1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
2    John B. Quinn (Bar No. 090378)
     (johnquinn@quinnemanuel.com)
3    William C. Price (Bar No. 108542)
     (williamprice@quinnemanuel.com)
4    Michael T. Zeller (Bar No. 196417)
     (michaelzeller@quinnemanuel.com)
5  865 South Figueroa Street, 10th Floor
6  Los Angeles, California  90017-2543
   Telephone:   (213) 443-3000
7  Facsimile:    (213) 443-3100

8  Attorneys for Mattel, Inc. and Mattel de
   Mexico, S.A. de C.V.

9                UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11                    SOUTHERN DIVISION

12

13  MATTEL, INC., a Delaware          CASE NO. CV 04-9049 DOC (RNBx)
    corporation,
14                                    Consolidated with
                                      Case No. CV 04-09059
15                Plaintiff,          Case No. CV 05-02727

16       vs.                          Hon. David O. Carter

17                                    MATTEL'S OPPOSITION TO MGA
    MGA ENTERTAINMENT, INC., a        PARTIES' MOTION FOR
18  California corporation, et al.,   JUDGMENT AS A MATTER OF
                                      LAW RE DUTY OF LOYALTY
19                Defendant.          PURSUANT TO FEDERAL RULE
                                      OF CIVIL PROCEDURE 50(a)
20
                                      Trial Date:  January 18, 2011
21

22  AND CONSOLIDATED ACTIONS

23

24

25

26

27

28

00505.07975/4053202.1

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT .................................................................................. 1

ARGUMENT ............................................................................................................. 1

I.  MGA'S MOTION MISSTATES APPLICABLE LAW FOR AIDING
    AND ABETTING BREACH OF THE DUTY OF LOYALTY .......................... 1

    A.  MGA's Position Is Contrary To California Law ................................. 1

    B.  MGA Misstates The Law On Aiding And Abetting Liability ................... 4

II. MGA AIDED AND ABETTED CARTER BRYANT'S BREACHES OF
    HIS DUTY OF LOYALTY TO MATTEL ...................................................... 5

    A.  There Is Ample Evidence Of Bryant's Breaches ............................... 5

    B.  Mattel Has Produced Ample Evidence Of MGA's Aiding and
        Abetting Bryant's Breaches ............................................................ 8

III. MATTEL AIDED AND ABETTED THE SAMPLEMAKERS' AND
     RYAN TUMALIUAN'S BREACHES OF DUTY OF LOYALTY TO
     MATTEL ................................................................................................. 12

    A.  Mattel Has Not Been "Fully Heard" On Its Claims Based On the
        Samplemakers And Ryan Tumaliuan ............................................ 12

    B.  Mattel Has (And Will) Produce Sufficient Evidence That MGA
        Aided And Abetted The Samplemakers' Breaches ......................... 13

    C.  Mattel Has (And Will) Produce Sufficient Evidence That MGA
        Aided And Abetted Ryan Tumaliuan's Breaches ........................... 14

IV. MATTEL HAS PRODUCED SUFFICIENT EVIDENCE OF
    DAMAGES CAUSED BY MGA'S AIDING AND ABETTING ...................... 15

CONCLUSION ........................................................................................................ 19

# TABLE OF AUTHORITIES

**Page**

## Cases

Adams v. Herman,
   106 Cal. App. 2d 92 (1951) ................................................................. 18

California Lettuce Growers v. Union Sugar Co.,
   45 Cal. 2d 474 (1955) ....................................................................... 19

Castaline v. Aaron Mueller Arts,
   2010 WL 583944 (N.D. Cal. Feb. 16, 2010) ........................................ 11

County of San Bernardino v. Walsh,
   158 Cal. App. 4th 533 (2007) ............................................................. 17

Eckard Brandes, Inc. v. Riley,
   338 F.3d 1082 (9th Cir. 2003) ............................................................ 17

Fowler v. Varian Assocs., Inc.,
   196 Cal. App. 3d 34 (1987) ............................................................ 2, 4

GAB Bus. Servs. Inc. v. Lindsey & Newsom Claim Servs., Inc.,
   83 Cal. App. 4th 409 (2000) ............................................................ 1, 2

GHK Assoc. v. Mayer Group, Inc.,
   224 Cal. App. 3d 856 (1990) .............................................................. 19

Hahn v. Onboard, LLC,
   2011 WL 703836 (D.N.J. Feb. 18, 2011) ............................................. 19

Hangarter v. Provident Life & Accident Ins. Co.,
   373 F.3d 998 (9th Cir. 2004) ................................................................ 1

Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.,
   556 F. Supp. 2d 1122 (E.D. Cal. 2008) .................................................. 2

Huong Que, Inc. v. Luu,
   150 Cal. App. 4th 400 (2007) ........................................................... 2, 8

LaLonde v. County of Riverside,
   204 F.3d 947 (9th Cir. 2000) ................................................................ 1

Logiclink, Inc. v. Keylink Serv. Solutions, Inc.,
   2009 WL 764526 (C.D. Cal. March 19, 2009) ...................................... 19

Los Angeles Land Co. v. Brunswick Corp.,
   6 F.3d 1422 (9th Cir. 1993) .......................................................... 11, 12

Marsu v. Walt Disney Co.,
   185 F.3d 932 (9th Cir. 1999) .............................................................. 18

Neilson v. Union Bank of Cal. N.A.,
    290 F. Supp. 2d 1101 (C.D. Cal. 2003) ................................................ 4, 18

Pierce v. Multnomah County,
    76 F.3d 1032 (9th Cir. 1996) ................................................................ 1

Puritas Laundry Co. v. Green,
    15 Cal. App. 654 (1911) ....................................................................... 2, 3

Reeves v. Sanderson Plumbing Prods., Inc.,
    530 U.S. 133 (2000) .............................................................................. 1

San Francisco Design Ctr. Assocs. v. Portman Cos.,
    41 Cal. App. 4th 29 (1995) ................................................................... 11

Saunders v. Superior Court,
    27 Cal. App. 4th 832 (1994) ................................................................. 4

Sensormatic Electronics Corp. v. TAG Co. US, LLC,
    632 F. Supp. 2d 1147 (S.D. Fla. 2008) ................................................ 18

Sokol Crystal Prods., Inc. v. DSC Commc'ns Corp.,
    15 F.3d 1427 (7th Cir. 1994) ................................................................ 18

Stigall v. City of Taft,
    58 Cal. 2d 565 (1962) ........................................................................... 3

Stockton Plumbing & Supply Co. v. Wheeler,
    68 Cal. App. 592 (1924) ....................................................................... 3

Stokes v. Dole Nut Co.,
    41 Cal. App. 4th 285 (1995) ................................................................. 2, 3, 4, 8

Thomson v. Call,
    38 Cal. 3d 633 (1985) ........................................................................... 3

Xum Speegle, Inc. v. Fields,
    216 Cal. App. 2d 546 (1963) ................................................................ 18

**Rules**

Rule 50(a)    ......................................................................................... 1, 7

Labor Code § 2863  ............................................................................. 3, 4

**Miscellaneous**

Restatement (2d) of Agency § 403 ...................................................... 17, 19

**Preliminary Statement**

MGA misstates the law governing the duty of loyalty and the standards for aiding and abetting and ignores much of the trial record.  MGA's Rule 50 motion should be denied.

**Argument**

Under Rule 50(a), judgment as a matter of law "is proper only when the evidence permits only one reasonable conclusion as to the verdict." Pierce v. Multnomah County, 76 F.3d 1032, 1037 (9th Cir. 1996) (quoting McGonigle v. Combs, 968 F.2d 810, 816 (9th Cir.), cert. dismissed, 506 U.S. 948, 113 S.Ct. 399, 121 L.Ed. 2d 325 (1992).  "The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." LaLonde v. County of Riverside, 204 F.3d 947, 959 (9th Cir. 2000) (reversing judgment as a matter of law). "If conflicting inferences may be drawn from the facts, the case must go to the jury." Pierce, 76 F.3d at 1037 (quoting Rutherford v. City of Berkeley, 780 F.2d 1444, 1448 (9th Cir. 1986)); see also Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1005 (9th Cir. 2004) ("[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge") (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000)).  "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves, 530 U.S. at 149.

## I.  MGA'S MOTION MISSTATES APPLICABLE LAW FOR AIDING AND ABETTING BREACH OF THE DUTY OF LOYALTY

### A.  MGA's Position Is Contrary To California Law

MGA has wrongly equated the duty of loyalty with fiduciary duty, arguing that the role of a fiduciary is reserved for officers who participate in company management and have discretionary authority in that managerial capacity.  Mot. at 3.  That is *not* the standard for the duty of loyalty; it is not even the standard for fiduciary duty.  The case MGA relies upon, GAB Bus. Servs. Inc. v. Lindsey & Newsom Claim Servs., Inc., 83 Cal.

App. 4th 409, 417 (2000), confirms that a fiduciary duty may be imposed by operation of law *or* undertaken by agreement.  See id. at 416-17.  More important, while fiduciary duty is limited to those whose duties or agreements establish that they are bound by the heightened standard applied to fiduciaries, *all* employees owe their employer an undivided duty of loyalty.  See Stokes v. Dole Nut Co., 41 Cal. App. 4th 285, 295 (1995) ("an employer has the right to expect the undivided loyalty of its employees"); Fowler v. Varian Assocs., Inc., 196 Cal. App. 3d 34, 41 (1987) ("California law does not authorize an employee to transfer his loyalty to a competitor.  During the term of employment, an employer is entitled to its employees' undivided loyalty.") (internal quotation omitted).

"The elements of a cause of action for breach of a duty of loyalty are: '(1) the existence of a relationship giving rise to a duty of loyalty; (2) one or more breaches of that duty; and (3) damage proximately caused by that breach.'"  Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc., 556 F. Supp. 2d 1122, 1142 (E.D. Cal. 2008) (quoting Huong Que, Inc. v. Luu, 150 Cal. App. 4th 400, 410 (2007)).  MGA ignores these authorities entirely.

Instead, MGA argues that the Court should disregard the common law duty of loyalty because California Supreme Court authority is scarce.  Mot. at 3.  But the very same argument could be used against MGA on its preemption claim.  In fact, California courts have made clear that all employees owe an undivided duty of loyalty; there is no conflict that would compel the Supreme Court to decide.  See Stokes, 41 Cal. App. 4th at 295; Fowler, 196 Cal. App. 3d at 41.  Contrary to MGA's assertions, the duty owed is nothing less than undivided loyalty based upon the position held within a company.  See Hanger Prosthetics & Orthotics, Inc., 556 F. Supp. 2d at 1142 (denying summary judgment on breach of duty of loyalty claim against former employees who allegedly acquired employer's confidential information for a competitor); see also Puritas Laundry Co. v. Green, 15 Cal. App. 654, 660 (1911) ("[W]hen a servant becomes engaged in a

1  business which necessarily renders him a competitor, a rival of his master, no matter how
2  much or how little time he devotes to it, he has an interest against his duty.").[1]   In
3  recognizing and enforcing that duty, California courts, including the court in Stokes,  have
4  not taken the position MGA urges, which would amount to refusing to decide any issue
5  that has not been specifically and repeatedly found by the California Supreme Court.
6  Courts instead have found clear direction based on other decisions of the state's high
7  Court in similar circumstances.  When discussing the common duty of loyalty, lower
8  courts have relied on principles established by the California Supreme Court in similar
9  contexts.  See, e.g., Stokes, 41 Cal. App. 4th at 296 (relying on the following California
10  Supreme Court cases for proposition that employer is due "undivided" loyalty by its
11  employees:  Thomson v. Call, 38 Cal.3d 633, 637 (1985) (voiding contract in which
12  councilman conveyed land to city, because "[t]he truism that a person cannot serve two
13  masters simultaneously finds expression in California's statutory doctrine that no public
14  official shall be financially interested in any contract made by that person or by any body
15  or board of which he or she is a member"); Stigall v. City of Taft, 58 Cal. 2d 565, 570
16  (1962) (reversing dismissal of taxpayer suit seeking to void plumbing contract for civic
17  center on grounds councilman on building committee owned the plumbing company);
18  Stockton Plumbing & Supply Co. v. Wheeler, 68 Cal. App 592, 601 (1924) (voiding city
19  contract for memorial auditorium where councilman also worked for the contractor based
20  on "the self-evident truth, as trite and impregnable as the law of gravitation, that no person
21  can, at one and the same time, faithfully serve two masters representing diverse or
22  inconsistent interests with respect to the service to be performed.").

23      MGA's arguments based on Labor Code § 2863 fare no better.  While Section 2863
24  imposes an independent duty on an employee to "give preference" to the business of an

---

25      [1]  Even if MGA were correct that only fiduciaries owe duties of loyalty (it is not), the
26  Court has never ruled that Carter Bryant did not owe a fiduciary duty to Mattel.  On the
   contrary, the Court held that "[a]ny fiduciary duty imposed by the [Inventions Agreement]
27  was limited to the employees' obligation to maintain the confidentiality of 'proprietary
   information'" and was therefore superseded by CUTSA.  See Dkt. No. 9600 at 75.
28

employer, nothing in the <u>Labor Code</u> provides that this is the limit or full extent of the employee's duty, or even that it is not broad enough to apply to the employees here. MGA ignores that California courts have consistently found a duty of loyalty owed without reference to Section 2863.  <u>See</u>, <u>e.g.</u>, <u>Stokes</u>, 41 Cal. App. 4th at 295; <u>Fowler</u>, 196 Cal. App. 3d at 41.  Indeed, MGA has yet to identify a single case in the nearly seventy-five years since California enacted <u>Labor Code</u> § 2863 (1937) in which a court limited the common law duty of loyalty to the text of the statute.

**B.   MGA Misstates The Law On Aiding And Abetting Liability**

To succeed on its aiding and abetting a breach of the duty of loyalty claim, Mattel must show that (1) MGA and/or Larian knew that the former employees' conduct constituted a breach of their duties; and (2) MGA and/or Larian gave substantial assistance or encouragement to the former employee to breach their duties.  <u>Saunders v. Superior Court</u>, 27 Cal. App. 4th 832, 846 (1994) (holding that plaintiffs can proceed on aiding and abetting theory for intentional tort claims, namely intentional interference with contract and prospective economic advantage) (citing Restatement (Second) of Torts § 876(b) (1979)) .  MGA cites <u>Neilson v. Union Bank of Cal. N.A.</u>, 290 F. Supp. 2d 1101, 1135 (C.D. Cal. 2003), for the proposition that substantial assistance is assistance "that was a substantial factor in causing the harm suffered." Mot. at 8.  But such a definition is fully consistent with the standard articulated in <u>Saunders</u> and quoted above.  Nor is there any authority for holding that the rules for aiding and abetting—as opposed to the scope of the duty—are somehow different when a fiduciary duty is involved.  Indeed, <u>Neilson</u> found that the plaintiffs had adequately pleaded aiding and abetting breach of fiduciary duty and that "under California law, a defendant may be found liable for aiding and abetting a breach of fiduciary duty even though the defendant owes no independent duty to the plaintiff, so long as the aider and abettor knows of, and substantially assists, the primary violator's breach of duty." <u>Id.</u> at 1137.  Mattel has introduced ample evidence showing that MGA and Larian knew and substantially assisted Bryant's and other Mattel employees' breaches of the duty of loyalty.

## II.   MGA AIDED AND ABETTED CARTER BRYANT'S BREACHES OF HIS DUTY OF LOYALTY TO MATTEL

Mattel has presented more than sufficient evidence that Carter Bryant breached his duty of loyalty to Mattel and that MGA and Larian aided and abetted his breaches.

### A.   There Is Ample Evidence Of Bryant's Breaches

In its ruling denying in part MGA's motion for summary judgment on Mattel's aiding and abetting the breach of the duty of loyalty claim, the Court found that "the conduct by Bryant that does not form the basis of Mattel's trade secret misappropriation counter-claim" is not preempted.  Dkt. No. 9600 at 91.  Such conduct includes Carter Bryant's "directing the production of the first generation Bratz dolls while still employed by Mattel, engaging other Mattel employees to unknowingly work on the Bratz dolls, using Mattel's physical resources to create a dummy doll for MGA, and working on other side projects for MGA."  Id. at 90.  Mattel has presented more than sufficient evidence of each of these categories—and more.

Mattel has presented evidence that Bryant directed the production of the first generation Bratz dolls for MGA while still employed by Mattel.  See, e.g., Jan. 28, 2011 Trial Tr., Vol. 1 (Bryant) at 96:17-25 (Bryant started working on Bratz shortly after Sept. 14); 108:7-13 (Bryant had discussions with Garcia in mid-September regarding Bratz); 108:23-109:1 (Bryant informed Garcia and Larian he was obtaining hair samples); id., Vol. 2 (Bryant) at 90:7-18 (Larian and Garcia knew Bryant was a Mattel designer in Sept. 2000 when he was helping launch Bratz); Feb. 3, 2011 Trial Tr., Vol. 1 (Bryant) at 108:18-109:7 (Bryant worked on Bratz, not solely Mattel projects, in early October); 129:14-20 (Bryant worked on Bratz from October 4-19 in Mattel design center).  For example, there is testimony that around June 2000, Bryant directed Anna Rhee to paint Bratz doll heads for MGA, discussing the issue secretly with Ms. Rhee during work hours at the Mattel Design Center.  See, e.g., Jan. 27, 2011 Trial Tr., Vol. 1 (Rhee) at 74:22-75:15; 81:16-82:21.  Ms. Rhee's invoices for this work—submitted to MGA—have been admitted.  See TX 201.  Indeed, months before he left Mattel, Bryant instructed Ms. Rhee

1   to use a code name on the invoices and submit them to MGA. Jan. 27, 2011 Trial Tr., Vol.

2   1 (Rhee) at 81:16-82:21; 83:1-84:1; 89:1-13.   MGA claimed Ms. Rhee's June 2000

3   invoices actually refer to work on Cabbage Patch dolls at the time, but Ms. Rhee denied

4   ever having worked on Cabbage Patch dolls, and she confirmed that the June 2000

5   invoices were in fact for her work on Bratz doll heads.   Jan. 27, 2011 Trial Tr., Vol. 1

6   (Rhee) at 85:14-18; 86:8-87:6. Her memory of it was clear because she was very proud of

7   the work and its eventual success in the marketplace.  Id., Vol. 3 at 26:12-27.

8       Also while still employed by Mattel, Bryant worked with MGA-paid sculptor

9   Margret Leahy to create a Bratz sculpt.  Bryant testified that his role "was to try to make

10  the final sculpt look as close as [he] could to [his] vision."  Feb. 3, 2011 Trial Tr., Vol. 2

11  at 29:17-19.  To accomplish that, Bryant gave Ms. Leahy a sculpt drawing—created while

12  a Mattel employee—to guide the sculpting process (TX 5-89) and worked with her on the

13  sculpt with Ms. Leahy, giving his input throughout the process.  Feb. 1, 2011 Trial Tr.,

14  Vol. 1 (Bryant) at 17:2-7; Jan. 28, 2011 Trial Tr., Vol. 2 at 17:18-22; 21:13-15.  As Bryant

15  also confirmed, Ms. Leahy created the final Bratz sculpt "from [his] drawing."  Feb. 1,

16  2011 Trial Tr., Vol. 1 (Bryant) at 12:12-14; TX 5-89; Feb. 3, 2011 Trial Tr., Vol. 2

17  (Bryant) at 27:13-15; 29:5-12.  Ms. Leahy's notes confirm Bryant's direction of the

18  sculpting process, and she testified that she incorporated Bryant's changes and comments.

19  See TX 1137-14; March 15, 2011 Trial Tr., Vol. 2 at 11:17-25; 13:7-9; 16:11-19.

20      Mattel has also shown that Mr. Bryant induced other employees to work on Bratz,

21  including Sheila Kyaw, who painted a doll's head during the summer of 2000 (see Jan. 28,

22  2011 Trial Tr., Vol. 1 (Bryant) at 83:2- 85:10), Elise Cloonan, who worked on the Bratz

23  logo (id. at 75:25-77:16), and Carmen Monteagudo, who rooted hair on a doll's head prior

24  to the pitch meeting with Mr. Larian.  Jan. 28, 2011 Trial Tr., Vol. 2 (Bryant) at  8:2-

25  10:17.  Bryant admitted he approached Ms. Kyaw and Ms. Monteagudo to help him

26  during the workday at Mattel—not on a weekend or evening.  See Feb. 3, 2011 Trial Tr.,

27  Vol. 2 (Bryant) at 35:18- 36:10; Feb. 1, 2011 Trial Tr., Vol. 2 (Bryant) 77:7- 78:4 (while

28  still employed by Mattel, Bryant asks Ms. Kyaw to do face painting for Bratz); id. at

80:11-81:13 (while still employed by Mattel, Bryant asks Ms. Monteagudo to do hair rooting for Bratz); Feb. 2, 2011 Trial Tr., Vol. 2 (Bryant) at 101:8-101:19 (both Rhee and Kyaw worked on Bratz face painting for Bryant); Feb. 3, 2011 Trial Tr., Vol. 2 (Bryant) at 8:20- 9:16 (Bryant hid from these Mattel employees that they were actually working on a project for a Mattel competitor).

Mattel has also shown that Bryant used Mattel resources to design the Bratz dolls, including by using Mattel resources to make a Bratz doll prototype during the summer of 2000. Jan. 28, 2011 Trial Tr., Vol. 1 (Bryant) at 83:2-85:10.  He specifically recalled removing the doll's head from a trash bin.  Feb. 1, 2011 Trial Tr., Vol. 2 (Bryant) at 69:21-74:7.   Confirming Bryant's testimony, Victoria O'Connor, MGA's director of licensing, testified that the prototype Bryant presented to MGA at the pitch meeting in late August or early September 2000 included BARBIE parts.  Feb. 4, 2011 Trial Tr., Vol. 1 (O'Connor) at 50:14-20.   Bryant also used Mattel's phones and fax machines to coordinate the design of the Bratz dolls, including by calling MGA from Mattel's Design Center.  Feb. 3, 2011 Trial Tr., Vol. 2 (Bryant) at 36:11-36:22; Jan. 28, 2011 Trial Tr., Vol. 1 (Bryant) at 92:2-11; TX 1309.  He also created the color poster Bratz drawings while employed by Mattel.  Jan. 28, 2011 Trial Tr., Vol. 1 (Bryant) at 15:15-22; 86:2-14; Feb. 1, 2011 Trial Tr., Vol. 1 (Bryant) at 99:14-100:2; Feb. 3, 2011 Trial Tr., Vol. 2 (Bryant) at 34:14-19.  Mattel has further shown that Mr. Bryant worked on other projects for MGA while he was still employed by Mattel, including MGA's Prayer Angels dolls. Jan. 28, 2011 Trial Tr., Vol. 2 (Bryant) at 50:10-18; Jan. 20, 2011 Trial Tr., Vol. 2 (Garcia) at 9:16-19.  Mattel's evidence of MGA's aiding and abetting Bryant's breaches of his duties of loyalty to Mattel is sufficient to satisfy Rule 50.

Indeed, even if MGA's exceedingly narrow reading of the duty of loyalty is accepted, and Bryant need only have given "preference" to Mattel while secretly working for its competitor, there is substantial evidence that he did not do even that.  Far from giving preference to Mattel, Bryant's contract with MGA specifically required that Bryant work for MGA on a "top priority basis," effective September 18, 2000, more than a month

1  before Bryant left Mattel.  <u>See</u> TX 15.  MGA fails to address, much less explain, how an
2  employee can possibly provide "top priority" services to a competitor of his current
3  employer without violating the duty of loyalty.

4        Finally, the jury would be easily justified in rejecting MGA's argument that
5  Bryant's conduct was permissible because he was merely preparing to compete with
6  Mattel.  (Mot. at 6.)  An employee  who is *preparing* to compete is still not allowed to
7  engage in direct competition with the employer or transfer his or her loyalty to a
8  competitor while working for the employer.  <u>See Stokes</u>, 41 Cal. App. 4th at 295 ("The
9  duty of loyalty is breached, and may give rise to a cause of action in the employer, when
10  the employee takes action which is inimical to the best interests of the employer."); <u>Huong</u>
11  <u>Que Inc.</u>, 150 Cal. App. 4th at 414 ("An employee, while employed, owes undivided
12  loyalty to his employer.  While California law does permit an employee to seek other
13  employment and even to make some 'preparations to compete' before resigning,
14  California law does not authorize an employee to transfer his loyalty to a competitor.")
15  (internal citation and quotation omitted).

16        **B.**      **Mattel Has Produced Ample Evidence Of MGA's Aiding and Abetting**
17                 **Bryant's Breaches**

18        The testimony of numerous witnesses establishes that MGA knowingly worked
19  with Bryant on Bratz while he was still employed by Mattel.  They did so not for days or
20  weeks before Bryant left Mattel, but for months.  Former MGA employee Jennifer Maurus
21  testified that Paula Garcia introduced her to Carter Bryant in the summer of 2000 at
22  MGA's offices, that Garcia told Ms. Maurus at that time that Bryant was a Mattel
23  employee, and showed Ms. Maurus some Bratz drawings Bryant had been working on.
24  Feb. 8, 2011 Trial Tr., Vol. 1 (Maurus) at 13:2-9; 14:2-9; 14:19-15:10; 15:17-25.  As
25  testified to by Ms. Rhee and Ms. Maurus, Mr. Bryant worked on Bratz for MGA at least
26  as of June 2000, and both Larian and Garcia (and therefore MGA) knew he was a Mattel
27  employee at the time. Jan. 27, 2011 Trial Tr., Vol. 1 (Rhee) at 81:16-82:21; 89:1-13; Jan.
28  27, 2011 Trial Tr., Vol. 1 (Rhee) at 81:16-82:21; 83:1-84:1; Jan. 28, 2011 Trial Tr., Vol. 1

1   (Bryant) at 86:21-23; id. Vol. 2 at 90:7-18; Feb. 3, 2011 Trial Tr. Vol. 2 (Bryant) at 19:16-
2   25; Feb. 8, 2011 Trial Tr., Vol. 2 (Larian) at 32:21-33:1).

3        Even if all this testimony is rejected (which the Court cannot do in considering
4   MGA's motion), MGA concedes that at least as of September 1, 2000, Bryant actually
5   told MGA and its employees that he was a Mattel employee. Jan. 27, 2011 Trial Tr., Vol.
6   4 (Bryant) at 23:16-24:3; Jan. 28, 2011 Trial Tr., Vol. 2 (Bryant) at 49:1-4; Feb. 3, 2011
7   Trial Tr., Vol. 2 (Bryant) at 19:16-25; Feb. 8, 2011 Trial Tr., Vol. 2 (Larian) at 41:15-21
8   (Larian knew Bryant was employed by Mattel). Victoria O'Connor testified that before
9   the official pitch meeting in August or September 2000, Paula Garcia told Ms. O'Connor
10  that Bryant was a Mattel employee. Feb. 4, 2011 Trial Tr., Vol. 1 (O'Connor) at 53:6-18.
11  Paula Garcia knew that during the time he was still employed by Mattel, Bryant was
12  meeting with hair vendors on Bratz, working with Margaret Leahy on a Bratz sculpt
13  during September 2000 and otherwise working with MGA on Bratz. Jan. 20, 2011 Trial
14  Tr., Vol. 1 (Garcia) at 50:25-51:9; 51:25-52:6; Jan. 26, 2011 Trial Tr., Vol. 2 (Garcia) at
15  20:12-20. Knowing Bryant was still working for Mattel, MGA paid Bryant's expenses on
16  the Bratz project. Jan. 20, 2011 Trial Tr., Vol. 1 (Garcia) at 53:24-54:1; see also id. at
17  61:23-62:5. Further, Bryant testified that Isaac Larian also knew Bryant was working on
18  Bratz during the time period Bryant was still employed by Mattel. Jan. 28, 2011 Trial Tr.,
19  Vol. 2 (Bryant) at 90:14-18.

20       Ms. Garcia estimated in an email written at the time that Mr. Bryant worked on
21  Bratz four hours a day beginning in the first part of September 2000 (more than a month
22  before he left Mattel), and she was able to describe the work he did for MGA on Bratz
23  from September to October of 2000. See TX 305; Jan. 20, 2011 Trial Tr., Vol. 1 (Garcia)
24  at 108:20-111:19; 107:16-108:19. Mr. Bryant was added to MGA's system as a vendor in
25  mid-September, almost a month before Bryant left Mattel. TX 11889; Feb. 18, 2011 Trial
26  Tr., Vol 1 (Larian) at 139:13-141:25. As MGA has long admitted, it hired and paid
27  sculptor Margret Leahy to work with Bryant on Bratz while Bryant was still employed by
28  Mattel (Mar. 15, 2011 Trial Tr., Vol. 1 (Leahy) at 144:8-19; 144:25-145:2; 145:6-21;

146:7-14; 149:20-150:7; 160:16-19; TX 1137-140) and Ms. Leahy completed at least two Bratz sculpts all while Bryant was still employed by Mattel,  March 15, 2011 Trial Tr., Vol. 2 at 56:19-57:6 (TX 1136 completed around October 11, 2000); Jan. 28, 2011 Trial Tr., Vol. 2 (Bryant) at 20:11-14 (first sculpt complete before October 4, 2000); March 16, 2011 Trial Tr., Vol. 1 (Leahy) at 10:17-12:23 (TX 1141 completed by October 19, 2000). Victoria O'Connor, testified that throughout the month of September 2000, she witnessed Carter Bryant at MGA's offices, during business hours, working with Paula Garcia.  Feb. 4, 2011 Trial Tr., Vol. 1 (O'Connor) at 85:12-21.  Indeed, MGA's own documents list the creation date of Bratz as September 18, 2000, more than a month before Bryant left Mattel.  SeeTX 551; Jan. 27, 2011 Trial Tr., Vol. 1 (Ashong) at 50:23-51:24.

        MGA knew this conduct was wrong and has admitted that at trial.  Ms. Garcia, a former Mattel employee herself, knew of and understood Bryant's obligations to Mattel, including that it was wrong for Bryant to work with MGA on Bratz or any other competing doll while he was still employed by Mattel.  Jan. 20, 2011 Trial Tr., Vol. 2 (Garcia) at 12:9-24; id. at Vol. 1 (Garcia) at 18:7-12; 19:6-16; 23:2-6; 24:8-15; 34:2-7; 42:8-12; 49:20-23; 48:22-49:5.  Mr. Larian similarly admitted that he understood that if any employee worked for MGA and Mattel at the same time, the employee would be breaching his obligations.  Feb. 9, 2011 Trial Tr., Vol. 1 (Larian) at 31:5-32:1.  Victoria O'Connor testified that MGA knew it would be a problem if Bryant had worked on Bratz at Mattel and that she specifically raised this concern with Mr. Larian and Ms. Garcia.  Feb. 4, 2011 Trial Tr., Vol. 1 (O'Connor) at 55:16-56:22.  Despite this, and knowing that Bryant was employed by Mattel at the time, Mr. Larian decided to begin work with Bryant on Bratz immediately after the pitch meeting on September 1, 2000.  Feb. 4, 2011 Trial Tr., Vol. 1 (O'Connor) at 60:2-25.[2]

_____

[2]   MGA also sent Mr. Bryant work on the Prayer Angels project during a time period when it knew he was still employed with Mattel, even though Paula Garcia admitted that this violated his employment agreement. Jan. 28, 2011 Trial Tr., Vol. 2 (Bryant) at 49:1-50:18; Feb. 1, 2011 Trial Tr., Vol 3 (Bryant) at 18:4-19:13; Jan. 20, 2011 Trial Tr., Vol. 2 (Garcia) at 9:11-10:8; id. Vol. 2 at 12:9-24.

MGA also took steps to conceal that Mr. Bryant worked for them. Larian gave conflicting and inaccurate accounts concerning the creation of Bratz (see Feb. 4, 2011 Trial Tr., Vol. 1 at 97:12-17; TX 4941) and imposed a gag order at MGA as to any reference to Mr. Bryant. Ms. O'Connor testified that Larian instructed MGA employees that no one should mention Mr. Bryant because there was concern that Mattel might actually own Bratz. Feb. 4, 2011 Trial Tr., Vol. 1 (O'Connor) at 97:18-23; 102:11-103:4; id. at Vol. 2 (O'Connor) at 84:25-85:13. For years, Larian and MGA concealed the timing and fact of Bryant's creation of Bratz. TX 4924; TX 7055; Feb. 9, 2011; Trial Tr., Vol. 2 (Larian) at 6:5-10:15. This included the Larian O'Connor email showing MGA's consciousness of guilt. TX 7055.

MGA argues that its conduct was innocent because it engaged in arm's length negotiations with Bryant to acquire and develop Bratz which is protected by the competition privilege. Mot. at 10. But the cases it relies on are not analogous: they concern only the hiring of employees from competitors, with no other wrongful conduct. Mattel's claim is not based on MGA's hiring of a Mattel employee. Rather, Mattel claims—and the evidence shows—that MGA and Larian interfered with actual contracts and induced Bryant to breach an existing duty to a competitor. The competition privilege does not apply. See Castaline v. Aaron Mueller Arts, 2010 WL 583944, at *5-6 (N.D. Cal. Feb. 16, 2010) (rejecting competition privilege defense because defendant's refusal to sell to third parties "may have interfered with actual contracts and thus constituted 'wrongful means'"; "Courts have drawn a distinction between contractual relations that are 'merely contemplated or potential' and those that are more definite.") (citations omitted); see also San Francisco Design Ctr. Assocs. v. Portman Cos., 41 Cal. App. 4th 29, 40 (1995) ("The primary difference between interference with prospective economic advantage and interference with contract is that a broader range of privilege to interfere is recognized when the relationship or economic advantage interfered with is only prospective. It is also settled that an affirmative defense to the tort of interference with prospective economic advantage is the privilege of competition."); Los Angeles Land Co.

1  v. Brunswick Corp., 6 F.3d 1422, 1431 (9th Cir. 1993) ("Because the record shows that

2  L.A. Land's contractual relations with Timberlake were 'merely contemplated or

3  potential,' Brunswick was free to 'refuse to deal with third parties [e.g., Timberlake]

4  unless they cease dealing with' L.A. Land.") (citations omitted).

5  **III.  MATTEL AIDED AND ABETTED THE SAMPLEMAKERS' AND RYAN**

6  **TUMALIUAN'S BREACHES OF DUTY OF LOYALTY TO MATTEL**

7  **A.   Mattel Has Not Been "Fully Heard" On Its Claims Based On the**

8  **Samplemakers And Ryan Tumaliuan**

9  Mattel has yet to have the opportunity to introduce to the jury the additional

10  evidence that supports its claims based on the samplemakers' and Ryan Tumaliuan's

11  misconduct.  Mattel rested its case subject to a stipulation that if an agreement could not

12  be reached with MGA as to the admission into evidence of certain Mattel and MGA

13  produced business records, custodians on either side could testify to the authenticity of

14  those business records.  See March 10, 2011 Trial Tr. Vol. 3 at 14:13-23; see also id. at

15  26:14-15.  The samplemaker personnel records from Mattel have yet to be admitted into

16  evidence via stipulation or the testimony of a Mattel custodian.  Those files would bolster

17  the evidence that the samplemakers knowingly and intentionally breached their duty of

18  loyalty by working for MGA even though they knew it was prohibited.  See Mattel

19  Confidentiality and Inventions Agreements for Cabrera (for 1995 & 2004), Morales (for

20  2000 & 2004), and Salazar (for 1996) (not yet admitted).  These are included in the

21  pending Mattel Custodian Documents Stipulation as part of their personnel files.  See TX

22  24134-00046-47, TX 24134-00031-35; TX 24135-00039, TX 24135-00024-28; and TX

23  35193-00037-38 respectively (not yet admitted).  Similarly, Ryan Tumaliuan's personnel

24  records from Mattel and MGA, which have yet to be admitted in their entirety,[3] are vitally

25

26  _____

[3]  See TX 20572; TX 09850 (Five pages from Tumaliuan's MGA personnel file, TX
27  09850-00024-28, were admitted into evidence, but the rest of file was not, pending
stipulation or admission through an MGA custodian.  February 22, 2011 Trial Tr., Vol. 1,
28  17-3.).

1   important to Mattel's duty of loyalty claim regarding Ryan Tumaliuan.

2        Because Mattel's opportunity to introduce evidence relevant to its claims has not

3   yet closed, MGA's motion is premature at best.

4        **B.    Mattel Has (And Will) Produce Sufficient Evidence That MGA Aided**

5              **And Abetted The Samplemakers' Breaches**

6        Mattel had introduced evidence that Ana Cabrera, Beatriz Morales and Maria

7   Salazar with MGA's knowledge and assistance, breached their duties of loyalty to Mattel.

8   Both Paula Garcia and Peter Marlow testified that the samplemakers worked for Mattel

9   while simultaneously working on dozens of Bratz doll samples and fashions.  See Jan. 20,

10  2011 Trial Tr., Vol. 2 (Garcia) at 36:23-37:12; Feb. 25, 2011 Trial Tr., Vol. 1 (Marlow) at

11  18:6-19:1.  The samplemakers knowingly acted against Mattel's interests by performing

12  these services for MGA, including by using fake social security numbers to attempt to

13  hide their disloyalty.  TX 13223-22; see Feb. 24, 2011 Trial Tr., Vol. 2 (Marlow) at 20:16;

14  see also TX 5595, IRS Letter to Veronica Marlow advising her of error in reporting.

15  MGA not only knew that the samplemakers' conduct constituted a breach of the duty of

16  loyalty, but substantially assisted and encouraged that breach by continuing to pay them

17  even after MGA itself admits knowing they worked for Mattel.  TX 606; February 25,

18  2011 Trial Tr., Vol. 1 at 52:18-24; see also Feb. 24, 2011 Trial Tr., Vol. 2 (Marlow) at

19  22:11-24 ("Q.  Did you and your wife ever inform MGA of the identity of third parties

20  who you used to work on the Bratz dolls?  A.  Yes.").  There is no evidence that Mattel

21  consented to their disloyalty.

22        There is sufficient evidence from which a reasonable juror could conclude that the

23  samplemakers breached duties to Mattel and that MGA aided and abetted those breaches.

24

25

26

27

28

**C.** **Mattel Has (And Will) Produce Sufficient Evidence That MGA Aided And Abetted Ryan Tumaliuan's Breaches**

Ryan Tumaliuan's Mattel employment began on May 19, 2003, while his MGA employment continued.  TX 20572-000013;[4] TX 09850.  Tumaliuan was a "full-time" employee of Mattel, paid at the annual rate of $24,960.  TX 20572-000013, 18.  While employed by Mattel, Tumaliuan worked in the Design Center in the "Large/Small Dolls Plush" department.  TX 20572-00013.  His Mattel employment ended on August 8, 2003, prior to the effective date of termination of his MGA employment.  TX 20572-000011-12; TX 09850-00088.

Because he was a paid, full-time employee of Mattel, Tumaliuan was expected to follow the same obligations as other Mattel employees.  Tumaliuan's signature on documents in his personnel file shows that he recognized his status as an employee of Mattel and his associated obligations.  See, e.g., TX 20572-00010. 18, 25, 26-27, 34. Tumaliuan maintained his MGA employment despite knowing that it was against Mattel policy.  See TX 20572-00018, 26-27.[5]  MGA has offered no evidence that Mattel gave informed consent for Ryan Tumaliuan's dual employment.  On his Mattel employment application Tumaliuan lied that his MGA employment had ended on "5/03," and that his "reason for leaving" was "location."  TX 20572-00020-21.  A reasonable juror could not help but conclude that a current MGA employee working in Mattel's Design Center, on false pretenses and in violation of company policy, was acting against Mattel's interests.

---

[4]   Although TX 20572 (Ryan Tumaliuan's Mattel personnel file) has not yet been admitted, it is the subject of the parties' pending stipulation, and Mattel rested its case conditioned upon its right to later seek its admission.

[5]   Tumaliuan received and signed a copy of Mattel's Confidential Information and Inventions Agreement, which includes the following language:

"My employment with the Company requires my undivided attention and effort.  Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time.  I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company."

(footnote continued)

1   The evidence also shows that MGA aided and abetted Mr. Tumaliuan's breaches.

2   Larian was aware of Mattel's security policies, especially regarding its Design Center.

3   Feb. 9, 2011 Trial Tr., Vol. 3 (Larian) at 71:8-15.  Yet, when it was reported to Larian and

4   Garcia that Yuval Caspi, an MGA employee and designer, had told Tumaliuan to "keep

5   his mouth closed, and at the same time, keep his eyes and ears open" during his time at

6   Mattel, Larian and Garcia did nothing about it.  Indeed, that same email recognized that

7   Tumaliuan was a "double agent" within Mattel acting for MGA. TX 9335.  Not only did

8   Larian and Garcia receive an e-mail telling them about this conversation, they approved it

9   by their acquiescence in the following e-mails on the chain.  Id.  At trial, both admitted

10  they took no action to stop him.  Jan. 25, 2011 Trial Tr., Vol. 2 (Garcia) at 13:13-18-7,

11  Feb. 9, 2011 Trial Tr., Vol. 3 (Larian) at 77:12-14, 77:22-78:1.  And, when he completed

12  his employment for Mattel, MGA intended him to continue his MGA employment.  TX

13  9335; Feb. 9, 2011 Trial Tr., Vol. 3 (Larian) at 72:25-73:2.

14  Paula Garcia also testified that it is "inappropriate" for someone to work at Mattel

15  and MGA at the same time.  Jan. 25, 2011 Trial Tr., Vol. 2 (Garcia) at 13:9-12.  Similarly,

16  Larian testified that it would be "inappropriate to have somebody go inside Mattel and

17  report to MGA what they had seen."  Feb. 9, 2011 Trial Tr., Vol. 3 (Larian) at 56:7-9.

18  Even so, both Larian and Garcia considered Ryan Tumaliuan as a viable candidate to

19  complete a design *during his Mattel internship*.  See TX 09335.

20  This evidence is more than enough for a reasonable jury to conclude that MGA and

21  Larian knew of the duty of loyalty that Tumaliuan owed Mattel and encouraged his

22  breaches.

23  **IV.    MATTEL HAS PRODUCED SUFFICIENT EVIDENCE OF DAMAGES**

24  **CAUSED BY MGA'S AIDING AND ABETTING**

25  Mattel is entitled to recover all damages that MGA's misconduct was a substantial

26  factor in causing.  See CACI 3901.  Bryant's breaches—aided and abetted by MGA—

27  _____

28  See TX 20572-00018, 26-27.

1   included developing Bratz while Bryant was still employed by Mattel, including through

2   the use of Mattel resources.  A jury could reasonably conclude that Bryant's breaches of

3   his duty of loyalty were a substantial factor contributing to MGA's ability to produce

4   Bratz and therefore of Mattel's lost profits.  Indeed, if Bryant had honored his duty of

5   loyalty to Mattel, MGA would never have had his Mattel-era work, which included the

6   very idea of Bratz, as well as the sculpts, drawings and names.  Bryant not only provided

7   to MGA the Bratz concepts and designs he created while with Mattel, but he created and

8   guided the Bratz sculpt that was ultimately used on all core Bratz fashion dolls while a

9   Mattel employee.  As Larian and Garcia admitted, without Bryant, there would be no

10  Bratz dolls.  See Feb. 11, 2011 Trial Tr., Vol. 1 (Larian) at 63:4-14 (agreeing that

11  "[w]ithout Mr. Bryant in September of 2000 showing you the 17 initial concept drawings,

12  showing you his idea for Bratz . . . there would have been no dolls"); Jan. 25, 2011 Trial

13  Tr., Vol. 1 (Garcia) at 114:18- 115:17 (agreeing that "you wouldn't have come up with

14  these dolls, as they're shown, without Carter Bryant bringing you his portfolio in

15  September of 2000").

16      Likewise, the samplemakers—with more than 100 years of doll-making experience

17  among them—breached their duties to Mattel by secretly working on Bratz for years while

18  they were employed by Mattel.  See Feb. 25, 2011 Trial Tr., Vol. 1 (Marlow) at 18:6-19:7.

19  At least one of the Mattel samplemakers worked on every Bratz doll that was developed

20  from October 2000 until at least June 2005.  See id. at 39:3-41:20; see also id. at 45:15-24

21  (Cabrera worked on at least 150 Bratz dolls of different themes and Cabrera

22  approximately 100 Bratz dolls while they were employed by Mattel); TX 13223.

23      Based on such evidence, a jury could easily conclude that Bryant's breaches of his

24  duties alone, let alone combined with the samplemakers' breaches, were a substantial

25  factor contributing to the development of Bratz.  Mattel has introduced evidence that

26  MGA's development of Bratz damaged Mattel by taking away hundreds of millions of

27  dollars in Barbie sales.  See March 8, 2011 Trial Tr., Vol. 2 at 15-20.  It is for the jury to

28  decide whether, and the extent to which, Bryant's and the samplemakers' disloyalty to

1   Mattel, aided and abetted by MGA, was a substantial factor contributing to Mattel's lost

2   profits.

3           A reasonable jury could also conclude that Bryant's and the samplemakers'

4   breaches provided MGA with an unfair "head start" on its sales of Bratz.  If Bryant had

5   not designed Bratz while still employed by Mattel, MGA would not have had Bryant's

6   design drawings by November 2000, when it used those drawings to pitch Bratz dolls at

7   "road show" presentations with significant retailers, including Kmart.  Feb. 8, 2011 Trial

8   Tr., Vol. 1 at 16:22-22:24, 59:14-61:14; TX 11152; TX 11336; Jan. 20, 2011 Trial Tr.,

9   Vol. 2 at 108:4-6, 110:14-16.  Likewise, without Bryant's drawings and early assistance

10  and the efforts of Mattel's samplemakers, MGA would not have had Bratz doll samples in

11  time for the 2001 Hong Kong Toy Fair in January 2001.  Feb. 4, 2011 Trial Tr., Vol. 1, at

12  61:11-62:3.  By not being able to promote Bratz during the 2001 promotional season

13  (which began in fall 2000), MGA would not have been able to bring Bratz to market in

14  time for the 2001 sales season.  March 15, 2011 Trial Tr., Vol. 1 at 116:2-13.  Indeed, if

15  Bryant had complied with his duty of loyalty to Mattel, MGA would never have had his

16  Mattel-era work, which included the very idea of Bratz, as well as the sculpts, drawings

17  and names.

18          Thus, at a minimum, Mattel is entitled to recover MGA's profits from sales of Bratz

19  dolls that are attributable to MGA's unlawful head start.  Disgorgement of profits is an

20  available form of damages for aiding and abetting breach of duty of loyalty claims.  See

21  Eckard Brandes, Inc. v. Riley, 338 F.3d 1082, 1086 (9th Cir. 2003) ("Although there are

22  few reported cases addressing the appropriate remedy, those we have found have also

23  required employees to turn over profits received as a result of breaching their duty of

24  loyalty."); Restatement (2d) of Agency, § 403 ("If an agent receives anything as a result of

25  his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its

26  value, or its proceeds, to the principal."); County of San Bernardino v. Walsh, 158 Cal.

27  App. 4th 533, 543 (2007) ("Disgorgement of profits is particularly applicable in cases

28  dealing with breach of a fiduciary duty"; "Active participants in the breach of fiduciary

1   duty by another are accountable for all advantages they gained thereby and are liable to

2   the beneficiary of the duty."); Neilson v. Union Bank of Cal., N.A., 290 F. Supp. 2d 1101,

3   1127 (C.D. Cal. 2003) (a party who aids and abets a breach of fiduciary duty will be

4   jointly liable) (citing Heckmann v. Ahmanson, 168 Cal. App. 3d 119 (1985)); Xum

5   Speegle, Inc. v. Fields, 216 Cal. App. 2d 546, 557 (1963) (upholding accounting of all

6   insurance commissions wrongfully diverted to defendant in action for breach of fiduciary

7   duty); Adams v. Herman, 106 Cal. App. 2d 92, 99 (1951) ("It is an integral part of that

8   rule that, if the agent makes a secret profit from the agency, the principal may recover

9   such profit.").

10      Disgorgement of profits is an appropriate remedy when a competitor's wrongful

11   conduct provides it with a "head start."  See Sokol Crystal Prods, Inc. v. DSC Commc'ns

12   Corp., 15 F.3d 1427, 1433 (7th Cir. 1994) (affirming damages award based on

13   disgorgement of profits generated by defendant during "head start" period prior to when

14   "defendant has discovered, or would have discovered, the trade secret without the

15   misappropriation"); Sensormatic Electronics Corp. v. TAG Co. US, LLC, 632 F. Supp. 2d

16   1147, 1187 (S.D. Fla. 2008) (calculating damages in patent infringement case in the

17   amount of "incremental profits from sales of the Series 58 labels during several possible

18   head start periods ranging from six months to three years").  Similarly, Mattel is entitled

19   to recover the lost value of its employees' services and its own supplies.

20      Mattel has evidence of MGA's revenues and profits from sales of Bratz that the jury

21   can use to determine the amount of the proper remedy.  See, e.g., TX 655, 16532, 27268

22   (MGA financial statements and sales figures); Feb. 17, 2011 Trial. Tr., Vol. 3 (Larian) at

23   122:5-14 (discussing MGA's profit margin).  Nothing more is required.  See CACI 3901

24   (plaintiff "does not have to prove the exact amount of damages that will provide

25   reasonable compensation for the harm" provided that jury is not required to "speculate or

26   guess in awarding damages"); Marsu v. Walt Disney Co., 185 F.3d 932, 939 (9th Cir.

27   1999) ("'[T]he fact that the amount of damage may not be susceptible of exact proof or

28   may be uncertain, contingent or difficult of ascertainment does not bar recovery.'") (citing

California Lettuce Growers v. Union Sugar Co., 45 Cal. 2d 474, 487 (1955)); GHK Assoc. v. Mayer Group, Inc., 224 Cal. App. 3d 856, 873 (1990) ("The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.").  Mattel is also entitled to recover, and will offer evidence of (either through stipulation or a Mattel custodian of records), the wages paid to its disloyal employees.  See Restatement (Second) of Agency § 403 ("If an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal."); Logiclink, Inc. v. Keylink Serv. Solutions, Inc., 2009 WL 764526, at *9 (C.D. Cal. March 19, 2009) (awarding disloyal employee's wages as damages for breach of fiduciary duty); Hahn v. Onboard, LLC, 2011 WL 703836, at *6 (D.N.J. Feb. 18, 2011) ("When an employee violates the duty of loyalty, the employer 'has a choice of remedies' to recover any benefits conferred upon the employee during the period of disloyalty, including wages paid to the employee.") (citations omitted).

## Conclusion

For all the foregoing reasons, MGA's motion should be denied.

DATED:  March 25, 2011          QUINN      EMANUEL      URQUHART & SULLIVAN. LLP


                                By /s/ John B. Quinn
                                   John B. Quinn
                                   Attorneys for Mattel, Inc., and Mattel de Mexico. S.A. de C.V.