QUINN EMANUEL URQUHART & SULLIVAN, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  William C. Price (Bar No. 108542)
  (williamprice@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Mattel, Inc. and Mattel de
Mexico, S.A. de C.V.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MATTEL, INC., a Delaware corporation, et al.,<br><br>Plaintiff,<br><br>vs.<br><br>MGA ENTERTAINMENT, INC., a California corporation, et al.,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 DOC (RNBx)<br><br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. David O. Carter<br><br>**MATTEL, INC.'S REQUEST FOR JURY INSTRUCTION CONCERNING IMPROPRIETY OF INFERENCES DRAWN FROM PRIVILEGED INFORMATION**<br><br>Trial Date: January 18, 2011 |

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

RELEVANT BACKGROUND ................................................................................. 2

ARGUMENT ............................................................................................................. 7

I.    IT IS IMPROPER TO ALLOW THE JURY TO DRAW INFERENCES FROM PRIVILEGED INFORMATION ................................ 7

II.    THE COURT SHOULD INSTRUCT THE JURY THAT IT MAY NOT DRAW INFERENCES FROM PRIVILEGED INFORMATION ........ 10

CONCLUSION ........................................................................................................ 12

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

Courtney v. United States,
　390 F.2d 521 (9th Cir. 1968),
　cert. denied, 393 U.S. 857 (1968) ............................................................................ 7

Doe ex rel. Rudy-Glanzer v. Glanzer,
　232 F.3d 1258 (9th Cir. 2000) ................................................................................. 8

In re Gibson,
　2007 WL 505746 (Bankr. S.D. Ala. Feb. 14, 2007) ............................................... 9

Home Indem. Co. v. Lane Powell Moss and Miller,
　43 F.3d 1322 (9th Cir. 1995) ................................................................................. 10

Nabisco, Inc. v. PF Brands, Inc.,
　191 F.3d 208 (2d Cir. 1999) .................................................................................... 8

Parker v. Prudential Ins. Co. of Am.,
　900 F.2d 772 (4th Cir. 1990) ................................................................................... 7

People v. Coddington,
　23 Cal. 4th 529 (Cal. 2000) ..................................................................................... 9

People v. Doolin,
　45 Cal. 4th 390 (2009) ............................................................................................. 9

Sharer v. Tandberg, Inc.,
　2007 WL 983849 (E.D. Va. Mar. 27, 2007) ........................................................... 8

THK Am., Inc. v. NSK, Ltd.,
　917 F. Supp. 563 (N.D. Ill. 1996) ............................................................................ 9

U.S. v. Morris,
　988 F.2d 1335 (4th Cir. 1993) ................................................................................. 8

Williams v. Sprint/United Mgmt. Co.,
　464 F. Supp. 2d 1100 (D. Kan. 2006) ..................................................................... 9

### Statutes

Cal. Evid. Code § 913(a) .............................................................................................. 9

Cal. Evid. Code § 913(b) ............................................................................................ 10

Fed. R. Evid. 501 .......................................................................................................... 9

## **Other Authorities**

BAJI 2.27 ........................................................................................................................... 11

CACI 215 ........................................................................................................................... 11

## Preliminary Statement

Mattel has properly asserted the attorney-client privilege and work product doctrine where they apply. The Court has reviewed and upheld Mattel's assertions of privilege on multiple occasions, including in particular as to matters that MGA has argued is relevant to its statute of limitations defense. See Dkt. Nos. 3284, 3410, 3669, 7785, 8974. Most recently, in denying MGA's Motion *in Limine* No. 24, the Court ruled that Mattel's assertion of a fraudulent concealment defense does not put at issue privileged communications and that, in any event, upholding the privilege "will not deny MGA access to information vital to its defense" because MGA already "has access to many non-privileged emails relating to the statute of limitations, generally, and the issue of Mattel's knowledge in particular." Dkt. No. 9663 at 4. That access has only increased since the Court's ruling, given the additional mid-trial depositions and other discovery that the Court has granted to MGA on its statute of limitations defense. Likewise, MGA itself has won rulings upholding the privilege on several occasions, including in instances where privileged information was relevant to Mattel's statute of limitations and laches defenses against MGA's own claims. See Dkt. Nos. 7717 (upholding MGA assertions of privilege over MGA investigations into trade secret thefts); Dkt. No. 8974 at 8-11 (upholding privilege over Brawer's communications with counsel pertaining to his and MGA's knowledge of accused toy fair activities and concluding that even the "subject matter" of privileged communications is privileged).

Nevertheless, MGA seeks to have the jury draw inferences from Mattel's privileged communications. For example, MGA asked Michele McShane, "without revealing the substance of any meetings," whether there was "ever a time when you met with Mr. De Anda, others may have been present as well, *to discuss a Bratz issue*."[1] Likewise, MGA repeatedly questioned Alan Kaye about "advice from

---

[1] March 17, 2011 Trial Tr., Vol. 2, at 76:1-4 (emphasis added).

counsel" that he purportedly received and about the reasons why Mattel attorneys made changes to Mattel's agreements, including by urging that Mattel's attorneys changed the language of one agreement because they believed "there was something wrong with the old one."[2] The only reason those questions were asked was to prompt the jury to draw inferences from privileged communications with counsel. Inviting the jury to speculate about matters protected by privilege and the work product doctrine would eviscerate their protections. A jury instruction is needed. In fact, California law requires one.

## Relevant Background

MGA has repeatedly examined Mattel's witnesses concerning communications and matters that MGA knows to be privileged or protected by work product. For example, MGA asked Alan Kaye repeatedly, and over Mattel's objections, about the reasons why Mattel attorneys made changes to Mattel's employment contracts:

> Q. Presumably the lawyers who added "ideas" back in, in had a reason, right?
>
> A. I would presume so.
>
> Q. But you didn't find out what the reason was, right?
>
> A. Uh, no.
>
> Q. And presumably the lawyers who made the changes in 2007 and had everybody come in and sign brand-new contracts, presumably they had a reason, right?
>
> MR. QUINN: Assumes facts not in evidence.
>
> THE WITNESS: Um –
>
> THE COURT: Overruled. Remember, he's speaking as a corporate designee. He's speaking for Mattel. You can answer the question.
>
> THE WITNESS: Can you repeat the question, please?

---

[2] March 16, 2011 Trial Tr., Vol. 3, at 15:13-16:3.

| | |
|---|---|
| 1 | Q.  Presumably when the contract was changed again in 2007 |
| 2 | by lawyers, they had a reason for that, right? |
| 3 | MR. QUINN:  Misstates the evidence. |
| 4 | THE COURT:  Just a moment.  In 2007? |
| 5 | MS. KELLER:  Yes. |
| 6 | THE COURT:  Or 2004? |
| 7 | MS. KELLER:  Both.  I've asked about 2004. |
| 8 | THE COURT:  Overruled. |
| 9 | Q.  You recall again the contract was changed in 2007, right? |
| 10 | A.  I -- I thought this -- I thought the next change was 2006. |
| 11 | Q.  Okay. Let's even – let's talk about that.  The next change, 2006, |
| 12 | that also was changed by the lawyers, right? |
| 13 | A. Yes. |
| 14 | Q. Presumably the lawyers had a reason for changing it, right? |
| 15 | A. Presumably. |
| 16 | Q. Presumably the lawyers thought words were actually important, |
| 17 | right? |
| 18 | A. Presumably. |
| 19 | Q. But you didn't find out why that change was made either, right? |
| 20 | A. No. |
| 21 | Q. And when the employees were asked to execute again another |
| 22 | confidentiality and inventions agreement, you said that was based on |
| 23 | advice from counsel, right? |
| 24 | A. Yes. |
| 25 | Q. You didn't ask counsel why that was, right? |
| 26 | A. Why which was? |
| 27 | | |
| 28 | | |

| | |
|---|---|
| 1 | Q. You didn't ask counsel why – when the attorneys said the current |
| 2 | employees needed to execute another confidentiality and inventions |
| 3 | agreement in 2006, you didn't ask them why that was, right? |
| 4 | MR. QUINN: Your Honor, communications with counsel. |
| 5 | THE COURT: Overruled. |
| 6 | THE WITNESS: I'm sorry. I thought – I'm – I may have |
| 7 | misunderstood. I thought you were talking about the specific words. If |
| 8 | you're talking about the general concept of changing the agreement. |
| 9 | Q. No. Specific words? |
| 10 | A. Specific words. I did not asked them about the change |
| 11 | in the specific words.[3] |
| 12 | |
| 13 | Q. You did not want to know that the lawyers changed the language |
| 14 | so that it would actually be clear that the kind of – the kind of situation |
| 15 | that Carter Bryant described would actually be covered? |
| 16 | MR. QUINN: Assumes facts. It's argumentative. |
| 17 | THE COURT: Overruled. |
| 18 | THE WITNESS: I'm sorry, can you repeat that question? |
| 19 | BY MS. KELLER: Q. You didn't want to know why the language |
| 20 | was changed to this specific language that I just talked about because |
| 21 | you didn't want to find out that the lawyers changed it so that the kind |
| 22 | of situation that Carter Bryant has described would actually be covered |
| 23 | by a Mattel contract, right? |
| 24 | A. No, that's not correct.[4] |
| 25 | MGA also examined former Mattel attorney Michele McShane concerning |

---

[3] March 17, 2011 Trial Tr., Vol. 1 at 78:17-81:4.
[4] March 17, 2011 Trial Tr., Vol. 1 at 82:3-84:3.

entries on Mattel's privilege log:

    Q. Let me ask you to take a look at Exhibit 9633, the first page, please.

    A. (Witness so complies.) Yes, I saw this in my deposition.

    Q. And you see that's excerpts from privilege log?

    A. Yes.

    Q. And that's the kind of document where parties put down which documents are privileged that they are going to hold back in litigation?

    A. Yes.

    Q. And it reflects there the fax from Mr. Franke to you dated February 20th, 2002?

    A. Yes. And where is that, please?

    Q. The very first line.

    A. Okay. Yes.

    Q. And then Ms. Jolicoeur has a communication with outside counsel on June 20th, 2002?

    A. Yes.

    Q. And Ms. Jolicoeur has another communication with outside counsel on September 30th, 2002?

MR. QUINN: Your Honor, this lacks foundation. Just reading the log, or asking the witness?

THE COURT: Overruled. Now, the question is, the redactions will simply be noted as "outside counsel"; is that correct?

MS. HURST: That's correct.

THE COURT: The redactions are simply noted as outside counsel.

THE WITNESS: Yes.

MS. HURST: Your Honor, may I offer just the first page of 9633?

MR. QUINN: We object to this, your Honor.

THE COURT: You may. It's received.

1   Q. So I think we were at the entry 261, a facsimile dated
2   September 30th, 2002, and that's Sonia Jillocour; right?
3   A. Yes.
4   Q. Okay. And you said she worked for you; right?
5   A. That's correct.
6   Q. And Anita Kersting, on October 16, 2002, did she work for you as
7   well?
8   A. Yes.
9   Q.  And November 13, 2002, there is a website printout with
10  handwritten notations; right?
11  A. Yes.
12  Q.  And if you can continue down the page, there's a series of
13  communications involving outside counsel; right?
14  A. And what's redacted represents outside counsel?
15  Q. Yes.
16  A. That would be 11 instances.
17  Q. Is that what you count?
18  A. Yes. It looks like approximately 11.
19  Q. Okay.
20  A. That would involve outside counsel.
21  Q. All right. You had the authority to retain outside counsel for
22  litigation in 2002 and 2003; correct?
23  A. Yes. But it's pursuant to privilege communications,
24  and – [5]

MGA also asked Ms. McShane about whether she had a privileged discussion
with Mr. DeAnda "to discuss a Bratz issue":

---
[5]   March 17, 2011 Trial Tr., Vol. 2 at 71:17-73:25.

> Q. Let me ask you to look at Exhibit 8277. Before we look at that, without revealing the substance of any meetings, was there ever a time when you met with Mr. De Anda, others may have been present as well, to discuss a Bratz issue?
>
> A. I recall there was probably at least one meeting, but – as to the substance, attorney-client privilege would be asserted.
>
> Q. But you do recall that there was a meeting involving Mr. De Anda; right?
>
> A. Vaguely, yes.[6]

## Argument

### I. IT IS IMPROPER TO ALLOW THE JURY TO DRAW INFERENCES FROM PRIVILEGED INFORMATION

Courts widely recognize that it is error to permit a jury to draw inferences based on privileged communications. Thus, in a spousal privilege case, the Ninth Circuit reversed a criminal conviction because the district court had permitted comment "on the failure of appellant to call his wife as a witness, and in arguing that if called, her testimony would have been adverse to the appellant's case," which effectively served to destroy the spousal privilege. Courtney v. United States, 390 F.2d 521, 528 (9th Cir. 1968), cert. denied, 393 U.S. 857 (1968). The Fourth Circuit has elaborated on the rationale for the prohibition against drawing inferences from the assertion of privilege. In Parker v. Prudential Ins. Co. of Am., 900 F.2d 772 (4th Cir. 1990), the plaintiff argued that the trial court, in directing a verdict against her, impermissibly inferred the substance of her privileged communications with counsel. The Fourth Circuit agreed:

> [T]he trial court impermissibly used testimony from [the plaintiff's counsel] to draw an inference about the substance of her conversations

---

[6] March 17, 2011 Trial Tr., Vol. 2 at 75:25-76:10.

> with him. . . . The privilege was created to protect the right to effective counsel. "[A]n individual in a free society should be encouraged to consult with his attorney whose function is to counsel and advise him and he should be free from apprehension of compelled disclosures by his legal advisor." [citations]. ***To protect that interest, a client asserting the privilege should not face a negative inference about the substance of the information sought.***

Id. at 775 (emphasis added); see also Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 225-26 (2d Cir. 1999) ("[The attorney-client] privilege is designed to encourage persons to seek legal advice, and lawyers to give candid advice, all without adverse effect. If refusal to produce an attorney's opinion letter based on claim of the privilege supported an adverse inference, persons would be discouraged from seeking opinions, or lawyers would be discouraged from giving honest opinions. Such a penalty for invocation of the privilege would have seriously harmful consequences." (citations omitted)); Doe ex rel. Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1265 (9th Cir. 2000) (discussing Nabisco with approval); U.S. v. Morris, 988 F.2d 1335, 1340-41 (4th Cir. 1993) ("The prosecutor's cross-examination of Mrs. Morris about her invocation of the [marital] privilege is bound to have had as a purpose to infer that she would have testified before the grand jury if she had something exculpatory to say. To permit such an inference would destroy the privilege. Indeed, if we were to allow this practice to continue, a defendant whose spouse invoked the privilege would be in greater peril, because of the improper inference, than a defendant whose spouse testified at both proceedings. Thus, the assertion of the privilege would mean a necessary disadvantage, an unacceptable result.").[7] Any other rule would not only effectively eviscerate privilege, but would

---

[7] See also Sharer v. Tandberg, Inc., 2007 WL 983849, at *2 (E.D. Va. Mar. 27, 2007) (precluding defendants from questioning plaintiff at trial regarding privileged communications where the only probative value was an inference as to the substance
(footnote continued)

place parties in the untenable position of either trying to dispel negative inferences without being able to disclose the substance of the communications or else being forced to waive privilege.

California law, which governs privilege questions in federal cases "with respect to an element of a claim or defense as to which State law supplies the rule of decision" (Fed. R. Evid. 501), is in accord. Specifically, California Evidence Code § 913(a) provides:

> If in the instant proceeding or on a prior occasion a privilege is or was exercised not to testify with respect to any matter, or to refuse to disclose or to prevent another from disclosing any matter, ***neither the presiding officer nor counsel may comment thereon, no presumption shall arise because of the exercise of the privilege, and the trier of fact may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding***.

Cal. Evid. Code § 913(a) (emphasis added). Courts have interpreted this language to mean what it says. People v. Doolin, 45 Cal. 4th 390, 441 (2009) ("The jury may not draw any inference from a witness's invocation of a privilege.") (citing Cal. Evid. Code § 913(a)); People v. Coddington, 23 Cal. 4th 529, 605-06 (Cal. 2000) (although harmless in the circumstances, it was error for court to permit prosecutor

---

of the communication); In re Gibson, 2007 WL 505746, at *3 (Bankr. S.D. Ala. Feb. 14, 2007) (court "cannot draw a negative inference" from party's "invocation of the attorney-client privilege"); THK Am., Inc. v. NSK, Ltd., 917 F. Supp. 563, 566-68 (N.D. Ill. 1996) (precluding defendant "from making any mention of the fact that [plaintiff] has refused to disclose its attorney patent opinions and . . . from arguing to the jury that a negative inference can be drawn based thereon" because it "has long been established that attorneys' patent opinions . . . are protected by the attorney-client privilege" and that, "[a]s part of this protection, adverse inferences against parties who refuse to disclose attorney opinions are disallowed") (citations omitted); Williams v. Sprint/United Mgmt. Co., 464 F. Supp. 2d 1100, 1108 (D. Kan. 2006) ("Because the court has concluded that defendant has not waived the privilege . . . , it would be inappropriate to permit plaintiffs to inquire about such [privileged information] and then force defendant to either invoke the privilege in the jury's presence (creating the negative inference desired by plaintiffs) or waive the privilege by responding to the question.").

to "invit[e] jury to infer" from fact that defense had interviewed experts that it did not call as trial witnesses – which the court found to be protected work product information – that "their testimony would not be favorable"; if a party were permitted to use an opposing party's privileged work product in that manner, then "thorough [pre-trial] investigation would be discouraged").

As MGA knows, the communications about which it has examined Mattel's witnesses is privileged. Indeed, the Court has previously ruled, at MGA's urging, that even the "subject matter" of an attorney-client communication is privileged and that privilege logs are not evidence that "may be admitted into evidence as relevant to one of the claims in the lawsuit." Dkt. No. 8974 at 9. Nevertheless, MGA has been permitted before the jury to introduce Mattel's privilege log, elicit testimony about privilege log entries and examine witnesses on both the subject matter and content of privileged communications. MGA has asked such questions to prejudice Mattel so as to invite the jury to draw adverse inferences against Mattel based upon privileged communications. That, as just shown, is improper under the law.

## II. THE COURT SHOULD INSTRUCT THE JURY THAT IT MAY NOT DRAW INFERENCES FROM PRIVILEGED INFORMATION

At a minimum, a curative instruction should be given. Consistent with the federal authorities cited above, California state law mandates that the court, "at the request of a party who may be adversely affected because an unfavorable inference may be drawn by the jury because a privilege has been exercised, ***shall instruct the jury that no presumption arises because of the exercise of the privilege and that the jury may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding***." Cal. Evid. Code § 913(b) (emphasis added). See also Home Indem. Co. v. Lane Powell Moss and Miller, 43 F.3d 1322, 1328-29 (9th Cir. 1995) (holding that the "district court properly applied [Alaska law] in barring [party] from raising negative inferences before the jury based on [opposing party's] assertion of the attorney-client privilege and in instructing the jury not to

draw such inferences.").

Both CACI and BAJI include model jury instructions based on section 913(b). CACI 215 – "Exercise of a Communication Privilege" – provides: "People have a legal right not to disclose what they told their [doctor/attorney, etc.] in confidence because the law considers this information privileged. People may exercise this privilege freely and without fear of penalty. You must not use the fact that a witness exercised this privilege to decide whether he or she should be believed. Indeed, you must not let it affect any of your decisions in this case." Similarly, BAJI 2.27 – "No Unfavorable Inference From Exercise of a Privilege" – provides: "If, [at a deposition] [in answers to interrogatories] a privilege not to testify with respect to any matter [or to refuse to disclose or to prevent another from disclosing any matter] has been exercised, no assumption of fact is to be made by you because of the exercise of that privilege, and you must not draw any inference therefrom as to the believability of the witness or as to any matter in issue in this trial."

Because of the unfair prejudice to Mattel if the jury were permitted to draw adverse inferences from privileged communications, Mattel requests that the Court instruct the jury as set forth in CACI 215 and BAJI 2.27. Alternatively, Mattel proposes the following jury instruction based upon these model instructions:

<u>JURY INSTRUCTION NO. ___</u>

<u>NO UNFAVORABLE INFERENCES FROM
EXERCISE OF A PRIVILEGE</u>

People and companies have a legal right not to disclose their confidential communications with their attorneys because the law considers this information to be privileged. The parties and witnesses in this case may exercise this privilege freely and without fear of penalty. You must not use the fact that a party or witness exercised this privilege to decide whether he, she or it should be believed. You also must not draw any inference from a party's or witness's assertion of the privilege

or infer the content of any privileged information.  Indeed, you must not let a party's failure to disclose its privileged communications affect any of your decisions in this case in any way.

### Conclusion

Mattel respectfully requests that the Court instruct the jury that it is prohibited from drawing inferences concerning the content of any Mattel privileged information, in accordance with the proposed jury instruction set forth above.

DATED: March 28, 2011         QUINN EMANUEL URQUHART & SULLIVAN. LLP

By /s/ John B. Quinn
John B. Quinn
Attorneys for Mattel, Inc., and Mattel de Mexico. S.A. de C.V.