1              **UNITED STATES DISTRICT COURT**

2              **CENTRAL DISTRICT OF CALIFORNIA**

3          **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    – – – – – – –

5
   MATTEL, INC., et al.,            )
6                                    )
             Plaintiffs,            )
7                                    )
        vs.                         ) No. CV 04-9049 DOC
8                                    )    Day 39
   MGA ENTERTAINMENT, INC., et al., )    Volume 1 of 3
9                                    )
                                     )
10            Defendants.            )
   _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    Jury Trial

16              Santa Ana, California

17            Thursday, March 24, 2011

18

19

20

21  Debbie Gale, CSR 9472, RPR, CCRR
    Federal Official Court Reporter
22  United States District Court
    411 West 4th Street, Room 1-053
23  Santa Ana, California 92701
    (714) 558-8141
24

25  04cv9049 Mattel 2011-03-24 D39V1

```
 1    APPEARANCES OF COUNSEL:

 2

      FOR PLAINTIFF MATTEL, INC., ET AL.:
 3
               QUINN EMANUEL URQUHART & SULLIVAN
 4             BY:  JOHN QUINN
                    WILLIAM PRICE
 5                  MICHAEL T. ZELLER
                    Attorneys at Law
 6             865 South Figueroa Street
               10th Floor
 7             Los Angeles, California 90017
               (213) 443-3000
 8

 9

10

11    FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12             ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
               BY:  THOMAS S. McCONVILLE
13                  Attorney at Law
               4 Park Plaza
14             Suite 1600
               Irvine, California 92614
15             (949) 567-6700

16             - AND -

17             ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
               BY:  ANNETTE L. HURST
18                  Attorney at Law
               405 Howard Street
19             San Francisco, California 94105
               (415)773-5700
20
               - AND -
21
               KELLER RACKAUCKAS
22             BY:  JENNIFER KELLER
                    Attorney at Law
23             18500 Von Karman Avenue
               Suite 560
24             Irvine, California 92612
               (949) 476-8700
25
```

DEBBIE GALE, U.S. COURT REPORTER

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4
             LAW OFFICES OF MARK E. OVERLAND
5            By:  MARK E. OVERLAND
                  Attorney at Law
6            100 Wilshire Boulevard
             Suite 950
7            Santa Monica, California 90401
             (310) 459-2830
8
             - AND -
9
             SCHEPER KIM & HARRIS LLP
10           BY:  ALEXANDER H. COTE
                  Attorney at Law
11           601 West 5th Street
             12th Floor
12           Los Angeles, California 90071
             (213) 613-4660
13

14   ALSO PRESENT:

15           MGA ENTERTAINMENT, INC.
             BY:  JEANINE PISONI
16                Attorney at Law
             16360 Roscoe Boulevard
17           Suite 105
             Van Nuys, California 91406
18

19           ROBERT A. ECKERT, MATTEL CEO

20           ISAAC LARIAN, MGA CEO

21           KEN KOTARSKI, Mattel Technical Operator

22           MIKE STOVALL, MGA Technical Operator

23           RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

24

25

1                          **I N D E X**

2    **WITNESSES**              **DIRECT**  **CROSS**  **REDIRECT**  **RECROSS**

3    VILLASENOR, Salvador

4    By Mr. Price                                                        5

5

6    VILAPPU, GLENN

7    By Ms. Hurst                15                   94

8    By Mr. Quinn                        63

9

10   JOACHIMSTAHLER, Erich

11   By Mr. Quinn                                                      109

12

13

14                         **EXHIBITS**

15                          (None)

16

17

18

19

20

21

22

23

24

25

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

5

|   |   |
|---|---|
|   | 1 |

       1    **SANTA ANA, CALIFORNIA, THURSDAY, MARCH 24, 2011**

       2    **Day 39, Volume 1 of 3**

       3    (8:35 a.m.)

08:35    4    *(In the presence of the jury.)*

08:35    5    THE COURT: All right. We're back in session.

08:35    6    The jury's present. The alternates are present.

08:35    7    Thank you for your courtesy. If you would please

08:36    8    be seated. The parties are present.

08:36    9    I saw Mr. Villasenor this morning, Counsel, about

08:36   10    7:30. I know he's in the building.

08:36   11    *(Witness Villasenor enters the courtroom.)*

08:36   12    **SALVADOR VILLASENOR, MGA'S WITNESS, PREVIOUSLY SWORN**

08:37   13    **RESUMED THE STAND**

08:37   14    THE COURT: The witness is present, and Mr. Price

08:37   15    is continuing his cross-examination of Mr. Villasenor on

08:37   16    behalf of Mattel.

08:37   17    **RECROSS-EXAMINATION (Resumed)**

08:37   18    BY MR. PRICE:

08:37   19    Q. Good morning, Mr. Villasenor.

08:37   20    A. Good morning.

08:37   21    Q. When we left yesterday, we were talking about your

08:37   22    conversation with Mr. Louie. It's correct, is it not, that

08:37   23    Mr. Louie told you that your coverage at tradeshows and

08:37   24    conferences did not maximize the impact on the business and

08:37   25    showed questionable judgment. Do you recall Mr. Louie

| 08:37 | 1 | saying that to you?  Correct? |
|---|---|---|
| 08:37 | 2 | A.   I do not recall him saying that to me. |
| 08:37 | 3 | MR. PRICE:  Your Honor, if we could look at -- |
| 08:37 | 4 | it's September 13, 2010, page 685, line 8 through 15. |
| 08:38 | 5 | *(Document provided to the witness.)* |
| 08:38 | 6 | MR. PRICE:  And if I may read, Your Honor? |
| 08:38 | 7 | THE COURT:  Just a moment. |
| 08:38 | 8 | MR. PRICE:  It's 685, line 8 through 15. |
| 08:38 | 9 | THE COURT:  You may. |
| 08:38 | 10 | MR. PRICE:  (Reading:) |
| 08:38 | 11 | "QUESTION:  Did Mr. Louie or any of your |
| 08:38 | 12 | supervisors at Mattel ever tell you that your coverage at |
| 08:38 | 13 | tradeshows and conferences did not maximize the impact on |
| 08:38 | 14 | the business and showed questionable judgment? |
| 08:38 | 15 | "ANSWER:  I recall John Louie mentioning something |
| 08:38 | 16 | like that. |
| 08:38 | 17 | BY MR. PRICE: |
| 08:38 | 18 | Q.   Sir, if -- you also talked about meeting with -- with |
| 08:38 | 19 | Mr. Moore, Mattel's in-house counsel in December.  And I'd |
| 08:38 | 20 | like to call your attention to -- let you look at |
| 08:38 | 21 | Exhibit 9484.  And that's the December 12, 2005 e-mail that |
| 08:39 | 22 | your attorney drafted and then you edited and sent to |
| 08:39 | 23 | Mattel. |
| 08:39 | 24 | *(Document provided to the witness.)* |
| 08:39 | 25 | *(Document displayed.)* |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:39 | 1 | BY MR. PRICE: |
| 08:39 | 2 | Q.   I'm sorry.  December 22nd, 2005. |
| 08:39 | 3 |      And in this e-mail you talk about work conditions being |
| 08:39 | 4 | intolerable, et cetera -- or your attorney does.  Is it |
| 08:39 | 5 | correct that in this e-mail, the one sent December 22, 2005, |
| 08:39 | 6 | there's no mention of any stress or concern pertaining to |
| 08:39 | 7 | any litigation, correct? |
| 08:39 | 8 | A.   In the -- in this letter here? |
| 08:40 | 9 | Q.   Yeah.  In the December 22, 2005 e-mail that your |
| 08:40 | 10 | attorney drafted and you edited and sent to Mattel, this |
| 08:40 | 11 | December 22, 2005, is it correct that there's no mention |
| 08:40 | 12 | of -- uh, of, uh, stress as a result of this litigation? |
| 08:40 | 13 |         MS. KELLER:  Your Honor, this is unfair to the |
| 08:40 | 14 | witness given the redaction, the mention of litigation. |
| 08:40 | 15 |         THE COURT:  Just a moment. |
| 08:40 | 16 |         No.  Overruled. |
| 08:40 | 17 |         You can answer the question. |
| 08:40 | 18 | BY MR. PRICE: |
| 08:40 | 19 | Q.   Is that correct? |
| 08:40 | 20 | A.   That's correct.  However, at the time I was feeling |
| 08:40 | 21 | stress. |
| 08:40 | 22 | Q.   Well, uh, actually, if you -- when you testified about |
| 08:40 | 23 | your meeting with Mr. Moore -- first, let me ask you this: |
| 08:40 | 24 | When you talked to Mr. Moore, there's no request that you |
| 08:40 | 25 | sign any confidentiality agreement, right? |

| 08:40 | 1 | A.    I don't recall exactly what Mr. Moore and I talked |
| 08:41 | 2 | about.  I don't recall the entire conversation. |
| 08:41 | 3 | Q.    My question is, before you sent the December 22, 2005 |
| 08:41 | 4 | e-mail complaining about the directions and instructions |
| 08:41 | 5 | about Market Intelligence and feeling stressed, before then, |
| 08:41 | 6 | no one asked you to sign any confidentiality agreements, |
| 08:41 | 7 | right? |
| 08:41 | 8 | A.    At Mattel? |
| 08:41 | 9 | Q.    Concerning -- yeah -- concerning any litigation, |
| 08:41 | 10 | correct? |
| 08:41 | 11 | A.    Correct. |
| 08:41 | 12 | Q.    And, uh, you say you were -- you were stressed.  But at |
| 08:41 | 13 | your deposition, uh, you recall you testified you didn't |
| 08:41 | 14 | remember any questions Mr. Moore asked you or even the |
| 08:41 | 15 | general subject of the questions.  Do you recall that? |
| 08:41 | 16 | MS. KELLER:  Your Honor, there has been privilege |
| 08:41 | 17 | asserted as to this whole area. |
| 08:41 | 18 | MR. PRICE:  He answered, Your Honor.  He was |
| 08:41 | 19 | permitted to answer. |
| 08:41 | 20 | THE COURT:  Just a moment. |
| 08:41 | 21 | MS. KELLER:  Not by us, by the way. |
| 08:41 | 22 | THE COURT:  Just a moment, both of you now. |
| 08:42 | 23 | MR. PRICE:  Your Honor, I could direct the witness |
| 08:42 | 24 | to a page so you'll see the questions and answers. |
| 08:42 | 25 | THE COURT:  You'll have to do that for me also, |

CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

9

| | | |
|---|---|---|
| 08:42 | 1 | Counsel. |
| 08:42 | 2 | MR. PRICE:  I will.  That's 435. |
| 08:42 | 3 | THE COURT:  Thank you. |
| 08:42 | 4 | MR. PRICE:  Lines 1 through 7 –- or 1 to 18. |
| 08:42 | 5 | *(Document provided to the witness.)* |
| 08:42 | 6 | THE COURT:  Just a moment.  Page 435? |
| 08:42 | 7 | MR. PRICE:  Yes.  That's on September 13, 2010, on |
| 08:42 | 8 | lines 1 through 18. |
| 08:43 | 9 | THE COURT:  Just a moment.  I want to read before. |
| 08:43 | 10 | MR. PRICE:  Sure.  It begins at 433, Your Honor. |
| 08:43 | 11 | 433, line 23, is where the line of questioning began. |
| 08:43 | 12 | MS. KELLER:  Your Honor, in fairness, I'm going to |
| 08:43 | 13 | ask that other portions be read in elsewhere in his |
| 08:43 | 14 | deposition. |
| 08:43 | 15 | THE COURT:  Just a moment. |
| 08:43 | 16 | You can both discuss a rule of completeness, |
| 08:43 | 17 | because counsel won't have any further time for examination. |
| 08:43 | 18 | So we'll stop the clock running, Debbie, for just |
| 08:43 | 19 | a moment. |
| 08:43 | 20 | Ladies and gentlemen, I'll be right with you. |
| 08:44 | 21 | *(Pause in the proceedings at 8:43 a.m.)* |
| 08:44 | 22 | THE COURT:  Are there any other sections you're |
| 08:44 | 23 | requesting? |
| 08:44 | 24 | MR. PRICE:  Pardon me, Your Honor? |
| 08:44 | 25 | THE COURT:  Any other sections you're requesting |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 10 of 154   Page ID #:312038
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

10

| | | |
|---|---|---|
| 08:44 | 1 | to be read between the two of you? |
| 08:44 | 2 | MR. PRICE:  Only -- no. |
| 08:45 | 3 | THE COURT:  All right.  Counsel, I think that at |
| 08:46 | 4 | the present time, the answer on line 18 corresponds to his |
| 08:46 | 5 | confusion beginning on page 432 and 433 where the objections |
| 08:46 | 6 | begin.  And there were so many objections on the two pages |
| 08:46 | 7 | by both counsel involved and both sides that this answer |
| 08:46 | 8 | is -- you'll see on page 18, "I do not recall any of the |
| 08:46 | 9 | questions." |
| 08:46 | 10 | MS. KELLER:  I'm not offering it, Your Honor. |
| 08:46 | 11 | THE COURT:  I know you're not, Counsel, but the |
| 08:46 | 12 | end result is we really don't have an answer because of the |
| 08:46 | 13 | confusion caused on the first two pages, quite frankly, from |
| 08:46 | 14 | both sides. |
| 08:46 | 15 | MR. PRICE:  I'll move on. |
| 08:46 | 16 | THE COURT:  I'm not going to allow the reading of |
| 08:46 | 17 | this.  It's not impeaching.  It's not going to be allowed. |
| 08:47 | 18 | Start the clock now. |
| 08:47 | 19 | BY MR. PRICE: |
| 08:47 | 20 | Q.   Mr. Villasenor, we're looking at 9484, the initial |
| 08:47 | 21 | e-mail that you sent, and it was after that on January 11, |
| 08:47 | 22 | 2006, that your attorney wrote 9525, and you saw that |
| 08:47 | 23 | yesterday.  We'll put it up on the screen.  That's the |
| 08:47 | 24 | January 11, 2006 letter from Mr. Barrera to Ms. Wagner. |
| 08:47 | 25 | *(Document displayed.)* |

| | | |
|---|---|---|
| 08:47 | 1 | BY MR. PRICE: |
| 08:47 | 2 | Q.   Do you recall looking at that yesterday? |
| 08:47 | 3 | A.   I do. |
| 08:47 | 4 | Q.   And this was written entirely by your counsel, correct? |
| 08:48 | 5 | A.   That's correct. |
| 08:48 | 6 | Q.   Uh, and, uh, although you're copied on it, I think your |
| 08:48 | 7 | testimony is that you have no recollection of reading this, |
| 08:48 | 8 | correct? |
| 08:48 | 9 | A.   That's correct. |
| 08:48 | 10 | Q.   And you see there's -- there's a paragraph there, three |
| 08:48 | 11 | down -- this is written by your counsel:  "As a preliminary |
| 08:48 | 12 | matter, please be advised that this letter and any and all |
| 08:48 | 13 | communications therewith are inadmissible in Court or any |
| 08:48 | 14 | judicial proceeding pursuant to Evidence Code 1152 and |
| 08:48 | 15 | governing principles of California and federal law, |
| 08:48 | 16 | including Federal Rules of Evidence, Rule 408." |
| 08:48 | 17 |      Do you see that? |
| 08:48 | 18 | A.   I see that. |
| 08:48 | 19 | Q.   And that was something put in the letter, not by |
| 08:48 | 20 | Mattel, but by your counsel concerning this letter, correct? |
| 08:48 | 21 | A.   Correct. |
| 08:48 | 22 | Q.   And then if you go to the second page, that paragraph, |
| 08:48 | 23 | the last paragraph, you recall that's where your counsel |
| 08:49 | 24 | says that there should be a severance agreement and that |
| 08:49 | 25 | Mr. Bousquette got 5.4 million and Ms. Barad got 40 million, |

| | | |
|---|---|---|
| 08:49 | 1 | and that you weren't demanding a specific sum.  Do you see |
| 08:49 | 2 | that? |
| 08:49 | 3 | A.   I do. |
| 08:49 | 4 | Q.   And it was about a week after this letter that your |
| 08:49 | 5 | attorney demanded the specific sum of about $3 million, |
| 08:49 | 6 | correct? |
| 08:49 | 7 | A.   (No response.) |
| 08:49 | 8 | Q.   If you look at 26979, which we had in front of you last |
| 08:49 | 9 | night, to refresh your memory? |
| 08:49 | 10 | A.   I'm sorry, where's that at? |
| 08:49 | 11 | Q.   26979. |
| 08:50 | 12 | MR. PRICE:  Your Honor, if I could just approach |
| 08:50 | 13 | the witness and show him a copy? |
| 08:50 | 14 | THE COURT:  You may. |
| 08:50 | 15 | *(Document produced to the witness.)* |
| 08:50 | 16 | BY MR. PRICE: |
| 08:50 | 17 | Q.   So it was about a week after January 11th? |
| 08:50 | 18 | A.   I see it. |
| 08:50 | 19 | Q.   It's about a week after that your attorney then |
| 08:50 | 20 | demanded a sum of about $3 million, right? |
| 08:50 | 21 | A.   That's what's on here, correct. |
| 08:50 | 22 | Q.   And you were also asked about the rules going into toy |
| 08:50 | 23 | fair, about registering for toy fair.  Do you recall that? |
| 08:50 | 24 | A.   I do. |
| 08:50 | 25 | Q.   And those rules changed over time, correct? |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 13 of 154   Page ID #:312041
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

13

| | | |
|---|---|---|
| 08:50 | 1 | A.   They did. |
| 08:50 | 2 | Q.   I mean, at some point you had to show a picture ID, |
| 08:50 | 3 | correct? |
| 08:50 | 4 | A.   Correct. |
| 08:50 | 5 | Q.   Did you ever use an invoice? |
| 08:50 | 6 | A.   I don't recall ever using an invoice. |
| 08:50 | 7 | Q.   So at the time you went, the requirements to get in |
| 08:51 | 8 | were a business card and -- and a picture ID, correct? |
| 08:51 | 9 | A.   I think prior to 2001, it was just a business card, and |
| 08:51 | 10 | then after 2001, around that time period, they required a |
| 08:51 | 11 | business card and a picture ID. |
| 08:51 | 12 | Q.   And that was the requirement up until the time you |
| 08:51 | 13 | stopped going into the toy fair, correct? |
| 08:51 | 14 | A.   From what I remember, correct. |
| 08:51 | 15 | Q.   And you see there was -- you said you recalled a |
| 08:51 | 16 | meeting with Mr. Friedman, correct? |
| 08:51 | 17 | A.   That is correct. |
| 08:51 | 18 | Q.   And your understanding, he was meeting with a lot of |
| 08:51 | 19 | people 'cause he was just getting onboard? |
| 08:51 | 20 | A.   That I'm not aware of.  That I don't recall. |
| 08:51 | 21 | Q.   And that meeting there were no discussions about you |
| 08:51 | 22 | using false ID's, correct? |
| 08:51 | 23 | A.   We did talk about the competitive catalogs and price |
| 08:51 | 24 | lists and the library. |
| 08:51 | 25 | Q.   But you didn't talk about using false ID's, correct? |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 14 of 154   Page ID #:312042
CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

14

| | | |
|---|---|---|
| 08:51 | 1 | A.   I -- I don't recall. |
| 08:51 | 2 | MR. PRICE:  Nothing further. |
| 08:51 | 3 | THE COURT:  Now, sir, I'm going to ask you to |
| 08:51 | 4 | remain on call until April 8th.  The case, I thought was |
| 08:52 | 5 | previously going to conclude a lot later than it is.  But |
| 08:52 | 6 | I've been holding everybody else until May.  So until |
| 08:52 | 7 | April 8th. |
| 08:52 | 8 | Thank you very much, sir.  You may step down. |
| 08:52 | 9 | THE WITNESS:  Thank you. |
| 08:52 | 10 | *(Witness steps down subject to recall.)* |
| 08:52 | 11 | THE COURT:  Your next witness, please. |
| 08:52 | 12 | MS. HURST:  Your Honor, Mr. Larian and MGA call |
| 08:52 | 13 | Mr. Glenn Vilppu. |
| 08:52 | 14 | THE COURT:  Thank you, sir.  If you would raise |
| 08:52 | 15 | your right hand. |
| 08:52 | 16 | **GLENN VILPPU, MGA'S WITNESS, SWORN** |
| 08:52 | 17 | THE WITNESS:  I do. |
| 08:53 | 18 | THE COURT:  Thank you.  Sir, would you state your |
| 08:53 | 19 | full name for the jury, please. |
| 08:53 | 20 | THE WITNESS:  I'm sorry? |
| 08:53 | 21 | THE COURT:  Your full name for the jury, please. |
| 08:53 | 22 | THE WITNESS:  Glenn Valentine Vilppu. |
| 08:53 | 23 | THE COURT:  Would you spell your last name, sir. |
| 08:53 | 24 | THE WITNESS:  Glenn, G-L-E-N-N; middle initial, V; |
| 08:53 | 25 | last name is Vilppu, V-I-L-P-P-U. |

| | | |
|---|---|---|
| 08:53 | 1 | THE COURT:  Thank you. |
| 08:53 | 2 | And this is direct examination by Ms. Hurst on |
| 08:53 | 3 | behalf of MGA and Mr. Larian. |
| 08:53 | 4 | **DIRECT EXAMINATION** |
| 08:53 | 5 | BY MS. HURST: |
| 08:53 | 6 | Q.   Good morning, Mr. Vilppu. |
| 08:53 | 7 | A.   Good morning. |
| 08:53 | 8 | Q.   Would you pull that microphone close to your mouth, |
| 08:53 | 9 | please or pull up the chair. |
| 08:53 | 10 | A.   Thank you. |
| 08:53 | 11 | Q.   Thank you.  Mr. Vilppu, where do you reside? |
| 08:53 | 12 | A.   I live in a small town of Acton in northern Los Angeles |
| 08:53 | 13 | County. |
| 08:53 | 14 | Q.   And we notice that you have a device on your ear there. |
| 08:54 | 15 | Is that called a cochlear implant? |
| 08:54 | 16 | A.   Correct. |
| 08:54 | 17 | Q.   And so sometimes you have trouble hearing; is that |
| 08:54 | 18 | correct? |
| 08:54 | 19 | A.   Correct. |
| 08:54 | 20 | Q.   All right.  If there's anything you can't hear from me |
| 08:54 | 21 | or Mr. Quinn, would you just ask us to repeat the question? |
| 08:54 | 22 | A.   I will. |
| 08:54 | 23 | Q.   All right.  What is it that you do, sir? |
| 08:54 | 24 | A.   I'm a professional artist, and educator. |
| 08:54 | 25 | Q.   What is your specialty? |

| 08:54 | 1  | A.    I teach drawing, primarily, that's used in the |
| 08:54 | 2  | animation industry, traditional animation. |
| 08:54 | 3  | Q.    And are there particular subjects for your drawing |
| 08:54 | 4  | expertise? |
| 08:54 | 5  | A.    Yes. |
| 08:54 | 6  | Q.    And what is your particular drawing expertise? |
| 08:54 | 7  | A.    Well, it's traditional Renaissance drawing, but it's |
| 08:54 | 8  | applied to the animation industry where you create the |
| 08:54 | 9  | ability to take and visualize and communicate your ideas |
| 08:54 | 10 | without models to start with and then later on to go farther |
| 08:55 | 11 | with that. |
| 08:55 | 12 | Q.    And, um, have you drawn -- is your particular expertise |
| 08:55 | 13 | in drawing both in Renaissance and for animation directed to |
| 08:55 | 14 | the human form? |
| 08:55 | 15 | A.    Yes. |
| 08:55 | 16 | Q.    Okay.  Do you have any education -- formal education in |
| 08:55 | 17 | the arts? |
| 08:55 | 18 | A.    Yes, I have a bachelor's and a master's degree from the |
| 08:55 | 19 | Art Center College of Design. |
| 08:55 | 20 | Q.    Okay.  How long have you been teaching drawing and |
| 08:55 | 21 | animation of the human form? |
| 08:55 | 22 | A.    Uh, drawing, I've been teaching for over 50 years, |
| 08:55 | 23 | which includes drawing for animation.  It's all the same. |
| 08:55 | 24 | Q.    All right.  Where are some of the schools that you've |
| 08:55 | 25 | taught drawing? |

| | | |
|---|---|---|
| 08:55 | 1 | A.   Uh, starting with the Art Center College of Design, I |
| 08:55 | 2 | taught for 13 years.  I'm at currently in UCLA in the film |
| 08:56 | 3 | school animation program.  I teach literally all over the |
| 08:56 | 4 | world:  Denmark, Savannah College of Art and Design.  I do |
| 08:56 | 5 | an annual teaching thing in Ringling College of Art and |
| 08:56 | 6 | Design in Florida.  Just about -- colleges all over. |
| 08:56 | 7 | Q.   And have you had your own art school? |
| 08:56 | 8 | A.   Yes, I have. |
| 08:56 | 9 | Q.   Okay.  Have you taught at the American Animation |
| 08:56 | 10 | Institute? |
| 08:56 | 11 | A.   I am currently teaching there also. |
| 08:56 | 12 | Q.   What types of classes do you teach? |
| 08:56 | 13 | A.   I teach drawing, drawing for animation, head drawing, |
| 08:56 | 14 | figure construction -- uh, it's an approach, an analytical |
| 08:56 | 15 | approach of drawing a figure. |
| 08:56 | 16 | Q.   Did you say head drawing? |
| 08:56 | 17 | A.   Head drawing, yes. |
| 08:56 | 18 | Q.   A specific class on how to -- |
| 08:56 | 19 | A.   That's a specific class, yes. |
| 08:56 | 20 | Q.   Have you also taught at movie studios? |
| 08:56 | 21 | A.   Yes. |
| 08:56 | 22 | Q.   Which movie studios have you taught? |
| 08:57 | 23 | A.   Um, all of the major ones; Disney, Warner Bros., |
| 08:57 | 24 | DreamWorks, Rhythm & Hues, just about -- many of the smaller |
| 08:57 | 25 | studios also. |

CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

18

| 08:57 | 1 | Q.   Okay.  Have you taught specifically for cartoons at |
| 08:57 | 2 | studios where their principal focus is cartoons and |
| 08:57 | 3 | animation? |
| 08:57 | 4 | A.   Yes. |
| 08:57 | 5 | Q.   Okay.  Did that include Nickelodeon? |
| 08:57 | 6 | A.   Yes. |
| 08:57 | 7 | Q.   And Cartoon Network? |
| 08:57 | 8 | A.   Yes. |
| 08:57 | 9 | Q.   Would you describe briefly your teaching experience for |
| 08:57 | 10 | Disney? |
| 08:57 | 11 | A.   First of all, it was -- while I was current with them |
| 08:57 | 12 | as -- working with the studio, I was also teaching for them, |
| 08:57 | 13 | and so I was teaching the people in the studio, developing |
| 08:57 | 14 | their skills at drawing. |
| 08:57 | 15 | Q.   Have you authored any books that you use for teaching |
| 08:57 | 16 | the human form, drawing of the human form? |
| 08:57 | 17 | A.   I think I have about six or seven books. |
| 08:57 | 18 | Q.   Does that include any textbooks? |
| 08:57 | 19 | A.   The *Vilppu Drawing Manual*.  It's used literally around |
| 08:58 | 20 | the world as a textbook in class. |
| 08:58 | 21 | Q.   Okay.  And does that particularly concern drawing of |
| 08:58 | 22 | the human form? |
| 08:58 | 23 | A.   Yes. |
| 08:58 | 24 | Q.   Do you have specific drawing manuals for various parts |
| 08:58 | 25 | of the human body? |

| 08:58 | 1  | A.   Yes. |
| 08:58 | 2  | Q.   And are those also widely used? |
| 08:58 | 3  | A.   Yes. |
| 08:58 | 4  | Q.   Do any of your teaching manuals teach the drawing of |
| 08:58 | 5  | the human anatomy? |
| 08:58 | 6  | A.   Yes. |
| 08:58 | 7  | Q.   And do you describe standards for the drawing of human |
| 08:58 | 8  | anatomy and human figures in your various manuals? |
| 08:58 | 9  | A.   Yes. |
| 08:58 | 10 | Q.   Okay.  Can you tell us some of the other schools and |
| 08:58 | 11 | universities and organizations that use your works? |
| 08:58 | 12 | A.   Uh, well, of course, UCLA.  Ringling College of Art and |
| 08:58 | 13 | Design, Savannah College of Art and Design, Columbia College |
| 08:59 | 14 | of Art and Design.  Literally all over, yeah. |
| 08:59 | 15 | Q.   Are there any museums that use your works? |
| 08:59 | 16 | A.   Yes.  The Getty Museum uses my material, the reference |
| 08:59 | 17 | material. |
| 08:59 | 18 | Q.   And who generally are the types of students that you |
| 08:59 | 19 | teach drawing and animation of the human form? |
| 08:59 | 20 | A.   Well, I get a broad range.  Everywhere from a lot of |
| 08:59 | 21 | professionals, teachers, and those wishing to get into the |
| 08:59 | 22 | industry. |
| 08:59 | 23 | Q.   And have you ever had any sculptors attending your |
| 08:59 | 24 | classes on anatomy and figure drawing? |
| 08:59 | 25 | A.   Quite a few actually, yes. |

| | | |
|---|---|---|
| 08:59 | 1 | Q.   Okay.  Can you give some examples of the type of work |
| 08:59 | 2 | that you've done when working for animation studios? |
| 08:59 | 3 | A.   Well, actually, working and doing story boards, uh, |
| 08:59 | 4 | layouts, uh, some character design, uh, teaching -- of |
| 09:00 | 5 | course, teaching in the studios, uh, taking -- doing |
| 09:00 | 6 | presentation work, uh... |
| 09:00 | 7 | Q.   Are there any movies or TV series that you've worked on |
| 09:00 | 8 | that we might have heard of? |
| 09:00 | 9 | A.   Uh, yes.  I'm trying to think -- you got me.  Tiny |
| 09:00 | 10 | Toons first. |
| 09:00 | 11 | Q.   How about the *Fox and the Hound*? |
| 09:00 | 12 | A.   Right, right.  Thank you.  I have trouble remembering |
| 09:00 | 13 | my children's names.  Okay. |
| 09:00 | 14 | Q.   Let me stop you there. |
| 09:00 | 15 | A.   *Fox and the Hound*, *The Black Caldron,* I did |
| 09:00 | 16 | presentation work for *FernGully*; and, like I say, Tiny |
| 09:00 | 17 | Toons.  I've done for independent studios.  I worked on |
| 09:00 | 18 | films for European television. |
| 09:00 | 19 | Q.   Have you ever testified as an expert in court before? |
| 09:00 | 20 | A.   No.  This is quite a new experience. |
| 09:00 | 21 | Q.   Was most of your animation work intended for younger |
| 09:01 | 22 | audiences? |
| 09:01 | 23 | A.   Yes. |
| 09:01 | 24 | Q.   Are you also a practicing artist? |
| 09:01 | 25 | A.   Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 21 of 154   Page ID #:312049

| | | |
|---|---|---|
| 09:01 | 1 | Q.   What particular aspects are there to drawing for |
| 09:01 | 2 | animation when you're trying to draw the human form for |
| 09:01 | 3 | purposes of animation?  What are the key aspects of that? |
| 09:01 | 4 | A.   Well, you have to have a very good control of the |
| 09:01 | 5 | proportions you're working with.  You need to be able to |
| 09:01 | 6 | construct a figure from the imagination.  We don't have |
| 09:01 | 7 | models standing around in studios.  So it's to be able to |
| 09:01 | 8 | bring your ideas from imagination out to the real world. |
| 09:01 | 9 | MS. HURST:  Your Honor, we offer Mr. Vilppu as an |
| 09:01 | 10 | expert in the drawing of the human form. |
| 09:01 | 11 | THE COURT:  You may proceed. |
| 09:01 | 12 | MS. HURST:  Thank you, Your Honor. |
| 09:01 | 13 | BY MS. HURST: |
| 09:01 | 14 | Q.   By the way, Mr. Vilppu, have you ever sculpted a doll? |
| 09:01 | 15 | A.   Actually, yes. |
| 09:01 | 16 | Q.   And what was that? |
| 09:02 | 17 | A.   Unfortunately, it was a contract for taking and making |
| 09:02 | 18 | a doll for Marilyn Monroe with the skirts flying up. |
| 09:02 | 19 | Unfortunately, my -- they didn't have the rights to do it. |
| 09:02 | 20 | Q.   Uh-oh! |
| 09:02 | 21 | A.   I also sculpted a thing for Rhythm & Hues, where we |
| 09:02 | 22 | were working on a project to take in and make a DVD for |
| 09:02 | 23 | drawing the figure, and I did quite a series of preliminary |
| 09:02 | 24 | drawings, uh, for the sculptor. |
| 09:02 | 25 | Q.   So you've actually made drawings for the use by a |

| | | |
|---|---|---|
| 09:02 | 1 | sculptor to create a doll; is that right? |
| 09:02 | 2 | A.   Correct. |
| 09:02 | 3 | Q.   Now, what was your assignment in connection with this |
| 09:02 | 4 | matter? |
| 09:02 | 5 | A.   I was asked to compare drawings by Carter Bryant with |
| 09:03 | 6 | various dolls and sculptures. |
| 09:03 | 7 | Q.   And in connection with that, what did you do to prepare |
| 09:03 | 8 | yourself? |
| 09:03 | 9 | A.   I looked at a lot of drawings.  I looked at the |
| 09:03 | 10 | sculptures.  I've looked at dolls quite a bit. |
| 09:03 | 11 | Q.   And did you read deposition testimony, as well? |
| 09:03 | 12 | A.   Yes, I did. |
| 09:03 | 13 | Q.   And did you review the reports of other experts that |
| 09:03 | 14 | have been prepared by Mattel's experts? |
| 09:03 | 15 | A.   Yes. |
| 09:03 | 16 | Q.   And you did also refer to some of your own books and |
| 09:03 | 17 | manuals in order to assist you in formulating your opinions? |
| 09:03 | 18 | A.   Yes, I did. |
| 09:03 | 19 | Q.   And did you prepare a written report in connection with |
| 09:03 | 20 | this matter? |
| 09:03 | 21 | A.   Yes, I did. |
| 09:03 | 22 | Q.   And you were first retained back in 2008; is that |
| 09:03 | 23 | right? |
| 09:03 | 24 | A.   Correct. |
| 09:03 | 25 | Q.   Okay.  And you bill -- you've billed MGA at the rate of |

| | | |
|---|---|---|
| 09:03 | 1 | a hundred dollars an hour; is that correct? |
| 09:03 | 2 | A.   Correct.  Well, for a minimum of six hours per day. |
| 09:03 | 3 | Q.   And what's the total amount that you've billed MGA in |
| 09:03 | 4 | connection with this matter? |
| 09:03 | 5 | A.   Uh, up to today, which hasn't been billed yet, the |
| 09:04 | 6 | total will be around $1800 -- I mean, excuse me, including |
| 09:04 | 7 | the previous one, $3800. |
| 09:04 | 8 | Q.   Did you mean 38,000? |
| 09:04 | 9 | A.   Excuse me, yes, 38,000. |
| 09:04 | 10 | Q.   That would really be a bargain. |
| 09:04 | 11 | A.   Sorry. |
| 09:04 | 12 | Q.   All right.  Based on your review of all of these |
| 09:04 | 13 | materials and your expertise in drawing the human form and |
| 09:04 | 14 | including drawing the human form for animation, did you |
| 09:04 | 15 | reach any conclusions based on your comparisons of the |
| 09:04 | 16 | drawings and the sculpts and your comparisons of the |
| 09:04 | 17 | drawings and the dolls? |
| 09:04 | 18 | A.   Yes, I did. |
| 09:04 | 19 | Q.   All right.  Let's start with your comparison of the |
| 09:04 | 20 | drawings to the dolls, those first-generation four dolls and |
| 09:04 | 21 | Carter Bryant's drawings. |
| 09:04 | 22 | Would you say that those dolls are a faithful execution |
| 09:05 | 23 | of those drawings? |
| 09:05 | 24 | A.   No. |
| 09:05 | 25 | Q.   Why not? |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 24 of 154   Page ID #:312052
CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

24

| | | |
|---|---|---|
| 09:05 | 1 | A.   They basically don't follow through the same idea. |
| 09:05 | 2 | Q.   And why do you say that? |
| 09:05 | 3 | A.   Uh, they're like different people. |
| 09:05 | 4 | Q.   And is it -- in your work, have you from time to time |
| 09:05 | 5 | had the responsibility for evaluating whether someone has |
| 09:05 | 6 | carried out an assignment properly in that fashion? |
| 09:05 | 7 | A.   Uh, yes. |
| 09:05 | 8 | Q.   And is there terminology that you use in such an |
| 09:05 | 9 | evaluation process? |
| 09:05 | 10 | A.   Yes. |
| 09:05 | 11 | Q.   And what is that? |
| 09:05 | 12 | A.   Well, generally, if the final product doesn't match the |
| 09:05 | 13 | idea, it's -- usually, we refer to it as being out of |
| 09:05 | 14 | model -- off model.  Excuse me. |
| 09:05 | 15 | Q.   And did you reach any conclusion about whether the |
| 09:05 | 16 | first generation dolls are off model with respect to Carter |
| 09:05 | 17 | Bryant's drawings, as you used that term? |
| 09:06 | 18 | A.   Uh, yes, I did. |
| 09:06 | 19 | Q.   And what is your conclusion in that regard? |
| 09:06 | 20 | A.   They were off model. |
| 09:06 | 21 | Q.   Ms. McComb testified that in her opinion the dolls are |
| 09:06 | 22 | a direct translation of the drawings.  Do you agree with |
| 09:06 | 23 | that? |
| 09:06 | 24 | A.   No. |
| 09:06 | 25 | Q.   And is that for the same reason, because you view them |

| | | |
|---|---|---|
| 09:06 | 1 | as being off model? |
| 09:06 | 2 | A.   Correct. |
| 09:06 | 3 | Q.   Now, I want to go into talking with you step by step |
| 09:06 | 4 | what are the principles of drawing and animation that you've |
| 09:06 | 5 | relied on in forming your opinions.  All right? |
| 09:06 | 6 | A.   Correct.  Okay. |
| 09:06 | 7 | Q.   In reaching your opinion that you've just described, |
| 09:06 | 8 | did you look at both the similarities and the differences |
| 09:06 | 9 | between the drawings and the dolls? |
| 09:06 | 10 | A.   Yes, I looked at both. |
| 09:06 | 11 | Q.   All right.  And did you find similarities? |
| 09:06 | 12 | A.   Yes. |
| 09:06 | 13 | Q.   Okay.  And what types of similarities did you find? |
| 09:07 | 14 | A.   Same kind of similarities that we –– everybody in this |
| 09:07 | 15 | room is basically the same, except nobody would confuse me |
| 09:07 | 16 | with you even if we are the same Nordic type. |
| 09:07 | 17 | Q.   So what you're saying is that you saw similarities |
| 09:07 | 18 | based on standard human elements? |
| 09:07 | 19 | A.   Yes. |
| 09:07 | 20 | Q.   Okay.  And so what types of similarities did you see? |
| 09:07 | 21 | A.   Well, like we all have one head, hopefully.  We've got |
| 09:07 | 22 | two arms, eyes, nose, mouth.  We all tend to be fairly |
| 09:07 | 23 | normal, as far as I can tell. |
| 09:07 | 24 | Q.   And did you see that there were standard proportions of |
| 09:07 | 25 | some type used in both the drawings and in the dolls in the |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 26 of 154   Page ID #:312054
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

26

| | | |
|---|---|---|
| 09:07 | 1 | sculpts? |
| 09:07 | 2 | A.   Yes, I did. |
| 09:07 | 3 | Q.   And have you prepared some exhibits that will help you |
| 09:07 | 4 | illustrate the principles that you're gonna be talking about |
| 09:07 | 5 | here today? |
| 09:07 | 6 | A.   Yes, I have. |
| 09:07 | 7 | Q.   Okay.  And would it help you in testifying to show |
| 09:08 | 8 | these exhibits to the jury to explain what you're talking |
| 09:08 | 9 | about? |
| 09:08 | 10 | A.   Yes, it would. |
| 09:08 | 11 | Q.   All right.  Let me ask you to look at Exhibit 27490. |
| 09:08 | 12 | *(Document provided to the witness.)* |
| 09:08 | 13 | THE WITNESS:  Okay. |
| 09:08 | 14 | BY MS. HURST: |
| 09:08 | 15 | Q.   And what is that? |
| 09:08 | 16 | A.   This is a series of -- the ones on the top are drawings |
| 09:08 | 17 | from my own drawing manual.  The ones at the bottom were |
| 09:08 | 18 | from *Atlas of Human Anatomy*, which is a standard text. |
| 09:08 | 19 | Q.   And does this page illustrate standard proportions in |
| 09:08 | 20 | drawing the human figure? |
| 09:08 | 21 | A.   Yes, they do. |
| 09:08 | 22 | MS. HURST:  And, Your Honor, may I request |
| 09:08 | 23 | permission to show Exhibit 27490 to the jury? |
| 09:08 | 24 | THE COURT:  Do I have a copy of these, also, |
| 09:08 | 25 | Counsel? |

| | | |
|---|---|---|
| 09:08 | 1 | MS. HURST:  It should be in your Vilppu binder, |
| 09:08 | 2 | Your Honor, but we can hand one up as well. |
| 09:08 | 3 | THE COURT:  All right.  You can put that up on the |
| 09:08 | 4 | screen for a moment. |
| 09:09 | 5 | *(Document displayed.)* |
| 09:09 | 6 | BY MS. HURST: |
| 09:09 | 7 | Q.  All right.  Now -- |
| 09:09 | 8 | MS. HURST:  Did we give Mr. Vilppu a laser |
| 09:09 | 9 | pointer? |
| 09:09 | 10 | BY MS. HURST: |
| 09:09 | 11 | Q.  Do you have a laser pointer up there, Mr. Vilpu? |
| 09:09 | 12 | A.  Yes. |
| 09:09 | 13 | Q.  You're going to have to talk loudly when you're facing |
| 09:09 | 14 | away from the microphone.  Okay? |
| 09:09 | 15 | Can you explain to us the significance of these |
| 09:09 | 16 | diagrams in terms of standard body proportions? |
| 09:09 | 17 | A.  I'm going to point to the one over closest to the jury |
| 09:09 | 18 | here, because this is a little squished. |
| 09:09 | 19 | What we use in standard proportions -- this is a |
| 09:09 | 20 | basic -- the head size so that a normal figure is roughly -- |
| 09:09 | 21 | this is an artistic convention of eight heads, which a |
| 09:09 | 22 | normal figure is about is seven and a half to seven and |
| 09:09 | 23 | three-quarters high. |
| 09:09 | 24 | On the bottom, you see these are basic proportions of |
| 09:09 | 25 | children.  You see that a newborn is roughly four heads |

| | | |
|---|---|---|
| 09:10 | 1 | high, very short legs, and as we start getting older, a |
| 09:10 | 2 | two-year-old will start becoming maybe four, five heads |
| 09:10 | 3 | high. |
| 09:10 | 4 | These are standard proportions that we all have. |
| 09:10 | 5 | Doesn't make any difference if you're six-five, four-five; |
| 09:10 | 6 | we're all within the same range. |
| 09:10 | 7 | Q.   All right.  And so the number of head lengths in the |
| 09:10 | 8 | standard body proportion varies by age; is that correct? |
| 09:10 | 9 | A.   Correct. |
| 09:10 | 10 | Q.   And are there also standard proportions for the human |
| 09:10 | 11 | head itself? |
| 09:10 | 12 | A.   Yes, there are. |
| 09:10 | 13 | Q.   Okay.  Actually, before we go off of this one, is |
| 09:10 | 14 | there -- in animation are there ways that people vary the |
| 09:10 | 15 | head height based -- in order to try to convey information? |
| 09:10 | 16 | A.   Well, using of the head size is a means of |
| 09:10 | 17 | communicating certain feelings.  And that if we take and |
| 09:11 | 18 | reduce the head size in a character or animation -- uh, if |
| 09:11 | 19 | we make the head size larger, it goes along with being -- |
| 09:11 | 20 | with a child.  So the closer we get something in proportion |
| 09:11 | 21 | to a child, the more cute, the more appealing it is. |
| 09:11 | 22 | So we would use -- it would vary from -- anywhere from |
| 09:11 | 23 | five to three heads or even down to one head if you look at |
| 09:11 | 24 | Saturday morning cartoons. |
| 09:11 | 25 | Q.   So it's a standard technique to make the head larger in |

| | | |
|---|---|---|
| 09:11 | 1 | proportion to the overall body in order to convey a feel of |
| 09:11 | 2 | youthfulness or cuteness? |
| 09:11 | 3 | A.   Correct. |
| 09:11 | 4 | Q.   And what about the other way?  Is there also a standard |
| 09:11 | 5 | for making the head smaller? |
| 09:11 | 6 | A.   Well, I think we're all aware of fashion drawings where |
| 09:11 | 7 | you take and stretch it out and the heads are very small. |
| 09:11 | 8 | Michelangelo used smaller heads to create a sense of power. |
| 09:11 | 9 | It's a design element. |
| 09:11 | 10 | Q.   Okay.  And you mentioned there were also standard |
| 09:11 | 11 | proportions for the human head, right? |
| 09:12 | 12 | A.   Correct. |
| 09:12 | 13 | Q.   Let me ask you to look at Exhibit 27491. |
| 09:12 | 14 | (Document provided to the witness.) |
| 09:12 | 15 | THE WITNESS:  Okay. |
| 09:12 | 16 | BY MS. HURST: |
| 09:12 | 17 | Q.   And do you recognize that? |
| 09:12 | 18 | A.   Yes, I do. |
| 09:12 | 19 | Q.   Is that a figure from your manuals on standard |
| 09:12 | 20 | proportion of the human head? |
| 09:12 | 21 | A.   It's part of my drawing manual on head drawing. |
| 09:12 | 22 | MS. HURST:  Your Honor, I request permission to |
| 09:12 | 23 | show that to the jury. |
| 09:12 | 24 | THE COURT:  I don't see the relevance, Counsel. |
| 09:12 | 25 | MS. HURST:  Your Honor, uh -- |

| | | |
|---|---|---|
| 09:12 | 1 | BY MS. HURST: |
| 09:12 | 2 | Q.   Mr. Vilppu, does this drawing explain what are the |
| 09:12 | 3 | standard sizes and proportions for drawing of the human |
| 09:12 | 4 | head? |
| 09:12 | 5 | THE COURT:  How does that relate to a doll? |
| 09:12 | 6 | MS. HURST:  It relates to Carter Bryant's drawings |
| 09:12 | 7 | and the similarities, Your Honor, between the drawings and |
| 09:12 | 8 | the dolls being a feature of standard proportions. |
| 09:12 | 9 | THE COURT:  I'm briefly going to allow this.  I'm |
| 09:12 | 10 | putting you on warning.  I think this is unduly consumptive |
| 09:12 | 11 | of time. |
| 09:12 | 12 | MS. HURST:  We'll move along quickly. |
| 09:12 | 13 | BY MS. HURST: |
| 09:12 | 14 | Q.   And does this show the standard proportions of the |
| 09:13 | 15 | human head? |
| 09:13 | 16 | *(Document displayed.)* |
| 09:13 | 17 | THE WITNESS:  Yes, it does.  You'll notice that |
| 09:13 | 18 | the eyes are exactly in the center -- this is for everybody. |
| 09:13 | 19 | The distance from the -- the brow moves up slightly, but the |
| 09:13 | 20 | distance from the brow to the chin, the halfway point is the |
| 09:13 | 21 | bottom of the nose.  The halfway point from the nose to the |
| 09:13 | 22 | chin is the bottom of the lower lip.  The width of the head |
| 09:13 | 23 | will generally be five eyes wide.  The halfway point on the |
| 09:13 | 24 | figure is -- just in the head and profile is just to the |
| 09:13 | 25 | front of the ear, which is also our balancing point. |

| | | |
|---|---|---|
| 09:13 | 1 | The face, generally, which most people look at is |
| 09:13 | 2 | broken down into thirds.  But that's not the size of the |
| 09:13 | 3 | head.  The head is actually the top of the head, which makes |
| 09:13 | 4 | us see where the eyes are actually in the center between the |
| 09:13 | 5 | nose and the chin. |
| 09:14 | 6 | BY MS. HURST: |
| 09:14 | 7 | Q.   All right.  Let me stop you there.  Thank you. |
| 09:14 | 8 | Do those standard proportions vary for babies or |
| 09:14 | 9 | children? |
| 09:14 | 10 | A.   Yes, they do. |
| 09:14 | 11 | Q.   And what's the variation? |
| 09:14 | 12 | A.   Well, as a child -- when the child is born, that we |
| 09:14 | 13 | find that the eyes are only about one-third.  And 'cause |
| 09:14 | 14 | that's because there's basically no mouth, no chin, no |
| 09:14 | 15 | teeth.  And as we grow, our chin continues to grow, as our |
| 09:14 | 16 | nose does, and so that the eyes, generally, move up.  And so |
| 09:14 | 17 | that if you want to create a feeling of cuteness, you |
| 09:14 | 18 | usually make the eyes little lower, top of the head a little |
| 09:14 | 19 | larger.  The converse works if you want to make something -- |
| 09:14 | 20 | MR. QUINN:  Your Honor, objection.  Narrative. |
| 09:14 | 21 | THE COURT:  Well, we've got the cuteness with the |
| 09:14 | 22 | eyes, Counsel.  Your next question. |
| 09:14 | 23 | MS. HURST:  Thank you, Your Honor. |
| 09:14 | 24 | BY MS. HURST: |
| 09:14 | 25 | Q.   So if everybody has these same standard proportions, |

| | | |
|---|---|---|
| 09:14 | 1 | Mr. Vilppu, then how to do we tell each other apart? |
| 09:15 | 2 | A.   Correct.  We tell each other apart because of the |
| 09:15 | 3 | subtlety of the differences. |
| 09:15 | 4 | Q.   Okay. |
| 09:15 | 5 | A.   Everybody -- literally, everybody in this room, if we |
| 09:15 | 6 | measure, eyes are in the middle. |
| 09:15 | 7 | Q.   Okay.  And do you have an illustration designed to show |
| 09:15 | 8 | how these subtle differences enabled people to tell each |
| 09:15 | 9 | other apart? |
| 09:15 | 10 | A.   Yes, I do. |
| 09:15 | 11 | Q.   Would you look at Exhibit 27492, please. |
| 09:15 | 12 |                    (Document provided to the witness.) |
| 09:15 | 13 | BY MS. HURST: |
| 09:15 | 14 | Q.   And is that a figure that you use to teach about how |
| 09:15 | 15 | the standard proportions and the human head can, uh, show |
| 09:15 | 16 | different people, using only subtle differences? |
| 09:15 | 17 | A.   Yes, I do. |
| 09:15 | 18 |         MS. HURST:  All right.  Your Honor, request |
| 09:15 | 19 | permission to publish 27492. |
| 09:15 | 20 |          MR. QUINN:  Objection.  Relevance. |
| 09:15 | 21 |          THE COURT:  Sustained. |
| 09:15 | 22 | BY MS. HURST: |
| 09:15 | 23 | Q.   Mr. Vilppu, is it part of -- one of the bases for your |
| 09:15 | 24 | opinion that these subtle differences that are significant |
| 09:16 | 25 | in evaluating the comparisons between the Carter Bryant |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 33 of 154   Page ID #:312061
CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

33

| | | |
|---|---|---|
| 09:16 | 1 | drawings and the sculptures in this case? |
| 09:16 | 2 | A.   Yes. |
| 09:16 | 3 | Q.   And does this picture help you illustrate and explain |
| 09:16 | 4 | the subtle differences between the drawings and the sculpts? |
| 09:16 | 5 | A.   Yes, it does. |
| 09:16 | 6 | MS. HURST:  Your Honor, request permission to |
| 09:16 | 7 | publish. |
| 09:16 | 8 | MR. QUINN:  Same objection. |
| 09:16 | 9 | THE COURT:  Sustained. |
| 09:16 | 10 | BY MS. HURST: |
| 09:16 | 11 | Q.   You've been talking about the standard anatomical |
| 09:16 | 12 | proportions for human figure drawing.  Do those also apply |
| 09:16 | 13 | in animation? |
| 09:16 | 14 | A.   Uh -- |
| 09:16 | 15 | MR. QUINN:  Objection.  Relevance. |
| 09:16 | 16 | THE COURT:  Overruled. |
| 09:16 | 17 | You can answer that question. |
| 09:16 | 18 | Sir, you can answer that question. |
| 09:17 | 19 | THE WITNESS:  Would you repeat the question again, |
| 09:17 | 20 | please. |
| 09:17 | 21 | BY MS. HURST: |
| 09:17 | 22 | Q.   Sure.  How, if at all, did these standard proportions |
| 09:17 | 23 | that you've been talking about apply in animation? |
| 09:17 | 24 | A.   Uh, it depends on how you -- what kind of character you |
| 09:17 | 25 | want to make.  But for creating -- creating a -- "cute" -- |

DEBBIE GALE, U.S. COURT REPORTER

| 09:17 | 1 | we take and move the eyes down, make more childlike.  And as |
|---|---|---|
| 09:17 | 2 | I mentioned a little bit about, the converse would be true. |
| 09:17 | 3 | If we wanted to make somebody look mean, we move the eyes |
| 09:17 | 4 | up, drop the jaw down.  They also take in the making the |
| 09:17 | 5 | eyes a little bit larger in a child. |
| 09:17 | 6 | Q.   Are there also techniques for enlarging body parts? |
| 09:17 | 7 | A.   Yes. |
| 09:17 | 8 | Q.   Okay.  And is foreshortening one of those techniques? |
| 09:17 | 9 | A.   Well, foreshortening is a view.  But the technique in |
| 09:18 | 10 | making, like, big feet or big hands or shrinking body parts, |
| 09:18 | 11 | that's common design elements that you use all the time. |
| 09:18 | 12 | Q.   And what -- what is the purpose for using those common |
| 09:18 | 13 | design elements? |
| 09:18 | 14 | A.   Well, it creates a unique look.  It takes and defines |
| 09:18 | 15 | the character.  But there -- these are universal tools that |
| 09:18 | 16 | we use. |
| 09:18 | 17 | Q.   Are you familiar with the term -- use of the term |
| 09:18 | 18 | "inspiration" in connection with artists? |
| 09:18 | 19 | A.   Yes, I am. |
| 09:18 | 20 | Q.   Okay.  And what does the word "inspiration" -- how is |
| 09:18 | 21 | the word "inspiration" generally used by artists? |
| 09:18 | 22 | MR. QUINN:  Objection, Your Honor.  Outside the |
| 09:18 | 23 | scope of his opinion. |
| 09:18 | 24 | THE COURT:  No. |
| 09:18 | 25 | You can answer that question, sir. |

| | | |
|---|---|---|
| 09:18 | 1 | THE WITNESS:  We –– as an artist, we draw our |
| 09:18 | 2 | inspiration or ideas from literally everything.  All the |
| 09:19 | 3 | world that's around us, looking at things.  Artists –– the |
| 09:19 | 4 | standard cliché is art is based on art.  So we're constantly |
| 09:19 | 5 | bringing in elements that have gone on in the past.  It's |
| 09:19 | 6 | tradition. |
| 09:19 | 7 | BY MS. HURST: |
| 09:19 | 8 | Q.   All right.  I'm going to ask you to turn to an example |
| 09:19 | 9 | of one of Carter Bryant's drawings that you looked at. |
| 09:19 | 10 | MS. HURST:  Would you show the witness |
| 09:19 | 11 | Exhibit 302, page 7, please. |
| 09:19 | 12 | *(Document provided to the witness.)* |
| 09:19 | 13 | BY MS. HURST: |
| 09:19 | 14 | Q.   Do you recognize this as one of the drawings you that |
| 09:19 | 15 | reviewed? |
| 09:19 | 16 | *(Document displayed.)* |
| 09:19 | 17 | THE WITNESS:  Yes. |
| 09:19 | 18 | BY MS. HURST: |
| 09:19 | 19 | Q.   And in looking at this, are there aspects of it that |
| 09:19 | 20 | you would identify as standard or commonly known to artists |
| 09:20 | 21 | by, you know, September of 2000 when this was shown to MGA? |
| 09:20 | 22 | A.   Uh, yes. |
| 09:20 | 23 | Q.   What are those? |
| 09:20 | 24 | A.   Okay.  Should I point them out here? |
| 09:20 | 25 | Q.   Sure. |

09:20   1   A.   First of all, the size of the head, which is standard

09:20   2   cartoon type of thing. The basic distortions of the body

09:20   3   are normal for cartooning. Done all the time. Big feet,

09:20   4   there's nothing unusual about that. The pose is a standard

09:20   5   kind of pose that we see. Again, these are all very, very

09:20   6   normal type things.

09:20   7   Q.   And is that -- is there a particular term for that

09:20   8   pose?

09:20   9   A.   Well, I've heard people talking, but it's sort of a --

09:20   10   traditional Renaissance art, we would refer to it as a

09:21   11   variation on contrapposto.

09:21   12   Q.   What does contrapposto mean?

09:21   13   A.   Means literally opposite. And so what you find is the

09:21   14   knees going one way and the hips going one way. The

09:21   15   shoulders would normally go another way, but it's just a

09:21   16   play of opposites.

09:21   17   Q.   What about the arms out, is there anything unusual

09:21   18   about that?

09:21   19   A.   No. I look at these drawings as fashion drawings for

09:21   20   dolls. So you -- he used it like a mannequin to put clothes

09:21   21   on.

09:21   22   Q.   What do you mean by mannequin?

09:21   23   A.   Well, mannequin is, in drawing, something like this,

09:21   24   you would have like a cutout for children's -- making dolls.

09:21   25   You would have a cutout. Then you take and cut the clothes

09:21   1   out and put 'em on top again and again and again.  It's all
09:21   2   different types of clothes.  You don't redraw the mannequin.
09:21   3   You take and put paper over it.  You add new clothes.
09:21   4   There's no point to redrawing it.
09:22   5   Q.   And when you reviewed all of Carter Bryant's drawings
09:22   6   in connection with this matter, did you see any drawings
09:22   7   where it appeared that he was using it as a mannequin in the
09:22   8   fashion that you've just described?
09:22   9   A.   I think almost all of his drawings.
09:22   10   Q.   And have you had any training in fashion drawing?
09:22   11   A.   Yes, I have.
09:22   12   Q.   And based on that training, would you say that Carter
09:22   13   Bryant's drawings are principally fashion drawings?
09:22   14   A.   For dolls, yes.
09:22   15   Q.   Not for humans?
09:22   16   A.   Yes.
09:22   17   Q.   Okay.  Now, in looking at Carter Bryant's drawings --
09:22   18   and let's take this one right here as an example -- in your
09:22   19   view, is there enough information in that drawing to make a
09:22   20   three-dimensional doll?
09:22   21   A.   No.
09:22   22   Q.   And why do you say that?
09:22   23   A.   There's very little information.
09:22   24   Q.   And would this be sufficient for you to make an
09:22   25   animation out of?

| 09:22 | 1 | MR. QUINN: Objection. Relevance. |
| 09:23 | 2 | THE WITNESS: I'm sorry? |
| 09:23 | 3 | THE COURT: As far as animation is concerned, I |
| 09:23 | 4 | thought he was here for the dimensions. |
| 09:23 | 5 | MS. HURST: All right. That's fine. |
| 09:23 | 6 | THE COURT: From two-dimensional to |
| 09:23 | 7 | three-dimensional, et cetera. |
| 09:23 | 8 | Sustained. |
| 09:23 | 9 | MS. HURST: I'll restate. |
| 09:23 | 10 | THE COURT: All right. |
| 09:23 | 11 | BY MS. HURST: |
| 09:23 | 12 | Q. In animation are you trying to take a two-dimensional |
| 09:23 | 13 | object and turn it into three dimensions? |
| 09:23 | 14 | A. Correct. |
| 09:23 | 15 | Q. And that's the same kind of thing that MGA was trying |
| 09:23 | 16 | to do with these pictures in turning them into dolls, right? |
| 09:23 | 17 | A. Correct. |
| 09:23 | 18 | Q. And having worked -- well, strike that. |
| 09:23 | 19 | So what kind of information is missing from this |
| 09:23 | 20 | picture that you would expect to see for something that was |
| 09:23 | 21 | designed to create a three-dimensional depiction? |
| 09:23 | 22 | A. In developing characters in animation, we do |
| 09:23 | 23 | turnarounds, which are drawings as part of a model sheet |
| 09:23 | 24 | that we use to take and show multiple aspects of the figure |
| 09:23 | 25 | turning around: Multiple views; front side, back, as if it |

DEBBIE GALE, U.S. COURT REPORTER

| 09:24 | 1 | was a real object that you could turn. |
| 09:24 | 2 | Q.   And that would be the standard set of drawings that you |
| 09:24 | 3 | would see when you're trying to create a three-dimensional |
| 09:24 | 4 | object? |
| 09:24 | 5 | A.   Correct. |
| 09:24 | 6 | Q.   And in all of your review of all of Carter Bryant's |
| 09:24 | 7 | drawings, did you see anything with that kind of information |
| 09:24 | 8 | in it? |
| 09:24 | 9 | A.   No. |
| 09:24 | 10 | Q.   Have you -- have you brought an example of a model |
| 09:24 | 11 | sheet, as you use the term, to show the types of |
| 09:24 | 12 | three-dimensional information that you would expect to see? |
| 09:24 | 13 | A.   Yes, I have. |
| 09:24 | 14 | Q.   Would you take a look at Exhibit 18817, please. |
| 09:24 | 15 | *(Document provided to the witness.)* |
| 09:25 | 16 | MR. QUINN:  Um, Your Honor, we object to this.  It |
| 09:25 | 17 | was not included in his report.  It was not available at his |
| 09:25 | 18 | deposition. |
| 09:25 | 19 | THE COURT:  Well, I've seen this before a number |
| 09:25 | 20 | of times during the evening sessions. |
| 09:25 | 21 | MS. HURST:  It's been provided in the binders, |
| 09:25 | 22 | Your Honor. |
| 09:25 | 23 | THE COURT:  Yeah.  Overruled. |
| 09:25 | 24 | BY MS. HURST: |
| 09:25 | 25 | Q.   So -- |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:25 | 1 | (Document displayed.) |
| 09:25 | 2 | BY MS. HURST: |
| 09:25 | 3 | Q.   Mr. Vilppu, would you explain, please, with reference |
| 09:25 | 4 | to these drawings, the type of three-dimensional information |
| 09:25 | 5 | that you're talking about? |
| 09:25 | 6 | A.   There was probably more, but this, you have a front |
| 09:25 | 7 | view and you have a profile view.  Now, these are actual |
| 09:25 | 8 | drawings for a doll. |
| 09:25 | 9 | Q.   And are there also figures used to show the relative |
| 09:25 | 10 | proportions of the various body parts? |
| 09:25 | 11 | A.   Yes.  You can actually -- you can see the markings on |
| 09:26 | 12 | the side here.  These are actually marked off head lengths, |
| 09:26 | 13 | where the knees are -- carry through the whole idea in using |
| 09:26 | 14 | profiles, front view, back views.  There's quite a bit of |
| 09:26 | 15 | information there given in the drawing.  So actually, |
| 09:26 | 16 | these -- it's my understanding that these were drawings |
| 09:26 | 17 | actually for a sculptor to make -- make the doll. |
| 09:26 | 18 | Q.   All right.  And have you also -- have you seen anything |
| 09:26 | 19 | like this in any of Carter Bryant's drawings that you |
| 09:26 | 20 | reviewed? |
| 09:26 | 21 | A.   No. |
| 09:26 | 22 | Q.   Okay.  Have you also taken one of Carter Bryant's |
| 09:26 | 23 | drawings and prepared a three-dimensional rendering of it as |
| 09:26 | 24 | faithfully as possible to try to illustrate this principle |
| 09:26 | 25 | of the missing information? |

| | | |
|---|---|---|
| 09:26 | 1 | A.   Yes, I have. |
| 09:26 | 2 | Q.   All right.  Would you please take a look at |
| 09:26 | 3 | Exhibit 36630. |
| 09:26 | 4 | *(Document provided to the witness.)* |
| 09:27 | 5 | BY MS. HURST: |
| 09:27 | 6 | Q.   And does that include one of Carter Bryant's drawings? |
| 09:27 | 7 | A.   Yes, it does. |
| 09:27 | 8 | Q.   And two of the head sculpts? |
| 09:27 | 9 | A.   Yes. |
| 09:27 | 10 | Q.   And a drawing that you've made? |
| 09:27 | 11 | A.   Correct. |
| 09:27 | 12 | MS. HURST:  Your Honor, I request permission to |
| 09:27 | 13 | show. |
| 09:27 | 14 | THE COURT:  You may display it. |
| 09:27 | 15 | MS. HURST:  Thank you. |
| 09:27 | 16 | *(Document displayed.)* |
| 09:27 | 17 | BY MS. HURST: |
| 09:27 | 18 | Q.   All right.  You're looking at Exhibit 36630; is that |
| 09:27 | 19 | correct? |
| 09:27 | 20 | A.   Correct. |
| 09:27 | 21 | Q.   And that is Mr. Bryant's head drawing on the left, |
| 09:27 | 22 | right? |
| 09:27 | 23 | A.   Yes. |
| 09:27 | 24 | Q.   And then the second column from the left, those are |
| 09:27 | 25 | three drawings that you made, correct? |

| | | |
|---|---|---|
| 09:27 | 1 | A.   Correct. |
| 09:27 | 2 | Q.   And you're -- in making those, you did your absolute |
| 09:27 | 3 | best to try to make it identical to what was in Carter |
| 09:27 | 4 | Bryant's drawings; is that right? |
| 09:27 | 5 | A.   Uh, yes. |
| 09:27 | 6 | Q.   So could you describe for us all of the information |
| 09:28 | 7 | that you had to add in order to take that drawing and turn |
| 09:28 | 8 | it into a three-dimensional object? |
| 09:28 | 9 | A.   Well, Carter Bryant's drawing has no -- literally no |
| 09:28 | 10 | information to give you a sense of what the roundness of the |
| 09:28 | 11 | figure is -- the head. |
| 09:28 | 12 | So what I did in here is I created a light source and |
| 09:28 | 13 | pushed tone around the side.  I took and created the shallow |
| 09:28 | 14 | openings for the eyes.  I brought out the nose.  I rendered |
| 09:28 | 15 | the lips.  I added tones around.  I did my best not to |
| 09:28 | 16 | change the basic shape of what he already had. |
| 09:28 | 17 | Q.   All right.  And did you show it from different angles? |
| 09:28 | 18 | A.   I'm sorry? |
| 09:28 | 19 | Q.   Did you also show that from different angles? |
| 09:28 | 20 | A.   Yes.  So this is, uh, comparing the same view.  Then I |
| 09:28 | 21 | turned it mentally to profile, and then I did a |
| 09:29 | 22 | three-quarter back view. |
| 09:29 | 23 | Q.   And with respect to the second and third drawings, you |
| 09:29 | 24 | had to entirely imagine it; is that right? |
| 09:29 | 25 | A.   Correct.  I did not use the sculpts as a starting |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 43 of 154   Page ID #:312071
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

43

| | | |
|---|---|---|
| 09:29 | 1 | point.  I used his drawing. |
| 09:29 | 2 | Q.   All right.  And did you see anything in Carter Bryant's |
| 09:29 | 3 | drawings that enabled -- that provided that type of |
| 09:29 | 4 | information that you've supplied there? |
| 09:29 | 5 | A.   No. |
| 09:29 | 6 | Q.   Why don't we stay with this.  And go right into your |
| 09:29 | 7 | comparisons of the sculpts here. |
| 09:29 | 8 | MS. HURST:  And, Mr. Rorie, could we give the |
| 09:29 | 9 | witness Exhibit 1136, the gray sculpt, and Exhibit 1733, the |
| 09:30 | 10 | final production sculpt. |
| 09:30 | 11 | *(Exhibits provided to the witness.)* |
| 09:30 | 12 | BY MS. HURST: |
| 09:30 | 13 | Q.   Got 'em? |
| 09:30 | 14 | A.   I have them. |
| 09:30 | 15 | Q.   And have you had a series of photographs of these |
| 09:30 | 16 | prepared to make it easier for the jury to see while you're |
| 09:30 | 17 | talking about the two sculpts? |
| 09:30 | 18 | A.   Yes, I have. |
| 09:30 | 19 | Q.   Would you look at Exhibit 35826, please. |
| 09:30 | 20 | *(Document provided to the witness.)* |
| 09:30 | 21 | BY MS. HURST: |
| 09:30 | 22 | Q.   And is that the series of photographs? |
| 09:30 | 23 | A.   Correct. |
| 09:30 | 24 | MS. HURST:  All right.  May I publish 35826, |
| 09:30 | 25 | Your Honor? |

| | | |
|---|---|---|
| 09:30 | 1 | THE COURT:  You may. |
| 09:30 | 2 | *(Document displayed.)* |
| 09:30 | 3 | BY MS. HURST: |
| 09:30 | 4 | Q.   All right.  Is this 35826-2 that we see here on the |
| 09:30 | 5 | screen? |
| 09:30 | 6 | A.   Uh, dash 2. |
| 09:30 | 7 | Q.   Now, in your evaluation of these two sculpts, what is |
| 09:30 | 8 | your conclusion about them? |
| 09:31 | 9 | A.   Well, I think we can see if -- if we look at these, |
| 09:31 | 10 | that there's a big difference in size, loss of arms also. |
| 09:31 | 11 | But they were done in a totally different size.  Regardless |
| 09:31 | 12 | of the color, we see that the dark figure has a rather fluid |
| 09:31 | 13 | flowing gesture to it, which is totally not there in the |
| 09:31 | 14 | doll itself.  The shapes of the legs are quite different. |
| 09:31 | 15 | And even the feeling for the age is different.  This sculpt |
| 09:31 | 16 | is much -- much older feeling. |
| 09:31 | 17 | Q.   When you say "this sculpt" has a much older feeling, |
| 09:31 | 18 | which one are you referring to, for the record? |
| 09:31 | 19 | A.   The sculpt -- the black -- I'm sorry.  Here, you can |
| 09:31 | 20 | see that this is -- there's a flow to the figure.  There's a |
| 09:31 | 21 | gesture in the legs.  The general -- the general feeling, |
| 09:32 | 22 | the general feeling of this figure is quite different. |
| 09:32 | 23 | Where, if I draw a line through the center here, you would |
| 09:32 | 24 | see that this is pretty much vertical, straight.  You see |
| 09:32 | 25 | that the head is tilted forward.  Actually, there's sort of |

09:32  1    a rhythm to this figure that is totally nonexistent in the
09:32  2    doll itself.
09:32  3    Q.   So how would you characterize the final production
09:32  4    sculpt in terms of its feel?
09:32  5    A.   Final -- this -- also the fact that there's no
09:32  6    features, particularly.  This has all been washed up.  This
09:32  7    is -- again, I use the term this is just a -- a mannequin,
09:32  8    in a sense, that you can paint any kind of features on, that
09:32  9    you can put clothes on.  It's totally devoid of any of the
09:32  10   characteristics that we see in the sculpt right there.
09:32  11   Q.   And in particular, if you look at the stomachs between
09:32  12   the two, how would you compare those?
09:33  13   A.   If you take and look at the stomach, you'll find that
09:33  14   there's a -- proportional changes in here.  You see that
09:33  15   the -- uh, here, we get more of a stomach coming out.  Here
09:33  16   it's a bit straighter.  At this point it's fairly subtle,
09:33  17   but it's enough when you start looking at people that
09:33  18   their -- it's a considerable difference.  And also, if you
09:33  19   look at the arms and how we find that the arm of the doll
09:33  20   actually is much thinner in proportion than the actual, uh,
09:33  21   sculpt itself is.
09:33  22   Q.   And would you consider those breasts to be the same
09:33  23   from your perspective, as a human-figure drawer?
09:33  24   A.   No.
09:33  25   Q.   Why not?

| | | |
|---|---|---|
| 09:33 | 1 | A.   You'll find that the doll, again, feels older, more |
| 09:33 | 2 | developed.  This is really more a child, although maybe a |
| 09:34 | 3 | little bit more. |
| 09:34 | 4 | Q.   I'm sorry, did you say the sculpt? |
| 09:34 | 5 | A.   This is a little bit of a child.  It's not -- depending |
| 09:34 | 6 | on the age.  We look at the head size, we would -- it's |
| 09:34 | 7 | really young. |
| 09:34 | 8 | Q.   And how would you compare the shoulders? |
| 09:34 | 9 | A.   We find that the shoulders are fairly -- across here |
| 09:34 | 10 | were much more of a slope to 'em.  They're narrower in |
| 09:34 | 11 | proportion.  Looking at the dolls, you find that the |
| 09:34 | 12 | shoulders are very narrow coming across.  Uh, we find that |
| 09:34 | 13 | in the actual sculpt they were much wider. |
| 09:34 | 14 | MS. HURST:  And let's move to the page of that |
| 09:34 | 15 | showing the rearview of the two sculpts, please. |
| 09:34 | 16 | (Document provided to the witness.) |
| 09:34 | 17 | (Document displayed.) |
| 09:34 | 18 | BY MS. HURST: |
| 09:34 | 19 | Q.   And is that page 4 of Exhibit 35826, Mr. Vilppu? |
| 09:34 | 20 | A.   Yes. |
| 09:34 | 21 | Q.   All right.  And when you look at the rearview, how -- |
| 09:34 | 22 | what is your comparison of the two? |
| 09:35 | 23 | A.   Well, I think this shows more clearly the differences |
| 09:35 | 24 | between, like, the pelvis and the whole hips.  Also, again, |
| 09:35 | 25 | the shape of the legs.  This sculpt has a little bit more |

CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

47

| | | |
|---|---|---|
| 09:35 | 1 | shape to it, the doll.  I sort of call 'em telephone poles. |
| 09:35 | 2 | But so there's very little things going on there.  You find |
| 09:35 | 3 | that the width that the -- basically, across the hips there |
| 09:35 | 4 | is considerably narrower than we have up here. |
| 09:35 | 5 | Here you can see a little bit clearer the shoulders, |
| 09:35 | 6 | the angle across the shoulders, where we get the sloping of |
| 09:35 | 7 | the shoulders in here. |
| 09:35 | 8 | So fairly dramatic differences. |
| 09:35 | 9 | Also, what shows up here in this, in the doll, to -- |
| 09:35 | 10 | compared to the sculpt is we get the feeling that the arm is |
| 09:35 | 11 | a lot longer.  But that's probably the photograph. |
| 09:35 | 12 | So also, the fact that the -- in the sculpt there was |
| 09:35 | 13 | an attempt to make a gesture with the legs coming in like |
| 09:36 | 14 | that, which is totally nonexistent in the doll. |
| 09:36 | 15 | MS. HURST:  Um, and can we see the side view as |
| 09:36 | 16 | well, please. |
| 09:36 | 17 | (Document provided to the witness.) |
| 09:36 | 18 | (Document displayed.) |
| 09:36 | 19 | BY MS. HURST: |
| 09:36 | 20 | Q.   And is that page 5 of Exhibit 35826? |
| 09:36 | 21 | A.   No. |
| 09:36 | 22 | MS. HURST:  Eight -- sorry. |
| 09:36 | 23 | THE WITNESS:  This is better, yeah. |
| 09:36 | 24 | BY MS. HURST: |
| 09:36 | 25 | Q.   Which one are you looking at, Mr. Vilppu? |

CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

48

| | | |
|---|---|---|
| 09:36 | 1 | A.   08. |
| 09:36 | 2 |          MS. HURST:  Is that what we got, Mike? |
| 09:36 | 3 | BY MS. HURST: |
| 09:36 | 4 | Q.   Okay.  So in looking at this, how would you |
| 09:36 | 5 | characterize the posture between the sculpt and the doll? |
| 09:36 | 6 | A.   Well, again, the -- you'll find that this is a -- if I |
| 09:36 | 7 | take in -- one way of comparing these is almost to think |
| 09:36 | 8 | of -- if they were humans.  You find my mother would have |
| 09:36 | 9 | said, "Stand up straight."  That the gesture is off, too |
| 09:37 | 10 | flowy, while the doll is perfectly straight up and down. |
| 09:37 | 11 |      Again, you see more of an emphasis on the buttocks |
| 09:37 | 12 | area, where the doll is pretty straight up and down.  You |
| 09:37 | 13 | got a lot more definition, more change in here. |
| 09:37 | 14 |      Also size of feet, and of course the overall size of |
| 09:37 | 15 | the two dolls is quite different. |
| 09:37 | 16 |      You'll find that there's also a difference in -- the |
| 09:37 | 17 | head here is straight up and down.  Here we have the head is |
| 09:37 | 18 | tilted.  We find that there's a -- a basic shape, which we |
| 09:37 | 19 | can talk about later -- is, uh, different, the shape of the |
| 09:37 | 20 | head.  Here we find the chin going back.  Here the chin's |
| 09:37 | 21 | coming forward. |
| 09:37 | 22 |      A lot of differences make a different person. |
| 09:37 | 23 | Q.   All right.  Let's move on to the head, as you suggest. |
| 09:37 | 24 |      And did you find in looking at the head of the sculpt |
| 09:38 | 25 | and the final production doll that there was a difference in |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 49 of 154   Page ID #:312077
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

49

| | | |
|---|---|---|
| 09:38 | 1 | the standard proportions? |
| 09:38 | 2 | A.   Yes, I did. |
| 09:38 | 3 | Q.   All right.  And did you make a drawing to illustrate |
| 09:38 | 4 | that? |
| 09:38 | 5 | A.   Yes, I did. |
| 09:38 | 6 | Q.   Would you please look at Exhibit 36631. |
| 09:38 | 7 | *(Document provided to the witness.)* |
| 09:38 | 8 | BY MS. HURST: |
| 09:38 | 9 | Q.   Is that the drawing that you made to illustrate the |
| 09:38 | 10 | differences in standard proportions on the two heads? |
| 09:38 | 11 | A.   Correct. |
| 09:38 | 12 | MS. HURST:  Your Honor, may I publish? |
| 09:38 | 13 | THE COURT:  Just a minute. |
| 09:38 | 14 | You may. |
| 09:38 | 15 | MS. HURST:  Thank you. |
| 09:38 | 16 | *(Document displayed.)* |
| 09:39 | 17 | BY MS. HURST: |
| 09:39 | 18 | Q.   Okay.  All right, can you explain, Mr. Vilppu, what -- |
| 09:39 | 19 | I note that you've made three blue lines there on each of |
| 09:39 | 20 | the heads.  Can you explain what that illustrates? |
| 09:39 | 21 | A.   On the sculpt there, we find that the -- they're |
| 09:39 | 22 | talking about children proportions.  You find that the eyes |
| 09:39 | 23 | are considerably lower.  They're not in the center.  Also, |
| 09:39 | 24 | the -- in the bottom one, which is the doll, you find that |
| 09:39 | 25 | they've been made more normal, that the eyes are actually in |

CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

50

| | | |
|---|---|---|
| 09:39 | 1 | the center. |
| 09:39 | 2 | There's –– I outlined the –– in the sculpture, I |
| 09:39 | 3 | outlined the lips indicating the nose and the shape of the |
| 09:39 | 4 | eyes.  These are totally –– well, they're not really that |
| 09:39 | 5 | clear, or in the case of the eyes, they're not there. |
| 09:39 | 6 | There's no eye sculpture. |
| 09:39 | 7 | You notice that the vertical line here, that in the |
| 09:39 | 8 | sculpture the chin is going back, where in the final doll, |
| 09:40 | 9 | the chin comes forward.  These are normal human variations. |
| 09:40 | 10 | Q.   So focusing on that last point for a moment, would you |
| 09:40 | 11 | say that the overall structure of the face is different |
| 09:40 | 12 | between the two? |
| 09:40 | 13 | A.   Yes, I would.  The main –– main difference being one |
| 09:40 | 14 | that the sculpt originally up here actually was more |
| 09:40 | 15 | childlike, where on the bottom, it is still childlike, but |
| 09:40 | 16 | it's a little bit older. |
| 09:40 | 17 | Q.   All right.  And let's turn back to Exhibit 36630, |
| 09:40 | 18 | please. |
| 09:40 | 19 | (Document displayed.) |
| 09:40 | 20 | BY MS. HURST: |
| 09:40 | 21 | Q.   And using those views of the sculpt and the final |
| 09:40 | 22 | production doll –– pardon me, the sculpture, the gray |
| 09:41 | 23 | sculpture, Exhibit 1136, and the final production doll, |
| 09:41 | 24 | would you please just describe what you see in terms of |
| 09:41 | 25 | comparisons for, uh, standard facial anatomy. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:41 | 1 | A.   In other words, in the sculpt, the actual eyes are |
| 09:41 | 2 | pretty much centered again.  One characteristic that's |
| 09:41 | 3 | different now from the drawing is that -- this is a common |
| 09:41 | 4 | mistake that beginning students make, is that they make the |
| 09:41 | 5 | features of the face way too large.  You find that in the |
| 09:41 | 6 | sculpt now the features have been reduced down in comparison |
| 09:41 | 7 | to the size of the head to more a normal relationship. |
| 09:41 | 8 | You find that in the final sculpt we take and have |
| 09:41 | 9 | the -- the shape -- the shape of the head is much softer in |
| 09:42 | 10 | terms of the chin going down.  There's no eye -- there's no |
| 09:42 | 11 | eye sculpture at all. |
| 09:42 | 12 | Uh, proportions have dropped a little bit again from |
| 09:42 | 13 | the first sculpt to the doll.  So you start looking -- you |
| 09:42 | 14 | start looking at the profiles here, you can see that the |
| 09:42 | 15 | chin -- the chin here is a little bit more pointed.  We find |
| 09:42 | 16 | that the way -- the way -- generally -- generally, the |
| 09:42 | 17 | doll's a bit softer. |
| 09:42 | 18 | Q.   And have you described a series of changes that you see |
| 09:42 | 19 | that were made from the sculpt to the final -- preliminary |
| 09:42 | 20 | sculpt to the final sculpt? |
| 09:42 | 21 | A.   Yeah.  Big difference.  I mean, I look at this as a |
| 09:42 | 22 | transition.  This is a transition from an idea, through a |
| 09:43 | 23 | series of steps that we went through -- or I didn't go |
| 09:43 | 24 | through, that he went through -- the sculptor went through |
| 09:43 | 25 | to take and make the doll.  It's a transition from one thing |

Case 2:04-cv-09049-DOC-RNB  Document 10283  Filed 03/28/11  Page 52 of 154  Page ID #:312080
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

52

| | | |
|---|---|---|
| 09:43 | 1 | to the next. |
| 09:43 | 2 | Q.   And how would you characterize the overall feel of -- |
| 09:43 | 3 | having made those transitions, the overall feel of the final |
| 09:43 | 4 | sculpt as compared to Carter Bryant's drawings? |
| 09:43 | 5 | A.   Well, the final sculpt is much more pleasant, a much |
| 09:43 | 6 | sweeter figure. |
| 09:43 | 7 | Q.   In your view, do those -- would you consider those to |
| 09:43 | 8 | be the same person? |
| 09:43 | 9 | A.   No. |
| 09:43 | 10 | Q.   Would you consider them to be virtually identical? |
| 09:43 | 11 | A.   No. |
| 09:43 | 12 | Q.   And is that for all of the reasons that you've been |
| 09:43 | 13 | describing? |
| 09:43 | 14 | A.   Correct. |
| 09:43 | 15 | Q.   All right.  Now, I want to move on to a comparison with |
| 09:44 | 16 | Carter Bryant's drawings and the dolls. |
| 09:44 | 17 |      Have you prepared some slides to illustrate your |
| 09:44 | 18 | comparison of Carter Bryant's drawings, fashion drawings, |
| 09:44 | 19 | and the first generation dolls? |
| 09:44 | 20 | A.   Yes, I have. |
| 09:44 | 21 | Q.   Would you look at Exhibit 36625, please. |
| 09:44 | 22 |           *(Document provided to the witness.)* |
| 09:44 | 23 | BY MS. HURST: |
| 09:44 | 24 | Q.   And does Exhibit 36625 contain a series of slides that |
| 09:44 | 25 | you had made to illustrate your comparison between Carter |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 53 of 154   Page ID #:312081
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

53

| | | |
|---|---|---|
| 09:44 | 1 | Bryant's drawings and the first generation dolls? |
| 09:45 | 2 | A.   Excuse me, what was the number again? |
| 09:45 | 3 | Q.   36625. |
| 09:45 | 4 | A.   Yes, thank you. |
| 09:45 | 5 | MS. HURST:  Your Honor, may I have permission to |
| 09:45 | 6 | publish 36625? |
| 09:45 | 7 | THE COURT:  You may. |
| 09:45 | 8 | *(Document displayed.)* |
| 09:45 | 9 | MS. HURST:  Thank you. |
| 09:45 | 10 | BY MS. HURST: |
| 09:45 | 11 | Q.   All right.  Now, this first drawing, this is the |
| 09:45 | 12 | comparison -- that's Carter Bryant's drawing of Hallidae on |
| 09:45 | 13 | the left and the first-generation Sasha on the right; is |
| 09:45 | 14 | that correct? |
| 09:45 | 15 | A.   Correct. |
| 09:45 | 16 | Q.   And that's 36625, page 1; is that right? |
| 09:45 | 17 | A.   Yes. |
| 09:45 | 18 | Q.   And what is it that you've done here? |
| 09:45 | 19 | A.   I actually drew lines tracing exactly over the drawing |
| 09:45 | 20 | and photograph of the doll that was made to fit the same |
| 09:45 | 21 | size as the drawing.  And the -- not changing anything, but |
| 09:45 | 22 | taking in all of the clear-cut lines that you could see -- I |
| 09:45 | 23 | didn't try to deal with any of the tones or anything else, |
| 09:46 | 24 | just the lines that were easily traceable. |
| 09:46 | 25 | Q.   All right.  So let's move to the next page and show |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 54 of 154   Page ID #:312082
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

54

| | | |
|---|---|---|
| 09:46 | 1 | those lines. |
| 09:46 | 2 | *(Document displayed.)* |
| 09:46 | 3 | BY MS. HURST: |
| 09:46 | 4 | Q.   And does this illustrate, page 2, these lines that |
| 09:46 | 5 | you've shown, as to the key features that you identified |
| 09:46 | 6 | between the drawings and the dolls? |
| 09:46 | 7 | A.   Yes. |
| 09:46 | 8 | Q.   All right.  And what do those show? |
| 09:46 | 9 | A.   Well, they show some pretty dramatic difference.  For |
| 09:46 | 10 | instance, if we start with the one on the left and then |
| 09:46 | 11 | comparing across, I would start with -- excuse my |
| 09:46 | 12 | characterization here, but the lip, upper lip on the one on |
| 09:46 | 13 | the left is like a handlebar mustache. |
| 09:46 | 14 | MS. HURST:  Mike, can you go to the next page and |
| 09:46 | 15 | just show us that. |
| 09:46 | 16 | *(Document displayed.)* |
| 09:46 | 17 | BY MS. HURST: |
| 09:46 | 18 | Q.   Why don't you go ahead and show us that. |
| 09:46 | 19 | A.   Yeah.  The contrast between those two is pretty |
| 09:46 | 20 | dramatic.  The lower lip, you can see the design of the way |
| 09:47 | 21 | the lip goes and the rather squarish bottom, where Sasha is |
| 09:47 | 22 | actually very rounded.  So these are two different people. |
| 09:47 | 23 | They're not the same. |
| 09:47 | 24 | MS. HURST:  All right.  Let's go back to the prior |
| 09:47 | 25 | page for a moment, Mike, with the full facial. |

55

| | | |
|---|---|---|
| 09:47 | 1 | *(Document displayed.)* |
| 09:47 | 2 | THE WITNESS:  Now -- as we go back to this, we |
| 09:47 | 3 | find that the -- looking at the eyes, these are dramatic. |
| 09:47 | 4 | Again, these are very, very different.  Much, much larger |
| 09:47 | 5 | shape.  Even though the angle tends to be a little similar, |
| 09:47 | 6 | the overall emphasis is quite different. |
| 09:47 | 7 | The -- in this case, you can see that the eyebrows |
| 09:47 | 8 | are not that much different, but they're still the same. |
| 09:47 | 9 | But the nose in the -- Carter Bryant really didn't |
| 09:47 | 10 | draw much of a nose.  And in the sculpt this was added, but |
| 09:48 | 11 | that's not enough to really see anything. |
| 09:48 | 12 | But the size of the pupils, the heaviness of the |
| 09:48 | 13 | line, the number of eyebrow -- or eyelashes.  The fact that |
| 09:48 | 14 | we have eyelashes on the bottom, where we have none on the |
| 09:48 | 15 | drawing, uh, quite different.  Two different people. |
| 09:48 | 16 | BY MS. HURST: |
| 09:48 | 17 | Q.   So you're overall -- basically, your bottom-line view |
| 09:48 | 18 | is that if you look at those two, they're different people? |
| 09:48 | 19 | A.   Absolutely. |
| 09:48 | 20 | Q.   All right.  Now, let's look at the comparison of Carter |
| 09:48 | 21 | Bryant's Jade drawing to MGA's first-generation Jade doll. |
| 09:48 | 22 | *(Document provided to the witness.)* |
| 09:48 | 23 | BY MS. HURST: |
| 09:48 | 24 | Q.   And that's Exhibit 36623; is that correct?  We're |
| 09:48 | 25 | looking at the pages, actually, if you want to -- |

| | | |
|---|---|---|
| 09:49 | 1 | A.   Oh, okay. |
| 09:49 | 2 | Q.   Yeah.  Is that Exhibit 36623? |
| 09:49 | 3 | A.   Okay. |
| 09:49 | 4 | Q.   And have you used exactly the same process that you |
| 09:49 | 5 | just described with respect to the Jade drawing and the Jade |
| 09:49 | 6 | doll? |
| 09:49 | 7 | A.   Yes. |
| 09:49 | 8 | Q.   And these are the outline drawings that you made? |
| 09:49 | 9 | A.   Correct. |
| 09:49 | 10 | *(Document displayed.)* |
| 09:49 | 11 | BY MS. HURST: |
| 09:49 | 12 | Q.   And what do you see looking at the outline drawings of |
| 09:49 | 13 | the Jade drawing versus the Jade doll? |
| 09:49 | 14 | A.   Well, we find that -- pretty much the same kind of |
| 09:49 | 15 | differences that I talked about previously.  The handlebar |
| 09:49 | 16 | mustache difference.  Notice that in the Jade doll here that |
| 09:49 | 17 | we have this notch, which is quite normal to have this notch |
| 09:49 | 18 | in the upper lip.  Quite -- actually, very un-normal not to |
| 09:49 | 19 | have a notch up there.  In fact, I doubt if any in the room |
| 09:50 | 20 | here doesn't have one. |
| 09:50 | 21 | Q.   Let's focus on the eyes here.  Did you also separately |
| 09:50 | 22 | compare the eyes for Jade? |
| 09:50 | 23 | *(Document displayed.)* |
| 09:50 | 24 |      THE WITNESS:  Again, you can see big differences |
| 09:50 | 25 | in the eyelashes; actually, the size, different placement of |

| 09:50 | 1 | where the line for where the eyelid would go; the fact that |
|-------|---|--|
| 09:50 | 2 | the shape here in the drawing is not closed off where the |
| 09:50 | 3 | tear duct would be, where we do close it off over here; the |
| 09:50 | 4 | size of the pupils.  Again, very different. |
| 09:50 | 5 | BY MS. HURST: |
| 09:50 | 6 | Q.   Does this help illustrate the principle that when |
| 09:50 | 7 | you're dealing with a human anatomy, it's really subtle |
| 09:50 | 8 | differences that convey, in the sum, a very different |
| 09:50 | 9 | impression? |
| 09:50 | 10 | A.   Uh, yes.  If I was doing a portrait, it would become |
| 09:50 | 11 | critical. |
| 09:50 | 12 | Q.   So if you were doing a portrait of Jade the drawing, |
| 09:50 | 13 | would you come up with Jade the doll as MGA did? |
| 09:51 | 14 | A.   I wouldn't get paid. |
| 09:51 | 15 | Q.   All right.  Now, let's look at Zoe to Cloe, is that |
| 09:51 | 16 | Exhibit 36620?  Okay. |
| 09:51 | 17 | (Document provided to the witness.) |
| 09:51 | 18 | (Document displayed.) |
| 09:51 | 19 | BY MS. HURST: |
| 09:51 | 20 | Q.   And you used the same process here again? |
| 09:51 | 21 | A.   Yes.  The one thing, if I could comment here, is that |
| 09:51 | 22 | the -- if you're looking at the doll and how much more |
| 09:51 | 23 | attractive the doll is.  It's more pleasant.  That was a |
| 09:51 | 24 | very important part of me looking at 'em and seeing the |
| 09:51 | 25 | characters.  But I went through the same process in breaking |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 58 of 154   Page ID #:312086
CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

58

| | | |
|---|---|---|
| 09:51 | 1 | these down. |
| 09:51 | 2 | *(Document displayed.)* |
| 09:51 | 3 | THE WITNESS:  You can see the change.  The gap |
| 09:51 | 4 | here was caused by the fact that in making the copy from the |
| 09:52 | 5 | drawing, there in the drawing, the hair was covering up the |
| 09:52 | 6 | eyelashes, so we didn't re-create the eyelashes because of |
| 09:52 | 7 | the hair. |
| 09:52 | 8 | BY MS. HURST: |
| 09:52 | 9 | Q.   You meant the eyebrow? |
| 09:52 | 10 | A.   I'm sorry? |
| 09:52 | 11 | Q.   You meant the eyebrow? |
| 09:52 | 12 | A.   Yes, yes.  The same thing with the lips.  Very large at |
| 09:52 | 13 | the top.  Notice the notch in the lower lip.  Squarish. |
| 09:52 | 14 | Round.  In this case, he does have a notch at the top. |
| 09:52 | 15 | Q.   And again, it's, in your opinion, that these -- the |
| 09:52 | 16 | drawing and the doll actually depict different people; is |
| 09:52 | 17 | that right? |
| 09:52 | 18 | A.   Correct. |
| 09:52 | 19 | Q.   And lastly, let's go with the comparison between Lupe |
| 09:52 | 20 | and Yasmin, which is 36618. |
| 09:52 | 21 | *(Document provided to the witness.)* |
| 09:52 | 22 | *(Document displayed.)* |
| 09:52 | 23 | BY MS. HURST: |
| 09:52 | 24 | Q.   And have you followed the same process here, |
| 09:52 | 25 | Mr. Vilppu? |

| | | |
|---|---|---|
| 09:52 | 1 | A.    Yes, I have. |
| 09:52 | 2 | Q.    And you made the outline drawings? |
| 09:52 | 3 | A.    Correct. |
| 09:52 | 4 | Q.    And what is your conclusion in looking at the outline |
| 09:53 | 5 | drawings? |
| 09:53 | 6 | A.    Well, again, we have dramatic, dramatic differences in, |
| 09:53 | 7 | first of all, in size.  In fact, in all these drawings that |
| 09:53 | 8 | he's made the upper lip really huge, and in the drawing -- |
| 09:53 | 9 | in the final doll it's much more of a normal kind of a |
| 09:53 | 10 | relationship.  The shape, of course, is different on here. |
| 09:53 | 11 | You can see the way -- creating that -- again, that |
| 09:53 | 12 | handlebar-mustache look. |
| 09:53 | 13 | Q.    And what about the eyebrows on this one? |
| 09:53 | 14 | A.    On the eyebrow, it's a different shape now.  And you |
| 09:53 | 15 | can see where we get a much darker -- or I should say wider |
| 09:53 | 16 | beginning, then the way it goes back. |
| 09:53 | 17 |      This, by the way, is actually a very important element |
| 09:53 | 18 | in taking and drawing portraiture.  Each person's eyebrow is |
| 09:53 | 19 | quite different. |
| 09:53 | 20 | Q.    And is the eyebrow, in this particular example, |
| 09:53 | 21 | significant in conveying age information? |
| 09:54 | 22 | A.    Yes.  The Lupe drawing, the drawing looks much older |
| 09:54 | 23 | and much -- looks a little bit more harsh in comparison. |
| 09:54 | 24 | You see that the Yasmin takes -- and really is much more |
| 09:54 | 25 | pleasant, a much sweeter -- feels like a much older type |

| | | |
|---|---|---|
| 09:54 | 1 | character. |
| 09:54 | 2 | Q.   Now, you mention that you've done a lot of animation |
| 09:54 | 3 | work for children, right? |
| 09:54 | 4 | A.   Correct. |
| 09:54 | 5 | Q.   And you also are familiar with children in your own |
| 09:54 | 6 | life; is that true? |
| 09:54 | 7 | A.   Yes, lots of children. |
| 09:54 | 8 | Q.   And in your experience, are children, and specifically |
| 09:54 | 9 | girls ages seven to twelve, able to perceive the kind of |
| 09:54 | 10 | differences that you've been discussing today? |
| 09:54 | 11 | MR. QUINN:  Objection. |
| 09:54 | 12 | THE WITNESS:  Yes. |
| 09:54 | 13 | THE COURT:  Sustained. |
| 09:54 | 14 | MR. QUINN:  Move to strike. |
| 09:54 | 15 | THE COURT:  Stricken. |
| 09:54 | 16 | BY MS. HURST: |
| 09:54 | 17 | Q.   Do you have experience drawing animation for children |
| 09:55 | 18 | in that target age group? |
| 09:55 | 19 | A.   Yes, I do. |
| 09:55 | 20 | Q.   And have you worked on films and cartoons for that |
| 09:55 | 21 | target age group? |
| 09:55 | 22 | A.   Yes. |
| 09:55 | 23 | Q.   And have you drawn and animated things for that |
| 09:55 | 24 | particular target age group? |
| 09:55 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 09:55 | 1 | Q.   And taking into account your experience in working for |
| 09:55 | 2 | that target age group, have you any view as to whether the |
| 09:55 | 3 | target age group is able to perceive the kind of things that |
| 09:55 | 4 | you've been discussing here today? |
| 09:55 | 5 | MR. QUINN:  Same objection.  And relevance. |
| 09:55 | 6 | THE COURT:  Sustained.  Relevance and lack of |
| 09:55 | 7 | foundation, Counsel. |
| 09:55 | 8 | MS. HURST:  Your Honor, may we have a sidebar on |
| 09:55 | 9 | relevance? |
| 09:55 | 10 | THE COURT:  No. |
| 09:55 | 11 | BY MS. HURST: |
| 09:55 | 12 | Q.   All right.  Mr. Vilppu, let's -- let's summarize now. |
| 09:55 | 13 | In your view, is the final production sculpt, the |
| 09:55 | 14 | blank -- final production blank, is that virtually identical |
| 09:56 | 15 | to any Carter Bryant drawing that you saw? |
| 09:56 | 16 | A.   No. |
| 09:56 | 17 | Q.   Is it virtually identical to the gray sculpt, the |
| 09:56 | 18 | preliminary sculpt? |
| 09:56 | 19 | MR. QUINN:  Objection.  Your Honor, ultimate |
| 09:56 | 20 | issue. |
| 09:56 | 21 | THE COURT:  This is something that you'll be able |
| 09:56 | 22 | to judge, ladies and gentlemen, your final decision about |
| 09:56 | 23 | these sculpts along with the dolls, et cetera, but I'll let |
| 09:56 | 24 | him cast his opinion. |
| 09:56 | 25 | You can cast your opinion, sir. |

| | | |
|---|---|---|
| 09:56 | 1 | BY MS. HURST: |
| 09:56 | 2 | Q.   Is that final production sculpt virtually identical to |
| 09:56 | 3 | the preliminary sculpt, Exhibit 1136? |
| 09:56 | 4 | A.   No. |
| 09:56 | 5 | Q.   And did you also look at the other sculptures done by |
| 09:56 | 6 | Margaret Leahy in connection with your work? |
| 09:56 | 7 | A.   Yes. |
| 09:56 | 8 | Q.   And in your review, did you find that that final |
| 09:56 | 9 | production sculpt was virtually identical to any of the |
| 09:56 | 10 | sculptures made by Margaret Leahy? |
| 09:56 | 11 | A.   No. |
| 09:56 | 12 | Q.   It was not? |
| 09:56 | 13 | A.   Everything is a transition from one to the next. |
| 09:56 | 14 | Q.   Okay.  In your comparisons of the drawings to those |
| 09:57 | 15 | first generation dolls, was it your conclusion that they do |
| 09:57 | 16 | not appear to be the same people? |
| 09:57 | 17 | A.   Correct. |
| 09:57 | 18 | Q.   And that the similarities between them are accounted |
| 09:57 | 19 | for by standard techniques and drawing of human anatomy? |
| 09:57 | 20 | A.   Correct. |
| 09:57 | 21 | Q.   And is it your overall view that MGA's execution in |
| 09:57 | 22 | creating its first-generation dolls was significantly |
| 09:57 | 23 | different from what Carter Bryant drew? |
| 09:57 | 24 | A.   Yes. |
| 09:57 | 25 |      MS. HURST:  Thank you.  No further questions. |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 63 of 154   Page ID #:312091
CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

63

| | | |
|---|---|---|
| 09:57 | 1 | THE COURT:  Do you want to start your |
| 09:57 | 2 | cross-examination now or take a recess and then start? |
| 09:57 | 3 | MR. QUINN:  Let's take the recess, if we could, |
| 09:57 | 4 | Your Honor. |
| 09:57 | 5 | THE COURT:  Okay.  We'll take 15 minutes.  We'll |
| 09:57 | 6 | resume at quarter after the hour. |
| 09:57 | 7 | You're admonished not to the discuss this matter |
| 09:57 | 8 | amongst yourselves, nor form or express any opinion |
| 09:57 | 9 | concerning the case. |
| 09:57 | 10 | And, sir, if you would return at quarter after the |
| 09:57 | 11 | hour, please, at 10:15.  Thank you. |
| 09:58 | 12 | *(Witness steps down.)* |
| 09:58 | 13 | *(Recess held at 9:58 a.m.)* |
| 10:16 | 14 | *(Proceedings resumed at 10:16 a.m.)* |
| 10:16 | 15 | *(In the presence of the jury.)* |
| 10:16 | 16 | THE COURT:  All right.  We're back on record.  The |
| 10:16 | 17 | jury's present, the alternates, all parties, the witness. |
| 10:16 | 18 | And, Counsel -- thank you, sir.  If you would be |
| 10:16 | 19 | seated. |
| 10:16 | 20 | And this is Mr. Quinn on cross-examination of |
| 10:16 | 21 | Mr. Vilppu. |
| 10:16 | 22 | MR. QUINN:  Thank you, Your Honor. |
| 10:16 | 23 | **CROSS-EXAMINATION** |
| 10:16 | 24 | BY MR. QUINN: |
| 10:16 | 25 | Q.   Good morning, Mr. Vilppu. |

| | | |
|---|---|---|
| 10:16 | 1 | A.    Good morning. |
| 10:16 | 2 | Q.    My name is John Quinn and I represent Mattel. |
| 10:16 | 3 | I understood you to say that if you had been asked to |
| 10:16 | 4 | do a portrait and had come up with a portrait, the drawing |
| 10:16 | 5 | that we looked at, that you wouldn't get paid? |
| 10:16 | 6 | A.    Correct. |
| 10:16 | 7 | Q.    Is it your understanding that MGA has asked Carter |
| 10:16 | 8 | Bryant to repay the over $30 million that MGA has paid him? |
| 10:17 | 9 | MS. HURST:  Objection.  Beyond the scope. |
| 10:17 | 10 | Argumentative. |
| 10:17 | 11 | THE COURT:  It's a little argumentative, Counsel. |
| 10:17 | 12 | Sustained. |
| 10:17 | 13 | BY MR. QUINN: |
| 10:17 | 14 | Q.    If we could look at one of those exhibits we were just |
| 10:17 | 15 | looking at. |
| 10:17 | 16 | MR. QUINN:  Ken, if we could put up 36625-1. |
| 10:17 | 17 | (Document displayed.) |
| 11:59 | 18 | BY MR. QUINN: |
| 10:17 | 19 | Q.    36625-1, which is a -- on the left-hand side, we have |
| 10:17 | 20 | the Hallidae head drawing that Carter Bryant did, correct? |
| 10:17 | 21 | A.    Correct. |
| 10:17 | 22 | Q.    And on the right-hand side, we have something |
| 10:17 | 23 | different.  We have a photograph, right?  Is that correct? |
| 10:17 | 24 | A.    Correct. |
| 10:17 | 25 | Q.    And, I mean, you understand that photographs can be |

| 10:17 | 1 | misleading? |
| 10:17 | 2 | A.   I assume. |
| 10:17 | 3 | Q.   Yeah.  And this photograph, does it look to you like it |
| 10:17 | 4 | was taken from maybe a little bit upward angle? |
| 10:17 | 5 | A.   I don't know.  I didn't take the photograph. |
| 10:17 | 6 | Q.   All right.  But when -- I mean, you understand that |
| 10:17 | 7 | these dolls are -- they are shown in -- in retailers' stores |
| 10:18 | 8 | on shelves, right? |
| 10:18 | 9 | A.   Correct. |
| 10:18 | 10 | Q.   And these types of decisions and comparisons can be |
| 10:18 | 11 | made by ordinary human beings, correct? |
| 10:18 | 12 | A.   Correct. |
| 10:18 | 13 | Q.   I mean, people without art degrees? |
| 10:18 | 14 | A.   Correct. |
| 10:18 | 15 | Q.   They will -- moms and kids will see the dolls on the |
| 10:18 | 16 | shelves in the store and make decisions about what they're |
| 10:18 | 17 | going to buy based on what they see with their naked eyes, |
| 10:18 | 18 | right? |
| 10:18 | 19 | A.   Right. |
| 10:18 | 20 | Q.   And they won't see them and they won't compare drawings |
| 10:18 | 21 | and they won't compare them to dolls blown up on very large |
| 10:18 | 22 | screens like we have here? |
| 10:18 | 23 | A.   Correct. |
| 10:18 | 24 | Q.   I mean, you'll agree that if you blow up an image a |
| 10:18 | 25 | hundred times or thousand times, it kind of magnifies the |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:18 | 1 | differences?  Would you agree with that? |
| 10:18 | 2 | A.   Not necessarily. |
| 10:18 | 3 | Q.   Well, if we can go back and look at 36625-2, if we look |
| 10:19 | 4 | at the next page, dash 2. |
| 10:19 | 5 | *(Document displayed.)* |
| 10:19 | 6 | BY MR. QUINN: |
| 10:19 | 7 | Q.   You've told us that you did these drawings that are |
| 10:19 | 8 | below, correct? |
| 10:19 | 9 | A.   Correct. |
| 10:19 | 10 | Q.   And then if we could look at the next page, dash 3, |
| 10:19 | 11 | these are your drawings as well, correct? |
| 10:19 | 12 | *(Document displayed.)* |
| 10:19 | 13 | THE WITNESS:  Correct. |
| 10:19 | 14 | BY MR. QUINN: |
| 10:19 | 15 | Q.   And in doing these drawings, you would agree that they |
| 10:19 | 16 | do not contain all the detail of the pictures or the images |
| 10:19 | 17 | that you were drawing from, correct? |
| 10:19 | 18 | A.   Correct. |
| 10:19 | 19 | Q.   So they don't contain all the detail of the dolls or |
| 10:19 | 20 | the drawings? |
| 10:19 | 21 | A.   They contain all the detail that convey the character |
| 10:19 | 22 | of the doll. |
| 10:19 | 23 | Q.   Well, you made -- you made decisions about what details |
| 10:19 | 24 | to include and which to omit, correct? |
| 10:19 | 25 | A.   Based on what was easy to clearly define. |

CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

67

| | | |
|---|---|---|
| 10:19 | 1 | Q.    And in choosing which details to include and which to |
| 10:19 | 2 | omit, you were trying to highlight the differences and mask |
| 10:19 | 3 | the similarities, correct? |
| 10:20 | 4 | A.    No. |
| 10:20 | 5 | Q.    Take a look at your deposition page 622, line 21. |
| 10:20 | 6 | *(Document provided to the witness.)* |
| 10:20 | 7 | THE WITNESS:  Which line? |
| 10:20 | 8 | MR. QUINN:  622, line 21, to 623, line 8. |
| 10:20 | 9 | And I'd request permission to read that, |
| 10:20 | 10 | Your Honor. |
| 10:20 | 11 | THE COURT:  You may. |
| 10:20 | 12 | THE WITNESS:  Okay. |
| 10:20 | 13 | THE COURT:  You may. |
| 10:20 | 14 | MR. QUINN:  (Reading:) |
| 10:20 | 15 | "QUESTION:  Why did you choose to focus on some |
| 10:20 | 16 | elements of the top depictions and ignore other elements? |
| 10:20 | 17 | "ANSWER:  Why did we choose to focus on some |
| 10:20 | 18 | elements of the top pictures while ignoring other elements? |
| 10:21 | 19 | "ANSWER:  The parts that we focused on clearly |
| 10:21 | 20 | showed strong differences. |
| 10:21 | 21 | "QUESTION:  So the focus was, the attempt here was |
| 10:21 | 22 | simply to highlight differences and not reflect |
| 10:21 | 23 | similarities; is that right? |
| 10:21 | 24 | "ANSWER:  It was the point, yes." |
| | 25 | |

| | | |
|---|---|---|
| 09:49 | 1 | BY MR. QUINN: |
| 10:21 | 2 | Q.   Now, in fact, your -- your assignment in this case was |
| 10:21 | 3 | to try to identify differences between the drawings and the |
| 10:21 | 4 | dolls, correct? |
| 10:21 | 5 | A.   No. |
| 10:21 | 6 | Q.   Well, you were asked to consider ways in which the |
| 10:21 | 7 | Bratz drawings -- were you asked to consider ways in which |
| 10:21 | 8 | the Bratz drawings and the Bratz dolls were similar? |
| 10:21 | 9 | A.   I was asked to look at them and compare both ways. |
| 10:21 | 10 | Q.   Did anyone ask you to consider the ways in which the |
| 10:21 | 11 | Bratz drawings of the Bratz and the Bratz dolls were |
| 10:21 | 12 | similar?  Did they ask you to do that? |
| 10:21 | 13 | A.   Not specifically. |
| 10:22 | 14 | Q.   And, in fact, you were not asked to consider the ways |
| 10:22 | 15 | in which the Bratz drawings and the Bratz dolls were |
| 10:22 | 16 | similar, true? |
| 10:22 | 17 | A.   No. |
| 10:22 | 18 | Q.   My statement is not true? |
| 10:22 | 19 | A.   No -- yes, your statement is true. |
| 10:22 | 20 | Q.   Okay. |
| 10:22 | 21 | A.   I mean, what I'm saying I was not asked specifically to |
| 10:22 | 22 | look at differences.  I was asked to look at the dolls and |
| 10:22 | 23 | make my decisions about what I thought about was similar or |
| 10:22 | 24 | different. |
| 10:22 | 25 | Q.   But it's true that you were not asked to consider the |

| | | |
|---|---|---|
| 10:22 | 1 | ways in which the Bratz drawings and the Bratz dolls are |
| 10:22 | 2 | similar, true? |
| 10:22 | 3 | A.   I'm not understanding your question.  Excuse me. |
| 10:22 | 4 | Q.   Were you asked -- in your work on this case, were you |
| 10:22 | 5 | asked to consider the ways in which the Bratz drawings and |
| 10:22 | 6 | the Bratz dolls are similar? |
| 10:22 | 7 | A.   That was part of it, yes. |
| 10:22 | 8 | MR. QUINN:  Your Honor, if we could turn to |
| 10:22 | 9 | Exhibit -- page 244 of your deposition, lines 16 to 25. |
| 10:22 | 10 | THE COURT:  Just a moment.  Is it Volume II? |
| 10:23 | 11 | MR. QUINN:  This is Volume I. |
| 10:23 | 12 | MS. HURST:  Your Honor, that concerns the earlier |
| 10:23 | 13 | matter. |
| 10:23 | 14 | THE COURT:  Just a moment.  244.  Counsel, what |
| 10:23 | 15 | lines? |
| 10:23 | 16 | MR. QUINN:  Lines 16 to 25. |
| 10:23 | 17 | THE WITNESS:  Okay.  This is the first trial? |
| 10:23 | 18 | THE COURT:  Just a minute. |
| 10:23 | 19 | THE WITNESS:  Which lines were these now? |
| 10:23 | 20 | MS. HURST:  Just wait. |
| 10:23 | 21 | THE WITNESS:  Huh? |
| 10:23 | 22 | MS. HURST:  Wait for the judge.  Okay? |
| 10:23 | 23 | I'm sorry, Mr. Quinn, which lines did you request? |
| 10:23 | 24 | MR. QUINN:  Lines 16 through 25. |
| 10:23 | 25 | THE COURT:  Page 244, lines 16 through 25.  Now, |

| | | |
|---|---|---|
| 10:23 | 1 | let me read for just a moment. |
| 10:24 | 2 | MS. HURST:  And -- |
| 10:24 | 3 | THE COURT:  Counsel, just a moment. |
| 10:24 | 4 | Now, is there a rule-of-completeness issue here? |
| 10:24 | 5 | MS. HURST:  Yes, Your Honor, over to the next |
| 10:24 | 6 | page, lines 1 through 3. |
| 10:24 | 7 | THE COURT:  Just a moment. |
| 10:24 | 8 | All right.  Counsel, you may read from page 244, |
| 10:24 | 9 | line 16, through page 245, line 3. |
| 10:24 | 10 | MR. QUINN:  (Reading:) |
| 10:24 | 11 | "QUESTION:  When you were asked to work on this |
| 10:24 | 12 | report, did anyone ask you to consider ways in which the |
| 10:25 | 13 | Bryant drawings of Bratz and the Bratz dolls are similar? |
| 10:25 | 14 | "ANSWER:  Did they ask how they were similar or if |
| 10:25 | 15 | they were similar? |
| 10:25 | 16 | "QUESTION:  When you were asked to work on the |
| 10:25 | 17 | report, were you asked to consider ways in which the Bratz |
| 10:25 | 18 | drawings and the Bratz dolls are similar? |
| 10:25 | 19 | "ANSWER:  No.  Let me clarify that.  I was asked |
| 10:25 | 20 | to take a look at the different things and, basically, draw |
| 10:25 | 21 | conclusions to them." |
| 10:25 | 22 | BY MR. QUINN: |
| 10:25 | 23 | Q.   But your focus was primarily on the differences, |
| 10:25 | 24 | correct? |
| 10:25 | 25 | A.    No. |

| | | |
|---|---|---|
| 10:25 | 1 | Q.   If we could take a look at your deposition page 555, |
| 10:25 | 2 | lines 18 to 24. |
| 10:25 | 3 | MR. QUINN:  And request permission to read that, |
| 10:25 | 4 | Your Honor. |
| 10:25 | 5 | THE COURT:  Just a moment. |
| 10:26 | 6 | MS. HURST:  It's not impeaching, Your Honor. |
| 10:26 | 7 | THE COURT:  Just a minute. |
| 10:26 | 8 | No, it's not impeaching, Counsel.  You can ask him |
| 10:26 | 9 | about how he primarily focused, but it's not inconsistent. |
| 08:59 | 10 | BY MR. QUINN: |
| 10:26 | 11 | Q.   So you focused primarily on the differences, correct? |
| 10:26 | 12 | A.   No. |
| 10:26 | 13 | MR. QUINN:  Request permission to read that, |
| 10:26 | 14 | Your Honor. |
| 10:26 | 15 | MS. HURST:  Same objection. |
| 10:26 | 16 | THE COURT:  Overruled. |
| 10:26 | 17 | You may read, Counsel, that portion. |
| 10:26 | 18 | MR. QUINN:  (Reading:) |
| 10:26 | 19 | "QUESTION:  In preparing your report, you focused |
| 10:26 | 20 | on the differences? |
| 10:26 | 21 | "ANSWER:  I focused on -- I noticed similarities. |
| 10:26 | 22 | I didn't -- most of them were very general anatomical |
| 10:26 | 23 | similarities that I take for granted in animation, either |
| 10:27 | 24 | through animation or through life.  So I focused on the |
| 10:27 | 25 | differences primarily." |

| 11:59 | 1 | BY MR. QUINN: |
|---|---|---|
| 10:27 | 2 | Q.   Now, let's -- you've told us, as I understand it, that |
| 10:27 | 3 | you think the dolls are, in your professional opinion, |
| 10:27 | 4 | different than the drawings, correct? |
| 10:27 | 5 | A.   Correct. |
| 10:27 | 6 | Q.   But you would agree that any three-dimensional object |
| 10:27 | 7 | is always going to be different than a two-dimensional |
| 10:27 | 8 | object? |
| 10:27 | 9 | A.   Well, it depends on the object, of course. |
| 10:27 | 10 | Q.   And you believe that there is no -- in this case, in |
| 10:27 | 11 | the case of a two-dimensional drawing, there's always going |
| 10:27 | 12 | to be differences between a two-dimensional drawing and a |
| 10:27 | 13 | three-dimensional rendition? |
| 10:27 | 14 | A.   Well, the quality of the drawing is gonna make a big |
| 10:27 | 15 | difference. |
| 10:27 | 16 | Q.   But there's always going to be a difference between a |
| 10:27 | 17 | two-dimensional object and a three-dimensional object, |
| 10:28 | 18 | correct? |
| 10:28 | 19 | A.   By their nature. |
| 10:28 | 20 | Q.   The answer's yes? |
| 10:28 | 21 | A.   Yes. |
| 10:28 | 22 | Q.   All right.  And you believe that there's no way for a |
| 10:28 | 23 | sculptor to make a sculpture of a drawing that would not be |
| 10:28 | 24 | different from the drawing, correct? |
| 10:28 | 25 | A.   A drawing that's -- the drawing is a flat piece of |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 73 of 154   Page ID #:312101
CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

73

| | | |
|---|---|---|
| 10:28 | 1 | paper; a sculpture is a three-dimensional.  There's going to |
| 10:28 | 2 | be differences. |
| 10:28 | 3 | Q.   There will always be differences, correct? |
| 10:28 | 4 | A.   Yes. |
| 10:28 | 5 | Q.   And just so that we understand where you're coming from |
| 10:28 | 6 | and what your concept of differences are, if we could take a |
| 10:28 | 7 | look at Exhibit 9668. |
| 10:28 | 8 | MR. QUINN:  This is a demonstrative, Your Honor. |
| 10:28 | 9 | I'd request permission to publish this, Your Honor. |
| 10:28 | 10 | THE COURT:  Can I see it? |
| 10:28 | 11 | MS. HURST:  I don't have it, Your Honor. |
| 10:28 | 12 | THE COURT:  He's going to hand you a copy. |
| 10:29 | 13 | (Document provided to the Court.) |
| 10:29 | 14 | THE COURT:  Well, Counsel, I'll certainly allow |
| 10:29 | 15 | that, but then I'll go back and allow for both of you so |
| 10:29 | 16 | that you have absolutely co-equal footing. |
| 10:29 | 17 | MS. HURST:  I have it, Your Honor, I apologize. |
| 10:29 | 18 | THE COURT:  Just a moment. |
| 10:29 | 19 | Then I will allow, previously not allowed, |
| 10:29 | 20 | 27492-0001, which are the five faces. |
| 10:29 | 21 | So you can certainly put this one up.  9668. |
| 10:29 | 22 | MR. QUINN:  Thank you, Your Honor. |
| 10:29 | 23 | (Document displayed.) |
| 09:31 | 24 | BY MR. QUINN: |
| 10:29 | 25 | Q.   We're talking about, Mr. Vilppu, your concept of |

| 10:29 | 1 | differences, and we're looking at the masterpiece -- |
| 10:29 | 2 | Leonardo da Vinci's masterpiece, the Mona Lisa, correct? |
| 10:29 | 3 | A.   Correct. |
| 10:29 | 4 | Q.   And one of these images has been changed to make the |
| 10:30 | 5 | smile bigger, that famous enigmatic smile has been made into |
| 10:30 | 6 | a broad smile, correct? |
| 10:30 | 7 | A.   Correct. |
| 10:30 | 8 | Q.   And it's your view putting a bigger smile on the Mona |
| 10:30 | 9 | Lisa -- |
| 10:30 | 10 | THE COURT:  For those of us who aren't cultured |
| 10:30 | 11 | which one's the real one?  Just joking.  All right.  I'm |
| 10:30 | 12 | sorry.  Continue on. |
| 09:34 | 13 | BY MR. QUINN: |
| 10:30 | 14 | Q.   It's your view that just in terms of your understanding |
| 10:30 | 15 | of differences and different works, just so we can |
| 10:30 | 16 | understand that, you believe that putting a bigger smile on |
| 10:30 | 17 | the Mona Lisa, but leaving all other things the same, |
| 10:30 | 18 | results in an entirely different work, correct? |
| 10:30 | 19 | A.   We have a -- the Mona Lisa, the original is an icon. |
| 10:30 | 20 | Q.   Right.  So is the answer yes? |
| 10:30 | 21 | A.   No.  Because you're -- it is different because we now |
| 10:30 | 22 | have changed an icon to a caricature. |
| 10:30 | 23 | Q.   And your opinion is that these pictures are not similar |
| 10:30 | 24 | at all? |
| 10:30 | 25 | A.   Correct. |

| | | |
|---|---|---|
| 10:30 | 1 | Q.   Correct? |
| 10:30 | 2 | A.   Correct. |
| 10:31 | 3 | Q.   And you had some -- in answering Ms. Hurst's questions, |
| 10:31 | 4 | you talked a little bit about big feet, big head, and how in |
| 10:31 | 5 | your animation world these are things that have been done |
| 10:31 | 6 | before; they're used to express various emotions or |
| 10:31 | 7 | attitudes, correct? |
| 10:31 | 8 | A.   Correct. |
| 10:31 | 9 | Q.   But you would agree that not all dolls with big heads |
| 10:31 | 10 | look like Bratz, right? |
| 10:31 | 11 | A.   That all dolls with big heads do not look like Bratz? |
| 10:31 | 12 | Q.   Would you agree that all dolls with big heads don't |
| 10:31 | 13 | necessarily look like Bratz, correct? |
| 10:31 | 14 | A.   Correct. |
| 10:31 | 15 | THE COURT:  Like the Bratz doll. |
| 10:31 | 16 | BY MR. QUINN: |
| 10:31 | 17 | Q.   Like the Bratz doll? |
| 10:31 | 18 | A.   Correct. |
| 10:31 | 19 | Q.   And not all dolls with large lips look like Bratz, |
| 10:31 | 20 | correct? |
| 10:31 | 21 | A.   Correct. |
| 10:31 | 22 | Q.   And there could be dolls with large eyes that don't |
| 10:31 | 23 | look like Bratz, correct? |
| 10:31 | 24 | A.   Correct. |
| 10:31 | 25 | Q.   And there can be dolls with lots of makeup that don't |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 76 of 154   Page ID #:312104
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

76

| | | |
|---|---|---|
| 10:31 | 1 | look like Bratz? |
| 10:31 | 2 | A.   I'm sorry.  With what kind of makeup? |
| 10:32 | 3 | Q.   Lots of makeup.  There could be dolls with lots of |
| 10:32 | 4 | makeup that still don't look like Bratz? |
| 10:32 | 5 | A.   Yeah.  Not necessarily, yes. |
| 10:32 | 6 | Q.   And these are all, you've told us, standard elements, |
| 10:32 | 7 | and you could combine those standard elements and still come |
| 10:32 | 8 | up with a doll that didn't look like Bratz, correct? |
| 10:32 | 9 | A.   I would imagine you could have.  If I gave that as an |
| 10:32 | 10 | assignment in a class to 30 students, they will come up with |
| 10:32 | 11 | 30 different variations. |
| 10:32 | 12 | Q.   Exactly.  So what matters is how those specific |
| 10:32 | 13 | combinations of elements are combined, correct? |
| 10:32 | 14 | A.   Correct. |
| 10:32 | 15 | Q.   And, um, you're not aware of any other dolls that have |
| 10:32 | 16 | the same proportions as Bratz, correct? |
| 10:32 | 17 | A.   I can't say that, no. |
| 10:32 | 18 | Q.   I'm sorry? |
| 10:32 | 19 | A.   I would find that if I went out and looked, I would |
| 10:32 | 20 | find many dolls with the same proportions as the Bratz |
| 10:32 | 21 | dolls. |
| 10:32 | 22 | Q.   Sir, as you sit here and having done your expert work, |
| 10:32 | 23 | can you identify to me any dolls that have the same |
| 10:33 | 24 | proportions as Bratz? |
| 10:33 | 25 | MS. HURST:  Objection.  That was beyond the scope. |

| | | |
|---|---|---|
| 10:33 | 1 | THE COURT:  Overruled. |
| 10:33 | 2 | THE WITNESS:  I think if I had a catalog of Disney |
| 10:33 | 3 | dolls, that we would find many of them with the same |
| 10:33 | 4 | proportions. |
| 11:59 | 5 | BY MR. QUINN: |
| 10:33 | 6 | Q.   Well, as of your -- as of the date of your |
| 10:33 | 7 | deposition -- let's just say as of December 10, 2010, it's |
| 10:33 | 8 | true, isn't it, that you didn't know of any other dolls that |
| 10:33 | 9 | had the same proportions of Bratz, correct? |
| 10:33 | 10 | A.   Off the top of my head in a deposition, no. |
| 10:33 | 11 | Q.   And you can't think of one now as you sit here? |
| 10:33 | 12 | A.   I'm sorry, what? |
| 10:33 | 13 | Q.   And you cannot think of one here now as you sit here? |
| 10:33 | 14 | A.   I cannot -- I'm not very good at remembering names. |
| 10:33 | 15 | I'm very visual.  I would have to have it in front of me. |
| 10:33 | 16 | Q.   And you began your testimony by talking about standard |
| 10:33 | 17 | human proportions, right? |
| 10:33 | 18 | A.   Correct. |
| 10:33 | 19 | Q.   And you showed us some charts about that from your |
| 10:33 | 20 | teaching materials, correct? |
| 10:34 | 21 | A.   Correct. |
| 10:34 | 22 | Q.   But you will agree that the Bratz dolls do not have |
| 10:34 | 23 | standard human proportions, correct? |
| 10:34 | 24 | A.   Correct. |
| 10:34 | 25 | Q.   In fact, if a 5-foot 6-inch live Bratz doll walked |

CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

78

| 10:34 | 1 | through that door right now, we'd probably all run in |
| 10:34 | 2 | terror, correct? |
| 10:34 | 3 | A.   Correct. |
| 10:34 | 4 | Q.   And you've been quite candid, actually, about your lack |
| 10:34 | 5 | of experience when it comes to dolls, correct? |
| 10:34 | 6 | A.   I don't understand what the question is. |
| 10:34 | 7 | Q.   Well, you'll agree -- you have a background in what |
| 10:34 | 8 | sounds like a fascinating subject of Renaissance drawing and |
| 10:34 | 9 | its application to animation, but you're not an expert on |
| 10:34 | 10 | dolls, correct? |
| 10:34 | 11 | A.   True. |
| 10:34 | 12 | Q.   And you're not an expert in the design and development |
| 10:34 | 13 | of dolls, correct? |
| 10:34 | 14 | A.   I have been around it an awful lot, so I'm familiar |
| 10:34 | 15 | with it. |
| 10:34 | 16 | Q.   Well, in fact, you consider yourself totally |
| 10:35 | 17 | incompetent concerning the process of taking a design for a |
| 10:35 | 18 | doll and converting it into an actual doll, true? |
| 10:35 | 19 | A.   No. |
| 10:35 | 20 | Q.   Let's take a look at your deposition, page 45. |
| 10:35 | 21 | *(Document provided to the witness.)* |
| 10:35 | 22 | THE WITNESS:  Page 41? |
| 10:35 | 23 | MR. QUINN:  45. |
| 11:00 | 24 | BY MR. QUINN: |
| 10:35 | 25 | Q.   In terms of, um -- page 45, lines 16 to 25.  Is it true |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:35 | 1 | that you -- again, your words -- |
| 10:35 | 2 | MS. HURST:  Objection.  Publishing the hearsay. |
| 10:35 | 3 | THE COURT:  Sustained. |
| 10:35 | 4 | MS. HURST:  It's not impeaching, Your Honor. |
| 10:35 | 5 | BY MR. QUINN: |
| 10:35 | 6 | Q.   Sir, do you consider yourself to be totally incompetent |
| 10:35 | 7 | on the process of actually making a doll as a doll maker |
| 10:36 | 8 | does? |
| 10:36 | 9 | A.   Uh, we were talking in context of a stuffed doll, plush |
| 10:36 | 10 | doll.  I've never done any sewing. |
| 10:36 | 11 | Q.   You have never done any work on a fashion doll, |
| 10:36 | 12 | correct? |
| 10:36 | 13 | A.   I have worked with fashion dolls in part of my work at |
| 10:36 | 14 | Marvel Comics. |
| 10:36 | 15 | Q.   Sir, you have never -- you've never purchased a fashion |
| 10:36 | 16 | doll? |
| 10:36 | 17 | A.   I have a wife that does that. |
| 10:36 | 18 | Q.   Okay.  But you don't do it? |
| 10:36 | 19 | A.   I've had at one time eight children in my household. |
| 10:36 | 20 | We've had many fashion dolls in the house.  Working in the |
| 10:36 | 21 | animation studio, the cubicles are full of action dolls, |
| 10:36 | 22 | fashion dolls, all kind of dolls that we use as mannequins |
| 10:36 | 23 | to work from. |
| 10:36 | 24 | Q.   In terms of your own experience with designing dolls, |
| 10:36 | 25 | you had this plush doll that you worked on some 25 years |

CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

| | | |
|---|---|---|
| 10:36 | 1 | ago? |
| 10:37 | 2 | A.   Correct. |
| 10:37 | 3 | Q.   And that doll was never actually completed, correct? |
| 10:37 | 4 | A.   No, it was completed. |
| 10:37 | 5 | Q.   So that was actually brought to market and it was |
| 10:37 | 6 | finished? |
| 10:37 | 7 | A.   Correct. |
| 10:37 | 8 | Q.   That was a plush doll? |
| 10:37 | 9 | A.   Correct. |
| 10:37 | 10 | Q.   And how is that different than -- that's different than |
| 10:37 | 11 | a fashion doll? |
| 10:37 | 12 | A.   Yes.   There was no fashion to it. |
| 10:37 | 13 | Q.   Well, that -- was that the doll you called the "Owie" |
| 10:37 | 14 | doll? |
| 10:38 | 15 | A.   Owie.   Owie.   It was a stuffed bear that had a wound |
| 10:38 | 16 | that was for children who had been abused. |
| 10:38 | 17 | Q.   So is that the plush doll that you're referring to? |
| 10:38 | 18 | A.   Yes.   We also did a doll called "Big Foot." |
| 10:38 | 19 | Q.   Sir -- |
| 10:38 | 20 | A.   We also did a doll called "Big Foot." |
| 10:38 | 21 | Q.   Sir, let's take 'em one at a time. |
| 10:38 | 22 | The Owie doll, that was the plush doll that you were |
| 10:38 | 23 | referring to earlier? |
| 10:38 | 24 | A.   Correct. |
| 10:38 | 25 | Q.   And after you created your picture of that doll, you |

CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

81

| | | |
|---|---|---|
| 10:38 | 1 | weren't involved in the process of actually creating a |
| 10:38 | 2 | three-dimensional, plush, soft doll out of that drawing, |
| 10:38 | 3 | correct? |
| 10:38 | 4 | A.    I didn't do the sewing, no. |
| 10:38 | 5 | Q.    Okay.  I'm sorry? |
| 10:38 | 6 | A.    I didn't do the sewing. |
| 10:38 | 7 | Q.    But you weren't involved in actually -- you created a |
| 10:38 | 8 | picture, and the steps that -- for the creation of an actual |
| 10:38 | 9 | three-dimensional doll, you were not involved with that, |
| 10:38 | 10 | true? |
| 10:39 | 11 | A.    Not -- true. |
| 10:39 | 12 | Q.    And so -- |
| 10:39 | 13 | A.    Excuse me.  I don't think you're familiar with making |
| 10:39 | 14 | plush dolls.  Plush doll is a drawing that you make, and |
| 10:39 | 15 | somebody cuts it out of a piece of cloth and sews it up and |
| 10:39 | 16 | stuffs it. |
| 10:39 | 17 | Q.    All right.  Very different than a fashion doll, |
| 10:39 | 18 | correct? |
| 10:39 | 19 | A.    This was a stuffed teddy bear. |
| 10:39 | 20 | Q.    Sir, very different than a fashion doll; can we agree |
| 10:39 | 21 | on that? |
| 10:39 | 22 | A.    Yeah. |
| 10:39 | 23 | Q.    I'm sorry? |
| 10:39 | 24 | A.    Yes. |
| 10:39 | 25 | Q.    And you've never actually sculpted a doll, correct? |

| | | |
|---|---|---|
| 10:39 | 1 | A.    No. |
| 10:39 | 2 | Q.    Take a look at your deposition, page 49. |
| 10:39 | 3 | THE COURT:  (Reading:) |
| 10:39 | 4 | "You've actually sculpted a doll, correct?" |
| 10:39 | 5 | "No." |
| 10:39 | 6 | BY MR. QUINN: |
| 10:39 | 7 | Q.    Have you ever actually sculpted a doll -- |
| 10:39 | 8 | A.    Yes. |
| 10:39 | 9 | Q.    -- yourself, sir? |
| 10:39 | 10 | Take a look at your deposition, sir, page 49, lines |
| 10:39 | 11 | 16 to 20. |
| 10:40 | 12 | MR. QUINN:  I'd request permission to read that, |
| 10:40 | 13 | Your Honor. |
| 10:40 | 14 | THE COURT:  You may. |
| 10:40 | 15 | MR. QUINN:  (Reading:) |
| 10:40 | 16 | "You've never sculpted a doll; is that correct? |
| 10:40 | 17 | "ANSWER:  A doll? |
| 10:40 | 18 | "QUESTION:  Yes.  Have you ever sculpted a doll? |
| 10:40 | 19 | "ANSWER:  No." |
| 10:40 | 20 | BY MR. QUINN: |
| 10:40 | 21 | Q.    You know that, from what you've read, that Margaret |
| 10:40 | 22 | Leahy was the sculptor who came up with original Bratz |
| 10:40 | 23 | sculpts -- you know that, correct? |
| 10:40 | 24 | A.    Correct. |
| 10:40 | 25 | Q.    And you know she wasn't working from a blank piece of |

| | | |
|---|---|---|
| 10:40 | 1 | paper, correct? |
| 10:40 | 2 | MS. HURST:  Objection.  Calls for hearsay. |
| 10:40 | 3 | THE COURT:  Now, just a moment. |
| 10:40 | 4 | No, you can testify to that. |
| 10:40 | 5 | Overruled. |
| 10:40 | 6 | THE WITNESS:  Well, I understand she was doing an |
| 10:40 | 7 | awful lot of work from imagination. |
| 10:40 | 8 | BY MR. QUINN: |
| 10:40 | 9 | Q.   Sir, you know she wasn't working from a blank piece of |
| 10:40 | 10 | paper, correct? |
| 10:40 | 11 | A.   True. |
| 10:40 | 12 | Q.   You know she had Carter Bryant's drawing, correct? |
| 10:40 | 13 | A.   Correct. |
| 10:40 | 14 | Q.   And you know that Carter Bryant gave her comment -- |
| 10:41 | 15 | gave comments on her sculpt, correct? -- from the |
| 10:41 | 16 | depositions you've read? |
| 10:41 | 17 | MS. HURST:  Same objections.  Publishing hearsay. |
| 10:41 | 18 | THE COURT:  Overruled. |
| 10:41 | 19 | You can answer that question. |
| 10:41 | 20 | THE WITNESS:  Uh, correct. |
| 10:41 | 21 | BY MR. QUINN: |
| 10:41 | 22 | Q.   And we looked at those two different sculpts.  The gray |
| 10:41 | 23 | sculpt, 1136, and 17733, which is referred to as the final |
| 10:41 | 24 | production sculpt. |
| 10:41 | 25 | You're aware that after Ms. Leahy did the gray sculpt, |

| 10:41 | 1 | Exhibit 1136, she got comments from Carter Bryant about the |
| 10:41 | 2 | changes he thought needed to be made.  You're aware of that, |
| 10:41 | 3 | aren't you? |
| 10:41 | 4 | *(Document displayed.)* |
| 10:41 | 5 | THE WITNESS:  Yes.  I understand he was working |
| 10:41 | 6 | for MGA at the time. |
| 11:59 | 7 | BY MR. QUINN: |
| 10:41 | 8 | Q.   Right.  And he gave comments.  He said, "This isn't my |
| 10:41 | 9 | vision," and she came up with another sculpt, correct? |
| 10:41 | 10 | MS. HURST:  Objection.  Misstates the evidence. |
| 10:41 | 11 | THE COURT:  Overruled. |
| 10:41 | 12 | THE WITNESS:  I -- I don't know. |
| 10:41 | 13 | BY MR. QUINN: |
| 10:41 | 14 | Q.   You don't know; is that correct? |
| 10:41 | 15 | A.   I'm not sure.  I don't think I've heard that. |
| 10:41 | 16 | Q.   Well, if we can look at Exhibit -- |
| 10:42 | 17 | THE COURT:  I'll let you go into argument about |
| 10:42 | 18 | that. |
| 10:42 | 19 | MR. QUINN:  All right. |
| 10:42 | 20 | THE COURT:  As far as his foundation is concerned |
| 10:42 | 21 | and how these sculpts are created, you can certainly argue |
| 10:42 | 22 | the evidence that came from Carter Bryant and Paula Garcia, |
| 10:42 | 23 | et cetera. |
| 11:59 | 24 | BY MR. QUINN: |
| 10:42 | 25 | Q.   I mean, I think you've just said that you understood |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 85 of 154   Page ID #:312113
CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

85

| | | |
|---|---|---|
| 10:42 | 1 | that Mr. Bryant was working for MGA at the time? |
| 10:42 | 2 | A.    Correct. |
| 10:42 | 3 | Q.    Did you understand he was also working for Mattel at |
| 10:42 | 4 | the time? |
| 10:42 | 5 | A.    No. |
| 10:42 | 6 | Q.    So you thought when he met with Ms. Leahy and gave |
| 10:42 | 7 | comments on the sculpt that he was no longer working with |
| 10:42 | 8 | Mattel; is that correct? |
| 10:42 | 9 | A.    I don't -- I have no knowledge. |
| 10:42 | 10 | Q.    So you just don't know? |
| 10:42 | 11 | A.    I don't know. |
| 10:42 | 12 | Q.    And you've told us about you have a lot of experience |
| 10:42 | 13 | in the commercial world doing drawing and animation and |
| 10:42 | 14 | things like that, correct? |
| 10:42 | 15 | A.    Correct. |
| 10:42 | 16 | Q.    I'm sorry? |
| 10:42 | 17 | A.    Yes. |
| 10:42 | 18 | Q.    Have you ever done a drawing or an animation while you |
| 10:42 | 19 | were under contract to -- while you were working for one |
| 10:42 | 20 | company and taken a drawing or animation that you created in |
| 10:43 | 21 | that work and took -- taken it to another company while you |
| 10:43 | 22 | were still under contract with that first company? |
| 10:43 | 23 | MS. HURST:  Objection. |
| 10:43 | 24 | THE WITNESS:  No. |
| 10:43 | 25 | MS. HURST:  Misstates the evidence. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:43 | 1 | THE COURT:  Overruled. |
| 10:43 | 2 | MS. HURST:  Argumentative. |
| 10:43 | 3 | THE COURT:  Overruled. |
| 10:43 | 4 | MS. HURST:  Beyond the scope. |
| 10:43 | 5 | THE COURT:  Overruled. |
| 10:43 | 6 | BY MR. QUINN: |
| 10:43 | 7 | Q.   Have you ever done that, sir? |
| 10:43 | 8 | A.   No. |
| 10:43 | 9 | Q.   'Cause you know that would be wrong? |
| 10:43 | 10 | A.   Uh, it is common practice, uh, in the animation |
| 10:43 | 11 | industry while you're working with one studio to take and |
| 10:43 | 12 | work on other projects, other people's work at other studios |
| 10:43 | 13 | or in doing freelance work.  Studios will take and farm out |
| 10:43 | 14 | their own work to people all around the world to do. |
| 10:43 | 15 | Q.   How about if you have a contract that provides that |
| 10:43 | 16 | things that you develop during your employment are owned by |
| 10:43 | 17 | the company?  Have you ever had such a contract yourself? |
| 10:43 | 18 | THE COURT:  I'll allow the question, but we're |
| 10:43 | 19 | getting a little far afield from this expert, Counsel, and I |
| 10:43 | 20 | don't know if either one of you know what the answer is |
| 10:43 | 21 | going to be. |
| 10:43 | 22 | MR. QUINN:  All right. |
| 10:43 | 23 | THE COURT:  I would suggest that we move on. |
| 10:44 | 24 | BY MR. QUINN: |
| 10:44 | 25 | Q.   Have you ever worked under one of those contracts that |

| | | |
|---|---|---|
| 10:44 | 1 | says that the person -- the company you're working for will |
| 10:44 | 2 | own your work product? |
| 10:44 | 3 | A.   Yes. |
| 10:44 | 4 | Q.   And have you ever taken any of that work product while |
| 10:44 | 5 | you were contracted to that company, while you were still |
| 10:44 | 6 | under contract, and taken it to another company? |
| 10:44 | 7 | MS. HURST:  Objection.  Assumes facts.  Beyond the |
| 10:44 | 8 | scope. |
| 10:44 | 9 | THE COURT:  I'm going to sustain the objection. |
| | 10 | BY MR. QUINN: |
| 10:44 | 11 | Q.   All right.  Finally, if we could look at 23797-16. |
| 10:44 | 12 | *(Document provided to the witness.)* |
| 10:44 | 13 | *(Document displayed.)* |
| 10:44 | 14 | MR. QUINN:  These are in evidence, Your Honor. |
| 10:44 | 15 | If we could put those up on the screen. |
| 10:44 | 16 | *(Document displayed.)* |
| 10:44 | 17 | MR. QUINN:  Ken, if we could just go through these |
| 10:44 | 18 | dash 16, dash 17. |
| 10:44 | 19 | *(Documents displayed.)* |
| 10:44 | 20 | BY MR. QUINN: |
| 10:44 | 21 | Q.   And my question to you, sir, is going to be in |
| 10:44 | 22 | connection with your work, did you see these drawings and |
| 10:44 | 23 | these dolls? |
| 10:44 | 24 | A.   Yes, I did. |
| 10:44 | 25 | Q.   And dash 18? |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 88 of 154   Page ID #:312116
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

88

| | | |
|---|---|---|
| 10:44 | 1 | *(Document displayed.)* |
| 11:59 | 2 | BY MR. QUINN: |
| 10:44 | 3 | Q.   And dash 19? |
| 10:44 | 4 | *(Document displayed.)* |
| 10:44 | 5 | THE WITNESS:  Yes, I saw them. |
| 10:44 | 6 | MR. QUINN:  And then we could look at -- this is |
| 10:45 | 7 | also in evidence, Your Honor, 23797. |
| 10:45 | 8 | *(Document displayed.)* |
| 10:45 | 9 | MR. QUINN:  23797-1. |
| 10:45 | 10 | *(Document displayed.)* |
| 10:45 | 11 | BY MR. QUINN: |
| 10:45 | 12 | Q.   Did you see these -- |
| 10:45 | 13 | A.   Yes, I have. |
| 10:45 | 14 | Q.   -- closeups as well, and dash 2? |
| 10:45 | 15 | A.   Yes. |
| 10:45 | 16 | *(Document displayed.)* |
| 10:45 | 17 | MR. QUINN:  Dash 3? |
| 10:45 | 18 | *(Document displayed.)* |
| 10:45 | 19 | MR. QUINN:  And dash 4? |
| 10:45 | 20 | *(Document displayed.)* |
| 10:45 | 21 | BY MR. QUINN: |
| 10:45 | 22 | Q.   You see those? |
| 10:45 | 23 | A.   Correct. |
| 10:45 | 24 | Q.   And you understand these are comparisons of the head of |
| 10:45 | 25 | Carter Bryant's original drawings, then some fashion |

| | | |
|---|---|---|
| 10:45 | 1 | drawings, and then the dolls themselves, correct? |
| 10:45 | 2 | A.   Correct. |
| 10:45 | 3 | Q.   And you understand that the buying decisions and |
| 10:45 | 4 | comparisons that you're talking about are going to be made |
| 10:45 | 5 | by people who don't have art degrees, correct? |
| 10:45 | 6 | MS. HURST:  Objection.  Irrelevant.  Misstates the |
| 10:45 | 7 | evidence.  And also I was instructed that I could not |
| 10:45 | 8 | inquire into this area about the target purchasers. |
| 10:45 | 9 | THE COURT:  Overruled. |
| 10:45 | 10 | You can answer the question, sir. |
| 10:45 | 11 | THE WITNESS:  Uh, would you repeat the question, |
| 10:45 | 12 | please. |
| 10:45 | 13 | BY MR. QUINN: |
| 10:45 | 14 | Q.   Yeah, the consumers, the buyers of these products are |
| 10:45 | 15 | not people who have art degrees? |
| 10:46 | 16 | A.   I don't consider the buyers -- I'm -- I assume that |
| 10:46 | 17 | they don't have art degrees, yeah. |
| 10:46 | 18 | Q.   And, again, they will be -- |
| 10:46 | 19 | THE COURT:  I'm sorry.  Excuse me.  Did you say |
| 10:46 | 20 | "buyers" or "manufacturers"? |
| 10:46 | 21 | MR. QUINN:  I said buyers, purchasers. |
| 10:46 | 22 | THE COURT:  Sustained. |
| 10:46 | 23 | MR. QUINN:  People who go to the store. |
| 10:46 | 24 | THE COURT:  Sustained. |
| 10:46 | 25 | MS. HURST:  Move to strike. |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 90 of 154   Page ID #:312118
CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

90

| | | |
|---|---|---|
| 10:46 | 1 | THE COURT:  Strike the answer. |
| 10:46 | 2 | BY MR. QUINN: |
| 10:46 | 3 | Q.   But you believe that people who make buying decisions |
| 10:46 | 4 | are in a position to -- themselves to make comparisons and |
| 10:46 | 5 | to judge -- make judgments concerning the similarities of |
| 10:46 | 6 | dolls? |
| 10:46 | 7 | MS. HURST:  Same objection.  This goes to the |
| 10:46 | 8 | target purchaser question that I asked. |
| 10:46 | 9 | THE COURT:  Now, what you asked were conversations |
| 10:46 | 10 | about seven-year-olds.  That's entirely different.  So you |
| 10:46 | 11 | can answer the question. |
| 10:46 | 12 | THE WITNESS:  Okay.  Well, first of all, I think |
| 10:46 | 13 | that if these -- we saw these as people, we would very |
| 10:46 | 14 | easily make a difference.  I, from my own experience of -- |
| 10:46 | 15 | with children, Cabbage Patch doll, my children were able to |
| 10:47 | 16 | take and discern -- |
| 10:47 | 17 | THE COURT:  Sir, sir.  Just a moment. |
| 10:47 | 18 | THE WITNESS:  Sorry. |
| 10:47 | 19 | THE COURT:  Counsel may be right.  I precluded her |
| 10:47 | 20 | from conversations involving his experience with |
| 10:47 | 21 | seven-year-olds.  Let's talk this out for a moment, and |
| 10:47 | 22 | we'll do that in front of the jury very calmly.  And the |
| 10:47 | 23 | reason I did that is I didn't want to get into surveys or |
| 10:47 | 24 | his personal discussion with one seven-year-old or get into |
| 10:47 | 25 | a whole litany of that kind of evidence.  That's for the |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

91

| | | |
|---|---|---|
| 10:47 | 1 | jury to determine.  And I wouldn't think he had the |
| 10:47 | 2 | expertise with a couple seven-year-olds or even his own |
| 10:47 | 3 | children to take the place of the jury. |
| 10:47 | 4 | Now, for both of you, that's been precluded.  If |
| 10:47 | 5 | you want to open that door, then we'll get into your vast |
| 10:47 | 6 | knowledge about seven-year-olds, but right now, no. |
| 10:47 | 7 | I'm going to strike the answer and if you want to |
| 10:47 | 8 | ask the question, then the door is open. |
| 10:47 | 9 | MR. QUINN:  I will withdraw the question, |
| 10:47 | 10 | Your Honor.  Thank you. |
| 10:47 | 11 | THE COURT:  All right.  This whole area involving |
| 10:47 | 12 | seven-year-olds and the discussion he's had with them is |
| 10:47 | 13 | stricken.  It's completely and totally irrelevant. |
| 10:48 | 14 | All right.  Counsel. |
| 10:48 | 15 | MR. QUINN:  I'm done, Your Honor. |
| 10:48 | 16 | THE COURT:  Thank you. |
| 10:48 | 17 | Counsel, your redirect. |
| 10:48 | 18 | MS. HURST:  Thank you, Your Honor. |
| 10:48 | 19 | THE COURT:  Ladies and gentlemen, the reason for |
| 10:48 | 20 | that is, just so you know, we'll talk about a couple things |
| 10:48 | 21 | that happened behind the scene, then we get into surveys |
| 10:48 | 22 | and, et cetera.  This is going to be for you to determine. |
| 10:48 | 23 | You're going to be the only eight people in history who's |
| 10:48 | 24 | heard this case and will decide it, so... |
| 10:48 | 25 | Counsel. |

| | | |
|---|---|---|
| 10:48 | 1 | MS. HURST:  Your Honor, I want to make sure I move |
| 10:48 | 2 | into evidence the demonstratives that we've used. |
| 10:48 | 3 | THE COURT:  It's denied. |
| 10:48 | 4 | MS. HURST:  Your Honor, they just showed the ones |
| 10:48 | 5 | they have in evidence on cross. |
| 10:48 | 6 | THE COURT:  And I didn't receive 'em. |
| 10:48 | 7 | MS. HURST:  They were previously received. |
| 10:49 | 8 | THE COURT:  Did I? |
| 10:49 | 9 | MS. HURST:  Yes. |
| 10:49 | 10 | THE COURT:  Did I receive yours?  I don't recall |
| 10:49 | 11 | that. |
| 10:49 | 12 | MR. QUINN:  Those composites? |
| 10:49 | 13 | MS. HURST:  Yes. |
| 10:49 | 14 | MR. QUINN:  With a different witness. |
| 10:49 | 15 | THE COURT:  Just a moment, with this witness? |
| 10:49 | 16 | MS. HURST:  With a different witness, they were |
| 10:49 | 17 | previously received. |
| 10:49 | 18 | THE COURT:  No.  No.  We'll talk this out in front |
| 10:49 | 19 | of you also.  I've let you see demonstratives coming from |
| 10:49 | 20 | the notebook, because those were already photographs of the |
| 10:49 | 21 | notebook.  I doubt that you're going to get any other |
| 10:49 | 22 | demonstrative from any other witness in this case, from |
| 10:49 | 23 | damages experts to whomever with all their charts. |
| 10:49 | 24 | So you'll have to refresh my recollection, |
| 10:49 | 25 | Counsel, about what I've let in.  And if it's Mr. –– not |

| | | |
|---|---|---|
| 10:49 | 1 | Aginsky, but Mr. -- |
| 10:49 | 2 | MR. QUINN:  Those composites came in? |
| 10:49 | 3 | THE COURT:  No, no, the chart with all the scales. |
| 10:49 | 4 | MR. QUINN:  Kinrich. |
| 10:49 | 5 | THE COURT:  Kinrich.  I doubt that that's going to |
| 10:49 | 6 | come in.  I'm probably not going to allow that in either, |
| 10:49 | 7 | Counsel, so now what's the complaint? |
| 10:49 | 8 | I want you to see the way we spend our evenings. |
| 10:49 | 9 | I'm just joking with you, as ladies and gentlemen of the |
| 10:49 | 10 | jury. |
| 10:49 | 11 | What's our complaint? |
| 10:50 | 12 | MS. HURST:  23797, Your Honor, was the one they |
| 10:50 | 13 | just used on cross that had been previously admitted. |
| 10:50 | 14 | THE COURT:  Well, not through this witness, he |
| 10:50 | 15 | wasn't. |
| 10:50 | 16 | MS. HURST:  No, but it was a demonstrative used |
| 10:50 | 17 | with an earlier witness. |
| 10:50 | 18 | THE COURT:  All right.  You'll have to show that |
| 10:50 | 19 | to me, Counsel. |
| 10:50 | 20 | Now, it may come in through a different witness |
| 10:50 | 21 | and be relevant, but as far as these presentations are |
| 10:50 | 22 | concerned, these are just demonstratives that they can show |
| 10:50 | 23 | to you. |
| 10:50 | 24 | So perhaps you have an exhibit from another |
| 10:50 | 25 | witness and it was relevant as to that witness, but as far |

CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

94

| | | |
|---|---|---|
| 10:50 | 1 | as your demonstratives and your presentations are concerned |
| 10:50 | 2 | through these witness, unless they've come into evidence |
| 10:50 | 3 | through another witness, they're irrelevant. |
| 10:50 | 4 | Now, if they reach a stipulation, by the way, |
| 10:50 | 5 | outside your presence and they both decide that these want |
| 10:50 | 6 | to come in co-equally, then they'd be received.  I'll |
| 10:50 | 7 | probably grant that, but as far as each side... |
| 10:51 | 8 | MS. HURST:  Well, Your Honor, then I would move to |
| 10:51 | 9 | strike 23797 from evidence. |
| 10:51 | 10 | THE COURT:  We'll take that up after the jury, and |
| 10:51 | 11 | I'll see what witness that pertained to.  Because I can't |
| 10:51 | 12 | recall, and you won't show that to me right now, Counsel. |
| 10:51 | 13 | MS. HURST:  I will show it to you. |
| 10:51 | 14 | THE COURT:  No, you won't. |
| 10:51 | 15 | We'll continue on and finish this examination, |
| 10:51 | 16 | right now. |
| 10:51 | 17 | MS. HURST:  Okay. |
| 10:48 | 18 | **REDIRECT EXAMINATION** |
| 11:59 | 19 | BY MS. HURST: |
| 10:51 | 20 | Q.   Mr. Vilppu, is it true that you were asked to make a |
| 10:51 | 21 | comparison using your judgment? |
| 10:51 | 22 | A.   Correct. |
| 10:51 | 23 | Q.   Did anybody tell you to ignore similarities? |
| 10:51 | 24 | A.   No. |
| 10:51 | 25 | Q.   You noted the similarities, in fact? |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 95 of 154   Page ID #:312123
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

95

| | | |
|---|---|---|
| 10:51 | 1 | A.   Yes. |
| 10:51 | 2 | Q.   But you found that they were mostly the product of |
| 10:51 | 3 | common elements, right? |
| 10:51 | 4 | A.   Correct. |
| 10:52 | 5 |        MS. HURST:  And could we see Exhibit 27492, |
| 10:52 | 6 | please. |
| 10:52 | 7 |        *(Document provided to the witness.)* |
| 10:52 | 8 |        *(Document displayed.)* |
| 10:52 | 9 | BY MS. HURST: |
| 10:52 | 10 | Q.   Could you explain what this is, Mr. Vilppu. |
| 10:52 | 11 | A.   These are illustrations -- these are illustrations from |
| 10:52 | 12 | a book on heads.  It's called "Heads."  And it is all these |
| 10:52 | 13 | people.  There's -- in fact, in here there's females, males. |
| 10:52 | 14 | There's even judges. |
| 10:52 | 15 |        *(Laughter in the courtroom.)* |
| 10:52 | 16 |        THE WITNESS:  Cab drivers.  All kinds of people. |
| 10:52 | 17 | But they're all -- they were purposefully shot exactly the |
| 10:52 | 18 | same way to show actually the fact that how similar we all |
| 10:52 | 19 | are.  And you'll notice that all of the eyes line up.  But |
| 10:52 | 20 | you can very distinctly see one person is different than the |
| 10:52 | 21 | other person.  I mean, you're not gonna confuse -- |
| 10:53 | 22 |        MR. QUINN:  Objection.  This is a narrative, |
| 10:53 | 23 | Your Honor. |
| 10:53 | 24 |        THE COURT:  Well, finish your answer, sir. |
| 10:53 | 25 |        You're not going to confuse what? |

CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

96

| | | |
|---|---|---|
| 10:53 | 1 | THE WITNESS:  One individual with another |
| 10:53 | 2 | individual. |
| 10:53 | 3 | THE COURT:  All right.  Thank you. |
| 10:53 | 4 | BY MS. HURST: |
| 10:53 | 5 | Q.   And could we go back to Exhibit 9668, please. |
| 10:53 | 6 | *(Document displayed.)* |
| 10:53 | 7 | BY MS. HURST: |
| 10:53 | 8 | Q.   And is that the depictions of the Mona Lisa, |
| 10:53 | 9 | Mr. Vilppu? |
| 10:53 | 10 | A.   Yes. |
| 10:53 | 11 | Q.   And you called the original an icon, right? |
| 10:53 | 12 | A.   Correct. |
| 10:53 | 13 | Q.   And the alteration a caricature? |
| 10:53 | 14 | A.   Correct. |
| 10:53 | 15 | Q.   And could you explain the sense in which you believe |
| 10:53 | 16 | that these are significantly different? |
| 10:53 | 17 | A.   Well, this is something that -- sometimes it's very |
| 10:53 | 18 | educational to see, as a teacher. |
| 10:53 | 19 | Okay.  Look at the expression of the eyes up there |
| 10:54 | 20 | to -- look at the mouth.  Now, if you look at the |
| 10:54 | 21 | expressions of the eyes of the altered one to the original, |
| 10:54 | 22 | they don't look the same, yet they have not been changed. |
| 10:54 | 23 | And because we relate every part to every other part, and so |
| 10:54 | 24 | that there is definitely a difference that has been caused |
| 10:54 | 25 | to the whole caricature because of the smile. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:54 | 1 | Q.   And are you talking about differences, not only in the |
| 10:54 | 2 | literal appearance of these drawings, but differences in |
| 10:54 | 3 | meaning? |
| 10:54 | 4 | A.   Differences in meaning –– in general, the feeling. |
| 10:54 | 5 | It's –– the feeling is a totally dramatically different |
| 10:54 | 6 | quality. |
| 10:54 | 7 | Q.   And when you're drawing human figures, are the subtle |
| 10:54 | 8 | differences significant in terms of conveying meaning and |
| 10:54 | 9 | expression? |
| 10:54 | 10 | A.   They're critical. |
| 10:54 | 11 | Q.   And did you see differences in the meaning and |
| 10:54 | 12 | expression between Carter Bryant's drawings and those Bratz |
| 10:55 | 13 | dolls? |
| 10:55 | 14 | A.   Yes. |
| 10:55 | 15 | Q.   And how would you characterize those? |
| 10:55 | 16 | A.   Well, the dolls are –– they came through –– as I look |
| 10:55 | 17 | through the stuff all the time –– but that –– that they're |
| 10:55 | 18 | much, much sweeter.  They're much more appealing in |
| 10:55 | 19 | comparison to Carter Bryant's drawings. |
| 10:55 | 20 | Q.   And Mr. Quinn asked you some questions about whether |
| 10:55 | 21 | Carter Bryant made comments in the process.  Do you remember |
| 10:55 | 22 | that? |
| 10:55 | 23 | A.   Yes. |
| 10:55 | 24 | Q.   And from your review of all those materials, was it |
| 10:55 | 25 | your conclusion that it was MGA who controlled the overall |

CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

98

| | | |
|---|---|---|
| 10:55 | 1 | process of what that sculpt and what those dolls would look |
| 10:55 | 2 | like? |
| 10:55 | 3 | MR. QUINN:  That's beyond the scope, Your Honor, |
| 10:55 | 4 | and lacks foundation. |
| 10:55 | 5 | THE WITNESS:  Well, I remember -- |
| 10:55 | 6 | THE COURT:  I'll let you answer -- well, strike |
| 10:55 | 7 | that. |
| 10:55 | 8 | I'm going to sustain the objection, Counsel. |
| 10:55 | 9 | THE WITNESS:  I'm sorry? |
| 10:55 | 10 | THE COURT:  You don't have to answer the question. |
| 10:55 | 11 | BY MS. HURST: |
| 10:55 | 12 | Q.   In your review of the materials Mr. Quinn referred to, |
| 10:56 | 13 | who did you conclude had the final authority with respect to |
| 10:56 | 14 | the appearance of the Bratz production sculpt? |
| 10:56 | 15 | MR. QUINN:  Same objection.  And irrelevant. |
| 10:56 | 16 | THE COURT:  Between who?  Who are you referring |
| 10:56 | 17 | to?  I don't understand.  Refresh my recollection. |
| 10:56 | 18 | MS. HURST:  Mr. Quinn asked about Carter Bryant's |
| 10:56 | 19 | comments, and now I'm asking about the end result of that |
| 10:56 | 20 | process. |
| 10:56 | 21 | THE COURT:  You can ask that question. |
| 10:56 | 22 | MS. HURST:  All right. |
| 10:56 | 23 | THE COURT:  My apologies. |
| | 24 | BY MS. HURST: |
| 10:56 | 25 | Q.   So in your review of everything you saw here, who did |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 99 of 154   Page ID #:312127
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

99

| 10:56 | 1 | you conclude controlled what that final Bratz production |
| 10:56 | 2 | sculpt would look like? |
| 10:56 | 3 | A.   MGA. |
| 10:56 | 4 | Q.   And what about the dolls? |
| 10:56 | 5 | A.   MGA. |
| 10:56 | 6 | MS. HURST:  Thank you. |
| 10:56 | 7 | THE COURT:  Recross. |
| 10:56 | 8 | MR. QUINN:  Nothing, Your Honor. |
| 10:56 | 9 | THE COURT:  All right.  Now, ladies and gentlemen, |
| 10:56 | 10 | would you excuse us for just one moment.  I'd like to speak |
| 10:56 | 11 | to counsel. |
| 10:56 | 12 | Sir, if would you remain for just a moment. |
| 10:56 | 13 | We'll be right back to you.  Ladies and gentlemen, |
| 10:56 | 14 | you're admonished not to discuss this matter amongst |
| 10:56 | 15 | yourselves, nor form or express any opinion concerning this |
| 10:56 | 16 | case. |
| 10:57 | 17 | *(Jury recesses at 10:57 a.m.)* |
| 10:57 | 18 | THE COURT:  All right.  Counsel, if you would be |
| 10:57 | 19 | seated. |
| 10:57 | 20 | *(Outside the presence of the jury.)* |
| 10:57 | 21 | THE COURT:  Now, let's discuss this out of the |
| 10:57 | 22 | presence of the jury, Ms. Hurst. |
| 10:57 | 23 | MS. HURST:  Your Honor -- |
| 10:57 | 24 | THE COURT:  No, I'm speaking now.  You're |
| 10:57 | 25 | listening. |

| | | |
|---|---|---|
| 10:57 | 1 | MS. HURST:  I thought you were asking me. |
| 10:57 | 2 | THE COURT:  I'm speaking to you.  That's right. |
| 10:57 | 3 | You're listening. |
| 10:57 | 4 | MS. HURST:  I apologize. |
| 10:57 | 5 | THE COURT:  I can't recall quickly enough on the |
| 10:57 | 6 | bench Exhibit 36772.  And as a judge, I cannot absorb |
| 10:57 | 7 | quickly enough with 40,000 exhibits a belief that, "Judge, |
| 10:57 | 8 | you let this in, and therefore we should get our |
| 10:57 | 9 | demonstratives in."  Because I can't recall by number the |
| 10:58 | 10 | specific exhibit you're referring to and how that exhibit |
| 10:58 | 11 | came in through any one of the 50 witnesses we've had.  And |
| 10:58 | 12 | I'm going to demonstrate that to you by referring you to |
| 10:58 | 13 | 27849.  Would you tell me what that exhibit is, please? |
| 10:58 | 14 | MS. HURST:  I don't know, Your Honor. |
| 10:58 | 15 | THE COURT:  30,815, what exhibit is that? |
| 10:58 | 16 | MS. HURST:  I don't know, Your Honor. |
| 10:58 | 17 | THE COURT:  Then when you put a Court in that |
| 10:58 | 18 | position, to simply accept demonstratives when I've already |
| 10:58 | 19 | indicated that I'm not going to do that out of the presence |
| 10:58 | 20 | of the jury, it puts me in the position of getting into a |
| 10:58 | 21 | disagreement with you in front of the jury. |
| 10:58 | 22 | Now, I'm going to inform both counsel that I'm |
| 10:58 | 23 | probably not going to allow any demonstratives in this case, |
| 10:58 | 24 | with one exception.  The demonstratives that I've |
| 10:58 | 25 | continually told you informally and formally about that come |

| 10:58 | 1 | from the notebook itself, where the different professionals |
| 10:58 | 2 | blew up the actual writing pages and showed us where the ink |
| 10:59 | 3 | samples were taken from. |
| 10:59 | 4 | And that's been co-equal. |
| 10:59 | 5 | I think I've indicated to Mattel that you're not |
| 10:59 | 6 | getting in your demonstratives through Wagner. |
| 10:59 | 7 | MR. PRICE:  You indicated that. |
| 10:59 | 8 | THE COURT:  I think I've indicated to you that |
| 10:59 | 9 | you're not going to get in your demonstratives through |
| 10:59 | 10 | Molinski. |
| 10:59 | 11 | MR. McCONVILLE:  Malackowski. |
| 10:59 | 12 | THE COURT:  Malackowski. |
| 10:59 | 13 | Mr. Quinn had requested, but I had initially |
| 10:59 | 14 | received and indicated to him informally he's probably not |
| 10:59 | 15 | going to get his charts in that show the different |
| 10:59 | 16 | percentages through his expert. |
| 10:59 | 17 | MS. HURST:  Kinrich. |
| 10:59 | 18 | THE COURT:  Kinrich.  I always get Chemical Ali |
| 10:59 | 19 | mixed up with -- I'm just kidding you. |
| 10:59 | 20 | So the end result is you're hopeless.  And I've |
| 10:59 | 21 | told you to simplify this down for the jury and to get your |
| 10:59 | 22 | professional hats on, and if you don't, they're going to be |
| 11:00 | 23 | wondering what your experts are talking about. |
| 11:00 | 24 | I'm not letting in these demonstratives, because |
| 11:00 | 25 | this is nothing more than an aid to an expert.  And under |

| | | |
|---|---|---|
| 11:00 | 1 | the *Johnson* case, I have the clear authority to do that. |
| 11:00 | 2 | Now, you control your own future.  If both sides |
| 11:00 | 3 | want to stipulate, and you think it's beneficial to both of |
| 11:00 | 4 | you, you will come to me and tell me. |
| 11:00 | 5 | If you want to argue during your final arguments |
| 11:00 | 6 | and use the screen, I'm willing to do that. |
| 11:00 | 7 | Right now you're not.  There isn't going to be a |
| 11:00 | 8 | thing that goes up on the board. |
| 11:00 | 9 | Now, have you found 1851 for me?  Ms. Hurst, did I |
| 11:00 | 10 | make my point? |
| 11:00 | 11 | MS. HURST:  Yes, Your Honor. |
| 11:00 | 12 | THE COURT:  What you can't do is just shout out an |
| 11:00 | 13 | exhibit and say, "Judge, because it came in, therefore we |
| 11:00 | 14 | should have our demonstratives in."  I have no idea, |
| 11:00 | 15 | Ms. Hurst, what witness that came in through.  So if you're |
| 11:00 | 16 | going to challenge me in front of the jury, you're going to |
| 11:01 | 17 | get a real abrupt response from the Court.  And we are |
| 11:01 | 18 | continually getting to that position, and I think it's |
| 11:01 | 19 | hurting your case. |
| 11:01 | 20 | Now, the lectern's yours as a courtesy, because I |
| 11:01 | 21 | have no idea what you were talking about. |
| 11:01 | 22 | So your turn. |
| 11:01 | 23 | MS. HURST:  May I show the Court the exhibit? |
| 11:01 | 24 | THE COURT:  No, I'm not interested right now. |
| 11:01 | 25 | MS. HURST:  All right. |

| | | |
|---|---|---|
| 11:01 | 1 | THE COURT: This should be done beforehand. In |
| 11:01 | 2 | other words, I was here until about 2:00 o'clock looking at |
| 11:01 | 3 | are your exhibits last night. I know you were up until 2:30 |
| 11:01 | 4 | the night before. I'm here all the time. But I can't |
| 11:01 | 5 | recall, and that doesn't mean I can balance out and let in |
| 11:01 | 6 | demonstratives for one side or the other. |
| 11:01 | 7 | MS. HURST: All right. |
| 11:01 | 8 | THE COURT: I told you I'm not going to do that. |
| 11:01 | 9 | MS. HURST: At the conclusion of Ms. Garcia's |
| 11:01 | 10 | examination, Mr. Quinn moved into evidence certain |
| 11:01 | 11 | demonstratives that were used by her, including |
| 11:01 | 12 | Exhibit 23797, which is the picture of the three heads that |
| 11:01 | 13 | I'm holding up that Mr. Quinn just used to cross-examine |
| 11:01 | 14 | Mr. Vilppu with. This was previously received. |
| 11:02 | 15 | THE COURT: Just a moment. Then you can show him |
| 11:02 | 16 | that already previously received exhibit. That wasn't your |
| 11:02 | 17 | request. Your request was to move in all the demonstratives |
| 11:02 | 18 | that you used. |
| 11:02 | 19 | MS. KELLER: We want to be able to move our |
| 11:02 | 20 | evidence in because their evidence has come in. The Court |
| 11:02 | 21 | in front of the jury previously received this document |
| 11:02 | 22 | comparing the heads. |
| 11:02 | 23 | THE COURT: We're not communicating. |
| 11:02 | 24 | If I have previously received a document, you can |
| 11:02 | 25 | certainly show it. But you had a sweeping request, "Judge, |

Case 2:04-cv-09049-DOC-RNB  Document 10283  Filed 03/28/11  Page 104 of 154  Page ID #:312132
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

104

| 11:02 | 1  | receive all the demonstratives that I've just used in my |
| 11:02 | 2  | presentation." |
| 11:02 | 3  | MS. HURST:  I meant to detail them one by one, but |
| 11:02 | 4  | the Court immediately denied the request.  I meant to go |
| 11:02 | 5  | through them one by one. |
| 11:02 | 6  | THE COURT:  You want to go back on the record. |
| 11:02 | 7  | That's exactly what you didn't say.  You may have intended |
| 11:02 | 8  | it, but that's what you did not -- |
| 11:02 | 9  | MS. HURST:  Well, the Court said "denied" before I |
| 11:02 | 10 | could get the next word out of my mouth, to be quite honest. |
| 11:02 | 11 | THE COURT:  Why didn't you start with the specific |
| 11:02 | 12 | demonstrative that you wanted to move in?  Because Mr. Quinn |
| 11:03 | 13 | did the same thing, by the way, so we balance this out.  If |
| 11:03 | 14 | you recall, Mr. Quinn wanted, so we have co-equality here, |
| 11:03 | 15 | all the demonstratives to come from Dr. Aginsky.  And we |
| 11:03 | 16 | went through those piece by piece and got rid of 17, 18, 19, |
| 11:03 | 17 | 20, 22, 23 -- one by one. |
| 11:03 | 18 | MS. HURST:  Your Honor, the Court said "denied" |
| 11:03 | 19 | before I could get to my note, to be perfectly honest, and |
| 11:03 | 20 | then I did not want to argue with you.  If I had understood |
| 11:03 | 21 | that that was the issue, that you just needed the numbers, I |
| 11:03 | 22 | would have immediately moved to the numbers. |
| 11:03 | 23 | THE COURT:  Well, we can do that outside the |
| 11:03 | 24 | presence of the jury.  I'm not going to go through this with |
| 11:03 | 25 | you now in front of the jury. |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 105 of 154   Page ID #:312133
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

105

| 11:03 | 1 | MS. HURST:  Understood. |

11:03    1    MS. HURST:  Understood.

11:03    2    THE COURT:  You're going to be put in a tough box

11:03    3  by me.  Once you challenge me, you're not going to prevail,

11:03    4  not in front of the jury.  And I think it's your

11:03    5  responsibility to start with the exact demonstrative that

11:03    6  you want and that it's your job you make sure I know what

11:03    7  that is so I have a chance to make a ruling and not just say

11:04    8  a number.

11:04    9    MS. HURST:  Okay.  Well, Your Honor, I thought

11:04   10  they had each been handed to you during the course of the

11:04   11  examination, and I was going to then refer to those of which

11:04   12  ones we wanted.  So I'm happy to do that outside of the

11:04   13  presence of the jury later.  But we just need to know --

11:04   14  because these comparison drawings came in earlier -- if our

11:04   15  comparison drawings can come in as well.

11:04   16    That's all.

11:04   17    THE COURT:  "These comparison drawings came in

11:04   18  earlier, so therefore, Judge" -- if you're sitting in my

11:04   19  position, all you've heard is "We're now moving in our

11:04   20  demonstratives."  The obvious answer is going to be

11:04   21  "denied."

11:04   22    Now, where are we going to go from here?

11:04   23    MS. HURST:  I think we should excuse the witness

11:04   24  and move on to the next witness, and I will take up these

11:04   25  demonstratives later outside the presence of the jury.

11:04    1          THE COURT:  I can certainly inform them which ones
11:04    2    are appropriate and which ones aren't.
11:05    3          For instance, just to complete my record.
11:05    4          MS. HURST:  Your Honor, we're happy to go through
11:05    5    it later if the Court wishes.
11:05    6          THE COURT:  Well, let's just take an example.
11:05    7    36630.  Why would I allow that in?
11:05    8          MS. HURST:  Because --
11:05    9          THE COURT:  If I allowed in 18817, why wouldn't I
11:05   10    be then allowing in a comparison of your previously denied
11:05   11    expert who shrunk and dimensionalized for Mattel?
11:05   12          These are demonstratives.  They're photographs
11:05   13    taken at different angles.  He can demonstrate his
11:05   14    viewpoint, but potentially they're misleading.  They can aid
11:05   15    him, but they're not a piece of evidence.  The jury is going
11:06   16    to have the originals on 36618, 36623, 36625; the same issue
11:06   17    concerning 36631.  I don't know if I'm going to get into
11:06   18    that kind of drawing which I denied this witness the ability
11:06   19    to make, anything other than him demonstrating on the
11:06   20    screen; otherwise, I don't know why I'm not into the
11:06   21    dimensional that the previously excluded expert from Mattel
11:06   22    was entering into.
11:06   23          And as far as the general education is concerned,
11:06   24    I initially cut off your request until Mr. Quinn opened the
11:06   25    door with the Mona Lisa, the different caricatures involved

CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

107

| 11:06 | 1 | in what I previously allowed you to get into in redirect. |
|---|---|---|
| 11:06 | 2 | Now, I thought that these witnesses were on the |
| 11:06 | 3 | stand for one reason; very simply, to tell us the difference |
| 11:06 | 4 | between two dimensional and three dimensional, and yet now |
| 11:07 | 5 | we got into the whole conclusionary issue because Mr. Quinn |
| 11:07 | 6 | opened that door, of which you've now had to respond to the |
| 11:07 | 7 | understanding of what Carter Bryant was and how he received |
| 11:07 | 8 | input or not. |
| 11:07 | 9 | So we've gone far afield once again. |
| 11:07 | 10 | So while I appreciate the aggressiveness of the |
| 11:07 | 11 | parties, it always catches the Court in the position of each |
| 11:07 | 12 | side, quite frankly, trying to get one piece of evidence in, |
| 11:07 | 13 | quite frankly, that each side knows and recognizes on |
| 11:07 | 14 | occasion is improper.  And it's continuing. |
| 11:07 | 15 | So... |
| 11:07 | 16 | Doctor, it's been a pleasure to have you here. |
| 11:07 | 17 | We'll call the jury back in. |
| 11:07 | 18 | And would you get the jury, please. |
| 11:07 | 19 | THE WITNESS:  Been a very educational experience. |
| 11:07 | 20 | THE COURT:  Well, I know it has been. |
| 11:07 | 21 | It's been a pleasure to have you here, sir. |
| 11:08 | 22 | *(Witness steps down subject to recall.)* |
| 11:08 | 23 | *(In the presence of the jury.)* |
| 11:09 | 24 | THE COURT:  All right.  The jury's present.  The |
| 11:09 | 25 | alternates are present.  All counsel are present. |

CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

108

| | | |
|---|---|---|
| 11:09 | 1 | Thank you for your courtesy. |
| 11:09 | 2 | Doctor, we're going to thank and excuse -- strike |
| 11:09 | 3 | that.  We're going to keep you on call until the date of |
| 11:09 | 4 | April 8th.  Okay? |
| 11:09 | 5 | THE WITNESS:  I am leaving -- |
| 11:09 | 6 | THE COURT:  You go about any vacation you have |
| 11:09 | 7 | planned or any professional obligations.  If we need you, |
| 11:09 | 8 | we'll find you. |
| 11:09 | 9 | THE WITNESS:  Okay.  I'll be in Europe. |
| 11:09 | 10 | THE COURT:  Okay.  We'll find you. |
| 11:09 | 11 | THE WITNESS:  Thank you. |
| 11:09 | 12 | THE COURT:  Thank you very much.  You may step |
| 11:09 | 13 | down. |
| 11:09 | 14 | *(Witness steps down subject to recall.)* |
| 11:09 | 15 | THE COURT:  Counsel, your next witness. |
| 11:09 | 16 | MS. KELLER:  Your Honor, we're recalling Erich |
| 11:09 | 17 | Joachimstahler.  I believe Mr. Quinn was on cross (sic). |
| 11:09 | 18 | THE COURT:  Thank you. |
| 11:10 | 19 | Dr. Joachimstahler, if you would come forward, |
| 11:10 | 20 | sir. |
| | 21 | **ERICH JOACHIMSTAHLER, MGA'S WITNESS, PREVIOUSLY SWORN,** |
| | 22 | **RESUMED THE STAND** |
| 11:10 | 23 | THE COURT:  If you would have a seat. |
| 11:10 | 24 | THE WITNESS:  Thank you. |
| 11:10 | 25 | THE COURT:  Now, Doctor, Dr. Joachimstahler, do |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:10 | 1 | you remember the oath that was administered to you the other |
| 11:10 | 2 | day? |
| 11:10 | 3 | THE WITNESS:  The? |
| 11:10 | 4 | THE COURT:  The oath that you took. |
| 11:10 | 5 | THE WITNESS:  Yes. |
| 11:10 | 6 | THE COURT:  The same oath applies, sir. |
| 11:10 | 7 | If you would move the microphone a little closer. |
| 11:10 | 8 | This is Mr. Quinn, and I believe he was on re-re-redirect. |
| 11:10 | 9 | I'm just kidding you.  It was re-recross. |
| 11:10 | 10 | MR. QUINN:  Recross. |
| 11:10 | 11 | THE COURT:  Recross.  And this is the final set of |
| 11:10 | 12 | questions. |
| 11:10 | 13 | MR. QUINN:  This is it. |
| 11:10 | 14 | THE COURT:  This is it.  All right. |
| 11:10 | 15 | Counsel. |
| 11:10 | 16 | **RECROSS-EXAMINATION** *(Resumed)* |
| 11:10 | 17 | BY MR. QUINN: |
| 11:10 | 18 | Q.   Good morning, doctor. |
| 11:10 | 19 | A.   Good morning. |
| 11:10 | 20 | Q.   Just to follow up on a few things from your testimony |
| 11:10 | 21 | last week.  You told us when you were talking about the -- |
| 11:10 | 22 | in response to Ms. Keller's questions, you were talking |
| 11:10 | 23 | about the personality of Bratz.  And you talked about the |
| 11:10 | 24 | sexiness for little girls, but not like a 14- or |
| 11:11 | 25 | 16-year-old. |

| | | |
|--|--|--|
| 11:11 | 1 | Could you explain that a little bit to us? |
| 11:11 | 2 | A.   Yes.  Um, I -- um, the personality consists of several |
| 11:11 | 3 | attributes.  We usually have a combination five, six, seven. |
| 11:11 | 4 | One of these elements is also a -- a childish innocence, |
| 11:11 | 5 | sexiness.  I think that's what I said.  Something like -- |
| 11:11 | 6 | Q.   A childish innocent sexiness? |
| 11:11 | 7 | A.   Yes.  It's like how 14-year-olds, teenagers are, um, |
| 11:11 | 8 | view -- what I -- what is the term "sexy," yes. |
| 11:11 | 9 | Q.   Okay.  Thank you. |
| 11:11 | 10 | Now, you said the famous John Deere brand colors are |
| 11:11 | 11 | red and yellow? |
| 11:11 | 12 | A.   Uh, no.  If I -- I apologize if I did.  It's green and |
| 11:11 | 13 | yellow. |
| 11:11 | 14 | Q.   All right.  Red and yellow, that would be somebody |
| 11:11 | 15 | else? |
| 11:11 | 16 | A.   Red and yellow, I don't think in the lawn-mowing |
| 11:12 | 17 | business. |
| 11:12 | 18 | Q.   Maybe sport cars, like Ferrari. |
| 11:12 | 19 | Now, how much -- in terms of total sales, what, in |
| 11:12 | 20 | terms of -- I mean, you've told us you've spent $400,000 in |
| 11:12 | 21 | your research in this case, correct? |
| 11:12 | 22 | A.   That's correct, yes. |
| 11:12 | 23 | Q.   And so, can you tell us in terms of total sales what |
| 11:12 | 24 | amount of sales for a product would you, in your mind, |
| 11:12 | 25 | consider to make a successful fashion doll product? |

| | | |
|---|---|---|
| 11:12 | 1 | A.    Now, can you clarify:  Do you mean in the first year or |
| 11:12 | 2 | do you mean over years? |
| 11:12 | 3 | Q.    In the lifetime of a product.  For -- let me back up |
| 11:12 | 4 | for a second.  First, you told us that an awful lot of |
| 11:12 | 5 | toys -- even good toys, good products -- only last for a |
| 11:12 | 6 | year or two, correct? |
| 11:12 | 7 | A.    That's correct. |
| 11:12 | 8 | Q.    So in terms of total sales for the life of a product, |
| 11:12 | 9 | what would be the total sales that you think would be |
| 11:12 | 10 | necessary for you, sir, in your opinion, to consider a |
| 11:12 | 11 | fashion doll successful? |
| 11:12 | 12 | A.    I don't really look at it in terms of sales because |
| 11:13 | 13 | they are specialized dolls.  They are more mainstream dolls |
| 11:13 | 14 | that appear to broader ranges of -- so it's very difficult |
| 11:13 | 15 | to express it in a sales number -- |
| 11:13 | 16 | Q.    All right. |
| 11:13 | 17 | A.    -- in itself. |
| 11:13 | 18 | Q.    But you, in response to one -- Ms. -- one of |
| 11:13 | 19 | Ms. Keller's questions last week, you were, um, quite |
| 11:13 | 20 | definite.  She asked you if you'd ever heard of the Diva |
| 11:13 | 21 | Starz brand, and you said, yes.  And she said, "Another |
| 11:13 | 22 | flop?"  And you said, "Yes, significantly, Diva Starz was a |
| 11:13 | 23 | flop." |
| 11:13 | 24 |         Do you recall that testimony? |
| 11:13 | 25 | A.    Yes, I do. |

CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

112

| | | |
|---|---|---|
| 11:13 | 1 | Q.   What were the total sales of Diva Starz? |
| 11:13 | 2 | A.   I don't know.  Diva Starz disappeared from the market |
| 11:13 | 3 | and was perceived to be not very successful. |
| 11:13 | 4 | Q.   Now, would your opinion change if the total sales for |
| 11:13 | 5 | Diva Starz worldwide were $186 million?  Would that affect |
| 11:13 | 6 | your opinion at all, sir? |
| 11:13 | 7 | A.   Um, again -- now, that's a global figure, a launch by a |
| 11:13 | 8 | very major company in the -- with distribution strengths, |
| 11:14 | 9 | with existing capabilities. |
| 11:14 | 10 | The strength of a brand is not in the first -- yeah, I |
| 11:14 | 11 | need to complete the answer. |
| 11:14 | 12 | Q.   If you can answer it "yes" or "no," I'd really |
| 11:14 | 13 | appreciate it if you would.  If you can fairly answer the |
| 11:14 | 14 | question "yes" or "no." |
| 11:14 | 15 | And my question to you is, if Diva Starz' total sales |
| 11:14 | 16 | were $186 million, would you still consider it a flop?  Yes |
| 11:14 | 17 | or no. |
| 11:14 | 18 | A.   Um, the answer would not change. |
| 11:14 | 19 | Q.   So it's flop?  $186 million, in your opinion, that |
| 11:14 | 20 | would be a flop? |
| 11:14 | 21 | MS. KELLER:  Objection.  Your Honor, this is an |
| 11:14 | 22 | argumentative question at this point. |
| 11:14 | 23 | THE COURT:  Overruled. |
| 11:14 | 24 | You can answer the question. |
| 11:14 | 25 | THE WITNESS:  Yes, I would -- I would consider |

| | | |
|---|---|---|
| 11:14 | 1 | still, uh, the brand that is not in the -- on the shelf for |
| 11:14 | 2 | more than a year or two a flop, yes. |
| 11:14 | 3 | BY MR. QUINN: |
| 11:14 | 4 | Q.   Even if it was $186 million in sales? |
| 11:14 | 5 | A.   Because sales -- |
| 11:14 | 6 | Q.   Sir -- |
| 11:14 | 7 | MS. KELLER:  Your Honor, I'd ask the witness be |
| 11:14 | 8 | allowed to finish his answer. |
| 11:15 | 9 | THE COURT:  Yeah.  But we're all on a time clock, |
| 11:15 | 10 | and it's counting against the parties. |
| 11:15 | 11 | If you can answer the question quickly, answer the |
| 11:15 | 12 | question. |
| 11:15 | 13 | THE WITNESS:  Okay. |
| 11:15 | 14 | THE COURT:  Okay? |
| 11:15 | 15 | THE WITNESS:  As far as I can, yes.  The answer's |
| 11:15 | 16 | yes. |
| 11:15 | 17 | BY MR. QUINN: |
| 11:15 | 18 | Q.   All right.  And you told us last week, in response to |
| 11:15 | 19 | one of Ms. Keller's questions -- you were talking about |
| 11:15 | 20 | importance of the brand.  And you said "Products change, |
| 11:15 | 21 | designs change, sponsorships change, marketing campaigns |
| 11:15 | 22 | change" -- do you recall saying that? |
| 11:15 | 23 | A.   Yes, I do. |
| 11:15 | 24 | Q.   Can you tell us whether or not the body and head of the |
| 11:15 | 25 | core teenage -- Bratz teenage fashion dolls -- the design of |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 114 of 154   Page ID #:312142
CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

114

| | | |
|---|---|---|
| 11:15 | 1 | the body and the head of the core Bratz teenage fashion |
| 11:15 | 2 | dolls ever -- or changed ever up to 2008; do you know? |
| 11:15 | 3 |        MS. KELLER:  Objection.  Beyond the scope of this |
| 11:15 | 4 | witness's expertise. |
| 11:15 | 5 |        THE COURT:  Overruled.  Branding expert, |
| 11:15 | 6 | allegedly. |
| 11:15 | 7 |        You can answer the question. |
| 11:15 | 8 | BY MR. QUINN: |
| 11:15 | 9 | Q.   Do you know if that design ever changed -- of the body |
| 11:16 | 10 | and the head -- right up to 2008? |
| 11:16 | 11 | A.   It's not a teenage doll, so I think you -- you spoke |
| 11:16 | 12 | about a teenage doll. |
| 11:16 | 13 | Q.   The core Bratz fashion dolls, do you know if the body |
| 11:16 | 14 | or the head ever changed up through 2008? |
| 11:16 | 15 | A.   No, I don't know it. |
| 11:16 | 16 | Q.   You were talking successful Mattel brands and -- and |
| 11:16 | 17 | you've heard of Hot Wheels? |
| 11:16 | 18 | A.   Yes. |
| 11:16 | 19 | Q.   Successful brand? |
| 11:16 | 20 | A.   Yes. |
| 11:16 | 21 | Q.   Heard of Fisher-Price? |
| 11:16 | 22 | A.   Yes.  Acquired brand by Mattel. |
| 11:16 | 23 | Q.   American Girl, have -- |
| 11:16 | 24 | A.   Yes. |
| 11:16 | 25 | Q.   -- you heard of that? |

| | | |
|---|---|---|
| 11:16 | 1 | A.   Acquired brand by Mattel. |
| 11:16 | 2 | Q.   And Mattel has grown those brands, correct? |
| 11:16 | 3 | A.   I don't know.  I don't study -- I didn't study them in |
| 11:16 | 4 | particular. |
| 11:16 | 5 | Q.   All right.  So you're not in a position to say that |
| 11:16 | 6 | Mattel has not grown brands that it has acquired, are you? |
| 11:16 | 7 | A.   No, I'm not in the position.  It's not in my testimony. |
| 11:16 | 8 | Q.   How about Polly Pocket, have you heard of that brand? |
| 11:16 | 9 | A.   Yes, absolutely. |
| 11:16 | 10 | Q.   And Uno, have you heard of that brand? |
| 11:17 | 11 | A.   Yes, also acquired. |
| 11:17 | 12 | Q.   Was Hot Wheels acquired? |
| 11:17 | 13 | A.   It's Fisher-Price, I believe. |
| 11:17 | 14 | Q.   Hot Wheels? |
| 11:17 | 15 | A.   Yeah. |
| 11:17 | 16 | Q.   Could you be wrong about that? |
| 11:17 | 17 | A.   Yeah.  I didn't study that. |
| 11:17 | 18 | Q.   All right.  So you might -- Hot Wheels -- so far as you |
| 11:17 | 19 | know, Hot Wheels might have been a brand that was developed |
| 11:17 | 20 | internally at Mattel, correct? |
| 11:17 | 21 | A.   That's possible.  I didn't study that. |
| 11:17 | 22 | Q.   And Masters of the Universe? |
| 11:17 | 23 | A.   Could be. |
| 11:17 | 24 | Q.   All right.  We were talking about brands and products |
| 11:17 | 25 | versus product designs.  It's true, isn't it, that this -- |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:17 | 1 | after this meeting -- meeting with Carter Bryant and seeing |
| 11:17 | 2 | his designs back in 2000, it's true that after that, MGA was |
| 11:17 | 3 | completely transformed, correct? |
| 11:17 | 4 | A.   Um, yes.  I don't know how you mean that, but I don't |
| 11:17 | 5 | know -- MGA transformed. |
| 11:17 | 6 | Q.   So they'd never had a successful brand before, so far |
| 11:17 | 7 | as you know? |
| 11:17 | 8 | A.   As far as I know, yes. |
| 11:17 | 9 | Q.   They had never done any out-licensing before, so far as |
| 11:18 | 10 | you know? |
| 11:18 | 11 | A.   I don't know, yes. |
| 11:18 | 12 | Q.   Did you know whether or not MGA had gone through a |
| 11:18 | 13 | bankruptcy before meeting Carter Bryant? |
| 11:18 | 14 | A.   No, I did not know.  I don't know. |
| 11:18 | 15 | Q.   Do you know whether or not Bratz is far and away the |
| 11:18 | 16 | most successful product MGA has ever had? |
| 11:18 | 17 | A.   I -- I would guess so. |
| 11:18 | 18 | Q.   And have you seen -- you said you've read a lot of |
| 11:18 | 19 | documents and read some deposition testimony. |
| 11:18 | 20 | Have you seen an e-mail from Mr. Larian dated in |
| 11:18 | 21 | September of 2000, where he says, based solely on seeing the |
| 11:18 | 22 | designs, he's prepared to commit millions and build a brand? |
| 11:18 | 23 | A.   That's very gutsy.  I didn't -- I don't recall the |
| 11:18 | 24 | e-mail. |
| 11:18 | 25 | Q.   Well, if we could take a look at Exhibit 16788.  If we |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 117 of 154   Page ID #:312145
CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

117

| | | |
|---|---|---|
| 11:18 | 1 | could show that to you. |
| 11:18 | 2 | (Document provided to the witness.) |
| 11:18 | 3 | MR. QUINN:  And this is in evidence, Your Honor. |
| 11:18 | 4 | *(Document displayed.)* |
| 11:18 | 5 | BY MR. QUINN: |
| 11:18 | 6 | Q.   It's dated September 13, 2000.  Do you see that? |
| 11:19 | 7 | A.   Yes. |
| 11:19 | 8 | Q.   And, as of that date, based on your research, do you |
| 11:19 | 9 | know whether there was anything that existed at that point |
| 11:19 | 10 | other than Mr. Bryant's designs? |
| 11:19 | 11 | A.   Let me -- should I read the e-mail first? |
| 11:19 | 12 | Q.   Sure. |
| 11:19 | 13 | A.   Okay.  Okay. |
| 11:19 | 14 | Q.   As of the time that Mr. Larian says here on |
| 11:19 | 15 | September 13, 2000, that "We are going to risk and spend |
| 11:19 | 16 | millions making this brand and line happen," do you know |
| 11:19 | 17 | whether anything in the nature of a Bratz object or item |
| 11:19 | 18 | existed, other than Mr. Bryant's drawings as of the time |
| 11:19 | 19 | Mr. Larian made this statement? |
| 11:19 | 20 | A.   Uh, no, I don't know. |
| 11:19 | 21 | Q.   Uh, but you did interview Paula Garcia? |
| 11:20 | 22 | A.   Yes, I did. |
| 11:20 | 23 | Q.   And you remember what Ms. Garcia told you about her |
| 11:20 | 24 | reaction to Mr. Bryant and these designs, correct? |
| 11:20 | 25 | A.   Uh, yeah.  I don't know the conversation anymore, but |

| | | |
|---|---|---|
| 11:20 | 1 | I -- it's in my report, yes. |
| 11:20 | 2 | Q.   Yes, it's in your report.  And what she told you is |
| 11:20 | 3 | that -- and I quote from your report -- "I saw him" -- |
| 11:20 | 4 | meaning Carter Bryant -- "and I remember that day like |
| 11:20 | 5 | yesterday.  I was so impressed by him as a person and an |
| 11:20 | 6 | artist.  I was blown away by his ability to look outside the |
| 11:20 | 7 | box.  His ability to create this amazing trend was very |
| 11:20 | 8 | impressive.  It takes a very different designer to look |
| 11:20 | 9 | outside of the box and see the huge lips and tiny, tiny |
| 11:20 | 10 | nose.  It was so much bigger than the fashions.  I remember |
| 11:20 | 11 | thinking he is a true creative genius.  He can think about |
| 11:21 | 12 | fashion as such a bigger concept." |
| 11:21 | 13 |      That's what she told you, isn't it? |
| 11:21 | 14 | A.   I think I remember that, yes. |
| 11:21 | 15 |           MR. QUINN:  Thank you, sir. |
| 11:21 | 16 |           THE COURT:  All right.  Now, Doctor -- |
| 11:21 | 17 |           Well, we've had direct, cross, redirect, recross; |
| 11:21 | 18 | is that correct? |
| 11:21 | 19 |           MR. QUINN:  Yes, Your Honor. |
| 11:21 | 20 |           THE COURT:  Okay.  We're going to place you on |
| 11:21 | 21 | call, but I doubt that you'll be returning.  I need you on |
| 11:21 | 22 | call so no additional subpoenas have to be served across the |
| 11:21 | 23 | country or the world, until the date of April 8th.  It's a |
| 11:21 | 24 | Friday.  Go about your professional responsibilities though. |
| 11:21 | 25 | Take any trips you need to.  If we need you, we'll be |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 119 of 154   Page ID #:312147
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

119

| | | |
|---|---|---|
| 11:21 | 1 | courteous.  We'll find you. |
| 11:21 | 2 | THE WITNESS:  Thank you. |
| 11:21 | 3 | THE COURT:  Thank you very much, sir.  You may |
| 11:21 | 4 | step down. |
| 11:21 | 5 | *(Witness steps down subject to recall.)* |
| 11:21 | 6 | THE COURT:  Counsel, your next witness. |
| 11:21 | 7 | MS. KELLER:  Your Honor, may we have just two |
| 11:21 | 8 | minutes to set up for our next witness? |
| 11:21 | 9 | THE COURT:  Certainly.  Certainly. |
| 11:21 | 10 | Do you just want to let the jury go or -- |
| 11:21 | 11 | MS. KELLER:  I think that would be great. |
| 11:21 | 12 | THE COURT:  (to the jury:)  Why don't you just go |
| 11:21 | 13 | outside.  We're just going to move a bunch of boxes for a |
| 11:21 | 14 | moment.  We'll come and get you in just a moment. |
| 11:21 | 15 | Please don't discuss this matter nor form or |
| 11:22 | 16 | express any opinion concerning the case. |
| 11:22 | 17 | *(Jury recesses at 11:22 a.m.)* |
| 11:22 | 18 | *(Outside the presence of the jury.)* |
| 11:22 | 19 | MS. KELLER:  Your Honor, my understanding was this |
| 11:22 | 20 | morning, initially, the Court said Mr. Larian wasn't |
| 11:22 | 21 | testifying today, and then said, well, he could as long as |
| 11:22 | 22 | we understood that the planogram stuff might be coming in. |
| 11:22 | 23 | And that's who we were planning -- |
| 11:22 | 24 | THE COURT:  No.  I'm not certain it is coming in. |
| 11:22 | 25 | I need to have a long discussion.  Remember -- we'll stay on |

11:22   1   the record.

11:22   2           Remember, last evening, I was given for the first

11:22   3   time about 6:00 o'clock a motion from Mr. Quinn concerning

11:22   4   planograms.  I hadn't even read that.  There were a number

11:22   5   of e-mails.  And last evening I devoted my efforts to

11:22   6   personnel files.  And then after those efforts I devoted my

11:22   7   efforts to planograms.

11:22   8           So since everybody wants the Court to make a

11:23   9   decision on a wing and a prayer, I have a long and

11:23   10  thoughtful discussion to enter into.  Some of those, for

11:23   11  instance -- have a seat, since we're enjoying each other's

11:23   12  company -- and I let you go last night early, which was a

11:23   13  huge mistake on my part.

11:23   14          I'm doing this from memory, but, for instance,

11:23   15  No. 1 on the page appears to be hearsay.

11:23   16          No. 2 is split between page 1 -- or what I call

11:23   17  page 1 and the next page.  That appears to be hearsay.

11:23   18          No. 3 may be appropriate.

11:23   19          No. 4, concerning Kuemmerle, down in a

11:23   20  counterfeit -- which is a counterfeit location, may be

11:23   21  appropriate.  I'm not certain yet.  When she says, "I'm your

11:23   22  spy," I need to have a discussion with you about that.

11:23   23          Now, if I flip over to the -- I'm sorry -- the

11:23   24  eighth one down, on what I call the second page of

11:23   25  Mr. Quinn's brief, 7 or 8, that one is appropriate.  If I go

11:24  1    over to the next page, there's two that can't sort out

11:24  2    planogram.  In other words, the third page, if you flip that

11:24  3    briefing over, it doesn't say whether in a planogram or not.

11:24  4    It's absolutely confusing.

11:24  5           Number 2, I want to have a discussion with you

11:24  6    about MGA creating the impression that the Pomona Toy Fair,

11:24  7    for instance, is a facility that, through the questioning,

11:24  8    sounds like there is illegal access or improper access being

11:24  9    gained, when we find out it's a completely open facility.

11:24  10   And the problem is, once again, for the Circuit, that both

11:24  11   sides are creating this milieu.

11:24  12          Each side apparently wants to present a whole

11:24  13   series of documents and have the jury believe that the

11:24  14   entire package contains trade secrets, when, in fact, one

11:25  15   small portion might be a trade secret, possibly, the FOB.

11:25  16          I need to have a very thorough discussion about

11:25  17   where we're going.  Because I thought that it was very, very

11:25  18   clear from the beginning that my ruling was that Mattel

11:25  19   could respond in kind, but they could only respond at the

11:25  20   conclusion of your case; in other words, that you could

11:25  21   present your case and shape your trade secrets with

11:25  22   Mr. Larian on the stand, and even during your case, they

11:25  23   could not cross-examine him in this area.  I thought that

11:25  24   was very clear to both parties.

11:25  25          Yesterday, for the first time, I heard that the

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 122 of 154   Page ID #:312150
CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

122

11:25   1   planograms now were being given to me, and it tipped me off

11:25   2   about 6:30 or 7:00 -- listen very closely, Ms. Hurst -- it

11:25   3   tipped me off at that time that what Mattel wanted to do,

11:25   4   against my earlier order, was get into this

11:25   5   cross-examination concerning planograms, which I had never

11:26   6   expected.

11:26   7           Mr. Zeller had always represented to me that he

11:26   8   had two instances:  One was some kind a midnight entry; and

11:26   9   another was a hearsay problem involving a gentleman over in

11:26   10  Germany.  And that was the extent of my knowledge.

11:26   11          Now I'm presented with planograms which do not

11:26   12  have anything to do with what I call the sneaking in.  So

11:26   13  the prejudice would seem to outweigh the probative value.

11:26   14  And yet MGA's done the same thing.  You've gotten into a

11:26   15  whole series of discussions about the Pomona Toy Fair, and

11:26   16  made it appear to the jury like the Pomona Toy Fair is an

11:26   17  effort by Mr. Villasenor to get documents and catalogs and,

11:26   18  until we get an explanation from Mr. Price, realize it's a

11:26   19  wide-open toy fair.

11:26   20          So it's draining both of your time, quite frankly.

11:27   21  And it's what I call the "avalanche effect."

11:27   22          So I'm going to hold to my original ruling.  You

11:27   23  can put Mr. Larian up on the stand, but what I wanted to

11:27   24  discuss with you:  If you do, he's going to be up on the

11:27   25  stand again.  If you want to expose him three times, that's

| 11:27 | 1 | fine. Because he's going up on the stand now, if you want |
|---|---|---|
| 11:27 | 2 | him to, and I'm going to preclude Mattel from asking any |
| 11:27 | 3 | questions, holding to my original ruling -- |
| 11:27 | 4 | MS. KELLER: Your Honor -- |
| 11:27 | 5 | THE COURT: I'm speaking. You're listening now. |
| 11:27 | 6 | MS. KELLER: I'm sorry. |
| 11:27 | 7 | THE COURT: You're listening. |
| 11:27 | 8 | I'm holding to my original ruling that there's not |
| 11:27 | 9 | to be any mention in cross-examination, if you put him up, |
| 11:27 | 10 | so you can shape your trade secret claims. |
| 11:27 | 11 | But then he's going right back up on the stand in |
| 11:27 | 12 | rebuttal. And that's when Mattel's going to be able to |
| 11:27 | 13 | speak to Mr. Larian about the breadth and scope of this, |
| 11:27 | 14 | which I haven't had time to talk to counsel about, quite |
| 11:27 | 15 | frankly. And I would have done that at midnight last night, |
| 11:27 | 16 | but you weren't around. |
| 11:28 | 17 | Now, second, Mr. Eckert's going right back up on |
| 11:28 | 18 | the stand, and that's surrebuttal. So each of you can weigh |
| 11:28 | 19 | how many times you want your clients up there. But there |
| 11:28 | 20 | will eventually be an explanation. And I hold them both |
| 11:28 | 21 | totally accountable for their corporations, quite frankly. |
| 11:28 | 22 | And I don't care if Mattel's got 30,000 employees |
| 11:28 | 23 | or you've got 5,000 employees. Both of you gentlemen are |
| 11:28 | 24 | responsible. |
| 11:28 | 25 | So, now, Counsel, let me be courteous. You have |

| | | |
|---|---|---|
| 11:28 | 1 | the lecturn. |
| 11:28 | 2 | MS. KELLER:  If I could dispose of one issue |
| 11:28 | 3 | quickly.  The Pomona Toy Fair was open once you got in it |
| 11:28 | 4 | with a badge after representing yourself to be a retailer. |
| 11:28 | 5 | THE COURT:  Great. |
| 11:28 | 6 | MS. KELLER:  So -- and that's -- that's what |
| 11:28 | 7 | happened. |
| 11:28 | 8 | THE COURT:  And how do I sort that out between |
| 11:28 | 9 | planograms, for instance? |
| 11:28 | 10 | MS. KELLER:  Has nothing to do with -- |
| 11:28 | 11 | THE COURT:  I'm about to instruct the jury that |
| 11:28 | 12 | planograms for both sides are open.  But "planogram" is a |
| 11:28 | 13 | big word.  How do we know, without foundation, that all |
| 11:28 | 14 | planograms, in all instances, are open? |
| 11:28 | 15 | I don't know that for sure.  It's just a label.  I |
| 11:29 | 16 | don't know, and neither does the jury, anything more than a |
| 11:29 | 17 | planogram as display, like at Costco, or whatever, set up. |
| 11:29 | 18 | But are we to assume that all planograms are open |
| 11:29 | 19 | at all times? |
| 11:29 | 20 | Now, I understand that Mattel wants that avalanche |
| 11:29 | 21 | effect to come in, you know, 11 different planograms, |
| 11:29 | 22 | et cetera.  And I may be in the position of instructing the |
| 11:29 | 23 | jury that the planograms are totally irrelevant unless |
| 11:29 | 24 | there's confidential information that's obtained. |
| 11:29 | 25 | I don't know yet.  But I haven't had time to |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 125 of 154   Page ID #:312153
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

125

| 11:29 | 1 | discuss it with you 'cause all this got dropped on me last |
| 11:29 | 2 | night at 7:00 o'clock for the first time. |
| 11:29 | 3 | MS. KELLER:  May I respond? |
| 11:29 | 4 | THE COURT:  Please. |
| 11:29 | 5 | MS. KELLER:  It has always been the Court's |
| 11:29 | 6 | ruling, as I've understood it, that Mattel was going to be |
| 11:29 | 7 | able to cross-examine Isaac on the weaknesses in our case, |
| 11:29 | 8 | as we present it, and on our own conduct in our case. |
| 11:29 | 9 | That's always been our understanding. |
| 11:29 | 10 | THE COURT:  No. |
| 11:29 | 11 | MS. KELLER:  And -- |
| 11:29 | 12 | THE COURT:  No.  Initially, if you remember, I had |
| 11:30 | 13 | a specific order that this -- I would let Mattel take this |
| 11:30 | 14 | in rebuttal, because there was a request at one time by MGA |
| 11:30 | 15 | to shape your case.  And there was an agreement, I thought, |
| 11:30 | 16 | that each party would shape their case. |
| 11:30 | 17 | Now, that may not be true.  And maybe I'm |
| 11:30 | 18 | confused.  But we went back on the record and looked last |
| 11:30 | 19 | night, and we're fairly convinced that that was the request |
| 11:30 | 20 | made at one time.  Now, if I'm mistaken, that's fine.  But |
| 11:30 | 21 | if so, I'd advise you not to put your client up right now |
| 11:30 | 22 | until we have a thorough and thoughtful discussion about |
| 11:30 | 23 | this. |
| 11:30 | 24 | MS. KELLER:  Your Honor, this is one of the few |
| 11:30 | 25 | things that I actually do remember, because the Court was |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 126 of 154   Page ID #:312154
CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

126

| | | |
|---|---|---|
| 11:30 | 1 | very clear that, in Mattel's case, we were -- that Mattel |
| 11:30 | 2 | was not gonna be allowed to cross-examine our witnesses |
| 11:30 | 3 | about our claims in our affirmative case.  And that was a |
| 11:30 | 4 | bright line that the Court drew and enforced. |
| 11:30 | 5 | And then -- and, repeatedly, we were told when -- |
| 11:30 | 6 | THE COURT:  You mean in Mattel's case? |
| 11:30 | 7 | MS. KELLER:  Yes. |
| 11:31 | 8 | THE COURT:  You mean, not "our case."  You mean |
| 11:31 | 9 | Mattel's case? |
| 11:31 | 10 | MS. KELLER:  In Mattel's case, the Court drew a |
| 11:31 | 11 | bright line that Mattel would not be allowed to |
| 11:31 | 12 | cross-examine things that were part of MGA's affirmative |
| 11:31 | 13 | case, and the Court enforced that. |
| 11:31 | 14 | THE COURT:  And I thought the same rule applied to |
| 11:31 | 15 | your case. |
| 11:31 | 16 | MS. KELLER:  Yes.  And said, once we get to MGA's |
| 11:31 | 17 | case -- and I thought you heard the Court say this again |
| 11:31 | 18 | last night -- then, cross-examination would be wide open.  I |
| 11:31 | 19 | thought I heard the Court say that just last night in terms |
| 11:31 | 20 | of -- |
| 11:31 | 21 | THE COURT:  I did.  I did.  And I said that to you |
| 11:31 | 22 | informally, and I made a mistake.  Last night, about |
| 11:31 | 23 | 7:00 o'clock we went back, after I read all of this -- went |
| 11:31 | 24 | back to the personnel files until about 10:00.  Came back to |
| 11:31 | 25 | your issue about 10:00 o'clock or 10:30 last night, and |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 127 of 154   Page ID #:312155
CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

127

| | | |
|---|---|---|
| 11:31 | 1 | realized that I'd previously instructed both parties, |
| 11:31 | 2 | because you'd requested it, that you be able to shape your |
| 11:31 | 3 | case and the trade secrets. |
| 11:31 | 4 | And the complaint specifically came, I think, from |
| 11:31 | 5 | Ms. Hurst; and that is, "We have the right to shape our |
| 11:32 | 6 | case."  And at that time, I'd made -- and I'll go pull it |
| 11:32 | 7 | for you if you want.  I'd made the ruling at that time, |
| 11:32 | 8 | then, we're not going to get into that; that you have the |
| 11:32 | 9 | right to shape your case, you know, in a cohesive form, but |
| 11:32 | 10 | then both of the clients are going to be back up on the |
| 11:32 | 11 | stand. |
| 11:32 | 12 | Now, if I'm wrong about that, so be it.  I'll go |
| 11:32 | 13 | back and look again. |
| 11:32 | 14 | Now, Mr. Price. |
| 11:32 | 15 | MR. PRICE:  Your Honor, this is -- you may want to |
| 11:32 | 16 | mark this down -- this is the time I think I agree with |
| 11:32 | 17 | Ms. Keller. |
| 11:32 | 18 | THE COURT:  I'm marking that down that I'm wrong. |
| 11:32 | 19 | Let me state that for the record. |
| 11:32 | 20 | MR. PRICE:  I mean, in our case, they were able to |
| 11:32 | 21 | attack our case, but not put on their case. |
| 11:32 | 22 | THE COURT:  Right. |
| 11:32 | 23 | MR. PRICE:  In their case, we obviously need to be |
| 11:32 | 24 | able to attack their case.  A key part of their case is |
| 11:32 | 25 | whether or not this information was trade secret or not. |

| | | |
|---|---|---|
| 11:32 | 1 | THE COURT:  Just a moment. |
| 11:32 | 2 | If you both agree, then I'm humbly wrong.  Let me |
| 11:32 | 3 | back away.  That is my position.  If you both agree that's |
| 11:32 | 4 | what's going to occur, it doesn't matter what I think or |
| 11:33 | 5 | what I ruled.  I'm wrong.  And that's what we'll do. |
| 11:33 | 6 | But I need time, then, to sort out this |
| 11:33 | 7 | information, because you're complaining about planograms out |
| 11:33 | 8 | there.  I'm getting this late last night, and I'm not going |
| 11:33 | 9 | to get this avalanche effect from you.  And I'm certainly |
| 11:33 | 10 | not going to excuse you at 7:00 o'clock because you seem a |
| 11:33 | 11 | little tired, and not have you both around.  That was a huge |
| 11:33 | 12 | mistake on my part.  You should have been here at 12:30 last |
| 11:33 | 13 | night with me, then. |
| 11:33 | 14 | So you can put Mr. Larian on direct examination. |
| 11:33 | 15 | But I haven't been able to sort the scope of this with you, |
| 11:33 | 16 | and I haven't been able to go over each exhibit with you. |
| 11:33 | 17 | MS. KELLER:  We do have a problem, Your Honor, in |
| 11:33 | 18 | that, I know the Court's been protective of Mattel's ability |
| 11:33 | 19 | to shape its case and call its witnesses in the order it |
| 11:33 | 20 | wanted, quite protective.  And the Court had indicated it |
| 11:33 | 21 | was also gonna be protective of our ability to shape our |
| 11:33 | 22 | case and call our witnesses in the order we wanted to.  And |
| 11:33 | 23 | we did have strategic reasons for calling Mr. Larian now. |
| 11:34 | 24 | THE COURT:  Then call him. |
| 11:34 | 25 | MS. KELLER:  We also -- well, but what I'm hearing |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 129 of 154   Page ID #:312157
CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

129

| | | |
|---|---|---|
| 11:34 | 1 | is that cross would be reserved for later. |
| 11:34 | 2 | THE COURT:  I don't know.  I just need time. |
| 11:34 | 3 | MS. KELLER:  And we also -- |
| 11:34 | 4 | THE COURT:  And I demand that time from you. |
| 11:34 | 5 | MS. KELLER:  Oh, I understand.  And we also |
| 11:34 | 6 | believed -- |
| 11:34 | 7 | THE COURT:  And dropping this on me from both |
| 11:34 | 8 | sides yesterday is ridiculous. |
| 11:34 | 9 | MS. KELLER:  Your Honor, we didn't drop anything |
| 11:34 | 10 | on anybody. |
| 11:34 | 11 | THE COURT:  No, No.  I got the -- whenever you |
| 11:34 | 12 | filed this, I got this planogram request literally handed to |
| 11:34 | 13 | me at 7:00.  I got your response handed to me at 7:00.  Now, |
| 11:34 | 14 | it may have been docketed.  But remember, I'm on the bench |
| 11:34 | 15 | the whole day.  So you tell me when this was filed on behalf |
| 11:34 | 16 | of Mattel? |
| 11:34 | 17 | I'll go back and check my records for a moment and |
| 11:34 | 18 | verify it, so be very careful about what you tell me.  I'll |
| 11:34 | 19 | set the record for the Circuit about what's happening here. |
| 11:34 | 20 | You were here Sunday.  There was no indication. |
| 11:34 | 21 | You were here Saturday.  There was no indication. |
| 11:35 | 22 | And part of that's MGA's fault, quite frankly -- |
| 11:35 | 23 | so we lay this record -- because you haven't been able to |
| 11:35 | 24 | give, if you will, a good order to Mattel.  Your |
| 11:35 | 25 | notebooks -- I'm going to make a blunt record.  Your |

| 11:35 | 1 | notebooks haven't been as well-prepared.  They haven't been |
| 11:35 | 2 | as timely.  So I think there's a large fault that falls on |
| 11:35 | 3 | MGA concerning this.  Now they come in at the last moment |
| 11:35 | 4 | helter-skelter, but Mattel's been magnificently prepared |
| 11:35 | 5 | concerning these notebooks. |
| 11:35 | 6 | How that order came in may be different.  But |
| 11:35 | 7 | these notebooks from MGA have been coming in late, frankly. |
| 11:35 | 8 | So it's co-equally shared. |
| 11:35 | 9 | MS. KELLER:  Your Honor, we've had notebooks that |
| 11:35 | 10 | have come in late at night, the night before the witness |
| 11:35 | 11 | takes the stand.  We've had things handed to us the morning |
| 11:35 | 12 | of, when the witness is on the stand.  We've had as many as |
| 11:35 | 13 | half a dozen notebooks handed to us as the witness was |
| 11:35 | 14 | walking to the witness stand.  So, I'm sorry, Your Honor, |
| 11:35 | 15 | I'm sorry for our occasional tardiness.  We have had some |
| 11:35 | 16 | organizational issues.  But it's not the case that Mattel |
| 11:36 | 17 | has always -- |
| 11:36 | 18 | THE COURT:  There's a huge difference when Mattel, |
| 11:36 | 19 | at least, hands me a witness list, and I've got binders |
| 11:36 | 20 | literally three or four weeks before trial I can go through. |
| 11:36 | 21 | And I know that you had to respond.  But I think I've been |
| 11:36 | 22 | really, really generous.  And it wasn't the case of |
| 11:36 | 23 | notebooks.  I know that they came tumbling in. |
| 11:36 | 24 | It's the fact that I didn't have notebooks for |
| 11:36 | 25 | entire witnesses until a couple days before. |

| 11:36 | 1 | MS. KELLER:  Your Honor, we also had witness lists |
| 11:36 | 2 | given to us by Mattel that morphed completely from one day |
| 11:36 | 3 | to the next.  We had 19 people that they had us prepare for |
| 11:36 | 4 | who they didn't call. |
| 11:36 | 5 | THE COURT:  I know. |
| 11:36 | 6 | MS. KELLER:  So saying that we got a witness list, |
| 11:36 | 7 | that would be like giving us a fictitious witness list, and |
| 11:36 | 8 | then getting praised for having turned in a witness list. |
| 11:36 | 9 | THE COURT:  I understand.  And to be a little bit |
| 11:36 | 10 | protective of you on the record, I understand that you've |
| 11:36 | 11 | gotten what I call the "avalanche effect," you know, 30 |
| 11:36 | 12 | witnesses who were going to be called, half of whom got |
| 11:36 | 13 | called off, half of them got turned around.  To create a |
| 11:36 | 14 | record for both sides, I know you've been overwhelmed by |
| 11:37 | 15 | just volumes of paper. |
| 11:37 | 16 | But, by the same token, you can't put a Court in |
| 11:37 | 17 | the position of getting this information at 7:00 o'clock in |
| 11:37 | 18 | the evening, having it informally handed to me -- and, |
| 11:37 | 19 | remember, up until last night, I thought Mr. Larian was |
| 11:37 | 20 | coming on at the end of the day. |
| 11:37 | 21 | It was only when I demanded last night to know the |
| 11:37 | 22 | order, and you had an informal conference right here, that |
| 11:37 | 23 | you moved him up two witness.  Now, I'm not finding fault |
| 11:37 | 24 | with that.  But Plunkett was going to testify beforehand, |
| 11:37 | 25 | and so was another witness. |

Case 2:04-cv-09049-DOC-RNB    Document 10283    Filed 03/28/11    Page 132 of 154    Page ID #:312160
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

132

| | | |
|---|---|---|
| 11:37 | 1 | And if you want me to, I'll read through my notes |
| 11:37 | 2 | and the order that they were going to be called.  So Larian |
| 11:37 | 3 | got shifted ahead two or three witnesses from what the |
| 11:37 | 4 | agreement was, and then I get this planogram memo. |
| 11:37 | 5 | MS. HURST:  Your Honor, we have an agreement. |
| 11:37 | 6 | THE COURT:  Well, we're having fun on the record |
| 11:37 | 7 | right now. |
| 11:37 | 8 | How much farther do we want to go with this? |
| 11:37 | 9 | MS. HURST:  Well, I think this will resolve the |
| 11:37 | 10 | issue. |
| 11:37 | 11 | THE COURT:  All right. |
| 11:37 | 12 | MS. HURST:  We're going to discuss planograms with |
| 11:37 | 13 | Mr. Larian on direct, and they can get into it on cross; but |
| 11:38 | 14 | we've agreed, as we filed a separate motion, about e-mails |
| 11:38 | 15 | regarding the City of Riverside.  And they'll stipulate that |
| 11:38 | 16 | they're not gonna ask about that. |
| 11:38 | 17 | THE COURT:  All right.  Now, I want you to wait |
| 11:38 | 18 | here for just one moment. |
| 11:38 | 19 | All right.  Counsel, get out your motion.  I want |
| 11:38 | 20 | to be absolutely certain what's happening here. |
| 11:38 | 21 | Turn to page 9 -- in fact, why don't we just let |
| 11:38 | 22 | the jury go to lunch.  Nancy, tell them to come back at |
| 11:38 | 23 | 1:30 -- or, strike that -- 12:30.  Tell them to go to lunch. |
| 11:38 | 24 | I want to know exactly what's happening on these |
| 11:38 | 25 | motions.  And who's going to be taking this on -- |

| | | |
|---|---|---|
| 11:38 | 1 | MR. PRICE:  I'll be taking on cross-examination. |
| 11:38 | 2 | THE COURT:  Who's taking on direct? |
| 11:39 | 3 | MS. HURST:  I am. |
| 11:39 | 4 | THE COURT:  Okay.  No. 1, I was prepared to rule |
| 11:39 | 5 | hearsay. |
| 11:39 | 6 | MS. HURST:  Yeah.  We're not agreeing to |
| 11:39 | 7 | testimony.  We were just talking about documents. |
| 11:39 | 8 | THE COURT:  We're going to go through these for a |
| 11:39 | 9 | moment. |
| 11:39 | 10 | MS. HURST:  All right.  So 1, we agree, is |
| 11:39 | 11 | excluded? |
| 11:39 | 12 | MR. PRICE:  We're going to call -- |
| 11:39 | 13 | THE COURT:  I wanted time to have each of you |
| 11:39 | 14 | argue about this.  I wanted a couple hours of your time to |
| 11:39 | 15 | perfect your record, as a courtesy.  In case I'm wrong, the |
| 11:39 | 16 | Circuit had a good record. |
| 11:39 | 17 | MR. PRICE:  Your Honor, on 1 and 2, we're going to |
| 11:39 | 18 | call those witnesses. |
| 11:39 | 19 | THE COURT:  Okay.  Just a moment.  If I would have |
| 11:39 | 20 | known that last night, you would have saved me probably 45 |
| 11:39 | 21 | minutes going back and looking at documents.  Okay.  So |
| 11:39 | 22 | let's do this. |
| 11:39 | 23 | MS. HURST:  And we're not agreeing -- |
| 11:39 | 24 | THE COURT:  No, no.  Now, hold on now.  1 and 2 I |
| 11:39 | 25 | believed were hearsay -- okay? -- and I was going to exclude |

| | | |
|--|--|--|
| 11:39 | 1 | them. |
| 11:39 | 2 | No. 3, the question I wanted to answer was, it was |
| 11:39 | 3 | nebulous, 09854. |
| 11:39 | 4 | And for the Circuit, as a courtesy, No. 1 that's |
| 11:40 | 5 | being referred to is on page 9 of Mr. Quinn's submission to |
| 11:40 | 6 | the Court.  And it concerns the depositional testimony of |
| 11:40 | 7 | Potgiesser, October 26, 2010. |
| 11:40 | 8 | And are you going to call Potgiesser. |
| 11:40 | 9 | MR. PRICE:  If we have time, yes. |
| 11:40 | 10 | THE COURT:  Okay.  All right. |
| 11:40 | 11 | The second one's Lisa Saunders.  And I believe |
| 11:40 | 12 | that that was hearsay.  And the reason I believe that is |
| 11:40 | 13 | obvious:  It was the depositional transcript of Lisa |
| 11:40 | 14 | Saunders, and it was about planograms and retailers, which |
| 11:40 | 15 | are not typically confidential information.  But I wanted to |
| 11:40 | 16 | have each of you argue that so, in case I was wrong and I |
| 11:40 | 17 | had a planogram that required a secret badge to get in -- |
| 11:40 | 18 | like the Pomona Toy Fair, and I'm just kidding you for a |
| 11:41 | 19 | moment -- because "planogram" means nothing to me.  It |
| 11:41 | 20 | means, usually it's open.  But, by definition, it doesn't |
| 11:41 | 21 | mean I can assume that there aren't certain planograms where |
| 11:41 | 22 | a badge might be recovered -- or, required. |
| 11:41 | 23 | And you gotta remember that everybody led |
| 11:41 | 24 | everybody down the primrose path because Pomona, apparently, |
| 11:41 | 25 | was supposed to be open, from your view, Mr. Price.  But |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 135 of 154   Page ID #:312163
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

135

11:41  1   from Ms. Keller's view, it required a badge to get in.

11:41  2   That's the evidence a Court should not be excluding.  I

11:41  3   should be giving that to the jury, to let the two of you, on

11:41  4   direct and cross-examination, Ms. Keller, make your point

11:41  5   that Pomona required a badge; and your point, Mr. Price,

11:41  6   that everything was on the table, and it was kind of

11:41  7   loosey-goosey.

11:41  8         So I left that for the jury in terms of Pomona.

11:41  9   The jury can decide that.

11:42  10         MR. PRICE:  Your Honor --

11:42  11         THE COURT:  Oh, no.  I'm having fun now.  You're

11:42  12   spending your lunch hour with me.

11:42  13         No. 3, it seems to me that this February 13, 2008

11:42  14   e-mail by MGA Marketing to Director Angelika Sternberg

11:42  15   advising Isaac Larian and several other MGA managers that

11:42  16   Zapf managers -- that, quote, "Two of our colleagues have

11:42  17   been able to enter the booth of our competitor and wrote

11:42  18   attached report," end of quote.  The competitor was Mattel,

11:42  19   and the report contained unreleased Mattel product

11:42  20   information.

11:42  21         Now, if you notice, when that was submitted to me

11:42  22   by Mr. Quinn, certain parts are in quotes, and certain parts

11:42  23   aren't.  And I wanted you to pull that document and have a

11:42  24   discussion with me on the record to protect both of your

11:43  25   clients about, one, was this Mattel product information;

11:43  1   two, what was being referred to, was it a planogram; three,

11:43  2   was there independent record -- or evidence in the record

11:43  3   that could show the Court whether I was the gatekeeper and

11:43  4   should let that through.

11:43  5          And I couldn't tell from No. 3.  So that was open

11:43  6   to discussion between you this evening -- or last night.

11:43  7          Number 4 is 09875.  It's an April 30th, 2002

11:43  8   e-mail from Isaac Larian to Julie Mote.  Now, here,

11:43  9   Ms. Kuemmerle, I believe, is not in a planogram.  She's

11:43  10  actually in what I call a "counterfeit."  She's not even in

11:43  11  a retail store.  But here's what she says -- and maybe she

11:43  12  ought to just have to explain herself, since she's coming

11:43  13  back anyway.

11:43  14         "You should have seen me with my digital camera,

11:43  15  taking the picture in the middle of your showroom" -- I'm

11:44  16  sorry -- "in the middle of their showroom.  I was doing spy

11:44  17  work for you."

11:44  18         Now, let me stop for a moment.  All I'm getting is

11:44  19  a verbal recitation from each counsel that this is a

11:44  20  counterfeit, or this is not.  I can't tell.  I think it's

11:44  21  counterfeit, but I can't guess.  And on this record, I'm not

11:44  22  gonna create a sloppy record for the Circuit.

11:44  23         So I figured, since Ms. Kuemmerle was coming back

11:44  24  anyway, whether she was in a secret showroom or not, or in a

11:44  25  counterfeit, she could get up and explain herself with that

11:44  1   statement.  So, tentatively, that was going to come in

11:44  2   subject to your arguments this evening, which should have

11:44  3   been last night.

11:44  4          Number 5, 01939, it's a December 16, 2004 e-mail

11:44  5   from then MGA PR Director David Malacrida, to Isaac Larian,

11:44  6   "Subject," quote, "Insider Mattel Barbie News."

11:45  7          Mr. Malacrida writes, quote, "From a source of

11:45  8   my –– in New York City," and forwards Barbie information

11:45  9   obtained from a Mattel preview.  Larian, in turn, forwards

11:45  10  to Paula Garcia, Ed Rodriguez, Mercedes (sic) Ward, Ron

11:45  11  Brawer, Nick Contreras and Diana Lin.

11:45  12         This is hearsay.  At least initially, it's not

11:45  13  evidence of MGA activities.  But I wanted to have a

11:45  14  discussion and have Mattel create a record, in case I was

11:45  15  wrong, and persuade me that that initial thought that I had

11:45  16  at 10:30 or 11:00 last night was incorrect.

11:45  17         No. 6, TX08931, a January 31st e-mail by Isaac

11:45  18  Larian to MGA, "Subject:  Sales Staff Competitive Info," end

11:45  19  of quote.  Mr. Larian writes, quote, "As you go to POG, i.e.

11:45  20  planograms" –– which are supposedly open and MGA fears this

11:46  21  avalanche effect of what is a nonconfidential, nonguarded

11:46  22  planogram –– "or talk to buyers, please check and let me

11:46  23  know what our competitors are doing in fashion dolls, mini

11:46  24  dolls, large dolls, Mattel, Jakks, Bandai, Hasbro."

11:46  25         Janine Firth responds on February 3rd, 2003,

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 138 of 154   Page ID #:312166
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

138

| | | |
|---|---|---|
| 11:46 | 1 | quote, "I was at the layout room today, and walked the |
| 11:46 | 2 | aisles since no buyers are around today.  Here's what I |
| 11:46 | 3 | got."  Her response includes information on Mattel products. |
| 11:46 | 4 | From the gist of this e-mail, this appears to be a |
| 11:46 | 5 | planogram.  There's nothing confidential about this. |
| 11:46 | 6 | Ms. Hurst is absolutely right about that.  And I was |
| 11:46 | 7 | prepared to preclude it, but I wanted to give Mattel a |
| 11:46 | 8 | chance to respond in a thoughtful manner, and tell me why |
| 11:46 | 9 | this was secretive -- which apparently nobody wants to spend |
| 11:46 | 10 | the time with the Court. |
| 11:46 | 11 | "7," 09334 January 27, 2004, an e-mail by Isaac |
| 11:47 | 12 | Larian to Shawn Brower, with copies to Julie Chomo and |
| 11:47 | 13 | Jessica Calafa, "Subject:  Target." |
| 11:47 | 14 | Shawn Brower writes, quote, "I tried to steal a |
| 11:47 | 15 | line list from the Mattel showroom, but all I was able to |
| 11:47 | 16 | get was a license list and marketing one sheet, passed to |
| 11:47 | 17 | both Marcy."  That was coming in.  That seemed directly on |
| 11:47 | 18 | point. |
| 11:47 | 19 | Now, I wanted to give MGA a chance to respond, and |
| 11:47 | 20 | tell me why I was wrong.  But that's, I think, the very one |
| 11:47 | 21 | instance that Mr. Zeller pointed out to the Court, from day |
| 11:47 | 22 | one, when Mr. Zeller represented to me consistently -- I've |
| 11:47 | 23 | got one and maybe two of what we're going to call sneaking |
| 11:47 | 24 | in, in return of MGA showrooms -- I'm sorry -- of Mattel |
| 11:47 | 25 | showrooms. |

11:47  1           But remember, up to this point, I'd never heard

11:47  2    from Mr. Zeller -- or Mr. Quinn, or you, Mr. Price --

11:48  3    anything about anything about 11 or 12 efforts.  That was a

11:48  4    first last evening.  And Ms. Hurst was responding

11:48  5    informally, "Judge, this is the avalanche effect."  And I

11:48  6    haven't even had a chance to read these documents yet.

11:48  7           Now, let's go on to No. 8, TX9427, January 19,

11:48  8    2005, e-mail from Isaac Larian to Lisa Saunders, Ron Brawer,

11:48  9    and Nick Contreras.  "Subject:  Barbie v. Bratz."

11:48  10          Lisa Sanders forwards Mattel's space allocation

11:48  11   and states, quote, "Do not pass this info to anyone.  I

11:48  12   could get in trouble for snooping.  Here is the space for

11:48  13   Fall in case of Barbie, Mattel v. Bratz."

11:48  14          Larian writes in response, "Good job.  You are

11:48  15   cooking.  How many feet for Babyes and Rescue Pets?"

11:48  16          Now, on one hand, I believe that that was possibly

11:48  17   a planogram or a retailer, and Ms. Hurst was correct.  On

11:48  18   the other hand, that language does not lend itself to a lot

11:49  19   of confidence on the Court's part, when somebody says, "Do

11:49  20   not pass this information to anyone.  I could get in trouble

11:49  21   for snooping."  I wanted to have a thoughtful discussion

11:49  22   with both of you for as long as you wanted to tonight to set

11:49  23   a record and have a little bit better understanding of what

11:49  24   this was about.

11:49  25          No. 10 -- I'm sorry -- No. 9.  This is TX09617,

| 11:49 | 1 | February 9, 2005, e-mail from Margot Lopez, to Shirin |
|---|---|---|
| 11:49 | 2 | Makabi, Ron Brawer, and Shirin Salemnia.  "Subject:  How are |
| 11:49 | 3 | we doing on room nights for NYTF?" which has to be New York |
| 11:49 | 4 | Toy Fair. |
| 11:49 | 5 | Brawer writes to Margot Lopez, quote, "I'd like to |
| 11:49 | 6 | see if we can get Shirin in for a few days to collect |
| 11:49 | 7 | catalogs from other showrooms.  Two nights," end of quote. |
| 11:49 | 8 | I couldn't tell from this e-mail, but it appeared, |
| 11:49 | 9 | initially, that this was an open, if you will, showroom or |
| 11:49 | 10 | planogram.  But if I was going to rule against Mattel on |
| 11:50 | 11 | this piece of evidence, I wanted Mattel to create a record |
| 11:50 | 12 | to protect you in the Circuit.  And if I'd made a mistake, |
| 11:50 | 13 | then the Circuit could clearly see that.  In other words, |
| 11:50 | 14 | these are great gifts I'm giving you both, if you'll just |
| 11:50 | 15 | spend some time with me. |
| 11:50 | 16 | TX9429, August 26, 2005.  It's an e-mail from Lisa |
| 11:50 | 17 | Saunders to Ron Brawer.  "Subject:  Re: year-to-date Fall's |
| 11:50 | 18 | 2005 Sales Dolls Kmart."  This e-mail is in response to a |
| 11:50 | 19 | prior e-mail by Saunders on August 25, 2005, where she |
| 11:50 | 20 | provides toy ranking, and states, quote, "I was just at |
| 11:50 | 21 | planogram, and given this info today, not to go further than |
| 11:50 | 22 | this e-mail for year-to-date Fall 2005 rankings in sales and |
| 11:50 | 23 | girls at Kmart." |
| 11:50 | 24 | I was going to exclude that.  This is clearly a |
| 11:50 | 25 | retailer.  It's clearly a planogram.  There is nothing |

11:50    1    confidential here.  But I wanted to create time for Mattel

11:50    2    to make the record and persuade me that I was wrong.

11:51    3              No. 11, TX09528, January 31st, 2005, e-mail by MGA

11:51    4    employee Sandrine de Raspide, forwarding to Isaac Larian,

11:51    5    Ron Brawer, and Paula Garcia, about "Unreleased Mattel

11:51    6    product information obtained from the Paris Toy Fair.

11:51    7              Raspide also writes, quote, "Hasbro got ahold of

11:51    8    Mattel's catalog; therefore, their analysis will catch up

11:51    9    with Hasbro on this issue on Wednesday."

11:51    10             Now, you have to remember, Mattel has strenuously

11:51    11   resisted, and I have, quite frankly, granted no further

11:51    12   discovery about Mattel's activities concerning any other

11:51    13   competitor.

11:51    14             Believe me, if this case was starting over again,

11:51    15   I'd have a much different ruling in that regard, knowing

11:51    16   what I know now.  Okay?  So everybody better hope that this

11:51    17   is "the" trial.

11:51    18             And it appeared to me that this was third-party,

11:52    19   that these were catalogs readily available -- I didn't want

11:52    20   to get into Hasbro, because Mattel had resisted that, in a

11:52    21   sense.  And so I didn't think you should be benefiting from

11:52    22   the very thing that you'd been resisting, in terms of

11:52    23   discovery, about Hasbro.  Because if Mattel was sneaking

11:52    24   into Hasbro or Jakks showrooms, which I don't know -- I

11:52    25   don't know -- you can't help me, Mr. Larian.  You're going

| 11:52 | 1 | to be quiet now -- I granted your discovery request and |
| 11:52 | 2 | didn't let that go any further.  I cut off all the Hasbro |
| 11:52 | 3 | and Jakks, et cetera. |
| 11:52 | 4 | Now, I'm assuming it didn't exist on Mattel's |
| 11:52 | 5 | part.  But that's why you weren't going to get into that. |
| 11:52 | 6 | This is third-party, for goodness sakes, and their catalogs. |
| 11:52 | 7 | That's not confidential. |
| 11:52 | 8 | No. 12, 08891, it's an April 20, 2006 e-mail from |
| 11:53 | 9 | Isaac Larian to MGA's employee, "Subject:  Re:  Head's Up." |
| 11:53 | 10 | This concerns Mattel's unreleased product, quote, "MyScene |
| 11:53 | 11 | Bling Bling Gems," end of quote. |
| 11:53 | 12 | Isaac Larian writes, quote, "I and Daphne need to |
| 11:53 | 13 | know which retailer will handle this Fall ASAP, end of |
| 11:53 | 14 | quote.  Lisa Saunders responds on April 28, 2006, quote, |
| 11:53 | 15 | "What I was able to find out is that MyScene Bling Bling is |
| 11:53 | 16 | being introduced for Fall 2006 from Mattel.  I'm not able to |
| 11:53 | 17 | find out if it comes with real jewelry or not.  I'll go down |
| 11:53 | 18 | to the planogram room as soon as we get back from the sales |
| 11:53 | 19 | meeting to see if Kmart has placed," end of quote. |
| 11:53 | 20 | I was initially inclined not to let Mattel -- I'll |
| 11:53 | 21 | wait until you and Mr. Zeller have your conversation. |
| 11:53 | 22 | MR. PRICE:  I'm sorry, Your Honor. |
| 11:53 | 23 | THE COURT:  No.  I don't mean that rudely on my |
| 11:53 | 24 | part.  I want you to take your time. |
| 11:53 | 25 | MR. PRICE:  We're ready, Your Honor. |

Case 2:04-cv-09049-DOC-RNB  Document 10283  Filed 03/28/11  Page 143 of 154  Page ID #:312171
CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

143

| 11:53 | 1 | THE COURT: Then have Mr. Zeller have a seat. |
| 11:54 | 2 | All right. On one hand, it sounded like this was |
| 11:54 | 3 | a planogram. It was an open area. There was no |
| 11:54 | 4 | confidential commune -- or there was no security, in a |
| 11:54 | 5 | sense. But, once again, I can't assume that. If I just say |
| 11:54 | 6 | "planogram," and I think "open," how do I know I'm not in |
| 11:54 | 7 | the position that we were falling into in terms of Pomona, |
| 11:54 | 8 | where the parties have a legitimate conflict over |
| 11:54 | 9 | Ms. Keller's position that a pass is required to initially |
| 11:54 | 10 | get in, and your position, on behalf of Mattel, is, once |
| 11:54 | 11 | you're in, which is relatively easy to do, everything's out |
| 11:54 | 12 | on the table? |
| 11:54 | 13 | That's for the jury to decide. Judges shouldn't |
| 11:54 | 14 | be taking that from a jury. |
| 11:54 | 15 | But right on the face of this, it appeared that |
| 11:54 | 16 | this was a planogram. But I didn't like the words, "I will |
| 11:54 | 17 | go down to the planogram room as soon as we get back," and I |
| 11:54 | 18 | wanted to discuss and get from you any further documentation |
| 11:54 | 19 | or any further evidence, so that the Circuit saw this, and |
| 11:55 | 20 | they knew that the Court had as much evidence as possible |
| 11:55 | 21 | from both of you. |
| 11:55 | 22 | Now, No. 13, 09533, it's a February 3rd, 2007 |
| 11:55 | 23 | e-mail by former MGA marketing manager Sternberg to Isaac |
| 11:55 | 24 | Larian, with copies to Ron Brawer, Paula Garcia, and Thomas |
| 11:55 | 25 | Pfau. "Subject: Competition." |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 144 of 154   Page ID #:312172
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

144

| 11:55 | 1 | Sternberg writes, quote, "We have some news for |
|---|---|---|
| 11:55 | 2 | you, which we heard from customers regarding Get Connected |
| 11:55 | 3 | Barbie. They show it as a top secret theme in a closed room |
| 11:55 | 4 | at toy fair. We furthermore heard that they were coming up |
| 11:55 | 5 | with a new big Barbie house and an airplane. In Polly |
| 11:55 | 6 | Pocket, they are introducing again high-priced accessories," |
| 11:55 | 7 | end of quote. |
| 11:55 | 8 | I have no idea why this is confidential |
| 11:55 | 9 | information in this, and was not going to let Mattel get |
| 11:55 | 10 | into it because it seemed like this avalanche affect, this |
| 11:56 | 11 | effect -- to bring in a whole series of e-mails and |
| 11:56 | 12 | documents that, quite frankly, had no relevance, that were |
| 11:56 | 13 | absolutely open, that were nonconfidential -- and that was |
| 11:56 | 14 | Ms. Hurst's concern last evening. |
| 11:56 | 15 | Now, No. 14 and 15 fall into the same area. Here |
| 11:56 | 16 | I couldn't tell, and I wanted to have a thoughtful |
| 11:56 | 17 | discussion with you this evening. |
| 11:56 | 18 | On No. 14, it's 09539, it's a February 3rd -- now |
| 11:56 | 19 | it says "3007" e-mail. I think that is supposed to be 2007 |
| 11:56 | 20 | e-mail. From Petra Kockler -- or Koehler -- I'm sorry -- |
| 11:56 | 21 | MGA Executive, Thomas Pfau's assistant, to Larian, with |
| 11:56 | 22 | copies to Garcia, Brawer, Sternberg, and Pfau. "Subject" |
| 11:56 | 23 | quote, "Toy Fair," end of quote. Koehler writes about |
| 11:56 | 24 | unreleased Mattel product information obtained from a Mattel |
| 11:56 | 25 | toy fair showroom. |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 145 of 154   Page ID #:312173
CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

145

| | | |
|---|---|---|
| 11:56 | 1 | Quote, "Isaac, some more information on the main |
| 11:56 | 2 | Barbie themes," end of quote, and goes on to list three |
| 11:57 | 3 | products.  And Barbie -- and Brawer responds, "Very helpful. |
| 11:57 | 4 | Danke schoen." |
| 11:57 | 5 | I have no idea from this e-mail if this is coming |
| 11:57 | 6 | from a planogram.  There's no independent evidence that |
| 11:57 | 7 | either of you have submitted to me.  And, once again, it's |
| 11:57 | 8 | this avalanche effect.  Just throw it up on the wall. |
| 11:57 | 9 | So I was gonna discuss with you 09539 and find out |
| 11:57 | 10 | if you had any additional information to build each of your |
| 11:57 | 11 | respective records for this Court and the Circuit so I knew |
| 11:57 | 12 | what this pertained to. |
| 11:57 | 13 | 2233, February 25, 2007 e-mail from MGA executive |
| 11:57 | 14 | Thomas Pfau to Isaac Larian.  "Subject," quote/unquote, |
| 11:57 | 15 | "Large doll."  Pfau writes, quote, "Isaac, we found out |
| 11:57 | 16 | today that M is coming with large doll, My Loving Baby, this |
| 11:57 | 17 | year," end of quote.  "Included is additional detail on the |
| 11:57 | 18 | product features and packaging for the Mattel product," |
| 11:57 | 19 | quote, "My Loving Baby." |
| 11:57 | 20 | I have no idea where this information was obtained |
| 11:58 | 21 | from.  I don't know if it's a planogram.  I don't know if |
| 11:58 | 22 | it's a newspaper article.  And MGA didn't help me with this. |
| 11:58 | 23 | And they hadn't had time to help me with this.  I want to |
| 11:58 | 24 | see what this comes out of -- if this is a press release, |
| 11:58 | 25 | one of their documents. |

| | | |
|---|---|---|
| 11:58 | 1 | All I got was a general response from MGA, in |
| 11:58 | 2 | generic form, quite frankly, because they didn't respond |
| 11:58 | 3 | categorically to each one of these. |
| 11:58 | 4 | No. 16, TX09546, February 7, 2007 e-mail from MGA |
| 11:58 | 5 | Vice President of Sales Lisa Saunders to Paula Garcia, |
| 11:58 | 6 | regarding, quote, "Chat Divas," end of quote," and "Ron, |
| 11:58 | 7 | sitting in planogram" -- sitting in planogram -- "Barbie is |
| 11:58 | 8 | doing Chat Divas for Fall '07.  They talk and sing and they |
| 11:58 | 9 | can be plugged in iPod or other musical sources.  This is |
| 11:58 | 10 | all package says," end of quote. |
| 11:58 | 11 | Well, I was going to rule against Mattel in terms |
| 11:59 | 12 | of the introduction of this because it was obvious that they |
| 11:59 | 13 | were sitting in a planogram, but I wanted Mattel to have the |
| 11:59 | 14 | opportunity to come back and tell me if this planogram |
| 11:59 | 15 | required a secret pass to get in or some kind of |
| 11:59 | 16 | identification or not. |
| 11:59 | 17 | Now, tentatively, what I was going to allow, going |
| 11:59 | 18 | into the hearing and without hearing any of you, which was a |
| 11:59 | 19 | tremendous discourtesy on my part -- my initial thoughts |
| 11:59 | 20 | were subject to lots of changes: |
| 11:59 | 21 | No. 7.  Mattel should absolutely be allowed to |
| 11:59 | 22 | inquire into No. 7, which is TX09334. |
| 11:59 | 23 | You should be allowed to inquire into 09875. |
| 11:59 | 24 | Maybe Kuemmerle is sitting inside a counterfeit down in |
| 11:59 | 25 | South America.  But since she's coming back, maybe she can |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 147 of 154   Page ID #:312175
CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

147

| | | |
|---|---|---|
| 11:59 | 1 | explain and clear up why she's making such an asinine |
| 12:00 | 2 | statement, if she is, "You should have seen me with my |
| 12:00 | 3 | digital camera, taking the picture in the middle of their |
| 12:00 | 4 | showroom.  I was doing spy work for you." |
| 12:00 | 5 | Now, that may be absolutely innocent.  It may be |
| 12:00 | 6 | her joking around.  But I'm not going to be the gatekeeper, |
| 12:00 | 7 | and just assume that she's telling the truth, or she's |
| 12:00 | 8 | joking with Mr. Larian.  She can get up on the stand and |
| 12:00 | 9 | explain that. |
| 12:00 | 10 | Number three, I was going to tentatively allow you |
| 12:00 | 11 | to inquire into No. 14 and 15, because I have no idea, and |
| 12:00 | 12 | didn't wish to preclude you from asking the foundational |
| 12:00 | 13 | questions about, if you got this e-mail, where was this, and |
| 12:00 | 14 | what was this about? |
| 12:00 | 15 | And there was one more that I was -- I was toying |
| 12:00 | 16 | with, quite frankly, and it was the -- now, finally, I |
| 12:01 | 17 | wanted to have a discussion about this with you -- and I'm |
| 12:01 | 18 | not sure which one was.  And I had a thought last evening |
| 12:01 | 19 | about one more possible inquiry and I can't quite remember |
| 12:01 | 20 | it, because I wanted to engage tonight, since I thought that |
| 12:01 | 21 | Larian would be on the last part of the evening tonight. |
| 12:01 | 22 | And I was wrong, apparently, and readily admit that I |
| 12:01 | 23 | didn't -- I didn't realize that it was going to come in this |
| 12:01 | 24 | part of the case.  So my fault. |
| 12:01 | 25 | What I'm trying to search out is the general tone |

CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

148

| | | |
|---|---|---|
| 12:01 | 1 | and tenor about what's equitably fair between the two of |
| 12:01 | 2 | you, as well.  In other words, Mr. Price, you got what I |
| 12:01 | 3 | call the "avalanche effect" from MGA in terms of, "Here are |
| 12:01 | 4 | the documents that are supposedly trade secrets, presented |
| 12:02 | 5 | at a presentation in Mattel in the auditorium."  And |
| 12:02 | 6 | although Ms. Keller went through one page, you know, the |
| 12:02 | 7 | impression is that these are massive amounts of documents |
| 12:02 | 8 | and the jury might believe the whole document report are |
| 12:02 | 9 | just full of trade secrets.  And you spent time having to go |
| 12:02 | 10 | through and show the jury that the vast majority of these |
| 12:02 | 11 | were cut-and-paste and duplicates, public. |
| 12:02 | 12 | Well, I'm not certain yet why, when the |
| 12:02 | 13 | impression's being created with the jury that Mr. Villasenor |
| 12:02 | 14 | is going through all of these showrooms, and we step over |
| 12:02 | 15 | into something like the Pomona Toy Fair, which is just one |
| 12:02 | 16 | step beyond, from my impression, regardless of the past |
| 12:02 | 17 | going in, why I'm going to limit this.  So, although I hear |
| 12:03 | 18 | Ms. Hurst's argument concerning planograms –– and they just |
| 12:03 | 19 | want to throw it up on the wall –– I'm also hearing that |
| 12:03 | 20 | most of this can, quite frankly, be explained away.  And |
| 12:03 | 21 | what I was going to fashion this evening was an instruction, |
| 12:03 | 22 | quite frankly, that was going to say, basically, the Court |
| 12:03 | 23 | believes and understands that you, as the jury, should –– |
| 12:03 | 24 | that planograms are generally open to the public; and until |
| 12:03 | 25 | shown otherwise, that is what you're to assume.  And then |

| | | |
|---|---|---|
| 12:03 | 1 | each of you can explain why a particular planogram was not. |
| 12:03 | 2 | Okay? |
| 12:03 | 3 | So those were my thoughts last evening. |
| 12:03 | 4 | Now, the lectern's yours. |
| 12:03 | 5 | MR. PRICE:  One moment, Your Honor. |
| 12:03 | 6 | THE COURT:  And I missed you all last night.  I |
| 12:03 | 7 | should have never let you go at 7:00.  That was a kindness |
| 12:03 | 8 | that I regret. |
| 12:04 | 9 | Let the record reflect the reason I did, and the |
| 12:04 | 10 | Court was kind, I was worried about counsel holding up, |
| 12:04 | 11 | quite frankly. |
| 12:04 | 12 | MR. PRICE:  Your Honor, we're trying to see if we |
| 12:04 | 13 | can come to an agreement. |
| 12:04 | 14 | THE COURT:  Yeah.  And, by the way, you don't have |
| 12:04 | 15 | to.  I'm not asking. |
| 12:04 | 16 | MR. PRICE:  I understand. |
| 12:04 | 17 | THE COURT:  I could have sorted this out with you. |
| 12:04 | 18 | I just really wanted the courtesy with each of you having a |
| 12:04 | 19 | hearing where you really could lay out your positions, make |
| 12:04 | 20 | your arguments, Mr. Zeller, 'cause, then, I would have let |
| 12:04 | 21 | you argue this matter, and Ms. Hurst, so you had a good |
| 12:04 | 22 | record for the Circuit, so in case I made a mistake, each of |
| 12:04 | 23 | you had an appealable issue; and I wanted to ask you a lot |
| 12:04 | 24 | more information about this, frankly. |
| 12:04 | 25 | Now, on the record, Ms. Hurst and Mr. -- |

Case 2:04-cv-09049-DOC-RNB   Document 10283   Filed 03/28/11   Page 150 of 154   Page ID #:312178
CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

150

| | | |
|---|---|---|
| 12:05 | 1 | whoever -- your deposition will take place Friday evening, |
| 12:05 | 2 | not tonight.  There's a tremendous amount of information |
| 12:05 | 3 | that this Court went over last evening.  I called in the |
| 12:05 | 4 | special master and his assistant.  I employed four law |
| 12:05 | 5 | clerks.  And I also represent to you I've looked at |
| 12:05 | 6 | 80 percent of this material.  And I'll get to the other |
| 12:05 | 7 | 20 percent tonight.  And there's a tremendous amount of |
| 12:05 | 8 | information coming out, and I don't believe that you can |
| 12:05 | 9 | effectively have Jill Thomas examined until each of you have |
| 12:05 | 10 | gotten this information. |
| 12:05 | 11 | And if it's -- if it occurs tonight, with the |
| 12:05 | 12 | briefing schedule that I'm holding you to, you know, |
| 12:05 | 13 | 5:00 o'clock for the briefing on the Duty of Loyalty and |
| 12:05 | 14 | Conversion, and the response by Mattel on the same issues, |
| 12:05 | 15 | 5:00 o'clock on Friday, with arguments at 8:00 on Saturday, |
| 12:05 | 16 | you're gonna crack.  And you can't absorb the information |
| 12:05 | 17 | for either side quickly enough, so... |
| 12:06 | 18 | MR. McCONVILLE:  Your Honor, can Mr. Larian go |
| 12:06 | 19 | grab a bite to eat before he testifies? |
| 12:06 | 20 | THE COURT:  Why?  Just sit here and enjoy us. |
| 12:06 | 21 | Watch what we do at night for a change. |
| 12:07 | 22 | MR. PRICE:  Your Honor, the agreement we've come |
| 12:07 | 23 | to is that Mattel will be able to use all of these e-mails. |
| 12:07 | 24 | And then, after the examination, the Court, we agree, can |
| 12:07 | 25 | give the instruction that the planograms mentioned in these |

CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

151

| 12:08 | 1 | e-mails appear to be open. |
| 12:08 | 2 | THE COURT:  You two draw up –– you draft that |
| 12:08 | 3 | agreement right now. |
| 12:08 | 4 | MS. HURST:  And part of the agreement is on that |
| 12:08 | 5 | Riverside document.  That stays out. |
| 12:08 | 6 | THE COURT:  "The check's in the mail." |
| 12:08 | 7 | You draft it so I see it, and then we'll go to |
| 12:08 | 8 | lunch. |
| 12:08 | 9 | MS. HURST:  Do you want us to draft the |
| 12:08 | 10 | instruction that will be given, as well? |
| 12:08 | 11 | THE COURT:  Right now. |
| 12:08 | 12 | MS. HURST:  Okay. |
| 12:08 | 13 | THE COURT:  We're all sitting waiting for you. |
| 12:08 | 14 | *(Pause in the proceedings at 12:08 p.m.)* |
| 12:08 | 15 | *(Proceedings resumed at 12:11 p.m.)* |
| 12:11 | 16 | THE COURT:  Okay.  Read it. |
| 12:11 | 17 | MR. PRICE:  "Mattel and MGA agree that Mattel may |
| 12:12 | 18 | cross-examine Mr. Larian on Items 3 through 16 listed on |
| 12:12 | 19 | pages 10 through 12 of Mattel's Offer of Proof Regarding |
| 12:12 | 20 | Evidence of MGA's Receipt of Information Regarding Mattel's |
| 12:12 | 21 | Unreleased Products, filed on March 16, 2001. |
| 12:12 | 22 | Mattel will not examine Mr. Larian on |
| 12:12 | 23 | Exhibit 24324 and will not go into subject matter of that |
| 12:12 | 24 | exhibit." |
| 12:12 | 25 | THE COURT:  Stipulated to by Mattel? |

CV 04-9049 DOC – 3/24/2011 – Day 39, Volume 1 of 3

152

| | | |
|---|---|---|
| 12:12 | 1 | MR. PRICE:  Yes. |
| 12:12 | 2 | THE COURT:  And by MGA? |
| 12:12 | 3 | MS. HURST:  Yes. |
| 12:12 | 4 | THE COURT:  Then have a nice lunch. |
| 12:12 | 5 | MS. HURST:  Wait, wait.  We have the language of |
| 12:12 | 6 | the instruction to be given, as well. |
| 12:12 | 7 | THE COURT:  Oh, please. |
| 12:12 | 8 | MR. PRICE:  After the examination. |
| 12:12 | 9 | MS. HURST:  So, after the examination, the |
| 12:12 | 10 | stipulated instruction is: |
| 12:12 | 11 | "Mattel has introduced a number of e-mails |
| 12:12 | 12 | regarding planogram rooms during the cross-examination.  You |
| 12:12 | 13 | are to consider the planogram rooms referenced in these |
| 12:12 | 14 | e-mails to be open to the public and the information there |
| 12:12 | 15 | is not considered a trade secret." |
| 12:12 | 16 | THE COURT:  Stipulated to by Mattel? |
| 12:13 | 17 | MR. PRICE:  Yes. |
| 12:13 | 18 | THE COURT:  And by MGA? |
| 12:13 | 19 | MS. HURST:  Yes. |
| 12:13 | 20 | THE COURT:  Now, one thing:  Why isn't that |
| 12:13 | 21 | unfair, though, to Mattel?  Why shouldn't that also pertain |
| 12:13 | 22 | to planogram rooms in general? |
| 12:13 | 23 | MS. HURST:  Actually, they asked for it to be -- |
| 12:13 | 24 | THE COURT:  I know that. |
| 12:13 | 25 | MR. PRICE:  We asked it to just be these specific |

CV 04-9049 DOC - 3/24/2011 - Day 39, Volume 1 of 3

153

| | | |
|---|---|---|
| 12:13 | 1 | ones. |
| 12:13 | 2 | THE COURT:  Okay.  I want to make certain, |
| 12:13 | 3 | because, you know, planogram rooms -- I don't want to think |
| 12:13 | 4 | that all -- I'm assuming all planograms rooms are open. |
| 12:13 | 5 | MS. HURST:  Not necessarily. |
| 12:13 | 6 | THE COURT:  But not necessarily.  That's the |
| 12:13 | 7 | problem with these e-mails, and that's why I needed time |
| 12:13 | 8 | with you.  Some of them aren't.  So, all right.  We'll see |
| 12:13 | 9 | you in 18 minutes.  Have a nice lunch. |
| 12:13 | 10 | MS. HURST:  Thank you. |
| 12:13 | 11 | *(Lunch recess held at 12:13 p.m.)* |
| 12:13 | 12 | *(Further proceedings reported by Jane Sutton* |
| 12:13 | 13 | *rules in Volume II.)* |
| 12:13 | 14 | -oOo- |
| 12:13 | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

12:13  1                          -oOo-

12:13  2

12:13  3                       CERTIFICATE

12:13  4

12:13  5        I hereby certify that pursuant to Section 753,

12:13  6   Title 28, United States Code, the foregoing is a true and

12:13  7   correct transcript of the stenographically reported

12:13  8   proceedings held in the above-entitled matter and that the

12:13  9   transcript page format is in conformance with the

12:13  10  regulations of the Judicial Conference of the United States.

12:13  11

12:13  12  Date:  March 24, 2011

12:13  13

12:13  14
12:13
12:13  15  _____
12:13
12:13  16           DEBBIE GALE, U.S. COURT REPORTER
                     CSR NO. 9472, RPR
12:13  17

       18

       19

       20

       21

       22

       23

       24

       25