1

1             UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3        HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4                  – – – – – – –

5

6    MATTEL, INC., ET AL.,            )
                                      )
7              Plaintiffs,            )
                                      )
8         vs.                         ) No. CV 04-9049-DOC
                                      )    Day 39
9    MGA ENTERTAINMENT, INC., ET AL., )    Volume 2 of 3
                                      )
10             Defendants.            )
     _____)

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                    Jury Trial

17               Santa Ana, California

18             Thursday, March 24, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-03-24 MattelV2

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART & SULLIVAN
               By:   JOHN B. QUINN
5                    MICHAEL T. ZELLER
                     WILLIAM PRICE
6                    Attorneys at Law
               865 South Figueroa Street
7              10th Floor
               Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   THOMAS S. MC CONVILLE
12                   Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             - AND -

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   ANNETTE L. HURST
17                   Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700

19             - AND -

20
               KELLER RACKAUCKAS, LLP
21             BY:   JENNIFER L. KELLER
                     Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4            SCHEPER, KIM & OVERLAND, LLP
              BY:  ALEXANDER H. COTE  (Not Present)
 5               Attorney at Law
              601 West Fifth Street
 6            12th Floor
              Los Angeles, California 90071
 7            (213) 613-4660

 8            – AND –

 9            LAW OFFICES OF MARK E. OVERLAND
              BY:  MARK E. OVERLAND
10               Attorney at Law
              100 Wilshire Boulevard
11            Suite 950
              Santa Monica, California 90401
12            (310) 459-2830

13

14    Also Present:

15            ISAAC LARIAN, MGA CEO
              ROBERT ECKERT, Mattel CEO
16            LILY MARTINEZ, Mattel Employee
              KEN KOTARSKI, Mattel Technical Operator
17            MIKE STOVALL, MGA Technical Operator
              RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan
18            KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe
              WARRINGTON PARKER, Orrick Herrington & Sutcliffe
19            MELANIE PHILLIPS, Orrick Herrington & Sutcliffe
              FRANK RORIE, Orrick Herrington & Sutcliffe
20            DIANA RUTOWSKI, Orrick Herrington & Sutcliffe
              DENISE MINGRONE, Orrick Herrington & Sutcliffe
21

22

23

24

25
```

CV 04-9049-DOC – 03/24/2011 – Day 39, Vol. 2 of 3

4

1                              **I N D E X**

2

3

4                          **EXAMINATION**

5   **Witness Name**        **Direct**     **Cross**     **Redirect**     **Recross**

6   LARIAN, ISAAC
      By Ms. Hurst          22

7

8

9                            **EXHIBITS**

10  **Exhibit**                           **Identification**     **Evidence**

11  Defendants' No. 1366                                        137
    Defendants' No. 1802                                         61
12  Defendants' No. 9301                                         50
    Defendants' Nos. 9353, 9402                                 144
13  Defendants' No. 9475                                         32
    Defendants' Nos. 9488, 9489                                  99
14  Defendants' No. 9499-24                                      88
    Defendants' No. 9512                                         47
15  Defendants' No. 9533                                         67
    Defendants' No. 9591                                         50
16  Defendants' Nos. 9593-1 through -15                          98
    Defendants' No. 9594                                         49
17  Defendants' Nos. 9604-1, 9604-22 through -24                 95
    Defendants' Nos. 9604-14 through -17                         96
18  Defendants' No. 9854                                         71
    Defendants' Nos. 11239A, 11239B                             135
19  Defendants' No. 12844                                        66
    Defendants' No. 13120                                       137
20  Defendants' No. 13123                                       139
    Defendants' Nos. 17200, 17201, 17202, 17203                 147
21  Defendants' No. 17204, 17205                                148
    Defendants' No. 17379                                       127
22  Defendants' No. 17527                                       127
    Defendants' No. 17593                                       123
23  Defendants' No. 18741                                       126
    Defendants' Nos. 26546-1, 26546-44 through -46              94
24  Defendants' Nos. 26571-1, 26571-10                          89
    Defendants' No. 26580                                        87
25  Defendants' Nos. 26580-2, 26580-64, 26580-65                88

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 5 of 170   Page ID #:312974
CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

5

1                    **I N D E X** (Continued)

2

3                         **EXHIBITS**

4    <u>**Exhibit**</u>                      **Identification**    **Evidence**

5    Defendants' No. 26755-2                                 98
     Defendants' Nos. 26755-5 through -12                    97
6    Defendants' Nos. 26758-1, 26758-7, 26758-10,            95
                     26758-12
7    Defendants' Nos. 27105 and 27106                       138
     Defendants' No. 27035                                  150
8    Defendants' No. 27046                                  134
     Defendants' No. 27108                                  139
9    Defendants' Nos. 27128, 27129                          133
     Defendants' No. 27134                                  137
10   Defendants' No. 27178                                  135
     Defendants' No. 27243                                  148
11   Defendants' Nos. 27284, 27289                          143
     Defendants' Nos. 31177, 31178                          158
12   Defendants' Nos. 31179 through 31184                   159
     Defendants' Nos. 32836-13, 32836-24, 32836-27,          91
13                   32836-66, 32836-79, 32836-80
                     through -89
14   Defendants' No. 34486                                   21
     Defendants' Nos. 34490, 34491                           20
15   Defendants' Nos. 34492, 34497                           18
     Defendants' No. 34503                                   20
16   Defendants' Nos. 34504, 34505                           17
     Defendants' No. 34508                                   20
17   Defendants' No. 34509                                   17
     Defendants' No. 34511                                    9
18   Defendants' Nos. 34513, 34514                           19
     Defendants' Nos. 34516, 34518                           16
19   Defendants' No. 34525                                   14
     Defendants' No. 34535                                   13
20   Defendants' No. 34536                                   11
     Defendants' No. 34542                                   19
21   Defendants' No. 34543                                   18
     Defendants' No. 34548                                   10
22   Defendants' No. 34782                                   16
     Defendants' No. 34783                                   17
23   Defendants' No. 34785                                   17
     Defendants' No. 34786                                   18
24   Defendants' No. 34787                                   21
     Defendants' No. 34788                                   18
25   Defendants' No. 34814                                    9

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 6 of 170   Page ID #:312975
CV 04-9049-DOC – 03/24/2011 – Day 39, Vol. 2 of 3

6

```
 1                      I N D E X  (Continued)

 2

 3                           EXHIBITS

 4    Exhibit                        Identification    Evidence

 5    Defendants' No. 34819                              19
      Defendants' No. 34820                              18
 6    Defendants' No. 34823                              10
      Defendants' Nos. 34835, 34836                      19
 7    Defendants' Nos. 34837, 34838                      20
      Defendants' No. 34841                              11
 8    Defendants' No. 34842                              12
      Defendants' No. 34844                              13
 9    Defendants' Nos. 34845, 34846                      16
      Defendants' No. 35223                              21
10    Defendants' No. 35265                             118
      Defendants' No. 36633                              83
11    Defendants' No. 36635                              58
      Defendants' No. 36639                              25
12    Defendants' No. 36640-32                           35
      Defendants' No. 36640-33                           36
13    Defendants' Nos. 36640-34, 36640-35               37
      Defendants' Nos. 36640-36 through -39             39
14    Defendants' Nos. 36640-41 through -44             40
      Defendants' No. 36641                             133
15    Defendants' No. 36642                             144
      Defendants' No. 36643                             145
16    Defendants' No. 36644                             149
      Defendants' Nos. 36649, 36650                     151
17    Defendants' Nos. 36651, 36652                     153
      Defendants' Nos. 36655, 36661                     156
18    Defendants' Nos. 36662, 36663                     157
      Defendants' Nos. 36656 through 36660              154
19    Defendants' Nos. 36664, 36665                     155
      Defendants' Nos. 36684, 36685                     130
20    Defendants' No. 36688                             125
      Defendants' No. 36695                             127
21    Defendants' No. 36704                             117
      Defendants' No. 36715                             119
22    Defendants' No. 36716                             120
      Defendants' No. 36717                             122
23    Defendants' No. 36718                             121
      Defendants' Nos. 36707, 36719 through 36721       124
24    Defendants' No. 36742                             128

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 7 of 170   Page ID #:312976
CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

7

```
 1              SANTA ANA, CALIFORNIA, THURSDAY, MARCH 24, 2011

 2                        DAY 39, VOLUME 2 OF 3

 3                            (12:33 p.m.)

 4              (The following proceedings is taken in the

 5         presence of the jury.)

 6              THE COURT:  We are back in session.  The jury is

 7    present, alternates are present, all counsel, the parties.

 8              Thank you for your courtesy.

 9              And Counsel, will you call your next witness.

10              MS. HURST:  Your Honor, I was wondering if we

11    could do those two requests for judicial notice before we

12    start the next witness; would that be acceptable?

13              THE COURT:  That's between you and Mattel.

14              (Attorney discussion held off the record.)

15              MS. HURST:  Mr. Price has agreed, but we are

16    getting him a copy, your Honor.

17              THE COURT:  Okay.  If you have one copy, if you

18    want to read that with both of you standing at the lectern,

19    that will save some time.

20              MS. HURST:  Your Honor, do you want to give a

21    preparatory instruction about what a judicial notice is?

22              THE COURT:  That would be a good idea.  Thank you,

23    both.

24              Judicial notice means that the parties have asked

25    the Court or a party has asked the Court to take notice of a
```

CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

8

```
 1    certain type of document, and oftentimes it's a document
 2    that's filed with a government agency, so it's called
 3    judicial notice.
 4            Now, Counsel, beyond that, I can read an
 5    instruction if you'd like to, but why don't you give them
 6    the stipulation.
 7            MS. HURST:  Thank you, your Honor.
 8            On or about November 25th, 1991, Cameron Jordan of
 9    Beverly Hills, California, filed an application for the
10    registration of Beverly Hills Bratz, with a Z, as a
11    trademark for dolls and dolls accessories and dolls clothing
12    in International Class 28.
13            And this is Trial Exhibit 34814.
14            And may we display that at this time, your Honor?
15            THE COURT:  You may.
16            MS. HURST:  Excuse me.  Is that 34814?
17            Okay.  No later than January 27, 1992, trademark
18    application 74/225219 was available to the general public in
19    the files of the PTO, the Patent and Trademark Office.
20            And your Honor, I'd move the admission of 34814.
21            THE COURT:  That's received.
22            And the Court is taking judicial notice.  That
23    means it's a binding document.  It's been received into
24    evidence for your consideration.
25
```

 1                    *(Defendants' Exhibit No. 34814 is received in*

 2           *evidence.)*

 3                    MS. HURST:  As of April 26th, 1995, the

 4      application of Cameron Jordan for the registration of

 5      Beverly Hills Bratz as a trademark for dolls and dolls

 6      accessories and dolls clothing in International Class 28 was

 7      abandoned.

 8                    And this is reflected in Trial Exhibit 34511.

 9                    THE COURT:  I'll receive that exhibit at this

10      time.

11                    And you can display it, Counsel.

12                    *(Defendants' Exhibit No. 34511 is received in*

13           *evidence.)*

14                    MS. HURST:  Thank you, your Honor.

15                    On or about -- we're going to the next one, now.

16                    On or about May 4th, 1999, Pangeea Corporation of

17      Dana Point, California, filed an application for the

18      registration of Brat Boards as a trademark for games, toys

19      and play things in International Class 28.  That's trial

20      Exhibit 34823.

21                    THE COURT:  And I'll receive 34823 at this time

22      and take judicial notice of that document.

23                    You may display it.

24                    MS. HURST:  Thank you, your Honor.

25

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 10 of 170   Page ID #:312979
CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

10

1              *(Defendants' Exhibit No. 34823 is received in*

2         *evidence.)*

3              MS. HURST:  No later than July 6th, 1999, the Brat

4    Board application was available to the general public in the

5    files of the Patent and Trademark office.

6              *(Attorney discussion held off the record.)*

7              MS. HURST:  As of April 6th, 2000, the application

8    of Pangeea Corporation for the registration of Brat Boards

9    as a trademark for games, toys and play things in U.S.

10   Class 22 and International Class 28 was abandoned.  And

11   that's reflected in Exhibit 34548.

12             THE COURT:  And you may display 34548.

13             That's received by the Court, and I'll take

14   judicial notice of that document.

15             *(Defendants' Exhibit No. 34548 is received in*

16        *evidence.)*

17             MS. HURST:  Excuse me.  So we'll move to the next

18   one, now.

19             THE COURT:  Please.

20             MS. HURST:  On or about April 16, 1998, Rodney E.

21   Cliff of Sunrise, Florida, filed an application for the

22   registration of Brat Pack and Design as a trademark for

23   children's doll backpacks -- doll/backpacks, children's

24   clothing, children's coloring books, games, toys and play

25   things in International Class 28, and that's Trial

1    Exhibit 34841.

2          THE COURT:  That's received by the Court.  The

3    Court's taking judicial notice of that document.

4          You may display it, Counsel.

5          *(Defendants' Exhibit No. 34841 is received in*

6       *evidence.)*

7          MS. HURST:  No later than June 16, 1998, the

8    application for Brat Pack and Design was available to the

9    general public in the files of the Patent and Trademark

10   Office.

11         As of November 15, 2000, the application of Rodney

12   E. Cliff for the registration of Brat Pack and Design as a

13   trademark for children's dolls/backpacks, children's

14   clothing, children's coloring books, games, toys and play

15   things in International Class 28 was abandoned.  That

16   abandonment is reflected in Trial Exhibit 34536.

17         THE COURT:  I'll receive 34536, take judicial

18   notice of that document.

19         You may display it, Counsel.

20         *(Defendants' Exhibit No. 34536 is received in*

21      *evidence.)*

22         MS. HURST:  Thank you, your Honor.

23         Moving to the next item.

24         On or about March 2nd, 1998, The Jim Henson

25   Company of New York, New York, and Hollywood, California,

```
 1   filed an application for the registration of Brats, with an

 2   S, of the Lost Nebula as a trademark for, among other

 3   things, toys and games, action toys and accessories,

 4   including action figures, action figure accessories, role

 5   playing sets and a variety of other categories reflected

 6   therein, and that is trial Exhibit 34842.

 7            THE COURT:  I'll receive 34842, take judicial

 8   notice of that document.

 9            You may display it, Counsel.

10            MS. HURST:  Thank you, your Honor.

11            (Defendants' Exhibit No. 34842 is received in

12       evidence.)

13            MS. HURST:  The next item is no later than

14   May 4th, 1998, the trademark application for Brats of the

15   Lost Nebula was available to the general public in the files

16   of the Patent and Trademark Office.

17            As of August 6th, 1999, this application of The

18   Jim Henson Company for the registration of Brats, with an S,

19   of the Lost Nebula was abandoned as reflected in Trial

20   Exhibit 34535.

21            THE COURT:  The Court will take notice of 34535,

22   the abandonment.  I'll receive that document into evidence.

23            And you may display it, if you haven't already

24   done so.

25            MS. HURST:  Thank you, your Honor.
```

```
 1              THE COURT:  Thank you.

 2              (Defendants' Exhibit No. 34535 is received in

 3         evidence.)

 4              MS. HURST:  The next item, your Honor, on or about

 5    January 16, 1996, Lisa R. Consoli, C-o-n-s-o-l-i, of

 6    San Diego, California, filed an application for the

 7    registration of Bratz, with a Z, as a trademark for

 8    snowboards in International Class 28, that is reflected in

 9    Trial Exhibit 34844.

10              THE COURT:  34844 will be received.  The Court is

11    taking judicial notice of that document.

12              You may display it, Counsel.

13              (Defendants' Exhibit No. 34844 is received in

14         evidence.)

15              MS. HURST:  No later than March 18, 1996, the

16    trademark application of Bratz for snowboards was available

17    to the general public in the files of the Patent and

18    Trademark Office.

19              On or about December 3rd, 1996, Bratz, with a Z,

20    was registered on the principal register as a trademark for

21    snowboards in International Class 28, and that's reflected

22    in Trial Exhibit 34525.

23              THE COURT:  34525 will be received into evidence.

24    The Court is taking judicial notice of that registration.

25              Counsel, you may display it.
```

1          *(Defendants' Exhibit No. 34525 is received in*

2      *evidence.)*

3          MS. HURST:  Your Honor, if I may, I would just

4   move the remainder of the exhibits in from the judicial

5   notice at this time.

6          THE COURT:  Do you want to state those, or do you

7   want to just submit the judicial notice as an actual piece

8   of evidence?  What have you and Mattel decided on that?

9          *(Attorney discussion held off the record.)*

10         MS. HURST:  Your Honor, we've agreed that we will

11  submit the request for judicial starting on page 2, line 15

12  through the end.

13         THE COURT:  Do you just want to put that on a

14  separate piece of paper, then?

15         MS. HURST:  Yeah, we'll put it on a separate piece

16  of paper.

17         THE COURT:  Do you want to give it an exhibit

18  number?

19         MS. HURST:  Yeah, we'll do that, your Honor.  And

20  we'll take care of it outside the presence of the jury.

21         THE COURT:  Well, do we have one now that we can

22  just create the record so we don't have to come back to one

23  more thing?

24         MS. HURST:  Through 15, through page 15, line 24,

25  we'll make that Exhibit 41006, your Honor.

1      THE COURT:  41006, Nancy, and that will be

2  received by the Court.  You'll start at page 2, line 15,

3  extend through page --

4      MS. HURST:  Page 15, line 24.

5      THE COURT:  Line 24.

6      And Mr. Price, you've been able to check that at

7  the same time?

8      MR. PRICE:  Yes.

9      THE COURT:  All right.  Thank you.

10      MS. HURST:  And your Honor, should I read, then,

11  the trial exhibits that are referenced therein so --

12      THE COURT:  Why don't you so they are in the

13  record and the jury knows.

14      Now, ladies and gentlemen, counsel are saving a

15  lot of time between themselves.  Page 2, line 15, through

16  page 15, line 24 will be put into a document.  These are all

17  items that the Court's receiving.  I'm taking judicial

18  notice of them.  They are a series of registrations and

19  abandonments that would probably take both sides an

20  extraordinary period of time to put on.

21      They reached a stipulation.  It's basically

22  binding on us.  I'm required, if requested, to take judicial

23  notice of those obvious documents that have been filed, for

24  instance, with the IRS or the Treasury Department.  In this

25  case it's the Patent and Trademark Office, okay?

```
1           MS. HURST:  Okay.  Your Honor, Trial Exhibit 34845
2    referenced in paragraph 31 of the request.
3           THE COURT:  Received.
4           (Defendants' Exhibit No. 34845 is received in
5      evidence.)
6           MS. HURST:  Trial Exhibit 34518 referenced in
7    paragraph 34 of the request.
8           THE COURT:  Received.
9           (Defendants' Exhibit No. 34518 is received in
10     evidence.)
11          MS. HURST:  Trial Exhibit 34846 referenced in
12   paragraph 36 of the request.
13          THE COURT:  Received.
14          (Defendants' Exhibit No. 34846 is received in
15     evidence.)
16          MS. HURST:  Trial Exhibit 34516 referenced in
17   paragraph 39 of the request.
18          THE COURT:  Received.
19          (Defendants' Exhibit No. 34516 is received in
20     evidence.)
21          MS. HURST:  Trial Exhibit 34782 referenced in
22   paragraph 41.
23          THE COURT:  Received.
24          (Defendants' Exhibit No. 34782 is received in
25     evidence.)
```

1           MS. HURST:  34509 referenced in paragraph 44.

2           THE COURT:  Received.

3           *(Defendants' Exhibit No. 34509 is received in*

4     *evidence.)*

5           MS. HURST:  34783 referenced in paragraph 46.

6           THE COURT:  Received.

7           *(Defendants' Exhibit No. 34783 is received in*

8     *evidence.)*

9           MS. HURST:  34505 referenced in paragraph 49.

10          THE COURT:  Received.

11          *(Defendants' Exhibit No. 34505 is received in*

12    *evidence.)*

13          MS. HURST:  34785 referenced in paragraph 51.

14          THE COURT:  Received.

15          *(Defendants' Exhibit No. 34785 is received in*

16    *evidence.)*

17          MS. HURST:  34504 referenced in paragraph 54.

18          THE COURT:  I'm sorry, the last one, I apologize.

19          MS. HURST:  34504 referenced in paragraph 54.

20          THE COURT:  Thank you.  Received.

21          *(Defendants' Exhibit No. 34504 is received in*

22    *evidence.)*

23          MS. HURST:  34788 referenced in paragraph 56.

24          THE COURT:  Received.

25

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 18 of 170   Page ID #:312987
CV 04-9049-DOC – 03/24/2011 – Day 39, Vol. 2 of 3

18

1           *(Defendants' Exhibit No. 34788 is received in*
2      *evidence.)*
3           MS. HURST:  34497 referenced in paragraph 59.
4           THE COURT:  Received.
5           *(Defendants' Exhibit No. 34497 is received in*
6      *evidence.)*
7           MS. HURST:  34786 referenced in paragraph 61.
8           THE COURT:  Received.
9           *(Defendants' Exhibit No. 34786 is received in*
10     *evidence.)*
11          MS. HURST:  34492 referenced in paragraph 64.
12          THE COURT:  Received.
13          *(Defendants' Exhibit No. 34492 is received in*
14     *evidence.)*
15          MS. HURST:  344 -- pardon me -- strike that.
16          34820 referenced in paragraph 67.
17          THE COURT:  Received.
18          *(Defendants' Exhibit No. 34820 is received in*
19     *evidence.)*
20          MS. HURST:  34543 referenced in paragraph 70.
21          THE COURT:  Received.
22          *(Defendants' Exhibit No. 34543 is received in*
23     *evidence.)*
24          MS. HURST:  34819 referenced in paragraph 72.
25          THE COURT:  Received.

```
 1              (Defendants' Exhibit No. 34819 is received in
 2        evidence.)
 3              MS. HURST:  34542 referenced in paragraph 75.
 4              THE COURT:  Received.
 5              (Defendants' Exhibit No. 34542 is received in
 6        evidence.)
 7              MS. HURST:  34835 referenced in paragraph 77.
 8              THE COURT:  Received.
 9              (Defendants' Exhibit No. 34835 is received in
10        evidence.)
11              MS. HURST:  34514 referenced in paragraph 80.
12              THE COURT:  Received.
13              (Defendants' Exhibit No. 34514 is received in
14        evidence.)
15              MS. HURST:  34836 referenced in paragraph 82.
16              THE COURT:  Received.
17              (Defendants' Exhibit No. 34836 is received in
18        evidence.)
19              MS. HURST:  34513 referenced in paragraph 85.
20              THE COURT:  Received.
21              (Defendants' Exhibit No. 34513 is received in
22        evidence.)
23              MS. HURST:  34837 referenced in paragraph 87.
24              THE COURT:  Received.
25
```

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 20 of 170   Page ID #:312989
CV 04-9049-DOC – 03/24/2011 – Day 39, Vol. 2 of 3

20

```
 1              (Defendants' Exhibit No. 34837 is received in
 2      evidence.)
 3              MS. HURST:  34508 referenced in paragraph 90.
 4              THE COURT:  Received.
 5              (Defendants' Exhibit No. 34508 is received in
 6      evidence.)
 7              MS. HURST:  34838 referenced in paragraph 93.
 8              THE COURT:  Received.
 9              (Defendants' Exhibit No. 34838 is received in
10      evidence.)
11              MS. HURST:  34503 referenced in paragraph 96.
12              THE COURT:  Received.
13              (Defendants' Exhibit No. 34503 is received in
14      evidence.)
15              MS. HURST:  34491 referenced in paragraph 98.
16              THE COURT:  Received.
17              (Defendants' Exhibit No. 34491 is received in
18      evidence.)
19              MS. HURST:  344 -- sorry.  I just said that one.
20              34490 referenced in paragraph 103.
21              THE COURT:  490, received.
22              (Defendants' Exhibit No. 34490 is received in
23      evidence.)
24              MS. HURST:  And 34787 referenced in paragraph 108.
25              THE COURT:  Received.
```

1          *(Defendants' Exhibit No. 34787 is received in*
2       *evidence.)*
3              MS. HURST:  34486 referenced in paragraph 111.
4              THE COURT:  Received.
5          *(Defendants' Exhibit No. 34486 is received in*
6       *evidence.)*
7              MS. HURST:  And 35223 referenced in paragraph 114.
8              THE COURT:  Received.
9          *(Defendants' Exhibit No. 35223 is received in*
10      *evidence.)*
11             MS. HURST:  And now that we've put everybody to
12      sleep, we call Mr. Larian.
13             THE COURT:  Mr. Larian.
14             Thank you, Counsel.
15             Mr. Larian, sir, if you'd raise your right hand,
16      we will reswear you, although we've sworn you before.
17             **ISAAC LARIAN, DEFENDANTS' WITNESS, RESWORN**
18             THE WITNESS:  I do.
19             THE COURT:  Sir, if you'd please be seated, and if
20      you'd just walk along the railing, and if you'd please be
21      seated here in the witness box once again.
22             THE WITNESS:  I want to get my glasses.
23             THE COURT:  Okay.
24             After you are seated, reintroduce yourself to the
25      jury by just stating your name, okay?

```
1              Thank you, sir.
2              THE WITNESS:  Thank you.
3              I'm Isaac Larian.
4              THE COURT:  Okay.  And this is Ms. Hurst on direct
5    examination of Mr. Larian.
6              MS. HURST:  Thank you, your Honor.
7                      DIRECT EXAMINATION
8    BY MS. HURST:
9    Q    Have you ever been to a toy fair?
10   A    I have been to many toy fairs.
11   Q    Tell me the different toy fairs that you've been to.
12   A    I have been to Nuremberg toy fair.  I've been to
13   New York toy fair.  I have been to Hong Kong toy fair.  I
14   have been to Pomona toy fair.  I've been to Paris toy fair.
15   I've been to London toy fair, Tokyo toy fair.
16   Q    Why do you go to so many toy fairs?
17   A    To -- basically to have a booth where we promote and
18   sell our products to the retailers.
19   Q    Is that an important part of your business?
20   A    Yes.
21   Q    And you said you've -- what's the purpose of a toy
22   fair?
23   A    When you go to a toy fair, you basically have your
24   mockups and packaging for your future products where you
25   show it to the retailers and the customers who come there to
```

1    persuade them to buy your product.

2    Q    And what time of year are these toy fairs usually held?

3    A    The first toy fair is in January, first week of January

4    every year in Hong Kong.  Then comes after that is the New

5    York toy fair, which is in New York.  Then the Nuremberg toy

6    fair, and the other toy fairs, just depending on the time of

7    the year, fall in between.

8        Basically during the first -- all of the toy fairs are

9    in the first quarter of the year.

10   Q    Before 2006, what was it like at New York toy fair?

11   A    Before 2006, New York toy fair was in two different

12   sections.  One was in the Javits center, which is like a

13   convention center, where the smaller toy companies show

14   their products openly.

15       Then there was a toy building, which was on 205th

16   Avenue, toy building has been there over a hundred years

17   until they shut it down and they turned it into

18   condominiums, but it was two adjacent buildings where there

19   were private showrooms that all -- almost all toy companies

20   show their product in, except for Hasbro, who had their own

21   building near the toy -- near the toy building, and Mattel,

22   which had their own closed-door building also near the toy

23   building.

24   Q    So in this separate toy building, would -- would MGA

25   lease space?

CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

24

1    A    Yes, we would.

2    Q    And other toy manufacturers as well?

3    A    Yes.

4    Q    Now, do most of the major toy manufacturers go to toy

5    fairs?

6    A    I'm sorry?

7    Q    Do most of the major toy manufacturers go to toy fairs?

8    A    Yes.

9    Q    And did MGA attend major toy fairs every year?

10   A    Every year except when they shut down the toy building,

11   they converted it to a condominium.  For two years, we did

12   not go to the New York toy fair, but we started to go back

13   again in 2010.

14   Q    And what two years were those that you were not there?

15   A    The best of my recollection, I think it's 2008 or '9,

16   but I could be wrong.

17   Q    Okay.  And when did MGA start attending toy fairs?

18   A    I don't remember the exact date, but early '90s.

19   Q    And has MGA had a showroom at major toy fairs every

20   year?

21   A    Yes, except the exception that I just told you, for two

22   years, we were not in New York.

23   Q    And in Hong Kong, how does it work?

24   A    In Hong Kong, again, there are two shows, one is big --

25   they call it Hong Kong Trade Development Council that puts

1    on a big show in the convention center where a lot of

2    smaller toy companies show their products, but the bigger

3    manufacturer basically rent offices in different buildings,

4    high-rises, and that's where you have your offices as well

5    as your toy show.

6    Q    And did MGA have separately rented offices in

7    conjunction with the Hong Kong toy fair?

8    A    Yes, for as long as I can remember, we've been in the

9    toy business.

10   Q    Let me ask you to take a look at Exhibit 36639?

11   A    Yes, go ahead.

12   Q    Do you recognize that?

13   A    Yes, I do.

14   Q    And what is it?

15   A    That is the blueprint of our New York toy fair show,

16   which was in the toy building.

17              MS. HURST:  And your Honor, move the admission of

18   36639.

19              THE COURT:  Received.

20              (Defendants' Exhibit No. 36639 is received in

21        evidence.)

22   BY MS. HURST:

23   Q    And you see that Exhibit 36639 is displayed up there on

24   the screen for the jury, Mr. Larian?

25   A    Yes, it is.

1  Q    Do you have a laser pointer or do we need to get you

2  one?

3  A    I don't have a laser pointer.

4       Thank you.

5  Q    Got it?

6  A    Yes.

7  Q    Explain this to us, explain how it worked.

8  A    Okay, if you go to the first page -- the second page

9  first, I think, is easier to show.

10      So this is --

11           THE WITNESS:  Can I stand up, your Honor?

12           THE COURT:  You can stand up and you can put your

13  back to me, sir.

14           THE WITNESS:  This is the first floor of our

15  toy -- toy show, so this is the front entrance.  This is two

16  story -- two-story toy show.  These are stairs that would

17  come down here.

18           And then -- so this was the entrance, people would

19  come in here.  There is a curtain here, if you can see that,

20  right there, because they don't want people to see what's

21  inside here, and here, we also had the security guard,

22  basically, inside the toy show.

23           So the customers who had -- who had appointments

24  will sign in, then come and sit in the reception area.  Once

25  they sit in the reception area, depending on what kind of

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 27 of 170   Page ID #:312996
CV 04-9049-DOC – 03/24/2011 – Day 39, Vol. 2 of 3

27

1    product do they buy, they would be walked in either through

2    this curtain area, this is what we call gallery, or they

3    would walk in through here.

4            In the galleries where you see here, right up

5    here, that's where we show all the Bratz products, all of

6    this area, and you can see there's a TV where we were

7    showing our TV commercial or how the product worked, right

8    there.

9            So this area basically was all -- from here all

10   the way down is all Bratz.  Then you have walls here.

11           So if we only have the customer or distributors

12   who were only interested -- we were only going to sell them

13   Bratz, we'd walk them through here, from this door and then

14   walk them out.

15           And this area here, we had other products.  For

16   example, we had -- in this year, we were showing Best

17   Friends product, which was another fashion doll that we

18   have.  We had Rescue Pets, which is the plush that we had.

19   Then we had game -- this area was all games, so we had

20   classic arcade like we had Pac-Man, et cetera, casino games

21   like black jack, poker.  These are all games, and we also

22   made Bratz games, handheld game as well as board games.

23           Then in here, we had the King Kong, which was a

24   brand that we had some toys for.  Then you walk in here, you

25   have other products, basically, that you walk through, Lil'

```
 1    Bratz, sports, other products we had.
 2    BY MS. HURST:
 3    Q    Let me stop you there.  This is a top floor of a
 4    two-floor layout; is that right?
 5    A    It's actually three floors.  From here, if you could
 6    imagine the steps here, like there were about eight, nine
 7    that you would go, so that was the first floor, and then
 8    there was one floor below that.
 9    Q    Okay.
10    A    So that's the stairs, like this here, the stairs here.
11    Q    All right.  So this is the upper floor that we are
12    looking at now?
13    A    Yes, that's correct.
14    Q    Okay.
15         And can we see the other page, please.
16         And then what was on the lower level?
17    A    Can you go back one more time.  Go back to the previous
18    page one more time.
19              MR. PRICE:  Your Honor, object.  This appears to
20    be a narrative.
21              THE COURT:  The question is?
22    BY MS. HURST:
23    Q    What else is it that you want to show us on that floor,
24    Mr. Larian?
25              MR. PRICE:  Object.  Calls for a narrative.
```

1          THE COURT:  It's overruled.

2          THE WITNESS:  There are stairs here that go to

3    downstairs.

4    BY MS. HURST:

5    Q    There are stairs on that floor so you can go back and

6    forth between the two floors?

7    A    Yes, these are the stairs.  So, here, basically we had

8    our conference room.  We had an area where we would show our

9    closeout for food and drug product, displays that we were

10   storing, refrigerator, kitchen, et cetera.

11        Then we had some of the products that were not very

12   important for us, like MGA RC was in a small area there, but

13   all of these rooms that you see here, these are all rooms

14   for us -- for us here where we show -- where we had meetings

15   with the customers and other people.

16   Q    So each of the square boxes on the lower level floor

17   plan page were actually meeting rooms?

18   A    That's correct.

19   Q    And were they closed off from one another?

20   A    Yes, they are.

21   Q    Okay.  Why don't you have a seat.

22        All right.  So you displayed products in the galleries;

23   is that right?

24   A    Yes.

25   Q    And how would you show them?

CV 04-9049-DOC – 03/24/2011 – Day 39, Vol. 2 of 3

30

```
 1    A     I -- I think I talked about that already.

 2    Q     What sort of things did you display?

 3    A     We showed, again, mockups and packaging and what you

 4    call sizzle.  For example, you have a new product coming

 5    out, let's say you have the plasma TV, you would shoot a

 6    sizzle of how it works, how it plays, to show that so the

 7    customer can see how the product actually works.

 8    Q     And could people touch the product?

 9    A     Yes, they could touch it, they could see the packaging,

10    they could see the size of it, yes.

11    Q     Okay.  Let me ask you --

12    A     All of those were in 3D.

13    Q     Let me ask you to look at Exhibit 911, pages 2 through

14    4?

15    A     Yes, go ahead.

16    Q     Do you recognize that?

17    A     Yes, I do.

18          MS. HURST:  It's already in evidence, your Honor,

19    I believe.

20          THE COURT:  It is.

21    BY MS. HURST:

22    Q     And what is that?

23    A     That was a Bratz room in our Hong Kong toy show.

24    Q     All right.  So this is, I believe, the one Mr. Romano

25    referred to when he was testifying?
```

1    A    Yes.  Again, Hong Kong toy show, we had a large space

2    as big as this courtroom with different rooms, all rooms

3    separately, and this was the Bratz room.

4    Q    And so that was the launch year for Bratz, right?

5    A    That's correct.

6    Q    Now, do you give or show retailers any documents in

7    these showrooms?

8    A    Sometimes we do, yes.

9    Q    And what type of documents do you sometimes give or

10   show them?

11   A    Well, it changed during the years.  Earlier on, we had

12   catalogs that we would give to them.  Later on, we changed

13   those to sell sheets.  The catalog is bound, so it's like a

14   little booklet, it has everything in it.  The sell sheet is

15   a page for each product.  And we also gave them price list,

16   to legitimate customers.

17   Q    And did you actually give them these things to take

18   away?

19   A    After they had seen it, yes.

20   Q    Let me ask you to take a look at Exhibit 9475; do you

21   recognize that?

22   A    Yes.

23   Q    What is it?

24   A    This is one of the catalogs we had early on.

25   Q    All right.

```
 1              MS. HURST:  Your Honor, I move the admission of
 2      9475.
 3              THE COURT:  Received.
 4              (Defendants' Exhibit No. 9475 is received in
 5         evidence.)
 6      BY MS. HURST:
 7      Q    And is this one of -- Mr. Larian, were you a 30(b)(6)
 8      witness in this case?
 9      A    Yes, I've been many 30(b)(6) witness in this case.
10      Q    And was one of your topics to look at all of the
11      documents produced by Mattel related to these toy fair
12      issues?
13      A    Yes, it was.
14      Q    And was this one of the documents you looked at?
15      A    Yes, it was.
16      Q    Can we see the lower right-hand corner, please, do you
17      see that?
18      A    Yes.
19      Q    And is that a Mattel Bates number on your catalog?
20      A    Yes, this catalog was in possession of Mattel.
21      Q    All right.  And did you ever knowingly give your
22      catalogs to Mattel?
23      A    No.  We never give our catalogs to Mattel.
24      Q    Let me ask you to look at Exhibit 9505.
25           You know what, I've been informed that's just a
```

1    duplicate, so we can -- never mind.  I apologize.  Strike

2    that.

3         Now, what are sell sheets?

4    A    Again, as I mentioned earlier, sell sheets is basically

5    one sheet of product for each product that shows what the

6    product does, a picture of it, the dimensions of the

7    packaging, et cetera.

8    Q    And is one of the reasons that you went from using

9    catalogs to sell sheets so that you could better control the

10   flow of information?

11   A    Exactly.  So we would not give -- in the previous

12   exhibit that you looked at, it had all of our products in

13   there.  We went to sell sheets, so when we had, for example,

14   a distributor who was only distributing Rescue Pets for us,

15   we would only give them sell sheets for those, not the rest

16   of the product.

17   Q    Let me ask you to take a look at Exhibit 36640?

18   A    Yes.

19   Q    And do you recognize that?

20   A    Yes, I do.

21   Q    And are those examples of some MGA sell sheets?

22   A    It's only one sheet that I see here.

23        I don't think this is a sell sheet.

24   Q    All right.  Let me just check my numbers here.

25   A    There are some sell sheets in there but not on the

1    first page.  There are some sell sheets in there.

2    Q    Okay.  There are sell sheets in there?

3    A    Yes, there are.

4    Q    Are those all MGA documents?

5    A    I'm sorry?

6    Q    Do you recognize all of the pages as MGA documents?

7    A    Well, the first page has a Mattel production number on

8    it.

9    Q    Okay.  But looking at the document, is it an MGA

10   document?

11   A    Yes.

12   Q    Okay.

13   A    I mean, I haven't gone through every page of this.

14   Q    Okay.  Let me ask you to look at -- starting at

15   page 51, I apologize, I don't have the right page written

16   down here.

17   A    Page 51?

18   Q    Using the trial exhibit number.

19   A    051?

20   Q    Now I really look like an idiot.

21        Page 32.  There are two trial exhibit numbers on it.

22   Let's make sure we are looking at 36640, and it's page 32.

23   A    Yes.

24   Q    Now we got it.

25        Do you recognize that as a sell sheet?

1    A    Yes, I do.

2    Q    And continuing --

3          MS. HURST:  Your Honor, move to admit page 32 of

4    Exhibit 36640.

5          THE COURT:  Received.

6          (Defendants' Exhibit No. 36640-32 is received

7    in evidence.)

8          MR. PRICE:  Object on relevance.  I don't know if

9    it's tied to a trade secret.

10         THE COURT:  I'm sorry?

11         MR. PRICE:  I object on relevance.  I don't know

12   if it's tied to any trade secret.

13         THE COURT:  Received.

14   BY MS. HURST:

15   Q    All right.  This is an MGA sell sheet?

16   A    Yes, it is.

17   Q    And what product is that for?

18   A    That's a large doll we made called Hopscotch Heather,

19   basically plays like a real hopscotch.  Every time we went

20   over the hopscotch board here, it sang hopscotch, hopscotch.

21   Q    And did you note a Bates number on that one?

22   A    Mattel.

23   Q    So that came from Mattel's files?

24   A    Yes.

25   Q    And did you ever knowingly give your sell sheet for

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 36 of 170   Page ID #:313005
CV 04-9049-DOC – 03/24/2011 – Day 39, Vol. 2 of 3

36

1   Hopscotch Heather to Mattel?

2   A    We never gave our sell sheet to Mattel.

3   Q    Can you just walk us through the kind of information

4   that's on a sell sheet?

5   A    If you look at the top here, it basically talks about

6   what the product does.  I'm talking about right there.  Then

7   it -- the next bullet down, it shows what is included in the

8   package.  It comes with the doll and mat, sidewalk chalk, an

9   outfit, hairbrush and batteries.

10       Then if you go down one more feature, it shows what the

11  doll actually does, sings her hopscotch song, counts along

12  with you, sings the entire hopscotch song, et cetera.

13  BY MS. HURST:

14  Q    All right.  And would you look at the next page in

15  Exhibit 36640, page 33.

16  A    Yes.

17  Q    Is that also an MGA sell sheet?

18  A    Yes, it is.

19            MS. HURST:  Move to admit, your Honor.

20            THE COURT:  Received.

21            *(Defendants' Exhibit No. 36640-33 is received*

22       *in evidence.)*

23  BY MS. HURST:

24  Q    And what product is that for?

25  A    This was a product called My Dream Baby.  It was at the

1    time, one of the most sophisticated toys ever made.  This

2    doll had voice recognition, but it -- this doll has a little

3    baby which was born, and as you took care of it, it grew

4    actually in size as well as emotionally, and it had

5    artificial intelligence.

6    Q    And where did this one sell sheet come from?

7    A    What do you mean where did it come from?

8    Q    What's the Bates number on it?

9    A    Mattel.

10   Q    And did you ever knowingly give this sell sheet to

11   Mattel?

12   A    Not that I know, no.

13   Q    Turn to the next page in the exhibit, please, page 34.

14   A    Yes.

15   Q    And is that an MGA sell sheet for Bratz?

16   A    Yes, the first one.  It's for the first year, 2001.

17   Q    And page 35, is that also?

18   A    Yes, they are.

19          MS. HURST:  All right.  Move to admit 34 and 35,

20   your Honor.

21          THE COURT:  Received.

22          (Defendants' Exhibit Nos. 36640-34 and 35 is

23       received in evidence.)

24   BY MS. HURST:

25   Q    So those are the sell sheets for the very first year of

1   Bratz?

2   A    Yes, but if you look at that picture, this is the first

3   mockup, this changed when we went to production.  If you

4   look at that doll, it's -- the face, et cetera, is

5   different.  And this is in February of 2001, the production

6   is different than that.

7   Q    So it wasn't even that -- that wasn't even the finished

8   doll yet?

9   A    This was just a handmade mockup.

10  Q    Okay.  Is that one of the ones that Anna Rhee worked on

11  in December?

12  A    Yes.

13  Q    And this one, you actually -- you did share with

14  Mr. Romano for purposes of trying to distribute in Latin

15  America, right?

16  A    That's correct.

17  Q    I'm going to ask you to take a look at some of the

18  additional pages in the exhibit.  Page 36, is that an MGA

19  sell sheet for Jumpin' Jenni?

20  A    Yes.

21  Q    Page 37, is that an MGA sell sheet for Scooter

22  Samantha?

23  A    Yes.

24  Q    Page 38, is that an MGA sell sheet for Hello Kitty

25  Matchmaker Journal?

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 39 of 170   Page ID #:313008
CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

39

1    A    Yes.

2    Q    Page 39, is that a sell sheet for Hello Kitty Virtual

3    Crush?

4    A    Actually there are two products in this.

5    Q    Virtual Crush and --

6    A    It's a journal.

7    Q    Thirty-eight was a journal, right?

8    A    Right.

9    Q    And 39 is the Virtual Crush?

10   A    That's correct.

11   Q    And those are all MGA sell sheets?

12   A    Yes.

13        MS. HURST:  Move to admit, your Honor.

14        THE COURT:  Received.

15        (Defendants' Exhibit Nos. 36640-36 through

16        36640-39 is received in evidence.)

17   BY MS. HURST:

18   Q    And you saw all of those in this case with Mattel Bates

19   numbers on them, produced from Mattel files, right?

20   A    Yes, I do.

21   Q    And moving on to page 41, is that an MGA product, a

22   sell sheet for the Eye Candy Matchmaker Journal?

23   A    Yes, it is.

24   Q    Page 42, the Eye Candy, Eye Spy?

25   A    Yes, it's also.

1    Q     Page 43, that's a Liar, Liar and DJ Chaos?

2    A     That's correct.

3    Q     Page 44, Monkey See, Monkey Do?

4    A     That's correct.

5          MS. HURST:  Your Honor, move to admit 41, 42, 43

6    and 44.

7          THE COURT:  Received.

8          *(Defendants' Exhibit Nos. 36640-41 through*

9    *36640-44 is received in evidence.)*

10         MS. HURST:  And can we see 44, please.

11   BY MS. HURST:

12   Q     Now, I think you mentioned that one when you were here

13   earlier testifying.  Was that -- that was one of the ones

14   for which you had high hopes and were, unfortunately,

15   disappointed; is that right?

16   A     Yes, sold very few pieces.

17   Q     Okay.

18   A     Less than.

19   Q     And again, all of these sell sheets have been produced

20   from Mattel's files; is that right?

21   A     Yes, they are.

22   Q     Page 45, is that an MGA sell sheet for Palm Puppies?

23   A     Yes, it is.

24   Q     And 46 is an MGA sell sheet for Me and My Shadow?

25   A     Yes, it is.

1    Q    Forty-seven, Hello Kitty Scooter?

2    A    Yes.

3    Q    Okay.  And if you can continue in the exhibit, do you

4    see numerous additional pages that are MGA sell sheets?

5    A    Yes, there are.

6    Q    What are price lists?

7    A    Price list is basically confidential pricing that you

8    give to your customer that has an item number, has a UPC,

9    those bar codes that you see when you go to stores.  The bar

10   code number has the name of the product, has a brief

11   description of it.  FOB Hong Kong, because we sell a lot of

12   product what we call in DI or direct import, and FOB, L.A.

13   pricing as well as the dimensions of the packaging.

14   Q    You said DI, direct import?

15   A    Yes.

16   Q    What's that mean?

17   A    Again, we sell a lot of our product, MGA sells a lot of

18   its product directly to the retailers in what we call FOB,

19   Hong Kong.

20        So, for example, Toys R Us or Walmart basically buys --

21   picks up the merchandise in Hong Kong or China now, they

22   have changed it to China.  They pay for the freight, they

23   basically do all the transportation to take it to their

24   stores, and it doesn't come to our warehouse.

25   Q    Has it been an advantage to MGA since early in its

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 42 of 170   Page ID #:313011
CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

42

1    existence as a company to sell that way?

2    A    Yes, it is.

3    Q    And why is that an advantage?

4    A    Let's say MGA, for example, imports 1,000 containers a

5    year, and we get -- we get a rate of $2,000 per container to

6    import them to U.S.A., but Walmart, for example, imports

7    150-, 200,000 container, so they pay a lot lower price for

8    the container, so they basically -- if they take it from

9    Hong Kong, they take that saving in transportation costs, et

10   cetera, and that goes to their bottom lines of their profit

11   margin on our product is higher than if they are buying it

12   from us in Los Angeles.

13   Q    So it's a win-win for you and for the retailer?

14   A    For the retailer and for us because, for us, we don't

15   warehouse the merchandise, we don't tie our cash flow.

16   Q    Okay.  And is just the fact that you were willing to

17   sell products to take delivery in Hong Kong, was that

18   advantageous to you as a business?

19   A    Yes, it is.

20   Q    And the fact that you had two different prices, one for

21   taking delivery in Hong Kong and one for taking delivery in

22   Los Angeles, was that beneficial to you as a business?

23   A    Yes, it was.  It is still to date.

24   Q    And that's because you can give retailers flexibility

25   that way?

CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

43

```
 1    A    That's right.  They like to buy as much as possible,

 2    they like to buy in direct import.

 3    Q    And they like to wait until the last minute to see

 4    whether the product is going to be a hit or not and then buy

 5    more, right?

 6              MR. PRICE:  Objection.  Leading.

 7              THE COURT:  Overruled.  It's self-evident, you can

 8    answer the question.

 9              THE WITNESS:  Yeah, yes, of course.

10    BY MS. HURST:

11    Q    Let me ask you to look at Exhibit 9503?

12    A    Go ahead.

13    Q    Is that an example of one of the price lists that

14    you've been talking about?

15    A    Yes, it is.

16              MS. HURST:  And is that already in evidence?

17    BY MS. HURST:

18    Q    Okay.  9508, can you take a look at that?

19    A    Yes.

20    Q    And is that one of your price lists?

21    A    Yes, it is.

22    Q    And what is the Bates number on that one?

23    A    It's M1730256.

24    Q    Is that a Mattel Bates number?

25    A    It is.
```

1    Q    And so that's your price list coming out of Mattel's

2    files?

3    A    That's correct.

4    Q    And what does it say on the top of that price list?

5    A    It says, Price list U.S.A. fall 2002 confidential, our

6    prices -- our prices are estimate and subject to change.

7    Q    So you would actually put the word "confidential" on

8    these price lists?

9    A    Yes.

10   Q    And how did you use these price lists in conjunction

11   with toy fairs?

12   A    Again, we would give these to select customers who --

13   legitimate customers to take back with them after they had

14   seen, felt and touched the product, to take back and to

15   write their orders.  They don't give you orders right there

16   at the toy show.  They write the orders later on.

17   Q    And why do they wait?

18   A    Because they want to see everybody's product, and then

19   they go through the planogram process.  They select -- like,

20   for example, here, let's say we have over 100 product, they

21   will select maybe 10 or 15, say send those samples to the

22   planogram room, and they go to every toy vendor and ask for

23   samples to go to the planogram room, and then they look at

24   it.

25         Planogram room is like a -- a simulated store where

CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

45

```
 1    they go and set up the products, and then they go through it
 2    again.  Out of 10 products, for example, they have selected
 3    from MGA, they maybe buy four or five of them, and they put
 4    the rest of them away.
 5    Q    So if in that process --
 6    A    But they want to have the price so they can -- on those
 7    that they select to buy the product.
 8    Q    If in that process -- well, let me ask you this:
 9    During that process, you're trying to convince them to buy
10    your product and not somebody else's, right?
11    A    Yes, we always try to do that.
12    Q    And would it be helpful to you to know what the
13    competitors are selling right during that period of time?
14    A    Of course.
15    Q    Would it give you an advantage if you could go to them
16    and discuss in detail the relative features of your products
17    versus the competitor?
18    A    I don't understand your question.
19    Q    If you knew what your competitor was doing --
20    A    Right.
21    Q    -- in that period of time, would it help you to sell
22    your product?
23    A    Of course, it can change --
24    Q    How?
25    A    Well, if I knew, for example, Mattel was selling a
```

1    fashion doll for $10, I would go and change my prices to $9

2    so we can get that product in there.

3              MR. PRICE:  Your Honor, I'm sorry.  I'm going to

4    object as to "price" because it's not a trade secret.

5              THE COURT:  Overruled.

6    BY MS. HURST:

7    Q    And talking about features for a minute, would it help

8    you to know the features of the competitors' products?

9    A    Right.  You have -- the beauty of the toy business is

10   it's like a fashion business.  For one season, you have --

11   you're supposed to have exclusivity on your new products

12   coming out.

13        So if your competitor sees what you have coming in,

14   they go ahead and quickly change -- either come up with a

15   comparative product against it with the features similar to

16   that, change pricing, change packaging, change advertising

17   against it because you advertise your product in the fourth

18   quarter with Nickelodeon, et cetera, and the times that you

19   advertise is very important, so if they have that

20   information, they can -- they can compete against it.

21   Q    And can they also, if they know what the product looks

22   like and what its features are, make better arguments about

23   why it's more likely to sell?

24   A    Absolutely.

25   Q    Let me ask you to look at Exhibit 9512?

1    A    Yes.

2    Q    And you recognize that as an MGA price list?

3    A    Yes, it is.

4    Q    With a Mattel Bates number on it?

5    A    Yes.

6          MS. HURST:  I move that in, your Honor.

7          THE COURT:  Received.

8          *(Defendants' Exhibit No. 9512 is received in*

9    *evidence.)*

10   BY MS. HURST:

11   Q    And 9591, do you recognize that as an MGA price list?

12   A    Yes, it is.

13   Q    With a Mattel Bates number on it?

14   A    Yes.

15   Q    And what year is that one for?

16   A    2004.

17   Q    Okay.

18   A    For spring of 2004.

19   Q    Spring 2004?

20   A    Right.

21   Q    Do you typically give the fall price lists at these toy

22   fairs in January and February?

23   A    Yes.

24   Q    So that's really advance information, then, right?

25   A    It is.

1  Q    Because when did the fall products come out in relation

2  to the toy fairs?

3  A    We've talked about the planogram, so once they make a

4  decision, they give you the orders, and usually you ship the

5  products from Hong Kong in May, the production -- goes into

6  production in April, and they take possession of the product

7  in Hong Kong in May and June.

8  Q    And that's for the fall products?

9  A    That's correct.

10  Q    So the spring products come out right away?

11  A    The spring product is usually shipped in September,

12  October, November.  Actually it goes to production

13  September, and usually it's shipped in January the year

14  before and early February.

15  Q    All right.  So the spring product is getting shipped to

16  the retailers right around the time of the toy fairs?

17  A    Yes, that's correct.

18  Q    And then it goes on the shelf around Easter or so, is

19  that -- maybe a little earlier?

20  A    Yes, February, March.

21  Q    All right.  But the fall product doesn't come on the

22  shelf for several months, right?

23  A    That's correct.  Usually fall products, if you go to

24  Target, for example, or Walmart, the best time to buy last

25  season's product at a lower price is usually through July

CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

49

```
 1   and August, because that's when they go through the
 2   markdowns to clear the old merchandise and make room for the
 3   new products.
 4   Q    Let me ask you to look at 9594, and is that an MGA
 5   price list?
 6            MR. PRICE:  Your Honor, may I have a continuing
 7   objection on the relevance regarding the trade secret
 8   information.
 9            THE COURT:  You may.
10            MR. PRICE:  Thank you.
11            Overruled.
12            THE WITNESS:  Yes, it is.
13   BY MS. HURST:
14   Q    And that's an MGA price list with a Mattel Bates number
15   on it?
16   A    That's correct.
17            MS. HURST:  Move admission of 9594, your Honor.
18            THE COURT:  Received.
19            (Defendants' Exhibit No. 9594 is received in
20        evidence.)
21            MS. HURST:  Okay.  Your Honor, I'm informed that I
22   neglected to move in 9591, which is the last one.  May that
23   be admitted as well?
24            THE COURT:  Received also.
25
```

1          *(Defendants' Exhibit No. 9591 is received in*

2     *evidence.)*

3    BY MS. HURST:

4    Q    And Mr. Larian, would you look at Exhibit 9301 as well,

5    please?

6    A    Yes.

7    Q    And is that an MGA price list with a Mattel Bates

8    number on it?

9    A    It is.

10          MS. HURST:  I move the admission of 9301, your

11   Honor.

12          THE COURT:  Received.

13          *(Defendants' Exhibit No. 9301 is received in*

14     *evidence.)*

15   BY MS. HURST:

16   Q    Now, did you ever knowingly, other than in the case of

17   Mr. Romano, mean to give your price lists to Mattel?

18   A    No.

19   Q    All right.  Let's step back a minute and talk about who

20   gets invited to your showrooms at toy fair.

21         Who do you generally invite?

22   A    We invite retailers, we invite distributors who buy our

23   products.

24   Q    What about licensees?

25   A    We invite licensees who license our products, and

1    sometimes we invite licensing partners.  For example, we do

2    business with Disney on certain licenses, sometimes we

3    invite them for them to and come see their own product.

4    Q    So like that time Mr. Kilpin came?

5    A    That's correct.

6    Q    And what did he tell you about Bratz that time when he

7    came?

8              MR. PRICE:  Objection.  Hearsay.

9              THE COURT:  Overruled.

10             THE WITNESS:  He says they were great and I think

11   he sent me an e-mail that says congratulations on kicking

12   Barbie's ass.

13   BY MS. HURST:

14   Q    Do you ever invite members of the press to the

15   showrooms?

16   A    Rarely we do.

17   Q    And remember that schematic that you were showing us,

18   where do you put the press when you do invite them?

19   A    I'm sorry?

20   Q    The layout that you showed us of the New York

21   galleries, can -- just describe for us which of the rooms

22   you put the press in.

23   A    Downstairs, if you recall, where it says a conference

24   room, that's where we take them.

25   Q    So you don't take them in the galleries?

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 52 of 170   Page ID #:313021
CV 04-9049-DOC – 03/24/2011 – Day 39, Vol. 2 of 3

52

1    A    Sometimes we take them to a special portion -- special

2    area of the gallery, sometimes.

3    Q    And do you -- is that the exception or is that the

4    rule?

5    A    I'm sorry?

6    Q    When you let the press in the gallery, is that the

7    exception or the rule?

8             MR. PRICE:  Object.  It's vague as to time.

9    BY MS. HURST:

10    Q    This is all, you understand, pre-2006 toy fair?

11    A    Yes.  It's an exception.

12    Q    And do you -- and how -- do you control the access of

13    the press to the galleries when you go there?

14    A    Yes, we do.

15    Q    All right.  Do you allow them to take pictures?

16    A    We never allow anybody to take pictures.

17    Q    Anybody?

18    A    Anybody.

19    Q    Not even the retailers?

20    A    Including the retailers.

21    Q    Not the licensees?

22    A    Nobody.

23    Q    Not the distributors?

24    A    Even our own employees are not allowed to take pictures

25    in the showroom.

1    Q    Why not?

2    A    Because we don't want that information -- when you have

3    a new product coming out to the market, in the toy business,

4    it's like a holy grail of the business, and you don't want

5    that information to get out to your competitors before the

6    actual product has come out to the market.

7    Q    And can you take a look at Exhibit 9350?

8    A    Yes.

9    Q    And is this what -- you were here for Mr. Villasenor's

10   testimony, right?

11   A    I was.

12   Q    And you recognize this as one of the documents that

13   Mattel showed to Mr. Villasenor?

14   A    I am.

15   Q    And does this reference the fact that MGA has a policy

16   of not allowing photographs to be taken in its showroom?

17   A    Yes, that's what the reporter writes right there.

18   Q    Do you ever give the press pictures of your unreleased

19   products?

20   A    Only with press kits, so if you have, let's say, a

21   thousand products, we want to -- we want to promote a few of

22   those products, we do a press release and we put a picture

23   of that, and you leave it in the toy fairs, what they call

24   press -- press room, which is separate from all the

25   showrooms, and you put that in there.

1    Q    So that would be a special press kit, which would have

2    only those things that you want to disclose to the press?

3    A    That's correct.

4    Q    And you meet with them in the separate conference area,

5    as you described?

6    A    Right.

7    Q    And do you ever give them -- the press your catalogs

8    and your sell sheets and your price lists?

9    A    We do not.

10   Q    Now, what do you do to control access to these areas

11   that you've been -- and the information that you've been

12   talking about in connection with your showrooms at, let's

13   start with New York toy fair?

14   A    First of all, it's by invitation only.  Secondly, we

15   have now sign-in sheet, which is like an NDA, and then we do

16   all this --

17             MR. PRICE:  Object to relevance as to what they do

18   now.

19             THE COURT:  At the present time, Counsel?

20             MS. HURST:  We'll go back to the --

21   BY MS. HURST:

22   Q    Just give us a general description.

23             MS. HURST:  We can strike that and start over.

24             MR. PRICE:  Again, objection as to time frame.

25   Are we talking about before 2006?

```
 1              MS. HURST:  We'll make it clear.

 2    BY MS. HURST:

 3    Q    First of all, is there a security guard?

 4    A    Yes.

 5    Q    And --

 6              THE COURT:  And you are referring to before 2006?

 7              MS. HURST:  Yes.

 8    BY MS. HURST:

 9    Q    And this is before 2006, right?

10    A    Yes.

11    Q    And what is the security guard required to do before

12    allowing people into the showroom?

13    A    To check their badge, to see if they are -- they were

14    allowed in by TIA, not somebody who just walks in off the

15    street.

16    Q    And do you check to make sure that their badge

17    matches -- prior to 2006, did you check and make sure that

18    their badges match their identifying information?

19    A    Yes, the receptionist does that.

20    Q    Okay.  And were there any signs posted prior to 2006

21    that said anything about what -- how people were supposed to

22    behave?

23    A    No pictures, only people who are invited are allowed in

24    the showroom.

25    Q    And when somebody would come before 2006 and present a
```

1    toy fair -- a New York toy fair badge to your receptionist,

2    what did that mean to you?

3    A    That TIA has checked their credentials, and they are

4    real, that they are -- they are who they say they are.

5    Q    And have you ever personally checked in to get one of

6    those badges?

7    A    I have.

8    Q    And what do they make you give?  I mean, they probably

9    know you by now, but what do they make you give them?

10             MR. PRICE:  Objection.  Vague as to time.

11   BY MS. HURST:

12   Q    Prior to 2006, what did they make you give them?

13             THE COURT:  Overruled.

14             THE WITNESS:  For sure, they will ask for your

15   driver's license, they will ask for your business cards,

16   sometimes they will ask for an invoice.  That's my own

17   personal -- even today, and they know me, but they still ask

18   for that.

19   BY MS. HURST:

20   Q    And do they do that at Hong Kong as well?

21   A    That's correct.

22   Q    And in Hong Kong, what have you done to control access

23   to your showrooms used in conjunction with toy fair?

24   A    Again, same thing, is by invitation only.  We have --

25   we don't have a security guard there, but we have a very

CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

57

```
 1    enclosed reception area away from the offices as well as
 2    from the showrooms and galleries.
 3         And people have to check in, they have to sign in, they
 4    have to put their bags, et cetera, away, no cameras allowed,
 5    before they are escorted into the -- into the galleries.
 6    Q    Prior to 2006, what -- other than putting up signs
 7    saying "no pictures," what else did you do when retailers
 8    came to visit your showrooms, what else did you do to get
 9    assurances about confidentiality?
10    A    We made sure that they are real customers.
11    Q    And did you also instruct them to keep the information
12    confidential?
13    A    Absolutely, all the time.
14    Q    Did you ever require retailers to sign nondisclosure
15    agreements prior to 2006?
16    A    I don't remember the dates, the years, but we have had
17    that policy in place for a few years.
18    Q    Do you also have general nondisclosure agreements
19    between you and the retailers as part of your ongoing
20    business relationships with them?
21              MR. PRICE:  Objection.  Vague as to time.
22              THE COURT:  I'm assuming this is all before 2006;
23    is that correct, Counsel?
24              MS. HURST:  Correct.
25              THE COURT:  Overruled.
```

1          THE WITNESS:  Yes.

2   BY MS. HURST:

3   Q    Let me ask you to take a look at Exhibit 36635?

4   A    Yes.

5   Q    And do you recognize this as a form of confidentiality

6   agreement that you used in conjunction with toy fairs in

7   2005?

8   A    Yes, we do -- yes, I do.

9          MS. HURST:  Your Honor, I move to admit 36635.

10         THE COURT:  Received.

11         *(Defendants' Exhibit No. 36635 is received in*

12     *evidence.)*

13  BY MS. HURST:

14  Q    And this is one that would have been -- this is

15  January '05; is that right?

16  A    It is.

17  Q    So that would be used at the Hong Kong toy fair in '05?

18  A    That's correct.

19  Q    And here, you started putting in writing what you had

20  been telling people in the past when they came into the

21  showrooms, right?

22  A    Yes.

23         MR. PRICE:  Objection.  Vague.

24         THE COURT:  About what was told in the past?

25         MR. PRICE:  Yes.

1    BY MS. HURST:

2    Q    And what is it that it says there?  And you can just

3    put it in your own words if you want.

4    A    Let me -- you want me to read it?

5    Q    Sure.

6    A    "Your permission to visit MGA Entertainment offices and

7    facilities is granted subject to your agreement to keep

8    confidential any information that may be disclosed to you

9    concerning MGA's business affairs, including but not limited

10   to, MGA's product lines, product names, designs, artwork,

11   trade dress, advertising and/or marketing plans.

12        "By signing your name below, you agree that you will

13   not disclose any information which MGA considers

14   confidential to any third party, including but not limited

15   to, any parties who are in the business of manufacturing or

16   licensing products or providing services in competition with

17   MGA's products or services."

18   Q    So in other words, you specifically said, don't give

19   this to my competitor?

20   A    Yes.

21        MS. HURST:  Your Honor, would now be a good time

22   for a break.

23        THE COURT:  Yes, it would.

24        You are admonished not to discuss this matter

25   amongst yourselves, nor form or express any opinion

CV 04-9049-DOC – 03/24/2011 – Day 39, Vol. 2 of 3

60

```
1    concerning the case.  We'll come and get you at, why don't
2    we say 2:00, 20 minutes, okay?
3              THE CLERK:  All rise.
4              (Recess.)
5              (The following proceedings is taken in the
6         presence of the jury.)
7              THE COURT:  We are back in session.  Counsel are
8    present, the parties, the jury, the alternates.
9              And Ms. Hurst, continued direct examination of
10   Mr. Larian.
11             Counsel?
12             ISAAC LARIAN, DEFENDANTS' WITNESS, RESUMED
13                  DIRECT EXAMINATION (continued)
14   BY MS. HURST:
15   Q    Did you ask me to find that e-mail with Mr. Kilpin for
16   you?
17   A    I did.
18   Q    And do you have Exhibit 1802 in front of you?
19   A    Yes, I do.
20   Q    And is that the e-mail exchange that you were referring
21   to?
22   A    Yes, it is.
23             MS. HURST:  Your Honor, I move the admission
24   of 1802.
25             THE COURT:  Received.
```

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 61 of 170   Page ID #:313030
CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

61

```
 1              (Defendants' Exhibit No. 1802 is received in

 2         evidence.)

 3              MR. PRICE:  I object.  Mr. Kilpin wasn't at Mattel

 4    at this time.  It's pre-Mattel.  It's hearsay.

 5              MS. HURST:  That's true, your Honor.

 6              THE COURT:  Thank you.

 7              Well, it's going down now, right?

 8              MS. HURST:  It's not being offered for the truth,

 9    your Honor, it's just being offered for the exchange and

10    Mr. Kilpin's notice and knowledge about the Bratz product

11    introduction.

12              THE COURT:  Overruled.

13              This is not for the truth of the matter asserted.

14    It's technically hearsay.

15    BY MS. HURST:

16    Q    And is that e-mail there in the middle, December 11,

17    2001, "Congratulations on beating Barbie," from Mr. Kilpin

18    while he was at Disney?

19    A    It is, and I apologize.  I don't know why I used the

20    other things.  He says congratulations.  I apologize.

21    Q    And this is before actually he even came to the toy

22    fair that year, right?

23    A    That's correct, we were corresponding about Disney.

24    Q    Okay.  And you wanted to tell the jury that you felt a

25    little miffed about using that language?
```

1    A    I'm just tired.  I apologize.

2    Q    Let's go back to Exhibit 36635.  And this was the

3    sign-in sheet that we were looking at before the break; is

4    that right?

5    A    Yes, it is.

6    Q    Now, was the January '05, was that the first time that

7    you ever used this sign-in sheet?

8    A    I don't remember when was the first time.  I don't

9    recall.

10   Q    Did you start using it before 2005?

11   A    It's possible.  I just don't recall without looking at

12   it.

13   Q    Did -- did you look -- did you instruct people to look

14   for other sign-in sheets at toy fairs?

15   A    I did.

16   Q    And did you believe that in the past, that there had

17   been other sign-in sheets at toy fairs?

18   A    For many years --

19              MR. PRICE:  I object.  That's irrelevant, your

20   Honor, his belief.

21              THE COURT:  Other toy fairs being?

22              MS. HURST:  Pre-2006, your Honor.

23              THE COURT:  And this specifically is from

24   New York?

25              MS. HURST:  This is from Hong Kong.

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 63 of 170   Page ID #:313032
CV 04-9049-DOC – 03/24/2011 – Day 39, Vol. 2 of 3

63

1              THE COURT:  From Hong Kong.

2              MS. HURST:  Right.

3              THE COURT:  So when you say what other toy fairs,

4    what toy fairs are those?

5              MS. HURST:  I'll be specific.

6    BY MS. HURST:

7    Q    Mr. Larian, have you also seen sign-in sheets in use at

8    New York toy fair prior to 2006?

9    A    I have.

10   Q    And did you ask people to go look and see if they can

11   find the other sign-in sheets that had been used from the

12   earlier years?

13   A    Yes.

14   Q    And did you look everywhere for those?

15   A    Not personally, but I directed people to look --

16             THE COURT:  Just a moment.  Let's be absolutely

17   clear.  You are referring to sign-in sheets of MGA?

18             MS. HURST:  Yes.

19             THE COURT:  And right now, we are discussing the

20   New York toy fair, and it's prior to 2006?

21             MS. HURST:  Yes.

22             THE COURT:  All right.  I want to be absolutely

23   clear about the time frame and the location.

24   BY MS. HURST:

25   Q    And they were used there prior to 2006, true?

1    A    That's --

2              MR. PRICE:  I object.  That misstates his

3    testimony.

4              THE COURT:  No.  Overruled.

5              You can answer the question.

6    BY MS. HURST:

7    Q    And was it not until 2010, the middle of 2010 that you

8    found out about the need to go locate these documents?

9    A    For this litigation, yes.

10   Q    Because that was the first time that you found out

11   about Mattel engaging in these practices, right?

12             MR. PRICE:  Object.  Irrelevant.  It goes into

13   areas --

14             THE COURT:  No.  Overruled.  It only goes to when

15   these were produced and why.

16             THE WITNESS:  That's correct, they --

17   BY MS. HURST:

18   Q    So in the summer of 2010, when you had people start

19   looking for these old sign-in sheets, you had difficulty

20   locating them; is that right?

21   A    That's correct.

22   Q    And these were the only ones that you could find?

23             MR. PRICE:  Object.  That assumes facts not in

24   evidence that there were other time sheets like this to be

25   found.

```
 1              THE COURT:  Well, ladies and gentlemen, Mr. Larian
 2    is testifying that there are other time sheets.  These are
 3    the only time sheets that will be before you.  You'll be the
 4    judge of this.
 5              All right.  Overruled.
 6    BY MS. HURST:
 7    Q    And even when -- in the years when you weren't using
 8    the sign --
 9    A    I lost the question.
10    Q    There wasn't one.
11    A    Okay.
12    Q    Even in the years when you weren't using these sign-in
13    sheets, did you give oral instructions like this?
14    A    Absolutely, to our employees as well as to the
15    customers who would come to our showroom.
16    Q    And everybody else who would come to your showroom
17    would be told "This is confidential"?
18    A    100 percent.
19    Q    And the issue is that you just don't remember exactly
20    when you started putting it in writing, right?
21              MR. PRICE:  Objection.  Argumentative.  It's not
22    the issue.
23              MS. HURST:  Well --
24              THE COURT:  Well, sustained.
25
```

1    BY MS. HURST:

2    Q    It's the case that you just don't remember exactly when

3    you started putting it in writing?

4    A    That's correct.

5    Q    Let me ask you to look at Exhibit 12844.

6    A    Go ahead.

7    Q    Do you recognize that as e-mail exchange from MGA on or

8    about October 13, 2000, regarding the Hong Kong toy fair of

9    2001?

10   A    Yes.

11   Q    Okay.

12           MS. HURST:  Your Honor, I move to admit 12844.

13           THE COURT:  All right.  Received.

14           *(Defendants' Exhibit No. 12844 is received in*

15       *evidence.)*

16   BY MS. HURST:

17   Q    And is this an e-mail where you were instructing people

18   to have separate closed showrooms with limited access?

19   A    The whole showroom is closed in Hong Kong, but even

20   within the closed showroom, for certain products, we had

21   separate room completely locked, some sensitive products

22   that we would not even show to regular customers.

23   Q    And this was actually -- you treated Bratz that way in

24   2001; is that right?

25   A    Yes, we had separate rooms for Bratz, yes.

1    Q    So those pictures that we were looking at earlier from

2    the Hong Kong showroom in 2001 when Bratz was first

3    introduced, that was a separate locked showroom?

4    A    It was in a separate room.  I don't remember if it was

5    locked showroom or not, but --

6    Q    But it was a separate room and you controlled the

7    access to it?

8    A    Yes.

9    Q    Now, despite your instructions, do the retailers

10   sometimes disclose information when you've asked them not

11   to?

12   A    They do.

13   Q    And in fact, do retailers sometimes give you

14   information?

15   A    I have personally got a lot of information, but the

16   general rule is they do talk to you.

17   Q    Let me ask you to take a look at Exhibit 9533?

18   A    Yes.

19   Q    Do you recognize this as an e-mail that was sent to you

20   by Angelika Sternberg on or about February 3rd, 2007?

21   A    Yes, I do.

22           MS. HURST:  Your Honor, move to admit 9533.

23           THE COURT:  Received.

24           *(Defendants' Exhibit No. 9533 is received in*

25        *evidence.)*

1    BY MS. HURST:

2    Q    Now, is this an example of retail customers providing

3    information to some of your colleagues?

4    A    Yes, this is in Germany, yes.

5    Q    Okay.  And what's -- what's your reaction to receiving

6    this kind of information?

7    A    I just don't have -- don't remember my reaction.

8    Q    All right.  Is this any -- is it the case that you make

9    all these instructions and you expect that the retailers

10   will keep the information confidential, but sometimes they

11   like to disclose it for their own purposes?

12             MR. PRICE:  Objection.  Leading and compound.

13             THE COURT:  Just reask the question, Counsel.

14             MS. HURST:  Sure.

15   BY MS. HURST:

16   Q    Do retailers sometimes choose to disclose information

17   for their own business purposes?

18   A    Selectively when it fits them well, yes.

19             MS. HURST:  And we can take that down, Mike.

20   BY MS. HURST:

21   Q    So if they want to try to bargain for a lower price,

22   they'd do that sometimes, right?

23   A    I think that's the only time I know that they do.

24   Q    All right.  You were here yesterday when you saw the

25   e-mail exchange between Mr. Villasenor and Mr. Turetzky

1    about, you just saved me a million bucks with this price

2    list; do you remember that?

3    A    I do.

4    Q    Can you explain to the jury how somebody might save a

5    million bucks by getting a competitor price list?

6              MR. PRICE:  I want to object.  That's speculation

7    concerning that e-mail.

8              THE COURT:  As far as the specific e-mail, it's

9    sustained.  You can talk about how a competitor --

10             MS. HURST:  Yes.

11   BY MS. HURST:

12   Q    So generally speaking --

13             MR. PRICE:  I move to strike the preface.

14             THE COURT:  Stricken.

15   BY MS. HURST:

16   Q    Generally speaking, Mr. Larian, how might a competitor

17   save a million bucks by getting a competitor retail price

18   list?

19   A    My experience has been that one retailer comes and

20   tells you that your competitor is selling a similar product

21   at $1 or $2 lower, these retailers not all the time tell you

22   the truth, they are just doing that to do their job to get a

23   better price, so if I get my hand -- if somebody gets their

24   hand on the competitor's price list and say no, they are not

25   charging a lower price, then you would not bring your price

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 70 of 170   Page ID #:313039
CV 04-9049-DOC – 03/24/2011 – Day 39, Vol. 2 of 3

70

1   down to compete with them, so that's how you save the money.

2          MR. PRICE:  Your Honor.  I move to strike as

3   speculation unless this has happened.

4          THE COURT:  Overruled.

5   BY MS. HURST:

6   Q    Now, despite the fact that the retailers do manipulate

7   the situation to their advantage when possible, do you

8   expect them to keep the detailed information and pictures,

9   the sell sheets, the price lists, all that stuff that you

10  give them in the closed showrooms, do you expect them to

11  keep that confidential?

12  A    Yes, we do.

13  Q    And are you aware of retailers giving your competitors

14  sell sheets?

15  A    I'm not aware of one.

16  Q    And to your knowledge, has anyone from MGA gone inside

17  a closed Mattel showroom?

18  A    Not that I know of.

19  Q    Okay.  Did you see any e-mails in this case that

20  suggested that maybe there was somebody in Germany who might

21  have seen a Mattel showroom?

22  A    Yes.

23  Q    Okay.  Would you look at Exhibit 9854?

24  A    Yes, I have seen that.

25  Q    All right.  And is that an e-mail to you from Angelika

1   Sternberg again?

2   A    Yes.

3          MS. HURST:  All right.  Your Honor, move to admit

4   9854.

5          THE COURT:  Received.

6          (Defendants' Exhibit No. 9854 is received in

7       evidence.)

8   BY MS. HURST:

9   Q    Now, what does that say there?

10  A    Where?

11  Q    Just the text of the e-mail.

12  A    "Two of our colleagues have been able to enter

13  the booth of our competitor and wrote the attached report."

14  Q    Does the attached report include some information about

15  some Mattel products?

16  A    It does.

17  Q    All right.  And is that in the Nuremberg toy fair?

18  A    It is.

19  Q    And how is the Nuremberg toy fair set up?

20  A    Nuremberg toy fair is the biggest toy fair in the

21  world, and again, you have both combination of closed and

22  opened showrooms in the same -- the same -- it's actually

23  multiple buildings, 13 different buildings.

24  Q    And do toy manufacturers have both opened and closed

25  showrooms at the Nuremberg toy fair?

1   A    Yes.

2   Q    And have you seen open booths of Mattel at the

3   Nuremberg toy fair?

4   A    I have not.

5   Q    Okay.  And so do you have any idea where this report

6   came from or how they got the information?

7   A    The only thing I can think of is Angelika used to work

8   at Mattel before she came to --

9              MR. PRICE:  Object.  This is --

10             THE COURT:  Sustained.  Stricken.  Speculative.

11  BY MS. HURST:

12  Q    Has anyone from MGA ever, to your knowledge, used fake

13  business cards to get into a competitor's showroom?

14  A    We have never, ever done that.

15  Q    Does MGA have any employees whose job it is to use fake

16  credentials to get into a competitor's showroom?

17  A    We do not.

18  Q    Have you ever had such a person?

19  A    Never had.

20  Q    And do you have any manuals there on how to fake your

21  way into getting competitor information?

22  A    We do not.

23  Q    Have you seen any -- in your role as a 30(b)(6) witness

24  in this case, have you seen any documents from Mattel that

25  suggest that Mattel's practice of getting into showrooms

```
 1    continued after 2006?

 2    A    I have.

 3            MR. PRICE:  Objection, your Honor.  This is

 4    hearsay, lack of personal knowledge.  He's commenting on

 5    evidence.

 6            THE COURT:  I'd have to go back, once again, I

 7    don't want to get caught by surprise, and see what the

 8    30(b)(6) designation is, see what it's extended to, so I

 9    agree with counsel, we are not going to go into this area

10    right now.

11    BY MS. HURST:

12    Q    Let me ask you to take a look at Exhibit 9869.

13            MS. HURST:  Lynn, do you have a copy?

14            (Attorney discussion held off the record.)

15    BY MS. HURST:

16    Q    Let me ask you to --

17            MS. HURST:  Do we have 1812A up there?

18            This was admitted with Mr. Kilpin the other day.

19    BY MS. HURST:

20    Q    Do you recognize that document on the screen,

21    Mr. Larian?

22    A    I do.

23    Q    You saw that when Mr. Kilpin was testifying the other

24    day?

25    A    Yes.
```

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 74 of 170   Page ID #:313043
CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

74

```
 1   Q    Can we go to page, I think it's 23 of that document,
 2   please.
 3        Do you recognize that?
 4   A    I sure do.
 5   Q    What is that?
 6        MR. PRICE:  Your Honor, my understanding, this
 7   isn't the binder, is it?
 8        MS. HURST:  It's admitted.
 9        THE COURT:  It's in evidence.
10        MR. PRICE:  Well, I thought Chris would have a
11   copy in our binder so we can review it.
12        THE COURT:  I know it's in evidence.  It is in the
13   binders.
14        MR. PRICE:  Okay.  It's not in ours.
15        THE COURT:  No, it's in the binders.
16        Overruled.
17   BY MS. HURST:
18   Q    What is this?
19   A    This is Bratz shop -- if you go to Toys R Us -- like,
20   if you go to Toys R Us now, in the front of the store, they
21   have what they call Little Tikes Feature Shop that goes for
22   a few months.
23        So this was a concept for Bratz shop that we had given
24   to Toys R Us, and I really have no idea -- that's what it
25   was.  I just don't want to say any more.
```

1    Q    So with Toys R Us, you would come up with ideas for

2    special promotional shops with them?

3    A    We would come up with it, not with Toys R Us.  We

4    would -- we would -- they would tell us to come up with

5    feature shop concepts and we would come up with them, and

6    this is one of them.

7              MR. PRICE:  Your Honor, I am going to object.

8    This isn't one of the trade secrets.  It's irrelevant.

9              THE COURT:  Overruled.

10   BY MS. HURST:

11   Q    And is this a picture of a public place?

12   A    It's not.

13   Q    How did that concept art work when you gave it to Toys

14   R Us, what was it like?

15   A    Basically our artists' duties, they set it up, they

16   take pictures and then they put it in big presentation

17   boards, and we take it to Toys R Us to pitch for them to do

18   this for the coming -- for the next season, for the fall

19   season.

20   Q    And can we look at the next page of that exhibit,

21   1812A, please?  Is that also --

22             MS. HURST:  Is that page 24?

23   BY MS. HURST:

24   Q    That's page 24, is that also part of your mockup of

25   concept art?

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 76 of 170   Page ID #:313045
CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

76

1    A    It is.

2    Q    So that's not a public place at all, right?

3    A    It is not.

4         MS. HURST:  And can we look at page 25.

5    BY MS. HURST:

6    Q    Is that also part of your concept art mockup of a

7    special Bratz store at Toys R Us?

8    A    Yes, it is.

9    Q    Now, what's the Bates number on those pages?  Did that

10   come from Mattel's files?

11   A    It did.

12   Q    And was that confidential artwork business proposal

13   that you shared with Toys R Us?

14   A    100 percent.

15   Q    And do you have any idea how that could have gotten

16   into Mattel's possession?

17        MR. PRICE:  Objection.  Speculation.

18        THE WITNESS:  They stole it.

19        THE COURT:  Well --

20        MR. PRICE:  And move to strike that, obviously.

21        THE COURT:  Yeah, sustained.

22   BY MS. HURST:

23   Q    Can you think of any legitimate business way that

24   Mattel would have possession of this concept art proposal

25   that you made to Toys R Us?

1    A    I do not.  There is no legitimate reason for it.

2    Q    Now, let me ask you, have you ever heard the term

3    "planogram"?

4    A    I have.

5    Q    And is the planogram room the same thing as a showroom?

6    A    It's not.

7    Q    What is a planogram room?

8    A    The planogram room, different retailers have, either

9    they call it layout room or planogram room.  They take --

10   imagine a warehouse, they take it, they put shelves in it,

11   they try to -- so this -- these shelves are for toys, these

12   shelves are for food, these shelves for -- another shelf for

13   clothing, for shoes, et cetera, where they try to come up

14   with their merchandising for the coming fall on the product

15   they are going to buy and put them in the stores.

16       So you see that first -- I'm going to use Target as an

17   example.  They do that, they make the planogram, goes

18   through months of tweaking by the retailer.  Usually for

19   fall, they are done by end of March, early April, and

20   then -- completing it.

21       Then when you go to stores in August 1 or September,

22   that's what you see, they transfer that to the actual retail

23   stores.

24   Q    So they do these mockups after the toy fairs; is that

25   right?

CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

78

```
 1   A    It's a process that starts sometimes even in December,
 2   but for certain retailers, that goes on all the way through
 3   March, April to finalize.
 4   Q    Okay.  And when they get them finalized, then do you
 5   sometimes get the chance to go in there and see what it
 6   looks like?
 7   A    Yes.
 8   Q    And do your buyers sometimes get the chance to go in
 9   there and see what it looks like?
10   A    They do all the time.
11   Q    All right.  Because that's how they display your
12   products, right?
13   A    That's right.
14   Q    And do your buyers sometimes report to you on
15   competitive information that they've seen in the planogram
16   rooms?
17   A    Sometimes they do.
18   Q    And if you look at Exhibit 8931, please.
19   A    Yes, go ahead.
20   Q    And is that an example of one of your buyers, Jeanine
21   Firth (phonetic), reporting to you about information --
22   competitive information she saw in a planogram room?
23   A    Jeanine Firth was not our buyer, she was an employee at
24   MGA.
25   Q    My mistake, I'm sorry.  One of your salespeople?
```

1    A    That's correct.

2    Q    Okay.  And she -- she reported to you on something that

3    she had seen in a planogram room; is that right?

4    A    That's right.  She -- Walmart calls it a layout room.

5    Q    Now, can you take pictures of competitors' projects in

6    planogram rooms?

7    A    No.

8    Q    Are there rules about that?

9    A    Absolutely.

10   Q    And what happens if you violate those rules?

11   A    If they catch you, they will throw you out.  They would

12   throw the vendor out.  I know, for example, in case of Lego,

13   it happened, they throw them out for a season.

14   Q    And would that be a way that a salesperson might lose

15   their job, if they did something like that?

16   A    Yes.

17   Q    And so a salesperson would be -- could be very nervous

18   about sharing information from a planogram room for that

19   reason?

20        MR. PRICE:  Objection.  Speculation.

21        THE COURT:  Overruled.

22        THE WITNESS:  That's correct.

23   BY MS. HURST:

24   Q    Even though the information is available to competitors

25   in the planogram rooms, the salespeople still feel nervous

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 80 of 170   Page ID #:313049
CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

80

1    about sharing it because they can't afford to get sideways

2    with the retailers, right?

3              MR. PRICE:  Objection.  Leading.  Lack of

4    foundation.

5              THE COURT:  Overruled.  It's self-evident

6    concerning the answer.

7              You can answer that, sir.

8              THE WITNESS:  Yes, if the salesman -- For example,

9    Jeanine, here, she sells to -- she lives in Bentonville,

10   Arkansas, and she sells to Walmart, and the salespeople move

11   jobs, so if they are caught giving that information, then

12   they could lose their job basically, not at the company, but

13   also they cannot call on Walmart anymore.

14   BY MS. HURST:

15   Q    Now, do you consider sharing information out of

16   planogram rooms to be the equivalent of using fake

17   credentials to sneak into private showrooms at toy fairs?

18             MR. PRICE:  Objection.  Argumentative.

19   Irrelevant.

20             THE COURT:  No.  Overruled.

21             You can answer that question.

22             THE WITNESS:  Absolutely not.  Completely two

23   different things.

24   BY MS. HURST:

25   Q    Are you aware of anyone from MGA taking pictures in

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 81 of 170   Page ID
#:313050
CV 04-9049-DOC – 03/24/2011 – Day 39, Vol. 2 of 3

81

1   planogram rooms in violation of the retailers' rules?

2   A    I am not.

3   Q    Now, have you ever done anything to try to restrict

4   your competitors from getting access to your products in

5   planogram rooms?

6   A    Yes, we have.

7   Q    What have you done?

8        MR. PRICE:  Object, your Honor.  It's beyond the

9   time period.

10       THE COURT:  I thought this was 2006 and before.

11  BY MS. HURST:

12  Q    Did you understand that to be the question?

13  A    I do.

14       THE COURT:  Overruled.

15  BY MS. HURST:

16  Q    Prior to 2006, did you do anything to try to restrict

17  competitor access to your products in planogram rooms?

18  A    Yes, we did.

19  Q    What did you do?

20  A    We asked retailers to please planogram all products

21  separately from our competitors.  That's one thing we did.

22       The second thing we did is instead of sending actual

23  products and actual packaging, we sent white boxes.  So when

24  somebody looked at it, they didn't know what's coming.

25  Q    And explain that white boxes a little bit more.  What

1    do you mean by that?

2    A    Well, in order to have a planogram, they get also not

3    only -- it's not only the product but they have to -- the

4    retailer -- I'm talking about the retailers, they also have

5    to measure the shelves, what fits on the shelves.

6         So we sent white boxes that are exactly the same size

7    of an actual package that's going to be shipped in fall, but

8    there's nothing written on it, so it's just a white box, so

9    they can do their measurements on the shelves.

10   Q    So they can lay it out and figure out if things fit

11   together without you having to show your product?

12   A    But they have seen the product before, but now nobody

13   else can see it.

14   Q    All right.  Let me ask you to look at Exhibit 36633?

15   A    Yes, go ahead.

16   Q    Do you recognize this as an e-mail exchange that you

17   had with a buyer at Target?

18   A    Yes.

19   Q    And does this e-mail exchange concern your efforts to

20   keep confidential information and planograms at Target prior

21   to 2006?

22   A    Yes.

23        MS. HURST:  Your Honor, move the admission of

24   36633.

25        THE COURT:  Received.

1          (Defendants' Exhibit No. 36633 is received in
2      evidence.)
3    BY MS. HURST:
4    Q    Now, let's look at the -- the bottom e-mail, that's the
5    first e-mail, right, that's written by you?
6    A    It is.
7    Q    And what's the date on that?
8    A    It is October 29, 2004.
9    Q    And you sent it to, is that Bonita Rooney?
10   A    Yes, she was the senior buyer at Target.
11   Q    Okay.  And Julie Chomo, who's cc'd on there, who is
12   that?
13   A    Our salesperson for Target.
14   Q    And what did you write to Ms. Rooney?
15   A    "I have been trying to get ahold of you on the phone,
16   but I believe you were busy.  I'm writing because we have a
17   concern that MGA information for product and marketing and
18   sales has been shared by retailers with our competitors such
19   as a category manager.  We are very concerned about this,
20   and would respectfully ask Target not to share MGA's
21   information with any MGA competitors.
22        "Thank you for your understanding and cooperation."
23   Q    And then did you get a response from Ms. Rooney?
24   A    Yes.
25   Q    And did Ms. Rooney agree that they were taking the

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 84 of 170   Page ID #:313053
CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

84

1    procedures -- they had agreed to adopt the procedures that

2    you had requested with respect to confidentiality?

3              MR. PRICE:  I'm going to object.  This is hearsay,

4    your Honor.

5              THE COURT:  Counsel?

6              MS. HURST:  It goes to reasonable efforts, your

7    Honor, and --

8              THE COURT:  It goes to conduct.  There is an

9    exception to the hearsay rule.  Technically this is hearsay.

10   We can't examine Ms. Rooney when she's responding, she's not

11   here in court, so it can't be offered for the truth of the

12   matter.  It's to show the conduct and the efforts concerning

13   security, if any, on Mr. Larian's part with retailers.

14             Okay.  Counsel.

15   BY MS. HURST:

16   Q    And Ms. Rooney wrote, "Regarding confidential

17   information, we have taken extreme caution with the Bratz

18   brand to maintain confidentiality," right?

19   A    Exactly.

20   Q    And she refers to the white boxes there, as you

21   described?

22   A    Where do you see -- yes.

23   Q    There in the last sentence of that -- that second

24   paragraph, "the white boxes have been allowed"?

25   A    Yes.

1   Q     And she refers to separate planogram rooms, right?

2   A     She does.

3   Q     All right.  And then did you -- is this an example of

4   where you were giving those instructions to retailers to try

5   to enforce the confident -- the continuing confidentiality

6   of your products prior to 2006 through the planogram

7   process?

8   A     Yes.

9   Q     Now, is it your understanding that Mattel got access to

10  information about MGA's unreleased products from MGA

11  showrooms at New York toy fair?

12  A     I found out during this litigation.

13  Q     Okay.  And you found that out in the middle of 2010,

14  right?

15  A     That's correct.

16  Q     And did you review the documents reflecting Mattel's

17  possession of MGA product information?

18  A     Yes, I have.

19  Q     And did you review Mattel's toy fair reports in

20  document and video form?

21  A     I have.

22  Q     And did you see pictures and pricing and other

23  information about MGA products in those reports?

24  A     I have.

25  Q     All right.  Will you take a look at Exhibit 26580?

1    A    Yes.

2    Q    And is that an example of one of the reports?

3    A    Yes, it is.

4    Q    And that's -- what year is that?

5    A    2000.

6    Q    Okay.

7         MS. HURST:  Your Honor, move the admission of

8    26580.

9         THE COURT:  Let me see that report.

10        Counsel, can I get that report for just a second.

11        One of the difficulties, ladies and gentlemen,

12   will be, I don't want you to assume as documents come in

13   from either party, whether it involves a trade secret from

14   either party, that that necessarily contains confidential

15   information.  In other words, it's what I call the avalanche

16   affect, here is a document, and you might assume that every

17   page in there has a trade secret involved or confidential

18   information.

19        I'll allow this exhibit, but I'm going to require

20   counsel for each side to point out the salient parts of

21   that, otherwise it just appears that a telephone book is

22   coming at you from either party.

23        So Counsel, I'll receive it, but I would suggest

24   that you point out that portion.

25        MS. HURST:  I will, your Honor, thank you.

```
 1              THE COURT:  That you are interested in.
 2              Now, I'll require that of Mattel also.
 3              (Defendants' Exhibit No. 26580 is received in
 4         evidence.)
 5    BY MS. HURST:
 6    Q    Let me ask you to look at Exhibit 9499 while we are
 7    finding the specific page on that one, that last one?
 8    A    Yes.
 9    Q    And is that also a report from the year 2000?
10    A    Yes.
11    Q    And would you turn to page 24 of that report?
12    A    Bates number 24 or --
13    Q    It should be trial exhibit page 24.
14    A    Yes.
15    Q    And are those MGA products?
16    A    Two of them are.
17    Q    Is that Hopscotch Heather?
18    A    Yes, and My Dream Baby.
19    Q    And My Dream Baby?
20    A    Yes.
21    Q    And those products were not yet on the market at that
22    time?
23    A    They were not.
24              MS. HURST:  And your Honor, I think 9499 may
25    already be in, but we'd move the admission of page 24 of --
```

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 88 of 170   Page ID #:313057
CV 04-9049-DOC – 03/24/2011 – Day 39, Vol. 2 of 3

88

```
 1              THE COURT:  Okay, page 24, all right.  9499,
 2     page 24, received.
 3              (Defendants' Exhibit No. 9499-24 is received
 4         in evidence.)
 5     BY MS. HURST:
 6     Q    Okay.  Let's go back to the last one, 26580?
 7     A    Page number?
 8     Q    Page -- Trial Exhibit 64.
 9         And do you see there on the bottom of 64 and at the top
10     of 65, those are those same year 2000 products?
11     A    They are.  There is only one here, Hopscotch Heather.
12     Q    And at the top of the next page, do you see My Dream
13     Baby?
14     A    Yes, I do.
15     Q    Okay.
16              MS. HURST:  Your Honor, I move to admit pages 1,
17     64 and 65 of 26580.
18              THE COURT:  Received.
19              MS. HURST:  Actually, let's make it page 2, if
20     that's all right, your Honor, to give the context for the
21     contents.
22              THE COURT:  Okay.  Received.
23              (Defendants' Exhibit No. 26580-2, 26580-64
24         and 26580-65 is received in evidence.)
25
```

CV 04-9049-DOC – 03/24/2011 – Day 39, Vol. 2 of 3

89

```
 1   BY MS. HURST:

 2   Q    All right.  Moving to 2001, Mr. Larian, will you take a

 3   look at page 26571?

 4   A    26571.

 5   Q    Pardon me, Exhibit 26571?

 6   A    Yes, I have it.

 7   Q    And could you look at page 10 of that, please?

 8   A    Go ahead.

 9   Q    Do you see an MGA product depicted there?

10   A    Yes.

11         MS. HURST:  Your Honor, move the admission of

12   26571.

13         THE COURT:  Page 10?

14         MS. HURST:  Page 10 and page 1 as well, your

15   Honor, for context.

16         THE COURT:  Received.

17         (Defendants' Exhibit No. 26571-1 and 26571-10

18     are received in evidence.)

19         MS. HURST:  All right.  And could we show page 10.

20         THE COURT:  Certainly.

21   BY MS. HURST:

22   Q    And is that a written description there of MGA

23   products?

24   A    Two of them, yes.

25   Q    And is that before those products were released to the
```

1    market?

2    A    Yes.

3    Q    Let me ask you to look at 32836.

4    A    Yes.

5    Q    And that's a 2001 toy fair report; is that correct?

6    A    Yes.

7    Q    And these are all Mattel reports that you've seen

8    before in your role as a 30(b)(6) witness, correct?

9    A    That's correct.

10   Q    And can you take a look at page 13 of that one.

11   A    Yes.

12   Q    And does that have Bratz on it?

13   A    It does.

14   Q    And would you look at page 24.

15   A    Yes.

16   Q    Does that have an MGA product on it?

17   A    Yes.

18   Q    And would you look at page 27, please.

19   A    Yes.

20   Q    Does that have an MGA product on it?

21   A    Yes, it does.

22   Q    And page 66?

23   A    Yes.

24   Q    Is that "Monkey See, Monkey Do"?

25   A    Yes.

1    Q    The infamous "Monkey See, Monkey Do"?

2    A    Yes.

3    Q    That's an MGA product, right?

4    A    It is.

5    Q    And page 79?

6    A    Yes.

7    Q    Does that have an MGA product on it?

8    A    Yes.

9    Q    Page 80?

10   A    Page -- I'm sorry, yes.

11   Q    Does that have an MGA product on it?

12   A    Yes.

13   Q    And page 89?

14   A    Yes.

15   Q    Does that have an MGA product on it?

16   A    Yes, it does.

17            MS. HURST:  All right.  Your Honor, I move to

18   admit those pages.

19            THE COURT:  I'll receive each of those pages,

20   Counsel.

21            MS. HURST:  All right.

22            THE COURT:  32836.

23            (Defendants' Exhibit No. 32836, pages 13, 24,

24       27, 66, 79, 80 and 89, are received in evidence.)

25

1    BY MS. HURST:

2    Q    Mr. Larian, did you go through the toy fair reports

3    that had been produced by Mattel and find the MGA products

4    for each year in the written reports?

5    A    I did.

6    Q    And did you also look at videos from 1999 and 2004?

7    A    I did.

8    Q    And on those videos, did you see depicted MGA products?

9    A    I did.

10            MR. PRICE:  Object.  It's vague as to videos.

11            THE COURT:  Overruled.

12   BY MS. HURST:

13   Q    And did you -- were those videos of the toy fair --

14   New York toy fair presentations made at Mattel?

15   A    They were.

16   Q    And they showed MGA products?

17   A    They did.

18   Q    Now, were those -- in reviewing all of those documents

19   and videos, did you find that the MGA products have been

20   shown in the MGA showrooms at New York toy fairs in those

21   years?

22   A    Yes.

23   Q    And were those products that MGA was planning to sell

24   both in the spring and the fall seasons later those years?

25            MR. PRICE:  Your Honor, I'm going to object.  This

1   is compound and overbroad.

2           THE COURT:  It's overbroad, Counsel.

3           (Attorney discussion held off the record.)

4   BY MS. HURST:

5   Q    Let me ask you to look at Exhibit 9507, Mr. Larian.

6   A    Yes.

7   Q    Pages 142 and 143?

8           MR. PRICE:  9507?

9           THE COURT:  9507, 142 and 143.

10          MS. HURST:  I think that's already in evidence,

11  your Honor.

12  BY MS. HURST:

13  Q    Do you see MGA products there?

14  A    I do.

15  Q    Please look at Exhibit 26546.

16          MR. PRICE:  What year is 9507?

17          THE COURT:  26546.

18          THE WITNESS:  What page number?

19  BY MS. HURST:

20  Q    At pages 44 to 46.

21  A    Yes.

22  Q    And do you see MGA products there?

23  A    I do.

24          MS. HURST:  Your Honor, I move to admit 26546.

25          THE COURT:  Received, 44 through 46.

CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

94

```
 1              MS. HURST:  And could we have the cover pages as

 2   well, your Honor.

 3              THE COURT:  Certainly.  The cover page, I assume,

 4   is page 1?

 5              MS. HURST:  Yes.

 6              THE COURT:  Okay.

 7              (Defendants' Exhibit No. 26546, pages 1, 44,

 8        45 and 46, are received in evidence.)

 9   BY MS. HURST:

10   Q    Please take a look at Exhibit 9604.

11   A    Yes.

12   Q    And pages 22 to 24?

13   A    9604, is that what's on the screen?  No.

14        Pages?

15   Q    Pages 22 to 24.

16   A    Yes.

17   Q    And are there MGA products found on those pages?

18   A    There are.

19              MS. HURST:  Your Honor, we move to admit pages 1,

20   22 and 24 of Exhibit 9604.

21              MR. PRICE:  I'm going to object to relevance since

22   we don't know if these were unreleased.

23              THE COURT:  Received.

24              MR. PRICE:  It's not a toy fair report.

25
```

```
 1              (Defendants' Exhibit No. 9604, pages 1, 22
 2        and 24, are received in evidence.)
 3   BY MS. HURST:
 4   Q    Please look at Exhibit 26758.
 5   A    Yes.
 6   Q    Would you please look at pages 7, 10 and 12.
 7   A    Seven -- what's the other page numbers?
 8              THE COURT:  7, 10 and 12.
 9              THE WITNESS:  Yes, go ahead.
10   BY MS. HURST:
11   Q    And did those all depict MGA products?
12              MR. PRICE:  I'm going to object.  There are
13   multiple pictures on the page, your Honor.
14              THE COURT:  Overruled.
15              THE WITNESS:  Pages -- on page 12, I don't see a
16   product.
17              Oh, yes, I see it.  Yes, they are.
18              MS. HURST:  Your Honor, move to admit 1, 7, 10 and
19   12 of Exhibit 26758.
20              THE COURT:  Received.
21              (Defendants' Exhibit No. 26758, pages 1, 7,
22        10 and 12, are received in evidence.)
23   BY MS. HURST:
24   Q    And let's go to 9604 for a minute, Mr. Larian.
25   A    Ninety --
```

1   Q     9604.

2   A     Okay.

3   Q     Would you turn to page 14, please.

4   A     Yes.

5   Q     And is that a Bratz Wild Life Safari collection?

6   A     Hold on one second.

7         Yes, it is.

8   Q     And page 15, is that MGA's Girls Night Out?

9   A     Yes, it is.

10  Q     And page 16, is that MGA's Sun-Kissed Summer?

11  A     Yes, it is.

12  Q     And page 17, is that the Lil' Dance Bratz Party?

13  Pardon me, Lil' Bratz Dance Party?

14  A     Yes, it is.

15        MS. HURST:  Your Honor, I move to admit those

16  pages as well.

17        THE COURT:  Received.

18        *(Defendants' Exhibit No. 9604, pages 14*

19    *through 17, are received in evidence.)*

20  BY MS. HURST:

21  Q     Please turn to trial Exhibit 26755.

22  A     Yes.

23  Q     And page 5, does that have a -- does that have Bratz

24  products on it?

25  A     It does.

1    Q    Page 6?

2    A    Yes.

3    Q    Page 7?

4    A    Yes.

5    Q    Page 8?

6    A    Yes.

7    Q    And page 9?

8    A    Yes.

9    Q    And page 10, does that have -- pages 10 and 11, 12, do

10   those all refer to MGA and Bratz products?

11   A    They do.

12            MS. HURST:  Your Honor, I move to admit those.

13            THE COURT:  Received.

14            MR. PRICE:  Your Honor, I object.  There is no

15   date on it.  It doesn't seem to be from a toy fair.

16            THE COURT:  Thank you.

17            (Defendants' Exhibit No. 26755, pages 5

18        through 12, are received in evidence.)

19            THE WITNESS:  So does page 2, you missed that one.

20            Annette, page 2 also has Bratz.

21   BY MS. HURST:

22   Q    Mr. Larian, does page 2 also have a description of

23   Bratz on it?

24   A    It does.

25            MS. HURST:  And your Honor, I move to admit that

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 98 of 170   Page ID #:313067
CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

98

1    one as well?

2              THE COURT:  Received.

3              (Defendants' Exhibit No. 26755-2 is received

4         in evidence.)

5    BY MS. HURST:

6    Q    Please look at Exhibit 9593.

7    A    Yes.

8    Q    Please look at page 15.

9    A    Yes.

10   Q    And do you see there are several MGA products?

11   A    I do.

12   Q    And this is the 2005 New York toy fair report; is that

13   right?

14   A    Front page, yes.

15             MS. HURST:  Move to admit pages 1 and 15, your

16   Honor.

17             THE COURT:  Received.

18             (Defendants' Exhibit No. 9593, pages 1 and

19        15, are received in evidence.)

20   BY MS. HURST:

21   Q    Please look at Exhibit 9488.

22             MS. HURST:  Do have a copy sheet for it?

23             THE WITNESS:  Here is a sheet.

24   BY MS. HURST:

25   Q    And can you see that that's a video in its original

1   form?

2   A    Yes.

3   Q    And did you watch that video and observe MGA products

4   on it?

5   A    I did.

6           MS. HURST:  Your Honor, move to admit 9488.

7           THE COURT:  Received.

8           *(Defendants' Exhibit No. 9488 is received in*

9       *evidence.)*

10  BY MS. HURST:

11  Q    And would you look also at 9499 -- or pardon me, 9489.

12  Is that also a copy sheet for a video?

13  A    It is.

14  Q    And was that a 1999 video that you looked at?

15  A    Too fast.  I don't remember.  Where is it?  I can't

16  say --

17  Q    You can't tell the year from the --

18       Okay.  Your Honor, can we admit 9489?

19          THE COURT:  You may.  Received.

20          *(Defendants' Exhibit No. 9489 is received in*

21      *evidence.)*

22  BY MS. HURST:

23  Q    And you saw MGA products on that video as well?

24  A    I did.

25  Q    All right.  Now, did you have prepared a summary

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 100 of 170   Page ID #:313069
CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

100

1    document that identified all of the different MGA products

2    that you had seen in all of these various toy fair reports

3    and videos?

4    A     I did.

5    Q     And would you please look at Exhibit 36737.

6    A     Yes.

7    Q     And does this contain the complete summary of all of

8    the descriptions and pictures that you had seen in all of

9    the toy fair videos and reports?

10   A     Yes, I looked at it last night.

11           MS. HURST:  Your Honor, I move to admit 36737.

12           MR. PRICE:  Your Honor, I object to --

13           THE COURT:  Let's take a look at that this

14   evening.  Let's take a look at that tonight.

15           MS. HURST:  Thank you.

16   BY MS. HURST:

17   Q     Now, having looked at all of these various reports and

18   summarized them -- first of all, were these products that

19   were on the shelves at the time of the reports that you saw?

20           MR. PRICE:  Objection.  It's compound.

21           THE COURT:  Overruled.

22           THE WITNESS:  They were not.

23   BY MS. HURST:

24   Q     Were they products that MGA was planning to sell in the

25   future?

```
1              MR. PRICE:  Your Honor, objection.  Many of these
2        are undated documents that --
3              THE COURT:  Overruled.
4              MR. PRICE:  Lack of foundation.
5              THE COURT:  No.  Overruled.
6              Counsel, both of you, be careful.  It doesn't mean
7        I'm going to accept these as a sweeping ruling.  So be
8        certain if you truly want a document in, that you've got the
9        foundation for that, and I'm putting Mattel on notice also.
10       The jury will know what to look for explicitly rather than
11       just avalanches of information, so they'll know each of your
12       claims.
13       BY MS. HURST:
14       Q    In those years, 1999 through 2005, did MGA use some
15       combination of catalogs, sell sheets and price lists for
16       those products?
17       A    I'm sorry, can you repeat the question?
18       Q    In those years from 1999 through 2006, did you use
19       catalogs and sell sheets and price lists in your showrooms?
20       A    We did.
21       Q    And did you consider that information to be
22       confidential?
23       A    Yes.
24       Q    Was it valuable information?
25             MR. PRICE:  Objection.  This is compound.
```

1          THE COURT:  Overruled.

2          THE WITNESS:  Yes, 100 percent.

3   BY MS. HURST:

4   Q    Would you have knowingly given it to competitors?

5   A    Would not.

6   Q    Please look at Exhibit 8558.

7        Please turn to page -- first of all, is that a Mattel

8   interrogatory response in this case?

9          MR. PRICE:  Your Honor, I object.  This isn't the

10  witness to do interrogatory responses with.

11         THE COURT:  Yeah, I'm going to sustain that,

12  Counsel.

13         MS. HURST:  He used it in his 30(b)(6) deposition

14  as a summary, your Honor.

15         THE COURT:  You'll have to show me that, Counsel.

16  I'll accept that from you.  I have no reason to distrust

17  that, but I'd like to see it.

18         MS. HURST:  All right.

19         THE COURT:  We can do that after the recess.  Time

20  is valuable.

21         MS. HURST:  All right.

22         THE COURT:  Now, remember, I'm putting you each on

23  notice that concerning a summary document, we are going to

24  be going through every one of those, and you can't expect

25  they are going to be received unless I have dates and times.

1    I made Mattel go through that with numerous items, and they

2    took a lot of time doing that.

3         MS. HURST:  Understood.

4         THE COURT:  So if this is any attempt at all just

5    to get a sweeping ruling, you can expect it won't be coming

6    in, so please take your time with this.

7         MS. HURST:  Understood, your Honor.  Okay.

8    BY MS. HURST:

9    Q    Please turn to page 253 of that exhibit, Mr. Larian.

10        MR. PRICE:  Your Honor, I object.  A 30(b)(6)

11   witness for one party can't testify as a 30(b)(6).

12        THE COURT:  Are we back to 8558?

13        MS. HURST:  I'm just going to put in the

14   foundation, your Honor.  I understand the Court's ruling not

15   to publish it.

16        THE COURT:  Well, it's not even to inquire into it

17   right now.  I need to check the record to see if he's a

18   30(b)(6) witness specifically for this area and what he

19   said, and if this is properly being used.  So I think you

20   ought to move to the next area, now.

21        MS. HURST:  Your Honor, I believe it's a Mattel

22   response, so it's a party admission?

23        THE COURT:  I don't know.  I don't have it in

24   front of me, Counsel.  So unfortunately, if you want to use

25   time, I'd read it, that's fine, but I would just suggest

CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

104

1    that time is valuable for both of you.  I'd move to the next

2    area, and then I can look at it during recess.  But if you

3    hand me a thick of documents, I'll sit here and read, but

4    the time is running on you.

5              MS. HURST:  All right.  I'll move on, your Honor.

6              THE COURT:  All right.

7    BY MS. HURST:

8    Q    Why would it be valuable to a competitor to be able to

9    go into your showrooms and look at those products?

10             MR. PRICE:  Objection.  It's compound and Rule 14

11   products.

12             THE COURT:  Overruled.  Overruled.

13             THE WITNESS:  Because when they come to your

14   showroom, they can feel, touch, play like a retailer does

15   with your product.  They can get to know how the product

16   works.  How does it play.  You cannot just do that by

17   catalog sheet, and that's why retailers from all over the

18   world spend millions of dollars as a whole.  10,000 people

19   come to toy shows.  That's why it's valuable.  They come and

20   feel and touch and play with the toy before they make a

21   buying decision.

22   BY MS. HURST:

23   Q    So meeting the toy in person is the most valuable way

24   of acquiring the information --

25   A    It is.

```
 1   Q     -- correct?

 2   A     Otherwise, we would not spend hundreds of thousands of

 3   dollars going to toy shows.

 4   Q     And -- but what about pictures?  Are those -- is it

 5   also valuable to get pictures in advance of your

 6   competitors' products?

 7   A     It is.

 8         Can I take a restroom break, please?

 9              THE COURT:  Certainly.

10              You are admonished not to discuss this matter

11   amongst yourselves, nor form or express any opinion

12   concerning this case.  We'll come and get you at about --

13   oh, let's say 3:15, okay?  Have a nice recess.

14              And sir, if you'd want to step down.

15              And counsel, we'll see you at 3:15.

16              THE COURT:  Better yet.  Why don't you have a seat

17   for a moment and spend a few minutes together.

18              THE WITNESS:  Your Honor, can I go?

19              THE COURT:  Certainly.

20              Why don't you, Mr. Eckert, go take a restroom

21   break.

22              (The following proceedings is taken outside

23        the presence of the jury.)

24              THE COURT:  All right.  Counsel, the jury is no

25   longer present.
```

1          Let's talk through what's happening with the

2     summary, with the summary chart so there are no surprises,

3     and if I reject it, you are not caught by surprise claiming

4     unfairness.  By the same token, I don't have this avalanche

5     effect again, not knowing what this is.

6          MS. HURST:  I'm just trying to follow the template

7     that Mattel was using with Ms. Owens, your Honor, and if I'm

8     not quite doing it right, then I apologize.

9          THE COURT:  No, you are doing fine.  Here is the

10    problem, though.  I required Mattel to use a lot of time

11    going through their trade secrets, so we got more

12    specificity, and you can use time.  You've got -- you're 12

13    hours ahead of Mattel, for goodness sakes, at this point.

14    You can use the time also designating these trade secrets

15    and showing us where they are as well.  In fact, you have a

16    competitive advantage right now with Mattel in terms of

17    time, so there is no reason with their requirement with more

18    specificity, you don't have the same.

19         MS. HURST:  Your Honor, I think --

20         THE COURT:  So I don't -- I don't knonw.  See, I

21    haven't seen 36737.  So tonight, I'm going to go through a

22    laborious process with each of you trying to figure out,

23    unless you do this on the record, what's coming in and

24    what's not, and I don't think I'm going to do that.  I think

25    it has to be done in front of the jury, and I think you have

1    to designate what is truly a trade secret here, and that's

2    what I've been waiting for.

3           Now, I'll see you in 15 minutes, so go use the

4    restroom.

5           By the way, still on the record, a lot of this

6    evidence is also coming in for unfair business competition,

7    17200.  So I know there's trade secret objections, but

8    remember, I'm the decider on the 17200 case, but the jury

9    will make the initial advisory decision, which the Court

10   will be interested in.

11          *(Recess.)*

12          *(The following proceedings is taken in the*

13      *presence of the jury.)*

14          THE COURT:  Back in session.  The jury is present,

15   the alternates, the parties.

16          Examination by Ms. Hurst on behalf of Mr. Larian

17   and MGA.

18          Counsel?

19          **ISAAC LARIAN, DEFENDANTS' WITNESS, RESUMED**

20               DIRECT EXAMINATION (Continued)

21   BY MS. HURST:

22   Q    Let's go back to Exhibit 26571, Mr. Larian.

23   A    Yes.

24   Q    And this is Mr. Villasenor's February 16th, 2001, New

25   York toy fair report; is that right?

1    A    Yes.

2    Q    And on page 10, that's Trial Exhibit Page 10 --

3    A    Yes.

4    Q    -- there were descriptions of the MGA products,

5    correct?

6    A    That's correct.

7    Q    Now, if you assume that someone got access to your

8    showroom for this information in an unauthorized way in

9    February of 2001, would you consider it valuable that they

10   were able to see, touch, here, smell and play with the

11   product?

12   A    That's why people go to toy shows.  That's why we have

13   toy shows.

14   Q    And would it be valuable for a competitor to do that?

15   A    Yes.  Again, that's why retailers and distributors,

16   everybody goes to the toy show, they travel to go to the toy

17   show.

18   Q    And would that opportunity otherwise be available to a

19   competitor to come into your showroom and do that?

20   A    Sorry, I don't get -- I don't understand your question.

21   Q    Would a competitor be able to come into your showroom

22   and get access to the Bratz and Palm Puppies products

23   described here in this report?

24   A    They are not supposed to.

25   Q    Okay.  And did you make efforts to keep the information

1    about these products confidential?

2    A    We did.

3    Q    In particular, was FOB L.A. price for Bratz, was that

4    confidential information as of February 16, 2001?

5    A    All of the --

6            MR. PRICE:  I'm going to object it's irrelevant.

7    It's not a listed trade secret.

8            THE COURT:  Overruled.

9            THE WITNESS:  All of our selling prices to the

10   retailer, the wholesale prices, are valuable.

11   BY MS. HURST:

12   Q    And you say there is a reference to a website there?

13   A    Yes.

14   Q    Was the Bratzpack.com website up yet in February of

15   2001?

16   A    It was not.

17   Q    And so actually the images -- the website images of the

18   dolls were not yet available at this time; is that true?

19   A    The website did not launch until April of 2001, two or

20   three months later.

21   Q    And had you yet released the Palm Puppies product to

22   the market?

23   A    No, we had not.

24   Q    And were these descriptions of those products, did you

25   consider that to be confidential at the time as well?

1   A    Yes, we did.

2   Q    Would it be valuable to a competitor, even if they

3   couldn't see the product, to get pictures of it or to learn

4   descriptions of it when that was not yet publicly available

5   information?

6   A    It would be valuable to them, yes.

7   Q    Please look at 32836.

8   A    Yes.

9   Q    And this was also a 2001 toy fair report; did you see

10  that?

11  A    Yes, I did.

12  Q    And there was MGA information on page 13; is that

13  right?

14          THE COURT:  You just went over this, Counsel, 13,

15  24, 27, 66, 79, 80 and 89.

16          MS. HURST:  Yes, and I'm just trying to follow the

17  court's instructions.

18  BY MS. HURST:

19  Q    With respect to this document, Mr. Larian, were the --

20  was the information about MGA products that you saw in here

21  confidential at the time?

22  A    It was.

23  Q    For example, on page 13, where it talks about A cost?

24  A    That's FOB cost.  That's -- no, that's not A -- A price

25  is the price domestically that you sell or a wholesale price

1    you sell to a customer.

2    Q    So that's a customer price as opposed to --

3    A    That's the price you sell to Toys R Us, to Walmart, to

4    Target, not to the general public.

5    Q    And was that confidential at the time?

6    A    Yes, it was.

7    Q    And if you look at page 24, does that contain

8    confidential pricing information as well?

9    A    It does.

10   Q    And was Scooter Samantha in the marketplace yet at that

11   point?

12   A    It was not.

13   Q    And what does it say about advertising there?

14   A    "TV support is planned."

15   Q    And is that confidential information?

16   A    It is.

17   Q    And why is that significant to a competitor?

18   A    Because if they know your advertising product and they

19   have a similar product, they might also advertise, they

20   might move their advertising, they might increase the GRP,

21   the money that they spent to advertise.

22   Q    And is it true that advertising makes a big difference

23   in your projections for how many units of these products

24   that you are going to sell?

25   A    Huge, huge.

1    Q    And so if a competitor knows that you -- in advance

2    that you plan to advertise the product, then that gives them

3    a significant piece of information about the product; is

4    that right?

5    A    Not about the product, but about the marketing plan.

6    Q    About your marketing strategy?

7    A    That's correct.

8    Q    And if they knew about all of your products and when

9    you plan to TV advertise them, would that be significant

10   competitive information?

11   A    Yes, but we don't advertise all of our products.  We

12   only advertise a select few.

13   Q    And so if a competitor knew which were the select few

14   that you plan to advertise, would that be valuable?

15   A    Absolutely.

16   Q    And could they plan their whole marking strategy based

17   on that?

18   A    Or adjust their marketing plan strategy against it.

19   Q    For example, a competitor could decide to put TV

20   advertising for a direct head-to-head competition, where

21   they hadn't planned to do that before?

22   A    Right, or they could advertise earlier, or they could

23   increase what you call "waiting advertising," which means

24   more frequency later.

25   Q    And if they had similar products coming onto the

1    market, could they decide to save money in advertising and

2    try to ride off of your coat tails?

3    A    Yes, or vice versa, and they could also change their

4    pricing.

5    Q    In each instance where you had examined these toy fair

6    reports for each year, have you found information that MGA

7    considered to be confidential as of that time?

8    A    Yes.

9              MR. PRICE:  Objection.  Compound.

10             THE COURT:  Overruled.

11   BY MS. HURST:

12   Q    And that has included pictures where those were not yet

13   available, right?

14   A    Yes.

15   Q    And descriptions when those were not yet available?

16   A    Yes.

17   Q    And whether or not the product was going to be TV

18   advertised?

19   A    Yes.

20   Q    And the pricing to retailers?

21   A    Yes.

22   Q    All of those are elements of the confidential

23   information?

24   A    It is.

25   Q    But in your view, what was the most important thing

1    that Mr. Villasenor and his colleagues were able to get in

2    terms of business information about MGA?

3    A    They pretended to be a buyer.  They came to our

4    showroom, and like a buyer, they touched, played, looked and

5    got information that they would not even have otherwise.

6    They were -- they were able to basically act like a buyer

7    and get all of that information, then go and share it with

8    the rest of the people at Mattel.

9    Q    And -- and how would that be valuable to the rest of

10   the people at Mattel?

11   A    Because they could change their designs.  They could

12   come up with product, they could compete with that.  They

13   could change their pricing, their marketing plans, sales

14   plans, everything.

15   Q    When you watched the videos, did you see them -- did

16   you hear people asking questions about some of the products?

17   A    The video that I saw was in a big auditorium with

18   multi-level sitting, like when you go to college --

19             MR. PRICE:  I'm going to object.  This is hearsay,

20   describing a video.  We have the video.

21             THE COURT:  Is that video in evidence?

22             MS. HURST:  Yes, we admitted it during

23   examination.

24             THE COURT:  Overruled.

25             You can continue.

1              THE WITNESS:  It's like when I go to UCLA, they

2     have these different levels where people sit around,

3     students sit around, and somebody is in the well downstairs,

4     the teacher is teaching.  It was something like that with

5     big screen and these three -- at least three people that I

6     remember in the video were describing each product and --

7     BY MS. HURST:

8     Q    And were they answering questions about the products?

9     A    They were describing the product, and then people in

10    the audience will ask them questions, "How about this?  How

11    about that?" and they were able to answer it.  And if they

12    were not in people's showroom, in our showroom, they would

13    not be able to answer that.

14             MR. PRICE:  Your Honor, I'm going to object.  It's

15    just not specific enough for trade secret.

16             THE COURT:  Overruled.

17    BY MS. HURST:

18    Q    So you saw in court yesterday that they showed

19    Mr. Villasenor press reports and other sorts of articles

20    where there were other descriptions of products, right?

21    A    I was.

22    Q    Is there a difference between reading it, reading about

23    it, you know, and these press things and seeing them

24    yourself in person?

25    A    Absolutely.  You could see -- if the retailers could

1    see what's in the press release or in a catalog, why would

2    they travel to come to your showroom and spend time to look

3    at your product and touch it and feel it, look at the

4    packaging, which is important, and get to know about your

5    advertising?  If all of that was in a press release, why --

6    there would not be any toy fairs.

7    Q    Now, have you seen any examples of Mattel products that

8    you were concerned that at the time seemed like they had

9    gotten access to your confidential information?

10               MR. PRICE:  Object.  Irrelevant.

11               THE COURT:  Overruled.

12               THE WITNESS:  And I don't understand the question.

13   BY MS. HURST:

14   Q    Okay.  Have you -- you made a claim for unfair

15   competition in this case, right?

16   A    We have.

17   Q    And it involved copying of products, right?

18   A    Yes.

19   Q    And at the time you didn't know what Mr. Villasenor and

20   his cohorts were doing, right?

21   A    I had no idea.

22   Q    But you were worried because you could see they were

23   copying your product.

24               MR. PRICE:  Objection.  This is improper

25   characterization and opinion.

```
 1                  THE COURT:  Overruled.

 2                  THE WITNESS:  There were too many coincidences

 3      as -- too many coincidences.

 4      BY MS. HURST:

 5      Q    So let's look at some of these products that were in

 6      the reports.

 7           Would you look at Exhibit 36704, please.

 8      A    Yes.

 9      Q    Do you recognize that?

10      A    I do.  The handle is missing, but yes.

11      Q    Is that a Bratz Winter Wonderland collection, Jade?

12      A    Yes.  They all had a handle like this.

13                  MS. HURST:  Your Honor, I move to admit 36704?

14                  THE COURT:  Received.

15                  (Defendants' Exhibit No. 36704 is received in

16           evidence.)

17      BY MS. HURST:

18      Q    And please take a look at 35265; do you recognize that?

19      A    I sure do.

20      Q    What's that?

21      A    It's MyScene Chillin' Out, which was a knockoff of

22      Bratz Winter Wonderland.

23                  MR. PRICE:  Your Honor, I move to strike.  Lack of

24      foundation.

25                  THE COURT:  Overruled.
```

1      Now, remember, this is his opinion.  You'll be the

2  judge about what copying, if any, went back and forth

3  between MGA and Mattel --

4           MS. HURST:  I move to admit --

5           THE COURT:  -- and vice versa.

6           MS. HURST:  I'm sorry, your Honor.  I move to

7  admit 35265.

8           THE COURT:  Received.

9           *(Defendants' Exhibit No. 35265 is received in*

10      *evidence.)*

11 BY MS. HURST:

12 Q    Was this an example of what -- at the time of a product

13 that you just couldn't understand how MyScene could come out

14 with the same idea in such a short time after yours?

15 A    I was just -- I was shocked.

16 Q    All right.  Please take a look at 36715.

17      What's that?

18 A    This was a play set.  This was Bratz Formal Funk Super

19 Stylin' Runway Disco.  It was a very elaborate play set

20 where you would you put the doll -- you have to take the

21 product out to really see what it does, but it was really

22 literally like a disco floor.  You would put the dolls here.

23 They would dance with each other.  You would plug in -- you

24 see this here are speakers, so you could plug in your MP3

25 player or IPOD radio and --

1    Q    All right.  Let me stop you there.

2              MS. HURST:  Move to admit 36715, your Honor?

3              THE COURT:  Received.

4              *(Defendants' Exhibit No. 36715 is received in*

5         *evidence.)*

6    BY MS. HURST:

7    Q    Please take a look at Exhibit 36716; do you recognize

8    that?

9    A    I sure do.

10   Q    And is that a MyScene Sound Lounge?

11   A    It's completely the trapezoid-type packaging.

12   Q    And was that another one where it came out onto the

13   market and you -- how did you feel when you saw that?

14             MR. PRICE:  Objection, your Honor.  We dropped the

15   copying claim on this.

16             THE COURT:  Overruled.

17             THE WITNESS:  I'm sorry?

18   BY MS. HURST:

19   Q    How did you feel when you saw that MyScene Sound Lounge

20   come onto the market?

21   A    I can not express my feeling.

22             MR. PRICE:  Objection.  That's irrelevant.

23             THE COURT:  His feelings?

24             MR. PRICE:  Yes.

25             THE COURT:  Sustained.

1    BY MS. HURST:

2    Q    Did the MyScene Sound Lounge come out close in time to

3    the Runway Disco?

4              MR. PRICE:  Objection.  Ambiguous.

5              THE COURT:  Overruled.

6              THE WITNESS:  Yes, it did, and it was mentioned

7    that it was right next to it at Toys R Us.  I do remember

8    that perfectly well.

9    BY MS. HURST:

10   Q    And were you surprised at the coincidence of the

11   similar type product in similar shape packaging?

12   A    I was.

13             MR. PRICE:  Object.  It's argumentative as

14   phrased, and move to strike.

15             THE COURT:  Overruled.

16             Well, strike the "surprised," Counsel.

17   BY MS. HURST:

18   Q    Please take a look at 36718.

19             MS. HURST:  Oh, your Honor, I think I failed to

20   move in 36716, the Sound Lounge.

21             THE COURT:  Received.

22             *(Defendants' Exhibit No. 36716 is received in*

23        *evidence.)*

24             MR. PRICE:  And your Honor, so I don't interrupt,

25   can I have a continuing objection on the dropped claims?

```
 1              THE COURT:  A continuing objection, Counsel.

 2              MR. PRICE:  Thank you.

 3   BY MS. HURST:

 4   Q    36718, is that Bratz Motorcycle Meygan?

 5   A    Yes.

 6              MS. HURST:  Your Honor, I move to admit 36718?

 7              THE COURT:  Received.

 8          (Defendants' Exhibit No. 36718 is received in

 9       evidence.)

10   BY MS. HURST:

11   Q    And please take a look at 36717.  What's that?

12   A    It's a MyScene version with the motorcycle.

13   Q    Did you observe that coming out in the marketplace at

14   the time?

15   A    When our product came in, they came out about the same

16   time.

17   Q    And what was your reaction to that?

18              MR. PRICE:  Same objection.  Irrelevant.

19              THE COURT:  Overruled -- well, the reaction is not

20   important.  I mean, I'm not concerned -- too concerned about

21   his emotion.  Maybe "surprise" is the correct word or

22   "concern" that he -- I'll let you ask it.

23              MS. HURST:  All right.

24              THE COURT:  I think I'm -- I'm going to reverse my

25   ruling.  You can ask it.  It's just a common term.
```

1    BY MS. HURST:

2    Q    Were you concerned to see that your motorcycle theme

3    came onto the market and then their motorcycle theme came

4    onto the market close in time?

5    A    I was very concerned.

6    Q    And at this point, you had seen the Sound Lounge and

7    the Chillin' Out as well, right?

8    A    Yes.  I don't know if they were all about the same

9    time, but yes, they were very close together.

10   Q    Please take a look at 17593.

11          MS. HURST:  Oh, your Honor, move in the 36717, the

12   MyScene Vespa.

13          THE COURT:  Received.

14          (Defendants' Exhibit No. 36717 is received in

15      evidence.)

16          THE WITNESS:  What happened?

17   BY MS. HURST:

18   Q    Do you recognize 17593, Mr. Larian?

19   A    Yes, I do.

20   Q    What is that?

21   A    This is one of the Bratz Petz that we had.  This was

22   supposed to be a fox or a dog.  Actually it was a dog.

23   Q    I'm going to admit, that looks a little odd to me.  Did

24   they sell well?

25   A    They were extremely successful.

1          MS. HURST:  Your Honor, move to admit 17593?

2          THE COURT:  Received.

3          (Defendants' Exhibit No. 17593 is received in

4      evidence.)

5   BY MS. HURST:

6   Q    And please take a look at Exhibit 17589, and that one

7   is already in evidence, I believe.

8          What's that one, Mr. Larian?

9   A    That's a cat version of the Bratz Petz.

10  Q    All right.  And again, was that a bestseller?

11  A    The whole series of these, what we call the Bratz Petz,

12  were extremely great sellers.

13  Q    All right.  Please take a look at 36719, 36720 and

14  36721.

15  A    Yes, I have seen these.

16  Q    Do you recognize those?

17  A    I sure do.

18  Q    And are those MyScene pets products?

19  A    They are.

20  Q    And were you concerned to see those arrive in the

21  marketplace very close in time to your Bratz Petz?

22  A    They came out about the same time.

23  Q    And --

24          (Attorney discussion held off the record.)

25          MS. HURST:  Your Honor, move to admit 36719, 720

1    and 721?

2            THE COURT:  I'm confused about "the same time."

3    Does that mean it came out before or after?

4            THE WITNESS:  No.  At the same time, sir.  They

5    were at the same time.  I remember I was at Target and saw

6    them right next to each other at the Target store.

7            THE COURT:  Received.

8            *(Defendants' Exhibit Nos. 36719, 36720 and*

9        *36721 are received.)*

10   BY MS. HURST:

11   Q    And please take a look at 36707.

12   A    Yes.

13   Q    What's that?

14   A    This is a toy we had called "Alien Racers."  It was a

15   remote control car.  Boys really liked it.  The girls

16   didn't.

17           MS. HURST:  Your Honor, I move to admit 36707?

18           THE COURT:  Received.

19           *(Defendants' Exhibit No. 36707 is received in*

20       *evidence.)*

21   BY MS. HURST:

22   Q    And please take a look at 36688.

23   A    Yes.

24   Q    Do you recognize that?

25   A    Yes, it is -- I do.

1    Q    What's that?

2    A    It's a Hot Wheels car.  It's been out for a long time,

3    but the key thing was they called this X -- we called this

4    product Alien Racers, so they called it Acceleracers, which

5    are no longer in the market, nor is Alien Racers.

6    Q    So on the Acceleracers, it was a Hot Wheel that was

7    previously in the market; is that right?

8    A    Well, Hot Wheels has been on the market a long time,

9    yes, so basically they just changed the name.  I think after

10   they found out about the Alien Racers, they changed the

11   name, and even the logo is very -- you can see it for

12   yourself.

13   Q    Now, of all the MGA products that you've just been

14   looking at, were those in the toy fair reports?

15   A    They were.

16          MS. HURST:  Your Honor, I also move to admit

17   36688, the Acceleracers.

18          THE COURT:  Received.

19          (Defendants' Exhibit No. 36688 is received in

20       evidence.)

21   BY MS. HURST:

22   Q    And please take a look at Exhibit 18741.

23   A    Yes.

24   Q    Do you recognize that?

25   A    Yes, I do.

1   Q    And is that Bratz Girls Night Out Yasmin?

2   A    Yes.

3   Q    Was the Girls Night Out product in one of the toy fair

4   reports?

5   A    It was.

6           MS. HURST:  Your Honor, move to admit 18741?

7           THE COURT:  Received.

8           *(Defendants' Exhibit No. 18741 is received in*

9       *evidence.)*

10  BY MS. HURST:

11  Q    Please take a look at 36695 and 17379.

12  A    Yes.

13  Q    Are those MyScene Day and Nite Chelsea and Madison?

14  A    Yes, they are.

15  Q    And do you recognize those as MyScene products that

16  came out after Bratz Girls Night Out Yasmin?

17  A    I am not exactly sure when they came out.  About the

18  same time.  I don't know if it was exactly the same day.

19  Q    And did it strike you again as a --

20  A    For sure it was the same year, the same season.

21  Q    Did it strike you as a strange coincidence to see these

22  MyScene products so close in time to your Bratz girls night

23  out?

24          MR. PRICE:  Objection.  Argumentative.

25  Irrelevant.

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  Yes.

 3              MS. HURST:  Your Honor, move to admit 36695 and

 4    17379?

 5              THE COURT:  Received.

 6              (Defendants' Exhibit Nos. 17379 and 36695 are

 7         received in evidence.)

 8    BY MS. HURST:

 9    Q    Please take a look at 17527.

10         What's that?

11    A    This is a product that we called Bratz Forever Diamond.

12    Q    And what was -- what was the feature on that?

13    A    The big deal about this was that it came out with

14    actual little diamond -- real diamond pieces that was in the

15    jewelry for the girls to wear.

16    Q    And did you see that in one of the toy fair reports?

17    A    I did.

18    Q    Please take a look at 36742, one of the Mattel toy fair

19    reports; you saw Bratz Forever Diamonds in there, right?

20    A    Yes.

21    Q    Do you recognize 36742?

22    A    I do.

23    Q    And what's that?

24    A    It is MyScene Bling Bling, but now it comes with

25    real -- I don't know how to pronounce this word --
```

1   Q    Amethyst?

2   A    Yes.  This is some sort of stone, but I don't know how

3   to pronounce it well.

4   Q    And was MyScene Bling Bling a product that you were

5   familiar with at the time?

6   A    I'm sorry?

7   Q    Was MyScene Bling Bling a product that you were

8   familiar with when it came out on the market?

9   A    Yes, I was.

10  Q    And did you observe a change in that product?

11  A    A sudden change, yes.

12  Q    And did that change -- what was that change?

13  A    They came out with real -- real stones, real -- I don't

14  know how to pronounce this, but there were a series of them

15  with real stones.  We had come up with real diamonds, so all

16  of a sudden they changed and came out with real jewelry

17  stones.

18  Q    And did the change in My Bling Bling occur right about

19  the time that your Bratz Diamonds were coming on the market?

20  A    It did.

21          MS. HURST:  Your Honor, move 17527 and 36742 into

22  evidence.

23          THE COURT:  Received.

24          *(Defendants' Exhibit Nos. 17527 and 36742 are*

25      *received in evidence.)*

```
 1              (Attorney discussion held off the record.)

 2    BY MS. HURST:

 3    Q    Were there other examples of Mattel products that you

 4    saw that you felt were strangely similar to yours that were

 5    coming out at about the same time, or shortly thereafter?

 6    A    Many.

 7              MR. PRICE:  Objection.  Vague and ambiguous.

 8              THE COURT:  Sustained.

 9              We'll strike the answer.

10              You can go through those, Counsel, if you want to.

11              MS. HURST:  Okay.

12    BY MS. HURST:

13    Q    Please take a look at 36685; do you recognize that?

14    A    I do.

15    Q    You like that one?

16    A    Yes.

17    Q    You're giving it a big smile.

18    A    Yes.

19    Q    What is that?

20    A    It's from the '70s, that's why I'm smiling.  It's

21    Flashback Fever.  It came out -- this is a doll that had the

22    roller blades, but if you see this here, this is a little CD

23    that actually played the '70s music.

24              MS. HURST:  Your Honor, move to admit 36685?

25              THE COURT:  Received.
```

CV 04-9049-DOC – 03/24/2011 – Day 39, Vol. 2 of 3

130

```
 1              (Defendants' Exhibit No. 36685 is received in
 2       evidence.)
 3   BY MS. HURST:
 4   Q    Please take a look at 36684, Mr. Larian.
 5   A    Yes.
 6   Q    Do you recognize that?
 7   A    Yes, MyScene Roller Girls.
 8   Q    And is that, again, one that came out close in time to
 9   your Flashback Fever?
10   A    Yeah.  It's missing -- missing the music CD.
11              MS. HURST:  Your Honor, move to admit 36684?
12              THE COURT:  Received.
13              (Defendants' Exhibit No. 36684 is received in
14       evidence.)
15   BY MS. HURST:
16   Q    Do you remember the product Forever Best Friends?
17   A    I do.
18   Q    And do you remember during Mr. Kilpin's testimony that
19   there were some e-mails that were admitted regarding that
20   product?
21   A    I do.
22   Q    Now, you did announce that product in the press, right?
23   A    We did.
24   Q    And you had -- you even had a picture of the dolls,
25   right?
```

```
 1    A     In L.A. Times, yes.

 2    Q     Was there -- did you release a picture of the packaging

 3    on that product to the public?

 4    A     I don't think so, no.

 5    Q     And were you surprised to see the Wee 3 Friends in a

 6    similarly shaped package within a short period of time?

 7              MR. PRICE:  Objection.  Irrelevant, your Honor.

 8    Packaging is not an issue.

 9              THE COURT:  Overruled.

10              THE WITNESS:  I was.

11    BY MS. HURST:

12    Q     Would using information about MGA's products from these

13    toy fair reports, if Mattel was using that information to

14    get the jump on your products and your prices and your

15    marketing plans, would that hurt MGA?

16              MR. PRICE:  Objection.  That's irrelevant.

17    Overbroad.

18              THE COURT:  Do you mean hurt financially?

19              MS. HURST:  Yes.

20              THE COURT:  Overruled.

21    BY MS. HURST:

22    Q     Would that financially hurt MGA?

23    A     It did.

24    Q     Explain what you mean.

25    A     We lost sales.  We lost profit.  We lost shelf space.
```

1    Q    Did the -- strike that.

2         All right.  We're going to move to some financial

3    records, now.

4    A    Okay.

5    Q    You understand that there were damages experts

6    testifying in this case on both sides, right?

7    A    I am.

8    Q    And we've given them all sorts of financial records,

9    right?

10   A    I'm aware of that.

11   Q    All right.  So we're going to go through hopefully

12   quickly, now, a series of financial records so that we have

13   them in evidence.

14        Would you please take a look at Exhibit 36641.

15   A    Yes.

16   Q    I'm going to ask you to put a stack in front of you,

17   and then we'll identify what they are, hopefully all at

18   once.

19        27128, 27129?

20   A    Okay.  These are all the reports.

21   Q    And are all of those royalty statements for Carter

22   Bryant?

23   A    They are.

24   Q    And 36641, that's the Q2, 2001 royalties?

25   A    36 -- is this the one?

1       Yes.

2   Q    And 27128, that's quarter three, 2001 royalties to

3   Carter Bryant?

4   A    Yes.

5   Q    And 27129, that's Q4, 2001 royalties to Carter Bryant?

6   A    Yes.

7           MS. HURST:  Your Honor, I move to admit each of

8   those.

9           THE COURT:  Received.

10          (Defendants' Exhibit Nos. 27128, 27129 and

11      36641 are received in evidence.)

12          MS. HURST:  27300, please, and 27130.

13          THE WITNESS:  Yes.

14  BY MS. HURST:

15  Q    You have 27300, Mr. Larian?

16  A    Yes.

17  Q    And is that Q2, quarter two, 2002 royalties paid to

18  Carter Bryant?

19  A    It is.

20          MS. HURST:  I move to admit, your Honor?

21          THE COURT:  27130 is quarter two?

22          MS. HURST:  27300, your Honor.  I'm sorry.

23          THE COURT:  And what is 27130?

24          MS. HURST:  It's Q4, 2002.

25          THE COURT:  That's quarter four?

```
 1              MS. HURST:  Yes.

 2              THE COURT:  All right.  Received.

 3              THE WITNESS:  Weren't they all admitted during

 4    Carter Bryant's?

 5    BY MS. HURST:

 6    Q    No.  There's a few, apparently, that were not, so we

 7    are going to get them all in now.

 8              MS. HURST:  Please show the witness 27046.

 9              THE WITNESS:  What's the number?

10    BY MS. HURST:

11    Q    27046, do you recognize that as a report of the 2003

12    royalties paid to Carter Bryant?

13    A    Yes.

14              MS. HURST:  Move to admit, your Honor?

15              THE COURT:  Received.

16              (Defendants' Exhibit No. 27046 is received in

17         evidence.)

18              MS. HURST:  Please show the witness 11239B and A.

19              THE WITNESS:  Yes.

20    BY MS. HURST:

21    Q    Do you recognize 11239B as 2004 royalties paid to

22    Carter Bryant?

23    A    Yes.

24    Q    And 11239A as 2005 royalties paid to Carter Bryant?

25    A    Yes.
```

```
 1              MS. HURST:  Move to admit, your Honor?

 2              THE COURT:  Received.

 3              (Defendants' Exhibit Nos. 11239A and 11239B

 4       are received in evidence.)

 5   BY MS. HURST:

 6   Q    Please take a look at 27178.

 7   A    Yes.

 8   Q    And are those the fourth quarter 2007 through second

 9   quarter 2008 royalties paid to Carter Bryant?

10   A    Yes.

11              MS. HURST:  Move to admit, your Honor?

12              THE COURT:  Received.

13              (Defendants' Exhibit No. 27178 is received in

14       evidence.)

15   BY MS. HURST:

16   Q    Now, let me just stop you there, Mr. Larian.

17        Did you -- you paid Carter Bryant over the years

18   something in excess of $30 million; is that right?

19   A    We did.

20   Q    Now, was all of that based on just the original concept

21   drawings?

22   A    Absolutely not.

23   Q    How did -- how did the royalty payments work?

24   A    Basically on any doll that he worked on, even after

25   2002, 2003, 2004, and so on, we paid him a royalty.
```

1   Q    So he had to actually work on the doll in order to get

2   a royalty on it?

3   A    That is correct.

4   Q    And that was after the first generation, right?

5   A    Not only a doll.  For example, he did the Bratz Babies,

6   which were completely different, Bratz Ponies, and we paid

7   him royalty on that.  This is long after 2001.  There's a

8   whole bunch of products.  I mean, I can go through it, if

9   you want.

10  Q    The 30 -- 30-plus million dollars you paid Carter

11  Bryant includes all of that work over all of those years?

12  A    Exactly.

13  Q    And did you look -- did you quantify how much was

14  related to just that -- the royalties just that first

15  generation of dolls, did you figure out how much that was?

16  A    I did, I just don't recall it.

17  Q    You had forgotten it now, okay.  We'll come back to

18  that.

19       All right.  Please take a look at 27134.

20  A    Yes.

21  Q    Do you recognize that as the 1997 to 2000 consolidated

22  statement of operations for MGA?

23  A    Yes, I do.

24           MS. HURST:  Move to admit, your Honor?

25           THE COURT:  Received.

 1          *(Defendants' Exhibit No. 27134 is received in*
 2      *evidence.)*
 3   BY MS. HURST:
 4   Q    Please take a look at 1366.
 5   A    Yes.
 6          *(Attorney discussion held off the record.)*
 7   BY MS. HURST:
 8   Q    Do you recognize that as a 2001 consolidated statement
 9   of operations for MGA?
10   A    I do.
11   Q    Please take a look at --
12          MS. HURST:  I move to admit, your Honor?
13          THE COURT:  Received.
14          *(Defendants' Exhibit No. 1366 is received in*
15      *evidence.)*
16   BY MS. HURST:
17   Q    Please take a look at 13120.
18   A    Yes.
19   Q    Is that the 2002 consolidated statement of operations?
20   A    Yes.
21          MS. HURST:  Move to admit, your Honor?
22          THE COURT:  Received.
23          *(Defendants' Exhibit No. 13120 is received in*
24      *evidence.)*
25

CV 04-9049-DOC – 03/24/2011 – Day 39, Vol. 2 of 3

138

1    BY MS. HURST:

2    Q    And please take a look at 27105 and 27106.

3    A    Yes.

4    Q    Do you recognize those as the 2003 and 2004

5    consolidated statement of operations?

6    A    Yes.

7              MS. HURST:  Move to admit, your Honor?

8              THE COURT:  Received.

9              (Defendants' Exhibit Nos. 27105 and 27106 are

10       received in evidence.)

11   BY MS. HURST:

12   Q    Please take a look at 13123.

13   A    13 --

14   Q    -- 123.

15   A    Yes.

16   Q    And is that the 2005 consolidated statement of

17   operations?

18   A    Yes.

19             MS. HURST:  Move to admit, your Honor?

20             THE COURT:  Received.

21             (Defendants' Exhibit No. 13123 is received in

22       evidence.)

23   BY MS. HURST:

24   Q    Please take a look at 27108.

25   A    Yes.

1  Q    And is that the 2006 consolidated statement of

2  operations?

3  A    Yes.

4          MS. HURST:  I move to admit?

5          THE COURT:  Received.

6          *(Defendants' Exhibit No. 27108 is received in*

7       *evidence.)*

8  BY MS. HURST:

9  Q    Let me just stop you there.

10      These are financial documents that show all of the

11 performance of MGA; is that right?

12 A    That's correct.

13 Q    And is Little Tikes a company associated with MGA?

14 A    It is.

15 Q    And when did you acquire Little Tikes?

16 A    2006.

17 Q    What kind of a situation was it in when you acquired

18 it?

19 A    When we bought Little Tikes, we bought it from a

20 company called New World Corporation, and it's based in

21 Hudson, Ohio, and it was not doing good financially at all.

22 Q    And you heard Mr. Wagner offer the opinion that, you

23 know, basically MGA had run Little Tikes into the ground,

24 right?

25 A    I did.

1          MR. PRICE:  Objection.  Mischaracterized and

2    argumentative.

3          THE COURT:  I don't recall that.  Did he say that?

4          MS. HURST:  That was the "never any success"

5    opinion, your Honor.

6          THE COURT:  Okay.  "Never any success."

7          MS. HURST:  "Never profitable in any other

8    business line" opinion.

9    BY MS. HURST:

10   Q    You heard that, right?

11   A    I did.  I read -- I read his testimony.

12   Q    What are the -- what are the true facts about Little

13   Tikes?

14          MR. PRICE:  Objection.  Ambiguous, calls for a

15   narrative and argumentative.

16          THE COURT:  I'm going to sustain that.

17          I can't remember exactly the testimony concerning

18   that.  So why don't we just ask him what his opinion is of

19   Little Tikes, and I'm going to strike the preface.

20          I don't know if it was run into the ground or

21   doing extremely well.  I can't recall, and I apologize to

22   the jury about that.

23   BY MS. HURST:

24   Q    Was Little Tikes profitable when you acquired it?

25   A    It was not.

1    Q     Why not?

2    A     They had not come up with one new product in three

3    years, and in toy business, if you don't come up with new

4    products, like a fashion business, you basically don't

5    succeed.  New World, Rubbermaid, they are not in toys

6    business.  They are in plastic.  They sell plastic by the

7    pound.  And Little Tikes is a factory based in Hudson, Ohio,

8    and newer Rubbermaid owned it, and they had not come up with

9    one new product.  They were just trying to sell plastic by

10   the pound, and then that's why they were not successful

11   anymore.

12   Q     Were there also issues with the cost structure of

13   Little Tikes?

14   A     It was.

15   Q     And what were the issues with the cost structure?

16   A     Little Tikes I think is now the biggest U.S.-based toy

17   manufacturer still based in U.S.A., and the cost of labor

18   and everything else in U.S.A. is a lot higher than whether

19   it's in China or Mexico.

20   Q     When you first acquired Little Tikes, were you going to

21   reduce that cost of labor?

22   A     I was.

23   Q     What was your plan?

24   A     My plan was to move Little Tikes to Mexico.

25   Q     And what happened?  Did you do that?

1    A    I did not.

2    Q    Why not?

3    A    I went to Ohio and I met with the employees.  Some have

4    worked there for over 20 or have worked there over 30 and 40

5    years, and it was their whole life, and I just couldn't.  My

6    heart wouldn't do it.

7    Q    And so is Little Tikes profitable today?

8    A    It is.

9    Q    And how did you make that happen?

10   A    Innovation, a lot of innovation, a lot of new products.

11   Q    Can you give some examples of some of the new Little

12   Tikes products since MGA took it over?

13   A    Yes.

14   Q    What are they?

15   A    Little Tikes Anchor Away.  If you have kids or

16   grandkids, I'm pretty sure you have one in your houses.

17   That was one of them.  We cannot keep it in stock.  There's

18   barbecue, Little Tikes Barbecue, an ice cream maker, which

19   actually literally when you -- you can make ice cream

20   from -- from scratch and go outside in front of your house,

21   like they sell lemonade, sell the real ice cream.  We made a

22   gardening cart, which is very popular.  I mean, I can go on

23   and on.

24        The first year we bought Little Tikes, we came up with

25   100 new products, and they had not come up with one product

CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

143

1    in 3 years.  We came up with 100 new products.

2    Q    And have you turned Little Tikes around to where it's

3    profitable today?

4    A    Very profitable and growing.

5    Q    And you did that even though you kept the higher cost

6    of labor for the plant in Hudson, Ohio?

7    A    And I'm glad I did, yes.

8    Q    All right.  Let's continue with some of those

9    financials now.

10        Please take a look at 27284.

11   A    27 --

12   Q    284 and 289 are the next two, 27284 and 27289.

13        And are those the 2007 and 2008 consolidated statement

14   of operations?

15   A    Yes, it is.

16           MS. HURST:  I move to admit, your Honor?

17           THE COURT:  Received.

18           *(Defendants' Exhibit Nos. 27284 and 27289 are*

19        *received in evidence.)*

20   BY MS. HURST:

21   Q    Please take a look at 9353.

22   A    Yes.

23   Q    And is that the 2009 consolidated statement of

24   operations?

25   A    Yes, it is.

CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

144

1    Q    Please take a look at 36642.

2         MS. HURST:  Your Honor, move to admit that last

3    one, 9353.

4         THE COURT:  Received, and so is 27284 and 27289.

5         MS. HURST:  Thank you.

6         (Defendants' Exhibit No. 9353 is received in

7    evidence.)

8    BY MS. HURST:

9    Q    And then 36642, that's a 2010 consolidated statement of

10   operations?

11   A    It is.

12        MS. HURST:  I move to admit, your Honor?

13        THE COURT:  Received.

14        (Defendants' Exhibit No. 36642 is received in

15   evidence.)

16   BY MS. HURST:

17   Q    And please take a look at 9402.

18   A    Yes.

19   Q    Is that the 2007 through 2009 consolidated financial

20   statements?

21   A    They are.

22        MS. HURST:  Move to admit, your Honor?

23        THE COURT:  Received.

24        (Defendants' Exhibit No. 9402 is received in

25   evidence.)

1    BY MS. HURST:

2    Q    Please take a look at 36643.

3         Do you recognize that as the 2009 consolidated cash

4    flow statement?

5    A    No.  I don't have it in front of me.

6    Q    Oh, my apologies.

7    A    Yes.

8              MS. HURST:  I move to admit, your Honor?

9              THE COURT:  Received.

10             *(Defendants' Exhibit No. 36643 is received in*

11        *evidence.)*

12   BY MS. HURST:

13   Q    Do you also keep reports of how many unit sales and

14   dollar sales you have for each SKU or product?

15   A    SKU, yes.

16   Q    Yes, SKU --

17   A    It stands for "stock-keeping unit."

18   Q    Okay.  And you keep track of how many of each unit of

19   each product you sell; is that right?

20   A    Yes.

21   Q    And that helps you monitor the success, or the lack

22   thereof, of each product; is that true?

23   A    Yes.

24   Q    All right.  By the way, have the different Bratz female

25   dolls products performed differently over the years?

1    A    They have.

2    Q    Have some of them been a wild success?

3    A    Some of them have been wild failures.

4    Q    Can you give some examples of each category?

5    A    Yes.  Winter Wonderland was our biggest seller, and

6    Bratz Punk was not.

7    Q    Bratz Punk was not, so not so hot?

8    A    It went with the name, I guess.  No.

9    Q    Too much, Bratz Punk?

10   A    Yes.

11   Q    So even though you had that same sculpt in those basic

12   female dolls over the years, they still perform very

13   differently; is that true?

14   A    Yes, that's the nature of the business.

15   Q    And that's because other factors are important to the

16   sales of the product, right?

17   A    Yes.

18   Q    Could you take a look at 17200, please.

19   A    Okay.  Go ahead.

20   Q    You should have a whole stack there.  Is that the 2001

21   sales by company by SKU report?

22   A    Yes, it is.

23        MS. HURST:  Move to admit, your Honor?

24        THE COURT:  Received.

25

CV 04-9049-DOC – 03/24/2011 – Day 39, Vol. 2 of 3

147

```
 1              (Defendants' Exhibit No. 17200 is received in

 2       evidence.)

 3   BY MS. HURST:

 4   Q    17201?

 5   A    Yes.

 6   Q    Is that the 2002 sales by company by SKU report?

 7   A    It is.

 8            MS. HURST:  Move to admit, your Honor?

 9            THE COURT:  Received.

10            (Defendants' Exhibit No. 17201 is received in

11       evidence.)

12   BY MS. HURST:

13   Q    17202, is that the 2003 sales company by SKU report?

14   A    It is.

15            MS. HURST:  Move to admit?

16            THE COURT:  Received.

17            (Defendants' Exhibit No. 17202 is received in

18       evidence.)

19   BY MS. HURST:

20   Q    17203, is that the 2004 sales by company by SKU?

21   A    It is.

22            MS. HURST:  Move to admit?

23            THE COURT:  Received.

24            (Defendants' Exhibit No. 17203 is received in

25       evidence.)
```

1    BY MS. HURST:

2    Q    17204, is that the 2005 sales by company by SKU?

3    A    Yes, it is.

4              MS. HURST:  Move to admit?

5              THE COURT:  Received.

6              *(Defendants' Exhibit No. 17204 is received in*

7         *evidence.)*

8    BY MS. HURST:

9    Q    17205, is that the 2006 sales by company by SKU?

10   A    Yes, it is.

11             MS. HURST:  Move to admit?

12             THE COURT:  Received.

13             *(Defendants' Exhibit No. 17205 is received in*

14        *evidence.)*

15   BY MS. HURST:

16   Q    27243, do you have that, Mr. Larian?

17   A    Yes, I do.

18   Q    Is that the 2007 sales by company by SKU?

19   A    It is.

20             MS. HURST:  Move to admit, your Honor?

21             THE COURT:  Received.

22             *(Defendants' Exhibit No. 27243 is received in*

23        *evidence.)*

24   BY MS. HURST:

25   Q    36644, do you have that?

1    A    Yes, I do.

2    Q    And is that the 2010 fourth quarter sales by company by

3    SKU?

4    A    Yes.

5              MS. HURST:  Move to admit.

6              THE COURT:  Received.

7              *(Defendants' Exhibit No. 36644 is received in*

8        *evidence.*

9    BY MS. HURST:

10   Q    Please take a look the 27035.

11       Are you familiar with a type of document called an

12   "Item Master List"?

13   A    I am.

14   Q    And how is that used in your business?

15   A    It shows basically what's -- what's the item -- I

16   can't -- I have to -- it shows the item, the name of the

17   product, what type of product it is, what division, which

18   area do we account for it for profit and loss.

19   Q    Okay.  And is 27035 an MGA item master list?

20   A    27 --

21   Q    -- 035.

22   A    Yes, it is.

23             MS. HURST:  Move to admit, your Honor.

24             THE COURT:  Received.

25

```
 1              (Defendants' Exhibit No. 27035 is received in

 2        evidence.)

 3   BY MS. HURST:

 4   Q    Would you please take a look at 36649.

 5              THE COURT:  I'm sorry, 27035 is what year?

 6              MS. HURST:  I think it's actually covering a

 7   multi-year period of time, your Honor.

 8              THE WITNESS:  Many years.

 9   BY MS. HURST:

10   Q    Are the different dates indicated on there, Mr. Larian?

11              THE COURT:  Or at least what range?

12              THE WITNESS:  I can't see the dates in here.

13   BY MS. HURST:

14   Q    How are the items indicated?  Are they by SKU?

15   A    Yes, item number, division, toys, profit center, brand,

16   sub-brand, themes, product type.

17   Q    And this goes over a many-year period of time; is that

18   right?

19   A    It is.  I can see Pac-Man that was like, for example,

20   in 2000 --

21              THE COURT:  Do you have a range?  Is it 1990 or is

22   it 2000?  What is this?

23              THE WITNESS:  It's 2000 -- your Honor, it's 2000

24   onward.

25              THE COURT:  2000 onward?
```

```
 1              Counsel?

 2              MS. HURST:  Yeah.  These are used by the damages

 3     experts, your Honor.

 4              THE COURT:  All right.  It's received.

 5     BY MS. HURST:

 6     Q    Please take a look at 36649, Mr. Larian.

 7          Was this another example of the MGA item master list?

 8     A    Yes, it is.

 9              MS. HURST:  Move to admit?

10              THE COURT:  Received.

11              (Defendants' Exhibit No. 36649 is received in

12          evidence.)

13     BY MS. HURST:

14     Q    And 36650, is that another example?

15     A    Yes, and this has a date on it --

16     Q    Okay.

17     A    -- as of September 28, 2010.

18     Q    All right.  So that's the most recent one?

19     A    Yes.

20              MS. HURST:  Move to admit, your Honor.

21              THE COURT:  Received.

22              (Defendants' Exhibit No. 36650 is received in

23          evidence.)

24              (Attorney discussion held off the record.)

25              MS. HURST:  Apparently we can't reach any
```

1    stipulation, your Honor.

2              MR. PRICE:  Your Honor, I object.  Move to strike.

3              THE COURT:  Sustained, stricken.

4              Disregard comment by counsel.

5    BY MS. HURST:

6    Q    Please take a look at 36651.

7         And is that a schedule of Bratz assortment pack

8    components?

9    A    I have it here.  Yes, it is.

10   Q    And that explains which products were sold in each

11   group to the retailers; is that right?

12   A    In -- in an assortment, so you want me to explain how

13   it works?

14   Q    Sure, yeah, tell us how it works.

15   A    So you have a shipper carton, let's say it takes six

16   dolls in it, but based on the sales of -- like we put two of

17   Cloe, one of Sasha, one of Jade, two of another product in

18   there, so that's how -- that's what it is.

19   Q    So if somebody wanted to analyze how many of each

20   product that you sold, this would be a useful piece of

21   information, right?

22   A    It is.

23             MS. HURST:  Okay.

24             Your Honor, I move to admit 36651?

25             THE COURT:  Is there a date?  Once again, is there

1    a way to tell a range of time?

2            THE WITNESS:  Your Honor, it's -- this has 2001,

3    2002 -- it goes from 2001 onward.

4            THE COURT:  All right.  Okay.  Thank you.

5            MS. HURST:  May that be admitted, your Honor.

6            THE COURT:  Received.

7            *(Defendants' Exhibit No. 36651 is received in*

8        *evidence.)*

9    BY MS. HURST:

10   Q    36652, is that another example of the assortment pack

11   component breakdown?

12   A    Yes.

13   Q    And what time period does that cover?

14   A    2002 onward.

15           MS. HURST:  Move to admit?

16           THE COURT:  Received.

17           *(Defendants' Exhibit No. 36652 is received in*

18       *evidence.)*

19   BY MS. HURST:

20   Q    36653, is that another example?

21   A    No, it's not.

22   Q    Okay.  My mistake.

23        How about 36656, is that an assortment pack "bill of

24   materials per item"?

25   A    Yes, it is.

1   Q    And again, would that be useful to someone who was

2   trying to analyze how many different units you had sold of

3   each of your different doll products?

4   A    It is.

5           MS. HURST:  Your Honor, move to admit 36656.

6           THE COURT:  Received.

7           (Defendants' Exhibit No. 36656 is received in

8       evidence.)

9   BY MS. HURST:

10  Q    36657, -58, -59, -60, -57 through -60, are those all

11  assortment pack component sheets as well?

12  A    Yes, they are.

13          MS. HURST:  Your Honor, move to admit?

14          THE COURT:  Received.

15          (Defendants' Exhibit Nos. 36657, 36658, 36659

16      and 36660 are received in evidence.)

17  BY MS. HURST:

18  Q    And -64, 36664, is that an assortment pack component

19  report, Mr. Larian?

20  A    What's the number again?

21  Q    36664.

22  A    Yes.

23  Q    All right.

24          MS. HURST:  Move to admit, your Honor?

25          THE COURT:  Received.

1           *(Defendants' Exhibit No. 36664 is received in*

2        *evidence.)*

3    BY MS. HURST:

4    Q    And 36665, is that another assortment pack bill of

5    materials?

6    A    It is.

7            MS. HURST:  Move to admit, your Honor?

8            THE COURT:  Received.

9            *(Defendants' Exhibit No. 36665 is received in*

10       *evidence.)*

11   BY MS. HURST:

12   Q    All right.  Last group, with my apologies to everyone.

13       Please take a look at 36654.

14   A    Go ahead.

15   Q    Is that a Bratz Formal Funk sell sheet?

16   A    It is.

17           MS. HURST:  Move to admit, your Honor?

18           THE COURT:  Is there a time period on it?

19           THE WITNESS:  It is after 2002.

20           MS. HURST:  Your Honor, Formal Funk was one of the

21   six dolls.

22           THE COURT:  Received.

23           THE WITNESS:  Actually, this is --

24           THE COURT:  I don't know the range.  I don't know

25   if it's 2002, a quarter or a year.

1          MS. HURST:  It's a sales sheet, so it generally

2     describes the product.

3          THE COURT:  Oh, my apologies.  Received.

4          MR. PRICE:  My objection, your Honor, is that MGA

5     produced --

6          THE COURT:  Thank you.  It's received.

7          *(Defendants' Exhibit No. 36654 is received in*

8        *evidence.)*

9     BY MS. HURST:

10    Q    36655, is that an Ooh La La sell sheet?

11    A    Yes, 2005.

12         MS. HURST:  Move to admit, your Honor?

13         THE COURT:  Received.

14         *(Defendants' Exhibit No. 36655 is received in*

15       *evidence.)*

16    BY MS. HURST:

17    Q    36661, is that another Ooh La La sell sheet?

18    A    Yes, it is, of a different product.

19         MS. HURST:  Move to admit, your Honor.

20         THE COURT:  Received.

21         *(Defendants' Exhibit No. 36661 is received in*

22       *evidence.)*

23    BY MS. HURST:

24    Q    36662, is that an Ooh La La product information form?

25    A    Yes.

```
 1              MS. HURST:  Move to admit, your Honor?

 2              THE COURT:  Received.

 3              (Defendants' Exhibit No. 36662 is received in

 4       evidence.)

 5   BY MS. HURST:

 6   Q     And 36663, is that an Ooh La La product summary?

 7   A     It is.

 8              MS. HURST:  Move to admit?

 9              THE COURT:  Received.

10              (Defendants' Exhibit No. 36663 is received in

11       evidence.)

12   BY MS. HURST:

13   Q     Okay.  Please take a look at 31177.

14   A     Three -- I don't have it.

15         Go ahead.

16   Q     Do you recognize that as a sales by customer report for

17   2001?

18   A     Yes.

19   Q     And can you explain what a sales by customer report is?

20   A     Sure.  It's how much you sold to customers in one year,

21   both in quantity and in dolls.

22   Q     And who were the customers in this context?

23   A     Retailers, Ames Department Store, Shopko, Walmart,

24   Sams -- I mean, do you want me to read the whole thing?

25   Q     No.  Just give us some examples.
```

1        Is Kohl's one of your customers?

2    A    Yes, they are.

3    Q    They were in 2001?

4    A    They were.

5            MS. HURST:  Move to admit 31177, your Honor?

6            MR. PRICE:  Objection.  No foundation for this

7    one, your Honor.

8            THE COURT:  Received.

9            Oh, just a moment.

10           2001, received.

11           (Defendants' Exhibit No. 31177 is received in

12    evidence.)

13   BY MS. HURST:

14   Q    All right.  Please take a look at 31178.

15   A    Yes.

16   Q    And is that a 2002 MGA sales by customer report?

17   A    It is.

18           MS. HURST:  Move to admit, your Honor?

19           THE COURT:  Received.

20           (Defendants' Exhibit No. 31178 is received in

21    evidence.)

22   BY MS. HURST:

23   Q    And 31179, is that a 2003 MGA sales by customer?

24   A    It is.

25           MS. HURST:  Move to admit?

1           THE COURT:  Received.

2           (Defendants' Exhibit No. 31179 is received in

3      evidence.)

4  BY MS. HURST:

5  Q    31180, is that a 2004 MGA sales by customer?

6  A    It is.

7           MS. HURST:  Move to admit?

8           THE COURT:  Received.

9           (Defendants' Exhibit No. 31180 is received in

10     evidence.)

11 BY MS. HURST:

12 Q    And if you look at -81, -82, -83 and -84, are those the

13 2005 through 2008 sales by customer reports?

14 A    Yes, they are.

15          MS. HURST:  I move to admit, your Honor?

16          THE COURT:  Each of those are received.

17          (Defendants' Exhibit Nos. 31181 through 31184

18     are received in evidence.)

19 BY MS. HURST:

20 Q    Now, prior to 2005, did you do business with the

21 department store Kohl's?

22 A    We did.

23 Q    And would you just describe Kohl's, like what kind of a

24 retailer are they?

25 A    They are -- they are a specialty store.  They sell

1    clothing, they sell toys.  It's a chain based out of the

2    Midwest, and they have stores all over the country,

3    including California.

4    Q    Were they a good customer?

5    A    Very good customer.  They have over 100 stores.

6    Q    What types of products did they buy?

7    A    I just mentioned that.  They bought toys, clothing,

8    shoes.  That's what they buy and that's what they sell.

9    Q    Did you, based on the sales by customer reports, have

10   prepared a chart of your sales to Kohl's over the course of

11   your relationship with that company?

12   A    I have.

13   Q    Would you please take a look at 36738.

14            THE COURT:  And just one moment, Counsel.

15            Ladies and gentlemen, it won't be a distraction,

16   but I'm going to start the movement of some prisoners up for

17   a later evening session, so the marshals will be bringing up

18   some people.  That's not meant to distract you, but I need

19   to bring some people up.

20            So I'll just ask you to give me those chairs back

21   for just a moment.  You can leave the product there.  They

22   won't care.

23            I'll need three chairs, probably.  Nancy, have

24   them be seated quietly.

25            And Counsel, my apologies.

1           MS. HURST:  Thank you, your Honor.

2    BY MS. HURST:

3    Q    Have you found 36738, Mr. Larian?

4    A    I have.

5    Q    And is that the summary chart of the sales to Kohl's

6    that you identified and have prepared using the sales by

7    customer reports?

8    A    Yes, I did.

9           MS. HURST:  Your Honor, move to admit 36738.

10          MR. PRICE:  Objection.

11          THE COURT:  Just one moment.

12          I'm sorry, Mr. Price?

13          MR. PRICE:  Objection.  It's a demonstrative and

14   inappropriate summary.

15          THE COURT:  I haven't looked at this.  I'm not

16   sure.  Is this --

17          MS. HURST:  Your Honor, it's in the binders, I

18   believe.

19          THE COURT:  Well, I've seen 60,000 exhibits,

20   Counsel.  I'm sorry, show it to me.

21          MS. HURST:  We are handing it up, your Honor.

22          THE COURT:  Now, did this -- did you -- who made

23   this?

24          THE WITNESS:  I had it made, your Honor.

25          THE COURT:  Okay.  You had it made.

 1              Sustained.

 2              MS. HURST:  Your Honor, may we display it without

 3     admitting it?

 4              THE COURT:  Certainly.

 5              MS. HURST:  Okay.  Thank you.

 6              THE COURT:  You can use the demonstrative, but

 7     it's not a record.  We switched, now, from records to

 8     apparently a demonstrative, here.

 9              MS. HURST:  All right.

10     BY MS. HURST:

11     Q    Is this the summary of your sales to Kohl's over the

12     time period 2002 to 2009?

13     A    It is.

14     Q    So your business with Kohl's was growing for the three

15     years, 2002 to 2004; is that right?

16     A    They were.

17     Q    And then what happened?

18     A    All of a sudden, they didn't buy our product in 2005

19     and 2006, and those two years were -- we had some of the

20     most innovative best products ever.

21              MR. PRICE:  Object to the latter part of the

22     answer as nonresponsive.

23              THE COURT:  Overruled.

24     BY MS. HURST:

25     Q    What were some of your innovative best products ever in

1    2005, 2006?

2    A    Some of the best Bratz products that we had were in

3    those two years.

4    Q    And Kohl's didn't buy any?

5    A    They didn't.

6    Q    Did they give you any explanation?

7    A    They did not.

8    Q    Did you have any falling out with them?

9    A    We did not.

10   Q    Did they complain to you that you had done anything

11   wrong?

12   A    Never did.

13   Q    I --

14   A    I was just shocked.

15   Q    Did they complain about the products?

16   A    They did not.

17   Q    Did they complain about your prices?

18   A    They did not.

19   Q    Since you've been in this litigation, have you found an

20   explanation for what happened to Kohl's?

21        MR. PRICE:  Objection.  Inappropriate question,

22   asking to --

23        THE COURT:  "Since this litigation," sustained.

24        If you've got e-mails, et cetera, I think those

25   have been received, Counsel.  That's for argument.

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 164 of 170   Page ID #:313133
CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

164

1   BY MS. HURST:

2   Q    Have you seen documents in your capacity as a 30(b)(6)

3   witness that, in your belief, explained this sudden drop in

4   sales to Kohl's?

5   A    I have.

6            MR. PRICE:  Objection.  You can't be your own

7   30(b)(6) witness.

8            MS. HURST:  Your Honor, that's the one-way ratchet

9   rule that the Court had previously ruled upon.

10           THE COURT:  Yeah, just a moment.

11           I'm thinking.  I'll be right with you.

12           MS. HURST:  Your Honor, we are going to bring

13  Mr. Stockton to authenticate the e-mail as the basis for

14  this.

15           THE COURT:  Have I received the e-mail subject to

16  the representation that he would be coming in?

17           Do you remember, Mr. Price?  Help me.

18           MR. PRICE:  I don't believe there's been a

19  witness.

20           THE COURT:  Well, no, there hasn't been a witness

21  yet.  I don't know if that e-mail was received subject to --

22           MR. PRICE:  No.

23           *(Discussion held off the record.)*

24           THE COURT:  Can we continue on in another area and

25  come back to this?

Case 2:04-cv-09049-DOC-RNB   Document 10285   Filed 03/28/11   Page 165 of 170   Page ID
#:313134
CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

165

```
 1          MS. HURST:  This is our finish, your Honor, so we
 2   are going to print it out and make sure everybody has a copy
 3   and see if the Court wants to --
 4          THE COURT:  All right.  So it's subject to a
 5   motion to strike.  I'll take the testimony.  That way we can
 6   move on to cross-examination, and if it's an inappropriate
 7   ruling by the Court, I can strike it because you have
 8   perfect memories so you'll know when to strike it, don't
 9   you, ladies and gentlemen of the jury?
10              (No audible response.)
11          THE COURT:  All right, Counsel, ask the question.
12          MS. HURST:  All right.  Please display
13   Exhibit 26612.
14          THE COURT:  Now, as a representation, you'll have
15   a witness coming in concerning this?
16          MS. HURST:  Yes, Mr. Vollero is -- has been
17   identified and has been requested to attend, your Honor.
18          MR. PRICE:  Objection.  This is an internal Mattel
19   document he's going to comment on.
20   BY MS. HURST:
21   Q    Do you see Mr. Vollero's on the cc line?
22          MS. HURST:  And your Honor, this was also
23   forwarded to Mr. Stockton, who we also intend to call on the
24   subsequent --
25              THE COURT:  Well, I'll take it subject to a motion
```

1    to strike.

2            MS. HURST:  Thank you, your Honor.

3    BY MS. HURST:

4    Q    All right.  Mr. Larian, this is one of the documents

5    that you've reviewed in connection with your 30(b)(6)

6    deposition; is that right?

7    A    Yes.

8    Q    And Mitt Zablow, have you heard of him before?

9    A    I know him.

10   Q    You've met him, right?

11   A    I have.

12   Q    Who is he?

13   A    He was executive vice president of sales for Mattel for

14   many, many years.

15   Q    And Jerry Cleary, do you know him?

16   A    Yes.

17   Q    You met him, too?

18   A    I know him for many years.

19   Q    And who is he?

20   A    He became at one time Mitt Zablow's boss.

21   Q    Also sales at Mattel?

22   A    Yes, reporting to Mr. Eckert.

23   Q    Okay.  And this e-mail says -- the subject is "Kohl's,

24   great news Barbie," right?

25   A    Yes.

1   Q    "Kohl's has agreed to the following," and then it says,

2   "Double Barbie's retail space to 8 feet for a minimum of two

3   years," right?

4   A    Yes.

5   Q    And then it says, "The competitor will not be

6   represented in their toy department for two years"; do you

7   see that?

8   A    Yes.

9   Q    "Not be represented" in all caps, right?

10  A    Yes.

11  Q    Now, what's the date on this e-mail, Mr. Larian?

12           THE COURT:  Just a moment.  Let's take this down

13  for just a moment.  Now I understand what this is.

14           Are you asking Mr. Larian to comment on this as a

15  cause or a reason for Kohl's stoppage?

16           MS. HURST:  Yes.

17           THE COURT:  Now, just a moment.

18           Who do you represent will be coming into court to

19  lay the foundation for this document?

20           MS. HURST:  Mr. Vollero and --

21           THE COURT:  Just a minute.  Just a minute.  Just a

22  minute.  Very slowly, now.

23           MS. HURST:  Drew Vollero.

24           THE COURT:  Okay.  And when will he be coming?

25           MS. HURST:  Well, tomorrow.

1          THE COURT:  Tomorrow?

2          Who is he employed by?

3          MS. HURST:  Mattel.

4          THE COURT:  Is there any disagreement that he's

5     been subpoenaed and he's going to be here?

6          MR. ZELLER:  He's going to be here.  Obviously, we

7     don't agree with what's being said, but he will be here

8     tomorrow.

9          THE COURT:  Well, what I can do is if there is any

10    disagreement, I can simply take the recess.  It's a logical

11    breaking time if you are almost done with your direct, and

12    we can start with this tomorrow and have Mr. Vollero down

13    first thing to authenticate this document, so there is no

14    mistake by the Court and then continue on.  Plus, I want to

15    discuss this 30(b)(6) issue that we have, and I want to see

16    the designation, of course.

17         MS. HURST:  Your Honor, I understand there is no

18    objection to admitting and reading the e-mail.

19         THE COURT: All right.  Well, then let's continue

20    on, but let me just take it subject to a motion to strike in

21    case I'm making a mistake.  That way we give continuity to

22    it and make sure Mr. Vollero is present tomorrow, but I've

23    accepted counsel's representations on both sides.

24         All right.  Please continue.  You can put the

25    e-mail back up.

1          MS. HURST:  Thank you, your Honor.

2          *(Live reporter switch with Maria Dellaneve.)*

3                          -oOo-

-oOo-

**CERTIFICATE**

        I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  March 25, 2011

_____

JANE C.S. RULE, U.S. COURT REPORTER
CSR NO. 9316