UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

- - - - - - -

# CERTIFIED TRANSCRIPT

MATTEL, INC., et al.,          )
                               )
                Plaintiffs,    )
                               )
        vs.                    )
                               )
MGA ENTERTAINMENT, INC., et al., ) No. CV 04-9049-DOC (RNBx)
                               )    Day 40
                               )    Volume 2 of 2
                Defendants.    )
_____)


REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
SANTA ANA, CALIFORNIA
FRIDAY, MARCH 25, 2011

Denise Paddock, CSR 10199, CMRS, RMR, CRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
transcripts@ocrecord.com www.ocrecord.com
032511 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 40 V2
03/25/2011

1    APPEARANCES OF COUNSEL:

2    FOR PLAINTIFF MATTEL, INC., ET AL.:

3            QUINN EMANUEL URQUHART & SULLIVAN LLP
             BY: JOHN QUINN
4                WILLIAM PRICE
                 MICHAEL T ZELLER
5                Attorneys at Law
             865 S Figueroa Street, 10th Floor
6            Los Angeles, CA 90017-2543
             213-443-3000

7
     FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:
8
             ORRICK HERRINGTON & SUTCLIFFE LLP
9            BY: THOMAS S McCONVILLE
                 Attorney at Law
10           4 Park Plaza, Suite 1600
             Irvine, CA 92614
11           949-567-6700

12           - AND -

13           ORRICK HERRINGTON & SUTCLIFFE LLP
             BY: ANNETTE L HURST
14               Attorney at Law
             405 Howard Street
15           San Francisco, CA 94105
             415-773-5700

16
             KELLER RACKAUCKAS LLP
17           BY:  JENNIFER L KELLER
                  Attorney at Law
18           18500 Von Karman Avenue, Suite 560
             Irvine, CA 92612
19           949-476-8700

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

 1   **APPEARANCES OF COUNSEL (Continued):**

 2

 3

 4     FOR CARLOS GUSTAVO MACHADO GOMEZ:

 5             LAW OFFICES OF MARK E OVERLAND
               BY: Mark E Overland
 6                 Attorney at Law
               100 Wilshire Boulevard, Suite 950
 7             Santa Monica, CA 90401
               310-459-2830
 8
               -AND-
 9
               SCHEPER KIM AND HARRIS LLP
10             BY: ALEXANDER H COTE
                   Attorney at Law
11             601 West Fifth Street, 12th Floor
               Los Angeles, CA 90071-2025
12             213-613-4655

13             ALSO PRESENT:

14             MGA ENTERTAINMENT, INC.
               BY: JEANINE PISONI
15                 Attorney at Law
               16360 Roscoe Boulevard, Suite 105
16             Van Nuys, California 91406

17

18   ALSO PRESENT:

19             KEN KOTARSKI, Mattel Technical Operator

20             MIKE STOVALL, MGA Technical Operator

21

22

23

24

25

UNITED STATES DISTRICT COURT

## CHRONOLOGICAL INDEX

032511 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 40 V2
CV 04-9049 DOC

**WITNESS:**                                                          **PAGE:**

**ISAAC LARIAN**
REDIRECT EXAMINATION RESUMED
BY MS. HURST............................................      5
RECROSS-EXAMINATION RESUMED
BY MS. HURST............................................     60
RECROSS-EXAMINATION
BY MR. PRICE............................................     66


**PROCEEDINGS:**
Open court - jury present..............................      5
Open court - jury not present..........................     39
Recess taken...........................................     40
Open court - jury not present..........................     40
Recess taken...........................................     57
Open court - jury not present..........................     57
Open court - jury present..............................     60
Open court - jury not present..........................     96
Recess taken...........................................     96
Adjournment............................................     97


**EXHIBIT(S) RECEIVED INTO EVIDENCE:**

 9340 and 9339              ...........................     72

Video recording 9489
played off the record      ...........................     27

 9869                      ...........................     35

 16941, 942, 943, and 944  ...........................     62

 24337A                    ...........................     16

 24348                     ...........................     17

 24359                     ...........................     23

 24790                     ...........................     94

 36112                     ...........................     12

 367123                    ...........................     12

CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

5

|     |                                                           |
| --- | --------------------------------------------------------- |
| 1   | SANTA ANA, CALIFORNIA; FRIDAY, MARCH 25, 2011             |
| 2   | Day 40, Volume 2 of 2                                     |
| 3   | P.M. SESSION.                                             |
| 4   | (Open court - jury present.)                             |
| 12:47 5 | THE COURT:  We're back in session.                   |
| 6   | The jury's present, alternates, all counsel, the        |
| 7   | parties, and Ms. Hurst on redirect, Mr. Larian.          |
| 8   | MS. HURST:  Thank you, Your Honor.                       |
| 9   | **ISAAC LARIAN,**                                         |
| 12:47 10 | witness, called by Defendant(s), previously sworn   |
| 11  | **REDIRECT EXAMINATION RESUMED**                          |
| 12  | BY MS. HURST:                                             |
| 13  | Q.  Can we please show the witness Exhibit 9875, which was |
| 14  | just admitted.                                            |
| 12:48 15 | A.  Yes.                                             |
| 16  | Q.  And that was an e-mail to you from Ms. Kuemmerle; right? |
| 17  | A.  Yes, it was.                                          |
| 18  | Q.  And Ms. Kuemmerle is a bit excited in her e-mail?    |
| 19  | Is that true?                                            |
| 12:48 20 | A.  Yes.                                             |
| 21  | Q.  She says "I knew you were going to go ape" --        |
| 22  | Okay.                                                    |
| 23  | THE COURT:  Oh, you don't have to dress it up,           |
| 24  | Counsel.                                                 |
| 12:48 25 | (Laughter.)                                          |

UNITED STATES DISTRICT COURT

1    Q.    BY MS. HURST:   -- "ape shit"; right?

2    A.    Yes.

3    Q.    Now, what was this about?

4    A.    This is in Brazil we had a competitor by the name of

12:49 5    Estrella.

6          They had knocked off Bratz completely and she was

7    in Brazil, in Sao Paulo, Brazil, in their showroom, which in

8    Brazil it is open, and now she was taking pictures of the

9    Bratz knockoffs.

12:49 10   Q.    And she then says she talks to her dad, a lawyer, about

11   it; right?

12   A.    Yes.

13   Q.    And register --

14   A.    He suggests registration.

12:49 15   Q.    Okay.  And then what did you do?

16   A.    I immediately instructed our lawyers to file for

17   copyright and trademark registration in Brazil so we can take

18   action against Estrella.

19   Q.    Okay.  So let's look up the page in the thread there.

12:49 20         So you forwarded your e-mail -- you responded to

21   Ms. Kuemmerle; right?

22   A.    Yes.

23   Q.    And then you copied Julie Mote; right?

24   A.    Yes, she was our in-house counsel.

12:50 25   Q.    And Beth Cahill was your paralegal; right?

1    A.    Yes.

2    Q.    And what did you say?

3    A.    "Let's register this now and move."

4    Q.    And then there's that reference, you said it was

12:50  5    Estrella?

6    A.    Yes.  And I am asking Gulliver, who was our distributor,

7    to help.  Gulliver was our official distributor in Brazil.

8    Q.    And there's the reference to the Estrella people because

9    you were concerned because you thought they were knocking you

12:50 10    off?  Is that right?

11    A.    Susana used to say that the Estrella people are her

12    friends, so I am just being a little bit sarcastic when I say

13    I thought you said they were your friends.

14    Q.    All right.  So as a result of this communication from

12:50 15    Ms. Kuemmerle regarding a knockoff product, you suggested the

16    registration of Bratz copyrights and trademarks in Brazil?

17        Is that right?

18    A.    I did.

19    Q.    Let me ask you to take a look at Exhibit 16941, 16942,

12:51 20    16943 and 16944.

21    A.    Yes.

22    Q.    Do you see those?

23    A.    I do.

24    Q.    And are those the certificates of copyright registration

12:51 25    that were maintained in MGA's files that you directed to be

```
 1    registered in response to that e-mail that we just showed

 2    that was admitted by Mattel?

 3    A.    Yes, yes.

 4           MR. PRICE:  Your Honor, I object.  There has been a

 5    previous ruling on these.

 6           THE COURT:  Yeah, this is a difficult one because

 7    previously I had made a ruling on that, but the problem is

 8    that this e-mail now has come in that I've allowed, which is

 9    9875, so just a moment.

10           (Pause in the proceedings.)

11           MR. PRICE:  We can take this up -- this is not

12    even -- well --

13           THE COURT:  Yeah.

14           MR. PRICE:  We ask for the opportunity to talk to

15    you about it.

16           It's not relevant.

17           THE COURT:  I agree.

18           MS. HURST:  Your Honor, this does show that this

19    was all for --

20           THE COURT:  That's all, Counsel.

21           Thank you very much.

22           (Pause in the proceedings.)

23           THE COURT:  Just a minute.

24           (Pause in the proceedings.)

25           THE COURT:  I had sustained -- well, I had --
```

12:51 5
12:52 10
12:52 15
12:52 20
12:53 25

CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

9

| | |
|---|---|
| 1 | Just a moment, Ladies and Gentlemen. |
| 2 | My apologies. |
| 3 | (Pause in the proceedings.) |
| 4 | MR. PRICE:  Your Honor, if it's redacted -- |
| 12:53  5 | THE COURT:  If it's redacted it's not going to be |
| 6 | an issue. |
| 7 | MR. PRICE:  If it's redacted -- |
| 8 | THE COURT:  Yeah, it won't be an issue at all, |
| 9 | Counsel. |
| 12:53 10 | This portion, I don't think, is a problem, |
| 11 | obviously, so why don't you two just have a conversation |
| 12 | privately. |
| 13 | It's very easy. |
| 14 | I'm trying to keep the lawsuit confined to the |
| 12:53 15 | relevant portions, Ladies and Gentlemen, that I think that |
| 16 | you should be considering. |
| 17 | MR. PRICE:  Your Honor, there -- she won't redact, |
| 18 | so -- |
| 19 | THE COURT:  We'll take it down, then, and we'll |
| 12:53 20 | come back to it in awhile. |
| 21 | MS. HURST:  Are you talking about the e-mail or the |
| 22 | registration? |
| 23 | THE COURT:  You two have a private conversation. |
| 24 | We don't need to enjoy your company right now. |
| 12:54 25 | You two talk. |

UNITED STATES DISTRICT COURT

```
 1              (Pause in the proceedings.)

 2              MS. HURST:  Your Honor, I'm going to offer the four

 3      exhibits in accordance with the instruction made in the

 4      e-mail.

12:54 5          THE COURT:  All right.  Not at this time.

 6              I won't receive them at this time until a further

 7      discussion takes place out of the presence of the jury.

 8      Q.  BY MS. HURST:  Mr. Larian, did you, in fact -- and you

 9      did, in fact, instruct the lawyers to file registration;

12:54 10     right?

 11     A.  I did.

 12     Q.  And this was back in the 2002 time frame?

 13     A.  It was in January 26, 2002.

 14     Q.  Actually, let's look at that e-mail.

12:54 15         What's the date on the e-mail?

 16     A.  April 30, 2002.

 17     Q.  And were -- were the registrations --

 18     A.  I'm sorry.

 19     Q.  -- were the registrations -- do you have those four

12:55 20     registrations in front of you?

 21     A.  I apologize, September 2002.  That's when I registered;

 22     right.

 23     Q.  So the registrations were made in September 2002; is

 24     that correct?

12:55 25     A.  The final registration, yes.
```

UNITED STATES DISTRICT COURT

```
 1    Q.   And did your registrations disclose --

 2              MR. PRICE:  Objection, Your Honor.  She's going to

 3    try to bypass the court's --

 4              THE COURT:  Yeah, I'm going to move on to another

 5    subject.

 6              I really want to have a conversation with you

 7    outside the presence of the jury.  And until we have that

 8    conversation we're not going to go any further with this.

 9    Q.   BY MS. HURST:  Let me ask you this, Mr. Larian:  Were

10    you trying to conceal the identity of Carter Bryant --

11              MR. PRICE:  Objection.

12              THE COURT:  Sustained.

13              MR. PRICE:  Move to strike.

14              THE COURT:  Sustained; stricken.

15              (Pause in the proceedings.)

16    Q.   BY MS. HURST:  Prior to Mattel's use of a zipper bag on

17    Wee 3 Friends, had MGA ever used a vinyl zipper bag?

18    A.   Yes, we invented it.

19    Q.   Please take a look at Exhibit 36112 and 36723.

20    A.   Yes.

21    Q.   Are those both MGA products?

22    A.   They are.

23    Q.   And -- and what product is 36112?

24    A.   That's the Lil' Bratz, Chloe, Fashion Tote.

25    Q.   Fashion Tote?
```

```
 1    A.   Yes.

 2              MS. HURST:  Your Honor, move the admission of

 3    36112.

 4              (Exhibit(s) 36112, received.)

12:57 5          THE COURT:  Received.

 6    Q.   BY MS. HURST:  And 367123, what's that?

 7    A.   They were the Lil' Bratz Spring Break Shasha and they

 8    were introduced in 2002.

 9              MS. HURST:  And move the admission of that,

12:57 10   Your Honor.

 11             THE COURT:  Received.

 12             (Exhibit(s) 367123, received.)

 13   Q.   BY MS. HURST:  And when did Wee 3 Friends with its final

 14   bag come out?

12:57 15   A.   Can I see that, please.

 16   Q.   And what exhibit are you referring to, Mr. Larian?

 17   A.   It's Exhibit 24713, it's in 2004, three years later.

 18   Q.   So would it be fair to say that the vinyl zipper bag was

 19   a type of packaging known to MGA before Wee 3 Friends came on

12:57 20   the market?

 21   A.   We did it two years before.

 22   Q.   Mr. Larian, please take a look at Exhibit 36738.

 23             And was this the Kohl's sales summary that you

 24   prepared?

12:58 25   A.   Yes, yes.
```

1   Q.   And what were MGA's sales to Kohl's in 2002?

2   A.   $1,030,596.

3   Q.   And was that only Bratz products or was that other

4   products as well?

12:59 5   A.   It was everything.

6   Q.   And what were those sales to Kohl's in -- by MGA in

7   2003?

8   A.   $1,407,652.

9   Q.   And you came up with these numbers using your sales by

12:59 10   company by SCU report; right?

11   A.   I did.

12   Q.   And what were the sales by MGA in 2004?

13   A.   $5,089,159.

14   Q.   And what about 2005?

12:59 15   A.   It was $646,230.

16   Q.   And what about 2006?

17   A.   Zero.

18   Q.   Why don't we just finish this and then we'll look at

19   that other 2006 document.

13:00 20          2007 what were the sales to Kohl's?

21   A.   $7,823,781.

22   Q.   2008.

23   A.   $3,651,054.

24   Q.   2009?

13:00 25   A.   $1,100,560.

1    Q.    Now please take a look at Exhibit 24747.

2          Do you see that?

3    A.    Yes, I see it on the screen.  I can't read it.

4    Q.    I think she is going to get it for you.

13:00 5          And while we're finding the paper copy, Mike, can

6    you blow up the footer down in the lower right-hand corner,

7    please.

8          And do you see there is a name there in the lower

9    right-hand corner, Mr. Larian?

13:01 10   A.    Yes, I do.

11   Q.    R. Wiggins?

12   A.    Yes.

13   Q.    Who was that?

14   A.    He was a salesperson for Newell Rubbermaid.

13:01 15   Q.    Newell Rubbermaid?  That was the company you bought

16   Little Tikes from?

17   A.    That's the company, yes.

18   Q.    And when you integrated Little Tikes into MGA did you

19   acquire their books and records?

13:01 20   A.    Yes.

21   Q.    And did you put their sales data into your systems?

22   A.    At that time, yes.

23   Q.    And is this document a Little Tikes sales document?

24   A.    It is.

13:01 25   Q.    And did you complete your acquisition of Little Tikes

CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

1    after 2006?

2    A.    I think we did it in 2006, I believe, to the best of my

3    recollection.

4    Q.    All right. So when your MGA sales numbers there were

13:01 5    accurate? Is that right?

6    A.    That's right.

7    Q.    The ones on the summary chart?

8    A.    They're 100 percent accurate.

9    Q.    Are mark downs an issue that commonly comes up with your

13:02 10    retail customers?

11    A.    Everyday.

12    Q.    A lot of those e-mails that Mr. Price showed you from

13    Kohl's, did those even have your name on them?

14    A.    No.

13:02 15    Q.    That's because it was a markdown issue that wasn't even

16    significant enough to come to your attention; right?

17    A.    Some had my name on it, but that's correct.

18    Q.    Have you had markdown issues where Target's requested

19    markdowns you didn't want to give?

13:02 20    A.    Yes.

21    Q.    Have you had markdown issues where Wal-Mart's requested

22    markdowns you didn't want to give?

23    A.    Yes.

24    Q.    Toys"R"Us?

13:03 25    A.    Every retailer.

UNITED STATES DISTRICT COURT

1    Q.   Has any other retailer ever frozen you out of their

2    business completely for a two-year period of time?

3    A.   Never.

4    Q.   Mr. Price asked you to look at a Kohl's order

13:03 5   cancellation document.

6              Let me ask you to look at 24337A.

7              MR. PRICE:  What's the exhibit again?  24 --

8              MS. HURST:  24337A.

9    Q.   Does that include the attachment to the order

13:03 10  cancellation?

11   A.   It does.

12             MS. HURST:  Your Honor, move the admission of

13   24337A.

14             THE COURT:  Received.

13:03 15            (Exhibit(s) 24337A, received.)

16   Q.   BY MS. HURST:  Would you look at the second page of the

17   exhibit, Mr. Larian.

18   A.   Yes.

19   Q.   What's the total order amount of the total order

13:04 20  cancellation there?

21   A.   $78,261.12.

22   Q.   Do you consider a $78,000 order cancellation a serious

23   business issue affecting the relationship?

24   A.   It does not.

13:04 25  Q.   Please look at Exhibit 24348.

```
        1    A.   Yes.

        2    Q.   And please look at 24347 as well.

        3         Do you see both of those, Mr. Larian?

        4    A.   Yes.

13:05   5    Q.   At 24347, that's already in evidence.

        6         Mr. Price showed you that one; right?

        7    A.   Yes.

        8    Q.   And that was the one which ended with the email "they

        9    cherry pick our line," that e-mail that you wrote?

13:05  10    A.   Yes.

       11    Q.   Is that right?

       12         Now, does the e-mail thread continue into 24348?

       13    A.   It does.

       14         MS. HURST:  Your Honor, move to admit 24348.

13:06  15         THE COURT:  Received.

       16         (Exhibit(s) 24348, received.)

       17    Q.   BY MS. HURST:  Look on the second page of 24348.

       18         Is that the "they cherry pick our line" e-mail?

       19    A.   Yes.

13:06  20    Q.   And then what happens next?  What's in the next e-mail?

       21    You offer -- what's your offer there?

       22    A.   On the $550,000 at 10 percent, if they buy -- of 2005

       23    purchases.

       24    Q.   And did you think that was a good proposal?

13:06  25    A.   Yes.
```

1    Q.   And what was the response from Holly Chabot to

2    Mr. Brawer in the next e-mail?

3    A.   The buyer was pleased but now needs another credit for

4    6 percent agreed to prior to the situation for December

13:06  5  bottom line.

6         THE COURT:  Just a moment, Counsel.  I didn't --

7    just a minute.

8    Q.   BY MS. HURST:  Actually, I think you jumped ahead,

9    Mr. Larian.

13:07 10       Let's go down in the e-mail to December 20, 2004,

11   at 11:32 a.m. and that's Ms. Chabot's response regarding the

12   proposal for $550,000; right?

13   A.   Yes.

14   Q.   She says "thank you for your response!"  Right?

13:07 15  A.   Yes.

16   Q.   "I'll be working closely with the rep, we should have no

17   problem in securing 5.5 million in business for next year."

18        Right?

19   A.   Yes.

13:07 20  Q.   She thought that was a good deal and she thought she'd

21   have no problem in getting the business; right?

22   A.   Yes.

23   Q.   And then when Mr. Brawer inquired "what happened?"  In

24   the next e-mail; right?

13:07 25  A.   Yes.

| | |
|---|---|
| 1 | Q.   She reported that the buyer was pleased with the |
| 2 | proposal; right? |
| 3 | A.   The buyer -- yes. |
| 4 | Q.   The buyer was pleased with your proposal; right? |
| 13:07 5 | A.   Yes. |
| 6 | Q.   Now, that was on December 21st, 2004; right? |
| 7 | A.   Yes, two days later. |
| 8 | Q.   At that point in December the buyer is pleased with your |
| 9 | proposal; right? |
| 13:08 10 |       MR. PRICE:  I object.  I assume this wasn't offered |
| 11 | for the truth, but it's hearsay as to what the buyer said. |
| 12 |       THE COURT:  Once again, this is hearsay. |
| 13 |       It just shows the conduct of the parties concerning |
| 14 | this Kohl's issue. |
| 13:08 15 | Q.   BY MS. HURST:  And did Mr. Price show you this e-mail |
| 16 | with the buyer was pleased information phrase in it? |
| 17 |       MR. PRICE:  Objection as phrased, Your Honor. |
| 18 |       THE COURT:  Overruled. |
| 19 |       THE WITNESS:  He did not. |
| 13:08 20 |       He did not. |
| 21 | Q.   BY MS. HURST:  Okay.  Now, a number of the e-mails -- |
| 22 | well, let's look at 24357, please. |
| 23 | A.   Yes. |
| 24 | Q.   And this was one of the e-mails that you looked at -- |
| 13:09 25 | A.   Yes. |

1   Q.   -- with Mr. Price; is that right?

2   A.   I did.

3   Q.   And what's the date on that?

4   A.   November -- which one, the top?  Or the --

13:09 5   Q.   The bottom regarding the Kohl's/MGA relationship.

6   A.   November 2, 2005.

7   Q.   And what was -- do you remember what the date was on the

8   Mattel e-mail with saying good news, Barbie, the competitor

9   won't be represented in the toys department for two years?

13:09 10   A.   I don't remember.

11   Q.   Was that January 2005?

12   A.   Can you show it to me?  I don't remember.

13        (Pause in the proceedings.)

14        MS. HURST:  Please take a look at 26612.

13:10 15   A.   Yes, it's on the screen, I see it.

16   Q.   And the date on that is January 27, 2005; right?

17   A.   It is.

18   Q.   And -- so you worked all throughout 2005 to try to get

19   the business; right?

13:10 20   A.   We did.

21        MR. PRICE:  Objection; that's lack of foundation

22   that he even knows this.

23        THE COURT:  Overruled.

24   Q.   BY MS. HURST:  And at any point during that period of

13:10 25   time did Kohl's come and tell you, well, tough luck because

```
 1    we got a side deal over here with Mattel and we're not going

 2    to --

 3              THE COURT:  That's more argumentative, Counsel.

 4              That's argumentative.

13:10 5         Strike the question.

 6              Ask a question now.

 7    Q.   BY MS. HURST:  At any time during 2005 did Kohl's inform

 8    you that they had an exclusive relationship with Mattel and

 9    that they were no longer interested in your business?

13:10 10   A.   No.

 11   Q.   Mr. Larian -- have you ever heard of a "dollar buy-in"

 12   program?

 13   A.   I'm sorry?

 14   Q.   Have you ever heard of a "dollar buy-in" program or

13:11 15   "slotting fee"?

 16   A.   I have.

 17   Q.   And what do those terms mean?

 18   A.   You just basically give the retailer certain amount of

 19   fees to buy your product.

13:11 20   Q.   So basically it's like --

 21   A.   They give you -- they give a -- "slotting fee" stands

 22   for give me a shot on your shelf space.

 23   Q.   So basically it's like a bribe to take your product?

 24   A.   It is.

13:12 25             MR. PRICE:  Objection; this is argumentative.
```

UNITED STATES DISTRICT COURT

```
 1              Move to strike.
 2              THE COURT:  Just a moment, Counsel.
 3              Just a moment.
 4              (Pause in the proceedings.)
13:12  5        THE COURT:  Overruled.
 6  Q.   BY MS. HURST:  And would you --
 7              THE COURT:  Now, I'm not sure that that's a
 8  "bribe."
 9              That may be too harsh a word, but why don't we
13:12 10  strike "bribe" for a moment, Counsel, and you can go into
11  what a "slotting fee" is.
12  Q.   BY MS. HURST:  Are there sometimes payments made to
13  retailers to buy a spot on their shelves?
14  A.   We have never done that.
13:13 15  Q.   And have you heard of that being used in the industry?
16  A.   Yes.
17              MR. PRICE:  Objection; it asks for hearsay.
18              THE COURT:  Overruled.
19  Q.   BY MS. HURST:  In fact, if you take a look at 24359 --
13:13 20  A.   Okay.  I have it.
21              THE COURT:  Ladies and Gentlemen, I'm not quite
22  certain where we're going with this, but you need to
23  understand the industry, apparently, so we delve into a
24  little bit more of the industry.
13:13 25  Q.   BY MS. HURST:  -- I believe this is one of the e-mails
```

Case 2:04-cv-09049-DOC-RNB   Document 10289   Filed 03/28/11   Page 23 of 97   Page ID #:312605
CV 04-9049 DOC - 03/25/2011  Volume 2 of 2

23

| | |
|---|---|
| 1 | that Mr. Price showed you?  Is that right? |
| 2 | A.   I don't know if it is or not. |
| 3 | Q.   All right.  Take a look at that. |
| 4 | Do you see there an e-mail exchange between |
| 13:13 5 | John Dibattista and Ron Brawer of MGA? |
| 6 | A.   Yes. |
| 7 | Q.   And then they forwarded that to you and it's concerning |
| 8 | Kohl's; right? |
| 9 | A.   Yes. |
| 13:13 10 | MS. HURST:  Your Honor, move to admit 24359. |
| 11 | THE COURT:  Received. |
| 12 | (Exhibit(s) 24359, received.) |
| 13 | Q.   BY MS. HURST:  And do you see there in the e-mail on the |
| 14 | bottom of Page 1 that Mr. Dibattista is reporting on a |
| 13:14 15 | meeting -- or a call with Kohl's. |
| 16 | A.   Yes. |
| 17 | Q.   And this is at the end of 2006; right? |
| 18 | A.   2000 -- yes, December 15th, 2006. |
| 19 | Q.   And Mr. Dibattista reported "they did not ask for |
| 13:14 20 | slotting or shelf allowance -- it seems the past is in the |
| 21 | past"; right? |
| 22 | A.   Yes. |
| 23 | Q.   Now, would you compare that -- would you take a look at |
| 24 | 24358, please. |
| 13:14 25 | A.   Yes. |

```
 1    Q.   And this one's already in evidence.

 2              Would you look on the second page, please.

 3              And do you see there on the top there is a

 4    reference to a substantial increase in a dollar buy-in?

13:15  5    A.   Yes.

 6    Q.   So at about this time in 2005 was Kohl's demanding that

 7    you pay them to get a space on their shelf?

 8    A.   Yes.

 9    Q.   And did you consider that to be inappropriate and

13:15 10    unethical behavior?

11    A.   Yes.

12    Q.   How do you think Mattel got that exclusive?

13              MR. PRICE:  Objection; speculation.

14              THE COURT:  Sustained.

13:15 15    Q.   BY MS. HURST:  Did anybody from Kohl's ever tell you,

16    well, we got the slotting fee from Mattel so we're going to

17    freeze you out?

18              MR. PRICE:  Objection; that was not in good faith.

19              THE COURT:  I'm sorry?

13:16 20              MR. PRICE:  Objection; not in good faith.

21              THE COURT:  Sustained; strike the question.

22    Q.   BY MS. HURST:  Please refer to Exhibit 7907.

23              THE WITNESS:  Can you make that bigger.  I can't

24    see it.

13:17 25    Q.   BY MS. HURST:  And is that one of the -- the e-mails
```

 1    that you sent directing somebody to purchase a product to

 2    look at?

 3    A.    Yes.

 4    Q.    And where were you directing them to get the product

13:17  5    from?

 6    A.    Retail store Toys"R"Us.

 7    Q.    So when you asked people to match the Swappin Styles

 8    look, you were basing that on styles that were already on the

 9    shelves at retail; right?

13:18 10    A.    I believe so, yes.

11    Q.    Not product seen only at that point in a showroom;

12    right?

13    A.    That's correct.

14    Q.    Please take a look at Exhibit 1321.

13:19 15          Now, was this the e-mail from your daughter

16    critiquing the western theme?

17    A.    Yes, it is.

18    Q.    And your answer was let's look at the competition and

19    see if we can do better; right?

13:19 20    A.    Yes.

21    Q.    Now, when was this e-mail?

22    A.    2004.

23    Q.    December 2004?

24    A.    Yes.

13:19 25    Q.    Was -- were e-mails or conversations with your daughter,

UNITED STATES DISTRICT COURT

        1    Yasmin, about the product a common occurrence?

        2    A.    Everyday.

        3    Q.    She -- and how -- over what period of time did you ask

        4    for feedback from Yasmin?

13:19   5    A.    Since she was six, seven, eight years old.

        6    Q.    And you remember -- it's been several weeks now -- you

        7    were asked a series of questions about press articles where

        8    you had said that your children inspired you for Bratz?

        9          Do you remember that?

13:19  10    A.    Yes.

       11    Q.    And is this an example of what you were talking about in

       12    those press articles when you said your children had inspired

       13    you in the creation of Bratz?

       14    A.    Yes.

13:20  15    Q.    So when you talked to the Wall Street Journal and

       16    Business Week and others about your children inspiring you in

       17    the creation of products, this is the kind of thing you

       18    meant; right?

       19    A.    This is one example, yes.

13:20  20    Q.    And it was a frequent -- you had your own focus group

       21    there at home; right?

       22    A.    I had three of my own and then about -- we are blessed

       23    with 27 nieces and nephews and growing.

       24    Q.    So was it the absolute truth when you told those

13:20  25    reporters that the creation of Bratz was inspired by your

UNITED STATES DISTRICT COURT

1    family members?

2    A.   Partly inspired by my family.  Partly.

3         MS. HURST:  Your Honor, we have some video clips

4    from 9489 which we admitted yesterday which Mr. Larian has

13:21 5   reviewed and we would like to play.

6         THE COURT:  You may.

7         MS. HURST:  Thank you.

8         (Video recording 9489 played off the record, per

9    order of the court and stipulation of counsel and transcribed

13:21 10  herein.)

11   Q.   BY MS. HURST:  Were those some of the clips that you

12   viewed in the 1999 video of the Mattel toy fair competitive

13   review?

14   A.   Yes.  This was the presentation after toy fair they had

13:25 15  made to Mattel executives.

16   Q.   And you could see there the people sitting in the

17   audience viewing the presentation?

18   A.   Yes.

19   Q.   Hear them asking questions?

13:25 20  A.   Yes.

21   Q.   And there was even a question and an answer about how if

22   you speed up with the ribbon the music plays faster and if

23   you slow down it plays slower?

24   A.   Yes.

13:26 25  Q.   Is that the kind of thing you're talking about when you

CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

1    say that having that knowledge of the product before it's on

2    the shelf is incredibly valuable?

3    A.   Yes.

4    Q.   Now, you -- did you attend the deposition of

13:26 5    Sharon Rahimi in this case?

6    A.   I did.  I did.

7    Q.   And did you recognize that that was Sharon Rahimi on

8    that video?

9    A.   Yeah, that was the lady that was talking.

13:26 10   Q.   That was her?

11   A.   Yes, she was.

12   Q.   Please take a look at Exhibit 24748.

13   A.   Yes.

14   Q.   And was that the org chart from Mattel Germany -- or

13:27 15   pardon me -- MGA Germany that Mr. Price showed you?

16   A.   It is.

17   Q.   Is there a bio for Thomas Pfau, your managing director

18   there?

19   A.   Yes, it is.

13:27 20   Q.   Is that on the second page?

21   A.   Page 3.

22   Q.   Could you take a look at that, please.

23        Where did Mr. Pfau work before he came to MGA in

24   Germany?

13:28 25   A.   Mattel.

1    Q.    Mattel in Germany?

2    A.    Yes.

3    Q.    Are there other employees at MGA in Germany who worked

4    at Mattel in Germany before they came over to MGA?

13:28 5    A.    Yes.

6    Q.    Who else?

7    A.    There were a few of them.

8          Angelika was one of them.  I don't remember all of

9    them.  But Angelika for sure.  There were a few of them.

13:28 10   Q.    Angelika was 15 years with Mattel Germany before coming

11   over to MGA?

12   A.    Yes.

13   Q.    Please take a look at Exhibit 9533.

14          And is that the "M" --

13:29 15          I'm sorry.  That's the wrong one.

16          Please take a look at 9854.  I apologize.

17   A.    Yes.

18   Q.    Was that the "M" booth report?

19   A.    Yes.

13:29 20   Q.    And remind us again who that was from.  Who wrote -- who

21   sent that to you?

22   A.    Angelika.

23   Q.    And she was the woman who had worked at Mattel for

24   15 years before coming over?

13:29 25   A.    That's correct.

UNITED STATES DISTRICT COURT

          1    Q.   And she copied it to, among other people, Thomas Pfau?

          2    Is that right?

          3    A.   She did.

          4    Q.   He had also worked at Mattel Germany before coming over?

13:29     5    A.   Yes.

          6    Q.   Have you investigated since your deposition how this

          7    report came.

          8              About?

          9    A.   I have.

13:29    10    Q.   And what did you learn?

         11    A.   I called --

         12              MR. PRICE:  Objection; hearsay.

         13              THE COURT:  I'm going to sustain that, Counsel.

         14              MS. HURST:  Your Honor, he was asked in a 30(b)(6)

13:29    15    capacity.

         16              MR. PRICE:  After his deposition.

         17              THE COURT:  After his deposition now.

         18              That's the problem.  Now we're in trial.

         19              I'm going to sustain the objection.

13:30    20              Now, if you have evidence of this up to the time

         21    and including the -- the deposition itself, that's

         22    appropriate, but after the deposition to the point of trial

         23    it's not.

         24              (Pause in the proceedings.)

13:30    25    Q.   BY MS. HURST:  Were there a lot of people at MGA Germany

                              UNITED STATES DISTRICT COURT

```
 1    that had previously worked at Mattel Germany?

 2    A.    Yes.

 3    Q.    And did they maintain friendly relationships with their

 4    colleagues?

 5    A.    Yes, they did.

 6              MR. PRICE:  Objection; lack of foundation.

 7              THE COURT:  Sustained.

 8              Generally speaking, it's too broad, Counsel.

 9              Sustain; I'll strike the answer and reask the

10    question.

11    Q.    BY MS. HURST:  What's the atmosphere at the

12    Nuremberg Toy Fair?

13              THE COURT:  Around Oktoberfest?

14              (Laughter.)

15              MS. HURST:  Actually, it's February, Your Honor.

16              The "10" is the European convention, so I

17    believe --

18    Q.    Is that right, it's in February?

19              Is that right, Mr. Larian?

20    A.    It is right, it's in February.

21    Q.    But is it like Oktoberfest, anyway?

22    A.    No, Oktoberfest is much more lively.  You get more beer

23    than you get at Nuremberg Toy Show.

24    Q.    Is there beer at the Nuremberg Toy Show?

25    A.    There is.  It's in Germany.
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  I think we're going to move on, though.

 2              I think the impression is a bunch of drunk people

 3      sitting around and talking.  Let's not go there.

 4              Let's move on and we'll strike the question and

13:31  5      answer; okay.

 6              (Laughter.)

 7      Q.   BY MS. HURST:  Mr. Larian, please take a look at

 8      Exhibit 9869.

 9      A.   Yes.

13:32 10             No, I don't have 9869.  I have 9860.

11              MS. HURST:  I think I handed mine to the court

12      during recess.

13              THE COURT:  Just a moment.

14              Here, Counsel.

13:32 15             It might be down on the front shelf, if you did.

16              I don't see it.

17              (Discussion held off the record.)

18              MS. HURST:  I'll move on to something else and come

19      back to that.

13:33 20     Q.   All right.  Mr. Larian, there were two documents, 9339

21      and 9340?

22      A.   Yes.

23      Q.   And those -- Mr. Price asked you about those.

24              Those were Mattel documents that were produced from

13:33 25     MGA's files.
```

UNITED STATES DISTRICT COURT

1              Is that right?

2    A.   That's correct.

3    Q.   And what are the dates on those documents?

4    A.   I'm sorry.  I can't find the date.

13:33 5    Q.   On 9339, would you take a look at the second page.

6    A.   2002, yes.

7    Q.   That's a 2002 document?

8    A.   Yes.

9    Q.   And what about 9340?

13:34 10   A.   2000.

11   Q.   So 2000 for 9340 and 2002 for 9339?

12   A.   That's right.

13   Q.   How did it come to be the case that those Mattel

14   documents were produced with MGA Bates numbers on them?

13:34 15        MR. PRICE:  I object to lack of foundation; calls

16   for speculation.

17        THE COURT:  Are these the documents we discussed

18   during the recess?

19        MS. HURST:  Yes.

13:34 20        THE COURT:  Overruled.

21        THE WITNESS:  There was a discovery in this case.

22   We directed our attorneys and employees to look for these

23   documents, for any document, any document that relates to

24   Mattel in this case, in boxes of ex-Mattel employees who

13:34 25   worked at MGA, these documents were found.

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

34

```
 1    Q.   BY MS. HURST:  And do you think they should have had
 2    those documents?
 3    A.   No, they should not have brought -- I don't know if they
 4    should have had it or not.  They should not have brought it
 5    to MGA.
 6    Q.   There's pricing information in those documents?
 7         Is that right?
 8    A.   There are.
 9    Q.   And you consider that pricing information to be
10    confidential; right?
11    A.   Yes.
12    Q.   And have you ever looked at or used those documents in
13    any way?
14    A.   No.
15    Q.   We've got 9869, now.
16         (Pause in the proceedings.)
17         THE WITNESS:  Go ahead.
18    Q.   BY MS. HURST:  Do you recognize 9869 as a Mattel e-mail
19    that you looked at in preparation to testify as a 30(b)(6)
20    witness in this matter?
21    A.   Yes.
22    Q.   And it's an e-mail from David Allmark to Brian Stockton
23    and Jerome Bossick forwarding an e-mail from other Mattel
24    employees?  Is that right?
25    A.   Yes.
```

13:35 5
13:35 10
13:35 15
13:36 20
13:36 25

UNITED STATES DISTRICT COURT

1          MS. HURST:  Your Honor, move to admit conditionally

2     9869.

3          THE COURT:  This is the e-mail we discussed on the

4     representation that there would be a witness next week?

13:36  5          MS. HURST:  Yes, Your Honor.

6          THE COURT:  All right.  I'll receive this

7     conditionally.

8          MR. PRICE:  And for the record we object and it's

9     inappropriate to ask these questions.

13:36 10          (Exhibit(s) 9869, received.)

11          THE COURT:  Just so the record's clear, which

12     witness will testify so we have a good record.

13          MS. HURST:  Mr. Stockton, Your Honor.

14          THE COURT:  Thank you; overruled.

13:36 15     Q.  BY MS. HURST:  And that's a February 9th, 2009, e-mail

16     on the bottom there, Mr. Larian?

17     A.  Yes, February 2009.

18     Q.  And it's -- what's the subject?

19     A.  "Bratz update."

13:37 20     Q.  And is this referring to the Nuremberg Toy Fair in 2009?

21     A.  It does.

22     Q.  Now, does this discuss a brand new product line that had

23     not yet been launched by MGA?

24     A.  Yes, it does.

13:37 25     Q.  And what was that?

| | |
|---|---|
| 1 | A.   Moxi Girls. |
| 2 | Q.   What is it -- what does it say there with Moxi Girls? |
| 3 | A.   It says "just picked up some bit and pieces from MGA |
| 4 | stand in Nuremberg.  Very limited range of Bratz |
| 13:37 5 | spring/summer About Five collection, including a Cow Girl!" |
| 6 | And then it says "new concept that was behind |
| 7 | closed doors, Moxi Girls.  Apparently this is a common |
| 8 | terminology in the US meaning a girl with attitude.  They are |
| 9 | positioning this as a natural successor to Bratz and is the |
| 13:38 10 | latest fashion doll collection that will be launched in |
| 11 | autumn/winter." |
| 12 | Do you want me to read the rest of it? |
| 13 | Q.   That's -- that's enough. |
| 14 | Did you have a private showroom at Nuremberg in |
| 13:38 15 | 2009? |
| 16 | A.   Yes, we did. |
| 17 | Q.   And what was the level of confidentiality for Moxi Girls |
| 18 | at that time? |
| 19 | A.   It was very, very confidential.  We had in a room within |
| 13:38 20 | another room.  I don't know how they got in there. |
| 21 | Q.   Now, are you aware that at one time Mattel was claiming |
| 22 | in this case that the name of -- |
| 23 | MR. PRICE:  Objection, Your Honor.  Objection; it's |
| 24 | irrelevant what Mattel once claimed and what's been dropped |
| 13:39 25 | and what hasn't. |

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10289   Filed 03/28/11   Page 37 of 97   Page ID #:312619
CV 04-9049 DOC - 03/25/2011 Volume 2 of 2

37

```
 1              THE COURT:  Sustain; we'll strike the question.
 2     Reask it.
 3              It's too argumentative.
 4     Q.   BY MS. HURST:  Did Mattel assert that your product name
13:39 5   Moxi Girls was one of its trade secrets?
 6              MR. PRICE:  Objection; objection.  It's irrelevant.
 7     Move to strike.
 8              THE COURT:  It's not a trade secret in this matter
 9     at the present time counsel, sustain.
13:39 10             MS. HURST:  Your Honor, there was a question of
11     Mr. Kilpin that was comparable that was not -- it was
12     referring to --
13              THE COURT:  We'll, take it outside the presence of
14     the jury.  We'll take a recess in a few moments.
13:39 15             Move on now.
16              We'll have that discussion later on.
17              MS. HURST:  Thank you, Your Honor.
18     Q.   Please take a look at Exhibit 22225.
19     A.   Yes.
13:40 20   Q.   Did you get the price listing catalog?
21     A.   We did not.
22     Q.   And what is your expectation about what retailers will
23     do when they are exposed -- when you instruct them to keep
24     your information confidential?
13:40 25   A.   We hope.
```

UNITED STATES DISTRICT COURT

1    Q.   Do you hope and expect that they'll keep it

2    confidential, but you know that sometimes they're going to

3    ignor it?

4    A.   Absolutely, yes.

13:40  5    Q.   Please take a look at Exhibit 23702.

6         Was that the severance agreement for Mr. Koch that

7    Mr. Price showed you?

8    A.   Yes, yes, it is.

9    Q.   And he showed you the confidentiality provision on that?

13:41 10   A.   Yes, he did.

11   Q.   Please take a look also at Exhibit 9266.

12        And is that Mr. Villasenor's separation agreement

13   that we looked at during his testimony?

14   A.   Yes.

13:42 15   Q.   And you see there Paragraph H of Mr. Villasenor's

16   agreement?

17   A.   Yes.

18   Q.   And it specifically says that he will keep confidential

19   any allegations of alleged wrongful conduct that occurred

13:42 20   while he was employed with the company?  Do you see that?

21   A.   Yes, I do.

22   Q.   And then two paragraphs -- the next paragraph it says

23   that -- that that type of information won't be disclosed for

24   any counsel for any party asserting claims against Mattel?

13:43 25        Do you see that?

```
 1    A.    I can't.

 2    Q.    Against the released parties, which were Mattel?

 3    A.    I don't know where you're reading.  I'm sorry.

 4    Q.    Okay.  In the second paragraph on Page 5?

13:43  5    A.    Okay.  Yes.

 6    Q.    Do you see anything like I'll keep secret wrongful

 7    conduct and I won't talk to the lawyers for any parties

 8    suing -- suing us?  Do you see anything like that in

 9    Mr. Koch's separation agreement?

13:43 10   A.    No, you don't.

11   Q.    Have you ever paid anybody severance to keep quiet about

12   allegations of wrongful conduct?

13   A.    Never.

14              MS. HURST:  Your Honor, except for the issues about

13:44 15   which we have an open discussion, I'm concluding my

16   examination.

17              THE COURT:  All right.

18              Ladies and Gentlemen why don't you take a recess.

19              Let me speak to counsel.

13:44 20             This would be a good time before we have recross.

21              You are admonished not to discuss this matter

22   amongst yourselves nor form or express any opinion.

23              Probably about 15 or 20 minutes.

24              Have a nice recess.

13:45 25             (Open court - jury not present.)
```

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10289   Filed 03/28/11   Page 40 of 97   Page ID #:312622
CV 04-9049 DOC - 03/25/2011 Volume 2 of 2

40

```
 1              THE COURT:  Why don't you go take a five-minute

 2     recess, because there's no reason to stay right now, to have

 3     both Mr. Price and Ms. Keller present -- I mean, Ms. Hurst

 4     present.

13:45  5              Five-minute recess.

 6              (Recess taken.)

 7              (Open court - jury not present.)

 8              THE COURT:  We're back on the record and there was

 9     a document that you had referred the court back to, 9869.

13:50 10              I don't know what that document is from memory and,

11     second, you referred me back to something that happened

12     during Mr. Kilpin's testimony.

13              MS. HURST:  We're fine on 9869, Your Honor.

14              It's actually just the Brazilian copyright

13:51 15     registration.

16              THE COURT:  All right.

17              No. 1, I've already ruled that I don't believe that

18     that's the kind of notoriety and publicity that put the world

19     on notice in Brazil, in a Portuguese speaking country, and

13:51 20     that a copyright registration comes in.  That's the very

21     limine motion that I had already ruled against you on.  And I

22     don't know how we lead into that from Exhibit No. -- just a

23     moment -- well, what's what I was referring to, I'm sorry.  I

24     mixed up my numbers.

13:52 25              It was 16941, 42, 43, 44 and 36112, 36723 and
```

UNITED STATES DISTRICT COURT

1    24713, I believe.

2           This was -- these were the copyrights, I believe,

3    that I already ruled on because your initial request was that

4    the world was put on notice or that there was notice of MGA

13:52 5    not hiding the fact that Carter Bryant was the inventor

6    through the Brazilian registration.

7           I don't know how we got into that other than the

8    9875, which should be a e-mail involving Kuemmerle, which was

9    Isaac Larian to Julie Mote and it includes an e-mail from

13:52 10    Susana Kuemmerle to Isaac Larian dated April 19th, 2002,

11    where she writes "you should have seen me with my digital

12    camera taking the picture in the middle of their showroom.  I

13    was doing spy work for you."

14           I don't know how you're precluded from having

13:53 15    Ms. Kuemmerle come in here who has been ordered back on the

16    30th or 31st of March saying she's standing in a counterfeit

17    showroom taking pictures.  I guess your response is, Judge,

18    that doesn't make any sense because there would have to be a

19    registration to show it was a counterfeit showroom.

13:53 20           MS. HURST:  Exactly.

21           THE COURT:  Okay.

22           MS. HURST:  So, Your Honor, what I would show is it

23    shows a continuous course of conduct by MGA.  They got the

24    information about counterfeiting.  In the next e-mail

13:53 25    Mr. Larian instructed counsel to go ahead and get things

 1    registered and to move on the matter now, and then --

 2              THE COURT:  Once you -- which you had got --

 3              MS. HURST:  And then these were registered and,

 4    Your Honor, if the court wants to give a limiting instruction

13:53  5    that this does not put Mattel on notice or there's not

 6    sufficient evidence that Mattel was on notice by the

 7    registrations, I think that's fine, but it does absolutely

 8    show the legitimacy of this.

 9              It also shows --

13:54 10              THE COURT:  That might be a fair --

11              MS. HURST:  And it shows a lack of concealment.

12              It shows -- whether it's going to be public whether

13    or not they were really on notice or not.

14              THE COURT:  As long as it can't be argued by

13:54 15    counsel that this is notice.

16              MR. PRICE:  Your Honor, here's the problem.

17              They made the same argument last time and you said,

18    look, this is too prejudicial, this is not noticed to anyone

19    and there was no information that MGA would think this was

13:54 20    "public."

21              THE COURT:  I know, but that's before you chose to

22    go into these Kuemmerle e-mails.  Remember, you opened that

23    door now and you've been forewarned.

24              MR. PRICE:  But it depends upon what issue?

13:54 25              We told Ms. Hurst, when she asked, we would have no

```
 1   objection to these coming in if Carter Bryant's name, any
 2   reference to him, is redacted.  That way they get to use it
 3   for the purpose they legitimately want to use it.
 4            She refused.
 5            THE COURT:  Oh, I see.
 6            MR. PRICE:  She said she wants Carter Bryant's name
 7   in there.
 8            THE COURT:  Just a moment.
 9            Put up 9875 for me.
10            MS. HURST:  That's it right there, Your Honor.
11            THE COURT:  And where is Carter Bryant's name?  Let
12   me see your suggestion.
13            MS. HURST:  It's on 16941, Your Honor.
14            MR. PRICE:  It's on the registrations, Your Honor.
15            MS. HURST:  On the registrations.
16            THE COURT:  Put up one of the registrations, then.
17            MS. HURST:  16941, please, Mike.
18            THE COURT:  Let's see what you're suggesting,
19   Mr. Price.  That may be the answer.
20            Just a moment.
21            MR. PRICE:  Do you see that last paragraph because
22   it means nothing to anybody because it's in Portuguese.
23            THE COURT:  Right.
24            MS. HURST:  Your Honor, the difference now is that
25   9875 does clearly show that Mr. Larian had an expectation of
```

CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

44

```
 1    disclosure.  That's what's different now.

 2             They introduced 9875.  They're arguing fraudulent

 3    concealment in this litigation.

 4             This is the difference now.

13:55  5             First, it shows there was a proper purpose for the

 6    picture-taking, but, second, it also shows that he did have

 7    an expectation of public disclosure.

 8             So even if it's not noticed to them for purposes of

 9    the statute of limitations, and the court can make that

13:56 10    limiting instruction, it is highly relevant to rebut the

11    inference of concealment, and they introduced 9875, it shows

12    an expectation to disclosure through legal proceedings.  This

13    is the step -- first step taken in connection with that.

14             This is very relevant and with a limiting

13:56 15    instruction there's no prejudice on the statute of

16    limitations defense for them because the court has instructed

17    that it can't be noticed for that purpose.

18             It's only coming in to rebut the inference of

19    deliberate concealment, which they have argued vociferously,

13:56 20    and here it is pursuant to Mr. Larian's express instruction,

21    there is something that he clearly intends to be a public

22    disclosure of Carter Bryant as the author associated with the

23    works, in 2002, exactly when they're claiming that this was

24    concealed.

13:57 25             The prejudice to them was not for improper purpose
```

UNITED STATES DISTRICT COURT

1    for admission.  With a limiting instruction, we absolutely

2    would agree with that.

3            The prejudice to them is that it's effective in

4    rebutting the inference of concealment.

13:57  5         Here now they've offered 9875, it shows an

6    instruction, it shows an intention to disclose, and then the

7    disclosure was made.

8            We're not saying that that put them on notice, but

9    it does rebut the inference of concealment.

13:57  10        MR. PRICE:  Your Honor, it's undisputed that

11   someone was instructed to file this.

12           That has always been undisputed.

13           Of course we always assumed that was Mr. Larian.

14           But you made your decision, Your Honor, because

13:57  15   there is no evidence that this would be public.

16           THE COURT:  No, but I also didn't expect, when I

17   made that decision, Mr. Price, that you would be seeking to

18   introduce an e-mail that -- which is 9875, at the time of

19   that ruling.

13:58  20        So that was a choice also that you made.

21           MR. PRICE:  I want to interrupt you.

22           But that has nothing to do with whether or not this

23   is public.

24           Look, they've always argued, and the court has

13:58  25   considered, that Mr. Larian directed this to be filed.

CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

```
 1          THE COURT:  No, I think that the end result of this
 2     is, in fact, the limiting instruction and if they're
 3     instructed to do it they will do it.  They will not consider
 4     this.
13:58 5          MR. PRICE:  But, Your Honor, the other part, which
 6     is -- this shows that Mr. Larian wasn't trying to conceal.
 7          The reason you didn't allow that before is there's
 8     no evidence this is public.
 9          Exhibit 9875 doesn't change that at all.  Whether
13:58 10   or not the registration is public, the question is whether or
11     not there is evidence --
12          THE COURT:  It does in conjunction with
13     Susana Kuemmerle's testimony, and that's what I'm reawaiting.
14     She's coming back.
13:58 15         You see all this becomes very easy to make a
16     decision on when Susana Kuemmerle is back on the stand and
17     she's ordered back on March --
18          MR. ZELLER:  The 30th.
19          THE COURT:  -- March 30th; yeah.
13:59 20         And therefore I can find out why she's in the
21     showroom and what the context of this is.
22          MR. PRICE:  Well --
23          THE COURT:  Because you're both right.  You're both
24     right, frankly.
13:59 25         It was a judgment call.
```

UNITED STATES DISTRICT COURT

1      MS. HURST:  And, Your Honor, just so the court

2  knows, the version that Mattel produced of these

3  registrations, the custodian information that they supplied

4  with them is that it's a public record.  That's what they

13:59  5  said, and I can produce the documentation to the court which

6  shows that they have admitted that this is a public record.

7      When they produce their copy of it, that's what

8  they called it "public record."

9      But even still, Your Honor, I'm willing to submit

13:59  10  to the limiting instruction.

11      This 9875 clearly shows --

12      Mike, can you show the second e-mail with

13  Mr. Larian's instruction.

14      -- here it talks about counterfeiting, it talks

13:59  15  about her consulting with a lawyer, it talks about them

16  taking legal action.  Everyone expects that legal action is a

17  public proceeding.

18      If the court wants me to lay up one more question

19  foundation with Mr. Larian --

14:00  20      THE COURT:  No.

21      MS. HURST:  -- that I expected legal action to be a

22  public proceeding, I will; but with the limiting instruction

23  this is the right thing to do.

24      It responds to both the negative inference.

14:00  25  They've tried to put up with this all caps buying e-mail, and

1    it also properly rebuts the fraudulent concealment

2    allegation.

3              THE COURT:  Mr. Price, one more round, and then

4    we're done.

14:00  5              MR. PRICE:  First, if you want someone to address

6    what we said to them, Mr. Zeller can address that discovery.

7    He's been going -- holding his hand up like this.

8              Your Honor, this doesn't -- there's never been

9    evidence that anyone expected the registration to be public.

14:00 10              We're lucky to live in the United States, by the

11   way, where we have public proceedings.  But that's not

12   true --

13              THE COURT:  Well, thank you, Mr. Price.  I

14   appreciate that.

14:00 15              MR. PRICE:  I mean we really are.

16              THE COURT:  I agree with you, by the way, for the

17   record.

18              MR. PRICE:  But that's not exactly how it works

19   throughout the rest of the world.

14:00 20              So when you first heard this, Your Honor, you said

21   no evidence this is public or would be expected to be public,

22   and this doesn't change that.  This just says register it

23   now.  And the reason might be we think people are infringing,

24   but that doesn't mean that we have any expectation that the

14:01 25   registration itself would become a public document.  That's

 1    why you refused before and that's why you should now.

 2              So what's the harm in taking Carter Bryant out?

 3              THE COURT:  Yeah.

 4              MS. HURST:  Your Honor, but that's really argument

14:01 5    from the evidence.  This is enough foundation for his

 6    expectation of public disclosure.

 7              THE COURT:  All right.

 8              For my record, I had initially excluded MGA from

 9    using the copyright registrations in Brazil.

14:01 10             The court, feeling in the in limine motion and

 11   still making the finding that this was not quote-unquote the

 12   kind of public notice that was placing the world on notice

 13   concerning Carter Bryant, by the same token now we have one

 14   of the critical witnesses and credibility absolutely

14:02 15   paramount in this matter.

 16             This will be decided quite frankly on what will

 17   turn out to be very few pieces of evidence and Carter Bryant,

 18   probably, Mr. Eckert, and Mr. Larian's testimony, along with

 19   a few others.

14:02 20             And credibility is so critical that MGA's not going

 21   to be precluded from introducing this piece of evidence which

 22   seems to substantiate now what Mr. Larian is saying.

 23             My only concern is Mr. Price's suggestion -- and I

 24   don't find any fault with both parties -- Mr. Price and

14:02 25   Mattel have the right to attempt to impeach Mr. Larian, but

1    Mr. Larian has the right also to show that this was not only

2    innocent behavior but apparently was a showroom or a

3    counter -- what I am going to call a "counterfeit" pursuant

4    to his registration in Brazil.

14:03  5          The critical question is Carter Bryant.

6                I'm going to want to hear more.

7                I'm going to want to hear more argument on that,

8    but for the time being unless you want Mr. Larian to come

9    back, you can display this, but I'm going to want you to take

14:03 10   out Carter Bryant for the time being.  I may change that, but

11   I don't know that that should be stricken -- or allowed to be

12   flashed up to the jury.

13               You are certainly not precluded to ask questions,

14   but the intonation of this is that you really want

14:03 15   Carter Bryant's name in front of the jury.

16               MS. HURST:  Your Honor, but that is what's

17   necessary to rebut the inference of concealment.

18               It's -- it's -- it's the -- the concealment that

19   they've been arguing is the concealment of the connection

14:03 20   between Carter Bryant and Bratz.

21               And this precisely goes to this, on its face, 9875

22   says, if the court can instruct, this is not notice to

23   Mattel.

24               We have no problem with that.

14:04 25               THE COURT:  And you stipulate to that?

 1              MS. HURST:  Absolutely.

 2              THE COURT:  And you will not argue it.

 3              MS. HURST:  Absolutely.

 4              And only -- we're only offering it to rebut

14:04  5   concealment, not to argue that it's notice.

 6              But Mr. Larian's expectation about whether it would

 7   be public and the reality may be two different things, we

 8   understand that, but his expectation, his subjective

 9   understanding is highly relevant and this substantiates it.

14:04 10              THE COURT:  All right.  Mr. Price will close.

11              I want each side to have equal argument.

12              MR. PRICE:  Your Honor, this e-mail has nothing to

13   do with Mr. Larian's intention of making Carter Bryant

14   public.  It goes to his motivation, arguably, which is why I

14:04 15   said we won't object to it coming in if it's redacted.

16              It goes to his motivation in filing the

17   registration, but if the Brazil office is not public, it's

18   not public.  And we see here that apparently there was an

19   attorney involved as well giving advice.

14:05 20              There needs to be a showing that this had an

21   expectation, this registration, of being public.

22              THE COURT:  Well, as public -- as has expectations

23   in Brazil.

24              MR. PRICE:  Yes, and the argument, Your Honor, that

14:05 25   she's making is the same one that she made before and that

CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

```
 1    you ruled on.
 2            The question is does this e-mail change that and it
 3    doesn't change that aspect at all.
 4            THE COURT:  Why not?
14:05 5        MR. PRICE:  Because the question was --
 6            THE COURT:  So you had the choice, you had like 13
 7    e-mails and this is one that was di minimus, quite frankly.
 8            MR. PRICE:  Well, it -- it is di minimus.
 9            THE COURT:  It is di minimus.
14:05 10       MR. PRICE:  I think.
11            THE COURT:  We didn't have to go there, but
12    sometimes you don't see it.
13            MR. PRICE:  But what I did know, what I do know, is
14    this might go to motivation for filing the registration.
14:05 15   There was obviously some motivation.  It may be relevant to
16    taking the sting out of this e-mail.
17            It is not any more relevant now than it was before
18    as to Mr. Larian's view as to whether or not that filing and
19    the information in that filing would be public.
14:06 20       THE COURT:  All right.  I want some time to think
21    about it.
22            MS. HURST:  Your Honor, may I --
23            THE COURT:  No.  You may not now.
24            We're done.
14:06 25       I want ten minutes by myself.
```

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10289   Filed 03/28/11   Page 53 of 97   Page ID
#:312635
CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

53

```
 1              MS. HURST:  Can I give the court the public

 2    record -- the piece of paper that Mattel gave us that says

 3    this is a public record on it?  Can I give that to the court?

 4              THE COURT:  Certainly.

14:06  5              MS. HURST:  I'm going to hand the court a

 6    September 23rd, 2009, letter from Quinn Emanuel from

 7    Marshall Searcy and an attachment that is a printout from the

 8    date of file that was provided to us showing that the

 9    document with the Bates number M 151750 is public record.

14:06 10              THE COURT:  Just a moment.

11              I'm receiving this for the first time.

12              I don't believe I've seen this before.

13              Have I?

14              MS. HURST:  That's right, Your Honor.

14:06 15              THE COURT:  Just a minute.  Let me read this.

16              (Pause in the proceedings.)

17              THE COURT:  Who is Marshall Searcy?

18              MS. HURST:  He's a partner at Quinn Emanuel.

19              THE COURT:  Is that true?

14:07 20              MR. ZELLER:  Yes.

21              MR. QUINN:  Yes.

22              MR. PRICE:  Yes.

23              THE COURT:  Thank you.

24              It's just a new name for me.

14:07 25              Is he a big partner?
```

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10289   Filed 03/28/11   Page 54 of 97   Page ID
#:312636
CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

54

```
 1              MR. QUINN:  He's actually kind of short,
 2    Your Honor.
 3              THE COURT:  A short partner.
 4              (Laughter.)
14:07  5        THE COURT:  Well, now documents are flying in.
 6              We have a letter --
 7              MR. QUINN:  He's large in other ways.
 8              THE COURT:  We have a letter -- two -- and now we
 9    have 1703, which I assume are the registrations.
14:07 10        Is that correct?
11              MS. HURST:  Those are the ones produced by Mattel,
12    Your Honor, and you see the Bates number there is
13    M 0151750 --
14              THE COURT:  All right.
14:07 15        MS. HURST:  -- and that correlates to what Mattel
16    called a public record when it produced the document.
17              THE COURT:  Thank you.
18              Now you're done.
19              MS. HURST:  Thank you.
14:07 20        THE COURT:  That's the end of your argument.
21              Mr. Zeller.
22              MR. ZELLER:  Very briefly, Your Honor.
23              I was the one actually responsible for obtaining
24    those registrations, so I -- I have direct knowledge of why
14:07 25  this says "public record."
```

```
 1              It's because when I obtained it years later in 2006
 2        that was its status.
 3              In fact, there's no reason to think -- in fact,
 4        based upon what I know -- about how the Brazilian copyrights
14:08  5  work and, in fact, the Brazilian courts, that that was public
 6        before then.
 7              In fact, there was this Estrella litigation that's
 8        gone on for years between MGA and this company Estrella
 9        that's referenced in the e-mails, and we have repeatedly
14:08 10  tried to get those court filings out of the court system in
11        Brazil and have never been able to obtain anything of
12        significance.
13              THE COURT:  Well, I'm thinking -- I'm doing a joke
14        with both of you -- I've been thinking about sending out an
14:08 15  e-mail to my colleagues that I'm willing to take any
16        Quinn Emanuel litigation and any Mattel and MGA litigation
17        from this point forward.
18              MR. ZELLER:  I understand.
19              THE COURT:  Why don't you go take a ten-minute
14:08 20  recess.
21              Mr. Price --
22              MR. PRICE:  Not on this.
23              THE COURT:  It's certainly your lectern but, then,
24        Ms. Hurst, I invite you back.
14:08 25              MR. PRICE:  Not on this.  It's on another
```

UNITED STATES DISTRICT COURT

1    recross -- on a recross issue.

2          And that is Ms. Hurst showed the video.  We're

3    talking about Mattel getting information from other

4    competitor showrooms, in fact, almost all of them, and I -- I

14:09 5    think I should be able to -- remember that exhibit -- I'm

6    going to give you a number but I'm going to tell you what it

7    is too because I know it's hard to get these numbers --

8          THE COURT:  No, I want you to refer back to 1842.

9          MR. PRICE:  That one, Your Honor, is --

14:09 10          (Laughter.)

11          MR. PRICE:  But the e-mail from Mr. Larian says,

12    can you do me a favor?  Can you get me these catalogs and

13    price lists from these shows -- I mean, that's exactly what

14    they've -- the point is --

14:09 15          THE COURT:  Didn't you already refer to that?

16          MR. PRICE:  You did.  I had the redacted, so it

17    wouldn't have all those other showrooms.  We just had Mattel.

18          THE COURT:  I see.

19          MR. PRICE:  Whereas they've gone through everybody

14:09 20    in the world.

21          THE COURT:  So, remember, this is the very

22    discovery that you resisted, that my special master ruled on,

23    that I upheld.

24          I mean, I -- I'm perfectly willing, at any time, to

14:09 25    retract that ruling.

UNITED STATES DISTRICT COURT

1          You've always stood in that way and I've honored

2     that.

3          Now, if we want to get into that worldwide search,

4     that's absolutely fine.

14:10 5          You're the ones who know if there's nothing there

6     or there's a lot there.

7          I mean, if Mattel is doing this with Hasbro and

8     Jacks, that would be a difficult position.  This isn't

9     confined, then, to just MGA.

14:10 10          I doubt that that is, I'm not making a record it

11     is, but only you know.  I've upheld your motion so far.

12          So I'm going to take a recess because eventually

13     the truth is going to get back to work today and I would

14     suggest that that not go there, but that's up to you.

14:10 15          MR. PRICE:  A related issue, Your Honor.

16          THE COURT:  If I was you I'd take ten minutes.

17          (Recess taken.)

18          (Open court - jury not present.)

19          THE COURT:  All right.  Counsel we're going to open

14:18 20     up this lawsuit.

21          We're on the record and I'm going to allow the

22     copyright registration filed in Brazil.

23          I will give no limiting instruction.  The jury will

24     be the fact finder.

14:18 25          There are three reasons for this decision.

1    First, it rebuts Mattel's inference that the

2  e-mail from Ms. Kuemmerle to Mr. Larian discussed nefarious

3  activity.

4    In fact, Kuemmerle's activities in Latin America

14:18  5  may have been part of a pattern of weeding out and

6  prosecuting counterfeiters in that region of the world.  If

7  may also have constituted conduct that's untoward or -- I'll

8  use a stronger word -- thievery of another competitor.

9    This is, however, now a jury determination of the

14:19 10  copyright registration, is directly probative on that point

11  of whether MGA was seeking to enforce its intellectual

12  property rights in Latin America.

13    Second, it rebuts Mattel's allegation that MGA

14  fraudulently concealed the basis for Mattel's claims, which

14:19 15  supposedly tolls the statute of limitations.

16    Moreover, under the California Uniform Trade

17  Secrets Act, which has a more dramatic statute of

18  limitations.  The copyright registration in Brazil may have

19  been discovered by Mattel through the exercise of reasonable

14:19 20  diligence.

21    That standard for what triggers the statute of

22  limitations is thus a jury determination about whether the

23  registration now triggered the statute of limitations.

24    And, third, this case absolutely turns on

14:19 25  credibility.  This whole discussion involving this e-mail has

```
 1  turned the court's prior rulings on its head, and the
 2  introduction of this e-mail by Mattel now is brought to the
 3  forefront because credibility absolutely triumphs, and I can
 4  see the Circuit reading this and the court didn't open this
 5  area now.
 6          No. 2, you may bring in Hasbro.  You may bring in,
 7  from your side, those other e-mails, and I will open up those
 8  other e-mails that you have requested, Mr. Price, in total,
 9  for other activities; but I will now cause the discovery by
10  Mattel in that area and my ruling is reversed.
11          We are going to open up this whole area concerning
12  any other activities, if any, by Mattel of any other and I'll
13  leave that to Mr. Price.
14          Now get the jury.
15          MR. QUINN:  Your Honor, I thought you gave us a
16  choice on that.
17          THE COURT:  I gave Mr. Price a choice.
18          MR. QUINN:  Oh.
19          THE COURT:  So we're opening it up.
20          MR. PRICE:  Your Honor, do I have the choice of not
21  going into it is my question.
22          THE COURT:  You do.  You have the choice.
23          MR. PRICE:  I'm not going to open it up.
24          THE COURT:  Then my ruling stands.
25          We're not going to open it up.
```

UNITED STATES DISTRICT COURT

```
 1                    MR. PRICE:  Okay.

 2                    THE COURT:  In other words, I'll hang with ya.

 3                    MR. PRICE:  Thank you.

 4                    THE COURT:  For the time being.

14:21  5              All right.  Your choice.

 6                    (Open court - jury present.)

 7                    THE COURT:  All right.  And the jury's present, the

 8         alternates are present, all counsel, the parties are present,

 9         the witness is present.

14:22 10              And I think we'll have an agreement.

11                    We're going to recess about 10 after 3:00 today, so

12         counsel knows, just so you're not rushing out to take your

13         final -- is that enough time to get there comfortably?

14                    All right.  You just remind us.

14:22 15              Thank you.

16                    All right.  Counsel, if you'd like to continue with

17         your recross of Mr. Larian.

18                    MS. HURST:  Thank you, Your Honor.

19                    (Discussion held off the record.)

14:22 20                     RECROSS-EXAMINATION RESUMED

21         BY MS. HURST:

22         Q.   Please take a look at Exhibit 9875, Mr. Larian.

23                    It's been admitted.  I know that.

24         A.   Yes, go ahead.

14:23 25         Q.   And the e-mail that you sent to -- response to
```

UNITED STATES DISTRICT COURT

```
 1    Ms. Kuemmerle with the copy to your lawyer and you said
 2    "let's register this NOW and move"; right?
 3    A.   Yes.
 4    Q.   And what did you mean by "and move"?
 5    A.   Sue them.
 6    Q.   So what was your expectation about the nature of that
 7    lawsuit?
 8    A.   They were knocking off Bratz and we wanted to sue them
 9    to stop them.
10    Q.   Did you have any expectation about whether the records
11    of that lawsuit would be public or private?
12    A.   My expectation is that when you file a lawsuit it's
13    public.
14    Q.   And was there any -- did you, in fact, sue Estrella?
15    A.   We did.
16    Q.   And was there any publicity about that?
17    A.   There was.
18    Q.   Please take a look at Exhibit 16941, 942, 943, and 944?
19    A.   Yes.
20    Q.   Are those the copyright registrations for Bratz doll
21    works that you caused to be filed in Brazil in connection
22    with the Estrella -- what you hoped to become Estrella
23    lawsuit?
24    A.   Yes, they are.
25         MS. HURST:  Your Honor, move to admit
```

14:23 — 5
14:23 — 10
14:23 — 15
14:24 — 20
14:24 — 25

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB  Document 10289  Filed 03/28/11  Page 62 of 97  Page ID #:312644
CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

62

       1   those four exhibits.

       2           THE COURT:  Received.

       3           (Exhibit(s) 16941, 942, 943, and 944, received.)

       4   Q.   BY MS. HURST:  Now let's take a look at 16941.

14:24  5           This is in Portuguese; right?

       6   A.   It is.  Well, some portions are in Portuguese.

       7   Q.   And this -- this is a copy that was maintained in MGA's

       8   files of the registration certificate that you got?  Is that

       9   right?

14:24 10   A.   Yes.

      11   Q.   Would you turn to the second page, please, Mike.

      12           (Pause in the proceedings.)

      13   Q.   BY MS. HURST:  And is that a -- a picture of Chloe?

      14   A.   It is.

14:25 15   Q.   And although it's in Portuguese, can you read the -- the

      16   date in the lower right-hand corner.

      17   A.   Yes, September 26, 2002.

      18   Q.   And who does it say is the author --

      19           MR. PRICE:  Your Honor, I -- I -- I -- I move to

14:26 20   strike, since he can't read the Portuguese.

      21           MS. HURST:  You can tell that that's September 26,

      22   2002.

      23           Mike, can you highlight that.

      24           THE COURT:  Just a moment.

14:26 25           MR. PRICE:  It sounds like "September" but

```
  1     I don't know.

  2            (Laughter.)

  3            THE COURT:  Both counsel --

  4     Q.   BY MS. HURST:  Well, does it say --

14:26 5        THE COURT:  Both counsel can read Portuguese.

  6            I'm just kidding.

  7     Q.   BY MS. HURST:  Well, does it say 26 Septembro 2002?

  8            (Laughter.)

  9            THE COURT:  Ladies and Gentlemen, I'll just let you

14:26 10   decide what that means.

  11           (Laughter.)

  12    Q.   BY MS. HURST:  Does it also say "autor

  13     Carter H. Bryant"?

  14    A.   Yes.

14:26 15       THE COURT:  I'll let you figure out what that means

  16   also, Ladies and Gentlemen.

  17           THE WITNESS:  Yes.

  18    Q.   BY MS. HURST:  Now, when you asked the lawyers to go

  19   ahead and get this filed it was your belief that

14:27 20  Carter Bryant as the author of Chloe, it would be exposed to

  21   the world; right?

  22           MR. PRICE:  Objection; leading.

  23           THE COURT:  Overruled.

  24           THE WITNESS:  Yes, of course.

14:27 25  Q.   BY MS. HURST:  And you weren't trying to hide that fact
```

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

1    in September of 2002; right?

2    A.   Or ever.  We never tried to hide the fact that

3    Carter Bryant was the designer for the sketches for Bratz.

4    Q.   All right.  Let's look at Exhibit 16942.  Let's look at

14:27 5   the second page there.

6            Who is that?

7    A.   Jade.

8    Q.   And that -- what's the date say?

9    A.   26 of September, 2002.

14:27 10  Q.   And what does -- does it say "autor

11    Carter H. Bryant"?

12   A.   Yes, with that spelling; yes.

13   Q.   And please take a look at the second page of 16943.

14   A.   Yes.

14:27 15  Q.   And was that one of your first generation dolls there?

16   A.   That's correct, Shasha.

17   Q.   Shasha.

18           What's the date on that one?

19   A.   26 September 2002.

14:28 20  Q.   And who does it say it is autor

21    on this one?

22   A.   Carter Bryant.

23   Q.   Please take a look at the second page of 16944.

24   A.   Yes.

14:28 25  Q.   Who is that?

UNITED STATES DISTRICT COURT

1    A.   That's my daughter, that's Yasmin.

2    Q.   Yasmin the doll?

3    A.   Yes.

4    Q.   Yasmin the doll?

14:28  5    A.   Yes.

6    Q.   And named after your daughter?

7    A.   Yes.

8    Q.   What is the date on that?

9    A.   September 26, 2007.

14:28 10    Q.   What is the autor?

11    A.   Carter Bryant.

12    Q.   You had these filed in Brazil with every expectation

13    that that information was public; right?

14    A.   And they were public.

14:29 15    Q.   And that was -- well, you don't really know whether it's

16    public or not; right?

17         MR. PRICE:  Objection; move to strike on opinion,

18    Your Honor lack of foundation.

19         THE COURT:  Well, it's intent.  Whether it was

14:29 20    public or not, that's a different question.  That's for you

21    to decide.

22         But you can testify about the registrations being

23    filed in Brazil and what the meaning is, what his

24    expectations were concerning it.

14:29 25         MS. HURST:  Thank you.

```
 1    Q.   Were you trying to hide the fact that Carter Bryant was

 2    an author of Bratz when you had these filed for purposes of

 3    litigation in Brazil --

 4    A.   No.

14:29  5    Q.   -- or any other time?

 6    A.   No.

 7    Q.   Thank you.

 8              THE COURT:  Have you concluded?

 9              MS. HURST:  Yes.

14:29 10              THE COURT:  All right.

11              Counsel, recross.

12                    RECROSS-EXAMINATION

13    BY MR. PRICE:

14    Q.   Mr. Larian, when you look at these registrations, 16941,

14:30 15    as an example --

16    A.   Yes.

17    Q.   -- now, you filed these in connection with that case

18    against Estrella; is that right?

19    A.   Estrella, yes.

14:30 20    Q.   Estrella; thank you.

21              In fact, your lawyer in that case had the file

22    sealed; correct?

23    A.   I don't know.

24    Q.   You don't know whether or not one way or another that

14:30 25    case file was sealed?
```

1    A.    I do not.

2    Q.    You weren't involved in those decisions?

3    A.    Sealing or not sealing, no.

4    Q.    Yes.

14:30  5          You understand that "sealing" means something's not

6    available to the public in a court context; right?

7    A.    Yes.  Yes, I am.

8    Q.    And if you look, say, at 16941 could you show us here

9    where this document says that Mr. Bryant created the

14:30 10   designs -- and, actually, if you look at the second page, the

11   last paragraph, I guess another word you can probably

12   understand here is the second from the bottom there where it

13   says "designer" do you see that?

14   A.    Yes.

14:31 15  Q.    Perhaps even Norte Americano you could figure out.

16          But where here does this say that Mr. Bryant did

17   the Bratz designs while he was working for Mattel?

18          MS. HURST:  Objection; argumentative and assumes

19   facts -- and assumes facts.

14:31 20          THE COURT:  Just a moment.

21          (Pause in the proceedings.)

22          THE COURT:  Sustained.

23   Q.    BY MR. PRICE:  Does the registration, as far as you

24   know, say that Mr. Bryant created the Bratz' designs while he

14:31 25  was at Mattel?

         1              MS. HURST:  Objection; assumes facts.

         2              THE COURT:  Overruled.

         3              THE WITNESS:  No, it doesn't.

         4    Q.   BY MR. PRICE:  And when you were going to sue Estrella

14:32    5    in Brazil, you were suing for knockoffs, you said?

         6    A.   Yes.

         7    Q.   And these were knockoffs of dolls that you thought

         8    looked like your Bratz dolls?

         9    A.   They were -- they were exact copy of Bratz dolls.

14:32   10    Q.   Okay.  So -- so you weren't suing because Estrella

        11    had -- had drawn a design or some picture that they were

        12    selling that looked like Bratz dolls; right?

        13    A.   I'm sorry.  I don't understand.

        14    Q.   You weren't suing Estrella because they were selling

14:32   15    hand drawn pictures of something that looked like a Bratz

        16    doll; correct?

        17    A.   No.

        18    Q.   So you were suing on a doll, and as part of the

        19    registration, you -- you put Mr. Bryant's name in; correct?

14:32   20    A.   Yes.

        21    Q.   And the one word here that we probably can understand is

        22    you have him here as the designer; correct?

        23    A.   Yes.

        24    Q.   And just like you remember, do you recall earlier in the

14:32   25    trial I had talked to you about certain language in the

                        UNITED STATES DISTRICT COURT

 1    affidavit in a lawsuit in Hong Kong?  Do you recall there was

 2    certain language in an affidavit that I was talking to you

 3    about?

 4    A.   I don't.

14:33 5    Q.   You -- you -- you brought actions in Hong Kong against

 6    people you thought were knocking off Bratz dolls; correct?

 7            MS. HURST:  Objection; beyond the scope and prior

 8    rulings.

 9            MR. PRICE:  I was -- I was allowed to go into that

14:33 10   on a limited basis before, Your Honor, and this opens up why

 11   his -- why his -- his thought process of suing and what it

 12   means.

 13           Not getting into dolls.

 14   Q.   Let me ask you this and we can get a ruling:  In that

14:33 15   Hong Kong suit were you suing dolls -- were you suing

 16   three-dimensional dolls that were being sold in Hong Kong,

 17   the ones we talked about before when you took the stand?

 18   A.   I have never sued any dolls in my life.

 19           (Laughter.)

14:34 20   Q.   BY MR. PRICE:  Were you suing companies because they

 21   made dolls?

 22   A.   Yes.

 23   Q.   Touché.

 24           And earlier we got into evidence of what you had

14:34 25   attached.  Do you remember those Carter Bryant drawings you

Case 2:04-cv-09049-DOC-RNB  Document 10289  Filed 03/28/11  Page 70 of 97  Page ID #:312652
CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

70

1    had attached in connection with suing because someone was

2    selling dolls, do you recall that?

3    A.   I'm sorry.  Please --

4          MS. HURST:  Your Honor, beyond the scope;

14:34 5    irrelevant; prior rulings.

6          MR. PRICE:  I'll move on.

7          It's in the record and I have limited time.

8    Q.   So -- and you were talking about the expectation of --

9    of Exhibit 16941 becoming public.

14:34 10          Do you know, one way or another, whether or not

11    this certificate ever actually became public and what date?

12    A.   I assume it's the date of this here, and I know it

13    became public because Mattel produced it, gave us a copy of

14    it.

14:35 15    Q.   Well, tell us what year that was.

16    A.   I don't remember the direct year, but for sure I

17    remember Mattel give us a copy of it, so it must have been

18    public.  How did they get it otherwise?

19    Q.   That was in 2006; right?

14:35 20    A.   I don't remember the date.

21    Q.   And have you -- when you got this you -- I take it you

22    didn't mail a copy of the registration to Mattel; correct?

23    A.   No, I didn't.

24    Q.   And you said that there was some press about the

14:35 25    lawsuit.  There was nothing in the press concerning this

```
 1    registration or the date; correct?

 2    A.   There was a lot of press.

 3         I didn't memorize all the press that happened.

 4    Q.   And in terms of production, did MGA produce this

14:35  5    document before 2006?

 6    A.   I don't know.

 7    Q.   Now, you had been asked some questions about -- about

 8    Exhibits 93 -- 9340 and 9339.

 9         And, Your Honor, I would move those into evidence.

14:36 10        THE COURT:  I don't know which ones those are.  I

11    apologize.

12         MR. PRICE:  Those are the ones that Mr. Larian said

13    were in his files because a Mattel employee brought them

14    over.

14:36 15        THE COURT:  Received.

16         MS. HURST:  I object and move to strike that

17    comment as misstating the testimony.  He said they were not

18    in his files.

19         THE COURT:  Not in his files but they were found in

14:36 20    a box.

21         Is that correct, counsel?

22         MR. PRICE:  That was the testimony.

23         MS. HURST:  Yes.

24         THE COURT:  Those were the same exhibits, and he

14:36 25    didn't look at them but they were found in a box by employees
```

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | that came over. |
| 2 | Those are received, Counsel. |
| 3 | (Exhibit(s) 9340 and 9339, received.) |
| 4 | Q.  BY MR. PRICE:  And if you look at 9339, it says |
| 14:36  5 | Mattel -- |
| 6 | A.  Yes. |
| 7 | Q.  -- and -- and if you go a couple of pages in, let's say, |
| 8 | Page 5, do you see it says "order of presentation -- 2002 |
| 9 | New York Toy Fair" -- |
| 14:36 10 | A.  Hold on.  I'm not there. |
| 11 | Q.  And there is a column there -- |
| 12 | A.  Hold on one second, Mr. Price. |
| 13 | Q.  Let her take you there. |
| 14 | -- and there is a column that says "A" price. |
| 14:37 15 | Do you see that? |
| 16 | A.  Yes. |
| 17 | Q.  You told us that's based on the wholesale price in the |
| 18 | United States? |
| 19 | A.  That's correct. |
| 14:37 20 | Q.  And you if you look, say, at Page 63. |
| 21 | If we could show him that. |
| 22 | A.  Yes. |
| 23 | Q.  And you see that that has a column which is A/FOB price; |
| 24 | correct? |
| 14:37 25 | A.  A/FOB, yes. |

```
 1    Q.    And if you look at Exhibit 9340 --
 2    A.    But if you go to the right it says "City of Industry"
 3    domestic ship point City of Industry.  It doesn't say
 4    Hong Kong.
 5    Q.    If you say -- if you look at 9340 -- I'm sorry, is it
 6    your testimony that FOB price in the United States is not a
 7    trade secret but FOB price Hong Kong is?
 8    A.    No, no.
 9    Q.    Well, just gratuitously commenting?
10          I've got some time problems.
11          MS. HURST:  Objection, Your Honor.
12          THE COURT:  I'm allowing you to make that comment.
13          Just answer the question.
14          THE WITNESS:  Yes.
15    Q.    BY MR. PRICE:  Now if you go to 9340, you see it also
16    says "Mattel millennium 2000 order presentation" and you
17    understand that's a presentation at the toy fair; right?
18    A.    Hold on one second.  I don't see that.
19    Q.    Go to the first page, and then let's turn to Page 9.
20          THE COURT:  And you shouldn't have to do a thing.
21          She'll turn it.  That's her responsibility.
22          THE WITNESS:  Okay.  Perfect.
23          MS. HURST:  Your Honor, can I have a continuing
24    objection that the witness has no foundation at all for this
25    document.
```

14:37 at line 5
14:38 at line 10
14:38 at line 15
14:38 at line 20
14:38 at line 25

```
 1              THE COURT:  Overruled.

 2              MS. HURST:  Previous --

 3    Q.  BY MR. PRICE:  And you see it says, again, it shows the

 4    "A" price on all of these products?  Do you see that?

 5    A.  Yes, I do.

 6    Q.  And you were a 30(b)(6) witness with respect to MGA's

 7    claims for unfair competition and trade secrets; correct?

 8    A.  I believe so.  I've been a 30(b)(6) for so many things,

 9    so I believe so; yes.

10    Q.  And in connection with that you were asked how MGA

11    obtained 9339, the 2002 New York Toy Fair document.

12    A.  I don't recall.

13    Q.  If you'd look at --

14              MS. HURST:  Your Honor, at the recess we had a

15    specific discussion about this.

16              THE COURT:  Just a moment.

17              (Pause in the proceedings.)

18              THE COURT:  I thought we had had that discussion

19    over the lunch hour.  I thought I had allowed you to bring

20    these forth with the understanding that I was going to allow

21    examination on these.

22              MR. PRICE:  Yes.

23              THE COURT:  Overruled.

24              MS. HURST:  But --

25              THE COURT:  Maybe I'm missing something, Ms. Hurst.
```

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

1    I'm glad to send the jury home early today and discuss it

2    with you.

3           I must be missing some part of this conversation

4    and I apologize.

14:40  5           MS. HURST:  No, it's all right, Your Honor.

6    Let's --

7           THE COURT:  My apologies.

8    Q.   BY MR. PRICE:  If you would look at your deposition,

9    September 1, 2010, Page 4176, Lines 1 through 6.

14:41 10           THE COURT:  I may have indicated to each of you

11    that I had trouble recalling when he was a 30(b)(6) witness

12    and when, and I asked you to gather that information, which I

13    haven't seen.  So if either one of you have any problems in

14    this area, let's just recess.  Forty minutes isn't going to

14:41 15    make a difference and let's just discuss it.

16           I want to make sure you're both relatively

17    uncomfortable.

18           I'm just kidding.

19           I'm happy to recess.

14:41 20           MS. HURST:  We'd like to conclude Mr. Larian's

21    examination.

22           THE COURT:  Okay.  If I'm making a mistake I'd like

23    to correct this.

24           I just don't have the 30(b)(6)s, when and how they

14:41 25    occurred, everybody's been a 30(b)(6) -- I'm just kidding

1    you -- but --

2    Q.   BY MR. PRICE:  So you have that in front of you, sir?

3    A.   I do.

4    Q.   So as of September 1, 2010, you did not know how MGA

14:41 5    obtained Exhibit 9339; correct?

6    A.   That's what I said.  I probably did not recall.

7    Q.   And you probably did not know when MGA obtained that;

8    correct?

9    A.   That's right, I don't.  I still don't.

14:41 10   Q.   And if you look at Page 4177, you had no explanation as

11   to why Becky Harris was listed as the custodian of the

12   document; correct?

13   A.   Where am I reading?

14   Q.   Page 4177, it's the next page, Lines 2 through 5.

14:42 15   A.   I need to read it.

16   Q.   It's just Lines 2 through 5.  You had no explanation as

17   to why Becky --

18        MS. HURST:  Your Honor, I object to this as

19   improperly referring to prior testimony and publishing

14:42 20   hearsay.

21        THE COURT:  Well, just a moment.

22        THE WITNESS:  I'd like to read it.

23        THE COURT:  Just a minute.

24        (Pause in the proceedings.)

14:42 25        MR. PRICE:  Your Honor, if we're going to have this

UNITED STATES DISTRICT COURT

         1    delay, I'd like a recess.

         2              THE COURT:  I'm going to stop the time.

         3              Just toll the time.

         4              Well, where's 4178?  I want to read that also.

14:43    5              MR. PRICE:  Pardon me, Your Honor?

         6              THE COURT:  I want to read 4178 as well.

         7              MR. PRICE:  Down to where, Your Honor?

         8              THE COURT:  Well, I haven't read it yet or I'd tell

         9    you.

14:43   10              MR. PRICE:  Oh, I'm sorry.

        11              (Pause in the proceedings.)

        12              THE COURT:  I have to read 4179.

        13              Isn't this fun?

        14              (Laughter.)

14:43   15              MR. PRICE:  Yeah.

        16              THE COURT:  There's lots of colloquy going back and

        17    forth.

        18              No, I just -- it's more fun if you just hand me one

        19    page at a time.

14:43   20              (Laughter.)

        21              THE COURT:  Pardon me, Ladies and Gentlemen, I'm

        22    learning to read, apparently.

        23              (Laughter.)

        24              (Pause in the proceedings.)

14:44   25              THE COURT:  4180.

Case 2:04-cv-09049-DOC-RNB   Document 10289   Filed 03/28/11   Page 78 of 97   Page ID #:312660
CV 04-9049 DOC - 03/25/2011   Volume 2 of 2

78

```
 1            (Laughter.)
 2            THE COURT:  I'm about to send the jury home,
 3      Counsel.
 4            (Pause in the proceedings.)
14:44 5       THE COURT:  4181.
 6            (Pause in the proceedings.)
 7            THE COURT:  Well, counsel, to get the answer to
 8      this you would have to take five pages and it would have to
 9      include 4181, minimally, all the way down to Line 12, and the
14:45 10    four pages in between are absolute nonsense by counsel who
 11      are involved in this deposition.
 12           MR. PRICE:  They -- they were.
 13           THE COURT:  They were.  Yes, they were.
 14           MR. PRICE:  May I?  4177, Lines 2 through 5, do you
14:45 15    see that fact?
 16           THE COURT:  No, you're going to need a lot more
 17      than that, Counsel, if we're getting into this area.
 18           MR. PRICE:  Can we get this --
 19           THE COURT:  Now I know what happened at the
14:45 20    depositions.
 21           MR. PRICE:  I'll start asking questions, if you
 22      like, and we can start the time again and we can bypass it
 23      this way.
 24           THE COURT:  I've got all the time in the world.
14:45 25           MR. PRICE:  Oh, but I don't.
```

CV 04-9049 DOC - 03/25/2011   Volume 2 of 2

```
 1              (Laughter.)
 2              MR. PRICE:  So whenever you're ready I can ask the
 3      next question.
 4              THE COURT:  You can ask the next question, but
14:45 5  we're not getting into this, you know, without a complete
 6      summary on this and --
 7              MR. PRICE:  Okay.
 8              THE COURT:  Start the time again.
 9      Q.  BY MR. PRICE:  Becky Harris was listed as the custodian
14:45 10 of the document; correct?
11              MS. HURST:  Objection; lacks foundation.
12      Q.  BY MR. PRICE:  Correct?
13              THE COURT:  Overruled.
14              You can answer that question.
14:46 15             THE WITNESS:  I don't know.
16      Q.  BY MR. PRICE:  If you would look at 4177, Lines 2 to
17      5 -- does that refresh your recollection that Becky Harris
18      was listed as the custodian of the document?
19      A.  41- --
14:46 20 Q.  77, Lines 2 through 5.
21              THE COURT:  And she'll turn the page for you.
22              THE WITNESS:  Yes.
23      Q.  BY MR. PRICE:  Pardon?
24      A.  Go ahead.  What's the question?
14:46 25 Q.  Does that refresh your recollection that Becky Harris
```

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | was listed as the custodian by MGA as the custodian of this |
| 2 | document? |
| 3 |        MS. HURST:  Objection; asked and answered. |
| 4 |        THE COURT:  It sounds like a fact -- |
| 14:46 5 |        MS. HURST:  Objection; assumes facts that he ever |
| 6 | knew in the first place. |
| 7 |        THE COURT:  Thank you, Counsel. |
| 8 |        THE WITNESS:  No, it doesn't. |
| 9 | Q.   BY MR. PRICE:  Do you know who Becky Harris is? |
| 14:46 10 | A.   I do. |
| 11 | Q.   And she's never worked for Mattel; correct? |
| 12 |      Is that correct? |
| 13 | A.   No.  If she ever worked for Mattel?  I hope she hasn't. |
| 14 | Q.   And when we looked at 9339 you told us that you learned |
| 14:47 15 | that this was found in a box, I believe, at MGA, and it's |
| 16 | correct that you first learned that explanation during the |
| 17 | lunch break? |
| 18 | A.   No. |
| 19 | Q.   The first time, weren't you educated during the lunch |
| 14:47 20 | break as to how this document was obtained by MGA? |
| 21 | A.   Today's lunch break? |
| 22 | Q.   Today's lunch break or a break today. |
| 23 | A.   Frankly I don't know if it was -- that was one of the |
| 24 | things discussed or not.  I had other issues not related to |
| 14:47 25 | this case in my mind. |

1     Q.   So sometime between September 1, 2010, and today you

2     talked to someone and learned that 9339 and 9340 were brought

3     over by former Mattel employees?

4     A.   Can you give me that question again, please.

14:47 5            MS. HURST:   Your Honor --

6     Q.   BY MR. PRICE:   September 1, 2010, the date of your

7     deposition as a 30(b)(6) witness --

8     A.   Right.

9     Q.   -- and today, so during the time after you testified,

14:48 10  you then learned -- you say that this was brought to MGA by a

11    Mattel employee?

12    A.   I don't know if it was after or before.  I don't

13    remember.

14    Q.   Who?

14:48 15  A.   I'm sorry?

16    Q.   Who?  Which Mattel employee brought these?

17    A.   I don't know.

18    Q.   You testified about the vinyl bag in -- in

19    Wee 3 Friends, do you recall that, versus 4-Ever Best

14:48 20  Friends?

21    A.   Yes.

22    Q.   And it's true that Mattel used a vinyl bag back in 2002

23    as well; correct?

24    A.   I don't know.

14:48 25  Q.   Well, if you look at Exhibit 798, that's your e-mail or

CV 04-9049 DOC - 03/25/2011 Volume 2 of 2

```
 1    the e-mail concerning Wee 3 Friends -- I'm sorry -- 7908.

 2            And this is already in evidence, Your Honor.

 3            If we could look at 7908-6, you see it's a

 4    March 13, 2004, e-mail copying you -- I'm sorry -- March 13,

 5    2004 e-mail from Ms. Garcia --

 6    A.   I don't have the -- I don't have it.

 7    Q.   -- copying you -- it's on the screen --

 8    A.   I can't read this screen well; I'm sorry.

 9    Q.   Well, there's one behind you, if you'd like?

10            THE COURT:  It's your responsibility to have the

11    document put in front of the witness.

12            Thank you.

13            THE WITNESS:  Okay.  I've got the document.

14    Q.   BY MR. PRICE:  Where it says in 7908-6 "Elaine, here are

15    images of the vinyl bag that I spoke to in the below."

16            "Can you see piping and also zipper that runs along

17    shape of the bag" do you see that?

18    A.   Yes.

19    Q.   And that's referring -- it says 4-Ever Best Friends

20    versus Wee 3 Friends, do you see that?

21    A.   Do I.

22    Q.   And that's referring to the images of Mattel's packaging

23    on Wee 3 Friends?

24    A.   Yes.

25    Q.   You were also asked about communications with Kohl's,
```

CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

```
 1    and you recall being asked about whether or not this is

 2    something that didn't come to your attention, that you

 3    weren't on a lot of these e-mails.

 4          Do you recall that?

14:50 5   A.   I said I was on some of them, not on a lot of them.

 6    Q.   And if you look at 224347, December 19, 2004, this is

 7    where you said to Mr. Brawer, "they cherry pick our line."

 8          Do you see that?

 9    A.   I'm sorry.  What page are you on?  This is not --

14:51 10  Q.   Right -- right there at the top.

 11   A.   Excuse me.  This is not in this document that Rachel

 12   gave me.  I cannot find it in here.

 13   Q.   Well, you can see the -- you can see it's blown up right

 14   behind you or on the screen.

14:51 15  A.   Can I please get the exhibit in front of me.

 16          MS. HURST:  Just sit tight and wait for the

 17   document.

 18          THE COURT:  These documents should be placed in

 19   front of you.

14:51 20         Until they are, you don't respond.

 21          Okay.

 22          THE WITNESS:  Thank you.

 23          THE COURT:  And that goes for both sides.  Your

 24   side places it in front, Mr. Eckert's side places it in front

14:51 25  of the witnesses.  Until they're there, you don't answer.
```

CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

```
 1   Q.   BY MR. PRICE:  This is for you, right, "they cherry pick
 2   our line"?  This is on December 19, 2004, you see that, right
 3   at the top?
 4   A.   Yes.
 5   Q.   And it attaches e-mail strings to it; correct?
 6   A.   It does.
 7   Q.   And if you look at Page 24347-003, the third line, "the
 8   estimated shortfall and gross margin dollars is
 9   $1.87 million."
10        Do you see that?
11   A.   Yes.
12   Q.   And that was brought to your attention in this e-mail;
13   right?
14   A.   Just give me a minute to take a look.
15   Q.   Well, what I just read is in this e-mail that was
16   brought to your attention; correct?
17   A.   I'm just trying to find it, sir, if it was to my
18   attention or not.
19   Q.   Well, I -- third line from the bottom, right there at
20   Page 3.
21        MS. HURST:  Your Honor, can I ask that Mr. Price
22   stop arguing with the witness while he's trying to read.
23        THE COURT:  Sure, why don't you two get up and talk
24   to each other for just a moment.
25        Now, you find that, sir, at your convenience.
```

UNITED STATES DISTRICT COURT

1          (Pause in the proceedings.)

2          THE WITNESS:  My name is not on this e-mail.  My

3     name is not on this e-mail.  That's why I'm lost.

4     Q.   BY MR. PRICE:  Mr. Larian, your name is at the top.  The

14:52 5   whole thing was sent to you?

6     A.   Can you hold on just a second.  I'm going to try to find

7     it.

8     Q.   We showed it to you.

9     A.   Yes, my name on the first page of the e-mail.

14:53 10  Q.   Now, you were shown an e-mail from, I guess,

11    Holly Chabot, C-h-a-b-o-t, where she said the buyer appeared

12    pleased.

13         Do you see where that's at, 24348, Ms. Hurst asked

14    you about it?

14:53 15  A.   Yes.

16    Q.   And she says "the buyer was pleased -- but now needs a

17    letter of credit for the 6 percent agreed to prior to this

18    situation for his December bottom line.  He needs this ASAP."

19         Do you see that?

14:53 20  A.   I do.

21    Q.   And you didn't agree to that, did you?

22    A.   I don't remember if I did or not.

23    Q.   Ms. Holly, she worked for you; correct?

24    A.   I don't remember her.

14:54 25  Q.   Well, you testified about this e-mail from Ms. Chabot to

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10289   Filed 03/28/11   Page 86 of 97   Page ID #:312668
CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

86

1    Mr. Brawer about the buyer being pleased.

2    A.    Yes.

3    Q.    You don't know who she is?

4    A.    That's -- that's -- that's what the e-mail said, yes,

14:54 5    and it's an MGA produced document.  I don't remember who she

6    was.

7    Q.    So because it's an MGA produced document and that says

8    that's who she is, you believe it was correct; correct?

9         MS. HURST:  Objection; argumentative; and that's

14:54 10   been the premise for most of Mr. Price's examination.

11        THE COURT:  You can state your belief about that,

12   who you believe she is.

13        THE WITNESS:  I don't know who she is.

14        THE COURT:  Okay.

14:54 15        THE WITNESS:  I don't remember her.

16   Q.    BY MR. PRICE:  I'm just saying you testified about it,

17   so you obviously believe this is an MGA document -- you're

18   not copied on it -- that was from Ms. Chabot and -- and you

19   trust what she says here; correct?

14:54 20   A.    It says here the buyer was pleased.

21         Can you highlight that.

22   Q.    And you believe that?

23   A.    Yes, that's what it says.  I don't know what -- what you

24   meant.

14:55 25   Q.    So let me have you look, then, at 24350.

```
 1              (Pause in the proceedings.)

 2              MS. HURST:  Your Honor, the court previously

 3    excluded this one as hearsay, 24350.

 4              THE COURT:  I'm going to allow it.  It will show

14:55  5    conduct and of what eventually the decisions were concerning

 6    Kohl's.

 7              So, obviously, this is hearsay again.  But since

 8    we've gone down this whole string of Kohl e-mail from

 9    different sources and different parties, it's not for the

14:56 10    truth of the matter but it will show the eventually

11    negotiations and hopefully give some light on the conduct and

12    the reasons involving Kohl.

13              And, Counsel, thank you very much.

14              MS. HURST:  Your Honor --

14:56 15    Q.   BY MR. PRICE:  And -- and you have that in front of you,

16    24350?

17    A.   I do.

18    Q.   And this is -- Holly Chabot is on this, correct, an MGA

19    document?

14:56 20    A.   It's an e-mail from her to herself.

21              THE COURT:  And is this the document that's up on

22    the screen right now?

23              MR. PRICE:  No, Your Honor.

24              MS. HURST:  No.

14:56 25              MR. PRICE:  No, Your Honor.
```

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

```
 1              That's the prior one.

 2              We move 24350 in evidence.

 3              MS. HURST:  Your Honor, it's a prior ruling.  It's

 4      a note to herself.

14:56  5              THE COURT:  Just a moment.

 6              But I have also allowed a note to herself through

 7      MGA, et cetera, and this note to herself is not for the

 8      truth; okay.  You are not to take it for the truth.

 9      Hopefully that will give some clarity about eventual things

14:57 10      that occurred concerning the Kohl contract for both sides.

11              So it's not received, I don't believe I received it

12      before and I'm not receiving it now.

13              Did you just ask that I receive it again?

14              MR. PRICE:  You didn't receive it before,

14:57 15      Your Honor.

16              THE COURT:  I'm not receiving it now, it's hearsay,

17      but you can talk to the witness about it.

18              MR. PRICE:  All right.

19              THE COURT:  And I'll refer you back to 18493.

14:57 20              I'm just kidding.

21              (Laughter.)

22              MR. PRICE:  I know.

23              THE COURT:  All right.

24      Q.   BY MR. PRICE:  Were you informed in February of 2005

14:57 25      that the MGA offer of promising a 550,000 if 5.5 million was
```

Case 2:04-cv-09049-DOC-RNB  Document 10289  Filed 03/28/11  Page 89 of 97  Page ID #:312671
CV 04-9049 DOC - 03/25/2011 Volume 2 of 2

89

1  completed in business, that this did not help the bottom line

2  and there was an emergency meeting end of January?

3  A.   I have no recollection of that.

4  Q.   Were you told that Kohl had bad taste -- the Kohl buyer

14:58 5  had a bad taste in his mouth about MGA?

6  A.   I have no recollection of that.

7  Q.   If you look at 24 --

8       THE COURT:  Now, was this witness available, this

9  Holly Chabot?

14:58 10       MR. PRICE:  I have no idea.

11       THE COURT:  Did anybody check?  Why didn't somebody

12  find her?  It would save a lot of time.

13       Just produce her, for either side, and that will

14  end this discussion, if Holly Chabot is the turning point of

14:58 15  this case, they will bring her, one side or the other, I

16  promise you.

17       All right.  Counsel, let's move along.

18  Q.   BY MR. PRICE:  We'll look at 24341.

19  A.   Yes.

14:58 20  Q.   And if you look at the second and third page, do you see

21  there's an e-mail from a Tom, buyer, toys, Kohl's department?

22  A.   I don't see that.

23  Q.   The second page of 24341.

24       Do you see that, where it says "Tom, with each

14:59 25  passing week" --

```
 1              MS. HURST:  Objection; to the publication and
 2      hearsay.
 3              MR. PRICE:  Just that part, Your Honor, so I can
 4      direct him to it.
14:59  5        MS. HURST:  I'm going to object this is hearsay.
 6      You can't tell what it is.
 7              It looks like another note to herself.
 8              THE COURT:  Counsel, that was a speaking objection.
 9      Let's stop now.
14:59 10 Q.    BY MR. PRICE:  Is this from the MGA files, MGA 15323199?
11      A.    Yes.
12      Q.    Were you informed around December of 2004 that the Bratz
13      business was a disaster at Kohl's?
14              MS. HURST:  Objection, Your Honor, move to strike;
14:59 15  the publication of the hearsay.
16              THE COURT:  Overruled; overruled.
17              You can reask the question.
18      Q.    BY MR. PRICE:  Were you told in December of 2004 that
19      the Bratz business was a disaster?
15:00 20 A.    No.
21      Q.    Were you told that it could impact people's jobs, the
22      Bratz performance at Kohl's?
23      A.    Whose jobs?
24      Q.    The people at Kohl's.
15:00 25 A.    I have no recollection of that whatsoever.  Kohl's is a
```

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB  Document 10289  Filed 03/28/11  Page 91 of 97  Page ID #:312673
CV 04-9049 DOC - 03/25/2011 Volume 2 of 2

91

```
 1   huge corporation.  I don't understand how to could affect
 2   their jobs.
 3   Q.   We saw a video clip 9489 and the MGA product on that was
 4   the hall of shame, the one with the bear; is that right?  The
 5   Toby, was that the only MGA product that we saw in that clip?
 6   A.   That's right.
 7   Q.   And you believe that is one of -- a clip which gives an
 8   example of the people at Mattel talking about the -- the
 9   feel, the sense you get from playing with something at a toy
10   fair room; correct?
11           MS. HURST:  Objection; misstates the testimony.
12           THE COURT:  Sustained.
13   Q.   BY MR. PRICE:  Well, I asked you --
14           THE COURT:  Counsel, you can ask that question.
15           That's not what I said before, but you can
16   certainly ask in that area.
17   Q.   BY MR. PRICE:  I had asked you, in my examination, if
18   you can find an example of, in that presentation, people
19   talking about the touch and the feel of the toy.
20           Do you recall that?
21           MS. HURST:  Objection.
22           THE COURT:  Overruled.
23           MS. HURST:  That misstates the testimony during the
24   direct.
25           THE COURT:  Overruled.
```

UNITED STATES DISTRICT COURT

1           THE WITNESS:  And I don't remember what you asked

2    me.  You asked me so many questions, I lost track.

3    Q.   BY MR. PRICE:  Is it your belief that that video that

4    you showed, do you believe that video shows examples of the

15:01  5    people at Mattel talking about the touch and feel and -- and

6    play that you could find out about a toy only if you played

7    with it?

8           THE COURT:  I'll sustain the objection, Counsel,

9    already.

15:02 10           The testimony was about toy fairs, why people went

11   to toy fairs.

12           MR. PRICE:  Yes.

13           THE COURT:  And that was specific, from both sides.

14           You go to toy fairs to touch and feel the toys, not

15:02 15   the video.

16   Q.   BY MR. PRICE:  Oh, but I was asking did the video --

17   remember I asked you earlier about whether or not the

18   catalogs contain that kind of information.

19           Do you recall that?

15:02 20   A.   I'm sorry.  I don't remember all the questions that you

21   asked me, so please ask me a question.

22   Q.   Did the catalogs contain information about the touching

23   and feeling and play patterns of the toys, the catalogs?

24   A.   The catalogs did not show you how a 3D toy plays or

15:02 25   looks like; no.

1    Q.    And my question is did you see in that video clip

2    evidence that Mr. Villasenor or -- or someone else conveyed

3    information about the touch and feel of the play pattern of

4    the toys they were showing, something you couldn't get from

15:03   5    the catalogs?

6    A.    Yes.  Yes, I saw that.

7    Q.    And -- and that you're saying is the ribbon?

8          Is that the example you're --

9    A.    That's one of the examples.

15:03   10    Q.    Okay.

11    A.    It's a one-hour movie that I watched last night, and --

12    and the night before, a Mattel movie, I'm talking about.

13    Q.    You were talking about -- Ms. Hurst asked you about --

14    something about slotting fees?

15:03   15          Do you recall that, slotting fees?

16    A.    Yes.

17    Q.    And slotting fees are when you pay a fee to get space, a

18    slot?

19    A.    Slotting fee is also known as payoff in the toy

15:03   20    industry.  When you pay off a retailer to buy your product.

21    Q.    Okay.  And that's something that MGA's never done?

22    A.    I'm not aware of ever doing that, no.

23    Q.    Let me show you what we've marked as Exhibit 24790.

24          Do you see this is an MGA produced document?  At

15:04   25    the bottom it says MGA 1492156; correct?

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 03/25/2011 Volume 2 of 2

94

```
 1              Mr. Larian, I've asked you whether or not it's an
 2      MGA produced document.
 3      A.   I need to take a look at it.
 4      Q.   Well, you can tell by looking at the corner of the
 5      document on that; right?
 6              Your Honor, I move Exhibit 24790 into evidence.
 7              THE COURT:  I'll receive it.
 8              MS. HURST:  Objection; lacks foundation; hearsay.
 9              THE COURT:  Received.
10              (Exhibit(s) 24790, received.)
11      Q.   BY MR. PRICE:  And who is Gary Thomson?
12      A.   He was the head of sales at MGA at one time.
13      Q.   And we see Gary Thomson, the BSA Toys?
14      A.   Yes.
15      Q.   And we have the first e-mail "we will do the $20,000
16      slotting fee and give 50 percent, but they need to commit to
17      all items across all doors.  Please get specs today."
18      A.   Yes.
19      Q.   Did I read that correctly?
20      A.   You did.
21              THE COURT:  But you can't see it on the screen,
22      Counsel.
23              You've misplaced it on the screen.
24              MS. HURST:  Actually, he didn't read it correctly
25      either.
```

15:04  5
15:05 10
15:05 15
15:05 20
15:05 25

```
 1   Q.   BY MR. PRICE:  We will do the $20,000 slotting fee --

 2            THE COURT:  No.  Counsel, look up at the screen for

 3   a moment.  You'll see the jury -- oh, I see up there.

 4            Well, it's also down below as well also; yes.

 5   Q.   BY MR. PRICE:  And further down below, where there is a

 6   request to pay $20,000 slotting fee, do you see that?

 7   A.   Yes, I do.

 8   Q.   And this concerns Staples?

 9   A.   Yes, which we never did business with because I would

10   not authorize it.

11   Q.   So -- so Mr. Thomson made an offer that you did not

12   authorize?  That's your testimony?

13   A.   Absolutely.

14   Q.   I assume that MGA has registrations for copyright or

15   trademark throughout the world; correct?  Many different

16   countries; correct?

17   A.   I'm not so sure if I can tell you throughout the world,

18   but many countries.

19   Q.   And the only example -- well, the only example you can

20   show us with Mr. Bryant's name on it was Brazil?

21   A.   No, it's not.

22            MS. HURST:  Objection, Your Honor, given the prior

23   history on this issue.

24            THE COURT:  Overruled.  I've opened up this area

25   now, so counsel you may inquire.
```

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

```
 1    Q.    BY MR. PRICE:  Is that correct?

 2    A.    I'm sorry?

 3    Q.    Is that correct?

 4    A.    What -- what is correct?

 5    Q.    The only example that you can show us that has

 6    Mr. Bryant's name on it is Brazil?

 7    A.    No.

 8              MS. HURST:  Objection; misstates the testimony.

 9              THE COURT:  His answer's no.

10              MR. PRICE:  Nothing further, Your Honor.

11              THE COURT:  Okay.

12              I'm going to send you home.

13              You are admonished not to discuss this matter among

14    yourselves or form or express any opinion about this case.

15              We'll see you Tuesday.

16              Have a wonderful weekend.

17              (Open court - jury not present.)

18              THE COURT:  Mr. Larian, Mr. Eckert, have a nice

19    weekend.

20              Counsel, if you'll be seated for a moment.

21              Have a nice night.

22              All right.  Now let's go off the record for just a

23    moment.

24              (Recess taken.)

25       //                                              //
```

CV 04-9049 DOC - 03/25/2011 - Volume 2 of 2

1          (Adjournment at 15:38 to resume on Saturday,

2   March 26, 2011, at 8:00.  Next session reported by

3   Sharon Seffens.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25