1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL, INC., et al.,
                    Plaintiffs,
         vs.

                                   CV-04-9049-DOC
MGA ENTERTAINMENT, INC.,   STATUS CONFERENCE
et al.,                    Volume 1 of 2
                    Defendants.

    --------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

Saturday, March 26, 2011

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

```
 1    APPEARANCES OF COUNSEL:

 2    For Plaintiff MATTEL, INC., ET AL.:

 3    JOHN B. QUINN
      MICHAEL T. ZELLER
 4    WILLIAM PRICE
      QUINN EMANUEL URQUHART & SULLIVAN, LLP
 5    865 South Figueroa Street, 10th Floor
      Los Angeles, CA  90017
 6    (213) 443-3000

 7    For Defendant MGA ENTERTAINMENT, INC., ET AL.:

 8    THOMAS MCCONVILLE
      ORRICK HERRINGTON & SUTCLIFFE LLP
 9    4 Park Plaza, Suite 1600
      Irvine, CA  92614
10    (949) 567-6700

11    ANNETTE HURST
      ORRICK, HERRINGTON & SUTCLIFFE LLP
12    The Orrick Building
      405 Howard Street
13    San Francisco, CA  94105
      (415) 773-4585
14
      JENNIFER L. KELLER
15    KELLER RACKAUCKAS LLP
      18500 Von Karman Avenue, Suite 560
16    Irvine, CA
      (949) 476-8700
17

18    FOR CARLOS GUSTAVO MACHADO GOMEZ:

19    ALEXANDER COTE
      SCHEPER KIM AND HARRIS LLP
20    601 West Fifth Street, 12th Floor
      Los Angeles, CA  90071-2025
21    (213) 613-4655

22

23

24

25
```

1

2                              **INDEX**

3                                                              **PAGE**

4    **STATUS CONFERENCE**                                       **4**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    SANTA ANA, CALIFORNIA; SATURDAY, MARCH 26, 2011; 8:30 A.M.

 2              (Jury not present)

 3              THE COURT:  We are on the record, and all counsel

 4    are present.

 5              Today this hearing will concern the following four

 6    issues:  first, the counterclaim for aiding and abetting

 7    breach of duty of loyalty; the counterclaim for conversion;

 8    the request for entry of a constructive trust; and the

 9    special verdicts.

10              In particular, I want us to focus on the duty of

11    loyalty, and I am going to open with my question to you as

12    counsel:  What equitable reason is there for requiring

13    employees to observe a duty of loyalty in all aspects of

14    their employment, even in aspects in which they are not a

15    fiduciary?

16              I don't care who addresses the Court first.  Mr.

17    Zeller, if you want to, or Ms. Hurst.  You can incorporate

18    public policy in the argument.  You can incorporate what you

19    think the law is.  You can incorporate Conrad Rushing's

20    opinion -- wherever you want to go with it.

21              MR. QUINN:  I will be arguing this, Your Honor.

22              THE COURT:  Okay.  Thank you, Mr. Quinn.  Let's go

23    off the record for just a minute.

24              (Off-the-record discussion)

25              THE COURT:  Okay, Mr. Quinn.
```

```
 1              MR. QUINN:  From the Court's introductory remarks,
 2   it sounds like the Court is looking at this from the
 3   standpoint of first principles -- why should we recognize
 4   such a duty at all?  I mean, I think the case law in this
 5   area and the use of the phrase duty of loyalty has suffered
 6   from serious imprecision.  We see that phrase used in very
 7   different contexts.
 8              If we look at it closely, I think we will see it
 9   means very different things.  For example, there is a very
10   substantial body of law on what's referred to as the duty of
11   loyalty that's owed by a director of a corporation.  Wholly
12   apart from officers and fiduciary duty, there is federal
13   case law, Delaware case law, California case law, about a
14   director's duty of loyalty and duty of care and what that
15   means for a director and a director's obligation to avoid
16   conflicts of interest.
17              It's related to the -- sometimes arises in the
18   context of what is called the corporate opportunity doctrine
19   where a director of a corporation takes for their own
20   account an opportunity that presents itself in the
21   corporation's line of business.  And we have a very
22   substantial body of law that addresses a director's duty of
23   loyalty.
24              We also have -- in the law of fiduciary duty there
25   is recognized a duty of loyalty, as one way of describing
```

1    what a fiduciary's duties are.  And as described in the

2    context of a fiduciary duty, that duty is very different

3    than what we think the law requires as to a nonfiduciary

4    employee.

5         A fiduciary, of course, has an obligation to put

6    the interests of the entity or the person as to whom they

7    stand in a fiduciary relationship always above their own

8    interests.

9         I think there is a Cardozo phrase that the highest

10   -- it escapes my mind right now -- but, the utmost duty to

11   observe and protect the interests of the person or entity in

12   which they stand in a fiduciary relationship.  In that

13   context the phrase "duty of loyalty" is used in the case

14   law, and it means something very different.  It means

15   something quite a bit different than what we could expect of

16   a nonfiduciary, including a nonfiduciary employee, someone

17   who is neither an officer nor a director.

18        Then we get to the duty of loyalty which the case

19   law recognizes in California and which we believe has some

20   recognition also in the labor code statute.  And that phrase

21   there is also used, duty of loyalty, but it causes -- it

22   means something in that context quite a bit different.

23   There it means really you can't put yourself in a position

24   where you are, to use the old-fashioned phrase, serving two

25   masters.

1          So I think if we look at these cases -- and there

2     is a tendency to just look at the phrase, duty of loyalty,

3     as it is used in different contexts, and there is a great

4     opportunity for mischief there.  So we do not argue that an

5     employee who is not a fiduciary, not a director, has a duty

6     of loyalty in any sense at all in which a director does or a

7     fiduciary does.

8          But just from the standpoint of common sense and

9     what I think people in this state would expect, the notion

10    that an employee cannot serve two masters is something that

11    everyone -- you would have to translate it into contemporary

12    language -- is something that anyone would understand and

13    expect, that if you have some -- and again, this is

14    something that I think still has to be developed in the case

15    law, because we could not argue and would not argue for the

16    position.  I don't think it would be consistent with

17    contemporary social mores and expectations of the

18    performance of employees.

19         To say that for someone who had a part-time job at

20    McDonald's couldn't also have -- or a full-time job at

21    McDonald's, couldn't also have a full-time job at Burger

22    King, you know, flipping burgers.  So obviously it has to

23    have something to do with the nature of the job and the

24    skills of the employee.

25         But I think if you ask the man in the street

 1    whether, describing the circumstances of this case, whether
 2    it's acceptable or consistent with what they think it's fair
 3    to expect an employee such as Carter Bryant to do or the
 4    skilled seamstresses or even Tumalian to be serving two
 5    masters at once, is it okay for them to be -- the skills
 6    that they have, for them to be employing them simultaneously
 7    on behalf of two employers who are competitors in the same
 8    field?  I'm pretty sure a survey would show that 90 percent
 9    of the people, just common sense, would think, no, that is
10    wrong.
11           That is not -- you don't have to get to the
12    concepts of fiduciary duty and putting your employer's
13    interests above your own.  No, we don't expect that of those
14    employees.  They have jobs.  They get a paycheck.  They do
15    what they do.
16           But they can't simultaneously work for two
17    employers.  They can't serve two masters.  I think it would
18    seem wrong to all of us the notion that if one accepts our
19    version on this motion, is required under the law, if one
20    accepts our version of what happened here, I don't think
21    anyone could say that this is right, that Mr. Bryant did not
22    violate a duty that he owed to Mattel, a duty of loyalty.
23           So I'm accepting the Court's invitation to look at
24    this from the standpoint of first principles and what is
25    ethical and what is appropriate and what we in this state

today expect of employees.  That was wrong.  It breaches a
duty, and we can call it the duty of loyalty.  There is case
law in support, as the Court knows, for that notion and
calling it a duty of loyalty.

MGA's position seems to be they hark back to the
statute, the labor code section which talks in terms of
priority.  If you look at what they are saying, it seems to
be -- first off, the statute itself speaks only in terms of
work that an employee does for their own account versus what
they owe their employer.  It says they are supposed to put
their employer's interests first.

On its face it doesn't squarely address the
situation of serving two masters concurrently, which I think
makes a difference and would seem to most people to be
wrong.  But their argument is that this just is something
that involves priorities, that they are in the first
instance -- I actually forget what the statutory phrase is.
Maybe somebody can help me out.  Is it priority?

MR. ZELLER:  Preference.

MR. QUINN:  Preference.  They're supposed to give
preference.  Now, what they argue is that, okay, 60
percent/40 percent.  You know, you have satisfied your duty.
If it does apply to the two-masters situation, you have
satisfied your duty if you give most -- if you give
preference, 60 percent of your effort and loyalty, to your

1   employer; and, you know, 40 percent to yourself.  And to

2   push it to an extreme, you know, as long as it's not 51

3   percent/49 percent, you haven't violated your duty.

4          Again, harking back to first principles, I think

5   if you submitted that proposition to the man in the street

6   in this state, they would think that doesn't make any sense.

7   Just in practical terms, that's not how people -- that's not

8   consistent with the expectations of either employers or

9   employees.  You know, as long as I am giving you preference,

10  more than 50 percent of my loyalty, my heart, my effort, you

11  know, I have satisfied my obligations as an employee.

12         I don't think that on the face of it, I don't

13  think it's consistent with any case that we are aware of or

14  that MGA has been able to cite.  And I don't think it's

15  consistent with what we all naturally expect in our

16  contemporary understanding of the employer/employee

17  relationship.

18         So there is not -- we have case law which

19  recognizes the existence of a duty of loyalty where Courts

20  have recognized the existence of a duty of loyalty owed by

21  employees to their employers in a nonfiduciary duty

22  situation.  We have no case law rejecting that proposition.

23         If we reflect on the matter as I have suggested, I

24  think contemporary notions of what employees owe to their

25  employers suggest that there is some duty of loyalty and an

1    obligation above and beyond what an at-will employee who

2    could be terminated or could quit at any time owes to the

3    employer.

4              So for these reasons, Your Honor, I think there

5    are -- really, to reject on a purely legal basis the

6    existence of a duty of loyalty would be unprecedented and

7    would be inconsistent with the case law that's on the table

8    before us now.

9              THE COURT:  Can I engage you in a conversation for

10   a moment?  And you can ask Mr. Price or Mr. Zeller to join

11   in, but I just want to hear from you today, from whoever is

12   arguing from MGA.  And remember, when I am asking these

13   questions, I am truly asking for answers.

14             Oftentimes opinions get written by Courts that are

15   broad-sweeping opinions, but they are based on specific

16   facts obviously.  So facts oftentimes determine what the

17   public now reads as a broad-sweeping opinion, which is

18   always a dangerous place to be in terms of precedent.

19             I want to start with a couple people in this case

20   -- Brawer.  Obviously fiduciary duty.  A person who is an

21   executive branch, paid well, moves from Mattel to MGA,

22   fiduciary responsibility is easy to define.

23             Then I want to take the example that you used of

24   the Burger King/McDonald's employee.  Or in this case I want

25   to take the three seamstresses or --

```
 1              MR. QUINN:  Bryant?

 2              THE COURT:  No.  We use a different word for the

 3    seamstresses.  We use --

 4              MR. PRICE:  Patternmakers?

 5              THE COURT:  Patternmakers.  Thank you.

 6    Patternmakers.  They have been referred to as both ways as

 7    each party has tried to either enhance or diminish their

 8    worth in terms of the business.  Obviously MGA wants to call

 9    them simple seamstresses, and Mattel wants to call them, you

10    know, fashion makers.

11              When Mattel filed the claim, you -- and I don't

12    mean you specifically, but you were not without a remedy in

13    filing a breach of contract claim.  And, in fact, eventually

14    their fate was being fired.

15              Second, you are not without a remedy in terms of

16    taking what I am going to call a common employee and not

17    only binding them contractually, but Mattel obviously also

18    has the right to fire those employees if they see fit.

19              The question becomes:  What happens with the vast

20    majority of Americans who are common everyday workers who

21    may be given a document on a specific occasion?  You hand

22    me, for instance, a will and ask me to keep that in

23    safekeeping for a period of time; or, you know, the

24    financial statements of Quinn-Emanuel for the year, and you

25    ask me to keep that for a brief period of time.  Even if I
```

```
 1    am a common employee, I would think on that specific
 2    occasion where you hand me a very important document, I have
 3    some fiduciary duty to you, but it's a narrow fiduciary duty
 4    in terms of that single document that you gave to me.
 5              Come on in, counsel, and we will be with you on
 6    both sides.  Thank you for being here.
 7              What I might not have, though, and what might be
 8    damaging to the American work force is a complete duty of
 9    loyalty that measures into the rubric of a fiduciary duty
10    because the dangers would be as follows.  If that's the
11    case, what makes capitalism so different than any other
12    system is, first, the mobility of the work force; second,
13    the creativity of our work force as exemplified by Silicon
14    Valley.  It may be the only thing that sets America apart
15    right now in a competitive marketplace in the world.
16              If the common American worker, however we define
17    that, the vast majority of whom probably do not have a,
18    quote, unquote, fiduciary duty but may arguably from
19    Mattel's perspective -- and MGA's perspective because I
20    think they might join in this argument -- have a fiduciary
21    duty, aren't people intentionally stifling that very
22    movement?
23              I am not talking about Brawer.  In fact, I don't
24    quite even know what to do with the hypothetical where I
25    have Boeing engineers, let's say, earning $118,000 as part
```

```
 1  of the middle-class or upper middle-class by way of example,
 2  and whether I would categorize them as having a fiduciary
 3  duty or duty of loyalty, or whether I would encourage their
 4  marketability and their movement, especially in California,
 5  because they are well paid.  They are given top-secret
 6  documents.  They are working on a fuel line for some
 7  aircraft.
 8          But I want to go back to the common American
 9  worker, and I wan to take Beatrice and all the other three
10  common workers.  I thought that over the history of this
11  country that corporate America's reigns had been
12  significantly loosened; that the old company town, the old
13  monopolies or large corporate America that existed in the
14  1800s when we emerged in our industrial revolution, had
15  initially taken this duty, and it had been very strong in
16  terms of the company because there was no mobility.
17          You worked in West Virginia for a coal mining
18  company, as my grandfather did.  You worked for Peabody.
19  And in those days in our history, we were tied to the
20  company, and in a sense the company tied to them through
21  literally the corner store that you went to that was company
22  owned.
23          Everything I read going back to English precedent
24  takes into account almost class distinctions.  When you look
25  at English jurisprudence, it has a lot of class
```

distinctions, and the mobility in America seems to be
freeing, if you will, this incredible resource of employees.

Now, I can argue that there is not only a duty of
loyalty but a fiduciary duty given any specific document
given to the common American worker. I don't think you and
I disagree with that at all.

What I am concerned about are not Carter Bryant
for a moment. I just want to take the three patternmakers
or seamstresses. They haven't supposedly worked on company
time, although that's arguable factually. I thought in
competitive American capitalism, we encourage you to get a
second job to get ahead. We didn't stifle you. And if we
were going to take away your right to work from 6:00 in the
evening until 10:00 at night, we ought to do that
contractually because we should be paying you more money.

If the company has the right, then, to say to a
worker -- Ms. Keller, for instance -- that you can't work
from 6:00 to 10:00 or you can't go over and sweep floors at
McDonald's or flip burgers in this common mundane area, then
we ought to contract for that and we ought to pay her
overtime, et cetera.

So what's troubling me is -- just take my analogy,
although it's a bad analogy, Early Light for a moment.
We're going to take Early Light factory, and we're going to
take MGA and Mattel, both producing product inside the same

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
1   factory.  There's supposedly a partition or security.  And
2   the anomaly of that is Mr. Choy says to both Mattel and MGA,
3   "Don't worry about it.  We have a duty of loyalty here.  We
4   have a responsibility, and you shouldn't worry about these
5   manufacturers."
6            Although husbands and wives may work on different
7   sides of the rooms, workers get together and have some tea
8   after work and we talk about one product that we're
9   producing on one side and the other.  It's rather ludicrous
10  that there, Mattel and MGA enter into that kind of agreement
11  with Mr. Choy, you know, that we are all going to accept.
12           But here we have these common American workers who
13  literally under the supposed loyal -- the same thing I
14  really worry about philosophically is this, Mr. Quinn.
15           I am going to give you a broad perspective and
16  come back to individual thoughts for a moment.  The broad
17  perspective is this.  If I write an opinion on the duty of
18  loyalty that stifles this very mobility which I think is the
19  creative and competitive advantage for capitalism in the
20  world, what that means is that any worker that moves from
21  Ms. Keller's company to your company literally can be sued
22  by the prior company because every company will say all the
23  creative ideas that came up in Mr. Quinn's company was
24  actually concocted over here in Ms. Keller's company.
25           The end result of that is we stop mobility and we
```

1   allow prior companies going back a hundred of years of

2   American to almost create a monopoly.  So I worry about

3   taking away this competitive movement, and I worry about the

4   right of the American worker just to make a decent living,

5   because we have all gone to second incomes except the bench

6   apparently.  I am just kidding you.

7          Finally, it seems to strike at the heart of

8   everything that California doesn't stand for.  Now, that's a

9   very, very mushy philosophical thought, but it is much

10  different than the class distinctions in England.  It's much

11  different than a hundred years ago in America where company

12  towns literally sprang up and you worked for Hoover Vacuum

13  Cleaner or John Deere your whole life.  And by the way, it

14  is green and yellow.  It's not red -- whoever that expert

15  was.

16         So I am worried about mobility.  I am worried that

17  as a hiring company I am less liable to hire the worker that

18  comes from another company even in the competitive sense.

19  And I think that Mattel and MGA would both be damaged if I

20  wrote this kind of opinion.

21         In other words, this isn't just Mattel losing a

22  claim.  This is a striking opinion that almost I would like

23  to call for amicus briefing on.  So that's the start of our

24  conversation today which is going to be long and lengthy,

25  because I probably put 100, 200 hours just in trying to

1    think through where I believe America is today.

2          Now, Conrad Rushing mushed the two together.

3    Conrad was a judge I knew at the California Judicial College

4    back in the 1980s.  Wonderful jurist.  But in his opinion he

5    put the two together.  It's picked up in an unpublished

6    opinion by my colleague, Susan Illston.

7          Tentatively I disagree with the reasoning, and I

8    am very, very concerned about how that got put together.

9    And their fact situation is so much different, though,

10   because Mattel isn't out of pocket.  You had the right to

11   file a breach of contract claim.  I am just talking about

12   the seamstresses or the fashion makers for a moment.

13         So now with that mushy kind of conversation, you

14   can respond any way you want to.  Then I am going to come

15   back to some more facts in this case just concerning the

16   seamstresses or fashion makers for a moment.

17         Your turn.

18         MR. QUINN:  These are obviously interesting

19   questions.  This isn't a situation where -- and we are not

20   arguing for a situation where employees are in effect

21   indentured or prevented from getting second jobs or

22   vulnerable to being sued if they quit one employer and go to

23   work for a competitor if they haven't taken trade secrets

24   information with them.

25         We are talking -- and I think we have to focus on

 1    the situation of serving two masters.

 2            THE COURT:  Let me break in, and you can interrupt

 3    me also.

 4            MR. QUINN:  All right.

 5            THE COURT:  We will take our robes off and coats

 6    off today.

 7            MR. QUINN:  Okay.

 8            THE COURT:  How are they serving two masters as

 9    long as we have that kind of representation in this case

10    that they are keeping things secret or separate?  Just like

11    Choy is representing through Early Light to Mattel and MGA

12    that they are keeping things separate.  In other words, why

13    do I distrust Beatriz, Morales, Cabrera?  Why do I distrust

14    these ladies' representations any more than I should

15    distrust Choy's representations?

16            MR. QUINN:  Well, Mr. Zeller points out to me that

17    there is evidence that Salazar was working for MGA during

18    the day as well.  It wasn't just after 5:00.  But I think we

19    have to start from -- again, at this stage we are supposed

20    to get the benefit of all inferences in the evidence.

21            THE COURT:  Right.

22            MR. QUINN:  The Court also knows that we have a

23    hanging issue about document custodians.  Their personnel

24    files have not come in yet.  When they do, the Court will

25    see that they were parties to inventions agreements.  The

1    evidence is --

2            THE COURT:  Let's stop there for a moment.  You

3    have the right to fire them.

4            MR. QUINN:  Right.

5            THE COURT:  In other words, Mattel is not out of

6    remedy, and you can actually bind the American work force

7    through contract.  I am not ever suggesting that there can't

8    be such a thing as, quote, unquote, "a fiduciary duty with a

9    common worker."  And I am not suggesting that you can't bind

10   the common American worker even if they are a janitor.

11           What I am suggesting, though, is whether you call

12   that an adhesion contract or not, which can be litigated on

13   another day, you have got contractual remedies because there

14   the American worker can say, you know, if you're not going

15   to let me work after 6:00 -- see, I used to work down on the

16   docks in San Francisco unloading trucks from 8:00 to 5:00,

17   and then I'd drive across the bridge and from 6:00 to 10:00

18   I'd bust tires over at Sears & Roebuck.  Okay.

19           Now, you have a right to tell young Dave Carter

20   that he can't go over and work at Sears & Roebuck or even in

21   a competitive longshoreman position or dock position, you

22   know, sorting goods at night.  But if you're going to take

23   away that income, I ought to know that in a contractual

24   relationship where I can say:  You know, John, pay me a

25   little bit more money, then.  Pay me 15 cents more an hour.

```
 1   And by the way, I like the free time from 6:00 to 10:00.

 2            So Mattel wasn't without a remedy.  And what I am

 3   worried about is that initially MGA is going to join you in

 4   this argument, thinking that they've prevailed on this

 5   claim.  But if I write this opinion, it is significantly

 6   changing, and MGA may be the first party in the future that

 7   wishes this kind of opinion hadn't been written because it's

 8   going to go against Conrad Rushing potentially.  It's going

 9   to have some significance.

10            So I am back to you again.  You can bind them

11   contractually, but you chose not to sue them on that basis.

12            MR. QUINN:  Well, Your Honor, we're talking about

13   -- again, looking at the evidence most favorably to Mattel

14   on this at this point, these are highly specialized, skilled

15   employees.  They aren't just seamstresses.  This is an art

16   in making the very first versions of the fashions for a

17   fashion doll, the distinguishing unique aspect of a fashion

18   doll, that and the hair.

19            There is evidence that this is a rare skill

20   putting these together.  This may be something difficult for

21   us to fathom and understand everything that goes into it,

22   but there is evidence supporting our view that this is

23   highly skilled.

24            We have seen evidence that MGA had a real hard

25   time finding other people who could do this.  There must
```

1    have been some reason that for five years they were paying

2    Veronica Marlow a seven-figure amount of money to provide

3    these services.

4           I would argue -- and these are employees who are

5    salaried employees with benefits.  They are not longshoremen

6    or working by the hour.  These are employees who have

7    significant, important jobs with highly valuable skills.  I

8    don't think -- it's not stretching the analogy to look at

9    this as, you know, go to Silicon Valley and think in terms

10   of an engineer who has some specialized expertise today in

11   nanotechnology or solar energy or something like that.

12          Let's just change the fact situation.  Would any

13   of us think it would be appropriate for such a person to

14   serve two masters?

15          THE COURT:  Let me ask you this question, because

16   that's where I am struggling, because I tossed out the

17   engineering example to you.  It's a great analogy that

18   you've just propounded.

19          There is the middle ground.  There is the very

20   person that I don't know how to classify.  In one case I

21   could say that a person has a fiduciary duty because they

22   are paid $118,000 a year.  But I might be looking at a shop

23   of 2,000 engineers working.

24          The other argument could be, wait a minute.

25   Mobility in the work force, you can bind them contractually.

1   They have no duty of loyalty except they might have a

2   specific duty of loyalty concerning a fuel propulsion system

3   that they are working on.

4           But corporate America isn't allowed to bind them

5   in this concept of duty of loyalty because the competitor

6   couldn't hire them.  And quite frankly, competitive hiring

7   is good in the marketplace on many occasions as long as you

8   are not stealing our trade secrets.  So now the engineer

9   goes from Boeing to Northrup.

10          MR. QUINN:  He quits one and goes to the other.

11          THE COURT:  Yes, or he's induced.

12          MR. QUINN:  Whatever.

13          THE COURT:  Whatever.

14          MR. QUINN:  But he's terminated one employment.

15          THE COURT:  Yeah.  And by the way, he signs the

16  contracts two weeks before he goes, so we get rid of all

17  that, because, of course, we're not going to accept

18  employment unless we have negotiated with the future

19  employer.

20          And Boeing turns around and says, you know, we

21  think you worked partially on this fuel line.  We can't

22  quite prove it, but we are filing a complaint.  And they

23  file it in good faith, you know, with the facts they've got

24  at that time, because he's in the same department.  Lo and

25  behold, it turns out that he's not working on the fuel

```
 1   system.  He is working on a brake system that has fluid.
 2   There we have absolutely stifled competition.
 3          That's why California, I think, writes their laws
 4   in this way, because it's just a creative, mobile state.
 5   And how we catch you if you're violating our laws on the
 6   state level is we get you on the trade secret
 7   misappropriation.  That's the problem I am having.
 8          If I let the duty of loyalty go forward, I am not
 9   only sweeping in a class since this -- I am mushing
10   fiduciary duty into what may be a nonexistent duty of
11   loyalty.  I don't know quite how to define what I'm going to
12   call the upper middle-class who has fiduciary duties on some
13   occasions but shouldn't be bound to corporate America and
14   the old company work town.  And I have got the Brawers of
15   the world, who no doubt have a fiduciary duty.
16          I am starting to look at America and the
17   capitalist system as only being able to thrive with that
18   kind of competitive and mobility advantage.  Therefore, if I
19   write this duty of loyalty and I continue to mush this
20   together as Conrad Rushing does, I'm deeply concerned that
21   one is striking against California law and creativity.  So
22   maybe we come back to the fact situation of just how do we
23   define the seamstresses or fashion makers, and that's the
24   critical issue.
25          MR. QUINN:  Again, Your Honor, I don't think this
```

1    is a mobility issue as such.  I think that's a red herring.

2              THE COURT:  How about an overtime issue?

3              MR. QUINN:  Mobility is important.  Overtime

4    issue?

5              THE COURT:  Yeah.  Why can't the seamstresses or

6    American work force go out and work after 6:00?  Now, for a

7    moment I know the argument is that they're working on Mattel

8    time.  But after 6:00 why can't they go out and work?

9              MR. QUINN:  They can.

10             THE COURT:  Can they work in the same industry?

11             MR. QUINN:  Can they -- if they have these

12   specialized skills --

13             THE COURT:  Yes.

14             MR. QUINN:  -- should they also be able to

15   concurrently work for a competitor?

16             THE COURT:  Sure.  They represent to you that they

17   keep the product separate.  Why do I believe them any more

18   than David Choy who says to Mattel and MGA, oh, we keep our

19   product separate because we have two different sides at the

20   factory.  But all the way Mrs. Chin and Mr. Chin go home at

21   night and they work on two different sections of the factory

22   and, of course, they don't talk about their product.  But

23   they go out and have tea.

24             MR. QUINN:  Then, Your Honor, then the Dombrowskis

25   of the world who are responsible for sourcing that activity

 1  globally go into it with their eyes open.  They've made a

 2  decision.  Yeah, we are going to tour the facility, Early

 3  Light's facility, see what Francis Choy does, and make a

 4  decision, you know, I am comfortable with this situation.

 5      THE COURT:  But there is whole set of Mattel, and

 6  rightfully so, that was very uncomfortable with this

 7  position; who really were saying let's go to another

 8  factory.  Let's not take a chance.

 9      MR. QUINN:  Well, there was the one witness who

10  said they were uncomfortable.  And Dombrowski, who goes to

11  China four times a year; a witness who hadn't had the tour

12  -- I forget her name, Adrienne Fontanella.  Dombrowski says,

13  no, we're not going to do that.  And there is no evidence

14  that it was moved because he said he's comfortable with

15  that.

16      So he goes into it with his eyes open and says

17  this is fine.  But what happens here when you have a breach

18  of a duty of loyalty is the employer never got a chance to

19  make that judgment.  Am I comfortable having my skilled

20  seamstresses working on a fashion doll for a competitor?

21  That would be an analogous situation.

22      THE COURT:  Okay.  We are going to come back after

23  a recess.  I just saw Justice Trotter walk in and other

24  counsel.  But let me leave you with this thought, because I

25  would like to talk to him for a moment and open up the

1   complex courtroom.

2          When we come back this morning, I want you to talk

3   to Mike Zeller and Mr. Price.  I may be very satisfied with

4   those answers, and I am going to test MGA in the same way in

5   a few moments.

6          MR. QUINN:  Can I add just one other thought, Your

7   Honor?

8          THE COURT:  You can always add another thought.

9          MR. QUINN:  And I appreciate the opportunity to

10  extol the benefits, advantages, and history of American

11  capitalism.

12         THE COURT:  Good.

13         MR. QUINN:  But today, you know, from the -- it's

14  not so -- employee mobility isn't so much an issue.  But if

15  you're talking about allocating capital, what investor would

16  be comfortable allocating capital investing in a company if

17  they knew there was a prospect that people with highly

18  skilled jobs that have special rare talent for the key

19  product could work for competitors?  That's capitalism.

20  That's important.

21         I mean, the easier thing, the nanotechnology

22  company, the startup solar energy situation, Your Honor --

23         THE COURT:  You have got to be kidding me.

24         MR. QUINN:  No, seriously.  And venture capital

25  firms.  If they knew that the key engineers there could also

1     work for the Chinese to make it, you know, to throw it into

2     stark relief, no venture capital firm would invest in a

3     situation like that.

4            THE COURT:  Well, we've just destroyed Silicon

5     Valley, then, because that's exactly what happened.  Let me

6     go back to the old company days again because we're talking

7     about it -- capitalism and class distinction and whether a

8     duty of loyalty even should exist.

9            Old-time corporate America denominated, and

10    rightfully so, with our industrial revolution.  And we were

11    able to say you work in a company town at a company store

12    for a coal company, or you work for John Deere or Hoover

13    Vacuum.  I agree that there is a duty of loyalty if I hand

14    you a document even as a common worker.  Here is the will

15    for my family.  John, take care of it.

16           I can create that fiduciary duty in a very narrow

17    sense for the common American worker, however we define a

18    duty of loyalty or fiduciary duty.  My concern is that

19    America's competitive advantage in capitalism and the one

20    thing that we may have left is this not only mobility but

21    the creativity that goes with it.

22           MR. QUINN:  Absolutely, Your Honor.

23           THE COURT:  That's what Silicon Valley created.

24    So what you have is Silicon Valley -- and I don't want to

25    use that as a model for the country.  Of course, you have

```
 1    competitors hiring.  As long as I am not taking your trade
 2    secret and stealing from you, which I have a remedy for in
 3    trade secret misappropriation, it's hard for me to
 4    understand if we are going to remain competitive why I would
 5    find a duty of loyalty, let's say, for the middle class,
 6    however you define that, or the middle-of-the-road American
 7    worker down to the janitor, because you can bind that person
 8    contractually.  You have remedies.  But Mattel chose not
 9    to --
10              MR. QUINN:  We're not talking about the janitor.
11    And I can tell you, Your Honor, having represented benchmark
12    capital --
13              THE COURT:  Just a moment.  So we're done with
14    McDonald's and Burger King, that example you used?
15              MR. QUINN:  And I started by saying -- well, I am
16    not arguing for a duty of loyalty there.
17              THE COURT:  Okay.  I'll cross that off my list.
18              MR. QUINN:  I never was.  That was always crossed
19    off.  But I can tell you, having represented major venture
20    capital firms in Silicon Valley, there is no way they would
21    invest in a company if they thought there was some prospect
22    that a key engineer, people with specialized skills, could
23    work for a competitor even if, hypothetically speaking, they
24    weren't using trade secrets.
25              THE COURT:  Just a moment.
```

```
 1              MR. QUINN:  No -- but this is important for
 2    capitalism.  We're talking about how you allocate capital.
 3    It's not just employee mobility.  It's how you allocate
 4    capital.
 5              THE COURT:  I would agree with you concerning
 6    somebody like Mr. Brawer.  I shudder to think that Mattel
 7    would close its doors or MGA would close its doors with
 8    Beatriz, Cabrera, Morales.
 9              MR. QUINN:  Now we're arguing the facts and the
10    evidence.  I mean, I am drawing analogy obviously.
11              THE COURT:  Right.
12              MR. QUINN:  But, you know, we get the benefit of
13    the inferences on how rare these skills are and how
14    important fashions are to a fashion doll.
15              THE COURT:  No, Mr. Quinn.  It's been
16    invigorating, as always.
17              MR. QUINN:  Thank you, Your Honor.
18              THE COURT:  Now, you'll come back with me, though.
19    I'm not done with our discussion.  Okay?  I find it very
20    challenging.
21              All right.  For MGA, be careful what you argue,
22    because you may prevail on this duty of loyalty.  I'm not
23    certain, and I'm going to come back to Tumalian, the intern,
24    next.
25              And finally I'm going to come back to Carter
```

1   Bryant, because I believe Carter Bryant is superseded

2   initially by the trade secret misappropriation.  Mattel

3   never filed a trade secret misappropriation, which is what

4   Judge Wardlaw was inquiring about if you listened to the

5   oral argument at the Circuit.

6           She was very concerned why, and because you

7   weren't able to represent Mattel at that time.  There was no

8   answer forthcoming from counsel who was in front of the

9   Circuit.

10          So tentatively when we come back on the record in

11  a few moments, Carter Bryant, I would believe, would have a

12  fiduciary duty.  There is my engineer, Mr. Quinn, that I

13  think falls right within your scenario.  The problem with

14  Carter Bryant, I believe, tentatively is superseded by the

15  trade secret misappropriation claim, which is consistent

16  with what I've ruled so far.

17          With Tumalian, who is the intern, I'm having an

18  equally difficult time.  So on each category I may be

19  writing and trying to designate.

20          Finally, for MGA.  Don't get too confident,

21  because while you may prevail on a claim, this basically

22  would be a pretty far-reaching decision that has a

23  tremendous effect on corporate America.  And it would in

24  some ways be perceived to disagree with Conrad Rushing's

25  opinion up in the district or the appellate court up in

1    Santa Clara.  By the way, he is a fine jurist.

2            By the same token, I am going to ask you the same

3    question, so think about this during the recess.  Why,

4    regardless of mobility and regardless of the capitalist

5    system and less class distinction in America, why shouldn't

6    the Court find that these are not janitors or hamburger

7    flippers.  This is not the vast majority of the American

8    labor work force producing, and that at least these

9    seamstresses have two problems factually.

10           One is the contention that they worked for some

11   small period of time for MGA while they were working out of

12   their home in what would normally be 8:00 to 5:00 hours.

13   And you can read California law into it, because I've come

14   to believe that California law in terms of trade secret

15   misappropriation is harsh for only one reason.

16           The law seems to indicate mobility creativity, and

17   California is far different than the state law, for

18   instance, in the state of Washington where Boeing and

19   Microsoft have a tremendous influence on legislative acts.

20   There you have got less mobility written into their state

21   law, and the trade secret misappropriation laws look a

22   little different.

23           Finally, I'll take Judge Kozinski's position.  You

24   know he's like to preempt and sweep.  He'd like to preempt

25   even apparently a copyright -- I'm sorry -- trade secret

```
 1   misappropriation over the copyright.  And that's probably
 2   going to be one of your arguments.
 3          I am fairly confident for Carter Bryant that
 4   Carter Bryant is superseded by the trade secret
 5   misappropriation.  So it's probably going to leave minimally
 6   the argument about the three seamstresses/fashion makers,
 7   and Tumalian, who is the intern.
 8          Now, let me visit with Judge Trotter for a moment.
 9          (Recess.)
10          THE COURT:  All counsel are present.  The Court
11   appreciates your courtesy.
12          Let me go back to Mr. Quinn for a moment.  Let's
13   agree, Mr. Quinn, that on one hand many workers have a
14   fiduciary duty in the American workplace by virtue of their
15   position in the hierarchies of corporate America, or an
16   individual task employed by them by an employer.
17          The best example I can think of is simply I
18   entrust you with my will or a document.  The problem is that
19   the latter situation in which I trust you with a document is
20   rather short-lived in terms of a fiduciary duty, and it only
21   applies, I think, to a single task.
22          But the vast majority of the American work force
23   does not have at least a fiduciary duty to their employer.
24   Instead oftentimes I think there is a rubric of a duty of
25   loyalty.  It seems to me in the filing that on one hand
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    there is a contractual claim that wasn't filed, and there is

2    a duty of loyalty claim that is filed.  And the difference

3    -- if I was filing it, not you -- is that my duty of loyalty

4    claim leads to unjust enrichment and potentially punitive

5    damages, greater damages.  My contractual claim doesn't.  It

6    leads to contract damages.

7         But you do have an intentional interference claim

8    which in all likelihood is going to go to the jury.  I think

9    this right to work in a sense has benefited America and our

10   tradition and it's separated us -- and I repeat this -- from

11   most of the world not only in terms of our ingenuity and our

12   mobility, but just our hard work.  I know that you know

13   this, but we are the hardest working society in the world

14   right now.

15        The average American worker has surpassed the

16   Japanese worker per month by 20 hours.  So that old myth of

17   other nations being harder working long passed in the 1990s.

18   I am not too certain that that isn't encapsulated in

19   California Civil Code 16600, but I wasn't in the

20   legislature.  Nobody elected me to any position.  I am just

21   conceptually thinking:  Why does California take this

22   position?

23        You can, of course, you and MGA -- I am speaking

24   to MGA also -- the American -- corporate America can control

25   their workers by contract.  But here you have conceded that

1    there are no contractual obligations, and I am speaking

2    about the fashion makers.

3            MR. QUINN:  Or patternmakers.

4            THE COURT:  Or patternmakers or seamstresses.

5    Each side attaches their own word.  There are no contractual

6    obligations.  There's no fiduciary duty.  Instead they are

7    supposed to fall under this broad umbrella of this imposed

8    duty of loyalty.

9            And I repeat to you that what you are hearing is a

10   deep-seated concern that if I allow you to proceed, that I

11   have this feeling that it stifles the very mobility and

12   ingenuity and the hard work that capitalism flourishes

13   under.

14           So it means that almost any employee changing a

15   job would be subject to a lawsuit by a former employer for

16   any of his work or her work that the former employer deemed

17   or speculated occurred during the first term of employment.

18   For most common Americans this almost smacks of corporate

19   servitude, and I think that was loosened literally a hundred

20   years ago.

21           The interesting dichotomy -- just so we're talking

22   philosophically before I get back to the specifics, which I

23   am going to with a vengeance in a moment -- is that the

24   American middle class seems to be dissipating.  So when we

25   just sit back and we were having a cup of coffee at

1    Starbucks right now and having a casual conversation, I

2    would state to you that I would be very, very concerned

3    about where is that duty of loyalty back from the American

4    corporate hierarchy.  It seems to be so top-loaded in terms

5    of executive compensation and, if you will, outsourcing

6    overseas.

7           I have heard this back and forth between Mr.

8    Larian and Mr. Machado, and for the record each party has

9    subtly tried to place in front of the jury -- and there is

10   nothing wrong with this.  In fact, I would try to do it.

11   But 35,000 American employees by Mattel certainly.  Mr.

12   Larian's response is he has the only American factory left,

13   Little Tikes, and so he employs American workers.

14           The counter-response is that you, Mattel, have

15   shipped out to Indonesia.  All that is just sympathetic for

16   the jury, but it does raise this corporate servitude that

17   was loosened, I think.  And such a broad claim by MGA -- so

18   I put them in the same position as you, as Mattel -- if

19   allowed to proceed against the three fashion doll makers or

20   seamstresses, would once again smack of that same binding

21   problem.

22           I don't think that that's become the American

23   dream, and I don't think that's what capitalism or corporate

24   America or our society benefits from.

25           I do think it's so ironic that this factory space

```
 1   that's shared with competitors at Early Light and with the
 2   representation from Dennis Choy that we have a separate
 3   factory, and just overlooking the fact that factory workers
 4   may be related, et cetera, may work on different competitive
 5   toys, somehow has greater credence than a seamstress or a
 6   fashion maker saying, you know, in my home I don't mix these
 7   two.  So that on a philosophical basis is very troubling to
 8   me.
 9           In a moment I am going to turn this over to you.
10   You have got an uphill argument with me concerning Carter
11   Bryant.  The reason for that is I think that he is
12   superseded by the trademark misappropriation claim.
13           On Tumalian, I really want to hear why Tumalian
14   has this, quote, unquote, duty of loyalty when he is
15   employed by both companies, has contracts with both
16   companies, is a paid extern, et cetera.
17           So now I am done with the philosophy.  The lectern
18   is completely yours.
19           MR. QUINN:  Again, Your Honor, when it comes to
20   Francis Choy and Early Light, there is full disclosure.
21   Dombrowski has a choice.  He has an opportunity to say it's
22   okay or it's not okay, thumbs up, thumbs down, on whether we
23   want to source our manufacturing product at that facility
24   given those circumstances.
25           Mattel never had that choice as to the skilled
```

```
 1   patternmakers.  That's an important difference.  It's the
 2   secrecy of it.  It would be an analogous situation to Early
 3   Light if they had come to Mattel and said, you know, we also
 4   want to make fashions for a competitive fashion doll.  Do
 5   you have any problem with it?  If they went to the
 6   equivalent of Dombrowski in the design set.  They didn't.
 7   We never had that chance.  It was secret.
 8           In terms of the Court's concern about mobility and
 9   whether employees are going to be unfairly tethered to their
10   employers, we'd be turning back the clock on the course or
11   the trend of employer/employee relations.  I think we've got
12   to focus on the issue here.  It's really concurrent serving
13   two masters.  Serving two masters, it's concurrent
14   employment.  It's not mobility.  So employees are still free
15   to go work someplace else.
16           The Court has made some observations which I think
17   there is a lot of truth in about the enforcement of trade
18   secrets litigation in California and how that interplays
19   with 16600.  I think it's the reason why Silicon Valley is a
20   hotbed of trade secrets litigation, for that very reason.
21           We are dealing here with a different circumstance,
22   and I submit that there are compelling interests in why we
23   don't want -- it's not good for American employers and
24   therefore not good for the American workplace and for
25   competition for employees with special skills to be able to
```

```
 1   secretly work concurrently for competitors.  I mean, if that
 2   was an accepted, widespread practice, I'm not sure that that
 3   might have some impact on employment in limiting -- I mean,
 4   if employers knew that they had to nail that down somehow, I
 5   am not sure that that wouldn't limit employee freedom in
 6   some fashion.
 7            THE COURT:  Just a moment.  That's a good point.
 8   In other words, let me repeat back to you what I just heard
 9   so you know that I am tracking or not, and you can repeat it
10   again.
11            Judge, that could also create a lack of mobility.
12   Employers would have to take the commonest worker coming
13   into their workplace and make sure that their contracts were
14   so well defined, and why wouldn't that have a chilling
15   effect also.
16            MR. QUINN:  Exactly.
17            THE COURT:  Okay.
18            MR. QUINN:  Exactly.  I mean, if you had to
19   suddenly deal with the prospect that any of your employees
20   -- and we're not talking about hamburger flippers here but
21   skilled workers -- could work for the competition at the
22   same time and they wouldn't necessarily even have to tell
23   you about it, I think that would have far-ranging
24   repercussions.
25            THE COURT:  I almost called for amicus briefing on
```

1    this issue and would have if I had had more time.

2         MR. QUINN:  I'd point out that the duty of loyalty

3    claim was before the Ninth Circuit.  The Ninth Circuit

4    reached out on a number of different issues.  It did not

5    reach out on this.

6         THE COURT:  The reason they didn't is that they

7    didn't have a trade secret misappropriation claim staring

8    them in the face and this issue of supersession.  And if you

9    listen to Judge Wardlaw, she keeps asking:  Where is the

10   trade secret misappropriation claim?  She couldn't be any

11   more clear about her search for that.

12        MR. QUINN:  Well, I think it was because MGA took

13   this issue off the table.  If I could read to the Court from

14   MGA's brief to the Ninth Circuit:  "Whether an employee has

15   breached their duty of loyalty is a question for the trier

16   of fact.  No ironclad rule as to the type of conduct which

17   is permissible can be stated," citing the Bancroft decision.

18   So there MGA kind of said that's not an issue before the

19   Court at this time.

20        Now, if I can turn to the supersession issue as it

21   relates to Carter Bryant.  The Court has ruled on that in

22   the summary judgment motion in denying the motion for MGA's

23   motion for summary judgment on the aiding and abetting

24   breach of loyalty claim.  The Court found in its opinion,

25   Docket No. 9600 at page 91, quote:  "The conduct by Bryant

```
 1    that does not form the basis of Mattel's trade secrets

 2    misappropriation counterclaim is not preempted."

 3           And the Court noted that:  "Such conduct includes

 4    Carter Bryant's" -- and I'm quoting now from the Court's

 5    opinion -- "directing the production of the first generation

 6    Bratz dolls while still employed by Mattel, engaging other

 7    Mattel employees to unknowingly work on Bratz dolls, using

 8    Mattel's physical resources to create a dummy doll for MGA,

 9    and working on other side projects" -- i.e., the Angel

10    project, I think is what the Court had in mind -- "for MGA."

11           THE COURT:  How does that deal with duty of

12    loyalty?

13           MR. QUINN:  Well, the point is that the Court has

14    found, and I think correctly so, that those activities by

15    Mr. Bryant are not preempted by the uniform trade secrets

16    acts.  I take supersession to be another work for

17    preemption.  Maybe somebody's going to explain to me that

18    there's a difference in that, but that's what I understand

19    that to mean.

20           It's clear that the uniform trade secrets act does

21    not act to preempt duty of loyalty claims that are not based

22    on the misappropriation of confidential information.  Let me

23    repeat that again.  The uniform trade secrets act does not

24    and cannot preempt duty of loyalty claims or any claims for

25    that matter that are not based on the misappropriation of
```

1   information.  In the uniform trade secrets act there is a

2   savings clause that says precisely that.

3            I would cite to the Court a Northern District of

4   California decision from last year, TMX Funding, Inc.,

5   versus Impero Technologies, where the Court says precisely

6   that.  And in the context of a duty of loyalty claim, the

7   Court says that the USTA preempts common law claims that are

8   based on the same nucleus of facts as the misappropriation

9   of trade secrets claim.

10            THE COURT:  Is this Judge Illston, unpublished

11   opinion?

12            MR. QUINN:  I am looking, Your Honor.  It's Jeremy

13   Fogel.

14            THE COURT:  Okay.  I knew him at the California

15   Judicial College also back in the 1980s.  A wonderful

16   jurist, very respected.

17            MR. QUINN:  This is from 2010 Westlaw, 2509979,

18   Northern District of California.  And the Court said:

19   "Regardless of whether the information is a trade secret,

20   defendants may be liable for breach of the duty of loyalty

21   if they utilized Teledex's proprietary information for

22   conversion if they wrongfully deprived TMX of possession of

23   that information; for unfair competition if they

24   misappropriated TMX's proprietary information; for

25   interfering with TMX's prospective economic advantage; and

1    for accessing computerized information without

2    authorization."

3            These claims in that case were not based on the

4    same nucleus of facts as the trade secrets claim.  There was

5    a breach of loyalty claim as well.  The Court said not the

6    same nucleus of facts that forms the basis of the trade

7    secrets claim, so not preempted.

8            Similarly, we think the Court got it right with

9    respect to Carter Bryant in the summary judgment order where

10   the Court said the same thing, that Mr. Bryant had done

11   these other things that I listed which do not in themselves

12   comprise taking proprietary information.

13           THE COURT:  Assume for a moment that tentatively

14   the Court ruled against you concerning the fashion makers or

15   seamstresses and the intern, but allowed you to go forward

16   hypothetically on the duty of loyalty.  What would the Court

17   do with a verdict on the duty of loyalty and a verdict on

18   the trade secret misappropriation?  Isn't that double

19   recovery?

20           MR. QUINN:  Well, I think we would have to look at

21   that.

22           THE COURT:  Yes, we would.  So let's look at that.

23           MR. QUINN:  I think --

24           THE COURT:  See, that's the problem Judge Larson

25   got into.  And I know it's a $100 million verdict from his

perspective.  But I've often said it's really a $40 million

verdict, that there was supersession or preemption, if you

will, on the three state law claims; that regardless of the

letter that he received, legally speaking there was

$10 million on the copyright and $30 million on one of those

claims, and everything else legally was double recovery.

Now, the jury apparently wrote a note to his

clerk.  He saw that.  I accepted that the jury may have

intended $100 million.  But legally on the face of it, it's

a difficult verdict to uphold.

MR. QUINN:  Right.

THE COURT:  Don't I have the same problem with

duty of loyalty, just focusing on Carter Bryant, and the

trade secret misappropriation claim?  What do I do with

that?

MR. QUINN:  Well, first off I would submit, Your

Honor, there is no reason -- I don't think there is any good

reason to take this away from the jury at this point.  We

are having other claims go to the jury and at least one that

we know is not for the jury to decide at all.  The Court is

going to get an advisory verdict on the 17200.

Why would, especially given this Court's concern

about finality --

THE COURT:  Are you suggesting that I simply send

this to the jury for a verdict and no damages?  If I were in

```
 1   your position, I would be filing this claim for one reason,

 2   and it's a decent reason, and that is unjust enrichment and

 3   potentially punitive damages.  It gives me greater damages

 4   than contractual damages.

 5          MR. QUINN:  I was addressing the preliminary

 6   question really, sort of not yet answering the question the

 7   Court asked.  But the preliminary question, why take this

 8   away from the jury at this stage?  The Court can always

 9   receive a verdict, and then maybe there will be a defense

10   verdict on that.  Then, you know, there won't potentially an

11   error have been made.  So I think there are compelling

12   reasons to let the jury decide this.

13          THE COURT:  By the way, that will be my only

14   question to MGA.  And that is --

15          MR. QUINN:  Why not let them decide?  What's the

16   harm at this stage?

17          THE COURT:  Even if it's error, even if the Court

18   felt strongly that this shouldn't go, why are you risking

19   potentially an appeal on this issue and why are you taking a

20   very client who may be sue-happy also in terms of his

21   employees, MGA, and having an opinion come out from the

22   Court like this?  I mean, this harms MGA just as much as it

23   harms Mattel.

24          MR. QUINN:  To answer the Court's question, then,

25   you don't know if you're going to have to face that choice.
```

```
 1    You don't know what that verdict form is going to come back
 2    in here looking like.  They may find for breach of duty of
 3    loyalty and not find on trade secrets.  They might find on
 4    trade secrets and not find on duty of loyalty.
 5              THE COURT:  They might be so confused with the
 6    more contradictory claims that are claimed that they never
 7    reach a verdict and we get to do it all over again.
 8              MR. QUINN:  But, you know, there are scenarios
 9    where the Court doesn't have to face that situation if it's
10    a duplicative recovery.  Now, let's assume there is a
11    verdict for Mattel on both of those claims.  Then that issue
12    has to be addressed.
13              There is a body of law, case law, that tells us
14    what we need to do in that situation.  And that is, as I
15    recall it, is there any scenario under which these could be
16    completely independent recoveries?
17              THE COURT:  Would you explain that to me.  What
18    scenario?
19              MR. QUINN:  You have to analyze the elements of
20    the claims.
21              THE COURT:  Well, that's what we're going to do.
22    That's what we're going to do right now.
23              MR. QUINN:  And what the verdict is.
24              THE COURT:  That's what we're going to do right
25    now.  American jurors are supposed to understand what
```

1  they're doing, and we're supposed to get it in a form so

2  that they can understand it.  So let's go through that

3  together.

4          MR. QUINN:  I mean, let's suppose on the breach of

5  duty on loyalty they came back with a verdict for $25,000.

6  And trade secrets, they came back with a verdict for $100

7  million.  I think the Court could conclude that, well, this

8  is a jury that thought, you know, soliciting the help of

9  coworkers, putting together a dummy doll, working on prayer

10  angels, you know, the Angel face, and those other

11  nonpreempted claims, that they thought based on what they

12  heard, $25,000 is appropriate, and it's not redundant; it's

13  not additive.

14          THE COURT:  Now I want to propose to you that you

15  prevailed in your argument, but the Court instructs the jury

16  that the duty of loyalty is limited to a two-week period,

17  that the breach of duty of loyalty is basically limited to a

18  two-week period, and therefore their damages are very

19  confined.

20          In other words, you have got a broad trade secrets

21  misappropriation, but you put yourself in a position -- and

22  I don't mean you personally, but you've tactically put

23  yourself in a position where the Court instructs breach of

24  duty of loyalty is for this two-week period of time that you

25  are to consider.  And you come back with, as you said, a 25-

 1    or 50-thousand-dollar verdict concerning Tumalian, the

 2    fashion doll designers or makers or seamstresses, Carter

 3    Bryant.

 4              MR. QUINN:  Well, Carter Bryant, they can conclude

 5    that he started working of this much earlier.

 6              THE COURT:  Okay.  August, then.

 7              MR. QUINN:  August?

 8              THE COURT:  Let's say August 1st all the way to

 9    October 19th.

10              MR. QUINN:  Until his employment ended?

11              THE COURT:  October 19th.

12              MR. QUINN:  Whatever.

13              THE COURT:  October 19th.

14              MR. QUINN:  All right.  But it's still a question

15    of what damages follow from the aiding and abetting of that.

16    I mean, he could, by virtue of his breach of his duty of

17    loyalty and MGA's aiding and abetting of that, set in motion

18    something that is significantly greater.

19              THE COURT:  The natural and foreseeable

20    consequences.

21              MR. QUINN:  There you go.

22              THE COURT:  Okay.

23              MR. QUINN:  Something like that.  In the case of

24    the sample makers, you know, we've got a multi-year period

25    of time.  Arguably this product never could have been

1    launched or at least launched as quickly as it was without

2    the assistance of these women, and that had significant

3    consequences.

4            So there are factual issues here for the jury to

5    decide.  I would say, Your Honor, why didn't we sue for

6    breach of contract or why -- we are entitled -- if someone

7    aids and abets, assists another in breaching their duty,

8    that's a tort.  It's well recognized that those who

9    interfere with other people's duties, our only remedy is not

10   to fire them and exercise our contractual remedies.

11           If somebody has aided and abetted them in

12   breaching a duty, we are entitled to pursue that other

13   person for tort damages if the elements are otherwise met.

14   Any other rule -- suppose you don't recognize that rule.  It

15   would just encourage people to interfere with other persons'

16   duties.  And the law for centuries has recognized that those

17   who aid and abet others in breaching their duties can be

18   called to account for it.

19           THE COURT:  Okay.  I will be back to you.

20           MR. QUINN:  All right.

21           THE COURT:  I really enjoyed your discussion with

22   me.

23           All right.  For MGA, let me start with Mr. Quinn's

24   last concern.  A tort and the increased recovery that occurs

25   by virtue of a tort extends and somewhat curtails because of

```
1    its chilling factor, non-theft.  And contractual damages may

2    not be sufficient as far as corporate America is concerned

3    in stopping workers from literally stealing them blind.

4              How does or doesn't the inclusion of a breach of

5    duty of loyalty interplay with trade secret misappropriation

6    so that there is some clout over a person who has a duty of

7    loyalty from literally stealing corporate America blind?

8              MS. HURST:  If we are talking about tangible

9    property, the tort law of conversion continues to apply.

10             THE COURT:  Okay.

11             MS. HURST:  Okay.  So let's start there.

12             THE COURT:  Okay.

13             MS. HURST:  So there are still tort remedies if

14   what we are talking about is tangible property.

15             THE COURT:  Are dolls tangible property?

16             MS. HURST:  Do you want to get to conversion now?

17   I would really love to respond on duty of loyalty first

18   before we get there if the Court doesn't mind.

19             THE COURT:  Sure.

20             MS. HURST:  And then with respect to intangibles,

21   of course, the trade secrets act does apply as well as other

22   forms of intellectual property which may be pertinent in any

23   particular case, such as patent rights or copyrights.

24             The problem with creating -- so what they want to

25   do is create a new common law tort duty, and the consequence
```

1   of creating that new common law tort duty is that

2   consequential damages are available and punitive damages are

3   available.

4           Now, every time the California Supreme Court has

5   been asked to consider whether to create a new tort duty in

6   connection with employment relationships in the last two

7   decades, it has said no.

8           THE COURT:  How do I deal with Conrad Rushing's

9   opinion?  How do you read that opinion?

10          MS. HURST:  It is a managing agent and former

11  owner and officer that is a fiduciary in that case.

12          THE COURT:  So he threw in dicta about duty of

13  loyalty?

14          MS. HURST:  Exactly.

15          THE COURT:  He conflated the two concepts; didn't

16  he?

17          MS. HURST:  Correct.

18          THE COURT:  Why didn't my colleague in an

19  unpublished opinion, Susan Illston, pick up that concept and

20  run with it?  She's an extraordinary jurist.

21          MS. HURST:  I am not familiar with that case that

22  you're referring to.  I would have to confess, Your Honor.

23  Which case is that?

24          THE COURT:  I will get it for you in a minute.

25          MS. HURST:  Okay.

```
 1          THE COURT:  It's an unpublished opinion.  I
 2   haven't cited it.  I take Judge Kozinski's position on that.
 3   I just don't like unpublished opinions.
 4          MS. HURST:  Let me just elaborate on that, if I
 5   may, the statement I made a few moments ago.  As the Court
 6   undoubtedly knows sitting in California, the California
 7   jurisprudence on creating tort duties out of inherently
 8   contractual relationships reached its zenith in the Siemens
 9   case.
10          And ever since the Siemens case, the California
11   Supreme Court was strongly criticized, and the California
12   Supreme Court overruled Siemens and specifically in the
13   employment context in Foley versus Interactive Data said,
14   look, the employment relationship is an inherently
15   contractual relationship.  This is Foley versus Interactive
16   Data, 47 Cal.3d 654.
17          And the Court analyzed:  Is there something
18   special about the employment relationship?  Is there
19   something special about public policy in connection with the
20   employment relationship?  And it said no.  In that case the
21   Court was considering are we going to place a tort duty on
22   the employer in reference to the employees.  Will the
23   employees have a right to bring a tort claim against the
24   employer for essentially wrongful discharge, a general tort
25   of discharge without cause?  The Court said no, for all of
```

```
 1    the policy reasons that this Court has been articulating

 2    this morning.

 3           We can't add that level of uncertainty.  The Court

 4    said the expansion of tort remedies in the employment

 5    context has potentially enormous consequences for the

 6    stability of the business community.  This situation

 7    undermines the statutory mandate that neither compensatory

 8    tort damages nor exemplary damages are available in an

 9    action arising from the breach of a contract obligation,

10    citing Civil Code 3333 and 3294.

11           As we have reiterated, the employment relationship

12    is fundamentally contractual, and several factors combined

13    to persuade us that in the absence of legislative direction

14    to the contrary, contractual remedies should remain the sole

15    available relief for breaches of the implied covenant of

16    good faith and fair dealing in the employment context.

17           Now, the California Supreme Court is not a one-way

18    ratchet.  It is not the kind of court where it will deny

19    obligations on employers that it will then place on

20    employees in exactly the same side on the other side of that

21    relationship.

22           The California Supreme Court isn't going to say on

23    the one hand that employers have no higher obligation to

24    their employees.  But on the other hand the employees do

25    have this tort duty back to the employers.  That is not the
```

54

```
1    law in California.  How do we know it's not the law of
2    California?  Because in 2008 the California Supreme Court
3    reiterated in the strongest possible terms the significance
4    of Business & Professions Code Section 16600.  That's the
5    Edwards versus Arthur Andersen case, 44 Cal.4th 937.
6            In that case the Court said under the common law,
7    contractual restraints on the practice of a profession,
8    business, or trade were considered valid as long as
9    reasonable.  This was true even in California.  However, in
10   1872 -- this is quite a venerable public policy now in the
11   state of California -- in 1872 California settled public
12   policy in favor of open competition and rejected the common
13   law rule of reasonableness.  That was in enacting the
14   predecessors to 16600, Civil Code Section 1673.
15           In that case the California Supreme Court
16   expressly rejected a narrow restraint exception that had
17   been developed in the Ninth Circuit, saying we are not going
18   with the Ninth Circuit on this.  No, Ninth Circuit.  That is
19   not the law of California.
20           The Court held Section 16600 "represents a strong
21   public policy of the state which should not be deluded by
22   judicial fiat" -- quoting Scott versus Snelling & Snelling.
23   It is unambiguous.  And if the legislature intended the
24   statute to apply only to restraints that were unreasonable
25   or overbroad, it could have included language to that
```

effect.  The Court expressly rejected the Ninth Circuit's narrow restraint exception.

THE COURT:  No, what's the anomaly here is that the Ninth Circuit I think may be more inclined to take the Edwards position than the United States Supreme Court.

MS. HURST:  Ultimately this is a question of California law.  So we need to look to what the California Supreme Court is saying for guidance and what the California Legislature has said for guidance.

Now, as I pointed out, in every chance -- Freeman and Mills, Foley, Applied Equipment, Hunter versus Upright, the Court has systematically rejected the imposition of tort duties in what is fundamentally a contractual relationship.

THE COURT:  My view is that the Ninth Circuit is likely to take your position.  My guess is that the Supreme Court will probably defer to the Ninth Circuit on this issue unless they are going to undertake this whole preemption idea.

So in a sense if they are going to abrogate your strongest argument in terms of the Edwards case and the California Supreme Court's position, the United States Supreme Court would have to in a sense dictate to California if you are correct.  And if they do, then the problem is they had better be uniformity across the country, because you're taking from your perspective 16600 and case law and

1 abrogating or pushing aside the legislative history in

2 California.

3          So, therefore, I think that the true target

4 audience for all of these rulings is in fact the Ninth

5 Circuit on this particular issue.  On the RICO, I think the

6 true target audience for these issues is the United States

7 Supreme Court.  Anyway, we have got different Courts that

8 are going to interplay on different issues.

9          MS. HURST:  Well, to the Court's point, Judge

10 Kozinski has expressed views on this issue of creating tort

11 remedies out of contractual relationships and expressed his

12 views very strongly in the Oki America versus Microtech

13 case, 872 F.2d 312.  In that case the Court -- Judge

14 Kozinski concurring -- strongly criticizing Siemens.  And

15 this was before Foley went back and overruled Siemens.

16          And by the way, in Foley the California Supreme

17 Court cited this concurrence of Judge Kozinski in support of

18 its decision to engage in the overruling of Siemens except

19 in the insurance context.  So the Ninth Circuit has

20 expressly approved of this language -- pardon me.  The

21 California Supreme Court has expressly approved of this

22 language of Judge Kozinski.

23          THE COURT:  In what case?

24          MS. HURST:  In the Oki America case.

25          THE COURT:  Okay.

57

```
 1           MS. HURST:  And they did that in the Foley case,
 2   Your Honor.  Let me just double-check that.  I think it's
 3   the Foley case.
 4           THE COURT:  While you're looking that up -- well,
 5   I'll wait.
 6           MS. HURST:  Just one moment.
 7           THE COURT:  I'll find it.  You don't have to --
 8           MS. HURST:  Here it is.  It's in Freeman and
 9   Mills.  My apologies, Your Honor.  It's in Freeman and Mills
10   where the Court, the California Supreme Court, expressly
11   approves of Judge Kozinski's discussion in Oki, and that's
12   in the Freeman and Mills case, 11 Cal.4th 85.  And the
13   passage discussing Judge Kozinski's concurrence is at 99.
14           THE COURT:  Thank you.
15           MS. HURST:  What Judge Kozinski said in Oki is:
16   "In inventing the tort of bad faith denial of a contract,
17   the California Supreme Court has created a cause of action
18   so nebulous in outline and so unpredictable in application
19   that it more resembles a brick thrown from a third-story
20   window than a rule of law."
21           That is exactly what we have here with this duty
22   of loyalty claim, exactly what we have here with this duty
23   of loyalty claim.  We have had a systematic series of
24   admissions now over a six-year period that this claim has
25   been litigated by Mattel that have profoundly changed the
```

58

1   nature of the claim.  I mean, now they are even conceding

2   that my McDonald's versus Burger King is right, that that's

3   not a problem.  Now they're at that point.

4           When we started, they weren't there.  They have

5   had to systematically concede to the point where now what

6   they have is you can't serve two masters at the same time.

7           THE COURT:  I wasn't involved in the prior

8   proceedings.  Why wasn't this argued thoroughly before?  Why

9   in the second trial are we at the point of examining this?

10  I am baffled by this.

11          MS. HURST:  I don't know.  I mean, I have reviewed

12  the briefing.  I don't understand it.  I mean, it's just --

13  you know, maybe it's just different lawyering, Your Honor.

14  I don't know what else to say.

15          THE COURT:  Maybe that's an unfair question on my

16  part.  Let's move along.

17          MS. HURST:  My able colleague, Ms. Phillips,

18  reminds me that in the prior trial there had been a finding

19  of fiduciary duty which somewhat abrogated the necessity of

20  a separate discussion of duty of loyalty.  So it became --

21  it wasn't focused on in this degree because it wasn't

22  necessary to focus on it in this degree with the prior

23  holding that there was a fiduciary duty.

24          THE COURT:  Why should I take these three entities

25  -- the seamstresses/fashion doll makers, the intern, and

1    Bryant -- as one homogeneous group?  In other words, it is,

2    as you sort this out, now going back to the facts instead of

3    the philosophy, the Court may view the intern closest to

4    your position, Carter Bryant closest to Mattel's position,

5    and the seamstresses open for discussion.

6            This isn't one size fits all necessarily, and

7    that's the problem with the jurisprudence in this area.  So

8    I want to focus for a moment on the seamstresses/fashion

9    doll makers and not discuss any other group with you for a

10   moment.

11           MS. HURST:  I am going to urge the Court to adopt

12   a legal rule like this.  Outside the fiduciary context, this

13   is a matter of contract.  If there are contractual

14   provisions at issue and the standards for interference with

15   contract can be satisfied consistent with supersession under

16   the trade secrets act and other limitations, then that's the

17   available remedy.

18           Now, I have my doubts about whether you can make

19   an interference with contract claim at least without the

20   wrongful act requirement when you're dealing with an

21   employment-at-will relationship.

22           THE COURT:  Let's focus on that.  That's a

23   broad-sweeping rule, and I expected you to propound that

24   argument.  So let's just have another discussion as we did

25   with Mr. Quinn.

1          Now I am going to take Mattel's position.  By

2     virtue of the problems that we're having with just the

3     inventions agreement and the verbiage of whether ideas is

4     included or not, does that put corporate America in the

5     position of having to have their contracts so well defined

6     that every employee from a janitor all the way up to what I

7     am going to call middle management.

8          Or I am going to take the example of the Boeing

9     engineer again, $118,000 a year, works in a super secret

10    DARPA project, certainly not a manager but certainly a

11    person entrusted with a high degree of sensitive

12    information.  Why isn't there a fiduciary duty in what I

13    call this kind of middle-class, high-earning, nonmanagerial

14    position where a fiduciary duty/duty of loyalty, whatever

15    that is, doesn't exist?

16          MS. HURST:  Let me say this first.  There is -- it

17    is absolutely the best for the American worker to have a

18    clear contract to read before she signs up for the job.

19    That is the best for everyone.

20          THE COURT:  Why?  What are the policy reasons

21    behind that?

22          MS. HURST:  Because then you really know what you

23    are signing up for.  You know when you come in there and

24    they say take it or leave it, I am telling you with clarity

25    I own you, American worker.

```
 1              THE COURT:  Just a moment.  Now the claim will be
 2    adhesion contract.  Judge, these are all adhesion contracts;
 3    you should disregard every one of them.
 4              MS. HURST:  That may happen.  We didn't press that
 5    issue in this case, and 16600 and the California Legislature
 6    may have a view on that ultimately.  The California
 7    Legislature and 16600, it may ultimately come to that.
 8              It is still better to give that worker the choice,
 9    the knowing choice whether to enter into that relationship
10    proposed by the employer or not.  A huge amount of business
11    in this country is done by small and midsize companies
12    started by families and friends.
13              Now, let's talk about that garage in Silicon
14    Valley for a minute -- Hewlett and Packard, Wozniak and
15    Jobs.  What the rule of imposing a tort duty with
16    consequential damages and punitive damages does, here's what
17    it does.  It allows the monopolist to concentrate human
18    capital.  It allows that party with power to concentrate
19    that power, to concentrate human capital the same way it
20    concentrates economic capital.
21              That's a rule that benefits the monopolist.  It's
22    a rule against the entrepreneur, against the development of
23    the small and medium-sized businesses.  And I have to say
24    when I put on Mr. Dombrowski, I never in a million years
25    saw, foresaw the Court's point today, but it's absolutely
```

```
 1   right.  What a remarkable turn of events to propose that the
 2   Chinese workers are going to be treated better than the
 3   American workers.
 4           And is secrecy the answer to that?  No, it's not.
 5   No, it's not, because the secrecy here is also keeping
 6   secret from these workers what it is they're supposedly
 7   signing up for.
 8           THE COURT:  See, that's the problem I am having.
 9   The future of this country will be in the basic American
10   worker, however you define who he or she is.  And the
11   strength of this country will eventually come from the
12   working force of this country.  It will partially come from
13   managers and those at the top of the hierarchy, but there
14   has been a continuing chain in this country to outsource.
15           And unless America gets its capitalistic spirit
16   back, which will start with the common American worker,
17   whether they're sweeping a floor or flipping hamburgers or
18   what I call that middle echelon, this country will become a
19   second-rate power and capitalism will mean nothing because
20   it's being outsourced.
21           The dichotomy that keeps running through my mind
22   is where is the duality and balance when this is being
23   demanded of the American worker, and there's no response
24   from the American corporate sector back in turn when the
25   outsourcing is taking place.
```

```
 1              It's a fascinating question that's far beyond my
 2     capability.  I really look forward to the Circuit sorting
 3     this out some day in the United States Supreme Court.
 4              MS. HURST:  So what we have is they want a tort
 5     duty on something that is an inherently contractual
 6     relationship.  They want a new tort duty.  They want to
 7     treat skill, not secret knowledge but skill.
 8              THE COURT:  But doesn't this have a healthy
 9     benefit, though?  As a worker, if you tell me that my only
10     liability is contractual, I am going to pay back that which
11     I took.  One of the benefits of having a tort is that it
12     does have a partial chilling effect.  I can't just go out
13     and steal the company blind.  I am at risk here.  I am at
14     risk for greater than the value that I took.
15              MS. HURST:  That's where we have conversion and we
16     have trade secret misappropriations.
17              THE COURT:  Now, conversion I'm not certain is
18     going to exist, so let's move over to trade secret
19     misappropriation, which is where we began our discussion.
20     How does trade secret misappropriation in California law
21     give me a comfort level that that policy concern on my part
22     about the American worker having no draconian or chilling
23     remedy beyond the value of what I took get encapsulated in
24     trade secret misappropriation so that this doesn't occur?
25     Because corporate America has that right.
```

1        MS. HURST:  Because trade secret misappropriation

2   is the way of dividing the line between skills and specific

3   pieces of valuable information.

4        THE COURT:  Explain that to me.

5        MS. HURST:  So what they want to do by proposing

6   to create a tort duty for serving two masters is effectively

7   make available a punitive damages remedy for using your

8   skill to benefit another, not for taking knowledge that was

9   secret knowledge and shouldn't be given to the competitor,

10  but simply for using the skill to benefit the competitor.

11        Mr. Quinn has made it clear.  He has laid it on

12  the line.  We want all $400 million, $800 million,

13  $1 billion, whatever it is.  Now, this is the extremity of

14  the position they're taking.  Because those seamstresses

15  helped MGA kick off Bratz and set in motion, they used their

16  skill and not some secret knowledge, not the Mattel playbook

17  that we have heard about so many times, but just their

18  skill.

19        The trade secret claim is the knife that cleaves

20  between skill and a specific piece of valuable information

21  that can be protected.

22        THE COURT:  Explain that to me.

23        MS. HURST:  The trade secret claim only lets you

24  protect your valuable business information, specific

25  information.  It must be identified and defined and

1    demonstrated to be secret.

2              THE COURT:  Please continue.

3              MS. HURST:  So that claim is the claim that

4    strikes the balance, takes into account 16600.  As I said,

5    the knife that cleaves between people who are allowed to

6    practice their skills and taking your information, your

7    valuable information, and giving that over for someone

8    else's benefit.

9              THE COURT:  Now, I will put this on the record.  I

10   need to cease the argument for a moment.  It's 11:30.  And

11   the reason and with my humble apologies, I have got my very

12   first law clerk who is coming to get married and flew down

13   today, and I have got to marry him and his wife-to-be at

14   1:00.  I have got to drive to San Clemente to do that.

15             We're going to be right back in session.  They

16   have invited me to go to lunch with them.  And my other

17   first former law clerk is coming down also.  So I want to go

18   -- I'll perform the wedding at 1:00.  I want to have time to

19   have a quick lunch.  They know that my hours are insane, so

20   they know I'm coming back.

21             I want to send you home or back to your offices

22   until 4:00.  Okay?  But we are going to be in constant

23   session and we are going to come right back to this issue

24   until I am satisfied and you are satisfied with your

25   arguments.  And I apologize to you for it, but this is the

1    weekend.

2            Second, I am going to give to you -- you already

3    have the special verdicts that I am proposing.  I went over

4    those informally with you.  Anything that you can do by

5    agreement I am happy to listen to in terms of those special

6    verdicts.  Otherwise those are basically the special

7    verdicts I am going to hand out.

8            In other words, I am not working too much more on

9    those special verdict question, and I am not going to

10    readily adapt one person proposing another special verdict

11    line as opposed to another.  So if you get together and you

12    agree, be my guest.

13            Now, of course, I will allow argument on the

14    special verdict question that you think is so inappropriate

15    that it shouldn't be asked, but it's going to be pretty

16    short-lived.  I'm pretty far down the line in terms of that

17    special verdict, and I have basically thrown both of yours

18    away.

19            The conversion argument is not going to take very

20    long, and the equitable isn't going to take very long.  I

21    will reserve intentional interference.  I truly believe that

22    that's going to the jury.  You can brief it any way you want

23    to.  I truly believe trade secret misappropriation is going

24    to the jury.  Obviously copyright is going to the jury.

25            What's in balance is this duty of loyalty claim,

1    and that's the most significant thing that we can be doing

2    today, along with the special verdict.  Now we are in

3    constant engagement until that's done.  So from 4:00 to

4    midnight if you want, or 4:00 to 8:00 tonight, whatever you

5    choose, but we are right back in session at 8:00 and we are

6    right back in session on Monday.

7            Until that's done -- and that's my effort to try

8    desperately to give you back next weekend, because if it's

9    not done, you are right back in session.  And I am not going

10   to give you the law in this area, which I am only required

11   to do prior to the time you argue.  So the benefit you have

12   is if you want me to give you the law that I am going to

13   instruct on, we all better get it done this weekend

14   regardless of how horrendous it is so that you can look at

15   it for a couple days.  Otherwise, guess what?  Tuesday night

16   here it is.  So that's my concern.

17           Now, next door I know that Justice Trotter -- and

18   I'll put this on the record -- is having some discussion

19   with carriers.  I have not entered into that.  I will not

20   get near those discussions.  When he is done, if you would

21   simply give me some direction -- and I will phone back in a

22   while -- I can close down that complex courtroom.

23           If he wants to go to midnight, tell him that's

24   fine.  If he wants to resume tomorrow, that's fine, if he's

25   making progress.  If you need additional carriers ordered in

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    for Monday, that's fine.  But when it's done, that's the
 2    last effort I'm going to make to open the courthouse.  It's
 3    done.
 4            Finally, I had one other thought for you to help
 5    you.  Anything you can do on these special verdicts is going
 6    to save you a terrific amount of time with me, because now
 7    I'm never going to let it go for the next two or three or
 8    four days or the next two or three or four hours.
 9            There's one more issue I had.  Let me think for
10    just a moment.  You have all heard of the concept of
11    efficient breach.  The law of contracts does not allow the
12    plaintiff to recover the defendant's unjust enrichment or
13    seek punitive damages because sometimes the benefit of the
14    breach exceeds the benefit of the bargain.
15            The common-law duties like fiduciary duties are
16    exceptions to that general rule.  The concept is that if an
17    individual is entrusted with the authority to act on behalf
18    of his principal, the profits he reaps from self-dealing are
19    actual profits that derive from the employer's business,
20    good will, and authority.
21            He was put in a position of trust and confidence
22    to benefit the principal, and so the corporate
23    opportunities, profits, and the like should be returned to
24    the principal.  That's really where this entire body of
25    fiduciary obligations comes from.  The origins were
```

1    incorporated by the English Court of Chancery and had the

2    power to enforce equity through the imposition of trust

3    injunctions and the like.

4            Now, it's amazing that this case -- I was a

5    history major, and it's amazing that some of these concepts

6    were in common history courses.  I had forgotten some of

7    these Chancery issues.  It's fascinating to come 40 years

8    later back to an 18-year-old class that you're taking at

9    UCLA and have some of these concepts coming into vogue in

10   the latter part of my life.

11           I don't see how, though, that principle makes

12   sense in the context of employee labor, and I'm putting you

13   both on notice of this.  The beneficiary owns the trust

14   property and the principal owns its customer lists and the

15   business good will.  So it is equitable that the profits

16   that the disloyal fiduciary generates through the misuse of

17   that underlying property should be returned to the

18   principal.

19           But the employer does not own its employees, and

20   the fruits of those labors should remain with the employee.

21   However you classify the duty, the consequences are the

22   same.  You are creating a new concept or a new exception to

23   the concept of efficient breach by allowing the recovery of

24   unjust enrichment and punitive damages that result from an

25   employee's misuse of its own labor.  And I am concerned that

 1  that really squares with the law.

 2          So here is where I am at.  I am capable of

 3  listening to you today, and you will be here tomorrow

 4  working on the special verdicts or tonight.  And I can work

 5  certainly between midnight and 2:00 or 10:00 and 2:00.  It

 6  doesn't matter.  But I am going to be potentially handing

 7  down decisions in conversion and duty of loyalty relatively

 8  quickly.

 9          If you somehow reach a settlement agreement, do

10  you truly want the Court to write in this area and hand down

11  an opinion?  Because the first person that may complain

12  about an opinion is Mr. Larian and MGA.  In litigation he

13  certainly won't, but the very first, maybe, you know, small

14  corporate America, not Mattel or companies like Mattel.

15          In other words, this opinion doesn't have to be

16  handed down if there is any possibility of a settlement if I

17  am going this direction.  In other words, it could be

18  delayed a couple of days so I can see what happens.  By the

19  same token, if I am going in this direction and I subscribe

20  to what I am kind of indicating how this is flowing down the

21  line, I am quite capable of handing that down by Sunday if I

22  decide to.

23          Now, I have written two opinions in the back.  You

24  don't know it.  They come out in exactly opposite ways.

25  Isn't that incredible?  They come out finding for Mattel on

```
 1   this issue, and they come out finding for MGA on this issue.

 2   So I see what that looks like on both sides.  So I will

 3   leave you with that thought.  It doesn't have to be handed

 4   down today or tomorrow if you are making progress in terms

 5   of settlement.  By the same token, if we're not, you know, I

 6   am going to reach these decisions relatively quickly.

 7          All right, I am going to see you at 4:00.  Be

 8   patient with me.  I think I will be here actually at 3:30,

 9   but I could be here at 4:15.  Okay.  You are ordered back at

10   that time.  Thank you.

11          MR. MCCONVILLE:  Judge, my father's 80th

12   celebration is today, and I'm supposed to go with my family

13   at 5:00 tonight up to Los Angeles.

14          THE COURT:  One person from this side is fine.

15   One person is fine.  Okay?  One person, because I'm going

16   right from here into those special verdicts.  The person I

17   really need here is the person who's arguing the final

18   argument.  All right.

19          (Recess.)

20

21                          -oOo-

22

23

24

25
```

72

```
 1

 2

 3

 4                         CERTIFICATE

 5

 6         I hereby certify that pursuant to Section 753,

 7   Title 28, United States Code, the foregoing is a true and

 8   correct transcript of the stenographically reported

 9   proceedings held in the above-entitled matter and that the

10   transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13   Date:  March 27, 2011

14

15

16                       Sharon A. Seffens 3/27/11
                         _____
17                       SHARON A. SEFFENS, U.S. COURT REPORTER

18

19

20

21

22

23

24

25
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER