1

2

3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL, INC., et al.,
                    Plaintiffs,
        vs.

                                        CV-04-9049-DOC
MGA ENTERTAINMENT, INC.,    STATUS CONFERENCE
et al.,                     Volume 2 of 2
                    Defendants.

    --------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

Saturday, March 26, 2011

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

```
 1    APPEARANCES OF COUNSEL:

 2    For Plaintiff MATTEL, INC., ET AL.:

 3    JOHN B. QUINN
      MICHAEL T. ZELLER
 4    QUINN EMANUEL URQUHART & SULLIVAN, LLP
      865 South Figueroa Street, 10th Floor
 5    Los Angeles, CA  90017
      (213) 443-3000
 6

 7    For Defendant MGA ENTERTAINMENT, INC., ET AL.:

 8

 9    ANNETTE HURST
      ORRICK, HERRINGTON & SUTCLIFFE LLP
      The Orrick Building
10    405 Howard Street
      San Francisco, CA  94105
11    (415) 773-4585

12    JENNIFER L. KELLER
      KELLER RACKAUCKAS LLP
13    18500 Von Karman Avenue, Suite 560
      Irvine, CA
14    (949) 476-8700

15    FOR CARLOS GUSTAVO MACHADO GOMEZ:

16    ALEXANDER COTE
      SCHEPER KIM AND HARRIS LLP
17    601 West Fifth Street, 12th Floor
      Los Angeles, CA  90071-2025
18    (213) 613-4655

19

20

21

22

23

24

25
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

3

INDEX

                                                                  **PAGE**

**STATUS CONFERENCE**                                               **4**

```
 1    SANTA ANA, CALIFORNIA; SATURDAY, MARCH 26, 2011; 5:25 P.M.
 2              (Jury not present)
 3              THE COURT:  I have had an opportunity to talk with
 4    Justice Trotter briefly.  I was prepared to order the
 5    carriers back on Monday to this court.  Instead, Justice
 6    Trotter has persuaded me that it would be a much better
 7    idea, since I am ordering you back, to send you over to
 8    JAMS.  It's just a little bit more conducive.
 9              But what I had forgotten to ask was what time is
10    appropriate for Justice Trotter.
11              JUSTICE TROTTER:  9:00 a.m.
12              THE COURT:  Okay, you are due at JAMS at 9:00 a.m.
13    I would ask this.  I would ask you not to recess these
14    negotiations until you and I have a personal phone call.
15              I am going to excuse you from the proceedings.
16    We'll be in session, as you know, the rest of this evening
17    and Sunday and Monday.  Mr. Larian will be excused to be at
18    JAMS also.
19              (Recess.)
20              THE COURT:  Counsel, we are back in session.  We
21    are back on the record.  All counsel are present.
22              Now if you'd like to continue, please.
23              MS. HURST:  Thank you, Your Honor.  Going back to
24    the Otsuka versus Polo Ralph Lauren case, which is the case
25    by Judge Illston, there is no doubt that that case certainly
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    involved a low-level employee, a sales clerk at a retail

2    store.  The Court there looked to a Ninth Circuit case

3    involving Hawaii law in which the Ninth Circuit had looked

4    to the restatement of agency.

5            Judge Illston, however, did not consider any of

6    the California Supreme Court authorities that I have

7    discussed this morning.  There is no citation to Foley,

8    Freeman and Mills, Edwards versus Arthur Andersen, or any of

9    the other cases recognizing that tort duties arising from

10   the employment relationship are to be few and far between in

11   the state of California.

12           Those cases recognize -- many of them recognize

13   the important role that Section 16600 plays.  In the Eckert

14   case, the Hawaii case decided by the Ninth Circuit, in that

15   case you had a situation where the salespeople who had

16   knowledge of the bid for a sewage maintenance contract used

17   that knowledge to set up a competing company and undercut

18   their employer.

19           In California you could use a trade secret

20   misappropriation claim to get the remedy for that.

21   Knowledge of the secret bid to the government agency would

22   be just the kind of information that would be protected.

23   That kind of conduct would be proscribed under California

24   law using a different theory, and it's also available to the

25   plaintiffs here.

```
 1              I think that the Polo case is a harder case.  I
 2   think frankly that the rule that I am proposing is that the
 3   remedy there would be limited to termination or perhaps even
 4   a fraud claim.  I mean, if the employee misrepresented
 5   himself to acquire an economic benefit in the form of a
 6   discount, that actually might be a fraud claim as well.
 7              But certainly I am proposing that that -- on the
 8   facts, you know, I don't want to mince words on the facts of
 9   the Otsuka case.  It would be a different result.  But I do
10   propose that, especially given the California Supreme Court
11   authority, Judge Kozinski's commentary in the Oki America
12   case and the California Supreme Court's subsequent approval
13   of that, that we are not going to have these nebulous tort
14   duties in the contractual context, that that is the right
15   result.
16              Judge Illston did not -- apparently, though, that
17   line of reasoning in those cases were not brought to Judge
18   Illston's attention in connection with that matter, the Polo
19   matter.  Also I do note that that was a 12(b)(6) case --
20   although, given what we are discussing today, I am not sure
21   that makes a lot of difference because we really are just
22   talking about legal duties here, I think.
23              The Court asked how does the theory of efficient
24   breach play into all of this.  Well, certainly we are
25   talking about at-will employment relationships here, and
```

1   California law allows for an at-will employment

2   relationship.  And the Foley case recognizes, proscribes

3   burdens on employers associated with that by not allowing a

4   tort duty for, for lack of a better word, wrongful

5   termination or termination without good cause.

6          The California Courts and legislators have

7   scrupulously protected the employer's right to terminate at

8   will when it is efficient to do so.  Even a long-term

9   employee would be entitled to know more than a contractual

10  remedy.  In that way, California public policy has protected

11  employers and limited the remedies for employees.

12         The converse should also be true.  And when it's

13  more efficient for the employee to start up that business in

14  the garage, when it's better for us socially as it is to

15  promote competition and the free flow of both human and

16  economic capital, then the tort duty is the sledgehammer,

17  not the scalpel.  And it's an inappropriate -- and it's

18  inappropriate to impose it.

19         Here the trade secret misappropriation claim can

20  serve as the scalpel.  It's got the requirements that allow

21  Courts to distinguish between a claim that's based on

22  improper acquisition and use of truly confidential

23  information versus trying to own somebody's set skills.

24  That is what Section 16600 says you just can't do in

25  California.  You can't own somebody's skills.

1              Under the theory that Mattel posits in this case,

2    a secretary with uncommonly fast typing skills, a unique set

3    of uncommonly fast typing skills, cannot work two jobs.  She

4    cannot work and earn any extra compensation for her own

5    account or anyone else's because she has got an uncommon

6    talent.

7              Mattel poses the rule that the uncommon talent or

8    the uncommon skill or the creative talent or the creative

9    skill is what entitles an employer to exclusive ownership of

10   that labor capability.  It's exactly the opposite of what we

11   should be promoting.  People with uncommon talents and

12   skills should have the highest degree of mobility from a

13   tort perspective because that is what will maximize the

14   optimum outcomes, and that is where efficiency is well

15   served.

16             Mattel wants to have it both ways.  They want to

17   pay these people $20,000 a year and at the same time claim

18   they are incredibly valuable employees, or $30,000 a year in

19   the case of the seamstresses, sample makers, whatever you

20   want to call them.  That's not credible.  It does not lie in

21   the mouth of Mattel to claim that they're entitled to

22   exclusively own these skill sets and that they are

23   incredibly valuable while at the same time paying them 30

24   some thousand dollars a year.

25             The contract remedy here is sufficient.  It is

9

```
 1    sufficient.  And assuming it's enforceable or assuming it's
 2    consistent with the at-will doctrine in California, the
 3    interference with contract tort also supplies a remedy that
 4    is tortlike in nature.
 5           Now, as we have argued in connection with the
 6    interference contract tort, we do believe that when you're
 7    talking about interference with an at-will employment
 8    relationship, you have got to meet the wrongful conduct
 9    requirement.  I just want to say that for purposes of
10    preserving our position.
11           But there is simply no need for the vast majority
12    of cases to impose a new tort duty, which is really what is
13    being proposed here.  If there is some small class of cases
14    for where a tort duty would be most appropriate, then that
15    is the kind of balancing that Courts have to make all the
16    time and decide that that small class of cases simply does
17    not outweigh the negative effects of adopting a new tort
18    duty overall.
19           That's certainly the sort of rationale that Judge
20    Kozinski used in the Oki America case.  As a result, both
21    the commercial world and the Courts are needlessly burdened.
22    The parties are hamstrung in developing binding agreements
23    by the absence of clear legal principles.  Overburdened
24    Courts must adjudicate disputes that are incapable of
25    settlement because no one can predict how or even by what
```

 1    standard they will be decided.  That was Judge Kozinski's

 2    language in the concurrence in Oki, and it's fully

 3    applicable here.

 4            That brings me to another important point, which

 5    is you can't have an aiding and abetting tort claim for a

 6    duty as nebulous -- a legal duty as nebulous as this one.

 7    If the lawyers can't say what the duty is, if the lawyers

 8    can't say what the source of the duty is, if they can't say

 9    with clarity what the boundaries of the duty are, then to

10    hold the business person responsible in tort with the

11    prospect of punitive damages on an aiding and abetting

12    theory for a legal duty of such nebulous proportion is

13    wholly inappropriate.

14            That is the case here, especially with respect to

15    the samplemakers and interns and so forth.  I mean, no one

16    -- and, frankly, Carter Bryant, no one who anyone would ever

17    think is a fiduciary.  They are not fiduciaries as defined

18    by law.  So at best they would have to meet the four-part

19    test only recently announced in City of Hope, which none of

20    them do here.  There is just no reason why anyone would ever

21    think that these kinds of special, very special duties are

22    owed.

23            Now, the Court has repeatedly expressed concern

24    that there is a duty of confidentiality with respect to

25    specific information, and we don't disagree.  But really

what that is is it's a duty to maintain in confidence, which
has always been one aspect of a tort duty that also exists
in the fiduciary duty context along with the duty of good
faith, the duty of care, and the duty of loyalty.

The duty to maintain in confidence is protected in
California by the trade secret tort. It's covered. If it's
not a trade secret, then California has made the decision
that it won't be protected, and that's what the supersession
is about.

Is the claim here against Carter Bryant fully
superseded? Yes. We know that now because we see in
opposition to the JMOL motion that Mattel wants to claim all
of the same remedies associated with Bratz that it claims
under its trade secret claim.

It wants again all of Bratz under that theory,
unapologetically reading now the substantial factor
causation to mean virtually nothing, no but-fors, not
required. Now we are down to the notion that, you know,
setting in motion through two weeks of overlapping
employment is the basis for a $400 million-plus damages
award.

So it's clear that Mattel really isn't complaining
about Mr. Bryant's failure to perform his services while he
was employed by Mattel. They are not complaining that he
didn't do his job. They are not complaining that he was

```
 1    distracted or didn't show up for work or didn't give it his
 2    full attention or his full effort.  They are not claiming
 3    any of that.  They haven't put in a theory that they
 4    overpaid him for any period of time because he didn't put in
 5    his full work week or anything like that.
 6            What they are seeking is a theory of consequential
 7    damages for all the value of Bratz, which really means what
 8    they are seeking is the value of the intellectual property,
 9    whatever it may be, the copyright or trade secret or ideas,
10    whatever it is.  That's what they are really seeking, the
11    value of the intellectual property under this theory.
12            That's why it is clear, clear based on their
13    opposition to our JMOL and otherwise based on the evidence
14    that has been submitted that what they are doing is again
15    seeking to circumvent the limitations in other areas of law
16    with these nebulous tort duties.
17            The Court said why risk taking this away from the
18    jury.  It's very prejudicial to submit a tort theory called
19    duty of loyalty to the jury when that legal theory doesn't
20    exist.  It's branding MGA and Mr. Larian with very strongly
21    offensive concepts.  I mean, loyalty, a basic value, it
22    seems so simple.  It seems deceptively simple.  It is
23    deceptive.
24            That's why it is so prejudicial to suggest the
25    violation of one of our basic principles when the duty
```

```
 1    doesn't exist.  Nobody wants to be disloyal, and to brand
 2    someone as disloyal when that legal duty does not exist, to
 3    permit that to happen is highly prejudicial and it infects
 4    the jury's thinking about the other claims.
 5            So why would MGA risk taking it away?  Well, first
 6    of all, we don't think it's much of a risk because we think
 7    the Court would be absolutely legally correct and that there
 8    would be numerous grounds on which to keep this claim from
 9    going to the jury, including supersession, duplication of
10    recovery, and otherwise.  But it is highly prejudicial.
11            It was used that way in Phase I.  The fiduciary
12    duty and duty of loyalty claims in Phase I were used to
13    bootstrap everything.  The mantra of disloyalty is strong.
14    There is no doubt about it.  If that legal duty does not
15    exist, then it should not have a place in the final
16    arguments in this case because it's extremely prejudicial.
17            There is no evidence at all of any harm whatsoever
18    flowing from this claim associated with Ryan Tumaliuan, none
19    whatsoever.  It's an independent grounds for dismissal.  I
20    mean, there has been no evidence frankly about Ryan
21    Tumaliuan at all.  There has been no evidence regarding what
22    he did for anybody.
23            He worked for MGA first, for God's sake.  I mean,
24    if there is a duty of loyalty, he worked for MGA first and
25    then he went to Mattel.  We've had all of one e-mail, "keep
```

1    your eyes and ears open."  That's been the full extent of

2    the evidence regarding Ryan Tumaliuan.

3           Even if they put in personnel files, that's not

4    going to remedy the problem.  Nobody has come and testified

5    to anything about what his duties were for Mattel or that he

6    failed in them in any way because of some disloyalty

7    vis-a-vis MGA, and that claim should not go to the jury.

8           All it ever was was a vehicle for them to put in

9    bad e-mails.  They accomplished their objective.  But the

10   elements of that claim have not been met.  No reasonable

11   juror could find -- even if you assume there is a duty of

12   loyalty for an intern, which is absurd, no reasonable juror

13   could find a tort claim there.

14           There has been no harm demonstrated for Carter

15   Bryant and the seamstresses other than the very same theory

16   that Mattel is pursuing with respect to its Bratz damages.

17   They are not limiting their harm to the loss of services.

18   They are claiming, well, this whole thing set Bratz in

19   motion.

20           Now, on the seamstresses that violates California

21   law on causation.  It just absolutely does.  Substantial

22   factor still means but for, and there is no way a reasonable

23   juror could find that but for the seamstresses working for

24   Veronica Marlow and MGA's deliberate use of seamstresses

25   working for Veronica Marlow that it knew were also working

1  for Mattel that all of Bratz resulted.  It's speculative,

2  unbelievably speculative, beyond the bounds of appropriate

3  consequential damages under California law.  Speculative and

4  duplicative at the same time.

5        So for all of those reasons, there is no duty for

6  the reasons we have discussed.  If there is a duty, you

7  can't find aiding and abetting here where the contours of it

8  have heretofore been unknown, unannounced, and highly

9  nebulous for anyone who can't clearly be considered a

10  fiduciary.  And because there is no cognizable harm

11  consistent with what the duty might be for any of these

12  persons -- Carter Bryant, the seamstresses, Ryan Tumaliuan

13  -- for all of those reasons and because it's highly

14  prejudicial to MGA to permit the assertion of disloyalty, of

15  procuring disloyalty where that is not a legal duty, the

16  Court should act under Rule 50(a) to keep this claim from

17  going to the jury.

18        THE COURT:  Mr. Quinn.

19        MR. QUINN:  Your Honor, MGA argues that we are

20  seeking the creation of a new tort, and I have to point out

21  that we are the only ones that have authority on our side on

22  this issue.  We have -- there is case law recognizing the

23  existence of a duty of loyalty in a nonfiduciary context.

24  There is Fowler versus Varian Associates, Stokes versus Dole

25  Nut Company.  Then two federal cases:  the Otsuka case,

1    which is the Illston opinion, and Hanger Prosthetics, an

2    Eastern District of California case.  Each of those cases

3    recognizes the existence of a duty of loyalty.  No case has

4    been cited to the Court to support the proposition that

5    there is no duty of loyalty.

6         So we shouldn't lose sight of the fact, Your

7    Honor, that we are not riding on a tabula rasa.  We can talk

8    about first principles, but there is precedent to be

9    considered and the precedent is all on our side.

10        Now, to argue that -- really MGA is arguing for a

11   change in the law and arguing that if the California Supreme

12   Court would address this issue today, they would come out

13   differently arguing from cases like Foley Interactive, from

14   Oki America.  But that's a different kind of argument,

15   though.  That's very different than saying that we are

16   arguing for the recognition of a new tort.

17        In the Stokes case, the Court said, and I quote,

18   "The duty of loyalty is breached and may give rise to a

19   cause of action in the employer when the employee takes

20   action which is inimical to the best interests of the

21   employer."  That's the legal landscape that this is being

22   decided in.

23        So we can't pretend that there isn't case law

24   recognizing the duty of loyalty.  There is no case that has

25   been cited to the Court indicating that there is no duty of

```
 1   loyalty.

 2           If it's so clear that the California Supreme Court

 3   would come out differently if it was presented to the

 4   Supreme Court, why didn't they say something to the Ninth

 5   Circuit about that?  Why did they instead -- why did MGA

 6   instead argue to the Ninth Circuit in the passage that I

 7   quoted to the Court this morning that it's really a question

 8   of fact for the jury, which is what they told the Ninth

 9   Circuit?

10           If we are so out of bounds in suggesting that

11   there is a duty of loyalty and there is such a claim, why

12   didn't the Ninth Circuit say something about it?  In his

13   opinion in this case, Judge Kozinski expressed no view, no

14   view at all that the cause of action for the duty of loyalty

15   was problematic or questionable.

16           MGA places a lot of reliance on Oki America

17   decision in 1988, and that frankly is completely irrelevant.

18   It has nothing to do with the employment context.  It has

19   nothing to do with these duties.

20           There was that brief window in time when

21   California recognized the unique cause of action of the tort

22   of wrongful denial of the existence of a contract.  We can

23   all remember that moment, a couple of years where that claim

24   was out there.

25           And Kozinski in the Oki America case coins the
```

 1    phrase tortification of contract law and says this is nuts.

 2    You know, he expresses his view that the California Supreme

 3    Court has been smoking something, in effect.  But it has

 4    nothing to do with what we are talking about here today.

 5    Again, they are trying to -- MGA is trying to extrapolate

 6    and predict that the California Supreme Court would come out

 7    some other way based upon decisions that predate the cases

 8    that we have cited to the Court which continue to recognize

 9    the existence of a duty of loyalty.

10            I didn't really hear a response with respect to

11    Carter Bryant as to why this Court should change its view on

12    preemption because of the particular conduct which this

13    Court identified in its summary judgment opinion, which was

14    not -- did not relate to misappropriation of trade secrets,

15    directing production of the first-generation dolls while

16    employed by Mattel, engaging other Mattel employees to

17    unknowingly work on Bratz dolls, using Mattel's physical

18    resources to create a dummy, and working on the Angel face

19    and other side projects for MGA.  I didn't hear a response

20    to that.

21            The Court, I think, as I said earlier, correctly

22    concluded that those claims for breach of duty of loyalty

23    based on that conduct which does not sound in trade secrets

24    is not preempted.

25            MGA argues that it's highly prejudicial to have

1   this claim go to the jury.  We are having an unfair

2   competition claim go to the jury, which we all recognize

3   there is no right to a jury trial on.  That's much more

4   prejudicial.  Now apparently things that they did not

5   identify in their February statement as being trade secrets

6   are going to be proffered, like FOB pricing, are going to be

7   proffered as supporting the 17200 claim.  That all is going

8   to go into the jury room.

9           The question of unfair competition, I think that

10  has a much greater potential for infecting the proceedings.

11  It's just confusing.  It sounds too much like

12  misappropriation of trade secrets.  And as we're going to

13  argue to the Court this week -- we'll file something on this

14  -- we think it's clear that the FOB pricing, these new

15  issues, to the extent they are now offered as supporting the

16  17200 claim, are preempted under CACI multimedia.

17          That is a case of preemption.  That is taking

18  information which -- confidential information which does

19  sound in trade secret.  That would clearly be, to the extent

20  that's offered now as supporting unfair competition claim,

21  that is clearly preempted.  But this is a much more

22  prejudicial -- submitting that unfair competition claim to

23  the jury is much more prejudicial than a duty of loyalty

24  claim.

25          It's not just a question of fast typing.  The

evidence can be construed, understood in this case to suggest that these really are unique -- the ability to create the original fashions for fashion dolls is a unique and rare skill that would require MGA for a period of five years to cause Mattel employees to breach duties to their employer and pay millions of dollars in order to get those services.

These aren't employees who make $20,000 or $30,000.  Morales was paid over $50,000 in salary plus benefits.  But the key thing here, I think, is that this work was -- and it's really an answer, I think, to the issue of employee mobility and the free flow of human capital, is that this is concurrent employment done in secret.

Those are the two elements.  If either of them were missing, we would not be arguing for this claim.  If they had disclosed it so it was more like the choice that Dombrowski faced in hiring Early Light in China, then we wouldn't have a claim for breach of duty of loyalty, if it hadn't been done in secret.

If it's not concurrent, it's not an issue of duty of loyalty.  It's those two elements taken together -- the fact that it was done in secret and that it's concurrent employment.  That takes it outside the sphere of any concern we have about free flow of human capital and employee mobility.

```
 1              So this has nothing to do about whether to start

 2    up a new business in a garage.  It's whether you can

 3    concurrently serve two masters in secret.  Under the world

 4    that MGA argues for, the only protection employers would

 5    have is either contractual or trade secrets.  That's it,

 6    period.  Recognition of no other duties outside the

 7    fiduciary duty context.

 8              Now, we can imagine what the result would be if

 9    employers had to rely solely on contractual protections

10    outside the trade secrets context.  You can imagine

11    everything would have to be negotiated.  Clearly we know

12    that to avoid the claim that this was a contract of

13    adhesion, apparently the employee needs to have a lawyer

14    advising him or her.

15              Otherwise they face a defense where, you know,

16    lawyers or HR people in trial are going to be questioned

17    extensively as they were here about:  Didn't you explain it

18    to them?  Didn't they have a chance to get legal advice

19    about it, et cetera?  Except it would become much, much

20    worse.  Everything would have to be spelled out in a

21    contract.

22              The only protection you could have is if that

23    employee -- you know, like negotiating a prenuptial

24    agreement, if you told the employee:  You need to get a

25    lawyer.  You need to get some advice.  We want to make sure
```

```
1    that this is free from attack, and that's the only way we
2    can make sure that you're not going to secretly serve two
3    masters.
4           I ask:  What would the results of that be for
5    American business if we had to have those types of
6    negotiations with whole classes of employees on some type of
7    individual basis?  That certainly would not be a good thing.
8           Thank you, Your Honor.
9           THE COURT:  Okay.  Ms. Hurst, your conclusion.
10          MS. HURST:  Last round.  Brawer and Stokes are
11   both termination cases, not tort cases.  We are citing a
12   statute.  Statutes still mean something the last time I
13   checked.  The statute says an employee who has the business
14   to transact on his or her own account must only give
15   preference to the employer.
16          That statutory language is inconsistent with an
17   exclusive duty to work only for one person.  This duty of
18   loyalty, what's so obnoxious about it is listen to us now.
19   We are standing here arguing about unique skill sets and
20   whether a unique skill set is something that can suddenly
21   entitle an employer to own all of the labor of a particular
22   employee.
23          How would one ever determine in advance the unique
24   skill set?  How could one ever predict his or her
25   prospective liability?  And then, what does that look like?
```

1    I mean, the Court adjudicating a unique skill set, it's

2    practically as bad as adjudicating, you know, content for

3    speech purposes or, you know, the legitimacy of religious

4    tenets.

5             Now we're going to have individuals in being

6    evaluated as to whether they have the highest rate of typing

7    or the third percentile -- you know, they're in the 98th

8    percentile.  And anybody who's in the 95th percentile or

9    above, there is a duty of loyalty, which means they can't

10   work for two people at the same time.  And everybody below,

11   it's exactly the kind of class distinction only it's a skill

12   set distinction now that they are proposing.

13            THE COURT:  In a general sense that may be true,

14   but here Mattel argues that it's narrowing.  In other words,

15   from the broad philosophical discussion that I got in

16   initially with Mr. Quinn, now the concurrent employment and

17   that it's done in secret.

18            In other words, now we're past the philosophical

19   discussion we've had.  Now it narrows down to the uniqueness

20   of this competitive situation between concurrency and

21   secrecy.

22            MS. HURST:  Well, making concurrency unlawful is

23   inconsistent with 2863.

24            THE COURT:  Now, just a moment.  That means I can

25   work 8:00 to 5:00 for McDonald's and go over to Burger King

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    and sneak out during my lunch hour and work 12:00 to 1:00?

2            MS. HURST:  If McDonald's has set that lunch hour

3    and you are entitled to it and you have otherwise satisfied

4    the statutory requirement to give preference to McDonald's

5    by following their rules to be there when you are supposed

6    to be there, then, yes.

7            THE COURT:  Can I work 12:00 to 2:00 and claim

8    that I am late?

9            MS. HURST:  No.

10           THE COURT:  What's the remedy?

11           MS. HURST:  Termination.

12           THE COURT:  What happens if I am in the

13   intellectual property field and I do the same thing as an

14   engineer?

15           MS. HURST:  We are back to Jobs and Wozniak.  They

16   are just wrong when they say that limiting it to concurrency

17   doesn't affect the garage startup.  The garage startup is

18   always concurrent.

19           THE COURT:  Well, Jobs and Wozniak wasn't working

20   at the same time when they were in their garage.  Now, that

21   might be nights and weekends.

22           MS. HURST:  Right.  It's nights and weekends.

23           THE COURT:  We're not talking about that for a

24   moment.  They are talking about concurrency of the

25   seamstresses.

1           MS. HURST:  Well, there is no evidence here of

2     anything other than nights and weekends.

3           THE COURT:  Okay.  Now, there is the disagreement.

4     There is a document that Mattel believes that they have that

5     shows that the seamstresses were working, I'm going to say,

6     during daylight hours.

7           I am not certain on this record if they were

8     working out of their homes as employees, out of a garage,

9     and they didn't have to physically go in to Mattel, or if

10    they were required to go in to Mattel.  It's been a little

11    nebulous about what their location status was.

12          MS. HURST:  Well, Mattel's work rules required

13    them to be at Mattel when they were working for Mattel.

14          THE COURT:  There is a document.  It's an October

15    document that I want you to pull for me.  It's billing, and

16    that billing will show a number of hours that are charged,

17    and I think it comes to $5,000.  And then there is a

18    separate amount -- I may be wrong -- $4,000, a separate

19    amount.  And off on the right-hand side it has dates going

20    back to September.  It appears -- because I don't have a

21    calendar, a 2000 calendar -- that the dates correspond to

22    what would be working dates at Mattel.

23          MS. HURST:  I know which document the Court is --

24          THE COURT:  Just pull it.

25          MS. HURST:  I am pretty sure it's Exhibit 5723 is

```
 1   what the Court is thinking of.  What Mattel has argued is
 2   that because one of these days shows a high number of hours,
 3   it must mean a conflict.
 4            THE COURT:  I am not worried about one day.  In
 5   other words, I can go back to the calendar and see if that
 6   was even a Saturday.  I don't know.
 7            MS. HURST:  No.  It's a Wednesday.
 8            THE COURT:  Okay.
 9            MS. HURST:  It's a Wednesday.
10            THE COURT:  I believe you.
11            MS. HURST:  Yeah.
12            THE COURT:  What about the rest of the days?
13            MS. HURST:  Well, the problem is that this is a
14   backwards way of looking at it.
15            THE COURT:  Well, that's okay.  Let me look
16   backwards for a moment.  What about the rest of the days?
17            MS. HURST:  I am looking at Exhibit 5723.  It's a
18   time card for Maria Helena Salazar for the Marlows.  She has
19   got a certain number of hours each day for a period of time
20   in October of 2000.
21            THE COURT:  Now, what's happening here?  This
22   record is very unclear.  Is she supposed to be at Mattel
23   working but hypothetically I can assume she is taking a sick
24   day and working out of her garage?  How am I supposed to
25   read this document?
```

1          MS. HURST:  That's the backwards problem.  That's

2     exactly the backwards problem I am talking about.  They

3     can't prove that she failed to satisfy her duties at Mattel

4     by proving that she was also doing something else.

5          They have to come with evidence that she failed to

6     satisfy her duties at Mattel, which has never happened.

7     There has been no supervisor who has come here to say Maria

8     Helena Salazar failed to show up to work, was falling asleep

9     on the job, any of it.

10          THE COURT:  I am not satisfied with that.  I am

11     going to stop the avalanche now.  I am going to ask a

12     question.

13          If she is supposed to be employed for 8:00 to 5:00

14     on normal work days, and let's assume that that's Monday,

15     Tuesday, Wednesday, Thursday, and Friday; and the fact

16     situation shows that whether she is sick, claims a vacation

17     day, that she is being paid for it because she is supposed

18     to be a salaried employee.  She is working concurrently, and

19     I don't mean nights or weekends, but I mean concurrently --

20          MS. HURST:  There is no evidence of that in this

21     case.

22          THE COURT:  Well, then I would like to see 5723.

23          MS. HURST:  All it is is a time card for work for

24     Veronica Marlow.

25          THE COURT:  And doesn't that time card indicate

```
 1   work days that she in theory would be working at Mattel?
 2             MS. HURST:  Yes, but it doesn't indicate that she
 3   wasn't at Mattel for her regular work hours on those days.
 4             THE COURT:  Are you going to show me that
 5   document?
 6             MS. HURST:  I would be delighted to.  I only have
 7   the one copy of it.
 8             THE COURT:  Well, I'll give you back the document
 9   in just a moment.
10             MS. HURST:  Is that Exhibit 5723?
11             MR. QUINN:  Yes.
12             (Document handed to the Court)
13             THE COURT:  I will give this right back to you.
14   Thank you.
15             Okay.  So I am going to repeat your argument back
16   to you.  On Friday where it shows seven hours, that might be
17   -- well, see, I don't know whether she is working 40 hours a
18   week or 35 hours a week at Mattel.  I don't have her
19   personnel file.
20             So let's just cut the baby in half and say she is
21   working 35 hours a week instead of 40 hours a week, because
22   it's not proven to me hypothetically.  Okay?
23             MS. HURST:  Well, there is evidence in the record
24   that Mattel employees get off at 1:00 on Friday.
25             THE COURT:  Okay.  So let's take Friday.  Just let
```

```
 1    me walk through this for a moment.  She works seven hours,

 2    so she would work from, let's say, 1:30 or 2:00 until 9:00.

 3    From your perspective that would account for that.

 4    Saturday, three hours; Sunday, 8.5 hours, no concern;

 5    Monday, 4.5 hours; Tuesday, 4.5 hours.

 6           So let's assume she's a hard-working lady.  I can

 7    understand 4.5 hours.  Let's assume she gets off at 4:30,

 8    5:00, 4:00.  The point is that there is enough time.  It's

 9    Wednesday with 10.5 hours on October 18th that would

10    indicate that she would have a very difficult time working

11    20 and a half hours.  That's what she would have to work.

12    Now, that's my schedule.  That's not hers.

13           MS. HURST:  And ours since we have been with you,

14    Judge.

15           THE COURT:  So let's keep going down.  Thursday,

16    four hours.  I can accept that.  Five hours on Friday,

17    getting off at 1:00 or 3:00.  Okay.  The jury gets off at

18    3:00.  I am not too concerned.  Saturday, eight; Sunday,

19    eight; Monday, 5.5.  My concern is Wednesday, October 18th,

20    and how she can work 10.5 hours and not have that concurrent

21    time.

22           MS. HURST:  They have badges.  Everybody comes in

23    and out every day.  They could have anybody come here and

24    testify that she failed to show up for work that day, and

25    they haven't.
```

30

```
 1              THE COURT:  On the face of it, it appears that she
 2    is working concurrent hours.
 3              MS. HURST:  Well, as long as there's 24 hours in a
 4    day and you haven't gone over the number that would be a
 5    normal work day at Mattel, all it shows is that she may be
 6    losing sleep.  It does not show concurrency.
 7              And frankly, you know, to hang a $400 million
 8    claim on a 10-and-a-half-hour, one-day time card is absurd,
 9    which is what they are trying to do.
10              THE COURT:  What is the evidence in my record that
11    shows that this is secret as Mr. Quinn claims?  In other
12    words, that the Mattel fashion doll designers or makers or
13    seamstresses are secretly working.  Because, remember the
14    disagreement that you may have with Mr. Quinn is it's not
15    secret at all.  It's going through Veronica Marlow.  So
16    there is no evidence in this record that it's, quote,
17    unquote, secret.  I am going to have Mr. Quinn respond in
18    just a moment.  What evidence do you recall concerning
19    secrecy?
20              MS. HURST:  I don't recall that any supervisor or
21    other person responsible for the employment of these people
22    came and said anything about that.
23              THE COURT:  With the seamstresses -- I'm going to
24    turn to Mr. Quinn just for a moment.
25              With Leahy it's different, and Leahy hasn't
```

```
 1   entered into this equation yet.  Leahy's testimony was:
 2   Everybody at Mattel was doing this.  In fact, when I was
 3   working at Mattel, my supervisor helped me and explained to
 4   me how I could work these extra hours.
 5          Now, Leahy is not part of this claim, but at least
 6   in Leahy's case it cuts two ways.  One is a poor reflection
 7   on Mattel if they are claiming that this is a breach of duty
 8   when a supervisor is telling you how to do this.
 9          On the other hand, there is a certain amount of
10   secrecy because the other inference is you are not supposed
11   to be doing it.  Everybody else was doing it, just like
12   everybody else is robbing a bank, so it's okay for me to rob
13   a bank.
14          Mr. Quinn, I want to turn back to what evidence is
15   there of secrecy concerning either Tumaliuan or the three
16   seamstresses or fashion designers or makers.
17          MR. QUINN:  Peter Marlow testified that Mattel was
18   never told.  And there is that letter that's in evidence --
19   we'll get the exhibit number -- that he writes to Isaac
20   Larian where he says these women have stable jobs.  If it
21   were ever found out what they did, they would be humiliated
22   and fired.  The Court may remember that.  It's Exhibit
23   13223, Your Honor.  That language appears on page 3.
24          THE COURT:  Okay.
25          MR. QUINN:  With respect to Tumaliuan, the secrecy
```

```
 1    I think is clear from that MGA e-mail about, you know, keep
 2    your mouth shut and your eyes open.  It didn't come into
 3    evidence, of course, but there was that language that he was
 4    a double agent.  Oh, it did come in?  All right.
 5              Now, with respect to Leahy --
 6              THE COURT:  She is not part of the claim.
 7              MR. QUINN:  She's not part of the claim, but I
 8    think her testimony was that the work she was counseled on
 9    by the supervisor was not competitive work, was not
10    competitive employment.  It was another job.  It was
11    moonlighting in a sense, but it wasn't in Mattel's line of
12    business.
13              In fact, on the stand she testified, she
14    acknowledged it would be wrong if it were competitive work.
15              THE COURT:  Okay.  Ms. Hurst.
16              MS. HURST:  So now a third condition has been
17    added -- concurrent, competitive, and secret.  It's just
18    over the course of the last few minutes more fiat again.
19              THE COURT:  Well, I have already added
20    competitive.  I added that a long time ago, so that's
21    nothing new.  In other words, it's a narrowing concept.  If
22    I start broadly with the duty of loyalty, I'm
23    extraordinarily concerned.
24              If I start narrowing that to the fact situation --
25    concurrency, secrecy, and in the same competitive industry
```

 1    -- then I certainly don't see it as necessarily a fiduciary

 2    duty.  But the problem is I am not certain honestly of a

 3    duty of loyalty is a valid claim.

 4            MS. HURST:  Right.  But that doesn't distinguish

 5    it from McDonald's versus Burger King.

 6            THE COURT:  I'm going to come back to you with a

 7    different thought.  Why aren't I, if I am instructing in

 8    this area at all, instructing straight from statutory

 9    language under 16600?

10            Second, why aren't I limiting this to this brief

11    period of time because aiding and abetting is really a

12    natural and foreseeable consequences theory?  In other

13    words, the breadth is overwhelming, and you're talking about

14    a duty of loyalty that has some extraordinary limitations to

15    it.  It's like a box.

16            So to me, conceptually the problem I am having

17    between the two of you is I am rather astounded that this

18    discussion hasn't taken place before.  However a Court came

19    out on this case for seven years, there hasn't been a

20    discussion about the duty of loyalty.

21            Second, even if I instructed on 16600 and took the

22    statutory language, I am having trouble, Mr. Quinn, because

23    we are going to another round, okay, with why I am supposed

24    to extend that other than a small box in time through August

25    to October 19th or the 24th -- no, 19th -- why I am going to

```
 1    let aiding and abetting -- well, we'll talk about that in a
 2    moment.  Ms. Hurst.
 3           MS. HURST:  If I can respond to this Marlow
 4    evidence.  Now what they're relying on is hearsay that came
 5    into evidence subject to an expressed limiting instruction.
 6           Peter Marlow says that Mattel doesn't know.  He
 7    doesn't have any foundation for that.  And that letter came
 8    in, that e-mail came in expressly pursuant to a limiting
 9    instruction that it was hearsay, to be explained, you know,
10    used to explain conduct or mental states and so forth.
11           It shows the bankrupt nature of this claim, that
12    with their 120 hours, they did not bring in a single person
13    to testify that any of these people failed in their job
14    responsibilities.  They don't have a loss of services.  It's
15    a sham.  This whole thing is a --
16           THE COURT:  I hear that, but it can't be repeated
17    enough times.  I've got that.  It's a sham-a-lam.  We're
18    missing Mr. McConville.
19           MS. HURST:  We are missing Mr. McConville, so
20    we're having a sham-a-lam in his honor.
21           THE COURT:  Okay.
22           MS. HURST:  That's the huge part of the problem
23    with it.  They want to hang all of their $400 million on
24    these disloyal, evil, disloyal, you know, working in secret,
25    when 2863 says as long as you give preference to your
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    employer, that's your obligation.  It doesn't say you have

2    to tell your employer.

3           I mean, really what they are proposing still gets

4    the McDonald's shift worker.  If the McDonald's shift worker

5    doesn't want to tell his manager that he's also working at

6    Burger King, then that's it.  We are right back to the

7    McDonald's shift worker.  It's concurrent; it's competitive;

8    and it's secret.

9           THE COURT:  I understand the principle.  Now I am

10   going to come back and say to you that I think that this is

11   the very argument that supports what I started to espouse to

12   Mr. Quinn about the ability of people to work hard,

13   overtime, and even in the same competitive industry, and do

14   analogy to the silliness of Mr. Choy's representations about

15   the Early Light factory and yet the American worker not

16   being able to literally go home and work and make the same

17   kinds of representations or have the same or better ethics

18   than people in other countries, which I happen to believe in

19   in this great country.

20          The problem that you've got is Wednesday, October

21   18th.  Everything else on this list would support your

22   argument, and I don't understand yet how October 18th is

23   anything more than concurrent employment.

24          MS. HURST:  There are 24 hours in a day.  Until

25   they hit a number that goes over 24, it doesn't give rise to

```
 1    an inference of concurrency, not without somebody to come in
 2    here and testify she didn't show up for work that day.
 3            Until they hit -- if her obligation -- and frankly
 4    we don't even know because nobody testified.  But if you
 5    assume she was supposed to be there for eight and a half
 6    hours, then until we get to, you know, 15 hours, there is no
 7    inference on its face for concurrency.
 8            THE COURT:  All right.  I want to turn back to
 9    5723, page 3.  There the worker hours from October 23rd
10    continue on.  And although the days aren't noted, October
11    30th of 2000, what day of the week is that?
12            MS. HURST:  It's a Monday.
13            THE COURT:  Okay.  Now, just a moment.  November
14    3rd, 2000, what day of the week is that?  And, Mr. Quinn,
15    check this so we have no disagreement.
16            MS. HURST:  It's a Friday.
17            THE COURT:  Okay.  November 4th would be a
18    Saturday.  November 5th is a Sunday; November 6th, a Monday;
19    November 7th, a Tuesday; November 8th, a Wednesday; November
20    9th, a Thursday.
21            There are no hours that are over five hours except
22    for what appears to be a Saturday eight-hour day that this
23    person is putting in.  In other words, I am dealing with
24    three and four hours on each of the other evenings.  No
25    difference than me working the docks in San Francisco eight
```

 1   hours and driving across and busting tires at Sears &

 2   Roebuck from 6:00 to 10:00 at night.  No difference at all,

 3   but I am not in a competitive industry when I am doing that.

 4          So the next part of this equation is the

 5   competitiveness.  Let me not leave this, because in going

 6   through these records to November 10th, if I left November

 7   9th -- which is what day?

 8          MS. HURST:  Thursday.

 9          THE COURT:  November 10th, a Friday, four hours;

10   the 12th, Saturday, six hours; the 13th, Sunday, four hours;

11   and then Monday, four hours; the 15th, five hours; the 16th,

12   five hours; the 17th, three hours; the 18th, 6.5 hours.

13          Now I want to go over to November 24th on these

14   records.  And on November 24th, there's 13 hours.  I want

15   you to tell me what date November 24th, 2000, is.

16          MS. HURST:  Friday.

17          THE COURT:  Friday.  Thank you.

18          MS. HURST:  It's the Friday after Thanksgiving.

19          THE COURT:  The Friday after Thanksgiving?

20          MS. HURST:  Yes.

21          THE COURT:  Excellent.  Okay.  For your

22   perspective that's a savior.  The 25th is a Saturday.

23   That's 16 hours.  So there is one day going through these

24   records -- I want to double-check.  November 30th, what day

25   of the week, in 2000?

38

```
 1           MS. HURST:  Thursday.
 2           THE COURT:  Thursday.  Nine hours on Thursday.
 3   That would be the other suspect date if these were actually
 4   recordkeeping hours.  So November 30th, a Thursday, and
 5   Wednesday, October 18th, a Wednesday.
 6           I am going to ask one more question.  These
 7   records are for Maria Helena Salazar.  Why wouldn't I assume
 8   on the face that these records are actually for Maria Helena
 9   Salazar and this isn't a combination of her work or anyone
10   else's work or even her husband's work?
11           And why wouldn't I assume, if you argued to me,
12   that your argument would be incorrect if she is just kind of
13   lumping in some past work when I've got a daily schedule of
14   work?
15           MS. HURST:  The testimony was that this was a
16   combined time sheet for her and her husband, who was also a
17   skilled sewer.  That was the testimony from Mr. Marlow.
18           THE COURT:  I understand that.  Why hasn't Maria
19   Helena Salazar been called by either party?  My guess is,
20   and I'll be blunt about it, that probably Mattel didn't
21   want, you know, three or two or one rather sympathetic
22   ladies coming into the court.  Why haven't you called her?
23           MS. HURST:  I mean, honestly, because given the
24   120-hour limitation and what should be the dollar value of
25   this claim, we have bigger fish to fry.  And also because
```

```
 1   they haven't met their burden of proof at all.

 2           THE COURT:  Well, I'm not suggesting it.  I am

 3   just asking questions.  Do what you want.

 4           MS. HURST:  I do want to note for the record that

 5   Veronica Marlow is not a competitor of Mattel.

 6           THE COURT:  That's right.  She is a private

 7   contractor or a contractor to Mattel, at least in this

 8   period of time.

 9           Well, she's also, though, MGA.  In this period of

10   time she has primarily moved over into what I call the MGA

11   camp.  I don't remember any evidence in 2000 that she is

12   also doing concurrent work for Mattel.  Am I incorrect about

13   that?

14           MS. HURST:  She is a vendor.

15           THE COURT:  I understand that.  I am going to ask

16   it again.  That's not an answer.  Is she doing, she being

17   Veronica Marlow, or Peter Marlow or a combination of Peter

18   Marlow and Veronica Marlow, is she doing concurrent work on

19   a contract basis or any other basis in October or November

20   of 2000 for both MGA and Mattel?

21           MS. HURST:  I don't think there is any evidence in

22   the record.

23           THE COURT:  I don't either.  I think it's just

24   MGA.

25           All right.  Ms. Hurst.
```

1          MS. HURST:  Mr. Quinn argued that he didn't hear a

2    response to the claim that the conduct of Carter Bryant was

3    outside the trade secret claim.  Yes, there was a response

4    to that.  The response was that it's clear that they are not

5    claiming that conduct as the basis for the harm because they

6    are claiming all of Bratz associated with their duty of

7    loyalty claim associated with Carter Bryant.

8          By claiming all of the profits of Bratz either as

9    a loss or a lost profits damages theory associated with the

10   duty of loyalty claim with Carter Bryant, they are making it

11   clear that two weeks of working for both is not what this is

12   really about.  It's another sham-a-lam -- in honor of Mr.

13   McConville.

14         What they are -- they say that his overlapping

15   work is the basis for their claim.  But when you look at the

16   remedy that they're asserting, it's clear that the real

17   claim is the same as the intellectual property claim.  You

18   can't get to $400 million disgorgement of profits based on a

19   couple weeks of overlapping work.

20         If all they were talking about was the performance

21   of services, then their damages claim would be the lost

22   value of services for that period of time, even assuming

23   that they could prove that.  And maybe it would be something

24   like we missed our deadline for a week or two to get a

25   product in the market, and we lost some orders because of

1    that.  That would be consequential damages flowing from one

2    of their employees failing to perform his services.

3            But that's not what they are seeking.  What they

4    are straightforwardly seeking is all of MGA's profits on

5    Bratz because of a couple of weeks' period of consulting.

6    And that makes it clear that it is superseded, because when

7    you look at the harm that they're claiming and the damages

8    that they're claiming, it becomes clear that the true

9    gravamen of what they're asserting is the intellectual

10   property, not this other two weeks or whatever it is of

11   overlapping work.

12           THE COURT:  So if I decide that this claim is

13   appropriate, what's your suggestion in that case other than

14   deciding that the claim is not appropriate?  Now, your

15   fallback position?  And I'll ask Mr. Quinn -- well, he

16   doesn't have a fallback position if I don't get the claim.

17           MS. HURST:  The damages instruction for the claim

18   has to limit the remedies to the value of the loss of

19   services.

20           THE COURT:  Yes.  In other words, what time period

21   might be a contention?  October 19th to what?

22           MS. HURST:  It doesn't even matter, frankly.  I

23   mean, I don't think you have to define a time period.  You

24   just have to say that the damages for this claim are limited

25   to the value of lost services.

42

```
 1            THE COURT:  That's dangerous, because although I
 2   absolutely trust the American juror, I don't know why I
 3   wouldn't set a time period on that.
 4            MS. HURST:  Okay.  Well, both.  We would be fine
 5   with both, but we absolutely think that there has to be --
 6            THE COURT:  But the confusion in the argument can
 7   become a fog.  I don't know why that isn't from the first
 8   meeting or even from June.  However you want to extrapolate
 9   that, it's pretty clear to me the first meeting is sometime
10   in August.
11            MS. HURST:  Yes.
12            THE COURT:  And the last possible date, and I may
13   be turned around, I think it's October 19th.
14            MS. HURST:  Correct.
15            THE COURT:  It's not the 24th; it's the 19th.
16            MS. HURST:  The 19th.
17            THE COURT:  The 19th.  That seems to be the
18   limitation if you lose on this that it's faced with.  The
19   prejudicial effect is duty of loyalty.  That's why I am
20   saying I don't know that a duty-of-loyalty claim exists; but
21   a 16600 claim, a statutory claim, may exist.
22            If that's the case, I may be inclined to take away
23   the prejudice of the duty of loyalty.  I am rather astounded
24   -- I will say it again -- that we are getting into this
25   discussion seven years into the case.
```

1          MS. HURST:  Well, can I just tell you I had a

2     knock-down, drag-out, with Skadden about this and nobody

3     believed me?

4          THE COURT:  But regardless, it just seems to me

5     that there is a limitation.

6          But now I want to turn to Mr. Quinn, because Mr.

7     Quinn, if he prevails, is going to tell me that there

8     shouldn't be a limitation on aiding and abetting, which is

9     really all the natural and foreseeable consequences of this

10    act flow...  Pick it up from there.

11         MR. QUINN:  Right.  I have no quarrel with the

12    proposition that the duty of loyalty is bounded by the

13    period of employment.  Once Carter Bryant resigns, you know,

14    in November or December he doesn't continue to owe a duty of

15    loyalty.

16         THE COURT:  What about the fashion --

17         MR. QUINN:  Skilled patternmakers or whatever?

18         THE COURT:  Skilled patternmakers, because --

19         MR. QUINN:  Fashion makers.

20         THE COURT:  -- each side has a nomenclature for

21    the Circuits.  Patternmaker, seamstress, fashion maker.

22         MR. QUINN:  Obviously the duty of loyalty is a

23    creature of the employment status.  But let's remember that

24    this is a question in this setting on this motion wherein we

25    need to look at the evidence from the standpoint of Mattel,

 1    how it could be interpreted.

 2            THE COURT:  Now, hold on.  Let me take Carter

 3    Bryant, and let me define that as sometime in August for a

 4    moment hypothetically to October 19th.

 5            MR. QUINN:  Exactly.

 6            THE COURT:  What about the seamstresses or the

 7    skilled fashion makers?

 8            MR. QUINN:  Well, I think the evidence there is

 9    that it's, like, five-plus years, a five-plus-year period.

10            THE COURT:  Okay.  And Tumaliuan?

11            MR. QUINN:  Tumaliuan, I believe it's less than a

12    year.  It's, like, six or seven months, I believe.  Again we

13    have to put his personnel file into the record.

14            THE COURT:  How does the jury attach a value to

15    Tumaliuan?

16            MR. QUINN:  I think that they have to -- we are

17    entitled to the benefit of whatever inferences can be drawn

18    of his acting as a double agent.

19            THE COURT:  Hypothetically I just gave you that.

20    Now how does the jury define what the value of Tumaliuan is

21    as an intern?

22            MR. ZELLER:  Well, one way of looking at this is

23    MGA characterizes this as we are basically asking for

24    disgorgement based on two weeks, which is simply not

25    correct.  One approach --

1          THE COURT:  I'm sorry.  No.  No.  No.  No.  No.

2     No.  How do I value Tumaliuan?

3          MR. ZELLER:  As part of the entire bundle of these

4     workers, these employees working for years together for MGA.

5          THE COURT:  No.  No.  I am probably going to

6     reject that.  So now I am going to turn to Carter Bryant.

7     How do I value Carter Bryant?  I am just telling you that

8     it's a great argument.  I am going to reject it.

9          MR. QUINN:  That's going to be up to the jury.

10    They will be instructed on what the measure of damages for

11    aiding and abetting, and it's up to the jury.

12         THE COURT:  Okay.

13         MR. QUINN:  But, Your Honor, if I could respond to

14    some of the other points.  And if I could ask the Court a

15    question.

16         THE COURT:  Sure.

17         MR. QUINN:  The Court just referred to the

18    silliness regarding Choy and Early Light.  The Court does

19    not seem to have been persuaded --

20         THE COURT:  No, I'm not.

21         MR. QUINN:  -- by my proffered distinction that it

22    was disclosed to Dombrowski that there would be two factory

23    lines there and they would work on two products.  If I could

24    ask the Court --

25         THE COURT:  Sure.

1           MR. QUINN:  In the Court's mind why doesn't that

2    make a difference as opposed to a situation where an

3    employee is working in secret?

4           THE COURT:  It's not that I am rejecting Mr. Choy,

5    who I have never met.  I just hold this system in such high

6    esteem that I am just as liable to take the word or

7    representation of seamstresses or people who give that same

8    representation who are citizens of this country as I am Mr.

9    Choy, who is a citizen of another country.

10          MR. QUINN:  Sure, but the seamstresses didn't make

11   any such representation.  Unlike Mr. Choy, the seamstresses

12   didn't tell Mattel, "We're going to work for a competitor.

13   Just to let you know, we are working for a competitor."

14          THE COURT:  Well, just a moment.  It's not Mr.

15   Choy.  It's the -- and I'll use the word -- silliness of

16   50,000 workers in Early Light.  And you are my brother, and

17   you work on one side of the factory and I work on the other

18   side of the factory, or my wife works on the other side of

19   the factory.  And she comes home and says, "I worked on a

20   beautiful doll today.  It's got blond hair; it's got a big

21   head; it's got large eyes.  And it squeaks and has a baby,"

22   or something.

23          I say to her, "You know, gee, I worked in the same

24   factory, and it's a funny thing.  We're working on the same

25   kind of doll, but this one doesn't squeak.  This one has

1    tears that run out of its eyes."  Now, I'm being silly with

2    this analogy.

3           It's astounding to me that MGA and Mattel are

4    employing the same manufacturer.  And I know at Mr. Choy's

5    level, he truly believes that there's a separation with

6    thousands of workers going home who are either related or

7    friends, or in our case maybe having a beer after work, and

8    not discussing their employment, and that those secrets in a

9    sense pass by minor workers back and forth.

10          I mean, I can't imagine coming to either Orrick or

11   Quinn Emanuel and having you draw a wall in a sense and

12   represent to me as a client that you could represent both me

13   and my adversary.

14          MR. QUINN:  Well, there is no evidence -- first

15   off, I guess my reaction to that is, first, this is a

16   contractual relationship, a subcontractor who's

17   manufacturing product.  The employees of that subcontractor

18   owe no duty -- I don't know about Chinese law --

19          THE COURT:  Well, just a moment.  In America,

20   though, I hear your argument that they would owe a duty.

21          MR. QUINN:  I am talking about a duty arising out

22   of Mattel's employees.  I'm not talking about --

23          THE COURT:  I am going to take Early Light, and I

24   am going to bring them to America now.

25          MR. QUINN:  Yes.

```
 1              THE COURT:  I am going to put Early Light in Los

 2    Angeles.  And an employee starts telling his or her spouse

 3    about the product that they are working on.

 4              MR. QUINN:  Same contractual relationship.

 5              THE COURT:  Also breach of duty of loyalty?

 6              MR. QUINN:  No.

 7              THE COURT:  Why?

 8              MR. QUINN:  Because they are not Mattel employees.

 9    They are employees of an outside contractor, a contract

10    manufacturer.

11              THE COURT:  Breach of duty by the manufacturer?

12              MR. QUINN:  There may be a -- there conceivably

13    could be a contract, depending upon the terms of the

14    contract.  If they haven't taken appropriate -- say there is

15    provisions in the contract that says you are going to make

16    sure --

17              THE COURT:  I am almost with you.  Now, employee

18    number one who worked on this side of the factory now goes

19    to work on that side of the factory.  In their intellectual

20    brain they take the ideas or concepts that they were working

21    on and they somehow implement those with no intent.  It's

22    just a common, what I call, a toolbox of intellectual

23    property that they take with them as a minor worker.  Breach

24    of duty of loyalty?

25              MR. QUINN:  Not to Mattel.  They are not an
```

49

1    employee of Mattel.  They are an employee of a contract

2    manufacturer named Early Light which enters into a contract

3    with Mattel.

4              THE COURT:  Knowingly entering into a contract

5    with Mattel?

6              MR. QUINN:  Yeah.  And that presumably is governed

7    by that contractual relationship.  We are way outside the

8    duty of employment loyalty here.  It's up to Mattel and

9    Early Light -- if Mattel wants some type of protection

10   against that type of thing, it's up to Mattel to negotiate

11   contract terms which give it to the extent possible

12   protection from that sort of thing.

13             I mean, all we are talking about here is a duty

14   arising out of the employment relationship.  The Court

15   raises the question -- Mr. Zeller hands me a note.  The

16   manufacturing employees are not working in the Design

17   Center, is another way of looking at it.

18             I am told that Exhibit 13223, Mr. Marlow's letter,

19   came in on February 10, 2011, through Mr. Larian at 3815

20   without a limiting instruction, that it came in for all

21   purposes.

22             THE COURT:  I don't think I am going to worry

23   about a decision whether it was --

24             MR. QUINN:  Right.  But, I mean, the jury is

25   entitled to conclude that this was cloaked in secrecy -- the

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    activities of the seamstresses, the activities of Mr.
 2    Tumaliuan, the activities of Mr. Bryant.  That it was
 3    deliberately -- Mr. Bryant, that it was deliberately hidden
 4    and to draw inferences from that, the fact that these
 5    activities were not disclosed.
 6            I mean, for all we know, these time sheets are
 7    fabricated.  The jury doesn't have to credit those, given
 8    the circumstances here.  So far as we know, these women did
 9    this work in the Design Center at Mattel, worked on Bratz
10    product.  The jury might believe that.
11            THE COURT:  If I am speculating, part of those 10
12    hours could be overlap.
13            MR. QUINN:  Exactly.  But, you know, I don't think
14    that's necessary for a breach of duty of loyalty.  I don't
15    think serving two masters means that you are concurrently in
16    time literally serving two masters.
17            THE COURT:  But we can speculate also that they
18    don't have five-day work weeks.  We don't know right now --
19    although the record seemed to indicate to me candidly that
20    they have five-day work weeks, which is why I was counting.
21    But I am not certain if this is a day off or if they are
22    concurrent.  And it appears to me there is a good chance
23    that this is concurrent time.
24            MR. QUINN:  Well, certainly on the same days, you
25    know, work days that they are working -- you know, giving
```

```
 1    them the benefit of the doubt, let's say they are not doing
 2    it in the Design Center.  The jury could believe otherwise.
 3                THE COURT:  Now, there is testimony in the record
 4    that her husband also was an accomplished --
 5                MR. QUINN:  The jury might not credit that either.
 6    They may look at Peter Marlow and the way he --
 7                THE COURT:  No, not Peter Marlow.  Her husband,
 8    Salazar's husband, was an accomplished fashion maker.
 9                MR. QUINN:  The only evidence of that was Peter
10    Marlow's testimony.  And the jury had a chance to observe
11    Mr. Marlow and the way he answered questions, and they may
12    decide that was a subterfuge and a ruse.
13                THE COURT:  But I am saying it plays both ways.
14    These could be combined hours.  These could be her hours.
15    But there's 10.5 hours on a Wednesday.
16                MR. QUINN:  Right.  In terms of the statutory
17    language --
18                THE COURT:  Which would make it an 18.5-hour day.
19    By the end of the day you will have been here at least that
20    time.
21                MR. QUINN:  We are serving only one master.
22                THE COURT:  And I am serving each of you.
23                MR. QUINN:  You are.  But in terms of the
24    statutory language, why shouldn't you just give the jury the
25    statutory language in the four cases that I have cited to
```

1   the Court where the duty of loyalty has been recognized.  In

2   none of them do the Courts cite to that statute.  I don't

3   see any reason -- whatever those Courts are talking about in

4   terms of the scope of the duty of loyalty, they haven't

5   thought that statute factored into it.

6           THE COURT:  I don't want to be impolite to my

7   colleagues, but I don't know what they were talking about

8   right now.  And I am not satisfied yet that there is, quote,

9   unquote, a duty of loyalty.

10          There might be a statutory instruction and there

11  may be a limiting, but I am very concerned about this

12  duty-of-loyalty concept.  But precedent seems to be on your

13  side.  Okay?  Certainly my respect for Judge Illston is

14  extraordinarily high.  And I need to go back and look at

15  that unpublished case, although I agree with Judge Kozinski.

16  I don't rely on unpublished cases usually.

17          Okay.  Now why don't you finish your argument, and

18  then Mr. Hurst, because you started.  We will conclude

19  briefly, and then I was to take a brief recess for a moment

20  just to do a little bit of thinking.  And then we are going

21  to go on to conversion.

22          MR. QUINN:  I think I have covered the points I

23  wanted to make, Your Honor.

24          THE COURT:  Okay.  Ms. Hurst.

25          MS. HURST:  It's ironic that the Chinese contract

1    manufacturer gets more protection because it's in a

2    contractual, arms-length contractual relationship, than the

3    American worker.

4            The California Supreme Court, which is who we care

5    about here, has repeatedly said that the employment

6    relationship will be viewed primarily as a contractual one

7    and the circumstances giving rise to tort duties associated

8    with that relationship will be very few and far between.

9            Foley, Hunter versus Upright, 6 Cal.4th 1174.

10   Hunter describes all of the California Court of Appeal cases

11   in the meantime in which Courts consistently rejected the

12   notion of tort remedies arising from the employment

13   relationship.  Stokes and Fowler are termination cases.

14           And outside the employment context, the California

15   Supreme Court, which is who we are care about here, has

16   consistently said we are not going to impose tort duties

17   where there are fundamentally contractual relationships.

18   All right.  I'm sorry.  I can see I am repeating myself.  I

19   apologize, Your Honor.

20           THE COURT:  That's okay.

21           MS. HURST:  So, look.  What Mr. Quinn is arguing

22   on the evidence is speculative inferences.  All right.  Rule

23   50(a) gives him the benefit of reasonable inferences.  It

24   does not give the benefit of pure speculation.

25           THE COURT:  Okay.

54

```
 1            MS. HURST:  Now, Mr. Marlow testified that these
 2   employees worked from their homes, their garages, with their
 3   sewing machines set up.  There has been absolutely no
 4   evidence to the contrary, and that was evidence that it was
 5   within Mattel's power to produce if there were any.
 6            Giving them the benefit of the reasonable
 7   inference does not entitle them to the speculative
 8   inference; that just because there is a long day on that
 9   second shift one or two times, that means she was actually
10   sitting in Mattel's Design Center working on Bratz.
11            I've got to tell you, I think if you ask Mr. Quinn
12   if it's his contention that any of these people were sitting
13   in Mattel's Design Center working on Bratz, he'd say no
14   because then you would have an enormous statute of
15   limitations problem.
16            That's not their contention.  Their contention is
17   that these women were not allowed to go home and work at
18   night in their garages and in their sewing rooms on Bratz.
19            THE COURT:  Why isn't there any CACI or BAJI
20   instructions on duty of loyalty, Mr. Quinn?
21            MR. QUINN:  I don't know.
22            THE COURT:  That's because there might not be any.
23            MR. QUINN:  I will say each of these cases recites
24   the elements as if they are well known.  They cite the same
25   three elements.  Beyond that, I say nothing further, Your
```

```
 1    Honor.

 2              THE COURT:  Well, thank you very much.  Ms. Hurst.

 3              MS. HURST:  There aren't any because there isn't

 4    any, because it's a fiduciary duty and because everybody has

 5    got it all confused.  They've got it all confused with

 6    fiduciary duty.

 7              THE COURT:  All right.  Let's do this.  It's 7:00

 8    now.  If you want some food, you can go out and get it.  If

 9    you want me to get right back to conversion, I'll do that.

10    So I don't know how hungry you are.  I don't know how long

11    your arguments concerning conversion will be, and I don't

12    know how far along, if at all, you are on the special

13    verdicts.

14              So you tell me how I govern my evening.  But I

15    need about 20 minutes now just for quiet reflection close in

16    time to your arguments.  I want to make my own notes so I

17    recall those after you leave this evening and I can go back

18    to them when you're not here.

19              And I would also like to finish off the notebooks

20    that were given to me yesterday.  I have got one more

21    passage that I -- frankly I don't think that there is

22    anything in these books in addition that is going to cause

23    disclosure by the Court.

24              I want to go back and check one more thing.  I was

25    a little sleepy.  I left last night at 10:00, and I just
```

56

1    wasn't tracking one paragraph that I want to look at one

2    more time.  But I think you are going into the deposition

3    tomorrow with all that the Court's going to release frankly.

4    So I think you can rest easy with that.  I haven't seen

5    anything that would cause further redaction or further

6    unredaction.

7             Now, you tell me how you want to govern your

8    evening.

9             *(Off-the-record discussion)*

10            THE COURT:  Just give me a few moments and let's

11   come back with conversion.  The key to tonight are the

12   special verdict forms.  That's the key to how our evening

13   ends.  It doesn't mean I need completion.  It just means

14   that I need to discuss it with you.

15            *(Recess.)*

16            THE COURT:  We are back on the record.

17            MS. HURST:  I have a proposed verdict form that I

18   have just given to them.  I wonder if I can give it to the

19   Court and we can discuss it tomorrow.

20            THE COURT:  Sure.  I'll try not to burn you out

21   because I know you've also got that depo.

22            MS. HURST:  Tomorrow or Monday instead of today.

23   It's just an idea.

24            THE COURT:  First of all, it's way too big.

25   Mine's much smaller.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1            MS. HURST:  It's not that much bigger.

 2            THE COURT:  Well, obviously this is the one I

 3    should give, then.  I've got to read it first.

 4            MS. KELLER:  I was just going to say on Ms.

 5    Hurst's behalf, when it comes to verdict form, size is one

 6    consideration, but simplicity of the questions is another.

 7            THE COURT:  Sure.

 8            (Off-the-record discussion)

 9            THE COURT:  We are back on the record, counsel,

10    concerning conversion and the equitable trust.  I don't care

11    who starts off, and I don't care who argues.

12            MS. HURST:  I'll start.

13            THE COURT:  Just a moment.  Mr. Zeller was going

14    to start.

15            MS. HURST:  Oh, I didn't see that.  I apologize.

16            MR. ZELLER:  Actually this is an aside, Your

17    Honor, because I just saw that there was an order issued

18    through Pacer about those two investigation files which seem

19    to suggest that we are being ordered to produce unredacted

20    versions of those.  It says order compelling production.  So

21    obviously since I haven't seen the order, I just wanted to

22    make sure --

23            THE COURT:  Let me go back and check.  I'll be

24    right back.

25            MR. ZELLER:  Because also I would like to talk
```

1   with the Court about those.

2           MS. HURST:  No.  This is the old order.  It's the

3   old order just hitting the docket.  It's just the one to

4   turn it over to the Court.  That's all it is.

5           THE COURT:  I have made no further orders about

6   that from the last time I made the order to bring it over to

7   the Court.  Let me make that ruling right now.

8           MR. ZELLER:  Okay.  Sure.

9           THE COURT:  The Court has looked at both files

10  submitted, and I don't see any reason why the Court would

11  cause further redaction at this time.  Strike that -- or

12  unredact the present information that's being given to MGA.

13          MR. ZELLER:  Thank you, Your Honor.  That just

14  threw me there for a moment, so I apologize.

15          THE COURT:  That's because your days are fading

16  into nights and your nights are fading into days.  That was

17  Friday.  All right.

18          Now let's get on with the conversion and equitable

19  trust.

20          MR. ZELLER:  My perspective is it's MGA's motion,

21  so they should go first.  But also if the Court has

22  particular issues, it might make sense to address them.

23          THE COURT:  It seems to me that Judge Larson got

24  it absolutely right.  It's a piece of paper.  You're going

25  to argue in a few moments on behalf of Mattel that the paper

1    has inherent value that Judge Larson recognized, and I think

2    this Court is inclined to recognize that it's simply going

3    to be given back to whoever prevails on this.

4            And I had a question before I looked at these

5    proposed special verdicts about ownership, but I hadn't

6    flushed that out fully.  It seems to me that my trade secret

7    misappropriation claim is going to tell the Court what to

8    do.

9            But that's my initial thoughts, Ms. Hurst.  In

10   other words, it's just a redundant, confusing instruction to

11   the jury that's totally unnecessary.

12           MS. HURST:  I don't want to really spend a lot of

13   time on this conversion claim.  I am just going to make two

14   brief points.

15           The first point is that the thing and the

16   intellectual property right are different.

17           THE COURT:  It's the piece of paper.

18           MS. HURST:  It's the sculpt.  It's the picture.

19   It is not the abstract bundle of rights that is the

20   invention or the design or the idea or the whatever

21   associated with it.  It's not the information.  It's not any

22   of that.  It's just the thing.

23           THE COURT:  That's my initial thinking.  Somebody

24   might get a piece of paper with a drawing on it and a

25   sculpt.

```
1              MS. HURST:  Right.  And the reason why, then, the
2     claim is defective when you understand that.  There are two
3     reasons.  First, the contract doesn't actually cover the
4     thing.  It covers the abstract right to the extent it covers
5     it.
6              THE COURT:  How am I -- I am going to take you
7     through a whole set of what-ifs.  Wouldn't I be governed by
8     the trade secret misappropriation claim and a verdict on
9     that claim?  If not, then my special instructions would have
10    to have the jury reach the issue of ownership.
11             MS. HURST:  Well, I think you need to raise the
12    issue of ownership anyway, as you'll see from our verdict
13    form.
14             THE COURT:  That is a special verdict form alone.
15    And remember, I only have my special verdict form so far.
16             MS. HURST:  Right.
17             THE COURT:  Is my special verdict form alone
18    without any further instruction sufficient?
19             MS. HURST:  Yours wasn't.
20             THE COURT:  Exactly.
21             MS. HURST:  No disrespect intended.
22             THE COURT:  I don't want to instruct, though,
23    through a special verdict form.  So when I use words like
24    ownership, it seems to me that that has to come in the body
25    of instruction.
```

```
 1              MS. HURST:  And it is in the contract
 2    instructions.
 3              THE COURT:  Okay.
 4              MS. HURST:  All those contract instructions that
 5    we look at cover it and the work made for hire if the Court
 6    is going to give that instruction.
 7              THE COURT:  Okay.
 8              MS. HURST:  If.  I'll stay with that.
 9              THE COURT:  Next thought.
10              MS. HURST:  So anyway, so number one, difference
11    between abstract right and the object -- actually the patent
12    context.  This is probably easiest to visualize because in
13    the patent context, the claims of the patent are the
14    property, intellectual property, and any embodiment of that
15    is not covered at all by the intellectual property.
16              But more importantly, apart from the fact that the
17    contract doesn't cover the tangible object, is that there
18    has been no harm.  There has been no evidence of damages,
19    and the measure of damages for a conversion claim is the
20    fair market value of the work at the time converted.  Mattel
21    has put in absolutely no evidence on this element.
22              THE COURT:  Well, since I am at a disadvantage and
23    you just handed both Mattel and me your proposed special
24    verdict forms, I am not sure what you cover in this yet.
25              MS. HURST:  I didn't cover conversion or duty of
```

1    loyalty in there.  It's really just -- but I am really just
2    talking about the JMOL now.
3              THE COURT:  Now I am going to come back to the
4    critical question that I have got which you haven't answered
5    yet, and that is:  How do I know who to return or give the
6    drawing and sculpt to?
7              MS. HURST:  Our view -- what I am arguing on the
8    JMOL, okay, is that even if you gave them the inventions,
9    you still wouldn't give them the drawing and the sculpt.
10             THE COURT:  I understand that.
11             MS. HURST:  But if I'm wrong, then return is
12   replevin, which is for the Court to decide.
13             THE COURT:  And I am going to ask the question
14   again.  How do I decide that?  So far, conceptually I have
15   thought that the trade secret misappropriation claim would
16   govern what the Court did.
17             If you have a better suggestion, tell me what that
18   is.  Then I am going to take you through a whole set of
19   hypotheticals if you agree with that.  And if you don't,
20   then I want to know, because I agree with you that the
21   conversion claim makes absolutely no sense if I am governed
22   by the trade secret misappropriation claim.
23             MS. HURST:  The way that -- and I know the Court
24   hasn't had a chance to look at this yet.  The way that we
25   have proposed the special verdict form, we have broken out

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

 1    the drawings from the sculpts --

 2              THE COURT:  I am at a disadvantage here.

 3              MS. HURST:  I know.  I know.  I'm just going to

 4    say -- I know the Court can't respond now because I just

 5    handed this up.  We have broken out the drawings from the

 6    sculpts, and those should be considered separately here.  So

 7    the trade secret claim doesn't necessarily -- isn't

 8    necessarily going to tell us unless we are able to break

 9    those things out separately.

10              THE COURT:  How does the Court -- in other words,

11    since I am submitting so much to the jury, I don't see why I

12    am not using the jury as my vehicle.  If I am giving them

13    the statute of limitations, I am giving them ideas.  I am

14    giving advisory on 17200.  It doesn't make sense to me not

15    to be governed --

16              MS. HURST:  I agree, and we should give them a

17    question on ownership, which is what we're proposing.  I

18    think frankly, I mean, you could have the tangible objects

19    follow the ownership of the rights as well.  I mean, it's

20    not technically correct to do that, but --

21              THE COURT:  Just a moment.  I am assuming that you

22    have done the same thing I have in my initial special

23    verdict when I drafted this and put in a question about

24    ownership.  Who owns it?

25              MS. HURST:  Yes.

```
 1              THE COURT:  This is 15 minutes into the same
 2    question I was asking.  Do I instruct in the body of
 3    instructions something about ownership, or do I just leave
 4    it hanging like a chad in my special verdict form?  Because
 5    I think Courts should be reluctant to ever instruct through
 6    a special verdict form.  Now, I am not sure it needs any
 7    definition, by the way.  I am not sure ownership needs any
 8    definition.
 9              MS. HURST:  I don't think it needs any more than
10    answering the interpretation questions.
11              THE COURT:  Okay.
12              MS. HURST:  And I think you put that together with
13    the questions on the verdict form, and you have your answer.
14              THE COURT:  All right.  Now, let me turn to Mr.
15    Zeller or Mr. Quinn.
16              MR. ZELLER:  Taking, I think, the practical issue
17    of the verdict form first, what I would suggest is this.  I
18    think the preliminary question for the jury is:  Does Mattel
19    own X, Y, and Z?  The instructions would say to the jury
20    that Mattel asserts that it owns these properties in one of
21    two ways:  number one, pursuant to the agreement, which of
22    course carries with it the various issues that the Court
23    will be instructing on; or it's a work made for hire.  And
24    the jury can decide basically the question of ownership.
25              Obviously there were issues as we all know with
```

1    the Phase I jury, but one part of that verdict form that did

2    work pretty well was it specified what exhibits we are

3    talking about.  It broke it down for the jury what elements,

4    because they could decide that some of the drawings, some of

5    the ideas, whatever it is that's on the table, were

6    conceived of or reduced to practice while Bryant was a

7    Mattel employee pursuant to his agreement.  Perhaps some

8    weren't.

9          So the jury can make that determination on an

10   element-by-element basis, we'll call it.  Things could be

11   obviously grouped together, but I think ultimately the jury

12   needs to say, you know, yay or nay on these various

13   drawings.

14         The second piece, I would submit, on this -- and I

15   do think that the Court ought to be sending conversion to

16   the jury because that eliminates, I think, a potential

17   ambiguity, because the next part of it would be basically,

18   you know, are the defendants liable or has Mattel proven by

19   a preponderance of the evidence, whatever the phraseology

20   is, for conversion?  Yes or no.  If it's yes, here is the

21   amount of damages.

22         The reason why I think it's important to do that

23   is that in some ways there may not be that much of a

24   disagreement at least conceptually between Mattel and MGA on

25   this, which is the tangible, which is what we're getting at

1    in terms of your question of who do you give it to.  Does it
2    go to Mattel or does it go to MGA?  That needs to be
3    separately considered by the jury.  It won't tell us
4    necessarily enough.  Even if they decide, well, Mattel owns
5    this drawing, because was there conversion?  I mean, that's
6    the predicate for returning it to Mattel if that's
7    consistent with the jury's finding.
8           So I think you have to have both of these pieces
9    to really make that determination.  I don't think it follows
10   necessarily as a matter of course that the jury's trade
11   secret determination has to be driven fully by the
12   conversion or -- I should put it this way, that the
13   conversion determination has to be driven fully by trade
14   secret.
15          The jury could decide for a whole variety of
16   reasons -- not that we would agree with them, but the jury
17   could decide that perhaps Mattel didn't take adequate steps
18   to protect its trade secrets and therefore it fails on that
19   element, even though it also finds that in fact Carter
20   Bryant created these works while a Mattel employee.
21          Now, that would have, of course, implications for
22   copyright and our copyright claims, but the jury could find
23   one element of trade secret misappropriation not satisfied
24   that would not be dispositive of conversion.  So I think
25   that's the practical issue that we're facing with the

```
 1    verdict form.
 2              THE COURT:  Okay.  Now, you haven't seen Ms.
 3    Hurst's latest rendition and neither have I.  Instead of
 4    going through mine one by one tonight -- that just doesn't
 5    make sense -- I want to read your product tonight and give
 6    Mr. Zeller a chance to respond and let me reflect on what
 7    you have written.
 8              Now Ms. Hurst.
 9              MS. HURST:  First of all, let me say at the
10    beginning of Mr. Zeller's remarks, we have, I think, a rare
11    moment of agreement, which is that there should be some kind
12    of chart.  I don't think it should be all those numbers, the
13    exhibit numbers, without any explanation.  I think things
14    should be grouped together with some nonargumentative words
15    --
16              THE COURT:  Where would that go?
17              MS. HURST:  In what I just handed up, it's -- you
18    know, if you look at 4 and 5.
19              THE COURT:  Okay.
20              MS. HURST:  That's an example.  I just tried to
21    group them together with some hopefully nonargumentative
22    descriptions, and maybe the parties could ultimately get
23    together and agree to what those descriptions would be.
24              THE COURT:  We'll be getting together all right.
25              MS. HURST:  Yeah.
```

```
 1              THE COURT:  Don't worry about that.
 2              MS. HURST:  But I think on the first part of what
 3    Mr. Zeller said, you know, we have a rare moment of
 4    agreement.
 5              On the second part, though, with respect to
 6    conversion, I strongly disagree.  In fact, both Mattel's
 7    brief and Mr. Zeller's remarks point out exactly why we have
 8    a huge problem here, because they are conflating the
 9    abstract value of the intellectual property with the
10    tangible object.
11              And this is hard.  This is hard stuff.  It's hard
12    to understand the distinction.  It's hard to get that 17 USC
13    202 and in your mind divorce the abstract right from the
14    object.  The jury is going to be very likely to be confused
15    by this.
16              If you just look at Mattel's brief, you see the
17    problem that we have.  Mattel has introduced evidence from
18    which the jury could calculate the value of Bryant's
19    drawings and sculpts.  I'm looking at their opposition at
20    pages 9 to 10.  MGA itself recognized the value of such
21    property as artistic works when it first saw them.
22              And then there's a bunch of quotes about how
23    beautiful they were and that we committed to spending
24    millions to develop them based on our assessment of the
25    property.  Here it is.  Heather McComb testified that MGA
```

 1  used the converted property to translate Bratz from

 2  two-dimensional to three-dimensional.  This is an argument

 3  about the intellectual property and the value of the

 4  intellectual property, the information in the tangible

 5  objects.

 6          This is exactly what cannot be permitted.  This is

 7  exactly what cannot be permitted.  There has been no

 8  evidence of the fair market value of the drawings and the

 9  sculpts as objects, divorced from any intellectual property.

10  And that's the standard for damages.  And given the massive

11  opportunity for confusion here, that should not go to the

12  jury.

13          MR. ZELLER:  Addressing then, I think, the legal

14  arguments here, first of all, I am not aware of any

15  authority that says that an issue such as this one which is

16  a damages issue, just because it's potentially confusing to

17  a jury, trumps our Seventh Amendment rights.  I am just

18  unaware of any such authority.

19          Second, I disagree that it's that confusing.  What

20  Ms. Hurst does not include is in fact the rest of what we

21  say in that part of our submission.  We are simply pointing

22  out that MGA has put in -- there is evidence of record that

23  these tangibles have artistic value of their own.  This is

24  simply to distinguish it from the case where some Courts

25  have said even if you have a tangible, like calling it a

 1    thumb drive, that that's not really sufficient to carry the

 2    weight of a conversion claim because there is nothing

 3    special about it.

 4           This is simply to point out that these are

 5    artistic works of their own accord.  It's something that has

 6    its own value that has been recognized.  So then the second

 7    part of the question is simply what could the jury

 8    determine.  The jury, of course, does not -- and this is

 9    black-letter law.  The jury doesn't have to determine

10    damages with precision.

11           There are definitely guideposts that it can use in

12    order to draw an inference as to what the value is.  One of

13    them was, in fact -- and this is further pointed out in our

14    brief, and this is the part that MGA did not talk about --

15    MGA's own argument.  MGA itself has argued in this case that

16    the fair market value of these artistic works can be

17    determined from the payments that were made to Carter Bryant

18    pursuant to the contract as of the time he left Mattel.

19           So that is, in fact, what the jury in the first

20    instance, in the first trial, put down as the value, exactly

21    what MGA had suggested.  To us this is an important issue.

22    I mean, I understand that the Court has noted and there is

23    no disputing that obviously the dollar amount is not what is

24    driving this.

25           We are not going to be up and saying the

1   conversion claim essentially is a disguised intellectual

2   property claim where the jury can smuggle in, you know,

3   substantial damages awards.  What we are saying and the

4   reason why we want it in is because it will, in fact, help

5   set the facts as to what jury has found and what Carter

6   Bryant did when he did it.  We think that those are

7   important issues and facts for the jury to decide in this

8   instance.

9          But in terms of making a determination, what I

10  would point to is the Phase I trial record at page 8236,

11  line 23, through 8237, line 19, where MGA's counsel argued

12  to the first jury that the value of the drawings could be

13  based on an amount of value from the Carter Bryant contract

14  with MGA, which again I think he picked the number of about

15  $31,500 or maybe it was $28,500.  But it was an amount based

16  upon the MGA/Bryant agreement itself.

17         The only other thing I would say is that this

18  argument that Mattel's contract does not govern the

19  tangible, I guess is the argument; that somehow the

20  inventions agreement with Carter Bryant only covers

21  intangible rights.

22         The language of the contract itself is clear and

23  certainly clear enough to get to a jury to make a

24  determination as to what is covered here.  But paragraph 2-A

25  says:  I hereby assign to the company and/or its nominees

1    all my right, title, and interest in such inventions.

2          Title -- and we cited at least one case on this

3    proposition -- is classically recognized as conveying rights

4    in actual documents, actual drawings, intangibles.  And

5    certainly a jury would be entitled to conclude from this

6    language, just from the word title, that it is meant to

7    convey and assign rights in the tangibles themselves.

8          Thank you.

9          THE COURT:  Okay.

10         MS. HURST:  One more.

11         THE COURT:  You can have as many times as you

12   want.

13         MS. HURST:  Okay.  This really is it.  I only have

14   one more.  Really, if you look at their brief in opposition,

15   I don't know if the people writing it -- if they are going

16   to make these arguments to the jury, we have got a serious

17   problem.

18         In their brief in opposition at pages 10 and 11,

19   they argue ownership of the sculpts based on joint

20   authorship under copyright.  There it is right there.

21   At worst for Mattel, MGA is a joint author of the works

22   citing the joint authorship instruction.  They are

23   clearly conflating the copyright with the material

24   object.

25         We can't let this happen in front of the jury

```
 1    because it is too hard to understand to begin with.  Now,
 2    it's not an interference with their Seventh Amendment right
 3    to take a claim away from the jury because they have a
 4    failure of proof on one of their elements.  They do have a
 5    failure of proof on one of their elements, and I am just
 6    giving the Court a practical reason why this also matters,
 7    because the Court is very practical and it often wants to
 8    know why does it matter.
 9              They have failed in their proof on the fair market
10    value.  Now, with all due respect, it's completely unfair to
11    cite closing argument from the prior trial as evidence of
12    fair market value.  As far as I know, we have not been
13    allowed to cite what the lawyers have said --
14              THE COURT:  It doesn't matter, because Judge
15    Larson's eventual solution was to basically give the
16    drawings back.
17              MS. HURST:  Right.  And the Court will have that
18    equitable authority if that's what it determines should be
19    done.
20              THE COURT:  Okay.
21              MS. HURST:  But there has been no proof about the
22    loss of value, of use, in the meantime or anything like
23    that.  So there is a failure on an element.  That's what
24    Rule 50(a) is for.  For practical reasons, including some
25    very huge opportunity for jury confusion here, it should be
```

1    taken away.  That's my thought.

2            MR. ZELLER:  The problem is that without some sort

3    of finding on conversion, we aren't going to know.  I mean,

4    the other claims are not coextensive as to these tangibles,

5    and we simply won't know.  So that's the practical problem.

6            THE COURT:  So I cannot rely upon trade secret

7    misappropriation to give the Court guidance.

8            MR. ZELLER:  Right.

9            THE COURT:  And I cannot rely upon a question

10   concerning ownership to give the Court guidance in the

11   special verdict.

12           MR. ZELLER:  That's a little trickier.  I mean, I

13   think it's very clear that the trade secret determination is

14   not dispositive on conversion.  The ownership question is a

15   little trickier because obviously what we are asking about

16   in some instances are actual drawings.  In other instances,

17   we are going to be asking about matters that are purely

18   intangible potentially.

19           So I think it's a little difficult.  The reason

20   why I think the conversion question itself is helpful is

21   that it eliminates any ambiguity on that and any fight.

22           And, you know, you're absolutely right.  The Court

23   is absolutely correct that Judge Larson eventually decided

24   the way of resolving this was to take away the damages

25   verdict and return the drawings.  That still will be

 1    available to the Court as an option, you know, barring

 2    unforeseen circumstances, I guess, depending on the jury's

 3    answer to the conversion question.

 4           But I am concerned that we are going to end up

 5    with ambiguities and arguments about what exactly the

 6    verdict means as to the actual three-dimensional tangibles

 7    that are involved here.

 8           The only other point I would make is that this

 9    point about the joint author argument.  Just to step back

10    for a moment, MGA had filed -- and I presume that the Court

11    saw it -- belatedly an additional supplemental JMOL on this

12    issue about Margaret Leahy.

13           Frankly I didn't think that it was tied to

14    conversion itself.  I thought it was a more general JMOL

15    saying that they owned the rights in the sculpt not only

16    just as a tangible but the intangible rights as well because

17    of her contributions or the fact that she had participation

18    in the sculpt.

19           The bottom line is that at that level it's clearly

20    a disputed issue.  There is ample evidence for the jury to

21    determine that Carter Bryant, in fact, is the author of that

22    sculpture.  That is for the jury, and I don't think I need

23    to belabor all the evidence as to why.

24           Now, to the extent that MGA is trying to argue

25    this authorship point as an issue for conversion, it really

1    -- frankly, its rationale escapes me, and it certainly

2    wasn't connected in any kind of, I don't think, logical way

3    to the conversion claim.

4              I mean, ultimately the jury is going to decide:

5    Did Carter Bryant create these drawings and these sculpts

6    or not?  So barring further explanation from MGA, I don't

7    see how the joint authorship issue or Margaret Leahy's

8    contributions really bear on this conversion issue at

9    all.

10             The jury is going to decide was the property

11   converted or not.  They're going to make their arguments as

12   to why it's not.  But as a matter of law, this point about

13   Margaret Leahy, call it whatever construct one wants to give

14   it.  It's a disputed factual issue as to what her

15   contributions were, if any, that were really anything

16   meaningful.

17             MS. HURST:  Okay.  I am just going to respond.

18   The point about Margaret Leahy is we paid for the sculpt.

19   Therefore, the material object is owned by us.  We paid for

20   it.  It doesn't have anything to do with the copyright.

21   They are the ones arguing joint authorship.  We are just

22   saying we paid for it; we own it.  Usually when you pay for

23   something to be created, you own it unless there is some

24   agreement evidencing the contrary.

25             So we are not arguing joint ownership.  In fact, I

 1    should say now on the record that we withdraw our request

 2    for a joint authorship instruction, and we no longer rely on

 3    that defense and do not wish it to be submitted to the jury.

 4              THE COURT:  Just a moment.

 5              MR. ZELLER:  Just very briefly, the Court has

 6    already answered that question.  The Court already said to

 7    the jury -- when MGA made that exact point, you know, we

 8    paid for this sculpture, you turned to the jury, Your Honor,

 9    and said:  "That is going to be something for you to decide

10    as to who owns this."

11              So, I mean, that issue has not changed, and

12    that's simply not an appropriate matter for a JMOL at this

13    point.

14              MS. HURST:  Done.  Submitted.

15              THE COURT:  Let's just discuss very quickly.  I'm

16    worried about, Ms. Hurst, you undertaking a deposition at

17    12:00 noon and then being able to participate in, you know,

18    any special verdict discussion.  You can't be two places at

19    one time.  If that's the case, I don't know why I have Mr.

20    Keller or Mr. Quinn and Mr. Price sitting here.

21              So we're going to go off the record informally and

22    just discuss whether it's 8:00, 12:00, what your schedule is

23    for tomorrow, and how we get all these issues resolved so

24    hopefully I give you next weekend back.  Because if I can't

25    get you next weekend back, then here we are, so we're going

78

1    to go off the record.

2              (Off-the-record discussion.)

3              (Whereupon, the proceedings were concluded.)

4                        -oOo-

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

79

1

2

3

4                            CERTIFICATE

5

6          I hereby certify that pursuant to Section 753,

7  Title 28, United States Code, the foregoing is a true and

8  correct transcript of the stenographically reported

9  proceedings held in the above-entitled matter and that the

10 transcript page format is in conformance with the

11 regulations of the Judicial Conference of the United States.

12

13 Date:  March 27, 2011

14

15                        Sharon A. Seffens 3/27/11

16                        _____

17                        SHARON A. SEFFENS, U.S. COURT REPORTER

18

19

20

21

22

23

24

25