QUINN EMANUEL URQUHART & SULLIVAN, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  William C. Price (Bar No. 108542)
  (williamprice@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Mattel, Inc., and
Mattel de Mexico, S.A. de C.V.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| MATTEL, INC., a Delaware corporation,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>MGA ENTERTAINMENT, INC., a California corporation, et al.,<br><br>　　　　Defendants.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. 04-09049 DOC (RNBx)<br><br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. David O. Carter<br><br>**MATTEL'S TRIAL BRIEF REGARDING MGA CONSUMER SURVEY EXPERT THOMAS GRUCA**<br><br>Trial Date:  Jan. 18, 2011 |

## Preliminary Statement

The Court has stated several times, including during the recent exam of MGA expert Glenn Vilppu (see March 24, 2011 Trial Tr., Vol. 1 at 90-91), that it will not permit the introduction of survey evidence. In keeping with that prohibition, Mattel expert Ran Kivetz, who surveyed the reasons consumers choose to buy Bratz dolls, did not testify. Mattel expert Kenneth Hollandar was likewise precluded from offering his survey results concerning the connection consumers make between Bratz dolls and Bryant's drawings. Dkt. No. 9696 at 7-8. Nevertheless, MGA intends to elicit survey evidence from Thomas Gruca. Mr. Gruca's survey was intended "to measure the relative influence of the appearance of the Bratz doll on purchasing decisions compared to other product and brand attributes." Expert Report of Thomas S. Gruca, dated Mar. 17, 2008 ("Gruca Report"), ¶ 6.

The Court should exclude Mr. Gruca's testimony. His survey is flawed, unreliable and irrelevant for many reasons. Among them, the survey was not intended to establish why consumers buy Bratz dolls, but instead to measure the "relative influence" of certain factors on consumer purchasing decisions. The survey was also an improper memory test in that the respondents, including girls as young as four, were asked to recall what influenced their decision to buy a Bratz doll up to a year earlier. The respondents were not shown any Bratz dolls and instead had to rely on their recollection, if any, of the purchase decision. In excluding Mr. Hollander for failing to show the survey participants Bratz dolls and for not asking a question congruent with the issues in the case, the Court concluded that "Hollander, in short, asked his survey participants the wrong question and failed to show them the relevant creative works." Dkt. No. 9696 at 7. To the same extent that Mr. Hollander's survey was irrelevant and unreliable, and for the additional reasons that render Mr. Gruca's survey unreliable, Mr. Gruca's survey should be excluded.

# Argument

## THE GRUCA SURVEY IS UNRELIABLE AND SHOULD BE EXCLUDED

Mr. Gruca's survey is unreliable, misleading and irrelevant for several reasons, discussed below. The Court should preclude Mr. Gruca from offering his survey results to the jury.

### A. The Gruca Survey Did Not Measure the Importance of the Appearance of Bratz Dolls to Consumers' Purchasing Decisions

Despite its express purported purpose of attempting "to measure the relative influence of the appearance of the Bratz doll on purchasing decisions compared to other product and brand attributes" (Gruca Report ¶ 6), the Gruca survey did not attempt to measure the importance that consumers place on the appearance of Bratz dolls in deciding whether to purchase them. See Gruca Depo., Vol. 2 at 99:13-100:3. Instead, it sought to measure the relative "influences" on consumers' purchasing decisions allocated among eight criteria selected by someone other than Mr. Gruca. Gruca Report ¶ 6; Gruca Depo., Vol. 2 at 142:21-143:10. The Gruca survey did not address the importance of the appearance of the Bratz doll on mothers' and daughters' purchasing decisions. Id. at 173:5-10.

Mr. Gruca's failure to address that information was not surprising. He had never before conducted any survey involving intellectual property or copyright issues. Gruca Depo, Vol. 1 at 48:21-49:7. In preparing his report, he did not look at either Bratz dolls or Barbie dolls. Id. at 23:21-24:16. He also had no professional experience with the toy industry. Id. at 23:1-4.

By failing to measure the importance of the appearance of the Bratz dolls, Gruca "failed to ask the right question." See McCarthy: Cf. J. Thomas McCarthy, 6 McCarthy on Trademarks and UnfairCompetition § 32:170 (4th ed. 2008) ("[I]f the survey questions are not congruent with the issues in the case, the results will not only be irrelevant, but may also be prejudicially misleading to the jury."); see also Dkt. No. 9696 at 7 ("Hollander failed to ask the survey participants whether the

Bryant drawings were "substantially similar in the total concept and feel"; he simply inquired into whether the drawings 'look like' the Bratz dolls. Hollander, in short, asked his survey participants the wrong question and failed to show them the relevant creative works."). Mr. Gruca's survey should be excluded as irrelevant.

### B. The Gruca Survey Was An Improper Memory Test

As reflected in the Survey Questionnaire, Question No. 9, mothers and daughters were asked to respond with respect to the last Bratz doll they had purchased "during the past 12 months." However, Mr. Gruca is unaware of any studies that have focused on how well people remember their reasons for making a relatively small dollar-value purchase months earlier. Gruca Depo., Vol. 2 at 192:5-16. For example, he is not aware of any study of how well parents recall their reasons for making $10-$15 purchases for their children even six months after the fact. Id. at 198:21-25. He also has no idea how well or how long typical adults remember $5 to $15 purchases. Id. at 210:18-211:23. Accordingly, when designing the study, he did not account for the possibility that respondents might be attempting to reconstruct or guess at the reasons they made their purchase months earlier. Id. at 213:14-215:6. Still further, Mr. Gruca does not know whether a person who reconstructs an event months after the fact would give a different account of it than she would have given if asked about it at the time of the event. Id. at 216:19-217:7.

Mr. Gruca compounded his error in requiring a memory test of the respondents by failing to show them any Bratz dolls. The Court found that Mr. Hollander's survey was flawed for this very reason. See Dkt. No. 9696 at 7 ("But Hollander's survey did not even show its participants each allegedly infringing Bratz dolls, or even an exemplar of each generation of those dolls; the survey instead asked its participants to rely upon their recollection, if any, of the Bratz dolls."). Mr. Gruca's survey's memory-test survey results should be excluded as unreliable.

### C. The Gruca Survey Improperly Asked Respondents to Provide the Same Information Twice

The two most important questions in the Gruca survey were Question Nos. 20 and 21. Question No. 20 asked the respondents to rate each of the eight product and brand attributes MGA selected on a one-to-five scale, with one being "not very influential" and five being "very influential" to the respondents. Question No. 21 addressed the same eight product and brand attributes, this time asking respondents to assign each one a point value, with the sum of all allocated point values totaling 100.

Mr. Gruca concluded in deposition that he has no idea at what age girls are capable of adding eight numbers totaling 100 and further conceded that he is not aware of *any* studies concerning the validity of the "test-retest" method employed in asking survey respondents to rate the same factors twice, in response to Question Nos. 20 and 21. Gruca Depo., Vol. 2 at 131:2-11. He also did not know whether the "test-retest" method employed created a bias in favor of MGA. Id. at 117:14-118:7; at 129:21-130:3. These factors also render the survey unreliable.

### D. The Gruca Survey Improperly Employed Overlapping Categories and Used Terms that Even Gruca Could Not Define or Explain

The Gruca survey purported to study eight attributes: (i) the "quality" of the Bratz doll; (ii) the "appearance" of the Bratz doll; (iii) the outputs included with the purchased Bratz doll; (iv) the accessories included with the purchased Bratz doll; (v) the "personality" of the purchased Bratz doll; (vi) the "play theme" associated with the purchased Bratz doll; (vii) the "appeal" of having a genuine Bratz product; and (viii) the appeal of the product packaging. As reflected in one of the articles cited by Mr. Gruca, it is critical that the attributes surveyed must not overlap. See Gruca Report ¶ 8, *citing* H. Sattler & S. Hensel-Borner, *A Comparison of Conjoint Measurement with Self-Explicated Approaches*, in CONJOINT MEASUREMENT: METHODS AND APPLICATIONS 147 (4th ed. 2003).

In deposition, however, Mr. Gruca testified that he does not know whether girls perceive a doll's personality as distinct from its appearance. Gruca Depo., Vol. 1 at 81:10-14. He also acknowledged that personality can be conveyed through appearance. Id. at 80:18-21. Nor does he know whether the survey respondents included the concept of appearance within the term "quality." Id. at 195:15-196:6. He also failed to consider that there can be an overlap between "quality" and "accessories," as reflected in MGA expert Dr. Joachimsthaler's Report:

> [T]he dolls are sold with numerous *accessories* and in theme packs, such as lifestyle packs and fashion packs. The ability to fill out the package with lots of value has resulted in the creation of a *quality* brand that girls as well as moms see as superior to other doll products.

Joachimsthaler Initial Report at 44, ¶ 81 (emphasis added).

Mr. Gruca, himself, had no understanding of what the "personality" of the Bratz dolls is. Gruca Depo., Vol.1 at 71:17-24; 72:2-7; 74:3-11. In his mind, the "personality" of a doll is created by, and expressed through, its marketing, but that is not something the survey conveyed to respondents. Gruca Depo., Vol. 1 at 72:11-73:4; 73:16-74:11. He also did not know whether "personality is conveyed to a child buying a Bratz doll through the appearance of the doll." Gruca Depo., Vol. 1 at 86:6-17.

The survey questionnaire also included a number of terms that young girls would not be expected to understand. For example, it used "purchase," as opposed to "buy," even though Gruca did not know at what age girls would understand that term. Id. at 185:21-186:9; 186:12-21. It referred to "fashion dolls" notwithstanding that Gruca, himself, did not know what that term meant until he read the report of another expert. Id. at 171:25-172:15. Mr. Gruca also did not have any personal understanding what the term "personality" meant. Id. at 70:18-25.

### E. The Gruca Survey Was Improperly Weighted by References to "Genuine" Bratz Products.

Question Nos. 20 and 21 referred to the "appeal of having a 'genuine' Bratz™ product." Quite obviously, surveyed respondents might interpret the survey as drawing a distinction between Bratz products made by MGA and Bratz products made by imitators or counterfeiters. Mr. Gruca does not know, however, whether mothers are aware that there can be counterfeit products in the marketplace. Gruca Depo., Vol. 2 at 146:14-18. He even denied knowing whether mothers might be aware that many Louis Vuitton bags are counterfeit. Id. at 146:19-147:2. For that reason, he did not consider whether survey respondents might interpret "genuine" as meaning "not counterfeit." Id. at 147:17-148:10. Instead, Mr. Gruca likened the reference to "genuine" Bratz products to a former General Motors advertising campaign exhorting customers to buy "genuine GM parts." Id. at 148:17-149:2. But that explanation was inapposite. There were many competitors who sold after-market products that could be used in General Motors vehicles. Here, by contrast, there are no competitors selling "Bratz" dolls.

### F. The Gruca Survey Did Not Study Typical Mothers and Daughters

The respondents to the Gruca survey had a median annual household income of $85,000. Gruca Report, App. B, at 11. The United States Census Bureau reported that in 2006, the median annual household income was just $48,201. Accordingly, the respondents in the Gruca survey were, on average, far wealthier than mothers purchasing Bratz dolls are likely to be. Unsurprisingly, MGA did not share any demographic information with Mr. Gruca. Gruca Depo., Vol. 1 at 245:12-23. Mr. Gruca also did not have information from any other source concerning the average household income of families that purchased Bratz dolls. Id. at 247:24-248:6. The mothers responding to the Gruca survey were also better educated than typical mothers. Two-thirds of the responding mothers had a college degree and 29% of them had done post-graduate work. Gruca Report, Appx. B, at 13.

According to the 2003 U.S. Census report, only 25.7% of women nationally had attained a college degree or better.

The geographic distribution of the Gruca survey respondents also was not representative of the nation as a whole. As reflected in the Gruca Report, Appx. B, at 31, the geographic distribution of the survey respondents was: South – 36%; Midwest – 25%; Northeast – 21%; and West – 18%. Accordingly, the Northeast and the West combined represented just 39% of survey respondents while the South, alone, represented 36% percent, but Mr. Gruca testified in deposition that he had "no idea" how that compared to the national population. Gruca Depo., Vol. 1 at 271:4-12. He also did not know how those numbers compared to the demographic characteristics of the target population, and did not ask. Id. at 271:17-272:4. That is significant because Mr. Gruca conceded that for some products, consumers in different regions of the country respond differently. Id. at 165:15-18; 166:2-10. Unsurprisingly, he has no idea whether consumers in some states might react differently than consumers in other states to Bratz dolls. Id. at 170: 13-20. He also did nothing to find out. Id. at 283:18-284:7.

### G. **An Unreliably Low Percentage of Respondents Self-Selected to Take the Survey**

E-Rewards, an Internet panel company, provided a panel of 14,656 target consumers to Mr. Gruca. Gruca Depo., Vol. 1 at 146:4-18. Mr. Gruca does not know how e-Rewards drew that sample. Id. at 148:18-20. Significantly, just 2.2% of the target consumers responded. Id. at 150:21-23. The extremely low response rate rendered the survey unreliable. As reflected in an article written by Shari Seidman Diamond, entitled *Reference Guide on Survey Research,* published in the REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. 2000) by the Federal Judicial Center, response rates should be far, far higher:

> [r]esponse rates between 75% and 90% usually yield reliable results, but the researcher should conduct some check on the representativeness

00505.07975/4055700.3

-7-
MATTEL'S TRIAL BRIEF RE CONSUMER SURVEY TESTIMONY OF THOMAS GRUCA

of the sample. Potential buyers should receive greater scrutiny when the response rate drops below 75%. If the response rate drops below 50%, the survey should be regarded with significant caution as a basis for precise quantitative statements about the population from which the sample was drawn.

Because the response rate for the Gruca survey was just 2.2%, it must be considered unreliable.

## Conclusion

For the reasons set forth above, Mattel respectfully requests that the Court preclude Mr. Gruca from testifying.

DATED: March 29, 2011          QUINN EMANUEL URQUHART & SULLIVAN. LLP


By /s/ Michael T. Zeller
Michael T. Zeller
Attorneys for Plaintiff and Counter-Defendant Mattel, Inc. and Mattel de Mexico. S.A. de C.V.