QUINN EMANUEL URQUHART & SULLIVAN, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Mattel, Inc., and Mattel de Mexico, S.A. de C.V.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MATTEL, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>MGA ENTERTAINMENT, INC., a California corporation, et al.,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 DOC (RNBx)<br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. David O. Carter<br><br>**MATTEL, INC.'S SECOND SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE OPINIONS AND TESTIMONY OF JAMES E. MALACKOWSKI**<br><br>*DAUBERT* MOTION NO. 2<br><br>Hearing Date: TBD<br>Time: TBD<br>Place: Courtroom 9D |

**Preliminary Statement**

During the March 19, 2011 Daubert hearing, Mr. Malackowski made a number of admissions that require the exclusion of his testimony. *First*, he admitted that his "top down" damages number is not based on the calculation of any head start damages despite the fact that MGA's damages for trade secret misappropriation are based on head start. *Second*, Mr. Malackowski admitted that he had the necessary information to determine the length of the alleged head start period for each of the 32 accused MY SCENE products and that he needed to perform such a calculation as an essential predicate to his damages opinion. Yet, he also admitted that he did not to do so. As such, his so-called "bottom up" approach—which "extrapolates" head start damages for 30 products based on a head start analysis of only two products—is speculative and based on insufficient data. *Third*, Mr. Malackowski admitted that his apportionment "methodology," consisting of simply mathematically averaging various quantitative analyses and using that as his apportionment figure, was not supported by any authority. *Finally*, Mr. Malackowski's attempt to restyle his admittedly improper apportionment of Mattel's lost profits as a "demand factor" analysis to determine lost BARBIE sales is directly contradicted by his own reports, and his opinions apportioning Mattel's lost profits should be excluded.

**Argument**

**I.   MR. MALACKOWSKI'S "TOP-DOWN" CALCULATIONS SHOULD BE EXCLUDED**

During the Daubert hearing, Mr. Malackowski could not get his story straight with respect to whether his top-down damages calculation is a "head start" calculation or something else entirely. Mr. Malackowski initially stated that even though his top down damages number was offered as a calculation of head start damages, it was in fact not based on *any* head start period at all—but somehow it still "reflected" purported head start damages.[1] When pressed, Mr. Malackowski was forced to admit that this top-down

---

[1] March 19, 2011 Daubert Hearing Tr. at 94:6-1 ("Q. And you told us in your report (footnote continued)

damages number consists of only head start damages and a separately calculated amount for restitution:

> Q. Did you specifically identify any amount of damages in this 148 million to $200 million range here that reflected anything other than head start damages?
>
> A. No, sir. For the specific top down approach, there's no further identification other than those two components: The bottom up and then the restitution.[2]

Mr. Malackowski further admitted, however, that his top-down damages number is untethered to any head start damages calculation.[3] In fact, he admitted that the jury *should not* use the top-down calculations if they want to award head start damages.[4] Together, these admissions render Mr. Malackowski's top-down damages calculations inadmissible. A head start damages number that is not based on any head start calculation should not be presented to the jury.

Mr. Malackowski also admitted that if the jurors decide the question of the alleged misappropriation of MGA's themes "one theme at a time," his top-down calculation offers them no guidance on how to calculate damages.[5] He stated that in order to do that they

---

that you believe that your top down approach, which we've been talking about, quantifies head start damages? A. I believe reflected within the top down approach are the effects of the head start. I don't call it head start damages.")

[2] Id. at 81:5-10.

[3] Id. at 96:20-24 ("Q. You just explained to the judge how you did head start calculation. None of that was done for your terms here -- it's the top down? THE WITNESS: Correct.")"); 132:16-19 ("A. The top down approach considers head start benefits but it does not calculate head start benefits. So I don't have that analysis.")

[4] Id. at 20-133:7 ("Q. So let's be clear then. What you're saying is that you consider the question, but you offer no calculation that allows the jury to do anything other than award every penny of profit during the head start period under those two approaches, the top down approach; correct?

A. No, I don't think that's correct.

Q. Please tell us how is the jury suppose to make that calculation.

A. *I don't believe that the jury should make a calculation of head start for the top down approach. If the jury wants to base damages on head start, they should look to the bottom up approach*, just like I gave two examples for the Mattel: 33 million without head start.") (emphasis added).

[5] Id. at 88:15-89:16. (" Q. So you said to Ms. Keller that a juror -- you know, for your bottom up approach -- could allocate among trade secrets. They could pick and choose. Do you recall that?

A. I do.

(footnote continued)

would need to use his "bottom-up" calculations, "and that's perfectly acceptable." But the question is whether the top-down calculations are "perfectly acceptable," and by Mr. Malackowski's own admissions, they are not.

## II. MR. MALACKOWSKI'S "BOTTOM-UP" CALCULATION SHOULD BE EXCLUDED

### A. Mr. Malackowski Failed to Calculate Head Start Damages for 30 of the 32 Accused My Scene Products

Mr. Malackowski claimed that his so-called "bottom-up" approach seeks to calculate head start damages. He further admitted that the head start period should be measured by the amount of time the alleged trade secret was actually secret,[6] and that it is an essential predicate to his damages opinion to calculate this time period.[7] Indeed, the Court noted that calculation of the head start period is necessary for a head start damages calculation.[8] Mr. Malackowski also admitted he had the information to determine the

---

Q. But they couldn't do that at all with any of your top down approaches; correct?
A. On a specific product basis, they could not. They would go to the bottom up approach and eliminate there, or begin to use the percentage -- I would recommend to use the percentage reduction from the bottom up approach to adjust the top down approach. So if you want to take out 10 percent of the sales or 10 themes, we can cross them out. We know the effect of that and we could apply the same adjustment to the top down approach.
Q. You didn't do a chart attempting to do that?
A. Frankly, if the jury is going to start to knock out individual themes, I think they're focused on the bottom up approach. They're looking one theme at a time, and that's perfectly acceptable.")

[6] Id. at 106:16-22 ("Q. But in calculating head start, you told us one of the data points is when the information became public?
A. Yes.
Q. So if it's a two week time frame, for example, and it took Mattel five months to put something on the market, what would be the head start?
A. By definition to your question, it would be two weeks.")

[7] Id. at 94:2-5 ("Q. Let me ask that question again: If you're trying to calculate head start damages, it's your responsibility to calculate a head start, period? A. I think that's fair. Yes, sir.")

[8] Id. at 95:22-96:3 ("THE COURT: No, no. It's not confusing. Let's say that again. You have to calculate not only is the product secret, but then you have to take in this added factor. And I'm going to make it really simple. How long is it secret? What's that time period? How do you get that time period for the 114 products, let alone any one of those products?")

head start period for most if not all of the 32 alleged trade secrets.[9]  Yet, he failed to calculate head start damages for each of the 32 accused MY SCENE products and instead "extrapolated" head start damages for 30 of the accused products based on a head start analysis for only two.[10]  This approach is speculative and does not pass <u>Daubert</u> scrutiny.  <u>See</u> <u>Guillory v. Domtar Indus.</u>, 95 F.3d 1320, 1330-31 (5th Cir. 1996) (excluding expert testimony based on "altered facts and speculation"); <u>Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.</u>, 135 F. Supp. 2d 1031, 1040-41 (N.D. Cal. 2001) (excluding expert's arbitrary "assumptions and simplifications that are not supported by real-world evidence").

Mr. Malackowski made no attempt to even determine if any of the 30 MY SCENE products could have benefitted from a head start.  Mr. Malackowski admitted that he did not consider any timeline evidence that would establish whether any of the products, other than MY SCENE Chillin' Out or MY SCENE Bling Bling, for which he calculates more than $130 million in unjust enrichment damages, actually had any head start.[11]  In fact, he admitted that even if there was evidence that the head start period was only one week, his calculations would still be based on the assumption that the head start period was three to

---

[9] <u>Id</u>. at 108:3-8 ("Q.  Well, break it down.  Of the other 30 products, okay, how many of those products did you have the information, the time that it was at the toy fair and the time that MGA actually came out with the products?  How many products of the 30 did you have information?  A.  I would say a majority of them.")

[10] <u>Id</u>. at 105:11-24 ("THE COURT:  Counsel, please continue.  Now, with Bling Bling, three months, 28 percent Chillin' Out, five months head start, 42 percent an everything is extrapolated, apparently, from that.
BY MR. PRICE:
Q.  From those two figures, from two out of the 32 products, you then do an averaging method?
A.  A weighted average, yes, sir.
Q.  And, of course, I guess, to average you need at least two figures; correct?
A.  Correct.
Q.  And you took these two for MyScene Chillin' Out and MyScene Bling Bling?
A.  Yes, sir.")

[11] Mr. Malackowski admitted during his deposition that he did not consider any information related to the actual release dates of the Bratz products or the actual conception date or first invoice dates of the MY SCENE products in coming to his conclusions as to head start damages; instead, he simply *assumed* that the MY SCENE products benefitted from a head start.  Malackowski Depo. Tr., dated Feb. 8, 2011 at 634:17-637:12.

five months.[12] Mr. Malackowski further admitted that he has no idea whether any of the 14 accused products that he was unable to identify in Mattel's financial records actually generated a single dollar of revenue—yet he intends to opine that Mattel gained nearly $60 million in unjust enrichment for these products.[13] This is not just an "unreliable methodology." It is no methodology at all. Mr. Malackowski's "bottom-up" calculations should be excluded under Rule 702 and Daubert.

### B.  Mr. Malackowski Has The Data He Claims He Needed to Calculate The Length of The Head Start Period

Mr. Malackowski initially claimed that he could not calculate the length of the head start period for 30 of the 32 products because he did not have MY SCENE monthly revenue data.[14] After Mattel pointed out in its supplemental Daubert brief that Mr. Malackowski's lack of monthly revenue data did not prevent him from calculating the head start period or head start damages for MY SCENE Chillin' Out or MY SCENE Bling Bling, Mr. Malackowski claimed for the first time at the Daubert hearing that he was unable to calculate a head start period for the remaining 30 products because he did not have data on "product development cycles" from Mattel.[15]

However, it is undisputed that Mr. Malackowski had access to MGA's information which would have allowed him to determine the period between when the purported trade secret information was allegedly misappropriated and when (at least according to MGA) it was publicly disclosed[16]—which is the very definition of the "head start" period. Indeed, Mr. Malackowski admitted that the data necessary to calculate a maximum head start

---

[12] Id. at 110:22 -111:1 ("Q. So if the information on one of the 32 products became public, say, a week after toy fair, your analysis would still assume a head start of somewhere between three and five months? A. Yes.")
[13] Id. at 112:6-9 ("Q. You have no idea what the revenue was for any of those other 14 products; correct? A. Correct. It's not like I don't want to know. I just don't know.")
[14] Malackowski Depo. Tr., dated Feb. 8, 2011 at 645:1-14, Feb. 8, 2011; see also January 28, 2011 Supplemental Report of James E. Malackowski at 12.
[15] March 19, 2011 Daubert Hearing Tr. at 98:11-15.
[16] Id. at 108:3-8.

period was entirely within MGA's possession.[17] That he chose not to use that information does not justify his "extrapolation" from two products to more than $130 million in purported unjust enrichment.

Moreover, prior to the Daubert hearing, neither MGA nor Mr. Malackowski indicated that they need information regarding Mattel's product development cycles to calculate the length of any head start period and had been denied such information. To the contrary, Mr. Malackowski's admission that he had product development information for MY SCENE Bling Bling and MY SCENE Chillin' Out belies any suggestion now that product development information was improperly withheld.

## III. MR. MALACKOWSKI CONCEDES THAT THERE IS NO SUPPORT FOR SIMPLY AVERAGING THE RESULTS OF HIS SIX APPORTIONMENT METHODS

In his December 1 rebuttal report, Mr. Malackowski used six "quantitative" apportionment methodologies that arrived at various estimates of the alleged proper apportionment of MGA's profits.[18] After describing the results of these six different methodologies, Mr. Malackowski then used various "qualitative" Georgia-Pacific factors

---

[17] Id. at 105:18-106:12 ("Q. But to calculate head start, you have to know when the information of MGA became public; right?
A. Yes, sir.
Q. The only data you looked at was My Scene Chillin' Out and My Scene Bling Bling?
A. That was the data that was available, as I think we've made very clear.
Q. Well, let's make that clear. MGA could have given you data as to when they made these products public?
A. That wasn't my data gap. My data gap was when --
THE COURT: I'm sorry. Answer that question first.
MS. KELLER: Your Honor, that assumes facts not in evidence that we're talking about the same thing here.
THE COURT: I understand. But I just want to know what was given to you and what wasn't.
THE WITNESS: I had MGA data for the products that sold, but they did not sell all of these products.")

[18] See Rebuttal Expert Report of James E. Malackowski at 38-41 and 51-52, Dec. 1, 2010. Mr. Malackowski applies all six methodologies to the Bratz copyrights and all but the "time contribution" methodology to the Bratz trade secrets.

to adjust the apportionment estimates of these six methodologies to arrive at an ultimate apportionment figure.[19] However, in light of the Court's Order limiting Mr. Wagner's use of the Georgia-Pacific factors, at the Daubert hearing, Mr. Malackowski purported to excise the Georgia Pacific factors from his analysis, and, instead of using the Georgia Pacific factors to balance the results of the six apportionment methodologies, Mr. Malackowski simply took the mathematical average of the six apportionment methodologies and used that as his ultimate apportionment figure.[20]

When questioned about what gave him the confidence to use these six "quantitative" methodologies without also using the "qualitative" Georgia-Pacific factors relied upon in his report, Mr. Malackowski admitted that there was *no authority* supporting his method of simply mathematically averaging the results of his six quantitative analyses to come up with an apportionment factor.[21] When pressed, he admitted that there is nothing more than his "25 years of experience and judgment" that support this methodology.[22] Mr. Malackowski may not avoid the requirements that his testimony be the "product of reliable principles and methods" simply by adverting to his experience as a damages expert. Fed. R. Evid. 702; Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-594 (1993) (noting that two pertinent factors in assessing the reliability of an expert's methodology are whether it "has been subjected to peer review and publication" and whether it enjoys "general acceptance" within a "relevant scientific community); Rider v. Sandoz Pharmaceuticals Corp., 295 F.3d 1194, 1197 (11th Cir. 2002) (noting that the Supreme Court has "made it clear that testimony based solely on the experience of an expert would not be admissible.") (citing Kumho Tire

---

[19] Id. at 40-41; see also March 19, 2011 Daubert Hearing Tr. at 127:16-128:9.
[20] March 19, 2011 Daubert Hearing Tr. at 61:9-25.
[21] March 19, 2011 Daubert Hearing Tr. at 127:3-12 ("Q. And are you aware -- is there anything in the literature which talks about just taking a mathematical average of these sorts of -- of a license rate and investment rate, profit rate, product profit comparison, influence factors? **Is there somewhere where there is accepted methodology just to average things like that to come up with a number to use?** A. **To answer your question, specifically, no**.") (emphasis added)
[22] Id. at 130:20-131:6.

Co., Ltd. v. Carmichael, 526 U.S. 137 (1999)).  Mr. Malackowski's apportionment analysis is not supported by any authority or literature and ultimately amounts to nothing more than his *ipse dixit*.[23]  General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").  This is insufficient under the Daubert test and his apportionment analysis should be excluded.  See Oddi v. Ford Motor Co., 234 F.3d 136, 158 (3d Cir. 2000) (excluding expert testimony "based on nothing more than [the expert's] training and years of experience" where the expert's training and experience did not "furnish the necessary reliability . . . [the expert's] *ipse dixit* does not withstand Daubert's scrutiny."); Multimatic, Inc. v. Faurecia Interior Systems USA, Inc., 358 Fed .Appx. 643, 653 (6th Cir. 2009) (affirming exclusion of damages expert opinion relying on a methodology that "had not been scientifically tested, had not been subject to peer review and was not generally accepted in the economic community.").

## IV.  MR. MALACKOWSKI SHOULD NOT BE PERMITTED TO APPORTION MATTEL'S LOST PROFITS

Mr. Malackowski conceded that sweat equity is not to be considered to reduce damages for lost profits.[24]  At the Daubert hearing, Mr. Malackowski stated that his so-

---

[23] Id. at 131:7-18 ("Q.  **Can you point me to anything in the literature, anything that you've published, any case which says, this is an appropriate methodology, taking these factors and averaging them?**  Other than referring to Georgia-Pacific where it' doing something similar, can you refer me to anything that says this is an appropriate methodology for an expert
A.  I'm sorry, because I'm not making myself clear.  I'm not saying that's the case, no.
THE COURT:  Just a moment.  Yes or no to that answer.
THE WITNESS:  **No, I wouldn't expect it**.") (emphasis added).
[24] Id. at 124:20-125:1 ("Q.  Here, under trade secret under lost profits, you understand that -- Is it your understanding that sweat equity is not to be considered to reduce the damages number for lost profits/trade secrets? A.  I agree with that. This is not intended to represent sweat equity and lost profits.").

called "demand factor" (a term that he had not used prior to Mattel's objection to his attempt to apportion lost profits) that he uses to reduce the Barbie lost profit numbers is analogous to Mr. Wagner's regression market share allocation method.[25] What Mr. Malackowski ignores is that Mr. Wagner uses the market share allocation of Bratz sales that do not expand the market to determine lost BARBIE sales, and therefore Mr. Malackowski's "demand factor" explanation is not analogous to Mr. Wagner's method of determining lost sales.

Mr. Malackowski uses the Mattel cannibalization study to determine lost BARBIE sales. But he then adds the extra step of applying his apportionment factor (which he now calls "demand factor") to apportion between sweat equity and the value of the intellectual property.[26] His attempt to now say he is not apportioning lost profits between the value of the intellectual property and sweat equity is contradicted by Mr. Malackowski's own report. In fact, prior to Mattel's Daubert challenge on this issue, Mr. Malackowski expressly stated that he *was* apportioning Mattel's lost profits, and he even has an entire section of his December 1, 2010 rebuttal report (Section 6.4.3) dedicated to apportioning Mattel's lost profits:

> **6.4.3. Apportionment** Mr. Wagner failed to apportion his lost profits calculations to determine lost profits attributable to the alleged copyright infringement. In order to determine Mattel lost profits attributable to its claimed copyright, *the cannibalized Barbie profits and alternatively the cannibalized My Scene profits must be apportioned to reflect the effect only of sales of the original Jade and Sasha or the first four Bratz dolls as well as the contribution of the asserted copyright to those sales*.[27]

Mr. Malackowski's claim that he is simply determining lost sales and not further apportioning lost profits is directly refuted by his own reports. This improper opinion should be excluded. See Law Bulletin Pub., Co. v. Rodgers, 1988 WL 130024, *4 (N.D. Ill. Nov. 28,1988) (denying motion to exclude evidence of plaintiff's lost profits in copyright case on basis that plaintiff failed to "apportio[n] its alleged lost profits to isolate

---

[25] Id. at 66:23-67:8.
[26] See December 1, 2010 Rebuttal Report of James Malackowski, § 6.4.3.
[27] December 1, 2010 Rebuttal Report of James Malackowski at 38 (emphasis added).

that part attributable to [defendant's] use of the copyrighted material," holding that "[t]he apportionment of [defendant's] profits attributable to the alleged infringement is relevant only to the calculation of [defendant's] profits, not to [plaintiff's] lost profits.").

**Conclusion**

For the foregoing reasons, Mattel respectfully requests that the Court preclude Mr. Malackowski from offering either his "top down" or "bottom up" unjust enrichment calculations, and from offering any opinion based on his six "quantitative" apportionment analyses or improperly apportioning Mattel's lost profits.

DATED: March 30, 2011

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By *_/s/ Michael T. Zeller_*
Michael T. Zeller
Attorneys for Mattel, Inc. and Mattel de Mexico, S.A. de C.V.