1

1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3       **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                  – – – – – – –

5
   MATTEL, INC., et al.,              )
6                                     )
                Plaintiffs,           )
7                                     )
        vs.                           ) No. CV 04-9049 DOC
8                                     )    Day 41
   MGA ENTERTAINMENT, INC., et al.,   )    Volume 1 of 3
9                                     )
                                      )
10              Defendants.           )
   _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    Jury Trial

16               Santa Ana, California

17             Tuesday, March 29, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-03-29 D41V1

1    **APPEARANCES OF COUNSEL:**

2

     FOR PLAINTIFF MATTEL, INC., ET AL.:

3

             QUINN EMANUEL URQUHART & SULLIVAN
4            BY:   JOHN QUINN
                   WILLIAM PRICE
5                  MICHAEL T. ZELLER
                   Attorneys at Law
6            865 South Figueroa Street
             10th Floor
7            Los Angeles, California 90017
             (213) 443-3000

8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12           ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
             BY:   THOMAS S. McCONVILLE
13                 Attorney at Law
             4 Park Plaza
14           Suite 1600
             Irvine, California 92614
15           (949) 567-6700

16           - AND -

17           ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
             BY:   ANNETTE L. HURST
18                 Attorney at Law
             405 Howard Street
19           San Francisco, California 94105
             (415)773-5700

20           - AND -

21           KELLER RACKAUCKAS
22           BY:   JENNIFER KELLER
                   Attorney at Law
23           18500 Von Karman Avenue
             Suite 560
24           Irvine, California 92612
             (949) 476-8700

25

Case 2:04-cv-09049-DOC-RNB Document 10337 Filed 03/31/11 Page 3 of 153 Page ID #:313523
CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4

5              LAW OFFICES OF MARK E. OVERLAND
              By:  MARK E. OVERLAND
                    Attorney at Law
6              100 Wilshire Boulevard
              Suite 950
7              Santa Monica, California 90401
              (310) 459-2830

8              - AND -

9
              SCHEPER KIM & HARRIS LLP
10             BY:  ALEXANDER H. COTE
                    Attorney at Law
11             601 West 5th Street
              12th Floor
12             Los Angeles, California 90071
              (213) 613-4660

13

14   ALSO PRESENT:

15             MGA ENTERTAINMENT, INC.
              BY:  JEANINE PISONI
16                  Attorney at Law
              16360 Roscoe Boulevard
17             Suite 105
              Van Nuys, California 91406

18

19             ROBERT A. ECKERT, MATTEL CEO

20             ISAAC LARIAN, MGA CEO

21             KEN KOTARSKI, Mattel Technical Operator

22             MIKE STOVALL, MGA Technical Operator

23

24

25

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

4

1                        **I N D E X**

2     **WITNESSES**              **DIRECT**  **CROSS**  **REDIRECT**  **RECROSS**
      LARIAN, Isaac
3     By Mr. Price                                                   10

4
      PLUNKETT, Carey
5     By Mr. McConville           16                  52

6     By Mr. Zeller                         41                       62

7
      VOLLERO III, Andrew
8     By Mr. McConville           69                 135

9     By Mr. Zeller                        122                      145

10

11

12

13                       **EXHIBITS**

14    **EXHIBIT NO.**                  **IDENTIFICATION**   **IN EVIDENCE**

15
         9358    The Toy Tree business                         20
16               card

17      24004    Business agreement                           123
                 between Mattel and
18               Kohl's 2005/2006

19      24005    Business Agreement                           128
                 betwwen Mattel and
20               Kohl's 2006

21      24792    E-mail from Mr. Larian                        10
                 to Mr. Thompson dated
22               6/29/2004

23      24793    E-mail from Mr. Larian                        12
                 to Mr. Thompson dated
24               4/17/2002, subject: Due
                 Diligence

25

1                          **EXHIBITS** (Continued)

2        **EXHIBIT NO.**              **IDENTIFICATION**      **IN EVIDENCE**

3          36613    Spring 2005 Line Review                      138
                    Meeting Recap
4
           36731    E-mail from Mr. Turetzky                      106
5                   to Mr. Vollero dated
                    4/15/2005
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEBBIE GALE, U.S. COURT REPORTER

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, TUESDAY, MARCH 29, 2011** |
|       | 2  | **Day 41, Volume 1 of 3** |
|       | 3  | (8:27 a.m.) |
| 08:21 | 4  | *(Outside the presence of the jury.)* |
| 08:27 | 5  | THE COURT:  All right.  We're on the record.  All |
| 08:27 | 6  | counsel are present.  The parties are present. |
| 08:27 | 7  | The clerk just informed me that a juror named -- |
| 08:27 | 8  | THE CLERK:  Nadine Done. |
| 08:27 | 9  | THE COURT:  Nadine Done, who's the young juror who |
| 08:27 | 10 | is going to school, went to a wedding this weekend.  The |
| 08:27 | 11 | bride was a Mattel designer, but she didn't talk about the |
| 08:27 | 12 | case, and she wasn't a bridesmaid or a member of the wedding |
| 08:27 | 13 | party. |
| 08:27 | 14 | Do any parties want to question her outside the |
| 08:27 | 15 | presence of the jury? |
| 08:28 | 16 | MS. KELLER:  May we have a moment to confer? |
| 08:28 | 17 | THE COURT:  Sure.  She just informed Nancy of that |
| 08:28 | 18 | ten minutes ago. |
| 08:28 | 19 | MS. KELLER:  Your Honor, could we find out who the |
| 08:28 | 20 | designer is?  I mean, since we have a Mattel designer |
| 08:28 | 21 | sitting at counsel table every day as a corporate |
| 08:28 | 22 | representative. |
| 08:28 | 23 | THE COURT:  Why don't you just ask Lily Martinez |
| 08:28 | 24 | if she was at the wedding? |
| 08:28 | 25 | MS. KELLER:  Well, that's not really our issue. |

| | | |
|---|---|---|
| 08:28 | 1 | THE COURT:  Were you at the wedding? |
| 08:28 | 2 | MS. MARTINEZ:  No. |
| 08:28 | 3 | THE COURT:  See, there's lot of Mattel designers. |
| 08:28 | 4 | Now, if you want to put a big red line around it, I'm happy |
| 08:28 | 5 | to bring the juror out, but I'm not going to run back and |
| 08:28 | 6 | forth making inquiries. |
| 08:28 | 7 | MS. KELLER:  That was the only question that we |
| 08:28 | 8 | had, Your Honor.  That was the only question that we had. |
| 08:28 | 9 | THE COURT:  Okay.  I'll bring the juror out, and |
| 08:28 | 10 | let's ask her. |
| 08:28 | 11 | You want the juror to come out, Counsel? |
| 08:28 | 12 | MS. KELLER:  Yes, thank you. |
| 08:28 | 13 | THE COURT:  Okay. |
| 08:29 | 14 | MS. KELLER:  Your Honor, I'm sorry.  I have |
| 08:29 | 15 | misunderstood.  Did you say the jury or the juror? |
| 08:29 | 16 | THE COURT:  Juror, as in one. |
| 08:29 | 17 | MS. KELLER:  That's what I thought. |
| 08:29 | 18 | *(Juror enters the courtroom.)* |
| 08:29 | 19 | THE COURT:  Thank you very much.  How are you? |
| 08:29 | 20 | Now, the juror is present.  Nancy had just told me |
| 08:29 | 21 | you were fortunate enough to go to a wedding this weekend, |
| 08:29 | 22 | and the little I knew is there was a Mattel designer who was |
| 08:29 | 23 | the bride. |
| 08:29 | 24 | JUROR:  Yes. |
| 08:29 | 25 | THE COURT:  Did you have any conversation with her |

CV 04-9049 3 – 3/29/2011 – Day 41, Volume 1 of 3

8

| | | |
|---|---|---|
| 08:29 | 1 | about your jury service? |
| 08:29 | 2 | JUROR:  Or anyone else. |
| 08:29 | 3 | THE COURT:  Pardon me? |
| 08:29 | 4 | JUROR:  Or anyone else. |
| 08:29 | 5 | THE COURT:  Or anyone else. |
| 08:29 | 6 | Did she recognize that you were a juror on the |
| 08:29 | 7 | case? |
| 08:29 | 8 | JUROR:  No. |
| 08:29 | 9 | THE COURT:  Did you engage in any type of |
| 08:29 | 10 | conversation? |
| 08:29 | 11 | JUROR:  No. |
| 08:29 | 12 | THE COURT:  Did any members of the wedding party? |
| 08:30 | 13 | JUROR:  No. |
| 08:30 | 14 | THE COURT:  So you are just kind of an anonymous |
| 08:30 | 15 | person there, or are you the bridemaid or maid of honor? |
| 08:30 | 16 | JUROR:  No, I was just a guest.  I didn't even |
| 08:30 | 17 | know anybody. |
| 08:30 | 18 | THE COURT:  A guest.  How large was the wedding? |
| 08:30 | 19 | JUROR:  Like 100, 150 people. |
| 08:30 | 20 | THE COURT:  And none of us were invited except |
| 08:30 | 21 | you, huh? |
| 08:30 | 22 | JUROR:  Yes. |
| 08:30 | 23 | THE COURT:  I'm just kidding you. |
| 08:30 | 24 | Counsel, do you have any questions, either party? |
| 08:30 | 25 | Ms. Keller? |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

9

| | | |
|---|---|---|
| 08:30 | 1 | MS. KELLER:  Just one.  Are you a friend of the |
| 08:30 | 2 | bride? |
| 08:30 | 3 | JUROR:  No.  I was a friend of the groom's friend. |
| 08:30 | 4 | I'm his girlfriend. |
| 08:30 | 5 | MS. KELLER:  Okay.  Thanks. |
| 08:30 | 6 | THE COURT:  Counsel, any questions?  Mr. Price or |
| 08:30 | 7 | Mr. Quinn? |
| 08:30 | 8 | MR. QUINN:  No thanks. |
| 08:30 | 9 | THE COURT:  Thank you very much.  Thank you for |
| 08:30 | 10 | informing us immediately.  That's absolutely appropriate. |
| 08:30 | 11 | *(Juror returns to jury room.)* |
| 08:30 | 12 | *(Jury enters the courtroom.)* |
| 08:32 | 13 | *(In the presence of the jury.)* |
| 08:32 | 14 | THE COURT:  We're back in session.  The jury's |
| 08:32 | 15 | present.  Alternates are present. |
| 08:32 | 16 | Counsel, thank you for your courtesy.  If you |
| 08:32 | 17 | would be seated. |
| 10:21 | 18 | **ISAAC LARIAN, MGA'S WITNESS, PREVIOUSLY SWORN** |
| 10:21 | 19 | **RESUMED THE STAND** |
| 08:32 | 20 | THE COURT:  By agreement, Mr. Larian has returned |
| 08:32 | 21 | to the stand. |
| 08:32 | 22 | Mr. Price had one more document, a couple more |
| 08:32 | 23 | questions to ask. |
| 08:32 | 24 | Mr. Price. |
| 08:32 | 25 | MR. PRICE:  Your Honor, it was two documents. |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

10

| | | |
|---|---|---|
| 08:32 | 1 | THE COURT:  My apologies, two documents and a |
| 08:32 | 2 | couple more questions. |
| 08:32 | 3 | MR. PRICE:  Thank you. |
| 08:32 | 4 | **RECROSS-EXAMINATION  (Resumed)** |
| 08:32 | 5 | BY MR. PRICE: |
| 08:32 | 6 | Q.   Mr. Larian, I believe you said that Kohl's demanding a |
| 08:32 | 7 | slotting fee was inappropriate and unethical behavior; do |
| 08:32 | 8 | you recall that? |
| 08:32 | 9 | A.   And illegal, yes. |
| 08:32 | 10 | Q.   And if we can show you Exhibit 24792. |
| 08:32 | 11 | *(Document provided to the witness.)* |
| 08:32 | 12 | BY MR. PRICE: |
| 08:33 | 13 | Q.   Do you see that's an e-mail from you to Gary Thompson, |
| 08:33 | 14 | in June 29, 2004? |
| 08:33 | 15 | A.   Yes. |
| 08:33 | 16 | MR. PRICE:  Move 24792 into evidence. |
| 08:33 | 17 | THE COURT:  Received. |
| 08:33 | 18 | *(Exhibit No. 24792 received in evidence.)* |
| 08:33 | 19 | MR. PRICE:  Show that. |
| 08:33 | 20 | *(Document displayed.)* |
| 08:33 | 21 | BY MR. PRICE: |
| 08:33 | 22 | Q.   And the second paragraph, from Mr. Thompson to you, |
| 08:33 | 23 | "Kmart is buying approximately 2 million in their stationary |
| 08:33 | 24 | program for 2004.  All items except this one are |
| 08:33 | 25 | promotional.  In order to be in the basic program, they are |

11

| | | |
|---|---|---|
| 08:33 | 1 | asking for a slotting fee.  The value of the order is |
| 08:33 | 2 | $53,640, and our hard cost is $24,840 at 54 percent margin. |
| 08:33 | 3 | If we take the slotting fee into account, we would be at a |
| 08:33 | 4 | 43 percent margin.  Their only discount is a 1 percent |
| 08:33 | 5 | defective, no advertising, et cetera.  I would suggest |
| 08:33 | 6 | offering half, which would give us a 48 percent margin. |
| 08:34 | 7 | Please advise your thoughts." |
| 08:34 | 8 | And your response at the top is, "Do the best you can. |
| 08:34 | 9 | Isaac Larian."  Correct? |
| 08:34 | 10 | A.   Yes.  I did check over the weekend and -- "Do the best |
| 08:34 | 11 | you can" -- to get the product placed.  And we did get the |
| 08:34 | 12 | product placed, and we did not pay any slotting fee.  It is |
| 08:34 | 13 | illegal to stop a retailer from buying your product for two |
| 08:34 | 14 | years by giving you a slotting fee, as Mattel did with |
| 08:34 | 15 | Kohl's. |
| 08:34 | 16 | Q.   So you looked at this over the weekend and prepared an |
| 08:34 | 17 | answer? |
| 08:34 | 18 | A.   I did.  No, I did also checked to make sure. |
| 08:34 | 19 | Q.   Uh, but in your e-mail when Mr. Thompson -- Kmart -- so |
| 08:34 | 20 | you're saying Kmart was asking for something that was |
| 08:34 | 21 | unethical, inappropriate, and illegal? |
| 08:34 | 22 | A.   That's correct. |
| 08:34 | 23 | Q.   And your response was "Do the best you can," and then |
| 08:34 | 24 | Mr. Thompson did the best he could? |
| 08:34 | 25 | A.   Yes.  To get the placement, and he'd then give 'em the |

| 08:34 | 1 | slotting fees. |
| 08:34 | 2 | Q.   So he was able to negotiate that away? |
| 08:34 | 3 | A.   That's correct. |
| 08:34 | 4 | Q.   Uh, but you didn't in your response say, "That's |
| 08:34 | 5 | illegal, unethical, and I'm not going to do it," correct? |
| 08:34 | 6 | A.   No, I did not. |
| 08:34 | 7 | Q.   You just said -- |
| 08:34 | 8 | A.   And we did not do it. |
| 08:34 | 9 | Q.   You just said, "Do the best you can"? |
| 08:34 | 10 | A.   Exactly. |
| 08:35 | 11 | Q.   And if you look at Exhibit 24793, you see that is an |
| 08:35 | 12 | e-mail from you to Mr. Thompson, dated April 17, 2002, |
| 08:35 | 13 | Subject:  Due diligence. |
| 08:35 | 14 |      Do you see that? |
| 08:35 | 15 | A.   I do. |
| 08:35 | 16 |           MR. PRICE:  Move 24793 into evidence. |
| 08:35 | 17 |           THE COURT:  Received. |
| 08:35 | 18 |           *(Exhibit No. 24793 received in evidence.)* |
| 08:35 | 19 |            *(Document displayed.)* |
| 08:35 | 20 | BY MR. PRICE: |
| 08:35 | 21 | Q.   And you see this has a few columns:  "Item," "RSP," |
| 08:35 | 22 | R-S-P, and then "Customers."  Do you see that? |
| 08:35 | 23 | A.   I do. |
| 08:35 | 24 | Q.   In the first section there, you say, "Updated listing |
| 08:35 | 25 | of the company's top 30 customers by name and geographic |

13

| | | |
|---|---|---|
| 08:35 | 1 | location, business segment, and total for each of the past |
| 08:35 | 2 | two years, including year to date indicating dollar sales, |
| 08:35 | 3 | the total unit sales by product, and gross profit |
| 08:35 | 4 | represented by such customers, as well as the number of |
| 08:35 | 5 | years as a customer." Do you see that? |
| 08:35 | 6 | A.   I do. |
| 08:35 | 7 | Q.   And this is referring to your customers? |
| 08:35 | 8 | A.   That's correct. |
| 08:35 | 9 | Q.   And it's the top 30 customers? |
| 08:35 | 10 | A.   Yes, it's the due diligence. |
| 08:36 | 11 | Q.   And so you're trying to find out where they are and |
| 08:36 | 12 | what you sold to them for the last two years? |
| 08:36 | 13 | A.   Yes. |
| 08:36 | 14 | Q.   Including the unit sales and the gross product for |
| 08:36 | 15 | those customers over the last couple years? |
| 08:36 | 16 | A.   Yes. |
| 08:36 | 17 | Q.   And then you say, "Please also indicate the amount of |
| 08:36 | 18 | slotting fees in aggregate paid to each of the top 30 |
| 08:36 | 19 | customers." Do you see that? |
| 08:36 | 20 | A.   I do. |
| 08:36 | 21 | Q.   And that's your request to Mr. Thompson, to gather that |
| 08:36 | 22 | information, correct? |
| 08:36 | 23 | A.   It is.  Because the company was in negotiation to be |
| 08:36 | 24 | sold.  And the lawyers for the other company wanted to make |
| 08:36 | 25 | sure that we haven't done anything illegal.  And that's why |

CV 04-9049 3 – 3/29/2011 – Day 41, Volume 1 of 3

14

| | | |
|---|---|---|
| 08:36 | 1 | the subject matter is due diligence.  And one of the things |
| 08:36 | 2 | they wanted to find out if we have paid slotting fees to any |
| 08:36 | 3 | customers on the top 30, and that was a due diligence.  If |
| 08:36 | 4 | you look at it, there's eight different ones, and we did |
| 08:36 | 5 | check.  We didn't pay anybody any slotting fees. |
| 08:36 | 6 | Q.   But here you don't say anything about slotting fees |
| 08:36 | 7 | being illegal, unethical, or inappropriate? |
| 08:37 | 8 | A.   No.  This is I'm relaying the request by the lawyers |
| 08:37 | 9 | for the company who wanted to acquire MGA to Gary Thompson |
| 08:37 | 10 | to reply to them for the due diligence to buy MGA. |
| 08:37 | 11 | Q.   Okay.  So what we have, then, is both Target and Kmart, |
| 08:37 | 12 | you're saying, were asking for something that's illegal, |
| 08:37 | 13 | unethical, and inappropriate? |
| 08:37 | 14 | A.   Where is Kmart? |
| 08:37 | 15 | Q.   Kmart, that's the 24792. |
| 08:37 | 16 | A.   But you said Target. |
| 08:37 | 17 | Q.   Wasn't that the e-mail last week? |
| 08:37 | 18 | A.   I don't recall the e-mail. |
| 08:37 | 19 | Q.   I'm sorry.  Staples.  It was Staples and Kmart -- |
| 08:37 | 20 | A.   Yes. |
| 08:37 | 21 | Q.   -- that were asking for something inappropriate, |
| 08:37 | 22 | illegal, and unethical, correct? |
| 08:37 | 23 | A.   Exactly.  As I told you on Friday, we refused to give |
| 08:37 | 24 | any slotting allowance to Staples, and for the past 25 |
| 08:37 | 25 | years, we have not done zero.  We have done no business with |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:37 | 1 | Staples at all.  None. |
| 08:37 | 2 | Q.   And with Kmart, you did the best you could? |
| 08:37 | 3 | A.   That's right. |
| 08:37 | 4 | MR. PRICE:  No further questions. |
| 08:37 | 5 | THE COURT:  All right.  Sir, you may step down. |
| 08:37 | 6 | Thank you very much. |
| 08:37 | 7 | *(Witness steps down subject to recall.)* |
| 08:37 | 8 | THE COURT:  Counsel, your next witness, please. |
| 08:37 | 9 | MR. McCONVILLE:  Your Honor, we call Carey |
| 08:38 | 10 | Plunkett. |
| 08:38 | 11 | THE COURT:  Thank you. |
| 08:38 | 12 | Thank you.  Would you step forward between the |
| 08:38 | 13 | double doors.  Stop in that location and raise your right |
| 08:38 | 14 | hand. |
| 08:38 | 15 | **CAREY PLUNKETT, MGA'S WITNESS, SWORN** |
| 08:38 | 16 | THE WITNESS:  I do. |
| 08:38 | 17 | THE COURT:  Thank you very much.  If you will come |
| 08:38 | 18 | along and walk along the side of the rail, and there's an |
| 08:38 | 19 | entrance closest to the wall, near the boxes. |
| 08:38 | 20 | State your full name for the jury, please. |
| 08:38 | 21 | THE WITNESS:  Carey Ann Plunkett. |
| 08:38 | 22 | THE COURT:  Would you spell your last name for the |
| 08:38 | 23 | jurors. |
| 08:38 | 24 | THE WITNESS:  It's P-L-U-N-K-E-T-T. |
| 08:38 | 25 | THE COURT:  Thank you. |

Case 2:04-cv-09049-DOC-RNB   Document 10337   Filed 03/31/11   Page 16 of 153   Page ID #:313536
CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

16

| | | |
|---|---|---|
| 08:38 | 1 | This is direct examination by Mr. McConville on |
| 08:39 | 2 | behalf of MGA and Mr. Larian. |
| 08:39 | 3 | **DIRECT EXAMINATION** |
| 08:39 | 4 | BY MR. McCONVILLE: |
| 08:39 | 5 | Q.   Good morning, Ms. Plunkett. |
| 08:39 | 6 | A.   Good morning. |
| 08:39 | 7 | Q.   Where do you work? |
| 08:39 | 8 | A.   I work at Mattel. |
| 08:39 | 9 | Q.   How long have you worked at Mattel? |
| 08:39 | 10 | A.   Ten and a half years. |
| 08:39 | 11 | Q.   Have you been employed by Mattel the entire time for |
| 08:39 | 12 | ten and a half years? |
| 08:39 | 13 | A.   Yes, I have. |
| 08:39 | 14 | Q.   And what was your position when you started at Mattel? |
| 08:39 | 15 | A.   I started as a senior analyst in the Consumer Insights |
| 08:39 | 16 | group. |
| 08:39 | 17 | Q.   And what is your current title? |
| 08:39 | 18 | A.   My current title is Director of Consumer Insights. |
| 08:39 | 19 | Q.   And over those ten years, you've received promotions |
| 08:39 | 20 | along the way? |
| 08:39 | 21 | A.   Yes, I have. |
| 08:39 | 22 | Q.   And with those promotions come increase in salaries? |
| 08:39 | 23 | A.   Yes, they do. |
| 08:39 | 24 | Q.   I want to turn your attention to the year 2002.  What |
| 08:39 | 25 | was your position in 2002? |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

| 08:39 | 1 | A.   My position was senior analyst. |
| 08:39 | 2 | Q.   And in that position, what were your responsibilities? |
| 08:39 | 3 | A.   I worked on -- we're divided by brands, and I worked on |
| 08:40 | 4 | categories of large dolls, baby dolls, and plush toys. |
| 08:40 | 5 | Q.   When you say "worked on," what was your job to work on |
| 08:40 | 6 | those? |
| 08:40 | 7 | A.   We did research with consumers around product |
| 08:40 | 8 | development, advertising development, marketing strategy. |
| 08:40 | 9 | Q.   Was part of your responsibilities at that time to |
| 08:40 | 10 | conduct research, as well, at the New York Toy Fair? |
| 08:40 | 11 | A.   I'm sorry, can you repeat the question? |
| 08:40 | 12 | Q.   Let me ask you, in addition to the responsibilities you |
| 08:40 | 13 | described, was one of the things that you did in 2002 was to |
| 08:40 | 14 | attend the New York Toy Fair? |
| 08:40 | 15 | A.   I did attend one New York Toy Fair in 2002, yes. |
| 08:40 | 16 | Q.   And you attended that as a Mattel employee, correct? |
| 08:40 | 17 | A.   I was working at Mattel at the time, yes. |
| 08:40 | 18 | Q.   Well, Mattel paid for you to go to the New York Toy |
| 08:40 | 19 | Fair, right? |
| 08:40 | 20 | A.   Yes, they did. |
| 08:40 | 21 | Q.   And while you were at the New York Toy Fair, your |
| 08:40 | 22 | accommodations were paid by Mattel? |
| 08:40 | 23 | A.   Yes. |
| 08:41 | 24 | Q.   And your incidental expenses were paid by Mattel? |
| 08:41 | 25 | A.   Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10337   Filed 03/31/11   Page 18 of 153   Page ID #:313538
CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

18

| | | |
|---|---|---|
| 08:41 | 1 | Q.   And at that -- so the only toy fair you attended in |
| 08:41 | 2 | 2002 was the New York Toy Fair? |
| 08:41 | 3 | A.   That's correct. |
| 08:41 | 4 | Q.   And what other people from the research department |
| 08:41 | 5 | attended the New York Toy Fair in 2002? |
| 08:41 | 6 | A.   With me, um, I don't know if they were in the research |
| 08:41 | 7 | department. |
| 08:41 | 8 | Q.   Okay. |
| 08:41 | 9 | A.   But Sal Villasenor, Kelly Osier Dermody, and Tyler |
| 08:41 | 10 | Snyder. |
| 08:41 | 11 | Q.   And one of the things that you had to do -- and when |
| 08:41 | 12 | you were at the -- I'm sorry.  When you were at the New York |
| 08:41 | 13 | Toy Fair, did you attend -- did you visit competitors' |
| 08:41 | 14 | showrooms at the New York Toy Fair? |
| 08:41 | 15 | A.   Yes. |
| 08:41 | 16 | Q.   And one of the competitors that you visited was the MGA |
| 08:41 | 17 | showroom, correct? |
| 08:41 | 18 | A.   Yes. |
| 08:41 | 19 | Q.   And part of preparing for attending the New York Toy |
| 08:42 | 20 | Fair was for you to create business cards that identified |
| 08:42 | 21 | you as being from a toy retailer that was not Mattel, |
| 08:42 | 22 | correct? |
| 08:42 | 23 | A.   We had business cards made with my actual name on them, |
| 08:42 | 24 | but represented myself as being a toy store owner. |
| 08:42 | 25 | Q.   And the toy store that you owned was not Mattel, |

| | | |
|---|---|---|
| 08:42 | 1 | correct? |
| 08:42 | 2 | A.   Correct. |
| 08:42 | 3 | Q.   And these -- these business cards that you had |
| 08:42 | 4 | prepared, that was done at Kinko's, correct? |
| 08:42 | 5 | A.   Ms. Snyder and myself had them made at Kinko's, yes. |
| 08:42 | 6 | Q.   So you and Ms. Snyder went to Kinko's to have these |
| 08:42 | 7 | business cards made to access the showrooms at the New York |
| 08:42 | 8 | Toy Fair, right? |
| 08:42 | 9 | A.   The business cards were made to register for toy fair. |
| 08:42 | 10 | Q.   Understood.  But you needed to register for the toy |
| 08:42 | 11 | fair in order to access the showrooms, right? |
| 08:42 | 12 | A.   Correct. |
| 08:42 | 13 | Q.   And part of the registration process was presenting |
| 08:43 | 14 | this business card, which indicated that you were a toy shop |
| 08:43 | 15 | owner, correct? |
| 08:43 | 16 | A.   Yes, it was a mail-in registration. |
| 08:43 | 17 | Q.   And part of that mall-in registration included a |
| 08:43 | 18 | business card that reflected that you worked for a company |
| 08:43 | 19 | called The Toy Tree, correct? |
| 08:43 | 20 | A.   Correct. |
| 08:43 | 21 |     MR. McCONVILLE:  If we could put in front of the |
| 08:43 | 22 | witness Exhibit 9358, please. |
| 08:43 | 23 |     *(Document provided to the witness.)* |
| 08:43 | 24 | BY MR. McCONVILLE: |
| 08:43 | 25 | Q.   Do you have that, ma'am? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10337   Filed 03/31/11   Page 20 of 153   Page ID
#:313540
CV 04-9049 3 – 3/29/2011 – Day 41, Volume 1 of 3

20

| 08:43 | 1 | A.   I do, yes. |
| 08:43 | 2 | Q.   And do you recognize this as a business card with your |
| 08:43 | 3 | name on it, Carey Plunkett? |
| 08:43 | 4 | A.   Yes, my name's there. |
| 08:43 | 5 | Q.   And it's for a company called The Toy Tree, correct? |
| 08:43 | 6 | A.   Yes. |
| 08:43 | 7 | MR. McCONVILLE:  Your Honor, I move into evidence |
| 08:43 | 8 | Exhibit 9358. |
| 08:43 | 9 | THE COURT:  Received. |
| 08:43 | 10 | *(Exhibit No. 9358 received in evidence.)* |
| 08:43 | 11 | *(Document displayed.)* |
| 08:43 | 12 | BY MR. McCONVILLE: |
| 08:43 | 13 | Q.   Ma'am, is this the business card you were discussing |
| 08:44 | 14 | that you had made at Kinko's with Ms. Snyder? |
| 08:44 | 15 | A.   Yes. |
| 08:44 | 16 | Q.   And it was this business card that you used to register |
| 08:44 | 17 | in order to gain access to competitors' showrooms at the |
| 08:44 | 18 | New York Toy Fair, correct? |
| 08:44 | 19 | A.   I'm sorry, can you repeat the question? |
| 08:44 | 20 | Q.   Sure.  This was the business card that you used to |
| 08:44 | 21 | register for the New York Toy Fair, correct? |
| 08:44 | 22 | A.   Correct. |
| 08:44 | 23 | Q.   And you'll see on this business card there's an address |
| 08:44 | 24 | of 7729 Chandelle Place, right? |
| 08:44 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 08:44 | 1 | Q.    Whose address is that? |
| 08:44 | 2 | A.    That is Matt Turetzky's address. |
| 08:44 | 3 | Q.    And Matt Turetzky, what was his position in 2002? |
| 08:44 | 4 | A.    He was a VP over Consumer Insights, as well as, I |
| 08:44 | 5 | believe, strat planning at the time, Strategic Planning. |
| 08:44 | 6 | Q.    So he was -- was he your direct boss? |
| 08:44 | 7 | A.    No. |
| 08:44 | 8 | Q.    Where was he in the chain of command? |
| 08:45 | 9 | A.    I believe at the time he was my boss's boss's boss. |
| 08:45 | 10 | Q.    So three levels up from you? |
| 08:45 | 11 | A.    Yes. |
| 08:45 | 12 | Q.    Who was your immediate boss in 2002? |
| 08:45 | 13 | A.    The beginning of 2002, it was Cynthia Smith. |
| 08:45 | 14 | Q.    And then? |
| 08:45 | 15 | A.    And then we had a restructuring, where then I reported |
| 08:45 | 16 | to Michael Shore. |
| 08:45 | 17 | Q.    And prior to using Mr. Turetzky's address on this Toy |
| 08:45 | 18 | Tree business card, you received his permission to use his |
| 08:45 | 19 | address, correct? |
| 08:45 | 20 | A.    I don't -- I don't remember the process of how that |
| 08:45 | 21 | decision was made that his address would be on that card. |
| 08:45 | 22 | Q.    You don't recall a meeting with Mr. Turetzky where you |
| 08:45 | 23 | told him you were gonna use his address? |
| 08:45 | 24 | A.    No. |
| 08:45 | 25 | Q.    Do you recall a meeting with anyone where you discussed |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10337   Filed 03/31/11   Page 22 of 153   Page ID #:313542
CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

22

| | | |
|---|---|---|
| 08:45 | 1 | the use of Mr. Turetzky's address? |
| 08:45 | 2 | A.    No. |
| 08:45 | 3 | Q.    So, although you don't remember, do you believe it was |
| 08:45 | 4 | just happenstance that you chose the address of your boss's |
| 08:45 | 5 | boss's boss to be on this business card? |
| 08:46 | 6 | A.    I can't say that I chose to put his address on there. |
| 08:46 | 7 | I don't remember what that process was or who made those |
| 08:46 | 8 | decisions. |
| 08:46 | 9 | Q.    How many toy fairs had you attended prior to 2002? |
| 08:46 | 10 | A.    None. |
| 08:46 | 11 | Q.    And how many toy fairs have you attended since 2002? |
| 08:46 | 12 | A.    None. |
| 08:46 | 13 | Q.    So the only toy fair you attended was the New York Toy |
| 08:46 | 14 | Fair in 2002, right? |
| 08:46 | 15 | A.    Yes. |
| 08:46 | 16 | Q.    And that was roughly February 2002? |
| 08:46 | 17 | A.    Yes. |
| 08:46 | 18 | Q.    And so the only toy fair you were -- you attended, you |
| 08:46 | 19 | had these business cards created, right? |
| 08:46 | 20 | A.    Yes. |
| 08:46 | 21 | Q.    But you don't recall having a discussion with your |
| 08:46 | 22 | boss's boss's boss to put his address on these business |
| 08:46 | 23 | cards? |
| 08:46 | 24 | A.    No, I don't personally remember having any discussion |
| 08:46 | 25 | with him about the address on the card. |

| | | |
|---|---|---|
| 08:46 | 1 | Q.   So did you have a discussion with anyone about putting |
| 08:46 | 2 | Mr. Turetzky's address on this card? |
| 08:46 | 3 | A.   I don't remember. |
| 08:47 | 4 | Q.   Did this -- so these -- as I understood the process, |
| 08:47 | 5 | you had to register with the New York Toy Fair in order to |
| 08:47 | 6 | get credentials, in essence, to access the showrooms? |
| 08:47 | 7 | A.   I believe you had to register to get a badge. |
| 08:47 | 8 | Q.   Okay.  And so -- and the badge was what would permit |
| 08:47 | 9 | you access the showrooms at the toy fair? |
| 08:47 | 10 | A.   I -- I don't remember the process.  Some of the toy |
| 08:47 | 11 | fairs were -- some of the showrooms were open and others -- |
| 08:47 | 12 | I -- I don't really remember the process of how -- how we |
| 08:47 | 13 | entered. |
| 08:47 | 14 | Q.   Okay.  But in any event, you do recall that you did |
| 08:47 | 15 | access the MGA showroom at the New York Toy Fair in 2002, |
| 08:47 | 16 | correct? |
| 08:47 | 17 | A.   Yes, I do remember that. |
| 08:47 | 18 | Q.   And, uh, you entered the MGA showroom along with Tyler |
| 08:47 | 19 | Snyder, correct? |
| 08:47 | 20 | A.   I entered it with Tyler, yes. |
| 08:48 | 21 | Q.   And in accessing the MGA showroom, did you identify |
| 08:48 | 22 | yourself as being a Mattel employee? |
| 08:48 | 23 | A.   No, I did not. |
| 08:48 | 24 | Q.   And the reason you didn't identify yourself as a Mattel |
| 08:48 | 25 | employee is because you knew that MGA would not permit a |

| | | |
|---|---|---|
| 08:48 | 1 | Mattel employee to access its showroom, correct? |
| 08:48 | 2 | A.   I don't remember having to identify myself as anything |
| 08:48 | 3 | going into the showroom. |
| 08:48 | 4 | Q.   But you did identify yourself when you registered as |
| 08:48 | 5 | being with The Toy Tree, correct? |
| 08:48 | 6 | A.   I -- I don't remember having to identify myself as |
| 08:48 | 7 | anything -- |
| 08:48 | 8 | Q.   I understand. |
| 08:48 | 9 | A.   -- going in. |
| 08:48 | 10 | Q.   But during the registration process, whatever it was, |
| 08:48 | 11 | you submitted a business card that says you worked for The |
| 08:48 | 12 | Toy Tree, correct? |
| 08:48 | 13 | A.   Yes.  To mail register in (sic), yes. |
| 08:49 | 14 | Q.   And once you were inside the MGA showroom, you obtained |
| 08:49 | 15 | information about MGA products, correct? |
| 08:49 | 16 | A.   What do you mean by "obtained"? |
| 08:49 | 17 | Q.   Did you receive written information from MGA? |
| 08:49 | 18 | A.   We were handed a folder when we left the showroom. |
| 08:49 | 19 | Q.   And that folder included MGA catalogs, correct? |
| 08:49 | 20 | A.   I don't remember what was in the -- in the folder. |
| 08:49 | 21 | Q.   And -- but the showroom -- whatever information they |
| 08:49 | 22 | provided you, they provided to you because you had that |
| 08:49 | 23 | badge to get into the MGA showroom, correct? |
| 08:49 | 24 |          MR. ZELLER:  Assumes facts. |
| 08:49 | 25 |          THE COURT:  Overruled. |

Case 2:04-cv-09049-DOC-RNB   Document 10337   Filed 03/31/11   Page 25 of 153   Page ID #:313545
CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

25

| 08:49 | 1 | THE WITNESS:  I don't remember whether I had to |
|---|---|---|

08:49    1    THE WITNESS:  I don't remember whether I had to

08:49    2    show any credentials to get into the showroom.

08:49    3    BY MR. McCONVILLE:

08:49    4    Q.    Okay.  But you had credentials prepared, correct?

08:49    5    A.    I did, yes.

08:49    6    Q.    And who at Mattel directed you to prepare those

08:49    7    credentials?

08:49    8    A.    Sal Villasenor.

08:49    9    Q.    And was -- did you have a conversation with

08:49    10    Mr. Villasenor about preparing, you know, the business card

08:50    11    here called "The Toy Tree"?

08:50    12    A.    Yes.

08:50    13    Q.    And what do you recall about that conversation?

08:50    14    A.    I recall him telling Tyler and I that we should be a

08:50    15    retailer, and then he instructed us how to get the business

08:50    16    cards made up at Kinko's.  And then how to register for toy

08:50    17    fair.

08:50    18    Q.    Did you have any discussion with -- was it Cynthia

08:50    19    Smith you said?  Was that your boss at the time?

08:50    20    A.    I believe so, yes.

08:50    21    Q.    Did you discuss that with her?

08:50    22    A.    No, I did not.

08:50    23    Q.    Did you discuss this process with Michael Shore?

08:50    24    A.    No, I did not.

08:50    25    Q.    And after -- so in any event, you registered for the

| 08:50 | 1 | toy fair, and you were able to enter the MGA showroom, |
| 08:50 | 2 | correct? |
| 08:50 | 3 | A.   I was in the MGA showroom in 2002, yes. |
| 08:50 | 4 | Q.   And while you were there, you were handed some |
| 08:50 | 5 | information, right? |
| 08:50 | 6 | A.   Yes. |
| 08:50 | 7 | Q.   And you were able to see the products that were |
| 08:50 | 8 | displayed in the showroom, correct? |
| 08:50 | 9 | A.   We were guided around the showroom, yes, and shown the |
| 08:51 | 10 | products. |
| 08:51 | 11 | Q.   And you understood at the time that those products were |
| 08:51 | 12 | not products that were currently in the market place, |
| 08:51 | 13 | correct? |
| 08:51 | 14 | A.   Uh, I understood that most of the products were not |
| 08:51 | 15 | currently in the marketplace. |
| 08:51 | 16 | Q.   That these were unreleased products, right? |
| 08:51 | 17 | A.   Yes. |
| 08:51 | 18 | Q.   And after you -- well, how long did the toy fair last? |
| 08:51 | 19 | A.   Um, we were there for two days. |
| 08:51 | 20 | Q.   When you say "we," who are you talking about? |
| 08:51 | 21 | A.   Sal Villasenor, Tyler Snyder, and Kelly Dermody Osier. |
| 08:51 | 22 | Q.   And once you returned from the New York Toy Fair, did |
| 08:51 | 23 | you prepare a report? |
| 08:51 | 24 | A.   We did. |
| 08:51 | 25 |           MR. McCONVILLE:  I'd like to put in front of the |

| 08:51 | 1 | witness Exhibit 9634, please. |
| 08:52 | 2 | *(Document provided to the witness.)* |
| 08:52 | 3 | MR. McCONVILLE:  This is already in evidence. |
| 08:52 | 4 | *(Document displayed.)* |
| 08:52 | 5 | BY MR. McCONVILLE: |
| 08:52 | 6 | Q.   Ms. Snyder, you see the first page of this document is |
| 08:52 | 7 | an e-mail from Tyler Snyder.  She attended the showroom with |
| 08:52 | 8 | you or the show *(sic)* fair with you, correct? |
| 08:52 | 9 | A.   I'm sorry, can you repeat that?  I'm Ms. Plunkett. |
| 08:52 | 10 | Q.   I'm sorry. |
| 08:52 | 11 | Ms. Plunkett, you see that this e-mail is from Tyler |
| 08:52 | 12 | Snyder, right? |
| 08:52 | 13 | A.   I see, yes, that this e-mail is from Tyler Snyder. |
| 08:52 | 14 | Q.   And did you -- she's the person who went to the MGA |
| 08:52 | 15 | showroom with you? |
| 08:52 | 16 | A.   Yes. |
| 08:52 | 17 | Q.   And you'll see this is an e-mail dated February 21, |
| 08:52 | 18 | 2002.  Was that around the time you returned from the |
| 08:52 | 19 | New York Toy Fair? |
| 08:53 | 20 | A.   I don't -- I don't remember the timing. |
| 08:53 | 21 | Q.   And this e-mail is to a list of people here.  Who is |
| 08:53 | 22 | Ivy Ross? |
| 08:53 | 23 | A.   I didn't know Ivy Ross at this time. |
| 08:53 | 24 | Q.   Do you know who she -- having worked at Mattel for ten |
| 08:53 | 25 | years, do you know who Ivy Ross -- what position she had? |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

28

| | | |
|---|---|---|
| 08:53 | 1 | A.   I later -- many years later, I did work with Ivy Ross. |
| 08:53 | 2 | Q.   And what was her position? |
| 08:53 | 3 | A.   At that time, which was probably around 2004, she was |
| 08:53 | 4 | the -- either a VP or senior VP of design. |
| 08:53 | 5 | Q.   And who is Cassidy Park? |
| 08:53 | 6 | A.   I didn't know Cassidy Park in 2002. |
| 08:53 | 7 | Q.   And did you come to understand who she was? |
| 08:53 | 8 | A.   Yes.  Later -- years later, I worked with Cassidy Park. |
| 08:53 | 9 | Q.   And what position does Ms. Park have? |
| 08:53 | 10 | A.   She is no longer with Mattel. |
| 08:54 | 11 | Q.   Okay.  What position did she have when you became aware |
| 08:54 | 12 | of her? |
| 08:54 | 13 | A.   When I worked with her, she was the VP of design. |
| 08:54 | 14 | Q.   If you go to the second page of the exhibit, it says, |
| 08:54 | 15 | "Bratz 2002 MGA." |
| 08:54 | 16 | Let me ask you:  Were you -- as part of this attending |
| 08:54 | 17 | the toy fair, were you directed to attend the MGA showroom? |
| 08:54 | 18 | A.   No, I don't remember being directed to attend any of |
| 08:54 | 19 | the showrooms. |
| 08:54 | 20 | Q.   You don't recall one way or the other who -- who may |
| 08:54 | 21 | have told you that you needed to go to the MGA showroom? |
| 08:54 | 22 | MR. ZELLER:  Assumes facts. |
| 08:54 | 23 | THE COURT:  Overruled. |
| 08:54 | 24 | THE WITNESS:  I -- I just remember, you know, we |
| 08:54 | 25 | would look at what the press was saying about different |

08:54  1    galleries, and then we would go visit that and go see the
08:54  2    products that were being publicized.
08:54  3    BY MR. McCONVILLE:
08:54  4    Q.   So prior to going to the New York Toy Fair, no one told
08:55  5    you that you should try to get information on the -- on the
08:55  6    Bratz product line of MGA?
08:55  7    A.   No.  No one told me that.
08:55  8    Q.   And you just decided that that was something you would
08:55  9    do based on the press accounts you heard while at the
08:55  10   New York Toy Fair?
08:55  11   A.   Yeah, that's what we did.
08:55  12   Q.   And how many times did you visit the MGA showroom?
08:55  13   A.   Just once.
08:55  14   Q.   So looking at the first paragraph, it says, "Carey
08:55  15   Plunkett --" is that you?
08:55  16   A.   That's me.
08:55  17   Q.   What's 3253?
08:55  18   A.   That's my extension.
08:55  19   Q.   At Mattel?
08:55  20   A.   Yes.
08:55  21   Q.   "-- and Tyler Snyder walked the MGA showroom on
08:55  22   Tuesday, February 12th.  The following is an update on what
08:55  23   is happening in 2002 with the Bratz brand."  And then it
08:55  24   goes on to list information.
08:55  25        Let's take a look at "Bratz Funk 'N Glow."  It says,

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

30

| | | |
|---|---|---|
| 08:55 | 1 | "In June/July a new group will come out with glowing |
| 08:56 | 2 | clothes.  The symbol for the girl will light up on her |
| 08:56 | 3 | clothing, like a princess crown on the back of her jacket. |
| 08:56 | 4 | Fiberoptic technology is being used.  FOB HK 18.99." |
| 08:56 | 5 | Do you see that? |
| 08:56 | 6 | A.  I see that, yes. |
| 08:56 | 7 | Q.  And that was information you gathered from walking the |
| 08:56 | 8 | MGA showroom, correct? |
| 08:56 | 9 | A.  I don't remember really anything from what we saw in |
| 08:56 | 10 | the showrooms. |
| 08:56 | 11 | Q.  But the title -- the first sentence of this says, |
| 08:56 | 12 | "Walked the MGA showroom," correct? |
| 08:56 | 13 | A.  It does say that, yes. |
| 08:56 | 14 | Q.  So it's fair to conclude that by walking the MGA |
| 08:56 | 15 | showroom, you were able to get information, for example, on |
| 08:56 | 16 | Bratz Funk 'N Glow, right? |
| 08:56 | 17 | A.  I mean, I didn't -- I don't remember drafting this. |
| 08:56 | 18 | Tyler Snyder drafted it.  Again, I don't remember specific |
| 08:57 | 19 | products that we saw in the showrooms. |
| 08:57 | 20 | Q.  Well, this isn't -- this Bratz Funk 'N Glow says it's |
| 08:57 | 21 | going to be coming out in June or July, right? |
| 08:57 | 22 | A.  Yes. |
| 08:57 | 23 | Q.  So this wasn't information that you, for example, got |
| 08:57 | 24 | from going to a Target store, right? |
| 08:57 | 25 | A.  No. |

DEBBIE GALE, U.S. COURT REPORTER

08:57  1   Q.   And the listed price there of "FOB HK 18.99."  Do you

08:57  2   know what that is?

08:57  3   A.   Do I know what FOB pricing is?

08:57  4   Q.   Yes.

08:57  5   A.   Uh, I know that it's not consumer retail pricing.

08:57  6   Q.   So it's not -- it's not information that would be

08:57  7   available to a consumer at a retail store, right?

08:57  8            MR. ZELLER:  Question is overbroad.  Assumes

08:57  9   facts.

08:57  10           THE COURT:  Overruled.

08:57  11           THE WITNESS:  Um, it's not in my realm of

08:57  12  responsibility or -- in my job as researcher, I don't deal

08:57  13  with -- I only deal with consumer pricing.  I don't deal

08:57  14  with FOB pricing.  So I...

08:58  15  BY MR. McCONVILLE:

08:58  16  Q.   But the FOB pricing was information that you and

08:58  17  Ms. Snyder gathered from the MGA showroom, right?

08:58  18  A.   Again, I don't -- I don't really remember what exact

08:58  19  information came out.  And I don't remember having anything

08:58  20  to do with this e-mail.

08:58  21  Q.   Well, this was the only toy fair you've ever attended,

08:58  22  right?

08:58  23  A.   Yes.

08:58  24  Q.   And prior to going to the toy fair, you were advised by

08:58  25  Sal Villasenor that you had to create a Toy Tree business

CV 04-9049 3 – 3/29/2011 – Day 41, Volume 1 of 3

32

| | | |
|---|---|---|
| 08:58 | 1 | card, right? |
| 08:58 | 2 | A.   I don't remember if he suggested the toy –– the name of |
| 08:58 | 3 | the company, but... |
| 08:58 | 4 | Q.   He told you that you had to create a business card for |
| 08:58 | 5 | a retailer that didn't exist, right? |
| 08:58 | 6 | A.   Yes, yes. |
| 08:58 | 7 | Q.   And, uh, since that time, you've attended no other toy |
| 08:58 | 8 | fairs, right? |
| 08:58 | 9 | A.   No, I have not. |
| 08:58 | 10 | Q.   And let me ask you this:  Did you prepare any other |
| 08:58 | 11 | report for any other competitor of Mattel's once you |
| 08:58 | 12 | returned from the New York Toy Fair? |
| 08:58 | 13 | A.   We did a presentation. |
| 08:59 | 14 | Q.   Did you –– |
| 08:59 | 15 | A.   Of all –– all retail –– or all toy companies. |
| 08:59 | 16 | Q.   Is that the presentation that you would do at the |
| 08:59 | 17 | MGA –– I'm sorry –– the Mattel theater? |
| 08:59 | 18 | A.   Yes.  It was in the Mattel theater. |
| 08:59 | 19 | Q.   And that would be attended by a hundred people or so? |
| 08:59 | 20 | A.   I don't know how many people were there. |
| 08:59 | 21 | Q.   Well, it's a big room, right? |
| 08:59 | 22 | A.   About this big. |
| 08:59 | 23 | Q.   Could you estimate how many people attended the |
| 08:59 | 24 | presentation after the New York Toy Fair? |
| 08:59 | 25 | A.   In 2002? |

| | | |
|---|---|---|
| 08:59 | 1 | Q.   Yes. |
| 08:59 | 2 | A.   I don't know how many that room holds. |
| 08:59 | 3 | Q.   Pardon me? |
| 08:59 | 4 | A.   I don't remember -- I don't know how many people that |
| 08:59 | 5 | room holds or whether -- I don't remember if it was full or |
| 08:59 | 6 | not. |
| 08:59 | 7 | Q.   Okay.  But separate and apart from that presentation |
| 08:59 | 8 | that was given to a larger audience -- |
| 08:59 | 9 | A.   Uh-huh. |
| 08:59 | 10 | Q.   Can we agree it was a larger audience than the handful |
| 08:59 | 11 | of people listed on this e-mail? |
| 09:00 | 12 | A.   Yes. |
| 09:00 | 13 | Q.   So separate and apart from that presentation, did you |
| 09:00 | 14 | prepare any other written report for any other competitor |
| 09:00 | 15 | other than MGA? |
| 09:00 | 16 | A.   "Any other" assumes that I prepared this.  I didn't -- |
| 09:00 | 17 | I don't remember preparing any report when we came back from |
| 09:00 | 18 | toy fair other than the presentation that we presented. |
| 09:00 | 19 | Q.   Did you get any feedback from anyone concerning this |
| 09:00 | 20 | report that's Exhibit 9643? |
| 09:00 | 21 | A.   That's the e-mail from Tyler Snyder? |
| 09:00 | 22 | Q.   Yes. |
| 09:00 | 23 | A.   No, because my name -- I didn't send it. |
| 09:00 | 24 | Q.   I understand.  I'm asking you if you had any discussion |
| 09:00 | 25 | with anyone, since the text of the document said that you |

| | | |
|---|---|---|
| 09:00 | 1 | and Tyler Snyder walked the MGA showroom? |
| 09:01 | 2 | A.   No, I didn't -- I didn't know many of these people on |
| 09:01 | 3 | the distribution, so I didn't hear anything about this |
| 09:01 | 4 | e-mail from any of those people. |
| 09:01 | 5 | Q.   Did Sal Villasenor tell you why it was you had to |
| 09:01 | 6 | create The Toy Tree business card? |
| 09:01 | 7 | A.   I don't remember. |
| 09:01 | 8 | Q.   Did he tell you that it was a longstanding practice at |
| 09:01 | 9 | Mattel? |
| 09:01 | 10 | A.   No, he did not. |
| 09:01 | 11 | Q.   Did you have an understanding that it was a |
| 09:01 | 12 | longstanding practice at Mattel? |
| 09:01 | 13 | A.   No.  This was -- in 2002, that was the first time I'd |
| 09:01 | 14 | ever heard of that practice. |
| 09:01 | 15 | Q.   And had you heard of it since 2002? |
| 09:01 | 16 | A.   No. |
| 09:01 | 17 | Q.   And when someone -- so this is the first toy fair |
| 09:01 | 18 | you've ever attended, and someone asked you to create a |
| 09:01 | 19 | business card that doesn't accurately reflect your business, |
| 09:01 | 20 | right? |
| 09:01 | 21 | A.   Yes. |
| 09:01 | 22 | Q.   Did that make you feel uncomfortable? |
| 09:01 | 23 | A.   Yes, it did. |
| 09:02 | 24 | Q.   What did you do with this discomfort? |
| 09:02 | 25 | A.   Well, I was told at the time that, um -- you know, this |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

35

09:02    1    information -- once you're at toy fair, the information

09:02    2    isn't confidential any longer.  And so...

09:02    3    Q.   Who told you that?

09:02    4    A.   It was either Sal Villasenor or Kelly Dermody.

09:02    5    Q.   So the information that you were -- gathered, you were

09:02    6    told, was public information?

09:02    7    A.   Yeah.

09:02    8    Q.   About unreleased competitor products?

09:02    9    A.   Yeah.  That's what toy fair is.

09:02   10    Q.   Based on your one you've attended?

09:02   11    A.   Well, based on the one I've attended, and also every

09:02   12    year as part of my job in understanding the context of the

09:02   13    toy industry, you know, I go online and look at what's

09:02   14    happening from toy fair and what awards are being won and

09:02   15    the top -- you know, the hot list for Christmas for boys'

09:02   16    toys, girls' toys.

09:03   17    Q.   And after returning from the toy fair, you received a

09:03   18    promotion, correct?

09:03   19    A.   Um, I received a promotion sometimes the middle of

09:03   20    2002, but I wouldn't connect the two.

09:03   21    Q.   Okay.  Let's look at Exhibit 9368, which I believe is

09:03   22    in evidence.

09:03   23              *(Document provided to the witness.)*

09:03   24              *(Document displayed.)*

        25

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

36

| 09:03 | 1 | BY MR. McCONVILLE: |
| 09:03 | 2 | Q.   Do you recognize this document, ma'am? |
| 09:03 | 3 | A.   This appears to be a document that -- I have seen this |
| 09:03 | 4 | document, yes. |
| 09:03 | 5 | Q.   Okay.  And this is March 11, 2002.  Do you see that? |
| 09:03 | 6 | A.   I do. |
| 09:03 | 7 | Q.   So this was a month after you came back from the toy |
| 09:03 | 8 | fair, right? |
| 09:03 | 9 | A.   Yes. |
| 09:03 | 10 | Q.   And if you'd go to the last paragraph on this memo, you |
| 09:03 | 11 | were being congratulated for successfully compiling and |
| 09:04 | 12 | presenting a competitive review of the toy fair for 2002, |
| 09:04 | 13 | correct? |
| 09:04 | 14 | A.   It says that at the bottom in the context of many other |
| 09:04 | 15 | things. |
| 09:04 | 16 | Q.   Understood.  But one of the things that you were |
| 09:04 | 17 | singled out for was your ability to present a competitive |
| 09:04 | 18 | review of the toy fair for 2002, right? |
| 09:04 | 19 | A.   It says that, yes. |
| 09:04 | 20 | Q.   And since 2002, you've been promoted how many times? |
| 09:04 | 21 | A.   Four times. |
| 09:04 | 22 | Q.   And what was your promotion in 2002?  What position did |
| 09:04 | 23 | you get? |
| 09:04 | 24 | A.   It was to supervisor. |
| 09:04 | 25 | Q.   Of what? |

DEBBIE GALE, U.S. COURT REPORTER

| 09:04 | 1 | A.    Of Consumer Insights for large dolls, baby dolls, and |
| 09:04 | 2 | plush toys. |
| 09:04 | 3 | Q.    And you'll see that this is written by Michael Shore. |
| 09:05 | 4 | Who I think you said was your boss at the time? |
| 09:05 | 5 | A.    There was a transition period around the middle of |
| 09:05 | 6 | 2002. |
| 09:05 | 7 | Q.    And in 2002, he was your boss at some point, right? |
| 09:05 | 8 | A.    Yes. |
| 09:05 | 9 | Q.    And did Mr. Shore know that you were using The Toy Tree |
| 09:05 | 10 | business cards at the toy fair? |
| 09:05 | 11 | A.    I don't think so. |
| 09:05 | 12 | Q.    Did you receive a reprimand, Ms. Plunkett, for using |
| 09:05 | 13 | The Toy Tree business card? |
| 09:05 | 14 | A.    Yes, I did. |
| 09:05 | 15 | Q.    When was that? |
| 09:05 | 16 | A.    It was about a year and some ago. |
| 09:05 | 17 | Q.    So roughly 2010?  Sometime in 2010? |
| 09:05 | 18 | A.    Probably the beginning of 2010. |
| 09:05 | 19 | Q.    So it was -- the toy fair was the beginning of 2002? |
| 09:05 | 20 | A.    Yes. |
| 09:05 | 21 | Q.    So eight years after using this business card, you |
| 09:06 | 22 | received some sort of reprimand; is that right? |
| 09:06 | 23 | A.    Yes. |
| 09:06 | 24 | Q.    And you understood that that was around the time that |
| 09:06 | 25 | MGA began taking depositions in this case related to the |

| | | |
|---|---|---|
| 09:06 | 1 | Market Intelligence group, right? |
| 09:06 | 2 | MR. ZELLER:  This is getting into discovery. |
| 09:06 | 3 | THE COURT:  Overruled. |
| 09:06 | 4 | THE WITNESS:  I don't know. |
| 09:06 | 5 | BY MR. McCONVILLE: |
| 09:06 | 6 | Q.   So tell me, how did this meeting with -- well, who gave |
| 09:06 | 7 | you the reprimand? |
| 09:06 | 8 | A.   She's the director of human resources. |
| 09:06 | 9 | Q.   What's her name? |
| 09:06 | 10 | A.   Her name is Maureen Tafoya. |
| 09:06 | 11 | Q.   I'm sorry? |
| 09:06 | 12 | A.   Maureen Tafoya. |
| 09:06 | 13 | Q.   And describe for me what happened at this meeting |
| 09:06 | 14 | with -- well, did you have a meeting with her? |
| 09:06 | 15 | A.   I did. |
| 09:06 | 16 | Q.   How did you come to learn you needed to have a meeting |
| 09:06 | 17 | with Ms. Tafoya? |
| 09:06 | 18 | A.   She left me a voice mail saying she wanted to meet with |
| 09:07 | 19 | me, and then she put a meeting on my calendar for that day. |
| 09:07 | 20 | Q.   And what happened at the meeting? |
| 09:07 | 21 | A.   Asked me if I had ever been to a New York Toy Fair, and |
| 09:07 | 22 | then she asked me basically about the practice of using |
| 09:07 | 23 | business cards.  And I explained to her what I'm explaining |
| 09:07 | 24 | here.  And she -- she asked me if I understood that that was |
| 09:07 | 25 | against Mattel's code of conduct and that that is |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

39

| 09:07 | 1 | inappropriate behavior.  And I said yes.  And she asked |
|---|---|---|
| 09:07 | 2 | me -- she said, you know, "This is behavior that can never |
| 09:07 | 3 | happen again.  This is not within our code." |
| 09:07 | 4 | Q.   Is there anything else you can remember from that |
| 09:07 | 5 | meeting? |
| 09:07 | 6 | A.   That was sort of the gist of it. |
| 09:07 | 7 | Q.   Was there anything ever put in your personnel file, if |
| 09:07 | 8 | you know? |
| 09:07 | 9 | A.   I don't know. |
| 09:07 | 10 | Q.   Other than this meeting with Maureen Tafoya, did you |
| 09:08 | 11 | discuss with anyone else that in 2002, that it was against |
| 09:08 | 12 | Mattel's policy to use these business cards? |
| 09:08 | 13 | A.   I don't know if it was against the policy in 2002.  I |
| 09:08 | 14 | don't remember when the current code of conduct was |
| 09:08 | 15 | instilled. |
| 09:08 | 16 | Q.   So in the absence of Mattel writing it in the code of |
| 09:08 | 17 | conduct, you don't think you would have been reprimanded for |
| 09:08 | 18 | this? |
| 09:08 | 19 | A.   I don't know who knew. |
| 09:08 | 20 | Q.   Pardon me? |
| 09:08 | 21 | A.   I don't know who knew what at that point in time.  I |
| 09:08 | 22 | didn't really say much to anyone about the practice. |
| 09:08 | 23 | Q.   Because you were uncomfortable with it, right? |
| 09:08 | 24 | A.   Yeah. |
| 09:08 | 25 | Q.   So eight years after the fact, you had this meeting |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

40

| | | |
|---|---|---|
| 09:08 | 1 | with Maureen Tafoya, right? |
| 09:08 | 2 | A.   Yes. |
| 09:08 | 3 | Q.   Did she -- did you receive some sort of reduction in |
| 09:09 | 4 | salary? |
| 09:09 | 5 | A.   Not that I know of. |
| 09:09 | 6 | Q.   Did you receive any sort of reduction in your position? |
| 09:09 | 7 | A.   No. |
| 09:09 | 8 | Q.   In fact, right around the time of this meeting, you |
| 09:09 | 9 | were actually promoted, right? |
| 09:09 | 10 | A.   Um, I believe I was promoted a few months before that |
| 09:09 | 11 | meeting, but I don't remember the exact timing. |
| 09:09 | 12 | Q.   In any event, close in time to this meeting with |
| 09:09 | 13 | Ms. Tafoya -- what was her title again? |
| 09:09 | 14 | A.   I believe she's the director of human resources. |
| 09:09 | 15 | Q.   So at around the time of this meeting with the director |
| 09:09 | 16 | of human resources, you received a promotion, right? |
| 09:09 | 17 | MR. ZELLER:  Misstates the witness's testimony. |
| 09:09 | 18 | THE COURT:  Reask the question, Counsel. |
| 09:09 | 19 | BY MR. McCONVILLE: |
| 09:09 | 20 | Q.   So you said this -- this meeting with the head of HR |
| 09:09 | 21 | occurred roughly early 2010, right? |
| 09:09 | 22 | A.   Yes. |
| 09:09 | 23 | Q.   And within a few months of that, either before or |
| 09:10 | 24 | either after, you received a promotion from Mattel, right? |
| 09:10 | 25 | A.   I received my promotion to director in November of '09. |

Case 2:04-cv-09049-DOC-RNB   Document 10337   Filed 03/31/11   Page 41 of 153   Page ID #:313561
CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

41

| | | |
|---|---|---|
| 09:10 | 1 | Q.   And whatever this reprimand was, did she tell you -- |
| 09:10 | 2 | did Ms. Tafoya tell you how she found out about your |
| 09:10 | 3 | involvement? |
| 09:10 | 4 | A.   She did not. |
| 09:10 | 5 | Q.   Did you ask? |
| 09:10 | 6 | A.   No. |
| 09:10 | 7 | Q.   And you understood that your promotion was not |
| 09:10 | 8 | contingent on whether or not you were using -- you used a |
| 09:10 | 9 | fake business card in 2002, right? |
| 09:10 | 10 | A.   I'm sorry, can you ask the question again? |
| 09:10 | 11 | Q.   Sure.  You understood that your promotion was not |
| 09:10 | 12 | hindered in any way by the fact that in 2002 you posed as a |
| 09:10 | 13 | retailer when you were not a retailer, right? |
| 09:10 | 14 | A.   I don't believe -- no, my position wasn't compromised |
| 09:10 | 15 | because of the mistake in 2002. |
| 09:11 | 16 | MR. McCONVILLE:  No further questions. |
| 09:11 | 17 | THE COURT:  Cross-examination by Mr. Zeller on |
| 09:11 | 18 | behalf of Mattel. |
| 09:11 | 19 | **CROSS-EXAMINATION** |
| 09:11 | 20 | BY MR. ZELLER: |
| 09:11 | 21 | Q.   Good morning, Ms. Plunkett. |
| 09:11 | 22 | A.   Good morning. |
| 09:11 | 23 | Q.   So you went into MGA's showroom in 2002 at New York Toy |
| 09:11 | 24 | Fair? |
| 09:11 | 25 | A.   Correct. |

42

| | | |
|---|---|---|
| 09:11 | 1 | Q.   And when you went into this showroom -- or before you |
| 09:11 | 2 | went into the showroom, did anyone at MGA have you sign |
| 09:11 | 3 | something called a nondisclosure agreement? |
| 09:11 | 4 | A.   No. |
| 09:11 | 5 | Q.   Did you see other people there in the showroom of MGA? |
| 09:11 | 6 | A.   Yes. |
| 09:11 | 7 | Q.   Was there, in fact, a line out the door? |
| 09:11 | 8 | A.   Yeah.  What I remember from the process is we lined up |
| 09:11 | 9 | with groups of people and then were guided through the |
| 09:11 | 10 | gallery in these groups of ten to twelve people. |
| 09:12 | 11 | Q.   And you said a couple times "guided through."  What do |
| 09:12 | 12 | you mean by that? |
| 09:12 | 13 | A.   There was a woman -- I don't know -- I don't remember |
| 09:12 | 14 | what her position was, but she -- she kind of just walked us |
| 09:12 | 15 | around the gallery and told us what the products were. |
| 09:12 | 16 | Q.   And so you were with a group? |
| 09:12 | 17 | A.   Yes. |
| 09:12 | 18 | Q.   Do you recall about how many people were with you in |
| 09:12 | 19 | the particular group, in this guide? |
| 09:12 | 20 | A.   Around ten to twelve. |
| 09:12 | 21 | Q.   And were the other people in this group, were they |
| 09:12 | 22 | known to you, or were they strangers? |
| 09:12 | 23 | A.   They were -- I didn't know anyone other than Tyler in |
| 09:12 | 24 | that group. |
| 09:12 | 25 | Q.   And at any time when the presenter or the tour guide |

DEBBIE GALE, U.S. COURT REPORTER

43

| | | |
|---|---|---|
| 09:12 | 1 | was showing you MGA product there in the showroom, did the |
| 09:12 | 2 | presenter ever say you can't discuss any of this information |
| 09:12 | 3 | or it's secret or confidential? |
| 09:12 | 4 | A.   No. |
| 09:12 | 5 | Q.   Did anyone -- I understand you've already said that you |
| 09:12 | 6 | didn't sign anything saying you would keep the information |
| 09:13 | 7 | confidential.  Did anyone there in the showroom, working for |
| 09:13 | 8 | MGA, say to you in words or substance that you needed to |
| 09:13 | 9 | keep the information that you saw, information about these |
| 09:13 | 10 | products, secret or confidential or you couldn't share it |
| 09:13 | 11 | with other people? |
| 09:13 | 12 | A.   No. |
| 09:13 | 13 | Q.   During the course of it, were you allowed to go up and |
| 09:13 | 14 | play with the products? |
| 09:13 | 15 | A.   No. |
| 09:13 | 16 | Q.   Or touch them? |
| 09:13 | 17 | A.   No. |
| 09:13 | 18 | Q.   Were they up on displays of some kind? |
| 09:13 | 19 | A.   Um, it's hard to remember.  I don't really remember how |
| 09:13 | 20 | they were displayed. |
| 09:13 | 21 | Q.   And it was your understanding that the information that |
| 09:13 | 22 | you saw there in the showroom, I think you were saying |
| 09:13 | 23 | earlier was public information and wasn't confidential, even |
| 09:13 | 24 | though these are products that are not yet actually on store |
| 09:13 | 25 | shelves? |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

44

09:13  1   A.   It's my understanding that by the time you get to toy
09:13  2   fair, the information is not confidential and is publicly
09:13  3   available.
09:14  4   Q.   Well, what's your understanding of the -- well, let me
09:14  5   back up.
09:14  6        You've been to one toy fair, I think you've said, and
09:14  7   then Mr. McConville, MGA's counsel, was asking you some
09:14  8   questions about, well, how do you really know what happens
09:14  9   at toy fair.  Maybe if you could explain to us a little bit
09:14  10  more.  What is your familiarity with toy fair and its public
09:14  11  nature based on?
09:14  12  A.   Well, one, at the time I was told by either Sal
09:14  13  Villasenor or Kelly Dermody Osier that -- I was told that
09:14  14  before we went.  And then just as a general course of
09:14  15  business, my job in research is to understand what's
09:14  16  happening in the industry, and toy fair is a great
09:14  17  opportunity where there's a lot of press around the toy of
09:14  18  the year.  That's a very coveted award to win coming out of
09:14  19  toy fair.
09:14  20       There's also the -- you know, we want to know what are
09:14  21  the hot -- what's the industry saying about hot toys for the
09:14  22  year in girls' toys, boys' toys.  And what are the trends?
09:15  23  You know, we want to understand what are -- what are trends
09:15  24  for the upcoming year in terms of toys.
09:15  25  Q.   And this was part of your job to, um, search out for

CV 04-9049 3 – 3/29/2011 – Day 41, Volume 1 of 3

45

| | | |
|---|---|---|
| 09:15 | 1 | public information about toy fairs? |
| 09:15 | 2 | A.   I don't know if it's exactly part of my job, but I |
| 09:15 | 3 | mean, I guess it is, because we -- you know, we need to |
| 09:15 | 4 | understand what's happening in the industry. |
| 09:15 | 5 | Q.   Well, let me ask it this way.  I mean, have you seen, |
| 09:15 | 6 | uh, press releases by companies such as MGA that pertain to |
| 09:15 | 7 | even unreleased products that are being shown in their toy |
| 09:15 | 8 | fair showroom? |
| 09:15 | 9 | A.   Yes.  Every year as a course of business, I -- I look |
| 09:15 | 10 | at the press coming out of toy fair.  And if things are hot |
| 09:15 | 11 | and winning awards, then those are the items that will be, |
| 09:15 | 12 | um, in the press. |
| 09:15 | 13 | Q.   Have you also seen bloggers write about their own tours |
| 09:16 | 14 | of toy company showrooms at New York Toy Fair? |
| 09:16 | 15 | A.   Um, yeah, I mean, that's -- in addition to the toy fair |
| 09:16 | 16 | publications and the major publications like *Toy Book* and/or |
| 09:16 | 17 | *Playthings* that come out at that time, I would look at any |
| 09:16 | 18 | bloggers who have walked the galleries. |
| 09:16 | 19 | Q.   And since 2000, it's been a regular part of your job |
| 09:16 | 20 | duties to search for and review press materials such as news |
| 09:16 | 21 | articles or blogs or press releases concerning the toy |
| 09:16 | 22 | industry? |
| 09:16 | 23 | A.   Yes. |
| 09:16 | 24 | Q.   And you've regularly reviewed industry publications |
| 09:16 | 25 | such as *Playthings*, I think you mentioned, and *Toy Book*? |

| | | |
|---|---|---|
| 09:16 | 1 | A.   Yes. |
| 09:16 | 2 | Q.   And this has all been in connection with your job of |
| 09:16 | 3 | gathering and analyzing publicly available information |
| 09:16 | 4 | about -- about products that are available through toy |
| 09:16 | 5 | companies? |
| 09:16 | 6 | A.   Yes.  It's good -- it's good practice in research to |
| 09:17 | 7 | understand the context of the industry.  So, yes. |
| 09:17 | 8 | Q.   If you could, please, take a look at a collection of |
| 09:17 | 9 | materials that we put together, that I believe that you've |
| 09:17 | 10 | had an opportunity to review in -- prior to this time so we |
| 09:17 | 11 | aren't spending time with the jury reviewing all of it.  And |
| 09:17 | 12 | these are Exhibits 9882, 20315, 20516, 20588, 20629, 21301, |
| 09:17 | 13 | 22389, 23888, and 23904. |
| 09:17 | 14 | MR. McCONVILLE:  Object.  These are all hearsay, |
| 09:17 | 15 | Your Honor. |
| 09:17 | 16 | *(Documents provided to the witness.)* |
| 09:17 | 17 | THE COURT:  Are those the series of press |
| 09:17 | 18 | releases?  Are they MGA press releases? |
| 09:18 | 19 | MR. ZELLER:  They're press releases. |
| 09:18 | 20 | THE COURT:  Are each one of those MGA press |
| 09:18 | 21 | releases? |
| 09:18 | 22 | MR. ZELLER:  Not all of them.  Some of them are |
| 09:18 | 23 | press releases.  Some are articles.  Some are bloggers. |
| 09:18 | 24 | THE COURT:  The press releases I'll allow.  The |
| 09:18 | 25 | articles I will not at this time until I review them. |

| | | |
|---|---|---|
| 09:18 | 1 | MR. ZELLER:  We have been through them, Your |
| 09:18 | 2 | Honor.  These are ones that we've been through with the |
| 09:18 | 3 | Court. |
| 09:18 | 4 | THE COURT:  And I consented to them? |
| 09:18 | 5 | MR. McCONVILLE:  We object, Your Honor. |
| 09:18 | 6 | THE COURT:  I'll take this outside the presence of |
| 09:18 | 7 | the jury, but you can refer to them, Counsel. |
| 09:18 | 8 | MR. ZELLER:  Thank you, Your Honor.  I'll just |
| 09:18 | 9 | move them in, then. |
| 09:18 | 10 | THE COURT:  They're not received at this time. |
| 09:18 | 11 | MR. ZELLER:  Understand.  If I could just lay the |
| 09:18 | 12 | foundation and make my offer, Your Honor, so she doesn't |
| 09:18 | 13 | have to come back. |
| 09:18 | 14 | BY MR. ZELLER: |
| 09:18 | 15 | Q.   You've had an opportunity to review these articles |
| 09:18 | 16 | previously? |
| 09:18 | 17 | A.   Yes. |
| 09:18 | 18 | MR. McCONVILLE:  Objection.  Vague.  They aren't |
| 09:18 | 19 | all articles. |
| 09:18 | 20 | BY MR. ZELLER: |
| 09:18 | 21 | Q.   I wasn't quite done.  Have you had a chance to review |
| 09:18 | 22 | these materials, which include press releases or press |
| 09:18 | 23 | announcements by MGA, articles, and blogs about toy fair? |
| 09:18 | 24 | A.   Yes. |
| 09:18 | 25 | Q.   And do you recognize these as materials that you expect |

| | | |
|---|---|---|
| 09:18 | 1 | that you reviewed as part of the normal course of your |
| 09:19 | 2 | duties there at Mattel in collecting information, public |
| 09:19 | 3 | information, about competitor products? |
| 09:19 | 4 | A.   The -- yes, the *Toy Book* and these types of articles |
| 09:19 | 5 | would be ones that I would look at every -- each February |
| 09:19 | 6 | for toy fair. |
| 09:19 | 7 | MR. ZELLER:  Your Honor, I would offer them |
| 09:19 | 8 | subject to the hearsay objection, which I guess we'll |
| 09:19 | 9 | discuss otherwise outside the presence of the jury. |
| 09:19 | 10 | THE COURT:  Ladies and gentlemen, once again, I'll |
| 09:19 | 11 | probably let in certain portions of this.  I just want time |
| 09:19 | 12 | to read to make certain that there's no hearsay that comes |
| 09:19 | 13 | in.  Also, there's an exception to the hearsay rule.  This |
| 09:19 | 14 | may show, you know, what she's relying upon.  But I need a |
| 09:19 | 15 | little bit of time tonight with counsel. |
| 09:19 | 16 | All right. |
| 09:19 | 17 | MR. ZELLER:  Thank you, Your Honor. |
| 09:19 | 18 | BY MR. ZELLER: |
| 09:19 | 19 | Q.   And generally speaking, these kind of materials, |
| 09:19 | 20 | articles from toy industry publications, um, blog entries, |
| 09:20 | 21 | and newspaper articles, come out around the time of toy fair |
| 09:20 | 22 | and sometimes even before? |
| 09:20 | 23 | A.   Yes. |
| 09:20 | 24 | Q.   And they describe, uh, unreleased products that |
| 09:20 | 25 | manufacturers such as MGA are trying to promote to the |

| | | |
|---|---|---|
| 09:20 | 1 | public, right? |
| 09:20 | 2 | A.   Yes. |
| 09:20 | 3 | Q.   If you could, please, take a look at Exhibit 9643. |
| 09:20 | 4 | *(Document provided to the witness.)* |
| 09:20 | 5 | BY MR. ZELLER: |
| 09:20 | 6 | Q.   This is the Tyler Snyder e-mail that you were shown |
| 09:20 | 7 | previously with the report attached to it. |
| 09:20 | 8 | *(Document displayed.)* |
| 09:20 | 9 | BY MR. ZELLER: |
| 09:20 | 10 | Q.   And based on your knowledge of the industry practice |
| 09:20 | 11 | and how toy companies operate by publicizing their products |
| 09:21 | 12 | around the time of toy fair, is your expectation that some |
| 09:21 | 13 | of the information contained in this report in fact was |
| 09:21 | 14 | publicly released by MGA? |
| 09:21 | 15 | MR. McCONVILLE:  Objection.  Calls for |
| 09:21 | 16 | speculation. |
| 09:21 | 17 | THE COURT:  Sustained. |
| 09:21 | 18 | BY MR. ZELLER: |
| 09:21 | 19 | Q.   Well, let's take a look at Exhibit 23890.  This is in |
| 09:21 | 20 | evidence.  It's a *Reuters* article. |
| 09:21 | 21 | *(Document provided to the witness.)* |
| 09:21 | 22 | *(Document displayed.)* |
| 09:21 | 23 | BY MR. ZELLER: |
| 09:21 | 24 | Q.   And we won't go through all of this, but let's take a |
| 09:21 | 25 | look at the entry in Exhibit 9643 for Bratz Funk 'N Glow |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

50

| | | |
|---|---|---|
| 09:21 | 1 | that you were asked about. |
| 09:21 | 2 | A.   Okay. |
| 09:21 | 3 |        MR. ZELLER:  If we can pull that up, please, |
| 09:21 | 4 | Mr. Kotarski. |
| 09:21 | 5 |        (Technician complies.) |
| 09:21 | 6 | BY MR. ZELLER: |
| 09:21 | 7 | Q.   And you recall you were asked questions by MGA's |
| 09:21 | 8 | counsel about this entry, Bratz Funk 'N Glow? |
| 09:21 | 9 | A.   Yes. |
| 09:21 | 10 | Q.   Do you recall that? |
| 09:22 | 11 |        MR. ZELLER:  If we could then pull up 23890 and |
| 09:22 | 12 | put that side by side. |
| 09:22 | 13 |        (Technician complies.) |
| 09:22 | 14 | BY MR. ZELLER: |
| 09:22 | 15 | Q.   And you'll find a paragraph in there that begins, "At |
| 09:22 | 16 | toy fair 2002, MGA Entertainment showed a new version of the |
| 09:22 | 17 | Bratz with Funk 'N Glow clothes embedded with fiberoptics," |
| 09:22 | 18 | and then continues on? |
| 09:22 | 19 | A.   Yes, I see that. |
| 09:22 | 20 | Q.   By the way, you'll see that this *Reuters* article, |
| 09:22 | 21 | 23890, is dated February 14.  You see that? |
| 09:22 | 22 | A.   Yes, February 14. |
| 09:22 | 23 | Q.   And what's the date of the Mattel e-mail that MGA's |
| 09:22 | 24 | counsel asked you about? |
| 09:22 | 25 | A.   February 21st. |

DEBBIE GALE, U.S. COURT REPORTER

09:22  1   Q.   So that's about a week later?

09:22  2   A.   Yes.

09:22  3   Q.   And you understand from seeing this *Reuters* article,

09:22  4   Exhibit 23890, I mean, certainly the fact that MGA was going

09:22  5   to release Bratz Funk 'N Glow with light-up clothing was not

09:23  6   secret; in fact, it was public, right?

09:23  7            MR. McCONVILLE:  Objection.  No foundation.

09:23  8            THE COURT:  Overruled.

09:23  9            THE WITNESS:  I'm sorry, could you repeat the

09:23  10  question, please?

09:23  11  BY MR. ZELLER:

09:23  12  Q.   Sure.

09:23  13       You understand from seeing this *Reuters* article, dated

09:23  14  February 14th, that by the time that this report was written

09:23  15  or distributed on February 21st, the fact that MGA was gonna

09:23  16  come out with a doll called Bratz Funk 'N Glow with light-up

09:23  17  clothing was already public knowledge?

09:23  18  A.   Yes, it was out in the *Reuters* article on the 14th.

09:23  19  Q.   And you're not surprised to see the fact that even

09:23  20  though products being shown in a toy fair showroom are not

09:23  21  yet on the market in the sense that they're there on the

09:23  22  shelves available to consumers, that it's already public

09:23  23  knowledge, right?

09:23  24  A.   Again, that's the purpose of toy fair, is to generate

09:23  25  publicity for your products coming out.

52

| | | |
|---|---|---|
| 09:23 | 1 | MR. ZELLER: Nothing further, Your Honor. Thank |
| 09:23 | 2 | you. |
| 09:24 | 3 | THE COURT: Redirect, Mr. McConville. |
| 09:24 | 4 | **REDIRECT EXAMINATION** |
| 09:24 | 5 | BY MR. McCONVILLE: |
| 09:24 | 6 | Q. Ms. Plunkett, let's look back at that exhibit you were |
| 09:24 | 7 | just looking at, which was 23890. Do you have that in front |
| 09:24 | 8 | of you? |
| 09:24 | 9 | A. The *Reuters* article? |
| 09:24 | 10 | Q. Yeah. |
| 09:24 | 11 | A. Yes. |
| 09:24 | 12 | Q. You're not suggesting, are you, that you used a fake |
| 09:24 | 13 | business card and flew to New York and spent two days there |
| 09:24 | 14 | because you could get the information out of a *Reuters* news |
| 09:24 | 15 | articles, are you? |
| 09:24 | 16 | MR. ZELLER: Argumentative. |
| 09:24 | 17 | THE COURT: Overruled. |
| 09:24 | 18 | You can answer that question. |
| 09:24 | 19 | THE WITNESS: No. I was saying -- all I was |
| 09:24 | 20 | saying was that the information is publicly available. |
| 09:24 | 21 | BY MR. McCONVILLE: |
| 09:24 | 22 | Q. Right. Publicly available information that you used a |
| 09:24 | 23 | fake business card to get into an MGA showroom to obtain; is |
| 09:24 | 24 | that what you're saying? |
| 09:24 | 25 | A. No. |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

53

| | | |
|---|---|---|
| 09:24 | 1 | Q.   Because it doesn't make any sense, does it? |
| 09:24 | 2 | THE COURT:  Sustained.  You did object, |
| 09:24 | 3 | Mr. Zeller? |
| 09:25 | 4 | MR. ZELLER:  I did. |
| 09:25 | 5 | THE COURT:  Sustained.  That question's stricken, |
| 09:25 | 6 | Counsel. |
| 09:25 | 7 | BY MR. McCONVILLE: |
| 09:25 | 8 | Q.   Do you believe it's Mattel's business practice to have |
| 09:25 | 9 | employees fly to New York Toy Fair when they can sit at |
| 09:25 | 10 | their cubicle and look information up on computers?  Do you |
| 09:25 | 11 | believe that's Mattel's practice? |
| 09:25 | 12 | A.   I don't believe it's Mattel's practice. |
| 09:25 | 13 | Q.   Right.  Because you got to go -- you have to go to the |
| 09:25 | 14 | New York Toy Show in order to get into a competitor's |
| 09:25 | 15 | showroom, right? |
| 09:25 | 16 | A.   I'm sorry.  Can you repeat the question, please? |
| 09:25 | 17 | Q.   Sure.  Sitting at a computer doing research doesn't get |
| 09:25 | 18 | you into an MGA showroom, right? |
| 09:25 | 19 | A.   The information is available -- |
| 09:25 | 20 | Q.   I understand that. |
| 09:25 | 21 | A.   -- on the internet. |
| 09:25 | 22 | Q.   I'm gonna ask you to answer my question yes/no if you |
| 09:25 | 23 | can.  If you can't, let me know. |
| 09:25 | 24 | When you're sitting at your computer at a Mattel |
| 09:25 | 25 | cubicle, can you access an MGA showroom? |

Case 2:04-cv-09049-DOC-RNB   Document 10337   Filed 03/31/11   Page 54 of 153   Page ID
#:313574
CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

54

| | | |
|---|---|---|
| 09:25 | 1 | A.   No.  But you can access the information that's at toy |
| 09:25 | 2 | fair from that showroom. |
| 09:25 | 3 | Q.   Okay.  And so it's Mattel's -- it's Mattel's business |
| 09:26 | 4 | practice to have employees -- well, you were uncomfortable |
| 09:26 | 5 | using the fake business card, right? |
| 09:26 | 6 | A.   Yes, but I wouldn't characterize it as Mattel's |
| 09:26 | 7 | business practice. |
| 09:26 | 8 | Q.   Okay.  So we'll characterize it -- how would you |
| 09:26 | 9 | characterize it? |
| 09:26 | 10 | A.   I would characterize it as -- there was -- it's -- it |
| 09:26 | 11 | was just a convenience to see things firsthand versus |
| 09:26 | 12 | reading it online. |
| 09:26 | 13 | Q.   So Mattel had you engage in something that you were |
| 09:26 | 14 | uncomfortable doing as a convenience to Mattel; is that what |
| 09:26 | 15 | you're saying? |
| 09:26 | 16 | A.   Yes. |
| 09:26 | 17 | Q.   So in this convenience that you were engaging in on |
| 09:26 | 18 | behalf of Mattel, would not permit you to access an MGA |
| 09:26 | 19 | showroom, right? |
| 09:26 | 20 | A.   I -- I'm sorry, I don't understand your question. |
| 09:26 | 21 | Q.   Sure.  So you don't -- let me ask a different question. |
| 09:26 | 22 | You don't want to make the -- you don't want to leave |
| 09:27 | 23 | the impression, do you, that the information that you |
| 09:27 | 24 | received at the MGA showroom was available publicly?  Do |
| 09:27 | 25 | you? |

55

| | | |
|---|---|---|
| 09:27 | 1 | MR. ZELLER:  Argumentative. |
| 09:27 | 2 | THE COURT:  Sustained. |
| 09:27 | 3 | BY MR. McCONVILLE: |
| 09:27 | 4 | Q.   Let's look at that article again, ma'am. |
| 09:27 | 5 | A.   Okay. |
| 09:27 | 6 | Q.   The 23890.  And you'll see -- I want you to review that |
| 09:27 | 7 | article for me, please, and tell me where you see FOB |
| 09:27 | 8 | pricing and just point to the line for me, and then we'll go |
| 09:27 | 9 | right there. |
| 09:27 | 10 | A.   It lists the suggested retail price. |
| 09:27 | 11 | Q.   I thought you said that was not FOB pricing? |
| 09:27 | 12 | MR. ZELLER:  Misstates the witness's testimony. |
| 09:27 | 13 | Argumentative. |
| 09:27 | 14 | THE COURT:  I think it's also confusing.  Just |
| 09:28 | 15 | reask the question. |
| 09:28 | 16 | MR. McCONVILLE:  Sure. |
| 09:28 | 17 | BY MR. McCONVILLE: |
| 09:28 | 18 | Q.   So your belief is that FOB pricing is the retail |
| 09:28 | 19 | pricing? |
| 09:28 | 20 | A.   No, I didn't say that. |
| 09:28 | 21 | Q.   Okay.  So when I asked you to point to me in the |
| 09:28 | 22 | article where it shows FOB pricing, just point it out to me, |
| 09:28 | 23 | and we'll both go there right now. |
| 09:28 | 24 | A.   I don't see any -- it just says -- the only pricing |
| 09:28 | 25 | that's listed here is it says, "The dolls will be priced |

| 09:28 | 1 | about ten dollars higher.  Suggested retail is 24.99." |
| 09:28 | 2 | Q.   And that's not FOB pricing, right? |
| 09:28 | 3 | A.   No, it's retail.  Suggested retail. |
| 09:28 | 4 | Q.   And let's go back to the report that was Exhibit 9643. |
| 09:28 | 5 | And it says there FOB -- under Bratz Funk 'N Glow, it says, |
| 09:28 | 6 | "FOB HK 18.99," right? |
| 09:28 | 7 | A.   Yes, it says that. |
| 09:28 | 8 | Q.   That's not information you received from a -- research |
| 09:28 | 9 | on *Reuters*, right? |
| 09:28 | 10 | A.   Again, I don't remember having anything to do with this |
| 09:29 | 11 | e-mail. |
| 09:29 | 12 | Q.   Right.  So what I believe you testified when Mattel's |
| 09:29 | 13 | counsel was asking you was that you recall a guided tour, |
| 09:29 | 14 | right? |
| 09:29 | 15 | A.   Yes. |
| 09:29 | 16 | Q.   You recall that you didn't sign a confidentiality |
| 09:29 | 17 | agreement, right? |
| 09:29 | 18 | A.   Correct. |
| 09:29 | 19 | Q.   You recall that no one told you to keep the information |
| 09:29 | 20 | secret, right? |
| 09:29 | 21 | A.   Correct. |
| 09:29 | 22 | Q.   Now, by you don't recall how you got Matt Turetzky's |
| 09:29 | 23 | address, right? |
| 09:29 | 24 | A.   Correct. |
| 09:29 | 25 | Q.   You don't recall if anyone ever asked you for |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:29 | 1 | credentials to enter the MGA showroom, right? |
| 09:29 | 2 | MR. ZELLER:  This is argument. |
| 09:29 | 3 | THE COURT:  No.  Overruled. |
| 09:29 | 4 | You can answer the question. |
| 09:29 | 5 | THE WITNESS:  I'm sorry.  Can you repeat that? |
| 09:29 | 6 | BY MR. McCONVILLE: |
| 09:29 | 7 | Q.   Sure.  You don't recall whether anyone asked you for |
| 09:29 | 8 | credentials getting into the MGA showroom, right? |
| 09:29 | 9 | A.   No, I don't remember the process. |
| 09:29 | 10 | Q.   And you don't recall who told you to go to an MGA |
| 09:30 | 11 | showroom, right? |
| 09:30 | 12 | A.   I don't believe anyone told me to go to the MGA |
| 09:30 | 13 | showroom. |
| 09:30 | 14 | Q.   You don't remember what information you got from MGA, |
| 09:30 | 15 | right? |
| 09:30 | 16 | A.   Well, I -- I remember a folder, but I didn't look |
| 09:30 | 17 | inside the folder. |
| 09:30 | 18 | Q.   Right.  So you don't remember what information you |
| 09:30 | 19 | received from MGA, right? |
| 09:30 | 20 | A.   No, I don't remember. |
| 09:30 | 21 | Q.   But you do remember that someone told you that you |
| 09:30 | 22 | don't have to keep it secret? |
| 09:30 | 23 | MR. ZELLER:  Misstates the witness's testimony. |
| 09:30 | 24 | THE COURT:  Restate the question, Counsel. |
| 09:30 | 25 | Sustained. |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

58

| | | |
|---|---|---|
| 09:30 | 1 | BY MR. McCONVILLE: |
| 09:30 | 2 | Q.   But you do recall that someone -- that no one advised |
| 09:30 | 3 | you that you had to keep it secret, right? |
| 09:30 | 4 | A.   That would be something I would remember, if someone |
| 09:30 | 5 | asked me to keep it secret. |
| 09:30 | 6 | Q.   But you wouldn't remember using your boss's boss's |
| 09:30 | 7 | boss's address on a business card, right? |
| 09:30 | 8 | A.   All I'm saying is I don't know if I was personally |
| 09:30 | 9 | involved in that process of deciding whose address went on |
| 09:30 | 10 | that card. |
| 09:30 | 11 | Q.   And you don't remember preparing this report, which is |
| 09:31 | 12 | Exhibit 9643, right? |
| 09:31 | 13 | A.   No. |
| 09:31 | 14 | Q.   And you don't remember preparing any other reports |
| 09:31 | 15 | other than the presentation and the -- in the Mattel |
| 09:31 | 16 | theater, right? |
| 09:31 | 17 | A.   Yes.  I only prepared the report -- the presentation. |
| 09:31 | 18 | Q.   And when you testified during your examination |
| 09:31 | 19 | concerning the various exhibits that were listed, you didn't |
| 09:31 | 20 | mean to suggest that those were exhibits that you relied on |
| 09:31 | 21 | at the time in 2002, did you? |
| 09:31 | 22 | MR. ZELLER:  Argumentative. |
| 09:31 | 23 | THE COURT:  Sustained. |
| 09:31 | 24 | BY MR. McCONVILLE: |
| 09:31 | 25 | Q.   Well, let's take a look at Exhibit 20682.  I don't want |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10337   Filed 03/31/11   Page 59 of 153   Page ID #:313579
CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

59

| | | |
|---|---|---|
| 09:31 | 1 | to publish it. |
| 09:31 | 2 | *(Document provided to the witness.)* |
| 09:31 | 3 | MGA'S ASSISTANT:  It's 20628. |
| 09:32 | 4 | THE COURT:  Just a moment 20628 or -82? |
| 09:32 | 5 | MR. McCONVILLE:  I'm sorry.  20628. |
| 09:32 | 6 | THE COURT:  Thank you. |
| 09:32 | 7 | BY MR. McCONVILLE: |
| 09:32 | 8 | Q.   So, for example, you said this was information that was |
| 09:32 | 9 | publicly available at the time this article came out, right? |
| 09:32 | 10 | A.   I don't know if I said that.  I didn't say that. |
| 09:32 | 11 | Q.   Pardon me? |
| 09:32 | 12 | A.   I said -- I'm sorry, can you rephrase the question? |
| 09:32 | 13 | Q.   Sure.  Maybe I just need to get clarification. |
| 09:32 | 14 | Those lists of exhibits that you said you reviewed |
| 09:32 | 15 | prior to testifying today -- |
| 09:32 | 16 | A.   Yes. |
| 09:32 | 17 | Q.   -- you said that was information that was publicly |
| 09:32 | 18 | available, right? |
| 09:32 | 19 | A.   Yes. |
| 09:32 | 20 | Q.   Who did you meet with to prepare for your testimony |
| 09:33 | 21 | today? |
| 09:33 | 22 | A.   Which individuals? |
| 09:33 | 23 | Q.   We'll start there, sure. |
| 09:33 | 24 | A.   I met with my attorneys. |
| 09:33 | 25 | Q.   And who are your attorneys? |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

60

| | | |
|---|---|---|
| 09:33 | 1 | A.   Um, the folks from Quinn Emanuel. |
| 09:33 | 2 | Q.   And how long did you meet with 'em to prepare for your |
| 09:33 | 3 | testimony? |
| 09:33 | 4 | A.   Um, I don't remember, a few hours. |
| 09:33 | 5 | Q.   And over how many days? |
| 09:33 | 6 | A.   I was supposed to testify last Friday, and we -- we've |
| 09:33 | 7 | been here since last Friday.  But not preparing all that |
| 09:33 | 8 | time; just waiting. |
| 09:33 | 9 | Q.   And who showed you the articles that you were gonna be |
| 09:33 | 10 | testifying about today? |
| 09:33 | 11 | A.   Um, Viola did.  I'm sorry, I don't know her last name. |
| 09:33 | 12 | Q.   Okay.  And she's an attorney -- one of Mattel's |
| 09:33 | 13 | attorneys? |
| 09:33 | 14 | A.   Yes. |
| 09:33 | 15 | Q.   And in looking at this exhibit, 20628, I'm trying to |
| 09:33 | 16 | figure out what it is -- you're saying this is information |
| 09:34 | 17 | that was publicly available at the time this was written? |
| 09:34 | 18 | Is that what you're saying? |
| 09:34 | 19 | A.   These are -- these are news articles.  This is from |
| 09:34 | 20 | REC, so, yes, these are the types of articles that would be |
| 09:34 | 21 | publicly available.  It says February 22, 2003. |
| 09:34 | 22 | Q.   February 22nd, 2003.  So this isn't something that you |
| 09:34 | 23 | relied on when you prepared the Exhibit 9643 that talks |
| 09:34 | 24 | about walking the MGA showroom, right? |
| 09:34 | 25 | A.   Again, I don't remember having anything to do with this |

| 09:34 | 1 | e-mail. |
| 09:34 | 2 | Q.  Understood.  The e-mail that's 9643 that describes you |
| 09:34 | 3 | walking the MGA showroom with Tyler Snyder? |
| 09:34 | 4 | A.  Yes. |
| 09:34 | 5 | Q.  And what's the date on that e-mail? |
| 09:35 | 6 | A.  The date on that e-mail is February 21, 2002. |
| 09:35 | 7 | Q.  February 21, 2002, which is consistent with your |
| 09:35 | 8 | recollection about when you went to the New York Toy Fair, |
| 09:35 | 9 | right? |
| 09:35 | 10 | A.  Yes. |
| 09:35 | 11 | Q.  And this article, which is 20628, what did you say the |
| 09:35 | 12 | date on that was? |
| 09:35 | 13 | A.  The date is February 22, 2003. |
| 09:35 | 14 | Q.  So that's not something that you could have relied on |
| 09:35 | 15 | as of 2002? |
| 09:35 | 16 | A.  No. |
| 09:35 | 17 | Q.  Right? |
| 09:35 | 18 | A.  Correct. |
| 09:35 | 19 | Q.  And, in fact, you don't recall ever relying on this |
| 09:35 | 20 | particular article, right? -- which is Exhibit 20628? |
| 09:35 | 21 | A.  I don't remember this specific article, but as a course |
| 09:35 | 22 | of business, these would be the types of articles that I |
| 09:35 | 23 | would look at to understand the context of the industry |
| 09:35 | 24 | coming out of toy fair. |
| 09:35 | 25 | Q.  And this was the article that was shown to you over the |

Case 2:04-cv-09049-DOC-RNB   Document 10337   Filed 03/31/11   Page 62 of 153   Page ID #:313582
CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

62

| 09:35 | 1 | last couple days while you were preparing for your |
| 09:35 | 2 | testimony, right? |
| 09:35 | 3 | A.   Yes. |
| 09:35 | 4 | Q.   And, in fact, if you look at the bottom, this article |
| 09:35 | 5 | actually says, "copyright 2010," right? |
| 09:36 | 6 | A.   Yes. |
| 09:36 | 7 |        MR. McCONVILLE:  No further questions. |
| 09:36 | 8 |        THE COURT:  Recross-examine, Mr. Zeller on behalf |
| 09:36 | 9 | of Mattel. |
| 09:36 | 10 |        **RECROSS-EXAMINATION** |
| 09:36 | 11 | BY MR. ZELLER: |
| 09:36 | 12 | Q.   Just with respect to that last exhibit you were being |
| 09:36 | 13 | asked about, Exhibit 20628, you were asked about a copyright |
| 09:36 | 14 | date of 2010 at the bottom.  What's the actual date of the |
| 09:36 | 15 | article? |
| 09:36 | 16 | A.   The date of the article is February 22, 2003. |
| 09:36 | 17 | Q.   And so you understand, that the 2010 date at the bottom |
| 09:36 | 18 | is simply because that's when it was printed out? |
| 09:37 | 19 | A.   Yes, I think so. |
| 09:37 | 20 | Q.   The date of the article itself was back in February of |
| 09:37 | 21 | 2003, around the time of toy fair? |
| 09:37 | 22 | A.   Yes. |
| 09:37 | 23 | Q.   You were asked questions about why go to New York Toy |
| 09:37 | 24 | Fair.  Is it the case that you've done your job for -- I |
| 09:37 | 25 | think you said about ten and a half years -- for that entire |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

63

| | | |
|---|---|---|
| 09:37 | 1 | time, with the exception of about the February of 2002 time |
| 09:37 | 2 | period, doing your job without going to New York Toy Fair? |
| 09:37 | 3 | A.   Yes. |
| 09:37 | 4 | Q.   And you've been able to find this information online |
| 09:37 | 5 | and otherwise get information about what competitors are |
| 09:37 | 6 | showing in their toy fair showrooms during New York Toy |
| 09:37 | 7 | Fair? |
| 09:37 | 8 | A.   Yes. |
| 09:37 | 9 | MR. McCONVILLE:  Objection.  Foundation. |
| 09:37 | 10 | THE COURT:  Overruled. |
| 09:37 | 11 | MR. ZELLER:  And, Your Honor, I would ask |
| 09:37 | 12 | permission to perhaps ask about one of these articles in |
| 09:38 | 13 | light of the questions that were asked. |
| 09:38 | 14 | THE COURT:  Certainly.  It's only the receipt |
| 09:38 | 15 | until I can read them and see what needs to be -- |
| 09:38 | 16 | MR. ZELLER:  Right. |
| 09:38 | 17 | THE COURT:  -- edited out for hearsay purposes and |
| 09:38 | 18 | what's irrelevant. |
| 09:38 | 19 | BY MR. ZELLER: |
| 09:38 | 20 | Q.   And so, if you can take a look at Exhibit 9882. |
| 09:38 | 21 | *(Document provided to the witness.)* |
| 09:38 | 22 | BY MR. ZELLER: |
| 09:38 | 23 | Q.   Without getting into the details of what this is, can |
| 09:38 | 24 | you just tell us generally what this is? |
| 09:38 | 25 | A.   This is a blog from someone who had walked the MGA |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

64

| | | |
|---|---|---|
| 09:38 | 1 | showroom in 2006. |
| 09:38 | 2 | Q.   And it's called, in fact, "Toy Fair and MGA 2006"? |
| 09:38 | 3 | A.   Yes. |
| 09:38 | 4 | Q.   And it reflects that someone -- |
| 09:38 | 5 | MR. McCONVILLE:  Objection.  Publishing the |
| 09:38 | 6 | hearsay, Your Honor. |
| 09:38 | 7 | THE COURT:  Sustained.  I thought this was a |
| 09:38 | 8 | newspaper article. |
| 09:38 | 9 | Could I see that, please? |
| 09:38 | 10 | THE WITNESS:  Yes. |
| 09:38 | 11 | THE COURT:  Just a moment.  Thank you very much. |
| 09:38 | 12 | Appreciate it. |
| 09:38 | 13 | (Document provided to the Court.) |
| 09:38 | 14 | MR. ZELLER:  This is a blog entry. |
| 09:38 | 15 | MR. McCONVILLE:  Then it lacks foundation.  No |
| 09:38 | 16 | authentication. |
| 09:39 | 17 | THE COURT:  Sustained. |
| 09:39 | 18 | BY MR. ZELLER: |
| 09:39 | 19 | Q.   It's generally -- you understand from seeing articles |
| 09:39 | 20 | and blog entries that it's not unusual for toy companies to |
| 09:39 | 21 | actually invite members of the press or journalists and the |
| 09:39 | 22 | like into their toy fair showrooms in order to report on the |
| 09:39 | 23 | products that they see? |
| 09:39 | 24 | MR. McCONVILLE:  Objection.  No foundation. |
| 09:39 | 25 | THE COURT:  Sustained. |

| 09:39 | 1  | BY MR. ZELLER: |
| 09:39 | 2  | Q.   Let me back up. |
| 09:39 | 3  |        THE COURT:  Not based on this blog, Counsel.  If |
| 09:39 | 4  | she has personal knowledge, you're more than welcome to ask. |
| 09:39 | 5  | BY MR. ZELLER: |
| 09:39 | 6  | Q.   I apologize.  I'm divorcing it entirely from that blog |
| 09:39 | 7  | entry. |
| 09:39 | 8  |      I'm just asking, generally speaking, based on your |
| 09:39 | 9  | knowledge and experience based upon your job, it's the case |
| 09:39 | 10 | that you have seen members of the press write articles or |
| 09:39 | 11 | blog entries in which they talk about actually going into |
| 09:39 | 12 | and being invited into toy company showrooms in order to |
| 09:39 | 13 | report on the unreleased products that they see there? |
| 09:40 | 14 |        MR. McCONVILLE:  Objection.  No foundation with |
| 09:40 | 15 | this witness. |
| 09:40 | 16 |        THE COURT:  Overruled. |
| 09:40 | 17 |        You can answer that question. |
| 09:40 | 18 |        MR. McCONVILLE:  And hearsay. |
| 09:40 | 19 |        THE COURT:  Overruled. |
| 09:40 | 20 |        THE WITNESS:  I'm sorry, can you repeat the |
| 09:40 | 21 | question? |
| 09:40 | 22 | BY MR. ZELLER: |
| 09:40 | 23 | Q.   Sure.  You have from time to time during the course of |
| 09:40 | 24 | your work, come across articles or blog entries written by |
| 09:40 | 25 | members of the press, where they describe being invited |

09:40    1    into --

09:40    2            THE COURT:  I'm sorry.  I thought this pertained

09:40    3    to her experience.  In other words, what she knew.  If it's

09:40    4    based upon these blog entries, that objection's sustained.

09:40    5            So we won't be getting into 9882, which is really

09:40    6    the import of the question.

09:40    7            But you can ask her if she's personally done this

09:40    8    before, if she's seen press there.  You're more than welcome

09:40    9    to.

09:40   10            MR. ZELLER:  Okay.

09:40   11            THE COURT:  But it's based upon her information.

09:40   12    BY MR. ZELLER:

09:40   13    Q.   And so then focusing solely on your own experience in

09:40   14    your job as an analyst there at Mattel, are you surprised

09:40   15    that -- to -- to see instances where a member of the press

09:41   16    or a journalist is actually invited into a toy fair showroom

09:41   17    by the toy company manufacturer?

09:41   18            MR. McCONVILLE:  Objection.  No foundation.

09:41   19            THE COURT:  Overruled.

09:41   20            You can answer that question.

09:41   21            THE WITNESS:  No.  One the big purposes of toy

09:41   22    fair is to generate publicity about your upcoming products,

09:41   23    and so you see a lot of press coming out of toy fair and a

09:41   24    lot of descriptions around products and what those product

09:41   25    features are, what the pricings are, and what's the hot

| | | |
|---|---|---|
| 09:41 | 1 | toys, and who's winning the awards coming out.  So that's |
| 09:41 | 2 | the type of information that is publicly available during |
| 09:41 | 3 | and after toy fair. |
| 09:41 | 4 | BY MR. ZELLER: |
| 09:41 | 5 | Q.   And these -- this publicity that you're talking about |
| 09:41 | 6 | that comes about in February during the time of New York Toy |
| 09:41 | 7 | Fair is about products that are not yet on the market; in |
| 09:41 | 8 | other words, they're gonna be released and actually sold to |
| 09:41 | 9 | consumers later on in the year? |
| 09:41 | 10 | MR. McCONVILLE:  Objection.  No foundation with |
| 09:41 | 11 | this witness. |
| 09:41 | 12 | THE COURT:  Overruled. |
| 09:41 | 13 | You can answer that question. |
| 09:41 | 14 | THE WITNESS:  Correct.  Most of them are |
| 09:41 | 15 | unreleased. |
| 09:42 | 16 | BY MR. ZELLER: |
| 09:42 | 17 | Q.   I apologize.  I didn't mean to cut you off. |
| 09:42 | 18 | A.   I said, "Correct.  Most of them are unreleased." |
| 09:42 | 19 | MR. ZELLER:  Thank you. |
| 09:42 | 20 | THE COURT:  All right.  Ms. Plunkett, we're going |
| 09:42 | 21 | to ask you to remain available until next week.  And just to |
| 09:42 | 22 | be safe, I'm going to say April 8th, which is a Friday.  The |
| 09:42 | 23 | case should conclude or will conclude on Tuesday, April 5th. |
| 09:42 | 24 | THE WITNESS:  Okay. |
| 09:42 | 25 | THE COURT:  Now, if you have any personal plans or |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10337   Filed 03/31/11   Page 68 of 153   Page ID #:313588
CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

68

| | | |
|---|---|---|
| 09:42 | 1 | responsibilities, keep those obligations.  If we need you, |
| 09:42 | 2 | we'll summon you back to court.  I don't think you'll be |
| 09:42 | 3 | returning. |
| 09:42 | 4 | THE WITNESS:  Okay. |
| 09:42 | 5 | THE COURT:  Thank you very much.  You may step |
| 09:42 | 6 | down. |
| 09:42 | 7 | *(Witness steps down subject to recall.)* |
| 09:42 | 8 | THE COURT:  Counsel, your next witness, please. |
| 09:42 | 9 | MR. McCONVILLE:  Andrew Vollero. |
| 09:42 | 10 | THE COURT:  Thank you. |
| 09:43 | 11 | Thank you, Mr. Vollero.  If you would step forward |
| 09:43 | 12 | between the double doors, sir.  And now, would you raise |
| 09:43 | 13 | your right hand, sir. |
| 09:43 | 14 | **ANDREW VOLLERO III, MGA'S WITNESS, SWORN** |
| 09:43 | 15 | THE WITNESS:  I do. |
| 09:43 | 16 | THE COURT:  Thank you, Mr. Vollero.  If you would |
| 09:43 | 17 | walk along the side of the jury rail, please.  If you would |
| 09:43 | 18 | be seated. |
| 09:43 | 19 | Would you state full name for the jury. |
| 09:43 | 20 | THE WITNESS:  Andrew Vollero III. |
| 09:43 | 21 | THE COURT:  Spell your last name, sir. |
| 09:43 | 22 | THE WITNESS:  V-O-L-L-E-R-O. |
| 09:43 | 23 | THE COURT:  Thank you.  This is direct examination |
| 09:43 | 24 | by Mr. McConville on behalf of MGA and Mr. Larian. |
| | 25 | |

| | | |
|---|---|---|
| 09:43 | 1 | **DIRECT EXAMINATION** |
| 09:43 | 2 | BY MR. McCONVILLE: |
| 09:43 | 3 | Q.   Mr. Vollero, where do you work? |
| 09:43 | 4 | A.   I work for Mattel. |
| 09:43 | 5 | Q.   And what's your position at Mattel currently? |
| 09:43 | 6 | A.   I'm currently the senior vice president of ^Corporate |
| 09:44 | 7 | Strategy and Corporate Development. |
| 09:44 | 8 | Q.   And who do you report to? |
| 09:44 | 9 | A.   Right now I report to the CFO of Mattel, Kevin Farr. |
| 09:44 | 10 | Q.   And how long have you been at Mattel? |
| 09:44 | 11 | A.   I've been at Mattel for ten years. |
| 09:44 | 12 | Q.   So you began roughly 2000? |
| 09:44 | 13 | A.   I began in the Fall of 2000. |
| 09:44 | 14 | Q.   And what was your position in the Fall of 2000? |
| 09:44 | 15 | A.   I was the senior vice president of Finance and Strategy |
| 09:44 | 16 | for the Boys and Entertainment division. |
| 09:44 | 17 | Q.   And to whom did you report in 2000 when you started? |
| 09:44 | 18 | A.   I reported to the president of the division, Matt |
| 09:44 | 19 | Bousquette. |
| 09:44 | 20 | Q.   And how long did you report to Mr. Bousquette? |
| 09:44 | 21 | A.   Through the Fall of 2005. |
| 09:45 | 22 | Q.   And during the 2000 to 2005 time frame, did you have |
| 09:45 | 23 | someone reporting to you by the name of Matt Turetzky? |
| 09:45 | 24 | A.   Matt joined my team in the Spring of 2003.  So from the |
| 09:45 | 25 | Spring of 2003 until the Fall of 2005. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

70

| | | |
|---|---|---|
| 09:45 | 1 | Q.   And in that -- what was Mr. Turetzky's position at that |
| 09:45 | 2 | time? |
| 09:45 | 3 | A.   Mr. Turetzky was the vice president of Strategic |
| 09:45 | 4 | Planning. |
| 09:45 | 5 | Q.   And I'm sorry, you said you were a senior vice |
| 09:45 | 6 | president at that time? |
| 09:45 | 7 | A.   That's correct. |
| 09:45 | 8 | Q.   Is that -- I'm trying to get an understanding for |
| 09:45 | 9 | titles at Mattel. |
| 09:45 | 10 | A.   Right. |
| 09:45 | 11 | Q.   So if you're a senior vice president, that's a bigger |
| 09:45 | 12 | title than that just being a regular vice president? |
| 09:46 | 13 | A.   Correct. |
| 09:46 | 14 | Q.   Okay.  And do you recall that in the Spring of 2003 |
| 09:46 | 15 | through 2005, while Mr. Turetzky was reporting to you, that |
| 09:46 | 16 | you were aware of a group at Mattel called the Market |
| 09:46 | 17 | Intelligence group? |
| 09:46 | 18 | A.   Yes, I am. |
| 09:46 | 19 | Q.   And you were aware of Sal Villasenor, correct? |
| 09:46 | 20 | A.   That is correct. |
| 09:46 | 21 | Q.   And who was Sal Villasenor between 2003 and 2005? |
| 09:46 | 22 | A.   When you -- I'm not sure I understand your question. |
| 09:46 | 23 | Q.   Sure.  Has -- how long have you known Sal Villasenor? |
| 09:46 | 24 | A.   Sal was part of the team that I joined when I joined |
| 09:46 | 25 | the Boys/Entertainment group back in 2000. |

09:46   1   Q.    Okay.  So you've been aware of Mr. Villasenor since you
09:46   2   started at Mattel in 2000?
09:46   3   A.    Not when I started, but shortly after I started.
09:46   4   Q.    And between 2000 to the end of 2005, was Mr. Villasenor
09:47   5   in your chain of command?
09:47   6   A.    Yes, he was.
09:47   7   Q.    And in the -- from 2000 to 2005, did you have regular
09:47   8   meetings with Mr. Villasenor?
09:47   9   A.    No, I did not.
09:47  10   Q.    Did you have occasion to talk to Mr. Villasenor over
09:47  11   those five years?
09:47  12   A.    They were definitely times that our paths crossed, but
09:47  13   our paths did not cross very often.
09:47  14   Q.    What was Mr. Villasenor's job?
09:47  15   A.    Generally, his job was to support the marketing team.
09:47  16   And I have a high level understanding of it, because
09:47  17   Mr. Villasenor never really reported to me.  He reported to
09:47  18   people in my organization.
09:47  19         But Mr. Villasenor was to support the marketing team in
09:47  20   two ways.  First, he was in charge of historical data
09:47  21   analysis.  We subscribe to some syndicated data services,
09:47  22   and so Mr. Villasenor was responsible to support the
09:47  23   marketing team with historical data pulls from that
09:48  24   information.
09:48  25         And the second thing that he did was he was in charge

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

72

| | | |
|---|---|---|
| 09:48 | 1 | of keeping an eye out on the retail landscape.  He was |
| 09:48 | 2 | responsible for both trend analysis and competitive |
| 09:48 | 3 | analysis. |
| 09:48 | 4 | Q.   And you're aware that one of the things that |
| 09:48 | 5 | Mr. Villasenor did in carrying out his job for Mattel was to |
| 09:48 | 6 | pose as a fake retailer, right? |
| 09:48 | 7 | A.   No, I'm not. |
| 09:48 | 8 | Q.   You're not aware that Mr. Villasenor used fake |
| 09:48 | 9 | credentials to access competitors' showrooms? |
| 09:48 | 10 | A.   When I had the job, no, I was not. |
| 09:48 | 11 | Q.   But you did become aware of it at some point? |
| 09:48 | 12 | A.   Yes, I did. |
| 09:48 | 13 | Q.   When did you become aware of it? |
| 09:48 | 14 | A.   I became aware of it in 2006.  As I mentioned, I left |
| 09:48 | 15 | the division in 2005.  I had a conversation with the fellow |
| 09:48 | 16 | that replaced Matt Turetzky, a fellow by the name of John |
| 09:48 | 17 | Louie.  John Louie gave me an update on the division, and in |
| 09:48 | 18 | that update, he told me that Sal had used fake credentials |
| 09:49 | 19 | to access competitive showrooms. |
| 09:49 | 20 | Q.   But prior to learning that in 2006, you were unaware |
| 09:49 | 21 | that Mr. Villasenor was using fake credentials to access |
| 09:49 | 22 | competitors' showrooms, right? |
| 09:49 | 23 | A.   That is correct. |
| 09:49 | 24 | Q.   And he -- during this entire time, from 2000 to 2005, |
| 09:49 | 25 | Mr. Villasenor was in your chain of command, right? |

Case 2:04-cv-09049-DOC-RNB   Document 10337   Filed 03/31/11   Page 73 of 153   Page ID #:313593
CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

73

| | | |
|---|---|---|
| 09:49 | 1 | A.    There might have been a time that he wasn't for a brief |
| 09:49 | 2 | time, but, yes, for the majority of that time, he was within |
| 09:49 | 3 | my chain of command, yes. |
| 09:49 | 4 | Q.   And you don't recall having a conversation with Matt |
| 09:49 | 5 | Turetzky where he expressed concern about Mr. Villasenor's |
| 09:49 | 6 | practice? |
| 09:49 | 7 | A.    Mr.-- Mr. Turetzky did express concern about |
| 09:49 | 8 | Mr. Villasenor's practice.  Mr. Turetzky did not go into the |
| 09:49 | 9 | details of that practice.  How we left that conversation was |
| 09:49 | 10 | Mr. Turetzky was gonna work with our legal department to get |
| 09:49 | 11 | their thoughts and go ahead and execute whatever they said. |
| 09:49 | 12 | Q.   So whatever the conversation was that you had with |
| 09:50 | 13 | Mr. Turetzky, he expressed concern as it relates to a legal |
| 09:50 | 14 | matter, right? |
| 09:50 | 15 |            MR. ZELLER:  Mischaracterizes the witness's |
| 09:50 | 16 | testimony. |
| 09:50 | 17 |            THE COURT:  Overruled. |
| 09:50 | 18 |            THE WITNESS:  Not sure I understand the question. |
| 09:50 | 19 | Can you repeat that? |
| 09:50 | 20 | BY MR. McCONVILLE: |
| 09:50 | 21 | Q.   Sure.  I thought you just said that you did have a |
| 09:50 | 22 | conversation with Mr. Turetzky concerning Sal Villasenor, |
| 09:50 | 23 | right? |
| 09:50 | 24 | A.   Yes, that is correct. |
| 09:50 | 25 | Q.   And as part of that conversation with Mr. Turetzky, he |

| | | |
|---|---|---|
| 09:50 | 1 | expressed to you some notion that he needed to consult with |
| 09:50 | 2 | Legal concerning Sal Villasenor's activities, right? |
| 09:50 | 3 | A.   That -- that's correct. |
| 09:50 | 4 | Q.   And how often did Mr. Turetzky have conversations with |
| 09:50 | 5 | you where he said he needed to bring to Legal an issue |
| 09:50 | 6 | related to someone you supervised? |
| 09:50 | 7 | A.   Not particularly often, but I think more the point is |
| 09:50 | 8 | working with a legal team is not something -- we do that a |
| 09:50 | 9 | lot in our group.  So I mean a conversation about "I'm gonna |
| 09:51 | 10 | go get the legal department's point of view on this" is not |
| 09:51 | 11 | something I said, "Okay, that's something I need to be a |
| 09:51 | 12 | part of."  I volunteered my services to Matt to say, "Do you |
| 09:51 | 13 | need me to be involved in this?"  And he said, "No, I can |
| 09:51 | 14 | handle it." |
| 09:51 | 15 | Q.   Understood.  So give me another example of when |
| 09:51 | 16 | Mr. Turetzky came to you to discuss a need to go consult |
| 09:51 | 17 | with legal regarding a particular employee's actions. |
| 09:51 | 18 | A.   I cannot remember one. |
| 09:51 | 19 | Q.   So it's the only time in the -- in your -- when you |
| 09:51 | 20 | were supervising Mr. Turetzky where he expressed that he |
| 09:51 | 21 | needed to go to legal to discuss a matter concerning an |
| 09:51 | 22 | employee, right? |
| 09:51 | 23 | A.   As far as I can remember, yes. |
| 09:51 | 24 | Q.   And how many conversations did you have with |
| 09:51 | 25 | Mr. Turetzky -- well, let me back up. |

| | | |
|---|---|---|
| 09:51 | 1 | How often -- how long were you and Mr. Turetzky -- how |
| 09:51 | 2 | long was Mr. Turetzky reporting to you? |
| 09:51 | 3 | A.   Little over two years. |
| 09:51 | 4 | Q.   So during those two years, how often did you have |
| 09:51 | 5 | conversations with Mr. Turetzky? |
| 09:52 | 6 | A.   Very frequently. |
| 09:52 | 7 | Q.   And during those very frequent conversations, the only |
| 09:52 | 8 | time he mentioned to you the need to go to legal was as it |
| 09:52 | 9 | relates to Sal Villasenor, right? |
| 09:52 | 10 | A.   That's correct. |
| 09:52 | 11 | Q.   And despite that, you did not learn that there was an |
| 09:52 | 12 | issue with regard to Mr. Villasenor using false credentials |
| 09:52 | 13 | in years later, right? |
| 09:52 | 14 | A.   That's correct. |
| 09:52 | 15 | Q.   But, in fact, you did know that Mr. Villasenor was in a |
| 09:52 | 16 | group called "Market Intelligence," right? |
| 09:52 | 17 | A.   I do know that he worked on a -- in a group called |
| 09:52 | 18 | "Market Intelligence."  You know, it represented Sal |
| 09:52 | 19 | Villasenor and Stephanie Page.  That's the size of that |
| 09:52 | 20 | group, so... |
| 09:52 | 21 | Q.   Right.  So he forced -- Mr. Villasenor forced you to |
| 09:52 | 22 | adopt the name "Market Intelligence"? |
| 09:52 | 23 | MR. ZELLER:  Argumentative. |
| 09:52 | 24 | THE WITNESS:  No.  Mr. Villasenor -- |
| 09:52 | 25 | THE COURT:  Answer the question. |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

76

| | | |
|---|---|---|
| 09:52 | 1 | THE WITNESS:  Yeah.  Mr. Villasenor created that |
| 09:52 | 2 | name himself.  That wasn't a name that was created by |
| 09:52 | 3 | somebody for him. |
| 09:52 | 4 | BY MR. McCONVILLE: |
| 09:52 | 5 | Q.   Right.  I understand. |
| 09:53 | 6 | So -- and when Mr. Villasenor created the name for |
| 09:53 | 7 | himself of Market Intelligence, was that before or after |
| 09:53 | 8 | your conversation with Matt Turetzky where he said he had to |
| 09:53 | 9 | go to legal regarding Sal Villasenor? |
| 09:53 | 10 | A.   I -- I don't remember when the conversation was that I |
| 09:53 | 11 | had with Matt Turetzky, nor do I remember when Sal created |
| 09:53 | 12 | the department name of Market Intelligence. |
| 09:53 | 13 | Q.   Now, you say Mr. Villasenor created the department |
| 09:53 | 14 | name.  Did you veto it? |
| 09:53 | 15 | A.   I didn't think about it one way or another. |
| 09:53 | 16 | Q.   But it was something that you were aware of, right? |
| 09:53 | 17 | A.   I'm aware that Sal called his department the Market |
| 09:53 | 18 | Intelligence group.  It didn't mean one thing to me or |
| 09:53 | 19 | another. |
| 09:53 | 20 | Q.   Well, when Mr. Turetzky had this conversation with you |
| 09:53 | 21 | regarding needing to go to Legal to discuss Mr. Villasenor, |
| 09:53 | 22 | did he mention to you that Mr. Villasenor was using false |
| 09:53 | 23 | credentials to access competitors' showrooms? |
| 09:54 | 24 | A.   No, he did not. |
| 09:54 | 25 | Q.   And at that time you understood that one of |

DEBBIE GALE, U.S. COURT REPORTER

09:54   1   Mr. Villasenor's jobs was to gather competitive information

09:54   2   about other toy companies, right?

09:54   3   A.   I knew that he gathered competitive information, yes.

09:54   4   Q.   About other toy companies, right?

09:54   5   A.   Yes.

09:54   6   Q.   And when Mr. Turetzky raised with you this notion that

09:54   7   he had to go to Legal, did you follow up with him about what

09:54   8   happened?

09:54   9   A.   No, I did not.

09:54   10   Q.   So other than agreeing to assist Mr. Turetzky, you did

09:54   11   nothing to follow up on what became of Legal's opinion

09:54   12   regarding Sal Villasenor?

09:54   13   A.   The conversation that Matt and I had was very brief.

09:54   14   He -- there was no reason for me to think that Matt wouldn't

09:54   15   go ahead and execute.  He worked with the legal team pretty

09:54   16   closely on a number of issues.  Seemed like it was pretty

09:55   17   straightforward.

09:55   18   Q.   And after you learned in 2006 about Mr. Villasenor's

09:55   19   use of false credentials to get competitor information, did

09:55   20   you go to Legal and discuss it with them?

09:55   21   A.   No, I did not.

09:55   22   Q.   Did you have a conversation with anybody after you

09:55   23   learned about it to advise them what you knew at the time?

09:55   24   A.   Did I -- did I have a conversation to advise them what

09:55   25   I knew?  No, I did not.  I did speak with our legal team

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

78

| | | |
|---|---|---|
| 09:55 | 1 | after, to close -- to -- they asked me sort of about the |
| 09:55 | 2 | situation.  But I did not go to anybody and say what |
| 09:55 | 3 | happened. |
| 09:55 | 4 | Q.   And after you had this conversation with Mr. Turetzky, |
| 09:55 | 5 | did you go to Matt Bousquette and discuss it with him? |
| 09:55 | 6 | A.   Did not. |
| 09:55 | 7 | Q.   And did Mr. Turetzky express to you during -- let me |
| 09:55 | 8 | back up. |
| 09:55 | 9 | So you only recall one conversation with Mr. Turetzky |
| 09:56 | 10 | concerning Sal Villasenor and going to Legal, right? |
| 09:56 | 11 | A.   That's correct. |
| 09:56 | 12 | Q.   Did he ever come back to you and ask you to provide him |
| 09:56 | 13 | with a cover in case Mr. Bousquette continued to ask for |
| 09:56 | 14 | competitive information? |
| 09:56 | 15 | A.   No, I don't recall that conversation. |
| 09:56 | 16 | Q.   Did you have any conversation with Mr. Turetzky |
| 09:56 | 17 | concerning the requests Mr. Bousquette was making concerning |
| 09:56 | 18 | competitive information regarding retailers? |
| 09:56 | 19 | A.   Not that I recall. |
| 09:56 | 20 | Q.   Do you recall yourself receiving reports from |
| 09:56 | 21 | Mr. Villasenor's department? |
| 09:56 | 22 | A.   The Market Intelligence group periodically put out |
| 09:56 | 23 | reports, and I would have been on the copy list of those. |
| 09:56 | 24 | Q.   Let me ask you this:  Is it common at Mattel for two |
| 09:57 | 25 | employees to get together to create their own department? |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

79

| | | |
|---|---|---|
| 09:57 | 1 | A.   I'm not really sure I understand your question. |
| 09:57 | 2 | Q.   Sure.  I thought your testimony was -- I don't want to |
| 09:57 | 3 | "characterize," so if I get it wrong, you'll let me know.  I |
| 09:57 | 4 | thought your testimony was Sal Villasenor, along with one |
| 09:57 | 5 | other person, named themselves Market Intelligence, and they |
| 09:57 | 6 | just did that, right? |
| 09:57 | 7 | A.   In terms of the name of the department? |
| 09:57 | 8 | Q.   Yeah. |
| 09:57 | 9 | A.   Yeah, I was not involved in the naming of that |
| 09:57 | 10 | department. |
| 09:57 | 11 | Q.   Right.  So I'm asking you, at any other time in your |
| 09:57 | 12 | ten years at Mattel, have two employees gotten together to |
| 09:57 | 13 | name themselves a department? |
| 09:57 | 14 | A.   People change the names of their department all the |
| 09:57 | 15 | time.  I mean, if I think about our accounting group, |
| 09:57 | 16 | sometimes it's capital accounting, sometimes it's a |
| 09:57 | 17 | different set of accounting, sometimes it's fixed cost |
| 09:57 | 18 | accounting.  People change the name of their groups all the |
| 09:57 | 19 | time. |
| 09:57 | 20 | Q.   Right.  I understand. |
| 09:57 | 21 |     I'm asking when two people get together -- has that |
| 09:57 | 22 | ever happened where just two people changed the name -- |
| 09:58 | 23 | named themselves a department? |
| 09:58 | 24 | A.   Again, I -- the flexibility to name the department |
| 09:58 | 25 | typically sits with the people that are in the department. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

80

| | | |
|---|---|---|
| 09:58 | 1 | I have seen many groups change the name of their |
| 09:58 | 2 | departments. |
| 09:58 | 3 | Q.    Okay.  So give me an example from your ten years where |
| 09:58 | 4 | two people got together to do it? |
| 09:58 | 5 | A.    The point I'm not making is around the actual people |
| 09:58 | 6 | themselves, whether it's two or four or six.  Take Matt |
| 09:58 | 7 | Turetzky's group.  They could be strategic planning.  They |
| 09:58 | 8 | could be business development.  They could be a whole series |
| 09:58 | 9 | of different things depending on what they wanted to be. |
| 09:58 | 10 | Matt -- the people within the department drive the name of |
| 09:58 | 11 | the department. |
| 09:58 | 12 | Q.    I thought what you said was they created their own |
| 09:58 | 13 | department. |
| 09:58 | 14 | A.    They created the name of their own department. |
| 09:58 | 15 | Q.    And, um, these examples that you've provided, I'm just |
| 09:58 | 16 | trying to figure out if you can think of one where two |
| 09:58 | 17 | people got together to rename their department? |
| 09:59 | 18 | A.    The -- the thought of renaming the department, I can |
| 09:59 | 19 | give you lots of examples of.  As it relates to specifically |
| 09:59 | 20 | two people -- |
| 09:59 | 21 | Q.    Yes. |
| 09:59 | 22 | A.    -- at one time recommending a name change, I can't |
| 09:59 | 23 | recall any. |
| 09:59 | 24 | Q.    And can you give me an example -- well, let me ask you |
| 09:59 | 25 | this:  We've seen "org" charts here.  And it goes Matt |

| | | |
|---|---|---|
| 09:59 | 1 | Bousquette at the top, and then, um, Andrew Vollero |
| 09:59 | 2 | underneath him, and then Matt Turetzky in this chain of |
| 09:59 | 3 | command we're talking about, and then underneath |
| 09:59 | 4 | Mr. Turetzky is Mr. Villasenor, right? |
| 09:59 | 5 | A.   Sometimes.  I mean, that would be org chart from 2003 |
| 09:59 | 6 | to '5, something like that. |
| 09:59 | 7 | Q.   So in this chain of command, what I'd like you to tell |
| 10:00 | 8 | me is when -- when, in your experience, in your ten years, |
| 10:00 | 9 | has a person four levels removed from the president been |
| 10:00 | 10 | able to rename their department without getting approval |
| 10:00 | 11 | from someone above? |
| 10:00 | 12 | A.   Yeah.  Uh, the -- the particular situation of that, I |
| 10:00 | 13 | can't think of one particular example, but I can tell you in |
| 10:00 | 14 | my particular situation when I took my job -- you asked me |
| 10:00 | 15 | to state my role. |
| 10:00 | 16 | Q.   Right. |
| 10:00 | 17 | A.   I was Corporate Strategy and Corporate Development. |
| 10:00 | 18 | Once upon a time, that was Corporate Strategy in one area, |
| 10:00 | 19 | M&A in another.  I renamed our department to Corporate |
| 10:00 | 20 | Strategy and Corporate Development. |
| 10:00 | 21 | Q.   Right.  And you're a senior vice president, right? |
| 10:00 | 22 | A.   Yes, I am. |
| 10:00 | 23 | Q.   And Sal Villasenor is not, right? |
| 10:00 | 24 | A.   That's correct. |
| 10:00 | 25 | Q.   So why don't we look at Exhibit 9284, please. |

| 10:00 | 1 | (Document provided to the witness.) |
|-------|---|--------------------------------------|

10:01   2        (Document displayed.)

10:01   3        MR. McCONVILLE:  Is that in evidence?  Oh.

10:01   4   BY MR. McCONVILLE:

10:01   5   Q.   And you'll see here that Exhibit 9284 is a memo from

10:01   6   the Market Intelligence Department, right?

10:01   7   A.   That's correct.

10:01   8   Q.   And so as of February 11, 2004, Mr. Villasenor had

10:01   9   successfully renamed himself the Market Intelligence

10:01  10   Department, right?

10:01  11   A.   The group was called the Market Intelligence

10:01  12   Department, yes.

10:01  13   Q.   The group of two, right?

10:01  14   A.   Yes, the group of two.

10:01  15   Q.   And you'll see here that you're a recipient of this,

10:01  16   correct?

10:01  17   A.   Correct.

10:01  18   Q.   And this memo -- let me ask you this:  How often did

10:01  19   you get memos from the Market Intelligence Department?

10:01  20   A.   I would say they were periodic.  I don't think there

10:01  21   was a set time or calendar to them.  If I had to estimate, I

10:02  22   would say maybe one or two a month.  That would be my guess.

10:02  23   Q.   One or two memos from the Market Intelligence

10:02  24   department per month?

10:02  25   A.   That would be my guess.

| | | |
|---|---|---|
| 10:02 | 1 | Q.   And within -- let me ask you this:  Did you ever attend |
| 10:02 | 2 | one of the presentations concerning the toy fair results |
| 10:02 | 3 | that occurred in the Mattel presentation theater? |
| 10:02 | 4 | A.   I missed most of them.  They conflicted with the |
| 10:02 | 5 | financial calendar.  But I definitely saw one or two in and |
| 10:02 | 6 | out. |
| 10:02 | 7 | Q.   And you understood that it was Mr. Villasenor's |
| 10:02 | 8 | responsibility to put those presentations on? |
| 10:02 | 9 | A.   Yes, I did. |
| 10:02 | 10 | Q.   And did you ever ask Mr. Villasenor how it was he |
| 10:02 | 11 | gathered the information that he provided either in those |
| 10:02 | 12 | presentations or in the reports -- |
| 10:02 | 13 | A.   No, I did not. |
| 10:02 | 14 | Q.   -- that he generated? |
| 10:02 | 15 | A.   No, I did not. |
| 10:02 | 16 | Q.   Because you relied on Matt Turetzky to bring to you any |
| 10:02 | 17 | issues that may have arisen concerning Mr. Villasenor's |
| 10:02 | 18 | practices? |
| 10:02 | 19 | A.   Yeah, I would say that's partly accurate.  And then I |
| 10:03 | 20 | generally was not in the day to day of this function.  I |
| 10:03 | 21 | spent most of my time on the finance responsibilities with |
| 10:03 | 22 | this group. |
| 10:03 | 23 | Q.   And you understood that one of the things that the |
| 10:03 | 24 | Market Intelligence Department gathered was pricing |
| 10:03 | 25 | information, right? |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

84

| 10:03 | 1 | A.   I -- I never saw any pricing information from the |
| 10:03 | 2 | Market Intelligence group in terms of those presentations, |
| 10:03 | 3 | so I don't understand that to be true. |
| 10:03 | 4 | Q.   So you're -- one of the jobs I think you were talking |
| 10:03 | 5 | about was that you were -- you were responsible for the |
| 10:03 | 6 | finances for the Mattel brands? |
| 10:03 | 7 | A.   That's correct. |
| 10:03 | 8 | Q.   And one of the things that finances focused on is |
| 10:03 | 9 | whether or not Mattel's turning a profit, right? |
| 10:03 | 10 | A.   Among other things, yes. |
| 10:03 | 11 | Q.   And one of the things that would help Mattel turn a |
| 10:03 | 12 | profit is to know what its competitors are -- how they're |
| 10:04 | 13 | pricing their products, right? |
| 10:04 | 14 |             MR. ZELLER:  Assumes facts. |
| 10:04 | 15 |             THE COURT:  Overruled. |
| 10:04 | 16 |             THE WITNESS:  Yeah, that would not be a big driver |
| 10:04 | 17 | of what the -- what drives the profitability of Mattel. |
| 10:04 | 18 | Mattel's profitability would be driven by what its able to |
| 10:04 | 19 | sell, the gross margins they sell it at, the advertising |
| 10:04 | 20 | that we spend on it, and the overhead underneath the |
| 10:04 | 21 | division.  That would drive the income statement of our |
| 10:04 | 22 | business. |
| 10:04 | 23 | BY MR. McCONVILLE: |
| 10:04 | 24 | Q.   I'm sorry.  So you said sales and what? |
| 10:04 | 25 | A.   Sales, which lead to a gross margin, with advertising |

Case 2:04-cv-09049-DOC-RNB   Document 10337   Filed 03/31/11   Page 85 of 153   Page ID
#:313605
CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

85

| 10:04 | 1 | expenses and overhead expenses as well. |

10:04   1   expenses and overhead expenses as well.

10:04   2   Q.   So -- uh, you know, I'm not a finance guy, but would

10:04   3   you think it would help Mattel to make more sales if it knew

10:04   4   its competitors' prices?

10:04   5   A.   Hard for me to answer that question.  I mean, Mattel,

10:04   6   basically, tries to sell more goods.  We're generating

10:04   7   product to sell more goods, to try to sell them profitably.

10:04   8   That's the drivers of the business.

10:05   9   Q.   Okay.  And so if -- and the people who you're targeting

10:05  10   for these sales are ultimately consumers, right?

10:05  11   A.   Correct.

10:05  12   Q.   Uh, children and their parents, right?

10:05  13   A.   Correct.

10:05  14   Q.   And you know children and their parents are sensitive

10:05  15   to prices, right?

10:05  16   A.   Yes.

10:05  17   Q.   So if you have a competitor's pricing, then you'd be

10:05  18   able to put a Mattel price below a competitor's price in

10:05  19   order to make more sales, right?

10:05  20   A.   No, I don't think that's accurate.  I think ultimately

10:05  21   the children and the parent buy from the retailer.  The

10:05  22   retailer decides what price a product is ultimately gonna be

10:05  23   sold at.  That's what the -- that is what the consumer is

10:05  24   looking at, is the price on the retail shelf.

10:05  25   Q.   And you understand that a retailer sets its price based

| | | |
|---|---|---|
| 10:05 | 1 | in part on how much Mattel sells the product to the |
| 10:05 | 2 | retailer, right? |
| 10:05 | 3 | A.   That is one of the factors that I think a retailer |
| 10:05 | 4 | considers when they decide what the price is. |
| 10:05 | 5 | Q.   And so if Mattel knew prior to the release of, let's |
| 10:06 | 6 | say, an MGA product what MGA was intending to sell that |
| 10:06 | 7 | product to a retailer, Mattel could price competitively, |
| 10:06 | 8 | right? |
| 10:06 | 9 | A.   No, I don't think that's right.  I mean, in general, |
| 10:06 | 10 | I'm not close enough to our pricing process.  Our pricing |
| 10:06 | 11 | process is traditionally driven by our marketing team, so |
| 10:06 | 12 | it's hard for me to comment on sort of our pricing |
| 10:06 | 13 | practices. |
| 10:06 | 14 | Q.   But you understood as the supervisor of Sal Villasenor |
| 10:06 | 15 | that one of the things he was getting was competitor's |
| 10:06 | 16 | pricing prior to the product being sold to a retailer, |
| 10:06 | 17 | right? |
| 10:06 | 18 | A.   I knew that there were price lists, so I am aware that |
| 10:06 | 19 | there were price lists that were distributed.  I didn't |
| 10:06 | 20 | really think much about what they were used for or how they |
| 10:06 | 21 | fit in.  In general, in the financial world, that's not |
| 10:06 | 22 | something that's particularly relevant for us. |
| 10:06 | 23 | Q.   So as a senior vice president at Mattel, you weren't |
| 10:06 | 24 | concerned where Sal Villasenor was getting the price lists? |
| 10:06 | 25 | A.   I wouldn't say that.  I would say I was not thinking |

| | | |
|---|---|---|
| 10:07 | 1 | about price lists in general.  But if you asked me about an |
| 10:07 | 2 | overarching thought for price lists, generally I think price |
| 10:07 | 3 | lists are shared with customers, and generally things shared |
| 10:07 | 4 | with customers tend to find their way to the marketplace. |
| 10:07 | 5 | Q.   Understood.  And one of the ways they find their way to |
| 10:07 | 6 | the marketplace, at least in the Mattel model, is to pose as |
| 10:07 | 7 | someone you are not and get it from a competitor, right? |
| 10:07 | 8 | MR. ZELLER:  Argumentative. |
| 10:07 | 9 | THE COURT:  Sustained. |
| 10:07 | 10 | You can argue that, Counsel, during final |
| 10:07 | 11 | argument, but it's argumentative. |
| 10:07 | 12 | BY MR. McCONVILLE: |
| 10:07 | 13 | Q.   How often did you make requests of Sal Villasenor for |
| 10:07 | 14 | market intelligence? |
| 10:07 | 15 | A.   Very, very rarely. |
| 10:07 | 16 | Q.   Give me a number, if you can. |
| 10:07 | 17 | A.   Don't -- can't really think of a number, but it would |
| 10:07 | 18 | be very infrequent.  I mean the majority of requests that I |
| 10:07 | 19 | got were primarily around financial information.  Are we |
| 10:07 | 20 | gonna hit the plan?  Can I get more money in my budget?  You |
| 10:07 | 21 | know, what does the inventory look like this quarter?  Those |
| 10:08 | 22 | were the vast majority of the questions that I fielded. |
| 10:08 | 23 | Q.   And if -- did you have any understanding as to |
| 10:08 | 24 | Mr. Bousquette's need to receive information from Market |
| 10:08 | 25 | Intelligence? |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

88

| 10:08 | 1  | A.   Matt and I rarely spoke about the function.  Matt may |
| 10:08 | 2  | have had his own requests that he worked with Sal.  Once in |
| 10:08 | 3  | a while, Matt would ask me a question about a product or |
| 10:08 | 4  | something, and I might forward it down to Sal to get his |
| 10:08 | 5  | thoughts, but no, that was not -- again, Mr. Bousquette's |
| 10:08 | 6  | conversations with me were:  Are we going to make plan this |
| 10:08 | 7  | quarter?  How do our margins look?  What can we do to get |
| 10:08 | 8  | what we need to get to in terms of the sales plan?  Those |
| 10:08 | 9  | are the type of questions I fielded from Mr. Bousquette. |
| 10:08 | 10 | Q.   And so if Mr. Bousquette had requests of -- of the |
| 10:08 | 11 | Market Intelligence group, you'd suspect that he'd go |
| 10:08 | 12 | directly to Sal Villasenor to make that request? |
| 10:08 | 13 | A.   Yeah, I don't know that for a fact, so I can't say that |
| 10:08 | 14 | for sure, but he could have done that.  There are occasions |
| 10:08 | 15 | also that he would ask me a question, and I would work it |
| 10:08 | 16 | through the Market Intelligence group. |
| 10:09 | 17 | Q.   And, um, I mean, I understand it sounds like you were |
| 10:09 | 18 | focused primarily on finances, right? |
| 10:09 | 19 | A.   Yes, that was my primary responsibility. |
| 10:09 | 20 | Q.   But Mr. Bousquette was focused more on the entire |
| 10:09 | 21 | brand, right? |
| 10:09 | 22 | A.   Well, he was the president of the division. |
| 10:09 | 23 | Q.   So he was focused beyond just financials, right? |
| 10:09 | 24 | A.   That's correct. |
| 10:09 | 25 | Q.   And so, um, when Mr.-- I know you don't know for sure, |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10337   Filed 03/31/11   Page 89 of 153   Page ID #:313609
CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

89

| | | |
|---|---|---|
| 10:09 | 1 | but you assume that if Mr. Bousquette had a request of Sal |
| 10:09 | 2 | Villasenor, he would just go make that request directly to |
| 10:09 | 3 | Mr. Villasenor? |
| 10:09 | 4 | A.   I can't -- |
| 10:09 | 5 |          MR. ZELLER:  Assumes facts. |
| 10:09 | 6 |          THE COURT:  Overruled. |
| 10:09 | 7 |          THE WITNESS:  I don't know the answer to that.  I |
| 10:09 | 8 | didn't talk to Mr. Bousquette about how he used the Market |
| 10:09 | 9 | Intelligence group. |
| 10:09 | 10 | BY MR. McCONVILLE: |
| 10:09 | 11 | Q.   Well, you knew that Mr. Villasenor and Mr. Bousquette |
| 10:09 | 12 | were friends, right? |
| 10:09 | 13 | A.   Um, that's a hard question.  I'm not sure I know the |
| 10:09 | 14 | answer to that.  They certainly knew each other.  They |
| 10:09 | 15 | worked together for a while.  What their relationship was, |
| 10:09 | 16 | I'm not certain. |
| 10:10 | 17 | Q.   Okay.  And so when Mr. Bousquette made requests for |
| 10:10 | 18 | information that you had to filter down -- I don't want to |
| 10:10 | 19 | put words in your mouth, but it sounds like what you were |
| 10:10 | 20 | saying is sometimes Mr. Bousquette might go directly to |
| 10:10 | 21 | Mr. Villasenor and sometimes he would run his requests |
| 10:10 | 22 | through you, right? |
| 10:10 | 23 | A.   Again, hard for me to say that he went directly to the |
| 10:10 | 24 | Market Intelligence group, but there were times that he |
| 10:10 | 25 | asked me for stuff. |

90

| | | |
|---|---|---|
| 10:10 | 1 | Q.   When he asked things from you, was it more of an *ad hoc* |
| 10:10 | 2 | basis? |
| 10:10 | 3 | A.   Absolutely. |
| 10:10 | 4 | Q.   And how often did those *ad hoc* requests come in? |
| 10:10 | 5 | A.   I would say, again, very, very infrequently.  When Matt |
| 10:10 | 6 | and I communicated, it was primarily on a financial basis, |
| 10:10 | 7 | very much around sort of the plan; are we gonna make the |
| 10:10 | 8 | plan, around the numbers, around the margins, around the |
| 10:10 | 9 | business itself. |
| 10:10 | 10 | Q.   And in the time when Mr. Turetzky was a vice president |
| 10:10 | 11 | reporting to you, did Mr. Bousquette go to Mr. Turetzky to |
| 10:11 | 12 | make requests of Market Intelligence? |
| 10:11 | 13 | A.   I don't know the answer to that. |
| 10:11 | 14 | Q.   Okay.  But you understood that the request for Market |
| 10:11 | 15 | Intelligence on an *ad hoc* basis would be something that |
| 10:11 | 16 | Mr. Bousquette would do either through you or someone else, |
| 10:11 | 17 | potentially? |
| 10:11 | 18 | A.   Yeah.  Very infrequently.  I remember getting a, uh, |
| 10:11 | 19 | request or two. |
| 10:11 | 20 | Q.   All right.  I'd like to put in front of you |
| 10:11 | 21 | Exhibit 36731. |
| 10:11 | 22 | THE COURT:  Would this be a good time for a |
| 10:11 | 23 | recess? |
| 10:11 | 24 | MR. McCONVILLE:  Sure.  All right. |
| 10:11 | 25 | THE COURT:  You're admonished not to discuss this |

| | | |
|---|---|---|
| 10:11 | 1 | matter amongst yourself, nor form or express any opinion |
| 10:11 | 2 | concerning the case.  We'll come and get you. |
| 10:11 | 3 | Sir, if you will be seated promptly at 10:30.  All |
| 10:11 | 4 | right. |
| 10:11 | 5 | *(Witness steps down.)* |
| 10:11 | 6 | *(Jury recesses.)* |
| 10:11 | 7 | THE COURT:  Counsel, then 10:30.  Have a nice |
| 10:11 | 8 | recess. |
| 10:11 | 9 | *(Recess held at 10:11 a.m.)* |
| 10:31 | 10 | *(Proceedings resumed at 10:31 a.m.)* |
| 10:31 | 11 | THE COURT:  We're back in session.  The jury's |
| 10:31 | 12 | present, the alternates and counsel. |
| 10:31 | 13 | Thank you for your courtesy. |
| 10:31 | 14 | Counsel, if you would like to continue with your |
| 10:31 | 15 | direct examination, please. |
| 10:31 | 16 | This is Mr. McConville on behalf of MGA and |
| 10:31 | 17 | Mr. Larian. |
| | 18 | BY MR. McCONVILLE: |
| 10:31 | 19 | Q.   Mr. Vollero, have you been attending the trial at all |
| 10:31 | 20 | since it started? |
| 10:31 | 21 | A.   No, I have not. |
| 10:31 | 22 | Q.   I think one of the things you said before we broke was |
| 10:31 | 23 | that you had received price lists before, but didn't know |
| 10:31 | 24 | where they had come from, something along those lines? |
| 10:32 | 25 | A.   I believe what I said was I have seen price lists that |

| 10:32 | 1 | I've been copied on, but I've never looked at the price |
| 10:32 | 2 | lists, nor have I been aware of any -- you had asked me if I |
| 10:32 | 3 | had seen them with regards to competitive toy reviews, and I |
| 10:32 | 4 | said no, I had not. |
| 10:32 | 5 | Q.   Okay.  Do you recall -- following up on that, do you |
| 10:32 | 6 | recall learning that one of the things that Mr. Villasenor |
| 10:32 | 7 | gathered were price lists from competitors? |
| 10:32 | 8 | A.   I think I already knew that Mr. Villasenor had gathered |
| 10:32 | 9 | price lists, but -- so I'm not sure I understand your |
| 10:32 | 10 | question. |
| 10:32 | 11 | Q.   You answered it. |
| 10:32 | 12 | And were you aware of how it was Mr. Villasenor |
| 10:32 | 13 | collected the price lists concerning competitors? |
| 10:32 | 14 | A.   No.  I never asked him his methodology for gathering |
| 10:32 | 15 | those. |
| 10:32 | 16 | Q.   Okay.  But other than -- putting aside whether you |
| 10:32 | 17 | asked him, did you ever become aware of how he did it? |
| 10:32 | 18 | A.   I became aware, after I left the division, when I had |
| 10:33 | 19 | that conversation with John Louie. |
| 10:33 | 20 | Q.   In 2006? |
| 10:33 | 21 | A.   In 2006. |
| 10:33 | 22 | Q.   Okay.  I want to -- one of the things you said you were |
| 10:33 | 23 | focused on as the -- as -- more of the financial processes |
| 10:33 | 24 | for the Mattel brands, right? |
| 10:33 | 25 | A.   Right.  My core responsibilities were financial and |

| | | |
|---|---|---|
| 10:33 | 1 | strategic. |
| 10:33 | 2 | Q.    And you were focused principally on finding whether or |
| 10:33 | 3 | not Mattel was gonna make a profit and hit a bottom line, |
| 10:33 | 4 | right? |
| 10:33 | 5 | A.    Well, I would say that's a gross categorization; but, |
| 10:33 | 6 | overall, you're in charge for the finances of the division. |
| 10:33 | 7 | Q.    And one of the things you were in charge of is to |
| 10:33 | 8 | figure out whether there was a way for Mattel to save money, |
| 10:33 | 9 | right? |
| 10:33 | 10 | A.    Yeah, I -- that's a pretty broad statement.  Can you be |
| 10:33 | 11 | more specific? |
| 10:33 | 12 | Q.    Sure.  One of the things that drives Mattel's |
| 10:33 | 13 | profitability are costs, right? |
| 10:33 | 14 | A.    That's correct. |
| 10:33 | 15 | Q.    And if you have too many costs, your profits are lower, |
| 10:33 | 16 | right? |
| 10:34 | 17 | A.    If you have costs, that will affect your profits, yes. |
| 10:34 | 18 | Q.    Okay.  So with that gross oversimplification, would |
| 10:34 | 19 | things come to your attention that the Market Intelligence |
| 10:34 | 20 | Department was doing that would help Mattel reduce its |
| 10:34 | 21 | costs? |
| 10:34 | 22 | A.    The Market Intelligence group is a couple of people.  A |
| 10:34 | 23 | couple of people would be a couple hundred thousand dollars |
| 10:34 | 24 | of overhead, give-or-take.  Generally, I focus on 5- to |
| 10:34 | 25 | $10 million business issues, big initiatives that drive the |

| | | |
|---|---|---|
| 10:34 | 1 | division.  Those would be things that I would typically be |
| 10:34 | 2 | focused on from a cost perspective, as how we could take |
| 10:34 | 3 | millions of dollars out of a cost structure, as opposed to |
| 10:34 | 4 | something else -- if that's what your question is. |
| 10:34 | 5 | Q.   Well, I appreciate that.  That wasn't my question. |
| 10:34 | 6 | But one of the things you were focused on was finding |
| 10:34 | 7 | if there was a way to save -- couple million dollars.  You |
| 10:34 | 8 | were focused on bigger -- bigger fish, as we say. |
| 10:35 | 9 | A.   Yeah, at a higher level, right. |
| 10:35 | 10 | Q.   And one of the things that would reduce costs would be |
| 10:35 | 11 | if you had an ability to get a competitor's price list, |
| 10:35 | 12 | right? |
| 10:35 | 13 | A.   I'm not understanding how that would reduce my cost. |
| 10:35 | 14 | Q.   Well, if you had -- if you had your competitor's price |
| 10:35 | 15 | list, then you wouldn't have to do -- spend money on |
| 10:35 | 16 | research, right? |
| 10:35 | 17 | A.   No.  No, absolutely not. |
| 10:35 | 18 | Q.   So one way that you could save money is to take a |
| 10:35 | 19 | shortcut by copying information from a competitor, right? |
| 10:35 | 20 | A.   No.  That -- that's a gross overstatement and not |
| 10:35 | 21 | accurate. |
| 10:35 | 22 | Q.   Okay. |
| 10:35 | 23 | A.   The cost structure of the division -- 50 to 60 percent |
| 10:35 | 24 | of Mattel's cost structure is driven by head count.  If you |
| 10:35 | 25 | were gonna go after the cost structure of the |

Case 2:04-cv-09049-DOC-RNB   Document 10337   Filed 03/31/11   Page 95 of 153   Page ID
#:313615
CV 04-9049 3 – 3/29/2011 – Day 41, Volume 1 of 3

95

| | | |
|---|---|---|
| 10:35 | 1 | organization -- or cost structure of the company, you would |
| 10:35 | 2 | go after the organization. |
| 10:36 | 3 | As it relates to why we do research, we do research to |
| 10:36 | 4 | understand how consumers interact with our toys.  That's why |
| 10:36 | 5 | we do market research.  We do market research to figure out |
| 10:36 | 6 | whether or not Barbie is appealing to a consumer, whether a |
| 10:36 | 7 | commercial is gonna resonate with a consumer, whether |
| 10:36 | 8 | Hot Wheels are gonna sell in Germany, or when we gotta |
| 10:36 | 9 | change the assortment.  There's all sorts of things we're |
| 10:36 | 10 | using for research. |
| 10:36 | 11 | Q.    Understood.  And one of the things you research are |
| 10:36 | 12 | competitor information from their showrooms, right? |
| 10:36 | 13 | A.    No.  We don't go out of our way to go grab competitive |
| 10:36 | 14 | research.  When I think about market research, market |
| 10:36 | 15 | research is about asking a consumer how they interact with a |
| 10:36 | 16 | commercial or how they interact with a toy.  That's -- the |
| 10:36 | 17 | thrust of market research is the consumer reaction to our |
| 10:36 | 18 | product. |
| 10:36 | 19 | Q.    Okay.  Let me ask a better question. |
| 10:36 | 20 | The Market Intelligence Department's job was to use |
| 10:36 | 21 | false credentials to get into competitor's showrooms to |
| 10:36 | 22 | gather information, right? |
| 10:36 | 23 | A.    That is incorrect. |
| 10:36 | 24 | MR. ZELLER:  Argument. |
| | 25 | |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | BY MR. McCONVILLE:                                           |
| 10:37 | 2  | Q.   And part of the reason they did that was to conduct    |
| 10:37 | 3  | research, right?                                             |
| 10:37 | 4  | A.   Uh, the original thought is not correct, so it's hard  |
| 10:37 | 5  | for me to answer that second -- that second piece.          |
| 10:37 | 6  | Q.   You understood that the Market Intelligence Department |
| 10:37 | 7  | conducted research on competitor products, right?           |
| 10:37 | 8  | A.   I understood that the Market Intelligence group, as I  |
| 10:37 | 9  | talked about before, did a couple of things:  They were     |
| 10:37 | 10 | responsible for the historical data in the categories,      |
| 10:37 | 11 | through NPD, to inform the marketing department.            |
| 10:37 | 12 | The second thing that they were responsible to do was       |
| 10:37 | 13 | to keep their eyes open on the retail landscape and the     |
| 10:37 | 14 | competitive landscape.  They were responsible for           |
| 10:37 | 15 | competitive information and for trend research.             |
| 10:37 | 16 | Q.   Okay.  So let's focus on your word "competitive        |
| 10:37 | 17 | information."  You with me?                                  |
| 10:37 | 18 | A.   Yes.                                                    |
| 10:37 | 19 | Q.   Part of what Market Intelligence did was do research on |
| 10:37 | 20 | competitive information, right?                              |
| 10:37 | 21 | A.   That's correct.                                         |
| 10:37 | 22 | Q.   Those are your words, right?                            |
| 10:37 | 23 | A.   The competitive research are things like grabbing press |
| 10:37 | 24 | releases or going onto websites and taking a look at product |
| 10:38 | 25 | categories.  Those are what I understood their              |

| | | |
|---|---|---|
| 10:38 | 1 | responsibilities to be. |
| 10:38 | 2 | Q.   Okay.  So who would know better the role of market |
| 10:38 | 3 | intelligence, Sal Villasenor or you? |
| 10:38 | 4 | A.   Sal Villasenor was far closer to what was going on than |
| 10:38 | 5 | I was. |
| 10:38 | 6 | Q.   Okay.  So let's hypothetically assume that one of the |
| 10:38 | 7 | things the Market Intelligence Department did, as part of |
| 10:38 | 8 | its research, was to sneak into competitor's showrooms to |
| 10:38 | 9 | get competitive information.  You with me? |
| 10:38 | 10 | A.   I understand the supposition, yes. |
| 10:38 | 11 | Q.   Okay.  That's Mattel's research, in part, correct? |
| 10:38 | 12 | A.   That is not Mattel's research, in part. |
| 10:38 | 13 | Q.   Okay.  So was Mr. Villasenor paid a salary? |
| 10:38 | 14 | A.   Mr. Villasenor was paid a salary. |
| 10:38 | 15 | Q.   And Mr. Villasenor had supervisors? |
| 10:38 | 16 | A.   He did have supervisors. |
| 10:38 | 17 | Q.   And Mr. Villasenor reported -- |
| 10:38 | 18 | COURT REPORTER:  Counsel, I can't hear you. |
| 10:38 | 19 | THE COURT:  Where are you going, anyway? |
| 10:38 | 20 | *(Laughter in the courtroom.)* |
| 10:39 | 21 | MR. McCONVILLE:  I like to walk around. |
| 10:39 | 22 | THE COURT:  Get back -- get to that lectern. |
| 11:59 | 23 | BY MR. McCONVILLE: |
| 10:39 | 24 | Q.   Mr. Villasenor had supervisors, right? |
| 10:39 | 25 | A.   Yes, he did. |

| | | |
|---|---|---|
| 10:39 | 1 | Q.   And his supervisors were aware that he used fake |
| 10:39 | 2 | credentials to get into competitor's showrooms as part of |
| 10:39 | 3 | his research, right? |
| 10:39 | 4 | A.   That, I don't know. |
| 10:39 | 5 | Q.   'Cause you didn't know, right? |
| 10:39 | 6 | A.   That's correct. |
| 10:39 | 7 | Q.   Despite having a conversation with Matt Turetzky, where |
| 10:39 | 8 | he said he had legal concerns about what Mr. Villasenor was |
| 10:39 | 9 | doing, right? |
| 10:39 | 10 | A.   Mr. Villasenor -- or Mr. Turetzky told me he had |
| 10:39 | 11 | concerns.  He went to the legal department.  Whether that |
| 10:39 | 12 | constituted legal concerns, I'm not sure. |
| 10:39 | 13 | Q.   Did he go to the legal department to discuss his tie? |
| 10:39 | 14 | A.   I'm not sure what Mr. Turetzky discussed with the legal |
| 10:39 | 15 | department. |
| 10:39 | 16 | Q.   Would it be common for Mr. Turetzky to go to legal |
| 10:39 | 17 | department to get advice on something other than legal |
| 10:39 | 18 | matters? |
| 10:40 | 19 | A.   No, not to my knowledge. |
| 10:40 | 20 | Q.   Okay.  So one of the things that the market research |
| 10:40 | 21 | department did was competitive information gathering, right? |
| 10:40 | 22 | A.   Yes. |
| 10:40 | 23 | Q.   And one of the things that a competitor has are their |
| 10:40 | 24 | own price lists, correct? |
| 10:40 | 25 | A.   Companies have price lists, yes. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

99

| | | |
|---|---|---|
| 10:40 | 1 | Q.   And one of the things that Mr. Villasenor did was |
| 10:40 | 2 | gather price lists from competitors, correct? |
| 10:40 | 3 | A.   Yes. |
| 10:40 | 4 | Q.   And in gathering these price lists from competitors, it |
| 10:40 | 5 | saved Mattel money, right? |
| 10:40 | 6 | A.   That, I'm not tracking with you on. |
| 10:40 | 7 | Q.   Okay.  Let's put in front of you Exhibit 274- -- I'm |
| 10:40 | 8 | sorry -- 2746-R-00129. |
| 10:40 | 9 | (Document provided to the witness.) |
| 10:41 | 10 | MR. McCONVILLE:  2746-R-00129, this is in |
| 10:41 | 11 | evidence. |
| 10:41 | 12 | (Document displayed.) |
| 10:41 | 13 | BY MR. McCONVILLE: |
| 10:41 | 14 | Q.   And you'll see this is an e-mail from Mr. Villasenor to |
| 10:41 | 15 | Mr. Turetzky, attaching a TV games price list. |
| 10:41 | 16 | Do you see that? |
| 10:41 | 17 | A.   This is the first time I've seen these exhibits so |
| 10:41 | 18 | I'm -- where are you here? |
| 10:41 | 19 | Q.   At the bottom, that says, "Attachment" -- it's actually |
| 10:41 | 20 | up on the screen.  It might be easier for you. |
| 10:41 | 21 | A.   Okay. |
| 10:41 | 22 | Q.   It's highlighted.  Do you see that? |
| 10:41 | 23 | A.   I see that there's an attachment. |
| 10:41 | 24 | Q.   Okay.  And the attachment is named "TV Games Price |
| 10:42 | 25 | List," right? |

CV 04-9049 3 – 3/29/2011 – Day 41, Volume 1 of 3

100

| | | |
|---|---|---|
| 10:42 | 1 | A.   Uh, right, in the lower left-hand column, yes -- or -- |
| 10:42 | 2 | yes. |
| 10:42 | 3 | Q.   And this is an e-mail to matthew.turetzky@Mattel.com? |
| 10:42 | 4 | A.   Yes. |
| 10:42 | 5 | Q.   And it's from Sal Villasenor, right? |
| 10:42 | 6 | A.   Yes. |
| 10:42 | 7 | Q.   Now, would Mr. Turetzky, in his position as a vice |
| 10:42 | 8 | president, have an appreciation for the amount of money |
| 10:42 | 9 | Mattel could save by having a competitor's price list? |
| 10:42 | 10 | A.   Not sure. |
| 10:42 | 11 | Q.   Well, why don't we look at Exhibit 27464-R-158, which |
| 10:42 | 12 | is also in evidence. |
| 10:42 | 13 | (Document provided to the witness.) |
| 10:42 | 14 | (Document displayed.) |
| 10:42 | 15 | BY MR. McCONVILLE: |
| 10:42 | 16 | Q.   And you'll see, this is a response to the e-mail we |
| 10:42 | 17 | just looked at from matthew.turetzky@Mattel.com.  He says, |
| 10:43 | 18 | "This is great.  You just saved Mattel close to $1 million." |
| 10:43 | 19 | Do you see that? |
| 10:43 | 20 | A.   I do see that statement. |
| 10:43 | 21 | Q.   So would Mr. Turetzky have an appreciation, as a vice |
| 10:43 | 22 | president at Mattel, as to how Mattel might save money? |
| 10:43 | 23 | A.   Mr. Turetzky certainly would understand our business |
| 10:43 | 24 | system. |
| 10:43 | 25 | Q.   Okay.  So Mr. Turetzky concludes that this price list |

DEBBIE GALE, U.S. COURT REPORTER

| 10:43 | 1 | has saved Mattel a million dollars, right? |
| 10:43 | 2 | A.   I can't glean this from that, because I don't know what |
| 10:43 | 3 | the "TV Games Price List" is.  I don't know what that is. |
| 10:43 | 4 | Q.   Okay.  But the e-mail says, "You just saved Mattel |
| 10:43 | 5 | close to a million dollars," right? |
| 10:43 | 6 | MR. ZELLER:  This is argument. |
| 10:43 | 7 | THE COURT:  Sustained. |
| 10:43 | 8 | BY MR. McCONVILLE: |
| 10:43 | 9 | Q.   And you, yourself -- how many times did you receive |
| 10:43 | 10 | competitor's price lists? |
| 10:43 | 11 | A.   Don't know the answer to that. |
| 10:44 | 12 | Q.   More than five? |
| 10:44 | 13 | A.   Wouldn't have -- wouldn't have a thought on them. |
| 10:44 | 14 | Don't know how many times I would receive them.  It would |
| 10:44 | 15 | certainly be very infrequent. |
| 10:44 | 16 | Q.   I'm sorry.  Very? |
| 10:44 | 17 | A.   Very infrequent. |
| 10:44 | 18 | Q.   Okay.  And you never followed up with anyone to figure |
| 10:44 | 19 | out where those competitor price lists came from? |
| 10:44 | 20 | A.   No, I did not. |
| 10:44 | 21 | Q.   Did Mr. Bousquette -- do you recall having |
| 10:44 | 22 | conversations with Mr. Bousquette where he expressed a |
| 10:44 | 23 | desire to gather competitive information about Bratz? |
| 10:44 | 24 | A.   I don't remember having a conversation with |
| 10:44 | 25 | Mr. Bousquette on that topic. |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

102

| 10:44 | 1 | Q.   Do you recall having a discussion at all with |
| 10:44 | 2 | Mr. Bousquette concerning how Bratz was taking Barbie's |
| 10:44 | 3 | market share? |
| 10:44 | 4 | A.   Certainly.  There were discussions about Bratz and |
| 10:44 | 5 | market share, sure. |
| 10:44 | 6 | Q.   And Mr. Bousquette, in response to Bratz taking market |
| 10:44 | 7 | share, was focused on "How do we compete with Bratz," right? |
| 10:45 | 8 | A.   I think -- I think the -- Mr. Bousquette was certainly |
| 10:45 | 9 | thinking about how we make Barbie more competitive, yes. |
| 10:45 | 10 | Q.   Versus Bratz, right? |
| 10:45 | 11 | A.   Yes, among others. |
| 10:45 | 12 | Q.   And one of the things that would assist Mr. Bousquette |
| 10:45 | 13 | was the research that was gathered by Mr. Villasenor, right? |
| 10:45 | 14 | A.   I -- I don't know that for a fact. |
| 10:45 | 15 | Q.   But you would assume -- what's Mr. Bousquette's title? |
| 10:45 | 16 | A.   He was the president of Mattel Brands. |
| 10:45 | 17 | Q.   And as the president of Mattel Brands, you would assume |
| 10:45 | 18 | that Mr. Bousquette would avail himself of whatever |
| 10:45 | 19 | information he could to assist Mattel in regaining its |
| 10:45 | 20 | market share versus Bratz, right? |
| 10:45 | 21 | MR. ZELLER:  This is argument. |
| 10:45 | 22 | THE COURT:  As far as Mr. Bousquette's concerned, |
| 10:45 | 23 | that's correct, Counsel.  It's sustained. |
| 10:45 | 24 | BY MR. McCONVILLE: |
| 10:45 | 25 | Q.   Based on -- |

| | | |
|---|---|---|
| 10:45 | 1 | THE COURT:  It's somebody else's opinion. |
| 08:44 | 2 | BY MR. McCONVILLE: |
| 10:45 | 3 | Q.   Based on your interactions with Mr. Bousquette, did you |
| 10:45 | 4 | find him to be a detail-oriented man? |
| 10:45 | 5 | A.   There was times that he was detail-oriented, yes. |
| 10:46 | 6 | Q.   In fact, he was successful at Mattel, right? |
| 10:46 | 7 | A.   He was the president of the division. |
| 10:46 | 8 | Q.   Right.  He got promoted to the president of the |
| 10:46 | 9 | division, right? |
| 10:46 | 10 | A.   Yes. |
| 10:46 | 11 | Q.   Based on his work at Mattel, right? |
| 10:46 | 12 | A.   Yes. |
| 10:46 | 13 | Q.   So presumably someone valued his skill set enough to |
| 10:46 | 14 | make him the president of Mattel Brands, right? |
| 10:46 | 15 | A.   That's correct. |
| 10:46 | 16 | Q.   And in that skill set that Mr. Bousquette used, was he |
| 10:46 | 17 | the type of person who would focus on the level of detail on |
| 10:46 | 18 | how Mattel could compete with Bratz to get information from |
| 10:46 | 19 | competitors? |
| 10:46 | 20 | A.   Not sure really how to answer that question 'cause I -- |
| 10:46 | 21 | Matt had his hands in a lot of things, so -- you know, what |
| 10:46 | 22 | Matt knew or what he didn't know, or what Matt read or |
| 10:46 | 23 | didn't read, I don't know. |
| 10:46 | 24 | Q.   Let's look at Exhibit 9284, which we showed you before |
| 10:46 | 25 | the break. |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

104

| | | |
|---|---|---|
| 10:46 | 1 | *(Document provided to the witness.)* |
| 10:46 | 2 | *(Document displayed.)* |
| 10:46 | 3 | BY MR. McCONVILLE: |
| 10:47 | 4 | Q.   And you'll see, at a minimum, that Matt Bousquette was |
| 10:47 | 5 | receiving information from the Market Intelligence |
| 10:47 | 6 | Department, right? |
| 10:47 | 7 | A.   He is on the chain of command, yes. |
| 10:47 | 8 | Q.   And did you ever have discussion with Mr. Bousquette |
| 10:47 | 9 | where he said, "What the heck is the Market Intelligence |
| 10:47 | 10 | Department?" |
| 10:47 | 11 | A.   No, I did not. |
| 10:47 | 12 | Q.   He understood what their function was, right? |
| 10:47 | 13 | A.   I don't know that. |
| 10:47 | 14 | Q.   You don't know that? |
| 10:47 | 15 | A.   I don't know what he thought of the Market Intelligence |
| 10:47 | 16 | group. |
| 10:47 | 17 | Q.   After you learned in 2006 about Mr. Villasenor's use of |
| 10:47 | 18 | false credentials, did you speak to anyone else in senior |
| 10:47 | 19 | management about that practice? |
| 10:47 | 20 | A.   I had moved on at that point.  I had left the operating |
| 10:48 | 21 | division, and I was now in the corporate strategy and |
| 10:48 | 22 | development role, so I was not interacting with the division |
| 10:48 | 23 | personnel at that point. |
| 10:48 | 24 | Q.   So the answer's no? |
| 10:48 | 25 | A.   The answer is, no, I didn't talk to anyone. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 3 – 3/29/2011 – Day 41, Volume 1 of 3

105

| 10:48 | 1 | THE COURT:  All right. |
| 10:48 | 2 | Just a moment, Counsel.  I need to take an |
| 10:48 | 3 | emergency phone call. |
| 10:48 | 4 | You're admonished not to discuss this matter |
| 10:48 | 5 | amongst yourselves, nor form or express any opinion |
| 10:48 | 6 | concerning the case. |
| 10:48 | 7 | *(Pause in the proceedings at 10:48 a.m.)* |
| 11:00 | 8 | *(Proceedings resumed at 11:02 a.m.)* |
| 11:00 | 9 | *(In the presence of the jury.)* |
| 11:02 | 10 | THE COURT:  All right.  The jury's present.  The |
| 11:02 | 11 | alternates are present. |
| 11:02 | 12 | And, Counsel, if you would like to continue, |
| 11:02 | 13 | please, with your examination. |
| 11:02 | 14 | MR. McCONVILLE:  Yes. |
| 11:02 | 15 | BY MR. McCONVILLE: |
| 11:02 | 16 | Q.   Mr. Vollero, I believe I asked you before about the |
| 11:02 | 17 | frequency of *ad hoc* requests to the Market Intelligence |
| 11:02 | 18 | Department.  Do you remember that? |
| 11:02 | 19 | A.   Yes, I do. |
| 11:02 | 20 | Q.   And I believe your testimony was *ad hoc* requests were |
| 11:02 | 21 | pretty infrequent? |
| 11:02 | 22 | A.   Yes, that's correct. |
| 11:02 | 23 | Q.   And so I'd like to put in front of you Exhibit 36731, |
| 11:02 | 24 | and ask you if you can identify this document for me, |
| 11:02 | 25 | please. |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

106

| | | |
|---|---|---|
| 11:02 | 1 | *(Document provided to the witness.)* |
| 11:02 | 2 | THE WITNESS: Yes. It was in my -- it was in my |
| 11:02 | 3 | binder of exhibits to review, yes. |
| 11:02 | 4 | BY MR. McCONVILLE: |
| 11:02 | 5 | Q. And do you recognize this as an e-mail from Matt |
| 11:03 | 6 | Turetzky to you, dated April 15, 2005? |
| 11:03 | 7 | A. Yes, I do. |
| 11:03 | 8 | MR. McCONVILLE: Your Honor, move into evidence |
| 11:03 | 9 | Exhibit 36731. |
| 11:03 | 10 | |
| 11:03 | 11 | *(Exhibit No. 36731 received in evidence.)* |
| 11:03 | 12 | *(Document displayed.)* |
| 11:03 | 13 | BY MR. McCONVILLE: |
| 11:03 | 14 | Q. If you see the subject line on this, it says, "Strat |
| 11:03 | 15 | Planning Project Update." Do you see that? |
| 11:03 | 16 | A. Yes, I do. |
| 11:03 | 17 | Q. And this is Mr. Turetzky reporting to you about how his |
| 11:03 | 18 | strategic plan is coming along? |
| 11:03 | 19 | A. Um, I would probably characterize it a little bit |
| 11:03 | 20 | different. This would be all of the projects that Matt |
| 11:03 | 21 | would be working on in his roles and responsibilities. And |
| 11:03 | 22 | this would represent the work that he's currently doing. |
| 11:03 | 23 | Q. And one of the things that he did as a vice president |
| 11:03 | 24 | was he had Sal Villasenor report to him, right? |
| 11:03 | 25 | A. Yes, that's correct. |

CV 04-9049 3 – 3/29/2011 – Day 41, Volume 1 of 3

107

| 11:03 | 1 | Q. And if we go to the second page of this exhibit, you'll |
|---|---|---|
| 11:04 | 2 | see there's a heading called, "Market Intelligence."  And |
| 11:04 | 3 | you'll see, under No. 6, he says, "lots of *ad hoc* requests." |
| 11:04 | 4 | Do you see that? |
| 11:04 | 5 | A. I do. |
| 11:04 | 6 | Q. Okay. And you understood that if Mr. Turetzky was |
| 11:04 | 7 | receiving requests on an *ad hoc* basis, he would –- or |
| 11:04 | 8 | related to market intelligence, he would know better the |
| 11:04 | 9 | volume of requests being made, correct? |
| 11:04 | 10 | A. Mr. Turetzky would be much closer to the Market |
| 11:04 | 11 | Intelligence group on a day-to-day basis than I would be. |
| 11:04 | 12 | Q. So he would be much better at assessing whether or not |
| 11:04 | 13 | there were lots of *ad hoc* requests coming, right? |
| 11:04 | 14 | A. He would be much closer to that detail than I would be. |
| 11:04 | 15 | Q. Correct? I'm trying to ask you questions that are |
| 11:05 | 16 | gonna require you to say "yes" or "no" or agree with me. |
| 11:05 | 17 | A. Right. |
| 11:05 | 18 | Q. –- so –- |
| 11:05 | 19 | THE COURT: Or he can disagree with you. |
| 11:05 | 20 | BY MR. McCONVILLE: |
| 11:05 | 21 | Q. Or disagree with me. Or say you don't understand. |
| 11:05 | 22 | A. Right. |
| 11:05 | 23 | Q. Lots of options. |
| 11:05 | 24 | A. Right. |
| 11:05 | 25 | Q. So let me try one more time. |

CV 04-9049 3 – 3/29/2011 – Day 41, Volume 1 of 3

108

| 11:05 | 1 | MR. ZELLER:  I'd move to strike the commentary. |
| 11:05 | 2 | THE COURT:  Strike all the commentary. |
| 11:05 | 3 | Reask the question. |
| 11:05 | 4 | Answer the question, sir. |
| 11:05 | 5 | BY MR. McCONVILLE: |
| 11:05 | 6 | Q.   Matt Turetzky would know better than you the volume of |
| 11:05 | 7 | *ad hoc* requests being made to market intelligence, correct? |
| 11:05 | 8 | A.   I don't know what Matt thinks about the volume of |
| 11:05 | 9 | *ad hoc* requests, so it's hard for me to compare what I know |
| 11:05 | 10 | versus what he knows. |
| 11:05 | 11 | My point is, on the *ad hoc* requests, they don't -- |
| 11:05 | 12 | that's a day-to-day thing that I tended to not be involved |
| 11:05 | 13 | with.  So if the answer is -- he's in a better position to |
| 11:05 | 14 | know those requests?  Yes, he is. |
| 11:05 | 15 | Q.   And that was my question. |
| 11:05 | 16 | A.   Okay. |
| 11:05 | 17 | Q.   So, correct? |
| 11:06 | 18 | A.   He -- Matt is in a better position for those requests. |
| 11:06 | 19 | Q.   Mr. Turetzky was in a better position than you to |
| 11:06 | 20 | assess the volume of *ad hoc* requests of the Market |
| 11:06 | 21 | Intelligence Department, correct? |
| 11:06 | 22 | MR. ZELLER:  This is asked and answered. |
| 11:06 | 23 | MS. KELLER:  No.  I haven't got an answer. |
| 11:06 | 24 | THE COURT:  Stop, both of you. |
| 11:06 | 25 | Okay.  Overruled. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

109

| | | |
|---|---|---|
| 11:06 | 1 | Answer the question. |
| 11:06 | 2 | THE WITNESS:  He should be in a better position to |
| 11:06 | 3 | address the *ad hoc* requests, yes. |
| 11:06 | 4 | BY MR. McCONVILLE: |
| 11:06 | 5 | Q.   And he would know better the *ad hoc* requests that he |
| 11:06 | 6 | was receiving from Matt Bousquette, correct? |
| 11:06 | 7 | A.   If he were receiving them, he would know that, yes. |
| 11:06 | 8 | Q.   During the break, did you have an opportunity to speak |
| 11:06 | 9 | with a lawyer for Mattel? |
| 11:06 | 10 | A.   Yes, I did. |
| 11:06 | 11 | Q.   And you had discussed your testimony in this case, |
| 11:07 | 12 | correct? |
| 11:07 | 13 | A.   No, I did not. |
| 11:07 | 14 | Q.   How long did you meet with the lawyers for Mattel prior |
| 11:07 | 15 | to testifying today? |
| 11:07 | 16 | A.   I met with counsel starting last week, and had a couple |
| 11:07 | 17 | of sessions reviewing the documents that you provided. |
| 11:07 | 18 | Q.   So over the course of how many days? |
| 11:07 | 19 | A.   Well, I met with the attorneys on Monday, and received |
| 11:07 | 20 | your binder on Tuesday, and I've been on-call since |
| 11:07 | 21 | Wednesday. |
| 11:07 | 22 | Q.   So for three days you met with the Mattel lawyers; is |
| 11:07 | 23 | that right? |
| 11:07 | 24 | MR. ZELLER:  Misstates the witness's testimony. |
| 11:07 | 25 | THE COURT:  I'm sorry? |

| 11:07 | 1 | MR. ZELLER:  Misstates the witness's testimony. |
| 11:07 | 2 | THE COURT:  Just a moment. |
| 11:07 | 3 | MR. McCONVILLE:  I'll withdraw it. |
| 11:07 | 4 | BY MR. McCONVILLE: |
| 11:07 | 5 | Q.   How many days did you meet with the Mattel lawyers? |
| 11:07 | 6 | A.   I met with them for a couple of hours on Monday.  I met |
| 11:08 | 7 | with them Tuesday night, after receiving your binder of |
| 11:08 | 8 | materials.  And then, after that, I've been waiting in the |
| 11:08 | 9 | wings here for me to be called. |
| 11:08 | 10 | Q.   And during the waiting period, you've had conversations |
| 11:08 | 11 | with Mattel lawyers concerning your testimony, correct? |
| 11:08 | 12 | A.   I would say that I've had infrequent conversations with |
| 11:08 | 13 | the attorneys; but, in general, you're more focused on |
| 11:08 | 14 | getting into Court than you are, sort of, the particular |
| 11:08 | 15 | business issues. |
| 11:08 | 16 | Q.   So, frequently or infrequently, you've met with the |
| 11:08 | 17 | Mattel lawyers over the course of over a week, correct? |
| 11:08 | 18 | A.   Yeah, I -- I think that's overstating it.  I think the |
| 11:08 | 19 | amount of time that I've gone through the material with our |
| 11:08 | 20 | attorneys would be a couple of hours on Wednesday, and would |
| 11:08 | 21 | also be a couple of hours on Tuesday night.  And I would say |
| 11:08 | 22 | the vast majority of the time Wednesday, Thursday and Friday |
| 11:08 | 23 | has just been waiting for myself to be called to the stand |
| 11:09 | 24 | here today.  And I did not spend any time with them over the |
| 11:09 | 25 | weekend. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

111

| | | |
|---|---|---|
| 11:09 | 1 | Q.   And you've been advised how to respond to questions, |
| 11:09 | 2 | correct? |
| 11:09 | 3 | MR. ZELLER:  This is argument.  It's getting into |
| 11:09 | 4 | the substance of communications. |
| 11:09 | 5 | THE COURT:  Yeah.  Sustained. |
| 11:09 | 6 | BY MR. McCONVILLE: |
| 11:09 | 7 | Q.   You've been advised to provide detailed responses to |
| 11:09 | 8 | "yes" or "no" questions, correct? |
| 11:09 | 9 | MR. ZELLER:  Same objections.  Gets into |
| 11:09 | 10 | privilege. |
| 11:09 | 11 | THE COURT:  You can answer that generally, without |
| 11:09 | 12 | the content of the conversation. |
| 11:09 | 13 | THE WITNESS:  I would say "less advised" and more |
| 11:09 | 14 | we've just gone through the material.  I mean, the meetings, |
| 11:09 | 15 | themselves, have been fairly brief.  Your binder of review |
| 11:09 | 16 | was fairly long, and so it's less about being advised and |
| 11:09 | 17 | more about familiarizing yourself with documents from six |
| 11:09 | 18 | and seven and eight years ago. |
| 11:09 | 19 | BY MR. McCONVILLE: |
| 11:09 | 20 | Q.   So none of the lawyers advised you to provide -- |
| 11:10 | 21 | THE COURT:  I'm going to sustain the objection, |
| 11:10 | 22 | Counsel.  We're not going to get into this about lawyers. |
| 11:10 | 23 | MR. McCONVILLE:  Okay. |
| 11:10 | 24 | BY MR. McCONVILLE: |
| 11:10 | 25 | Q.   Okay.  Let me ask you this:  Are you familiar with a |

| | | |
|---|---|---|
| 11:10 | 1 | company called Kohl's? |
| 11:10 | 2 | A.   Yes, I am. |
| 11:10 | 3 | Q.   Kohl's is a retailer, correct? |
| 11:10 | 4 | A.   Very big one. |
| 11:10 | 5 | Q.   Kohl's sells, among other things, toys? |
| 11:10 | 6 | A.   Yes, they do. |
| 11:10 | 7 | Q.   And in 2004/2005 timeframe, you were aware that Mattel |
| 11:10 | 8 | products were being sold at Kohl's? |
| 11:10 | 9 | A.   Yes. |
| 11:10 | 10 | Q.   And you were also aware, in that same time frame, at |
| 11:10 | 11 | least in 2004, that MGA products were being sold at Kohl's, |
| 11:10 | 12 | correct? |
| 11:10 | 13 | A.   Um, I don't know if that -- at the time, I was, but it |
| 11:10 | 14 | makes sense that they were. |
| 11:10 | 15 | Q.   It makes sense because Bratz was taking Barbie's market |
| 11:10 | 16 | share, correct? |
| 11:10 | 17 | A.   Uh, I don't know that to be true at Kohl's. |
| 11:10 | 18 | Q.   You understood that, in general, Bratz was a very |
| 11:10 | 19 | popular product, correct? |
| 11:10 | 20 | A.   It was a popular product, yes. |
| 11:10 | 21 | Q.   And as a popular product, retailers like to carry it, |
| 11:11 | 22 | correct? |
| 11:11 | 23 | MR. ZELLER:  Question's overbroad. |
| 11:11 | 24 | THE COURT:  Overruled. |
| 11:11 | 25 | THE WITNESS:  Again, retailers decide what |

| | | |
|---|---|---|
| 11:11 | 1 | products and what categories of products they're going to |
| 11:11 | 2 | carry.  Kohl's, in particular, is a mass merchant, has a lot |
| 11:11 | 3 | of different merchandise, clothing, et cetera.  Whether they |
| 11:11 | 4 | carried their product in toys, I'm not sure I knew that. |
| 11:11 | 5 | BY MR. McCONVILLE: |
| 11:11 | 6 | Q.   I thought you just said you knew that they sold toys? |
| 11:11 | 7 | A.   Oh, I knew that they sold toys.  I'm not sure that they |
| 11:11 | 8 | sold the MGA product, is my point. |
| 11:11 | 9 | Q.   So you're not aware that Kohl's was selling Bratz |
| 11:11 | 10 | products in the 2004 time frame? |
| 11:11 | 11 | A.   No, I didn't say that.  What I said was, I was not |
| 11:11 | 12 | certain that they were.  They may have been.  I just don't |
| 11:11 | 13 | know. |
| 11:11 | 14 | Q.   And in the 2004/2005 time frame, you understood that |
| 11:11 | 15 | Bratz was taking Barbie market share, correct? |
| 11:11 | 16 | A.   Barbie was gaining -- or Bratz was gaining market share |
| 11:11 | 17 | *vis-a-vis* Barbie, yes, in 2004. |
| 11:12 | 18 | Q.   And you recall that there was an effort within Mattel |
| 11:12 | 19 | to try and thwart -- I'm sorry. |
| 11:12 | 20 | You recall there was an effort at Mattel to try and |
| 11:12 | 21 | restore Barbie's market share, correct? |
| 11:12 | 22 | A.   I would say that there was an effort to try to get the |
| 11:12 | 23 | brand back on solid foundation.  I would say we worked on |
| 11:12 | 24 | the product and did a whole lot of things.  I don't think we |
| 11:12 | 25 | thought about it in terms of market share, as much as we |

| | | |
|---|---|---|
| 11:12 | 1 | thought about the things we needed to do to make the brand |
| 11:12 | 2 | better. |
| 11:12 | 3 | Q.   And in making the brand better you were hoping to sell |
| 11:12 | 4 | more Barbies? |
| 11:12 | 5 | A.   That's correct. |
| 11:12 | 6 | Q.   And in selling more Barbies, you would take -- you |
| 11:12 | 7 | would regain market share, correct? |
| 11:12 | 8 | A.   That's not true. |
| 11:12 | 9 | Q.   Okay. |
| 11:12 | 10 | A.   You could grow a market, right?  So, if you grow a |
| 11:12 | 11 | market, that doesn't necessarily take share. |
| 11:12 | 12 | Q.   Okay.  Bratz was competing with Barbie in the |
| 11:12 | 13 | marketplace, correct? |
| 11:12 | 14 | A.   That is correct. |
| 11:12 | 15 | Q.   And you're aware that Bratz was taking Barbie sales, |
| 11:12 | 16 | correct? |
| 11:12 | 17 | A.   The way that the -- |
| 11:12 | 18 | Q.   If you can't answer the question, just say you can't |
| 11:13 | 19 | answer the question. |
| 11:13 | 20 |         MR. ZELLER:  Your Honor, if he wants to ask a |
| 11:13 | 21 | "yes" or "no" question, he can just pose it that way.  He |
| 11:13 | 22 | didn't for this question. |
| 11:13 | 23 |         THE COURT:  Sustained. |
| 11:13 | 24 | BY MR. McCONVILLE: |
| 11:13 | 25 | Q.   Is it true, yes or no, that Bratz was, in the 2004/2005 |

| | | |
|---|---|---|
| 11:13 | 1 | time frame, taking Barbie's market share?  Yes or no. |
| 11:13 | 2 | A.   Barbie was losing share. |
| 11:13 | 3 | Q.   So I -- |
| 11:13 | 4 | A.   Yes.  Barbie was losing share, yes. |
| 11:13 | 5 | Q.   And you understood that, as part of Mattel's efforts to |
| 11:13 | 6 | restore the brand, that Mattel was targeting the -- |
| 11:13 | 7 | targeting Bratz as a competitor, correct? |
| 11:13 | 8 | MR. ZELLER:  Question is vague as to "targeting." |
| 11:13 | 9 | Question's vague. |
| 11:13 | 10 | THE COURT:  What do you mean by "targeting," |
| 11:14 | 11 | Counsel? |
| 11:14 | 12 | BY MR. McCONVILLE: |
| 11:14 | 13 | Q.   One of the competitors for Barbie in that time frame |
| 11:14 | 14 | was Bratz, correct? |
| 11:14 | 15 | A.   That is correct. |
| 11:14 | 16 | Q.   And one of the things that Mattel was attempting to do |
| 11:14 | 17 | was compete with Bratz in the marketplace, yes? |
| 11:14 | 18 | A.   Yes. |
| 11:14 | 19 | Q.   And in competing with Bratz in the marketplace, one of |
| 11:14 | 20 | the places was at the retailer, Kohl's, correct? |
| 11:14 | 21 | A.   That -- I don't remember if Kohl's was the place, so I |
| 11:14 | 22 | can't answer that.  But, I think, as a general rule, we |
| 11:14 | 23 | competed across a number of retailers, whether it was |
| 11:14 | 24 | Walmart or Target.  It's the Kohl's specific thing that I |
| 11:14 | 25 | can't really comment on. |

| 11:14 | 1 | MR. McCONVILLE:  Okay.  Why don't we take a look |
| 11:14 | 2 | at Exhibit 26612. |
| 11:14 | 3 | *(Document provided to the witness.)* |
| 11:14 | 4 | *(Document displayed.)* |
| 11:14 | 5 | BY MR. McCONVILLE: |
| 11:15 | 6 | Q.   You'll see this is an e-mail, correct? |
| 11:15 | 7 | A.   Correct. |
| 11:15 | 8 | Q.   Dated January 27, 2005, right? |
| 11:15 | 9 | A.   Correct. |
| 11:15 | 10 | Q.   It's from Milt Zablow, correct? |
| 11:15 | 11 | A.   Correct. |
| 11:15 | 12 | Q.   Who was Milt Zablow at that time? |
| 11:15 | 13 | A.   Probably, at that time, Milt was our leader of |
| 11:15 | 14 | alternative channels.  So we tend to think of our mass |
| 11:15 | 15 | accounts in one bucket, and we tend to think of all the |
| 11:15 | 16 | other guys in the other. |
| 11:15 | 17 | Milt, I think, was the leader at that point, the lead |
| 11:15 | 18 | sales guy for our alternate channel business. |
| 11:15 | 19 | Q.   You'll see that CC'd on this e-mail is you, yes? |
| 11:15 | 20 | A.   Yes. |
| 11:15 | 21 | Q.   You'll see also Matt Bousquette, true? |
| 11:15 | 22 | A.   Yes. |
| 11:15 | 23 | Q.   And you'll see that the subject is "Kohl's, Great News, |
| 11:16 | 24 | Barbie." |
| 11:16 | 25 | Did I read that correctly? |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

117

| | | |
|---|---|---|
| 11:16 | 1 | A.   Yes, you did. |
| 11:16 | 2 | Q.   And the e-mail says, "It's final.  Kohl's has agreed to |
| 11:16 | 3 | the following: |
| 11:16 | 4 | "Double Barbie's retail space to 8 feet for a minimum |
| 11:16 | 5 | of 2 years. |
| 11:16 | 6 | "The competitor will NOT BE REPRESENTED in their toy |
| 11:16 | 7 | department for two years" -- and the "not be represented" is |
| 11:16 | 8 | in all caps. |
| 11:16 | 9 | Did I read that correctly? |
| 11:16 | 10 | A.   Yes. |
| 11:16 | 11 | Q.   And you understood that the competitor referenced here |
| 11:16 | 12 | was Bratz, true? |
| 11:16 | 13 | A.   At the time of this e-mail, yes. |
| 11:16 | 14 | Q.   And so you understood Milt Zablow, the head of |
| 11:16 | 15 | alternate channels, was reporting that Bratz would not be |
| 11:17 | 16 | carried for two years at the Kohl's toy department, true? |
| 11:17 | 17 | A.   That's what the e-mail says. |
| 11:17 | 18 | Q.   And it goes on to say at the bottom, "Let's |
| 11:17 | 19 | congratulate Julie Scholvin, for this outstanding |
| 11:17 | 20 | accomplishment." |
| 11:17 | 21 | Did I read that correctly? |
| 11:17 | 22 | A.   Yes. |
| 11:17 | 23 | Q.   And this e-mail is announcing good news for Barbie, |
| 11:17 | 24 | right? |
| 11:17 | 25 | A.   Yes. |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

118

| 11:17 | 1 | Q. In fact, it's announcing great news for Barbie, right? |
|---|---|---|
| 11:17 | 2 | A. Yes. |
| 11:17 | 3 | Q. And you understood that the way that Mattel was able to |
| 11:17 | 4 | get Bratz out of Kohl's for two years was by pressuring |
| 11:17 | 5 | Kohl's, correct? |
| 11:17 | 6 | A. Not correct. |
| 11:17 | 7 | MR. ZELLER: Assumes facts. Argumentative. |
| 11:17 | 8 | THE COURT: Overruled. |
| 11:17 | 9 | BY MR. McCONVILLE: |
| 11:17 | 10 | Q. You understood -- you understood that Mattel pressured |
| 11:17 | 11 | Kohl's to drop Bratz, true? |
| 11:17 | 12 | A. Not true. |
| 11:18 | 13 | Q. In your experience, Barbie has never been frozen out of |
| 11:18 | 14 | a retail for two years, has it? |
| 11:18 | 15 | A. Not to my knowledge. |
| 11:18 | 16 | Q. And in your experience, it is uncommon for a successful |
| 11:18 | 17 | product that's competing with Barbie to be frozen out of a |
| 11:18 | 18 | retailer for two years, true? |
| 11:18 | 19 | A. So -- had no knowledge whether or not Bratz was |
| 11:18 | 20 | successful, so hard for me to comment on that statement. |
| 11:18 | 21 | Q. You didn't know in 2004 and 2005 that Bratz was taking |
| 11:18 | 22 | Barbie's market share; is that your testimony? |
| 11:18 | 23 | A. No. |
| 11:18 | 24 | MR. ZELLER: Argumentative about "testimony." |
| 11:18 | 25 | THE COURT: Overruled. |

CV 04-9049 3 – 3/29/2011 – Day 41, Volume 1 of 3

119

| | | |
|---|---|---|
| 11:18 | 1 | THE WITNESS:  No, we -- |
| 11:18 | 2 | BY MR. McCONVILLE: |
| 11:18 | 3 | Q.   You knew -- |
| 11:18 | 4 | A.   We just talked about -- right?  We just talked about |
| 11:18 | 5 | that I knew that Bratz was gaining market share.  You're |
| 11:18 | 6 | asking me a particular question about Kohl's, and |
| 11:18 | 7 | particularly around pressure at Kohl's. |
| 11:18 | 8 | I mean, Kohl's is an $18 billion retailer.  They have |
| 11:19 | 9 | 1100 stores.  They are three times as big as Mattel. |
| 11:19 | 10 | MR. McCONVILLE:  Your Honor, nonresponsive. |
| 11:19 | 11 | THE COURT:  No, it's responsive. |
| 11:19 | 12 | Your next question. |
| 11:19 | 13 | MR. McCONVILLE:  Okay. |
| 11:19 | 14 | BY MR. McCONVILLE: |
| 11:19 | 15 | Q.   You understood that your -- that Mattel's business |
| 11:19 | 16 | plan -- |
| 11:19 | 17 | THE COURT:  Just a moment. |
| 11:19 | 18 | Ladies and gentlemen, listen to the question and |
| 11:19 | 19 | listen to the answer. |
| 11:19 | 20 | Question.  Answer. |
| 11:19 | 21 | And you'll determine whether it's responsive or |
| 11:19 | 22 | not.  Okay? |
| 11:19 | 23 | All right. |
| 11:19 | 24 | BY MR. McCONVILLE: |
| 11:19 | 25 | Q.   It is true that Mattel pressured Kohl's to drop the |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:19 | 1 | Bratz product, isn't it? |
| 11:19 | 2 | A.   That would not be my understanding.  I did not |
| 11:19 | 3 | participate in the dialogues between the Kohl's sales team |
| 11:19 | 4 | and the Mattel sales team, so I can't say for sure what |
| 11:19 | 5 | happened in those discussions. |
| 11:19 | 6 | But my knowledge would not say that Mattel pressured |
| 11:20 | 7 | Kohl's into dropping the MGA line.  And, in fact, my |
| 11:20 | 8 | experience would say Kohl's is a massive retailer capable of |
| 11:20 | 9 | making its own decisions. |
| 11:20 | 10 | Q.   Are you done? |
| 11:20 | 11 | THE COURT:  Counsel -- strike it.  Argumentative. |
| 11:20 | 12 | Disregard Counsel's comments. |
| 11:20 | 13 | Okay.  Your question now. |
| 11:20 | 14 | BY MR. McCONVILLE: |
| 11:20 | 15 | Q.   You understood that Mattel paid Kohl's a slotting fee, |
| 11:20 | 16 | true? |
| 11:20 | 17 | A.   That is not true. |
| 11:20 | 18 | Q.   You understood that Mattel paid Kohl's to keep Bratz |
| 11:20 | 19 | off the shelf, true? |
| 11:20 | 20 | A.   Not true. |
| 11:20 | 21 | Q.   You understand that engaging in this behavior by Mattel |
| 11:20 | 22 | was anticompetitive, true? |
| 11:20 | 23 | A.   Not true. |
| 11:20 | 24 | Q.   You understood that the competitor referenced here that |
| 11:20 | 25 | will not be represented was Bratz, right? |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

121

| 11:20 | 1 | A.   I believe that to be true. |
| 11:20 | 2 | Q.   And as a result of Mattel's agreement with Kohl's, |
| 11:20 | 3 | Bratz was no longer carried for two years, true? |
| 11:20 | 4 | A.   Repeat the question again? |
| 11:20 | 5 | Q.   You understood that in the 2005 and 2006 time frame, |
| 11:21 | 6 | that Bratz was not carried at Kohl's, true? |
| 11:21 | 7 | MR. ZELLER:  Assumes facts. |
| 11:21 | 8 | THE COURT:  Overruled. |
| 11:21 | 9 | THE WITNESS:  Just in terms of reading the e-mail, |
| 11:21 | 10 | it says that the competitor will not be represented. |
| 11:21 | 11 | BY MR. McCONVILLE: |
| 11:21 | 12 | Q.   This is -- if you can't answer my question, just say |
| 11:21 | 13 | you can't answer it, and I will do my best to rephrase. |
| 11:21 | 14 | Is it true -- |
| 11:21 | 15 | MR. ZELLER:  Your Honor, I'd move to strike the |
| 11:21 | 16 | comment. |
| 11:21 | 17 | THE COURT:  I'll strike the answer and I'll strike |
| 11:21 | 18 | the question. |
| 11:21 | 19 | Reask the question. |
| 11:21 | 20 | MR. McCONVILLE:  Sure. |
| 11:21 | 21 | BY MR. McCONVILLE: |
| 11:21 | 22 | Q.   Yes or no, as a result of Mattel's deal with Kohl's, |
| 11:21 | 23 | Bratz was no longer carried at Kohl's?  Yes or no. |
| 11:21 | 24 | MR. ZELLER:  Assumes facts. |
| 11:21 | 25 | THE COURT:  Overruled. |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

122

| | | |
|---|---|---|
| 11:21 | 1 | THE WITNESS:  Yes. |
| 11:21 | 2 | MR. McCONVILLE:  No further questions. |
| 11:21 | 3 | THE COURT:  Cross-examination by Mr. Zeller on |
| 11:21 | 4 | behalf of Mattel. |
| 11:21 | 5 | **CROSS-EXAMINATION** |
| 11:21 | 6 | BY MR. ZELLER: |
| 11:22 | 7 | Q.   If you could please take a look at that last e-mail |
| 11:22 | 8 | that you were being asked about, which is Exhibit 26612. |
| 11:22 | 9 | *(Document provided to the witness.)* |
| 11:22 | 10 | *(Document displayed.)* |
| 11:22 | 11 | BY MR. ZELLER: |
| 11:22 | 12 | Q.   And this is an e-mail that you received from Milt |
| 11:22 | 13 | Zablow, and it's dated January, 27, 2005? |
| 11:22 | 14 | A.   Yes. |
| 11:22 | 15 | Q.   And so this is actually after the written agreement |
| 11:22 | 16 | between Mattel and Kohl's had been reached? |
| 11:22 | 17 | A.   That -- that's likely true, yes. |
| 11:22 | 18 | Q.   Well, please take a look at Exhibit 24004. |
| 11:22 | 19 | *(Document provided to the witness.)* |
| 11:22 | 20 | BY MR. ZELLER: |
| 11:22 | 21 | Q.   Do you recognize what this is? |
| 11:22 | 22 | A.   This would be a benefit's outline between Mattel and |
| 11:22 | 23 | Kohl's.  They outline the business agreement between the two |
| 11:23 | 24 | parties. |
| 11:23 | 25 | MR. ZELLER:  I'd move Exhibit 24004 into evidence, |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

123

| | | |
|---|---|---|
| 11:23 | 1 | Your Honor. |
| 11:23 | 2 | THE COURT:  Received. |
| 11:23 | 3 | *(Exhibit No. 24004 received in evidence.)* |
| 11:23 | 4 | *(Document displayed.)* |
| 11:23 | 5 | BY MR. ZELLER: |
| 11:23 | 6 | Q.   And if we take a look at the top of the first page, |
| 11:23 | 7 | you'll see it's entitled 2005/2006 Mattel Basic Program, |
| 11:23 | 8 | Kohl's." |
| 11:23 | 9 | So this is, as you understand it, the actual agreement |
| 11:23 | 10 | between Mattel and Kohl's for that time period? |
| 11:23 | 11 | A.   That's correct. |
| 11:23 | 12 | Q.   And if you take a look at the page -- the last page, |
| 11:23 | 13 | which is 24004-7, you'll see there, at the end, it's signed |
| 11:23 | 14 | and dated? |
| 11:23 | 15 | *(Document displayed.)* |
| 11:23 | 16 | THE WITNESS:  Yes. |
| 11:23 | 17 | BY MR. ZELLER: |
| 11:23 | 18 | Q.   And it's dated January 25, 2005? |
| 11:23 | 19 | A.   From Kohl's. |
| 11:23 | 20 | Q.   Right. |
| 11:23 | 21 | A.   Yes. |
| 11:23 | 22 | Q.   Well, yeah.  And then, January 27, 2005 for Mattel? |
| 11:23 | 23 | A.   Correct. |
| 11:23 | 24 | Q.   And so, by the time of this e-mail, there was actually |
| 11:23 | 25 | a written agreement already in place? |

CV 04-9049 3 – 3/29/2011 – Day 41, Volume 1 of 3

124

| | | |
|---|---|---|
| 11:24 | 1 | A.   Yes. |
| 11:24 | 2 | Q.   Let's take a look at the first page of the -- of what's |
| 11:24 | 3 | being described here in the e-mail, when compared to the |
| 11:24 | 4 | actual agreement itself.  And this is page 1 of 24004. |
| 11:24 | 5 | You'll see that there's a Paragraph 3 called "Barbie |
| 11:24 | 6 | Promotional program." |
| 11:24 | 7 |      Do see that? |
| 11:24 | 8 | A.   Yes. |
| 11:24 | 9 | Q.   And is it your understanding that that's what's being |
| 11:24 | 10 | described in this e-mail that Mr. Zablow sent? |
| 11:24 | 11 | A.   That's correct. |
| 11:24 | 12 |      MR. ZELLER:  So, perhaps if we can pull that, um, |
| 11:24 | 13 | side-by-side, Ken.  This is Exhibit 26612, and then compare |
| 11:24 | 14 | it to the first page of 24004, and then Paragraph 3 of the |
| 11:24 | 15 | agreement. |
| 11:24 | 16 |      *(Technician complies.)* |
| 11:24 | 17 | BY MR. ZELLER: |
| 11:24 | 18 | Q.   And then, so, directing your attention, then, to the |
| 11:24 | 19 | e-mail, and let's just compare what's here. |
| 11:25 | 20 |      "Kohl's has agreed to the following," and then the |
| 11:25 | 21 | first line, "Double Barbie's retail space to 8 feet for a |
| 11:25 | 22 | minimum of two years." |
| 11:25 | 23 |      Do you see that? |
| 11:25 | 24 | A.   Yes, I do. |
| 11:25 | 25 | Q.   And then you'll see that, in the agreement itself, it |

125

| | | |
|---|---|---|
| 11:25 | 1 | states "Kohl's can earn 1,250,000 for maintaining a minimum |
| 11:25 | 2 | of 8 feet of Barbie planogram space for entire year 2005 and |
| 11:25 | 3 | 2006." |
| 11:25 | 4 | Do you see that? |
| 11:25 | 5 | A.   Yes. |
| 11:25 | 6 | Q.   So that first line, as you understand it, from the |
| 11:25 | 7 | e-mail is reflected here in Paragraph 3 of the agreement? |
| 11:25 | 8 | A.   Correct. |
| 11:25 | 9 | Q.   Then directing your attention to the third line -- |
| 11:25 | 10 | we'll come back to the competitor one in a moment, but |
| 11:25 | 11 | skipping over to the third line, it says, "Incremental |
| 11:25 | 12 | Barbie tower versus '04." |
| 11:25 | 13 | And then, if you can compare that to Paragraph 3, do |
| 11:25 | 14 | you see a reference to "Kohl's will also agree to an |
| 11:26 | 15 | incremental wing wall or tower in each calendar year 2005 |
| 11:26 | 16 | and 2006"? |
| 11:26 | 17 | A.   Yes. |
| 11:26 | 18 | Q.   And so you recognize that as, then, the part of the |
| 11:26 | 19 | agreement that corresponds to the e-mail? |
| 11:26 | 20 | A.   Correct. |
| 11:26 | 21 | Q.   Then directing your attention to the fourth line of |
| 11:26 | 22 | that e-mail, it says, "minimum 9.5 million Barbie '05 |
| 11:26 | 23 | shipping." |
| 11:26 | 24 | Do you see that? |
| 11:26 | 25 | A.   Um. |

| | | |
|---|---|---|
| 11:26 | 1 | Q.    That's the fourth line down on the e-mail. |
| 11:26 | 2 | A.    Okay, yes.  Yes. |
| 11:26 | 3 | Q.    And then directing your attention to Paragraph 3 of the |
| 11:26 | 4 | agreement, do you see where it says, "Kohl's must maintain a |
| 11:26 | 5 | minimum shipping volume of $9.5 million in Barbie branded |
| 11:26 | 6 | items, domestic and/or import, in calendar year 2005." |
| 11:26 | 7 | Do you see that? |
| 11:26 | 8 | A.    Yes. |
| 11:26 | 9 | Q.    And so that corresponds, then, to that portion of the |
| 11:27 | 10 | e-mail? |
| 11:27 | 11 | A.    Yes, it does. |
| 11:27 | 12 | Q.    And then directing your attention to the part -- the |
| 11:27 | 13 | fifth line down of this e-mail, where it says, "Minimum |
| 11:27 | 14 | 10.5 million Barbie '06 shipping." |
| 11:27 | 15 | Do you see that? |
| 11:27 | 16 | A.    Yes. |
| 11:27 | 17 | Q.    And that's, in fact, in that line I was just reading, |
| 11:27 | 18 | as well, where it says a "minimum volume of 10.5 million in |
| 11:27 | 19 | Barbie branded items in calendar year 2006"? |
| 11:27 | 20 | A.    Yes. |
| 11:27 | 21 | Q.    And so that's also reflected there in the agreement |
| 11:27 | 22 | itself? |
| 11:27 | 23 | A.    Yes. |
| 11:27 | 24 | Q.    And then directing your attention to the "plus," and |
| 11:27 | 25 | then there's another line under the e-mail, where it says, |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

127

| | | |
|---|---|---|
| 11:27 | 1 | "Incremental presence for Little Mommy segment will now be |
| 11:27 | 2 | positioned on the back wall," and then three exclamation |
| 11:27 | 3 | points. |
| 11:27 | 4 | Do you see that? |
| 11:27 | 5 | A.   Yes. |
| 11:27 | 6 | Q.   And that's also reflected in this agreement where you |
| 11:27 | 7 | see -- the bottom, or near the end of Paragraph 3, |
| 11:27 | 8 | "Additionally, Mattel's Little Mommy segment will have |
| 11:28 | 9 | placement at Kohl's and be merchandised on the back wall." |
| 11:28 | 10 | Do you see that? |
| 11:28 | 11 | A.   Yes. |
| 11:28 | 12 | Q.   And so that's also referenced there in this agreement; |
| 11:28 | 13 | is that true? |
| 11:28 | 14 | A.   That's true.  Yes, it is. |
| 11:28 | 15 | Q.   Now, you've reviewed this agreement, this Kohl's |
| 11:28 | 16 | agreement? |
| 11:28 | 17 | A.   Yes. |
| 11:28 | 18 | Q.   Did you see anything in that saying that MGA will not |
| 11:28 | 19 | be represented at Kohl's? |
| 11:28 | 20 | A.   No, there's nothing in here I saw. |
| 11:28 | 21 | Q.   Directing your attention to Exhibit 24005. |
| 11:28 | 22 | *(Document provided to the witness.)* |
| 11:28 | 23 | BY MR. ZELLER: |
| 11:28 | 24 | Q.   Do you recognize what this is? |
| 11:28 | 25 | A.   Yes.  It's -- same type of idea.  It's just the 2006 |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:28 | 1 | version of the sales benefit program. |
| 11:28 | 2 |       MR. ZELLER:  I would move Exhibit 24005 into |
| 11:28 | 3 | evidence. |
| 11:28 | 4 |       THE COURT:  Received. |
| 11:28 | 5 |      (Document displayed.) |
| 11:28 | 6 | BY MR. ZELLER: |
| 11:28 | 7 | Q.  And so you recognize this as a continuation of that |
| 11:28 | 8 | Kohl's Mattel agreement?  In other words, this is the actual |
| 11:29 | 9 | agreement that continued the deal in place between Mattel |
| 11:29 | 10 | and Kohl's for 2006? |
| 11:29 | 11 | A.  Yes.  It's built on the old agreement. |
| 11:29 | 12 | Q.  And, in fact, looking at the first sentence, it |
| 11:29 | 13 | recites, "The 2006 Kohl's Mattel sales benefit program |
| 11:29 | 14 | provides Kohl's with the opportunity to earn significant |
| 11:29 | 15 | benefits based on their performance as follows." |
| 11:29 | 16 |     And, by the way, is it your experience that, in dealing |
| 11:29 | 17 | with toy manufacturers, retailers expect to make their own |
| 11:29 | 18 | money? |
| 11:29 | 19 | A.  Oh, absolutely.  They -- they carry your product |
| 11:29 | 20 | because they want to carry your product.  And they want to |
| 11:29 | 21 | carry your product because they make money carrying your |
| 11:29 | 22 | product. |
| 11:29 | 23 | Q.  And have you ever had experience with -- while there at |
| 11:29 | 24 | Mattel -- with instances where a toy was -- was not selling |
| 11:29 | 25 | well enough such that a manufacturer could meet what |

| | | |
|---|---|---|
| 11:29 | 1 | sometimes is called its "margins"?  Does that happen? |
| 11:30 | 2 | A.   Absolutely. |
| 11:30 | 3 | Q.   And what typically does the retailer do in those |
| 11:30 | 4 | circumstances? |
| 11:30 | 5 | A.   Yeah, I mean, literally, hundreds of examples of where |
| 11:30 | 6 | a toy -- or, frankly, even a brand doesn't make the |
| 11:30 | 7 | financial hurdles of what Walmart needs or Target needs. |
| 11:30 | 8 | And what they do is they'll drop the line.  They certainly |
| 11:30 | 9 | will drop the toys if the toys don't provide the margin. |
| 11:30 | 10 | But on many occasions, they'll just say, "I don't need |
| 11:30 | 11 | this line."  There will be -- maybe there are ten -- take |
| 11:30 | 12 | action figures, which is in toys -- it's a category in toys. |
| 11:30 | 13 | The buyers, all the time, will say, "We have too many |
| 11:30 | 14 | brands.  We need to be able to execute better.  We're going |
| 11:30 | 15 | to go from six brands to three brands.  It's less inventory |
| 11:30 | 16 | for us, and so there's competition among the brands for the |
| 11:30 | 17 | space." |
| 11:30 | 18 | The dropping of the brands or the toys happens all the |
| 11:30 | 19 | time at the retail level. |
| 11:30 | 20 | Q.   When we're talking about "margin," we're really talking |
| 11:30 | 21 | about the amount of money that the retailer makes from |
| 11:30 | 22 | selling the products? |
| 11:31 | 23 | A.   That's correct. |
| 11:31 | 24 | Q.   Now, in your experience do toy manufacturers need to be |
| 11:31 | 25 | concerned about whether its customers -- namely, the |

CV 04-9049 3 – 3/29/2011 – Day 41, Volume 1 of 3

130

| | | |
|---|---|---|
| 11:31 | 1 | retailers -- are making money selling their products? |
| 11:31 | 2 | A.   Yes.  I mean, the -- the, um, retailers are looking to |
| 11:31 | 3 | grow with people that are making the money.  That's their -- |
| 11:31 | 4 | that's their standard formula. |
| 11:31 | 5 | So, certainly the economics of a retailer is something |
| 11:31 | 6 | that you don't have necessarily access to, but they'll let |
| 11:31 | 7 | you know if they're not making enough money with your |
| 11:31 | 8 | product. |
| 11:31 | 9 | Q.   And have you had experience and instances where |
| 11:31 | 10 | competitors appeared indifferent to whether or not a |
| 11:31 | 11 | retailer was making money? |
| 11:31 | 12 | MR. McCONVILLE:  Objection.  Hearsay. |
| 11:31 | 13 | THE COURT:  Overruled. |
| 11:31 | 14 | THE WITNESS:  Not sure I fully understand the |
| 11:31 | 15 | question. |
| 11:31 | 16 | BY MR. ZELLER: |
| 11:31 | 17 | Q.   Well, I want you to assume that a toy manufacturer has |
| 11:31 | 18 | said it's indifferent, doesn't care whether or not a |
| 11:31 | 19 | retailer makes money selling its products. |
| 11:31 | 20 | Would you expect, based on your experience in the toy |
| 11:32 | 21 | industry, that that toy manufacturer would be successful in |
| 11:32 | 22 | selling those products? |
| 11:32 | 23 | A.   Yeah, that would not be a good long-term strategy.  I |
| 11:32 | 24 | mean, ultimately, you know, you're in business.  You partner |
| 11:32 | 25 | with a retailer.  You want to grow their profitability and |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

131

| | | |
|---|---|---|
| 11:32 | 1 | your profitability.  That's how you build a long-term |
| 11:32 | 2 | relationship here. |
| 11:32 | 3 | Q.   And is it your understanding as to -- what's Mattel's |
| 11:32 | 4 | practice?  Does it take into account an attempt to work with |
| 11:32 | 5 | the retailers to make sure that they actually receive the |
| 11:32 | 6 | margins that they're looking for in selling Mattel products? |
| 11:32 | 7 | MR. McCONVILLE:  Objection.  Compound. |
| 11:32 | 8 | THE COURT:  Overruled. |
| 11:32 | 9 | You can answer the question. |
| 11:32 | 10 | THE WITNESS:  Yeah.  Overall, yes.  I mean, |
| 11:32 | 11 | certainly, we don't tell the retailers what they can sell |
| 11:32 | 12 | our products for, so they set their own prices. |
| 11:32 | 13 | But the retailers will certainly let us know how |
| 11:32 | 14 | fast our inventory is turning, what kind of margins they're |
| 11:32 | 15 | getting on our product, and they'll tell us how that stands |
| 11:33 | 16 | against the rest of the people in the space. |
| 11:33 | 17 | Ultimately, you get more space with the retailer |
| 11:33 | 18 | if you're providing a good economic equation.  If you're |
| 11:33 | 19 | not, they're gonna drop your product. |
| 11:33 | 20 | BY MR. ZELLER: |
| 11:33 | 21 | Q.   And you understand part of way that that's done is |
| 11:33 | 22 | through programs of the kind that we're talking about -- or |
| 11:33 | 23 | sometimes they're called "programs," I guess -- with |
| 11:33 | 24 | retailers like Kohl's. |
| 11:33 | 25 | A.   Yeah.  This is a great example of a program where |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

132

| 11:33 | 1 | you're getting incremental space for Barbie, and you're |
| 11:33 | 2 | getting incremental placement for other toys in the line. |
| 11:33 | 3 | This is a classic program that was likely designed by |
| 11:33 | 4 | our sales team when they sat down with the customer and |
| 11:33 | 5 | said, "What are you looking for?"  "Here's what we're |
| 11:33 | 6 | looking for."  And you can make a deal. |
| 11:33 | 7 | Q.   Is it your understanding that toy manufacturers |
| 11:33 | 8 | commonly or frequently enter into these kinds of programs? |
| 11:33 | 9 | I'm just talking, generally, not necessarily the terms here |
| 11:33 | 10 | with Kohl's -- with retailers. |
| 11:33 | 11 | A.   Yeah.  We have -- these sales benefit programs are very |
| 11:33 | 12 | consistent across our major customers.  Mattel has programs |
| 11:33 | 13 | with just about each one of our major customers. |
| 11:34 | 14 | Q.   And what about others in the toy industry?  Is that |
| 11:34 | 15 | common for them, as well? |
| 11:34 | 16 | MR. McCONVILLE:  Objection.  Foundation. |
| 11:34 | 17 | THE COURT:  Overruled. |
| 11:34 | 18 | THE WITNESS:  Yeah.  I -- hard for me to say |
| 11:34 | 19 | whether or not others do.  But I can't imagine we're the |
| 11:34 | 20 | only guys that do this.  I got to think a lot of other |
| 11:34 | 21 | customers have programs with other toy companies. |
| 11:34 | 22 | BY MR. ZELLER: |
| 11:34 | 23 | Q.   Now, you have read these two agreements we've talked |
| 11:34 | 24 | about with Kohl's, 24004 and 24005.  Did you see anything in |
| 11:34 | 25 | there reflecting what is sometimes called a "slotting fee"? |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

133

| 11:34 | 1 | A.   No, I did not. |
| 11:34 | 2 | Q.   Directing your attention to Exhibit 24005. |
| 11:34 | 3 | *(Document displayed.)* |
| 11:34 | 4 | BY MR. ZELLER: |
| 11:34 | 5 | Q.   This is the 2006 agreement.  And we won't spend a lot |
| 11:34 | 6 | of time with it, but if we can just go to Paragraph 3 on the |
| 11:34 | 7 | second page. |
| 11:34 | 8 | *(Document displayed.)* |
| 11:34 | 9 | BY MR. ZELLER: |
| 11:34 | 10 | Q.   And this is -- again, is the provision dealing with the |
| 11:34 | 11 | Barbie promotional program? |
| 11:35 | 12 | A.   Yes. |
| 11:35 | 13 | Q.   And it has the terms that we talked about previously: |
| 11:35 | 14 | A minimum of 8 feet, minimum shipping volume of |
| 11:35 | 15 | 10.5 million, providing an incremental wing wall or tower, |
| 11:35 | 16 | and then the placement of Mattel's Little Mommy on the back |
| 11:35 | 17 | wall? |
| 11:35 | 18 | A.   Correct. |
| 11:35 | 19 | Q.   Did you see anywhere in this agreement any reference to |
| 11:35 | 20 | MGA? |
| 11:35 | 21 | A.   No, I do not. |
| 11:35 | 22 | Q.   Directing your attention to Exhibit 9284. |
| 11:35 | 23 | *(Document provided to the witness.)* |
| 11:35 | 24 | BY MR. ZELLER: |
| 11:35 | 25 | Q.   This was the memo from Mr. Villasenor and Stephanie |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

134

| 11:35 | 1 | Page that Counsel asked you about a couple of times? |
| 11:35 | 2 | *(Document displayed.)* |
| 11:35 | 3 | THE WITNESS:  Yes. |
| 11:35 | 4 | BY MR. ZELLER: |
| 11:35 | 5 | Q.   If we can put that side by side with Exhibit 20621 in |
| 11:35 | 6 | evidence. |
| 11:35 | 7 | *(Technician complies.)* |
| 11:36 | 8 | MR. ZELLER:  If we can go to the second page, |
| 11:36 | 9 | Ken -- the second page of Exhibit 9284. |
| 11:36 | 10 | *(Technician complies.)* |
| 11:36 | 11 | BY MR. ZELLER: |
| 11:36 | 12 | Q.   And, generally speaking, you see, from comparing these |
| 11:36 | 13 | two documents, that what Mr. Villasenor reproduced here in |
| 11:36 | 14 | this memo to you and others was an MGA press release? |
| 11:36 | 15 | MR. McCONVILLE:  Objection.  No foundation. |
| 11:36 | 16 | THE COURT:  Just a moment. |
| 11:36 | 17 | Overruled. |
| 11:36 | 18 | BY MR. ZELLER: |
| 11:36 | 19 | Q.   Do you see that, Mr. Vollero? |
| 11:36 | 20 | A.   Yes, I do. |
| 11:36 | 21 | Q.   Now, is it your understanding that information that a |
| 11:36 | 22 | toy company, such as MGA, releases to the press or announces |
| 11:37 | 23 | to the world through a press release is a trade secret? |
| 11:37 | 24 | A.   No.  That's not a trade secret under my understanding |
| 11:37 | 25 | of trade secrets. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

135

| | | |
|---|---|---|
| 11:37 | 1 | MR. ZELLER:  Nothing further, Your Honor. |
| 11:37 | 2 | Thank you. |
| 11:37 | 3 | THE COURT:  Redirect by Mr. McConville on behalf |
| 11:37 | 4 | of MGA and Mr. Larian. |
| 11:37 | 5 | **REDIRECT EXAMINATION** |
| 11:37 | 6 | BY MR. McCONVILLE: |
| 11:37 | 7 | Q.   But you ultimately learned that one of the techniques |
| 11:37 | 8 | that Sal Villasenor utilized to gather his information for |
| 11:37 | 9 | his reports was by sneaking into competitor's showrooms and |
| 11:37 | 10 | posing as someone he was not, true? |
| 11:37 | 11 | A.   I learned that Sal had used fake business cards to go |
| 11:37 | 12 | into competitive showrooms to gather information, so, yes, I |
| 11:38 | 13 | did understand that. |
| 11:38 | 14 | That was subsequent to this document.  This document's |
| 11:38 | 15 | published in 2004.  I learned about that in 2006. |
| 11:38 | 16 | Q.   You were asked questions concerning Exhibit 24004; do |
| 11:38 | 17 | you remember that? |
| 11:38 | 18 | A.   I don't remember the exhibit number. |
| 11:38 | 19 | Q.   It was the agreement between -- |
| 11:38 | 20 | A.   The Kohl's basic sales program? |
| 11:38 | 21 | Q.   Correct. |
| 11:38 | 22 | A.   Yes. |
| 11:38 | 23 | Q.   This agreement was reached after -- well, how long was |
| 11:38 | 24 | the negotiation between Kohl's and Mattel before this |
| 11:38 | 25 | agreement was reached? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 3 – 3/29/2011 – Day 41, Volume 1 of 3

136

| 11:38 | 1 | A.   I don't know the answer to that.  I did not participate |
| 11:38 | 2 | in the negotiation between Kohl's and Mattel. |
| 11:38 | 3 | Q.   So you don't know what was going on with regard to the |
| 11:38 | 4 | terms negotiated between Kohl's and Mattel, true? |
| 11:39 | 5 | A.   In terms of the interface with that customer and going |
| 11:39 | 6 | through the iterations of the terms, no, I do not. |
| 11:39 | 7 | Q.   Did you go through any of iteration of the terms with |
| 11:39 | 8 | this customer? |
| 11:39 | 9 | A.   I don't remember my particular role in this deal.  But, |
| 11:39 | 10 | in general, how agreements work with customers are that the |
| 11:39 | 11 | sales team interfaces with the customer.  The marketing team |
| 11:39 | 12 | helps develop the program.  And the financial guys, at the |
| 11:39 | 13 | end, decide whether or not it's a good deal and whether |
| 11:39 | 14 | there's money in the budget. |
| 11:39 | 15 | So I don't remember my particular role on this, but it |
| 11:39 | 16 | is possible that, at the end of this deal, I looked at it |
| 11:39 | 17 | and said, "Okay.  This is a good deal for Mattel, and |
| 11:39 | 18 | there's money to cover it in the budget." |
| 11:39 | 19 | Q.   Yes or no, you do not recall participating in this |
| 11:39 | 20 | negotiation with Kohl's? |
| 11:39 | 21 | A.   I do not recall. |
| 11:39 | 22 | Q.   So you do not know -- let me start over. |
| 11:39 | 23 | It is true that you do not know the terms which Mattel |
| 11:40 | 24 | offered to Kohl's during the negotiation, true? |
| 11:40 | 25 | A.   That's a difficult question to answer.  Can you please |

| 11:40 | 1 | rephrase it? |
| 11:40 | 2 | Q.   Tell me any term that you know that was provided to |
| 11:40 | 3 | Kohl's prior to this agreement being executed.  Any term. |
| 11:40 | 4 | A.   Right.  Okay.  So you can glean the terms from this |
| 11:40 | 5 | particular e-mail, or from this sales policy. |
| 11:40 | 6 | So you're saying before this sales policy that I had to |
| 11:40 | 7 | chance to review -- before I saw this, you're asking me what |
| 11:40 | 8 | I knew about the particular deal? |
| 11:40 | 9 | Q.   Yes. |
| 11:40 | 10 | A.   I don't remember what I knew about that deal. |
| 11:40 | 11 | Q.   So it's possible you knew nothing about it, true? |
| 11:40 | 12 | A.   It is possible that I did know nothing about the |
| 11:40 | 13 | particular program. |
| 11:40 | 14 | Q.   So why don't we take a look at Exhibit 36613. |
| 11:40 | 15 | *(Document provided to the witness.)* |
| 11:41 | 16 | THE COURT:  That would be August 20th, 2004; is |
| 11:41 | 17 | that correct? |
| 11:41 | 18 | MR. McCONVILLE:  Yes. |
| 11:41 | 19 | THE COURT:  All right. |
| 11:41 | 20 | BY MR. McCONVILLE: |
| 11:41 | 21 | Q.   You recognize this as a Mattel document concerning |
| 11:41 | 22 | Kohl's? |
| 11:41 | 23 | A.   That's what it says in the e-mail. |
| 11:41 | 24 | MR. McCONVILLE:  Your Honor, move Exhibit 36613 |
| 11:41 | 25 | into evidence. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:41 | 1 | THE COURT:  Received. |
| 11:41 | 2 | *(Exhibit No. 36613 received in evidence.)* |
| 11:41 | 3 | *(Document displayed.)* |
| 11:41 | 4 | BY MR. McCONVILLE: |
| 11:41 | 5 | Q.   You'll see that the title of this document is "Spring |
| 11:41 | 6 | 2005 Line Review Meeting Recap." |
| 11:41 | 7 | Do you see that? |
| 11:41 | 8 | A.   I do. |
| 11:41 | 9 | Q.   And you'll see that it's dated August 18 to August 19, |
| 11:41 | 10 | 2004, correct? |
| 11:41 | 11 | A.   Correct. |
| 11:41 | 12 | Q.   And the focus of this memo was discussing -- was |
| 11:41 | 13 | relating, in part, to striking an agreement with -- between |
| 11:41 | 14 | Kohl's and Mattel, true? |
| 11:41 | 15 | A.   Yes. |
| 11:41 | 16 | Q.   And you'll look, on page 2 -- |
| 11:42 | 17 | *(Document displayed.)* |
| 11:42 | 18 | BY MR. McCONVILLE: |
| 11:42 | 19 | Q.   -- it says -- midway down, there's a paragraph that |
| 11:42 | 20 | begins "Kohl's." |
| 11:42 | 21 | It says, "Kohl's is very interested in having their |
| 11:42 | 22 | current space analyzed prior to toy fair in November.  They |
| 11:42 | 23 | agreed to review the total number of toy vendors.  Currently |
| 11:42 | 24 | they have over 70 toy vendors." |
| 11:42 | 25 | Did I read that correctly? |

Case 2:04-cv-09049-DOC-RNB   Document 10337   Filed 03/31/11   Page 139 of 153   Page ID #:313659
CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

139

| | | |
|---|---|---|
| 11:42 | 1 | A.   Yes. |
| 11:42 | 2 | Q.   And you understood in the 2004 time frame that Bratz |
| 11:42 | 3 | was one of the vendors whose products were being sold at |
| 11:42 | 4 | Kohl's, true? |
| 11:42 | 5 | MR. ZELLER:  Assumes facts. |
| 11:42 | 6 | THE COURT:  Overruled. |
| 11:42 | 7 | THE WITNESS:  Right.  So the -- I -- what I said |
| 11:42 | 8 | was I was aware that Bratz was taking market share overall. |
| 11:42 | 9 | As it relates to Kohl's, I was not particularly |
| 11:42 | 10 | certain of who had space at Kohl's or not. |
| 11:42 | 11 | BY MR. McCONVILLE: |
| 11:42 | 12 | Q.   But you can tell by reading the memo that one of the |
| 11:43 | 13 | things that was being discussed by Mattel with Kohl's was a |
| 11:43 | 14 | review of the total number of toy vendors, true? |
| 11:43 | 15 | A.   So, from what -- I became aware of this -- |
| 11:43 | 16 | Q.   I -- I'm sorry. |
| 11:43 | 17 | A.   -- this e-mail in the binder that you provided to me, I |
| 11:43 | 18 | am not, that I can see, on the CC list of this. |
| 11:43 | 19 | So, no, I'm not aware of this meeting.  I didn't sit in |
| 11:43 | 20 | this meeting.  And, uh, I don't have particular knowledge of |
| 11:43 | 21 | the statement that you are bringing out on page 2, other |
| 11:43 | 22 | than I saw this in the binder that you provided last week. |
| 11:43 | 23 | Q.   Similarly, you can provide no information about the |
| 11:43 | 24 | agreement that ultimately resulted, right? |
| 11:43 | 25 | A.   I don't remember my particular role with regards to |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

140

| | | |
|---|---|---|
| 11:43 | 1 | that agreement. |
| 11:43 | 2 | Q.   So whatever knowledge you're relying on to provide |
| 11:44 | 3 | testimony about the agreement, I'd like you to rely -- that |
| 11:44 | 4 | same knowledge -- and provide testimony concerning the |
| 11:44 | 5 | following statement, if you can. |
| 11:44 | 6 |       Kohl's is -- |
| 11:44 | 7 |            MR. ZELLER:  Ask that the comment be stricken. |
| 11:44 | 8 |            THE COURT:  Well, "if you can" will be stricken. |
| 11:44 | 9 | The rest of the question's appropriate. |
| 11:44 | 10 | BY MR. McCONVILLE: |
| 11:44 | 11 | Q.   "Kohl's is very interested in having their current |
| 11:44 | 12 | space analyzed prior to toy fair in November.  They agreed |
| 11:44 | 13 | to review the total number of toy vendors.  Currently they |
| 11:44 | 14 | have over 70 toy vendors." |
| 11:44 | 15 |       Did I read that correctly? |
| 11:44 | 16 | A.   Yes, you did. |
| 11:44 | 17 | Q.   Now, it's safe to assume that one of the terms that |
| 11:44 | 18 | Mattel was negotiating with Kohl's was the total number of |
| 11:44 | 19 | vendors being represented at Kohl's, true? |
| 11:44 | 20 | A.   False. |
| 11:44 | 21 |            MR. ZELLER:  That assumes facts. |
| 11:44 | 22 |            THE COURT:  Overruled. |
| 11:44 | 23 |            THE WITNESS:  Not to my knowledge. |
| 11:44 | 24 | BY MR. McCONVILLE: |
| 11:44 | 25 | Q.   And, in fact -- and in fact, what we know, if we look |

CV 04-9049 3 – 3/29/2011 – Day 41, Volume 1 of 3

141

| | | |
|---|---|---|
| 11:45 | 1 | at Exhibit 26612, which is the e-mail we've been looking at, |
| 11:45 | 2 | is that the term that was successfully negotiated was that |
| 11:45 | 3 | "The competitor will not be represented in their toy |
| 11:45 | 4 | department for two years," true? |
| 11:45 | 5 | A.   No.  You don't know that. |
| 11:45 | 6 | Q.   Stop me if I've misread the e-mail.  Well, let me start |
| 11:45 | 7 | over. |
| 11:45 | 8 | You agree with me that the competitor that's referenced |
| 11:45 | 9 | in Exhibit 26612 was Bratz, true? |
| 11:45 | 10 | A.   Yes. |
| 11:45 | 11 | Q.   And "The competitor will not be represented in their |
| 11:45 | 12 | toy department for two years." |
| 11:45 | 13 | Did I read that correctly? |
| 11:45 | 14 | A.   That's what it says in the e-mail. |
| 11:45 | 15 | Q.   And part of that negotiation that you've seen between |
| 11:45 | 16 | Kohl's and Mattel related to the total number of vendors |
| 11:46 | 17 | that Kohl's would carry, true? |
| 11:46 | 18 | A.   Mattel would be focused on its product.  Where it could |
| 11:46 | 19 | place its product and "incremental placement of Little |
| 11:46 | 20 | Mommy," et cetera. |
| 11:46 | 21 | How many toy vendors Kohl's carries, that would not be |
| 11:46 | 22 | something that Mattel would be able to say or have a point |
| 11:46 | 23 | of view on.  Kohl's is a big retailer.  They make their |
| 11:46 | 24 | decisions themselves. |
| 11:46 | 25 | Q.   Whatever the terms are, it was something that was |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

142

| | | |
|---|---|---|
| 11:46 | 1 | discussed with Kohl's -- the total number of vendors, true? |
| 11:46 | 2 | A.   I have no knowledge of that. |
| 11:46 | 3 | Q.   But that's what the Spring 2005 Line Recap meeting |
| 11:46 | 4 | discusses, right? |
| 11:46 | 5 | A.   That's what it says in that particular memo. |
| 11:46 | 6 | Q.   And the ultimate result of the negotiation between |
| 11:46 | 7 | Mattel and Kohl's was that MGA and Bratz were frozen out of |
| 11:46 | 8 | Kohl's, true? |
| 11:46 | 9 | MR. ZELLER:  That assumes facts. |
| 11:46 | 10 | THE COURT:  Overruled. |
| 11:47 | 11 | THE WITNESS:  I don't know that to be true, no. |
| 11:47 | 12 | BY MR. McCONVILLE: |
| 11:47 | 13 | Q.   Do you believe that Milt Zablow is overstating when he |
| 11:47 | 14 | says, "The competitor will not be represented in their toy |
| 11:47 | 15 | department for two years"? |
| 11:47 | 16 | A.   I have no reason not to take that at face value. |
| 11:47 | 17 | Q.   And let's look at some of the terms that are in |
| 11:47 | 18 | Exhibit 24004, which is the agreement between Kohl's and |
| 11:47 | 19 | Mattel. |
| 11:47 | 20 | MR. McCONVILLE:  And I'd like to go to bullet |
| 11:47 | 21 | point 3. |
| 11:47 | 22 | *(Document displayed.)* |
| 11:47 | 23 | BY MR. McCONVILLE: |
| 11:47 | 24 | Q.   And I believe you said that this agreement is a great |
| 11:47 | 25 | example of a program with a retailer, and that it was likely |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:47 | 1 | designed by Mattel's sales team, true? |
| 11:47 | 2 | A.   Yes. |
| 11:47 | 3 | Q.   And one of the terms that is agreed to here is that, |
| 11:47 | 4 | "Kohl's can earn $1,250,000 for maintaining a minimum of |
| 11:48 | 5 | 8 feet of Barbie planogram space." |
| 11:48 | 6 | Did I read that correctly? |
| 11:48 | 7 | A.   Yes, you did. |
| 11:48 | 8 | Q.   And the $1,250,000 was money paid by Mattel so that |
| 11:48 | 9 | Kohl's would carry Barbie, true? |
| 11:48 | 10 | A.   I would say it looks like $1.25 million is being paid |
| 11:48 | 11 | for maintaining a minimum of 8 feet of Barbie planogram. |
| 11:48 | 12 | Q.   And that's a term that's reflected on the face of this |
| 11:48 | 13 | agreement, right? |
| 11:48 | 14 | A.   That's correct. |
| 11:48 | 15 | Q.   And, in addition, you were asked questions about |
| 11:48 | 16 | whether or not you looked through here and saw that MGA |
| 11:48 | 17 | would be excluded from Kohl's -- I'm sorry -- in agreement |
| 11:49 | 18 | 24004 -- and your testimony, I believe, was, no, there's no |
| 11:49 | 19 | reference in here to excluding MGA from Kohl's.  True? |
| 11:49 | 20 | MR. ZELLER:  The question's compound.  Vague. |
| 11:49 | 21 | THE COURT:  Overruled. |
| 11:49 | 22 | THE WITNESS:  I didn't see any exclusion of MGA in |
| 11:49 | 23 | this particular agreement. |
| 11:49 | 24 | BY MR. McCONVILLE: |
| 11:49 | 25 | Q.   So that's not in the face of the agreement, right? |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

144

| | | |
|---|---|---|
| 11:49 | 1 | A.    It's not in the agreement. |
| 11:49 | 2 | Q.    But the e-mail memorializing the great news for Barbie |
| 11:49 | 3 | announces that "The competitor will not be represented in |
| 11:49 | 4 | their toy department for two years," true? |
| 11:49 | 5 | A.    That's what it says. |
| 11:49 | 6 | Q.    And you understood that, if you put an exclusionary |
| 11:49 | 7 | provision like this in an agreement, that it would be |
| 11:49 | 8 | illegal, right? |
| 11:49 | 9 | MR. ZELLER:  Assumes facts.  Argumentative. |
| 11:49 | 10 | THE COURT:  Overruled. |
| 11:49 | 11 | You can answer that question. |
| 11:49 | 12 | THE WITNESS:  The basics of the agreement, itself, |
| 11:49 | 13 | I -- I didn't participate in. |
| 11:50 | 14 | If you're asking me whether or not I participated |
| 11:50 | 15 | in something where we negotiated a deal to exclude MGA, the |
| 11:50 | 16 | answer is no. |
| 11:50 | 17 | BY MR. McCONVILLE: |
| 11:50 | 18 | Q.    And, if that term, the exclusion term, were put in the |
| 11:50 | 19 | actual agreement, you understood that that would be illegal, |
| 11:50 | 20 | true? |
| 11:50 | 21 | A.    I didn't think about it one way or another.  I didn't |
| 11:50 | 22 | put together the agreement, didn't put together the legal |
| 11:50 | 23 | side of it.  I don't know what was contemplated when the |
| 11:50 | 24 | agreement was put together. |
| 11:50 | 25 | MR. McCONVILLE:  No further questions. |

| | | |
|---|---|---|
| 11:50 | 1 | THE COURT:  Recross by Mr. Zeller on behalf of |
| 11:50 | 2 | Mattel. |
| 11:50 | 3 | **RECROSS-EXAMINATION** |
| 11:50 | 4 | BY MR. ZELLER: |
| 11:50 | 5 | Q.   It's the case that you don't know whether or not the |
| 11:50 | 6 | reason why the competitor, MGA, was not being represented at |
| 11:51 | 7 | Kohl's at a particular time period was because of MGA's own |
| 11:51 | 8 | relationship with Kohl's, right? |
| 11:51 | 9 | MR. McCONVILLE:  Objection.  No foundation. |
| 11:51 | 10 | THE COURT:  Overruled. |
| 11:51 | 11 | THE WITNESS:  I have no insights into MGA's |
| 11:51 | 12 | relationship with Kohl's. |
| 11:51 | 13 | BY MR. ZELLER: |
| 11:51 | 14 | Q.   And that's not something that you're familiar with at |
| 11:51 | 15 | all? |
| 11:51 | 16 | A.   No, I am not. |
| 11:51 | 17 | Q.   So whether or not MGA was being represented at Kohl's, |
| 11:51 | 18 | was MGA's -- result of MGA's own actions, is something you |
| 11:51 | 19 | don't know one way or another? |
| 11:51 | 20 | A.   Correct. |
| 11:51 | 21 | Q.   But you do know it's not in the agreements that we've |
| 11:51 | 22 | looked at between Mattel and Kohl's? |
| 11:51 | 23 | A.   No, it's not. |
| 11:51 | 24 | Q.   And we didn't see any language being pointed to by |
| 11:51 | 25 | MGA's counsel suggesting that those agreements excluded MGA? |

Case 2:04-cv-09049-DOC-RNB   Document 10337   Filed 03/31/11   Page 146 of 153   Page ID #:313666
CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

146

| | | |
|---|---|---|
| 11:52 | 1 | A.    That's correct. |
| 11:52 | 2 | Q.    You were asked some questions about the money that was |
| 11:52 | 3 | paid, I think, or the figure was $1,250,000 for the 8 feet. |
| 11:52 | 4 | And if you could please describe your understanding of |
| 11:52 | 5 | that -- of that charge or that payment.  What exactly is -- |
| 11:52 | 6 | is being contemplated by that provision? |
| 11:52 | 7 | MR. McCONVILLE:  Objection.  Lacks foundation. |
| 11:52 | 8 | THE COURT:  Overruled. |
| 11:52 | 9 | THE WITNESS:  Right.  So -- |
| 11:52 | 10 | THE COURT:  (To the jury:) now I'm letting him |
| 11:52 | 11 | testify in his general business sense.  I don't know whether |
| 11:52 | 12 | he's involved in the agreement or not.  I'll let you judge |
| 11:52 | 13 | that, as the jury.  But he certainly has a business sense, |
| 11:52 | 14 | and he's involved in the financial areas. |
| 11:52 | 15 | So you can testify to what your understanding is. |
| 11:52 | 16 | THE WITNESS:  Right. |
| 11:52 | 17 | So, to the point about profitability for a |
| 11:52 | 18 | customer, customers have promotional plans.  That's what |
| 11:52 | 19 | this agreement is.  It offers certain moneys that a customer |
| 11:53 | 20 | can earn over and above the product's sale themselves. |
| 11:53 | 21 | We are giving this customer a chance to earn up to |
| 11:53 | 22 | $1.25 million if they meet a series of thresholds.  One of |
| 11:53 | 23 | those thresholds is they must maintain 8 feet of Barbie |
| 11:53 | 24 | space.  And if they're able to do that -- and then |
| 11:53 | 25 | correspondingly, they not only need to keep the space, but |

| 11:53 | 1 | they need to be able to produce, they need to be able to |
| 11:53 | 2 | generate orders of nine and a half and ten and a half |
| 11:53 | 3 | million dollars. |
| 11:53 | 4 | If they're able to do that, they will then earn |
| 11:53 | 5 | the benefits that qualify for that particular program. |
| 11:53 | 6 | BY MR. ZELLER: |
| 11:53 | 7 | Q.   This is working essentially as a minimum guarantee? |
| 11:53 | 8 | A.   Yeah.  I would say, yes.  This is something that -- |
| 11:53 | 9 | right.  If they're able to perform and meet these |
| 11:53 | 10 | performance criteria, the moneys will be paid out.  If |
| 11:53 | 11 | they're not able to meet the performance criteria, they will |
| 11:54 | 12 | not earn the moneys, and they will not get a million 250. |
| 11:54 | 13 | Q.   And as we're talking about, the agreement provided for |
| 11:54 | 14 | 8 feet of shelf space for Barbie at Kohl's. |
| 11:54 | 15 | And is -- is it up to Kohl's to decide how many total |
| 11:54 | 16 | feet of space it gives a particular manufacturer? |
| 11:54 | 17 | A.   Yeah.  Very -- very much so.  I mean, toys, in general, |
| 11:54 | 18 | is a very seasonal category.  The space that we are |
| 11:54 | 19 | allocated in a store in the Spring is very different than in |
| 11:54 | 20 | the Fall.  In general, the space in the toy department can |
| 11:54 | 21 | very much change depending on the programs and the products, |
| 11:54 | 22 | et cetera. |
| 11:54 | 23 | Q.   And I think, at one point you were talking about Kohl's |
| 11:54 | 24 | as a very substantial well-known retailer? |
| 11:54 | 25 | A.   Yeah, they're huge.  I mean, this is a customer you |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

148

| | | |
|---|---|---|
| 11:54 | 1 | want to do business with.  They're gonna pay their bills. |
| 11:54 | 2 | They're gonna pay 'em on time.  They're gonna pay 'em in |
| 11:54 | 3 | full.  It's a good customer to do business with.  They're |
| 11:54 | 4 | growing.  It's $18 million, as I said.  They're three times |
| 11:54 | 5 | as big as Mattel.  This is a big company. |
| 11:54 | 6 | Q.   Has it been your experience that Mattel is able to |
| 11:55 | 7 | pressure retailers of the size of Kohl's with an |
| 11:55 | 8 | 18 billion-dollar company? |
| 11:55 | 9 | A.   Absolutely not.  This is -- ultimately, a retailer has |
| 11:55 | 10 | the shelf.  That's what they decide.  They decide who goes |
| 11:55 | 11 | on the shelf.  They decide how many square feet the |
| 11:55 | 12 | particular vendor's going to get.  They decide what to price |
| 11:55 | 13 | the product at.  Those are ultimately the decisions the |
| 11:55 | 14 | retailer makes. |
| 11:55 | 15 | Q.   And has it been your experience or belief, these years |
| 11:55 | 16 | in the toy industry, that a substantial retailer, such as |
| 11:55 | 17 | Kohl's, enters into illegal agreements with Mattel, whether |
| 11:55 | 18 | they're written or oral or otherwise? |
| 11:55 | 19 | A.   No. |
| 11:55 | 20 | Q.   If you can a take a look at Exhibit 36613. |
| 11:55 | 21 |           *(Document provided to the witness.)* |
| 11:55 | 22 | BY MR. ZELLER: |
| 11:55 | 23 | Q.   This is the memo you were asked about, this 2005 Line |
| 11:55 | 24 | Review Meeting Recap? |
| 11:55 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:55 | 1 | Q.   Directing your attention to the general feedback |
| 11:56 | 2 | section on the first page.  Do you see where it's talking -- |
| 11:56 | 3 | it says, "Overall, Kohl's feedback is very positive."  And |
| 11:56 | 4 | then it talks about some of the positive aspects of Mattel |
| 11:56 | 5 | that Kohl's reported. |
| 11:56 | 6 | Do you see that? |
| 11:56 | 7 | A.   Yes, I do. |
| 11:56 | 8 | Q.   And then, if you go all the way to the bottom of that |
| 11:56 | 9 | paragraph, do you see where it says, "Product newness and |
| 11:56 | 10 | freshness are two key elements in their product selection |
| 11:56 | 11 | criteria, in addition to price and margin"? |
| 11:56 | 12 | Do you see that? |
| 11:56 | 13 | A.   Yes, I do. |
| 11:56 | 14 | Q.   And I understand, you've told us that you weren't on |
| 11:56 | 15 | this memo, didn't see it at the time; but is this kind of |
| 11:56 | 16 | language that you're seeing here reported with respect to |
| 11:56 | 17 | Kohl's consistent with your understanding as to what |
| 11:56 | 18 | criteria retailers use? |
| 11:56 | 19 | MR. McCONVILLE:  Objection.  Foundation. |
| 11:56 | 20 | THE COURT:  Overruled. |
| 11:56 | 21 | THE WITNESS:  Sure.  I mean, absolutely.  You |
| 11:56 | 22 | know, the customer is trying to bring people into their |
| 11:56 | 23 | stores.  Product newness and freshness are certainly two |
| 11:56 | 24 | things that they would be very much interested in. |
| | 25 | |

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

150

| | | |
|---|---|---|
| 11:57 | 1 | BY MR. ZELLER: |
| 11:57 | 2 | Q.   And so is it the case that, if Kohl's, at that time, |
| 11:57 | 3 | had a substantial amount of inventory of another toy |
| 11:57 | 4 | manufacturer, would it be your understanding that that would |
| 11:57 | 5 | be consistent -- and it wasn't selling very quickly -- would |
| 11:57 | 6 | that be consistent or inconsistent with that criterion about |
| 11:57 | 7 | product newness and freshness? |
| 11:57 | 8 | A.   Yeah. |
| 11:57 | 9 | MR. McCONVILLE:  Objection.  Vague. |
| 11:57 | 10 | THE COURT:  Overruled. |
| 11:57 | 11 | THE WITNESS:  The -- in general, you know, the toy |
| 11:57 | 12 | business is a fashion-based business.  I mean, you do want |
| 11:57 | 13 | the newest, and you want the best.  And to the extent that |
| 11:57 | 14 | you've got carryover product or old product sitting on the |
| 11:57 | 15 | shelf, that's a tough sell. |
| 11:57 | 16 | BY MR. ZELLER: |
| 11:57 | 17 | Q.   And then, focusing then on the last part, it says, "in |
| 11:57 | 18 | addition to price and margin." |
| 11:57 | 19 | Do you see that? |
| 11:57 | 20 | A.   Sorry.  Where are you? |
| 11:57 | 21 | Q.   At the very end of that sentence, it says, "in addition |
| 11:57 | 22 | to price and margin"? |
| 11:57 | 23 | A.   Yes, yes. |
| 11:57 | 24 | Q.   And you understand that's something else that Kohl's |
| 11:57 | 25 | was saying mattered to it in terms of the toy companies it |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

151

| | | |
|---|---|---|
| 11:57 | 1 | was working with? |
| 11:57 | 2 | A.   Right. |
| 11:57 | 3 | Q.   And when you see the word "margin" here, do you |
| 11:58 | 4 | understand it to be referring to the money that Kohl's makes |
| 11:58 | 5 | as opposed to the amount of money that Mattel makes? |
| 11:58 | 6 | A.   Oh, absolutely.  Absolutely.  I mean, ultimately, a |
| 11:58 | 7 | retailer is -- certainly, they want you to do well.  But |
| 11:58 | 8 | ultimately, they're responsible for their own P&L that |
| 11:58 | 9 | they're going to need to manage their margins.  That's |
| 11:58 | 10 | something a retailer would focus on. |
| 11:58 | 11 | Q.   And so, in this memo, as you understand it, it |
| 11:58 | 12 | reflected the fact that Kohl's communicated to Mattel that |
| 11:58 | 13 | Kohl's cares about its own margin in deciding what products |
| 11:58 | 14 | to put on its shelves; is that true? |
| 11:58 | 15 | A.   That would be my takeaway from that sentence, yes. |
| 11:58 | 16 | MR. ZELLER:  Nothing further. |
| 11:58 | 17 | THE COURT:  Sir, we're going to ask you to remain |
| 11:58 | 18 | available, sir, until the date of April 8th.  But the case, |
| 11:58 | 19 | I believe, will conclude on April 6th. |
| 11:58 | 20 | Thank you very much.  You may step down. |
| 11:58 | 21 | THE WITNESS:  Thank you. |
| 11:58 | 22 | *(Witness steps down subject to recall.)* |
| 11:58 | 23 | THE COURT:  All right.  Now, Counsel, instead of |
| 11:58 | 24 | calling the next witness, why don't we send the jury to |
| 11:58 | 25 | lunch and resume at 1:00 o'clock. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10337   Filed 03/31/11   Page 152 of 153   Page ID #:313672
CV 04-9049 3 - 3/29/2011 - Day 41, Volume 1 of 3

152

| | | |
|---|---|---|
| 11:58 | 1 | You're admonished not to discuss this matter |
| 11:58 | 2 | amongst yourselves nor form or express any opinion |
| 11:59 | 3 | concerning the case. |
| 11:59 | 4 | We'll see you at 1:00 o'clock. |
| 11:59 | 5 | Counsel, 1:00 o'clock, please. |
| 11:59 | 6 | *(Lunch recess held at 11:59 a.m.)* |
| 11:59 | 7 | *(Further proceedings reported by Jane Sutton* |
| 11:59 | 8 | *Rule in Volume II.)* |
| 11:59 | 9 | -oOo- |
| 11:59 | 10 | |

11:59    1                              -oOo-

11:59    2

11:59    3                            CERTIFICATE

11:59    4

11:59    5          I hereby certify that pursuant to Section 753,

11:59    6    Title 28, United States Code, the foregoing is a true and

11:59    7    correct transcript of the stenographically reported

11:59    8    proceedings held in the above-entitled matter and that the

11:59    9    transcript page format is in conformance with the

11:59   10    regulations of the Judicial Conference of the United States.

11:59   11

11:59   12    Date:  March 29, 2011

11:59   13

11:59
11:59
11:59   14
11:59
11:59   15         _____
                   DEBBIE GALE, U.S. COURT REPORTER
        16         CSR NO. 9472, RPR

11:59   17

10:12   18

10:12   19

        20

        21

        22

        23

        24

        25