1

1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3       **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                  – – – – – – –

5

6    MATTEL, INC., ET AL.,              )
                                        )
7              Plaintiffs,              )
                                        )
8         vs.                           ) No. CV 04-9049-DOC
                                        )    Day 41
9    MGA ENTERTAINMENT, INC., ET AL.,   )    Volume 2 of 3
                                        )
10             Defendants.              )
     _____)

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                    Jury Trial

17                Santa Ana, California

18             Tuesday, March 29, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-03-29 MattelV2

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4            QUINN, EMANUEL, URQUHART & SULLIVAN
             By:   JOHN B. QUINN
5                  MICHAEL T. ZELLER
                   WILLIAM PRICE
6                  Attorneys at Law
             865 South Figueroa Street
7            10th Floor
             Los Angeles, California 90017-2543
8            (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11           ORRICK, HERRINGTON & SUTCLIFFE, LLP
             BY:   THOMAS S. MC CONVILLE
12                 Attorney at Law
             4 Park Plaza
13           Suite 1600
             Irvine, California 92614
14           (949) 567-6700

15           – AND –

16           ORRICK, HERRINGTON & SUTCLIFFE, LLP
             BY:   ANNETTE L. HURST
17                 Attorney at Law
             405 Howard Street
18           San Francisco, California 94105
             (415) 773-5700

19           – AND –

20
             KELLER RACKAUCKAS, LLP
21           BY:   JENNIFER L. KELLER
                   Attorney at Law
22           18500 Von Karman Avenue
             Suite 560
23           Irvine, California 92612
             (949) 476-8700

24

25

```
 1   APPEARANCES OF COUNSEL (Continued):

 2

 3   FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4            SCHEPER, KIM & OVERLAND, LLP
              BY:  ALEXANDER H. COTE  (Not Present)
 5                 Attorney at Law
              601 West Fifth Street
 6            12th Floor
              Los Angeles, California 90071
 7            (213) 613-4660

 8            - AND -

 9            LAW OFFICES OF MARK E. OVERLAND
              BY:  MARK E. OVERLAND
10                 Attorney at Law
              100 Wilshire Boulevard
11            Suite 950
              Santa Monica, California 90401
12            (310) 459-2830

13

14   Also Present:

15            ISAAC LARIAN, MGA CEO
              ROBERT ECKERT, Mattel CEO
16            LILY MARTINEZ, Mattel Employee
              KEN KOTARSKI, Mattel Technical Operator
17            MIKE STOVALL, MGA Technical Operator
              RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan
18            KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe
              WARRINGTON PARKER, Orrick Herrington & Sutcliffe
19            MELANIE PHILLIPS, Orrick Herrington & Sutcliffe
              FRANK RORIE, Orrick Herrington & Sutcliffe
20            DIANA RUTOWSKI, Orrick Herrington & Sutcliffe
              DENISE MINGRONE, Orrick Herrington & Sutcliffe
21

22

23

24

25
```

1                          **I N D E X**

2

3

4                        **EXAMINATION**

5

6   **Witness Name**      **Direct**    **Cross**    **Redirect**    **Recross**

7   NORMILE, ROBERT
        By Ms. Keller         6                        104
8       By Mr. Quinn                     90

9   MOORE, MICHAEL
        By Ms. Keller       109

10

11

12

13                         **EXHIBITS**

14

15  **Exhibit**                        **Identification**    **Evidence**

16  Defendants' No. 9484R                                       60

17  Defendants' No. 26565R                                     145

18  Defendants' No. 27464R-117                                 117

19  Defendants' No. 37009R                                      86

20

21

22

23

24

25

1              SANTA ANA, CALIFORNIA, TUESDAY, MARCH 29, 2011

2                        DAY 41, VOLUME 2 OF 3

3                            (1:02 p.m.)

4              (The following proceedings is taken in the

5         presence of the jury.)

6              THE COURT:  All right.  We are back in session.

7    The jury is present, the alternates are present.

8              Thank you, Counsel, for your courtesy.  Please be

9    seated.

10             And Counsel, if you'd like to call your next

11   witness on behalf of MGA and Mr. Larian.

12             MS. KELLER:  Your Honor, we would call Robert

13   Normile.

14             THE COURT:  Thank you, sir.  If you'd step forward

15   between the double doors.

16             Now, sir, will you stop at that location and

17   please raise your right hand.

18             **ROBERT NORMILE, DEFENSE WITNESS, SWORN**

19             THE WITNESS:  Yes, I do.

20             THE COURT:  Thank you, sir.

21             If you'd walk along the side of the jury railing,

22   please.  There is an entrance down here close to the wall.

23             MS. KELLER:  And your Honor, before we begin, I'd

24   like to confirm that the Court's order excluding Jill Thomas

25   as a potential witness is still in effect.

```
 1              THE COURT:  It is in effect.

 2              MS. KELLER:  Because I did see her in here this

 3    morning.

 4              THE COURT:  That is in effect.

 5              MS. KELLER:  Thank you.

 6              THE COURT:  And sir, will you please be seated and

 7    state your name for the record.

 8              THE WITNESS:  Robert John Normile.

 9              THE COURT:  Will you spell your last name, sir.

10              THE WITNESS:  N-o-r-m-i-l-e.

11              THE COURT:  This is direct examination by

12    Ms. Keller on behalf of MGA and Mr. Larian.

13              MS. KELLER:  Thank you, your Honor.

14                         DIRECT EXAMINATION

15    BY MS. KELLER:

16    Q    Mr. Normile, in February of 2011, this last month, you

17    became executive vice president, chief legal officer and

18    secretary to the board of directors of Mattel, true?

19    A    Yes, it is.

20    Q    And before then, from March 1999 to February of 2011,

21    you were senior vice president, general counsel and

22    secretary to the board, right?

23    A    You know, I actually thought that I got that

24    appointment later than March, but only by months, I am not

25    sure it matters.
```

1    Q    You've held that position for 12 years, approximately?

2    A    Approximately, yes.

3    Q    From 1999 until last month?

4    A    Yes.

5    Q    And as chief legal officer and general counsel, you

6    reported directly to the CEO, Bob Eckert, right?

7    A    Yes, that's correct.

8    Q    And that's since he joined the company as CEO and

9    chairman of the board in the year 2000, correct?

10   A    Yes, correct.

11   Q    You were promoted to vice president and assistant

12   general counsel in 1994?

13   A    I believe so, yes.

14   Q    And that was significant because as a vice president,

15   you became an officer of the company as well as a lawyer for

16   the company, right?

17   A    That is correct, I was a vice president and I'm an

18   officer.

19   Q    And when you became general counsel in 1999, your

20   responsibilities increased, correct?

21   A    Yes.

22   Q    And among other things, as general counsel, you were

23   responsible for managing the Mattel legal department, true?

24   A    True.

25   Q    Now, as of February 15th, 2010, there were about 35

1   lawyers in the legal department?

2   A    I think it would be 38, maybe even 40 by that date, 40

3   probably.

4   Q    Attorneys in the legal department at Mattel El Segundo

5   are organized into groups, true?

6   A    True.

7   Q    And those groups include an intellectual property

8   group, correct?

9   A    Yes.

10   Q    And a litigation group, correct, as well --

11   A    Yes.

12          *(Interruption in the proceedings.)*

13   BY MS. KELLER:

14   Q    And others as well that are not so relevant here, true?

15   A    True.

16   Q    Now, the litigation group is responsible for dealing

17   with labor and employment issues, right?

18   A    As well as litigation, yes.

19   Q    Some litigation as well, correct?

20   A    (No audible response.)

21   Q    And the intellectual property, or IP group, is

22   responsible for the registration, maintenance and

23   enforcement of intellectual property issues, correct?

24   A    Yes, and some litigation as well.

25   Q    And some smaller litigation, right?

1    A    Yes.

2    Q    Michael Moore, he is one of your in-house attorneys; is

3    he not?

4    A    Yes, he is.

5    Q    And he's in the intellectual property group?

6    A    Yes, he is.

7    Q    And Jill Thomas, she is head of litigation; is she not?

8    A    She is.

9    Q    And she also has an executive title, vice president,

10   right?

11   A    Yes.

12   Q    And assistant general counsel, true?

13   A    Correct.

14   Q    Now, Ms. Thomas has principal responsibility for

15   managing this litigation, true?

16   A    Yes, she does.

17   Q    And Mr. Moore plays a supporting role to her?

18   A    Yes, he does.

19   Q    Now, during the early days of this litigation, it was

20   Mr. Moore who had the primary responsibility for managing

21   this litigation, true?

22   A    That is correct.

23   Q    But ultimately, you are the one responsible for the

24   decisions and actions of the attorneys under you, true?

25   A    Yes, I am.

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 10 of 185   Page ID #:313683
CV 04-9049-DOC – 03/29/2011 – Day 41, Vol. 2 of 3

10

1   Q    They are supposed to report to you on all important

2   matters, right?

3   A    Yes.

4   Q    Now, I want to talk for a moment about your role and

5   responsibilities as general counsel and as chief legal

6   officer.

7        As chief legal officer, you are the highest ranking

8   corporate officer who deals with legal affairs, right?

9   A    Yes, I am.

10  Q    And a chief legal officer is, more or less, the same

11  thing as general counsel, the head --

12  A    I agree with that, yes.

13  Q    Okay.  And the chief lawyer in a company, right?

14  A    Yes, that's correct.

15  Q    And at all the -- in all the events related to this

16  litigation, you were in one of those two positions, right?

17  A    I believe that's correct, yes.

18  Q    And you weren't just an administrator as general

19  counsel, true?

20  A    I'm not sure I understand what you mean "not just an

21  administrator."

22  Q    Well, we talked about the fact that you reported

23  directly to Mr. Eckert, right?

24  A    Yes, we did.

25  Q    I mean, not "we," you personally reported directly to

1   Mr. Eckert, right?

2   A    Yes, I did.

3   Q    And you still do?

4   A    I still do, yes.

5   Q    And you are also required to competently advise the

6   CEO, Mr. Eckert, and so-called C level officers like the

7   chief financial officer, the chief operating officer, right?

8   A    Yes, I do, with the support of a strong team, yes.

9   Q    You also report to the board of directors?

10  A    I wouldn't say I report to the board of directors.  I

11  advise the board of directors, and I'm secretary on the

12  board of directors.

13  Q    You provide reports on any legal issues to the board of

14  directors?

15  A    I provide reports of some legal issues to the board of

16  directors, yes.

17  Q    You are also secretary to the board of directors?

18  A    I am, yes.

19  Q    You are in charge of keeping the corporate minutes,

20  making sure they are true, complete and accurate?

21  A    Yes.

22  Q    And Mattel is a publicly traded company, right?

23  A    It is.

24  Q    So it has reporting obligations to its shareholders as

25  well as to the Securities and Exchange Commission, right?

CV 04-9049-DOC – 03/29/2011 – Day 41, Vol. 2 of 3

12

```
 1   A    That's right, we report to the SEC, and reports are
 2   then published.  Those reports that we file with the SEC are
 3   published to the shareholders.
 4   Q    And you would agree to me when --
 5             THE COURT:  Just a moment.  I'm going to slow you
 6   down just a little bit.  Watch Jane's face.
 7             (Laughter.)
 8             THE COURT:  Slow down, both of you, all right?
 9             Your question.
10   BY MS. KELLER:
11   Q    You would agree with me, would you not, that the
12   general counsel's primary objective is to ensure that the
13   company is operating within the law at all times?
14   A    That is certainly a primary objective, yes.
15   Q    And to report any material noncompliance with the
16   company's legal obligations immediately to management, true?
17   A    If something is material noncompliance, yes.
18   Q    And if appropriate, to report that noncompliance to
19   your board of directors, right?
20   A    Something that actually reaches the threshold of
21   materiality, I believe I would report it to the board, yes.
22   Q    And you would agree, would you not, that the
23   traditional role of the general counsel in a publically
24   traded corporation has expanded during the last decade?
25   A    I've been a general counsel during the last decade, and
```

1   I would say the role has generally expanded.  I don't know

2   what's going on at other companies, but certainly there's

3   been more issues to deal with, board issues to deal with in

4   my circumstances.

5   Q    Well, there's been various events that have lead to

6   corporate governance reforms for all companies, right?

7   A    That's correct, yes.

8   Q    For example, the Sarbanes-Oxley Act?

9        MR. QUINN:  Objection as to relevance, your Honor.

10       THE COURT:  What's the relevance?

11       MS. KELLER:  The relevance goes to his obligations

12  to report the wrongdoing up the chain.

13       THE COURT:  Overruled.

14       THE WITNESS:  Yes, Sarbanes-Oxley was legislation

15  during the course of my term as the general counsel.

16  BY MS. KELLER:

17  Q    Passed in 2002?

18  A    I believe that's right.

19  Q    Imposed on companies much greater reporting and

20  compliance obligations than they have had in the past,

21  right?

22  A    Generally, that's probably true.

23  Q    And there's been some splashy cases in the news, like

24  the Enron case, that have also --

25       MR. QUINN:  Objection.  Relevance.

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 14 of 185   Page ID #:313687
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

14

 1              THE COURT:  Yeah, you are to disregard.  We are

 2    not going to compare Enron, et cetera.  It's irrelevant.

 3              MR. QUINN:  Move to strike, your Honor.

 4              THE COURT:  Stricken.

 5              MS. KELLER:  I'm not comparing it.

 6              THE COURT:  I know.  It's --

 7    BY MS. KELLER:

 8    Q     There has been some splashy cases in the news that have

 9    also lead to increased corporate governance rules, right?

10    A     I would say that's generally true, yes.

11    Q     And in the last decade, there's also been an increase

12    in shareholder demands and pressure from shareholders for

13    accountability, right?

14              MR. QUINN:  Objection.  Relevance.

15              THE COURT:  Overruled.

16              THE WITNESS:  I think that's a fair statement as a

17    generality, yes.

18    BY MS. KELLER:

19    Q     And, in fact, one of the things that you try to do in

20    your position is manage things in such a way that you are

21    not going to have shareholder lawsuits against you for

22    Mattel misconduct, right?

23    A     Yes.

24    Q     Now, members of the board of directors also have

25    responsibility and potential liability for the wrongdoing of

1    the company, right?

2    A    They certainly would have liability if they fail to

3    fulfill their duties.  They can have liability in that sort

4    of a circumstance.

5    Q    Now, let's go back for a moment to the Sarbanes-Oxley

6    Act of 2002 that we talked about.  That applies to all

7    public companies, right?

8    A    I believe it does, yes.

9    Q    And one of the things that that act established is

10   attorneys' responsibilities under the Act, right?

11             MR. QUINN:  Again, your Honor, objection.

12   Relevance.

13             THE COURT:  Overruled.

14   BY MS. KELLER:

15   Q    Correct?

16   A    Yes.

17   Q    And, in fact, it directed the Securities and Exchange

18   Commission to set minimum standards of professional conduct

19   for attorneys in public companies, right?

20   A    Yes, it did.

21   Q    And it includes a rule that an attorney has to report

22   to the chief legal officer or chief executive officer of a

23   public company evidence of material violations of either

24   securities laws, breaches of fiduciary duty or other

25   violations of law by the company or its agents, right?

Case 2:04-cv-09049-DOC-RNB  Document 10338  Filed 03/31/11  Page 16 of 185  Page ID #:313689
CV 04-9049-DOC – 03/29/2011 – Day 41, Vol. 2 of 3

16

1   A     No.  I think the way you phrased that is overbroad.

2   The focus of those requirements are with respect to the

3   securities laws and other similar state laws, so you -- you

4   phrased it in a way that it's overbroad.

5   Q    Well, for example, let's just narrow it, if you came

6   into possession of information that a company was engaging

7   that somebody within the company was engaging in some

8   criminal wrongdoing to benefit the company, that would

9   certainly be covered, right?

10  A     No, it would not.

11  Q    If you came into information that somebody was engaging

12  in anti-competitive practices by using fake identities to

13  benefit the company in a systematic way, that certainly

14  would qualify, wouldn't it?

15  A     It would not.

16  Q    In fact, you decided it didn't in this particular case,

17  right?

18  A     I'm sorry, I decided that it didn't?

19  Q    You decided that it did not qualify in this particular

20  case.

21  A     I -- I --

22            MR. QUINN:  Excuse me, it's vague and ambiguous,

23  your Honor.

24            THE COURT:  Overruled.

25            Answer the question.

1          THE WITNESS:  I knew and know it does not apply.

2    BY MS. KELLER:

3    Q    Do you have a legal opinion from any authority telling

4    you, as general counsel of Mattel, that Sal Villasenor's and

5    the marketing intelligence department's conduct in creating

6    fraudulent identities to engage in anti-competitive behavior

7    on behalf of Mattel did not need to be reported up the chain

8    of command?

9          MR. QUINN:  Your Honor, irrelevant.  Asks for

10   legal analysis, legal conclusion.

11         THE COURT:  Overruled.

12         THE WITNESS:  And I'd like you to clarify, are you

13   talking about reporting to the SEC or the chain of command?

14   I am not sure what you are referring to.

15   BY MS. KELLER:

16   Q    Let's start with the chain of command.

17         Do you have any legal opinion telling you that you did

18   not have to report to Robert Eckert the allegations of

19   criminal wrongdoing within the marketing intelligence

20   department, by which I mean creating fraudulent identities

21   to engage in anti-competitive practices against MGA?

22         MR. QUINN:  Vague and ambiguous as to a legal

23   opinion other than his own.

24         THE COURT:  Overruled.

25         THE WITNESS:  You are asking whether I got a

1    written legal opinion?

2              THE COURT:  No.  Just a moment.

3              This is his opinion.  He can cast his opinion.

4    BY MS. KELLER:

5    Q    I'm asking if you got a written legal opinion from

6    anyone telling you that you did not have to report that up

7    the chain of command.

8    A    I -- I know the requirements, and so no need to get a

9    legal opinion, and I did not do so.

10   Q    So the answer is, "No, I never got one"?

11   A    No, I never got one.

12   Q    Does Mattel have a corporate policy of deliberately

13   trying to insulate its CEO from knowledge of criminal

14   wrongdoing within Mattel?

15   A    No.

16   Q    Now, the general counsel's role has expanded after

17   Sarbanes-Oxley to make you the guardian of corporate ethics

18   within the company, correct?

19   A    I don't know that I would agree with that.  I'm not

20   clear what you are referring to.

21   Q    Have you ever attended any seminars directed to the

22   importance of the Sarbanes-Oxley Act as it affects general

23   counsel of companies?

24   A    I believe I have, yes.

25   Q    And you know that one of the principle rule -- one of

```
 1   the principle lessons to be drawn is that the general

 2   counsel is no longer just a lawyer but the guardian of

 3   corporate ethics, right?

 4   A    I don't know that it was phrased that way, and the

 5   seminar I attended, I don't think I heard it phrased that

 6   way.

 7   Q    Do you understand that you are now the guardian of

 8   legal compliance for the corporation?

 9   A    I believe I do, and I believe I was before

10   Sarbanes-Oxley.

11   Q    Who is the guardian of corporate ethics for Mattel if

12   it's not you?

13   A    I believe I am, I'm just saying I don't think it's as a

14   result of Sarbanes-Oxley, but my role with respect to

15   corporate ethics is very significant.  I am not exclusive,

16   but I have a significant role with respect to corporate

17   ethics.

18   Q    So you are supposed to be the guardian of corporate

19   ethics within Mattel?

20   A    I'm probably the lead guardian.  I -- I hesitate to say

21   that I'm the only one, but I would certainly take

22   responsibility as the lead guardian.

23   Q    You and Mr. Eckert, the two of you?

24   A    I think he has a significant role in it as well.

25   Q    A significant role?  Isn't he the leader of the
```

 1   company?

 2   A    Well, he is, but frankly, I deal with a lot of issues

 3   that he doesn't see because they are not at a level where

 4   they need to go to the CEO.

 5   Q    So you're the number one guardian, and he's the number

 6   two guardian, is that --

 7              MR. QUINN:  Objection.  This is argumentative.

 8              THE COURT:  Sustained.

 9   BY MS. KELLER:

10   Q    Would you categorize yourself in the hierarchy as who

11   is guardian of corporate ethics within Mattel as number one

12   and Mr. Eckert is number two?

13   A    You need to explain to me how you're doing your

14   hierarchy.  Is it importance or unimportance?  I deal with a

15   larger volume of issues, but the more important ones are

16   brought to him.

17   Q    Are you the guardian of legal compliance at Mattel?

18   A    Yes, I am.

19   Q    Are you responsible for making certain that things

20   happening in the corporation are both legal and ethically

21   appropriate?

22   A    I'm responsible to make sure that if unethical or

23   illegal conduct occurs, that it is stopped, yes.

24   Q    And reported up the chain to the person who is

25   ultimately responsible to the shareholders, Robert Eckert?

```
 1    A    That would depend on -- on the particular issue.  There
 2    are some issues that I don't find a need to report to him
 3    and would not be appropriate to report to him.
 4    Q    Your client is supposed to be the corporation, right?
 5    A    Yes, it is definitely the corporation.
 6    Q    It's not supposed to be any one individual in the
 7    corporation?
 8    A    That's true.
 9    Q    Even someone with the ability to give you a big pay
10    boost, right?
11    A    Correct.
12    Q    It's supposed to be that Mattel is your client.
13    A    Mattel is definitely my client.
14    Q    And Mattel's ethical and legal health is up to you, in
15    large part, right?
16    A    Yes.
17    Q    Now, you know that this litigation, Mattel v. MGA, has
18    been a very, very significant piece of litigation within
19    Mattel for the last seven years?
20    A    Yes, I do.
21    Q    If not the most significant, right?
22    A    I would agree with that.
23    Q    And major developments in this litigation have been
24    faithfully reported by you to Mr. Eckert, true?
25    A    It would depend on the major, and I will tell you also
```

1    sometimes my attorneys will have direct communications with

2    Mr. Eckert as well.  I am not the only party who talks to

3    him about the case.

4    Q    When you say "attorneys," do you mean within Mattel or

5    outside counsel?

6    A    Frankly both, but I was referring to in-house counsel,

7    but there was certainly occasions where outside counsel has

8    reported issues to him.  I've generally been present for

9    those, I would think, but I am not sure in every case.

10   Q    Do you understand that in litigation like this that the

11   production of documents is a very important issue, correct?

12   A    Yes, it is.

13   Q    And you understand that Mattel has both legal and

14   ethical obligations with respect to the production of

15   documents in litigation, right?

16   A    Yes.

17   Q    So for example, hiding relevant and material

18   documents --

19            MR. QUINN:  Objection, your Honor.  The Court's

20   ruled on these issues for both sides.

21            THE COURT:  I have as to both law firms involved,

22   but not as to Mattel.  Overruled.

23            THE WITNESS:  In fact, can you repeat the

24   question?

25

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 23 of 185   Page ID #:313696
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

23

1    BY MS. KELLER:

2    Q    Hiding documents that you know are important documents

3    to produce in litigation, that's a violation of Mattel's

4    obligations, isn't it?

5    A    Hiding documents that are required to be produced in

6    discovery would be a violation of our obligations, yes.

7    Q    Hiding documents that you know are relevant that the

8    other side may not know exists, that would be a violation,

9    right?

10   A    I -- I believe so.  I'm not a litigator who knows the

11   precise phraseology in the area, but I believe the way you

12   said it was correct.

13   Q    How long have you been a lawyer?

14   A    Since 1985.

15   Q    That would be how many years?

16   A    Twenty-two, 21.

17   Q    You know unequivocally that hiding relevant documents

18   in litigation is wrong?

19   A    I believe that's correct.  And my only comment was I

20   can't recite the rule to you the way I will know rules in

21   some other areas, not being a litigator, but substantively,

22   I am not trying to disagree with that point.  I believe

23   that's correct.

24   Q    You know it's wrong, right?

25   A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 24 of 185   Page ID #:313697
CV 04-9049-DOC – 03/29/2011 – Day 41, Vol. 2 of 3

24

1    Q    Now, you also knew that in this litigation, MGA had

2    claims that Mattel had engaged in unfair business practices,

3    right?

4    A    Yes.

5    Q    Had misappropriated MGA's trade secrets, right?

6              MR. QUINN:  Your Honor, I object.  This is

7    something that's been discussed in terms of the timing.

8              THE COURT:  Overruled.

9              THE WITNESS:  I'm sorry, can you repeat the

10   question?

11   BY MS. KELLER:

12   Q    You knew that MGA had accused Mattel of unfair business

13   practices, right?

14             MR. QUINN:  Objection.  Vague as to time.

15             THE COURT:  Overruled.

16             THE WITNESS:  Yeah, I -- without his objection, I

17   was going to say I am not clear what time you are referring

18   to because that came in at some point.  I just couldn't tell

19   you exactly when.

20   BY MS. KELLER:

21   Q    You know what this case is about, don't you?

22   A    I do.

23             MR. QUINN:  Argumentative, your Honor.

24             THE COURT:  Overruled.

25

1   BY MS. KELLER:

2   Q    And you knew that as Mattel's guardian of corporate

3   ethics and guardian of legal compliance that it was up to

4   you to produce anything showing that Mattel had, indeed,

5   engaged in unfair business practices, specifically against

6   MGA, correct?

7   A    I know we had that responsibility, yes.

8   Q    You knew it was up to you to make sure it happened,

9   right?

10  A    I -- I have responsibility, but I will tell you as a

11  lawyer not managing the case, who is not a litigator, I did

12  not have substantial detailed involvement in those matters,

13  but I certainly have responsibility in the sense of being

14  the senior legal officer of the company.

15  Q    You knew it was up to you to make sure that Mattel was

16  in compliance?

17  A    I had ultimate responsibility, yes.

18  Q    Now, let's take a look at Exhibit 9484R.  This is a

19  December 22nd, 2005, e-mail from Sal Villasenor addressed to

20  you and Mark Kimball; do you see that?

21  A    I do.

22  Q    And this starts out -- it says, "Attention," by the

23  way, "vice president, law division," and it starts out, "I

24  have worked for Mattel for almost 14 years.  I am currently

25  the manager of market intelligence."

1          I'm sorry, we've got 9484R.

2          "I have recently met with my direct supervisor, John

3     Louie regarding Mattel's goals and expectations of me with

4     respect to market intelligence at upcoming trade shows and

5     events.  I have also been approached by Mattel's attorneys,

6     Michael Moore and" redacted, "who have" redacted.  "This

7     recent activity and the fact that the trade shows are fast

8     approaching has forced me" --

9               MR. QUINN:  I'm sorry, your Honor.  There is a

10    copy in evidence which I think only has one redaction in it.

11    I don't know why we aren't using that.

12              THE COURT:  Overruled.

13              MS. KELLER:  We will be.

14    BY MS. KELLER:

15    Q    In this e-mail, let's see, "I believe that my work

16    conditions have become intolerable, and I'm writing to

17    complain about Mattel's directives and instructions to

18    gather market intelligence from competitors through unlawful

19    means.  I no longer wish to engage in misrepresentations and

20    undercover assignments in which I am paid by Mattel to

21    attend trade shows and events.  I fear that my actions may

22    expose me to personal criminal liability, and I'm stressed

23    about the fallout which may occur.  My conscience does not

24    allow me to continue in this role, and I do not feel I can

25    take the pressure to engage in misrepresentations any

 1   longer."

 2       You recognize this document, right?

 3   A    I do, yes.

 4   Q    It caused quite a stir when it arrived in your e-mail

 5   at Mattel, didn't it?

 6   A    I wouldn't agree with that.  I was familiar with some

 7   background.  I recognized Mr. Villasenor's name, and at the

 8   time I got it, I viewed it as a situation where someone was

 9   looking for an opportunity for a payday.

10   Q    You've rehearsed that answer, haven't you?

11   A    I have not.

12   Q    And the fact of the matter is, it isn't every day, I

13   hope, that you get letters in your role as general counsel

14   at Mattel where you're told that a Mattel employee has been

15   subjecting himself to criminal liability, right?

16   A    It is not.

17   Q    It is pretty rare, isn't it?

18   A    Very, very much so.

19   Q    You've buried this e-mail until last year, didn't you?

20   A    No, I did not.

21   Q    Now, in this e-mail, Mr. Villasenor identifies himself

22   as the manager --

23           MR. QUINN:  Your Honor, I object.  This gets into

24   discovery issues.  The Court --

25           THE COURT:  Overruled.

1    BY MS. KELLER:

2    Q    In this e-mail, he identifies himself as the manager of

3    market intelligence, right?

4    A    Yes.

5    Q    You knew what that meant, didn't you?

6    A    I'm not sure I focused on it, and no, I wouldn't have

7    known what it meant.  It's not familiar terminology to me

8    when I got this e-mail.

9    Q    Because you had no idea that there was even a market

10   intelligence department at Mattel; isn't that true?

11   A    I did not, and till this day questioning whether there

12   was really a department.

13   Q    Even though you've seen e-mails with "market

14   intelligence" across them, you maintain that it probably

15   didn't exist, right?

16   A    I am of the view that it was probably not a department.

17   My understanding is that there were, at most, two people

18   ever in this function, and at Mattel, that is not a

19   department.

20   Q    And you gained that understanding by mere preparation

21   to testify here today, right?

22   A    I believe looking at the transcript, yes.

23   Q    Well, that's the story, now, isn't it?

24            MR. QUINN:  It's argumentative.

25            THE COURT:  Sustained.  Stricken.

```
 1              (Interruption in the proceedings.)

 2              THE COURT:  Stop, both of you.  That's it.  Take a

 3    deep breadth, both of you.

 4              The objection is sustained.  It's argumentative.

 5    Now a question.

 6    BY MS. KELLER:

 7    Q    You understand that it's now Mattel's version that Sal

 8    Villasenor was a rogue employee with only one other person

 9    working with him who created this phony name of "market

10    intelligence," right?

11              MR. QUINN:  Objection.  Argumentative.

12              THE COURT:  Sustained.

13              MR. QUINN:  Move to strike, your Honor.

14              THE COURT:  Stricken.

15    BY MS. KELLER:

16    Q    So in this letter, Mr. Villasenor is telling you and

17    Mr. Kimball that Mattel itself had directed and instructed

18    him to gather market intelligence from competitors through

19    unlawful means, correct?

20    A    That is what the letter says.

21    Q    And it says that Mattel paid him to attend trade shows

22    and engage in misrepresentations and undercover assignments,

23    correct?

24    A    I think in substance, I am not sure where you are on

25    that point -- yeah, I see it.
```

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 30 of 185   Page ID #:313703
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

30

1    Q    And he says that he feared his actions might expose him

2    to personal criminal liability, and that he was stressed

3    about the fallout, right?

4    A    Yes.

5    Q    So Mr. Villasenor was telling you personally that at

6    Mattel's direction, he had engaged in misrepresentations in

7    undercover assignments at trade shows and did it to gather

8    market intelligence from competitors, correct?

9    A    That is what his letter says.

10   Q    Now, being a lawyer, you are telling us this didn't set

11   off any alarm bells at the time?

12          MR. QUINN:  Objection.  Argumentative, "telling

13   us."

14          THE COURT:  Sustained.

15          MR. QUINN:  Move to strike.

16          THE COURT:  Stricken.

17          Counsel, your next question.

18   BY MS. KELLER:

19   Q    You're a lawyer, right?

20   A    I am a lawyer, yes.

21   Q    Lawyer in charge of guarding corporate ethics, right?

22   A    Yes.

23   Q    And corporate compliance, right?

24   A    Yes.

25   Q    And you would agree, wouldn't you, that an employee of

 1   Mattel's making misrepresentations in order to gather

 2   intelligence from other competitors that could potentially

 3   expose him to criminal liability would be a bad thing,

 4   right?

 5   A    Completely unacceptable conduct, yes.

 6   Q    And so did you educate yourself about all this when you

 7   received this e-mail?

 8   A    What I did is I took it to Ms. Thomas, my senior

 9   employment lawyer, who had an investigation conducted with

10   respect to the allegations in the letter.

11   Q    She is not a criminal lawyer, right?

12   A    She personally is not a criminal lawyer.  We don't have

13   a criminal lawyer in-house.

14   Q    And you didn't go to one to find out, "Gee, what sort

15   of" --

16            MR. QUINN:  Argumentative.

17            THE COURT:  We are going to stop.  We are going to

18   strike the "gee" and "oh, golly gosh."  Stricken.

19            Reask the question.

20   BY MS. KELLER:

21   Q    And you didn't go to anybody with criminal experience

22   to find out what kind of exposure Mr. Villasenor might

23   actually have as a result of his actions, correct?

24   A    We went to a major firm that I believe probably would

25   have criminal expertise.

1    Q    Here is my question:  Did you seek out somebody with a

2    criminal law background or who practiced criminal law or was

3    a former prosecutor and say, "I want you to tell me what

4    criminal charges this guy could actually be subjected to"?

5              MR. QUINN:  Vague.  Him personally?

6              THE COURT:  Overruled.

7              THE WITNESS:  I assigned this to one of my

8    attorneys, who took it to a major firm that I expect would

9    have the ability to advise on criminal matters, and I was

10   not involved in the actual discussions with that law firm.

11             MS. KELLER:  I would object as it's nonresponsive

12   and move to strike.

13             THE COURT:  It's responsive.  Your next question.

14   BY MS. KELLER:

15   Q    Did you direct the person you delegated to to go get an

16   opinion about what charges Mr. Villasenor might face?

17             MR. QUINN:  Excuse me, this is communications

18   among counsel, your Honor.  Privilege.

19             THE COURT:  Overruled.

20             THE WITNESS:  No.  I had complete confidence that

21   she knew how to handle an investigation based on the facts

22   of what's presented here.

23   BY MS. KELLER:

24   Q    Did you direct her to do that?

25   A    I did not tell her specifically to do that, no.

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 33 of 185   Page ID #:313706
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

33

1    Q    So you have actually nothing that came back to you

2    where you are assured that Mr. Villasenor, in fact, has no

3    criminal liability as a result of his actions, true?

4    A    Whether he personally has criminal liability?

5    Q    Yeah, yes.

6    A    In the interim, I have gotten some more knowledge in

7    this, and I am still uncertain at this point.

8    Q    At the time, when you got this, did you get --

9    A    As to --

10   Q    -- did you get anything back analyzing for you what

11   potential criminal liability Mr. Villasenor might have?

12   A    I got nothing specific on Mr. Villasenor's liability,

13   no.

14   Q    And as the general counsel of a public company, it was

15   up to you to ensure that Mattel and its employees had not

16   been engaging in criminal conduct, right?

17   A    It is absolutely my obligation to make sure that if

18   there is some kind of criminal conduct that has occurred,

19   that it does not continue or recur, and that conduct was

20   historic with respect to this letter, and it did not recur,

21   and those are my obligations.

22   Q    You did -- as a general counsel of a public company, it

23   was up to you to make sure that Mattel had not engaged in

24   criminal conduct, true?

25   A    No, I don't believe so.  If it had engaged in criminal

 1    conduct that's a historical fact, then I can't go back in

 2    time and undue that.

 3    Q    It was up to you to investigate it, right?

 4    A    Yes.

 5    Q    And by the way, you knew because you've been a general

 6    counsel for a long time that Mattel itself could have

 7    criminal liability as a result of an employee's criminal

 8    conduct if Mattel knew or should have known about it, right?

 9    A    If there is criminal conduct that the company knew or

10    should have known, the company can have liability with

11    respect to that, I believe.

12    Q    The company can be indicted for that, right?

13              MR. QUINN:  This is just argument, your Honor.

14              THE COURT:  Overruled.

15              THE WITNESS:  If there is criminal conduct that

16    the company knew or should have known, I think that,

17    hypothetically, it could be indicted, and here, I had plenty

18    of reason to think this was not criminal conduct, and your

19    next question, I suppose.

20    BY MS. KELLER:

21    Q    You knew, of course, that the company actually had a

22    manual on how to go about committing the criminal conduct,

23    right?

24              MR. QUINN:  Assumes facts, your Honor.

25              THE COURT:  As far as the criminal conduct is

1   concerned, that's stricken.  That's for the jury to decide.

2   You can just rephrase the question, Counsel.

3   BY MS. KELLER:

4   Q    You knew that Mattel actually had a manual to give its

5   employees on how to create false identities and misrepresent

6   themselves in order to get into competitors' private

7   showrooms, correct?

8   A    No, I did not.

9   Q    You found out, didn't you?

10  A    At some point in time we learned that there had been

11  something created within Mattel --

12  Q    Is that a "yes"?

13       MR. QUINN:  Excuse me, your Honor, I don't think

14  he had a chance to finish his answer.

15       THE COURT:  Finish your answer, sir.

16       THE WITNESS:  -- which, on its face, appears to be

17  a description of how one can go into trade shows or toy

18  fairs using false credentials to collect materials.

19  BY MS. KELLER:

20  Q    Well, it actually tells people how to create

21  credentials, right?

22  A    I believe it does.

23  Q    It tells people what kinds of identities to make up?

24  A    It probably does.

25  Q    It tells where to get cards printed even, right?

1    A    I believe it does.

2    Q    It tells them to show up rather than pre- -- make

3    appointments in advance with toy manufactures because the

4    toy manufactures might check on their identities right?

5    A    I believe so.

6    Q    It gives them false addresses to use, right?

7    A    I -- I am not sure it gives addresses.  I think it

8    might suggest to use home address or some --

9    Q    Or the address of someone like, say, Matt Turetzky, for

10   example?

11   A    Sorry, I don't remember that.  It may be, but I don't

12   recall that.

13   Q    And you've been monitoring this trial, haven't you?

14            MR. QUINN:  Vague.

15            THE COURT:  Overruled.

16            THE WITNESS:  I have not been familiar with the

17   testimony in this trial because I haven't been present, but

18   I have been getting high level reports on the progress of

19   the trial.

20   BY MS. KELLER:

21   Q    You've been getting briefed, right?

22   A    High level briefing, yes.

23   Q    You also know that if you had turned this matter over

24   to law enforcement for a criminal investigation, that could

25   have had a devastating impact on Mattel, right?

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 37 of 185   Page ID #:313710
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

37

1   A    No, I don't believe that's true.  The materials that

2   these folks.

3   Q    Sir --

4           MR. QUINN:  Excuse me, can he finish his answer,

5   your Honor?

6           THE COURT:  Finish your answer, sir.

7           THE WITNESS:  I knew at the time and I know now

8   that the materials these folks were going in and sneaking

9   around in toy fairs to get are not trade secret materials,

10  so I do not believe there would be even a significant impact

11  with respect to this -- with the authorities.  It's not

12  stealing something that is trade secret.

13  BY MS. KELLER:

14  Q    No.  It was public, right?  That's your position on

15  behalf of Mattel as Mattel's lawyer?

16          MR. QUINN:  Compound.  Argumentative.

17          THE COURT:  Overruled.

18          THE WITNESS:  It is my understanding that

19  materials at toy fairs are being given to customers and the

20  press, as opposed by giving it to the press we can argue

21  it's even public.  They are certainly not trade secret.

22  BY MS. KELLER:

23  Q    You are well aware of the fact that it's Mattel's legal

24  position in this case that all these things that these

25  people snuck into confidential showrooms using fake

```
 1    credentials to get were public, right?

 2            MR. QUINN:  Argumentative.  Irrelevant.

 3            THE COURT:  Overruled.

 4            THE WITNESS:  I think the legal position is that

 5    they're not trade secret.  I am not sure your reference as

 6    to public --

 7    BY MS. KELLER:

 8    Q    Well, I'm asking --

 9            (Interruption in the proceedings.)

10            THE COURT:  Stop.

11            Rest your hands.

12            Okay.  Counsel?

13    BY MS. KELLER:

14    Q    You didn't leave it up to law enforcement to make that

15    determination, did you?

16            MR. QUINN:  Objection.  Relevance, your Honor.

17            THE COURT:  Overruled.

18            THE WITNESS:  To make what determination?

19    BY MS. KELLER:

20    Q    The determination of whether this was criminal conduct,

21    you didn't leave that up to law enforcement to make that

22    decision, did you?  I mean, that's a "yes" or "no."

23    A    I am not sure what you mean by "leave it up to them."

24    Q    Did you report it to law enforcement; "yes" or "no"?

25    A    No, I did not.
```

1    Q    And so we don't know what a law enforcement agency

2    would have thought about whether this amounts to fraud or

3    theft of trade secrets, right?

4              MR. QUINN:  Irrelevant.  Speculation.

5    Argumentative.

6              THE COURT:  Speculation I believe is correct,

7    Counsel.  Overruled -- I'm sorry, sustained.

8              You don't have to answer that question.

9              THE WITNESS:  All right.

10   BY MS. KELLER:

11   Q    And you never reported it to any prosecuting authority,

12   like the United States Attorneys' Office, correct?

13   A    That's correct, yes.

14   Q    And you never reported it to the SEC, correct?

15   A    Absolutely not.  It's not within their purview.

16   Q    Well, you never reported it to any police or

17   investigative agency, not the FBI, no one, right?

18   A    That's correct.

19   Q    You knew that you were in litigation with MGA, and so

20   you made your own decision that everything that had happened

21   was okay legally, right?

22   A    Well, A, I was aware we were in litigation with MGA.  I

23   never connected these two back at the time, or well until

24   some point in the process of the case when I understood that

25   this stuff became relevant in discovery and -- I'm sorry,

1   can you repeat the back half of the question?  I've lost the

2   back half.

3   Q    Let me ask you a new one.

4        Even if no criminal charges were ever filed, any

5   publicity about Mr. Villasenor and his claims of criminal

6   misconduct could have decreased the share value of the

7   company; the publicly traded shares could have gone down in

8   value, true?

9   A    No, I don't believe that's true at all.

10  Q    Oh, you don't believe that if a company like Mattel is

11  accused of criminal conduct, let's say fraud and theft of

12  trade secrets in a systematic way, that that would affect

13  the value of the shares?

14  A    The mere accusation would not, and these -- this

15  circumstance where non-trade secret material was taken, no,

16  I don't believe it would at all.

17  Q    And it's not non-trade secret material because Mattel

18  takes the position that all the things that these guys snuck

19  in and took were public, right?

20  A    It's non-trade secret because it was not treated in a

21  trade secret manner, which is necessary to maintain a trade

22  secret.

23  Q    Well, at the time you didn't know what the heck they

24  had taken, did you?

25  A    I knew they got materials they collected from a toy

1    fair showroom.

2    Q    But you didn't know what they had, right?

3    A    I knew the allegation was and the claim was that they

4    had taken materials from --

5    Q    You know that --

6            (Interruption in the proceedings.)

7            THE COURT:  Stop.  Stop.

8            Rest your hands.

9            Okay.  Counsel?

10   BY MS. KELLER:

11   Q    You know that even the public finger-pointing about

12   criminal conduct can expose a company to suits by its

13   shareholders, right?

14   A    I think that would depend on the content of the public

15   finger-pointing.

16   Q    Is that a "yes"?

17   A    That's a depends on the contents.

18   Q    Could have exposed the company to shareholder suits,

19   true?

20           MR. QUINN:  Vague as to what's being referred to

21   now.

22           THE COURT:  Do you understand the question?

23           THE WITNESS:  I understand it to refer to this,

24   and the answer is "no."

25           THE COURT:  Okay.

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 42 of 185   Page ID #:313715
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

42

1    BY MS. KELLER:

2    Q    Let me give you a hypothetical.  Let's say a news

3    report comes out that the FBI --

4            MR. QUINN:  Your Honor, this is argumentative.

5    This is not an expert.

6            THE COURT:  Sustained.

7            MR. QUINN:  Move to strike.

8            THE COURT:  Stricken.

9    BY MS. KELLER:

10   Q    As the top lawyer overseeing the legal department, you

11   knew that the legal department was taking these allegations

12   very seriously, right?

13   A    The allegations in this document?

14   Q    Yes.

15   A    Actually, we certainly handled them as one would treat

16   serious allegations because we have an obligation, upon

17   getting a letter like this, to do that.  But I will be

18   honest with you that because of my prior familiarity and

19   because of my impression of this letter as basically an

20   opportunistic attempt to get a chunk of money from the

21   company, I personally view this letter as rather short on

22   credibility, and I can't say that I viewed it as a very

23   serious matter.

24   Q    You knew that when you received this letter, Michael

25   Moore, an attorney working for you, had already talked to

 1   Mr. Villasenor around 10 times between June and December of

 2   2005, right?

 3   A    No, I wasn't aware of 10 times.  I was aware of a

 4   conversation.

 5   Q    Didn't you ask for Mr. Villasenor's personnel file?

 6   A    No, I did not.  Ms. Thomas may well have done so.

 7   Q    The personnel file that you now know contains a number

 8   of Mattel documents identifying him as manager of market

 9   intelligence?

10   A    I would assume that the personnel file would refer to

11   his title, and if his title is accurately reported here,

12   then I would expect it would be in the file.

13   Q    And this is how Mr. Villasenor identified himself in

14   his e-mail to you?

15   A    That's in the first line of this e-mail, yes.

16   Q    Now, when Mr. Moore spoke with Mr. Villasenor these

17   multiple times between June and December of 2005, before you

18   received the e-mail from him in December from

19   Mr. Villasenor, you knew that Mr. Moore was talking to

20   Mr. Villasenor in connection with the MGA litigation, right?

21   A    I'm not sure what time you are referring to, but I

22   don't believe I did at any point, actually.

23   Q    This December 22nd, 2005 e-mail that you've

24   characterized as essentially a shakedown attempt, okay?

25   When you got this e-mail, you knew that your attorney

 1    in-house, Michael Moore, had talked to Mr. Villasenor

 2    multiple times in connection with the MGA litigation and

 3    unfair competition claims, right?

 4    A    No, that's not correct.  At the time I got this, I was

 5    aware that Mr. Moore had had a conversation with

 6    Mr. Villasenor in which he learned that there had been

 7    historic conduct of this type that had already ended, and he

 8    emphasized that that is inappropriate conduct that should

 9    not be repeated because it's in violation of Code of

10    Conduct.

11    Q    He talked to him because of this litigation that we're

12    in.  Michael Moore talked to Mr. Villasenor because of this

13    lawsuit, correct?

14              MR. QUINN:  Again, assumes facts, your Honor.

15              THE COURT:  Well, not that.

16              MR. QUINN:  Lack of foundation.

17              THE COURT:  It's not a question, Counsel.  It's an

18    accusation how --

19    BY MS. KELLER:

20    Q    Is it correct that the reason Michael Moore was talking

21    to Mr. Villasenor was because of this MGA litigation?  And

22    that's a "yes" or "no."

23    A    And is there a time frame connected with that in terms

24    of my knowledge?

25    Q    Yes, between June and December of 2005.

1    A    No.

2    Q    Mr. Moore didn't report back to you what he was doing?

3    A    No, he didn't -- he didn't tell me in any level of

4    specificity such as that, and I am not sure that Mr. Moore

5    and I even directly discussed this point.

6    Q    Did he not tell you that he was talking to

7    Mr. Villasenor on 10 occasions?

8    A    No, he did not.

9    Q    And you don't know that even today?

10   A    I do not know that even today.

11   Q    Do you know that his deposition was taken within the

12   last several days?

13   A    I knew it was scheduled.

14   Q    Are you being briefed about the content of the

15   depositions that are being taken?

16   A    To some degree.

17   Q    Were you briefed about the fact --

18            MR. QUINN:  Your Honor, I object to other

19   testimony.  Mr. Moore will be testifying as the next

20   witness, as I understand it.

21            THE COURT:  Overruled.

22   BY MS. KELLER:

23   Q    Were you briefed about the fact that he met with

24   Villasenor about the MGA litigation 10 times between June

25   and December of 2005?

1          MR. QUINN:  It misstates the testimony, your

2     Honor, and it assumes facts.

3          THE COURT:  Well, I'll leave that for the jury.

4          Apparently, Mr. Moore and Ms. Thomas will be

5     testifying, so we'll see what their testimony is.

6          Overruled.

7          THE WITNESS:  No, I certainly was not told 10

8     times.  I believe I heard at some point from -- I can't

9     place when, that during the course of doing interviews

10    relating to the MGA case, Mr. Moore had his first

11    conversation with Mr. Villasenor, which is the one that I

12    was aware of at the time of receiving this.  But the 10

13    times or even more than once, I don't believe I heard prior

14    to your suggesting it in these remarks.

15    BY MS. KELLER:

16    Q    So he didn't report that back to you at the time?

17         MR. QUINN:  It assumes facts, your Honor.

18         THE COURT:  Overruled.

19         THE WITNESS:  He didn't report what back to me?

20    BY MS. KELLER:

21    Q    He didn't report back to you how many meetings he was

22    having with Mr. Villasenor or what the subject matter was?

23    A    No.

24    Q    And this is while a lawsuit that is a huge matter

25    within Mattel is going on, right?

1   A    Yes, a matter that I'm not directly managing.

2   Q    And you knew that in April of 2005, just before that

3   June time period, that MGA had sued Mattel for unfair

4   competition; you knew that?

5   A    I'm sure I knew that, yes.

6   Q    And you understood that the allegation that Mattel's

7   employees at Mattel's direction were faking their

8   credentials at trade shows to gain confidential information

9   was highly relevant to your claim of unfair competition,

10  true?

11          MR. QUINN:  Your Honor, objection.  The Court has

12  made rulings on this and when these issues were in the case

13  and when they weren't.

14          THE COURT:  Overruled.  Not as to Mattel, Counsel.

15          THE WITNESS:  I don't remember anything that had

16  some specificity in those claims and certainly did not

17  connect this to the MGA litigation when it came in.

18  BY MS. KELLER:

19  Q    You knew that MGA claimed that Mattel was unfairly

20  competing against it, right?

21  A    I did know that, yes.

22  Q    And you knew that Mr. Villasenor had now come to you

23  and said, "Hey, we've been directed by Mattel to do these

24  unfair things, and I don't want to do them anymore," right?

25  A    That's what this letter says.

1   Q    And as general counsel in charge of overseeing all your

2   in-house lawyers, it was your obligation to keep on top of

3   these issues, right?

4            MR. QUINN:  Vague.

5            THE COURT:  Overruled.

6            THE WITNESS:  It's my obligation to confirm that

7   if there's been any illegal activity, it doesn't recur, and

8   in fact, this was already historic and never did recur.

9   BY MS. KELLER:

10  Q    You knew that this was a big problem.

11  A    I actually did not view it as a big problem.  I viewed

12  it as an employment issue because this fellow had gone to a

13  lawyer who was being very opportunistic sort of to try to

14  stick the company up.

15  Q    And after the December 22nd, 2005 e-mail, there was a

16  flurry of activity about this within the legal department,

17  true?

18  A    I believe Ms. Thomas triggered an investigation.  I

19  don't know that I would call that a flurry, but she

20  triggered an investigation on these issues.

21  Q    There were numerous meetings and telephone

22  conversations where this e-mail was discussed, right?

23  A    I would expect that in the course of dealing with this,

24  there would have been such with Ms. Thomas.  I don't believe

25  I was in such meetings.

1    Q    You haven't talked to her about this?

2    A    I have not, actually.

3    Q    Up until today, you have never discussed this with

4    Ms. Thomas, like "What did you do?  You were in charge.

5    What did you do to check this stuff out?"

6              MR. QUINN:  It's compound, your Honor.

7              THE COURT:  Sustained.  Reask the question.

8    BY MS. KELLER:

9    Q    Up until today, you had never discussed with Ms. Thomas

10   the steps she took back then?

11   A    No, I never asked her, "How many meetings did you

12   attend, and was there a flurry?"  I know that she conducted

13   an investigation through an outside lawyer, and I got a

14   report of the results of that investigation.  You are asking

15   me whether I knew there was a flurry of meetings, I don't

16   expect my lawyers to report those things to me.

17   Q    You actually participated yourself, personally, in

18   telephone calls with Michael Moore, Jill Thomas, outside

19   counsel, and Mark Kimball about this e-mail from Sal

20   Villasenor in the first 30 days after December 22nd, 2005,

21   correct?

22   A    I --

23   Q    You personally?

24   A    I may have, but I don't recall such a conversation.

25   Q    People in your legal department, including you, were

1    worried about this, right?

2    A     No.  I believe Ms. Thomas and I, both, were concerned

3    about it as an employment claim by an opportunistic lawyer

4    trying to do a stickup, who had a client who had a little

5    bit of dirt that they were trying to stretch to a lot of

6    money.

7    Q     That's your position today, right?

8              MR. QUINN:  It's argumentative, your Honor.

9              THE COURT:  Sustained.

10             MR. QUINN:  Move to strike.

11             THE COURT:  Stricken.

12   BY MS. KELLER:

13   Q     You have prepared for your testimony by reviewing what

14   Mattel's legal positions are today, true?

15   A     I've done extensive preparation for my testimony, and

16   I'm familiar with Mattel's legal position, yes.

17   Q     And you're familiar with all of Mattel's legal theories

18   also, right?

19   A     Honestly, as the -- as a lawyer not directly managing

20   the case, I'm not going to say I'm aware of all of the

21   theories, I'm sorry.

22   Q     You are as familiar as anybody as any lawyer in-house

23   at Mattel, with the possible exception of Jill Thomas, about

24   what Mattel's legal theories and defenses are in this case,

25   are you not?

1   A   I would say the possible exception of Michael Moore as

2   well as Jill Thomas.

3   Q   But you are the head of the legal department.

4   A   I am the head and responsible for the law department.

5   Q   You are the executive who makes the executive decisions

6   about, for example, reporting up the chain, right?

7   A   I want to point out reporting up the chain can be done

8   by other people, but I make the decision that come as

9   through me, yes.

10  Q   But you are the one in the legal department who is a

11  direct report to Bob Eckert?

12  A   I am.

13  Q   So if something is going to get reported to the legal

14  department to Bob Eckert, it comes through you.

15  A   If it's something significant, it's likely to come

16  through me, yes.

17  Q   Now, when we first -- we took a look at 9484R, when you

18  first saw that letter, there was nothing redacted from it,

19  in other words, nothing had been whited out, right?

20  A   I'm sure that's the case.

21  Q   And you know as chief legal officer of Mattel that this

22  e-mail was not produced to MGA until 2010, correct?

23  A   I couldn't have quoted you when it was produced,

24  actually.

25  Q   Well, you know it was last year sometime, right?

1   A    It sounded -- it makes to sense to me that it was, but

2   I wouldn't have been able to come up with that on my own.

3   Q    And you know it was only produced when MGA subpoenaed

4   Mr. Villasenor himself to testify in his deposition in July

5   of 2010, right?

6            MR. QUINN:  Your Honor, there were objections and

7   no motion to compel handled by outside counsel.  The Court

8   knows the history.

9            THE COURT:  Overruled.

10           THE WITNESS:  I didn't know that at the tail, no.

11  BY MS. KELLER:

12  Q    And you know that the version of the e-mail that was

13  produced to MGA in 2010 redacted the portion concerning what

14  your in-house lawyer, Michael Moore, and your outside

15  counsel said to Mr. Villasenor when they approached him,

16  that part got whited out, right?

17  A    There was definitely some whited-out material.  I don't

18  know exactly what goes in there.

19  Q    Do you see where it says, "I've also been approached by

20  Mattel's attorneys Michael Moore and," redacted, "who have"

21  blank?

22  A    I see that.

23  Q    You knew what it said in there because you had seen the

24  document before the white out, right?

25  A    I'm sure when I saw this document I knew what it said,

1    but I did not recall this, and I honestly don't recall

2    exactly what it says now.  Mr. Quinn pointed out there's one

3    that doesn't have all of it redacted?

4    Q    And that one we just got last Friday, you know that,

5    right?

6    A    I did not know that.

7    Q    You know it was last Friday that MGA got its first

8    chance to see what Mr. Villasenor was telling you in his

9    e-mail about what your in-house attorney, Michael Moore, and

10   outside counsel did when they approached him, right?

11   A    No, I did not know that.

12             MS. KELLER:  Let's display trial Exhibit 9484A.

13   BY MS. KELLER:

14   Q    Now, we see the part that has been redacted displayed,

15   and it says, "I have also been approached by Mattel's

16   attorneys, Michael Moore and" blank, "who have inquired

17   about the business practices I have been required to follow

18   when attending trade shows and events."

19        So you knew when you saw this that Mr. Villasenor was

20   saying he wanted to talk about the -- and he had been

21   talking to your lawyers about the business practices he had

22   been required to follow when attending trade shows and

23   events, and you knew what those business practices were,

24   right?

25   A    The letter does say "required to follow," or I guess

 1   "business practices."  I'm sort of inverting the sentence.

 2   And I do know what business practices had been at issue with

 3   respect to Mr. Villasenor.  I had those two pieces.  There

 4   may have been other things that they were talking to him

 5   about.

 6   Q    And you had claimed attorney-client privilege as to

 7   that part, right?

 8           MR. QUINN:  "You" meaning him personally?

 9   BY THE COURT:

10   Q    You, Mattel, Mattel had claimed attorney-client

11   privilege, right?

12           MR. QUINN:  This is outside counsel, your Honor.

13           THE COURT:  Overruled.

14           THE WITNESS:  Well, I gather from the redaction

15   that that could be the basis for the redaction.

16   BY MS. KELLER:

17   Q    You never represented -- your legal department never

18   represented Mr. Villasenor, right?

19   A    No, we did not.

20   Q    You didn't give him any legal advice, right?

21   A    No, I don't believe we did.

22   Q    So there was no attorney-client privilege, right?

23   A    You are asking me to assess whether there's

24   attorney-client privilege here?

25           Well, with respect to the discussions with

```
 1    Mr. Villasenor, I believe there could be privilege.  Again,

 2    I'm not a litigator, but I believe there could be privilege

 3    if you are interviewing a client for purposes -- or an

 4    employee of the client for purposes of giving advice.

 5    Q    He wasn't your client, Mattel's client, right?

 6    A    An employee of --

 7    Q    And he wasn't being given legal advice, you just told

 8    us that, right?

 9    A    We're not advising Sal Villasenor, no.

10    Q    So there was no attorney-client relationship between

11    Mr. Villasenor and Mattel, right?

12              MR. QUINN:  This is argumentative, your Honor.

13              THE COURT:  Overruled.

14              THE WITNESS:  The attorney-client relationship

15    runs between the attorneys and Sal's employer, Mattel.

16    BY MS. KELLER:

17    Q    There was no attorney-client relationship between

18    Mr. Villasenor and your in-house counsel, right?

19    A    Not between him personally, no.

20    Q    And there wasn't any attorney-client relationship

21    between Mr. Villasenor and your outside counsel, right?

22    A    Not to him personally, no.

23    Q    And, in fact, what he had been called in about was just

24    fact-gathering, right?

25              MR. QUINN:  Lacks foundation.
```

```
 1                THE COURT:  Overruled.

 2                THE WITNESS:  I don't know exactly what he had

 3   been called in about.  I see the words in his letter, which

 4   I generally find to be a letter written by counsel to

 5   maximize their position, so I don't know what they --

 6   BY MS. KELLER:

 7   Q    But Michael Moore worked for you, so you had every

 8   ability to go ask Michael Moore what it was about, right?

 9   A    I absolutely had that ability, yes.

10   Q    As you do today?

11   A    I have that ability, and in my preparation, I have not

12   been talking directly to other witnesses.

13   Q    You don't want to know, do you?

14   A    That's not true.

15   Q    You know that there was no valid grounds for Mattel to

16   claim attorney-client privilege either to withhold this

17   document completely until last year or to white out the

18   portion that we are looking at now?

19                MR. QUINN:  Your Honor, this is argumentative.

20                THE COURT:  Overruled.

21                MR. QUINN:  Asks for a legal conclusion.

22                THE COURT:  Overruled.

23                Answer the question, sir.

24                THE WITNESS:  No.  I personally think there are

25   grounds, and I don't agree with your statement.
```

 1   BY MS. KELLER:

 2   Q    You were trying to hide this, correct?

 3   A    No.

 4   Q    Only after you were forced to reveal it did you come up

 5   with the explanation that you always thought it was a

 6   shakedown document and not really very important, right?

 7   A    The moment I received this, I viewed it as a shakedown

 8   document that was unlikely to be important, though we took

 9   the proper steps, nonetheless.

10   Q    You thought that Mr. Villasenor was trying to extort

11   Mattel?

12   A    I wouldn't use the word "extortion."  That has

13   particular legal significance that may go beyond what's in

14   this letter.

15   Q    Well, you had the ability to just say, "Mr. Villasenor,

16   this is a shakedown, you're fired," true?

17   A    That would be a very clumsy way to handle things, and I

18   would never do that upon receiving a letter like this, even

19   if I don't think it has any credibility.

20   Q    And the reason it would be clumsy is because

21   Mr. Villasenor would drop right outside of Mattel and tell

22   MGA all about it, right?

23   A    Absolutely never crossed my mind.

24   Q    You think his attorney is engaging in an outrageous

25   shakedown of Mattel, true?

1   A    I call it a shakedown, somewhat outrageous, yes.

2   Q    And you thought there was no justification for it,

3   right?

4   A    I doubted there was, but wanted to have an

5   investigation done to determine what the facts were.

6   Q    And all you had to do -- he was an at-will employee,

7   right?

8   A    That's correct.

9   Q    That means that you can let him go any time you want,

10  right?

11  A    Well, actually, I believe he might already had gone out

12  on leave, which does complicate the matter, and I am not an

13  employment lawyer, but either at the time of this he had

14  gone out on leave or very quickly after he had gone out on

15  leave.

16  Q    He was an at-will employee, correct?

17  A    He was an at-will employee, yes.

18  Q    And that means an at-will employee can quit whenever he

19  wants and the company can let him go whenever it wants,

20  true?

21  A    I'm not sure that's true as to an employee who's gone

22  out on a stress leave without having liability to that

23  employee.

24  Q    Well, you weren't going to have liability to a guy

25  who's a liar, making it all up, creating his own department

1    and is a rogue doing things on his own, right?

2    A    Unfortunately, I'm afraid if he's out on stress leave

3    and you just fire him summarily, even if those facts are

4    true, you may have liability to him.

5    Q    You could have just said, "Get lost."  And if you had

6    liability, so what?  Let him sue you.  You are in the right.

7              MR. QUINN:  Your Honor, move to strike.

8              THE COURT:  Stricken.

9    BY MS. KELLER:

10   Q    If you had liability, you could have litigated that

11   with him, right?

12   A    Why would I want to create liability unnecessarily?  I

13   am not sure I understand the point.

14   Q    Instead what you did was you bought him off for his

15   silence, true?

16             MR. QUINN:  It's argument.

17             THE WITNESS:  False.

18             THE COURT:  Sustained.

19             You don't have to answer that question, sir.  It's

20   sustained.

21   BY MS. KELLER:

22   Q    You did a separation agreement, Exhibit 9266 --

23        And your Honor, before we move on, could I move into

24   evidence 9484A -- R?

25             THE COURT:  It's received.

CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

60

```
 1              MS. KELLER:  Thank you, your Honor.

 2              (Defendants' Exhibit No. 9484R is received in

 3       evidence.)

 4  BY MS. KELLER:

 5  Q    You entered into a separation agreement with

 6  Mr. Villasenor, correct?

 7  A    Yes.  Mattel entered into an agreement with him, right.

 8  Q    And as the top guy, you would have had to approve it,

 9  right?

10  A    We don't have a specific rule that I had to approve it,

11  but it's probable that I approved this.

12  Q    Well, you're the guardian of Mattel's ethics and

13  compliance, and so you had to be involved in this particular

14  agreement, right?

15  A    Well, I probably approved this in the sense of -- in

16  the sense of knowing broadly what the terms were and what

17  the compensation was.

18  Q    And so you approved the clause that was inserted in

19  this that said that he had to "not discuss or disclose to

20  anyone the fact of this agreement and any allegations of

21  wrongful conduct by the company," right?

22  A    Well --

23  Q    Sir?

24  A    I don't believe that the agreement says that as

25  absolutely as you did, because there are exceptions to that,
```

1   so if you want to walk me through a particular clause, which

2   I see is on the screen but I haven't read, I'd be happy to

3   do that, but the way you phrased is an overstatement of the

4   agreement.

5   Q    You approved the clause that Mr. Villasenor was not to

6   discuss or disclose to anyone the fact of this agreement or

7   his wrongful conduct, correct?

8   A    I approved that as part of an agreement that had an

9   appropriate exception to that language.

10  Q    Well, obviously if he was subpoenaed to a court in

11  order to testify, Mattel had no power to keep him from doing

12  so, right?

13  A    That's right, and we should not do so, and so we

14  accepted that.

15  Q    Well, you could not do so, you were powerless to do

16  anything if he was subpoenaed into a court of law in order

17  to testify, right?

18  A    I believe that's correct.

19  Q    So that was meaningless, that part?

20  A    It's not meaningless at all.  We did not contractually

21  put him in a position where that would be an issue.

22  Q    And you knew that if you did, you yourself would be

23  violating the law and could be prosecuted, right?

24  A    I assume that's the case.

25  Q    So you didn't put that -- you put in here that except

1    for that situation, where he'd be required to testify

2    anyway, that if he disclosed his wrongdoing or the company's

3    wrongdoing, it was a violation of his agreement, right?

4    A    We absolutely wanted to make sure that he didn't come

5    back for more.

6    Q    You also wanted to make sure that no one else knew

7    about what had been going on in Mattel?

8    A    I don't agree with that statement.

9    Q    And you specifically did not want MGA to know about it?

10            THE COURT:  Counsel, I want a question, not a

11   statement.  Those are statements.  It's stricken.

12   BY THE COURT:

13   Q    Did you specifically provide in this agreement that

14   parties to litigation against Mattel were not to be told?

15   A    I believe it does say that, yes.

16   Q    And you knew that the very party you were in litigation

17   with on the biggest case within Mattel was MGA, right?

18   A    I'm sure we were in litigation with a number of

19   parties, but the MGA case was almost certainly the largest.

20   Q    So in addition to not turning over the document for

21   years, then turning over a document with a key part whited

22   out --

23            MR. QUINN:  Again, your Honor, objection to the

24   discovery history.

25            THE COURT:  Overruled.

1   BY MS. KELLER:

2   Q    You also inserted a clause buying Mr. Villasenor's

3   silence?

4   A    That's absolutely not true.  We did not buy his

5   silence.

6   Q    And after the document was finally produced and after

7   the whited-out part was finally revealed, then you said this

8   was just a shakedown, right?

9   A    As I've said earlier in my testimony, the moment I got

10  it, I recognized it as a shakedown.

11  Q    And you said you left it up to Michael Moore and Jill

12  Thomas to investigate this?

13  A    I think I left it with Jill Thomas is my recollection.

14  Q    You have taken the position that you never had any

15  obligation to report this to the corporation itself,

16  correct?

17           MR. QUINN:  Objection.  Argumentative.

18           THE COURT:  Just restate the question.

19  BY MS. KELLER:

20  Q    You've taken the position, have you not, that you never

21  had any obligation --

22           MR. QUINN:  Same objection, your Honor.

23           THE COURT:  Well, I haven't heard the question

24  yet.

25           Why don't you finish the question.

1    BY MS. KELLER:

2    Q    You've taken the position, have you not, that you never

3    had any duty to report what you found out about this

4    Villasenor's situation to Mr. Eckert?

5    A    That's true, yes.

6    Q    And you didn't ever tell him about it, right?

7    A    I did at some point.  Not at this time.

8    Q    Well, you only told him after it essentially blew up in

9    the middle of this litigation, right?

10   A    No.  Unfortunately, I can't put the timing of it, but I

11   do remember a later date, which was not close to these

12   dates, where I had a brief conversation, and it was a very

13   brief conversation.

14   Q    Would it have been right around Mr. Villasenor's

15   deposition in July of 2010?

16   A    Again, I don't know the timing of it.

17   Q    And isn't it part of your duty to be the guardian of

18   corporate ethics, along with Mr. Eckert at your side, to --

19              THE COURT:  Well, I'm going to strike the question

20   already, Counsel.  Just reask it.

21   BY THE COURT:

22   Q    Given that you are the number one guardian of the

23   corporation's ethics and Mr. Eckert's number two, as I

24   understood your testimony earlier --

25   A    I don't think I ever got clarity on what you meant by

 1   one and two.  I think I got the broadest volume.  He got the

 2   most important things that I --

 3           THE COURT:  I'm going to strike the question,

 4   Counsel.  Mr. Eckert will be testifying, and you'll have a

 5   chance to ask Mr. Eckert his position, ask this question.

 6   BY THE COURT:

 7   Q    It was your obligation to report to Mr. Eckert if there

 8   was even something that you thought was a hint of serious

 9   wrongdoing in the company, right?

10   A    If I thought that there was serious wrongdoing at the

11   company, I would definitely have taken it to him.

12   Q    And is it also your testimony that Ms. Thomas never

13   fully informed you of the results of her investigation?

14   A    I don't believe that's my testimony.  I can't remember

15   the details of the report that I got, but it's not my view

16   that she failed to fully inform me.  I just don't remember

17   with precision.

18   Q    So you didn't get a full report, Mr. Eckert didn't get

19   any report, I mean, when --

20   A    I certainly haven't said that I didn't get any report

21   or a full report.  I said I don't recall the report with

22   precision.

23   Q    Now, you've known for a while that you were going to be

24   testifying, right?

25   A    Weeks or months, I'm not sure.

1    Q    You've had plenty of opportunity to study every

2    document, every deposition that you wanted to, right?

3    A    In weeks or months, I certainly could have done that.

4    Q    You knew that this was going to be an issue that was

5    going to be a serious issue in this case, right?

6    A    I knew it was an allegation that MGA had made and that

7    there was a possibility that I would end up talking to you

8    about it today.

9    Q    And you didn't educate yourself about all the details

10   even then?

11   A    I think I educated myself as to the relevant details.

12   Q    Did you in -- in the course of educating yourself, did

13   you ever identify who created the manual that was given to

14   employees about how to create fraudulent identities?

15   A    I'm not sure that's known.  I don't know the answer as

16   to who did that.

17   Q    Did you try to find out?

18   A    I -- I think I inquired.  I don't think -- I think I

19   inquired where it came from, and I do recall, actually, that

20   I learned that it came from Sal's discovery, but Sal didn't

21   say he created it.

22   Q    You have a very skilled head of security at Mattel,

23   Richard de Anda, right?

24   A    He has been head of security at times.  I don't think

25   he's currently our head of security.

1    Q    You've always had pretty skilled security people at

2    Mattel, right?

3    A    We've had some skilled people and some less so.

4    Q    A whole department, right?

5    A    There is a department, a security department, yes.

6    Q    Or a police officer, yes?

7    A    Some.

8    Q    Former FBI agents, yes?

9    A    I am not aware of what.

10   Q    And did you ever direct anybody in your security

11   department, you personally, "Hey, I want to find out as the

12   guardian of the company's ethics, I need to find out who

13   created this manual on how to fake identities and sneak into

14   competitors' showrooms"; did you do that?

15   A    No, I didn't.

16   Q    Since you've educated yourself about all this, have you

17   learned that there were two or more people engaged in this

18   practice over the years?

19   A    Yeah, I learned it's four or five, depending on how you

20   define "this practice."

21   Q    Did you learn that this had been going on at Mattel

22   from 1992 to 2005, 13 years?

23   A    I don't know the start date, but I am aware of the end

24   date of February of 2005, I think.  I'm not certain even on

25   that point.

1    Q    And in educating yourself, did you learn that two of

2    Mr. Villasenor's immediate supervisors, Jeff Lange and

3    Candice Chang, actually engaged in this practice themselves?

4    A    No, I'm not familiar with those names.

5    Q    In the course of investigating the wrongdoing, did you

6    find out that two of Mr. Villasenor's supervisors, Bennett

7    Wolk and Matt Turetzky, actually approved of those

8    practices?

9    A    No.  My understanding is that Matt Turetzky directed

10   him not to do this, and with respect to Bennett Wolk, I

11   actually am unclear what the facts are.

12   Q    Are you aware that Mr. Turetzky testified in this trial

13   that he knew all about this practice?

14            MR. QUINN:  Misstates the testimony, your Honor.

15            THE COURT:  Overruled.

16            THE WITNESS:  My understanding is he testified

17   that he had told Sal that he's not allowed to engage in this

18   practice.

19   BY MS. KELLER:

20   Q    Are you aware that he testified that he knew about it

21   when it was going on and did nothing?

22   A    No.

23   Q    Are you aware that --

24            THE COURT:  Now, just a moment.

25            For the ladies and gentlemen of the jury, you'll

1    recall that testimony.  I'll leave that to you whether

2    that's an accurate statement by counsel or not.

3    BY MS. KELLER:

4    Q    Are you aware that Jill Thomas in your legal department

5    knew in 2006 that Kelly Osier and Sharon Rahimi had engaged

6    in the same practices using fake business cards to get entry

7    into confidential showrooms?

8    A    I believe I would have known from Jill that the

9    investigation revealed that those parties had in earlier

10   years, I think dating back to 2001 or 2002, I believe those

11   two had done that.  I could be confusing because there are

12   some differences as to who did what in this regard.

13   Q    So it's a "yes," she told you that?

14   A    I believe she did, because I got a report of the

15   investigation.

16   Q    And did you know that when Mr. Villasenor arrived at

17   Mattel in 2002, that he said it was already going on, there

18   were already Mattel employees engaging in the practice,

19   which is why he didn't question it; were you aware that?

20   A    I think I heard that, but I am not exactly sure where

21   or when.

22   Q    And did you ever direct security to get down there and

23   root this out, find out, get to the bottom of it?

24   A    Well, no.  What I was aware of is that everyone who was

25   engaged in the practice and who was still an employee at the

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 70 of 185   Page ID #:313743
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

70

1     end of the investigation was reprimanded, and so we had an

2     investigation that had identified the people who were still

3     at the company, and I don't see any purpose in asking

4     security to look for people who have left, frankly.

5     Q    And is this the reprimand, the letter that vaguely

6     talks about being disappointed with some employees' conduct;

7     is that what you are talking about?

8     A    I am not sure if we are talking about the same letter.

9     Q    Speaking of Mr. Turetzky, by the way, are you aware

10    that Mr. Turetzky actually approved the use of his own home

11    address on the fake business cards?

12    A    No, I'm not.

13    Q    Did you ever ask him?

14    A    No, I didn't.

15    Q    Did you ever direct anybody else to ask him?

16    A    No.  I didn't attempt to direct the investigation.

17    Q    Or did you ever say, "I want to find out from this

18    guy's boss exactly what the boss knew"?

19    A    No.  The investigation was done by an outside lawyer

20    under Jill Thomas' supervision.

21    Q    In reviewing the materials before testifying today, did

22    you look at his testimony in this very case, Matt

23    Turetzky's?

24         MR. QUINN:  Your Honor, the witness was excluded.

25    He can't review testimony.

1              THE COURT:  Overruled.

2              THE WITNESS:  I don't believe I did, no.

3    BY MS. KELLER:

4    Q    Did anybody brief you about it?

5              THE COURT:  Now, ladies and gentlemen, there's

6    been an exclusion of witnesses once they've been called, so

7    you should know that they've been instructed not to

8    communicate with one another, or at least if not explicitly

9    by the Court, that's been understood by all counsel.

10             Now, whether they have or not, we --

11             MR. QUINN:  Or to read trial transcripts, your

12   Honor.

13             THE COURT:  Pardon me?

14             MR. QUINN:  Or to read trial transcripts.

15             THE COURT:  No, Counsel, just that they are not

16   supposed to communicate.

17   BY MS. KELLER:

18   Q    Have you read Mr. Turetzky's testimony in this very

19   trial?

20   A    No.

21   Q    Has anybody briefed you about it?

22   A    No.

23   Q    Have you learned that somebody named Carey Plunkett

24   actually went into the MGA showroom using fake credentials?

25   A    I believe I was aware that someone had done that, or at

 1    least there was an allegation.  I'm not very clear on that

 2    and whether it's Carey Plunkett.

 3    Q    Are you aware that Tyler Bradley, formerly Tyler

 4    Snyder, went into MGA showrooms?

 5    A    I'm sorry, with respect to your last question, I think

 6    Carey Plunkett, if I'm recalling correctly, did not use

 7    false credentials at any time.  I may be confusing her with

 8    another individual, but that's my recollection.

 9              THE COURT:  Now, just a moment.

10              Witnesses who are testifying have been previously

11    instructed generally to counsel and the court that they are

12    not to discuss their testimony with each other.  That may,

13    in fact, also extend to counsel also stating to a witness,

14    "You shouldn't be reading the testimony or depositional

15    testimony of somebody else."

16              I don't recall, Counsel, that explicit admonition,

17    but I take it that that's a standard admonition.  I just

18    don't recall giving it at the end of the case.  I recall

19    giving the admonition not to discuss it, so counsel may have

20    extended that, and appropriately so.  I would hope that they

21    come to court fresh with their own information, but it may

22    be that there's been some slippage and maybe some

23    inadvertent slippage, so --

24              Counsel?

25

1   BY MS. KELLER:

2   Q    The fact of the matter is since you've never directed

3   security to do a thorough investigation about this, you

4   really don't know who might have been involved in it,

5   correct?

6   A    We had an outside lawyer conducting an investigation.

7   Q    You never had anybody from security or law enforcement

8   conduct an investigation, right?

9   A    That's true.

10  Q    And when you are in the middle of litigation with a

11  party like MGA, you don't necessarily want an investigation

12  to turn up a lot of wrongdoing, right?

13  A    I want the investigation that one would do based on the

14  letter I received, and that's what we have conducted, and

15  we -- I honestly would not have handled it any differently

16  whether we had not been in litigation with MGA; it had no

17  bearing.

18  Q    You learned that Mattel had actually recruited Sharon

19  Rahimi, a former employee who left in 1999, to come back in

20  2004 as a, quote, "consultant," unquote, expressly so that

21  she could engage in this very practice, right?

22  A    No, that's not true.  She is a consultant today, I

23  think, doing other things.  I'm actually -- I'm sorry, I'm a

24  little unclear, but I'm confident that I've never had

25  information suggesting that we recruited her to engage in

 1    the conduct that Sal talks about here.

 2    Q    Did you ever ask her?

 3    A    Again, I didn't conduct the investigation.

 4    Q    And this -- these reprimands that you talked about, it

 5    was in 2006, Alan Kaye sent Michael Shore a letter in which

 6    he expressed disappointment that allegations of passed

 7    conduct that would be incompatible with Mattel's principles

 8    had recently surfaced, that's the reprimand letter you were

 9    talking about?

10    A    It may be.  I'd probably need to have the letter in

11    front of me.  And the way you described it was that Alan

12    sent him a letter, and I very much doubt that's the way that

13    was conveyed.

14    Q    So it's 25103, please take a look.

15         Is this a letter you characterized as a reprimand?

16    A    This is the letter I was thinking of, yes.

17    Q    And it's drafted by Jill Thomas?

18    A    I'm not certain who drafted it.

19    Q    And it doesn't say that Mr. Shore did anything wrong,

20    right?

21    A    Well, I believe it says there are allegations of

22    conduct incompatible with Mattel's principles.

23    Q    It doesn't say he did them, right?

24    A    It certainly implies that we think he did it.  It was

25    disappointment that it was reported earlier.

1    Q    When you're reprimanding somebody, don't you want to do

2    something more than just imply that he could be one of a

3    vague class of people that might have done something wrong?

4    A    Well, as I mentioned earlier, I am confident this

5    wouldn't have been mailed to him.  It would have been

6    presented to him, and there would have been a discussion,

7    I'm sure, so I think he understood what we were talking

8    about.

9    Q    Well, the "would have" and "would have," you don't

10   know?  I mean, are you telling me is "we would have done

11   this," or "we would have done that," and so he would have

12   understood --

13               (Interruption in the proceedings.)

14               THE COURT:  Let's strike the question and reask

15   it.

16               MS. KELLER:  I'll -- I'll -- I'll move on.

17   BY MS. KELLER:

18   Q    This is it, though, this is what you characterize as

19   Michael --

20               MR. QUINN:  This is --

21               THE WITNESS:  Yes.

22               (Interruption in the proceedings.)

23               THE COURT:  Stop.  Stop.  Stop.

24               Rest.

25               Counsel, reask the question.

1    BY MS. KELLER:

2    Q    This is what you characterize as Michael Shore's

3    reprimand, true?

4    A    Yes.

5    Q    Are you aware that all these people, Michael Shore,

6    Carey Plunkett, Sharon Rahimi, Kelly Dermody, Geri Pilgrim,

7    Matt Turetzky, they all got raises and bonuses after this

8    conduct occurred; are you aware of that?

9    A    Not specifically, no.

10   Q    And you know Mr. Villasenor was given a couple hundred

11   thousand dollars when he left, right?

12   A    That doesn't sound -- I'm not familiar with that

13   number, a couple hundred thousand.  I don't know.

14   Q    I want to ask you about a different topic.

15        Oh, you -- do you still maintain that you don't even

16   know of any group within Mattel that's ever been referred to

17   as the "market intelligence group"?

18             MR. QUINN:  It's argumentative.

19             THE COURT:  We're going to strike the words "do

20   you still maintain."

21             Reask the question.

22   BY MS. KELLER:

23   Q    As of February 16th, 2010, was it your position that

24   you had never been aware of any group within Mattel called

25   the "market intelligence group"?

CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

77

1    A    Yes.

2    Q    Is that still true?

3    A    Is it still true that I'm not aware?  I'm aware that

4    this group called itself -- I actually thought it was a

5    department, although I don't think the moniker is correct.

6    Q    Did you testify under oath in February of 2010 that you

7    didn't even recognize the name?

8    A    What name?

9    Q    "Market intelligence group"?

10   A    I probably did.  I am not familiar at that time with

11   it.  I've since learned that they called themselves a

12   department or group.

13   Q    I want to ask you about a different topic.

14        You know that the initials NHB have been used as a

15   reference to MGA within Mattel's law department, correct?

16   A    Yes.

17   Q    In fact, you were the one who decided that instead of

18   writing MGA, you would use NHB to refer to MGA, right?

19   A    Yes, I did.

20   Q    And this was after there was a Wall Street Journal

21   article in July of 2003 identifying Carter Bryant as a

22   designer of Bratz, right?

23   A    Yes, it was actually prompted by that Wall Street

24   Journal article.

25   Q    And the article concerned you enough that you created

1   this code, right?

2   A    I was concerned that given --

3   Q    Sir, is that a "yes"?

4            MR. QUINN:  Excuse me, your Honor.  Can he finish

5   his answer?

6            THE COURT:  Just a moment.

7            Finish your answer.

8            THE WITNESS:  I was concerned that given some of

9   the suggestions in the article that Bratz was an

10  infringement of a Mattel property, that there would be focus

11  on this by employees, and Mattel has an unfortunate rumor

12  mill, and I was concerned about that rumor mill intersecting

13  with the fact that the department had a number of

14  MGA-related matters going on, and I didn't want employees to

15  think that there was some sort of fight brewing between the

16  law department and MGA over that article.

17  BY MS. KELLER:

18  Q    So that's the only reason for it, the rumor mill,

19  right?

20  A    Yes.

21  Q    Back to my original question, the article concerned you

22  enough that you created a code NHB; "yes" or "no"?

23  A    Well, the article to get the rumor mill --

24  Q    Sir?  Sir, is that a "yes"?

25  A    I think that's a "yes."

1    Q    And didn't you tell Michael Moore, your in-house

2    intellectual property lawyer, that NHB was an acronym for

3    North Hills Bratz?

4    A    I don't remember telling Michael that, but that is

5    where it came from.

6    Q    So it's just a coincidence that N is one letter up from

7    M, H is one letter up from G, and B is one letter up from A?

8    A    It actually is.

9    Q    And you orally instructed members of the law department

10   to use NHB as a code, right?

11   A    I recall instructing Jill Thomas.  I think she probably

12   said that to others.  I think my only conversation was with

13   Jill.

14   Q    You instructed her that that was the code to be used

15   for MGA from now on, right?

16   A    I am not sure if I said for all times, but I said let's

17   use NHB instead of MGA.

18   Q    In connection with any lawsuit regarding Carter Bryant

19   and Bratz, right?

20   A    It would be with respect to any matters we had going on

21   and the billings on any matters we had going on that related

22   to MGA.

23   Q    You even wanted NHB used in connection with invoices of

24   outside attorneys, right?

25   A    I don't recall specifically saying that the outside

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 80 of 185   Page ID #:313753
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

80

1    attorneys should put NHB on, but my concern was as bills go

2    through the accounting department, for example, and I

3    suppose the accounting department does get -- I'm trying to

4    get the history and time of our accounting process --

5                 MS. KELLER:  Objection.  Nonresponsive.

6                 MR. QUINN:  Your Honor --

7                 THE COURT:  No, no, no.  Both of you stop.

8                 We are going to strike the question.  We are going

9    to wait for you.  Are you okay?

10                 *(No audible response.)*

11                 THE COURT:  Okay.  The reason for striking the

12    question and the answer and the objection and the counter

13    objection is because counsel are talking over the top of

14    each other, and talking over the top of the witness, who is

15    talking over the top of counsel, who is talking over the top

16    of witness.

17                 All right.  She's going to ask you a question,

18    now.

19                 THE WITNESS:  Okay.

20    BY MS. KELLER:

21    Q    Is one circumstance in which NHB was used with respect

22    to invoices of outside attorneys; "yes" or "no"?

23    A    Yes.

24    Q    You didn't want anyone to start asking questions if you

25    paid large sums to outside counsel in anticipation of a

1    lawsuit against Carter Bryant, correct?

2    A    That's not true.

3    Q    You even used NHB in conversation, right?

4    A    I think we probably did, yes.

5    Q    You used NHB on some e-mails, right?

6    A    Yes.

7    Q    Let's take a look at Exhibit 2302R, which is in

8    evidence.  This is an e-mail from Robert Eckert to himself

9    dated April 28th, 2004.

10        Now, you know, as Mattel's general counsel at the time,

11   that Mattel sued Carter Bryant the day before, April 27th,

12   2004, right?

13   A    Sounds about right.

14   Q    So a day after Mattel sued Carter Bryant, Mr. Eckert

15   e-mailed himself an online Wall Street Journal article about

16   Mattel's lawsuit with "NHB time line" written in the top

17   left, right?

18   A    I see that line there, and I don't understand how that

19   would get above one's name in an e-mail.

20   Q    Sir, do you see -- do you see it there?

21   A    I see it.  You asked if whether I knew he e-mailed that

22   to himself with that on it, and I don't understand how you

23   can do that.

24   Q    And that testimony mirror's Mr. Eckert's, doesn't it,

25   even though I didn't ask you about it?

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 82 of 185   Page ID #:313755
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

82

```
 1              MR. QUINN:  It's argumentative, your Honor.  Move
 2    to strike.
 3              THE WITNESS:  I have no --
 4              THE COURT:  You don't have to answer the question.
 5    BY MS. KELLER:
 6    Q    And you know, Mr. Normile, as Mattel's general counsel
 7    at the time and now, that the only document produced in this
 8    case until last month that had NHB on it was this one; is
 9    that right?
10              MR. QUINN:  It's just absolutely false, your
11    Honor.
12              THE COURT:  Yeah, I'm going to sustain the
13    objection.  I'll take that up with counsel.  I don't know if
14    that's correct or not.  Let us discuss that after.
15    BY MS. KELLER:
16    Q    Well, do you remember testifying on this subject at
17    your deposition, sir?
18    A    I remember testifying of the subject of NHB, yes.
19    Q    Was it your instruction to use NHB even when discussing
20    MGA with Mr. Eckert?
21    A    I'm sure I never gave him an instruction to that
22    effect.  He may have potentially picked it up because that
23    was a use in the law department.
24    Q    What about Richard de Anda in global security?
25    A    My only conversation on the subject was with Jill
```

1    Thomas.

2    Q    Did you instruct Jill Thomas to have everyone start

3    using NHB with respect to the MGA litigation?

4    A    I instructed her to use NHB with respect to references

5    to MGA.  Generally -- I probably wasn't specific, but my

6    import was with respect to the law department.  It may have

7    moved beyond that.

8    Q    And you had no reason other than your concern about the

9    rumor mill at Mattel for this, right?

10   A    That's correct.

11   Q    But you know as general counsel, that your lawyers,

12   Michael Moore and Jill Thomas, were using NHB as code even

13   in investigative reports, right?

14   A    I did not know that.

15   Q    And in investigations targeting Mattel employees for

16   any real or imagined contact with MGA or MGA employees,

17   right?

18   A    No, I'm not clear what you are referring to.

19   Q    This was years after the 2004 lawsuit against Carter

20   Bryant that I'm talking about.

21   A    I'm just not --

22           MR. QUINN:  This is vague and ambiguous, Your

23   Honor.

24           THE COURT:  Just a moment.  Do you understand the

25   question?

```
 1                THE WITNESS:  I don't understand the question.

 2                THE COURT:  I'm going to strike the question.

 3                Reask the question, Counsel.

 4    BY MS. KELLER:

 5    Q    You had been worried about the rumor mill ginning up

 6    because you didn't want people speculating about a lawsuit

 7    against Carter Bryant before one had been filed, right?

 8    A    My concern at the time was really rumors relating to

 9    MGA because the article suggests that basically Bratz might

10    be an infringement of an internal Mattel project, so my

11    focus was on MGA more than Carter Bryant when I instituted

12    this.

13    Q    Okay.  But it was years after the 2004 lawsuit against

14    Carter Bryant, years after the Mattel rumor mill issue that

15    this NHB was still being used?

16    A    I believe it ended up being in use for years.  I think

17    it became just complete habit to refer to MGA as NHB by

18    people in the law department.

19    Q    Well, and it was also a way to be able to say that you

20    didn't have documents relating to MGA called upon, right?

21                MR. QUINN:  This is just argumentative.  There is

22    no good faith basis for that question, your Honor.

23                THE COURT:  Just a minute.

24                Sustained.

25                MR. QUINN:  Millions of documents were produced.
```

```
 1            THE COURT:  Sustained and strike the answer.
 2    BY MS. KELLER:
 3    Q    Let's -- under your leadership, the Mattel legal
 4    department has regularly referred to -- referred any
 5    suspicions of misconduct by employees to global security to
 6    investigate, right?
 7    A    I'm sorry, you're switching topics, I didn't follow the
 8    whole question.  Can you repeat it?
 9    Q    Under your leadership, the Mattel legal department has
10    regularly referred allegations of misconduct by employees to
11    global security to investigate, true?
12    A    Certainly significant numbers.  I wouldn't say all, but
13    I think significant numbers, yes.
14    Q    And you are aware, are you not, that sometimes these
15    matters are referred to with the letters NHB?
16    A    I thought you were speaking generally, so if they
17    relate to MGA, they may be referred to as NHB, but others
18    would not be.
19    Q    Let's look at Exhibit 37009-32; do you recognize this
20    as --
21    A    I don't have the document.
22         If you are asking me if I recognize this, I don't
23    believe I do.  This doesn't look familiar.
24    Q    Is this a document with your assistant general counsel,
25    Jill Thomas' -- it's a document that the original e-mail
```

1    message is from your assistant general counsel, Jill Thomas?

2    A    It appears to be, yes.

3    Q    Dated Tuesday, February 13, 2007?

4    A    Yes.

5         MS. KELLER:  Your Honor, I move it into evidence.

6    This is 37009R.

7         THE COURT:  Received.

8         *(Defendants' Exhibit No. 37009R is received*

9    *in evidence.)*

10        THE COURT:  Well, we can take this up during the

11   recess.

12        MS. KELLER:  Your Honor, and I'll --

13        THE COURT:  Just a moment.  I want to see that

14   document.

15        Thank you very much.

16        MR. QUINN:  There are some issues with this

17   document, your Honor.

18        THE COURT:  I'll sustain the objection at this

19   time, Counsel.  We'll discuss this outside the presence of

20   the jury.

21   BY MS. KELLER:

22   Q    You delegated to Ms. Thomas, for the most part,

23   investigations of employees that you thought might have say,

24   for example, a friend who worked at MGA?

25   A    I don't recall delegating any such investigation.

1    Q    Or an employee of Mattel's who maybe had attended a

2    birthday party of an MGA employee, would you delegate an

3    investigation of that nature to Ms. Thomas?

4              MR. QUINN:  Objection.  Irrelevant, your Honor.

5              THE COURT:  Just a moment.

6              It's sustained at the present time.

7    BY MS. KELLER:

8    Q    Mattel was vigilant about investigating anyone who was

9    ever thought to have any connection with MGA, true?

10   A    No, I don't believe that's true.  It depends on how you

11   define a connection.

12   Q    Well, for example, if a Mattel employee even went to a

13   birthday party of an MGA employee, that might be cause for

14   investigation, right?

15             MR. QUINN:  Same objection, your Honor.  This is

16   irrelevant.

17             THE COURT:  Does this have to do with security

18   issues, trade secrets, where are we at in this conversation?

19             MR. QUINN:  I don't know, your Honor.

20             THE COURT:  Just a moment.

21             Counsel?

22             MS. KELLER:  Security issues and investigation,

23   follow-up, NHB, the degree of vigilance.

24             THE COURT:  All right.  I think it's time for the

25   jury to take a recess.

 1           You are admonished not to discuss this matter

 2     amongst yourselves, nor form or express any opinion

 3     concerning this case.  Have a nice recess.  I think we'll

 4     come get you in 20 minutes to 2 hours.  I'm just kidding

 5     you.

 6           *(Laughter.)*

 7           THE COURT:  And Counsel, have a seat.  And

 8     Mr. Normile, please step down, sir, and wait out in the

 9     hallway, please.  Thank you.

10           *(The following proceedings is taken outside*

11        *the presence of the jury.)*

12           THE COURT:  All right.  Counsel, the jury is no

13     longer present.

14           Concerning 37009, which is now before the Court,

15     Mr. Moore will certainly be testifying, and apparently

16     Mr. de Anda has been called back.  This document can be gone

17     into with them.  I don't expect reasonably that Mr. Normile

18     is going to know about that document.

19           Number 2, where are we going?  In other words, if

20     it's tied to a trade secret, I know there is a tape

21     involving Brawer, which I've seen portions of, and there's

22     surveillance of Brawer after he left Mattel, but the general

23     question about a birthday party leaves me with a memory

24     lapse.  Is this Brawer at a birthday party?

25           MS. KELLER:  No, your Honor.

1          THE COURT:  Who is it and what's the relevance?

2          MS. KELLER:  This is what -- in the new group of

3    documents that we've been looking at, what we have seen is

4    an incredible degree of vigilance about anything having to

5    do with anybody connected to MGA, and that went on for

6    years.

7              And I think that has to do, among other things,

8    with the statute of limitations in that it shows a degree of

9    investigative vigilance within Mattel that lends credence to

10   the idea that they knew or should have known or should have

11   investigated Carter Bryant.

12             I mean, here is a guy who they think was a

13   designer, they have already -- who was a designer at Mattel,

14   they are already are on notice through Lily Martinez and Ivy

15   Ross and an anonymous letter early on that -- claiming that

16   he had infringed on -- infringed Mattel products, and we

17   have just an almost fanatical monitoring of all kinds of --

18   any contact, if somebody is thought to have applied for a

19   job at MGA, they are investigated thoroughly, followed,

20   surveilled.  Phone logs are pulled.

21             If somebody, even an intern who's expressed an

22   interest in an MGA job, and so it doesn't make any sense --

23   and de Anda was there the whole time.  It makes no sense

24   that knowing the allegations about Carter Bryant and Mattel,

25   that they would not have acted in accordance with their

1    habit and their custom and their practices all the way

2    through and investigated that to the hilt.

3           THE COURT:  Not at this time, Counsel.  That's new

4    information.  I haven't had a chance to review it.  I'd want

5    to see the documents, and I'd want to see the specificity of

6    that.  I am going to preclude you from this area at this

7    time.  It's speculative.

8           All right.  Counsel, you've got 15 minutes for

9    recess.

10           *(Recess.)*

11           *(The following proceedings is taken in the*

12       *presence of the jury.)*

13           THE COURT:  All right.  We are back in session.

14    The jury is present, the alternates, all counsel and the

15    parties.

16           And this is the continued direct examination by

17    Ms. Keller on behalf of MGA and Mr. Larian.

18                **ROBERT NORMILE, DEFENSE WITNESS, RESUMED**

19           MS. KELLER:  Nothing further at this time, your

20    Honor.

21           THE COURT:  Cross-examination by Mr. Quinn on

22    behalf of Mattel.

23                        **CROSS-EXAMINATION**

24    BY MR. QUINN:

25    Q    Mr. Normile, if we could take a look at Exhibit 9484A,

 1    that's the version with only the one redaction, all right?

 2             MR. QUINN:  If we could put that up on the screen.

 3             And Ken, if we can perhaps enlarge that second

 4    paragraph.

 5    BY MR. QUINN:

 6    Q    You were asked by Ms. Keller about that second sentence

 7    there, which says, "I've also been approached by Mattel's

 8    attorneys, Michael Moore and blank, who have inquired about

 9    the business practices I have been required to follow when

10    attending trade shows and events"; do you see that?

11    A    I'm sorry, the wrong paragraph was up initially, so I

12    need to catch up with you.  So it's the first paragraph now,

13    so -- yes, I see that.

14    Q    And you were asked some questions about -- Ms. Keller

15    about whether that phrase that had been redacted, have

16    inquired about the business practice I've been -- practices

17    I've been required to follow when attending trade shows and

18    events, whether that ever could have been privileged; do you

19    recall those questions, subject to the attorney --

20    A    I recall some questions along those lines, yes.

21    Q    Okay.  You indicated that the client is Mattel?

22    A    Yes.

23    Q    And in your understanding as general counsel, does --

24    do Mattel's lawyers, can they have privileged communications

25    with Mattel employees?

1    A    Certainly.

2    Q    And can you explain how that works?

3    A    Well, it's really the only way to have conversations

4    with the company because Mattel, Inc., is not in itself a

5    being that you can have communications with, so it is

6    through the employees that you communicate with the client,

7    the corporate entity.

8    Q    So there is no Mattel who we can call up and talk to.

9    It's just employees and people -- the folks who work there?

10   A    That's right.

11   Q    And one of them at the time was a man by the name of

12   Sal Villasenor?

13   A    That's correct.

14   Q    And was it your understanding that as an employee, it

15   would be possible for Mattel's lawyers to have -- in doing

16   their jobs to advising the company, to have privileged

17   communications with Mr. Villasenor just like any other

18   employee?

19   A    Yes.

20   Q    And it appears that the attorney who initially redacted

21   that thought that that was properly privileged because it

22   refers to, Mr. Villasenor is talking about a communication

23   that he had with Mattel lawyers, a -- one, a Mr. Michael

24   Moore, who had made a certain inquiry of him, correct?

25             MS. KELLER:  Objection.  Calls for speculation

 1   unless the attorney is going to be produced for cross

 2   examination.

 3           THE COURT:  That does call for speculation, but

 4   you can state your opinion.  You were asked your opinion

 5   during direct examination, you want to cast an opinion

 6   concerning this from your perspective, you may.

 7           MS. KELLER:  Your Honor, I'd move to strike the

 8   portion dealing with "the attorney obviously thought" unless

 9   we are going to have that person testify.

10           THE COURT:  Well, that question is stricken.  Just

11   reask it.  He can testify from his own perspective.  He was

12   asked on direct his opinion.

13           MR. QUINN:  Right.

14   BY MR. QUINN:

15   Q    Do you believe that Michael Moore could have a

16   communication with a Mattel employee which could be subject

17   to the attorney-client privilege?

18   A    Absolutely.

19   Q    And why is that?

20   A    Because Michael Moore is an attorney, and an employee

21   of Mattel is an employee of his client.

22   Q    Now, the language -- this refers to an inquiry here

23   that Mr. Villasenor said he had from a lawyer?

24   A    I'm sorry, the -- the -- I was looking for the word

25   "inquiry."  Yes.

Case 2:04-cv-09049-DOC-RNB  Document 10338  Filed 03/31/11  Page 94 of 185  Page ID #:313767
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

94

1   Q    Michael Moore, who have inquired about the business

2   practices?

3   A    Yes, that's correct.

4   Q    Would an inquiry potentially be the type of

5   communication that could be subject to attorney-client

6   privilege?

7   A    Yes.

8   Q    All right.  So let's look at the substance of that.

9   We -- we have the unredacted version up there.  And what it

10  refers to is "Business practices I've been required to

11  follow when attending trade shows and events"; do you see

12  that?

13  A    I do.

14  Q    Now, that language or very similar language was always

15  in this letter, wasn't it, if you look down at the next

16  paragraph?

17  A    You mean the same concept?

18  Q    Yes.

19  A    I don't think the concept of the inquiry is in the next

20  paragraph, but I would have to read it, but certainly the

21  notion of business practices that he's been required to

22  follow when attending trade shows and events, that notion is

23  certainly covered in the next paragraph.

24  Q    So it says in the second sentence of the next

25  paragraph, "I no longer wish to engage in misrepresentations

```
 1    and undercover assignments in which I am paid by Mattel to

 2    attend trade shows and events," closed quote.

 3         Do you see that?

 4    A    I do, yes.

 5    Q    And that was never redacted?

 6    A    That's correct.

 7    Q    That was never hidden?

 8    A    That's correct.

 9    Q    The -- the redaction, which has since been removed,

10    related to an inquiry with a lawyer covering the same

11    subject, correct?

12    A    That's correct.

13    Q    Now, you've indicated a couple of times in response to

14    Ms. Keller's questions that you regarded this letter, when

15    you saw it, as a stickup, I think were your words?

16    A    I think I used those words.

17    Q    Could you please explain why you characterize it that

18    way?

19    A    Well, I was aware of Sal Villasenor from prior

20    information, and I understood him to be an employee who

21    engaged in improper conduct at an earlier period of time and

22    was told not to engage in that conduct.

23         I then get this letter that seems to suggest that he's

24    being told to engage in that conduct, and it has caused

25    stress, which is a word you will see in employment-type
```

1    disputes very frequently when someone is being opportunistic

2    and sometimes when they're not, there are certainly genuine

3    stress issues, and then the letter directs all further

4    communications to be through his lawyer, so he's hired

5    counsel, and --

6              THE COURT:  That's one paragraph down.

7              THE WITNESS:  It is.  I'm sorry.  I was referring

8    to the whole letter.

9              MR. QUINN:  If we can put that last paragraph up,

10   Ken.

11             THE COURT:  Okay.

12             THE WITNESS:  And essentially the letter falls

13   into a category of what's called a whistle-blower letter or

14   whistle-blower communication.  And if a whistle-blower is

15   alerting you to bad behavior by someone else, you need to

16   investigate, for sure, and you can have a serious issue.

17             Here, I knew that he had already been told not to

18   engage in this conduct, and he appears to be trying to

19   position himself as a whistle-blower after he's been told

20   not to engage in the conduct by sort of late, claiming that

21   he's being told to engage in the conduct.

22             MS. KELLER:  Objection.  This is a narrative

23   answer.

24             THE COURT:  Overruled.

25

1    BY MR. QUINN:

2    Q    Did you -- when you received this letter, did you think

3    that, uh-oh, we are facing a claim from Mr. Villasenor?

4    A    I felt we would probably be facing a claim from

5    Mr. Villasenor, yes.

6    Q    And by the way, in the second paragraph, do you see the

7    reference there to a John Louie?

8    A    I do, yes.

9    Q    And do you know Mr. Louie?

10   A    I don't know Mr. Louie.  I'm familiar with the name at

11   this point.

12   Q    Do you know whether he had recently been assigned to be

13   Mr. Villasenor's supervisor and had told him, I'm not

14   comfortable with your doing any gray activities?

15            MS. KELLER:  Objection.  No foundation.

16            THE COURT:  No, you can answer that question if

17   you are familiar with it at the time of this letter.

18            THE WITNESS:  At the time of this letter, I did

19   not know the John Louie name, no.

20   BY MR. QUINN:

21   Q    Now, you were asked some questions about when this

22   letter was provided to MGA.  Are you aware that this case

23   was stayed for a period of over a year?

24   A    Yes.

25   Q    Where all discovery stopped?

1    A    Yes.

2    Q    And I believe some dates of that stay have already been

3    read into the record, but you are aware that both sides have

4    made significant discovery requests of each other?

5    A    Very significant, yes.

6    Q    And millions of document have been produced by both

7    sides?

8    A    Yes.

9    Q    And that as part of that also, both sides have made

10   objections and asserted claims of privilege?

11   A    Yes.

12   Q    And sometimes, many times, there have been motions to

13   the Court and the Court has ruled on those -- on those

14   matters; are you aware of that?

15   A    I am.

16   Q    And that's been true by both sides in this case,

17   correct?

18   A    Yes.

19   Q    You indicated that you turned this matter over to Jill

20   Thomas, and she was your chief employment lawyer?

21   A    Yes.

22   Q    And why would she have been the logical person to

23   handle this?

24   A    Because it appears to be an employment claim positioned

25   as a whistle-blower letter.

1    Q    Did you regard Ms. Thomas as being competent to handle

2    this matter?

3    A    Yes, though I expected her to work with outside counsel

4    on a matter such as this.

5    Q    How many years have you worked with Ms. Thomas?

6    A    I believe she joined Mattel in '97, if I recall

7    correctly.

8    Q    Sorry, I'm bad --

9    A    Sorry.

10   Q    Fourteen years roughly?

11   A    Fourteen years.

12           THE COURT:  Stop, stop, stop.  We are going to

13   strike the question.  We are going to strike the answer.

14           Jane can't get the talk over.  So Jane, just a

15   moment, just rest.

16           Okay.  Counsel, your question.

17           MR. QUINN:  I apologize, your Honor.

18           THE COURT:  That's okay.  I want time for both

19   sides, so --

20   BY MR. QUINN:

21   Q    You've worked with her for about 14 years?

22   A    Yes, that's correct.

23   Q    Let me ask you, even if case is -- a claim is brought

24   and even if it doesn't have merit, is it still expensive to

25   defend and resolve?

1   A    Absolutely.  You can spend a lot of money, and we do

2   often, unfortunately, spend a lot of money on meritless

3   claims.

4   Q    And in this case, Ms. Keller asked you some questions,

5   he was an at-will employee and couldn't you just terminate

6   him, and you indicated that that, in itself, could also

7   expose the company to liability?

8   A    That's correct.

9   Q    And why is that?

10  A    Well, in a circumstance where an employee has

11  positioned themself as a whistle-blower, there are, I

12  believe, statutory protections, and even in the absence of

13  statutory protections, I think you would have a problem

14  under case law with a whistle-blower, and if an employee has

15  gone on a stress leave, you can have claims for terminating

16  someone on stress leave, and the substance, if you'd like me

17  to get into, is that they would claim that you were

18  retaliating against them for having raised the claims or

19  gone out on stress leave.

20  Q    So ultimately, Mattel paid, to resolve this matter and

21  to get Mr. Villasenor to leave, some $160,000, a number like

22  that?

23  A    A number like that, yes.

24  Q    Why would Mattel pay Mr. Villasenor $160,000 for a

25  claim that apparently you believe was meritless?

1    A    Well, there were multiple components in there.  Some of
2    the money went to his lawyer.  Often, you end up paying the
3    fees of the counsel to the employee.
4              MS. KELLER:  Objection.  Misstates the evidence.
5    Lawyer's fees were paid separately.
6              THE COURT:  Hold on.  No speaking objections.
7              MS. KELLER:  It misstates the evidence, your
8    Honor.
9              THE COURT:  All right.
10             You can ask questions on redirect, Counsel.
11   Overruled.
12   BY MR. QUINN:
13   Q    So why would Mattel pay $160,000?
14   A    We frequently pay severance when employees leave,
15   depends on the circumstance of their departure, but this is
16   an employee who had been with the company for 14 years, and
17   the severance amount is calculated relative to length of
18   employment, and that's a fairly long employment period.
19             And also, with respect to the stress claims, there were
20   claims of medical expenses that came into account, and this
21   is fairly typical of employment disputes where you've got a
22   bunch of factors that contribute to a payment that you'd
23   rather not make, but as a practical matter, it's better to
24   make the payment than go on into litigation over the issues.
25

1    BY MR. QUINN:

2    Q    Does the cost of defending the claim factor into that,

3    the decision of making a payment?

4    A    Absolutely.  You can inevitably spend more than that if

5    you fought a case like this.

6    Q    You were also asked some questions about the provision

7    in the settlement agreement where he agreed -- where

8    Mr. Villasenor agreed not to publicize or make comments

9    about his claim or the underlying conduct; do you recall

10   that?

11   A    I do, yes.

12   Q    Why would Mattel agree to that?

13   A    Well, we would want a provision --

14        MS. KELLER:  Objection.  Assumes facts not in

15   evidence that Mattel agreed to it as opposed to asked for

16   it.

17        THE COURT:  Overruled.

18        MR. QUINN:  Requires an agreement, your Honor.

19        THE COURT:  Overruled.

20        THE WITNESS:  From my perspective, we would want

21   that in an agreement in these circumstances.  We have

22   somebody who has been very opportunistic in trying to come

23   and get a payday from us, and if we were to simply settle

24   all the issues that he's raised without addressing something

25   like that, you would expect there's a possibility they'd

1    come back and ask for more under a threat of going to the

2    press, for example, or something like that.

3            And frankly, this was not something that we would

4    have wanted publicized.  It's inappropriate conduct,

5    embarrassing conduct, and we would not have wanted it to be

6    splattered across the papers.

7    BY MR. QUINN:

8    Q    And finally, you were asked some questions about the

9    code "NHB," which I think you said was your idea?

10   A    It was, yes.

11   Q    Now, you come from a business transactional legal

12   background rather than as a litigator, correct?

13   A    That's right.

14   Q    And in your background as a business transactional

15   lawyer, are code names commonplace?

16   A    They are, yes.

17   Q    And why is that?

18   A    Well, for example, in the context of corporate

19   acquisitions, which is something I've been involved with

20   extensively in my career, particularly in the case of public

21   companies, there is concern that if the name of the target

22   company were to become known, there's a risk of insider

23   trading that would violate the securities laws, so you want

24   confidentiality and strict secrecy really about the party in

25   question, and we typically routinely, in fact, use code

1    names in those circumstances.

2    Q    And have you used them before for litigation matters or

3    anticipated litigation matters as well, other than in this

4    instance?

5    A    I have, yes.

6            MR. QUINN:  Nothing further.  Thank you.

7            THE COURT:  Redirect by Ms. Keller.

8                      **REDIRECT EXAMINATION**

9    BY MS. KELLER:

10   Q    Mattel is the biggest toy company in the world?

11   A    Yes, it is.

12   Q    Richest toy company in the world?

13   A    Depending on how you say richest, I think we would most

14   likely be, yes.

15   Q    So somebody in your company who has shaken you down,

16   who is engaged in wrongful conduct that may be criminal

17   conduct for many years, because you don't want to have to

18   fight it out in a lawsuit with him, you pay him off; is that

19   pretty much what it boils down to?

20   A    I wouldn't phrase that as a payoff to him, but we

21   settled the claim.

22   Q    This guy didn't have a lot of money, you knew that,

23   right?

24   A    I don't know that I knew that.  I don't consider that

25   relevant in these contexts.

1   Q    It's relevant to how much justice he can afford, right?

2          MR. QUINN:  This is argumentative.  Vague and

3   ambiguous.

4          THE COURT:  Overruled.

5          THE WITNESS:  No, it's not.  Typically in these

6   claims, I don't know about this particular case, but

7   typically the lawyers are on contingency fees where they are

8   not being paid by their client.

9   BY MS. KELLER:

10   Q    Have you been instructed to give long, narrative

11   answers to my questions so it will eat up time?

12   A    I have not.

13   Q    Okay.  I'm going to ask you a question.  Somebody who

14   isn't rich, somebody who has never made the kind of money

15   you make or some of the other Mattel executives make can't

16   afford to fight a long, bitter lawsuit against Mattel,

17   right?

18   A    No, that's not true.

19   Q    Somebody who is making say 60-, 70-, $80,000 a year,

20   that person, if he has to shell out a couple million dollars

21   in attorney's fees probably isn't going to be able to do it,

22   right?

23   A    If he had to pay attorney's fees in that magnitude, he

24   probably wouldn't be able to do it.

25   Q    And you thought that any lawsuit he would bring would

```
1    be completely meritless, right?

2    A    I did expect that any lawsuit he would bring on the --

3    at the time that I got this letter would likely be

4    meritless, but I knew we had to investigate to determine

5    whether that's true.

6    Q    And you knew that Mattel can afford to hire the finest

7    attorneys in the United States, right?

8    A    Quinn Emanuel.

9    Q    There you go.

10   A    Yes.

11   Q    And so you knew that this meritless lawsuit --

12        MR. QUINN:  I don't object, your Honor.

13        (Laughter.)

14   BY MS. KELLER:

15   Q    You knew that this meritless lawsuit brought by this

16   guy who didn't make much money was going to be easy for your

17   firm, as you said, Quinn Emanuel, to crush, crush the guy

18   like a gnat, right?

19   A    No, not at all.

20   Q    So how much do you suppose Mattel might have spent on

21   attorney's fees altogether?  I mean, here is Mr. Villasenor,

22   wouldn't the first thing that you'd do would be to fling

23   right back in his face all of his wrongful conduct?

24   A    In the context of a litigation, is that what you are

25   saying?
```

1    Q    Yeah.

2    A    I never got to the point of thinking about litigation

3    strategy in the case, to tell you the truth.

4    Q    You could have crushed him in an instant with all of

5    the wealth that Mattel has and the legal fire power, right?

6    A    No, we have cases more currently underway that have

7    been going on for more than a decade, one particular case

8    where the plaintiff has not paid legal fees.  It is a

9    contingency case, and we've spent many millions of dollars

10   on the case.

11   Q    What's the name of the case?

12   A    The name of the case is Gunther Wall.

13   Q    And who are the lawyers on the other side?

14   A    I think there have been a number of different firms

15   over the years.

16   Q    And you think Mr. Villasenor -- you're actually telling

17   us that you think Mr. Villasenor's case would have fallen

18   into that category?

19            MR. QUINN:  Objection.  Argumentative.  Vague and

20   ambiguous.

21            THE COURT:  Sustained in its present form.

22   BY MS. KELLER:

23   Q    You know that the reason Mattel paid Mr. Villasenor

24   money to go away was because you didn't want his allegations

25   to see the light of day in a lawsuit, in a newspaper or

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 108 of 185   Page ID #:313781
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

108

1    anywhere else, right?

2    A    That's not true.

3              MS. KELLER:  Nothing further.

4              THE COURT:  Recross?

5              MR. QUINN:  Nothing further.

6              THE COURT:  Okay.  Sir, I'm going to ask you to

7    remain on call until, just to be safe, Friday, and the case

8    will go to the jury on April 7th, but I'll ask you to remain

9    on call until late then.  Thank you very much.  You may step

10   down.

11             Counsel, your next witness, please.

12             MS. KELLER:  We call Michael Moore, your Honor.

13             THE COURT:  Thank you.

14             Mr. Moore, if you'd step forward between the

15   double doors, sir.  And would you stop at that location and

16   please raise your right hand.

17             **MICHAEL MOORE, DEFENSE WITNESS, SWORN**

18             THE WITNESS:  I do.

19             THE COURT:  Mr. Moore, if you'd please be seated

20   here in the witness box.

21             Mr. Moore, if you'd state your full name for the

22   jury, please.

23             THE WITNESS:  Michael Christopher Moore.

24             THE COURT:  Will you spell your last name, sir.

25             THE WITNESS:  M-o-o-r-e.

1          THE COURT:  Thank you.

2          Counsel, direct examination by Ms. Keller.

3                    **DIRECT EXAMINATION**

4    BY MS. KELLER:

5    Q    Mr. Moore, you're an in-house attorney for Mattel; is

6    that right?

7    A    Yes.

8    Q    And you joined Mattel in 2000?

9    A    Yes.

10   Q    Michelle McShane hired you, did she?

11   A    She did.

12   Q    Is your current position as an expert counsel in the

13   Mattel law department with your specific area being

14   intellectual property?

15   A    Yes.

16   Q    Now, you are aware that in April of 2005, MGA sued

17   Mattel for, among other things, unfair competition, correct?

18   A    Yes.

19   Q    And you considered MGA's -- the allegations in MGA's

20   complaint to be fairly broad, true?

21   A    Yes, I did.

22   Q    Now, they were different from the claims that Mattel

23   had previously investigated and asserted against Carter

24   Bryant, right?

25   A    The --

```
 1              MR. ZELLER:  The question is overbroad.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  They were different claims.

 4    BY MS. KELLER:

 5    Q    And on April 18th, 2005, a memorandum from Robert

 6    Normile was distributed to all Mattel employees instructing

 7    them to preserve documents related to the allegations in

 8    MGA's complaint, right?

 9    A    That's right.

10    Q    You helped coordinate the collection, preservation of

11    those documents?

12    A    Yeah, I assisted with the coordination in the

13    collection of documents related to that case.

14    Q    And based on the allegations in MGA's complaint, Mattel

15    began interviewing employees who might have had some

16    knowledge about those allegations or information relevant to

17    them?

18    A    Yes, I participated in conducting witness interviews.

19    Q    Mattel interviewed more than 60 people in connection

20    with those allegations?

21    A    Yes.

22    Q    Sal Villasenor was one of those interviewed?

23    A    Yes.

24    Q    And together with outside counsel, you met with

25    Mr. Villasenor in connection with MGA's allegations, you,
```

1    yourself?

2    A    Yes, I did.

3    Q    And this was on June 21st or 22nd?

4    A    That's right.

5    Q    And had this been delegated to you by Mr. Normile or

6    Ms. Thomas?

7    A    One of the two.

8    Q    Now, is it correct that you don't remember instructing

9    Mr. Villasenor in that meeting to preserve documents

10   themselves?

11   A    Not specifically in that meeting.

12   Q    Now, that meeting, June 21st or 22nd, wasn't the first

13   time you had ever talked to Mr. Villasenor, correct?

14   A    No, not the first time I had ever spoken to him.  I had

15   met him previously in 2003.

16   Q    You had actually spoken to him several times before

17   June 2005, true?

18   A    About various things, yes.

19   Q    Right.  What I'm driving at, he wasn't an anonymous

20   figure to you at that point; you knew who he was?

21   A    Yes, that's true.

22   Q    But your contact with him increased dramatically after

23   MGA filed its lawsuit alleging unfair competition, right?

24   A    I began to talk to him a little bit more, but I don't

25   know that dramatically is the right word.

1  Q    Well, between June and December of 2005, isn't it true

2  that you and Mr. Villasenor had around 10 substantive

3  conversations concerning the MGA litigation?

4  A    That's not true.  We --

5  Q    Did you speak to him probably 10 to 20 times since June

6  to December of 2005?

7  A    Yeah, that's an estimate, and I was including in an

8  estimate, incidentally bumping into him in the cafeteria and

9  the elevator and other things.

10  Q    I'm specifically talking about in connection with this

11  lawsuit.

12  A    I think I spoke to him less than 20 times about this

13  lawsuit, in that period.

14  Q    But you had substantive discussions with him about this

15  lawsuit, correct?

16  A    Yeah, I had probably about four, maybe five substantive

17  conversations with him, and by that I mean, you know,

18  setting up additional witness interview time and potentially

19  even talking about gathering other types of information in

20  terms of NPD publicly-available information.

21  Q    You talked to him between 10 and 20 times between June

22  and December 2005 altogether, right, 10 to 20?

23  A    Yeah, about 10 to 20.

24  Q    And you had multiple substantive conversations with him

25  as well, right?

1    A    Again, I had about this particular case, probably four,

2    five.

3    Q    About 10 substantive conversations altogether?

4    A    Well, conversations also included trying to set up

5    times to meet with him again.

6    Q    No, I'm talking about substantive conversations, around

7    10?

8    A    Well, I'm telling you more about what the conversations

9    were about.

10   Q    I'm asking about substantive conversations, not

11   scheduling, not picking out a time, not come to my office,

12   not bumping into each other in the cafeteria.

13        Sitting down and having substantive conversations,

14   wasn't it more like 10 times?

15   A    No, that's not what I remember.

16   Q    Take a look at your deposition from a few days ago,

17   March 20th, 2011, and I'm looking at lines 19 through 24.

18            MR. ZELLER:  Page?

19            MS. KELLER:  Page 669.

20            THE WITNESS:  Okay, I'm there.

21   BY MS. KELLER:

22   Q    Did you have around 10 substantive conversations with

23   Mr. Villasenor between June and December of 2005?

24   A    It says 10 to 20 times that I spoke with him.  Later

25   on, it says probably about five to six were substantive.

1        MS. KELLER:  Your Honor, I'd ask permission to

2   read lines 19 through 24.

3        THE COURT:  You may.

4   BY MS. KELLER:

5   Q    Question:  "How many of those were substantive

6   conversations of any kind rather than saying hi in the

7   hallways?"

8        Answer:  "Probably 5, 6, you know, I'm going to say

9   more like, thinking about it now, 10."

10       And this is just a few days ago, right, this testimony

11  was given?

12  A    Yes, that's right.  And you're right, I do say 10 here,

13  and in that, I was including setting up meetings about the

14  case.

15  Q    Substantive conversations, that's what it says, right?

16  A    That's -- that's what it says.

17  Q    That's what you were asked, right?

18  A    That's what I was asked, and I'm telling you what I

19  meant.

20  Q    Okay.  What I'm asking, though, is what we see on the

21  typewritten page, those were the actual words that you were

22  asked, right?

23  A    That's right.

24  Q    And earlier you discussed the 10 to 20 times in

25  connection with casual conversations, right?

1    A    (No audible response.)

2    Q    If you remember.  Do you need to read your deposition

3    to remember?

4    A    No, I don't think I spoke to him at all more than 20

5    times, including casual conversations.

6    Q    Now, the conversations that you had that were

7    substantive concerned the MGA litigation, correct?

8    A    Some of them did, yes.

9    Q    And some of them were in person and some were by phone,

10   right?

11   A    Yes.

12   Q    You also collected documents from Mr. Villasenor?

13   A    We did.

14   Q    And aside from you, yourself, outside counsel and Jill

15   Thomas were also involved in collecting documents from him,

16   true?

17   A    Yes, that's right.

18   Q    And these were collected from the area of Mattel where

19   Mr. Villasenor worked?

20   A    Yes.

21   Q    Now, as soon as you got documents from Mr. Villasenor,

22   you gave them to outside counsel, true?

23   A    Yes.

24   Q    And you identified these documents as relevant to MGA's

25   unfair competition claims against Mattel, correct?

1   A    I don't remember exactly what I said, but I would have

2   said, these are from Sal.

3   Q    Well, but generally speaking, that was why you

4   identified the documents and why you turned them over to

5   outside counsel, true?

6   A    True.

7   Q    And are you aware that these documents related to

8   Mr. Villasenor were not produced by Mattel until 2010?

9        MR. ZELLER:  That assumes facts.

10       THE COURT:  Overruled.

11       THE WITNESS:  I'm not aware of exactly when they

12  were produced.

13  BY MS. KELLER:

14  Q    Were you aware of the fact that they were produced only

15  after MGA issued a subpoena to Mr. Villasenor in 2010?

16       MR. ZELLER:  That assumes facts.

17       THE COURT:  Overruled.

18       THE WITNESS:  No, I'm not aware of when they were

19  produced.

20  BY MS. KELLER:

21  Q    Now, I'd like you to take a look at Exhibit 9484R, and

22  this is -- this is the e-mail that Mr. Villasenor sent to

23  Mr. Normile and Mark Kimball on December 22nd, 2005, on

24  which you were copied.

25       Now, before receiving this e-mail, you'd actually

```
 1   talked to Mr. Villasenor within a day, right?

 2   A    Yes, that's right.

 3   Q    And the reference that you see at the bottom to

 4   Patricio Barrera, you knew that Mr. Villasenor had a lawyer,

 5   right?

 6   A    I knew he had been speaking to a lawyer, right.

 7   Q    And you weren't surprised to find that it was Patricio

 8   Barrera, true?

 9   A    Well, I was not expecting this letter.

10   Q    Well, the fact that Patricio Barrera was the lawyer

11   referenced didn't surprise you, right, as opposed to some

12   other lawyer?

13   A    The name was familiar because I had heard it just

14   recently, yeah.

15   Q    And if we can look at Exhibit 27464R, page 117.  If you

16   look at the original message, this is actually an e-mail

17   from you to Mr. Villasenor dated December 22nd, 2005, right?

18   A    That's correct.

19         MS. KELLER:  Your Honor, I move the admission of

20   27464R-117.

21         THE COURT:  Received.

22         (Defendants' Exhibit No. 27464R-117 is

23      received in evidence.)

24   BY MS. KELLER:

25   Q    Now, you sent this -- this e-mail to Mr. Villasenor at
```

```
 1    10:59 a.m., right before the time you received Exhibit 9484R

 2    at 2:41 p.m., correct?

 3            MS. KELLER:  See if we can put them side by side.

 4    BY MS. KELLER:

 5    Q    And this -- this e-mail from Michael Moore to Sal

 6    Villasenor dated December 22nd, 2005 says, "Hey Sal, the

 7    direct dial number for," and it's been redacted, "is," and

 8    it gives a phone number.  "Please see if you can have Pat

 9    call," there's another name redacted, "directly"; do you see

10    that?

11    A    I do.

12    Q    And so when you said, "Please see if you can have Pat

13    call," you were referring to Pat Barrera, right?

14    A    I was.

15    Q    So you knew Mr. Villasenor had retained an attorney

16    before you ever received Exhibit 9484R, the letter where

17    Mr. Villasenor talks about the stress he's been

18    experiencing, right?

19    A    Well, I knew he had been speaking to Pat Barrera.  I

20    didn't know whether he had been -- what he had been retained

21    for or whether -- if he was just a friend.

22    Q    Well, at this point, you were on a first-name basis

23    with Mr. Villasenor, right?

24    A    I was.

25    Q    And basically you told -- what you were telling
```

1    Mr. Villasenor in this e-mail is, if you are going to have

2    another person in the discussion, then I think it's better

3    that that person be Mattel's outside counsel, right?

4    A    Well, what I'm saying here is, essentially, if --

5    essentially, yeah, if you are going to have an outside

6    lawyer speak about something, then I'm going to have John

7    Corey speak to the outside lawyer.

8    Q    You were referring to Mattel's outside lawyer speaking

9    to Mr. Villasenor's outside lawyer, right?

10   A    Yes, I'm sorry, outside counsel, right.

11   Q    So you understood, then, that the subject matter of the

12   conversation between Mr. Barrera and Mr. Redacted would

13   concern the MGA litigation, right?

14   A    No, I didn't have that understanding then.  I wasn't

15   quite sure what was happening.

16           MS. KELLER:  If I can have just a moment, your

17   Honor.

18   BY MS. KELLER:

19   Q    And Mr. Moore, when you were deposed March 20th and

20   March 21st of this year, that's the first time you've been

21   deposed in connection with this case, right?

22   A    I was deposed last year.

23   Q    Okay.  That's -- in connection with this issue,

24   correct?

25   A    In connection with Sal Villasenor.

1    Q    Yes.

2    A    Yes.

3    Q    You thought that the subject matter of the conversation

4    between Mr. Barrera and outside counsel would concern the

5    MGA litigation, correct?

6    A    In some way it might relate.  I wasn't sure then what

7    it was going to relate to.

8    Q    When you testified a few days ago, did you say that you

9    understood that it would relate -- it would concern the MGA

10   litigation?

11             MR. ZELLER:  It's improper use of the transcript.

12             MS. KELLER:  Your Honor --

13             THE COURT:  Overruled.

14   BY MS. KELLER:

15   Q    Did you just testify a few days ago that you thought

16   the subject matter of the conversation would concern the MGA

17   litigation?

18   A    Well, I thought it might concern the MGA litigation.

19             MS. KELLER:  Your Honor, I'd ask to read page 768,

20   lines 11 through 13?

21             MR. ZELLER:  What day is it?

22             MS. KELLER:  3/21/11.

23             THE COURT:  You may.

24             MS. KELLER:  "The witness:  I thought the subject

25   matter of the conversation would concern the MGA

1    litigation."

2    BY MS. KELLER:

3    Q    And Mr. Moore, in fact, that was your purpose --

4              MR. ZELLER:  Your Honor, can the question be read?

5    There is no question that's been read here.

6              MS. KELLER:  I will ask the question, your Honor.

7              Question:  "Do you understand the subject matter

8    of the contemplated conversation to in some way involve the

9    MGA litigation?"

10             Answer:  "I thought the subject matter of the

11   conversation would concern the MGA litigation."

12   BY MS. KELLER:

13   Q    Now, Mr. Moore, in between last week and now, is there

14   any -- has there been anything that's occurred that has

15   caused your memory to become less acute?

16   A    No.

17   Q    When you gave that testimony a week ago, were you

18   trying to give truthful testimony?

19   A    Absolutely.

20   Q    Had you been prepared carefully for your deposition?

21   A    I spoke with outside counsel.

22   Q    And outside counsel spent time preparing you and

23   working with you and showing you documents, right?

24   A    Yeah, some time.

25   Q    And in fact, the purpose -- your purpose in having

1    outside counsel contact Mr. Barrera was that you wanted them

2    to speak, in connection with MGA litigation, any additional

3    document collection needed, and any information you could

4    get from Mr. Villasenor that would relate to MGA's claims,

5    correct?

6    A    Well, I -- at the time, I thought that MGA litigation

7    might come up and might concern it, and if it would concern

8    it, then I would have outside counsel speak with Pat

9    Barrera.

10   Q    It was your purpose in setting up the meeting, right?

11   A    Yeah, I intended to set up the meeting for that

12   purpose.

13   Q    Yes, because it was going to relate to MGA's claims,

14   right?

15   A    Well, I was never sure of that.

16   Q    That's the reason you did it, true?  The reason you

17   suggested having outside counsel and Pat Barrera get

18   together was in connection with the MGA litigation, right?

19   A    I was working with outside counsel on the MGA

20   litigation, and so I -- and I was trying to speak with Sal

21   about the MGA litigation, and when he mentioned a lawyer, I

22   referred the lawyer to outside counsel.

23   Q    Okay.  That was my question.  This was all in

24   connection with the MGA litigation, true?

25   A    (No audible response.)

1    Q    Yes?

2    A    Well, true.

3    Q    Now, you personally learned about the practice of using

4    fake business cards to get competitive information in the

5    process of talking with Mr. Villasenor, right?

6    A    I learned at some point in June of '05, that he had

7    used fake business cards.

8    Q    And between June and December of 2005, you also learned

9    that other people had been -- other people at Mattel had

10   been using fake business cards and fake identifies to get

11   competitive information, true?

12   A    I had heard that.

13   Q    And this was between June and December, right?

14   A    That's right.

15   Q    And it was -- when you learned about the other

16   employees using fake business cards to get competitive

17   information, it was some time after June 21st, 2005?

18   A    Yes, it was.

19   Q    And is it your contention that while you knew they were

20   using fake business cards and fake identities to get

21   competitors' information, that you didn't know anything

22   about their using that information to sneak into

23   competitors' showrooms until Mr. Villasenor's deposition?

24             MR. ZELLER:  Argumentative about contention.

25             THE COURT:  Overruled.

```
 1            THE WITNESS:  I -- I didn't know exactly what had

 2   been done until Sal Villasenor's deposition.

 3   BY MS. KELLER:

 4   Q    So you knew he had -- you knew he and others at Mattel

 5   had fake business cards, right?

 6   A    That's what they said, yes.

 7   Q    You knew that he and others had used those fake

 8   business cards and fake identities to get competitors'

 9   information, right?

10   A    That's right.

11   Q    And you never asked them -- never asked Mr. Villasenor

12   or any of the others, well, what did you do, how do you use

13   it to get the information?  Never asked?

14   A    I believe that question was asked.

15   Q    By you?

16   A    By me and outside counsel.

17   Q    Well, but with -- just -- as I understand it, it wasn't

18   until Mr. Villasenor's deposition last year that you had any

19   idea that he was actually using those cards and fake

20   identities and that the others were, to get into

21   competitors' showrooms; is that true?  Or did you know in

22   2005?

23   A    I wasn't certain that they'd been used to get inside of

24   competitors' showrooms.

25   Q    When you say you weren't certain, did you ask?
```

1   A    Questions were asked about how things were done.

2   Q    Did you ask?

3   A    I asked and outside counsel asked.

4   Q    And did you -- okay.  You asked?

5   A    Right.

6   Q    When you had all these meetings with Mr. Villasenor

7   where you had substantive discussion about the MGA

8   litigation, one of the questions that you surely must have

9   asked was, well, so what were these fake identities for,

10  right?

11  A    That's right.

12  Q    And how did you get the competitors' confidential

13  information, right?

14  A    That question was asked, yes.

15  Q    And so Mr. Villasenor told you, well, we used the fake

16  identities to sneak into private showrooms at toy fairs,

17  right?

18  A    That's not what I understand.

19  Q    Do you have notes of these conversations?

20  A    I don't have notes of them, no.

21  Q    Did you make notes of these conversations?

22  A    I didn't, no.

23  Q    Did you direct somebody with you to make notes while

24  you were interviewing him?

25  A    I didn't instruct anybody to take notes.

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 126 of 185   Page ID #:313799
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

126

1    Q    Did you see anybody taking notes?

2    A    Well, I knew somebody was taking notes.

3    Q    Who was taking notes?

4    A    Outside counsel.

5    Q    Of the interviews of Mr. Villasenor?

6    A    Of at least one interview, yes.

7    Q    Which interview was that?

8    A    The one that took place June 21st, 2005.

9    Q    Are you claiming that that information is privileged

10   and therefore nondiscloseable to MGA?

11            MR. ZELLER:  This is just argument.

12            THE COURT:  Overruled.

13            MR. ZELLER:  And work product.

14            THE COURT:  Overruled.

15            THE WITNESS:  I am not making that claim

16   necessarily.  I think it is work product and it's

17   privileged.  It's a witness interview done in connection

18   with litigation.

19   BY MS. KELLER:

20   Q    How long did this interview last?

21   A    I'm not -- I'm not certain.

22   Q    More than an hour?

23   A    That, I don't know.

24   Q    More than two hours?

25   A    Well, the interview I attended lasted probably about 45

1    minutes.

2    Q    The one that you had outside counsel present taking

3    notes?

4    A    Well, the one -- at that particular interview, I am not

5    sure that notes were taken.

6    Q    So you're sure they were taken at some interview?

7    A    Actually, no, I'm assuming they were, but yeah.

8    Q    You are talking about 10 conversations with

9    Mr. Villasenor, okay, right?

10            MR. ZELLER:  Misstates the witness' testimony.

11            THE WITNESS:  No, that's not what I'm talking

12    about.

13            THE COURT:  Overruled.

14   BY MS. KELLER:

15   Q    Ten substantive conversations, right?

16   A    I had 10 conversations, estimated.

17   Q    At how many were outside counsel present?

18   A    Probably maybe one or two.

19   Q    You have no record of this that you kept?

20   A    That I had an interview with Sal Villasenor?

21   Q    You have not even jotted down the date and time and who

22   was present somewhere, on a calendar maybe, a file?

23   A    Well, the interview with Sal Villasenor, I believe, is

24   reflected on my calendar, but -- somewhere.

25   Q    As well as who was there?

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 128 of 185   Page ID #:313801
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

128

1    A    I'm not sure, I haven't seen it.

2    Q    Was it your goal not to leave a paper trail?

3    A    No.

4    Q    Are you aware that MGA only got the chance to see the

5    unredacted portion of Exhibit 9484R last Friday for the

6    first time?

7    A    Yeah, I'm not aware when they first -- when it was

8    first unredacted and shown to MGA.

9    Q    Well, let's look at that exhibit again with the

10   redacted portion revealed, and this -- this says, "I have

11   recently met with my direct supervisor, John Louie,

12   regarding Mattel's goals and expectations of me with respect

13   to market intelligence at upcoming trade shows and events.

14   I've also been approached by Mattel's attorneys, Michael

15   Moore and blank, who have inquired about the business

16   practices I have been required to follow when attending

17   trade shows and events."

18        So you and Mattel's outside counsel interviewed

19   Mr. Villasenor specifically about the business practices he

20   had been required to follow when attending trade shows and

21   events, right?

22              MR. ZELLER:  That assumes facts.

23              THE COURT:  Overruled.

24   BY MS. KELLER:

25   Q    That's what it says, right here, doesn't it?

```
 1              MR. ZELLER:  It's compound.

 2              THE WITNESS:  Well, it says --

 3              THE COURT:  Just a moment.  Do you understand the

 4    question?  Do you understand the question, sir?

 5              THE WITNESS:  I think I understand it.

 6    BY MS. KELLER:

 7    Q    I'll reask it.  What it says is that you and this

 8    outside counsel inquired about the business practices

 9    Mr. Villasenor had been required to follow when attending

10    trade shows and events, right?  Is that what it says?

11    A    That's what it says, we were inquiring.

12    Q    And you knew -- when this letter refers to the business

13    practices he had been required to follow when attending

14    trade shows and events, you knew that that was using fake

15    identities and fake business cards to get into Mattel's

16    competitors' private showrooms and get confidential catalogs

17    and price lists, right?

18    A    I knew -- well, I thought that this particular sentence

19    referred to him using fake business cards.

20    Q    You did not think because of Mattel's assertions of

21    privilege, that this document would ever see the light of

22    day, right?

23              MR. ZELLER:  Assumes facts.

24              THE COURT:  Overruled.

25              You can answer the question, sir.
```

```
 1              THE WITNESS:  Yeah, I provided this memo, this
 2    e-mail to counsel, and if it was going to be produced, it
 3    should be produced.
 4    BY MS. KELLER:
 5    Q     When did you produce it to counsel?
 6    A     Counsel saw this e-mail very soon after it was written.
 7    Q     How soon?
 8    A     I couldn't tell you exactly, but I think within a few
 9    days, if not that very day.
10    Q     So you thought it was important enough -- you thought
11    this letter was important enough to get it to Mattel's
12    outside counsel right away, true?
13    A     I thought it was an important letter, yeah, and I
14    thought that outside counsel should see it.
15    Q     And you thought that the allegations in it were
16    potentially explosive allegations concerning the MGA
17    litigation, right?
18              MR. ZELLER:  Argumentative, "explosive."
19              THE COURT:  Overruled.
20    BY MS. KELLER:
21    Q     True?
22    A     I didn't know whether it was going to concern the MGA
23    litigation or not, but I knew these were important
24    allegations to look in to, for sure.
25    Q     Well, as we've discussed, when you set up the meetings
```

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 131 of 185   Page ID #:313804
CV 04-9049-DOC – 03/29/2011 – Day 41, Vol. 2 of 3

131

1   with Mr. Villasenor's lawyer, it was specifically about the

2   MGA litigation that you were talking, right?

3   A    Well, I wasn't sure what they would be talking about,

4   but that was certainly going to be a subject.

5   Q    We just read from your deposition where you said you

6   thought the conversations were going to concern MGA's

7   litigation; do you remember that, just a few minutes ago?

8   A    I do.  I was a little confused as to why Pat Barrera

9   was involved, but --

10  Q    The bottom line is, you knew that MGA and Mattel were

11  in very heated litigation at the time you got this letter,

12  right?

13  A    That's right.

14  Q    And you knew that MGA had accused Mattel of unfair

15  business practices, right?

16  A    That's right.

17  Q    And now, you've got a guy in house who's saying, I

18  think I've been committing criminal wrongdoing by being

19  forced by Mattel to do, you know, engage in wrongful conduct

20  when I'm going into these competitors' showrooms; you've got

21  this guy telling you that, right?

22  A    Well, what Mr. Villasenor did, I think, was wrong.  I'm

23  not sure that it was criminal, but yes, he's saying that

24  he's concerned about his conduct.

25  Q    Well, and you don't know if it was criminal because you

1    personally didn't investigate whether his activity violated

2    any laws criminally, right?

3    A    Well, what I understand he was doing was getting

4    competitive information from toy -- from toy fairs.

5    Q    Under false pretenses with fake credentials, right?

6    A    (No audible response.)

7    Q    Correct?

8    A    Yes, and at toy fairs, the information there generally

9    isn't trade secret.

10   Q    Well, I understand that's Mattel's position, but what

11   I'm asking --

12              MR. ZELLER:  Move to strike the comment.

13              THE COURT:  Sustained.  Stricken.

14   BY MS. KELLER:

15   Q    That's Mattel's legal position, isn't it?

16              MR. ZELLER:  Move to strike.

17              THE COURT:  Sustained.  Stricken.

18   BY MS. KELLER:

19   Q    What I'm asking you is, did you call up any prosecutor

20   at the time and say, hey, I just want to run a hypothetical

21   by you, assume that there is this employee who's

22   manufacturing fake credentials at the company's request and

23   that he's going down and he's getting into confidential

24   closed competitors' showrooms using this fake identity and

25   he's obtaining information that is not available to the

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 133 of 185   Page ID #:313806
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

133

1   public, could that be fraud, you didn't have that -- place

2   that call, right?

3           MR. ZELLER:  It's irrelevant.  It's speculative.

4   Hypothetical.  Argumentative.

5           THE COURT:  In its present form, Counsel,

6   sustained.

7   BY MS. KELLER:

8   Q    Did you place a call to a prosecutor to ask if sneaking

9   into a competitors' private showroom with falsified

10  credentials could constitute fraud; did you do that?

11  A    I did not call a prosecutor to discuss this, no.

12  Q    Did you call a prosecutor and ask if sneaking into a

13  competitors' private showroom and getting confidential

14  information with fake credentials could constitute theft of

15  trade secrets?

16          MR. ZELLER:  Assumes facts.

17          THE COURT:  Overruled.

18  BY MS. KELLER:

19  Q    And you, yourself --

20          THE COURT:  Just a moment.  There is no answer.

21          Answer the question, sir.

22          THE WITNESS:  I'm sorry, could you repeat the

23  question?

24  BY MS. KELLER:

25  Q    Did you call any prosecutor and say, I want to know if

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 134 of 185   Page ID #:313807
CV 04-9049-DOC – 03/29/2011 – Day 41, Vol. 2 of 3

134

1  sneaking into competitors' showrooms using fake credentials

2  and fake ID and obtaining confidential information could

3  constitute theft of trade secrets?

4  A     No, I was speaking to outside counsel about this.

5  Q     Well, you, yourself, though, have a pretty good

6  background in criminal law because you were a deputy

7  district attorney in San Diego, right?

8  A     No, I was an attorney for the district attorney's

9  office down in San Diego, but I wasn't deputy district

10 attorney.

11 Q     While you were at the San Diego D.A.'s office, I

12 imagine that you met some other deputy district attorneys,

13 met some deputy D.A.'s there?

14             MR. ZELLER:  This is completely irrelevant.

15             THE COURT:  Overruled.

16             You can answer the question.

17             THE WITNESS:  Yes.

18 BY MS. KELLER:

19 Q     You had people you can call and ask hypothetically,

20 right?

21 A     I don't know that I knew somebody who was left down

22 there, but I didn't maintain any acquaintances down at the

23 San Diego district attorney's office.

24 Q     Well, you knew that you could call the local district

25 attorney's office in Los Angeles or even Orange County, and

1    you could ask them a hypothetical question, right?

2              MR. ZELLER:  Irrelevant.

3              THE COURT:  Overruled.

4              THE WITNESS:  I was speaking to outside counsel

5    about this matter.

6    BY MS. KELLER:

7    Q    You didn't want to know if Mr. Villasenor's conduct

8    could truly be characterized as criminal, you didn't want to

9    know that, did you?

10   A    I didn't believe it was true.

11   Q    You didn't investigate it yourself, did you?

12   A    I don't know what you mean.  I asked questions, and we

13   got answers, and I didn't believe it was criminal.

14   Q    You didn't have your -- well, you are telling us that

15   Mr. Villasenor never told you that he snuck into private

16   showrooms with these false credentials?

17             MR. ZELLER:  It's argumentative, you're not

18   telling us.

19             THE COURT:  Just a moment.

20             Sustained.

21   BY MS. KELLER:

22   Q    Is it your testimony that Mr. Villasenor never even

23   told you he was sneaking into private showrooms with fake

24   credentials?

25             MR. ZELLER:  Argumentative.  "Your testimony."

1           THE COURT:  Overruled.

2           THE WITNESS:  I didn't know that he was sneaking

3    into toy fair showrooms using false credentials.

4    BY MS. KELLER:

5    Q    Well, you knew he was doing something with the false

6    credentials, right?

7    A    Yeah, I knew he was using false credentials to get

8    competitive information at toy fairs, but I didn't know it

9    was sneaking into showrooms.

10   Q    You didn't ask for any details?

11   A    We spoke to Sal Villasenor, and he didn't say that.

12   Q    You didn't ask him?

13   A    We asked him what was -- what was done.

14   Q    How about all the other employees that you had who it

15   turns out were sneaking into private showrooms, did they

16   tell you that?  Did they all conceal that?

17   A    Well, at the time, we only knew of Sal as a current

18   employee who used fake business cards at all.

19   Q    Let's look at Exhibit 9525R.  This is a letter from

20   Mr. Barrera to Eve Wagner dated January 6th, 2006.

21        Now, until your deposition March 21st, 2011, is it true

22   that you had never seen or heard of this letter?

23   A    Yeah, I don't remember seeing this letter.

24   Q    Or even hearing about it, right?

25   A    I don't remember hearing about this specific letter,

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 137 of 185   Page ID #:313810
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

137

1    no.

2    Q    Jill Thomas was the Mattel in-house lawyer who dealt

3    with this lawyer, Eve Wagner?

4    A    That's right.

5    Q    And you worked closely with Ms. Thomas in connection

6    with this case, right?

7    A    We worked together.

8    Q    She never told you that -- let's look at page 2 of this

9    letter, top paragraph, where it says, "Mr. Villasenor has

10   specifically expressed his concerns regarding Mattel's

11   business practices in connection with upcoming trade shows

12   and he is nervous about issues raised in pending litigation

13   against Mattel"; do you see that?

14   A    I see that.

15   Q    And what Mr. Villasenor was nervous about coming up was

16   he was nervous that MGA would find out the very thing that

17   we've now found out about the comprehensive use of false

18   credentials and sneaking into private showrooms, right?

19             MR. ZELLER:  Calls for speculation.

20             THE COURT:  Sustained.

21   BY MS. KELLER:

22   Q    What you have seen in connection with this litigation

23   is you've seen a handout that Mattel employees had that told

24   them exactly how to sneak into private showrooms, right?

25   A    I've seen that produced in discovery.

1    Q    You know that the Mattel employees in the market

2    intelligence division or market intelligence department were

3    told specifically in this Mattel handout how to get into

4    private showrooms, right?

5    A    I didn't see that particular memo until much later.

6    Q    And when you say "much later," a year, two years?

7    A    I didn't see that particular memo for, I think, more

8    than a couple years later.

9    Q    And when you say -- when it says, "He's nervous about

10   issues raised in pending litigation against Mattel," that

11   was the MGA case, right?

12              MR. ZELLER:  Calls for speculation.

13              THE COURT:  Overruled.

14              THE WITNESS:  That's what I think he's referring

15   to.

16   BY MS. KELLER:

17   Q    And that's -- the part about Mattel's business

18   practices in connection with upcoming trade shows is almost

19   the same language as the formerly redacted portion of

20   Mr. Villasenor's December 22nd, 2005 e-mail, right?

21   A    I could say it's similar.

22   Q    You were one of the people responsible for dealing with

23   Mr. Villasenor about the MGA litigation, true?

24   A    That's true.

25   Q    And you learned that not only was Mr. Villasenor

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 139 of 185   Page ID #:313812
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

139

1    nervous about the upcoming litigation with MGA and whether

2    he'd be found out, he was also nervous about speaking to you

3    and outside counsel about the MGA litigation, true?

4                MR. ZELLER:  Calls for speculation.

5                THE COURT:  Just a moment.

6                Sustained.

7    BY MS. KELLER:

8    Q    Was it your understanding that Mr. Villasenor was

9    nervous about speaking to you and outside counsel about the

10   MGA litigation?

11   A    I knew he'd been nervous, he seemed nervous to me.

12   Q    About that, about speaking to you and outside counsel

13   about the MGA litigation, right?

14   A    We were speaking to him about the MGA litigation, and I

15   think he was nervous generally.

16   Q    And one of the things that you were concerned about is

17   you wanted to make sure that what Mr. Villasenor had to say

18   about what had been going on in the market intelligence

19   department did not come to light in the MGA litigation,

20   true?

21   A    That's not true.

22   Q    Let's look at 9266, Mr. Villasenor's separation

23   agreement.  Who drafted that within your legal department?

24   A    I don't know if this was drafted within the legal

25   department, I don't know.

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 140 of 185   Page ID #:313813
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

140

1    Q    Were you at all concerned about the portion of this

2    that required Mr. Villasenor not to discuss or disclose to

3    any person or entity any allegations of wrongful conduct by

4    Mattel that occurred while he was employed with Mattel, and

5    I'm talking about 9266, page 5, section H?

6              MR. ZELLER:  Misstates the contract.

7              THE COURT:  Overruled.

8              THE WITNESS:  I wasn't specifically concerned

9    about this particular paragraph.  I don't really remember

10   reading this particular paragraph at the time.

11   BY MS. KELLER:

12   Q    Well, you understand that this settlement agreement

13   obligated Mr. Villasenor, in return for getting money from

14   Mattel, not to disclose or discuss with any person or entity

15   the fact of this agreement, any allegations of alleged

16   wrongful conduct by the company or any released party that

17   allegedly occurred while I was employed with the company?

18             MR. ZELLER:  Misstates the document.

19             THE COURT:  Overruled.

20   BY MS. KELLER:

21   Q    Do you see that under A and B of Section H on page 5?

22   A    Yeah, I don't understand this agreement to be a payoff

23   of any kind.

24   Q    Is that a legal position of Mattel's that you're

25   stating?

```
 1              MR. ZELLER:  Argumentative.

 2              THE COURT:  Sustained.

 3    BY MS. KELLER:

 4    Q    What I'm asking you is, you understand that this

 5    agreement says, I'm just talking about what it says, that in

 6    return for Mr. Villasenor, among other things, keeping his

 7    mouth shut about any wrongful conduct, he's getting paid

 8    off, right?

 9              MR. ZELLER:  Argumentative.

10              THE COURT:  Overruled.

11              You can answer the question.

12              THE WITNESS:  No, that's not what I understand

13    this document to mean at all.  Nothing in this document

14    would, I think, prevent Mr. Villasenor from testifying as he

15    did.

16    BY MS. KELLER:

17    Q    Nothing would prevent a court from ordering him to

18    testify, right?

19    A    That's right.

20    Q    Nothing would prevent a subpoena from being issued to

21    him and a court enforcing it, right?

22    A    That's right.

23    Q    But no agreement could do that, true?

24    A    Not that I'm aware of.

25    Q    Am I right about that, there is no agreement that could
```

1    do that?

2    A    I think that's right.

3    Q    So let's put that aside for a second, unless he is

4    forced to by a court of law, unless someone finds out and

5    he's forced to testify, this agreement says he can't tell

6    anybody what he did or what Mattel did, right?

7              MR. ZELLER:  Argumentative about finding out.

8              THE COURT:  Sustained.

9    BY MS. KELLER:

10   Q    Unless somebody finds out about the conduct, they can't

11   ask about it, true?

12   A    I think they can ask about conduct they don't know

13   about, sure.

14   Q    Well, they'd have to know he exists, right?

15             MR. ZELLER:  It's just argumentative.

16             THE COURT:  Do you understand the question?

17             THE WITNESS:  Yes, I do.

18             THE COURT:  You can answer it.

19             THE WITNESS:  Yeah, I thought MGA knew -- somebody

20   at MGA knew that Sal Villasenor existed.

21             MS. KELLER:  I move to strike that, your Honor.

22             THE COURT:  No, I'm going to have you reask

23   another question, Counsel, or the same question.

24   BY MS. KELLER:

25   Q    Did you expect MGA to interview all 25,000 Mattel

1   employees to find out if they had knowledge of any

2   wrongdoing that involved Mattel?

3           MR. ZELLER:  That's argumentative.

4   BY MS. KELLER:

5   Q    I mean that involved MGA?

6           THE COURT:  Sustained in its present form,

7   Counsel.

8   BY MS. KELLER:

9   Q    Mattel didn't want MGA finding out what Mr. Villasenor

10  and the other employees at Mattel had been doing in market

11  intelligence, true?

12          MR. ZELLER:  Assumes facts.

13          THE COURT:  Well, it's the reference to Mattel.

14  I'm going to sustain the objection.

15          It's not about his testimony, his state of mind,

16  his activities, or if he represents Mattel in the legal

17  capacity, you can ask him that, but as far as Mattel

18  generally, it's too broad.

19  BY MS. KELLER:

20  Q    The separation agreement was on behalf of Mattel,

21  right?

22  A    Yes, that's right.

23  Q    And one of the released parties was Mattel, right?

24  A    I'd have to check, but I believe that Mattel would be

25  released.

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 144 of 185   Page ID #:313817
CV 04-9049-DOC – 03/29/2011 – Day 41, Vol. 2 of 3

144

1    Q    And the separation agreement provides, among other

2    things, that Mr. Villasenor is not to disclose any

3    allegations of wrongful conduct by Mattel to MGA's lawyers,

4    true?

5    A    Well, I don't think it specifically says that, no.  It

6    requires a confidentiality -- confidentiality from Sal

7    Villasenor, but...

8    Q    If you look at the second paragraph of 3H, it says that

9    Mr. Villasenor shall not disclose any confidential

10   information to any counsel for any party threatening or

11   asserting claims against any of the released parties, that

12   would be MGA, right?

13   A    Well, it would be anybody including MGA.

14   Q    You knew that MGA had a lawsuit, though, with Mattel at

15   the time, right?

16   A    I did.

17   Q    Now, was Mr. Normile involved in supervising the

18   separation agreement with -- was he involved in the

19   separation agreement with Mr. Villasenor?

20   A    I don't know.

21   Q    Do you know why there is no signature on behalf of

22   Mattel on this agreement, if you look at page 9?

23   A    Yeah, I can tell you I didn't manage this agreement, so

24   I don't know why there's not.

25   Q    Do you know who did manage it?

1    A    I thought this was managed by Jill Thomas.

2    Q    Do you know why there is no signature on it on behalf

3    of Mattel?

4    A    No, I don't.

5    Q    Do you know who authorized payments on behalf of Mattel

6    to be made to Mr. Villasenor?

7    A    I don't, not specifically, no.

8    Q    And if we look at Exhibit 26565R, is this a letter from

9    you to Mr. Villasenor dated September 25th, 2006, with your

10   signature?

11   A    Yes, it is.

12   Q    And the letter refers to the separation agreement and

13   general release with Mr. Villasenor, right?

14   A    It does.

15   Q    And it actually refers to the separation agreement,

16   right?

17   A    It does.

18   Q    And it talks about how you are going to be meeting with

19   him --

20        MS. KELLER:  Oh, your Honor, I move that document

21   into evidence, 26565R.

22        THE COURT:  Received.

23        *(Defendants' Exhibit No. 26565R is received*

24   *in evidence.)*

25

1    BY MS. KELLER:

2    Q    It says you are going to meet October 9th, right?

3    A    Yes.

4    Q    And it says, "Consistent with Section 3 of your

5    separation agreement and general release"?

6    A    Yes, it says in connection with Section 3J.

7    Q    That means he's going to cooperate with you in

8    litigation against MGA?

9    A    Well, I don't have the specific clause in front of me,

10   but the idea was that this section would allow for me to

11   continue witness interviews in connection with the MGA case.

12   Q    Specifically interviewing him, right?

13   A    Yes.

14   Q    And then it says the meeting is going to occur after

15   August 31st, 2006; do you see that?

16   A    Yes, I do.

17   Q    So this is -- since this is referring to the separation

18   agreement that's Exhibit 9266, then you must have seen the

19   separation agreement before you wrote this letter

20   September 25th, 2006, right?

21   A    Yes, I think I did.

22   Q    And if we look at 9266-6, 3J referred to in your

23   letter, that says Mr. Villasenor is going to agree to meet

24   with Mattel's counsel to provide information relevant to the

25   ongoing litigation, right?

1    A    Yes, that's right.

2    Q    And the only litigation that you understood

3    Mr. Villasenor had relevant information about was the MGA

4    litigation, right?

5    A    At the time, that's the only thing I knew he had

6    information about, right.

7    Q    So that's what this letter refers to, then, when it

8    talks about meeting with him, this letter 26565R, right?

9    A    Yes.

10   Q    Please take a look at Exhibit 700A, and this is an

11   affidavit that you signed September 10th, 2007.

12   A    Okay.

13   Q    And you attached a list to your September 2007

14   affidavit of people you had spoken to in connection with the

15   Carter Bryant investigation, right?

16   A    That's right.

17   Q    But not a list of the people you'd spoken to in

18   connection with the investigation of MGA's allegations,

19   right?

20   A    That's right.

21   Q    And Mr. Villasenor didn't really have anything to do

22   with the Carter Bryant investigation, did he?

23   A    No.

24   Q    He was relevant to MGA's allegations of unfair business

25   practices, right?

1           MR. ZELLER:  That misstates the records.  Assumes

2      facts.

3           THE COURT:  Overruled.

4      BY MS. KELLER:

5      Q     Correct?

6      A     Well, I was interviewing him about issues he may know

7      of in relation to the MGA litigation, yes.

8      Q     Right, the unfair business practices claim that MGA had

9      made, true?

10     A     Yes.

11     Q     Are there notes or a list somewhere that was the basis

12     for your assertion in your affidavit that there had been

13     interviews with more than 60 people?

14          MR. ZELLER:  This gets into work product.

15          THE COURT:  That may, Counsel.  I'll delay that.

16     BY MS. KELLER:

17     Q     Do you have a list of the 60 people who were

18     interviewed?

19     A     I personally don't have a list right now, no.

20     Q     Is there one?

21     A     There's a collection of information, yes.

22     Q     Is there a list of the 60 people who were interviewed?

23     A     I think there is.

24     Q     As of last week, was it your testimony that you didn't

25     know?

1    A    Last week, I didn't know.

2    Q    Is there a log that reflects when and who collected

3    documents from Mr. Villasenor?

4           MR. ZELLER:  This is getting into work product at

5    this point.

6           THE COURT:  Just a moment.

7           No, overruled.

8           You can answer that question.

9           THE WITNESS:  I don't know if there is a log

10   specifically.

11   BY MS. KELLER:

12   Q    Why were the MGA catalogs produced by Mattel from

13   Mr. Villasenor's custody collected?

14   A    I'm sorry, are you asking me why weren't they?

15   Q    Why were they?

16          MR. ZELLER:  That assumes facts.

17          THE COURT:  First of all, foundationally, does he

18   know if this occurred or not.

19   BY MS. KELLER:

20   Q    There were documents -- there were MGA catalogs that

21   were produced by Mattel from Sal Villasenor's custody in

22   this case; are you aware of that?

23   A    Not recently, no.  I'm not aware of that, no.

24   Q    Do you know what was -- who collected everything from

25   Mr. Villasenor, is there a log of that?  Person A took such

1    and such, person B took such and such, person C took such

2    and such; do you know?

3    A    I know documents were preserved, and there was an

4    effort to preserve and collect everything that related to

5    Sal Villasenor or in his cubicle and --

6    Q    Do you have a list of who got what, when?

7    A    I don't have a list.

8    Q    Do you know if such a list exists?

9    A    I don't know.

10   Q    Did you collect any of his fake business cards?

11        MR. ZELLER:  Can I have a standing objection on

12   privilege and work product, your Honor?

13        THE COURT:  You can.

14        It's overruled.

15        MR. ZELLER:  Thank you.

16        THE WITNESS:  I didn't, no.

17   BY MS. KELLER:

18   Q    Did you direct anyone else to do that?

19   A    Well, at some point, Jill Thomas was working on this.

20   I didn't collect any, and he never said he had any when I

21   was speaking with him.

22   Q    Do you know if anybody got fake business cards from

23   him, Jill Thomas or anybody else?

24   A    I don't know.

25   Q    Did you ask him for them?

1    A    I did.

2    Q    And what did he tell you?

3    A    He didn't have them -- any.

4    Q    Who were the people that you -- you first heard that

5    there were other people who had been using fake business

6    cards sometime after June 21st, 2005, right?

7    A    That's right.

8    Q    Who were they?

9    A    That was never revealed to me.

10   Q    By whom?

11   A    By Sal Villasenor.

12   Q    How about by Jill Thomas?

13          MR. ZELLER:  This gets into a privilege

14   communication.

15          THE COURT:  Sustained.

16   BY MS. KELLER:

17   Q    So even today, do you not know who the other people

18   were at Mattel who were sneaking into showrooms using fake

19   business cards?

20   A    Well, as a result of Sal's deposition, I knew.

21   Q    But as a result of any investigation that Mattel did or

22   that you directed somebody to do or that Jill Thomas did,

23   you are telling me that even today, you don't have any idea

24   yourself who these people were?

25          MR. ZELLER:  It's compound.  Assumes facts.

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 152 of 185   Page ID #:313825
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

152

```
 1                THE COURT:  Overruled.
 2                We'll strike "Are you telling me today," that's
 3      argumentative.  The rest of the answer -- or the question
 4      remains, I'm sorry.
 5      BY MS. KELLER:
 6      Q    Was there a policy within even Mattel's legal
 7      department to wall people off from information so no one
 8      person would know all of the pieces of the hole when it came
 9      to MGA?
10      A    No, there was no one general policy about that, no
11      policy about that at all.
12      Q    Is there a policy among the attorneys to not tell each
13      other things that they found out so that they won't know
14      them if their depositions are taken?
15                MR. ZELLER:  This assumes facts and also gets us
16      into protective order issues.
17                THE COURT:  Sustained.
18      BY MS. KELLER:
19      Q    Did you ever think to investigate to find out who these
20      people were, all the people at Mattel who had been using
21      fake IDs?
22      A    That was part of the reason I was following up with
23      Sal.
24      Q    But it wasn't just Sal, was it?  It was a lot of
25      people, true?
```

1    A    I don't know that it was a lot of people, but there

2    were others, and I found that out later.

3    Q    You found out the practice went back to 1992, right?

4    A    I don't know how far it went back.

5    Q    Didn't you investigate that?

6    A    Between June of 2005 and December of -- the time of the

7    e-mail, December of 2005, my understanding was that it had

8    not happened for a while and it had -- no one had -- it was

9    not an ongoing activity, and it hadn't happened for a while,

10   and we are talking about the use of fake business cards.

11   Q    But you are telling us you don't even know who the

12   other people were who were involved, so how can you know

13   that it wasn't going on anymore?  You didn't investigate,

14   did you?

15           MR. ZELLER:  That misstates the witness'

16   testimony.

17           THE COURT:  Well, sustained.

18           You can reask the question.

19   BY MS. KELLER:

20   Q    You didn't want to know that this was something that

21   had been going on at Mattel since 1992, did you?

22   A    I wanted to know all the facts that I could.

23   Q    But you didn't do anything to find them out, did you?

24   A    That's not true.

25   Q    You wanted to blame Sal Villasenor for the whole thing,

1    right?

2    A     No, I wanted to find out facts.

3    Q     It's -- you understand that it's Mattel's position that

4    Mr. Villasenor was -- he and one other person created this

5    name for a department, you know that, right?

6              MR. ZELLER:  This is argumentative.

7              THE COURT:  Sustained.

8    BY MS. KELLER:

9    Q     Isn't it true that Sal Villasenor was not the

10   originator of this practice at Mattel, using fake IDs and

11   fake identities to sneak into private showrooms and get

12   confidential information, he wasn't the first guy who did

13   that, was he?

14   A     Well, I don't know that he was the first.  I know there

15   were others.

16   Q     Well, you also knew that it went back to 1992?  You

17   said you relied on his deposition, right?

18             MR. ZELLER:  Misstates the witness' testimony.

19             THE COURT:  Overruled.

20             THE WITNESS:  No, I didn't read his deposition in

21   its entirety.  I just understand from his deposition that

22   that's what he said.

23   BY MS. KELLER:

24   Q     Okay.  How did you know which parts to read?

25   A     Well, I didn't read his depositions at all.  I heard

1    this about what was said.

2    Q    Okay.  But since it was important to you to investigate

3    and get to the bottom of it, wouldn't you start by reading

4    his whole deposition, beginning to end?

5              MR. ZELLER:  This question is vague as to time.

6              THE COURT:  No, overruled.

7              You can answer the question.

8              THE WITNESS:  Well, counsel I know, outside

9    counsel, was getting to the bottom of this, and at that

10   point, that wasn't my role, to get to the bottom of it.  I

11   helped coordinate interviews to get to the bottom of it, but

12   I didn't participate a hundred percent.

13   BY MS. KELLER:

14   Q    When outside counsel are engaged in a lawsuit, don't

15   you think it's a bit of a conflict of interest to expect

16   counsel to get to the bottom of allegations like this?

17             MR. ZELLER:  This is argument.

18             THE COURT:  Sustained.

19   BY MS. KELLER:

20   Q    Wouldn't it be better to turn this over to a private --

21   or rather a public law enforcement agency and let that

22   agency, which has no dog in the hunt, get to the bottom of

23   it?

24             MR. ZELLER:  Lacks foundation.

25             THE COURT:  No, overruled.

 1          You can answer that question.

 2          THE WITNESS:  I'm an attorney for the company, my

 3    duty is to the company, so I first would go to my own

 4    outside counsel.

 5    BY MS. KELLER:

 6    Q    I'm talking about, to get a really fair and objective

 7    examination and really find out what happened and really get

 8    to the bottom of it and really find out if a crime had been

 9    committed or not committed, the best thing to do would be to

10    just turn it over to law enforcement, right?

11          MR. ZELLER:  This is argumentative and assumes

12    facts.

13          THE COURT:  Overruled.

14          THE WITNESS:  Well, there are processes and

15    procedures in place at Mattel for reporting these kinds of

16    activities, and then that's something that is not in my

17    area.

18    BY MS. KELLER:

19    Q    Not my question.  Here is my question --

20          MR. ZELLER:  Move to strike the first part.

21          THE COURT:  Sustained.

22    BY MS. KELLER:

23    Q    If you really want to get to the bottom of it and you

24    really want to find out how long it's been going on and

25    whether crimes have been committed, the best thing to do

1    would be to turn to public, objective law enforcement

2    agency, not somebody who Mattel was paying for advice,

3    right?

4                MR. ZELLER:  This is argumentative.

5                THE COURT:  Overruled.

6                THE WITNESS:  Well, as a lawyer for the company, I

7    don't think I can do that and, you know, this is something

8    that I, you know, we spoke with outside counsel about.

9    BY MS. KELLER:

10   Q    When somebody tells you that he believes his actions

11   could expose him to personal criminal liability, isn't the

12   best thing to do, to turn that over to the people who

13   investigate personal criminal liability, the police?

14               MR. ZELLER:  This assumes facts.

15               THE COURT:  Overruled.

16               THE WITNESS:  Well, an investigation was done.  I

17   think that was the best thing to do.

18   BY MS. KELLER:

19   Q    That's not my question.

20        If you really want to get to the bottom of it, and

21   somebody tells you he thinks he has personal criminal

22   liability, don't you want to turn that over to the very

23   people whose job it is to investigate personal criminal

24   liability, the police?

25   A    I don't think that's necessarily the action to take,

1   no.

2   Q   Well, if you want to protect the company, you don't do

3   that; true?

4   A   I don't think that's the way to get answers out of

5   people, by sending the police right at them.

6   Q   If you want to protect the company, you try to bury it,

7   right?

8          MR. ZELLER:  This is argumentative.

9          THE COURT:  Sustained.

10  BY MS. KELLER:

11  Q   Now, have you ever read the deposition of Matt

12  Turetzky?

13  A   I've read a portion of it.

14  Q   Have you read the portion where he allows the people

15  who are sneaking into the private showrooms to put his own

16  personal address on their business cards?

17         MR. ZELLER:  This is improper use of a deposition.

18         THE COURT:  Overruled.

19         THE WITNESS:  No, I haven't read that part.

20  BY MS. KELLER:

21  Q   How did you know which parts to read, were you given a

22  list by somebody and just told, only read these parts?

23  A   I've communicated with outside counsel, and they

24  basically gave me excerpts.

25  Q   So you were directed by Mattel's outside attorneys as

1    to what parts to read and not read?

2              MR. ZELLER:  This is argumentative.

3              THE COURT:  Overruled.

4              THE WITNESS:  Only as a matter of suggestion, yes.

5    BY MS. KELLER:

6    Q    Have you ever read the deposition of Carey Plunkett?

7    A    No.

8    Q    Tyler Bradley?

9    A    No.

10   Q    Kelly Osier?

11   A    No.

12   Q    Sharon Rahimi?

13   A    No.

14   Q    But you feel that you got to the bottom of things?

15             MR. ZELLER:  This is argumentative.  Vague as to

16   time.

17             THE COURT:  Sustained.

18             It's vague, Counsel.

19   BY MS. KELLER:

20   Q    And you never spoke with any of those people or

21   interviewed them either, the ones I just listed?

22   A    I've spoken to Tyler Snyder briefly, but that's it.

23   Q    Now, isn't there a requirement within Mattel itself

24   that allegations of criminal conduct by a Mattel employee

25   acting within the course and scope of employment are

1    supposed to be reported for compliance purposes up the chain

2    of command?

3    A    Well, I don't know that it says that specifically

4    because -- but I think that's what -- exactly what you do,

5    is you report it up.

6    Q    Did you report this to Mr. Eckert at the time you got

7    information about it?

8    A    No.

9    Q    Was there a policy of trying to insulate him from

10   information like that?

11   A    No.  The first thing I did was report it to Bob

12   Normile.

13   Q    And you don't know if this was ever reported to the

14   board of directors; is that true?

15   A    Well, Bob Normile, I think, works with the board of

16   directors.

17   Q    Do you know if it was ever reported to the board of

18   directors?

19   A    I don't know.

20   Q    Do you know if it was ever reported to the internal

21   audit department?

22   A    I don't know.

23   Q    Do you know if it was ever reported to the SEC?

24   A    I don't know.

25   Q    Or any other third party at all?

1   A    I don't know that it was.

2   Q    I want to talk to you a little bit about Carter Bryant.

3        In the summer of 2003, you began investigating alleged

4   potential misconduct by Carter Bryant when he was a Mattel

5   employee, true?

6   A    In the summer of 2003, I began to investigate what was

7   going on in relation to a Wall Street Journal article that

8   came out.

9   Q    But it had to do with Carter Bryant, right?

10  A    Yes, it did.

11  Q    And it had to do with Carter Bryant when he was a

12  Mattel employee, right?

13  A    It had to do with Carter Bryant who had been a Mattel

14  employee, yes.

15  Q    And that same summer, you told the people responsible

16  for Mattel's phone system to identify, collect and preserve

17  all phone logs for the El Segundo campus for 2000, true?

18  A    Yeah, I instructed them to preserve phone logs.

19  Q    And Mattel actually had a computer with Microcall

20  software installed that logged all calls coming into and

21  going out of the El Segundo campus, correct?

22  A    Yeah, more or less.  Some information wasn't included

23  in those logs.

24  Q    And the phone log data was archived on a monthly basis,

25  right?

1   A    Yes, there are monthly backup tapes for that particular

2   Microcall software.

3   Q    But you never received the tapes for October of 2000,

4   right?

5           MR. ZELLER:  The Court has ruled on spoliation,

6   are we getting into this now?

7           THE COURT:  No, overruled.

8   BY MS. KELLER:

9   Q    You never received the October 2000 tapes?

10  A    I never did.

11  Q    You asked for them, though, right?

12  A    I did.

13  Q    Did you ever receive the December 2000 tapes?

14  A    No.

15  Q    Did you ask for those, too?

16  A    I did.

17  Q    And you asked the people responsible to keep looking

18  for them, right?

19  A    Yes.

20  Q    And you never got those?

21  A    Well, we couldn't figure out whether they actually

22  existed or they were misplaced but...

23  Q    Well, you got the ones for September, right?

24  A    We did.

25  Q    August?

1    A    That's right.

2    Q    But October was missing, true?

3    A    That's true.

4    Q    Got November, though, right?

5    A    We had November.

6    Q    And you know that October 2000 is a crucial period in

7    this case, true?

8    A    Well, it's an important period, yes.

9    Q    Well, you know that it's important because Mattel is

10   alleging that Carter Bryant was somehow working for MGA

11   during that period, right?

12   A    Yes, during that period and potentially before.

13   Q    And you know that it was important because after he

14   signed his consulting agreement with MGA on October 4th,

15   2000, that he gave notice to Mattel the very next day, you

16   are aware of that, right?

17            MR. ZELLER:  This is argument about consulting

18   agreement.

19            THE COURT:  Just a moment.

20            Overruled.

21            THE WITNESS:  Would you repeat the question?

22   BY MS. KELLER:

23   Q    Yeah, you know that Mr. Bryant signed his consulting

24   agreement with MGA on October 4th, 2000 and gave notice to

25   Mattel the very next day, right?

```
 1              MR. ZELLER:  This is just argument and assumes

 2      facts.

 3              THE COURT:  Overruled.

 4              THE WITNESS:  I wasn't sure when Carter Bryant

 5      signed that employment agreement or that consulting

 6      agreement.

 7      BY MS. KELLER:

 8      Q    You, yourself, actually saw the agreement between MGA

 9      and Mr. Bryant on November 23rd, 2003, correct?

10      A    It was November 24th, 2003.

11      Q    That you saw it personally?

12      A    Yes.

13      Q    And you saw the terms in the agreement, right?

14      A    I did.

15      Q    Now, I want to turn to another topic.  Turning back to

16      your affidavit, Exhibit 700A, you list a number of people,

17      we talked about that, right?

18      A    That's right.

19      Q    And you said under penalty of perjury in this affidavit

20      that these were --

21              MR. ZELLER:  This is publishing hearsay and

22      improper use of an affidavit.

23              THE COURT:  Just a moment.

24              There is no question, Counsel.  I don't know what

25      you are referring to.
```

```
 1              MS. KELLER:  700A, your Honor.

 2              THE COURT:  I know it's 700A, but what are you

 3    asking?

 4              MS. KELLER:  Okay.  I'll ask the question.

 5    BY MS. KELLER:

 6    Q    The list of people were the people you spoke with about

 7    Mattel's potential claims against Carter Bryant concerning

 8    Bratz, right?

 9    A    Yes, I spoke about the whole case with -- the Carter

10    Bryant issues with them, yes.

11    Q    And you spoke to each of these people when you were

12    investigating potential claims and issues surrounding the

13    Wall Street Journal article, right?

14    A    That's right, I spoke to them during the investigation.

15    Q    And the issues that you spoke to them about generally

16    related to Carter Bryant and what they knew about anything

17    he might have done with respect to Bratz, right?

18    A    Well, right, and it depends on exactly who you are

19    talking about.  Some of these folks were IT people, so I

20    would ask them about whether backup tapes existed for the

21    time, where Carter Bryant's computer would be if he had one,

22    things of that nature.

23    Q    And is it true that you don't know of anyone who

24    suspected in 2001 that Carter Bryant created Bratz; is that

25    a true statement?
```

1    A    That's -- that's not true.

2    Q    Okay.  Who was it -- who -- then who was it?

3    A    I'm sorry, let me correct it.  I don't know of anyone

4    in 2001 who suspected that Carter Bryant was involved in

5    Bratz.

6    Q    How about whether anybody suspected in 2001 that

7    Mr. Bryant was somehow involved in the creation of Bratz or

8    the Bratz idea?

9    A    The earliest I knew that somebody suspected that he

10   might be involved without really any facts to support it was

11   2002.

12   Q    Have you talked to Jill Nordquist?

13   A    At some point, yes.

14   Q    And then you are aware that Jill Nordquist suspected in

15   2001 that Carter Bryant created Bratz, right?

16   A    I don't know exactly what her level of knowledge or

17   suspicion was.

18   Q    Well, she was one of the 60 people you interviewed?

19   A    She's one of the people that I spoke with at some point

20   about the Carter Bryant case.

21   Q    And are you aware that she was present when others in

22   the design center discussed their suspicions about

23   Mr. Bryant's involvement in the creation of Bratz?  Have you

24   talked with her about that?

25   A    Yes, I talked with her generally about that.  I don't

1    know whether it was 2001, though, that's my issue.

2    Q    Well, I'm focusing on 2001, okay?

3         And are you aware of a person named Anne Parducci, a

4    senior vice president?

5    A    Yes.  I never met her, but I'm aware of her.

6    Q    And you know that Jill Nordquist talked about her

7    suspicions with that person too, right?

8    A    I can't remember what Jill Nordquist has said.

9    Q    And are you aware that Lily Martinez said she suspected

10   something was amiss when Carter Bryant wouldn't tell her

11   whether he was going to work for a competitor; are aware of

12   that?

13   A    I'm aware that she thought something was a little bit

14   off, but that was it.

15   Q    Just something was off, that's all?

16             MR. ZELLER:  This is argument.

17             THE COURT:  Well, sustained.

18   BY MS. KELLER:

19   Q    Well, you are aware that the statute of limitations is

20   an issue in this case, right?

21   A    I am.

22   Q    And that means that -- when we talk about the statute

23   of limitations, that means there is a certain number of

24   years that somebody has in which to bring a lawsuit on a

25   given topic or they lose the right to maintain the lawsuit,

1    right?  It's a cutoff period, isn't it?

2             MR. ZELLER:  That assumes facts.  It depends on

3    the claim.

4             THE COURT:  Overruled.

5    BY MS. KELLER:

6    Q    I am just talking generally.

7    A    Generally, there is a certain amount of time that you

8    have to bring a lawsuit, you know, assuming you have facts

9    and evidence to support something like that.

10   Q    Right.  So depending on the claim, it could be one year

11   or two years or three years or four years, but at some

12   point, your right to sue is cut off, right?

13            MR. ZELLER:  That misstates the law.

14            THE COURT:  Overruled.

15   BY MS. KELLER:

16   Q    Correct?  I'm just talking generally?

17   A    Well, very, very generally, I think the statute of

18   limitations is a period of years for which you should bring

19   a lawsuit, and there may be some exceptions to that.

20   Q    Right.  And you are aware that the statute of

21   limitations is an issue in this case, right?

22   A    Yes.

23   Q    Now, you interviewed a person named Mina Mirkazemi; do

24   you remember that?

25   A    Yes.

1    Q    And you know that Mina Mirkazemi is Mercedeh Ward's

2    sister, true?

3    A    Yes.

4    Q    And are you aware that Mattel design center employee

5    Elise Cloonan created a logo for Bratz before September 1st,

6    2000; did you know that?

7    A    I'm not -- I know I wasn't aware of that.

8    Q    And are you aware that Mattel design center employee

9    Carmen Monteagudo did the hair rooting for a dummy doll that

10   Mr. Bryant created before pitching his Bratz idea to MGA on

11   September 1st, 2000?

12   A    I remember her saying that she did hair for Carter

13   Bryant.  I don't think she knew it was for Bratz.

14   Q    Do you remember her saying she did hair rooting for a

15   dummy doll for Carter Bryant, though?

16   A    I don't know that she said those specific words but

17   something like that.

18   Q    Well, and it was before September 1st, 2000, correct?

19   A    I'm not sure when.

20   Q    And are you aware that Mattel design center employee

21   Sheila Kyaw did the face painting for the dummy doll?

22   A    Yes.

23   Q    And you know that that was before September 1st, 2000,

24   right?

25            MR. ZELLER:  This is vague as to when he knew.

```
 1            THE COURT:  Sustained.  It's not -- the issue is
 2    when he knew, not the reference back to each of these
 3    specific dates, so I'm going to sustain the objection as to
 4    all three areas thus far.
 5            MR. ZELLER:  And I move to strike, then, the
 6    answer as well.
 7            THE COURT:  It's stricken.
 8    BY MS. KELLER:
 9    Q    Well, when you interviewed these various people, or you
10    caused them to be interviewed, it was important for you to
11    know what the dates were, right?
12            MR. ZELLER:  This is vague as to who, now.
13            THE COURT:  Sustained.  Vague as to time.  We need
14    to know when the approximate time is that he's interviewing
15    these people, what year.
16    BY MS. KELLER:
17    Q    When did you interview Mina Mirkazemi?
18    A    I interviewed her in 2003, in the summer thereof.
19    Q    And you were asking her about events that had occurred
20    back in 2000, right?
21    A    I asked her what she knew about Carter Bryant.
22    Q    And you asked her about suspicions she had had about
23    Carter Bryant's involvement in creating Bratz while he was
24    still a Mattel employee, right?
25            MR. ZELLER:  This is getting into a privileged
```

1    conversation.

2              THE COURT:  Overruled.

3              THE WITNESS:  I asked her whether she knew

4    anything about the creation of Bratz and Carter Bryant's

5    role in it.

6    BY MS. KELLER:

7    Q    And the timing was important to you, right?

8    A    The timing of when Carter Bryant created Bratz?

9    Q    The time -- all the timing, the timing of when he was a

10   Mattel employee, when he started working on Bratz, those

11   things were all important to you, weren't they?

12   A    Well, when I was interviewing Mina Mirkazemi, I didn't

13   know what had happened, so I was asking just about anything.

14   Q    And when you interviewed Mattel design center employee

15   Carmen Monteagudo about the hair rooting, you asked her when

16   that was, right?

17             MR. ZELLER:  This is still vague as to time.

18   BY MS. KELLER:

19   Q    When did you interview Carmen --

20             THE COURT:  First of all, sustained.  The jury

21   needs to know, and Counsel, I need to know the time of these

22   interviews, otherwise it's irrelevant.

23   BY MS. KELLER:

24   Q    When did you interview Carmen Monteagudo about the hair

25   rooting?

1    A    Not until, I think, 2004.

2    Q    Do you have notes on that?

3    A    I don't remember that I have notes, no.

4    Q    Did you write the date down when you interviewed her?

5    A    I can't remember specifically.

6    Q    Wasn't the date that you interviewed her important to

7    you?

8    A    Well, finding out the information was important to me,

9    yeah, the day was too, sure.

10   Q    For the same reason it was important to Mattel's

11   counsel, right?

12            MR. ZELLER:  The question is vague.

13            THE COURT:  I'm going to sustain the objection,

14   Counsel.

15   BY MS. KELLER:

16   Q    When did you interview Mattel design center employee

17   Sheila Kyaw about doing the face painting for the dummy

18   doll?

19   A    Sometime in 2004.

20   Q    Did you make notes of what date that was?

21   A    I might have.  I can't remember right now.

22   Q    Did you review your notes before testifying either at

23   your deposition or here today?

24   A    No.

25   Q    Can you bring those notes with you tomorrow?

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 173 of 185   Page ID #:313846
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

173

 1          MR. ZELLER:  That's an improper question, your

 2   Honor.

 3          THE COURT:  No, overruled.

 4          You can answer the question.

 5          THE WITNESS:  Can I bring my notes of my interview

 6   with Sheila Kyaw tomorrow?

 7   BY MS. KELLER:

 8   Q    All -- notes of interviews with all of these people?

 9   A    Again, I am not sure they exist.  I don't know exactly

10   where they are, but -- so I don't know that I can bring them

11   tomorrow.

12   Q    You knew this was a billion dollar lawsuit that Mattel

13   potentially had against Carter Bryant and MGA, right?

14          MR. ZELLER:  The question is vague as to time.

15   Argumentative.

16          THE COURT:  Well, as to time, sustained, but I

17   think it's a dangerous question for both sides.

18          MS. KELLER:  I'll -- I'll rephrase.

19          THE COURT:  Sustained.

20   BY MS. KELLER:

21   Q    You knew when you were interviewing all these people,

22   that you were interviewing them about a potentially

23   important lawsuit for Mattel, correct?

24   A    I was interviewing them to find out what had happened

25   with Carter Bryant.  It could be important.  I didn't know.

1  Q    But you were with the legal department at the time,

2  right?

3  A    Yes.

4  Q    You were a lawyer for the legal department, true?

5  A    True.

6  Q    And the question was, what action to take against

7  Carter Bryant, right?

8            MR. ZELLER:  This is, again, vague as to time.

9            THE COURT:  Sustained.

10  BY MS. KELLER:

11  Q    At the time you interviewed these people, you knew that

12  writing down the date that you interviewed them and what

13  they said was important, right?

14            MR. ZELLER:  Still vague as to time.  There are

15  different times that he's talked about now.

16            THE COURT:  Well, overruled.

17            You can answer that question generally.

18            THE WITNESS:  Okay.  Well, for some people, I

19  spoke to them in 2004, and some I spoke to earlier.

20  BY MS. KELLER:

21  Q    Whenever you spoke to them, you knew that it was

22  important to write down the date of the interview, true?

23  A    Well, if I was going to take notes of an interview, I'd

24  generally write down the date, yes.

25  Q    And you knew that it was also important to write down,

 1   not only the date of the interview, but the dates they told

 2   you various things had happened, true?

 3   A    If I had information that they told me and I wrote it

 4   down, then it would be written down.  I don't know if I took

 5   notes on everything that they told me.

 6   Q    Well, then, what I'm asking you is, would you please

 7   look for those notes tonight and bring them with you

 8   tomorrow to court, okay?  Will you do that?

 9   A    Well, I'm not saying notes as to every person exist or

10   that I know that they exist, I'm just --

11   Q    Sheila Kyaw, who did the face painting for dummy doll,

12   she's a pretty important person, isn't she?

13               MR. ZELLER:  This is argument.

14               THE COURT:  No, overruled.

15               You can answer the question.

16               THE WITNESS:  I understand she did the face

17   painting for the eye, so is she an important person, she's a

18   pretty good face painter.

19   BY MS. KELLER:

20   Q    Well, isn't it Mattel's contention that because she

21   worked for Mattel, that was one of the violations of Carter

22   Bryant's employment agreement, he solicited her to work on

23   this Bratz concept, I mean, isn't that one of Mattel's

24   contentions?

25   A    I don't know if it's a contention, but it's something,

1   sure, it's an evidence that Carter Bryant created Bratz

2   while he was at Mattel.

3   Q    So you know it's an important fact, right?

4            MR. ZELLER:  Again, vague as to time.

5            THE COURT:  Overruled.

6   BY MS. KELLER:

7   Q    You know that's important, right?  What Sheila Kyaw

8   said, when she said it, right?

9   A    Well, what Sheila Kyaw says is very important, yes.

10  Q    And the date you interviewed her was important, right?

11  A    Yes, it's --

12  Q    And the date she said she did the face painting is

13  important, right?

14  A    Well, the date -- sure, if she did the face painting

15  while Carter Bryant was at Mattel, yes.

16  Q    And you know that Carter Bryant paid her with a check

17  dated August 25th, 2000, drawn on his Mattel Federal Credit

18  Union bank account, right?

19           MR. ZELLER:  Vague as to time.

20           THE COURT:  Overruled.

21           THE WITNESS:  Yeah, I found that out some time

22  later, yeah.

23  BY MS. KELLER:

24  Q    Well, did you find it out when you interviewed her?

25  A    No, not the first time.

1    Q    When was the first time you interviewed her, what date?

2    A    I don't know the exact date.

3    Q    What approximate date?

4    A    I believe it was some time in 2004, I think -- I

5    believe it was after the lawsuit was filed.

6    Q    And is this a person that you don't have any notes for,

7    too?

8              MR. ZELLER:  Objection as to "too."

9              THE COURT:  Sustained.

10   BY MS. KELLER:

11   Q    Is this a person that you don't have any notes for?

12   A    I don't know that I have notes for her or not.

13   Q    Mr. Moore, as a lawyer for Mattel involved in

14   investigating this, you knew that your notes of your

15   interview with Sheila Kyaw could be really important in this

16   case, true?

17             MR. ZELLER:  This assumes facts.

18             THE COURT:  Overruled.

19             THE WITNESS:  I knew Sheila Kyaw was a Mattel

20   employee and she was able to testify as to what she told me.

21   BY MS. KELLER:

22   Q    Sir, you knew that what was important is when Mattel

23   found out about all this, that was important for the statute

24   of limitations, when Mattel knew or should have reasonably

25   suspected, you knew that, right?

```
 1              MR. ZELLER:  Misstates the legal standard.  Also
 2   is vague to the Kyaw interview, if this is what it's about.
 3              THE COURT:  Overruled.
 4   BY MS. KELLER:
 5   Q   You know it's important for the statute of limitations,
 6   when Mattel knew, reasonably should have known or suspected
 7   that Carter Bryant was working on Bratz while he was still a
 8   Mattel employee; you know that, don't you?
 9              MR. ZELLER:  Misstates the law.
10              THE COURT:  Overruled.
11              THE WITNESS:  That's not my understanding of the
12   law.
13   BY MS. KELLER:
14   Q   And Sheila Kyaw was a critical, potential witness as to
15   the statute of limitations, correct?
16   A   Well, she was a witness as to what she did for Carter
17   Bryant.
18   Q   She was a witness who was paid by a check dated
19   August 25th, 2000, right?
20   A   It's been a while since I've seen the check, so I'm
21   assuming that's right.
22   Q   After you interviewed any of these 60 people on the
23   list that you referred to in your affidavit, did you give
24   your interview notes to anyone in the legal department?
25              MR. ZELLER:  Move to strike the reference to the
```

1    affidavit.

2              THE COURT:  No, overruled.

3              You can answer the question.

4              But it does assume facts not in evidence, Counsel,

5    concerning the affidavit.

6              Just a moment.

7              MS. KELLER:  I will rephrase.

8    BY MS. KELLER:

9    Q    After you interviewed the people on the list that you

10   attached to your affidavit we've previously discussed, did

11   you give your interview notes to any other person?

12   A    I don't know that interview notes existed or that I

13   gave it to any other person.

14   Q    If you made interview notes, did you give them to any

15   other person?

16   A    I possibly could have given them to a paralegal.

17   Q    So you are telling us, then, that you don't even know

18   if you made any notes of any interviews of any of these

19   witnesses?

20             MR. ZELLER:  Objection.  Argumentative as you're

21   telling us.

22             THE COURT:  Overruled.

23             THE WITNESS:  I know I took notes during this

24   time.  I just can't remember what notes were taken as to

25   which interview and which person.

 1    BY MS. KELLER:

 2    Q    Where are they now?

 3    A    They've been retained.

 4    Q    By whom?

 5    A    Well, Mattel should have them, we should have them, or

 6    if they exist, outside counsel should have them.

 7    Q    Who at Mattel should have them?

 8    A    Well, somebody at Mattel -- the law department should

 9    have them.

10    Q    A name, please?

11    A    Well, either I should have them or they should exist in

12    our files somewhere.

13    Q    If they exist, right?

14    A    That's right, if -- if --

15    Q    If they exist, they should be somewhere?  Do you have a

16    file --

17              MR. ZELLER:  Your Honor, she interrupted the

18    witness.

19              THE COURT:  Sustained.

20              Strike the answer.  Strike the question.  Reask

21    the question.

22    BY MS. KELLER:

23    Q    So if I'm correct, then, if they exist, they are

24    somewhere at Mattel, but you don't know whether they exist

25    or where they would be at Mattel; is that true?

```
 1              MR. ZELLER:  Misstates the witness' testimony.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  You are asking me for my memory on

 4    specific notes and times and dates, and I just don't know

 5    whether they exist.

 6    BY MS. KELLER:

 7    Q    Well, would you agree with me that as lawyers, we're

 8    trained to be careful about such things as dates and times

 9    of interviews?

10    A    Well, generally when I'm taking an interview, it could

11    be just a discussion I had in the design center so --

12    Q    But these weren't casual chats with people, these were

13    part of an investigation that, among other things, would

14    have to do with potentially the statute of limitations in a

15    very important lawsuit for Mattel, right?

16              MR. ZELLER:  Question is overbroad.  Vague as to

17    time.

18              THE COURT:  Overruled.

19              THE WITNESS:  At the time, a lot of interviews

20    were conducted, you know, there was really no consideration

21    of the statute of limitations.  The question was, what

22    happened?  We didn't know.

23    BY MS. KELLER:

24    Q    Back to my question.  As lawyers, when we are

25    investigating anything, whether we think there is something
```

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 182 of 185   Page ID #:313855
CV 04-9049-DOC - 03/29/2011 - Day 41, Vol. 2 of 3

182

```
 1    to it or not, if we are investigating something to see if
 2    there is a basis for a lawsuit, for example, we are trained
 3    to be careful about writing down dates and times of people
 4    we talk to and what they said, right?
 5              MR. ZELLER:  Move to strike the preamble comment.
 6              THE COURT:  Overruled.
 7              MR. ZELLER:  And it's compound.
 8              THE COURT:  Overruled.
 9    BY MS. KELLER:
10    Q    Do you understand my question?
11    A    Yeah, I understand your question.  And I take notes
12    during some interviews, and some interviews, I don't take
13    notes.
14    Q    Here is my question again:  As lawyers, we are trained
15    to be careful about writing down dates and times and what
16    people said when we are doing interviews whether or not a
17    lawsuit is later filed, right?  True statement?
18    A    Well, it's true if there's an important interview or
19    some kind of interview that you want to take notes about
20    that you would write the date, and -- and there are some
21    interviews that can occur that you don't take notes about.
22    Q    But in a case like this where you're interviewing a
23    whole group of people, you don't know what's important until
24    you're done with all of the interviews, right?
25    A    You know, in -- during the summer of 2003, we didn't
```

Case 2:04-cv-09049-DOC-RNB   Document 10338   Filed 03/31/11   Page 183 of 185   Page ID #:313856
CV 04-9049-DOC – 03/29/2011 – Day 41, Vol. 2 of 3

183

1  know what was important at all, because we didn't know what

2  happened.

3  Q    Which is why it's even more important to write down

4  every date, every time and what everybody says, so you can

5  put it all together later, right, Mr. Moore?

6  A    Well, I know I have notes about my investigation.

7  Q    You do know you have notes?

8  A    Well, I know I've kept records of things that have

9  happened during the time we were doing the investigation.  I

10  just don't know if there were notes taken of every

11  interview, is what I'm saying.

12  Q    However many interviews there may be, where are those

13  notes now?  Who has them?

14  A    If they are interview notes, I would think either

15  Mattel has them or outside counsel has them.

16  Q    Didn't you keep your own file, for example, on your

17  computer?  I mean, didn't you type up your notes after you

18  got back to your office and keep your own file?

19  A    Sometimes I did that.

20  Q    And do you have those today?

21  A    Well, I have notes -- in the course of this case, yes,

22  I've done that.  And do I have them today?  I should.

23  Q    Have you looked?

24  A    You're posing this question now, I haven't looked since

25  today.

1   Q    Did you look yesterday or last week?

2   A    I haven't reviewed my notes in connection with this.

3   Q    Have you looked to see if they exist?

4   A    Well, no, because this is the first time I've been

5   asked.

6            MS. KELLER:  Your Honor, I'm about to go on to a

7   new topic.  I wonder if we could take our break.

8            THE COURT:  It's a good time for a recess.

9            You are admonished not to discuss this matter

10  amongst yourself, nor form or express any opinion concerning

11  the case.  Good night.  We are in recess.  We'll see you

12  tomorrow at 8:30.  Please drive carefully.

13           Counsel, we'll be back in session in 15 minutes.

14           *(Recess.)*

15           *(Following proceedings reported by Dennise*

16      *Paddock.)*

17                         -oOo-

18

19

20

21

22

23

24

25

1                          -oOo-

2                     **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  March 30, 2011

12

13

14          _____

15          JANE C.S. RULE, U.S. COURT REPORTER
            CSR NO. 9316

16

17

18

19

20

21

22

23

24

25