```
                 UNITED STATES DISTRICT COURT

                CENTRAL DISTRICT OF CALIFORNIA

           HONORABLE DAVID O. CARTER, JUDGE PRESIDING

                    - - - - - - -
```

# CERTIFIED TRANSCRIPT

```
MATTEL, INC., et al.,            )
                                 )
                Plaintiffs,      )
                                 )
         vs.                     )
                                 )
MGA ENTERTAINMENT, INC., et al., )  No. CV 04-9049-DOC (RNBx)
                                 )     Day 41
                                 )     Volume 3 of 3
                Defendants.      )
_____)
```

```
           REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS
                         JURY TRIAL
                    SANTA ANA, CALIFORNIA
                   TUESDAY, MARCH 29, 2011
```

```
Denise Paddock, CSR 10199, CMRS, RMR, CRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
transcripts@ocrecord.com www.ocrecord.com
032911 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 41 V3
03/29/2011
```

**APPEARANCES OF COUNSEL:**

FOR PLAINTIFF MATTEL, INC., ET AL.:

      QUINN EMANUEL URQUHART & SULLIVAN LLP
      BY: JOHN QUINN
          WILLIAM PRICE
          MICHAEL T ZELLER
          Attorneys at Law
      865 S Figueroa Street, 10th Floor
      Los Angeles, CA 90017-2543
      213-443-3000

FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: THOMAS S McCONVILLE
         Attorney at Law
      4 Park Plaza, Suite 1600
      Irvine, CA 92614
      949-567-6700

      - AND -

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: ANNETTE L HURST
         Attorney at Law
      405 Howard Street
      San Francisco, CA 94105
      415-773-5700

      KELLER RACKAUCKAS LLP
      BY:  JENNIFER L KELLER
         Attorney at Law
      18500 Von Karman Avenue, Suite 560
      Irvine, CA 92612
      949-476-8700

1   **APPEARANCES OF COUNSEL (Continued):**

2

3

4     FOR CARLOS GUSTAVO MACHADO GOMEZ:

5           LAW OFFICES OF MARK E OVERLAND
            BY: Mark E Overland
6               Attorney at Law
            100 Wilshire Boulevard, Suite 950
7           Santa Monica, CA 90401
            310-459-2830
8
            -AND-
9
            SCHEPER KIM AND HARRIS LLP
10          BY: ALEXANDER H COTE
                Attorney at Law
11          601 West Fifth Street, 12th Floor
            Los Angeles, CA 90071-2025
12          213-613-4655

13          ALSO PRESENT:

14          MGA ENTERTAINMENT, INC.
            BY: JEANINE PISONI
15              Attorney at Law
            16360 Roscoe Boulevard, Suite 105
16          Van Nuys, California 91406

17

18   ALSO PRESENT:

19          KEN KOTARSKI, Mattel Technical Operator

20          MIKE STOVALL, MGA Technical Operator

21

22

23

24

25

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10339   Filed 03/31/11   Page 4 of 83   Page ID #:313862
CV 04-9049 DOC - 03/29/2011 - Volume 3 of 3

4

1          SANTA ANA, CALIFORNIA; TUESDAY, MARCH 29, 2011

2                    Day 41, Volume 3 of 3

3                    P.M. SESSION

4          (Open court - jury not present.)

17:28  5          THE COURT:  All right.  All counsel are present.

6          The jury's not present.

7          The court was in the process of handing down a

8     series of rulings yesterday, and was interrupted yesterday

9     before I could make some other rulings.

17:28 10          This is a tentative ruling by the court.

11          And I want all counsel to listen closely because it

12    pertains to the 17200 claim and it's a dramatic change from

13    the court's prior position.

14          Prior to trial Mattel moved in limine to exclude

17:28 15    evidence relevant to equitable claims and defenses, including

16    both Mattel and MGA Entertainment, claims under business --

17    or California Business and Professions Code 17200.

18          This court denied that request because the evidence

19    at issue was relevant to the legal claims, in addition to the

17:29 20    equitable claims.

21          For instance, evidence that Mattel interfered with

22    MGA's licensing and retailer relationships undercuts Mattel's

23    claim that it suffered lost profits as a result of MGA's

24    alleged trade secret misappropriation and copyright

17:29 25    infringement.

1          Moreover, evidence that MGA solicited Mattel

2     employees to moonlight was not just relevant to Mattel's

3     statutory, unfair competition claim, but also its claim for

4     intentional interference with contractual relations.

17:29 5          Given the substantial overlap between the equitable

6     and legal claims, as well as this court's disinclination to

7     recall the parties to separately try the equitable issues and

8     at the same time after initially indicating to the parties my

9     strong disagreement with bifurcation and inviting the jury to

17:30 10    come back for a punitive phase after a three-month trial with

11    a perplexed jury, thinking that they were going home, I was

12    persuaded by the wisdom of counsel for both parties to

13    bifurcate.

14          But after the jury returned a verdict on the legal

17:30 15    claims, I had declined to exclude evidence relevant to the

16    equitable claims and defenses, including both parties' claims

17    also under Business and Professions Code 17200.

18          Now, this court later indicated that I was inclined

19    to try the equitable claims and defenses to an advisory jury

17:30 20    pursuant to Federal Rule of Civil Procedure 39(c), and I

21    think I've been very consistent in my discussion with counsel

22    that I always had an advisory jury on 17200 claims, and that

23    you had rarely, if ever -- in fact, I had never bifurcated a

24    trial before, including patent.

17:31 25          Neither party has since consented, though, to

1    allowing the advisory jury's verdict to have a binding effect

2    pursuant to Federal Rule of Civil Procedure 39(c)(2), and

3    I'll take that up if there is a request with either counsel

4    in just a moment.

17:31 5         In addition, the parties have both raised concerns

6    at different times about whether the jury will improperly

7    conclude that the parties' claims for unfair competition

8    encompassed the allegations of trade secret misappropriation.

9         This court has previously concluded that the

17:31 10   California Uniform Trade Secrets Act supercedes claims,

11   including the unfair competition claims in this case based

12   upon the misappropriation of trade secret information.

13        And I refer you to the order on motions for summary

14   judgment, Docket 9600 at 91, and the order on motions

17:32 15   in limine, Docket No. 9669 at 22.

16        Also, I cite back *KC Multimedia, Inc., versus*

17   *Bank of America Tech. & Operations, Inc.*, at 171 Cal.App.4th

18   939 at 961 (2009), holding that unfair competition claim

19   based upon misappropriation of trade secret information was

17:32 20   superceded.

21        Last evening I was prepared to discuss with you,

22   before we had a small interruption, that there is a

23   substantial risk of jury confusion now on the issue of

24   whether the conduct that gives rise to the trade secret

17:32 25   claims also gives rise to the unfair competition claims.

1          To avoid this confusion, I'm tentatively inclined

2     not to instruct the jury on these claims or seek any advisory

3     verdict from this jury on these claims.  Instead, on the

4     basis of the evidence admitted during the trial the court's

17:32 5     more inclined now to separately issue written findings of

6     fact and conclusions of law on the parties' unfair

7     competition claims pursuant to Federal Rule of Civil

8     Procedure 52(a).

9          Now, I'm going to leave the bench for a couple

17:33 10    moments.  I want each side to discuss separately.  If you

11    both decide that you want the jury to act in a binding effect

12    pursuant to Federal Rule of Civil Procedure 39(c)(2), I may

13    follow that advice.

14         If either one of you doesn't, I want to hear your

17:33 15    argument as to why not.

16         Second, I'm going to raise with you -- if I take

17    the 17200 claim from the jury which gives the court, in a

18    sense, the last word on this case, then let me ask the

19    following questions for you to consider:

17:33 20         If 17200 does not go to the jury, does that mean

21    that other equitable claims and defenses should not be sent

22    to the jury as well?  For instance, laches, unclean hands and

23    even alter ego which, although Mattel has requested an

24    instruction, notwithstanding the 17200 verdict, I don't

17:34 25    understand, and the law indicates no right, to alter ego.

1          So that's a whole a lot of decisions about how this

2     court instructs the jury.

3          Now, second, Federal Rule of Civil Procedure

4     39(b)(6) provides that a party may issue a deposition

17:34 5     subpoena that names as the deponent a public or private

6     corporation and upon receipt of such subpoena the named

7     organization must designate one or more officers, directors,

8     or managing agents, or designate other persons who consent to

9     testify on its behalf.

17:34 10          The persons designated must testify about

11     information known or reasonably available to the

12     organization.

13          On April 27th, 2010, MGA Entertainment, Inc., its

14     subsidiaries and Isaac Larian, collectively MGA, served a

17:35 15     subpoena that named Mattel as a deponent on 27 topics of

16     examination.

17          Now, I'm going to refer you to the minute order on

18     discovery matters, Docket 809 at 7.

19          Mattel then moved for protective order on all 27

17:35 20     topics identified in MGA's Notice of Deposition, and I refer

21     you to Topic 9 on the same docket, No. 807.

22          Concerning communications between Mattel and its

23     licensees regarding potential or actual licensees with MGA.

24     Also, same docket number, 8079, I refer you to Page 10; it

17:35 25     sought testimony about Mattel's practice, if any, or

1   expressed -- strike that -- of expressly or implicitly

2   pressuring retailers and licensees to cease doing business

3   with MGA.  And I refer you to the same docket, No. 8079,

4   Pages 10 through 11.

17:35 5          This court overruled Mattel's objection to Topic 9

6   as overbroad and unduly burdensome.  I accordingly ordered

7   Mattel to either designate a 30(b)(6) witness to testify as

8   to the topic or produce Bob Eckert and/or Neil Friedman to

9   testify as to Mattel's practice, if any, of communications

17:36 10  with its licensees about actual or potential MGA licensees;

11  and I cite Page 11 of the same document previously cited.

12  Mattel chose to produce Mr. Eckert.

13          Mattel now argues on the eve of Mr. Eckert's trial

14  testimony that his testimony should not bind the corporation

17:36 15  and that he should not be required to testify about matters

16  known or reasonably known by the corporation, because he was

17  never formerly designated as a corporate representative

18  pursuant to Rule 30(b)(6).

19          Mattel's interpretation of this court's June 7th,

17:36 20  2000, order is unreasonable.

21          I provided Mattel the option of producing either

22  Messrs. Eckert or Friedman to testify about Mattel's

23  licensing practices because their testimony was expected to

24  be as or more informed as a corporate representative on that

17:37 25  issue.

1          In fact, I did not order Mr. Eckert to testify

2     about his personal knowledge of Mattel's licensing practice

3     but instead ordered Mr. Eckert to testify about Mattel's

4     practice, if any, of communicating with its licensees about

17:37 5     actual or potential MGA licenses.

6          And I refer you back to Docket 8079 at 11.  He was

7     expected to by this court and should have educated himself

8     about that subject by speaking to all relevant individuals

9     within Mattel.

17:37 10          It is not unreasonable for Mattel -- I think it's

11    now unreasonable for Mattel to now claim that Mr. Eckert

12    lacks knowledge about all Mattel licensing practices, whether

13    in his personal capacity or in a representative capacity.

14          Therefore, Mattel's request that Mr. Eckert be

17:37 15    excused from testifying about information known or reasonably

16    available to the organization is going to be tentatively

17    denied, but I'm going to pay the courtesy of listening to

18    Mattel one more time on that issue.

19          Now, down in Georgia where this court does not have

17:38 20    jurisdiction, I want to cite to you a case called

21    *United States versus Southern District of New York, Methyl*

22    *Tertiary, Butyl Ether Products Liability Litigation.*

23          It's from a learned colleague of mine in New York,

24    and I just refer that to you.  The cite is (2009) Westlaw,

17:38 25    1840882.

1       And I think that that's an extraordinarily

2   interesting case, and I commend that to you for your reading.

3   You can draw your own conclusions.  The judge in Georgia will

4   make his decision tomorrow and will inform the court.

17:38  5       Finally, during the testimony today of Mr. Moore,

6   Mr. Moore referenced certain notes potentially prepared by

7   outside counsel during one or more of the interviews of

8   Mr. Villasenor in 2005.

9       Now, what's the parties' position on this? because

17:39 10   this is the first time I'm hearing about any notes concerning

11   the statute of limitations.

12       MS. KELLER:  Yes, Your Honor.

13       And we, as well, we would ask that those notes be

14   produced, along with any calendars that he has for those

17:39 15   years, showing -- that -- that may contain information about

16   when he actually interviewed these people.

17       THE COURT:  I anticipated that.

18       Mr. Moore, you are present.  You are ordered to

19   drive back to El Segundo.

17:39 20       We are going to keep the light on for you tonight.

21       MR. QUINN:  Can we respond?

22       THE COURT:  Just a moment.

23       MR. QUINN:  Do we get to respond?

24       THE COURT:  Oh, Counsel, absolutely.

17:39 25       Mr. Quinn.

1          MR. QUINN:  Your Honor, this is attorney work

2    product, and it was objectionable for Ms. Keller, in front of

3    the jury, to ask Mr. Moore if he would produce attorney work

4    product.

17:39  5          And it's -- an attorney is entitled to interview

6    witnesses and take notes, and just because he's made notes

7    doesn't mean that they're producible, and she certainly

8    should not have asked that question in front of the jury.  It

9    sets us up to be in a position like we're hiding something.

17:40 10          THE COURT:  All right.

11          Counsel.

12          MS. KELLER:  Interviewing fact witnesses, in-house

13   counsel interviewing fact witnesses, not seeking or giving

14   legal advice, is not privileged and to the extent that

17:40 15   counsel argues it is, the contents were disclosed in the

16   talking points document that was -- at least -- certainly

17   there was enough disclosed in the talking points document

18   that he prepared that it's a waiver.

19          THE COURT:  Okay.

17:40 20          MR. QUINN:  That's -- that's absurd.  There's

21   nothing in those talking points documents about Mr. Moore's

22   interviews.

23          MGA has never produced notes of its counsels'

24   interviews with witnesses ever.  Not one.

17:40 25          This is -- she said it's interview of a fact

1      witness.  What other kind of a witness is there?  Interview

2      of a law witness?

3              Lawyers interview witnesses, they take notes, those

4      are work product, routinely so.  Any notes that he took after

17:41  5      the case was filed were scheduled on our log or before.

6              It's -- it's -- and, frankly, Your Honor, we'd

7      request that the jury and -- I'm going to ask to go on the

8      record at some point.

9              THE COURT:  Oh, I think you are on the record.

17:41  10              I hope you're on the record.

11              I plan to be on the record at all times from now

12      on, Counsel.

13              MR. QUINN:  That's not necessary, Your Honor.

14              THE COURT:  No, I want a record.

17:41  15              MR. QUINN:  All right.  Your Honor, it was improper

16      to make that -- I mean, it's easy to do it this evening; we

17      know we are going to be together, we are together every

18      evening, some evenings later than others.  That request did

19      not need to be made to the jury, and we'd request that the

17:41  20      court rule that those didn't have to be produced and that the

21      jury be told that that request was improper.

22              THE COURT:  Okay.

23              MS. KELLER:  Your Honor, he also testified in his

24      deposition that he supplied the information for those talking

17:41  25      points, and he supplied the information from the talking

1    points from the information he gathered.

2         MR. QUINN:  He said I don't -- that's not his --

3    that's not his testimony.  Like his interview with

4    Sheila Kyaw, the content of that is somewhere buried in those

17:42  5    talking points?  I don't think so.  And I'd be very

6    interested to see the passage of the deposition that

7    counsel's referring to.

8         MS. KELLER:  He's not quoting from his notes, but

9    the summary that he -- of the position of Mattel that was in

17:42 10    the talking points released to the public was based on all

11    the work that he did in interviewing these people.

12         MR. QUINN:  That's -- that's simply not true.

13    That's simply not true, Your Honor.

14         MS. KELLER:  Well, then we would just ask the court

17:42 15    to review it in-camera because we think it -- it sounds as if

16    it could contain critical information that we haven't seen,

17    and it goes to -- if there's anything --

18         THE COURT:  Mr. Moore, if you'd wait outside for

19    just a moment, sir.

17:42 20         MR. QUINN:  Could we also have their interview

21    notes reviewed as well, Your Honor?  This seems now to be a

22    one-way street.  All the files we're being ordered to

23    produce, all the witnesses, the evening depositions.

24         You know, we -- we have a statute of limitations

17:43 25    issue too.  When did they know about Sal Villasenor?  The

1   court heard Mr. Larian's testimony the other day that as of

2   2009 he said he had known about it for some number of years;

3   it was vague.  At Mr. Brawer's deposition we asked him, "Did

4   you tell the lawyers when you went over to MGA about

17:43 5   Mr. Villasenor's activities?"

6            Instruction not to answer.

7            Ultimately he gets to answer the question, but he's

8   supposed to exclude from his answer anything that he might

9   have told the lawyers.

17:43 10            Do we get that?

11            THE COURT:  Counsel?

12            MS. KELLER:  There is a significant difference

13   between in-house counsel and outside counsel.

14            If this were outside counsel commissioned to do the

17:43 15   investigation, I think Mr. Quinn would have a point.

16            This is inside counsel who is wearing many hats,

17   including coaching corporate communications on putting out

18   these talking points.

19            He is not -- it is not -- he is not in the same

17:44 20   position that outside counsel would be conducting a truly

21   independent investigation.

22            He has many different obligations.  Mattel may be

23   his client, but he is also an employee and he also has

24   reporting obligations.  The whole legal department has

17:44 25   reporting obligations and compliance obligations to the SEC,

 1    to all sorts of other entities.

 2              MR. QUINN:  Well --

 3              MS. KELLER:  So they're not in the same position

 4    that outside counsel is at all.

17:44 5              MR. QUINN:  *Upjohn versus the United States*, the US

 6    Supreme Court case, the lawyers there were in-house lawyers.

 7    It was their interviews of Upjohn employees.  The court --

 8    the United States Supreme Court said privilege applies fully.

 9    And I know the court's given -- has some thoughts on this,

17:44 10    but the -- the state of the law from the US Supreme Court is

 11   in *Upjohn* there is no distinction in the application of the

 12   privilege from in-house lawyers when they're acting as

 13   lawyers and outside lawyers.

 14             And it's hard to think of a more core lawyerly

17:45 15    activity than interviewing witnesses in connection with

 16   investigating a potential claim.

 17             MS. KELLER:  That apparently was not what he was

 18   doing in the summer, according to him.  According to him he

 19   was just trying to figure out what was going on.

17:45 20             He wasn't investigating a claim.  He's essentially

 21   denied that.  He just said he wanted to -- he was

 22   investigating who talked to the Wall Street Journal.  That's

 23   what he said in his deposition and wanted to get to the

 24   bottom of that.  It may have morphed into something later,

17:45 25    but he's been pretty clear that he didn't know what it was

1    about yet.

2         MR. QUINN:  Exactly.  And lawyers often interview

3    people where they don't know the landscape, they don't know

4    what it's all about and they're trying to find out what it's

17:45 5    all about, for the purpose of giving legal advice to their

6    client, i.e., here, Mattel.

7         MS. HURST:  Your Honor, *Upjohn* also makes clear

8    that facts are not privileged.

9         THE COURT:  Isn't there the necessity issue also

17:46 10   with *Upjohn*?

11        MS. HURST:  Yes.  With respect to the work product

12   claim there's clearly necessity here, Your Honor.

13        MR. QUINN:  But this does not -- if we look at the

14   case law on necessity -- you know, if we're going to define

17:46 15   it to say there's only one set of Michael Moore notes and

16   therefore it's absolutely necessary that we get them if we're

17   going to see the Michael Moore notes, that necessity

18   exception becomes meaningless.  It's ridiculous.

19        There is a case law on what "necessity" means.

17:46 20        There's no shortage of evidence in this case

21   bearing on the statute of limitations issues.

22        THE COURT:  Would you like me to go do some

23   research?

24        MS. HURST:  We would ask that Mr. Moore  --

17:46 25        THE COURT:  We're here.  I'm going to keep the

1    light on.  We can go as far as you want.  As soon as I can do

2    some research, look at *Upjohn* again, look at necessity or

3    not, I'm happy to do that.  I'd be happy to hear your

4    arguments as long as we'd like.  Otherwise, I'm sitting here.

17:47  5          MS. HURST:  Can we have Mr. Moore go get the notes

6    in the meantime? because the court's clearly entitled to

7    order an in-camera review.

8          THE COURT:  Well, I know that.

9          That's really up to the two of you.

17:47 10          He's driving down the highway, he's coming back and

11    we're sitting here.

12          Now, I would like to take the time to go back and

13    thoroughly research this, instead of a wing and a prayer, and

14    be comfortable with whatever I feel and come out and give you

17:47 15    a tentative and let you argue again.  But if I decide to go

16    get his notes, I don't care if it's 10:00 tonight.  He'll be

17    back at 3:00 in the morning.  And that's up to you because

18    you're all going to be sitting here.

19          So you all make the choice.

17:47 20          MR. QUINN:  Well, Your Honor, I choose for whatever

21    doesn't keep me up till 3:00 a.m.

22          THE COURT:  You're fine.  You look good; you sound

23    good; you're a warrior.  I enjoy that.

24          MR. QUINN:  Thank you, Your Honor.

17:47 25          THE COURT:  Good.

UNITED STATES DISTRICT COURT

```
 1              MR. QUINN:  But can I -- a couple of other things.

 2        You know --

 3              THE COURT:  Well, here's what I'd suggest.

 4              I'd suggest that you free the good ol' judge for

17:47 5   just a couple moments, and you sit down and talk about the

 6   17200 claim.  That is really a critical discussion.

 7              I have turned my viewpoint around substantially

 8   because I'm becoming also a little concerned about the

 9   overlap between trade secret misappropriation and 17200.

17:48 10             Quite frankly, I'm also becoming more and more

11   concerned about what I was thinking concerning laches being

12   submitted or alter ego or unclean hands and all of these kind

13   of have a domino effect.

14              I know there's an alter ego instruction out on

17:48 15  behalf of Mattel, but a little bit of that has some synergy

16   to it, so I really need the 17200.

17              And without both of you stipulating to it, quite

18   frankly, I don't know why, then, I'm not going to violate my

19   time-honored rule, because I do tell you, this would --

17:48 20  normally the 17200 I take it to the jury on an advisory

21   opinion, but it's usually a three- to a four-day case.

22              No. 2, I never bifurcate cases because I don't want

23   the same jury to have to come back.

24              Now, on a three-month case, guess what we're going

17:49 25  to be saying to them, whatever they reach and if there's any
```

1    claim on behalf of Mattel, we're going to have a pretty

2    interesting jury, saying, hi, folks, can you spend a little

3    bit more time with us?  They're not going to be happy.

4          So until we make that initial decision and you give

17:49 5    me some time to do some research, here you are.  You're my

6    captive, and time means nothing to me.  And all of you are

7    here tonight.  Nobody's leaving for your birthday parties or,

8    you know, 80th reunions.  Here you sit.

9          So you decide what you want me to do, because here

17:49 10    I'm sitting.

11          MR. QUINN:  What's the court's preference?

12          THE COURT:  I was going to go research *Upjohn* and

13    go look at the law.

14          MR. QUINN:  All right.

17:49 15          THE COURT:  And you were going to decide if you

16    wanted Mr. Moore to start down the highway or not, because if

17    I rule in Mattel's favor and take your position we'll call

18    him and turn him around.

19          If I don't rule in your favor or I want an

17:50 20    in-camera review, I don't care if it takes me to 7:00 or

21    9:00.  He's going down that highway, the lights stay on in

22    the courthouse and he's coming back at 9:00 or 3:00 a.m. and

23    you're sitting here.

24          Now, decide.

17:50 25          Now, have a little conference amongst yourselves

1    because right now you look good.  Tomorrow you won't look

2    good.

3              Talk to each other real quick and then talk to each

4    other and tell me what to do.

17:50 5          MR. QUINN:  I think the -- the court's notion of

6    doing some research while we think about that 17200 issue is

7    a good one.

8              THE COURT:  What do you want to do with Mr. Moore,

9    because if I don't need him we can call him and say,

17:50 10   "Mr. Moore, stop in El Segundo."

11             MR. ZELLER:  Your Honor --

12             THE COURT:  If we do need him and I want an

13   in-camera review or I think that there's necessity, then he's

14   turning that car around.

17:50 15         MR. QUINN:  Your Honor, we have people in

16   El Segundo for the last 45 minutes already on this job.

17             THE COURT:  Okay.  Well, then, I get to go back and

18   he doesn't have to drive down there; right?

19             MR. QUINN:  Okay.

17:50 20         THE COURT:  But doesn't he know that if I decide if

21   I want to look at these notes, doesn't he have to know where

22   they are?

23             Maybe he can just call down.

24             Okay.  Look at Mr. Moore in the hallway, then.

17:51 25   He'll be a valuable resource, and I'll go back and try to do

1    some research.

2            Why don't you pull this case, the product's

3    liability case I gave you.

4            In fact, I've got some copies for each of you.

17:51  5            Pardon me for the -- for the bad ink, but this --

6            Off the record for a moment.

7            (Discussion held off the record.)

8            THE COURT:  When the video was played of the Mattel

9    auditorium, Sal Villasenor and Stephanie Paige, what year was

17:52 10    that video?

11            ALL RESPONSE:  1999.

12            THE COURT:  Okay.  All right.

13            Nancy, turn on the -- while you're sitting here you

14    will be watching a March 19th, 2004, video.

17:52 15            Put that on.

16            Put up the screen and I want you to watch this.

17            This is 2004.  And that way you can see this one

18    and I'm going to go do some review of this.

19            (Recess taken.)

18:34 20            THE COURT:  All right.  Then we're on the record

21    and I'm going to hand out to you Judge Larson's opinion

22    concerning alter ego on the *Superman* case, stating that

23    there's no right to jury trial, alter ego.

24            I'm going to hand out to you the Seventh Circuit,

18:34 25    which is the Circuit case that the court has located, and

1    invite you to read them on alter ego, also stating no right

2    to jury trial on alter ego.

3         Concerning Mr. Moore, I referred to Chief

4    Judge Kozinski's opinion in *McKenzie versus McCormick*,

18:35  5    27 Fed.4th, 1415, Ninth Circuit 1994.  That opinion

6    reiterates the standard on *Hickman versus Taylor*, 329 US 495,

7    1947, that the law generally disfavors the production of an

8    attorney, witness' interviews prepared in anticipation of

9    litigation.

18:35 10        Contrary to MGA's argument, neither

11   Judge Kozinski's opinion in *McKenzie* nor under the

12   Supreme Court's opinions in *Hickman* or *Upjohn* make any

13   distinction between factual communications and nonfactual

14   communications.

18:35 15        In fact, there has been argument twice that the

16   attorney work product for privileged communications may be

17   disclosed if they contain purely factual material by MGA.

18        I think that's simply false.  The underlying facts

19   may be discoverable but the communication itself, even if it

18:35 20   is a factual communication -- and I'm going to repeat that --

21   even if it is a factual communication still enjoys the

22   protection of the attorney-client privilege and/or work

23   product doctrines.

24        In fact, *Upjohn Company versus United States* in

18:36 25   that case the Supreme Court explicitly rejected the argument

Case 2:04-cv-09049-DOC-RNB   Document 10339   Filed 03/31/11   Page 24 of 83   Page ID #:313882
CV 04-9049 DOC - 03/29/2011   Volume 3 of 3

24

1    that I think MGA's counsel has now made in several hearings.

2         The court held "while it would probably be more

3    convenient for the government to secure the protected matter

4    by simply subpoenaing the protected matter, such

5    considerations of conveniences do not overcome the

6    privilege."

7         That cite, of course, is 449 US 383395 1981.

8         "However, an attorney's mental impressions

9    contained in witness interview notes do not qualify as work

10   product unless prepared in anticipation of litigation.

11        "Even in the work product doctrine applies, the

12   court may order production in two circumstances.

13        "First, if the work product is nonopinion work

14   product, then it would be produced if there is a substantial

15   need and the party seeking discovery would face undue

16   hardship absent disclosure; and second, if the work product

17   is opinion work product, then it may be produced if there is

18   a far greater showing of necessity and unavailability by

19   other means.

20        "In the *McKenzie* case, Judge Kozinski appeared to

21   commend the district court for conducting an in-camera review

22   of the materials to determine if any of them were of, quote,

23   impeachment value.

24        "In that case, the majority concluded that the

25   district judge did not abuse his discretion by refusing to

1    order the disclosure of the materials.

2           "It therefore appears that there are three

3    threshold questions for the court to answer.

4           "First, whether the notes were prepared in

18:37 5    anticipation of litigation; second, whether the notes are

6    opinion or nonopinion work product; and third, whether and to

7    what extent there is a substantial need for the materials and

8    undue hardship would befall MGA absent discovery."

9           To absolve those questions and to order that I am

18:38 10    not abusing my discretion, I am ordering the review of those

11    materials in-camera.

12           Now, how long that takes is simply up to you to get

13    the materials down to me.

14           Now I'm going to turn back to the 17200.  That is a

18:38 15    final ruling by the court and that's a final direction until

16    those materials are resolved this evening.

17           I want to hear your thoughts about the 17200.

18           I'm prepared to make this a final determination,

19    but this causes a whole avalanche of affirmative defenses and

18:38 20    equitable defenses, laches, unclean hands, potentially, and I

21    know that you'll nitpick over one or two, but I really need

22    to get your thoughts.

23           And I'm going to start with Mattel, and the reason

24    for that is you've taken the consistent position from the

18:39 25    beginning that, well, depending upon the argument and the

1    time, that you didn't want the 17200 to go to the jury.

2              So, I'm listening.

3              MR. QUINN:  Your Honor, could I ask, since we're

4    going to need to get these notes right away, what time period

18:39  5    the court has in mind for the notes?

6              THE COURT:  Whenever you get them.

7              MR. QUINN:  No, I mean, notes for what period of

8    time when he's taking notes?

9              THE COURT:  Well, he took them explicitly -- let me

18:39 10    go back and get my notes.

11              MR. QUINN:  He said --

12              THE COURT:  He took them explicitly, and here's how

13    scattered the testimony was.

14              Let me go over a few people with you.

18:39 15              Mina -- and I may be pronouncing it -- Mirkazemi or

16    Mirkazemi.

17              MR. ZELLER:  Mirkazemi.

18              THE COURT:  Who is the -- and also

19    Carmen Monteagudo, and I'm mispronouncing --

18:40 20              Regarding Mina Mirkazemi, she was interviewed,

21    supposedly, sometime in the summer of 2003, and that's the

22    best I have on the record so far.

23              Then I've got Carmen --

24              MR. MCCONVILLE:  Monteagudo.

18:40 25              THE COURT:  Monteagudo.

```
 1            MS. HURST:  Monteagudo.

 2            THE COURT:  Monteagudo -- my apologies --

 3     interviewed sometime in 2004.

 4            And then I've got Shiela Kyaw, of course, familiar

18:40  5     to all of us, interviewed allegedly sometime in 2004, but

 6     then counsel, of course, called to the attention of the

 7     witness the check dated August 22nd, 2000.

 8            Now, it would seem to me, that just to make this

 9     easy, I'm looking for the notes from 2005 backward in time.

18:40 10           MR. ZELLER:  Okay.

11            THE COURT:  And that will be very easy to be

12     produced, and I think what we will save is the "up and down

13     the highway."

14            MR. QUINN:  Can we have the notes of their

18:41 15     attorneys' interviews with MGA employees concerning when they

16     knew about Sal Villasenor?

17            THE COURT:  Certainly.  Certainly.

18            Let's just get some transparency on it, so let's

19     get those notes over to you as well.

18:41 20           MS. HURST:  Well, we'll get them to the court the

21     same way.

22            THE COURT:  The same way -- in-camera.

23            Let's start the court's ruling.

24            MS. KELLER:  May I say one thing on the record -- I

18:41 25     know the court's ruling on it is final.
```

 1          THE COURT:  It's always open for discussion.  You

 2    can take as long as you'd like for it.

 3          MS. KELLER:  I just wanted it on the record because

 4    I averted to it, but I didn't have the depo pages, that

18:41 5    Mr. Moore also said at Page 871 to 872 of his deposition

 6    transcript that he gave all of the information that he got on

 7    what had actually happened to the outside PR people who

 8    prepared the talking points.  And so --

 9          THE COURT:  How could that be privileged?

18:41 10          MS. HURST:  Exactly.

 11          MS. KELLER:  That was our position.

 12          MS. HURST:  I would like to give the court the

 13    cites for that if that's acceptable to the court.

 14          THE COURT:  What are the cites?

18:42 15          MS. HURST:  In Mr. Moore's March 21st, 2011,

 16    transcript --

 17          THE COURT:  Why don't you just give me the

 18    transcript.  March 21st --

 19          MS. HURST:  I will.  I'll give you cites and then

18:42 20    I'll give you the transcript, Your Honor.

 21          At 871, 17 through 872, 15, Mr. Moore testified --

 22          THE COURT:  871, 17 through 872 --

 23          MS. HURST:  15.

 24          THE COURT:  -- 15.

18:42 25          MS. HURST:  He testifies he spoke with the PR

1    people and he was one of the people who supplied them with

2    information about the case.

3              THE COURT:  Okay.

4              MS. HURST:  And then at 880, Your Honor --

18:42  5              THE COURT:  880.

6              MS. HURST:  -- Mr. Moore testifies what he told the

7    PR people, and I asked him "what did you tell the PR people

8    about the case?"

9              He said, what I conveyed to them was, essentially,

18:43 10    the story about how the Wall Street Journal article came out,

11    how I looked into the facts, if any, what was true about the

12    article, what happened and then receiving correspondence from

13    CityWorld in Hong Kong, leading up to me going to Hong Kong,

14    seeing Carter Bryant's drawings with MGA and then the Bratz

18:43 15    drawings.

16              He told the PR people all of the information he

17    had.

18              MR. ZELLER:  He --

19              THE COURT:  Why don't we just get it rolling down

18:43 20    the highway now.

21              MR. QUINN:  We are, Your Honor.

22              But, Ms. Hurst, once again, that's not what that

23    says.

24              He said, were you one of the people who supplied

18:43 25    him with information?

CV 04-9049 DOC - 03/29/2011 - Volume 3 of 3

```
 1              He said, yes, I remember speaking with them.  I was
 2      one of them.
 3              And then he told them about the Wall Street Journal
 4      article, that receiving correspondence from CityWorld, what
18:43 5   happened, nowhere does he say he told them about his
 6      interviews about these people.
 7              THE COURT:  I'll be able to read it.
 8              MR. QUINN:  You will.
 9              THE COURT:  And the end result is I just suggest to
18:43 10  you that we start gathering the information.
11              MR. QUINN:  No, we are.  That's --
12              THE COURT:  That --
13              MR. QUINN:  We're gathering our information and
14      we're sure MGA now is gathering theirs.
18:44 15             MR. MCCONVILLE:  So, Your Honor --
16              THE COURT:  Now let's go back now.
17              Now let's go back to the 17200 for a moment.
18              That's a critical decision for both of you and I
19      want to know if you've had enough time to discuss it and I
18:44 20  want to hear your respective decisions on the record before I
21      make a final determination as a courtesy.
22              So I don't care who I started with; Mattel?
23              MR. QUINN:  Your Honor, I agree, it's a very, very
24      important decision.
18:44 25             THE COURT:  Yeah.
```

UNITED STATES DISTRICT COURT

1          MR. QUINN:  And it's frankly something that we

2     thought had been resolved and it's something that we feel

3     bound to talk to our client about.

4          THE COURT:  Okay.  Well, I'm listening.

18:44  5          The arguments yesterday --

6          MR. QUINN:  Right.

7          THE COURT:  -- caused a lot of reflection on my

8     part.

9          MR. QUINN:  Yes.

18:44 10          THE COURT:  And I was prepared to discuss this with

11     you last night, but we got somewhat sidetracked.

12          This was the third ruling coming out, but this was

13     in a tentative form and I didn't want to surprise either one

14     of you by handing down a final ruling without a discussion,

18:44 15     so this is a courtesy for both of you, frankly.  It's

16     monumental because it really does give the control to the

17     court and the last word.

18          MR. QUINN:  It's the kind of thing that we really

19     think we have to deliberately go through this with our client

18:45 20     and talk about it.

21          THE COURT:  Do you want to wait until tomorrow

22     night, then, as a courtesy?

23          MR. QUINN:  We'd appreciate that.

24          THE COURT:  Why don't we.

18:45 25          It's so important because laches, alter ego, there

 1    is a huge series --

 2              Thank you.

 3              There is a huge series of things that potentially

 4    occur, like a domino effect that occur on behalf of MGA.

18:45  5              What's your position, MGA?  Or would you like to

 6    talk to your client also?

 7              MS. HURST:  We've --

 8              THE COURT:  I would suggest that you talk to

 9    Mr. Larian also.

18:45 10              I mean, it's really a -- it's something that this

11    court's never done before.

12              I've always taken an advisory opinion, but quite

13    frankly they've always been three- to five-day cases and if I

14    was wrong, you know, it was an easy case to retry.

18:46 15              This is a really difficult place for both of you to

16    be, and so I don't want any surprises.  I want you to

17    thoughtfully think that out and talk to your clients.

18              MS. KELLER:  Your Honor, we actually already did,

19    and, frankly, we think it's an issue for the court, that

18:46 20    should be decided by the court, and we've always thought that

21    on the 17200.

22              THE COURT:  Well, so does -- so does Mattel.

23              MS. KELLER:  Well, we think that it's a -- we think

24    it's a -- something that should be determined by the court

18:46 25    and it's our preference for it not to go to the jury.

1      THE COURT:  So does Mattel up to this time.  That's

2  been their position also.

3      MR. QUINN:  So since MGA opposed our motion on

4  this, I'll just point out --

18:46 5      MS. KELLER:  I should have withdrawn that.  I

6  wasn't here, so I don't know what MGA has always -- but it's

7  our position that it should be determined by the court.

8      MS. HURST:  And then with respect to the defenses,

9  Your Honor, it would be our view that unclean hands should

18:46 10  still be submitted to the jury because that's a legal defense

11  under California law.

12      THE COURT:  I'll go back and research that.

13  We're -- I'm doing a lot of research back there right now,

14  but I don't want to speak too quickly; but I don't see alter

18:47 15  ego right now.

16      MS. HURST:  Alter ego should not go to the jury.

17      THE COURT:  I don't know if I'm piecemealing it.

18  Let me go back and find case law on this.

19      MS. HURST:  Can I give the court some cites on

18:47 20  unclean hands?

21      THE COURT:  Absolutely.

22      MS. HURST:  Unclean hands is a legal defense that

23  is in both *Unilogic vs. Burroughs*, 10 Cal.App.4th --

24      THE COURT:  Just a moment.  Just a moment.

18:47 25      Just one minute.

1              So *Unilogic* --

2              MS. HURST:  10 Cal.App.4th 612.

3              THE COURT:  Just one moment.

4              10 Cal.App.4th.

18:47  5              And what's the 10 Cal.App.4th -- what?

6              MS. HURST:  612.

7              THE COURT:  612 for unclean hands.

8              MS. HURST:  And also, Your Honor, *Fiber Board*.

9              THE COURT:  *Fiber Board*.  Okay.

18:48 10              MS. HURST:  227 Cal.App.2d 675 at 728:  "We are

11   satisfied that the equitable defense of unclean hands is

12   available in this state as a defense to a legal action."

13              THE COURT:  Okay.  Now what's your position

14   concerning laches?

18:48 15              MS. HURST:  You know, it's overlapped with the

16   statute of limitations defense, but, frankly, it's -- it

17   doesn't really add much, so we don't feel strongly about that

18   one way or the other.

19              THE COURT:  What do you want?  And then I'm going

18:48 20   to ask Mattel what they want.

21              You have to take a position now.

22              (Discussion held off the record.)

23              MS. HURST:  We'd like the court to decide laches.

24              THE COURT:  Okay.  And what about alter ego?  I

18:49 25   know what your position's going to be on that but you might

| | |
|---|---|
| 1 | as well state it on the record. |
| 2 | MS. HURST:  Alter ego is there is no |
| 3 | Seventh Amendment jury-trial right for alter ego under -- we |
| 4 | filed a brief on this yesterday, Your Honor.  There is a |
| 18:49 5 | California case right on point. |
| 6 | THE COURT:  What is that California case? |
| 7 | MS. HURST:  You know, I'll find it in just a |
| 8 | moment. |
| 9 | I think it's *Donovan*. |
| 18:49 10 | Also, Your Honor -- |
| 11 | THE COURT:  Just stay with me now. |
| 12 | Find that case. |
| 13 | MS. HURST:  I will find it. |
| 14 | (Pause in the proceedings.) |
| 18:50 15 | MS. HURST:  Pardon me. |
| 16 | *Dow Jones versus Avenel*, A-v-e-n-e-l -- |
| 17 | THE COURT:  Okay. |
| 18 | MS. HURST:  -- 151 Cal.App.3d 144 at 148. |
| 19 | THE COURT:  Now, do you want formal briefing on |
| 18:50 20 | that this evening?  Do you want to turn out formal briefing |
| 21 | or do you want to submit it on the cases and let me go back |
| 22 | and read them? |
| 23 | MS. HURST:  We're satisfied with what we filed. |
| 24 | I think the point that we really want to underscore |
| 18:50 25 | to the court is that on undercapitalization, which is one of |

 1    the key factors, the court would have to consider evidence

 2    regarding net worth ability to meet bills as they're coming

 3    due, and most importantly for these purposes, the

 4    availability of liability insurance which should absolutely

18:50  5    be precluded from consideration by the jury for this matter

 6    under Rule 411.

 7            So, really, we just can't -- couldn't get a fair

 8    assessment of the alter ego matter with the jury because of

 9    the fact -- without severe prejudice, basically.

18:51 10            THE COURT:  Okay.  Now, how does Mattel want me to

11    conduct myself?  How would you like me to proceed this

12    evening?

13            MR. QUINN:  Well, there are some things that

14    happened today that, regretfully, Your Honor, are going to

18:51 15    cause us to renew or supplement our mistrial motion and I'd

16    like to put those on the record, if I may.

17            THE COURT:  Certainly.

18            MR. QUINN:  The court said very, very early on in

19    the case that we're not going to get into issues regarding

18:51 20    discovery, but yet today they were permitted to question

21    Mr. Normile and Mr. Moore, about whether they had buried

22    documents, whether that December 22nd, I think it is, e-mail

23    from Sal Villasenor, was tardily produced.

24            The court well knows the history on that, that the

18:51 25    document requests for MGA that arguably would have covered

1    that was overbroad, it was irrelevant to the case as it then

2    stood, we objected to it and there was no motion to compel.

3            In other words, we did exactly what the Federal

4    Rule of Civil Procedure permits us to do and contemplate.

18:52  5         We behaved properly.  The court knows that.

6            The court's examined, questioned me personally,

7    about this on the witness stand.

8            And they were permitted to ask questions suggesting

9    to the jury that we buried it.

18:52 10          There is no obligation under the Federal Rule of

11   Civil Procedure to voluntarily produce documents.  The

12   rules -- and this is a rule of law that there is a procedure.

13          You have a Rule 34 request.  The other side is

14   entitled to object.  If they're unhappy with the response,

18:52 15  they bring a motion to compel.

16          If they don't do that, they're not permitted to

17   communicate to the jury that the document was buried.  That's

18   exactly what happened.

19          It's contrary to what this court said very early on

18:52 20  in this case that we are not going to get into discovery.

21          And I assigned that as misconduct and I assigned

22   that as grounds for a mistrial.

23          At a minimum now, with some witness, we need to put

24   on the stand a witness who can explain the -- really, this

18:53 25  should be done by the court instructing the jury as to how

UNITED STATES DISTRICT COURT

1    Rule 34 and motions to compel work, and instructing the jury

2    that parties are entitled to frame requests however they

3    want, that they may be objectionable, that responding parties

4    are entitled to object, and then if there's no motion to

18:53 5    compel, there's no obligation to produce documents.

6            We respectfully submit the court -- it's proper for

7    the court to instruct the jury to that effect.

8            THE COURT:  Okay.

9            MR. QUINN:  And if that's -- and that's what

18:53 10   happened here -- and there was no burying of the document and

11   it was improper of counsel to suggest that the document was

12   buried.

13           Short of that we need to put a witness on the stand

14   who will explain to the jury what happened here, here's the

18:53 15   document request, and by the way this is one of 1,943

16   document requests that MGA served on Mattel that we objected,

17   just as they have objected, countless times in this

18   litigation, that they did not bring a motion to compel and

19   that you jurors should understand.  This is the history, this

18:54 20   is what happened, and the document was not buried.

21           THE COURT:  Okay.

22           MR. QUINN:  That's the first ground.

23           And we actually need more time in order to explain

24   that, Your Honor.

18:54 25           THE COURT:  Okay.

UNITED STATES DISTRICT COURT

1          MR. QUINN:  Second, after the court very early on

2     in this case said that we're not going to have any evidence

3     expoiliation, barred our efforts to put into evidence

4     Carter Bryant's Evidence Eliminator, wiping his computer,

18:54 5     paid for by MGA, Mr. Machado destroying his hard drive.  We

6     couldn't make reference to that.

7          Farhad Larian destroying a collection of documents

8     he had assembled in support of his claim that Bratz was hid

9     from him and it was actually developed much earlier than it

18:54 10     was.

11          The use of BeClean Software.  I can go on.

12          There are many other instances of proffered

13     spoliation evidence that we wanted to use and -- and in all

14     cases the court, I thought, was clear that, no, neither side

18:55 15     is going to get out of that -- is going to get into that.

16          Today counsel got into where are the missing

17     telephone records?  I think that was actually referenced in

18     the in limine motions.

19          Where are the missing telephone records from

18:55 20     October?

21          Again, that was improper.

22          You know, here we are in the last week of trial and

23     for the first time there's some suggestion now of, one,

24     burying documents; and, two, spoliating evidence.

18:55 25          Where is it?

1          Third, witnesses have been compelled to answer

2     questions -- lawyers, Mr. Normile and Mr. Moore -- about

3     their conversations with Mattel employees, and the suggestion

4     has been made to Mr. Normile, well, you didn't represent

18:56  5     Sal Villasenor, when every lawyer in this courtroom knows

6     that's irrelevant.  He represents the corporate entity.  He's

7     entitled to have communications with the corporation's

8     employees in aid of his providing legal advice to the entity,

9     in the aid of doing the very things that Ms. Keller elicited

18:56 10     from him that was his job as general counsel to do.

11          THE COURT:  Okay.

12          MR. QUINN:  Our privilege objections were work

13     product objections as to communications that Mr. Normile had

14     and Mr. Moore had, were overruled, particularly in light of

18:56 15     the fact that, as I referenced earlier, we were completely

16     blocked in our efforts to find out what they knew about

17     Mr. Villasenor and when they knew it just isn't appropriate.

18          And then, finally, Your Honor, the request in front

19     of the jury -- you know, this is the United States District

18:56 20     Court.  This isn't -- this isn't some bushily municipal court

21     somewhere asking the witness on a stand, "Mr. Moore,

22     Mr. Moore, will you bring your notes here tomorrow of his

23     interviews?"  Completely unnecessary and inappropriate.

24          Any lawyer would know that there's an issue

18:57 25     implicated there.  A lawyer's interviews -- a corporate

| | |
|---|---|
| 1 | lawyer's interviews with the corporation's employees, |
| 2 | inherent in that is the possibility there is a privilege |
| 3 | issue here, there is a work product issue here. |
| 4 | THE COURT:  Uh-huh. |
| 18:57 5 | MR. QUINN:  The question was either asked to force |
| 6 | us in front of the jury to assert the privilege -- improper |
| 7 | in itself -- or, two, to take some position that, no, we're |
| 8 | not going to provide this information and we're hiding |
| 9 | something, could easily have been handled outside the |
| 18:57 10 | presence the jury. |
| 11 | That was improper.  The jury should be told that |
| 12 | that was improper. |
| 13 | I find that as the fourth ground for seeking a |
| 14 | mistrial. |
| 18:57 15 | Finally, Your Honor, on the subject of a |
| 16 | mistrial -- Mr. Eckert's testimony's coming up.  One of the |
| 17 | pending grounds for mistrial is that counsel gratuitously, |
| 18 | when Mr. Eckert was last on the stand, said, you know, "there |
| 19 | are magnets that kill children, aren't there?"  And then |
| 18:58 20 | said, hiding behind the court's skirts, "Your Honor, I'd |
| 21 | request permission -- I'd request a sidebar.  I may have to |
| 22 | go into a prohibited area," where, one, she had no evidence |
| 23 | whatsoever that there had ever been a Mattel magnet that had |
| 24 | ever killed a child.  Two, there wasn't a court order |
| 18:58 25 | excluding that; it wasn't a prohibited area.  Three, then |

Case 2:04-cv-09049-DOC-RNB   Document 10339   Filed 03/31/11   Page 42 of 83   Page ID
#:313900
CV 04-9049 DOC - 03/29/2011 Volume 3 of 3

42

1    made no effort to ask the court for permission to offer such

2    evidence, contrary to what she had told the jury, because she

3    knew she had no such evidence, to this day hasn't asked for

4    it.  That was improper.

18:58  5        We would ask that the -- and we had submitted a

6    couple of different versions of instructions that we -- we

7    request that the court give the jury.

8        The last time we raised this issue several weeks

9    ago the court said it would consider doing that when

18:58 10    Mr. Eckert was next on the stand.  I just want to call the

11    court's attention, he may be coming to the stand tomorrow, I

12    believe he will, and we'd request that the court give that

13    instruction then.

14        THE COURT:  Counsel.

18:59 15        MS. KELLER:  With respect to inquiring about

16    production of documents and when documents were produced,

17    Mr. Larian, who is actually a defendant and not just a

18    witness in this litigation, was beaten up pretty extensively

19    by Mattel in his examination about documents as to which his

18:59 20    attorneys had claimed privileged, and it was clearly

21    suggested in the questions that the reason that the privilege

22    had been claimed is because he never wanted them to see the

23    light of day.

24        Those were actually Mr. Price's words, and that's

18:59 25    why I used them today; that he expected that if they claimed

 1    privilege, the documents would never see the light of day,

 2    but they did see the light of day, only later.

 3            As far as the production of documents generally, I

 4    haven't been present for this whole case.  I've only been

19:00 5    present for part of it, but this case has -- is replete with

 6    examples of Mattel manipulating the discovery process for

 7    years and years, filing, you know, hundred-page long

 8    responses to our requests for documents.

 9            As of fall 2009 there was discovery requests

19:00 10   pending by MGA that were still not being responded to by

 11   Mattel.  We didn't even know Mr. Villasenor existed, let

 12   alone did we know that years before -- years -- in 2005, in

 13   June, that Mattel's in-house counsel had extensively

 14   questioned him multiple times about the MGA litigation, and

19:01 15   his practices of invading, among others, our showrooms with

 16   these phony credentials.  We never knew about it, they didn't

 17   tell us about it, and every time we tried to -- to -- to

 18   broadly request documents they objected in voluminous form.

 19            So it seems for Mattel to be now claiming that

19:01 20   they're the victims here is -- is disingenuous at minimum.

 21            My co-counsel can better address the history of the

 22   case, but from what -- but just from what I have seen, they

 23   have played games with holding documents and not just a

 24   document here and there.  There are 35 boxes sitting up in LA

19:01 25   of documents that were amassed by Mr. Villasenor

1    over the years.

2         As the court knows, we haven't even had an

3    opportunity really to -- to examine those, and we won't, and

4    we're living with that; but the fact that these things are

19:02  5    being produced only -- the Villasenor document I'm pretty

6    confident would have never come to light -- ever -- had we

7    not noticed Mr. Villasenor's deposition, because they knew he

8    had the document.

9         Kohl's, those documents that the court has seen,

19:02 10    that document did not come to light until after the discovery

11    had been cut off in this case.

12         There has been so much -- there have been so many

13    instances here of withholding documents that it's actually --

14    it's hard to list them all.

19:02 15         With respect to the missing phone records that I

16    asked about, I do not recall seeing that anywhere in any

17    motion in limine.

18         If it was the subject of a ruling by the court, I

19    apologize.  I don't remember ever seeing it, but there have

19:03 20    been so many rulings it's possible I made a mistake.

21         Maybe Ms. --

22         THE COURT:  Aren't there 81 in limine motions?

23         MS. KELLER:  I --

24         THE COURT:  I don't recall.  I'm going to go back

19:03 25    and look, Counsel.  Each of you flooded the court with a

1    number of items, but I don't recall any ruling either; but I

2    could be wrong.

3         MS. KELLER:  But when it comes to spoliation, one

4    of the court's rulings, for example, that I couldn't ask

19:03  5    Mr. Eckert about his double-deleted e-mails, and I didn't.

6    The court was very explicit about that and I didn't go near

7    it, despite the fact that we have almost no e-mails from this

8    man, the CEO of the company.  And all we have by way of

9    e-mails from him are these missives from Bob Eckert to all

19:03 10    the Mattel employees about the theme of the month.

11         I mean, here is a guy running a multibillion dollar

12    corporation and he -- it appears he doesn't even have any

13    e-mails that he sends and receives, as far as -- as far as

14    we've been able to tell, but we haven't -- we have not raised

19:04 15    that specter.

16         As far as Mr. Villasenor and Michael Moore,

17    Mr. Villasenor was clearly adverse to Mattel at the time that

18    he's being interviewed.

19         He's gone -- he's being grilled by Moore, he's gone

19:04 20    out and gotten a lawyer -- that's referenced in the -- in the

21    latest e-mail that I asked Mr. Moore about where he's --

22    where Mr. Moore himself is suggesting that maybe outside

23    counsel needs to -- John Corey -- needs to talk with

24    Villasenor's attorney, if it's going to go any further.  This

19:04 25    is before the December 22nd 19 -- 2005, letter is sent.

 1          And, of course, they characterized that letter as

 2     being, you know -- a stickup.

 3          So the idea that Villasenor and Mattel had a unity

 4     of interest at that point is just false.  This person is in a

19:05  5     different position than a typical employee where the umbrella

 6     shield of the corporation might be seen to cover him.  And

 7     as -- as we pointed out, we think that there was a waiver, if

 8     there is any privileged material in those conversations, we

 9     think -- we think there's -- there's -- there is a waiver.

19:05 10          So I'm trying to think if I've missed anything,

 11     because I --

 12          (Discussion held off the record.)

 13          MS. KELLER:  Oh, in the request for the additional

 14     notes, there has been a lot of conflicting information in

19:05 15     this case about the statute of limitations, and there has

 16     been a lot of -- there have been a lot of inferences that

 17     could be drawn that Mattel knew a lot sooner than they claim

 18     to have known, enough to arouse suspicions that would have

 19     triggered the statute.

19:06 20          They're claiming, on our part, fraudulent

 21     concealment.  That's -- that's the claim that they have

 22     leveled against us.  We think that the fraudulent concealment

 23     is on the other side, and we think that the court should

 24     examine these notes in-camera and see if they exist.  You

19:06 25     know, if Mr. Moore wasn't completely clear on whether they

Case 2:04-cv-09049-DOC-RNB  Document 10339  Filed 03/31/11  Page 47 of 83  Page ID #:313905
CV 04-9049 DOC - 03/29/2011 - Volume 3 of 3

47

1    exist.  But these interview notes could be the only evidence

2    that we end up having of the actual dates when Mattel was on

3    notice here or -- or should have been on notice.

4           McShane -- Michelle McShane, who was the person

19:07 5    that you would expect to be able to tell us the relevant date

6    has -- she's a blank slate.  She doesn't remember anything.

7    Nothing.  No dates.  Gone.

8           We called her to the stand and she had -- she

9    really had close to amnesia about this.

19:07 10          If, in fact, this is the effort that Mattel

11   undertook early on to figure out whether Carter Bryant had

12   had any involvement with the creation of Bratz, the court

13   should know about it, and the court should see if any of that

14   is impeaching.

19:07 15          MR. QUINN:  Okay.  Well --

16          THE COURT:  No, Mr. Quinn, without interruption

17   from MGA.

18          MR. QUINN:  So we've now joined issue.

19          We've said there was no reason to make that request

19:07 20   in front of the jury, and they merely said the notes may have

21   valuable information in it and it's nonresponsive to my

22   point, that that was clearly going to be a sensitive issue to

23   ask a lawyer for his notes in front of the jury.

24          I -- this is not federal court practice the way I'm

19:08 25   familiar with it that you spring that on people, just like it

1    isn't, you know, asking -- announcing that there isn't a

2    stipulation in front of the jury like Ms. Hurst did last

3    week.  You know, there was no response to that.  That was

4    improper to ask him to spring that on us.

19:08  5         They've got an argument that they want to make

6    about how they should see the notes and how they're

7    important.  They should do it this evening.

8         It was calculated; it was deliberate; it was in

9    that tone of voice:  "Would you share those notes with us,

19:08 10   Mr. Moore?"

11        It was done for an impact on the jury and that was

12   improper.

13        That Sal Villasenor at some point did not have a

14   unity of interest with Mattel, that at some point he was

19:09 15   clearly averse, it does not go to whether the lawyer for the

16   entity can have a privileged communication with the employee.

17   It happens all the time.  It happened in the *Upjohn* case.  I

18   mean, cases where people are taking bribes, an investigation

19   is being done.  The corporation still has a privilege.  It's

19:09 20   the corporation's privilege and the corporation can waive the

21   privilege, but whether or not there is a unity of interest

22   between the employee and the entity has nothing whatsoever to

23   do with whether the privilege attaches.

24        Next.  35 boxes we still haven't seen.  Your Honor

19:09 25   knows -- you met Mr. Cook last night.  We had three lawyers

 1  go through those 35 boxes, identify documents and produce

 2  them.

 3          I realize that there's an open issue, they're

 4  challenging whether the production relating to MGA and Bratz

19:09 5  was complete, but the suggestion here that I'm -- that I'm

 6  hearing that the 35 boxes were hidden from them or there

 7  wasn't document production out of them or they haven't gotten

 8  the benefit of that somehow is simply wrong.

 9          That -- you know, that -- with respect to the

19:10 10  burying, Sal Villasenor's e-mail, that whole question, the

 11  defense to that conduct is we didn't -- you know, we -- they

 12  never told us about it, we didn't know to ask for it, you

 13  know, that is -- that's got nothing to do with anything.

 14          I mean, you serve a discovery request, we respond,

19:10 15  we have no obligation to tell them, you know, by the way we

 16  have this document.  That's why lawyers -- skilled lawyers

 17  are hired -- to develop cases, find out what their case is,

 18  ask the right questions and frame your discovery requests

 19  properly and, where appropriate, make motions to compel.

19:10 20          That didn't happen here.  Again, the jury has been

 21  left with the wrong impression that we buried that document,

 22  where all we did was avail ourselves of what the rule of law

 23  contemplates in this case under the Federal Rule of Civil

 24  Procedure.  We did nothing wrong.

19:11 25          We complied with the rules.

1          The jury should be told we complied with the rules.

2          We've been through this with the court several

3     times.

4          The difference with respect to Mr. Larian is that

19:11  5     communication, as MGA ultimately acknowledged, when, by the

6     way, the discovery master was about to order production of

7     Mr. Larian's e-mail and MGA said it's not privileged after

8     all, after they'd maintained for years that it was, that

9     document was never privileged.

19:11 10          Sal Villasenor's e-mail was never withheld on the

11     grounds of privilege.  Ultimately we produced that, there was

12     a redaction relating to an inquiry from a lawyer which I

13     think was arguably -- it was in good faith, it refers to an

14     inquiry from a lawyer, the court just the other day overruled

19:12 15     that, said I don't see it, and it was produced then, but that

16     document was never withheld.

17          Once it was requested, we produced it.

18          So, again, Your Honor, I don't think there is any

19     answer that's been made for these issues that I've raised.

19:12 20          And, also, the idea that they didn't know, is

21     false, that they didn't know about Mr. Villasenor.

22     Mr. Larian testified on the stand last week that as of 2009

23     he had known for some number of years.  The court will hear

24     from Mr. Brawer in our rebuttal case that he knew what

19:12 25     Mr. Villasenor was up to and he knew it when he went over to

1    MGA and he talked to people about it.

2            So this was not hidden.

3            THE COURT:  Counsel.

4            (Discussion held off the record.)

19:13  5      MS. KELLER:  Your Honor, I have just been looking

6    at a decision --

7            (Discussion held off the record.)

8            MS. KELLER:  I have just been looking at a

9    California decision, and I have not yet had a chance to look

19:13 10   and see if it is the same under Rule 26, and so -- but the --

11   the rule that I'm looking at -- the case I'm looking at is

12   *Coito vs. Superior Court*, it's a 2010 case, and at least in

13   California the decision would -- if California law is the

14   same as Rule 26, the decision contains at least four holdings

19:14 15   that would be significant here.

16            1, a written or recorded statement obtained from a

17   percipient witness is classic evidentiary material and is

18   afforded no protection from disclosure by an absolute

19   attorney work-product privilege; 2, an attorney's choice of

19:14 20   which witnesses to interview and/or the questions asked

21   during the course of an interview in most cases will not

22   reflect counsel's impressions, conclusions and theories about

23   the case, sufficiently will provide protection from

24   disclosure under the qualified attorney work-product

19:14 25   privilege for written or recorded statements; 3, a party

Case 2:04-cv-09049-DOC-RNB   Document 10339   Filed 03/31/11   Page 52 of 83   Page ID #:313910
CV 04-9049 DOC - 03/29/2011 Volume 3 of 3

52

1    responding to written discovery cannot rely on the court's

2    previous holdings in this should be in *Nacht & Lewis* to

3    protect from discovery a list of witnesses interviewed or

4    their statements obtained by that party's attorney or

19:14 5    representative; and, 4, to the extent a party wishes to

6    invoke a qualified attorney work-product privilege to present

7    from disclosure, the list of the individuals it is -- it has

8    interviewed or their written or recorded statements, it needs

9    to make a foundational showing at an in-camera hearing that

19:15 10    the material in issue is privileged -- that the privileged

11    material in issue is derivative in nature.

12              That is at 182 Cal.App.4th 758.

13              (Discussion held off the record.)

14              MS. HURST:  Your Honor, with respect to the

19:16 15    discovery conduct issues, I strenuously disagree with

16    Mr. Quinn's characterization of the overall history and law

17    here, but to be very specific there was an order issued in

18    September of 2007 that said produce anything related to the

19    statute of limitations defense.

19:16 20              THE COURT:  By Judge Larson?

21              MS. HURST:  By Judge Infante and then it was

22    confirmed.

23              THE COURT:  By Judge Larson?

24              MS. HURST:  Yes.

19:16 25              And at a minimum everything in 2001 --

         1          THE COURT:  What's the docket number on that?

         2          MS. HURST:  I'll have to get that for the court.

         3     One moment.

         4          At a minimum all of the Villasenor stuff in 2001

19:16    5     and the walk the showroom in 2002 show -- and that August

         6     2001 Turetzsky memo, that was never produced.

         7          I mean, there are serious problems here, very

         8     serious problems, and, you know, there is a good-faith

         9     obligation not to serve misleading discovery responses that

19:17   10     claim that things don't exist when you know they do, that

        11     there was a court order on this stuff that's responsive for

        12     statute of limitations' purposes.

        13          THE COURT:  Okay.  Can I make a suggestion that we

        14     get on the phone with our clients one more time tonight.  I

19:17   15     want to make a decision on the 17200 tonight.

        16          If you're consulting with Mr. Normile, you've got

        17     his number, and, Mr. Eckert, you've got his number.  And

        18     Mr. Larian -- I'd appreciate another call to Mr. Larian also

        19     because I want a final decision tonight because I'm writing

19:17   20     tonight and I have three or four of these done now and I

        21     would have had these done last night but for the

        22     interruption.

        23          So we'll get them on the phone and if not I'm going

        24     to make the decision sometime tonight by nine, ten, eleven

19:18   25     o'clock.

1          Now, how long will it take to get these documents

2     in from Sal Villasenor and -- no, I'm going to do some work

3     and I'll come back in five minutes or five hours.

4          You tell me.

19:18  5          MR. MCCONVILLE:  Your Honor, with regard to the --

6     to the notes, I don't even know that there are any, so we

7     have to confirm that there aren't any.

8          THE COURT:  Go find them.

9          MR. MCCONVILLE:  Well, if there's nothing to

19:18 10  find --

11          THE COURT:  If there's nothing to find have Sal

12     sign an affidavit that there's nothing to find.  It's very

13     simple.

14          That way I have under penalty of perjury, "I can't

19:18 15  find any of these notes."

16          MR. MCCONVILLE:  That presumes they existed,

17     Your Honor.  So we have a difference.

18          Mr. Moore testified to the existence of notes.

19          THE COURT:  Counsel, it's up to you.

19:18 20          I don't care, but we sit here -- we, happy family,

21     okay? until you make the inquiry and tonight you are all

22     here.

23          This isn't the escape time now.

24          MR. QUINN:  I find it very hard to believe that

19:19 25  some MGA lawyer over on that side hasn't spoken to people

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB  Document 10339  Filed 03/31/11  Page 55 of 83  Page ID #:313913
CV 04-9049 DOC - 03/29/2011 Volume 3 of 3

55

 1    about Mr. Villasenor --

 2            THE COURT:  We are going to find out.  We are going

 3    to find out, aren't we?

 4            And so all you have to do now is decide when you're

19:19 5    going to get -- let me go back and do research.

 6            I can sit here all night with you and then I'll

 7    start the research later on.

 8            It's totally up to you.

 9            MS. HURST:  Your Honor, that order is

19:19 10   Docket No. 989.

 11           THE COURT:  989.

 12           I can't tell you how much I regret not having this

 13   case from the very, very beginning, but -- well, do you want

 14   me to sit here or do you want me to go to work?

19:19 15          MR. QUINN:  Is it our choice, Your Honor?

 16           (Laughter.)

 17           THE COURT:  I'm a servant to both of you,

 18   Mr. Quinn, and Ms. Keller.

 19           What do you want me to do?

19:20 20          MR. QUINN:  We're -- we're content on this side for

 21   Your Honor to do whatever work the court feels necessary and

 22   we will place a call to our client and with a view to try to

 23   get a decision on the issues the court has asked for a

 24   decision on.

19:20 25          THE COURT:  Well, I'm going to make

Case 2:04-cv-09049-DOC-RNB   Document 10339   Filed 03/31/11   Page 56 of 83   Page ID #:313914
CV 04-9049 DOC - 03/29/2011 Volume 3 of 3

56

1    a ruling tonight.

2            Okay.  I want to give you all the time that's

3    possible.  I don't care if I make it 9:00 tonight or even

4    midnight.  I'm moving through these issues now.  I'm moving

19:20  5    through them quickly now.

6            MS. KELLER:  And, Your Honor, we're confident that

7    the position we already expressed is the position that we

8    will maintain.

9            THE COURT:  I would just appreciate it if you would

19:20  10   communicate with Mr. Larian and Mr. Eckert.

11           MS. KELLER:  We will certainly do so.

12           THE COURT:  I know Mr. Normile is involved and

13   maybe Mr. -- whomever, the attorney I met for Mr. Larian the

14   other day.

19:20  15           Right.  Whoever that is.

16           Remain in the little room outside so I can come to

17   you immediately.

18           And how will I know when the materials come down

19   from both sides?

19:21  20           I'll check with you in a little while, then.

21           All right.

22           (Recess taken.)

23           THE COURT:  Okay.  We're on the record.

24           Where's all my counsel?

20:33  25           (Pause in the proceedings.)

1          We've got millions of cleanup things also.

2          You know, chads hanging.

3          THE COURT:  Okay.  Then we're on the record.  All

4     counsel are present.

20:34 5          I'm going to start through a laundry list of about

6     nine different subjects this evening before I loop back to

7     the 17200 decision.

8          I want to start with the doctrine of unclean hands

9     is an equitable claim for which no right to a jury trial

20:34 10    exists in this court's opinion.  That's the rule under

11    federal law as recognized by the United States Supreme Court

12    decades ago in *Precision Instrument Manufacturing Company vs.*

13    *Automotive Maintenance Machinery Company*, 324 US 806, 1945.

14          Even if we were to analyze the issue under state

20:35 15    law and the right to a jury trial guaranteed by the

16    Constitution in the State of California, the result would be

17    no different.

18          MGA cites to this court *Unilogic, Inc. vs.*

19    *Burroughs Corp.*, but that case acknowledged that the unclean

20:35 20    hands defense is equitable in nature and, of course, the

21    cite, Ms. Hurst, you are right on point, 10 Cal.App.4th 612,

22    622, 1992.

23          The court in that case acknowledged that "the trial

24    court has discretion whether to submit an equitable defense

20:35 25    to the jury" when that defense is interposed against a legal

 1    claim and concluded that the trial court did not abuse its

 2    discretion in deciding to send the equitable defense to the

 3    jury.  That ruling is hardly remarkable because it mirrors

 4    the discretion entrusted to the federal district court under

 5    Federal Rule of Civil Procedure 39(c).

 6          In this case, however, I'm not going to send the

 7    equitable unclean hands defense to the jury given the breadth

 8    of this case, or at least tentatively not, until we have a

 9    discussion on the 17200 case because it's extremely confusing

10    and prejudicial for the jury to consider the doctrine

11    called -- I'm sorry -- called "inequitable conduct" that's

12    much narrower -- much narrower than it sounds.

13          Now, I want to loop back, because I think I'm

14    adopting Mr. Quinn's argument from last evening.  I think

15    it's the appropriate ruling to take the 17200.  MGA's been

16    clamoring for that for quite a period of time.

17          I want to hear from Mr. Quinn now.

18          Have you been able to contact your client?  And if

19    not I'm going to make the ruling.

20          MR. QUINN:  Yes, Your Honor.

21          THE COURT:  All right.

22          MR. QUINN:  We don't think there should be any

23    change in what the court has indicated all along, what would

24    go to the jury and what wouldn't.

25          I mean, we're concerned that we made decisions

 1    about how to use our time, strategic decisions and objections

 2    that have been made.

 3            THE COURT:  So it's a complete reversal from

 4    yesterday's argument?

20:37  5            MR. QUINN:  Not from yesterday, no.

 6            THE COURT:  All right.  Thank you.

 7            In all likelihood I'm going to take the 17200

 8    claims from the jury.

 9            Now, I want to have a discussion, though, in

20:37 10    relation to some of those tentative decisions about unclean

 11    hands.

 12            I'm going to hear from you one more time, but,

 13    Ms. Hurst, if I take the 17200 claims into the court's hands

 14    in this matter, I doubt that I'm giving unclean hands.

20:37 15            MS. HURST:  Your Honor, the *Fiber Board* case, which

 16    was the second cite that I earlier supplied to the court --

 17    I'm just finding the page number; one moment, please --

 18            THE COURT:  I've already looked at *Fiber Board*,

 19    Counsel.  I'm happy to have you cite it again and I'll go

20:38 20    back and look one more time.

 21            MS. HURST:  Your Honor, we do have multiple state

 22    law claims remaining in the action.  The intentional

 23    interference claim, the trade secret misappropriation claim,

 24    in particular, to which this is directly related, and so

20:38 25    the -- under *Fiber Board*, under California law unclean hands

UNITED STATES DISTRICT COURT

1    is a legal defense to a damages claim and the evidence is

2    exactly the same.  So unclean hands really does need to go to

3    the jury on the trade secret misappropriation and intentional

4    interference claim.

20:38 5              THE COURT:  Mr. Zeller, briefly, or Ms. Quinn -- or

6    Mr. Quinn.

7              MR. ZELLER:  Your Honor, we -- we agree that

8    assuming the 17200 claim stays with the court, that it does

9    not go to the jury, it should not be piecemeal.  That would

20:39 10   include anything that is an equitable defense and the court

11   is absolutely right.  Unclean hands has long been recognized

12   as an equitable defense that the court has discretion to send

13   to the jury or not.

14             THE COURT:  Okay.  I want to continue the

20:39 15   discussion that I intended to have with you on these nine

16   subjects last night, this evening, and that is on the jury

17   instructions or verdicts I had rejected MGA's argument that I

18   have to make the relation-back ruling before the jury -- jury

19   reaches the verdict.

20:39 20             Both parties acknowledge that Judge Larson

21   committed error by allowing Mattel's counterclaims to relate

22   back to a pleading in a different action, and it also

23   tentatively appears to me that -- and I'll set a longer

24   record about this at the appropriate time, probably this

20:40 25   weekend -- but Judge Larson thought that the trade secret

1    misappropriation claim did not concern Carter Bryant, but he

2    thought it was a misappropriation claim based on designs that

3    inspired Carter Bryant like Toon Teens.

4         The only case to discuss an analogous circumstance

20:40 5    was the First Circuit in the *Marcoux* case that we discussed

6    back in November, but the difference there was that the

7    Circuit -- or, I'm sorry -- that the district judge that

8    erroneously allowed relation back, knew the scope of the

9    claims at the time of the amendment.

20:40 10        Now, I don't want to recite the litany of thorny

11   legal issues right now or here, but you can see how difficult

12   this is and how close a legal call it may be at the Circuit.

13        I think it may be profound error to make the

14   relation-back ruling before the jury reaches a verdict,

20:40 15   because the Circuit later determines -- or if they do later

16   determine that I made the wrong ruling, the only remedy will

17   probably be a full retrial, so I tentatively believe it would

18   be significantly safer to poll the jury on the dates and make

19   the relation-back ruling after they render a verdict.

20:41 20        But, as always, I'm going to open this up to brief

21   discussion and I'll start with whoever wants to address the

22   court.

23        But now we're closing out a lot of issues this

24   evening -- or it should have been last night, but it's this

20:41 25   evening, so I don't care who starts.

```
 1            MR. ZELLER:  What I'll do is I'll skip over the

 2   legal argument about relation back and everything else, but

 3   presumably we'll talk about that at a later date, but we

 4   agree that it -- there is no reason to do anything other than

 5   submit a question to the jury as to the dates, and then the

 6   court -- that will be the factual finding of the jury.

 7            We talked about it last night.  It's our viewpoint

 8   that the court has discretion as to how this gets submitted

 9   to the jury.

10            THE COURT:  And then the tolling, et cetera, for

11   the court.

12            MR. ZELLER:  Correct.

13            THE COURT:  Let me turn to MGA.  I know that they

14   disagree.

15            MS. HURST:  Your Honor, I'm not sure I have much to

16   add to our previously expressed grounds as to why we think we

17   should be entitled to up or down on statute of limitations.

18            Having said that, I think it -- in addition to

19   that, it's -- it's unwieldy to ask the jury for a date, so

20   what I understand, I guess, is that the court's going to put

21   in a box with some choices.

22            I think the real question, then, is are those

23   choices keyed to dates that have legal significance because

24   they're pleading dates?  Or are they keyed to dates that have

25   potential legal significance because of the evidence?
```

UNITED STATES DISTRICT COURT

 1             THE COURT:  Evidence tapes.

 2             MS. HURST:  And --

 3             THE COURT:  Now, assuming that that was going to

 4    happen, what would be your position?

20:43  5             Do you want to think about it for a moment?

 6             MS. HURST:  Yeah, let me just think about it.

 7             THE COURT:  I'm only on No. 3.  Okay?

 8             Mr. Zeller?

 9             MR. ZELLER:  We'll give that some thought as well.

20:43 10             THE COURT:  Well, you've got about ten minutes, but

11    that's fine.  I was joking with you, but I'm closing it out.

12             I planned to close it out last night to give you

13    the weekend, but you're going to start running,

14    unfortunately.  Without your help I'll be making decisions

20:43 15    and they will be final now.

16             MR. ZELLER:  In the absence of a response by MGA, I

17    would just say, Your Honor, that I think that the dates would

18    be the ones that are tied to pleadings, because I think those

19    are the relevant ones.  Then, of course, it also has to be

20:43 20    then ascertained as to what relates back to what and the

21    like, but really the operative dates are not ones of evidence

22    but rather dates of -- of -- tied to pleadings.

23             MS. HURST:  My concern, Your Honor, is that we

24    really need to treat the parties separately here.  I mean,

20:44 25    there really is a profound legal difference between the

 1   entities and persons in this regard.

 2           THE COURT:  Uh-huh.

 3           MS. HURST:  And I'm concerned about the prejudice

 4   and lumping them -- I'm particularly concerned about the

 5   prejudice of lumping them in together.  I mean, there is

 6   literally no argument that Mr. Larian relates back here, and

 7   it -- not really any viable one.

 8           And so to -- to suggest that pleading dates that

 9   might be relevant for Mr. Larian, for example, would be MGA's

10   intervention date or MGA's complaint date or other dates of

11   that sort is -- is very problematic.  I'm not sure what the

12   answer to that problem is yet, but --

13           THE COURT:  Okay.  Well, think about it a little

14   bit longer tonight.  Okay?

15           Last evening I wanted to have a longer conversation

16   with you, and I realize that I restricted Mattel to your

17   second amended trade secret claim chart, and I prevented you

18   from further amending your trade secret claim chart to

19   specify the concepts, Mr. Quinn, that you claimed as trade

20   secrets and the "specific concepts that Carter Bryant took to

21   MGA."  Which has long been a concern of you -- of yours.

22           I have to balance MGA's concerns about a moving

23   target against Mattel not being overly constrained by

24   procedural rules, so I'm starting to believe that after all

25   this time that the right solution is to simply get rid of

1    this separately identified concepts that I thought were such

2    a good idea at the beginning of the case, and the trade

3    secret claims chart, and simply instruct the jury that the

4    claimed trade secret information is all the information

20:46 5    contained in the sketches and sculpts that Carter Bryant

6    created.

7         Now, Ms. Hurst, you complained the other day that I

8    would be committing reversible error by taking this step, but

9    I think I respectfully disagree with you.  In fact, I'll use

20:46 10    your phrase, "I respectfully disagree," and I'm just kidding

11    you for a moment.

12         I think that my proposed solution strikes the

13    proper balance between maintaining some of the fairness to

14    MGA and assuring that Mattel has a fair chance to argue its

20:46 15    case to the jury.

16         And I think contrary to your argument, as I've been

17    reflecting over the last couple of months, I also think that

18    my solution causes minimal prejudice to MGA since Mattel's

19    trade secret claim charts lists all the drawings and sculpts

20:46 20    anyway.

21         So, once again, I want you both to set your

22    respective records on this.  I'm still listening.  I'm trying

23    to come up with the fairer solution to both parties, and I

24    apologize to both of you but it's been quite a journey.  So I

20:47 25    really don't care where we start, and take your time with it.

UNITED STATES DISTRICT COURT

1          MR. QUINN:  Your Honor, we're a week from closing.

2     We've tried the case based on that chart.  It was used with

3     Wagner; he was cross-examined extensively on it.  We built

4     our case around that.

20:47 5          THE COURT:  So you want the chart.

6          MR. QUINN:  We want the chart and we want them held

7     to their Column 1.  We want parity of treatment.

8          THE COURT:  I think you're going to find -- if

9     that's your argument later on, I think you're going to find

20:47 10    an awfully good record against you, unfortunately, so I want

11    to forewarn you about that and see if that changes your

12    argument.

13         MR. QUINN:  I'm not sure what -- candidly, I'm not

14    sure what the court is referring to.

20:47 15         THE COURT:  Well, I'll -- I'll get it out to you.

16         MR. QUINN:  Because the court was quite clear in

17    February that we were both to identify trade secrets and it

18    was going to be definitive and it was going to last for all

19    time, and now what I'm hearing is that MGA, at this late

20:47 20    date, apparently is going to be permitted to come up with

21    some new ones.

22         THE COURT:  No, quite the opposite.  It's been

23    fairly well defined and I'll get out a tentative to you in

24    just a moment so you can see my reasoning.

20:48 25         MGA.

Case 2:04-cv-09049-DOC-RNB   Document 10339   Filed 03/31/11   Page 67 of 83   Page ID #:313925
CV 04-9049 DOC - 03/29/2011 - Volume 3 of 3

67

1          MS. HURST:  Your Honor, I really think the problem

2    with just going with a broad "all information in the drawings

3    and sculpts" is that it doesn't allow for assessment as to

4    each concept, the timing, whether it was a trade secret at

20:48 5    that time, whether -- separately, whether MGA ever used -- I

6    mean, that long list of drawings they have, I mean, some of

7    that stuff there's no evidence MGA ever saw it at all.  Lots

8    of it there's no evidence MGA ever saw it at all.

9          So by removing the buckets, the court is taking

20:48 10   away the jury's ability to evaluate the elements of the claim

11   with respect to each of the separately identified trade

12   secrets.  It's also taking away our ability to argue the

13   applicability of prior art.  If it's just all information

14   mish-mashed together, you know, I cross-examined

20:49 15   Ms. Fontanella on that Diva Starz catalog for the specific

16   purpose of knocking out 11 of the 12 elements of their

17   combination of ideas, trade secret, in Bucket 1.

18          You know, we've had a request for judicial notice

19   on the Bratz name directed to Bucket 2.  I -- I find myself

20:49 20   in rare agreement with Mr. Quinn on this one, that not for --

21   obviously we think we've disclosed in our chart and we'll

22   address that separately, but, you know, under IMAX just

23   saying all the information in these drawings and sculpts

24   doesn't distinguish it from anything, and if that's what it

20:49 25   is then we really do have a copyright preemption here.  I

1    mean, if it's just all this stuff and these drawings and

2    sculpts, then there's no distinguishable basis whatsoever

3    from the copyright claim.

4         I -- you know, I won't say the phrase, Your Honor,

20:50 5   but I do think that would be a terrible mistake.

6         THE COURT:  Okay.  So I hear somewhat of a

7    consensus on this?

8         MR. QUINN:  Well, we think it's too late to change

9    our chart.  We think they should be held to their chart.

20:50 10       THE COURT:  Okay.

11        Ms. Hurst, you asked me to instruct the jury on the

12   Section 205(d) defense under the copyright act.

13        Even though I had granted Mattel's motion for

14   summary judgment on that issue, you can make an argument on

20:50 15  that once again if you'd like to, but I'm tentatively

16   inclined to deny your request for the reasons I fully set

17   forth in this summary judgment, so I want to give the lectern

18   back to you.

19        MS. HURST:  Thank you, Your Honor.

20:50 20       Mattel has repeatedly examined witnesses for the

21   premise that reps and warranties are legally irrelevant, and

22   it has suggested -- not only suggested but ridiculed --

23   ridiculed -- Mr. Larian, ridiculed Mr. Rosenbaum, and used

24   Mr. Friedman and others to suggest that reps and warranties

20:51 25  are irrelevant and they provide no basis for reliance by MGA

1    and that that is, you know -- therefore MGA had no --

2    basically no legitimate basis for believing that it owned

3    Carter Bryant's works.

4         Now, the law is otherwise, and 205(d) specifically

20:51 5  is the vehicle by which the law is otherwise, and the court

6    in the summary judgment order did not take away the defense

7    on the basis of the reps and warranties, but rather on the

8    basis of the recordation requirement, on, basically, frankly,

9    a technical ruling that the recordation requirement wasn't

20:52 10 met.

11        This technical ruling is wrong, and in all events

12   Mattel is estopped to assert the recordation requirement.

13        The ruling is wrong because there was a recordation

14   before Mattel's recordation.  It was the Fox recordation.

20:52 15 Fox derived rights from MGA for its motion picture, it filed

16   a recordation of those rights and in the chain of title filed

17   with that recordation it included Carter Bryant -- an

18   assignment from Carter Bryant, reference to an assignment

19   from Carter Bryant.  So there was a recordation that anybody

20:52 20 searching the office's records could see included

21   Carter Bryant in the chain of title of assignments for Bratz.

22        Moreover, there were numerous copyright

23   registrations filed by MGA which evidenced assignment from

24   Carter Bryant, so anyone searching on the records of the

20:53 25 office under the name "Carter Bryant" or "Bratz" or "MGA and

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB Document 10339 Filed 03/31/11 Page 70 of 83 Page ID #:313928
CV 04-9049 DOC - 03/29/2011 Volume 3 of 3

70

1    Carter Bryant" would get notice that there had been an

2    assignment between Carter Bryant and MGA.

3           Now, the relevant date here for recordation is in

4    2006.  That's when Mattel first came and recorded.  So any

20:53 5    registrations and recordations evidencing assignment of title

6    between Carter Bryant and MGA prior to the middle of 2006

7    satisfies the statutory requirement, and there were numerous

8    of those.

9           THE COURT:  Okay.

20:53 10          MS. HURST:  There have been multiple registrations

11   that have been admitted into evidence already that one

12   searching on the copyright office records for would find

13   evidencing assignment of title between Carter Bryant and

14   Bratz.

20:53 15          So what -- what we have here -- and then on top of

16   that is the recordation requirement.  The purpose of it is to

17   put the world on constructive notice so that you can claim

18   you have constructive notice.

19          Here we have a situation where the -- the prior

20:54 20   transferee had actual notice of the subsequent transfer prior

21   to its recordation.  And so basically what they're doing is

22   asserting a statutory technicality that's designed to provide

23   constructive notice when they already had actual notice.  In

24   fact, it was established today through the testimony of

20:54 25   Mr. Moore -- today -- that they had actual notice as of

 1    November 24th, 2003.  And our -- their recordation was not

 2    until three years later in the context of litigation.

 3              Basically, quite frankly, they went out and they

 4    looked it up and they probably said to themselves oh, goody,

20:54  5    we've got a gotcha.  These lawyers on the other side for MGA

 6    didn't figure out to go record in this other way, and that's

 7    literally what we are dealing with here.  We are dealing with

 8    a Mattel "gotcha" three years after they had actual notice.

 9              And the jury should be allowed to consider this,

20:55 10    especially because they're relying on a technicality where

11    they had actual notice, they should be estopped to claim that

12    technicality, when they had actual notice as was admitted

13    today, and because they opened the door to this by

14    relentlessly cross-examining witnesses, suggesting --

20:55 15    ridiculing those reps and warranties as if they were

16    illegally relevant, which is not true.  So they also pervade

17    a misimpression and they set up a legal fiction in this court

18    by what they've done on this all on the basis of a

19    technicality "gotcha" that where that statutory requirement

20:55 20    is designed to afford constructive notice, and they had

21    "actual" notice.

22              So not only should they be estopped because they

23    had actual notice, but also because of their conduct in this

24    trial where they've come in and created this legal

20:56 25    misimpression in front of the jury.

1          Your Honor, what Judge Larson had decided was that

2    he would let this defense go to the jury and consider the

3    recordation issue afterwards.

4          Respectfully I would urge the court to at least do

20:56 5    that much.  If the court isn't fully convinced on the

6    recordation issue at this time, then I would at least

7    strongly urge the jury to -- to let it have consideration of

8    the good faith purchaser defense.  It's clear that the other

9    elements -- the elements of royalty consideration, valuable

20:56 10   consideration, other elements are met.  The jury should be

11   entitled to consider the lack of notice and good faith

12   elements, and the court should consider that defense, along

13   with the other issues of ownership in this case.

14         If afterwards the court decides for some reason,

20:56 15   you know, after taking a further look at it, the recordation

16   requirement can't be met, we don't agree with that, but at

17   the very minimum given Mattel's manipulative, misleading

18   impression that they left with the jury, the jury should be

19   informed that this is -- this is relevant and available as a

20:57 20   legal defense.

21         THE COURT:  All right.  Mr. Zeller.

22         MR. ZELLER:  Yes.

23         Thank you, Your Honor.

24         I won't comment on the rhetoric that unfortunately

20:57 25   pervades MGA's arguments.

1          Its crux, this is completely untethered to the

2     statutory language.  The statutory language of Section 205(d)

3     is pretty straightforward and it says:  "As between two

4     conflicting transfers, the one executed first prevails if it

20:57 5     is recorded," and then it goes on to talk about the ways in

6     which it can be properly recorded.  But the bottom line is so

7     long as it is recorded before, the later transfer is

8     recorded.

9          So this is a way of dealing with conflicting

20:58 10    transfers.

11         And in many respects MGA really has it backward

12    here because if Mattel's theory is correct and we, of course,

13    believe it is, but taking Mattel's point of view for a

14    moment, we were the first ones in time.  Our assignment was

20:58 15    first.

16         If Carter Bryant created Bratz while he was

17    employed by Mattel and our inventions agreement covers that

18    invention, we were the first transferee.  MGA is the

19    second-comer.  And under the statutory provision, the

20:58 20    second-comer gets potentially superior rights only if they

21    meet the statutory requirements.  And MGA has not done so.

22         The transfer that they are relying upon, one by

23    Fox, is not even one by MGA and is not one of the relevant

24    rights; it's one about these derivative rights in a movie.

20:58 25         But in any event MGA has simply never recorded.

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10339   Filed 03/31/11   Page 74 of 83   Page ID #:313932
CV 04-9049 DOC - 03/29/2011 Volume 3 of 3

74

1    That's undisputed.

2            And the particular assignment that MGA relies upon

3    in this case, which is the agreement dated as of

4    September 18th, 2000, has not been recorded.  That is the

20:59  5    operative document.

6            The other argument that they make in order to

7    circumvent the recordation requirement is, is that, well, MGA

8    had numerous registrations; but as we have argued and the

9    court has -- has recognized, to treat recordation and

20:59 10    registration as one in the same would be -- would conflict

11    with the language of the statute.  They -- the statute

12    recognizes and the copyright office recognizes that those are

13    different acts.

14            The final point I would make here, Your Honor,

20:59 15    is -- is that these arguments about Mattel's

16    cross-examination of Mr. Larian, Mr. Rosenbaum and others

17    about the reps and warranties has absolutely nothing to do

18    with Section 205(d) and whether that's available as a

19    defense.

21:00 20            There's statutory language that MGA is required to

21    meet in order to even make a prime facie showing that it can

22    meet this defense and that it is something that should be

23    submitted to the jury.

24            Regardless of the rhetoric surrounding MGA's

21:00 25    perception of the cross-examination of these witnesses, that

1    has absolutely nothing to do with the fact that MGA does not

2    and cannot meet the statutory language.

3            THE COURT:  I am going to take MGA's motion for

4    reconsideration of the copyright act preemption ruling under

5    submission.  That's an issue that I can take up after the

6    jury renders a verdict.

7            And MGA's motion and request for interlocutory

8    appeal is denied.

9            That's a final order by the court this evening.

10           There needs to be another hearing on

11   Mr. Malackowski for final arguments from the parties on

12   whether he should be excluded under *Daubert*.

13           Ms. Hurst and Ms. Keller, I'm putting you on notice

14   that I think his opinion's on thin ice right now.

15           The -- his report's basically, from my reading,

16   again, over the weekend, a simple, factual recitation but

17   there's extremely rude math, and whatever calculations he

18   does are not very transparent to me.

19           Now, I have to tell you also, Wagner is on thin ice

20   as well, so I want him back in here.

21           And if it's Ms. Keller and Mr. Price examining

22   Mr. Malackowski, I want him in here as early as tomorrow

23   night.  So maybe we need to get on the phone.

24           But assuming both of you argue the *Daubert* motion,

25   I'm going to want some discussion of the case law and whether

 1      its methods are reliable or not.

 2              So that's fair notice to both of you.

 3              The next issue I wanted to discuss with you

 4      yesterday was Mattel filed a motion to exclude Thomas Gruca's

21:02  5      expert opinion and in that motion it complains and explains

 6      that Mr. Gruca conducted a survey of purchasers to determine

 7      the extent to which they relied upon the brand in choosing to

 8      buy a particular product.

 9              I had previously excluded Mattel's expert,

21:02 10      Mr. Kenneth Hollander, from testifying because his purchaser

11      survey appeared to be very flawed and the same appears to be

12      the case here concerning Mr. Gruca.

13              So the only thing I want to know this evening is

14      whether there's more to Mr. Gruca's opinion than this survey

21:03 15      that he apparently conducted.

16              And if there is, then I want to get him in here and

17      I want to see what he's testifying to about concerning other

18      issues and then I'll possibly consider partially excluding

19      his testimony pursuant to *Daubert*.

21:03 20              So I want you to discuss that and I'll come back to

21      you in a few moments and have that discussion after I go back

22      in chambers.

23              The next issue -- and I really apologize -- I meant

24      to cover all of this last evening and try to give you a

21:03 25      breather for the weekend, but we'll see.

Case 2:04-cv-09049-DOC-RNB  Document 10339  Filed 03/31/11  Page 77 of 83  Page ID #:313935
CV 04-9049 DOC - 03/29/2011 - Volume 3 of 3

77

1          MGA objected to discovery motion No. 108, and the

2     discovery master held that MGA shall not have access to all

3     35 boxes of documents that he reviewed last evening and all

4     day today, and MGA's objections are -- are overruled by the

21:03  5     court at this time.

6          Now, I have to admit I'm still going through a few

7     documents this evening.  I'm going to leave that open after

8     you leave tonight because I've got some more work to do.

9          And, finally, I'm going to consider once again

21:04 10     Mr. Castilla.

11          Mattel filed the motion to compel additional

12     deposition time with Jorge Castilla, Docket No. 10124, and I

13     had permitted Mattel to depose Mr. Castilla during the trial,

14     just as I permitted MGA to depose Mr. Michael Moore and

21:04 15     Ms. Jill Thomas.

16          But I looked at the briefing on this issue and I --

17     I tentatively believe that Mattel had more than sufficient

18     opportunity to examine Mr. Castilla and I -- I don't think

19     that the additional deposition time is merit- -- or has merit

21:04 20     at the present time.

21          So I'd like to hear from Mr. Zeller once again,

22     specifically, because I went back and looked at the

23     deposition at the time and for the life of me I'm a little --

24     I'm a little concerned about your request for an adverse

21:05 25     inference concerning Mr. Castilla's invocation of the

         1    privilege against self-incrimination, because it's largely

         2    moot.

         3              So let me hear from you one more time.

         4              MR. ZELLER:  Yes, Your Honor.  Thank you.

21:05    5              Focusing on the first issue, which is really the

         6    amount of time.

         7              THE COURT:  Right.

         8              MR. ZELLER:  I mean, we had approximately five

         9    hours --

21:05   10              THE COURT:  Uh-huh.

        11              MR. ZELLER:  -- of time with Mr. Castilla on the

        12    record.  The prior deposition was, I'm sure the court is

        13    aware, although it was seven hours it was practically all

        14    invocation of the Fifth Amendment, so, therefore, assuming

21:05   15    that Mattel is not permitted to use his invocation of the

        16    Fifth Amendment, that deposition for all practical purposes

        17    is -- is not usable for us.

        18              So that means we had a five-hour period.

        19              Really the issue here with Mr. Castilla has as much

21:06   20    to do with the fact that there were approximately 90 files

        21    that he took.  It just simply takes time to go through those

        22    with him.

        23              You know, it's not necessarily one of these

        24    situations -- because, obviously, how much time one needs

21:06   25    with a witness just depends on how much there is to cover,

Case 2:04-cv-09049-DOC-RNB   Document 10339   Filed 03/31/11   Page 79 of 83   Page ID #:313937
CV 04-9049 DOC - 03/29/2011 - Volume 3 of 3

79

and because of the breadth of the information that he took

and having to ask him about it, as well as its potential use,

we just didn't think that the time was -- was sufficient, and

we need more to go through it.

21:06  You know, there -- there have been some other

analogs of other depositions here in the case where more time

was given.

In fact, to -- and I don't want to make this sound

like a tit for tat, but MGA had actually, probably about two

21:06  or three times the amount of time we had to depose

Mr. Castilla in those five hours to take the depositions of

people where they were trying to attack the trade secret

status of that information.

So just looking at it from that kind of parity --

21:07  and, again, I don't mean to suggest that this should be

100 percent equal, but I think it should give the court, I

think, some indication as to how long it does take to go

through these materials.

So I mean, you know, candidly, yes, we thought that

21:07  he was slowing down the process somewhat because he was on a

clock and the like.  I don't want to make too much out of

that because the fact is, is that five hours would have been

a challenge to begin with, and so, respectfully, we just ask

the court to -- to give us an opportunity for a bit more time

21:07  with Mr. Castilla to -- to pin down the remainder of the

 1      trade secret information that we've been asking about.

 2              THE COURT:  Let me turn to MGA.

 3              MR. MCCONVILLE:  Your Honor, Mr. Castilla has now

 4      been deposed twice.  The first deposition they didn't spend

21:07 5  any time asking him any questions about any of the trade

 6      secrets.  They chose to spend their time however they spend

 7      their time, coming back to the court, expecting the court to

 8      give them more time, which the court has been very generous.

 9      You know, I can think of days and days of depositions where I

21:08 10 thought to myself, I'd have taken a different approach if I

 11     really wanted to get answers to particular questions.  So I

 12     think Mr. Castilla falls into that same category.

 13             The man has been subjected to Mr. Zeller's 12 hours

 14     of depositions.  If you can't get what you need in 12 hours

21:08 15 you're not asking the right questions; so I think more time

 16     just begets more time, just begets more time, just begets

 17     more time.

 18             At some point you've got to be efficient, ask your

 19     questions and get down and, you know, and discipline in

21:08 20 your -- disciplining yourself instead of going back to the

 21     court for continually requesting more time will get the

 22     answers that you need.

 23             MR. ZELLER:  Just very briefly, Your Honor.

 24             THE COURT:  Sure.

21:08 25         MR. ZELLER:  The first deposition Mr. Castilla

1    invoked the Fifth Amendment over 500 times.  The idea that he

2    was not asked about the trade secrets is incorrect.  I took

3    that deposition.  I put every one of those documents in front

4    of him and he invoked the Fifth Amendment.

21:09  5          In fact, Mr. Castilla went so far as to invoke the

6    Fifth Amendment on questions about his background, so that

7    was not even accomplished, you know, in terms of productive

8    deposition time where we got answers, actual answers from the

9    witness during the first deposition.

21:09 10          So, respectfully, to say that this deposition was

11   12 hours, I -- I don't think is -- is remotely correct at

12   all.  It was five.

13          THE COURT:  Okay.

14          MR. ZELLER:  Thank you.

21:09 15          THE COURT:  Anything else?

16          MR. MCCONVILLE:  Nope.

17          THE COURT:  Okay.  Now, you tell me, because I

18   don't know when to come back out, how we're doing with our

19   journey through our notes for Sal Villasenor and Mr. Moore.

21:09 20          MR. ZELLER:  We'll check right now.

21          THE COURT:  I just don't want to leave and have you

22   sitting here.

23          Give me a time to come back.  So why don't you

24   check.  As soon as we're done with those I'll send you home

21:10 25   tonight.

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10339   Filed 03/31/11   Page 82 of 83   Page ID #:313940
CV 04-9049 DOC - 03/29/2011 Volume 3 of 3

82

1          Now, who is going to sign off on these notes?  Is

2     Mr. Moore personally going to sign off on these notes?  And

3     who is going to sign off for Sal Villasenor?

4               MS. HURST:  We have none.

21:10  5               THE COURT:  You have none?

6               MS. HURST:  Correct.

7               THE COURT:  Representation on the record:  You have

8     absolutely none?

9               MS. HURST:  We have checked with several prior

21:10 10     in-house lawyers and the witness himself.

11               THE COURT:  Okay.

12               (Pause in the proceedings.)

13               THE COURT:  Well, I tell you what I could do.  I

14     could set this to work very -- aside very easily and that's

21:10 15     an affidavit under penalty of perjury for Mr. Moore and

16     Mr. Sal Villasenor, and I'm not kidding.

17               I'll put him in jail and I'll put that right on the

18     record.

19               So if either one of you aren't satisfied at the end

21:11 20     of the evening, that will go right onto Mr. Moore's signature

21     and right onto Sal Villasenor's signature.

22               MR. QUINN:  It's really not Mr. Villasenor's

23     signature, Your Honor.

24               THE COURT:  Whose is it?

21:11 25               MR. QUINN:  It would, then, be the -- the

1    lawyers for MGA.

2              THE COURT:  Which ones?

3              MR. QUINN:  I don't know who they are.  We don't

4    know.

21:11  5       THE COURT:  Well, that's a shame.

6         Okay.  Well, I'm going to go back in chambers

7    unless there is a time estimate.

8         I'm going to start sending out opinions now almost

9    every 10 to 15 minutes, so just start checking your

21:11 10   computers.

11             All right.

12             Okay.  Denise go down and rest.  As soon as they

13   knock on the door they'll let you know and bring you back.

14             (Recess taken.)

21:11 15         (Adjournment at 21:53 to resume on

16   Wednesday, March 30, 2011 at 8:00 a.m.  Next session

17   Reported by Debbie Gale.)

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT