CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

- - - - - - -

MATTEL, INC., et al.,              )
                                   )
              Plaintiffs,          )
                                   )
        vs.                        ) No. CV 04-9049 DOC
                                   )     Day 42
MGA ENTERTAINMENT, INC., et al.,   )     Volume 1 of 3
                                   )
                                   )
              Defendants.          )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial

Santa Ana, California

Wednesday, March 30, 2011


Debbie Gale, CSR 9472, RPR, CCRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-8141

04cv9049 Mattel 2011-03-30 D42V1

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 2 of 152   Page ID #:313955
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

2

1    **APPEARANCES OF COUNSEL:**

2

     FOR PLAINTIFF MATTEL, INC., ET AL.:
3
              QUINN EMANUEL URQUHART & SULLIVAN
4             BY:   JOHN QUINN
                    WILLIAM PRICE
5                   MICHAEL T. ZELLER
                    Attorneys at Law
6             865 South Figueroa Street
              10th Floor
7             Los Angeles, California 90017
              (213) 443-3000
8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12            ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
              BY:   THOMAS S. McCONVILLE
13                  Attorney at Law
              4 Park Plaza
14            Suite 1600
              Irvine, California 92614
15            (949) 567-6700

16            - AND -

17            ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
              BY:   ANNETTE L. HURST
18                  Attorney at Law
              405 Howard Street
19            San Francisco, California 94105
              (415)773-5700
20
              - AND -
21
              KELLER RACKAUCKAS
22            BY:   JENNIFER KELLER
                    Attorney at Law
23            18500 Von Karman Avenue
              Suite 560
24            Irvine, California 92612
              (949) 476-8700
25

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4
          LAW OFFICES OF MARK E. OVERLAND
5         By:  MARK E. OVERLAND  (not present)
               Attorney at Law
6         100 Wilshire Boulevard
          Suite 950
7         Santa Monica, California 90401
          (310) 459-2830
8
          - AND -
9
          SCHEPER KIM & HARRIS LLP
10        BY:  ALEXANDER H. COTE
               Attorney at Law
11        601 West 5th Street
          12th Floor
12        Los Angeles, California 90071
          (213) 613-4660
13

14   ALSO PRESENT:

15        MGA ENTERTAINMENT, INC.
          BY:  JEANINE PISONI
16             Attorney at Law
          16360 Roscoe Boulevard
17        Suite 105
          Van Nuys, California 91406
18

19        ROBERT A. ECKERT, MATTEL CEO

20        ISAAC LARIAN, MGA CEO

21        KEN KOTARSKI, Mattel Technical Operator

22        MIKE STOVALL, MGA Technical Operator

23

24

25

CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

4

**I N D E X**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| STOCKTON, Bryan | | | | |
| By Mr. McConville | 7 | | 29 | |
| By Mr. Quinn | | 21 | | |
| THOMAS, Jill | | | | |
| By Ms. Hurst | 37 | | 134 | |
| By Mr. Quinn | | 117 | | |

**EXHIBITS**

| EXHIBIT NO. | IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 9869 | E-mail from Mr. Allmark to Mr. Stockton dated 2/10/2009 | 17 |
| 20122 | Mattel 2003 employee handbook | 132 |
| 20471 | Mattel employee handbook | 133 |
| 24060 | Mattel log-in screen shot | 131 |
| 36114-5 | Page 5 of Exhibit 36114 – 2002 Log | 100 |
| 36114 | 2002 Case Management Log | 105 |
| 36817-19 | Page 19 of Exhibit 36817 list of key words | 93 |
| 36817-1 | Front page of seurity file | 118 |
| 36817-2 | Chronological record | 118 |

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, WEDNESDAY, MARCH 30, 2011**               |
|       | 2  | **Day 42, Volume 1 of 3**                                          |
|       | 3  | (8:41 a.m.)                                                         |
| 08:41 | 4  | *(In the presence of the jury.)*                                   |
| 08:41 | 5  | All right.  We're back in session.  The jury's                     |
| 08:41 | 6  | present, the alternates, all counsel, the parties.                 |
| 08:41 | 7  | Counsel, if you would like to call your next                       |
| 08:41 | 8  | witness.                                                            |
| 08:41 | 9  | MR. McCONVILLE:  Your Honor, we'd call Bryan                        |
| 08:41 | 10 | Stockton, please.                                                   |
| 08:41 | 11 | THE COURT:  Thank you, sir.  If you would be kind                   |
| 08:41 | 12 | enough to step forward.                                            |
| 08:41 | 13 | MR. McCONVILLE:  Before we call him, the parties                    |
| 08:41 | 14 | have reached a stipulation we discussed with the Court              |
| 08:41 | 15 | concerning the AEO designation, which I'd like to read now          |
| 08:41 | 16 | if I could.                                                        |
| 08:41 | 17 | THE COURT:  You may.                                                |
| 08:42 | 18 | MR. McCONVILLE:  (Reading:)                                         |
| 08:42 | 19 | "Some documents in evidence have words -- or have                   |
| 08:42 | 20 | the words, quote, 'Confidential.  Attorney's Eyes Only' at          |
| 08:42 | 21 | the bottom of the document.                                        |
| 08:42 | 22 | "Pursuant to a Court order, these words were added                  |
| 08:42 | 23 | to copies of these documents after this case started by the        |
| 08:42 | 24 | attorneys for all parties.                                         |
| 08:42 | 25 | "The, quote, 'Confidential.  Attorney's Eyes Only'                  |

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

6

| | | |
|---|---|---|
| 08:42 | 1 | words are not evidence that a document is, in fact, |
| 08:42 | 2 | confidential or a trade secret.  That is a determination for |
| 08:42 | 3 | you to make separate and apart from the use of the words, |
| 08:42 | 4 | quote, 'Confidential.  Attorney's Eyes Only.'" |
| 08:42 | 5 | THE COURT:  All right.  Thank you. |
| 08:42 | 6 | And, ladies and gentlemen, that's a binding |
| 08:42 | 7 | stipulation if accepted by Mattel. |
| 08:42 | 8 | MR. ZELLER:  It is, Your Honor. |
| 08:42 | 9 | THE COURT:  And accepted by MGA? |
| 08:42 | 10 | MR. McCONVILLE:  Yes, sir. |
| 08:42 | 11 | THE COURT:  All right.  Thank you very much. |
| 08:42 | 12 | That's binding upon us.  You'll see some of |
| 08:42 | 13 | documents that have "Attorney's Eyes Only."  That was added |
| 08:42 | 14 | by order of the Court. |
| 08:42 | 15 | MR. McCONVILLE:  Your Honor, Mr. Machado as well? |
| 08:43 | 16 | THE COURT:  And Mr. Machado, as well. |
| 08:43 | 17 | MR. COTE:  Thank you. |
| 08:43 | 18 | THE COURT:  Thank you very much. |
| 08:43 | 19 | MR. McCONVILLE:  And Bryan Stockton. |
| 08:43 | 20 | THE COURT:  Mr. Stockton. |
| 08:43 | 21 | Thank you, sir.  If you would step forward between |
| 08:43 | 22 | the double doors, please.  And raise your right hand, |
| 08:43 | 23 | please. |
| 08:43 | 24 | **BRYAN STOCKTON, MGA'S WITNESS, SWORN** |
| 08:43 | 25 | THE WITNESS:  I do. |

CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

7

| | | |
|---|---|---|
| 08:43 | 1 | THE COURT:  Thank you, sir.  If you would please |
| 08:43 | 2 | be seated here in the witness box. |
| 08:43 | 3 | Sir, would you state your full name for the jury, |
| 08:43 | 4 | please. |
| 08:43 | 5 | THE WITNESS:  Bryan Grant Stockton. |
| 08:43 | 6 | THE COURT:  Would you spell your last name, sir. |
| 08:43 | 7 | THE WITNESS:  S-T-O-C-K-T-O-N. |
| 08:43 | 8 | THE COURT:  Thank you. |
| 08:43 | 9 | Direct examination by Mr. McConville on behalf of |
| 08:43 | 10 | MGA and Mr. Larian. |
| 08:43 | 11 | **DIRECT EXAMINATION** |
| 08:43 | 12 | BY MR. McCONVILLE: |
| 08:43 | 13 | Q.   Good morning, Mr. Stockton. |
| 08:43 | 14 | A.   Good morning. |
| 08:43 | 15 | Q.   Where do you work? |
| 08:43 | 16 | A.   Mattel. |
| 08:43 | 17 | Q.   How long -- |
| 08:43 | 18 | A.   Approximately ten and a half years. |
| 08:44 | 19 | Q.   What is your current position at Mattel? |
| 08:44 | 20 | A.   Chief operating officer. |
| 08:44 | 21 | Q.   And what was your original position at Mattel when you |
| 08:44 | 22 | began there -- I'm sorry, did you say ten and a half years |
| 08:44 | 23 | ago? |
| 08:44 | 24 | A.   Yes. |
| 08:44 | 25 | Q.   What was your original position? |

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

8

| | | |
|---|---|---|
| 08:44 | 1 | A.    Executive Vice President of Business Planning and |
| 08:44 | 2 | Development. |
| 08:44 | 3 | Q.    And in the hierarchy structure we've heard testimony |
| 08:44 | 4 | about vice president, senior vice presidents.  Is an |
| 08:44 | 5 | executive vice president someone above a senior vice |
| 08:44 | 6 | president in the "org" chart? |
| 08:44 | 7 | A.    Generally, yes. |
| 08:44 | 8 | Q.    And in your case, were you above the senior vice |
| 08:44 | 9 | presidents at Mattel? |
| 08:44 | 10 | A.    Yes. |
| 08:44 | 11 | Q.    And you're currently the chief operating officer; is |
| 08:44 | 12 | that right? |
| 08:44 | 13 | A.    Yes, that's right. |
| 08:44 | 14 | Q.    Do you have any other titles? |
| 08:44 | 15 | A.    No. |
| 08:44 | 16 | Q.    To whom do you report? |
| 08:44 | 17 | A.    Bob Eckert, our chairman and CEO. |
| 08:44 | 18 | Q.    How were you recruited to Mattel ten and a half years |
| 08:45 | 19 | ago? |
| 08:45 | 20 | A.    I received a phone call from Bob. |
| 08:45 | 21 | Q.    I'm sorry, Mr. Eckert? |
| 08:45 | 22 | A.    Yes, from Mr. Eckert.  And Mr. Eckert and I had worked |
| 08:45 | 23 | together at Kraft.  And I went through a formal interview |
| 08:45 | 24 | process and was asked to join the company. |
| 08:45 | 25 | Q.    How long had you known Mr. Eckert prior to receiving |

| | | |
|---|---|---|
| 08:45 | 1 | that phone call? |
| 08:45 | 2 | A.   Probably 20 years, roughly. |
| 08:45 | 3 | Q.   So you've known Mr. Eckert now for roughly 30 years? |
| 08:45 | 4 | A.   25 to 30, yes. |
| 08:45 | 5 | Q.   And, uh, have you -- are you guys -- are you friends? |
| 08:45 | 6 | A.   Uh, yes.  Friends and professionals. |
| 08:45 | 7 | Q.   And how did Mr. Eckert -- you guys worked together at |
| 08:45 | 8 | Kraft; is that what you said? |
| 08:45 | 9 | A.   Yes. |
| 08:45 | 10 | Q.   And what was your position at Kraft? |
| 08:45 | 11 | A.   My last position was president of the food service |
| 08:45 | 12 | division. |
| 08:45 | 13 | Q.   And you worked with Mr. Eckert while he was at Kraft? |
| 08:46 | 14 | A.   Yes, I did. |
| 08:46 | 15 | Q.   And so after he went to Mattel, he then recruited you |
| 08:46 | 16 | from Kraft? |
| 08:46 | 17 | A.   No, he did not. |
| 08:46 | 18 | Q.   So explain to me the nature of the phone call that you |
| 08:46 | 19 | had for Mr. Eckert ten and a half years ago. |
| 08:46 | 20 | A.   I had left Kraft Foods roughly two years before Bob |
| 08:46 | 21 | did, so I was recruited from Basic Vegetable Products. |
| 08:46 | 22 | Q.   Okay.  So you were at Basic Vegetable Products, which |
| 08:46 | 23 | was not affiliated with Kraft? |
| 08:46 | 24 | A.   No. |
| 08:46 | 25 | Q.   What was your position at Basic Vegetable Products? |

| | | |
|---|---|---|
| 08:46 | 1 | A.    President and CEO. |
| 08:46 | 2 | Q.    So Mr. Eckert called you to recruit you from Basic |
| 08:46 | 3 | Vegetable Products? |
| 08:46 | 4 | A.    Yes. |
| 08:46 | 5 | Q.    And at the time Mr. Eckert called to recruit you, did |
| 08:46 | 6 | you have an employment contract with Basic Vegetable |
| 08:46 | 7 | Products? |
| 08:46 | 8 | A.    I had an employment agreement. |
| 08:46 | 9 | Q.    And was it inconsistent with your employment agreement |
| 08:46 | 10 | to be able to have a conversation about getting another job? |
| 08:47 | 11 | A.    Uh, no.  In fact, we were selling the company at the |
| 08:47 | 12 | time. |
| 08:47 | 13 | Q.    So it's not uncommon in your experience for people who |
| 08:47 | 14 | are under contract to be recruited by other companies? |
| 08:47 | 15 | A.    I'm not an expert on that.  I would just simply say in |
| 08:47 | 16 | my case we were trying to sell the company, Basic Vegetable |
| 08:47 | 17 | Products, and the owners knew that I would be looking for |
| 08:47 | 18 | another job. |
| 08:47 | 19 | Q.    Right.  And I -- how long have you been a |
| 08:47 | 20 | professional -- how long you been working? |
| 08:47 | 21 | A.    30 some-odd years. |
| 08:47 | 22 | Q.    And in your 30 some-odd years, is it uncommon for |
| 08:47 | 23 | someone who is under an employment contract to be recruited |
| 08:47 | 24 | by another company? |
| 08:47 | 25 | A.    I would say it's not uncommon. |

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

11

| 08:47 | 1 | Q.   And did you view that recruitment process as violating |
|---|---|---|
| 08:47 | 2 | any duty that you owed to Basic Vegetable Products? |
| 08:47 | 3 | A.   In that specific instance, no, because, again, the |
| 08:47 | 4 | owners knew we were selling the company and they were |
| 08:47 | 5 | expecting me to look for a new job. |
| 08:48 | 6 | Q.   And did you believe it was inappropriate for Mr. Eckert |
| 08:48 | 7 | to give you a call to recruit you to Mattel? |
| 08:48 | 8 | A.   Uh, no, because the owners knew that I was going to be |
| 08:48 | 9 | looking for a new job. |
| 08:48 | 10 | Q.   And if you had not been looking for a new job, would |
| 08:48 | 11 | that have been inappropriate for Mr. Eckert to reach out to |
| 08:48 | 12 | you? |
| 08:48 | 13 | A.   Bob and I were friends.  It was not uncommon for us to |
| 08:48 | 14 | have casual conversations. |
| 08:48 | 15 | Q.   And while you were still employed at Kraft, was |
| 08:48 | 16 | Mr. Eckert at Mattel? |
| 08:48 | 17 | A.   No. |
| 08:48 | 18 | Q.   Okay.  And did you -- in any event, this recruitment |
| 08:48 | 19 | process, you did not view it as being unethical, right? |
| 08:48 | 20 | A.   It was not unethical.  I was selling the company, Basic |
| 08:48 | 21 | Vegetable Products, and the owners knew that I needed to get |
| 08:48 | 22 | another job. |
| 08:48 | 23 | Q.   And when you -- you said you went through a formal |
| 08:48 | 24 | interview process at Mattel; is that right? |
| 08:48 | 25 | A.   That's correct. |

DEBBIE GALE, U.S. COURT REPORTER

| 08:48 | 1  | Q.   And during that interview process, had you already quit |
| 08:49 | 2  | your job at Basic Vegetable Products? |
| 08:49 | 3  | A.   Uh, no. |
| 08:49 | 4  | Q.   So while you were interviewing with Mattel, you still |
| 08:49 | 5  | had a job at your prior employer, right? |
| 08:49 | 6  | A.   That's correct. |
| 08:49 | 7  | Q.   And when you accepted your job at Mattel, you were |
| 08:49 | 8  | still employed at Basic Vegetable Products, correct? |
| 08:49 | 9  | A.   The overlap was about three days. |
| 08:49 | 10 | Q.   So you accepted your job at Mattel while you were still |
| 08:49 | 11 | employed at another company, right? |
| 08:49 | 12 | A.   The owners were aware of that. |
| 08:49 | 13 | Q.   Yes or no?  You accepted the job at Mattel while you |
| 08:49 | 14 | were still employed by someone else? |
| 08:49 | 15 | A.   Yes. |
| 08:49 | 16 | Q.   And you didn't view that to be unethical, right? |
| 08:49 | 17 | A.   I had full disclosure with the owners in terms of what |
| 08:49 | 18 | I was doing. |
| 08:49 | 19 | Q.   Yes or no.  In your view it was ethical for you to be |
| 08:49 | 20 | behave that way; yes or no? |
| 08:49 | 21 | A.   Yes, it was ethical because I had been giving the |
| 08:49 | 22 | owners full disclosure. |
| 08:49 | 23 | Q.   Prior to testifying here today, have you been prepared |
| 08:50 | 24 | by lawyers for Mattel? |
| 08:50 | 25 | A.   Yes, I have. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:50 | 1 | Q.   How long have you spent preparing for your testimony |
| 08:50 | 2 | today? |
| 08:50 | 3 | A.   A few hours.  I've been sitting and waiting as well. |
| 08:50 | 4 | Q.   And with whom did you prepare? |
| 08:50 | 5 | A.   Uh, attorneys from Quinn. |
| 08:50 | 6 | Q.   Which ones? |
| 08:50 | 7 | A.   James Webster and Marshal -- I'm sorry, I don't |
| 08:50 | 8 | remember his last name. |
| 08:50 | 9 | Q.   And did they show you documents during that prep |
| 08:50 | 10 | session? |
| 08:50 | 11 | A.   Uh, yes. |
| 08:50 | 12 | Q.   And did they discuss with you, uh, the need to provide |
| 08:50 | 13 | narrative answers in response to "yes" or "no" questions? |
| 08:50 | 14 | A.   Uh, no. |
| 08:50 | 15 | Q.   How much money do you make at Mattel? |
| 08:50 | 16 | A.   $1 million a year. |
| 08:50 | 17 | Q.   That's your salary? |
| 08:50 | 18 | A.   Yes. |
| 08:50 | 19 | Q.   Are you eligible for a bonus? |
| 08:50 | 20 | A.   Yes. |
| 08:50 | 21 | Q.   What is your bonus range? |
| 08:50 | 22 | A.   Uh, my target bonus is 85 percent of that. |
| 08:51 | 23 | Q.   So $850,000? |
| 08:51 | 24 | A.   Yes. |
| 08:51 | 25 | Q.   And what about -- are you -- do you receive stock |

| 08:51 | 1 | awards -- |
|---|---|---|
| 08:51 | 2 | A.   Yes. |
| 08:51 | 3 | Q.   -- as part of your compensation? |
| 08:51 | 4 | A.   Yes, I do. |
| 08:51 | 5 | Q.   And what are your stock award eligibilities this year? |
| 08:51 | 6 | A.   It depends on the performance of the company. |
| 08:51 | 7 | Q.   What's the maximum you expect to receive? |
| 08:51 | 8 | A.   Well, it would be a guess.  I'll say roughly $800,000. |
| 08:51 | 9 | Q.   Of shares? |
| 08:51 | 10 | A.   Of shares, yes. |
| 08:51 | 11 | Q.   And are you provided with any other perks as a result |
| 08:51 | 12 | of your job? |
| 08:51 | 13 | A.   Uh, no. |
| 08:51 | 14 | Q.   Do they -- does Mattel pay for a country club |
| 08:51 | 15 | membership? |
| 08:51 | 16 | A.   No.  I have a -- I get an allowance for a company car, |
| 08:51 | 17 | and that's it. |
| 08:51 | 18 | Q.   Okay.  During your tenure at Mattel, have you been in |
| 08:52 | 19 | charge of the -- at some point of the international |
| 08:52 | 20 | division? |
| 08:52 | 21 | A.   Yes. |
| 08:52 | 22 | Q.   I don't want to use the wrong word.  How would you |
| 08:52 | 23 | characterize the international division at Mattel? |
| 08:52 | 24 | A.   Those words are perfect. |
| 08:52 | 25 | Q.   Okay.  And did you -- have you attended the Nuremberg |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 15 of 152   Page ID #:313968
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

15

| | | |
|---|---|---|
| 08:52 | 1 | Toy Fair? |
| 08:52 | 2 | A.    Yes, I have. |
| 08:52 | 3 | Q.    And in what years have you attended the Nuremberg Toy |
| 08:52 | 4 | Fair? |
| 08:52 | 5 | A.    Every year from 2004 through 2011. |
| 08:52 | 6 | Q.    So seven years? |
| 08:52 | 7 | A.    Roughly seven or eight years. |
| 08:52 | 8 | Q.    Seven or eight years. |
| 08:52 | 9 | And it's true that the Nuremberg Toy Fair is generally |
| 08:52 | 10 | an open toy fair, right? |
| 08:52 | 11 | A.    That's correct. |
| 08:52 | 12 | Q.    And -- but some companies have closed-door showrooms, |
| 08:52 | 13 | correct? |
| 08:52 | 14 | A.    Yes. |
| 08:52 | 15 | Q.    Including Mattel, right? |
| 08:52 | 16 | A.    Yes. |
| 08:52 | 17 | Q.    And some of Mattel's competitors also have closed door |
| 08:52 | 18 | showrooms, correct? |
| 08:53 | 19 | A.    Yes. |
| 08:53 | 20 | Q.    And by having a closed-door showroom, from Mattel's |
| 08:53 | 21 | perspective anyhow, Mattel is limiting access to the -- to |
| 08:53 | 22 | the products that it's displaying at the Nuremberg Toy Fair, |
| 08:53 | 23 | correct? |
| 08:53 | 24 | A.    We limit access just simply to control who is in the |
| 08:53 | 25 | showroom and make sure that they are escorted around, that |

| | | |
|---|---|---|
| 08:53 | 1 | we can answer their questions. |
| 08:53 | 2 | Q.   By limiting access that's -- that's something you do in |
| 08:53 | 3 | order to control who can have an ability to enter your |
| 08:53 | 4 | showroom, right? |
| 08:53 | 5 | A.   Well, we're the world's largest toy company.  We have a |
| 08:53 | 6 | lot of people that would like to come into the showroom, but |
| 08:53 | 7 | we try to limit to our customers and people who are in |
| 08:53 | 8 | publications that want to see our products. |
| 08:53 | 9 | Q.   So you try to limit access, right? |
| 08:53 | 10 | A.   Yes. |
| 08:53 | 11 | Q.   And you understand that there are competitors of Mattel |
| 08:53 | 12 | who also try to limit access to their products at the |
| 08:53 | 13 | Nuremberg Toy Fair, correct? |
| 08:53 | 14 | A.   I don't know how they do that, but I will assume that |
| 08:53 | 15 | they probably do. |
| 08:54 | 16 | Q.   Okay. |
| 08:54 | 17 | MR. McCONVILLE:  Let's put in front of |
| 08:54 | 18 | Mr. Stockton Exhibit 9869. |
| 08:54 | 19 | *(Document provided to the witness.)* |
| 08:54 | 20 | MR. McCONVILLE:  Is this in evidence? |
| 08:54 | 21 | *(Document displayed.)* |
| 08:54 | 22 | BY MR. McCONVILLE: |
| 08:54 | 23 | Q.   Mr. Stockton, I'd ask you to look at this document and |
| 08:54 | 24 | see if you recognize it. |
| 08:54 | 25 | A.   Yes, I do. |

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

17

| | | |
|---|---|---|
| 08:54 | 1 | Q.   And this is an e-mail, at the top anyhow, from David |
| 08:54 | 2 | Allmark to you, dated February 10, 2009; is that right? |
| 08:54 | 3 | A.   That's correct. |
| 08:54 | 4 | MR. McCONVILLE:  Your Honor, I believe this was |
| 08:54 | 5 | admitted conditionally.  I would move it in unconditionally. |
| 08:54 | 6 | THE COURT:  Received. |
| 08:54 | 7 | *(Exhibit No. 9869 received in evidence.)* |
| 08:54 | 8 | BY MR. McCONVILLE: |
| 08:54 | 9 | Q.   And I would like to go down to the first e-mail from |
| 08:54 | 10 | someone named Sarah Allen.  Who is Sarah Allen? |
| 08:54 | 11 | A.   Sarah Allen works in public relations.  She has her own |
| 08:55 | 12 | consulting company, and we hire Sarah to do that work. |
| 08:55 | 13 | Q.   So she's a third party who's not a Mattel employee; is |
| 08:55 | 14 | that right? |
| 08:55 | 15 | A.   That's correct. |
| 08:55 | 16 | Q.   But Mattel pays for her services, right? |
| 08:55 | 17 | A.   Yes. |
| 08:55 | 18 | Q.   And you'll see that the subject of this e-mail is |
| 08:55 | 19 | "Bratz Update."  Did I read that correctly? |
| 08:55 | 20 | A.   Yes. |
| 08:55 | 21 | Q.   And you'll see that in this e-mail Ms. Allen is |
| 08:55 | 22 | reporting in February of 2009 that -- in the third paragraph |
| 08:55 | 23 | there -- "There's a new concept that was behind closed |
| 08:55 | 24 | doors:  Moxie Girls.  Apparently, this is a common |
| 08:55 | 25 | terminology in the U.S. meaning a girl with attitude.  They |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

18

08:55    1    are positioning this as the natural successor to Bratz, and

08:55    2    it's the latest fashion doll collection that will be

08:55    3    launched autumn/winter."

08:55    4        Do you see that?

08:56    5    A.   Yes, I do.

08:56    6    Q.   And so this -- in this e-mail, Sarah Allen is reporting

08:56    7    a Bratz update, right?

08:56    8    A.   She's reporting on some general information.

08:56    9    Q.   And what she's reporting in this e-mail is what she's

08:56   10    learned behind closed doors, correct?

08:56   11    A.   No.   That's not what this says.

08:56   12    Q.   Let's read it together.

08:56   13        "New concept that was behind closed doors."  Did I read

08:56   14    that correctly?

08:56   15    A.   Yes, you did.

08:56   16    Q.   The words "closed doors" are written in the text of

08:56   17    this e-mail, correct?

08:56   18    A.   Yes.  It doesn't say that she saw it behind closed

08:56   19    doors.

08:56   20    Q.   So this information that Sarah Allen is relaying is

08:56   21    information that was behind closed doors for MGA, correct?

08:56   22    A.   Based on my follow-up conversation with Sarah,

08:56   23    apparently there was some -- a Moxie behind -- I don't know

08:56   24    if it was closed doors, but in a separate section of their

08:57   25    showroom.

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

19

| | | |
|---|---|---|
| 08:57 | 1 | Q.   Yes or no?  Sarah Allen is reporting information that |
| 08:57 | 2 | was behind closed doors?  Yes or no?  If you can answer it |
| 08:57 | 3 | yes or no.  If you can't, let me know and I'll try to |
| 08:57 | 4 | rephrase. |
| 08:57 | 5 | A.   I cannot answer that yes or no. |
| 08:57 | 6 | Q.   Okay.  You'll agree with me that the text of the e-mail |
| 08:57 | 7 | says that Sarah Allen is providing information that was |
| 08:57 | 8 | behind closed doors, true? |
| 08:57 | 9 | A.   That's what this says. |
| 08:57 | 10 | Q.   And you'll agree with me that certain toy retailers |
| 08:57 | 11 | have closed showrooms at Nuremberg, correct? |
| 08:57 | 12 | A.   Yes. |
| 08:57 | 13 | Q.   So this is information in the e-mail that Sarah Allen |
| 08:57 | 14 | is relaying concerning an unreleased product line, correct? |
| 08:57 | 15 | A.   It doesn't say it was an unreleased product line. |
| 08:57 | 16 | Q.   You'll see in the text of the e-mail that it says, |
| 08:57 | 17 | "this is the latest fashion doll collection that will be |
| 08:57 | 18 | launched autumn/winter."  Did I read that correctly? |
| 08:58 | 19 | A.   Yes. |
| 08:58 | 20 | Q.   And you'll see that the date of the e-mail is February, |
| 08:58 | 21 | correct? |
| 08:58 | 22 | A.   Yes. |
| 08:58 | 23 | Q.   And you'll agree with me that autumn/winter is after |
| 08:58 | 24 | February, right? |
| 08:58 | 25 | A.   That's correct. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

20

| | | |
|---|---|---|
| 08:58 | 1 | Q.   And so it stands to reason that this product that is |
| 08:58 | 2 | described is an unreleased product that is coming out in |
| 08:58 | 3 | autumn/winter, correct? |
| 08:58 | 4 | A.   It would say it has not shipped, but it's certainly |
| 08:58 | 5 | been talked about. |
| 08:58 | 6 | Q.   She is reporting to you a product that, quote, "will be |
| 08:58 | 7 | launched autumn/winter," correct? |
| 08:58 | 8 | A.   That's what this document says. |
| 08:58 | 9 | Q.   And this was a report done by Sarah Allen, a non-Mattel |
| 08:58 | 10 | employee, correct? |
| 08:58 | 11 | A.   It's an e-mail from her, yes. |
| 08:58 | 12 | Q.   And she's not bound by Mattel's code of conduct, right? |
| 08:58 | 13 | A.   We would expect her to behave just as if she's an |
| 08:58 | 14 | employee. |
| 08:58 | 15 | Q.   Other than your expectation, you know that the Mattel |
| 08:58 | 16 | code of conduct only applies to Mattel, correct? |
| 08:58 | 17 | A.   We would expect that to go off to our vendors as well. |
| 08:59 | 18 | Q.   Other than that expectation, you understood that the |
| 08:59 | 19 | Mattel code of conduct applies to Mattel employees, correct? |
| 08:59 | 20 | A.   It does apply to our employees. |
| 08:59 | 21 | Q.   Has Mattel ever paid retailers in Germany to keep MGA |
| 08:59 | 22 | product off the shelf? |
| 08:59 | 23 | A.   No. |
| 08:59 | 24 | Q.   Has Mattel ever paid a retailer in Greece named "Jumbo" |
| 08:59 | 25 | to keep MGA product off the shelf? |

| 08:59 | 1 | A.    No. |
| 08:59 | 2 | MR. McCONVILLE:  No further questions. |
| 08:59 | 3 | THE COURT:  Cross-examination by Mr. Quinn on |
| 08:59 | 4 | behalf of Mattel. |
| 08:59 | 5 | **CROSS-EXAMINATION** |
| 08:59 | 6 | BY MR. QUINN: |
| 08:59 | 7 | Q.   Mr. Stockton, if we could take a look at that exhibit, |
| 08:59 | 8 | Exhibit 9869. |
| 08:59 | 9 | MR. QUINN:  Ken, if we could put that up on the |
| 08:59 | 10 | screen. |
| 08:59 | 11 | *(Document displayed.)* |
| 08:59 | 12 | BY MR. QUINN: |
| 08:59 | 13 | Q.   You indicated that this is from a Sarah Allen? |
| 08:59 | 14 | A.   Yes. |
| 08:59 | 15 | Q.   And Sarah Allen was an outside PR person? |
| 08:59 | 16 | A.   Yes. |
| 08:59 | 17 | Q.   And she apparently forwarded this e-mail.  There's one |
| 09:00 | 18 | at the top to a -- this was forwarded to you by a David |
| 09:00 | 19 | Allmark? |
| 09:00 | 20 | MR. QUINN:  Perhaps we can look at that. |
| 09:00 | 21 | *(Technician complies.)* |
| 09:00 | 22 | THE WITNESS:  Yes. |
| 09:00 | 23 | BY MR. QUINN: |
| 09:00 | 24 | Q.   Who's David Allmark? |
| 09:00 | 25 | A.   David Allmark at the time was the general manager of |

| | | |
|---|---|---|
| 09:00 | 1 | the UK, Canada, and Eastern Europe. |
| 09:00 | 2 | Q.   So if we could go back down to Sarah Allen's e-mail. |
| 09:00 | 3 | You were asked about the code of conduct and whether it |
| 09:00 | 4 | applies to vendors.  Do you know whether Mattel actually |
| 09:00 | 5 | expects its vendors to comply with its code of conduct? |
| 09:00 | 6 | A.   Yes. |
| 09:00 | 7 | Q.   And do you know whether that code of conduct is |
| 09:00 | 8 | actually supplied to vendors and they're requested to comply |
| 09:00 | 9 | with it? |
| 09:00 | 10 | A.   I don't know that for a fact, but that's how we act. |
| 09:00 | 11 | Q.   This indicates at the bottom in the last line, uh, |
| 09:00 | 12 | Sarah Allen says, "Sorry, much -- not much detail." |
| 09:00 | 13 |      Do you see that there?  "Sorry, not much detail." |
| 09:00 | 14 | A.   Yes. |
| 09:00 | 15 | Q.   Did that indicate to you whether or not it sounded like |
| 09:00 | 16 | Sarah Allen herself had actually gotten into a closed MGA |
| 09:01 | 17 | toy fair booth? |
| 09:01 | 18 | A.   Um, no.  In fact, it doesn't.  The memo doesn't suggest |
| 09:01 | 19 | that.  I did call Sarah Allen to find out where she got the |
| 09:01 | 20 | information. |
| 09:01 | 21 |      MR. McCONVILLE:  Objection.  Hearsay. |
| 09:01 | 22 | BY MR. QUINN: |
| 09:01 | 23 | Q.   Where did she get the information? |
| 09:01 | 24 | A.   She -- |
| 09:01 | 25 |      THE COURT:  Just a moment.  Where did the |

| | | |
|---|---|---|
| 09:01 | 1 | objection come from? |
| 09:01 | 2 | MR. McCONVILLE:  Me.  Hearsay. |
| 09:01 | 3 | THE COURT:  Counsel? |
| 09:01 | 4 | MR. QUINN:  State of mind, Your Honor. |
| 09:01 | 5 | THE COURT:  Overruled. |
| 09:01 | 6 | BY MR. QUINN: |
| 09:01 | 7 | Q.   Based on your conversation with her, do you have an |
| 09:01 | 8 | understanding about whether she actually got into an MGA |
| 09:01 | 9 | closed toy fair booth? |
| 09:01 | 10 | MR. McCONVILLE:  Objection.  Hearsay. |
| 09:01 | 11 | THE COURT:  No.  This goes to his state of mind, |
| 09:01 | 12 | and I'm going to allow it. |
| 09:01 | 13 | Remember, though, we don't have Sarah Allen here |
| 09:01 | 14 | for cross-examine purposes. |
| 09:01 | 15 | Overruled. |
| 09:01 | 16 | You can answer the question. |
| 09:01 | 17 | THE WITNESS:  Thank you. |
| 09:01 | 18 | I spoke with Sarah, and she had a conversation |
| 09:01 | 19 | with a reporter who works for *Toys and Playthings* magazine, |
| 09:01 | 20 | which is a large toy trade magazine from the UK. |
| 09:02 | 21 | MR. McCONVILLE:  Objection.  Double hearsay. |
| 09:02 | 22 | THE COURT:  I think now, Counsel, we're too far |
| 09:02 | 23 | removed. |
| 09:02 | 24 | MR. QUINN:  All right. |
| 09:02 | 25 | THE COURT:  I'm going to sustain the objection. |

| | | |
|---|---|---|
| 09:02 | 1 | BY MR. QUINN: |
| 09:02 | 2 | Q.   So in your understanding, based on your conversation |
| 09:02 | 3 | with her, had she personally gotten into an MGA toy fair |
| 09:02 | 4 | booth? |
| 09:02 | 5 | A.   No, she did not. |
| 09:02 | 6 | Q.   And in your understanding, did she get this information |
| 09:02 | 7 | from a journalist? |
| 09:02 | 8 | A.   Yes. |
| 09:02 | 9 | Q.   That's what she told you? |
| 09:02 | 10 | A.   Yes. |
| 09:02 | 11 | Q.   And is that -- is this an unusual event that -- and |
| 09:02 | 12 | based on your experience in attending toy fairs, is it |
| 09:02 | 13 | unusual that journalists will go into even closed toy fair |
| 09:02 | 14 | booths and talk about what they see? |
| 09:02 | 15 | A.   Well, toy fairs are exactly that.  It's an opportunity |
| 09:02 | 16 | for a vendor to promote their products and sell the |
| 09:02 | 17 | products, not only to their retail customers, but to trade |
| 09:02 | 18 | magazines like *Toys and Playthings* magazine, because you're |
| 09:02 | 19 | trying to hype and promote your product early on in the |
| 09:02 | 20 | year.  So it would not be unusual.  And it, frankly, |
| 09:02 | 21 | wouldn't be unusual for Sarah to talk to a number of |
| 09:03 | 22 | different people who are in publications. |
| 09:03 | 23 | Q.   If we could look at the first line of this e-mail -- |
| 09:03 | 24 | first off, anywhere in this e-mail, do you see a description |
| 09:03 | 25 | of this new doll, the doll that's being talked about here, |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 25 of 152   Page ID #:313978
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

25

| | | |
|---|---|---|
| 09:03 | 1 | Moxie Girls? |
| 09:03 | 2 | A.   Uh, no.  That's just a name. |
| 09:03 | 3 | Q.   And there's no information at all about the name, |
| 09:03 | 4 | correct? -- other than the name about this new concept? |
| 09:03 | 5 | A.   Correct. |
| 09:03 | 6 | Q.   And she says there at the bottom, as you've indicated, |
| 09:03 | 7 | "not much detail"? |
| 09:03 | 8 | A.   That's correct. |
| 09:03 | 9 | Q.   And by the way, do you know whether or not, as of the |
| 09:03 | 10 | time of this e-mail, February 10, 2009, MGA had already |
| 09:03 | 11 | filed a public trademark application for that name? |
| 09:03 | 12 | MR. McCONVILLE:  Objection.  Foundation. |
| 09:03 | 13 | THE COURT:  Overruled.  If you know the answer, |
| 09:03 | 14 | you can state it, sir. |
| 09:03 | 15 | THE WITNESS:  Thank you. |
| 09:03 | 16 | Uh, yes, in preparation for this testimony, I |
| 09:03 | 17 | became aware of the fact that there was a trademark |
| 09:04 | 18 | application on December 31, 2008. |
| 09:04 | 19 | BY MR. QUINN: |
| 09:04 | 20 | Q.   About two months before this e-mail where you're told |
| 09:04 | 21 | about the name Moxie Girls? |
| 09:04 | 22 | A.   Yes. |
| 09:04 | 23 | Q.   If you would take a look, please, at Exhibit 24783 |
| 09:04 | 24 | which should be put in front of you now. |
| 09:04 | 25 | *(Document provided to the witness.)* |

| | | |
|---|---|---|
| 09:04 | 1 | BY MR. QUINN: |
| 09:04 | 2 | Q.   Is this a copy of the trademark application that you're |
| 09:04 | 3 | referring to, dated December 31, 2008, two months before the |
| 09:04 | 4 | date of that e-mail, filed by MGA for the trademark Moxie |
| 09:04 | 5 | Girls? |
| 09:04 | 6 | A.   Yes, it is. |
| 09:04 | 7 |          MR. QUINN:  We'd offer this in evidence, |
| 09:04 | 8 | Your Honor. |
| 09:04 | 9 |          MR. McCONVILLE:  Objection.  Foundation, |
| 09:04 | 10 | Your Honor. |
| 09:04 | 11 |          THE COURT:  Could I see that one moment, sir. |
| 09:04 | 12 |          THE WITNESS:  Yes. |
| 09:04 | 13 |          THE COURT:  Does it have a stamp on it, Counsel? |
| 09:04 | 14 |          MR. QUINN:  This one does not, Your Honor. |
| 09:04 | 15 |          THE COURT:  Does not? |
| 09:04 | 16 |          MR. QUINN:  Does not have a stamp on it. |
| 09:04 | 17 |          THE COURT:  Well, certification of any type? |
| 09:04 | 18 | We'll take that up out of the presence of the jury.  I'll |
| 09:04 | 19 | take it under consideration, Counsel. |
| 09:04 | 20 |          THE WITNESS:  Thank you. |
| 09:04 | 21 | BY MR. QUINN: |
| 09:04 | 22 | Q.   In any event, you're aware that the only information |
| 09:04 | 23 | about this new concept, Moxie Girls, the name, was already |
| 09:05 | 24 | the subject of a public trademark application that had been |
| 09:05 | 25 | filed two months before? |

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

27

| 09:05 | 1 | A.   I'm sorry.  Can you repeat the question again? |
| 09:05 | 2 | Q.   You are aware that the only information concerning this |
| 09:05 | 3 | new concept which is in the e-mail, the name Moxie Girls, |
| 09:05 | 4 | was already the subject of a trademark application two |
| 09:05 | 5 | months before? |
| 09:05 | 6 | A.   Yes. |
| 09:05 | 7 | Q.   Which was public, right? |
| 09:05 | 8 | A.   Yes. |
| 09:05 | 9 | Q.   And then, if we could go back to the e-mail, |
| 09:05 | 10 | Exhibit 9869. |
| 09:05 | 11 | (Document displayed.) |
| 09:05 | 12 | BY MR. QUINN: |
| 09:05 | 13 | Q.   If we look at the first line, Ms. Allen says to you, |
| 09:05 | 14 | "just picked up some bits and pieces from the MGA stand at |
| 09:05 | 15 | Nuremberg.  Very limited range for Bratz spring/summer, |
| 09:05 | 16 | about five collections including a cowgirl theme." |
| 09:05 | 17 | Do you see that? |
| 09:05 | 18 | A.   Yes, I do. |
| 09:05 | 19 | Q.   Was it revolutionary that a fashion doll would be done |
| 09:05 | 20 | with a cowgirl theme? |
| 09:05 | 21 | A.   No. |
| 09:05 | 22 | Q.   Do you know whether or not a year before Bratz had done |
| 09:06 | 23 | a fashion doll with a cowgirl theme? |
| 09:06 | 24 | A.   I don't know, but a cowgirl theme is a pretty common |
| 09:06 | 25 | theme. |

CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

28

| | | |
|---|---|---|
| 09:06 | 1 | Q.   Have you seen any -- any information on any MGA |
| 09:06 | 2 | websites indicating that MGA itself had previously done a |
| 09:06 | 3 | Bratz cowgirl theme doll? |
| 09:06 | 4 | A.   Uh, yes.  I'm aware there was a fan site called, I |
| 09:06 | 5 | think, "Bratz fans, glam," something like that, that was |
| 09:06 | 6 | blogging about some different Bratz concepts. |
| 09:06 | 7 | Q.   And if we could take a look at Exhibit 24791-2. |
| 09:06 | 8 | *(Document provided to the witness.)* |
| 09:06 | 9 | BY MR. QUINN: |
| 09:06 | 10 | Q.   Do you see there a cowgirl-themed Sasha from a website |
| 09:06 | 11 | blog December 7, 2008, several months before? |
| 09:06 | 12 | A.   Yes. |
| 09:06 | 13 | MR. McCONVILLE:  Objection.  Foundation and |
| 09:07 | 14 | hearsay. |
| 09:07 | 15 | THE COURT:  It's the foundation.  I don't know if |
| 09:07 | 16 | Mr. Stockton -- |
| 09:07 | 17 | Did you actually obtain this, sir, or was it just |
| 09:07 | 18 | shown to you? |
| 09:07 | 19 | THE WITNESS:  I found it during my testimony -- |
| 09:07 | 20 | preparation for testimony. |
| 09:07 | 21 | THE COURT:  But it was in a notebook that was |
| 09:07 | 22 | presented to you? |
| 09:07 | 23 | THE WITNESS:  Yes. |
| 09:07 | 24 | THE COURT:  Sustained. |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 29 of 152   Page ID #:313982
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

29

| 09:07 | 1 | BY MR. QUINN: |
|---|---|---|

09:07  1  BY MR. QUINN:

09:07  2  Q.   But you're aware from your appearance in the toy

09:07  3  business that cowgirl themes have been done with fashion

09:07  4  dolls previously?

09:07  5  A.   Yes.  Yes.  It's not uncommon.

09:07  6  Q.   Including with Bratz?

09:07  7  A.   Yes.

09:07  8        MR. QUINN:  Nothing further.

09:07  9        THE COURT:  Redirect by Mr. McConville on behalf

09:07  10  of MGA and Mr. Larian.

09:07  11               **REDIRECT EXAMINATION**

09:07  12  BY MR. McCONVILLE:

09:07  13  Q.   So Mr. Stockton, I believe you testified -- I want to

09:07  14  make sure I understand this -- that the -- that the

09:07  15  description in the e-mail, where it says the word "Moxie,"

09:08  16  that that wasn't something that was -- or that was something

09:08  17  that was not providing enough information about the product,

09:08  18  right?

09:08  19  A.   Uh, there's no value to the word, no.

09:08  20  Q.   Okay.  So it's fair to say that there's no value to a

09:08  21  doll name, right?

09:08  22  A.   I didn't say that.  What I said is that this

09:08  23  information doesn't tell you anything about the concept.

09:08  24  Q.   Well, I thought you just said that the name had no

09:08  25  value, right?

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

30

| 09:08 | 1 | A.   The name in this e-mail has no value. |
| 09:08 | 2 | Q.   I see. |
| 09:08 | 3 | A.   It didn't say what it is. |
| 09:08 | 4 | Q.   Okay.  I see.  So if the name is in this e-mail, it has |
| 09:08 | 5 | no value, right? |
| 09:08 | 6 | A.   It doesn't explain what Moxie is. |
| 09:08 | 7 | Q.   So in the absence of an explanation, a name by itself |
| 09:08 | 8 | has no value, right? |
| 09:08 | 9 | A.   In this context, in this e-mail, the name doesn't |
| 09:08 | 10 | provide any actionable data. |
| 09:08 | 11 | Q.   Right.  So I understand you're limiting your testimony |
| 09:08 | 12 | to this e-mail to this name Moxie.  I understand that. |
| 09:09 | 13 | My question to you is the existence of a name of a doll |
| 09:09 | 14 | is not valuable, correct? |
| 09:09 | 15 | MR. QUINN:  Objection.  Overbroad. |
| 09:09 | 16 | THE COURT:  Overruled. |
| 09:09 | 17 | THE WITNESS:  Am I supposed to answer? |
| 09:09 | 18 | THE COURT:  You can answer, sir. |
| 09:09 | 19 | THE WITNESS:  The name in this e-mail doesn't |
| 09:09 | 20 | create value because you don't know what this concept is. |
| 09:09 | 21 | BY MR. McCONVILLE: |
| 09:09 | 22 | Q.   I understand that.  I'm asking you based on your |
| 09:09 | 23 | experience and based on your testimony that you provided to |
| 09:09 | 24 | Mattel's counsel, I'm asking you to use that same |
| 09:09 | 25 | experience, and I'm gonna ask you the name of a doll that's |

| | | |
|---|---|---|
| 09:09 | 1 | referenced in a document is of no value, true? |
| 09:09 | 2 | MR. QUINN:  It's argumentative.  Mattel's counsel. |
| 09:09 | 3 | THE COURT:  Overruled.  You can answer, sir. |
| 09:09 | 4 | THE WITNESS:  Okay.  Names like Barbie have |
| 09:09 | 5 | tremendous value because we've invested in it for many, many |
| 09:09 | 6 | years. |
| 09:09 | 7 | BY MR. McCONVILLE: |
| 09:09 | 8 | Q.  Okay. |
| 09:09 | 9 | A.  In that particular case, that name has value.  In this |
| 09:09 | 10 | case, there's nothing here, so I don't know what the value |
| 09:09 | 11 | is. |
| 09:09 | 12 | Q.  So the name of a doll that's unreleased, like Moxie, |
| 09:10 | 13 | has no value, true? |
| 09:10 | 14 | A.  In this particular e-mail, it doesn't. |
| 09:10 | 15 | Q.  Understood.  And in this particular e-mail, it's the |
| 09:10 | 16 | name of a doll that has not been released and, therefore, it |
| 09:10 | 17 | has no value, true? |
| 09:10 | 18 | A.  It's the name of a doll that MGA was showing retailers |
| 09:10 | 19 | and PR people in their showroom in Nuremberg the prior week. |
| 09:10 | 20 | Q.  So it's your understanding that the only -- that if a |
| 09:10 | 21 | name of a doll product that is not on the market only has no |
| 09:10 | 22 | value if the name is Moxie; is that true? |
| 09:10 | 23 | MR. QUINN:  Vague and ambiguous. |
| 09:10 | 24 | THE COURT:  Do you understand the question, sir? |
| 09:10 | 25 | THE WITNESS:  No, I don't. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 32 of 152   Page ID #:313985
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

32

| | | |
|---|---|---|
| 09:10 | 1 | THE COURT:  I'll have him reask it. |
| 09:10 | 2 | THE WITNESS:  Thank you. |
| 09:10 | 3 | THE COURT:  Reask the question. |
| 09:10 | 4 | BY MR. McCONVILLE: |
| 09:10 | 5 | Q.   It's your testimony, then, that the reason that the |
| 09:10 | 6 | Moxie name is of no value is because it's in this e-mail, |
| 09:10 | 7 | true? |
| 09:10 | 8 | A.   You're asking -- well, in this e-mail, the name has no |
| 09:11 | 9 | value because it doesn't say what the concept is. |
| 09:11 | 10 | Q.   So the name would have no value if it doesn't describe |
| 09:11 | 11 | the concept, true? |
| 09:11 | 12 | A.   In this e-mail, I can't tell what the concept is. |
| 09:11 | 13 | Q.   I understand.  So let's step away from the e-mail. |
| 09:11 | 14 | And I'll ask you, based on your years of experience, |
| 09:11 | 15 | does the name of a doll without description have value? |
| 09:11 | 16 | A.   The answer is yes.  It depends if it's an established |
| 09:11 | 17 | name, like Barbie, that has tremendous value.  If it's a new |
| 09:11 | 18 | doll, where no one knows what the name is or what the |
| 09:11 | 19 | concept is, it would have limited or no value until you |
| 09:11 | 20 | surround it with the concept. |
| 09:11 | 21 | Q.   Okay.  So the -- you testified that you had -- you |
| 09:11 | 22 | followed up with Sarah Allen concerning this e-mail, true? |
| 09:12 | 23 | A.   That's correct. |
| 09:12 | 24 | Q.   Isn't it true, sir, that you actually never |
| 09:12 | 25 | investigated the content of this e-mail? |

| | | |
|---|---|---|
| 09:12 | 1 | A.    There was nothing in this e-mail that would cause me to |
| 09:12 | 2 | take action. |
| 09:12 | 3 | Q.    You took no steps to investigate Sarah Allen's actions |
| 09:12 | 4 | as described in this e-mail, true? |
| 09:12 | 5 | A.    There's nothing in this e-mail that would have caused |
| 09:12 | 6 | me to take any action. |
| 09:12 | 7 | Q.    Yes or no?  You took no steps to investigate Sarah |
| 09:12 | 8 | Allen's actions as described in this e-mail.  Yes or no? |
| 09:12 | 9 | A.    I did not follow up, because there's nothing in this |
| 09:12 | 10 | e-mail that would trigger any action on my part. |
| 09:12 | 11 | Q.    So you did not follow up, because you took no action, |
| 09:12 | 12 | but you had a conversation with Sarah Allen.  Is that your |
| 09:12 | 13 | testimony? |
| 09:12 | 14 | A.    I took no action off of this e-mail, because there's |
| 09:12 | 15 | nothing in this that would prompt me to take an action.  And |
| 09:12 | 16 | I did call Sarah Allen in preparation for this testimony. |
| 09:13 | 17 | Q.    Oh, I see.  So you followed up with Sarah Allen just a |
| 09:13 | 18 | few days ago prior to testifying, true? |
| 09:13 | 19 | A.    That's true. |
| 09:13 | 20 | Q.    And, um, you provided some testimony regarding |
| 09:13 | 21 | information that you gathered from a website.  Do you |
| 09:13 | 22 | remember that testimony? |
| 09:13 | 23 |          THE COURT:  Ladies and gentlemen -- |
| 09:13 | 24 |          Just a moment, Counsel.  I thought that this or |
| 09:13 | 25 | believed when these questions were being asked that this was |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 34 of 152   Page ID #:313987
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

34

| | | |
|---|---|---|
| 09:13 | 1 | a contemporaneous conversation with Sarah Allen in relation |
| 09:13 | 2 | to the e-mail.  I only recently have heard, Mr. Quinn and |
| 09:13 | 3 | Mr. McConville, that this was a phone call that you recently |
| 09:13 | 4 | placed with Sarah Allen. |
| 09:13 | 5 | THE WITNESS:  Yes. |
| 09:13 | 6 | THE COURT:  Ladies and gentlemen, I'm going to |
| 09:13 | 7 | strike the prior testimony. |
| 09:13 | 8 | MR. QUINN:  Your Honor, she'll be called.  She |
| 09:13 | 9 | will testify. |
| 09:13 | 10 | THE COURT:  Then I'll keep the gentleman on call. |
| 09:13 | 11 | She'll be here? |
| 09:13 | 12 | MR. QUINN:  Yes, she will be here. |
| 09:13 | 13 | THE COURT:  Then I'll take it subject to a motion |
| 09:13 | 14 | to strike as a courtesy. |
| 09:13 | 15 | MR. QUINN:  Thank you, Your Honor. |
| 09:13 | 16 | THE COURT:  So I'll come back to that ruling.  I |
| 09:14 | 17 | want to make sure Sarah Allen testifies.  If she does, then |
| 09:14 | 18 | this testimony would be hearsay, but not for the truth, |
| 09:14 | 19 | because she'll actually be here. |
| 09:14 | 20 | All right.  Counsel. |
| 09:14 | 21 | BY MR. McCONVILLE: |
| 09:14 | 22 | Q.   Going back to the website, I believe you said you were |
| 09:14 | 23 | describing your ability to gather information from a website |
| 09:14 | 24 | concerning cowgirl themes.  Do you remember that? |
| 09:14 | 25 | A.   There's websites that have all sorts of information on |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 35 of 152   Page ID #:313988
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

35

| | | |
|---|---|---|
| 09:14 | 1 | all sorts of toys. |
| 09:14 | 2 | Q.   So it's fair to say that if information is on a website |
| 09:14 | 3 | concerning a toy, it's publicly available information? |
| 09:14 | 4 | A.   Yes. |
| 09:14 | 5 | Q.   So, for example, if there's a website on Yahoo that |
| 09:14 | 6 | describes the name of a designer, that would be public |
| 09:14 | 7 | information, true? |
| 09:14 | 8 | A.   Yes. |
| 09:14 | 9 | Q.   You also testified about the -- that you found |
| 09:15 | 10 | trademark applications concerning Moxie, right? |
| 09:15 | 11 | A.   Uh, yes.  I discovered in preparation for this |
| 09:15 | 12 | testimony. |
| 09:15 | 13 | Q.   So again, that was something you learned in the past |
| 09:15 | 14 | few days, true? |
| 09:15 | 15 | A.   Yes. |
| 09:15 | 16 | Q.   And you're aware, aren't you, that trademark |
| 09:15 | 17 | applications aren't publicly available for months and months |
| 09:15 | 18 | and months after they're filed? |
| 09:15 | 19 | MR. QUINN:  Misstates the law, Your Honor. |
| 09:15 | 20 | THE COURT:  Overruled. |
| 09:15 | 21 | BY MR. McCONVILLE: |
| 09:15 | 22 | Q.   You need to answer the question. |
| 09:15 | 23 | A.   I'm not aware of the timing when they become public. |
| 09:15 | 24 | But this was dated on that date. |
| 09:15 | 25 | MR. McCONVILLE:  No further questions. |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 36 of 152   Page ID #:313989
CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

36

| | | |
|---|---|---|
| 09:15 | 1 | THE COURT:  Recross by Mr. Quinn on behalf of |
| 09:15 | 2 | Mattel. |
| 09:15 | 3 | MR. QUINN:  No questions, Your Honor. |
| 09:15 | 4 | THE COURT:  Mr. Stockton, we're leaving all of the |
| 09:15 | 5 | witnesses on call until the date of April 8th just to be |
| 09:15 | 6 | certain.  I was originally saying May 7th, but April 8th. |
| 09:15 | 7 | THE WITNESS:  Okay. |
| 09:15 | 8 | THE COURT:  Go about your professional |
| 09:15 | 9 | responsibilities and duties.  I doubt you'll be called back |
| 09:15 | 10 | to Court.  If we need you, we'll find you. |
| 09:15 | 11 | THE WITNESS:  Thank you. |
| 09:16 | 12 | *(Witness steps down subject to recall.)* |
| 09:16 | 13 | THE COURT:  Counsel, your next witness. |
| 09:16 | 14 | MR. McCONVILLE:  Your Honor, at this point we'd |
| 09:16 | 15 | call Terry Hauenstein.  There's a motion pending on that. |
| 09:16 | 16 | THE COURT:  Counsel, that was just given to me |
| 09:16 | 17 | yesterday, wasn't it? |
| 09:16 | 18 | MR. McCONVILLE:  Yes. |
| 09:16 | 19 | THE COURT:  Denied.  Your next witness. |
| 09:16 | 20 | MR. McCONVILLE:  Terry Hauenstein. |
| 09:16 | 21 | THE COURT:  Well, no.  I must have misstated that. |
| 09:16 | 22 | My apologies.  I reverse that motion.  Terry Hauenstein |
| 09:16 | 23 | won't be called until I have more chance to talk to both |
| 09:16 | 24 | counsel.  That was just presented to me last evening, and |
| 09:16 | 25 | I'm not going to proceed with Terry Hauenstein right now. |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 37 of 152   Page ID #:313990
CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

37

| | | |
|---|---|---|
| 09:16 | 1 | So call your next witness. |
| 09:16 | 2 | MS. HURST:  Jill Thomas. |
| 09:16 | 3 | THE COURT:  All right.  Jill Thomas, please. |
| 09:17 | 4 | All right.  Thank you.  If you would now please |
| 09:17 | 5 | raise your right hand. |
| 09:17 | 6 | **JILL THOMAS, MGA'S WITNESS, SWORN** |
| 09:17 | 7 | THE WITNESS:  I do. |
| 09:17 | 8 | THE COURT:  Thank you.  If you would walk along |
| 09:17 | 9 | the side of the jury railing, please. |
| 09:17 | 10 | Now, state your full name for the jury. |
| 09:17 | 11 | THE WITNESS:  It's Jill Elizabeth Thomas. |
| 09:17 | 12 | THE COURT:  Spell your last name, please. |
| 09:17 | 13 | THE WITNESS:  T-H-O-M-A-S. |
| 09:17 | 14 | THE COURT:  Thank you, Counsel.  This is direct |
| 09:17 | 15 | examination by Ms. Hurst on behalf of MGA and Mr. Larian. |
| 09:17 | 16 | **DIRECT EXAMINATION** |
| 09:17 | 17 | BY MS. HURST: |
| 09:17 | 18 | Q.   Good morning, Ms. Thomas. |
| 09:17 | 19 | A.   Good morning. |
| 09:17 | 20 | Q.   When did you join Mattel? |
| 09:17 | 21 | A.   In 1996. |
| 09:17 | 22 | Q.   And what was your title at that time? |
| 09:17 | 23 | A.   It was senior counsel. |
| 09:18 | 24 | Q.   And what is your title? |
| 09:18 | 25 | A.   Excuse me.  I'm sorry. |

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

38

| | | |
|---|---|---|
| 09:18 | 1 | Q.   That's all right.  We've all been hacking around in |
| 09:18 | 2 | here for a few weeks. |
| 09:18 | 3 | What is your title today? |
| 09:18 | 4 | A.   My title today is assistant general counsel. |
| 09:18 | 5 | Q.   And you've received two promotions to get to that |
| 09:18 | 6 | point; is that correct? |
| 09:18 | 7 | A.   Yes.  There was a promotion after senior counsel, and |
| 09:18 | 8 | then I became assistant general counsel. |
| 09:18 | 9 | Q.   And how long have you been the assistant general |
| 09:18 | 10 | counsel? |
| 09:18 | 11 | A.   Since around 2000. |
| 09:18 | 12 | Q.   So more than a decade? |
| 09:18 | 13 | A.   Correct. |
| 09:18 | 14 | Q.   And what is your general area of responsibility there |
| 09:18 | 15 | as an attorney at Mattel? |
| 09:18 | 16 | A.   My general area is litigation and employment law |
| 09:19 | 17 | matters. |
| 09:19 | 18 | Q.   And is it true that you report directly to Mr. Normile, |
| 09:19 | 19 | the general counsel? |
| 09:19 | 20 | A.   Yes. |
| 09:19 | 21 | Q.   Is it also true that you have had the principal |
| 09:19 | 22 | responsibility for handling this litigation for some period |
| 09:19 | 23 | of time? |
| 09:19 | 24 | A.   I've had the primary responsibility in-house since |
| 09:19 | 25 | about mid-2005. |

DEBBIE GALE, U.S. COURT REPORTER

| 09:19 | 1 | Q.   And that was shortly after MGA filed its claims against |
| 09:19 | 2 | Mattel in this case, true? |
| 09:19 | 3 | A.   True. |
| 09:19 | 4 | Q.   And you've worked with Mr. -- |
| 09:19 | 5 | A.   Sorry for my coughing. |
| 09:20 | 6 | Q.   Go ahead and take a drink, and then we'll continue. |
| 09:20 | 7 | You've worked closely with Mr. Moore from time to time |
| 09:20 | 8 | in connection with this matter; is that true? |
| 09:20 | 9 | A.   Yes, that's true. |
| 09:20 | 10 | Q.   Is it also true that you were responsible for |
| 09:20 | 11 | supervising a legal investigation in connection with |
| 09:20 | 12 | Mr. Villasenor's activity? |
| 09:20 | 13 | A.   Yes, it is. |
| 09:20 | 14 | Q.   And you assumed that responsibility for supervising |
| 09:20 | 15 | that investigation beginning in January 2006, right? |
| 09:20 | 16 | A.   I'd say I assumed responsibility the day that I learned |
| 09:20 | 17 | of his complaint, his -- he sent in a letter. |
| 09:20 | 18 | Q.   And that was the letter he sent in December of 2005; is |
| 09:20 | 19 | that correct? |
| 09:20 | 20 | A.   It was December 22nd, 2005, correct. |
| 09:20 | 21 | Q.   You remember that pretty clearly? |
| 09:20 | 22 | A.   Yes.  Because it was the day we were closing for our |
| 09:20 | 23 | holiday break at Mattel. |
| 09:21 | 24 | Q.   At that point you were unaware that Mr. Moore had had |
| 09:21 | 25 | some ten conversations with Mr. Villasenor in connection |

CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

40

| 09:21 | 1 | with the MGA lawsuit; is that true? |
| 09:21 | 2 | A.   I was aware he'd had some -- some discussions to try to |
| 09:21 | 3 | set up a meeting with him.  But I was not aware that he had |
| 09:21 | 4 | had ten meetings.  I'm not aware of that fact. |
| 09:21 | 5 | Q.   And you're not aware that he had had ten meetings or |
| 09:21 | 6 | conversations -- that Mr. Moore had had ten meetings or |
| 09:21 | 7 | conversations with Mr. Villasenor between June and December |
| 09:21 | 8 | of 2005, right? |
| 09:21 | 9 | A.   No, I'm not aware of that. |
| 09:21 | 10 | Q.   And you're not even aware of it to this day, true? |
| 09:21 | 11 | A.   True. |
| 09:21 | 12 | Q.   And you weren't aware that Mr. Moore had exchanged |
| 09:21 | 13 | e-mail with Mr. Villasenor the day before his complaint, |
| 09:21 | 14 | directing him to Mattel's outside counsel, true? |
| 09:22 | 15 | A.   I'm sorry.  Can you repeat that again? |
| 09:22 | 16 | Q.   You're also not aware that Mr. Moore had exchanged |
| 09:22 | 17 | e-mail with Mr. Villasenor the day before he made his |
| 09:22 | 18 | complaint; is that true? |
| 09:22 | 19 | A.   Well, you had said something about directing him to |
| 09:22 | 20 | outside counsel.  I know he'd had communications.  I don't |
| 09:22 | 21 | know if they were e-mail, in person, about setting up a |
| 09:22 | 22 | meeting with Mr. Villasenor, and that Mr. Villasenor had |
| 09:22 | 23 | avoided that meeting and finally told Michael that he, |
| 09:22 | 24 | Mr. Villasenor, was going to consult counsel. |
| 09:22 | 25 | Q.   And at that point Mr. Moore referred him to your |

Case 2:04-cv-09049-DOC-RNB  Document 10346  Filed 03/31/11  Page 41 of 152  Page ID #:313994
CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

41

| | | |
|---|---|---|
| 09:22 | 1 | outside counsel, right? |
| 09:22 | 2 | A.   I don't recall that. |
| 09:22 | 3 | Q.   Okay.  After you became aware of the December 2005 |
| 09:22 | 4 | e-mail, you hired an outside law firm to investigate |
| 09:22 | 5 | Mr. Villasenor's allegations, right? |
| 09:22 | 6 | A.   Yes, I did.  After hiring our usual litigation |
| 09:23 | 7 | employment counsel, we hired separate counsel to do an |
| 09:23 | 8 | investigation. |
| 09:23 | 9 | Q.   So you hired two separate law firms, right? |
| 09:23 | 10 | A.   Correct. |
| 09:23 | 11 | Q.   One for litigation and one for conducting an |
| 09:23 | 12 | investigation, right? |
| 09:23 | 13 | A.   We hired an attorney to do a separate investigation, |
| 09:23 | 14 | correct. |
| 09:23 | 15 | Q.   And the attorney who conducted the investigation, that |
| 09:23 | 16 | was Eve Wagner; is that right? |
| 09:23 | 17 | A.   Yes, it was. |
| 09:23 | 18 | Q.   And then your outside law firm that was supposed to |
| 09:23 | 19 | handle any litigation by Mr. Villasenor, that was a firm |
| 09:23 | 20 | called Paul Hastings, right? |
| 09:23 | 21 | A.   Yes, it was. |
| 09:23 | 22 | Q.   And you set it up so that they had separate |
| 09:23 | 23 | responsibilities, right? |
| 09:23 | 24 | A.   Yes.  Eve's responsibility was to investigate the |
| 09:23 | 25 | allegations.  That doesn't mean that Elena Baca was not |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 42 of 152   Page ID #:313995
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

42

| | | |
|---|---|---|
| 09:23 | 1 | aware of the investigation and didn't review things. |
| 09:24 | 2 | Q.   Yes or no?  You set up so they had separate |
| 09:24 | 3 | responsibilities? |
| 09:24 | 4 | A.   Yes, they had separate responsibilities. |
| 09:24 | 5 | Q.   In connection with the investigation, Mr. Villasenor |
| 09:24 | 6 | was interviewed, correct? |
| 09:24 | 7 | A.   Yes, that's correct. |
| 09:24 | 8 | Q.   And Stephanie Page was interviewed, true? |
| 09:24 | 9 | A.   I believe that's correct. |
| 09:24 | 10 | Q.   And Matt Turetzky was interviewed, correct? |
| 09:24 | 11 | A.   Yes. |
| 09:24 | 12 | Q.   And John Louie was interviewed, right? |
| 09:24 | 13 | A.   John Louie was interviewed. |
| 09:24 | 14 | Q.   But you can't identify anybody else who was |
| 09:24 | 15 | interviewed, right? |
| 09:24 | 16 | A.   I couldn't on Sunday.  I think that Michael Shore was |
| 09:24 | 17 | interviewed, and I know there were several other people who |
| 09:24 | 18 | were.  I just can't remember who they were. |
| 09:25 | 19 | Q.   You've had your recollection refreshed since Sunday to |
| 09:25 | 20 | add the name Michael Shore to the list? |
| 09:25 | 21 | A.   I haven't had it refreshed.  I just thought about it a |
| 09:25 | 22 | lot, and I think Michael Shore was interviewed. |
| 09:25 | 23 | Q.   During the process of that investigation, you became |
| 09:25 | 24 | aware that Sharon Rahimi was someone who had been using fake |
| 09:25 | 25 | business cards in connection with work for Mattel, true? |

| 09:25 | 1 | A.   I learned that in the past that Sharon Rahimi had used |
| 09:25 | 2 | fake business cards to get into showrooms at toy fairs. |
| 09:25 | 3 | Q.   And at that point Sharon Rahimi had been a Mattel |
| 09:25 | 4 | employee in the past, right? |
| 09:25 | 5 | A.   Yes, she had.  She was no longer at Mattel. |
| 09:25 | 6 | Q.   And, uh, she was then -- then in 2006, a contractor for |
| 09:25 | 7 | Mattel, right? |
| 09:25 | 8 | A.   I believe that's the case. |
| 09:25 | 9 | Q.   Now, Mattel expects its contractors to adhere to its |
| 09:26 | 10 | code of conduct, right? |
| 09:26 | 11 | A.   Yes, they do. |
| 09:26 | 12 | Q.   All right.  So when you heard -- |
| 09:26 | 13 | A.   Let me correct that.  There is a -- there is something |
| 09:26 | 14 | that is very similar to our code of conduct for independent |
| 09:26 | 15 | contractors.  It's not worded exactly the same way since |
| 09:26 | 16 | they're not employees, but it's similar. |
| 09:26 | 17 | Q.   Well, does that similar code prohibit your contractors |
| 09:26 | 18 | from using fake ID's to get into competitors' showrooms? |
| 09:26 | 19 | MR. QUINN:  Time frame, Your Honor.  In effect, |
| 09:26 | 20 | when Rahimi was -- |
| 09:26 | 21 | THE COURT:  Just the time frame, Counsel. |
| 09:26 | 22 | MR. QUINN:  Yes, Your Honor. |
| 09:26 | 23 | BY MS. HURST: |
| 09:26 | 24 | Q.   Has that separate code ever prohibited, in your view, |
| 09:26 | 25 | your contractors from using fake ID's to get into |

| | | |
|---|---|---|
| 09:26 | 1 | competitors' showrooms? |
| 09:26 | 2 | A.   The code of conduct prohibits the use of any misleading |
| 09:26 | 3 | means to gain competitive information, so the answer is yes. |
| 09:26 | 4 | Q.   And did it prohibit that during the first half of the |
| 09:26 | 5 | decade between 2000 and 2006? |
| 09:27 | 6 | A.   The code of conduct was implemented in January of 2003, |
| 09:27 | 7 | so that would apply from January 2003 forward.  But it has |
| 09:27 | 8 | never been a practice that I think Mattel would condone. |
| 09:27 | 9 | Q.   All right.  So as far as you were concerned, when you |
| 09:27 | 10 | learned that Ms. Rahimi had been using fake business cards |
| 09:27 | 11 | to get into competitors' showrooms, that was absolutely a |
| 09:27 | 12 | violation of Mattel's policy, right? |
| 09:27 | 13 | A.   I don't recall if her -- I believe her past conduct had |
| 09:27 | 14 | occurred before the implementation of the code of conduct, |
| 09:27 | 15 | so I don't believe it was a violation of that since it |
| 09:27 | 16 | didn't exist.  But I don't think it is conduct that Mattel |
| 09:27 | 17 | would have condoned. |
| 09:27 | 18 | Q.   You couldn't find any other policy that might have |
| 09:27 | 19 | violated at that point? |
| 09:27 | 20 | A.   I don't recall there being anything specific that |
| 09:27 | 21 | addressed that situation, but it certainly isn't something |
| 09:27 | 22 | that Mattel would have condoned even pre-2003. |
| 09:28 | 23 | Q.   So having found out that this contractor was engaging |
| 09:28 | 24 | in activity that Mattel absolutely does not condone, the |
| 09:28 | 25 | first thing that you did was instruct people to stop using |

| | | |
|---|---|---|
| 09:28 | 1 | that contractor, right? |
| 09:28 | 2 | A.   No, that's not correct. |
| 09:28 | 3 | Q.   Well, did you instruct them to discipline that |
| 09:28 | 4 | contractor in some way? |
| 09:28 | 5 | A.   I don't have a specific memory of what was done with |
| 09:28 | 6 | regard to Sharon Rahimi.  I do have a specific recollection |
| 09:28 | 7 | as to one of the other people who had left and become a |
| 09:28 | 8 | contractor, so I'm assuming that I did the same thing. |
| 09:28 | 9 | Q.   Okay.  Let's just focus on Ms. Rahimi for a moment. |
| 09:28 | 10 | A.   Okay. |
| 09:28 | 11 | Q.   It's true that you did not instruct anyone to terminate |
| 09:28 | 12 | Mattel's association with Ms. Rahimi after learning that she |
| 09:29 | 13 | had used fake business cards, right? |
| 09:29 | 14 | A.   No, I did not. |
| 09:29 | 15 | Q.   And in fact, you're not aware of Rahimi having been |
| 09:29 | 16 | reprimanded or disciplined in any way, right? |
| 09:29 | 17 | A.   As an employee, she was gone by the time we learned of |
| 09:29 | 18 | the past conduct. |
| 09:29 | 19 | Q.   You're not aware, yes or no, of Rahimi being |
| 09:29 | 20 | reprimanded or disciplined in any way, correct? |
| 09:29 | 21 | A.   Correct. |
| 09:29 | 22 | Q.   And you actually didn't know whether Rahimi was an |
| 09:29 | 23 | independent contractor in 2006, did you? |
| 09:29 | 24 | A.   I don't have a clear memory of whether she was or she |
| 09:29 | 25 | wasn't.  I only have a memory of one person, and I'm |

| 09:29 | 1  | assuming that we treated any other people that we knew were |
| 09:29 | 2  | contractors the same way.  It's just five years.  I don't |
| 09:29 | 3  | remember that specifically. |
| 09:29 | 4  | Q.   So, yes or no, you didn't even know in 2006 whether she |
| 09:29 | 5  | was a contractor or employee, correct? |
| 09:30 | 6  | A.   I don't recall what I knew in 2006. |
| 09:30 | 7  | Q.   Okay.  And you did not take steps in 2006 to find out |
| 09:30 | 8  | whether she was an independent contractor, right? |
| 09:30 | 9  | A.   I don't have a memory specifically with regard to her |
| 09:30 | 10 | what steps I took. |
| 09:30 | 11 | Q.   And after 2006 you did not take any steps to find out |
| 09:30 | 12 | whether Rahimi was still a contractor, right? |
| 09:30 | 13 | A.   I don't believe that after 2006 I did so. |
| 09:30 | 14 | Q.   Okay.  And as far as you know, to this day, Sharon |
| 09:30 | 15 | Rahimi is perfectly eligible to work with Mattel; isn't that |
| 09:30 | 16 | right? |
| 09:30 | 17 | A.   Yes, I believe so. |
| 09:30 | 18 | Q.   You also found out in 2006 that Kelly Osier had used |
| 09:31 | 19 | fake business cards to get into competitors' showrooms, |
| 09:31 | 20 | right? |
| 09:31 | 21 | A.   Yes, I did. |
| 09:31 | 22 | Q.   And so -- and you also did not instruct anyone to |
| 09:31 | 23 | terminate Mattel's association with Ms. Osier, right? |
| 09:31 | 24 | A.   No, I did not. |
| 09:31 | 25 | Q.   And you're not aware of Osier being disciplined or |

| | | |
|---|---|---|
| 09:31 | 1 | reprimanded in any way, true? |
| 09:31 | 2 | A.   Well, disciplined and reprimanded is something you do |
| 09:31 | 3 | to an employee.  And my understanding was that she had left |
| 09:31 | 4 | the company once her past conduct was -- was discovered. |
| 09:31 | 5 | Q.   Osier continued to work as an independent contractor |
| 09:31 | 6 | with Mattel; isn't that true? |
| 09:31 | 7 | A.   That is true. |
| 09:31 | 8 | Q.   Okay.  And her status as a contractor was not affected |
| 09:31 | 9 | in any way as a result of you learning she had been using |
| 09:31 | 10 | fake business cards, true? |
| 09:31 | 11 | A.   Her -- her status was not affected, correct. |
| 09:32 | 12 | Q.   And Rahimi and Osier today remain contractors for |
| 09:32 | 13 | Mattel, true? |
| 09:32 | 14 | A.   I assume so, but I'm not sure. |
| 09:32 | 15 | Q.   Was Rahimi interviewed in the investigation? |
| 09:32 | 16 | A.   I can't recall one way or the other.  I would assume |
| 09:32 | 17 | so. |
| 09:32 | 18 | Q.   Was Osier interviewed in the investigation? |
| 09:32 | 19 | A.   Again, I can't recall.  I would assume if she could be |
| 09:33 | 20 | reached, she was. |
| 09:33 | 21 | Q.   You said that Mr. Villasenor had been, in your view, |
| 09:33 | 22 | avoiding providing information in connection with the MGA |
| 09:33 | 23 | litigation; is that right? |
| 09:33 | 24 | A.   No.  I said I understood he had been avoiding |
| 09:33 | 25 | scheduling a meeting with Michael. |

Case 2:04-cv-09049-DOC-RNB  Document 10346  Filed 03/31/11  Page 48 of 152  Page ID #:314001
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

48

| | | |
|---|---|---|
| 09:33 | 1 | Q.   Mr. Moore? |
| 09:33 | 2 | A.   Michael Moore.  Mr. Moore.  I'm sorry. |
| 09:33 | 3 | Q.   But you understood that what Mr. Moore wanted to talk |
| 09:33 | 4 | to him about was the MGA litigation, right? |
| 09:33 | 5 | A.   I believe so. |
| 09:33 | 6 | Q.   Isn't it true that at some point during the |
| 09:34 | 7 | investigation, Mr. Villasenor's attorney specifically |
| 09:34 | 8 | offered to provide documents and reports regarding his |
| 09:34 | 9 | allegations concerning competitive intelligence? |
| 09:34 | 10 | A.   After the investigation was concluded, my understanding |
| 09:34 | 11 | is that he offered to provide the business cards he used |
| 09:34 | 12 | and -- and based on a letter I've seen, some passes to our |
| 09:34 | 13 | litigation counsel. |
| 09:34 | 14 | Q.   Let me ask you to take a look at Exhibit 9481. |
| 09:34 | 15 | (Document provided to the witness.) |
| 09:34 | 16 | THE WITNESS:  Okay. |
| 09:35 | 17 | BY MS. HURST: |
| 09:35 | 18 | Q.   Is this the letter that you were referring to that you |
| 09:35 | 19 | saw from Mr. Villasenor's counsel to your counsel, Elena |
| 09:35 | 20 | Baca, concerning Mr. Villasenor's offer to provide |
| 09:35 | 21 | information? |
| 09:35 | 22 | A.   Yes, it is. |
| 09:35 | 23 | Q.   And if you turn to the second page of that letter -- |
| 09:35 | 24 | A.   Yes. |
| 09:35 | 25 | Q.   -- Mr. Barrera -- just one moment. |

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

49

09:36    1             MS. HURST:  Your Honor, move to admit 9481.

09:36    2             MR. QUINN:  It's hearsay, Your Honor.

09:36    3             THE COURT:  Could I see that document for just one

09:36    4    second.

09:36    5             THE WITNESS:  Sure.

09:36    6               (Document provided to the Court.)

09:36    7             THE COURT:  Thank you.  I'll return this to you.

09:36    8             THE WITNESS:  Thank you.

09:36    9             THE COURT:  Counsel, why wouldn't this be hearsay?

09:36    10             MS. HURST:  Your Honor, this and the response go

09:36    11    to Mattel's state of mind and the adequacy of its

09:36    12    investigation; it's conduct.

09:36    13             THE COURT:  I'm going to let you inquire of the

09:36    14    witness, and you can refer to this for the time being.

09:36    15             MS. HURST:  All right.  Thank you.

09:36    16             THE COURT:  But I'm not sure I'm going to

09:36    17    eventually receive it.

09:36    18             MS. HURST:  Thank you, Your Honor.

09:37    19    BY MS. HURST:

09:37    20    Q.   So can we look at the second page of 9481, please?

09:37    21    A.   Sure.  Okay.

09:37    22               (Document displayed.)

09:37    23    BY MS. HURST:

09:37    24    Q.   And the first paragraph there -- and this is a letter

09:37    25    from Mr. Barrera who was counsel for Mr. Villasenor at the

CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

50

| | | |
|---|---|---|
| 09:37 | 1 | time, right? |
| 09:37 | 2 | A.   Correct.  That's who it's from. |
| 09:37 | 3 | Q.   And it's an April -- |
| 09:37 | 4 | THE COURT:  Just a moment.  Could you take that |
| 09:37 | 5 | down on the screen.  If I'm not going to receive it, I don't |
| 09:37 | 6 | want to display it.  You can question the witness about this |
| 09:37 | 7 | letter, but it shouldn't be displayed at this time. |
| 09:37 | 8 | *(Document removed from screen.)* |
| 09:37 | 9 | BY MS. HURST: |
| 09:37 | 10 | Q.   And Mr. Barrera wrote, "We would be happy to direct a |
| 09:37 | 11 | respond to Ms. Wagner --" |
| 09:37 | 12 | MR. QUINN:  Objection. |
| 09:37 | 13 | BY MS. HURST: |
| 09:37 | 14 | Q.   -- "about the investigation" -- |
| 09:37 | 15 | MR. QUINN:  Publishing -- |
| 09:37 | 16 | BY MS. KELLER: |
| 09:37 | 17 | Q.   -- right? |
| 09:37 | 18 | MR. QUINN:  Publishing hearsay, Your Honor. |
| 09:37 | 19 | THE COURT:  Overruled. |
| 09:37 | 20 | THE WITNESS:  It says, "I would be happy to |
| 09:37 | 21 | provide that report --" I'm sorry.  Where are you reading? |
| 09:37 | 22 | BY MS. HURST: |
| 09:37 | 23 | Q.   I'm just looking at the first sentence.  He says he'd |
| 09:37 | 24 | be happy to direct a response to Ms. Wagner, right? |
| 09:37 | 25 | A.   Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 51 of 152   Page ID #:314004
CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

51

09:37  1  Q.   Ms. Wagner was Mattel's investigation lawyer, right?

09:38  2  A.   I'm sorry.  "We would be happy" -- yes, yes.

09:38  3  Q.   "We'd be happy to direct a response to Ms. Wagner,"

09:38  4  right?

09:38  5  A.   That's what he says, yes.

09:38  6  Q.   And that was -- Ms. Wagner was Mattel's investigation

09:38  7  lawyer, right?

09:38  8  A.   Yes.  Uh-huh.

09:38  9  Q.   And Mr. Barrera says he'd like to dispute the findings

09:38  10  of Ms. Wagner's investigation, right?

09:38  11  A.   Correct.

09:38  12  Q.   He says he's prepared his own report -- Mr. Barrera

09:38  13  says he's prepared his own report, right?

09:38  14  A.   Correct.

09:38  15  Q.   And he says he'd be happy to provide that report to

09:38  16  Mattel, true?

09:38  17  A.   Yes, he does.

09:38  18  Q.   And he also says that "Mr. Villasenor is prepared to

09:38  19  produce to Ms. Wagner or anyone else for Mattel some of the

09:38  20  evidence he has in his position such as business cards,

09:38  21  identification badges, and the like," right?

09:38  22  A.   Correct.  Well, he says, "to support and establish his

09:39  23  allegations of a hostile working environment."

09:39  24  Q.   Right.  But you also wanted to get that information

09:39  25  because you knew it was evidence that you had to turn over

| 09:39 | 1 | in the Mattel -- MGA-Mattel lawsuit, right? |
| 09:39 | 2 | A.   No, that's not correct. |
| 09:39 | 3 | Q.   Okay.  So it's not correct. |
| 09:39 | 4 | And could you take a look at 37002, please. |
| 09:39 | 5 | *(Document provided to the witness.)* |
| 09:39 | 6 | THE WITNESS:  Okay. |
| 09:39 | 7 | BY MS. HURST: |
| 09:39 | 8 | Q.   And 37002, that's a letter from your litigation lawyer |
| 09:39 | 9 | back to Mr. Barrera, right?  Not your investigation lawyer? |
| 09:39 | 10 | A.   Yes, it's our employment litigation lawyer. |
| 09:40 | 11 | Q.   And on -- can you turn to the second page for that? |
| 09:40 | 12 | THE COURT:  Excuse me, this would be Wagner? |
| 09:40 | 13 | THE WITNESS:  I'm sorry.  This is Baca. |
| 09:40 | 14 | THE COURT:  Elena Baca.  Okay. |
| 09:40 | 15 | BY MS. HURST: |
| 09:40 | 16 | Q.   This is Ms. Baca, right? |
| 09:40 | 17 | A.   Correct. |
| 09:40 | 18 | Q.   And she was acting for Mattel when she sent this |
| 09:40 | 19 | letter, 37002, right? |
| 09:40 | 20 | A.   Yes, she was. |
| 09:40 | 21 | Q.   And you saw this letter at the time, right? |
| 09:40 | 22 | A.   I must have.  It's stamped with my office's stamp. |
| 09:40 | 23 | Q.   And you were supervising her work for Mattel, right? |
| 09:40 | 24 | A.   Yes, I was. |
| 09:40 | 25 | Q.   And she wrote, "We have no interest in receiving your |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 53 of 152   Page ID #:314006
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

53

| 09:40 | 1 | work product or any supposed report of your investigation," |
| 09:40 | 2 | right? |
| 09:40 | 3 | A.   I'm sorry, where is that? |
| 09:40 | 4 | Q.   The first sentence on page 2.  Right? |
| 09:40 | 5 | "We have no interest in receiving your work product or |
| 09:40 | 6 | any supposed report of your investigation." |
| 09:40 | 7 | That's what she wrote, right? |
| 09:40 | 8 | A.   That is what she wrote, correct. |
| 09:40 | 9 | Q.   So Mr. Barrera offered his report and evidence |
| 09:40 | 10 | supporting it, and your lawyer, Elena Baca, wrote back and |
| 09:41 | 11 | said we have no interest in receiving that, right? |
| 09:41 | 12 | A.   Correct. |
| 09:41 | 13 | Q.   And that's because this whole investigation was a |
| 09:41 | 14 | whitewash; isn't that right, Ms. Thomas? |
| 09:41 | 15 | A.   That's not correct. |
| 09:41 | 16 | Q.   That's why you set it up with two different law firms |
| 09:41 | 17 | so you could segregate the information, hide the evidence |
| 09:41 | 18 | from MGA and conduct a whitewash; isn't that true? |
| 09:41 | 19 | A.   No.  It was set up with two attorneys in case it went |
| 09:41 | 20 | to litigation so that Ms. Wagner could be a witness. |
| 09:41 | 21 | Q.   So you expected that not to be privileged; you expected |
| 09:41 | 22 | her to be able to come and testify; is that right? |
| 09:41 | 23 | A.   We wanted the option to decide whether or not we'd |
| 09:41 | 24 | waive privilege. |
| 09:41 | 25 | Q.   And have you turned over that report today? |

54

| | | |
|---|---|---|
| 09:41 | 1 | A.   No, because we've never waived privilege on her.  Well, |
| 09:41 | 2 | actually, there is no report on it.  We didn't go to |
| 09:41 | 3 | litigation, so a report wasn't prepared. |
| 09:41 | 4 | Q.   So you had an investigation, but there was never any |
| 09:41 | 5 | report? |
| 09:42 | 6 | A.   That's correct.  Let me clarify.  There was no written |
| 09:42 | 7 | report. |
| 09:42 | 8 | Q.   You didn't want Mr. Barrera's investigation report |
| 09:42 | 9 | because you knew that wouldn't be privileged, right? |
| 09:42 | 10 | A.   I knew Mr. Barrera's report would be a biased report |
| 09:42 | 11 | because he was a plaintiff's contingency-fee lawyer |
| 09:42 | 12 | representing a plaintiff who had a claim. |
| 09:42 | 13 | Q.   And you didn't want that report in your files, right? |
| 09:42 | 14 | 'Cause it was biased? |
| 09:42 | 15 | A.   I wasn't the one that sent this letter.  This was the |
| 09:42 | 16 | response of our counsel.  I don't recall discussing her |
| 09:42 | 17 | response before this letter went out. |
| 09:42 | 18 | Q.   You knew if Mr. Barrera's report was in your files that |
| 09:43 | 19 | you would have to turn it over in this litigation, didn't |
| 09:43 | 20 | you? |
| 09:43 | 21 | A.   No, I did not. |
| 09:43 | 22 | Q.   How would it hurt you to just look at his report? |
| 09:43 | 23 | MR. QUINN:  This is argumentative, Your Honor. |
| 09:43 | 24 | It's vague and ambiguous.  "How would it hurt you?" |
| 09:43 | 25 | THE COURT:  It's vague and ambiguous, Counsel. |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 55 of 152   Page ID #:314008
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

55

| | | |
|---|---|---|
| 09:43 | 1 | Sustained. |
| 09:43 | 2 | BY MS. HURST: |
| 09:43 | 3 | Q.   How would it jeopardize Mattel's legal interest to |
| 09:43 | 4 | receive and look at Mr. Barrera's report? |
| 09:43 | 5 | A.   At this point in time, I believe that the investigation |
| 09:43 | 6 | was concluded, and we were looking at trying to settle his |
| 09:43 | 7 | claims with him.  And so I don't think there would have been |
| 09:43 | 8 | any point to that.  Again, I did not write the letter or |
| 09:43 | 9 | take that position. |
| 09:43 | 10 | Q.   Well, the letter was sent on Mattel's behalf, right? |
| 09:43 | 11 | A.   Yes, it was. |
| 09:43 | 12 | Q.   And you received it at the time, right? |
| 09:43 | 13 | A.   Correct. |
| 09:43 | 14 | Q.   And in your capacity as Mattel's chief counsel handling |
| 09:43 | 15 | this litigation, did you call up Ms. Baca and say, you know |
| 09:43 | 16 | what, actually that might be relevant evidence for the MGA |
| 09:43 | 17 | case, and so you should withdraw the letter and retract it |
| 09:44 | 18 | and go ahead and get that report from Mr. Barrera? |
| 09:44 | 19 | A.   No, I did not. |
| 09:44 | 20 | Q.   I'm going to turn now to a different subject matter. |
| 09:44 | 21 | You were at Mattel in 2002, right? |
| 09:44 | 22 | A.   I was at Mattel for part of 2002. |
| 09:44 | 23 | Q.   You were there -- |
| 09:44 | 24 | A.   I was employed by them all of 2002. |
| 09:44 | 25 | Q.   You had a maternity leave for a period of time in 2002? |

| | | |
|---|---|---|
| 09:44 | 1 | A.   Correct. |
| 09:44 | 2 | Q.   Remind me what that period was. |
| 09:44 | 3 | A.   It was mid-August to the week of Thanksgiving. |
| 09:45 | 4 | Q.   All right.  You knew Michele McShane, right? |
| 09:45 | 5 | A.   Yes, I did. |
| 09:45 | 6 | Q.   And you were both assistant general counsels in 2002; |
| 09:45 | 7 | is that right? |
| 09:45 | 8 | A.   Yes.  There were four or five assistant general |
| 09:45 | 9 | counsels. |
| 09:45 | 10 | Q.   And is it true that you had no knowledge at all that |
| 09:45 | 11 | Ms. McShane was investigating MGA concerning Bratz in the |
| 09:45 | 12 | first part of 2002? |
| 09:45 | 13 | A.   I had no knowledge of anything like that, no. |
| 09:45 | 14 | Q.   You got involved with Carter Bryant in the summer of |
| 09:45 | 15 | 2003, right? |
| 09:45 | 16 | MR. QUINN:  It's vague and ambiguous. |
| 09:45 | 17 | THE COURT:  Sustained.  "Involved," you mean |
| 09:45 | 18 | investigating?  Talk?  Sustained. |
| 09:45 | 19 | BY MS. HURST: |
| 09:45 | 20 | Q.   Were you responsible for a litigation involving Mattel |
| 09:46 | 21 | called the Gunther-Wahl case? |
| 09:46 | 22 | A.   Yes, I was and I still am. |
| 09:46 | 23 | Q.   And that's a case where Gunther-Wahl is claiming Mattel |
| 09:46 | 24 | theft of ideas, right? |
| 09:46 | 25 | A.   It's a breach of implied contract case involving a |

09:46  1    pitch that involved a purported cartoon series concept

09:46  2    involving fairies.

09:46  3    Q.    So Gunther-Wahl came and pitched a cartoon concept

09:46  4    about fairies, and then Mattel released various fairy doll

09:46  5    products, and Gunther-Wahl is claiming that it should be

09:46  6    compensated for those fairy doll products, right?

09:46  7    A.    Essentially, yes.

09:46  8    Q.    And Mattel has absolutely disputed any obligation to

09:46  9    pay in that case, right?

09:46  10   A.    Yes.

09:46  11   Q.    And Mattel designers who created fairy products have

09:46  12   had to be witnesses in that case, right?

09:47  13   A.    Some have.  It's rather complex, because it went to

09:47  14   trial once and when it went to trial the first time, we had

09:47  15   very few fairy products.  So some of the designers who

09:47  16   testified had done things with butterflies and various

09:47  17   things that the plaintiff claimed we borrowed from her

09:47  18   concept.

09:47  19        And then after we won that trial, it went up on appeal

09:47  20   and, uh, in the meantime, they filed another suit to add

09:47  21   fairy products that had come out.

09:47  22        So, yes, in the second part of the case, there were

09:47  23   more designers that had designed fairies, and they were

09:47  24   deposed, to my understanding.

09:47  25   Q.    Let me try this again.

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 58 of 152   Page ID #:314011
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

58

| | | |
|---|---|---|
| 09:47 | 1 | Yes or no?  Mattel designers who designed fairy |
| 09:47 | 2 | products have had to be witnesses in that case? |
| 09:47 | 3 | A.   Yes. |
| 09:47 | 4 | Q.   And one of the Mattel designers who had designed a |
| 09:47 | 5 | fairy product, who was a witness in that case, is Carter |
| 09:48 | 6 | Bryant? |
| 09:48 | 7 | A.   Yes, that's correct. |
| 09:48 | 8 | Q.   Right?  And it's Mattel's view that Carter Bryant did |
| 09:48 | 9 | absolutely nothing wrong in designing that fairy product for |
| 09:48 | 10 | Mattel, right? |
| 09:48 | 11 | MR. QUINN:  Objection.  Relevance, Your Honor. |
| 09:48 | 12 | It's another lawsuit. |
| 09:48 | 13 | THE COURT:  Sustained. |
| 09:48 | 14 | Ladies and gentlemen, the answer is stricken.  The |
| 09:48 | 15 | question is stricken. |
| 09:48 | 16 | BY MS. HURST: |
| 09:48 | 17 | Q.   So in the summer of 2003, you got involved in looking |
| 09:48 | 18 | for Carter Bryant to be a witness in the Gunther-Wahl |
| 09:48 | 19 | lawsuit, right? |
| 09:48 | 20 | A.   I'd had a request to get his address and contact |
| 09:48 | 21 | information for our outside counsel so that we could depose |
| 09:48 | 22 | him. |
| 09:48 | 23 | Q.   So he could be a witness in that lawsuit, right? |
| 09:48 | 24 | A.   Correct. |
| 09:48 | 25 | Q.   And you requested that information about how to contact |

| | | |
|---|---|---|
| 09:48 | 1 | him on July 22nd, 2003, right? |
| 09:48 | 2 | A.   Well, I first requested the information from HR.  And |
| 09:48 | 3 | then on July 22nd, I requested the information from |
| 09:48 | 4 | security. |
| 09:48 | 5 | Q.   All right.  And would you take a look at |
| 09:49 | 6 | Exhibit 1195-RS, page 66, please. |
| 09:49 | 7 | *(Document provided to the witness.)* |
| 09:49 | 8 | *(Document displayed.)* |
| 09:49 | 9 | THE WITNESS:  Okay. |
| 09:49 | 10 | BY MS. HURST: |
| 09:49 | 11 | Q.   And on that chronological record of investigation, it |
| 09:49 | 12 | shows, "July 22nd, 2003, researched Bryant's current address |
| 09:49 | 13 | for legal, Jill Thomas." |
| 09:49 | 14 | A.   Right. |
| 09:49 | 15 | Q.   And this record is how you know the date was on |
| 09:49 | 16 | July 22nd, 2003, right? |
| 09:49 | 17 | A.   Yes, I've seen -- I've seen this during the course of |
| 09:49 | 18 | this litigation, so I'm adopting that as the date.  I don't |
| 09:49 | 19 | have a specific recollection that it was that date. |
| 09:49 | 20 | Q.   Now, about four days earlier, on July 18th, 2003, there |
| 09:49 | 21 | was a *Wall Street Journal* article published naming Carter |
| 09:50 | 22 | Bryant as the designer of Bratz, correct? |
| 09:50 | 23 | A.   I'm aware that there was.  I don't know if I saw it on |
| 09:50 | 24 | that date. |
| 09:50 | 25 | Q.   In fact, it's your testimony that you were unaware of |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 60 of 152   Page ID #:314013
CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

60

| | | |
|---|---|---|
| 09:50 | 1 | that article when you requested this information about |
| 09:50 | 2 | Mr. Bryant, right? |
| 09:50 | 3 | A.   I don't recall being aware of it or associating it with |
| 09:50 | 4 | this request. |
| 09:50 | 5 | Q.   And you were unaware that Mr. Moore was at that point |
| 09:50 | 6 | conducting an investigation into the circumstances of the |
| 09:50 | 7 | *Wall Street Journal* article, right? |
| 09:50 | 8 | A.   I don't believe I was.  But I wasn't a hundred percent |
| 09:50 | 9 | sure. |
| 09:50 | 10 | Q.   Was it about this time that Mr. Normile instructed you |
| 09:50 | 11 | to start using NHB for MGA? |
| 09:50 | 12 | A.   Sometime in the Summer or early Fall, I recall that Bob |
| 09:50 | 13 | Normile wanted us to use NHB as an abbreviation for MGA.  I |
| 09:50 | 14 | don't recall that it was specifically this time period. |
| 09:51 | 15 | Q.   I'm sorry.  Did you say "abbreviation"? |
| 09:51 | 16 | A.   Well, it was another name for MGA. |
| 09:51 | 17 | Q.   It was a substitution code for MGA, right? |
| 09:51 | 18 | MR. QUINN:  Vague and ambiguous.  "Substitution |
| 09:51 | 19 | code." |
| 09:51 | 20 | THE COURT:  Well, substitution, another name. |
| 09:51 | 21 | Counsel, can you two reach a compromise.  I'm just joking |
| 09:51 | 22 | with you.  What do you want to call it? |
| 09:51 | 23 | MR. QUINN:  Code. |
| 09:51 | 24 | THE COURT:  Code.  All right.  It's a |
| 09:51 | 25 | substitution/code, ladies and gentlemen.  They can refer to |

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

61

| | | |
|---|---|---|
| 09:51 | 1 | it however they would like to. |
| 09:51 | 2 | BY MS. HURST: |
| 09:51 | 3 | Q.   Let's just look at this and see if we can understand |
| 09:51 | 4 | this. |
| 09:51 | 5 |            *(Document displayed.)* |
| 09:51 | 6 | BY MS. HURST: |
| 09:51 | 7 | Q.   So MGA, that's a party to this lawsuit, correct? |
| 09:51 | 8 | A.   Correct. |
| 09:51 | 9 | Q.   And if you shift the M one letter in the alphabet, you |
| 09:51 | 10 | get an N, right? |
| 09:51 | 11 | A.   Uh-huh. |
| 09:51 | 12 | Q.   Can you answer? |
| 09:51 | 13 | A.   Yes. |
| 09:51 | 14 | Q.   If you shift the G one letter in the alphabet, you get |
| 09:52 | 15 | an H, right? |
| 09:52 | 16 | A.   Right. |
| 09:52 | 17 | Q.   And if you shift the A one letter in the alphabet, you |
| 09:52 | 18 | get a B, right? |
| 09:52 | 19 | A.   That's right. |
| 09:52 | 20 | Q.   And sometimes people call that a substitution code, |
| 09:52 | 21 | don't they? |
| 09:52 | 22 | A.   I don't know if they do, but that's not how the name |
| 09:52 | 23 | was derived.  It's -- um, it's pretty interesting. |
| 09:52 | 24 | Q.   It's just a coincidence that that was NHB that you |
| 09:52 | 25 | chose to use as the code? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:52 | 1 | A.   Yes, it was, because it stood for North Hills Bratz. |
| 09:52 | 2 | Q.   So you took Mr. Normile's words to heart, and you began |
| 09:52 | 3 | using NHB to refer to MGA routinely, right? |
| 09:52 | 4 | A.   Yes, correct. |
| 09:52 | 5 | Q.   And in late 2003, Mattel implemented an e-mail filter |
| 09:52 | 6 | to monitor incoming and outgoing e-mails, right? |
| 09:53 | 7 | A.   My –– my recollection was that it was in 2004, but –– |
| 09:53 | 8 | but at some point they –– Mattel did implement an e-mail |
| 09:53 | 9 | filter. |
| 09:53 | 10 | Q.   And what you were looking for was evidence that your |
| 09:53 | 11 | employees were communicating with competitors, including |
| 09:53 | 12 | MGA, right? |
| 09:53 | 13 | A.   I don't know that that was the specific purpose. |
| 09:53 | 14 | Q.   Certainly, you were monitoring communications with and |
| 09:53 | 15 | concerning MGA, right? |
| 09:53 | 16 |         MR. QUINN:  May I have a continuing objection on |
| 09:53 | 17 | this, Your Honor. |
| 09:53 | 18 |         THE COURT:  You may. |
| 09:53 | 19 |         MR. QUINN:  On relevance and privilege. |
| 09:53 | 20 |         THE COURT:  It goes to security.  Overruled. |
| 09:53 | 21 |         MR. QUINN:  Thank you, Your Honor. |
| 09:53 | 22 |         THE WITNESS:  It's difficult for me to answer that |
| 09:53 | 23 | with regard to the 2004 time period, because I wasn't very |
| 09:53 | 24 | involved in that process at that point. |
| | 25 | |

| | | |
|---|---|---|
| 09:53 | 1 | BY MS. HURST: |
| 09:53 | 2 | Q.   But you understand now that Mattel implemented this |
| 09:54 | 3 | e-mail filter, right? |
| 09:54 | 4 | A.   Correct. |
| 09:54 | 5 | Q.   And that it was using the e-mail filter to monitor |
| 09:54 | 6 | communications between Mattel's employees and anyone at MGA, |
| 09:54 | 7 | right? |
| 09:54 | 8 | A.   I don't think -- in part, yes.  I think they were -- I |
| 09:54 | 9 | think they were looking at any e-mails that, um -- that got |
| 09:54 | 10 | caught in the filter in response to certain key words that |
| 09:54 | 11 | were in that filter. |
| 09:54 | 12 | Q.   And one of those key words was MGA, right? |
| 09:54 | 13 | A.   I believe so, yes. |
| 09:54 | 14 | Q.   And you were also monitoring key words for other |
| 09:54 | 15 | competitors:  Jakks, Hasbro, Spinmaster, right? |
| 09:54 | 16 | A.   We may have been.  I wasn't responsible for putting -- |
| 09:54 | 17 | for putting that together. |
| 09:54 | 18 | Q.   At some point Mattel actually implemented a policy of |
| 09:54 | 19 | investigating every employee who was -- had any of these |
| 09:55 | 20 | communications with the word "MGA" in it, right? |
| 09:55 | 21 | A.   I don't believe that's correct. |
| 09:55 | 22 | Q.   You investigated employees who applied -- considered |
| 09:55 | 23 | applying for jobs at MGA, right? |
| 09:55 | 24 | MR. QUINN:  Objection.  Relevance, Your Honor. |
| 09:55 | 25 | THE COURT:  Sustained. |

09:55   1    BY MS. HURST:

09:55   2    Q.   Certainly, you began looking at everyone who was

09:55   3    leaving Mattel and had announced that they would go to MGA

09:55   4    to work?

09:55   5            MR. QUINN:  Same objection.

09:55   6    BY MS. HURST:

09:55   7    Q.   Right?

09:55   8            MR. QUINN:  Objection, Your Honor.

09:55   9            THE COURT:  Yeah, I'm not sure where we're going

09:55   10   with this, Counsel.

09:55   11           Could I see you at sidebar, both of you, for just

09:55   12   a moment, please.

09:55   13           (To the jury:) Excuse us for just a moment.

09:55   14           Well, it's a good time for a break.

09:55   15           You're admonished not to discuss this matter

09:55   16   amongst yourselves, nor form or express any opinion

09:55   17   concerning the case.

09:55   18           I'll let you take an early recess, and counsel

09:56   19   will just remain.

09:56   20             *(Jury recesses at 9:56 a.m.)*

09:56   21           THE COURT:  Ms. Thomas, if you would step down for

09:56   22   a moment and rejoin us at quarter after the hour, please.

09:56   23           THE WITNESS:  Thank you.

09:56   24           THE COURT:  Okay.

09:56   25             *(Witness steps down and exits proceedings.)*

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

65

| | | |
|---|---|---|
| 09:56 | 1 | *(Out of the presence of the jury.)* |
| 09:56 | 2 | THE COURT:  All right.  Counsel, if you would be |
| 09:56 | 3 | seated, please.  The jury is no longer present. |
| 09:56 | 4 | Where are we going with this line of questioning? |
| 09:56 | 5 | MS. HURST:  Your Honor, to rebut the inference of |
| 09:56 | 6 | inducement to remove trade secret materials, I'd like to |
| 09:56 | 7 | establish the practice of monitoring, that it extended to |
| 09:56 | 8 | employees leaving for other competitors as well, and that |
| 09:56 | 9 | employees leaving for other competitors did, in fact, remove |
| 09:56 | 10 | materials, and that Mattel -- and this was -- you know, this |
| 09:56 | 11 | was the issue with the investigation logs that the Court had |
| 09:56 | 12 | ordered. |
| 09:56 | 13 | And this witness has knowledge related to that. |
| 09:56 | 14 | THE COURT:  Does she? |
| 09:56 | 15 | MS. HURST:  Yes. |
| 09:56 | 16 | THE COURT:  How do I know that? |
| 09:56 | 17 | MS. HURST:  From her deposition testimony, |
| 09:56 | 18 | Your Honor. |
| 09:56 | 19 | THE COURT:  I read it once but -- briefly read |
| 09:57 | 20 | portions of it.  I don't recall that, and it's my neglect, |
| 09:57 | 21 | obviously. |
| 09:57 | 22 | MS. HURST:  She testified that she had been |
| 09:57 | 23 | involved in at least four investigations of questionable |
| 09:57 | 24 | activity by departing employees where they had established |
| 09:57 | 25 | the downloading of confidential information, and that had no |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 66 of 152   Page ID #:314019
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

66

| 09:57 | 1 | involvement whatsoever with MGA.  And further, actually, |
| 09:57 | 2 | that they have not taken any -- they've not sued those |
| 09:57 | 3 | people. |
| 09:57 | 4 | THE COURT:  All right.  Now, just a moment. |
| 09:57 | 5 | I thought I ordered 73 files disclosed.  There |
| 09:57 | 6 | were 73 files that I looked at. |
| 09:57 | 7 | MR. ZELLER:  They were produced, Your Honor. |
| 09:57 | 8 | THE COURT:  There were 73 files disclosed? |
| 09:57 | 9 | A large number of those files seemed to indicate |
| 09:57 | 10 | that, for want of a better word, Mattel was being stolen |
| 09:57 | 11 | blind by some of their employees, whether they were going to |
| 09:57 | 12 | Jakks or Hasbro or to MGA.  And obviously, Mattel became |
| 09:57 | 13 | concerned about -- across-the-board about their intellectual |
| 09:58 | 14 | property being taken. |
| 09:58 | 15 | So I can understand the implementation of |
| 09:58 | 16 | security. |
| 09:58 | 17 | Your concern has always been that that was |
| 09:58 | 18 | targeted.  It was targeted to or -- the lawsuit was targeted |
| 09:58 | 19 | to only MGA employees, and that's why Cooney and the rest of |
| 09:58 | 20 | the group were named and no other parties were pursued by |
| 09:58 | 21 | Mattel, regardless of the intellectual property theft. |
| 09:58 | 22 | I'm not sure of the numbers, the final numbers |
| 09:58 | 23 | involved, and I'm not sure that four is a selective base, so |
| 09:58 | 24 | I want to hear your questions for just a moment. |
| 09:58 | 25 | What are you going to ask her? |

| | | |
|---|---|---|
| 09:58 | 1 | MS. HURST:  I'd like to ask her that, uh, she was |
| 09:58 | 2 | involved in the investigations of these -- the so-called |
| 09:58 | 3 | questionable activities; that she personally was involved in |
| 09:58 | 4 | at least four investigations involving employees leaving for |
| 09:58 | 5 | companies other than MGA. |
| 09:58 | 6 | THE COURT:  No, no.  Just a moment.  Just a |
| 09:58 | 7 | minute. |
| 09:59 | 8 | Well, that's the opposite of why I produced the |
| 09:59 | 9 | files.  I thought your claim from the very beginning, when |
| 09:59 | 10 | this case came into this Court over a year ago from |
| 09:59 | 11 | Judge Larson's court, was that this was a selective |
| 09:59 | 12 | prosecution; that you were concerned that because |
| 09:59 | 13 | intellectual property was being taken by numerous Mattel |
| 09:59 | 14 | employees, whether they went to Hasbro, Jakks, or MGA, that |
| 09:59 | 15 | Mattel had selectively brought lawsuit against -- I'm going |
| 09:59 | 16 | to just call it "Cooney," the seven persons that were |
| 09:59 | 17 | charged in the RICO allegations, for instance, and that the |
| 09:59 | 18 | others who were going to competitors were simply not |
| 09:59 | 19 | targeted. |
| 09:59 | 20 | I thought your position had always been this is a |
| 10:00 | 21 | selective prosecution because Bratz now became available, |
| 10:00 | 22 | and because of -- I'm sorry -- profitable, and because of |
| 10:00 | 23 | that profitability, because intellectual property was taken, |
| 10:00 | 24 | that this was simply a targeted lawsuit by Mattel. |
| 10:00 | 25 | So now the opposite question's being asked, and |

| 10:00 | 1 | that is you're extending it other persons going to other |
| 10:00 | 2 | companies, and I just simply don't understand. |
| 10:00 | 3 | MS. HURST:  Two things.  First of all, it shows |
| 10:00 | 4 | that departing employees across the board have their own |
| 10:00 | 5 | motivations for taking things, and it helps rebut the |
| 10:00 | 6 | inference that MGA induced anything. |
| 10:00 | 7 | Second of all, they know these other people have |
| 10:00 | 8 | downloaded things and they haven't sued them, so it does |
| 10:00 | 9 | support the selective prosecution. |
| 10:00 | 10 | THE COURT:  Not in this way.  No.  I'm going to |
| 10:00 | 11 | sustain the objection.  There was an objection? |
| 10:00 | 12 | MR. QUINN:  Yes. |
| 10:00 | 13 | THE COURT:  Sustained. |
| 10:00 | 14 | You can get in a summary witness if you'd like to, |
| 10:00 | 15 | just as Mr.-- who? -- Kinrich? |
| 10:00 | 16 | MR. QUINN:  Kinrich. |
| 10:01 | 17 | THE COURT:  Kinrich.  Once again, I don't think |
| 10:01 | 18 | I'm going to accept the charts for either one of them, but |
| 10:01 | 19 | you can get in a selective witness showing the number of |
| 10:01 | 20 | people under investigation through the logs, if there were |
| 10:01 | 21 | 73 or 20. |
| 10:01 | 22 | MS. HURST:  We can't do that because we don't have |
| 10:01 | 23 | all the investigation files.  And you can't tell from the |
| 10:01 | 24 | logs which ones are this type of investigation versus |
| 10:01 | 25 | another.  And we have now -- we have poured through those |

| | | |
|---|---|---|
| 10:01 | 1 | logs, and there are literally hundreds of investigations of |
| 10:01 | 2 | employee background reports and other sorts of things -- in |
| 10:01 | 3 | fact, for example, Mr. Brower's investigation file is not |
| 10:01 | 4 | listed as an investigation of theft of confidential |
| 10:01 | 5 | information.  It's simply listed as a background report. |
| 10:01 | 6 | THE COURT:  I'm not going to allow that to take |
| 10:01 | 7 | place, though, in a backdoor manner, where we have a |
| 10:01 | 8 | selective group of four people. |
| 10:01 | 9 | It's the same problem I'm being presented with, by |
| 10:01 | 10 | the way, the Brisbois tape, which we'll come back to |
| 10:01 | 11 | tonight. |
| 10:01 | 12 | I'm going to sustain the objection at this time. |
| 10:01 | 13 | MS. HURST:  Your Honor, her testimony is also |
| 10:01 | 14 | relevant to statute of limitations, because it's showing all |
| 10:02 | 15 | of this -- |
| 10:02 | 16 | THE COURT:  Now, just a moment.  Now we're |
| 10:02 | 17 | switching after that ruling, which is now final. |
| 10:02 | 18 | Now, we're raising statute of limitations.  Let me |
| 10:02 | 19 | hear your argument concerning that. |
| 10:02 | 20 | MS. HURST:  Mattel's massive security apparatus |
| 10:02 | 21 | and investigatory capabilities, their ability to know at a |
| 10:02 | 22 | moment's notice what people are doing supports our inference |
| 10:02 | 23 | that they knew much sooner everything about Carter Bryant |
| 10:02 | 24 | and what those employees -- or certainly that they were |
| 10:02 | 25 | capable of knowing much sooner. |

| | | |
|---|---|---|
| 10:02 | 1 | THE COURT:  Just a moment.  You haven't been |
| 10:02 | 2 | precluded.  I let you get into the implementation of that |
| 10:02 | 3 | system.  I believe your question was a leading question that |
| 10:02 | 4 | it took place early in 2003, and her response was, no, I |
| 10:02 | 5 | believe it was early in 2004 or -- strike that -- late in |
| 10:02 | 6 | 2004.  So you haven't been precluded.  There was an |
| 10:03 | 7 | objection, of course. |
| 10:03 | 8 | MR. QUINN:  Yeah. |
| 10:03 | 9 | THE COURT:  Okay.  Now, what's the next avenue? |
| 10:03 | 10 | All right.  Now, let's discuss this witness that I |
| 10:03 | 11 | received last evening about 9:00 o'clock.  I never should |
| 10:03 | 12 | have let all of you go home without resolving that.  So it's |
| 10:03 | 13 | my apology and my fault.  And let me apologize to Mr. Price |
| 10:03 | 14 | and to Mr. McConville.  Mr. Price, you're welcome to go at |
| 10:03 | 15 | any time. |
| 10:03 | 16 | MR. PRICE:  Thank you. |
| 10:03 | 17 | THE COURT:  Take one of MGA's counsel with you so |
| 10:03 | 18 | it's always balanced.  And I didn't see you literally |
| 10:03 | 19 | putting your head down at 9:00 or 10:00 o'clock last |
| 10:03 | 20 | evening, or I would have been a little bit more kind. |
| 10:03 | 21 | Tell me about this witness I received about 9:30, |
| 10:03 | 22 | Mr. Quinn's handoff.  Some document where Mr. Quinn was |
| 10:03 | 23 | complaining about a witness that was not on the witness |
| 10:03 | 24 | list. |
| 10:03 | 25 | MR. QUINN:  Yes, the witness was identified to us |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 71 of 152   Page ID #:314024
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

71

| | | |
|---|---|---|
| 10:03 | 1 | yesterday afternoon. |
| 10:04 | 2 | THE COURT: Tell me about this witness. Who is |
| 10:04 | 3 | it? Because we never resolved it last evening. I simply |
| 10:04 | 4 | had a document from one counsel. Mr. McConville and |
| 10:04 | 5 | Ms. Keller were present at the time. |
| 10:04 | 6 | MR. McCONVILLE: Yes, sir. |
| 10:04 | 7 | THE COURT: And Ms. Hurst, I'm not sure if she was |
| 10:04 | 8 | here. And we never resolved it. Who is this witness? And |
| 10:04 | 9 | if it's just a clerk or a clerical person to substantiate |
| 10:04 | 10 | records, there's no problem. I've given the same courtesy |
| 10:04 | 11 | to Mattel with a couple of their witnesses that weren't on |
| 10:04 | 12 | the list, so I'm not concerned. But if this is a |
| 10:04 | 13 | substantive witness, I want to know about this witness. Who |
| 10:04 | 14 | is it? |
| 10:04 | 15 | MR. McCONVILLE: Her name is Terry Hauenstein. |
| 10:04 | 16 | THE COURT: Okay. Now, who is Terry Hauenstein? |
| 10:04 | 17 | MR. McCONVILLE: She's MGA's global director of |
| 10:04 | 18 | Human Resources. |
| 10:04 | 19 | THE COURT: Just a moment. |
| 10:04 | 20 | MGA's director of Human Resources. |
| 10:04 | 21 | Just a moment. And what she's going to testify |
| 10:04 | 22 | to? |
| 10:04 | 23 | MR. McCONVILLE: She's going to essentially say, |
| 10:04 | 24 | um, that she's reviewed the HR files and, in summary, MGA |
| 10:04 | 25 | has hired over the course of -- from 1999 through 2007, |

| | | |
|---|---|---|
| 10:05 | 1 | hundreds of employees, and a small subset of those employees |
| 10:05 | 2 | are Mattel employees, former Mattel employees. |
| 10:05 | 3 | THE COURT:  Now, just a moment. |
| 10:05 | 4 | In other words, the efforts on behalf of MGA to |
| 10:05 | 5 | show that they're not targeting Mattel? |
| 10:05 | 6 | MR. McCONVILLE:  Correct. |
| 10:05 | 7 | THE COURT:  They're hiring across-the-board from |
| 10:05 | 8 | Hasbro or Jakks or competitive companies? |
| 10:05 | 9 | MR. McCONVILLE:  Right.  Everyone, everywhere, and |
| 10:05 | 10 | that it's a small -- I mean, there's evidence now before the |
| 10:05 | 11 | jury through Mr. Kinrich that somehow these handful of |
| 10:05 | 12 | employees who took trade secrets had skewed salaries.  So |
| 10:05 | 13 | this is someone who's going to come in and say, "I've |
| 10:05 | 14 | reviewed the HR files --" |
| 10:05 | 15 | THE COURT:  That comes as no surprise to the |
| 10:06 | 16 | Court.  I'm going to short-circuit that.  Now, the only |
| 10:06 | 17 | question is, what documents are they referring to?  Because |
| 10:06 | 18 | I have not reviewed her notebooks. |
| 10:06 | 19 | MR. QUINN:  Your Honor, I have no problem with the |
| 10:06 | 20 | first half of that if they want to say that, you know, we |
| 10:06 | 21 | only hired a handful of Mattel employees, or they decreased |
| 10:06 | 22 | and we hired from elsewhere.  I have no problem with that. |
| 10:06 | 23 | But the second half, going into Kinrich and saying the |
| 10:06 | 24 | downloaders weren't paid more, and they want to do battle |
| 10:06 | 25 | with Kinrich -- |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 73 of 152   Page ID #:314026
CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

73

| | | |
|---|---|---|
| 10:06 | 1 | MR. McCONVILLE:  I'm sorry.  Let me be clear. |
| 10:06 | 2 | She's not going to talk about salary.  She's just going to |
| 10:06 | 3 | talk about the number of people hired. |
| 10:06 | 4 | MR. QUINN:  No problem if that's it. |
| 10:06 | 5 | MR. McCONVILLE:  That's it. |
| 10:06 | 6 | THE COURT:  All right.  What else?  Since we're |
| 10:06 | 7 | having a complaint session here. |
| 10:06 | 8 | MR. QUINN:  Your Honor -- |
| 10:06 | 9 | THE COURT:  Just a moment.  Just a moment.  I want |
| 10:06 | 10 | to finish with MGA first 'cause they're presenting their |
| 10:06 | 11 | case. |
| 10:06 | 12 | MR. McCONVILLE:  Do we have any other issues to |
| 10:06 | 13 | raise with the judge on this break? |
| 10:07 | 14 | MS. HURST:  Do we know what the timetable is for |
| 10:07 | 15 | the resolution of the issues with Mr. Moore? |
| 10:07 | 16 | THE COURT:  Why don't you two talk privately. |
| 10:07 | 17 | MS. HURST:  Our concern, Your Honor, is that |
| 10:07 | 18 | 'cause we're not sure when Mr. Moore is going back on, |
| 10:07 | 19 | whether our next witness is here yet. |
| 10:07 | 20 | THE COURT:  Well, I got the notebook about 7:30, |
| 10:07 | 21 | and I'm up to Tab 68.  So when I finish that notebook, I'll |
| 10:07 | 22 | make a decision.  It was represented to me -- it was |
| 10:07 | 23 | 10:00 o'clock or 10:30 last night, and it was represented to |
| 10:07 | 24 | me Mattel needed about another three hours to assemble the |
| 10:07 | 25 | notebook, so I didn't think it was wise to hold you -- well, |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 74 of 152   Page ID #:314027
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

74

| 10:07 | 1 | I did think it was wise to hold you until 1:00 o'clock, but |
| 10:07 | 2 | you looked a little tired, so I sent you home. |
| 10:07 | 3 | MR. McCONVILLE:  One other issue, Your Honor, |
| 10:07 | 4 | given the status of Tyler Bradley, we need direction from |
| 10:08 | 5 | the Court on all -- we have taken all the efforts we can to |
| 10:08 | 6 | get a witness here.  She is unavailable, similar to the |
| 10:08 | 7 | reporters, the Court permitted the reading of a transcript |
| 10:08 | 8 | for those reporters who had previously been deposed who were |
| 10:08 | 9 | then unavailable.  We have done our showing of |
| 10:08 | 10 | unavailability, and we would like the opportunity to present |
| 10:08 | 11 | Ms. Snyder Bradley's deposition testimony. |
| 10:08 | 12 | THE COURT:  Let me speak both to Mattel and to |
| 10:08 | 13 | MGA, because I've been trying to reflect, and let me |
| 10:08 | 14 | hopefully make a record for the Circuit. |
| 10:08 | 15 | From the very beginning of this lawsuit, when the |
| 10:08 | 16 | Court first got this lawsuit, I was stunned by the |
| 10:08 | 17 | interrogatories that were flying back and forth between |
| 10:08 | 18 | parties.  It took, literally, because of the volume that |
| 10:08 | 19 | Judge Larson was being presented with, in terms of the |
| 10:08 | 20 | paperwork, if you will, between the parties, two months for |
| 10:09 | 21 | the special master to make an individual decision; then |
| 10:09 | 22 | Judge Larson tried to review that within a month, if he was |
| 10:09 | 23 | lucky.  By that time, then, there were numerous motions for |
| 10:09 | 24 | reconsideration, and so four and five months were proceeding |
| 10:09 | 25 | down the line in terms of discovery.  And by the time the |

| 10:09 | 1 | first judge had a chance to hand down the ruling, quite |
| 10:09 | 2 | frankly, I think both parties disabused his ruling and |
| 10:09 | 3 | disabused Judge Larson.  I'll make a public record of that |
| 10:09 | 4 | anytime.  And in much stronger terms, if I need to, in |
| 10:09 | 5 | written form. |
| 10:09 | 6 | So what the parties learned to do was simply |
| 10:09 | 7 | disobey the Court's order, because there was no immediate |
| 10:09 | 8 | sanction, and apparently the Court lost clout because of the |
| 10:09 | 9 | time frame and the massive paperwork and machinations of |
| 10:09 | 10 | counsel involved on both sides. |
| 10:09 | 11 | And I think the game was equally played by both |
| 10:09 | 12 | sides.  When this Court got this case, I put an immediate |
| 10:09 | 13 | stop to that.  That was your first filing of the 159-page |
| 10:09 | 14 | motion that the Court dumped on the floor the first night. |
| 10:10 | 15 | From that time, it turned to a series of |
| 10:10 | 16 | depositions, and from the time of those depositions, I made |
| 10:10 | 17 | it absolutely clear to Mr. Quinn, Mr. Zeller -- Mr. Price |
| 10:10 | 18 | hadn't joined me at that time -- and Ms. Hurst and |
| 10:10 | 19 | Mr. McConville -- because Ms. Keller had not joined me -- |
| 10:10 | 20 | that this was going to turn to depositions immediately.  It |
| 10:10 | 21 | was going to be an adversarial process.  But I represented |
| 10:10 | 22 | to both parties from the beginning of this case that this |
| 10:10 | 23 | Court frowned upon any deposition testimony. |
| 10:10 | 24 | First of all, I didn't think depositions had |
| 10:10 | 25 | the -- if you will, the credibility or the ability to judge |

| | | |
|---|---|---|
| 10:10 | 1 | a person's demeanor from the stand.  If I'm speaking in any |
| 10:10 | 2 | way that you want to contradict about my directions from the |
| 10:10 | 3 | beginning of this case, I want you to correct me, |
| 10:10 | 4 | Mr. McConville. |
| 10:10 | 5 | MR. McCONVILLE:  No, sir. |
| 10:10 | 6 | THE COURT:  And I made it very, very clear right |
| 10:10 | 7 | from the beginning that I perceived that what the parties |
| 10:10 | 8 | were going to try to do, frankly, was manipulate this system |
| 10:11 | 9 | by putting in -- and I've got even stronger words if I need |
| 10:11 | 10 | to write an opinion about this -- snippets of |
| 10:11 | 11 | interrogatories, snippets of depositions.  And MGA was the |
| 10:11 | 12 | first to complain that Mattel was about to spring that on |
| 10:11 | 13 | 'em and present, if you will, a halfway lawsuit. |
| 10:11 | 14 | At this late date, those rules have been |
| 10:11 | 15 | absolutely co-equal, and the code says "may."  It doesn't |
| 10:11 | 16 | say "I must" or "I shall." |
| 10:11 | 17 | Now, this has been through an independent judicial |
| 10:11 | 18 | ruling in Atlanta.  And even if Mattel is paying the |
| 10:11 | 19 | attorneys' fees, in reading that fee agreement, I find that |
| 10:11 | 20 | that fee agreement is separate and apart from counsel who |
| 10:11 | 21 | represents Tyler Snyder down in Atlanta. |
| 10:11 | 22 | I don't see any link other than Mattel's paying |
| 10:11 | 23 | for the attorneys' fees, just as MGA has paid for the |
| 10:11 | 24 | attorneys' fees. |
| 10:11 | 25 | You'll have to go about it your own way.  You have |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 77 of 152   Page ID #:314030
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

77

10:11  1    the ability to appeal to District Court down in Atlanta.  I
10:11  2    will not be allowing depositional testimony.  I've taken --
10:11  3    I'm speaking; you're listening.
10:12  4            I've taken the extraordinary measure of offering a
10:12  5    teleconference.  The judge has declined to do so in Atlanta,
10:12  6    my colleague.  I am not affronted by that.  That's an
10:12  7    independent judicial decision.  And to change the rules at
10:12  8    this late stage, for any reviewing Court who thinks that the
10:12  9    Court should have exercised its power, while never
10:12  10   disagreeing with the Circuit, this case could have never
10:12  11   been tried in a fair way without people taking the stand,
10:12  12   being subject to cross-examination in a court of law and not
10:12  13   a depositional setting, which is rather one-sided without a
10:12  14   judicial officer present.  And here, the jury's had a chance
10:12  15   to judge the demeanor of the different participants.
10:12  16           I decline and, therefore, I will not allow
10:12  17   depositional testimony.
10:12  18           Now, you take that up to the District Court down
10:12  19   in Atlanta and see if you can get the magistrate judge who
10:12  20   made the ruling reverse it.  I find that very prejudicial at
10:13  21   this point to switch the rules I set.
10:13  22           MR. McCONVILLE:  I understand, Your Honor.  But in
10:13  23   that same vein, when you were discussing the absence of
10:13  24   witnesses, you were discussing an adverse inference would
10:13  25   flow to the party.

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 78 of 152   Page ID #:314031
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

78

| | | |
|---|---|---|
| 10:13 | 1 | THE COURT:  Just a moment.  Let me make a record |
| 10:13 | 2 | concerning that. |
| 10:13 | 3 | Absolutely.  And I threatened MGA and Mattel |
| 10:13 | 4 | concerning Kuemmerle, who was down in Brazil. |
| 10:13 | 5 | MR. McCONVILLE:  Correct. |
| 10:13 | 6 | THE COURT:  Okay.  But each party responded and |
| 10:13 | 7 | made best efforts.  Here, I have an independent decision by |
| 10:13 | 8 | a judicial officer.  I don't find that it's appropriate to |
| 10:13 | 9 | hand down an adverse inference against Mattel at this time. |
| 10:13 | 10 | Now, if Mattel had that within their power and had |
| 10:13 | 11 | produced that person or not or -- strike that -- not |
| 10:13 | 12 | produced that person, as Susan Kuemmerle was on the line, I |
| 10:13 | 13 | might have found a much different situation. |
| 10:13 | 14 | But I don't see how Mattel is controlling that |
| 10:13 | 15 | when this now goes through an independent judicial officer's |
| 10:13 | 16 | determination down in Atlanta.  I'm not going to issue an |
| 10:13 | 17 | adverse inference in this matter. |
| 10:13 | 18 | MS. HURST:  Sir, Susana Kuemmerle is not employed |
| 10:14 | 19 | by MGA.  We used our best efforts to get her here and we got |
| 10:14 | 20 | her here.  We have now, based largely in part on the Court's |
| 10:14 | 21 | statement to us that if you don't get someone here who used |
| 10:14 | 22 | to be your employee, you will get an adverse inference.  We |
| 10:14 | 23 | complied with the Court's orders, because the Court was very |
| 10:14 | 24 | clear.  We have now complied with what the Court said, and |
| 10:14 | 25 | what we're asking is for Court to do -- we all understood |

| | | |
|---|---|---|
| 10:14 | 1 | that you had to have a witness here 'cause no depos were |
| 10:14 | 2 | gonna be played, and if not, there would be an adverse |
| 10:14 | 3 | inference. |
| 10:14 | 4 | We are asking for the next step.  To say that |
| 10:14 | 5 | Mattel does not control this witness is to -- is to say that |
| 10:14 | 6 | they paid for the motion to quash that was filed.  So they |
| 10:14 | 7 | didn't say, "We're not gonna pay you if you file this motion |
| 10:14 | 8 | to quash"; they said, "We will pay you to quash the |
| 10:14 | 9 | subpoena." |
| 10:14 | 10 | THE COURT:  This was an independent judicial |
| 10:14 | 11 | officer's determination, and that's significantly different. |
| 10:15 | 12 | If this hadn't gone through the process, the Court |
| 10:15 | 13 | process, I think I would hand down an adverse inference just |
| 10:15 | 14 | like I stated I would.  I usually follow through with what |
| 10:15 | 15 | I'm saying. |
| 10:15 | 16 | But here what goes through an independent judicial |
| 10:15 | 17 | officer's determination, that now is not Mattel's call. |
| 10:15 | 18 | That befalls the judiciary.  And if the colleague decides |
| 10:15 | 19 | that that's the appropriate remedy and -- that's the end of |
| 10:15 | 20 | the discussion. |
| 10:15 | 21 | Now, if you want to appeal it down in Atlanta, you |
| 10:15 | 22 | can take it down to Atlanta, but I'm declining to allow this |
| 10:15 | 23 | to go by way of depositional testimony.  And I'm declining |
| 10:15 | 24 | an adverse inference.  Our conversation is now finished. |
| 10:15 | 25 | Okay.  Now, what else do we have to complain |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 80 of 152   Page ID #:314033
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

80

| 10:15 | 1 | about? |
| 10:15 | 2 | MR. QUINN:  Your Honor, last night I raised the |
| 10:15 | 3 | issue about the questioning about whether we buried a |
| 10:15 | 4 | document when we had fully complied with the federal rules. |
| 10:15 | 5 | Counsel's questioning about "you only produced |
| 10:15 | 6 | this document; we only got it last week." |
| 10:15 | 7 | We have e-filed and provided to the other side a |
| 10:16 | 8 | proposed curative instruction, which I think is neutral, |
| 10:16 | 9 | that just says there's a procedure under the federal rules |
| 10:16 | 10 | where you serve a request, a party can object, motions to |
| 10:16 | 11 | compel can be made. |
| 10:16 | 12 | THE COURT:  I decline to give that at this time. |
| 10:16 | 13 | I'm going to look very closely at some tapes that |
| 10:16 | 14 | are out to the videographer or a person in Pasadena at the |
| 10:16 | 15 | present time.  Those are 2004 tapes involving Sal |
| 10:16 | 16 | Villasenor.  And those are not in a format that can be |
| 10:16 | 17 | apparently readily transformed for viewing. |
| 10:16 | 18 | I want to know if this presentation's being |
| 10:16 | 19 | presented by Mattel as of 2004.  So the video I showed you |
| 10:16 | 20 | last night of 2004 is just one video.  There's another video |
| 10:16 | 21 | out there with his name on it. |
| 10:16 | 22 | And I decline to do so at the present time. |
| 10:16 | 23 | MR. QUINN:  Understood, Your Honor. |
| 10:16 | 24 | THE COURT:  What else would counsel like to |
| 10:16 | 25 | complain about today? |

| | | |
|---|---|---|
| 10:16 | 1 | MR. QUINN:  Just to give the Court the heads-up, |
| 10:16 | 2 | we will seek to introduce evidence of MGA bearing documents, |
| 10:17 | 3 | producing documents in the middle of trial and redacting |
| 10:17 | 4 | things.  That's on our agenda. |
| 10:17 | 5 | THE COURT:  No, "Judge" Quinn, you will not; |
| 10:17 | 6 | you'll ask me. |
| 10:17 | 7 | MR. QUINN:  I'm asking.  It's on our agenda for |
| 10:17 | 8 | wish list. |
| 10:17 | 9 | THE COURT:  Not without a hearing outside the |
| 10:17 | 10 | presence of the jury.  And I'll see those documents. |
| 10:17 | 11 | MR. QUINN:  Here's one, Your Honor. |
| 10:17 | 12 | THE COURT:  Not now.  Not the usual last moment. |
| 10:17 | 13 | MR. QUINN:  Well, Your Honor, we were only |
| 10:17 | 14 | subjected to this questioning yesterday afternoon. |
| 10:17 | 15 | THE COURT:  No, not now. |
| 10:17 | 16 | What else? |
| 10:17 | 17 | Okay.  Five minutes. |
| 10:17 | 18 | *(Recess held at 10:17 a.m.)* |
| 10:24 | 19 | *(Proceedings resumed at 10:24 a.m.)* |
| 10:24 | 20 | *(Outside the presence of the jury.)* |
| 10:24 | 21 | THE COURT:  All right.  Then we're back on the |
| 10:24 | 22 | record outside the presence of the jury. |
| 10:24 | 23 | After recess, I'm still going to hold to my ruling |
| 10:24 | 24 | concerning Bradley -- or Tyler Bradley, and I'm declining |
| 10:24 | 25 | MGA's request for an adverse inference. |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 82 of 152   Page ID #:314035
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

82

| | | |
|---|---|---|
| 10:24 | 1 | However, I'm going to reverse -- Ms. Hurst, I |
| 10:24 | 2 | think you're right -- I'm going to allow the inquiry that |
| 10:24 | 3 | you wanted to conduct into the "four employees" |
| 10:24 | 4 | investigation by Ms. Thomas.  I do agree with you that this |
| 10:24 | 5 | does rebut the inference that MGA had anything to do with |
| 10:24 | 6 | the trade secret thefts, and this is the appropriate witness |
| 10:24 | 7 | to speak to about that. |
| 10:24 | 8 | MR. QUINN:  Your Honor, I've never had a chance to |
| 10:24 | 9 | address that. |
| 10:24 | 10 | THE COURT:  All right.  Counsel. |
| 10:24 | 11 | MR. QUINN:  I don't -- if other employees stole, |
| 10:24 | 12 | how does that either - how is that probative of either |
| 10:24 | 13 | liability or damages, about whether there was theft in this |
| 10:25 | 14 | case? |
| 10:25 | 15 | I'm -- it really escapes me about how that's |
| 10:25 | 16 | probative of any issue in this case:  Investigations of |
| 10:25 | 17 | other employees who go to other toy companies. |
| 10:25 | 18 | THE COURT:  Okay.  Thank you. |
| 10:25 | 19 | Get the jury, please. |
| 10:25 | 20 | *(In the presence of the jury.)* |
| 10:26 | 21 | THE COURT:  All right.  The jury's present.  The |
| 10:26 | 22 | alternates are present, all counsel, the parties. |
| 10:26 | 23 | Thank you for your courtesy. |
| 10:26 | 24 | Ms. Thomas. |
| 10:26 | 25 | And your continued examination -- Mr. Cote, if you |

| | | |
|---|---|---|
| 10:26 | 1 | would be seated -- by Ms. Hurst. |
| 10:26 | 2 |      MS. HURST:  Thank you, Your Honor. |
| 10:26 | 3 | BY MS. HURST: |
| 10:26 | 4 | Q.   One of Mattel's concerns was that its employees were |
| 10:26 | 5 | communicating with people in MGA, right? |
| 10:26 | 6 | A.   It would depend on those communications but -- but, |
| 10:26 | 7 | they were concerned that there were communications going on |
| 10:26 | 8 | that would indicate, um, employees were -- from MGA were |
| 10:26 | 9 | trying to get information or recruit people from Mattel. |
| 10:26 | 10 | Q.   And in this case one of your concerns in particular was |
| 10:26 | 11 | that there had been some Mattel employees who were |
| 10:27 | 12 | seamstresses, or sometimes called sample makers, who had |
| 10:27 | 13 | been working for MGA or helping MGA at the same time they |
| 10:27 | 14 | were working for Mattel, right? |
| 10:27 | 15 |      MR. QUINN:  Objection as to time frame. |
| 10:27 | 16 |      THE COURT:  Overruled. |
| 10:27 | 17 |      THE WITNESS:  We never had that concern until we |
| 10:27 | 18 | learned of that around the time of Ms. Marlow's deposition. |
| 10:27 | 19 | BY MS. HURST: |
| 10:27 | 20 | Q.   And in -- when you learned of the names of those |
| 10:27 | 21 | seamstresses in the Marlow deposition, you instructed your |
| 10:27 | 22 | security officer, Mr. de Anda, to interview them, correct? |
| 10:27 | 23 | A.   One of the ladies had left Mattel.  But I spoke with HR |
| 10:27 | 24 | and security about talking with the two who were still |
| 10:27 | 25 | working in the design center. |

| | | |
|---|---|---|
| 10:27 | 1 | Q.   And you spoke with HR and security, and then |
| 10:28 | 2 | Mr. de Anda went and searched their homes, correct? |
| 10:28 | 3 | A.   I don't know about both of them; but I know, after he |
| 10:28 | 4 | and HR had met with Ana Cabrera that, with her permission, |
| 10:28 | 5 | they went with her to her house.  And she showed them where |
| 10:28 | 6 | she had done the work.  I know that second-hand through |
| 10:28 | 7 | Richard de Anda and the HR representative. |
| 10:28 | 8 | Q.   So Mr. de Anda went to their home, searched Ana |
| 10:28 | 9 | Cabrera's home, took a box of materials, and examined the |
| 10:28 | 10 | area where she had done her work; is that right? |
| 10:28 | 11 | A.   I don't know that I'd characterize it as a "search." |
| 10:28 | 12 | She provided a box of materials at some point; I believe it |
| 10:28 | 13 | was when they went with her to her house. |
| 10:28 | 14 | Q.   And then you fired her, right? |
| 10:28 | 15 | A.   Eventually she got fired, yes. |
| 10:28 | 16 | Q.   And you fired Beatriz Morales too, right? |
| 10:28 | 17 | A.   I believe at the time she was working as a temp through |
| 10:29 | 18 | out temp agency, and her temp contract was -- was ended. |
| 10:29 | 19 | Q.   And it wasn't renewed, right? |
| 10:29 | 20 | A.   That's correct. |
| 10:29 | 21 | Q.   And you did all of that after finding out their names |
| 10:29 | 22 | in the deposition of Veronica Marlow, right? |
| 10:29 | 23 | A.   I wasn't in the deposition, and I didn't see the |
| 10:29 | 24 | transcript.  I learned that there was concern about, um -- |
| 10:29 | 25 | about those women being at Mattel because of these |

CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

85

| | | |
|---|---|---|
| 10:29 | 1 | activities. |
| 10:29 | 2 | Q.   You knew that they had stopped working for Veronica |
| 10:29 | 3 | Marlow and MGA years earlier, right? |
| 10:29 | 4 | A.   I believe that HR and security learned that during |
| 10:29 | 5 | their discussions with both women. |
| 10:29 | 6 | Q.   Even though they had stopped working for Veronica |
| 10:29 | 7 | Marlow and MGA years earlier, when you found out their |
| 10:29 | 8 | names, you still directed that they be fired; isn't that |
| 10:29 | 9 | right? |
| 10:29 | 10 | MR. QUINN:  This is irrelevant, Your Honor. |
| 10:29 | 11 | THE COURT:  Counsel?  Counsel? |
| 10:29 | 12 | MS. HURST:  Your Honor, it contrasts to the |
| 10:29 | 13 | treatment of Mr. Villasenor and others.  They're claiming |
| 10:30 | 14 | vindication of principle across the board. |
| 10:30 | 15 | THE COURT:  I'm going to sustain the objection. |
| 10:30 | 16 | BY MS. HURST: |
| 10:30 | 17 | Q.   Did you pay severance to Ana Cabrera the way you did to |
| 10:30 | 18 | Mr. Villasenor? |
| 10:30 | 19 | A.   No, we did not. |
| 10:30 | 20 | MR. QUINN:  Irrelevant, Your Honor. |
| 10:30 | 21 | THE COURT:  That's overruled. |
| 10:30 | 22 | THE WITNESS:  No, we did not. |
| 10:30 | 23 | BY MS. HURST: |
| 10:30 | 24 | Q.   Did you pay severance to Beatriz Morales the way you |
| 10:30 | 25 | did to Sal Villasenor? |

| 10:30 | 1 | A.   We didn't pay severance to Sal Villasenor.  We settled |
| 10:30 | 2 | an employment claim with him so... |
| 10:30 | 3 | THE COURT:  Counsel, I'm going to reverse my |
| 10:30 | 4 | ruling.  It was an incorrect ruling.  You can make the |
| 10:30 | 5 | inquiry. |
| 10:31 | 6 | MS. HURST:  Was that directed to me, Your Honor? |
| 10:31 | 7 | THE COURT:  Yes. |
| 10:31 | 8 | MS. HURST:  I want to make sure. |
| 10:31 | 9 | THE COURT:  Yes. |
| 10:31 | 10 | MS. HURST:  Okay.  Thank you. |
| | 11 | BY MS. HURST: |
| 10:31 | 12 | Q.   All right.  So you fired Ana Cabrera in 2008, after |
| 10:31 | 13 | learning of her name in a deposition, even though she had |
| 10:31 | 14 | not worked for MGA for years, right? |
| 10:31 | 15 | A.   I'm sorry.  Can you repeat that question? |
| 10:31 | 16 | Q.   You had Ana Cabrera fired in 2008, after learning of |
| 10:31 | 17 | her name in a deposition, even though she had not worked for |
| 10:31 | 18 | MGA for years, right? |
| 10:31 | 19 | A.   Um, I didn't personally have her fired, but HR |
| 10:31 | 20 | determined that she should be terminated.  And I believe the |
| 10:31 | 21 | activities had occurred or had ended approximately three |
| 10:31 | 22 | years before then. |
| 10:31 | 23 | Q.   And that was true when you learned about Ms. Rahimi's |
| 10:31 | 24 | name, too:  You believed her activities had ended, right? |
| 10:31 | 25 | A.   Yes, that's correct. |

| | | |
|---|---|---|
| 10:32 | 1 | Q.   And that's your excuse for not having done anything |
| 10:32 | 2 | about Ms. Rahimi? |
| 10:32 | 3 | THE COURT:  Counsel, there's an objection.  It's |
| 10:32 | 4 | argumentative. |
| 10:32 | 5 | BY MS. HURST: |
| 10:32 | 6 | Q.   The fact that you believed Ms. Rahimi's activities had |
| 10:32 | 7 | occurred in the past is the reason why you took no adverse |
| 10:32 | 8 | action against her; isn't that right? |
| 10:32 | 9 | A.   I don't believe that's correct. |
| 10:32 | 10 | Q.   And the fact that you believed Ms. Osier's activities |
| 10:32 | 11 | had occurred in the past is the reason that you took no |
| 10:32 | 12 | adverse action against her, right? |
| 10:32 | 13 | A.   Uh, that's -- that's part of the reason, but it's not |
| 10:32 | 14 | the whole reason. |
| 10:32 | 15 | Q.   And the reason that you took no more adverse action |
| 10:32 | 16 | against Mr. Shore than a letter in his file was because you |
| 10:32 | 17 | believed his activities had occurred in the past, correct? |
| 10:32 | 18 | A.   His activities were different than Sal Villasenor's |
| 10:32 | 19 | activities. |
| 10:32 | 20 | Q.   Well, you knew from your investigation that Mr. Shore |
| 10:32 | 21 | and Ms. Plunkett were the ones who recruited Mr. Turetzky |
| 10:33 | 22 | and got his home address for the business cards, didn't you? |
| 10:33 | 23 | A.   No, I did not know that. |
| 10:33 | 24 | Q.   Oh, so you didn't find that out in your investigation: |
| 10:33 | 25 | That Mr. Shore actually personally went to Mr. Turetzky and |

| | | |
|---|---|---|
| 10:33 | 1 | recruited him to be part of the scheme and got his home |
| 10:33 | 2 | address to send the catalogs to? |
| 10:33 | 3 | MR. QUINN:  This is argumentative.  Compound. |
| 10:33 | 4 | THE COURT:  Do you understand the question? |
| 10:33 | 5 | THE WITNESS:  Yes. |
| 10:33 | 6 | MR. QUINN:  Also assumes facts not in evidence. |
| 10:33 | 7 | THE COURT:  Overruled. |
| 10:33 | 8 | THE WITNESS:  I'm not aware of those facts. |
| 10:33 | 9 | MS. HURST:  Okay. |
| 10:33 | 10 | THE COURT:  Now, ladies and gentlemen, once again, |
| 10:33 | 11 | it only goes to state of mind.  It's also hearsay.  Okay? |
| 09:05 | 12 | BY MS. HURST: |
| 10:33 | 13 | Q.   So Mr. Shore is still at Mattel as the head of consumer |
| 10:33 | 14 | research -- the whole consumer research department, right? |
| 10:33 | 15 | A.   Yes.  He is now the head of consumer research. |
| 10:33 | 16 | Q.   And Sharon Rahimi is still a contractor for Mattel, |
| 10:33 | 17 | right? |
| 10:33 | 18 | A.   I believe so, but I don't know. |
| 10:33 | 19 | Q.   And Kelly Osier is still a contractor for Mattel, |
| 10:33 | 20 | right? |
| 10:34 | 21 | A.   I believe so, but I don't know. |
| 10:34 | 22 | Q.   And Geri Pilgrim, who got the other letter, is still |
| 10:34 | 23 | employed by Mattel, right? |
| 10:34 | 24 | A.   No, that's not correct. |
| 10:34 | 25 | Q.   She quit? |

| | | |
|---|---|---|
| 10:34 | 1 | A.   She retired. |
| 10:34 | 2 | Q.   Okay.  Carey Plunkett is still employed by Mattel, |
| 10:34 | 3 | right? |
| 10:34 | 4 | A.   That's correct.  She's employed by Mattel. |
| 10:34 | 5 | Q.   But Ana Cabrera got fired, right? |
| 10:34 | 6 | A.   She did. |
| 10:34 | 7 | Q.   And Beatriz Morales got fired, right? |
| 10:34 | 8 | A.   Her temp assignment was ended, yes. |
| 10:34 | 9 | Q.   So you were using these key words to monitor.  "MGA" |
| 10:35 | 10 | was one of the key words, right? |
| 10:35 | 11 | A.   Yes.  I believe "MGA" was one of the key words. |
| 10:35 | 12 | Q.   And, if you would find out that employees might be |
| 10:35 | 13 | discussing employment with MGA, then you would conduct an |
| 10:35 | 14 | investigation, right? |
| 10:35 | 15 | A.   I don't believe that's accurate. |
| 10:35 | 16 | Q.   Is it true that at some point you implemented a policy |
| 10:35 | 17 | that, if you were looking at anyone going to a competitor, |
| 10:35 | 18 | you would look at their computer for questionable activity? |
| 10:35 | 19 | A.   That's correct.  If we were aware that somebody was |
| 10:35 | 20 | going to a competitor, we'd look at their computer for |
| 10:35 | 21 | questionable activity. |
| 10:35 | 22 | Q.   And -- |
| 10:35 | 23 | A.   I personally would not, but that would be done by |
| 10:35 | 24 | security or IT. |
| 10:35 | 25 | Q.   And you would get involved in those investigations if |

CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

90

| | | |
|---|---|---|
| 10:35 | 1 | there was –– if you found evidence of questionable activity, |
| 10:35 | 2 | right? |
| 10:35 | 3 | A.   Sometimes I would. |
| 10:35 | 4 | Q.   Okay.  Let me ask you to look at Exhibit 36817, please. |
| 10:36 | 5 | *(Document provided to the witness.)* |
| 10:36 | 6 | THE WITNESS:  Okay. |
| 09:05 | 7 | BY MS. HURST: |
| 10:36 | 8 | Q.   And this exhibit is an example of an investigation file |
| 10:36 | 9 | where you learned that somebody might be seeking employment |
| 10:36 | 10 | at MGA, and then you'd investigate it for questionable |
| 10:36 | 11 | activity, correct? |
| 10:36 | 12 | A.   This looks like a security file. |
| 10:36 | 13 | Q.   And you worked with the security department, right? |
| 10:36 | 14 | A.   Uh, yes.  But I did not look at their files. |
| 10:36 | 15 | Q.   This is a file that you saw in your deposition the |
| 10:36 | 16 | other day, right? |
| 10:36 | 17 | A.   Yes.  Yes, it is. |
| 10:36 | 18 | Q.   And it's a file that we looked at that resulted from |
| 10:36 | 19 | the e-mail monitoring, right? |
| 10:36 | 20 | A.   That's what it appears to be. |
| 10:36 | 21 | Q.   And it's a file of someone who was considering |
| 10:37 | 22 | employment at MGA, right? |
| 10:37 | 23 | A.   I hadn't seen this before my deposition, so I'd just be |
| 10:37 | 24 | going off of what the document looks like; but that's |
| 10:37 | 25 | what –– it looks like some kind of investigation of someone |

CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

91

| | | |
|---|---|---|
| 10:37 | 1 | who was looking to go to MGA. |
| 10:37 | 2 | Q.   All right.  Now, you knew that the procedures for |
| 10:37 | 3 | investigating questionable activity included getting what's |
| 10:37 | 4 | called an "image" or an exact copy of somebody's hard drive, |
| 10:37 | 5 | right? |
| 10:37 | 6 | MR. QUINN:  Objection.  Relevance, Your Honor. |
| 10:37 | 7 | THE COURT:  Overruled. |
| 10:37 | 8 | THE WITNESS:  Yes, I had that understanding. |
| 11:59 | 9 | BY MS. HURST: |
| 10:37 | 10 | Q.   And then you would -- security would search the copy of |
| 10:37 | 11 | the hard drive for specific terms to look for evidence, |
| 10:37 | 12 | right? |
| 10:37 | 13 | MR. QUINN:  Objection, Your Honor.  Time period. |
| 10:37 | 14 | All these questions, we don't know... |
| 10:37 | 15 | THE COURT:  I thought this was after 2004 or 2000. |
| 10:37 | 16 | What time? |
| 10:37 | 17 | MR. QUINN:  The question isn't clear. |
| 10:37 | 18 | THE COURT:  What time period, Counsel? |
| 10:37 | 19 | BY MS. HURST: |
| 10:38 | 20 | Q.   The procedures were implemented, you believe, sometime |
| 10:38 | 21 | in around 2005, correct? |
| 10:38 | 22 | A.   Yeah.  Around the mid 2000 time period, I believe. |
| 10:38 | 23 | Q.   All right.  And when the image of the hard drive would |
| 10:38 | 24 | get made, then you would look for -- use these key words to |
| 10:38 | 25 | look for evidence, right? |

Case 2:04-cv-09049-DOC-RNB  Document 10346  Filed 03/31/11  Page 92 of 152  Page ID #:314045
CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

92

| | | |
|---|---|---|
| 10:38 | 1 | A.   That I'm not certain of.  I know that they would look |
| 10:38 | 2 | to see if there was any evidence that a portable storage |
| 10:38 | 3 | device, like a thumb drive, had been attached to the |
| 10:38 | 4 | computer; and then I think they'd go from there, if there |
| 10:38 | 5 | was any evidence of an attachment of a portable storage |
| 10:38 | 6 | device. |
| 10:38 | 7 | Q.   Let me ask you to look at Exhibit 36817, page –- the |
| 10:38 | 8 | numbered page 19. |
| 10:38 | 9 | *(Document provided to the witness.)* |
| 10:38 | 10 | THE WITNESS:  All right. |
| 09:17 | 11 | BY MS. HURST: |
| 10:38 | 12 | Q.   You see that? |
| 10:39 | 13 | A.   Yes, I do. |
| 10:39 | 14 | Q.   All right.  And that's part of a list of key words used |
| 10:39 | 15 | in connection with this investigation file, right? |
| 10:39 | 16 | A.   It appears to be. |
| 10:39 | 17 | MS. HURST:  Your Honor, move the admission of page |
| 10:39 | 18 | 19 of Exhibit 36817? |
| 10:39 | 19 | MR. QUINN:  Objection.  As to relevance, |
| 10:39 | 20 | Your Honor. |
| 10:39 | 21 | THE COURT:  Somebody will have to hand that to me. |
| 10:39 | 22 | THE WITNESS:  Oh. |
| 10:39 | 23 | THE COURT:  You keep your copy. |
| 10:39 | 24 | THE WITNESS:  Okay. |
| 10:39 | 25 | THE COURT:  Thank you.  All right.  I'm not going |

| | | |
|---|---|---|
| 10:39 | 1 | to receive it at this time.  Time is valuable, Counsel. |
| 10:39 | 2 | MS. HURST:  Your Honor, may I show it to you? |
| 10:39 | 3 | THE COURT:  You may. |
| 10:39 | 4 | *(Document provided to the Court.)* |
| 10:39 | 5 | THE COURT:  Let me see. |
| 10:39 | 6 | You may inquire.  It's received. |
| 10:39 | 7 | MS. HURST:  Thank you, Your Honor. |
| 10:39 | 8 | MR. QUINN:  May I have a continuing objection to |
| 10:39 | 9 | this line? |
| 10:39 | 10 | THE COURT:  You may. |
| 10:39 | 11 | MR. QUINN:  Relevance and privilege. |
| 10:39 | 12 | THE COURT:  You may. |
| 10:39 | 13 | *(Exhibit No. 36817-19 received in evidence.)* |
| 10:40 | 14 | *(Document displayed.)* |
| 11:59 | 15 | BY MS. HURST: |
| 10:40 | 16 | Q.   All right.  Now, Ms. Thomas, you understand that this |
| 10:40 | 17 | is a list of key words and then explanations, right? |
| 10:40 | 18 | A.   The first time I saw this was Sunday, and that's -- |
| 10:40 | 19 | that's what it appears to be. |
| 10:40 | 20 | Q.   And -- |
| 10:40 | 21 | MR. QUINN:  I move to strike, Your Honor.  Lack of |
| 10:40 | 22 | foundation. |
| 10:40 | 23 | THE COURT:  Overruled. |
| 11:59 | 24 | BY MS. HURST: |
| 10:40 | 25 | Q.   And one of the key words listed here is "Mercedeh |

| 10:40 | 1 | Ward," right? |
|---|---|---|

10:40  1   Ward," right?

10:40  2   A.   That's correct.

10:41  3   Q.   And the description of Mercedeh Ward is "Person of

10:41  4   interest.  Mina Mirkazemi's sister," right?

10:41  5   A.   Right.  That's what it says.

10:41  6   Q.   And Mina Mirkazemi, she was an Mattel employee?

10:41  7   A.   I'm not sure.

10:41  8   Q.   And it says, "Mercedeh Ward," "Went to MGA to work with

10:41  9   Carter Bryant," right?

10:41  10  A.   That's correct.  That's what it says.

10:41  11  Q.   Now, Mercedeh Ward went to MGA to work with Carter

10:41  12  Bryant.  That was in October of 2000, right?

10:41  13  A.   I don't know when she went to MGA.

10:41  14  Q.   People at Mattel who worked with Mina Mirkazemi knew

10:41  15  that her sister went -- Mercedeh Ward -- went to MGA to work

10:42  16  with Carter Bryant in October of 2000; isn't that right,

10:42  17  Ms. Thomas?

10:42  18           MR. QUINN:  Objection.  Speculation, Your Honor.

10:42  19           THE COURT:  Overruled.

10:42  20           THE WITNESS:  I don't know anything directly about

10:42  21  this.  Now that you mention that they were sisters, I think

10:42  22  I had heard that, but I don't think I knew that.

10:42  23  BY MS. HURST:

10:42  24  Q.   Anybody who wanted to know could go right down to the

10:42  25  design center and ask Mina Mirkazemi whether her sister,

| 10:42 | 1 | Mercedeh Ward, was over at MGA working with Carter Bryant in |
|---|---|---|
| 10:42 | 2 | October of 2000; isn't that right? |
| 10:42 | 3 | MR. QUINN:  Vague and ambiguous. |
| 10:42 | 4 | THE COURT:  Overruled. |
| 10:42 | 5 | MR. QUINN:  Vague as to time, as well. |
| 10:42 | 6 | THE COURT:  Overruled. |
| 10:42 | 7 | THE WITNESS:  I don't know. |
| 10:42 | 8 | BY MS. HURST: |
| 10:42 | 9 | Q.  Well, do you have any reason to believe that Mina |
| 10:42 | 10 | Mirkazemi would refuse to give you information? |
| 10:42 | 11 | A.  No.  I don't think I know Mina.  I think she is a |
| 10:42 | 12 | Mattel employee, but I have no reason one way or the |
| 10:42 | 13 | other... |
| 10:42 | 14 | Q.  If you, in the legal department, or Michele McShane, or |
| 10:42 | 15 | Mr. Moore wanted to go down to the design center and |
| 10:42 | 16 | interview Ms. Mirkazemi in October of 2000, you would expect |
| 10:43 | 17 | that she would cooperate with you, right? |
| 10:43 | 18 | MR. QUINN:  Calls for speculation. |
| 10:43 | 19 | THE COURT:  Overruled. |
| 10:43 | 20 | THE WITNESS:  If she was in the design center in |
| 10:43 | 21 | 2000 -- |
| 10:43 | 22 | BY MS. HURST: |
| 10:43 | 23 | Q.  Yeah. |
| 10:43 | 24 | A.  -- I would presume that, as a Mattel employee, she |
| 10:43 | 25 | would cooperate with in-house counsel. |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 96 of 152   Page ID #:314049
CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

96

| | | |
|---|---|---|
| 10:43 | 1 | Q.   And if you asked her, "Is your sister, Mercedeh Ward, |
| 10:43 | 2 | over at MGA working with Carter Bryant on Bratz?" you would |
| 10:43 | 3 | expect that if she knew that information she would honestly |
| 10:43 | 4 | answer, right? |
| 10:43 | 5 | A.   I suppose so.  I can only guess. |
| 10:43 | 6 | Q.   It would be generally expected of the employees in the |
| 10:43 | 7 | design center at Mattel that they would cooperate with an |
| 10:43 | 8 | investigation of in-house counsel, right? |
| 10:43 | 9 | A.   Yes.  If in-house counsel was doing an investigation, |
| 10:43 | 10 | my assumption would be that the employees would cooperate. |
| 10:43 | 11 | Q.   And that they would honestly and truthfully answer |
| 10:43 | 12 | questions, right? |
| 10:43 | 13 | A.   One would hope so. |
| 10:43 | 14 | Q.   And that -- |
| 10:44 | 15 | THE COURT:  Just a moment, Counsel. |
| 10:44 | 16 | I think you can inquire as far as an inquiry can |
| 10:44 | 17 | be made.  You don't know what people are going to say, so |
| 10:44 | 18 | I'm going to sustain the objection. |
| 10:44 | 19 | MS. HURST:  Thank you, Your Honor. |
| 01:59 | 20 | BY MS. HURST: |
| 10:44 | 21 | Q.   Now, one of the other key words on here is actually one |
| 10:44 | 22 | of those in-house attorneys, Michele McShane, right? |
| 10:44 | 23 | A.   Yes.  Michele McShane had been in-house counsel. |
| 10:44 | 24 | Q.   And Ms. McShane is described as "Mattel attorney on |
| 10:44 | 25 | case originally," right? |

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

97

| | | |
|---|---|---|
| 10:44 | 1 | A.   I see that written here, yes. |
| 10:44 | 2 | Q.   And that's a reference to Ms. McShane's 2002 |
| 10:44 | 3 | investigation, right? |
| 10:44 | 4 | A.   Um, I don't know what it's a reference to.  I could |
| 10:44 | 5 | hypothesize that it was a copyright analysis she did in |
| 10:44 | 6 | 2002, but I don't know. |
| 10:44 | 7 | Q.   It says, "on case originally," right? |
| 10:45 | 8 | A.   Correct, that's what it says. |
| 10:45 | 9 | Q.   That's this case, right, Ms. Thomas? |
| 10:45 | 10 | A.   I have no way of knowing that.  I don't know who |
| 10:45 | 11 | prepared this. |
| 10:45 | 12 | Q.   It goes on to say that Ms. McShane -- |
| 10:45 | 13 | THE COURT:  Well, just a moment, Counsel. |
| 10:45 | 14 | You only showed me that document one time, and I |
| 10:45 | 15 | saw the top portion. |
| 10:45 | 16 | Go down to the bottom of the page. |
| 10:45 | 17 | MS. HURST:  Certainly, Your Honor. |
| 10:45 | 18 | THE COURT:  On the right-hand side.  Further.  All |
| 10:45 | 19 | the way. |
| 10:45 | 20 | MS. HURST:  *(Complies.)* |
| 10:45 | 21 | THE COURT:  All right.  You may proceed. |
| 10:45 | 22 | MS. HURST:  Thank you, Your Honor. |
| 10:45 | 23 | BY MS. HURST: |
| 10:45 | 24 | Q.   All right.  The key word description also describes |
| 10:45 | 25 | Ms. McShane as someone who has "performed some interviews," |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 98 of 152   Page ID #:314051
CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

98

| | | |
|---|---|---|
| 10:45 | 1 | right? |
| 10:45 | 2 | A.   Yes.  It says, "Martinez and Beal-Park." |
| 10:46 | 3 | Q.   "Martinez," you understand that's Lily Martinez, right? |
| 10:46 | 4 | A.   I would assume that. |
| 10:46 | 5 | Q.   And "Beal-Park," you understand that's Cassidy |
| 10:46 | 6 | Beal-Park, right? |
| 10:46 | 7 | A.   Yes, I would assume that. |
| 10:47 | 8 | MS. HURST:  I apologize.  I'm just looking for an |
| 10:47 | 9 | exhibit number.  Give me a moment, please. |
| 10:47 | 10 | All right.  Please turn to Exhibit 36114. |
| 10:47 | 11 | *(Document provided to the witness.)* |
| 10:47 | 12 | BY MS. HURST: |
| 10:47 | 13 | Q.   Do you recognize that as the 2002 case management log |
| 10:47 | 14 | of Mattel's security department? |
| 10:47 | 15 | A.   That's what it appears to be. |
| 10:47 | 16 | Q.   Please turn to page 5 of that log. |
| 10:48 | 17 | A.   Okay. |
| 10:48 | 18 | Q.   And do you see there's an entry there for -- it says, |
| 10:48 | 19 | "IR" number.  You understand that refers to Incident Report |
| 10:48 | 20 | number, right? |
| 10:48 | 21 | A.   I do now.  But I don't see what you're looking at. |
| 10:48 | 22 | Q.   In the upper left-hand corner, "IR" number; do you see |
| 10:48 | 23 | that? |
| 10:48 | 24 | A.   Oh, yeah. |
| 10:48 | 25 | Q.   And there's a series of numbers of your different case |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 99 of 152   Page ID #:314052
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

99

| 10:48 | 1 | files, investigations that have been opened, right? |
| 10:48 | 2 | A.   Yes, I see that. |
| 10:48 | 3 | Q.   And there's one numbered 02-115, right? |
| 10:48 | 4 | A.   Yes, I see that. |
| 10:48 | 5 | Q.   And there's a reference there to MGA, correct? |
| 10:48 | 6 | A.   Correct. |
| 10:48 | 7 | MS. HURST:  Your Honor, move the admission of |
| 10:48 | 8 | 36114, page 5. |
| 10:48 | 9 | THE COURT:  Is this the log from 2002? |
| 10:48 | 10 | MS. HURST:  Yes, it is, Your Honor. |
| 10:48 | 11 | THE COURT:  Just a moment. |
| 10:49 | 12 | Was there a red ink mark on the bottom, last page |
| 10:49 | 13 | of that?  Is it in red? |
| 10:49 | 14 | *(Document provided to the Court.)* |
| 10:49 | 15 | MS. HURST:  Your Honor, I haven't gotten to the |
| 10:49 | 16 | bottom, last page. |
| 10:49 | 17 | THE COURT:  Bottom last page.  This was supposed |
| 10:49 | 18 | to be produced in color.  Do you just have black-and-white |
| 10:49 | 19 | copies? |
| 10:49 | 20 | MS. HURST:  We do right now, Your Honor, yes. |
| 10:49 | 21 | THE COURT:  It's going to be received.  Both |
| 10:49 | 22 | counsel have colored copies of this? |
| 10:49 | 23 | MS. HURST:  We did get colored copies. |
| 10:49 | 24 | THE COURT:  Okay.  It's received. |
| 10:49 | 25 | MS. HURST:  Thank you. |

| 10:49 | 1 | (Exhibit No. 36114-5 received in evidence.) |
| 10:49 | 2 | (Document displayed.) |
| 10:49 | 3 | THE COURT:  Counsel, proceed. |
| 10:49 | 4 | MS. HURST:  Thank you, Your Honor. |
| 10:49 | 5 | THE COURT:  Do you have a colored copy in front of |
| 10:49 | 6 | you? |
| 10:49 | 7 | THE WITNESS:  I don't think so. |
| 10:49 | 8 | THE COURT:  Somebody give her a colored copy. |
| 10:49 | 9 | This is in different ink.  We've got green ink on |
| 10:49 | 10 | it.  We've got red ink on it. |
| 10:49 | 11 | MS. HURST:  Your Honor, I'm not sure we have |
| 10:50 | 12 | colored copies in the courtroom right now.  I apologize. |
| 10:50 | 13 | MR. QUINN:  We don't have 'em here, Your Honor. |
| 10:50 | 14 | THE COURT:  Just a moment. |
| 10:50 | 15 | Ladies and gentlemen, why don't you visit amongst |
| 10:50 | 16 | yourselves. |
| 10:50 | 17 | (Pause in the proceedings at 10:50 a.m.) |
| 10:53 | 18 | (Proceedings resumed at 10:53 a.m.) |
| 10:53 | 19 | THE COURT:  All right.  Counsel, proceed. |
| 10:53 | 20 | BY MS. HURST: |
| 10:53 | 21 | Q.   So the entry here, about halfway down the page, you see |
| 10:53 | 22 | that, Ms. Thomas? |
| 10:53 | 23 | A.   The one you pointed out, the 115? |
| 10:53 | 24 | Q.   Yes. |
| 10:53 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 10:53 | 1 | Q.   And that's Incident Report No. 02-115, right? |
| 10:53 | 2 | A.   Right. |
| 10:53 | 3 | Q.   And the location is "El Segundo DC," right? |
| 10:53 | 4 | A.   Right. |
| 10:53 | 5 | Q.   And "DC" stands for design center, right? |
| 10:53 | 6 | A.   Yes. |
| 10:53 | 7 | Q.   And the date is listed as March 19, 2002, right? |
| 10:53 | 8 | A.   Correct. |
| 10:53 | 9 | Q.   And the type of report is "Theft proprietary info," |
| 10:53 | 10 | right? |
| 10:53 | 11 | A.   That's what it says, yes. |
| 10:53 | 12 | Q.   And then, the additional info listed is "MGA," correct? |
| 10:54 | 13 | A.   Correct. |
| 10:54 | 14 | Q.   Now, that entry actually corresponds to the case file |
| 10:54 | 15 | that we see -- we've seen in Exhibit 1195, right? |
| 10:54 | 16 | *(Document provided to the witness.)* |
| 10:54 | 17 | THE WITNESS:  Yes, it would appear to. |
| 10:54 | 18 | BY MS. HURST: |
| 10:54 | 19 | Q.   And that's the one where your name was listed as having |
| 10:54 | 20 | asked for Carter Bryant's address, July 22nd, 2003, right? |
| 10:54 | 21 | A.   I think so, if this is the one that we were looking at. |
| 10:54 | 22 | Yes. |
| 10:54 | 23 | Q.   If you look at page 66. |
| 10:54 | 24 | A.   Yes. |
| 10:54 | 25 | Q.   All right.  So the case management log description was |

| | | |
|---|---|---|
| 10:54 | 1 | "Theft of proprietary info regarding MGA," right? |
| 10:55 | 2 | A.   Right, that's what it says. |
| 10:55 | 3 | Q.   And then you've got your case chronological log here, |
| 10:55 | 4 | and that corresponds to the case management log, right? |
| 10:55 | 5 | A.   I'm sorry.  Can you repeat that? |
| 10:55 | 6 | Q.   Sure.  The chronological record is page 66 of -- |
| 10:55 | 7 | A.   Oh, yes. |
| 10:55 | 8 | Q.   Okay.  And that corresponds to the entry in the case |
| 10:55 | 9 | management log, right? |
| 10:55 | 10 | A.   Yeah.  The number at the top of the chronological |
| 10:55 | 11 | records says "02-115," and the case entry says "02-115" -- |
| 10:55 | 12 | Q.   All right. |
| 10:55 | 13 | A.   -- or case management log. |
| 10:55 | 14 | Q.   And then we have the key word? |
| 10:55 | 15 | A.   I'm sorry.  Is that in another exhibit? |
| 10:55 | 16 | Q.   Yeah.  I'm sorry.  We're all staying here together. |
| 10:55 | 17 | Give me one moment. |
| 10:55 | 18 | A.   Want me to stick my fingers in all these? |
| 10:56 | 19 | Q.   And that's 36817, page 19. |
| 10:56 | 20 | *(Document provided to the witness.)* |
| 10:56 | 21 | THE WITNESS:  Okay. |
| 10:56 | 22 | *(Document displayed.)* |
| 10:56 | 23 | BY MS. HURST: |
| 10:56 | 24 | Q.   All right.  And we've got the description there in the |
| 10:56 | 25 | key word of Ms. McShane, right? |

| | | |
|---|---|---|
| 10:56 | 1 | A.    Correct. |
| 10:56 | 2 | Q.    As the "Mattel attorney on case originally," right? |
| 10:56 | 3 | A.    That's what it says. |
| 10:56 | 4 | Q.    And that's the same Michele McShane who was part of the |
| 10:57 | 5 | Spring 2002 investigation, as referenced -- that is |
| 10:57 | 6 | referenced in this investigation file, right? |
| 10:57 | 7 | A.    I'm sorry.  Can you ask that again? |
| 10:57 | 8 | Q.    Sure.  I'm sorry.  It was a bad question. |
| 10:57 | 9 |      Ms. McShane was involved in the Spring 2002 |
| 10:57 | 10 | investigation that is referenced in the chronological record |
| 10:57 | 11 | and in the case management log and as described in the key |
| 10:57 | 12 | word, correct? |
| 10:57 | 13 |         MR. QUINN:  It's compound.  Lacks foundation. |
| 10:57 | 14 | Vague and ambiguous. |
| 10:57 | 15 |         THE COURT:  Overruled. |
| 10:58 | 16 |         THE WITNESS:  I -- I have no idea. |
| 10:58 | 17 | BY MS. HURST: |
| 10:58 | 18 | Q.    When you made an inquiry about Carter Bryant for the |
| 10:58 | 19 | Gunther-Wahl case in July of 2003, that inquiry was recorded |
| 10:58 | 20 | in the MGA investigation file, right? |
| 10:58 | 21 | A.    Yes, I believe that's where Rich de Anda put it. |
| 10:58 | 22 | Q.    And it references Bryant's current address, right? |
| 10:58 | 23 | A.    Yes, it does. |
| 10:58 | 24 | Q.    And that entry, when you inquired about Bryant's |
| 10:58 | 25 | address, was made in the MGA investigation file, right? |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 104 of 152   Page ID #:314057
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

104

| | | |
|---|---|---|
| 10:58 | 1 | A.   It appears to have been.  I'm not sure that I told Rich |
| 10:59 | 2 | what case I was interested in getting the address from -- or |
| 10:59 | 3 | what matter. |
| 10:59 | 4 | Q.   And your inquiry was in July of 2003, right? |
| 10:59 | 5 | A.   I believe I made an initial inquiry in late June, and I |
| 10:59 | 6 | did not get any information from HR, and so then I asked |
| 10:59 | 7 | Rich de Anda for the information. |
| 10:59 | 8 | Q.   And eventually Mr. Bryant was -- he gave a deposition |
| 10:59 | 9 | in the Gunther-Wahl case, right?  He gave sworn testimony? |
| 10:59 | 10 | A.   Yes, he did. |
| 10:59 | 11 | Q.   And that was on September 9th, 2003, correct? |
| 10:59 | 12 | A.   I know it was in late August or early September.  If |
| 10:59 | 13 | you're representing that's the date, I'll accept it. |
| 10:59 | 14 | Q.   All right.  Let me ask you to turn to -- back to |
| 11:00 | 15 | Exhibit 36114, to the very last page there. |
| 11:00 | 16 | A.   Okay. |
| 11:00 | 17 | Q.   And do you see there on the last page of the 2002 case |
| 11:00 | 18 | management log -- actually -- |
| 11:00 | 19 | MS. HURST:  Your Honor, if I may, I'm going to |
| 11:00 | 20 | move the admission of the entire 2002 case management log, |
| 11:00 | 21 | Exhibit 36114. |
| 11:00 | 22 | MR. QUINN:  Most of that's irrelevant, Your Honor. |
| 11:00 | 23 | THE COURT:  Received. |
| 11:00 | 24 | We'll go through and excise out any personal |
| 11:01 | 25 | information later on.  It's received. |

| | | |
|---|---|---|
| 11:01 | 1 | *(Exhibit No. 36114 received in evidence.)* |
| 11:01 | 2 | BY MS. HURST: |
| 11:01 | 3 | Q.   So on the last page of the log, there's a reference to |
| 11:01 | 4 | Carter Bryant, right? |
| 11:01 | 5 | *(Document displayed.)* |
| 11:01 | 6 | THE WITNESS:  Yes, there is. |
| 11:01 | 7 | BY MS. HURST: |
| 11:01 | 8 | Q.   And the type of report is "Intellectual property"? |
| 11:01 | 9 | A.   That's what it says. |
| 11:01 | 10 | Q.   The date, September 9, 2003, right? |
| 11:01 | 11 | A.   Correct.  That's what the date is. |
| 11:01 | 12 | Q.   But this is the 2002 case management log, right? |
| 11:01 | 13 | A.   I -- I know nothing personally about this log that -- |
| 11:01 | 14 | that's what it says. |
| 11:01 | 15 | Q.   And the incident report number here is listed as |
| 11:01 | 16 | "02-1680," right? |
| 11:01 | 17 | A.   That's what it appears to be, yes. |
| 11:01 | 18 | Q.   Now, you've seen an anonymous letter sent to Mr. Eckert |
| 11:01 | 19 | about Carter Bryant and MGA and Bratz, right? |
| 11:02 | 20 | A.   I believe I've seen it in the course of this |
| 11:02 | 21 | litigation, yes. |
| 11:02 | 22 | Q.   Okay.  And you've seen that there was a security |
| 11:02 | 23 | investigation file in which the anonymous letter was placed, |
| 11:02 | 24 | correct? |
| 11:02 | 25 | A.   I don't know where the letter was placed. |

| 11:02 | 1 | Q.   Let me ask you this:  Do you have any explanation at |
| 11:02 | 2 | all -- well, strike that. |
| 11:02 | 3 | As of the time of your deposition last week, you had no |
| 11:02 | 4 | explanation at all as to why the anonymous letter file |
| 11:02 | 5 | concerning Carter Bryant was a separate file added more than |
| 11:02 | 6 | a year later to the 2002 case management log; isn't that |
| 11:02 | 7 | right? |
| 11:02 | 8 | A.   Correct.  I have no information about that. |
| 11:02 | 9 | Q.   And even though your inquiry about Carter Bryant went |
| 11:02 | 10 | into the MGA file, you've got no explanation as to why the |
| 11:03 | 11 | anonymous letter was later placed in a separate file, right? |
| 11:03 | 12 | A.   I don't know any facts about where it was placed. |
| 11:03 | 13 | Q.   Or why it was placed there apparently on the same day |
| 11:03 | 14 | Mr. Bryant was deposed in the Gunther-Wahl matter, right? |
| 11:03 | 15 | A.   Correct. |
| 11:03 | 16 | Q.   But you were responsible for the Gunther-Wahl matter, |
| 11:03 | 17 | right? |
| 11:03 | 18 | A.   Yes.  But I didn't keep security files. |
| 11:03 | 19 | Q.   You regularly communicated with Mr. de Anda, right? |
| 11:03 | 20 | A.   Correct. |
| 11:03 | 21 | Q.   Did you communicate with him on the day of Mr. Bryant's |
| 11:03 | 22 | deposition in the Gunther-Wahl matter. |
| 11:03 | 23 | A.   I don't recall doing so, no. |
| 11:04 | 24 | Q.   Was there something that Mattel learned from |
| 11:04 | 25 | Mr. Bryant's testimony in the Gunther Wall matter that made |

| 11:04 | 1  | it want to separate the files between MGA and Carter Bryant? |
| 11:04 | 2  | A.   I don't recall anything like that. |
| 11:04 | 3  | Q.   Was there -- did you instruct Mr. de Anda to remove the |
| 11:04 | 4  | anonymous letter and the related correspondence from the MGA |
| 11:04 | 5  | file? |
| 11:04 | 6  | A.   No, I did not. |
| 11:04 | 7  |         MR. QUINN:  Excuse me.  Assumes it was ever there, |
| 11:04 | 8  | Your Honor.  Assumes facts not in evidence. |
| 11:04 | 9  |         THE COURT:  Assumes facts not in evidence. |
| 11:04 | 10 |         But Counsel, you can rephrase the question. |
| 11:04 | 11 | BY MS. HURST: |
| 11:04 | 12 | Q.   Other inquiries about Carter Bryant went into the MGA |
| 11:04 | 13 | file, right? |
| 11:04 | 14 | A.   I don't know. |
| 11:05 | 15 | Q.   Well, you saw the entry there when you asked for Carter |
| 11:05 | 16 | Bryant's address, right? |
| 11:05 | 17 | A.   Correct. |
| 11:05 | 18 | Q.   And, in fact, from the outset, the investigation of MGA |
| 11:05 | 19 | concerned Carter Bryant, as well, didn't it? |
| 11:05 | 20 | A.   I'm not sure which investigation file you're referring |
| 11:05 | 21 | to. |
| 11:05 | 22 | Q.   Well, let me ask you to go back and look at 1195, |
| 11:05 | 23 | page 66. |
| 11:05 | 24 | A.   Okay. |
| 11:05 | 25 | Q.   And you see, right there, there's the entry March 28th, |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 108 of 152   Page ID #:314061
CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

108

| | | |
|---|---|---|
| 11:05 | 1 | right? -- refers to Carter Bryant, right? -- on the second |
| 11:05 | 2 | line? |
| 11:05 | 3 | A.   Yes.  Oh, no.  It's "Cassidy Park." |
| 11:06 | 4 | Okay.  I see "Carter Bryant." |
| 11:06 | 5 | Q.   "Carter Bryant," right? |
| 11:06 | 6 | A.   Yes. |
| 11:06 | 7 | Q.   And then in the next entry, at 1500, the same day, |
| 11:06 | 8 | "Checked HR for Bryant's file," right? |
| 11:06 | 9 | A.   That's what it says, yes. |
| 11:06 | 10 | Q.   And then when you asked for Bryant's current address, |
| 11:06 | 11 | "Bryant," that went into the chronological log, right? |
| 11:06 | 12 | A.   That request is in the log, yes. |
| 11:06 | 13 | Q.   So "Bryant," "Bryant," "Bryant," all right there on the |
| 11:06 | 14 | log, right? |
| 11:06 | 15 | A.   I wasn't involved in any of the activity in '02, so I |
| 11:06 | 16 | don't know what that was involving. |
| 11:06 | 17 | I can only assume that, when I asked for Carter |
| 11:06 | 18 | Bryant's address, that Richard de Anda placed it in here.  I |
| 11:06 | 19 | don't know that he knew what case I was asking for it on.  I |
| 11:06 | 20 | don't know if he knew it was Gunther-Wahl. |
| 11:06 | 21 | Q.   So without you instructing him specifically, |
| 11:06 | 22 | Mr. De Anda just assumed that anything about Carter Bryant |
| 11:06 | 23 | belonged in the MGA investigation file, right? |
| 11:06 | 24 | A.   I don't know. |
| 11:06 | 25 | MR. QUINN:  Assumes facts and calls for |

| | | |
|---|---|---|
| 11:06 | 1 | speculation. |
| 11:06 | 2 | THE COURT:  Overruled. |
| 11:07 | 3 | Your answer was "I don't know"? |
| 11:07 | 4 | THE WITNESS:  I don't know. |
| 11:07 | 5 | BY MS. HURST: |
| 11:07 | 6 | Q.   And you have no explanation as to why the other |
| 11:07 | 7 | anonymous letter about Carter Bryant is not found in the MGA |
| 11:07 | 8 | investigation file, correct? |
| 11:07 | 9 | A.   I don't know what file the anonymous letter was put |
| 11:07 | 10 | into. |
| 11:07 | 11 | Q.   Let me ask you to take a look at Exhibit 6302, which is |
| 11:07 | 12 | already in evidence. |
| 11:07 | 13 | (Document provided to the witness.) |
| 11:07 | 14 | (Document displayed.) |
| 11:07 | 15 | BY MS. HURST: |
| 11:07 | 16 | Q.   And you see there's a case file number there on |
| 11:08 | 17 | Exhibit 6302? |
| 11:08 | 18 | A.   Yes, it's "02-1680." |
| 11:08 | 19 | Q.   And that corresponds to that final entry -- the |
| 11:08 | 20 | incident report number on that final entry of the case |
| 11:08 | 21 | management log, Exhibit 36114, right? |
| 11:08 | 22 | A.   Yes, they do. |
| 11:08 | 23 | Q.   All right.  And you see in Exhibit 6302 -- |
| 11:08 | 24 | A.   Yes? |
| 11:08 | 25 | Q.   -- that there's an anonymous letter on page 5 about |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 110 of 152   Page ID #:314063
CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

110

| | | |
|---|---|---|
| 11:08 | 1 | Carter Bryant, Bratz, and MGA, right? |
| 11:09 | 2 | A.   Yes.  Oh, but it's very small. |
| 11:09 | 3 | Q.   You've seen this letter before, right? |
| 11:09 | 4 | A.   Yeah, I've seen a bigger version of it. |
| 11:09 | 5 | Q.   It refers to "MGA" on its face, right? |
| 11:09 | 6 | A.   Oh, yes.  Yes, it does. |
| 11:09 | 7 | Q.   And refers to "Carter Bryant" on its face? |
| 11:09 | 8 | A.   Yes, it does. |
| 11:09 | 9 | Q.   And it refers to "Bratz" on its face, right? |
| 11:09 | 10 | A.   I'm sure -- yes, it does.  I'm sorry.  It's very bad |
| 11:09 | 11 | print. |
| 11:09 | 12 | Q.   And those are all subjects that are also mentioned on |
| 11:09 | 13 | page 66 of the 02-115 investigation file. |
| 11:10 | 14 |      Carter Bryant's identified there, right? |
| 11:10 | 15 | A.   Yeah.  This page does say "Carter Bryant" on it. |
| 11:10 | 16 | Q.   And it says, "Bratz" dolls, right? |
| 11:10 | 17 | A.   Yes, it has "Bratz" in quotation marks. |
| 11:10 | 18 | Q.   And it says "MGA," right? |
| 11:10 | 19 | A.   Yes. |
| 11:10 | 20 | Q.   And yet they are in separate files, right? |
| 11:10 | 21 | A.   I -- I would assume they're separate matters. |
| 11:10 | 22 | Q.   And you don't have any explanation for why the |
| 11:11 | 23 | anonymous letter got put in a separate file sometime in |
| 11:11 | 24 | 2003, right? |
| 11:11 | 25 |           MR. QUINN:  Assumes facts not in evidence, |

DEBBIE GALE, U.S. COURT REPORTER

| 11:11 | 1 | Your Honor. |
| 11:11 | 2 | THE COURT: As stated, Counsel, it does. |
| 11:11 | 3 | Sustained. |
| 11:11 | 4 | THE WITNESS: I don't have any idea. I could make |
| 11:11 | 5 | guesses, but I don't know. |
| | 6 | BY MS. HURST: |
| 11:11 | 7 | Q. You don't have any -- I believe that I should rephrase |
| 11:11 | 8 | the -- thank you for your answer. Let me rephrase the |
| 11:11 | 9 | question. |
| 11:11 | 10 | You have no explanation as to why the anonymous letter |
| 11:11 | 11 | was placed in a file on or about September 9, 2003, right? |
| 11:11 | 12 | A. No. The only wild guess I'd have -- and this would |
| 11:11 | 13 | just be looking at the document -- is, it says, "Occurrence |
| 11:11 | 14 | date: "9/5/2002," and then "Reported date: 9/9/2003," so I |
| 11:12 | 15 | don't know if that's -- I don't know if that's related to it |
| 11:12 | 16 | or not. |
| 11:12 | 17 | Q. Is it true that Mattel has attempted to separate its |
| 11:12 | 18 | investigations concerning this matter in order to make them |
| 11:12 | 19 | appear unrelated? |
| 11:12 | 20 | A. I don't believe that's the case. |
| 11:12 | 21 | Q. And you understand that the statute of limitations is a |
| 11:12 | 22 | significant issue in this case, right? |
| 11:12 | 23 | A. I understand it's an issue in the case. |
| 11:12 | 24 | Q. And it would be beneficial to Mattel to separate out |
| 11:12 | 25 | the different investigations and make them appear as if they |

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

112

| | | |
|---|---|---|
| 11:12 | 1 | were not part of one continuing course of conduct by Mattel |
| 11:12 | 2 | to investigate MGA, right? |
| 11:12 | 3 | MR. QUINN:  It's argumentative.  Improper opinion. |
| 11:12 | 4 | THE COURT:  Sustained in its present form. |
| 11:12 | 5 | BY MS. HURST: |
| 11:13 | 6 | Q.   You understand that it is one of Mattel's arguments in |
| 11:13 | 7 | this litigation that these investigations were separate and |
| 11:13 | 8 | not part of a continuous course of conduct by Mattel, right? |
| 11:13 | 9 | MR. QUINN:  Objection.  Argumentative, Your Honor. |
| 11:13 | 10 | It's not asking about facts. |
| 11:13 | 11 | THE COURT:  Sustained. |
| 11:13 | 12 | BY MS. HURST: |
| 11:13 | 13 | Q.   You understand that it is Mattel's factual assertion in |
| 11:13 | 14 | this case that these investigations were separate and not |
| 11:13 | 15 | part of a single continuing course of conduct, right? |
| 11:13 | 16 | MR. QUINN:  Same objection, Your Honor. |
| 11:13 | 17 | THE COURT:  Overruled. |
| 11:13 | 18 | You can answer that question. |
| 11:13 | 19 | THE WITNESS:  I believe that is the fact, yes. |
| 11:13 | 20 | BY MS. HURST: |
| 11:13 | 21 | Q.   And that fact, were it true, would be beneficial to |
| 11:14 | 22 | Mattel in defending against the assertion of a statute of |
| 11:14 | 23 | limitations in this case -- |
| 11:14 | 24 | MR. QUINN:  Argumentative. |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

| 11:14 | 1 | BY MS. HURST: |
|---|---|---|
| 11:14 | 2 | Q.   -- right? |
| 11:14 | 3 |         MR. QUINN:  Argumentative. |
| 11:14 | 4 |         THE COURT:  Overruled. |
| 11:14 | 5 |         THE WITNESS:  Could you repeat that? |
| 02:59 | 6 | BY MS. HURST: |
| 11:14 | 7 | Q.   Were it true that these were actually separate |
| 11:14 | 8 | investigations and not a single continuous investigation, |
| 11:14 | 9 | you understand that that would be beneficial to Mattel in |
| 11:14 | 10 | trying to defeat a statute of limitations defense, correct? |
| 11:14 | 11 | A.   Correct. |
| 11:14 | 12 | Q.   And in order to make it look as if these were not part |
| 11:14 | 13 | of a single investigation, it would be helpful to Mattel to |
| 11:14 | 14 | separate out the different documents into separate files, |
| 11:14 | 15 | correct? |
| 11:14 | 16 |         MR. QUINN:  Argumentative, Your Honor. |
| 11:14 | 17 |         THE COURT:  Well, in its present form, it is, |
| 11:14 | 18 | Counsel. |
| 11:14 | 19 |         MS. HURST:  Okay. |
| 11:14 | 20 | BY MS. HURST: |
| 11:14 | 21 | Q.   In order to establish that these were separate |
| 11:15 | 22 | investigations rather than a single continuous |
| 11:15 | 23 | investigation, one thing that Mattel could do would be to |
| 11:15 | 24 | separate them into separate files, correct? |
| 11:15 | 25 |         MR. QUINN:  Argumentative.  Speculation. |

| | | |
|---|---|---|
| 11:15 | 1 | THE COURT:  It's still argumentative. |
| 11:15 | 2 | I think you can establish, Counsel, and ask the |
| 11:15 | 3 | question.  But this is for argument. |
| 11:15 | 4 | MS. HURST:  All right.  Thank you, Your Honor. |
| 11:15 | 5 | BY MS. HURST: |
| 11:15 | 6 | Q.   Let's go back to Exhibit 36817, page 19. |
| 11:15 | 7 | (Document provided to the witness.) |
| 11:15 | 8 | (Document displayed.) |
| 11:15 | 9 | THE WITNESS:  Okay. |
| 11:15 | 10 | BY MS. HURST: |
| 11:16 | 11 | Q.   The description there regarding Ms. McShane describes |
| 11:16 | 12 | this entire case as part of the same investigation, doesn't |
| 11:16 | 13 | it, Ms. Thomas? |
| 11:16 | 14 | MR. QUINN:  Vague and ambiguous. |
| 11:16 | 15 | THE COURT:  Overruled. |
| 11:16 | 16 | MR. QUINN:  Lacks foundation. |
| 11:16 | 17 | THE COURT:  Overruled. |
| 11:16 | 18 | THE WITNESS:  I'm not sure what that "Mattel |
| 11:16 | 19 | attorney on case originally" refers to, and I don't know who |
| 11:16 | 20 | put it in there. |
| 11:59 | 21 | BY MS. HURST: |
| 11:16 | 22 | Q.   So you think Mr. de Anda is the best person to ask |
| 11:16 | 23 | about that? |
| 11:16 | 24 | A.   I don't know.  I don't know if it would be -- I would |
| 11:16 | 25 | just be guessing as to who put it in there.  I have no idea. |

| | | |
|---|---|---|
| 11:16 | 1 | Q.   But you think these descriptions came from the law |
| 11:16 | 2 | department originally, right? |
| 11:16 | 3 | A.   I'm not sure. |
| 11:16 | 4 | Q.   Wasn't it your view, in your deposition, that these |
| 11:16 | 5 | were attorney work-product; that they came from the lawyers, |
| 11:16 | 6 | these descriptions? |
| 11:16 | 7 | A.   I think these words came from the law department.  I |
| 11:16 | 8 | don't know about the notes that go with it. |
| 11:17 | 9 | Q.   Well -- |
| 11:17 | 10 | A.   And some of the terms might have come from security, |
| 11:17 | 11 | but I think most of 'em came from the law department. |
| 11:17 | 12 | Q.   When you saw this document in your deposition, you |
| 11:17 | 13 | tried to get it back; isn't that right? |
| 11:17 | 14 |            MR. QUINN:  Your Honor, object. |
| 11:17 | 15 |            THE COURT:  Sustained. |
| 11:17 | 16 |            MR. QUINN:  Move to strike. |
| 11:17 | 17 |            THE COURT:  Stricken. |
| 11:17 | 18 |            Ladies and gentlemen, disregard the question. |
| 11:17 | 19 | BY MS. HURST: |
| 11:17 | 20 | Q.   So did the description there, "Mattel attorney on case |
| 11:17 | 21 | originally," did that come from the law department or the |
| 11:17 | 22 | security department? |
| 11:17 | 23 | A.   I have no idea. |
| 11:17 | 24 | Q.   Well, both were in a position to know what |
| 11:17 | 25 | Ms. McShane's role in the cases had been, true? |

| | | |
|---|---|---|
| 11:17 | 1 | A.   I'm not sure about that.  It could have been someone |
| 11:17 | 2 | using language carelessly.  I have no idea. |
| 11:18 | 3 | Q.   You've investigated employees leaving for competitors |
| 11:18 | 4 | other than MGA, as well, true? |
| 11:18 | 5 | A.   Yes, that's true. |
| 11:18 | 6 | Q.   And you've imaged somewhere between 20 and 200 -- |
| 11:18 | 7 | MR. QUINN:  Objection.  Irrelevant, Your Honor. |
| 11:18 | 8 | THE COURT:  Counsel, I believe this is the area |
| 11:18 | 9 | I've allowed you to inquire into. |
| 11:18 | 10 | BY MS. HURST: |
| 11:19 | 11 | Q.   You've imaged somewhere between 20 and 200 hard drives |
| 11:19 | 12 | in doing it, right? |
| 11:19 | 13 | A.   I personally haven't, but that was my -- my rough |
| 11:19 | 14 | estimate of, um, how many hard drives may have been captured |
| 11:19 | 15 | when we learned someone was leaving Mattel to go to a |
| 11:19 | 16 | competitor. |
| 11:19 | 17 | Q.   And then you were involved in between 8 and |
| 11:19 | 18 | 20 investigations associated with those matters, right? |
| 11:19 | 19 | A.   That was my estimate. |
| 11:19 | 20 | Q.   And about five times you found that there were |
| 11:19 | 21 | instances -- the ones you were involved in, where an |
| 11:19 | 22 | employee -- you thought an employee took confidential |
| 11:19 | 23 | information, right? |
| 11:19 | 24 | A.   I think that I had answered that with regard to, um, |
| 11:19 | 25 | employees who had gone someplace other than Mattel -- I |

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

117

| | | |
|---|---|---|
| 11:19 | 1 | mean, other than MGA.  And then I remembered that one of |
| 11:19 | 2 | those five that I was thinking of was MGA, so it was four. |
| 11:20 | 3 | Q.    So there were four instances that you were involved |
| 11:20 | 4 | where you believed employees took confidential information |
| 11:20 | 5 | and it had absolutely nothing to do with MGA, right? |
| 11:20 | 6 | A.    Correct. |
| 11:20 | 7 | Q.    And Mattel has not sued any of those people, right? |
| 11:20 | 8 | MR. QUINN:  Objection.  Irrelevant. |
| 11:20 | 9 | THE COURT:  Overruled. |
| 11:20 | 10 | THE WITNESS:  Not yet. |
| 11:20 | 11 | MS. HURST:  No further questions at this time. |
| 11:20 | 12 | THE COURT:  Cross-examination, then, by Mr. Quinn |
| 11:20 | 13 | on behalf of Mattel. |
| 11:20 | 14 | **CROSS-EXAMINATION** |
| 11:20 | 15 | BY MR. QUINN: |
| 11:21 | 16 | Q.    Good morning, Ms. Thomas. |
| 11:21 | 17 | A.    Good morning. |
| 11:21 | 18 | Q.    If we could look at -- if we could put up on the |
| 11:21 | 19 | screen, which I understand we now can, exhibit -- exhibit |
| 11:21 | 20 | with those terms on it.  36817-19. |
| 11:21 | 21 | A.    Okay. |
| 11:21 | 22 | *(Document displayed.)* |
| 11:21 | 23 | MR. QUINN:  There it is. |
| 11:21 | 24 | BY MR. QUINN: |
| 11:21 | 25 | Q.    And on the left-hand side, you have some -- these are |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 118 of 152   Page ID #:314071
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

118

| | | |
|---|---|---|
| 11:21 | 1 | search terms that are used? |
| 11:21 | 2 | A.   Yes, I believe so. |
| 11:21 | 3 | Q.   And then there are some notes on the right side |
| 11:21 | 4 | concerning those search terms? |
| 11:21 | 5 | A.   That's what it appears to be, yes. |
| 11:21 | 6 | Q.   Now, this Exhibit 36817, this page comes out of a |
| 11:22 | 7 | security department file, correct? |
| 11:22 | 8 | A.   Uh, yes.  It appears to have come out of a security |
| 11:22 | 9 | department file. |
| 11:22 | 10 | Q.   I mean, this is not a legal department file? |
| 11:22 | 11 | A.   No, it was not. |
| 11:22 | 12 | Q.   And this security investigation was opened -- if you |
| 11:22 | 13 | take a look at page dash 2 -- in May of 2006, correct? |
| 11:22 | 14 | MR. QUINN:  Your -- |
| 11:22 | 15 | THE WITNESS:  That's when -- |
| 11:22 | 16 | MR. QUINN:  -- Honor, if I could offer pages dash |
| 11:22 | 17 | 1 and dash 2, the front page of the security file, and the |
| 11:22 | 18 | chronological record? |
| 11:22 | 19 | THE COURT:  Received. |
| 11:22 | 20 | *(Exhibit No. 36817-1 received in evidence.)* |
| 11:22 | 21 | *(Exhibit No. 36817-2 received in evidence.)* |
| 11:22 | 22 | MR. QUINN:  If we could look -- first look at the |
| 11:22 | 23 | first page. |
| 11:22 | 24 | *(Document displayed.)* |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:22 | 1 | BY MR. QUINN: |
| 11:22 | 2 | Q.   This appears to be a copy of -- maybe a tab on a file |
| 11:22 | 3 | there, which has got a number "06-0290," which, presumably, |
| 11:22 | 4 | the security department puts on there? |
| 11:22 | 5 | A.   I would presume, yes. |
| 11:22 | 6 | Q.   And then, if we look at the next page -- |
| 11:22 | 7 | *(Document displayed.)* |
| 11:22 | 8 | BY MR. QUINN: |
| 11:22 | 9 | Q.   -- we see this is a file that's opened in May of 2006, |
| 11:22 | 10 | correct? |
| 11:22 | 11 | A.   That's what it appears to be, yes. |
| 11:22 | 12 | Q.   And this is -- if you turn to page dash 19, that |
| 11:23 | 13 | page -- "06," obviously, that's 2006, correct?  Going back |
| 11:23 | 14 | to page dash 2.  "06" means 2006? |
| 11:23 | 15 | A.   Oh, yes, yes. |
| 11:23 | 16 | Q.   So that's when this file was opened, correct? |
| 11:23 | 17 | A.   I would presume so, yes. |
| 11:23 | 18 | Q.   And that's when this -- at least, as of then, this -- |
| 11:23 | 19 | these key terms had been arrived at to search hard drives in |
| 11:23 | 20 | appropriate cases, correct? |
| 11:23 | 21 | A.   I would presume so, yes. |
| 11:23 | 22 | MS. HURST:  Objection.  Lacks foundation. |
| 11:23 | 23 | Move to strike. |
| 11:23 | 24 | THE COURT:  Overruled. |
| | 25 | |

| | | |
|---|---|---|
| 11:23 | 1 | BY MR. QUINN: |
| 11:23 | 2 | Q.   Do you know when Mattel started to implement these -- |
| 11:23 | 3 | identified these key terms, this e-mail filter? |
| 11:23 | 4 | A.   I do not.  I could make a best guess. |
| 11:23 | 5 | Q.   What's your best estimate? |
| 11:23 | 6 | A.   My best estimate is sometime in 2004 or forward. |
| 11:24 | 7 | Q.   And -- but by the time that this file is opened here -- |
| 11:24 | 8 | this is 2006 -- and by the time these notes are made, the |
| 11:24 | 9 | case has been pending against Mr. Bryant for two years, |
| 11:24 | 10 | correct? |
| 11:24 | 11 | A.   Correct. |
| 11:24 | 12 | MS. HURST:  Objection.  Lacks foundation. |
| 11:24 | 13 | MR. QUINN:  Well, let me ask -- |
| 11:24 | 14 | MS. HURST:  Assumes facts not in evidence. |
| 11:24 | 15 | THE COURT:  Just a moment. |
| 11:24 | 16 | If this is in 2004, the case against Mr. Bryant |
| 11:24 | 17 | for two years?  I thought it was filed April 27th, 2004? |
| 11:24 | 18 | MR. QUINN:  Yes.  There's a stipulation to that, |
| 11:24 | 19 | in fact. |
| 11:24 | 20 | THE COURT:  All right.  So the question is? |
| 11:24 | 21 | BY MR. QUINN: |
| 11:24 | 22 | Q.   So as of the time this file is opened, the case against |
| 11:24 | 23 | Mr. Bryant has been pending for two years, correct? |
| 11:24 | 24 | A.   Correct. |
| 11:24 | 25 | Q.   And by then his deposition has been taken, correct? |

| | | |
|---|---|---|
| 11:24 | 1 | A.    I believe so. |
| 11:24 | 2 | Q.    And in that deposition information was learned about -- |
| 11:24 | 3 | was acquired about -- he testified, in other words, about |
| 11:24 | 4 | what he did and his dealings with MGA while he was still a |
| 11:25 | 5 | Mattel employee, correct? |
| 11:25 | 6 | A.    Yes, he did. |
| 11:25 | 7 | Q.    And there was some question -- you said that one of the |
| 11:25 | 8 | things that are done when an employee leaves -- as of -- |
| 11:25 | 9 | there came a point where, when an employee would leave to go |
| 11:25 | 10 | to work for a competitor, you would, at least in some cases, |
| 11:25 | 11 | check the hard drive, and seek evidence about portable |
| 11:25 | 12 | memory devices, such as thumb drives, had been attached to |
| 11:25 | 13 | the -- to the computer, correct? |
| 11:25 | 14 | A.    That's correct.  I didn't personally do it, but others |
| 11:25 | 15 | did. |
| 11:25 | 16 | Q.    And by the time Mattel started that practice, had it -- |
| 11:25 | 17 | had there been instances where Mattel discovered that |
| 11:25 | 18 | employees had left, attached thumb drives and downloaded |
| 11:25 | 19 | information? |
| 11:25 | 20 | A.    Yes, I believe that had occurred. |
| 11:25 | 21 | Q.    Including employees who had done that, and then had |
| 11:25 | 22 | joined MGA? |
| 11:25 | 23 | A.    Correct. |
| 11:25 | 24 | Q.    And if we look at this -- |
| 11:25 | 25 |           MR. QUINN:  If we could blow up in -- the middle |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

122

| | | |
|---|---|---|
| 11:26 | 1 | of this, Ken. |
| 11:26 | 2 | *(Technician complies.)* |
| 11:26 | 3 | BY MR. QUINN: |
| 11:26 | 4 | Q.   Do you see there the name PabloVargas@hotmail.com as |
| 11:26 | 5 | being one of the key terms? |
| 11:26 | 6 | Do you see that? |
| 11:26 | 7 | A.   Yes, I do. |
| 11:26 | 8 | Q.   And then plot04@aol.com, correct? |
| 11:26 | 9 | A.   Correct. |
| 11:26 | 10 | Q.   So by this time Mattel had had some experience -- some |
| 11:26 | 11 | hard experience with these types of events and these types |
| 11:26 | 12 | of issues? |
| 11:26 | 13 | MS. HURST:  Objection.  Argumentative. |
| 11:26 | 14 | THE COURT:  Overruled. |
| 11:26 | 15 | THE WITNESS:  Correct. |
| 11:26 | 16 | BY MR. QUINN: |
| 11:26 | 17 | Q.   Did you think there was anything wrong with Mattel |
| 11:26 | 18 | putting in place steps to try to protect itself -- |
| 11:26 | 19 | A.   No, I didn't. |
| 11:26 | 20 | Q.   -- given the history? |
| 11:26 | 21 | A.   No, I didn't. |
| 11:26 | 22 | Q.   Now, you were asked some questions here about Michele |
| 11:26 | 23 | McShane -- that entry about Michele McShane and the note |
| 11:26 | 24 | "Mattel attorney on the case originally." |
| 11:26 | 25 | And in response to Ms. Hurst's question, you said |

| | | |
|---|---|---|
| 11:26 | 1 | something about a copyright investigation that you thought |
| 11:27 | 2 | she had been involved in. |
| 11:27 | 3 | Do you recall saying that? |
| 11:27 | 4 | A.   Yeah.  I think I said a copyright analysis. |
| 11:27 | 5 | Q.   If we could take a look at Exhibit 1195-RS-66, the |
| 11:27 | 6 | chronological record file. |
| 11:27 | 7 | *(Document provided to the witness.)* |
| 11:27 | 8 | *(Document displayed.)* |
| 11:27 | 9 | MR. QUINN:  And if we could enlarge that entry on |
| 11:27 | 10 | March 28th. |
| 11:27 | 11 | *(Technician complies.)* |
| 11:27 | 12 | THE WITNESS:  Okay. |
| 11:27 | 13 | BY MR. QUINN: |
| 11:27 | 14 | Q.   Where it says, "Met with Cassidy Park to get more |
| 11:27 | 15 | information on the MGA issue.  She" -- |
| 11:27 | 16 | I'm sorry.  I can't read that. |
| 11:27 | 17 | A.   It looks like "suggested." |
| 11:27 | 18 | Q.   -- "suggested Carter Bryant as illustrator/former |
| 11:27 | 19 | employee who may have plagiarized design of Lily Martinez |
| 11:27 | 20 | and created Bratz dolls for MGA." |
| 11:27 | 21 | Do you see that? |
| 11:27 | 22 | A.   Yes, I do. |
| 11:27 | 23 | Q.   Could "plagiarize" in your mind be another word for |
| 11:28 | 24 | copying? |
| 11:28 | 25 | A.   *(No response.)* |

DEBBIE GALE, U.S. COURT REPORTER

| 11:28 | 1 | Q. If you plagiarize something, is that another way of |
|---|---|---|

11:28   1   Q.   If you plagiarize something, is that another way of

11:28   2   saying you copy it?

11:28   3   A.   Yes, I think it could be.

11:28   4   Q.   As in copyright infringement?

11:28   5   A.   Yes.  And someone who's from security might combine

11:28   6   those two.

11:28   7   Q.   Do you know whether or not -- do you know what, um --

11:28   8   do you know whether Lily Martinez had worked on a design

11:28   9   called "Toon Teens," a design for a doll?

11:28   10   A.   In -- in 2002, I did not.  But sometime in late '03 or

11:28   11   '04, I would have learned that she had worked on a project

11:28   12   called "Toon Teens."

11:28   13   Q.   And do you know -- there's a reference there to Cassidy

11:28   14   Park.  Do you know whether or not Mr. de Anda had been

11:28   15   approached by Cassidy Park and, uh, Ms. Ross, Ivy Ross, with

11:29   16   concerns about the idea that Mr. Bryant, after leaving

11:29   17   Mattel, had copied Toon Teens?

11:29   18           MS. HURST:  Objection.  Lacks foundation.

11:29   19           THE COURT:  Overruled.

11:29   20           If you know.

11:29   21           THE WITNESS:  What I know is based on what's

11:29   22   occurred since the case against Carter Bryant was filed.

11:29   23           But that's my understanding.

11:59   24   BY MR. QUINN:

11:29   25   Q.   And back in that time frame, would Michele McShane be

| 11:29 | 1 | the one who would issue -- look into issues such as that: |
|---|---|---|
| 11:29 | 2 | Copyright infringement of the Lily Martinez design? |
| 11:29 | 3 | A. Yes. She was the assistant general counsel over the |
| 11:29 | 4 | intellectual property section. |
| 11:29 | 5 | Q. Now, isn't it true that about 100 Mattel employees have |
| 11:29 | 6 | left Mattel to go to work for MGA? |
| 11:30 | 7 | MS. HURST: Objection. Lacks foundation. |
| 11:30 | 8 | THE COURT: Overruled. |
| 11:30 | 9 | THE WITNESS: That sounds accurate. |
| 11:30 | 10 | BY MR. QUINN: |
| 11:30 | 11 | Q. And isn't it true that Mattel has not sued any of those |
| 11:30 | 12 | employees except the ones that Mattel has concluded stole |
| 11:30 | 13 | Mattel intellectual property or had had a conflict of |
| 11:30 | 14 | interest or wouldn't acknowledge their obligations to |
| 11:30 | 15 | protect proprietary information? |
| 11:30 | 16 | MR. COTE: Objection. Argumentative. |
| 11:30 | 17 | THE COURT: Overruled. |
| 11:30 | 18 | THE WITNESS: That's correct. |
| 11:30 | 19 | BY MR. QUINN: |
| 11:30 | 20 | Q. And is it true that several employees have gone to |
| 11:30 | 21 | non-MGA competitors, and they are the subject of ongoing |
| 11:30 | 22 | investigations presently? |
| 11:30 | 23 | A. At least three are, yes. Uh, yes. |
| 11:30 | 24 | Q. Let's take a look at exhibit -- well, let's talk about |
| 11:31 | 25 | the Sal Villasenor investigation. |

| | | |
|---|---|---|
| 11:31 | 1 | You indicated that you retained two firms to look into |
| 11:31 | 2 | that, or had different roles, I think you said. |
| 11:31 | 3 | A.   Yes.  We retained Elena Baca from Paul Hastings, and |
| 11:31 | 4 | then Eve Wagner separately. |
| 11:31 | 5 | Q.   And Eve Wagner was to do investigation.  And the Paul |
| 11:31 | 6 | Hastings firm was to deal with the claim from a litigation |
| 11:31 | 7 | standpoint or mediation or settlement? |
| 11:31 | 8 | A.   Correct.  So I viewed them as over the whole thing, |
| 11:31 | 9 | yes. |
| 11:31 | 10 | Q.   But, in your experience -- can you tell us roughly, |
| 11:31 | 11 | approximately how many different employment claims you've |
| 11:31 | 12 | handled in your career? |
| 11:31 | 13 | A.   Well, of employment claims while at Mattel, it's |
| 11:31 | 14 | probably between 50 and a hundred. |
| 11:31 | 15 | Q.   Is it -- |
| 11:31 | 16 | A.   I mean, my section.  I have a gal that reports to me |
| 11:31 | 17 | that might also help with those. |
| 11:32 | 18 | Q.   Is it rare or unusual to actually hire two different |
| 11:32 | 19 | lawyers:  One to do an investigation, and one to be |
| 11:32 | 20 | litigation counsel? |
| 11:32 | 21 | A.   No, it's not. |
| 11:32 | 22 | Q.   Why do you do that? |
| 11:32 | 23 | A.   In case of litigation, if we want to have the |
| 11:32 | 24 | investigating lawyer be a witness, then we can do so without |
| 11:32 | 25 | having our trial lawyer be a witness. |

| 11:32 | 1 | Q.   And in this -- can you tell us what the average |
| 11:32 | 2 | employment case -- employment claim costs Mattel to defend? |
| 11:32 | 3 |             MS. HURST:  Objection.  Irrelevant. |
| 11:32 | 4 |             THE COURT:  Overruled. |
| 11:32 | 5 |             THE WITNESS:  Um, I don't know "average."  But if |
| 11:32 | 6 | you took a simple claim, even if it had no merit, if you had |
| 11:32 | 7 | to take it to the summary judgment stage, which is a way |
| 11:32 | 8 | where you can get it thrown out if it has no merit, it would |
| 11:32 | 9 | probably be at least a couple hundred thousand. |
| 11:32 | 10 |         If you couldn't get a claim dismissed at that |
| 11:33 | 11 | stage and you had to take it through trial, my experience is |
| 11:33 | 12 | it would be -- probably the low end would be a million, and |
| 11:33 | 13 | depending on how complex and hard-fought it was, it could go |
| 11:33 | 14 | up from there. |
| 11:33 | 15 | BY MR. QUINN: |
| 11:33 | 16 | Q.   Even if it ultimately turned out that the company did |
| 11:33 | 17 | not have any liability? |
| 11:33 | 18 | A.   Correct. |
| 11:33 | 19 | Q.   Can you tell us whether -- approximately how many of |
| 11:33 | 20 | the claims ultimately end up going to trial versus getting |
| 11:33 | 21 | settled or dismissed somewhere else along the way? |
| 11:33 | 22 | A.   We try to resolve most of our claims prior to |
| 11:33 | 23 | litigation, and then we -- we're always open to trying to |
| 11:33 | 24 | resolve them during litigation, so very few of them go |
| 11:33 | 25 | through trial. |

| | | |
|---|---|---|
| 11:33 | 1 | Q.   And of the ones that don't go to trial, can you tell us |
| 11:33 | 2 | whether -- you know, approximately what percentage of those |
| 11:33 | 3 | end up getting settled, as opposed to being dismissed on |
| 11:33 | 4 | summary judgment or some other way? |
| 11:33 | 5 | A.   Oh, I'd say the majority:  80, 90 percent. |
| 11:33 | 6 | Q.   You end up settling the cases? |
| 11:34 | 7 | A.   Correct. |
| 11:34 | 8 | Q.   And the resolution of Mr. Villasenor's case, it was a |
| 11:34 | 9 | payment of about $160,000? |
| 11:34 | 10 | A.   Correct. |
| 11:34 | 11 | Q.   And in terms of the amounts paid in settlement, can you |
| 11:34 | 12 | tell us, you know, where that would stand -- you know, as an |
| 11:34 | 13 | average amount?  Below average?  Above average? |
| 11:34 | 14 | A.   It would strike me as about average.  I mean, it |
| 11:34 | 15 | depends on the -- it depends on the employee's salary level |
| 11:34 | 16 | and factors like that.  But that wouldn't be surprising to |
| 11:34 | 17 | have it be 160. |
| 11:34 | 18 | Q.   Now, at some point early on, did his attorney make a |
| 11:34 | 19 | demand about how much he thought his client ought to be |
| 11:34 | 20 | paid? |
| 11:34 | 21 | A.   Yes, he did. |
| 11:34 | 22 | Q.   And what was that demand? |
| 11:34 | 23 | A.   That demand was $3 million. |
| 11:34 | 24 | Q.   Why was it that Mattel agreed to pay Mr. Villasenor |
| 11:34 | 25 | ultimately the $160,000? |

| | | |
|---|---|---|
| 11:35 | 1 | A.    Well, the main reason was we didn't want him to stay at |
| 11:35 | 2 | the company.  We wanted him out.  The next is that he was on |
| 11:35 | 3 | a purported medical leave; and if we had terminated him, I |
| 11:35 | 4 | am confident we would have gotten a retaliation claim.  And, |
| 11:35 | 5 | then, the third is that I understood that our outside |
| 11:35 | 6 | counsel wanted to complete a witness interview in the MGA |
| 11:35 | 7 | case, and he hadn't cooperated with that, so we put that in |
| 11:35 | 8 | as a requirement. |
| 11:35 | 9 | Q.    Now, you were asked some questions about the two |
| 11:35 | 10 | contractors who you found out were outside contractors who |
| 11:35 | 11 | were still doing work with Mattel:  Ms. Rahimi and |
| 11:35 | 12 | Ms. Osier. |
| 11:35 | 13 | A.    Yes. |
| 11:35 | 14 | Q.    Did you do anything to learn what type -- when you |
| 11:35 | 15 | began your investigation or began handling this claim, did |
| 11:35 | 16 | you do anything to learn what they were then doing as |
| 11:35 | 17 | outside contractors for the company? |
| 11:35 | 18 | A.    Not at the beginning, but at the conclusion I did. |
| 11:36 | 19 | Q.    And what did you learn? |
| 11:36 | 20 | A.    I learned that Ms. -- I don't recall with regard to |
| 11:36 | 21 | Ms. Rahimi.  But with regard to Ms. Osier, I had inquired of |
| 11:36 | 22 | someone at Mattel whether she was still working as a |
| 11:36 | 23 | contractor.  And she was.  And she was doing children's |
| 11:36 | 24 | focus groups. |
| 11:36 | 25 | Q.    Wasn't doing anything relating to toy fair? |

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

130

| | | |
|---|---|---|
| 11:36 | 1 | A.   No, she was not. |
| 11:36 | 2 | Q.   And even though you don't recall exact -- learning |
| 11:36 | 3 | exactly what Ms. Rahimi was doing, do you believe that you |
| 11:36 | 4 | satisfied yourself she wasn't doing anything relating to toy |
| 11:36 | 5 | fair? |
| 11:36 | 6 | A.   Yes.  I believe I would have done the same thing. |
| 11:36 | 7 | Q.   "North Hills Bratz."  Why North Hills? |
| 11:36 | 8 | A.   I believe that's where their company was originally |
| 11:36 | 9 | headquartered. |
| 11:36 | 10 | Q.   In terms of a city or locality? |
| 11:37 | 11 | A.   Yeah, I think it's in the Valley. |
| 11:37 | 12 | Q.   Do -- are Mattel employees all informed that Mattel has |
| 11:37 | 13 | the right to monitor their e-mail communications? |
| 11:37 | 14 | A.   I'm sorry.  Can you repeat that? |
| 11:37 | 15 | Q.   Are Mattel employees all informed that Mattel reserves |
| 11:37 | 16 | the right to monitor their e-mail communications? |
| 11:37 | 17 | A.   Yes, they are. |
| 11:37 | 18 | Q.   If we could look at Exhibit 24060.  24060. |
| 11:37 | 19 | *(Document provided to the witness* |
| 11:37 | 20 | BY MR. QUINN: |
| 11:37 | 21 | Q.   Can you identify that document, please? |
| 11:37 | 22 | A.   Uh, yes, I can.  It's a log-in screen that you -- comes |
| 11:37 | 23 | up on your screen when you're logging into your computer. |
| 11:37 | 24 | And you press "Okay," and you're able to continue. |
| 11:37 | 25 | Q.   So all employees see this when they log into a Mattel |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:37 | 1 | computer? |
| 11:37 | 2 | MS. HURST:  Objection.  Vague as to time. |
| 11:37 | 3 | THE COURT:  Overruled. |
| 11:37 | 4 | THE WITNESS:  Yes, they do. |
| 11:59 | 5 | BY MR. QUINN: |
| 11:37 | 6 | Q.   As of the time this filter, at least, was implemented, |
| 11:38 | 7 | you know that this was in place? |
| 11:38 | 8 | A.   This wasn't a filter.  This was a screen notice. |
| 11:38 | 9 | Q.   I know.  But the filter that Ms. Hurst asked you |
| 11:38 | 10 | about -- |
| 11:38 | 11 | A.   Oh. |
| 11:38 | 12 | Q.   -- as of the time that was implemented, was this log-in |
| 11:38 | 13 | screen in place? |
| 11:38 | 14 | A.   Yes. |
| 11:38 | 15 | MR. QUINN:  We'd offer Exhibit 24060, Your Honor. |
| 11:38 | 16 | THE COURT:  Received. |
| 11:38 | 17 | *(Exhibit No. 24060 received in evidence.)* |
| 11:38 | 18 | *(Document displayed.)* |
| 11:38 | 19 | BY MR. QUINN: |
| 11:38 | 20 | Q.   And that says, in the last sentence, "Use of the system |
| 11:38 | 21 | may be monitored to the extent allowed by applicable law," |
| 11:38 | 22 | correct? |
| 11:38 | 23 | A.   I know it's in there.  I just don't see it. |
| 11:38 | 24 | Q.   The last -- |
| 11:38 | 25 | A.   Yes.  I see it, yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 132 of 152   Page ID #:314085
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

132

| 11:38 | 1 | Q.   And then are employees also told in the employee |
|---|---|---|
| 11:38 | 2 | handbook that the company reserves the right to monitor |
| 11:38 | 3 | their e-mails? |
| 11:38 | 4 | A.   Yes, they are. |
| 11:38 | 5 | Q.   If we could take a look at Exhibit 20122.  20122. |
| 11:38 | 6 | *(Document provided to the witness.)* |
| 11:38 | 7 | BY MR. QUINN: |
| 11:38 | 8 | Q.   Is that the 2003 employee handbook? |
| 11:39 | 9 | A.   Yes, it appears to be. |
| 11:39 | 10 | MR. QUINN:  I'd offer that, Your Honor. |
| 11:39 | 11 | THE COURT:  Received. |
| 11:39 | 12 | *(Exhibit No. 20122 received in evidence.)* |
| 11:39 | 13 | *(Document displayed.)* |
| 11:39 | 14 | BY MR. QUINN: |
| 11:39 | 15 | Q.   If we look at page dash 30. |
| 11:39 | 16 | *(Document displayed.)* |
| 11:39 | 17 | BY MR. QUINN: |
| 11:39 | 18 | Q.   And does that say, "All messages sent and received, |
| 11:39 | 19 | including personal messages, and all data and information |
| 11:39 | 20 | stored on the company's electronic mail system, voicemail |
| 11:39 | 21 | system, or computer systems are the company's property, |
| 11:39 | 22 | regardless of content.  As such, the company reserves the |
| 11:39 | 23 | right to access all of its electronic mail systems at any |
| 11:39 | 24 | time in its sole discretion," right? |
| 11:39 | 25 | Do you see that? |

| 11:39 | 1 | A.   "Right to access all of its technology resources, |
| 11:39 | 2 | including computers, voicemail and electronic mail systems," |
| 11:39 | 3 | yes. |
| 11:39 | 4 | Q.   Thank you.  And then under "Privacy," it says, |
| 11:39 | 5 | "Employees should understand, therefore, that they have no |
| 11:39 | 6 | right of privacy with respect to any messages or information |
| 11:39 | 7 | created or maintained on the company's technology resources, |
| 11:40 | 8 | including what might have been thought or considered by the |
| 11:40 | 9 | employees to be personal information or messages," correct? |
| 11:40 | 10 | A.   That's correct. |
| 11:40 | 11 | Q.   Are there similar warnings in the 2005 and 2007 |
| 11:40 | 12 | employees handbooks:  Exhibit 20471 and 20419? |
| 11:40 | 13 | *(Documents provided to the witness.)* |
|  | 14 | BY MR. QUINN: |
| 11:40 | 15 | Q.   And in 20471, I'd call your attention to page 37. |
| 11:40 | 16 | A.   Bates No. 37? |
| 11:40 | 17 | Q.   No.  It's Exhibit Number dash 36, dash 37, |
| 11:40 | 18 | Exhibit 20471-36, -37? |
| 11:40 | 19 | A.   Okay.  Got it. |
| 11:40 | 20 | MR. QUINN:  We'd offer this, Your Honor, the |
| 11:40 | 21 | entire Exhibit 20471. |
| 11:40 | 22 | THE COURT:  Received. |
| 11:40 | 23 | *(Exhibit No. 20471 received in evidence.)* |
| 11:40 | 24 | *(Document displayed.)* |
|  | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 134 of 152   Page ID #:314087
CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

134

| 11:40 | 1 | BY MR. QUINN: |
| 11:40 | 2 | Q.   And then on pages dash 36, 37, is there a similar |
| 11:40 | 3 | disclaimer about computer files and employees should |
| 11:40 | 4 | understand they have no right of privacy with respect to any |
| 11:41 | 5 | messages or information created or maintained on the |
| 11:41 | 6 | company's technology resources? |
| 11:41 | 7 | A.   That's correct. |
| 11:41 | 8 | Q.   And there's similar disclaimers in employees handbooks |
| 11:41 | 9 | issued after that.  I won't take the time to go through it. |
| 11:41 | 10 | But is that your understanding? |
| 11:41 | 11 | A.   Yes, that's correct. |
| 11:41 | 12 | MR. QUINN:  Nothing further. |
| 11:41 | 13 | THE COURT:  Redirect. |
| 11:41 | 14 | MS. HURST:  Your Honor, I want to get that color |
| 11:41 | 15 | file.  Would it be all right if we broke for lunch now and |
| 11:41 | 16 | continued redirect after lunch? |
| 11:41 | 17 | THE COURT:  Here's the colored file now. |
| 11:41 | 18 | Nancy, give it to counsel. |
| 11:41 | 19 | Counsel, there's the file for both of you. |
| 11:41 | 20 | MS. HURST:  Thank you, Your Honor. |
| 11:41 | 21 | THE COURT:  You can share that. |
| 11:42 | 22 | **REDIRECT EXAMINATION** |
| 11:42 | 23 | BY MS. HURST: |
| 11:42 | 24 | Q.   On that last point, Ms. Thomas, it's true that Mattel |
| 11:42 | 25 | has always reserved the right to monitor its employees' |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 135 of 152   Page ID #:314088
CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

135

| | | |
|---|---|---|
| 11:42 | 1 | e-mail and computers, right? |
| 11:43 | 2 | A.   I don't know if it has always done so, but I know |
| 11:43 | 3 | they've done so, at least, since 2000.  They may -- I wasn't |
| 11:43 | 4 | as involved in those issues earlier on. |
| 11:43 | 5 | Q.   Certainly Mattel has always been of the view that it |
| 11:43 | 6 | was perfectly proper for it to monitor employees' activities |
| 11:43 | 7 | using its facilities and equipment, right? |
| 11:43 | 8 | A.   That's correct, as long as they were notified that that |
| 11:43 | 9 | could occur. |
| 11:43 | 10 | Q.   And, in fact, Mattel has video cameras that it uses in |
| 11:43 | 11 | its facilities, right? |
| 11:43 | 12 | A.   Mattel has security cameras. |
| 11:43 | 13 | Q.   Including in the design center, right? |
| 11:43 | 14 | A.   I'm sure they do.  I'm just not that familiar with the |
| 11:43 | 15 | design center, but I'm sure they have security cameras in |
| 11:43 | 16 | the design center. |
| 11:43 | 17 | Q.   And it would certainly be your view that it would be |
| 11:43 | 18 | acceptable for Mattel to monitor its employees' activities |
| 11:44 | 19 | to ensure that they were following the rules there, right? |
| 11:44 | 20 | A.   Um, I don't know what you mean by "monitor." |
| 11:44 | 21 | Q.   Well, look at their e-mails. |
| 11:44 | 22 |      Would be an example, right? |
| 11:44 | 23 | A.   That's correct.  That would be appropriate, as long as |
| 11:44 | 24 | they were notified that that was a possibility. |
| 11:44 | 25 | Q.   Used video cameras for security purposes, right? |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 136 of 152   Page ID #:314089
CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

136

| | | |
|---|---|---|
| 11:44 | 1 | A.    Um, in public areas, yes. |
| 11:44 | 2 | Q.    Not in the bathroom, right? -- for example. |
| 11:44 | 3 | A.    Yeah, or a private office. |
| 11:44 | 4 | Q.    Well, and you thought it was okay to make copies of |
| 11:44 | 5 | hard drives, right? -- and look on hard drives? |
| 11:44 | 6 | A.    Correct.  That was appropriate, as long as they knew |
| 11:44 | 7 | that we had the right to review their electronic |
| 11:44 | 8 | information. |
| 11:44 | 9 | Q.    And those were all tools that were available to Mattel |
| 11:44 | 10 | to monitor its employees' activities in the Summer of 2000, |
| 11:44 | 11 | correct? |
| 11:45 | 12 | A.    I -- I believe so. |
| 11:45 | 13 | Q.    And you also had a way of looking at logs of people's |
| 11:45 | 14 | telephone calls, right? |
| 11:45 | 15 | A.    I believe we would have had some telephone records. |
| 11:45 | 16 | I'm not sure how detailed they would have been. |
| 11:45 | 17 | Q.    You had a way, using a system called "Microcall," of |
| 11:45 | 18 | looking at the calls into and out of extensions, right? |
| 11:45 | 19 |          MR. QUINN:  Time frame, Your Honor. |
| 11:45 | 20 |          THE COURT:  Overruled. |
| 11:45 | 21 |          THE WITNESS:  Excuse me.  I'm not aware of that. |
| 11:45 | 22 | BY MS. HURST: |
| 11:45 | 23 | Q.    In fact, you're aware that records of Mr. Bryant's |
| 11:45 | 24 | phone calls for certain periods of time have actually been |
| 11:45 | 25 | produced in this litigation, right? |

CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

137

| | | |
|---|---|---|
| 11:46 | 1 | A.   I believe that's the case.  Where I'm hesitant is I |
| 11:46 | 2 | can't recall if they were just outgoing.  I don't know if we |
| 11:46 | 3 | could -- had records of incoming phone calls.  I'm not sure. |
| 11:46 | 4 | I know there were some phone records relating to Mr. Bryant |
| 11:46 | 5 | that were produced in this action. |
| 11:46 | 6 | Q.   All right.  So it's your belief that you could get at |
| 11:46 | 7 | least outgoing telephone logs from the 2000 time frame, |
| 11:46 | 8 | right? |
| 11:46 | 9 | A.   I believe so, but I'm not certain. |
| 11:46 | 10 | Q.   And that was a tool that was also available to Mattel |
| 11:46 | 11 | in 2000, right? |
| 11:46 | 12 | A.   I think that information -- and, again, I'm not sure |
| 11:46 | 13 | what the format was -- would have been available. |
| 11:46 | 14 | Q.   So if Mattel was suspicious of Carter Bryant when he |
| 11:46 | 15 | left Mattel in October of 2000, Mattel could have imaged his |
| 11:46 | 16 | hard drive, looked on its e-mail servers, looked at his |
| 11:47 | 17 | telephone logs, and examined security camera footage to try |
| 11:47 | 18 | and investigate his activity? |
| 11:47 | 19 |          MR. QUINN:  Assumes facts, at least as to some of |
| 11:47 | 20 | that; for example, that he had a computer. |
| 11:47 | 21 |          THE COURT:  Overruled. |
| 11:47 | 22 |          THE WITNESS:  Yeah.  I don't know.  You're |
| 11:47 | 23 | assuming that we'd be suspicious of what? |
| 11:47 | 24 | BY MS. HURST: |
| 11:47 | 25 | Q.   Well, my question is, if you were suspicious at the |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

138

| | | |
|---|---|---|
| 11:47 | 1 | time of Carter Bryant's departure in October 2000, these |
| 11:47 | 2 | tools -- taking copies of hard drives, looking at e-mail, |
| 11:47 | 3 | looking at security cameras, and looking at telephone |
| 11:47 | 4 | logs -- were all available to you in October of 2000, true? |
| 11:47 | 5 | A.   I -- I believe that information would have been |
| 11:47 | 6 | available, yes. |
| 11:47 | 7 | Q.   And if, in early 2001, people heard about Bratz and |
| 11:48 | 8 | were suspicious about Carter Bryant's involvement in it, |
| 11:48 | 9 | those were all tools that were available then to Mattel, as |
| 11:48 | 10 | well, correct? |
| 11:48 | 11 | A.   I believe those -- that information would have been |
| 11:48 | 12 | available to people, if they -- if they were to look at it, |
| 11:48 | 13 | I -- I don't -- I'm not sure what was available in 2001. |
| 11:48 | 14 | Q.   When you fired Ms. Cabrera and terminated the contract |
| 11:49 | 15 | of Ms. Morales, you did that as a matter of principle, |
| 11:49 | 16 | right? |
| 11:49 | 17 | MR. QUINN:  It's beyond the scope, Your Honor. |
| 11:49 | 18 | THE COURT:  Overruled. |
| 11:49 | 19 | THE WITNESS:  Partly.  The other part was that, |
| 11:49 | 20 | having worked for a competitor while their groups that they |
| 11:49 | 21 | were working with were working on Barbie products, we didn't |
| 11:49 | 22 | think it was possible, um, if their coworkers had known |
| 11:49 | 23 | they'd engaged that conduct, to have them continue working |
| 11:49 | 24 | with their groups at the design center. |
| | 25 | |

| | | |
|---|---|---|
| 11:49 | 1 | BY MS. HURST: |
| 11:49 | 2 | Q.   You thought that would have infected morale? |
| 11:49 | 3 | A.   My understanding from HR is they didn't think that |
| 11:49 | 4 | would be acceptable to their coworkers. |
| 11:49 | 5 | Q.   So you're saying that the coworkers wanted Ana Cabrera |
| 11:49 | 6 | fired? |
| 11:49 | 7 | A.   No.  I think everyone was very disappointed and upset |
| 11:50 | 8 | that that had happened.  But, um, HR had expressed a concern |
| 11:50 | 9 | that people -- people during that time frame felt that MGA |
| 11:50 | 10 | had been stealing our concepts, and so it would have been |
| 11:50 | 11 | unacceptable to have someone continue to work with the |
| 11:50 | 12 | design group who had been working on the side for MGA. |
| 11:50 | 13 | Q.   Just in this time frame, 2008, is that what you're |
| 11:50 | 14 | saying? |
| 11:50 | 15 | A.   That's when we learned of it, yes. |
| 11:50 | 16 | Q.   And at that point you were already suing MGA, right? |
| 11:50 | 17 | A.   Yes, we were. |
| 11:50 | 18 | Q.   And at that point you had -- you had sort of a bunker |
| 11:50 | 19 | mentality going on over there at Mattel with respect to MGA, |
| 11:50 | 20 | didn't you? |
| 11:50 | 21 |          MR. QUINN:  Argumentative. |
| 11:50 | 22 |          THE COURT:  Sustained as to "bunker mentality." |
| 11:50 | 23 | BY MS. HURST: |
| 11:51 | 24 | Q.   Was it your testimony that it was not surprising to pay |
| 11:51 | 25 | Mr. Villasenor $160,000? |

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

140

| 11:51 | 1 | A.    In the context of an employment claim, I don't think it |
| 11:51 | 2 | was surprising. |
| 11:51 | 3 | Q.    But you thought that his hostile work environment claim |
| 11:51 | 4 | was baseless, didn't you? |
| 11:51 | 5 | A.    That's correct.  I don't think he was subject to a |
| 11:51 | 6 | hostile work environment. |
| 11:51 | 7 | Q.    And if you were looking to vindicate a principle with |
| 11:51 | 8 | Mr. Villasenor, then you would have said, "Go ahead and sue |
| 11:51 | 9 | us 'cause we think we're right about this," right? |
| 11:51 | 10 | A.    Um, that's one approach. |
| 11:51 | 11 | Q.    And that's the approach that you took with Ana Cabrera |
| 11:51 | 12 | and Beatriz Morales? |
| 11:51 | 13 | A.    I don't -- I don't consider those similar.  That |
| 11:51 | 14 | approach -- that's an approach I've taken on a couple other |
| 11:51 | 15 | employment cases, and I have learned the hard way that the |
| 11:52 | 16 | Court system can be fairly unpredictable, so it's a fairly |
| 11:52 | 17 | expensive, risky undertaking to pursue an employment claim |
| 11:52 | 18 | on that basis. |
| 11:52 | 19 | Q.    Isn't it true that your contractor in China who |
| 11:52 | 20 | manufactures Mattel products works for both Mattel and MGA? |
| 11:52 | 21 | A.    If you're talking about Early Light, I believe so. |
| 11:52 | 22 | Q.    So the -- it's okay for the contractors in China to |
| 11:52 | 23 | work for both Mattel and MGA, but not Ana Cabrera and |
| 11:52 | 24 | Beatriz Morales; is that right? |
| 11:52 | 25 | A.    Given the circumstances of the contractual relationship |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 141 of 152   Page ID #:314094
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

141

| | | |
|---|---|---|
| 11:52 | 1 | between that contractor and Mattel, I believe so. |
| 11:52 | 2 | Q.   And Anna Rhee, she is an independent contractor who |
| 11:52 | 3 | works for both Mattel and MGA, right? |
| 11:52 | 4 | A.   I believe she has worked for both.  I don't know if |
| 11:52 | 5 | it's overlapping or what the status is. |
| 11:53 | 6 | Q.   And she came here and testified for Mattel in this |
| 11:53 | 7 | case, right? |
| 11:53 | 8 | A.   She testified, yes. |
| 11:53 | 9 | Q.   And you have never had any problem with her working for |
| 11:53 | 10 | both Mattel and MGA at the same time, right? |
| 11:53 | 11 | A.   Again, these are contractors that have contracts in |
| 11:53 | 12 | place and -- and I believe that there are procedures in |
| 11:53 | 13 | place to -- to make sure that there isn't any overlap of |
| 11:53 | 14 | information. |
| 11:53 | 15 | Q.   You said Beatriz Morales was a contractor when she was |
| 11:53 | 16 | fired too, right? |
| 11:53 | 17 | A.   She was a temp working for a company called Pro.  She |
| 11:53 | 18 | wasn't an independent contractor. |
| 11:53 | 19 | Q.   So she was working for a vendor the same way that Anna |
| 11:53 | 20 | Rhee is a vendor, or Francis Choi is a vendor, when you |
| 11:53 | 21 | fired her, right? |
| 11:53 | 22 | A.   No, that's not correct. |
| 11:53 | 23 | Q.   You knew that if Sal Villasenor filed a litigation, |
| 11:53 | 24 | that would be public document, right? |
| 11:54 | 25 | A.   Yes, I did. |

CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

142

| 11:54 | 1 | Q.   And you knew that if Sal Villasenor made allegations |
| 11:54 | 2 | that he was subject to a hostile work environment because he |
| 11:54 | 3 | could no longer meet the demands for information, that would |
| 11:54 | 4 | become public, right? |
| 11:54 | 5 | A.   Yes, that would. |
| 11:54 | 6 | Q.   And you knew that if Sal Villasenor alleged that he had |
| 11:54 | 7 | falsified credentials on behalf of Mattel in connection with |
| 11:54 | 8 | his hostile work environment claim, you knew that would |
| 11:54 | 9 | become public in a lawsuit, right? |
| 11:54 | 10 | A.   I don't think he was currently doing that, so I don't |
| 11:54 | 11 | think it was related to his purported hostile work |
| 11:54 | 12 | environment claim; but, yes, I knew it would become public |
| 11:54 | 13 | that he had engaged in using misleading means to enter |
| 11:54 | 14 | various tradeshows. |
| 11:55 | 15 | MS. HURST:  Your Honor, would now be a good time |
| 11:55 | 16 | to break? |
| 11:55 | 17 | THE COURT:  Apparently now would be a good time to |
| 11:55 | 18 | break. |
| 11:55 | 19 | Ladies and gentlemen, you're admonished not to |
| 11:55 | 20 | discuss this matter amongst yourselves, nor form or express |
| 11:55 | 21 | any opinion concerning the case. |
| 11:55 | 22 | We'll see you at 1:00 o'clock. |
| 11:55 | 23 | Have a nice recess. |
| 11:55 | 24 | *(Jury recesses at 11:55 a.m.)* |
| 11:55 | 25 | THE COURT:  (To the witness:)  If you will return |

DEBBIE GALE, U.S. COURT REPORTER

| 11:55 | 1 | at 1:00 o'clock, please. |
| 11:55 | 2 | *(Witness steps down for lunch.)* |
| 11:55 | 3 | *(Outside the presence of the jury.)* |
| 11:58 | 4 | THE COURT:  All right.  Counsel, we're back on the |
| 11:58 | 5 | record in the Mattel-MGA matter. |
| 11:58 | 6 | Since we seem to be having a vigorous day, what do |
| 11:58 | 7 | we want to do next? |
| 11:58 | 8 | MR. QUINN:  I was hoping I could persuade the |
| 11:58 | 9 | Court to take a look at these documents. |
| 11:58 | 10 | THE COURT:  Now you can. |
| 11:58 | 11 | MR. QUINN:  These are in evidence. |
| 11:58 | 12 | THE COURT:  Okay.  Thank you very much.  I |
| 11:58 | 13 | appreciate it.  Before your recross? |
| 11:58 | 14 | MR. QUINN:  Yes. |
| 11:58 | 15 | THE COURT:  Okay.  Now, are these documents that |
| 11:58 | 16 | you would want -- |
| 11:58 | 17 | Counsel, do you have copies of these documents? |
| 11:58 | 18 | MS. HURST:  I think so, Your Honor. |
| 11:58 | 19 | THE COURT:  Now, for both of you, here's the |
| 11:59 | 20 | problem:  You want Ms. Thomas to testify about information |
| 11:59 | 21 | between Isaac Larian -- or from Angelika Sternberg to Isaac |
| 11:59 | 22 | Larian through Jill Thomas, Mr. Quinn? |
| 11:59 | 23 | MR. QUINN:  Yes, Your Honor. |
| 11:59 | 24 | THE COURT:  And the import of that is? |
| 11:59 | 25 | MR. QUINN:  It's just -- Your Honor, it's just the |

| 11:59 | 1 | fact of the late production of the documents.  I mean, we |
| 11:59 | 2 | were -- there was questioning yesterday about late |
| 11:59 | 3 | production of documents by Mattel, and documents being |
| 11:59 | 4 | buried.  And I want to offer documents that MGA produced |
| 11:59 | 5 | late, along with the transmittal letters which show when |
| 11:59 | 6 | they were produced, and then also that e-mail that we got in |
| 11:59 | 7 | the middle of trial.  When we tried to bring out that the |
| 11:59 | 8 | "Tell Paula that -- "Make sure Paula's prepared not to know |
| 12:00 | 9 | about the seamstresses," and Mr. Holden's response, which we |
| 12:00 | 10 | only got in the middle of trial, we tried to bring that out |
| 12:00 | 11 | and the objection was sustained. |
| 12:00 | 12 | Yet, yesterday, they were permitted to bring out |
| 12:00 | 13 | that they didn't get an unredacted version of the Sal |
| 12:00 | 14 | Villasenor letter until last Friday. |
| 12:00 | 15 | THE COURT:  No.  You have to remember two things |
| 12:00 | 16 | happened.  Just like you having a valid request for a |
| 12:00 | 17 | privilege or work product, this case goes clear back, on |
| 12:00 | 18 | some of these e-mails -- not the specific one you |
| 12:00 | 19 | mentioned -- to Mr. Nolan and the prior representation.  And |
| 12:00 | 20 | the Court held extensive hearings, you know, on crime fraud |
| 12:00 | 21 | with both sides. |
| 12:00 | 22 | Now, this e-mail your referring to is a clawback. |
| 12:00 | 23 | You got that e-mail.  I turned that over to you for |
| 12:00 | 24 | questioning. |
| 12:00 | 25 | MR. QUINN:  Your Honor, not the one involving |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 145 of 152   Page ID #:314098
CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

145

| | | |
|---|---|---|
| 12:00 | 1 | Mr. Holden.  Not the one involving Mr. Holden.  We got that |
| 12:00 | 2 | in the middle of trial. |
| 12:00 | 3 | THE COURT:  Just a moment.  You'll have to show me |
| 12:00 | 4 | that e-mail. |
| 12:00 | 5 | MR. QUINN:  All right. |
| 12:00 | 6 | THE COURT:  Okay. |
| 12:01 | 7 | Second, my concern is this:  If I allow this in, |
| 12:01 | 8 | I'm facing a motion involving Mr. Eckert.  And that's an |
| 12:01 | 9 | attempt by MGA, when Mr. Eckert gets up on the stand, to |
| 12:01 | 10 | impeach him through hearsay retail documents written by |
| 12:01 | 11 | Mr. Larian to other retailers, or retailers to Mr. Larian. |
| 12:01 | 12 | And MGA has a pending motion, which is of tremendous concern |
| 12:01 | 13 | to Mattel on the reverse side, concerning hearsay. |
| 12:01 | 14 | So, Mr. Quinn and MGA, let's enter into a |
| 12:01 | 15 | conversation with where we're going about all of this kind |
| 12:01 | 16 | of evidence, because, on one hand, I don't know that Jill |
| 12:01 | 17 | Thomas is prepared to testify to this.  And that's not the |
| 12:01 | 18 | import of this e-mail, anyway.  It appears to be offered for |
| 12:01 | 19 | an entirely different purpose. |
| 12:01 | 20 | The problem is, if we get into that kind of |
| 12:02 | 21 | general ruling by the Court, then Mr. Eckert's exposed, |
| 12:02 | 22 | because MGA wants to test him about e-mails that I don't |
| 12:02 | 23 | believe he could have ever seen. |
| 12:02 | 24 | MR. QUINN:  Your Honor, these are documents that |
| 12:02 | 25 | are in evidence, except for the transmittal letters, which |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 146 of 152   Page ID #:314099
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

146

| | | |
|---|---|---|
| 12:02 | 1 | will indicate what date they were produced. |
| 12:02 | 2 | THE COURT:  Okay. |
| 12:02 | 3 | MR. QUINN:  So they have been permitted to say in |
| 12:02 | 4 | front of the jury that we buried documents, we produced |
| 12:02 | 5 | documents years late.  We heard that yesterday. |
| 12:02 | 6 | THE COURT:  Well, only in specific areas, Counsel. |
| 12:02 | 7 | MR. QUINN:  Well, that Sal Villasenor e-mail, we |
| 12:02 | 8 | heard that in two witnesses.  And I think it was a subject |
| 12:02 | 9 | of multiple questions -- that we buried that.  They didn't |
| 12:02 | 10 | get it until last Summer. |
| 12:02 | 11 | And the Court -- |
| 12:02 | 12 | THE COURT:  Which Sal Villasenor? |
| 12:02 | 13 | MR. QUINN:  That's the December 22nd e-mail, the |
| 12:02 | 14 | Exhibit 9484-A. |
| 12:02 | 15 | THE COURT:  Just a moment. |
| 12:02 | 16 | That's a mischaracterization.  That was redacted. |
| 12:03 | 17 | So what you're really referring to is the implication that |
| 12:03 | 18 | the redacted portion had not been disclosed, not the entire |
| 12:03 | 19 | e-mail? |
| 12:03 | 20 | MR. QUINN:  They did both.  They did both.  They |
| 12:03 | 21 | said this was buried for years.  "You knew back in 2006, |
| 12:03 | 22 | 2005, it was relevant to a pending lawsuit.  We didn't get |
| 12:03 | 23 | this until the Summer."  That's number one. |
| 12:03 | 24 | Then, number two, "We didn't get the redacted |
| 12:03 | 25 | version until last Friday." |

| | | |
|---|---|---|
| 12:03 | 1 | THE COURT: Mr. Eckert, I'm sorry. Why don't you |
| 12:03 | 2 | go to lunch with Mr. Larian. My apologies. There's no |
| 12:03 | 3 | reason for you to have to sit here. |
| 12:03 | 4 | MR. QUINN: So it's two separate inquiries that |
| 12:03 | 5 | have been put on the table here. |
| 12:03 | 6 | One, we suppressed the entire document for years. |
| 12:03 | 7 | They didn't get it until 2010. |
| 12:04 | 8 | Two, that they didn't get an unredacted version |
| 12:04 | 9 | until last Friday. |
| 12:04 | 10 | I want to be able to show that MGA has produced |
| 12:04 | 11 | documents late, that we didn't get their allegation -- their |
| 12:04 | 12 | documents concerning their snooping in toy fairs until last |
| 12:04 | 13 | September and November, and that we didn't get the e-mail |
| 12:04 | 14 | exchange between Mr. Larian and his counsel until the middle |
| 12:04 | 15 | of this trial. |
| 12:04 | 16 | THE COURT: Okay. Let me repeat back to you what |
| 12:04 | 17 | I'm hearing. |
| 12:04 | 18 | This involves -- this February 3rd, 2007 letter |
| 12:04 | 19 | involves what I'm going to refer to as snooping into |
| 12:04 | 20 | Mattel's showroom by MGA. |
| 12:04 | 21 | MR. QUINN: I believe it -- I actually don't -- |
| 12:04 | 22 | I'm having sets made, Your Honor. I believe that's what it |
| 12:04 | 23 | does refer to. |
| 12:04 | 24 | THE COURT: Well, "Dear Isaac, we have some news |
| 12:04 | 25 | from you which we heard from customers regarding Get |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 148 of 152   Page ID #:314101
CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

148

| | | |
|---|---|---|
| 12:04 | 1 | Connected Barbie.  They show it as a top secret theme in a |
| 12:04 | 2 | closed room at toy fair.  The retail price point will be |
| 12:05 | 3 | around" –– and then Euro 90 –– "which is seen by the trade |
| 12:05 | 4 | as far too high for a simple doll with Internet connection |
| 12:05 | 5 | and MP3 player. |
| 12:05 | 6 | "The main theme movie will be *Princess of the* |
| 12:05 | 7 | *Island*, Robinson Crusoe story.  Storyline:  Barbie and a lot |
| 12:05 | 8 | of animals on a lonely island.  A very nice and handsome guy |
| 12:05 | 9 | is rescuing her and the animals from the island into |
| 12:05 | 10 | civilization, and Barbie and this guy, of course, fall in |
| 12:05 | 11 | love and want to get married.  His parents are against this |
| 12:05 | 12 | relationship since they want him to marry another girl. |
| 12:05 | 13 | This girl, at the end, realized" –– or "realize" –– I'm |
| 12:05 | 14 | sorry –– "that a true love cannot be skipped until" –– |
| 12:05 | 15 | dash –– "and finally backtrack and opens the way for Barbie |
| 12:05 | 16 | and her beloved." |
| 12:05 | 17 | "We furthermore heard that they are coming up with |
| 12:05 | 18 | a new Barbie house and an airplane.  In Polly Pocket, |
| 12:05 | 19 | they're introducing again high-priced accessories. |
| 12:05 | 20 | "Regards" –– well –– |
| 12:05 | 21 | "B–R–G–D–S, Angelika." |
| 12:06 | 22 | And when did you receive this? |
| 12:06 | 23 | MR. QUINN:  That was produced to us on |
| 12:06 | 24 | September 3, 2010. |
| 12:06 | 25 | THE COURT:  Just a moment.  September 3rd? |

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 149 of 152   Page ID #:314102
CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

149

| 12:06 | 1 | MR. QUINN:  September 3rd, 2010. |
|---|---|---|

12:06  1    MR. QUINN:  September 3rd, 2010.

12:06  2    THE COURT:  And so --

12:06  3    MR. QUINN:  We have the transmittal letter.

12:06  4    THE COURT:  What I'm really hearing is that you're

12:06  5  concerned that the implication is that Mattel has, in a

12:06  6  sense, been accused of late production, when you feel that

12:06  7  that's been equaled or even surpassed, from your position,

12:06  8  by MGA?

12:06  9    MR. QUINN:  Yes.  I mean, we -- it ought to be a

12:06  10  parity.  There ought to be a level playing field here.

12:06  11    THE COURT:  Well, I think that there is,

12:06  12  Mr. Quinn, although I know that --

12:06  13    MR. QUINN:  No.  Well, that --

12:06  14    THE COURT:  -- you disagree.

12:06  15    All right.  Thank you.

12:06  16    On behalf of MGA --

12:06  17    And I'm joking with Mr. Quinn, but he's not joking

12:06  18  with the Court.

12:06  19    Counsel.

12:06  20    MS. HURST:  Your Honor, we object to the use --

12:06  21  first of all, not all of these documents have been admitted.

12:06  22  But this witness has no foundation to offer testimony about

12:06  23  them.  And if they do this, then it's gonna have to be,

12:07  24  "This stuff was all produced in response to the new claim

12:07  25  that we were able to make because you buried the Villasenor

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10346   Filed 03/31/11   Page 150 of 152   Page ID #:314103
CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

150

| | | |
|---|---|---|
| 12:07 | 1 | evidence."  It's gonna be right down the road. |
| 12:07 | 2 | Now, they hammered Mr. Larian twice on, you know, |
| 12:07 | 3 | documents that were withheld.  They've had a full |
| 12:07 | 4 | opportunity on this.  And this is just -- it's not |
| 12:07 | 5 | appropriate. |
| 12:07 | 6 | THE COURT:  All right. |
| 12:07 | 7 | Counsel, Mr. Quinn. |
| 12:07 | 8 | MR. QUINN:  Your Honor, I don't think I have |
| 12:07 | 9 | anything more to add.  I'd just be repeating myself. |
| 12:07 | 10 | THE COURT:  All right. |
| 12:07 | 11 | MR. QUINN:  These documents were produced late. |
| 12:07 | 12 | We've got the transmittal letters.  We can prove when they |
| 12:07 | 13 | were produced.  We have significant evidence, which we only |
| 12:07 | 14 | got in the middle of trial.  We should be able to establish |
| 12:07 | 15 | the same thing. |
| 12:07 | 16 | THE COURT:  Your motion's denied. |
| 12:07 | 17 | There's a significant difference between 9484 -- |
| 12:07 | 18 | without making too much further of a record, unless you want |
| 12:08 | 19 | me to.  The Court also views that that was improperly |
| 12:08 | 20 | excised as work product, and should have been disclosed at a |
| 12:08 | 21 | much earlier date. |
| 12:08 | 22 | Now, I'm more than willing to guard Jon Corey and |
| 12:08 | 23 | your law firm, but I -- I'll accept your representation it |
| 12:08 | 24 | was done in good faith.  But that was not work product. |
| 12:08 | 25 | Now, Counsel, what else are we going to do? |

| | | |
|---|---|---|
| 12:08 | 1 | MS. HURST:  We're fine, Your Honor. |
| 12:08 | 2 | THE COURT:  Counsel? |
| 12:08 | 3 | MR. QUINN:  We're content. |
| 12:08 | 4 | THE COURT:  All right.  Then have a good lunch. |
| 12:08 | 5 | We'll see you at 1:00 o'clock. |
| 12:08 | 6 | *(Lunch recess held at 12:08 p.m.)* |
| 12:08 | 7 | *(Further proceeding reported by Jane Rule in* |
| 12:08 | 8 | *Volume II.)* |
| 12:08 | 9 | -oOo- |
| 12:08 | 10 | |

CV 04-9049 DOC – 3/30/2011 – Day 42, Volume 1 of 3

152

-oOo-


CERTIFICATE


        I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:  March 30, 2011



                        _____
                        DEBBIE GALE, U.S. COURT REPORTER
                        CSR NO. 9472, RPR