1                   UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3              HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4                         – – – – – – –

5

6    MATTEL, INC., ET AL.,            )
                                      )
7              Plaintiffs,            )
                                      )
8         vs.                         ) No. CV 04-9049-DOC
                                      )    Day 42
9    MGA ENTERTAINMENT, INC., ET AL., )    Volume 2 of 3
                                      )
10             Defendants.            )
     _____)

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                        Jury Trial

17                    Santa Ana, California

18                  Wednesday, March 30, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-03-30 MattelV2

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 2 of 135   Page ID
#:314107
CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

2

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

 4              QUINN, EMANUEL, URQUHART & SULLIVAN
                By:  JOHN B. QUINN
 5                   MICHAEL T. ZELLER
                     WILLIAM PRICE
 6                   Attorneys at Law
                865 South Figueroa Street
 7              10th Floor
                Los Angeles, California 90017-2543
 8              (213) 443-3000

 9

10    FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                BY:  THOMAS S. MC CONVILLE
12                   Attorney at Law
                4 Park Plaza
13              Suite 1600
                Irvine, California 92614
14              (949) 567-6700

15              - AND -

16              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                BY:  ANNETTE L. HURST
17                   Attorney at Law
                405 Howard Street
18              San Francisco, California 94105
                (415) 773-5700
19
                - AND -
20
                KELLER RACKAUCKAS, LLP
21              BY:  JENNIFER L. KELLER
                     Attorney at Law
22              18500 Von Karman Avenue
                Suite 560
23              Irvine, California 92612
                (949) 476-8700

24

25
```

CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

3

```
 1   APPEARANCES OF COUNSEL (Continued):

 2


 3   FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4            SCHEPER, KIM & OVERLAND, LLP
             BY:  ALEXANDER H. COTE  (Not Present)
 5                Attorney at Law
             601 West Fifth Street
 6           12th Floor
             Los Angeles, California 90071
 7           (213) 613-4660

 8            - AND -

 9           LAW OFFICES OF MARK E. OVERLAND
             BY:  MARK E. OVERLAND
10                Attorney at Law
             100 Wilshire Boulevard
11           Suite 950
             Santa Monica, California 90401
12           (310) 459-2830

13

14   Also Present:

15           ISAAC LARIAN, MGA CEO
             ROBERT ECKERT, Mattel CEO
16           LILY MARTINEZ, Mattel Employee
             KEN KOTARSKI, Mattel Technical Operator
17           MIKE STOVALL, MGA Technical Operator
             RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan
18           KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe
             WARRINGTON PARKER, Orrick Herrington & Sutcliffe
19           MELANIE PHILLIPS, Orrick Herrington & Sutcliffe
             FRANK RORIE, Orrick Herrington & Sutcliffe
20           DIANA RUTOWSKI, Orrick Herrington & Sutcliffe
             DENISE MINGRONE, Orrick Herrington & Sutcliffe
21

22

23

24

25
```

4

```
 1                          I N D E X

 2

 3

 4                        EXAMINATION

 5

 6    Witness Name        Direct    Cross    Redirect    Recross

 7    THOMAS, JILL
         By Ms. Hurst                           5
 8       By Mr. Quinn                                       14

 9    HAUENSTEIN, TERALYN
         By Mr. McConvile    35
10       By Mr. Quinn                47

11    BRAWER, RON
         By Ms. Keller      67
12

13

14

15                        EXHIBITS

16

17    Exhibit                    Identification    Evidence

18    Defendants' No. 4240                            115

19    Defendants' No. 4248                            110

20    Defendants' No. 8616                            106

21    Defendants' No. 37103                            10

22

23

24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 5 of 135   Page ID #:314110
CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

5

| 1 | SANTA ANA, CALIFORNIA, WEDNESDAY, MARCH 30, 2011 |
|---|---|
| 2 | DAY 42, VOLUME 2 OF 3 |
| 3 | (1:02 p.m.) |
| 4 | *(The following proceedings is taken in the* |
| 5 | *presence of the jury.)* |
| 6 | THE COURT:  All right.  Then we are back on the |
| 7 | record.  The jury is present, all counsel, the parties, the |
| 8 | witness. |
| 9 | If you'd please be seated.  Thank you for your |
| 10 | courtesy. |
| 11 | This is going to be redirect examination of |
| 12 | Ms. Thomas by Ms. Hurst. |
| 13 | MS. HURST:  Thank you, your Honor. |
| 14 | **REDIRECT EXAMINATION (Continued)** |
| 15 | BY MS. HURST: |
| 16 | Q    Good afternoon, Ms. Thomas. |
| 17 | A    Hi. |
| 18 | Q    Please take a look at Exhibit 36114C.  We now have the |
| 19 | color copy of the 2002 log; do you see that? |
| 20 | A    Hold on. |
| 21 | Q    And we are looking at page 5.  I apologize, I forgot to |
| 22 | say that. |
| 23 | A    Yes, I'm looking at page 5. |
| 24 | Q    And there's an entry there for -- that's the entry |
| 25 | 02-115.  It's the MGA entry for theft of proprietary |

CV 04-9049-DOC – 03/30/2011 – Day 42, Vol. 2 of 3

6

1    information, right?

2    A    Yes, I see that.

3    Q    Now, in 2002, Toon Teenz, that was an unreleased

4    product design, right?

5    A    I -- in 2002?

6    Q    Right.  It had never been released to the market,

7    correct?

8    A    I just know this from this case, but I believe that the

9    Toon Teenz designs were released on the Barbie doll.

10   Q    Are you talking about the decals on the Cool Skating

11   Barbie?

12   A    Correct.

13   Q    But the prototype dolls have never been released to the

14   market, right?

15   A    No.  It was a prototype.  It hadn't been made into a

16   doll.

17   Q    And you considered those prototype designs to be

18   proprietary information at Mattel, right?

19   A    It was proprietary because it had to do with Mattel

20   business, but I don't know if it's confidential because it

21   looked like the drawings.

22   Q    So let's me ask you this:  Was the prototype entirely

23   disclosed in those decals that were on the Roller Skating

24   Barbie?  Was that public information; is that your view?

25   A    My view is just from what I've seen in the -- in --

1    since this case began, but I think that the drawings look

2    similar to the prototype, but certainly the decals weren't

3    like a photo of the prototype.

4    Q    All right.  So you would consider the unreleased

5    prototypes of Toon Teenz to be proprietary information at

6    Mattel, wouldn't you?

7    A    I don't necessarily think so.

8    Q    You'll recall that Mr. Quinn asked you whether -- well,

9    let me ask you this:  Are they not proprietary designs

10   because certain aspects of them have been previously

11   disclosed to the marketplace?

12   A    Are you talking about the prototype or the drawings?

13   Q    Whatever your last answer, that you don't necessarily

14   think so, was about.

15   A    I had no knowledge of -- of to whom the prototype doll

16   had been shown within or outside of the company.  I'm just

17   basing it on what I've learned since this lawsuit was filed.

18   Q    Well, generally speaking, Mattel would consider its

19   unreleased product designs to be proprietary information,

20   wouldn't it?

21   A    Well, to the extent that no version of that product had

22   been released on a Mattel product outside the company and --

23   or shown to retailers or divulged some other way outside of

24   the company.

25   Q    All right.  So if aspects of a design, say a big head,

CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

8

1    if that concept had been previously disclosed, then you

2    wouldn't consider it to be a trade secret or proprietary

3    information, right?

4    A    I don't think I'd think a big head was a trade secret.

5    Q    If some combination of ideas had been previously

6    disclosed by Mattel, say big head, big feet, little noses,

7    you wouldn't consider that to be proprietary information of

8    Mattel either, would you?

9    A    Not big head, big feet, little noses, no.

10   Q    You certainly didn't think that the idea for a fashion

11   doll was proprietary information in 2002, right?

12   A    No, I did not.

13   Q    You testified in response to Mr. Quinn's questions that

14   this investigation was about copyright infringement, right?

15   A    I think it was a copyright -- wait, which investigation

16   are we talking about?

17   Q    The one we are looking at right here, 02-115.

18            MR. QUINN:  Misstates her testimony.

19            THE COURT:  Overruled.

20            THE WITNESS:  I didn't have any concurrent

21   knowledge of this investigation when it was going on, but I

22   believe it had to do with a copyright analysis of whether

23   Toon Teenz was -- well, whether Bratz infringed Toon Teenz.

24   BY MS. HURST:

25   Q    And you are saying that now because in Exhibit 1195, on

1    page 66, it says "plagiarized design," right?

2    A    No.  I'm saying that because I understand that to be

3    the facts that -- that have come out since the case was

4    filed.  I didn't know about this analysis at the time it

5    occurred, so I'm explaining what I've seen in the case.  I

6    don't know that it's related to this report.  I'll take a

7    look.

8    Q    Well, you'll recall Mr. Quinn asked you about the

9    language "plagiarized design," right?

10   A    Yes, yes.

11   Q    And he sort of suggested that was a poor man's way of

12   saying copyright infringement, right?

13             MR. QUINN:  It's argumentative, your Honor.

14             THE COURT:  Well, "a poor man's way," but you

15   understand the question, don't you?

16             THE WITNESS:  Yeah.  He asked if I thought that

17   someone might understand "plagiarized" to be the same thing

18   as "copying," and -- and I said I did.

19   BY MS. HURST:

20   Q    All right.  Let me ask you to take a look at the --

21   what we've had marked as Exhibit 37103, which is Mattel's

22   2000 -- year 2000 case management log.

23   A    Okay.

24   Q    Do you recognize that as a document produced by Mattel

25   in connection with this litigation?

```
 1   A    It has the "M" next to the number, so I would presume

 2   so.

 3           MS. HURST:  Your Honor, move to admit 37103,

 4   subject to redacting later.

 5           THE COURT:  Received.

 6           MS. HURST:  Thanks.

 7           (Defendants' Exhibit No. 37103 is received in

 8       evidence.)

 9   BY MS. HURST:

10   Q    Unfortunately --

11           MS. HURST:  Do you have it?

12           Okay.

13   BY MS. HURST:

14   Q    If you turn to the page ending 140, which is the Bates

15   number.  I apologize, I don't have the trial exhibit

16   embossed version up here.  It's page 4.

17   A    40 or 4?

18           THE COURT:  She'll turn the page for you.

19           THE WITNESS:  Oh, okay.

20   BY MS. HURST:

21   Q    Do you have that?

22   A    Yes.

23   Q    And the very first entry there is Incident Report

24   Number 61 in the year 2000, right?

25   A    Correct.
```

1    Q    And the type of report is copyright, true?

2    A    It says that, yes.

3    Q    And it's assigned to Mr. Simoneau, right?

4    A    That's what it says, yes.

5    Q    And he's the very same person that the theft of the

6    proprietary information investigation was assigned to,

7    02115, right?

8    A    Does it say that?  I'm sorry.  I thought that was

9    de Anda.

10   Q    Okay.  Let's get the document here.

11   A    Oh, yes, it does say -- yes, it does say Simoneau.

12   Q    Okay.  And if you'd look further down on page 4 of

13   Exhibit 37103.

14   A    Yes.

15   Q    There is Case Number 74?

16   A    Yes.

17   Q    It also says "copyright violation," right?

18   A    Yes, it does.

19   Q    Again, assigned to Mr. Simoneau, right?

20   A    Yes, it does.

21   Q    And if you'd turn over to page 10 of the exhibit, the

22   Bates ending 146.

23   A    Okay.

24   Q    Do you see there is a number 190 there, "incident

25   report," right?

1    A    Yes.

2    Q    And what's the type of report listed there?

3    A    Type of report listed is "copyright violations."

4    Q    Okay.  And another six pages in on page 16, Bates

5    ending 152, do you see Incident Report Number 303,

6    "miscellaneous copyright violation," right?

7    A    Yes, I do.

8    Q    And all the way on the bottom page, Incident Number

9    320, "copyright violations," right?

10   A    Yes, that's what it says.

11   Q    And that's one assigned to Mr. de Anda, right?

12   A    That's what it looks like.

13   Q    So the 2000 case management log has numerous instances

14   of investigations labeled as copyright violations, correct?

15   A    Yes, it has a number of them, uh-huh.

16   Q    And when we look at the 2002 case management log,

17   Exhibit 36114C --

18   A    Yes.

19   Q    -- that was called a "theft of proprietary

20   information," correct?

21   A    Yes, it says theft/proprietary information.

22   Q    It doesn't say "copyright violation," right?

23   A    Correct.

24   Q    And a theft of proprietary information, that's a common

25   way of saying trade secret misappropriation, right?

CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

13

1    A    I don't necessarily agree.

2    Q    Isn't it true that you sometimes heard a claim for

3    trade secret misappropriation referred to as a theft of

4    proprietary information?

5    A    I don't recall that because to me, I -- I don't use the

6    word "proprietary" information that much because

7    "proprietary" can also be your patents, which are not trade

8    secrets.

9    Q    So you've never heard the phrase "theft of proprietary

10   information" used to refer to as trade secret

11   misappropriation; is that right?

12   A    I don't think that's true.  I probably have.  I just

13   don't recall it being used in this case that way, and it's

14   not necessarily something I would use, either.

15   Q    But Mr. Simoneau knew how to distinguish between a

16   copyright violation and a theft of proprietary information

17   as revealed by these case management logs; isn't that right?

18   A    I don't know what Mr. Simoneau knew.

19   Q    Would you turn, please, to the last page of

20   Exhibit 36114.

21   A    Which one is -- oh, okay.

22   Q    And that's the page where the entry for incident report

23   021680 was added in, right?

24   A    Yes, I see that.

25   Q    And can you see the color of the ink there?

1    A    Yes.

2    Q    And it's clearly blue and different from the ink of the

3    entries on the other page; is that correct?

4    A    Yes, it's a different color than the entries on the

5    rest of the page.

6    Q    Do you recognize that handwriting?

7    A    No, I don't.

8              *(Attorney discussion held off the record.)*

9              MS. HURST:  No further questions.

10             THE COURT:  Recross by Mr. Quinn on behalf of

11   Mattel.

12                        **RECROSS-EXAMINATION**

13   BY MR. QUINN:

14   Q    Ms. Thomas, if we can look at that last exhibit, 36114,

15   the case management log, and Ms. Hurst called your attention

16   to the last page in the entry there in blue on page -34.

17   A    Uh-huh.

18   Q    If we thumb through this, the case management log,

19   there is actually a lot of different entries that are in

20   different colored ink.

21             MR. QUINN:  Ken, if we can perhaps just thumb

22   through that.

23   BY MR. QUINN:

24   Q    Do you see some in yellow, some in red, some of them in

25   some combination of them?

1    A    Yes, I see that.

2    Q    Is it fair to say throughout this case management log,

3    different colored ink is used, correct?

4    A    Yes.

5    Q    And if we could look at that last entry that Ms. Hurst

6    was just asking you about on -- about on page -34, the

7    incident report on the left hand side is 2-1680, correct?

8    A    That's correct.

9    Q    And that -- and that's the last entry in this 2002 case

10   management log, correct?

11   A    It appears to be.

12   Q    If you could look -- look at Exhibit 6302, that is the

13   case management file that I think that corresponds to that

14   entry.  It's the -- the number of the file is 2-1680 --

15   A    That's correct.

16   Q    -- correct?

17        And this relates to a -- an anonymous letter, correct?

18   A    Yes, it appears to.

19   Q    And again, the 02 there in the case number refers to,

20   so far as you know, the year 2002?

21   A    Yes, that's correct.

22   Q    And so this exhibit that we're looking at here is

23   16- -- 16302 is the incident report relating to the

24   anonymous letter, correct?

25   A    It appears to be, yes.

1   Q    If you'd look at page -5, we see the anonymous letter,

2   correct?

3   A    Yes.  It looks a little shrunken down, but yes.

4   Q    And in the upper right-hand corner, it's got the stamp

5   "Received, Robert A Eckert, August," I can't read it,

6   "2002," correct?

7   A    Correct.

8   Q    So this was logged as the last entry in the 2002 case

9   management log on Exhibit 36114-34, correct?

10  A    Yes, it appears to have been.

11  Q    All right.  So it's an anonymous letter that was

12  received in 2002, and it's entered in the -- in the

13  related -- incident report investigation file is entered in

14  the 2002 case management log, correct?

15  A    Correct.

16  Q    You were asked some questions about copyright violation

17  and entries in the case management log for the year 2000

18  where Mr. Simoneau's name appears and the words "copyright

19  violation" appear, correct?

20  A    Yes.

21  Q    Now, before you make a determination as to whether

22  there is a copyright violation, do you have to look into

23  that and analyze that?

24  A    Yes, you'd have to analyze the item that was supposedly

25  infringing the -- the other item.

1   Q    So you wouldn't -- if you hadn't made that

2   determination, you wouldn't open up a file saying "copyright

3   violation"?

4            MS. HURST:  Objection.  It assumes facts.  Lack of

5   foundation.

6            THE COURT:  Well, it does, Counsel.

7   BY MR. QUINN:

8   Q    Would you open up a file in this circumstance saying

9   "copyright violation" if you had not yet made a

10  determination yet that there was a copyright violation?

11  A    Well, if you hadn't determined that there was a

12  copyright violation, then I am not sure there would be

13  anything else to investigate.

14  Q    You were asked some questions about fashion doll

15  designs.  Now, of course, you would consider a Mattel

16  employee's for a particular style, design type of fashion

17  doll to be Mattel's proprietary property, correct?

18           MS. HURST:  Objection.  Argumentative.

19           THE WITNESS:  Yes, I would.

20           MS. HURST:  And vague.

21           THE COURT:  Just a moment.

22           MS. HURST:  Incomplete hypothetical.

23           THE COURT:  Overruled.  That was inquired in

24  recross (sic).

25

1    BY MR. QUINN:

2    Q    I'm not sure if I got --

3    A    I think I said "yes."

4    Q    All right.  Do you know whether or not Mr. Simoneau is

5    an attorney?

6    A    He is not.

7    Q    And you are aware that Ms. McShane oversaw that

8    copyright analysis?

9    A    Yes --

10            MS. HURST:  Objection.  Assumes facts as to the

11    nature of the analysis.

12            THE COURT:  Well, as to this specific analysis,

13    Counsel?

14            MR. QUINN:  Yes.

15            THE COURT:  Or generally speaking?

16            MR. QUINN:  With respect to the copyright analysis

17    where the question of plagiarizing Ms. Martinez's designs.

18            THE COURT:  You mean specifically?  I want to be

19    sure of this 2-160.

20            MR. QUINN:  No, 2 -- I think it's 02-115, your

21    Honor.

22            Is it 115?

23            (No audible response.)

24            MR. QUINN:  02-115, your Honor.

25            THE COURT:  Show me that, I'm sorry.

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 19 of 135   Page ID #:314124
CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

19

```
 1              MR. QUINN:  It's on 36114-5, page --
 2              THE COURT:  Let's put that up for just a moment.
 3              MR. QUINN:  36114-5.
 4              THE COURT:  Just put it up.
 5              And the question was?
 6              MR. QUINN:  And the question was -- it's
 7    referenced there, the theft proprietary information.
 8    BY MR. QUINN:
 9    Q    My question was whether you know if Ms. McShane was
10    overseeing the copyright analysis relating to that?
11              MS. HURST:  Objection.  Assumes facts not in
12    evidence regarding --
13              THE COURT:  Sustained.
14    BY MR. QUINN:
15    Q    Ms. McShane was the chief intellectual property lawyer
16    at Mattel at that time?
17    A    Yes, she was the assistant general counsel in that
18    section.
19    Q    So if there were an analysis that needed to be done on
20    a copyright infringement issue, would she be the logical one
21    to do that?
22    A    Yeah, she would have been.
23    Q    And are you aware that she did that copyright analysis
24    after Mr. Simoneau initially opened up that incident report
25    2-115 on the indicated date of March 19th, 2002?
```

1          MS. HURST:  Object and move to strike.  Privilege

2    has previously been asserted.

3          THE COURT:  No, I -- I assume it's being waived.

4    I'm not sure.

5          MR. QUINN:  This is following up on the question

6    they asked, your Honor.

7          THE COURT:  I know.  I'm going to let you do that,

8    but I just want to make certain that we are all --

9          MR. QUINN:  I'm just asking the date.

10          THE COURT:  Counsel, you can follow-up.  Counsel,

11    go ahead and ask the question.

12    BY MR. QUINN:

13    Q    Do you know whether Ms. McShane got involved in this

14    issue after the date indicated here of March 19th, 2002,

15    where it indicates that it's Mr. Simoneau that opened this

16    file?

17    A    I believe it was after if this is reflecting a meeting

18    that -- that he referred to.

19          MS. HURST:  Move to strike the prior question.

20          THE COURT:  Well, here's the confusion, ladies and

21    gentlemen.  It's whether Ms. McShane is actually supervising

22    and looking after this file, or if she's the head of the

23    intellectual property, and that's what we are not going to

24    know because this witness wasn't there.

25          I'll certainly let you testify from the log, but

1    I'm a little concerned, Counsel, that it's a specific

2    question, and it sounds like Ms. McShane is actually

3    supervising this file.  She may be the head of the entire

4    section, everything may be ran by her, I'm not sure.  So I'm

5    going to strike the prior question and strike the prior

6    answer.  Reask the question.

7              MR. QUINN:  Right.

8    BY MR. QUINN:

9    Q    Do you know whether the investigation of this matter

10   was handled by the legal department or by the security

11   department?

12             MS. HURST:  Objection.  Lacks foundation.

13             THE COURT:  Well, if you know, you could answer

14   that question.

15             THE WITNESS:  I don't know of an investigation

16   that was done by the law department, so I'm making the

17   assumption if there was an investigation, it was done by

18   security.

19   BY MR. QUINN:

20   Q    Would a -- would the security department do an analysis

21   of a copyright issue?

22   A    No, they would not.

23   Q    You were asked some questions about Early Light and

24   contractors in China and comparing their situation to that

25   of the skilled sample makers or seamstresses.

1    A    Correct.

2    Q    With respect to the contractors in China, Early Light,

3    which do work for both Mattel and for competitors, is that

4    information disclosed in advance to Mattel at a particular

5    factory that they'll be worked on for more than one toy

6    company?

7    A    I believe so.  I'm not certain.  I do know that with

8    regard to Early Light, I know that Mr. Debrowski knows the

9    head of that company very well, and that they are one of the

10   biggest vendors, and that they particularly have some

11   procedures in place to keep the intellectual property of

12   their various customers separated.  So I don't know if

13   that's the same with other vendors.

14   Q    So would Mr. Debrowski be in a position to know whether

15   or not Mattel had knowledge that competitor product was also

16   being produced at those factories?

17   A    I believe he would have been in such a position.

18   Q    Now, did the -- so far as you are aware, did the

19   skilled sample makers, Ms. Salazar, Ms. Cabrera, did they

20   ever disclose to Mattel that they were also working on

21   competitive product while they were doing work for Mattel?

22   A    Only -- only Ms. Cabrera and Ms. Morales told us that

23   after we already learned it and after they were confronted

24   by HR and security.  Before then, no.

25   Q    And counsel asked you some questions about the

```
 1    deposition of Carter Bryant that was taken in Gunther-Wahl
 2    case; do you recall that?
 3    A    Yes, I do.
 4    Q    And she asked you whether you had learned something in
 5    that case which had some affect on your assessment of the
 6    situation; do you recall that?
 7              MS. HURST:  Objection.  Misstates the question and
 8    the testimony.
 9              THE WITNESS:  I remember her --
10              THE COURT:  No.  Just a moment.
11              THE WITNESS:  I'm sorry.
12              THE COURT:  I'm sorry.  I apologize.
13              Overruled.
14              You can answer the question.
15              THE WITNESS:  I remember her asking about the
16    deposition.
17    BY MR. QUINN:
18    Q    And did you, in fact, learn something --
19    A    Sorry.
20    Q    Did you learn something about Mr. Bryant's activities
21    in his deposition in the Gunther-Wahl case?
22              MS. HURST:  Objection.  Calls for hearsay.
23    Improper publication of deposition testimony in another
24    matter.
25              THE COURT:  I thought we both got into this area.
```

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 24 of 135   Page ID #:314129
CV 04-9049-DOC – 03/30/2011 – Day 42, Vol. 2 of 3

24

1           MS. HURST:  No.  We did not ask for substance,

2    just the date.

3           MR. QUINN:  She asked whether she learned

4    something.

5           THE COURT:  Yeah, let me go back, Counsel.  Let's

6    find it.

7           Ladies and gentlemen, I'm going to ask your

8    indulgence.  It's completely my fault.  I can't remember

9    that answer, so you are going to go have a recess.  And I

10   want to be careful and be certain that I have the answer, so

11   pardon me.  It's totally my fault for not remembering.  I'll

12   be right back.

13           *(The following proceedings is taken outside*

14       *the presence of the jury.)*

15           THE COURT:  Now, counsel, have a seat.

16           Counsel, I recall Gunther-Wahl.  I just don't

17   recall how far we got into the deposition.

18           There is an objection that was improper

19   publication of hearsay.

20           Counsel, was it redirect?

21           MS. HURST:  I don't know, your Honor.

22           THE COURT:  Let's go back.  Was it on direct, do

23   you recall?

24           MR. QUINN:  It was on direct.

25           THE COURT:  Thank you.

1            MR. QUINN:  And if you can search words in

2    proximity, it was Carter Bryant and Gunther-Wahl in his

3    deposition.

4            (Discussion held off the record.)

5            THE COURT:  Okay.  Counsel, the first time we

6    picked this up was at 10:59.  I want you to listen closely

7    and then steer the Court in this area, if you can.

8            Stay right there, Debbie.

9            Question:  "And eventually Mr. Bryant was -- he

10   gave the deposition in the Gunther-Wahl case" -- he gave

11   sworn testimony?"

12           "Yes, he did."

13           (Discussion held off the record.)

14           THE COURT:  "And eventually Mr. Bryant" --

15   remember this is a rough transcript.

16           "And eventually Mr. Bryant was -- he gave a

17   deposition in the Gunther-Wahl case, right?  He gave sworn

18   testimony?

19           Answer:  "Yes, he did."

20           Question:  "And that was September 9th, 2003,

21   correct?"

22           Answer:  "I know it was in late August or early

23   September.  If you are representing that that's the date,

24   I'll accept it."

25           Now, Counsel, where are we?

```
 1          MR. QUINN:  She goes on to ask whether she learned

 2   something from that deposition.

 3          (Discussion held off the record.)

 4          THE COURT:  Okay.  Thank you.

 5          MR. QUINN:  I think it's later on when Ms. Hurst

 6   asked, "Why you split up the files into two separate files,

 7   was it because it's something that you learned in the

 8   Gunther-Wahl deposition?"

 9          THE COURT:  There was an objection at that time

10   that there was a publication of hearsay by you, Mr. Quinn.

11          Okay.  This says, question, "Did you communicate

12   with him on the day of Mr. Bryant's deposition in the

13   Gunther-Wahl matter?"

14          "I don't recall doing so, no."

15          Question:  "Was there something that Mattel

16   learned from Mr. Bryant's testimony in the Gunther-Wahl

17   matter that made it want to separate the files between MGA

18   and Carter Bryant?"

19          Answer:  "I don't recall anything like that."

20          MR. QUINN:  That's what I was thinking of, your

21   Honor.

22          THE COURT:  And your question?

23          MR. QUINN:  The question is going into what did

24   she learn from Mr. Bryant's testimony in Gunther-Wahl

25   matter, and Mr. Bryant testified that back in the
```

1  Gunther-Wahl matter that back in 1998 when he was living in

2  Missouri, he did not -- no work in the design field.

3        THE COURT:  That has nothing to do with separating

4  the files.  That's totally disconnected.

5        MR. QUINN:  I think it's to rebut the notion that

6  there was a reason to do it.  I mean, it's entirely

7  consistent with our case here, your Honor, that they are the

8  ones saying he did design work there.  We are saying he did

9  it when he was at Mattel, so there was no reason for us to

10  separate the files.  This is entirely consistent with our

11  theory of what happened.

12        THE COURT:  State that to me one more time.  And I

13  apologize.

14        MR. QUINN:  This is entirely -- we had no reason

15  to separate files and create a contrived or false record

16  because what we learned from his testimony is entirely

17  consistent with what we are saying here.

18        THE COURT:  But who is -- who is in charge of

19  these files?  Is it Ms. Thomas?  I don't think so.  I think

20  she's looking back --

21        MR. QUINN:  No, she's not.  She's being questioned

22  about it extensively.

23        THE COURT:  Who is?

24        MR. QUINN:  Mr. de Anda.  See, these are security

25  department files.

1          THE COURT:  And is he going to testify?

2          MR. QUINN:  Yes, he is, your Honor, but they

3     questioned her extensively.

4          THE COURT:  Hold on.  I understand that.

5          Ms. Hurst?

6          MS. HURST:  Your Honor, the witness -- they are

7     trying to publish hearsay from a deposition of Carter Bryant

8     for the truth of the matter asserted.  All we are trying to

9     get out is whether the files were separated or not.

10         THE COURT:  I think you can cast your opinion that

11    there is no reason to separate the files and cast your

12    opinion as to why.  As far as the actual testimony of Carter

13    Bryant, that's simply hearsay.  It's not coming in for an

14    appropriate purpose, but you can respond to this.

15         MR. QUINN:  Your Honor, it's not coming in for the

16    truth, and Mr. Bryant is going to be back, so, I mean, it

17    can be received --

18         THE COURT:  Well, no.  We'll bring him back, then,

19    but I want to make certain.  It's a hearsay purpose.  You

20    can certainly respond to this.

21         And Ms. Hurst, you opened the door.

22         Question:  "Was there something that Mattel

23    learned from Mr. Bryant's testimony" -- just a moment -- "in

24    the Gunther-Wahl matter that made it want to separate the

25    files between MGA and Carter Bryant?"

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 29 of 135   Page ID #:314134
CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

29

1          Well, first of all, Ms. Hurst, how would

2    Ms. Thomas even know that?  What's the basis of that

3    question?

4          MS. HURST:  She said she didn't know.  She said,

5    "There is nothing that I know of," so now they are coming

6    back and trying to, you know, publish hearsay on an answer

7    that was "I don't know, no."

8          THE COURT:  Well, but you've asked her a question

9    when she's not in charge of the file, the end result is the

10   implication to the jury, from hindsight, from the witness

11   that she somehow understands the lack of separation or

12   separation.  I'm going to overrule the objection.  This door

13   was opened by --

14          Thank you, Deb.

15          MS. HURST:  Your Honor, the witness was the person

16   communicating with outside counsel and the security

17   department.  That is how she would know.

18          THE COURT:  It will not be offered for the truth,

19   Counsel.  Thank you for the discussion.

20          MS. HURST:  Your Honor, given that it was beyond

21   the scope of redirect, may I have further cross, then,

22   because this was --

23          THE COURT:  In this area, I will.

24          MS. HURST:  All right.

25          THE COURT:  This will be the exception because

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 30 of 135   Page ID #:314135
CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

30

```
 1   this is a whole new area beyond the scope of cross.
 2           MS. HURST:  Thank you, your Honor.
 3           THE COURT:  I'll be fair to both sides.
 4           I will give them an instruction that it's not for
 5   the truth, but if you have that knowledge, you can state
 6   that knowledge, okay?
 7           THE WITNESS:  Okay.
 8           (The following proceedings is taken in the
 9       presence of the jury.)
10           THE COURT:  Well, the jury is present.  The
11   alternates are present.  All counsel are present, the
12   parties.
13           And Ms. Thomas, if you'd please be seated.  Thank
14   you.
15           First of all, let me apologize.  That was just my
16   total inability to recall that, and I sincerely apologize to
17   you.
18           And so now we are back in session.
19           And Counsel, your question is?
20                   RECROSS-EXAMINATION (Continued)
21   BY MR. QUINN:
22   Q   Were you aware at the time Mr. Bryant's deposition was
23   being taken in the Gunther-Wahl case, were you aware that he
24   was being deposed?
25   A   Yes.
```

1    Q    And -- and at the time, was that deposition and the

2    substance of his testimony reported to you?

3    A    Yeah, it was reported to me afterwards.

4    Q    All right.  And then after that, did you actually get a

5    copy of the transcript of his testimony?

6    A    I believe I did.

7    Q    And in that deposition, did Mr. Bryant testify --

8              THE COURT:  No, just a moment.

9              This is not for the truth of the matter asserted.

10   Mr. Bryant's testified.  He may be back, I'm not certain,

11   but this testimony is not for the truth, and I'm allowing it

12   in so the witness can respond to a question that Ms. Hurst

13   asked.

14   BY MR. QUINN:

15   Q    Did you learn that in that deposition in the

16   Gunther-Wahl case on September 9th, 2003, that Mr. Bryant

17   testified as follows:

18        Question --

19              MS. HURST:  Can we have the page and line number,

20   please?

21              MR. QUINN:  Page 89, line 23, to 90, line 7.

22              Question:  "By the way, during the time you were

23   away from Mattel, you indicated that from 1998 until January

24   of 1999, you indicated that you had done some work here in

25   Missouri.  What type of work did you do?"

1       Answer:  "Oh, I think at the time I was just generally

2    doing -- I think I was actually working in a movie theater."

3       Question:  "Okay.  Nothing in the design field?"

4       Answer:  "No."

5    BY MR. QUINN:

6    Q    Did you learn about that testimony shortly after the

7    deposition?

8    A    Yes, I did.

9    Q    And then you were asked some questions about what types

10   of security measures Mattel had in place back in 2000.  I

11   mean, do you have any reason to believe that in the design

12   center, Mattel had a camera that was trained on Mr. Bryant's

13   workplace?

14   A    No, I don't.

15   Q    Do you have any reason to believe, one way or another,

16   as to whether Mr. Bryant had doll designs on his computer in

17   the design center?

18   A    I don't even know that he would have used a computer

19   for doll designs.

20   Q    That was going to be my next question.  Do you even

21   know whether Mr. Bryant even had a computer in the design

22   center?

23   A    I don't.

24   Q    Now, Ms. Hurst asked you this morning some questions

25   about the -- your correspondence with Mr. Villasenor's

```
 1    attorney and about, you know, you wouldn't want to get any
 2    report from him or any information from him because you
 3    know -- you would know at the time that that would have to
 4    be turned over to MGA in this lawsuit; do you recall that
 5    question?
 6    A    Yeah, I recall that question.
 7    Q    And your answer was "no," correct?
 8    A    Correct.
 9    Q    Could you explain that answer, please.
10         MS. HURST:  Objection.  Beyond the scope of
11    redirect.
12         THE COURT:  Overruled.
13         THE WITNESS:  Oh, at the time that that
14    investigation occurred, there were claims in the MGA case
15    that are no longer in the case, but none of them had
16    anything to do with toy fairs or this type of activity.
17    BY MR. QUINN:
18    Q    When did MGA add claims relating to toy fairs to the
19    case?
20    A    I believe that occurred this last summer.
21    Q    Summer of 2010?
22    A    Correct.
23         MR. QUINN:  Thank you.
24         THE COURT:  All right.  Now, I'm going to allow
25    each counsel a brief round before this witness leaves.
```

1              Counsel?

2              MS. HURST:  No questions, your Honor.  That's

3      fine.  Thank you.

4              THE COURT:  Mr. Quinn?

5              MR. QUINN:  No questions.

6              THE COURT:  As soon as I said that, we are not

7      going to have a brief round.

8              *(Laughter.)*

9              THE COURT:  So Ms. Thomas, I'm going to ask you to

10     remain available until April 11th.  It's a Friday.  Go about

11     your professional responsibilities or whatever planned

12     vacation.  If we need you, we'll find you.  Thank you very

13     much.

14             Counsel, your next witness, please.

15             MR. MC CONVILLE:  Your Honor, we call Terri

16     Hauenstein.

17             THE COURT:  Thank you.

18             Will you step forward, please, between the double

19     doors.

20             And now will you raise your right hand.

21             **TERALYN HAUENSTEIN, DEFENSE WITNESS, SWORN**

22             THE WITNESS:  I do.

23             THE COURT:  If you'd please come up to the witness

24     stand, please.

25             And would you state your full name for the jurors?

```
 1              THE WITNESS:  Teralyn Jocelyn Hauenstein.

 2              THE COURT:  And would you spell your last name for

 3       the jurors, please.

 4              THE WITNESS:  H-a-u-e-n-s-t-e-i-n.

 5              THE COURT:  Thank you.

 6              And this is direct examination by Mr. McConville

 7       on behalf of MGA and Mr. Larian.

 8                        DIRECT EXAMINATION

 9       BY MR. MC CONVILLE:

10       Q    Good afternoon, Ms. Hauenstein.  How are you?

11       A    Very good, thank you.

12       Q    Where do you work?

13       A    I work for MGA.

14       Q    Where are you located?

15       A    In Hudson, Ohio, at Little Tikes.

16       Q    I'm sorry, at Little Tikes?

17       A    Little Tikes.

18       Q    Little Tikes is now part of MGA, correct?

19       A    It is, correct.

20       Q    And how long have you worked for MGA?

21       A    Since May 27th of '08.

22       Q    And what's your current position?

23       A    Vice president of Global HR, human resources.

24       Q    And what are your responsibilities as the vice

25       president of Global HR?
```

CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

36

1    A    To pull together not just the domestic holdings, but

2    also to pull together the international various offices, and

3    so forth, as we -- as we know them to be.

4    Q    As it relates to human relations?

5    A    Yes, yes, the personnel, the personnel and so forth,

6    which is a new -- a new role.

7    Q    I'm sorry, it's what?

8    A    It's a new role.

9    Q    For you or for MGA?

10   A    For MGA to have it globally.

11   Q    And do you have any specialized training in human

12   resources?

13   A    Yes, I have a master's degree in public administration

14   with a focus on human resources, and I have an SPHR, which

15   is the Senior Professional in Human Resources, which is the

16   highest certification in the United States.

17   Q    And as the vice president of Global Human Resources,

18   are you familiar with MGA's hiring of its employees?

19   A    Yes.

20   Q    How are you familiar with that?

21   A    That's something that we do daily, and it's also

22   something that I have reviewed periodically.  We're required

23   to maintain personnel files and maintain governmental files

24   as far as I-9s and things like that, so we have to review

25   these frequently.

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 37 of 135   Page ID #:314142
CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

37

1  Q    And although you started in 2008, do you have an

2  understanding of -- of the people who were hired by MGA

3  before you joined in 2008?

4  A    Yes.

5  Q    How do you have that understanding?

6  A    Because periodically I've gone through some files as

7  needed, and have also -- also, it's a process that we had

8  followed for quite a few years.  It's a normal process.

9  Q    And in connection with this litigation, did someone ask

10 you to review your files in order to compile a list of the

11 number of people hired by MGA from 1999 to 2007?

12 A    Yes.

13 Q    And did you do that?

14 A    Yes.

15 Q    You compiled a list?

16 A    Yes, to -- to the best of our ability.  Would you like

17 me to explain --

18 Q    Yes, please.

19 A    -- why I say that?

20 Q    How did you compile the list?

21 A    Okay.  I said to the best of our ability because until

22 2007, there was not a digital way to maintain those files.

23 Starting in 2007, a digital software piece from ADP was put

24 into -- into play, and at that time, the files from payroll

25 were -- populated those, took all the people that were

```
 1    currently working at MGA and anybody going forward since

 2    2007 went into this digital system.

 3           MR. MC CONVILLE:  And if we could put in front of

 4    Ms. Hauenstein Exhibits 35006 and 35007, please.

 5    BY MR. MC CONVILLE:

 6    Q    And I'd ask you to review those.

 7    A    Okay, yes.

 8    Q    Ma'am, are these the lists that you compiled when

 9    someone asked you to compile a list of people who were hired

10    by MGA between 1999 and 2007?

11    A    1999 and 2007, yes.  We -- we had -- when we found that

12    we didn't have all of that information because anyone who

13    had been hired since 19- -- or after 1999 but had left the

14    company prior to 2007 would not be in those digital files.

15    So what we had to do at that point, then, was to take a look

16    at other -- other avenues to try to determine where and how

17    many people had been hired by -- by MGA.

18         So we also had international holdings, like I said

19    prior to -- to me coming on board, we didn't really have a

20    centralized program for the -- the global holdings.  So at

21    that point, I believe it started in 2007 where the

22    international locations would send a list, just -- just a

23    manual list, and send that to MGA.  They did that once in

24    2007 and did it once or twice in 2008, and then it became

25    every month so that you could kind of have a running list.
```

1    But they still did not have it digitalized.

2        So we looked at lists just -- that's something that HR

3    does anyway in the course of their normal day to look at

4    lists of people and maintaining those people in the files

5    and where they are located, so --

6    Q    You've discussed a review that you did.  Did you

7    personally review all the documents that you've just

8    described?

9    A    Yes, I've reviewed numerous documents.  I may not have

10   reviewed personally every single personnel file, but I've

11   reviewed quite a few personnel files that we had there at

12   MGA.

13   Q    If you look at Exhibit 35006, can you describe for me

14   what this list reflects?

15   A    This reflects individuals who were hired or -- or

16   hired, left and rehired, that work at MGA or did work at

17   MGA, one or the other, and it's -- it reflects over those

18   years, 1999 through 2007, and some of those individuals may

19   have, at times, been in different locations, not just in the

20   United States, so --

21   Q    That's Exhibit 35006?

22   A    35006, yeah.

23   Q    And what were the total number of people hired by MGA,

24   based on your review, between 1999 and 2007?

25   A    I am going to look at the number that's here, because I

 1    didn't commit it to memory.

 2         718 from 1999 to 2007.

 3    Q    And you broke that -- the number of hires by years as

 4    well, correct?

 5    A    Yes.

 6    Q    So for example, in the year -- on the first page of the

 7    exhibit, in the year 1999, there were three additional hires

 8    that MGA made that year, correct?

 9    A    Yes, yes.

10    Q    And then if you go to Exhibit 35007, can you tell me

11    what this reflects?

12    A    This -- this reflects individuals at various locations

13    outside of the United States.

14    Q    And did you total up those numbers or -- or are they --

15    are they included in the Exhibit 35006?

16    A    Well, there's not a total on these but, I mean, I can

17    count them now.

18    Q    Well --

19    A    If you want.

20         Oh, did you want me to count them?

21    Q    No, no, that's fine.

22    A    Okay.

23    Q    But this Exhibit 35007 reflects your efforts in

24    compiling the list of employees who were hired

25    internationally between the years --

1    A    Yes.

2    Q    -- that we've discussed, 1999 to 2007?

3    A    Yes, to -- to -- to my knowledge --

4    Q    Right.

5    A    -- because we, again, were relying on basically sending

6    an e-mail to whoever we thought was an office manager or an

7    HR person, if they had one, and saying, "Please send back to

8    us monthly who you have working there."

9    Q    And then after the result of your review, did someone

10   ask you to compare the total number of employees who were

11   hired versus the total number of ex-Mattel employees who

12   were hired by MGA?

13   A    Yes, we were asked to -- to take a look at a list that

14   was -- that was brought in that -- my understanding was it

15   was a list from Mattel, and so we took a look at this list,

16   and we looked to see if there were any -- any gaps, and in a

17   couple of instances, we didn't have the same people, we

18   didn't have the same information.  And again, we believe

19   that that was because there was not a centralized program in

20   place during most of those years, virtually all the years.

21       So we then had to do a pretty exhaustive search through

22   all of our personnel files that we could, and in some cases

23   had issues with names, for example, because in some of the

24   Asian names, they might have a nickname, they might have

25   used a Christian name when we would have used the purely

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 42 of 135   Page ID #:314147
CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

42

1   Asian name, or vice versa.  So in one instance, for example,

2   I know that we looked through at least 15 files trying to

3   find "Cheng" or "Chang," and that was -- that was just

4   trying to figure any possible way that it could have been

5   mistaken.

6   Q    And -- and the list that you were talking about that

7   reflected ex-Mattel employees who were then hired by MGA,

8   that was a list provided to you by the lawyers of this case,

9   right?

10  A    Correct.

11  Q    And did you ultimately do a graphic demonstration of

12  the number of people hired by MGA over the years as compared

13  to the number of ex-Mattel employees hired by MGA over the

14  years?

15  A    Yes.

16          MR. MC CONVILLE:  Could we put in front of the

17  witness Exhibit 37094.

18          Your Honor, do I have permission to publish this

19  demonstrative?

20          THE COURT:  You may.

21          (Attorney discussion held off the record.)

22  BY MR. MC CONVILLE:

23  Q    Is this the chart that you had prepared --

24  A    Yes.

25  Q    -- that reflects --

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 43 of 135   Page ID #:314148
CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

43

1   A    Yes.

2   Q    -- the total number of hires?

3   A    Yes.

4   Q    And on this chart, the blue line indicates what?

5   A    The blue line indicates the employees that were hired

6   during that year in each column that were not former Mattel

7   employees.

8   Q    And what does the red line indicate?

9   A    The red is that they were, at some point in their

10  career, a Mattel employee prior to coming to MGA.

11  Q    So for example, if you could explain the year 2003.

12  A    2003, there were 10 hires that were former Mattel

13  employees, and 78 hires that were not former Mattel

14  employees.

15  Q    So the total number of hires were then 88?

16  A    Yes.

17  Q    And the -- looking at this chart graphically, based on

18  your review, would you say that the total number of

19  ex-Mattel employees who were hired by MGA was greater or

20  less than the total number of people who were hired by MGA?

21  A    Oh, there's a significant difference.  The number of

22  ex-Mattel employees is minor compared to the number of

23  non-Mattel employees.

24  Q    And the information that's reflected on this chart,

25  does any of it reflect hires that MGA made in -- that were

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 44 of 135   Page ID #:314149
CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

44

1   employed by MGA in Germany?

2   A    No.

3   Q    Why is that?

4   A    There's a company called Zapf in Germany.  That is an

5   MGA holding in progress, I guess you might say.  But we had

6   no idea.  In fact, I had no idea until a day and a half ago,

7   I guess, that there was any kind of German employee that was

8   an MGA employee.  I was under the impression that anyone in

9   Germany was actually a Zapf employee.

10  Q    So --

11  A    So my mistake.  I said, "Don't include them.  They are

12  not an MGA employee.  They are a Zapf employee."

13  Q    But you later learned that possibly these people who --

14  A    Pretty much a day and a half ago, when I was trying to

15  find out, you know, how this person got paid, or something

16  like that, and it's like, oh, my goodness, I made a mistake.

17  Q    And the -- but the -- but the numbers that relate to

18  Zapf, would they have any -- how many total employees are we

19  talking about?

20  A    We're talking about maybe 12 over those years.

21  Q    So would it have any significant effect on the --

22  A    No, no, not what you would consider significant, no.

23  Q    And based on your review of the files, has MGA hired

24  folks from other toy companies other than Mattel?

25  A    Oh, sure, all toy companies have, pretty much.  I don't

1    know of a toy company that hasn't.  They use a term, if you

2    don't mind, it's called "incestuous," where the -- the --

3    whether it's, you know, Bandai or RC2 or Spin Master or

4    Hasbro or Fisher Price, or they all have kind of passed --

5    it's a small industry, and they've all kind of passed

6    around.  Many -- many of the creative people want to work

7    for Isaac because you can be creative.  It's an

8    entrepreneurial environment, so you can be more creative,

9    but we work everywhere.

10             MR. QUINN:  Objection, your Honor.  Narrative and

11   move to strike also.

12             THE COURT:  No.  The answer remains.

13             Your next question, Counsel.

14   BY MR. MC CONVILLE:

15   Q    So I just want to run through these numbers that are on

16   this chart.

17   A    Uh-huh.

18   Q    So in 1999, there were 6 total hires by MGA, and 3 of

19   those were former Mattel employees; is that right?

20   A    Yes.

21   Q    And in 2000, there were 12 hires?

22   A    Uh-huh.

23   Q    And 5 of those were ex-Mattel employees?

24   A    Yes.

25   Q    And in 2001, there were 21 hires; is that right?

1    A    Yes.

2    Q    And 5 of those were ex-Mattel employees?

3    A    Yes.

4    Q    2002, there were 44 hires?

5    A    Correct.

6    Q    And 10 of those were ex-Mattel employees?

7    A    Yes.

8    Q    In 2003, there were 88 hires?

9    A    Yes.

10   Q    And that was -- 10 of those were ex-Mattel employees?

11   A    Yes.

12   Q    And in 2004, there were 108 hires by MGA, total?

13   A    Yes.

14   Q    And 22 of those were former Mattel employees?

15   A    Yes.

16   Q    And in 2005, there were 120 total hires at MGA; is that

17   right?

18   A    Yes, 120.

19   Q    And 17 were ex-Mattel employees?

20   A    Yes.

21   Q    In 2006, there were 170 hires; is that right?

22   A    Yes.

23   Q    And 15 of those were ex-Mattel employees?

24   A    Yes.

25   Q    And in 2007, there were 214 hires --

1   A     Yes.

2   Q     -- total; is that right?

3   A     Yes.

4   Q     And the vast majority of those were Little Tikes, the

5   acquisition of Little Tikes?

6   A     Yes.

7   Q     And of the 214, 6 are ex-Mattel employees, correct?

8   A     Yes.

9             MR. MC CONVILLE:  No further questions.

10            MR. QUINN:  Would you leave that up top?

11            MR. MC CONVILLE:  Yes.

12            THE COURT:  Cross-examination, please, by

13   Mr. Quinn on behalf of Mattel.

14                      **CROSS-EXAMINATION**

15   BY MR. QUINN:

16   Q     Good afternoon.

17   A     Hello.

18   Q     My name is John Quinn, and I'm counsel for Mattel.

19   A     Nice to meet you.

20   Q     Now, Little Tikes, I think you indicated the employees

21   who came with Little Tikes to MGA are included in this bar

22   chart here?

23   A     Yes.

24   Q     And what year was Little Tikes acquired by MGA?

25   A     2006.

1    Q    And --

2    A    At the -- at the very end of 2006.  I don't know if it

3    they actually started the management until 2007.  I'm not

4    sure.  I came on in 2008.

5    Q    So how many employees were there in the Little Tikes

6    work force who joined MGA at the time of that acquisition?

7    A    In 2006, I can't say.  In 2000 -- I mean, I can tell

8    you how many there are now.  In 2007, I would -- I would --

9    you know what?  I can't tell you exactly, sorry.

10   Q    And was there more than a hundred employees?

11   A    Oh, yes.

12   Q    More than 200 employees?

13   A    Yes, I would say so.  I wasn't there, but I would say

14   so, yes.

15   Q    I mean, you've done some research to prepare for your

16   testimony --

17   A    Yes, yes.

18   Q    -- and I take it you know it's several hundred

19   employees?

20   A    A couple hundred employees, sure.

21   Q    Who are included here came up because they came over

22   from Little Tikes to MGA --

23   A    Yes.

24   Q    -- as part of that acquisition, correct?

25   A    Yes.  However, not to mistake, some stayed at Little

1   Tikes and some moved -- positions moved to MGA.

2   Q    Maybe they moved out here to the West Coast or went

3   somewhere else?

4   A    We -- there currently are a couple people that are here

5   still.

6   Q    Okay.  Now, Little Tikes, that was a company based in

7   Ohio?

8   A    Hudson, Ohio.

9   Q    And after MGA acquired it, MGA gave some consideration

10  to shutting down that operation and moving it to Mexico; is

11  that correct?

12  A    The -- the wise thing to many people would have been to

13  do something like that.  However, that would have been a

14  huge loss of jobs.

15  Q    Right, and so what happened was the State of Ohio gave

16  MGA some tax benefits and low interest loans, correct?

17  A    Are you talking about when they acquired Little Tikes?

18  That's not correct.

19  Q    Well, instead of moving to -- that operation to Mexico,

20  MGA was able to get from the State of Ohio a -- a package

21  consisting of something like a 4 million-dollar, 3 interest

22  loan at 3 percent to get them to stay; is that true?

23  A    In 2007?

24  Q    At any point, at any time since the acquisition, isn't

25  it true that --

1    A     Mr. Quinn, the property was purchased outright,

2    including all the buildings.

3    Q     Let me -- focus on my question, please.

4    A     Okay.

5    Q     Do you know whether or not, after the acquisition, the

6    decision was made instead of moving that business to Mexico,

7    to keep it there because MGA was able to get some benefits

8    from the State of Ohio; do you know whether that's true or

9    not?

10   A     I believe that we have some benefits by staying in the

11   State of Ohio.  That was not the decision.  That was not the

12   reason.

13   Q     That's not my question.  Do you know whether they got

14   some financial assistance, some tax incentives and grants,

15   whether MGA got that to keep that business there instead of

16   moving it to Ohio; do you know, "yes" or "no"?  I mean

17   instead of moving it to Mexico; do you know, "yes" or "no"?

18   A     Eight months ago, yes.  Six, eight months, yes.

19   Q     Now, it's true that the skills in bringing out a new

20   product, it may require some particular skills that some

21   smaller group of employees or potential employees may have

22   than other employees, right?

23   A     Yes.

24   Q     All right.  And it's true that in connection with

25   bringing out the Bratz product, Paula Garcia was considered

1    very important that she wanted to make sure that the key

2    Bratz employees would be people who were groomed at Mattel;

3    isn't that true?

4              MR. MC CONVILLE:  Objection.  There is no

5    foundation for this witness.

6              THE COURT:  If you know the answer, you can answer

7    the question.

8              THE WITNESS:  I don't know the answer to that.

9    BY MR. QUINN:

10   Q    Well, let's take a look at Exhibit 11254.

11   A    Is that in this book?

12   Q    11254.

13   A    It doesn't look like it's in this book.

14             MR. MC CONVILLE:  Your Honor, I'm going to object

15   to beyond --

16             MR. QUINN:  May I approach the witness, your

17   Honor?

18             THE COURT:  Not until I see the exhibit.

19             MR. MC CONVILLE:  Beyond the scope and no

20   foundation.

21             THE COURT:  Just a moment.

22             MR. QUINN:  This is in evidence, your Honor.

23             THE COURT:  Well, it may be in evidence, but that

24   doesn't mean that this witness --

25             MR. MC CONVILLE:  Can I see it?

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 52 of 135   Page ID #:314157
CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

52

```
 1              No foundation, your Honor.

 2              THE WITNESS:  Can I have some water, please?

 3              THE COURT:  Certainly.

 4              THE WITNESS:  Thank you.

 5              MR. MC CONVILLE:  And it's irrelevant, based on

 6   this witness' testimony.

 7              THE COURT:  Were you employed there in 2003?

 8              THE WITNESS:  No, sir.

 9              THE COURT:  Sustained.

10   BY MR. QUINN:

11   Q    You've done some research to prepare to come here to

12   testify?

13   A    Yes.

14   Q    And you've collected data going back, I think, to,

15   what, 2000 or --

16   A    1999.

17   Q    1999?

18   A    Yes.

19   Q    And you collected that data?

20   A    Yes.

21   Q    And you understand that that's represented in the

22   charts that counsel showed us?

23   A    Yes, yes.

24   Q    And that's what your testimony is based on, going back

25   to 1999 in your research, right?
```

1    A    Yes.

2            MR. QUINN:  And your Honor, we'd like to question

3    her about these exhibits, which are in evidence.

4            THE COURT:  It's sustained.  Counsel, it's not

5    even within her purview.  Sustained.

6    BY MR. QUINN:

7    Q    Well, did you research -- as part of your research, did

8    you research how many members of the key Bratz launch team

9    came from Mattel?

10   A    No.  I don't even know who the key Bratz launch team

11   are.

12   Q    All right.  Are you familiar with the name "Carter

13   Bryant"?

14   A    I have heard the name in association with this trial.

15   Q    Are you familiar with the name "Mercedeh Ward"?

16   A    Yes.

17   Q    Are you familiar with the name "Paula Garcia"?

18   A    Yes.

19   Q    Are you familiar with the sample makers, Beatrice

20   Morales and Maria Salazar, are those names known to you?

21   A    I know the names, but I don't know them, for example.

22   Q    Are you -- are you aware that all those persons came

23   from Mattel?

24   A    Yes, I believe so.

25   Q    And do you know whether or not Ms. Garcia expressed the

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 54 of 135   Page ID #:314159
CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

54

```
 1   view --
 2           MR. MC CONVILLE:  Objection.  Publishing hearsay
 3   that the Court's already ruled on.
 4           THE COURT:  Counsel --
 5   BY MR. QUINN:
 6   Q    Do you know whether or not Paula Garcia only wanted
 7   employees who have been groomed at Mattel?
 8           MR. MC CONVILLE:  Same objection, your Honor.
 9           THE COURT:  No.
10           You can answer that question generally.
11           THE WITNESS:  No, I -- I have no idea.
12   BY MR. QUINN:
13   Q    Do you know whether or not Mr. Larian wanted the
14   recruiting people at MGA to aggressively recruit from inside
15   Mattel?
16           MR. MC CONVILLE:  Same objection.
17           THE COURT:  No.
18           You can answer that question generally.
19           THE WITNESS:  I can tell you that I know for a
20   fact from him speaking to me that he did not want people
21   from Mattel, and that if I ever found out there was someone
22   from Mattel, they were to not ever tell us anything that had
23   to do with Mattel.
24   BY MR. QUINN:
25   Q    Do you know whether or not back in 1999, Mr. Larian
```

1    ever gave the direction that we should aggressively recruit

2    from inside Mattel; did you ever hear that?

3                MR. MC CONVILLE:  Objection.  She wasn't present

4    in 1999.

5                THE COURT:  No, I understand that.

6                But if you've had a conversation with Mr. Larian

7    in that regard --

8                THE WITNESS:  No.

9                THE COURT:  -- back in 1999, you can answer that.

10               THE WITNESS:  No.

11               THE COURT:  Okay.

12               THE WITNESS:  Never.

13   BY MR. QUINN:

14   Q    Let me see if I can refresh your recollection.  I'd

15   like to show you Exhibit 11856.

16               MR. MC CONVILLE:  Your Honor, she didn't say her

17   memory needed refreshing.

18               THE COURT:  Well, that's true, Counsel.

19               Counsel, no, no, no, no.

20   BY MR. QUINN:

21   Q    Well, as I understood your chart, if it we could put

22   this back up here, is it true that in the 1999 to 2001 time

23   period, 13 of the 26 new hires came from Mattel; half of

24   them?

25               MR. MC CONVILLE:  Objection.  Bad math.

 1              (Laughter.)

 2              THE COURT:  Overruled.  I went to the same school

 3    Mr. Quinn did.  Mr. Quinn has perfect math.

 4              MR. QUINN:  Public school.

 5              THE COURT:  Public school.

 6              Just joking with both counsel, for the record, but

 7    it's close enough.

 8              (Laughter.)

 9              THE WITNESS:  Could you ask me the question again?

10    BY MR. QUINN:

11    Q    It's -- I guess there is a total of 27 new hires -- 26

12    new hires, that's in blue for --

13    A    If you're talking about 1999 to 2001 --

14    Q    Yeah.

15    A    -- 21 plus 12 plus 6 is the total new hires.

16    Q    Right.

17    A    And out of that, 13 was from Mattel, or previous Mattel

18    at some point in their life.

19              THE COURT:  The percentage of that is?

20              I'm just kidding you.

21              (Laughter.)

22    BY MR. QUINN:

23    Q    So what is the total of new hires?  Your arithmetic is,

24    indeed, better than mine.  What's the total of new hires for

25    those three years?

```
 1   A    You're probably not nervous.

 2          (Laughter.)

 3          THE WITNESS:  Out of 39, there were 13, and my

 4   fractions are terrible, so --

 5          THE COURT:  Hold on.  We can take judicial notice

 6   of this.

 7          Counsel, do any of you have a computer?  Just take

 8   21, 12, which is 23, 6 is 58.  I'm just kidding you.

 9          So what is that?  That's going to be 33 -- 39, and

10   then you've got 13.

11          THE WITNESS:  So 13 out of 39 --

12          MR. QUINN:  That's roughly a third.

13          THE COURT:  A third.

14          MR. QUINN:  About a third.

15          MR. MC CONVILLE:  I will stipulate it's a third.

16          THE COURT:  Okay.

17          (Laughter.)

18   BY MR. QUINN:

19   Q    So in those three years, approximately one-third were

20   from Mattel?

21   A    Yes.

22   Q    And in 2000, the year Bratz was introduced, 5 of 7 --

23   A    5 of the 12?

24   Q    -- 5 of the 12 were from Mattel, correct?

25   A    Yes.
```

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 58 of 135   Page ID #:314163
CV 04-9049-DOC – 03/30/2011 – Day 42, Vol. 2 of 3

58

```
1            MR. MC CONVILLE:  Objection.  Misstates the

2    testimony.

3            THE COURT:  Overruled.

4    BY MR. QUINN:

5    Q    Would you agree that it's quality, not quantity that

6    matters?

7    A    In what?

8            (Laughter.)

9    BY MR. QUINN:

10   Q    In terms of recruiting.  In terms of recruiting.

11   A    In terms of recruiting, we always try to find the best

12   person possible.

13   Q    Thank you very much.

14   A    Thank you.

15           THE COURT:  Redirect?

16           MR. MC CONVILLE:  No questions, your Honor.

17           THE COURT:  Okay.  Recross?  Anything from either

18   party?

19           (No audible response.)

20           THE COURT:  Okay.  Thank you very much.

21           Now, we want you -- we are leaving all the

22   witnesses on call until April 11th, but you go about your

23   professional duties and responsibilities, take any planned

24   vacation.  If we need you, we'll find you; we promise.

25           Thank you very much.
```

```
 1                    THE WITNESS:  Thank you.

 2                    THE COURT:  Counsel, your next witness, please.

 3                    THE WITNESS:  Do I leave this?

 4                    THE COURT:  That's fine.  We'll get all that.  You

 5       don't have to worry about that.

 6                    THE WITNESS:  Thank you.

 7                    THE COURT:  Counsel?

 8                    MS. KELLER:  Your Honor, I think we still are

 9       deferring that one witness, so if we are, then we would call

10       Ron Brawer.

11                    THE COURT:  Okay.  Mr. Brawer.

12                    MR. QUINN:  This is a complete change and no

13       notice.

14                    THE COURT:  So I'm the only one who doesn't know.

15                    Ladies and gentlemen, we are going to have a brief

16       recess.  I apologize about all the recesses.  It's totally

17       my responsibility.

18                    I am admonishing you not to discuss this matter

19       amongst yourselves, nor form or express any opinion

20       concerning this case.  Have a nice recess.

21                    All right, counsel.  Let's have a seat.

22                    (The following proceedings is taken outside

23             the presence of the jury.)

24                    THE COURT:  Okay.  Now, the jury is no longer

25       present.
```

CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

60

```
 1              Where are we?

 2         MS. KELLER:  Your Honor, he was on our list for

 3    today.

 4         THE COURT:  I know he is.

 5         MS. KELLER:  So I don't understand why this is a

 6    complete surprise.

 7         THE COURT:  Well, I thought Mr. Brawer was always

 8    going to testify.  What's our surprise here?

 9         MR. PRICE:  We got an e-mail 10:26 last night

10    saying that tomorrow's -- today's order was Moore, Stockton,

11    Bradley, Terri Hauenstein, Jill Thomas, de Anda and Eckert.

12    Brawer is not on the list at all.

13         MS. HURST:  No, that's not right.

14         MR. MC CONVILLE:  I told them this morning, didn't

15    I tell you this morning, I gave you a list?

16         THE COURT:  For the record, that's somewhat

17    typical between the parties sometimes.  They've been

18    informing each other on both sides occasionally, which has

19    become the rule, that there's always been a change order,

20    and of course, the Court is the last to know.

21         MR. PRICE:  And this morning obviously wouldn't be

22    enough -- Brawer is a very important witness, obviously, and

23    we had this list from last night at 10:30, this is who we

24    prepared for.  Mr. de Anda has been here for a while, and,

25    of course, that happens to witnesses.
```

```
 1            THE COURT:  Now, just a moment.  I don't recall
 2    de Anda -- I know Mr. Stockton was going to be on the list,
 3    and I had allowed the last witness, Mr. Moore is still --
 4    going through files.  We have Stockton.  Mr. Normile's
 5    testified.  Jill Thomas, Vollero.  I always believed that
 6    Mr. Brawer was going to testify.  It was simply a matter of
 7    when.  So what's the big surprise here for the parties?
 8            MS. KELLER:  We're down to very few people, your
 9    Honor, and --
10            THE COURT:  Well, just a moment.  Let's find out
11    who we have so there's no issues between the parties.
12            We have Mr. Brawer in the hallway; is that
13    correct?
14            MR. MC CONVILLE:  Correct.
15            THE COURT:  Okay.  And then after Mr. Brawer -- or
16    before Mr. Brawer, we have Mr. de Anda in the hallway.
17            MS. KELLER:  We have him, but your Honor, because
18    some information came in through Ms. Thomas and because of
19    our limited time, we may or may not call him, so we want to
20    call Mr. Brawer and see --
21            THE COURT:  That's fair enough.  Both sides have
22    cancelled witnesses.  I think Mattel cancelled numerous
23    witnesses on you.
24            MS. KELLER:  Nineteen, to be exact.
25            THE COURT:  That's fine.  It's evening out.
```

```
 1          MS. KELLER:  And we are really coming right down

 2   to the end, and one problem is we want to be able to finish

 3   Mr. Moore because the last two witnesses are very critical

 4   witnesses and we don't want one of them to be Mr. Moore.

 5          THE COURT:  And I need a little bit more time with

 6   those notebooks, obviously.  I got up to tab 68.  I think I

 7   got those because it was represented to me that Mattel

 8   needed more time about what, Mike, 9:30, last night, 10:00?

 9   I can't remember.  You want three more hours; isn't that

10   correct?

11          MR. ZELLER:  Yes.

12          THE COURT:  Happy to give it to you.  I didn't

13   think anybody wanted to come back at 1:00.  You all looked

14   awfully tired, so I sent you home.

15          I got here at seven.  The books arrived at 7:30

16   promptly.  I went through them until 8:20.  And I'm at

17   tab 68.  Until I finish tab 100 and something, he's not

18   getting back up on the stand.

19          MS. KELLER:  I understand.

20          THE COURT:  So apparently Mr. Brawer is going up,

21   but I want to hear who we have left.

22          We have your alleged damages expert, Mr. -- what's

23   his name?

24          MS. KELLER:  Malackowski.

25          THE COURT:  And I don't mean that maliciously, I
```

 1   mean just Mr. Malackowski.

 2          MS. KELLER:  And Mr. Eckert.

 3          THE COURT:  And Mr. Eckert.  There's no surprises

 4   now.  We're down to maybe de Anda depending on Brawer,

 5   correct?

 6          MS. KELLER:  Yes.

 7          THE COURT:  We have Mr. Malackowski, subject to me

 8   hearing from him tonight.  I want to go through that one

 9   more time very briefly, but I think I'm marginally

10   satisfied, but like Mr. Wagner, I always want to hear both

11   of these damages back to back, and there was a good chance

12   neither one of them were going to testify, frankly, but

13   Mr. Wagner has gotten up on the stand and maybe Malackowski

14   will.

15          MS. KELLER:  And Mr. Eckert.

16          THE COURT:  And Mr. Eckert, and then you're done.

17          It looks like we are all on notice, Mr. Quinn?

18          MR. QUINN:  No, we weren't on notice.  They gave

19   us a list.

20          THE COURT:  No, no.

21          MR. QUINN:  We had some significant witnesses

22   before this one, who they told us to prepare for.  We are

23   not ready for Mr. Brawer.

24          THE COURT:  I'm trying my best to find out what's

25   happening.  This is what's happening.  We've got Mr. Brawer,

1    we've got -- in other words, we have got three witnesses

2    left, that's what I'm hearing.

3              MR. MC CONVILLE:  And Moore.

4              MS. KELLER:  And Mr. Moore.

5              MR. QUINN:  Mr. McConville now acknowledges that

6    he didn't tell us about Brawer.

7              THE COURT:  Can we do this?  Can we take

8    Mr. Brawer on direct examination, it should fill most of the

9    rest of the day.  It gives you the advantage tonight of

10   going home with no cross-examination until tomorrow, so I

11   don't know why we couldn't be adequately prepared for

12   Mr. Brawer.  Keep the jury moving at least in that portion.

13   Give me time tomorrow -- or tonight with Mr. Moore.

14             MR. QUINN:  We haven't been through the binder.

15             MR. PRICE:  We haven't been through the binders, I

16   don't know if that's an issue.

17             THE COURT:  Well, we can move slowly.  I think we

18   all know what Brawer is going to say.  But here is what's

19   going to happening to you, your time is disappearing, and I

20   don't mean time on the clock.  You're all desperately asking

21   for time this weekend, which I'm trying to give to you and

22   some nights back to you.

23             MR. PRICE:  Your Honor, Mr. Brawer has nothing --

24   his testimony has nothing to do with Mr. de Anda, so de Anda

25   is here.  So if they are not going to call him, they made

1    that decision, fine.

2              THE COURT:  No, we are not going to do that.  It

3    happened with Mattel also.  You cancelled numerous

4    witnesses.  I mean, literally at the last moment, and I went

5    through all of this on the opposite side, so it's kind of

6    deja vu, here it is again on your side now.  Let's not go

7    back and forth with this.

8              No, no, Counsel, guess what.  We just stopped.

9              Now, you are going to call Mr. Brawer now.  You

10   are going to put him up on the stand as soon as we take a

11   recess.  And then I'm going to recess for the day wherever

12   you are, whether you're into this an hour or 45 minutes or

13   three hours.

14             You are going to call Malackowski tomorrow, and

15   you are going to call Mr. Eckert tomorrow, and then you're

16   resting unless you call de Anda or Moore back.  That's going

17   to give me time to look at these binders concerning

18   Mr. Moore.  Understood?  And we are going to move very, very

19   slowly, and if there is a question concerning the evidence,

20   we'll just slow down and take a look at it.

21             MS. KELLER:  Well, I think Moore is coming back,

22   in any event, because they haven't had a chance --

23             THE COURT:  Oh, he's coming back.

24             MS. KELLER:  -- for their exam, so the only thing

25   I'm trying to avoid is I know your Honor understands the

1    importance of the order of presentation of the case, and I'm

2    just trying -- I just don't want to finish --

3              THE COURT:  I gave Mattel the same opportunity.  I

4    wanted Mattel to finish on a high note, so witnesses were

5    moved around.  You'll have the same courtesy and you'll

6    finish your case the way you choose.

7              Now, do you need a restroom break?  At my age, I

8    don't.  But if you do, you might take one.

9              *(Laughter.)*

10             MR. PRICE:  Usually it works the other way, but

11   yes.

12             THE COURT:  Okay.  Then go take a restroom break.

13   See you in 10 minutes.

14             *(Recess.)*

15             *(The following proceedings is taken in the*

16       *presence of the jury.)*

17             THE COURT:  Back in session.  The jury is present,

18   all counsel, the alternates.

19             Thank you for your courtesy.

20             And Counsel on behalf of MGA and Mr. Larian, your

21   next witness, please.

22             MS. KELLER:  Yes, your Honor, we call Ron Brawer.

23             THE COURT:  And sir, will you come through the

24   double doors, and please raise your right hand.

25

1          **RON BRAWER, DEFENSE WITNESS, SWORN**

2          THE WITNESS:  Yes, I do.

3          THE COURT:  Thank you, sir.  If you'd please walk

4    along the side of the jury railing, and there is an entrance

5    near the boxes, and if you'd be seated, sir.

6          And sir, will you state your full name for the

7    jury, please.

8          THE WITNESS:  Ron Brawer.

9          THE COURT:  And will you spell your last name for

10   the jury, please.

11         THE WITNESS:  B-r-a-w-e-r.

12         THE COURT:  Thank you.

13         This is direct examination by Ms. Keller on behalf

14   of MGA and Mr. Larian.

15         MS. KELLER:  Thank you, your Honor.

16                     **DIRECT EXAMINATION**

17   BY MS. KELLER:

18   Q    Mr. Brawer, where do you work currently?

19   A    I currently own my own toy company called the Maya

20   Group.

21   Q    Called the what?

22   A    The Maya Group.

23   Q    And can you tell us a little bit about your education,

24   starting with college?

25   A    I was a graduate of the State University of New York in

```
 1    Albany.  I got a bachelor's in business administration.  I
 2    later got an MBA from New York University in a joint program
 3    with SUNY University, and I had an executive MBA -- an
 4    executive MBA program at the Wharton School of Business at
 5    the University of Pennsylvania.
 6    Q    We're going to need you to keep your voice up just a
 7    little bit and slow down.
 8    A    Okay.
 9    Q    So that we don't give this lady arthritis, okay?
10         Now, what was your first job in the toy industry?
11    A    Well, the first kind of children's products job that I
12    had was I had a baby product called Relax, Inc., Relax baby
13    products and that was started in 1991.
14    Q    Where did you go to work after that?
15    A    In 1996, I started as a senior product manager in the
16    marketing department at Tyco Toys.
17    Q    And senior product manager, what did that involve?
18    A    It was a marketing position.
19    Q    Was there any brands that you were involved with that
20    we might have heard of?
21    A    I was involved with Magna Doodle and View-Master.
22    Q    When was that again?
23    A    That was in 1996.
24    Q    And did you stay with Tyco?
25    A    I did stay with Tyco.  In 1997, Mattel acquired Tyco,
```

1    so I became a part of the Mattel organization.

2    Q    And -- okay.  So Mattel acquired Tyco in '97?

3    A    Uh-huh.

4    Q    You stayed on, right?

5    A    Yes.

6    Q    And who did you report to?

7    A    In 1997 when Mattel acquired Tyco, there was a -- I

8    became the director of marketing at Matchbox toys, and the

9    Matchbox brand was reporting in to Gene Murtha.

10   Q    And what was your next position at Mattel?

11   A    Gene left the Mattel, and I became vice president of

12   marketing for Matchbox toys.

13   Q    And who did you report to then?

14   A    I reported to the general manager of the facility, it

15   was out in New Jersey, and that was a gentleman by the name

16   of Jim Alley.

17   Q    And what was your next position at Mattel?

18   A    In the year 2000, I was transferred out to El Segundo,

19   to Los Angeles, and we relocated, and I became the vice

20   president of customer marketing.

21   Q    What were your responsibilities in that role?

22   A    As a -- I supported the U.S. operations for sales

23   initiatives, so it was primarily a sales function.

24   Q    Who did you report to then?

25   A    I started to report to the president of the division

```
1    that I worked for, which was Matt Bousquette.

2    Q    What was your next position?

3    A    About a year or so later, I was then promoted to senior

4    vice president of global customer marketing, and I continued

5    to report to Matt Bousquette.

6    Q    And then how about after that, did you stay on at

7    Mattel?

8    A    Yes, I stayed on at Mattel until the year 2004.  In

9    2004, I was given the title of general manager and senior

10   vice president of sales, I guess, and I was responsible for

11   the global Toys R Us business for Mattel.

12            THE COURT:  I'm sorry, maybe some of the witnesses

13   don't know.  I see Mr. Normile is here, which is fine, but I

14   want -- and Ms. Thomas.

15            If any of you are going to be recalling any of

16   those witnesses, then they should be excluded.  If you are

17   not, then I should be lifting those orders and let anybody

18   attend from either side.  So let's just take a moment and be

19   certain.  I want that coequal.

20            In other words, let's let people back in if they

21   are interested who have been witnesses for both sides, but

22   if a person has a chance of being a witness, I don't want to

23   be surprised or have one side accusing the other that

24   they've heard some portion of the testimony.

25            MS. KELLER:  Your Honor, since we don't know until
```

1    rebuttal, I think it's safer to exclude all of the

2    witnesses.

3                THE COURT:  Then across the board.

4                I want to thank both of you.  It just protects

5    credibility, et cetera, in case you're recalled as a

6    witness.  So if you'd be kind enough just to wait outside.

7    And I'll keep that witness exclusion, then, for both sides

8    until rebuttal and surrebuttal.

9                MS. KELLER:  Thank you, your Honor.

10               THE COURT:  That was unintentional.  The witnesses

11   just hadn't been informed.

12               Counsel, thank you.

13   BY MS. KELLER:

14   Q    Okay.  Now, where were we when we left off?  Had you

15   just become in charge of the Toys R Us account for Mattel?

16   A    Correct.

17   Q    And what about after that?

18   A    Well, that was my last position at Mattel, and after

19   that, I eventually left Mattel and I joined the MGA company.

20   Q    Now, before you left, what -- what year was it that you

21   left and joined MGA?

22   A    I joined MGA in the year 2004.

23   Q    During -- well, during the period of the early 2000s,

24   was there any kind of change in the responsibilities of the

25   group you were in?

1    A    The most dramatic in public changes that occurred at

2    Mattel was that we were a divisionalized structure, meaning

3    that I worked for the boys' group and there was a girls'

4    group and then there was sort of a Fisher Price group, so

5    there were three different groups.

6         And in the years 1997 through 2001, I worked

7    exclusively for the boys' group with Matt Bousquette as the

8    president of that division.

9         Around 2002, 2003, I am not exactly sure of the date,

10   Bob made the decision or Mattel made the decision to pull

11   the two groups together, and they created one group under

12   Mattel brands.

13        And the group that was then put in charge of the

14   combined groups was our group, the boys' group, and we now

15   assumed responsibility not only for brands like Hot Wheels

16   and Matchbox, but we also then had to take on the

17   responsibilities of things like Barbie and Polly Pocket.

18   Q    Were there any particular pressures at that time

19   because of the Barbie brand?

20   A    What I think was driving some of this was really two

21   kind of major things going on internally.  There was no

22   question that at the time that all of this started to take

23   place, there was a lot of -- there was a sales decline in

24   Barbie.  And you've got to understand, Barbie to Mattel was

25   the -- is or was the --

```
 1              MR. PRICE:  Object, your Honor, this is a
 2    narrative.
 3              THE COURT:  Sustained.
 4    BY MS. KELLER:
 5    Q    What was the meaning of Barbie to Mattel?
 6    A    Barbie to -- Barbie to --
 7              MR. PRICE:  Objection.  Lack of foundation.
 8              THE COURT:  Overruled.
 9              You can answer that question.
10              This is from his perspective, from his position at
11    that time at Mattel.
12              THE WITNESS:  Yeah.  So Barbie was a large
13    percentage of the sales but an even larger percentage of the
14    profit.  It was a very, very powerful brand, you know, very,
15    very well distributed throughout the world, and there was a
16    significant decline year on year in the 2001, 2002, 2003
17    time period for Barbie sales and hence Barbie profitability.
18    And it was obviously a concern to Mattel.
19    BY MS. KELLER:
20    Q    Was this the reason that you perceived for the
21    structural changes, the organizational changes?
22    A    I think that was the major reason and I think that was
23    a valid business reason.  I think the other issue that
24    really came up a lot was the environment was very political,
25    was very --
```

```
 1            MR. PRICE:  Objection.  This is another narrative.
 2   Beyond the scope.
 3            THE COURT:  Sustained.
 4            Now, she'll ask you questions, you can respond to
 5   those questions, we've got lots of time, okay?
 6            THE WITNESS:  Okay.
 7            THE COURT:  All right.  Counsel.
 8   BY MS. KELLER:
 9   Q    What, if any, political pressures did you perceive?
10   A    There was a lot of infighting between the boys' and
11   girls' group during the time that I was discussing prior to
12   our being merged.  And I think part of the rationale perhaps
13   also for merging those groups was to try and break down
14   those walls and put them all under one group.
15   Q    What in particular did you see Matt Bousquette trying
16   to do to in some way stem the decline in the sales of
17   Barbie?
18   A    Well, there was an immediate and powerful initiative to
19   try and grab hold of where the Barbie brand was and what we
20   could do to try and resurrect -- or not resurrect, really,
21   but to reinvigorate the sales and to reinvigorate the
22   profitability.
23        There were definitely some marketing moves that were
24   done, there were definitely some product moves that were
25   done.  So there was a lot of changes that we tried to create
```

1   to the product line and to the brand in that 2002, 2003 time

2   period, because we understood we had a very short window in

3   which to try and prove ourselves and our ability to make the

4   changes.

5        We also launched a series of competitive brands, none

6   of which worked, but we tried for Flavas and we tried these

7   other brands that would try and capture a larger share of

8   the market and perhaps stem some of the other issues, but

9   through 2002 and 2003, the sales continued to decline.

10  Q    And now, so in 2004, the -- the -- how did you come to

11  take over the Toys R Us business?

12  A    So what we saw -- there was an increasing amount of

13  pressure on our group.  As these groups merged, you needed

14  to somehow try and find a way to, you know, create a new

15  dynamic within the company -- or within the division.

16       And what we saw was that, you know, nothing we were

17  really trying was working.  And it was -- got to the point

18  where, you know, it was pretty scorched earth.  It was

19  anything and everything that you could try, people were

20  willing to talk about.

21       Operationally was there things we could do to sort of

22  limit access to supply, if there was anything we could do,

23  you know, from the legal standpoint, from any angle, from

24  the PR standpoint, anything we could do to try and bring

25  down the competitive pressures and bring up the sales of

```
 1    Barbie.
 2         When that wasn't working, Matt, who was --
 3              MR. PRICE:  Objection.  Now we are into a
 4    narrative.
 5              THE COURT:  Sustained.
 6    BY MS. KELLER:
 7    Q    When you say -- this is all moving very quickly, so I
 8    need you to slow down, take a deep breath, okay?
 9    A    Okay.
10    Q    When you say the competitive pressures, do you mean
11    from MGA and Bratz?
12    A    Yeah, I think what -- part of what was happening was
13    that Barbie was losing market share --
14              MR. PRICE:  Objection.  Beyond the scope of the
15    question after "yep."
16              THE COURT:  No, overruled.
17    BY MS. KELLER:
18    Q    Can you explain?
19    A    Bratz was gaining market share at the time that Barbie
20    was seeing these declines.
21    Q    So this was a pretty intense and stressful period,
22    then, to be working at Mattel where you were?
23    A    Yes, certainly in our division, which was not
24    performing.
25    Q    So you then became the general manager of Toys R Us?
```

1    A    So a certain point in time, I was asked to take on a

2    different role, and my boss at the time, Matt, asked me to

3    go in to look at a different role at the company.

4    Q    You mean Mr. Bousquette?

5    A    Yes, Mr. Bousquette.

6    Q    Okay.

7    A    And I also then had conversations with Mr. Eckert and

8    Mr. Kaye, and that led to my taking on this different role.

9    Q    And the different role being?

10   A    The general manager of Toys R Us.

11   Q    Now, did that change result -- that -- that change that

12   you were to take over as head of Toys R Us, did that result

13   in improved performance for Barbie?

14   A    No.

15   Q    Did it change your reporting obligations?

16   A    Yes.  I no longer reported to Matt Bousquette.  I

17   reported to a new head of sales whose name was Jerry Cleary,

18   the EVP of sales.

19   Q    What other changes did this mean for you personally?

20   A    I was asked to do a job that was essentially based in

21   New York.  Toys R Us is headquartered in Paramus, New

22   Jersey, so it meant two or three times a month, I was flying

23   out to New York to try and do the job, which wasn't really

24   anything I wanted to do.

25   Q    So ultimately -- and we are going to come back to this

CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

1    in a minute, but ultimately, you changed jobs and went to

2    MGA, true?

3    A    Correct.

4    Q    So were you at Mattel when Bratz was first introduced

5    to the market?

6    A    Yes, I was.

7    Q    And as you said, you were working for Mr. Bousquette in

8    2003 and 2004?

9    A    Yes, I was.

10   Q    Originally with boys and then it merged with girls?

11   A    That's correct.

12   Q    And how -- within Mattel, how was the success of Bratz

13   being perceived in 2002 and 2003?

14           MR. PRICE:  Objection.  Calls for speculation.

15   Hearsay and overbroad.

16           THE COURT:  Just a moment.

17           I want to hear once again what your position was

18   at that time in 2002 and 2003.

19           THE WITNESS:  I was the senior vice president of

20   global customer marketing.

21           THE COURT:  Now, ladies and gentlemen, remember,

22   the word Bratz and Mattel and MGA and Barbie, kind of

23   generic terms in a sense, and counsel may sometimes ask, as

24   counsel just did, how is something perceived within Mattel.

25           This is this witness' perception, and we can't

1    lose track of that from either side as they refer back and

2    forth to Mattel on one hand or MGA on the other.

3            So technically, the objection is sustained,

4    Counsel, it's a correct objection.

5            By the same token, Counsel, just reask it.

6    BY MS. KELLER:

7    Q    What did you see happening with Bratz in 2002 and 2003?

8    A    The --

9            MR. PRICE:  Lack of foundation.  He's at Mattel.

10           THE COURT:  Overruled.

11           You can answer that question.

12           THE WITNESS:  Bratz was gaining in market share,

13   was growing in sales and had become a greater focus in the

14   company Mattel as a competitive issue.

15   BY MS. KELLER:

16   Q    What was the reaction you were getting from retailers

17   to Bratz?

18           MR. PRICE:  Objection.  Hearsay.

19           THE COURT:  Overruled.

20           You can answer the question.

21           THE WITNESS:  Yeah, I was in contact with many

22   retailers at the time, and they were very pleased with

23   telling us the performance of Bratz and how well it was

24   doing relative to our -- to our product lines.

25

1   BY MS. KELLER:

2   Q    Was that worrisome to you?

3   A    Oh, it was a big problem.

4   Q    Was it worrisome within Mattel in general, in other

5   words, it's not limited to just you, but when you looked

6   around you at your coworkers, other executives, were they

7   reacting the same way, were they worried?

8              MR. PRICE:  Objection.  Overbroad.  Speculation.

9              THE COURT:  Overruled.

10             You can answer the question.

11             THE WITNESS:  So I'm clear, the rise of Bratz and

12   the gain of market share of Bratz in that 2002, 2003 time

13   period coincided with a decline in sales with Barbie, so we

14   really had -- at Mattel, we were really concerned about it.

15   We had a retailer guy at Toys R Us, I remember, telling

16   me --

17             MR. PRICE:  Your Honor, hearsay.

18             THE COURT:  Sustained.  Sustained.

19   BY MS. KELLER:

20   Q    Tell me the reactions you were getting from some of the

21   retailers.

22             MR. PRICE:  Object.  That calls for hearsay.

23             THE COURT:  Overruled.

24             You can state your answer to that question.

25             Let me remind you, though, we don't have the

1    retailer here.  This is his perception and conversation.

2          So, Counsel.

3          THE WITNESS:  Right.  The -- the sound bite I

4    remember best from back then from one retailer at Toys R Us

5    was that Barbie was becoming a mausoleum within Toys R Us.

6    It had all this shelf space, and it wasn't moving, it was

7    dead -- it was dead product, and we needed to reinvigorate

8    it.

9    BY MS. KELLER:

10   Q    And were you present in any meetings at Mattel where

11   Bratz was discussed?

12   A    I was present in many meetings where Bratz was

13   discussed.

14   Q    And what was the reaction in your group over the

15   increasing success of Bratz?

16   A    There was a growing, you know, concern, there was, you

17   know, growing pressure to try and figure out how to fix the

18   problem.

19   Q    And within these meetings, did you also hear directly

20   from Matt Bousquette?

21   A    Matt Bousquette led many of these meetings.

22   Q    And what was Mr. Bousquette's -- what was

23   Mr. Bousquette's leadership about in terms of what you

24   should do about Bratz?

25   A    Oh, I mean, Matt was in -- Matt was crazed with trying

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 82 of 135   Page ID #:314187
CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

82

1    to figure out how to fix the problem.  He would have done

2    anything to try and change the dynamic in the marketplace.

3              MR. PRICE:  Your Honor, I want to move to strike

4    as speculation to "have done anything."

5              THE COURT:  "Done anything" is stricken.  The rest

6    of the answer remains.  Including crazed?  I'm just joking.

7    Let's strike "crazed" also, okay?

8              THE WITNESS:  Thank you.

9    BY MS. KELLER:

10   Q    Let's substitute highly focused for crazed, okay?

11   A    Okay.

12   Q    Would you agree with me that Mr. Bousquette was highly

13   focused on the problem that Bratz was on the rise and Barbie

14   was on the decline?

15   A    Yes, Matt was highly focused.  Matt and I had personal

16   conversations where we knew that the future of our division

17   and the future of the health and well being of our group or

18   our employees was on fixing the Barbie problem.  And part of

19   fixing the Barbie problem was to attack Bratz, and it was

20   something that we were focused on every day -- every day

21   that we went to work.

22   Q    You mentioned a little while ago that one of the ways

23   in which you decided to attack MGA or attack Bratz brand was

24   operationally.  Can you explain what you meant by that?

25   A    Well, I think what became clear is that not only were

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 83 of 135   Page ID #:314188
CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

83

```
 1   we focused on it in the division, but the whole corporation
 2   was becoming more involved in how to -- how to deal with not
 3   only with the Bratz or, quote unquote, Barbie problem, so
 4   from an operations standpoint, there were discussions about
 5   what could happen with the factories and what discussions
 6   could you have with the factories in order to try and limit
 7   supply --
 8             MR. PRICE:  I'm going to object.  This is hearsay.
 9             THE COURT:  Just a moment.
10             MS. KELLER:  It's offered to show conduct, your
11   Honor, not state of mind.
12             THE COURT:  Overruled.
13             MR. PRICE:  His conduct?
14   BY MS. KELLER:
15   Q    So when you say there were discussions about what to do
16   with the factories, what did you mean by that?
17   A    What could be done to discuss with the factories to try
18   and ensure that the best supply chain possible is available
19   to Mattel and there were limitations to MGA.
20   Q    Limitations on MGA's supply chain?
21   A    Limitations on -- there's some critical components that
22   go in to making a doll.  The number one and most hard to get
23   is hair.  Believe it or not, there's a limited number of
24   factories in the world that can actually produce
25   good-quality hair that make for a good-quality fashion doll.
```

```
 1        And so the more you can tie up the hair manufacturing,

 2   the more likely you are to be able to limit the amount of

 3   supply that someone else might be able to create for other

 4   quality fashion dolls.

 5   Q    Well, how could Mattel do that?  How could Mattel go

 6   about, quote, tying up the hair factories?

 7   A    I --

 8             MR. PRICE:  Let me object.  That calls for

 9   speculation.

10             THE WITNESS:  And my answer is, I don't know the

11   details of how they would have gone --

12             THE COURT:  I'm going to sustain the objection.

13             THE WITNESS:  Sorry.

14   BY MS. KELLER:

15   Q    Okay.  You don't know the details, you just know that

16   that was one of the things in discussion?

17   A    Correct.

18   Q    And how about with respect to the media, was there

19   any -- was there any discussion going on about how to use

20   the media to hurt Bratz and help Barbie?

21             MR. PRICE:  Objection.  Calls for hearsay.

22             MS. KELLER:  Again --

23             THE COURT:  Are you personally involved in this

24   discussion?

25             THE WITNESS:  Yes.
```

```
 1              THE COURT:  I'd like more foundation.  With who,
 2    when and where?
 3    BY MS. KELLER:
 4    Q    Were you personally involved in discussions within
 5    Mattel with other executives about, for example, this issue
 6    we just talked about of trying to, say, corner the market on
 7    doll hair, were you personally involved in those
 8    discussions?
 9              MR. PRICE:  Object.  Mischaracterizes his
10    testimony.
11              THE COURT:  Overruled.
12              THE WITNESS:  Yes.
13    BY MS. KELLER:
14    Q    And who did you have those discussions with?
15    A    The discussions I recall most vividly are -- we had a
16    weekly staff meeting with Matt Bousquette that would last
17    for hours.  I mean every -- I think it was every Monday, but
18    we would have a staff meeting that could last four, five
19    hours.
20         Matt was very structured about having this very long
21    meeting, and we would go through a series of different
22    issues and steps that, you know, there was an agenda every
23    week that looked at what we needed to cover in terms of
24    dealing with sales, dealing with marketing, dealing with the
25    competitive situation.
```

 1          And in many of those meetings, I recall there were

 2    discussions about what could we do beyond just product in

 3    order to try and fight the market share loss of Barbie.

 4    Q    So in other words, in addition to trying to make a

 5    better Barbie, you also wanted to figure out how to -- how

 6    to hurt sales, marketing, production of Bratz, right?

 7              MR. PRICE:  Objection.  Leading.

 8              THE COURT:  Sustained.

 9    BY MS. KELLER:

10    Q    Okay.  Were you personally ever present in any meetings

11    where use of the media to hurt the Bratz brand was discussed

12    or to deprive the Bratz brand of access to media?

13    A    I -- I don't recall any -- any meetings specifically at

14    that time period around depriving Bratz of media.  What

15    is -- what I did come to know --

16              MR. PRICE:  Your Honor, I object.  This is now a

17    narrative.

18              THE COURT:  Sustained.

19    BY MS. KELLER:

20    Q    What discussions were you present for with respect to

21    the media in terms of the Barbie versus Bratz scenario?

22    A    So at a later point in my career when I was already

23    working for MGA, there were discussions often with the media

24    companies about the pricing --

25              MR. PRICE:  I object.  This is hearsay now, your

1    Honor.

2              THE COURT:  Sustained.

3    BY MS. KELLER:

4    Q    Did you find it difficult once you were an executive

5    with MGA to purchase the type of media buys specifically

6    from, say, Nickelodeon that you expected you would be able

7    to buy for Bratz?

8    A    When I was an executive at MGA?

9    Q    Right.

10   A    When I was an executive at MGA, the pricing of our

11   media relative to Mattel was at a disadvantage.

12   Q    And in addition to any legitimate business reasons, did

13   you become aware of any other reasons for that?

14             MR. PRICE:  I'm going to object.  Lack of

15   foundation.  Hearsay.

16             THE COURT:  Well, you can answer that "yes" or

17   "no," and then I want to hear the foundation for this before

18   we get into any alleged conversations.

19             THE WITNESS:  I would say the answer is "no."

20   BY MS. KELLER:

21   Q    Okay.  When you were still with Mattel, can you tell

22   us, was there any discussion or plan to use public relations

23   against the Bratz brand in a negative way?

24   A    I do recall a conversation I had with Matt Bousquette

25   that the use of negative PR would become one of our

1   strategies.

2   Q    What do you mean by negative PR?

3   A    I actually don't know exactly what he meant.  I assume

4   that --

5              MR. PRICE:  Objection.  Speculating.

6              THE COURT:  Sustained.

7   BY MS. KELLER:

8   Q    What did you understand he was talking about?  What was

9   your understanding of what he was talking about?

10             MR. PRICE:  Objection.  That's irrelevant.  He

11  said he didn't know.

12             THE COURT:  He can give us his mind set for his

13  alleged conduct, but it's hearsay as to Matt Bousquette.

14  Matt Bousquette isn't here testifying, so we don't know.

15             Counsel, thank you.

16             You can answer the question.

17             THE WITNESS:  So my understanding of what negative

18  PR meant was that we would be disparaging PR -- do

19  disparaging PR against Bratz or whatever competitor we

20  needed.

21  BY MS. KELLER:

22  Q    Do you mean formal ads that would have Mattel's name on

23  it or something more subtle?

24  A    I can't be certain, but it can be more subtle.

25  Q    Now, we --

```
 1            THE COURT:  Counsel, I'm going to strike this
 2   testimony.
 3            This is your interpretation or are these words
 4   from Matt Bousquette?
 5            THE WITNESS:  Matt Bousquette told me that the
 6   company would be initiating negative PR against Bratz.
 7            THE COURT:  And the rest of that is your
 8   interpretation?
 9            THE WITNESS:  I can only --
10            THE COURT:  Okay.  I'm going to strike the
11   remainder of that.  That answer remains, Counsel.  The
12   remainder of his interpretation is stricken.
13   BY MS. KELLER:
14   Q    So you never said to Matt Bousquette, for example, tell
15   me exactly what the plan is, what do you mean, what kind of
16   negative publicity?
17   A    No, I did not.
18   Q    Okay.  Now, when you were at Mattel, did you become
19   aware of whether any Mattel employees were using false
20   credentials to get into competitors' showrooms at toy fairs?
21   A    Yes, I was aware that Mattel employees used false
22   credentials to get into competitor's showrooms.
23   Q    And was this -- was this something that was well hidden
24   within Mattel?
25            MR. PRICE:  Objection.  Lack of foundation.  And
```

1   ambiguous.

2           MS. KELLER:  I'll back up and ask a different

3   question.

4           THE COURT:  Sustain the objection.

5   BY MS. KELLER:

6   Q    How did you first become aware of it?

7   A    The first I can recall of how I became aware of this

8   was Sal Villasenor, who worked in this department, actually

9   told me that he did it.

10  Q    And was it your understanding that he worked alone or

11  with others?

12  A    No, it was a whole department.

13  Q    And what was your understanding of what he would obtain

14  for Mattel to use?

15  A    He would go into showrooms and try and elicit catalogs,

16  price lists and any kind of marketing information, product

17  information he could from showrooms of various competitors.

18  Q    Unreleased products?

19  A    Yes, unreleased products.

20  Q    And did he mention which showrooms he went into

21  specifically in these conversations with you?

22  A    I can't recall specific showrooms, no.

23  Q    Now, after you went to work at MGA, did you ever tell

24  Mr. Larian or other people at MGA about what Mr. Villasenor

25  had been doing at Mattel?

1   A      No, I did not.

2   Q      Why not?

3   A      You have to understand, for me, the -- the -- Sal

4   Villasenor in this department was something that existed

5   from the day I walked into Mattel, so not having ever worked

6   in a major toy company before or ever having really

7   understood what the norms of this industry are, it existed,

8   I figured that's the way people do business, everybody knew

9   about it.  It wasn't like it was some secret.

10      They had -- they would do -- they would go to toy fair,

11  and then right afterwards, they would assemble all of the

12  executives and all of the marketing people in the company

13  and they would do a download of everything that they learned

14  at these shows.

15      So everybody knew what they were doing.  Everybody knew

16  that they were getting information that wasn't publicly

17  available.  And I didn't think of it as something that was

18  done outside of the norm of, quote unquote, market research.

19  It sat in market research.  It sat in market research the

20  entire time I was at Mattel.

21  Q   At some point, did somebody start to question you about

22  it, about Mr. Villasenor and his activities, at some point

23  in litigation, for example?

24  A      The way that this became something that I began to talk

25  about was, I went through a series of depositions prior to

1    my arrival here.  I spent about 40, 45 hours in depositions,

2    and Mr. Zeller, who did the majority of those depositions,

3    would continually --

4               MR. PRICE:  Your Honor, I am going to object.

5    This is irrelevant.  Hours in deposition --

6               THE COURT:  Sustained.  Strike it.

7               Reask the question.

8    BY MS. KELLER:

9    Q    Specifically, how did it first come up --

10              THE COURT:  Let's just put all of the hours and

11   burdens for all of the witnesses, they've all been through

12   lots of depositions.

13              THE WITNESS:  Okay.

14              THE COURT:  Let's just say coequal depositions.

15              THE WITNESS:  Fair enough.

16              THE COURT:  So we get rid of who's had the most

17   and who's had the least of depositions.  Everybody here has

18   been through --

19              THE WITNESS:  Do I rank high?

20              THE COURT:  Thank you very much, sir.  You are

21   going to be quiet now.

22              THE WITNESS:  Sorry.

23              THE COURT:  Lots of depositions on both sides,

24   trust me on that.

25              Now, Counsel, let's get on with it.

1   BY MS. KELLER:

2   Q    So after you left Mattel and went to MGA, would it be

3   true that the first time this topic really came up, you had

4   anybody question you about it was at a deposition?

5   A    Yes.

6   Q    And what caused you to remember it at the deposition?

7   A    During the deposition -- one of the depositions, the

8   person asking the question continually asked the question of

9   whether or not I could remember anything unethical that

10  Mattel had ever done.  And I was asked to continually probe

11  my mind to try and remember whether or not I could think of

12  anything else or anything that was unethical.

13       And it was actually something I hadn't thought about.

14  I mean, I hadn't really put the whole Sal thing in the

15  forefront of my mind at any point of time.  And you know how

16  you sort of have one of these ah-ha moments or all of a

17  sudden something comes back to you and it's something that,

18  you know, I guess this really fits the bill, so it kind of

19  came to me that, well, here was this group, Sal was a part

20  of it, there were other people involved, they were

21  falsifying their identifications, they were -- they were

22  falsely going into showrooms of competitors, they were

23  taking the, quote unquote, trade secrets of other

24  competitors, and the irony of it all, that we are sitting

25  here in a case involving trade secret theft --

CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

94

```
 1              MR. PRICE:  Your Honor, object.  This is not
 2    characterization.  This is a narrative.  Move to strike.
 3              THE COURT:  Sustained.  The last portion of it is
 4    stricken, starting with "the irony of it all."  The rest
 5    remains.
 6    BY MS. KELLER:
 7    Q    Okay.  So then you discussed, during your deposition,
 8    what you knew about Mr. Villasenor and the things that the
 9    market intelligence department had been doing, right?
10    A    That's correct.
11    Q    Now, moving on to another topic, when you were at
12    Mattel, were you aware of any efforts to imitate or copy
13    MGA's Bratz themes?
14              MR. PRICE:  I object.  That's irrelevant.  No
15    claims.
16              MS. KELLER:  It goes to innovation, your Honor.
17              THE COURT:  Well, it depends upon the time period.
18    BY MS. KELLER:
19    Q    You left Mattel in 2004?
20    A    Correct.
21              MS. KELLER:  So this would be --
22              THE COURT:  All right.  You may inquire.
23    BY MS. KELLER:
24    Q    Were you aware of any efforts to imitate or copy any of
25    MGA's Bratz themes?
```

1    A    The one that I can recall the best is the -- the theme

2    of winter fun or there was a winter theme coming from Bratz

3    for, I believe it was the Christmas of 2003, it might have

4    been 2004, I don't recall which one, but it was one of the

5    big Bratz themes, and we immediately developed a MyScene

6    theme called Chillin' Out.

7    Q    Was this Bratz Winter Wonderland?

8    A    It was Bratz' Winter Wonderland, thank you.

9    Q    Okay.  And how about -- do you remember a Bratz product

10   called Diamondz with a Z on the end?

11   A    Yes, I do recall that.

12   Q    And did Mattel have any response to that in terms of

13   trying to copy it?

14   A    This was while I was working at MGA, upon --

15          MR. PRICE:  I move to object for lack of

16   foundation.

17          THE COURT:  Sustained.

18   BY MS. KELLER:

19   Q    Well, while you were at MGA, did you see Mattel try to

20   copy or, in fact, copy an MGA product?

21          MR. PRICE:  I'll object.  Ambiguous as to "copy."

22          THE COURT:  No, overruled.

23          This is his opinion, remember.

24          You can answer the question.

25          THE WITNESS:  Again, I think it was in the year

```
 1    2004, it may have been 2005, 2005, I was working at MGA, and

 2    the big theme for us was Bratz Diamondz, so a doll was

 3    provided with a diamond chip, it was a big idea.

 4           And before we could even release the doll, Mattel

 5    had -- and this was our big, big theme, Mattel had come in

 6    with a cheaper -- much cheaper doll, offering a stone called

 7    Gems, so there was a MyScene Gems or a Barbie Gems doll that

 8    came in right on top of the Diamondz doll.

 9    BY MS. KELLER:

10    Q    Are you aware -- did you ever visit a MGA toy fair

11    showroom when you were an MGA executive?

12    A    Yes, all the time.

13    Q    And were those private showrooms kept confidential?

14    A    Yes, they --

15           MR. PRICE:  Objection.  Vague as to time period.

16           THE COURT:  Sustained.  I need more foundation,

17    where, when.

18    BY MS. KELLER:

19    Q    Can you tell us what years at MGA you visited MGA toy

20    fair showrooms?

21    A    Throughout my career at MGA, I was a leader in the

22    sales organization and in the marketing organization, so I

23    would have always been visiting the showrooms, so it would

24    have been every year from 2004 up until 2009, when I left.

25    Q    What did MGA do to maintain the confidentiality of its
```

1    private showrooms?

2            MR. PRICE:  I'll object again as to time period.

3    It assumes it's the same over those years.

4            THE COURT:  I need some time period, Counsel.  I

5    need some location also.

6            Sustained.

7    BY MS. KELLER:

8    Q    Okay.  Let's say 2004, did you visit the New York toy

9    fair?

10   A    I would not have been there in 2004.  I would have

11   still been an employee of Mattel's.

12   Q    Okay.  2005?

13   A    In 2005, I would have been at New York toy fair in --

14   in -- I believe, you know, I can't -- I can -- I can tell

15   you that I attended every Hong Kong toy fair every year from

16   2005 all the way up through 2010.  I can tell you that the

17   protocol for entering the Hong Kong toy fair --

18           MR. PRICE:  Objection.  This is beyond the scope

19   of the question.  I thought we were identifying.

20           THE COURT:  Sustained.

21   BY MS. KELLER:

22   Q    Let's talk about the protocol for entering the Hong

23   Kong toy fair.  What did MGA require of people to get in to

24   the private showrooms?

25   A    The showroom in Hong Kong had three layers of security,

CV 04-9049-DOC – 03/30/2011 – Day 42, Vol. 2 of 3

98

1   so you had personnel at an entrance way that had to receive

2   and identify anybody coming in to actually visit the

3   showroom, so you had to know who you were.

4        The second thing is you had a sign-in sheet, so if you

5   were attending, you had to sign in, and if you were a

6   customer or somebody requiring an NDA, we asked that you

7   sign an NDA.

8   Q    What's is an NDA?

9   A    A nondisclosure agreement.

10  Q    What did the nondisclosure agreement provide for?

11  A    The essence of the nondisclosure agreement provided

12  that you would keep confidential anything that you saw in

13  that showroom.

14  Q    Now, sometimes you would invite press to see some of

15  your products, right?

16  A    In some of the shows, such as New York, we might use

17  press as a vehicle for the show, yes.

18  Q    And would the press have to sign an agreement that the

19  press would not release information about the product until

20  a certain date?

21            MR. PRICE:  I'm going to object as to location and

22  time.

23            THE COURT:  Sustained.

24  BY MS. KELLER:

25  Q    Let's say at the New York toy fair, if you decided to

1    share your products with the press -- and press was

2    important for selling some of the products, wasn't it?

3    A    Yes, press -- particularly in the New York toy fair,

4    not so much Hong Kong, but in the New York toy fair, press

5    was one of the reasons that you went to the show.

6    Q    And if you decided to share some of your products with

7    the press, if they were unreleased products, would you give

8    the press a date before which they couldn't write about the

9    product?

10            MR. PRICE:  Objection.  It's vague as to when and

11   where.

12            THE COURT:  Just a moment.

13            Are you referring to Hong Kong or New York when

14   you are giving this next answer?

15            THE WITNESS:  I'm focused on New York right now.

16            THE COURT:  All right.  Overruled.

17            MR. PRICE:  The objection is as to time, your

18   Honor.  He couldn't say he was there in 2004.

19            THE COURT:  Sustained.

20            The year, Counsel.  He never answered if he went

21   to the New York toy fair in 2005.

22   BY MS. KELLER:

23   Q    2005 through 2010, did you attend the New York toy fair

24   every year?

25   A    I attended the New York toy fair in the years we

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 100 of 135   Page ID #:314205
CV 04-9049-DOC – 03/30/2011 – Day 42, Vol. 2 of 3

100

1    exhibited.  We did not exhibit every year in New York, but I

2    recall in 2005, 2006, we were in New York and we did

3    exhibit.

4    Q    In 2005 and in 2006, when you exhibited in New York,

5    let's just limit it to those years and only the New York toy

6    fair, okay?  If you shared a product -- an unreleased

7    product with the press, what arrangements would you have

8    with the press to make sure that they didn't write about it

9    before you wanted them to?

10   A    Well, the procedures that I recall were not so much

11   about limiting the time when they could write about it.  It

12   was more about choosing the products that we would release

13   information on early.

14        And so if there were items that were specific that we

15   decided we wanted press on, we would create an area that was

16   not visible to the rest of the showroom so that the press

17   could come in and see those products.  So we were selective

18   as to what we showed the press prior to full disclosure of

19   the product line.

20   Q    Okay.  And why was it that you wanted to keep your

21   unreleased products confidential?

22   A    Depending on when the publicity hits and the amount of

23   information released, you could be giving your competitors

24   an advantage or an opportunity, let's call it, to come out

25   and try and knock you off or do something that, you know,

1    would potentially stem your sales before you even got there.

2    Q    In general, from 2005 to 2010, just in general, would

3    you sometimes release some information about a product but

4    not all of it to the press?  In other words, might you

5    release a description of the product but not the pricing

6    information?

7    A    I'll be honest with you, I don't recall exactly what

8    was released, but generally if we -- we made the decision

9    whether or not to release the product information or not.

10       In general, I can say that from 2005 to 2010, we made

11   the decision in the doll area in particular to release less

12   and less information.  So what was a more -- a more -- I

13   don't call it routine, but we would pick a larger number of

14   products to release information on earlier on; by the later

15   time periods, we were releasing very little.

16   Q    Did that have anything to do with Mattel's copying your

17   products?

18   A    I think it had to do with, yeah, the fear that Mattel

19   would figure out the theme too early and try and knock us

20   off.  After Diamondz -- the Diamondz, Gems issue happened,

21   it became pretty standard for us not to try and release any

22   information too early.

23   Q    Now, back when you first decided to go to work at MGA,

24   when did you first have contact with anybody at MGA about

25   the idea of maybe working there?

1    A    The first time I ever sent an e-mail to MGA was in

2    2001.

3    Q    And -- do you remember who it was you sent it to?

4    A    No, I think I sent it to a generic mailbox, and I don't

5    believe I received a response.

6    Q    Okay.  Did you at some later time again contact

7    somebody at MGA?

8    A    In 2003, I was in contact with a headhunter from MGA

9    who was researching a chief operating officer role at MGA.

10   Q    And was that the position that you were interested in?

11   A    That was the position I was talking to the man about,

12   yes.

13   Q    And who was it that you talked to about that?

14   A    His name is Ron Jervis.

15   Q    When was it that you talked to Ron Jervis?

16   A    I believe it was 2003.

17   Q    And did you end up working there in 2003?

18   A    No, I did not.

19   Q    Was there a time you again began talking with MGA about

20   working there?

21   A    Yeah, the 2003 discussions broke off.  I was not the

22   right person for the chief operating officer role, and then

23   in 2004, I began discussions again with MGA.

24   Q    And was there some reason you decided to start those

25   discussions with MGA again?

1    A    Well, it pretty much coincides with that move to a job

2    in New York and having to kind of do this new role at

3    Mattel.  And on top of it, there were a lot of pressures

4    going on at Mattel that I didn't feel were being fairly

5    apportioned, and I wasn't happy in my role at Mattel, so I

6    started looking for other jobs, MGA being one of the

7    candidates.

8    Q    In 2004, did you interview with Mr. Larian?

9    A    Yeah, at some point in 2004, I definitely met Isaac

10   Larian.

11   Q    Can you describe the interview you had with him?

12   A    Um, well, I had I think at least -- I think I had two

13   interviews with him.

14   Q    Okay.

15   A    The -- the first one, the one that I recall best is we

16   met at LAX airport, at the restaurant in the airport, and

17   Mr. Larian brought a questionnaire with about 50 pages worth

18   of questions, and he asked me all these psycho questions

19   about what would I do if I was renting a car, would I take a

20   mid size, a small car, a large car, I don't know, a lot of

21   things -- nothing that had to do with work, but a lot of

22   things, I guess, that looked at the personality that you

23   were interviewing, and we went through that for, I think,

24   about a good two hours.

25   Q    Tell us about the second interview.

Case 2:04-cv-09049-DOC-RNB    Document 10347    Filed 03/31/11    Page 104 of 135    Page ID
#:314209
CV 04-9049-DOC – 03/30/2011 – Day 42, Vol. 2 of 3

104

1    A    The second time I think I met Isaac, we met at a Target

2    store, and we walked around the store, and we just talked

3    about marketing stuff, you know, how the store was

4    positioned, where products were, and he kind of -- he

5    queried me on my knowledge for how well I understood how

6    merchants sell products, retailers sell products.

7    Q    And was there any discussion between the two of you

8    about his desire that you keep any Mattel information that

9    you had confidential?

10   A    Yes.  When -- when Isaac decided to get involved with

11   the interviewing process, before we could even begin to

12   talk, there was a great concern on MGA's side that I was a

13   spy for Mattel.

14       And so they made -- they started sending over letters,

15   legal letters, and advising me to get a lawyer, and I did,

16   to actually review all the, you know, requirements that we

17   both had in terms of keeping our information confidential

18   and in terms of not sharing any trade secrets.  And after a

19   bit of back and forth between the lawyers, we finally agreed

20   on the terminology of that letter, and that's what allowed

21   us to begin to discuss what was going on, the job

22   opportunity.

23   Q    And did you actually send Mr. Larian a letter

24   memorializing those discussions and memorializing that you

25   were going to keep Mattel information that was confidential

1   and proprietary secret, and on the same token, you would

2   keep any MGA information that you got that was proprietary

3   and confidential, you were going to keep that a secret as

4   well?

5   A    Yes, and I think the letter even says that we weren't

6   going to discuss anything that we considered proprietary or

7   confidential.

8         MS. KELLER:  And if we could see 8616.

9   BY MS. KELLER:

10  Q    This is June 12, 2004 letter starting "Dear Isaac" and

11  signed by you; do you recognize that letter?

12  A    Yes, I do.

13  Q    Is that the letter we've been talking about?

14  A    Yes, it is.

15        MS. KELLER:  Your Honor, I'd move Exhibit 8616

16  into evidence.

17        MR. PRICE:  Your Honor, it's hearsay, if not

18  offered for the truth, it's fine.

19        THE COURT:  Let's wait until after court today.

20        MS. KELLER:  Okay.

21  BY MS. KELLER:

22  Q    Was the purpose of this letter to memorialize the

23  understanding that you had with Mr. Larian and that

24  Mr. Larian had with you about whether you would keep

25  information confidential, both of you, I mean both as to

1    Mattel and as to MGA, that each side would remain walled off

2    from the other?

3    A    Yes, the intention was that we would not share any

4    confidential information and that we were not going to share

5    anything that was considered proprietary or confidential.

6    Q    And did this letter accurately reflect your intentions?

7    A    I'm not reading every word right now, but as far as I

8    recall, yes, it did.

9    Q    Was this letter drafted with the help of your lawyer?

10   A    Yes, it was.

11   Q    And among other things, does it provide that to the

12   extent that I have the obligation under law and/or any

13   agreements or policies to keep --

14            MR. PRICE:  Your Honor, I object if it's not in

15   evidence, but if it's being put in evidence just to show his

16   intentions, I have no objection.

17            THE COURT:  Okay.  Counsel?

18            MS. KELLER:  Then I would ask that it be moved in,

19   your Honor.

20            THE COURT:  Received.  This is simply to show his

21   intentions.

22            *(Defendants' Exhibit No. 8616 is received in*

23        *evidence.)*

24   BY MS. KELLER:

25   Q    So again, we were discussing the fact that this was a

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 107 of 135   Page ID #:314212
CV 04-9049-DOC – 03/30/2011 – Day 42, Vol. 2 of 3

107

1    two-way street.  Mr. Larian and you each wanted these

2    provisions as part of your understanding before you could go

3    forward, true?

4    A    Yes.

5    Q    Okay.  And if you look at the second paragraph -- or

6    let's start with the first paragraph, it says, "Dear Isaac,

7    the purpose of this letter is to confirm certain facts with

8    respect to my current employment with Mattel and the

9    parameters of any discussions with you relative to possible

10   employment with MGA Entertainment, Inc."

11       And then let's go down to the second paragraph.  It

12   says, "To the extent that I have the obligation under law

13   and/or any agreements or policies to keep confidential

14   Mattel's proprietary, confidential and trade secret

15   information, I assure you that I do not intend to disclose

16   to you any such information.  And I expect that you will not

17   seek to inquire with regard to any such information.

18       "I understand that your interest in me is based on my

19   knowledge of the toy industry and not on any specific and

20   nonpublic information I may have regarding Mattel, its

21   customers or suppliers."

22       And then the next paragraph says, "In the event that

23   I'm offered employment with MGA, it is with the

24   understanding that any employment with MGA will be subject

25   to any ongoing obligations that I have to keep

1    Mattel-related information confidential."

2         Now, did you consider this a letter, so to speak, to

3    cover your rear end or did you really mean it?

4    A    No, I absolutely meant it.  If I can provide a little

5    bit of explanation.

6              THE COURT:  No, that's fine.  Counsel is capable

7    of asking you a question.

8              THE WITNESS:  Fair enough.

9              THE COURT:  Both of them are, you'll get

10   counsel -- questions from the other side.  Just answer the

11   question.

12   BY MS. KELLER:

13   Q    Well, explain -- when you said I really meant it, would

14   you explain what it was that you meant?

15   A    The -- I was interviewing with Isaac Larian who I did

16   not know, who had a fierce and negative reputation within

17   Mattel, and I was not interested at all in having Mattel

18   employees find out that I was considering an opportunity

19   with MGA.  And I was also -- had absolutely no intention of

20   providing MGA with any information that was at all secretive

21   or -- or business related from Mattel.

22        I -- I was not at all sure that this was a job that was

23   going to happen for me, so it was an opportunity to meet

24   Isaac, to understand what the opportunity was, but I wanted

25   to make it very clear that I was not going to provide any

1    secrets or any information on that side.

2    Q    And what -- in that interview, what did Mr. Larian tell

3    you about whether he wanted you to disclose any secrets that

4    Mattel had to him?

5    A    Both his lawyer and Isaac were very clear that they

6    didn't want me to disclose any information to them, they

7    really didn't, and I think later on, what I came to

8    understand was --

9              MR. PRICE:  Objection.  This seems to be hearsay

10   and a narrative.

11             THE COURT:  Sustained.

12   BY MS. KELLER:

13   Q    How long was it before you ultimately came to an

14   agreement with MGA?

15   A    I actually left Mattel or announced my resignation in

16   the middle of September.

17   Q    And why the time line between June and September?

18   A    It was the excruciating negotiation with Isaac, you

19   know, the back and forth and with MGA.  It was a very long,

20   protracted negotiation.

21   Q    Was the -- did you get what you asked for right off the

22   bat in terms of money?

23   A    No, I did not.

24   Q    And was the compensation you negotiated higher than you

25   were getting at Mattel?

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 110 of 135   Page ID #:314215
CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

110

1    A    There were parts of my compensation that were higher,

2    so like my base salary went up.  My bonus package wasn't as

3    good, my -- my health benefits wasn't as good, my car

4    allowance was less.  On the whole, I think they were more or

5    less the same.  I did get an options package that if the

6    company did well and it was sold, then I had a chance to

7    make some more money.

8    Q    If we take a look at Exhibit 4248, do you recognize

9    this as an e-mail exchange between you and Mr. Larian, the

10   first one starting August 4th and ending August 10th, 2004?

11   A    Yes, I do.

12   Q    And was that with respect to the issue of your

13   compensation?

14   A    Yes, this is with respect to my compensation.

15   Q    Proposed compensation?

16   A    Proposed compensation.

17           MS. KELLER:  Your Honor, I'd move 4248 into

18   evidence.

19           MR. PRICE:  No objection.

20           THE COURT:  No objection, all right.  Received.

21           *(Defendants' Exhibit No. 4248 is received in*

22       *evidence.)*

23   BY MS. KELLER:

24   Q    Now, if you take a look at the second portion from the

25   top dated August 10th from you, the e-mail Ron and Sharon,

1   that's your RonSha@Adelphia.net?

2   A    Yes, that's my e-mail, mine and my wife's.

3   Q    And it starts off, "Okay, so help us solve our one

4   remaining issue.  I feel fair is compensation at a level

5   similar to where I am today, not more, not less, but

6   similar.  50K when I'm eligible for over 350K next spring is

7   too big a gap."

8        Was this part of your negotiating with Mr. Larian?

9   A    Yes, it was.

10  Q    And were there benefits that you were getting at Mattel

11  in addition to what you've just told us about that you

12  didn't get at MGA, stock options, for example?

13  A    I had stock options at MGA, correct -- I'm sorry, at

14  Mattel.

15  Q    A car allowance?

16  A    I had a car allowance at both, but the car allowance at

17  Mattel was higher.

18  Q    Deferred compensation?

19  A    Deferred compensation.

20  Q    Was your deferred compensation at MGA guaranteed or did

21  it depend on meeting goals that you didn't have to meet at

22  Mattel?

23  A    There was a base compensation that was guaranteed.

24  There was a salary.  And there was a salary at Mattel.  I'm

25  not sure I understand the question beyond that.

1    Q    Well, I'm thinking, you know, were there goals that you

2    had to meet at MGA in order to get --

3    A    Additional compensation.

4    Q    -- additional compensation?

5    A    There were bonus structures at both companies.

6    Q    Okay.  How much of your compensation at MGA was

7    dependent on sales as opposed to guaranteed?

8    A    You know, I don't recall the exact percentages.  There

9    was a base salary and then there was a bonus, I think, that

10   could have gone to a hundred percent of my base salary, but

11   I'm not a hundred percent sure or remember exactly what the

12   number is.

13   Q    In Exhibit 4248 that we just looked at, you said that

14   you would be eligible for a $350,000 bonus next spring.  Was

15   that something that you were giving up by going to MGA?

16   A    Yeah, there were a series of bonuses that I was

17   eligible for at Mattel that were special sort of event

18   bonuses that you would -- that I was eligible for.  There's

19   a long-term incentive plan.  There was -- when they switched

20   jobs from customer marketing to -- to the New York TRU job,

21   they put $100,000 incentive bonus there.

22        So there was several hundred thousand dollars of

23   one-time incentives that were available to me in the

24   following spring if I was to still be a Mattel employee,

25   some of which I had to do nothing more than be a Mattel

1    employee, some of which the company needed to hit some

2    numbers in order for me to receive.

3    Q    Well, let's talk, then, about why it was that you took

4    the job.  I mean, you mentioned one thing is you didn't want

5    to be in New York all the time.  Were there other reasons

6    that you decided to move over from Mattel to MGA?

7    A    Yeah, I mean, for a while, my -- my nature is at the

8    end of the day, I believe that what I enjoy most is running

9    a business or running a company or being involved in more

10   than any one functional area.

11        So I spent a lot of years in sales, I did a good job

12   there.  I spent a lot of years in marketing, I did a good

13   job there.  The way that Mattel is structured, unless you're

14   the president of a division -- or at least the way it was

15   structured back then, you could really only work in one of

16   those functions.

17        At a certain point in time in my career, what I really

18   wanted was a wider berth of responsibility, so being able to

19   do more than one thing at one time, and also to have the

20   opportunity to earn more money.

21        And those are the two things that really pulled me into

22   a job that would have kind of got me excited about getting a

23   job.  And at MGA, while the money wasn't certain, the

24   responsibilities being offered were exciting and the -- and

25   the money was adequate that it really wouldn't have made a

1    difference in my lifestyle.

2         The other things that were going on, I think we

3    addressed a little bit already today, the business was not

4    working at -- at Mattel.  Barbie was in a state of decline.

5    The pressure was coming from all sorts of angles, the

6    politics were heavy.  My boss, Matt Bousquette, had suddenly

7    asked me to take a new role and take a new job that I wasn't

8    excited about that was in New York.

9         And so when I looked at the combination of the two

10   things, it just seemed like 2004 was the right time to move.

11   Q    So you resigned from Mattel in mid-September 2004?

12   A    I resigned from Mattel in mid-September 2004, correct.

13   Q    And if you take a look at Exhibit 4240, was that one of

14   the documents that you had to sign to join MGA, and this is

15   a document dated September 17th, 2000 entitled

16   "Understanding Regarding Compliance with Obligations to

17   Former Employers"?  Is this part of what you had to sign to

18   join MGA?

19   A    From what I remember, yes, and that is my signature, so

20   yes.

21              MS. KELLER:  Your Honor, I'd move 4240 into

22   evidence.

23              MR. PRICE:  No objection.

24              THE COURT:  Received.

25

1           (Defendants' Exhibit No. 4240 is received in

2      evidence.)

3   BY MS. KELLER:

4   Q    If we look at the bottom paragraph here, I mean, the

5   entire letter essentially deals with your obligations not to

6   use competitive information from Mattel, not to give that to

7   MGA, right?

8   A    Correct.

9   Q    And if we look at the bottom portion of this, it says,

10  "In this regard, if you accept MGA's offer of employment,

11  among other things, you should not retain any of Mattel's

12  property or confidential and proprietary information,

13  including Mattel's customer-related information or any

14  information regarding prospective customers, nor should you

15  use or disclose Mattel's property and/or confidential and

16  proprietary information in connection with your employment

17  at MGA or otherwise.

18      "All of Mattel's property and confidential and

19  proprietary information must be returned to Mattel before

20  you commence work for MGA, and to the extent that any Mattel

21  confidential and proprietary information, including Mattel

22  customer-related information, or any information regarding

23  prospective customers is stored on your personal digital

24  assistant, PDA, and/or BlackBerry and/or home and/or laptop

25  computers or in personal files, all such information must be

1    left at or returned to Mattel, and you should not retain any

2    copies in a hard or electronic form."

3         In addition to signing this letter, were you told

4    orally not to bring any Mattel information to MGA?

5    A    I believe I was, yes.

6    Q    And with -- in addition to being told that by

7    Mr. Larian, who else told you that?

8    A    The lawyers that I was working with all advised against

9    bringing anything.  I want to bring nothing.  Those are the

10   people I recall.

11   Q    Do you remember Daphne Gronich, the general counsel at

12   MGA, telling you that as well?

13   A    She would have told me that as well, yes.

14   Q    What were the circumstances of your resignation from

15   Mattel?  I mean, what happened on the day you actually

16   resigned?

17   A    The --

18            MR. PRICE:  Your Honor, I'm going to object.  It's

19   irrelevant.

20            THE COURT:  Overruled.

21            THE WITNESS:  On the day that I resigned, I came

22   in early, about 7:30 in the morning.  I went and found my

23   immediate supervisor at the time, whose name was Jerry

24   Cleary, who was head of sales.  I gave him a letter of

25   resignation.  He asked me where I was going.  I told him I

```
 1    was going to MGA.  He gave me some thoughts on that.
 2              And then he walked me to my office where he asked
 3    me to wait.  I waited there until security came, and they
 4    walked me out of the building.
 5    BY MS. KELLER:
 6    Q    When you left Mattel, did you take anything from your
 7    office?
 8    A    I did not take anything from my office on that day, no.
 9    Q    Did you take any personal effects from your office?
10    A    I had taken some personal effects the two days prior, I
11    hadn't been at work for the previous two days, and I knew
12    that I was going to be resigning in the morning, and I just
13    took my personal effects.
14    Q    Pictures of family, that kind of thing?
15    A    Yes.
16    Q    Did you take any documents with Mattel information?
17    A    No, I did not.
18    Q    Did you start working for MGA before your last day at
19    Mattel?
20    A    No, I did not.
21    Q    Did you ever work from home when you were at Mattel?
22    A    Yes, I did.
23    Q    Did anyone at Mattel ever tell you you could not do
24    that?
25    A    No, no one told me that.  They were happy to have me
```

1    work.

2    Q    Did you have a home computer that you used?

3    A    Yes, we did have a home computer.

4    Q    Would you sometimes put Mattel documents on it?

5    A    Often -- especially in those days, I'm not even sure we

6    had laptops yet, and we would e-mail work home so you could

7    have a file to work on at home and then e-mail yourself back

8    the work you had done at night, so that's sort of how it

9    went back and forth.  So there was plenty of Mattel

10   documentation on my home computer.

11   Q    After you resigned from Mattel, did you do anything to

12   make sure that your home computer no longer contained Mattel

13   information?

14   A    So what happened was on the advice of the attorneys I

15   was working with, they thought the best thing I could do was

16   to have a professional service brought in who specialized in

17   wiping your hard drive clean, which was not something I was

18   familiar with at the time.

19        And they arranged to have a company come in, who imaged

20   the hard drive and then wiped it clean and made sure that

21   they got rid of all of the Mattel stuff on the hard drive.

22        And the reason we went through all the trouble is, it's

23   a relatively new computer, it was the family computer, it

24   had all of the pictures and everything on there, and so my

25   wife preferred that we try and wipe the hard drive clean

1    rather than chuck it and get a new one.

2              MS. KELLER:  Your Honor, do you mind if we take a

3    break right now briefly.

4              THE COURT:  That would be fine.

5              You are admonished not to discuss this matter

6    amongst yourselves, nor form or express an opinion

7    concerning this case.

8              Why don't you take a brief recess and we'll come

9    and get you in 10 minutes.  Thank you very much.

10             *(The following proceedings is taken outside*

11        *the presence of the jury.)*

12             THE COURT:  We are back on the record.  All

13   counsel are present.  And Mr. Price?

14             MR. PRICE:  Your Honor, having seen Mr. Brawer's

15   binder, there are a number of documents in here that relate

16   to a complaint that Mattel brought against Mr. Brawer.

17   There was a demur, it was a sustained with leave to amend.

18   I think eventually it was sustained, period, because we

19   could not allege that he was using confidential information

20   that was a declaratory relief claim.

21             THE COURT:  I see.  Explain this to me.  Educate

22   me a little bit.  When Mr. Brawer left, I know -- first of

23   all, I've seen a number of videos.  Do all of you have

24   the -- and the record should reflect that Mr. Brawer is not

25   present.

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 120 of 135   Page ID #:314225
CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

120

```
 1              Do all of you have the videos of Mr. Brawer, the
 2     surveillance videos?
 3              MS. KELLER:  Yes, your Honor.
 4              THE COURT:  And you have all three?
 5              MS. KELLER:  I think we have all three.
 6              THE COURT:  You have all three also, Counsel?
 7              MS. HURST:  We do.
 8              THE COURT:  Okay.  That's laborious watching.
 9              MR. PRICE:  I don't see that in the binders.
10              THE COURT:  All right.  Let's discuss that also.
11     Let's see if we are going anyplace with the 20 hours.
12              MS. HURST:  Those are in the binders, just to be
13     clear.
14              THE COURT:  Let's focus on one thing at a time.
15     Are we going to be watching videos?
16              MS. KELLER:  We were going to ask to display
17     several clips, not the whole thing.
18              THE COURT:  Well, you don't have enough time for
19     the whole thing.  I'm just joking with you.  It's hours.
20              So let's find out what those clips are.
21              MR. PRICE:  Clearly we are going to object to
22     those as being absolutely irrelevant to anything on trial.
23              THE COURT:  Let's discuss those, I can anticipate
24     those coming and the objections, so let's get that on the
25     record also.
```

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 121 of 135   Page ID #:314226
CV 04-9049-DOC – 03/30/2011 – Day 42, Vol. 2 of 3

121

 1          And explain to me what occurred.  When Mr. Brawer
 2     left Mattel, was -- I know when he went over to MGA, there
 3     was some kind of accusation, obviously, involving some
 4     confidential information, I thought; no?
 5          MR. ZELLER:  Your Honor, very, very briefly, the
 6     chronology was, is that, on his way out, Mr. Brawer said
 7     during his exit interview that he didn't -- he never signed
 8     the code of conduct and was not bound by it.
 9          THE COURT:  That's correct.  In fact, there was a
10     discussion that took place that he was not bound.  In fact,
11     I even thought that there was some renegotiation in that
12     period of time.  I thought there was a request by Mr. Brawer
13     to renegotiate in that brief period of time and an
14     unwillingness to sign the, I'm going to call them severance
15     papers.  That's my memory of looking at those documents.
16          MR. ZELLER:  Prior to the time that he resigned
17     from Mattel, he had been presented, as many other Mattel
18     employees had, with a new inventions agreement.  And
19     basically he said he had an issue with one particular
20     passage in it, and that turned out to have dragged on for
21     some period of time, and then he resigns, and then he says,
22     I'm not bound by the code of conduct, by the way, and then
23     as a result of that, Mattel brought a declaratory relief
24     action.  That was the only claim, was dec relief --
25          THE COURT:  Because obviously Mattel must have

1   been suspicious, from your perspective, in that regard, a

2   person who is not going to sign.  From his perspective, it's

3   a new inventions agreement that he's not going to sign, so

4   we have this tussle going back and forth.  He walks out.

5   You have no severance or no new inventions agreements or

6   inventions agreement.

7           All right.  Now, Mr. Price, what's your concern?

8   Educate me.

9           MR. PRICE:  My concern is, first, and Mr. Zeller

10  can give you details, my understanding is this was resolved.

11          THE COURT:  Oh, you have a photographic memory,

12  stay with me.

13          MR. PRICE:  I'm just looking through this.  My

14  understanding is the lawsuit was dropped when Mr. Brawer

15  agreed that he would be bound by the code of conduct.

16          THE COURT:  I see.

17          MR. PRICE:  But in the meantime, there was a

18  complaint filed.  There was a demur sustained.  There was an

19  appeal, and --

20          THE COURT:  Was this in Superior Court?

21          MR. PRICE:  Yes.

22          THE COURT:  Over in downtown Los Angeles.

23          MR. PRICE:  Yes, yes.

24          THE COURT:  And how soon after his severance or

25  his resignation was the suit filed?

1          MR. PRICE:  It was filed October 21, 2004.

2          THE COURT:  All right.  Now, let's find out where

3    we are allegedly going with this.

4          What's happening from MGA's side, what are you

5    seeking?

6          MS. KELLER:  Well, we anticipate that, in numerous

7    ways, that Mattel is going to try to show that this witness

8    is biased and prejudiced against Mattel.  And so we think we

9    should be entitled to bring out first the fact that Mattel

10   sued him.

11         He never -- never made any statements during his

12   departure about not abiding by Mattel's, you know, not

13   honoring Mattel's proprietary and confidential information.

14   Four separate times he said he would.  But they wanted him

15   to sign this brand new inventions agreement on his way out,

16   which he didn't want to sign.

17         THE COURT:  So really, here is what I'm hearing,

18   and then each of you will correct me, of course, as you

19   always do.  What I'm hearing is, it's not a matter of this

20   evidence coming in, it's a matter of who gets it in first.

21         MS. KELLER:  I think that's actually true.

22         THE COURT:  No, no, hold on.  Bear with me.  I

23   used to practice law a long time ago.

24         It's all coming in, in other words, the accusation

25   that he's biased against Mattel is obviously going to be an

1   attack by Mattel upon Mr. Brawer.

2           And you're trying, just like Mr. Quinn did with a

3   couple of his witnesses, to take the sting out of that.  You

4   want to introduce that bias first.  In other words, you want

5   to wear the white hat.

6           MS. KELLER:  Well, yes, and in addition to that, I

7   think that it also shows the degree of enmity between the

8   two companies or at least -- there's already been some

9   discussion of it, but when you sue an employee who hasn't

10  done anything merely because he won't sign a new agreement

11  on his last day, I think that shows a certain amount of

12  enmity going the other way as well.

13          THE COURT:  Now, just a minute.  This lawsuit is

14  going to apparently come in at some point.

15          MR. PRICE:  I'm not going to use it.

16          THE COURT:  I see.  You're seeking to exclude that

17  lawsuit.

18          MR. PRICE:  Yes, yes.

19          THE COURT:  Okay.  There we go.

20          MR. PRICE:  And certainly --

21          THE COURT:  Why, it bears upon bias, he's got a

22  lot of probably dissatisfaction over that lawsuit since he's

23  sued, why isn't that evidence of his bias against Mattel?

24          MR. PRICE:  Well, I think it was resolved, so we

25  are not saying this lawsuit caused bias.

1        THE COURT:  Was it resolved -- excuse me, now, not
2   so fast, the avalanche doesn't do it for me.
3        Here we go:  Was it resolved because there was a
4   settlement that was reached that was amicable between the
5   parties or was it resolved because the Court made a decision
6   like granting a demur?  If it's a court decision, that's not
7   resolved.
8        MS. KELLER:  There was a demur granted, your
9   Honor.
10        THE COURT:  Mr. Zeller?
11        MR. ZELLER:  The demur was granted by the Superior
12   Court.  It was appealed.  There was a reversal in Mattel's
13   favor, so it came back down.  In the interim, Mr. Brawer's
14   lawyers sent a letter to Mattel's counsel saying, look, he
15   agrees he's bound by the code of conduct, and we treated
16   that as now he's bound, and we dismiss the suit.  So it was
17   after, of course, it was remanded.
18        And then further, when I asked Mr. Brawer at his
19   deposition, and I think this is where it take us up until
20   today, when I asked him in the deposition whether he agreed
21   he was bound by Mattel's code of conduct, he agreed.
22        THE COURT:  Now, here is the problem for a court,
23   there is no way to chop that up.  I mean, there is no way to
24   segment that out without being unfair to one of the parties.
25   There's no logical place to cut that.

```
 1              And he's obviously got an arguable credibility

 2    problem in terms of his leaving for both sides.  I mean, a

 3    bias and animosity, it works both ways.  I mean, there is

 4    nothing like the truth in transparency.  What's the concern

 5    here?

 6              MR. PRICE:  The problem, your Honor, is they are

 7    using it, as Ms. Keller said, not to show his bias but to

 8    show how much Mattel hated MGA and to show that Mattel used

 9    litigation, that they would file lawsuits against their

10    employees.

11              THE COURT:  Against this innocently wronged

12    person.

13              MR. PRICE:  In fact, that's really the reason they

14    want it in, because they know we are not going to ask him

15    about this.  They know we are not going to say he was biased

16    because of this.  They just want it in to show that Mattel

17    is a bad actor.

18              MS. KELLER:  There is another reason, your Honor,

19    why it's important.  Mattel is going to argue that Brawer

20    should have disclosed the Villasenor misconduct to MGA right

21    away or he should have disclosed it to others right away,

22    instead of keeping it to himself all those years.  Brawer

23    had already been sued for doing nothing.  I mean, he had

24    been sued just for leaving Mattel, and he was gun shy.

25              THE COURT:  So this had a chilling effect on
```

1    his --

2         MS. KELLER:  He was gun shy about being sued

3    again, and I think that's -- I know that's coming, that he's

4    going to be attacked for not disclosing that earlier.

5         THE COURT:  Is that why you wanted the recess, was

6    this the next area you were going into?

7         MS. KELLER:  Yes, Your Honor.

8         THE COURT:  Is there a way to skirt that area and

9    have a little bit more testimony today or is this the next

10   issue that has to be decided?

11        MS. KELLER:  I could rearrange things and ask

12   about something else.

13        THE COURT:  Why don't you rearrange things.  Let's

14   get to a calmer point this evening so we are not getting

15   pushed during a 10 or 15-minute recess.  I think I've

16   allowed him to be called out of order, but that shouldn't

17   put you at a disadvantage in terms of being able to object

18   and have a thoughtful hearing.

19        MR. PRICE:  And that will also, your Honor, give

20   you a chance to look at the transcript today where he was

21   already asked why he didn't say, and he was asked at his

22   deposition, and this was never mentioned.  That's a good

23   lawyer's argument, but it's not what he said under oath.

24        MS. KELLER:  Well, that sounds like grounds for

25   cross-examination and impeachment, it doesn't sound like

1    grounds for exclusion.

2          THE COURT:  So you won't mind if I look at this

3    tonight, will you?  Good.

4          MS. KELLER:  I can do some other things.

5          THE COURT:  We can rearrange.

6          MR. PRICE:  That and the video surveillance are

7    the big issues.

8          MS. KELLER:  Your Honor, the video is three

9    minutes and 26 seconds in total length.

10         THE COURT:  Put it up.

11         (Videotape played.)

12         THE COURT:  Now, I'm going to guess for a moment

13   that that might be Mr. Brawer's wife and child?

14         MS. KELLER:  Yes, your Honor.

15         THE COURT:  How would I possibly know that?

16         MS. KELLER:  Because Mr. Brawer was going to

17   testify to that.

18         THE COURT:  I know, I used to practice at one

19   time.

20         Now, why would we want -- this is Mr. Brawer in

21   his shorts; is that correct?

22         MS. KELLER:  Yes, your Honor.

23         THE COURT:  All right.  And that's his son on a

24   skateboard, correct?

25         MS. KELLER:  Yes.

1          THE COURT:  Okay.

2          *(Videotape continuing.)*

3          THE COURT:  Mr. Brawer and a neighbor and maybe a

4     child of his, I'm not sure.

5          Mr. Brawer stealing a car.

6          *(Laughter.)*

7          THE COURT:  Just joking for the record.  But he's

8     near a car.  That's a joke for the record, so the Circuit

9     doesn't get concerned.

10         And then since I one time sat where each of you

11    did, the next question would be, and weren't there hours of

12    this kind of tape?

13         MS. KELLER:  Days.

14         THE COURT:  Days, okay.  I missed it by a couple

15    days.

16         Now, explain to me the relevance of this again.

17         MS. KELLER:  It was after -- it was after this

18    that Mattel sued Mr. Brawer, number one.  Number two, it

19    shows the lengths that Mattel will go to investigate any

20    former employee, and it shows the resources that they have

21    to investigate any former employee.  The -- Mr. Brawer, by

22    the way, learned of this when it was -- information about it

23    was published in the Wall Street Journal.

24         THE COURT:  Was this published in the Wall Street

25    Journal?  I don't mean the video but --

Case 2:04-cv-09049-DOC-RNB  Document 10347  Filed 03/31/11  Page 130 of 135  Page ID
#:314235
CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

130

 1          MS. KELLER:  The reference to it.

 2          THE COURT:  Just a moment.  I saw Mr. Zeller just

 3  shoot out of his seat.  Mr. Zeller.

 4          MR. ZELLER:  Your Honor, for them to raise that

 5  point, MGA -- and this is documented.  MGA actually leaked a

 6  whole series of AO materials to the Wall Street Journal.

 7  This was material selected by MGA.

 8          THE COURT:  I see.

 9          MR. ZELLER:  So for them to somehow put that on

10  us, it was in violation of the Judge Larson order, by the

11  way.

12          THE COURT:  So from Mattel's perspective, it was

13  selectively leaked to gain sympathy with the press.

14          MR. ZELLER:  It was and on the eve of the first

15  trial.

16          MS. KELLER:  That's been the assertion.  I haven't

17  seen any proof of it.

18          THE COURT:  You weren't counsel of record then, so

19  you wouldn't know.

20          MS. KELLER:  Your Honor, we did not choose what to

21  videotape.  Mattel did.  There is no legitimate business

22  purpose for videotaping somebody's wife and children.  There

23  is no legitimate business purpose for videotaping somebody

24  playing with his kid.  There just isn't.  And --

25          THE COURT:  Here is what I'm going to demand of

```
1    both parties.  I didn't mind Mr. Brawer being called out of

2    order.  I don't mind the normal e-mails we've looked at, but

3    this Court won't be pushed into a time slot making that

4    decision, with the jury sitting out in the hallway.

5           So for the time being, if Mr. Brawer is going to

6    testify again today, he's not going to be testifying to

7    these videotapes until I have time to make a good record,

8    take a look at all of this evidence and calmly go over this

9    with all of counsel.  So we can send the jury home if you'd

10   like to right now.

11          MS. KELLER:  I can do some additional --

12          THE COURT:  You can do some more, that's fine, and

13   why don't you take us to a comfortable part without the

14   surveillance and without the lawsuit, and that way I can

15   decide calmly what's the appropriate action, and I can make

16   a record of it for both parties so we have a good record.

17              (Interruption in the proceedings.)

18              (Recess.)

19              (The following proceedings is taken in the

20          presence of the jury.)

21          THE COURT:  Don't get too comfortable.  I'm going

22   to send you home.  We are going to spend our time more

23   productively.

24          You are admonished not to discuss this matter

25   amongst yourselves, nor form or express any opinion.
```

```
 1              See you tomorrow at 8:30.  You go out and beat the
 2    traffic.  Thank you.
 3              (The following proceedings is taken outside
 4         the presence of the jury.)
 5              THE COURT:  The jury is not present.
 6              Mr. Brawer, would you be kind enough to wait out
 7    in the hallway for a few moments.  I just don't know what
 8    the conversation is going to lead to in a moment, and I'm
 9    going to ask Mr. Larian and Mr. Eckert if they'd like to
10    leave this evening.  There is no reason to stay.
11              Counsel, if you'd be seated.
12              Let's start through a series of issues this
13    evening.  First of all, I'm going to eventually need time
14    before we can recess this evening concerning the remainder
15    of the material Mr. Moore gave us, and I probably need
16    another hour, hour and a half with that material.
17              I need Mr. Malackowski.
18              MS. KELLER:  Malackowski.
19              THE COURT:  Is he here?
20              MS. HURST:  He's going to be here at 4:30.
21              THE COURT:  Okay.  I need to speak to him, and I
22    need to get him on the record first so Mr. Price can leave,
23    and Ms. Keller can leave, because you are both doing
24    Malackowski, aren't you?
25              MS. KELLER:  Yes, your Honor.
```

```
 1            THE COURT:  So if I take him right at 4:30, then I
 2    can get you two on the way so you can prepare for tomorrow.
 3    I'll retain Ms. Hurst, Mr. McConville, Mr. Quinn and
 4    Mr. Zeller, and we can go over these issues tonight.
 5            Mr. Cote, you're welcome to remain or you can go
 6    home, whatever your pleasure is.  And my thought is that I
 7    just not start this issue right now, that I wait for
 8    Mr. Malackowski next.  That's the block I'd like to take in
 9    the next half-hour from 4:30 to five or whatever.  I can use
10    the next 20 minutes just going back through some more
11    folders back there because I think we are only going to get
12    partially through the tape argument and the arguments
13    concerning the demur, so why don't you go out and get a hot
14    chocolate or a cup of coffee or something, and I'll meet you
15    back here at 4:30.
16            MS. KELLER:  Your Honor, in the interim, may we
17    release Mr. Brawer until tomorrow?
18            THE COURT:  Is there any reason we need him this
19    evening, Mr. Zeller, Mr. Quinn?
20            Or Ms. Keller?
21            MR. QUINN:  No.
22            MS. KELLER:  I don't think so.
23            THE COURT:  Okay.  Then why don't you release
24    Mr. Brawer until tomorrow morning.  I just didn't know what
25    to anticipate.
```

Case 2:04-cv-09049-DOC-RNB   Document 10347   Filed 03/31/11   Page 134 of 135   Page ID #:314239
CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

134

1          MS. KELLER:  Thank you, your Honor.

2          MR. COTE:  Judge, you asked me yesterday to remind

3     you about our JMAL.

4          THE COURT:  That's right.  When are we going to

5     hear it?

6          MR. COTE:  I think the opposition was to be filed

7     yesterday or today.

8          THE COURT:  Okay.  I just haven't read it yet.

9     I've been on the bench all day, but I'll read it.

10         MR. COTE:  It hasn't come in yet.  That's why you

11    haven't read it.

12         THE COURT:  I probably haven't read it for that

13    reason.

14         MR. COTE:  We'll probably argue it Thursday,

15    Friday, Saturday?

16         THE COURT:  I don't know.  It depends upon when I

17    can read it.  It could be Saturday.

18         MR. COTE:  Any time, your Honor.  Thank you.

19         THE COURT:  Now, anything else or do you want to

20    recess until 4:30?

21         MS. KELLER:  Thank you, your Honor.

22         THE COURT:  Okay.  4:30.

23         *(Recess.)*

24         *(Following proceedings is reported by Dennise*

25         *Paddock.)*

1              -oOo-

2           **CERTIFICATE**

3

4        I hereby certify that pursuant to Section 753,

5   Title 28, United States Code, the foregoing is a true and

6   correct transcript of the stenographically reported

7   proceedings held in the above-entitled matter and that the

8   transcript page format is in conformance with the

9   regulations of the Judicial Conference of the United States.

10

11  Date:  March 31, 2011

12

13

14       _____

15       JANE C.S. RULE, U.S. COURT REPORTER
         CSR NO. 9316

16

17

18

19

20

21

22

23

24

25