```
          UNITED STATES DISTRICT COURT

        CENTRAL DISTRICT OF CALIFORNIA

      HONORABLE DAVID O. CARTER, JUDGE PRESIDING
```

- - - - - - -

# CERTIFIED TRANSCRIPT

```
MATTEL, INC., et al.,              )
                                   )
                Plaintiffs,        )
                                   )
        vs.                        )
                                   )
MGA ENTERTAINMENT, INC., et al.,   )  No. CV 04-9049-DOC (RNBx)
                                   )     Day 42
                                   )     Volume 3 of 3
                Defendants.        )
_____)
```

```
        REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS
                      JURY TRIAL
                 SANTA ANA, CALIFORNIA
              WEDNESDAY, MARCH 30, 2011
```

```
Denise Paddock, CSR 10199, CMRS, RMR, CRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
transcripts@ocrecord.com www.ocrecord.com
033011 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 42 V3
03/30/2011
```

**APPEARANCES OF COUNSEL:**

FOR PLAINTIFF MATTEL, INC., ET AL.:

      QUINN EMANUEL URQUHART & SULLIVAN LLP
      BY: JOHN QUINN
          WILLIAM PRICE
          MICHAEL T ZELLER
          Attorneys at Law
      865 S Figueroa Street, 10th Floor
      Los Angeles, CA 90017-2543
      213-443-3000

FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: THOMAS S McCONVILLE
          Attorney at Law
      4 Park Plaza, Suite 1600
      Irvine, CA 92614
      949-567-6700

      - AND -

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: ANNETTE L HURST
          Attorney at Law
      405 Howard Street
      San Francisco, CA 94105
      415-773-5700

      KELLER RACKAUCKAS LLP
      BY:  JENNIFER L KELLER
          Attorney at Law
      18500 Von Karman Avenue, Suite 560
      Irvine, CA 92612
      949-476-8700

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3

 4      FOR CARLOS GUSTAVO MACHADO GOMEZ:

 5             LAW OFFICES OF MARK E OVERLAND
               BY: Mark E Overland
 6                 Attorney at Law
               100 Wilshire Boulevard, Suite 950
 7             Santa Monica, CA 90401
               310-459-2830
 8
               -AND-
 9
               SCHEPER KIM AND HARRIS LLP
10             BY: ALEXANDER H COTE
                   Attorney at Law
11             601 West Fifth Street, 12th Floor
               Los Angeles, CA 90071-2025
12             213-613-4655

13             ALSO PRESENT:

14             MGA ENTERTAINMENT, INC.
               BY: JEANINE PISONI
15                 Attorney at Law
               16360 Roscoe Boulevard, Suite 105
16             Van Nuys, California 91406

17

18    ALSO PRESENT:

19             KEN KOTARSKI, Mattel Technical Operator

20             MIKE STOVALL, MGA Technical Operator

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1              SANTA ANA, CALIFORNIA; WEDNESDAY, MARCH 30, 2011

 2                      Day 42, Volume 3 of 3

 3                         P.M. SESSION

 4              (Open court - jury not present.)

17:16 5         THE COURT:  We're back on the record; all counsel

 6    are present.

 7              I'm not going to take Mr. Malackowski for a moment

 8    because I've been searching transcripts and I want to take up

 9    the matter of the surveillance tapes for just a moment and

17:16 10   arguments by counsel pertaining to those surveillance tapes.

 11             I want a complete discussion with both counsel for

 12   a moment and I don't care which counsel starts.

 13             Okay.  So who first?

 14             MS. KELLER:  I'd be happy to.

17:17 15        Since I'm the proponent to the evidence --

 16             THE COURT:  Okay.

 17             MS. KELLER:  -- I'd be happy to add something.

 18             One of Mattel's themes throughout the case,

 19   including now, is that Mattel could not have filed suit

17:17 20   against Carter Bryant based on the evidence it had only early

 21   on because Mattel, before filing a lawsuit, thoroughly

 22   investigates everything.

 23             Well, they do thoroughly investigate, but as we --

 24   now, first having to do with the lawsuit against

17:18 25   Mr. Brawer -- the two issues are the lawsuit against
```

1    Mr. Brawer and the surveillance of Mr. Brawer.

2           The surveillance, I think, illustrates, first of

3    all, the tremendous vigilance that Mattel shows in protecting

4    its products, in watching anybody who leaves Mattel to go to

17:18  5    a competitor, the investigation resources that they will

6    devote, I mean, literally following this guy for days on end,

7    even his family, even his kids.

8           Absolutely everything they did, everywhere they

9    went, in an attempt, I guess, to find something about

17:18 10    Mr. Brawer that -- that they could use.

11           Failing to find anything, they then sue him without

12    any more information than he had gone to work for MGA.

13           Now, given the fact that their position has been

14    that they couldn't possibly have sued Carter Bryant earlier

17:19 15    because they thought that he might have come up with Bratz

16    and thereby infringe Toon Teens, but they didn't know

17    anything further, their conduct as a whole with regard to

18    Mr. Brawer belies that, because they had -- surely they would

19    have devoted even greater resources even earlier on to

17:19 20    looking at Carter Bryant, who they knew to be involved in the

21    creation of the only Fashion Doll ever to take on Barbie.

22           Ron Brawer was just an executive at Mattel, and

23    look at the resources they devoted to following him,

24    surveilling him, seizing his hard drive at work, getting all

17:19 25    his e-mails.

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10348   Filed 03/31/11   Page 6 of 135   Page ID #:314246
CV 04-9049 DOC - 03/30/2011 Volume 3 of 3

6

1    I mean, had they -- I think the jury, given the

2    history of this case and the sometimes inexplicable lapses,

3    coincidences, changes, late-discovered evidence, would be --

4    I think that -- that we could draw an inference from the

17:20 5    conduct toward Mr. Brawer that would carry over into -- and

6    should carry over into the conduct toward MGA, Mr. Larian and

7    Carter Bryant.

8        Our position is and has been that they knew long

9    before they say they knew, that Carter Bryant was not only

17:20 10   the creator of Bratz but that Carter Bryant had done some

11   work on Bratz while he was still at Mattel.  But they chose

12   to sit on their rights; they chose to wait and see if this

13   became a huge hit; they chose to think that it might just be

14   a fad.  But their intelligence operation at Mattel is as good

17:21 15   as any corporate intelligence operation you'll find.

16       I mean, it really is amazing that they have the

17   capacity to monitor every telephone call, videotape people as

18   they go through the building, have a guarded entrance where

19   nobody can come and go taking anything proprietary from

17:21 20   Mattel, surveil people, the manpower to surveil people and

21   videotape them around the clock for days on end just because

22   they've changed jobs and gone to a competitor, trace their

23   e-mails, make pretext phone calls to competitors to try to

24   find out information about them.

17:22 25       I mean -- and, of course, get into their

1    confidential showrooms.

2         Their intelligence operation at Mattel is pretty

3    amazing and this is partly illustrative of that and their

4    dedication of suing people that they think even might

17:22 5  possibly someday do something to harm Mattel is illustrated

6    by the preemptive strike on Mr. Brawer, and it belies the

7    position that they couldn't have done the same with

8    Carter Bryant or MGA.

9         And it also shows -- I think the lawsuit shows

17:22 10 partly why Mr. Brawer was so reluctant to divulge anything

11   about Mattel to MGA, including the Villasenor business,

12   because anything he divulged about Mattel to MGA was likely

13   to get him sued.  He had already been sued once.  Once

14   burned, twice shy.  He then finds out --

17:23 15      THE COURT:  What about his testimony today?  His

16   testimony today was, "I was being deposed by Mr. Zeller and

17   during my deposition I had an *aha moment.*  You know, those

18   aha moments you sometimes have, and that's when

19   Sal Villasenor came back to me and that's when I put together

17:23 20  this whole group."

21         Now that's what I've heard today.

22         MS. KELLER:  Right.  But one of the things that's

23   going to happen is he's going to be asked why didn't he tell

24   MGA about it earlier?

17:23 25      In other words, why didn't you tell Mr. Larian and

1   MGA if you thought it was a bad thing?  Why didn't you tell

2   them that you were -- that Mattel had been spying on them all

3   that time?

4               THE COURT:  Let me test that for a moment.

17:24  5               But the deposition concerning Mr. Brawer took place

6   on what day and what year?

7               MS. KELLER:  He said he testified for a total of

8   45 hours, so I have a lot of different --

9               MR. PRICE:  January of 2010.

17:24 10               THE COURT:  Okay.

11               MS. KELLER:  January 26, 2010?  I don't -- I don't

12   have the cite at my fingertips, but --

13               THE COURT:  So if it's in 2010, is that the

14   explanation for not saying anything about Sal Villasenor?

17:24 15               (Discussion held off the record.)

16               THE COURT:  In other words, he just had an aha

17   moment in 2010, and so if he just had the aha moment in 2010,

18   that's his explanation in front of the jury for the

19   recollection concerning Sal Villasenor?

17:25 20               MS. KELLER:  Well, first he signs the agreement

21   that he's not going to say anything about Mattel to anyone.

22               THE COURT:  That's back in 2005 or 2006?

23               MS. KELLER:  Right, and he honors that agreement.

24               THE COURT:  Right.

17:25 25               MS. KELLER:  And he doesn't tell anybody anything.

```
 1              THE COURT:  Okay.

 2              MS. KELLER:  Despite the fact that they sue him, he

 3      still keeps his mouth shut; he says nothing.

 4              And then he's being deposed under oath,

17:25 5  aggressively, not about this specific topic but he's being

 6      repeatedly asked about whether he knows of any -- of anything

 7      bad Mattel's done, of any misconduct by Mattel.

 8              And, snap, this pops into his head.  But that's

 9      years later; that's years after he's left.

17:25 10             But one of the big questions will be, well, you

11      thought this was so terrible, why didn't you tell Mr. Larian

12      and MGA about it?

13              THE COURT:  Okay.  Okay.  Let me hear from

14      Mr. Price.

17:26 15             MR. PRICE:  Well, your memory's correct and this is

16      just trying to smear Mattel.

17              This witness, Mr. Brawer, has testified that he

18      didn't think there was anything wrong, because at Mattel --

19      that's what he said today -- that was the culture, that --

17:26 20  that this is just what companies do and just -- in the back

21      of his head and then in 2002 he had an aha moment --

22              MR. QUINN:  2010.

23              MR. PRICE:  -- 2010, I'm sorry.  2010 he had an aha

24      moment.

17:26 25             Now, of course we're going to attack him on that.
```

UNITED STATES DISTRICT COURT

 1    Now, he has never said it under oath -- and he's had two

 2    opportunities -- to say "I remembered it.  I didn't tell MGA

 3    because there had been this lawsuit with Mattel."  He never

 4    said that.

17:26 5              THE COURT:  Can I test that for a moment with you?

 6              MR. PRICE:  Yes.

 7              THE COURT:  What do I do with the March 9th and

 8    March 10th testimony of Jill Nordquist, specifically

 9    Docket No. 10183, Pages 7 and 8, and Docket No. 10182,

17:27 10   Pages 109 to 116?

 11             MR. PRICE:  The same thing you'd do with

 12   Exhibit 4373.

 13             THE COURT:  Excellent.

 14             Now, that is an entirely appropriate answer.

17:27 15            (Laughter.)

 16             THE COURT:  Let me read to you for a moment.

 17             (Reading.)

 18             "Question:  Have you had heard" --

 19             Now, this is on direct examination by Mattel.

17:27 20            (Reading.)

 21             (Direct Examination by Mr. Zeller:)

 22             "Question:  Have you heard of something called a

 23   'Swappin' Styles'?

 24             "Answer:  Yes, I have.

17:27 25            "Question:  If you could, please, take a look at

1    Exhibit 24297.  It's actually a tangible item.

2              "Answer:  Sorry.

3              "Question:  Do you recognize this?

4              "Answer:  I do.

17:28  5        "Question:  What do you recognize it as?

6              "Answer:  As MyScene Swappin' Styles.

7              "Question:  This is a product that Mattel came out

8    with?

9              "Answer:  Yes.

17:28 10        "Question:  Do you know a Ron Brawer?

11             "Answer:  [Yes], I do.

12             "Question:  And was Mr. Brawer, at one time, with

13   Mattel?

14             "Answer:  Yes, he was.

17:28 15        "Question:  Do you know what level he was within

16   Mattel?

17             "Answer:  At the time that he left Mattel?

18             "Question:  Yes.

19             "Answer:  I believe he was a senior vice president.

17:28 20        "Question:  And he left in about the October of

21   2004 time period?

22             "Answer:  Yes.

23             "Question:  Do you know if Ron Brawer, while he was

24   still at Mattel, ever saw Swappin' Styles prior to the time

17:28 25   that Mattel released the doll?

```
 1                "MR. MCCONVILLE:  Your Honor, objection.  Based on

 2       the claims, this is irrelevant.

 3                "THE COURT:  No.  Overruled.

 4                "You can answer the question.

 5                "THE WITNESS:  Yes, he did.

 6                (Question by Mr. Zeller:)

 7                "Question:  And, in fact, Mr. Brawer then went to

 8       MGA in October of 2004?

 9                "Answer:  Yes.

10                "Question:  If you'd please take a look at

11       Exhibit 8989.

12                "Answer:  Yes.

13                "MR. ZELLER:  And, Your Honor, I would move

14       Exhibit 24297 into evidence.  It's the doll.

15                "THE COURT:  Let me see the doll.

16                "MR. MCCONVILLE:  Relevance.

17                "THE COURT:  All right.  Received.

18                "(Plaintiffs' Exhibit(s) 24297 is received in

19       evidence.)

20                (Question by Mr. Zeller:)

21                "Question:  Do you recognize Exhibit 8989?

22                "Answer:  Yes.

23                "Question:  And what is it?

24                "Answer:  This is an e-mail from me to my senior

25       vice president.
```

17:28 at line 5
17:29 at line 10
17:29 at line 15
17:29 at line 20
17:29 at line 25

CV 04-9049 DOC - 03/30/2011 - Volume 3 of 3

13

```
 1              "MR. ZELLER:  I would move Exhibit 8989 into

 2      evidence.

 3              "MR. MCCONVILLE:  Relevance.

 4              "THE COURT:  Who was your senior vice president?

17:29  5         "THE WITNESS:  Tim Kilpin.

 6              "THE COURT:  Okay.

 7              "Overruled.  It's received.

 8              (Plaintiffs' Exhibit(s) 8989 is received in

 9      evidence.)

17:30 10         (Question by Mr. Zeller:)

 11             "Question:  And then focusing on the e-mail that

 12     you were involved with here, that's the one dated

 13     September 17, 2004?

 14             "Answer:  Yes.

17:30 15         "Question:  And it has a subject of 'line review'?

 16             "Answer:  Yes.

 17             "Question:  What is the line review?

 18             "Answer:  We had just completed our global line

 19     reviews, I believe, in -- just prior to this date, where we

17:30 20    show our entire offerings for the season to our salespeople

 21     and our subsidiaries from around the world.

 22             "Question:  So this is an internal Mattel review of

 23     our products that are to be released at some point in the

 24     future?

17:30 25         "Answer:  Yes.
```

1          "Question:  And there was such a line review in

2     September of 2004?

3          "Answer:  I'm not sure if it was September or

4     August, but yes, in that approximate time frame.

17:30  5          "Question:  Approximately around the time of this

6     e-mail?

7          "Answer:  Yes.

8          "Question:  And during that line review, was there

9     something called "Too Popular," T-o-o Popular, that was part

17:31 10     of the line review?

11          "Answer:  Yes.

12          "Question:  And was that what became of

13     Swappin' Styles?

14          "Answer:  Yes

17:31 15          "Question:  And maybe if you can just tell us a

16     little bit about -- what was the -- what was the idea behind

17     Swappin' Styles?

18          "THE COURT:  Okay.  Counsel, you are over your

19     30 minutes.  Do you want to use that 30 minutes you had in

17:31 20     rebuttal also?

21          "MR. ZELLER:  Yes, sir, just to finish this up.

22          "THE COURT:  All right.

23          "THE WITNESS:  The concept was that you could take

24     different hairstyles and mix them up and match them by

17:31 25     popping one head off of -- taking one head and popping it

CV 04-9049 DOC - 03/30/2011 - Volume 3 of 3

```
 1    onto the doll, or taking that off and popping a different

 2    head onto the doll.

 3             (Question by Mr. Zeller:)

 4             "Question:  And that was for Fashion Dolls?

 5             "Answer:  It was for the MyScene Fashion Doll.

 6             "Question:  All right.  And as of the time of this

 7    e-mail, 8989, and at the time of the line review, had Mattel

 8    disclosed Too Popular or Swappin' Styles to the public?

 9             "Answer:  No.

10             "Question:  It was still an internal Mattel project

11    at the time?

12             "Answer:  Yes.

13             "Question:  Was it -- was Too Popular and

14    Swappin' Styles public by the time Mr. Brawer left Mattel in

15    October of 2004 --

16             "Answer:  No.

17             "Question:  -- the following month after this

18    e-mail?

19             "Answer:  No.

20             "Question:  And Mr. Brawer saw Too Popular, which

21    later became Swappin' Styles as part of this line review?

22             "Answer:  Yes.

23             "Question:  And do you see that referenced

24    somewhere in the Exhibit 8989?

25             "Answer:  Yes.
```

1        "Question:  Perhaps is that the part where it says,

2   "On 8/9, the following MyScene items were presented at global

3   line reviews with Ron present"?

4        "Answer:  Yes.

17:32 5        "Question:  And "Ron" is Ron Brawer?

6        "Answer:  Yes.

7        "Question:  So if you can perhaps read Item No. 1

8   for us.

9        "Answer:  "Too Popular, mix and match the hairstyle

17:33 10  and fashion by removing the head and replacing it with

11  another.  It comes with four heads and complete fashions."

12        "Should I continue?

13        "Question:  Yes, please.

14        "Answer:  "Comments by Ron:  Thumbs up, really

17:33 15  strong, make it $20 versus 15 A and keep all the piece

16  count."

17        "Question:  And "Ron" here, again, refers to

18  Ron Brawer?

19        "Answer:  Yes.

17:33 20        "Question:  And what did the "A," what was that

21  referred to?

22        "Answer:  The list or wholesale price.

23        "Question:  And then it says, "Keep all the piece

24  count"; what's that mean?"

17:33 25        "Answer:  That means that all of the other pieces

UNITED STATES DISTRICT COURT

1   you get with the doll, whether they be hair brushes or

2   fashions or other items.

3           "Question:  So was Mr. Brawer directing that the --

4   the price of this item should be actually be increased from

17:34 5   $15 to $20?

6           "Answer:  It appears so, yes.

7           "Question:  And then after this, about October 4th,

8   right after this e-mail, Mr. Brawer went to MGA?

9           "Answer:  Yes.

17:34 10          "Question:  And after Mr. Brawer left Mattel and

11   went to MGA, did MGA come out with the product that had

12   swapping heads or changeable heads?

13          "Answer:  Yes.

14          "Question:  What was that product called?

17:34 15          "Answer:  I believe it was called "Head Games."

16          "Question:  If you could please take a look at

17   Exhibit 24298.

18          Do you recognize this?

19          "Answer:  Yes.

17:34 20          "Question:  What is this?

21          "Answer:  It's the Bratz Head Games item.

22          "MR. ZELLER:  I would move Exhibit 24298 into

23   evidence.

24          "THE COURT:  Received.

25      //                                      //

```
 1              (Plaintiffs' Exhibit No. 24298 is

 2     received in evidence.)

 3              (Question by Mr. Zeller:)

 4              "Question:  And generally speaking, what is -- what

18:13  5     is this Head Games product?

 6              "Answer:  It shows -- it shows a Fashion Doll with

 7     a head on it, as well as three accompanying heads that you

 8     can mix and match.

 9              "Question:  And so it was the same concept of

18:13 10     the -- of a Fashion Doll having these changeable heads with

11     hairstyles that Swappin' Styles had?

12              "Answer:  Yes.

13              "Question:  The same concept that Mr. Brawer had

14     seen prior to the time he left Mattel?

18:14 15              "Answer:  Yes.

16              "MR. ZELLER:  Nothing further, Your Honor.

17              "THE COURT:  All right."

18              THE COURT:  To test this, first you alleged a

19     misappropriation claim, Mr. Price, that Mr. Brawer

17:35 20     misappropriated the product concept behind MyScene Swappin'

21     Styles doll.

22              This witness that I've referred to is

23     Ms. Nordquist --

24              MR. ZELLER:  Uh-huh.

17:35 25              THE COURT:  -- and the clear inference is that
```

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 03/30/2011   Volume 3 of 3

19

 1   Mr. Brawer had shared the concept with MGA in some nefarious

 2   fashion, so the videos, it will be argued, also rebut that

 3   proposition because it's literally apparently days and days

 4   of surveillance and the investigators did not discover that

17:35  5   Brawer did anything untoward.

 6         Second, Ron Brawer in the pleading was supposed to

 7   be the driving force behind recruiting some employees to MGA,

 8   so he's allegedly -- he's alleged to have recruited Cooney --

 9   let me see if I can remember them all -- Castilla, Contreras,

17:35 10   among others, he has some connection to Gustavo Machado.

11         So I would just like you to test that with me for a

12   moment before I turn back to MGA because I've got some more

13   questions about them or for them.

14         MR. PRICE:  Well, two things.

17:36 15         On the trade secret theft for Swappin' Styles --

16         THE COURT:  Right.

17         MR. PRICE:  -- I mean, obviously, he can say "I

18   didn't do it; I promised not to do it."  He started doing

19   that with the documents.

17:36 20         The video doesn't go to that at all because,

21   obviously, we can't see inside the MGA offices.  We don't

22   know what he's saying to them.

23         The only reason for the video -- in fact,

24   Ms. Keller said this earlier when she argued that there's no

17:36 25   legitimate business reason or justification for that video,

UNITED STATES DISTRICT COURT

1    so it's kind of a schizophrenic argument.  That's what she

2    said this morning and that, of course, is what she will argue

3    to the jury.

4           Now she's saying that the video shows that Mattel

17:36  5    had such great security they could have discovered things,

6    they could have discovered things with respect to

7    Carter Bryant.

8           THE COURT:  And now let me test Mattel for a

9    moment.

17:37 10           MR. PRICE:  Uh-huh.

11           THE COURT:  Why, if this video is taken about the

12    time that Brawer leaves Mattel, which is around 2005 -- 2004,

13    I'm sorry.

14           MS. KELLER:  2004, October.

17:37 15           THE COURT:  2004.  I apologize.

16           Why should I relate that back to the capability of

17    Mattel in September/October of 2000?

18           In other words, how do I have that link back, if

19    you will, if the argument eventually becomes what Mr. Price

17:37 20    fears, and that is you had the capability in 2004 in

21    following Mr. Brawer around, you certainly had the capability

22    back in 2000.  How do we know that?

23           MS. KELLER:  Well, Jill Thomas knows that, for one

24    thing.  She said she had looked back and looked into it, and

17:37 25    they did have those capabilities, and we've seen from their

```
 1    investigation logs, we've seen from the whole history that
 2    Mattel security, the whole time, including when Carter Bryant
 3    was there -- there's been testimony about that -- was
 4    extreme, it had tremendous security.
17:38  5              THE COURT:  How do I know that it's the same in
 6    2000 as it was in 2004?  Do I look to Jill Thomas' testimony?
 7              MS. KELLER:  She pretty much said so.
 8              THE COURT:  Now, I see three heads bobbing on the
 9    MGA side.
17:38 10              Now my next question is this:  If the testimony was
11    allowed, why -- let Mr. Price focus for a moment.
12              MR. PRICE:  I'm sorry, Your Honor.
13              THE COURT:  No, quite the opposite.  I want people
14    talking, okay, so please take the time.  And I'm not
17:38 15    affronted by it, in fact, I'm encouraging it.
16              MR. PRICE:  Okay.  That's the answer to my
17    question.
18              (Discussion held off the record.)
19              THE COURT:  I'm asking the questions because I want
17:38 20    answers; otherwise I wouldn't ask the questions.  I'd just
21    hand down a ruling.  Rulings are easy.
22              Now, why, if I believe that there's import to the
23    tape, am I letting you control the snippets of the tape?
24              In other words, I've got him walking -- I've got
17:39 25    the wife walking into a bank with a child, I've got him
```

UNITED STATES DISTRICT COURT

1    looking like a car burglar out in a parking lot -- which is

2    probably the best scene for Mattel if it comes in -- and I'm

3    just joking about that -- but we see him walking around.

4    He's visiting with a neighbor whose neighbor has a child

17:39  5    apparently or maybe it was one of his children.

6            But, you know, why am I taking days and days of

7    videotape if it's coming up and letting a party control, you

8    know, the three minutes?  And I'm not saying that those are

9    the three best or worst minutes, but I can't represent to you

17:39 10    I've watched all of it, but I've watched it enough to be

11    brain-dumb watching it.

12            So here's my question:  If it's appropriate, why

13    these snippets?  Or do I give -- you know, the ludicrousness

14    of MGA choosing three minutes of whatever snippet they want?

17:40 15            MS. KELLER:  Well, Your Honor, I think the answer

16    to that is, number one, parties always choose portions of

17    evidence to introduce, of all kinds.  I mean --

18            THE COURT:  So under 106 they can put anything that

19    they want in?

17:40 20            MS. KELLER:  Well, that's historically what

21    happens.  Otherwise, in this case it would be three years

22    long.

23            We have a time limit and --

24            THE COURT:  No, I understand.

17:40 25            Let me go back to MGA now --

```
 1              MS. KELLER:  And --

 2              THE COURT:  Thank you.

 3              Mr. Price.

 4              I'll be right back with you.

 5              Mr. Price.

 6              MR. PRICE:  Well, first, you've seen the clip.

 7              Their only point is we're filming the kids.  It's

 8    three minutes, basically, of filming the kids.

 9              THE COURT:  Yeah.

10              MR. PRICE:  Now, really, what's that -- what's that

11    being used for?

12              THE COURT:  Just a moment.

13              If I was to let the tape in, okay, I think the

14    focus is on Brawer.  So if I was to ever let the tape in,

15    which is not a ruling right now, I don't see the point

16    concerning the wife going into a bank or a house with the

17    children.  It's supposed to be Brawer who is sneaking around

18    or delivering a product, so I'm a little concerned about why

19    I'm supposed to have the wife.

20              And the only response to that, quite frankly, can

21    be because of the depth of their surveillance, you know, the

22    encompassment of the surveillance, but it's not targeted

23    towards Brawer.  The clip you're not showing doesn't seem to

24    me to be potentially a fair snippet of what I -- and I forgot

25    it was ours.  Quite frankly I gave up on it after a while.
```

1          So why am I allowing, you know, those particular

2     snippets?

3          MS. KELLER:  Well, we didn't choose what Mattel

4     would videotape.  Mattel didn't limit themselves to

17:41 5     videotaping Ron Brawer.  They decided to also videotape his

6     wife and his children, and they now say, well, that shouldn't

7     be admitted, that we did that because that's prejudicial to

8     us.

9          Well, they were the ones --

17:41 10          THE COURT:  Well, maybe parts of it and parts of it

11     not.  If the wife who comes in looks a little --

12          MS. KELLER:  I think it shows -- number one, it

13     shows the thoroughness of the investigation.  They just

14     weren't going to limit themselves to him going in and out

17:42 15     of -- of Mattel.

16          They were even going to film his wife and kids to

17     see if there was anything remotely possible that probably

18     the -- we can't even imagine that it might yield them,

19     otherwise, why are they doing it?

17:42 20          It makes no -- I mean, if they're not trying to be

21     extraordinarily thorough, why are they doing it?

22          THE COURT:  There is a difference between letting

23     you show that and letting you talk about it.  There is a huge

24     difference.

17:42 25          MS. KELLER:  That was the next thing I was going to

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10348   Filed 03/31/11   Page 25 of 135   Page ID #:314265
CV 04-9049 DOC - 03/30/2011   Volume 3 of 3

25

1        suggest, Your Honor.

2            If the court thinks it's unfair for us just to

3        excerpt those little portions of it, then I would ask

4        Mr. Brawer, you know, did you become aware that you were

17:42  5        videotaped -- have you -- by Mattel?  Have you actually

6        watched the tapes?  Do they even include videotapes of your

7        wife and children as well as you?

8            And I don't see any unfairness to that, mark the

9        videotapes, put them into evidence, and the jurors can watch

17:43 10        all or part of them.

11            But it -- it -- it seems to me, odd, that a party

12        chooses to go to this extremity, to videotape somebody's wife

13        and kids.  We don't know whether it's for legitimate

14        investigation reasons or -- or what, but they do it, and then

17:43 15        say, well, to tell anybody what we did is going to prejudice

16        us.

17            (Discussion held off the record.)

18            MS. KELLER:  It -- Mr. McConville is saying it's

19        kind of like a drug case where you follow the person to see

17:43 20        if they drop off the contraband and maybe they do and maybe

21        they don't.

22            I don't know.  I can't explain why the

23        investigators did what they did, but I know what they did was

24        surveil this man and his family around the clock.

17:43 25            The other thing is Mr. Brawer is going

Case 2:04-cv-09049-DOC-RNB   Document 10348   Filed 03/31/11   Page 26 of 135   Page ID #:314266
CV 04-9049 DOC - 03/30/2011 - Volume 3 of 3

26

```
 1    to be portrayed --
 2              THE COURT:  How did this get out to the press?
 3              MS. KELLER:  I don't know the answer.
 4              THE COURT:  Well, I know you don't.
 5              You weren't counsel.
 6              Mr. McConville --
 7              MR. MCCONVILLE:  I don't know.
 8              THE COURT:  Ms. Hurst?
 9              MS. HURST:  They said it was 2008, Your Honor.
10    That's before our time.
11              MR. PRICE:  In their exhibits they have the Wall
12    Street Journal article.
13              THE COURT:  I'm not saying that.
14              I just don't have the same counsel, apparently,
15    here, or we'd have the same heart-to-heart discussion about
16    how the case is being tried.
17              Who was it?  Nolan?
18              MS. HURST:  Well, I think we should ask them as
19    well.
20              THE COURT:  Who was counsel at the time?
21              MR. PRICE:  We want this public.
22              MR. ZELLER:  He's asking.
23              THE COURT:  Listen to me.
24              I'm not asking questions just to ask them.
25              I'm not wasting my time just to get answers.
```

                    1              The easiest thing for me to do is just come out and

                    2      make rulings.

                    3              So the reason that I'm asking is I'm genuinely

                    4      asking.

17:44      5              Who was counsel at the time?

                    6              MR. ZELLER:  Tom Nolan was lead counsel at the

                    7      time.

                    8              THE COURT:  I wish I would have known that at the

                    9      in-camera session, not that it had anything to do with the

17:45    10      in-camera session but we would have had a heart-to-heart

                  11      about this.  I would have asked where these got released and

                  12      why this is being tried out in the press in this kind of

                  13      manner.

                  14              That's extraordinarily inflammatory and

17:45    15      extraordinarily detrimental to Mattel.

                  16              MR. ZELLER:  And I think the court can tell --

                  17      we'll give the court the article, but you can just tell from

                  18      the face of it, it was a selective leak of documents such as

                  19      the "house on fire" documents, all the things that MGA wanted

17:45    20      to talk about in the first trial and they've talked about

                  21      extensively in the second trial.

                  22              I mean, from the face of it, it's quite clear and

                  23      this was prior to the time that Judge Larson had signed any

                  24      order releasing any documents designated AEO.

17:45    25              MS. KELLER:  Your Honor, if I may?

                    UNITED STATES DISTRICT COURT

          1              (Discussion held off the record.)

          2              MS. KELLER:  Your Honor, in 2008 we didn't even

          3    have the videos.  We had to move you to release them.

          4              So I'm sitting here listening -- seriously -- we

17:45     5    didn't have them.

          6              THE COURT:  I know.  I'm chuckling.

          7              MS. KELLER:  Nolan didn't have them either.

          8              THE COURT:  I'm not accusing Mr. Nolan, I'm just

          9    saying this:  I can't imagine Mattel releasing them.

17:46    10              MS. KELLER:  But Mattel has made a lot of enemies

         11    over the years by bullying and mistreating their employees

         12    and by, frankly, acting like Gestapo.  They have.  Everybody

         13    is prettifying it, but that's what they've done.

         14              We don't know if somebody in Mattel might have done

17:46    15    it; we don't know if somebody in security might have done it;

         16    we don't know if one of their own fired employees might have

         17    done it.

         18              But we didn't even get it ourselves until

         19    Your Honor released it to us and then to have MGA's side,

17:46    20    whoever the lawyers were, accused of releasing it is really

         21    unfair.

         22              THE COURT:  Well, I'm not accusing Mr. Nolan, I

         23    would have asked if he had and I would have asked the other

         24    side if he had known.  I'm just kind of curious why the case

17:46    25    is being tried in the press.

```
 1              By the way, for the record, the case in this phase,
 2      whatever phase we're in, has been rather calm.
 3              Gentlemen, on the record, my compliments to both
 4      sides.  The case has cooled down from the first case.  This
17:47 5  is because of your ethics, quite frankly, on both sides.
 6      Thank you.
 7              MS. KELLER:  Our side of the table has not made
 8      statements to the press.  Our side of the table has not
 9      issued Tweets.
17:47 10            THE COURT:  Did you hear me say thank you?
 11             MS. KELLER:  Our side of the table --
 12             THE COURT:  Did you hear me thank you?
 13             MS. KELLER:  Thank you.
 14             THE COURT:  Okay.  Now, Mr. Price -- and thank you
17:47 15 also.
 16             MR. PRICE:  First of all, Your Honor, they didn't
 17     have the videos.  They had the reports of the surveillance
 18     and that was what was leaked.
 19             THE COURT:  Oh, I see.  So the videos never got
17:47 20 leaked.
 21             MR. PRICE:  I don't think the videos themselves.
 22     It's the reports and that's what was said but he was
 23     surveilled.
 24             THE COURT:  But Mattel never leaked those.
17:47 25            MR. PRICE:  No, and their reports talk about that.
```

UNITED STATES DISTRICT COURT

1          Now, what you just heard was Ms. Keller's closing

2     argument.

3          As you said, Your Honor, this would be

4     extraordinarily inflammatory.

17:47  5          She just talked about Gestapo tactics and that's

6     why they want to put this in, not because it relates back to

7     2000 or 2001.  No one said we were surveilling people in 2000

8     or 2001.

9          By 2004 we had gotten burned.  By 2004, Mr. Bryant,

17:48 10    we knew he had gone over to MGA, he had been working for them

11    while he was working for us.

12         By 2004, by this time we knew about the -- the

13    three amigos.  We knew that they had stolen documents.

14         So this surveillance took place in that two-week

17:48 15    time period when Mr. Brawer left the building but was still

16    being paid by Mattel.

17              THE COURT:  Okay.

18              MR. PRICE:  And, you know, we wanted to see what he

19    was doing.

17:48 20         But it's irrelevant to any issue in this case

21    because he wasn't even at MGA yet.  And all they want it in

22    for is for the, as you said, extraordinarily inflammatory

23    suggestion that Mattel is a Gestapo-like organization.

24              THE COURT:  What about the MyScene Swappin'

17:48 25    dolls -- style dolls concerning the misappropriation of

1    product?  Why did -- why did we get into that?  That was over

2    Mr. McConville's objection.

3             In other words, you opened the door and it's right

4    out front in terms of the inference that Mr. Brawer stole it,

17:49  5    and here we are, you know, over the objection of

6    Mr. McConville.

7             Mr. Price?

8             MR. PRICE:  Okay.  Well, he's trying to --

9             THE COURT:  Well, that's okay.  Take your time.

17:49 10            MR. PRICE:  But if I could make a quick response.

11            THE COURT:  Talk to Mr. Zeller.

12            (Discussion held off the record.)

13            MR. PRICE:  Your Honor, that two-week period is

14    before he's at MGA.

17:49 15            THE COURT:  Uh-huh.

16            MR. PRICE:  We didn't say he did it before he went

17    to MGA.

18            There's surveillances for the two-week period where

19    he's being paid by Mattel and, obviously, that's surveillance

17:49 20    in public places.  I mean, these are all public places.

21            THE COURT:  Right.

22            MR. PRICE:  Mr. Brawer doesn't have a claim here

23    for invasion of privacy or anything, which, of course, the

24    jury's not going to realize that this is -- this is not

17:50 25    illegal.  They're going to be told it's Gestapo conduct.  But

UNITED STATES DISTRICT COURT

```
 1    they're surveilling him in public places before he starts

 2    MGA.

 3           This video doesn't say one way or another whether

 4    or not once he went to MGA, you know, he told them about

 5    Swappin' Styles.

 6           Now, he can say, obviously, I didn't, here's my

 7    agreement.

 8           And to tell you the truth, Your Honor, I'm not

 9    examining about it.  It just wasn't part of my -- for my

10    remaining 11 hours --

11           (Discussion held off the record.)

12           MR. PRICE:  It was just -- it's just -- you know,

13    it's just copying of trade secrets, but this video has

14    nothing to do with that.

15           And when you look at the other side, which is the

16    extraordinary inflammatory nature of this -- and you just saw

17    it, you know (indicating).

18           THE COURT:  Well, let me -- I'm going to go back in

19    chambers and -- in just a moment, but I want to deal next and

20    discuss with both of you this whole series of events that

21    cause, eventually, the filing in Los Angeles Superior Court,

22    and the complexity of this and the confusion that this

23    potentially causes, and then ask you how in the world don't

24    we eventually get into this and how do I shape that if we do?

25           In other words, you're going to have to attack
```

UNITED STATES DISTRICT COURT

1    Brawer's creditability.

2            Instead of you -- let me make it easy.  If I was in

3    your position I would have to attack his creditability.

4            One of the ways I'm going to attack him is show

17:51 5    that he's biased and that he's biased against Mattel.

6            Now, one of the claims is going to be that he

7    didn't report Sal Villasenor's activities for this long

8    period of time.  And today we heard he had an aha moment.

9            In the past in the depositions there's other

17:51 10   testimony concerning this gentleman.

11           As soon as that's raised, even if it doesn't come

12   in on direct examination, even if I limit MGA, when you

13   attack credibility, how, in good faith, does that stay out as

14   a motivating fact for an explanation on MGA's behalf?

17:52 15           Let me strike that.

16           I'm not limiting you.

17           Do you understand that?

18           MR. PRICE:  Uh-huh.

19           THE COURT:  But in not limiting you, in terms of an

17:52 20   attack on creditability, even if it's not direct, how do I

21   deal in redirect with, "Judge, one of the reasons he didn't

22   report it was because he was chilled by the lawsuit in

23   Los Angeles," and then we're off and running.

24           The complexity of this is mind-boggling for the

17:52 25   jury in terms of a demurrer, an eventual settlement because

```
 1    he agrees to the code of conduct, et cetera.

 2              Now, the easy answer is, "Judge, don't let it in at

 3    all."

 4              Now I've heard that answer, okay.

17:52  5        What else can you think of, if anything?  And then

 6    I'll turn back to Mattel -- I mean, MGA.

 7              MR. PRICE:  Well, first, MGA obviously wouldn't

 8    want to be introducing evidence he's biased against Mattel.

 9    So --

17:53 10        THE COURT:  Yes, they would.

11              Hold on.

12              Mr. Quinn did the same thing.

13              I've got excellent attorneys here.

14              You always want to get out in front of the bad news

17:53 15  first.

16              In other words, you never want the opponent to

17    control; you want to shape.

18              So, of course -- of course MGA wants to put this

19    in.  They want to anticipate, you know, your excellent

17:53 20  cross-examination in terms of credibility, they can see it

21    coming and they're going to want to get it out on the table

22    like "Ho hum," because they don't want you to shape it.

23              Of course they want to get it in.

24              It seems to me this is coming in.  It's how it gets

17:53 25  shaped when it's coming in.  And I think in some ways that
```

 1   choice ought to be yours to shape first, but I'm not certain

 2   about that, so I want to talk to you about this.

 3          MR. PRICE:  We're not going to contend that because

 4   of this lawsuit he's biased against Mattel.  We're not going

17:54 5   to make that argument.

 6          THE COURT:  What are you going to argue?

 7          MR. PRICE:  What we're going to argue is he's not

 8   being honest about, you know, remembering Sal Villasenor and

 9   telling anyone at MGA.

17:54 10          THE COURT:  Now, what -- what -- now, just a

11   moment.

12          MR. PRICE:  Okay.

13          THE COURT:  Let's test that.  We've got all night.

14          What's the difference?

17:54 15          MR. PRICE:  The difference --

16          THE COURT:  The response from MGA is, yeah, he's

17   not being honest; but, yes, he is being honest because he was

18   chilled and he didn't want to report this for a number of

19   years because he got sued.

17:54 20          Now, whether I believe that or not is -- I'm a

21   gatekeeper, so how do we deal with that?

22          MR. PRICE:  Well, the way you deal with it is

23   there's no good faith basis for them to say that.

24          This man has been asked on at least two occasions,

17:54 25   including today in front of the jury, and that is not

 1    what he said.

 2            THE COURT:  Has he ever made that explanation at

 3    any other time during the depositional testimony that was

 4    taken?

17:55 5           MR. PRICE:  No.

 6            THE COURT:  So we've never heard the explanation

 7    before that he was chilled because he was afraid of a

 8    lawsuit?

 9            MR. PRICE:  Right.

17:55 10           THE COURT:  And we haven't heard that explanation

11    at the time of his deposition in 2010?

12            MR. PRICE:  No.

13            THE COURT:  Now, hold on for a second.

14            Without a whole lot of words -- deposition.

17:55 15           Did he ever say that he was chilled or is this

16    something I'm going to hear for the first time?

17            MS. KELLER:  I don't think he was asked; and I'd

18    have to comb through this right now, but I don't think he was

19    asked why he didn't tell Isaac Larian.  I don't think he was

17:55 20    asked that, but he will be now.

21            And, Your Honor, if I can just respond while

22    Mr. McConville is looking --

23            THE COURT:  Not yet.  Not yet.

24            Now, when he is asked now, what can I expect to

17:55 25    hear, that he was chilled?

1          MS. KELLER:  I think he's going to say that he

2    honored his commitment to Mattel for a number of reasons, one

3    of which was he didn't want to be sued.

4          I mean, he -- he's afraid of Mattel.

17:56  5          Now, they're going to argue he's lying.  You just

6    heard that from Mr. Price.  They're going to argue he's a

7    liar.

8          What's his motive to lie?  Okay.

9          What are they going to argue is his motive to lie?

17:56 10    Is he being paid under the table?  Is it friendship with

11    Mr. Larian?  Is it irrational hatred of Mattel?

12          THE COURT:  Why wouldn't I allow Mattel to shape

13    that on cross-examination?  The only rational argument that

14    you have for taking this out on direct is to take the sting

17:56 15    away from it.

16          MS. KELLER:  Because if it's admissible, it's

17    admissible, for the same reason that in a criminal case if

18    you call a defendant to the stand you can ask him about his

19    prior felony.  It's our case.  This is our -- supposed to be

17:56 20    our chance to shape our case.

21          They had their chance to shape theirs and they

22    shaped it in ways like reading from the complaint by

23    Farhad Larian against his brother after the court told him

24    they're not to --

17:57 25          THE COURT:  We're not going to do "he did this and

1    he did that."

2            MS. KELLER:  Well, I'm just saying they shaped

3    their case.  They shaped their case in a lot of ways that we

4    objected to.

17:57 5            THE COURT:  Sure.

6            MS. KELLER:  But they got to do it.

7            This -- I think that the best thing to do in a

8    situation like this, if this guy's going to be accused of

9    being a liar, then let the jurors hear all the different

17:57 10   factors.

11           Let them hear, "You know what?  Maybe he is.  Maybe

12   he really doesn't like Mattel and maybe one reason he doesn't

13   like them is that they had him, his wife and his kids

14   followed and videotaped.  Maybe he doesn't like Mattel

17:57 15   because Mattel sued him."

16           That doesn't make him a liar, but if there is a

17   bias, the jurors should know what the legitimate bias is, not

18   some speculation about what's this -- why is this guy

19   standing up for Mattel -- standing up for MGA now?  Why is

17:58 20   this guy doing this?  What's really going on?

21           Because that's going to be argued.  And, you know,

22   what's wrong with transparency?  Really?

23           THE COURT:  Now, I can hear, since we're always

24   back and forth, well, what's wrong with transparency in terms

17:58 25   of Farhad Larian?  You know, I can hear it coming right from

```
 1    the other side.
 2              MS. KELLER:  Well, you know something, they read
 3    the complaint after the court said they couldn't.  They threw
 4    in shoe patents that are completely irrelevant to this case
 5    and wanted to dirty us up.
 6              Now when something is directly relevant and is
 7    something that Mattel directly did involving a witness in
 8    this case, they don't want the jury to know about it and they
 9    don't want the jury to know about it because, A, it makes
10    them look bad.
11              THE COURT:  Right.
12              MS. KELLER:  And, B, they want to leave in the
13    jurors' minds an erroneous impression about the reasons he
14    may have bias against Mattel.
15              And, you know, let it all out there.  Let -- he
16    doesn't like Mattel.  Okay.  He has good reasons for that,
17    but that doesn't mean he's lying.
18              THE COURT:  Okay.  Okay.
19              MR. PRICE:  We're not going into that.
20              We're not going to say here are the reasons you
21    dislike Mattel.  We're going to test his sworn testimony,
22    which she elicited.
23              If he comes back and says, oh, I didn't tell
24    Isaac Larian because of surveillance in a lawsuit, it will be
25    an attorney-planted statement because he has twice been asked
```

UNITED STATES DISTRICT COURT

1    and he has never said this.  So this is really the most

2    underhanded thing you can think of.  You know, Your Honor,

3    how extraordinarily inflammatory this is.  This man has

4    testified about this on two occasions, this morning he

17:59 5    testified about it, and all I'm going to be saying is let's

6    look at your explanation.  It makes no sense.

7         And so her argument is, oh, then he gets to give

8    another one, which he's never given before, so that we can

9    get into evidence this extraordinarily inflammatory stuff?

17:59 10        Is he really going to say, yes, I did know about

11   Mr. Villasenor and others going into showrooms?  I was

12   actually in the MGA showroom as an executive of MGA knowing

13   that the person next to me might be from Mattel, but I didn't

14   tell anyone because I learned, you know, in 2008 that there

18:00 15   was surveillance, or because they sued me in a declaratory

16   relief action, which of course opens up a trial within a

17   trial, so we get to explain what happened, and then there is

18   the settlement, you know.

19        This is -- I'm amazed that she could actually say

18:00 20   this with a straight face.  You heard his testimony.

21        THE COURT:  There is a note coming your way.

22        MR. PRICE:  We have to spend a lot of time

23   explaining the lawsuit, a demurrer, an appeal, the fact that

24   it was settled because he agreed to sign the code of conduct,

18:00 25   we have to get in what dec relief is, we've got to get in the

1    fact he wouldn't sign the code of conduct or a

2    confidentiality statement, and that everybody walked away

3    and, by the way, his attorneys' fees were all paid by MGA.

4            I mean, 403's pretty simple.  It's extraordinarily

18:01 5    inflammatory.  On the other hand, it is not of minimal

6    relevance, it is of no relevance unless it's concocted

7    relevance to get the evidence in.

8            THE COURT:  Uh-huh.

9            MR. PRICE:  Because, I mean, ask Ms. Keller.  She

18:01 10    asked him this morning:  Did you tell anyone?

11            No, I didn't remember it until, aha, I was pestered

12    and pestered and pestered.

13            (Discussion held off the record.)

14            THE COURT:  Okay.  Now --

18:01 15            MS. KELLER:  Well, we've now been accused -- or I

16    guess I'm being accused of planting to suborn perjury.  It

17    would be an attorney-planted statement, and I am truly amazed

18    to hear this from this side of the table given some of the

19    stuff we've seen in this trial, but be that as it may, people

18:01 20    have lots of reasons for motivations.

21            You can be afraid of being sued; you can be

22    honoring your agreement because you're afraid of being sued;

23    you can just not want to go into it because it's more trouble

24    than it's worth for you to be caught in the cross hairs;

18:02 25    there can be lots of reasons.

1          But, frankly, this witness is going to say -- and I

2     have a good-faith belief that he will say, honestly, that one

3     of the reasons that he didn't want to tell Mr. Larian

4     anything about anything that happened at Mattel, anything,

18:02 5     including Villasenor -- anything -- was because he didn't

6     want to get sued again, and Mr. Larian made it pretty clear

7     to him that he, Mr. Larian, didn't want to get sued either.

8          THE COURT:  Now, the third issue tonight is there

9     has been a consistent complaint about magnets killing

18:02 10     children that was elicited on the first occasion that

11     Mr. Larian -- or strike that -- Mr. Eckert testified.

12          This court is not a fact-finder.

13          There were some articles insinuating that.  The

14     vast majority of the articles which were hearsay seemed to

18:02 15     say that there was simply a congressional investigation and

16     health concerns.

17          Mr. Quinn submitted a request that the court simply

18     say, in basic terms, that that is not true; by the same

19     token, you were going to have a suggestion to the court from

18:03 20     your standpoint.

21          What is that?

22          MS. KELLER:  And we submitted it already,

23     Your Honor.

24          MR. MCCONVILLE:  We filed it last night.

18:03 25          THE COURT:  Hand it to me.

```
 1              I want to read it right now.

 2              And then I've got about six other things tonight.

 3              Another night in paradise.

 4              MS. HURST:  It's going to take me a minute,

18:03 5    Your Honor.  I'm having a few computer problems.

 6              THE COURT:  I've got lots of time.  That's

 7    all right.

 8              Mr. Malackowski, we'll be with you in a few

 9    moments, sir.

18:05 10              Just relax.

11              I saw Mr. Wagner here.  It's old home week.

12              (Laughter.)

13              (Pause in the proceedings.)

14              THE COURT:  Now you're both former prosecutors or

18:05 15   defense counsel.  Remember those old autopsy photos where you

16    had somebody shot 20 times in the head and you didn't need 20

17    gunshot wounds?  Well, it's kind of like an analogy.

18              If I do allow this tape or a portion thereof, I'm

19    not too certain you're getting in the wife and children.

18:06 20              MS. KELLER:  The judge always tells me, Your Honor,

21    that it proves malice and it's all coming in.

22              THE COURT:  Thank you very much.

23              You must have been over in Judge Briseno's court.

24              MR. MCCONVILLE:  Absence of mistake.

18:06 25              THE COURT:  Sure.
```

```
 1                 Give me that piece of paper over here.

 2                 MR. MCCONVILLE:  It couldn't have been suicide.

 3                 THE COURT:  For the record, let me just comment

 4        he's the finest trial judge in the superior court, probably,

18:06  5        and the oldest.

 6                 All right.  Your request is, "There was prior

 7        testimony from Mr. Eckert about Mattel's recalls starting

 8        2007 of products containing lead paint and magnets.

 9                 "This testimony is or was relevant solely for

18:07 10        purposes of your consideration of the notoriety of the

11        recalls and whether that may have affected the performance of

12        Mattel's brands and products.

13                 "You should disregard any suggestion of physical

14        harm from lead paint or magnets and that should not figure in

18:07 15        your consideration of this matter."

16                 Well, let me think about that.  That's a judgment

17        call.

18                 MR. QUINN:  Can I respond to that, Your Honor?

19                 THE COURT:  Certainly.

18:07 20                 MR. QUINN:  If the court were to give that it would

21        be confirming that what she said to the jury is right; that

22        in fact, you know, there is evidence, that she has evidence,

23        and that you're telling them -- you're then telling them

24        she's right, it's irrelevant, you shouldn't consider it, you

18:07 25        can't hear it.
```

 1          You'd just be confirming what she represented by

 2   those questions:  "Isn't it true that Mattel magnets kill

 3   children?"

 4          "Eckert:  No, it isn't.

18:07 5          "Your Honor, may we have a sidebar?  We may need to

 6   go into a prohibited area."

 7          If you give this instruction --

 8          THE COURT:  Just a moment.

 9          "Objection.  Sustained."

18:08 10         That's the portion you forgot.

11         MR. QUINN:  Yes, but she said -- she

12   communicated --

13         THE COURT:  And then she said, "Your Honor, may we

14   have a sidebar?"

18:08 15         MR. QUINN:  Then go to sidebar.

16         "And you would be telling them that she was right?

17         "You would be telling them that you should

18   disregard any idea that this caused harm, that indeed, as she

19   said, you're prohibiting her from inducing that evidence?

18:08 20         "Now, what's wrong with that?

21         "The only evidence is that a Mattel magnet has

22   never killed any child anywhere" -- Eckert's testimony.

23         After she asked for that sidebar, has she ever made

24   an offer of proof?  Did she ever even bring it up again?

18:08 25         It was simply false.  It was another underhanded

1    tactic.  It was simply false.  She's never made an

2    offer of proof.

3            MR. MCCONVILLE:  Yes, she has.

4            MR. QUINN:  She'd be hiding --

18:08  5            MR. MCCONVILLE:  That's false right there.  She did

6    make an offer of proof.

7            MR. QUINN:  Yeah; that there are confidential

8    settlements, and Mr. McConville asked --

9            MR. MCCONVILLE:  That wasn't it either.

18:09 10            THE COURT:  I'm going to leave the bench in a

11    moment and you two can talk to each other if you'd like to.

12            But, if you remember, then we pulled four articles.

13    I specifically asked for four articles during the recess, and

14    what we got in -- and you may have gone to the bathroom, but

18:09 15    I think Mr. Price was here and Mr. Zeller, but maybe you were

16    here.

17            MR. QUINN:  No, I'm familiar with the articles.

18            THE COURT:  We went through four articles, and I

19    found that those four articles were hearsay.  They were

18:09 20    sensational accusations in light of the congressional

21    investigation.  I asked where the good-faith belief was, and

22    four articles were produced.  Some from well-known magazines,

23    a couple from --

24            MS. KELLER:  The New York Times.

18:09 25            THE COURT:  -- the New York Times.

```
 1          But -- all during the recess, but that didn't
 2     validate it.  That just --
 3          MR. QUINN:  No; but they weren't Mattel magnets is
 4     the point.
18:09 5          Other companies, other toy manufacturers, have had
 6     magnets that have come off and have killed children.
 7          No Mattel magnet has ever killed a child, and that
 8     was the question.
 9          THE COURT:  But Mattel was mentioned in that
18:09 10    article, unfortunately, because of the sensationalism
11     involved.
12          MR. QUINN:  Yeah, but that --
13          THE COURT:  We don't control the press, but that's
14     what occurred; and Mattel got swept up in that article as one
18:10 15    of the primary contributors, and the article unfortunately
16     and probably unfairly focused on Mattel because it was at the
17     same time as the congressional investigation and they had the
18     big gorilla.  You know, they had the big elephant in the room
19     in front of Congress at the time and, regardless, here's
18:10 20    Mattel right in the middle of it with Mr. Eckert testifying
21     in front of Congress.
22          MR. QUINN:  But there is no evidence.
23          Sure, I'm familiar with the articles, Your Honor,
24     but there is nothing in that article, there's no evidence and
18:10 25    no offer of proof that a Mattel magnet has ever killed a
```

1    child.  And for her to say that in front of the jury that

2    she's prohibited from going into it, and then you're telling

3    the jury, yes, she's right, she's prohibited from going into

4    it, confirms what she implied is true.

18:10  5         THE COURT:  Uh-huh.

6         MR. QUINN:  She could have read the article and

7    said it wasn't Mattel magnets; she could have said that.

8         She could have said that isn't there a potential

9    that if a magnet comes off a toy it could hurt a child?

18:11 10   Instead she chose to accuse Mr. Eckert that Mattel magnets

11   kill kids.

12        THE COURT:  I'm going to joke with you.

13        I know neither one of you would want that, do you

14   want to just introduce the articles?

18:11 15        Of course not.  Of course not.

16        Because the press wrote that in a sensational way,

17   frankly.

18        But, listen, I'd like to go back in chambers and do

19   some writing and some thinking for a moment on these two

18:11 20   issues and then we'll get to Mr. Malackowski eventually, but

21   I think we've got three or four important things to think

22   about and decide very quickly.  Okay.

23        Or do you want me to hear Mr. Malackowski now and

24   come back to these?  I'm happy to do either one.

18:11 25        MS. KELLER:  We're at the court's -- we're at the

Case 2:04-cv-09049-DOC-RNB    Document 10348    Filed 03/31/11    Page 49 of 135    Page ID #:314289
CV 04-9049 DOC - 03/30/2011 - Volume 3 of 3

49

1    court's service, Your Honor.

2              THE COURT:  Sure.

3              MR. QUINN:  Can we do Mr. Malackowski now? because

4    Mr. Price will do it.

18:11 5        THE COURT:  As a courtesy to Mr. Price let me do

6    that, but let me go back to chambers because I've got to

7    switch piles of materials.  So you've got to give me about 15

8    or 20 minutes back in chambers.

9              Why don't you take a restroom break, go get a cup

18:12 10   of coffee and see me back here at 6:30.

11             MR. PRICE:  Thanks for the courtesy.

12             THE COURT:  Let me get my mind turned around now to

13   lost profits.

14             MR. PRICE:  The more mundane stuff.

18:12 15        THE COURT:  Yeah, the more mundane.

16             Thank you very much.

17             MR. MCCONVILLE:  Judge, do you want our

18   supplemental brief that we filed earlier tonight on the

19   *Daubert* -- they filed a *Daubert* opposition and -- do you want

18:12 20   this?

21             THE COURT:  Sure.

22             (Recess taken.)

23             THE COURT:  We're back on the record.  Counsel are

24   present.

18:47 25        All right.  All counsel are -- well --

UNITED STATES DISTRICT COURT

1              (Pause in the proceedings.)

2              THE COURT:  Is Ms. Hurst going to be here?

3              MS. KELLER:  I'm sorry, Your Honor, what?

4              THE COURT:  Is Ms. Hurst going to be here?

18:48 5        MS. KELLER:  She is.  She was just washing down her

6    last little bit of dinner.

7              THE COURT:  All right.  We're on the record.  All

8    counsel are present.

9              Mr. Price or Mr. Zeller or Mr. Quinn, I've already

18:48 10  held that the trade fair claim relates back to November 20th,

11   2006.

12             As long as MGA didn't know about the conduct prior

13   to November 20th, 2003, the claim's timely.

14             So I guess I'm asking myself, who cares if

18:48 15  Mr. Brawer knew about this in October 2004?  And you're

16   entitled to preserve an issue for appeal, but I've got the

17   feeling that it's simply an issue being preserved for appeal.

18             MR. ZELLER:  Well, I -- I think the state of the

19   trial record at this point is, is that MGA has affirmatively

18:49 20  said more than once that it did not know.  I mean, that has

21   been -- in fact, the court will recall that they had been

22   affirmatively using that as a sword against Mattel, saying,

23   "We didn't know.  Mattel buried it.  Mattel suppressed it."

24             So the fact that Mr. Brawer knew, the fact that

18:49 25  Mr. Larian knew, the fact that others at MGA knew, even apart

 1    from the statute of limitations, is directly relevant and

 2    they made it relevant.

 3           THE COURT:  I'm going to ask it again:  Who is

 4    doing the examination of this witness tomorrow?

18:49  5       MR. PRICE:  I will be.

 6           THE COURT:  Okay.  Mr. Price.

 7           It seems like it's an appellate issue.

 8           I don't understand why it's important or why it's

 9    relevant.

18:49 10       MR. PRICE:  Well, it's important for -- for two

11    reasons.

12           One is we're saying that -- that -- you know, what

13    is in these toy fairs is not confidential.  Mr. -- Mr. Brawer

14    said, for example, everybody at Mattel knew this.  They went

18:50 15    to these presentations and, of course, they're willing to say

16    that this was incestuous, that people went in and out of

17    these organizations, people knew this was happening.

18           And then he goes to MGA and we've -- we get to

19    suggest that, actually compellingly suggest, that obviously

18:50 20    he told Mr. Larian and they did nothing about it.

21           Why?  Why would you do nothing about it?  Not

22    because of the statute of limitations, but because you expect

23    this information at toy fairs to get out to your competitors.

24           So -- so -- so that's the -- actually, that's the

18:50 25    basic reason.  You know, they know about it and they do

Case 2:04-cv-09049-DOC-RNB   Document 10348   Filed 03/31/11   Page 52 of 135   Page ID #:314292
CV 04-9049 DOC - 03/30/2011 Volume 3 of 3

52

1    nothing because, well, this is kind of what you expected;

2    yeah.

3              So it's relevant to their expectations of

4    confidentiality.  That -- that -- that's the key question.

18:51 5          The second part, as Mr. Zeller was saying, we have

6    to go up against this testimony time and time again that

7    this -- MGA didn't know about this until 2010.

8              THE COURT:  Uh-huh.

9              MR. PRICE:  That this was suppressed, et cetera.

18:51 10         Whereas Mr. Brawer will say, oh, that's the kind of

11   thing that he thought was typical and hundreds of people saw

12   it and then, you know, he went to MGA and, boy, he even

13   forgot about it for years, even though he was attending,

14   apparently, every toy fair after 2005.

18:51 15         So -- and it goes to his creditability.

16             He has said, you know, I didn't tell anyone, and --

17   and you have to remember this guy continued to have --

18   have -- have communications with Villasenor, you know.

19             I mean, this guy sent an e-mail to Machado saying

18:51 20  you should hire this guy because he's really good at getting

21   competitive information.

22             THE COURT:  Uh-huh.

23             MR. PRICE:  Which I think is -- is pretty good

24   evidence that, again, there's no expectation of

18:52 25  confidentiality.  When he told Mr. Machado that you've got to

 1    hire this guy, you should hire this guy, he's good at getting

 2    competitive information, he knew how Mr. Villasenor got

 3    competitive information.  So it's relevant for all those

 4    three things:  Lack of expectation of confidentiality; it's

18:52  5    relevant because they have tried to give the jury the

 6    impression, you know, this was, you know, buried and no one

 7    knew about it, when, in fact, MGA did know about it; and it

 8    goes to his credibility.

 9            THE COURT:  Anybody else?

18:52 10            MS. KELLER:  This seems to be -- first of all, the

11    position that Mattel is taking with respect to trade secrets

12    seems to be completely opposite of the position they've been

13    taking to date.

14            Secondly, is Mr. -- is the -- is the expectation

18:52 15    that Mr. Brawer is going to be able to sneak into Mattel

16    showrooms as notorious as he is at Mattel?

17            I -- I don't think so.  I -- I just don't

18    understand the argument, but I'm a simpleton, so maybe I'm

19    just not getting it.

18:53 20            THE COURT:  All right.  Then Mr. Wagner, if you'd

21    step forward -- I'm sorry -- Mr. -- my apologies.

22            EXPERT WITNESS MALACKOWSKI:  Malackowski.

23            THE COURT:  Mr. Malackowski.

24            Would you come forward, sir.

25        //                                            //

1          **JAMES MALACKOWSKI**,

2          expert witness, sworn

3          THE COURT:  I'd like to hear from you one more

4    time, sir, and I want to walk through the latest series of

18:53  5   slides with you and I want to get those projected up as we go

6    so we both see them.

7          EXPERT WITNESS MALACKOWSKI:  Okay.

8          THE COURT:  It won't take long; Mr. Wagner's here.

9              And I want to say to both of you gentlemen, what I

18:53 10   wanted to do initially, Mr. Malackowski and Mr. Wagner, was I

11   wanted to hear you back to back.  So the court's great

12   misgiving, unfortunately, is I couldn't get you scheduled --

13   through no fault of yours.  I know one of you had a sick

14   daughter; taking a vacation; another one wasn't available.

18:53 15       I wanted to hear both of my experts back to back.

16          I have to tell you, honestly, that Mr. Wagner

17   barely made it on the stand.  I'm not sure whether you're

18   making it up there yet; okay?

19          So we're going to listen very carefully and I think

18:54 20   so, but I just want to be reaffirmed, that my tentative

21   decision to let you testify is well taken.  All right?

22          EXPERT WITNESS MALACKOWSKI:  Fair enough,

23   Your Honor.

24          THE COURT:  All right.

18:54 25       You -- and also I was getting slides or -- counsel

```
 1    were getting slides up to 2:00 in the morning before

 2    Mr. Wagner testified.

 3              I'll be here until 2:00.

 4              Do you have any more slides for me tonight?

18:54 5         EXPERT WITNESS MALACKOWSKI:  I do not, Your Honor.

 6              THE COURT:  You do not.

 7              Well, okay.  Well, that's a blessing.

 8              EXPERT WITNESS MALACKOWSKI:  All right.

 9              THE COURT:  Take me through this process one more

18:54 10   time.

11              I want to hear it beginning to end.

12              First slide.

13              EXPERT WITNESS MALACKOWSKI:  So, Your Honor, I

14    looked at both the MGA damages for trade secret

18:54 15   misappropriation and unfair competition, and then I obviously

16    corrected what I thought needed to be corrected with

17    Mr. Wagner.

18              My analysis began by looking at the 114 alleged

19    trade secrets that were the unreleased products at the toy

18:55 20   fair.  And so as we talked about when I was last here, I've

21    shown for each and every year those 114 products.

22              After looking at the products on a year-by-year

23    basis, I next identified which of those products ultimately

24    became Bratz products in the marketplace.

18:55 25        THE COURT:  Okay.
```

Case 2:04-cv-09049-DOC-RNB   Document 10348   Filed 03/31/11   Page 56 of 135   Page ID #:314296
CV 04-9049 DOC - 03/30/2011 - Volume 3 of 3

56

 1              EXPERT WITNESS MALACKOWSKI:  And those became

 2      shaded.

 3              And then I went one more step and said of the

 4      Bratz' products in the marketplace, which had competitive

 18:55 5      MyScene or Mattel product?  And those also became shaded,

 6      so --

 7              THE COURT:  Which shaded color?

 8              EXPERT WITNESS MALACKOWSKI:  The dark blue

 9      represents the products that have MyScene competitive

 18:55 10      product; the light blue represent Bratz products without

 11      competition; and the other trade secrets represent products

 12      that were ultimately not released or non-Bratz.

 13              THE COURT:  Okay.

 14              EXPERT WITNESS MALACKOWSKI:  And so then we can go

 18:56 15      to the next slide.

 16              This slide, Your Honor, is just simply a summary of

 17      the results looking at the three different approaches.

 18              The first analysis was a top-down approach, which

 19      was really a benchmark approach, very similar to what

 18:56 20      Mr. Wagner did when he looked at the profitability and

 21      compared it to other toy companies.

 22              I looked at the profitability and compared it to

 23      other Mattel data, and we'll look at that shortly.

 24              And then the bottom-up approach was, frankly, in

 18:56 25      response to some of your rulings and questions about trying

 1  to allocate to individual trade secrets the original claim I

 2  made from the top down.  So we'll go into each of those.

 3          The next slide.

 4          So the next slide is the first analysis of the

18:56 5  top-down approach, and, Your Honor, it's really pretty

 6  straightforward.

 7          The dark blue larger region represents the MyScene

 8  profitability for both product and license revenues.

 9          And the theory of damage is that but for the

18:57 10  alleged misappropriation of MGA's trade secrets over an

 11  extended period of time, MyScene would not have been as

 12  successful as it was.

 13          And so what we need to understand is what's a fair

 14  benchmark to use to determine a more accurate measure of

18:57 15  MyScene sales but for the misappropriation?

 16          And rather than looking at average results from

 17  unrelated toy companies with unrelated products, I went

 18  specifically to look at, in this case, Mattel's experience

 19  with its fashion dolls for older girls and, in particular, as

18:57 20  shown in the bottom of the chart, I looked at their sales and

 21  profits for Generation Girlz, Diva Starz and Flavas.

 22          THE COURT:  Just a moment.

 23          (Pause in the proceedings.)

 24          THE COURT:  Okay.

18:57 25          EXPERT WITNESS MALACKOWSKI:  And, Your Honor, what

Case 2:04-cv-09049-DOC-RNB   Document 10348   Filed 03/31/11   Page 58 of 135   Page ID #:314298
CV 04-9049 DOC - 03/30/2011 Volume 3 of 3

58

1    this chart really shows is that Mattel's normal experience is

2    that when the fashion dolls come out they have an initial

3    success but then they quickly taper off, and this analysis

4    supports what I saw in the record of the case that one of the

18:58  5    benefits that Mattel received from the ongoing and continual

6    alleged misappropriation of trade secrets is that they were

7    able to extend and rejuvenate the life of MyScene so that its

8    sales over time were greater than they should have been.

9         And so I simply calculate the difference to show --

18:58 10    of the total profit represented on this chart -- 348 million

11    shown above, of that 348 million, 146 million is what Mattel

12    should have earned and kept, and the 202 million is what they

13    achieved through their misappropriation and that should be

14    disgorged.

18:58 15         THE COURT:  Okay.

16         EXPERT WITNESS MALACKOWSKI:  The next chart,

17    Your Honor, is very similar, but rather than looking only at

18    the Mattel fashion dolls for older girls, I looked

19    specifically at Mattel's MyScene experience.  And so,

18:59 20    generally speaking, you can see that the light blue top bar

21    kind of follows the dark blue line.  It's essentially the

22    same, but I removed two products that I had good data for,

23    which was MyScene Bling Bling and MyScene Chillin' Out.

24         And so I simply said that but for the

18:59 25    misappropriation over the extended period of time, their 2003

Case 2:04-cv-09049-DOC-RNB   Document 10348   Filed 03/31/11   Page 59 of 135   Page ID #:314299
CV 04-9049 DOC - 03/30/2011 - Volume 3 of 3

59

1    analysis and going forward would have been less than it

2    really was, and so I have the same 348 million at the top,

3    but this time I let Mattel keep 199 million and I say only

4    149 would be disgorged.

18:59 5          And between the two of these approaches I have my

6    range.

7          THE COURT:  Okay.

8          EXPERT WITNESS MALACKOWSKI:  And, Your Honor, this

9    is very similar, again, to the benchmark approach that

18:59 10   Mr. Wagner used, but I tried to be as specific as I could to

11   these companies and these products.

12         The next slide.

13         So now, in response, as I mentioned to Your Honor's

14   order and request, I want to look specifically not at the top

19:00 15   but at the bottom and build a case for each and every one of

16   these products that I can.

17         And this is just an illustration for the jury to

18   explain what a "head start" is.

19         And it says, you know, to be brief, at the

19:00 20   beginning you can see there was the alleged theft of trade

21   secrets in February of year '01.  That trade secret was

22   disclosed in May of that year, and that difference represents

23   the head start.

24         So the actual product that's accused was launched

19:00 25   in November and we're simply saying it shouldn't have

1    launched in November, it should have been delayed by the

2    amount of the head start.

3            Does that make sense?

4            THE COURT:  Yes.

19:00  5            EXPERT WITNESS MALACKOWSKI:  So, next slide.

6            So I began with the 114 trade secrets that were

7    alleged to be misappropriated, but I began to narrow it to

8    realize, first, they weren't all Bratz' products.  Some of

9    them were -- there was a Spiderman product, for example.

19:01 10            So only 73 of those 114 related to Bratz.  But of

11   those 73, not all of them became competitive MyScene Mattel

12   products in the marketplace.

13            That's not to say that there wasn't some benefit

14   from seeing what MGA was doing, from getting the "playbook"

19:01 15   so to speak, but it didn't actually make the competitive

16   good.

17            So I wanted to focus from my bottom-up approach on

18   the 32 products that Mattel actually launched into the

19   marketplace.

19:01 20            Unfortunately, Your Honor, I did not have data for

21   all 32 from Mattel.  And what I had data for was 18.  So I

22   started with the revenues from the 18 and I backed into the

23   32.

24            THE COURT:  Okay.

19:01 25            EXPERT WITNESS MALACKOWSKI:  Next slide.

         1              And this, Your Honor, just goes to the calculation.

         2              So for the 18 I knew there was $312 million in

         3    revenue.

         4              So these aren't small products.  We're talking

19:01    5    about very significant sales.

         6              The 24 percent -- 24.1 percent damages is based

         7    upon the two case studies that I had the best information

         8    for, again, Chillin' Out and Bling Bling, and we'll talk

         9    about those shortly, but I used that experience to determine

19:02   10    what the head start damages would be for those 18 products.

        11              THE COURT:  Okay.

        12              EXPERT WITNESS MALACKOWSKI:  Next slide.

        13              This is the first example of Chillin' Out.

        14              So it shows when it was shown at the toy fair in

19:02   15    February of '03, when Bratz first introduced their product

        16    called Winter Wonderland, when the MyScene Chillin' Out was

        17    released and the delay that should have occurred.

        18              And when you do the analysis of the delay period

        19    and the ramp-up, it's $4.1 million.  So that's a good, solid

19:02   20    building block for us.

        21              Next slide.

        22              I have another good solid building block, which is

        23    the same thing for the Bling Bling product.

        24              And, Your Honor, this is actually kind of an

19:02   25    interesting one, because MyScene actually released a Bling

     1    Bling -- a Bling product before Bratz Diamonds was shown at

     2    the toy fair.

     3              So when I first looked at this I said, well, how

     4    can there be any trade secret misappropriation?  Their

19:03 5    product came first?

     6              But I had good information to know that what was

     7    taken was the notion of the girls having the gem in a ring

     8    they could wear.  That was part of the embodiment of the

     9    trade secret and the documents are very clear on that.

19:03 10             And so following that, I calculated again what the

    11    head start was and they experienced $17.7 million in head

    12    start damages for that product.

    13             And so with those two anchors in mind -- next

    14    slide -- I went back and used those two anchors to

19:03 15   extrapolate back from the 18 to the 32, from 75 million to

    16    133.

    17             THE COURT:  Okay.

    18             EXPERT WITNESS MALACKOWSKI:  Next slide.

    19             And so as the court has requested that I try to

19:03 20   show an allocation byproduct, this chart -- this chart

    21    reflects that allocation.

    22             And so for each of the 18 products I had sales data

    23    for, I allocated based upon sales.

    24             THE COURT:  Now, do you understand -- and

19:04 25   Mr. Wagner's here -- that in all likelihood, gentlemen, your

 1    illustrations won't be going to the jury?

 2                EXPERT WITNESS MALACKOWSKI:  I do understand that,

 3    Your Honor.

 4                THE COURT:  So, for Mr. Wagner, if you're back in

19:04 5    rebuttal, I'll just say to you and Mr. Malackowski, without

 6    these charts and without the stipulation of counsel -- you

 7    know, respective counsel -- because they can stipulate and

 8    the court might accede to their request -- but these won't be

 9    going back into the jury.

19:04 10                How in the world is this helpful to the jury?

11                EXPERT WITNESS MALACKOWSKI:  So, I think the charts

12    overall are helpful in two ways, Your Honor.

13                THE COURT:  They're not going to happen.

14                EXPERT WITNESS MALACKOWSKI:  But I think showing

19:04 15    the charts are helpful in two ways.

16                THE COURT:  Okay.

17                EXPERT WITNESS MALACKOWSKI:  One, I think it really

18    does set forth the methodology.

19                THE COURT:  Okay.

19:04 20                EXPERT WITNESS MALACKOWSKI:  So they get a sense

21    that I started with the benchmark approach and I tried to go

22    product by product.

23                THE COURT:  Okay.

24                EXPERT WITNESS MALACKOWSKI:  And then I think --

19:04 25    you know --

CV 04-9049 DOC - 03/30/2011 - Volume 3 of 3

```
 1              THE COURT:  And by the way, they may have them.
 2         That's up to counsel.
 3              EXPERT WITNESS MALACKOWSKI:  And I know some of
 4    them are pretty good note takers so they may have some good
19:05 5    information on their own as well.
 6              THE COURT:  Honestly, with both of you and
 7    Mr. Wagner here, the jury isn't going to be able to.
 8         The slides have to go so quickly that they
 9    honestly, for both damages expert, they're not -- they may
19:05 10   understand the methodology or try to, and they may understand
11   general numbers, but I doubt in putting up what is so readily
12   apparent to both of you gentlemen, that they can absorb that.
13              EXPERT WITNESS MALACKOWSKI:  I'm going to try my
14   best, Your Honor.
19:05 15              THE COURT:  And I know Mr. Wagner will also.
16         But I'm just forewarning you, this is pretty heavy
17   stuff for a jury.
18              EXPERT WITNESS MALACKOWSKI:  Yeah, I appreciate
19   that.
19:05 20              THE COURT:  What is your next slide?
21              EXPERT WITNESS MALACKOWSKI:  Next slide.
22              THE COURT:  Now, this one we can't read.
23         It's kind of like the initial inventions agreement
24   that the circuit had to examine.
19:05 25              EXPERT WITNESS MALACKOWSKI:  And, Your Honor,
```

1    frankly I don't anticipate using this one with the jury.

2              This one I prepared after I last saw you in

3    response to the cross-examination question what I was

4    getting --

19:05  5              THE COURT:  I see.  Show me.

6              EXPERT WITNESS MALACKOWSKI:  So there was a lot of

7    questions during my cross-examination of why didn't you go

8    back and look at the fair and the launch date for all of the

9    MGA products, because you had MGA data?

19:06 10              And what I tried to explain is, this is like taking

11   a trip.  And when you take a trip you need a car with gas and

12   you need directions.

13              Well, I could go back and look at how much gas was

14   in the car for each one of these, but I only had the

19:06 15   directions for a few.  And knowing I needed both pieces prior

16   to now I didn't go back and do the extra work; but

17   anticipating that I'm going to be asked about it, I did.

18              THE COURT:  Okay.

19              EXPERT WITNESS MALACKOWSKI:  And so this chart just

19:06 20   goes through what the head start would have been based only

21   upon MGA data.

22              THE COURT:  I see.

23              EXPERT WITNESS MALACKOWSKI:  And at the end of the

24   day, you know, the rough average is 3.1 months and I assumed

19:06 25   three months for my two examples and so it is confirming,

UNITED STATES DISTRICT COURT

 1    there is nothing about the other products that creates

 2    concern in my view.

 3              THE COURT:  Okay.

 4              EXPERT WITNESS MALACKOWSKI:  Next slide.

19:06 5         This is a chart I believe the jury's already seen

 6    with Mr. Larian and it simply shows the Kohl's sales, so

 7    you're familiar with this chart, and this is what actually

 8    happened and then I'll explain to the jury in the next slide

 9    that this is what should have happened is that the sales to

19:07 10   MGA should not have dropped off but they should have had a

 11   relatively consistent performance and this illustrates that,

 12   Your Honor.

 13             THE COURT:  Next slide.

 14             EXPERT WITNESS MALACKOWSKI:  Next slide.

19:07 15        Now we're moving to talk not about the calculation

 16   of damages for MGA alone but we're also starting to look at

 17   Mr. Wagner's calculations for Mattel.

 18             And there's a lot of discussion, or a critique that

 19   I have of Mr. Wagner is that he was looking at the wrong

19:07 20   dolls, that he should have been looking at the first four

 21   dolls plus Formal Funk Dana or Ohh La La Cloe or he should

 22   have been looking at the first four characters, but instead

 23   he was looking at generally core fashion dolls or all of

 24   Bratz.

19:07 25        And what I wanted to do was give the jury a sense

Case 2:04-cv-09049-DOC-RNB   Document 10348   Filed 03/31/11   Page 67 of 135   Page ID #:314307
CV 04-9049 DOC - 03/30/2011 - Volume 3 of 3

67

1    of how big a difference that makes.

2           And so when you see this chart, the little blue

3    dark ribbon at the bottom is the first -- I'll call them six

4    dolls, and then the first four characters come in the next

19:08 5    block, core fashion dolls, are bigger than that.

6           But when Mr. Wagner uses, effectively, all of Bratz

7    for his trade secret claims, that's why his numbers are so

8    much larger than mine.

9           Next slide.

19:08 10           I think what's good for the goose is good for the

11    gander, so if I am willing to calculate the head start for

12    Mattel as it relates to their MyScene product, I think a

13    measure of damages for Mattel should be the head start that

14    MGA received with Bratz, and this has been in my reports from

19:08 15    the beginning; and this chart illustrates for the jury the

16    head start period that I considered for MGA.

17           In other words, had Carter Bryant not showed up and

18    they still move forward designing the doll based, for

19    example, on them seeing Diva Starz, they would have entered

19:08 20    the market some five months later.

21           THE COURT:  Okay.

22           EXPERT WITNESS MALACKOWSKI:  Next slide.

23           Now, Your Honor, we're going into the actual

24    computations that we discussed at the last hearing, which is

19:08 25    where I correct Mr. Wagner's calculations and calculate a

1    head start.

2              THE COURT:  Okay.

3              EXPERT WITNESS MALACKOWSKI:  So this one just shows

4    the numeric computation of the head start with 7 million

19:09  5    being the conclusion.

6              Next slide.

7              We spent some time on this one, I know, one of the

8    ones we tested on, and this simply shows that Mr. Wagner's

9    benchmarks, in my opinion, are not accurate, because if all

19:09 10    of the benefits were due to alleged intellectual property you

11    would expect similar performance across the Bratz line and,

12    of course, you don't see that.

13              This looks at individual SKUs.  The next chart

14    looks at themes.

19:09 15              Next chart.

16              THE COURT:  Let's go back to the last chart.

17              I was somewhat facetious about having you count

18    over last time, but you can equate each of those to a

19    different product.

19:09 20              EXPERT WITNESS MALACKOWSKI:  Yes, sir.

21              THE COURT:  How does the jury know by looking at

22    this chart what product this relates to or does it matter?

23              EXPERT WITNESS MALACKOWSKI:  It really doesn't

24    matter.  The point is with the jury is that I dug a little

19:10 25    deeper and I tested Mr. Wagner's assumption that everything

1   should be due to the intellectual property, and my way of

2   testing it was to look for variation and clearly I found

3   variation.

4           THE COURT:  And what are those variations?

19:10  5           EXPERT WITNESS MALACKOWSKI:  The variations are

6   that the products performed very differently and the reason

7   they performed very differently has to be for things other

8   than the intellectual property because the sculpt and the

9   drawings are all the same, so it has to be that MGA sweat

19:10 10   equity.

11           THE COURT:  Okay.

12           EXPERT WITNESS MALACKOWSKI:  The next chart,

13   Your Honor -- there's actually two of these that look very

14   similar and they're not in an ideal order for this purpose.

19:10 15           But to be very direct, I understand there's some

16   concern as to whether or not the brand wear survey will be

17   allowed in by the court, and so I show my apportionment

18   factors with and without the brand wear survey.

19           This happens to be the chart without, but you see

19:10 20   from a numeric average it's again very close to my 20 and

21   12 percent that I used in my calculations.  So I'll use this

22   chart or the one that looks very similar to it, but not both.

23           THE COURT:  Okay.

24           EXPERT WITNESS MALACKOWSKI:  Next.

19:11 25           So now I'm going through and collecting --

1    correcting Mr. Wagner's analysis, using my apportionment

2    factors and what I believe are the correct sales bases, and

3    this is some simple math to illustrate that for the jury.

4            THE COURT:  Next chart.

19:11 5          EXPERT WITNESS MALACKOWSKI:  Next chart.

6            THE COURT:  Flip back.

7            (Pause in the proceedings.)

8            THE COURT:  All right.  I want to focus on this

9    unjust enrichment chart for just a moment.

19:12 10         Explain to my jury the MGA copyright profits over

11   the ten-year period of time and the distinction of

12   9.2 million to 273.7 million.

13           Explain those two figures.

14           EXPERT WITNESS MALACKOWSKI:  Sure.

19:12 15         The reason those figures are so different is

16   largely because of the dolls or the SKUs that I am including

17   for the sales.

18           THE COURT:  All right.

19           Now I'm going to repeat back to you.

19:12 20         The first generation, four dolls, plus the two that

21   I am allowing to the jury are covered under your copyright,

22   9.2 million; is that correct?

23           EXPERT WITNESS MALACKOWSKI:  Yes, sir.

24           THE COURT:  Where are the sculpts?

19:13 25         EXPERT WITNESS MALACKOWSKI:  The sculpts are in the

CV 04-9049 DOC - 03/30/2011 - Volume 3 of 3

1    trade secret claim.

2            THE COURT:  So when you say "first four

3    characters," all generations of Sasha, Jade, Yasmin and Cloe,

4    it's more than the initial reading.

19:13  5          Do you see the first four characters?  And then

6    look at the copyright, the first four dolls.

7            EXPERT WITNESS MALACKOWSKI:  The first four

8    characters are initially larger --

9            THE COURT:  But the first four characters encompass

19:13 10   what?

11           EXPERT WITNESS MALACKOWSKI:  Do they encompass --

12   the first four dolls --

13           THE COURT:  Okay.

14           EXPERT WITNESS MALACKOWSKI:  -- in all of their

19:13 15   varieties, all of their SKUs.  So if they change hair, if

16   they change face paint, if they change clothes, it's all

17   included.

18           THE COURT:  Do they encompass Ohh La La and Formal

19   Funk Dana?

19:14 20          EXPERT WITNESS MALACKOWSKI:  It would include Ohh

21   La La Cloe because it is part of one of the original first

22   four dolls.

23           I would have to go back and check Formal Funk Dana.

24   I don't want to speculate.  But I could check.

19:14 25          THE COURT:  Now, explain to me again the difference

1    in the apportionment factor; the 20 percent and the 12

2    percent.

3            EXPERT WITNESS MALACKOWSKI:  Why they're different

4    for me or different for Mr. Wagner?

19:14  5            THE COURT:  Well, this is your analysis.  Why the

6    difference in the apportionment factor again?

7            EXPERT WITNESS MALACKOWSKI:  Well, in my opinion

8    the sweat equity, as it relates to the broader sales under

9    the trade secret column, is disproportionately greater than

19:14 10    MGA.  MGA contributed more to that larger population of dolls

11    because they were regenerating them over a period of time,

12    coming up with more styles.

13            THE COURT:  Let me say it a different way:  The

14    more I produce the more efficient I am.

19:14 15            EXPERT WITNESS MALACKOWSKI:  That's part of it,

16    yes, sir.

17            THE COURT:  So my 12 percent really has to do with

18    the increased production because I'm getting more efficient

19    because I'm putting out more product.  Wrong?

19:15 20            EXPERT WITNESS MALACKOWSKI:  I would say that's not

21    wrong, but that's not the main point I'm trying to make.

22            THE COURT:  Okay.

23            EXPERT WITNESS MALACKOWSKI:  The main point I'm

24    trying to make is that when you look at the copyright column

19:15 25    and what's alleged to have been misappropriated and compare

 1    that to those first six dolls, they encompass a, relatively

 2    speaking, larger contribution.

 3          When you're looking at all of the contributions you

 4    have to take into account all of MGA's efforts to come up

19:15 5    with new themes and new advertising and new styles.

 6          THE COURT:  So over time the sweat equity literally

 7    increases in the trade secret misappropriation.

 8          EXPERT WITNESS MALACKOWSKI:  That's exactly right.

 9          THE COURT:  I'm going to ask you again:  How do you

19:15 10   come up with the 12 percent?

11          EXPERT WITNESS MALACKOWSKI:  The specific number?

12    I base it on the quantitative evidence I could find in the

13    record and that was the chart we looked at a moment ago with

14    the checkmarks.

19:15 15         THE COURT:  Take me back to that chart.

16          EXPERT WITNESS MALACKOWSKI:  Can we go back a few.

17          So I've looked at -- here there are shown five

18    different quantitative analyses.  Of those five, four I

19    relate to the trade secrets.

19:16 20         In addition to the quantitative --

21          THE COURT:  One minute.

22          I see the average again, let's just say 12 or 12.6,

23    it doesn't matter --

24          EXPERT WITNESS MALACKOWSKI:  Yes.

19:16 25         THE COURT:  -- how do you come up with that

UNITED STATES DISTRICT COURT

```
 1    12 percent?
 2              EXPERT WITNESS MALACKOWSKI:  I take the 12.6 and I
 3    round it down --
 4              THE COURT:  I'm sorry.  Let me be simple.
19:16 5         How do you come up with the 12.6 percent?
 6              EXPERT WITNESS MALACKOWSKI:  The 12.6 is the
 7    numeric average.
 8              THE COURT:  Of what?
 9              EXPERT WITNESS MALACKOWSKI:  Of the four factors
19:16 10   that are checked above it.
11              THE COURT:  Okay.
12              Now, what's my numeric factor for license rates?
13    Because I'm assuming your 12.6 is an average.
14              EXPERT WITNESS MALACKOWSKI:  Yes, sir.
19:16 15        THE COURT:  And I don't know the variance or the
16    rate in each of those four.
17              EXPERT WITNESS MALACKOWSKI:  So four license rates
18    is 13.8 percent.
19              THE COURT:  Where did you get that from?
19:17 20        EXPERT WITNESS MALACKOWSKI:  I divided the
21    3 percent that was being paid to Carter Bryant in the arm's
22    length transaction -- in the transaction between Carter and
23    MGA.  So they determined that they would pay him a 3 percent
24    royalty for use of his intellectual property.
19:17 25        THE COURT:  How did you get 13 percent?
```

         1              EXPERT WITNESS MALACKOWSKI:  That is the average

         2    rate that MGA charged third parties for a package of

         3    intellectual property that included -- was contributed by

         4    Carter Bryant, and so 3 percent is a percentage of the 13.8.

19:17    5              Can I try one more time, because I don't think --

         6              THE COURT:  I don't understand it.

         7              EXPERT WITNESS MALACKOWSKI:  Carter Bryant bought

         8    some intellectual property that MGA paid him -- let's just

         9    use dollars.  It may be easier.

19:18   10              THE COURT:  No, 3 percent.

        11              EXPERT WITNESS MALACKOWSKI:  MGA added its sweat

        12    equity.  Because they added value, they could charge more.

        13    They went out to the market and sold the package for

        14    13.8 percent.

19:18   15              THE COURT:  Okay.

        16              EXPERT WITNESS MALACKOWSKI:  I then determined of

        17    that package what percentage of the package was due to

        18    Carter Bryant.

        19              So 3 divided by 13.8.

19:18   20              THE COURT:  Equals?

        21              EXPERT WITNESS MALACKOWSKI:  21.8.  And that became

        22    the quantitative factor that I used.

        23              THE COURT:  Under copyright?

        24              EXPERT WITNESS MALACKOWSKI:  Under -- in this case

19:18   25    it's the same for both of them.

UNITED STATES DISTRICT COURT

1        So I used 21.8 for the copyright and 21.8 for the

2    trade secret.

3            THE COURT:  Under license rates?

4            EXPERT WITNESS MALACKOWSKI:  Yes, sir.

19:18  5        THE COURT:  Investment rates.

6            In other words, if I've got 20.8 percent --

7            EXPERT WITNESS MALACKOWSKI:  21.8.

8            THE COURT:  -- 21.8 percent under trade secret,

9    eventually to get it to 12.6 percent average, I'm going to

19:18 10   have to eventually have some pretty low rates, in investment

11   rates, in profit rates, and product profit, aren't I?

12           EXPERT WITNESS MALACKOWSKI:  Exactly.

13           THE COURT:  Let's move down to investment rates.  I

14   want to know your trade secret.

19:19 15       EXPERT WITNESS MALACKOWSKI:  13.2 percent,

16   Your Honor.

17           THE COURT:  I want to know your profit rate on your

18   trade secret.

19           EXPERT WITNESS MALACKOWSKI:  6.8 percent,

19:19 20   Your Honor.  That's the one that drives it down.

21           THE COURT:  I want to know your product profit.

22           EXPERT WITNESS MALACKOWSKI:  13.5 percent.

23           THE COURT:  If I have 13-plus, 13-plus, 13-plus is

24   6 percent; how do I get 12.6 percent?

19:19 25       EXPERT WITNESS MALACKOWSKI:  Well, I can --

1          THE COURT:  If I just average 13, 13 and 13,

2     roughly, and 6, am I at 12?

3          EXPERT WITNESS MALACKOWSKI:  I'm -- ultimately you

4     will get to 12.6.

19:19  5          THE COURT:  I will?  I don't think so.

6          EXPERT WITNESS MALACKOWSKI:  Yes.

7          MS. KELLER:  Can we bring him the schedules,

8     Your Honor, that he used for his computations?

9          EXPERT WITNESS MALACKOWSKI:  I have them

19:19 10    calculated.

11          THE COURT:  I have a mathematical genius as a

12     counsel, so why don't you compute that out on the computer

13     for me.

14          EXPERT WITNESS MALACKOWSKI:  Okay.

19:20 15          THE COURT:  But you may be right.

16          Let's just take 13, 13, 13, 39 and rough figures,

17     6, let's take 45, roughly, divided by 4 is approximately, oh,

18     10.something percent.

19          Close enough.

19:20 20          EXPERT WITNESS MALACKOWSKI:  So, Your Honor, as

21     Mr. Webster corrected me, when I gave you the 21.8, I gave

22     you the copyright number.

23          The trade secret number is 13.2, so now I have the

24     whole schedule.

19:20 25          THE COURT:  Let me see it.

```
 1              Okay.  There we go.
 2              I don't think the jury's going to have a clue of
 3      how you got to 12.6 percent.
 4              In other words, we just have checkmarks by it, so
19:20 5  they don't have an average under "trade secret."
 6              They don't know how the license rates compute out
 7      under either "copyright" or "trade secret."  It's just a
 8      check.
 9              EXPERT WITNESS MALACKOWSKI:  Can I submit a new
19:20 10 chart with the numbers?
 11             THE COURT:  I got them at 2:00 in the morning from
 12     Mr. Wagner.
 13             EXPERT WITNESS MALACKOWSKI:  You'll have them
 14     before then.
19:21 15        THE COURT:  I'm not suggesting that you do, I'm
 16     just saying that I initially am listening to you and I have
 17     to accept to your 12.6 percent of what.  Only you're going
 18     through this so quickly that the jury has no idea other than
 19     it's an average of 12.6 percent, what the variations are
19:21 20 under license rates, investment rates, profit rates or
 21     product rate or profit product, and somebody might argue that
 22     just one of these should apply instead of an average; and if
 23     somebody took, for instance, 6 percent compared to
 24     13.8 percent, that could be double.
19:21 25        EXPERT WITNESS MALACKOWSKI:  You know, that's a
```

```
 1   fair point, Your Honor, because I was not anticipating --

 2            THE COURT:  I'm not criticizing.

 3            EXPERT WITNESS MALACKOWSKI:  I know.

 4            THE COURT:  I'm just trying to think what my jury's

 5   listening to, and I think they're going to be in shock and

 6   awe after both of you testify, if you testify.

 7            All right.  Take me up with the next slide.

 8            Again.  Go up again.  Keep going up.

 9            EXPERT WITNESS MALACKOWSKI:  Next.

10            THE COURT:  Now, what's this?

11            EXPERT WITNESS MALACKOWSKI:  So this is my analysis

12   of -- this is my analysis, Your Honor, of both head start

13   damages, that's the first line, of 7 million, and then the

14   lost profits damages for copyright and trade secret.

15            THE COURT:  Okay.

16            EXPERT WITNESS MALACKOWSKI:  I'm sorry, that's

17   MGA's unjust enrichment for copyright and trade secret.

18            THE COURT:  Now, let me talk to you, Mr. Wagner,

19   for a moment, and counsel.

20            I'm hearing that you're going to attempt not only

21   to set forth your numbers, but during your testimony you're

22   also going to try to educate the jury, from your perspective,

23   why Mr. Wagner's numbers are wrong?

24            Counsel, is that the way you want this to occur?

25            In other words, I originally envisioned -- and it's
```

19:21   5
19:21   10
19:22   15
19:22   20
19:22   25

Case 2:04-cv-09049-DOC-RNB    Document 10348    Filed 03/31/11    Page 80 of 135    Page ID #:314320
CV 04-9049 DOC - 03/30/2011 - Volume 3 of 3

80

1    up to the two of you -- that each would present their

2    positive case and then each might have a chance on rebuttal.

3           But I guess I could just let you go any way you

4    want to in terms of time.

19:23  5           You're the one who's reserving time, and if we

6    never get to Mr. Wagner, we never get to Mr. Wagner.

7           And if you never get to this gentleman, maybe

8    you're taking a chance not getting this evidence out now.

9           So let me just leave it.  I don't care.  If you

19:23 10   want to do both while he's up there, that's fine, because

11   you've got no guarantee that you've got enough time left,

12   frankly, for MGA later on and you've got to reserve time for

13   Mr. Wagner if you want him in rebuttal before time ends.  So

14   I'll just leave that to you.  Okay?

19:23 15          MS. KELLER:  My understanding is, Your Honor, we

16   have two hours and twenty minutes for everything and --

17          THE COURT:  No, no.

18          I limited them to two hours and twenty minutes; but

19   what would be unfair is if you're limited to two hours and

19:23 20   twenty minutes and now they have another hour on rebuttal

21   that was never intended.

22          I always envisioned positive cases.  In other

23   words.  Remember, I always wanted the experts not only to be

24   heard by me at one time, I was even hoping to try to convince

19:24 25   the two of you to put them on back to back at some point.

1          That didn't work.  I couldn't manipulate either one

2    of you into doing that.

3          So I'm not precluding them -- precluding you to

4    2 hours and 20 minutes, because if I do here's what occurs:

19:24 5    It's unfair.  I've got 2 hours and 20 minutes, they have

6    another hour left, say, for rebuttal --

7          MR. PRICE:  So, Your Honor --

8          MS. KELLER:  So we could use our allotted time

9    remaining for surrebuttal if --

19:24 10         THE COURT:  You could use it for surrebuttal with

11   your damages expert, but if you're going to do that I kind of

12   would like that to be fair in terms of time with both

13   damages' experts.

14         I'd like to strike an agreement with everybody that

19:24 15   there's 2 hours and 20 minutes with your case, do with it

16   what you want, and then coequal time to them, if you have it

17   left, because you've got to be careful.

18         I'm just not going to go over that 120 hours.

19         I don't know how to make that fair, frankly.

19:25 20         MR. PRICE:  Actually, we talked to Mr. McConville

21   earlier and I thought we had an agreement.

22         THE COURT:  Well, tell me what that is.

23         MR. PRICE:  Which was everything goes in and

24   Mr. Malackowski is on the stand tomorrow or the next day,

19:25 25   that is the affirmative case and criticizing Mr. Wagner, that

1   2 hours and 20 minutes is what he gets for the affirmative

2   case --

3          THE COURT:  Oh, I see.  I see.

4          MR. PRICE:  -- and I asked Mr. McConville "how much

19:25 5   do you want for the rebuttal to Mr. Wagner?" and -- and we

6   hadn't -- I haven't heard back from him on that.

7          THE COURT:  Is this rebuttal while he's on the

8   stand tomorrow or is it surrebuttal after Mr. Wagner

9   testifies?

19:25 10          MR. PRICE:  While he's on the stand tomorrow,

11   because I think normally the expert following the second --

12          THE COURT:  I'm going to take a break in a moment.

13          Let's get Mr. Malackowski on his way and I'll do

14   some work while you discuss that later on.

19:25 15          That's something we can discuss later tonight

16   without holding you up.

17          Okay.

18          EXPERT WITNESS MALACKOWSKI:  Next slide.

19          This simply extends the last slide to talk about

19:26 20   the disgorgement associated with the Bratz -- the Bratz name

21   and Bratz sculpt, as we talked about at the last hearing,

22   that's based upon the cost approach, what it would cost to

23   come up with a new name or to hire a designer for a new

24   sculpt.

19:26 25          THE COURT:  Okay.

1          EXPERT WITNESS MALACKOWSKI:  Next slide.

2          This is the lost profits calculation, so it's the

3     adjustments I make to Mr. Wagner's analysis looking at

4     cannibalization rates rather than regression, demand factors

19:26  5     rather than market share, and the conclusion.

6          THE COURT:  Okay.

7          EXPERT WITNESS MALACKOWSKI:  Next.

8          I don't anticipate that I will use this slide.  I

9     anticipate this might be cross-examination, but I utilize

19:26 10     this to support my 12 and 20 percent factors that we talked

11     about to show that it is right in line with Barbie's sales to

12     girls aged 8 to 9 as compared to the total Barbie sales.

13          THE COURT:  Okay.

14          EXPERT WITNESS MALACKOWSKI:  This is just an

19:26 15     analysis of Mattel's actual sales of Barbie to show that they

16     began to decline before Bratz entered the marketplace.

17          THE COURT:  Okay.

18          EXPERT WITNESS MALACKOWSKI:  Next.

19          This is a summary of the numbers that we have seen

19:27 20     before, adding them all on one chart.

21          THE COURT:  Just a moment.

22          Okay.

23          EXPERT WITNESS MALACKOWSKI:  Next slide.

24          This goes to what portion of Mr. Larian's

19:27 25     distributions are attributable to the copyright and trade

```
 1    secrets at issue.

 2              THE COURT:  Okay.  And you take the same 12 and

 3    20 percent factor?

 4              EXPERT WITNESS MALACKOWSKI:  Yes; because I'm

 5    trying to determine of the money that is received how much of

 6    that is due to the intellectual property.

 7              THE COURT:  Where did you get the 111.8 million?

 8              EXPERT WITNESS MALACKOWSKI:  That takes his

 9    distribution times his share ownership of approximately

10    80 percent.

11              THE COURT:  Where did you get that distribution

12    amount?

13              EXPERT WITNESS MALACKOWSKI:  From the accounting

14    records, Your Honor.  His distribution records.

15              THE COURT:  From what year?

16              EXPERT WITNESS MALACKOWSKI:  That's cumulative over

17    the period.

18              THE COURT:  Of what time?

19              EXPERT WITNESS MALACKOWSKI:  I would have to go

20    back to the schedule.  I believe it's 2002 through 2009.

21              THE COURT:  Okay.  Here comes help.

22              These are his total distributions?

23              EXPERT WITNESS MALACKOWSKI:  2001 to 2009, but 2001

24    was zero, so, yes, I was correct.

25              THE COURT:  And his total distributions in the
```

19:27  5
19:27  10
19:27  15
19:28  20
19:28  25

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 03/30/2011 - Volume 3 of 3

```
 1     trade secrets area?

 2             EXPERT WITNESS MALACKOWSKI:  This is his total

 3     distributions.

 4             THE COURT:  Okay.  Counsel.

19:28 5             EXPERT WITNESS MALACKOWSKI:  This just relates to

 6     the Mexican documents and my focus on the labor hours as

 7     opposed to the overhead cost.

 8             THE COURT:  Okay.

 9             EXPERT WITNESS MALACKOWSKI:  Next slide.

19:28 10            This shows the actual profits of MyScene, which I

11     believe is the measure of mitigation.

12             THE COURT:  Okay.

13             EXPERT WITNESS MALACKOWSKI:  Next slide.

14             I don't think this one will be used, but this is

19:28 15    likely a response in cross-examination about whether or not

16     in my opinion Mr. Wagner accounted for mitigation.

17             I don't believe that he did.

18             THE COURT:  Okay.

19             EXPERT WITNESS MALACKOWSKI:  Next slide.

19:28 20            This summarizes everything all together on one

21     chart, a conclusion.

22             The next slide.

23             This is the alternative that we may not see, one or

24     the other.

19:29 25            This simply -- simply shows the head start that I
```

Case 2:04-cv-09049-DOC-RNB  Document 10348  Filed 03/31/11  Page 86 of 135  Page ID #:314326
CV 04-9049 DOC - 03/30/2011 Volume 3 of 3

86

1   calculated for Bratz, the $7 million in a graphic form.

2           THE COURT:  Okay.

3           EXPERT WITNESS MALACKOWSKI:  These are background

4   slides.  I don't know if this will be used, but describing

19:29 5   for MGA which products they developed internally versus which

6   ones they acquired or licensed.

7           THE COURT:  Okay.

8           EXPERT WITNESS MALACKOWSKI:  And the next slide is

9   the same for Mattel.

19:29 10          THE COURT:  Okay.

11          EXPERT WITNESS MALACKOWSKI:  I think that's it --

12  oh, then we had one other AcceleRacers head start.

13          THE COURT:  And why AcceleRacers?

14          EXPERT WITNESS MALACKOWSKI:  AcceleRacers is not a

19:29 15  doll product, so I used it separately, but it is one of the

16  asserted misappropriated trade secrets.

17          THE COURT:  All right.  Any other slides?

18          EXPERT WITNESS MALACKOWSKI:  I think that's it.  I

19  believe the last one may be repeated, but that's the last one

19:30 20  I think we saw.

21          THE COURT:  Let me turn this over to counsel for

22  just a moment.

23          Any questions by either counsel?

24          MR. PRICE:  Yes.

19:30 25          THE COURT:  Please.

1           Now, just a moment.  I'll be here at 7:00 tomorrow.

2           If you have any additional slides, like

3      Mr. Wagner --

4           EXPERT WITNESS MALACKOWSKI:  I'll show up.

19:30  5    THE COURT:  No.  I want counsel in here from both

6      sides.

7           You pay the courtesy if you're working at 2:00 in

8      the morning to keep your little clickers on tonight.

9           All right.

19:30 10    MS. KELLER:  May we clarify one thing, Your Honor?

11          With respect to the Larian distributions, are those

12     distributions the ones that are attributable to the first

13     four characters, not all Larian distributions that came from

14     MGA; correct?

19:30 15    EXPERT WITNESS MALACKOWSKI:  Correct.

16          MS. KELLER:  Okay.

17          THE COURT:  Okay.  Now, just a moment.

18          So it doesn't include Dana or Ohh La La?

19          EXPERT WITNESS MALACKOWSKI:  That would be in the

19:31 20   first column, Your Honor.

21          THE COURT:  I know that.

22          I'm talking about trade secret.

23          That does not include Dana or Ohh La La?

24          EXPERT WITNESS MALACKOWSKI:  It includes Ohh La La

19:31 25   for sure because that's a Cloe character.

UNITED STATES DISTRICT COURT

 1          I need to go back and check whether it includes

 2   Dana.

 3          It does not.

 4          THE COURT:  All right.  Who wants to ask questions?

19:31 5          MR. PRICE:  I will, Your Honor.

 6          First, I want to make sure on Slide 2 -- do we have

 7   that, Ken -- where you have the 114 trade secrets.

 8          In dark blue you have identified Bratz trade

 9   secrets where there was some -- something similar you said

19:31 10  that came out from Mattel?

 11          EXPERT WITNESS MALACKOWSKI:  Yes, sir.

 12          MR. PRICE:  Okay.  Now, you're testifying as to

 13   damages, not liability; correct?

 14          EXPERT WITNESS MALACKOWSKI:  Yes, sir.

19:31 15          MR. PRICE:  And I knew you can rely on hearsay, but

 16   here is my question:

 17          Have you checked the trial record to date to see

 18   whether or not there has been testimony that there were

 19   Mattel MyScene products that are similar to all of these MGA

19:32 20  trade secrets that you have in dark blue?

 21          EXPERT WITNESS MALACKOWSKI:  I have been reviewing

 22   the trial record for that purpose; yes, sir.

 23          MR. PRICE:  And -- and -- and so based upon the

 24   evidence this jury is going to see -- unless we have a

19:32 25  surprise witness -- according to the trial record, what in

UNITED STATES DISTRICT COURT

 1    the trial record -- what evidence is there that -- these dark

 2    blue MGA products that there were similar Mattel products?

 3              MS. KELLER:  Your Honor, I'm going to object that

 4    this goes beyond the scope of the *Daubert* which was supposed

 5    to be to test the validity of the way he formulates his

 6    opinions.

 7              This is starting to sound like trial

 8    cross-examination and counsel's already had a full shot at

 9    Mr. Malackowski before and he will again, but this is

10    supposed to be directed as to whether there is a sound,

11    economic basis for his opinion.

12              THE COURT:  Overruled.

13              And by the way, I think I spent three different

14    sessions -- and Mr. Wagner, weren't you here for three

15    different sessions?

16              MR. WAGNER:  I was, Your Honor.

17              THE COURT:  You were here for three sessions.

18    Mr. Malackowski was here for only two.

19              MS. KELLER:  We didn't get cross-examination,

20    Your Honor.

21              The court asked the questions, I think, the last

22    two times.

23              THE COURT:  No.  I gave you examination on the last

24    occasion.

25              MR. PRICE:  I remember asking questions.

Case 2:04-cv-09049-DOC-RNB   Document 10348   Filed 03/31/11   Page 90 of 135   Page ID #:314330
CV 04-9049 DOC - 03/30/2011 - Volume 3 of 3

90

```
 1                THE COURT:  Absolutely.

 2                MR. PRICE:  Yeah.

 3                THE COURT:  And by the way, I -- I threw that open

 4      for Mr. Wagner, I believe.

19:33  5                You were asked a number of questions, weren't you,

 6      Mr. Wagner?

 7                MR. WAGNER:  I was, Your Honor.

 8                THE COURT:  On at least two or three different

 9      occasions.

19:33 10                All right.  Counsel, your questions.

11                He's going to ask questions.

12                EXPERT WITNESS MALACKOWSKI:  So --

13                THE COURT:  Question.

14                MR. PRICE:  So my question was, well, first of all,

19:33 15      obviously as a damages expert, you're not qualified to say

16      that you did a comparison and can say that, you know, this

17      product at Mattel is similar to this product at MGA.

18                You're not telling us that you're giving that

19      opinion; correct?

19:34 20                EXPERT WITNESS MALACKOWSKI:  Well, I haven't -- I

21      have, over my experience, done product comparisons for the

22      assessment of damages many, many times so I consider that

23      within my area of expertise.  But I base that upon the record

24      of the case and my interviews with the fact -- factual

19:34 25      witnesses who are -- who are involved.
```

1          THE COURT:  So, in other words, you made this

2     objective determinations about the light blue and the dark

3     blue?

4          EXPERT WITNESS MALACKOWSKI:  Based upon my

19:34 5     interviews with the MGA vice presidents; yes.

6          MR. PRICE:  Okay.  And, again, I know you can rely

7     on hearsay, but I'm just wondering, do you know -- you can

8     rely on hearsay, but the jury can't.  So do you know if

9     there's evidence in the record that each of these dark blue

19:34 10     MGA products have similar Mattel products?

11          Do you know if there's any fact-witness testimony

12     before the jury on that?

13          EXPERT WITNESS MALACKOWSKI:  I know there is,

14     certainly, for some of them.  I don't know that I see all of

19:34 15     them.

16          MR. PRICE:  Which ones do you believe there is

17     actually fact testimony for, so this is something that can

18     actually go to the jury?

19          EXPERT WITNESS MALACKOWSKI:  Well, I don't have an

19:35 20     opinion as to what can or can't go to the jury.

21          Putting that aside, I believe Mr. Larian testified

22     to a number of them and I would defer back to his testimony.

23          MR. PRICE:  So you haven't relied on trial

24     testimony, that is, anything -- what the jury's heard about

19:35 25     what products are similar; correct?

```
 1              EXPERT WITNESS MALACKOWSKI:  Well, again, I believe

 2     the trial testimony confirms my analysis, in whole or in

 3     part; but this analysis was prepared before the trial

 4     testimony.

 5              MR. PRICE:  Okay.

 6              I want to ask you about your top-down approach --

 7              THE COURT:  Just a moment.

 8              Because you talked with the MGA vice president?

 9              EXPERT WITNESS MALACKOWSKI:  Yes, sir.

10              THE COURT:  Who was that?

11              EXPERT WITNESS MALACKOWSKI:  I talked to two vice

12     presidents.

13              THE COURT:  About these products?

14              EXPERT WITNESS MALACKOWSKI:  About these products.

15              THE COURT:  So you got their opinion about the

16     similarity or dissimilarity?

17              EXPERT WITNESS MALACKOWSKI:  Yes, sir.

18              THE COURT:  And transferred their opinion to this?

19              EXPERT WITNESS MALACKOWSKI:  Yes, sir.

20              THE COURT:  Okay.  Thank you.

21              Counsel.

22              MR. PRICE:  And -- and -- and for the top-down

23     approach, which we have in -- in Chart 4, first of all, I

24     want to make -- I want to make sure I understand the concept.

25              Do you see the light-blue area?
```

```
 1              EXPERT WITNESS MALACKOWSKI:  I do.

 2              MR. PRICE:  So that's your opinion as to what

 3       Mattel would have earned on MyScene, if the MyScene -- if it

 4       just sold products that did not have the trade secret?

19:36 5              So, for example, if Mattel sold a MyScene funeral

 6       director, you know, product, which MGA didn't have anything

 7       similar to, then those kind of profits would go into the

 8       light-blue area?

 9              EXPERT WITNESS MALACKOWSKI:  I'm not sure I

19:36 10      understand your question, but I think the answer's no.

11              The light-blue area represents what the profits for

12       MyScene would have been had they not misappropriated the

13       trade secrets that they're accused of misappropriating.

14              MR. PRICE:  So the MyScene light-blue area is the

19:36 15      sort of "but for" world where Mattel has not used any MGA

16       trade secrets?

17              EXPERT WITNESS MALACKOWSKI:  Absolutely.

18              MR. PRICE:  So in the light-blue area these are

19       products that don't have any trade secrets?

19:37 20             EXPERT WITNESS MALACKOWSKI:  By definition those

21       are intended to be products that do not benefit from MGA

22       trade secrets.

23              MR. PRICE:  But you're saying that Mattel made

24       products that did have MGA trade secrets such as the MyScene,

19:37 25      Bling Bling and those others; correct?
```

UNITED STATES DISTRICT COURT

```
 1              EXPERT WITNESS MALACKOWSKI:  Yes, sir.

 2              MR. PRICE:  And you understand that to do an unjust

 3      enrichment calculation, that you have to take them into

 4      account, sweat equity, on -- on products that use the trade

19:37 5      secret?  In fact, you subtracted that in your affirmative

 6      damages analysis; correct?

 7              EXPERT WITNESS MALACKOWSKI:  Generally speaking,

 8      yes.  The benchmark approach does that allocation or

 9      apportionment, again, exactly like Mr. Wagner did with his

19:37 10      profit benchmarks.

11              MR. PRICE:  No, no.  Mr. Wagner's profit benchmarks

12      didn't allocate between sweat equity and the trade secret,

13      did they?

14              EXPERT WITNESS MALACKOWSKI:  Well, I think -- you

19:37 15      can ask him, but I think the intended purpose is, yes, the

16      same.

17              MR. PRICE:  Your belief is that his benchmark

18      allocated between sweat equity and trade secret?

19              MS. KELLER:  Your Honor, I'm going to object again,

19:38 20      and I checked the record this time.  I only asked questions

21      the first time.

22              THE COURT:  You did?

23              MS. KELLER:  Only the very first time of

24      Mr. Wagner, and this cross-examination is not, again, going

19:38 25      toward the economic basis of this expert's basis.
```

CV 04-9049 DOC - 03/30/2011 — Volume 3 of 3

1          Now he's being cross-examined on his attack of

2   Wagner's calculations and, Your Honor, that's just not the

3   purpose of a *Daubert* hearing.

4          The court -- the court initially told us we could

19:38 5   each have an hour for cross-examination, and that was it, and

6   we were cut off at that point, and then the court called

7   Mr. Wagner back and asked him many questions.

8          THE COURT:  Uh-huh.

9          MS. KELLER:  But this is giving Mr. Price an extra

19:38 10  shot at cross-examining like it's a depo.

11          THE COURT:  Well, I think that's true.

12          I think the end result is we should focus on his

13   initial opinion, like Mr. Wagner's initial opinion, and let

14   it go at that, and then let both experts come back and have

19:39 15  at it with coequal quality.

16          MS. KELLER:  The scientific basis or -- and in this

17   case, economic basis for his having a legitimate opinion, not

18   just a free cross-examination as to all areas.

19          MR. PRICE:  And, Your Honor, this is focused on

19:39 20  he's required under law -- and of course the Ninth Circuit --

21   to allocate sweat equity.  And this calculation doesn't do

22   that, because in the light-blue area that's if you're selling

23   Mattel MyScene without any trade secrets, and the dark blue

24   is, okay, this is the profit because they sold Mattel

19:39 25  products with trade secrets.

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10348   Filed 03/31/11   Page 96 of 135   Page ID
#:314336
CV 04-9049 DOC - 03/30/2011   Volume 3 of 3

96

1          But those products had packaging, they had, you

2     know, advertising, they had, you know, sweat equity in them.

3          So the point of this examination is, is there is no

4     calculation for sweat equity here.

19:39 5          EXPERT WITNESS MALACKOWSKI:  I don't know if I can

6     say I disagree, but I disagree.

7          THE COURT:  Well, tell us why you disagree.

8          EXPERT WITNESS MALACKOWSKI:  Well, take, for

9     example, Bling Bling.  Within the light-blue area, sales of

19:40 10    Bling Bling without the real gem, that represents the trade

11     secret, or for a period of time, it's perfectly fine that

12     those are included in there.

13          I am simply trying to remove the excess profit that

14     was made as a result of the continued alleged

19:40 15    misappropriation of trade secrets over the period of time.

16          MR. PRICE:  So that's my point.

17          So MyScene Bling Bling with a -- a real diamond

18     chip would be in the blue area; correct?

19          EXPERT WITNESS MALACKOWSKI:  Well, the --

19:40 20          MR. PRICE:  Isn't that what you just said?

21          EXPERT WITNESS MALACKOWSKI:  The enhancement

22     associated with the trade secret would be part of the blue

23     area.  It's not product-specific.  It's not some products in

24     blue and some products in dark blue.  It's looking at what

19:40 25    profits and sales would have been without the collective

UNITED STATES DISTRICT COURT

1    benefit of going into the toy fairs and the other

2    misappropriated -- alleged misappropriated acts for some

3    period of time.

4              MR. PRICE:  But you were saying that Mattel had

19:40 5    additional products because it got these trade secrets?  It

6    came out with products it would not have otherwise had;

7    correct?

8              EXPERT WITNESS MALACKOWSKI:  That may be true, yes.

9              MR. PRICE:  Okay.  So those products that Mattel

19:41 10    would not have otherwise had, such as, you're saying MyScene,

11    Bling Bling with a diamond, those products still have sweat

12    equity behind them; correct?

13              EXPERT WITNESS MALACKOWSKI:  To answer your

14    question, yes.

19:41 15              MR. PRICE:  Again, there's advertising, there's

16    packaging, there's creativity; correct?

17              EXPERT WITNESS MALACKOWSKI:  I agree.

18              MR. PRICE:  And you have not -- this methodology

19    does not permit you to allocate sweat equity in this top-down

19:41 20    approach.

21              EXPERT WITNESS MALACKOWSKI:  I disagree.  It

22    allocates it at a macro level, not a product-by-product

23    level.

24              THE COURT:  Okay.  Now, in the bottom-up approach,

19:41 25    do you calculate sweat equity?

UNITED STATES DISTRICT COURT

```
 1              EXPERT WITNESS MALACKOWSKI:  I do, Your Honor, but

 2   I limit it to the head start.  Everything but the head start

 3   is allocated to Mattel as their sweat equity.

 4              THE COURT:  Okay.  And you have a top-down 2

19:41  5   approach.  Do you calculate sweat equity at that?

 6              EXPERT WITNESS MALACKOWSKI:  At a macro level; not

 7   at a micro level.

 8              THE COURT:  What does that mean?

 9              EXPERT WITNESS MALACKOWSKI:  That means I do it

19:42 10   holistically using a benchmark, not product-by-product.

11              THE COURT:  A couple more questions, Counsel.

12              MR. PRICE:  Let me ask you about methodology on the

13   bottom-up approach.

14              EXPERT WITNESS MALACKOWSKI:  Yes, sir.

19:42 15              THE COURT:  Let's get to the right slide, then.

16              MR. PRICE:  And the bottom-up approach, then, I

17   think is -- you start explaining it on Page 7; is that right?

18              EXPERT WITNESS MALACKOWSKI:  Yes, sir.

19              MR. PRICE:  Can you explain the methodology.

19:42 20              EXPERT WITNESS MALACKOWSKI:  Yes, sir.

21              MR. PRICE:  So you had 32 products; correct?

22              It says "matched with MyScene products"?

23              EXPERT WITNESS MALACKOWSKI:  Yes.

24              MR. PRICE:  You had MyScene revenues for 18

19:42 25   products, you're telling us?
```

| | |
|---|---|
| 1 | EXPERT WITNESS MALACKOWSKI:  Yes, sir. |
| 2 | MR. PRICE:  Actually, you had revenues for |
| 3 | everything, you just didn't have it by month; is that right? |
| 4 | EXPERT WITNESS MALACKOWSKI:  No.  For some products |
| 19:42 5 | I didn't have evidence at all. |
| 6 | MR. PRICE:  You couldn't find any revenues from a |
| 7 | particular product from the Mattel -- from the Mattel |
| 8 | financials? |
| 9 | EXPERT WITNESS MALACKOWSKI:  For some products, |
| 19:43 10 | that's true. |
| 11 | MR. PRICE:  For how many products did you have |
| 12 | financial revenues out of the 32? |
| 13 | EXPERT WITNESS MALACKOWSKI:  Well, I could only |
| 14 | find it for 18.  I have a lot of Mattel documents that are |
| 19:43 15 | aggregated, so I know total MyScene for a year, but it's not |
| 16 | broken out by product. |
| 17 | MR. PRICE:  Okay.  And then on the next page, you |
| 18 | have 18 products now that you say you have revenues for; |
| 19 | correct? |
| 19:43 20 | EXPERT WITNESS MALACKOWSKI:  Yes, sir. |
| 21 | MR. PRICE:  And that percentage that you have, |
| 22 | damages percent of revenues, that's what dictates -- that's |
| 23 | used to calculate the head-start damages; right? |
| 24 | EXPERT WITNESS MALACKOWSKI:  Yes, sir. |
| 19:43 25 | MR. PRICE:  And the way you did that was you took a |

 1   sample of two products.

 2          EXPERT WITNESS MALACKOWSKI:  Bling and Chillin',

 3   yes, sir.

 4          MR. PRICE:  That's two out of the 18; right?

19:44  5          EXPERT WITNESS MALACKOWSKI:  Yes, sir.

 6          MR. PRICE:  And just as a methodology.  I mean,

 7   I -- I -- you're well-versed in statistics; right?

 8          EXPERT WITNESS MALACKOWSKI:  Generally.

 9          MR. PRICE:  As a methodology you know that that is

19:44 10   not a scientifically appropriate sample, 2 out of the 18?

11          EXPERT WITNESS MALACKOWSKI:  I don't think

12   scientific statistical sampling is relevant to this analysis.

13          It's all of the evidence that is available.  It's

14   the best estimate given, what was available.

19:44 15          MR. PRICE:  Okay.  But my -- my question was

16   different, that -- that -- that statistically this is not a

17   valid sampling to come up with at 24 percent?

18          You agree with that?

19          EXPERT WITNESS MALACKOWSKI:  No, because this is

19:44 20   not a statistical sample, so I don't think your question's

21   relevant.

22          MR. PRICE:  Well, assume it's -- assume you're

23   using statistics here.

24          Okay.  You can tell it's not a statistical sample,

19:44 25   but taking 2 out of the 18 and then using that across all

UNITED STATES DISTRICT COURT

1    those products is not a valid statistical methodology.

2    Whether you say you're using that or not, that would not be a

3    valid statistical methodology, correct?

4            EXPERT WITNESS MALACKOWSKI:  I would not use it as

19:45 5    such; correct.

6            MR. PRICE:  And you're saying that you didn't have

7    enough information to use any other analysis; right?

8            EXPERT WITNESS MALACKOWSKI:  I did not have -- yes,

9    generally, for the bottom-up approach; correct.

19:45 10            MR. PRICE:  But as a -- as a professional using a

11    methodology, if you don't have enough information to do an

12    appropriate methodology, you say I can't give you a number;

13    right?

14            EXPERT WITNESS MALACKOWSKI:  But I didn't try to

19:45 15    use the statistical methodology your question implies.

16            I used an estimate based upon the best available

17    information, and I'm comfortable -- I would have liked to

18    have more, but I'm comfortable in this analysis.

19            MR. PRICE:  Okay.  So if you had had information

19:45 20    just on one product, for example, out of the 18, would you

21    have been comfortable using that information and -- and --

22    and multiplying it times 32 products?

23            EXPERT WITNESS MALACKOWSKI:  I hadn't thought about

24    that question.

19:45 25            I don't have an aversion, per se, to using one if

 1    it's representative.  It would be the best available.  It

 2    would be the only way to allocate on a product-by-product

 3    basis.

 4              MR. PRICE:  If you only had one, that would be the

19:46  5    only way; but the question is, as a professional economist

 6    expert, do you really think you can give a reliable opinion

 7    on the damages over 32 products by looking at one example in

 8    calculating the damages as a percent of revenue for that one

 9    example?

19:46 10              Is that really, professionally, what you would feel

 11    comfortable doing?

 12              EXPERT WITNESS MALACKOWSKI:  Well, I don't know,

 13    because I haven't done it.

 14              For the two examples I feel comfortable because the

19:46 15    total reconciles very nicely with the top-down approach, so

 16    they confirm each other, and the end result is reasonable.

 17              So knowing that I use the best-available data and I

 18    tested that calculation for reasonableness by looking at the

 19    top-down conclusions gives me comfort.

19:47 20              MR. PRICE:  So -- so -- just to be clear, then,

 21    even if you had one product -- not two, but one -- then you

 22    would still be comfortable as a professional using this

 23    calculation because you also did the top-down approach?

 24              EXPERT WITNESS MALACKOWSKI:  I don't know.  I

19:47 25    haven't done that.  I don't know.

1          MR. PRICE:  Well, I'm asking you right now.

2          You know your methodology.

3          Would using one be appropriate?

4          EXPERT WITNESS MALACKOWSKI:  If by using one I came

19:47  5   up with a number that was consistent with the top-down

6     approach, that would make me comfortable.

7          If it was inconsistent, that would require me to

8     investigate further.  I haven't done that analysis.

9          MR. PRICE:  Are you aware of any publication or

19:47 10   anything which -- which says that to calculate damages you

11    can take a sample which does not meet the standards of being

12    statistically significant, 2 out of 18, and then use the

13    percent damages for standard revenues for those and multiply

14    it over, actually, 32 products?

19:47 15        EXPERT WITNESS MALACKOWSKI:  Yes.  Actually, this

16    happens in accounting all the time.  You may, for example,

17    have a bill of goods for one product, showing what the cost

18    is for one product, and then you multiply that by the

19    millions that were made, and then in the end you look at the

19:48 20   total and you look for variances or reasonableness, but

21    starting with one data point and extrapolating to a

22    homogenous set or a similar set.  It happens all the time.

23    There is no concern with that as long as you test your work.

24         MR. PRICE:  There you're talking about fungible

19:48 25   products; right?

UNITED STATES DISTRICT COURT

```
 1              EXPERT WITNESS MALACKOWSKI:  Maybe yes, maybe no.
 2      It depends upon the product in the industry.
 3              MR. PRICE:  Your finding was that on the MyScene
 4      Chillin' Out the damages were 41.9 percent of revenue;
 5      correct?
 6              EXPERT WITNESS MALACKOWSKI:  Yes, I believe that's
 7      correct.
 8              MR. PRICE:  And that on the Diamond Bratz or the --
 9      the MyScene Bling, that the damages percent -- as percent of
10      revenue were 21.9 percent; correct?
11              EXPERT WITNESS MALACKOWSKI:  I believe that's
12      correct.
13              MR. PRICE:  And that's a difference, just in
14      selecting those two, of 20 percent; right?
15              EXPERT WITNESS MALACKOWSKI:  Arithmetically I don't
16      disagree with that.
17              MR. PRICE:  And then what you did in your damages
18      calculation was arithmetically take a weighted average and
19      come up with 24.1 percent; correct?
20              THE WITNESS:  I'm just talking about the
21      conclusion.
22              MR. PRICE:  I'm just talking about the mathematics
23      that are on Page 8; correct, sir?
24              EXPERT WITNESS MALACKOWSKI:  Yes.
25              MR. PRICE:  And then using those two samples, which
```

```
 1    you'll agree have very different results for -- for revenue

 2    damages as a percentage of revenue; correct?

 3              EXPERT WITNESS MALACKOWSKI:  By the amount that you

 4    just quantified, approximately 20 percent.

19:49 5        MR. PRICE:  I mean one's double the other almost;

 6    right?

 7              EXPERT WITNESS MALACKOWSKI:  Yes, sir.

 8              MR. PRICE:  And so you used that average and then

 9    multiplied it across 32 products; right?

19:49 10       EXPERT WITNESS MALACKOWSKI:  Yes, sir.

11             MR. PRICE:  All right.

12             And -- and then when you went to Chart 12, where

13    you then do head-start damages by product, I mean, breaking

14    them out among the 32, I mean, that break-out is simply

19:50 15  the -- the point -- the 24.1 percent times the revenues you

16    could -- you could calculate?

17             EXPERT WITNESS MALACKOWSKI:  For the ones that had

18    revenues, yes, sir.

19             MR. PRICE:  And I want to ask you about Chart 13,

19:50 20  which you said it the bottom-up head-start analysis using MGA

21    data.  You see there are, for example, on -- on Bratz Boyz --

22             THE COURT:  Just a moment.

23             I want to anticipate something.

24             Am I going to hear tomorrow either on direct or

19:50 25  cross-examination if you were asked questions about the
```

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 03/30/2011 - Volume 3 of 3

106

```
 1    availability of data from Mattel whether you were able to get

 2    that data from Mattel?

 3              EXPERT WITNESS MALACKOWSKI:  No, sir.

 4              You and I spoke about that last time.

19:51 5         THE COURT:  And repeat to me again what your belief

 6    is so I'm not surprised tomorrow.

 7              EXPERT WITNESS MALACKOWSKI:  That data simply was

 8    not available to me.

 9              THE COURT:  And why?  Why were you told that wasn't

19:51 10   available?

 11             EXPERT WITNESS MALACKOWSKI:  I don't have an

 12   opinion as to why it wasn't available.  It was not --

 13             THE COURT:  Because I can anticipate that question

 14   being asked by one or more counsel tomorrow.

19:51 15        EXPERT WITNESS MALACKOWSKI:  And I have no opinion

 16   as to why it's not available.  I only --

 17             MS. KELLER:  Your Honor, for the record we moved to

 18   compel the additional data.

 19             THE COURT:  I know.  I know.

19:51 20        MS. KELLER:  And so for this witness to be

 21   penalized because Mattel refused to supply it to us is not

 22   fair to MGA nor to the witness.

 23             THE COURT:  I'm hearing that.  That's what I'm

 24   anticipating now.

19:51 25        MR. PRICE:  But, Your Honor, it is fair.  They
```

Case 2:04-cv-09049-DOC-RNB   Document 10348   Filed 03/31/11   Page 107 of 135   Page ID #:314347
CV 04-9049 DOC - 03/30/2011 - Volume 3 of 3

107

1    moved to compel and you denied it because they didn't ask for

2    and try to get the information within the time period they

3    were supposed to.

4            That's why you denied the motion to compel.

19:51  5         So to blame Mattel would be totally wrong.  We

6    complied with the rules and this expert apparently didn't ask

7    for it in time or whatever.

8            THE COURT:  I'm just going to have to be able to

9    say tomorrow that you weren't able to get it.

19:52 10         MS. KELLER:  Well, we asked for it as part of

11   routine supplementation under Rule 26, Your Honor, and we

12   tried to get it.

13           MR. MCCONVILLE:  And a continuing obligation rule.

14           MS. KELLER:  And they have a continuing obligation

19:52 15   under that rule and they have continuously resisted it.

16           And now having successfully resisted it when it's

17   well within their power to get it to us, they want to impeach

18   the witness with it.

19           So I don't think that Mattel should be allowed to

19:52 20   ask that if we're not allowed to explain it.

21           It's what's -- neither side should -- should be

22   penalized if -- if Mattel refuses to give us the information

23   that says "gotcha."

24           THE COURT:  I'm not anticipating that they're going

19:52 25   to ask that question.  I'm anticipating that you'll

 1    ask the question.

 2            MS. KELLER:  Well, they are asking it in a way,

 3    because this is what Mr. Price is asking right now:  Aha, you

 4    only had complete information for two products and so you're

19:52 5    extrapolating from that and you don't have the additional

 6    information, do you?

 7            And he knows the reason is they wouldn't give it to

 8    us.

 9            That is so unfair --

19:53 10           EXPERT WITNESS MALACKOWSKI:  Your Honor --

 11           MS. KELLER:  -- in any courtroom, at any level.

 12           MR. PRICE:  Your Honor, one, that doesn't make this

 13   an appropriate methodology and my questions are as to the

 14   methodology of using a sample size of 2 out of 32, which I

19:53 15   hope goes to *Daubert*.  There's no support for the

 16   methodology.

 17           Two, we're not required to volunteer documents.

 18   The court has ruled that they didn't ask for this in the

 19   appropriate time frame, that we had no obligation to give it

19:53 20   to them and it's their obligation to build their case, so

 21   blame can't be pointed at Mattel.

 22           The argument they just made right now is the

 23   argument they made in -- in their motion, the ex parte, you

 24   know, that there was routine supplementation required and the

19:53 25   court said no.

1          So it's not our fault.  We played by the rules.

2     And the question is simply:  Is the methodology he has given

3     what he has? because it's not our fault that he has what he

4     has.

19:54  5          Is the methodology reliable?  And as I said, I hope

6     this goes to whether he can even testify about it, not in

7     front of the jury but obviously it would be in front of the

8     jury.

9          MS. KELLER:  When we talk about playing by the

19:54 10    rules we have been asking for this information repeatedly

11    dating back to November 22nd, 2006, and that we have

12    consistently had our request for the information resisted.

13         And I'm looking right now at our opposition to the

14    Daubert motion No. 2 that we filed January 18th, 2011, laying

19:54 15    out this whole chronology -- filed tonight -- laying out this

16    whole chronology going back to November 22nd, 2006.

17         THE COURT:  Is that what's limiting you to 2 of the

18    18 categories?

19         EXPERT WITNESS MALACKOWSKI:  Yes, sir.

19:55 20        THE COURT:  How would you calculate this

21    differently, if at all, if you had the figures,

22    hypothetically, for the 18 categories?

23         That would take away the reliance on just two of

24    the products.

19:55 25        EXPERT WITNESS MALACKOWSKI:  Your Honor, for the --

CV 04-9049 DOC - 03/30/2011 - Volume 3 of 3

```
 1              THE COURT:  You'd get a valid average, then,
 2      couldn't you?
 3              EXPERT WITNESS MALACKOWSKI:  Yes, sir.  A more
 4      valid average.
19:55 5              THE COURT:  A more valid average.
 6              All right.
 7              Sir, would you step down for just a moment.
 8              I'm going to take a recess for just a few moments.
 9              EXPERT WITNESS MALACKOWSKI:  Yes, sir.
19:56 10              THE COURT:  Let me bring up one other -- well, I'll
11      come back with you in just a moment.
12              Sir, why don't you step down.
13              Thank you.
14              All right.
19:56 15              All right.  Counsel, why don't you take a 20-minute
16      break or so.  And rest your hands for just a minute.
17              (Recess taken.)
18              THE COURT:  All right.  Counsel, we're back on the
19      record.
19:58 20              All right.  Counsel, let me speak to all of you.
21              We're on the record.
22              This is entirely the court's responsibility.
23              There is an order dated November 1st, 2010, that I
24      sent out, and that was MGA's ex parte application for an
19:58 25      order to compel production and supplementation of documents,
```

CV 04-9049 DOC - 03/30/2011 - Volume 3 of 3

```
 1    was filed 24 days after the applicable discovery cutoff and

 2    is denied as untimely.

 3              I was in the middle of the summary judgment, quite

 4    frankly, and the deadlines were upon us, and this places you

19:59  5    in a very unfair position from my standpoint.

 6              I think your methodology is much clearer to me this

 7    evening, and I would let you testify, quite frankly.

 8              You've cleared up a lot of the questions that I

 9    had.

19:59 10              I'm not going to cause you to be put in this

11    position.

12              You're going to have the discovery necessary, and

13    we're apparently going to have to scramble to do it over the

14    weekend; but you'll probably be testifying Monday and we'll

19:59 15    be working throughout the weekend.

16              But this is -- and I'll make a record of it -- this

17    was 24 days late.  You've played by the rules and I'll accept

18    that.  There is no fault for the party involving MGA, but as

19    far as I'm concerned your methodology potentially is

19:59 20    appropriate, if not coequal at least with Mr. Wagner's, to

21    put you in the position of an unfair sampling.

22              EXPERT WITNESS MALACKOWSKI:  Thank you, Your Honor.

23              THE COURT:  So to -- I would expect Monday, but

24    it's going to require a lot of work on your part and a lot of

20:00 25    work on Mattel's part, which I'm about to compel.
```

1        Okay?

2        EXPERT WITNESS MALACKOWSKI:  Yes, sir.

3        THE COURT:  So, Counsel, why don't you give me

4   about 20 minutes.

20:00  5        I'm going to be sending out orders and these are

6   going to be forthwith orders for the production of this

7   material.

8        MS. HURST:  Can we ask for it in native format,

9   please, Your Honor, because that will make it go much faster.

20:00  10        THE COURT:  It will be in native format and you'll

11   at least have the weekend.  It'll be to you very, very soon.

12        MR. ZELLER:  Your Honor, can we be heard on the

13   discovery point of this?  Not the order, but the discovery

14   point, because he has the data.  He has the data.

20:00  15        He has the same data for those two products that he

16   has used and is extrapolating.  He has the same data for all

17   the other products.

18        THE COURT:  Thank you.

19        No, it's my responsibility, and I'm going to put

20:00  20   that on the record.

21        (Recess taken.)

22        THE COURT:  We're back on the record.

23        I have one additional question for you, sir, if

24   you'll be seated.

20:14  25        Would you explain to me once again the difference

UNITED STATES DISTRICT COURT

1   between your "Top-down 1" and your "Top-down 2" approach.

2            EXPERT WITNESS MALACKOWSKI:  Two different

3   benchmarks, Your Honor.

4            One uses the Mattel history for fashion dolls for

5   older girls, Diva Starz, Generation Girls, et cetera.

6            One uses the benchmark, the actual MyScene growth

7   rates on a year-to-year basis but starting from a lower

8   point, with the one comment I adjusted-out the Bling and

9   Chillin' because I knew those were impacted or biased by the

10  trade secrets.

11           THE COURT:  Show me.

12           Put your charts up again so we slow down.

13           Okay.  No. 4, Top-Down 1.  Here we go.

14           EXPERT WITNESS MALACKOWSKI:  Your Honor, the 2002

15  data reflects the actual sales of MyScene.  You can see it's

16  the same for the dark- and the light-blue area.

17           THE COURT:  Uh-huh.

18           EXPERT WITNESS MALACKOWSKI:  I then projected 2003

19  based upon the Mattel business records.  So you can see the

20  2003 data point.

21           THE COURT:  Okay.

22           EXPERT WITNESS MALACKOWSKI:  Now, what happens

23  after 2003, I went back to look at the historical performance

24  of Generation Girlz, Diva Starz and Flavas, and I tracked how

25  those three Mattel products, targeted towards older girls,

1    performed over their life, and I concluded that but for the

2    trade secret misappropriation, MyScene would have behaved in

3    a like manner.  It did much better.  And the additional sales

4    represent the profit to be disgorged.

20:15  5           THE COURT:  Top-down 2.

6           EXPERT WITNESS MALACKOWSKI:  Top-down 2,

7    Your Honor, 2002 is the same; 2003 is the same.

8           I need a new projection for what can happen in the

9    future.

20:15 10          THE COURT:  Can I put those side by side?

11          MR. MCCONVILLE:  (Clapping.)

12          THE COURT:  Okay.  Great.

13          EXPERT WITNESS MALACKOWSKI:  So, starting with 2003

14   forward, the light blue changes -- the curve changes.  The

20:16 15   second chart, the performance is based upon what actually

16   happened with MyScene.

17          THE COURT:  Top-down 2.

18          EXPERT WITNESS MALACKOWSKI:  Top-down 2.

19          THE COURT:  Just refer to it as Top-Down 2.

20:16 20          EXPERT WITNESS MALACKOWSKI:  Top-down 2 is based

21   upon MyScene performance.  You can see it looks very similar

22   to the dark blue.  The difference is I knew, because I had

23   the documents, that Chillin' and Bling benefitted from the

24   trade secrets, so I removed those when I calculated the

20:16 25   growth pattern for MyScene.

 1          THE COURT:  If you get the documents requested in

 2   document -- or Docket No. 9000, how long would it take you to

 3   recalculate your figures based upon the information that --

 4   that I would order from Mattel?

20:17  5          EXPERT WITNESS MALACKOWSKI:  I almost hate to say

 6   this for my team, but I think I can be fairly efficient if I

 7   can find the information, because I'm really looking just for

 8   the launch dates and the monthly sales.

 9          THE COURT:  But I'm going to reconvene court on

20:17 10   Saturday or Sunday.

 11          The two counsel doing the examination will be here.

 12   I'm going to see those figures again.  And I want to be

 13   courteous.  I want to give you enough time so you're not

 14   coming into the court needlessly.

20:17 15          I can convene at 10:00 Sunday evening.  I don't

 16   have any hours.

 17          EXPERT WITNESS MALACKOWSKI:  I think if we had two

 18   days after we got the information.  So if we had the weekend

 19   and we get it tomorrow or Friday --

20:17 20          THE COURT:  Well, I think you could be on the stand

 21   as early as Monday.

 22          And I don't want to put that kind of pressure on

 23   you, and I also want to afford the chance for me to walk

 24   through that one more time, but if that's impossible, you

20:17 25   know, I understand that.

1          I repeat for the record that's totally the court's

2     mistake.  I got into the summary judgment, quite frankly, and

3     the parties, through no fault of their own, were pressing on

4     both sides for additional discovery, et cetera, and I think I

20:18 5     was up to 160 discovery orders by that time and, quite

6     frankly, I was focused on a lengthy summary judgment.  I

7     accept full responsibility for that, but it's not fair.

8          MS. KELLER:  Your Honor, we're seeing huge

9     potential logistical problems with this.  Not only -- not

20:18 10     only this witness, because we don't know what volume of

11     information we're going to get when --

12          THE COURT:  Well, we'll find out.  We'll find out.

13          MS. KELLER:  -- but, Your Honor, in addition we

14     have the rest of our witnesses coming.

20:18 15          We don't want to have to --

16          THE COURT:  You're going to keep them coming

17     regardless because you represented that this was the last

18     witness.  And if I need to recess, that's what I'm going to

19     do.

20:18 20          As simple as that.  It's not --

21          MR. PRICE:  Your Honor, one quick thing.  What he's

22     asking for, Mattel doesn't do; because he wants monthly

23     profit-and-loss statements by -- by product.  What we gave

24     him was annual.

20:18 25          THE COURT:  That's my order.

CV 04-9049 DOC - 03/30/2011 - Volume 3 of 3

```
 1                  It's already docketed.  It's out.

 2                  I'll be back within just moments.

 3                  MR. PRICE:  Your Honor, do you also want, if you

 4       look at the order, also, the ex parte included Kohl's

20:19 5  information --

 6                  THE COURT:  Sir, step down.

 7                  I'll be right back.

 8                  (Recess taken.)

 9                  THE COURT:  All right.  The next issue we're going

20:25 10 to take up with all counsel -- Mr. Malackowski you can have a

 11      seat -- is the issue concerning the magnet and swallowing of

 12      magnets.

 13                 I'm going to read into the record questions and the

 14      answers so that the Circuit has a complete record of what

20:25 15 occurred.

 16                 (Reading.)

 17                 "Question:  And there was a fourth recall on

 18      October --

 19                 "MR. QUINN:  Your Honor, there's no good-faith

20:25 20 basis for that question.  I request that the question and the

 21      answer be stricken.

 22                 "MS. KELLER:  Children died.

 23                 "THE COURT:  The question remains.  The answer's

 24      "No."

20:25 25                 (Question by Ms. Keller:)
```

UNITED STATES DISTRICT COURT

1          "Question:  You know better, don't you, Mr. Eckert?

2          "Answer:  No.  In fact, I know no child died as a

3    result of swallowing a magnet in a Mattel toy.

4          "MS. KELLER:  Your Honor, I would ask to recess to

20:26 5    inquire of the court as to whether I may ask the next

6    question about a possibly prohibited area.

7          "THE COURT:  Well, it depends.

8          Why don't we move on and get to the recess so we

9    don't take another sidebar."

20:26 10         THE COURT:  Now, I'm going to go back before that,

11   in fact.  There's another question that followed -- or

12   superceded this.

13         This is a -- a -- an improper question and I've

14   intimated to both counsel that I'm going to clear this up

20:26 15   when Mr. Eckert retakes the stand.

16         The following will be read by the court:

17         "I have not prohibited the introduction of any

18   evidence that any Mattel magnets killed any children.

19   However, MGA has not shown me any admissible evidence to this

20:26 20   effect.  Thus you are to disregard the issue of whether any

21   Mattel magnet killed any children."

22         And that will be read, Mr. Quinn, either on his

23   taking the stand or just before he takes the stand.

24         Now, the next issue is that I'm not going to be

20:27 25   surprised tomorrow by the request of MGA to put in a series

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10348   Filed 03/31/11   Page 119 of 135   Page ID #:314359
CV 04-9049 DOC - 03/30/2011 Volume 3 of 3

119

1    of questions concerning this information about e-mails that

2    you view Mr. Eckert should be privy to as a 30(b)(6) witness.

3              I've made my motion concerning his status, but I

4    may have to go back in the back and get some more documents.

20:27   5         I'm not sure where I put them, but my concern is

6    this:

7              I don't expect a 30(b)(6) witness to be prepared,

8    nor is it even appropriate that Mr. Eckert is being asked

9    about e-mails between Mr. Larian and a retailer.

20:28  10         So the problem that I'm having, Ms. Keller, is that

11   the impression can be created this way:  "Let me show you

12   Exhibit No. 16345," and that exhibit is put in front of

13   Mr. Eckert or someone hands it to him, and in it is an e-mail

14   from Larian, and I'll have to get those e-mails in just a

20:28  15   moment, and let's take the second e-mail that I recall, but

16   not by number, and in the bottom paragraph on the first

17   page there is a sentence about Mattel basically putting a

18   vendor -- or, I'm sorry -- retailer out of the market a few

19   years before.

20:29  20         Those questions have to be asked in good faith.

21         How -- how -- how would Mr. Eckert be able to

22   answer those questions?

23         In other words, the 30(b) is for your company to

24   step forward and to testify about what Mr. Larian knows about

20:29  25   MGA or Mattel knows about Mattel.

UNITED STATES DISTRICT COURT

1       I'm holding them both fairly accountable.  Whether

2   you call them a 30(b)(6) or not, I designate him a 30(b)(6).

3   My record's clear about that, and he was chosen.  But it's a

4   way of hearsay coming in and what I've seen before in the

20:30  5   trial courts is then counsel places the document in front of

6   the witness and says "does this refresh your recollection?"

7       Now, you can use anything to refresh a person's

8   recollection, supposedly, but when he says "no" oftentimes

9   counsel don't stop with a "no."

20:30 10       The next question that sometimes gets asked is,

11  well, isn't it true that a retailer was put out of business

12  named, you know, Stump Factory, two years before?

13      The impression is left on the jury that that's

14  exactly what the document says.

20:31 15      So I'm a little bit concerned that I'm going to get

16  put into a position as a trial judge tomorrow with documents

17  flying in quickly without a full discussion this evening of

18  where we're going with this.

19      MS. KELLER:  I -- I -- I'm -- does the court have a

20:31 20  particular document in mind?  Because I have to tell you I'm

21  in the dark right now.

22      THE COURT:  That's the motion that was filed.

23      There was six documents.

24      I've got a fairly good memory.  I'll go back and

20:31 25  get them and I'll be right with you.

```
 1              MR. QUINN:  Your Honor, I have a couple of
 2      additional copies.
 3              THE COURT:  If you want to give me a copy, I've got
 4      mine marked up, so -- in fact, mine's all tabbed.
20:31  5        MR. PRICE:  Your Honor, can I take someone and
 6      leave?
 7              THE COURT:  Absolutely.
 8              MR. PRICE:  May I take someone and leave?
 9              THE COURT:  Absolutely.  Take whoever you choose,
20:31 10     Mr. Price.
11              MR. MCCONVILLE:  (Indicating.)
12              MR. QUINN:  It will be a fight.
13              THE COURT:  Mr. Price, let me apologize to you.
14              I did not intend to keep you here those late hours.
20:31 15        You just have to remind me.  I don't have any hours
16      and I apologize to you.
17              MR. PRICE:  Thank you.
18              THE COURT:  Let's just take, I think it's 9050,
19      from memory, for a moment.  I may be wrong about that.
20:32 20        Yeah, there it is.
21              I want you to go down the very first page the very
22      bottom e-mail for a moment, and it says, "I know Edg-"
23      Melvin -- "I know Egmont was threatened by Mattel a few years
24      ago, but is that still the case?  Have you asked recently?"
20:32 25        "Thanks.  Larian."
```

UNITED STATES DISTRICT COURT

```
 1                Now, that's not a 30(b)(6) designation.

 2           MS. KELLER:  Your Honor, I'm sorry.  I'm so groggy

 3      I'm not even tracking anymore.

 4           THE COURT:  Mr. McConville is coming to the rescue.

 5           Move over there, Mr. McConville.

 6           MS. KELLER:  I'm trying to concentrate, but I'm

 7      having a little trouble.

 8           Your Honor, it hasn't been my intention to try to

 9      get these e-mails in through Mr. Eckert.

10           THE COURT:  Well, let's --

11           MS. KELLER:  I might want to ask Mr. Eckert about

12      what he did to investigate whether, for example, Egmont was

13      threatened by Mattel, but --

14           THE COURT:  Here's the problem.  See, that's a

15      statement again.

16           I'm not precluding you inquiring in the retail

17      business.  You can ask if he knows if Egmont was threatened

18      by Mattel in terms of being a "retailer."

19           You're not precluded from asking these questions --

20      what you're doing is this.  Watch.

21           (Laughter.)

22           MS. KELLER:  No, I know what you're talking about.

23           THE COURT:  No, no, let me show it to you.

24           MS. KELLER:  I saw Mr. Quinn do it today so I know

25      exactly what you're talking about.
```

20:32 (line 5)
20:33 (line 10)
20:33 (line 15)
20:33 (line 20)
20:33 (line 25)

UNITED STATES DISTRICT COURT

```
 1              MR. QUINN:  I got stopped.

 2              THE COURT:  Well, you were both heading that way.

 3              "Now, was Mr. -- was Egmont put out of business a

 4     couple years ago?"

20:34 5         "No."

 6              "Well, does that refresh your recollection?"

 7              "No."

 8              "Are you sure Egmont wasn't put out of business a

 9     couple years ago?"

20:34 10            And then Mr. Quinn moves towards her; you move

11     towards the stand without asking me.

12              The effect is the same.

13              There's 30 percent of a trial that takes place that

14     never gets captured on the record, so we're going to walk

20:34 15   through these questions.

16              So, Mr. Zeller, if you want to take the stand or

17     Mr. McConville and, Ms. Keller, start with your questions.

18              Let's hear them.

19              MS. HURST:  I'll be Mr. Eckert.

20:34 20            MR. MCCONVILLE:  No, let me.  Let me.

21              MS. HURST:  No, no, no.  I have eight volumes of

22     Eckert deposition.

23              (Laughter.)

24              THE COURT:  It's late and I'm just joking with all

20:34 25   of you.
```

UNITED STATES DISTRICT COURT

 1              Just tell me where we are going with this?

 2              (Laughter.)

 3              THE COURT:  I'm just joking, but that's fine.

 4              Let her sit up there.

20:34  5        (Laughter.)

 6              THE COURT:  Where are we going with this?

 7              I don't want any surprises and I don't want

 8     Mr. Eckert or Mr. Larian unnecessarily embarrassed.

 9              I know each of you feel your clients have been

20:35 10   embarrassed by the other side, et cetera, et cetera, but this

 11    isn't 30(b)(6) stuff.

 12             MS. KELLER:  I'm not arguing that it is.

 13             THE COURT:  Okay.  Now, let's go through the first

 14    e-mail.

20:35 15        Let's take 9049.

 16             And I apologize.  I've got my copies all marked up

 17    and they're back in the back, but this might save us some

 18    time.

 19             This is from Isaac Larian to Ms. Gronich, okay, and

20:35 20   Dale Cendali.  It says, "A few things.  I haven't received an

 21    e-mail that Vito claims was sent to me recently," blah, blah,

 22    blah.

 23             "No. 2, we will not hire Bob Carver.  Hope all is

 24    well and have a great Memorial Day."

20:36 25        What are you after in this e-mail?

1        MS. KELLER:  The next sentence says, "By the way,

2   Mattel just terminated all foreign and FunDough agreements

3   due to Bratz."

4        THE COURT:  I'm not precluding you from asking

20:36  5   Mr. Eckert if Mattel terminated all foreign and FunDough

6   agreements due to Bratz.

7        What I'm precluding you from doing is simply

8   saying, now, does this -- if he says no --

9        MS. KELLER:  I understand, Your Honor.

20:36 10        THE COURT:  Let me be clear.  Let's spend a little

11   time together.

12        Then the document doesn't get shoved up in his face

13   and the question gets reasked because the impression is the

14   same, and that is, there is a document and the impression

20:36 15   upon the jury is that that's exactly what's this other

16   document.

17        MS. KELLER:  Your Honor, what about being able to

18   ask him whether he ever investigated what is contained in

19   this document after he found out about it?

20:37 20        THE COURT:  It's the same thing.  It leads us the

21   same place.  In other words, it makes the document

22   legitimate.

23        MS. KELLER:  Isn't the 30(b)(6) obligation to

24   investigate on behalf of the corporation all of the subject

20:37 25   matter that is -- that is included within his 30(b)(6)

CV 04-9049 DOC - 03/30/2011 Volume 3 of 3

```
 1    designation, and wouldn't that include investigating these
 2    issues?
 3              THE COURT:  I don't think this even necessarily has
 4    to fall within a 30(b)(6).
20:37 5          So he was expected by me to be a 30(b)(6) witness
 6    and he was put forward even though Mattel disagrees as such.
 7    And if I have to start parsing words I will, and now I'll
 8    just hand out orders on everything and it will be very
 9    explicit.
20:38 10             MS. KELLER:  I intend to follow to the letter and
 11   the spirit any rule the court gives me here.
 12             I'm not going to parse anything.
 13             If the court says, I don't want you asking him,
 14   sticking this e-mail in front of him or asking him about it,
20:38 15  I'm not going to do it, Your Honor.
 16             I mean, it's --
 17             THE COURT:  I don't think that there is a
 18   good-faith basis to put the e-mail right under his nose, and
 19   I don't think there is a good-faith basis unless he says "I
20:38 20  don't recall" to refresh his recollection.
 21             If he says "no," I don't think you can use
 22   Isaac Larian's personal e-mail that may be very self-serving
 23   for that purpose.
 24             Now, if you've got another document, okay -- if
20:38 25  you've got a Mattel document or an MGA document, okay, I'd
```

```
 1    like to see it or know about it, but certainly you can use

 2    Mattel documents.

 3         Maybe there's something out there that retailers

 4    got, for instance, but this is awfully difficult for a court

 5    when I've got Larian communicating with somebody else and

 6    Larian hasn't --

 7              MR. MCCONVILLE:  This is going the other way,

 8    Judge.  This is to Mr. Larian from a different person.  This

 9    isn't Mr. Larian saying this statement.

10              THE COURT:  Great.  Bring him in.

11         I'm not precluding this area at all.

12         It's the way we're getting to it.  It's the way

13    we're going through a whole bunch of documents quickly that

14    are technically hearsay to begin with.

15         You don't need many of them.  If they're out there

16    and he can say it, one or two of these people are

17    devastating.

18              MS. KELLER:  So we can ask about the subject

19    matter, just not use the e-mail --

20              THE COURT:  Exactly.

21              MS. KELLER:  -- not refer to the e-mail.

22              THE COURT:  Exactly.

23              MS. KELLER:  -- and then if we -- if he says he

24    doesn't recall --

25              THE COURT:  Get to a recess and talk to me.  Okay?
```

UNITED STATES DISTRICT COURT

1          MS. KELLER:  And then if he denies it we can bring

2     in one of these people on rebuttal?

3          THE COURT:  Absolutely.  Absolutely.

4          MS. KELLER:  Okay.

20:39 5          THE COURT:  Because if you do it the other way,

6     what it looks like is that it's true.  Everybody moves on.

7          Let's take the second one, 9050.

8          MS. HURST:  Your Honor, can we excuse

9     Mr. Malackowski now?

20:40 10          THE COURT:  Yes, absolutely.

11          But, Mr. Malackowski, I'm going to want you back

12     here at 5:00 tomorrow.

13          MS. HURST:  I think he's in the breakout room, but

14     I'll tell him, Your Honor.

20:40 15          THE COURT:  Tell him I want him here at 5:00.  I

16     want him to know what time I'm reconvening court this

17     weekend.

18          (Pause in the proceedings.)

19          THE COURT:  In other words, Egmont is fair game.

20:40 20          How do I say that.  Okay?

21          MS. KELLER:  Right.

22          THE COURT:  It's how you get there with evidence

23     rather than the impression and then you get up and argue it.

24          Let's go to 9051.  It's quicker for me just to do

20:40 25     it rather than go back into chambers and get it.

```
 1              You see it's all about Egmont in this e-mail also.

 2     It's Egmont, Egmont, Egmont.

 3              There's somebody out there named Frank Knau,

 4     K-n-a-u.  Now, I think what you're going to get is "I don't

20:41 5    know anything about it" or, yes, that Egmont was related to

 6     so-and-so.

 7              So what else in 9051 are you after?

 8              It looks like it's just Egmont to me.

 9              MR. MCCONVILLE:  That's it, Your Honor.

20:42 10             THE COURT:  Okay.  Let's go to 9052.

11              Mattel has frightened off with threats of cutting

12     their ad space in the magazines.  He's talking to a Nick

13     Austin.

14              Now, I don't know the basis for Nick Austin's

20:42 15    opinion in this e-mail, which makes it double hearsay about

16     how these ads are being cut off.

17              So are you precluded from asking if he cut off a

18     magazine?  Not at all.  Not one bit.

19              It's just that I -- I know counsel and the court --

20:43 20    or both sides are very reputable.  I just want to make

21     certain that we're not getting into some difficulty in front

22     of the jury again tomorrow.

23              MS. KELLER:  No, I understand, Your Honor -- and I

24     would imagine --

20:43 25             THE COURT:  We're almost done.
```

UNITED STATES DISTRICT COURT

1           9053.

2           MS. KELLER:  What if some of these witnesses

3    haven't been deposed, Your Honor, who could be rebuttal

4    witnesses to Mr. Eckert?

20:43 5           It's that -- I'm concerned where I might get into a

6    position where we can have a rebuttal witness, but they're

7    going to be objected to on the basis that they haven't been

8    deposed.

9           THE COURT:  You know something?  I've given over

20:43 10   30-some depositions to Mattel.  I gave more than 99 percent

11   of the court's.

12          I think we started with 50 and we ended with 34 or

13   35 now.  You just have to let me know, you know, who that is

14   and I'll bring him into court.  We'll put him right up there.

20:43 15  You can depose -- you can ask him questions.

16          There aren't going to be any surprises, but there

17   aren't going to be any lies.

18          I think Mr. Austin is going to tell the truth,

19   quite frankly.  He's going to say "yes, I have," or "no, I

20:44 20  haven't."

21          So, I know from your perspective, I know you don't

22   believe that, but --

23          MS. KELLER:  Hope springs eternal, Your Honor.

24          THE COURT:  Well, I think he's going to be fine.

20:44 25  We'll see.

Case 2:04-cv-09049-DOC-RNB   Document 10348   Filed 03/31/11   Page 131 of 135   Page ID #:314371
CV 04-9049 DOC - 03/30/2011 Volume 3 of 3

131

```
 1              Okay.  The bottom -- it's -- I imagine the part you
 2     want:  "What was the full name of Mattel head of operation in
 3     manufacturing that Francis told me in July last year had come
 4     to HK" -- which means Hong Kong -- "to ask EL not to make
20:44 5     Bratz for MJ?  It was wrong."
 6              Who do you think that is?
 7              MR. MCCONVILLE:  Early Light.
 8              THE COURT:  Well, "Francis" is Francis Choi --
 9              MR. MCCONVILLE:  Right.
20:45 10             THE COURT:  -- but it was Ron.
11              Ron is the person, supposedly, who is going to
12     Francis Choi.
13              I mean, you can certainly ask him if he sent
14     somebody to Hong Kong --
20:45 15             MS. KELLER:  I think he --
16              THE COURT:  -- in July, apparently, of 2003, or if
17     he knew that there was someone from Mattel going over.
18              MS. KELLER:  I think we already had testimony about
19     that, Your Honor, from Adrienne Fontanella about Debrowski
20:46 20     going over.
21              THE COURT:  I think that is allegedly Debrowski,
22     but that's just speculation.
23              9054.
24              MS. KELLER:  Your Honor, I don't -- we don't intend
20:46 25     to use that particular e-mail.
```

UNITED STATES DISTRICT COURT

1           THE COURT:  9055.

2           "So Morten, I need to know the name of every

3    licensee that Mattel threatened or put pressure on to not

4    license Bratz.  Please advise urgently.  Isaac Larian."

20:47  5           So it's Mr. Larian at Egmont again.

6           "Isaac, they went to Egmont and Euromic to

7    discuss."

8           It's always Egmont.

9           9056.

20:47 10           MS. KELLER:  Your Honor, he's -- the author of this

11   e-mail is a licensing agent in Europe.  That's why he's

12   discussing the different people that pressure's been put on.

13           Morten -- Kidz' consult, I guess.

14           THE COURT:  "Hi, Sandrine" -- this is 9056 -- "I

20:47 15   was going to call you tonight to tell you the bad news.

16   Michelle spoke to Mattel on Friday night and they were

17   absolutely adamant that they were not to take on Bratz.

18           So I have no idea who Michelle is.  I have no idea

19   who the speaker is -- or the information is coming from

20:48 20   Mattel.

21           MS. KELLER:  It's -- it's -- it's another character

22   licensing and marketing person, Your Honor.  This is one of

23   their employees.

24           THE COURT:  Do you know who it is?

20:48 25           MS. KELLER:  Graham Stephen, the "kind regards."

```
 1              THE COURT:  Let me see him.

 2              MS. KELLER:  In Europe -- I guess it says "South

 3      Africa" here at the top.  It's just another international

 4      licensing person.

20:48 5              THE COURT:  9057.

 6              Richard Kamarck.

 7              MS. KELLER:  Same original message from Morten,

 8      Kidz' counsel.

 9              THE COURT:  9058.

20:49 10             And I apologize.  I have all this marked up in the

11      back.  Okay.

12              "A number of the companies aren't comfortable about

13      proceeding with the Bratz' licenses.  They are concerned

14      about losing their Barbie rights.  These companies include

20:49 15     Smith & Brooks (apparel), Zeon (watches).  May not have their

16      Barbie license renewed anyway.  We'll know more about that in

17      a month."

18              Who is Hayley?

19              MS. KELLER:  Your Honor, it looks like another

20:49 20     licensing agent in the UK.  Not on our witness list at the

21      moment.

22              THE COURT:  You can inquire if licenses are being

23      cut off, but just to shove the e-mails in front to make it

24      looks like it's --

20:50 25             MS. KELLER:  Your Honor, I wonder if I could sub
```

1    myself in for Mr. Price?

2         THE COURT:  Yes.  Go ahead and get some rest along

3    with Mr. Price because you two are on tomorrow.

4         MS. KELLER:  Thank you.

20:50 5    THE COURT:  Okay.  The next thing is I need a

6    little bit more time, then, with counsel.  I've got to go

7    back and finish off this notebook for a moment concerning

8    Mr. Moore, so I'll be back with you and we'll just do it by

9    the numbers.

20:50 10        Denise, why don't you go down a take a break, about

11   20 minutes or so.

12        THE REPORTER:  Okay.

13        MS. KELLER:  And, Your Honor, I guess the only

14   remaining issue is whether we are going to be permitted to

20:50 15   play the Brawer video, and the court hasn't ruled on that

16   yet.

17        THE COURT:  If you want to stick around I'll show

18   you exactly what's going to be allowed in just a moment.

19        MR. MCCONVILLE:  That's all right.  We'll let her

20:50 20   know, Judge.

21        THE COURT:  You don't have to.

22        It will take one second.  Just one second.  Hold

23   on.

24        (Pause in the proceedings.)

20:53 25        THE COURT:  Here's the order.  The final's already

CV 04-9049 DOC - 03/30/2011 - Volume 3 of 3

1     been docketed.

2               MS. KELLER:  Thank you.

3               (Recess taken.)

4               (Adjournment at 21:33 to resume on Thursday,

20:53  5     March 31, 2011, at 8:00 a.m.  Next session reported by

6     Debbie Gale.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25