Case 2:04-cv-09049-DOC-RNB   Document 10370   Filed 04/04/11   Page 1 of 89   Page ID #:314911
CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

1

1              **UNITED STATES DISTRICT COURT**

2              **CENTRAL DISTRICT OF CALIFORNIA**

3          **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                   - - - - - - -

5

   MATTEL, INC., et al.,              )
6                                      )
              Plaintiffs,              )
7                                      )
       vs.                             ) No. CV 04-9049 DOC
8                                      )    Day 43
   MGA ENTERTAINMENT, INC., et al.,    )    Volume 1 of 3
9                                      )
                                       )
10            Defendants.              )
   _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                   Jury Trial

16              Santa Ana, California

17            Thursday, March 31, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-03-31 D43V1

Case 2:04-cv-09049-DOC-RNB   Document 10370   Filed 04/04/11   Page 2 of 89   Page ID #:314912
CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

2

1   **APPEARANCES OF COUNSEL:**

2

    FOR PLAINTIFF MATTEL, INC., ET AL.:
3
                QUINN EMANUEL URQUHART & SULLIVAN
4               BY:   JOHN QUINN
                      WILLIAM PRICE
5                     MICHAEL T. ZELLER
                      Attorneys at Law
6               865 South Figueroa Street
                10th Floor
7               Los Angeles, California 90017
                (213) 443-3000
8

9

10

11  FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12              ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
                BY:   THOMAS S. McCONVILLE
13                    Attorney at Law
                4 Park Plaza
14              Suite 1600
                Irvine, California 92614
15              (949) 567-6700

16              - AND -

17              ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
                BY:   ANNETTE L. HURST
18                    Attorney at Law
                405 Howard Street
19              San Francisco, California 94105
                (415)773-5700
20
                - AND -
21
                KELLER RACKAUCKAS
22              BY:   JENNIFER KELLER
                      Attorney at Law
23              18500 Von Karman Avenue
                Suite 560
24              Irvine, California 92612
                (949) 476-8700
25

Case 2:04-cv-09049-DOC-RNB   Document 10370   Filed 04/04/11   Page 3 of 89   Page ID #:314913
CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4
              LAW OFFICES OF MARK E. OVERLAND
5             By:  MARK E. OVERLAND  (not present)
                   Attorney at Law
6             100 Wilshire Boulevard
              Suite 950
7             Santa Monica, California 90401
              (310) 459-2830
8
              – AND –
9
              SCHEPER KIM & HARRIS LLP
10            BY:  ALEXANDER H. COTE
                   Attorney at Law
11            601 West 5th Street
              12th Floor
12            Los Angeles, California 90071
              (213) 613-4660
13

14   ALSO PRESENT:

15            MGA ENTERTAINMENT, INC.
              BY:  JEANINE PISONI
16                 Attorney at Law
              16360 Roscoe Boulevard
17            Suite 105
              Van Nuys, California 91406
18

19            ROBERT A. ECKERT, MATTEL CEO

20            ISAAC LARIAN, MGA CEO

21            KEN KOTARSKI, Mattel Technical Operator

22            MIKE STOVALL, MGA Technical Operator

23

24

25

**I N D E X**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| BRAWER, Ron | | | | |
| By Ms. Keller | 6 | | | |
| By Mr. Price | | 23 | | |

**EXHIBITS**

| EXHIBIT NO. | IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 4237 | Communication from Mr. Brawer to HR MGA | 58 |
| 4241 | E-mail from Mr. Bousquette dated 3/5/2004 | 28 |
| 4242 | E-mail from Mr. Brawer to Mr. Bousquette dated 3/18/2004 | 30 |
| 4245 | E-mail from Mr. Brawer to Mr. Larian | 59 |
| 4249 | E-mail from Mr. Brawer to Mr. Kimball dated 8/13/2004 | 44 |
| 4251 | Exit interview document | 55 |
| 4252 | Letter messengered to Mr. Brawer 9/25/2004 | 63 |
| 7971 | Letter dated 7/19/2006 | 69 |
| 8621 | E-mail from Mr. Brawer to Mr. Larian dated 5/24/2004 | 60 |

Case 2:04-cv-09049-DOC-RNB   Document 10370   Filed 04/04/11   Page 5 of 89   Page ID #:314915
CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

5

|  | **EXHIBITS (Continued)** | |
|---|---|---|
| **EXHIBIT NO.** | **IDENTIFICATION** | **IN EVIDENCE** |
| 20996 | Letter hand-delivered to Mr. Brawer 10/1/2004 | 65 |
| 24820 | Court order dismissing complaint | 72 |
| 24822 | Filing to dismiss complaint dated 9/22/2006 | 72 |
| 34676 | Complaint | 25 |

CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

6

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, THURSDAY, MARCH 31, 2011**                   |
|       | 2  | **Day 43, Volume 1 of 3**                                            |
|       | 3  | (8:31 a.m.)                                                           |
| 08:31 | 4  | *(In the presence of the jury.)*                                     |
| 08:31 | 5  | THE COURT:  We're in session.  The jury and the                     |
| 08:31 | 6  | alternates are present.  All counsel are present.                    |
| 08:31 | 7  | Counsel, thank you for your courtesy.                                |
| 08:31 | 8  | Mr. Brawer is on the witness stand.                                  |
| 10:21 | 9  | **RON BRAWER, MGA'S WITNESS, PREVIOUSLY SWORN**                       |
| 10:21 | 10 | **RESUMED THE STAND**                                                |
| 08:31 | 11 | THE COURT:  And, Counsel, if you would like to                      |
| 08:31 | 12 | continue on with your direct examination.                            |
| 08:32 | 13 | **DIRECT EXAMINATION (Resumed)**                                     |
| 08:32 | 14 | BY MS. KELLER:                                                        |
| 08:32 | 15 | Q.   Good morning, Mr. Brawer.                                       |
| 08:32 | 16 | A.   Good morning.                                                   |
| 08:32 | 17 | Q.   Mr. Brawer, when we broke yesterday, we were talking            |
| 08:32 | 18 | about when you left Mattel.  And you said you had actually           |
| 08:32 | 19 | had a forensic person come to your house and wipe your hard          |
| 08:32 | 20 | drive so that you would be absolutely sure you didn't have           |
| 08:32 | 21 | any Mattel information on it; is that right?                          |
| 08:32 | 22 | A.   That's correct.                                                 |
| 08:32 | 23 | Q.   And why is it that you were so concerned as to whether          |
| 08:32 | 24 | there might be any Mattel information at all on your                  |
| 08:32 | 25 | computer?                                                            |

| | | |
|---|---|---|
| 08:32 | 1 | A.   Under advice of counsel, I was told to make sure I |
| 08:32 | 2 | brought absolutely no information from Mattel to MGA, and |
| 08:33 | 3 | having information on my home computer would have perhaps |
| 08:33 | 4 | constituted having information from Mattel while I was an |
| 08:33 | 5 | MGA employee.  And therefore, I didn't have -- want to have |
| 08:33 | 6 | anything on that computer. |
| 08:33 | 7 | MR. PRICE:  Your Honor, Mr. Brawer is waiving his |
| 08:33 | 8 | privilege with his counsel? |
| 08:33 | 9 | THE COURT:  Counsel, is he waiving his privilege? |
| 08:33 | 10 | MS. KELLER:  I don't represent Mr. Brawer. |
| 08:33 | 11 | THE COURT:  Mr. Brawer, you have an |
| 08:33 | 12 | attorney-client privilege.  If we're going to get into part |
| 08:33 | 13 | of the conversation about advice of counsel, you have the |
| 08:33 | 14 | right to that privilege. |
| 08:33 | 15 | We have clergy privilege.  We have spousal |
| 08:33 | 16 | privileges.  It's really designed under the law to keep |
| 08:33 | 17 | confidentiality between different persons we might go to for |
| 08:33 | 18 | advice or in our own marriages. |
| 08:33 | 19 | If you're waiving that right, that means that |
| 08:33 | 20 | counsel -- if you're going to talk about advice of counsel, |
| 08:33 | 21 | what it really means is that we get into this area that |
| 08:33 | 22 | you're potentially waiving that right. |
| 08:33 | 23 | And there's been a lot of discussion about both |
| 08:34 | 24 | parties in this matter outside your presence. |
| 08:34 | 25 | Are you willing to waive your right to advice of |

Case 2:04-cv-09049-DOC-RNB   Document 10370   Filed 04/04/11   Page 8 of 89   Page ID #:314918
CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

8

| 08:34 | 1 | counsel in this matter?  Or do you have an attorney even |
| 08:34 | 2 | here today? |
| 08:34 | 3 | THE WITNESS:  I guess I don't have an attorney |
| 08:34 | 4 | here today. |
| 08:34 | 5 | THE COURT:  Okay.  Well, you're probably the |
| 08:34 | 6 | first. |
| 08:34 | 7 | *(Laughter in the courtroom.)* |
| 08:34 | 8 | MS. KELLER:  Well, Your Honor -- |
| 08:34 | 9 | THE COURT:  I'm joking, Counsel. |
| 08:34 | 10 | MS. KELLER:  Given that, I think it wouldn't be |
| 08:34 | 11 | fair to ask him to waive his attorney-client privilege, so |
| 08:34 | 12 | I'll -- |
| 08:34 | 13 | THE COURT:  Strike the question.  Strike the |
| 08:34 | 14 | answer. |
| 08:34 | 15 | I'm not certain it is a complete waiver.  I'm not |
| 08:34 | 16 | certain yet where they would go. |
| 08:34 | 17 | This is an awfully fine line that's being drawn |
| 08:34 | 18 | between the parties and the Court on different occasions. |
| 08:34 | 19 | And just, in caution, if counsel's willing to |
| 08:34 | 20 | withdraw it, let's strike the question, strike the answer. |
| 08:34 | 21 | BY MS. KELLER: |
| 08:34 | 22 | Q.   Let's just put it in a more simple way, Mr. Brawer. |
| 08:34 | 23 | Did you make sure that your computer hard drive was wiped |
| 08:34 | 24 | clean in order to protect yourself? |
| 08:34 | 25 | A.   Yes.  I did everything I could to make sure I had no |

Case 2:04-cv-09049-DOC-RNB  Document 10370  Filed 04/04/11  Page 9 of 89  Page ID #:314919
CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

9

| 08:34 | 1 | information on my computer. |
| 08:34 | 2 | Q.   And it also protected Mattel, true? |
| 08:35 | 3 | A.   It also protected Mattel. |
| 08:35 | 4 | Q.   And it also protected MGA, right? |
| 08:35 | 5 | A.   Yes, it did. |
| 08:35 | 6 | Q.   Okay.  Now, after you left Mattel, at some point did |
| 08:35 | 7 | you become aware that you and your family were actually |
| 08:35 | 8 | being followed by people from Mattel? |
| 08:35 | 9 | MR. PRICE:  Objection.  To relevance. |
| 08:35 | 10 | THE COURT:  Overruled. |
| 08:35 | 11 | MR. PRICE:  Foundation. |
| 08:35 | 12 | THE COURT:  Overruled. |
| 08:35 | 13 | You can answer the question. |
| 08:35 | 14 | THE WITNESS:  I had a suspicion that I was being |
| 08:35 | 15 | followed during the period that I was -- in the ten days, |
| 08:35 | 16 | two weeks between giving my resignation to Mattel and |
| 08:35 | 17 | actually joining MGA. |
| 08:35 | 18 | BY MS. KELLER: |
| 08:35 | 19 | Q.   During that two-week period, were you still being paid |
| 08:35 | 20 | by Mattel? |
| 08:35 | 21 | A.   Yes, I was. |
| 08:35 | 22 | Q.   At some point later, were your suspicions confirmed? |
| 08:35 | 23 | Yes? |
| 08:35 | 24 | A.   They were. |
| 08:35 | 25 | Q.   How did that happen? |

CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

10

| | | |
|---|---|---|
| 08:35 | 1 | A.   The memory that I have of how I -- |
| 08:35 | 2 | MR. PRICE:  Objection.  Hearsay.  And second, can |
| 08:35 | 3 | we have a standing objection based upon -- |
| 08:35 | 4 | MS. KELLER:  Goes to his state of mind. |
| 08:36 | 5 | THE COURT:  I'm not sure where the answer's going |
| 08:36 | 6 | to lead, but I think it's going to show state of mind and |
| 08:36 | 7 | conduct and why he took certain actinos and why he |
| 08:36 | 8 | discovered this, if it is true. |
| 08:36 | 9 | MR. PRICE:  So, Your Honor, if I can have a |
| 08:36 | 10 | standing objection? |
| 08:36 | 11 | THE COURT:  Standing objection to all of this, |
| 08:36 | 12 | Counsel. |
| 08:36 | 13 | MR. PRICE:  And a limiting instruction as to what |
| 08:36 | 14 | it's for. |
| 08:36 | 15 | THE COURT:  Yeah. |
| 08:36 | 16 | (To the jury:) This is not for the truth of the |
| 08:36 | 17 | matter asserted, again, and how he came into this |
| 08:36 | 18 | information, whatever this is.  It's only designed to show |
| 08:36 | 19 | how he became aware if he was being surveilled or not, and |
| 08:36 | 20 | that's for you to determine. |
| 08:36 | 21 | BY MS. KELLER: |
| 08:36 | 22 | Q.   When was it that your suspicions that you were being |
| 08:36 | 23 | followed by people from Mattel were confirmed? |
| 08:36 | 24 | A.   I read an article in the *Wall Street Journal* that |
| 08:36 | 25 | mentioned my name and discussed the surveillance. |

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

11

08:36  1    Q.   In the course of this litigation, have you seen video
08:36  2    surveillance tapes that show you and your family?
08:36  3    A.   I've never seen any video surveillance of my family or
08:36  4    I.
08:36  5    Q.   I want to show you a video clip, and tell me if you
08:37  6    recognize the person in it, okay? -- person or persons.
08:37  7    31175.
08:37  8             MR. PRICE:  Your Honor, object to the relevance
08:37  9    since he's never seen it, and that's the basis.
08:37  10             THE COURT:  Overruled.
08:37  11             *(Video played.)*
08:37  12             THE WITNESS:  That's me.
08:37  13    BY MS. KELLER:
08:37  14    Q.   And who's that with you?
08:37  15    A.   That's my neighbor Don, and that's my son Aviv,
08:37  16    A-V-I-V.
08:37  17             MS. KELLER:  And let's show Video Clip 3176.
08:37  18             *(Video played.)*
08:37  19             THE WITNESS:  That's me and my daughter Maya,
08:37  20    M-A-Y-A.  I don't know who that other person is.
08:38  21             That's the back of our house.  That's myself and
08:38  22    that's Maya again.
08:38  23             That's one of our cars, and that's me and my
08:38  24    daughter.
       25

| | | |
|---|---|---|
| 08:38 | 1 | BY MS. KELLER: |
| 08:38 | 2 | Q.   And you see the September 27, 2004 date? |
| 08:38 | 3 | A.   Uh-huh. |
| 08:39 | 4 | Q.   On the film? |
| 08:39 | 5 | A.   Yeah, I do. |
| 08:39 | 6 | MR. PRICE:  Your Honor, may I request the Court |
| 08:39 | 7 | instruct the jury as to the relevance per the Court's order, |
| 08:39 | 8 | the limited area this is relevant to? |
| 08:39 | 9 | THE COURT:  Not at this time, Counsel. |
| 08:39 | 10 | I will in just a moment when the follow-up |
| 08:39 | 11 | questions take place. |
| 08:39 | 12 | BY MS. KELLER: |
| 08:39 | 13 | Q.   Um, are you aware of Mattel conducting any other |
| 08:39 | 14 | surveillance shortly after you left? |
| 08:39 | 15 | A.   Directly on myself, no.  I don't know of any other |
| 08:39 | 16 | particular incidents of surveillance directly. |
| 08:39 | 17 | Q.   Were you aware of your secretary also being videotaped? |
| 08:39 | 18 | A.   My secretary, uh... |
| 08:39 | 19 | MR. PRICE:  Objection.  Lack of foundation.  Calls |
| 08:39 | 20 | for hearsay. |
| 08:39 | 21 | THE COURT:  Foundation, Counsel.  How he's aware |
| 08:39 | 22 | of this, if it occurred. |
| 08:39 | 23 | THE WITNESS:  My secretary did mention to me -- |
| 08:39 | 24 | MR. PRICE:  Objection.  Now we're talking hearsay. |
| 08:39 | 25 | THE COURT:  Sustained. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

13

| | | |
|---|---|---|
| 08:39 | 1 | MR. PRICE:  Move to strike question and -- |
| 08:39 | 2 | THE COURT:  Stricken. |
| 08:39 | 3 | BY MS. KELLER: |
| 08:40 | 4 | Q.   Do you know how many days total Mattel surveilled you? |
| 08:40 | 5 | MR. PRICE:  Objection.  To lack of foundation. |
| 08:40 | 6 | Said he's never seen them. |
| 08:40 | 7 | THE COURT:  I've heard the answer that he has |
| 08:40 | 8 | never seen this. |
| 08:40 | 9 | Do you know the answer to that question? |
| 08:40 | 10 | THE WITNESS:  No, I do not. |
| 08:40 | 11 | THE COURT:  Okay. |
| 08:40 | 12 | BY MS. KELLER: |
| 08:40 | 13 | Q.   After you left Mattel, did Mattel sue you? |
| 08:40 | 14 | A.   Yes, they did. |
| 08:40 | 15 | Q.   And what did they sue you over? |
| 08:40 | 16 | A.   The way it was explained to me, it was a very |
| 08:40 | 17 | complicated, uh, complaint.  It was a declaratory relief, |
| 08:40 | 18 | uh, which I still, after having 20 lawyers explain it to me, |
| 08:40 | 19 | don't hundred percent understand.  But it boils down in my |
| 08:40 | 20 | mind to the suspicion that I potentially had access to |
| 08:40 | 21 | information that could be confidential, that I could have |
| 08:40 | 22 | potentially taken to MGA and I could have potentially given |
| 08:40 | 23 | to MGA, and therefore, they were launching a lawsuit. |
| 08:40 | 24 | Q.   Did the Court dismiss that lawsuit on what's called a |
| 08:41 | 25 | "demurrer" by you? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:41 | 1 | A.   Yes. |
| 08:41 | 2 | Q.   Was there an appeal, then, of the demurrer? |
| 08:41 | 3 | A.   Yes, there was. |
| 08:41 | 4 | Q.   And is your understanding of a demurrer you're not even |
| 08:41 | 5 | getting into the facts of the case.  You look at what's |
| 08:41 | 6 | alleged and decide if it's enough for a lawsuit? |
| 08:41 | 7 | MR. PRICE:  Objection.  To lack of foundation. |
| 08:41 | 8 | THE COURT:  Overruled. |
| 08:41 | 9 | THE WITNESS:  Yes. |
| 08:41 | 10 | BY MS. KELLER: |
| 08:41 | 11 | Q.   And the appellate court then reversed it for the trial |
| 08:41 | 12 | court to decide if there was enough to have a lawsuit, |
| 08:41 | 13 | right? |
| 08:41 | 14 | A.   I understand that was the case, yes. |
| 08:41 | 15 | Q.   And what happened then? |
| 08:41 | 16 | A.   The case was dropped. |
| 08:41 | 17 | Q.   And was there just an agreement on your part in return |
| 08:41 | 18 | that you'd abide by the Mattel code of conduct? |
| 08:41 | 19 | A.   Um, we sent a letter in -- I believe around that time, |
| 08:41 | 20 | uh, clarifying that we had never, um, uh, said we would not |
| 08:41 | 21 | abide by the code of conduct and we were going to abide by |
| 08:41 | 22 | the code of conduct. |
| 08:41 | 23 | THE COURT:  Now, just a moment.  You've asked for |
| 08:41 | 24 | a limiting instruction.  I'm happy to give that.  It would |
| 08:41 | 25 | track some of the things we discussed last evening.  And |

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

15

| | | |
|---|---|---|
| 08:42 | 1 | before I give that, do you want me to give that now, and |
| 08:42 | 2 | I'll go back and get the documents? |
| 08:42 | 3 | MR. PRICE:  Why don't we discuss the language |
| 08:42 | 4 | instead of doing it on the fly? |
| 08:42 | 5 | THE COURT:  All right.  It's up to you. |
| 08:42 | 6 | MR. PRICE:  I'll wait. |
| 08:42 | 7 | THE COURT:  I'll wait. |
| 08:42 | 8 | BY MS. KELLER: |
| 08:42 | 9 | Q.  Mr. Brawer, between -- after you were sued by Mattel, |
| 08:42 | 10 | what effect did that have on your fear of Mattel? |
| 08:42 | 11 | A.  Well, it confirmed for me that Mattel was litigious and |
| 08:42 | 12 | that they were clearly willing to take me to court even if |
| 08:42 | 13 | they had absolutely nothing to sue me on. |
| 08:42 | 14 | Q.  And was that, in your mind, because you had gone to |
| 08:42 | 15 | MGA? |
| 08:42 | 16 | A.  It was a hundred percent because I went to MGA. |
| 08:42 | 17 | Q.  Now, if we could turn for a moment to the topic of MGA. |
| 08:43 | 18 | What was your position when you started there? |
| 08:43 | 19 | A.  I was hired as the executive vice president of |
| 08:43 | 20 | marketing and sales. |
| 08:43 | 21 | Q.  What were your responsibilities? |
| 08:43 | 22 | A.  I was the leader of the domestic sales operation, and I |
| 08:43 | 23 | was head of all marketing operations. |
| 08:43 | 24 | Q.  As head of marketing, are you familiar with the concept |
| 08:43 | 25 | of branding? |

CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

16

| | | |
|---|---|---|
| 08:43 | 1 | A.    Yes, I believe I am familiar with the concept of |
| 08:43 | 2 | branding. |
| 08:43 | 3 | Q.    And what is it, in your mind? |
| 08:43 | 4 | A.    When you launch a product line, you try to not only |
| 08:43 | 5 | make the product the issue or the opportunity for the |
| 08:43 | 6 | purchase, but to leave behind it something greater, which is |
| 08:43 | 7 | called the brand.  And the brand encompassed not just the |
| 08:43 | 8 | product itself, but encompasses the package; it encompasses |
| 08:43 | 9 | the television advertising you might put on it, very much |
| 08:43 | 10 | the logo or the name of product; the color that you might |
| 08:43 | 11 | attribute to the product whenever you see the product; the |
| 08:43 | 12 | formation of any packaging or any sort of geometric shapes |
| 08:44 | 13 | that are unique to that brand so that there's a residual |
| 08:44 | 14 | effect from the purchase.  And it creates a one plus one. |
| 08:44 | 15 | So it's not just that someone buys into your product, but |
| 08:44 | 16 | they buy into your brand, and therefore, you have a |
| 08:44 | 17 | sustainable opportunity to introduce more products and to |
| 08:44 | 18 | leverage up a larger portfolio. |
| 08:44 | 19 | Q.    Were you involved in the branding process with Bratz? |
| 08:44 | 20 | A.    Um, there was a branding process already in place, but |
| 08:44 | 21 | I did add to it as I arrived in the company, yes. |
| 08:44 | 22 | Q.    And what were you able to see about that process that |
| 08:44 | 23 | made Bratz a successful line? |
| 08:44 | 24 | A.    Again, I want to make it clear that I think Bratz was a |
| 08:44 | 25 | very successful line at the time I already joined in 2004. |

Case 2:04-cv-09049-DOC-RNB   Document 10370   Filed 04/04/11   Page 17 of 89   Page ID #:314927
CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

17

08:44 1   Um, where I perhaps added was providing some vision on

08:44 2   how to segment some of the -- the -- uh, the businesses, how

08:44 3   to, um, look at new opportunities for new, um -- I want to

08:45 4   call it age -- age, uh -- ages that the dolls could take

08:45 5   form on that might be -- that might be -- that might be

08:45 6   helpful, so a way to extend the brand into, uh, unique

08:45 7   consumers.  Um, those are some of the things that come to

08:45 8   mind.

08:45 9   Q.   So you had seen Bratz, then, both as a competitor from

08:45 10   the outside and as an executive from the inside.

08:45 11   Um, was there any one particular person that you

08:45 12   thought was kind of the prime mover in making the Bratz

08:45 13   brand a success?

08:45 14   A.   Isaac Larian is -- is Bratz.  I mean, Isaac Larian was

08:45 15   the driving force behind Bratz.

08:45 16   Q.   And can you explain that a little bit?

08:45 17   A.   Isaac --

08:45 18       MR. PRICE:  Object.  Lacks foundation.  Before he

08:45 19   got there.

08:45 20       THE COURT:  Overruled.  You can cast your opinion.

08:45 21       THE WITNESS:  Isaac --

08:45 22       THE COURT:  And you were aware of him in the

08:46 23   industry also -- within the industry?

08:46 24       THE WITNESS:  Absolutely, yes.

08:46 25       THE COURT:  Before you got there?

Case 2:04-cv-09049-DOC-RNB   Document 10370   Filed 04/04/11   Page 18 of 89   Page ID #:314928
CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

18

08:46   1               THE WITNESS:  Yes, I was.

08:46   2               THE COURT:  All right.  Overruled.

08:46   3               THE WITNESS:  Isaac was a -- yeah, there were very

08:46   4   few people in the world that I've worked with, and I've

08:46   5   worked with thousands in the toy industry, who have a true

08:46   6   gift for product and an eye for how to create a beautiful

08:46   7   product.  And one of the most important things in a product

08:46   8   is how to find its functionality and its beauty.

08:46   9               Maybe the best in the world that I ever worked

08:46   10  with was Jill Barad as Mattel, and she was the CEO of

08:46   11  Mattel.  Probably number two in the world for me was Isaac.

08:46   12  I mean, Isaac has a gift, true gift, especially when it

08:46   13  comes to dolls.  Um, he can see how to make a doll look more

08:46   14  beautiful.  And it sounds strange, but it's an artistic

08:46   15  talent; it's innate.  It's not something people learn in

08:46   16  school, I don't believe.

08:46   17              And I think he did -- added that passion in that

08:46   18  instant into the product line, and I think Bratz had a

08:46   19  position in the market that made the dolls more attractive

08:47   20  than its competitors, which is what was a fuel for some of

08:47   21  its growth.

08:47   22              Um, I think then, um, he had a fairly good vision

08:47   23  for how to segment and brand the business, as well.  You

08:47   24  know, how -- what to call it -- how to advertise it, um, and

08:47   25  I think how to package it.  He has a great eye for

Case 2:04-cv-09049-DOC-RNB   Document 10370   Filed 04/04/11   Page 19 of 89   Page ID #:314929
CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

19

| | | |
|---|---|---|
| 08:47 | 1 | packaging. |
| 08:47 | 2 | Um, and so I think those -- his inspiration on the |
| 08:47 | 3 | dolls, his inspiration on the fashions, his inspiration on |
| 08:47 | 4 | the packaging, his inspiration on the advertising -- and I |
| 08:47 | 5 | saw this very firsthand.  I mean, I'm talking about a guy I |
| 08:47 | 6 | sat next to -- |
| 08:47 | 7 | MR. PRICE:  Now, we're into a narrative. |
| 08:47 | 8 | THE COURT:  Sustained. |
| 08:47 | 9 | BY MS. KELLER: |
| 08:47 | 10 | Q.   How closely did you observe Mr. Larian's involvement in |
| 08:47 | 11 | the process? |
| 08:47 | 12 | A.   I saw -- I saw Mr. Larian do this 15 hours a week for |
| 08:47 | 13 | years.  I mean, I was in line reviews with him constantly. |
| 08:47 | 14 | I was, uh, in meetings with him constantly.  We were |
| 08:47 | 15 | reviewing, creative, constantly together.  I saw his passion |
| 08:48 | 16 | for it. |
| 08:48 | 17 | And there's no question in my mind at least that Bratz |
| 08:48 | 18 | would never have been anything close to what it became if it |
| 08:48 | 19 | hadn't fallen in the lap of Isaac or if it hasn't come out |
| 08:48 | 20 | of Isaac.  And that's really where the -- where it comes in. |
| 08:48 | 21 | So... |
| 08:48 | 22 | Q.   You talked a minute ago about the creative process. |
| 08:48 | 23 | Did you see a difference in how the creative process worked |
| 08:48 | 24 | at Mattel versus MGA? |
| 08:48 | 25 | MR. PRICE:  Your Honor, I object to lack of |

Case 2:04-cv-09049-DOC-RNB  Document 10370  Filed 04/04/11  Page 20 of 89  Page ID #:314930
CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

20

| | | |
|---|---|---|
| 08:48 | 1 | foundation, given his position at Mattel.  And irrelevant. |
| 08:48 | 2 | THE COURT:  No, it goes to branding.  Overruled. |
| 08:48 | 3 | You can answer it. |
| 08:48 | 4 | (To the jury:)  Now, remember, this is his |
| 08:48 | 5 | personal opinion. |
| 08:48 | 6 | THE WITNESS:  So my position at both Mattel and at |
| 08:48 | 7 | MGA allowed me to sit in and review the creative process on |
| 08:48 | 8 | both ends.  And I was able to see what they call line |
| 08:48 | 9 | reviews.  Line reviews are where the designers will bring |
| 08:49 | 10 | you their conceptualizations of whatever it is that people |
| 08:49 | 11 | are trying to create. |
| 08:49 | 12 | Mattel was a very big organization, for the good |
| 08:49 | 13 | and the bad.  And it was slow to move, had a lot of layers, |
| 08:49 | 14 | and making -- getting things done and getting things created |
| 08:49 | 15 | was a much tougher task at Mattel.  Um, it -- it's just the |
| 08:49 | 16 | way it's structured.  Um, there's a lot of functional |
| 08:49 | 17 | groups, as well, that get involved in the product process, |
| 08:49 | 18 | which sometimes makes it good, but lot of times can have the |
| 08:49 | 19 | effect of too many cooks in the kitchen kind of thing. |
| 08:49 | 20 | Um, on MGA's side -- |
| 08:49 | 21 | THE COURT:  Okay.  Counsel, your next question. |
| 08:49 | 22 | BY MS. KELLER: |
| 08:49 | 23 | Q.   Tell us how long MGA differed from that in its creative |
| 08:49 | 24 | process that you saw? |
| 08:49 | 25 | A.   MGA -- on the MGA side, it was highly centralized |

| | | |
|---|---|---|
| 08:49 | 1 | around Isaac.  Isaac would find, generally, one or two |
| 08:49 | 2 | people, a Paula Garcia or somebody else who was in the |
| 08:49 | 3 | design area, and worked very closely with them to drive the |
| 08:50 | 4 | process much quicker. |
| 08:50 | 5 | And, um -- and so he had, uh, a huge amount of patience |
| 08:50 | 6 | and passion for the creative side.  He would drive it very |
| 08:50 | 7 | quickly.  If he saw something he liked, the company went and |
| 08:50 | 8 | made it.  It was the entrepreneur versus the corporation, |
| 08:50 | 9 | and that's really how the differences in the process really |
| 08:50 | 10 | evolved. |
| 08:50 | 11 | Um, I think the appreciation -- |
| 08:50 | 12 | MR. PRICE:  Your Honor -- |
| 08:50 | 13 | THE COURT:  Sustained. |
| 08:50 | 14 | BY MS. KELLER: |
| 08:50 | 15 | Q.   How did that affect how quickly products could get to |
| 08:50 | 16 | market? |
| 08:50 | 17 | A.   Oh, MGA could create products much quicker than Mattel. |
| 08:50 | 18 | Q.   And get 'em to market quicker? |
| 08:50 | 19 | A.   Get 'em to market quicker. |
| 08:50 | 20 | Q.   Um, did Mattel come up with any really significant new |
| 08:50 | 21 | brands while you were there? |
| 08:50 | 22 | A.   (No response.) |
| 08:51 | 23 | Q.   Well, when I say "come up with," I mean, from scratch |
| 08:51 | 24 | as opposed to buying another company or buying another |
| 08:51 | 25 | brand? |

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

22

| | | |
|---|---|---|
| 08:51 | 1 | A.    Um, I guess it depends how large significant is. |
| 08:51 | 2 | Nothing near the size of Bratz. |
| 08:51 | 3 | Q.    Um, let's talk in particular about one product at |
| 08:51 | 4 | Mattel while you were there.  Do you remember seeing a |
| 08:51 | 5 | product in development called Swappin Styles? |
| 08:51 | 6 | A.    Um, I don't recall now, but, um, it did come up in my |
| 08:51 | 7 | depositions. |
| 08:51 | 8 | Q.    Okay.  Well, before you left Mattel, do you remember |
| 08:51 | 9 | seeing a product being developed that was a doll with |
| 08:51 | 10 | switchable heads? |
| 08:51 | 11 | A.    As I said, I don't recall ever having seen that. |
| 08:51 | 12 | Q.    Did you have any involvement in the design of an MGA |
| 08:51 | 13 | product called "Head Games"? |
| 08:51 | 14 | A.    I had no involvement in the design of Head Games. |
| 08:51 | 15 | Q.    Was it your idea to sell a product at MGA with |
| 08:51 | 16 | swappable heads? |
| 08:52 | 17 | A.    No, it was not. |
| 08:52 | 18 | Q.    When you started working at MGA, did you ever tell |
| 08:52 | 19 | anyone at MGA that Mattel was planning to sell a product |
| 08:52 | 20 | called "Swappin Styles"? |
| 08:52 | 21 | A.    Absolutely not. |
| 08:52 | 22 | Q.    Did you tell anyone at MGA that Mattel was planning to |
| 08:52 | 23 | introduce a new doll with swappable head? |
| 08:52 | 24 | A.    Absolutely not. |
| 08:52 | 25 | Q.    Did you tell anyone at MGA any new product ideas you |

| | | |
|---|---|---|
| 08:52 | 1 | had seen at Mattel being developed? |
| 08:52 | 2 | A.   Hundred percent no. |
| 08:52 | 3 | Q.   And why not? |
| 08:52 | 4 | A.   First off, I had a duty of confidentiality certainly on |
| 08:52 | 5 | that -- on that level to not disclose what Mattel was doing |
| 08:52 | 6 | on the creative side.  And in fairness, Isaac and the MGA |
| 08:52 | 7 | people really were not interested in having me spew a bunch |
| 08:52 | 8 | of ideas that Mattel was trying to create. |
| 08:52 | 9 | Q.   They wanted to create their own ideas? |
| 08:52 | 10 | A.   They wanted to create their own ideas. |
| 08:52 | 11 | MS. KELLER:  I have nothing further at this time, |
| 08:52 | 12 | Your Honor. |
| 08:52 | 13 | THE COURT:  Cross-examination, Mr. Price. |
| 08:53 | 14 | **CROSS-EXAMINATION** |
| 08:53 | 15 | BY MR. PRICE: |
| 08:53 | 16 | Q.   Mr. Brawer, when you gave your notice at Mattel and |
| 08:53 | 17 | left, you knew why they were suspicious of you, didn't you? |
| 08:53 | 18 | A.   No, I did not. |
| 08:53 | 19 | Q.   Well, uh, you said there was complaint for declaratory |
| 08:53 | 20 | relief that was filed against you, right? |
| 08:53 | 21 | A.   There was a complaint filed against me after I joined |
| 08:53 | 22 | MGA, correct. |
| 08:53 | 23 | Q.   And you saw the complaint; talked about it with your |
| 08:53 | 24 | lawyer? |
| 08:53 | 25 | A.   Yes, I did. |

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

24

| | | |
|---|---|---|
| 08:53 | 1 | MR. PRICE:  Your Honor, if we could show |
| 08:53 | 2 | Mr. Brawer 34676. |
| 08:53 | 3 | THE COURT:  346... |
| 08:53 | 4 | MR. PRICE:  76. |
| 08:53 | 5 | THE COURT:  Thank you. |
| 08:53 | 6 | *(Document provided to the witness.)* |
| 08:54 | 7 | BY MR. PRICE: |
| 08:54 | 8 | Q.   Now, first off, Mr. Brawer, you understand that the |
| 08:54 | 9 | complaint filed against you did not seek any damages at all; |
| 08:54 | 10 | it sought a declaratory relief that you had certain |
| 08:54 | 11 | obligations, correct? |
| 08:54 | 12 | A.   Um, I don't -- I don't know -- I didn't understand, as |
| 08:54 | 13 | I said earlier, what the purpose of the complaint was. |
| 08:54 | 14 | Q.   Well, you said you had an attorney and talked to him, |
| 08:54 | 15 | right? |
| 08:54 | 16 | A.   Yes, I did. |
| 08:54 | 17 | Q.   And he told you that there weren't any damages that |
| 08:54 | 18 | were being sought by Mattel, just a declaratory statement |
| 08:54 | 19 | ruling that you had certain obligations, correct? |
| 08:54 | 20 | MS. KELLER:  Objection, Your Honor.  The Court's |
| 08:54 | 21 | already brought up the attorney-client privilege issue, and |
| 08:54 | 22 | now he's being asked what his attorney told him. |
| 08:54 | 23 | THE COURT:  I think this is opening this up in |
| 08:54 | 24 | terms of a lawsuit, Counsel. |
| 08:54 | 25 | Just a moment. |

| | | |
|---|---|---|
| 08:54 | 1 | MS. KELLER:  It also misstates the complaint, |
| 08:54 | 2 | Your Honor. |
| 08:54 | 3 | THE COURT:  Overruled. |
| 08:54 | 4 | You can answer the question. |
| 08:55 | 5 | THE WITNESS:  I was never a hundred percent clear |
| 08:55 | 6 | on what the objective of the complaint was, no. |
| 08:55 | 7 | BY MR. PRICE: |
| 08:55 | 8 | Q.   Did anyone ever tell you that Mattel was seeking money |
| 08:55 | 9 | from you in its complaint? |
| 08:55 | 10 | A.   No, no one told me that they were seeking money. |
| 08:55 | 11 | Q.   And what they were seeking was an acknowledgment that |
| 08:55 | 12 | you would be bound by the Mattel code of conduct, right? |
| 08:55 | 13 | A.   Um, I was never explained that, that clearly, no. |
| 08:55 | 14 | Q.   So no one told you that, not even your attorney? |
| 08:55 | 15 | MS. KELLER:  Objection.  Misstates the relief |
| 08:55 | 16 | sought in the complaint. |
| 08:55 | 17 | THE COURT:  Well, Counsel, do each of you have the |
| 08:55 | 18 | release? |
| 08:55 | 19 | MR. PRICE:  Release?  I have the complaint, and I |
| 08:55 | 20 | would move it into evidence, Your Honor. |
| 08:55 | 21 | THE COURT:  Counsel, any objection? |
| 08:55 | 22 | MS. KELLER:  Your Honor, I haven't had a chance to |
| 08:55 | 23 | thoroughly review it but... |
| 08:55 | 24 | *(Exhibit No. 34676 received in evidence.)* |
| 08:55 | 25 | THE COURT:  Received. |

CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

26

| | | |
|---|---|---|
| 08:55 | 1 | (Document displayed.) |
| 08:55 | 2 | MR. PRICE:  Thank you. |
| 08:55 | 3 | BY MR. PRICE: |
| 08:55 | 4 | Q.   Let's get some background here.  You signed a |
| 08:55 | 5 | confidentiality agreement with Tyco, correct? |
| 08:56 | 6 | A.   I signed a confidentiality and inventions agreement |
| 08:56 | 7 | with Tyco, something like that, yes. |
| 08:56 | 8 | Q.   And then Mattel took over Tyco, right? |
| 08:56 | 9 | A.   Correct. |
| 08:56 | 10 | Q.   And as of the time you left Mattel, you had never |
| 08:56 | 11 | signed a confidentiality agreement with Mattel; is that |
| 08:56 | 12 | right? |
| 08:56 | 13 | A.   Um, I don't think I signed anything other than what was |
| 08:56 | 14 | in my human resources folder.  There were a few different |
| 08:56 | 15 | documents there.  I don't recall exactly which ones were in |
| 08:56 | 16 | there. |
| 08:56 | 17 | Q.   Well, in March 2004 -- actually, if you could look at |
| 08:56 | 18 | the complaint on page 5, paragraph 15. |
| 08:56 | 19 | (Document displayed.) |
| 08:56 | 20 | BY MR. PRICE: |
| 08:56 | 21 | Q.   Is it true that around March of 2004, the president of |
| 08:56 | 22 | Mattel Brands, Matt Bousquette, distributed a memorandum to |
| 08:56 | 23 | the employees in his executive group, director or above, |
| 08:56 | 24 | that enclosed a survey confirming compliance with Mattel's |
| 08:56 | 25 | code of conduct and an updated employee confidentiality and |

| 08:57 | 1 | inventions agreement?  Do you recall that? |
| 08:57 | 2 | A.   Yes, I do. |
| 08:57 | 3 | Q.   And if you'd look at Exhibit 4241. |
| 08:57 | 4 | A.   I'm sorry.  Where am I looking now? |
| 08:57 | 5 | Q.   We're going to show you 4241. |
| 08:57 | 6 | *(Document provided to the witness.)* |
| 08:57 | 7 | THE WITNESS:  Okay. |
| 08:57 | 8 | BY MR. PRICE: |
| 08:57 | 9 | Q.   You have that in front of you? |
| 08:57 | 10 | A.   Yes, I do. |
| 08:57 | 11 | Q.   And you see that's the March 5, 2004, e-mail from |
| 08:57 | 12 | Mr. Bousquette to people who were, you know, senior |
| 08:57 | 13 | executives, director and above, with the code of conduct and |
| 08:57 | 14 | confidentiality agreement.  Do you see that? |
| 08:57 | 15 | A.   Yes, I do. |
| 08:57 | 16 | Q.   And you understood that part of the code of conduct was |
| 08:57 | 17 | that you weren't to reveal confidential information that you |
| 08:57 | 18 | obtained at Mattel, correct? |
| 08:57 | 19 | A.   Completely agree, yes. |
| 08:57 | 20 | MR. PRICE:  Your Honor, move Exhibit 4241 into |
| 08:57 | 21 | evidence. |
| 08:57 | 22 | THE COURT:  And once again that is the -- |
| 08:57 | 23 | MR. PRICE:  This is the Matt Bousquette, March 5, |
| 08:57 | 24 | 2004 e-mail asking the directors and above to fill out the |
| 08:57 | 25 | code of conduct and the survey. |

CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

28

| | | |
|---|---|---|
| 08:58 | 1 | THE COURT:  Received. |
| 08:57 | 2 | *(Exhibit No. 4241 received in evidence.)* |
| 08:58 | 3 | *(Document displayed.)* |
| 08:58 | 4 | BY MR. PRICE: |
| 08:58 | 5 | Q.  And by the way, your understanding is that everybody |
| 08:58 | 6 | who reported directly to Mr. Bousquette, except for you, |
| 08:58 | 7 | signed the code of conduct and the new confidentiality |
| 08:58 | 8 | agreement? |
| 08:58 | 9 | MS. KELLER:  Objection.  Calls for speculation. |
| 08:58 | 10 | No foundation. |
| 08:58 | 11 | THE COURT:  Overruled. |
| 08:58 | 12 | THE WITNESS:  I wouldn't know that. |
| 08:58 | 13 | BY MR. PRICE: |
| 08:58 | 14 | Q.  You didn't talk to your direct -- your other senior |
| 08:58 | 15 | executives and, say, "Have you signed this?" |
| 08:58 | 16 | A.  I did not talk to all of the other senior executives |
| 08:58 | 17 | and ask them if they signed that, no. |
| 08:58 | 18 | Q.  Let me show an organizational chart, if we can. |
| 08:58 | 19 | MR. PRICE:  It's in evidence, Your Honor, as 9272. |
| 08:58 | 20 | If we can just put that up, Ken. |
| 08:58 | 21 | *(Document displayed.)* |
| 08:58 | 22 | BY MR. PRICE: |
| 08:58 | 23 | Q.  And it's the second page. |
| 08:58 | 24 | And this says, "Boys/Entertainment 2003." |
| 08:58 | 25 | Do you see that? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:58 | 1 | A.    Yes. |
| 08:58 | 2 | Q.    And couldn't find any for 2004, but in 2003, you're |
| 08:58 | 3 | reporting directly to Mr. Bousquette, or is there someone in |
| 08:58 | 4 | between you? |
| 08:58 | 5 | A.    No.  I think everyone on that chart is reporting to |
| 08:59 | 6 | Mr. Bousquette directly. |
| 08:59 | 7 | Q.    Is that who's referred to as director and above? |
| 08:59 | 8 | A.    Actually, director and above at Mattel would include |
| 08:59 | 9 | many, many more people. |
| 08:59 | 10 | Q.    Okay.  So you're even at a higher level than director? |
| 08:59 | 11 | A.    Um, yes, I am a higher level than director. |
| 08:59 | 12 | Q.    Did -- could you tell us anyone who was with Mattel in |
| 08:59 | 13 | March 5, 2004, who refused to sign the code of conduct and |
| 08:59 | 14 | confidentiality agreement other than yourself? |
| 08:59 | 15 | MS. KELLER:  Objection, Your Honor.  25,000 |
| 08:59 | 16 | employees.  That calls for speculation. |
| 08:59 | 17 | THE COURT:  Overruled. |
| 08:59 | 18 | THE WITNESS:  I have no idea who did and did not |
| 08:59 | 19 | sign this declaration. |
| 08:59 | 20 | BY MR. PRICE: |
| 08:59 | 21 | Q.    Well, if you'd look at Exhibit 4242. |
| 08:59 | 22 | *(Document provided to the witness.)* |
| 08:59 | 23 | BY MR. PRICE: |
| 08:59 | 24 | Q.    And this is an e-mail you sent to Mr. Bousquette in |
| 08:59 | 25 | response to the request that you for the first time |

Case 2:04-cv-09049-DOC-RNB   Document 10370   Filed 04/04/11   Page 30 of 89   Page ID #:314940
CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

30

| | | |
|---|---|---|
| 09:00 | 1 | acknowledge the code of conduct and signed the |
| 09:00 | 2 | confidentiality agreement, correct? |
| 09:00 | 3 | A.   Yes, um, this was an e-mail that I sent to |
| 09:00 | 4 | Mr. Bousquette. |
| 09:00 | 5 | MR. PRICE:  Move Exhibit 4242 into evidence. |
| 09:00 | 6 | MS. KELLER:  Your Honor, I object to the |
| 09:00 | 7 | continuing description of this as the code of conduct. |
| 09:00 | 8 | THE COURT:  Well, on redirect, whatever it's |
| 09:00 | 9 | called, you'll -- we've always had some semantical |
| 09:00 | 10 | differences about things between counsel, and they'll frame |
| 09:00 | 11 | their questions on redirect. |
| 09:00 | 12 | Overruled. |
| 09:00 | 13 | And this is an e-mail dated what date again? |
| 09:00 | 14 | MR. PRICE:  March 18, 2004, from Mr. Brawer to |
| 09:00 | 15 | Mr. Bousquette, 4242. |
| 09:00 | 16 | THE COURT:  Thank you.  Received. |
| 09:00 | 17 | *(Exhibit No. 4242 received in evidence.)* |
| 09:00 | 18 | *(Document displayed.)* |
| 09:00 | 19 | BY MR. PRICE: |
| 09:00 | 20 | Q.   And here you say to Mr. Bousquette, "Response to note |
| 09:00 | 21 | concerning signature of code of conduct survey." |
| 09:00 | 22 | Do you see that? |
| 09:00 | 23 | A.   Yes, I do. |
| 09:00 | 24 | Q.   "My apologies for not meeting your deadline on signing |
| 09:00 | 25 | the code of conduct survey.  I applaud the company's |

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

31

| 09:00 | 1  | vigorous protection of it intellectual property." |
| 09:01 | 2  | That's what you wrote, correct? |
| 09:01 | 3  | A.   I did write that, yes. |
| 09:01 | 4  | Q.   "There is one section of the document that contains new |
| 09:01 | 5  | and fairly broad language that I felt should be reviewed |
| 09:01 | 6  | prior to signing.  My hope is to have the document review |
| 09:01 | 7  | complete by no later than March 24, 2004.  I would be happy |
| 09:01 | 8  | to meet with you or anyone from the company from that time |
| 09:01 | 9  | forward to discuss the document."  It says, "Thanks, Ron |
| 09:01 | 10 | Brawer." |
| 09:01 | 11 | Do you see that? |
| 09:01 | 12 | A.   Yes, I did. |
| 09:01 | 13 | Q.   And by that time, you had already had contact with MGA, |
| 09:01 | 14 | correct, by March 2004? |
| 09:01 | 15 | A.   At some point I had had contact with MGA, right, prior |
| 09:01 | 16 | to that. |
| 09:01 | 17 | Q.   Prior to March -- |
| 09:01 | 18 | A.   Yes. |
| 09:01 | 19 | Q.   -- 2004, correct? |
| 09:01 | 20 | A.   Yes. |
| 09:01 | 21 | Q.   And by this time, March of 2004, you were in a very |
| 09:01 | 22 | senior position at Mattel, correct? |
| 09:01 | 23 | A.   I was in a very senior position at Mattel, yes. |
| 09:01 | 24 | Q.   You, for example, attended, I think you said line |
| 09:01 | 25 | meetings? |

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

32

| | | |
|---|---|---|
| 09:01 | 1 | A.   Yes, I did. |
| 09:01 | 2 | Q.   And those are meetings where you're going over future |
| 09:01 | 3 | product, correct? |
| 09:01 | 4 | A.   That's correct, yes. |
| 09:01 | 5 | Q.   And retailers aren't invited to those meetings, right? |
| 09:02 | 6 | A.   Absolutely not. |
| 09:02 | 7 | Q.   And the press isn't invited to those meetings, correct? |
| 09:02 | 8 | A.   No, they were not. |
| 09:02 | 9 | Q.   These are meetings discussing product sometimes up to a |
| 09:02 | 10 | year in advance, correct? |
| 09:02 | 11 | A.   Sometimes more. |
| 09:02 | 12 | Q.   And you were attending such meetings throughout 2003 |
| 09:02 | 13 | and 2004, right? |
| 09:02 | 14 | A.   That is correct. |
| 09:02 | 15 | Q.   And you were, uh -- during that same time frame, you |
| 09:02 | 16 | had communication in 2003 and 2004 with MGA, correct? |
| 09:02 | 17 | A.   I had had communication with MGA during that time |
| 09:02 | 18 | period, yes. |
| 09:02 | 19 | Q.   And after March 18, 2004, you continued to have |
| 09:02 | 20 | communication with MGA, correct? |
| 09:02 | 21 | A.   After March 18th, I did have communication with MGA, |
| 09:02 | 22 | correct. |
| 09:02 | 23 | Q.   And, uh, at some point, uh, Alan Kaye, the head of |
| 09:02 | 24 | Human Resources said there was a rumor that you were in |
| 09:02 | 25 | contact with MGA, correct? |

CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

33

| | | |
|--|--|--|
| 09:02 | 1 | A.   Um, Alan Kaye –– I don't know.  I mean, Alan Kaye –– I |
| 09:03 | 2 | think you're referring to Alan Kaye came to me one time and, |
| 09:03 | 3 | uh, threatened me that if I would go to MGA, there would be |
| 09:03 | 4 | big trouble. |
| 09:03 | 5 | Q.   Well, uh, what you said is that he came to you –– well, |
| 09:03 | 6 | let me ask it this way. |
| 09:03 | 7 |      He came to you and asked whether or not you had contact |
| 09:03 | 8 | with MGA, correct? |
| 09:03 | 9 | A.   That's correct. |
| 09:03 | 10 | Q.   And your response to him was, "No, I have not," |
| 09:03 | 11 | correct? |
| 09:03 | 12 | A.   That's correct. |
| 09:03 | 13 | Q.   I mean, you lied to him? |
| 09:03 | 14 | A.   I did lie to him. |
| 09:03 | 15 | Q.   Now, you said that, uh, that you were threatened at the |
| 09:03 | 16 | time.  Is there anything in writing which –– where you say |
| 09:03 | 17 | that there was some kind of threat? |
| 09:03 | 18 | A.   Alan Kaye said to me that I would be in big trouble if |
| 09:03 | 19 | I went to MGA. |
| 09:03 | 20 | Q.   That wasn't my question.  Is there anything in writing |
| 09:03 | 21 | anywhere, anywhere where you have put down that, oh, when I |
| 09:03 | 22 | was asked by Mr. Kaye if I was in contact with MGA and I |
| 09:03 | 23 | lied to him, at that time he threatened me. |
| 09:03 | 24 | A.   I confirmed that with my wife.  I don't remember if I |
| 09:04 | 25 | wrote it down or not, but I did go home that day and I did |

CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

34

| | | |
|---|---|---|
| 09:04 | 1 | tell her that I was threatened at work. |
| 09:04 | 2 | MR. PRICE:  So are you waiving the marital |
| 09:04 | 3 | privilege? |
| 09:04 | 4 | MS. KELLER:  Your Honor, this is abusive. |
| 09:04 | 5 | THE COURT:  Well, no. |
| 09:04 | 6 | MS. KELLER:  It really is. |
| 09:04 | 7 | THE COURT:  The confirmation with your wife is a |
| 09:04 | 8 | privileged communication.  If you -- |
| 09:04 | 9 | MS. KELLER:  On this specific issue alone? |
| 09:04 | 10 | THE COURT:  On this specific issue alone. |
| 09:04 | 11 | MS. KELLER:  And not on his whole life. |
| 09:04 | 12 | THE COURT:  Well, thank you very much, Counsel. |
| 09:04 | 13 | We'll stop the speaking objections now.  Right?  We're done |
| 09:04 | 14 | with that. |
| 09:04 | 15 | On this one issue, if you say you confirmed it |
| 09:04 | 16 | with your wife, I'll let you answer that question. |
| 09:04 | 17 | THE WITNESS:  Yes. |
| 09:04 | 18 | THE COURT:  But that doesn't mean that literally |
| 09:04 | 19 | your wife can't be called into these proceedings.  I want |
| 09:04 | 20 | you to understand that. |
| 09:04 | 21 | THE WITNESS:  If I confirm that and then she gets |
| 09:04 | 22 | asked on anything and everything, or is only on this one -- |
| 09:04 | 23 | THE COURT:  On this subject. |
| 09:04 | 24 | THE WITNESS:  On this subject, no problem. |
| | 25 | |

| 09:04 | 1 | BY MR. PRICE: |
|---|---|---|
| 09:04 | 2 | Q.   And at your deposition, you said you didn't recall what |
| 09:04 | 3 | Mr. Kaye said to you.  You just recall -- |
| 09:04 | 4 | THE COURT:  Just a moment, Counsel. |
| 09:04 | 5 | We may need some time.  I'm not sure there is such |
| 09:04 | 6 | a thing as a limited waiver. |
| 09:05 | 7 | So let's stop for just a moment and slow down. |
| 09:05 | 8 | MR. PRICE:  Literally stop? |
| 09:05 | 9 | THE COURT:  Literally stop.  We'll stop the time |
| 09:05 | 10 | clock.  You can see counsel for both sides are very |
| 09:05 | 11 | concerned about this time clock. |
| 09:05 | 12 | Why don't we strike that question and strike that |
| 09:05 | 13 | answer for the moment.  And let's take that up during the |
| 09:05 | 14 | recess for both parties. |
| 09:05 | 15 | And let me discuss that with you also.  You don't |
| 09:05 | 16 | have counsel present, so it's a hard discussion to have |
| 09:05 | 17 | about the law and how it applies. |
| 09:05 | 18 | THE WITNESS:  Okay.  I appreciate that. |
| 09:05 | 19 | THE COURT:  I can see you're concerned.  You're |
| 09:05 | 20 | concerned about your personal discussions and your wife. |
| 09:05 | 21 | Okay.  Well, okay. |
| 09:05 | 22 | THE WITNESS:  Sure. |
| 09:05 | 23 | THE COURT:  All right.  Counsel, let's strike the |
| 09:05 | 24 | question and strike the answer. |
|  | 25 |  |

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

36

| | | |
|---|---|---|
| 09:05 | 1 | BY MR. PRICE: |
| 09:05 | 2 | Q.   You now -- at your deposition, you were represented by |
| 09:05 | 3 | MGA's counsel, correct? |
| 09:05 | 4 | A.   Yes, I was. |
| 09:05 | 5 | Q.   In fact, they have an agreement with you paying you for |
| 09:05 | 6 | your time, correct? |
| 09:05 | 7 | A.   They have an agreement paying me for my time, correct. |
| 09:05 | 8 | Q.   Including time when you're on the stand? |
| 09:06 | 9 | A.   Not including time when I'm on the stand. |
| 09:06 | 10 | Q.   And at the deposition when you said you were threatened |
| 09:06 | 11 | by Mr. Kaye, is it correct you had no recollection of what |
| 09:06 | 12 | he said? |
| 09:06 | 13 | A.   I don't recall the specifics of what I said at the |
| 09:06 | 14 | deposition. |
| 09:06 | 15 | Q.   If you look at page 1115, this is on March 5th, 2010. |
| 09:06 | 16 | A.   I'm sorry.  Can somebody -- |
| 09:06 | 17 |         THE COURT:  Somebody's going to hand you |
| 09:06 | 18 | something.  You don't have to reach for a thing.  It just |
| 09:06 | 19 | magically appears. |
| 09:06 | 20 |         THE WITNESS:  I appreciate it. |
| 09:06 | 21 |         (Document provided to the witness.) |
| 09:06 | 22 | BY MR. PRICE: |
| 09:06 | 23 | Q.   If you're there, it's 1115, lines 13 through 22. |
| 09:07 | 24 |         Do you have that in front of you? |
| 09:07 | 25 |         MS. KELLER:  Your Honor, I would ask that the |

| | | |
|---|---|---|
| 09:07 | 1 | portion above be read, starting at 114 (sic), line 23, down. |
| 09:07 | 2 | THE COURT: Just a moment. |
| 09:07 | 3 | MS. KELLER: And it's not inconsistent at all. |
| 09:07 | 4 | THE COURT: Just a moment. |
| 09:07 | 5 | MR. PRICE: I'll reads 23, down. |
| 09:07 | 6 | THE COURT: Just a moment. What lines, now, both |
| 09:07 | 7 | of you requested? Let me start with Mattel, which lines? |
| 09:07 | 8 | MR. PRICE: I'll agree to what Ms. Keller |
| 09:07 | 9 | suggested, I think, which is line 23 at 1114 to 1115, line |
| 09:07 | 10 | 22. |
| 09:07 | 11 | MS. KELLER: Your Honor, it's not inconsistent. |
| 09:07 | 12 | THE COURT: Just a moment. |
| 09:08 | 13 | Counsel, it's not inconsistent. It's what he |
| 09:08 | 14 | testified to. |
| 09:08 | 15 | MR. PRICE: Well, let me ask a question. |
| 09:08 | 16 | BY MR. PRICE: |
| 09:08 | 17 | Q. What did you understand Mr. Kaye to say when you say he |
| 09:08 | 18 | told you there would be big problems if you went to MGA? |
| 09:08 | 19 | A. That he was threatening me. |
| 09:08 | 20 | Q. Well, what do you recall -- what did you understand him |
| 09:08 | 21 | to say beyond that? Anything? |
| 09:08 | 22 | A. Well, are you asking me what did I think the threat |
| 09:08 | 23 | could convey? |
| 09:08 | 24 | Q. What did you understand Mr. Kaye to say when he told |
| 09:08 | 25 | you there would be big problems if you went to MGA? |

| 09:08 | 1 | A.   I guess the first threat I would have assumed would |
| 09:08 | 2 | have been, you know, that they would have attacked me with a |
| 09:08 | 3 | lawsuit. |
| 09:08 | 4 | MR. PRICE:  Your Honor, may I read 13 -- I mean, |
| 09:08 | 5 | page 1115, lines 13 to 22? |
| 09:08 | 6 | MS. KELLER:  And, uh, that's fine.  I still don't |
| 09:08 | 7 | think it's inconsistent. |
| 09:08 | 8 | THE COURT:  It's not inconsistent. |
| 09:08 | 9 | BY MR. PRICE: |
| 09:09 | 10 | Q.   At the time you said you don't recall what you felt, |
| 09:09 | 11 | correct? |
| 09:09 | 12 | THE COURT:  Well, it's not inconsistent, Counsel. |
| 09:09 | 13 | BY MR. PRICE: |
| 09:09 | 14 | Q.   At the time of your deposition did you say you didn't |
| 09:09 | 15 | recall what you thought this threat would manifest itself |
| 09:09 | 16 | as? |
| 09:09 | 17 | A.   And I think I just said I -- actually, I ended up using |
| 09:09 | 18 | the exact same word of "threat."  And you asked me now three |
| 09:09 | 19 | times what did I think, and I was trying to define to you |
| 09:09 | 20 | what I thought "threat" might mean.  I didn't -- I wasn't |
| 09:09 | 21 | asked that specific question in the deposition. |
| 09:09 | 22 | Q.   Well, did you at the time feel threatened with legal |
| 09:09 | 23 | action? |
| 09:09 | 24 | A.   I remember -- |
| 09:09 | 25 | Q.   Potential legal action? |

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

39

| | | |
|---|---|---|
| 09:09 | 1 | A.    I remember feeling threatened. |
| 09:09 | 2 | Q.    I thought you said you felt threatened with potential |
| 09:09 | 3 | legal action; is that true? |
| 09:09 | 4 | A.    I think if you asked me to define what that is likely |
| 09:09 | 5 | to have meant to me, that is legal action, yes. |
| 09:09 | 6 | Q.    At your deposition, though, is it correct you said you |
| 09:09 | 7 | didn't recall whether you felt threatened with potential |
| 09:09 | 8 | legal action? |
| 09:09 | 9 | MS. KELLER:  That's -- misstatement of the |
| 09:09 | 10 | testimony, Your Honor, taken as a whole. |
| 09:09 | 11 | MR. PRICE:  Lines 18 through 22. |
| 09:10 | 12 | THE COURT:  Well, why don't we just read the whole |
| 09:10 | 13 | section?  Would that satisfy everybody? |
| 09:10 | 14 | MR. PRICE:  That would be fine.  Starting with |
| 09:10 | 15 | 1114, line 23.  Question -- |
| 09:10 | 16 | THE COURT:  No, no. |
| 09:10 | 17 | MR. PRICE:  I think that's what Ms. Keller |
| 09:10 | 18 | requested. |
| 09:10 | 19 | THE COURT:  Go back to line 14, all the way down |
| 09:10 | 20 | to 22.  Is there any objection by either party? |
| 09:10 | 21 | MS. KELLER:  No objection. |
| 09:10 | 22 | MR. PRICE:  No objection. |
| 09:10 | 23 | THE COURT:  Read it, then. |
| 09:10 | 24 | MR. PRICE:  (Reading:) |
| 09:10 | 25 | "QUESTION:  Did you have those discussions |

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

40

| | | |
|---|---|---|
| 09:10 | 1 | directly with Mr. Kaye? |
| 09:10 | 2 | "ANSWER:  I know I had discussion in part with Bob |
| 09:10 | 3 | Eckert, and I believe Alan Kaye was involved at some point. |
| 09:10 | 4 | "QUESTION:  Do you recall an occasion in which |
| 09:10 | 5 | with Mr. Kaye asked you whether or not you had been in |
| 09:10 | 6 | contact with MGA? |
| 09:10 | 7 | "ANSWER:  Yes, I do. |
| 09:10 | 8 | "QUESTION:  What do you recall about that |
| 09:10 | 9 | conversation? |
| 09:10 | 10 | "ANSWER:  It was a period prior, significantly |
| 09:10 | 11 | prior to this period, I believe, and he showed up informally |
| 09:10 | 12 | without a meeting, pulled me aside, and asked me if I was in |
| 09:11 | 13 | contact at all with MGA, and then threatened me that if I |
| 09:11 | 14 | was, that I would be in big trouble. |
| 09:11 | 15 | "QUESTION:  How did he threaten you? |
| 09:11 | 16 | "ANSWER:  He said Mattel would create big problems |
| 09:11 | 17 | for me if I were to go to MGA. |
| 09:11 | 18 | "QUESTION:  Was this sometime in 2003? |
| 09:11 | 19 | "ANSWER:  Potentially. |
| 09:11 | 20 | "QUESTION:  That's your best recollection, |
| 09:11 | 21 | correct? |
| 09:11 | 22 | "ANSWER:  Correct. |
| 09:11 | 23 | "And what did you understand Mr. Kaye to say when |
| 09:11 | 24 | he told you that there would be big problems if you went to |
| 09:11 | 25 | MGA? |

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

41

| 09:11 | 1 |     "ANSWER:  Don't recall.  I know that I recall |
|---|---|---|
| 09:11 | 2 | feeling threatened. |
| 09:11 | 3 |     "QUESTION:  Did you feel threatened with potential |
| 09:11 | 4 | legal action? |
| 09:11 | 5 |     "ANSWER:  I don't recall exactly what the threat |
| 09:11 | 6 | manifested itself in, but I know that I didn't feel |
| 09:11 | 7 | comfortable about the words he used." |
| 09:11 | 8 | BY MR. PRICE: |
| 09:11 | 9 | Q.   Now, Mr. Brawer, it would obviously be inappropriate |
| 09:11 | 10 | for Mr. Kaye to threaten you, correct? |
| 09:11 | 11 | A.   I think it was. |
| 09:11 | 12 | Q.   So, uh, is there any report that you filed with anyone |
| 09:11 | 13 | saying, "I've just been threatened"? |
| 09:11 | 14 | A.   Alan Kaye was the most senior person in Human |
| 09:11 | 15 | Resources -- |
| 09:11 | 16 | Q.   So -- |
| 09:11 | 17 | A.   -- so I didn't feel comfortable reporting it to |
| 09:12 | 18 | anybody. |
| 09:12 | 19 | Q.   So you didn't report it to Mr. Kaye.  Did you ever tell |
| 09:12 | 20 | Mr. Larian that you had been threatened?  Put it in writing |
| 09:12 | 21 | to Mr. Larian that Mr. Kaye had threatened you? |
| 09:12 | 22 |     MS. KELLER:  Objection.  Assumes facts not in |
| 09:12 | 23 | evidence that he could report Mr. Kaye's threat to Mr. Kaye. |
| 09:12 | 24 | Was asked if he reported it to Mr. Kaye. |
| 09:12 | 25 |     THE COURT:  Overruled.  The question was as to |

| 09:12 | 1 | Mr. Larian. |
|---|---|---|
| 09:12 | 2 | BY MR. PRICE: |
| 09:12 | 3 | Q.   You went to MGA -- |
| 09:12 | 4 | THE COURT:  Counsel, he hasn't answered the |
| 09:12 | 5 | question. |
| 09:12 | 6 | Answer the question.  Did you ever report it to |
| 09:12 | 7 | Mr. Larian? |
| 09:12 | 8 | THE WITNESS:  I did not report this to Mr. Larian. |
| 09:12 | 9 | I didn't work for Mr. Larian. |
| 09:12 | 10 | BY MR. PRICE: |
| 09:12 | 11 | Q.   No, I'm talking about when you went to MGA.  When you |
| 09:12 | 12 | went to MGA, did you ever tell Mr. Larian, you know, "I was |
| 09:12 | 13 | threatened if I had contact with you"? |
| 09:12 | 14 | A.   I don't recall ever telling Mr. Larian that, no. |
| 09:12 | 15 | Q.   So there's nothing in writing anywhere that reflects a |
| 09:12 | 16 | threat by Mr. Kaye, correct? |
| 09:12 | 17 | A.   As I stated, I don't believe there's anything in |
| 09:12 | 18 | writing, no. |
| 09:12 | 19 | Q.   And you didn't tell Mr. Bousquette, who was your direct |
| 09:12 | 20 | report, your boss, correct? |
| 09:12 | 21 | A.   No, I wouldn't have told Mr. Bousquette. |
| 09:12 | 22 | Q.   You didn't tell Mr. Eckert there was a -- you mentioned |
| 09:13 | 23 | Mr. Eckert's name.  You didn't tell Mr. Eckert of any |
| 09:13 | 24 | threat, correct? |
| 09:13 | 25 | A.   No, I did not go to Mr. Eckert. |

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

43

| | | |
|---|---|---|
| 09:13 | 1 | Q.   And you continued working for Mattel for a year or so |
| 09:13 | 2 | after this conversation, correct? |
| 09:13 | 3 | A.   I can't specify the time, but a year would probably be |
| 09:13 | 4 | on the low side, yes. |
| 09:13 | 5 | Q.   So what you did do is you -- is you lied to Mr. Kaye |
| 09:13 | 6 | and said, "I have no contact with MGA," correct? |
| 09:13 | 7 | A.   That's correct. |
| 09:13 | 8 | Q.   And then it was sometime after that that you refused to |
| 09:13 | 9 | sign the conflict of interest questionnaire and the |
| 09:13 | 10 | confidentiality agreement, which is Exhibit 4241, correct? |
| 09:13 | 11 | MS. KELLER:  Objection.  To characterization of |
| 09:13 | 12 | this document. |
| 09:13 | 13 | THE WITNESS:  I did not sign -- |
| 09:13 | 14 | THE COURT:  Overruled.  You can answer. |
| 09:13 | 15 | THE WITNESS:  I did not sign the confidentiality |
| 09:13 | 16 | agreement -- or what do you call it?  Code of conduct?  I'm |
| 09:13 | 17 | losing track of what you're calling it. |
| 09:13 | 18 | BY MR. PRICE: |
| 09:13 | 19 | Q.   And you continued to refuse to sign the code of conduct |
| 09:13 | 20 | that Mr. Bousquette had sent out to his direct reports, uh, |
| 09:13 | 21 | up until the time you left Mattel, right? |
| 09:13 | 22 | A.   And that was on continued advice of counsel, correct. |
| 09:14 | 23 | Q.   So you had counsel for the last, what? -- six, seven |
| 09:14 | 24 | months you were at Mattel, who was advising you not to sign |
| 09:14 | 25 | Mattel's code of conduct, correct? |

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

44

| | | |
|---|---|---|
| 09:14 | 1 | A.   My sister is a lawyer, and she -- I sent her the |
| 09:14 | 2 | document when it suddenly appeared in March of 2004.  And I |
| 09:14 | 3 | asked her her opinion on one specific paragraph of this -- I |
| 09:14 | 4 | don't remember -- it was -- seven-page, single-spaced |
| 09:14 | 5 | document -- and, um, asked her if she thought it was a fair |
| 09:14 | 6 | California employment, um, um, paragraph.  And she felt that |
| 09:14 | 7 | it was too broad and that I should ask for more specifics. |
| 09:14 | 8 | And I then began a process of trying to get a more specific |
| 09:14 | 9 | paragraph written. |
| 09:14 | 10 | Q.   Well, let's turn to Exhibit 4249. |
| 09:14 | 11 | Do you see -- this is an e-mail from you to a Mark |
| 09:15 | 12 | Kimball.  He's in Human Resources? |
| 09:15 | 13 | A.   Mark Kimball was in Human Resources, yes. |
| 09:15 | 14 | Q.   And this is August 13, 2004, correct? |
| 09:15 | 15 | A.   That's correct. |
| 09:15 | 16 | MR. PRICE:  Your Honor, I move Exhibit 4249 into |
| 09:15 | 17 | evidence. |
| 09:15 | 18 | THE COURT:  Received. |
| 09:15 | 19 | *(Exhibit No. 4249 received in evidence.)* |
| 09:15 | 20 | *(Document displayed.)* |
| 09:15 | 21 | BY MR. PRICE: |
| 09:15 | 22 | Q.   And you see this says, "Confidential Employee |
| 09:15 | 23 | Relations. |
| 09:15 | 24 | "I have signed the copy of the letter that I will drop |
| 09:15 | 25 | off on your desk on my way out this evening.  Thanks for |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

45

| | | |
|---|---|---|
| 09:15 | 1 | writing it up." |
| 09:15 | 2 | That's your first sentence, correct? |
| 09:15 | 3 | A. That is correct. |
| 09:15 | 4 | Q. It says, "It is amended in paragraph 6. It requires a |
| 09:15 | 5 | payment of 120,000 by the next pay period and maintains the |
| 09:15 | 6 | resignation and termination clauses," paren, "despite their |
| 09:15 | 7 | being more restrictive than discussed. It deletes all |
| 09:15 | 8 | references to the confidentiality agreement. As you have |
| 09:15 | 9 | agreed when Alan Kaye negotiated the terms of the job, there |
| 09:15 | 10 | was no mention of the confidentiality agreement. |
| 09:15 | 11 | Withholding the agreed-to bonus for a qualification not |
| 09:16 | 12 | agreed to is a violation of our company's," quote, |
| 09:16 | 13 | "unwavering integrity," quote -- quote, "values," paren, |
| 09:16 | 14 | "Frankly, Mark, it feels like extortion," closed paren. |
| 09:16 | 15 | "Please let me know if you plan to continue to pursue this |
| 09:16 | 16 | linkage." |
| 09:16 | 17 | Do you see that? |
| 09:16 | 18 | A. Yes, I see those words. |
| 09:16 | 19 | Q. Now, you were an at-will employee you said, correct? |
| 09:16 | 20 | A. I was an at-will employee at Mattel, correct. |
| 09:16 | 21 | Q. Which means you could have been dismissed at any time, |
| 09:16 | 22 | correct? |
| 09:16 | 23 | A. That is correct. |
| 09:16 | 24 | Q. For no reason at all? |
| 09:16 | 25 | A. I assume that allows no reason at all. |

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

46

| | | |
|---|---|---|
| 09:16 | 1 | Q.   And by this time, again, the only confidentiality |
| 09:16 | 2 | agreement you had signed was one with Tyco back in, what was |
| 09:16 | 3 | it -- what year was it that you signed with Tyco? |
| 09:16 | 4 | A.   I signed the Tyco agreement in '96. |
| 09:16 | 5 | Q.   And between '96 and 2004, you had been in dozens of |
| 09:16 | 6 | confidential meetings at Mattel discussing future Mattel |
| 09:16 | 7 | products that not retailers, not press, no one outside of |
| 09:16 | 8 | Mattel had seen, correct? |
| 09:16 | 9 | A.   No. |
| 09:16 | 10 | Q.   How many had you been at? |
| 09:17 | 11 | A.   Maybe thousands, hundreds. |
| 09:17 | 12 | Q.   And Mattel is saying we'd like a confidentiality |
| 09:17 | 13 | agreement with you, right? |
| 09:17 | 14 | A.   Mattel had a confidentiality agreement with me. |
| 09:17 | 15 | Q.   Well, look at the second page where it says, |
| 09:17 | 16 | "definition of Mattel's proprietary information."  Is -- |
| 09:17 | 17 | this was your language or the language Mattel was |
| 09:17 | 18 | suggesting? |
| 09:17 | 19 | MS. KELLER:  Excuse me.  May we have a moment to |
| 09:17 | 20 | get the document? |
| 09:17 | 21 | THE WITNESS:  Yeah.  I need a little bit of time |
| 09:17 | 22 | here. |
| 09:17 | 23 | THE COURT:  Next question, Counsel.  She'll catch |
| 09:17 | 24 | up. |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

47

| | | |
|---|---|---|
| 09:17 | 1 | BY MR. PRICE: |
| 09:17 | 2 | Q.    Okay.  Look at the second page, it says, "Definition of |
| 09:17 | 3 | Mattel's proprietary information."  And you see that there's |
| 09:17 | 4 | some -- there's some underlining there. |
| 09:17 | 5 |      Do you see that? |
| 09:17 | 6 | A.    Yeah.  I see -- I do see some underlined words, yes. |
| 09:17 | 7 |        (Document displayed.) |
| 09:17 | 8 | BY MR. PRICE: |
| 09:17 | 9 | Q.    It says, under little (i) -- defined as confidential if |
| 09:17 | 10 | it's discovered in connection with your employment -- |
| 09:17 | 11 | "Personnel details such as compensation, job performance, or |
| 09:17 | 12 | any other information that an individual outside of Mattel |
| 09:17 | 13 | who has no confidentiality agreement with Mattel would |
| 09:18 | 14 | otherwise not know." |
| 09:18 | 15 |      Do you see that? |
| 09:18 | 16 | A.    Correct. |
| 09:18 | 17 | Q.    And that would be Mattel's confidential information, |
| 09:18 | 18 | correct? |
| 09:18 | 19 | A.    Uh, I don't know. |
| 09:18 | 20 | Q.    You weren't willing to agree to that, were you? |
| 09:18 | 21 | A.    I don't know.  I don't recall the specifics of whether |
| 09:18 | 22 | that specific point was something I was agreeing to or not. |
| 09:18 | 23 | Q.    And look at little "6," which is underlining -- |
| 09:18 | 24 | underlined, "Manufacturing, distribution, and sales methods |
| 09:18 | 25 | and processes that an individual outside of Mattel who has |

| | | |
|---|---|---|
| 09:18 | 1 | no confidentiality agreement with Mattel would otherwise not |
| 09:18 | 2 | know." |
| 09:18 | 3 | Do you see that? |
| 09:18 | 4 | A.   I do see it, yes. |
| 09:18 | 5 | Q.   And that's confidential information, you would agree, |
| 09:18 | 6 | correct? |
| 09:18 | 7 | A.   As I said, it depends on the -- I guess the test that |
| 09:18 | 8 | you put on what Mattel would have considered confidential. |
| 09:18 | 9 | I don't know how you can have a manufacturing, a |
| 09:18 | 10 | distribution, or a sales method with an outside third party |
| 09:18 | 11 | that no one outside of Mattel would have any knowledge of. |
| 09:18 | 12 | Q.   It says, "that an individual outside of Mattel who has |
| 09:18 | 13 | no confidentiality agreement with Mattel would otherwise not |
| 09:19 | 14 | know." |
| 09:19 | 15 | That's what it says, right? |
| 09:19 | 16 | A.   So help me understand what it is.  I just want to take |
| 09:19 | 17 | it slowly. |
| 09:19 | 18 | Q.   Well, let's recap.  You're in discussions with MGA at |
| 09:19 | 19 | this time, correct? |
| 09:19 | 20 | A.   In March, I don't remember if I was or not, actually. |
| 09:19 | 21 | Q.   In August 13, 2004? |
| 09:19 | 22 | A.   In August, yes, I was. |
| 09:19 | 23 | Q.   You have a lawyer at this time? |
| 09:19 | 24 | A.   I do have a lawyer in August. |
| 09:19 | 25 | Q.   You lied to Mr. Kaye about whether you were talking to |

| | | |
|---|---|---|
| 09:19 | 1 | MGA, correct? |
| 09:19 | 2 | MS. KELLER:  Objection.  Asked and answered three |
| 09:19 | 3 | times now. |
| 09:19 | 4 | THE COURT:  Overruled. |
| 09:19 | 5 | THE WITNESS:  You're not going chronologically, |
| 09:19 | 6 | but, yes. |
| 09:19 | 7 | BY MR. PRICE: |
| 09:19 | 8 | Q.   And you don't want to be bound by this confidentiality |
| 09:19 | 9 | agreement; you're stalling, right? |
| 09:19 | 10 | A.   Actually, no, I'm not stalling at all. |
| 09:19 | 11 | Q.   Well -- |
| 09:19 | 12 | A.   It took -- |
| 09:19 | 13 | Q.   -- let's talk about -- |
| 09:19 | 14 | A.   It took months to get this written by Mattel. |
| 09:19 | 15 | Q.   Well, let's look at the complaint.  If you look at |
| 09:19 | 16 | page -- it's 34676-0008. |
| 09:20 | 17 | A.   I'm sorry.  Oh. |
| 09:20 | 18 | Q.   And you can see it on the monitor.  And you -- |
| 09:20 | 19 | THE COURT:  Now, just a moment. |
| 09:20 | 20 | (To the jury:) This is the complaint brought by |
| 09:20 | 21 | Mattel, so of course the parties, and the response, each |
| 09:20 | 22 | party has an interest.  So these allegations you're not to |
| 09:20 | 23 | take as the truth, but it is to show, you know, what |
| 09:20 | 24 | eventually led to whatever conduct the parties entered into |
| 09:20 | 25 | in terms of this either confidentiality agreement or the |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

50

| | | |
|---|---|---|
| 09:20 | 1 | code of conduct. |
| 09:20 | 2 | Counsel. |
| 09:20 | 3 | BY MR. PRICE: |
| 09:20 | 4 | Q.   If you look at paragraph 23, is it true that about |
| 09:20 | 5 | May 2004 you began performing "GM" duties working with one |
| 09:20 | 6 | of Mattel's major retail customer accounts; is that true? |
| 09:20 | 7 | A.   Correct. |
| 09:20 | 8 | Q.   And if we go to paragraph 26, you see it says, "After |
| 09:20 | 9 | Brawer's resignation, a review of Mattel's telephone records |
| 09:21 | 10 | revealed that Brawer had ongoing contact with MGA during the |
| 09:21 | 11 | summer of 2004." |
| 09:21 | 12 | Is it correct that you had ongoing contact with MGA |
| 09:21 | 13 | during the summer of 2004? |
| 09:21 | 14 | A.   Define ongoing. |
| 09:21 | 15 | Q.   Used the way that you would use it as a human being, |
| 09:21 | 16 | just regular dictionary. |
| 09:21 | 17 | A.   No. |
| 09:21 | 18 | Q.   Did you meet with Mr. Larian in 2004? |
| 09:21 | 19 | A.   Yes, I did. |
| 09:21 | 20 | Q.   Did you have e-mail correspondence with Mr. Larian in |
| 09:21 | 21 | 2004? |
| 09:21 | 22 | A.   Yes, I did. |
| 09:21 | 23 | Q.   Did you contact Mr. Larian from MGA -- I mean, from |
| 09:21 | 24 | Mattel -- Mattel, using Mattel's telephone in 2004? |
| 09:21 | 25 | A.   I did use Mattel's cell phone unaware that it was |

Case 2:04-cv-09049-DOC-RNB   Document 10370   Filed 04/04/11   Page 51 of 89   Page ID #:314961
CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

51

| | | |
|---|---|---|
| 09:21 | 1 | Mattel's. |
| 09:21 | 2 | Q.   Did you, uh -- uh, reveal any of that to Mattel at the |
| 09:21 | 3 | time you weren't signing the code of conduct/confidentiality |
| 09:21 | 4 | agreement? |
| 09:21 | 5 | A.   I was in the process of interviewing for another job. |
| 09:22 | 6 | I did not disclose that to Mattel, no. |
| 09:22 | 7 | Q.   Did you tell them, "The reason I don't want to sign |
| 09:22 | 8 | this is because I'm about to go to a competitor and I don't |
| 09:22 | 9 | want to be bound by the code of conduct"? |
| 09:22 | 10 | A.   I actually, never told 'em ever that I didn't want to |
| 09:22 | 11 | be bound by the code of conduct.  All I did was ask for a |
| 09:22 | 12 | very broad paragraph that I felt was limiting my ability to |
| 09:22 | 13 | secure another job in the event that I wanted to leave |
| 09:22 | 14 | Mattel, to be better defined. |
| 09:22 | 15 | Q.   Well, if we go on, is it true that -- if you look at |
| 09:22 | 16 | paragraph 28 -- I'm sorry, 27 -- that you call MGA's office |
| 09:22 | 17 | on June 1, 2004, and the next day attended a line review |
| 09:22 | 18 | where Mattel presented its spring 2005 products for review? |
| 09:22 | 19 | A.   Counsel, I'll be honest with you.  I can tell you there |
| 09:22 | 20 | were many errors in this complaint regarding my -- |
| 09:22 | 21 | Q.   Was this one of them? |
| 09:22 | 22 | A.   I can -- I don't know if this is a specific one.  I do |
| 09:22 | 23 | know there are specific errors regarding my whereabouts and |
| 09:23 | 24 | meetings that I supposedly attended that I did not attend. |
| 09:23 | 25 | There are some very specific ones I can point out to you if |

| | | |
|---|---|---|
| 09:23 | 1 | you would like. |
| 09:23 | 2 | Q.   I'm asking -- |
| 09:23 | 3 | A.   So I can't confirm with -- with any certainty that I -- |
| 09:23 | 4 | that the information presented here is correct. |
| 09:23 | 5 | Q.   But you -- you just don't remember one way or the |
| 09:23 | 6 | other, correct? |
| 09:23 | 7 | A.   I don't know whether I was in the state of California |
| 09:23 | 8 | on the day that this suggests that I was there. |
| 09:23 | 9 | Q.   This you do know:  During this time period in the |
| 09:23 | 10 | summer of 2004, you were attending meetings where Mattel was |
| 09:23 | 11 | talking about -- people were talking about confidential |
| 09:23 | 12 | information such as line reviews, correct? |
| 09:23 | 13 | A.   That is correct. |
| 09:23 | 14 | Q.   And during the same time period, you were making calls |
| 09:23 | 15 | to MGA, correct? |
| 09:23 | 16 | A.   One had nothing to do with the other. |
| 09:23 | 17 | Q.   That wasn't my question.  During the same period, you |
| 09:23 | 18 | were making calls to MGA, correct? |
| 09:23 | 19 | A.   Correct. |
| 09:23 | 20 | Q.   And none of this was, of course, revealed to Mattel, |
| 09:23 | 21 | correct? |
| 09:24 | 22 | A.   I did not reveal this to Mattel, no. |
| 09:24 | 23 | Q.   And then is it true that on September 15th you left |
| 09:24 | 24 | work at noon to begin a religious holiday? |
| 09:24 | 25 | A.   I believe that was the date, yes. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

53

| 09:24 | 1 | Q.   And if you look at the complaint, page 10, there's a |
| 09:24 | 2 | paragraph 34.  So it says on September 15, 2004, Brawer left |
| 09:24 | 3 | work at noon to begin a two-day religious holiday. |
| 09:24 | 4 | Do you see that? |
| 09:24 | 5 | A.   Yes, I do. |
| 09:24 | 6 | Q.   Is it true that when you left on September 15, 2004, |
| 09:24 | 7 | you carried a large cardboard box with binders and other |
| 09:25 | 8 | materials? |
| 09:25 | 9 | A.   I believe I did, yes. |
| 09:25 | 10 | Q.   And after your departure, did you instruct your |
| 09:25 | 11 | assistant to print Mattel's 2004 sales plan for the large |
| 09:25 | 12 | toy retailer for you, saying you needed it for a meeting? |
| 09:25 | 13 | A.   I don't recall that one way or the other. |
| 09:25 | 14 | Q.   One way or the other? |
| 09:25 | 15 | A.   One way or the other. |
| 09:25 | 16 | Q.   So you're not denying that you did get that, correct? |
| 09:25 | 17 | A.   I can't deny it.  I can't -- I can't -- I don't |
| 09:25 | 18 | remember if it ever happened. |
| 09:25 | 19 | Q.   And so if you look at 35, it says on September 17 -- |
| 09:25 | 20 | MS. KELLER:  Your Honor, I'm gonna object to the |
| 09:25 | 21 | continued reading of this complaint. |
| 09:25 | 22 | THE COURT:  Overruled. |
| 09:25 | 23 | MS. KELLER:  This is -- |
| 09:25 | 24 | THE COURT:  Overruled. |
| 09:25 | 25 | MS. KELLER:  It is all hearsay. |

CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

54

| | | |
|---|---|---|
| 09:25 | 1 | THE COURT:  Overruled.  He can ask questions about |
| 09:25 | 2 | this complaint and whether this complaint is true or not. |
| 09:25 | 3 | Overruled. |
| 09:25 | 4 | Counsel, please continue. |
| 09:25 | 5 | BY MR. PRICE: |
| 09:25 | 6 | Q.   It's on paragraph 35.  "On September 17, 2004, the day |
| 09:25 | 7 | Brawer was scheduled to return to work after the holiday, at |
| 09:25 | 8 | or about 7:30 a.m., Brawer informed his supervisor, Jerry |
| 09:25 | 9 | Cleary, that he was leaving Mattel effective October 1, |
| 09:26 | 10 | 2004, to work for a competitor, MGA." |
| 09:26 | 11 | Is that accurate? |
| 09:26 | 12 | A.   That is accurate, yes. |
| 09:26 | 13 | Q.   And shortly after that, Mattel hand-delivered a letter |
| 09:26 | 14 | to you reminding you of your confidentiality obligations.  I |
| 09:26 | 15 | mean, not only through October 1st, but, you know, on an |
| 09:26 | 16 | ongoing basis, right? |
| 09:26 | 17 | A.   I don't see anything about hand-delivered.  Are you |
| 09:26 | 18 | asking me to continue to read this, or is this a new thing? |
| 09:26 | 19 | Q.   I'm asking you about a fact.  Look at Exhibit 4252. |
| 09:26 | 20 | 4245. |
| 09:26 | 21 | THE COURT:  Just a moment.  4245? |
| 09:26 | 22 | MR. PRICE:  I may have the wrong -- |
| 09:27 | 23 | BY MR. PRICE: |
| 09:27 | 24 | Q.   Eventually, you had an exit interview with Mattel |
| 09:27 | 25 | around September 29th; is that right? |

DEBBIE GALE, U.S. COURT REPORTER

| 09:27 | 1 | Look at 4251. That one I think we have for you. |
| 09:27 | 2 | A. I'm a little lost right now. |
| 09:27 | 3 | THE COURT: You don't have to do anything. It |
| 09:27 | 4 | just appears on your desk. |
| 09:27 | 5 | THE WITNESS: Okay. |
| 09:27 | 6 | *(Document provided to the witness.)* |
| 09:27 | 7 | THE WITNESS: You're asking now about the exit |
| 09:27 | 8 | interview? |
| 09:27 | 9 | BY MR. PRICE: |
| 09:27 | 10 | Q. I am. |
| 09:27 | 11 | A. Okay. |
| 09:27 | 12 | Q. And 4251, do you see that as a document that you went |
| 09:27 | 13 | over on September 29th with the folks at Mattel? |
| 09:27 | 14 | A. Yes, I do. |
| 09:27 | 15 | Q. And the exit interview and the check-out forms -- |
| 09:27 | 16 | MR. PRICE: Oh, Your Honor, I move Exhibit 4251 |
| 09:27 | 17 | into evidence. |
| 09:27 | 18 | THE COURT: Received. |
| 09:27 | 19 | *(Exhibit No. 4251 received in evidence.)* |
| 09:27 | 20 | *(Document displayed.)* |
| 09:27 | 21 | BY MR. PRICE: |
| 09:27 | 22 | Q. This is something that you also refused to sign, |
| 09:27 | 23 | correct? |
| 09:28 | 24 | A. On advice of counsel, I was advised not to sign |
| 09:28 | 25 | anything in this meeting. |

Case 2:04-cv-09049-DOC-RNB   Document 10370   Filed 04/04/11   Page 56 of 89   Page ID #:314966
CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

56

| 09:28 | 1 | Q. And this is same counsel you've had now for about six |
| 09:28 | 2 | months? |
| 09:28 | 3 | A. Yeah. I -- I don't recall exactly the amount of time |
| 09:28 | 4 | but, yes. |
| 09:28 | 5 | Q. Now, at this time by this time in September 2004, you |
| 09:28 | 6 | were aware that Mr. Bryant had been sued, correct? |
| 09:28 | 7 | A. In September of 2004? |
| 09:28 | 8 | Q. Yes. |
| 09:28 | 9 | A. No, I was not aware of that. |
| 09:28 | 10 | Q. It wasn't discussed that -- that Mattel discovered an |
| 09:28 | 11 | agreement contract between Mr. Bryant and Mr. Larian? |
| 09:28 | 12 | A. I don't -- |
| 09:28 | 13 | Q. That was dated as of the time you still worked for |
| 09:28 | 14 | Mattel? |
| 09:28 | 15 | A. I know this is gonna sound shocking, but I actually |
| 09:28 | 16 | wasn't close enough to the details of the litigation at |
| 09:28 | 17 | Mattel to know that the person was Carter Bryant or anything |
| 09:28 | 18 | related to it. It wasn't like public news there. |
| 09:29 | 19 | Q. Well, as a senior executive, did you know that -- that |
| 09:29 | 20 | earlier that year three individuals at Mattel de Mexico had |
| 09:29 | 21 | left, downloaded documents, and joined MGA? |
| 09:29 | 22 | A. Is there a question there? |
| 09:29 | 23 | Q. Were you aware of that? |
| 09:29 | 24 | A. Um, I don't recall being aware of that, no. |
| 09:29 | 25 | Q. All right. Were you aware in general that Mattel |

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

57

| | | |
|---|---|---|
| 09:29 | 1 | thought it was a victim by the summer of 2004 of thefts of |
| 09:29 | 2 | trade secrets by MGA? |
| 09:29 | 3 | MS. KELLER:  Objection.  Argumentative question. |
| 09:29 | 4 | THE COURT:  Overruled. |
| 09:29 | 5 | MS. KELLER:  And it misstates the evidence. |
| 09:29 | 6 | THE COURT:  Overruled. |
| 09:29 | 7 | You can answer the question. |
| 09:29 | 8 | THE WITNESS:  I don't recall ever perceiving the |
| 09:29 | 9 | people at Mattel as feeling themselves victims. |
| 09:29 | 10 | BY MR. PRICE: |
| 09:29 | 11 | Q.   Well, it's around this time frame that you then wiped |
| 09:29 | 12 | your computers clean, correct? -- your home computer? |
| 09:29 | 13 | A.   It was after -- after -- between jobs as I was leaving |
| 09:29 | 14 | Mattel and entering MGA that I did wipe my home computer |
| 09:30 | 15 | clean, correct. |
| 09:30 | 16 | Q.   And when you say "between jobs," MGA paid for that? |
| 09:30 | 17 | A.   I don't recall who paid for it.  I know that I was |
| 09:30 | 18 | still an employee of Mattel as I was doing it, correct. |
| 09:30 | 19 | Q.   But MGA paid for you to do that, correct? |
| 09:30 | 20 | A.   As I said, I don't recall who actually paid for it. |
| 09:30 | 21 | Q.   And if you'd look at -- if you'd look at 4237. |
| 09:30 | 22 | *(Document provided to the witness.)* |
| 09:30 | 23 | THE WITNESS:  Okay. |
| 09:30 | 24 | BY MR. PRICE: |
| 09:30 | 25 | Q.   That is a communication -- I think you testified about |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10370   Filed 04/04/11   Page 58 of 89   Page ID #:314968
CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

58

| | | |
|---|---|---|
| 09:30 | 1 | this earlier, where you sent in 2001 your -- your resumé to |
| 09:31 | 2 | HR MGA and you didn't receive a response? |
| 09:31 | 3 | A.   I don't recall receiving a response.   This was three |
| 09:31 | 4 | years earlier than the time period we were just looking at, |
| 09:31 | 5 | correct. |
| 09:31 | 6 | Q.   This is the one you talked about in direct, correct? |
| 09:31 | 7 | A.   I believe so. |
| 09:31 | 8 | MR. PRICE:  Move 4237 into evidence. |
| 09:31 | 9 | THE COURT:  Received. |
| 09:31 | 10 | *(Exhibit No. 4237 received in evidence.)* |
| 09:31 | 11 | *(Document displayed.)* |
| 09:31 | 12 | BY MR. PRICE: |
| 09:31 | 13 | Q.   Then if you would look at 4239. |
| 09:31 | 14 | *(Document provided to the witness.)* |
| 09:31 | 15 | BY MR. PRICE: |
| 09:31 | 16 | Q.   And let me ask you this:  In August of 2003, were you |
| 09:31 | 17 | talking with representatives of MGA about joining MGA or |
| 09:31 | 18 | interviewing with MGA? |
| 09:31 | 19 | A.   At that point I did interview with representatives of |
| 09:31 | 20 | MGA in 2003, correct. |
| 09:31 | 21 | Q.   And if you'd look at -- if you look at 8613 -- |
| 09:32 | 22 | actually, let's -- I'm sorry.  Let's skip that and go to |
| 09:32 | 23 | 4245. |
| 09:32 | 24 | *(Document provided to the witness.)* |
| | 25 | |

| | | |
|---|---|---|
| 09:32 | 1 | BY MR. PRICE: |
| 09:32 | 2 | Q.   Is this an e-mail that you sent to Mr. Larian from your |
| 09:32 | 3 | home computer around May 7 of 2004? |
| 09:32 | 4 | A.   I believe it is, yes. |
| 09:32 | 5 | MR. PRICE:  Your Honor, move 4245 into evidence. |
| 09:32 | 6 | THE COURT:  Received. |
| 09:32 | 7 | *(Exhibit No. 4245 received in evidence.)* |
| 09:32 | 8 | *(Document displayed.)* |
| 09:32 | 9 | BY MR. PRICE: |
| 09:32 | 10 | Q.   And at the top it says, "I have absolutely no |
| 09:32 | 11 | contract/employment restrictions and exist in a |
| 09:32 | 12 | work-for-hire situation." |
| 09:32 | 13 | Do you see that? |
| 09:33 | 14 | A.   Yes. |
| 09:33 | 15 | MS. KELLER:  Your Honor, may we see what it's |
| 09:33 | 16 | responsive to below it? |
| 09:33 | 17 | THE COURT:  Counsel, there's redirect.  So... |
| 09:33 | 18 | BY MR. PRICE: |
| 09:33 | 19 | Q.   Now, you said in your direct that you put in writing |
| 09:33 | 20 | with Mr. Larian a number of times that you weren't going to |
| 09:33 | 21 | reveal confidential Mattel information, correct? |
| 09:33 | 22 | A.   I did not plan -- I did not reveal any confidential |
| 09:33 | 23 | information. |
| 09:33 | 24 | Q.   My question is, you put in writing to Mr. Larian -- we |
| 09:33 | 25 | have a paper trail between you and Mr. Larian that you said, |

| | | |
|---|---|---|
| 09:33 | 1 | "I don't want to reveal confidential information," and he |
| 09:33 | 2 | said, "I don't want you to"? |
| 09:33 | 3 | A.   Correct.  When we were ready to meet face to face, a |
| 09:33 | 4 | paper trail was created. |
| 09:33 | 5 | Q.   But during the time of your meeting, you still had not |
| 09:33 | 6 | signed that code of conduct with Mattel telling Mattel you |
| 09:33 | 7 | were going to abide by the code of conduct, correct? |
| 09:33 | 8 | MS. KELLER:  Objection to the characterization of |
| 09:33 | 9 | it as a code of conduct as opposed to a new contract. |
| 09:33 | 10 | THE COURT:  Overruled. |
| 09:33 | 11 | THE WITNESS:  Um, I -- I did not sign the new |
| 09:33 | 12 | document that was put in front of me, correct. |
| 09:33 | 13 | BY MR. PRICE: |
| 09:33 | 14 | Q.   Well, you later agreed that you were gonna be bound by |
| 09:33 | 15 | that document, right? |
| 09:34 | 16 | A.   That's correct. |
| 09:34 | 17 | Q.   Now, if you'd look at 8621, and if you'd look at the |
| 09:34 | 18 | middle e-mail there, you see that's -- contains an e-mail |
| 09:34 | 19 | from you to Mr. Larian, dated May 24, 2004.  Is that right? |
| 09:34 | 20 | A.   Yeah, I see it. |
| 09:34 | 21 | MR. PRICE:  Move Exhibit 8621 into evidence. |
| 09:34 | 22 | THE COURT:  Received. |
| 09:34 | 23 | *(Exhibit No. 8621 received in evidence.)* |
| 09:34 | 24 | *(Document displayed.)* |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

61

| 09:34 | 1 | BY MR. PRICE: |
|-------|---|---|
| 09:34 | 2 | Q.   If we go to that paragraph in the middle, May 24, 2004, |
| 09:34 | 3 | this is sent from your home computer? |
| 09:34 | 4 | A.   It's sent from my home e-mail, correct. |
| 09:35 | 5 | Q.   And it talks about, "Isaac, hello.  Appreciate your |
| 09:35 | 6 | note.  I've attached the presentation prepared for you when |
| 09:35 | 7 | we were going to meet at Target a week or two ago." |
| 09:35 | 8 |      Do you see that? |
| 09:35 | 9 | A.   Yes, I do. |
| 09:35 | 10 | Q.   And -- and what you attached was -- if you look at, |
| 09:35 | 11 | starting at page 5, this was the format of a, uh -- a |
| 09:35 | 12 | Mattel's format for a position description questionnaire |
| 09:35 | 13 | with activities, et cetera, correct? |
| 09:35 | 14 | A.   Correct. |
| 09:35 | 15 | Q.   And you had filled this out so that you could tell |
| 09:35 | 16 | Mr. Larian while you were at Target, you know, sort of what |
| 09:35 | 17 | your activities were, correct? |
| 09:35 | 18 | A.   No. |
| 09:35 | 19 | Q.   Well, if you look at 8621-0006. |
| 09:35 | 20 |           (Document displayed.) |
| 09:35 | 21 | BY MR. PRICE: |
| 09:35 | 22 | Q.   You see it says, "primary activities," and it talks |
| 09:35 | 23 | about the percentage of time for primary activities? |
| 09:35 | 24 | A.   Yeah.  I believe your question was if this was a job |
| 09:35 | 25 | description of what I was doing at Mattel. |

CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

62

| 09:35 | 1 | Q.   Uh-huh. |
| 09:35 | 2 | A.   This was not a job description of what I was doing at |
| 09:35 | 3 | Mattel. |
| 09:35 | 4 | Q.   Was this a description of where you thought your job |
| 09:36 | 5 | competencies were using the Mattel format? |
| 09:36 | 6 | A.   I wouldn't characterize it as that, no. |
| 09:36 | 7 | Q.   You were doing it to describe your future role at MGA, |
| 09:36 | 8 | right? |
| 09:36 | 9 | A.   You got it, yes. |
| 09:36 | 10 |        MR. PRICE:  And if I may approach the witness, |
| 09:36 | 11 | Your Honor, with 4252. |
| 09:36 | 12 |        THE COURT:  Well, just a moment.  Everybody seems |
| 09:36 | 13 | to be approaching without -- give counsel that, and give me |
| 09:36 | 14 | a copy.  And I'm sure you'll be able to do that in just a |
| 09:36 | 15 | moment, Mr. Price. |
| 09:36 | 16 |          *(Document provided to the Court.)* |
| 09:36 | 17 |        MR. PRICE:  Save the time and walk anyway, even if |
| 09:36 | 18 | you say I can't use it? |
| 09:36 | 19 |        THE COURT:  No.  Why don't you just stay there. |
| 09:36 | 20 |        All right.  Mr. Price start walking. |
| 09:36 | 21 |          *(Document provided to the witness.)* |
| 09:37 | 22 |        THE COURT:  You may ask questions. |
| 09:37 | 23 | BY MR. PRICE: |
| 09:37 | 24 | Q.   This is a letter that you received on September 20, |
| 09:37 | 25 | 2004, after you said you were resigning, correct? |

| | | |
|---|---|---|
| 09:37 | 1 | A.   Can I have time to read it? |
| 09:37 | 2 | THE COURT:  Sure.  Read it. |
| 09:37 | 3 | THE WITNESS:  Thank you. |
| 09:37 | 4 | THE COURT:  Stop the clock, Deb. |
| 09:38 | 5 | THE WITNESS:  Okay. |
| 09:38 | 6 | THE COURT:  Now, start the clock, Deb. |
| 09:38 | 7 | BY MR. PRICE: |
| 09:38 | 8 | Q.   This was a letter that was messengered to you around |
| 09:38 | 9 | September 20, 2004, correct? |
| 09:38 | 10 | A.   Yes, it was. |
| 09:38 | 11 | MR. PRICE:  Move 4252 into evidence. |
| 09:38 | 12 | THE COURT:  Received. |
| 09:38 | 13 | *(Exhibit No. 4252 received in evidence.)* |
| 09:38 | 14 | *(Document displayed.)* |
| 09:38 | 15 | BY MR. PRICE: |
| 09:38 | 16 | Q.   And if you look at the first paragraph and, for |
| 09:38 | 17 | example, the last line, it says, "We will also need to |
| 09:38 | 18 | confirm your ongoing fiduciary and confidentiality |
| 09:38 | 19 | obligations and transition any information necessary for |
| 09:38 | 20 | another individual to assume your previous |
| 09:38 | 21 | responsibilities." |
| 09:38 | 22 | Do you see that? |
| 09:38 | 23 | A.   Yes, I do. |
| 09:38 | 24 | Q.   And then, the next paragraph it says, "We remind you |
| 09:38 | 25 | that during this two-week period you should not be |

Case 2:04-cv-09049-DOC-RNB   Document 10370   Filed 04/04/11   Page 64 of 89   Page ID #:314974
CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

64

| 09:38 | 1 | performing any services or acting in any way that would |
|---|---|---|
| 09:38 | 2 | violate Mattel's code of conduct." |
| 09:38 | 3 | Do you see that? |
| 09:38 | 4 | A.   Yes, I do. |
| 09:38 | 5 | Q.   And the two-week period is the two weeks you're being |
| 09:38 | 6 | paid by Mattel before you join MGA, correct? |
| 09:38 | 7 | A.   That is correct. |
| 09:38 | 8 | Q.   Uh, and that was one of the dates of the -- the video |
| 09:39 | 9 | you saw; that was in that period? |
| 09:39 | 10 | A.   That was correct. |
| 09:39 | 11 | Q.   "And we also remind you that as an executive of Mattel, |
| 09:39 | 12 | you were bound by Mattel's confidentiality policies as well |
| 09:39 | 13 | as your fiduciary duties, all of which continue after |
| 09:39 | 14 | October 1st." |
| 09:39 | 15 | Do you see that? |
| 09:39 | 16 | A.   Yes, I do. |
| 09:39 | 17 | Q.   And shortly after that you were sent -- let's do 20996. |
| 09:39 | 18 | *(Document provided to the witness.)* |
| 09:39 | 19 | BY MR. PRICE: |
| 09:39 | 20 | Q.   And you see that as a letter that was hand-delivered to |
| 09:39 | 21 | you around October 1st, 2004? |
| 09:39 | 22 | A.   I see the date, yes. |
| 09:39 | 23 | Q.   And this is something that was messengered to you |
| 09:39 | 24 | around that date? |
| 09:40 | 25 | A.   I -- we did receive some letters around that date, yes. |

CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

65

| 09:40 | 1 | MR. PRICE:  Your Honor, move 20996 into evidence. |
|---|---|---|
| 09:40 | 2 | THE COURT:  Received. |
| 09:40 | 3 | *(Exhibit No. 20996 received in evidence.)* |
| 09:40 | 4 | *(Document displayed.)* |
| 09:40 | 5 | BY MR. PRICE: |
| 09:40 | 6 | Q.   And you see on the second page there's a line that |
| 09:40 | 7 | says. |
| 09:40 | 8 | "I, Ron Brawer, confirm that I will not disclose to |
| 09:40 | 9 | MGA," paren, "or any other third party," closed paren, "or |
| 09:40 | 10 | permit MGA," paren, "or any other third party," paren, "to |
| 09:40 | 11 | use any of Mattel's confidential or proprietary |
| 09:40 | 12 | information." |
| 09:40 | 13 | Do you see that? |
| 09:40 | 14 | A.   I do see that, yes. |
| 09:40 | 15 | Q.   And you did not sign that and return it, correct? |
| 09:40 | 16 | A.   Um, I don't recall what our response was, but I know |
| 09:40 | 17 | that all this information was provided to -- this was a |
| 09:40 | 18 | legal letter from an attorney, and I provided it to my |
| 09:40 | 19 | attorney, and I let them figure out what the best way was to |
| 09:40 | 20 | respond to this. |
| 09:40 | 21 | Q.   Well, you never signed it, right? |
| 09:40 | 22 | A.   I don't know if I signed this particular letter.  I do |
| 09:40 | 23 | believe there was a draft response of some kind. |
| 09:40 | 24 | Q.   A draft response to this October 1st letter? |
| 09:40 | 25 | A.   There was a draft response of some kind to these |

Case 2:04-cv-09049-DOC-RNB   Document 10370   Filed 04/04/11   Page 66 of 89   Page ID #:314976
CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

66

| | | |
|---|---|---|
| 09:41 | 1 | letters asking me to do something regarding my ongoing |
| 09:41 | 2 | responsibilities. |
| 09:41 | 3 | Q.   You ever seen a copy of this signed by you? |
| 09:41 | 4 | A.   I'm sorry? |
| 09:41 | 5 | Q.   Have you ever seen a copy of Exhibit 20996, dated |
| 09:41 | 6 | October 1, 2004 -- have you ever seen a copy of this -- |
| 09:41 | 7 | A.   I don't. |
| 09:41 | 8 | Q.   -- signed by you? |
| 09:41 | 9 | A.   I don't recall whether or not I signed this particular |
| 09:41 | 10 | letter.  I don't believe I did.  I think there was something |
| 09:41 | 11 | else drafted that I did sign. |
| 09:41 | 12 | Q.   Well, a few weeks later, because you hadn't signed |
| 09:41 | 13 | anything or agreed to be bound by confidentiality, this |
| 09:41 | 14 | complaint was filed, 34676, correct? |
| 09:41 | 15 | MS. KELLER:  Objection.  Assumes this witness |
| 09:41 | 16 | knows why Mattel filed this complaint.  It's facts not in |
| 09:41 | 17 | evidence. |
| 09:41 | 18 | THE COURT:  Overruled.  It's a timing issue.  If |
| 09:41 | 19 | you know the timing of this complaint being filed, you can |
| 09:41 | 20 | answer that question. |
| 09:41 | 21 | THE WITNESS:  The complaint was filed in |
| 09:41 | 22 | mid-October. |
| 09:41 | 23 | BY MR. PRICE: |
| 09:41 | 24 | Q.   And we've gone through some of the complaint, and if |
| 09:41 | 25 | you'd look at page 12, paragraph 40, where it says, |

| 09:42 | 1 | "On October 1, 2004, Brawer's final day of employment |
| 09:42 | 2 | with Mattel, Mattel hand-delivered to Brawer a letter that |
| 09:42 | 3 | identified with reasonable particularity the nature of |
| 09:42 | 4 | Mattel's proprietary information, reminded Brawer of his |
| 09:42 | 5 | confidentiality agreements to Mattel, and further requested |
| 09:42 | 6 | that Brawer acknowledge and agree that he would maintain the |
| 09:42 | 7 | confidentiality of Mattel's proprietary information," paren, |
| 09:42 | 8 | "as identified in the letter by signing and returning a copy |
| 09:42 | 9 | of the letter to Mattel. |
| 09:42 | 10 | "As of the date of the filing of this complaint, Brawer |
| 09:42 | 11 | has not responded to the letter." |
| 09:42 | 12 | Do you see that? |
| 09:42 | 13 | A.   Yes, I see that. |
| 09:42 | 14 | Q.   And that's accurate, correct? |
| 09:42 | 15 | A.   I don't know if -- I don't believe that to be accurate, |
| 09:42 | 16 | no. |
| 09:42 | 17 | Q.   Well, if you look at the next page, page 13, this is |
| 09:42 | 18 | where it then has the causes of action which is entitled |
| 09:42 | 19 | "Declaratory Relief Against Brawer." |
| 09:42 | 20 | Do you see that? |
| 09:42 | 21 | A.   Yes, I do. |
| 09:43 | 22 | Q.   And you were asked about what happened after this, that |
| 09:43 | 23 | there was a demurrer.  It went to the Court of Appeal.  It |
| 09:43 | 24 | came down where Mattel was permitted to -- to amend the |
| 09:43 | 25 | complaint and go forward.  And at that time you -- your -- |

09:43    1    you said, "Okay.  I'll agree to be bound by the code of
09:43    2    conduct," right?
09:43    3            MS. KELLER:  Objection.  Assumes facts not
09:43    4    evidence, that this was not a negotiation between counsel.
09:43    5    BY MR. PRICE:
09:43    6    Q.   Well --
09:43    7            THE COURT:  Overruled.
09:43    8            You can answer the question.
09:43    9            THE WITNESS:  Um, again, maybe -- maybe this is
09:43   10    gonna sound strange, but all of this is lawyers writing me
09:43   11    letters.  When lawyers start to write me letters and
09:43   12    lawsuits get filed against me, I hand it over to other
09:43   13    lawyers.  The lawyers drafted a response.
09:43   14            I'm happy to look at the response that the lawyer
09:43   15    drafted confirming or -- you know, what we did or did not
09:43   16    agree to, but I can't recall word for word whether or not,
09:43   17    what Mr. Price is suggesting is exactly the course of
09:44   18    events.
09:44   19    BY MR. PRICE:
09:44   20    Q.   Okay.
09:44   21    A.   So --
09:44   22    Q.   Look at 7971.
09:44   23    A.   7971?
09:44   24    Q.   7971.
09:44   25            (Document provided to the witness.)

DEBBIE GALE, U.S. COURT REPORTER

| 09:44 | 1  | BY MR. PRICE: |
| 09:44 | 2  | Q.   You see it's a July 19, 2006 letter written after the |
| 09:44 | 3  | appeal, correct? |
| 09:44 | 4  | A.   Yes. |
| 09:44 | 5  | Q.   And if you look at the second page, you are copied on |
| 09:44 | 6  | the letter, correct? |
| 09:44 | 7  | A.   Yes. |
| 09:44 | 8  | Q.   And this was sent by your attorney, correct? |
| 09:44 | 9  | A.   Yes. |
| 09:44 | 10 | MR. PRICE:  Move 7971 into evidence. |
| 09:44 | 11 | THE COURT:  Received. |
| 09:44 | 12 | *(Exhibit No. 7971 received in evidence.)* |
| 09:44 | 13 | *(Document displayed.)* |
| 09:44 | 14 | BY MR. PRICE: |
| 09:44 | 15 | Q.   And you see in the second paragraph your attorney, uh, |
| 09:44 | 16 | quotes the opinion of the Court of Appeal, correct? |
| 09:44 | 17 | A.   Again, if you don't mind I would like a moment to be |
| 09:44 | 18 | able to read this. |
| 09:44 | 19 | THE COURT:  Certainly. |
| 09:44 | 20 | THE WITNESS:  So I can refresh my memory. |
| 09:44 | 21 | THE COURT:  Stop the clock. |
| 09:46 | 22 | THE WITNESS:  Okay.  I've now read it. |
| 09:46 | 23 | THE COURT:  Start the clock. |
| 09:46 | 24 | BY MR. PRICE: |
| 09:46 | 25 | Q.   And in the second paragraph your attorney quotes from |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

| | | |
|---|---|---|
| 09:46 | 1 | the Court of Appeal opinion, sending the case back down to |
| 09:46 | 2 | the trial court, correct? |
| 09:46 | 3 | A.   Yes, he does. |
| 09:46 | 4 | Q.   And then in the next letter -- next paragraph you see |
| 09:46 | 5 | it says, "With this letter, on behalf of Mr. Brawer, we seek |
| 09:46 | 6 | to make clear that Mr. Brawer does not dispute that he was |
| 09:46 | 7 | bound by Mattel's code of conduct -- conduct, regardless of |
| 09:46 | 8 | the fact that he did not sign the code of conduct. |
| 09:46 | 9 | Mr. Brawer also does not disavow any ongoing obligations |
| 09:46 | 10 | under Mattel's code of conduct.  To the contrary, Mr. Brawer |
| 09:46 | 11 | acknowledges that he was bound by all legally enforceable |
| 09:47 | 12 | obligations arising under Mattel's code of conduct.  These |
| 09:47 | 13 | acknowledgments are not limited to Mr. Brawer's lay |
| 09:47 | 14 | interpretation of the code of conduct; rather, this is an |
| 09:47 | 15 | acknowledgment as to all of Mr. Brawer's legally enforceable |
| 09:47 | 16 | obligations arising under the code of conduct that may exist |
| 09:47 | 17 | under applicable law." |
| 09:47 | 18 |      Now, you authorized your counsel to say that?  To |
| 09:47 | 19 | say -- |
| 09:47 | 20 | A.   Absolutely.  I think the key point here is legally |
| 09:47 | 21 | enforceable. |
| 09:47 | 22 | Q.   And then -- well, it's either legally enforceable or |
| 09:47 | 23 | it's not, right? |
| 09:47 | 24 |           MS. KELLER:  Objection.  Argumentative. |
| 09:47 | 25 |           THE COURT:  Sustained.  Just restate the question. |

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

| | | |
|---|---|---|
| 09:47 | 1 | BY MR. PRICE: |
| 09:47 | 2 | Q.   Look at the next page. |
| 09:47 | 3 | *(Document displayed.)* |
| 09:47 | 4 | BY MR. PRICE: |
| 09:47 | 5 | Q.   "With these acknowledgments by Mr. Brawer," paren, "as |
| 09:47 | 6 | well as his prior acknowledgment in October 2004, this |
| 09:47 | 7 | should end any further litigation or claims by Mattel |
| 09:48 | 8 | against Mr. Brawer." |
| 09:48 | 9 | You authorized your attorney to say that, correct? |
| 09:48 | 10 | A.   Yes. |
| 09:48 | 11 | Q.   And having acknowledged that you were bound by the |
| 09:48 | 12 | obligations under the code of conduct, whatever was legally |
| 09:48 | 13 | enforceable, even though you didn't sign it -- having |
| 09:48 | 14 | acknowledged that, Mattel agreed to and did dismiss the |
| 09:48 | 15 | complaint, right? |
| 09:48 | 16 | A.   That is the course of events, correct. |
| 09:48 | 17 | Q.   And if you would look at Exhibit 24822. |
| 09:48 | 18 | *(Document provided to the witness.)* |
| 09:49 | 19 | BY MR. PRICE: |
| 09:49 | 20 | Q.   You see that's Mattel's filing asking that the |
| 09:49 | 21 | complaint be dismissed on September 22, 2006? |
| 09:49 | 22 | A.   I've never seen this before, but that's what it appears |
| 09:49 | 23 | to be. |
| 09:49 | 24 | MR. PRICE:  Your Honor, move 24822 into evidence. |
| 09:49 | 25 | THE COURT:  Received. |

CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

72

| | | |
|---|---|---|
| 09:49 | 1 | *(Exhibit No. 24822 received in evidence.)* |
| 09:49 | 2 | *(Document displayed.)* |
| 09:49 | 3 | BY MR. PRICE: |
| 09:49 | 4 | Q.  And if you'd look at 24820. |
| 09:49 | 5 | *(Document provided again to the witness.)* |
| 09:49 | 6 | BY MR. PRICE: |
| 09:49 | 7 | Q.  You see that's an order of the Court dismissing the |
| 09:49 | 8 | complaint pursuant to the request. |
| 09:49 | 9 | A.  We lost it, sorry. |
| 09:49 | 10 | Q.  24820.  Tamara will help you find that. |
| 09:49 | 11 | *(Document provided to the witness.)* |
| 09:49 | 12 | THE WITNESS:  I'm sorry, the question again? |
| 09:49 | 13 | BY MR. PRICE: |
| 09:49 | 14 | Q.  This is the order of the Court dismissing the complaint |
| 09:49 | 15 | pursuant to Mattel's request, correct? |
| 09:49 | 16 | A.  Um, again, I assume that's what this is.  You guys |
| 09:50 | 17 | would know better than me. |
| 09:50 | 18 | MR. PRICE:  Move 24820 into evidence. |
| 09:50 | 19 | THE COURT:  Received. |
| 09:50 | 20 | *(Exhibit No. 24820 received in evidence.)* |
| 09:50 | 21 | BY MR. PRICE: |
| 09:50 | 22 | Q.  And you were asked about how this -- this affected you, |
| 09:50 | 23 | the filing of this complaint for declaratory relief. |
| 09:50 | 24 | And, uh, you actually had discussions with Mr. Larian |
| 09:50 | 25 | that one thing you -- you might do is bring a countersuit? |

Case 2:04-cv-09049-DOC-RNB   Document 10370   Filed 04/04/11   Page 73 of 89   Page ID #:314983
CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

73

| | | |
|---|---|---|
| 09:50 | 1 | A.   Yeah.  It's -- you know, when you get punched, |
| 09:50 | 2 | sometimes you want to punch back. |
| 09:50 | 3 | Q.   And MGA was paying for your attorneys' fees in |
| 09:50 | 4 | connection with Mattel's complaint for declaratory relief |
| 09:50 | 5 | that you're bound by the code of conduct, correct? |
| 09:50 | 6 | A.   MGA paid for the defense of the complaint, correct. |
| 09:50 | 7 | Q.   And you understood that the complaint was asking that |
| 09:50 | 8 | you be required to abide by the code of conduct that you |
| 09:50 | 9 | refused to sign? |
| 09:50 | 10 |       MS. KELLER:  Objection.  Assumes facts not in |
| 09:50 | 11 | evidence.  That it was a code of conduct. |
| 09:50 | 12 |       THE COURT:  Overruled. |
| 09:50 | 13 |       (To the jury:)  Now, you're not to assume it's a |
| 09:50 | 14 | code of conduct.  That's going to be a dispute, whether this |
| 09:50 | 15 | was a new agreement or a code of conduct. |
| 09:51 | 16 |       Counsel can shape their words for both sides.  But |
| 09:51 | 17 | you'll see the dispute, as jurors, very quickly. |
| 09:51 | 18 |       Overruled. |
| 09:51 | 19 |       THE WITNESS:  I'm sorry.  Can I have the question |
| 09:51 | 20 | repeated? |
| 09:51 | 21 | BY MR. PRICE: |
| 09:51 | 22 | Q.   MGA was paying your legal fees in connection with |
| 09:51 | 23 | Mattel's declaratory relief complaint that it be declared |
| 09:51 | 24 | that you were bound by the code of conduct? |
| 09:51 | 25 | A.   I -- as I said, MGA did pay the expenses.  Um, I was |

Case 2:04-cv-09049-DOC-RNB  Document 10370  Filed 04/04/11  Page 74 of 89  Page ID #:314984
CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

74

| | | |
|---|---|---|
| 09:51 | 1 | never a hundred percent clear on what exactly Mattel wanted |
| 09:51 | 2 | out of this.  I just understood that they sued me, uh, in |
| 09:51 | 3 | very short time after I left the Mattel organization. |
| 09:51 | 4 | Q.  Well, in Exhibit 7971, your attorney's letter to |
| 09:51 | 5 | Mattel, it says you're bound by -- and this is your |
| 09:51 | 6 | attorney's words -- "Mattel's code of conduct, regardless of |
| 09:51 | 7 | the fact that he did not sign the code of conduct," correct? |
| 09:51 | 8 | A.  As long as it is legally enforceable, correct. |
| 09:51 | 9 | Q.  But the words "code of conduct" was used by your |
| 09:52 | 10 | attorney, correct? |
| 09:52 | 11 | A.  Um, yeah.  The code of conduct was in there.  That |
| 09:52 | 12 | wasn't the issue that we were disputing.  The issue was |
| 09:52 | 13 | whether or not the document was legal. |
| 09:52 | 14 | Q.  Is there any communication with Mattel in writing where |
| 09:52 | 15 | you say that what they are requiring you to sign is illegal? |
| 09:52 | 16 | A.  Well, the way I understood it from my attorney -- |
| 09:52 | 17 | Q.  My question was -- |
| 09:52 | 18 | MS. KELLER:  Objection.  Could the witness be |
| 09:52 | 19 | allowed to finish his answer, Your Honor? |
| 09:52 | 20 | THE COURT:  Let's stop for just a moment. |
| 09:52 | 21 | (To the reporter:)  Rest your hands.  Okay? |
| 09:52 | 22 | Now, your question was? |
| 09:52 | 23 | BY MR. PRICE: |
| 09:52 | 24 | Q.  My question is, in your communications with Mattel |
| 09:52 | 25 | during this time period from March 2004 to the time you |

Case 2:04-cv-09049-DOC-RNB  Document 10370  Filed 04/04/11  Page 75 of 89  Page ID #:314985
CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

75

| | | |
|---|---|---|
| 09:52 | 1 | left, did you write any communications with Mattel where you |
| 09:52 | 2 | said that what you were being asked to sign was illegal or |
| 09:52 | 3 | unenforceable? |
| 09:52 | 4 | A.   Um, I believe -- |
| 09:52 | 5 |             MS. KELLER:  Objection. |
| 09:52 | 6 |             MR. PRICE:  There's no question -- |
| 09:52 | 7 |             MS. KELLER:  Your Honor, may he be allowed to |
| 09:52 | 8 | answer? |
| 09:52 | 9 |             THE COURT:  Answer the question. |
| 09:53 | 10 |             THE WITNESS:  My perspective was that the |
| 09:53 | 11 | paragraph on employment restrictions was too broad. |
| 09:53 | 12 | BY MR. PRICE: |
| 09:53 | 13 | Q.   My question was, did you say anything to Mattel in |
| 09:53 | 14 | writing where you were saying that what you were asked to |
| 09:53 | 15 | sign was illegal or unenforceable? |
| 09:53 | 16 | A.   I don't recall where I used the word "illegal."  I know |
| 09:53 | 17 | that we disputed whether or not the paragraph on employment |
| 09:53 | 18 | restrictions or what they -- not employment restrictions, |
| 09:53 | 19 | but what they considered to be confidential information |
| 09:53 | 20 | would create an employment restriction. |
| 09:53 | 21 | Q.   Let me switch to a different topic here. |
| 09:53 | 22 |       You discussed Mr. Villasenor in your direct |
| 09:53 | 23 | examination; do you recall that? |
| 09:53 | 24 | A.   Yes, I do. |
| 09:53 | 25 | Q.   And at the time that you were at Mattel, you thought |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

76

| | | |
|---|---|---|
| 09:53 | 1 | that the department that he was in -- that the title was |
| 09:53 | 2 | something like competitive analyst, right? |
| 09:53 | 3 | A.   When are you saying I said that? |
| 09:54 | 4 | Q.   At the time that you were at Mattel, up until 2004, you |
| 09:54 | 5 | thought that Mr. Villasenor's department was, quote, |
| 09:54 | 6 | "competitive analysts" or something like that, correct? |
| 09:54 | 7 | A.   I -- I don't know that I remember that being the name |
| 09:54 | 8 | of the group. |
| 09:54 | 9 | Q.   If you'd look at -- this is January 26, 2010, page 646. |
| 09:54 | 10 | (Document provided to the witness.) |
| 09:54 | 11 | BY MR. PRICE: |
| 09:54 | 12 | Q.   Lines -- do you have 646?  It's lines 11 through 21. |
| 09:54 | 13 | A.   If you don't mind, I'm going to read a little bit |
| 09:54 | 14 | before. |
| 09:55 | 15 | Q.   11 to 21. |
| 09:55 | 16 | A.   Maybe I'm reading the wrong page. |
| 09:55 | 17 | THE COURT:  Do you have page 646? |
| 09:55 | 18 | THE WITNESS:  646. |
| 09:55 | 19 | THE COURT:  It should be lines 11 through 21, and |
| 09:55 | 20 | it would be contained probably on lines 19 and 20. |
| 09:55 | 21 | MR. PRICE:  Yes. |
| 09:55 | 22 | THE WITNESS:  So I'm sorry, can you restate your |
| 09:56 | 23 | question? |
| 09:56 | 24 | BY MR. PRICE: |
| 09:56 | 25 | Q.   At the time that you were at Mattel, you didn't know |

Case 2:04-cv-09049-DOC-RNB   Document 10370   Filed 04/04/11   Page 77 of 89   Page ID #:314987
CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

77

| | | |
|---|---|---|
| 09:56 | 1 | what Mr. Villasenor's department title was, and you thought |
| 09:56 | 2 | it might have been something like competitive analyst, |
| 09:56 | 3 | correct? |
| 09:56 | 4 | A.   Um, yes, correct. |
| 09:56 | 5 | Q.   And -- and you were being truthful about that; you're |
| 09:56 | 6 | not trying to hide whether the title was Market |
| 09:56 | 7 | Intelligence? |
| 09:56 | 8 | MS. KELLER:  Objection.  Your Honor, he said he |
| 09:56 | 9 | didn't know what it was. |
| 09:56 | 10 | THE COURT:  Overruled.  You can answer the |
| 09:56 | 11 | question. |
| 09:56 | 12 | THE WITNESS:  Um, I was trying to be truthful |
| 09:56 | 13 | throughout my depositions, yes. |
| 09:56 | 14 | BY MR. PRICE: |
| 09:56 | 15 | Q.   Now, let's talk about -- about your discussions with |
| 09:56 | 16 | Mr. Villasenor.  And, uh, he told you that he was using |
| 09:56 | 17 | false business cards to get into toy showrooms, correct? |
| 09:56 | 18 | A.   Yes, he did. |
| 09:56 | 19 | Q.   And you testified that there would be these -- these |
| 09:56 | 20 | big meetings where they do competitive -- uh, these |
| 09:56 | 21 | competitive reviews?  Do these videos? |
| 09:57 | 22 | A.   Yes. |
| 09:57 | 23 | Q.   A lot of people would be there, right? |
| 09:57 | 24 | A.   Correct. |
| 09:57 | 25 | Q.   You said, uh, that "Everyone knew what was going on." |

CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

78

| 09:57 | 1 | Do you remember that phase, "Everyone knew"? |
| 09:57 | 2 | A.   Yes, I do. |
| 09:57 | 3 | Q.   So hundreds of people, you say, knew what was going on |
| 09:57 | 4 | 'cause they were attending these presentations, correct? |
| 09:57 | 5 | A.   Correct. |
| 09:57 | 6 | Q.   And do you believe, as some have, that there's kind of |
| 09:57 | 7 | an incestuous relationship between employees in this |
| 09:57 | 8 | industry, where they can go from one company to another and |
| 09:57 | 9 | do go from one company to another? |
| 09:57 | 10 | A.   I don't like the term "incestuous." |
| 09:57 | 11 | Q.   It's not mine, but go ahead. |
| 09:57 | 12 | A.   But I do believe that there's a -- there's a lot of |
| 09:57 | 13 | people who go from one company to another in the toy |
| 09:57 | 14 | industry; that's correct. |
| 09:57 | 15 | Q.   So a lot of people who were gonna go from -- who were |
| 09:57 | 16 | going from one toy company to another, from Mattel to |
| 09:57 | 17 | another company, knew about this, right? |
| 09:57 | 18 | A.   Yes.  Well, I don't know whether they knew or not, but |
| 09:57 | 19 | I do know that -- that a lot of people do go from one toy |
| 09:57 | 20 | company to another. |
| 09:57 | 21 | Q.   Well, you said, "Everyone knew," everyone who was |
| 09:58 | 22 | attending these presentations, right? |
| 09:58 | 23 | MS. KELLER:  Objection.  I believe the testimony |
| 09:58 | 24 | was at the executive level, Your Honor. |
| 09:58 | 25 | MR. PRICE:  It wasn't. |

| | | |
|---|---|---|
| 09:58 | 1 | THE COURT:  Just a moment. |
| 09:58 | 2 | Overruled. |
| 09:58 | 3 | Answer the question. |
| 09:58 | 4 | BY MR. PRICE: |
| 09:58 | 5 | Q.   You said, "Everyone knew," not just the executive |
| 09:58 | 6 | levels? |
| 09:58 | 7 | A.   There was a large population at Mattel that knew about |
| 09:58 | 8 | this group, yes. |
| 09:58 | 9 | Q.   And at the time -- well, let me strike that. |
| 09:58 | 10 | Your belief is that even if it's wrong, that it's |
| 09:58 | 11 | common practice in the trade? |
| 09:58 | 12 | A.   What Sal did specifically? |
| 09:58 | 13 | Q.   What Sal did specifically. |
| 09:58 | 14 | A.   No, I don't know that to be common practice in the |
| 09:58 | 15 | trade. |
| 09:58 | 16 | Q.   When did it first occur to you that what Mr. Villasenor |
| 09:59 | 17 | was doing was wrong? |
| 09:59 | 18 | A.   Again, my most vivid memory of when I really had that |
| 09:59 | 19 | moment of understanding what Mr. Villasenor was doing was |
| 09:59 | 20 | wrong was during the taking of my depositions, whenever that |
| 09:59 | 21 | particular one was. |
| 09:59 | 22 | Q.   And, uh, that was in -- around January of 2010; do you |
| 09:59 | 23 | recall that? |
| 09:59 | 24 | A.   Yes, I do recall that. |
| 09:59 | 25 | Q.   And prior to that, you had no belief that what |

| | | |
|---|---|---|
| 09:59 | 1 | Mr. Villasenor was doing was -- just wasn't right; is that |
| 09:59 | 2 | correct? |
| 09:59 | 3 | A.   No.   I think the way I would put it is that prior to |
| 09:59 | 4 | that, I just didn't think about it.   It just wasn't |
| 09:59 | 5 | something I had thought about in years. |
| 10:00 | 6 | Q.   Well, so it first occurred to you that it wasn't right |
| 10:00 | 7 | in January of 2010? |
| 10:00 | 8 | A.   When I was posed with a question of ethics and what |
| 10:00 | 9 | Mattel's wrongs were, yes. |
| 10:00 | 10 | MR. PRICE:   Your Honor, if we could read from |
| 10:00 | 11 | Mr. Brawer's deposition, January 26, 2010, 648, line 12, |
| 10:00 | 12 | through 649, line 2. |
| 10:00 | 13 | *(Document provided to the witness.)* |
| 10:00 | 14 | THE COURT:   You may. |
| 10:00 | 15 | MR. PRICE:   (Reading:) |
| 10:00 | 16 | "QUESTION:   Well, when did it first occur to you |
| 10:00 | 17 | that it wasn't right? |
| 10:00 | 18 | "ANSWER:   Probably after I left Mattel and I |
| 10:00 | 19 | started realizing that, you know, you can't just walk into |
| 10:00 | 20 | someone's showroom.   Because as I grew in responsibility at |
| 10:00 | 21 | MGA and had kind of a higher point of view maybe and a |
| 10:01 | 22 | little less siloed, I realized that, if somebody did that to |
| 10:01 | 23 | me, I would be incensed, and so it wasn't right for us to be |
| 10:01 | 24 | doing it to them.   And even if it was a common practice in |
| 10:01 | 25 | the trade, which is -- I guess, is maybe how I came to |

| | | |
|---|---|---|
| 10:01 | 1 | understand it, it wasn't right.  So I never allowed anybody |
| 10:01 | 2 | who worked for me to knowingly falsify their identity to go |
| 10:01 | 3 | into a showroom." |
| 10:01 | 4 | BY MR. PRICE: |
| 10:01 | 5 | Q.   I read that correctly, yes? |
| 10:01 | 6 | A.   Yeah, you did. |
| 10:01 | 7 | Q.   And what you testified to yesterday was that the first |
| 10:01 | 8 | time you remembered this or thought about it or thought it |
| 10:01 | 9 | was wrong was this "ah-ha" moment when you were asked |
| 10:01 | 10 | questions at your deposition, correct? |
| 10:01 | 11 | A.   Yeah, I think it was in the context of, you know, |
| 10:01 | 12 | things Mattel had done ethically wrong, correct. |
| 10:01 | 13 | Q.   And so you're at MGA in 2004.  You report directly to |
| 10:01 | 14 | Mr. Larian, correct? |
| 10:01 | 15 | A.   The entire time I was there. |
| 10:01 | 16 | Q.   And, in fact, you're going to tradeshows, right? |
| 10:01 | 17 | A.   Oh, absolutely, yes. |
| 10:01 | 18 | Q.   Uh, and you talked about whether or not MGA had an |
| 10:02 | 19 | expectation of confidentiality in those tradeshows, right? |
| 10:02 | 20 | A.   They did. |
| 10:02 | 21 | Q.   And I think you said that prior to 2005 you don't know |
| 10:02 | 22 | if there were, uh, nondisclosure agreements or anything of |
| 10:02 | 23 | that nature in New York.  Do you remember saying that |
| 10:02 | 24 | yesterday? |
| 10:02 | 25 | A.   I can't remember exactly what documentation was signed |

| | | |
|---|---|---|
| 10:02 | 1 | exactly in every tradeshow, correct. |
| 10:02 | 2 | Q.   So when you were at the toy fair showrooms in 2005, |
| 10:02 | 3 | 2006, et cetera, was Mr. Larian there? |
| 10:02 | 4 | A.   Yeah.  As far as I recall -- the assumption would be |
| 10:02 | 5 | yes. |
| 10:02 | 6 | Q.   And you report directly to him? |
| 10:02 | 7 | A.   And I report to him. |
| 10:02 | 8 | Q.   But you never tell him "Look left, look right, because |
| 10:02 | 9 | someone here might be from Mattel with a false |
| 10:02 | 10 | identification."  You don't tell him that his showroom isn't |
| 10:02 | 11 | secure; is that what you're telling us? |
| 10:02 | 12 | A.   Mr. Price, on my life, I never told the guy.  I never |
| 10:02 | 13 | told Isaac that anybody from Mattel might be walking in with |
| 10:03 | 14 | a false identification, no. |
| 10:03 | 15 | Q.   So you're thinking -- you're there working for MGA, a |
| 10:03 | 16 | fiduciary responsibility to MGA, right? |
| 10:03 | 17 | A.   Correct. |
| 10:03 | 18 | Q.   You know about the practice, correct? |
| 10:03 | 19 | A.   I have knowledge of the practice, correct. |
| 10:03 | 20 | Q.   You have an obligation -- if you expect stuff to remain |
| 10:03 | 21 | confidential, if that's really what you expect, you have an |
| 10:03 | 22 | obligation to tell your employer about that, right? |
| 10:03 | 23 | MS. KELLER:  Objection, Your Honor.  He had an |
| 10:03 | 24 | obligation to Mattel not to tell anybody about Mattel. |
| 10:03 | 25 | THE COURT:  Overruled. |

CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

83

| | | |
|---|---|---|
| 10:03 | 1 | You can answer the question. |
| 10:03 | 2 | THE WITNESS:  Yeah.  I have an obligation, if I |
| 10:03 | 3 | recall it, perhaps to tell Mr. Larian that there could be |
| 10:03 | 4 | spies from Mattel in the showroom.  I also have an |
| 10:03 | 5 | obligation not to divulge things that Mattel is doing to |
| 10:03 | 6 | MGA.  So in any case, whatever the obligations are legally, |
| 10:03 | 7 | the fact is I didn't tell Mr. Larian about this group. |
| 10:03 | 8 | BY MR. PRICE: |
| 10:03 | 9 | Q.  Ms. Keller just made an objection where she said you |
| 10:03 | 10 | had an obligation to Mattel to keep secret something which |
| 10:03 | 11 | you thought was wrong and illegal and which was adversely |
| 10:04 | 12 | impacting your current employer at MGA? |
| 10:04 | 13 | MS. KELLER:  Objection.  Your Honor, misstates the |
| 10:04 | 14 | objection. |
| 10:04 | 15 | THE COURT:  Overruled. |
| 10:04 | 16 | BY MR. PRICE: |
| 10:04 | 17 | Q.  Didn't she just say, "Oh, he had the obligation to |
| 10:04 | 18 | Mattel"?  Did you hear her say that? |
| 10:04 | 19 | A.  I heard her say that "He had the obligation to Mattel," |
| 10:04 | 20 | correct. |
| 10:04 | 21 | Q.  And yesterday when you were asked by Ms. Keller about |
| 10:04 | 22 | Mr. Villasenor, your answer wasn't "I was under some |
| 10:04 | 23 | obligation by Mattel, and that's why I didn't say anything." |
| 10:04 | 24 | Your answer was "I didn't say anything because I didn't even |
| 10:04 | 25 | remember it until 2010."  That's what you said yesterday, |

| | | |
|---|---|---|
| 10:04 | 1 | right? |
| 10:04 | 2 | A.   As I said, the question was when did I recall the Sal |
| 10:04 | 3 | Villasenor group, and my most vivid memory of recollecting |
| 10:04 | 4 | what that group does is in the deposition.  Whether or not |
| 10:04 | 5 | it ever flashed through my -- it possibly could have flashed |
| 10:04 | 6 | through my mind at points prior, but I never did anything |
| 10:04 | 7 | with that information relative to MGA. |
| 10:04 | 8 | Q.   My question is, is this the first time you ever said |
| 10:05 | 9 | under oath in response to why you didn't say anything -- |
| 10:05 | 10 | including yesterday in direct by Ms. Keller -- is this the |
| 10:05 | 11 | first time you have ever said, "Oh, I thought I wasn't |
| 10:05 | 12 | allowed to tell my boss about -- Mr. Larian -- because it |
| 10:05 | 13 | was covered by Mattel's confidentiality agreement"?  Is this |
| 10:05 | 14 | the first time you've ever said that? |
| 10:05 | 15 | A.   Okay.  So my testimony is clear -- |
| 10:05 | 16 | Q.   Yes or no?  Is the first time you ever said -- |
| 10:05 | 17 |           MS. KELLER:  Objection.  May the witness be |
| 10:05 | 18 | allowed to finish his answer? |
| 10:05 | 19 |           THE COURT:  Finish your answer. |
| 10:05 | 20 |           THE WITNESS:  So my testimony is clear, I don't |
| 10:05 | 21 | recall ever thinking about Sal Villasenor or the Mattel |
| 10:05 | 22 | intelligence group and saying to myself, I'm not allowed to |
| 10:05 | 23 | tell Isaac or the company about this.  I have no |
| 10:05 | 24 | recollection of that.  I don't know whether or not I ever |
| 10:05 | 25 | thought of Sal prior to -- to that date.  He may have come |

| | | |
|---|---|---|
| 10:05 | 1 | into my mind.  Um, what I do recall most vividly is the |
| 10:05 | 2 | recounting of what Sal's group did during my depositions. |
| 10:05 | 3 | BY MR. PRICE: |
| 10:06 | 4 | Q.  Well, having been told by Mr. Villasenor that he was |
| 10:06 | 5 | using fake identifications and telling us that everybody |
| 10:06 | 6 | knew it, you then recommended him for a job with MGA? |
| 10:06 | 7 | A.  Yeah. |
| 10:06 | 8 | Q.  And -- |
| 10:06 | 9 | A.  Actually, I don't know if I recommended him, but I |
| 10:06 | 10 | did -- I did meet with -- or at least get some e-mails from |
| 10:06 | 11 | Sal about a job. |
| 10:06 | 12 | Q.  Well, look at 22395. |
| 10:06 | 13 | THE COURT:  Counsel, I received a note from the |
| 10:06 | 14 | jury.  So stop at a convenient time.  It says they need a |
| 10:06 | 15 | bathroom break. |
| 10:06 | 16 | It doesn't have to be now.  You just stop when |
| 10:06 | 17 | it's convenient. |
| 10:06 | 18 | MR. PRICE:  We're in sync.  This is a good time. |
| 10:06 | 19 | THE COURT:  All right. |
| 10:06 | 20 | You're admonished not to discuss this matter |
| 10:06 | 21 | amongst yourselves, nor form or express any opinion |
| 10:06 | 22 | concerning this case.  We'll come and get you in about |
| 10:06 | 23 | 20 minutes, 25 after. |
| 10:06 | 24 | All right.  Sir, if you will step down and return |
| 10:06 | 25 | promptly at 25 minutes after the hour and be seated.  We'll |

| | | |
|---|---|---|
| 10:06 | 1 | start promptly. |
| 10:06 | 2 | (Jury recesses at 10:07 p.m.) |
| 10:07 | 3 | (Witness steps down and exits room.) |
| 10:07 | 4 | (Out of the presence of the jury.) |
| 10:07 | 5 | THE COURT:  Counsel, if you would be seated. |
| 10:07 | 6 | I wouldn't want to miss a morning session with |
| 10:07 | 7 | counsel.  Complaint time. |
| 10:07 | 8 | MS. KELLER:  I think the marital privilege issue |
| 10:07 | 9 | was the one that was for consideration at the break.  And, |
| 10:07 | 10 | Your Honor, it's our position -- I mean, I think all |
| 10:07 | 11 | privileges are -- all waivers of all privileges are pretty |
| 10:07 | 12 | much limited to the subject matter of the waiver. |
| 10:07 | 13 | THE COURT:  We need to do some research, don't we? |
| 10:07 | 14 | In other words, that's on a wing and a prayer on my part.  I |
| 10:07 | 15 | don't know if there can be a partial waiver.  I don't know |
| 10:07 | 16 | if there's any such thing.  I don't really recall that, and |
| 10:07 | 17 | I don't know how that expands. |
| 10:07 | 18 | In other words, "I told my wife," it leads to two |
| 10:07 | 19 | more things.  First of all, obviously, you wouldn't want any |
| 10:07 | 20 | personal information about their marital relationship, |
| 10:07 | 21 | children, family -- |
| 10:07 | 22 | MS. KELLER:  Finances. |
| 10:07 | 23 | THE COURT:  By the same token, I don't know where |
| 10:07 | 24 | the rest of that question leads.  Why should counsel be cut |
| 10:07 | 25 | off from asking additional questions if he says, "I told my |

| | | |
|---|---|---|
| 10:08 | 1 | wife"?  Well, "What did you tell your wife about this?" |
| 10:08 | 2 | Well, let's call the sister.  It could be family time in |
| 10:08 | 3 | here pretty soon. |
| 10:08 | 4 | So we need to do some research.  So go do some |
| 10:08 | 5 | research.  I'll just sit here. |
| 10:08 | 6 | Get out the code. |
| 10:08 | 7 | It's your bathroom break.  Sit there.  It's an |
| 10:08 | 8 | order.  Get out the code and get the research done. |
| 10:08 | 9 | Now, for Mr. Larian and Mr. Eckert, this is the |
| 10:08 | 10 | way we spend our nights and weekends, doing this. |
| 10:08 | 11 | MR. PRICE:  Your Honor, I know you like one issue |
| 10:08 | 12 | at the time.  While that research is being done, can we talk |
| 10:08 | 13 | about the limiting instruction? |
| 10:08 | 14 | THE COURT:  Yes, but that caught me by surprise, |
| 10:08 | 15 | because if I would have responded to your limiting |
| 10:08 | 16 | instruction, I would have read my ruling last evening.  I |
| 10:08 | 17 | don't think you wanted me to read my ruling last evening. |
| 10:08 | 18 | MR. PRICE:  I appreciate that. |
| 10:08 | 19 | THE COURT:  Now, what you're going to do is you're |
| 10:08 | 20 | going to get up out of your chair, Mr. Price, and you're |
| 10:08 | 21 | going to approach Ms. Keller, and you two are going to talk |
| 10:09 | 22 | about this limiting instruction. |
| 10:09 | 23 | Mr. Eckert, why don't you go use the restroom. |
| 10:09 | 24 | MR. ECKERT:  Thank you. |
| 10:09 | 25 | THE COURT:  Pleasure. |

CV 04-9049 DOC – 3/31/2011 – Day 43, Volume 1 of 3

88

10:09   1          And I don't see Mr. Larian here today.  Where's

10:09   2   Mr. Larian?

10:09   3          MS. HURST:  He's here.  We moved him back to

10:09   4   the --

10:09   5          THE COURT:  He's using the restroom also.

10:09   6              *(Recess held at 10:09 a.m.)*

10:09   7              *(Further proceedings reported by Maria*

10:09   8       *Dellaneve in Volume II.)*

10:09   9                         -oOo-

10:09   10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEBBIE GALE, U.S. COURT REPORTER

| 10:09 | 1 | -oOo- |
| 10:09 | 2 | |
| 10:09 | 3 | CERTIFICATE |
| 10:09 | 4 | |
| 10:09 | 5 | I hereby certify that pursuant to Section 753, |
| 10:09 | 6 | Title 28, United States Code, the foregoing is a true and |
| 10:09 | 7 | correct transcript of the stenographically reported |
| 10:09 | 8 | proceedings held in the above-entitled matter and that the |
| 10:09 | 9 | transcript page format is in conformance with the |
| 10:09 | 10 | regulations of the Judicial Conference of the United States. |
| 10:09 | 11 | |
| 10:09 | 12 | Date:  March 31, 2011 |
| 10:09 | 13 | |
| 10:09 | 14 | |
| 10:09 | 15 | _____ |
| 10:09 | 16 | DEBBIE GALE, U.S. COURT REPORTER<br>CSR NO. 9472, RPR |
| 10:09 | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |