Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL INC., et al.,          )
                              )
                Plaintiff,    )
                              )      DAY 43
         vs.                  ) No. CV 04-9049-DOC
                              )      VOLUME 2 OF 3
MGA ENTERTAINMENT, INC.,      )
                              )
                Defendant.    )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

THURSDAY, MARCH 31, 2011

Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

1    **APPEARANCES OF COUNSEL:**

2    **FOR THE PLAINTIFF:**  QUINN EMANUEL URQUHART OLIVER & SULLIVAN
                            BY:  MICHAEL ZELLER, ESQ.
3                           and  JOHN QUINN, ESQ.
                            865 S. FIGUEROA
4                           10TH FLOOR
                            LOS ANGELES, CALIFORNIA 90017
5                           (213)443-3000

6
     FOR THE DEFENDANTS:  ORRICK, HERRINGTON & SUTCLIFFE
7                           BY:  ANNETTE HURST, ESQ.
                            405 HOWARD STREET
8                           SAN FRANCISCO, CALIFORNIA 94105
                            (415)773-5700
9

10
     FOR THE DEFENDANTS:  ORRICK HERRINGTON & SUTCLIFFE
11                          BY:  THOMAS MCCONVILLE, ESQ.
                            4 PARK PLAZA
12                          SUITE 1600
                            IRVINE, CALIFORNIA 92614
13                           (949)567-6700

14
                            KELLER RACKAUCKAS
15                          BY:  JENNIFER KELLER, ESQ.
                            18500 VON KARMAN AVENUE
16                          SUITE 560
                            IRVINE, CALIFORNIA 92612

17

18
     FOR CARLOS MACHADO GOMEZ: LAW OFFICES OF MARK E. OVERLAND
19                          BY:  MARK OVERLAND, ESQ.
                            100 WILSHIRE BLVD
20                          SUITE 950
                            SANTA MONICA, CA. 90401
21                          (310) 459-2830

22

23

24

25

```
 1                         - AND -

 2                    SCHEPER KIM & HARRIS LLP
                      BY:  ALEXANDER COTE, ESQ.
 3                    601 WEST 5TH STREET_12TH FLOOR
                      LOS ANGELES, CA. 90071
 4                    (213) 613-4660

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1                           I N D E X

2
     DEFENDANTS'                                              VOIR
3    WITNESS              DIRECT   CROSS   REDIRECT  RECROSS  DIRE

4    RONALD BRAWER                 6        15        32

5

6    RICHARD deANDA      52       90                  97
                         87                           99
7

8

9

10                          EXHIBITS

11
     PLAINTIFF'S                          FOR          IN
12   EXHIBIT  DESCRIPTION             IDENTIFICATION  EVIDENCE

13     4240                                           42
       4266                                           48
14     9298                                            8
       9616                                           11
15     22395                                           6

16

17                          EXHIBITS

18
     DEFENDANTS'                          FOR          IN
19   EXHIBIT  DESCRIPTION             IDENTIFICATION  EVIDENCE

20     4241                                           21
       7978, 291-296                                  64
21     12167, pages 1, 2                              19
       31174, 31175, 31176                            61
22

23

24

25

Page 5

1          SANTA ANA, CALIFORNIA; THURSDAY, MARCH 31, 2011

2                                -oOo-

3          **MS. HURST:**  Your Honor, the California marital

4    communications privilege is found in section 980 of the Evidence

5    Code, and it specifically references section 912, which is the

6    general provision for waiver of any privileged communication of

7    any sort under California law.

8          **THE COURT:**  I think it's broad sweeping, isn't it?

9          **MS. HURST:**  Your Honor, it's the same rule as in the

10   attorney-client privilege, whoever is necessary to fairly disclose

11   on the subject matter.  And, Your Honor, that's the Sony computer

12   case, 229 FRD 632, and the TransAmerica case, 188 Cal.App.3d 1047.

13   There is also a rule that you can engage in selective waiver, but

14   that's again with respect to the subject matter.

15         **THE COURT:**  That was very helpful, counsel.

16         **MS. HURST:**  So the Court has broad discretion to fashion

17   the scope of the waiver.

18         **THE COURT:**  Here are all the privilege cards.  Here is

19   the official.  Here is witnesses.  Here, keep these.

20         **MS. HURST:**  Did I get right?  You already knew the

21   answer.  This was a trick question.

22         **THE COURT:**  But you need to establish a good record.

23   Right now I have sustained the objections.  California is a little

24   different than the federal.  Here is the spouse.  Take a look at

25   this.

Page 6

1          MS. HURST:  That's who is entitled to claim.

2          THE COURT:  I know, but California is a little

3    different.  Why don't we just move it along.  We're not going to

4    resolve it because the jury is coming in.

5          MR. PRICE:  At some point we want to talk about --

6          THE COURT:  We will, but right now we'll resolve this

7    later and the witness can wait in the hallway.

8                        (Jury in.)

9          THE COURT:  Back in session.  The jury is present, the

10   alternates, all counsel are present, the witness.

11         If you would be seated, sir.

12         And this is the continued cross-examination by Mr. Price

13   on behalf of Mattel.

14                  CROSS-EXAMINATION (CONTINUED)

15   BY MR. PRICE

16   Q    Mr. Brawer, if you would look at 22395.  It's now been placed

17   in front of you.

18   A    Okay.

19   Q    And this is an e-mail exchange between you and Mr. Machado?

20   A    Yes.

21         MR. PRICE:  I move 22395 into evidence.

22         THE COURT:  Received.

23              (Exhibit 22395 received in evidence.)

24   BY MR. PRICE

25   Q    And you see at the bottom there is an e-mail from

1   Mr. Villaseñor to you, November 14, 2006 saying.  "Ron, thank you

2   for making time in your schedule to talk to me yesterday.  As you

3   requested I will be e-mailing a copy of my résumé in the next few

4   days.  As I mentioned during our conversation, I have 15 years

5   marketing research/competitive intelligence experience in the toy

6   industry.  I am familiar with the products that you manufacture

7   and believe my experience would benefit your company.  Thanks

8   again for your time."

9          You see that?

10  **A**    Yes, I do.

11  **Q**    And so, as of November 2006, you knew that Mr. Villaseñor had

12  used false identification to get into competitors' showrooms;

13  right?

14  **A**    I did know that, yes.

15  **Q**    So you certainly knew he had lots of marketing

16  research/competitive intelligence experience; right?

17  **A**    Yes, I did.

18  **Q**    And you forwarded this to Mr. Machado where you say "possible

19  replacement for Christina."

20          Do you see that?

21  **A**    Yes, I do.

22  **Q**    And then his response to you is, "I remember this guy had a

23  lot of insights about the competitive environment.  I would also

24  like to consider him.  Thanks."

25          Do you see that?

1   **A**   Yes, I do.

2   **Q**   And it's your understanding that, in fact, there was an

3   interview; a meeting, let's say, with Mr. Villaseñor?

4   **A**   Between who?

5   **Q**   With Mr. Machado and Mr. Villaseñor?

6   **A**   I don't recall.

7   **Q**   Do you recall there being any meetings about it?

8   **A**   I'm sorry, do you mean an interview or --

9   **Q**   Any meetings with Mr. Villaseñor to talk about job

10  opportunities.

11  **A**   With anybody in the company?  There may have been with

12  someone.  I don't recall seeing him personally.

13  **Q**   And if you would look at 99 -- 9298.  Do you recognize that

14  as an e-mail between you and Mr. Machado?

15  **A**   Yes, I do.

16  **Q**   And the earlier e-mail was dated in November of 2006;

17  correct?

18  **A**   I'd have to go back and look.  I don't recall.

19  **Q**   Let's look at this one, Exhibit 9298.

20          **MR. PRICE:**  Your Honor, I move that into evidence.

21          **THE COURT:**  Received.

22          (Exhibit 9298 received in evidence.)

23  BY MR. PRICE

24  **Q**   And you see at the bottom it's from Mr. Villaseñor to you.

25  "Don't forget me.  Hi Ron.  Just wanted to remind you that I'm

1   still very interested in working for you at MGA.  I know that with

2   New York Toy Fair right around the corner, this is a busy time for

3   you.  However, I would like to continue our discussion about the

4   possibility of me joining your team.  Thanks.  Sal V.  P.S. keep

5   in mind that with my extensive experience in market intelligence,

6   know I can be a valuable resource at toy fair."

7           That's what Mr. Villaseñor sent you; correct?

8   **A**   Yes.  I think that is what he sent me.

9   **Q**   And when he sent you this, did you have one of those a-ha

10  moments where you realized, oh yeah, he told me about this

11  practice of using fault identification to get into toy fair?

12  **A**   Not as it relates to ethical standards in Mattel, but I did

13  remember what he did, yes.

14  **Q**   And in fact, you remembered that when you had the

15  communication with Mr. Machado in November of 2006?

16  **A**   The e-mail would reflect that I probably remembered what Sal

17  did, yeah.

18  **Q**   And your e-mail to Mr. Machado is, "Did you have him in for

19  interview?"

20          Do you see that?

21  **A**   Yes, I see that.

22  **Q**   And then later do you recall that Mr. Larian was attempting

23  to look at Mr. Villaseñor's résumé or had asked for it?

24  **A**   No, I do not.

25  **Q**   Now, with respect to these toy fairs, if you would look at

1    Exhibit 9533 which I believe is in evidence.

2    **A**    Okay.

3    **Q**    You see this is an e-mail to you from Angelika Sternberg in

4    the Germany office, or you are copied on it, February, 2007?

5    **A**    Yeah.  It's to Isaac.  I'm copied on it, yes.

6    **Q**    And this is where she says, "Dear Isaac, we have some news

7    for you which we heard from customers regarding Get Connected

8    Barbie.  They show it as a top secret theme in a closed room at

9    toy fair."

10           Do you see this?

11   **A**    Yes, I do.

12   **Q**    So you had the understanding, when you received this, that

13   was information from a closed room at toy fairs; right?

14   **A**    From a customer; correct.

15   **Q**    And Angelika Sternberg is not your customer.  She works for

16   the German office?

17   **A**    Exactly.  Her employee had been told something by a customer,

18   correct.

19   **Q**    And that's something that actually you sent e-mails -- let me

20   ask it this way.

21           You knew that retailers would talk to other

22   manufacturers about what they saw at competitors' showrooms?

23   **A**    I knew there is a risk when you show retailers' product, that

24   they will talk about it to other competitors, correct.

25   **Q**    Not just a risk.  You knew that happened?

1   **A**   I know that it could happen yeah.

2   **Q**   Well, you knew that MGA actually was the beneficiary of that?

3   **A**   In this particular case, yes.

4   **Q**   And the two purposes for toy fairs in New York I think you

5   said were sales and promotion; right?

6   **A**   At a high level that's a fair way to describe it.

7   **Q**   If you would look at Exhibit 9617 -- 9616.  I apologize.  And

8   you see this is sent the same day from Ms. -- at the bottom is

9   sent from Peter Kohler to Mr. Larian copying you and sent the same

10  day as Ms. Sternberg's e-mail.

11        Do you see that?

12  **A**   I'm just checking, but yes, it is the same date.

13        **MR. PRICE:**  9616 I think is in evidence, Your Honor.  If

14  not I offer it.

15        **THE COURT:**  Received.

16        (Exhibit 9616 received in evidence.)

17  BY MR. PRICE

18  **Q**   And at the bottom you see it says, "Isaac, some more

19  information on the main Barbie themes."

20  **A**   I see that, correct.

21  **Q**   And it adds information to the information that was contained

22  in the earlier e-mail; correct?  That's how you understood it?

23  **A**   No.  I don't understand it as more information from the

24  previous e-mail, but I do see it as information on Barbie,

25  correct.

1   **Q**    Well, in 9533, you see it talks about the main theme, movie,

2   etcetera.  Do you see that?

3   **A**    Yes, I do.

4   **Q**    And this next e-mail, the same day, is also coming from the

5   German office; correct?  9616?

6   **A**    Yeah, I do see that, but it appears to me the time is earlier

7   on this one than on the other one.

8   **Q**    You realize there are time differences between how they're

9   stamped, etcetera; correct?

10  **A**    Not in Germany.  They're both from Germany.

11  **Q**    It says some more information on the main Barbie themes.

12  That tells you there had been some previous information on the

13  main Barbie themes?

14  **A**    That's correct.

15  **Q**    And your response at the top is, "Very helpful.  Danka

16  schein."

17  **A**    That's correct.

18  **Q**    And it was -- let me ask you this.  I think you said that

19  when you left Mattel, that it was your belief that Mattel was

20  going to sue you.

21        Do you remember saying that?

22  **A**    I don't remember that if I said those exact words, no.

23  **Q**    But that was your belief?

24  **A**    My belief was that I was -- at different points in time there

25  was the risk of litigation from Mattel, correct.

1  **Q**   When you left, did you have a belief that Mattel was going to

2  sue you for leaving and joining MGA?

3  **A**   If you are asking was I surprised when I received my server

4  at the door at 10:00 o'clock at night, I was very surprised.

5  **Q**   That's not what I'm asking.  I'm saying consistent with what

6  you said before, did you believe when you left Mattel that you

7  were going to be sued by --

8  **A**   I didn't believe Mattel would actually sue me, no.  I feared

9  it, but I didn't actually believe that they were going to do it,

10 not the day that I left Mattel.

11 **Q**   Guidance Software Services, they're the company that wiped

12 your -- the information on your hard drive?

13 **A**   Absolutely.

14 **Q**   And those services were paid for by and reimbursed by MGA;

15 correct?

16 **A**   If you say so.

17 **Q**   That's your best recollection; right?

18 **A**   I don't remember if we got paid back or not.

19 **Q**   Mr. Brawer, during the break we just had, you were -- you met

20 with MGA's counsel in the room?

21 **A**   In the room there, yes.  Some of the lawyers came back there,

22 yes.

23 **Q**   But you are not being represented, you say today, by those

24 counsel; correct?

25 **A**   Apparently not.  That's what they say.

Page 14

1   **Q**    That's a surprise to you?

2   **A**    Well, it's not always clear to me when MGA is my counsel or

3   not, yes.  I'm not 100 percent sure on how that works.

4   **Q**    Well, in preparing for your testimony today did you review

5   documents with MGA counsel?

6   **A**    Yes, I did.

7   **Q**    Did you discuss your testimony with MGA counsel?

8   **A**    Yes, I did.

9   **Q**    Did you discuss these e-mails concerning Mr. Villaseñor

10  interviewing with MGA in the time frame of 2006?

11          **MS. KELLER:**  Your Honor, we'll represent we are

12  representing Mr. Brawer in his capacity as a former employee and

13  executive of MGA, not in his personal capacity.

14          **THE COURT:**  Hold that thought.  No more conversation.

15  It's his understanding.

16  BY MR. PRICE

17  **Q**    It's your understanding you are being represented today by

18  counsel?

19  **A**    My understanding is that I guess I don't have a lawyer for

20  myself, but I have a lawyer for myself as MGA.  I'm not

21  100 percent clear on who is my lawyer here, no.

22  **Q**    Well, when you reviewed the e-mails concerning Mr. Villaseñor

23  and his potential in coming to MGA, when you reviewed those, did

24  you think, oh yeah, I knew at the time that he had used fake

25  identification?  Did that kind of refresh your memory?

Page 15

1    **A**    I think your question was, did I review them in preparation

2    for this testimony recently, like in the last whatever, I don't

3    believe we went through those e-mails at all, no.

4    **Q**    So you have never gone through them until I just showed them

5    to you?

6    **A**    No.  In the deposition process I did see them come up.  Maybe

7    I'm being unclear, but that's what I thought you asked.

8    **Q**    Time is up.

9             **THE COURT:**  You are calling time on yourself.

10            **MR. PRICE:**  Yes.

11            **THE COURT:**  I want the record to reflect that.  All

12   right.

13            Counsel, questions on redirect by Ms. Keller.

14                       REDIRECT EXAMINATION

15   BY MS. KELLER

16   **Q**    So Mr. Brawer, as I understand it, when you were at Mattel,

17   you actually thought you had the right to look for another job,

18   true?

19   **A**    Yes, I did have a right to look for another job.

20   **Q**    What on earth made you think that?

21   **A**    I did not have a contract with Mattel that prohibited my

22   looking for another job.

23   **Q**    Did some of the other executives around you have contracts

24   with Mattel for fixed terms?

25   **A**    Yes.  And very widely known Matt Bousquette certainly had a

Page 16

1   contract with the company.

2            **MR. PRICE:**  Object.  This is hearsay.

3            **THE COURT:**  Overruled.  You can answer that question.

4            **THE WITNESS:**  I know from the public documents that Matt

5   had a contract with Mattel, Bob Eckert has a contract with Mattel.

6            So there were plenty of people who I reported up into

7   that had contracts with Mattel.

8   BY MS. KELLER

9   **Q**   What about you?  If Mattel wanted to let you go, what did

10  Mattel have to do?

11  **A**   I was very aware that any morning I could walk into work and

12  it could have been my last morning.

13  **Q**   So did you think that it was your right, in the absence of a

14  contract, as a free American worker to actually look for other

15  employment?

16  **A**   Yes.

17  **Q**   And tell us about that.  What was your thought process at the

18  time and where were you looking for another job?

19  **A**   Well, as I think I described yesterday, the situation at

20  Mattel had gotten tough.  They had reassigned me to a job in New

21  York.  There were still declining sales in the core business that

22  we were being asked to fix, and I was certainly feeling that there

23  was a pressure that at some point my career could end at Mattel.

24  **Q**   Did you see executives above you being fired over these

25  problems?

1    **A**    Yes.  And some of them even had contracts.  So there were

2    people being fired, or I don't know, let go or whatever you call

3    it.

4    **Q**    Where all did you decide to look to see if you could get a

5    better opportunity?  Was it only at MGA?

6    **A**    No.  So I am a pretty well-paid person, and there were only

7    some companies that would value my services at the payment that I

8    receive.  And I did pursue jobs with companies like Nintendo, with

9    Leapfrog.

10           MGA was attractive primarily, more than anything else,

11   because it was in Los Angeles and didn't require my relocation

12   and, therefore, we could have a sort of a stable family situation

13   while I was going through a work change.

14   **Q**    You had little kids?

15   **A**    Yes.  I had little kids.

16   **Q**    And a wife who wasn't thrilled about the idea of moving?

17   **A**    And I had a wife who wasn't thrilled about the idea of

18   moving.

19   **Q**    Did you know that because you were exploring the possibility

20   of other jobs, that basically you were becoming -- you were being

21   monitored; your e-mail, your phone calls, your comings and goings?

22           **MR. PRICE:**  Objection.  Assumes facts not in evidence

23   with regard to time.

24           **THE COURT:**  Overruled.

25           **THE WITNESS:**  I was only aware of that one threatening

1    conversation I had with Alan Kaye, but that did put some suspicion

2    in my mind, which led to my trying to be cautious about the whole

3    situation.

4    BY MS. KELLER

5    **Q**    Since Alan Kaye was the head of human resources and you would

6    have to report being threatened to human resources, I take it that

7    played a part in your not doing so?

8    **A**    Yes.

9    **Q**    Did you work hard for Mattel when you were there?

10   **A**    Every day I was there.

11   **Q**    Were you sure that you would find other employment?

12   **A**    I was not sure I would find other employment, and as long as

13   that negotiation went on with Isaac and MGA, it made me uneasy and

14   never really confirmed my decision to move over until, really,

15   that last day when I packed up that box.  And I just took a flier

16   and decided, you know what?  I'll take this risk with this company

17   I knew very little about, with this boss who had a very

18   questionable reputation in the industry and I would figure it out.

19   And so I made the move.  But I all along -- and this is what I all

20   along --

21              **MR. PRICE:**  Objection.  Narrative.

22              **THE COURT:**  Sustained.

23   BY MS. KELLER

24   **Q**    You already had an employee invention trade secret

25   confidentiality agreement with Mattel by virtue of the one you had

1    signed with Tyco before -- I'm sorry.  You already had a

2    confidentiality agreement that covered you with Mattel because you

3    had signed one at Tyco which Mattel then acquired; right?

4    **A**    That's correct.  That was my understanding.

5    **Q**    And that's 12167, pages 1 and 2; is that right?

6            If we could show Mr. Brawer that.

7            And that was signed back in April of 1996, was it?

8    **A**    That's correct.

9            **MS. KELLER:**  And I think that's already in evidence,

10   Your Honor.

11           **THE COURT:**  If not, it's re-received.

12           (Exhibit 12167, pages 1, 2 received in evidence.)

13   BY MS. KELLER:

14   **Q**    Now, you said the atmosphere was pretty tense at Mattel;

15   right?

16   **A**    Yes.

17   **Q**    And the atmosphere was especially tense about anything

18   regarding MGA; right?

19   **A**    I mean, it was no secret Mattel hated MGA, MGA hated Mattel.

20   There was no love lost between the two.

21   **Q**    And there was no secret that Bratz was doing incredibly well,

22   and Barbie was on the wing; right?

23   **A**    That Bratz was, yes, doing well while Barbie was not.

24   **Q**    So you were presented with this new agreement and you sent it

25   to your sister to take a look at it?

Page 20

1    **A**    That's exactly what happened.

2    **Q**    Your sister is a lawyer?

3    **A**    She is.

4    **Q**    And I think you said your sister thought it was really

5    overbroad?

6    **A**    There is a lot in there.  I don't know if it has been

7    produced in evidence, but it's like -- it's long, but there was

8    really one paragraph that concerned her, yes.

9    **Q**    Okay.  And that's --

10            **MR. PRICE:**  This appears to be a completely waiver of

11   the subject matter if we're going to substance.

12            **THE COURT:**  Counsel, I'm at your disposal, both sides.

13   We'll decide that but I'm just going to let this go now.

14   BY MS. KELLER

15   **Q**    And looking at --

16            **THE COURT:**  That doesn't mean personal relationships,

17   though.  Husband, wives, etcetera.  On this topic if both counsel

18   are getting into it, I'm assuming it's a waiver.  So.

19   BY MS. KELLER

20   **Q**    So, if you look at 4241, this is the group of new documents

21   that you were asked to sign; is that right?

22            **MS. KELLER:**  And Your Honor, I would move all of it in.

23   4241, pages -- is it all in evidence at this point, 1 through 14?

24            **THE COURT:**  I think it is, but if not I'll re-receive

25   it, counsel.

1          (Exhibit 4241 received in evidence.)

2    BY MS. KELLER

3    **Q**    If you look at the front, it's dated March 5, 2001, on page

4    1.  And it is from Matt Bousquette.  And "Subject:  Protecting

5    Mattel's intellectual property."  And it refers to having you sign

6    a new code of conduct.

7          Now, let's turn to page 2.  And it says "Code of

8    Conduct" at the top on the left.  But then if you go down a little

9    further where it actually says what it is, it says --

10          **MR. PRICE:**  Argumentative, Your Honor.

11          **THE COURT:**  Overruled.

12   BY MS. KELLER

13   **Q**    You look at the second bold part where it says, "All

14   employees must complete sections A, B and E below.  California and

15   Illinois employees must also complete section C below."  And it

16   has something about Wisconsin employees.

17          Anyway it says, "You acknowledge that all work that has

18   been or will be made by you solely or jointly with others that is

19   within the scope of your employment with your employer and is

20   protected by copyright, is work made for hire as that term is

21   defined in the United States Copyright Act with the result that

22   your employer will be the sole owner of such work."

23          So you see that, "all work that has been or will be made

24   by you" term?

25   **A**    Yes, I do.

1  **Q**    And then underneath that it says, "You have agreed to and do

2  hereby irrevocably assign to your employer in perpetuity," you

3  know that means forever?

4  **A**    Actually I do.

5  **Q**    "In perpetuity and without any limitation or reservation of

6  rights, all of your right, title and interest in and to your

7  invention which are defined as all inventions, discoveries,

8  improvements, developments, design, works, ideas, know-how,

9  techniques, methods, and trade secrets, whether or not patentable

10 or registerable that are created, conceived, developed, or reduced

11 to practice by you either alone or jointly with others, during the

12 period of your employment with your employer, using equipment,

13 supplies, facilities, or trade secrets of your employer or Mattel

14 based upon work performed for your employer, or related to your

15 employer's or Mattel's business or current, or anticipated

16 research and development."

17         So do you understand from reading this that any ideas

18 that you had that related in any way to Mattel's business were, if

19 you sign this agreement, going to belong to Mattel for all time?

20 Anything in your head even?

21 **A**    I mean, the way you read it now and describe it now, the

22 answer would be yes.

23 **Q**    And then underneath that it says --

24         **MR. PRICE:**  I object and move to strike because that's

25 irrelevant.

1          **THE COURT:**  Overruled.

2     BY MS. KELLER

3     **Q**    Underneath that it says, "Mattel's proprietary information

4     which is defined as any nonpublic information that you learn,

5     receive, or discover in connection with your employment that

6     relates to the business of Mattel or your employer, or one of

7     their business partners such as customers, suppliers, and

8     licensees, Mattel's proprietary information includes, without

9     limitation, information relating to," and it has this huge range

10    of things including even personnel, costs.  Everything.

11         And it says at the bottom, "You have agreed to and do

12    hereby forever waive and agree never to assert any moral rights

13    that you may have in or with respect to any of your inventions

14    even after any termination of your employment with your employer."

15         So not just legal rights, but even moral rights you are

16    giving up; right?

17    **A**    According to this, yes.

18    **Q**    And underneath that it has, "All employees.  Confirmation of

19    your obligation to protect Mattel's proprietary information."

20         And it says, "Your employment by your employer creates a

21    relationship of confidence and trust with respect to Mattel's

22    proprietary information.  In this regard, you acknowledge that you

23    have access to Mattel's proprietary information solely because of

24    your employment with your employer.  You must keep Mattel's

25    proprietary information confidential, and you may only use or

1   disclose such information as necessary to perform your job

2   responsibilities in accordance with Mattel policies.  Your

3   obligation to keep Mattel's proprietary information confidential

4   will continue even after termination of your employment with your

5   employer.  Mattel's proprietary information including all

6   intellectual property rights therein is and at all times will

7   remain Mattel's sole and exclusive property.  Mattel takes step to

8   maintain the secrecy and confidential nature of Mattel's

9   proprietary information.  And if a competitor discovered Mattel's

10  proprietary information, it could significantly damage Mattel and

11  your employ."

12          And there are boxes underneath all these "I agree."

13          And you go back to what Mattel's proprietary information

14  is that you are agreeing to keep secret for all time without

15  limitation, and it's virtually anything somebody could do in the

16  course of his employment; right?

17          **MR. PRICE:**  Objection.  Leading.

18          **THE COURT:**  Overruled.

19          **THE WITNESS:**  Yes.

20  BY MS. KELLER

21  **Q**    And so your sister took a look at this and probably used

22  legal terminology that amounted to, holy cow, right?  This is

23  really, really broad?

24          **THE COURT:**  Strike the "holy cow."  Re-ask the question,

25  counsel.

1          **THE WITNESS:**  My sister reviewed the document and found

2   in there certain paragraphs, one paragraph in particular -- I'm

3   not sure you have read that particular one -- that just in many

4   ways she felt could hinder my ability to find another job and was

5   just way overbroad and possibly illegal.

6          So she advised me to get further clarification on that

7   paragraph.

8   BY MS. KELLER

9   **Q**   And so you asked for further clarification and you said it

10  took a really long time for Mattel to get back to you; right?

11  **A**   That's correct.

12  **Q**   And you proposed your own narrower version of it that you

13  would be willing to sign; right?

14  **A**   Well, we identified that specific paragraph as the key

15  paragraph.  If they were willing to delete that paragraph, we were

16  willing to sign it.

17  **Q**   And before you resolved that issue with Mattel, you decided

18  to move on to another job; right?

19  **A**   That's correct.

20  **Q**   And then the day that you had your checkout with Mattel, they

21  gave you, among other things, this same document that we just read

22  and they said you have got to sign this; right?

23  **A**   They asked again if I would sign it, yes.

24  **Q**   And you said, "No, I'm not signing anything on my way out."

25  Right?

Page 26

1    **A**    That's what my advice was, correct.

2    **Q**    And you were already concerned, although you didn't think

3    Mattel was going to sue you, you were already concerned that was a

4    possibility; right?

5    **A**    They were definitely taking precautions.

6    **Q**    And that was partly because you had been threatened by

7    Mr. Kaye; right?

8    **A**    Absolutely.

9    **Q**    And you said it was 10:00 o'clock at night, the day you left

10   Mattel, that Mattel sued you?

11   **A**    No, not the day I left Mattel.

12   **Q**    Okay.  When was it?

13   **A**    When the server showed up, I remember it was a Thursday

14   because L.A. Law was on.  And that's all I can remember as to

15   exactly the date.  But it was about two weeks after I started at

16   MGA.  It may have been like the 20th or the 21st of October,

17   something, I guess a good six weeks after I had actually given my

18   notice of resignation.

19   **Q**    Where were you, sir?

20   **A**    In my house.

21   **Q**    10:00 o'clock at night?

22   **A**    Probably a little after 10 because L.A. Law had started.

23   **Q**    Now, we talked a little bit about the lawsuit before, but

24   originally the superior court simply did something called

25   sustaining a demurrer, meaning we don't think the complaint states

1   any kind of cause of action; right?

2           **MR. PRICE:**  That's irrelevant.

3           **THE COURT:**  Overruled.

4           **THE WITNESS:**  That was my understanding.  It was the

5   best win we could get.

6   BY MS. KELLER

7   **Q**    And you weren't actually accused in the complaint of doing

8   anything wrong; right?

9   **A**    No.

10  **Q**    And there were some things in the complaint that were

11  inaccurate?

12  **A**    Yes, there were.

13  **Q**    Was there one meeting in particular that you were accused of

14  being in where you were elsewhere?

15  **A**    As I read through the details of the complaint, there was one

16  reference to my having been at a meeting when I knew on that day I

17  was sitting in a Yankee game with my son in New York, and the

18  meeting was in El Segundo.  And this is referenced in the

19  complaint.

20          And so what I surmised is that the lawyers I guess or

21  whoever put this together, took my calendar --

22          **MR. PRICE:**  Objection.  This is speculation, "I

23  surmised," and irrelevant.

24          **THE COURT:**  Not in relation to the complaint.

25          No, you can finish your answer.

Page 28

1    Overruled.  This is his thought process about the

2  complaint, the demurrer.

3    Finish your answer.

4    **THE WITNESS:**  There were a lot of inaccuracies in the

5  complaint.  And that's because my secretary never updated my

6  calendar.  She was lousy at that.  And so all they probably really

7  had is a reference to go by as to where I was when I was, was

8  whatever was in my diary at the time.  And if I changed a schedule

9  or I didn't go to a meeting, it wasn't reflected in there.

10    So it wasn't an accurate chronology of where I had been

11  or what I had done.  So the dates in the complaint were just a

12  reflection of what was in the diary and had no relevance as to

13  whether I really was in a meeting or actually heard that meeting

14  or made that phone call when they claimed I made the phone call,

15  or whatever dots they were trying to connect which weren't true.

16  BY MS. KELLER

17  **Q**    When you got sued by Mattel, was that pretty unpleasant?

18  **A**    Yeah.  Called it a punch performance.

19  **Q**    Scary?

20  **A**    Yeah, a bit scary.

21  **Q**    And ultimately the court of appeal allowed Mattel a chance to

22  amend its complaint and try to come up with one that could survive

23  being dumped; right?

24  **A**    That's what I understood.  It was a technicality of some

25  level and they were being allowed to rewrite the complaint.

1  **Q**    And before that happened, your lawyer sent this letter saying

2  that you always intended to comply with any legally enforceable

3  portions of the code of conduct; right?

4  **A**    Yes.  And I believe he referenced that even prior to the --

5  or around the time that the complaint was filed.

6  **Q**    And that's 7971; right?  Exhibit 7971 is the letter from your

7  lawyer where your lawyer says that you acknowledge that you are

8  bound by all legally enforceable obligations arising under

9  Mattel's code of conduct; right?

10 **A**    This is the letter that arrived a year and a half after the

11 complaint was filed, but there a letter with similar language, I

12 believe, that existed even as the complaint was being filed.

13 **Q**    And did you think that you were disloyal to Mattel by

14 refusing to sign these documents that in your mind would give away

15 rights that could not be enforced under California law and give

16 them away for all time?

17 **A**    I was not being disloyal.  I was happy to sign an agreement

18 that precluded me from giving away trade secrets or confidential

19 information.  I just didn't want to have a restricted trade.  I

20 wanted to know that I could wake up any morning, get fired, and

21 find a new job and not be hassled because of it.

22 **Q**    Or wake up any morning and go seek a new job that paid you

23 more?

24 **A**    Same thing.

25 **Q**    That was better for your family?

1   **A**    I wanted to know I had -- if I didn't have a contract, I

2   could wake up any morning and look for a new job, or if I was

3   fired, find a new job, and I hadn't signed some 12-page document

4   that could cause a problem for me because I went to work for

5   another toy company.

6   **Q**    Were you concerned that if you signed something that broad,

7   another toy company might not want to hire you because the other

8   toy company might fear getting sued by Mattel?

9   **A**    No one likes gets sued 10 days after they start a new job.

10  It's not a privilege and it's something that you immediately think

11  might put your job at risk.

12           So, obviously better the case I had in terms of being

13  able to make the move that I wanted to make, the better I felt I

14  was positioned in the event that happened.

15  **Q**    Did you ever give away any trade secrets of Mattel's to MGA?

16  **A**    I did not give any trade secrets away of Mattel to MGA.

17  **Q**    Now that you have moved on and you have your own toy company,

18  have you ever given away any of MGA's trade secrets to anyone?

19  **A**    I have not given away any of MGA's trade secrets.

20  **Q**    How did you try in your own mind to be scrupulous about that?

21  You are moving from one toy company to another.  Obviously you

22  can't wipe the hard drive of your brain.  What did you do to try

23  to do your best to keep that -- to keep those things

24  compartmentalized?

25           **MR. PRICE:**  Argumentative as phrased, and suggestive.

1        **THE COURT:**  Overruled.

2        **THE WITNESS:**  So there are -- I guess there are two ways

3   you can look at it.  The first thing was to try coming in to do

4   all I could that would prevent any red flags from being raised by

5   having any documents or information, or things, if you will, that

6   would potentially raise a concern that I had been providing my new

7   employer with those documents or with confidential information.

8        So that's why we went through all the steps of wiping

9   hard drives and making sure I didn't talk to MGA during my 10-day

10  or two-week garden period, whatever you call it, the time when

11  they let you go but still pay you.  All of that stuff.

12       And then once you get into the job, all you can do, I

13  think, is use your best judgment.  Just absolutely remember that

14  you have an obligation.  If the word "Mattel" comes up, bells need

15  to ring and you need to know whether or not you need to preclude

16  yourself from the conversation or whether or not you need to stay

17  silent on an issue.  And you do your best to absolutely keep the

18  two separate.

19  BY MS. KELLER

20  **Q**   So if it's something new you are hearing about Mattel, that

21  some information somebody is giving to you, it's okay for you to

22  hear it, but it's not okay for you to take information that you

23  obtained while you were at Mattel and disseminate it if it's

24  confidential; right?

25  **A**   Yes.

Page 32

1          **MS. KELLER:**  I have nothing further.

2          **THE COURT:**  Recross by Mr. Price on behalf of Mattel.

3                         RECROSS-EXAMINATION

4     BY MR. PRICE

5     **Q**    Mr. Brawer, Ms. Keller just went through Exhibit 4241 with

6     you.  That's the e-mail from Mr. Bousquette and attaching the code

7     of conduct 2004 certification.

8          And do you remember she read you some language in that?

9     **A**    Yeah.  If somebody would bring it up, that would be great.

10    Yeah.

11    **Q**    And after reading all of that language, I think you said

12    those weren't the provisions that your sister was concerned about;

13    there was something else?

14    **A**    I believe there is another paragraph there that we referenced

15    in your previous cross-examination for me earlier.  And if we go

16    to that document, it will show you the paragraph specifically that

17    we were discussing, which has some references back to these

18    elements, but that was the one that we focused on.

19    **Q**    Could you tell the jury the one that you were actually

20    worried about rather than what was read to you during your

21    examination?

22    **A**    It will take me a while to find it in this document.  If you

23    want to help me.

24    **Q**    I don't know what you --

25    **A**    You showed me a document before where point 1 and point 5

Page 33

1    were underlined, and it was the redraft by Mattel of that

2    particular paragraph.

3              I don't remember the exhibit number, Your Honor.  I

4    apologize for that.

5              So if you give me that, then it will be easier for me to

6    find it.  But if not, I can take the time to go through this and

7    eventually I will find it.

8    **Q**   I want to find out what you didn't like in this agreement as

9    opposed to --

10   **A**   It's context -- it is from this agreement.

11             **MR. PRICE:**  To allow him to find that --

12             **THE COURT:**  We'll just stop the clock and go through the

13   agreement.

14             You referred him to 4241.

15             **MR. PRICE:**  4249 is what he was referring to.

16             **THE COURT:**  Just a moment.  You have got him in 4241.

17             **MR. PRICE:**  He said there is another exhibit --

18             **THE COURT:**  We're going to stay on -- why don't you and

19   Ms. Keller get together.  If there is another exhibit you think

20   contains this, so be it.  But right now we're going to stay on

21   4241.  We'll stay off the clock.

22        (Brief pause in proceedings)

23             **THE COURT:**  We're back on the record.  The time clock is

24   not running.

25             And counsel, if he is looking at 4241, there has been

Page 34

1   reference to 4249.  What should he be looking at?

2         MR. PRICE:  He suggested looking at this.  He wanted to

3   know the exhibit number.  It's where Mr. Kimble sends to him --

4         THE COURT:  You two talk about this quietly for just a

5   moment.  I don't want this in front of the jury.

6         Off the record.

7      (Brief pause in proceedings)

8         THE WITNESS:  So the focus of the concern by my sister,

9   by my attorney, was capital A.B, I guess.  So let's go through

10  that.

11  BY MR. PRICE

12  Q   So what was read to you by Ms. Keller, which is A sub 2,

13  where it says, "You have agreed and do assign, etcetera," that

14  wasn't the focus of concern; correct?

15        MS. KELLER:  Your Honor, misstates the testimony.  I

16  also read part B.

17        THE COURT:  Sustained.

18  BY MR. PRICE

19  Q   Let me ask this.

20        THE COURT:  Let's just put up the whole paragraph now.

21  Okay.  Let's just get it up.  In fact, either take this down or

22  display the whole document so the jury can see what is being

23  referred to here.

24  BY MR. PRICE

25  Q   You referred to B.  Let's blow that up.  That's B.  That's

1    what you said you had concern about.

2    **A**    That was the focus of our discussions, correct.

3    **Q**    And the focus of your discussions was not the paragraph above

4    that.  It was paragraph B here; correct?

5    **A**    In our conversations with Mattel we were discussing paragraph

6    B primarily, yes.

7    **Q**    And that defines Mattel's proprietary information as any

8    nonpublic information that you learn, receive, discover in

9    connection with your employment that relates to the business of

10   Mattel; correct?

11   **A**    Yeah.  It continues.

12   **Q**    And then it has a list of what that is; right?

13   **A**    Correct.

14   **Q**    Including personnel, product research, market and advertising

15   research.  Knowledge about personnel and what they make that you

16   get at Mattel, that's confidential information; correct?

17   **A**    Well, you are adding now.  It just says "personnel."

18   **Q**    Well, your knowledge even of who works for Mattel, that would

19   be confidential information; correct?

20   **A**    I don't think -- if you ask me as a layperson, I would say

21   no.

22   **Q**    Was it your intent to contact Mattel employees and try to get

23   them to come to MGA?

24   **A**    That wasn't the question.  I mean, if you are asking me --

25   **Q**    That's a question I just asked.

1   **A**     I did not have a specific intention of trying to contact

2   employees, but I don't believe that who works at Mattel is a

3   confidential information.

4   **Q**     Well, it says if --

5   **A**     Piece of information.  I just think what it is, is it's one

6   word that says "personnel" and it's very broad.

7   **Q**     How about product research, design, development, and

8   performance?

9            Let's do it the quick way.  Show me in one through nine

10  here.

11           **MS. KELLER:**  Is there a question, Your Honor?

12  BY MR. PRICE

13  **Q**     What was of concern of one through nine?

14           **THE COURT:**  He's asking him to show him what in this

15  document he is referring to.

16           **THE WITNESS:**  Okay.  So a lot of the issues here go to

17  there being a lot of people with access to this information which

18  could potentially make it not -- when is something public or not

19  public.  So cost, budgets, pricing, credit terms, deal terms and

20  finances, let's start with something a little more familiar with.

21  Those are all issues that would exist at customers.

22           So what you charge Toys R Us, what your budget -- not so

23  much budget, what their pricing is, what their credit terms are.

24  And how Toys R Us treats that information is not something I

25  understand.  And at the same time Toys R Us is an organization

Page 37

1    with thousands of employees.  And this could potentially be

2    information that is available to thousands of employees.

3           And whether or not there is an NDA demanding from a

4    company like Toys R Us or Walmart that all of these issues be

5    maintained confidential at the tens of thousands of employees that

6    these people all have doesn't make it clear to me whether or not

7    this is specifically the type of information that would be

8    confidential.

9    BY MR. PRICE

10   **Q**    When you said what you charge customers, you mean the

11   retailers?

12   **A**    I assume when they say -- I didn't know --

13   **Q**    I'm asking you to define --

14         **THE COURT:**  Counsel.

15         **THE WITNESS:**  It's not even clear what "cost" means.  Is

16   it the cost to the retailer or the cost that we paid for the

17   product?

18   BY MR. PRICE

19   **Q**    You said what you charged, did you say Toys R Us?

20   **A**    I made the example of Toys R Us.  When I read cost just now,

21   I read cost to be the cost that the retailer pays for the product.

22   But there is also a cost that you pay the factory for the product,

23   or the cost to make the product.  It doesn't say which of those

24   costs they're talking about.

25   **Q**    When you said what you charged the customer such as Toys R Us

1  you said -- your belief is that that's not something which is

2  nonpublic proprietary information; right?

3  **A**    My belief is that signing a document that claims that that is

4  proprietary information when it's written out this way is unclear,

5  correct.

6  **Q**    No, no.  I'm following up on the answer you gave.

7          Did you say that cost that you are charging to your

8  customer like Toys R Us, your belief are not necessarily nonpublic

9  information or proprietary information?

10          **MS. KELLER:**  Vague as time when the cost becomes public

11  information, Your Honor.

12          **THE COURT:**  Sustained.

13  BY MR. PRICE

14  **Q**    When you charge the amount -- if you tell a customer -- Toys

15  R Us -- this is going to be how much we charge you, okay, you are

16  telling Toys R Us with, as you said, thousands of employees, is it

17  your understanding that that would be confidential proprietary

18  information, nonpublic?

19  **A**    I don't know.  I really don't know.  It depends how Toys R Us

20  treats it.  If Toys R Us -- now that you have given that

21  information to somebody who potentially has -- who has now

22  disseminated it to thousands of people, it may not be confidential

23  anymore.

24  **Q**    You don't have an expectation of confidentiality when you

25  tell a customer like Toys R Us, this is what we're going to charge

Page 39

1    you for product?

2            **MS. KELLER:**  Objection.  Misstates the testimony.

3            **THE COURT:**  Overruled.

4            **THE WITNESS:**  I don't know whether that is kept

5    confidential, no.

6    BY MR. PRICE

7    **Q**    Do you have an expectation of a confidentiality when you tell

8    a customer like Toys R Us this is our FOB price we're going to

9    charge you?

10   **A**    Do I have an expectation of the customer?

11   **Q**    Based upon your experience?

12   **A**    I have an expectation that based on my experience -- and you

13   asked me this earlier -- when I tell customer anything, I am

14   taking a huge risk that that information will then become public.

15   Right?  That's what I said.  That doesn't mean that I have to go

16   broadcast it to everybody who asks me.

17           But whether a Court would find that information to be

18   legally kept confidential or not, I have no idea.  I have now told

19   somebody who has access to thousands of people through their

20   computer systems as to what that price is.  So I don't know

21   whether that is really a confidential piece of information

22   anymore.

23   **Q**    So you as a senior executive of MGA, in fact, head of sales,

24   thought it was a huge risk, therefore, not proprietary or

25   confidential, to tell a retailer what the FOB price was?

Page 40

1          **MS. KELLER:**  Misstates the testimony.

2          **THE COURT:**  Sustained.

3    BY MR. PRICE

4    **Q**   Did you say it was a huge risk when you told the retailer

5    that is the FOB price we're going to charge you?  Is that right?

6    **A**   I don't remember if I said it was exactly huge risk.  As I

7    said, when you tell a retailer something, you are telling -- you

8    are risking -- you are certainly risking the information becoming

9    public, correct.

10   **Q**   So would you then contest that that's proprietary

11   information?

12         **MS. KELLER:**  Objection.  Vague.

13         **THE COURT:**  If you understand the question.

14         **THE WITNESS:**  No, I didn't understand.

15   BY MR. PRICE

16   **Q**   This defines Mattel proprietary information and you say it

17   includes, in your understanding, FOB prices or A prices that you

18   tell customers you are going to going to charge them.

19         That's what you believe this would encompass among other

20   things?

21         **MS. KELLER:**  Objection.  Vague as to time.

22         **THE COURT:**  Sustained.

23   BY MR. PRICE

24   **Q**   When you read this, you said you had an issue with the

25   document.  My question is, did you agree at the time you read

1   this, or after you talked to your sister, that prices Mattel told

2   its customers it was going to charge them, FOB prices did you

3   agree those were proprietary and confidential?

4          **MS. KELLER:**  Vague as to time as to whether they're pre

5   or post release, Your Honor.

6          **THE COURT:**  Technically I think that's a good objection.

7   But I think, counsel, if we allow him to answer the question for

8   both sides, we'll find out what the answer is.

9   BY MR. PRICE

10  **Q**   At any time, at any time you tell a customer -- Toys R Us --

11  this is what I'm going to charge you, at any time, do you think

12  that's proprietary and confidential?

13  **A**   It's proprietary for me -- I may be asking the customer to

14  try to keep this information proprietary, but I may have crossed

15  the line by providing them with this price list or this price by

16  doing so and risking the confidentiality of that information.

17         You have to understand that once you start distributing

18  these price lists and distributing the cost of product, meaning

19  what the retailers are going to pay or what you expect to pay,

20  there is a fairly large public that tends to see this.  And how

21  proprietary or how confidential this information really could be

22  anywhere from zero to 100.  I really don't have the ability to

23  judge that directly.  But there's certainly a significant amount

24  of leakage from the moment that you start telling retailers what

25  the FOB cost is of a product.

Page 42

1    **Q**    Or what you expect to charge an FOB cost?

2    **A**    I don't know the difference.

3    **Q**    Toy fairs, you would have price list and FOB costs; right?

4    **A**    There are price lists.

5    **Q**    And that would be given to companies like Toys R Us who had

6    thousands of employees?

7    **A**    That's correct.

8    **Q**    And you would expect -- you used the term "leakage"?

9    **A**    Yes.

10   **Q**    And by the way, with respect to the nondisclosure agreements

11   or with respect to keeping things private, did you sign an

12   agreement with MGA that was a nondisclosure agreement?

13   **A**    Yes, I did.

14   **Q**    And is that Exhibit 4240?  It's in MGA's binder.  It may not

15   be in ours.

16   **A**    Yes, I did.

17            **MR. PRICE:**  4240, move that into evidence.

18            **THE COURT:**  Received.

19                (Exhibit 4240 received in evidence.)

20   BY MR. PRICE

21   **Q**    And that in paragraph A has confidential information, and

22   there's a long paragraph about confidential information; correct,

23   4240?

24   **A**    I don't think what I'm looking at and what I'm looking at

25   here are the same.

Page 43

1    **Q**    Let's do 4240.  Look at page 10.

2    **A**    Okay.  Yes.

3    **Q**    And there is a huge paragraph there that goes into detail

4    about confidential information that you can't disclose; correct?

5    **A**    That's correct.

6    **Q**    And in connection with going to MGA, you also assigned

7    inventions; correct?

8         Look at 4240, page 8.  Do you see you have your

9    assignment of interest of inventions?

10   **A**    Yes.

11   **Q**    And that includes you're assigning all interest which

12   employee may have and all patentable, and/or not patentable ideas,

13   and/or inventions made or conceived by employees solely or jointly

14   with others during employee's employment with the company; right?

15   **A**    I do see that, yes.

16   **Q**    And you also -- in fact, this one specifically says ideas;

17   right?  Assignment of interest, the one you signed with MGA?

18   **A**    Shall not apply to any idea or invention developed by

19   employee.

20   **Q**    That's in your Mattel agreement.  You want to look at that?

21        **MS. KELLER:**  Object to the form of the, I guess it's a

22   statement rather than question.

23        **THE COURT:**  Just restate the question, counsel.

24   BY MR. PRICE

25   **Q**    You said MGA says that it doesn't apply to work -- I'm sorry.

Page 44

1   Show me what you are talking about.

2   **A**    Maybe I'm -- I'm just trying to track with you.  So you have

3   got number one up.  You read the first three lines, and then it

4   continued for another line.

5           So I can read it, you can read it.  But it felt like it

6   was an incomplete read.

7   **Q**    Do you think that's different than what you got from Mattel?

8   **A**    I don't know.  I'm sure you have them both in front of you

9   and you can compare and contrast them if you would like.  I don't

10  know.

11  **Q**    I'm just saying you can't say that's different than what's in

12  --

13          **MS. KELLER:**  Objection.  Argumentative.

14          **THE COURT:**  Sustained.

15  BY MR. PRICE

16  **Q**    Look at 4241, page 4, paragraph C.  Do you see that's where

17  it says, "California and Illinois employees?"  Do you see that?

18          **THE COURT:**  I think the screen is confusing.  Put both

19  documents in front of him.

20          **THE WITNESS:**  Which part of this?

21  BY MR. PRICE

22  **Q**    You see in the MGA one it says, "This agreement does not

23  apply to any inventions which qualify as fully under the

24  provisions of California Labor Code Section 2870."

25          Do you see that?

Page 45

1  **A**    Which one?

2  **Q**    The MGA one.

3          **THE COURT:**  Just a moment.  Take the screen down.  It's

4  too confusing.  For my record, different paragraphs or documents

5  are flipping on and off.  Take everything down.  Now, slow down.

6  Get this in order so that we have a clear understanding of what

7  document is being referred to.

8  BY MR. PRICE

9  **Q**    Look at 4240, your MGA agreement, page 8.  You have an

10  assignment of interest.

11          **THE COURT:**  Put up 4240.

12  BY MR. PRICE

13  **Q**    It says the -- what you were saying was it has this sentence

14  I think, "This assignment shall not apply to any idea or

15  invention."

16        That's what you were referring to; correct?

17  **A**    Correct.

18  **Q**    Now, if you look at --

19  **A**    "Developed by employee...without equipment, supplies...."

20          **THE COURT:**  Take the underlining down.  Now read the

21  portion that you are either referring to or he is referring to.

22  So I want this absolutely clear what is being referred to.

23          **MR. PRICE:**  Would you like me to or the witness, Your

24  Honor?

25          **THE COURT:**  Both of you.  This is extraordinarily

Page 46

1   confusing.

2   BY MR. PRICE

3   **Q**    If you look at 4240-8, you were referring me to a sentence

4   after the one I read you; correct?

5   **A**    Correct.

6           **THE COURT:**  Highlight that entire sentence.

7   BY MR. PRICE

8   **Q**    That begins with, "This agreement shall not apply to any

9   idea."

10  **A**    "This assignment shall not apply."

11  **Q**    "This assignment shall not apply to any idea or invention

12  developed by employee entirely on employee's own time without

13  equipment, supplies, facilities or trade secret information of the

14  company unless such invention or idea, one, relates to the

15  business of the company or to company's actual or anticipated

16  research or development; or two, results from any work performed

17  by employee for the company."

18           Did I read that correctly?

19  **A**    Yes.

20  **Q**    And if you would look at then the code of conduct you were

21  asked to look at, 4241, page 4, paragraph C, and it says, "You

22  acknowledge that in accordance with California Labor Code Section

23  2870," and an Illinois code, and under bullet one, "Your

24  assignment in section A above specifically excludes inventions

25  that you develop entirely on your own time..."

Page 47

1          **THE COURT:**  Just a moment.  We can't see that, counsel.

2          **MR. PRICE:**  I think that's as big as we can blow it up.

3          **THE COURT:**  Well, then take it down.

4    BY MR. PRICE

5    **Q**    "Your assignment in section A above specifically excludes

6    inventions that you develop entirely on your own time without

7    using Mattel's equipment, supplies, facilities or trade secret

8    information except for those inventions that either, one, relate

9    at the time of conception, reduction to practice of the invention

10   to Mattel business or to Mattel's actual or demonstrably

11   anticipated research or development; or two, results from any work

12   performed by you for your employer."

13          Do you see that?

14   **A**    Yes, I do.

15   **Q**    So, in addition to signing MGA's nondisclosure agreement, you

16   also signed something called an Executive Employment Agreement;

17   correct?  And if you would look at 4266.

18   **A**    Was I supposed to draw a conclusion from what you showed me?

19   **Q**    See the time?  I'm asking questions.

20   **A**    I thought I missed a question.

21   **Q**    4266.

22   **A**    I am now on 4266.

23   **Q**    And this is an agreement you signed with MGA when you joined

24   October 5 of 2004; correct?

25   **A**    Yes, it is.

Page 48

1          **MR. PRICE:**  Move Exhibit 4266 into evidence.

2          **THE COURT:**  Received.

3              (Exhibit 4266 received in evidence.)

4    BY MR. PRICE

5    **Q**    With MGA, you agreed that for a period of a year after you

6    left MGA you wouldn't even try to contact someone employed at MGA

7    to try to get them to join another company; right?

8    **A**    Do you want to reference me to the exact spots?

9    **Q**    Look at 4266, page 7, paragraph 9.2.  "The executive agrees

10   that during the term and for the one-year period following

11   termination of his employment with the company, whether voluntary

12   or involuntary, he shall not either directly or indirectly on his

13   own behalf or in the service or on behalf of others, one, divert

14   or interfere with, or attempt to divert or interfere with (A), any

15   person then employed by the company, or (B), any person then

16   serving as a managerial-level employee of, or a sales

17   representative of, or a consultant to, or a designer for the

18   company; or two, divert or interfere with or attempt to divert or

19   interfere with any customer of or supplier to the company with

20   respect to the business."

21              Do you see that?

22   **A**    I do see that.

23   **Q**    And if this were enforced, it would mean when you left MGA,

24   you couldn't attempt to get business from any of MGA's customers

25   for a period of a year; right?

Page 49

1   **A**    Where does it say that?

2   **Q**    Where it says "The executive agrees that during the term and

3   for the one-year period following the termination of his

4   employment with the company, he shall not either directly or

5   indirectly on his own behalf, or in the service or on behalf of

6   others," and then look at Roman Numeral II, divert or interfere

7   with or attempt to divert or interfere with any customer of, or

8   supplier to, the company with respect to the business?"

9   **A**    Well, I certainly don't read that as precluding me from

10  calling on business for another company.

11  **Q**    You don't think that would prevent from you trying to divert

12  business from MGA and then getting the business at whatever

13  company you went for?

14  **A**    Mr. Price --

15          **MS. KELLER:**  Objection.  That misstates the testimony.

16          **THE COURT:**  Sustained.

17  BY MR. PRICE

18  **Q**    Do you understand this would prevent you from trying to

19  divert business from MGA to another company?

20  **A**    Maybe there's lawyers who would sue me over that.  That's not

21  the way I understood that paragraph to read.

22  **Q**    Did you have your sister look at this too?

23  **A**    No.  By this time I had different lawyers.

24  **Q**    And this is much more restrictive than anything you were

25  asked to sign?

1         **MS. KELLER:**  Objection to the legal opinion by Mr.

2    Price.

3         **THE COURT:**  Sustained.

4    BY MR. PRICE

5    **Q**    Your understanding is -- your understanding is that this is

6    much more restrictive than anything you signed with Mattel?

7         **MS. KELLER:**  Objection to the legal opinion by Mr.

8    Price.

9         **THE COURT:**  Overruled.

10        You can state your opinion.

11        **THE WITNESS:**  If this means personnel from the other

12   document, or if -- I don't even know how to compare this

13   particular paragraph to anything that I have signed to Mattel.

14        So if you show me what you think I'm comparing it to,

15   I'll draw your conclusion for you.

16   BY MR. PRICE

17   **Q**    I'm asking just -- you are looking at this; you looked at it

18   before you signed it.  Was it your understanding that it was more

19   restrictive than anything you were asked by Mattel to sign?

20        **MS. KELLER:**  Objection.  Vague as to what "it" is.  A

21   clause?  The whole thing?

22        **THE COURT:**  Well, you are referring to the entire

23   document, but he is referring also to 9.2 within the document.

24        So you can state your opinion as to 9.2 or apparently

25   the entire document.

1        **THE WITNESS:**  I think this is the specificity that we

2    were looking for in the Mattel document that it didn't include.

3    So when you just say "personnel" and you really mean this, then

4    you should say this.

5        I think this is pretty specific as to what it does or

6    does not allow, although even the now in the courtroom it appears

7    that we have a difference of opinion as to what the word "divert"

8    means.  But this explained to me what I was and was not allowed to

9    do with the enough clarity that I was able to sign on this

10   particular paragraph.

11   BY MR. PRICE

12   **Q**    Is it your understanding that MGA thought that provision was

13   unenforceable?

14        **MS. KELLER:**  Objection to what MGA thought.

15        **THE COURT:**  Sustained.

16   BY MR. PRICE

17   **Q**    Did you have any discussion with Mr. Larian about whether or

18   not the provisions of this executive employment agreement were

19   enforceable?

20   **A**    I don't recall having any of those discussions.

21        **MR. PRICE:**  Nothing further.

22        **THE COURT:**  Mr. Brawer, if you would remain, I want to

23   sort out, over the lunchtime, there has been some concern over the

24   marital privilege.  So if you would remain out in the hallway for

25   just a moment, I think we can resolve that very quickly.  I think

Page 52

1    you are going to be excused.  If you are, I'm going to ask you to

2    remain available until Friday, April 8 of 2015.  Just kidding you.

3    2011.  Step down, sir.

4            And counsel, call your next witness.

5            **MS. HURST:**  MGA calls Richard deAnda, Your Honor.

6            (Witness summoned to the courtroom.)

7            **THE COURT:**  Mr. deAnda, if you would step forward, sir,

8    and raise your right hand.

9            RICHARD deANDA, DEFENDANT'S WITNESS, SWORN

10           **THE COURT:**  Mr. deAnda, if you would have a seat, sir.

11   State your name for the jury, sir.

12           **THE WITNESS:**  Richard deAnda.

13           **THE COURT:**  Spell your last name.

14           **THE WITNESS:**  Small d-e, capital A-n-d-a.

15           **THE COURT:**  Direct examination please by Ms. Hurst on

16   behalf of MGA and Mr. Larian.

17                        DIRECT EXAMINATION

18   BY MS. HURST

19   **Q**    Good morning.

20   **A**    Good morning.

21   **Q**    Still switching over here.  Just give me a minute.

22           Mr. deAnda, you know a woman named Beatriz Morales;

23   correct?

24   **A**    Yes.

25   **Q**    And you found out her name from deposition testimony in this

1    case as a person who had been employed by Mattel and also had done

2    contract work for Veronica Marlow on behalf of MGA, true?

3    **A**    That's true.

4    **Q**    And in January of 2008 you then conducted an interview of

5    Ms. Morales after finding out her name from the deposition; is

6    that right?

7    **A**    That's correct.

8    **Q**    And you audio-taped that interview?

9    **A**    I did.

10   **Q**    And you conducted the interview in the English language; is

11   that right?

12   **A**    Yes.

13   **Q**    Spanish was Ms. Morales' first language; is that correct?

14   **A**    I don't know if it was her first language or not.  I know she

15   spoke Spanish.

16   **Q**    And did you permit Ms. Morales to have a lawyer present at

17   that audio-taped interview?

18            **MR. PRICE:**  Objection.  This is irrelevant.

19            **THE COURT:**  Is she being accused of a crime, counsel?

20   Sustained.

21   BY MS. HURST

22   **Q**    You were investigating potential wrongdoing by Ms. Morales;

23   right?

24   **A**    Yes.

25            **THE COURT:**  I'm going to reverse that.  My apologies.

Page 54

1    You may ask the question.

2    BY MS. HURST

3    **Q**    Did you permit her to have a lawyer present?

4    **A**    No.

5    **Q**    Did you go to Ms. Morales' home and search it?

6            **MR. PRICE:**  Objection.  Vague.  Irrelevant.

7            **THE COURT:**  Overruled.

8            **THE WITNESS:**  I accompanied her to her home and

9    collected items that she provided and gave me.

10   BY MS. HURST

11   **Q**    And you went to her home and you observed her work area

12   there; correct?

13   **A**    Yes.

14   **Q**    And did you inform her that she had any right to refuse your

15   search of her home?

16   **A**    I did not search her home.

17           **MR. PRICE:**  Objection.  Assumes facts not in evidence.

18           **THE COURT:**  Well, sustained.  Counsel, we're going to

19   get into a discussion -- or ladies and gentlemen of the jury --

20   about a search or what is voluntarily given obviously, and each

21   counsel will frame that as a search or a voluntary consent in just

22   a moment.  So don't be influenced by either counsel's labels.

23   Listen to the question, listen to the answer.

24   BY MS. HURST

25   **Q**    As a result of the information supplied by Ms. Morales in the

a66c3eb4-db17-4d6b-8da9-41b4217e98ed

Page 55

1    interview she was fired; correct?

2    **A**    I don't know the exact reason she was terminated.  I did not

3    participate in her termination, so I do not know the exact reason

4    she was terminated.

5    **Q**    It's your understanding that as a result of the information

6    that she supplied in that interview, her employment with Mattel

7    was terminated; correct?

8    **A**    Once again, I was not present during her termination.  I have

9    not seen any termination document nor did I speak with anyone with

10   regards to her termination as to the exact reason.  I don't know

11   that, counsel.

12   **Q**    Let me ask you to take a look at your deposition, page 698

13   line 17, through 21.

14   **A**    Yes, I did respond to your question where you are asking was

15   termination motivated by information I obtained during my

16   interview.  And my answer, I would say yes, but I have no personal

17   knowledge.

18   **Q**    Thank you.  You also found out the name of Ana Cabrera from a

19   deposition given in this case; is that right?

20   **A**    That is correct.

21   **Q**    And you also conducted an audio-taped interview of

22   Ms. Cabrera; is that right?

23   **A**    That's correct.

24   **Q**    And as a result of the information that she supplied in that

25   interview, her employment with Mattel was terminated; correct?

Page 56

1          **MR. PRICE:**  Objection.  This is irrelevant.

2          **THE COURT:**  Overruled.

3          **THE WITNESS:**  Once again, I was not present in her

4    termination nor I do know the exact cause.  I did not work human

5    resources at the time, but I did provide them with this

6    information.

7    BY MS. HURST

8    **Q**    And it's your understanding that as a result of that

9    information, Ms. Cabrera's employment with Mattel was terminated;

10   right?

11   **A**    Once again, I have no absolutely proof that she was

12   terminated for that.  She may have been terminated for another

13   cause, however, the information regarding the interview was

14   given -- presented to HR.

15   **Q**    "Yes" or "no," Mr. deAnda, it's your understanding that as a

16   result of the information that she supplied in that interview, her

17   employment with Mattel was terminated?

18   **A**    Probably, but I was not there at her termination.  That's all

19   I'm trying to tell you.  I'm trying to be exact.

20          **MS. HURST:**  Your Honor, request permission to read page

21   700, lines 15 through 19 of Mr. deAnda's deposition.

22          **MR. PRICE:**  Not inconsistent with what he said.

23          **THE WITNESS:**  I say basically answering your question --

24          **MS. HURST:**  There is no question pending.

25          **THE COURT:**  Sustained, counsel.  It's consistent.

Page 57

1   BY MS. HURST

2   **Q**   So you are just guessing about whether she was terminated as

3   a result of your interview?

4   **A**   I was not present during her termination.  I do not know

5   exactly why she was terminated.  I did present the findings of my

6   interview to the HR department.

7   **Q**   Was it shortly after that that she was terminated?

8   **A**   To the best of my recollection, I would say definitely within

9   a month, but I'm not -- within two weeks to a month, I think.

10          **THE COURT:**  Let me caution you, words like "to the best

11   of my recollection," not acceptable.  Answer the question.

12          **THE WITNESS:**  She was terminated sometime after and it

13   could have been a month.

14   BY MS. HURST

15   **Q**   Now, there was an investigation related to the activities

16   using falsified credentials by the Market Intelligence Group in

17   2006; correct?

18   **A**   You are going to have to refresh my memory.

19   **Q**   Were you part of the investigation into Mr. Villaseñor and

20   his group's activities?

21   **A**   I don't know.  We handled close to 1700 investigations during

22   that period of time.  Once again, I don't know.

23   **Q**   I mean, you're Mattel's head of security; right?

24   **A**   Right.  Was.

25   **Q**   If there was an important investigation in 2006 about whether

1   Mattel employees were engaged in wrongdoing, you would be involved

2   in that; right?

3   **A**    Not necessarily.

4   **Q**    Did you audiotape any interviews with Mr. Villaseñor?

5   **A**    I don't recall doing that.

6   **Q**    Did you audiotape any interviews with Carey Plunkett?

7   **A**    I don't know who Carey Plunkett is.

8   **Q**    Do you audiotape any interviews with Matt Turetzky to find

9   out who were all the employees who had been involved in falsifying

10  credentials?

11  **A**    No.

12           **MR. PRICE:**  Objection.  Assumes facts.

13           **THE COURT:**  Overruled.

14  BY MS. HURST

15  **Q**    You did conduct an investigation of Mr. Brawer; right?

16  **A**    I assisted in an investigation with Mr. Brawer.

17  **Q**    Please take a look at Exhibit 7978.  Can you just pull the

18  whole exhibit.  Do you have Exhibit 7978, Mr. deAnda?

19  **A**    Yes.

20  **Q**    Hold that up and show the jury how thick it is.  And that's

21  the investigative file 04-0423 for Mr. Brawer; is that right?

22  **A**    That's correct.

23  **Q**    And the investigative file reflects that you looked at

24  Mr. Brawer's e-mail; right?

25  **A**    What we did, we took screen snapshots of e-mails of

Page 59

1    Mr. Brawer.

2    **Q**    And you looked at his phone bills to see who he had been

3    talking to on the telephone; right?

4    **A**    His Mattel office phone and Mattel cell phone.

5    **Q**    Now, you have a company on the -- you had a company on the

6    side while you were the head of security at Mattel called deAnda

7    and Associates; right?

8    **A**    Yes.

9    **Q**    And in connection with your company on the side, you had used

10   an investigator named Jeff Letourneau?

11   **A**    Yes.

12   **Q**    And you had Mr. Letourneau conduct surveillance of

13   Mr. Brawer; true?

14   **A**    At the direction of the law department, yes.

15   **Q**    And Mr. Letourneau conducted surveillance of Mr. Brawer for

16   the two-week period between his termination from Mattel and his

17   start date in MGA; right?

18           **MR. PRICE:**  Objection.  Assumes facts regarding

19   termination from Mattel.

20           **THE COURT:**  Overruled.

21           **THE WITNESS:**  Well, he was still being compensated from

22   Mattel, yes, by Mattel.

23   BY MS. HURST

24   **Q**    So it was that two-week period?

25   **A**    Yes.

Page 60

1    **Q**    Please take a look at Exhibit 26022.

2    **A**    Yes.

3    **Q**    Is that a report that Mr. Letourneau made to you regarding

4    his surveillance of Mr. Brawer in September and October, 2004?

5    **A**    Give me one moment, please, yes.

6              **MS. HURST:**  Your Honor, move the admission of 26022.

7              **MR. PRICE:**  Object to the log on relevance, Your Honor.

8              **THE COURT:**  We'll take that up during the recess, Your

9    Honor.

10   BY MS. HURST

11   **Q**    Are there several references to video in the report from

12   Mr. Letourneau?

13   **A**    Yes, there are.

14   **Q**    Because Mr. Letourneau conducted video surveillance of

15   Mr. Brawer as well; right?

16   **A**    That's correct.

17   **Q**    And we have got a disk for you up there.  Would you please

18   take a look at Exhibits 31174, 31175, and 31176.

19          You see those have Mattel Bates numbers on them,

20   M011072, M0110723, and M0110724?

21   **A**    The 4 is cut off but I assume that to be a 4.

22   **Q**    And Mr. Letourneau provided you with copies of his video

23   surveillance; right?

24   **A**    Of these documents, yes.

25             **MS. HURST:**  Your Honor, move the admission of the video

Page 61

1   surveillance as well.

2          **MR. PRICE:**  Objection on the relevance.

3          **THE COURT:**  Overruled.  Received.

4               (Exhibit 31174, 31175, 31176 received in evidence.)

5   BY MS. HURST

6   **Q**   Now, please take a look at Exhibit 260.

7          **THE COURT:**  Before I receive those, let's go over those

8   at lunchtime also.  We'll go over those exhibits at the lunchtime,

9   counsel.

10          **MS. HURST:**  Thank you, Your Honor.

11  BY MS. HURST

12  **Q**   Please take a look at Exhibit 26020.  And that is another

13  report made to you by Mr. Letourneau; is that right?

14  **A**   Yes.

15  **Q**   And that's, again, surveillance of Mr. Brawer; correct?

16  **A**   Yes.

17  **Q**   And this was your surveillance of Mr. Brawer at his

18  going-away party from Mattel; is that right?

19  **A**   Yes.

20  **Q**   Now, it's true that as a result of all this surveillance, you

21  did not detect any evidence of Mr. Brawer meeting with a

22  competitor during that period of time when he was still being paid

23  by Mattel; right?

24  **A**   During the two-week period, no.

25  **Q**   So I'm correct; right?

Page 62

1    **A**    Yes.

2    **Q**    And in fact, you, as the head of Mattel's security, had no

3    knowledge or information that Mr. Brawer ever removed any

4    proprietary information from Mattel; isn't that right?

5    **A**    I had received information there were binders, but you are

6    correct, I did not know what the binders contained.

7    **Q**    Do you have any knowledge or information as you sit here

8    today to suggest that Mr. Brawer removed Mattel proprietary

9    information when he departed Mattel's employment?

10   **A**    I do not.

11   **Q**    Do you have any knowledge or information that Mr. Brawer

12   failed to return to Mattel any Mattel proprietary information in

13   his possession when he left Mattel's employment?

14   **A**    I do not.

15   **Q**    And you have no information that Mr. Brawer ever induced or

16   encouraged Mattel employees to take Mattel confidential

17   information; right?

18   **A**    That's correct.

19   **Q**    Please turn back to Exhibit 7978, that investigation file.

20   And I'll ask you to look at the page numbered 291 with the TX

21   number.

22           You see there is a TX number and 7978?

23   **A**    I understand.

24   **Q**    All these documents have a lot of numbers on them?

25   **A**    That was 200 --

Page 63

1   **Q**     -- 91, please.

2   **A**     Yes.

3   **Q**     And you see there is a toy fair check list, nondisclosure

4   agreement for domestic and international customers?

5   **A**     Yes.

6   **Q**     And that's Mattel document that was maintained as part of

7   Mr. Brawer's investigation file; correct?

8   **A**     That's correct.

9   **Q**     And then the next page, 292, is a Mattel Inc. Toy Fair

10   attendee nondisclosure agreement; right?

11          **MR. PRICE:**  Object as to time frame, date and relevance

12   of Mattel.

13          **THE COURT:**  Time, counsel?

14   BY MS. HURST

15   **Q**    This is part of Mr. Brawer's 2004 investigation file;

16   correct?

17          **THE COURT:**  The document itself, what does it say?

18          **MS. HURST:**  Your Honor, it does not have a date on it,

19   but it's part of the 2004 investigation file.

20          **THE COURT:**  Overruled.

21   BY MS. HURST

22   **Q**    292 is the toy fair attendee nondisclosure agreement;

23   correct?

24   **A**     Yes.

25   **Q**    293 is the -- another Mattel Inc. Toy Fair attendee

Page 64

1    nondisclosure agreement; correct?

2    **A**    This is the 2005, yes.

3    **Q**    And then 294 is a poster, "Mattel Inc. confidentiality

4    agreement.  Read before entering."  Correct?

5    **A**    Yes.

6    **Q**    And then 295 is "Language to be used for toy fair and pre-toy

7    fair placed outside each elevator door at the top of each

8    staircase.  Prohibition on recording confidential information."

9    Correct?

10   **A**    Yes.

11   **Q**    And 296 is "Language to be used for trade shows and

12   conventions and placed in the booths, reciting that information in

13   this area is intended to be confidential."  Correct?

14   **A**    Yes.

15          **MS. HURST:**  Your Honor, move the admission of 7978, 291

16   through 296.

17          **THE COURT:**  Received.

18              (Exhibit 7978, 291-296 received in evidence.)

19   BY MS. HURST

20   **Q**    Let's take a look at 294, Mr. deAnda.  Now, you know that

21   Mattel would keep confidential information that it presented in

22   connection with toy fair; right?

23          **MR. PRICE:**  Objection.  Assumes facts.

24          **THE COURT:**  Overruled.

25          **MR. PRICE:**  And lacks foundation.

Page 65

1          **THE COURT:**  Overruled.

2          **THE WITNESS:**  I'm sorry, could you repeat the question?

3    BY MS. HURST

4    **Q**    You know that Mattel would do its best to keep confidential

5    the information that it was presenting in connection with toy

6    fair?

7          **MR. PRICE:**  Lack of foundation.

8          **THE COURT:**  Overruled?

9          **THE WITNESS:**  Yes.

10   BY MS. HURST

11   **Q**    And this was the kind of thing you would post outside so

12   people coming in would know what the expectations were; right?

13   **A**    That's correct.

14   **Q**    And you're responsible for the security of Mattel's

15   confidential information, or you were as the head of security;

16   right?

17   **A**    That's right.

18         **MR. PRICE:**  Objection.  Overbroad.

19         **THE COURT:**  Overruled.

20   BY MS. HURST

21   **Q**    You were responsible for physical security; right?

22   **A**    Yes.

23   **Q**    You were responsible for computer security; right?

24   **A**    There was an IT security department.  I was not responsible

25   for that.

Page 66

1    **Q**    You worked with IT security to ensure that appropriate

2    password requirements and other sorts of requirements to protect

3    Mattel's information were in place; right?

4    **A**    I would say that's a fair statement.

5    **Q**    You supervised the use of security cameras at Mattel; right?

6    **A**    Yes.

7    **Q**    And the aspects of operational security related to Mattel's

8    facilities in the United States, that was all subject to your

9    ultimate supervision; right?

10   **A**    Globally, yes.

11   **Q**    Globally.

12            Now, this particular poster read, "During this

13   presentation, Mattel will disclose confidential information about

14   its product lines and marketing plans.  By entering the

15   presentation hall, you are agreeing to maintain the

16   confidentiality of Mattel's confidential information and not to

17   use the information in a manner that is detrimental to Mattel.

18   You also agree not to disclose Mattel's confidential information

19   to any party without the advanced written permission of Mattel.

20   If you are unwilling to agree with these terms, do not enter the

21   presentation hall.  Thank you and enjoy our presentation."

22            Did I read that correctly?

23   **A**    You did, yes.

24   **Q**    Would you turn to page 296, please.

25   **A**    Yes.

1    **Q**    Actually, let me pause for a moment.

2            Would you turn back to 291.  And it talks about

3    confidentiality agreement poster-size signs there in the second

4    half of the page there; right?

5    **A**    Yes.

6    **Q**    You might also want to look on the monitor.  Seems it's

7    easier to see there.

8            And on 291 it recites how Mattel's security office is

9    responsible for bringing the poster-size confidentiality agreement

10   signs and placing them throughout the fair; correct?

11   **A**    Yes.

12   **Q**    Now, please turn to page 296.  Now, this says, "This language

13   to be used for trade secrets and conventions and placed in the

14   booths."  Basic language; right?

15   **A**    Yes.

16   **Q**    And it says, "Entry into the Mattel space is entirely

17   voluntary."  Right?

18   **A**    That's correct.

19   **Q**    "In consideration of your admission to the Mattel space, you

20   agree to the following."  Then it has a series of four bullet

21   points; right?

22   **A**    That's correct.

23   **Q**    And it says, "Information, communications, and conversations

24   in this area are intended to be confidential."  Right?

25   **A**    Yes.

1  **Q**    And then it goes on to say, "no recording."  Right?

2  **A**    Yes.

3  **Q**    "No photographs."  Right?

4  **A**    Yes.

5            **THE COURT:**  Counsel, is it lunchtime?

6            You are admonished not to discuss this matter amongst

7  yourselves or form or express any opinion concerning the case.

8  See you at 1:00 o'clock.

9                        (Jury out.)

10           **THE COURT:**  Counsel be seated.

11           Now, counsel, we have a couple of things to sort out.

12 Let's do a little bit more research concerning the marital

13 privilege and see where we're going with this, or if the sister is

14 going to be called.  And I need to go back and do a little bit of

15 research to make sure my decisions are correct.

16           **MS. HURST:**  We just wanted to admit this to show that

17 despite extensive efforts, they were not able to find any evidence

18 of wrongdoing by Mr. Brawer.  And that --

19           **THE COURT:**  I thought we were talking about the marital

20 privilege.

21           **MS. HURST:**  I apologize, Your Honor.  My mistake.

22           **THE COURT:**  No.  The marital privilege.  So it seems we

23 have gotten deeply into it, frankly.  We have found our way into

24 it.  I didn't know that MGA was counsel for him for even a limited

25 purpose today.  And I thought that he had his own attorney up to

Page 69

1   this time.

2          So where are we with this issue?  Well then we'll sit

3   and enjoy each other's company.

4          **MS. KELLER:**  Your Honor, I think that the marital

5   privilege issue is already struck unless we want to recall

6   Mr. Brawer and ask him about it.  We're content to leave it.  But

7   I have no idea what Mr. Price intends.

8          **MR. PRICE:**  You struck the testimony.  So...

9          **THE COURT:**  No, we got right back into it.  I struck it

10  the first time, but my memory is then we got right back into it

11  with both parties.  But I may be confused about that because we

12  went back and forth, but that's why I have a record and I can go

13  back.

14         **MS. KELLER:**  We didn't get back into it about the wife.

15  We got into it about the sister being a lawyer.  But the wife, the

16  marital privilege issue, I think the Court struck it.  And I don't

17  have any desire to put him back on the stand and ask him about

18  that again.

19         **THE COURT:**  Stricken?

20         **MR. PRICE:**  Stricken.

21         **THE COURT:**  That was the ruling at that time.  That

22  ruling will stand.

23         Now, what about the sister?

24         **MR. PRICE:**  He testified about the substance of that.

25         **THE COURT:**  I know.  It seems to me that we wound all

Page 70

1    the way through that.  So it's up to each of you if you are

2    asserting a privilege there or not.  And I'm a little confused on

3    this record where we are at.  So I'll wait for each of you to tell

4    me.

5            MS. KELLER:  My understanding is that what Mr. Brawer

6    said was that he was fine discussing that.

7            THE COURT:  Mr. Price?

8            MR. PRICE:  That's what he said.  So if we have a time,

9    we might be able to talk to his sister.

10           THE COURT:  You may have.  Both of you may be calling

11   the sister.

12           What else?

13           MR. PRICE:  They moved into evidence all the videos,

14   which of course includes just the --

15           THE COURT:  Here is the problem.  Once deAnda is on the

16   stand -- my concern is a little bit different -- once deAnda comes

17   to the stand, that ruling does not hold for children, family

18   members, if he is aware of this.  That's a whole different matter

19   concerning Brawer.  There, I found the prejudicial effect for

20   those snippets outweighed the probative value.

21           If Mr. deAnda is aware, and he should be aware of

22   security nationwide for Mattel, that video now is fair game for

23   all parties.  And you can ask questions about Mr. deAnda once he

24   is back on the stand without limitation.

25           Now, as far as the videos coming in, let me tell you

1   what I'm confronted with.  I'm confronted with the same basic

2   problem concerning the Brawer thumb drive as I'm confronted with

3   these videos.  And although they're not analogous -- and we'll

4   spend this evening creating a better record for both parties --

5   we're really into the same area.

6           So you see, there is no foundation, in a sense.  There

7   is no chain for these particular videos, although I think that you

8   are going to establish that pretty quickly through deAnda.  He's

9   certainly authenticated that that's me and my children.  So there

10  is no authentication problems.  There's no foundation problems

11  that he said he was being videotaped.  DeAnda agrees and he agrees

12  it was during the two weeks while he was still employed by Mattel.

13  But having the whole video come in requires a little bit of

14  thought on my part, and I think over objections of Mattel.

15          By the same token, we're right back into that backpack.

16  And I put Mattel on notice that they may have the chain.  They may

17  not be getting in piece of evidence in.

18          And Ms. Brisbois is certainly available with backpack.

19  I know of no reason why she can't testify.  So I put Mattel on

20  notice about that.  I'm putting you on notice about these tapes.

21  I'm happy to try to sort that out now.  And I'm happy to listen to

22  you.  But I'm still going to do some research and take my time

23  with it.  And I've been warning both of you along the way so it

24  doesn't come as any surprise.

25          Right now I have indicated I'm not allowing in backpack

1   and Brisbois.  And you have her available and I'll take a

2   conference from Canada.  And I'm very concerned about the

3   admission of these videotapes, although you can play snippets of

4   it.

5         MS. KELLER:  There was a foundation though, because

6   deAnda did say that Letourneau did them at his direction and gave

7   them to him, and he identified them.  So I think the foundation is

8   laid.  The question is whether the Court wants all of it played.

9   But all of it relates to surveillance of Brawer and his family.

10        THE COURT:  All of it is about seven days.

11        MS. KELLER:  Your Honor, in addition we have one other

12   issue --

13        MR. PRICE:  Before we move from that.

14        THE COURT:  Let's stay with that because let's enjoy

15   each other for this period of time.  Now we'll go into this issue

16   with Mr. Price.

17        MR. PRICE:  Your Honor, the Court's order allowing

18   playing the videotapes said that the purpose of it, the

19   substantive purpose was to show that Mr. Larian did not ask

20   Mr. Brawer to recruit employees or steal trade secrets because the

21   observation during that time period didn't show that.  And in

22   weighing the prejudicial effect, you said it shouldn't be edited

23   to display family members.

24        And there is still, as we said, that incredible

25   prejudicial effect.  Remember, Ms. Keller is going to say, if

1   permitted -- I don't think she should be able to say -- this is

2   gestapo tactics.

3          **THE COURT:**  She is not going to say that.  Just like the

4   Aryan doll that was referenced earlier.

5          **MS. HURST:**  We never said that.

6          **THE COURT:**  I know, but she is not going to.

7          **MS. KELLER:**  I don't plan to.

8          **MR. PRICE:**  So, first, when we wanted a limiting

9   instruction, I talked to Ms. Keller about that.  And at the time

10  she said she didn't see the need for one.  And I think it should

11  be, with respect to Mr. deAnda, to -- he may be able to say yes,

12  this is what it is.  The question is why is it relevant for this

13  case.

14         And you have concluded, and we don't necessarily agree,

15  that it is relevant to whether Mr. Larian was trying to get people

16  to take trade secrets.  You have ruled that.  On the same

17  rationale, there is no need --

18         **THE COURT:**  You may be right.  I may need to rethink

19  that portion.  Just having deAnda on the stand really does raise

20  the concern, why the breadth of this kind of surveillance.  I

21  mean, from a legal standpoint you may be right.  Let me rethink

22  that.  I'll probably hold to my ruling, but I don't want to go

23  back and forth.

24         So each of you are trying to engage me.  I'm trying to

25  get time to go back and sort out my thoughts.  You are not going

Page 74

1   to let me do that.  So let me reverse that prior ruling which was

2   not this one you are referring to, so I'm specific.  But I think I

3   was too quick just to say deAnda is fair game for everything.

4   Let's leave this on the table with my ruling at the present time.

5            Let's hear from the other side on this issue.

6            **MR. PRICE:**  We do have a proposed limiting instruction.

7            **THE COURT:**  Counsel?

8            **MS. KELLER:**  And the Court wants to hear from us on this

9   issue?

10           **THE COURT:**  On this issue.

11           **MS. KELLER:**  Well, this shows a lot of things.  For one

12  thing it shows the breadth of the Mattel investigation

13  capabilities and the fact that -- and Brawer is just a departing

14  executive, albeit, he is departing to MGA.  But they don't have

15  any indication that Brawer is doing anything improper.  And they

16  surveil him on videotape for a whole two weeks just to try to

17  catch him doing a single thing that could be conceived of as

18  improper.

19           So, it certainly shows, because their position appears

20  to be, oh gosh, how could we ever have known about Carter Bryant?

21  Oh gosh, how could we have known early on what Carter Bryant was

22  doing?  See no evil, hear no evil, speak no evil.

23           But Mattel's security department was very active, and

24  not just in 2004.  We have seen the security logs going way back.

25  And in the absence of any evidence whatsoever of intellectual

a66c3eb4-db17-4d6b-8da9-41b4217e98ed

1   property theft, which we have heard, they still sued Mr. Brawer.

2   They sued him on the spot.

3          They are claiming they couldn't have sued Carter Bryant

4   earlier because they hadn't completed their investigation.  Well,

5   that's certainly belied by their actions with respect to

6   Mr. Brawer.  I mean, there are enough things in this case that

7   strain credulity already on the issue of statute of limitations,

8   but this really shows what resources they could deploy in a timely

9   way when they wanted to, even against somebody who hadn't done

10   anything, let alone somebody where they had already had reports

11   from within the design department that people were suspicious that

12   Carter Bryant was cribbing their designs and might have been

13   infringing Toon Teens and had gone over and was working on Bratz.

14          So it's relevant to a lot of different things.

15          **THE COURT:**  So far I haven't precluded you from getting

16   into the fact that the family was surveilled.  I have precluded

17   you thus far for the snippets of the wife walking in with the two

18   children into the bank.

19          I haven't precluded you from any other person, including

20   a wife and children, as long as it was Mr. Brawer.  And the reason

21   for that is that certainly Mr. Brawer has to be the focus of the

22   investigation.  It strikes me as incredible that the wife would

23   now be hand-carrying information over to MGA, which is why I have

24   drawn that line.

25          I think after listening to Mr. Price that's still the

1  appropriate line to draw.  The question is if I allow in the

2  videotapes and I supply the videotapes to the jury, now they can

3  watch those snippets.

4          And it strikes me that that was the one step too far

5  that the information would be transferred from Brawer through his

6  wife to MGA.  So that's why you got that limitation.  If you want

7  to excise out those portions, I probably have no problem bringing

8  in the video.  But I don't think it should just come rolling into

9  evidence.  And I think it undermines my ruling.  Plus, I think

10  we're getting pretty far-fetched in some of this.

11          But if the information was going to be transferred, it

12  was going to be transferred by Brawer.  It was going to be

13  transferred by him specifically.

14          **MS. KELLER:**  Well, there are a number of things we can

15  do.

16          **THE COURT:**  You are not precluded from asking about the

17  breadth of the surveillance.  It's the image that struck me of

18  being so prejudicial with just the wife walking inside the bank.

19  If you want to ask questions, you can ask questions.

20          **MS. HURST:**  Can we ask he be required to look at the

21  clips --

22          **THE COURT:**  Absolutely.

23          **MS. HURST:**  So when I bring him back and ask him, he has

24  to say --

25          **THE COURT:**  Absolutely.  He can look at the whole video

1    clip.  Watch all seven days of it.

2              MS. HURST:  It's only about 20 minutes total, I'm

3    informed, Your Honor.

4              THE COURT:  No.  There is a lot more.  If you look at --

5    I have got three different clips.  It covers hour and hours and

6    hours.  I don't know what's even transferred between the parties

7    up to this point.  I'm not sure what each party, quite frankly,

8    has.  But this is an extensive clip and clips.  It's numbing.  In

9    fact, it sent me to sleep.

10             But there is no transfer that I ever saw.  So certainly

11   you can have him watch all seven days.  We have time this weekend.

12             MS. KELLER:  Your Honor, we're also --

13             THE COURT:  That's up to you.  But if that's going to

14   happen, you better get him in here and have me order him to watch

15   that over the lunch hour.

16             MS. HURST:  Can we show him the clips right before we

17   resume in front of the jury and have him so he is prepared to

18   confirm when we resume?  Would that be okay?

19             THE COURT:  Certainly.

20             MR. PRICE:  That's the same thing as editing the clips.

21             THE COURT:  No, it's not.  That's simply keeping that

22   away from the jury.  But he can certainly testify or someone at

23   Mattel could testify about the extensiveness.  And I have never

24   precluded that, if you read my order carefully, from any oral

25   questioning being asked.

1          **MR. PRICE:**  I see that's not in your order.

2          **THE COURT:**  It is in my order.  Last line; look at the

3    last line, second page, third paragraph, turn to it.

4          **MR. PRICE:**  I was agreeing with you.  But for the same

5    reason that the visual is too prejudicial, the oral is also

6    irrelevant.  There is plenty of evidence of the extensiveness of

7    this.  They can say it went on for days.  And again, it's to the

8    issue of whether or not Mr. Larian had him in that time frame

9    contact employees or steal information.

10          The prejudicial effect of saying that his wife and kids

11    were surveilled I think you might have recognized last night, it's

12    inflammatory.  Even hearing it is inflammatory.  And why do you

13    have to go there when you can say it's extensive because it's

14    seven days, or whatever it was, it's X hours?

15          So you are just adding something on which -- it doesn't

16    add to the comprehensiveness significantly at all, particularly on

17    this issue, but it does create a great deal of prejudice.

18          **THE COURT:**  Counsel?

19          **MS. KELLER:**  Well, if nothing else it certainly shows

20    the comprehensiveness of what they were willing to do.  Went to a

21    lot of expense as well.  We have been hearing how they had to

22    settle Mr. Villaseñor with a confidentiality portion because they

23    couldn't spend the money on a lawsuit, couldn't risk it.  Here,

24    they have somebody videotaping this person and his family

25    practically around the clock just in hopes of maybe catching him

1    doing something wrong.  Maybe driving up to MGA while he was still

2    a Mattel employee.

3          So it certainly shows the breadth of it and the

4    comprehensiveness of it and the resources they were willing to

5    devote to it.

6          **THE COURT:**  Counsel?

7          **MR. PRICE:**  The resources are -- doesn't add to the

8    significance of the resources or the breadth to say the kids and

9    the wife in some clips are in it by themselves.  The guy was

10   surveilled for how many days, how many hours?  If that's an issue,

11   that's all you need.

12         And, of course, we have heard her closing argument here.

13   This was not a surveillance -- well, he wasn't sued for theft of

14   trade secrets.  Ms. Keller said we brought suit.  He was sued

15   because he wouldn't agree to the confidentiality.  We thought we

16   might find something.  There was surveillance.  You said the jury

17   can know that.

18         I mean, I'm not waiving our objections to that.  But if

19   the only idea is to say this is the scope on the surveillance that

20   goes to this issue of whether Mr. Larian was directing him to do

21   things, you have got more than enough evidence on that.  Adding

22   that the wife and kids are in there adds nothing except prejudice.

23         **THE COURT:**  Okay.  Counsel?

24         **MS. KELLER:**  We were actually sued for a trade secret

25   violation about Mr. Bryant by Mattel in this lawsuit.  They ended

1    up having to dump it, but that was certainly the contention.

2              **MS. HURST:**  And it shows that when they have nothing,

3    they go for what is in his head.  Same claim for Mr. Bryant.

4              **THE COURT:**  Counsel?  Mr. Zeller, join in.

5              **MR. ZELLER:**  I'd actually prefer lunch.

6              **THE COURT:**  No reason?

7              **MS. KELLER:**  We'll submit it, Your Honor.

8              **MR. PRICE:**  Submitted.

9              **THE COURT:**  Mr. Quinn?

10             **MR. QUINN:**  Submitted.

11             **THE COURT:**  Mr. McConville?

12             **MR. MCCONVILLE:**  Submitted.

13             **THE COURT:**  Ms. Hurst?

14             **MS. HURST:**  Thank you, Your Honor.  All done.

15             **THE COURT:**  Ms. Keller?

16             **MS. KELLER:**  Submitted again.

17             **THE COURT:**  Everybody submitted?  Everybody done?  You

18   can inquire into this orally.  You can go into this orally.  I

19   don't want that clip shown.  I don't like the visual on that.  But

20   you can inquire about the depth and breadth of the surveillance

21   including the wife and children.

22             **MS. KELLER:**  Do you want us to edit those portions out

23   of the whole tape, or is it okay if the tape itself comes in?

24             **THE COURT:**  I don't know if the whole tape is coming in.

25   I can discuss that with all of you tonight.  In fact, quite

Page 81

1    frankly, if all of you hadn't gotten so tired last night, we

2    issued seven orders.  We were going to go into the whole issue

3    concerning Canada and Brisbois last night, and were going to go

4    into what I anticipated the tape to be, but everybody left me.

5         **MS. KELLER:**  Your Honor, a more pressing matter because

6    we're coming down to the last of our witnesses is Mr. Moore.

7         **THE COURT:**  We're working.

8         **MS. KELLER:**  I'm wondering, because Mr. Eckert --

9         **THE COURT:**  You are not going to be able to call

10   Mr. Moore.  First of all, the special master is making a report to

11   me.  What you'll find is Mr. Moore is ordered to Los Angeles to

12   undertake an in camera hearing with the special master.  That will

13   take place early in the morning tomorrow.  And I'll get a report

14   back from the special master upon his recommendation.

15        There is some disagreement on my part with the breadth

16   of the recommendation, so I'm narrowing that, and I want to get a

17   good report from the special master in that in camera proceeding.

18   Some information, quite frankly, appears by necessity to be

19   available to you.  I'm the one who's narrowing that.  And if so, I

20   want to have a very good record of what Mr. Moore's responses.

21        I'll leave that at the present time, but you'll find you

22   are not going to be able to proceed with Mr. Moore today.

23        **MS. KELLER:**  Thank you, Your Honor.

24        **THE COURT:**  He will be here or around the area.  I

25   prefer the special master to conduct that so that I don't have to

Page 82

1   initially, but...

2           **MS. KELLER:**  Does the Court anticipate he might be

3   available to be examined again tomorrow?

4           **THE COURT:**  Depends upon his answers.  Can't foresee

5   that.  So we're done with this discussion.

6           **MS. KELLER:**  Thank you.

7           **THE COURT:**  He will not be testifying today in all

8   likelihood although he will be available.

9           Now, what else would you like to do?

10          **MS. KELLER:**  Have lunch.

11          **MR. PRICE:**  Lunch is good.

12          **THE COURT:**  Okay.  Go to lunch.

13          **MS. HURST:**  We can excuse Mr. Brawer; right?

14          **THE COURT:**  I want to make certain on the record that

15  each of you are satisfied with this.  First, spousal privilege and

16  attorney-client privilege, that you are really leaving the record

17  where it is without complaint or me having to get Mr. Brawer back

18  this evening, and I want him subject to recall, I think I stated

19  on the record until April 8 or 11.

20          **MR. MCCONVILLE:**  April 8al.

21          **MS. KELLER:**  Fine with us.

22          **THE COURT:**  Acceptable to both parties?  Excuse

23  Mr. Brawer.

24          Now informally, my representation to both of you

25  concerning rebuttal was that the only witness that I thought was

Page 83

1    appropriate, unless shown to the Court for rebuttal or

2    surrebuttal, was the damages expert because there had been

3    preclusion of Mr. Wagner going into a rebuttal in anticipation of

4    whether Mr. Malackowski would testify.

5           I'd also indicated to both of you, although each party

6    tends to be rather presumptive on occasion with this Court, that

7    you are going to do, quote, unquote, the following.  No, you are

8    not.  No, you are not.  You will submit to me the names of the

9    people that you believe in rebuttal and you will write down the

10   questions you are going to ask.  And when I see that, you will

11   submit to me the names of the people in surrebuttal and the

12   questions you are going to ask, and I will see those questions,

13   question by question.

14          I don't want to hear in the future that there has ever

15   been a representation other than holding people available.  And

16   the first intonation I got of that again was Carter Bryant last

17   night, either on the record or informal discussion, that we are

18   going to call Carter Bryant back.  You may if there is rebuttal.

19   My only representation to Mattel has been that you may call him

20   back if it's true rebuttal.  So there should be no presumption and

21   no claim at any time other than his availability.

22          I was asked last night to make certain that there was no

23   problem, but we were running into trouble with the attorney

24   because the attorney wasn't responding to phone calls.  I want to

25   see the questions.  I want to see if this is true rebuttal.  And

1   his surrebuttal also.  I want to see absolutely, based upon what

2   the rebuttal is, not only what that question or what that witness

3   is, I'm going to demand from each of you written questions by the

4   number, and those are the questions that you'll be asking.

5        And that's what we're going to be doing this weekend.

6   So don't either of you presume with this Court that there is any

7   other representation other than Mr. Wagner having the opportunity

8   to get back on the stand.

9        Now, if you disagree with that or you think that's a

10  misrepresentation, I want to hear that and I'm going to start with

11  Mr. Zeller first.

12       Has there been any other representation by this Court?

13  If so, I want you to take me on, on this issue, and I'm going to

14  turn to Ms. Hurst also.

15       **MR. ZELLER:**  There's absolutely not been anything

16  unclear about the Court's --

17       **THE COURT:**  Mr. Quinn, anything unclear about that?

18       **MR. QUINN:**  No, Your Honor.

19       **THE COURT:**  Mr. Price, anything unclear about that?  I

20  want you to take me on.  I want a very clear record.  I don't go

21  back on my word.

22       **MR. PRICE:**  You accurately, I think, represented what

23  you told us.  I have a question about what you said about the

24  questions.

25       **THE COURT:**  Write them out and I'll see them.

 1            **MR. PRICE:**  I wondered if that applied to Mr. Wagner.

 2            **THE COURT:**  No.  Not to Mr. Wagner.  I have always

 3    represented that you didn't have an opportunity to thoughtfully

 4    engage Mr. Wagner on Mr. Malackowski.  Now, we have a changing

 5    landscape on Malackowski that I know you are confronted with.  We

 6    had a changing landscape on Mr. Wagner that was just as egregious,

 7    if not more so.

 8            Now, any misunderstanding of what I've said, Mr.

 9    McConville?  And if I've made any other representation to you, I

10    want to hear that on the record.

11            **MR. MCCONVILLE:**  No, sir.

12            **THE COURT:**  Ms. Hurst?

13            MS. HURST:  No.

14            **THE COURT:**  Ms. Keller?

15            **MS. KELLER:**  Absolutely not.

16            **THE COURT:**  Now, when I tell you with one minute to go

17    that your argument is ending, sit down.

18            Mr. Price, what did I just say?

19            **MR. PRICE:**  You said when you tell us with one minute to

20    go that our argument is ending, sit down.

21            **THE COURT:**  Mr. Quinn?

22            **MR. QUINN:**  Sit down when you say there is one minute

23    left?

24            **THE COURT:**  No.  When I say it's a one-minute warning,

25    when that gong strikes with your 20 minutes --

Page 86

1          **MR. QUINN:**  I understand.

2          **THE COURT:**  You really understand that?

3          **MR. QUINN:**  I do.

4          **THE COURT:**  Sometimes counsel have not understood that.

5          Do you understand that, Ms. Keller?

6          **MS. KELLER:**  I do.

7          **THE COURT:**  Ms. Hurst?

8          **MS. HURST:**  Yes, Your Honor.

9          **THE COURT:**  Now, I will sit you down if you don't.  Do

10  you understand that?

11         **MS. KELLER:**  Yes.

12         **THE COURT:**  I'll have the means in this court to do so.

13  Do you understand that?  And that will be very embarrassing to all

14  counsel.  You do exactly what I say.

15         Now, you go have a nice lunch and I will see you in

16  exactly 29 minutes.

17         **MR. MCCONVILLE:**  Your Honor, there is one witness who is

18  getting on a plane for rebuttal and it's Susanna Kuemmerle?  If we

19  can get those questions sooner so maybe she doesn't have to get on

20  a plane.

21         **THE COURT:**  No.  Kuemmerle was always expected to come

22  back.  There was the second exception, my apologies, I forgot

23  Kuemmerle.  Kuemmerle was always a person we anticipated coming

24  back.

25         As far as the rest of the rebuttal witnesses, I'm going

Page 87

1  to see the specific questions, so start drafting them.  They're

2  going to get them to me in a timely fashion probably by Friday

3  night or Saturday morning.  Unfortunately, apparently our weekends

4  are gone.  Not that it's detriment for me, but it's going to be a

5  detriment for all of you.  We haven't even started down the final

6  set of special instructions yet.

7          MR. PRICE:  Will those questions be submitted to you in

8  camera?

9          THE COURT:  Absolutely.  That's not subject to the other

10  side seeing them for the time being.  Okay.  All right.  At least

11  initially so.  I don't want to hear a box later on that they're

12  not going to be made available, but I'll look at them in camera.

13              (at 12:31 a lunch recess was taken)

14          SANTA ANA, CALIFORNIA; THURSDAY, MARCH 31, 20011

15          THE COURT:  Back in session.  The jury is present, the

16  alternates are present, all counsel are present, the witness is

17  present.

18              Examination continued with Mr. deAnda.

19          MS. HURST:  Thank you, Your Honor.

20                  DIRECT EXAMINATION (RESUMED)

21  BY MS. HURST

22  Q   Mr. deAnda, did you have an opportunity to review some clips

23  from the Mr. Brawer's surveillance video during the break?

24  A   Yes.

25  Q   And you saw their surveillance of Mr. Brawer; correct?

Page 88

1   **A**    Yes.

2   **Q**    And also there were times when the video showed just his wife

3   and children; right?

4   **A**    I don't know his wife and children.  I have never seen them.

5   **Q**    Well, you saw a woman with children without a man in the

6   frame; right?

7   **A**    Yes.

8   **Q**    Walking up and down the street; right?

9   **A**    Yes.

10  **Q**    Dropping off children at various locations; right?

11  **A**    With children, yes.

12  **Q**    Carrying a child into a restaurant?

13  **A**    Yes.

14  **Q**    And Mr. Brawer was not seen in any of those; correct?

15  **A**    Not that I could see.

16  **Q**    So in fact, Mr. Letourneau was following Mr. Brawer's wife

17  and children in addition to Mr. Brawer; right?

18          **MR. PRICE:**  Objection.  Locations.

19          **THE COURT:**  Sustained.

20  BY MS. HURST

21  **Q**    Did Mr. Letourneau report to you he was following

22  Mr. Brawer's wife and children to make sure they weren't passing

23  any confidential information?

24          **MR. PRICE:**  Objection.  Assumes facts.

25          **THE COURT:**  Overruled.

Page 89

1            THE WITNESS:  No.

2    BY MS. HURST

3    **Q**    Did you direct Mr. Letourneau to surveil Mr. Brawer's wife

4    and children?

5    **A**    No.

6    **Q**    Isn't it true that Mattel has also conducted surveillance of

7    Mr. Larian and his family, Mr. deAnda?

8            **MR. PRICE:**  Objection.  There is no good faith question

9    for that.

10           **THE COURT:**  I don't know what you mean by surveillance,

11   counsel.  You mean video or what?

12           **MS. HURST:**  Of any form, Your Honor.

13           **THE COURT:**  No.  Too broad.

14   BY MS. HURST

15   **Q**    Has Mattel had Mr. Larian followed?

16           **MR. PRICE:**  Objection.  Irrelevant.

17           **THE COURT:**  Overruled.

18           **MR. PRICE:**  403.

19           **THE COURT:**  Overruled.

20           Answer the question, sir.

21           **THE WITNESS:**  No, to my knowledge.

22   BY MS. HURST

23   **Q**    Have you ever hired anybody to follow Mr. Larian?

24   **A**    I have not.

25   **Q**    You have any knowledge or information at all about Mattel

1    hiring people to follow Mr. Larian or any of his family members?

2    **A**    None.

3            **MS. HURST:**  No further questions.

4            **THE COURT:**  Cross-examination, Mr. Price, on behalf of

5    Mattel.

6            **MR. PRICE:**  Thank you, Your Honor.

7                          CROSS-EXAMINATION

8    BY MR. PRICE

9    **Q**    Mr. deAnda, you were asked questions about Ms. Morales and

10   Ms. Cabrera.

11           You were asked to talk with them after the sworn

12   deposition of Peter Marlow?

13   **A**    Yes.

14   **Q**    I'm sorry.  Veronica Marlow?

15   **A**    Yes.

16   **Q**    One of the Marlows.  You learned that they had testified that

17   they had been using Ms. Cabrera and Ms. Morales for doing Bratz

18   fashion-making for a number of years; correct?

19   **A**    Yes.  In the -- sewing the initial designs, yes.  Bratz

20   lines.

21   **Q**    Is it your understanding that Ms. Morales and Ms. Cabrera had

22   confidentiality agreements?

23   **A**    That was my understanding.

24   **Q**    So it was your understanding that they were, some part of the

25   day, working on samples for Mattel on the designs for Barbie;

Page 91

1    correct?

2    **A**    Yes.

3    **Q**    And then would then also work on designs and samples for

4    Barbie's competitor, Bratz?

5             **MS. HURST:**  Objection.  Hearsay.

6             **THE COURT:**  Overruled.

7             Answer the question, sir.

8             **THE WITNESS:**  Yes.

9    BY MR. PRICE

10   **Q**    Is that what you learned when you talked to Ms. Morales and

11   Ms. Cabrera?

12   **A**    That is correct.

13            **MS. HURST:**  Objection.  Move to strike.  Hearsay.

14            **THE COURT:**  Overrule.  Once again, goes to state of

15   mind, did Ms. Morales or Ms. Cabrera.  We haven't heard from them,

16   but it shows conduct, what the mental process was of Mr. deAnda.

17   BY MR. PRICE

18   **Q**    Now, you were also asked questions about the investigations

19   concerning Villaseñor.

20            Let me ask you this:  If someone threatens to sue the

21   company in connection with their employment, is it customary that

22   outside counsel or counsel will do the investigation on that

23   complaint?

24   **A**    Yes.  It's typically referred to our legal department.

25   **Q**    You were also asked questions about Mr. Brawer, and in

1    particular whether you had information that he actually took

2    proprietary confidential information.

3              Do you recall that?

4    **A**    Yes.

5    **Q**    Do you have information that he did take something in a box

6    from his office?

7    **A**    Yes.

8    **Q**    You said binders?

9    **A**    Binders.

10   **Q**    And do you have any idea what those binders are or were?

11   **A**    No.

12   **Q**    Are you aware that shortly thereafter that he erased memory

13   on his personal computer?

14   **A**    I was aware of that, yes.

15   **Q**    Have you ever looked at what was on his computer for which he

16   used for work at Mattel?

17   **A**    No, I personally did not.

18   **Q**    Let me show you some documents that you were shown by Ms.

19   Hurst.  It's part of Exhibit 7978.

20             And you recall you were shown these documents concerning

21   toy fair?  It's a really thick.

22   **A**    Yes.  This case, yes.

23   **Q**    And by the way, she asked you to show how thick it was.  If

24   you could kind of flip through there, is most of that phone

25   records, invoices, things of that nature?

1  **A**    The majority is phone records and what are called -- back

2  then we took what was called screen shots of Microsoft Outlook,

3  which is basically the e-mails.  Not the actual e-mail, just

4  simply the titles of the e-mails.

5  **Q**    Now, when you say "phone records," were these phone records

6  for Mattel phones?

7  **A**    Yes.

8  **Q**    If you would look at 7978.  And I think this was moved into

9  evidence.  We can show it.

10         You see it says "Toy fair check list, nondisclosure

11  agreements for domestic international customers."

12         Do you see that?

13  **A**    Yes.

14  **Q**    And then in the first paragraph there it says, "Toy fair NDA.

15  Use the Mattel Toy Fair NDA form."

16         Do you see that?

17  **A**    Yes.

18  **Q**    Now, if we go to the next document, 7978, you see that's a

19  form for nondisclosure agreement, 7978 -- I'm sorry, -00972.  If

20  we could blow up the first and second paragraph.

21         And actually that's -- you see in the second paragraph,

22  it says, "You would like to be admitted to the Mattel showrooms

23  for the Mattel Toy Fair."

24         Do you see that?

25  **A**    Yes.

1  **Q**    Also referred to as the Fall 2000 (sic) toy fair held at the

2  Mattel Conference and Leadership Center in El Segundo, California.

3          **THE COURT:**  Could we get that larger?  The jury isn't

4  going to be able to read that at all.  It's almost an impossible

5  document.

6  BY MR. PRICE

7  **Q**    "You would like to be admitted to the Mattel showrooms for

8  the Mattel Toy Fair also referred to as the Fall 2005 toy fair

9  held at the Mattel Conference and Leadership Center in El Segundo,

10 California between November 8 through November 19, 2004."

11         Do you see that?

12 **A**    Yes, I do.

13 **Q**    That refers to something called the Mattel Toy Fair; right?

14 **A**    That's correct.

15 **Q**    Now, in a Mattel Toy Fair, that's something that's pre New

16 York Toy Fair, Hong Kong Toy Fair and Nuremberg Toy Fair; correct?

17 **A**    Yes.

18 **Q**    And that takes place actually on Mattel's property in El

19 Segundo, what is called the El Segundo campus?

20 **A**    That's correct.

21 **Q**    For that toy fair, do a bunch of retailers come, or how is

22 that conducted?

23 **A**    It's conducted by -- customers come in individually and spend

24 two to three days touring the products, line of products.

25 **Q**    When you say they come individually, what do you mean?

1   **A**    They come exclusively by themselves.  In other words, they're

2   not commingled with other customers.

3   **Q**    And so, what we have here is documents at 7978-291 and -292

4   that relate to this private event that Mattel has on its campus

5   before the public toy fairs or the industry toy fairs in New York,

6   Hong Kong, etcetera; correct?

7   **A**    Yes.

8   **Q**    And if we look at the next one 293, this says Mattel Inc. Toy

9   Fair attendee nondisclosure agreement.  If you see in the second

10  paragraph, "you desire to be admitted to the Mattel showroom at

11  the Mattel Toy Fair also referred to."

12          You see that?

13  **A**    I do.

14  **Q**    And then 294, it says, "Mattel Inc. Confidentiality

15  Agreement."

16  **A**    Yes.

17  **Q**    And then it has got this big sign, "read before entering."  I

18  don't know how big it is.  And at the bottom it says, "If you are

19  unwilling to agree with these terms, do not enter the presentation

20  hall."

21          Do you see that?

22  **A**    Yes.

23  **Q**    Do you know what that refers to?

24  **A**    These signs are posted at the entrance to the Mattel Toy

25  Fair.

1   **Q**    Is Mattel the only toy maker showing toys at the Mattel Toy

2   Fair?

3   **A**    Yes.

4   **Q**    And all these documents are lumped together at the end of

5   this file?

6   **A**    Yes.

7   **Q**    -295 of 7978.  It says, "This is to be used for TF and pre-TF

8   and placed outside each elevator door at the top of each staircase

9   and at the entrance to the toy fair."

10          Do you see that?

11  **A**    Yes, I do.

12  **Q**    And then where it has "Prohibition.  It's a violation of

13  California law to record confidential information at the Mattel

14  event."

15          Do you see that?

16  **A**    Yes.

17  **Q**    And do you have any understanding that there is a -- there is

18  something at the New York Toy Fair or Hong Kong Toy Fair or

19  Nuremberg Toy Fair which would say it is a violation of California

20  law?

21  **A**    No.

22  **Q**    So all this stuff is totally different from the New York Toy

23  Fair?

24          **MS. HURST:**  Objection.  Lacks foundation.

25          **THE COURT:**  Overruled.

Page 97

1            **THE WITNESS:**  It's just is different as far as

2    describing the Mattel Toy Fair.  It doesn't say New York Toy Fair,

3    Hong Kong Toy Fair, or Nuremberg Toy Fair.

4            **MR. PRICE:**  Nothing further, Your Honor.

5            **THE COURT:**  Redirect.

6                         RECROSS-EXAMINATION

7    BY MS. HURST

8    **Q**    Mr. deAnda, please turn to that last exhibit, the page in

9    293.

10   **A**    Yes.

11   **Q**    And that's the toy fair attendee nondisclosure agreement; is

12   that right?

13   **A**    That's correct.

14   **Q**    And at paragraph 1, there is a definition of "confidential

15   information."  Is that right?

16   **A**    You are referring to the second paragraph or the --

17   **Q**    The paragraph with the numeral 1.

18   **A**    I'm sorry.  Okay.  I was looking at the wrong paragraph.  It

19   says, "Definition.  Confidential information."  That's the first

20   three words.

21   **Q**    And it includes -- it says, "Confidential information

22   includes but is not limited to designs, themes, play patterns, or

23   features of product lines, samples, information relating to the

24   introduction of new or modified products and product lines."

25   Right?

Page 98

1    **A**    That's correct.

2    **Q**    And that's because even though Mattel is disclosing this type

3    of information to retailers at toy fair, it still believes that

4    information is confidential; right?

5              **MR. PRICE:**  Objection.  Ambiguous as to "toy fair."

6              **THE COURT:**  Overruled.

7              **THE WITNESS:**  I'm sorry.  In reference to toy fairs?

8    BY MS. HURST

9    **Q**    Even though Mattel is disclosing this type of information to

10   retailers, it still expects them to keep it confidential; right.

11   **A**    There is an expectation, yes.

12   **Q**    Please turn to page 296, that last page of that exhibit.  You

13   see there at the top it says, "This language to be used for trade

14   shows and conventions."  Right?

15   **A**    Yes.

16   **Q**    And a trade show is where you go and competitors are present;

17   right?

18   **A**    I guess it could be interpreted in that fashion.

19   **Q**    And a convention is where you go and members of the public

20   are present; right?

21   **A**    I don't know the definition to be, but that could be so.

22   **Q**    And the language that Mattel chooses to use for places where

23   competitors and members of the public are present is that

24   admission is conditioned upon your agreement to keep the

25   information confidential; correct?

1          **MR. PRICE:**  Object to lack of foundation.

2          **THE COURT:**  Overruled.

3          **THE WITNESS:**  Yes.

4          **MS. HURST:**  No further questions.

5          **THE COURT:**  Recross by Mr. Price on behalf of Mattel.

6                         RECROSS-EXAMINATION

7    BY MR. PRICE

8    **Q**    Mr. deAnda, the two nondisclosure agreements that you were

9    shown, 292 and 293, both relate to the Mattel Toy Fair in El

10   Segundo on Mattel's property; correct?

11   **A**    Yes.

12   **Q**    And if you look at, I think at 293, I believe is what was

13   shown to you under the definition of "confidential information."

14   **A**    Yes.

15   **Q**    Do you see at the bottom of that paragraph it says,

16   "Confidential information does not include information that, one,

17   was known by you prior to the Mattel event without restriction as

18   to use or disclosure; two, is or becomes publicly available or

19   generally known in the industry through no fault of your own;

20   three, is independently developed by you without reference to or

21   use of any confidential information."

22          Do you see that?

23   **A**    Yes.

24   **Q**    And is it your understanding that these toy fairs that are

25   being discussed here are conducted before the toy fairs where

1    there is press releases and other toy makers are there and you

2    have many people coming to your showroom at one time?

3    **A**    Yes.

4    **Q**    Is it your understanding that any of these documents were

5    used in connection with the New York Toy Fair?

6              **MS. HURST:**  Objection.  Lacks foundation.

7              **THE COURT:**  Overruled.

8              THE WITNESS:  No.

9              **MR. PRICE:**  Nothing further.

10             **THE COURT:**  Mr. deAnda, we're going to continue to ask

11    you to remain available until April 8.  I believe the case will

12    conclude with argument to the jury on April 7.  So I'm being

13    cautious.  If you have any professional obligation,

14    responsibility, go about them.

15             Counsel, your next witness, please.

16             **MS. KELLER:**  Robert Eckert, Your Honor.

17             **THE COURT:**  Thank you.  Mr. Eckert, you can come right

18    across the well, sir.  If you stop at that location and we'll

19    administer an oath.

20             ROBERT ECKERT, DEFENDANT'S WITNESS, SWORN

21             **THE COURT:**  Please be seated.  Once you are seated,

22    state your name one again to the jury, spelling your last name.

23             **THE WITNESS:**  Robert Allen Eckert, E-c-k-e-r-t.

24             **MR. QUINN:**  May we approach for one question before the

25    examination again?

Page 101

1          **THE COURT:**  Who are you going to approach?

2          **MR. QUINN:**  Approach Your Honor.

3          **THE COURT:**  Just a moment, ladies and gentlemen.  I'm

4     going to be approached.

5              (Proceedings were held at sidebar but not

6     reported.)

7          **THE COURT:**  Why don't we send you home today and we'll

8     resume at 8:30 tomorrow.  Look at counsel jumping for joy.  I'm

9     just kidding you.  Why don't we resume at 8:30.

10             I apologize.  It's totally my fault, my responsibility.

11    And we'll see you promptly at 8:30 tomorrow morning.  Please don't

12    discuss this matter or form or express any opinion concerning the

13    case.  Have a nice afternoon.

14             Off the record.

15

16             (Recess had from 1:38 to 3:45.)

17         **THE COURT:**  All right.  Is Mr. Price gone?

18         **MR. MCCONVILLE:**  Yes.  I think he left.

19         **THE COURT:**  And Jennifer is gone?

20         **MR. MCCONVILLE:**  She'll come back in 15 for

21    Mr. Malackowski.

22         **THE COURT:**  Mr. Price is gone for the day?  Mike?

23             (Discussion held off the record.)

24         **THE COURT:**  We're on the record.  All counsel are

25    present, Mr. Price has been excused, Ms. Keller has been excused.

1          Yesterday I handed in a minute order instructing Mattel

2     to inform me at 7:00 o'clock this evening whether you would like

3     to abandon the buckets and specify your trade secrets including

4     all the information in the sculpts, and we can do it now, or it

5     can wait until 7:00 o'clock tonight.

6          **MR. QUINN:**  I think we'll need until seven, Your Honor.

7          **THE COURT:**  That's fine.

8          Second, I received a tentative order from the special

9     master I want to read to you concerning Mr. Moore, and that will

10    clean up the thoughts of the special master and see how you want

11    to proceed.

12         I'm going to read into the record the discovery master's

13    tentative report and recommendation to the Court and again get

14    your initial thoughts.  Just a moment.  Let me go back in the

15    back.

16         Counsel, I'll be right back with you.

17              (Brief pause in proceedings.)

18         **THE COURT:**  All right.  Well, let me start with the list

19    that was handed to Mr. Quinn today.  Counsel represented that

20    there were some tangibles.  What are these, new exhibits for Mr.

21    Eckert?

22         **MR. QUINN:**  What is -- apparently, they include

23    tangibles and there are some other things as well.  We have no

24    problem with those exhibits, Your Honor.  There is one other which

25    had been the subject of a claw back request under this Court's

Page 103

1    protective order.  There is a still a copy in Mr. Eckert's binder.

2         THE COURT:  Which one is it?

3         MR. QUINN:  It's an attorney-client privilege document.

4    It's a draft of a policy prepared by an in-house lawyer by the

5    name of Brian O'Connor.

6         THE COURT:  What is the number on it?

7         MR. QUINN:  This is Exhibit 9638.

8         THE COURT:  Let me see it.

9         MR. QUINN:  And the Court has an order with a -- which

10   is self-executing that upon request, we can request that a

11   document be returned to us.  And we have twice requested that this

12   document be returned, including the first time last October.

13        I'm handing the Court copies of a letter to the Orrick

14   firm on October 21, 2010 and a second one on February 28, 2011

15   clawing this back pursuant to the Court's order.  And we thought

16   we had gotten it back, but now it appears in the binder for Mr.

17   Eckert.

18        THE COURT:  Beyond that description, is everything else

19   acceptable?  Not that you won't object, but you are not being

20   surprised.

21        MR. QUINN:  That's fine.  Yes, Your Honor.

22        THE COURT:  Mr. Eckert would be prepared tomorrow.

23        The second thing I want to --

24        MS. HURST:  Can we argue?

25        THE COURT:  -- do is read to you the special master's

Page 104

1    tentative report and recommendation.  And I'm in contact with him,

2    but I thought instead of waiting until later tonight, I could

3    start down this process.  He hasn't signed it yet.  He asked me to

4    distribute it to counsel.

5              It reads as follows:

6              "Background.

7              On March 29, 2011, the Court ordered Mattel Inc.

8    (Mattel) to produce certain notes created and maintained by its

9    in-house counsel Michael Moore (the Moore documents).  In

10   response, Mattel provided the Court with binder entitled Michael

11   Moore Interview Notes For in Camera Review and containing 113

12   documents tabbed Nos. 1 through 113.  Mattel subsequently informed

13   the Court that the documents with tab Nos. 27 and 82 are

14   attorney-client privileged communications which were inadvertently

15   included in the binder.

16             Upon receiving the Moore documents, the Court instructed

17   the discovery master to review them in camera and recommend to the

18   Court whether the documents should be produced to" -- counsel,

19   I'll come back to that in just a moment.

20             Apparently, the discovery master just called Linda, who

21   just walked in and told me he is going to send a signed copy

22   instead of the tentative in just a moment.  Let me read from his

23   signed copy, see if there is any changes to what he sent me a

24   little while ago.  I was trying to save some time.

25             Now, you wanted to respond to this request to claw back?

1        MS. HURST:  I think in looking at the document, I

2    examined Mr. Eckert about that document at his deposition on

3    October 4.  It was marked as an exhibit at his deposition.  I

4    asked him to review it.  I'm looking at page 212 and 213.  I asked

5    him whether it had been implemented in any way.  He says he thinks

6    it was part of the code of conduct.  I think it's under California

7    Evidence Code.  I think it's right on point it's a waiver.

8        MR. QUINN:  By a letter dated October 21 -- and again,

9    this is a -- the Court order is self-executing.  We clawed it

10   back.  It should have been returned.  If they then wanted to

11   litigate the proprietary of the claw back, they can do that.

12       THE COURT:  Let me get my dates straight.  October 21

13   there is a letter from Quinn Emanuel.  There is also a letter

14   February 28 on an early date.  When was Mr. Eckert deposed?

15       MS. HURST:  October 4, 2010, he was asked about this

16   document.  I'm not disputing -- I see the letters.  I'm not

17   disputing they were sent or anything.  I'm just --

18       THE COURT:  What is the disagreement between the

19   parties?  You believe that --

20       MS. HURST:  I don't think it's privileged in the first

21   place.  But even if it was, it was waived because I marked it and

22   asked questions about it at the deposition.

23       THE COURT:  I need to go do a little bit more research.

24       MR. QUINN:  No, I agree with counsel's recitation of the

25   facts, Your Honor.  She did mark it and she did ask questions

Page 106

1    about it.  But then we promptly clawed, it back as the order

2    contemplates.

3            THE COURT:  This was right after the depo?

4            MR. QUINN:  Well, you'll see --

5            THE COURT:  Before the depo.

6            MR. QUINN:  No.  October 21.  It's about two weeks after

7    the deposition.

8            THE COURT:  No, you did before also, didn't you,

9    February 28?

10           MR. QUINN:  That's this year, Your Honor.  They used it

11   again.

12           THE COURT:  I see.

13           MR. QUINN:  And so I mean, counsel may have a point of

14   view or a position about whether it's privileged or not, but

15   that's something that should be raised and litigated.  The order,

16   the standing order contemplates that upon request the document

17   will be returned.  And we thought we had gotten it back and we

18   were surprised to see it in the binders.

19           THE COURT:  All right.  I have got to go back and read

20   it.  So what is your respective positions?  You obviously want it

21   clawed back, and if it's clawed back it shouldn't be referred to.

22           MR. QUINN:  Exactly.  Unless they want to litigate the

23   issue about privilege, then that's something that can be

24   discussed.  But I mean, this comes up the day before --

25           THE COURT:  And I need to go back and look at the law

1   and see what occurs.  If it's been divulged at a deposition, I

2   don't know the answer to that.

3        MS. HURST:  Even in our view it would be -- obviously,

4   we clawed back some certain e-mails that Mr. Larian was then

5   questioned about, because they took the position that even though

6   we had clawed it back, they were still entitled to it.  And that

7   would be our position here.

8        They continued to litigate about the document after we

9   had clawed back because you are still allowed to litigate about

10  the document once it's been clawed back.

11       THE COURT:  I think it's totally irrelevant.  The

12  question is going to rapidly become whether it's privileged or

13  work product.  Simple as that.

14       MS. HURST:  I think it's section 951.  I'm trying to

15  look real quick here.  I know there is a provision in the Evidence

16  Code, if you show something at a depo, the privilege is not

17  claimed, then it's waived.

18       MR. QUINN:  Our position would be, Your Honor, that the

19  order says what it says.  It should be complied with.  It was

20  negotiated.  They clawed back documents.  Any order should be

21  complied with.  And if they want to litigate the issue of

22  privilege, that would then be appropriate time to tee that issue

23  up and decide whether or not it's privileged.

24       MS. HURST:  That's what I'm doing.

25       MR. QUINN:  Except they hung on in violation of the

1    orders, Your Honor.  They hung on to copies of the document.  The

2    order said they weren't to do that.  There's nothing in the

3    Court's order that says if it's -- if you have a view that you

4    think it's been waived or marked at a deposition, it's absolute.

5    The Court's order says if a claw back letter is received, the

6    document should be returned.

7          **MS. HURST:**  Mr. Quinn has published the contents of

8    documents that we clawed back.

9          **THE COURT:**  This is leading no place right now.  I need

10   to go do some research.  Simple as that.  Okay.  What are we going

11   to do from this point forward?

12          In other words, what can we resolve tonight?  I'm going

13   to go get the special master's signed report, see what that says.

14   So I'll come back with you in just a moment.  Mr. Malackowski is

15   here.  What else do we have to resolve this evening?  It looks

16   like we're going to get into the decision about the buckets at

17   some point tonight.  We'll get into this claw back issue and

18   whether it's been divulged and what the status of it is and

19   whether this is going to be litigated tonight on this one

20   document.

21          The other documents seemed to be resolved concerning Mr.

22   Eckert.  What else?

23          **MR. QUINN:**  I think other issues that are still on the

24   table, Your Honor, there is the issue about the Brisbois thumb

25   drive and the contents of the document on the Brisbois thumb

1   drive.

2            We have made a motion in which we argue, Your Honor,

3   that with respect to Mr. Kinrich's charts, that they qualify as

4   summary exhibits under rule of evidence 1008.  That's one thing

5   that's also pending.

6            THE COURT:  Okay.  Let's clean some of this up tonight

7   for you then.

8            MR. QUINN:  If we have not already filed, we will

9   shortly, within minutes, have filed an offer of proof and request

10  to use documents with a subsequent witness showing that MGA late

11  produced documents.  MGA produced documents during trial as a way

12  of responding to the evidence that MGA has adduced that Mattel was

13  late in producing document or buried documents or produced them

14  late in trial.

15           THE COURT:  Okay.  What else?

16           MR. QUINN:  Those are the only things I know of, Your

17  Honor.  I have a copy, in case it would be handy for the Court, of

18  the protective order with the claw back provision if it would be

19  helpful.

20           THE COURT:  If you want to give it to me.  The more

21  things I have to read, the better back there.  It saves me coming

22  back and forth.

23           Now, what is loosely undecided for MGA?

24           MR. MCCONVILLE:  Your Honor, we have filed a brief with

25  the Court, and we supplemented it this week concerning the ability

a66c3eb4-db17-4d6b-8da9-41b4217e98ed

 1   to read the deposition testimony of Tyler Bradley.  The only thing

 2   the supplement raises with the Court is the fact that earlier in

 3   this case there was deposition transcript read of certain

 4   reporters who were, the Court found, to be unavailable, and so we

 5   were -- in addition to the record we made before concerning why it

 6   would be permissible in this situation to use the deposition of

 7   Tyler Bradley which is permissible under the rules.

 8            **THE COURT:**  What else?

 9            **MR. MCCONVILLE:**  We have some -- I don't know that there

10   are issues that need to be resolved, but we have received from

11   counsel a list of 12 or 13 rebuttal witnesses.  And if we could

12   get some focus on which ones are actually going to be --

13            **THE COURT:**  I'm going to see the questions to each one

14   quickly and I'll decide.  That's not your decision.

15            **MR. MCCONVILLE:**  Okay.

16            **THE COURT:**  But I doubt there's going to be very many

17   rebuttal witnesses.

18            **MR. MCCONVILLE:**  It would be helpful to know that in

19   advance because people are flying in.

20            **THE COURT:**  Better get them quick.  There's been no

21   representation by this Court that there were going to be rebuttal

22   witnesses.  So we'll see.

23            Concerning -- you have tapes of Brawer still outstanding

24   for a decision?

25            **MR. MCCONVILLE:**  Yes.

1           **THE COURT:**  What other evidentiary items?

2           **MR. MCCONVILLE:**  We had -- the Court may recall during

3    the testimony of Margaret Leahy, the Court originally admitted an

4    exhibit that was a -- I believe she characterized it as a design

5    drawing.  And it related to a character named Fiona from the Shrek

6    series.  And she identified it as a document that was a design

7    drawing that she received while she was at MGA.  And we originally

8    admitted that into evidence.  And at some point after she had

9    testified about it, you decided that it was no longer permissible

10   for the document to come into evidence.

11          **THE COURT:**  Get the exhibit for me.

12          **MR. MCCONVILLE:**  I have it here.

13          **THE COURT:**  What else?

14          **MR. QUINN:**  Jennifer isn't here, Your Honor, but we were

15   wondering -- we were hopeful that she'd be able to tell us, she

16   didn't know when we broke whether they would be showing Mr.

17   Eckert, whether there was intention to show Mr. Eckert Bratz

18   tangibles.  She said she didn't know.  Maybe that can be deferred

19   until she gets here.

20          **THE COURT:**  What else for MGA?  What else remains?  Give

21   me the tangible copy -- not the tangible but give me a printed

22   copy of that.

23          **MR. MCCONVILLE:**  I have it right here, judge.  Just

24   writing down the -- and I copied the transcript for the --

25          **THE COURT:**  Thank you very much.  Appreciate it.  Now

1   what else?

2          MR. MCCONVILLE:  Your Honor, earlier in the case -- and

3   I will get you the exhibit number -- there were certain

4   demonstratives that were admitted that we now seek to strike

5   because of the Court's ruling about -- the ruling has evolved as

6   the case has gone on.

7          THE COURT:  Probably Kinrich's.  I usually receive

8   those.

9          MR. MCCONVILLE:  There were some additional ones, Your

10  Honor, that I remember -- I believe they came in through Paula

11  Garcia two months ago.

12         THE COURT:  Get all that ready for me.  It saves you a

13  weekend potentially.

14         MR. MCCONVILLE:  We'll get that exhibit number.

15         THE COURT:  What else, Mr. Zeller?

16         MR. ZELLER:  One thing is that we still need a ruling

17  ultimately on the admissibility of the Bryant drawings.  The Court

18  had, way back when, directed the parties to deliver a binder of

19  drawings to Mr. Bryant to review prior to coming and testifying.

20  Mr. Bryant confirmed on the stand that he had done so and that

21  these were his drawings, his Bratz drawings.

22         The Court -- we moved for the admission of those

23  drawings.  The Court directed the parties to meet and confer and

24  reach a stipulation.  We have -- we sent a stipulation to MGA over

25  a month or so.  Probably longer now.  It's passed.  We have

Page 113

1    followed up, have not received a response.  We then filed a

2    request with the Court to simply move them into evidence.  And now

3    MGA is opposing it on a variety of grounds that we think are

4    pretty meritless.  But these are drawings that the witness already

5    indicated --

6              THE COURT:  Mushroom-shaped cloud.  See the exhibit

7    numbers, get out the exhibits.  Show me each one of these this

8    evening.

9              MR. ZELLER:  The Court has that binder.  It's the Bryant

10   drawing binder.  We'll provide more copies.

11             THE COURT:  Okay.  Now, remember I have returned all my

12   binders now.

13             MR. ZELLER:  Chris confirmed to me that that's one you

14   still have.

15             THE COURT:  Maybe I do, but you'll get me another one.

16   Otherwise, it won't be coming into evidence.  I think you'll get

17   it quickly for me now.

18             What else?  Why don't you make a list between the two of

19   you.  In other words, instead of just, judge, you haven't done the

20   following, you forgot, fine.  Let's get all this cleaned up if we

21   can.  So make a list, send me down that list this evening and

22   tomorrow.  Let's get it resolved.

23             Okay.  Now, how about all the other evidentiary items

24   with Kathy that you have been going over?  In other words, it's a

25   shame to bring you in on a Saturday and Sunday to ask these kinds

Page 114

1    of questions if we can get it done.  I'm trying to give time back

2    to counsel.

3           MS. HURST:  Your Honor, my understanding is with the

4    exception of the issues that we are just now discussing, that's

5    all resolved except for one thing, which is the label with which

6    the evidence is going to be presented to the jury.  We have asked

7    that the caption be Mattel versus MGA and MGA versus Mattel,

8    Mattel has refused and has labeled the box Mattel versus MGA.

9           THE COURT:  It will be Mattel versus MGA and MGA versus

10   Mattel.  Simple as that.

11          MS. HURST:  We'll prepare new labels.  Thank you, Your

12   Honor.

13          THE COURT:  Okay.  Now what else?

14          MS. HURST:  I have the numbers for those demonstratives.

15   Why don't we just print them out and assemble it so you know what

16   it is.

17          THE COURT:  I want it printed out, assembled.  That way

18   we're not wasting time.

19          But the most important decision you can tell me about

20   eventually from Mattel's perspective are the buckets.  Just a

21   final decision.

22          Second, it will tell me what to start doing in terms of

23   some special verdict forms to finish them off.  But I'm not going

24   to run through those again.  You each have copies of my latest

25   rendition.

1          **MS. HURST:**  On the verdict form, Your Honor, we filed an

2    additional couple of questions that did I want to call to the

3    Court's attention today.  We would like a question on mitigation.

4    There is about a 200 -- as the Court knows because it's seen

5    Mr. Malackowski's slides, that's about a $256 million swing

6    related to the My Scene line.  And what we would like to do is

7    make sure we know that in the event the jury awards a large number

8    for Mattel, whether they have taken mitigation into account or

9    not.

10          And so I think we filed two questions on that earlier.

11          **THE COURT:**  When I get through the majority of the

12   questions, I'll start considering a couple more from each of you.

13   But until that happens, until I get the basic 15 to 50 questions

14   down...

15          Now, how you want me to proceed is in your own hands.

16   And when you want me to come out this evening, that's up to you.

17          So I'm going to go back in chambers for a few moments

18   and I'll come back one more time, and you'll give me any further

19   directions at that time with the list or whatever as quickly as

20   you can.  If not, we'll be back later this evening.

21   (Whereupon there was a change in reporters and DENISE PADDOCK

22   reported the 5:00 P.M session.)

23                          -oOo-

24                      CERTIFICATE

25

a66c3eb4-db17-4d6b-8da9-41b4217e98ed

Page 116

1                    I hereby certify that pursuant to Section 753, Title 28,

2        United States Code, the foregoing is a true and correct transcript

3        of the stenographically reported proceedings held in the

4        above-entitled matter.

5

6        Date:  MARCH 31, 2011

7

8

9        MARIA DELLANEVE, U.S. COURT REPORTER
         CSR NO. 9132

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25