UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

- - - - - - -

# CERTIFIED TRANSCRIPT

MATTEL, INC., et al.,                )
                                     )
                    Plaintiffs,      )
                                     )
          vs.                        )
                                     )
MGA ENTERTAINMENT, INC., et al.,     )  No. CV 04-9049-DOC (RNBx)
                                     )     Day 43
                                     )     Volume 3 of 3
                    Defendants.      )
_____)


REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
SANTA ANA, CALIFORNIA
THURSDAY, MARCH 31, 2011


Denise Paddock, CSR 10199, CMRS, RMR, CRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
transcripts@ocrecord.com www.ocrecord.com
033111 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 43 V3
03/31/2011

**APPEARANCES OF COUNSEL:**

FOR PLAINTIFF MATTEL, INC., ET AL.:

      QUINN EMANUEL URQUHART & SULLIVAN LLP
      BY: JOHN QUINN
          WILLIAM PRICE
          MICHAEL T ZELLER
          Attorneys at Law
      865 S Figueroa Street, 10th Floor
      Los Angeles, CA 90017-2543
      213-443-3000

FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: THOMAS S McCONVILLE
          Attorney at Law
      4 Park Plaza, Suite 1600
      Irvine, CA 92614
      949-567-6700

      - AND -

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: ANNETTE L HURST
          Attorney at Law
      405 Howard Street
      San Francisco, CA 94105
      415-773-5700

      KELLER RACKAUCKAS LLP
      BY:  JENNIFER L KELLER
          Attorney at Law
      18500 Von Karman Avenue, Suite 560
      Irvine, CA 92612
      949-476-8700

**APPEARANCES OF COUNSEL (Continued):**


FOR CARLOS GUSTAVO MACHADO GOMEZ:

       LAW OFFICES OF MARK E OVERLAND
       BY: Mark E Overland
          Attorney at Law
       100 Wilshire Boulevard, Suite 950
       Santa Monica, CA 90401
       310-459-2830

       -AND-

       SCHEPER KIM AND HARRIS LLP
       BY: ALEXANDER H COTE
          Attorney at Law
       601 West Fifth Street, 12th Floor
       Los Angeles, CA 90071-2025
       213-613-4655

       ALSO PRESENT:

       MGA ENTERTAINMENT, INC.
       BY: JEANINE PISONI
          Attorney at Law
       16360 Roscoe Boulevard, Suite 105
       Van Nuys, California 91406


ALSO PRESENT:

       KEN KOTARSKI, Mattel Technical Operator

       MIKE STOVALL, MGA Technical Operator

CV 04-9049 DOC - 03/31/2011 - Volume 3 of 3

4

```
 1              SANTA ANA, CALIFORNIA; THURSDAY, MARCH 31, 2011

 2                        Day 43, Volume 3 of 3

 3                          PM SESSION.

 4              (Open court - jury not present.)

17:10  5              THE COURT:  We're on the record and while counsel's

 6      reading the discovery master report and recommendation re

 7      production of Michael Moore's -- or Mr. Moore's documents,

 8      I'm going to personally go get Nos. 27 and 82, Mr. Quinn, and

 9      hand those back to you now.

17:14 10              (Pause in the proceedings.)

11              THE COURT:  All right.  We're back on the record.

12              The court is personally returning 27 and 82 to

13      Mr. Quinn, so I have a record.

14              MR. QUINN:  Thank you, Your Honor.

17:14 15              THE COURT:  Now, in light of the special master's

16      recommendation, my thought is this:  On the 13 documents, my

17      view, because I've looked at them, is some of those are --

18      portions may be work product, portions may not, and I don't

19      want to simply hand over an entire document, making some

17:14 20      sweeping ruling.

21              So I've asked him to be present at 10:00 across the

22      street with a court reporter, with Mr. Moore and he can go

23      through the initial evaluation and discussion with Mr. Moore

24      about what's work product from Mr. Moore's perspective, what

17:14 25      isn't, make a recommendation back to the court while we're in
```

1   session.  Then he can come back across the street during the

2   lunch hour, notify the court what's occurring and that way I

3   can do two things at one time, quite frankly, and see what

4   his thoughts are.  He can also get Mr. Moore's testimony on

17:15 5   this as he goes.

6        Now, otherwise, I'm happy to do this myself.  I

7   just thought the special master had gone through this, made

8   the recommendation; I've read both of these.  I thought it

9   was an easier, quite frankly, and safer way to proceed, so I

17:15 10   had some expertise from Mr. O'Brien as well and I thought I'd

11   order Mr. Moore to be present at 9:30 because Mr. O'Brien

12   will be driving down from LA.

13        MR. QUINN:  Your Honor, I assume from reading the

14   opinion that the special master has also indicated that part

17:15 15   of the purpose of this will be to determine whether the

16   attorney-client privilege applies?

17        THE COURT:  Mostly work product, the necessity's

18   taking over, but we'll see.

19        Mr. Moore can make any statement he wants tomorrow.

17:15 20   I'm going to stay out of it for the time being.

21        MR. QUINN:  Okay.

22        THE COURT:  That's why I'm directing it to the

23   special master, so I don't want to get into that kind of

24   discussion right now.  I don't know.  If I was going to enter

17:16 25   into that I would simply have Mr. Moore down here now and do

1   it myself, but I think I would appreciate Mr. O'Brien

2   speaking to him initially.

3            MR. QUINN:  The only reason I say that, Your Honor,

4   is because in the paragraph beginning on 27, Page 4, carrying

17:16 5   over, the special master notes that Mattel has asserted the

6   attorney-client privilege as to these documents and he's

7   recommending an in-camera examination to determine whether

8   they are privileged as well.

9            THE COURT:  Uh-huh.  Well, would you like me to

17:16 10   conduct that?

11            MR. QUINN:  I -- I -- either procedure works,

12   Your Honor.  I -- I think it sounds efficient to have him

13   doing that while we're doing other things.

14            THE COURT:  That was my thought also.

17:16 15            MR. QUINN:  Right.

16            THE COURT:  So that's why I asked him to be down

17   here, but if anybody has any objection, let me know, and I'm

18   happy to take it on now.

19            Okay.  Let's let --

17:16 20            MR. QUINN:  I'm assuming this is still subject to

21   this court's review --

22            THE COURT:  Absolutely.

23            MR. QUINN:  -- and ultimate determination.

24            THE COURT:  That's why I asked him to come down to

17:17 25   Orange County rather than up to LA.

         1              Right.  Now, the -- the buckets, 7:00?

         2              MR. QUINN:  At 7:00, Your Honor.

         3              THE COURT:  It can be 8:00.  It doesn't matter, I

         4      mean, I'm not pressing you for it, but I can't go any

17:17    5      further.

         6              MR. QUINN:  We just need to get together.  We have

         7      only spoken about it briefly.  We just need to get together

         8      and take a recess, then.

         9              THE COURT:  Let me do some research, then.

17:17   10              MR. QUINN:  I'd really like to get the benefit of

        11      Mr. Price's thoughts, and he will be here, so I'd like to

        12      have him involved.

        13              THE COURT:  Sure, sure, sure.

        14              So what I'm saying is why don't I just take a

17:17   15      recess so Mr. Price is here.

        16              Oh, you mean he's coming back?

        17              MR. QUINN:  He is coming back here.

        18              THE COURT:  I've got 350 other cases I can work on,

        19      literally.

17:18   20              MR. QUINN:  I'm not suggesting the court ought to

        21      stay on the bench until he gets here.

        22              I'm just saying for purposes of our decision-making

        23      we'd like the chance to talk to him, and I know he'll be over

        24      here.  Otherwise, we're completely at the court's disposal.

17:18   25              THE COURT:  That's fine.

                      1              What am I going to do while I'm sitting here?

                      2              MR. QUINN:  Well, you said you had 370 cases.

                      3              THE COURT:  Now I'm confused.

                      4              Here's what I'm going to do.  I can sit here, wait

17:18  5       for Mr. Price and get your decision, or I can go back to the

                      6       back and start working on cases and give you time to talk to

                      7       Mr. Price and invite you back, or I can start taking on

                      8       different issues if you have them lined up and make some

                      9       decisions.

17:18 10             MS. KELLER:  And, Your Honor, Mr. Malackowski has

                    11       been ordered back for a 5:00 hearing and he's here and I'm

                    12       here.

                    13              THE COURT:  And the discovery's here.

                    14              MS. KELLER:  We don't know whether it is.  We

17:18 15       haven't received anything.

                    16              THE COURT:  It's here.

                    17              MR. MCCONVILLE:  We got something at 4:59.

                    18              MS. KELLER:  4:59.

                    19              I guess we did get something at 4:59, I'm hearing.

17:19 20             THE COURT:  Sure, it's here.

                    21              MS. KELLER:  Two pages.

                    22              MS. HURST:  Your Honor, can we raise the issue of

                    23       demonstratives in closing?

                    24              THE COURT:  No, no, let's stay with

17:19 25       Mr. Malackowski.  Let's get that information instead of

1    floating off to the next subject.

2              I'm going to take a recess for a moment, you're

3    going to get the information, you're going to look at it, and

4    we can excuse Mr. Malackowski, get to work, and tell me how

17:19  5    long it's going to take me to factor in all these.

6              But that's my first topic tonight.  Okay?

7              (Recess taken.)

8              THE COURT:  I want to see the October 4th, 2010,

9    deposition testimony of Mr. Eckert regarding this document.

17:34  10             MS. HURST:  Okay.

11             (Recess taken.)

12             THE COURT:  Have you had enough time to get those

13   transcripts?

14             MR. QUINN:  I believe she has, Your Honor.

18:09  15             MS. KELLER:  I think the Eckert testimony is here

16   on the side flagged with the orange sticky.

17             THE COURT:  Is that it right there?

18             Perfect.

19             And, Bill, have you guys had time to make the final

18:09  20   decisions?

21             Bill's going to go with the bucket?

22             MR. QUINN:  Yes, we have.

23             We're going with the new bucket.

24             THE COURT:  Okay.  Let's go on the record for a

18:09  25   moment.

UNITED STATES DISTRICT COURT

```
 1              Maybe I can get you home tonight.

 2              I'd like to get you guys to get some sleep, but --

 3              MS. KELLER:  I think she's in the restroom.

 4              Mr. McConville is going to go yell for her.

18:10  5        THE COURT:  Let me go back and read this transcript

 6       for a second, then.

 7              Give me five minutes while -- there's no rush.

 8              Hold on.

 9              (Recess taken.)

18:24 10        THE COURT:  All right.  Let's take three issues

11       immediately, and maybe I can get you home.

12              First I want to take the -- your decision about the

13       bucket system for single description of your trade secrets,

14       has all the information and the sketches and sculpts, and get

18:24 15       your initial thoughts without making a decision on that.

16              I don't want a final decision.  I just want to get

17       your thoughts, and then I'll express a couple of mine.

18              MR. QUINN:  And, Your Honor, I think we are

19       prepared to change the designation to what is set forth in

18:25 20       the court's minute order of March 30th.

21              THE COURT:  Let me talk to you about that for a

22       moment.

23              That may be an excellent decision.

24              You've got to remember, I was concerned

18:25 25       initially -- and, actually, I think proposed to you
```

1    informally on a Saturday two or three months ago that I was

2    concerned that the court might place itself in a position

3    that if a large verdict came in and the verdict couldn't be

4    adequately segmented out in terms of damages, that that might

5    be harmful to the case-in-chief in case Mattel prevailed.

6            One of the things I'm concerned about is that the

7    consequence of that decision has repeatedly been raised by

8    Ms. Hurst in her prior oral arguments.

9            And I've taken the time to make some notes tonight,

10   so let me just read them to you.

11           If you abandon the bucket system for a single

12   description of your trade secrets -- Mr. Zeller, Mr. Quinn --

13   as to all the information in the sketches and the sculpts,

14   that can make your copyright preemption argument much harder

15   in a posttrial and appellate process.

16           I don't know.  So that's not the court's thought,

17   it's just that you've got a preemption issue potentially

18   facing you up in the Circuit and, remember, I'm trying to

19   give you on the trade secret misappropriation the broadest

20   opportunity within the law, not the narrowest, and I think

21   I've started consistently with that all the way through.

22           So as you know, I've asked a specific question on

23   the special verdict form about whether MGA or Larian induced

24   Carter Bryant to disclose the sketches and sculpts.  And

25   though the Trade Secret Act makes you a misappropriator for

UNITED STATES DISTRICT COURT

1    other types of misconduct, like using information that you

2    know should not have been disclosed to you, I very

3    tentatively suspect that all these other theories of conduct

4    could be argued as a preemption or to be preempted by the

18:27 5    Copyright Act.

6          Now, that may not come to fruition, but you've got

7    to consider your panel en banc, the Supreme Court, and what I

8    don't want you to do is be trapped without a thoughtful

9    discussion amongst your team, because I don't know, coming

18:27 10   full circle, if I was right about the "buckets."  It was the

11   court's concern that I wanted the Circuit to be able to

12   reverse me on any -- any claim.  I want the Circuit to be

13   able to parcel out any damages with, hopefully, not touching

14   a verdict if the plaintiff or the defendant prevailed.

18:27 15         And I was worried about the case being sent back

16   with what I call the "avalanche" kind of verdict where the

17   Circuit just looked at it and said this is a distasteful

18   verdict.

19         So to tie into the facts of this case, if the jury

18:28 20   finds that Carter Bryant shared the Bratz' concepts with

21   Larian before Larian knew that Bryant conceived the concepts

22   at Mattel, then it could be argued that it would conflict

23   with the Copyright Act to basically require Larian to

24   dispossess himself of the concept.

18:28 25         Now, there's a fascinating discussion in that

 1    Mark Lemley article that I handed out, I think, about

 2    three -- three and a half weeks ago, and I took the time to

 3    give it to Ms. Hurst.

 4             You were there on that Saturday or Sunday.

18:28 5          MS. HURST:  Yes, Your Honor.

 6             THE COURT:  And I think I gave it to Mr. Zeller and

 7    I can't remember, Mr. Price or Mr. Quinn, if you were here;

 8    but it's an article about how the Trade Secrets Act was meant

 9    to be a one-stop shop for various theories of common-law

18:29 10   liability, and you've seen that a couple times with the

 11   rulings that the court's made, and you've seen that with

 12   Kim -- Judge Wardlaw's -- where's the trade secret

 13   misappropriation that she was asking about?

 14            So like a breach of fiduciary duty, conversion,

18:29 15   theft, et cetera, so these fiduciary tort duties have always

 16   been held to survive the Copyright Act preemption, but

 17   conversion has not.

 18            So I know you understand what I'm saying, but I

 19   don't want you to think that the court's pushing for either

18:29 20   one.  It was -- initially I thought you were right with one

 21   bucket.  I started thinking about the whole concept.  I

 22   started dividing out the buckets, without any responsibility

 23   on your part.  I was concerned that a large verdict then

 24   brought a sense from the Circuit that if, for no other

18:29 25   reason, than credible reasons, et cetera, that there would be

1    potentially an overturning or the law will closely scrutinize

2    the work, but I wanted to give the Circuit the opportunity to

3    say, Judge Carter, you're wrong on this, you're wrong on

4    this, but you're right on this.

18:30  5    So why don't you take your time with it, and the

6    more that I think about it you don't have to answer that

7    tonight.  Forget the 7:00.  But I need an answer, let's say,

8    by tomorrow and I'm trying to preserve the weekend, so take

9    one more night on it.

18:30 10    MR. ZELLER:  Thank you, Your Honor.

11    THE COURT:  So go to your appellate -- go to

12    Sullivan --

13    MR. QUINN:  Suzanne?  Kathleen?

14    THE COURT:  Yeah, Kathleen or -- or -- talk this

18:30 15    out with your appellate department also, because I'm giving

16    you the option.

17    Now, I'm not sure I'm right about the buckets --

18    you understand that -- and I think you started with the

19    argument, hey, it should be one, you know, concept here, and

18:30 20    I think that my initial reaction -- and I don't want you to

21    take credence from -- was a little bit of self-protection on

22    the court's part, so that hopefully the verdict wouldn't be

23    disturbed if there was a verdict.

24    MR. QUINN:  Understood, Your Honor.

18:31 25    THE COURT:  Okay.  You understand

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 03/31/2011 - Volume 3 of 3

```
 1    everything I've said?

 2              MR. QUINN:  Yes.

 3              THE COURT:  I'm not --

 4              MR. QUINN:  And perhaps we could --

18:31 5         THE COURT:  -- I'm not giving you the option right

 6    now, you understand, to MGA.  And I'm not saying I would even

 7    reduce it to a bucket, but I'm really thinking about it

 8    because otherwise I wouldn't be asking you for an initial

 9    decision.

18:31 10        And if you decide it's one bucket, I'm tentatively

11    and probably going to go that way, and MGA, I think, is going

12    to scream that they've shaped their case around the bucket

13    theory, but I think you may be right originally with your

14    original thought, you know, months ago.

18:31 15        But it also has the added consequence that if

16    you're hit with a verdict --

17              MR. QUINN:  Understood, Your Honor.

18              THE COURT:  -- it's going to be pretty difficult, I

19    think, for the Circuit to take a look -- in light of the last

18:31 20   opinion they wrote -- at a large number.

21              MR. QUINN:  Perhaps we could, if it would be

22    acceptable to the court, maybe try to come here tomorrow,

23    after having wordsmithed it a little bit and present

24    something building off of this.

18:32 25             THE COURT:  Okay.  Give me your best
```

1    option tomorrow.

2              MR. QUINN:  All right.

3              THE COURT:  You can see right now, though, I'm

4    holding to these buckets right now, okay, and right now I

18:32  5    still think it's a good concept.  In fact, it may be a

6    preference on my part, but I'm not sure I'm right.

7              MR. QUINN:  Thank you, Your Honor.

8              THE COURT:  And, Ms. Hurst, I'll invite you to join

9    that conversation tomorrow.  I want to hear the first

18:32 10    decision, though, from Mattel, and I'm going to keep a wide,

11    open mind on this.  Okay?

12              MS. HURST:  All right.  Well, I mean, I just

13    have -- and I hear the court, but I have to object to the

14    notion that they're going to come in here tomorrow night with

18:32 15    a new trade secret definition.  I just --

16              THE COURT:  Well, it's not going to be a new trade

17    secret definition.  That's not going to fly.

18              MS. HURST:  I will await the court's invitation to

19    put our objections on the record.

18:33 20              THE COURT:  It's a pretty thorough discussion, but,

21    really, it's been a real educational process for me.  And I

22    tell you, you really woke me up, Ms. Hurst, and I think

23    you've constantly foreseen the issue of this trade secret

24    misappropriation preemption issue concerning copyright.

18:33 25              And, frankly, it doesn't stop with the district

Case 2:04-cv-09049-DOC-RNB   Document 10372   Filed 04/04/11   Page 17 of 62   Page ID #:315132
CV 04-9049 DOC - 03/31/2011 - Volume 3 of 3

17

1    court.  Whatever I do is just the beginning of this process.

2    It's going to go to the Ninth Circuit and I'll betcha it's

3    going to go to the Supreme Court because both of you have the

4    resources and the intellectual capability to get it there.

18:33  5         So that's why I say let's take our time and sort it

6    out for appellate purposes.

7         And I think that my invitation for 7:00, there's

8    nothing magic about 7:00, but I can't give you your weekends

9    back until I get this done.

18:34 10         The second thing is, Mattel's failed to sustain the

11   burden of proving that the proposed exhibit, 9638, is

12   privileged.  Even if the document were privileged, that

13   privilege was waived when Mr. Eckert testified about the

14   document during his October 4th, 2010, deposition.

18:34 15         The case is *BoDeans Cone Company* -- B-o-d-e-a-n-s

16   Cone Company -- *LLC, versus Norse Dairy Systems LLC,*

17   678 Fed.Sup.2d 883.  It's a Northern District of Iowa 2009

18   case.  This is directly on point.

19         In that case the court concluded that any privilege

18:34 20   that attached to the document at issue had been waived when a

21   deponent testified at deposition about the document without

22   any objection or assertion of a privilege by his company's

23   lead counsel.

24         And that's found at Page 893.

18:35 25         The court concluded that the clawback request was

 1    too little, too late, because there's no point to allowing a

 2    party to seal the bag from which the cat has already escaped.

 3         Sounds familiar.

 4         Mattel here did not invoke the attorney-client

18:35 5    privilege or work product privileges during Mr. Eckert's

 6    deposition and Mr. Eckert proceeded to respond to questions

 7    about the document.  Only 17 days later, on October 21st,

 8    2010, was the first clawback request made to MGA, which

 9    Mattel reiterated in a letter on February 28th, 2011.

18:35 10        And -- and I looked, again, at the protective

 11   order.  It doesn't provide otherwise.  You ordered that the

 12   protective order is self-executing, but that order, in fact,

 13   only requires the return of supposedly privileged documents

 14   upon written request.  So even when a written request is

18:35 15   made, this isn't privileged.

 16        Now, I want to see Mr. Malackowski.  Where is he?

 17        I'm going to give you your transcript back for just

 18   a moment.

 19        MS. HURST:  Thank you, Your Honor.

18:36 20        THE COURT:  I think the rest of the evidentiary

 21   items can wait.

 22        There's no reason to take a night's sleep away from

 23   you concerning that.  I'd rather get you fresh tomorrow.

 24        But I want to see Malackowski for a moment.  I want

18:36 25   to get a time estimate on his part.

```
 1              Let me state for the record, Mr. Malackowski's

 2     here.

 3              Mr. Malackowski, have you received the information?

 4              MR. MALACKOWSKI:  I have, Your Honor.

18:36 5          THE COURT:  Now, I don't want you to rush that,

 6     okay?

 7              How long would it take you? so that I know when to

 8     reconvene.

 9              Saturdays and Sundays, fine.  I think counsel wants

18:36 10   to have you on the stand by Monday, and it was represented

 11    that you'd be their last witness.

 12             MR. MALACKOWSKI:  That's my understanding,

 13    Your Honor.

 14             THE COURT:  So this isn't a Friday --

18:36 15         MR. MALACKOWSKI:  No.

 16             THE COURT:  -- you don't have to say up -- by the

 17    way, for my record Mr. Wagner has paid us the same courtesy.

 18    I think I had 13 iterations and I actually got documents the

 19    morning of his testimony, with no fault of Mr. Wagner.

18:36 20         But you do have to prepare a report and Mattel has

 21    to be ready to go.

 22             So you tell me the time.

 23             MR. MALACKOWSKI:  So, I know what my staff would

 24    like.  We would like to provide the information on Monday,

18:37 25   work through the weekend; and you would like it --
```

```
  1              THE COURT:  No, that's too late.

  2              MR. MALACKOWSKI:  And you would like it to be ready

  3    to go Sunday, so we need to provide it on Sunday.

  4              THE COURT:  Sunday's about the drop-dead date.

18:37  5         MR. MALACKOWSKI:  We'll get it done.

  6              THE COURT:  Now, give me a time Sunday, because

  7    counsel's back in court -- for a court reporter -- and I want

  8    to hear from you.  I want to see the slides.

  9              MR. MALACKOWSKI:  I would like to have as long as

18:37 10   possible on Sunday.

 11              THE COURT:  6:00 in the evening?  5:00?

 12              Why don't you talk to your counsel right there.

 13    Why don't you go have a private conversation.

 14              (Discussion held off the record.)

18:46 15         (Recess taken.)

 16              THE COURT:  All right.  Counsel, then, we're back

 17    on the record and I went back and pulled the October 28th

 18    filing -- the October 28th, 2010, filing.

 19              Do you have that copy, Ms. Hurst?

18:51 20         MS. HURST:  Ms. Keller has it.

 21              THE COURT:  Ms. Keller, do you have it?

 22              MS. KELLER:  I am looking at it, Your Honor.

 23              It's on Page 1, and I'm going to refer to Line 7

 24    through 12.

18:51 25         Do you have that copy, Mr. Zeller?
```

1          MR. ZELLER:  We have it, Your Honor.

2          THE COURT:  Yeah.  First, my holding is as follows:

3          Mr. Malackowski, the methodology is sound

4     regardless of whether it incorporates Mattel's design and

18:52 5     development data.

6          Your head-start method is predicated on calculating

7     the difference in time between the toy fair and the time in

8     which the identical Mattel product was released.

9          Mattel -- I think Mattel's design and data

18:52 10    development does not affect this calculation.

11         In any event, segmenting from you to counsel now,

12    MGA's ex parte, which this court has granted in its entirety

13    last night, did not encompass design and development data and

14    was restricted to:

18:52 15         1.  Mattel's worldwide brand actuals, for example,

16    sales by SKU for 2010; and

17         2.  Mattel's worldwide sales by SKU from 2002

18    through and including 2006; and

19         3.  "All documents relating to Mattel's negotiation

18:53 20    with Kohl's in early 2005 resulting in Mattel's blocking the

21    sale of MGA products at Kohl's for two years."

22         I'm reading from Page 1 of Docket No. 9000, filed

23    October 28th, 2010; it's Page 2 of 11 in that document.

24         And I'm going to deem that you now have the

18:53 25    information that's sufficient to proceed in this matter.

18:53

18:54

18:54

18:54

18:54

18:55

```
 1            Now, in light of that, let me have an on-the-record

 2   conversation with what time we're going to reconvene on --

 3   well, I'm not certain it's even necessary except for, you

 4   know, credence for Mr. Price and Mr. Quinn, because remember

 5   this -- and I'll make a record of this -- no fault of

 6   Mr. Wagner's -- but I had 12 or 13 iterations of the report.

 7   There were apparently charts coming in at 2:00 in the morning

 8   and I received the last batch of charts at 7:15 in the

 9   morning of testimony.

10            Now, I just have to say, "moving targets."  That's

11   a moving target.  And so I know Mattel would like to make a

12   record of that.  I'd encourage you just to remain silent on

13   that point.  I'm joking with you.

14            MR. ZELLER:  I remember you talking about the

15   apples and oranges.

16            THE COURT:  Yeah, the apples and oranges.  Right.

17            But if we're going to reconvene we need all counsel

18   here, but I need a date and time.

19            Mr. Quinn, why don't you talk to Ms. Keller, you

20   decide how you govern -- or Mr. Price --

21            MR. PRICE:  I will.

22            THE COURT:  You two go talk.

23            Tell me the time.  If you need it, we'll reconvene.

24   If you don't, we won't, on that matter.

25            (Discussion held off the record.)
```

```
 1            THE COURT:  And while you're doing that let me

 2     address Mr. Quinn and Ms. Hurst for a moment.

 3            Another way of thinking of this, though, is that

 4     the Circuit isn't going to possibly even care about the

 5     buckets or nonbuckets.

 6            Another way of thinking of that is I'm trying to

 7     spin it out if I was lucky enough to be on the Circuit --

 8     which I'm not and I've never applied to, and by the way,

 9     they've never called me -- is the following:  The Circuit may

10     not care.  They may not care if you have a number of buckets

11     or you don't.  Mine's a more pragmatic approach.

12            You know, how is this looked at?  I don't know that

13     the Circuit would be influenced in terms of the preemption

14     issue or not.  I'll leave that to far wiser and smarter

15     people than me, but I wanted to raise that with you and I

16     thought that the deadline of 7:00 maybe didn't give you the

17     time to get back to your resources and the appellate

18     department and just talk that out thoroughly.

19            MR. QUINN:  Thank you.

20            THE COURT:  All right.  What are your thoughts?

21            MR. PRICE:  Your Honor, I don't think we need to

22     reconvene, but I would request, one, a chance to ask him in a

23     deposition about what he's done, because it's an entirely new

24     set of data.

25            THE COURT:  No, no, we'll do it right here.
```

Case 2:04-cv-09049-DOC-RNB   Document 10372   Filed 04/04/11   Page 24 of 62   Page ID #:315139
CV 04-9049 DOC - 03/31/2011   Volume 3 of 3

24

1           I get to hear it, okay?

2           So just tell me when.  We're not going to go

3     through a deposition.  We're all done with that.  We'll have

4     the deposition right in front of my presence because it will

18:56 5     be educational.

6           So you two get up again, approach each other, and

7     just tell me the time.

8           (Discussion held off the record.)

9           THE COURT:  Mr. Wagner's deposition basically took

18:56 10    place, for this record -- for my record, in this court also.

11    And all we have to do is look back at the number of

12    iterations, and I want this on the record, which we're never

13    ending.

14          MR. PRICE:  Your Honor, Ms. Keller is asking

18:57 15    Mr. Malackowski; but 6:00 p.m., Sunday might be the earliest.

16    I'm asking if maybe he can --

17          THE COURT:  No, 6:00 p.m., Sunday is fine.

18          MR. PRICE:  But she's asking if we might be able to

19    do it earlier.

18:57 20          THE COURT:  No, we don't have to do it earlier.

21    Give me the time.

22          MS. KELLER:  Yeah, his people haven't even looked

23    at data yet.

24          THE COURT:  6:00 p.m., Sunday.

18:57 25          MS. KELLER:  Or Monday morning.

CV 04-9049 DOC - 03/31/2011 Volume 3 of 3

```
 1              THE COURT:  No, no, we're back in session Monday

 2      morning.

 3              The jurors are coming back Monday.

 4              Now, I now have the right to switch it.  Up to this

 5      time I promised you that I would read the instructions first,

 6      but that was on the condition that we were arguing on

 7      Thursday.  So let's look at the time.

 8              111 hours and 39 minutes plus 108 hours and

 9      4 minutes.

10              What is that, Mr. Price?

11              MR. PRICE:  Oh, God, 219 hours and 4 minutes?

12              THE COURT:  Well, I happen to have the calculation

13      right here.

14              MR. MCCONVILLE:  I like Mr. Quinn's math better,

15      Your Honor.

16              MR. PRICE:  219:43.

17              THE COURT:  It's about, oh, let's just round it

18      off.

19              Isn't it around 220 hours, roughly?

20              So let's just calculate that out.

21              Let's just say that we get with Mr. Eckert on the

22      stand tomorrow, three or four hours at the most, and then

23      Mr. Malackowski can't proceed until Monday, and Mr. Moore, we

24      may have to recess for literally until Monday so that I can

25      get the information, whatever that is to counsel.
```

|      |    |                                                                        |
|------|----|------------------------------------------------------------------------|
|      | 1  | Now, if Mr. Moore and Mr. Price get started -- I                        |
|      | 2  | mean Mr. O'Brien get started at 10:00, maybe I've got it by              |
|      | 3  | noon.                                                                    |
|      | 4  | I mean, it's pretty simple, quite frankly.                              |
| 18:59| 5  | I'm just a little reluctant to give over the entire                     |
|      | 6  | document.  I want to see what's work product and have a good             |
|      | 7  | record.  But there are going to be some dates and times                 |
|      | 8  | coming to you.                                                          |
|      | 9  | MS. KELLER:  Your Honor --                                              |
| 18:59| 10 | THE COURT:  Now, let me do the higher math now.                         |
|      | 11 | Let's just say for Mr. Eckert, how long do you                          |
|      | 12 | think on direct?                                                        |
|      | 13 | MS. KELLER:  Three hours.                                               |
|      | 14 | THE COURT:  Three hours.                                                |
| 18:59| 15 | And on cross?  You don't have an idea right now?                        |
|      | 16 | MR. QUINN:  I don't, Your Honor.                                        |
|      | 17 | THE COURT:  Yeah.  Let's just say we roughly cover                      |
|      | 18 | four to five hours tomorrow.  Now let's calculate that out              |
|      | 19 | for a moment.                                                           |
| 18:59| 20 | That's 224 hours, approximately; right?  Minus 240,                     |
|      | 21 | leaves about 16 hours, doesn't it?                                      |
|      | 22 | 16 divided by 3 -- you see, we've gone through                          |
|      | 23 | Monday, Tuesday, Wednesday.  You're going to be arguing                 |
|      | 24 | Thursday.  That means I'm instructing on Friday.                        |
| 19:00| 25 | MR. PRICE:  Well, do you know what the court is                         |

         1    going to instruct, though, so we can say we believe --

         2              THE COURT:  Yeah, we believe.

         3              Now, if we can get to it earlier I will, but to

         4    have the jury start arguing on Friday is hard.

19:00    5              Unless you both reach a stipulation again -- if you

         6    really want me to instruct, then I'll have the jury argue on

         7    Friday.  We can always do that.  But I just don't want you

         8    looking at a jury, you know, Friday.

         9              MS. KELLER:  Your Honor, I think we have to

19:00   10    instruct first.

        11              I don't see how we make a closing argument without

        12    knowing what the jury instructions are.  I really don't.

        13              THE COURT:  Okay.  Here's what we'll do.

        14              We'll be arguing Friday, then, potentially.

19:00   15              I'll hold to it, then.  I hope maybe I can instruct

        16    maybe on Wednesday evening.  Maybe I can do that.

        17              So we'll see, and it depends upon rebuttal.

        18              Now, what else do you want to do this evening?

        19              MR. QUINN:  Your Honor, I, again, this issue of

19:01   20    Mr. Eckert taking the stand, and Ms. Keller won't tell me

        21    whether she intends to use any Bratz exhibits.  Every witness

        22    we've disclosed exhibits.

        23              THE COURT:  Yeah, I've got to see exhibits.  That's

        24    been the rule.

19:01   25              MS. KELLER:  I -- then I won't use Bratz exhibits

```
 1    if I have to --
 2              THE COURT:  Well, you can lay back a little bit.
 3    I've given both sides a little opportunity to lay back.  It
 4    depends -- usually you've told me in-camera.
19:01 5              Mr. Quinn has had an in-camera session with me.
 6    Why don't I have an in-camera session with you, and all I
 7    care about is such an unfair advantage, that's all.
 8              So I paid the courtesy to Mr. Quinn.  Why don't we
 9    have a little in-camera session with you.
19:01 10             MS. KELLER:  Your Honor, those have been as to
11    exhibits that haven't been previously disclosed.  We're not
12    talking about using any exhibits that haven't been previously
13    disclosed or in evidence.
14              I mean, they basically just want a signpost to what
19:02 15    I'm planning to do.
16              MR. QUINN:  We've done that with every witness,
17    Your Honor.
18              THE COURT:  No, we didn't.  Remember, Mr. Quinn?
19              MR. QUINN:  There was one where we said, we had
19:02 20    what?  Two exhibits that were intended for impeachment, and
21    we did that in-camera.  And I don't hear her saying that.
22              THE COURT:  Don't I have a right to listen to her
23    in-camera?  Did I listen to you in-camera?
24              MR. QUINN:  You did.
19:02 25             THE COURT:  I did.
```

UNITED STATES DISTRICT COURT

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | MR. QUINN:  I don't hear her saying this is                          |
|       | 2  | impeachment.  If she's saying impeachment, of course.                |
|       | 3  | THE COURT:  Okay.  Mr. Quinn and Counsel, would you                  |
|       | 4  | wait outside.  I want to speak to Ms. Keller for a moment.           |
| 19:02 | 5  | MR. MALACKOWSKI:  Can I go to work?                                  |
|       | 6  | THE COURT:  You should go to work.                                   |
|       | 7  | MR. MALACKOWSKI:  Thank you.                                         |
|       | 8  | THE COURT:  We'll be reconvening on Sunday at 6:00.                  |
|       | 9  | (Discussion held off the record.)                                   |
| 19:03 | 10 | THE COURT:  All of this other crew, they need to                    |
|       | 11 | go.  I don't know who all of these people are.                      |
|       | 12 | MR. MCCONVILLE:  They're lawyers who work for us                    |
|       | 13 | and one who worked for Mr. Malackowski.                             |
|       | 14 | THE COURT:  This is off the record for a moment.                    |
| 19:03 | 15 | (Discussion held off the record.)                                   |
|       | 16 | THE COURT:  All right.  Would you invite your                       |
|       | 17 | esteemed opponents in.                                              |
|       | 18 | (Pause in the proceedings.)                                        |
|       | 19 | THE COURT:  In fact, better yet, do you want a                      |
| 19:04 | 20 | record of that?                                                     |
|       | 21 | Mr. Quinn, did we have a record of our in-camera?                   |
|       | 22 | MR. QUINN:  I don't think so.                                       |
|       | 23 | THE COURT:  Okay.                                                   |
|       | 24 | We're back on the record.                                          |
| 19:04 | 25 | I've heard from counsel.                                           |

1    It's entirely appropriate.

2           It's not a surprise, so you're --

3           MR. QUINN:  We'll just conclude it's impeachment

4    material?

19:04  5           THE COURT:  It's -- well, yes, it's --

6           MR. QUINN:  Because that's what we were held to.

7    That was the standard.

8           THE COURT:  Yeah, it's -- it's kind of a

9    combination.

19:05 10           It's -- I don't know how to classify it.

11           Okay.

12           MR. QUINN:  I wish we had known what this other

13    category is.

14           THE COURT:  Trust me.  You're not disadvantaged.

19:05 15    Okay?  You are not disadvantaged.

16           MR. QUINN:  Okay.

17           THE COURT:  It's nothing that will shock the

18    conscience.

19           Okay.  Now, what else do you want to do tonight?

19:05 20           MR. QUINN:  I think we've provided the court with

21    the list.

22           THE COURT:  The list.

23           And those are things that I can decide literally

24    and get back to you on without having you struggle through an

19:05 25    evening session.  I can go to work back there.

UNITED STATES DISTRICT COURT

1           MR. MCCONVILLE:  Did you give him a list or --

2           MR. QUINN:  I did.

3           MS. KELLER:  And the only other thing, Your Honor,

4     is that the court had asked -- told us that we could use

19:05 5     demonstratives if we both agree.

6           MGA does not wish to use demonstratives in closing

7     argument.

8           THE COURT:  Okay.

9           MS. KELLER:  We just want to use trial

19:06 10    transcript --

11          THE COURT:  You can use demonstratives in closing

12    arguments.  They're not going into the jury.

13          You can put up demonstratives to make your point.

14    They can't go back to the jury.  They are not being received

19:06 15    into evidence.

16          MS. KELLER:  No, I understand that.  I thought the

17    court was saying we couldn't use them in closing argument

18    unless we both agreed.

19          THE COURT:  No, no.

19:06 20    MR. COTE:  That's what I thought.

21          THE COURT:  I didn't.  I never intended that.  You

22    can use demonstratives in closing, but they don't go into

23    evidence.  I've had a consistent opinion that demonstratives

24    don't go into evidence.

19:06 25    MR. COTE:  Okay.

1           THE COURT:  All right.

2           MR. MCCONVILLE:  I'm going to give you the list.

3           (Discussion held off the record.)

4           THE COURT:  Let's get you out of here.  Okay?

19:07 5     Why don't you go get some sleep tonight because

6      tomorrow's a big day.  And it sounds like we'll be in session

7      from three to five hours.

8           But I may have to report back and if I release the

9      documents to you, Ms. Keller, I may have to take another

19:07 10    recess.  There are really 13 different documents and they're

11     pretty easily absorbable.  You'll make the call.

12          If you want that to be on Monday, that's fine.

13     Okay?

14          MS. KELLER:  I appreciate that, Your Honor.

19:07 15    THE COURT:  All right.  Well, thank you very much.

16          Good night.

17          MR. QUINN:  Your Honor, could I say one thing on

18     the record?

19          THE COURT:  We're still on the record.

19:07 20    MR. QUINN:  You know, depending upon the ruling

21     with respect to Mr. Moore's notes tomorrow --

22          THE COURT:  Uh-huh.

23          MR. QUINN:  -- I just want to flag the possibility

24     that we may -- if some of those are ordered released, we may

19:07 25    want to seek Ninth Circuit review on an emergency writ

1    application.  We may be asking the court to stay the order --

2              THE COURT:  Certainly.

3              MR. QUINN:  -- pending that.

4              Just as a -- it's a kind of a heads up.

19:08  5       THE COURT:  Okay.

6              One other thing, then, while we're on the record:

7              What's the concern about 18817?

8              (Laughter.)

9              THE COURT:  I've been struggling with that

19:08 10   throughout the whole trial, and so let me tell you what it

11   is.

12              It's Larian's testimony of March 15th, 2011.  It's

13   the Fiona.

14              I'm inclined to receive that now.  I didn't

19:09 15   comprehend that.  It's a design.  It's what a structured

16   doll's supposed to look like.  I'm going to receive that into

17   evidence.

18              (Exhibit(s) 23797, received.)

19              MR. QUINN:  Isn't it just a demonstrative,

19:09 20   Your Honor?

21              THE COURT:  No, it's a sketch.  It's got lines on

22   it.

23              MR. QUINN:  But it was offered as a demonstrative,

24   Your Honor, and what does it have --

19:09 25       THE COURT:  No, it's not.

UNITED STATES DISTRICT COURT

1    MR. MCCONVILLE:  It was offered as a demonstrative

2    to your witness.  Leahy testified to it.

3    THE COURT:  Leahy testified to it.  It's what a

4    well-designed doll is supposed to look like.

19:09  5    All right.  23797.

6    MR. QUINN:  I'll buy it, Your Honor.

7    THE COURT:  I just want you to see what I've been

8    struggling with the last three months.

9    MS. HURST:  Yeah, that one we -- we actually don't

19:09 10    think it was ever admitted.  It's a demonstrative.  We just

11    want to make sure, and I have copies of it.

12    THE COURT:  Give it to the opposition.  It's a

13    demonstrative, I believe, from memory, and I don't think it

14    should be received.  It was a -- just as I don't think

19:10 15    Kinrich is coming in.

16    Now, these were comparison charts, weren't they?

17    MR. PRICE:  Yes.

18    THE COURT:  Yeah.  I've got those and I'll take

19    them back.

19:10 20    The use of demonstratives in closing argument;

21    that's fine.  You can trace through your damages expert if

22    you want to again.  You can use the --

23    MS. HURST:  No, we don't want to.

24    THE COURT:  I know you don't.

19:10 25    MS. HURST:  There's no agreement to use

UNITED STATES DISTRICT COURT

1    demonstratives in closing.

2            THE COURT:  I know they're not and I'm allowing

3    demonstratives to be used -- charts.

4            MS. KELLER:  Your Honor, I'm -- I mean, ordinarily

19:10 5   no demonstratives used in closing ever go back to the jury

6    because they're not evidence, so when the court said --

7            THE COURT:  They're not going back to the jury.

8            MS. KELLER:  Right.  So when the court said that

9    you weren't going to allow demonstratives unless both sides

19:11 10  agreed to it --

11           THE COURT:  That was evidence.

12           MS. KELLER:  Right.

13           THE COURT:  There is a complete disconnect, I can

14   see here, and it has to be my fault.

19:11 15          I contemplated, as in most trials, that counsel

16   oftentimes will actually stipulate, even though it's a

17   demonstrative, because it's beneficial to both sides.

18           In most normal cases, that occurs, even though it's

19   not an evidentiary-appropriate call; because usually both

19:11 20  sides finds that it's beneficial for their damages experts or

21   even comparison charts.

22           But oftentimes demonstratives are used for closing

23   argument.  Some of those, in fact, are just argument on a

24   board with underlining.  That's a demonstrative to make a

19:11 25  point, or flashing up a PowerPoint presentation with your

 1    arguments highlighted.  That's actually a demonstrative.

 2            MS. KELLER:  Is there any limitation on the number

 3    of slides, Your Honor, or is it unlimited?

 4            MR. PRICE:  Three hours.

19:12  5            THE COURT:  I don't know why I would limit you.

 6            MS. KELLER:  Okay.

 7            THE COURT:  I don't know why -- I don't know why it

 8    would get into that kind of discussion over 32 or 84.

 9            MS. HURST:  So just to be clear:  Like, any kind of

19:12 10    a PowerPoint, anything goes?  Is that the court's --

11            THE COURT:  Well, there's the problem.  That's a

12    good point, Ms. Hurst, because that means, once again, I'm

13    back to the same problem I had on opening statement, which I

14    haven't thought through, and that is I'd have to look at it,

19:12 15    wouldn't I?

16            And that's the agreement that you could never reach

17    in your opening statements.

18            MR. COTE:  Which is why I think we thought you were

19    requiring us to agree whether it would be done.

19:12 20            THE COURT:  I'm going to think that out again this

21    evening because I, frankly, don't have the time to sort

22    through your various PowerPoint presentations.

23            MR. COTE:  That's right.

24            MR. PRICE:  Your Honor, we used demonstratives in

19:12 25    trial, certainly those we could use.  You've seen those.

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10372   Filed 04/04/11   Page 37 of 62   Page ID #:315152
CV 04-9049 DOC - 03/31/2011 Volume 3 of 3

37

1        And secondly, of course, I think Ms. Keller was

2   saying, in terms of testimony, actual exhibits, I mean, I

3   don't think we're counting those as demonstratives, that

4   is --

19:13 5        MS. KELLER:  That's right.  We agree with that,

6   and, in fact, I thought all along what we were going to be

7   doing was be using trial transcripts, jury instructions and

8   exhibits that have been admitted in closing.  But the

9   demonstratives, when we did the opening, I know the court was

19:13 10   going -- originally said you -- you have to agree, and I had

11   said I don't want any, and then the court said I think that

12   might be unfair to Mattel because Ms. Glazer had earlier

13   indicated to them that she would agree to use demonstratives;

14   and so because of that the court allowed.

19:13 15        THE COURT:  You're refreshing my recollection.

16   That became the whole problem.

17        MS. KELLER:  Right.  And then this time the court

18   said, "okay, there's no more problem with a new lawyer coming

19   into the mix and -- and -- and, you know, basically them

19:13 20   getting sandbagged, so I'm telling you again, unless you both

21   agree on demonstratives, there aren't going to be any, but

22   you've got to agree," and so I wanted to make sure well

23   before Thursday.

24        THE COURT:  Let me go back and think about it

19:14 25   because there were certain demonstratives shown.

1          MR. QUINN:  Your Honor, ones that the jury has

2     already received -- demonstratives.  We understand they're

3     not going to go back to the jury room, but this is a closing

4     argument now.  It's not like the opening statement.

19:14 5          THE COURT:  Let me just go back and think it out.

6     Okay?

7          Give me a couple minutes.

8          Your 205D handout form for you.

9          The buckets of trade secrets were still out.

19:14 10          Moore's notes are still out for consideration.

11          Carter Bryant's drawings, you've got a wholesale

12     request for all of the drawings.

13          Was it 302?

14          MR. ZELLER:  I -- unfortunately I don't have the

19:15 15     binder, but 302, I believe, is already in evidence.  Then

16     what this was, was an additional collection of Carter Bryant

17     Bratz drawings that Mr. O'Brien reviewed --

18          THE COURT:  Show me the transcript tomorrow.  Just

19     bring it in tomorrow morning.  It's something I can do after

19:15 20     court.  My guess is we're going to have a short day, anyway.

21          Brisbois thumbdrive documents are still

22     outstanding.  For the life of me I still don't understand

23     why, with my generous offerings to counsel, Brisbois never

24     testified at trial.

19:15 25          Kinrich demonstratives are still outstanding and

UNITED STATES DISTRICT COURT

```
 1    evidence of late-produced products are still outstanding from

 2    MGA's perspective.

 3            All right.

 4            Well, why don't you go get some rest tonight, then,

 5    and we'll see you at 8:30 tomorrow.

 6            MR. ZELLER:  Thank you.

 7            MR. QUINN:  And the court saw that we had some

 8    other items on your list as well.

 9            THE COURT:  I'm going to read them into the record

10    so there's no doubt.

11            Mattel's request -- and I have them in the back --

12    but now they've been attached.

13            Admission of Bryant drawings, that binder was

14    submitted to me and I have it sitting right on my floor back

15    there.

16            Admission of the Kinrich summary exhibits pursuant

17    to 1006 of the Evidence Code.

18            And then you said you'd filed a supplemental brief.

19    I hadn't read that yet.  I'll read it tonight.

20            We have admission of the Brisbois thumbdrive and

21    the seven -- I thought it was six documents?

22            MR. QUINN:  Six, seven.

23            THE COURT:  It's six.

24            Look again.

25            You've got them here and you've also got them in
```

                    the -- on the page right at the bottom.

                             MR. QUINN:  It's seven, Your Honor.

                             THE COURT:  Seven?  Seven?

                             MR. QUINN:  Seven.

19:16                        THE COURT:  My apologies.  Okay.

                             You've got redacted articles authenticated by

                    Plunkett and the binder's been submitted to the court.

                             MR. ZELLER:  Yes.

                             THE COURT:  They can read that.  But that's

19:16               something we can do on Sunday if we have to reconvene.

                    There's no reason to run you in and out of court on something

                    like that.

                             The request that MGA produce Witness Plevan or the

                    equivalent concerning time and source regarding MGA's

19:17               knowledge regarding Sal Villasenor's fair-surveillance

                    activities.

                             The request that MGA produce witnesses to testify

                    about MGA's investigators to use false credentials to gain

                    access to competitor's showrooms at Hong Kong toy fair,

19:17               Exhibit 13742-0003 at Paragraphs 4 and 5, copy of exhibit

                    submitted.

                             Offer of proof of request to examine witness

                    concerning MGA's late production of documents, including

                    production mid-trial.

19:17                        Okay.

Case 2:04-cv-09049-DOC-RNB   Document 10372   Filed 04/04/11   Page 41 of 62   Page ID #:315156
CV 04-9049 DOC - 03/31/2011 - Volume 3 of 3

41

```
 1              MR. QUINN:  And, Your Honor, you skipped -- the
 2     court skipped one about the Bous- -- MGA's Bousquette
 3     surveillance video.
 4              THE COURT:  My apologies.
19:17  5        Request that MGA be ordered to introduce Bousquette
 6     surveillance video.
 7              Okay?
 8              MR. COTE:  Thank you, Your Honor.
 9              THE COURT:  Finally, when are we going to hear the
19:17 10   Rule 50?
11              When would Mattel be prepared on this issue?
12              MR. COTE:  You said Saturday.  That's fine with us,
13     Your Honor.
14              THE COURT:  Maybe Saturday morning, real early,
19:17 15   we'll get you out of here.
16              MR. QUINN:  That would be great.
17              MS. HURST:  We're going to file the rest of ours
18     before then as well.  They may need time to respond but we
19     may wish to bring a couple of points to the court's attention
19:18 20   at that time.
21              THE COURT:  Welcome to -- my guess is that trade
22     secret misappropriation, copyright --
23              MS. HURST:  No.  I understand.  We're --
24              THE COURT:  -- are going to the jury, minimally.
19:18 25        Intentional interference appears to be --
```

```
 1              MS. HURST:  We're focused a little more on the lack

 2      of any ability for a reasonable juror to find clear and

 3      convincing evidence of anything that would result in a second

 4      phase.

19:18  5              We definitely want to -- we definitely want to have

 6      a serious conversation on that.

 7              THE COURT:  When would you like to do that?

 8              MS. HURST:  Would Saturday be all right?

 9              THE COURT:  Saturday's fine.

19:18 10              MS. HURST:  And then I think we want to talk about

11      damages on intentional interference too.

12              We really want to focus on that.

13              THE COURT:  Sure.  You want the mitigation?

14              MS. HURST:  And the mitigation on the special

19:18 15      verdict.

16              THE COURT:  Well, now, let's go through the special

17      verdicts for a moment.

18              I mean let's talk about that for a moment.

19              You've got the modification that I've made.  What

19:19 20      are your objections to them?  I mean, thus far, besides

21      additions that you'd like to make?

22              MS. HURST:  I think I may be a little confused

23      about what the court's referring to.

24              THE COURT:  Special verdicts.

19:19 25              MS. HURST:  Is there a new version?
```

CV 04-9049 DOC - 03/31/2011 - Volume 3 of 3

43

```
 1              THE COURT:  I thought I gave them to you.

 2              MS. HURST:  I don't think so, Your Honor.

 3              THE COURT:  I've got them sitting on my floor.

 4              I'll be right back.

 5              Just a minute.  Why don't you look at them tonight,

 6         then.

 7              I thought -- I apologize.  I thought I handed them

 8         to you.

 9              MS. HURST:  None of us have seen it, sorry,

10         Your Honor.

11              THE COURT:  Why don't I give you this version

12         whether you've got it or not.

13              MS. HURST:  Thank you.

14              (Recess taken.)

15              THE COURT:  Okay.  Ready.

16              Let me give these to you and tell you my innermost

17         thoughts for a moment.

18              Okay.  We're on the record.  I'm going to

19         distribute to you some special verdict forms that are

20         tentative, but I'm deeply concerned about -- strike that.

21              I'm concerned about the way this went to the jury

22         in phase 1.

23              Let me give you an example, Mr. Quinn, Ms. Keller,

24         Ms. Hurst.  Come over here for a moment.

25              MR. MCCONVILLE:  Can I come?
```

19:19 (line 5)
19:19 (line 10)
19:23 (line 15)
19:23 (line 20)
19:24 (line 25)

UNITED STATES DISTRICT COURT

1          THE COURT:  Well, everybody can come over.

2          When this went to the jury in phase 1, I don't

3     understand why the original drawings aren't just going to the

4     jury.

19:24 5          So what the jury was getting was this avalanche

6     effect, and I'm just going to give you an idea.

7          Can somebody please tell me the difference between

8     Exhibit 50035 and Exhibit 757 on Halladay?

9          Now, we can go through this piece by piece, but

19:24 10    there are so many duplications that what you've got is this

11    avalanche effect and I don't understand why we're not working

12    off the original drawings, and I have no idea why this went

13    to the jury.

14          It just looks like a telephone book, which is

19:24 15    extraordinarily prejudicial.  So dig in.

16          Now, with your discerning eye, tell me the

17    difference.

18          MR. ZELLER:  I mean --

19          THE COURT:  No, no, no.  Not "I mean."  I'm asking,

19:25 20    tell me the difference between these two exhibits, and I'll

21    show you 20 more.

22          Now, step up there.

23          MR. ZELLER:  The issue is not -- from our

24    perspective -- these do look the same, but that's not --

19:25 25          THE COURT:  They are the same.

UNITED STATES DISTRICT COURT

1          MR. ZELLER:  They are the same.

2          I mean, in terms of how they appear, they are the

3     same; but my point is -- and this actually hearkens back to

4     ultimately an issue with MGA and --

19:25  5          THE COURT:  Louder so my court reporter has it.

6          MR. ZELLER:  This ultimately goes back to an issue

7     that MGA and Bryant created.  In terms of the history here,

8     what we were -- what MGA and Bryant produced for years were

9     poor black and white copies, also very scattered,

19:25 10     disparate --

11          THE COURT:  That's not an issue for the jury to be

12     concerned with.

13          That may be a struggle between you and counsel.

14          MR. ZELLER:  Eventually MGA produced and Bryant

19:25 15     produced some originals.

16          They have not produced all of the originals, so

17     there are not corresponding originals through no fault of

18     Mattel's for all these drawings.

19          MGA and Bryant have not produced them.

19:26 20          So there is no question that some of them were

21     created.  Some of them were embodied and copied.  Some of

22     them were produced by different sources.

23          THE COURT:  I understand, but tell me the

24     difference between 052 and 620001.

19:26 25          MR. ZELLER:  No, those are the same.

CV 04-9049 DOC - 03/31/2011 - Volume 3 of 3

1           THE COURT:  Okay.

2           MR. ZELLER:  But, again, part of it has to do with

3    the fact that also --

4           THE COURT:  I'm just joking now.

19:26 5           Tell me the difference between 750074 and

6    Exhibit 50111.

7           You see, I go to sleep reading this stuff.

8           MR. ZELLER:  Well, those are different.  Those two

9    are different.

19:26 10          You'll see that there is the --

11          THE COURT:  Okay.

12          MR. ZELLER:  -- there is the notary stamp.

13          THE COURT:  Good.

14          MR. ZELLER:  There is different timing on it.

19:26 15          THE COURT:  Those two are different, but what we

16   may be doing is spending a weekend taking out duplicates.

17          MR. ZELLER:  Well, and I think to some degree we

18   can certainly do that.

19          THE COURT:  Oh, no, we'll do it together.  That

19:27 20  way -- well, now, just a moment.  Just a moment.

21          All right.

22          The difference between 50112 and 620013?

23          MR. ZELLER:  Those are the same, except people put

24   different exhibit numbers on them and some of these, the

19:27 25  reason why there are duplicates, is because they reference

1  different exhibit numbers and that's how people identified

2  them.

3            THE COURT:  Now, I apologize to you.  I picked the

4  wrong one.

19:27  5       The difference between -- where is it? -- oh, here

6  it is -- 1328001 and 1328002?

7            MR. ZELLER:  Those are the same except one's a

8  photograph and one's a photocopy.

9            THE COURT:  Oh, here it is.

19:28  10      I'm sorry.  I picked the wrong one.

11           The difference between 10033 and 0003 and 10330004?

12           MR. ZELLER:  In order to totally compare them I'd

13  actually have to take these out.

14           THE COURT:  Take them out.

19:28  15           MR. ZELLER:  I mean, I --

16           THE COURT:  Mike, it's you and me comparing these.

17           MR. ZELLER:  Yeah.

18           THE COURT:  Maybe all day Saturday and Sunday.

19           MR. ZELLER:  They are the same.

19:29  20           THE COURT:  The point is, it's -- it's dazzling.

21           I've got what looks to be the New York telephone

22  book in front of me and so many of these are duplicates I

23  don't even know where to start.

24           MR. ZELLER:  Well, that's partly -- it's for a

19:29  25  variety of reasons.

UNITED STATES DISTRICT COURT

1          Some of them are purely historical, it's partly,

2     too, because people identified them by different numbers.

3          Sometimes people have testified.

4          I mean, it was more of an issue during phase 1, of

19:29 5     course, because if you were -- unlike in your court,

6     Your Honor, there was deposition testimony that was read and

7     sometimes people would refer to a different exhibit number,

8     so --

9          THE COURT:  Would you like some deposition

19:29 10    testimony read?

11          MS. HURST:  Yes, Tyler Bradley.

12          MR. PRICE:  Actually, sometimes it mattered who had

13    them.

14          So, for example, Steve Linker, you know, I had --

19:29 15          THE COURT:  I know.  But the problem is the jury

16    shouldn't be getting duplicates which give the impression of

17    volume when it's not there.

18          So how do -- Mr. Quinn's going to make the eventual

19    decision.  This may be resolved very quickly.  Okay?

19:30 20          MS. HURST:  May I address also on this issue?

21          THE COURT:  Yeah.

22          MS. HURST:  The other problem is they've taken

23    things that are really part of a single document and divided

24    them all up, so ten different tries.

19:30 25          I mean, Exhibit 1 is a great example.

1          Exhibit 1 is ten pages of the pitch book that all

2     go together and it's all spread out.

3          THE COURT:  So what would your suggestion be on

4     MGA's part?  And I think I know Mattel's position.

19:30  5          What would your suggestion be?

6          MS. HURST:  Well, in our proposed verdict form we

7     put them together in logical groupings that are not

8     duplicated and that's the way we believe it should be.

9          So, for example, four original drawings, 5-39,

19:30 10   5-40, 5-41, 5-42, the pitch book, Exhibit 302, other

11    versions, other forms of the pitch book, Exhibit 1,

12    Exhibit 3.

13          You know, the -- the --

14          THE COURT:  I've seen it.

19:31 15          Now, this is not what I'm doing.  I just took the

16    biggest iteration for a moment, so I don't want Mattel to

17    cling to this thinking that this is what I'm going to do.

18          MR. ZELLER:  Uh-huh.

19          THE COURT:  I just took the large iteration of this

19:31 20   for a moment because I can always cut it down.  Okay?

21          The next thing is go home tonight and think if you

22    really want that to occur.

23          I know, Mr. Zeller, from your perspective as able

24    and esteemed counsel, you do.

19:31 25          MR. ZELLER:  Uh-huh; I want that honored.

UNITED STATES DISTRICT COURT

1          THE COURT:  But from a trial counsel's perspective,

2     a jury might take one look at this and say, "quite easy to

3     check a different box and not move down."

4          MR. QUINN:  Can I ask a question about that?

19:31  5          THE COURT:  Yeah, Mr. Quinn, because you and

6     Mr. Price are going to be arguing.

7          MR. QUINN:  So when we get to MGA's trade

8     secrets --

9          THE COURT:  Exactly, I -- now, this isn't the

19:32 10    iteration I've got.  I've got two more iterations back there.

11          MR. QUINN:  I see documents listed in --

12          THE COURT:  In Appendix C and what does that mean?

13          MR. QUINN:  I don't know.  What is it?  "To be

14     defined" -- TBD.

19:32 15          THE COURT:  It's got to be coequal.  You can't be

16     sitting there with 114 in Appendix C.

17          MR. QUINN:  I mean, I just -- just thinking out

18     loud here -- and I'm actually not sure I agree with what I'm

19     about to say -- whether it makes sense to have a chart here

19:32 20     and a chart here or this references an appendix and that

21     references an appendix so they're treated the same way.  I

22     don't know.

23          THE COURT:  That's the next iteration we have.

24          I just had struggled with yours to begin with

19:32 25     because you're the first group I started with, recognizing I

 1   would struggle with MGA towards the end of the case.

 2          I'm almost convinced I'm going to go to appendices

 3   regardless, A, B, C, whatever, and that these will be treated

 4   coequally and they will reference back.

19:33 5          MR. QUINN:  Yeah.

 6          THE COURT:  Okay.  But I wanted to start with where

 7   you were because it looked familiar to you.

 8          MR. QUINN:  And that's part of your seducing us

 9   into your form.

19:33 10          THE COURT:  Yeah.

 11          MR. QUINN:  But I do think it's important --

 12          MS. HURST:  That's probably not going to work for

 13   me.

 14          MR. QUINN:  But I do think it's important that they

19:33 15   be required to make a determination --

 16          MS. HURST:  That's fine.

 17          MR. QUINN:  I'm sorry.  Can I touch it?

 18          "Yes" or "no" as to each here, and "yes" or "no" as

 19   to the avalanche, the 140 back here?

19:33 20          THE COURT:  Each one.

 21          MR. QUINN:  Each one coequal?

 22          THE COURT:  Coequal.

 23          MR. PRICE:  My concern about these numbers --

 24          MS. HURST:  Exactly -- well --

19:33 25          MR. PRICE:  -- is that with the witnesses in trial,

1    if the jurors were taking notes, some of them would be shown

2    5-52 and another one would be shown 1000 -- 10032-4 and

3    they're the same.

4         So we have to have our act together.  You've got in

19:34 5    the trial records --

6         THE COURT:  That's my problem too.

7         What happens if they go down with the thousands of

8    documents we have and Juror Dave does this:  I look at two of

9    these exhibits and I realize that they're duplicates right to

19:34 10   begin with, and my immediate impression is, counsel don't

11   know what they're doing.  These are a bunch of exhibits.  Why

12   am I going to waste my time?

13        I mean, we'd better be awfully certain that these

14   aren't duplicates because that's not grounds for a mistrial,

19:34 15   that's grounds for a juror just giving up and saying, well, I

16   checked off two or three exhibits already that are

17   duplicates.  This is a joke.

18        "No," "no," "no," "no," "no," "no," "no," "no."

19        MR. ZELLER:  Well, we can simply identify -- we can

19:34 20   have an exhibit and identify and say "duplicates" for those

21   who took those notes.

22        I mean, fundamentally part of it is, as Mr. Price

23   was saying, some of these documents came from different

24   sources and that is what ties the timing.

19:35 25        THE COURT:  If -- trust me.  Whatever it will be,

Case 2:04-cv-09049-DOC-RNB   Document 10372   Filed 04/04/11   Page 53 of 62   Page ID
#:315168
CV 04-9049 DOC - 03/31/2011  Volume 3 of 3

53

```
 1    it will be coequal, so here's the problem:  Back here I
 2    switched to, as Mr. Quinn pointed out, Appendix B and
 3    Appendix C, okay, and I'm almost convinced that I would go to
 4    Appendix A and attach it in the back.
19:35 5         The difference is this:  Mr. Quinn would like each
 6    one eventually checked off, and from your perspective you
 7    just want a general check.
 8         MS. HURST:  Well, no, I just -- I think there is a
 9    difference between owning a copyright and proving that
19:35 10   there's something -- that something is a trade secret.  Those
 11   are two very different legal questions.
 12        And while I appreciate Mr. Quinn's desire for
 13   coequality, those are just completely different questions.
 14        THE COURT:  Okay.  Well, why don't you go home and
19:36 15   get some sleep.
 16        MR. QUINN:  Different legal standards, but still
 17   separate determinations to be made by the jurors, trade
 18   secret by trade secret.
 19        THE COURT:  Okay.  Okay.
19:36 20        Thank you very much.  Why don't you get some sleep.
 21        MS. KELLER:  Before you go, we just got a document
 22   produced to us --
 23        MR. MCCONVILLE:  Of the many that were produced
 24   today.
19:36 25        THE COURT:  Just a moment.
```

```
 1              (Pause in the proceedings.)

 2              THE COURT:  Where did this come from?

 3              MS. KELLER:  It was just produced to us today.

 4              MS. HURST:  Because that order, you remember the

 5    third category was Kohl's documents in the ex parte.  So

 6    guess what we got?

 7              MS. KELLER:  Things with Kohl's.

 8              THE COURT:  From Tom Maskel at Kohl's to

 9    Julie Scholvin, 12-16-04, "Huge opportunity."

10              "Julie, I'd like -- I would like to explore a

11    potential" --

12              Here.  Why don't you go back and have a seat for a

13    second.

14              Let's read.

15              "Julie, I'd like to explore a huge opportunity with

16    you.  As you are well aware, I have zero love for Bratz.  In

17    my opinion this is a fad that is done.  As you are aware, we

18    have approximately four feet of POG space designated for

19    Bratz this spring.

20              "What would Mattel think about me throwing out

21    Bratz and replacing the space with our friend, Barbie?

22              "Here is the kicker, if I throw them out I'll need

23    some help with markdowns on old Bratz (we can talk $$ later).

24    I think you would agree this might be a nice opportunity for

25    Mattel to take back a little market share.  Before you pass
```

Case 2:04-cv-09049-DOC-RNB   Document 10372   Filed 04/04/11   Page 55 of 62   Page ID #:315170
CV 04-9049 DOC - 03/31/2011 - Volume 3 of 3

55

 1    this on please give me a call to discuss so we are clear on

 2    some of the details.

 3             "Thx.  Thomas Maskel, Buyer Toys, Kohl's Department

 4    Stores, (262)703-1250."

19:38  5          You want to call him?

 6             I'm just kidding you.  We can't phone him.  It's a

 7    three-hour's time difference.

 8             Now, this is from Tom Maskel at Kohl's to Julie --

 9    who is Julie Scholvin?

19:38 10         MR. MCCONVILLE:  She's the person from Mattel who

11    negotiated the deal about -- that resulted in MGA being

12    excluded from Kohl's for two years.

13             THE COURT:  Scholvin is?

14             MR. MCCONVILLE:  Yes.

19:38 15         THE COURT:  How do I know that?

16             MR. MCCONVILLE:  The e-mail that went into evidence

17    from Milt Zablow congratulated Julie on the great job she had

18    done.

19             THE COURT:  Show me that e-mail.

19:39 20         I recall the e-mail but I've got, now, nine binders

21    worth of notes.  So you can pull that up for me more quickly.

22             And Thomas Maskel, he's the -- what position does

23    he hold?  Apparently he's "buyer toys," Kohl's Department

24    Store?

19:39 25         How -- how did this come to you?

1        MS. KELLER:  The third category that the court

2    ordered produced from Malackowski involved Kohl's.

3             THE COURT:  Yesterday.

4             MS. KELLER:  And we just got it tonight.  It must

19:39  5    have been in connection with that production.

6             THE COURT:  But did it just fly through the door?

7             MR. MCCONVILLE:  Well, they produced them

8    electronically.  Someone just e-mailed me the document and I

9    had it printed while we were sitting here.

19:39 10            THE COURT:  Okay.  Let me see the document that is

11   in relation to this.

12            MS. HURST:  I'm printing 26612 right now,

13   Your Honor.

14            For once we need Mike here and he's not here.  It

19:40 15   almost never happens.

16            THE COURT:  Was that already produced?

17            MR. QUINN:  Your Honor, everybody here knows as

18   much about this as I do, but apparently -- what they are

19   saying is that this was -- must have been produced in

19:40 20   response to this third paragraph.

21            THE COURT:  To the third paragraph "all documents

22   relating to Mattel's negotiation with Kohl's in early 2005

23   resulting in Mattel's blocking the sale of MGA product at

24   Kohl's for two years."

19:40 25            MR. QUINN:  And you signed the order last

1    night granting it.

2            THE COURT:  I signed it last night.

3            MR. PRICE:  And, actually, Your Honor, we want to

4    bring up that this has nothing to do with what Malackowski

19:40  5    needed for his analysis, but that's what the order covered.

6            THE COURT:  Okay.

7            MR. QUINN:  It sounds like a good document for me.

8            MR. MCCONVILLE:  So we're going to want to use it

9    with Mr. Eckert.  So, you know, there you go.

19:41  10           MS. KELLER:  Well, and we're going to want

11   Ms. Scholvin produced, obviously.

12           THE COURT:  Where is Ms. Scholvin at?

13           MS. KELLER:  We have no idea.  She's not ours.

14           THE COURT:  Well, she's got to be around.  Is she

19:41  15   local?

16           Kohl's is, first of all, not a topic that catches

17   anybody by surprise, so where's Ms. Scholvin?

18           Is she in LA or is she in New York?

19           MR. ZELLER:  We'll find out.  I don't know.

19:41  20           THE COURT:  Well, could you find out for me.

21           MR. ZELLER:  And also if we could have their

22   Kohl's --

23           THE COURT:  I'm not negotiating for the moment.

24           MR. ZELLER:  I'm not negotiating.

19:41  25           THE COURT:  Can I just ask one question without a

        1   negotiation:  Where's Ms. Scholvin?

        2           MR. ZELLER:  We'll find out.  I don't know.

        3           THE COURT:  Thank you very much.

        4           MR. ZELLER:  They did not raise this with us

19:41   5   before.

        6           THE COURT:  Now negotiate with me.

        7           MR. ZELLER:  Thank you.

        8           We have been trying to contact their Kohl's person

        9   who is on the e-mails talking about what a disaster the Bratz

19:42  10   business is at Kohl's and all the problems that the court has

       11   seen in those e-mails, including the one that we couldn't get

       12   into evidence.

       13           THE COURT:  Who is that?

       14           MR. ZELLER:  Her name is Chozin, and she is on

19:42  15   those e-mails.

       16           MR. PRICE:  Chabot.

       17           MR. ZELLER:  Chabot, I'm sorry.  C-h-a-b-o-t.

       18           THE COURT:  Now, can I get that e-mail?

       19           MR. ZELLER:  Yes.

19:42  20           THE COURT:  Produce it for me.

       21           (Discussion held off the record.)

       22           THE COURT:  Well, let's just start with Julie

       23   Scholvin and start her moving this way.

       24           So let's get on our BlackBerrys and find out where

19:42  25   she is.

CV 04-9049 DOC - 03/31/2011 Volume 3 of 3

```
 1            MR. ZELLER:  If I can just step out, I'll call and
 2     see.
 3            THE COURT:  Sure, just call and find out if she's
 4     local or if she's flying in from DC or where.
19:43  5            (Pause in the proceedings.)
 6            MR. ZELLER:  So are we arguing Friday?
 7            THE COURT:  Well, no, you're arguing Thursday right
 8     now because with the hours I think we'll probably get done
 9     and I'll probably instruct late Wednesday.  What will happen
19:43 10     is we'll be in session all day Wednesday, the way it looks
11     like we're going, and it will take me an hour and a half
12     to --
13            MR. QUINN:  Are we on the record, Your Honor?
14            THE COURT:  Yeah.
19:43 15            MR. QUINN:  Could we go off for a second?
16            THE COURT:  Sure, we can go off the record.
17            (Discussion held off the record.)
18            THE COURT:  Where is she?
19            MR. ZELLER:  She apparently does still work for us.
19:46 20     She is in the Chicago area, so we are going to get her on a
21     plane and get her out here.
22            THE COURT:  Great.  Great.
23            Now, tell me again who you want.
24            Who is this person?
19:46 25            MR. ZELLER:  So this is --
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Let me see the e-mail so I make some

 2      link.

 3              MR. ZELLER:  We're printing it out as we speak.

 4              (Discussion held off the record.)

 5              THE COURT:  26612 is already in evidence.  That's

 6      an e-mail from Milt Zablow to Jerry Cleary and it's dated

 7      January 27th, 2005.

 8              And that's the congratulations letter.

 9              "Kohl has agreed to the following," and that is the

10      competitor will not be represented in their toy department

11      for two years and they're going to double Barbie's retail

12      space to eight feet for a minimum of two years.

13              So from your standpoint this e-mail of

14      December 16th, 2004, that MGA was just given shows the

15      genesis of that effort?  It's as simple as that.

16              MS. KELLER:  It shows it's a payoff.

17              MS. HURST:  It shows it's a payoff.

18              MR. MCCONVILLE:  To exclude Bratz.

19              THE COURT:  Okay.  Now, let me see the document

20      that --

21              MR. PRICE:  We're trying to print out.  Our system

22      crashed for a second.  We're doing it.

23              THE COURT:  Well, from this document?

24              MR. PRICE:  No, no, for the document.  Chabot.

25              MR. QUINN:  I hate to be a killjoy on this,
```

CV 04-9049 DOC - 03/31/2011 - Volume 3 of 3

1    Your Honor, but does Kohl's even go to the jury?  It seems

2    like that only goes to the 17200 claim which the court's now

3    going to decide, and I don't know how that affects this

4    discussion, but --

19:49  5              THE COURT:  Ms. Hurst?

6              MS. HURST:  I believe Mr. Quinn is correct, based

7    on the court's order.  We obviously don't agree with it,

8    but --

9              MS. KELLER:  It still would need to come into

19:49 10    evidence, in any event, Your Honor, whether the court is

11    reserving the issue to itself or whether it's going to the

12    jury.  So we would still need Julie Scholven here.

13              MR. QUINN:  That's fine, Your Honor, but I think

14    the jury at some point has to be told that they should ignore

19:50 15    everything they've heard about Kohl's because it's irrelevant

16    to all the issues that are -- go into them.

17              MS. HURST:  I don't think so.

18              MR. ZELLER:  This is one of them.

19              THE COURT:  Okay.  Go gather the last one.  Let me

19:50 20    start taking these.

21              I'm going to start making a notebook.

22              So it's the -- it's Holly Chabot?

23              MR. ZELLER:  Correct.

24              THE COURT:  All right.  Okay.  I'll be right back

19:50 25    with you.  I'm going to start making a notebook.

 1             All right.  Counsel, here's what we're going to

 2   do --

 3             MS. HURST:  Your Honor, I take it back.  It's still

 4   relevant to the setoff defense.  It's damages caused by

19:53 5   Mattel and we're entitled to set them off.

 6             THE COURT:  Setoff defense.

 7             MS. HURST:  Right.

 8             THE COURT:  Okay.  Now, first of all, my limine

 9   order was clear:  All relevant evidence concerning the 17200

19:53 10   comes in at the time of trial.  So on the 17200 I'm still the

11   decider.  So Ms. Cleary is moving from Chicago.  She will be

12   here on Monday.

13             MR. ZELLER:  At the very latest.

14             THE COURT:  Very latest.

19:53 15             And I'm going to go back and look at Holly Chabot

16   and send all of you home tonight.

17             Get as much rest as you can.

18             Mr. Eckert's a key person.  It's 8:00.  That will

19   give you two extra or three extra hours of sleep.  Okay?

19:54 20             I'm going to go back and read Holly Chabot and I'll

21   see you tomorrow.

22             Good night.

23             (Adjournment at 20:05 to resume on Friday, April 1,

24   2011 at 8:00 a.m.  Next session reported by Debbie Gale.)

20:05 25