Case 2:04-cv-09049-DOC-RNB  Document 10373  Filed 04/04/11  Page 1 of 144  Page ID #:315178
CV 04-9049 DOC – 4/1/2011 – Day 44, Volume 1 of 3

1

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3          HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4                     – – – – – – –

5
    MATTEL, INC., et al.,              )
6                                      )
              Plaintiffs,              )
7                                      )
         vs.                           ) No. CV 04-9049 DOC
8                                      )    Day 44
    MGA ENTERTAINMENT, INC., et al.,   )    Volume 1 of 3
9                                      )
                                       )
10            Defendants.              )
   _____)
11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                      Jury Trial

16                  Santa Ana, California

17                 Friday, April 1, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-04-01 D44V1

1    **APPEARANCES OF COUNSEL:**

2

    FOR PLAINTIFF MATTEL, INC., ET AL.:

3

            QUINN EMANUEL URQUHART & SULLIVAN
4           BY:   JOHN QUINN
                  WILLIAM PRICE
5                 MICHAEL T. ZELLER
                  Attorneys at Law
6           865 South Figueroa Street
            10th Floor
7           Los Angeles, California 90017
            (213) 443-3000

8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12          ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
            BY:   THOMAS S. McCONVILLE
13                Attorney at Law
            4 Park Plaza
14          Suite 1600
            Irvine, California 92614
15          (949) 567-6700

16          - AND -

17          ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
            BY:   ANNETTE L. HURST
18                Attorney at Law
            405 Howard Street
19          San Francisco, California 94105
            (415)773-5700

20          - AND -

21          KELLER RACKAUCKAS
22          BY:   JENNIFER KELLER
                  Attorney at Law
23          18500 Von Karman Avenue
            Suite 560
24          Irvine, California 92612
            (949) 476-8700

25

Case 2:04-cv-09049-DOC-RNB  Document 10373  Filed 04/04/11  Page 3 of 144  Page ID #:315180
CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

3

1   **APPEARANCES OF COUNSEL (Continued):**

2

3   FOR CARLOS GUSTAVO MACHADO GOMEZ:

4
            LAW OFFICES OF MARK E. OVERLAND
5           By:  MARK E. OVERLAND
                 Attorney at Law
6           100 Wilshire Boulevard
            Suite 950
7           Santa Monica, California 90401
            (310) 459-2830
8
            - AND -
9
            SCHEPER KIM & HARRIS LLP
10          BY:  ALEXANDER H. COTE
                 Attorney at Law
11          601 West 5th Street
            12th Floor
12          Los Angeles, California 90071
            (213) 613-4660
13

14  ALSO PRESENT:

15          MGA ENTERTAINMENT, INC.
            BY:  JEANINE PISONI
16               Attorney at Law
            16360 Roscoe Boulevard
17          Suite 105
            Van Nuys, California 91406
18

19          ROBERT A. ECKERT, MATTEL CEO

20          ISAAC LARIAN, MGA CEO

21          KEN KOTARSKI, Mattel Technical Operator

22          MIKE STOVALL, MGA Technical Operator

23

24

25

4

**I N D E X**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ECKERT, Robert A. | | | | |
| By Ms. Keller | 6 | | | |
| By Mr. Quinn | | 122 | | |

**EXHIBITS**

| EXHIBIT NO. | IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 2300 | Mattel's Code of Conduct | 68 |
| 5367 | E-mail from Mr. de Anda to Mr. Eckert re Flavas | 90 |
| 7501 | Mattel 2000 annual report | 101 |
| 9566 | 2006 Mattel Toy Fair Report | 116 |
| 9656 | 2004 Mattel Toy Fair Report | 117 |
| 17374 | MyScene Club Birthday NoLee in packaging | 110 |
| 17399 | Kiyoni Brown in packaging | 112 |
| 20327 | 2003 Mattel code of conduct | 11 |
| 23757 | What's on my Mind dated 1/9/2003 | 9 |
| 26230 | Mattel timeline | 104 |
| 26546 | Page 6 of 2003 Mattel New York Toy Fair Report | 118 |

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

5

**EXHIBITS (Continued)**

| EXHIBIT NO. | IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 31530 | 2004 Mattel Toy Fair Report | 118 |
| 35081 | Flavas P.Bo in packaging | 112 |
| 35307 | Pages 28 through 31 of 1997 Mattel catalog | 114 |
| 35308 | Pages 36 through 43 of 1987 Mattel catalog | 115 |
| 35310 | Mattel 1999 catalog | 113 |
| 35646 | E-mail from Mr. Ecketer to Ms. Sato dated 11/13/2007 | 34 |
| 36697 | MyScene Club Stylin' Head Madison in packaging | 111 |
| 36749 | E-mail to Mr. Eckert from Market Intelligence dated 5/22/2008 | 31 |
| 36750 | E-mail sent 8/28/2008 to various  recipients including Mr. Eckert | 29 |
| 36769 | E-mail from Mr. Nussbaum dated 5/10/2007 | 32 |
| 36772 | MyScene Junglicious Kennedy in packaging | 111 |
| 36774 | Mattel 2005 catalog | 108 |
| 36775 | Mattel 2006 catalog | 109 |
| 37116 | Video | 122 |

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 6 of 144   Page ID #:315183
CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

6

|  |  |  |
|---|---|---|
|  | 1 | **SANTA ANA, CALIFORNIA, FRIDAY, APRIL 1, 2011** |
|  | 2 | **Day 44, Volume 1 of 3** |
|  | 3 | (8:33 a.m.) |
| 08:33 | 4 | *(In the presence of the jury.)* |
| 08:33 | 5 | THE COURT:  Then we're back in session.  The |
| 08:33 | 6 | jury's present.  Alternates are present.  All counsel are |
| 08:33 | 7 | present. |
| 08:33 | 8 | Mr. Eckert has resumed the witness stand. |
| 10:21 | 9 | **ROBERT A. ECKERT, MGA'S WITNESS, PREVIOUSLY SWORN** |
| 10:21 | 10 | **RESUMED THE STAND** |
| 08:33 | 11 | THE COURT:  This is direct examination by |
| 08:33 | 12 | Ms. Keller on behalf of MGA and Mr. Larian. |
| 08:33 | 13 | Mr. Eckert was sworn yesterday. |
| 08:34 | 14 | Counsel. |
| 08:34 | 15 | MS. KELLER:  Thank you, Your Honor. |
| 08:34 | 16 | **DIRECT EXAMINATION** |
| 08:34 | 17 | BY MS. KELLER: |
| 08:34 | 18 | Q.   Mr. Eckert, Mattel's most recent proxy filing with the |
| 08:34 | 19 | Securities and Exchange Commission shows that this year you |
| 08:34 | 20 | made 11.4 million, up from the year before? |
| 08:34 | 21 | A.   It may. |
| 08:34 | 22 | Q.   This year; do you know that? |
| 08:34 | 23 | A.   2010? |
| 08:34 | 24 | Q.   Yes.  And you got stock awards with a fair market value |
| 08:34 | 25 | of nearly 4.1 million. |

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

7

| 08:34 | 1 | A.    Correct.  That is included in the $11 million, yes. |
| 08:34 | 2 | Q.    And the options valued at 1.9 million? |
| 08:34 | 3 | A.    Yes. |
| 08:34 | 4 | Q.    And a cash bonus of $3.3 million? |
| 08:34 | 5 | A.    Correct. |
| 08:34 | 6 | Q.    And those options and stock awards, you have not yet |
| 08:34 | 7 | cashed those in, correct? |
| 08:34 | 8 | A.    That's correct. |
| 08:34 | 9 | Q.    So again, the outcome of this trial will affect the |
| 08:34 | 10 | value of your options and stock awards, correct? |
| 08:34 | 11 | A.    It might. |
| 08:34 | 12 | Q.    Now, as CEO and chairman of the board of Mattel, you |
| 08:34 | 13 | set the tone for the company, right? |
| 08:35 | 14 | A.    I do. |
| 08:35 | 15 | Q.    And the company needs to reflect your views, your |
| 08:35 | 16 | values, and your ethical principles, true? |
| 08:35 | 17 | A.    Yes. |
| 08:35 | 18 | Q.    You believe that Mattel's values act as a moral compass |
| 08:35 | 19 | for the way you work within the walls of Mattel? |
| 08:35 | 20 | A.    I do. |
| 08:35 | 21 | Q.    Take a look at exit 7503, please. |
| 08:35 | 22 | *(Document provided to the witness.)* |
| 08:35 | 23 | BY MS. KELLER: |
| 08:35 | 24 | Q.    And this is the 2002 annual report and 10-K for Mattel |
| 08:35 | 25 | filed with the Securities and Exchange Commission. |

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 8 of 144   Page ID #:315185
CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

8

| | | |
|---|---|---|
| 08:35 | 1 | *(Document displayed.)* |
| 08:35 | 2 | BY MS. KELLER: |
| 08:35 | 3 | Q.   And if you look at page 7503, page 1, the title is |
| 08:35 | 4 | "Innovate," right? |
| 08:35 | 5 | A.   Correct. |
| 08:35 | 6 | Q.   And if we look at page 8. |
| 08:35 | 7 | *(Document displayed.)* |
| 08:35 | 8 | BY MS. KELLER: |
| 08:35 | 9 | Q.   The beginning of the paragraph in the second half, it |
| 08:35 | 10 | says, "I strongly believe that the only way to operate in |
| 08:36 | 11 | life and in business is with unwavering integrity.  There is |
| 08:36 | 12 | simply no room for compromise.  In light of the public's |
| 08:36 | 13 | diminished trust in corporate America, I'd like to emphasize |
| 08:36 | 14 | the importance of our values at Mattel". |
| 08:36 | 15 | And you believe that? |
| 08:36 | 16 | A.   I do. |
| 08:36 | 17 | Q.   And if you look at the third column, the -- of page 8, |
| 08:36 | 18 | in the second to last paragraph, you see, "You have my word |
| 08:36 | 19 | that Mattel will continue to operate with unwavering |
| 08:36 | 20 | integrity at every level of the business and in everything |
| 08:36 | 21 | we do." |
| 08:36 | 22 | You believe that too? |
| 08:36 | 23 | A.   I do. |
| 08:36 | 24 | Q.   Now, let's look at Exhibit 23757. |
| 08:36 | 25 | *(Document provided to the witness.)* |

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 9 of 144   Page ID #:315186
CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

9

| 08:36 | 1 | BY MS. KELLER: |
| 08:36 | 2 | Q.   And this is one of your "What's On My Mind" documents. |
| 08:37 | 3 | This is dated January 9, 2003.  At the beginning it says -- |
| 08:37 | 4 | Oh, I'm sorry.  You recognize this as one of your |
| 08:37 | 5 | "What's my Mind" documents? |
| 08:37 | 6 | A.   Yes, "What's On My Mind." |
| 08:37 | 7 | Q.   "What's On My Mind," I'm sorry. |
| 08:37 | 8 | And this is dated January 9, 2003? |
| 08:37 | 9 | A.   That's correct. |
| 08:37 | 10 | MS. KELLER:  Your Honor, I'd introduce 23757. |
| 08:37 | 11 | THE COURT:  Received. |
| 08:37 | 12 | *(Exhibit No. 23757 received in evidence.)* |
| 08:37 | 13 | *(Document displayed.)* |
| 08:37 | 14 | BY MS. KELLER: |
| 08:37 | 15 | Q.   Now, in the first paragraph you wrote: |
| 08:37 | 16 | "Last month I wrote to you about the importance of |
| 08:37 | 17 | Mattel's reputation and our commitment to integrity.  More |
| 08:37 | 18 | than a year ago, we adopted a statement of Mattel's vision |
| 08:37 | 19 | and values that was distributed to all employees.  As I've |
| 08:37 | 20 | said many times, our values act as a moral compass for the |
| 08:37 | 21 | way we work within the walls of Mattel and interact with our |
| 08:37 | 22 | coworkers, our partners, and our consumers.  Simply stated, |
| 08:38 | 23 | at Mattel we value:" |
| 08:38 | 24 | And then you list several bullet points, the last one |
| 08:38 | 25 | of which says, "ourselves, unwavering integrity, taking |

CV 04-9049 DOC – 4/17/2011 – Day 44, Volume 1 of 3

10

| | | |
|---|---|---|
| 08:38 | 1 | ownership of all that passes in front of us and being |
| 08:38 | 2 | accountable for the results of the business and the |
| 08:38 | 3 | development of our fellow employees." |
| 08:38 | 4 | Do you also believe that to be, true? |
| 08:38 | 5 | A.   I do.   In fact, I brought the words "unwavering |
| 08:38 | 6 | integrity" with me to Mattel. |
| 08:38 | 7 | Q.   And in the third paragraph it says: |
| 08:38 | 8 | "The challenge for all of us is to bring these values |
| 08:38 | 9 | to life in doing our jobs every single day in a manner |
| 08:38 | 10 | consistent with our commitment to act as one Mattel.  We |
| 08:38 | 11 | must strive to conduct our business in a socially |
| 08:38 | 12 | responsible and ethical manner, which respects the law, |
| 08:38 | 13 | protects the environment, and benefits the communities in |
| 08:39 | 14 | which we -- where we work.  We must remember that our |
| 08:39 | 15 | business results are never more important than acting |
| 08:39 | 16 | ethically and with integrity." |
| 08:39 | 17 | And you believe that also? |
| 08:39 | 18 | A.   I do. |
| 08:39 | 19 | Q.   And the third paragraph of page 2 -- or fourth |
| 08:39 | 20 | paragraph, rather. |
| 08:39 | 21 | (Document displayed.) |
| 08:39 | 22 | BY MS. KELLER: |
| 08:39 | 23 | Q.   Says, "Mattel's most valuable asset:  Our reputation. |
| 08:39 | 24 | "It's the accumulation of our individual actions based |
| 08:39 | 25 | on the decisions we make every day.  Each of us is |

| | | |
|---|---|---|
| 08:39 | 1 | responsible for acting with integrity, treating others with |
| 08:39 | 2 | dignity and respect, adhering to honesty and fairness in all |
| 08:39 | 3 | of our transactions and consistently," quote, "doing the |
| 08:39 | 4 | right thing," unquote. |
| 08:39 | 5 | And that's still true to this day, isn't it? |
| 08:39 | 6 | A.   Yes. |
| 08:39 | 7 | Q.   And, in fact, the Mattel website still talks about the |
| 08:39 | 8 | unwavering integrity that defines Mattel's corporate |
| 08:39 | 9 | culture, right? |
| 08:39 | 10 | A.   Yes, it does. |
| 08:39 | 11 | Q.   And it talks about how solid standards of corporate |
| 08:40 | 12 | governance are important to earning and maintaining trust, |
| 08:40 | 13 | right? |
| 08:40 | 14 | A.   Yes. |
| 08:40 | 15 | Q.   And take -- if you would, please, look at |
| 08:40 | 16 | Exhibit 20327. |
| 08:40 | 17 | *(Document provided to the witness.)* |
| 08:40 | 18 | BY MS. KELLER: |
| 08:40 | 19 | Q.   Is this the 2003 Mattel code of conduct? |
| 08:40 | 20 | A.   Yes, it is. |
| 08:40 | 21 | MS. KELLER:  Your Honor, I would move 20327 into |
| 08:40 | 22 | evidence. |
| 08:40 | 23 | THE COURT:  Received. |
| 08:40 | 24 | *(Exhibit No. 20327 received in evidence.)* |
| 08:40 | 25 | *(Document displayed.)* |

| | | |
|---|---|---|
| 08:40 | 1 | BY MS. KELLER: |
| 08:40 | 2 | Q.   And if you'd look at page 7. |
| 08:40 | 3 | A.   Dash 7? |
| 08:40 | 4 | Q.   Yes.  20327-7. |
| 08:40 | 5 | A.   I have it. |
| 08:40 | 6 | *(Document displayed.)* |
| 08:40 | 7 | BY MS. KELLER: |
| 08:40 | 8 | Q.   There's a portion that is entitled "Our |
| 08:40 | 9 | Responsibilities to Each Other," and then under that it |
| 08:40 | 10 | says, "Respect." |
| 08:40 | 11 | "We will treat others as we want to be treated, with |
| 08:41 | 12 | respect, dignity and fairness." |
| 08:41 | 13 | Now, you agree that it was improper for Mattel |
| 08:41 | 14 | employees to misrepresent their identities in order to gain |
| 08:41 | 15 | access to MGA's showrooms, correct? |
| 08:41 | 16 | A.   Yes, it was wrong. |
| 08:41 | 17 | Q.   You don't believe a person should misrepresent one's |
| 08:41 | 18 | self, period, right? |
| 08:41 | 19 | A.   That's correct. |
| 08:41 | 20 | Q.   The first time you heard anything about people in a |
| 08:41 | 21 | group called "Market Intelligence" using false information |
| 08:41 | 22 | to gain access to competitors' showrooms was at your |
| 08:41 | 23 | deposition in December of 2009, right? |
| 08:41 | 24 | A.   Um, it was in 2009 or 2010.  I believe in 2009 I heard |
| 08:41 | 25 | a hypothetical, but it was around that time. |

| | | |
|---|---|---|
| 08:41 | 1 | Q.   Please look at your deposition, page 156.  This is your |
| 08:41 | 2 | deposition of October 4, 2010, page 156. |
| 08:42 | 3 | *(Document provided to the witness.)* |
| 08:42 | 4 | THE WITNESS:  Line? |
| 08:42 | 5 | BY MS. KELLER: |
| 08:42 | 6 | Q.   Lines, uh, 14 through 19.  And 158, lines -- |
| 08:42 | 7 | A.   Oh, I'm sorry, it's 156? |
| 08:42 | 8 | Q.   That's right. |
| 08:42 | 9 | A.   I'm sorry.  I was at 157. |
| 08:42 | 10 | Q.   Lines 14 through 19. |
| 08:42 | 11 | A.   156, 14 through 19? |
| 08:42 | 12 | Q.   Yes. |
| 08:42 | 13 | A.   Okay. |
| 08:42 | 14 | Q.   Then 158, lines 12 through 20. |
| 08:42 | 15 | A.   All right. |
| 08:42 | 16 | Q.   So did you first hear about a group called "Market |
| 08:42 | 17 | Intelligence" -- |
| 08:42 | 18 | MR. QUINN:  This is not impeaching, Your Honor. |
| 08:42 | 19 | THE COURT:  Just a moment. |
| 08:43 | 20 | And on 158, Counsel, what lines? |
| 08:43 | 21 | MS. KELLER:  12 through 20. |
| 08:43 | 22 | THE COURT:  That's consistent, Counsel. |
| 08:43 | 23 | BY MS. KELLER: |
| 08:43 | 24 | Q.   Inside of Mattel, is it correct that the only |
| 08:43 | 25 | conversations you've had about this topic were with lawyers |

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

14

| | | |
|---|---|---|
| 08:43 | 1 | sometime before October 2010? |
| 08:43 | 2 | A.   That's correct. |
| 08:43 | 3 | Q.   And at your deposition in October 2010, you couldn't |
| 08:43 | 4 | think of any reason why Mattel employees would be going to |
| 08:44 | 5 | Kinko's to print up business cards that use their home |
| 08:44 | 6 | address rather than their Mattel business address, correct? |
| 08:44 | 7 | A.   Correct. |
| 08:44 | 8 | Q.   Or any reason why Mattel employees would be printing up |
| 08:44 | 9 | business cards with the instruction:  You can either put |
| 08:44 | 10 | down your home phone number or make up a fake number; just |
| 08:44 | 11 | don't put down your Mattel number.  Correct? |
| 08:44 | 12 | A.   That's right. |
| 08:44 | 13 | Q.   Or any reason why Mattel employees would be making up |
| 08:44 | 14 | business cards representing themselves to be retailers or |
| 08:44 | 15 | members of the press, right? |
| 08:44 | 16 | A.   That's correct. |
| 08:44 | 17 | Q.   And you didn't think this was appropriate for Mattel |
| 08:44 | 18 | employees to do any of those things, right? |
| 08:44 | 19 | A.   That's correct. |
| 08:44 | 20 | Q.   And you still think that? |
| 08:44 | 21 | A.   I do. |
| 08:44 | 22 | Q.   Now, after you were asked about this in your |
| 08:44 | 23 | December 2009 deposition, is it correct that you took no |
| 08:44 | 24 | steps at all to investigate whether Mattel employees or |
| 08:44 | 25 | contractors had actually done these things:  Used false |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:44 | 1 | information or misleading information to gain access to |
| 08:44 | 2 | competitors' showrooms? |
| 08:44 | 3 | MR. QUINN:  Misstates -- it assumes facts not in |
| 08:45 | 4 | evidence concerning the date. |
| 08:45 | 5 | THE COURT:  Overruled. |
| 08:45 | 6 | THE WITNESS:  I'm sure I said, "It will be |
| 08:45 | 7 | investigated." |
| 08:45 | 8 | BY MS. KELLER: |
| 08:45 | 9 | Q.   Is it true that you took no steps at all to investigate |
| 08:45 | 10 | it? |
| 08:45 | 11 | A.   That's correct. |
| 08:45 | 12 | Q.   And what you did, rather than investigate it, was |
| 08:45 | 13 | review the Mattel code of conduct to see if misrepresenting |
| 08:45 | 14 | yourself at a toy fair would violate the code of conduct, |
| 08:45 | 15 | right? |
| 08:45 | 16 | A.   That's right.  It was presented to me as a |
| 08:45 | 17 | hypothetical, and that's what I did. |
| 08:45 | 18 | Q.   You weren't concerned enough about this to cause any |
| 08:45 | 19 | investigation to occur to determine whether there was any |
| 08:45 | 20 | truth to the allegations, true? |
| 08:45 | 21 | A.   No, as I said, I'm sure it was being investigated. |
| 08:45 | 22 | Q.   You did not take any steps at all to investigate |
| 08:45 | 23 | whether Mattel employees or contractors were using fake or |
| 08:45 | 24 | misleading information to gain access to competitors' |
| 08:45 | 25 | showrooms after you were asked about this in your |

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 16 of 144   Page ID #:315193
CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

16

| 08:45 | 1 | December 2009 deposition, correct? |
| 08:45 | 2 | A.   No -- |
| 08:45 | 3 | MR. QUINN:  Sorry, Your Honor.  Assumes facts not |
| 08:45 | 4 | in evidence as to the time frame. |
| 08:45 | 5 | THE COURT:  Overruled. |
| 08:46 | 6 | THE WITNESS:  No, I did not personally have an |
| 08:46 | 7 | investigation. |
| 08:46 | 8 | BY MS. KELLER: |
| 08:46 | 9 | Q.   And as I said, all you did was review the Mattel code |
| 08:46 | 10 | of conduct, correct? |
| 08:46 | 11 | A.   That's correct. |
| 08:46 | 12 | Q.   You didn't think it was important enough to learn |
| 08:46 | 13 | whether Mattel employees and contractors had been |
| 08:46 | 14 | misrepresenting themselves to gain access to competitors' |
| 08:46 | 15 | showrooms, right? |
| 08:46 | 16 | A.   No, as I said, I was sure there was an investigation |
| 08:46 | 17 | that would be undertaken. |
| 08:46 | 18 | Q.   Well, you said -- am I correct that you did not launch |
| 08:46 | 19 | any investigation based on anything you had been asked?  I'm |
| 08:46 | 20 | not requesting whether you did it personally.  You also |
| 08:46 | 21 | didn't launch any investigation based on anything you had |
| 08:46 | 22 | been asked in that December 2009 deposition, correct? |
| 08:46 | 23 | A.   Yes. |
| 08:46 | 24 | Q.   That's correct? |
| 08:46 | 25 | A.   That is correct. |

Case 2:04-cv-09049-DOC-RNB Document 10373 Filed 04/04/11 Page 17 of 144 Page ID #:315194
CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

17

| | | |
|---|---|---|
| 08:46 | 1 | Q.   So it wasn't a question of whether you personally did |
| 08:46 | 2 | it; you also didn't launch an investigation to have anyone |
| 08:46 | 3 | else do it, correct? |
| 08:46 | 4 | A.   That's correct.  I was confident it was being |
| 08:46 | 5 | investigated. |
| 08:47 | 6 | Q.   You actually didn't appreciate the importance of the |
| 08:47 | 7 | topic, which is why you didn't 'cause any investigation to |
| 08:47 | 8 | occur, correct? |
| 08:47 | 9 | A.   That's right.  When it was presented to me as a |
| 08:47 | 10 | hypothetical, I didn't connect the dots. |
| 08:47 | 11 | Q.   And so you didn't take a break and ask your lawyers, |
| 08:47 | 12 | for example, hey -- |
| 08:47 | 13 | MR. QUINN:  Excuse me, Your Honor. |
| 08:47 | 14 | BY MS. KELLER: |
| 08:47 | 15 | Q.   You didn't -- |
| 08:47 | 16 | MR. QUINN:  Asking lawyers.  Privilege. |
| 08:47 | 17 | MS. KELLER:  I'm going to rephrase, Your Honor. |
| 08:47 | 18 | BY MS. KELLER: |
| 08:47 | 19 | Q.   You didn't take a break and say to anybody at Mattel, |
| 08:47 | 20 | "Hey, what's this all about?  I'm being asked these |
| 08:47 | 21 | questions.  What's going on?" |
| 08:47 | 22 | A.   That's right. |
| 08:47 | 23 | Q.   Now, do you consider this to be an example of |
| 08:47 | 24 | unwavering integrity? |
| 08:47 | 25 | A.   This example of people misrepresenting themselves and |

| | | |
|---|---|---|
| 08:47 | 1 | going to competitors showroom? |
| 08:47 | 2 | Q.   No.  Your actions in merely reviewing the Mattel code |
| 08:47 | 3 | of conduct and doing nothing else? |
| 08:47 | 4 | A.   I don't see the inconsistency. |
| 08:48 | 5 | Q.   Did you have to consult your code of conduct to know |
| 08:48 | 6 | that using fake ID's to get into competitors' private |
| 08:48 | 7 | showrooms at toy fairs was wrong? |
| 08:48 | 8 | A.   No, I did not. |
| 08:48 | 9 | Q.   Let's look at Exhibit 20327, the 2003 Mattel code of |
| 08:48 | 10 | conduct. |
| 08:48 | 11 | (Document provided to the witness.) |
| 08:48 | 12 | (Document displayed.) |
| 08:48 | 13 | BY MS. KELLER: |
| 08:48 | 14 | Q.   Entitled "Do the Right Thing." |
| 08:48 | 15 | And page 12. |
| 08:48 | 16 | (Document displayed.) |
| 08:48 | 17 | BY MS. KELLER: |
| 08:48 | 18 | Q.   It has a section called "Gathering Competitive |
| 08:48 | 19 | Information." |
| 08:48 | 20 | "Mattel does not seek to obtain competitive information |
| 08:48 | 21 | by illegal or unethical means and we do not knowingly use |
| 08:48 | 22 | any information obtained in this manner." |
| 08:48 | 23 | You would agree that gathering competitor information |
| 08:49 | 24 | with falsified credentials is at the very least unethical, |
| 08:49 | 25 | right? |

CV 04-9049 DOC – 4/17/2011 – Day 44, Volume 1 of 3

19

| | | |
|---|---|---|
| 08:49 | 1 | A.   Yes. |
| 08:49 | 2 | Q.   And you can't think of any circumstances in which it |
| 08:49 | 3 | would be okay with you for a group of Mattel employees and |
| 08:49 | 4 | contractors over a period of years to misrepresent |
| 08:49 | 5 | themselves to gain access to competitors' showrooms and |
| 08:49 | 6 | circulate the information they gained within Mattel, |
| 08:49 | 7 | correct? |
| 08:49 | 8 | A.   That's right. |
| 08:49 | 9 | Q.   And before this allegation was made, you were not aware |
| 08:49 | 10 | Mattel's Market Intelligence group had a "how to" manual on |
| 08:49 | 11 | how to get phony credentials for toy fairs, correct? |
| 08:49 | 12 | A.   That's correct. |
| 08:49 | 13 | Q.   But you now know there was such a manual produced by |
| 08:49 | 14 | Mattel in discovery in this case, right? |
| 08:49 | 15 | A.   Yes, that's correct. |
| 08:49 | 16 | Q.   And you heard testimony that this practice of using |
| 08:49 | 17 | phony credentials to sneak into competitors' showrooms |
| 08:50 | 18 | continued for 13 years, from 1992 to 2005, right? |
| 08:50 | 19 | A.   Yes, that's correct. |
| 08:50 | 20 | Q.   And that it involved Sal Villasenor, Jeff Lange, |
| 08:50 | 21 | Candice Chang, Bennett Wolk, Matt Turetzky, Carey Plunkett, |
| 08:50 | 22 | Tyler Snyder, Kelly Osier, Sharon Rahimi, Drew Vollero, |
| 08:50 | 23 | Michael Shore, and Geri Pilgrim, right on up to Matt |
| 08:50 | 24 | Bousquette, right? |
| 08:50 | 25 | A.   No. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 20 of 144   Page ID #:315197
CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

20

| 08:50 | 1 |                    MR. QUINN:  Excuse me.  Misstates the evidence, |

08:50   1              MR. QUINN:  Excuse me.  Misstates the evidence,
08:50   2   Your Honor.
08:50   3              THE COURT:  Overruled.  The answer's no.
08:50   4              THE WITNESS:  Sorry, Your Honor.
08:50   5   BY MS. KELLER:
08:50   6   Q.   And you were here when Mr. Turetzky testified that he
08:50   7   met with your in-house attorney, Michael Moore, in 2002 and
08:50   8   2003 to discuss the practice, right?
08:50   9   A.   I was.
08:50  10   Q.   And is it your position that independent contractors
08:50  11   like Kelly Osier and Sharon Rahimi don't have to adhere to
08:50  12   Mattel's code of conduct?
08:50  13   A.   No, that's not my position.  I think they do have to
08:51  14   adhere to the code of conduct.
08:51  15   Q.   Let's look at 20327, again, the 2003 Mattel code of
08:51  16   conduct, page 3.
08:51  17              (Document displayed.)
08:51  18   BY MS. KELLER:
08:51  19   Q.   Under "To whom do the guidelines and principles apply,"
08:51  20   and it says, "Unless stated otherwise, the code of conduct
08:51  21   applies to all Mattel employees and to any person performing
08:51  22   work or providing services on Mattel's behalf, including
08:51  23   field representatives, temporary or (sic) seasonal
08:51  24   employees, and legal agents."
       25

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 21 of 144   Page ID #:315198
CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

21

08:51   1   BY MS. KELLER:

08:51   2   Q.   Now, Ms. Rahimi's consulting services were reengaged

08:51   3   over a period of years by Mattel, correct?

08:51   4   A.   That I have learned, yes.

08:51   5   Q.   And Mattel did not need to keep doing that, did it?

08:51   6   A.   That's correct.

08:51   7   Q.   And Kelly Osier's services as a consultant were

08:51   8   reengaged over the years, correct?

08:52   9   A.   Um, I'm less confident about that, but I think that is

08:52   10   correct.

08:52   11   Q.   And the first time you had a discussion with anybody

08:52   12   about Sal Villasenor was in December of 2009 at your

08:52   13   deposition, correct?

08:52   14   A.   That's correct.   That's the first I heard his name.

08:52   15   Q.   So none of your executives who reported directly to

08:52   16   you, like Alan Kaye, the head of Human Resources, and Bob

08:52   17   Normile, the head of your legal department, told you about

08:52   18   this, right?

08:52   19   A.   That's correct.

08:52   20   Q.   And as of October 4, 2010, you didn't even know if any

08:52   21   investigation of Mr. Villasenor's -- of the allegations

08:52   22   about Mr. Villasenor or the allegations he made had ever

08:52   23   been conducted on Mattel's behalf, right?

08:52   24   A.   No.   I was -- I was confident at that time that there

08:52   25   would be or had been an investigation.

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

22

08:53   1   Q.   I'm asking as of October 4, 2010, you even knew if any
08:53   2   investigation had ever been conducted on Mattel's behalf of
08:53   3   Mr. Villasenor's allegations?
08:53   4   A.   You're correct; I didn't know that for a fact.
08:53   5   Q.   You didn't know it, period, right?
08:53   6   A.   Again, I was confident there had been an investigation,
08:53   7   but I did not know it.
08:53   8   Q.   Please take a look at page 183 of your deposition,
08:53   9   October 4, 2010.
08:53   10              *(Document provided to the witness.)*
08:53   11   BY MS. KELLER:
08:53   12   Q.   Lines -- page 183, lines 13 through 18.
08:54   13   A.   Okay.
08:54   14   Q.   As of October --
08:54   15              MR. QUINN:  Excuse me, Your Honor, if I could just
08:54   16   take a look at it.
08:54   17              THE COURT:  All right.  Counsel, please continue.
08:54   18   BY MS. KELLER:
08:54   19   Q.   As of October 4, 2010 --
08:54   20              MR. QUINN:  I don't think it's impeaching,
08:54   21   Your Honor.
08:54   22   BY MS. KELLER:
08:54   23   Q.   -- you didn't know whether any investigation of
08:54   24   Mr. Villasenor's allegations had ever occurred on Mattel's
08:54   25   behalf, correct?

| | | |
|---|---|---|
| 08:54 | 1 | A.   That's correct. |
| 08:54 | 2 | Q.   It wasn't a question of you were being confident that |
| 08:54 | 3 | such an investigation had occurred; you had no idea, right? |
| 08:54 | 4 | A.   No, that's not true.  In the deposition, I said I was |
| 08:54 | 5 | confident that all allegations like this in this lawsuit |
| 08:54 | 6 | were being investigated. |
| 08:54 | 7 | Q.   Were being investigated? |
| 08:54 | 8 | A.   Were -- |
| 08:54 | 9 | MS. KELLER:  Your Honor, may I read page 183, |
| 08:54 | 10 | lines 13 through 18, from the October 4th, 2010 deposition? |
| 08:55 | 11 | THE COURT:  I think you should read down to |
| 08:55 | 12 | line 25. |
| 08:55 | 13 | MS. KELLER:  That's a different topic, Your Honor. |
| 08:55 | 14 | New York Toy Fair. |
| 08:55 | 15 | THE COURT:  You're absolutely correct.  You may. |
| 08:55 | 16 | MS. KELLER:  (Reading:) |
| 08:55 | 17 | "QUESTION:  Did any investigation of |
| 08:55 | 18 | Mr. Villasenor's allegations in Exhibit 9696 ever occur on |
| 08:55 | 19 | Mattel's behalf? |
| 08:55 | 20 | "THE WITNESS:  I don't know." |
| 08:55 | 21 | BY MS. KELLER: |
| 08:55 | 22 | Q.   And you yourself did nothing at all between |
| 08:55 | 23 | December 17th, 2009, and October 4th, 2010, to check into |
| 08:55 | 24 | when -- whether any Mattel employees had been doing this: |
| 08:55 | 25 | Misrepresenting their identities to get into MGA's showroom, |

08:55   1   right?

08:55   2   A.    That's correct.

08:55   3   Q.    Now, in fact, before the allegation was made at your

08:55   4   deposition, you were not even aware of a thing called a

08:55   5   "Market Intelligence Department" at Mattel, right?

08:56   6   A.    That's right.

08:56   7   Q.    And you've heard Mattel executives testify here about

08:56   8   how the Market Intelligence Department name was just made up

08:56   9   by Sal Villasenor, right?

08:56   10  A.    I'm not sure I'd characterize it that way, but close.

08:56   11  Q.    Well, that he had -- he just called it that, right?

08:56   12          MR. QUINN:  Argumentative, Your Honor.

08:56   13          THE COURT:  The question's not clear, Counsel.

08:56   14  BY MS. KELLER:

08:56   15  Q.    Have you heard Mattel executives here in this courtroom

08:56   16  say that they believed the name "Market Intelligence

08:56   17  Department" was one that was just made up by Sal Villasenor?

08:56   18  A.    I think that's a fair characterization of what I've

08:56   19  heard.

08:56   20  Q.    And is it your testimony that there was no such

08:56   21  department?

08:56   22  A.    No.

08:56   23  Q.    Now, you know that others at Mattel, while

08:56   24  Mr. Villasenor was there, called his group the Market

08:56   25  Intelligence Department, right?

| | | |
|---|---|---|
| 08:56 | 1 | A.    They may have. |
| 08:56 | 2 | Q.    Well, in this courtroom you've actually seen, for |
| 08:57 | 3 | example, that the Human Resources Department called it that, |
| 08:57 | 4 | right? |
| 08:57 | 5 | A.    Um, yes, I think that was in -- it could have been in |
| 08:57 | 6 | his personnel file, or maybe it was in a promotion document |
| 08:57 | 7 | or something like that, yes. |
| 08:57 | 8 | Q.    Well, it was found many places in his personnel file |
| 08:57 | 9 | right? |
| 08:57 | 10 | A.    That I don't know. |
| 08:57 | 11 | Q.    Let's look at Exhibit 36092. |
| 08:57 | 12 | *(Document provided to the witness.)* |
| 08:57 | 13 | BY MS. KELLER: |
| 08:57 | 14 | Q.    Sal Villasenor's personnel file. |
| 08:57 | 15 | A.    I have it. |
| 08:57 | 16 | Q.    Let's look at page 65. |
| 08:57 | 17 | A.    I have it. |
| 08:57 | 18 | *(Document displayed.)* |
| 08:57 | 19 | BY MS. KELLER: |
| 08:57 | 20 | Q.    And it says, "To Sal Villasenor, from Human Resources. |
| 08:57 | 21 | Date:  March 3, 2004." |
| 08:57 | 22 | And it says, "Congratulations on your promotion.  The |
| 08:57 | 23 | following changes are effective with your promotion."  And |
| 08:58 | 24 | it says: |
| 08:58 | 25 | "Employee name:  Sal Villasenor. |

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

26

| | | |
|---|---|---|
| 08:58 | 1 | "Title.  Market Intelligence -- Manager, Market |
| 08:58 | 2 | Intelligence." |
| 08:58 | 3 | Now, this is from Mattel's own Human Resources |
| 08:58 | 4 | Department, right? |
| 08:58 | 5 | A.   Yes, it is. |
| 08:58 | 6 | Q.   If you look in the top left-hand corner, we actually |
| 08:58 | 7 | see the logo of the Mattel Human Resources Department, |
| 08:58 | 8 | right? |
| 08:58 | 9 | A.   That's correct. |
| 08:58 | 10 | Q.   And let's look at page 61. |
| 08:58 | 11 | (Document displayed.) |
| 08:58 | 12 | BY MS. KELLER: |
| 08:58 | 13 | Q.   And this is a Compensation Summary, 2004 Merit Review |
| 08:58 | 14 | and Stock Option Grant, and prepared for "Sal Villasenor." |
| 08:58 | 15 | And if we go down to "Job Title," it says, "Continuing |
| 08:58 | 16 | to reflect the one Mattel philosophy, new job titling |
| 08:58 | 17 | conventions have been established.  This has resulted in |
| 08:59 | 18 | adjustments to some job titles that align to job band level. |
| 08:59 | 19 | Your job title is now: |
| 08:59 | 20 | "New job title:  Manager, Market Intelligence. |
| 08:59 | 21 | "Former job title:  Manager, Market Intelligence." |
| 08:59 | 22 | And this, again, was from your own Human Resources |
| 08:59 | 23 | department, right? |
| 08:59 | 24 | A.   That's correct. |
| 08:59 | 25 | Q.   And it doesn't say, "The job title you have selected |

| | | |
|---|---|---|
| 08:59 | 1 | for yourself is Manager, Market Intelligence," right? |
| 08:59 | 2 | A.   Correct. |
| 08:59 | 3 | Q.   And there's no other job title listed here, true? |
| 08:59 | 4 | A.   True. |
| 08:59 | 5 | Q.   And if we go to page 64, we see an e-mail from Human |
| 08:59 | 6 | Resources to Personnel Records. |
| 08:59 | 7 | It says, "From MSSS-Human Resources.  Sent, Friday, |
| 09:00 | 8 | October 24 *(sic)*, 2004, to Personnel Records, El Segundo. |
| 09:00 | 9 | The subject is "Leave of absence notification." |
| 09:00 | 10 | And this lists the employee named as "Salvador |
| 09:00 | 11 | Villasenor" and the job title "Manager, Market |
| 09:00 | 12 | Intelligence," correct? |
| 09:00 | 13 | A.   Yes. |
| 09:00 | 14 | Q.   So this is actually an internal Mattel document, not |
| 09:00 | 15 | one Mr. Villasenor would necessarily have even seen, right? |
| 09:00 | 16 | A.   Uh, that's correct. |
| 09:00 | 17 | Q.   And this is October 28th, 2004, right? |
| 09:00 | 18 | A.   I would say October 29th, but we're only a day off. |
| 09:00 | 19 | Q.   I'm sorry.  You're absolutely right.  This is the |
| 09:00 | 20 | problem with not using my reading glasses all the time. |
| 09:00 | 21 | BY MS. KELLER: |
| 09:00 | 22 | Q.   Now, Manager, Market Intelligence is a job title Mattel |
| 09:01 | 23 | gave Mr. Villasenor, right? |
| 09:01 | 24 | A.   Yes. |
| 09:01 | 25 | Q.   And the job title to which Mattel repeatedly referred, |

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

28

| | | |
|---|---|---|
| 09:01 | 1 | right? |
| 09:01 | 2 | A.    Yes. |
| 09:01 | 3 | Q.    And the reason that Mattel executives have tried to |
| 09:01 | 4 | deny that such a department even existed is that it just |
| 09:01 | 5 | sounds bad, doesn't it? |
| 09:01 | 6 | A.    No. |
| 09:01 | 7 | Q.    In the corporate world, people use the term "optics." |
| 09:01 | 8 | You're familiar with that, right? |
| 09:01 | 9 | A.    I am. |
| 09:01 | 10 | Q.    That's when something just looks bad, right? |
| 09:01 | 11 |         MR. QUINN:  Just argument, Your Honor. |
| 09:01 | 12 |         THE COURT:  Sustained. |
| 09:01 | 13 | BY MS. KELLER: |
| 09:01 | 14 | Q.    Is the reason that Mattel executives have repeatedly |
| 09:01 | 15 | denied that this department even existed, that it results in |
| 09:01 | 16 | poor optics? |
| 09:01 | 17 |         MR. QUINN:  Objection.  Your Honor, misstates the |
| 09:01 | 18 | evidence. |
| 09:01 | 19 |         THE COURT:  Overruled. |
| 09:01 | 20 |         THE WITNESS:  I don't know what their reasons are. |
| 09:01 | 21 | That wouldn't influence my reason. |
| 09:01 | 22 | BY MS. KELLER: |
| 09:01 | 23 | Q.    And you yourself testified that you didn't even know |
| 09:01 | 24 | such a department existed, right? |
| 09:02 | 25 | A.    That's correct. |

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

29

| 09:02 | 1 | Q.   Since Mr. Villasenor is said to have created the name |
| 09:02 | 2 | himself, the department must have disappeared after he left |
| 09:02 | 3 | in 2006, right? |
| 09:02 | 4 | A.   I don't know when it left.  But I don't -- I don't |
| 09:02 | 5 | believe it exists today. |
| 09:02 | 6 | Q.   Let's look at Exhibit 36750. |
| 09:02 | 7 | *(Document provided to the witness.)* |
| 09:02 | 8 | BY MS. KELLER: |
| 09:02 | 9 | Q.   You see that this is an e-mail sent August 28th, 2008, |
| 09:02 | 10 | to various people, among them, you yourself, right? |
| 09:02 | 11 | A.   Yes. |
| 09:02 | 12 | MS. KELLER:  Your Honor, I would move 36750 into |
| 09:02 | 13 | evidence. |
| 09:02 | 14 | THE COURT:  Received. |
| 09:02 | 15 | *(Exhibit No. 36750 received in evidence.)* |
| 09:02 | 16 | *(Document displayed.)* |
| 09:02 | 17 | BY MS. KELLER: |
| 09:02 | 18 | Q.   And we see you here -- you're the -- one of the people |
| 09:03 | 19 | who's on this line. |
| 09:03 | 20 | MS. KELLER:  If we could display that. |
| 09:03 | 21 | *(Technician complies.)* |
| 09:03 | 22 | MS. KELLER:  Thank you. |
| 09:03 | 23 | BY MS. KELLER: |
| 09:03 | 24 | Q.   And the subject is "NPD, YTD --" that's for year to |
| 09:03 | 25 | date -- "2008 through June Toy Industry Review."  And we |

| 09:03 | 1 | see, in large script, "Sales Research/Market Intelligence |
| 09:03 | 2 | Department." |
| 09:03 | 3 | And it says, "To:  Distribution."  And you're listed |
| 09:03 | 4 | first on that CC line. |
| 09:03 | 5 | And it says, "Please find the NPD YTD 2008 through June |
| 09:03 | 6 | Toy Industry Review, which is located on the POS central |
| 09:03 | 7 | website." |
| 09:03 | 8 | And you received many such memos, didn't you, from the |
| 09:03 | 9 | Market Intelligence Department after the departure of |
| 09:03 | 10 | Mr. Villasenor? |
| 09:04 | 11 | A.  Well, I received this document monthly, so I think the |
| 09:04 | 12 | answer is yes. |
| 09:04 | 13 | Q.  So you knew that the Market Intelligence Department |
| 09:04 | 14 | lived on after the departure of Mr. Villasenor, right? |
| 09:04 | 15 | A.  Uh, no, I don't -- I don't really think about the -- |
| 09:04 | 16 | who these reports are from. |
| 09:04 | 17 | Q.  Well, you know he left in 2006, right? |
| 09:04 | 18 | A.  That's correct. |
| 09:04 | 19 | Q.  So you knew there was still a Market Intelligence |
| 09:04 | 20 | Department within Mattel, right? |
| 09:04 | 21 | A.  No.  I -- I really don't recall remembering that such a |
| 09:04 | 22 | phrase existed in Mattel. |
| 09:04 | 23 | Q.  Well, certainly the existence of this memo and the |
| 09:04 | 24 | existence of this time is evidence that it wasn't just |
| 09:04 | 25 | Mr. Villasenor's imagination that created the department, |

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

31

| | | |
|---|---|---|
| 09:04 | 1 | right?  You would agree with that, wouldn't you? |
| 09:04 | 2 | A.   No.  It could have easily been his imagination that |
| 09:04 | 3 | created it.  I don't know whose imagination discontinued it, |
| 09:05 | 4 | if it's been discontinued. |
| 09:05 | 5 | Q.   You haven't even checked, right? |
| 09:05 | 6 | A.   I don't believe it exists, but I have not checked. |
| 09:05 | 7 | Q.   But you didn't believe it existed before, right? |
| 09:05 | 8 | A.   I didn't know it existed before; that's correct. |
| 09:05 | 9 | Q.   So let's look at Exhibit 36749. |
| 09:05 | 10 | *(Document provided to the witness.)* |
| 09:05 | 11 | THE WITNESS:  I have it. |
| 09:05 | 12 | BY MS. KELLER: |
| 09:05 | 13 | Q.   And is this another e-mail to you from Market |
| 09:05 | 14 | Intelligence department?  This one dated May 22nd, 2008? |
| 09:05 | 15 | A.   Yes, from the Sales Research/Market Intelligence |
| 09:05 | 16 | Department. |
| 09:05 | 17 | MS. KELLER:  Your Honor, I'd move 36749 into |
| 09:05 | 18 | evidence. |
| 09:05 | 19 | THE COURT:  Received. |
| 09:05 | 20 | *(Exhibit No. 36749 received in evidence.)* |
| 09:05 | 21 | *(Document displayed.)* |
| 09:05 | 22 | BY MS. KELLER: |
| 09:05 | 23 | Q.   And this is another one where the subject is the "NPD |
| 09:05 | 24 | 2008 Quarter 1 Toy Industry Review," right? |
| 09:05 | 25 | A.   That's correct. |

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

32

| | | |
|---|---|---|
| 09:05 | 1 | Q.   And another one where the large script shows "Market |
| 09:05 | 2 | Intelligence Department," right? |
| 09:05 | 3 | A.   That's correct. |
| 09:05 | 4 | Q.   And let's look at Exhibit 36769. |
| 09:06 | 5 | A.   I have it. |
| 09:06 | 6 | Q.   And this is an e-mail from Conrad Nussbaum, right? |
| 09:06 | 7 | A.   That's right. |
| 09:06 | 8 | Q.   This is dated May 10, 2007, and you're the first person |
| 09:06 | 9 | copied? |
| 09:06 | 10 | A.   That's correct. |
| 09:06 | 11 | MS. KELLER:  Your Honor, I'd move 36769 into |
| 09:06 | 12 | evidence. |
| 09:06 | 13 | THE COURT:  Received. |
| 09:06 | 14 | (Exhibit No. 36769 received in evidence.) |
| 09:06 | 15 | (Document displayed.) |
| 09:06 | 16 | BY MS. KELLER: |
| 09:06 | 17 | Q.   And this one is another one it says, "Please find the |
| 09:06 | 18 | NPD 2008 Quarter 1 Toy Industry Review," et cetera.  And |
| 09:06 | 19 | again, we see the large script at the top "Sales |
| 09:06 | 20 | Research/Market Intelligence Department."  So you knew you |
| 09:06 | 21 | were regularly getting e-mails well after 2006 from the |
| 09:06 | 22 | Market Intelligence Department about sales research, right? |
| 09:06 | 23 | A.   I apparently was. |
| 09:06 | 24 | THE COURT:  Just a moment, Counsel.  I got a note |
| 09:06 | 25 | from the jury that they need to use the bathroom.  So we're |

| | | |
|---|---|---|
| 09:06 | 1 | just going to take about a five-minute recess. |
| 09:07 | 2 | Go back, stretch, and use the bathroom.  We'll |
| 09:07 | 3 | come right back into session. |
| 09:07 | 4 | I just got the note, Counsel, handed to me. |
| 09:07 | 5 | *(Recess held at 9:07 a.m.)* |
| 09:11 | 6 | *(Proceedings resumed at 9:11 a.m.)* |
| 09:11 | 7 | *(In the presence of the jury.)* |
| 09:11 | 8 | THE COURT:  All right.  We're back in session. |
| 09:11 | 9 | The jury is a present.  The alternates are present. |
| 09:11 | 10 | If all counsel would be seated.  Thank you for |
| 09:12 | 11 | your courtesy. |
| 09:12 | 12 | Ms. Keller, if you would like to resume your |
| 09:12 | 13 | examination, please. |
| 09:12 | 14 | MS. KELLER:  Thank you. |
| 09:12 | 15 | **DIRECT EXAMINATION (Resumed)** |
| 09:12 | 16 | BY MS. KELLER: |
| 09:12 | 17 | Q.   I think when we left we were discussing Exhibit 36769. |
| 09:12 | 18 | MS. KELLER:  And, Your Honor, if I haven't already |
| 09:12 | 19 | moved that in, I would move it in. |
| 09:12 | 20 | THE COURT:  Received. |
| 09:12 | 21 | *(Exhibit No. 36769 previously received in* |
| 09:12 | 22 | *evidence.)* |
| 09:12 | 23 | *(Document displayed.)* |
| 09:12 | 24 | BY MS. KELLER: |
| 09:12 | 25 | Q.   This is another e-mail to you.  This one sent May 10, |

| | | |
|---|---|---|
| 09:12 | 1 | 2007.  Other people are copied, as well.  And the subject, |
| 09:12 | 2 | "NPD 2007 First Quarter Toy Industry Review." |
| 09:12 | 3 | And again, in large script we see, "Sales |
| 09:12 | 4 | Research/Market Intelligence Department." |
| 09:12 | 5 | And is it your testimony that you just never paid |
| 09:12 | 6 | attention to these? |
| 09:12 | 7 | A.   Uh, no.  I focus on the from whom it is, so that's my |
| 09:13 | 8 | key to know what report it is. |
| 09:13 | 9 | Q.   From whom it is? |
| 09:13 | 10 | A.   Yes. |
| 09:13 | 11 | Q.   And that would include the fact that it is emanating |
| 09:13 | 12 | from the Market Intelligence Department, right? |
| 09:13 | 13 | A.   No.  When I get the e-mail, it's from Conrad Nussbaum. |
| 09:13 | 14 | Q.   And let's look at Exhibit 35646.  This is an e-mail |
| 09:13 | 15 | from you. |
| 09:13 | 16 | Q.   This is an e-mail from you to Alice M. Sato, dated |
| 09:13 | 17 | November 13, 2007.  You see that? |
| 09:13 | 18 | A.   Correct. |
| 09:13 | 19 | MS. KELLER:  Your Honor, I would move in 35646. |
| 09:13 | 20 | THE COURT:  Received. |
| 09:13 | 21 | *(Exhibit No. 35646 received in evidence.)* |
| 09:13 | 22 | *(Document displayed.)* |
| 09:13 | 23 | THE WITNESS:  I would pronounce it Alice Sato. |
| 09:13 | 24 | BY MS. KELLER: |
| 09:13 | 25 | Q.   Sato.  Thank you for the correction. |

| | | |
|---|---|---|
| 09:13 | 1 | This is another one that's entitled -- this one says, |
| 09:13 | 2 | "Q3 2007, Quarterly NPD Industry Review." |
| 09:13 | 3 | And if we look down below, we see "Sales |
| 09:14 | 4 | Research/Market Intelligence Department." |
| 09:14 | 5 | So this is another e-mail you were being sent from the |
| 09:14 | 6 | Market Intelligence Department, this one, "NPD 2007 Third |
| 09:14 | 7 | Quarter Toy Industry Review," right? |
| 09:14 | 8 | A.   That's correct. |
| 09:14 | 9 | Q.   And then, if we look at the top, we see that you were |
| 09:14 | 10 | asking Ms. Sato, "Would you please open and print the |
| 09:14 | 11 | attachment for me?  THX." |
| 09:14 | 12 | I guess that's "thanks"? |
| 09:14 | 13 | A.   It is. |
| 09:14 | 14 | Q.   And in this e-mail you're actually asking -- is |
| 09:14 | 15 | Ms. Sato a, uh -- is that your assistant? |
| 09:14 | 16 | A.   She's retired.  It was my assistant at the time. |
| 09:14 | 17 | Q.   And so you were asking her to actually print out for |
| 09:15 | 18 | you the Market Intelligence Department's report to you on |
| 09:15 | 19 | the third quarter toy industry review, right? |
| 09:15 | 20 | A.   I was asking her to print out the NPD report, which is |
| 09:15 | 21 | the attachment. |
| 09:15 | 22 | Q.   And so we see that you even wrote responses based on |
| 09:15 | 23 | e-mails that you got from the Market Intelligence |
| 09:15 | 24 | Department, right? |
| 09:15 | 25 | A.   That's correct.  I wouldn't -- I would say forwarding |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:15 | 1 | but... |
| 09:15 | 2 | Q.   And yet this was a department you couldn't even |
| 09:15 | 3 | remember existed when you were deposed in this case, right? |
| 09:15 | 4 | A.   That's correct. |
| 09:15 | 5 | Q.   And is this an example of adhering to Mattel's code of |
| 09:15 | 6 | corporate conduct of honesty, accountability, taking |
| 09:15 | 7 | ownership, unwavering integrity? |
| 09:15 | 8 | A.   Sure.  I think this is a great example of what I was |
| 09:15 | 9 | talking about.  If you look at the original message.  It's |
| 09:15 | 10 | from Conrad Nussbaum, and that is the trigger for me that |
| 09:16 | 11 | it's an NPD report.  I did not remember the name of the |
| 09:16 | 12 | department. |
| 09:16 | 13 | Q.   Now, you're also not aware of any research library at |
| 09:16 | 14 | Mattel up on the ninth floor, right? |
| 09:16 | 15 | A.   I wasn't at the time of my deposition. |
| 09:16 | 16 | Q.   That was just last year, right?  Just last October? |
| 09:16 | 17 | A.   That's correct. |
| 09:16 | 18 | Q.   And, in fact, you weren't aware of anyplace at Mattel |
| 09:16 | 19 | that contained catalogs of competitors, right? |
| 09:16 | 20 | A.   That's correct. |
| 09:16 | 21 | Q.   Or any room at Mattel that contained information |
| 09:16 | 22 | gathered from competitors, right? |
| 09:16 | 23 | A.   That's correct. |
| 09:16 | 24 | Q.   And while sitting here at trial, you've seen |
| 09:16 | 25 | Exhibit 9504, dated April 2001? |

| | | |
|---|---|---|
| 09:17 | 1 | A.   I have. |
| 09:17 | 2 | Q.   And if we -- this is from Sal Villasenor and Kelly |
| 09:17 | 3 | Osier, "Subject:  Toy Fair 2001 Competitive Toy Review." |
| 09:17 | 4 | And the first paragraph says, "This information was gathered |
| 09:17 | 5 | from competitive catalogs and price lists acquired at the |
| 09:17 | 6 | 2001 New York Toy Fair."  And if we look at the second to |
| 09:17 | 7 | last paragraph, it says, "The 2001 competitive catalogs and |
| 09:17 | 8 | price lists are available for viewing and copying.  Both are |
| 09:17 | 9 | kept in the WW marketing research library located on the 9th |
| 09:17 | 10 | floor tower building in El Segundo." |
| 09:17 | 11 | Now, it's not your position that Mr. Villasenor was |
| 09:17 | 12 | making up the existence of that library, is it? |
| 09:17 | 13 | A.   No. |
| 09:17 | 14 | Q.   If we look at the top of who this is being sent to, it |
| 09:18 | 15 | says, "Distribution," and you understand that was a list of |
| 09:18 | 16 | hundreds of people, right? |
| 09:18 | 17 | A.   I -- I suspect it was a long list.  I don't know |
| 09:18 | 18 | whether it was hundreds. |
| 09:18 | 19 | Q.   And you've seen in the course of this trial that on |
| 09:18 | 20 | other lists that are to distribution, that you're one of the |
| 09:18 | 21 | people included, right? |
| 09:18 | 22 | A.   I have seen in the course of this trial other lists |
| 09:18 | 23 | that do include me, yes. |
| 09:18 | 24 | Q.   And you don't believe that hundreds of people at Mattel |
| 09:18 | 25 | were being told about this collection of competitors, |

| | | |
|---|---|---|
| 09:18 | 1 | catalogs, and price lists, but you were excluded from that, |
| 09:18 | 2 | right? |
| 09:18 | 3 | MR. QUINN:  Assumes facts. |
| 09:18 | 4 | THE COURT:  Overruled. |
| 09:18 | 5 | THE WITNESS:  Uh, I suspect I didn't receive this. |
| 09:18 | 6 | That's correct. |
| 09:18 | 7 | BY MS. KELLER: |
| 09:18 | 8 | Q.   Do you believe that you were, as CEO, excluded from |
| 09:18 | 9 | knowing about the fact that on the ninth floor in El Segundo |
| 09:19 | 10 | there was a large library containing competitive catalogs |
| 09:19 | 11 | and price lists? |
| 09:19 | 12 | A.   No, I don't think I was being excluded.  But I didn't |
| 09:19 | 13 | know one existed, a so-called library, that is. |
| 09:19 | 14 | Q.   So the first you heard about it was last year? |
| 09:19 | 15 | A.   Uh, it was either 2009 or 2010. |
| 09:19 | 16 | Q.   Now, if we could move on to a different area.  You've |
| 09:19 | 17 | now learned that Matt Turetzky talked to Attorney Michael |
| 09:19 | 18 | Moore in 2002 and 2003 about the practice of using phony |
| 09:19 | 19 | credentials to get confidential information from |
| 09:19 | 20 | competitors' showrooms, right? |
| 09:20 | 21 | A.   Yes. |
| 09:20 | 22 | Q.   And you know that Michael Moore had, according to his |
| 09:20 | 23 | testimony, ten conversations with Sal Villasenor between |
| 09:20 | 24 | June 21st and December 21st, 2005, about that practice, |
| 09:20 | 25 | right? |

| 09:20 | 1 | A.   I think there was some debate over the number, as I |
|---|---|---|

A.   I think there was some debate over the number, as I
recall, but I believe there was some number of
conversations.
Q.   And you've heard Mattel executives and lawyers say that
Mr. Villasenor couldn't be terminated after this because he
could have sued Mattel, right?
A.   Um, no.  I heard Mattel's lawyers say they could not
imagine terminating him after he had filed the complaint
letter.
Q.   'Cause he could have sued Mattel, right?
A.   At that time, yes.
Q.   And, in fact, Jill Thomas testified -- and you were
here -- that it could have been expensive for Mattel,
because lawsuits involving wrongful termination, if they go
all the way, could actually amount to a million dollars,
right?
A.   That's what she said.
Q.   And so that's why Mr. Villasenor wasn't fired at all:
Because of money, right?
A.   No.  Had I had any chance to vote on that at any time,
he would have been fired and wouldn't have gotten a dime.
Q.   You met every single week with the head of your legal
department, right?
A.   Probably.
Q.   You know that, don't you?

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

40

| | | |
|---|---|---|
| 09:21 | 1 | A.    No, but I meet with 'em often. |
| 09:21 | 2 | Q.    You meet every single week with the head of Human |
| 09:21 | 3 | Resources and the head of Legal, right? |
| 09:21 | 4 | A.    I meet with 'em often. |
| 09:21 | 5 | Q.    You were meeting every single week with Alan Kaye and |
| 09:21 | 6 | Bob Normile, right? |
| 09:21 | 7 | A.    I meet with them often, both of them. |
| 09:21 | 8 | Q.    And this litigation was very prominent within your |
| 09:21 | 9 | company, as we've previously heard in your testimony, right? |
| 09:21 | 10 | A.    By "this litigation," you're talking about this case |
| 09:22 | 11 | right here? |
| 09:22 | 12 | Q.    This lawsuit. |
| 09:22 | 13 | A.    Yes, it is. |
| 09:22 | 14 | Q.    It was a big deal in Mattel, right? |
| 09:22 | 15 | A.    It is a big deal in Mattel. |
| 09:22 | 16 | Q.    And so after having heard these allegations about |
| 09:22 | 17 | Mr. Villasenor, Alan Kaye and Bob Normile never told you |
| 09:22 | 18 | about it? |
| 09:22 | 19 | A.    Not in 2005 or '6.  That's correct. |
| 09:22 | 20 | Q.    How about '7 or '8? |
| 09:22 | 21 | A.    That's correct too. |
| 09:22 | 22 | Q.    It was all kept from you, right? |
| 09:22 | 23 | A.    No.  I had a discussion with outside counsel regarding |
| 09:22 | 24 | this topic. |
| 09:22 | 25 | Q.    When? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 41 of 144   Page ID #:315218
CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

41

| 09:22 | 1 | A.   Either 2009 or 2010. |

A.   Either 2009 or 2010.

Q.   So between June 2005, when Mr. Villasenor first began
talking with your in-house attorney, Michael Moore, and
December 21st, 2005, when he wrote the letter that you've
seen, he could have been fired at any time, right?

A.   I would have fired him.

Q.   He was an at-will employee, correct?

A.   Yes.

Q.   And the people who went ahead and not only kept him on,
but essentially paid him off, they're still there, some of
them, right?

            MR. QUINN:   Assumes facts, Your Honor.

            THE COURT:   Overruled.

            MR. QUINN:   And it's argumentative.

            THE COURT:   Overruled.

            THE WITNESS:   I wouldn't use the term "pay off."

BY MS. KELLER:

Q.   Well, Michael Moore still works for you, right?

A.   He does.

Q.   And he knew during these meetings that everything he
was hearing about Mr. Villasenor violated Mattel's code of
conduct, right?

A.   Yes, I believe so.

Q.   He knew that Mr. Villasenor's conduct was something
that Mattel should not tolerate, right?

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

42

09:23    1    A.    Yes.  He should have known that, if he didn't.

09:23    2    Q.    He knew when he talked to Mr. Villasenor that

09:23    3    Mr. Villasenor's -- and all of the people who did this, not

09:23    4    just him, all these people within Mattel, were engaging in

09:24    5    unethical practices that violated your code of conduct,

09:24    6    true?

09:24    7    A.    That's correct.

09:24    8    Q.    And he still works for you?

09:24    9    A.    That's correct.

09:24   10    Q.    You haven't fired Michael Moore?

09:24   11    A.    No, I haven't.

09:24   12    Q.    You have fired Mr. Normile?

09:24   13    A.    No, I haven't.

09:24   14    Q.    Now, you fired people before, haven't you?

09:24   15    A.    I have.

09:24   16    Q.    You fired Adrienne Fontanella, true?

09:24   17    A.    Um, yes.

09:24   18    Q.    Matt Bousquette, true?

09:24   19    A.    Yes.

09:24   20    Q.    And a number of other people have been fired by Mattel,

09:24   21    right?

09:24   22    A.    Oh, I'm sure they have, yes.

09:24   23    Q.    Let's look at Exhibit 20122.

09:24   24              *(Document provided to the witness.)*

        25

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 43 of 144   Page ID #:315220
CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

43

| | | |
|---|---|---|
| 09:24 | 1 | BY MS. KELLER: |
| 09:24 | 2 | Q.    The July 2003 employee handbook. |
| 09:24 | 3 | *(Document displayed.)* |
| 09:24 | 4 | BY MS. KELLER: |
| 09:24 | 5 | Q.    And if you look at page 18 under "General Policies," |
| 09:25 | 6 | first paragraph, says "Standards of Conduct." |
| 09:25 | 7 | Have you gotten that yet? |
| 09:25 | 8 | A.    I have. |
| 09:25 | 9 | Q.    And it starts, "Every company employee needs guidelines |
| 09:25 | 10 | regarding conduct on the job.  Ours are simple, common sense |
| 09:25 | 11 | guidelines based on mutual courtesy, respect for the |
| 09:25 | 12 | individual, and cooperative team work.  We expect everyone |
| 09:25 | 13 | to keep these standards in mind in their everyday dealings |
| 09:25 | 14 | with customers, other employees, and the public in general." |
| 09:25 | 15 | And then, the second paragraph begins, "Certain conduct |
| 09:25 | 16 | is considered unacceptable at the company." |
| 09:25 | 17 | And then, if you go down to the third paragraph, |
| 09:25 | 18 | "Certain acts may be so serious that they could result in |
| 09:25 | 19 | termination of employment for a single offense.  Such |
| 09:26 | 20 | actions may include, but are not necessarily limited to, the |
| 09:26 | 21 | following:" |
| 09:26 | 22 | And if we go down to No. 14 on the next page, on |
| 09:26 | 23 | page 19. |
| 09:26 | 24 | *(Document displayed.)* |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 44 of 144   Page ID #:315221
CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

44

| | | |
|---|---|---|
| 09:26 | 1 | BY MS. KELLER: |
| 09:26 | 2 | Q.   We see that one of the grounds of termination is: |
| 09:26 | 3 | "Dishonesty, misrepresentation of facts, or falsification of |
| 09:26 | 4 | records, including the employment application, or |
| 09:26 | 5 | misrepresentation to obtain employee benefits or privileges |
| 09:26 | 6 | for self or others." |
| 09:26 | 7 | So Mr. Villasenor's conduct and those of his colleagues |
| 09:26 | 8 | in the Market Intelligence Department were grounds for |
| 09:26 | 9 | termination for even a single offense, right? |
| 09:26 | 10 | A.   I believe so, yes. |
| 09:26 | 11 | Q.   And instead of terminating him, Mattel promoted him, |
| 09:26 | 12 | raised his salary, and gave him bonuses, right? |
| 09:26 | 13 | A.   That's correct. |
| 09:26 | 14 | Q.   And you've heard that a number of the other people |
| 09:27 | 15 | involved in this, or who knew about it, or countenanced it, |
| 09:27 | 16 | were also promoted and given bonuses, right? |
| 09:27 | 17 | A.   That's correct. |
| 09:27 | 18 | Q.   Including Michael Shore, right? |
| 09:27 | 19 | A.   Yes. |
| 09:27 | 20 | Q.   And people who were involved in handling the Villasenor |
| 09:27 | 21 | matter within the Legal Department, including Jill Thomas, |
| 09:27 | 22 | they've either been promoted or given bonuses or not |
| 09:27 | 23 | terminated, right? |
| 09:27 | 24 | A.   Yes.  I -- I absolutely understand Jill Thomas' actions |
| 09:27 | 25 | given her views.  That doesn't necessarily mean it would be |

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

45

| 09:27 | 1 | everyone else's actions. |
| 09:27 | 2 | Q.   But if somebody at Mattel is in a really important |
| 09:27 | 3 | position and they engage in this sort of -- in wrongdoing, |
| 09:27 | 4 | it's important for you to stand up and take action, right? |
| 09:27 | 5 | A.   No.  I think it's important to stand up and take action |
| 09:27 | 6 | regardless of who does wrong.  It's right and wrong.  It's |
| 09:28 | 7 | very simple to me. |
| 09:28 | 8 | Q.   And to this very day, those people that we talked |
| 09:28 | 9 | about -- well, we talked about how Mr. Villasenor |
| 09:28 | 10 | consistently got raises, bonuses and promotions, right? |
| 09:28 | 11 | A.   That's correct. |
| 09:28 | 12 | Q.   Carey Plunkett never even got a written reprimand, |
| 09:28 | 13 | right? |
| 09:28 | 14 | A.   That's correct. |
| 09:28 | 15 | Q.   Not even a "disappointment" letter, right? |
| 09:28 | 16 | A.   That's correct. |
| 09:28 | 17 | Q.   Sometime in 2009, a superior called her in and told her |
| 09:28 | 18 | "Don't do that again," right? |
| 09:28 | 19 | A.   Uh, I believe it was somebody from the Human Resource |
| 09:28 | 20 | Department. |
| 09:28 | 21 | Q.   But she got promotions and salary increases every year |
| 09:28 | 22 | between 2000 and 2009, right? |
| 09:28 | 23 | A.   That's correct, she may have. |
| 09:28 | 24 | Q.   And she's still there? |
| 09:28 | 25 | A.   Yes, she is. |

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

46

| | | |
|---|---|---|
| 09:28 | 1 | Q.   And Tyler Bradley Snyder got no reprimand, right? |
| 09:28 | 2 | A.   (No response.) |
| 09:28 | 3 | Q.   No demotion?  No salary -- |
| 09:28 | 4 | A.   I'm sorry.  I'm trying to place Tyler Bradley Snyder. |
| 09:29 | 5 | I don't know. |
| 09:29 | 6 | Q.   Sharon Rahimi continues to this day to work for Mattel |
| 09:29 | 7 | as an independent contractor, right? |
| 09:29 | 8 | A.   That's correct. |
| 09:29 | 9 | Q.   Kelly Dermody Osier continues to work to this day for |
| 09:29 | 10 | Mattel as an independent contractor, right? |
| 09:29 | 11 | A.   I believe that's correct. |
| 09:29 | 12 | Q.   Michael Shore and Geri Pilgrim got "disappointment" |
| 09:29 | 13 | letters, right? |
| 09:29 | 14 | A.   Yes. |
| 09:29 | 15 | Q.   Ms. Pilgrim got no demotion, no reduction in pay, no |
| 09:29 | 16 | loss of bonus because of any of this, right? |
| 09:29 | 17 | A.   That's correct. |
| 09:29 | 18 | Q.   Matt Turetzky didn't even get a "disappointment" |
| 09:29 | 19 | letter, right? |
| 09:29 | 20 | A.   Right.  And he, in my judgment, is the worst offender |
| 09:29 | 21 | here or among the worst offenders. |
| 09:29 | 22 | Q.   And Drew Vollero didn't get one either, right? |
| 09:29 | 23 | A.   If I heard Drew Vollero correctly, he wasn't even aware |
| 09:29 | 24 | of this.  So I don't have any -- right now I don't have any |
| 09:29 | 25 | reason to associate him with this. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 47 of 144   Page ID #:315224
CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

47

| | | |
|---|---|---|
| 09:29 | 1 | Q.   And do you recall Mr. Friedman testifying that at the |
| 09:29 | 2 | same time Michael Shore was being reprimanded with his |
| 09:29 | 3 | "disappointment" letter that he was also being promoted to |
| 09:30 | 4 | the head of Consumer Research? |
| 09:30 | 5 | A.   I don't recall that specific, but that may be the case. |
| 09:30 | 6 | Q.   Well, you know it's the case, don't you? |
| 09:30 | 7 | A.   No, I don't know the timing.  I don't know the case. |
| 09:30 | 8 | I'm sorry. |
| 09:30 | 9 | Q.   Well, you were here when he testified, weren't you? |
| 09:30 | 10 | A.   I was here when Mr. Friedman testified. |
| 09:30 | 11 | Q.   And as of October 2009, Mr. Shore was being paid over |
| 09:30 | 12 | $230,000 plus benefits, right? |
| 09:30 | 13 | A.   I don't know that. |
| 09:30 | 14 | Q.   Sharon Rahimi gets over 150,000 a year to consult with |
| 09:30 | 15 | Mattel, right? |
| 09:30 | 16 | A.   I don't know that. |
| 09:30 | 17 | Q.   Matt Bousquette, when he was fired, he got a deal with |
| 09:30 | 18 | Mattel giving him a million and a half for two years, right? |
| 09:30 | 19 | A.   He did have a consulting arrangement with the company. |
| 09:30 | 20 | It may have been for that much money. |
| 09:30 | 21 | Q.   And Mr. Villasenor got almost 200,000 in severance pay, |
| 09:30 | 22 | money for his attorneys, and medical treatment, right? |
| 09:30 | 23 | A.   Uh, yes. |
| 09:30 | 24 | Q.   And that's because if you're a Mattel employee and you |
| 09:30 | 25 | engage in wrongdoing against Mattel's competitors, it's |

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

48

| | | |
|---|---|---|
| 09:30 | 1 | okay.  Right? |
| 09:30 | 2 | A.   No, it's not okay. |
| 09:31 | 3 | Q.   You're not fired; you're given bonuses, raises, |
| 09:31 | 4 | promotions, right? |
| 09:31 | 5 | A.   I wouldn't draw that conclusion. |
| 09:31 | 6 | Q.   Well, especially if it's against your key competitor, |
| 09:31 | 7 | MGA, right? |
| 09:31 | 8 |          MR. QUINN:  Unintelligible, Your Honor. |
| 09:31 | 9 |          THE COURT:  Sustained. |
| 09:31 | 10 | BY MS. KELLER: |
| 09:31 | 11 | Q.   If Mattel thinks that an employee has acted in a way |
| 09:31 | 12 | which could be interpreted as against Mattel's interest, |
| 09:31 | 13 | that's the only time it imposes discipline, right? |
| 09:31 | 14 | A.   No, that's not true. |
| 09:31 | 15 | Q.   Ana Cabrera and Beatriz Morales worked for Mattel for |
| 09:31 | 16 | years, right? |
| 09:31 | 17 | A.   I believe that's the case. |
| 09:31 | 18 | Q.   Ana Cabrera worked for Mattel for over 18 years, didn't |
| 09:31 | 19 | she? |
| 09:31 | 20 | A.   I don't know. |
| 09:31 | 21 | Q.   Have you looked -- |
| 09:31 | 22 | A.   No. |
| 09:31 | 23 | Q.   -- to see? |
| 09:31 | 24 | A.   I have not. |
| 09:31 | 25 | Q.   Do you care about them? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:31 | 1 | A.   To the extent I care about people, yes. |
| 09:31 | 2 | Q.   They were seamstresses, right? |
| 09:31 | 3 | A.   I would call them sample makers, but they did a job |
| 09:31 | 4 | like that. |
| 09:31 | 5 | Q.   Workers like Ana Cabrera and Beatriz Morales are kind |
| 09:32 | 6 | of the backbone of Mattel, aren't they?  They're everyday |
| 09:32 | 7 | workers, not the executives? |
| 09:32 | 8 | MR. QUINN:  Compound.  Vague and ambiguous. |
| 09:32 | 9 | THE WITNESS:  We've got 30,000 people who are the |
| 09:32 | 10 | backbone of Mattel.  I don't distinguish one person from |
| 09:32 | 11 | another in that. |
| 09:32 | 12 | BY MS. KELLER: |
| 09:32 | 13 | Q.   I'm asking you, workers, the people who actually make |
| 09:32 | 14 | the products that you sell; they're the backbone of the |
| 09:32 | 15 | company, aren't they? |
| 09:32 | 16 | A.   I, again, don't distinguish between people who make the |
| 09:32 | 17 | product, people who sell the product, people who create the |
| 09:32 | 18 | product.  All 30,000 people of Mattel are important. |
| 09:32 | 19 | Q.   After many years at Mattel, Jill Thomas fired them in |
| 09:32 | 20 | 2008 after learning from Victoria Marlow's deposition that |
| 09:32 | 21 | they had sewn fashions at night to make some money on the |
| 09:32 | 22 | side by working for Ms. Marlow, right? |
| 09:32 | 23 | MR. QUINN:  Assumes facts. |
| 09:32 | 24 | THE COURT:  Overruled. |
| 09:32 | 25 | MR. QUINN:  As to "at night." |

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 50 of 144   Page ID #:315227
CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

50

| | | |
|---|---|---|
| 09:32 | 1 | THE WITNESS:  I don't know what Ms. Thomas did, |
| 09:32 | 2 | but what they did was wrong. |
| 11:59 | 3 | BY MS. KELLER: |
| 09:32 | 4 | Q.   What they did was -- after their employment at Mattel |
| 09:33 | 5 | ended, they went to their garages, and they took patterns |
| 09:33 | 6 | that they had been given; they took clothes that they had |
| 09:33 | 7 | been given and they sewed them? |
| 09:33 | 8 | MR. QUINN:  Your Honor, this assumes facts. |
| 09:33 | 9 | THE COURT:  Overruled.  You both can question in |
| 09:33 | 10 | this area. |
| 09:33 | 11 | THE WITNESS:  I don't know what they did.  But if |
| 09:33 | 12 | they took Mattel patterns and sewed products for a |
| 09:33 | 13 | competitor of Mattel, whether it's day or night or in |
| 09:33 | 14 | between, it's wrong. |
| 11:59 | 15 | BY MS. KELLER: |
| 09:33 | 16 | Q.   Have you educated yourself at all about what they |
| 09:33 | 17 | actually did? |
| 09:33 | 18 | A.   No, I have not. |
| 09:33 | 19 | Q.   So you don't even know that they never took any Mattel |
| 09:33 | 20 | patterns? |
| 09:33 | 21 | A.   You just told me that.  I don't know. |
| 09:33 | 22 | Q.   No, I'm talking about what they did at night, working |
| 09:33 | 23 | for an independent contractor, sewing clothes for MGA.  They |
| 09:33 | 24 | took little cut-out pieces of fabric and sewed them into |
| 09:33 | 25 | doll clothes, right? |

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

51

| 09:33 | 1 | A.   I don't know what they did.  If they took Mattel -- |
| 09:33 | 2 | even if they didn't take Mattel items, if they were working |
| 09:33 | 3 | for a competitor, that's wrong. |
| 09:34 | 4 | Q.   And -- |
| 09:34 | 5 | A.   I don't care what position they're in. |
| 09:34 | 6 | Q.   Because right and wrong is really important to you. |
| 09:34 | 7 | They needed to be fired, right? |
| 09:34 | 8 | A.   Right and wrong is really important to me. |
| 09:34 | 9 | Q.   And you haven't done a thing to fire these people in |
| 09:34 | 10 | Mattel who participated in a many years' long, systematic |
| 09:34 | 11 | program of falsifying credentials to gain confidential |
| 09:34 | 12 | information from your competitors -- you haven't done a |
| 09:34 | 13 | thing to them, have you? |
| 09:34 | 14 | A.   Believe me, I've learned a lot here. |
| 09:34 | 15 | Q.   You haven't done -- |
| 09:34 | 16 | A.   And I am gonna find out what knew what when. |
| 09:34 | 17 | Q.   Well, you've been finding it out in this trial. |
| 09:34 | 18 | A.   I have.  I've read depositions.  I've listened to |
| 09:34 | 19 | testimony, and we're not gonna make these decisions about |
| 09:34 | 20 | people's career here on the witness stand, but we are |
| 09:34 | 21 | gonna -- we are gonna find out who knew what when. |
| 09:34 | 22 | Q.   You have had years and years to find out who knew what |
| 09:34 | 23 | when, haven't you? |
| 09:34 | 24 | A.   I have not.  But we will find out. |
| 09:34 | 25 | Q.   You have deliberately insulated yourself from having to |

52

| | | |
|---|---|---|
| 09:34 | 1 | know anything about this, right? |
| 09:35 | 2 | A.   No, that's not true. |
| 09:35 | 3 | Q.   Do you think it's morally wrong to keep promoting and |
| 09:35 | 4 | paying, in some cases, millions of dollars to executives who |
| 09:35 | 5 | were in on this stuff, while you fire little seamstresses |
| 09:35 | 6 | that are trying to earn a little extra money for their |
| 09:35 | 7 | families? |
| 09:35 | 8 | MR. QUINN:  Your Honor, this is argumentative. |
| 09:35 | 9 | THE WITNESS:  I'm not gonna paint -- |
| 09:35 | 10 | MR. QUINN:  Assumes facts. |
| 09:35 | 11 | THE COURT:  Overruled. |
| 09:35 | 12 | You can answer the question. |
| 09:35 | 13 | THE WITNESS:  Thank you. |
| 09:35 | 14 | I'm not gonna paint everybody with the same brush |
| 09:35 | 15 | here.  I don't know exactly who knew what or did what when. |
| 09:35 | 16 | Each individual circumstances might be different. |
| 09:35 | 17 | But I am gonna know that. |
| 09:35 | 18 | BY MS. KELLER: |
| 09:35 | 19 | Q.   And -- |
| 09:35 | 20 | A.   And there will be action, depending on the |
| 09:35 | 21 | circumstances of each individual person's situation. |
| 09:35 | 22 | Q.   You're saying that for the benefit of this lawsuit? |
| 09:35 | 23 | A.   No, I'm not. |
| 09:35 | 24 | Q.   Mr. Eckert -- |
| 09:35 | 25 | A.   Think of -- think of -- |

53

| | | |
|---|---|---|
| 09:35 | 1 | MR. QUINN:  Your Honor, may he finish his answer? |
| 09:35 | 2 | THE COURT:  Finish your answer, sir. |
| 09:35 | 3 | THE WITNESS:  No.  Think about Carey Plunkett, who |
| 09:36 | 4 | was up here.  I heard that she went -- and she may have been |
| 09:36 | 5 | the only one I think who was up here -- in 2002, went into |
| 09:36 | 6 | MGA's showroom.  That was wrong.  She wasn't comfortable at |
| 09:36 | 7 | the time.  She's been an employee for ten years since. |
| 09:36 | 8 | She's apparently done well.  For all I know, she did this |
| 09:36 | 9 | because Sal Villasenor talked her into doing it.  I'm not |
| 09:36 | 10 | sure I'm gonna treat Carey Plunkett or anybody should think |
| 09:36 | 11 | of Carey Plunkett the way we might think of a Matt Turetzky, |
| 09:36 | 12 | who is a supervisor, who knows the code of conduct, who's a |
| 09:36 | 13 | Harvard MBA, who knows right from wrong and said it was a |
| 09:36 | 14 | gray area.  Those to me are different situations. |
| 09:36 | 15 | BY MS. KELLER: |
| 09:36 | 16 | Q.   You're the CEO of the biggest toy company in the world, |
| 09:36 | 17 | right? |
| 09:36 | 18 | A.   I am. |
| 09:36 | 19 | Q.   You have practically unlimited resources to investigate |
| 09:36 | 20 | anything you wish to, right? |
| 09:36 | 21 | A.   I have substantial resources. |
| 09:36 | 22 | Q.   And, in fact, you used those resources, for example, to |
| 09:36 | 23 | send investigators over to Ana Cabrera's home to search it, |
| 09:37 | 24 | right? |
| 09:37 | 25 | A.   Uh, I know there's a debate on the term "search," but |

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 54 of 144   Page ID #:315231
CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

54

| | | |
|---|---|---|
| 09:37 | 1 | I -- I believe investigators, or Rich de Anda, specifically, |
| 09:37 | 2 | went to somebody's house. |
| 09:37 | 3 | Q.   You used your resources to interrogate those women on |
| 09:37 | 4 | tape by the former head of the LAPD Homicide Department, |
| 09:37 | 5 | right? |
| 09:37 | 6 | MR. QUINN:  Your Honor, this is argumentative. |
| 09:37 | 7 | THE COURT:  Overruled. |
| 09:37 | 8 | THE WITNESS:  I didn't direct those resources, but |
| 09:37 | 9 | I understand that happened. |
| 08:33 | 10 | BY MS. KELLER: |
| 09:37 | 11 | Q.   You could have found out anytime over the last years -- |
| 09:37 | 12 | anytime you wanted to exactly who did what, when, and |
| 09:37 | 13 | where -- anytime you wanted to, right? |
| 09:37 | 14 | A.   Had I known about this situation, yes, absolutely. |
| 09:37 | 15 | Q.   And you insulated yourself from knowing too much so you |
| 09:37 | 16 | wouldn't have to do anything, right? |
| 09:37 | 17 | A.   That simply isn't the case. |
| 09:37 | 18 | Q.   You don't have any evidence that these two women that |
| 09:37 | 19 | were fired ever created any designs of their own for Mattel |
| 09:38 | 20 | or MGA, right? |
| 09:38 | 21 | A.   I'm just reacting to what you're telling me.  I don't |
| 09:38 | 22 | have any evidence. |
| 09:38 | 23 | Q.   Because you haven't even checked to this very day, have |
| 09:38 | 24 | you? |
| 09:38 | 25 | A.   That's correct. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:38 | 1 | Q.   You don't care about them because they're little |
| 09:38 | 2 | people, right? |
| 09:38 | 3 | A.   No, that's not correct. |
| 09:38 | 4 | Q.   You have no evidence that those people did anything at |
| 09:38 | 5 | all to harm Mattel's interests, correct? |
| 09:38 | 6 | A.   That's correct.  I have no evidence of that. |
| 09:38 | 7 | Q.   You have evidence that at night they sewed some |
| 09:38 | 8 | fashions for an independent contractor, right? |
| 09:38 | 9 | A.   No.  I don't have any evidence.  Now you're changing |
| 09:38 | 10 | the assertion here. |
| 09:38 | 11 | Q.   Well, you know that when Ron Brawer left MGA -- |
| 09:38 | 12 | A.   When he left Mattel? |
| 09:38 | 13 | Q.   When he left Mattel. |
| 09:38 | 14 | A.   Excuse me, we don't need to start the whole question |
| 09:39 | 15 | over again. |
| 09:39 | 16 | Q.   -- when he left Mattel, that Mattel's Investigation |
| 09:39 | 17 | Department had him followed and videotaped for two weeks, |
| 09:39 | 18 | right? |
| 09:39 | 19 | A.   I know that now.  And I also know the circumstances in |
| 09:39 | 20 | which they did that. |
| 09:39 | 21 | Q.   And do you -- |
| 09:39 | 22 | A.   Here's a fellow who took documents or a binder out of |
| 09:39 | 23 | the company before he left, who lied to the head of Human |
| 09:39 | 24 | Resources, who was going to work for a competitor, who had |
| 09:39 | 25 | been in contact with a competitor for a long time, who would |

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

56

| | | |
|---|---|---|
| 09:39 | 1 | not comply with the code of conduct, and told us the code of |
| 09:39 | 2 | conduct didn't apply to him.  I could imagine why one would |
| 09:39 | 3 | want to know what he was up to.  And this was after we had |
| 09:39 | 4 | already been burned by the Machado situation down in Mexico. |
| 09:39 | 5 | We'd already had problems with people taking confidential |
| 09:39 | 6 | information from Mattel to MGA, so I can imagine why someone |
| 09:39 | 7 | would want to know what Ron Brawer was doing. |
| 09:39 | 8 | Q.   What did Ron Brawer's wife and children do? |
| 09:39 | 9 | A.   Nothing. |
| 09:39 | 10 | Q.   Have you looked at the videotape to see all the hours |
| 09:39 | 11 | that his wife and kids were videotaped with him not even in |
| 09:40 | 12 | the frame? |
| 09:40 | 13 | MR. QUINN:  It's false.  There's no evidence of |
| 09:40 | 14 | that, Your Honor.  "All the hours." |
| 09:40 | 15 | THE COURT:  Overruled. |
| 09:40 | 16 | THE WITNESS:  No, I have not. |
| 09:40 | 17 | But that would -- I can't see any reason why |
| 09:40 | 18 | somebody would do that. |
| 09:40 | 19 | BY MS. KELLER: |
| 09:40 | 20 | Q.   Have you checked? |
| 09:40 | 21 | A.   No, I have not. |
| 09:40 | 22 | Q.   Do you care? |
| 09:40 | 23 | A.   It's a little historical right now, but I do care.  It |
| 09:40 | 24 | doesn't make a lot of sense to me that somebody would do |
| 09:40 | 25 | that. |

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 57 of 144   Page ID #:315234
CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

57

| | | |
|---|---|---|
| 09:40 | 1 | Q.   Well, if your Investigation Department is videotaping |
| 09:40 | 2 | people's wives and kids, that's something you, as the head |
| 09:40 | 3 | man would want to know, right? -- so you could put a stop to |
| 09:40 | 4 | that? |
| 09:40 | 5 | A.   Uh, I would like to know that.  And it just doesn't -- |
| 09:40 | 6 | doesn't make sense to me. |
| 09:40 | 7 | Q.   Doesn't make sense if your legitimate business interest |
| 09:40 | 8 | is to surveil the individual to make sure he's not doing |
| 09:40 | 9 | anything against Mattel's business interests, right? |
| 09:40 | 10 | A.   That's correct. |
| 09:40 | 11 | Q.   But if you're doing it to intimidate, if you're doing |
| 09:40 | 12 | it for other reasons, it could make sense, right? |
| 09:40 | 13 | A.   I can't imagine any circumstances where it would make |
| 09:40 | 14 | sense.  I really can't. |
| 09:40 | 15 | Q.   And yet you haven't even checked to see if that |
| 09:41 | 16 | practice is still continuing at Mattel, right? |
| 09:41 | 17 | MR. QUINN:  Assumes facts not in evidence. |
| 09:41 | 18 | "Practice." |
| 09:41 | 19 | THE COURT:  Overruled. |
| 09:41 | 20 | THE WITNESS:  Until yesterday, I didn't even know |
| 09:41 | 21 | somebody did videotape Mr. Brawer's family. |
| 09:41 | 22 | BY MS. KELLER: |
| 09:41 | 23 | Q.   That surveillance cost Mattel a lot of money, didn't |
| 09:41 | 24 | it?  Two weeks of following and videotaping somebody? |
| 09:41 | 25 | A.   I have no idea. |

| | | |
|---|---|---|
| 09:41 | 1 | Q.   Have you checked? |
| 09:41 | 2 | A.   No, I haven't. |
| 09:41 | 3 | Q.   And you knew that because Mr. Brawer would not sign |
| 09:41 | 4 | these new inventions agreements that you saw up on the |
| 09:41 | 5 | screen when he left, you sued Mr. Brawer, right? |
| 09:41 | 6 | A.    No.  He said he never signed his code of conduct, and |
| 09:41 | 7 | he said when he left Mattel that he was not bound by the |
| 09:41 | 8 | code of conduct.  He was going to a competitor.  He had |
| 09:41 | 9 | taken binders out of Mattel. |
| 09:41 | 10 |     Go ahead. |
| 09:41 | 11 | Q.   Let's talk about that for a second.  What was in the |
| 09:41 | 12 | binders? |
| 09:41 | 13 | A.   I don't know. |
| 09:41 | 14 | Q.   You know what?  Are you aware that your own |
| 09:42 | 15 | surveillance of him on camera showed the box that he had |
| 09:42 | 16 | when he was leaving Mattel? |
| 09:42 | 17 | A.   It wouldn't surprise me. |
| 09:42 | 18 | Q.   You understand that no one can leave Mattel with a box |
| 09:42 | 19 | of items without them being checked, right? |
| 09:42 | 20 | A.   Yes. |
| 09:42 | 21 | Q.   You know that security -- |
| 09:42 | 22 |     MR. QUINN:  Vague and ambiguous. |
| 09:42 | 23 |     THE WITNESS:  Hang on.  He needs to object.  We'll |
| 09:42 | 24 | slow down. |
| 09:42 | 25 |     THE COURT:  Overruled. |

| | | |
|---|---|---|
| 11:59 | 1 | BY MS. KELLER: |
| 09:42 | 2 | Q.   You know that security checks every single thing that |
| 09:42 | 3 | somebody is taking out of Mattel in a box, right? |
| 09:42 | 4 | A.   Yes. |
| 09:42 | 5 | Q.   And you know there wasn't anything in any binders that |
| 09:42 | 6 | Mr. Brawer took that contained any proprietary Mattel |
| 09:42 | 7 | information, right? |
| 09:42 | 8 | A.   No, I don't know that. |
| 09:42 | 9 | Q.   So you sued him because you didn't know one way or the |
| 09:42 | 10 | other? |
| 09:42 | 11 | A.   We sued him for declaratory relief so that he would be |
| 09:42 | 12 | bound by the code of conduct. |
| 09:42 | 13 | Q.   You personally authorized that lawsuit, right? |
| 09:42 | 14 | A.   I was certainly aware of it. |
| 09:42 | 15 | Q.   You authorized it, didn't you? |
| 09:43 | 16 | A.   It wouldn't bother me to agree with that, but I don't |
| 09:43 | 17 | know if that was the case. |
| 09:43 | 18 | Q.   And yet, you heard Jill Thomas say that the reason |
| 09:43 | 19 | Mr. Villasenor had to be paid off was because a lawsuit -- |
| 09:43 | 20 | if he sued Mattel, it could be too expensive, right? |
| 09:43 | 21 |             MR. QUINN:  Argumentative, Your Honor. |
| 09:43 | 22 |             THE COURT:  The "paid off" is stricken. |
| 09:43 | 23 |             THE WITNESS:  Strike the "payoff."  We can have |
| 09:43 | 24 | the conversation. |
| | 25 | |

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

60

| | | |
|---|---|---|
| 09:43 | 1 | BY MS. KELLER: |
| 09:43 | 2 | Q.   You heard Ms. Thomas say that the reason Mr. Villasenor |
| 09:43 | 3 | had to be paid money rather than fired was it could be too |
| 09:43 | 4 | expensive if he sued Mattel, right? |
| 09:43 | 5 | A.   I did hear that. |
| 09:43 | 6 | Q.   And yet -- |
| 09:43 | 7 | A.   And I -- I think that's the wrong conclusion.  I think |
| 09:43 | 8 | as a matter of principle, he shouldn't have been paid. |
| 09:43 | 9 | Q.   And as a matter of principle, it wasn't too expensive |
| 09:43 | 10 | to Mattel to turn around and sue Ron Brawer, even though you |
| 09:43 | 11 | had no evidence of any wrongdoing on his part, correct? |
| 09:43 | 12 | A.   No, we -- we did believe he left Mattel with a binder. |
| 09:44 | 13 | He would not sign the code of conduct.  He told us he would |
| 09:44 | 14 | not be bound by the code of conduct.  He was going to a |
| 09:44 | 15 | competitor.  He had lied to the head of Human Resources. |
| 09:44 | 16 | Those to me are plenty of grounds to want to protect our |
| 09:44 | 17 | rights.  This, remember, is after we've already been burned |
| 09:44 | 18 | by things going from Mattel to MGA.  I think it's absolutely |
| 09:44 | 19 | within our rights to protect our information as best we can. |
| 09:44 | 20 | Q.   You think it's really bad for somebody to be going to a |
| 09:45 | 21 | competitor and lying about it to Human Resources, right? |
| 09:45 | 22 | Looking for another job? |
| 09:45 | 23 | A.   Well, I heard two different questions.  Looking for |
| 09:45 | 24 | another job I don't think is bad.  Lying to Human Resources |
| 09:45 | 25 | I think is bad. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:45 | 1 | Q.   You testified here at trial that it wasn't true that |
| 09:45 | 2 | you signed a contract with Mattel while you were still |
| 09:45 | 3 | employed at Kraft, right? |
| 09:45 | 4 | A.   That's correct. |
| 09:45 | 5 | Q.   And you testified that you resigned from your position |
| 09:45 | 6 | at Kraft before you signed the Mattel employment agreement, |
| 09:45 | 7 | which at the time was just a term sheet, right? |
| 09:45 | 8 | A.   That's a fact. |
| 09:45 | 9 | Q.   You were aboveboard with Kraft, right? |
| 09:45 | 10 | A.   I was. |
| 09:45 | 11 | Q.   You let Kraft know you were being considered for the |
| 09:45 | 12 | position of CEO and Chairman of the Board of Mattel before |
| 09:45 | 13 | you accepted Mattel's offer, right? |
| 09:45 | 14 | A.   That's correct. |
| 09:45 | 15 | Q.   And when you left Kraft, you didn't violate your |
| 09:45 | 16 | employment contract, right? |
| 09:45 | 17 | A.   I did not have an employment contract with Kraft. |
| 09:45 | 18 | Q.   Well, you were here when Tim Kilpin testified, right? |
| 09:45 | 19 | A.   I was. |
| 09:45 | 20 | Q.   And Mr. Kilpin, in 2003, was working for Disney, right? |
| 09:46 | 21 | A.   Yes. |
| 09:46 | 22 | Q.   And in October of 2003, Mr. Kilpin returned to Mattel |
| 09:46 | 23 | as a senior vice president of Girls Marketing and Design, |
| 09:46 | 24 | right? |
| 09:46 | 25 | A.   Yes. |

| 09:46 | 1 | Q.   He actually only accepted Mattel's offer in April of |
|---|---|---|
| 09:46 | 2 | 2003, true? |
| 09:46 | 3 | A.   That could be. |
| 09:46 | 4 | Q.   You heard him say that before then he had interviewed |
| 09:46 | 5 | with Alan Kaye and Matt Bousquette, right? |
| 09:46 | 6 | A.   Yes. |
| 09:46 | 7 | Q.   And you know as CEO and Chairman of the Board that |
| 09:46 | 8 | Mr. Kilpin accepted Mattel's offer while he was still |
| 09:46 | 9 | employed by and, in fact, under contract for a term contract |
| 09:46 | 10 | with Disney, right? |
| 09:46 | 11 | A.   I believe that's the case. |
| 09:46 | 12 | Q.   You know he accepted your offer before he even told |
| 09:46 | 13 | Disney he was gonna do so, right? |
| 09:46 | 14 | A.   That I don't know. |
| 09:46 | 15 | Q.   Mr. Kilpin was not an at-will employee of Disney who |
| 09:46 | 16 | was free to terminate his contract at any time, right? |
| 09:46 | 17 | A.   That's correct. |
| 09:46 | 18 | Q.   And so he was negotiating with Mattel while still under |
| 09:46 | 19 | contract to Disney, which Mattel knew, without telling |
| 09:47 | 20 | Disney, right? |
| 09:47 | 21 | A.   I'm sorry.  Could you just ask that one again.  I |
| 09:47 | 22 | didn't hear the very beginning of it. |
| 09:47 | 23 | Q.   He was negotiating -- |
| 09:47 | 24 | A.   Yes. |
| 09:47 | 25 | Q.   -- at Mattel while he was still under a term contract |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:47 | 1 | with Disney, and he wasn't telling Disney about at the time. |
| 09:47 | 2 | You heard him say that, right? |
| 09:47 | 3 | A.   I do know he was negotiating with Mattel while he was |
| 09:47 | 4 | under contract.  I don't remember whether or not he had |
| 09:47 | 5 | informed Disney of that. |
| 09:47 | 6 | Q.   You heard him say that he accepted your offer before |
| 09:47 | 7 | his contract with Disney expired, right? |
| 09:47 | 8 | A.   I believe that is what he said. |
| 09:47 | 9 | Q.   And you heard him say that he accepted your offer |
| 09:47 | 10 | without telling Disney he was going to do so, right? |
| 09:47 | 11 | A.   He may have. |
| 09:47 | 12 | Q.   And you heard him say that Disney was -- didn't want to |
| 09:47 | 13 | let him go.  Disney wouldn't let him out of his contract and |
| 09:47 | 14 | insisted that he stay on, right? |
| 09:47 | 15 | A.   That's correct.  And then I heard him say we withdraw |
| 09:47 | 16 | the offer. |
| 09:47 | 17 | Q.   You had no qualms about having people accept your job |
| 09:47 | 18 | offers before they had resigned positions at other companies |
| 09:47 | 19 | that they were under contract for, right? |
| 09:48 | 20 | A.   No, I do have qualms with that.  I don't think one |
| 09:48 | 21 | should accept employment for another company while they're |
| 09:48 | 22 | still employed by a former company.  The way to do this is |
| 09:48 | 23 | to resign and accept, in that order. |
| 09:48 | 24 | Q.   So you probably fired all the people who did that and |
| 09:48 | 25 | interfered with Mr. Kilpin's employment contract with |

64

| | | |
|---|---|---|
| 09:48 | 1 | Disney, right? |
| 09:48 | 2 | MR. QUINN:  Assumes facts. |
| 09:48 | 3 | THE WITNESS:  No.  I'm sure -- |
| 09:48 | 4 | MR. QUINN:  Assumes facts. |
| 09:48 | 5 | THE COURT:  Overruled. |
| 09:48 | 6 | THE WITNESS:  Sorry, counselor. |
| 09:48 | 7 | I'm sure many people don't follow the order I do. |
| 09:48 | 8 | BY MS. KELLER: |
| 09:48 | 9 | Q.   Is this an example of Mattel's unwavering integrity in |
| 09:48 | 10 | the code of conduct? |
| 09:48 | 11 | A.   Is what an example? |
| 09:48 | 12 | Q.   Negotiating secretly with Tim Kilpin while he was still |
| 09:48 | 13 | under contract at Disney, knowing full well that he had a |
| 09:48 | 14 | term contract at Disney and making him an offer well before |
| 09:48 | 15 | his Disney contract expired.  Is that an example -- |
| 09:48 | 16 | A.   Well, I -- |
| 09:48 | 17 | Q.   -- of unwavering integrity in Mattel's code of conduct? |
| 09:48 | 18 | A.   Sure.  I think employees are allowed to interview with |
| 09:48 | 19 | anybody they want to.  I don't think we have the right to |
| 09:49 | 20 | tell somebody you can't interview here because you have a |
| 09:49 | 21 | contract with someone else. |
| 09:49 | 22 | Q.   And -- |
| 09:49 | 23 | A.   And I heard Mr. Kilpin say he was surprised that Disney |
| 09:49 | 24 | didn't agree, so then he honored the contract. |
| 09:49 | 25 | Q.   The reason he was surprised was he hadn't told 'em |

| | | |
|---|---|---|
| 09:49 | 1 | anything about his negotiations with Mattel and Mattel |
| 09:49 | 2 | hadn't told Disney? |
| 09:49 | 3 | A.   I don't know that.  I don't know that he hadn't told |
| 09:49 | 4 | Disney and that's why he was surprised.  I just don't know |
| 09:49 | 5 | that. |
| 09:49 | 6 | Q.   When it benefits Mattel for an employee to commit |
| 09:49 | 7 | wrongdoing, whether it's an executive or a regular line |
| 09:49 | 8 | employee, nothing happens to that person, right? |
| 09:49 | 9 | A.   No. |
| 09:49 | 10 | Q.   We've seen that in this trial, haven't we? |
| 09:49 | 11 | A.   Unfortunately, I think we have seen instances in this |
| 09:49 | 12 | trial where people either did the wrong thing or knew of |
| 09:49 | 13 | someone who did the wrong thing, and those people didn't do |
| 09:49 | 14 | the right thing and take the appropriate action.  I think we |
| 09:49 | 15 | have seen that in this trial. |
| 09:49 | 16 | Q.   And we have seen that not a single person in the whole |
| 09:50 | 17 | group had any negative consequence from Mattel whatsoever as |
| 09:50 | 18 | long as their wrongful conduct was benefiting Mattel. |
| 09:50 | 19 | That's what we've seen, haven't we? |
| 09:50 | 20 | A.   No.  We've seen -- we heard from Carey Plunkett that |
| 09:50 | 21 | she has been talked to about some episode.  We've seen |
| 09:50 | 22 | letters, which in my experience at Mattel, is a big deal to |
| 09:50 | 23 | get a negative letter like that.  People are understanding |
| 09:50 | 24 | the situation. |
| 09:50 | 25 | Some people did the right thing.  John Louie, who -- |

| | | |
|---|---|---|
| 09:50 | 1 | who becomes Mr. Villasenor's supervisor -- I'll wait. |
| 09:50 | 2 | Q.   After MGA sued, right? |
| 09:50 | 3 | A.   I don't know what day he became a supervisor, but he -- |
| 09:50 | 4 | he then steps up and says, "Here's the system.  The code of |
| 09:50 | 5 | conduct is clear, and you can't do this stuff, Sal." |
| 09:50 | 6 | Q.   The only people in this whole case that we have seen |
| 09:50 | 7 | who were supposed to have committed some wrongdoing, who had |
| 09:51 | 8 | any consequence from Mattel, were Ana Cabrera and Beatriz |
| 09:51 | 9 | Morales, true? |
| 09:51 | 10 | A.   No. |
| 09:51 | 11 | Q.   Let's look again at Mattel's 2003 code of conduct, |
| 09:51 | 12 | Exhibit 20327. |
| 09:51 | 13 | (Document provided to the witness.) |
| 09:51 | 14 | (Document displayed.) |
| 09:51 | 15 | THE WITNESS:  I have it. |
| 09:51 | 16 | BY MS. KELLER: |
| 09:51 | 17 | Q.   Page 12. |
| 09:51 | 18 | (Document displayed.) |
| 09:51 | 19 | BY MS. KELLER: |
| 09:51 | 20 | Q.   Under the paragraph that we already saw about |
| 09:51 | 21 | "Gathering Competitive Information," it says: |
| 09:51 | 22 | "If we find ourselves in possession of information that |
| 09:51 | 23 | may have been obtained in an illegal or unethical manner, we |
| 09:51 | 24 | should immediately inform the law department and should turn |
| 09:51 | 25 | the information over only to a member of the law department |

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

67

09:52    1    staff, without showing it or sharing it with other Mattel

09:52    2    employees."

09:52    3         And this is still what you say about gathering

09:52    4    competitive information, isn't it?

09:52    5    A.   Uh, I think the last edition of the code of conduct was

09:52    6    2009 or '10.  It may very well be.

09:52    7    Q.   Well, the policy hasn't changed, has it?  That if

09:52    8    somebody finds -- somebody at Mattel finds themselves in

09:52    9    possession of information that may have been obtained in an

09:52   10    illegal or unethical manner that the law department should

09:52   11    immediately be informed, right?

09:52   12    A.   I don't know if the wording of the policy has changed,

09:52   13    but I'm sure the thought behind it has not.

09:52   14    Q.   Let's look at Exhibit 2300.

09:52   15              (Document provided to the witness.)

09:52   16    BY MS. KELLER:

09:52   17    Q.   This is Mattel's corporate governance, uh, Mattel's

09:53   18    code of ethics.

09:53   19    A.   Code of conduct.

09:53   20    Q.   And this is from 2008, right?

09:53   21    A.   The print date is 2008.

09:53   22    Q.   And you actually played a role in having this

09:53   23    particular code of conduct adopted at Mattel, didn't you?

09:53   24    A.   I played a role in the original code of conduct, yes.

09:53   25    Q.   Well, this one?

| | | |
|---|---|---|
| 09:53 | 1 | A.   Well, they're all substantially similar.  They all |
| 09:53 | 2 | evolve over time, so I would say -- I have my fingerprints |
| 09:53 | 3 | on all of the code of conducts at Mattel. |
| 09:53 | 4 | Q.   You played a role in having this code of conduct |
| 09:53 | 5 | adopted at Mattel, true? |
| 09:53 | 6 | A.   Yes. |
| 09:53 | 7 | Q.   And let's look at page -- |
| 09:53 | 8 | MS. KELLER:  Oh, Your Honor, I'd move 2300 into |
| 09:53 | 9 | evidence. |
| 09:53 | 10 | THE COURT:  Received. |
| 09:53 | 11 | (Exhibit No. 2300 received in evidence.) |
| 09:53 | 12 | (Document displayed.) |
| 09:53 | 13 | BY MS. KELLER: |
| 09:54 | 14 | Q.   Let's look at page 8, "Gathering Competitive |
| 09:54 | 15 | Information."  Do you see that part? |
| 09:54 | 16 | A.   Yes. |
| 09:54 | 17 | Q.   It says, "Mattel does not seek to obtain competitive |
| 09:54 | 18 | information by illegal or unethical means, and we do not |
| 09:54 | 19 | knowingly use any information obtained in this manner.  If |
| 09:54 | 20 | we find ourselves in possession of information that may have |
| 09:54 | 21 | been obtained in an illegal or unethical manner, we should |
| 09:54 | 22 | immediately inform the law department and should turn the |
| 09:54 | 23 | information only (sic) to a member of the law department |
| 09:54 | 24 | staff without showing it or sharing it with other Mattel |
| 09:54 | 25 | employees." |

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

69

| | | |
|---|---|---|
| 09:54 | 1 | Do you have a specific person in the law department in |
| 09:54 | 2 | mind? |
| 09:54 | 3 | A.   Um.  I don't, no. |
| 09:54 | 4 | Q.   Would that include Michael Moore? |
| 09:54 | 5 | A.   Sure. |
| 09:54 | 6 | Q.   Would that include Jill Thomas? |
| 09:54 | 7 | A.   Yes. |
| 09:54 | 8 | Q.   Would that include Bob Normile? |
| 09:55 | 9 | A.   Yes. |
| 09:55 | 10 | Q.   And you believe that they satisfactorily handled the |
| 09:55 | 11 | Villasenor matter, correct? |
| 09:55 | 12 | A.   They made certain judgments that I disagree with, but I |
| 09:55 | 13 | think they did do the important thing of making sure |
| 09:55 | 14 | Mr. Villasenor was not employed with the company and that |
| 09:55 | 15 | the practices that they had found had stopped. |
| 09:55 | 16 | Q.   Mr. Villasenor made his own decision to leave, right? |
| 09:55 | 17 | Remember that testimony? |
| 09:55 | 18 | A.   He made his own decision to go on a stress leave, yes. |
| 09:55 | 19 | Q.   Do you remember the testimony from both sides that he |
| 09:55 | 20 | made his own decision to leave? |
| 09:55 | 21 | Mattel didn't let him go. |
| 09:55 | 22 | MR. QUINN:  Assumes facts. |
| 09:55 | 23 | THE COURT:  Overruled. |
| 09:55 | 24 | THE WITNESS:  I believe that's the case. |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:55 | 1 | BY MS. KELLER: |
| 09:55 | 2 | Q.   So Mattel -- Mattel's law department didn't take any |
| 09:55 | 3 | action against him either, other than to negotiate a |
| 09:55 | 4 | severance package with him, correct? |
| 09:55 | 5 | A.   No.  I think they instructed his supervisor twice.  I |
| 09:56 | 6 | heard it, as both Matt Turetzky -- and, I think John Louie |
| 09:56 | 7 | didn't even consult the law department.  I think they told |
| 09:56 | 8 | Mr. Villasenor's supervisor, Matt Turetzky, that you can't |
| 09:56 | 9 | do that. |
| 09:56 | 10 | Q.   And that was only after this lawsuit, right? |
| 09:56 | 11 | A.   I don't know what date it was.  I think it was when |
| 09:56 | 12 | they were presented with the situation from Mr. Turetzky. |
| 09:56 | 13 | Q.   Well, you were -- just sitting here in this courtroom, |
| 09:56 | 14 | you heard that the reason that he was called to the law |
| 09:56 | 15 | department to be talked to was because of this litigation, |
| 09:56 | 16 | right? |
| 09:56 | 17 | MR. QUINN:  Vague and ambiguous as to "this |
| 09:56 | 18 | litigation," Your Honor. |
| 09:56 | 19 | THE COURT:  Overruled. |
| | 20 | BY MS. KELLER: |
| 09:56 | 21 | Q.   This lawsuit that we in right now. |
| 09:56 | 22 | A.   That I don't know. |
| 09:56 | 23 | Q.   So have you -- have you gone around to the people who |
| 09:56 | 24 | kept all this from you and demanded to know why they kept it |
| 09:56 | 25 | all from you? |

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 71 of 144   Page ID #:315248
CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

71

| | | |
|---|---|---|
| 09:56 | 1 | MR. QUINN:  It's argumentative.  And assumes |
| 09:56 | 2 | facts, Your Honor. |
| 09:57 | 3 | THE COURT:  Overruled. |
| 09:57 | 4 | MR. QUINN:  "Kept it from." |
| 09:57 | 5 | THE WITNESS:  No, I have not. |
| 09:57 | 6 | BY MS. KELLER: |
| 09:57 | 7 | Q.   Now, let's look at Exhibit 20327 again, the 2003 Mattel |
| 09:57 | 8 | code of conduct. |
| 09:57 | 9 | *(Document returned to the witness.)* |
| 11:59 | 10 | BY MS. KELLER: |
| 09:57 | 11 | Q.   And please look at page 3. |
| 09:57 | 12 | A.   I have it. |
| 09:57 | 13 | *(Document displayed.)* |
| | 14 | BY MS. KELLER: |
| 09:57 | 15 | Q.   And this says, "those with leadership roles have |
| 09:57 | 16 | additional responsibilities." |
| 09:57 | 17 | "Leaders should foster an environment of ethical |
| 09:57 | 18 | behavior by acting as role models, demonstrating ethical |
| 09:57 | 19 | behavior in the performance of their own duties, making sure |
| 09:57 | 20 | that employees understand that business results are never |
| 09:57 | 21 | more important than compliance with the standards for |
| 09:57 | 22 | ethical behavior. |
| 09:57 | 23 | "Acting to address incidents of unethical behavior, |
| 09:57 | 24 | including training, counseling, and disciplinary actions |
| 09:57 | 25 | where appropriate." |

| | | |
|---|---|---|
| 09:57 | 1 | You're the leader at Mattel, aren't you? |
| 09:58 | 2 | A.   I am. |
| 09:58 | 3 | Q.   And so your actions are more important than your words |
| 09:58 | 4 | when it comes to addressing unethical behavior, right? |
| 09:58 | 5 | A.   Yes. |
| 09:58 | 6 | Q.   You have done nothing to accept responsibility for the |
| 09:58 | 7 | situation in Market Intelligence, have you? |
| 09:58 | 8 | A.   No, that's not true. |
| 09:58 | 9 | Q.   You deny -- |
| 09:58 | 10 | A.   I -- I -- |
| 09:58 | 11 | Q.   You deny -- |
| 09:58 | 12 | MR. QUINN:  Excuse me, Your Honor.  May he finish |
| 09:58 | 13 | his answer? |
| 09:58 | 14 | THE COURT:  Finish your answer, sir. |
| 09:58 | 15 | THE WITNESS:  No.  I am the -- I believe -- |
| 09:58 | 16 | regardless of what Mr. Normile may have testified, I do |
| 09:58 | 17 | believe I am the person that keeps the culture and makes |
| 09:58 | 18 | sure we do the right thing.  And if Matt Turetzky read this |
| 09:58 | 19 | in 2003 when he was supervising Mr. Villasenor, that's |
| 09:58 | 20 | why -- you know, there's disappointment with Mr. Villasenor. |
| 09:58 | 21 | Matt Turetzky did the wrong thing, and that reflects on all |
| 09:59 | 22 | of us. |
| 09:59 | 23 | The problem here is that kind of behavior or that |
| 09:59 | 24 | kind of supervision among those people reflects on the |
| 09:59 | 25 | 30,000 people that get up every morning and want to do the |

| 09:59 | 1 | right thing at Mattel, and that includes me. |
| 09:59 | 2 | BY MS. KELLER: |
| 09:59 | 3 | Q.   You have done nothing to address the incidents of |
| 09:59 | 4 | unethical behavior of these people, nothing, right? |
| 09:59 | 5 | A.   I have not; that's correct. |
| 09:59 | 6 | Q.   And you certainly have not said, "You know what?  The |
| 09:59 | 7 | buck stops here.  I'm the head guy.  This happened on my |
| 09:59 | 8 | watch.  I'm resigning," right? |
| 09:59 | 9 | A.   That's correct. |
| 09:59 | 10 | Q.   Nor have you said the people who kept this from me |
| 09:59 | 11 | knowing how this violated every year of our code of conduct, |
| 09:59 | 12 | as well as common sense, those people are being fired.  None |
| 09:59 | 13 | of those people got fired, right? |
| 09:59 | 14 | A.   That's correct.  As I said, we're not gonna sit here on |
| 09:59 | 15 | the witness stand and make career decisions about people, |
| 09:59 | 16 | and we're not gonna paint everybody with the same bush. |
| 10:00 | 17 |          THE COURT:  Counsel, just a moment. |
| 10:00 | 18 |          We're going to take a recess and let the jury have |
| 10:00 | 19 | a break at this time. |
| 10:00 | 20 |          You're admonished not to discuss this matter |
| 10:00 | 21 | amongst yourselves, nor form or express any opinion |
| 10:00 | 22 | concerning this case. |
| 10:00 | 23 |          We'll take a recess for about 20 to 30 minutes. |
| 10:00 | 24 | We'll come and get you. |
| 10:00 | 25 |          Counsel, if you would remain for a moment. |

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

74

| | | |
|---|---|---|
| 10:00 | 1 | Sir, if you'd step down, please. |
| 10:00 | 2 | *(Witness steps down.)* |
| 10:00 | 3 | *(Jury recesses at 10:00 o'clock a.m.)* |
| 10:00 | 4 | *(Outside the presence of the jury.)* |
| 10:00 | 5 | THE COURT:  Now I'd like to speak to Mr. Larian |
| 10:00 | 6 | and Mr. Eckert in your presence. |
| 10:00 | 7 | Have a seat, Mr. Eckert. |
| 10:00 | 8 | Mr. Larian, I think you spent seven days on the |
| 10:00 | 9 | stand, and I allowed numerous and repetitive questions to be |
| 10:00 | 10 | asked of you by Mr. Price so that the jury had a clear |
| 10:01 | 11 | understanding. |
| 10:01 | 12 | And, Mr. Eckert, you're going to spend a very |
| 10:01 | 13 | unpleasant time on the stand also with the ability of |
| 10:01 | 14 | counsel to ask numerous questions. |
| 10:01 | 15 | I'll put on the record that I hold both of you |
| 10:01 | 16 | gentlemen absolutely responsible for your various employees. |
| 10:01 | 17 | And as Mr. Eckert said, and I think Mr. Larian |
| 10:01 | 18 | said, the buck stops with each of you. |
| 10:01 | 19 | There's a portion that I had previously excluded, |
| 10:01 | 20 | and those were snippets of the surveillance of Mr. Larian's |
| 10:01 | 21 | *(sic)* children and wife.  And I had limited that to |
| 10:01 | 22 | Mr. Eckert -- strike that -- Mr. Larian being with someone. |
| 10:02 | 23 | Each of you are absolutely responsible, whether it's Paula |
| 10:02 | 24 | Garcia or de Anda for the activities and actions of your |
| 10:02 | 25 | corporate entities. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:02 | 1 | And I don't care whether you've got five employees |
| 10:02 | 2 | or 5 million employees.  You're going to be allowed to play |
| 10:02 | 3 | two additional snippets.  One concerns the box and the |
| 10:02 | 4 | security arrangement that's now come into contention about |
| 10:02 | 5 | Mattel's security. |
| 10:02 | 6 | And the second snippet you're now going to be |
| 10:02 | 7 | allowed to play is the surveillance of the wife.  And the |
| 10:02 | 8 | reason for that is -- and it was included in my original |
| 10:02 | 9 | draft and I took it out. |
| 10:02 | 10 | The ability of the surveillance in 2004 and Mattel |
| 10:02 | 11 | having these capabilities in 2000 means that Carter Bryant |
| 10:02 | 12 | could have been adequately surveilled in 2000, in October, |
| 10:02 | 13 | just as Mr. Brawer was surveilled in 2004. |
| 10:03 | 14 | And therefore, whoever's in charge, Mr. De Anda or |
| 10:03 | 15 | whomever, with the same kind of machinations going on, in a |
| 10:03 | 16 | sense, lead this Court to believe that that's now relevant |
| 10:03 | 17 | evidence. |
| 10:03 | 18 | Now, we're going to take a brief recess.  And I'm |
| 10:03 | 19 | also having and will put on the record that we had a |
| 10:03 | 20 | midnight session up in Los Angeles, where these 35 boxes |
| 10:03 | 21 | came to the Court's attention on Tuesday evening. |
| 10:03 | 22 | I'm not making any record concerning that, but |
| 10:03 | 23 | this is obviously the -- some of the market intelligence |
| 10:03 | 24 | information that came out of Sal Villasenor's offices and |
| 10:03 | 25 | were over in the Paul Hastings offices. |

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 76 of 144   Page ID #:315253
CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

76

| | | |
|---|---|---|
| 10:03 | 1 | In particular, no one has had time to look at the |
| 10:03 | 2 | tapes because they were not compatible with any of the |
| 10:03 | 3 | equipment that we had.  Those tapes are being transcribed |
| 10:04 | 4 | today.  What I don't want is Mr. Eckert to be at a |
| 10:04 | 5 | disadvantage if this tape shows besides 1999, a 2004 |
| 10:04 | 6 | auditorium full of people who are being briefed once again |
| 10:04 | 7 | by Sal Villasenor or Stephanie Page. |
| 10:04 | 8 | Now, these were only brought to the Court's |
| 10:04 | 9 | attention on Tuesday evening, and I've been trying to get |
| 10:04 | 10 | those put into a format.  So I'm happy to recess these |
| 10:04 | 11 | proceedings today so Mr. Eckert isn't caught off guard if |
| 10:04 | 12 | these tapes show that during his term as president |
| 10:04 | 13 | Mr. Villasenor's, if you will, activity was continuing under |
| 10:04 | 14 | his watch.  Because he hasn't had a chance to see that and |
| 10:04 | 15 | he would be unprepared. |
| 10:04 | 16 | So I'm going to give you about 20 minutes to talk |
| 10:04 | 17 | to your client, and I'm going to give you about 20 minutes. |
| 10:05 | 18 | But all of this is coming to the Court at the last |
| 10:05 | 19 | moment at the very eve of trial.  Perhaps we should have had |
| 10:05 | 20 | one trial and started over again with all of the evidence |
| 10:05 | 21 | that's emerging.  And finally, we'd get all the evidence out |
| 10:05 | 22 | for both sides. |
| 10:05 | 23 | In addition to that, across the street, so the |
| 10:05 | 24 | Circuit knows, we're starting a hearing with Mr. O'Brien and |
| 10:05 | 25 | Mr. Moore. |

| | | |
|---|---|---|
| 10:05 | 1 | I'm looking carefully at the work product.  I'm |
| 10:05 | 2 | going to try to narrow that as much as possible, and you may |
| 10:05 | 3 | not be given any information.  It depends on some of the |
| 10:05 | 4 | answers given today by Mr. Moore.  But you know the Court is |
| 10:05 | 5 | extraordinarily displeased with Mr. Moore's testimony, and |
| 10:05 | 6 | I'll put that on the record without making any further |
| 10:05 | 7 | record.  And that was clear to Mattel in chambers or *in* |
| 10:05 | 8 | *camera*. |
| 10:05 | 9 | MR. QUINN:  Your Honor, may I address the issue |
| 10:05 | 10 | about the additional video excerpt? |
| 10:05 | 11 | THE COURT:  No, that's a final ruling. |
| 10:05 | 12 | You've got 25 minutes. |
| 10:05 | 13 | *(Recess held at 10:05 a.m.)* |
| 10:33 | 14 | *(Proceedings resumed at 10:33 a.m.* |
| 10:33 | 15 | *(In the presence of the jury.)* |
| 10:33 | 16 | THE COURT:  All right.  We're back on the record. |
| 10:33 | 17 | Mr. Eckert's present.  The counsel are present. |
| 10:33 | 18 | The jury and alternates are present. |
| 10:33 | 19 | Counsel, if you'd like to continue on with your |
| 10:33 | 20 | examination, please. |
| 10:33 | 21 | MS. KELLER:  Thank you, Your Honor. |
| 10:33 | 22 | **DIRECT EXAMINATION (Continued)** |
| 10:33 | 23 | BY MS. KELLER: |
| 10:34 | 24 | Q.  Mr. Eckert, we talking earlier about Mr. Villasenor |
| 10:34 | 25 | actually was the one who decided to leave Mattel. |

| | | |
|---|---|---|
| 10:34 | 1 | You remember that? |
| 10:34 | 2 | A.   Yes, I do. |
| 10:34 | 3 | Q.   And, in fact, Mattel's lawyers actually sent |
| 10:34 | 4 | Mr. Villasenor's lawyer a letter on May 9, 2006, essentially |
| 10:34 | 5 | telling him that his leave was up, and it was time for him |
| 10:34 | 6 | to come back to work, right? |
| 10:34 | 7 | A.   I don't know that. |
| 10:34 | 8 | MS. KELLER:  May I approach, Your Honor? |
| 10:34 | 9 | THE COURT:  You may. |
| 10:34 | 10 | MS. KELLER:  Showing you Exhibit 36813. |
| 10:34 | 11 | (Document provided to the witness.) |
| | 12 | BY MS. KELLER: |
| 10:35 | 13 | Q.   Have you had a chance to read the second paragraph, |
| 10:35 | 14 | sir? |
| 10:35 | 15 | A.   I have. |
| 10:35 | 16 | Q.   And the lawyer you had -- well, rather, Mattel's |
| 10:35 | 17 | lawyers actually wrote Mr. Villasenor's lawyer telling him |
| 10:35 | 18 | that his leave was up, and there was no reason for him to |
| 10:35 | 19 | continue with a leave of absence, right? |
| 10:35 | 20 | A.   I think that's the essence of this. |
| 10:35 | 21 | Q.   So he was welcome to come back to Mattel, true? |
| 10:36 | 22 | A.   So far what I've read would indicate that. |
| 10:36 | 23 | Q.   And again, your law department, by May of 2006, knew |
| 10:36 | 24 | all about Mr. Villasenor's group's use of phony credentials |
| 10:36 | 25 | to get into competitor's showrooms, true? |

CV 04-9049 DOC – 4/17/2011 – Day 44, Volume 1 of 3

79

| | | |
|---|---|---|
| 10:36 | 1 | A.    I certainly think some people in the department did, |
| 10:36 | 2 | yes. |
| 10:36 | 3 | Q.    But he was gonna be invited back to Mattel, right? |
| 10:36 | 4 | A.    Um, I don't know.  Here, we have two outside lawyers |
| 10:36 | 5 | communicating with one another.  And I don't know from what |
| 10:36 | 6 | basis people made those conclusions. |
| 10:36 | 7 | Q.    Well, the letter informed Mr. Villasenor's letter (sic) |
| 10:36 | 8 | that the investigation is over and that it is not your |
| 10:36 | 9 | client's intention to negotiate his separation from the |
| 10:36 | 10 | company; it would appear that there's no reason for him to |
| 10:36 | 11 | continue with a leave of absence, right? |
| 10:36 | 12 | A.    Correct. |
| 10:36 | 13 | Q.    That means come back to work, right? |
| 10:36 | 14 | A.    Uh, yes. |
| 10:36 | 15 | Q.    Now, we were talking before about the code of conduct. |
| 10:37 | 16 | Um, Mr. Turetzky, who you said in your view was maybe |
| 10:37 | 17 | the worst offender -- 'cause he was a supervisor, right? |
| 10:37 | 18 | A.    I wouldn't quibble with the term. |
| 10:37 | 19 | Q.    Well, he left in June of 2006, right? |
| 10:37 | 20 | A.    Yes. |
| 10:37 | 21 | Q.    And he got two years' consulting package with Mattel, |
| 10:37 | 22 | right? |
| 10:37 | 23 | A.    That's correct. |
| 10:37 | 24 | Q.    And that resulted in Mr. Turetzky actually making more |
| 10:37 | 25 | money than he had made when he was a Mattel executive, |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:37 | 1 | right? |
| 10:37 | 2 | A.    That I don't know. |
| 10:37 | 3 | Q.    You remember hearing that in his testimony? |
| 10:37 | 4 | A.    No, I don't. |
| 10:37 | 5 | Q.    And you said Mr. Brawer -- that it was legitimate to |
| 10:37 | 6 | sue Mr. Brawer because he refused to sign the code of |
| 10:37 | 7 | conduct, right -- |
| 10:37 | 8 | A.    Uh -- |
| 10:37 | 9 | Q.    -- and he took binders? |
| 10:37 | 10 | A.    And he lied to the head of Human Resources, and he told |
| 10:37 | 11 | us he would not be bound by the code of conduct -- |
| 10:38 | 12 | Q.    And -- |
| 10:38 | 13 | A.    -- in a time period where we had some issues with his |
| 10:38 | 14 | new employer, yes. |
| 10:38 | 15 | Q.    Because the code of conduct was really, really |
| 10:38 | 16 | important to Mattel, right? |
| 10:38 | 17 | A.    I think it is important. |
| 10:38 | 18 | Q.    It was -- making sure that everybody followed their |
| 10:38 | 19 | ethical responsibilities was very important to you |
| 10:38 | 20 | personally, right? |
| 10:38 | 21 | A.    It is.  It's, to me, analogous to the rules of the road |
| 10:38 | 22 | when you're learning to drive. |
| 10:38 | 23 | Q.    And, of course, as we saw yesterday, Mr. Brawer's -- |
| 10:38 | 24 | the materials he was asked to sign included a whole new |
| 10:38 | 25 | inventions agreement, right? |

| | | |
|---|---|---|
| 10:38 | 1 | A.   Yes. |
| 10:38 | 2 | Q.   And a whole new proprietary information agreement, |
| 10:38 | 3 | right? |
| 10:38 | 4 | A.   That, I don't know. |
| 10:38 | 5 | Q.   Well, you saw it on the screen yesterday, right? |
| 10:38 | 6 | A.   I did. |
| 10:38 | 7 | Q.   And it just had the title "Code of Conduct" at the top, |
| 10:38 | 8 | right? |
| 10:38 | 9 | A.   No.  I thought I saw references yesterday in the |
| 10:38 | 10 | documents that said, "code of conduct."  I could be wrong. |
| 10:38 | 11 | Q.   And so the ethical behavior aspect of the code of |
| 10:39 | 12 | conduct was so important to you that it was one of the |
| 10:39 | 13 | reasons that you decided to sue Ron Brawer in the absence of |
| 10:39 | 14 | any information that he had done anything wrong? |
| 10:39 | 15 | A.   No. |
| 10:39 | 16 | Q.   It's pretty common, isn't it, for people, when they're |
| 10:39 | 17 | looking for another job, not to tell Human Resources that |
| 10:39 | 18 | they're actively looking? |
| 10:39 | 19 | A.   I think it is common. |
| 10:39 | 20 | Q.   Even highly placed executives do that, right? |
| 10:39 | 21 | A.   I believe so. |
| 10:39 | 22 | Q.   And if people approach you and say, "Hey," you know, |
| 10:39 | 23 | "Are you interviewing with a competitor?" you wouldn't find |
| 10:39 | 24 | it unusual for the person to say, "No," would you? |
| 10:39 | 25 | A.   I don't know the circumstances.  I might find it |

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

82

| | | |
|---|---|---|
| 10:39 | 1 | unusual. |
| 10:39 | 2 | Q.   Now, and you say -- and another reason for the lawsuit |
| 10:39 | 3 | was that Mr. Brawer took binders with him when he left, |
| 10:39 | 4 | right? |
| 10:39 | 5 | A.   I think that was one the circumstances that led to |
| 10:40 | 6 | Mattel's concern. |
| 10:40 | 7 | Q.   And you know that because you had a security video of |
| 10:40 | 8 | him doing that, right? |
| 10:40 | 9 | A.   I don't know the source of the information, whether it |
| 10:40 | 10 | was one of the guards who saw it or whether it came off of a |
| 10:40 | 11 | security camera. |
| 10:40 | 12 | Q.   But he -- he left with a box that included binders, |
| 10:40 | 13 | right? |
| 10:40 | 14 | A.   I don't know whether it was in a box.  I have heard he |
| 10:40 | 15 | left with binders, or a binder. |
| 10:40 | 16 | Q.   Have you ever checked? |
| 10:40 | 17 | A.   No, I have not. |
| 10:40 | 18 | Q.   Have you ever looked at the security video? |
| 10:40 | 19 | A.   No, I have not. |
| 10:40 | 20 | Q.   Have you ever interviewed the security guard? |
| 10:40 | 21 | A.   No, I have not. |
| 10:40 | 22 | Q.   Did you ever tell Mr. de Anda to do that? |
| 10:40 | 23 | A.   No, I did not. |
| 10:40 | 24 | Q.   Did you ever do anything whatsoever before suing this |
| 10:40 | 25 | man to verify that he took any binders with him at all? |

| | | |
|---|---|---|
| 10:40 | 1 | A.    No, I did not. |
| 10:40 | 2 | Q.    And so he was going to work for MGA? |
| 10:40 | 3 | A.    That's correct. |
| 10:40 | 4 | Q.    And so you thought it was appropriate to have him |
| 10:41 | 5 | surveiled for the two-week period that he was on Mattel's |
| 10:41 | 6 | payroll, but not yet at MGA, right? |
| 10:41 | 7 | A.    Um, someone thought it was appropriate, yes. |
| 10:41 | 8 | Q.    With "you," Mattel? |
| 10:41 | 9 | A.    Yes. |
| 10:41 | 10 | Q.    You're the head person, right? |
| 10:41 | 11 | A.    That's correct. |
| 10:41 | 12 | Q.    You're -- you're in charge? |
| 10:41 | 13 | A.    That's correct. |
| 10:41 | 14 | Q.    And you, too, think it was appropriate to surveil him |
| 10:41 | 15 | for the two-week period, right? |
| 10:41 | 16 | A.    Um, I do. |
| 10:41 | 17 | Q.    And you were hoping that during that two-week period |
| 10:41 | 18 | you might find any instance of Mr. Brawer, say, crossing the |
| 10:41 | 19 | threshold of MGA, right? |
| 10:41 | 20 | A.    No.  Um, speaking as Mattel, I guess, what -- or as an |
| 10:41 | 21 | individual, what I would look for is either confirmation |
| 10:41 | 22 | that he is complying with the code of conduct and not |
| 10:41 | 23 | meeting with a competitor and not disclosing documents; or, |
| 10:41 | 24 | frankly, if that weren't the case, and he were meeting with |
| 10:41 | 25 | a competitor and disclosing documents, we'd want to know |

Case 2:04-cv-09049-DOC-RNB Document 10373 Filed 04/04/11 Page 84 of 144 Page ID #:315261
CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

84

| | | |
|---|---|---|
| 10:42 | 1 | that.  I think we'd want to protect our rights. |
| 10:42 | 2 | Q.   Well, it's not a competitor.  He told you he was going |
| 10:42 | 3 | to work for MGA. |
| 10:42 | 4 | A.   That's right. |
| 10:42 | 5 | Q.   You knew it? |
| 10:42 | 6 | A.   That's correct. |
| 10:42 | 7 | Q.   So you were hoping to catch him, maybe during the |
| 10:42 | 8 | two-week period that he was still receiving severance from |
| 10:42 | 9 | Mattel, walking across the threshold maybe into MGA or going |
| 10:42 | 10 | into MGA's parking lot.  That was the point of the |
| 10:42 | 11 | surveillance, right? |
| 10:42 | 12 | A.   I don't know what the point was; but certainly, if he |
| 10:42 | 13 | did that, that would be wrong. |
| 10:42 | 14 | Q.   But that was the point, wasn't it? |
| 10:42 | 15 | A.   I don't know what the point was. |
| 10:42 | 16 | Q.   Well, you already knew he was leaving to go to MGA, |
| 10:42 | 17 | right? |
| 10:42 | 18 | A.   We've established that. |
| 10:42 | 19 | Q.   And you don't know what the point was because you made |
| 10:42 | 20 | it your business not to know, right? |
| 10:42 | 21 | A.   No, that's not true. |
| 10:42 | 22 | Q.   You're the person who authorized the lawsuit, right? |
| 10:42 | 23 | A.   The lawsuit? |
| 10:42 | 24 | Q.   Against Mr. Brawer. |
| 10:42 | 25 | A.   Um, I may have been. |

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 85 of 144   Page ID #:315262
CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

85

| | | |
|---|---|---|
| 10:42 | 1 | Q.   You were, weren't you?  You were the person who |
| 10:42 | 2 | authorized it? |
| 10:42 | 3 | A.   I either did authorize it, or I was certainly aware if |
| 10:43 | 4 | it. |
| 10:43 | 5 | Q.   You authorized the surveillance, right? |
| 10:43 | 6 | A.   No.  I don't believe that's the case. |
| 10:43 | 7 | Q.   And I think you agreed with me that it would be a |
| 10:43 | 8 | violation of Mattel's code of conduct for the person doing |
| 10:43 | 9 | the surveillance to serveil his wife and children, right? |
| 10:43 | 10 | A.   I think it would be wrong either way.  Whether it's in |
| 10:43 | 11 | the code of conduct or not, I think it would be wrong. |
| 10:43 | 12 | Q.   Well, isn't it in the code of conduct that you treat |
| 10:43 | 13 | each other with dignity and respect at Mattel? |
| 10:43 | 14 | A.   Yes, it is. |
| 10:43 | 15 | Q.   And he was still on the Mattel payroll for those two |
| 10:43 | 16 | weeks, which is why you felt entitled to surveil him, right? |
| 10:43 | 17 | A.   Yes. |
| 10:43 | 18 | Q.   So wouldn't it be a violation of Mattel's code of |
| 10:43 | 19 | conduct for Mattel to videotape his wife and kids doing |
| 10:43 | 20 | things like going to the store? |
| 10:43 | 21 | A.   Um, again, I don't -- I don't think that's a good idea. |
| 10:43 | 22 | But I don't know the context of what was being taped when, |
| 10:43 | 23 | and who showed up in what frame, when. |
| 10:44 | 24 | Q.   Well, let's take a look at Exhibit 31174.  We've just |
| 10:44 | 25 | prepared a short clip of many days of surveillance.  But |

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 86 of 144   Page ID #:315263
CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

86

| | | |
|---|---|---|
| 10:44 | 1 | let's take a look. |
| 10:44 | 2 | MS. KELLER:  Your Honor, may we play it? |
| 10:44 | 3 | THE COURT:  You may. |
| 10:44 | 4 | *(Videotape played.)* |
| 10:44 | 5 | BY MS. KELLER: |
| 10:44 | 6 | Q.   Any legitimate business reason for that, Mr. Eckert? |
| 10:44 | 7 | A.   Um, I don't know the contents of those, you know, if |
| 10:45 | 8 | Ron Brawer were around.  But if somebody really were just |
| 10:45 | 9 | videotaping his family, I don't think there's any legitimate |
| 10:45 | 10 | business context or reason for that. |
| 10:45 | 11 | Q.   And you haven't educated yourself by watching these |
| 10:45 | 12 | tapes, any of them, to see what Mattel actually did in that |
| 10:45 | 13 | surveillance, have you? |
| 10:45 | 14 | A.   That's correct. |
| 10:45 | 15 | Q.   And that's because you don't want to know, right? |
| 10:45 | 16 | A.   No. |
| 10:45 | 17 | Q.   And you haven't -- if you watched these tapes and you |
| 10:45 | 18 | saw the videotaping of this man's wife and small children, |
| 10:45 | 19 | then you might have to take some action, right? |
| 10:45 | 20 | A.   No.  Again, I don't know the context of -- perhaps Ron |
| 10:45 | 21 | Brawer was in the next scene or not.  I just don't know |
| 10:45 | 22 | that. |
| 10:45 | 23 | Q.   Have you asked anyone -- |
| 10:45 | 24 | A.   No, I have not. |
| 10:45 | 25 | Q.   -- what the context was? |

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

87

| | | |
|---|---|---|
| 10:45 | 1 | A.   No, I have not. |
| 10:45 | 2 | Q.   Have you taken any steps to try to figure out if this |
| 10:45 | 3 | was proper? |
| 10:45 | 4 | A.   No. |
| 10:45 | 5 | Q.   And surely if you saw lengthy footage of a wife and |
| 10:45 | 6 | children being videotaped without the employee anywhere |
| 10:46 | 7 | around, you would never want to use the services of those |
| 10:46 | 8 | investigators again, would you? |
| 10:46 | 9 | MR. QUINN:  This assumes facts, Your Honor. |
| 10:46 | 10 | THE COURT:  Overruled. |
| 10:46 | 11 | THE WITNESS:  I'd want to know the circumstances |
| 10:46 | 12 | why they thought that was a good idea 'cause, on its |
| 10:46 | 13 | surface, it doesn't feel like a good idea to me. |
| 10:46 | 14 | BY MS. KELLER: |
| 10:46 | 15 | Q.   Can you think of a single legitimate business reason |
| 10:46 | 16 | for videotaping somebody's wife and kids? |
| 10:46 | 17 | A.   No, I can't. |
| 10:46 | 18 | Q.   So you'd want to terminate that person and make sure |
| 10:46 | 19 | Mattel never used the services of that investigator again, |
| 10:46 | 20 | if, let's say -- just be with me for a minute -- let's say |
| 10:46 | 21 | that you had videotape that showed just the wife and kids, |
| 10:46 | 22 | and the employee not anywhere in the frame, say for, you |
| 10:46 | 23 | know, half an hour or more. |
| 10:46 | 24 | A.   Yeah.  I'd want to know why somebody thought that was |
| 10:46 | 25 | relevant, appropriate, why they did it. |

| | | |
|---|---|---|
| 10:46 | 1 | I can't pass judgment on, you know, hearing one side of |
| 10:46 | 2 | the story.  On its surface, it doesn't make sense to me. |
| 10:47 | 3 | I'd want to know why somebody thought it made sense to them. |
| 10:47 | 4 | Q.   Isn't that a little creepy? |
| 10:47 | 5 | THE COURT:  Well, sustained. |
| | 6 | BY MS. KELLER: |
| 10:47 | 7 | Q.   I mean, don't you find it a little disturbing? |
| 10:47 | 8 | A.   I don't think it's right. |
| 10:47 | 9 | Q.   Don't you find it a little disturbing? |
| 10:47 | 10 | A.   I think that's a reasonable emotion, yes. |
| 10:47 | 11 | Q.   I mean, if you had left an employer to go work for a |
| 10:47 | 12 | competitor and you found out that your wife and kids were |
| 10:47 | 13 | being videotaped, coming and going from the store or school |
| 10:47 | 14 | or places like that, that would really be disturbing to you, |
| 10:47 | 15 | wouldn't it? |
| 10:47 | 16 | A.   Yes. |
| 10:47 | 17 | Q.   It would be wrong? |
| 10:47 | 18 | A.   Yes.  Based on the circumstances I know, it would be. |
| 10:47 | 19 | Q.   Is it sufficiently, potentially, disturbing enough to |
| 10:47 | 20 | you that you would want to take action to make sure nothing |
| 10:47 | 21 | like that ever happened at Mattel again? |
| 10:47 | 22 | A.   Yes. |
| 10:47 | 23 | Q.   Now, if we can turn to a little bit different topic. |
| 10:48 | 24 | You've testified that you think it would be improper |
| 10:48 | 25 | for someone to use phony credentials to sneak into a |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:48 | 1 | competitor's showroom, right? |
| 10:48 | 2 | A.   Yes. |
| 10:48 | 3 | Q.   But you've heard Mattel employees and executives |
| 10:48 | 4 | testify in this trial that they don't think it's that big of |
| 10:48 | 5 | a deal because catalogs and price lists at toy fairs are |
| 10:48 | 6 | seen by retailers and are, therefore, public.  You've heard |
| 10:48 | 7 | that, right? |
| 10:48 | 8 | MR. QUINN:  Misstates the evidence, Your Honor. |
| 10:48 | 9 | THE COURT:  Just a moment. |
| 10:48 | 10 | Overruled. |
| 10:48 | 11 | THE WITNESS:  I have. |
| 10:48 | 12 | BY MS. KELLER: |
| 10:48 | 13 | Q.   Now, do you agree that confidential information becomes |
| 10:48 | 14 | public the minute a retailer sees it? |
| 10:48 | 15 | A.   Um, not necessarily. |
| 10:48 | 16 | Q.   You once became concerned after learning that MGA had |
| 10:48 | 17 | gotten pictures of Flavas when that product hasn't been |
| 10:48 | 18 | released, right? |
| 10:49 | 19 | A.   Yes. |
| 10:49 | 20 | MS. KELLER:  If we could see Exhibit 5367. |
| 10:49 | 21 | *(Document provided to the witness.)* |
| 11:59 | 22 | BY MS. KELLER: |
| 10:49 | 23 | Q.   This is an e-mail chain with the top e-mail being sent |
| 10:49 | 24 | from Richard de Anda to you, copying Alan Kaye, Matt |
| 10:49 | 25 | Bousquette and Joe Eckroth. |

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 90 of 144   Page ID #:315267
CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

90

| | | |
|---|---|---|
| 10:49 | 1 | And then, at the bottom, we see a June 6, 2003 e-mail |
| 10:49 | 2 | with respect to Flavas, right? |
| 10:49 | 3 | A.   Yes. |
| 10:49 | 4 | MS. KELLER:  Your Honor, I'd move 5367 into |
| 10:49 | 5 | evidence. |
| 10:49 | 6 | THE COURT:  Received. |
| 10:49 | 7 | *(Exhibit No. 5367 received in evidence.)* |
| 10:49 | 8 | *(Document displayed.)* |
| 10:49 | 9 | BY MS. KELLER: |
| 10:49 | 10 | Q.   And at the bottom, June 6, 2003, from you, it says. |
| 10:49 | 11 | "I would appreciate it if you could investigate |
| 10:49 | 12 | something for us.  We began talking to retailers last week |
| 10:49 | 13 | about a significant new doll line called Flavas.  We have |
| 10:49 | 14 | shown retailers finished samples, but have not given them |
| 10:49 | 15 | any leave-behinds.  One buyer told Milt Zablow that the |
| 10:50 | 16 | makers of our key competitor, Bratz, received pictures of |
| 10:50 | 17 | Flavas three day ago.  I believe that it is possible that |
| 10:50 | 18 | the source of the leak was internal to Mattel.  I just don't |
| 10:50 | 19 | see how any of our retailers obtained pictures.  Obviously, |
| 10:50 | 20 | design center employees and/or operations folks or |
| 10:50 | 21 | photographers would be candidates. |
| 10:50 | 22 | "Would you please investigate this and see if you can |
| 10:50 | 23 | help identify the leak?  Feel free to talk to Matt |
| 10:50 | 24 | Bousquette for his perspective. |
| 10:50 | 25 | "Many thanks." |

| | | |
|---|---|---|
| 10:50 | 1 | Now, MGA's Bratz was -- that was a key competing |
| 10:50 | 2 | product, right? |
| 10:50 | 3 | A.   That's correct. |
| 10:50 | 4 | Q.   Not just any old competitor, true? |
| 10:50 | 5 | A.   Correct. |
| 10:50 | 6 | Q.   And were you present when Mr. de Anda testified that he |
| 10:50 | 7 | investigated Isaac Larian after a report that Mr. Larian had |
| 10:50 | 8 | in his possession some sort of Flavas product before it was |
| 10:50 | 9 | released.  Remember that? |
| 10:50 | 10 | A.   Uh, I don't. |
| 10:51 | 11 | Q.   Now, that's not what you're saying in this e-mail, |
| 10:51 | 12 | correct? |
| 10:51 | 13 | A.   Well, what I'm saying in this e-mail is this is a |
| 10:51 | 14 | product that was inside of Mattel, with no documents given |
| 10:51 | 15 | to retailers, to make sure it stays inside of Mattel.  And |
| 10:51 | 16 | somehow it got out of Mattel, so that's concerning to me. |
| 10:51 | 17 | Q.   But you're saying, "We have shown retailers finished |
| 10:51 | 18 | samples"? |
| 10:51 | 19 | A.   That's right.  They've seen it.  They haven't had |
| 10:51 | 20 | pictures of it, but they've seen it. |
| 10:51 | 21 | Q.   And you're saying, "I think someone inside Mattel |
| 10:51 | 22 | leaked photographs to retailers," right? |
| 10:51 | 23 | A.   I'm speculating.  Certainly possible.  Somebody did. |
| 10:51 | 24 | Q.   You're suggesting that Mattel design center employees |
| 10:51 | 25 | and/or operations folks or photographers could be candidates |

| | | |
|---|---|---|
| 10:51 | 1 | for the source of a leak, right? |
| 10:51 | 2 | A.    Yes. |
| 10:51 | 3 | Q.    And you're also saying, again, that you had shown |
| 10:51 | 4 | retailers finished samples of Flavas, right? |
| 10:51 | 5 | A.    That's correct. |
| 10:51 | 6 | Q.    So if an unreleased product becomes public once a |
| 10:51 | 7 | retailer even sees it, then Flavas was no longer |
| 10:51 | 8 | confidential at that point, right? |
| 10:52 | 9 | A.    Well, I think there are circumstances where that is |
| 10:52 | 10 | correct. |
| 10:52 | 11 | Q.    If an unreleased product becomes public once a retailer |
| 10:52 | 12 | sees it, Flavas was no longer confidential at that point, |
| 10:52 | 13 | correct? |
| 10:52 | 14 | A.    I believe Flavas, as a product line, was not |
| 10:52 | 15 | confidential.  We had shared it with retailers.  But I was |
| 10:52 | 16 | concerned about how that information got to a competitor.  I |
| 10:52 | 17 | mean, this is an example of what happens. |
| 10:52 | 18 | Q.    Did you have any proof that MGA had pictures of Flavas? |
| 10:52 | 19 | A.    No, I did not. |
| 10:52 | 20 | Q.    So it was just a rumor, right? |
| 10:52 | 21 | A.    Somebody told me that.  I don't know if I'd call that a |
| 10:52 | 22 | rumor. |
| 10:52 | 23 | Q.    But it was a rumor about a product that was no longer |
| 10:52 | 24 | confidential, right? |
| 10:52 | 25 | A.    That's correct.  It had been shared with retailers. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:52 | 1 | Q.   Yet you were very concerned, enough to ask Mr. de Anda |
| 10:52 | 2 | to investigate, right? |
| 10:52 | 3 | A.   That's right. |
| 10:52 | 4 | Q.   So even though you had shown Flavas to retailers, it |
| 10:52 | 5 | certainly appears to be the case that you still considered |
| 10:52 | 6 | this product to be confidential, right? |
| 10:53 | 7 | A.   Well, certainly we didn't give pictures of the product |
| 10:53 | 8 | to anyone.  So the fact that somebody took photographs of |
| 10:53 | 9 | this product, that was an issue for me. |
| 10:53 | 10 | Q.   But if it was -- if it was already public, photograph |
| 10:53 | 11 | or not, wouldn't matter, would it? |
| 10:53 | 12 | A.   No, it does matter.  I think the context of this does |
| 10:53 | 13 | matter. |
| 10:53 | 14 | Q.   So you still considered that product to be |
| 10:53 | 15 | confidential? |
| 10:53 | 16 | A.   Sure.  This is not a toy fair.  This is inside of |
| 10:53 | 17 | Mattel.  Customers come to see it.  And there is a time when |
| 10:53 | 18 | something does become public.  Toy fair is a good example of |
| 10:53 | 19 | that.  But when we're showing a customer a product line that |
| 10:53 | 20 | we're developing, perhaps for input, that's not a good time |
| 10:53 | 21 | to say it's public. |
| 10:53 | 22 | Q.   Well, the bottom line is, even though you had shown |
| 10:53 | 23 | this product to retailers, you still considered it to be |
| 10:53 | 24 | confidential, right? |
| 10:53 | 25 | A.   I did.  And -- and apparently retailers didn't, or |

CV 04-9049 DOC – 4/17/2011 – Day 44, Volume 1 of 3

94

| | | |
|---|---|---|
| 10:53 | 1 | somebody didn't. |
| 10:53 | 2 | Q.   I'm asking about you, sir, not what other people |
| 10:53 | 3 | thought.  You still considered it to be confidential, true? |
| 10:53 | 4 | A.   I did, yes. |
| 10:54 | 5 | Q.   And you didn't want it disclosed to competitors, right? |
| 10:54 | 6 | A.   That's correct.  I didn't -- I certainly didn't want |
| 10:54 | 7 | pictures of it disclosed to competitors. |
| 10:54 | 8 | Q.   You didn't want it disclosed to competitors at all? |
| 10:54 | 9 | A.   No.  I know -- |
| 10:54 | 10 | Q.   Right? |
| 10:54 | 11 | A.   No, that's not true.  I knew that the name "Flavas," |
| 10:54 | 12 | the idea was public. |
| 10:54 | 13 | What was not public, what was not made available to |
| 10:54 | 14 | retailers or to anybody that I know of outside of the |
| 10:54 | 15 | company, was leave-behinds or photographs or anything |
| 10:54 | 16 | associated with the launch.  So the fact that we had the |
| 10:54 | 17 | doll line named "Flavas" was public.  But pictures of the |
| 10:54 | 18 | product were not public.  This was not toy fair where we're |
| 10:54 | 19 | showing finished products that are being released. |
| 10:54 | 20 | Q.   Well, so is it -- is the information that the retailers |
| 10:54 | 21 | acquired in their heads about that unreleased product, is |
| 10:54 | 22 | that confidential or not? |
| 10:54 | 23 | A.   Um -- |
| 10:54 | 24 | Q.   Yes or no? |
| 10:54 | 25 | A.   At some point it isn't. |

| | | |
|---|---|---|
| 10:54 | 1 | Q.   Not "at some point." |
| 10:54 | 2 | At the point where you showed it to them, was it public |
| 10:55 | 3 | information?  Yes or no? |
| 10:55 | 4 | A.   I would like it not to be public information.  But I |
| 10:55 | 5 | also recognize that it becomes public once you disclose it |
| 10:55 | 6 | to a retailer. |
| 10:55 | 7 | Q.   Did you consider it to be confidential? |
| 10:55 | 8 | A.   I did. |
| 10:55 | 9 | Q.   Did you consider it to be something you didn't want |
| 10:55 | 10 | disclosed to competitors? |
| 10:55 | 11 | A.   "It" being photographs, yes. |
| 10:55 | 12 | Q.   Now, do you agree that any confidential or proprietary |
| 10:55 | 13 | information becomes public once it's shown to third parties |
| 10:55 | 14 | or strangers? |
| 10:55 | 15 | A.   Not necessarily. |
| 10:55 | 16 | Q.   You understand that's Mattel's position -- |
| 10:55 | 17 | A.   No, I don't. |
| 10:55 | 18 | Q.   -- in this litigation, right? |
| 10:55 | 19 | A.   No, I don't. |
| 10:55 | 20 | Q.   Inventory management is a significant factor in |
| 10:55 | 21 | Mattel's business, right? |
| 10:55 | 22 | A.   It is. |
| 10:55 | 23 | Q.   And that's also true for retailers? |
| 10:55 | 24 | A.   Yes. |
| 10:55 | 25 | Q.   Retailers need to accurately forecast their sales so |

| | | |
|---|---|---|
| 10:55 | 1 | they can successfully manage their own inventory, right? |
| 10:55 | 2 | A.   Yes. |
| 10:55 | 3 | Q.   You use point-of-sale data as part of your forecasting |
| 10:55 | 4 | process? |
| 10:56 | 5 | A.   We do. |
| 10:56 | 6 | Q.   And the point-of-sale data -- the "point of sale" is |
| 10:56 | 7 | data that is supplied to you by retailers, right? |
| 10:56 | 8 | A.   That's correct. |
| 10:56 | 9 | Q.   The retailers collect the data about their own sales of |
| 10:56 | 10 | your products, and then they give that data to you, right? |
| 10:56 | 11 | A.   That's correct. |
| 10:56 | 12 | Q.   And you're familiar with the documents that Mattel |
| 10:56 | 13 | claims were taken by Gustavo Machado, Mariana Trueba, and |
| 10:56 | 14 | Pablo Vargas? |
| 10:56 | 15 | A.   I've seen some of them here. |
| 10:56 | 16 | Q.   Well, you know that most of those were point-of-sale |
| 10:56 | 17 | documents, right? |
| 10:56 | 18 | A.   Uh, no.  But I did see point-of-sale documents.  I saw |
| 10:56 | 19 | strategic plans.  I saw line lists. |
| 10:56 | 20 | Q.   Have you educated -- |
| 10:56 | 21 | MR. QUINN:  Excuse me, Your Honor. |
| 10:56 | 22 | THE COURT:  Finish your answer. |
| 10:56 | 23 | THE WITNESS:  And I saw point-of-sale documents. |
| 10:56 | 24 | BY MS. KELLER: |
| 10:56 | 25 | Q.   My question was "most." |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 4/17/2011 – Day 44, Volume 1 of 3

97

| | | |
|---|---|---|
| 10:56 | 1 | A.   And my answer is I don't know. |
| 10:56 | 2 | Q.   Have you checked? |
| 10:56 | 3 | A.   No, I have not. |
| 10:56 | 4 | Q.   Are you at all interested? |
| 10:56 | 5 | A.   Not particularly. |
| 10:56 | 6 | Q.   You understand that these are trade secrets that you're |
| 10:57 | 7 | asking for –– many millions of dollars for?  You're claiming |
| 10:57 | 8 | these are trade secrets and you're entitled to a large |
| 10:57 | 9 | amount of money for them? |
| 10:57 | 10 | A.   Yes. |
| 10:57 | 11 | Q.   And you want that money from MGA? |
| 10:57 | 12 | A.   Uh, I don't know against whom the specific claim is |
| 10:57 | 13 | being made in that case.  But the fact is, trade secrets |
| 10:57 | 14 | that went from Mattel to MGA –– I think MGA is the culprit. |
| 10:57 | 15 | Q.   Well, you know, most of them are point-of-sale |
| 10:57 | 16 | documents, right? |
| 10:57 | 17 | A.   No, I don't know that. |
| 10:57 | 18 | Q.   Do you have any idea what the majority of the documents |
| 10:57 | 19 | that you're claiming are trade secrets comprise? |
| 10:57 | 20 | A.   The quantity is just not that important to me. |
| 10:57 | 21 | Q.   Do you have –– |
| 10:57 | 22 | A.   Let me explain. |
| 10:57 | 23 | THE COURT:  No, no.  Just a moment. |
| 10:57 | 24 | Finish your answer, sir. |
| 10:57 | 25 | THE WITNESS:  Yeah.  A strategic plan, global, a |

| 10:57 | 1 | line list that shows -- these aren't prices that we're gonna |
| 10:57 | 2 | sell something to -- at toy fair.  This is -- products that |
| 10:57 | 3 | are a year or two in advance, our product cost, what we're |
| 10:58 | 4 | going to promote.  I don't care how many pages that is. |
| 10:58 | 5 | That's a big deal. |
|  | 6 | BY MS. KELLER: |
| 10:58 | 7 | Q.  Well, I'm talking about information given to you by |
| 10:58 | 8 | third-parties, not confidential proprietary information that |
| 10:58 | 9 | Mattel generated. |
| 10:58 | 10 | I'm talking about your claim that point-of-sale |
| 10:58 | 11 | information given to you by third-party retailers is |
| 10:58 | 12 | something you should be paid millions of dollars for. |
| 10:58 | 13 | A.  I'm not gonna go through each document.  But the fact |
| 10:58 | 14 | is, for somebody to take that and then build their plans, |
| 10:58 | 15 | based on what we've done and the information we have at |
| 10:58 | 16 | retailers, that's wrong. |
| 10:58 | 17 | Q.  I'm talking about information that somebody gave you, |
| 10:58 | 18 | not information you gave somebody else. |
| 10:58 | 19 | Information that a third party collected, amassed, |
| 10:58 | 20 | already knew about, that that third party was already aware |
| 10:58 | 21 | of and gave to you -- |
| 10:58 | 22 | A.  Sold to -- |
| 10:58 | 23 | MR. QUINN:  Objection. |
| 10:58 | 24 | THE WITNESS:  Sold to us.  That's correct.  That's |
| 10:58 | 25 | wrong. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:58 | 1 | BY MS. KELLER: |
| 10:58 | 2 | Q.   Walmex is Walmart's Mexican store -- retailer, right? |
| 10:59 | 3 | A.   That's correct. |
| 10:59 | 4 | Q.   And if Walmart generated information for you, then that |
| 10:59 | 5 | retailer had to have seen that document, right? |
| 10:59 | 6 | A.   Not necessarily.  Certainly possible. |
| 10:59 | 7 | Q.   If the retailer created the document to give to you, |
| 10:59 | 8 | the retailer didn't see it? |
| 10:59 | 9 | A.   Depends on if it was a document or -- most of these |
| 10:59 | 10 | things come electronically.  There is no document that the |
| 10:59 | 11 | retailer sees. |
| 10:59 | 12 | Q.   If the retailer gave you the information, then the |
| 10:59 | 13 | retailer had the information to give you, right? |
| 10:59 | 14 | A.   That I agree with. |
| 10:59 | 15 | Q.   And if the retailer, had you -- had the information to |
| 10:59 | 16 | give you, then someone other than Mattel had the |
| 10:59 | 17 | information, right? |
| 10:59 | 18 | A.   That's correct. |
| 10:59 | 19 | Q.   Because it was provided to you by that someone, right? |
| 10:59 | 20 | A.   That's correct. |
| 10:59 | 21 | Q.   So that document cannot be a trade secret, right? |
| 10:59 | 22 | A.   No, that's incorrect. |
| 10:59 | 23 | Q.   And neither can any other point-of-sale documents from |
| 10:59 | 24 | a third party, right? |
| 10:59 | 25 | A.   That's incorrect. |

| | | |
|---|---|---|
| 10:59 | 1 | Q.   Now, you said pretty consistently that integrity is a |
| 11:00 | 2 | priority at Mattel, right? |
| 11:00 | 3 | A.   Yes. |
| 11:00 | 4 | Q.   And if we go back to Exhibit 23757, "What's on my |
| 11:00 | 5 | Mind," dated January 9, 2003 -- |
| 11:00 | 6 | (Document provided to the witness.) |
| 11:00 | 7 | (Document displayed.) |
| 11:00 | 8 | BY MS. KELLER: |
| 11:00 | 9 | Q.   -- in the third paragraph, you write: |
| 11:00 | 10 | "The challenge for all of us is to bring these values |
| 11:00 | 11 | to life in doing our job every single day, in a manner |
| 11:00 | 12 | consistent with our commitment to act as one Mattel.  We |
| 11:00 | 13 | must strive to conduct our business in a socially |
| 11:00 | 14 | responsible and ethical manner, which respects the law, |
| 11:00 | 15 | protects the environment, and benefits the communities where |
| 11:00 | 16 | we work.  We must remember that our business results are |
| 11:00 | 17 | never more important than acting ethically and with |
| 11:01 | 18 | integrity." |
| 11:01 | 19 | So business results should never take priority over |
| 11:01 | 20 | ethical behavior, right? |
| 11:01 | 21 | A.   Correct. |
| 11:01 | 22 | Q.   And you should always strive not to violate the law, |
| 11:01 | 23 | right? |
| 11:01 | 24 | A.   Yes. |
| 11:01 | 25 | Q.   And that includes laws that are designed to protect |

| | | |
|---|---|---|
| 11:01 | 1 | competition between and among companies, right? |
| 11:01 | 2 | A.   Yes. |
| 11:01 | 3 | Q.   That includes, for example, antitrust laws, right? |
| 11:01 | 4 | A.   Yes. |
| 11:01 | 5 | Q.   And so you should not, for example, agree with a |
| 11:01 | 6 | retailer to any kind of practice which is going to shut out |
| 11:01 | 7 | a competitor, right? |
| 11:01 | 8 | A.   It depends on the circumstances.  But, in general, yes; |
| 11:01 | 9 | but it depends on the circumstances. |
| 11:01 | 10 | Q.   And let's look at Exhibit 7501. |
| 11:01 | 11 | *(Document provided to the witness.)* |
| 11:59 | 12 | BY MS. KELLER: |
| 11:02 | 13 | Q.   This is Mattel's 2000 annual report.  This is your |
| 11:02 | 14 | first annual report, right? |
| 11:02 | 15 | A.   It is. |
| 11:02 | 16 | Q.   And if we look at -- |
| 11:02 | 17 | MS. KELLER:  Your Honor, I would move 7501 into |
| 11:02 | 18 | evidence. |
| 11:02 | 19 | THE COURT:  Received. |
| 11:02 | 20 | *(Exhibit No. 7501 received in evidence.)* |
| 11:02 | 21 | *(Document displayed.)* |
| 11:02 | 22 | BY MS. KELLER: |
| 11:02 | 23 | Q.   And the first -- on the cover, we see "Refocus," right? |
| 11:02 | 24 | A.   That's correct. |
| 11:02 | 25 | MS. KELLER:  May I have a moment, please? |

| | | |
|---|---|---|
| 11:59 | 1 | BY MS. KELLER: |
| 11:02 | 2 | Q.    If you look at page 8. |
| 11:02 | 3 | A.    TX8? |
| 11:02 | 4 | Q.    Yes.  TX7501-8. |
| 11:02 | 5 | A.    I have it. |
| 11:02 | 6 | *(Document displayed.)* |
| 11:02 | 7 | BY MS. KELLER: |
| 11:02 | 8 | Q.    We see, "Mattel's success depends on more than just |
| 11:03 | 9 | great.  We will succeed by having the right product in the |
| 11:03 | 10 | right place at the right time, and always doing it in such a |
| 11:03 | 11 | way that we maximize profitability since this is our first |
| 11:03 | 12 | priority." |
| 11:03 | 13 |     Is profitability the first priority or is acting with |
| 11:03 | 14 | integrity the first priority? |
| 11:03 | 15 | A.    They're both priorities.  But I would say acting |
| 11:03 | 16 | with -- building profitability while acting with integrity |
| 11:03 | 17 | is the priority. |
| 11:03 | 18 |     I do believe ethical conduct is more important than |
| 11:03 | 19 | business results. |
| 11:03 | 20 |         MS. KELLER:  Your Honor, I wonder if we could have |
| 11:03 | 21 | just a brief break? |
| 11:03 | 22 |         THE COURT:  Certainly. |
| 11:03 | 23 |         (To the jury:) All right.  You're admonished not |
| 11:03 | 24 | to discuss this matter amongst yourselves nor form or |
| 11:03 | 25 | express any opinion concerning the case. |

| | | |
|---|---|---|
| 11:03 | 1 | About five, ten minutes, Counsel? |
| 11:03 | 2 | About ten minutes, Counsel? |
| 11:03 | 3 | MS. KELLER:  That would be fine, Your Honor. |
| 11:03 | 4 | THE COURT:  All right.  Ten minutes. |
| 11:03 | 5 | *(Jury recesses at 11:03 a.m.)* |
| 11:04 | 6 | THE WITNESS:  May I step down? |
| 11:04 | 7 | THE COURT:  Oh, I'm sorry.  My apologies.  You may |
| 11:04 | 8 | step down. |
| 11:04 | 9 | THE WITNESS:  Thank you. |
| 11:13 | 10 | *(Recess held at 11:04 a.m.)* |
| 11:13 | 11 | *(Proceedings resumed at 11:13 a.m.)* |
| 11:13 | 12 | THE COURT:  All right.  We're back in session. |
| 11:13 | 13 | The jury's present.  The alternates are present. |
| 11:13 | 14 | Mr. Eckert's on the witness stand. |
| 11:13 | 15 | Continued examination by Ms. Keller on behalf of |
| 11:13 | 16 | MGA and Mr. Larian. |
| 11:13 | 17 | BY MS. KELLER: |
| 11:13 | 18 | Q.   Mr. Eckert, I'd like you to take a look at trial |
| 11:13 | 19 | Exhibit 9566. |
| 11:14 | 20 | A.   I don't have it. |
| 11:14 | 21 | Q.   Okay.  We're going to move to something else. |
| 11:14 | 22 | THE COURT:  You shouldn't have to get anything. |
| 11:14 | 23 | THE WITNESS:  They -- she's -- |
| 11:14 | 24 | THE COURT:  You shouldn't even have to turn a |
| 11:14 | 25 | page. |

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 104 of 144   Page ID #:315281
CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

104

| 11:14 | 1  | BY MS. KELLER: |
| 11:14 | 2  | Q.   You know that Mattel sells a line of fashion dolls |
| 11:14 | 3  | targeting older girls under the brand "MyScene," correct? |
| 11:14 | 4  | A.   We did, yes. |
| 11:14 | 5  | Q.   It's been discontinued? |
| 11:14 | 6  | A.   It has. |
| 11:14 | 7  | Q.   Please take a look at Exhibit 26230. |
| 11:14 | 8  | *(Document provided to the witness.)* |
| 11:15 | 9  | THE WITNESS:  Yes, I have it. |
| 11:15 | 10 | BY MS. KELLER: |
| 11:15 | 11 | Q.   And this is a document entitled "MyScene Timeline 2003 |
| 11:15 | 12 | to 2005"? |
| 11:15 | 13 | A.   Uh, I have "2005 Timeline." |
| 11:15 | 14 | Q.   Okay. |
| 11:15 | 15 | A.   26230? |
| 11:15 | 16 | Q.   26230. |
| 11:15 | 17 | A.   Mine says "2005 Timeline." |
| 11:15 | 18 | MS. KELLER:  Okay.  Your Honor, I'd move 26230 |
| 11:15 | 19 | into evidence. |
| 11:15 | 20 | THE COURT:  Received. |
| 11:15 | 21 | *(Exhibit No. 26230 received in evidence.)* |
| 11:15 | 22 | *(Document displayed.)* |
| 11:15 | 23 | BY MS. KELLER: |
| 11:15 | 24 | Q.   If you look at the bottom right-hand corner of the |
| 11:15 | 25 | first page, you see this is a document that came from |

| | | |
|---|---|---|
| 11:15 | 1 | Mattel? |
| 11:15 | 2 | A.   That's correct. |
| 11:15 | 3 | Q.   And this document shows photographs of various MyScene |
| 11:15 | 4 | products? |
| 11:15 | 5 | A.   Um, yes, it appears to. |
| 11:15 | 6 | Q.   On the first page, do you see a photo for the MyScene |
| 11:15 | 7 | product, "MyScene Goes Hollywood Party Limo," under the |
| 11:15 | 8 | column "Fall," for the 2005 timeline? |
| 11:16 | 9 | *(Document displayed.)* |
| 11:16 | 10 | THE WITNESS:  Uh, yes. |
| 11:16 | 11 | BY MS. KELLER: |
| 11:16 | 12 | Q.   Turning to the next page, 26230-2.  Do you see that the |
| 11:16 | 13 | document shows a photo of the MyScene product "Club Birthday |
| 11:16 | 14 | Car with Radio," under the column "Spring" for the 2005 |
| 11:16 | 15 | timeline? |
| 11:16 | 16 | *(Document displayed.)* |
| 11:16 | 17 | THE WITNESS:  Yes. |
| 11:16 | 18 | BY MS. KELLER: |
| 11:16 | 19 | Q.   On this same page, do you see that the document shows a |
| 11:16 | 20 | photo of the MyScene product, "Madison Stylin' Friend," |
| 11:16 | 21 | under the column, "Spring," for the 2005 timeline? |
| 11:16 | 22 | A.   Yes. |
| 11:16 | 23 | Q.   Turning to the third page, do you see a document for -- |
| 11:17 | 24 | with the photo for the MyScene product "Guava Gulch" under |
| 11:17 | 25 | the "Jammin' in Jamaica" column for Spring 2004? |

| | | |
|---|---|---|
| 11:17 | 1 | *(Document displayed.)* |
| 11:17 | 2 | THE WITNESS:  Yes. |
| 11:17 | 3 | BY MS. KELLER: |
| 11:17 | 4 | Q.   Turning to the fourth page, do you see a photo for the |
| 11:17 | 5 | MyScene product, "Madison's Loft Glow in the Dark, under |
| 11:17 | 6 | column "Fall 2004"? |
| 11:17 | 7 | *(Document displayed.)* |
| 11:17 | 8 | THE WITNESS:  Yes. |
| 11:17 | 9 | BY MS. KELLER: |
| 11:17 | 10 | Q.   On the same page, do you see that the document shows a |
| 11:17 | 11 | photo for the MyScene product "Delancey and Hudson |
| 11:17 | 12 | Convertible," under the column "Fall 2004"? |
| 11:17 | 13 | A.   Yes. |
| 11:17 | 14 | Q.   Turning to the fifth page, do you see that the document |
| 11:17 | 15 | shows a photo for the "MyScene Convertible" product under |
| 11:17 | 16 | the column "Spring 2003"? |
| 11:17 | 17 | *(Document displayed.)* |
| 11:17 | 18 | THE WITNESS:  Yes. |
| 11:17 | 19 | BY MS. KELLER: |
| 11:17 | 20 | Q.   On the same page, do you see a photo for MyScene, |
| 11:17 | 21 | "Night on the Town Dates," under "Spring 2003"? |
| 11:18 | 22 | THE COURT:  Repeat the question. |
| 11:18 | 23 | THE WITNESS:  I don't yet.  I'm sorry. |
| 11:18 | 24 | MyScene "Night on the Town Dates"? |
| | 25 | |

CV 04-9049 DOC – 4/17/2011 – Day 44, Volume 1 of 3

107

| | | |
|---|---|---|
| 11:59 | 1 | BY MS. KELLER: |
| 11:18 | 2 | Q.   Under the column "Spring 2003." |
| 11:18 | 3 |           THE COURT:  Why don't you blow that up on the |
| 11:18 | 4 | screen, so the witness can pick that out. |
| 11:18 | 5 |             *(Technician complies.)* |
| 11:18 | 6 |           THE WITNESS:  Oh.  Yeah.  I'm sorry. |
| 11:18 | 7 |           "Date Scene." |
| | 8 | BY MS. KELLER: |
| 11:18 | 9 | Q.   "Date Scene." |
| 11:18 | 10 | A.   I'm sorry. |
| 11:18 | 11 | Q.   Sorry about that. |
| 11:18 | 12 |        On the same page, do you see a photo for the MyScene |
| 11:18 | 13 | product "Spring Break," under the column "Spring 2003"? |
| 11:18 | 14 | A.   "Spring Break"?  No, I don't. |
| 11:19 | 15 |           THE COURT:  They'll blow that up for you. |
| 11:19 | 16 |           THE WITNESS:  Okay. |
| 11:19 | 17 |             *(Technician complies.)* |
| 11:59 | 18 | BY MS. KELLER: |
| 11:19 | 19 | Q.   Do you see at the top, where it sales, "Spring Break" |
| 11:19 | 20 | at the top of the page? |
| 11:19 | 21 | A.   Oh, yes, I do. |
| 11:19 | 22 | Q.   On the same page, do you see a photo for the MyScene |
| 11:19 | 23 | product "Club Scene" under the column "Spring 2003"? |
| 11:19 | 24 | A.   Does that say "Cafe Scene" or "Club Scene"? |
| 11:19 | 25 |        Oh, I'm sorry.  I see "Club Scene." |

CV 04-9049 DOC – 4/1/2011 – Day 44, Volume 1 of 3

108

| | | |
|---|---|---|
| 11:19 | 1 | Q.   And do you see that this document shows MyScene |
| 11:19 | 2 | products and their release dates from 2003 to 2005? |
| 11:19 | 3 | A.   Um, I don't know that these are release dates, but I do |
| 11:19 | 4 | see the years 2003 to 2005 and depictions of products. |
| 11:19 | 5 | Q.   Let's look at Exhibit 36774. |
| 11:20 | 6 | (Document provided to the witness.) |
| 11:20 | 7 | BY MS. KELLER: |
| 11:20 | 8 | Q.   The Mattel 2005 catalog.  Please look at the bottom |
| 11:20 | 9 | right-hand corner.  And do you see the little "M" for |
| 11:20 | 10 | Mattel? |
| 11:20 | 11 | A.   I do. |
| 11:20 | 12 | Q.   This is a document produced by Mattel, correct? |
| 11:20 | 13 | A.   That's correct. |
| 11:20 | 14 | Q.   And you recognize this as a Mattel 2005 catalog, do you |
| 11:20 | 15 | not? |
| 11:20 | 16 | A.   I do. |
| 11:20 | 17 | MS. KELLER:  Your Honor, I'd move 36774 into |
| 11:20 | 18 | evidence. |
| 11:20 | 19 | THE COURT:  Received. |
| 11:20 | 20 | (Exhibit No. 36774 received in evidence.) |
| | 21 | BY MS. KELLER: |
| 11:20 | 22 | Q.   Please turn to page 30. |
| 11:20 | 23 | (Document displayed.) |
| 11:59 | 24 | BY MS. KELLER: |
| 11:20 | 25 | Q.   Do you see that this page shows a photograph of the |

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 109 of 144   Page ID #:315286
CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

109

| | | |
|--|--|--|
| 11:20 | 1 | Mattel product "Cali Girl Riding Club"? |
| 11:20 | 2 | A.    "Assortment," yes. |
| 11:20 | 3 | Q.    Now, please look at Exhibit 36775. |
| 11:21 | 4 | A.    I have it. |
| 11:21 | 5 | Q.    So it's the Mattel 2006 catalog? |
| 11:21 | 6 | A.    That's correct. |
| 11:21 | 7 |        MS. KELLER:  Your Honor, I'd move 36775 into |
| 11:21 | 8 | evidence. |
| 11:21 | 9 |        THE COURT:  Received. |
| 11:21 | 10 |        *(Exhibit No. 36775 received in evidence.)* |
| 11:21 | 11 |         *(Document displayed.)* |
| 11:21 | 12 | BY MS. KELLER: |
| 11:21 | 13 | Q.    And you recognize this as -- what it purports to be -- |
| 11:21 | 14 | a Mattel 2006 catalog, correct? |
| 11:21 | 15 | A.    I do. |
| 11:21 | 16 | Q.    Look at page 17. |
| 11:21 | 17 |         *(Document displayed.)* |
| 11:21 | 18 |        THE WITNESS:  I have it. |
| 11:21 | 19 | BY MS. KELLER: |
| 11:21 | 20 | Q.    Do you see that this page shows a photo of a Mattel |
| 11:21 | 21 | product MyScene "Bling Vehicle"? |
| 11:21 | 22 | A.    Yes.  Called MyScene "My Bling Bling Wheels." |
| 11:21 | 23 | Q.    And if you go to page 26. |
| 11:21 | 24 |         *(Document displayed.)* |
| 11:21 | 25 |        THE WITNESS:  I have it. |

| | | |
|---|---|---|
| 11:21 | 1 | BY MS. KELLER: |
| 11:21 | 2 | Q.   Does this page have a photo of the Mattel product, |
| 11:21 | 3 | MyScene "Mall Maniac Playset"? |
| 11:21 | 4 | A.   Yes, the "Shop & Go Playsets." |
| 11:21 | 5 | Q.   Now, I'd like you to look at Exhibit 17374, some actual |
| 11:22 | 6 | MyScene products. |
| 11:22 | 7 | *(Exhibit provided to the witness.)* |
| 11:22 | 8 | BY MS. KELLER: |
| 11:22 | 9 | Q.   Do you recognize this as the MyScene Club Birthday |
| 11:22 | 10 | NoLee" product released by Mattel in 2004? |
| 11:22 | 11 | A.   Uh, yes, I do. |
| 11:22 | 12 | MS. KELLER:  Your Honor, I'd offer 17374 into |
| 11:22 | 13 | evidence. |
| 11:22 | 14 | THE COURT:  Received. |
| 11:22 | 15 | *(Exhibit No. 17374 received in evidence.)* |
| 11:22 | 16 | *(Document displayed.)* |
| 11:22 | 17 | BY MS. KELLER: |
| 11:22 | 18 | Q.   Please look at 36697. |
| 11:22 | 19 | *(Exhibit provided to the witness.)* |
| 11:22 | 20 | BY MS. KELLER: |
| 11:22 | 21 | Q.   Do you recognize this as the MyScene "Club Stylin' Head |
| 11:22 | 22 | Madison" product released by Mattel in 2003? |
| 11:22 | 23 | A.   I do. |
| 11:22 | 24 | MS. KELLER:  I would offer 36697, Your Honor? |
| 11:22 | 25 | THE COURT:  Received. |

| | | |
|---|---|---|
| 11:22 | 1 | *(Exhibit No. 36697 received in evidence.)* |
| 11:22 | 2 | *(Document displayed.)* |
| 11:59 | 3 | BY MS. KELLER: |
| 11:22 | 4 | Q.   And please look at 36772.  Do you recognize this as -- |
| 11:23 | 5 | *(Exhibit provided to the witness.)* |
| 11:23 | 6 | THE WITNESS:  "36772," that's correct. |
| 11:23 | 7 | BY MS. KELLER: |
| 11:23 | 8 | Q.   Do you recognize this as the MyScene "Junglicious |
| 11:23 | 9 | Kennedy" product released by Mattel in 2006? |
| 11:23 | 10 | A.   Just give me one moment.  I'm looking for the date. |
| 11:23 | 11 | Yes, I do. |
| 11:23 | 12 | MS. KELLER:  Your Honor, I'd offer 36772 into |
| 11:23 | 13 | evidence. |
| 11:23 | 14 | THE COURT:  Received. |
| 11:23 | 15 | *(Exhibit No. 36772 received in evidence.)* |
| 11:23 | 16 | *(Document displayed.)* |
| | 17 | BY MS. KELLER: |
| 11:23 | 18 | Q.   And if you could look at trial Exhibit TX35081. |
| 11:23 | 19 | Do you -- well, this is a Flavas "P.Bo"? |
| 11:24 | 20 | MGA ASSISTANT:  Can I have that number one more |
| 11:24 | 21 | time, please? |
| 11:24 | 22 | MS. KELLER:  TX35081.  And next we're going to be |
| 11:24 | 23 | looking for 17399. |
| 11:24 | 24 | MGA ASSISTANT:  Thank you. |
| 11:24 | 25 | *(Exhibit provided to the witness.)* |

| | | |
|---|---|---|
| 11:24 | 1 | THE WITNESS:  35081, yes, I have that. |
| 11:24 | 2 | BY MS. KELLER: |
| 11:24 | 3 | Q.   Is that a Flavas "P.Bo" Mattel product? |
| 11:24 | 4 | A.   It is? |
| 11:24 | 5 | MS. KELLER:  Your Honor, I will move 35081 into |
| 11:24 | 6 | evidence. |
| 11:24 | 7 | THE COURT:  Received. |
| 11:24 | 8 | *(Exhibit No. 35081 received in evidence.)* |
| 11:24 | 9 | *(Document displayed.)* |
| 11:59 | 10 | BY MS. KELLER: |
| 11:24 | 11 | Q.   And do you recognize 17399, as Mattel's "Kiyoni Brown" |
| 11:24 | 12 | product? |
| 11:24 | 13 | A.   I do. |
| 11:24 | 14 | MS. KELLER:  Your Honor, I'd move Exhibit 17399 |
| 11:24 | 15 | into evidence. |
| 11:24 | 16 | THE COURT:  Received. |
| 11:24 | 17 | *(Exhibit No. 17399 received in evidence.)* |
| 11:24 | 18 | *(Document displayed.)* |
| 11:24 | 19 | BY MS. KELLER: |
| 11:25 | 20 | Q.   I'm also gonna ask you to take a look at a catalog. |
| 11:25 | 21 | And that would be 35310. |
| 11:25 | 22 | *(Document provided to the witness.)* |
| 11:25 | 23 | THE WITNESS:  35310, I have it. |
| 11:25 | 24 | BY MS. KELLER: |
| 11:25 | 25 | Q.   Do you recognize this as pages from a 1999 Mattel |

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

113

| | | |
|---|---|---|
| 11:25 | 1 | catalog? |
| 11:25 | 2 | A.   I do. |
| 11:25 | 3 | Q.   Please turn to pages 35310-18 through 19. |
| 11:25 | 4 | A.   I have them. |
| 11:25 | 5 | Q.   Do you recognize this as describing a line of dolls |
| 11:25 | 6 | made by Mattel called Generation Girls? |
| 11:25 | 7 | A.   I do. |
| 11:25 | 8 | MS. KELLER:  Your Honor, I'd move 35310 into |
| 11:26 | 9 | evidence. |
| 11:26 | 10 | THE COURT:  Received. |
| 11:26 | 11 | *(Exhibit No. 35310 received in evidence.)* |
| 11:26 | 12 | *(Document displayed.)* |
| 11:26 | 13 | BY MS. KELLER: |
| 11:26 | 14 | Q.   If you could also look at 35307. |
| 11:26 | 15 | *(Document provided to the witness.)* |
| 11:26 | 16 | THE WITNESS:  I have that. |
| 11:26 | 17 | BY MS. KELLER: |
| 11:26 | 18 | Q.   Do you recognize this as a 1997 Mattel catalog? |
| 11:26 | 19 | A.   I do. |
| 11:26 | 20 | Q.   Please turn to page 30310, dash 28 through 31. |
| 11:26 | 21 | A.   I have them. |
| 11:26 | 22 | Q.   Do you recognize this as describing a line of dolls |
| 11:26 | 23 | made by Mattel called "Clueless"? |
| 11:26 | 24 | A.   I do. |
| 11:26 | 25 | MS. KELLER:  Your Honor, I'd move 35307-28 through |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

114

| | | |
|---|---|---|
| 11:26 | 1 | 31 into evidence. |
| 11:26 | 2 | THE COURT:  Received. |
| 11:26 | 3 | *(Exhibit No. 35307 received in evidence.)* |
| 11:26 | 4 | *(Document displayed.)* |
| 11:26 | 5 | BY MS. KELLER: |
| 11:26 | 6 | Q.   And if you could look at trial Exhibit 35308. |
| 11:26 | 7 | *(Exhibit provided to the witness.)* |
| 11:26 | 8 | THE WITNESS:  I have it. |
| 11:26 | 9 | BY MS. KELLER: |
| 11:26 | 10 | Q.   Do you recognize this as a -- |
| 11:26 | 11 | MS. KELLER:  Excuse me.  May I have a moment? |
| 11:26 | 12 | BY MS. KELLER: |
| 11:26 | 13 | Q.   Do you recognize this as a 1987 Mattel catalog? |
| 11:26 | 14 | A.   I do. |
| 11:26 | 15 | Q.   Please turn to pages 36 through 43. |
| 11:27 | 16 | A.   I have them. |
| 11:27 | 17 | Q.   Do you recognize this as describing a line of dolls |
| 11:27 | 18 | made by Mattel called "Hot Looks"? |
| 11:27 | 19 | A.   I do. |
| 11:27 | 20 | THE COURT:  Hot what? |
| 11:27 | 21 | THE WITNESS:  "Hot Looks," L-O-O-K-S. |
| 11:27 | 22 | THE COURT:  Thank you. |
| 11:27 | 23 | MS. KELLER:  Your Honor, I would move 35308-36 |
| 11:27 | 24 | through 43 into evidence. |
| 11:27 | 25 | THE COURT:  Received. |

| | | |
|---|---|---|
| 11:27 | 1 | *(Exhibit No. 35308 received in evidence.)* |
| 11:27 | 2 | *(Document displayed.)* |
| 11:27 | 3 | BY MS. KELLER: |
| 11:27 | 4 | Q.   And, Mr. Eckert, if you could look at Exhibit No. 9566. |
| 11:27 | 5 | And that is a 2006 Toy Fair Report by Mattel. |
| 11:27 | 6 | *(Document provided to the witness.)* |
| 11:27 | 7 | THE WITNESS:  I have it. |
| 11:27 | 8 | BY MS. KELLER: |
| 11:27 | 9 | Q.   And specifically if you could look at page 6, 7, 16, |
| 11:28 | 10 | 22? |
| 11:28 | 11 | A.   Hang on one second.  16? |
| 11:28 | 12 | Q.   22. |
| 11:28 | 13 | A.   22. |
| 11:28 | 14 | Q.   23. |
| 11:28 | 15 | A.   I have them. |
| 11:28 | 16 | Q.   35. |
| 11:28 | 17 | A.   I have it. |
| 11:28 | 18 | Q.   And 38.  Do all those pages contain MGA products? |
| 11:28 | 19 | A.   Give me just a second. |
| 11:28 | 20 | 38 does. |
| 11:28 | 21 | 35 does. |
| 11:28 | 22 | Page 24, was that next? |
| 11:28 | 23 | Q.   23. |
| 11:28 | 24 | A.   23, yes. |
| 11:29 | 25 | Q.   22? |

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

116

| | | |
|---|---|---|
| 11:29 | 1 | A.   Yes. |
| 11:29 | 2 | Q.   16? |
| 11:29 | 3 | A.   Yes. |
| 11:29 | 4 | Q.   6 and 7? |
| 11:29 | 5 | A.   Yes. |
| 11:29 | 6 | MS. KELLER:  Your Honor, I would move that exhibit |
| 11:29 | 7 | and those pages into evidence. |
| 11:29 | 8 | THE COURT:  Received. |
| 11:29 | 9 | *(Exhibit No. 9566 received in evidence.)* |
| 11:29 | 10 | *(Document displayed.)* |
| | 11 | BY MS. KELLER: |
| 11:29 | 12 | Q.   And if you could look at Trial Exhibit 9656, 2004 |
| 11:30 | 13 | Mattel Toy Fair Report.  9656.  2004. |
| 11:30 | 14 | THE COURT:  It's their responsibility to put that |
| 11:30 | 15 | in front of you. |
| 11:30 | 16 | THE WITNESS:  It's coming, I believe. |
| 11:30 | 17 | *(Document provided to the witness.)* |
| 11:30 | 18 | THE WITNESS:  This is Exhibit No. 09656? |
| 11:30 | 19 | BY MS. KELLER: |
| 11:30 | 20 | Q.   Yes, it is. |
| 11:30 | 21 | A.   I have it. |
| 11:30 | 22 | Q.   And I would like to ask you if you see MGA products on |
| 11:30 | 23 | pages 4, 22, and 23. |
| 11:31 | 24 | A.   On page 4, yes. |
| 11:31 | 25 | On page 22, yes. |

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

117

| | | |
|---|---|---|
| 11:31 | 1 | Q.   And page 23? |
| 11:31 | 2 | A.   On page 23, yes. |
| 11:31 | 3 | MS. KELLER:  And, Your Honor, I would move that |
| 11:31 | 4 | exhibit and those pages into evidence. |
| 11:31 | 5 | THE COURT:  Received. |
| 11:31 | 6 | *(Exhibit No. 9656 received in evidence.)* |
| 11:31 | 7 | *(Document displayed.)* |
| 11:31 | 8 | BY MS. KELLER: |
| 11:31 | 9 | Q.   And if you could take a look at Trial Exhibit 26546, |
| 11:31 | 10 | which is a 2003 Mattel New York Toy Fair Report. |
| 11:31 | 11 | *(Document provided to the witness.)* |
| 11:31 | 12 | THE WITNESS:  I have it. |
| 11:31 | 13 | BY MS. KELLER: |
| 11:31 | 14 | Q.   Do you recognize that?  And I would like you to look at |
| 11:31 | 15 | page 6. |
| 11:31 | 16 | A.   I don't recognize it.  But it is a Mattel-provided |
| 11:31 | 17 | document. |
| 11:31 | 18 | MS. KELLER:  Could I have a moment, please. |
| 11:31 | 19 | BY MS. KELLER: |
| 11:32 | 20 | Q.   If you take a look at page 6, do you see MGA products |
| 11:32 | 21 | on that page, specifically -- |
| 11:32 | 22 | A.   I don't -- go ahead.  I'm sorry. |
| 11:32 | 23 | Q.   -- bottom paragraph? |
| 11:32 | 24 | A.   Yeah, I see the bottom paragraph.  Yes. |
| 11:32 | 25 | MS. KELLER:  Your Honor, I'd move that page into |

| | | |
|---|---|---|
| 11:32 | 1 | evidence. |
| 11:32 | 2 | THE COURT:  Received. |
| 11:32 | 3 | *(Exhibit No. 26546 received in evidence.)* |
| 11:32 | 4 | *(Document displayed.)* |
| 11:32 | 5 | BY MS. KELLER: |
| 11:32 | 6 | Q.  And if you could look at Trial Exhibit 31530 -- |
| 11:32 | 7 | *(Document provided to the witness.)* |
| 11:32 | 8 | THE WITNESS:  I have it. |
| 11:32 | 9 | BY MS. KELLER: |
| 11:32 | 10 | Q.  -- 2004 Mattel Toy Fair Report.  Do you see MGA |
| 11:32 | 11 | products on pages 22 and 23? |
| 11:32 | 12 | A.  I do on page 22, and I do on page 23. |
| 11:32 | 13 | MS. KELLER:  Your Honor, I would move that exhibit |
| 11:32 | 14 | and those pages into evidence. |
| 11:32 | 15 | THE COURT:  Received. |
| 11:32 | 16 | *(Exhibit No. 31530 received in evidence.)* |
| 11:32 | 17 | *(Document displayed.)* |
| 11:32 | 18 | BY MS. KELLER: |
| 11:32 | 19 | Q.  Now, if we could turn back to a different topic, |
| 11:33 | 20 | Mr. Eckert. |
| 11:33 | 21 | We were talking before about how Mattel has very tight |
| 11:33 | 22 | security.  You would agree with that, wouldn't you? |
| 11:33 | 23 | A.  Yes. |
| 11:33 | 24 | Q.  And the building in El Segundo is especially |
| 11:33 | 25 | well-secured? |

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

119

| | | |
|---|---|---|
| 11:33 | 1 | A.    Yes. |
| 11:33 | 2 | Q.    Before people can come and go, they have to pass a |
| 11:33 | 3 | security desk, right? |
| 11:33 | 4 | A.    That's correct. |
| 11:33 | 5 | Q.    And that was true from 2000 until now, if not earlier, |
| 11:33 | 6 | right? |
| 11:33 | 7 | A.    That's correct. |
| 11:33 | 8 | Q.    And the security desk also is videotaped, true? |
| 11:33 | 9 | A.    I believe it is. |
| 11:33 | 10 | Q.    And, in fact, people are videotaped passing the |
| 11:33 | 11 | security desk on the way out, all the way out into the |
| 11:33 | 12 | parking garage, true? |
| 11:33 | 13 | A.    That, I don't know. |
| 11:33 | 14 | Q.    Mattel preserves its security videos so they can be |
| 11:33 | 15 | pulled up at a later time? |
| 11:33 | 16 | A.    That, I don't know. |
| 11:33 | 17 | Q.    And if somebody is going to leave with, for example, a |
| 11:34 | 18 | box of items, they either have to have a pass for those |
| 11:34 | 19 | items, or they have to go past the security desk with them |
| 11:34 | 20 | and have security inspect them, right? |
| 11:34 | 21 | A.    That's correct. |
| 11:34 | 22 | Q.    And that was also true in 2000 as well as in |
| 11:34 | 23 | 2011, right? |
| 11:34 | 24 | A.    I know it's true in 2011.  Uh, it wouldn't surprise me |
| 11:34 | 25 | if it were true in 2000. |

120

| | | |
|---|---|---|
| 11:34 | 1 | Q.   And you started in 2000? |
| 11:34 | 2 | A.   I did. |
| 11:34 | 3 | Q.   Right?  And so the security setup has not gotten |
| 11:34 | 4 | looser, has it? |
| 11:34 | 5 | A.   No, it has not. |
| 11:34 | 6 | Q.   So it's been substantially the same in terms of how the |
| 11:34 | 7 | entrance and exits are setup since you got there, right? |
| 11:34 | 8 | A.   Actually, things have moved quite a bit.  But I think, |
| 11:34 | 9 | generally speaking, it's the same process. |
| 11:34 | 10 | Q.   And if we could look at Exhibit 37116, I'm going to ask |
| 11:34 | 11 | you if you recognize this video as a video of your security |
| 11:35 | 12 | area? |
| 11:35 | 13 | *(Video played.)* |
| 11:35 | 14 | BY MS. KELLER: |
| 11:35 | 15 | Q.   Do you recognize that as your security area in |
| 11:35 | 16 | El Segundo? |
| 11:35 | 17 | A.   That's not how it's set up today, but this would |
| 11:35 | 18 | probably be -- from an earlier year, it would be, yes. |
| 11:35 | 19 | Q.   And let's look at that again.  Specifically, do you |
| 11:35 | 20 | recognize Ron Brawer in 2004 in this video? |
| 11:35 | 21 | Take a look at a man with a box coming, and then coming |
| 11:35 | 22 | back to the desk in a minute. |
| 11:35 | 23 | *(Video played.)* |
| 11:36 | 24 | THE WITNESS:  I believe that was him. |
| | 25 | |

| | | |
|---|---|---|
| 11:36 | 1 | BY MS. KELLER: |
| 11:36 | 2 | Q.   And then this video continues, so you see the security |
| 11:36 | 3 | guard appearing to check with him, right? |
| 11:36 | 4 | A.   I would say they're appearing to talk right now.  I |
| 11:36 | 5 | don't know that he's checking the box. |
| 11:36 | 6 | Q.   Not asking that. |
| 11:36 | 7 | A.   Oh, I'm sorry. |
| 11:36 | 8 | Q.   Checking with the security guard? |
| 11:36 | 9 | A.   I saw they communicated. |
| 11:36 | 10 | Q.   And the surveillance continues out to the parking |
| 11:36 | 11 | garage, right? |
| 11:36 | 12 | A.   That I don't know. |
| 11:36 | 13 | MS. KELLER:  See if we have that portion of the |
| 11:36 | 14 | clip. |
| 11:36 | 15 | (Video played.) |
| 11:59 | 16 | BY MS. KELLER: |
| 11:36 | 17 | Q.   That's the front door? |
| 11:36 | 18 | A.   That is an employee -- it's my daughter's car.  That's |
| 11:36 | 19 | an employee exit on the second floor. |
| 11:37 | 20 | Q.   And do you see Mr. Brawer walking across the picture a |
| 11:37 | 21 | second ago? |
| 11:37 | 22 | A.   No.  I'm sorry I was focused on the Jeep. |
| 11:37 | 23 | (Video replayed.) |
| 11:37 | 24 | THE WITNESS:  That could be him. |
| | 25 | |

| | | |
|---|---|---|
| 11:37 | 1 | BY MS. KELLER: |
| 11:37 | 2 | Q.   As we discussed earlier, Mattel's security |
| 11:37 | 3 | capabilities -- |
| 11:37 | 4 | A.   That was Brawer in the parking lot -- parking garage. |
| 11:37 | 5 | Q.   -- you would agree with me, would you not, that |
| 11:37 | 6 | Mattel's security capabilities are pretty sophisticated? |
| 11:37 | 7 | A.   Yes, I would. |
| 11:37 | 8 | Q.   And they have been the whole time you were there? |
| 11:37 | 9 | A.   I wouldn't dispute that. |
| 11:37 | 10 | MS. KELLER:  Your Honor, I'd move 37116 into |
| 11:37 | 11 | evidence. |
| 11:37 | 12 | THE COURT:  Received. |
| 11:37 | 13 | *(Exhibit No. 37116 received in evidence.)* |
| 11:37 | 14 | MS. KELLER:  I have nothing further at this time. |
| 11:37 | 15 | THE COURT:  Cross-examination by Mr. Quinn on |
| 11:37 | 16 | behalf of Mattel of Mr. Eckert. |
| 11:38 | 17 | **CROSS-EXAMINATION** |
| 11:38 | 18 | BY MR. QUINN: |
| 11:38 | 19 | Q.   Now, Mr. Eckert, the clips we just looked at were taken |
| 11:38 | 20 | in the office tower.  That's the security arrangements at |
| 11:38 | 21 | the office tower? |
| 11:38 | 22 | A.   That was at the time.  That's not the layout today. |
| 11:38 | 23 | Q.   And that's a different place than the design center? |
| 11:38 | 24 | A.   That's correct.  It's a different building a couple of |
| 11:38 | 25 | blocks away. |

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

123

| | | |
|---|---|---|
| 11:38 | 1 | Q.    So where Carter Bryant worked, in the design center, |
| 11:38 | 2 | that's a different place? |
| 11:38 | 3 | A.    That's correct. |
| 11:38 | 4 | Q.    And we saw Mr. Brawer leave there with a box under his |
| 11:38 | 5 | arm, right? |
| 11:38 | 6 | A.    Yes. |
| 11:38 | 7 | Q.    And you heard Mr. Brawer's testimony that he left on a |
| 11:38 | 8 | Thursday before a religious holiday? |
| 11:38 | 9 | A.    Yes. |
| 11:38 | 10 | Q.    And that he took a box with him? |
| 11:39 | 11 | A.    Yes. |
| 11:39 | 12 | Q.    Now, is it common at Mattel for people to take work |
| 11:39 | 13 | home with them? |
| 11:39 | 14 | A.    Yes. |
| 11:39 | 15 | Q.    You heard Mr. Brawer's testimony that he resigned the |
| 11:39 | 16 | next Monday? |
| 11:39 | 17 | A.    Yes. |
| 11:39 | 18 | Q.    So, so far as you know, would there have been any way |
| 11:39 | 19 | for a security guard to know that Mr. Brawer was leaving |
| 11:39 | 20 | with that box under his arm, and that was going to be his |
| 11:39 | 21 | last day of work at Mattel? |
| 11:39 | 22 | A.    Uh, I don't know that. |
| 11:39 | 23 | Q.    You've told us about your feelings regarding people -- |
| 11:39 | 24 | Mattel employee using false identification to get into toy |
| 11:39 | 25 | fair showrooms. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

124

| | | |
|---|---|---|
| 11:39 | 1 | Could you tell us why -- I mean, do you think -- from |
| 11:40 | 2 | your standpoint, would it make any business sense at all for |
| 11:40 | 3 | people to sneak into toy fair showrooms? |
| 11:40 | 4 | A.   No, it wouldn't. |
| 11:40 | 5 | Q.   Why not? |
| 11:40 | 6 | A.   I think this is a situation where the harder way is the |
| 11:40 | 7 | better way.  Carey Plunkett's term, I believe, when she sat |
| 11:40 | 8 | up here, was it was "convenient" to go to the showrooms and |
| 11:40 | 9 | gather the information.  In my view, it was the easy way or |
| 11:40 | 10 | the lazy way. |
| 11:40 | 11 | The information was gathered -- was gathered after |
| 11:40 | 12 | that, and you don't need to go to somebody's showrooms to |
| 11:40 | 13 | get that information.  And it's wrong. |
| 11:40 | 14 | Q.   Do you know, after December of 2005, when |
| 11:40 | 15 | Mr. Villasenor sent in his letter and then went out on |
| 11:40 | 16 | stress leave -- do you know whether or not Mattel continued |
| 11:40 | 17 | to collect information that same way in the years ahead from |
| 11:41 | 18 | toy fairs? |
| 11:41 | 19 | A.   Not the same way.  But I just saw a document in 2006 |
| 11:41 | 20 | that had toy fair information. |
| 11:41 | 21 | Q.   Let's take a look at that, Exhibit 8522, which I |
| 11:41 | 22 | believe is in evidence now. |
| 11:41 | 23 | *(Document displayed.)* |
| 11:41 | 24 | *(Document provided to the witness.)* |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

125

| | | |
|---|---|---|
| 11:41 | 1 | BY MR. QUINN: |
| 11:41 | 2 | Q.   We could look at the first page.  This is the |
| 11:41 | 3 | Competitive Overview for 2006? |
| 11:41 | 4 | A.   It is. |
| 11:41 | 5 | Q.   So -- and at the top, it refers to the "American |
| 11:41 | 6 | International Toy Fair"? |
| 11:41 | 7 | A.   It does. |
| 11:41 | 8 | Q.   So this would have been released early in 2006? |
| 11:41 | 9 | A.   Presumably. |
| 11:41 | 10 | Q.   All right.  After Mr. Villasenor has left the company? |
| 11:41 | 11 | A.   That's correct. |
| 11:41 | 12 | Q.   Or gone out on stress leave? |
| 11:41 | 13 | A.   That's correct. |
| 11:41 | 14 | Q.   If we could take a look at page dash 3 there, where it |
| 11:41 | 15 | says, "Methodology." |
| 11:41 | 16 | *(Document displayed.)* |
| 11:41 | 17 | THE WITNESS:  I have it. |
| 11:41 | 18 | BY MR. QUINN: |
| 11:41 | 19 | Q.   And it says, "The 2006 competitive product overview was |
| 11:41 | 20 | created by collecting content from a variety of press |
| 11:41 | 21 | releases, news articles, and widely accessible websites. |
| 11:42 | 22 | All included content is publicly available and can be |
| 11:42 | 23 | directly sourced by request.  None of this information was |
| 11:42 | 24 | directly or indirectly obtained or sought out of any third |
| 11:42 | 25 | party." |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

126

| | | |
|---|---|---|
| 11:42 | 1 | Do you see that? |
| 11:42 | 2 | A.   I do. |
| 11:42 | 3 | Q.   And do you know whether or not, after Mr. Villasenor |
| 11:42 | 4 | left, the company continued to collect information the way |
| 11:42 | 5 | Mr. Villasenor had? |
| 11:42 | 6 | A.   Well, it collected information, but not the way |
| 11:42 | 7 | Mr. Villasenor had. |
| 11:42 | 8 | Q.   Today does Mattel continue to collect competitive |
| 11:42 | 9 | information by sending people to toy fairs and preparing |
| 11:42 | 10 | these competitive overview reports? |
| 11:42 | 11 | A.   No, we do not. |
| 11:42 | 12 | Q.   How long ago did Mattel cease that practice of even |
| 11:42 | 13 | going to toy fairs to collect competitive information? |
| 11:42 | 14 | MS. KELLER:  Objection.  Assumes facts not in |
| 11:42 | 15 | evidence that this witness knows. |
| 11:43 | 16 | THE COURT:  Overruled. |
| 11:43 | 17 | THE WITNESS:  I don't know when that practice |
| 11:43 | 18 | started. |
| 11:43 | 19 | BY MR. QUINN: |
| 11:43 | 20 | Q.   How does Mattel collect competitive information now? |
| 11:43 | 21 | A.   We largely collect it through subscribing to a paid |
| 11:43 | 22 | service that provides information from toy fair to Disney, |
| 11:43 | 23 | to Mattel, and to several other companies. |
| 11:43 | 24 | Q.   What is the name of that service? |
| 11:43 | 25 | A.   I don't know. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

127

| | | |
|---|---|---|
| 11:43 | 1 | Q.   You were shown a number of documents which had the |
| 11:43 | 2 | "Sales Research/Market Intelligence" heading on it. |
| 11:43 | 3 | Do you recall that? |
| 11:43 | 4 | A.   I do. |
| 11:43 | 5 | Q.   If we could perhaps look at one of these that |
| 11:43 | 6 | Ms. Keller showed you.  Exhibit 36750-1. |
| 11:44 | 7 | MR. QUINN:  This is in evidence, Your Honor, if we |
| 11:44 | 8 | could -- do we have it? |
| 11:44 | 9 | THE COURT:  You can put it up on the screen if you |
| 11:44 | 10 | want to, Mr. Quinn. |
| 11:44 | 11 | MR. QUINN:  It's 36750-1. |
| 11:44 | 12 | THE COURT:  You can show it that way. |
| 11:44 | 13 | MR. QUINN:  I think we have a copy here that we |
| 11:44 | 14 | can use, Your Honor.  Thank you. |
| 11:44 | 15 | *(Document displayed.)* |
| 11:44 | 16 | MR. QUINN:  Perhaps if we can enlarge that at the |
| 11:44 | 17 | top. |
| 11:44 | 18 | *(Technician complies.)* |
| 11:44 | 19 | BY MR. QUINN: |
| 11:44 | 20 | Q.   This is one of a series that Ms. Keller showed you that |
| 11:44 | 21 | refers to "Sales Research/Market Intelligence" there at the |
| 11:44 | 22 | top? |
| 11:44 | 23 | A.   It is. |
| 11:44 | 24 | Q.   And can you tell -- by the way, there's a distribution |
| 11:44 | 25 | there.  Do you see that? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

128

| | | |
|---|---|---|
| 11:44 | 1 | A.    Yes. |
| 11:44 | 2 | Q.    Is this a document that was forwarded to you? |
| 11:44 | 3 | A.    Uh. |
| 11:44 | 4 | Q.    Can you tell us? |
| 11:44 | 5 | A.    No.  It looks like I received it directly. |
| 11:44 | 6 | *(Document now provided to the witness.)* |
| 11:44 | 7 | BY MR. QUINN: |
| 11:44 | 8 | Q.    And what is the information that's in this document? |
| 11:44 | 9 | A.    This is the June 2008 NPD Market Share Report. |
| 11:45 | 10 | Q.    And what is that? |
| 11:45 | 11 | A.    That's a monthly report that we've received every |
| 11:45 | 12 | month, at least since I've been at Mattel, that shows retail |
| 11:45 | 13 | sales as measured by NPD for all toy companies in all |
| 11:45 | 14 | categories. |
| 11:45 | 15 | Q.    Is this information that Mattel subscribes to and has |
| 11:45 | 16 | to pay for? |
| 11:45 | 17 | A.    We do. |
| 11:45 | 18 | Q.    Does this have anything at all to do with toy fair? |
| 11:45 | 19 | A.    No, it doesn't. |
| 11:45 | 20 | Q.    If we could look at another exhibit, similar exhibit |
| 11:45 | 21 | that Ms. Keller showed you, Exhibit 36749. |
| 11:45 | 22 | *(Document provided to witness.)* |
| 11:45 | 23 | THE WITNESS:  I have it. |
| 11:45 | 24 | *(Document displayed.)* |
| 11:45 | 25 | MR. QUINN:  And if we could enlarge that at the |

| | | |
|---|---|---|
| 11:45 | 1 | top. |
| 11:45 | 2 | BY MR. QUINN: |
| 11:45 | 3 | Q.   This is another document that Ms. Keller showed you. |
| 11:45 | 4 | Is this also NPD data that you get pursuant to the -- |
| 11:46 | 5 | that Mattel receives pursuant to a subscription? |
| 11:46 | 6 | A.   It is. |
| 11:46 | 7 | Q.   Again, does this have anything at all to do with toy |
| 11:46 | 8 | fair? |
| 11:46 | 9 | A.   It does not. |
| 11:46 | 10 | Q.   And then she showed you Exhibit 36769. |
| 11:46 | 11 | *(Document provided to the witness.)* |
| 11:46 | 12 | THE WITNESS:  I have it. |
| 11:46 | 13 | BY MR. QUINN: |
| 11:46 | 14 | Q.   That's another document with a heading at the top |
| 11:46 | 15 | "Sales Research" and "Market Intelligence"? |
| 11:46 | 16 | A.   Yes. |
| 11:46 | 17 | Q.   And is that also this NPD data that Mattel subscribes |
| 11:46 | 18 | to? |
| 11:46 | 19 | A.   Yes, it is. |
| 11:46 | 20 | Q.   Does that have anything to do with toy fair? |
| 11:46 | 21 | A.   No, it does not. |
| 11:46 | 22 | Q.   And there were a number of other documents that |
| 11:46 | 23 | Ms. Keller showed you in that line which have that heading |
| 11:46 | 24 | at the top.  Were those all NPD reports having nothing to do |
| 11:46 | 25 | with toy fair? |

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

130

| | | |
|---|---|---|
| 11:46 | 1 | A.    I believe that's the case. |
| 11:47 | 2 | Q.    Now, you were asked some questions by Ms. Keller about |
| 11:47 | 3 | what you had done since -- I mean, in response to her |
| 11:47 | 4 | question about when you first heard about the idea that |
| 11:47 | 5 | people had misrepresented themselves to get access to toy |
| 11:47 | 6 | fair booths, and you indicated that you heard a hypothetical |
| 11:47 | 7 | in December of 2009. |
| 11:47 | 8 |        Do you recall that? |
| 11:47 | 9 | A.    I do. |
| 11:47 | 10 | Q.    And she asked you questions about what you did to, you |
| 11:47 | 11 | know, research or find out about that hypothetical. |
| 11:47 | 12 |        Do you recall that? |
| 11:47 | 13 | A.    I do. |
| 11:47 | 14 |          MR. QUINN:  And, Your Honor, I'd request |
| 11:47 | 15 | permission to read that testimony from the deposition, |
| 11:47 | 16 | December 17, 2009, page 453, lines 13 to 16. |
| 11:47 | 17 |          MS. KELLER:  I think that's the part, Your Honor, |
| 11:47 | 18 | the Court found was not inconsistent. |
| 11:47 | 19 |          THE COURT:  I already found that was not, |
| 11:47 | 20 | inconsistent, Counsel. |
| 11:47 | 21 |          Sustained. |
| 11:47 | 22 |          MR. QUINN:  All right. |
| 11:47 | 23 | BY MR. QUINN: |
| 11:47 | 24 | Q.    Well, based on the single hypothetical question that |
| 11:48 | 25 | was asked of you in December of 2009, did you have -- did |

| | | |
|---|---|---|
| 11:48 | 1 | you feel like you had any information that would permit you |
| 11:48 | 2 | to start conducting an investigation? |
| 11:48 | 3 | A.   No, I didn't. |
| 11:48 | 4 | Q.   As of that date, 2009, Mr. Villasenor had been gone |
| 11:48 | 5 | from the company since June of 2006? |
| 11:48 | 6 | A.   That's correct. |
| 11:48 | 7 | Q.   And was it your understanding that -- is your |
| 11:48 | 8 | understanding now that, in fact, those practices had stopped |
| 11:48 | 9 | several years before as of the time your deposition was |
| 11:48 | 10 | taken? |
| 11:48 | 11 | A.   Yes. |
| 11:48 | 12 |         MS. KELLER:  Objection.  No foundation. |
| 11:48 | 13 |         THE COURT:  Overruled. |
| 11:48 | 14 |         THE WITNESS:  Yes. |
| 11:48 | 15 |         MR. QUINN:  Your Honor, I'd request permission |
| 11:48 | 16 | just to get in the hypothetical so that we know what it was |
| 11:48 | 17 | that he was put on notice of. |
| 11:48 | 18 |         THE COURT:  Tell me what the hypothetical was. |
| 11:48 | 19 |         MR. QUINN:  The hypothetical in his deposition. |
| 11:48 | 20 |         THE COURT:  I've already ruled it's consistent. |
| 11:48 | 21 | In fact, Mattel objected and I sustained it, so it's |
| 11:49 | 22 | consistent. |
| 01:59 | 23 | BY MR. QUINN: |
| 11:49 | 24 | Q.   And then your deposition was again taken just last |
| 11:49 | 25 | year, in October of 2010; is that correct? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

132

| | | |
|---|---|---|
| 11:49 | 1 | A.    That's correct. |
| 11:49 | 2 | Q.    And then you were actually questioned -- you heard the |
| 11:49 | 3 | name "Sal Villasenor" and you were questioned in some detail |
| 11:49 | 4 | about allegations regarding Mr. Villasenor? |
| 11:49 | 5 | A.    Yes.  And I had first heard of Mr. Villasenor's name in |
| 11:49 | 6 | 2009.  But in 2010 there were several other names. |
| 11:49 | 7 | Q.    And at that point that Ms. -- you told Ms. Keller that |
| 11:49 | 8 | you were confident that those allegations were being |
| 11:49 | 9 | investigated.  Do you recall saying that? |
| 11:49 | 10 | A.    I do. |
| 11:49 | 11 | Q.    And could you explain, please, what you meant; why you |
| 11:49 | 12 | were confident that those allegations were being |
| 11:49 | 13 | investigated as of the time your deposition was taken? |
| 11:49 | 14 | A.    Prior to the October 2010 deposition, I had met with |
| 11:49 | 15 | outside counsel.  And I knew they were aware of this topic. |
| 11:49 | 16 | And as I communicated at the deposition, I knew that |
| 11:50 | 17 | anything that had to do with this lawsuit would be |
| 11:50 | 18 | investigated.  I was confident of that. |
| 11:50 | 19 | Q.    So you were also asked questions about a research |
| 11:50 | 20 | library that existed at Mattel -- I think, the question was |
| 11:50 | 21 | on the Ninth floor. |
| 11:50 | 22 | I mean, have you actually visited that yourself? |
| 11:50 | 23 | A.    It is now on the eighth floor.  And I have. |
| 11:50 | 24 | Q.    And what is there?  What are the materials that are |
| 11:50 | 25 | there? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

133

| 11:50 | 1 | A.   It's a storage closet, similar to a storage closet we |
| 11:50 | 2 | have on the 15th floor, where I keep toys.  It is largely |
| 11:50 | 3 | what you would call brown legal file folders with catalogs, |
| 11:50 | 4 | sheets. |
| 11:50 | 5 | Q.   Catalogs of toy company's products? |
| 11:50 | 6 | A.   Yes. |
| 11:50 | 7 | Q.   Including competitor's products? |
| 11:50 | 8 | A.   Yes. |
| 11:50 | 9 | Q.   Information that is publicly available? |
| 11:50 | 10 | A.   It might be. |
| 11:50 | 11 | Q.   I mean, do you have any reason to think that there's |
| 11:51 | 12 | any information there that isn't provided to retailers, |
| 11:51 | 13 | members of the press, and otherwise made available at toy |
| 11:51 | 14 | fairs? |
| 11:51 | 15 | A.   No, I do not. |
| 11:51 | 16 | Q.   You were asked some questions about Exhibit 5367. |
| 11:51 | 17 |       MR. QUINN:  And if we could put that up on the |
| 11:51 | 18 | screen, Ken -- |
| 11:51 | 19 |       (Document displayed.) |
| 11:51 | 20 | BY MR. QUINN: |
| 11:51 | 21 | Q.   This is about the -- your e-mail to Mr. de Anda about |
| 11:51 | 22 | the Flavas product.  Do you recall that? |
| 11:51 | 23 | A.   Yes, I do. |
| 11:51 | 24 | Q.   And what was your concern here?  You asked Mr. de Anda |
| 11:51 | 25 | to look into something about Flavas.  Could you tell us what |

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

134

| 11:51 | 1 | your concern was? |
| 11:51 | 2 | A.   My concern was Flavas at the time was a product that |
| 11:51 | 3 | had not gone to a toy fair.  We had started showing Flavas |
| 11:51 | 4 | inside of Mattel's building to customers, giving them no |
| 11:51 | 5 | leave-behinds, no PowerPoints, no presentations, no |
| 11:51 | 6 | photographs.  And yet, I had learned that our competitor had |
| 11:52 | 7 | a photograph.  And I was concerned that somebody inside of |
| 11:52 | 8 | Mattel may have provided a competitor a photograph. |
| 11:52 | 9 | Q.   Now, at this -- I think you said at this point the name |
| 11:52 | 10 | "Flavas" and the fact that Mattel was coming out with this |
| 11:52 | 11 | new product line was something that was known? |
| 11:52 | 12 | A.   That's correct -- or certainly known by retailers. |
| 11:52 | 13 | Q.   And did you think that at that point, when you told |
| 11:52 | 14 | retailers that there's a product named "Flavas" and it's a |
| 11:52 | 15 | new product line that's gonna be coming out -- did you think |
| 11:52 | 16 | that information, once you told to retailers, was a trade |
| 11:52 | 17 | secret at that point? |
| 11:52 | 18 | A.   No, I did not. |
| 11:52 | 19 | Q.   But the photograph, why were you concerned in |
| 11:52 | 20 | particular about the photograph? |
| 11:52 | 21 | A.   Because I didn't think we had photographs of that |
| 11:52 | 22 | product.  We certainly didn't give anybody photographs of |
| 11:52 | 23 | that product.  And the fact that a competitor had |
| 11:52 | 24 | photographs of that product was disturbing to me. |
| 11:52 | 25 | Q.   If you had given photographs of the product -- if |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 135 of 144   Page ID #:315312
CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

135

| 11:53 | 1 | that's something you had actually released -- |
| 11:53 | 2 |      MS. KELLER:  Your Honor, I'm gonna object that |
| 11:53 | 3 | that assumes facts not in evidence, that the competitor had |
| 11:53 | 4 | the photos, based on prior testimony. |
| 11:53 | 5 |      THE COURT:  Overruled. |
| 11:53 | 6 | BY MR. QUINN: |
| 11:53 | 7 | Q.   I mean, if in fact you had given photographs of the |
| 11:53 | 8 | product to retailers, would you have had the same concern? |
| 11:53 | 9 | A.   Um, I might have been disappointed, but it -- it would |
| 11:53 | 10 | not have been the same concern. |
| 11:53 | 11 | Q.   And why is that?  Why would it not have been the same |
| 11:53 | 12 | concern? |
| 11:53 | 13 | A.   Because I realize that, even if we like retailers not |
| 11:53 | 14 | to pass information, they do.  So if we had given them |
| 11:53 | 15 | photographs, I could see how that could end up elsewhere. |
| 11:54 | 16 | Q.   Now, Mr. Brawer was a senior executive; is that |
| 11:54 | 17 | correct? |
| 11:54 | 18 | A.   Yes. |
| 11:54 | 19 | Q.   And did you interact with him on a fairly regular basis |
| 11:54 | 20 | while he was still at Mattel? |
| 11:54 | 21 | A.   Uh, yes.  I think it was fairly regular depending on |
| 11:54 | 22 | how one defines "fairly regular." |
| 11:54 | 23 | Q.   Did he ever tell you that he knew there was this |
| 11:54 | 24 | individual named "Sal Villasenor" who was using false ID's |
| 11:54 | 25 | to access toy fair showrooms while he was at Mattel? |

| | | |
|---|---|---|
| 11:54 | 1 | A.   No, he did not. |
| 11:54 | 2 | Q.   Now -- and did Mr. Brawer actually report directly to |
| 11:54 | 3 | you for some period? |
| 11:55 | 4 | A.   No.  He's never reported directly to me. |
| 11:55 | 5 | Q.   You were asked some questions about Exhibit 36813. |
| 11:55 | 6 | MR. QUINN:  Which I believe is this evidence, |
| 11:55 | 7 | Your Honor.  36813? |
| 11:55 | 8 | Your Honor, this is the letter that Mr. Brawer was |
| 11:55 | 9 | questioned about from Mattel's counsel.  I'd like to offer |
| 11:55 | 10 | this in evidence. |
| 11:55 | 11 | THE COURT:  Any objection? |
| 11:55 | 12 | MS. KELLER:  I think it's hearsay, Your Honor. |
| 11:55 | 13 | THE COURT:  Counsel, I just don't have it in front |
| 11:55 | 14 | of me, and I want to apologize to you. |
| 11:55 | 15 | Could one of you get that for me.  And then could |
| 11:55 | 16 | you also show me 40,814.  I'm just joking. |
| 11:55 | 17 | MR. QUINN:  Your Honor, while we -- could we -- |
| 11:55 | 18 | would now be a good time to take a lunch break? |
| 11:55 | 19 | THE COURT:  This would be an excellent time.  Why |
| 11:55 | 20 | don't I look at that over the lunch hour. |
| 11:55 | 21 | (To the jury:) You're admonished not to discuss |
| 11:55 | 22 | this matter amongst yourselves, nor form or express any |
| 11:55 | 23 | opinion concerning this case. |
| 11:55 | 24 | *(Jury recesses at 11:56 a.m.)* |
| 11:55 | 25 | Mr. Eckert, you may step down. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:56 | 1 | THE WITNESS:  Thank you. |
| 11:56 | 2 | *(Witness steps down for recess.)* |
| 11:56 | 3 | THE COURT:  All right.  Now, Counsel, if you would |
| 11:56 | 4 | like to remain seated for just a moment. |
| 11:56 | 5 | *(Outside the presence of the jury.)* |
| 11:56 | 6 | MR. QUINN:  Your Honor, I have it -- |
| 11:56 | 7 | THE COURT:  Mr. Quinn, I'm speaking now. |
| 11:56 | 8 | MR. QUINN:  I apologize. |
| 11:56 | 9 | THE COURT:  Sit down. |
| 11:56 | 10 | All right.  I've been waiting to read the |
| 11:56 | 11 | admonishment that I told counsel I would read.  Since I |
| 11:56 | 12 | hadn't gotten direction from Mattel, Mr. Quinn, I thought I |
| 11:56 | 13 | would read that at the end of Mr. Eckert's testimony.  I |
| 11:56 | 14 | could just as easily read that admonishment concerning -- |
| 11:56 | 15 | I'm allowing Mr. Eckert to be questioned about the date of |
| 11:56 | 16 | production -- well -- no. |
| 11:56 | 17 | "I have not prohibited the introduction of any |
| 11:56 | 18 | evidence that any Mattel magnets killed any children.  MGA |
| 11:57 | 19 | has not shown me any admissible evidence to this effect, |
| 11:57 | 20 | thus you are to disregard the issue of whether any Mattel |
| 11:57 | 21 | magnet killed any children." |
| 11:57 | 22 | Now, I've left that to your discretion about when |
| 11:57 | 23 | you want that read. |
| 11:57 | 24 | I didn't know if counsel were going to get into |
| 11:57 | 25 | that either on direct or cross; and if either of you did, I |

| | | |
|---|---|---|
| 11:57 | 1 | was going to read at that time; if not, I was going to read |
| 11:57 | 2 | it at the end of his testimony. |
| 11:57 | 3 | What's your choice? |
| 11:57 | 4 | MR. QUINN:  Your Honor, I would prefer we read it |
| 11:57 | 5 | right when we come back after lunch. |
| 11:57 | 6 | THE COURT:  I'll read when we come back after |
| 11:57 | 7 | lunch.  I just hadn't gotten any direction from you. |
| 11:57 | 8 | MS. KELLER:  Your Honor -- |
| 11:57 | 9 | THE COURT:  No, no.  Not the avalanche effect |
| 11:57 | 10 | again.  I'm going to give you direction now. |
| 11:57 | 11 | All right. |
| 11:57 | 12 | MR. QUINN:  I have the exhibit, Your Honor. |
| 11:57 | 13 | THE COURT:  Well, I don't need an exhibit. |
| 11:57 | 14 | MR. QUINN:  You had asked to see the exhibit that |
| 11:57 | 15 | I was about to -- that I was offering in evidence. |
| 11:57 | 16 | THE COURT:  Oh, that exhibit. |
| 11:57 | 17 | Well, see, now we're jumping topics. |
| 11:58 | 18 | MR. QUINN:  I apologize. |
| 11:58 | 19 | THE COURT:  No, that's fine.  I've got until |
| 11:58 | 20 | 1:00 o'clock. |
| 11:58 | 21 | Are you two going to wait for me to give direction |
| 11:58 | 22 | or are you going to try to give me direction? |
| 11:58 | 23 | MR. QUINN:  Going to wait, Your Honor. |
| 11:58 | 24 | THE COURT:  Going to wait, aren't you? |
| 11:58 | 25 | Ms. Keller? |

CV 04-9049 DOC - 4/17/2011 - Day 44, Volume 1 of 3

139

| | | |
|---|---|---|
| 11:58 | 1 | MS. KELLER:  I'm listening, Your Honor. |
| 11:58 | 2 | THE COURT:  Great.  All right. |
| 11:58 | 3 | All right.  It's been an education for both |
| 11:58 | 4 | Mr. Larian and Mr. Eckert so far. |
| 11:58 | 5 | The testimony for Mr. Eckert is that he recently |
| 11:58 | 6 | went to investigate the whereabouts of Market Intelligence |
| 11:58 | 7 | or the library. |
| 11:58 | 8 | Mr. Eckert, I don't know if you're even aware -- |
| 11:58 | 9 | and I say this with all due respect -- but that apparently |
| 11:58 | 10 | is over at Paul Hastings.  And this Court reconvened counsel |
| 11:58 | 11 | at 9:00 o'clock on Tuesday night, for the previously |
| 11:58 | 12 | undiscovered -- or at least unsubmitted boxes, which were |
| 11:59 | 13 | 35 in number, which appear to be a large part of either |
| 11:59 | 14 | Sal Villasenor's cubicle or the Market Intelligence |
| 11:59 | 15 | information.  Both counsel have stipulated that they don't |
| 11:59 | 16 | want the Court to go any further. |
| 11:59 | 17 | And I want you and Mr. Larian to hear the |
| 11:59 | 18 | conversations we've had about any requests, Mr. Larian, to |
| 11:59 | 19 | further open up any alleged spying activities on your part |
| 11:59 | 20 | that may be perjurious. |
| 11:59 | 21 | And the same has been made concerning Mattel: |
| 11:59 | 22 | That Mattel's counsel have resisted any further exploration |
| 12:00 | 23 | of materials that may put Mattel, because they're the |
| 12:00 | 24 | individual defendant -- you aren't -- in a situation of |
| 12:00 | 25 | either hiding evidence or being perjurous. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 12:00 | 1 | Now, that's a deal struck with the devil, in a |
| 12:00 | 2 | sense.  Because the Court had finally lost its level of |
| 12:00 | 3 | patience with both parties, gentlemen.  And I've made a |
| 12:00 | 4 | record repeatedly that I'm more than happy to open up any of |
| 12:00 | 5 | the activities on your part, Mr. Larian, in terms of spying |
| 12:00 | 6 | on any other company, if they exist, including Mattel. |
| 12:00 | 7 | And, Mr. Eckert, I want you to know I'm more than |
| 12:00 | 8 | happy to open up any other spying activities of any other |
| 12:00 | 9 | competitive companies other than MGA. |
| 12:00 | 10 | Now, initially this motion came to the Court with |
| 12:00 | 11 | resistance from Mattel.  MGA had made a motion to open up |
| 12:00 | 12 | all of this area.  I sustained Mr. Zeller's request at the |
| 12:00 | 13 | time not to open this up. |
| 12:01 | 14 | I want this record absolutely clear, from both |
| 12:01 | 15 | CEO's, as well as counsel, so there are no complaints in the |
| 12:01 | 16 | future, and then I'll hold to what each counsel are |
| 12:01 | 17 | requesting, but I want each of you gentlemen to know:  I'm |
| 12:01 | 18 | happy to open up this entire area.  And where that falls is |
| 12:01 | 19 | up to everybody in this Court to decide.  And I want you two |
| 12:01 | 20 | gentlemen involved in this discussion. |
| 12:01 | 21 | Now, the second thing is, I am increasingly |
| 12:01 | 22 | concerned.  When you both came into my court, Mr. Larian, my |
| 12:01 | 23 | perception was that there was a lot of game-playing going |
| 12:01 | 24 | on -- and I'll be frank with you -- that MGA had taken the |
| 12:01 | 25 | low road.  We need to have that discussion just on the |

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 141 of 144   Page ID #:315318
CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

141

12:01  1    record.  And I was very concerned about some e-mails from

12:01  2    Patty Glaser.  I was very concerned about some issues

12:01  3    involving Mr. Nolan.

12:01  4          But I warned both parties, including Mattel, that

12:02  5    this was a chance to start over with complete candidness

12:02  6    with the Court.  I believe -- Ms. Hurst, I think you

12:02  7    basically gave up every document that you could possibly

12:02  8    find.

12:02  9          What I'm concerned about is I'm still getting,

12:02  10   now, information literally the last week of trial.  And

12:02  11   Mr. Eckert was not going to be shielded from decisions made

12:02  12   by Elena Baca and Paul Hastings, nor will Mr. Eckert be

12:02  13   shielded in terms of representing Mattel concerning

12:02  14   Mr. Moore or Normile or Jill Thomas.

12:02  15         And therefore, I'm extraordinarily concerned that

12:02  16   this is coming in the last week of this trial.  I received a

12:02  17   document last evening that does not comport with the spirit

12:02  18   of the discovery rules, at least, although it's been pointed

12:02  19   out to the Court that there's no specific order by the

12:03  20   Court -- because I'd received a request from MGA during the

12:03  21   160-some pages I was writing, and denied that request for

12:03  22   additional discovery.  So, technically, there's compliance.

12:03  23         But it simply abrogates the rules of good faith

12:03  24   discovery.  The end result is, this document that's come in

12:03  25   last evening has the potentiality of, if true, at least

Case 2:04-cv-09049-DOC-RNB   Document 10373   Filed 04/04/11   Page 142 of 144   Page ID #:315319
CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

142

| 12:03 | 1 | causing an argument between the parties as to whether Mattel |
|---|---|---|

12:03    1    causing an argument between the parties as to whether Mattel

12:03    2    was, in fact, shutting out MGA concerning Kohl's.

12:03    3        So I guess, from my perspective, I thought that

12:03    4    the rules of discovery meant something to both parties.  And

12:03    5    I've become extraordinarily cautious now, as a Court.

12:03    6        And you've both risen, quite frankly, to that

12:03    7    level of great concern.

12:03    8        There's another motion for mistrial by Mattel in

12:04    9    this matter.  I'll take that up probably over the weekend.

12:04    10        But I want each of you gentlemen to be part of

12:04    11    that conversation.  I don't know how much you know.  I don't

12:04    12    know how much you know.  I don't know how you've been

12:04    13    shielded, or not, whether you've made inquiries, et cetera.

12:04    14    But I do repeat, somebody will be answering the question on

12:04    15    behalf of Mattel and on behalf of MGA.  And I hold both of

12:04    16    you accountable for that.

12:04    17        I don't know how much information's even come back

12:04    18    to you.  I don't even know if these boxes are important, if

12:04    19    all the discovery was turned over.  It's just rather

12:04    20    extraordinary to get them on a Monday evening.  And it's

12:04    21    extraordinary to get this last e-mail.

12:04    22        Now, the second problem is, the involvement with

12:04    23    outside counsel that I've shielded -- and I'm going to hold

12:04    24    to that.  I'm going to keep Quinn Emanuel, and I'm going to

12:04    25    keep the Orrick firm out of this discussion in front of the

| | | |
|---|---|---|
| 12:04 | 1 | jury. |
| 12:05 | 2 | So I'm also going to hold all of you here today |
| 12:05 | 3 | until I get this tape.  It's coming from Pasadena.  And |
| 12:05 | 4 | right now, I need time with the special master, who I've |
| 12:05 | 5 | specially brought in.  So I'm going to invite you to go to |
| 12:05 | 6 | lunch, but I want all of you back at 12:45. |
| 12:05 | 7 | And I don't need any additional comments right now |
| 12:05 | 8 | from any counsel. |
| 12:05 | 9 | Have a good lunch. |
| 12:05 | 10 | *(Recess held at 12:05 p.m.)* |
| 12:05 | 11 | *(Further proceeding reported by Jane Sutton* |
| 12:06 | 12 | *Rule at 12:05 p.m.)* |
| 12:06 | 13 | -oOo- |
| 12:06 | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

```
12:06   1                        -oOo-

12:06   2

12:06   3                      CERTIFICATE

12:06   4

12:06   5        I hereby certify that pursuant to Section 753,

12:06   6   Title 28, United States Code, the foregoing is a true and

12:06   7   correct transcript of the stenographically reported

12:06   8   proceedings held in the above-entitled matter and that the

12:06   9   transcript page format is in conformance with the

12:06  10   regulations of the Judicial Conference of the United States.

12:06  11

12:06  12   Date:  April 1, 2011

12:06  13

12:06  14
12:06
12:06  15   _____
12:06
12:06  16        DEBBIE GALE, U.S. COURT REPORTER
            CSR NO. 9472, RPR

12:06  17

       18

       19

       20

       21

       22

       23

       24

       25
```