1               **UNITED STATES DISTRICT COURT**

2              **CENTRAL DISTRICT OF CALIFORNIA**

3          **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                      - - - - - - -

5

6    MATTEL, INC., ET AL.,              )
                                        )
7              Plaintiffs,              )
                                        )
8         vs.                           ) No. CV 04-9049-DOC
                                        )    Day 44
9    MGA ENTERTAINMENT, INC., ET AL.,   )    Volume 2 of 3
                                        )
10             Defendants.              )
     _____)

11

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                        Jury Trial

17                   Santa Ana, California

18                  Friday, April 1, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25

     11-04-01 MattelV2

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART & SULLIVAN
               By:   JOHN B. QUINN
5                    MICHAEL T. ZELLER
                     WILLIAM PRICE
6                    Attorneys at Law
               865 South Figueroa Street
7              10th Floor
               Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   THOMAS S. MC CONVILLE
12                   Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             – AND –

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   ANNETTE L. HURST
17                   Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700

19             – AND –

20             KELLER RACKAUCKAS, LLP
21             BY:   JENNIFER L. KELLER
                     Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 3 of 81   Page ID #:315325
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

3

```
1    APPEARANCES OF COUNSEL (Continued):

2


3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4              SCHEPER, KIM & OVERLAND, LLP
               BY:  ALEXANDER H. COTE  (Not Present)
5                   Attorney at Law
               601 West Fifth Street
6              12th Floor
               Los Angeles, California 90071
7              (213) 613-4660

8              - AND -

9              LAW OFFICES OF MARK E. OVERLAND
               BY:  MARK E. OVERLAND
10                  Attorney at Law
               100 Wilshire Boulevard
11             Suite 950
               Santa Monica, California 90401
12             (310) 459-2830

13

14   Also Present:

15             ISAAC LARIAN, MGA CEO
               ROBERT ECKERT, Mattel CEO
16             LILY MARTINEZ, Mattel Employee
               KEN KOTARSKI, Mattel Technical Operator
17             MIKE STOVALL, MGA Technical Operator
               RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan
18             KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe
               WARRINGTON PARKER, Orrick Herrington & Sutcliffe
19             MELANIE PHILLIPS, Orrick Herrington & Sutcliffe
               FRANK RORIE, Orrick Herrington & Sutcliffe
20             DIANA RUTOWSKI, Orrick Herrington & Sutcliffe
               DENISE MINGRONE, Orrick Herrington & Sutcliffe
21

22

23

24

25
```

1                    **I N D E X**

2

3

4                    **EXAMINATION**

5

6   **Witness Name**      **Direct**   **Cross**   **Redirect**   **Recross**

7   ECKERT, ROBERT                      6
       By Mr. Quinn

8

9

10                   **EXHIBITS**

11

12  **Exhibit**                    **Identification**   **Evidence**

13  Plaintiffs' Nos. 24362, 24366                          16

14  Plaintiffs' Nos. 24367, 24373                          17

15  Plaintiffs' Nos. 24380, 24387, 24409                   18

16  Plaintiffs' Nos. 24418, 24419                          19

17  Plaintiffs' Nos. 24420, 24421                          20

18  Plaintiffs' Nos. 24423, 24428, 24429                   21

19  Plaintiffs' Nos. 24430, 24431, 24432                   22

20  Plaintiffs' Nos. 24433, 24434                          23

21  Plaintiffs' Nos. 24435, 24437, 24438                   24

22  Plaintiffs' Nos. 24439, 24441, 24442                   25

23  Plaintiffs' Nos. 24443                                 26

24  Plaintiffs' Nos. 24444, 24445, 24446                   27

25

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 5 of 81   Page ID #:315327
CV 04-9049-DOC – 04/01/2011 – Day 44, Vol. 2 of 3

5

```
 1                    I N D E X (Continued)

 2

 3

 4                          EXHIBITS

 5

 6    Exhibit                        Identification    Evidence

 7    Plaintiffs' Nos. 24447, 24463                       28

 8    Plaintiffs' Nos. 24464, 24465                       29

 9    Plaintiffs' Nos. 24466, 24467                       30

10    Plaintiffs' Nos. 24471, 24472                       31

11    Plaintiffs' No. 24474                               32

12    Plaintiffs' No. 24475                               31

13    Plaintiffs' No. 30068                               33

14    Plaintiffs' No. 36813                                9

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 6 of 81   Page ID #:315328
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

6

1        SANTA ANA, CALIFORNIA, FRIDAY, APRIL 1, 2011

2                 DAY 44, VOLUME 2 OF 3

3                      (1:06 p.m.)

4            (The following proceedings is taken in the

5        presence of the jury.)

6            THE COURT:  All right.  Then we are on the record.

7    The jury is present, counsel are present.

8            Mr. Eckert, if you'd have a seat, sir.  Thank you

9    for your courtesy.

10           Mr. Quinn, if you'd continue cross-examination,

11   please.

12           MR. QUINN:  Thank you, your Honor.

13        ROBERT ECKERT, PLAINTIFFS' WITNESS, RESUMED

14               CROSS-EXAMINATION (Continued)

15   BY MR. QUINN:

16   Q    Mr. Eckert, in that deposition that was taken --

17           THE COURT:  Oh, I'm sorry, Mr. Quinn.  Is this the

18   appropriate time?

19           MR. QUINN:  Yes, your Honor.

20           THE COURT:  All right.  Thank you.

21           Ladies and gentlemen, I have not -- there was a

22   period of questioning during the first testimony involving

23   Mr. Eckert, and it involved magnets.  I have not prohibited

24   the introduction of any evidence that any Mattel magnets

25   killed any children.  However, MGA has not shown me any

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 7 of 81   Page ID #:315329
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

7

1   admissible evidence to this effect; thus, you are to

2   disregard the issue of whether any Mattel magnet killed any

3   children; irrelevant.

4           And therefore, Counsel, if you'd like to proceed.

5           MR. QUINN:  Thank you, your Honor.

6   BY MR. QUINN:

7   Q   Mr. Eckert, this deposition in December of 2008, where

8   you were asked that hypothetical question about people

9   misrepresenting themselves to get into toy fairs, how many

10  days had your deposition been taken -- I'm sorry, 2009.  How

11  many days had your deposition been taken, including that

12  date, prior to that?

13  A   I had four days of depositions, by that time.

14          MS. KELLER:  Your Honor, I believe the Court had

15  previously ruled --

16          THE COURT:  Do each of you want to stipulate how

17  many days Mr. Larian, Mr. Eckert --

18          Both these gentlemen have been on the stand, trust

19  me, a lifetime.  I'm just joking with the jury for a moment,

20  but Mr. Larian and Mr. Eckert have gone through substantial

21  depositions, days and days and days and days for both

22  parties, so --

23          Counsel?

24          MR. QUINN:  Thank you, your Honor.

25

1    BY MR. QUINN:

2    Q    And other than that one, three-line hypothetical

3    question, had there been any other reference to these types

4    of activities in those four days of depositions?

5    A    (No audible response.)

6    Q    By these types of activities, I'm talking about people

7    representing themselves to get into toy fair showrooms.

8    A    No, there has not.

9             MR. QUINN:  Your Honor, we've got for the Court a

10   copy of that exhibit that I was asking Mr. -- that I sought

11   to introduce, 36813.

12            THE COURT:  Thank you.  I meant to come back and

13   join you at 12:45, and I couldn't because of a discussion in

14   chambers.

15            Just a minute.

16            Stop the clock for just a moment, Jane.

17            This is technically hearsay.  We don't have Elena

18   Baca present, but I'm allowing broad discretion when Mr.

19   Larian's on the stand and Mr. Eckert's on the stand, and

20   therefore, I'm going to let you refer to this, Counsel.

21   It's technically hearsay in terms of introduction, but you

22   may certainly refer to this.

23            MR. QUINN:  May it be offered, your Honor, because

24   Ms. Keller quoted the letter in questioning?

25            THE COURT:  Under these circumstances, yes, I will

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 9 of 81   Page ID #:315331
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

9

1    receive it.  I want to get as much information in front of

2    the jury as possible for both sides.

3              (Plaintiffs' Exhibit No. 36813 is received in

4        evidence.)

5    BY MR. QUINN:

6    Q    So this is a letter from the Paul Hastings firm to --

7    you probably understand that the Paul Hastings law firm was

8    representing Mattel with respect to the claim made by

9    Mr. Villasenor?

10   A    I do.

11   Q    And you see that's to a Patricio T. Barrera at the

12   Marcin, Barrera & O'Connor law firm, so you can understand

13   was representing Mr. Villasenor?

14   A    That's correct.

15   Q    And this is the letter that Ms. Keller was questioning

16   you about this morning about whether Mattel was actually

17   asking Mr. Villasenor to come back to work as of the date of

18   this letter, May 9th, 2006; do you recall those questions?

19   A    I do.

20   Q    And it says, there, in the first paragraph, or the

21   second paragraph, it says, "First, it appears that your

22   client is taking medication that, according to your office,

23   precludes him from working.  As you know, we initially

24   agreed to place Mr. Villasenor on a paid administrative

25   leave of absence during the investigation and potential

 1    negotiation of his separation from the company.

 2        "The investigation is over, and if it is no longer your

 3    client's intention to negotiate his separation from the

 4    company, it would appear that there's no reason for him to

 5    continue with a leave of absence, nor is Mattel interested

 6    in establishing an outside consultant relationship with

 7    Mr. Villasenor, as it is assessing whether it will continue

 8    any such relationships with any outside consultants.  Thus,

 9    Mattel is not interested in adding a new consultant to the

10    roster."

11        Then it goes on in the second paragraph, "Second,

12    presuming that your client wants to continue his employment,

13    is it your position that he requires a medical leave of

14    absence?  If so, we need for your client to provide the

15    medical certification and submit the required leave forms to

16    have his medical leave request processed.  Please let us

17    know if this is the case.  If so, we will have the

18    appropriate forms transmitted to your client.

19        "Third, assuming your client is medically unable to

20    perform his duties, do you know when his medical condition

21    would permit him to be released to work?  Similarly, if your

22    client is unable to work, is it your position that your

23    client, too, is medically unable to conclude his interview

24    with Mattel's litigation counsel?  Please confirm whether

25    this is the case."

 1        And then if we could skip to the second page, you'll

 2   see in the last paragraph beginning "fifth," it says,

 3   "Fifth, it is clear from the tenor of your letter that we do

 4   not see these issues similarly, given the fact that informal

 5   attempts to negotiate a settlement between Mattel and your

 6   client appear to have reached impasse, we can think of only

 7   one other solution:  We would be willing to split the

 8   expense of retaining a qualified mediator to secure the

 9   mediator's assessment and determine whether a resolution of

10   this matter can be reached."

11        Do you see that?

12   A    I do.

13   Q    And does -- are you -- is it the case in your

14   experience that lawyers involved in litigation and claims,

15   you know, sometimes write letters to each other to, you

16   know, advance the positions of their clients and to posture

17   and -- and -- and to try to -- as part of the process of

18   negotiating?

19   A    Yes, although I have limited experience in that area.

20   Q    But these are two outside -- there's two outside law

21   firms that are communicating with each other about a pending

22   claim?

23   A    Yes.

24   Q    And in the employment context, is it sometimes

25   necessary to call somebody's bluff and ask, "Are you really

1   disabled?"

2   A    Yes.

3   Q    You were asked some questions about the POS, point of

4   sale data, which Ms. Keller was questioning you about

5   whether, you know, that comes from the vendor and whether

6   that's confidential; do you recall those questions?

7   A    I do.

8   Q    Now, does the vendor just give you that information?

9   A    No, it's -- we pay for it.

10  Q    You have to pay for it?

11  A    That's correct.

12  Q    And in toy fairs, do the retailers who visit showrooms,

13  do they have to pay for the catalogs and the sell sheets and

14  the other information that they get?

15  A    No, they don't.

16  Q    We've heard some testimony in this case about pricing

17  and, in particular, FOB pricing.  Is it your experience that

18  retailers often volunteer your competitors' prices in order

19  to try to negotiate better prices from Mattel?

20  A    Yes, it is.

21  Q    And as part of that, do they give you information about

22  their own margins?

23  A    Yes, they do.

24  Q    Now, is it possible if you know the retail price of a

25  product in the retailer's margin to figure out what the FOB

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 13 of 81   Page ID #:315335
CV 04-9049-DOC – 04/01/2011 – Day 44, Vol. 2 of 3

13

1    price would be?

2    A    You can certainly estimate it.

3    Q    Can you tell us how that -- how that's done?  For

4    example, if you know a toy sells for $12, and the retailer

5    tells you that their margin is 25 percent, can you figure

6    out what the FOB price is?

7    A    Well, you figure out the A price of the wholesale

8    price, you take 75 percent of $12, which would be $9, so $9

9    is the cost of the retailers paying for the product, $3 is

10   his margin, which is 25 percent of $12, which is his retail

11   price.

12   Q    And then so the FOB price would be --

13   A    Yeah, I would do the A price --

14   Q    Right.

15   A    The A price, there, would be $9.  FOB in -- in -- in

16   the way I'm thinking about it would be a separate discount

17   from the A price for the retailer to pick up the goods in

18   Asia instead of in the United States.

19   Q    And is it easy to estimate what that is?

20   A    Yes.

21   Q    How -- how is that done?

22   A    As a rule of thumb in our business, it's about a

23   20 percent discount from the A price.

24   Q    So is it -- is it common or not common that the

25   retailers tell you what their margin is?

1   A    They tell us all the time.  That's -- that's their

2   requirement of us, as we are selling goods in their stores.

3   Q    Is that true of Walmart?

4   A    Yes.

5   Q    Target?

6   A    Yes.

7   Q    Toys R Us?

8   A    Yes.

9   Q    And with that information and knowing the retail price,

10  you can get pretty close to estimating the FOB price?

11  A    Yes.

12  Q    Does Mattel regard its FOB prices as being trade

13  secrets?

14  A    No, not at the time.  It's a toy fair.  I'm sure there

15  is some period of time where we do, as we are developing

16  products.

17  Q    But as of the time of the toy fair, are you telling

18  retailers what the FOB price will be?

19  A    Yes.

20  Q    And as of that point, do you think that this is a trade

21  secret once you've told your customers what the FOB price is

22  going to be for them?

23  A    No.  I think this is one of those things that we would

24  like to have them maintain confidentiality about but they

25  don't.

1    Q    And is the information that Mr. Machado had in the

2    documents that he downloaded, is that different than this

3    FOB pricing?

4    A    Yes, his --

5              MS. KELLER:  Assumes facts not in evidence that he

6    knows what documents Mr. Machado downloaded.

7              THE COURT:  Do you know what Mr. Machado

8    downloaded?

9              THE WITNESS:  I know what I saw here.  I don't

10   know if that's --

11             THE COURT:  Overruled.

12             You can answer the question.

13             THE WITNESS:  What I saw in the line list here

14   were not only FOB or A list price, but also our product

15   cost.  That is something that is never disclosed to the

16   retailer.  That is what we pay for the good from the vendor

17   or our own internal plant that's making the good that we, in

18   turn, sell to the retailer.  We never disclose our product

19   cost outside of Mattel.

20   BY MR. QUINN:

21   Q    Was there also information about estimated prices or

22   projected prices months or even a year in advance?

23   A    Yes.

24   Q    And is that something that would be available in the

25   toy fair showroom?

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 16 of 81   Page ID #:315338
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

16

1    A     At some point it will be available in the toy fair

2    showroom, but not with as much advance notice as I saw in

3    those documents.

4    Q     I'd like you, if you would, please, to take a look at

5    Exhibit 24362, 24362, and my question to you will be, does

6    that appear to be a copy of the 2000 Barbie Collectibles,

7    Royal Jewels Collection catalog?

8    A     Yes, it does.

9            MR. QUINN:  We'd offer that into evidence, your

10   Honor.

11           THE COURT:  Received.

12           *(Plaintiffs' Exhibit No. 24362 is received in*

13       *evidence.)*

14   BY MR. QUINN:

15   Q     And then if you'd take a look at Exhibit 24366.

16   A     I have it.

17   Q     Does that appear to be a copy of the 1996 Mattel

18   catalog?

19   A     Yes, it does.

20           MR. QUINN:  We'd offer that, your Honor.

21           THE COURT:  Received.

22           *(Plaintiffs' Exhibit No. 24366 is received in*

23       *evidence.)*

24   BY MR. QUINN:

25   Q     And then Exhibit 24367?

1   A    I have it.

2   Q    Does that appear to be a copy of the 2001 Mattel

3   catalog?

4   A    Yes, it does.

5           MR. QUINN:  I offer that, your Honor.

6           THE COURT:  Received.

7           *(Plaintiffs' Exhibit No. 24367 is received in*

8   *evidence.)*

9   BY MR. QUINN:

10  Q    24373?

11  A    I have it.

12  Q    Does that appear to be a copy of the 1994 Mattel Girls

13  Toys catalog?

14  A    Yes, it does.

15          MR. QUINN:  We'd offer that.

16          THE COURT:  Received.

17          *(Plaintiffs' Exhibit No. 24373 is received in*

18  *evidence.)*

19  BY MR. QUINN:

20  Q    24380?

21  A    I have that.

22  Q    Is that a copy of the 2002 Mattel catalog?

23  A    Yes.

24          MR. QUINN:  We'd offer that.

25          THE COURT:  Received.

1          *(Plaintiff's Exhibit No. 24380 is received in*

2      *evidence.)*

3   BY MR. QUINN:

4   Q    24387?

5   A    24387, I have that.

6   Q    Is that a copy of the 1997 Arco Girls catalog?

7   A    Yes, it is.

8   Q    What is Arco?

9   A    Arco is a Mattel company, as it says on the cover, that

10  at a time was the company from whom customers bought Mattel

11  products FOB or direct import.

12         MR. QUINN:  We'd offer that, your Honor.

13         THE COURT:  Received.

14         *(Plaintiffs' Exhibit No. 24387 is received in*

15     *evidence.)*

16  BY MR. QUINN:

17  Q    Then 24409?

18  A    I have that.

19  Q    Is that a copy of the 2003 Mattel catalog?

20  A    Yes, it is.

21         MR. QUINN:  We'd offer that.

22         THE COURT:  Received.

23         *(Plaintiffs' Exhibit No. 24409 is received in*

24     *evidence.)*

25

1    BY MR. QUINN:

2    Q    Then 24418?

3    A    I have that.

4    Q    Is that the 1960 Mattel Dolls catalog?

5    A    It's the 1960 Barbie catalog.

6    Q    All right.

7              MR. QUINN:  We'd offer that, your Honor.

8              THE WITNESS:  Oh, and Chatty Cathy.  It is -- it

9    is.

10             MR. QUINN:  We'd offer that, your Honor.

11             THE COURT:  Received.

12             *(Plaintiffs' Exhibit No. 24418 is received in*

13      *evidence.)*

14   BY MR. QUINN:

15   Q    24419?

16   A    I have that.

17   Q    Is that a copy of the 1961 Mattel Dolls catalog?

18   A    Yes.

19             MR. QUINN:  We'd offer that, your Honor.

20             THE COURT:  Received.

21             *(Plaintiffs' Exhibit No. 24419 is received in*

22      *evidence.)*

23   BY MR. QUINN:

24   Q    24420?

25   A    I have that.

CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

20

```
1   Q    Is that a copy of the Mattel catalog 20th Anniversary

2   issue, Fall of 1965?

3   A    It is.

4           MR. QUINN:  We'd offer that.

5           THE COURT:  Did you say 1965?

6           MR. QUINN:  Yes, 1965.

7           THE COURT:  All right.  Thank you.

8           Received.

9           (Plaintiffs' Exhibit No. 24420 is received in

10      evidence.)

11  BY MR. QUINN:

12  Q    Then 24421?

13  A    I have that.

14  Q    Is that the 1970 Mattel Dolls catalog, our 25th year?

15  A    Yes, it is.

16          MR. QUINN:  We'd offer that.

17          THE COURT:  Received.

18          (Plaintiffs' Exhibit No. 24421 is received in

19      evidence.)

20  BY MR. QUINN:

21  Q    Then 24423?

22  A    I have that.

23  Q    Is that a copy of the 1972 Mattel Dolls and Preschool

24  catalog?

25  A    Yes, it is.
```

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 21 of 81   Page ID #:315343
CV 04-9049-DOC – 04/01/2011 – Day 44, Vol. 2 of 3

21

```
 1              MR. QUINN:  We'd offer that.

 2              THE COURT:  Received.

 3              (Plaintiffs' Exhibit No. 24423 is received in

 4       evidence.)

 5   BY MR. QUINN:

 6   Q    24428?

 7   A    I have that.

 8   Q    Is that a copy of the 1979 Mattel Toys catalog?

 9   A    Yes, it is.

10              MR. QUINN:  We'd offer that.

11              THE COURT:  Received.

12              (Plaintiffs' Exhibit No. 24428 is received in

13       evidence.)

14   BY MR. QUINN:

15   Q    24429?

16   A    I have that.

17   Q    Is that a copy of the 1980 Mattel Toys catalog, Moving

18   Ahead?

19   A    Yes, it is.

20              MR. QUINN:  We'd offer that.

21              THE COURT:  Received.

22              (Plaintiffs' Exhibit No. 24429 is received in

23       evidence.)

24   BY MR. QUINN:

25   Q    24430?
```

1   A    I have that.

2   Q    Is that a copy of the 1981 Mattel toys catalog?

3   A    Yes, it is.

4           MR. QUINN:  We'd offer that.

5           THE COURT:  Received.

6           (Plaintiffs' Exhibit No. 24430 is received in

7      evidence.)

8   BY MR. QUINN:

9   Q    24431?

10  A    I have that.

11  Q    Is that a copy of the 1982 Mattel Toys catalog?

12  A    Yes, it is.

13          MR. QUINN:  We'd offer that.

14          THE COURT:  Received.

15          (Plaintiffs' Exhibit No. 24431 is received in

16     evidence.)

17  BY MR. QUINN:

18  Q    24432?

19  A    I have that.

20  Q    Is that a copy of the 1983 Mattel Toys catalog?

21  A    Yes, it is.

22          MR. QUINN:  We'd offer that.

23          THE COURT:  Received.

24          (Plaintiffs' Exhibit No. 24432 is received in

25     evidence.)

1    BY MR. QUINN:

2    Q    24433?

3    A    I have that.

4    Q    Is that the -- a copy of the 1984 Mattel catalog?

5    A    Yes, it is.

6                MR. QUINN:  We'd offer that.

7                THE COURT:  Received.

8                *(Plaintiffs' Exhibit No. 24433 is received in*

9         *evidence.)*

10   BY MR. QUINN:

11   Q    24434?

12   A    I have that.

13   Q    Is that the 1985 Mattel Toys catalog?

14   A    Yes, it is.

15               MR. QUINN:  We'd offer that.

16               THE COURT:  Received.

17               *(Plaintiffs' Exhibit No. 24434 is received in*

18        *evidence.)*

19   BY MR. QUINN:

20   Q    24435?

21   A    I have that.

22   Q    Is that the 1987 Mattel catalog?

23   A    Yes, it is.

24               MR. QUINN:  We'd offer that.

25               THE COURT:  Received.

CV 04-9049-DOC – 04/01/2011 – Day 44, Vol. 2 of 3

24

1             *(Plaintiffs' Exhibit No. 24435 is received in*

2        *evidence.)*

3    BY MR. QUINN:

4    Q    24437?

5    A    I have that.

6    Q    Is that the 1989 Mattel catalog?

7    A    Yes, it is.

8             MR. QUINN:  I'd offer that.

9             THE COURT:  Received.

10            *(Plaintiffs' Exhibit No. 24437 is received in*

11       *evidence.)*

12   BY MR. QUINN:

13   Q    24438?

14   A    I have that.

15   Q    Is that the Mattel 1990 Girls Toys catalog?

16   A    Yes, it is.

17            MR. QUINN:  We'd offer that.

18            THE COURT:  Received.

19            *(Plaintiffs' Exhibit No. 24438 is received in*

20       *evidence.)*

21   BY MR. QUINN:

22   Q    24439?

23   A    I have that.

24   Q    Is that the 1990 Arco catalog?

25   A    Yes, it is.

```
 1              MR. QUINN:  We'd offer that.

 2              THE COURT:  Received.

 3              (Plaintiffs' Exhibit No. 24439 is received in

 4      evidence.)

 5      BY MR. QUINN:

 6      Q    2441 (sic)?

 7      A    24441?

 8      Q    Right, three 4's.

 9      A    I have that.

10      Q    Is that the 1991 Barbie catalog?

11      A    Yes, it is.

12              MR. QUINN:  We'd offer that.

13              THE COURT:  Received.

14              (Plaintiffs' Exhibit No. 24441 is received in

15      evidence.)

16      BY MR. QUINN:

17      Q    24442?

18      A    I have that.

19      Q    Is that the 1995 Mattel Girls Toys catalog?

20      A    Yes, it is.

21              MR. QUINN:  We'd offer that.

22              THE COURT:  Received.

23              (Plaintiffs' Exhibit No. 24442 is received in

24      evidence.)

25
```

1    BY MR. QUINN:

2    Q    24443?

3    A    I have that.

4    Q    Is that the 1996 Arco Girls catalog?

5    A    No.  2-4- -- I'm sorry --

6    Q    I'm sorry, we have --

7    A    24433.

8    Q    Right.

9    A    You want 24443?

10   Q    Yeah.

11   A    I got it.

12   Q    Three 4's, 24443.

13   A    24443, I have that.

14   Q    Is that the 1996 Arco Girls catalog?

15   A    Yes, it is.

16             MR. QUINN:  We'd offer that.

17             THE COURT:  Received.

18             *(Plaintiffs' Exhibit No. 24443 is received in*

19        *evidence.)*

20   BY MR. QUINN:

21   Q    24444?

22   A    I have that.

23   Q    Is that the 1997 Barbie Collectibles catalog?

24   A    Yes, it is.

25             MR. QUINN:  We'd offer that.

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 27 of 81   Page ID #:315349
CV 04-9049-DOC – 04/01/2011 – Day 44, Vol. 2 of 3

27

```
 1              THE COURT:  Received.

 2              (Plaintiffs' Exhibit No. 24444 is received in

 3      evidence.)

 4  BY MR. QUINN:

 5  Q    24445?

 6  A    I have that.

 7  Q    Is that a copy the 1998 Arco catalog?

 8  A    It is.

 9              MR. QUINN:  We'd offer that.

10              THE COURT:  Received.

11              (Plaintiffs' Exhibit No. 24445 is received in

12      evidence.)

13  BY MR. QUINN:

14  Q    24446?

15  A    I have that.

16  Q    Is that the 1999 Arco catalog?

17  A    It is.

18              MR. QUINN:  We'd offer that.

19              THE COURT:  Received.

20              (Plaintiffs' Exhibit No. 24446 is received in

21      evidence.)

22  BY MR. QUINN:

23  Q    24447?

24  A    24447?

25  Q    Yes, 24447, the CD-ROM catalog?
```

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 28 of 81   Page ID #:315350
CV 04-9049-DOC – 04/01/2011 – Day 44, Vol. 2 of 3

28

1    A    24447?

2    Q    Yes.

3    A    Yes, I have that.

4    Q    Okay.  Is that the 1999 Barbie CD-ROM catalog?

5    A    Okay, yes.

6          MR. QUINN:  We'd offer that.

7          THE COURT:  Received.

8          *(Plaintiffs' Exhibit No. 24447 is received in*

9    *evidence.)*

10   BY MR. QUINN:

11   Q    24463?

12   A    24463, I have that.

13   Q    Is that a copy of an excerpt from the 1963 Mattel Dolls

14   catalog?

15   A    It is.

16          MR. QUINN:  We'd offer that.

17          THE COURT:  Received.

18          *(Plaintiffs' Exhibit No. 24463 is received in*

19   *evidence.)*

20   BY MR. QUINN:

21   Q    24464?

22   A    I have that.

23   Q    Is that a copy of the 1966 Mattel Preview, World of

24   Barbie?

25   A    Yes.

```
 1                 MR. QUINN:  We'd offer that.

 2                 THE COURT:  Received.

 3                 (Plaintiffs' Exhibit No. 24464 is received in

 4         evidence.)

 5     BY MR. QUINN:

 6     Q     24465?

 7     A     I have that.

 8     Q     Is that a copy of an excerpt from a 1971 Mattel Dolls

 9     catalog?

10     A     It is.

11                 MR. QUINN:  We'd offer that.

12                 THE COURT:  Received.

13                 (Plaintiffs' Exhibit No. 24465 is received in

14         evidence.)

15     BY MR. QUINN:

16     Q     24465?

17                 THE COURT:  Well, you just had 24465.

18                 MR. QUINN:  I'm sorry.

19                 THE COURT:  Wasn't that the --

20                 MR. QUINN:  Yeah.

21                 THE WITNESS:  Well done.  We have 24465.

22                 THE COURT:  You have 24465, Counsel.

23                 MR. QUINN:  All right.

24     BY MR. QUINN:

25     Q     I'm sorry, 24466?
```

1   A    I have that.

2   Q    Is that a copy of the Spring 1974 Mattel Toys catalog?

3   A    I would say it's probably excerpts.

4   Q    Excerpts?

5   A    Yes.

6        MR. QUINN:  We'd offer that.

7        THE COURT:  Received.

8        *(Plaintiffs' Exhibit No. 24466 is received in*

9   *evidence.)*

10  BY MR. QUINN:

11  Q    24467?

12  A    I have that.

13  Q    Are those excerpts from the 1992 Mattel Girls Toys

14  catalog?

15  A    Yes.

16       MR. QUINN:  We'd offer that.

17       THE COURT:  Received.

18       *(Plaintiffs' Exhibit No. 24467 is received in*

19  *evidence.)*

20  BY MR. QUINN:

21  Q    Then 24471?

22  A    I have that.

23  Q    Is that a copy the 1978 Mattel catalog?

24  A    It is.

25       MR. QUINN:  We'd offer that.

 1              THE COURT:  Received.

 2              *(Plaintiffs' Exhibit No. 24471 is received in*

 3       *evidence.)*

 4   BY MR. QUINN:

 5   Q    And then 24472?

 6   A    I have that.

 7   Q    Is that a copy of the 1982 Mattel catalog, Germany?

 8   A    It is in German.

 9              *(Laughter.)*

10              THE WITNESS:  It is.

11              MR. QUINN:  We'd offer that.

12              THE COURT:  Received.

13              *(Plaintiffs' Exhibit No. 24472 is received in*

14       *evidence.)*

15   BY MR. QUINN:

16   Q    And then 24475?

17   A    I have that.

18   Q    Is that a copy the 1991 Mattel Timeless Creations

19   catalog?

20   A    It is.

21              MR. QUINN:  We'd offer that.

22              THE COURT:  Received.

23              *(Plaintiffs' Exhibit No. 24475 is received in*

24       *evidence.)*

25

```
 1   BY MR. QUINN:

 2   Q    And then sadly, the last one, 30688?

 3   A    You didn't want 24474?

 4   Q    I don't have 24474.

 5   A    I do.

 6             (Laughter.)

 7   BY MR. QUINN:

 8   Q    Do you have 24474?

 9   A    I do.  Do you know what it is?

10   Q    No, do you?

11   A    Yes, I do.

12   Q    What is it?

13   A    It's a copy of the 2004 Girls Spring sell sheets.

14             MR. QUINN:  I'd offer that, your Honor.

15             THE COURT:  Received.

16             (Plaintiffs' Exhibit No. 24474 is received in

17        evidence.)

18             MR. QUINN:  Did we get 24475 in evidence?

19             THE WITNESS:  Yes.

20             THE COURT:  Yes, it's a 1991 Timeless Creation.

21             MR. QUINN:  Right.

22   BY MR. QUINN:

23   Q    And then, finally, 30068?

24   A    I have that.

25   Q    Is that a copy of the Barbie Collectibles 2002 catalog?
```

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 33 of 81   Page ID #:315355
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

33

1    A    It is.

2           MR. QUINN:  We'd offer that.

3           THE COURT:  Received.

4           (Plaintiffs' Exhibit No. 30068 is received in

5      evidence.)

6    BY MR. QUINN:

7    Q    Ms. Keller asked you some questions about your

8    compensation, you -- you recently got a raise?

9    A    No.

10   Q    Your compensation increased?

11   A    No.  My compensation for 2010 was recently disclosed.

12   Q    And did that indicate that you had an increase over the

13   year before?

14   A    My total compensation was higher than it was the prior

15   year.

16   Q    And approximately how much of an increase was it?

17   A    All in, all elements of the compensation, around

18   20 percent.

19   Q    How did the company do last year compared to the year

20   before?

21   A    Profitability grew by 30 percent.

22   Q    Is it surprising to you that you would get an increase

23   of 20 percent when the company's profitability grew

24   30 percent?

25   A    No.

1   Q    And you were asked a question about whether it's, you

2   know, appropriate to enter into an agreement to freeze out a

3   competitor; do you recall that question that Ms. Keller

4   asked?

5   A    I do.

6   Q    I mean, is it your understanding that a retailer is

7   required to continue to buy product from, say, Mattel even

8   if that retailer is not making money on that product?

9   A    No, it is not.

10  Q    And the same would be true if the retailer wasn't

11  making money on MGA's product, they would not be required to

12  continue to buy from MGA?

13  A    That would be my understanding.

14          MR. QUINN:  Nothing further.  Thank you.

15          MS. KELLER:  Your Honor, may we discuss a couple

16  things with the Court before I start?

17          THE COURT:  Yeah, I'm going to call a brief

18  recess.

19          You are not admonished to discuss this matter

20  amongst yourselves, nor form or express any opinion about

21  this case.  Why don't we take about 20 minutes.

22          Thank you.

23          And Mr. Eckert, why don't you step down.

24          THE WITNESS:  Yes, sir.

25

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 35 of 81   Page ID #:315357
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

35

 1              (The following proceedings is taken outside
 2         the presence of the jury.)
 3              THE COURT:  All right.  Mr. Eckert, Mr. Larian, if
 4    you gentlemen would like to take a break, you are more than
 5    welcome to.
 6              Counsel?
 7              MS. KELLER:  Your Honor, the Court had previously
 8    referenced an e-mail that we received late last night, and
 9    Mr. Eckert is not on a copy of that e-mail, but it had to do
10    with the Kohl's issue.
11              THE COURT:  You may inquire.
12              MS. KELLER:  Your Honor, we have -- there are --
13    we've been working all night going through and calling out
14    the ones that pertain to that, and there are a number of
15    additional ones that establish the underpinnings of the
16    Kohl's -- the whole Kohl's deal.
17              We also have previously heard the testimony of
18    Drew Vollero.  Some of those documents, frankly, cast a lot
19    of doubt upon Mr. Vollero's testimony, some of them
20    literally contradict some of the things he said.  We may be
21    asking the Court, as well, to bring Mr. Vollero back
22    possibly Monday.
23              THE COURT:  It's still your case.  You'll have to
24    make a specific request.
25              MS. KELLER:  I understand, your Honor.  I know

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 36 of 81   Page ID #:315358
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

36

1    he's not, at this point, a true rebuttal witness.

2         THE COURT:  Well, this isn't rebuttal.  This is

3    still your case.  I don't know if there is going to be any

4    rebuttal or surrebuttal, so it's still your case.  If you

5    want him back, he'll be here.

6         MS. KELLER:  Thank you, your Honor.

7         THE COURT:  So you need to inform Mattel of that

8    almost immediately so they may have them available Monday

9    morning.  You need to be very explicit on the record as to

10   who you want so Mattel is not chasing different people, and

11   then they are being called off at the last moment.

12        MS. KELLER:  This is a very specific witness in

13   response to these documents produced last night.

14        THE COURT:  Drew Vollero is going to be ordered

15   back, and he'll be here on Monday.  That's ordered by the

16   Court at this time.

17        MS. KELLER:  Thank you, your Honor.

18        *(Attorney discussion held off the record.)*

19        MS. KELLER:  But I can ask Mr. Eckert about all

20   these new produced documents?

21        THE COURT:  You may.

22        MS. KELLER:  Thank you, your Honor.

23        THE COURT:  I'm allowing Mr. Eckert to be

24   questioned about the date of this production concerning

25   Kohl's e-mail because Mr. Price attempted to impeach

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 37 of 81   Page ID #:315359
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

37

```
 1    Mr. Larian by suggesting that there was no evidence that
 2    Mattel paid Kohl's to not do business with MGA.  The
 3    production of this e-mail may be used to rehabilitate
 4    Mr. Larian's credibility on that point.
 5              MS. KELLER:  Thank you, your Honor.
 6              THE COURT:  Anything else?
 7              MR. OVERLAND:  I have a few questions of
 8    Mr. Eckert, if I may.
 9              THE COURT:  All right who is going --
10              MR. MC CONVILLE:  It will be his turn.
11              MS. HURST:  It's his turn.
12              THE COURT:  Now, remember, it was direct, cross,
13    this is supposed to be redirect.  So you'll be asking
14    questions for the first time of Mr. Eckert based upon his
15    cross?
16              MR. OVERLAND:  Yes.
17              THE COURT:  And do you have additional questions?
18              MS. KELLER:  I will.  I have --
19              THE COURT:  And then finally recross, then that's
20    the end.
21              MS. KELLER:  Yes.
22              THE COURT:  Mr. Eckert has been on the stand for a
23    short period of time compared to Mr. Larian.  That doesn't
24    get balanced, but you are entitled to ask questions.
25              All right.  Counsel, what else?
```

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 38 of 81   Page ID #:315360
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

38

1           MR. QUINN:  Your Honor, I would just --

2           THE COURT:  Now Mattel.

3           MR. QUINN:  I would hope, though, and expect that

4    there wouldn't be any reference to the fact that these

5    documents were just received last night for the reason that,

6    your Honor, the Court signed the order the day before.  We

7    produced them within 24 hours.  These have not previously

8    been requested.  We've produced them even though they

9    weren't something that the expert needed for that, you know,

10   financial -- that financial analysis concerning the -- he

11   wanted the monthly revenue by product.  Do you recall he

12   didn't bring up anything about Kohl's.  The Court signed an

13   order granting the ex-parte application altogether.  That

14   application covered Kohl's, so we've produced it within 24

15   hours, but they hadn't previously been requested.

16          THE COURT:  One of the things I was doing because

17   I invited you, which means ordered you to join me at 12:45

18   was checking with the special master.  He's going back

19   through all of his records right now, and the Court is also.

20   So we can simply recess and call Mr. Eckert back on Monday

21   and give me time, and I want to check my records.

22          MR. QUINN:  I mean, I would also -- it's our

23   recollection, your Honor, these documents have never been

24   requested before.  We have never received any documents from

25   MGA concerning Kohl's, concerning their transactions with

 1   Kohl's.

 2          MS. KELLER:  Your Honor --

 3          *(Attorney discussion held off the record.)*

 4          MS. KELLER:  Mr. McConville points out that that's

 5   objectively not true because they referred to the e-mail

 6   last night, but it would be our preference to go ahead with

 7   the examination of Mr. Eckert.

 8          THE COURT:  Well, the critical question is how

 9   does the Court view, you know, the general sense of

10   discovery rules versus an explicit order?  And it's becoming

11   more and more apparent to the Court that at least Mattel

12   believes that the Court must be explicit in every order, and

13   if so, I want Mattel to set the record concerning that, but

14   I want to have time to check my records also.

15          By the same token, discovery rules are also built

16   on some solemnness of understanding between the parties that

17   the discovery rules are rather broad and are intended to

18   divulge evidence, so I just want to take my time with that.

19          MS. KELLER:  I understand, your Honor.

20          THE COURT:  If you want to proceed today, you can,

21   but I need more time to take a look at that one specific

22   issue.  If you want to recess today, you can, and you can

23   bring Mr. Eckert back on the stand on Monday, but I need

24   time to look at this one specific issue, and the discovery

25   master is busy with Mr. Moore right now, but I asked him to

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 40 of 81   Page ID #:315362
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

40

 1   look at his records, and I want to look at my own.

 2            MS. KELLER:  I understand.

 3            THE COURT:  I want to see Judge Larson's records

 4   also.  I want to see what the import of this is.

 5            MS. KELLER:  May I have a moment to confer with my

 6   co-counsel?

 7            THE COURT:  Uh-huh, and that way also Mattel would

 8   have the benefit, hopefully, of seeing these documents that

 9   you've handed the Court for recross-examination purposes.

10            MS. KELLER:  Well, I know they've seen them

11   because they've produced them to us last night, but let

12   me -- if I may confer with my co-counsel, your Honor.

13            THE COURT:  Certainly.

14            (Attorney discussion held off the record.)

15            MR. QUINN:  We have them, your Honor.

16            THE COURT:  What I'm looking back at, also, are

17   the orders concerning SKUs.  I'm also looking at shelf space

18   as well as Kohl's.  This e-mail is rather broad, and the

19   discovery master was under the initial impression that this

20   was ordered, ordered under various headings, et cetera.  I'm

21   not certain of that, so I'm being cautious, and I'm not

22   proceeding alone.  And I want to make certain that Mattel

23   has a chance to respond, and I may not find that this has

24   been discovered before.

25            So if get pushed into a position, I can make

 1   decisions very quickly, but I'd prefer to have the time.

 2   Otherwise, my initial inclination is to preclude you from

 3   doing so until I can look at my records.

 4            (Attorney discussion held off the record.)

 5            MS. KELLER:  Your Honor, I think our preference,

 6   because of the various time crunches that we have coming up,

 7   is probably to go ahead.

 8            THE COURT:  I won't let you set that record.  You

 9   don't have a time crunch in the sense that even if I recess

10   today, there is enough time to get this case to the jury by

11   next Thursday.  If we just took the hours today -- you've

12   got about 224 hours between the parties.  Your limit, if I

13   multiply or add that correctly, is 240 hours, so there is no

14   time crunch, in a sense, because Wednesday -- I'm sorry,

15   Monday, Tuesday, 12 hours, and a couple hours on Wednesday,

16   and I'm instructing, so there is no time crunch.

17            So make your decision again and make certain this

18   is a conscious and valid position you wish to take.

19            MS. KELLER:  The only thing I'm wondering, your

20   Honor, is whether we'll end up having time to instruct the

21   jury before we argue because that is --

22            THE COURT:  I'll instruct the jury before you

23   argue.  You both agreed to that, and I'll do that.

24            Now, the question is really whether you want

25   Mr. Eckert on the stand in the heat, quite frankly, of this

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 42 of 81   Page ID #:315364
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

42

1    moment or continuity or if you want a break; that's really

2    yours.

3              MS. KELLER:  I appreciate it, your Honor.  I think

4    we'll go ahead and -- and take the recess, in that case.  I

5    was only concerned about the instruction issue, frankly.

6    That was my major concern.  I understand the other concern

7    the Court just mentioned.

8              THE COURT:  I think you both have bargained with

9    the Court, in a sense, that no matter what, you want me to

10   instruct beforehand.  In state court, you've got to

11   remember, we usually instruct after.  It's just reverse in

12   federal court.  After 17 years there, I'm used to

13   instructing afterwards, so --

14             MS. KELLER:  It's more -- at least from my

15   perspective, and I understand what the Court is saying, but

16   it's more a question of making sure that we know what the

17   instructions are with specificity before we argue.

18             THE COURT:  You'll know by Saturday, and you

19   wouldn't know them before Saturday anyway.  So why don't you

20   talk to your team again.  Just remember Mr. Eckert is on the

21   stand.  I don't know that the eventual import of when this

22   is, quote-unquote, gotten is of particular value, but I'm

23   allowing you to get into it because of the rather

24   extraordinary situation.

25             Now, that's not an accusation involving either

1   party, but by the same token, I need to go back and look

2   because the import of the discovery rules may have been that

3   SKUs were to be handed over, shelf space was an issue, and

4   that's what occupied the last 30 minutes of my discussion

5   with the special master, which is why I couldn't come out at

6   12:45.

7          MR. QUINN:  Your Honor, if we've timely

8   complied -- if the Court is satisfied that we've timely

9   complied with the order and there hadn't been a prior order,

10  it would really be inappropriate for them to refer to the

11  fact that they just got this last night.  That would be

12  irrelevant.

13         THE COURT:  And that's, you know, exactly the

14  position we find ourselves in, and I haven't been able to

15  look.  Plus, I think Mattel has a very good argument on the

16  other side, and that is unless we are specifically ordered

17  to do this, whatever the discovery rules are, whatever the

18  Court believes that the breadth of those are, it may be

19  irrelevant; you've complied.  But if nobody is going to say

20  anything, here we sit.

21         MR. MC CONVILLE:  Your Honor, regardless of

22  whether there was an order, if there is a pending document

23  request to which these documents would be responsive, then

24  we should be permitted to inquire as to why it wasn't

25  produced.

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 44 of 81   Page ID #:315366
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

44

```
 1              THE COURT:  Well, that's -- that's where I'm at
 2    also, you know, what do discovery rules mean?  Normally
 3    courts shouldn't be involved in ordering every specific
 4    product or request to be complied with.  That abrogates the
 5    discovery rules.  It treats it like the tax code, and that
 6    is very easily dealt with by a court.
 7              I just want to make certain that I go back through
 8    my own records and do that very carefully.
 9              MR. QUINN:  Of course, your Honor, if a discovery
10    request for documents, Rule 34, is served and objections are
11    made, there's no obligation to produce.
12              THE COURT:  That's right, and now I still would do
13    the research.  So we may end up with a big nothing, or we
14    may end up with discovery abuse.  And the question becomes,
15    you know, how that's framed.
16              It seems to me that even, from your perspective,
17    if there was not discovery abuse, or from the Court's
18    perspective, I mean, given the best argument by MGA, the
19    question will eventually become if it's significant from
20    this Court's standpoint to allow the date, and quite
21    frankly, I don't know it's going make a difference, because
22    Mr. Larian was put in the position initially of not having a
23    significant amount of this information, so his credibility
24    was called into question.
25              And regardless of whether I found abusive
```

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 45 of 81   Page ID #:315367
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

45

```
 1   discovery or not, tentatively I may end up allowing the date
 2   regardless, because when he gets the document that
 3   substantiates his position, it becomes critical now.  And
 4   this document, without finding any fault on Mattel's part,
 5   and assuming Mattel's position for a moment, I would
 6   probably, in all likelihood, end up allowing you to go into
 7   the date, because Mr. Larian didn't have this document when
 8   he testified, and it directly contradicts Mr. --
 9               ALL COUNSEL:  Vollero.
10               THE COURT:  Mr. Vollero.
11               MR. QUINN:  Actually, with respect, your Honor, I
12   don't think it contradicts Mr. Vollero, and Mr. Larian was
13   asked about MGA's relationship with Kohl's and testified
14   about MGA's relationship.  He doesn't know about Mattel's
15   relationship, and there wouldn't be foundation for him to
16   testify about that.  And the problem with telling -- letting
17   the jury know what the date of production is the jury may
18   conclude that we did something wrong.
19               Now, we've already filed -- we've submitted to the
20   Court a brief on this issue already that there was a -- we
21   were accused of having "buried," quote-unquote, the Sal
22   Villasenor December 22nd, 2005 e-mail for 5 years, whereas
23   the Court knows, because that was part of the basis for that
24   claim filed against us last summer, which the Court threw
25   out finding the allegations, quote-unquote, "irresponsible,"
```

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 46 of 81   Page ID #:315368
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

46

```
 1    the Court knows we were under no obligation to produce that

 2    document until last summer; none.  And any suggestion

 3    that -- I mean, the suggestion that we buried it was

 4    absolutely wrong, was improper, part of our basis for a

 5    continued motion for a mistrial.  This would only compound

 6    the problem.

 7              We got an order and went to extraordinary lengths

 8    to respond to it.  If it turns out that there's an order

 9    that -- an earlier order -- we are confident that there

10    isn't one -- that we should have produced this earlier,

11    that's a different conversation.  I understand that, but

12    it's completely inappropriate to compound a problem that's

13    already infected this trial to, once again, tell the jury

14    that we just produced a document, if that's done, then at

15    the same time I think the jury should be told, "And by the

16    way, Mattel was under no obligation to produce it any

17    earlier than they did, that Mattel fully complied."

18              So we're making a big deal out of timing of

19    production, which I think is peripheral and creates all

20    kinds of problems.

21              THE COURT:  I think the timing, here, is critical

22    concerning what Mr. Larian had when he testified.  It's how

23    that's handled, I agree with you.  It's how that comes out

24    in front of the jury, whether that's an accusation of

25    nonproduction, late production or from the Court.
```

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 47 of 81   Page ID #:315369
CV 04-9049-DOC – 04/01/2011 – Day 44, Vol. 2 of 3

47

```
 1           Now, eventually, or tentatively, my guess is that
 2      I'm going to allow the date.  It's how that's portrayed to
 3      the jury.  And if the two of you can come up with a mutual
 4      way so that Mr. Larian can rehabilitate concerning
 5      credibility, it seems to resolve it.  If it casts
 6      insinuation upon Mattel, then I've got to go back and do
 7      that research, and I ultimately have to reach some
 8      conclusion, write, and either I agree or disagree with you.
 9           MR. QUINN:  Right, I understand that, your Honor.
10           THE COURT:  So it seems to me that it's the date
11      that's important.  How it's portrayed is critical.
12           MR. QUINN:  Let's remember we are talking about
13      Mattel's own documents and Mr. Larian's testimony about
14      Mattel and Mattel's documents, which he never could have
15      seen and never saw.  I mean, I think there's a disconnect
16      here.  He -- Mr. Larian wasn't asked and could not have been
17      asked about Mattel's communications with Kohl's.  These are
18      Mattel's communications, a subject that he wasn't privy to.
19      The fact that he didn't see these could have no bearing on
20      his credibility with respect to his testimony concerning
21      MGA's communications with Kohl's.
22           THE COURT:  No, but it's Mr. Eckert who is on the
23      stand responding to these questions.
24           MR. QUINN:  It's fair to ask --
25           THE COURT:  There has to be rehabilitation of,
```

 1    potentially, Mr. Larian.

 2            Number two, the person from Mattel --

 3            MR. QUINN:  Julie Shevlin, who will be here

 4    Monday.

 5            THE COURT:  Julie Shevlin is another avenue, but

 6    that's, of course, a witness for Mattel who is employed by

 7    Mattel, and Mr. Eckert is the person who also should be

 8    responding to these questions, because a potential freezeout

 9    is a significant development.  And certainly, Mr. Eckert

10    would be potentially privy to that, and the jury can infer

11    that.

12            So here is the issue for both of you.  We can go

13    on with the drama, and I can eventually make a finding that

14    it was absolute compliance by Mattel until a specific order

15    was made by the Court, or I can make a finding that it's

16    absolute compliance by Mattel, but it wasn't in the spirit

17    of the evidentiary -- or strike that -- discovery rules, or

18    I can make the opposite, that it abused the discovery rules.

19    I can't make any of those findings unless I have time to go

20    back and search the myriad of orders that Judge Larson had

21    before him, all the special master orders.  Remember, we

22    turned out 160-some orders in the last 10 months, so I don't

23    want to do that on what I call a wing and a prayer.

24            But eventually, even if I allowed in the date and

25    made those findings outside the presence of the jury, then

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 49 of 81   Page ID #:315371
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

49

 1    I'd still have to wrestle with does the prejudicial effect

 2    outweigh the probative value of the date.  My guess is I'm

 3    going to allow in the date.  How that comes in, though, how

 4    that's portrayed in terms of prejudice causes me great

 5    concern.

 6              Now, if you two want me to write, I'm happy to

 7    write, but I just need that time.

 8              MS. KELLER:  So your Honor --

 9              THE COURT:  Let me indicate again, the date is

10    going to be forthcoming to Mr. Eckert.  How that date is

11    portrayed and how Mattel is potentially put in a position of

12    perceived prejudice is of great concern to me, and then I

13    need to substantiate the record if that was going to occur.

14    And I'm pretty uncomfortable with that.  I'm trying to keep

15    the law firms out, okay?  I don't know how this occurred.  I

16    don't know if this was Mattel's decision, and at this late

17    stage, if I keep drawing law firms into this, or get to the

18    point of naming law firms, it's pretty open season for both

19    of you, and I'd like to avoid that.

20              MS. KELLER:  May I respond, your Honor, since --

21              MR. QUINN:  We'd be happy, your Honor, to tell you

22    this was Quinn Emanuel's decision, and Mike Zeller can

23    address the production issue specifically.

24              THE COURT:  No, thank you.

25              Okay.  Why don't you two get up out of your

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 50 of 81   Page ID #:315372
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

50

1    chairs, Mr. Quinn, Ms. Keller, go to the back and see if you

2    can work this out, and in all likelihood, the date is going

3    to be relevant.

4            MS. KELLER:  Could we put one thing on the record

5    first, your Honor?

6            THE COURT:  Certainly.

7            MS. KELLER:  I think it's relevant -- the late

8    production is relevant far beyond Mr. Larian's testimony

9    because of the manner in which Mr. Vollero was questioned.

10   We didn't have the documents so that we could pin him down,

11   but he was also -- or ask him about it at deposition, but

12   also the manner in which he was questioned by Mr. Zeller was

13   such that I think that we're going to have a substantial

14   argument that, at best, his testimony ends up being quite

15   misleading.  Had we had the documents, the testimony would

16   have had to have been very different.

17           But having said that, your Honor, I -- I have

18   conferred with my colleagues, and I think it is best if we

19   take a recess and give the Court time and give ourselves

20   time to assimilate all this new information and to prepare

21   our examination of Mr. Eckert.

22           THE COURT:  Okay.

23           What's Mattel's thought?

24           MR. ZELLER:  Your Honor, just briefly, I mean, we

25   can obviously discuss this at some length, but I do want to

1    respond to the Vollero's accusation.

2            One thing I think the Court will find in looking

3    at the chronology of events that happened here is that MGA

4    did not raise this allegation about Kohl's until at the

5    close of discovery or after.  We, ourselves, Mattel, would

6    ask 30(b)(6) witnesses, including Mr. Larian, about the

7    bases of the unfair competition claims.  Kohl's was not

8    mentioned.  We're double checking that, confirming that.  I

9    obviously know the Court will be doing its own work in that

10   regard and seeing what the state of the record is.

11           THE COURT:  But the special master, in my

12   conversation, has alluded to sitting through numerous

13   depositions and requests concerning shelf space, SKUs, et

14   cetera, and the spirit of that order was complete

15   disclosure.

16           So while you may argue technically concerning

17   Kohl's with specificity, there's a fairly broad, at least,

18   initial discussion over the last half-hour about SKUs and

19   shelf space, and that -- so like I said, I need time.

20           MR. ZELLER:  With respect to the shelf space

21   allegations where such matters as rearranging things on

22   shelf space in Europe and other places, so --

23           THE COURT:  That was precluded of shelf space

24   also.

25           MR. ZELLER:  Well, we'll look into that.  But in

1    any event, your Honor --

2            THE COURT:  No.  I'll look into that.

3            MR. ZELLER:  No.  I understand.

4            THE COURT:  I'm tired of taking direction from

5    counsel right now.

6            MR. ZELLER:  I'm not suggesting about direction,

7    your Honor.

8            THE COURT:  Okay.

9            MR. ZELLER:  But the fact is MGA, while making

10   these accusations, has itself not disclosed discovery about

11   Kohl's.

12           THE COURT:  Okay.

13           MR. ZELLER:  That is perfectly clear.  They should

14   be ordered to come clean immediately as well.  The fact is

15   is the Court -- they made an ex parte.  The Court denied it.

16   Subsequently, the Court, within the last 48 hours, granted

17   that ex parte, we produced it.  But -- but, I mean, MGA acts

18   as though it is acting completely spotlessly clean here, and

19   that is simply not true.  There is -- there is a small

20   universe of documents they have produced about what

21   obviously was a very troubled relationship with Kohl's.

22   Those facts have yet to be discovered, yet to be disclosed

23   fully and completely by MGA.

24           THE COURT:  Okay.  Turn back to MGA.

25           MS. HURST:  Could I have that list back?

CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

53

```
 1            First, Mr. Larian was cross-examined in his

 2   capacity as a 30(b)(6) witness about whether he had any

 3   evidence about this, and so it did affect his credibility.

 4            Second, I, in the short time sitting here, have

 5   found what I believe are probably 8 to 10 different document

 6   requests to which these documents were responsive, going

 7   back to document requests served in early 2005 -- actually,

 8   pardon me, 2004.

 9            THE COURT:  Were each of these opposed by Mattel?

10   Because Mattel's position is going to be opposition,

11   nondisclosure.

12            MS. HURST:  And we are working on that, your

13   Honor, as the Court suggested, you know, recessing, and we

14   will work on it.  But I -- I, you know, 32, 48, 56, 57, 58,

15   61, 62, 64, 602, I'm sure there's going to be more when I

16   have time, all sought information about Mattel's

17   communications with retailers concerning MGA and Bratz, and

18   I just -- I think it makes --

19            THE COURT:  Did that include all retailers?  In

20   other words, it was nonspecific?

21            MS. HURST:  Yes, I believe so, and I'm checking,

22   so I don't want to get too far ahead of myself here, but

23   yes, I believe so, all retailers.

24            THE COURT:  I will do my research.  You'll have to

25   remember that my lunch was occupied with other matters, but
```

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 54 of 81   Page ID #:315376
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

54

1    this was one of the last matters because I wanted to get

2    Mr. Moore going across the street with the special master.

3              MS. HURST:  Right.

4              THE COURT:  So we only had a brief discussion, and

5    I'm not willing to make a ruling based on that brief

6    discussion.

7              MS. HURST:  And I agree, your Honor, and I think

8    we should have a chance to submit something to the Court

9    and -- but I'm just concerned because, you know, they can

10   say, "Well, if there is no order, there is no obligation,"

11   but the reality is that puts a terrible burden on the Court,

12   then.  But more importantly, when you serve document

13   requests, you don't know what's there.  I mean, that's the

14   point.  The other side knows what's there and we don't, and

15   so there has to be some good faith; the system can't work

16   otherwise.  Instead, they gave us a constant manipulation of

17   serve 275 pages of objections that nobody can figure out

18   whether there is a responsive document or not, and then bury

19   everything for five years, that is not the way civil

20   discovery is supposed to work.

21             THE COURT:  Well, the same accusation was made by

22   Mattel when you first came into the court, and I warned both

23   parties -- I absolutely want this on the record -- I want

24   both parties to be starting again.  This idea of 500- or

25   800-page motions, the constant bickering with

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 55 of 81   Page ID #:315377
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

55

```
 1   interrogatories, the delay from the time the special master
 2   tried to take this flood of information back to Judge
 3   Larson, and then the numerous motions for reconsideration,
 4   quite frankly, lead to a time lag where I think both parties
 5   fell into a -- both prior parties fell into a whole series
 6   of abuses, quite frankly, and I think my formal discussions
 7   were, at least, were that you were starting all over in this
 8   court afresh and anew.
 9              Now, I'll say it once again on the record, I'm
10   warning both parties, everything that you can conceivably
11   think of better be on the table, even as of this last
12   weekend, and that means good faith compliance with the
13   discovery request.
14              So if Quinn Emanuel's position is that there has
15   to be a specific order --
16              Put the microphone down.
17              -- a specific order for every single discovery
18   request made, and you're not going to turn over information
19   until there is a specific order by the Court, then I want to
20   know that on the record, and then we'll see how this Court
21   feels about whether there is an abuse concerning discovery.
22              Now, if it's not and you believe that you
23   complied, Mr. Quinn, you'll set that record tomorrow
24   morning, okay?
25              The same problem for MGA, you are not wearing the
```

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 56 of 81   Page ID #:315378
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

56

 1   white hat right now, either, when you came into this court.

 2        I had a very serious conversation I think with

 3   Ms. Hurst, with Mr. Zeller, who were my first two counsel,

 4   if you recall that conversation, and said informally to both

 5   of you that you had better get the information, at least to

 6   this Court, on the table right now.

 7        Now, if I'm finding out that you may have abused

 8   Judge Larson or Judge Block for a while, or Judge Infante up

 9   at JAMS, or whatever, I gave everyone a chance to start

10   over, so don't do that with this Court.  If I find abuse,

11   you'll be paying for this trial and more, and I'm not

12   kidding you about that.  I start with big numbers, I start

13   with 5-, 10-, $20 million; understood?

14        So you go back and search through your memory

15   bank, because when that motion for new trial comes up,

16   whoever prevails or not, if something is out there, I'm

17   putting you on fair notice, we'll start over again.  This is

18   going to be very, very expensive for the party who abuses

19   this court.

20        Now, so far I haven't made those findings, but

21   these discovery rules are designed in good faith.  They are

22   supposed to take the compliance of both parties.  This

23   adversary position that I love so much depends upon some

24   good faith.

25        When I go overseas, I'm preaching to other

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 57 of 81   Page ID #:315379
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

57

1    countries on every occasion about how virtuous our system

2    is, how we are that shining light on the hill in terms of

3    how we conduct ourselves.  And I preach that over and over

4    again across the world.  So you have to understand the depth

5    of my willingness to make certain that what I'm saying

6    reflects in what I'm doing.  And I don't think either of you

7    know me that well on either parties' side to know that I

8    mean exactly what say.

9           So now I'm going to call the jury back in for just

10   a moment.  Let's stop the drama.  Let's send them home for a

11   moment.  Invite them back at 8:30 on Monday.

12          Mr. Quinn?

13          MR. QUINN:  Yes, your Honor.

14          THE COURT:  Ms. Keller?

15          MS. KELLER:  Yes, your Honor.

16          THE COURT:  Okay.

17          Nancy, go get the jury.

18          *(The following proceedings is taken in the*

19       *presence of the jury.)*

20          THE COURT:  Well, the jury is present.

21          Would you like to go home this afternoon?

22          *(Laughter.)*

23          THE COURT:  Let's do that.  It's Friday, for

24   goodness sakes.  I'm feeling very generous.  I don't want

25   you to assume anything from the earlier recess.  It's just

1    that I just need some time with counsel, okay, and I'm going

2    to ask you back.  I need you back on Monday.

3              What day?

4              THE JURY:  Monday at 8:30.

5              THE JUROR:  6:00 a.m.

6              (Laughter.)

7              THE COURT:  Okay.  Monday at 8:30, and if one of

8    you forgets, we can't get started, but this case has to go

9    to you next week.  That gives you some time, at least,

10   before the break, you know, to attempt to reach a verdict,

11   but we don't know if it takes 5 days, 5 hours or 55 days.

12   We haven't discussed that yet.  But for me to send you out

13   just before the break a couple days beforehand, it's just

14   ridiculous.  This is why we need to push through next week.

15   And I think counsel will be arguing to you on Thursday, at

16   least that's when I'm planning.  But I think that we can

17   sort out a few things outside your presence to assure that

18   and make sure the case goes through smoothly, so the time is

19   well-taken.  We'll keep the light on for you and see you at

20   8:30 on Monday.

21        Now, has anybody talked to anybody about the case so I

22   can start all over again?

23              (Laughter.)

24              THE COURT:  Don't do it.  Don't do it.  We're

25   getting to that critical period of time.

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 59 of 81   Page ID #:315381
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

59

1          Now, I want to take the press on for just a

2    moment.  There will be increased press coverage, I promise

3    you.  It won't occur now, but around the time of the

4    arguments, you'll need to be very diligent because the case

5    will, in a sense, heat up in the press, and some of that you

6    may be accessible to.  Don't Google this case.  Don't get on

7    the internet about it, and if you recognize the case, the

8    best thing to do is put down any news articles that you

9    think might pertain to the case; fair enough?

10          Okay.  Thank you, and go have a wonderful weekend.

11          *(The following proceedings is taken outside*

12     *the presence of the jury.)*

13          THE COURT:  Mr. Eckert, Mr. Larian, why don't we

14    excuse you gentlemen.  We'll be busy.  Have a nice weekend,

15    and you're ordered back at 8:30 on Monday.

16          Now, eventually you are going to want instructions

17    in this matter, and when you get those is simply dependent

18    upon when we resolve all the other issues, so have a seat.

19          First, have you had time to discuss, finally, what

20    you want to do with the buckets?  And I don't need an answer

21    as of 2:00 Friday afternoon, but at some point I can't go

22    any further until I know your position.  And if you want to

23    discuss that later today or as late as tomorrow or Sunday,

24    that's fine, okay?  But that depends upon when everybody

25    gets the instructions.

```
 1              Second, I want to know who you intend to call or
 2    requesting to call as rebuttal witnesses.
 3              MR. ZELLER:  You want the list now?
 4              THE COURT:  I want it right now.
 5              MR. ZELLER:  So we were -- if you can just bear
 6    with me, and we'll find the note.
 7              THE COURT:  And if I can ask the able associates
 8    to put up on the board the time.  Just work while we're in
 9    session, that's fine.
10              While they are doing that, I want to hear with
11    specificity who remains concerning your case.  I know
12    Mr. Eckert is back on the stand Monday at 8:30 followed
13    by --
14              MR. MC CONVILLE:  Mr. Moore.
15              THE COURT:  Mr. Moore.
16              MR. MC CONVILLE:  We have to continue his
17    examination.
18              THE COURT:  Okay.
19              MR. MC CONVILLE:  There's Mr. Malackowski.  And
20    your Honor, we had requested and filed briefs on the issue
21    of Tyler Snyder-Bradley, and based on the testimony today of
22    Mr. Eckert, that the only person he was aware of who did
23    anything was Carey Plunkett who went into a MGA showroom, it
24    adds another reason for why the Tyler Snyder-Bradley
25    deposition should be played because she said, "I went into
```

1    an MGA showroom at the direction of Mattel and gathered

2    competitive information from MGA."

3            In addition to doing that, she used fake invoices

4    in order to get into the show, which we don't have anyone

5    testifying about that, and she used false advertising to get

6    in -- as part of the process to get into the MGA showroom.

7    So we would renew, again, our request to put in the

8    deposition of Tyler Snyder-Bradley.

9            THE COURT:  And who else?

10           MS. KELLER:  And I think we will be recalling

11   Mr. Vollero.

12           THE COURT:  Now, are you going to call the person

13   that I've requested, which means ordered, in on Monday from

14   Chicago, because if you are not, there's no reason for that

15   person to get on a plane.

16           MS. KELLER:  I don't think we need her, your

17   Honor.

18           THE COURT:  No, not "I don't think."  "Yes" or

19   "no"?

20           MS. KELLER:  We don't need her.

21           THE COURT:  So Mr. Zeller, call her off.  Don't

22   inconvenience her.

23           MR. ZELLER:  Thank you.

24           THE COURT:  All right.  Your rebuttal witnesses?

25           MR. ZELLER:  Yes, sir.  Patrick Potgiesser.

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 62 of 81   Page ID #:315384
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

62

```
 1              THE COURT:  In terms of MGA's entry into

 2    showrooms?

 3              MR. ZELLER:  As sort of a subtopic, but it's a

 4    more general heading.  He's an MGA executive in Europe.

 5    Basically, you share information with retailers, it's

 6    public, and that that's the expectation in the toy industry,

 7    including pricing information.

 8              THE COURT:  Any testimony about showrooms?

 9              MR. ZELLER:  Yes.  He -- he is familiar with MGA's

10    practice --

11              THE COURT:  Okay.

12              MR. ZELLER:  -- of getting into showrooms.  In

13    fact, he says it happens every year by MGA.

14              THE COURT:  Okay.  Second witness?

15              MR. ZELLER:  Second one is Lisa Saunders.

16              THE COURT:  Testifying as to what?

17              MR. ZELLER:  She's responsible for the Kmart

18    planograms.  The Court has, of course, heard some testimony

19    about planogram rooms.  Her testimony specifically will be

20    is that if it's in a planogram room, MGA understands it's

21    public.  And in particular, she will talk about one thing

22    that has not really been discussed by anyone else, which is

23    the particular timing of the planogram rooms, because Kmart

24    sets up before the toy fairs.

25              THE COURT:  Next witness?
```

1          MR. ZELLER:  Denise Van Patten.

2          THE COURT:  What will she be testifying to?

3          MR. ZELLER:  She's a journalist who has been

4    invited into and toured MGA showrooms.

5          THE COURT:  Hasn't there been substantial

6    testimony about journalists being welcomed?

7          MR. ZELLER:  There has, except MGA sometimes

8    qualified it.  This is -- this really goes to the heart of

9    why we would call Ms. Van Patten.  MGA suggested that

10   somehow the access of the journalists is restricted either

11   in terms of timing or in terms of that they're put into a

12   press room.  Ms. Van Patten will testify that she was given

13   a complete tour of everything in the showroom.

14         THE COURT:  All right.  Next?

15         MR. ZELLER:  There was the MGA representative,

16   Ms. Chabot, C-h-a-b-o-t, relating to the Kohl's matter, who

17   we've discussed.

18         THE COURT:  Now, is she going to be called?  In

19   other words, in light of the other person?

20         MR. ZELLER:  Yes.

21         THE COURT:  Okay.

22         MR. ZELLER:  In particular, there were a couple of

23   e-mails that we could not get in to Mr. Larian.  One was a

24   Kohl's e-mail that she was on that talked about that the

25   Bratz business was a disaster, and had some other comparable

1    language.

2         THE COURT:  All right.  Who else?

3         MR. ZELLER:  Then there is a Hong Kong

4    investigator, or a comparable witness.  We've actually asked

5    MGA to identify somebody, but MGA investigators have

6    routinely done sweeps of Hong Kong toy fair showrooms,

7    gaining entry using false credentials.  This is -- that is

8    reflected in that exhibit that we gave your Honor yesterday.

9         THE COURT:  Okay.

10        MR. ZELLER:  He is a -- the person on the

11   declaration or affirmation is a Hong Kong investigator hired

12   by MGA.  The person who actually did this is described as

13   Investigator X in the declaration, so we basically want

14   somebody who is either Investigator X or some MGA witness,

15   potentially a 30(b)(6) type, who would be able to verify.

16        THE COURT:  Who else?

17        MR. ZELLER:  Then we have Didier Pietri,

18   P-i-e-t-r-i.

19        THE COURT:  Okay.  Testifying as to?

20        MR. ZELLER:  Testify as to the common use of code

21   names, including NHB specifically within MGA.  It's a common

22   practice.

23        THE COURT:  Okay.  Next?

24        MR. ZELLER:  John Louie.  He was a supervisor of

25   Sal Villasenor.  Lily Martinez.  There's Susanna Kuemmerle,

1    and then potentially Mr. Larian.  And the last group we'll

2    say are attorneys who can testify as to the source and date

3    of MGA's knowledge of Sal Villasenor.  And what we've done

4    is identified a number of their -- the people who were

5    general counsel.  It has to be one of them.  I mean, if it

6    ends up being a situation we need to call each of them in a

7    series and say, you know, "Do you know the timing and source

8    of it," because that has never been disclosed.  We have no

9    idea what that is.

10             THE COURT:  Okay.  Just a moment.

11             Do you have the time?

12             Off the record for a moment.

13             *(Discussion held off the record.)*

14             THE COURT:  Okay.  Let's go on the record for a

15   moment.

16             Mattel has used 112 minutes and 21 seconds and

17   MGA --

18             MR. MC CONVILLE:  Hours.

19             MS. HURST:  Hours.

20             THE COURT:  "Hours," I'm sorry.  Thank you.

21             110 hours and 16 minutes.

22             Mr. McConville, how much does that add up to?

23             MR. MC CONVILLE:  122 hours and 37 minutes?

24             THE COURT:  200.

25             MR. MC CONVILLE:  200.

 1          THE COURT:  Okay.  Now, if you average six hours a

 2   day, which we're not, and it's Monday, Tuesday and

 3   Wednesday, and my guess is to finish your case with your

 4   damages expert for a couple hours, and let's just say that

 5   you take, hypothetically, just two hours and you want more,

 6   and Mr. Eckert who is certainly occupying some amount of

 7   time, and Mr. Moore who occupies some amount of time, and

 8   Mr. Vollero who occupies some amount of time, I don't know

 9   whether that's three, but it's minimally three to five

10   hours, minimally.  And if there is any cross-examination on

11   any of those people, it's minimally a couple hours.

12          Second, we've heard from Mr. Larian neither he or

13   Mr. Eckert will testify again.  You've both had adequate

14   time.  You've had seven or eight days with Mr. Larian, and

15   Mr. Eckert has been on the stand for probably four days.

16   I've allowed redundant questions, and when Mr. Eckert

17   concludes, he will not be allowed to be called back to the

18   stand by MGA.  And Mr. Larian will not be called back to the

19   stand by Mattel.  Cross them off your list.

20          If there is any time left, and if I deemed any of

21   these people to be relevant, then you are going to have

22   probably and realistically for both sides about an hour in

23   rebuttal and surrebuttal.  And what I won't allow is Mattel

24   to control the matter in rebuttal where you use up your time

25   in cross-examination, so that is going to end up being

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 67 of 81   Page ID #:315389
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

67

```
 1    coequal somehow.  And I'll take a look at this list by the
 2    time you're both done with your case and see where you stand
 3    in terms of time and weigh that against the relevance of the
 4    different witnesses.
 5            Quite frankly, after a 140 hours apiece, Lily
 6    Martinez has testified, Susanna Kuemmerle has testified,
 7    Lisa Saunders has testified --
 8            MR. QUINN:  Actually, she has not.
 9            THE COURT:  She has not?
10            Well, Potgiesser has not; seems to be a very
11    relevant witness, potentially.  I might allow it, don't know
12    yet, but I want to see the questions.
13            MR. QUINN:  Right.  We understand, your Honor.
14            THE COURT:  And if we run out of time, nobody is
15    getting on the stand.
16            MR. QUINN:  We understand.
17            THE COURT:  All right.  So here is the question:
18    I'm not going to govern this other than to tell you when the
19    120 hours for each side is up, that's the end of the case.
20    And I will make certain that you each have coequal time for
21    rebuttal and surrebuttal, so that cuts your time down
22    significantly, and I don't know where you stand on direct
23    and cross until I see the end of your case.
24            So it's absolutely impossible that both of you are
25    going to be put in the situation of just making some
```

1   choices.  And John Louie may be important to you than Lisa

2   Saunders or Patrick Potgiesser, but my guess is the most

3   important witness and the one witness I represented to you

4   that you'd have back on the stand, but you've got to reserve

5   time, was Wagner.  So I'll leave you with that thought and

6   no other representation from me.

7         Now, second, at the rate we're going, you are not

8   going to get these instructions until Monday or Tuesday

9   night.  I just want to inform you of that.  And until I get

10  time as we go off on these different issues and tangents,

11  here you sit.  I have all the time in the world, but you

12  don't.  Having sat in your position, I can remember

13  preparing arguments at 4:00 in the morning and getting up at

14  5:30 and going right back at it.

15        So I'll leave that to all of you, but you will be

16  absolutely, and I apologize to you for -- for this, but I'm

17  not going against my word at all.  I tried to give you this

18  weekend.  I'm not finding any fault with the parties, but

19  I'll go back and research this issue of discovery

20  thoroughly, and I'll take my time with it.

21        MR. QUINN:  Your Honor, may I --

22        THE COURT:  Mr. Quinn?

23        MR. QUINN:  Just in terms of -- the Court will, of

24  course, remember the shaping order that was entered into

25  early in the case.  We need to respond to their affirmative

1    claims.  We could -- remember, we are -- in a sense, we are

2    a defendant as to their affirmative claims, and yes, we

3    cross-examined people.  I mean, we'd like to make a case to

4    the Court that -- and we're not asking for more time.  The

5    time is what the time is.

6              THE COURT:  Okay.

7              MR. QUINN:  But we are in a little bit different

8    position in that we are, in effect, responding to

9    counterclaims, and we couldn't respond to that in our case

10   because of the case shaping order.

11             THE COURT:  Choose your time wisely.

12             All right.  Now, I'm going to go back and take a

13   recess and go to work.  I need to call over to the special

14   master, see how he's doing with Mr. Moore, and you can come

15   back in an hour or two or do whatever you want to.  In other

16   words, you'll shape my weekend for me also.  The only time

17   I'm not available from 6:00 to 8:00, but I can reconvene at

18   8:30 tonight.  You'll be back on the record regardless at

19   9:00 tomorrow -- or strike that -- 8:00 tomorrow.  I need to

20   hear the Rule 90 tomorrow, as I promised Mr. Cote and

21   Mr. Overland.  We need to get any last-moment issues out of

22   the way concerning the laundry list you've given me of the

23   remaining issues, and I think it's going to be a pretty full

24   weekend, the way we're going.

25             So if there are any thoughts you have about how

 1    you want to shape it, I'm glad to listen to your agreements

 2    or disagreements, but I'm not going to listen to you anymore

 3    until I hear both of you either agree or disagree just a

 4    moment after you have a conference.

 5           Finally, I'm really struggling with this idea of

 6    demonstratives.  The more I think this out, we started this

 7    case with disagreements and bickering between the parties

 8    over even exhibits that we knew would be coming into

 9    evidence.  I want to give you the ability to argue the case,

10    but I'm more and more inclined to either just allow just the

11    items received in evidence or nothing, and just put you

12    right back in the same position where we started.

13           Now, the "nothing" seems rather ridiculous because

14    I've allowed you both to use the ELMO and the projection as

15    you went.  I could have saved 20 hours if I wanted to by not

16    allowing you to do that, but I think it made the case more

17    understandable, and I think it worked to your benefit, to

18    start with, with a very complex case where you're having to

19    literally impeach a number of witnesses, and now it's turned

20    and it's worked to your benefit to put the documents up at

21    the same time.

22           So my preference between the two, between nothing

23    and the actual exhibits, are simply to limit it to the

24    actual exhibits.  And I want you two to have a discussion,

25    and it's lead counsel who are going to have this discussion

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 71 of 81   Page ID #:315393
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

71

1    because I'm done with the bickering, now.

2            So Mr. Quinn and Mr. Price, you are to speak to

3    Mr. McConville and Ms. Keller.  And if there is a

4    disagreement, nothing; we'll end it as we started it.

5            *(Attorney discussion held off the record.)*

6            THE COURT:  And I suggest to you that you start

7    preparing your final arguments in court because this is

8    where you're going to be.  Let me say that again, you'll be

9    in court most of the weekend, so I would prepare your final

10   arguments because I'm rolling right through.

11           Now, it may be Friday that we end up arguing to

12   the jury.  I am not sure how we are going to accomplish, you

13   know, 18 hours in 3 days and hold to it, so we'll probably

14   be over on Thursday, and I'll probably instruct on Thursday,

15   and you'll be arguing on Friday, which ought to be an

16   interesting view of the jury on Friday afternoon at 5:00,

17   so --

18           *(Attorney discussion held off the record.)*

19           MS. HURST:  Your Honor, will we be here on Friday

20   even though there is a government shutdown?

21           THE COURT:  We will be here Friday.  Believe it or

22   not, you may be on the front lawn, but we are going forward.

23           MS. HURST:  Okay.

24           *(Discussion held off the record.)*

25           THE COURT:  We are on the record.

1           Let's start again.

2           MR. PRICE:  The basic categories we now agree on,

3      your Honor, are verdict form, jury instructions, documents

4      used at trial -- I mean in evidence, and testimony that's

5      come out during the trial.

6           THE COURT:  In other words, snippets of the

7      dailies that you want to put up, "so and so said the

8      following"?

9           MR. PRICE:  Right.  Yes, yeah.  So it's exhibits,

10     testimony, verdict form, jury instructions.

11          The question is what can we use in demonstratives

12     that the jury has seen?  And right now we don't have an

13     agreement on that -- on the scope of that, and from Mattel's

14     point of view, your Honor, the whole point of this is to

15     assist the jury.  The whole point -- it's been a long trial,

16     and we've used demonstratives with them during the trial,

17     and I think it's made it easier for them to understand,

18     particularly, you know, evidence from, for example, damages

19     experts, to make comparisons.

20          THE COURT:  You both control the future.  You can

21     both stipulate to allowing a piece of evidence in.

22          MR. PRICE:  Well, your Honor, for example, let's

23     say we don't agree on demonstratives, so if we have two

24     exhibits in, say two dolls, it seems like on the fly we can

25     say, "pull up this doll and pull up that doll and compare

1   them." So that's not a demonstrative, that's using the

2   exhibits. But it would certainly be a lot quicker, easier

3   for the jury if we just have that done ahead of time.

4            THE COURT: My position is going to be that I

5   can't take the time to sort out the bickering, now, that's

6   consistently occurred between the parties. There's been

7   virtually, with no criticism of either party, an

8   extraordinary amount of time just with the bickering that's

9   gone back and forth. I mean, my easiest position is no

10  items of evidence at all. Most courts don't even allow, as

11  you know, a reread. Many federal courts don't allow that.

12  I don't know if you are aware of that.

13           Now, from my position, that's ridiculous. I'm

14  certainly going to give you the aid of the jury

15  instructions, the special verdicts, the evidence received

16  into evidence already. I don't know why I'm letting you

17  selectively pick out different pieces of testimony and put

18  it on the screen, but if you both stipulate to that, I'll do

19  that. Otherwise, I normally would not allow that. You just

20  argue what people have said, and you refer them to that

21  testimony, generally speaking. But if you agree, I'll

22  consent to that.

23           As far as demonstratives, I'm not inclined to do

24  that.

25           MR. PRICE: Your Honor, you talked about

1  bickering.  What we are talking about are demonstratives

2  which the Court has already allowed the jury to see.  And I

3  don't plan to object -- it's closing argument, this is

4  argument, you know.  It's not like opening.  And, you know,

5  in most courts I've been in, closing argument, you know,

6  kind of anything goes, as long as you are not misstating the

7  record.

8          THE COURT:  That's what I'm afraid of.

9          MR. PRICE:  And -- and we are talking about using

10 demonstratives the jury has seen already.  And the bickering

11 is simply, Ms. Keller says "No such demonstratives," and we

12 say "Yes such demonstratives," but it's not bickering as to,

13 you know, a particular demonstrative.  The jury has already

14 seen them.  And as the Court -- it helps, and that's what it

15 really comes down to.  I mean, these folks have heard a lot

16 of testimony, and Mr. Eckert was on the stand, and he was

17 asked about witnesses a few months ago, and he -- you know,

18 I can't remember what everybody said.  It's hard to remember

19 all this.

20          So I understand the Court doesn't have the time,

21 and I don't think the Court should take the time to go

22 through demonstrative by demonstrative.  It just doesn't

23 make sense.  On the other hand, there is no good reason not

24 to use the demonstratives which already have been used with

25 the jury.  At a minimum, I think the whole -- otherwise, it

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 75 of 81   Page ID #:315397
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

75

 1    makes their job a lot more difficult.

 2              THE COURT:  Okay.

 3              MS. KELLER:  When a particular witness is on the

 4    stand using a demonstrative with that witness, in the

 5    limited sense they've been allowed, does tend to explain

 6    their testimony as they go along.  The problem with using it

 7    divorced from that witness on the stand, divorced from the

 8    ability to explain or cross-examine them right then is that

 9    the demonstrative takes on a life of its own, and it becomes

10    more significant to the jurors in closing argument than it

11    should be.  And for that reason, I've taken the position

12    that we should not permit them.

13              THE COURT:  Okay.

14              MR. PRICE:  The Court's seen these and blessed

15    them, at least.

16              THE COURT:  No, I haven't blessed them.  I've seen

17    them.

18              MR. PRICE:  You've blessed them in the sense that

19    you let us use them with the jury.  I would say none are

20    going into evidence, except for the limited ones that you've

21    already mentioned.  So it's -- this is nothing new.  This is

22    just demonstratives that I know they used some, we used some

23    to help with -- our point of view, for example, is it's the

24    comparisons of the dolls.  I'm not good handling dolls.  You

25    know, I had a GI Joe, but to stand up there with a drawing

```
 1   of a doll is not as helpful to the jury as to putting it on
 2   the overhead, and you've already blessed and seen the
 3   demonstratives that we plan to use.
 4              THE COURT:  Okay.  Anything else?
 5              MS. KELLER:  No, your Honor.
 6              THE COURT:  You both control your own future.  I
 7   would not plan on using demonstratives.  I'll go back and
 8   think about it so it's not the heat of being on the bench
 9   and listening to your arguments, but I would not plan on
10   preparing a PowerPoint with demonstratives right now.  So
11   you spend your time the way you want to, but --
12              MR. PRICE:  Your Honor, one other topic, which
13   I've talked to Ms. Keller about yesterday and see if the
14   Court would agree with this, but is there some way we could
15   get, like, one of those mikes with the little thing on our
16   sides so that we are not wedded to this microphone and that
17   we can --
18              THE COURT:  Usually I've allowed a lectern to be
19   placed right in the middle of the well, so when you argue to
20   the jury, you're facing them rather than at that awkward
21   angle.  That angle is designed for a witness.  It's not
22   designed to talk to the jury.  And I have no concern as long
23   as that's a lectern that each of you set up and a microphone
24   that's coequally used and you coordinate that with our
25   people.  In fact, if you do that, I've usually instructed
```

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 77 of 81   Page ID #:315399
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

77

1    right in the middle of the well.  If you don't, and we can't

2    reach that quickly, because I'm not going to spend that much

3    staff time on it, quite frankly, then you'll be arguing from

4    there.

5              MR. PRICE:  We will reach an agreement.  We just

6    wanted to make sure it's okay with the Court.

7              THE COURT:  In fact, I prefer it.  I prefer to

8    have you in the middle of the well, and I prefer to have you

9    no closer than that Kleenex box.

10             MR. PRICE:  Okay.

11             Don't move the box.

12             THE COURT:  That's as close as you get.

13             MS. HURST:  We'll leave it right there.

14             THE COURT:  But you hug that lectern, and we make

15   certain that that's a sound system that can be heard, and

16   it's coequal and you both use the same sound system, okay?

17             MR. PRICE:  Okay.

18             THE COURT:  Now, that's more than appropriate.  In

19   fact, I prefer it.  I think that's what litigation should be

20   about, looking at them and talking to them, okay?

21             All right.  Now, what else?  We have a lot to do.

22             MS. HURST:  Your Honor, I have something to offer

23   the Court for when it assesses the discovery matters, if I

24   may.

25             THE COURT:  No.  Let me turn to Mr. Zeller, now,

1    first.  You've been trying to show me --

2           MR. ZELLER:  Oh, just the transcript you requested

3    yesterday about the testimony on the Bryant drawings that we

4    had sought to admit.

5           THE COURT:  Okay.  My concern is the duplications.

6    That would be 502, isn't it?

7           MR. ZELLER:  Yes, although I think the duplication

8    we were talking about yesterday is slightly different.

9    That's on the verdict form and it goes back to the jury --

10          THE COURT:  No.  It's on the exhibit itself.

11   There are so many duplications that I'm inclined to keep it

12   out, frankly, and to go right back to the original drawings.

13   But I wanted time to think about that this evening and

14   discuss that with you tomorrow, but if we're starting to

15   make decisions quickly, now, they're probably are not going

16   to come in.  We'll see, but I want time to think about that.

17          MR. ZELLER:  Maybe we can submit one without

18   duplicates and try and narrow it down.  I mean, but your

19   Honor, this would be extremely prejudicial.  These are the

20   drawings that are at issue in the case, the basis of our

21   claims.  Carter Bryant testified that these were the

22   drawings that he made and --

23          THE COURT:  Then do it quickly, though.  I've been

24   warning all parties for a lot of time that that fallback

25   position, after I make a ruling, is a difficult place to be.

1   So I'm not going to accept duplicates.  It's not going to

2   look this big when it's that big, so get your best effort

3   into me immediately.  But most of these are duplicates,

4   quite frankly.

5           MS. HURST:  And your Honor, there is another

6   problem, which is there's no time frame put on each

7   document.  I mean, that's critical here.  I mean, that's the

8   whole ballgame.  They didn't go through one by one and ask

9   him when.  I mean, you can't make that up later without the

10  witness.

11          THE COURT:  Okay.

12          Now, this is what we're doing this weekend.

13          MS. HURST:  All right.  I apologize.

14          THE COURT:  No, no.  That's fine.  That's what

15  we're doing.

16          MS. HURST:  Your Honor, there was an order of

17  Judge Infante on May 22nd, 2007, on Document Request Number

18  62 and 63, and it specifically required any deals with

19  retailers to keep Bratz off the shelf.  I mean, it's

20  almost -- I mean, it can't be a request more pertinently

21  worded.

22          THE COURT:  My guess is that there were subsequent

23  requests that Mattel probably opposed, and so Mattel will

24  take the position that in the subsequent request, there was

25  opposition.

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 80 of 81   Page ID #:315402
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

80

1          MS. HURST:  Well, but this is an order.  And there

2    was a reconsideration, which was denied at Docket 688.  I

3    mean, this is an order.

4          MR. QUINN:  We need to look at this, your Honor,

5    but this is not --

6          THE COURT:  Well, let's transfer it now.  I need

7    copies also.

8          MR. QUINN:  We also need to see the briefing.

9          THE COURT:  Absolutely.

10         MR. QUINN:  You know, this -- there's a debate

11    about whether this was a deal to keep Bratz off the shelf.

12         THE COURT:  Absolutely.  That's why I need the

13    time, and you do, too, so I'm sitting here.

14         MS. HURST:  May I --

15         THE COURT:  No, you are not just going throw it at

16    me, you are going to show it to the other side and then

17    respond and tell me what time you want to meet?

18         In other words, you are setting up your own time

19    frame for me, but the more we take time with this, the later

20    you get the instructions.  And if they come to you the night

21    before, just look at yourselves.

22              *(Attorney discussion held off the record.)*

23              *(Recess.)*

24              *(Following proceedings reported by Denise*

25         *Paddock.)*

Case 2:04-cv-09049-DOC-RNB   Document 10375   Filed 04/04/11   Page 81 of 81   Page ID #:315403
CV 04-9049-DOC - 04/01/2011 - Day 44, Vol. 2 of 3

81

1                              -oOo-

2                          **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  April 2, 2011

12

13

14          _____

15          JANE C.S. RULE, U.S. COURT REPORTER
            CSR NO. 9316

16

17

18

19

20

21

22

23

24

25