UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

- - - - - - -

# CERTIFIED TRANSCRIPT

| | |
|---|---|
| MATTEL, INC., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| MGA ENTERTAINMENT, INC., et al., | ) No. CV 04-9049-DOC (RNBx) |
| | ) Status Conference |
| | ) Volume 1 of 1 |
| Defendants. | ) |
| _____ | ) |

REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
SANTA ANA, CALIFORNIA
SATURDAY, APRIL 2, 2011

Denise Paddock, CSR 10199, CMRS, RMR, CRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
transcripts@ocrecord.com www.ocrecord.com
040211 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL STATUS
CONFERENCE 04/02/2011

**APPEARANCES OF COUNSEL:**

FOR PLAINTIFF MATTEL, INC., ET AL.:

      QUINN EMANUEL URQUHART & SULLIVAN LLP
      BY: JOHN QUINN
          WILLIAM PRICE
          MICHAEL T ZELLER
          Attorneys at Law
      865 S Figueroa Street, 10th Floor
      Los Angeles, CA 90017-2543
      213-443-3000

FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: THOMAS S McCONVILLE
          Attorney at Law
      4 Park Plaza, Suite 1600
      Irvine, CA 92614
      949-567-6700

      - AND -

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: ANNETTE L HURST
          Attorney at Law
      405 Howard Street
      San Francisco, CA 94105
      415-773-5700

      KELLER RACKAUCKAS LLP
      BY:  JENNIFER L KELLER
          Attorney at Law
      18500 Von Karman Avenue, Suite 560
      Irvine, CA 92612
      949-476-8700

UNITED STATES DISTRICT COURT

1    **APPEARANCES OF COUNSEL (Continued):**

2

3

4      FOR CARLOS GUSTAVO MACHADO GOMEZ:

5              LAW OFFICES OF MARK E OVERLAND
               BY: Mark E Overland
6                   Attorney at Law
               100 Wilshire Boulevard, Suite 950
7              Santa Monica, CA 90401
               310-459-2830
8
               -AND-
9
               SCHEPER KIM AND HARRIS LLP
10             BY: ALEXANDER H COTE
                   Attorney at Law
11             601 West Fifth Street, 12th Floor
               Los Angeles, CA 90071-2025
12             213-613-4655

13             ALSO PRESENT:

14             MGA ENTERTAINMENT, INC.
               BY: JEANINE PISONI
15                  Attorney at Law
               16360 Roscoe Boulevard, Suite 105
16             Van Nuys, California 91406

17

18   ALSO PRESENT:

19              KEN KOTARSKI, Mattel Technical Operator

20              MIKE STOVALL, MGA Technical Operator

21

22

23

24

25

UNITED STATES DISTRICT COURT

```
 1                 SANTA ANA, CALIFORNIA; SATURDAY, APRIL 2, 2011

 2                           Volume 1 of 1

 3                            A.M. SESSION

 4             (Open court - jury not present.)

09:14  5       THE COURT:  Counsel, we're on the record, then.

 6             All counsel are present.

 7             I want to start our conversation this morning with

 8     MGA and Mattel by starting with Mattel.

 9             What choice-of-law question has ever been submitted

09:14 10     by a federal court to the jury under a governmental interest

11     test and how and where would I find those instructions?

12             MR. ZELLER:  If you can just give me a moment,

13     Your Honor.

14             THE COURT:  Sure.  Sure.

09:15 15             And I pulled Lourdes Baird's case.  You'll see the

16     New Jersey case where Judge Baird finds that the trade secret

17     misappropriation took place in New Jersey, that the person

18     then comes to California in a short period of time afterwards

19     and Judge Baird found that the choice of law was appropriate

09:15 20     in California.

21             Now, that's different than the jurisdictional

22     question.  So the question that I'm struggling with is -- and

23     second, since Mattel brought the -- a criminal prosecution or

24     was involved in that criminal prosecution in Mexico, I can

09:15 25     imagine the Mexican government sitting in this room screaming
```

 1     that the choice of law is uniquely theirs.  On the other

 2     hand, there is a strong argument as follows:

 3           He's not just a Mexican citizen who steals

 4     documents relating to Mattel Mexico, he also eventually has

09:16  5     what I call a "backward nexus" to the United States.  He

 6     comes to the United States within a year and a half and

 7     becomes the vice president of MGA; and, second, that the

 8     documents that flow in the Internet age are not uniquely

 9     Mexican documents pertaining to Mexico Wal-Mart at all, that

09:16  10     they're documents that also flow across on the Internet, and

11     one of your strongest documents is what I'm going to call the

12     "global strategy report," -- and I'm misnaming that -- the

13     very report that Mr. Eckert's complaining about.

14           Find me a case where choice of law has ever been

09:16  15     submitted to the jury.  I can't find it, frankly.  I think

16     it's uniquely a court determination.

17           Now, the court could find that California law

18     applies.  But here, if we get into that situation -- and I'm

19     not submitting that to the jury that MGA's got a strong

09:17  20     argument that you've got a counter -- and, that is, criminal

21     prosecution, Mexican citizen, living in Mexico.

22           And I've got some questions for MGA.

23           MR. ZELLER:  The one thing I'm checking, Your Honor

24     and -- and I'm not entirely sure this is a

09:17  25     governmental-interest case -- I'm not sure it matters for the

1    Second Circuit's analysis -- but there's also the *Marra*

2    case -- M-a-r-r-a.

3             THE COURT:  M-a-r-r-a.

4             Have you read that?

09:17  5         MR. ZELLER:  Yes, I have --

6             THE COURT:  Okay.

7             MR. ZELLER:  -- and I was just actually checking to

8    see at what time -- or at that time what -- what test was

9    being applied.

09:17 10            And -- and the citation to it is 447 F.2d 1282.

11            And this was a -- a case -- it was a diversity case

12   asserting, basically, alienation-of-affections-type action, I

13   guess, back when these existed.  This is a 1971 case.

14            And what occurred was is that the -- because there

09:18 15   was a dispute about where the -- kind of the essence of the

16   interference occurred, whether it was New York or Vermont,

17   the court found -- the Court of Appeals found that the

18   district court's application of choice of law, without

19   sending -- basically being the factual dispute to the jury

09:18 20   was reversible and remanded back for basically a jury trial

21   saying because of the essential facts underlying the

22   choice-of-law determination were disputed.

23            And I think that is analogous here.

24            As the court has already found on summary judgment,

09:18 25   some of those issues are, you know, factually disputed and I

1    think that mix is really one for -- for the jury.

2              THE COURT:  I'll come right back to you.

3              I want to ask MGA a couple questions before you

4    start your prepared arguments.

09:19  5              Assuming for a moment that I can't find a

6    choice-of-law case that has ever been submitted to a jury,

7    that the governmental interest factors are those that the

8    court should decide, I want to hear from MGA in just a moment

9    what your position would be.

09:19 10              I'm now assuming that your next request will be,

11   Judge, then nothing should be referred to concerning

12   Mr. Larian and his activities.  And my response -- and this

13   isn't Mr. Cote, this is Ms. Keller and Mr. McConville and

14   Ms. Hurst I'm speaking to -- Judge, therefore all of this

09:19 15   evidence is now irrelevant.

16              Well, there is a very strong argument that it is

17   not and never would be for this reason:  The initial meeting

18   takes place at the New York Toy Fair in February between

19   Machado and Larian, and it then extends down to the W Hotel,

09:20 20   and then there's employment in Mexico with MGA Mexico, and lo

21   and behold, back he comes to the United States -- which is

22   what I call that "backward-looking" jurisdiction.

23              So there are strong ties.  What's ridiculous is I

24   would never apply the law of New York, if I got as far as a

09:20 25   choice of law; but there is a huge nexus, if you will, to

1    this country.

2            Under the governmental-interest test, though, you

3    might be right.  In other words, choosing between two

4    governments, Mexico might have the unique choice-of-law

09:20  5   argument, but I want to hear from Ms. Keller now what your

6    position's going to be, because two things will happen to you

7    at trial.

8            First of all, the motion, if it's granted, may not

9    remove any of this evidence from the jury and, therefore,

09:21 10   you're going to be in a position of arguing the very facts

11   that Mr. Overland and Mr. Cote are best prepared to argue.

12           You're going to now be in a position of having to

13   argue that the 200 items on the disc are inconsequential

14   except for four or five items that are being discussed.

09:21 15           MGA puts itself in the position of arguing on

16   behalf of Mr. Machado, creating an even stronger nexus

17   between the two in the jury's eyes, and I'm not certain that

18   you know the case as well, concerning these trade secret

19   misappropriations, which is why I've asked if there was bias.

09:21 20           You said that there was not, so I'm proceeding with

21   the Rule 90.

22           And if they're not excluded, if I decide choice of

23   law is a uniquely court-determinative issue, I don't want you

24   having the expectation that I'm going to curtail the evidence

09:22 25   in any way concerning Machado.

```
 1            So I want to hear those arguments now as if you've

 2   won the motion for a moment.

 3            Tentatively you've just prevailed:  "Judge, we now

 4   would like to exclude Mr. Machado's" -- so pick it up from

 5   there.

 6            MS. KELLER:  Well, Your Honor, you're right that I

 7   don't know this well enough, and I think I'll defer to

 8   Ms. Hurst on this.

 9            She's been the one --

10            THE COURT:  Why don't you have a conference about

11   that for a moment, because I anticipate if I can't find a

12   choice-of-law case and I don't know how to instruct the

13   government on governmental interest, then I don't know yet

14   until I hear from Mattel and you whether I would then

15   preclude evidence.  But it seems to me that Mattel has a very

16   strong interest.

17            And listen very closely:  What's Mr. Eckert

18   complaining about?

19            One, we got stolen blind.  We got stolen by a lot

20   of employees.

21            And "stolen's" a bad word.  Trade secrets were

22   misappropriated.

23            In fact, the news told me not to use the word

24   "stolen."

25            But, Judge, how can you preclude that evidence?
```

09:22
09:22
09:22
09:23
09:23

UNITED STATES DISTRICT COURT

1   You've got a New York Toy Fair where they meet, you've got

2   transactions taking place back and forth across international

3   boundaries, Mr. Larian flies all the way to Mexico, even if

4   it's Servicios on the Mattel side, it's still MGA Mexico on

09:23 5   the MGA side, and he's not only employed, but in this

6   Internet age, it's not just documents in Mexico that he has

7   access to, somehow he's got documents that come from the

8   Mattel El Segundo, and the most important of those documents

9   seem to be, from Mr. Eckert's perspective, this local

09:24 10   strategy.

11       Now, a lot of these trade secrets seem to me to be

12   inconsequential but they still go to the jury because we're

13   in a fight between what's publicized and what's not

14   publicized, and what are catalogs, and what were open, and I

09:24 15   don't know that I'm going to narrow that at all.

16       So if I don't narrow it, now you're in the position

17   of Mattel arguing, you know, Judge -- I mean, Ladies and

18   Gentlemen of the Jury, you know, there's 200 items out there.

19       And instead of Mr. Overland arguing it you have to

09:24 20   get up and you have to argue to the jury the following:  You

21   know, 60 of those are inconsequential.

22       And the jury's looking at MGA saying, how do you

23   know that?

24       And by the way, there's another 38 of those that

09:24 25   might be consequential, but of those 38, those are documents

UNITED STATES DISTRICT COURT

1    that he normally used during his business.  And oh, by the

2    way, since Mr. Machado is not here any longer and Ms. Keller

3    is arguing on behalf of MGA, six of those we're going to now

4    defend and tell you why they were nonconsequential.  And,

09:25 5    meanwhile, Mattel's arguing that they are consequential, and

6    the very person who knows the case who sat here with

7    Mr. Machado is now out of the case.  You have become Machado.

8          So I right now tentatively can't find any case that

9    says that this is anything other than a judge's decision on

09:25 10    choice of law, and I'm inviting both of you to find a case.

11    And I want to find any case where a court has submitted to a

12    jury the governmental interest factors.

13          Those eight factors are usually something that the

14    court considers.  And if that goes out the window at this

09:25 15    point, then you are going to have to step in, potentially,

16    into the place of Machado and argue on behalf of Mr. Machado,

17    because I'm not representing to you in this motion that I'm

18    narrowing this in any way.

19          So I want both sides to just -- those aren't

09:26 20    rulings yet, but really think this through on both sides.

21          Now, I assume from Mattel's position, that you're

22    consistent, although you've changed on a number of other

23    issues.  You're consistent in this regard, Mr. Quinn, you

24    want this, apparently, to go to the jury; is that correct?

09:26 25          MR. QUINN:  Yes, Your Honor.

```
 1              THE COURT:  Okay.

 2              Mr. Price, you're coequally arguing.  You're both

 3    here because you're both arguing.

 4              MR. PRICE:  Right.  I'm with John.

09:26  5        THE COURT:  You're with John.  All right.

 6              Mr. Zeller?

 7              MR. ZELLER:  Yes.

 8              THE COURT:  As able support.  Okay.

 9              All right.

09:26 10         Now, I'm happy to decide it today, by the way, so I

11    don't want you to think I'm not willing to decide this very

12    quickly in front of you.

13              Take your time.  I've got three more orders that

14    I'm working on that are search warrants back here, so take

09:27 15  your time.

16              (Recess taken.)

17              THE COURT:  All right.  Counsel, we're on the

18    record.

19              I would like Mr. Moore to return to court with the

10:04 20  special master and I want Mr. Zeller to call Mr. Moore and

21    see if tomorrow would be convenient.

22              MR. ZELLER:  I assume Santa Ana?

23              THE COURT:  Yeah, the special master will be here

24    also.  I'll schedule it for 9:00.

10:04 25         MR. ZELLER:  Okay.
```

CV 04-9049 DOC - 04/02/2011 Volume 1 of 1

```
 1            THE COURT:  The court did some additional reading

 2     after you left last evening and I want the special master to

 3     ask a few questions.

 4            I've got the special master waiting, so as soon as

10:04  5     you can get that information to me I'll call him.

 6            He's at the district conference.

 7            MR. ZELLER:  I'm sorry.  Was there something in

 8     addition to me contacting Mr. Moore?

 9            MR. QUINN:  Your Honor?

10:05 10            (Recess taken.)

11            THE COURT:  Is 9:00 okay?

12            MR. ZELLER:  I tried him on his cell, so I just

13     sent an e-mail, but I -- I mean, I think you can take it for

14     granted he'll be here.

10:07 15            THE COURT:  Okay.  I'll just set it for 9:00 with

16     Robert, then.

17            MR. ZELLER:  Okay.

18            (Recess taken.)

19            THE COURT:  Okay.  We're on the record for a

10:33 20     moment.

21            If Mattel claims that only some of the drawings --

22     or that you only own some of the drawings, then I have a

23     question for you, Mr. Zeller, to think about, because I don't

24     want Mattel trapped on 502.

10:34 25            If Carter Bryant created one drawing in 1998 and
```

UNITED STATES DISTRICT COURT

 1    then created a second drawing while in the employment of

 2    Mattel in 1999 -- or in July 1999, and the second drawing

 3    that was created in 1999 infringes the first drawing that was

 4    created in 1998, then under the work-for-hire provision of

10:34  5    the Copyright Act, is Mattel deemed to have infringed

 6    Carter Bryant's 1998 drawing in light of the fact that Mattel

 7    is deemed to be the author of the 1999 drawings, and is

 8    Bryant deemed to be the author of the 1998 drawings?

 9            In other words, I'm trying to figure out how the

10:34 10    jury can come down in each case scenario.  They may believe

11    that Carter Bryant created one or more of the drawings in

12    '98, one or more or the vast majority in 1999, they may

13    believe he created the drawings in 1998 and only added to, or

14    they may believe that he created none of these drawings in

10:35 15    1998 and it was all on Mattel's time.

16            So I'm trying to go through each scenario.  I mean,

17    it's a great law school question.  I just leave that to you

18    for a while and I'll be back.

19            (Recess taken.)

11:03 20            THE COURT:  Okay.  Then we're back on the record,

21    and the first question with all counsel present goes back to

22    MGA and to Mr. Machado's counsel, Mr. Overland and Mr. Cote.

23            Do you want the court to proceed with the Rule 9 --

24    strike that -- the Rule 50 motion?

11:03 25            MR. COTE:  Yes, Your Honor.

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 04/02/2011 Volume 1 of 1

```
 1              MR. OVERLAND:  We do, Your Honor.

 2              THE COURT:  Now, you have a separate entity, of

 3    course.  It's unconnected, in a sense, to MGA, but you've

 4    always been a party, so I've paid the courtesy of now asking

 5    MGA if there's any prejudice if the court decides the Rule 50

 6    motion to MGA and Mr. Larian.

 7              MS. HURST:  Your Honor, we believe you should

 8    proceed to decide the motion and dismiss Mr. Machado

 9    irrespective of whether the court is going to exclude the

10    evidence.

11              Obviously, we think that MGA Mexico and Mr. Larian

12    should also be dismissed from that claim pertaining to the

13    Mexican trade secrets, but even on the assumption that the

14    court is not going to dismiss them or all of them, we do

15    believe the court should proceed to dismiss Mr. Machado.

16              And we formally join in their motion.

17              THE COURT:  And you're taking into account the

18    distinct possibility that the court would allow all of the

19    evidence previously submitted to the jury, you know, subject

20    to further motion, to go before this jury?

21              MS. HURST:  Yes, and our position remains the same.

22              THE COURT:  Ms. Keller?

23              MS. KELLER:  I agree, Your Honor.

24              THE COURT:  Mr. McConville?

25              MR. MCCONVILLE:  Yes, sir.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  Excellent.

2          Okay.  Then I have my record.

3          Mr. Zeller.

4          MR. ZELLER:  Well, I think that's principally a

11:05  5   question addressed to the defendants.

6          We, of course, recognize that they have a -- a

7    right to make a JMAL.  As a practical matter we don't think

8    that it makes a lot of practical sense to -- to make such a

9    decision at this juncture, can submit the issue to the jury

11:05 10   and see how they come out.

11         The court always has the power, under a renewed

12   JMAL --

13         THE COURT:  Sure.

14         MR. ZELLER:  -- to consider these same issues,

11:05 15   but --

16         THE COURT:  Now, help me with this.  I'd like to do

17   as much research as time will allow to find where a

18   choice-of-law decision has not been made by the court.

19         I want you to find or quote to me a case where this

11:05 20   has been submitted to the jury.

21         MR. ZELLER:  This was the case I was referring to

22   earlier, and I think this is sort of the pertinent passage.

23         This is the *Marra*, M-a-r-r-a, case, Second Circuit,

24   1971, and the pertinent passage begins on Page 1284, and it

11:06 25   says -- the court says, "Because the plaintiff made a general

1    demand for a jury trial, the defendant was entitled to the

2    jury's consideration of every issue properly triable to it."

3            Then some citations.

4            "One such issue was the situs of defendant's

11:06 5  conduct, a factual determination upon which the choice of law

6    turned," and then the Court of Appeals go on -- goes on to

7    describe a Fifth Circuit decision called *Orr*, O-r-r, and then

8    after that discussion says:

9            "Although there was sufficient evidence to support

11:06 10 a finding that Esther Bushee's conduct occurred primarily in

11   Vermont" -- B-u-s-h-e-e's -- and she was the defendant in

12   that case -- "a review of the extensive evidence of New York

13   conduct makes clear that the court was not in a position to

14   direct the jury to make such a determination."

11:07 15         And then the court goes on to find that the

16   issue -- the factual issue, this factual dispute that was

17   underpinning the choice-of-law issue, because it should have

18   been submitted to the jury for a verdict, then proceeds to

19   reverse and remand the case.

11:07 20         THE COURT:  Okay.  To MGA, why shouldn't I

21   find -- and to Mr. Overland and Mr. Cote, representing

22   Mr. Machado -- why shouldn't I find that this is a California

23   choice of law?

24           Let's take the United States, for a moment,

11:07 25 separate out the issue of jurisdiction for just a moment.

```
  1    The conversation takes place in New York, the -- Mr. Larian

  2    flies to Mexico, but just as importantly, when MGA Mexico

  3    ceases to exist, Mr. Machado is hired back as a -- and

  4    eventually becomes the vice president, I thought, in the

11:08  5    United States with MGA.

  6           Now, I may be mistaken on the fact situation, he

  7    might be a lower level, but I thought he returned to the main

  8    offices, if you will.

  9           Did he?

11:08 10           MR. COTE:  In that particular case he moved to the

 11    United States before --

 12           THE COURT:  Now, just a moment.

 13           Let's get our time frame down for just a moment.

 14           He was hired by Mr. Larian once again on the date

11:09 15    of --

 16           MR. COTE:  April 16th is the day he signed his

 17    contract.

 18           THE COURT:  Of?

 19           MR. COTE:  2004.

11:09 20           THE COURT:  The search took place on the date of?

 21           MR. COTE:  October 20th, 2005, I think.  I'm not

 22    sure about the 20th.

 23           It's October 27th.

 24           THE COURT:  He returned to the United States and

11:09 25    became, instead of MGA Mexico, part of MGA, let's just
```

UNITED STATES DISTRICT COURT

 1    say, US, on the date of -- or approximate date of?

 2              MR. COTE:  It's July of 2000 and -- 2006.

 3              THE COURT:  So about nine or ten months after the

 4    search?

11:09 5              MR. COTE:  That's about right.

 6              THE COURT:  Okay.  Holding what position?

 7              (Discussion held off the record.)

 8              MR. COTE:  I don't remember his exact position.  I

 9    think it was vice president for international marketing in

11:09 10   the United States.

 11             THE COURT:  If he had, in a choice-of-law issue,

 12   stayed in Mexico, Mattel initiates a prosecution against a

 13   Mexican citizen and the majority of documents were documents

 14   created in Mexico, Mexico Wal-Mart, for instance, choice of

11:10 15  law would seem to be, at least to this court, a relatively

 16   easy issue to decide.

 17             But where I have at least a critical document, from

 18   Mattel's perspective, and the most critical being the -- I'm

 19   going to call it the "2005 global strategic report," which

11:10 20  may have limited value, but certainly has value for the

 21   following year, and possibly and arguably into the future,

 22   and that document comes from the main server for MGA in the

 23   United States and now crosses the Internet to Mexico, that

 24   potentially is a far different document than a document

11:11 25  solely created in Mexico.

 1          Mr. Overland, how does the federal government, for

 2     instance, gain jurisdiction when a gun is manufactured in

 3     Massachusetts, but a murder occurs using that same weapon in

 4     California?  The flimsy nexus to that that gives

11:12  5     jurisdiction, which is a different issue than choice of law,

 6     is the manufacturer of the weapon in another situs.

 7          Why should the court choose and make the decision,

 8     rather, the governmental-interest test, that Mexico choice of

 9     law prevails?

11:12 10          So, now, your argument.  Take it from the top.

11     Take it from your well-prepared preparation, and I give this

12     lectern to you.

13          MR. OVERLAND:  I just want to say one thing and

14     then I'll turn it over to Mr. Cote.

11:12 15          I'm not sure the court is correct with respect to

16     the classification of that particular document.  I think we

17     may be talking about two different documents.

18          I think the document that we're talking about is

19     Exhibit 7104, and Exhibit 7104 is not a global strategy

11:13 20     document.

21          THE COURT:  Why don't we get out all of the items

22     of evidence that each of you think are the most pertinent so

23     I can look at them again.

24          MR. OVERLAND:  Okay.

11:13 25          THE COURT:  And, remember, I've returned a lot of

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 21 of 158   Page ID #:315440
CV 04-9049 DOC - 04/02/2011   Volume 1 of 1

21

```
 1    those back to each of the parties because there were so many

 2    binders.  But why don't you get your support staff over, but

 3    give me the most important ones.  Don't dilute it with the

 4    avalanche effect.  Give me the ones that you really think

11:13 5  show --

 6              MR. OVERLAND:  I think we have 7104, which is the

 7    one that I think the court was referring to.

 8              THE COURT:  Okay.  Show that to Mr. Zeller.  I

 9    think he knows what it is.

11:13 10             (Pause in the proceedings.)

11              THE COURT:  Okay.  And I've been mispronouncing the

12    name of this.  So it's -- what do you want to call this?

13              MS. HURST:  It's a line list.

14              MR. COTE:  We called it a "preliminary line list"

11:14 15  or a "PLL" in our motion.

16              THE COURT:  And I also thought I heard it referred

17    as the "local strategy report" --

18              MS. HURST:  No; I think that that was something

19    else.  There was a strategy document in Mr. Castilla's "to

11:14 20  take" folder and I think that there has been some confusion.

21              THE COURT:  Can I see that also so I have a clear

22    record.

23              So why don't you go on with your argument.  Why

24    don't you take it as if I'd asked no questions today.

11:14 25             Just take me through your entire argument.
```

1          MR. COTE:  One second, please, Your Honor.

2          THE COURT:  And then, Mr. Zeller, I'm going to do

3    the same thing for you or Mr. Quinn or Mr. Price.  Just take

4    me through your entire argument from top to bottom with as

11:15 5    few interruptions as possible for me.

6          MR. COTE:  Thank you, Your Honor.

7          THE COURT:  And also let me inform MGA that you

8    could be in the position where if I granted a Rule 50 that I

9    don't take the next step and, that is, any narrowing.  I want

11:15 10    you to be aware of that, and I just leave that to your own

11    devices.  And Mattel is in the position of arguing the

12    breadth of this and you are contending with a number of items

13    on the disc, et cetera, and try to explain them away.  So I

14    want you to be aware of this.

11:15 15          Mr. Cote.

16          MR. COTE:  Thank you, Your Honor.

17          Our -- our arguments are stated in our papers, and

18    I don't want to repeat them.

19          THE COURT:  Well, I know and I want you to repeat

11:15 20    them all and I want a good record.  Time is not a problem.

21          MR. COTE:  I don't think I need to repeat them --

22          THE COURT:  Yes, you do.

23          MR. COTE:  What I'd like to focus on is responding

24    to the points that discovery --

11:15 25          THE COURT:  I want you to repeat all your

1    well-taken arguments.

2              MR. COTE:  Okay.

3              THE COURT:  You wrote them; I want them in the

4    record.

11:15  5              MR. COTE:  Then I'm going to come back to my first

6    point and start with my second point which is the borrowing

7    statute, Civil Code -- or rather, Civil Procedure Code 361.

8              This is a statute that says when a cause of action

9    arises in a foreign jurisdiction, and it's time-barred in

11:16 10    that jurisdiction, that it can't be pursued in California

11    because California would borrow the statute of limitations

12    from the foreign jurisdiction.

13              There is an exception in the statute for citizens

14    of California.  So this is an argument that applies only to

11:16 15    Mattel de Mexico, which is a plaintiff or, I guess, a

16    counterclaimant in this case.

17              The -- the application of the statute is -- is

18    clear on its face.  There's really nothing that needs to be

19    proven other than that the Mexico statute of limitations is

11:16 20    two years, which we've established, and I believe is

21    undisputed, and that Mattel was aware or at least suspected

22    the misappropriation of trade secrets more than two years

23    before they filed suit.

24              The -- the relevant dates there are Mattel --

11:17 25    Mattel de Mexico didn't actually join -- join this case

CV 04-9049 DOC - 04/02/2011 - Volume 1 of 1

1    until, I think it was March or April of 2010, so they're

2    very, very late, regardless.  But even assuming that their

3    joinder in this case in 2010 relates back to the first time

4    that anybody asserted a claim against Mr. Machado, the date

11:17  5    the parties have been using is November 20th, 2006, because

6    that's the day that Mattel filed for leave to amend its

7    answer to add the claims against Mr. Machado.

8        So if you go with November 20th, 2006, you back up

9    two years, you get November 20, 2004, of course.

11:18  10       The evidence is undisputed that Mr. Eckert --

11   through Mr. Eckert and through Mr. Deanda that Mattel

12   suspected Mr. Machado and the others of taking proprietary

13   information from Mattel on April 19th or 20th of 2004.

14   That's the date they opened the title, the investigative

11:18  15   file, where they called Mr. Machado a "suspect" and

16   Mr. Vargas a suspect, and Ms. Truebas a suspect, and the

17   heading in the file is "proprietary information."

18       If that wasn't clear enough, Mr. Deanda said, we

19   suspected they took proprietary information on the date we

11:18  20   opened this file, which is either April 19th or 20th, 2004.

21       April 19th is the day that Mr. Machado left Mattel

22   Servicios -- his employment there -- so it's also the day

23   that the cause of action would accrue under Mexico law,

24   because Mexico doesn't have a discovery period.

11:19  25       So the cause of action accrued, if you use

1    California accrual laws, on April 19th or 20th.  It accrued

2    under Mexico law, if you use Mexico's accrual laws, on April

3    19th, the date of the wrongdoing.

4            That's more than several months before November

11:19 5   2004, which is our cutoff date, which is why it's untimely.

6            There's other evidence cited in the papers which

7    shows that they knew about file copying and they knew that

8    Mr. Machado was going to MGA no later than May or July of

9    2004.

11:19 10         We can use any one of these dates and it's still

11   untimely under Mexico's two-year statute.

12           So if we import the Mexico two-year statute or we

13   borrow it through Section 361, then Mattel de Mexico's claims

14   are untimely, and that's really the sum total of the 361

11:20 15  argument.

16           We don't need to show anything else.

17           THE COURT:  Okay.

18           MR. COTE:  Now, Mattel's response to this is to

19   say, well, 361 requires that the cause of action arise in

11:20 20  Mexico, and it's their position that it really arose in

21   California, and they offer a variety of reasons for that.

22           And I want to go through those, if I could.

23           THE COURT:  Uh-huh.

24           MR. COTE:  First they say Mr. Machado accessed

11:20 25  Mattel's systems in El Segundo, California, to get documents;

1    and this is the same point the court was just asking about.

2            There is no evidence to support that assertion.

3            THE COURT:  Well, how -- how did they get it, then?

4            MR. COTE:  Well, the evidence shows that documents

11:20 5    made in the United States were e-mailed, or sent otherwise,

6    to Mexico all the time.  That's what the evidence shows.

7            For example --

8            THE COURT:  I thought there was testimony about

9    there being separate -- if you will, separate systems that

11:21 10    required access.

11           MR. COTE:  Well, let's look at the testimony.

12           Ms. Nordquist testified about this Exhibit 7104,

13    which we call in our papers the "preliminary line list";

14    that's the title on the top of the document.

11:21 15           THE COURT:  Right.

16           MR. COTE:  And she says it was kept in the

17    United States.  But she also said -- she admitted it was sent

18    to Ms. Truebas so that she could select the line.  Mattel

19    makes lots and lots of Barbie dolls every year, but Mattel in

11:21 20    Mexico doesn't sell all of them.  Someone has to pick which

21    ones to sell and which ones not to sell, and Ms. Truebas used

22    a line list to make that decision.

23           THE COURT:  Okay.

24           MR. COTE:  Once it's e-mailed to her in Mexico, she

11:21 25    has it in Mexico.

1          And here's -- let me give one more example, and

2     then I want to point to some testimony.

3          She testified about Exhibit 7110, which is

4     customized guidelines that all of Mattel's foreign

11:21  5     subsidiaries -- and, I guess, domestic too -- have to follow

6     if they are going to offer a customized product, meaning

7     exclusive for a particular retailer.

8          The evidence shows that this document, even though

9     Ms. Nordquist claimed was kept only in US servers, was

11:22 10     actually e-mailed to Ms. Truebas and 40 or 50 other people

11     throughout the world so that they could all use it in their

12     various international subsidiaries; and that e-mail is

13     Exhibit 8864.

14          And I asked Ms. Nordquist about that.  I said

11:22 15     after -- I showed her Exhibit 8864 and I asked her, "So they

16     didn't need to log into or access the US system to get this

17     information; right?"

18          And I'm -- I'm -- this is Day 31, Volume 1, Page 27

19     of the daily transcript, Your Honor.

11:22 20          And her answer was:  "The document was only stored

21     in the Mattel network, which is based in the US, so the only

22     way they could have" -- and then she paused -- "they could

23     not have logged into the US to get them."

24          So I followed up.

11:23 25          "And the reason why this e-mail -- this e-mail was

1    sent with the attachment was because those e-mails couldn't

2    get to the US to get a copy of it; right?

3              It was sent -- (Reading.)

4              "Answer:  It was sent with a copy.

11:23  5              "Question:  Right, because they couldn't log into

6    the US system and get it there; right?

7              "Answer:  That's what it appears to be.

8              "Question:  Does it appear to be anything else?

9              "Answer:  No."

11:23  10              Now, Ms. Nordquist is not the only one to have

11   testified in this regard.

12              Mr. Deanda said that Mattel employees can only get

13   access to information on Mattel servers if they are

14   authorized to do so by Mattel and they need the information

11:23  15   to do their job.

16              Mr. Machado's sole job was marketing toys in

17   Mexico -- boys' toys in Mexico.

18              THE COURT:  Regardless of his job, why am I to

19   assume that he couldn't get access?

11:24  20              MR. COTE:  Because Mr. Deanda testified that they

21   have strict security measures to prevent people from getting

22   access to things they don't need for their job.

23              Mr. Machado marketed boys' toys in Mexico;

24   Ms. Truebas marketed girls' toys in Mexico; Mr. Vargas was a

11:24  25   salesperson in Mexico.  They didn't have

 1    any US responsibility.

 2              THE COURT:  Okay.

 3              MR. COTE:  So if they got a document, it's because

 4    they needed it to do their job in Mexico.

11:24 5              Ms. Nordquist -- I'm sorry.  Ms. Willensky

 6    testified about the Mexico viability report, which is another

 7    document cited by Mattel in its papers; and that's

 8    Exhibit 6739.

 9              She testified that that document was sent to folks

11:25 10   in Mexico.

 11             We don't even need her testimony because it has a

 12   distribution cover memo on the front page, and it shows that

 13   it went to Mr. Zalzman, who was head of Mexico, and

 14   Mr. Ibarra, who was Mr. Machado's and Ms. Truebas's boss in

11:25 15  Mexico.

 16             So, again, another document that may have been

 17   created in the United States but was sent to Mexico.

 18             Mr. Machado testified that he never accessed

 19   anything outside of Mexico, he only got information from

11:25 20  internal Mattel Servicios' systems and what was on his

 21   hard drives, and all the evidence that Mattel offers to the

 22   contrary just shows that maybe Ms. Truebas got documents from

 23   her inbox, but that's also in Mexico, so there's no evidence

 24   of this international access.

11:25 25             THE COURT:  Okay.

1          MR. COTE:  The second reason why Mattel thinks that

2     the cause of action arose in California for purposes of the

3     borrowing statute is that the copying of documents was

4     induced by Mr. Larian, and he lives in California.

11:26 5          THE COURT:  Uh-huh.

6          MR. COTE:  Well, there's no evidence of that

7     inducement.  All the evidence by everyone who attended the

8     meetings was that Larian said "I only want your brain," and

9     Mr. Machado explicitly said that neither Mr. Larian,

11:26 10    Ms. Kuemmerle, or Mr. Park ever asked him or hinted to him or

11    suggested that he take documents from Mattel.  There's just

12    no evidence of inducement.

13          But let's assume that the jury were -- were to find

14    inducement, the inducement took place in either New York or

11:26 15    Mexico city.  New York Toy Fair in February of 2004 --

16          THE COURT:  Now there's where I want to stop for

17    just a moment.

18          MR. COTE:  Uh-huh.

19          THE COURT:  I want to break in.

11:26 20          My colleague, Judge Lourdes Baird, wrote an

21    opinion -- and I'll give it to you in a moment -- where the

22    trade secret misappropriation moved to New Jersey, I believe.

23    The person moved to California a short time later and she

24    found the choice of law to be California.

11:27 25          I'll get that case for you.

1    I've struggled with the time period, which is why I

2    started our discussion with "how long."

3        That was almost an immediate move.

4        MR. COTE:  Uh-huh.

11:27 5    THE COURT:  Here it could be argued that I have an

6    analogous situation because Mr. Machado is moving back within

7    seven to eight months to the United States and accepting a

8    position at MGA, and the difference in the two may simply be

9    the time period involved.

11:27 10    Now, trade secret misappropriation has a whole

11    series of issues involved, but I'll let you continue and I'll

12    get the case for you.

13        (Discussion held off the record.)

14        THE COURT:  In fact, why don't I just get the case

11:28 15    for you now.

16        MR. COTE:  Oh, thank you.

17        THE COURT:  It's what my colleague had to say about

18    it, and each of you can argue.

19        (Pause in the proceedings.)

11:30 20    THE COURT:  The case comes from my colleague,

21    Lourdes Baird.  Of course, one district court is not bound by

22    another, but the reasoning process might be of interest.  And

23    it's not arguable points but, again, I expect, Mr. Cote, one

24    of your arguments to be, frankly, that because Mattel brought

11:31 25    prosecution in Mexico and it's an ongoing prosecution, the

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 32 of 158   Page ID #:315451
CV 04-9049 DOC - 04/02/2011   Volume 1 of 1

32

```
 1   choice of law, in the long run, is held within the hands of
 2   Mattel.
 3          And in a sense that potentially is a strong
 4   argument.
11:31 5         MR. COTE:  Uh-huh.
 6          THE COURT:  I'll repeat that.
 7          Counsel aren't here -- well, not only --
 8          I have Mr. Price here, but Mr. Zeller's not here
 9   and Mr. Quinn's not here.
11:31 10        MR. PRICE:  I --
11          THE COURT:  But he'll be right back; they must have
12   just stepped out.
13          MR. PRICE:  I've been told they're visiting the
14   facilities.
11:31 15        THE COURT:  They're here?
16          MR. PRICE:  They're visiting the facilities or the
17   bathroom.
18          (Pause in the proceedings.)
19          (Discussion held off the record.)
11:32 20        THE COURT:  All right.  Mr. Zeller's back.  We'll
21   wait for Mr. Quinn and I'll repeat all this.
22          MR. ZELLER:  I think we'll be fine not waiting for
23   John.
24          THE COURT:  No, no, we'll wait for him.
11:32 25        If I only had one counsel arguing, but
```

UNITED STATES DISTRICT COURT

```
 1              I've got two.

 2                      (Pause in the proceedings.)

 3                      THE COURT:  We're back on the record.

 4                      The court's distributed Globespan versus O'Neill.

11:33  5     It comes from my colleague, Lourdes Baird, in the

 6     Central District of California.  Of course, it's not

 7     precedent, but it was the case I was referring to simply for

 8     the reasoning process.

 9                      And I go back and restate that I understand,

11:33 10     Mr. Cote, eventually your strongest argument may be that in a

11     choice-of-law situation which Mattel brings a prosecution in

12     Mexico under this fact situation and the prosecution is

13     ongoing, that the choice of law should eventually, obviously

14     flow to Mexico, from your perspective.

11:34 15                 So -- but I wanted you to absorb Globespan for a

16     moment, so let me stop, and, in fact, I'll --

17                      MR. OVERLAND:  I think we have a short answer to

18     this case.

19                      THE COURT:  Okay.  So, Mr. Cote, why don't you

11:34 20     continue on at your convenience.

21                      (Discussion held off the record.)

22                      THE COURT:  I'll be right back.

23                      (Recess taken.)

24                      THE COURT:  Okay.  You guys ready?

11:36 25                 MR. COTE:  We can keep going, Your Honor.
```

```
 1              Let's keep going, please.
 2              THE COURT:  Okay.  Then we're back on the record.
 3              Counsel's had time to read the case.
 4              Mr. Cote, continue.
11:36  5        MR. COTE:  I want to respond to the Globespan case
 6    before I forget.
 7              THE COURT:  Uh-huh.
 8              MR. COTE:  There are -- we're talking about two
 9    different types of choice of law here.  There's the borrowing
11:36 10   statute and there's the government-interest test, sort of the
11    standard choice of law analysis.
12              When you're talking about the borrowing statute,
13    the question is:  Where did the contract arise?  And when you
14    talk about the choice of law, the government-interest test,
11:36 15   the question is:  Where did the conduct take place?
16              And that's where we're going to get to when we talk
17    about the McCann case, M-c-C-a-n-n.
18              As to where the cause of action arose, remember the
19    cause of action is misappropriation of trade secrets, and
11:37 20   you've only misappropriated trade secrets if you acquire them
21    unlawfully.
22              The unlawful acquisition took place only in Mexico,
23    regardless of where Mr. Machado lived later.  It doesn't
24    change the -- the location of where the wrongdoing took
11:37 25   place.
```

1            The same is true under the government-interest test

2       under *McCann*.  The conduct still took place in Mexico.  The

3       fact that he later moved up here to the United States to

4       California doesn't change that analysis.  It just doesn't

11:37  5       seem to be important.

6            The -- the *Globespan* case predates *McCann* and I

7       would -- I would confess that prior to *McCann* this is an area

8       that we could have reasonable disagreement on; but after

9       *McCann* there is no further basis to disagree on this point, I

11:38 10       don't believe.

11            The other thing to note about *McCann* -- and we'll

12       get to this when we're done with the borrowing statute and

13       we're just talking about the government interest test -- is

14       that *McCann* involved a case where the plaintiff, not the

11:38 15       defendant, but where the plaintiff moved after the injury was

16       suffered and after the wrongdoing, the misconduct took place.

17       They moved from California to Oklahoma.

18            A little bit different because it's the plaintiff

19       moving, not the defendant moving; but the California Supreme

11:38 20       Court gave that absolutely no weight whatsoever.  It just

21       didn't matter.

22            It didn't matter that they moved for an innocent

23       reason; it didn't matter that it wasn't a situation of forum

24       shopping; it just didn't matter at all.

11:38 25            What *McCann* focused on was where the

1    conduct took place.

2          I was looking at the case this morning.  They used

3    the word "conduct" 37 times in that opinion.

4          I also just wanted to back up.

11:39 5          Briefly, when I said that Mr. Machado had testified

6    that he never accessed systems in California, I neglected to

7    give you the cites for that.  So I wanted to do that, if I

8    could, please.

9          It was Day 28; Volume 1, Page 53.

11:39 10          THE COURT:  Just a moment.

11          All right.

12          MR. COTE:  And Day 28; Volume 3, Pages 27 to 28.

13    The cite to Page 53 is the -- is the one that Mattel repeats

14    throughout their papers, and the question and answer that

11:39 15    they keep citing to doesn't support the proposition they cite

16    it for.

17          The question was:  (Reading.)

18          "Question:  In fact, you knew that systems that you

19    were accessing and copying documents from were computer

11:39 20    systems located here in the United States; correct?

21          "Answer:  I don't know that."

22          So we talked about the allegation that Mr. Machado

23    accessed computer systems in California.  We talked about the

24    allegation that he was induced by Mr. Larian.

11:40 25          There's no evidence to support either

CV 04-9049 DOC - 04/02/2011 Volume 1 of 1

1  of those propositions.

2          Mattel's next argument is that Mr. Machado

3  corresponded with Mr. Larian while Mr. Larian was in

4  California after Mr. Machado resigned.  This is the so-called

11:40  5  "Rome on fire" e-mail.

6          And they say this somehow influences where the

7  cause of action arose.

8          Well, the cause of action was already done by then.

9  The misconduct was done.  The documents had been taken.

11:40 10  Mr. Machado had resigned.

11          There was nothing left to do to finish the tort.

12          The fact that Mr. Machado wrote to someone in

13  California after the cause of action arose doesn't change

14  where the cause of action arose; it's just irrelevant.

11:41 15          (Discussion held off the record.)

16          MR. COTE:  And Mr. Machado also made it clear in

17  his testimony that the "Rome on fire" e-mail had absolutely

18  nothing to do with taking documents.

19          But even if the jury were to conclude that it did

11:41 20  or the court were to conclude that it did, has nothing to do

21  with where the cause of action arose.

22          And the last point that they make showing that the

23  cause of action arose in California is they say that

24  Ms. Truebas solicited documents from people in California --

11:41 25  and this is the Mexico viability report.  Again, there is an

 1    e-mail from Ms. Truebas to Jill Nordquist in the

 2    United States asking for a viability report.

 3         There's no evidence that she got it; there's no

 4    evidence that it was ever sent to her; there's no evidence

 5    that she ever gave it to Mr. Machado; there's no evidence

 6    that he ever took it; there's no evidence that it was ever

 7    found in MGA's offices, because it not on the CD and it's not

 8    among the paper copies.  It's a complete red herring.

 9         But even if you assume that Ms. Truebas did get it

10    from somebody -- and there's no evidence to show that she

11    did -- but even if you assume that she did, it wouldn't be a

12    tort, it wouldn't be misappropriation because she needed it

13    to do her job.

14         It's only misappropriation if she takes it and does

15    something else with it, or if she doesn't give it back when

16    she quits.

17         If she got it from someone in the United States,

18    she got it because she needed it to do her job, because the

19    Mexico viability report is a study of consumer preferences

20    for Barbie dolls in Mexico, and Ms. Truebas's sole

21    responsibility was selling Barbie dolls in Mexico.  It wasn't

22    misappropriated, even if she did get it from the

23    United States.

24         Misappropriation took place when she quit, if at

25    all.

UNITED STATES DISTRICT COURT

1          So those are the arguments that Mattel raises

2     against the borrowing statute.  None of them are supported by

3     the evidence.  The cause of action, indisputably, arose in

4     Mexico, and because it arose in Mexico we have to apply the

11:43  5     borrowing statute to Mattel de Mexico's claims and therefore

6     Mattel de Mexico should be out of the case on that point.

7          But even if the borrowing statute doesn't apply for

8     some reason, you just go to the regular choice-of-law

9     analysis, which is what I'm -- which was what I think the

11:43  10    court is most interested in, so we're going to talk about

11    that now.

12          THE COURT:  Uh-huh.

13          MR. COTE:  In everything I'm going to say about

14    choice-of-law analysis, the government-interest test applies

11:44  15    to Mattel, Inc., but it applies doubly to Mattel de Mexico to

16    the extent the court ever gets there.

17          And the steps are clear -- the court is aware of

18    them.  The first step is:  Is the law different between the

19    two jurisdictions?

11:44  20          I think everyone agrees that it is:  Two years in

21    Mexico; three years in California.

22          Second is:  Do both jurisdictions have an interest?

23          In our papers we conceded, or we assumed for

24    purposes of discussion, that California has some interest in

11:44  25    this case.  Mattel didn't concede that Mexico has some

 1   interest, so I'm going to address that briefly and then I'll

 2   get to the third step which is really where the meat of the

 3   argument is.

 4          *McCann* makes it very clear -- and let me give the

11:44  5   full cite for *McCann* -- *McCann* is 48 Cal.4th 68.  It's a 2010

 6   Supreme Court case applying choice-of-law analysis to the

 7   statute of limitations.

 8          It is right on point, and under *Irie* the court has

 9   to follow it.

11:45 10          *McCann* says that statutes of limitations are always

11   designed to do the following:  They are "intended to balance

12   the interest of injured persons in having a remedy available

13   for such injuries against the interests of" -- I put in

14   brackets "defendants" -- "in being subject to a specific time

11:45 15   limit during which they would remain potentially liable for

16   their actions."

17          This is a compelling interest for every

18   jurisdiction; to control the conduct within its borders and

19   to make these kinds of decisions.

11:45 20          That's what *McCann* says.

21          So *McCann* says that Mexico would have to have an

22   interest in this case because the conduct occurred within its

23   borders, but it's even stronger within the case because --

24   we're going to get to this ownership question a little bit

11:46 25   later -- the only evidence of who owns these alleged trade

1    secrets is Mr. Machado's employment contract, and that

2    employment contract says every document he gets is the

3    exclusive property of his employer and the "employer" is

4    defined as Servicios, and the Exhibit No. is 6401, and the

11:46  5    provision I'm talking about is on Page 16 of that document,

6    Paragraph 10.

7            So what this really is is a dispute between a

8    Mexico employee and a Mexico employer over the exclusive

9    property of the Mexico employer.

11:46 10           Clearly, Mexico has an interest in regulating that

11   issue and regulating all disputes between employees and

12   employers within its borders.

13           And the last reason why Mexico has an interest, of

14   course, is the one the court already alluded to.

11:46 15           There is a criminal prosecution going on in Mexico

16   arising out of this same conduct.  The arrest of

17   Mr. Machado -- or the criminal prosecution of Mr. Machado

18   that's ongoing today is all you need to show that Mexico has

19   at least some interest.

11:47 20           The raid of the 30 police officers on

21   MGA de Mexico's offices, which was described by Mr. Eckert on

22   the stand, is also evidence that Mexico has an interest.

23           Obviously, police don't go raiding willy-nilly

24   unless the state has an interest in whatever it is they're

11:47 25   raiding.

UNITED STATES DISTRICT COURT

1          So Mexico has an interest and we've conceded that

2     California has some interest, so now we have to go to the

3     comparative analysis.  This is the third step and this is

4     where the real meat is.

11:47  5          But luckily for us we have the *McCann* case, and the

6     *McCann* case lays it out really clearly, and it says that

7     California must yield to the foreign jurisdiction's interest

8     in, "being able to assure individuals and commercial entities

9     operating within its territory" -- "its territory" being

11:48 10    Mexico's territory -- "that applicable limitations on

11    liabilities set forth in the jurisdiction's law will be

12    available to those individuals and businesses in the event

13    they are faced with litigation in the future."

14          That should end the analysis.

11:48 15          *McCann* says, the conduct occurred in the borders of

16    Mexico?  Then Mexico gets to pick the statute of limitations.

17          That's the beginning and the end of the analysis.

18          *McCann* is all about where the conduct took place.

19          Now, Mattel has some arguments, and I want to talk

11:48 20    about those arguments.

21          First they say that California has rejected the

22    location of the wrong as an element of the choice-of-law

23    analysis.  This is what Judge Kozinski calls lex loci, and

24    it's impossible to square that contention with *McCann*.

11:49 25          *McCann* says California choice-of-law cases

1    nonetheless continue to recognize that a jurisdiction

2    ordinarily has the predominant interest in regulating the

3    conduct, the conduct that occurs within its borders.  That's

4    *McCann*, Page 97 to 98.

11:49  5         So Mattel's next argument is that, well, these

6    trade secrets were actually owned by Mattel.

7         Ownership doesn't matter in *McCann*; *McCann* is about

8    conduct.

9         It's *McCann* -- the first sentence in the real meat

11:49 10   of the discussion in *McCann* says the conduct for which

11   Plaintiff contends the defendant should be held liable

12   occurred in Oklahoma in 1957 at a time when Plaintiff was

13   present in Oklahoma and was an Oklahoma resident.

14        Where did the conduct take place?  That's what

11:49 15   *McCann* asks.

16        Judge Kozinski wrote an opinion in 1994, which is

17   cited favorably by *McCann*, Pages 97 and 100, and the opinion

18   is *Arno*, A-r-n-o, v. *Club Med*, 22 F.3d 1464, and in Note 5

19   Judge Kozinski writes, "it's not entirely clear why a state

11:50 20   has a legitimate interest in having one of its residents

21   collect money from the resident of another jurisdiction based

22   on conduct that occurred outside the state's boundaries.

23   When adjudicating disputes, after all, the state may not

24   favor a party just because that party lives within its

11:50 25   boundaries."

UNITED STATES DISTRICT COURT

1          Judge Kozinski is recognizing the same point that

2    *McCann* recognizes, which is, if the conduct occurs elsewhere,

3    that state has the predominant interest.  That's why

4    ownership doesn't matter, because the question is conduct.

11:51  5          But let's assume ownership matters.  As I said

6    before, the only evidence of ownership is that Servicios

7    owned all these documents.  That's Exhibit 6401.

8          There's no contrary evidence on that point.

9          One of the things the court must do on this third

11:51 10   step of the analysis is compare the relative importance of

11   the two statutes, and Mattel says California statute's

12   really, really important and Machado hasn't shown otherwise.

13          That's not true.

14          The three-year period was adopted as part of the

11:51 15   Uniform Trade Secrets Act.  It was adopted wholesale; it was

16   adopted nearly verbatim, as the cases we cite point out.

17          There is no commentary, no legislative notes that

18   explain why three years is better than some other year.

19          And, in fact, before the passage of the Uniform

11:52 20   Trade Secret Act, California applied either a two- or a

21   four-year statute depending on whether the trade secret claim

22   arose out of an oral or a written contract.

23          They applied two years before.  Clearly, two years

24   is not terribly offensive to California's interests, so the

11:52 25   idea that California is really, really opposed to two years

UNITED STATES DISTRICT COURT

 1    and it's a strong policy of the state, is unsupported by the

 2    history.

 3            And, finally, Mattel says that California's

 4    interests would be strongly impaired.  We already showed

11:52  5    their interest is pretty -- pretty weak, but here's what

 6    *McCann* says about California's interest; and this is Page 99

 7    of *McCann*:  "Certainly, if the law of the state is not

 8    applied here, California will not be able to extend its

 9    liberal statute of limitations for" -- I put in brackets

11:53 10    "injuries that occurred wholly outside of California."

11            "Nonetheless, our past choice of law decisions

12    teach that California's interests in applying its laws to a

13    potential plaintiff in a case in which the defendant's

14    allegedly tortious conduct occurred in another state is less

11:53 15    than its interest when the defendant's conduct occurred in

16    California."

17            And -- and I won't read you the other quote, but

18    the *McCann* court goes on to say when the conduct occurs in

19    another jurisdiction, that jurisdiction has the interest in

11:53 20    setting the statute of limitations.

21            And the impairment in this case would be slight,

22    if, in fact, there is any.  Mattel, Inc., is a United States

23    company, admittedly a California company -- admittedly --

24    which is why California has some slight interest here; but

11:53 25    it's doing -- it's doing business in Mexico.  It's hiring

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 46 of 158   Page ID #:315465
CV 04-9049 DOC - 04/02/2011   Volume 1 of 1

46

1    Mexican employees.  It's operating through several layers of

2    Mexico subsidiaries, companies organized under the laws of

3    Mexico.

4          And it's those subsidiaries that own all the

11:54 5   property that's at issue in this case, not Mattel, Inc.

6          On these facts it's reasonable to conclude, *McCann*

7    said, that Mattel, Inc., should not expect to subject the

8    defendant to a financial hazard that, in this case, Mexico

9    law had not created, and that's exactly what they're trying

11:54 10  to do here.  That's *McCann* at 99.

11         But there's unique facts in this case that make

12   that conclusion even stronger here, because *McCann*, remember,

13   was an asbestos injury.  The poor gentleman had inhaled

14   asbestos and 50 years earlier he had moved to California, and

11:54 15  he discovered his cause of action 50 years after his

16   exposure.  He brought his cause of action within the one-year

17   statute for personal injury; he thought he was golden, and he

18   died, actually, before the case even went to the Supreme

19   Court.  Tragic facts, nothing at all that was his fault,

11:55 20  nothing that he could have possibly done to bring his claim

21   timely because he didn't know about it.  He couldn't have

22   known about it before the statute ran.  It was a real equity

23   situation, but still the California Supreme Court said that

24   you have to apply the foreign jurisdiction choice of law --

11:55 25  or foreign jurisdiction statute of limitations -- excuse me.

1          In this case the equities tip far in the other

2     direction.  Mattel could have brought a timely claim here,

3     and this is perhaps a fact that may be unique among all the

4     choice of law and statute of limitation cases that we're

11:55 5     talking about.

6          In *McCann* they couldn't have brought a claim under

7     the law.

8          THE COURT:  When you say "here" you mean in

9     California?

11:55 10          MR. COTE:  I mean in this situation, and let me

11     get -- let me answer your question directly.

12          Mattel filed a criminal case in Mexico in April of

13     2005.

14          THE COURT:  Just a moment.

11:56 15          (Pause in the proceedings.)

16          THE COURT:  Okay.

17          MR. COTE:  They brought the criminal case in April

18     of 2005.  They could have brought a civil case at that time.

19          THE COURT:  In?

11:56 20          MR. COTE:  April of 2005.

21          THE COURT:  Where?

22          MR. COTE:  They could have brought it in Mexico.

23     They could have brought it here, if they thought they had

24     jurisdiction.  They could have brought it in federal court.

11:56 25     They could have brought it in state court.

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 48 of 158   Page ID #:315467
CV 04-9049 DOC - 04/02/2011 - Volume 1 of 1

48

1              THE COURT:  Okay.

2              MR. COTE:  That's three forums they could have

3    taken advantage of just in April of 2005.

4              The search took place in October of 2005.  They

11:56  5    could have brought a timely claim then under Mexican law in

6    any of those jurisdictions that we just spoke about.

7              They elected not to bring a civil suit at that

8    time.  They only brought a criminal suit.  I don't know why.

9    I wish I did.  They've never explained why.

11:57 10             But when you're balancing California's interest and

11   Mexico's interest in this case, California has absolutely no

12   interest in protecting Mattel from its election to pursue a

13   criminal remedy and not pursue a civil remedy at the same

14   time, which they could have done.

11:57 15             THE COURT:  Just a moment.

16             (Pause in the proceedings.)

17             THE COURT:  Just a moment.

18             (Pause in the proceedings.)

19             THE COURT:  Okay.  Now, just a moment.

11:58 20             (Pause in the proceedings.)

21             THE COURT:  Given that that's a strong argument on

22   behalf of MGA, hypothetically, if Mattel would have brought a

23   civil cause of action in the United States in either April or

24   October of 2005, with the pending criminal action in Mexico

11:59 25   in 2005, what would my choice of law be?

 1              MR. COTE:  I don't know why the analysis would be

 2     different.  I think it would still be Mexico.

 3              THE COURT:  Okay.  Now, when did Mattel bring their

 4     RICO claim?

11:59 5          MR. COTE:  I think it was part of the second

 6     amended answer, and I think that was November 20th, '06.

 7              THE COURT:  Okay.  Okay.

 8              If Mattel brought their RICO claim on

 9     November 20th, '06, and it encompasses Machado's conduct, why

12:00 10   doesn't that, in a sense, since it's within the statute of

 11    limitation's period, give rise -- or give rise to at least

 12    Mattel not electing an election?

 13              In other words, let me say it a different way

 14    because that's inarticulate.

12:00 15          Your strong argument is Mattel never brings any

 16    kind of action in the United States.  They pursue Machado in

 17    Mexico.  Judge, they made their election, and because it's

 18    even ongoing it's a stronger argument for MGA, but I -- if I

 19    was sitting in Mattel's position my counterargument would be,

12:01 20   you know, Judge, we did.  We didn't bring a civil action.

 21    What we did is we relied upon a RICO filing and that shows

 22    our intent and our belief that we always were going to pursue

 23    Machado in the United States and that you shouldn't limit MGA

 24    to argue that we made a "election," because if you really

12:01 25   want to see our election on behalf of Mattel, it was always

CV 04-9049 DOC - 04/02/2011 - Volume 1 of 1

```
 1    premature and we filed within our statutory time on RICO.

 2              Now, what are you going to do with that?

 3              Can I have just a minute?

 4              Yeah; why don't you take some time on that, because

 5    what it does is it weakens your election argument.

 6              Now, I'm going to take just a moment.

 7              Now I'm just tossing out some ideas.  Not that I

 8    believe any of these for either side; I'm just going to play

 9    with this for a while.

10              I'll be right back.

11              (Recess taken.)

12              THE COURT:  All right.

13              Your response on behalf of MGA -- strike that -- on

14    behalf of Mr. Machado.

15              MR. COTE:  Thank you, Your Honor.

16              Every cause of action has its own statute of

17    limitations.

18              THE COURT:  Right.

19              MR. COTE:  And the intent --

20              THE COURT:  And RICO has a four-year.

21              MR. COTE:  It does; and RICO may have been timely.

22              THE COURT:  Let's concede that RICO's timely.  That

23    doesn't show a complete election on Mattel's part.

24              MR. COTE:  The election concerns this cause of

25    action.  They elected when they knew all the facts they
```

Timestamps: 12:02 (line 5), 12:02 (line 10), 12:05 (line 15), 12:05 (line 20), 12:05 (line 25)

UNITED STATES DISTRICT COURT

 1    needed to know to bring the claim.  They knew all the facts

 2    in April of -- I would say -- 2004.

 3               THE COURT:  So let me repeat back to you so that

 4    you know I'm tracking this argument, and if I'm not you're

12:05  5    going to correct me.

 6               MR. COTE:  Uh-huh.

 7               THE COURT:  Judge, the RICO doesn't matter; it's

 8    the trade secret misappropriation.

 9               MR. COTE:  That's right.

12:06 10              THE COURT:  And if they were going to file, they

 11    should have filed a like cause of action in the

 12    United States.

 13               As simple as that.

 14               MR. COTE:  They -- if they wanted to bring a trade

12:06 15    secret case, they needed to bring the trade secret claim in a

 16    timely fashion and then they could have added whatever else

 17    it was they came up with later, then you would have a

 18    relation-back question.

 19               THE COURT:  Uh-huh.

12:06 20              MR. COTE:  And let's remember that the RICO claim

 21    was dismissed on its merits, so it doesn't -- the fact that

 22    they later came up with a theory that was timely but

 23    meritless doesn't let them back-door in a trade secret claim

 24    that's untimely.

12:06 25              THE COURT:  Okay.

UNITED STATES DISTRICT COURT

1          MR. COTE:  If you apply the Mexican law.

2          THE COURT:  Someone anticipated that answer, but --

3          MR. COTE:  What they should have done is filed a

4     trade secret claim if it was timely and then later added a

12:06  5     RICO claim.

6          THE COURT:  You see what I'm doing.  I'm playing

7     with each argument on each side.  That's what I do on my

8     nights and weekends.

9          So I'm raising an argument that I would expect

12:06 10     Mattel to raise and if they haven't, maybe they'll raise it,

11     but I'm trying also to see what your argument might be in

12     response and I somewhat expected the apples-to-oranges and

13     oranges-to-oranges argument.

14          What else do you have to say before I turn to

12:07 15     Mattel?

16          MR. COTE:  One more point, Your Honor, and I want

17     to address the point that they raise in their papers, and it

18     actually gave me some pause at first.  And this is the notion

19     that there was a stay and that they couldn't file the claims

12:07 20     because there was a stay.

21          I have just four or five points to make on this.

22     They will be brief, Your Honor.

23          First, there was no actual "stay" preventing the

24     filing of the claims against Mr. Machado.

12:07 25          I have Judge Manella's orders here.  I have copies

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 04/02/2011    Volume 1 of 1

```
 1    of it, if the court would like to read it.

 2              THE COURT:  I would eventually like copies of that.

 3              MR. COTE:  Do you want it now or do you want it

 4    later?

12:07  5              THE COURT:  Later.  I want to listen now and then

 6    I'll read it later.

 7              MR. COTE:  Here's what the reading says:  "Now that

 8    the Ninth Circuit has granted Mattel's permission" -- or

 9    "petition for permission to file an interlocutory appeal, all

12:08 10    discovery in these actions is stayed pending the

11    determination of the appeal."

12              The stay of --

13              THE COURT:  No, no, just a moment.

14              MR. COTE:  Yes.

12:08 15              THE COURT:  I had always operated under the

16    assumption that this was a complete stay.  This is simply a

17    stay of discovery?

18              MR. COTE:  It says it right here.  This next

19    sentence:  "The stay of discovery also applies to pending and

12:08 20    prospective discovery motions."

21              So you've got a stay of discovery and you've got a

22    stay of discovery motions.  You do not have a stay on filing

23    pleadings.

24              THE COURT:  Uh-huh.

12:08 25              MR. COTE:  And the way I know that that's true is
```

UNITED STATES DISTRICT COURT

1    because Mattel filed an answer in September 2005.

2         THE COURT:  Just a moment.  I had forgotten that.

3    Just a minute.  Just a minute.

4         So Mattel filed an answer in September 2005, which

12:09 5    I recall, which is during the time of the alleged argument

6    that there was a stay.

7         MR. COTE:  That's right, and I have a copy of that

8    too.

9         THE COURT:  And, now, I'd like to see both of those

12:09 10    documents eventually.

11        MR. COTE:  I've got them here, Your Honor.

12        THE COURT:  Okay.  All right.

13        MR. COTE:  I have a couple more points on the stay,

14    but I want to give you a chance to look at those, Your Honor.

12:09 15        THE COURT:  Okay.  I will.

16        MR. COTE:  Go ahead?  Okay.  Thank you.

17        And I just want to remind the court, procedurally,

18    how Mr. Machado got into this case.

19        He was added as a counterdefendant because Mattel

12:09 20    added a counterclaim to its answer in this case.  There is no

21    reason they couldn't have added those counterclaims to the

22    answer that they actually filed during the so-called "stay."

23        THE COURT:  Now, just a moment.

24        What date was Machado added, just to refresh my

12:10 25    recollection?

1        MR. COTE:  They -- they -- they made the Rule 15

2   motion to add him on November 20th, 2006, so that's the date

3   we've been using.

4        THE COURT:  Okay.  Okay.

12:10  5        MR. COTE:  Now, there -- so there was no stay.

6   It's just -- it's just not true.

7        But even if there was a stay -- and the

8   Ninth Circuit is clear -- that Mexico law would govern what

9   that means, and here's why.

12:10 10        As a case called *Hatfield v. Halifax*, 564 F.3d 117,

11   Ninth Circuit, 2009:  "When a foreign jurisdiction's

12   limitations' period is found to apply, that jurisdiction's

13   tolling laws will also apply."

14        There is no evidence that Mexico would have tolled

12:11 15   this case because of an interlocutory appeal that didn't even

16   result in a stay under California or federal law in the first

17   place.

18        And the court, I'm sure, is aware that an

19   interlocutory appeal doesn't automatically stay a case.

12:11 20   You've got to get permission from the district court, which I

21   assume someone did because Ms. -- Judge Manella stayed

22   discovery, but she didn't stay the rest of the case.

23        But the statute for the interlocutory appeal is

24   28 USC 1292, Subsection (b) as in a "boy."

12:11 25        THE COURT:  Okay.

1          MR. COTE:  And the last point on this, Your Honor,

2   even if you assume there is a stay, and even if you assume

3   that Mattel couldn't file this case in this court, given

4   those two points, there is no reason they couldn't have filed

12:12  5   a civil case in Mexico.

6          There is no reason they couldn't file a civil case

7   in California state court.

8          We know they know how to do this because as soon as

9   the court ruled on the *Omni* 808 issue, where did they go?

12:12  10          THE COURT:  State court in Los Angeles.

11          MR. COTE:  That's right.

12          THE COURT:  So my footnote didn't do too much good,

13   did it?

14          That's fine.

12:12  15          MR. COTE:  Your Honor, the statute of limitations,

16   I think, is the most important argument, and I was going to

17   leave it there unless the court had more questions.

18          THE COURT:  Well, I will have, but I want to turn

19   to Mattel first.

12:13  20          MS. HURST:  Yes; MGA de Mexico joins in all of that

21   lovely argument by Mr. Cote.

22          THE COURT:  Now, do you want to recess, Mr. Zeller?

23          MR. ZELLER:  No.

24          THE COURT:  Are you ready to go?

12:13  25          MR. ZELLER:  I am.

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 57 of 158   Page ID #:315476
CV 04-9049 DOC - 04/02/2011   Volume 1 of 1

57

```
 1            THE COURT:  Okay.  This is Mattel, Mr. Zeller.
 2            If at any time you want to take a break, tell me.
 3            MR. ZELLER:  I'll follow the court's lead and start
 4       at the beginning.
12:13 5            As the court has noted, this arose because there
 6       was initially a conversation between Mr. Larian -- or
 7       communications, I should say, between Mr. Larian and
 8       Mr. Machado here in the United States at New York Toy Fair.
 9       Significantly, throughout all of this, Mr. Larian is a
12:13 10      California resident, he is the head of a California
11       corporation.  MGA is a California corporation operating
12       principally out of Southern California.
13            And when I talk about these actions of
14       coordination, Mr. Machado is principally coordinating with
12:13 15      other California -- with California residents, including
16       Mr. Larian and others at MGA, and ultimately those are --
17       those are the individuals and the entity that he's ultimately
18       looking to benefit, in many respects, from his actions.
19            Mr. Machado, while one could, of course, get into
12:14 20      the back and forth about issues about Mattel Servicios and
21       the like, even apart from that, that debate, the fact is that
22       Mr. Machado admitted from the stand that he knew he had
23       obligations to Mattel, Inc., the parent.
24            In other words, he was aware that he had at least
12:14 25      some obligations that were not simply Mexico-centric, but,
```

 1    rather, he had a conflict-of-interest questionnaire and he

 2    had other obligations, no matter how one wants to parse them,

 3    but he, generally, he knew he had obligations to the parent

 4    company, Mattel, Inc., here in the United States, and he also

12:15  5    acknowledged from the stand that his duties had him doing

 6    work for the benefit of Mattel, Inc., the parent, as well.

 7           So there's already a substantial nexus even prior

 8    to the time when -- when the conduct in -- in question

 9    apparently begins.

12:15 10           Then once he is -- he has, of course, the meetings

11    with Mr. Larian and Mr. Park, both California residents

12    acting for a California company in Mexico.  On the day after

13    is when he and Ms. Truebas begin acting in concert, as he

14    also -- as Mr. Machado also testified to, to misappropriate

12:15 15    documents of Mattel in California and they do this by

16    communicating with Mattel employees here in California.

17           An example of that is Exhibit 8864.  This is the

18    e-mail with Jill Nordquist in which Ms. Truebas is -- is

19    asking for information.

12:16 20           Now, I -- I recognize that in the course of his

21    argument for Mr. Machado, Mr. Cote has made a number of

22    assertions about there's no evidence of this, there's no

23    evidence that -- that the particular document was taken,

24    including such matters as the viability report, but I think,

12:16 25    globally, it's fair to say that the jury can make a

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 59 of 158   Page ID #:315478
CV 04-9049 DOC - 04/02/2011 Volume 1 of 1

59

1      determination, including by rejecting Mr. Machado's

2      assertions, and that there is ample evidence -- and I'll talk

3      about that probably in more detail in a moment -- but there's

4      ample evidence for a jury to draw the inference that promptly

12:16 5      after the meeting with Mr. Larian and the others at the

6      W Hotel, and Ms. Truebas, who, again, Mr. Machado

7      recognized -- admitted that they were working together to

8      collect documents so they could download them and take them,

9      starts contacting people in the United States and asking for

12:17 10      those documents, and in that particular one was the

11      customized program, and, in fact, it's -- it's reflected --

12      or, actually, I may have to correct that.  If you would bear

13      with me for a moment.

14           (Pause in the proceedings.)

12:17 15           MR. ZELLER:  Yes, this is the e-mail from

16      Mariana Trueba to Jorge Machado dated April 15th, 2004, and

17      it's forwarding the -- the fall 2004 Barbie customized

18      product and policies.

19           And this is the one, when Mr. Machado was shown

12:18 20      this, that this is part of his coordinated activity with

21      Ms. Truebas to obtain documents, and this particular document

22      came from the US and Ms. Nordquist testified that this was on

23      US servers as well.

24           THE COURT:  All right.

12:18 25           MR. ZELLER:  Mr. Cote has argued, with respect to

 1   these computer systems -- and then there certainly was ample

 2   evidence that the documents, key documents here, such as the

 3   Barbie line list, the viability report, the customized fall

 4   guidelines, all were resident on US computers.

12:18 5          And -- and Mr. Cote relies on testimony by

 6   Jill Nordquist and -- and Rich Deanda, which talked about the

 7   fact that only those who are authorized could gain access to

 8   the US system.  But in many respects all Mr. Machado's

 9   argument is, is -- it's really a jury argument -- but in many

12:19 10   respects it just simply tries to turn the fact that Mattel

 11   took reasonable steps to protect its trade secrets on its

 12   head, to suggest that, well, he couldn't have possibly have

 13   done this.

 14          But Mr. Machado, himself, acknowledged that he did.

12:19 15          And I think this is important because also Mr. Cote

 16   read only a portion of what it is that Mr. Machado said in --

 17   in part of his testimony here.

 18          And this is Pages 53 -- Line 7 -- to 54, Line 17 of

 19   the March 4th, 2011, transcript, and it's -- it's Volume 1 of

12:20 20   4, Day 28, of the trial.  (Reading.)

 21          "Question:  You took market research reports that

 22   had been prepared by Mattel here in California; correct?

 23          "Answer:  I'm not sure about that.

 24          "Question:  You took documents that you knew came

12:20 25   from Mattel here in California; correct?

1              "Answer:  Yes, I copied some files.  Yes.

2              "Question:  In fact, you knew that systems that you

3    were accessing and copying documents from were computer

4    systems located here in the United States; correct?

12:20 5              "Answer:  I don't know about that.

6              "Question:  Well, you knew that the parent of

7    Mattel Mexico was here in California?

8              "Answer:  Yes.

9              "Question:  You had been here from time to time on

12:20 10   Mattel business; right?

11             "Answer:  Right.

12             "Question:  You knew that Mattel headquarters are

13   here in Southern California; right?

14             "Answer:  Right.

12:20 15             "Question:  You understood that the centralized

16   computer systems of Mattel are here in the United States?"

17             And there's an objection.

18             "Question:  California and Arizona; right?"

19             There's another objection; it's overruled.

12:21 20             And the witness says:

21             "Answer:  I know now.

22             "Question:  Well, you didn't think that Mattel,

23   Inc., the parent here in California had all of its computers

24   with the systems with these documents on them there in

12:21 25   Mexico, did you?"

1           There's another objection; it's overruled.

2           The witness:  (Reading.)

3           "Answer:  I didn't think that."

4           So the information, the jury is free to conclude

12:21  5    from that testimony that, No. 1, despite its broader

6    denial -- at least partial, I should say -- that, in fact,

7    Mr. Machado was fully aware that, in fact, he was accessing

8    and deliberately accessing systems here in the United States.

9           That's just simply a jury issue and that is an

12:21 10   issue that the jury is certainly free to draw its own

11   conclusions about.

12          The testimony that is relied upon such as Jill

13   Nordquist and Rich Deanda, doesn't do battle at all with that

14   testimony by Mr. Machado.

12:22 15          It's simply pointing out that, yes, Mattel has

16   restricted systems, he should not have been on those systems.

17          His testimony, either explicitly but certainly can

18   be inferred by the jury, recognizes that he, in fact, got

19   onto those systems and took those documents, among the

12:22 20   various ways in which these documents were taken.

21          I mean, I -- I don't think it -- it's a surprise

22   that trade secret cases, in particular, you know, readily can

23   be shown by direct evidence for each and every element.

24          Juries are free to infer from the circumstances the

12:22 25   totality of the circumstances that there was, in fact,

```
 1    willful misappropriation here, based upon that, and, in fact,
 2    it was directed toward the United States.
 3         Some of the other US-related information and
 4    documents that were taken includes 6739, which is the Barbie
 5    viability report, and that document is, in fact, a blueprint
 6    or a -- a playbook for Mattel's operations in the
 7    United States and worldwide its entire product line, well
 8    over a year in advance.
 9         And Mr. Cote cited some testimony from
10    Jill Nordquist in which he argued from that that the -- that
11    the -- that the line list was routinely sent to people in
12    Mexico and, therefore, no inference could be drawn that it
13    was actually taken from the United States or a United States
14    server.  But, in fact, that's not what Jill Nordquist
15    testified to.
16         Ms. Nordquist testified that the preliminary Barbie
17    line list that was taken in or about April of 2004 was not
18    shared outside of El Segundo, California.
19              THE COURT:  This is the line list --
20              MR. ZELLER:  It is --
21              THE COURT:  Just a moment.
22              Is that 7104?
23              MR. COTE:  It is, Your Honor.
24              MR. ZELLER:  Yes, 7104.
25              THE COURT:  All right.
```

1            Please continue.

2            MR. ZELLER:  And -- and Ms. Nordquist testified

3    specifically that certainly later iterations and forms of

4    line lists are distributed outside of El Segundo to the

12:24 5   foreign subsidiaries.  But she was very clear and testified

6    very clearly that the particular preliminary line list taken

7    as of April of 2004 was solely a US document.  It was not

8    something that was distributed to the subsidiaries.

9            THE COURT:  Okay.

12:25 10          MR. ZELLER:  So the -- the -- the testimony that

11   Mr. Cote is relying upon is for the wrong time period and is

12   not the document that is the subject of the trade secret

13   theft claim here.

14            There --

12:25 15          THE COURT:  If I have Fuentes, the Lord of the

16   skies -- I call him the "Lord of the Flies" -- down in

17   Mexicali and the Gulf, and the United States, both in

18   jurisdiction and choice of law, hands down an indictment out

19   of a grand jury in Miami because this person who is importing

12:25 20   narcotics into the United States but has never come to the

21   United States, what, Mr. Overland, and how, is that so

22   significantly different when the United States makes a, one,

23   jurisdictional choice and, second, chooses to impose our

24   choice of law in a situation that has importation of

12:26 25   narcotics on one side?

```
 1            How is that so different than the United States

 2      asserting jurisdiction over somebody like Mr. Machado who has

 3      at least come to the United States, come to toy fairs, come

 4      back to the United States?

12:26 5            Help me with that.

 6            MR. OVERLAND:  It's really different.

 7            MR. COTE:  I think there is a blending of issues.

 8            THE COURT:  Well, Mr. Overland was going to answer

 9      that because he's familiar with the concept.

12:27 10           MR. OVERLAND:  I think it's real different when

11      you're talking about the criminal law.

12            THE COURT:  Why?

13            MR. OVERLAND:  Because, No. 1, the statute is

14      broader and depends on the interstate commerce clause.

12:27 15           THE COURT:  Okay.

16            MR. OVERLAND:  Which is a -- as you know, in

17      criminal law is given much broader consideration than what

18      we're talking about here.

19            THE COURT:  Including jurisdiction, how we get

12:27 20      jurisdiction --

21            MR. OVERLAND:  Right.

22            THE COURT:  -- because the knife was manufactured

23      in Kentucky -- or the gun?

24            MR. OVERLAND:  Exactly.

12:27 25           THE COURT:  In other words, the rubric is the
```

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 66 of 158   Page ID #:315485
CV 04-9049 DOC - 04/02/2011   Volume 1 of 1

66

 1   United States reaches out when there's harm to our country,

 2   whether it's narcotics or violence, and it's a much more

 3   different factual situation than the civil.

 4            Then why would we ever have civil RICO?

12:27  5         Well, okay, I'll leave that to the Supreme Court.

 6            Who's arguing?  Mr. Zeller.

 7            MR. ZELLER:  And there is, of course, additional

 8   evidence that Mr. Machado, acting in concert with the US

 9   residents, intended to cause harm to Mattel here in the

12:28 10   United States and that he -- he understood fully that the

 11   harm -- that the brunt of the impact, including particularly

 12   with respect to documents such as the preliminary Barbie line

 13   list, would be felt in the United States.

 14            THE COURT:  Uh-huh.

12:28 15         So this isn't a person who is so completely outside

 16   the United States to have no nexus, just living in Mexico

 17   City, this is a person who comes to the United States, takes

 18   advantage of the toy fairs, is an international traveller,

 19   has a nexus in the sense that he comes right back to MGA as

12:28 20   the parent company, gets his hands on line lists, however he

 21   does it, which is more than just Mexican documents.

 22            MR. ZELLER:  Right.

 23            THE COURT:  So why shouldn't choice of law apply to

 24   your position too?

12:28 25         MS. KELLER:  Exactly.

1        And one other fact that I think may weigh in here,

2   is that when we brought the claim against Mr. Machado, he was

3   a US resident; he lived here.

4        This isn't a matter of just some happenstance like

12:29 5   in the California Supreme Court case that Mr. Machado relies

6   on so heavily.  This is Mr. Machado carrying out acts,

7   including directed toward the United States, involving the

8   United States and having completely foreseeable and almost

9   certainly intended consequences here in the United States.

12:29 10        THE COURT:  Uh-huh.

11        MR. ZELLER:  He then ultimately moves here, so this

12   is not a happenstance or a gotcha situation where he moves to

13   some remote jurisdiction after his -- after the -- the

14   conduct is ceased or the injury has -- has ended.

12:29 15        THE COURT:  Uh-huh.

16        MR. ZELLER:  I also think that part of the error in

17   Mr. Cote's analysis here is, is he treats the tort as having

18   ended the day that the documents are taken or the days, the

19   final day in which the documents are taken.

12:29 20        And one could make an argument as to why that could

21   be an argument for any number of purposes, but I -- I -- that

22   seems to simply ignore the facts, as well as the law, when it

23   comes to an issue like choice of law.

24        THE COURT:  Now, does it make a significant

12:30 25   difference if the date is the day that the docs are taken or

```
 1    is the outside limitation the day of the search?
 2              MR. ZELLER:  I -- I -- I would suggest that it --
 3    it's all -- it's all of those.  I think it's everything.
 4              THE COURT:  So Mattel's best perspective would be
12:30 5    October of 2005?
 6              MR. ZELLER:  Right.
 7              THE COURT:  How does that change the argument?
 8              MR. ZELLER:  Well, I -- I -- I think what it does
 9    is, I mean, it's giving a --
12:30 10              THE COURT:  In other words, there's some cutoff
11    date, and in playing with this last weekend, when I was
12    trying to think where we would be this weekend, I was trying
13    to evaluate if it made any difference to me whether it was
14    October or April of 2005, and it didn't seem to make a
12:30 15    difference in terms of the statute of limitations and the
16    choice of law and how -- how I came out on that.  So I don't
17    know that it -- I'll -- you can take October 2005 as the
18    date.
19              It didn't seem to change the fundamental arguments
12:31 20    that we're involved in.
21              MR. ZELLER:  Well, for -- for -- let me just focus
22    first on choice of law.
23              I think it actually goes on further, beyond October
24    of 2005, for purposes of what should be considered.
12:31 25              I mean, there's nothing in the -- in the -- in the
```

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 69 of 158   Page ID
#:315488
CV 04-9049 DOC - 04/02/2011   Volume 1 of 1

69

 1    choice-of-law context that I've seen that suggests that you

 2    don't consider all the facts, regardless of what the time is.

 3         But, in particular, one example of continuing

 4    conduct or at least effects of what it is that Mr. Machado

12:31 5    and the other two did in concert with MGA and Mr. Larian is,

 6    is that beyond October of 2005, MGA was selling a doll that

 7    appears to have -- at least the jury could infer -- its

 8    origins from the stolen line list.

 9         THE COURT:  Which one?

12:31 10         MR. ZELLER:  And that would be the Hollywood-themed

 11    dolls.  Those dolls were released in the summer of 2005, and

 12    so those -- those sales continued into, at least, we'll say

 13    the end of 2005.

 14         THE COURT:  Okay.

12:32 15         MR. ZELLER:  And we, obviously, for time reasons

 16    didn't put in evidence as to everything in terms of the

 17    lineup list, but we did provide at least that example of

 18    the -- the Hollywood doll which was on Mattel's line list.

 19    Mattel had been planning this Hollywood doll for, obviously,

12:32 20    months and months in advance, and then MGA launches a

 21    competing doll during the same season, subsequently in 2005.

 22         The thing that's also somewhat interesting about

 23    that example is that the line list shows that this was going

 24    to be a TV-promoted item.  MGA did not promote it on TV.

12:32 25    That can be indicia of the fact that what MGA was looking to

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 70 of 158   Page ID #:315489
CV 04-9049 DOC - 04/02/2011   Volume 1 of 1

70

 1    do was take a free ride off of Mattel's advertising of what

 2    it knew was going to be its future product.

 3            THE COURT:  Okay.

 4            MR. ZELLER:  And that's just -- that's obviously an

12:32  5    issue for the jury to decide, but from our perspective all

 6    this, these factual issues, are -- are -- are clearly

 7    disputed and need to be determined by a jury.

 8            The -- the other aspect, I would -- I would say too

 9    is that just in terms of the US connection is, is that

12:33 10   ultimately Mr. Machado recognized that his activities and

 11   actions were benefitting a California corporation.  This is

 12   what he was attempting to do, not only to further his own

 13   interests but further and advance the interests of Mattel --

 14   or, excuse me -- of MGA, which it knew or he knew, rather,

12:33 15   was a California corporation.

 16           So this is -- this is not happenstance.  This is

 17   not lighting striking Mr. Machado and a bolt from the blue

 18   that California has -- will have its law applied.

 19           THE COURT:  Because the best evidence of his intent

12:33 20   are his subsequent actions.  His subsequent actions are

 21   simply coming to the United States as a vice president.  He

 22   could have gone someplace else in Mexico, sought other

 23   employment, remained in Mexico, but comes to California.

 24           MR. ZELLER:  Absolutely.

12:34 25           And I think when we connect all of this together

                1    with the fact that, you know, the presumption starts with the

                2    application of California law.

                3              THE COURT:  Uh-huh.

                4              MR. ZELLER:  The burden is on Mr. Machado to prove

    12:34   5    otherwise.

                6              THE COURT:  Okay.

                7              MR. ZELLER:  So this isn't a matter of Mattel has

                8    to -- to affirmatively establish controlling -- that

                9    California law should control.  The burden is quite the

    12:34  10    opposite.

               11         And when you join together the fact that there are

               12    these connections, the conduct to California beforehand,

               13    continuing effects in California, targeting California, all

               14    the evidence that I've talked about, and then Mr. Machado is

    12:34  15    a resident here when he sued, along with the presumption,

               16    makes quite clear that Mr. Machado cannot sustain his burden

               17    of proof in showing that Mexican law should apply here.

               18              THE COURT:  Okay.  Now, question for you:

               19              No, I'll wait.  You continue.

    12:35  20              MR. ZELLER:  One issue that has been raised by the

               21    discussion, and I think it's a very interesting one, and I'm

               22    not sure that I necessarily have a -- that we've done full

               23    research on this particular issue, but it's sort of the

               24    interplay, as the court has talked about, between the fact

    12:35  25    that there's a civil case here in California and a criminal

1    prosecution in Mexico.

2           I think I'd start with the principle here that

3    these are different sovereigns, different interests, in

4    persuing these actions, and historically, as the court is

12:35 5   well aware, federal and state authorities are freed to

6    prosecute the same defendant for even the same conduct.  They

7    are different interests; they are different sovereigns.

8           THE COURT:  Now you've anticipated my question, so

9    now I'll ask it, which is what I was going to ask just a

12:36 10  moment ago.

11          Given the gravity of life or liberty in a criminal

12   prosecution versus monetary damages in a civil, why wouldn't

13   this court bow concerning choice of law to Mexico?

14          In other words, there are differences, substantial

12:36 15  differences, when jurisdictions have choice-of-law issues.

16   And when the court has that kind of interplay I understand

17   that I could accept choice-of-law decision or choice-of-law

18   choices in California, but it's a rather unique situation

19   when I have a criminal proceeding in Mexico that's ongoing

12:36 20  and I'm dealing with another jurisdiction.

21          I mean, but for that criminal proceeding, there

22   might be a very weakened argument on MGA's part because,

23   frankly, it leaves you with no other remedy.

24          But there in the interplay with the Mexican

12:36 25  authorities and the ability to bring a civil action -- or,

```
 1    strike that -- a criminal action, it would seem to me that
 2    there MGA has a very strong argument.
 3           And without finding any fault of Mattel, that
 4    choice becomes -- became Mattel's right and responsibility
 5    and choice to pursue that.  And having done that, it seems to
 6    me that MGA has a very strong argument when I come down to
 7    what I call that fourth prong, about where jurisdiction
 8    lies -- strike that -- choice of law lies.
 9           So how do you respond to that?  Because we always
10    get involved in this interplay, and it's a rather unique
11    situation.
12           Now, if it was reversed, my thoughts might be that
13    California with a criminal proceeding, you know, took
14    precedence, because life and liberty seems to be of a little
15    more gravity that monetary damages.
16           And I think we all recognize that whatever the
17    monetary award is in the United States with Mr. Machado as a
18    Mexican resident, your chances of recovery are pretty small.
19           You know, you can send it down to the Mexican
20    authorities with a criminal prosecution.  You may have the
21    leverage there.  It may be honored, it may not.
22           So how do I deal with that?
23           MR. ZELLER:  Well, I -- I -- I think the starting
24    point is the court's analysis previously, which is even if
25    you assume that you have somebody who is operating entirely
```

CV 04-9049 DOC - 04/02/2011 - Volume 1 of 1

```
 1    in Mexico, committing criminal acts that cause harm here in

 2    the United States, let's just say, importing, trafficking

 3    narcotics, and that -- that person could clearly be

 4    prosecuted by both sovereigns --

12:38  5             THE COURT:  Yes.

 6             MR. ZELLER:  -- by the United States and by Mexico,

 7    under each jurisdiction's laws.  And there you would have, in

 8    fact, I think an issue that would perhaps be even more

 9    difficult simply because --

12:39 10             THE COURT:  But why?  In other words, why does the

11    United States, with criminal proceedings in Mexico, feel that

12    it has the choice of law right?

13             I mean, if I was the Mexican government I would be

14    sitting here puzzled by that, because the gravamen seems to

12:39 15    be because of the criminal proceedings in Mexico.

16             And when you come down to that final analysis and

17    the court eventually starts balancing that, that's the one

18    weighty factor that I'm having a very, very difficult time

19    with.

12:39 20             Now, that's not finding fault, by the way.  That's

21    finding choice and who controls this.

22             Now, the more interesting question -- and I'm not

23    suggesting this:  What would this court do if there wasn't a

24    criminal proceeding down in Mexico?  You know, how would the

12:39 25    court feel about it under those circumstances?  But that's
```

1    the 800-pound gorilla on the end of the teeter totter.

2              MR. ZELLER:  Well, I think in terms of the

3    choice-of-law issue, the fact that there is a parallel

4    proceeding, whether it's criminal or civil, is not one of the

12:40  5    factors that's considered.

6              So the only reason why one would potentially, say,

7    go outside the -- the factors and look at whether or not

8    there is a pending criminal foreign prosecution would be to

9    try and assess:  Is there some way in which these proceedings

12:40 10    could conflict or would be an interference?

11              I mean, that would only seem to be the -- the --

12    the reason why, ultimately --

13              THE COURT:  But it's the same fact situation.

14              In other words, I'm not dealing with a rape-murder

12:40 15    in the United States or in Mexico and a trade secret

16    misappropriation.  I'm dealing with the same exact fact

17    situation in Mexico as I am in the United States, and that's

18    what's so striking to me.

19              One ends up in a criminal proceeding with the same

12:41 20    facts and one ends up in a civil proceeding with the same

21    facts.

22              Now, if these were different facts underlying this,

23    I would think that Mattel has a very strong argument.  But

24    these aren't.  These are the same exact facts underlying both

12:41 25    a civil and a criminal proceeding.  And so, therefore, it's

CV 04-9049 DOC - 04/02/2011 - Volume 1 of 1

```
 1    not a case where I have, I think, the balancing issues where

 2    I have different factors leading to different claims on the

 3    civil side in the United States.  Here I have the uniqueness

 4    of the same facts and that's what's troubling to me.

12:41 5              MR. ZELLER:  I think it ultimately goes back to the

 6    same issue of the different sovereigns and -- and you can

 7    simply have different sovereigns with different interests.

 8              I mean, one could make the same issue out of

 9    whether there was, say, a criminal prosecution in New Jersey

12:41 10   versus a civil action in California.

11              I think in most instances no one would think that

12    that means that New Jersey law must govern --

13              THE COURT:  Right.

14              MR. ZELLER:  -- the California action.  You can

12:42 15   have parallel proceedings and, you know, obviously there are

16    rules to deal with situations where they actually come into,

17    you know, loggerheads --

18              THE COURT:  Right.

19              MR. ZELLER:  -- but here, the mere fact that we

12:42 20   have parallel proceedings, I don't think factors into the

21    choice of law.

22              THE COURT:  Let me repeat that back to you so you

23    know that I'm tracking it.

24              Judge, what difference does it make?  You can have

12:42 25   a criminal proceeding over in New Jersey.  You can have a
```

1    civil proceeding out in California.

2             MR. ZELLER:  Exactly.

3             THE COURT:  So why should you care if it's Mexico

4    or the United States?

12:42  5         MR. ZELLER:  Correct.

6             THE COURT:  Okay.

7             MR. ZELLER:  And, again, it starts partly to from

8    the fact that choice-of-law rules here in California begin

9    with the presumption that the forum law applies.  Different

12:42 10   jurisdictions have different tests, they have different

11   starting points, but California's is that the -- the

12   presumption is, is that California law applies until proven

13   otherwise.

14            So I -- I -- I -- I understand the -- the -- and it

12:43 15   is an interesting issue.  I don't think there's any question

16   about it.

17            THE COURT:  It's a great law school test.  I look

18   forward to you and Mr. Quinn and Ms. Hurst and Mr. Cote

19   hitting the road sometime in some kind of a speech at law

12:43 20   schools on this topic.

21            I'm just joking with you, but it's fascinating.

22            MR. ZELLER:  It is.  And it's one of the more

23   interesting issues, I think, here in the choice-of-law

24   context.

12:43 25            But I do think that, ultimately, at the end of the

1    day it doesn't really factor into what kind of decision

2    should be made.

3              THE COURT:  All right.

4              MR. ZELLER:  And, particularly, given the fact that

12:43 5    everything else that one considers for purposes of choice of

6    law really does, rather overwhelmingly, point to the proper

7    application here of California law for purposes of this trade

8    secret misappropriation.

9              The one thing I would say -- and I -- I -- the

12:43 10   Mexican prosecution, while certainly substantially overlaps,

11   factually, it is not exactly the same.  I won't --

12             THE COURT:  Did you find more discs?

13             (Laughter.)

14             MR. ZELLER:  Well, there are -- the one thing is,

12:44 15   is that there's actually somewhat different conduct that's

16   actually involved there.

17             There is, actually, computer crimes that are also

18   involved there.

19             I don't want to make too big of an issue out of it

12:44 20   because I don't think at the end of the day that makes much

21   of a difference, but just -- just as a point of reference,

22   there are -- it's not necessarily just straight trade secret

23   misappropriation that's being prosecuted only in Mexico, but

24   it also involves access to computers and the like.

12:44 25             THE COURT:  I asked MGA a question, and the

UNITED STATES DISTRICT COURT

1    question I asked MGA I'm going to ask in reverse:

2            If I ruled in MGA's -- strike that -- Machado's

3    Rule 50 motion, I asked them, MGA, what limitations should be

4    placed upon Mattel?

12:45 5            If I rule in the Rule 50 motion on behalf of

6    Machado, what's your argument against any limitations being

7    placed on Mattel?

8            MR. ZELLER:  Well, I -- I -- I think the principal

9    one is that MGA and Mr. Larian will still be defendants to

12:45 10   those claims.  So the very same evidence is -- is -- is

11   already a matter of record and bears directly on their

12   liability.

13            THE COURT:  What happens if MGA Mexico, as well as

14   Mr. Machado, were subject to the Rule 50, but Mr. Larian

12:45 15   remained?  It wouldn't make any difference in terms of your

16   ability to argue the breadth of the evidence in front of the

17   jury, from my perspective.

18            Now, if you disagree with that, tell me what kind

19   of limitations you think, you know, could be argued against

12:46 20   you by MGA, for a moment, because, of course, if I grant the

21   Rule 50, I expect that, Judge, there are limitations,

22   et cetera.

23            But going through that in my own mind, I can't find

24   tentatively why it would place any limitations on Mattel.

12:46 25            MR. ZELLER:  And we agree with that.

CV 04-9049 DOC - 04/02/2011 - Volume 1 of 1

```
 1              THE COURT:  Okay.  I'll turn back.

 2              Now I've heard the legal arguments.

 3              For a moment I want to go to the practical side of

 4    the gate, and now I want to ask MGA and Ms. Hurst:  Assuming,

12:46  5    hypothetically, the worst or the best situation, depending

 6    upon on who the party is, if Mr. Machado was removed from the

 7    case, why shouldn't MGA Mexico, on a Rule 50, also be removed

 8    from this case?

 9              MS. HURST:  MGA Mexico should be removed from the

12:46 10    case; and I should make clear also, I said earlier MGA Mexico

11    joins in these arguments, and I should make clear that

12    Mr. Larian and MGA Entertainment do as well.

13              THE COURT:  And why should Mr. Larian supposedly be

14    removed from this case?

12:47 15              MS. HURST:  Well, I -- I mean, you know, I think

16    Mr. Larian should be removed because there's absolutely no

17    evidence whatsoever from which a reasonable juror could

18    conclude that he had anything to do with Mr. Machado's

19    actions.

12:47 20              And with all due respect --

21              THE COURT:  With all due respect.

22              MS. HURST:  Yeah, here it comes.

23              THE COURT:  Here it comes.

24              MS. HURST:  -- the fact that he had a job interview

12:47 25    at the toy fair -- I mean, look, if job interviews of the
```

1    departing employees were sufficient to give rise to that kind

2    of an inference, then there would never be a trade secret

3    departing-employee case that didn't go to a jury.

4              THE COURT:  But we're also forgetting a few things

12:47 5    like the presentation at the W Hotel and that presentation

6    happening, from Mattel's perspective, which is an issue for

7    the jury.

8              MS. HURST:  I -- I disagree.

9              I mean, the fact that you fly to the country in

12:48 10   which you're considering opening a subsidiary to meet with

11   the people that are going to open the subsidiary for you is

12   not nefarious conduct.

13             THE COURT:  Of those facts, you may be right.

14             MS. HURST:  And the fact that you get a

12:48 15   presentation full of basic market facts about the Mexican

16   market with third-party data in it, they haven't proven there

17   is a single Mattel trade secret in there.

18             THE COURT:  Let me go back to assuming you are not

19   prevailing on that argument for Mr. Larian.  Let's go to

12:48 20   MGA Mexico, because that's the argument I haven't heard so

21   far on this Rule 50 and then I'll come back to each party so

22   I can take a brief recess to think about this argument.

23             MS. HURST:  MGA Mexico is a Mexican citizen.  It's

24   the conduct that is alleged to have been involved in, again,

12:48 25   occurred in Mexico, and in particular, to respond to some of

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 04/02/2011 Volume 1 of 1

1    Mr. Zeller's arguments, you know, most of Mr. Zeller's

2    arguments are about personal jurisdiction.  It's about --

3    he's making personal -- he's making purposeful direction

4    arguments and that -- that doesn't have anything to do with

12:49  5    the governmental interest test.

6              THE COURT:  I understand that.

7              MS. HURST:  And, of course, we do have the

8    jurisdiction, lack of jurisdiction claim, for MGA Mexico, but

9    that's not what we're talking about right now.

12:49 10         There -- there's no evidence at all of harm to

11   Mattel or Mattel Mexico.  There's none whatsoever.  They're

12   not making an actual damages claim.  They're not making an

13   actual damages claim.

14             Let me repeat that.

12:49 15         They've got no evidence they were deprived of any

16   documents or anything.  It's total speculation.

17             And to come in here now, also, on this

18   Hollywood-theme thing, they dropped that.  They dropped the

19   Hollywood-theme claim.

12:49 20         It's not in 9801 that that line list was used for

21   Hollywood-themed dolls.

22             And I'll tell you this is really prejudicial to us

23   because you have absolute evidence that we started working on

24   the Hollywood theme before that very first interview with

12:50 25   Mr. Machado.

 1          I'm looking at an e-mail, February 4th, 2004,

 2     "We'll go with Hollywood theme for fall 2005."

 3          Didn't introduce that e-mail because Hollywood

 4     theme is not in 9801 as evidence of a claimed use of that

12:50  5     line list.

 6          THE COURT:  Okay.

 7          MS. HURST:  So they --

 8          Sure, and Mr. Cote is looking at the entry of 9801.

 9          MR. COTE:  I've got 9801 up and offered to read it

12:50 10     into the record for Your Honor.

11          It's 9801-3, Page 14, which is Trial Exhibit

12     No. 7104, which is what we're talking about:

13          "Document reflecting use of Mattel trade secret.

14     Machado and Truebas routinely accessed documents, downloaded

12:50 15     and copied from Mattel, off of the thumbdrive" -- Machado's

16     thumbdrive -- "to prepare advertising, marketing and

17     promotion document" -- I think they mean "documents" --

18     "while working for MGA."

19          That's it.

12:51 20          MS. HURST:  So *Bratz Goes to Hollywood* was not a

21     claimed use of that trade secret and it's prejudicial in the

22     extreme to let them start speculating about that now; and

23     they dropped that claim in the face of evidence that we then

24     didn't put in because they didn't make that claim.

12:51 25          They've got no evidence at all in support of that.

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 04/02/2011 - Volume 1 of 1

1          So there's no evidence of harm to Mattel, none

2     whatsoever.  Their entire remedies claim now, based on this

3     claim, is an unjust enrichment claim, and it's unjust

4     enrichment of MGA Mexico.  It's not even unjust enrichment of

12:51 5     either Mr. Larian -- or Mattel -- pardon me -- of

6     MGA Entertainment and it's based on an avoided cost analysis.

7          It's based on an avoided cost -- it's -- basically

8     their theory of benefit is MGA Mexico somehow benefitted in

9     connection with its startup costs by getting this data.

12:52 10          That is the benefit that happened in Mexico.

11          THE COURT:  Okay.

12          MS. HURST:  So, you know, the analysis here -- and

13     also there's no evidence that Mr. Larian was acting in a

14     capacity other than a founder of MGA Mexico.

12:52 15          I mean, the testimony was all that the purpose of

16     these meetings was to start a subsidiary in Mexico for

17     Mexican business purposes, and the evidence on harm showed

18     that MGA Mexico's revenues and operating profits increased

19     in -- this is undisputed; no dispute whatsoever -- revenues

12:52 20     and operating profits increased in Mexico in both of the

21     years following their departures.

22          So there's no harm here.  There's no territorial

23     interest in California because a California resident has been

24     harmed.

12:53 25          There has been no evidence.

 1          And that's the traditional protection that's

 2     offered when you're making the governmental-interest

 3     analysis.  You look at:  Do you have an interest in

 4     protecting the plaintiff in the location of its residence?

12:53 5     And there has been no evidence whatsoever to support a

 6     finding of that type in this case.

 7          THE COURT:  All right.  Now let me ask you

 8     something on the record, but informally.

 9          Ms. Hurst, look at your trial counsel.

12:53 10          Mr. Zeller, look at your trial counsel.

 11          We're going to go through each item on your list,

 12     and the very last thing I'm going to do are instructions.

 13          So you two are really controlling, in a sense, the

 14     debate today.

12:53 15          And so I hope that Mr. Price is working on his

 16     final argument.

 17          Ms. Keller, I hope that you're working on your

 18     final argument.

 19          So what do you want to do next?

12:53 20          MR. ZELLER:  There were just a few points just very

 21     briefly I wanted to respond to.

 22          And it -- it -- it -- also just in terms of what

 23     Mr. Cote had argued, which partly dealt with the equitable

 24     tolling issue, and he had pointed out that the order by

12:54 25     Judge Manella talks in terms of a discovery stay, but

```
 1    authorities we have cited in our brief says that even if it's
 2    a discovery stay it's -- equitable tolling still applies, and
 3    that makes perfect sense, because we couldn't take discovery.
 4              THE COURT:  Okay.
12:54  5              MR. ZELLER:  Whether or not you can amend doesn't
 6    have bearing on -- whether there is a practical matter as
 7    allowed does not really have much of a bearing on the
 8    equitable tolling point, because we were denied and we
 9    couldn't take discovery.
12:54 10              But even apart from that, there's -- there's
11    already the ruling by this court, and this was at MGA's and I
12    believe at Mr. Machado's insistence, but it was certainly at
13    MGA's insistence, that a ruling by this court that Mattel's
14    claims, these trade secret misappropriation claims are
12:54 15    compulsory to MGA's April 2005 complaint.
16              That seems to me to be fairly dispositive.
17              I mean, obviously, the court recognizes we think
18    certain claims relate back further, and I won't get into that
19    at the moment, but just for purposes of this argument here,
12:55 20    MGA and Mr. Machado are really acting contrary and making
21    arguments contrary to their own positions that this court
22    accepted previously.
23              If those claims are compulsory, our claims as
24    against MGA, MGA Mexico, Mr. Larian, Mr. Machado, have to
12:55 25    relate back to April of 2005.  There's no dispute that if
```

UNITED STATES DISTRICT COURT

 1    they relate back to that time period these are timely under

 2    any statute of limitations theory.

 3         The only other point I want to make was is that

 4    the -- the facts that I have been discussing here, these

12:55 5    connections to California, are not personal jurisdiction

 6    facts.  These are facts showing that California has a strong

 7    and legitimate interest in this dispute.

 8         And there -- there is certainly authority

 9    recognizing, contrary to MGA's argument near there at the

12:56 10   end, that California has a strong interest in providing a

 11   forum to its residents for causes of action arising from

 12   misappropriation of trade secrets.

 13        I mean that -- that's not exactly a startling legal

 14   proposition.

12:56 15        In fact, typically, one significant factor in all

 16   these kind of analyses is where was the injury felt and where

 17   was it foreseeable or even intended?

 18        And so for all those reasons we think that

 19   California is the appropriate governing law.

12:56 20        THE COURT:  All right.  Now, let me ask one more

 21   question and then turn back to Mr. Zeller.

 22        I note that at one time that each of you had

 23   discussed a possible resolution concerning Mr. Machado.

 24        Before I hand down a ruling in this matter in the

12:56 25   next day or two, because I want to do some writing outside

```
 1    your presence, is there any possibility of a resolution

 2    before I hand down this ruling?

 3              And, if so, you have about 24 hours to discuss it.

 4              Now I'm going to not go any further with that.

12:57  5    Okay?

 6              So I'll probably hand it down tomorrow evening if I

 7    can get time to write tonight.  If not, it will probably be

 8    handed down during the week, maybe as late as Wednesday

 9    night, which means we're still waiting for my jury

12:57 10    instructions.

11              And so, that's what I warned you about, Mr. Cote.

12    I want to get to this but I also want to get to the jury.

13              MR. COTE:  I appreciate it.

14              THE COURT:  So how much time we have is dependent

12:57 15    upon the time we will have thoughtful arguments.

16              So, Mr. Cote, any last thoughts?

17              MR. COTE:  Just to respond to that last thought,

18    Your Honor, where the injury is felt is not part of the

19    actual test.  It's not.  It's where the conduct took place.

12:57 20    That's it.  End of analysis.

21              THE COURT:  And Ms. Hurst.

22              MS. HURST:  And Mr. Zeller is incorrect that we

23    took the position that their counterclaims are compulsory to

24    MGA's 2005 complaint.

12:58 25              In fact, we filed briefs saying exactly the
```

UNITED STATES DISTRICT COURT

1    opposite.  We've argued they're permissive and they don't

2    relate back.

3         The assertion that we made is that our trade secret

4    misappropriation claims are compulsory to theirs because they

12:58  5    concern the same types of information and that has been borne

6    out and we have seen it time and again as their witnesses

7    have gotten on the stand and tried to distinguish between

8    what's public and what's not in ways that directly relate

9    this types of information to one another.

12:58 10         THE COURT:  Okay.

11         MS. HURST:  But that's not -- I mean, we've not

12    taken the view at all that those were compulsory.  We've

13    taken the view that they were permissive, and they are.

14         THE COURT:  Okay.  Now I want to make sure that

12:58 15    we've started with one, two, three, four -- we can go as many

16    times as you like.

17         Mr. Zeller.

18         MR. ZELLER:  Submitted, Your Honor.

19         THE COURT:  Ms. Hurst.

12:58 20         MS. HURST:  Submitted.

21         THE COURT:  Mr. Cote.

22         MR. COTE:  Thank you, Your Honor.

23         THE COURT:  Now, what would you like to take up

24    next?  Look at your lists.

12:59 25         MS. HURST:  We're ready -- I'm ready to answer the

CV 04-9049 DOC - 04/02/2011 Volume 1 of 1

```
 1    court's question from earlier about what happens if the jury
 2    finds something in '98 and something in '99; what's the legal
 3    implications of that?
 4              THE COURT:  Certainly.
12:59 5              MS. HURST:  I think we had those other items that
 6    we had talked about.
 7              THE COURT:  Well, let's start with '98/'99.
 8              MS. HURST:  All right.  So there's two different
 9    answers here depending on whether we're talking about
12:59 10   copyright or trade secret.
11              We'll start with copyright.
12              If the jury finds that Mr. Bryant created works in
13    1998 and in 1999, then -- and I don't think the
14    work-made-for-hire doctrine has any application here because
12:59 15   there has been no evidence at all that Bryant was doing this
16    as part of his -- his job duties.  But if you assume that the
17    assignment is a basis for ownership in '99 or any -- that
18    there's any basis or ownership of what he does in 1999, then
19    all Mattel would own would be any new expression that is
13:00 20   sufficiently original to qualify for copyright protection.
21              In other words, the '99 work would be derivative of
22    the '98 work, and what you own in a derivative work is only
23    that new expression which is sufficiently original to qualify
24    for copyright protection.
13:00 25              So, for example, if the jury were to find that he
```

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 04/02/2011   Volume 1 of 1

```
 1    did all of the black-and-white drawings in '98 and he colored

 2    in '99, then Mattel would own nothing under that.

 3               THE COURT:  How should I instruct?

 4               MS. HURST:  Under the Copyright Act.

13:00  5        THE COURT:  How should I instruct?

 6               MS. HURST:  Well, we have to explain what a

 7    "derivative work" is, and we have to explain that in the

 8    derivative work all you own is the new material that is

 9    sufficiently original to be copyrightable, and so --

13:01 10        THE COURT:  Do we have an instruction on that?

11               MS. HURST:  I think we do have a derivative-work

12    instruction.

13               THE COURT:  I think you do too.

14               MS. HURST:  Yeah, I think we do.

13:01 15        THE COURT:  Okay.

16               MS. HURST:  With respect to trade secret --

17               THE COURT:  Hopefully you'll see that before the

18    night before.

19               MS. HURST:  I hope so.

13:01 20        We may need that before the night before.

21               THE COURT:  You might need it before the night

22    before, but, remember, it's all up to you.

23               MS. HURST:  We're ready to go.  We're ready to go

24    eat lunch and get out of here and let you go, Your Honor.

13:01 25        THE COURT:  It's all up to you.
```

           1              We have a list from each of you.  We'll go right

           2     down that list.

           3              MS. HURST:  The other answer on trade secret is

           4     different.  If he started in '98, then there's no trade

 13:01     5     secret.

           6              THE COURT:  Okay.  Mr. Zeller.

           7              MR. ZELLER:  Well, the -- first of all, I mean,

           8     just as a practical matter, I think giving this kind of

           9     instruction to the jury is just going to be confusing.

 13:01    10              I mean, there is, in fact, no evidence that

          11     Mr. Bryant merely colored in his drawings.

          12              THE COURT:  In other words, it's all or nothing?

          13     It's either '98 or it's when you're working for Mattel?

          14              MR. ZELLER:  That's -- I think that's right.

 13:02    15              THE COURT:  Any evidence, Ms. Hurst, about, you

          16     know, the creation of some portion of the concept in '98 and

          17     then additions?  You know, that's what I've been trying to --

          18              MS. HURST:  Yes.  Yes.

          19              THE COURT:  I --

 13:02    20              MS. HURST:  Yes, the Lightbox testimony is directly

          21     on point for that.

          22              THE COURT:  The Lightbox.

          23              Just a moment.

          24              That's what I've been searching through and waiting

 13:02    25     for.

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 04/02/2011 - Volume 1 of 1

```
 1                Okay.  Derivative, Lightbox; okay.

 2                Lightbox.

 3                And that occurred in '99.  '99.

 4                Okay.  Next issue, then, and I may come back to

13:02  5     that with you.

 6                Concerning 502, what are we going to do about those

 7     exhibits?

 8                MR. ZELLER:  I -- I'm happy to report -- and this

 9     will be subject to confirmation by those closer to the

13:02 10     situation -- but I believe we have now located all the

11     originals for all those drawings.

12                So there is about ten.  We'll again call them.  We

13     now have the originals.  They still have to be formally moved

14     into evidence based on Mr. Bryant's testimony, but that's the

13:03 15     issue that remains.

16                THE COURT:  Great.

17                Doesn't that resolve a substantial amount of these

18     issues?

19                Now, we're going to bring Mr. Bryant back for that?

13:03 20                Why don't you and Mr. Zeller or Mr. Quinn talk

21     about that, because it seems rather ridiculous that there

22     isn't a stipulation, frankly.

23                So as Ms. Keller gets up out of her chair and

24     Mr. Quinn and they approach each other, and they resolve

13:03 25     this.
```

```
 1                (Discussion held off the record.)

 2                THE COURT:  And of course the question I've got is:

 3      Why not before?

 4                MR. ZELLER:  It's minutia.

13:03  5          (Discussion held off the record.)

 6                THE COURT:  Mr. McConville, you can go over there.

 7      It's two to one.

 8                MR. MCCONVILLE:  Ms. Hurst is going over there,

 9      Judge.

13:04 10          (Discussion held off the record.)

11                THE COURT:  Now, here's what's going to happen to

12      both of you.  So while you're thinking about your tactics --

13      it's obvious to me -- and I'll put this on the record -- it's

14      obvious to me that unless Mattel were to call Mr. Bryant

13:04 15  back, unless the facts were clearly relevant it's going to

16      create a tremendous amount of conflict for the party calling

17      him back.  I'm old enough.  I know that.

18                But MGA's not going to get the tactical advantage

19      without a stipulation.  In other words, Mattel's not going to

13:04 20  be put in the situation of bringing Mr. Bryant back over

21      drawings.  I'm simply going to say that the parties couldn't

22      reach an agreement, and Mr. Bryant was ordered back for this

23      one question because the parties couldn't reach an agreement

24      and that way it's not prejudicial to Mattel where you look

13:05 25  like you're dragging Mr. Bryant back into court for one
```

```
 1    question, because the prejudice for the party having to bring
 2    it back is almost insurmountable.
 3            MS. HURST:  Okay.  They closed their case without
 4    getting the testimony that they needed on the timing of these
13:05 5    drawings.
 6            THE COURT:  Up to you, then.
 7            MS. HURST:  They cannot prove that these were done
 8    while he was at Mattel, and that's the important fact.
 9            THE COURT:  Ms. Hurst, be very careful.  If you
13:05 10   looked at that, the court -- basically, in the transcript
11    said I would examine this later, I left that open -- read
12    that transcript.  So I would consult your trial counsel on
13    this one.  Okay?
14            So I'll be back in a little while.  You take a
13:05 15   break and you think about this now.
16            (Recess taken.)
17            MS. HURST:  No, they had all the same originals.
18    They were all the same originals that were previously in
19    evidence.
13:09 20           THE COURT:  Are these new?
21            MS. HURST:  No, they're not new.
22            MR. MCCONVILLE:  Here's the issue, Judge, in
23    essence.
24            The testimony from Carter Bryant --
13:09 25           THE COURT:  Hold on.
```

UNITED STATES DISTRICT COURT

1          We're going to go right back on the record.

2          We're right back on the record.

3          All counsel are present.

4          Well, they will be in a moment.

13:10  5          Let's get this sorted out because if Carter Bryant

6  has to come back I need to make the call; if he doesn't have

7  to come back I want to know and I want a clear record of

8  this.

9          All right.  We're on the record concerning these

13:10 10  drawings.

11          I want to make certain the court fully understands

12  what the disagreement is about these drawings.

13          I thought that the court had all of the originals

14  when I went through the copyright analysis, and then I --

13:10 15  it's represented to me that 502 have drawings and what I'm

16  allegedly hearing from Mattel is that these are additional

17  drawings?

18          Now, hold on now.  Mr. Zeller, have a seat.

19  Listen.

13:10 20          That these are additional drawings that weren't

21  presented to the court before and that MGA had these in their

22  possession?

23          So let's sort out this record very carefully, and I

24  don't care who starts.

13:11 25          MS. HURST:  No.  They were just reassembling them

1    in the portfolios and there were some that between yesterday

2    and today they couldn't find the originals of, and then we

3    went back in the jury room and got the portfolios, which had

4    always contained the admitted evidence from the first

13:11  5    trial --

6                  THE COURT:  Okay.  Just a moment.

7                  MS. KELLER:  -- and we found those additional

8    originals there.  So they've always been in the court's

9    custody.

13:11 10                  THE COURT:  Okay.  Now, are the black and whites

11    that I'm looking at, 502, then -- do I have original drawings

12    for them?

13                  MS. HURST:  Yes.  All the originals have been

14    located and they were always in the court's custody, so

13:11 15    they're not new.

16                  THE COURT:  Okay.  Just a moment.

17                  Has Mr. Zeller seen them?

18                  MR. ZELLER:  Yes.

19                  THE COURT:  Okay.  Now, Mr. Zeller.

13:11 20                  MR. ZELLER:  Right.  And Ms. Hurst is correct that

21    there was --

22                  THE COURT:  Okay.

23                  MR. ZELLER:  -- that there were about ten of

24    them -- I'm kind of ballparking -- that we could not locate

13:12 25    the originals for, but that's simply because they were in

CV 04-9049 DOC - 04/02/2011   Volume 1 of 1

```
 1    different portfolios, and that's resolved.

 2              THE COURT:  Okay.  That's resolved.

 3         So I don't need Carter Bryant back for this, and

 4    now I don't need 502 received into evidence, and I have all

13:12  5    the originals, which was what we thought we had in about two

 6    and a half weeks of work.

 7         And, by the way, just to kid you a little bit, you

 8    know that Judge Wardlow made the comment about sometimes we

 9    don't know what we're looking at in terms of dolls, and she

13:12 10    was referring to Judge Larson.

11         I've had the finest experts help me, Rachel and

12    Julia, my two esteemed law clerks who know more about dolls

13    and have given me more information and guidance than I could

14    possibly ever absorb.

13:12 15         Now I'm just joking with all of you, but, of

16    course, I've obviously had input from my law clerks and I'm

17    very fortunate to have two esteemed and well-versed

18    colleagues who work with me, and it took about two and a half

19    weeks of looking at your dolls, so I'm now an expert

13:13 20    regardless of my --

21              MS. HURST:  Well, let me just say this --

22              THE COURT:  -- background.

23              MS. HURST:  -- the court has all the originals but

24    they haven't all been admitted in this trial.

13:13 25              THE COURT:  Then why aren't they received
```

CV 04-9049 DOC - 04/02/2011   Volume 1 of 1

99

1    in this trial?

2           MS. HURST:  Because there was no testimony about

3    when they were created.

4           THE COURT:  Then why isn't that critical?

13:13  5           Because, remember, 502 came in and at that time

6    Mr. Zeller apparently hadn't located the originals.

7           MS. HURST:  They were here the whole time.

8           THE COURT:  Well, regardless, he hadn't located the

9    originals.

13:13 10           They started to go through 502 and try to point out

11    the black and whites.  Yes, he did.  Read the transcript.  He

12    certainly did.

13           And the court basically said instead of going

14    through each one of those -- now, what seems so ridiculous to

13:14 15    me is that these already came in at the first trial.

16           MR. ZELLER:  They did.

17           THE COURT:  I mean this is -- it's gamesmanship at

18    the best and it's silly.  If you want to drag Carter Bryant

19    back across the country, then that's what we're going to do.

13:14 20           But if these came in at the first trial and there's

21    no disagreement and you're resting on the fact that 502 was

22    in some form that was a drawing, that's just a shame to bring

23    him back.

24           These should, in fact, come into evidence.  But,

13:14 25    you're right, I can't just admit them.  But I would give

CV 04-9049 DOC - 04/02/2011 Volume 1 of 1

1    discretion to the parties.

2            MR. ZELLER:  If -- if I could, just on that

3    point --

4            THE COURT:  Well, I think this needs a thoughtful

13:14 5    discussion.

6            Are you really going to drag him back across the

7    country?

8            So you talk about this for a moment.

9            MS. KELLER:  Your Honor, the --

13:14 10           THE COURT:  No, I'm done now.

11           You talk about this now.

12           (Recess taken.)

13           THE COURT:  We're on the record.

14           All counsel are present.

14:05 15           The court had started an off-the-record statement

16    about Exhibit 5 which has led to quite a disagreement as to

17    counsel so I want to have everything stated on the record and

18    your respective positions.

19           So, I don't care who starts on this issue.

14:05 20           I think it's the next on one of your lists.

21           MR. ZELLER:  It was on ours, Your Honor.

22           During his testimony -- well, during the course of

23    Mr. Bryant's testimony, Mattel raised issue that there were

24    certain drawings that we wanted him to review outside the

14:06 25    jury's presence to save time.

CV 04-9049 DOC - 04/02/2011   Volume 1 of 1

1          The court directed that the parties assemble these

2    materials and deliver a binder of them to Carter Bryant.

3          Mr. Bryant did review them.  He was asked questions

4    about them by Mr. Price and the operative part of Mr. Price's

14:06  5    questioning was:  "Were you able to determine that that

6    binder was a collection of drawings that you did in

7    connection with Bratz?

8          "Answer:  Yes."

9          And then Mr. Price said, "Your Honor, does that

14:06 10   save us?"

11          And the court says, "That's satisfactory."

12          And the court goes on to explain to the jury that

13   he had these materials delivered to them so he could review

14   them outside their presence to save time.

14:06 15         And then the court says -- this is still addressing

16   the jury -- "You'll have a record of what items are received

17   and it will be in this binder, which are drawings that have

18   been referred to," which will be exhibits.

19          And then the court then poses the question to

14:07 20   Mr. Price:  "Are these the drawings for what time period,

21   though?  Just let the jury know what you are referring to,

22   generally."

23          "MR. PRICE:  Well, that's in dispute.

24          "THE COURT:  Well, the time periods are in dispute,

14:07 25   but are these allegedly originals or are they both originals

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 102 of 158   Page ID #:315521
CV 04-9049 DOC - 04/02/2011   Volume 1 of 1

102

1   and sketches?  I mean, are they colored or are they original

2   pencil sketches?

3            "MR. PRICE:  They are both.

4            "THE COURT:  They are both."

14:07  5        And then there is a further discussion and the

6   court says, "And the jury will have the originals also?"

7            "MR. PRICE:  Yes.

8            "THE COURT:  All right.  Thank you.

9            Now we can have this binder set aside and give them

14:07 10  to Kathy this evening, so this evening we can go over each of

11  these items."

12           And then during the course of that evening

13  discussion, the court directed the parties to meet and confer

14  and reach a stipulation.

14:07 15        We attempted to do so.  MGA ultimately declined, so

16  then we put this item back on the court's agenda; the

17  exhibits have been offered.  And so there is a clear record

18  on this, we have all the originals in the possession of the

19  parties and the court of these disputed exhibits, and what we

14:08 20  would do is, based on that record, offer them for -- for

21  admission to -- into evidence.

22           Or, as the court has also suggested, is the

23  alternative is, is to have Mr. Bryant come back and we would

24  move these in through further questioning.

14:08 25        But our perspective is that MGA's argument that --

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 103 of 158   Page ID #:315522
CV 04-9049 DOC - 04/02/2011   Volume 1 of 1

103

1   that they have been sandbagged by these exhibits doesn't

2   really hold up.

3          I mean, No. 1, it participated in this process;

4   No. 2, there was no objection made at the time about anything

14:08 5   that was unclear about them and; No. 3, it was absolutely

6   explicit in the conversation between the court and Mr. Price

7   that the time periods were in dispute.

8          MGA at that point was free to ask any and all

9   questions that it cared to ask about timing.

14:09 10          Our viewpoint was is that there is other evidence

11   of record that establishes the time periods in which these

12   drawings were made."

13          THE COURT:  Okay.  And Ms. Hurst.

14          MS. HURST:  Thank you, Your Honor.

14:09 15          Excuse me.

16          Mattel did not offer the drawings and after that

17   exchange in the court, Mr. Bryant was on the stand that day

18   and the next day.

19          THE COURT:  I think a total of about seven days.

14:09 20          MS. HURST:  Yes.

21          And they never sent us the stipulation that they

22   proposed until, like, weeks later, and when we got it we

23   found it was unacceptable.

24          But the bottom line is they had a failure to appear

14:09 25   on the timing of these.  They didn't illicit that testimony.

1          Yes, it's in dispute; but saying it's in dispute

2     isn't a substitute for eliciting the testimony.

3          I've been through the list of drawings that are

4     still in dispute.

14:09 5          It's all of Exhibit 2, which Mr. Bryant had

6     previously testified at the prior trial were color drawings

7     created after 1999.

8          Exhibit 5-14, 5-18, 5-19, 5-28, 5-95, 5-96 and 5-99

9     are all drawings he testified in the prior trial that he

14:10 10    created after he left Mattel on October 19th.

11         And then with respect to others, 5-76, 5-77, 5-78,

12    and 18281, those were always drawings he testified in the

13    prior trial were created during 1998.

14         And then with respect to 15 --

14:10 15         THE COURT:  Just a moment.

16         MS. HURST:  I'm sorry.

17         (Pause in the proceedings.)

18         THE COURT:  All right.  Please continue.

19         MS. HURST:  And then the final drawing, with

14:11 20    respect to which there's still a dispute is 15172, and on

21    that one I couldn't find any prior testimony at all, even

22    using the Bates number.

23         THE COURT:  Well, let's go see -- let's go through

24    and see if there's an agreement about what the prior

14:12 25    testimony was at least.

CV 04-9049 DOC - 04/02/2011   Volume 1 of 1

105

1          Is it agreed or disagreed that as to Exhibit 2 in

2     the prior trial that the color drawings he testified to were

3     created after 1999?

4          MR. ZELLER:  I didn't understand that that was the

14:12 5     assertion about the testimony.  Maybe I misunderstood it.

6          THE COURT:  Well, I'll read it back.

7          Ms. Hurst alleges and states that "it's all of

8     Exhibit 2, which Mr. Bryant had previously testified at the

9     prior trial, were color drawings created after 1999."

14:12 10         Did he testify to that?

11         MR. PRICE:  Yeah.

12         MR. ZELLER:  I think that's correct.

13         MR. PRICE:  There's no dispute those were

14     created --

14:12 15         THE COURT:  No dispute.

16         What about Exhibits 5-14, 5-18, 5-19, 5-28, 5-95,

17     5-96 and 5-99; did he testify in the prior trial that these

18     were created after he left Mattel on October 19th, 2000?

19         MR. ZELLER:  Can I have those numbers one more

14:13 20     time, Your Honor.  I have the drawings here.

21         THE COURT:  5-14, 5-18, 5-19, 5-28, 5-95, 5-96,

22     5-99 are all drawings that he testified in the prior trial he

23     created after he left Mattel on October 19th.

24         MR. ZELLER:  Yes.

14:13 25         THE COURT:  Okay.  With respect to 5-76, 5-77, 5-78

UNITED STATES DISTRICT COURT

```
 1    and 18281, that these were always drawings he testified to in

 2    the prior trial he created during 1998?

 3              MR. ZELLER:  I'm sorry.  The last one again,

 4    Your Honor.

14:14  5              THE COURT:  I'm sorry.

 6              5-76, 5-77, 5-78 and 18281.

 7              (Discussion held off the record.)

 8              MR. ZELLER:  I know that Mr. Bryant stated that all

 9    the others are 1998 --

14:14 10              THE COURT:  No, just take your time.  You and

11    Ms. Hurst can talk.

12              MR. ZELLER:  I'm not so sure about 10579.

13              THE COURT:  That's all right.  Take your time.

14              Where is Mr. Cote and Mr. Overland?

14:14 15              MR. MCCONVILLE:  They're at the breakout room.

16              Do you want me to get them?

17              THE COURT:  Sure.  They might as well enjoy this.

18              (Discussion held off the record.)

19              MR. ZELLER:  It appears that previously Mr. Bryant

14:14 20    had testified -- and I'm taking this from Ms. Hurst -- that

21    Exhibit 18281, which is the same as 10579, was -- was created

22    by Mr. Bryant -- Mr. Bryant will testify -- was created by

23    Mr. Bryant in August of 1998.

24              THE COURT:  Let me say it again.

14:15 25              5-76, 5-77, 5-78 and 1828 were created in 1998.
```

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 107 of 158   Page ID #:315526
CV 04-9049 DOC - 04/02/2011 Volume 1 of 1

107

1    That's what Mr. Bryant would say.

2              MR. PRICE:  That's what he would say.

3              THE COURT:  All right.  Just a moment.

4              MR. PRICE:  And --

14:15 5        THE COURT:  And 15172 is a mystery?

6              MS. HURST:  Right.

7              THE COURT:  All right.  Now, it's as simple as

8    this:  In seeking the admission of a binder of trial and

9    deposition exhibits of supposed drawings and sketches created

14:16 10  by Carter Bryant, this binder contained no originals in

11   Exhibit 5 and instead contains supposed photocopies of

12   originals and photographs of originals.  In addition, a

13   substantial amount, that I pointed out the other evening, are

14   simply a binder that contains duplicates of other documents

14:16 15  already in the binder.

16             The admission of these materials is flatly

17   unavailable pursuant to Federal Rule of Evidence 1003, which

18   provides that a duplicate is admissible unless, first, there

19   is a genuine question as to the authenticity of the original;

14:16 20  or, second, in the circumstances it would be unfair to admit

21   the duplicate in lieu of the original.

22             Now, both of these exceptions apply.

23             In addition, I specifically recall, for both

24   parties, that Kathy went and got all of these drawings for

14:17 25  you and gave all of these drawings to you.  And if you have

1    any disagreement I'll ask Kathy to come in and get her on the

2    record.

3          So on the first point in Rule 1003(1), there is a

4    dispute about the authenticity of the originals since nobody

14:17 5    knows where the originals came from and when they were

6    created.

7          And on the second point, contained in Rule 1003(2)

8    it would be patently unfair to admit the duplicates in lieu

9    of the originals because the originals have always been

14:17 10   available to these parties and were available for the seven

11   days that Carter Bryant was on the stand.

12         In addition, this is a fundamentally visual case

13   involving comparison of elements of artistic works, and the

14   jurors will be substantially disadvantaged and both parties

14:17 15   may be exposed to prejudice if the jury improperly relies on

16   duplicates, and sometimes photographs, of the originals.

17         Now, many of these documents are even in the black

18   and white, which would completely undermine the substantial

19   similarity analysis under the copyright law.

14:18 20         Now, I'm not going to receive Exhibit 5.  It's

21   baffling to me, and I'll state this to both parties:  That in

22   the seven days that the same testimony wasn't elicited from

23   Mr. Bryant as was elicited during the first trial.

24         And these originals were always available to you

14:18 25   and were given to you by Kathy and, in fact, were brought out

1    from the back room in my presence.

2             And they were never shown to Carter Bryant and

3    instead -- people, turn to Exhibit 5.  And I'm not going to

4    receive it.  So the record is going to stand as it is to the

14:18 5   jury and I'm going to let you try and work it out.  But I'm

6    not going to come in at this point and admit Exhibit 5."

7             MR. ZELLER:  Just for the record, Your Honor, the

8    originals were shown to Carter Bryant.  He was here and shown

9    all these.  This was done because it was procedure and for

14:18 10  the record --

11            THE COURT:  Then there's no reason that he

12   shouldn't have testified off the originals.

13            I mean, this is a half-billion-dollar case in

14   attorneys' fees and this testimony could have been easily

14:19 15  elicited by both parties when he was on the stand referring

16   to these originals.

17            And also it's been prepared, so we have a clear

18   record, that for some period of time I've accepted that these

19   were not available to Mattel, that you told me that these

14:19 20  were in the possession of the other party and that these

21   originals couldn't be found.

22            MR. ZELLER:  Your Honor, that's a different --

23   there are two issues that are going on here.

24            Number one is, is that throughout most of the

14:19 25  discovery in this case MGA and Bryant withheld the originals

1    from us.  We had to make a motion to obtain access to them.

2           We eventually did, but by that time these --

3    these -- these -- these photocopies that were produced by MGA

4    and Bryant themselves, that is all that they produced.

14:19 5    That's what we had to use in discovery.

6           THE COURT:  But you had them in the first trial.

7           They've been sitting here since the first trial.

8           Whatever the bickering back and forth that started

9    between the parties and this trading off that happened with

14:20 10   prior counsel, at least as far as these exhibits and

11   originals, were always available to the parties.  The

12   originals were right here in court.

13           That's my ruling.

14           MR. ZELLER:  During --

14:20 15           THE COURT:  How you work that out --

16           MR. ZELLER:  That just rewards MGA for stiffing us

17   on what we thought was an appropriate procedure.

18           THE COURT:  No.

19           MR. PRICE:  Your Honor, can I make just two points:

14:20 20   One is Exhibit 5 was used for convenience because that's what

21   he produced to us.  He saw the originals, he was given a

22   binder so that he could look at it, even though he also

23   looked at the originals, and so that when he took the stand

24   he could say, yes, these are all of my drawings.

14:20 25           Now, it's easy to match up the originals versus the

1    copies he gave us, so that -- that really shouldn't be an

2    issue.  This was done as a matter of convenience so that he

3    could simply say, yes, these are my drawings, rather than

4    have a big pile.

14:21 5          THE COURT:  You know, it's easily resolved.  I'll

6    leave that to both of you.  It's easily resolved on this

7    record.

8              I'm not sending it to the Circuit on this record.

9              MR. QUINN:  Your Honor, but they're not going --

14:21 10   they won't agree to this.

11             I just hope the court understands --

12             THE COURT:  I understand.

13             But it's easily -- I can set up a teleconference

14   very easy so he doesn't have to be brought back.  He can be

14:21 15   brought back by Mattel on this limited issue to clear this

16   record up.  In other words I'm not foreclosing you at all if

17   you feel that this is -- you've been stiffed in a sense,

18   quote/unquote, by MGA, and if this is the prior testimony,

19   it's rather ridiculous that this isn't in front of the jury.

14:21 20         And I agree with that and I'm offering my hand to

21   you so that you can get a very clear record of what his

22   testimony is.  But I can't accept these duplicates.

23             And, remember, it can't come to me in a telephone

24   book this big -- photographs -- when the originals are

14:22 25   sitting back there.  And that's the way it came to me,

1    frankly, and I would have never received this.

2            I slowed you down on this.  I wanted to go through

3    this at night.  Nobody came back to me.  I thought it was

4    worked out between the parties.  They claim that you didn't

14:22  5    send them this two weeks after.  I don't know.  I don't care.

6            The point is, duplicates can't come in under 1003,

7    and these are duplicates.

8            Now, I'm offering a remedy for that.  Maybe this is

9    the prior testimony that needs to be reread from the first

14:22 10    trial, and you two can work it out.  I don't want to go any

11    further with that.  Okay?

12            But you're not foreclosed.  You're not foreclosed.

13            And I don't want you to be in the position of being

14    foreclosed on something like this if you believe in good

14:22 15    faith you relied upon it.  But I can't accept 1003 when the

16    originals are sitting there and so I'm baffled by both

17    parties not getting into this for the seven days and why you

18    have the expectation.

19            That's why I slowed that down.  I didn't receive

14:23 20    this.  So you can't rely upon that when I'm saying that the

21    parties let's work that out during the evening and nothing

22    happens, and now you believe that this is going to be

23    received as an exhibit by the court?  No, that's

24    unreasonable.

14:23 25            By the same token, it's apparent to me that you

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 113 of 158   Page ID #:315532
CV 04-9049 DOC - 04/02/2011 - Volume 1 of 1

113

1   were relying upon it.  In other words, you thought the other

2   party would reach a stipulation, but now the other party

3   claims that they didn't get this stipulation until a week or

4   so later after Mr. Bryant left.

14:23  5          I wasn't a party to that.  I'll just take 1003, but

6   I'm offering you a teleconference.  Okay?

7          Maybe you can work it out in terms of a rereading

8   so he doesn't need to be brought back, or maybe he just needs

9   to be brought back.

14:23 10         So you two talk about that for a little while and

11  if you come up with a solution, let me know.

12         Now, what do you want to do next?

13         MR. QUINN:  Your Honor, one issue that I would like

14  to tee up for discussion, if we could, at some point this

14:24 15 weekend is a point that Ms. Hurst raised concerning the

16  continuing relevance before the jury of any evidence relating

17  to Kohl's.

18         Now, the 17200 -- it was relevant to the 17200

19  claim, and that -- that was the only claim it was relevant

14:24 20 to, we thought.

21         That's now not going to go to the jury.

22         Ms. Hurst, the other evening when I brought that

23  up, said she thought it was still relevant to setoff.

24         THE COURT:  No.

14:24 25         MR. QUINN:  And -- which would seem -- which was

1    news to us.

2              THE COURT:  No.  I'm not going to instruct in terms

3    of setoff.

4              MR. QUINN:  Well, if it is relevant somehow for the

14:24  5    jury for setoff, then the Kohl's evidence needs to come in

6    before the jury.  If it's not, then I submit there should be

7    no further evidence before the jury on Kohl's and there's no

8    reason --

9              THE COURT:  I'm hearing all the evidence on the

14:25 10   17200 claim at the same time, and I followed your lead taking

11   the 17200 away, but I've been very clear from the beginning.

12             All the 17200 evidence is coming in, and before

13   this I thought it was going to go to the jury for

14   consideration.

14:25 15             MR. QUINN:  Uh-huh.

16             THE COURT:  All right.

17             Now, what else are we going to do?

18             MR. QUINN:  Just as a question, is the jury going

19   to -- is the court going to instruct the jury at the end,

14:25 20   then, that the evidence relating to Kohl's is not relevant to

21   the claims being submitted to them?

22             THE COURT:  I don't know yet.

23             Nobody's given me time to get to the instructions

24   yet.

14:25 25             MR. QUINN:  All right.

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 115 of 158   Page ID #:315534
CV 04-9049 DOC - 04/02/2011 - Volume 1 of 1

115

1          THE COURT:  And we may know as late as Wednesday

2     night.

3          I'm going down your list.  I've got two lists back

4     there, so we're going to check off every item on that list,

14:25  5     and then we'll finally get to the instructions.

6          What's your next item?

7          MR. MCCONVILLE:  Your Honor, there's the issue of

8     whether the court would permit the reading or the showing of

9     Tyler Schneider's deposition.

14:25 10          THE COURT:  Denied.

11          And then I'll make a further record of that and

12     I'll hand it out in written form, and I think that that was

13     the first request, quite frankly, by MGA that we not proceed

14     this way and I think that the minor reading of the newspaper

14:26 15     articles, et cetera, was not only a request by MGA but it was

16     a fair reading.

17          That doesn't mean that that substitutes for a

18     witness, and I'm going to remain very consistent in this and

19     I think that MGA would be the first to complain if I would

14:26 20     have allowed this case to go by snippets and depositions and

21     whatever Mattel wanted to put on, which you believe would

22     obviously escape the truth and not get people in there.

23          And I've relied on that in the beginning and I'll

24     hold to that ruling.

14:26 25          So, now, what else?

1       MR. MCCONVILLE:  On our list, Judge, there was an

2   issue of whether or not he would get a bona fide purchaser

3   instruction under 205(d).

4       THE COURT:  I'd like to hear more about that.

14:26  5   Ms. Hurst, I'm interested.  205(d); I'd like to hear that

6   issue tonight and then I'll need a little more time to write

7   and think about that.

8           It's a wonderful issue, so why don't you proceed.

9       MS. HURST:  I'm not sure I have a lot to add to

14:27 10   what I said about this the other day, Your Honor, but we have

11   a situation where Mattel is the claimed prior transferee and

12   MGA is the claimed subsequent transferee, and under 205(d)

13   even if MGA was the subsequent transferee, if it recorded

14   first and had taken in good faith and without notice and for

14:27 15   valuable consideration, then MGA would own, despite any

16   assignment.

17       Now, they say they recorded first so this isn't

18   available to us.  They recorded in 2006, long after this

19   litigation had been going on for years.

14:27 20       There were -- there was a prior recordation by Fox,

21   which included in the chain of title -- and we filed a

22   request for judicial notice on this the other day -- included

23   in the chain of title, Carter Bryant as an assignor.  In

24   addition there were numerous prior registrations that were

14:28 25   filed, which included Carter Bryant as an assignor.

```
 1              Now, the significance of this is, is that the

 2      recordation requirement is really only for purposes of

 3      constructive notice, to put the world on notice; and, based

 4      on that prior Fox recordation -- and it doesn't say the party

 5      has to record, it doesn't say who has to record, it can be

 6      any recordation -- but the bottom line is based on that

 7      recordation and those registrations you could go search at

 8      the copyright office on Carter Bryant and find his

 9      involvement with Bratz.

10              THE COURT:  Right.

11              MS. HURST:  Now, not only that, we know they had

12      actual notice of the assignment from Bryant to MGA based on

13      Mr. Moore's testimony that he got the agreement from the

14      citywide case when he went to Hong Kong on November 23rd,

15      2003.  So, clearly, they had actual notice of the assignment

16      before they ever recorded years later in 2006.

17              Now, that recordation by them in 2006 is just a

18      "gotcha" move, quite frankly.

19              THE COURT:  Okay.

20              MS. HURST:  It's just a gotcha move, and what we

21      really have here is a situation where this is exactly all of

22      the issues that the jury's going to be considering anyway:

23      What was the effect of the representations and warranties?

24      Was Mr. Rosenbaum's work adequate?  What is the significance

25      of Ms. Wong's representation to Mr. Rosenbaum?  What about
```

CV 04-9049 DOC - 04/02/2011 Volume 1 of 1

118

1    Ms. O'Connor's role?  Was Mr. Larian justified in relying on

2    Ms. O'Connor and Mr. Rosenbaum and their work on all of this

3    and what Ms. Wang said?

4          All of that has to be considered by the jury

14:29 5    anyway.  So what you have, then, is them coming along and

6    examining vigorously all these witnesses that the reps and

7    warranties are irrelevant to the question of actual transfer,

8    which is false.  That's not true.  They are relevant,

9    legally, under the bona fide purchaser defense.  And so it's

14:30 10   created this misleading impression in front of the jury that

11   these reps and warranties are basically irrelevant, which is

12   not true.

13         And so by doing that, by -- by creating that

14   misleading impression and given the fact that the jury has to

14:30 15   consider these issues anyway and, basically, they're trying

16   to just pull a technical gotcha over here, it's really unfair

17   not to let the jury consider the bona fide purchaser defense.

18         And if at the end of the day the court were to

19   decide, well, I've considered the recordation issue and

14:30 20   ultimately I decide that's not right -- it could decide that.

21   We don't think that would be appropriate.  We think they're

22   estopped to claim the benefit of the recordation requirement.

23   It would be well within the court's right to make that

24   determination, given that this was all bound up in a legal

14:30 25   proceeding already anyway.

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Okay.

 2              MS. KELLER:  And since the jury has to consider all

 3      these issues and since they've created this misleading

 4      impression that the reps and warranties are irrelevant, it's

14:30 5  really not fair to MGA now, having created that misleading

 6      impression, not to let the jury consider the issue.

 7              THE COURT:  Okay.  Okay.

 8              Mr. Zeller.

 9              MR. ZELLER:  Well, in terms of the fairness, the

14:31 10  fact is, is that the hours are now 112 hours and 21 minutes

11      for Mattel, 110 hours and 16 minutes for MGA, and MGA wants

12      to interject a defense that this court already rejected on

13      summary judgment.

14              I mean, I think the unfair -- the disadvantage to

14:31 15  Mattel is pretty -- pretty patent here.

16              And MGA's hook, I think, here, in terms of its

17      argument, is that, well, Mattel has misled the jury into some

18      belief that the representations and warranties of the Bryant

19      agreement are -- are irrelevant.

14:31 20          I think she even said at one point "legally"

21      irrelevant, but that was clearly our point in front the jury.

22      That's clearly not the case.

23              Our position has been that the representations and

24      warranties in that case are a sham.  We've said that that was

14:31 25  simply -- everyone understood that despite the language, it's
```

UNITED STATES DISTRICT COURT

1    meaningless between Carter Bryant and Isaac Larian and the

2    other participants.  We've said that was a sham and that

3    doesn't change our position.

4            So that doesn't change anything whether 205(d)

14:32  5    should be allowed as a defense at this late stage of the game

6    or not.

7            It doesn't have anything to do with it.

8            The other concern is that MGA is asking, in fact,

9    the court to -- in kind of compounding this potential

14:32 10    disadvantage to Mattel -- MGA's asking that a -- a -- a

11    recordation by Fox would just float into evidence by judicial

12    notice, apparently without any judicial notice, so it could

13    argue whatever it wants to the jury about this.

14            I mean, the parties are virtually out of time and

14:32 15    the idea that they should be allowed to put in this document

16    by judicial notice so that they can make some argument to the

17    jury about it, I think, again just compounds this -- this

18    potential prejudice to Mattel if this is the way it will be

19    permitted.

14:33 20            I would say that at a bare minimum, to the extent

21    that the court would entertain the idea at all that they

22    should at this late stage be permitted to revive this defense

23    that the court found was unavailing under summary judgment,

24    that they would have to actually bring in witnesses and mount

14:33 25    actual testimony on this subject so that we can do battle

 1    with it.  But the idea that a recordation, that they're going

 2    to argue should have that same legal effect, just comes

 3    floating in at the last minute just -- but before the buzzer

 4    so we have no opportunity to respond to it or, even worse,

14:33 5    have to devote some of our "time" to simply responding to

 6    something that they are taking no time to put into evidence,

 7    you know, doesn't strike me as the right procedure at this

 8    juncture.

 9              THE COURT:  Okay.

14:33 10              I'm sorry.

 11              MS. HURST:  That's all right.

 12              If the court wants us to call a witness to put the

 13    Fox recordation in we will.  This is why we need to get the

 14    issue resolved so that we need to know if we need to call a

14:34 15    witness.

 16              There's no reason why a certified copy of a

 17    document from the copyright office can't be the subject of

 18    judicial notice the same way the various trademark

 19    registrations and other things were.

14:34 20              We can do that, but that's why we need to get a

 21    resolution of this issue so if that's required we can put it

 22    on.

 23              They have always -- they're not prejudiced in any

 24    way.  The elements of the bona fide purchaser defense are

14:34 25    consideration.

UNITED STATES DISTRICT COURT

           1              They've had -- they have not only had every

           2     opportunity to examine that, but they put it in front of the

           3     jury how much Carter Bryant received in royalties under the

           4     agreement.

14:34      5              Good faith they've been arguing.

           6              You just heard Mr. Zeller argue it's a sham and

           7     that's been their argument and they've put in all the

           8     evidence they need on that.

           9              And notice, and they've put in all the evidence

14:34     10     they need on that too.

          11              So there's nothing new here.  In fact, there's

          12     nothing new factually at all, which is why it is so unfair

          13     not to let this go to the jury.

          14              Now, Mr. Price repeatedly asked several witnesses,

14:35     15     "But you know those reps and warranties are irrelevant to the

          16     question of whether you actually owned it or not."

          17              Repeatedly asked those questions to try to

          18     establish that the question of transfer was not affected at

          19     all by reps and warranties.  That's not true.  That is a

14:35     20     false legal proposition under these circumstances.

          21              And so there's no prejudice to them at all from

          22     letting the jury consider this in terms of presentation of

          23     the evidence, and we have time still to put somebody on, to

          24     put on the recordation, if we have to, and they can call --

14:35     25     they've got time too.  They can call somebody and put in

1    their recordation and argue whatever they want to have.

2         So -- but this is really it.  We really do need to

3    know because this is the last week, and I respectfully submit

4    that it would just be a real shame not to let the jury

14:36  5    consider this and then have it go to the Ninth Circuit

6    without the benefit of the verdict on the bona fide purchaser

7    defense, because they're arguing some, you know, technicality

8    of constructive notice when they had actual notice, and then

9    we're going to have to come back and retry, you know, bona

14:36 10    fide purchaser defense when all the evidence was already

11    before the jury.

12         That would just not make sense at all.

13         And they knew this the whole time.  Even

14    Judge Larson was prepared to let this defense go to the jury,

14:36 15    and to deal with the recordation issue separately.

16         So this isn't -- you know, they can't claim

17    surprise.

18         It would be all the same witnesses, all the same

19    evidence, there's nothing that they haven't elicited relevant

14:36 20    to this and, you know, they can stand up and make their

21    argument that it's a sham based on the current record.

22              MR. ZELLER:  Is MGA --

23              THE COURT:  Mr. Zeller.

24              MR. ZELLER:  Is MGA now, I guess, stipulating that

14:36 25    all of Judge Larson's rulings should be kept in tact?

1      We'll -- we'll go with that, certainly.

2          (Laughter.)

3          MR. ZELLER:  But on a serious note, there is

4    something new factually here, which is the purported

14:37  5    recordation by Fox.  That's new in the sense that it has not

6    been introduced at trial.  It is new.

7          It would undoubtedly require testimony of someone

8    we have not had the opportunity to depose on this subject.

9          MGA didn't offer a 30(b)(6) witness on this subject

14:37 10    of their purported reliance of their recordation by Fox.

11          At a bare minimum MGA should be ordered immediately

12    to provide a witness and disclose full and complete discovery

13    about all their recordation activities before -- before the

14    court even should consider allowing this to go down that

14:37 15    road.

16          I mean, this is surprise and this is unfair at

17    this -- at this juncture, given where we are right now.  So

18    it's just simply not correct that there's nothing new

19    factually here.

14:37 20          The other thing that's -- I would say, finally, in

21    response to this, is that Ms. Hurst keeps on conflating two

22    things.

23          Something she's called a "bona fide purchaser

24    defense" and 205(d) and sort of trying to derive the notion

14:38 25    of recordation as a technicality.

1          Well, it's not a technicality.  It's the language

2     of the statute.  It's a statutory requirement.  This is not a

3     technicality.  It's absolutely required in order to assert

4     205(d).

14:38  5          205(d) is not a "bona fide purchaser" defense.

6     She's conflating, I think, some layperson's perspective of

7     what people in the industry think they're allowed to rely

8     upon versus an actual defense set forth in the -- in the

9     Copyright Act that, by its terms, requires recordation.

14:38 10          THE COURT:  Okay.

11          MR. ZELLER:  Thank you.

12          THE COURT:  Now, what would you like to do next?

13          Okay.  Well, we have a number of other things that

14     I can think of, but I want to have you go through your list

14:39 15     and then I've got a list.

16          MR. ZELLER:  Well, I mean, things that are on our

17     list -- we have the articles, the redacted articles that

18     we've submitted to the court in a binder.

19          THE COURT:  Yeah, why don't we get those out, and

14:39 20     those are the articles that you want to show were in response

21     to what had become public notice, in a sense, of different

22     MGA -- is that correct? -- product, Mr. Zeller, of different

23     MGA product?

24          MR. ZELLER:  Yes, Your Honor.  These are the

14:39 25     articles that Carey Plunkett had seen, testified to, and the

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 04/02/2011 - Volume 1 of 1

```
 1    court obviously wanted to look at them in their form before

 2    admitting them into evidence.

 3              We have gone through the procedure.

 4              THE COURT:  Has Mr. McConville seen these?

14:40  5       You gave me -- you tried to give me a binder the

 6    other day, and I don't know if I got it from you.

 7              MR. ZELLER:  You do have that binder, Your Honor.

 8              THE COURT:  I'm just not sure.  I'll go back and

 9    look.

14:40 10       Have you gone through these, Mr. McConville?

11              MR. MCCONVILLE:  I've seen them before, Your Honor.

12    I think in general they fall into multiple categories, but,

13    so --

14              THE COURT:  Is there an objection to them?

14:40 15        MR. MCCONVILLE:  Yeah, they're hearsay.

16              They're news articles that are hearsay and the

17    witnesses' testimony -- some of them are --

18              THE COURT:  Well --

19              MR. MCCONVILLE:  -- and the witness' testimony was

14:40 20  not that she looked at them at the time, but that these are

21    the kind of materials that are generally available.  So it

22    wasn't something that she personally relied on.

23              But I'm not really tracking exactly how we've

24    morphed from "no news articles are coming in" to now there's

14:40 25  certain different categories of news articles that may be
```

UNITED STATES DISTRICT COURT

1    coming in.  But in any event this witness did not say that

2    she relied on these news articles at the time.

3         Second, there's some of these which I believe are

4    Internet printouts, which I think the court has said at some

14:41  5    stage that you need more than something that's printed from

6    the Internet in order to find that it's reliable.

7         And the other categories are --

8         THE COURT:  Well, that was the prior ruling

9    concerning all the other articles --

14:41  10        MR. MCCONVILLE:  Right.

11        THE COURT:  -- that caused the production of the

12   actual person or article and that's why we had that reading

13   from the persons who had testified at the deposition.

14        MR. QUINN:  Your Honor, the difference with those

14:41  15   were those were for the truth.  This is not for truth.

16        If -- if a new toy is announced on the front

17   page of the New York Times on January 20th, 1951, it's no

18   longer confidential information.  As of January 20th -- or

19   whatever date I said -- 1951, it's public.

14:42  20        So it's not for truth.  We don't have to show that

21   anybody relied on it.  It's offered only to show it's out

22   there as of that date.

23        THE COURT:  I might agree with you.

24        What am I going to do, though, when they come off

14:42  25   the Internet?  I've got colleagues -- I think it was

1    Marilyn Patel who wrote the last article, along with another

2    judge --

3              MR. QUINN:  That's an authentication issue.

4              THE COURT:  Because it's not for the truth?

14:42  5              MR. QUINN:  Yes, but that's a legitimate issue.

6              But reliance isn't an issue; truth isn't an issue.

7    Authentication may be an issue.

8              THE COURT:  The second issue that MGA raised was

9    that Plunkett never said or referred to these different

14:42  10   products or that she relied upon them or saw them.

11             MR. QUINN:  Well, reliance isn't an issue.  We're

12   not saying she relied on them.  The question is, is this an

13   article that appeared in this magazine or can she identify

14   this magazine, this publication, as being, you know,

14:42  15   something that was out there?

16             THE COURT:  Okay.

17             MR. QUINN:  So it just goes to authentication.

18   Again, it's not an issue of truth, reliance or anything

19   related to that.

14:43  20             THE COURT:  And so far most of my colleagues have

21   felt that the Internet isn't a proper authentication, but

22   I've taken a little bit broader view than that.

23             My concern has always been not in terms of the

24   Internet being unreliable and who has the motivation to

14:43  25   change something on the Internet.  So, for instance, on the

1    Wikipedia page I can simply add to that page.  That's subject

2    to a lot of inherent discrepancy.

3         It's very difficult for the court to imagine --

4    strike that -- my colleagues are much more learned than this

14:43  5    court -- but it's hard for me to understand some of the

6    breadth of Judge Patel's writing on this issue because

7    there's no motivation to change these articles, and that's a

8    far different issue and situation than the motivation to

9    change a particular article.

14:43 10         But I still have, of course, a couple colleagues

11   who have written, in a very narrow sense, that the Internet's

12   not reliable, so --

13         MR. QUINN:  Well, I think that's the proper subject

14   for discussion is authentication --

14:44 15         THE COURT:  Uh-huh.

16         MR. QUINN:  -- but not hearsay and not reliance.

17         THE COURT:  Okay.  Now, let me ask very quickly.

18   We must have some microfiche on this.

19         You know what microfiche is, don't you, Mr. Cote?

14:44 20         MR. COTE:  I know what it is.  I just didn't

21   understand the question, Your Honor.

22         THE COURT:  Well, it's just, if I want to go down

23   to the Orange County Register and pull the article, I can

24   walk right across the street and pull the article, just like

14:44 25   that.

1          I mean, it's just that simple and that fast, and

2     that resolves a large part of the authentication issue that

3     my colleagues have taken a different view on.

4          I just don't see any motivation to change these

14:44 5     articles, quite frankly, from the Wall Street Journal.  So

6     I'm a little less-inherently distrustful of the Internet.

7          MR. QUINN:  Well, first the -- the easy ones,

8     Your Honor, several of the exhibits in this binder are MGA

9     press releases produced by MGA.

14:45 10          THE COURT:  Okay.  Now, let me go get those for

11     just a moment.

12          Let me go get the binder, because you gave it to

13     me.  I've got mounds of material back here.  Let me go find

14     it.

14:45 15          This is off the record for a moment.

16          (Discussion held off the record.)

17          (Recess taken.)

18          THE COURT:  Okay.  We're back on the record.

19          (Pause in the proceedings.)

15:03 20          THE COURT:  Okay.  All right.  Then we're back on

21     the record.

22          All counsel are present -- well, I'll wait for

23     Mr. Price, and I need Mr. --

24          (Discussion held off the record.)

15:03 25          THE COURT:  And I have a question for you,

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 131 of 158   Page ID #:315550
CV 04-9049 DOC - 04/02/2011   Volume 1 of 1

131

 1    Mr. Zeller, in just a moment about this.

 2              (Pause in the proceedings.)

 3              THE COURT:  Is it okay to proceed just without

 4    Mr. Price?

15:03  5              MR. ZELLER:  Yes.

 6              THE COURT:  All counsel are present.  We're back on

 7    the record.

 8              Ms. Hurst, your question is a concern about an

 9    entire new trial if what we get -- or what you'd call -- we

15:04 10    get an equitable panel that would consider it somewhat

 11    ridiculous that this question wasn't submitted to the jury.

 12              So let me respond in this way.

 13              I had already made a ruling at the time of summary

 14    judgment, and why wouldn't this court, to preclude the

15:04 15    possibility of a new trial, simply ask the jury one

 16    additional finding or question after the initial verdict on

 17    205(d)?

 18              Why wouldn't I simply ask them, did MGA purchase

 19    Carter Bryant's copyright in good faith?

15:04 20              The other two elements of 50 -- or 205(d) can be

 21    resolved by the court.  The first is consideration; it

 22    occurred.  The second is recordation; it did not occur.  And

 23    the third is -- really, the only question is did MGA purchase

 24    in good faith?

15:05 25              And to preclude a new trial in what I call an

1    "equity-minded" Circuit panel, if that's the concern, who

2    might think it's ridiculous because Mattel had been on notice

3    in 2004 because they got Carter Bryant's employment pursuant

4    to MGA presenting it during discovery, I don't see why, if

15:05 5    there is a great concern, I don't send it back for one

6    question.

7         I'm trying to simplify-down the questions for the

8    jury and what I don't want to do is get into an appellate

9    contest between you and Mr. Zeller on issues for appeal, and

15:05 10    the silliness of the record right now where one side says

11    that this is so easy to show and the objection is we'd have

12    to put on an additional witness on the other side.  It's just

13    so unnecessary.  It takes one question after the jury comes

14    in with a verdict.  It's a two-second question for them.

15:06 15         MS. HURST:  I agree, it only takes one question;

16    but it should be a question that's considered at the same

17    time as all the other questions because, for example, the

18    intentional interference and other things require

19    consideration of the same issues.

15:06 20         There's no reason to make it bifurcated or subject

21    to separate consideration.

22         THE COURT:  Why?  Why?  We do that all the time.

23         I can think of numerous examples where we send the

24    jury back on special questions or issues that we want

15:06 25    decided.

CV 04-9049 DOC - 04/02/2011 - Volume 1 of 1

```
 1              Why am I confounding and confusing the jury further

 2    on these initial findings?  I'm trying to simplify-down the

 3    questions and not complicate them.

 4              MS. HURST:  This is a pretty simple instruction.  I

 5    don't know why it --

 6              THE COURT:  I may just take the chance and hold to

 7    my summary judgment.

 8              MS. HURST:  I understand that.

 9              THE COURT:  And that puts you at tremendous risk,

10    quite frankly.

11              MS. HURST:  Well, I don't -- look, there's a lot of

12    things that put MGA at tremendous risk about this case,

13    but --

14              THE COURT:  No, no.  It's -- you're back to another

15    trial.

16              I'm offering you a safety valve and a way to

17    resolve this, quite frankly, without further confusion of

18    these special verdicts, and that is the opportunity to answer

19    that question and preclude that.

20              It's your client who may not be able to afford to

21    go through another trial.

22              MS. HURST:  The problem is, I think the court --

23              THE COURT:  I'm done with that.

24              You can decide.  We're going to move on.  I've

25    offered you the opportunity to go back and preclude it.
```

 1    You've got your record.

 2            MS. HURST:  Your Honor, I don't understand what

 3    question the court is asking.

 4            In other words, we don't have a verdict form yet,

15:07  5    so it's not clear to me why this is adding some significant

 6    burden to ask this question.

 7            If all -- if the only question the court is going

 8    to ask, and the last verdict form we saw just had one

 9    question about ownership on it, right?

15:07 10            THE COURT:  Sure.

11            MS. HURST:  If the court's only going to ask one

12    question about ownership and not ask about interpretation of

13    the contract and not ask about timing, but just one question

14    about ownership, then bona fide purchaser is part of that

15:08 15    question.

16            THE COURT:  Then why am I going against my summary

17    judgment?  In other words if I believe what I said, why am I

18    undoing the summary judgment?

19            MS. HURST:  Because they have deliberately

15:08 20    manipulated that issue during the presentation of trial to

21    prejudice MGA.  They have opened the door to further

22    consideration of that and, Your Honor, I mean, I don't want

23    to be confrontational, but I think the summary judgment was

24    wrong.

15:08 25            THE COURT:  Okay.  Thank you very much.  I'm sure

CV 04-9049 DOC - 04/02/2011 - Volume 1 of 1

```
 1    the Circuit will correct me.  Now I'm going to recess for a

 2    moment.

 3              Visit with each other.

 4              (Recess taken.)

15:09  5        THE COURT:  Okay.  We're back on the record.

 6              Now, Ms. Hurst, that's the same argument I'm

 7    hearing from Mattel:  Why not just send it to the jury on the

 8    choice of law question?

 9              Your motion's denied.

15:10 10        I'll stay right with my summary judgment.  So the

11    205 will not go to the jury and the record will reflect that

12    MGA's declined the court's opportunity for special verdict

13    question after the jury reaches a result.

14              All right.  Now --

15:10 15        MS. HURST:  Your Honor, I really don't think that

16    is fair.  I --

17              THE COURT:  Just a moment.

18              That's entirely fair.  That's entirely fair.  I

19    could see the same argument from Mattel:  Why don't you just

15:10 20    let the choice of law go to the jury?

21              MS. HURST:  Because there is absolutely no

22    precedent and Ninth Circuit law is to the contrary.

23    Bona fide purchaser, on the other hand, is completely

24    different.

15:10 25        It's not the same situation.
```

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 136 of 158   Page ID #:315555
CV 04-9049 DOC - 04/02/2011   Volume 1 of 1

136

```
 1              THE COURT:  Okay.
 2              MS. HURST:  Your Honor, we can't evaluate whether
 3      to put a subsequent special verdict or special interrogatory
 4      to the jury in the absence of a verdict form.  We just can't.
15:10 5              THE COURT:  Okay.
 6              MS. HURST:  And, you know, if when we get the
 7      verdict form and we see what it looks like, we may again make
 8      the request and -- and accede to the court's suggestion.
 9              But in the absence of a verdict form I don't know
15:11 10     how we can really properly evaluate the court's suggestion.
 11             THE COURT:  The door's always open.  I'd like to
 12     avoid a new trial also, but I'm not setting this up for
 13     appellate purposes.
 14             You know, I'll stand by my rulings, and so it's
15:11 15     denied.
 16             All right.  And what else would you like to cover
 17     this evening?
 18             MR. ZELLER:  Well, we have the --
 19             MR. MCCONVILLE:  Buckets.
15:11 20             MR. ZELLER:  -- the trade secret definition/bucket
 21     that I know has been eagerly anticipated.
 22             THE COURT:  Okay.  Trade secret buckets.  What are
 23     we going to do with those?
 24             MR. QUINN:  So it's as follows, Your Honor.  It
15:11 25     will sound familiar.
```

 1          "The concepts for the doll and the doll line -- the

 2     dolls and the doll line, disclosed by Carter Bryant to MGA

 3     prior to October 20, 2000, including, without limitation, the

 4     information contained in the designs and sculpts or any

 5     combination of the designs and sculpts, that Carter Bryant

 6     conceived or reduced to practice at any time during his

 7     employment with Mattel."

 8          So we tried to build off the language we had before

 9     and what was in the court order and have tried to simplify

10     it.

11          That's it.

12          THE COURT:  One bucket.

13          MR. QUINN:  One bucket.

14          THE COURT:  One bucket.

15          All right.  Now Ms. Hurst.

16          MS. HURST:  Well, that just completely violates the

17     Ninth Circuit opinion.  I don't even know where to start.

18          We've tried our entire case on the basis of the

19     definition in 9801.  We have constructed all of our prior art

20     on the basis of the definition in 9801.  We -- the -- the

21     thing that was just described completely violates the IMAX

22     decision in terms of any reasonable particularity that would

23     allow a jury to distinguish this from the prior art.

24          It conflates a number of different things done at

25     different times with potential -- very potential legal

UNITED STATES DISTRICT COURT

1    significance to that.

2            Basically they had a statutory -- they had a

3    complete failure of proof when they filed 9801, because what

4    they filed was something that said "these ideas are trade

15:13  5    secrets."

6            And under the statute, those do not qualify as

7    "trade secrets."  The kind of things that qualify as trade

8    secrets under the statute are information, and that is

9    defined with reference to the restatement, and it's

15:13 10    information as to -- as in knowledge of facts or

11    circumstances.  It's not creative works.  And *Silvaco* says

12    ideas are not protected and other cases make clear that when

13    California adopted the UTSA the language information is meant

14    to refer to knowledge of facts and circumstances, not

15:14 15    creative works.

16            And now they are trying to remedy -- they are

17    trying to remedy a complete failure to define a protectable

18    trade secret under the statute when we have two days left in

19    our case.

15:14 20            They are also trying to remedy their failure to

21    allocate their damages under the '02 Micro case.  They had a

22    failure to appear on damages because they had six to eight

23    different trade secrets to find and they didn't allocate

24    them.  That's prejudicial.

15:14 25            And on top of all of that, that new -- brand-new

 1    trade secret definition, when we have two days left in our

 2    case, is absolutely preempted by the Copyright Act because

 3    now it's tied specifically to the drawings and the sculpts.

 4          So I just -- I object on behalf of --

 5    15:15    THE COURT:  Mattel's been warned about that.

 6          MS. HURST:  Well, then I ask the court rule that

 7    they -- that -- that -- that the claim is preempted and not

 8    submitted to the jury if that's their "trade secret"

 9    definition.

15:15 10          THE COURT:  Okay.

11          MS. HURST:  We object to this in the strongest

12    possible terms.  This is legally inappropriate, it is

13    prejudicial to us to permit them to do this after we've tried

14    our whole case on the basis of a trade secret definition that

15:15 15    was late, by all measures anyway, and I -- you know, I don't

16    know what else to say about it.

17          THE COURT:  Okay.  Mr. Quinn or Mr. Zeller.

18          MR. QUINN:  Well, it's -- it's -- that's an

19    interesting argument for MGA to make.

15:16 20          Let's recall that MGA's claim trade secrets in this

21    case are Bratz Wildlife Safari, Bratz Girls' Night Out,

22    Bratz Sunkissed Summer, Bratz Lil' Dance Bratz Party, and I

23    think 26 or a hundred others.

24          I guess we'll find out, hopefully, by the time they

15:16 25    rest their case.

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 04/02/2011   Volume 1 of 1

1          Apparently those things, those Bratz things,

2     constitute knowledge or information; but our version of the

3     same thing doesn't constitute knowledge or information.

4          THE COURT:  All right.

15:16  5          What else would you like to do?

6          How about "backpack"?

7          MR. QUINN:  "Backpack" -- we're ready for

8     "backpack," Your Honor.

9          THE COURT:  Let's take up "backpack" tonight.

15:16 10          MR. QUINN:  I think the state of play on that -- we

11     submitted a brief on that as far as testimony from --

12          THE COURT:  Now, let me probe this with you a

13     little bit.

14          I've got a concern that has nothing to do with your

15:17 15     chain, but with 403 for a moment, and here's my concern:

16          At least with Machado I've got a linkage.  I've got

17     evidence in this record that Machado meets Larian in

18     New York, Larian flies to Mexico, Machado becomes employed,

19     same as Brisbois up in Canada, but a whole different fact

15:17 20     situation in front of the jury.

21          What I have here is simply a request to move in a

22     USB drive, but I don't know any other circumstances about it,

23     at least on this record.

24          I have no testimony concerning contact with

15:18 25     Mr. Larian.  I have no inducement that I'm aware of.  I have

UNITED STATES DISTRICT COURT

1    no conversation.

2            What I have is an employee, amongst hundreds of

3    employees, who download some piece of information, and I have

4    no testimony -- although I've invited you to show me the

15:18 5  authenticity through the USB drive itself.

6            First of all we started with this USB drive with a

7    hundred pieces of information.  From the summary judgment

8    motion I know that she's employed, that she works out of the

9    home, that she takes a good portion of this work product home

15:18 10 for some of the year.  I see the increased activity -- and

11   you're right, it's seven -- it wasn't six -- drives that were

12   downloaded close to the time that she leaves.  But I also

13   have a record that the same thing is occurring with employees

14   that go to Hasbro, Jakks, I've heard testimony at the time of

15:19 15 trial that these people aren't being pursued, that they're

16   still be considered, but according to the log these are very

17   old cases that should have been considered or could have been

18   considered at the same time as Brisbois.

19           Now, on the state of that record, with this many

15:19 20 people going over to different firms with no inducement on

21   this record, no testimony about what Larian did or didn't do,

22   and a bare tape, this puts the court in no different position

23   than any one of a number of a hundred employees or seven

24   employees or employees going to competitors other than MGA

15:19 25 downloading information.

UNITED STATES DISTRICT COURT

 1          So before we ever get to the authenticity of this

 2     or the chain -- because I think there is a stipulation that

 3     the chain's been met -- it came down from Canada -- what

 4     you're simply asking is I simply put this in according to the

15:20 5     chain, that this has some foundation to it, it has some

 6     authenticity, and then I drag off six pieces of product and

 7     the inference is that these are all trade secrets.

 8          Now, that's what I'm having difficulty with

 9     initially before we ever get to foundation.  That's what

15:20 10     concerned me, just under 403.  I've got no link to Larian

 11     making a phone call.

 12          I've got Deanda's testimony from my memory that she

 13     downloaded it, but if I go through Deanda's logs I've got 50

 14     to 70 people downloading.

15:20 15          Mattel feels it's been stolen blind by their

 16     employees.  I understand that.  But I don't understand why

 17     I'm just going to take a disc and allow that into evidence

 18     under 403 without, you know, something else from Mr. Larian

 19     when he was on the stand, and there was plenty of time to ask

15:20 20     him about that.  Everybody avoided it.

 21          So I don't even know if there was a phone call to

 22     her, at least on this record.

 23          MR. QUINN:  No, that's true.

 24          You don't have -- on this record you don't have any

15:21 25     conversation with Larian.  So as the court says, there's no

 1    clear evidence of that kind of inducement.

 2         What you have is downloading of seven identified

 3    file documents, and we've printed out the documents and the

 4    court has those.

15:21  5         THE COURT:  Right.

 6         MR. QUINN:  They are documents of the type which

 7    have been identified by other witnesses and other contacts as

 8    being confidential, a line list, a global strategy plan from

 9    the titles of the documents, and the paper copies themselves

15:21 10    from the testimony of Merryman who said that those were the

 11    file names that were there.

 12         We know that she did this on the eve of her

 13    departure.  The resignation letter is there, so we can narrow

 14    it down to having been done, like, I think within a day or

15:21 15    two --

 16         THE COURT:  Sure.

 17         MR. QUINN:  -- of her resignation.

 18         We know she's going to MGA.

 19         THE COURT:  Sure.

15:21 20         MR. QUINN:  We have the testimony of Mr. Kinrich

 21    that, like other downloaders, she got a very significant

 22    raise.  In her case it was something like 40 percent.  And

 23    then I think we have to see this in the context of all the

 24    other witnesses -- all the other downloaders who went to MGA,

15:22 25    so I think this is supportive and consistent with a pattern.

1          I'm speaking now to the 403 issue.

2          THE COURT:  You see, the opposite argument's made,

3    though.  It's one of the reasons that the RICO didn't survive

4    also.

15:22 5          The opposite argument is that, according to these

6    logs, there was a substantial number of people who downloaded

7    in the same way that went to Hasbro or Jakks or other

8    competitors, but they were never pursued.

9          So on the other side of the ledger I've got a

15:22 10   potential record that shows that from MGA's perception

11   they've always claimed that this is a selective prosecution.

12   So why -- what I don't understand is I don't have any

13   evidence to what Mr. Larian's doing.

14         MR. QUINN:  Well, you don't have any evidence other

15:22 15   than the circumstantial evidence of Larian's involvement.

16         But, Your Honor, I don't think it's true that

17   you -- I think you're extrapolating on a lot of logs.

18         THE COURT:  Okay.

19         MR. QUINN:  When Thomas was on the stand, I think

15:23 20   she said there were four others.

21         MR. ZELLER:  Yes, four.

22         MR. QUINN:  Four who had left.

23         THE COURT:  Four who had left that she was still

24   examining.

15:23 25         MR. QUINN:  Yes, that she was still examining, who

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 145 of 158   Page ID #:315564
CV 04-9049 DOC - 04/02/2011   Volume 1 of 1

145

 1    were not MGA, people who departed -- who did not go to MGA,

 2    four who had left, and we have testimony that this is a very

 3    mobile industry, that people do move from company to company.

 4            THE COURT:  Right.

15:23 5         MR. QUINN:  So I think it's fair to -- it's within

 6    the realm of the evidence here that there's probably a lot of

 7    people who have left Mattel, lots of people in the recent

 8    past, to go to work for other toy companies.

 9            But on the record here we only have four at all who

15:23 10   went to companies other than MGA.

11            THE COURT:  But I've got hundreds of other people

12    who -- strike that.

13            I've got so many other people who have downloaded

14    in different degrees or at least were looked at for

15:24 15   investigative purposes.

16            MR. QUINN:  Well, in the record I don't think you

17    can draw any conclusions from that based on the record

18    evidence.

19            THE COURT:  Is there something --

15:24 20        MR. QUINN:  They may have been "looked" at --

21            THE COURT:  Okay.

22            MR. QUINN:  -- but this is a case, I mean, where we

23    know it -- it -- it -- it's in the record that in this case

24    this was more than just looked at.  The data was recaptured.

15:24 25   We got back the thumbdrive.  We can identify the documents.

UNITED STATES DISTRICT COURT

1          And, frankly, on the other hand, we know this is --

2     this is -- it isn't right to do this.

3          What she did is not right, and she went to work for

4     MGA and she got a 40 percent raise.

15:24  5          THE COURT:  Let's never get in the position that we

6     ever think that this is right to do this.  I agree.

7          The question is, why?  What's the intent?

8          Is this linked to Mr. Larian or is this an

9     independent employee downloading and going over there.

15:25 10          You see, you've got a strong nexus with Machado,

11     and I'm not certain whether you charged Machado or not that I

12     wouldn't have let that in regardless because I've got that

13     nexus to Larian whether you have Machado down in Mexico or

14     not, and you probably would have always had that evidence in

15:25 15     retrospect, you know, as I started to understand the case

16     more.

17          There I've got a clear nexus of Larian in New York.

18     The jury can understand what that is.  I've got a clear nexus

19     to Larian down in Mexico flying down.  That becomes a juror

15:25 20     determination.

21          Up there with Brisbois, I don't have that nexus.

22     I'm not as comfortable of what he did or didn't do, because I

23     have nothing in the record.  I have this bare backpack tape.

24          So that's my concern.

15:25 25          I'm going to turn to MGA for a moment and then I'm

1    going to turn to you.

2            So let me turn to Ms. Keller, Mr. McConville,

3    Ms. Hurst.

4            MR. MCCONVILLE:  Your Honor, the state of the

15:26 5  record now is that there is a thumbdrive.

6            THE COURT:  Yeah.

7            MR. MCCONVILLE:  The court made it clear all along

8    that you expected to hear from Brisbois.  We never did.

9            The state of the record is we don't know what those

15:26 10 documents are.  Are they trade secrets?  That's what would

11   make them relevant.

12           There has been no testimony as to the contents of

13   the thumbdrive.  What we know is there was a thumbdrive.

14           THE COURT:  Yeah.

15:26 15         MR. MCCONVILLE:  So in the absence of making

16   them -- were they trade secrets?  Were they disclosed?  Were

17   they readily available?

18           They put on no evidence to satisfy any evidence of

19   that, A; B, it therefore renders them require irrelevant.

15:26 20         And at this late stage if they're going to try to

21   put evidence in, their case is closed, so from a "where were

22   they on the state of the record when they closed their case?"

23   They're stuck with what they did.  They made a strategic

24   call, whatever their call was, and that was it.

15:26 25         We've had no opportunity to examine anybody about

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 04/02/2011 Volume 1 of 1

148

```
 1    what the contents of these are.

 2              THE COURT:  Ms. Hurst has a note she's trying to

 3    pass you.

 4              (Laughter.)

15:27  5         MR. MCCONVILLE:  And so, I mean, we enjoy examining

 6    their witnesses about what they say are trade secrets.  We

 7    didn't have that opportunity because they put no evidence in.

 8    And if they put no evidence in, then how could they possibly

 9    get it to the jury?

15:27 10         And as the court has noted, there's no evidence

11    that MGA or Larian induced any of this other than they're

12    saying that it is so that is in evidence.

13              THE COURT:  Okay.  Why don't you do this, then.

14              Or I'm sorry, let me turn back to Mattel and then

15:27 15   back to you for a moment and then I've got one more

16    suggestion for this evening, hopefully to get you guys some

17    rest.

18              MR. QUINN:  Well, we do have comments as to Larian

19    who did identify file names and read them into the record.

15:27 20   So we do know those file names, they're familiar to us; line

21    list, global strategy plan.

22              I would say there's also a stipulation that the

23    document admission was -- issues were always left open at the

24    close of our case, and this was among those.

15:28 25              THE COURT:  Sure.
```

UNITED STATES DISTRICT COURT

1          MR. QUINN:  But if this was all the evidence we

2     had, we wouldn't -- if this was just a claim based solely

3     upon Brisbois's activity, we wouldn't have a case here.

4          But based upon the entire pattern here from Cooney

15:28 5     to Castilla to the Three Amigos in Mexico City, with

6     Kinrich's testimony I think there is a pattern here and we

7     know what some of those documents are because we've seen them

8     by title in other context.

9          And let's be realistic, the particular thumbdrive

15:28 10    has been identified, the court has it, it's in evidence and

11    the device itself is in evidence.

12          We can push a button and print it out and we know

13    what the documents are there.

14          But --

15:28 15          THE COURT:  Have I ever --

16          MR. QUINN:  -- as a last resort, if we need to,

17    we'll call Brisbois.

18          THE COURT:  It's your time and that's fine, but the

19    end result is this:  Have I received this in evidence?

15:28 20          MR. QUINN:  You have not received the device into

21    evidence.  However, I think you have -- the predicate exists.

22          I mean, we moved it in and you said you were going

23    to hold off on that.

24          THE COURT:  Okay.  Now, my suggestion is you just

15:29 25    wait.

```
 1          Let me go back and start sorting out some of the
 2   other issues you've raised tonight, because if I send you out
 3   now then I'm bringing you back later.  So I'd rather try to
 4   get you out of here at 4:00 or 5:00 or 6:00, rather than have
 5   you go out from 3:30 to 5:00 and then bring you back at
 6   6:00 or 7:00.
 7          MR. QUINN:  Okay.
 8          THE COURT:  So will you give me about a half an
 9   hour?
10          MR. MCCONVILLE:  Yes, sir.
11          THE COURT:  Or, you know, you can go out to dinner
12   tonight and we can come back later.  It's up to you.
13          I'll be back later.
14          (Recess taken.)
15          THE COURT:  We're on the record.
16          And I asked counsel to pull Docket No. 9801.
17          On the bucket side I had previously given Mattel a
18   choice between either electing to go with the original list
19   of buckets or electing to identify only the buckets and
20   drawings as trade secrets.
21          I provided this choice in order to balance two
22   interests.
23          First, Mattel's interests in being as specific as
24   possible about it's trade's secrets; and, second, MGA's
25   interest in not being subject to a moving target on a claim
```

1    that's already, at least, almost five years old.

2            First I want to reject, Ms. Hurst, your argument

3    that it would be unduly prejudicial -- or that you would be

4    unduly prejudiced by Mattel slimming down its claimed trade

16:25  5    secrets to the drawings and sculpts.

6            If you look at Mattel's chart in Docket 9801, I

7    think you will clearly see that the sculpts are identified in

8    trade secrets, Column No. 7, and the drawings are identified

9    as trade secrets in Column No. 10.

16:25 10           In short, I think MGA has always been on notice

11   from the very beginning that Bryant's creative works were

12   being claimed as trade secrets.  There's no prejudice to MGA.

13           However, Mattel's newest formulation today is

14   prejudicial because it's awfully late in the game as it comes

16:25 15   to this court; and as I made clear, I am only giving Mattel

16   the tentative option of discussing with the court either

17   using its original buckets or simply electing for the

18   drawings and sculpts.

19           Neither option prejudices MGA, so, once again, I'm

16:25 20   going to turn to Mattel one further time and I want you,

21   Mr. Price -- Mr. Price, please join in this conversation.

22           Please take some time.

23           MR. QUINN:  Well, that's a clear choice,

24   Your Honor.  We'll stick with where we were, but we believe

16:25 25   they've changed and we told you, FOB pricing was never in

1    their Column 1.

2              THE COURT:  Okay.  Now, where we were is going to

3    be where?

4              MR QUINN:  The status is, the existing buckets we

16:25 5    will stick with.

6              THE COURT:  In other words the not -- the eight,

7    nine buckets?

8              MR. QUINN:  Yes.

9              THE COURT:  Okay.  Okay.  It makes it quite easy.

16:25 10             Well, then if you'd remain for a few moments.

11             Now, I -- I can send you home in a little while, if

12    you wanted to get some rest, but not quite yet.

13             I'll have a series of orders coming out.  Some of

14    them will be briefed.  Some of them were lengthy -- depending

16:25 15    upon how much time I get this evening.  But on your Rule 90 I

16    need to do quite a bit of thinking and writing, and I would

17    expect that that's going to take some time.

18             I hope I can get through that.  I'm going to try.

19             Well, if you'd remain for a few moments --

16:25 20             MR. QUINN:  Your Honor, could I ask a question

21    about witnesses for Monday?

22             They -- MGA has told us that they want -- now want

23    to interrupt Eckert and put Vollero and Moore on the stand --

24             THE COURT:  No.

16:25 25             MR. QUINN:  -- and our view is they should finish

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 153 of 158   Page ID #:315572
CV 04-9049 DOC - 04/02/2011 Volume 1 of 1

153

1    with Eckert.

2             THE COURT:  Eckert finishes.  We're not going to

3    chop up Mr. Eckert.  He's on the stand and then Mr. Vollero

4    and then Mr. Moore and Mr. Vollero.

16:25  5             Unless -- just a moment -- I want to make sure.

6    Did I ever interrupt Larian the second time he got on the

7    stand?

8             If I did and there was a witness in between, then

9    it will be coequal.  But I don't recall that.  I recall

16:25 10   Larian getting on the stand and he just proceeded --

11   Mr. Zeller -- from --

12             MR. QUINN:  No, he continued -- he testified

13   continuously from March 24th to 29th --

14             THE COURT:  Yeah.

16:25 15             MR. QUINN:  -- without interruption.

16             THE COURT:  Yeah.

17             MS. KELLER:  But we -- Your Honor, we were forced

18   to take Mr. Eckert out of order because of the situation

19   here.

16:25 20             THE COURT:  Why?  What's happening here?

21             Is it this newly discovered evidence concerning

22   Kohl's?

23             MR. MCCONVILLE:  So you'll recall that Mr. Moore

24   was on the witness stand, and then we had to adjourn Moore

16:25 25   because the court wanted to conduct an in-camera with

1    Mr. Moore, so Mr. Moore's examination never completed.

2              THE COURT:  Well, just --

3              MR. MCCONVILLE:  Then we had to call Mr. Eckert.

4              THE COURT:  Just a moment.

16:25 5        I'm not too certain you aren't entitled to bring

6    Mr. Moore back ahead of Mr. Eckert.

7              You're right.  You've got two people out there, but

8    I'm not certain yet what I'm going to do with Mr. Moore.

9              I need Mr. O'Brien here.  There may be no

16:25 10   additional information.  I may be finding that this is

11   attorney-client privilege.

12             I'm not satisfied with my own ruling that this was

13   cumulative.  I went back and read, based upon the special

14   master's recommendation to the court, and thought more about

16:25 15   that last evening, and I'm not satisfied with my own ruling

16   so I'm going to acquire additional examination, and I'll

17   reach one of the two:  It's either nonprivileged or it's

18   privileged.  One of the two.

19             MR. QUINN:  But I think, Your Honor, the solution

16:25 20   can't be to interrupt two witnesses.

21             Having interrupted Moore, we shouldn't now

22   interrupt Eckert.  Let's get a witness done.

23             THE COURT:  Let's wait until tomorrow.  It's

24   "chasing a minnow" tonight.  Keeping you here for that's

16:25 25   nonsensical.

1          Will you give me just a little bit more time to

2     sort out a couple more things in chambers and then hopefully

3     I hope to get you on your way.

4          Are you done with this shelf of product?

16:25 5          MR. MCCONVILLE:  I -- I was curious why you wheeled

6     it out, but it was cool as it came through the door.

7          THE COURT:  You wanted to see the sculpts.

8          MS. KELLER:  Should we take it back?

9          MR. QUINN:  Mr. Overland asked what it was.

16:25 10          MS. KELLER:  There's actually something a little

11     macabre about it, Your Honor.

12          THE COURT:  You wanted to thank Mr. Overland for

13     attending the trial.

14          MS. KELLER:  Let's thank and excuse him, shall we?

16:25 15          THE COURT:  Now, you stay with me now for a little

16     while.

17          (Recess taken.)

18          THE COURT:  Okay.  First, I'm not going to instruct

19     on agency or agency law, agency, unless you both stipulate.

16:35 20          So there will be no instruction unless you both

21     reach a stipulation on that and agree.

22          Second, I'm going to convene at 10:00 tomorrow

23     instead of 9:00.  I want to pick up the special master at

24     7:00 or 7:30.  I want to have a discussion with him.  And,

16:36 25     therefore, for Mr. Moore, instead of 9:00, Mike,

1   how about 10:00?

2          MR. ZELLER:  Okay.

3          THE COURT:  Okay.  That way -- and that way you can

4   sleep in a little bit.

16:36 5        Mr. Overland, it's been a pleasure to have you here

6   today, sir.

7          MR. OVERLAND:  Thank you.

8          THE COURT:  Thank you, Mr. Cote.

9          MR. COTE:  Thank you.

16:36 10       THE COURT:  I don't see any reason why you should

11  be here tomorrow.

12         You have a good day Sunday.

13         Tomorrow I'll probably be handing out the special

14  verdicts one more time in light of our discussion today.

16:36 15 I've got some more work to do tonight.

16         I would like to try to write the Rule 50, but I

17  don't think I can complete it this evening.

18         I really think it's going to be Monday or Tuesday

19  night --

16:36 20       MR. OVERLAND:  That's fine.

21         THE COURT:  -- with the time I've got left and I

22  need to do some thinking about it.  I haven't decided that

23  yet in total.

24         And, finally, tomorrow night we have a hearing at

16:36 25 6:00, so I hope to let you go by 8:00 so you can make your

CV 04-9049 DOC - 04/02/2011 - Volume 1 of 1

```
 1    plans, get some sleep and then we're back in session on

 2    Tuesday.

 3              Anything else, Mr. Price?

 4              MR. PRICE:  Nothing.

16:37 5         THE COURT:  Mr. Quinn?

 6              MR. QUINN:  No, Your Honor.

 7              THE COURT:  Mr. Zeller?

 8              MR. ZELLER:  No, sir.

 9              THE COURT:  Ms. Hurst?

16:37 10        MS. KELLER:  No.

11              THE COURT:  Ms. Keller?

12              MS. HURST:  No, Your Honor.

13              THE COURT:  Mr. McNally?

14              MR. MCCONVILLE:  No, sir.

16:37 15        THE COURT:  Well, have a good evening, then.

16        //                                    //

17        //                                    //

18        //                                    //

19        //                                    //

20        //                                    //

21        //                                    //

22        //                                    //

23        //                                    //

24        //                                    //

25        //                                    //
```

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10378   Filed 04/04/11   Page 158 of 158   Page ID #:31577
CV 04-9049 DOC - 04/02/2011 - Volume 1 of 1

158

1              ALL RESPONSE:  Thank you.

2              (Adjournment at 16:37 to resume on Sunday, April 3,

3    2011 at 10:00 a.m.  Next session reported by Sharon Seffens.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT