1    ANNETTE L. HURST (State Bar No. 148738)
     ahurst@orrick.com
2    WARRINGTON S. PARKER III (State Bar No. 148003)
     wparker@orrick.com
3    ORRICK, HERRINGTON & SUTCLIFFE LLP
     The Orrick Building
4    405 Howard Street
     San Francisco, CA 94105
5    Telephone:   415-773-5700
     Facsimile:   415-773-5759
6
     WILLIAM A. MOLINSKI (State Bar No. 145186)
7    wmolinski@orrick.com
     ORRICK, HERRINGTON & SUTCLIFFE LLP
8    777 South Figueroa Street, Suite 3200
     Los Angeles, CA  90017
9    Telephone:  213-629-2020
     Facsimile:   213-612-2499
10
     THOMAS S. MCCONVILLE (State Bar No. 155905)
11   tmcconville@orrick.com
     ORRICK, HERRINGTON & SUTCLIFFE LLP
12   4 Park Plaza, Suite 1600
     Irvine, CA 92614-2258
13   Tel: (949) 567-6700/Fax: (949) 567-6710

14   Attorneys for MGA Parties

15              UNITED STATES DISTRICT COURT

16              CENTRAL DISTRICT OF CALIFORNIA

17                 SOUTHERN DIVISION

18   CARTER BRYANT, an individual          Case No. CV 04-9049 DOC (RNBx)

19            Plaintiff,                   Consolidated with Case No. CV 04-9059
                                           and Case No. CV 05-2727
20        v.
                                           **MOTION FOR JUDGMENT AS A
21   MATTEL, INC., a Delaware              MATTER OF LAW PURSUANT TO
     corporation,                          FEDERAL RULE OF CIVIL
22                                         PROCEDURE 50(a)**
            Defendant.
23                                         Trial Date: January 18, 2011
24                                         Judge:  Hon. David O. Carter
     AND CONSOLIDATED ACTIONS
25

26

27

28

1

# **TABLE OF CONTENTS**

2

3

**Page**

4

INTRODUCTION AND SUMMARY OF ARGUMENT........................................1

ARGUMENT.............................................................................................................5

I.    MATTEL'S ENTIRE CASE ON OWNERSHIP OF BRATZ FAILS
BECAUSE IT OFFERED NO ADMISSIBLE EVIDENCE IN
SUPPORT OF ITS INTERPRETATION OF THE INVENTIONS
ASSIGNMENT ..............................................................................................6

    A.    Only Objective Manifestations Of Intent Are Considered
"Competent" Extrinsic Evidence Under The Parol Evidence
Rule ...................................................................................................7

    B.    No Reasonable Juror Could Adopt Mattel's Interpretation Of
"Inventions" Given The State Of This Record ..................................8

        1.    Mattel Offered No Objective Evidence Of Its Intent To
Cover "Ideas" In The Inventions Agreement ............................8

        2.    Mattel Offered No Evidence Of Bryant's Subjective
Understanding Regarding Whether Ideas Were Covered
Under The Inventions Agreement ..............................................9

        3.    Mattel Offered No Competent Extrinsic Evidence Of Its
Own Subjective Understanding Regarding Whether Ideas
Were Covered Under The Inventions Agreement......................10

        4.    The Drafting History Proves That Mattel Did Not Intend
To Own Bryant's Ideas Under The Inventions Agreement......11

        5.    Mattel Cannot Assign Ideas Under The Inventions
Agreement Because Ideas Are Not Assignable Property
Under California Law .................................................................12

        6.    Mattel's Proffered Interpretation Runs Afoul Of §16600........13

        7.    The Contract Must Be Construed Against Mattel ...................13

    C.    No Reasonable Juror Could Adopt Mattel's Interpretation Of
The Phrase "At Any Time During My Employment." ......................14

        1.    Mattel Offered No Competent Evidence Of Bryant's
Objective Or Subjective Understanding Regarding The
Phrase "At Any Time During My Employment." ....................14

        2.    Mattel Offered No Extrinsic Evidence Of Mattel's Own
Objective or Subjective Understanding Regarding
Whether Mattel Owns Bryant's Work Created On Nights
And Weekends...........................................................................14

        3.    The Agreement Itself Belies Mattel's Intent That The
Phrase "During My Employment" Means "As A Result
Of My Employment" And Mattel Offered No Evidence
To Dispute This Inference .........................................................15

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**
**(continued)**

Page

4.   The Moonlighting Evidence Demonstrates Mattel's Understanding That It Did Not Own Work Done On Off Hours Outside The Scope Of Employment ............................. 16

5.   The Contract Must Be Construed Against Mattel ................... 18

II.   MATTEL FAILED TO PROVE INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS ....................................... 18

A.   Mattel Failed to Introduce Evidence Of Its Contracts With Ms. Cabrera, Ms. Morales, Ms. Salazar, and Mr. Tumaliuan.................... 18

B.   Mattel Did Not Prove Any Harm Resulting From The Alleged Interference ............................................................. 19

1.   Ryan Tumaliuan ................................................... 19

2.   The Seamstresses .................................................. 20

3.   Carter Bryant ...................................................... 20

C.   Mattel Did Not Prove A Breach Of Contract Or Actionable Disruption Caused By The MGA Parties ......................... 22

1.   Ryan Tumaliuan ................................................... 22

2.   The Seamstresses .................................................. 22

3.   Carter Bryant ...................................................... 23

D.   No Reasonable Juror Could Find That MGA Intended To Interfere With The Mattel Employees' Contracts............................. 24

1.   MGA Could Not Have Intended To Interfere ......................... 25

2.   That MGA Entered Into An Agreement With Bryant Does Not Support A Claim Of Interference ..................... 27

E.   Mattel's Interference Claim Is Barred By The Statute Of Limitations ............................................................. 28

1.   Carter Bryant ...................................................... 29

2.   The Seamstresses .................................................. 29

3.   Ryan Tumaliuan ................................................... 30

III.   THERE IS NO BASIS FOR PROCEEDING TO A PUNITIVE DAMAGES PHASE ....................................................... 31

IV.   THE MGA PARTIES ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON MATTEL'S "BRATZ" TRADE SECRETS CLAIM ........................................................................ 32

A.   MGA Did Not Wrongfully Acquire The Bratz Trade Secrets............ 33

B.   Mattel Did Not Make Reasonable Efforts To Maintain The Secrecy Of The Claimed Bratz Trade Secrets ..................... 35

C.   The Claimed Bratz Trade Secrets Are Not Secret .............................. 36

1.   The Bratz Concept Was Disclosed By Mattel Through Diva Starz ................................................................. 37

OHS WEST:261109694.1

1

## TABLE OF CONTENTS
### (continued)

2

Page

3    2.    All Of The Features Of The Bratz Concept Were Well Known Or Obvious.................................................................38

4

5    3.    The Bratz Name Had No Value to Mattel And Was Publicly Disclosed For Use With Dolls....................................40

6    4.    The Bratz Drawings Were Disclosed By Bryant Before Any Disclosure to MGA and Therefore Are Not Trade Secret And The Sculpts Have Never Been Secret...................40

7

8    D.    Bratz Is Not A Protectible Trade Secret—It Is Not "Information." .......................................................................41

9    1.    "The Bratz Concept" Is Not A Protectible Trade Secret..........41

10    2.    The Bratz Name Is Not "Information." ...................................42

   3.    The Sculpts And Carter Bryant Drawings Are Not "Information."................................................................43

11

12    E.    No Reasonable Juror Could Conclude That Mattel's Bratz-Related Trade Secret Claim Survives The Statute of Limitations......44

13    1.    Evidence Admitted to Date Conclusively Establishes That Mattel was Sufficiently On Notice of its Bratz Trade Secret Claim Well Before November 2003............................45

14

15    2.    Mattel's Bratz Trade Secret Claim Is Barred By The Statute Of Limitations ....................................................53

16    3.    Mattel's Bratz Name Trade Secret Is Barred By The Statute Of Limitations ....................................................54

17    4.    Fraudulent Concealment Cannot Apply ................................54

   5.    The Relation Back Doctrine Does Not Apply.........................56

18    6.    California's Doe-Defendant Rule Does Not Save Mattel's Claims .................................................................60

19

20 V.    MATTEL'S BRATZ TRADE SECRET CLAIM IS PREEMPTED BY COPYRIGHT LAW ...............................................................62

21    A.    Mattel's Bratz Trade Secret Claim Is Expressly Preempted by The Copyright Act ...........................................................63

22    1.    Mattel's Bratz Trade Secret Is Copyrightable Subject Matter........................................................................63

23    2.    Mattel Has Not Established That The Right It Seeks To Protect Is Qualitatively Different From Its Copyright Claim.........................................................................65

24

25    3.    Unpublished, Secret, Works Are Covered By The Copyright Act ..............................................................66

26    B.    All of Mattel's Theories Of Trade Secret Liability With Respect To Its Bratz Trade Secret Are Preempted...........................68

27

28

OHS WEST:261109694.1

**TABLE OF CONTENTS**
(continued)

Page

VI.   MATTEL, INC. AND MATTEL DE MEXICO S.A. DE C.V. FAILED TO MEET THEIR BURDEN ON THE MEXICAN TRADE SECRET CLAIMS ................................................................ 69

    A.   CUTSA Does Not Apply To The Misappropriation Of Alleged Trade Secrets In Mexico By Mexicans ................................. 69

    B.   Mattel's Trade Secret Claim Is Time Barred By The Statute Of Limitations Under Mexico Law ........................................ 70

    C.   Mattel, Inc. and Mattel de Mexico Have Failed To Satisfy The Elements Of A Trade Secret Claim .................................... 70

        1.   Ownership ................................................................ 70

        2.   No Evidence That The Materials Were Trade Secret .............. 71

        3.   No Evidence Of Improper Acquisition Or Use ...................... 72

    D.   Mattel And Mattel de Mexico Did Not Offer Evidence Sufficient To Allow A Reasonable Jury To Award Any Damages Or Unjust Enrichment For Use Of The Alleged Mexico Trade Secrets ................................................... 73

VII.  MATTEL DID NOT PROVE ITS "OTHER EMPLOYEE" TRADE SECRET CLAIMS ................................................................ 74

    A.   Janine Brisbois ............................................................. 74

        1.   Mattel Has Not Identified Any Trade Secret Information In the Files That Brisbois Copied ...................................... 74

        2.   Mattel Has Not Shown That The Files Brisbois Copied Were Acquired Through Improper Means Or Used ................. 75

        3.   Mattel Has Not Shown Damages To Mattel From Brisbois' Copying ......................................................... 75

    B.   Dan Cooney ................................................................. 75

    C.   Ron Brawer ................................................................. 76

    D.   Jorge Castilla ............................................................... 77

        1.   Castilla Did Not Use Any Mattel Information At MGA And There Is Not Evidence Of Improper Acquisition ............ 77

        2.   Mattel's "Improved Forecasting" Theory Failed ................... 78

VIII. MATTEL HAS NOT PRESENTED SUFFICIENT EVIDENCE TO SUPPORT AN AWARD OF EXEMPLARY DAMAGES ON MATTEL'S TRADE SECRET CLAIMS ..................................... 79

IX.   NO REASONABLE JURY COULD FIND IN FAVOR OF MATTEL ON ITS COPYRIGHT CLAIMS ........................................... 81

    A.   Mattel Cannot Claim Infringement Of Copyrights That No Reasonable Jury Could Find That It Owns ........................... 81

OHS WEST:261109694.1

**TABLE OF CONTENTS**
(continued)

Page

1.  Mattel Failed to Introduce Evidence of Copyright Registration Except as to a Zoe, Hallidae and Lupe Drawing ........................................................................ 81

2.  No Reasonable Jury Could Find That Mattel Has Proved That It Owns The Preliminary Bratz Sculpts .......................... 82

3.  No Reasonable Jury Could Find that Mattel Owns The Sketch, Trial Exhibit 5-89 ........................................ 84

4.  No Reasonable Jury Could Find that Mattel Proved That It Owns The Kmart Drawings ...................................... 84

5.  Mattel's Failure To Present Ownership of Any Drawing That Ooh La La Cloe Precludes a Finding of Infringement As to That Doll ................................................ 85

6.  Mattel's Claim to A Copyright in Bratz "Characters" Fails As A Matter of Law .......................................... 86

B.  No Reasonable Jury Could Find In Favor Of Mattel With Respect to the Issue of Infringement .................................. 87

1.  No Reasonable Jury Could Find That The Bratz Production Sculpt is Virtually Identical To The Preliminary Sculpts .............................................. 87

2.  Mattel Has Offered No Evidence That Any Other Bratz Production Sculpt Is Virtually Identical To The Preliminary Sculpts .............................................. 90

3.  No Reasonable Jury Could Conclude That The First Generation Dolls and Formal Funk Dana Are Substantially Similar To The Protectable Elements Of The Pitchbook Drawings ............................................ 90

C.  No Reasonable Jury Could Conclude That Mattel's Copyright Claim Survives The Statute of Limitation ............................. 95

1.  The Injury Rule Applies And Bars Mattel's Copyright Infringement Claim .............................................. 95

2.  A Reasonable Jury Must Find Mattel's Copyright Claim Barred Even if the Discovery Rule Applies ...................... 98

X.  MATTEL'S FAILURE TO PRESENT SUFFICIENT EVIDENCE OF DAMAGES MANDATES JUDGMENT AS A MATTER OF LAW ON MATTEL'S DAMAGES CLAIMS .................................... 100

A.  Mattel Did Not Present Evidence That Would Allow A Reasonable Jury To Award MGA's Profits On Bratz To Mattel ..... 100

B.  Wagner's Attempts To Apportion MGA's Profits For Bratz Are Speculative And Is Too Unreliable For A Jury ..................... 100

C.  Wagner Fails To Apportion Damages Between Mattel's Purported Trade Secrets .......................................... 102

OHS WEST:261109694.1

1

**TABLE OF CONTENTS**
(continued)

2

Page

3      D.    Wagner's Unreliable Assumption That Intellectual Property
             Explains The Entirety Of The Bratz "Excess Profitability" Is
4            Inherently Speculative.......................................................................... 103

5      E.    Mattel's Unjust Enrichment Theory Requires Speculative Leaps
             Of Faith That Find No Support In The Evidence Or The Law Of
6            The Case............................................................................................... 105

       F.    Mattel's Lost Profits Claim Is Speculative And Lacks
7            Foundation ........................................................................................... 108

8            1.    Mr. Wagner Has No Foundation for His Lost Profits
                   Analysis as Mattel Failed To Introduce Any Financial
9                  Documents Into Evidence.......................................................... 108

10           2.    Wagner's Testimony Does Not Provide A Reasonable
                   Basis For An Award Of Lost Profits Damages ....................... 109

11     G.    The Trial Evidence Requires A Reduction Of Any Damages
             Otherwise Due Mattel Based On Mattel's My Scene Mitigation
12           Efforts.................................................................................................. 111

       CONCLUSION............................................................................................... 112

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

OHS WEST:261109694.1

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Aalmuhammed v. Lee,*
    202 F.3d 1227 (9th Cir. 2000) ........................................................................ 82

*Aliotti v. R. Dakin & Co.,*
    831 F.2d 898 (9th Cir. 1987) .......................................................................... 92

*Alamar Biosciences, Inc. v. Difco Labs. Inc.,*
    1995 WL 912345 (E.D. Cal. Oct. 13, 1995) .................................................. 56

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.,*
    108 F.3d 1147 (9th Cir. 1997) .......................................................................... 5

*Apple Computer, Inc. v. Microsoft Corp.,*
    35 F.3d 1435 (9th Cir. 1994) .......................................................................... 92

*Applied Med. Res. Corp. v. United States Surgical Corp.,*
    2008 WL 1901935 (C.D. Cal. Apr. 29, 2008) ................................................. 5

*Auscape Int'l v. Nat'l Geographic Soc'y,*
    409 F. Supp. 2d 235 (S.D.N.Y. 2004) ............................................... 96, 97, 98

*Bailey v. N. Ind. Pub. Serv. Co.,*
    910 F.2d 406 (7th Cir. 1990) .......................................................................... 57

*Barrow v. Wethersfield Police Dep't,*
    66 F.3d 466 (2d Cir. 1995) ............................................................................. 58

*Bauer v. Interpublic Group of Cos., Inc.,*
    255 F. Supp. 2d 1086 (N.D. Cal. 2003) .......................................................... 28

*Bd. of Trade v. Swiss Credit Bank,*
    597 F.2d 146 (9th Cir. 1979) ............................................................................ 6

*Benge v. United States,*
    17 F.3d 1286 (10th Cir. 1994) ........................................................................ 57

*BIC  Leisure Prods., Inc. v. Windsurfing Int'l, Inc.,*
    1 F.3d 1214 (Fed. Cir. 1993) ........................................................................ 110

*Brewer-Giorgio v. Producers Video, Inc.,*
    216 F.3d 1281 (11th Cir. 2000) ...................................................................... 98

*Buffets Inc. v. Klinke,*
    73 F.3d 965 (9th Cir. 1996) ............................................................................ 39

*Cartel Asset Management v. Owen Financial Corp.,*
    249 Fed. Appx. 63, 80 (10th Cir. 2007) ....................................................... 107

- ii -

**TABLE OF AUTHORITIES**
(continued)

Page

*Cavalier v. Random House,*
297 F.3d 815 (9th Cir. 2002) ................................................................ 92

*Champagne Metals v. Ken-Mac, Inc.,*
458 F.3d 1073 (10th Cir. 2006) .......................................................... 107

*Children's Broad. Corp. v. Walt Disney Co.,*
245 F.3d 1008 (8th Cir. 2001) ............................................................ 102

*Conerly v. Westinghouse Elec. Corp.,*
623 F.2d 117 (9th Cir. 1980) ................................................................ 55

*Cosmetic Ideas, Inc. v. IAC/Interactivecorp,*
606 F.3d 612 (9th Cir. 2010) ................................................................ 81

*Country Road Music, Inc. v. MP3.com, Inc.,*
279 F. Supp. 2d 325 (S.D.N.Y. 2003) .................................................. 98

*Crowe v. Wiltel Commc'n Sys.,*
103 F.3d 897 (9th Cir. 1996) .................................................................. 5

*Data East USA, Inc., v. Epyx, Inc.,*
862 F.2d 204 (9th Cir. 1988) .......................................................... 87, 92

*Davis v. Yageo Corp.,*
481 F.3d 661 (9th Cir. 2007) ........................................................ 100, 108

*Del Madera v. Rhodes and Gardner, Inc.,*
820 F.2d 973 (9th Cir. 1987) ................................................................ 67

*DeVoto v. Pac. Fid. Life Ins. Co.,*
618 F.2d 1340 (9th Cir. 1980) .............................................................. 28

*Dollar Fed. Savings Bank v. Green Tree Acceptance, Inc.,*
1991 WL 40398 (D. Minn. March 21, 1991) ...................................... 25

*Dream Games of Arizona, Inc. v. PC Onsite,*
561 F.3d 983 (9th Cir. 2009) ................................................................ 92

*E.W. French & Sons, Inc. v. Gen'l Portland, Inc.,*
885 F.2d 1392 (9th Cir. 1989) .............................................................. 55

*Eich v. Bd. of Regents for Cent. Mo. State Univ.,*
350 F.3d 752 (8th Cir. 2003) .................................................................. 5

*Eleven Line, Inc. v. North Texas State Soccer Assoc., Inc.,*
213 F.3d 198 (5th Cir. 2000) .............................................................. 101

*Eng v. County of Los Angeles,*
2010 WL 3368130 (C.D. Cal. Aug. 24, 2010) .................................... 57

# TABLE OF AUTHORITIES
## (continued)

Page

*Entous v. Viacom Int'l,*
    151 F. Supp. 2d 1150 (C.D. Cal. 2001) ................................................... 64, 65

*Ets-Hokin v. Skyy Sprits, Inc.,*
    323 F.3d 763 (9th Cir. 2003) ................................................................... 87

*Express LLC v. Fetish Group,*
    464 F. Supp. 2d 965 (C.D. Cal. 2006) ..................................................... 19

*F.B.T. Prods., LLC v. Aftermath Records,*
    621 F.3d 958 (9th Cir. 2010) ................................................................... 8

*Feist Publ'ns, Inc. v. Rural Telephone Co.,*
    499 U.S. 340 (1991) ................................................................................ 92

*Forcier v. Microsoft Corp.,*
    123 F. Supp. 2d 520 (N.D. Cal. 2000) ..................................................... 28

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.,*
    462 F.3d 1072 (9th Cir. 2006) ................................................................. 81

*G.F. Co. v. Pan Ocean Shipping Co.,*
    23 F.3d 1498 (9th Cir. 1994) ................................................................... 57

*Garrett v. Fleming,*
    362 F.3d 692 (10th Cir. 2004) ................................................................. 58

*Gen'l Elec. Co. v. Joiner,*
    522 U.S. 146, 522 (1997) ................................................................. 102, 109

*Gibson-Homans Co. v. Wall-Tite, Inc.,*
    1992 U.S. Dist. LEXIS 21909 (C.D. Cal. Oct. 27, 1992) ..................... 72, 75

*Harper & Row Publishers, Inc. v. Nation Enters.,*
    471 U.S. 539 (1985) ................................................................................ 67

*Harper House, Inc. v. Thomas Nelson, Inc.,*
    889 F.2d 197 (9th Cir. 1989) ................................................................... 92

*Herbert Rosenthal Jewelry Corp. v. Kalpakian,*
    446 F.2d 738 (9th Cir. 1971) ................................................................... 92

*Hilderman v. Enea Teksci, Inc.,*
    2010 WL 546140 (S.D. Cal. Feb. 10, 2010) ........................................... 105

*Idema v. Dreamworks, Inc.,*
    162 F. Supp. 2d 1129 (C. D. Cal. 2001) .................................................. 67

*Ikon Office Solutions, Inc. v. Rezente,*
    2010 WL 5129293 (E.D. Cal. Feb. 3, 2010) ........................................... 78

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Jones v. Rath Packing Co.*,
  430 U.S. 519 (1977) ........................................................................ 68

*JustMed, Inc. v. Byce*,
  600 F.3d 1118 (9th Cir. 2010) .................................................... 72, 75

*KW Plastics v. United States Can Co.*,
  131 F. Supp. 2d 1289 (M.D. Ala. 2001) ...................................... 105

*Kewanee Oil Co. v. Bicron Corp.*,
  416 U.S. 470 (1974) ...................................................................... 39

*Kilkenny v. Arco Marine Inc.*,
  800 F.2d 853 (9th Cir. 1986) ..................................................... 57, 60

*Korn v. Royal Caribbean Cruise Line, Inc.*,
  724 F.2d 1397 (9th Cir. 1984) ....................................................... 57

*Krupski v. Costa Crociere S.p.A.*,
  130 S. Ct. 2485 (2010) ............................................................. 58, 60

*Lakeside-Scott v. Multnomah County*,
  556 F.3d 797 (9th Cir. 2009) .......................................................... 5

*Lamon v. Stiles*,
  2009 WL 230833 (E.D. Cal. Jan. 30, 2009) ................................... 57

*Lauter v. Anoufrieva*,
  2010 WL 3504745 (C.D. Cal. July 14, 2010) ............................. 55, 60

*Laws v. Sony Music Entm't, Inc.*,
  448 F.3d 1134 (9th Cir. 2006) ................................................... 63, 65

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*,
  342 F.3d 714 (7th Cir. 2003) .................................................... 41, 42

*Louisiana-Pac. Corp. v. Asarco, Inc.*,
  5 F.3d 431 (1993) ........................................................................ 60

*MAI Sys. Corp. v. Peak Computer*,
  991 F.2d 511 (9th Cir. 1993) .......................................................... 36

*Mangum v. Action Collection Serv., Inc.*,
  575 F.3d 935 (9th Cir. 2009) ........................................................... 5

*Mattel, Inc. v. Goldberger Doll Mfg. Co.*,
  365 F.3d 133 (2d Cir. 2004) .......................................................... 92

*Mattel, Inc. v. MGA Ent., Inc.*,
  616 F.3d 904 (9th Cir. 2010) ................................................... *passim*

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*MicroStrategy Inc. v. Business Objects, S.A.*,
429 F.3d 1344 (Fed. Cir. 2006) ................................................................ 105

*Miller v. Holtzbrinck Publishers, L.L.C.*,
377 Fed. Appx. 72, 73 (2d Cir. 2010) ...................................................... 65

*Murphy Tugboat Co. v. Crowley*,
658 F.2d 1256 (9th Cir. 1981) .................................................................. 19

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
105 F.3d 841 (2d Cir. 1997) ..................................................................... 64

*Nelson v. Adams USA, Inc.*,
529 U.S. 460 (2000) .................................................................................. 59

*Norfolk & Western Ry. Co. v. Ayres*,
538 U.S. 135 (2003) ................................................................................ 109

*O'Donnell v. Vencor*,
466 F.3d 1104 (9th Cir. 2006) .................................................................. 57

*Olson v. National Broadcasting Co., Inc.*,
855 F.2d 1446 (9th Cir. 1988) .................................................................. 86

*Orson, Inc. v. Miramax Film Corp.*,
189 F.3d 377 (3rd Cir. 1999) ................................................................... 65

*Pierce v. City of Chicago*,
2010 WL 4636676 (N.D. Ill. Nov. 8, 2010) ............................................ 60

*Pivot Point Int'l, Inc. v. Charlene Prods., Inc.*,
372 F.3d 913 (7th Cir. 2004) .................................................................... 92

*Polar Bear Prods. Inc. v. Timex Corp.*,
384 F.3d 700 (9th Cir. 2004) .................................................................... 96

*Powers v. Graff*,
148 F.3d 1223 (11th Cir. 1998) ................................................................ 58

*Rice v. Fox Broadcasting Co.*,
330 F.3d 1170 (9th Cir. 2003) .................................................................. 86

*Rickards v. Canine Eye Registration Found. Inc.*,
704 F.2d 1449 (9th Cir. 1983) .................................................................. 19

*Rutledge v. Boston Woven Hose & Rubber Co.*,
576 F.2d 248 (9th Cir. 1978) .................................................................... 54

*Satava v. Lowry*,
323 F.3d 805, 807, 812 (9th Cir. 2003) .............................................. 87, 92

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES
## (continued)

Page

*S.O.S., Inc. v. Payday, Inc.*,
   886 F.2d 1081 (9th Cir. 1989) ................................................................ 82

*Santa Maria v. Pac. Bell*,
   202 F.3d 1170 (9th Cir. 2000) ............................................................... 55

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
   969 F.2d 410 (7th Cir. 1992) ............................................................... 105

*Selby v. New Line Cinema Corp.*,
   96 F. Supp. 2d 1053 (C.D. Cal. 2000) ................................................... 64

*Stromback v. New Line Cinema*,
   384 F.3d 283 (9th Cir. 2004) ................................................................. 43

*TRW, Inc. v. Andrews*,
   534 U.S. 19 (2001) ...........................................................95, 96, 97, 98

*The Flintkote Co. v. Lysfjord*,
   246 F.2d 368 (9th Cir. 1957) ............................................................... 102

*Therapeutic Research Facility v. NBTY*,
   488 F. Supp. 2d 991 (E.D. Cal. 2007) ..............................................72, 75

*Torres v. City of Los Angeles*,
   548 F.3d 1197 (9th Cir. 2008) ............................................................ 5, 6

*Trigo v. TDCJ-CID Officials*,
   2010 WL 3359481 (S.D. Tex. Aug. 24, 2010) ...................................... 60

*U.S. ex rel. Berge v. Bd. of Trustees of the Univ. of Ala.*,
   104 F.3d 1453 (4th Cir. 1997) ............................................................... 64

*Union Bank v. Winnebago Indus., Inc.*,
   528 F.2d 95 (9th Cir. 1975) ................................................................ 7, 9

*Union Pacific R.R. Co. v. Nevada Power Co.*,
   950 F.2d 1429 (9th Cir. 1991) ............................................................... 57

*United States v. Clark*,
   218 F.3d 1092 (9th Cir. 2000) ................................................................. 6

*United States v. Valencia*,
   600 F.3d 389 (5th Cir. 2010) ............................................................... 109

*Utah Med. Prod., Inc. v. Graphic Controls Corp.*,
   350 F.3d 1376 (Fed. Cir. 2003) ........................................................... 110

*Vasquez v. Torres-Negron*,
   2007 WL 2244784 (S.D.N.Y. July 11, 2007) ........................................ 96

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES
### (continued)

Page

*Volk v. D.A. Davidson & Co.*,
   816 F.2d 1406 (9th Cir. 1987) ........................................................... 93

*W W Leasing Unlimited v. Torok Exploration, Mining & Const. Co.*,
   575 F.2d 1259 (9th Cir. 1978) ......................................................... 111

*Waddy v. Sears, Roebuck & Co.*,
   1994 WL 392483 (N.D. Cal. July 8, 1994) ...................................... 10

*Western Med. Consultants, Inc. v. Johnson*,
   835 F. Supp. 554 (D. Or. 1993) ........................................................ 78

*Wilson v. United States*,
   23 F.3d 559 (1st Cir. 1994) ............................................................... 58

*Worthington v. Wilson*,
   8 F.3d 1253 (7th Cir. 1993) .............................................................. 58

## STATE CASES

*1-800 Contacts, Inc. v. Steinberg*,
   107 Cal. App. 4th 568 (2003) ........................................................... 26

*Abba Rubber Co. v. Seaquist*,
   235 Cal. App. 3d 1 (1991) ................................................................ 37

*Ajaxo, Inc. v. ETrade Group, Inc.*,
   135 Cal. App. 4th 21 (2005) ............................................................. 33

*Am. Paper & Packaging Prods., Inc. v. Kirgan*,
   183 Cal. App. 3d 1318 (1986) .......................................................... 39

*Badie v. Bank of Am.*,
   67 Cal. App. 4th 779 (1998) ............................................................. 14

*Bionghi v. Metropolitan Water Dist. of So. Cal.*,
   70 Cal. App. 4th 1358 (1999) ........................................................... 16

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.*,
   226 Cal. App. 3d 442 (1990) ........................................................... 111

*Brant v. California Dairies, Inc.*,
   4 Cal. 2d 128 (1935) .......................................................................... 7

*Buxbon v. Smith*,
   23 Cal. 2d 535 (1944) ....................................................................... 27

*Courtesy Temporary Serv., Inc. v. Camacho*,
   222 Cal. App. 3d 1278 (1990) .......................................................... 36

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3    *Cypress Semiconductor Corp. v. Superior Court*,
       163 Cal. App. 4th 575 (2008)...................................................................44, 45

4

5    *Cytodyn, Inc. v. Amerimmune Pharmaceuticals, Inc.*,
       160 Cal. App. 4th 288 (2008).............................................................32, 33, 70

6    *Davis v. Nadrich*,
       174 Cal. App. 4th 1 (2009)........................................................................25, 26

7

8    *Desny v. Wilder*,
       46 Cal. 2d 715 (1956)........................................................................................12

9    *Diamond Multimedia Sys., Inc. v. Superior Court*,
       19 Cal. 4th 1036 (1999)...................................................................................69

10

11   *Diodes, Inc. v. Franzen*,
       260 Cal. App. 2d 244 (1968)..........................................................................27

12   *Dover v. Sadowinski*,
       147 Cal. App. 3d 113 (1983)..........................................................................61

13

14   *Edwards v. Arthur Andersen LLP*,
       44 Cal. 4th 937 (2008)...............................................................................13, 23

15   *Fox v. Ethicon Endo-surgery, Inc.*,
       35 Cal. 4th 797 (2005)..............................................................................44, 45

16

17   *Futurecraft Corp. v. Clary Corp.*,
       205 Cal. App. 2d 279 (1962).........................................................................37

18   *GAB Bus. Servs., Inc. v. Lindsey & Newson Claim Servs., Inc.*,
       83 Cal. App. 4th 409 (2000)..........................................................................74

19

20   *Geddes & Smith, Inc. v. St. Paul Mercury Indem. Co.*,
       63 Cal. 2d 602 (1965)....................................................................................111

21   *Grinnell Fire Protection Sys. Co. v. Am. Sav. & Loan Ass'n*,
       183 Cal. App. 3d 352 (1986)..........................................................................61

22

23   *Guerrieri v. Severini*,
       51 Cal. 2d 12 (1958)......................................................................................111

24   *Heston v. Farmers Ins. Group*,
       160 Cal. App. 3d 402 (1984)............................................................................9

25

26   *Jolly v. Eli Lilly & Co.*,
       44 Cal. 3d 1103 (1988)..............................................................................44, 45

27   *K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*,
       171 Cal. App. 4th 939 (2009).........................................................................18

28

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1

2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3    *Korea Supply Co. v. Lockheed Martin Corp.,*
        29 Cal. 4th 1134 (2003) .................................................................. 25

4

5    *London Mkt. Insurers v. Superior Court,*
        146 Cal. App. 4th 648 (2007) ........................................................ 11

6    *MacKinnon v. Truck Ins. Exch.,*
        31 Cal. 4th 635 (2003) .................................................................... 11

7

8    *Mayhew v. Benninghoff,*
        53 Cal. App. 4th 1365 (1997) ........................................................ 14

9    *McGee St. Prods. v. Workers' Comp. Appeals Bd.,*
        108 Cal. App. 4th 717 (2003) ........................................................ 60

10

11   *Mendoyoma Inc. v. County of Mendocino,*
        8 Cal. App. 3d 873 (1970) ........................................................... 100

12   *Metro Traffic Control Inc. v. Shadow Traffic Network,*
        22 Cal. App. 4th 853 (1994) ................................................... 27, 42

13

14   *Miller v. Bechtel Corp.,*
        33 Cal. 3d 868 (1983) ............................................................. 45, 55

15   *Mintz v. Blue Cross of California,*
        172 Cal. App. 4th 1594 (2009) ...................................................... 18

16

17   *Muggin v. Rueben H. Donnelly Corp.,*
        62 Cal. 2d 239 (1965) .................................................................... 13

18   *Norgart v. Upjohn,*
        21 Cal. 4th 383 (1999) .................................................................... 66

19

20   *Norwest Mortg., Inc. v. Superior Court,*
        72 Cal. App. 4th 214 (1999) .......................................................... 69

21   *Pacific Gas & Elec. Co. v. Bear Stearns & Co.,*
        50 Cal. 3d 1118 (1990) .................................................................. 19

22

23   *Palmer v. Truck Ins. Exch.,*
        21 Cal. 4th 1109 (1999) ................................................................... 7

24   *People ex rel. Lungren v. Superior Court,*
        14 Cal. 4th 294 (1996) .................................................................... 12

25

26   *Quelimane Co. v. Stewart Title Guar Co.,*
        19 Cal. 4th 26 (1998) ..................................................................... 25

27   *Reeves v. Hanlon,*
        33 Cal. 4th 1140 (2004) ................................................................. 27

28

- x -

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Reigelsperger v. Siller*,
   40 Cal. 4th 574 (2007)...........................................................................7, 9

4

*Resort Video, Ltd. v. Laser Video, Inc.*,
   35 Cal. App. 4th 1679 (1995)..................................................................111

5

6

*Richardson v. Allstate Ins. Co.*,
   117 Cal. App. 3d 8 (1981).......................................................................28

7

*Rokos v. Peck*,
   182 Cal. App. 3d 604 (1986)...................................................................12

8

9

*Sanchez-Corea v. Bank of Am.*,
   38 Cal. 3d 892 (1985).............................................................................110

10

*Scherer v. Mark*,
   64 Cal. App. 3d 834 (1976).....................................................................61

11

12

*Shaffer v. Debbas*,
   17 Cal. App. 4th 33 (1993)......................................................................111

13

*Silvaco Data Sys. v. Intel Corp.*,
   184 Cal. App. 4th 210 (2010)..............................................................*passim*

14

15

*Snapp & Assocs. Ins. Servs. Inc. v. Malcolm Bruce Burlingame Robertson*,
   96 Cal. App. 4th 884 (2002)....................................................................55

16

*Spector v. Nat'l Pictures Corp.*,
   201 Cal. App. 2d 217 (1962)....................................................................10

17

18

*Summerhays v. Scheu*,
   10 Cal. App. 2d 574 (1935)................................................................12, 13

19

*Tahoe Nat'l Bank v. Phillips*,
   4 Cal. 3d 11 (1971).................................................................................11

20

21

*Toscano v. Greene Music*,
   124 Cal. App. 4th 685 (2004)..................................................................100

22

*Trembath v. Digardi*,
   43 Cal. App. 3rd 34 (1974)......................................................................28

23

24

*Tuchscher Dev. Enters., Inc. v. San Diego Unified Port Dist.*,
   106 Cal. App. 4th 1219 (2003).................................................................24

25

*Vacco Indus., Inc. v. Van Den Berg*,
   5 Cal. App. 4th 34 (1992)........................................................................37

26

27

*Winet v. Price*,
   4 Cal. App. 4th 1159 (1992)...............................................................6, 7, 8

28

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3   *Wolf v. Superior Court,*
4      114 Cal. App. 4th 1343 (2004).................................................................. 6

*Woo v. Superior Court,*
5      75 Cal. App. 4th 169 (1999).................................................................. 61

6

**FEDERAL STATUTES**

7   17 U.S.C. § 102.................................................................................. 64

8   17 U.S.C. § 201.................................................................................. 82

9   17 U.S.C. § 301.............................................................................. 63, 64

10  17 U.S.C. § 411.................................................................................. 81

11  17 U.S.C. § 504.................................................................................. 31

12  17 U.S.C. § 507.................................................................................. 95

13  Fed. R. Civ. P. 15........................................................................... 57, 58

14  Fed. R. Civ. P. 50................................................................................ 5

15

**STATE STATUTES**

16  765 ILCS 1065/2(d).............................................................................. 24

17  Cal. Bus. & Prof. Code § 16600.......................................................... 13, 23, 24

18  Cal. Civil Code § 339........................................................................... 28

19  Cal. Civ. Code § 980............................................................................. 9

20  Cal. Civ. Code § 1624........................................................................... 13

21  Cal. Civ. Code § 1636........................................................................ 7, 10

22  Cal. Civ. Code. § 1654....................................................................... 6, 13

23  Cal. Civ. Code § 3294........................................................................... 32

24  Cal. Civ. Code § 3426.1.................................................................... *passim*

25  Cal. Civ. Code § 3426.3......................................................................... 79

26  Cal. Civ. Code § 3426.6...................................................................... 44, 45

27  Cal. Code Civ. Proc. § 474..................................................................... 60

28

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

**MISCELLANEOUS**

4  3 Nimmer on Copyright § 12.05 ......................................................................... 96, 98

5  CACI 2201 ................................................................................................... 18, 19, 23

6  CACI 3931 ............................................................................................................. 111

7  CACI 3941 ............................................................................................................... 31

8  CACI 3946 ............................................................................................................... 31

9  CACI 3949 ............................................................................................................... 32

10  CACI 4411 ....................................................................................................... 31, 80

11  Restatement (Second) of Torts § 766, comment *n* .................................................. 28

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **INTRODUCTION AND SUMMARY OF ARGUMENT**

2        As to each claim and relevant issue, Mattel has failed to prove essential

3    elements.  Judgment as a matter of law is therefore warranted.

4        ***Contract/Ownership.***  Mattel has failed to establish that Carter Bryant's

5    Inventions Agreement grants Mattel ownership of Bratz—which results in a failure

6    of proof as to both Mattel's Bratz trade secret and copyright claims.  The Ninth

7    Circuit determined that Bryant's Inventions Agreement is ambiguous in at least two

8    respects.  It does not unambiguously give Mattel the rights to Carter Bryant's ideas.

9    It does not unambiguously give Mattel ownership of work Bryant performed

10   outside of his work at Mattel.  *Mattel, Inc. v. MGA Ent., Inc.*, 616 F.3d 904, 909-10,

11   912 (9th Cir. 2010).  During this trial, Mattel has failed to introduce any evidence

12   establishing that the Inventions Agreement can be read to cover ideas.  Mattel has

13   failed to introduce evidence that either Bryant or Mattel intended the term

14   "inventions" to cover ideas.  In this regard, Mattel failed to introduce the only

15   extrinsic evidence that would bear on this issue—the mutual, outward, objectively

16   *communicated* intent of Bryant and Mattel to have the Inventions Agreement assign

17   Mattel the ownership of Bryant's ideas.  Mattel certainly never disclosed to Bryant

18   that it wanted to take his ideas.  Bryant never expressed a view that he believed that

19   it did.  That ends the matter.  *See* Part I, A, B, *infra*.

20       But even were we to look at the subjective intent of the parties, which is not

21   relevant in any case, the only evidence is that Bryant did not believe that he was

22   assigning ideas to Mattel.  Mattel, on the other hand, presents no relevant evidence

23   of its subjective intent.  Mattel's head of Human Resources could only provide

24   testimony about the way Mattel currently interprets the Inventions Agreement,

25   which is utterly irrelevant.  Otherwise, Mattel offered the testimony of other

26   employees, whose beliefs and intent are not relevant at all to what Mattel and

27   Bryant contracted to assign.  Finally, the drafting history of the Inventions

28   Agreement, California law prohibiting the assignment of ideas, and Section 16600

- 1 -

1  preclude a reading of the Inventions Agreement to cover ideas.  *See* Part I, A, B,

2  *infra*.

3      For the same reasons, the term "during my employment" cannot be read to

4  cover work done outside of working hours at Mattel.  Mattel has no evidence that

5  this is what it intended at the time of contracting, let alone that this was the

6  communicated intent of both parties at the time of contracting. *See* Part I, C, *infra*.

7      With regard to the term "during my employment," Mattel has an additional

8  issue.  Mattel's reading of the contract creates a conflict between paragraphs 1 and

9  2 of the Inventions Agreement.  Under Mattel's reading, Bryant was required to

10  assign the rights to Bratz to Mattel, but, because Bratz was not created "as a result

11  of" Bryant's employment at Mattel, Bryant had not obligation to keep Bratz

12  confidential.  This just further underscores Mattel's failure to establish that its

13  interpretation is proper.  *See* Part I, C, *infra*.

14      ***Intentional Interference with Contract.***  Mattel claims that MGA[1] interfered

15  with the contracts of Carter Bryant, Ana Cabrera, Beatriz Morales, Maria Salazar

16  and Ryan Tumaliuan.  The claims are barred by the statute of limitations.  But in

17  any case, Mattel has failed to introduce the contracts of Ana Cabrera, Beatriz

18  Morales, Maria Salazar and Ryan Tumaliuan into evidence.  Therefore, Mattel

19  cannot even establish the most fundamental of elements—that there was a contract

20  to interfere with.  Even were the contracts introduced, Mattel has presented no

21  evidence that any term of a contract was breached or that MGA knew that such a

22  breach occurred.  *See* Part II, *infra*.

23      In addition, MGA could not have intentionally interfered with the contract of

24  Bryant.  First, the contract is ambiguous.  That alone dictates that MGA could not

25  have known that its actions would result in interference.  Second, MGA

26

27

28

---

[1] As used in this brief, the term "MGA" and "MGA Parties" refers to all MGA entities and Isaac Larian.

1    investigated the issue and fully sought to avoid any interference.  As California

2    courts have found, such efforts preclude a finding of interference.  *See* Part II, *infra*.

3    Finally, there is no evidence of damages.  Mattel has chased after a trade

4    secret and copyright claim.  It introduced no evidence of any damages that arise

5    from its claim for intentional interference of contract.  This also means that punitive

6    damages are not warranted.  *See* Parts II, III,  *infra*.

7    **Bratz Trade Secrets.**  Mattel's Bratz trade secrets claims fail because Mattel

8    does not own them.  Nor has Mattel established that they are secret.  Indeed, Mattel

9    disclosed the trade secrets in Diva Starz, Bryant disclosed the trade secrets to

10    Alaska Momma, MGA paid and helped create the sculpts—so they were never

11    secret—and Bratz, as a name, simply is not a trade secret.  In addition, Bratz "as a

12    concept," the drawings, the sculpt, and the Bratz name are simply not information,

13    as that term is defined by California's Uniform Trade Secret Act.  Even if those

14    hurdles could be overcome, the claim is barred by the statute of limitations.  It is

15    also preempted in its entirety by the Copyright Act.  *See* Parts III, IV, *infra*.

16    **Mexico Trade Secrets.**  Mattel's trade secret claim as to Mexico also fails.

17    California's Uniform Trade Secret Act does not govern.  It does not apply to acts

18    taking place in Mexico.  The claims are time-barred.  And even were these issues

19    not fatal, Mattel has not proved it owns the claimed trade secrets, that the trade

20    secrets are in fact secret, and that the claimed trade secrets were improperly

21    acquired or used.  Finally, Mattel has failed to establish damages.  *See* Part VI,

22    *infra*.

23    **Remaining Trade Secrets.**  There is no evidence that Brisbois, Cooney or

24    Brawer took a trade secret, that MGA improperly acquired a trade secret, or that

25    Mattel has suffered damages.  As for Castilla, there is no evidence that MGA

26    acquired or used any trade secret.  *See* Part VII, *infra*.

27    **Copyright.**  Mattel's copyright claim fails on several fronts.  Mattel has failed

28    to establish that it has registered copyrights in all of the works at issue.  Mattel has

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1    further failed to show the required element of ownership of either the sculpts or

2    certain of the drawings on which Mattel's claim depends.  Beyond that, Mattel has

3    failed to establish that the Bratz production sculpt is virtually identical to the

4    sculpts crated by Margaret Leahy or that the Bratz dolls are substantially similar to

5    Bryant's drawings.  Finally, as with all other claims, Mattel's copyright claims are

6    barred by the statute of limitations.  *See* Part IX, *infra*.

7        ***Damages.***  Finally, Mattel's evidence of damages should not go to the jury.

8    There are insufficient facts to support the calculations.  And the methodologies used

9    are simply flawed.  Starting with the later point first, Mattel's damages calculations

10   for lost profits is arrived at using a financial figure from MGA and comparing it to

11   wholly different figures from other companies, which improperly measures MGA's

12   profits.  The damages calculations also fail to apportion damages between Mattel's

13   trade secrets.  This is to say nothing of the fact that Mattel's damages assume that

14   the profits to MGA (and the claimed unjust enrichment) all arose from the

15   intellectual property at issue, when the evidence establishes affirmatively that it

16   does not.   Finally, and setting aside methodology, there is no evidence of lost

17   profits to Mattel.  There is no evidence, for example, of a causal relationship

18   between Bratz sales and lost Barbie sales.  Mattel arrives at this figure doing little

19   more than assuming such a correlation.  And even were there some correlation,

20   damages must be reduced by any efforts at mitigation.  *See* Part X, *infra*.

21       For the foregoing reasons, this Court should grant judgment as a matter of

22   law.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1

**ARGUMENT**

2       Federal Rule of Civil Procedure 50(a)(1) provides that "[i]f a party has been

3   fully heard on an issue during a jury trial and the court finds that a reasonable jury

4   would not have a legally sufficient evidentiary basis to find for the party on that

5   issue, the court may (A) resolve the issue against the party; and (B) grant a motion

6   for judgment as a matter of law on a claim or defense that, under the controlling

7   law, can be maintained or defeated only with a favorable finding on that issue."

8   "Judgment as a matter of law is appropriate when the evidence presented at trial

9   permits only one reasonable conclusion.  That is, a motion for judgment as a matter

10   of law is properly granted only if no reasonable juror could find in the non-moving

11   party's favor." *Mangum v. Action Collection Serv., Inc.*, 575 F.3d 935, 938-39 (9th

12   Cir. 2009) (affirming JMOL for defendants).

13       Stated differently, a court should "grant a JMOL motion when there is a

14   'complete absence of probative facts to support the conclusion reached so that no

15   reasonable juror could have found for the nonmoving party.'" *Applied Med. Res.*

16   *Corp. v. United States Surgical Corp.*, 2008 WL 1901935, at *1 (C.D. Cal. Apr. 29,

17   2008) (quoting *Eich v. Bd. of Regents for Cent. Mo. State Univ.*, 350 F.3d 752, 761

18   (8th Cir. 2003)); *see also Torres v. City of Los Angeles*, 548 F.3d 1197, 1205-06

19   (9th Cir. 2008) (affirming granting of JMOL); *Am. Prof'l Testing Serv., Inc. v.*

20   *Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1155 (9th

21   Cir. 1997) (affirming JMOL); *Crowe v. Wiltel Commc'n Sys.*, 103 F.3d 897, 899

22   (9th Cir. 1996) (affirming granting of JMOL where plaintiff failed to prove element

23   of defamation claim).  Moreover, "a reasonable inference cannot be supported by

24   only threadbare conclusory statements instead of significant probative evidence . . .

25   a mere scintilla is not enough to sustain a verdict for the prevailing party."

26   *Lakeside-Scott v. Multnomah County*, 556 F.3d 797, 802 (9th Cir. 2009).

27       Rule 50(a)(1) also makes clear that the Court's power extends to resolving

28   "issues," not just claims or defenses.  Fed. R. Civ. P. 50(a)(1) ("the court may . . .

1    resolve the issue against the party"); *see also Torres*, 548 F.3d at 1210-12 (JMOL

2    granted on qualified immunity issue for one officer, but qualified immunity of other

3    defendants left for jury).

4    **I.      MATTEL'S ENTIRE CASE ON OWNERSHIP OF BRATZ FAILS
           BECAUSE IT OFFERED NO ADMISSIBLE EVIDENCE IN**
5    **SUPPORT OF ITS INTERPRETATION OF THE INVENTIONS
           AGREEMENT.**
6

7         The Ninth Circuit held two key terms in the 1999 Employee Confidential

8    Information and Inventions Agreement ("Inventions Agreement"), TX 9924,

9    between Mattel and Carter Bryant to be ambiguous: "inventions" and "during my

10   employment."  *Mattel, Inc. v. MGA Ent., Inc.*, 616 F.3d 904, 909-10, 912 (9th Cir.

11   2010).  Under California law, upon a finding of ambiguity, extrinsic evidence may

12   be admitted to interpret the contract.  *Winet v. Price*, 4 Cal. App. 4th 1159, 1165

13   (1992) (upon a finding of ambiguity, "the extrinsic evidence is then admitted to aid

14   in the second step-interpreting the contract"); *see also Wolf v. Superior Court*, 114

15   Cal. App. 4th 1343, 1351 (2004) (citing *Winet*).  If the extrinsic evidence regarding

16   the parties' intent does not resolve the ambiguity, "the court must construe the

17   ambiguous terms against the drafting party."  Cal. Civ. Code §1654 ("[The]

18   language of a contract should be interpreted most strongly against the party who

19   caused the uncertainty to exist."); *United States v. Clark*, 218 F.3d 1092, 1096 (9th

20   Cir. 2000) ("If the extrinsic evidence regarding the parties' intent does not resolve

21   the ambiguity, the court must construe the ambiguous terms against the drafting

22   party."); *see also Bd. of Trade v. Swiss Credit Bank*, 597 F.2d 146, 149 (9th Cir.

23   1979) (same).

24        The Ninth Circuit's ambiguity determination means that the disputed terms

25   must be construed against Mattel unless Mattel presents admissible evidence

26   sufficient to support an interpretation favorable to Mattel.  Mattel has offered no

27   admissible extrinsic evidence in support of its interpretation consistent with the

28   parol evidence rule.  Judgment as a matter of law should be entered for MGA.

**A.**   **Only Objective Manifestations Of Intent Are Considered "Competent" Extrinsic Evidence Under The Parol Evidence Rule.**

Since at least 1935, California has followed the objective theory of contract by which only the outward manifestations of a party's intent or understanding is relevant in the determination of contract meaning.  *See Brant v. California Dairies, Inc.*, 4 Cal. 2d 128, 133 (1935) ("But it is now a settled principle of the law of contract that the undisclosed intentions of the parties are . . . immaterial; and that the outward manifestation or expression of assent is controlling.").  The "intent" of the parties that matters in the assessment of contract meaning is their mutual, outward, objectively communicated intent.  *See* Cal. Civ. Code § 1636 ("A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.");  *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 115 (1999) (a contract must be interpreted to reflect "the mutual intentions of the parties at the time of contracting").  Under the objective theory, only communicated intent matters, and nothing a party may think or intend, but not disclose or express, affects the meaning of a contract.  *Reigelsperger v. Siller*, 40 Cal. 4th 574, 579 (2007) ("uncommunicated subjective intent is irrelevant").  *Union Bank v. Winnebago Indus.*, Inc., 528 F.2d 95, 99 (9th Cir. 1975) (applying California law and stating "the subjective, unexpressed and uncommunicated thoughts of a party are irrelevant to the material issue of the parties' intent").

The rules of contract interpretation are not altered when a court or jury interprets a contract already determined to be ambiguous.  When a contract is ambiguous, only "competent" extrinsic evidence may be considered to resolve the ambiguity.  "Competent" extrinsic evidence does not include evidence of a party's uncommunicated intent.  *Winet*, 4 Cal. App. 4th at 1165-66 ("evidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning

of contractual language"); *see also F.B.T. Prods., LLC v. Aftermath Records*, 621
F.3d 958, 963 (9th Cir. 2010) (citing *Winet*).

### B. No Reasonable Juror Could Adopt Mattel's Interpretation Of "Inventions" Given The State Of This Record.

As noted, the definition of "inventions" is ambiguous as to whether it
includes "ideas" that do not otherwise qualify as inventions.  Mattel offered no
competent evidence to support its position and all of the competent evidence and
law supports MGA's interpretation.  No reasonable juror could adopt Mattel's
interpretation.

### 1. Mattel Offered No Evidence Of Its Objective Intent To Cover "Ideas" In The Inventions Agreement.

Mattel failed to introduce any testimony regarding Bryant's or Mattel's
objective, disclosed intention at the time Bryant signed the Inventions agreement.
Mattel offered no evidence even indicating that a discussion or negotiation occurred
at the time of contracting such that Bryant's or Mattel's objective intention was
disclosed or communicated or from which the objective intention could be gleaned.
Mattel's hiring letter offered no such information.  *See* TX 1309.  Mattel's
Executive Vice President of Human Resources and Corporate Representative, Alan
Kaye, candidly admitted that, as a policy, Mattel did not discuss the Inventions
Agreement with new employees.  3/16/11 (Vol. 3) 6:15-7:17 (Kaye Testimony).

Before 1999, Bryant had worked at Mattel for a prior three-year stint.  Mattel
had numerous opportunities during that prior period to educate Bryant as to its
purported understanding, and again at the time of his subsequent reemployment.
But Mattel offered no letter, handbook, policy, instruction manual, human resources
form or any other document communicating Mattel's interpretation of the
Agreement.  Mattel provided no document or testimony whereby the term
"inventions" was defined to Bryant to include ideas not otherwise qualifying as
inventions.  Because Mattel failed to satisfy this basic legal requirement, its

1    interpretation of the Agreement to include ideas (and particularly here, the ideas for

2    the product names Bratz and Jade, and any purported combination of ideas

3    comprising a so-called Bratz trade secret) fails.

4         **2.    Mattel Offered No Evidence Of Bryant's Subjective**
          **Understanding Regarding Whether Ideas Were Covered**
5         **Under The Inventions Agreement.**

6         This Court previously confirmed that "[a]s a general rule, evidence of the

7    contracting parties' "undisclosed intent or understanding" is irrelevant to the

8    contract's interpretation.  Dkt. No. 9600 at 6 (Amended Summary Judgment

9    Order).  The Court found an exception, however:  "evidence of the parties'

10   subjective intent may be used 'in interpreting an ambiguity, although in the case of

11   contracts, it is a mutual declaration of intention which is sought to be found.'"  Dkt.

12   No. 9600 at 6 (citing *Heston v. Farmers Ins. Group*, 160 Cal. App. 3d 402, 414

13   (1984)).  The MGA Parties respectfully disagree.  The subjective intent exception

14   discussed in *Heston* is inconsistent with California Supreme Court authority.  After

15   the *Heston* decision, the California Supreme Court re-affirmed that an

16   "uncommunicated subjective intent is irrelevant."  *Reigelsperger*, 40 Cal. 4th at

17   579; *see also Union Bank*, 528 F.2d at 99.  Given that *Heston* is inconsistent with

18   California law, it is not surprising that no other courts have adopted the *Heston*

19   subjective intent exception in the twenty-seven years since it was decided.

20        Moreover, even if such an exception exists, Mattel failed to put forth any

21   evidence that Bryant shared a mutual understanding that Mattel owned Bryant's

22   ideas under the Inventions Agreement.  Bryant testified that he did not believe that

23   Mattel owned all of his ideas under the Inventions Agreement.  2/2/11 (Vol. 2)

24   26:3-25 (Bryant testimony) ("Q: Was it your understanding that any idea you came

25   up with during the time you were employed by Mattel would be owned by Mattel?

26   A: No.").  Mattel offered no evidence that Bryant believed otherwise at the time of

27   contracting.

28

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

Mattel's attempt to support its position with evidence of the subjective understandings of various other employees fails as a matter of law.  The intent or understanding of non-parties to a contract is not admissible, as Mattel conceded in its Motion for Partial Summary Judgment.  *See* Dkt. No. 9044 (Mattel MPSJ) at 8 (interpretation of non-party to contract is irrelevant); Cal. Civ. Code §1636 (object of interpretation is to ascertain intent of the parties); *Waddy v. Sears, Roebuck & Co.*, 1994 WL 392483, at *11 (N.D. Cal. July 8, 1994) (subjective understanding of other employees is irrelevant).  Mattel failed to offer any evidence that it *communicated its intentions to Bryant*.

**3.      Mattel Offered No Competent Extrinsic Evidence Of Its Own Subjective Understanding Regarding Whether Ideas Were Covered Under The Inventions Agreement.**

Indeed, Mattel did not even offer evidence of its own subjective intent at the time of contracting consistent with its interpretation.  While Mattel elicited reams of evidence regarding Mr. Kaye's *current* analysis, understanding, and textual interpretation of the Inventions Agreement, *see* 3/17/2011 (Vol. 1) 6:15-54:21 (Mattel Cross-Examination of Mr. Kaye), Mattel provided no evidence regarding Mattel's intent at the time of drafting or contracting, which is the only evidence of intent that may be considered.  *Spector v. Nat'l Pictures Corp.*, 201 Cal. App. 2d 217, 226-27 (1962) (holding that intent of party to contract before and at time contract entered into is relevant and that intent or understanding formed after contract is irrelevant).

Mattel conceded that it could not offer evidence regarding its own intent at the time of drafting because the drafter is dead.  4/17/11 (Vol. 2) 18:15-25 (Kaye Testimony).  Kaye testified that he did not know why the drafter, Joe McKay, conducted a complete "overhaul" of the previous agreement, Exhibit 9089, by drafting the version of the Inventions Agreement that Mr. Bryant ultimately signed, Exhibit 9924.  *Compare* TX 9089, 9090 *with* TX 9924; 3/16/11 (Vol. 2) 52:14-53:15 (Kaye Testimony).  Kaye further testified that he did not know why

1    "inventions" was not fully defined in the Inventions Agreement, why the word

2    "ideas" was removed from the Agreement, or why "during the period of my

3    employment" was changed to "during my employment."  3/16/11 (Vol. 2) 52:14-

4    53:15, 54:2-17, 57:9-15 (Kaye Testimony).  Mattel adduced no employee or

5    memorandum or attorney from the relevant time frame to explain the purposes and

6    content of the agreement at the time it was adopted.

7        Mattel introduced no evidence with regard to even its own intent at the time

8    of drafting the Inventions Agreement.

9        ### 4.    The Drafting History Proves That Mattel Did Not Intend To Own Bryant's Ideas Under The Inventions Agreement.

10

11       The drafting history of the Inventions Agreement demonstrates that Mattel

12   did not intend to own Bryant's ideas under the Inventions Agreement.  Mattel's

13   history of agreements shows otherwise.  *See MacKinnon v. Truck Ins. Exch.*, 31

14   Cal. 4th 635, 653 (2003) (drafting history of form insurance policies is relevant to

15   interpretation); *London Mkt. Insurers v. Superior Court*, 146 Cal. App. 4th 648, 661

16   (2007) (using drafting history to interpret form policy).

17       Sometime in 1993 or 1994, Mattel engaged in an overhaul of the Inventions

18   Agreement that had been in place at least since 1975.  In these nearly two decades

19   of prior Mattel agreements, Mattel clearly assigned *both* an employee's

20   "inventions" *and* "ideas."  TX 9077, 9081, 9083, 9084, 9085, 9086, 9087, 9088,

21   and 9089; 3/16/11 (Vol. 2) 36:16-37:17 (9077), 38:21-40:6 (9081), 40:23-41:7

22   (9083), 41:8-42:13 (9084), 42:14-43:20 (9085), 43:17-44:6 (9086), 45:2-46:20

23   (9087 & 9088), 49:1-17 (9089) (Kaye Testimony).  As noted by the Ninth Circuit,

24   "[t]his tends to show that the term 'inventions' alone doesn't include ideas."

25   *Mattel*, 616 F.3d at 910.  Further, the fact that Mattel actually *removed* the word

26   "ideas" from the Inventions Agreement means that Mattel did not intend to include

27   "ideas" within the ambit of the term "inventions."  *See Tahoe Nat'l Bank v.*

28   *Phillips*, 4 Cal. 3d 11, 16-17 (1971) ("Having on hand instruments which

- 11 -

1   unambiguously impose liens on realty, the bank cannot select an ambiguous

2   instrument and then, by extrinsic evidence, give it the effect of the unambiguous

3   form it eschewed.").

4        Mattel introduced no evidence to dispel the inference that Mattel understood

5   "inventions" and "ideas" to be distinct concepts as revealed by its prior use of the

6   word ideas and its change in contract language.  In fact, Kaye admitted that Mattel

7   could not explain that change.  3/16/11 (Vol. 2) 53:6-15 (Kaye Testimony).

8   Accordingly, the MGA Parties introduced undisputed extrinsic evidence regarding

9   Mattel's intent at the time of drafting.

10         **5.**    **Mattel Cannot Assign Ideas Under The Inventions**
11               **Agreement Because Ideas Are Not Assignable Property Under California Law.**

12        Strong legal reasons also support the conclusion that "ideas" should not be

13   read into the contract.  First, because ideas are not property under California law,

14   *see Desny v. Wilder*, 46 Cal. 2d 715, 731 (1956); Cal. Civ. Code § 980, they are not

15   assignable and cannot be exclusively owned.  *See Rokos v. Peck*, 182 Cal. App. 3d

16   604, 614 (1986); *Summerhays v. Scheu*, 10 Cal. App. 2d 574, 576-77 (1935).

17   Second, it would be improper to accept a definition of "inventions" that included

18   the word "ideas" because "ideas" is markedly dissimilar from the other items in the

19   list, such as "discoveries, improvements, processes, designs, know-how, data

20   computer programs and formulae."  *People ex rel. Lungren v. Superior Court*, 14

21   Cal. 4th 294, 307-08 (1996) ("In accordance with this principle of construction, a

22   court will adopt a restrictive meaning of a listed item if acceptance of a more

23   expansive meaning would make other items in the list unnecessary or redundant, or

24   would otherwise make the item markedly dissimilar to the other items in the list.")

25   (citation omitted).  Unlike ideas, the other items in the list are all capable of

26   receiving legal treatment as property.  Mattel's proffered interpretation is thereby

27   not supported by California law.

28

6.      **Mattel's Proffered Interpretation Runs Afoul Of §16600.**

Mattel's attempt to read the words "ideas" into its Inventions Agreement also renders the agreement unenforceable.  *See* Cal. Bus. & Prof. Code §16600.  Section 16600 provides that any restraints on employment are void.  *Id.*; *see also Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 945-48 (2008) (rejecting narrow restraint exception).  Section 16600 renders unenforceable contract provisions that prohibit employees from working for a competitor after employment is terminated, to the extent that the provision seeks to protect anything beyond trade secret information. *Muggin v. Rueben H. Donnelly Corp.*, 62 Cal. 2d 239, 243 (1965).

Under Mattel's proposed interpretation, Mattel could lay claim to an invention "reduced to practice" after an employee left Mattel's employment if that employee had the "idea" for the invention while working at Mattel.  Such interpretation is not permitted by Section 16600.  It prevents Bryant from pursuing his livelihood.  It is a restraint on trade.  *See Summerhays*, 10 Cal. App. 2d at 576-77 (interpreting agreement to prevent party from using invention was violative of Civil Code § 1624—the predecessor to § 16600).

Indeed, it goes even beyond that.  Mattel is not only claiming to have a right to learn Bryant's ideas; Mattel is claiming to have the exclusive right to those ideas even to the exclusion of Bryant.  In other words, Mattel is claiming that it owns Bryant's ideas and that he cannot even use them.  Such a proposition has long been considered violative of California law.  As long ago as *Summerhays*, California courts have refused to enforce assignment agreements that prevent a person from using their ideas in pursuit of a livelihood.

7.      **The Contract Must Be Construed Against Mattel.**

The Inventions Agreement is ambiguous.  Mattel has offered no admissible, relevant extrinsic evidence to support its interpretation.  The contract therefore *must* be interpreted against Mattel.  Cal. Civ. Code §1654.  Further, since this was an adhesion agreement drafted by lawyers, the rule of *contra proferentem* applies with

- 13 -

particular force.  *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 801 (1998); *Mayhew v. Benninghoff*, 53 Cal. App. 4th 1365, 1370 (1997).  On this record, no reasonable juror could adopt Mattel's interpretation requiring Bryant to assign ideas for Bratz and Jade and any combination of ideas that Mattel claims as a trade secret. Judgment as a matter of law should be granted in MGA's favor.

### C.   No Reasonable Juror Could Adopt Mattel's Interpretation Of The Phrase "At Any Time During My Employment."

#### 1.   Mattel Offered No Competent Evidence Of Bryant's Objective Or Subjective Understanding Regarding The Phrase "At Any Time During My Employment."

With regard to the phrase "during my employment," the analysis is no different.  There is no evidence regarding Bryant's objective understanding at the time of contracting because the agreement was never discussed at the time of contracting and Mattel otherwise adduced no evidence of its communicated intent prior to or at the time of contracting.

Further, Bryant's testimony regarding work done on off hours has been unequivocal:  he believed that "whatever I did on my own free time was my idea, that I owned it."  2/2/11 (Vol. 2) 26:3-25 (Bryant Testimony).  Mattel failed to introduce any evidence regarding Bryant's intent at the time of contracting, much less an intent that was consistent with Mattel's alleged intent.

#### 2.   Mattel Offered No Extrinsic Evidence Of Mattel's Own Objective or Subjective Understanding Regarding Whether Mattel Owns Bryant's Work Created On Nights And Weekends.

There is also no evidence of Mattel's objective intent at the time of contracting.  Mattel showed no internal memoranda, policies, or even emails discussing its belief prior to Bryant's execution that it owned every invention of an employee made around the clock even where outside the scope of employment.

The only testimony that could be potentially relevant under this Court's exception is extrinsic evidence relating to Mattel's subjective intent at the time of

1   contracting.  Mattel failed to present even this.  As established above, Mattel's

2   entire cross-examination of Kaye consisted of Kaye's *current* analysis,

3   understanding, and textual interpretation of the Inventions Agreement.  *See* 3/17/11

4   (Vol. 1) Tr. 6:15-54:21 (Mattel Cross-Examination of Mr. Kaye).  Mattel thereby

5   provided no evidence regarding Mattel's intent at the time of contracting or

6   drafting.

7          **3.      The Agreement Itself Belies Mattel's Intent That The Phrase**
          **"During My Employment" Means "As A Result Of My**
8          **Employment" And Mattel Offered No Evidence To Dispute**
          **This Inference.**
9

10         The language of the Inventions Agreement as a whole indicates that Mattel

11  intended the phrase "at any time during my employment" to be limited to

12  inventions made at any time within the *scope* of employment.  Mattel's proposed

13  interpretation for "during my employment" creates an inconsistency between

14  paragraphs 1 and 2 of the Inventions Agreement.  *See* Dkt. No. 9786 (Order

15  Directing Filing of Supplemental Briefing In Connection with Proposed Jury

16  Instructions) at 1-2.  Paragraph 1(a) of the Inventions Agreement regarding

17  confidential information conspicuously refers only to information developed or

18  discovered by Bryant "as a result of" his employment with Mattel, thereby not

19  including information developed or discovered on his own time and not "as a result

20  of" his employment with Mattel.  *Id.*  According to Mattel, however, paragraph

21  2(a), assigns all "inventions" created "at any time during my employment," *i.e.* "as

22  a result of" or "not as a result of" Bryant's employment with Mattel.  Mattel's

23  failure to include information developed or discovered other than "as a result of"

24  Bryant's employment with Mattel means that Bryant was under no duty to maintain

25  the confidentiality of information not created "as a result of" his employment with

26  Mattel.  This is fatal to Mattel's Bratz trade secret claim.  *Id.*

27         The disclosure limitation of Paragraph 1(a) to information developed or

28  discovered "as a result of" Bryant's Mattel employment works hand in hand with

1   the interpretation of the phrase "during my employment" to show that Mattel did

2   not intend to own information developed or discovered by Bryant outside of his

3   Mattel job.  *See* Dkt. No. 9857.  Under Paragraph 1(a), Mattel identifies a non-

4   disclosure obligation that extends to all information "developed or discovered as a

5   result of [Bryant's] employment," a category that notably would not include his

6   Bratz work.  Under Mattel's proposed interpretation regarding "during my

7   employment," Mattel would own "inventions" that were not conceived or reduced

8   to practice "as a result of" his employment at Mattel.  *Compare* Ex. 9924 ¶1(a) *with*

9   ¶2(a).  As a result, Mattel would purport to own a category of employee-created

10  information not subject to a non-disclosure obligation.  *Id.* at 1.  Such an

11  interpretation is antithetical to Mattel's other positions taken in this case.  *See, e.g.*,

12  *Bionghi v. Metropolitan Water Dist. of So. Cal.*, 70 Cal. App. 4th 1358, 1364

13  (1999) (extrinsic evidence may not be introduced to contradict or alter the terms of

14  a contract).

15      Mattel introduced no evidence to reconcile this inconsistency created by its

16  interpretation of the phrase "at any time during my employment."

17      **4.     The Moonlighting Evidence Demonstrates Mattel's
             Understanding That It Did Not Own Work Done On Off
18           Hours Outside The Scope Of Employment.**

19      Moonlighting by Mattel executives and managers further belies Mattel's

20  proposed interpretation of its Inventions Agreement to cover all work done outside

21  the scope of employment.  For example, Mattel's chief intellectual property

22  attorney, Michele McShane, understood the Inventions Agreement to permit her to

23  continue developing creative concepts on her own time which she believed she

24  owned.  At least one of these concepts, an idea for a television show "Animal

25  Control," included entertainment, merchandising and licensing rights of the sort

26  commonly pursued by Mattel in its business.  3/17/11 (Vol. 2) Tr. 89:21-97:5,

27  107:16-108:21 (McShane testimony).

28

1      Mattel's Vice President of Global Investigations, Richard De Anda, likewise

2  ran a business on the side.  3/9/11 (Vol. 1) Tr. 95:18-96:6, 96:23-97:17 (De Anda

3  testimony); 3/31/2011 (Vol. 2) Tr. 59:5-8 (De Anda testimony) ("Q: Now, you have

4  a company on the – you had a company on the side while you were the head of

5  security at Mattel called De Anda and Associates; right? A: Yes.").  Margaret

6  Leahy's supervisor, Michael Hebden, told her how to obtain moonlighting

7  opportunities.  3/15/11 (Vol. 1) Tr. 136:7-137:23 (Leahy Testimony).  Bryant was

8  familiar with the rampant moonlighting.  2/1/11 (Vol. 3) Tr. 16:17-17:16 (Bryant

9  Testimony) ("I think I have heard that a lot of Mattel people did other projects that

10  were not for Mattel outside of the regular work hours."); *see* 3/15/11 (Vol. 1) Tr.

11  137:24-138:8 (Leahy Testimony) ("[Moonlighting] was a common practice.").

12      Indeed, Mattel admits that its contract and handbooks expressly permitted

13  moonlighting with prior authorization.  3/9/11 (Vol. 1) Tr. 97:1-21 (De Anda

14  Testimony).  Leahy moonlighted *for a Mattel vendor* with the knowledge and

15  approval of her supervisor.  3/15/11 (Vol. 1) Tr. 136:7-137:23 (Leahy Testimony).

16  This vendor was obviously related to Mattel's business.  For Mattel to permit

17  moonlighting *at all*—but especially moonlighting within its line of business—is

18  directly inconsistent with the position Mattel now takes that it understood its

19  agreement to require assignment of every invention within its line of business,

20  including those outside the scope of employment.

21      As the Ninth Circuit noted, the evidence of Mattel's conduct with respect to

22  moonlighting is relevant to Mattel's supposed interpretation of the agreement.

23  *Mattel*, 616 F.3d at 912.  The fact that Mattel executives engaged in work during

24  their off-hours, including Mattel's chief IP lawyer and head of security, confirms

25  the inference that Mattel did not believe it owned the works of its employees

26  created on that employee's own time.

27

28

**5.**     **The Contract Must Be Construed Against Mattel.**

If any ambiguity remains, the law does not allow Mattel's interpretation to be adopted. Under *contra proferentum*, the contract must be construed against Mattel.

## II. MATTEL FAILED TO PROVE INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS.

Mattel has asserted claims of intentional interference against MGA and Mr. Larian with respect to Mattel's contracts with Carter Bryant, Ana Cabrera, Beatriz Morales, Maria Salazar and Ryan Tumaliuan.[2] Mattel has failed to present evidence from which an award of damages in its favor could be made, and otherwise has failed in its proof regarding this claim. Additionally, no reasonable juror could conclude that Mattel's interference claim survives the statute of limitations. For those reasons, the MGA Parties are entitled to judgment as a matter of law.

### A. Mattel Failed to Introduce Evidence Of Its Contracts With Ms. Cabrera, Ms. Morales, Ms. Salazar, and Mr. Tumaliuan.

Mattel's claims for intentional interference relating to Ms. Cabrera, Ms. Morales, Ms. Salazar, and Mr. Tumaliuan fail because Mattel has failed to admit into evidence any contracts with which it claims MGA and Larian interfered. The existence of a valid contract is an essential element of an intentional interference claim. CACI 2100; *Mintz v. Blue Cross of California*, 172 Cal. App. 4th 1594, 1603 (2009). Mattel failed in its proof as to this element.

---

[2] Mattel's claims for intentional interference relating to all other former Mattel employees are superseded under California's Uniform Trade Secret Act. *See* Dkt. No. 9600 at 72. While refusing to grant Mattel's motion for summary judgment regarding breaches by Castilla and Cooney, the Court identified the factual issue of whether the information allegedly taken by Castilla and Cooney amounts to trade secret. *See* Dkt. No. 9600 at 85. As this is the question to be tried, the claim is preempted by CUTSA. *K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*, 171 Cal. App. 4th 939, 954 (2009); *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 239 n. 22 (2010).

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

**B.**   **Mattel Did Not Prove Any Harm Resulting From The Alleged Interference.**

**1.**   **Ryan Tumaliuan.**

Mattel's sparse Tumaliuan evidentiary presentation did not include any evidence that would allow a reasonable juror to conclude that any alleged interference with his contract with Mattel caused any harm to Mattel.  Instead of putting on Mattel witnesses to discuss specific instances of breach and resulting harm, Mattel only discussed Tumaliuan with two MGA employees, Paula Garcia and Ms. Larian.  Neither Mr. Larian or Ms. Garcia could (or did) testify about harm to Mattel resulting from Tumaliuan's conduct.[3]  TX 9335; 1/25/2011 (Vol. 2) Tr. 14:6-20; 1/26/2011 (Vol. 1) Tr. 84:15-85:7; 2/9/2011 (Vol. 3) Tr. 66:22-79:7.

Mattel's damages expert, Michael Wagner, did not present the jury with a damage theory or amount for the alleged contractual interference relating to Tumaliuan.  As harm is an element of a claim for interference with contractual relations, judgment must be granted in MGA and Mr. Larian's favor.  *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990); CACI 2201; *Rickards v. Canine Eye Registration Found. Inc.*, 704 F.2d 1449, 1451-52, 1455-57 (9th Cir. 1983) (affirming grant of directed verdict under Fed. R. Civ. P. 50(a) on tortious interference and prospective advantage claims where plaintiff failed to establish several elements including damages; further affirming grant of summary judgment on the antitrust claims as there was no evidence of damages); *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1263 (9th Cir. 1981) (affirming grant of judgment as a matter of law for antitrust claim where there was insufficient evidence of damages); *Express LLC v. Fetish Group*, 464 F. Supp. 2d 965, 978-79

---

[3] In fact, in responding to MGA's JMOL regarding Mattel's duty of loyalty claim relating to Ryan Tumaliuan, in which MGA argued the claim must be dismissed for a failure to show harm, Mattel did not identify any alleged damage that it suffered as a result of the alleged conduct of Mr. Tumaliuan that is at issue in both that claim and this claim. *See* Dkt. No. 10275.

- 19 -

(C.D. Cal. 2006) (defendant entitled to judgment as a matter of law because there was no evidence of damages, granting summary judgment).

### 2.     The Seamstresses.

Mattel also failed to introduce evidence of harm that resulted from MGA and Mr. Larian's alleged interference with the contracts between Ms. Cabrera, Ms. Morales, and Ms. Salazar and Mattel.  Mattel did not, for example, offer evidence that they failed to perform their Mattel duties as a result of the alleged inducement of a breach by MGA.  Again, Mattel put on no Mattel witnesses to testify about the conduct of Cabrera, Morales, or Salazar, including the harm allegedly incurred. Wagner, Mattel's damages expert, did not provide the jury with a damage theory or amount relating to the alleged interference with the contracts of Cabrera, Morales, and Salazar.  With no evidence of harm resulting from the alleged misconduct, MGA and Mr. Larian are entitled to judgment on this claim.

### 3.     Carter Bryant.

Mattel's claim relating to Bryant suffers from the same evidentiary failure. Two obligations are at issue with respect to Bryant:  (a) the obligation not to engage in overlapping employment; and (b) the obligation to disclose all purportedly assigned inventions.

With respect to the first, despite all of the attention paid to Bryant's activities in September and October 2000, Mattel did not explain what it expected of Bryant, before or after he gave notice, and it did not present any evidence that would allow the jury to determine that Mattel was harmed as a result of any alleged interference by MGA with Bryant's contract with Mattel.  Mattel offered no evidence that Bryant failed in his duties during his last two months of employment with Mattel. Mattel offered no evidence that any shirking by Bryant in favor of MGA caused it to delay projects, miss deadlines, lose sales or profits, or otherwise suffer any financial consequence.  There simply is no evidence of harm to Mattel related to

1   Bryant's purported breach of the "conflicting activities" provision of his Employee

2   Confidential Information and Inventions Agreement.

3         With respect to Bryant's purported obligation to disclose to Mattel his Bratz

4   inventions, there also is no evidence that Mattel suffered any harm.  Mattel has not

5   offered a shred of evidence that it would have exploited such inventions even had it

6   been disclosed.  All that Mattel has offered is the testimony of Adrienne Fontanella,

7   who said she "would have liked to look at it."  3/17/2011 (Vol. 2) Tr. 30:21-31:9.

8   No witness has testified that Mattel would have pursued Bratz, and Ms.

9   Fontanella's testimony that she rejected the name for a multi-ethnic fashion doll

10  project and the testimony of numerous witnesses that Mattel rejected Toon Teens—

11  upon which Bratz is purportedly based—clearly shows otherwise.  3/17/2011 (Vol.

12  1) Tr. 109:6-14 (Mattel rejected the name "Bratz"); 1/19/2011 (Vol. 1) Tr. 45:9-

13  46:9 (Toon Teens did not make it past the research testing stage).

14        Nor has Mattel offered any evidence at all that it could have exploited Bratz

15  successfully, and made a brand out of it the way MGA did.  Instead, all of the

16  evidence is to the contrary:  Mattel's efforts to make lasting brands out of any of its

17  older-girl targeted products repeatedly failed.  Mattel failed to make an independent

18  viable brand out of Generation Girl, Mystery Squad, Diva Starz, or Flavas.  TX

19  8676 (Eckert email re "What Happened to Barbie); TX 1805 (Bratz Brief

20  discussing fact that "both Generation Girl and Diva Starz were unable to sustain the

21  older girl interest"); 3/2/2011 (Vol. 1) Tr. 90:21-91:9 (Generation Girl withdrawn

22  from market after 1 year), 123:11-13 (Flavas discontinued in 2004), 123:23-124:6;

23  3/11/2011 (Vol. 1) Tr. 94:2-18 (Generation Girl, Mystery Squad, and Diva Stars did

24  not recapture girls' interest).  With this record, no reasonable juror could equate

25  MGA's success with Bratz to a Mattel damages claim.

26        Accordingly, Mattel's expert Michael Wagner presented no theory of what

27  Mattel would have earned had it pursued Bratz.  His testimony was limited to

28  theories based on copyright infringement and trade secret misappropriation, and did

1   not identify damages specifically stemming from the alleged contractual breach.

2   *See* 3/8/2011 (Vol. 1) Tr. 79:2-130:19; 3/8/2011 (Vol. 2) Tr. 5:3-74:14; 3/9/2011

3   (Vol. 1) Tr. 6:16-94:4.

4       Accordingly, the Court must grant judgment in favor of MGA and Mr. Larian

5   for the claim of intentional interference.

6   **C.   Mattel Did Not Prove A Breach Of Contract Or Actionable Disruption Caused By The MGA Parties.**

7

8       **1.   Ryan Tumaliuan.**

9       Mattel has not presented evidence to support its theory that Mr. Tumaliuan

10  breached a contract he had with Mattel.  In the first instance, Mattel failed to put a

11  contract between Mattel and Ryan Tumaliuan in evidence.  Nor has Mattel put on

12  any Mattel witnesses to discuss Tumaliuan's actions that allegedly breached that

13  contract.  The only evidence in the record relating to Tumaliuan in any way is the

14  single email and testimony regarding that email by Paula Garcia and Isaac Larian.

15  TX 9335; 1/25/2011 (Vol. 2) Tr. 14:6-20; 1/26/2011 (Vol. 1) Tr. 84:15-85:7;

16  2/9/2011 (Vol. 3) Tr. 66:22-79:7.  This evidence demonstrates that MGA did *not*

17  interfere with and relationship between Mattel and Tumaliuan, as the email and the

18  testimony relating to it indicate that MGA and Mr. Larian decided not to have Mr.

19  Tumaliuan work on MGA projects while he was at "boot camp" at Mattel for his

20  school.  TX 9335; 1/25/2011 (Vol. 2) Tr. 14:6-20; 1/26/2011 (Vol. 1) Tr. 84:15-

21  85:7.  With a record devoid of evidence of an existing contract or of a specific

22  action that allegedly breached that contract, judgment must be entered in favor of

23  MGA and Mr. Larian with respect to this claim.

24       **2.   The Seamstresses.**

25       In the first instance, Mattel has failed even to introduce into evidence the

26  contracts allegedly breached by Cabrera, Morales, and Salazar.  Moreover, in ruling

27  on the parties' motions for summary judgment, the Court cautioned that it needed

28  information regarding the interpretation of the word "business" in the clause of

- 22 -

1    Mattel's Inventions Agreements that identifies a duty not to "engage in any

2    employment or business other than for the Company, or invest or assist (in any

3    manner) any business competitive with the business or the future business of the

4    Company."  Dkt. No. 9600 at 85.  However, Mattel has not put in any evidence

5    regarding the interpretation of the word "business."  MGA, on the other hand, has

6    elicited testimony about other Mattel employees engaged in moonlighting with

7    permission and encouragement from Mattel management.  3/15/2011 (Vol. 1) Tr.

8    136:13-138:8; 2/1/2011 (Vol. 3) Tr. 16:17-17:16; *see also* Part I.C.4, *supra*.  Thus,

9    the evidence in the record regarding the interpretation of "business" shows that

10   Mattel did not consider an employee to be engaged in "employment or other

11   business" when performing moonlighting work.

## 3.    Carter Bryant.

13   This Court has concluded that this claim against Carter Bryant is limited to

14   any supposed failure to communicate as promptly as practicable his "inventions" to

15   Mattel in September and October 2000.  Dkt. No. 9600 at 83-84.  As set forth above

16   in Part I, Mattel has failed to present sufficient evidence to prove that Bryant had

17   any such duty or contractual obligation to disclose his Bratz idea to Mattel.  Indeed,

18   all that has been established is that Carter Bryant's contract is ambiguous on

19   numerous fronts and therefore must be interpreted against Mattel.  Having failed to

20   prove that Carter Bryant's agreement required him to disclose his Bratz idea to

21   Mattel, it is impossible for a jury to conclude that MGA intentionally interfered

22   with that obligation.  CACI 2201.

23   Moreover, under Business and Professions Code section 16600, an employee

24   cannot be contractually restrained from future employment.  The California

25   Supreme Court has interpreted section 16600 in a literal sense and has held that

26   section 16600 prohibits contractual provisions that purport to limit a former

27   employee's ability to compete with his or her former employee.  *Edwards*, 44 Cal.

28   4th at 946-47.  Mattel's argument that it is entitled to the profits of the Bratz line is

- 23 -

1     an attempt to make an end run around section 16600.  According to Mattel, its

2     contract prohibits an employee from the future exploitation of an idea, if that idea,

3     while admittedly unrelated to the employee's job at Mattel, is developed in any

4     manner while at Mattel, as such conduct "*assist[s] (in any manner)* any business

5     competitive with the business or *the future business* of the Company."

6        Under Mattel's theory, a Mattel employee has committed a breach just by

7     having the idea come into his or her brain while a Mattel employee.  Even if the

8     employee were to do nothing to develop the idea until years after his or her

9     employment at Mattel, the mere act of having the idea come into his or her head

10     would be some manner of assistance to a future product that might be considered

11     competitive with Mattel's yet undeveloped future business lines.  Even as Mattel is

12     attempting to enforce the provision against Bryant, it is an attempt to restrain

13     Bryant's employment relationship with MGA in a manner contrary to section

14     16600.  As such, the term is an unenforceable non-compete provision and cannot

15     support a claim for intentional interference with contract.

16             **D.**     **No Reasonable Juror Could Find That MGA Intended To**

17                 **Interfere With The Mattel Employees' Contracts.**

18        To prove that MGA and Larian intended to interfere with Bryant's Inventions

19     Agreement by contracting with Bryant for the ownership rights to his Bratz work,

20     or with any of the individual Mattel employees' contracts, Mattel must show that

21     MGA and Mr. Larian knew that "the interference is certain or substantially certain

22     to occur as a result of his action.  The rule applies, in other words, to an interference

23     that is incidental to the actor's independent purpose and desire *but known to him to*

24     *be a necessary consequence of his action*."  *Tuchscher Dev. Enters., Inc. v. San*

25     *Diego Unified Port Dist.*, 106 Cal. App. 4th 1219, 1239 (2003) (emphasis added).

26     It is axiomatic, under California law, that neither MGA nor Mr. Larian could form

27     the intent to interfere because a third party must have sufficient knowledge of the

28     details of the contract with which it is interfering to form the intent to harm the

contractual relationship.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1155-1156 (2003); *Quelimane Co. v. Stewart Title Guar Co.*, 19 Cal. 4th 26, 56 (1998) (party allegedly interfering with contractual relationship must know the interference to be a necessary consequence of its actions); *Davis v. Nadrich*, 174 Cal. App. 4th 1, 10-11 (2009).

Indeed, because of this requirement, a party cannot be found to intentionally interfere with an ambiguous contract like Bryant's Inventions Agreement.  *See Dollar Fed. Savings Bank v. Green Tree Acceptance, Inc*., 1991 WL 40398, at *4 (D. Minn. March 21, 1991) ("This finding of ambiguity, as a matter of law, obviates a claim of wrongful interference with contract" because there was no evidence the defendant knew what was done was wrong).

### 1.  MGA Could Not Have Intended To Interfere.

MGA obtained assurances from Bryant's attorney and obtained representations and warranties from Bryant that guaranteed to MGA that Bryant owned all rights to Bratz.  *See*, *e.g.*, TX 15, 2207, 9258, 16788, 17236, 18463; 2//8/11 (Vol. 2) Tr. 45:9-20, 54:17-61:14 (Larian Testimony); 1/28/2011 (Vol. 3 ) Tr. 9:11-18 (Bryant hired Ann Wang to help him negotiate contract with MGA); Tr. 67:23-25 (MGA hired David Rosenbaum to draft the license agreement); 2/16/2011 (Vol. 1) Tr. 31:25-32:22; 2/22/2001 (Vol. 2) Tr. 22:11-16, 78:16-81:7, 150:23-151:1 (Rosenbaum Testimony); *see also* 3/11/11 (Vol. 3) Tr. 58:8-61:10 (Friedman Testimony).  Under such circumstances, courts have refused to find an intentional breach of contract.

For example, in *Davis*, the court upheld the grant of summary judgment for an attorney who had referred cases to a partner in a dissolving law firm because he was not sufficiently aware of the details and requirements of the partnership contract to be liable for intentionally interfering with that contract.  174 Cal. App. 4th at 10-11.  The partner told the defendant attorney that the partnership "was in dissolution, but remained open to wind-up its existing cases" and that "he had

1    begun his own practice and was accepting cases apart from" the partnership.  *Id*.

2    While the plaintiff argued that the defendant attorney "had no right to rely upon

3    [the partner's] statements that the [] partnership was dissolving" and "had a duty to

4    investigate further to ascertain if there was a partnership agreement," the court

5    rejected those arguments.  The Court found "assuming [defendant] had a duty to

6    investigate, [he] discharged that duty by talking to [the partner], the person who had

7    knowledge of the terms of the [] contract" and noting that the plaintiff "has

8    presented no facts that would have led [defendant] to disbelieve [the partner's]

9    statements."  *Id*. at 11.

10        *1-800 Contacts, Inc. v. Steinberg*, 107 Cal. App. 4th 568 (2003), although

11   arising in an anti-SLAPP motion, is also instructive.  The court found plaintiff (a

12   discount contact lens seller) would be unlikely to prevail on its intentional

13   interference with contract claims against defendant (a representative of optometrist

14   associations) where plaintiff's former legal counsel contacted defendant and offered

15   his services to groups of optometrists, which were direct competitors of plaintiff's

16   as contact lens sellers and were seeking laws regulating the activities of businesses

17   like plaintiff's.  *Id*. at 573.  Because the former employee repeatedly reiterated to

18   defendant that he would not disclose confidential information learned from his

19   previous employer, "stated and restated his contractual obligation not to work for a

20   defined class of competitors, and obtained assurances that neither [defendant]

21   Steinberg nor the optometric associations were within that class[,]" the court

22   concluded that, regardless of whether the former employee actually breached the

23   contract, "the evidence did not show or substantiate that Steinberg—either in

24   agreeing to work with [the former employee] on a subject of mutual concern or in

25   inviting or arranging for others interested to meet with them—*acted with*

26   *knowledge that any such breach would thereby be caused*."  *Id*. at 586 (emphasis

27   added).  The undisputed facts here show that Mr. Larian and MGA took steps to

28

- 26 -

1    verify that, by contracting with Bryant for the ownership of Bratz, they would not

2    infringe any potential rights of Mattel, and thus the intent element cannot be met.

3         With respect to Ryan Tumaliuan and the seamstresses, there is no evidence

4    that MGA was even aware that the seamstresses worked for Mattel and there is no

5    evidence that anything was done with Tumaliuan.  In fact, as to the seamstresses,

6    Marlow testified that, when directly asked for the names of the persons Ms. Marlow

7    employed, the Marlows refused to identify their employees.  2/25/2011 (Vol. 1) Tr.

8    77:12-21, 89:10-24 (Marlow Testimony).

9         **2.    <u>That MGA Entered Into An Agreement With Bryant Does</u>**
         **<u>Not Support A Claim Of Interference.</u>**

10

11        The fact that there was a contract between MGA and Bryant, even while

12   Bryant was employed by Mattel, is protected under the privilege of competition in

13   California.  Under California law, "it is not ordinarily a tort to hire the employees of

14   another for use in the hirer's business." *Buxbon v. Smith,* 23 Cal. 2d 535, 547

15   (1944).  "[N]o actionable wrong is committed by a competitor who solicits his

16   competitor's employees or who hires away one or more of his competitor's

17   employees who are not under contract, so long as the inducement to leave is not

18   accompanied by unlawful action." *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244,

19   255 (1968); *see Reeves v. Hanlon*, 33 Cal. 4th 1140, 1149-50 (2004).  To the

20   contrary, "absent a showing of unlawful purpose or means, [a competitor] is

21   privileged and not liable for inducing . . . employees to leave and move to" the

22   competitor. *Metro Traffic Control Inc. v. Shadow Traffic Network*, 22 Cal. App.

23   4th 853, 860 (1994).  The employer enjoys "immunity against liability" for such

24   standard business behavior. *Diodes*, 260 Cal. App. 2d at 267; *see Reeves*, 33 Cal.

25   4th at 1149-50.

26        In other words, there is a required element for independently wrongful

27   conduct in any claim for interference with an at-will employment relationship.

28   *Reeves*, 33 Cal. 4th at 1149-50.  Mattel has presented no evidence that MGA or Mr.

1   Larian engaged in any unlawful conduct in connection with the contract with

2   Bryant.  Accordingly, MGA and Mr. Larian must be granted judgment on Mattel's

3   intentional interference claim with respect to Mr. Bryant.  *See* Restatement

4   (Second) of Torts § 766, comment *n*;[4] *see also DeVoto v. Pac. Fid. Life Ins. Co.*,

5   618 F.2d 1340, 1348 (9th Cir. 1980) (noting that "where a contract has been

6   abrogated, competitors may thereafter offer to deal with the party who repudiated

7   the contract without incurring liability in tort: there is no act of inducement, and

8   once the contract is abrogated there is no advantage to appropriate") (citing

9   Restatement (Second) of Torts § 766, comment n); *Bauer v. Interpublic Group of*

10  *Cos., Inc.*, 255 F. Supp. 2d 1086, 1093, 1095 (N.D. Cal. 2003).

11       **E.**     **Mattel's Interference Claim Is Barred By The Statute Of Limitations.**

12

13       A claim for interference with contract is subject to the two-year statute of

14  limitations found in California Code of Civil Procedure section 339(1).  *See* Dkt.

15  No. 9600 at 93-94 ("Mattel's state law counter-claims grounded in tort, including

16  its counter-claims for . . . intentional interference with contractual relations must

17  have been brought within two years of the alleged wrongdoing.") (citing Cal. Code

18  Civ. Proc. § 339(1)); *accord Forcier v. Microsoft Corp.*, 123 F. Supp. 2d 520, 530

19  (N.D. Cal. 2000) (quoting *Richardson v. Allstate Ins. Co.*, 117 Cal. App. 3d 8, 11-

20  12 (1981)).  The claim generally accrues at the time of the defendant's wrongful act

21  of inducement, but "the accrual date could not be later than the actual breach of the

22  contract by the party who was wrongfully induced to breach."  *Forcier*, 123 F.

23  Supp. 2d at 530 (quoting *Trembath v. Digardi*, 43 Cal. App. 3d 834, 836 (1974)).

24  As this Court has already found, the discovery rule does not apply to claims for

---

25  [4] "One does not induce another to commit a breach of contract with a third person
26  under the rule stated in this Section when he merely enters into an agreement with
    the other with knowledge that the other cannot perform both it and his contract with
27  the third person. . . .  For instance, B is under contract to sell certain goods to C.  He
    offers to sell them to A, who knows of the contract.  A accepts the offer and
28  receives the goods.  A has not induced the breach and is not subject to liability
    under the rule stated in this Section."

intentional interference.  *See* Dkt. No. 3902 (June 2, 2008 Further and Final Order Re Statute of Limitations Defense) at 3 (noting that because the claim for intentional interference with contractual relations is not subject to the discovery rule, "the conclusions drawn by the Court regarding the possible accrual dates for the remaining state-law claims do not apply to" this claim).

### 1.   **Carter Bryant.**

Like Mattel's interference allegations involving other former Mattel employees, the Court held that Mattel's Carter Bryant interference claim was superseded by the California Uniform Trade Secrets Act to the extent it is based on the alleged inducement of misappropriation of "Mattel trade secrets and other proprietary information."  Dkt. No. 9600 (Amended Summary Judgment Order) at 82-83.  The interference claim survived only "to the extent it arises out of conduct unrelated to the misappropriation of Mattel's information."  *Id*. at 83.

In the case of Bryant, the surviving allegations include the possible inducement of his failure to "communicate . . . as promptly and fully as practicable all inventions," and his work with MGA in September and October 2000.  *Id*. at 84.  By definition, any such conduct occurred in 2000.  To assert a claim for intentional interference with Mattel's contract with Bryant, Mattel needed to file its claim by 2002.  However, more than six years passed between the conduct at issue and when Mattel first asserted a claim for intentional interference in October 2006 and first filed it in January 2007.  Dkt. No. 143 (Mattel's Amended Answer and Counterclaims).[5]  Thus, the MGA Parties are entitled to judgment on the Carter Bryant-related interference claim.

### 2.   **The Seamstresses.**

Mattel contends that Ana Cabrera, Beatriz Morales, and Maria Elena Salazar breached a contract with Mattel by performing Bratz-related work for MGA

---

[5] Even were this Court to find that the claims asserted in Dkt. No. 143 related back to April 2004, this claim is time barred.

- 29 -

1   through independent contractor Veronica Marlow.  The trial evidence shows that

2   Cabrera and Salazar began working for Marlow in 2000, 2/25/2011 (Vol. 1) Tr.

3   18:6-15, and Morales started working for Marlow in 2001.  *Id.* at 18:19-22.  Thus,

4   to state a claim for intentional interference with contract, Mattel must have pled

5   these claims by 2002 and 2003, respectively.  However, Mattel did not assert any

6   intentional interference claims relating to Cabrera, Morales, and Salazar until May

7   2009.  Dkt. No. 5607 (Mattel's Third Amended Answer and Counterclaims).

8   Accordingly, Mattel's intentional interference claim relating to these three

9   individuals is barred by the statute of limitations.

### 3.      Ryan Tumaliuan.

11  Mattel has never specifically alleged that MGA or Mr. Larian interfered with

12  a contract that Mattel had with Mr. Tumaliuan.  *See* Dkt. No. 7714 (Mattel's Fourth

13  Amended Answer and Counterclaims).  Yet in its summary judgment motion,

14  Mattel identified an alleged contract with Tumaliuan and argued that by accepting

15  an internship with Mattel while he was an intern at MGA, Tumaliuan breached a

16  contractual prohibition on "engag[ing] in any employment or business other than

17  for [Mattel], or invest[ing] in or assist[ing] (in any manner) any business

18  competitive with the business of" Mattel without obtaining consent.  Dkt. No. 9600

19  at 85-86.

20  The only evidence relating to Tumaliuan that has been presented to the jury

21  is a single email, TX 9335, that references Tumaliuan attending Mattel "boot camp"

22  as part of a class, and the testimony of Paula Garcia and Isaac Larian about that

23  email.  1/25/2011 (Vol. 2) Tr. 14:6-20; 1/26/2011 (Vol. 1) Tr. 84:15-85:7; 2/9/2011

24  (Vol. 3) Tr. 66:22-79:7.  From the text of the email, if Tumaliuan were an intern at

25  Mattel, the internship began in the summer of 2003.  TX 9335.  Thus, if MGA

26  induced a breach of Tumaliuan's contract with Mattel, it necessarily did so in 2003.

27  To satisfy the statute of limitations for a claim of intentional interference with

28  contract, Mattel would have needed to assert this claim by the summer of 2005.

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1   Mattel had not stated any claims against MGA by 2005 and did not make any

2   representations about claims relating to Tumaliuan until 2010.  Accordingly,

3   Mattel's intentional interference claim relating to Tumaliuan is barred by the statute

4   of limitations and judgment must be granted on behalf of MGA and Mr. Larian on

5   that claim.

## III.   THERE IS NO BASIS FOR PROCEEDING TO A PUNITIVE DAMAGES PHASE.

8        The parties agreed, and the Court ordered, bifurcation of any consideration of

9   punitive damages.  Under a bifurcated inquiry, the jury is queried in the first phase

10  whether there is a sufficient basis for the award of punitive damages, and in the

11  second phase, the jury is presented with the evidence for calculation of an amount.

12  CACI 3941, 3946.

13       Mattel is seeking to submit questions to the jury regarding willful copyright

14  infringement, willful and malicious trade secret misappropriation, and punitive

15  damages on the intentional interference with contract claim.  Mattel also seeks a

16  second phase of the case for calculation of punitive damages.  There is no basis for

17  continuing with the second phase; accordingly, there should be no further discovery

18  or trial before the jury of the enhanced damages issues.

19       First, willful copyright infringement is irrelevant to any issue in the case at

20  this point.  The only legal relevance of that issue is for enhanced *statutory* damages,

21  which are not sought and are not available here.  *See* 17 U.S.C. §504.

22       Second, whether to enhance damages on a trade secret claim is a question for

23  the Court.  *See* CACI 4411.  Both Mattel and MGA are seeking enhanced damages

24  on their respective trade secret misappropriation claims, and both claims must be

25  submitted to the Court.  It is not proper to consult the jury further on that issue.

26       Thus, the only claim that could be considered in a second phase is the

27  intentional interference tort claim.  But no reasonable juror could award punitive

28  damages against MGA or Mr. Larian on that claim in light of the record in this

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1   case.  The standard is clear and convincing evidence of malice, oppression or fraud.

2   Cal. Civ. Code 3294(a); CACI 3949.  Given the ambiguity of the contract, reliance

3   on counsel, MGA's substantial investment in the development of Bratz, and the

4   other evidence adduced, neither MGA nor Mr. Larian could be found by clear and

5   convincing evidence to have acted with malice, *i.e.*, "with intent to cause injury" or

6   with a "willful and knowing disregard of the rights or safety or another."  Neither

7   could be found by clear and convincing evidence to have acted with "oppression,"

8   *i.e.*, to have "subjected Mattel to cruel and unjust hardship in knowing disregard of

9   its rights."  The conduct of neither could be found by a reasonable juror to have

10  been despicable, *i.e.*, "so vile, base, or contemptible that it would be looked down

11  on and despised by a reasonable person."  No reasonable juror could find "fraud"

12  by clear and convincing evidence, *i.e.*, that MGA or Mr. Larian "intentionally

13  misrepresented or concealed a material fact and did so intending to harm Mattel."

14       There simply is no basis upon which to proceed to the second phase of a

15  bifurcated punitive damages inquiry.  The Court should dismiss Mattel's demand

16  for punitive damages.

17  **IV.   THE MGA PARTIES ARE ENTITLED TO JUDGMENT AS A**
    **MATTER OF LAW ON MATTEL'S "BRATZ" TRADE SECRETS**
18  **CLAIM.**

19       Mattel does not own the rights to Bratz, as established above.  Therefore,

20  Mattel has failed to establish that element of its claim.  *See* Cal. Civ. Code

21  §3426.1(d)(1); *Cytodyn, Inc. v. Amerimmune Pharmaceuticals, Inc.*, 160 Cal. App.

22  4th 288, 297 (2008) ("[A] prima facie claim for misappropriation of trade secrets

23  'requires the plaintiff to demonstrate [that it] owned [the] trade secret").

24       In addition, the claim fails for the following five reasons.  First, there is no

25  evidence that MGA improperly acquired the claimed trade secrets.  Second, Mattel

26  did not make reasonable efforts to keep claimed Bratz trade secrets secret.  Third,

27  the claimed trade secrets were not in fact secret at all.  Forth, the trade secrets that

28  Mattel has identified relating to Bratz are not entitled to trade secret protection

1    because they are not "information," as defined by California's Trade Secret Act.

2    Fifth, Mattel's Bratz trade secret claim is barred by the statute of limitations.  Sixth,

3    the claims are preempted by the Copyright Act.[6]

4         **A.     MGA Did Not Wrongfully Acquire The Bratz Trade Secrets.**

5             The acquirer of a claimed trade secret, such as the MGA Parties, cannot be

6    liable for trade secret misappropriation unless "he knew or had reason to know that

7    the trade secret was improperly disclosed."  *Ajaxo, Inc. v. E*Trade Group, Inc.*, 135

8    Cal. App. 4th 21, 66 (2005); Cal. Civ. Code § 3426.1(b).  Mattel has presented no

9    evidence that the Inventions Agreement prohibits Bryant's disclosure or that the

10   MGA Parties knew or had reason to know that any of the trade secrets were

11   improperly disclosed or that it wrongfully acquired the claimed trade secrets.

12            Even if Mattel could prove that it should own the rights to Bratz, the

13   Inventions Agreement permits disclosure of work that was not created "as a result"

14   of Bryant's employment with Mattel, i.e. Bryant's Bratz work.  Therefore, it has

15   failed to establish that element of its claim.  *See* Cal. Civ. Code §3426.1(d)(1);

16   *Cytodyn, Inc. v. Amerimmune Pharmaceuticals, Inc.*, 160 Cal. App. 4th 288, 297

17   (2008) ("[A] prima facie claim for misappropriation of trade secrets 'requires the

18   plaintiff to demonstrate [that it] owned [the] trade secret");  See Dkt. No. 9786

19   (Order Directing Filing of Supplemental Briefing In Connection with Proposed Jury

20   Instructions) at 1-2; *see also* Part I.C.3 *supra*.

21            Furthermore, MGA could not know that Mattel owned the trade secrets or

22   that Bryant's disclosure was wrongful.  What was unknown to MGA was that

23   Bryant created or reduced Bratz to practice while he was at Mattel.  The evidence

24   establishes that Bryant informed Mr. Larian, Bryant's own attorney who conveyed

25   _____

26   [6] In addition, Mattel's trade secret disclosure included numerous drawings for
     which no proof of any kind was offered at trial.  At the risk of stating the obvious, a

27   plaintiff seeking to prevail on a trade secret claim has the affirmative burden to
     prove that it owns the item that allegedly was misappropriated.  Cal. Civ. Code

28   §3426.1(d)(1); Dkt. No. 9600.  The MGA Parties are entitled to judgment that they
     did not misappropriate any trade secrets that Mattel failed to admit into evidence.

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1    it to MGA's attorney, and Ramona Prince that he created Bratz in 1998 while not

2    employed by Mattel.  *See, e.g.*, TX 18463; 2/8/11 (Vol. 2) Tr. 41:15-21 (Larian

3    Testimony); 2/22/11 (Vol. 2) Tr. 24:23-26:16 (Rosenbaum Testimony).  If MGA

4    did not know that Bryant created or reduced Bratz to practice while he was

5    employed by Mattel, however the Inventions Agreement is now interpreted, MGA

6    could not have known that disclosure by Bryant was improper.

7         In addition, whether or not Bryant created or reduced Bratz to practice while

8    he was at Mattel, the evidence establishes that it was unknown to MGA that Bryant

9    *did not* own the rights to Bratz or that he was improperly asserting ownership.

10   MGA obtained assurances from Bryant's attorney and obtained representations and

11   warranties from Bryant that guaranteed to MGA that Bryant owned all rights to

12   Bratz.  *See*, *e.g.*, TX 15, 2207, 9258, 16788, 17236, 18463; 2//8/11 (Vol. 2) Tr.

13   45:9-20, 54:17-61:14 (Larian Testimony); 1/28/2011 (Vol. 3 ) Tr. 9:11-18 (Bryant

14   hired Ann Wang to help him negotiate contract with MGA); Tr. 67:23-25 (MGA

15   hired David Rosenbaum to draft the license agreement); 2/16/2011 (Vol. 1) Tr.

16   31:25-32:22; 2/22/2001 (Vol. 2) Tr. 22:11-16, 78:16-81:7, 150:23-151:1

17   (Rosenbaum Testimony); *see also* 3/11/11 (Vol. 3) Tr. 58:8-61:10 (Friedman

18   Testimony).

19        Finally, what was completely unknowable to the MGA Parties—and what

20   remains unknown—is whether Bryant's Inventions Agreement gives Mattel any

21   rights to Bratz.  The Ninth Circuit has concluded that the Inventions Agreement is

22   ambiguous.  *Mattel*, 616 F.3d at 909-10, 912.  There is a trial for this very reason.

23   If the contract is ambiguous as to the rights of ownership, the MGA Parties cannot

24   very well have known or be held to have had reason to know that Bryant's

25   disclosure of Bratz or MGA's acquisition of the claimed Bratz trade secrets was

26   improper.

27

28

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

**B.    Mattel Did Not Make Reasonable Efforts To Maintain The Secrecy Of The Claimed Bratz Trade Secrets.**

Mattel's own Inventions Agreement did not require that Bryant keep "Bratz" confidential because the definition of what Bryant had to keep confidential is different than what Mattel claims it could own. *Compare* TX 9924 ¶1(a) *with* ¶2(a).  As noted recently by this Court, Mattel's proposed interpretation for "during my employment" creates a tension between paragraph 1 and paragraph 2 of the Inventions Agreement.  Dkt. No. 9786 (Order Directing Filing of Supplemental Briefing In Connection with Proposed Jury Instructions) at 1-2.  Paragraph 1(a) of the Inventions Agreement regarding confidential information conspicuously refers only to information developed or discovered by Mr. Bryant "as a result of" his employment with Mattel, thereby not including information developed or discovered on his own time and not "as a result of" his employment with Mattel. *Id.*  Paragraph 2(a), however, purports to assign all "inventions" created "at any time during my employment," *i.e.* "as a result of" or "not as a result of" Mr. Bryant's employment with Mattel.  The Court explained that Mattel's failure to include information developed or discovered other than "as a result of" Mr. Bryant's employment with Mattel created the possibility that Mr. Bryant was under no duty to maintain the confidentiality of information not created "as a result of" his employment with Mattel.  The Court remarked that such interpretation would be fatal to Mattel's Bratz trade secret claim. *Id.*

Mattel's interpretation is fatal to its Bratz trade secret claim.  Under Paragraph 1(a), Mattel identifies a non-disclosure obligation that extends to all information "developed or discovered as a result of [Mr. Bryant's] employment," a category that notably does not include Bryant's Bratz work.  Under Mattel's proposed interpretation regarding "during my employment," however, Mattel would own "inventions" that were not conceived or reduced to practice "as a result of" Bryant's employment at Mattel. *Compare* Ex. 9924 ¶1(a) *with* ¶2(a).

1   Therefore, Mattel purports to own a category of employee-created information is

2   not subject to a non-disclosure obligation.  *Id.* at 1.  In other words, Mattel may lay

3   claim to Bryant's "Bratz" works, but Bryant had no obligation to keep such work

4   confidential.

5          Additionally, Mattel did not take reasonable efforts to keep any of the

6   claimed Bratz trade secrets secret.  For this reason independently, Mattel's trade

7   secret claims also fail.  Mattel took no steps—let alone reasonable efforts—to

8   maintain the secrecy of the claimed Bratz trade secrets.  Cal. Civ. Code §

9   3426.1(d)(2) (information is protectable as trade secret where owner has taken

10  reasonable efforts to maintain secrecy); *Courtesy Temporary Serv., Inc. v.*

11  *Camacho*, 222 Cal. App. 3d 1278, 1288 (1990);  *see also MAI Sys. Corp. v. Peak*

12  *Computer*, 991 F.2d 511, 521 (9th Cir. 1993).

13         With regard to all of the claimed Bratz secrets, Mattel never informed Bryant

14  that things he created on his own time—whether in 1998 or at home, but while

15  employed at Mattel—was a Mattel trade secret.  *See* Part I, *supra*.  Nor did Mattel

16  inform Bryant that it considered ideas to be covered by its Inventions Agreement.

17  *See id.*

18         Thus, there is no evidence whatsoever that, as to the Bratz trade secrets,

19  Bryant would have known that he was not entitled to disclose the Bratz trade

20  secrets to a third party or that a third party would have known that it was wrongful

21  to acquire those claimed trade secrets.

22         **C.      The Claimed Bratz Trade Secrets Are Not Secret.**

23         Even assuming that Mattel owns any rights to Bratz, Mattel has failed to

24  establish that its Bratz trade secrets are in fact secret.  The Bratz concept was

25  known to the public.  The Bratz drawings, including the Hero Shot, were disclosed

26  by Bryant prior to any disclosure to MGA.  The Bratz name had been used with

27

28

dolls.  The Bratz sculpts were never secret—MGA had them created and paid for them.[7]

### 1.   The Bratz Concept Was Disclosed By Mattel Through Diva Starz.

A trade secret is "protectable only so long as it is kept secret by the party creating it."  *Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34, 50 (1992).  "If a so-called trade secret is fully disclosed by the products produced by use of the secret then the right to protection is lost."  *Id*. (citing *Futurecraft Corp. v. Clary Corp.*, 205 Cal. App. 2d. 279, 289 (1962)).  Moreover, if the trade secret is readily ascertainable, it is not a trade secret.  *Abba Rubber Co. v. Seaquist*, 235 Cal. App. 3d 1, 19-20 (1991).  Mattel's claims fail for both these reasons.

Mattel disclosed the alleged Bratz concept trade secret in its Diva Starz line.  Mattel began marketing Diva Starz in 2000.  1/19/11 (Vol. 1) Tr. 27; 3-16 (Ross Testimony).  As Mattel's former President of Girl's Division Adrienne Fontanella testified, Diva Starz had large heads and feet, large eyes, and small noses.  3/17/11 (Vol. 2) Tr. 19-7:-20:20 (Fontanella Testimony); *see also* 1/19/11 (Vol. 1) Tr. 114:12-115:7 (nothing unique about big head and big feet) (Ross Testimony).  They were multi-ethic.  There were sassy.  *Id.* at 21:14-20.  In fact, when Fontanella first saw Bratz, she thought that they copied Diva Starz.  *Id.* at 18.

In addition, as established by the evidence, each of the Diva Starz came with its own fashion, personality, back story and "icon"—something that represented the character.  Alexa is "[y]our personal expert on style" and comes with a bunny in her backpack and a cat icon on one of her accessories.  TX 432.  Her "pink dress is diva-licious."  *Id.*  Tia, the African-American Diva Starz, is a "hip, cool chick, a techno wizard" who comes with a different type of dog than the others in her backpack.  TX 17384.  She too remarks on her clothing.  *Id.*  Nikki is "big on sporty

---

[7] Mattel's trade secrets claim as to the Bratz sculpts, TX 1136A, TX 1141, the Bratz Hero Shot, TX 302B-1, and Bratz drawings are also preempted by the Copyright Act and judgment as a matter of law is warranted on these claims for this reason as well.  *See* Part V, *infra*.

fun." TX 433.  She "went to school with [her] bathing suit on under [her] clothes." *Id.*  She comes with a dog.  *Id.*  Nikki is "loving these red pants."  *Id.*  And, as with all the Diva Starz, Nikki's packaging notes that Nikki is more than willing to remark on the fashions and accessories she wears.  *Id.*  All of this is from the dolls and the packaging.

Were there any question, one just needs to turn to Mattel's description of the dolls.  They "are four teen friends, each with their own personality, ultra trendy look and cool attitude."  TX 35302-91.  They are "cool talkin' teens that really 'know' what's up . . . ."  *Id.*  Each, according to Mattel, have "distinctive personalities." *Id.*  Each comes with some type of animal—a cat, a teddy bear, a bunny, a dog.  *Id.*  Each has a nickname, Glam Girl Alexa, Earthy Girl Summer, Sporty Girl Paige, and Urban Girl Tia.  *Id.*

The only thing missing is the name "Bratz," but that was not secret, either.  *See* Part IV.C.3., *infra*.  Consequently, Mattel's claimed concept secret is not a secret at all and Mattel's concept trade secret claim fails as a matter of law.

## 2.      All Of The Features Of The Bratz Concept Were Well Known Or Obvious.

None of the features comprising the alleged Bratz trade secret was "secret." Vague as they are, iterations of these features were well known, obvious, or simply necessary characteristics of a doll depicting the human form.

The Bratz concept features appeared alone or in combination in numerous prior dolls and characters.  Combinations of features such as "oversized heads and feet," "large eyes," "large lips," "small almost non-existent noses," and "small bodies" are prevalent in the prior art.  For example, Betty Boop, from 1930, combines an "oversized head" with "large eyes" and a "small almost non-existent nose."  TX 13348, TX 34586.  The three Powerpuff Girls feature an "oversized head" with "large eyes" and a "small almost non-existent nose," and also include "small bodies."  They also have distinctive names such as Blossom, Buttercup, and

1  Bubbles.  TX 17769.  In 1998, Seventeen Magazine published three advertisements

2  for Paris Blues and Steve Madden shoes depicting female characters with

3  "oversized feet," "small almost non-existent noses" and a type of "attitude."  TX

4  17246-127, TX 17246-115.  Another 1998 Seventeen Magazine ad for Coca-Cola

5  featured a female character having "large eyes" and "large lips," with a different

6  "attitude."  TX 17246-193.

7         The Clueless lines of dolls from Mattel are a group of three multi-ethnic

8  friends.  They certainly have attitude and are hip and urban.  They are the "chicest

9  teen trio in Beverly Hills."  TX 23852-2.  The Hot Looks doll lines are five multi-

10  ethnic girls.  TX 24031.  They have their own fashions.  They have "the Hot Looks

11  Fashion System."  *Id.*  Each has their own personality—Stacey (the party girl),

12  Elkie (the athletic one), Chelsea (the adventurous one), Zizi (the creative one), and

13  Mimi (the romatic one).  *Id.*  They too are certainly hip.  They are, after all, "hot

14  fashion models."  *Id.*  They are trendy and have attitude.  They are "the coolest!"

15  *Id.*  And as for urban, whatever that means, they are a least urbane.  Mimi hales

16  from France.  And the Hot Looks dolls "have come from all over to be fashion

17  models at the Hot Looks Modeling Agency."  *Id.*

18         Mattel cannot overcome this by claiming that the Bratz concept is a unique

19  "combination" of known elements that is a protected trade secret because it is a

20  combination.  A trade secret must have some level of novelty or originality.

21  *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974); *Buffets Inc. v. Klinke*,

22  73 F.3d 965, 968 (9th Cir. 1996).  And whatever Mattel may say about

23  "combinations," California courts refuse to accord trade secret protection to things

24  that are merely compilations of publicly available information.  *Am. Paper &*

25  *Packaging Prods., Inc. v. Kirgan*, 183 Cal. App. 3d 1318, 1326 (1986).[8]

26

27  _____

28  [8] If by seeking to protect a combination of elements, Mattel is looking to protect the
    specific combination presented by the Bratz dolls, such a claim amounts to a
    copyright claim, and is preempted.  *See* Part V *infra.*

- 39 -

3. **The Bratz Name Had No Value to Mattel And Was Publicly Disclosed For Use With Dolls.**

As testified by Bryan Stockton, the name of an unreleased product has no value.  Therefore, the name Bratz could not have been a Mattel trade secret for this reason alone.  3/30/11 (Vol. 1) Tr. 32:14-20 (Stockton Testimony).

In any case, long before Bryant selected "Bratz," others had selected, and publicly disclosed, various "Bratz" or "Brats" names for dolls and related goods.  Dkt. No. 9830 (MGA Request for Judicial Notice re "Bratz" and "Brats" Trademarks); Dkt. No. 10052 (Order Granting RJN).

Even the name "Bratz" with a z had been in the public domain for nearly ten years in a trademark application for "Beverly Hills Bratz" for dolls.  *Id*. at 2-3.  Numerous other trademark applications had disclosed similar names for similar uses including "Brat Pack and Design" for children dolls, and Bratz for snowboards.  Dkt. Nos. 9830, 10052.  There was nothing about "Bratz" as a name for dolls that was secret in October 2000.

4. **The Bratz Drawings Were Disclosed By Bryant Before Any Disclosure to MGA and Therefore Are Not Trade Secret And The Sculpts Have Never Been Secret.**

In 1999, and before Carter Bryant met with MGA, he disclosed Bratz Drawings, including the Bratz Hero Shot, to Alaska Momma to pitch Bratz to them.  1/28/11 (Vol. 1) Tr. 73:21-23, 73:11-18 (Bryant Testimony); 2/1/11 (Vol. 3) Tr. 28:18-33:7; TX 62.  That means that in 2000, the Bratz Drawings, including the Bratz Hero Shot, could not be a trade secret; they were not secret.

Nor are the sculpts—TX 1136, 1141—Mattel trade secrets.  They were never secret, *i.e.*, unknown to MGA.  In fact, MGA paid for the sculpts and consulted on their creation.  Exs. 17823 & 17825; 3/15/2011 (Vol. 2) Tr. 18:25-35:6, 53:11-16 (Leahy Testimony); 1/25/2011 (Vol. 2) Tr. 60:17-61:24, 65:3-67:25, 74:7-75:11, 76:23-77:13 (Garcia Testimony); 2/2/2011 (Vol. 2) Tr. 95:23-96:9 (Bryant

Testimony).  While the sculpts may represent *use* of a trade secret (a proposition that MGA does not believe to be so), the sculpts cannot themselves *be* trade secrets.

### D.   Bratz Is Not A Protectible Trade Secret—It Is Not "Information."

#### 1.   "The Bratz Concept" Is Not A Protectible Trade Secret.

Ideas are not protectable trade secrets.  A trade secret that is described as "an aerodynamic race car" is not a trade secret.  The idea for a "portable computer with a fast processing speed" is not a trade secret.  To be sure, the way in which those concepts are actually and specifically implemented can be a trade secret, but not the idea for these items.  California's Uniform Trade Secret Act protects actual information—facts or data—"such as a customer's preferences, the location of a mineral deposit," or even the result of a certain method or process.  *Silvaco Data Sys.*, 184 Cal. App. 4th at, 220-21; Cal. Civ. Code § 3426.1 (trade secret protection is available only for "information, including a formula, pattern, compilation, program, device, method, technique, or process . . .)."  But what it does not protect is generalized aspects of the specific facts.

This is where Mattel's claim fails.  Mattel just describes broad attributes of a doll, which also distinguishes MGA's claimed trade secrets from Mattel's.  That is to say, MGA does not describe its trade secret as a doll with certain attributes.  The trade secrets are specific to the items identified as trade secrets, such as the appearance, play pattern of a specific doll or toy, pricing for the toys, and specific marketing efforts.  In contrast, Mattel does not claim specific attributes of Bratz—if it did, it would have a copyright preemption problem given its copyright claim and its scope.  It simply claims generalized characteristics that might attach to a doll— akin to saying that the trade secret is "an aerodynamic race car."  That cannot be a trade secret.[9]

---

[9] *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714 (7th Cir. 2003) (cited in Dkt. No. 9600 at 34), does not justify a different conclusion.  At issue in *Learning Curve* was not solely the concept or idea for a toy railroad track that

1     For example, Mattel's use of terms such as "hip, urban, edgy, and trendy"

2  does not provide information allowing a reasonable comparison with accused dolls

3  or concepts, or a contrast with already known doll and other products and ideas.

4  What is hip?  In popular culture, this question is a source of endless debate.

5  Moreover, Mattel cannot claim preclusive rights over something that changes with

6  every generation, or even every season as it concerns fashion, and is currently

7  unknown to anyone.  "Urban" is utterly meaningless as a doll concept.  There are

8  many types of "edges" and "trends," and trade secret law does not allow Mattel to

9  capture the market for this year's or next year's "trend" and the "edge" that may

10 follow it by claiming that it owns the idea of an "edgy" or "trendy" doll.  "Attitude"

11 is a term similarly lacking in content.  There are many "attitudes" a doll or person

12 might have or express, and nothing is communicated by reference to the notion of

13 "attitude."  A reference to "attitude" does not allow a jury to know which kind or

14 kinds of "attitude" may be involved.

15     To state it otherwise, Mattel's description of the "Bratz concept" is a series of

16 "undefined conclusions revealing nothing susceptible to appropriation or

17 misappropriation."  *Metro Traffic Control, Inc.* 22 Cal. App. 4th at 863.

18        **2.     The Bratz Name Is Not "Information."**

19     The name "Bratz" does not constitute "information" and, accordingly, does

20 not qualify for trade secret protection.   The name does not fit within any of the

21 types of information identified in section 3426.1, "formulas, patterns, compilations,

22 programs, devices, methods, techniques or processes," and an unused name that is

23 not a part of a company's business planning is not similar to the items listed in the

24 "made a 'clickety-clack' sound."  *Id.* at 718.  Rather, at issue were the way to
accomplish that result, *i.e.*, cutting grooves in the tracks.  *Id.* at 718-19 (discussing

25 what was claimed as trade secret); *id.* at 719-20 (identifying what plaintiff claimed
was the product that disclosed the trade secret—which was a track with parallel

26 grooves); *id.* at 723-24 (noting the expert testimony that identified the "little
impressions" as being unique).  Moreover, *Learning Curve* was decided under

27 Illinois law.  The Illinois statute, 765 ILCS 1065/2(d), defines a trade secret as
information "including but not limited to" a list of items that is broader than the

28 California list in section 3426.1.

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1   statute.  Moreover, the name fails to communicate any factual information.  It is

2   simply an abstract idea with no associated information, and is not protectable as a

3   trade secret under California law.  *Silvaco Data Sys.*, 184 Cal. App. 4th at 221

4   ("Trade secret law does not protect ideas as such.").

5         Unlike protectable information, such as a customer's preferences, the

6   location of a mineral deposit, the contact information of a customer or customers, a

7   manufacturing process that results in a stronger metal, a method of operation that

8   results in a more efficient business, or any other protectable information, "a doll

9   line named Bratz" is simply an abstract concept.  It conveys no factual knowledge

10   and, accordingly, it cannot support Mattel's claim for trade secret misappropriation.

11         **3.**        **The Sculpts And Carter Bryant Drawings Are Not**

12                       **"Information."**

13         Finally, the sculpts and Carter Bryant drawings identified in Mattel's trade

14   secret disclosure also fail to identify protectable "information" and, accordingly,

15   cannot qualify for trade secret protection.  Artistic drawings and sculptures are not

16   one of the protectable types of "information" listed in CUTSA.  Trade secret law

17   was not intended to protect a party who creates or obtains works of art—items than

18   only have true value in being disclosed to and viewed by others—and keeps those

19   works secret from the public.  *See also Stromback v. New Line Cinema*, 384 F.3d

20   283, 305 (9th Cir. 2004) (rejecting trade secret claim premised upon a poem

21   because it only had value "if [] exploited publicly" and not if kept secret).

22         To the extent the sculpts and drawings are less pure works of art, and more a

23   list of characteristics and features of a potential product, they, like the Bratz

24   concept, merely represent lists of product features that are unprotected under

25   California trade secret law.  *See Silvaco Data Sys.* 184 Cal. App. 4th at 221-22.

26   And again, MGA's trade secrets cannot be lumped into the same category.  MGA's

27   trade secrets pertain to specific dolls fully formed, their pricing and their specific

28   marketing.

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

### E.      No Reasonable Juror Could Conclude That Mattel's Bratz-Related Trade Secret Claim Survives The Statute of Limitations

The evidence establishes that Mattel's Bratz trade secret claim is barred by the applicable statute of limitations.  Indeed, Mattel's claim was barred by the time that it filed its motion to amend to add its claims against MGA, Mr. Larian and MGA HK on November 20, 2006.  As such, no reasonable jury could find in Mattel's favor and the Court should grant the MGA Parties' JMOL.

Mattel's "Bratz" trade secret claim is barred by the three-year statute of limitations.  Cal. Civil Code §3426.6.  The statute of limitations for trade secret misappropriations begins to run when a party has "reason at least to suspect a factual basis" for what California courts term the "generic elements" of a claim. *Cypress Semiconductor Corp. v. Superior Court*, 163 Cal. App. 4th 575, 586 (2008) (quoting *Fox v. Ethicon Endo-surgery, Inc*., 35 Cal. 4th 797, 807 (2005)); *see also* Cal. Civil Code §3426.6 (requiring "the exercise of reasonable diligence").  The generic elements are not the legal elements of any particular or specific claim, *e.g.*, a plaintiff need not suspect facts that support the elements of a trade secret misappropriation claim.  Rather, the generic elements are: wrongdoing, causation, and harm.  *Cypress Semiconductor Corp.*, 163 Cal. App. 4th  at 586 (citing *Norgart v. Upjohn Co*., 21 Cal 4th 383, 397 (1999)).

Under this rule, "'suspicion of one or more [of the generic] elements of a cause of action coupled with knowledge of the remaining elements' triggers the statute of limitations." *Id.* (quoting *Fox*, 35 Cal. 4th at 807). In applying this standard, "wrongdoing," "causation" and "harm" are not to be defined in a hypertechnical sense.  *Id.*; *see also Fox*, 35 Cal. 4th at 807; *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110 n.7 (1988) ("wrong," "wrongdoing," and "wrongful" are used in their lay understanding).  "'Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of

1   wrongdoing has injured them.'" *Cypress Semiconductor Corp.*, 163 Cal. App. 4th at

2   586 (quoting *Fox*, 35 Cal. 4th at 807).

3        The statute of limitations begins to run even if a plaintiff is "not . . . aware of

4   the specific facts necessary to establish the claim . . . ." *Jolly*, 44 Cal. 3d at 1111.

5   Moreover, once a "potential plaintiff . . . suspects that an injury has been

6   wrongfully caused [that plaintiff] must conduct a reasonable investigation of all

7   potential causes of that injury." *Fox*, 35 Cal. 4th at 808.  Whether or not an

8   investigation is conducted, the plaintiff is charged with knowledge of those facts

9   that a reasonable investigation would have revealed.  *Miller v. Bechtel Corp.*, 33

10  Cal. 3d 868, 875 (1983); *see also* Cal. Civ. Code §3426.6 (statute of limitations

11  begins to run when "by the exercise of reasonable diligence," the theft "should have

12  been discovered").

13          **1.**     **Evidence Admitted to Date Conclusively Establishes That**

14                  **Mattel Was Sufficiently On Notice of its Bratz Trade Secret Claim Well Before November 2003.**

15       MGA first showed the Bratz prototypes and drawings at the Hong Kong Toy

16  Fair in January 2001.  TX 911; 1/20/2011 (Vol. 2) Tr. 101:7-10 (Garcia

17  Testimony).  At that toy fair, Mattel employee Mateo Romano was invited to

18  MGA's showroom where he saw the Bratz drawings and prototypes.  3/22/2011

19  (Vol. 2) Tr. 8:8-9:17, 11:20-12:3 (Romano Testimony); TX 25860; *see also*

20  2/16/2011 (Vol. 2) Tr. 45:2-49:13 (Larian Testimony).  MGA offered Romano the

21  opportunity for Mattel to distribute Bratz in Latin America.  2/16/2011 (Vol. 2) Tr.

22  45:2-49:13 (Larian Testimony); 3/22/2011 (Vol. 2) Tr. 14:20-15:4 (Romano

23  Testimony).

24       At the New York Toy Fair in February 2001, Romano again visited the MGA

25  showroom and again saw the Bratz dolls and drawings.  3/22/2011 (Vol. 2) Tr.

26  13:11-14:2 (Romano Testimony).  After the New York Toy Fair, Romano sent a

27  description of "Bratz" and item numbers for the dolls to be entered into the

28  inventory system at Mattel's headquarters in El Segundo, California.  TX 25857;

3/22/2011 (Vol. 2) Tr. 15:14-16:1, 17:4-9, 21:7-22:21 (Romano Testimony).  This information was accessible to those in Mattel International working at Mattel's El Segundo headquarters.  3/22/2011 (Vol. 2) Tr. 20:9-15 (Romano Testimony).  In fact, in April 2001 a Mattel employee contacted Paula Garcia and asked why the MGA's Bratz and Scooter Samantha products were in Mattel's inventory system.  TX 16682-A; 1/26/2011 (Vol. 1) Tr. 120:4-122:6 (Garcia Testimony); 1/26/2011 (Vol. 2) Tr. 88:5-89:11 (Garcia Testimony).  After the New York Toy Fair, Romano informed MGA that Mattel declined to distribute Bratz "because some products are very similar to our own concepts and this is a very sensitive issue with the brand groups (Bratz and Samantha)."  TX 25858; 3/22/2011 (Vol. 2) Tr. 18:8-24 (Romano Testimony).

Mr. Romano was not the only Mattel employee to have seen Bratz at the New York Toy Fair.  Sal Villasenor also attended the 2001 New York Toy Fair and saw Bratz.  TX 9502; TX 9504; 3/22/2011 (Vol. 2) Tr. 79:13-17 (Villasenor Testimony).  By April 2001 Villasenor had disseminated two reports on the 2001 New York Toy Fair, once in February 2001 (TX 9502) and again in April 2001 (TX 9504).  The April report included photographs and pricing for Bratz.  TX 9504-0035, 0037.  Villasenor also described Bratz as "'Diva Starz' with a smarty attitude."  TX 9502-00010; TX 9504-0012.

MGA released Bratz in Spain in June or July of 2001 and in the United States shortly thereafter.  2/8/2011 (Vol. 1) Tr. 139:5-6 (Larian Testimony); 2/8/2011 (Vol. 2) Tr. 60:11-13 (Larian Testimony).

Mattel employees immediately drew the connection between Bratz and Mattel's Diva Starz product and unreleased Toon Teens project.  1/19/2011 (Vol. 1) Tr. 115:13-116:2 (Ross Testimony); 3/10/2011 (Vol. 1) Tr. 13:2-14:10 (Nordquist Testimony); 3/17/2011 (Vol. 2) Tr. 18:14-19:13, 21:14-22:2 (Fontanella Testimony).  Mattel's Sr. Director of Marketing Jill Nordquist referred to Bratz as a

1    Diva Starz knockoff.  3/10/2011 (Vol. 1) Tr. 13:2-23, 14:7-10 (Nordquist

2    Testimony).

3         Fontanella admitted during trial that she immediately thought that Bratz was

4    a copy of Diva Starz and that these similarities were obvious to her and anyone else

5    who saw Bratz.  3/17/2011 (Vol. 2) Tr. 18:14-19:13 (Fontanella Testimony).  In

6    particular, Fontanella thought that Bratz and Diva Starz both had large eyes, large

7    head, big feet, eye shadow, detail in the face paint, the little nose and the long hair.

8    3/17/2011 (Vol. 2) Tr. 20:6-20 (Fontanella Testimony).  Fontanella also thought

9    that character art on the packaging for Diva Starz and Bratz was similar.  *Id.* At

10   21:14-22:2 (Fontanella Testimony).

11        Mattel released its line of four Diva Starz fashion dolls (TX 17383, 17384,

12   35312, 35313) in the fall of 2000.  3/17/2011 (Vol. 1) Tr. 95:4-16 (Fontanella

13   Testimony); *see also* TX 35302-00090-00091.  As part of its naming of Diva Starz,

14   Mattel had considered and rejected the name "brats" in part because Mattel's

15   President of the Girls' Division Adrienne Fontanella did not like what the word

16   connoted.  TX 314, TX 316; 1/19/11 (Vol. 1) Tr. 28:21-25 (Ross Testimony);

17   1/26/11 (Vol. 3) Tr. 12:24-16:10 (Linker Testimony); 3/17/2011 (Vol. 1) 105:8-

18   107:109:14 (Fontanella Testimony).  Additionally, Mattel could not clear the

19   "brats" name through its legal department.  1/19/2011 (Vol. 1) Tr. 28:21-30:25

20   (Ross Testimony).

21        Mattel's catalogue from 2000 described Diva Starz Alexa, Paige, Summer

22   and Tia as: "Four teen friends, each with their own personality, ultra-trendy look,

23   and cool attitude."  TX 35302- 00090-00091.  The four multi-ethnic Diva Starz had

24   nicknames, mascots, and included fashion play, hair play and accessory play.  TX

25   35302- 00091; 3/17/2011 (Vol. 1) Tr. 98:3-102:22 (Fontanella Testimony).  The

26   Diva Starz were hip and trendy, had large oversized heads and feet, small noses,

27   small bodies, had attitude, distinctive names, fashions, and personalities or back

28

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1    stories about who they are.  3/17/2011 (Vol. 1) Tr. 103:6-104:4 (Fontanella

2    Testimony).

3        Mattel employees also drew the comparison between Bratz and Mattel's

4    unreleased product Toon Teens. TX 1C; 1/19/2011 (Vol. 1) 115:13-116:2, 126:6-

5    16 (Ross Testimony); 1/19/2011 (Vol. 2) 15:4-14 (Ross Testimony);  3/9/2011

6    (Vol. 2) Tr. 33:2-8 (testimony of Mr. De Anda); 3/17/2011 (Vol. 2) Tr. 22:6-23:5,

7    29:19-22 (Fontanella Testimony).  Fontanella thought the similarities included the

8    shape of the eyes, the eye face paint, the shape of the lips, the small nose, the big

9    feet and the short waist.  3/17/2011 (Vol. 2) Tr. 22:6-23:5 (Fontanella Testimony).

10   Ivy Ross, Cassidy Park and Lily Martinez knew that Bryant had seen Toon Teens

11   while at Mattel and believed that Bratz was "inspired" by the unreleased Toon

12   Teens.  TX 1195RS-0066; 1/19/2011 (Vol. 1) Tr. 115:13-116:2 (Ross Testimony);

13   3/9/2011 (Vol. 2) Tr. 77:22-79:23 (De Anda Testimony).

14       After Bryant left Mattel in October 2000, Mattel employees in the Design

15   Center suspected that Bryant had a "conflict of interest while he was working at

16   Mattel."  TX 36091-0033.  Nordquist testified that she did not believe Bryant when

17   he said that he was not going to work for a competitor and would not tell her where

18   he was going to work.  3/10/2011 (Vol. 1) Tr. 9:9-10:5 (Nordquist Testimony); *see

19   also*, 1/19/2011 (Vol. 2) 147:21-148:12 (Martinez Testimony).  Nordquist was

20   concerned that Bryant was in fact going to work for a competitor.  3/10/2011 (Vol.

21   1) Tr. 10:14-17 (Nordquist Testimony).

22       In the summer of 2001, Nordquist heard from two to three people in the

23   Mattel Design Center about Bryant's involvement and work on the Bratz doll.

24   3/10/2011 (Vol. 1) Tr. 11:22-12:7 (Nordquist Testimony).  Nordquist discussed this

25   information with Mattel's SVP Anne Parducci.  3/10/2011 (Vol. 1) Tr. 12:8-14

26   (Nordquist Testimony).

27       By August 2001, Mattel had begun investigating MGA, MGA HK and Isaac

28   Larian.  On August 21, 2001, Mattel VP Matthew Turetzky issued a report to SVP

- 48 -

1    Jerome Bossick detailing information on MGA, MGA HK and Mr. Larian.  TX
2    26701-A.  Similar to what Romano had reported in declining to distribute Bratz in
3    Latin America, Turetzky reported to Bossick:  "Recently, we have grown
4    increasingly concerned due to the similarity of some of [MGA's] products to ours
5    (Scooter Samantha, Bratz, and One Man Jam DJ Mixer)."  *Id.*

6         Turetzky's report to Bossick was prompted in part because of a belief at
7    Mattel that MGA was copying Mattel's products, including two large dolls, and
8    involved in the disappearance of prototypes from Mattel.  TX 26701-A; 3/22/2011
9    (Vol. 1) Tr. 114:22-115:5, 117:4-22, 142:20-143:21 (Turetzky Testimony).  The
10   disappearance of prototypes and similar products sold at MGA resulted in Mattel
11   instituting new security measures to protect its projects.  TX 9442 at 502, 503, 504;
12   3/22/2011 (Vol. 1) Tr. 113:13-115:14 (Turetzky Testimony).

13        On January 14, 2002, Mattel published a study, detailing harm caused by
14   sales of MGA's Bratz products to Mattel's sales of products targeted to older girls.
15   TX 9698, 9699, 9700, 26554; 3/3/2011 Tr. (Vol. 3) 12:15-14:25 (Eckert
16   Testimony).

17        On February 12, 2002, Carey Plunkett and Tyler Snyder snuck into MGA's
18   showroom at the New York Toy Fair.  TX 9643.  Plunkett subsequently distributed
19   an email to several top Mattel executives that described the new Bratz products and
20   pricing for them.  TX 9643.

21        By early 2002, more than one person at Mattel had connected Carter Bryant
22   with Bratz and MGA, including Adrienne Fontanella, Cassidy Park, Elise Cloonan,
23   Evelyn Viohl and Ivy Ross.  TX 1195RS-0066; TX 36091-0033 ("After Mr. Bryant
24   left, the design studio suspected that Mr. Bryant may have had a conflict of interest
25   while he was working at Mattel.");  1/19/2011 (Vol. 2) Tr. 150:6-153:13 (Martinez
26   Testimony); 3/9/2011 (Vol. 2) Tr. 6:20-23, 16:25-17:7 (De Anda Testimony);
27   3/17/2011 (Vol. 2) Tr. 23:16-24, 24:6-9 (Fontanella Testimony).  After she heard
28   that Bryant was working with MGA, Fontanella assumed that he was working on

1   Bratz because it was MGA's doll line.  3/17/2011 (Vol. 2) Tr. 23:16-24, 24:6-9

2   (Fontanella Testimony).  Fontanella then decided in early 2002 to involve Michelle

3   McShane, Mattel's chief legal officer responsible for enforcing Mattel's trademarks

4   and copyrights to determine whether or not Bratz was violating the legal rights of

5   Mattel.  3/17/2011 (Vol. 2) Tr. 24:10-25, 25:21-26:9 (Fontanella Testimony).

6   Fontanella met with McShane and Mattel's outside counsel to determine whether

7   Bratz was violating the legal rights of Mattel.  3/17/2011 (Vol. 2) Tr. 24:13-25

8   (Fontanella Testimony).

9          In February 2002, McShane received the resume of a former Mattel

10  employee, Mercedeh Ward, who left Mattel at about the same time as Bryant.  TX

11  8154; 3/17/2011 (Vol. 2) Tr. 68:1-69:5 (McShane Testimony).  Ward's resume

12  described her work with MGA HK on the production of MGA's then-new doll line,

13  which as Fontanella agreed, had to be Bratz.  TX 8154.

14         By this time, Mattel's outside counsel also was monitoring MGA's activities.

15  On February 5, 2002, Mattel's outside counsel sent Mr. Larian a letter demanding

16  that he remove references to Mattel's products on one of the Bratz fan websites.

17  TX 17252.  One month later, in early March 2002, this same website revealed

18  Bryant's role as the Bratz creator.  TX 4507.

19         On March 15, 2002, Mattel officially opened an investigative file that

20  identified Mr. Larian as the owner of MGA, and both Mr. Larian and MGA as a

21  "Suspect" in the "Theft" of "Proprietary Information."  TX 1195RS-004; 3/3/2011

22  (Vol. 2) Tr. 90:9-91:8 (Eckert Testimony); 3/3/11 (Vol. 1) Tr. 96:3-101:13, 102:13-

23  119:3 (Eckert Testimony); 3/9/2011 (Vol. 2) 11:8-12:21 (De Anda Testimony).  As

24  part of its investigation, Mattel interviewed some of the very employees who had

25  long suspected Bryant's involvement with Bratz, including Ivy Ross and Cassidy

26  Park.  TX 1195RS-0066; 3/9/2011 (Vol. 2) 8:25-9:23, 33:2-8 (De Anda

27  Testimony).  The investigative file reveals that Mattel believed that MGA, headed

28

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

by Mr. Larian, had "recently hired a number of former Mattel employees and its manufacturing products that appear to be Mattel designs."  TX 1195RS-004.

Mattel's investigator also interviewed Cassidy Park, Mattel's VP of Product Design, who "suspected Carter Bryant as illustrator/former employee who may have plagerized design of Lily Martinez and created 'Bratz' dolls for MGA."  TX 1195RS-066; 3/9/2011 (Vol. 2) 8:25-10:9, 33:2-8 (De Anda Testimony).  Ivy Ross too testified that the resemblance of Bratz to Toon Teens coupled with comments made by Bryant to Martinez that "Mattel will be sorry some day that they didn't make those dolls" made her think "that maybe there was something here." 1/19/2011 (Vol. 1) Tr. 115:13-116:7, 125:8-126:16 (Ross Testimony); 1/19/2011 (Vol. 2) Tr. 72:8-73:4 (Martinez Testimony); *see also* i*d*. at 156:6-15 (Martinez Testimony) (Bryant said "that he liked the doll so much, Mattel would be crazy not to make them.").  De Anda admitted that in March 2002 he suspected that Bryant had violated at least his confidentiality agreement with Mattel.  3/9/2011 (Vol. 2) Tr. 80:23-81:5 (De Anda Testimony).

On August 5, 2002, Mattel's CEO Robert Eckert received an anonymous letter stating that Bryant created Bratz in 2000 while employed by Mattel.  TX 1193; TX 6678-00005.  The anonymous letter made its way through SVP of Human Resources Alan Kaye and De Anda for investigation.  3/9/2011 (Vol. 2) Tr. 38:2-39:8 (De Anda Testimony); TX 1194.  Mattel did not open an official investigation into the anonymous letter until September 9, 2003.  TX 6678-00002.

By the fall of 2002, there were discussions not only in the lunch room, but also at the executive level, that Carter Bryant was the origin of the Bratz design. TX 9441; 3/22/2011 (Vol. 1) Tr. 124:2-125:2 (Turetzky Testimony).

In September 2002, MGA filed publicly available copyright registrations in Brazil covering Bratz that disclosed Carter Bryant as the "author."  TX 16941, 16942, 16943, 16944.  These documents were produced from Mattel's files in discovery.  *See id.*

1    Then, in July 2003, the *Wall Street Journal*, published an article about Bratz

2  that identified Mr. Larian as the President of MGA and Bryant as the creator of

3  Bratz.  TX 1C.  Eckert read the article at the time that it was published.  3/1/2011

4  (Vol. 2) Tr. 45:16-46:19 (Eckert Testimony); 3/3/2011 (Vol. 1) Tr. 124:3-7, 26:18-

5  22 (Eckert Testimony).

6    On September 4, 2003, Mattel received a letter from an attorney in Hong

7  Kong who informed Mattel about a "legal battle" where "one of the points in

8  contention is whether MGA owns the copyright of the design of the Bratz dolls."

9  TX 15987.  The letter specifically refers to "design and concept drawings" that

10  MGA "claims to be the origin of its relevant copyright in the Bratz dolls."  *Id.*  The

11  letter also states that MGA had "alleged that these drawings were made and drawn

12  originally by one Carter Bryant who (according to the Wall Street Journal news

13  article) was a former member of the Barbie designer team."  *Id.*  Finally, the letter

14  refers to Mattel's unreleased doll designed by Martinez.  *Id.*  On November 24,

15  2003, Mattel's in-house counsel Michael Moore went to Hong Kong and obtained

16  copies of Bryant's contract with MGA (signed by Mr. Larian) and Bryant's

17  drawings.  3/9/2011 (Vol. 2) Tr. 75:8-12 (testimony of Mr. De Anda).

18    In 2006 Mattel opened yet another investigation file on MGA.  TX 36817.

19  Within this file is a list of "keywords."  TX 36817-17 – TX 36817-20.  One of these

20  keywords is "Michele Mcshane" along with the following note: "Mattel Attorney

21  on case originally.  Performed some interviews – Martinez, Beal-Park."  TX 36817-

22  19.  This references the very same interviews in the 2002 investigation file

23  chronology entry dated March 28, 2002: "Met w/Cassidy Park to get more info on

24  MGA issue.  She suspected Carter Bryant as illustrator/former employee who may

25  have plagiarized design of Lily Martinez and created Bratz dolls for MGA."  TX

26  1195RS-66.  This keyword entry confirms that Mattel considered its 2006

27  investigation of MGA to be part of the very same "case" as its 2002 investigation.

28  Yet, Mattel opened separate files in at least 2002 (TX 1195RS), 2003 (TX 6678)

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

and 2006 (TX 36817), strategically segmenting its MGA investigation files in an effort to avoid discovery and a statute of limitations problem.  Indeed, the 2006 file was not produced until *during the current trial* on March 19, 2011.

### 2.  Mattel's Bratz Trade Secret Claim Is Barred By The Statute Of Limitations.

The evidence shows that Mattel suspected misappropriation of Bratz by the MGA Parties well before November 20, 2003.  Certainly Mattel had sufficient information to trigger its obligation to conduct a reasonable investigation to determine the origin of Bratz.  By March 2002, Bryant had been publicly identified on a Bratz fan website as the creator of Bratz.  TX 4507.  Also in March 2002, Mattel had opened an investigation that identified MGA and Mr. Larian as "Suspects" in the "Theft" of "Proprietary Information" and identified Bryant as possibly having "plagerized" Martinez's design to create Bratz for MGA.  TX 1195RS-004, 0066.  This information coupled with the suspicions of those in the Design Center that Bryant "may have had a conflict of interest *while he was working at Mattel*" (TX 36091-0033) were more than enough reason to suspect the factual basis for the generic elements of its Bratz trade secret misappropriation claim.  *See also* 1/19/2011 (Vol. 2) 150:18-23, 153:9-13 (Martinez Testimony).

In addition, by November 20, 2003, Mattel had received the Brazilian copyright certificates specifically naming Bryant (TX 16941, 16942, 16943, 16944), received the August 5, 2002 anonymous letter specifically tying Carter Bryant to the creation of Bratz while at Mattel (TX 1193), read the July 18, 2003 Wall Street Journal Article that identified Bryant as the creator of Bratz and the belief of Mattel employees that misappropriation had occurred; and received the September 4, 2003 letter from a Hong Kong attorney that laid out Bryant's involvement in the design of Bratz.

Given all of this evidence, Mattel's Bratz trade secret claim clearly accrued well before November 20, 2003 and thus expired before Mattel filed its motion to

1    amend its counterclaims in November 2006 and certainly before it actually filed its

2    motion to amend in January 2007.  No reasonable juror could find otherwise, and

3    the Court should therefore find in favor of MGA and Mr. Larian on Mattel's Bratz

4    trade secret claim.

5    **3.    Mattel's Bratz Name Trade Secret Is Barred By The Statute

6    Of Limitations.**

7         In 2000, Mattel paid Steve Linker about $200 to come up with alternative

8    names for what eventually became Diva Starz.  TX 314, 316; 1/26/2011 (Vol. 3) Tr.

9    56:18-22 (Linker Testimony).  "Brats" was one of many of the names considered,

10   and rejected, by Mattel.  TX 314, TX 316; 1/19/2011 (Vol. 1) Tr. 28:21-30:25

11   (Ross Testimony); 1/26/11 (Vol. 3) Tr. 12:24-16:10 (Linker Testimony); 3/17/2011

12   (Vol. 1) 105:8-107:109:14 (Fontanella Testimony).  In **February 2001**, Mattel

13   knew that MGA was planning to release a fashion doll called Bratz.  TX 9502;

14   3/22/2011 (Vol. 2) Tr. 82:19-23 (Villasenor Testimony).  Villasenor also

15   distributed Toy Fair Reports and emails reporting on Bratz in 2002 and **April and

16   May 2003**.  TX 9507-0142, 0143 (2002); TX 9275-0019-0021 (April 22, 2003);

17   TX 9273 (May 13, 2003).  Thus, by **February 2004** and no later than **May 13,

18   2006**, Mattel's claim for trade secret misappropriation for the name "Bratz" had

19   expired.  This is well before Mattel filed either its motion to amend or its complaint

20   asserting claims for trade secret misappropriation based on the Bratz name.  This

21   claim is time-barred.

22   **4.    Fraudulent Concealment Cannot Apply.**

23        Mattel has failed to prove that the doctrine of fraudulent concealment is

24   relevant here or that it can successfully toll the statute of limitations given the

25   overwhelming evidence to the contrary.  Nothing presented by Mattel during trial

26   demonstrates that MGA or Larian engaged in any "affirmative conduct" that

27   "would, under the circumstances of the case, lead a reasonable person to believe

28   that he did not have a claim for relief." *Rutledge v. Boston Woven Hose & Rubber*

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1   *Co.*, 576 F.2d 248, 250 (9th Cir. 1978); *see also id.* at 249-50 (must show defendant

2   actively misled and even denials of wrongdoing in press releases are not sufficient

3   when plaintiff is suspicious); *Conerly v. Westinghouse Elec. Corp.*, 623 F. 2d 117,

4   120 (9th Cir. 1980) (must show affirmative conduct on the part of the defendant

5   "which would lead a reasonable person to believe that there was no claim for

6   relief"); *see also Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1177 (9th Cir. 2000)

7   ("Fraudulent concealment necessarily requires active conduct by a defendant, above

8   and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the

9   plaintiff from suing in time."); *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415-

10  16 (9th Cir. 1987) (failure to disclose a fact is not fraudulent concealment absent a

11  relationship that obligates disclosure and plaintiff's ignorance of a cause of action is

12  not fraudulent concealment); *Lauter v. Anoufrieva* 2010 WL 3504745, at *22-23

13  (C.D. Cal. July 14, 2010) (collecting cases).

14       The so-called "evidence" relied on by Mattel, i.e, Mr. Larian's statements to

15  the press—even if correct—cannot be characterized as "affirmative conduct" that

16  any reasonable person would have relied on.  And, in fact, Mattel has not offered

17  any evidence demonstrating that Mattel *did* rely on Mr. Larian's statements to the

18  press.

19       In fact, all of the evidence demonstrates that Mattel had sufficient suspicions

20  to begin investigating MGA and Mr. Larian as early as August 2001 (TX 26701-A),

21  and launch an official investigation into MGA and Mr. Larian no later than March

22  15, 2002 (TX 1195RS).  Mattel knew or could have obtained the information it

23  would need to support a claim against MGA or Larian regarding Bratz, which

24  means that the doctrine of fraudulent concealment does not apply.  *Miller*, 33 Cal.

25  3d at 875; *Snapp & Assocs. Ins. Servs. Inc. v. Malcolm Bruce Burlingame

26  Robertson*, 96 Cal. App. 4th 884, 890-91 (2002); *E.W. French & Sons, Inc. v. Gen'l

27  Portland, Inc.*, 885 F.2d 1392, 1399 (9th Cir. 1989).  The facts known to Mateo

28  Romano, Sal Villasenor, Ivy Ross, Cassidy Park, Jill Nordquist, Adrienne

1  Fontanella, Anne Parducci, Matthew Turetzky, Jerome Bossick, Lily Martinez,

2  Richard De Anda, Robert Eckert, Carey Plunkett, Tyler Snyder, Elise Cloonan,

3  Evelyn Viohl, Michelle McShane, Robert Simoneau, Alan Kaye, Mattel's

4  investigative team in 2002, and Mattel's in-house counsel, were all within Mattel's

5  actual knowledge irrespective of any alleged attempt at "concealment" by MGA.

6  Had Mattel done the most basic investigation, it could have discovered

7  multiple publicly available sources of information identifying Bryant as the creator

8  of Bratz.  For example, a Yahoo! discussion group as part of the fan website being

9  monitored by Mattel's outside counsel identified Bryant as the Bratz creator.[10]  TX

10  4507.  Mattel also could have found MGA's publicly available September 26, 2002

11  copyright registrations filed in Brazil that specifically identify Bryant as the

12  "author" of Bratz.  TX 16941, 16942, 16943 and 16944.  *See Alamar Biosciences,*

13  *Inc. v. Difco Labs. Inc.*, 1995 WL 912345, at *5 (E.D. Cal. Oct. 13, 1995) (finding

14  that reasonable plaintiff who suspected that defendant had misappropriated trade

15  secrets could have and should have found published PCT patent application).

16  No act of "concealment" can erase Mattel's awareness of the critical and

17  established information which indisputably put it on notice of its claims.

## 5.     The Relation Back Doctrine Does Not Apply.

19  MGA's argument as to why the relation back doctrine does not apply to

20  allow Mattel to relate back to the April 27, 2004 Carter Bryant complaint or

21  MGA's April 12, 2005 complaint is set forth in its summary judgment papers, Dkt.

22  Nos. 9010 and 9121, and the MGA Parties' brief filed on March 10, 2011 in

23  response to the Court's February 16, 2011 Order (Dkt. No. 10179).  None of the

24

25  _____

26  [10] The February 7, 2002 cease and desist letter from Mattel's outside counsel to MGA prompted Mr. Larian to direct others not to mention Mattel "or any of their properties" and Bryant.  TX 17252.  Rather than showing some ill intent by Mr.

27  Larian, Mattel's so-called evidence demonstrates that Mr. Larian was trying to comply with the cease and desist letter.  And, in any case, Mr. Larian's email was

28  sent *after* Mr. Bryant had been revealed as the Bratz creator on the fan website.

1   evidence admitted during this trial has undermined MGA's argument because the
2   procedural facts remain the same.[11]

3       As an initial matter, Mattel's claims cannot relate back to its April 27, 2004
4   complaint against Carter Bryant because it is a pleading in a different action.
5   *O'Donnell v. Vencor*, 466 F.3d 1104, 111 (9th Cir. 2006) (second complaint is a
6   separate filing and does not relate back to an earlier, separate complaint); *Benge v.*
7   *United States*, 17 F.3d 1286, 1288 (10th Cir. 1994) (untimely second complaint did
8   not relate back to a separate timely complaint); *Bailey v. N. Ind. Pub. Serv. Co.*, 910
9   F.2d 406, 413 (7th Cir. 1990) (rejecting argument that an untimely complaint
10  related back to an earlier lawsuit filed against the same defendant because Rule
11  15(c) "by its terms, only applies to amended pleadings in the same action as the
12  original, timely pleading"); *Eng v. County of Los Angeles*, 2010 WL 3368130, at
13  *13-14 (C.D. Cal. Aug. 24, 2010) (a federal complaint cannot relate back to earlier
14  filed state court complaint); *Lamon v. Stiles*, 2009 WL 230833, at *4 (E.D. Cal. Jan.
15  30, 2009) (new complaint did not relate back to earlier complaint in separate, but
16  related, action because it was not an amendment to the earlier complaint).

17      In addition, because the evidence establishes that the statute of limitations on
18  Mattel's Bratz-related claims had expired by the time that Mattel filed its motion to
19  amend, the only means by which Mattel could seek to amend its complaint was
20  Fed. R. Civ. P. 15(c)(1)(C). *G.F. Co. v. Pan Ocean Shipping Co.*, 23 F.3d 1498,
21  1501 (9th Cir. 1994) (Rule 15(c)(1)(C) "'is the only vehicle through which a
22  plaintiff may amend his complaint, after a statute of limitation period has run,'" to
23  name a new defendant) (quoting *Korn v. Royal Caribbean Cruise Line, Inc.*, 724
24  F.2d 1397, 1399 (9th Cir. 1984)) (federal seaman's claim); *Kilkenny v. Arco Marine*
25  *Inc.*, 800 F. 2d 853, 856 (9th Cir. 1986) ("Because the statute of limitations period
26  expired prior to [plaintiff's] filing of the amended complaint, [Rule 15(c)] is the

27  _____
    [11] MGA HK and Mr. Larian were not parties until January 12, 2007 and thus the
28  relation back doctrine cannot apply to them. *Union Pacific R.R. Co. v. Nevada Power Co.*, 950 F. 2d 1429, 1432 (9th Cir. 1991).

1    only procedural avenue by which [plaintiff's] original complaint may be amended

2    to add additional parties") (emphasis added); *Wilson v. United States*, 23 F.3d 559,

3    562 (1st Cir. 1994) ("When a plaintiff amends a complaint to add a defendant, but

4    the plaintiff does so subsequent to the running of the relevant statute of limitations,

5    then Rule [15(c)(1)(C)] controls whether the amended complaint may 'relate back'

6    to the filing of the original complaint and thereby escape a timeliness objection.");

7    *see also Garrett v. Fleming*, 362 F.3d 692, 696-97 (10th Cir. 2004) (plaintiff's

8    "substitution of named defendants for the original unknown 'John Doe' defendants

9    amounted to adding a new party" such that "all requirements of [Rule 15(c)(1)(C)]

10   must be met in order for [the plaintiff's] amended pleadings to relate back to the

11   date of the original.") (§1983 claim); *Powers v. Graff*, 148 F.3d 1223, 1225-26

12   (11th Cir. 1998) (quoting *Garrett*, 362 F.3d 692, and affirming district court's

13   finding that Rule 15(c)(1)(C) was not met where plaintiffs knew the identity of the

14   proposed new defendants before the statute of limitations expired and should have

15   known they would be "persons arguably liable for the alleged wrongdoing.")

16   (federal securities law claim); *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466,

17   468-69 (2d Cir. 1995) (Rule 15(c)(1)(C) is the only means by which a plaintiff can

18   replace a "John Doe" with a named party) (§1983 claim); *Worthington v. Wilson*, 8

19   F.3d 1253 (7th Cir. 1993) (no relation back under Rule 15(c)(1)(C) where proposed

20   new defendants were unknown to plaintiff when original complaint was filed)

21   (same).

22       Under Rule 15(c)(1)(C), the inquiry is whether the failure to name MGA,

23   MGA HK and MGA Mexico and Mr. Larian was the result of a mistake as to their

24   identity, *e.g.*, Mattel sued one party believing that that party was the properly

25   named defendant.  Fed. R. Civ. P. Rule 15(c)(1)(C); *see also Krupski v. Costa*

26   *Crociere S.p.A.*, 130 S. Ct. 2485 (2010) (plaintiff mistakenly sued Costa Cruise

27   instead of the Italian related corporate entity Costa Crociere).

28

Here, that cannot be shown.  Mattel has never claimed that its failure to plead claims against MGA, MGA HK, MGA Mexico and Mr. Larian was due to a mistake of identity, which is what Rule 15(c)(1)(C) requires.  Indeed, the Court has already rejected any such claim by Mattel that it did not know the facts that each of the later-added MGA Parties played a role in its injury.  *See* Dkt. No. 142 at 8.

The overwhelming evidence demonstrates that Mattel knew that it had Bratz-related claims against MGA, MGA HK and Mr. Larian well before it filed its original complaint against Bryant on April 27, 2004.  Indeed, Mattel's complaint against Bryant identifies MGA and Mr. Larian, even if not by name.  Case No. 04-CV-9059 Dkt. No. 1, ¶¶ 12, 41-42.  And of course, by the time of the Bryant complaint, Mattel had obtained a copy of the contract between MGA and Bryant, dated "as of September 18, 2000," which assigned Bryant Work Product to MGA.  1/18/11 (Vol. 1) Tr. 49:20-51:13 (Mattel's Opening Statement); *see also* TX 15.  The contract was signed by Larian on behalf of MGA, and Bryant was still employed by Mattel on the "as of" date.  TX 15.  Mattel also obtained copies of Bryant's drawings in November 2003. 1/18/11 (Vol. 1) Tr.  49:20-51:13 (Mattel's Opening Statement).  Consequently, when it filed the Bryant state court complaint, Mattel knew that Bryant had assigned his intellectual property to MGA, that Larian had effectuated that assignment on behalf of MGA, and Mattel could easily have named MGA and Larian as defendants who "acting with full knowledge of Bryant's obligations to Mattel, aided and abetted Bryant in such wrongful conduct" (Mattel's 2004 Complaint ¶¶ 24, 32), or "unfairly used and diverted Mattel property" (*id*. at ¶ 36), or "wrongfully converted Mattel property" including "ideas, concepts, rights, designs, proprietary information, and other intellectual property and intangible property created by Bryant" (*id.* at ¶¶ 41, 42).

Given all of this knowledge, Mattel is not entitled to apply the relation back doctrine to save its claims.  *See, e.g.*, *Nelson*, 529 U.S. at 467 n.1 (Rule 15(c) not met where plaintiff "knew of [defendant's] role and existence and, until it moved to

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

amend its pleading, chose to assert its claim for costs and fees only against [the named defendant].”); *Louisiana-Pac. Corp.*, 5 F.3d at 434 (no relation back where plaintiff “knew perfectly well” the identity of the potential defendant and “[t]here was no mistake of identity, but rather a conscious choice of whom to sue”); *Kilkenny*, 800 F.2d at 857-58 (Rule 15(c) was “never intended to assist a plaintiff who ignores or fails to respond in a reasonable fashion to notice of a potential party, nor was it intended to permit a plaintiff to engage in piecemeal litigation”); *Pierce v. City of Chicago*, 2010 WL 4636676, at *4 (N.D. Ill. Nov. 8, 2010) (applying *Krupski* and finding that failure to name an additional defendant was not due to a mistake in identity); *Trigo v. TDCJ-CID Officials*, 2010 WL 3359481, at *18 (S.D. Tex. Aug. 24, 2010) (applying *Krupski* and finding that failure to name an additional defendant was not due to a mistake in identity); *Lauter v. Anoufrieva*, 2010 WL 3504745, at *24-25 (C.D. Cal. July 14, 2010) (applying *Krupski* and finding that failure to name an additional defendant was not due to a mistake in identity).

### 6.  California’s Doe-Defendant Rule Does Not Save Mattel’s Claims.

Similarly, California law does not permit the addition of new parties MGA, MGA HK and Larian as “doe” defendants where the initial failure to name them was not a mistake.  Thus, even assuming arguendo that Mattel could relate back to a different action (which it cannot), it must satisfy the lack of mistake standard. Generally, under California law “a complaint may not be amended to add a new defendant after the statute of limitations has run.”  *McGee St. Prods. v. Workers’ Comp. Appeals Bd.*, 108 Cal. App. 4th 717, 724-25 (2003).  “The only exception to this rule is when the original complaint states a cause of action against a Doe defendant and the plaintiff is unaware of the true identity of that party at the inception of the suit.”  *Id.*; Cal. Civ. Proc. Code §474 (pleading of doe defendants permissible when the plaintiff is “ignorant of the name of a defendant.”).  In

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

determining whether plaintiff is "ignorant of the name of the defendant," courts look at two things: (1) ignorance of the identity of the defendant; (2) ignorance of the facts giving rise to the cause of action against defendant.  A plaintiff is (1) ignorant of the identity of the defendant only if she lacks "actual knowledge" of the name of the defendant.  *Grinnell Fire Protection Sys. Co. v. Am. Sav. & Loan Ass'n*, 183 Cal. App. 3d 352, 359 (1986).  A plaintiff is (2) ignorant of the facts giving rise to the cause of action against defendant if she knows the identity of the person but is ignorant of the facts giving a cause of action against such person.

A plaintiff is not ignorant of the facts giving a cause of action where she knows the identity and facts giving rise to liability when the complaint is filed. *Scherer v. Mark*, 64 Cal. App. 3d 834, 840-41 (1976); *Dover v. Sadowinski*, 147 Cal. App. 3d 113 (1983) (no relation back where the plaintiff knew that the proposed defendant was involved in the underlying controversy, even if he did not know "how deeply" involved); *cf. Woo v. Superior Court*, 75 Cal. App. 4th 169, 180 (1999) (plaintiff cannot meet "good faith, bona fide ignorance as required" where the information concerning the additional defendants is readily available to the plaintiff).  "The pivotal question in this regard is 'did plaintiff know *facts*?' not 'did plaintiff know or believe that she had a cause of action based on those facts?" *Scherer*, 64 Cal. App. 3d at 841 (emphasis original).

As noted by the Court in its January 11, 2007 Order, Mattel did have sufficient facts and was not operating under some mistake.  Dkt. No. 142 at 8.  For the reasons discussed in the next section, it is apparent that Mattel did know facts at the time of its April 2004 filing, and made no mistake as to whether MGA, MGA HK and Larian should be included as defendants in its filing but instead made a deliberate tactical choice in that regard.

1
2

## V.   MATTEL'S BRATZ TRADE SECRET CLAIM IS PREEMPTED BY COPYRIGHT LAW.

3      Mattel's Bratz "trade secret" claim is nothing more than a blatant attempt to

4   seek state law protection for all the elements that this Court and the Ninth Circuit

5   have found are not protected by the federal Copyright Act.  The Copyright Act does

6   not permit such a runaround.  Mattel's Bratz trade secret claim is expressly and

7   impliedly preempted by the Copyright Act and should be dismissed in its entirety.[12]

8      Because the Bratz concept involves only well known or obvious (non-secret)

9   doll features, it cannot support a trade secret claim, as set forth above.  In an effort

10  to avoid the failure of its Bratz trade secret claim for this reason, Mattel has

11  attempted to recast its amorphous "concept" in terms of the particularized

12  expression of Carter Bryant's drawings.  Specifically, the Bratz trade secret has

13  been defined by Mattel as:

14         Category One:  A multi-ethnic group of hip, urban, edgy,
           trendy teen age girls fashion dolls and accessories,
15         collectively known as "Bratz," including designs for
           large, oversized heads and feet, large eyes, large lips,
16         small, almost non-existent noses, and small bodies. The
           dolls are four high school, multi-ethnic friends with
17         attitude; each have distinctive names, nick names,
           fashions, personalities, back stories and icons descriptive
18         of the doll's personal mascot.

19  Dkt. No. 9801.  This definition is simply another way of saying the particularized

20  expression of Carter Bryant's drawings, thus placing the "concept" squarely within

21

22  _____

    [12] This issue has been fully briefed by the parties both at summary judgment and in
23  connection with MGA's motion for reconsideration of the issue of preemption,
    which the Court has not yet ruled upon.  MGA's arguments therefore are
24  summarized here and MGA's prior briefs on this topic are hereby specifically
    incorporated.  *See* Dkt. No. 9084 at 25-26 (MGA Parties' Motion for Summary
25  Judgment); Dkt. No. 9572 (MGA Parties' Motion for Reconsideration of the
    Court's Summary Judgment Ruling Regarding Copyright Preemption of the Bratz
26  Drawings and Sculpts Trade Secrets, or, in the Alternative, for Certification of the
    Preemption Ruling for Interlocutory Appeal); and Dkt. No. 10064 (MGA Parties'
27  Reply in Further Support of Their Motion for Reconsideration on the Court's
    Summary Judgment Ruling Regarding Copyright Preemption of the Bratz
28  Drawings and Sculpts Trade Secrets, or in the Alternative for Certification of the
    Preemption Ruling for Interlocutory Appeal).

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

copyrightable subject matter.[13]  Indeed, the result of preemption becomes even more obvious when one looks carefully at the specific elements Mattel is claiming in its Bratz trade secret:  it consists of every element that this Court and the Ninth Circuit have specifically considered as part of Mattel's copyright claim and concluded that they are not protectable under Copyright law.  Mattel's attempted end run around the copyright law must be denied.

## A.  **Mattel's Bratz Trade Secret Claim Is Expressly Preempted by The Copyright Act.**

Section 301(a) of the Copyright Act sets forth two conditions for preemption. First, the state law claim must assert rights regarding works that fall within the general scope of copyright.  Second, the rights asserted under state law must be "equivalent" to the exclusive rights of copyright owners.  Where both conditions are satisfied—as is the case here with Mattel's Bratz trade secret claim—a state law cause of action is preempted by copyright.  *See Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1137-38 (9th Cir. 2006).

### 1.  **Mattel's Bratz Trade Secret Is Copyrightable Subject Matter.**

With respect to the first part of the preemption test, Mattel is asserting trade secret rights over works falling within the subject matter of copyright.  Indeed, Mattel seeks to protect through trade secret the very same works on which it has based its copyright claim:  Carter Bryant's drawings and the early Bratz sculpts.

Mattel cannot escape the conclusion that it is seeking trade secret protection for copyrightable subject matter by attempting to identify as its trade secret all the elements that this Court and the Ninth Circuit have found not protectable under

---

[13] The trade secrets allegedly misappropriated by Jorge Castilla, Gustavo Machado, and Janine Brisbois do not fall into this category as they do not appear to be based on expression within the scope of copyright preemption; rather, they appear to involve business information that does not include artistic works or other "works of authorship that are fixed in a tangible medium of expression."  The same is true of Mattel's purported Bratz name trade secret.

1    copyright law.  The law is well-established that just because an element has been

2    found unprotectable under copyright law does not mean that that element is not

3    covered as copyrightable subject matter.  In fact, it is well-settled that the scope of

4    copyrightable subject matter for purposes of preemption is much broader than that

5    which is actually protected under Copyright Act.  Section 301 of the Act expressly

6    incorporates within its preemptive reach *all* of Section 102—including not only the

7    protectable subject matter under Section 102(a) but also the unprotectable elements

8    described in Section 102(b).  Thus, it has been held repeatedly that ideas and other

9    uncopyrightable elements within a copyrightable work are within the scope of

10   copyrightable subject matter for preemption purposes.  *See, e.g.*, *Entous v. Viacom*

11   *Int'l*, 151 F. Supp. 2d 1150, 1159 (C.D. Cal. 2001) ("While 'ideas' do not enjoy

12   copyright protection, courts have consistently held that they fall within the 'subject

13   matter of copyright' for the purposes of preemption analysis."); *Selby v. New Line*

14   *Cinema Corp.*, 96 F. Supp. 2d 1053, 1058 (C.D. Cal. 2000) ("'ideas embodied in a

15   work covered by the [Act]' are nevertheless within the subject matter of copyright

16   for purposes of preemption because '[s]cope and protection are not synonymous.'")

17   (citation omitted); *see also U.S. ex rel. Berge v. Bd. of Trustees of the Univ. of Ala.*,

18   104 F.3d 1453, 1463 (4th Cir. 1997) (noting that ideas are specifically excluded

19   from Copyright Act protection but fall under the scope of copyright subject matter

20   and are therefore "clearly preempted by federal copyright law").  "Copyrightable

21   material often contains uncopyrightable elements within it, but Section 301

22   preemption bars state law misappropriation claims with respect to uncopyrightable

23   as well as copyrightable elements."  *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105

24   F.3d 841 (2d Cir. 1997).

25        There can be no debate that the first requirement for Section 301 preemption

26   is satisfied.

27

28

## 2.   Mattel Has Not Established That The Right It Seeks To Protect Is Qualitatively Different From Its Copyright Claim.

As for the second element of the preemption test, Section 106 of the Copyright Act confers upon copyright owners the exclusive right to reproduce, distribute and display original works of authorship, to prepare derivative works and to authorize the same.  The Ninth Circuit has held:

> To survive preemption, the state cause of action must protect rights which are qualitatively different from the copyright rights.  The state claim must have an extra element which changes the nature of the action.

*Laws*, 448 F.3d at 1143 (internal quotation marks omitted).

Mattel does not meaningfully or persuasively dispute that the right it is seeking to protect as trade secret is identical to what it seeks to protect under copyright law:  the right to commercially exploit, *i.e.*, reproduce and distribute, the idea for the Bratz concept, as embodied in the Carter Bryant's drawings and the Bratz sculpts.  Instead, Mattel turns to a blind reliance on the naming of its claim as "trade secret" and the requirement of "secrecy," a word it elevates to talismanic status in an effort to argue that its trade secret claim contains an "extra element."

Mattel's efforts failed.  In addition to the fatal fact that none of the elements claimed are even secret, as discussed above, the law does not permit a blind reliance on the label put on a claim or the word "secret."  Rather, the Ninth Circuit confirms that a specific examination of the asserted theory is required, in context, to determine whether the state law cause of action "qualitatively . . . *changes*" the nature of the action from a copyright claim.  *Id.* (emphasis added).

Consistent with this, this Court has specifically rejected a "categorical rule" exempting all claims of a certain type from preemption, noting that "Courts have instead adopted a more fact-specific inquiry" into whether a claim asserts rights that are equivalent to those in the Copyright Act.  *See Entous*, 151 F.Supp. 2d. at 1159-60; *see also Miller v. Holtzbrinck Publishers, L.L.C.*, 377 Fed.Appx. 72, 73 (2d Cir.

1   2010) ("In applying this standard, we take a restrictive view of what extra elements

2   transform an otherwise equivalent [state law] claim into one that is qualitatively

3   different from a copyright infringement claim . . .More specifically, [i]f

4   unauthorized publication is the gravamen of [plaintiff's] claim, then it is clear that

5   the right [she] seek[s] to protect is coextensive with an exclusive right already

6   safeguarded by the [Copyright] Act and thus that state law claim is preempted.")

7   (quotation omitted).

8       This is, therefore, a case specific inquiry.  When the claim asserted by Mattel

9   is considered, it is clear that it is not different at all from its copyright claim, let

10  alone qualtitatively different.  The same acts by MGA serve as the basis for

11  Mattel's copyright claim and its trade secret claim:  the alleged use and

12  modification of copyrighted material that Mattel claims its owns, without

13  authorization, to create a new line of dolls which were reproduced, distributed and

14  sold.  Mattel's trade secret claim is not only "equivalent," it is identical to Mattel's

15  copyright theory.  The fact that the elements that Mattel has identified as the

16  specific basis of its trade secret claim are, as noted above, largely the same exact

17  elements put forth by Mattel but rejected by the Court as copyright protectable

18  makes this conclusion even more obvious.

19      **3.     Unpublished, Secret, Works Are Covered By The Copyright**

20  **Act.**

21      In fact, as previously briefed, any attempt by the state to regulate

22  unpublished, *i.e.*, secret, works would run directly contrary to the intent of the

23  Congress in enacting the Copyright Act of 1976.  Prior to the revisions to the

24  copyright law made by the 1976 Act, the line had been drawn such that states

25  retained the right to regulate unpublished works.  Once the work was published,

26  and thus no longer secret, they became controlled exclusively by federal copyright

27  law.

28

1       In drafting the legislation that would become the 1976 Act, Congress

2  observed that that prior regime was "unpredictable and often unfair."  H.R. Rep.

3  No. 94-1476 at p. 129-130 (1976) ("'Publication,' perhaps the most important

4  single concept under the present law, also represents its most serious defect.").  To

5  remedy that defect, Congress adopted "a single system of Federal statutory

6  copyright from creation.  Under section 301 a work would obtain statutory

7  protection as soon as it is 'created'" . . . ."  H.R. Rep. No. 94-1476 at p. 129-130

8  (1976).  Thus, Congress intended to wrest protection of unpublished, secret, works

9  from the control of state law and created a unified federal system to govern their

10  exploitation.  *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539,

11  552-53 (1985) (noting that the Copyright Act of 1976 eliminated publication as the

12  dividing line between common law and statutory protection and that Section 106

13  expressly governs the right of first publication through the right of "first public

14  distribution").

15       Congress clearly intended to control the right of first public distribution for

16  works within the Copyright Act's purview.  As a result, there is no extra element

17  here in Mattel's claim that goes beyond its copyright claim:  the alleged acquisition

18  and use of the purported Bratz trade secret and the invasion of the right of first

19  public distribution are exactly the same acts.[14]

---

[14] As discussed in MGA's prior briefing, to the extent that cases discuss "secrecy" in preemption analysis of trade secret claims, a direct duty of secrecy and breach are required to bring such claims outside the ambit of copyright—neither of which are present here.  *See e.g. Del Madera v. Rhodes and Gardner, Inc.*, 820 F.2d 973, 977 (9th Cir. 1987) ("[A]n implied promise not to use or copy materials within the subject matter of copyright is equivalent to the protection provided by section 106 of the Copyright Act."); *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1194-95 (C. D. Cal. 2001) (trade secret claim based on alleged use of "confidential" conceptual creative work was preempted; making clear that to save such a claim from preemption the "secrecy" requirement would require "'disclosure' of a secret in contravention of a specific duty to keep that information confidential.").

**B.      All of Mattel's Theories Of Trade Secret Liability With Respect To Its Bratz Trade Secret Are Preempted.**

By Order dated March 3, 2011, Dkt. No. 10169, the Court requested that MGA address in this motion whether the Copyright Act preempts some, but not all, theories of liability under CUTSA.

If the Court intended to inquire by this Order whether it is MGA's position that none of Mattel's trade secret claims can survive copyright preemption, that is certainly not the case. As noted above, the trade secret claims concerning Mexico, for example, do not appear to have any relation to copyrightable subject matter. Moreover, there are certainly state law trade secret misappropriation claims in which the rights asserted are not equivalent to those asserted in copyright. But, that is not the case here.

If the Court was inquiring about the various theories of misappropriation protected by CUTSA, CUTSA protects against "acquisition, use and disclosure" of information that qualifies as trade secret. Cal. Civ. Code. §3426.1 *et seq.* Each of these acts in this case with respect to Mattel's Bratz trade secret is contemplated by and regulated by the Copyright Act. Section 106 of the Copyright Act specifically protects the right to "use and disclose to the public" through its grant of exclusive rights to "reproduce," "distribute," and "display." These rights are obviously equivalent. With respect to "acquisition," again, as noted above, Congress made a specific decision to regulate unpublished copyrightable works and thereby control the right of first publication and thus, the right to control others' acquisition of one's unpublished works. Each of these theories of liability with respect to Mattel's Bratz trade secret claim is preempted and should be dismissed as a matter of law.[15]

---

[15] By seeking to protect ideas in copyrightable works, unprotectable elements and unpublished works, Mattel's Bratz trade secret claim also must be dismissed under the principles of conflict preemption, as previously briefed by MGA. *See Jones v. Rath Packing Co.*, 430 U.S. 519 (1977) (applying conflict preemption and finding a state law preempted; "[o]ur task is 'to determine whether under the circumstances

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

## VI.   MATTEL, INC. AND MATTEL DE MEXICO S.A. DE C.V. FAILED TO MEET THEIR BURDEN ON THE MEXICAN TRADE SECRET CLAIMS.

### A.   CUTSA Does Not Apply To The Misappropriation Of Alleged Trade Secrets In Mexico By Mexicans.

Mattel has sought, and failed, to prove their case under California's Uniform Trade Secret Act. But it does not apply. The conduct at issue with respect to Machado, Trueba, and Vargas occurred in Mexico. California's Uniform Trade Secret Act does not apply to this extraterritorial conduct.

This is not a question of "choice of law," but a reflection of the fact that there is no choice to make because the laws of one sovereign do not apply to conduct occurring within the jurisdiction of another. The "'presumption against extraterritoriality is one against an intent to encompass conduct occurring in a foreign jurisdiction in the prohibitions and remedies of a domestic statute.'" *Norwest Mortg., Inc. v. Superior Court*, 72 Cal. App. 4th 214, 224 (1999) (quoting *Diamond Multimedia Sys., Inc. v. Superior Court*, 19 Cal. 4th 1036, 1058-59 (1999)). California "statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California." *Id*. at 224-25. However, here, all of the evidence reflects that the conduct at issue occurred in Mexico. 3/4/2011 (Vol. 1) 7:2-4 (Machado Testimony); TX 6401-01 (Mattel Servicios employment agreement listing Mexico address); TX 6793-19 (MGAE de Mexico employment agreement listing Mexico address).

To the extent Mattel's Mexico trade secret claim is based on conduct by Mexican citizens occurring in Mexico, CUTSA does not apply, irrespective of any choice of law analysis, and Mattel has not made any attempt to establish that the actions of those in Mexico violated Mexican law. Before trial, Mattel argued that

---

of this particular case, (the State's) law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"); *Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377, 386 (3rd Cir. 1999) (state law that purported to define the manner of distribution of copyrighted material overturned based on conflict preemption principles).

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1  some of the alleged trade secret documents taken by the Mexico employees were
2  located on servers in California as nexus for jurisdiction and applicability of
3  California law.  The evidence, however, proved otherwise.  During its case-in-chief,
4  out of the entirety of Mattel's Mexican trade secret documents, Mattel presented
5  evidence that purports to support a finding that only *two* documents—TX 7104 and
6  TX 7110—were located on servers in California.  Even if the Court were to accept
7  this as fact, surely the purported extraction of two individual documents is not
8  sufficient for the blanket application of CUTSA across all Mexican-centric conduct.
9  The MGA Parties are entitled to judgment as a matter of law on all of the other
10  alleged Mexico trade secret documents against Mattel.

### B.   Mattel's Trade Secret Claim Is Time Barred By The Statute Of Limitations Under Mexico Law.

13  The MGA Parties incorporate fully by this reference all arguments made by
14  Machado in his Motion for Judgment as a Matter of Law.  *See* Dkt. No. 10233
15  (Machado JMOL).

### C.   Mattel, Inc. and Mattel de Mexico Have Failed To Satisfy The Elements Of A Trade Secret Claim.

18  As to each of the elements of a trade secret claim, Mattel has failed entirely
19  as to its proof.  The evidence does not establish: (1) Mattel's ownership of a trade
20  secret, which it made reasonable efforts to maintain as a trade secret and which has
21  independent economic value due to its secrecy; (2) MGA's misappropriation of the
22  trade secret through wrongful acquisition, disclosure or use; and (3) injury to
23  Mattel.  Cal. Civ. Code § 3426.1 *et seq.*; *Silvaco Data Sys.*, 184 Cal. App. 4th at
24  220; *Cytodyn, Inc.*, 160 Cal. App. 4th at 297.

### 1.   Ownership.

26  The evidence establishes that Mattel Servicios, S.A. de C.V., not Mattel, Inc.
27  and not Mattel de Mexico own the alleged trade secrets at issue.  Machado's
28  contract with Mattel Servicios makes that plain and is indisputable.  TX 6401-10

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1   ("all documents and information [the employee] may be given due to the

2   employment relationship are the exclusive property of the EMPLOYER," wherein

3   the agreement previously defines the employer as simply, and only, Mattel

4   Servicios, S.A. de C.V); 3/8/2011 (Vol. 1) Tr. 7:11-8:23 (Machado Testimony).

5              **2.      No Evidence That The Materials Were Trade Secret.**

6          Mattel has admitted into evidence a CD purportedly found by the Mexican

7   police.  TX 8855A.  There is no evidence, however, as to the majority of items that

8   appear *on* the CD.  Therefore, there cannot be proof of any of the elements of the

9   trade secret claim, including that the materials were, in fact, a trade secret.

10         In addition, and more fundamentally, no one testified—and there is otherwise

11  no evidence—of the claimed trade secrets were valuable because they were secret.

12  Mattel only asked Mr. Machado whether he thought the materials he took would be

13  useful.  That information was believed to be "useful" to an employee in carrying

14  out his work is not the same things as independently valuable due to secrecy.  Many

15  items are useful in the performance of job duties, but not secret.

16         Moreover, as to the documents that purport to contain POS Data, TX 6734,

17  7077-87, 7090, 7096, 7112, 7119, 7120, 7124, 7130, 7138, 7148, 8466, 8471, 8866.

18  those are just not secret – and certainly not secrets of any Mattel entity.  The POS

19  data is collected by retailers.  3/8/11 (Vol. 1) Tr. 58:5-59:8, 60:3-13.  As such, it

20  belongs to them, not Mattel.  Mr. Cavassuto testified that Mattel de Mexico's

21  contracts with retailers permits retailer to disclose or sell the POS Data to someone

22  other than Mattel de Mexico.  3/8/11 (Vol. 1) Tr. 59:12-17, 60:11-21 (Testimony of

23  Cavassuto); TX 24264T, 24269T. And the retailers themselves are free to use the

24  POS Data for their own business purposes.  3/8/11 (Vol. 1) Tr. 59:20-24, 59:25-

25  60:2.

26         In addition, even were Mattel to claim that these same documents contain

27  other trade secrets, as noted below, Mattel has proven no injury to Mattel.

28

### 3.   No Evidence Of Improper Acquisition Or Use.

There is no evidence that MGA or Mr. Larian improperly acquired any trade secret.  Whether or not Machado or any other former Mattel employee possessed a trade secret, does not establish acquisition of those trade secrets by MGA or Mr. Larian. *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1131-32 (9th Cir. 2010) (possession of confidential information by employee, without proof that new employer used or benefited from trade secret, is not enough to support a claim); *Silvaco Data Sys.*, 184 Cal. App. 4th at 224 (use requires exploiting of trade secret); *Therapeutic Research Facility v. NBTY,* 488 F. Supp. 2d 991, 999 (E.D. Cal. 2007) (plaintiff has burden to show trade secrets were, in fact, used by defendants); *Gibson-Homans Co. v. Wall-Tite, Inc.*, 1992 U.S. Dist. LEXIS 21909, at *10 (C.D. Cal. Oct. 27, 1992) (company not liable for misappropriation just because employee retained trade secret document from former employer).

In addition, the evidence establishes that Mr. Larian specifically told Machado and others not to bring any Mattel materials to MGA.  TX 6793; 2/17/11 (Vol. 3) Tr. 57:18-62:23.  Therefore, the only evidence is that neither MGA nor Mr. Larian acquired the trade secrets at issue within the meaning of the CUTSA.

As to the claimed Mattel Viability Report, ("MVR") which is one of the only two documents Mattel asserts came from a U.S. server, TX 6739, the evidence is even more stark.  There is, in fact, no evidence that Machado or anyone else even had this document at any point.  It is absent from the CD purportedly found in the offices of MGA de Mexico.  *Compare* TX 8855A (bates no. MGA 3815506) *with* TX 6739 (bates no. M 0031292).  Nor is there evidence that the MVR was among the documents found at the MGA de Mexico office.

Nor is there evidence of any use of any of the trade secrets.  Machado testified that the only Mattel document he looked at was a report containing POS Data, which is not a trade secret activity and does not belong to Mattel.  Otherwise, there is no evidence that anyone at MGA, including Machado and others used any

1    claimed Mattel trade secret.  3/4/11 (Vol. 2) Tr. 40:8-23 (Machado Testimony);

2    3/4/11 (Vol. 4) Tr. 6:7-10:5 (Machado Testimony); *id.* at 75:3-76:12; 3/8/11 (Vol.

3    1) Tr. 14:6-16 (Machado Testimony); 2/23/11 (Vol. 1) Tr. 117:17-118:3

4    (Kuemmerle Testimony); 2/23/11 (Vol. 2) Tr. 84:10-13 (Kuemmerle Testimony);

5    *id.* at 85:19-88:11 (Kuemmerle Testimony).

6            **D.    Mattel And Mattel de Mexico Did Not Offer Evidence Sufficient
                     To Allow A Reasonable Jury To Award Any Damages Or
7                    Unjust Enrichment For Use Of The Alleged Mexico Trade
                     Secrets.**
8

9            There is also no evidence that would support an award to Mattel or Mattel de

10   Mexico for "use" of the alleged Mexico trade secrets.  In fact, Wagner admits that

11   he found no evidence that "Mattel lost any sales" in Mexico.  3/9/2011 (Vol. 1) Tr.

12   25:1-4.  Nor did he see any evidence establishing whether "MGA gained any sales

13   at all."  *Id.* at 25:5-25.  Thus, any award of actual damages would be speculative

14   and inappropriate.  At most, Mattel suppressed evidence on a couple of documents,

15   the POS data and MVR document, as to the cost to Mattel to acquire or create that

16   information.  But again, that Mattel spent money acquiring the document does not

17   mean it has value to MGA, and Mattel has not been deprived of possession of the

18   documents.  Without evidence of actual loss, Mattel shifted to an unjust enrichment

19   theory that stems from "a cost approach."  *Id.* at 26:1-16.  In essence, this latter

20   approach attempts to monetize what MGAE de Mexico would have had to spend in

21   developing the information it purportedly received for "free."  *Id.* at 26:17-20.

22   Enrichment, however, requires MGAE de Mexico to have received an actual

23   benefit.  In this case, Mattel set forth no evidence establishing a link that but for

24   MGAE de Mexico's supposed possession of Mattel information, it would not

25   otherwise have seen the rapid growth in market segment.  This speculative and

26   unsupported theory remains that—a theory.

27

28

## VII.   MATTEL DID NOT PROVE ITS "OTHER EMPLOYEE" TRADE SECRET CLAIMS.

To establish its claim for trade secret misappropriation, Mattel had to present evidence establishing the following: 1) Mattel's possession of a trade secret, which it made reasonable efforts to maintain as a trade secret and which has independent economic value due to its secrecy, 2) MGA's misappropriation of the trade secret through wrongful acquisition, disclosure or use, and 3) injury to Mattel.  Cal. Civ. Code § 3426.1 *et seq.*; *Silvaco Data Sys.*, 184 Cal. App. 4th at 220.  Mattel's claims based on the conduct of Janine Brisbois, Dan Cooney, Ron Brawer and Jorge Castilla have been an after-thought at this trial.  As to each, Mattel has not introduced legally sufficient evidence from which a reasonable jury could impose liability under California's Uniform Trade Secrets Act.  Judgment as a matter of law is therefore appropriate for the MGA Parties on these claims.

### A.   <u>Janine Brisbois.</u>

#### 1.   <u>Mattel Has Not Identified Any Trade Secret Information In the Files That Brisbois Copied.</u>

The only testimony regarding Janine Brisbois is that she copied "approximately 30" files to a USB storage device in the last three days of her employment with Mattel.  3/10/11 (Vol. 2) Tr. 11:12-18, 16:9-14 (Maryman Testimony); 3/9/11 (Vol. 2) Tr.  143:2-8, 143:22-144:12 (De Anda Testimony).  There is no testimony that this was or was not unusual.  There is no testimony that what she copied was a Mattel trade secret.

Under California's Uniform Trade Secret Act, it is not enough that an employee copies things and removes them from a former employer.  A plaintiff must establish that the things are in fact trade secret, including that the items taken were the subject of reasonable efforts to maintain their secrecy and derive independent economic value from their secrecy.  Cal. Civ. Code § 3426.1(d); *GAB Bus. Servs., Inc. v. Lindsey & Newson Claim Servs., Inc.*, 83 Cal. App. 4th 409, 428

MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT CV-04-9049 DOC (RNBx)

1   (2000) (plaintiff must establish secrecy and independent economic value).  Mattel

2   has not done that.  Here, Mattel has made no effort whatsoever to explain or

3   describe what information in the "approximately 30" files that Brisbois copied in

4   her final days as a Mattel employee are supposedly trade secret.

5   **2.   Mattel Has Not Shown That The Files Brisbois Copied Were**
        **Acquired Through Improper Means Or Used.**

6

7       In addition, even were it assumed that Brisbois took trade secrets, that does

8   not establish acquisition, use or disclosure to MGA or Mr. Larian.  Possession of

9   trade secrets by an employee is not enough to establish liability for

10  misappropriation by the employer.  Mattel's claim fails for this reason as well.

11  *JustMed, Inc.*, 600 F.3d at 1131-32; *Silvaco Data Sys.*, 184 Cal. App. 4th at 224;

12  *Therapeutic Research Facility,* 488 F. Supp. 2d at 999; *Gibson-Homans Co.* 1992

13  U.S. Dist. LEXIS 21909, at *10.

14  **3.   Mattel Has Not Shown Damages To Mattel From Brisbois'**
        **Copying.**

15

16      No testimony has been introduced suggesting that Mattel suffered damages

17  as a result of the copying by Brisbois.  Mattel's damages expert Michael Wagner

18  never mentioned Brisbois' name or any alleged damages attributable to her conduct

19  before the jury.  3/8/11 (Vol. 1) Tr. 79:12-130:19; 3/8/11 (Vol. 2) Tr. 5:6-22:4.

20  This is legally insufficient for a reasonable jury to award damages based on the

21  conduct of Brisbois.

22  **B.   Dan Cooney.**

23      Mattel claims that Mr. Cooney misappropriated one trade secret—the Toys R

24  Us "Merchant Model Optimization Tool."  *See* Dkt. No. 9801 (Mattel trade secret

25  chart identifying only one file for Mr. Cooney) Exhibit C (Non Bratz Trade Secrets)

26  at 32.  There is no evidence that this document was a Mattel trade secret, *i.e.*, that it

27  satisfies the elements of a trade secret.  There is no evidence of acquisition, use or

28  disclosure of the trade secret by MGA or Mr. Larian.  In fact, the evidence

1  established that MGA instructed Mr. Cooney not to bring anything from Mattel.

2  TX 2158; 2/17/11 (Vol. 4) Tr. 6:20-10:5 (Larian Testimony).

3          The only other document introduced and discussed during the trial relating to

4  Mr. Cooney was a document called the "Promo Matrix 11-2-2006 (FY '05 – Spring

5  '07).xls." It was attached to an email Mr. Cooney sent while at MGA. TX 23571;

6  2/10/11 (Vol. 2) Tr. 29:2-37:11 (Larian Testimony). Mr. Larian testified that he

7  was not copied on that email, and that he was not familiar with the file attached to

8  it. 2/10/11 (Vol. 2) Tr. 31:2-3, 34:7-8.

9          With regard to this document, as the Court observed on the record when it

10  received Exhibit 23751 (over the MGA Parties' objections), the Promo Matrix that

11  Mattel questioned Mr. Larian about "doesn't go to the trade secret claim. It goes to

12  confidentiality and what Mr. Cooney is downloading." 2/10/11 (Vol. 2) Tr. 35:16-

13  21. Indeed, Mattel had already abandoned its claims relating to Mr. Cooney's

14  promo matrix in October 2010, when it responded to MGA's separate statement in

15  support of summary judgment, and made clear its intentions with respect to this

16  file. Dkt. No. 9185 (Mattel Corrected Statement In Support of Genuine Issues),

17  Nos. 246 and 247 at 1037-43 (noting that "Mattel Promo Matrix Spreadsheet –Tab

18  2 contains one or more trade secrets misappropriated by MGA based on the actions

19  of Daniel Cooney").

20          Accordingly, no reasonable jury can consider this file as evidence that could

21  potentially support Mattel's trade secret claim against the MGA Parties. Without

22  evidence of what it claims was trade secret based on the conduct of Mr. Cooney,

23  Mattel's claim fails as a matter of law. Judgment should be granted to the MGA

24  Parties.

25      **C.    Ron Brawer.**

26          Before this trial started, Mattel narrowed the scope of its trade secret claims

27  involving Mr. Brawer to a single doll theme involving interchangeable heads. Dkt.

28  No. 9185 (Mattel Corrected Statement In Support of Genuine Issues), Nos. 98-111,

1  at 241-88 (expressly disclaiming any trade secret claim beyond Mattel's "Swappin'

2  Styles" theme).

3      During trial, Mattel abandoned this claim completely when it responded to

4  the Court's order of February 1, 2011, listing the universe of Mattel trade secrets at

5  issue in this case.  *See* Dkt. No. 9801.  Noticeably absent from that filing was any

6  mention of Mattel's "Swappin' Styles" or MGA's "Head Gamez" dolls as non-

7  Bratz trade secrets.  The Court has confirmed its allegiance to this statement as the

8  controlling document for trade secret identification purposes.  3/8/11 (Vol. 2) Tr.

9  75:5-77:22.

10      Accordingly, the one trade secret that Mattel alleged prior to the start of trial

11  has been dropped, and there is nothing left for the jury to find concerning trade

12  secret misappropriation based on the conduct of Brawer.

13      **D.    Jorge Castilla.**

14      Mattel acknowledges that 6 of the 96 files that Castilla copied to his "To

15  Take" folder were personal to Castilla and are not at issue in this case.  3/1/11 (Vol.

16  1) Tr. 63:17-23 (Owens Testimony). As to the remaining 90 files, Mattel has made

17  no showing of disclosure by MGA.  The extent of Mattel's evidence on use are

18  emails showing complaints by Isaac Larian about MGA's forecasting systems prior

19  to Mr. Castilla's employment at MGA.  But those complaints occurred before and

20  after Castilla joined MGA.

21      **1.    Castilla Did Not Use Any Mattel Information At MGA And**
22  **There Is Not Evidence Of Improper Acquisition.**

23      It is undisputed that Mr. Castilla gave the device to which he downloaded the

24  information he took when he left Mattel to the FBI before he joined MGA. 3/1/11

25  (Vol. 1) Tr. 49 (Owens Testimony).  Mattel presented no evidence providing a basis

26  on which a rational jury could conclude that the information otherwise materialized

27  at MGA.  *Id.* at 49 ("Q. Well, you don't have any evidence whatsoever that MGA

28  ever used one thing Mr. Castilla took from Mattel, true? A. True."); *id* at 50-51 ("I

- 77 -

1  don't have any information that MGA used it[.]"); *see also* 2/10/11 (Vol. 1) Tr.

2  120-21 (Larian Testimony); *id.* at 122 ("I don't know what he had downloaded.

3  Today is the first time I hear that he downloaded – whatever you called it –

4  strategic plan.").  Because the information never got to MGA, there is no support

5  for a finding of misappropriation by acquisition, use, or disclosure.  Indeed, as with

6  the other hires at MGA, MGA and Mr. Larian asked Mr. Castilla not to bring

7  anything with him from Mattel.  TX 6577; 2/17/11 (Vol. 3) Tr. 105:9-110:6 (Larian

8  Testimony).

9       It plainly is not sufficient to suggest that Mr. Castilla may have, by virtue of

10  his employment, had certain knowledge in his mental toolbox that he was able to

11  call upon in performing his job at MGA.  *See, e.g., Western Med. Consultants, Inc.*

12  *v. Johnson*, 835 F. Supp. 554, 557 (D. Or. 1993) (finding that an employee may use

13  "knowledge arose from general know-how, skill and experience gained while

14  employed by plaintiff" "in later competition with a former employer"); *Ikon Office*

15  *Solutions, Inc. v. Rezente*, 2010 WL 5129293, at *4 (E.D. Cal. Feb. 3, 2010)

16  (former employee may freely use general knowledge, skills, and experience

17  acquired under a former employer so long as the employee does not use or disclose

18  trade secrets or other confidential information).  As there is no evidence that

19  Castilla disclosed any Mattel trade secrets to MGA, MGA and Mr. Larian are

20  entitled to judgment on the Castilla trade secret claim for lack of evidence of

21  misappropriation.

22       **2.**     **Mattel's "Improved Forecasting" Theory Failed.**

23       Mattel tried to establish the use of Mattel information through a theory based

24  on the idea that MGA was dissatisfied with its forecasting and sought to improve its

25  forecasting by having Castilla bring forecasting materials from Mattel.  *See* 1/18/11

26  (Vol. 1) Tr. 85:10-86:14 (Mattel Opening Statement).  Mattel claimed it could

27  prove that MGA's forecasting improved after Castilla was hired.

28

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1    Setting aside the fact that the information never made it to MGA, Mattel

2    failed to present evidence supporting the lynchpin of its theory, a suspicious

3    improvement in MGA's forecasting that might have been attributable not to Mr.

4    Castilla's skill, the skill of others, or the ongoing experience acquired by the MGA

5    team, but to wrongful use of Mattel's proprietary forecasting information.  *See*

6    *generally* 2/10/11 (Vol. 1) Tr. 112:3-119:19 (Larian Testimony that problems with

7    MGA forecasting from 2006 through today).  Mattel pointed to no evidence and

8    elicited no testimony at trial establishing any improvement in MGA forecasting

9    after Mr. Castilla was hired.  *See id.*  Indeed, Mattel instead established that MGA

10   is seeking to improve its forecasting today.  *See* 2/10/11 (Vol. 1) Tr. 112:7 (Larian

11   Testimony) ("I'm never happy about the forecasting at MGA"); *id.* at 114:2 ("I

12   wasn't happy in 2006.  I'm not happy in 2011"); *id.* at 123:17-20 ("I know for a

13   fact, 100 percent, two things: That, A, he never brought that information to MGA;

14   and more importantly, our forecasting system has gotten worse since Jorge Castilla

15   joined MGA."); 2/10/11 (Vol. 2) Tr. 27:17-28:4; 2/17/11 (Vol. 3) Tr. 115:12-

16   123:15 (Larian Testimony regarding continuing forecasting problems after Mr.

17   Castilla's arrival at MGA); TX 9231-32, 34863 (evidence of MGA forecasting

18   problems through 2009).

19   Mattel's forecasting theory without evidence to support it is insufficient to

20   sustain a claim and, consequently, the MGA Parties are entitled to judgment as a

21   matter of law on this issue.

22   **VIII.  MATTEL HAS NOT PRESENTED SUFFICIENT EVIDENCE TO**
     **SUPPORT AN AWARD OF EXEMPLARY DAMAGES ON**
23   **MATTEL'S TRADE SECRET CLAIMS.**

24   Under California's Uniform Trade Secret Act, exemplary damages may be

25   awarded if "willful and malicious" misappropriation exists.  Cal. Civ. Code §

26   3426.3(c).  "Willful" misappropriation means acting "with a purpose or willingness

27   to commit the act or engage in the conduct in question, and the conduct was not

28   reasonable under the circumstances at the time and was not undertaken in good

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

faith." CACI 4411. "Malicious" misappropriation means acting "with an intent to cause injury, or that [the defendant's] conduct was despicable and was done with a willful and knowing disregard for the rights of others." *Id.* "Despicable" conduct is conduct "so vile, base, or wretched that it would be looked down on and despised by ordinary decent people." *Id.*

No such conduct has been shown here, and no evidence has been introduced into the record from which a reasonable jury could find "willful" and "malicious" misappropriation against MGA or Mr. Larian. With respect to the Bratz trade secrets, given the ambiguity of the Inventions Agreement and the steps that MGA took to ensure it was getting unencumbered rights to Bratz, there is no evidence that MGA was acting "willfully" or "maliciously" in obtaining the Bratz idea from Carter Bryant.

The evidence establishes that MGA affirmatively warned each of these employees verbally and in writing not to bring Mattel information to MGA. TX 2158, 6577, 4240; 2/17/11 (Vol. 4) Tr. 6:20-10:5 (Larian Testimony); 2/17/11 (Vol. 3) Tr. 105:9-110:6 (Larian Testimony); 3/30/11 (Vol. 2) Tr. 114:13-116:10 (Larian Testimony). This is far from willful or despicable conduct.

With respect to the Mexico trade secret claims, the evidence shows a conscious effort by MGA and Mr. Larian to ensure that no confidential information belonging to Mattel was brought to MGA. 2/17/11 (Vol. 3) Tr. 44:18-45:19 (Larian Testimony). Mr. Larian told Mr. Machado to "only bring his brain" to MGA. 3/4/11 (Vol. 4) Tr. 30:18-31:4 (Machado Testimony). MGA then required Machado, Trueba and Vargas to confirm in their MGA employment agreements that they would not bring any confidential information to MGA. TX 6793, 6794, 6795. Not a shred of evidence was produced suggesting that MGA or Mr. Larian asked these individuals to take information from Mattel or knew they had done so. The conduct of individuals why employed by Mattel, whether proper or improper, cannot support the inquisition of exemplary damages against MGA or Mr. Larian.

## IX.   NO REASONABLE JURY COULD FIND IN FAVOR OF MATTEL ON ITS COPYRIGHT CLAIMS.

### A.   Mattel Cannot Claim Infringement Of Copyrights That No Reasonable Jury Could Find That It Owns.

Before Mattel can prove infringement, it must first prove ownership of a valid copyright.  As this Court explained in granting partial summary judgment to the MGA Parties, "[t]o prove copyright infringement, Mattel must establish that: (1) it owns copyrights in the concept sketches and sculpts; (2) MGA copied original elements of the copyrighted works."  Dkt. No. 9600 (Amended Summary Judgment Order) at 12 (citing *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006)).[16]

### 1.   Mattel Failed to Introduce Evidence of Copyright Registration Except as to a Zoe, Hallidae and Lupe Drawing.

Registration or pre-registration is a prerequisite to a suit for copyright infringement.  *See* 17 U.S.C. § 411 ("[N]o civil action for infringement of the copyright in any United States work shall be instituted until pre-registration or registration of the copyright claim has been made in accordance with this title"); *Cosmetic Ideas, Inc. v. IAC/Interactivecorp*, 606 F.3d 612 (9th Cir. 2010).  In its case, Mattel admitted into evidence only three copyright registrations:

> 1) TX 13873 for a work titled "drawing of Doll No. 1," which corresponds to the pitchbook drawing of Zoe at TX 302-3;
>
> 2) TX 13874 for a work titled "drawing of Doll No. 2," which corresponds to the pitchbook drawing of Hallidae at TX 302-7;
>
> 3) TX 13880 for a work titled "drawing of Doll No. 7," which corresponds to the pitchbook drawing of Lupe at TX 302-8.

Mattel did *not* introduce evidence of any registrations for the sculpts, for Jade drawings, or for any other drawings.  Mattel's failure to introduce any other copyright registrations fails to satisfy a prerequisite for a finding of infringement as

---

[16] Mattel's failure to introduce an original drawing by Bryant precludes it from seeking to rely on that drawing with respect to its copyright claims, as it cannot establish ownership of any such drawing. Dkt. No. 10358.

1  to any copyrights claimed by Mattel other than the three listed above.  Accordingly,

2  Mattel's copyright infringement claim should be limited to infringement of these

3  three works by the first generation Cloe doll, the first generation Sasha doll and the

4  first generation Yasmin doll, respectively.

5  **2.    No Reasonable Jury Could Find That Mattel Has Proved That It Owns The Preliminary Bratz Sculpts.**

6

7  A copyright "vests initially in the author or authors of the work" as provided

8  by Section 201(a) of the Copyright Act.  Under the Ninth Circuit standards for

9  authorship, Margaret Leahy, not Carter Bryant, was the author of the preliminary

10  Bratz sculpt (TX 1136A).  "[C]ontribution of independently copyrightable material

11  to a work intended to be an inseparable whole will not suffice to establish

12  authorship of a joint work."  *Aalmuhammed v. Lee*, 202 F.3d 1227, 1233 (9th Cir.

13  2000).  An author is defined as the "person to whom the work owes its origin and

14  who superintended the whole work, the 'master mind.'"  *Id*.  "A person who merely

15  describes to an author what the commissioned work should do or look like is not a

16  joint author for purposes of the Copyright Act."  *S.O.S., Inc. v. Payday, Inc.*, 886

17  F.2d 1081, 1087 (9th Cir. 1989).  This is particularly true where the recipient of

18  such direction is not bound to accept it.  *Aalmuhammed*, 202 F.3d at 1235

19  ("absence of control is strong evidence of the absence of co-authorship").  Ms.

20  Leahy's testimony, along with that of Mr. Bryant and Ms. Garcia, establishes that

21  in creating her preliminary sculpt, Margaret Leahy was the master mind who

22  exercised control over the sculpt, while Bryant's contribution amounted to no more

23  than a general vision and a few suggestions she did not follow.  Ms. Leahy, not

24  Bryant, is the sole author of the preliminary sculpts.

25  Trial Exhibit 1136A:  In September of 2000, Carter Bryant gave Ms. Leahy

26  some drawings (TX 12118-1, TX 12118-7, TX 12118-8) and a Steve Madden ad for shoes

27  (TX 1127).  3/15/11 (Vol. 1) Tr. 146:25-150:9 (Leahy Testimony).  He said to her

28  "Here are my rough drawings.  Here's this poster.  Just go and do your magic.  Get

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1    started.  Run with it."  *Id.* at 150:13-21.  Bryant's drawings did not have enough

2    information and were too vague for Ms. Leahy to refer to them in the sculpting

3    process.  *Id.* at 152:18-153:7; 3/15/11 (Vol. 2) Tr. 94:15-24 (Leahy Testimony).

4    She was sculpting something that was naked, but Bryant's drawings all depicted a

5    figure in clothing.  3/15/11 (Vol. 1) Tr. 153:8-16 (Leahy Testimony).  However, she

6    did refer to the Steve Madden ad (TX 1127) because it was a "manipulated

7    photograph" that "implies more dimensions than Carter's drawings."  *Id.* at 153:17-

8    154:6.  She also had in her mind the concept of the big head and big feet, which

9    was the trend at the time.  *Id.* at 154:7-155:2.  Ultimately, however, Leahy testified

10   that she did not use these items as inspiration for the sculpt, but rather she "just

11   came up with it in my head."  *Id.* at 157:4-17.  The first tangible result of this

12   process was Trial Exhibit 1136A, a cast of the first clay sketch that Leahy made,

13   which was returned to her from Gentle Giant Studios after October 6, 2000.

14   3/15/11 (Vol. 2) Tr. 18:25-19:23 (Leahy Testimony); TX 4551.  Leahy, not Bryant,

15   created Trial Exhibit 1136A.

16        MGA hired and paid Leahy for her work.  TX 17823, 17825; 3/15/11 (Vol.

17   2) Tr. 32:30-35:6, 53:11-16 (Leahy Testimony); 1/25/11 (Vol. 2) Tr. 60:11-25,

18   67:2-25 (Garcia Testimony).  It is MGA, not Mattel, that owns the copyright in Ms.

19   Leahy's work.  Mattel has introduced no evidence to the contrary, let alone

20   evidence that it has an ownership interest.  Mattel's claim of ownership of a

21   copyright in the exploratory sculpt (TX 1136A) must fail.

22        Trial Exhibit 1141A:  Similarly, Mattel cannot prove that it owns the second

23   sculpt created by Leahy.  After receiving the mold for Trial Exhibit 1136A back

24   from Gentle Giant, Leahy began additional work on the sculpt.  In transitioning

25   from Trial Exhibit 1136A to the next sculpt, Ms. Leahy did not work with Bryant,

26   she did not refer to Bryant's drawings, nor did Bryant provide any direction at all.

27   3/15/11 (Vol. 2) Tr. 22:12-22 (Leahy Testimony).  The next iteration, Trial Exhibit

28   1141A, was made from a mold that Gentle Giant created on October 23, 2000, *after*

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

Bryant left Mattel.  *Id.* at 23:17-26:7; TX 1140A, 1140B, 1140C, 1140D; TX 1141A; 1/25/11 (Vol. 2) Tr. 76:23-77:10 (Garcia Testimony).  As with Trial Exhibit 1136A, MGA retained and paid Leahy for her work.  TX 17823; TX 17825; 3/15/11 (Vol. 2) Tr. 32:30-35:6, 53:11-16 (Leahy Testimony); 1/25/11 (Vol. 2) Tr. 60:11-25, 67:2-25 (Garcia Testimony).  There is no evidence that can support Mattel's claim of ownership in a copyright with respect to Trial Exhibit 1141A.

### 3.   No Reasonable Jury Could Find that Mattel Owns The Sketch, Trial Exhibit 5-89.

After receiving the second sculpt (TX 1141A) from Gentle Giant sometime after October 23, 2000, Leahy had a meeting with Bryant.  3/15/11 (Vol. 2) Tr. 35:14-36:2 (Leahy Testimony).  After that meeting, Bryant made a drawing of the sculpt.  *Id.*  That drawing (TX 5-89) was made by Bryant on or around October 25, 2000, *after* he had left Mattel.  *Id.* at 37:24-38:6.  Leahy did not use this drawing at all in creating later iterations of the sculpt.  *Id.* at 36:11-37:5.  Trial Exhibit 5-89 was not created while Bryant was still at Mattel.  It was created at a time when his sole employer was MGA.  Mattel has no claim to ownership of Trial Exhibit 5-89.

### 4.   No Reasonable Jury Could Find that Mattel Proved That It Owns The Kmart Drawings.

Mattel claims the first generation Bratz dolls infringe the drawings that appear in Trial Exhibits 1107, 1108, 1109, and 1110 ("Kmart Drawings").  The evidence shows these drawings were also created after Bryant left Mattel.  As a result, these drawings are not owned by Mattel and cannot form the basis for an infringement claim.

As discussed above, Bryant left Mattel on October 19, 2000.  1/28/11 (Vol. 1) Tr. 96:4-9 (Bryant Testimony).  Bryant created the Kmart Drawings in November 2000, after leaving Mattel.  2/2/11 (Vol. 3) Tr. 8:24-9:10:10 (Bryant Testimony); 1/26/11 (Vol. 2) Tr. 38:20-39:17, 43:20-25 (Garcia Testimony).  Bryant made these drawings at the direction of Garcia in an effort to portray the

1   fashions that would be produced with the first Bratz dolls.  *Id*.  The drawings were

2   created for an MGA meeting with Kmart, on or about November 7, 2000.  *Id*.

3   Bryant testified that in developing the Kmart Drawings, he did not use the fashion

4   drawings he had created before he left Mattel; specifically, he did not use the

5   drawings he showed Mr. Larian during the September 1, 2000 "pitch" meeting.

6   2/2/10 (Vol. 3) Tr. 9:11-10:11 (Bryant Testimony).  Indeed, he testified that the

7   Kmart Drawings are completely different from those he presented to MGA in his

8   pitchbook.  *Id*. at 10:6-13:15.

9        Because the Kmart Drawings were created after Bryant left Mattel, and at the

10   direction of MGA employee Garcia, Mattel cannot assert a copyright in the

11   drawings, and any infringement claim based on the Kmart Drawings must be

12   rejected.

13        **5.   Mattel's Failure To Present Ownership of Any Drawing
           That Ooh La La Cloe Precludes a Finding of Infringement
14         As to That Doll.**

15        Mattel failed to present evidence sufficient to establish a finding that MGA's

16   second generation doll Ooh La La Cloe infringes any copyright owned by Mattel.

17   Specifically, Mattel failed to present evidence that it owns a registered copyright in

18   the sketch depicted in Trial Exhibit 5-51 and Trial Exhibit 11810-1.  No depiction

19   of this sketch was even admitted in evidence.

20        In the Court's Amended Order on MGA's Motion for Summary Judgment

21   ("Amended MSJ Order"), the Court granted MGA's motion as to all subsequent

22   generation Bratz dolls with the exception of Ooh La La Cloe and Formal Funk

23   Dana.  Dkt. No. 9600 at 28-29.  The Court noted that "a reasonable fact-finder

24   could conclude that Ooh La La Cloe is substantially similar to the protectable

25   elements of the sketch depicted in TX 5.051, TX 11810.001."  *Id*. at 28.

26        During its case-in-chief, Mattel failed to enter either Trial Exhibit 5-51 or

27   Trial Exhibit 11810-1 into evidence.  Accordingly, Mattel failed to present evidence

28   that it owns a copyright in the sketch pictured in those exhibits.  Without this sketch

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1   to compare to Ooh La La Cloe, no reasonably jury could conclude that Ooh La La

2   Cloe infringes a Mattel copyright.  Mattel's claim for copyright infringement based

3   on Ooh La La Cloe as an infringing work fails as a matter of law.

4           **6.      Mattel's Claim to A Copyright in Bratz "Characters" Fails
                       As A Matter of Law.**

5

6           In granting summary judgment as to subsequent generation dolls, the Court

7   held that "Mattel thus cannot claim a copyright in the Bratz characters circumvent

8   [sic] the rule that the copying of the idea and expression required by the idea does

9   not constitute infringement."  Dkt. No. 9600, n.12.  Yet, Mattel still apparently

10  seeks to advance a claim of so-called "character infringement"  in its proposed jury

11  instructions.  Dkt. No. 9683 at 99 (Mattel's Fourth Amended Proposed Jury

12  Instructions).  Mattel's claim must fail.

13          In this case, the Ninth Circuit recognized no such theory in setting forth the

14  applicable standard for the sketches.  *Mattel,* 616 F.3d 904 (discussing only the

15  "look" of the dolls and sketches).  The Ninth Circuit has explained that "characters

16  are ordinarily not afforded copyright protection" apart from the copyrighted work,

17  unless they are "especially distinctive" or comprise "the story being told."  *Rice v.*

18  *Fox Broadcasting Co.*, 330 F.3d 1170, 1175 (9th Cir. 2003).  Thus, "[c]haracters

19  that have received copyright protection have displayed consistent, widely

20  identifiable traits."  *Id*.  Indeed, it is characters such as Superman, Godzilla, and

21  Rocky that have risen to the level of character infringement.

22          The holding in *Olson v. National Broadcasting Co., Inc.*, 855 F.2d 1446 (9th

23  Cir. 1988), is also instructive.  In *Olson*, the court rejected plaintiff's copyright

24  claim based on "lightly sketched characters" which were "depicted only by three-or

25  four-line summaries" in the treatment and screenplay, "plus whatever insight into

26  their characters may be derived from their dialogue and action." *Id*. at 1452-53.

27  Bryant's sketches cannot constitute "characters"—there was no screenplay or detail

28  and repetition to discern any "traits," let alone the kind of "well-defined," "widely-

identifiable" physical and personality mannerisms that have been uniformly required for "character" copyright protection in the Ninth Circuit.

Any claim by Mattel that the short description of Bratz in Trial Exhibit 302 is sufficiently developed to constitute protectable characters fails as a matter of law.

### B. No Reasonable Jury Could Find In Favor Of Mattel With Respect to the Issue of Infringement.

In this very case, the Ninth Circuit has set the standard for copyright infringement: "Mattel will have to show that the Bratz production sculpts are virtually identical to Bryant's drawings or the preliminary sculpts, or that the Bratz dolls are substantially similar to Bryant's drawings, in each case disregarding similarities in unprotectable ideas." *Mattel,* 616 F.3d at 917.  Mattel has failed to meet this standard as a matter of law as to the Bratz sculpts and the Bratz dolls.

### 1. No Reasonable Jury Could Find That The Bratz Production Sculpt is Virtually Identical To The Preliminary Sculpts.

The Ninth Circuit recognized that the idea behind the Bratz dolls allows only a narrow range of expression.  Because the relevant expression is "highly constrained," the preliminary sculpts (TX 1136A and TX 1141A) are "entitled to only thin copyright protection against virtually identical copying." *Mattel,* 616 F.3d at 915 (citing *Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003) and *Satava v. Lowry*, 323 F.3d 805, 812 (9th Cir. 2003)).

Before "virtual identity" can be assessed, it is necessary to filter out expression that is inseparable from the idea and expression that is "indispensable or at least standard in the treatment of a given idea." *Data East USA, Inc., v. Epyx, Inc.*, 862 F.2d 204, 208 (9th Cir. 1988) (cited in *Mattel,* 616 F.3d at 915).  This requires filtering out the elements that "necessarily follow from . . . are inseparable from, indispensible to, or even standard treatment of the idea" of an attractive young, female fashion doll with exaggerated proportions. *Mattel*, 616 F.3d at 915.  Standard treatment of features must not be considered.  Accordingly, the large head,

large eyes, large feet, tiny waist, small nose, long arms, and other human body parts must be filtered out along with standard treatment of those elements. *See* 3/24/11 (Vol. 1) Tr. 26:11-31:19, 33:22-34:16 (Vilppu Testimony).  Only the particularized expression is protected.  Here, that particularized expression changed drastically from the preliminary sculpt (TX 1136A) to the final production sculpt (TX 17733) and from the second sculpt (TX 1141A) to the final production sculpt (TX 17733).

Paula Garcia did not like the preliminary sculpt that Margaret Leahy created (TX 1136A) for MGA's purposes. 1/25/11 (Vol. 2) Tr. 64:18-65:21 (Garcia Testimony).  Specifically, she thought it was "too sexy for our mission to appeal to girls who are 7 to 10" and she didn't like her posturing, which she found to be "hunched over" and "aloof." *Id.* Ms. Garcia provided this feedback to Leahy. *Id.* Accordingly, from the exploratory sculpt (TX 1136A), to the October 23 sculpt (TX 1141A), to the December 2000 sculpt (TX 1234A) and finally to the Bratz production sculpt (TX 17733), the expression of the female form changed considerably.  These differences in expression that occurred between Trial Exhibit 1136A and Trial Exhibit 17733, from head to toe, include the following:

- The size of the body and head is different in height and volume;
- The production sculpt is perfectly straight up and down while the exploratory sculpt is "too flowy" and slouched;
- The exploratory sculpt had "a scribing of an eyebrow shape" and "sculpting details of the eye, the eyelid" that the Bratz production head does not – "there's no eye sculpture at all";
- The nose of the exploratory sculpt pointed up, while the nose of the final Bratz production sculpt points down;
- The lips in the exploratory sculpt were "over-sexy, over-swollen" with a defined location, while the lips of the production sculpt lack "those creases and indications" so that they don't appear so "collagened;"
- The ears of the exploratory sculpt were pulled forward and turned out, while the ears of the production sculpt are much smaller;

- The shape of the head differs with the chin forward in the production sculpt and back in the exploratory sculpt;

- The neck of the exploratory sculpt was "lunging forward," while the neck of the production sculpt became "more vertical, more natural;"

- The breasts and torsos are different shapes;

- There are "proportional changes" in the stomachs with one coming out and the other not;

- The breasts are not the same with the exploratory sculpt being more developed;

- The production sculpt's shoulders are narrower in proportion and have more slope to them;

- The hips of the exploratory sculpt are much wider and more mature than the production sculpt;

- The crotch of the exploratory sculpt was V-shaped, while the crotch of the production sculpt is U-shaped;

- The "tush" of the exploratory sculpt had more material and was more developed than the less "voluminous" production sculpt;

- The thighs of the exploratory sculpt were developed and "really thick," while the thighs of the production sculpt are thinner without much shape;

- One knee of the exploratory sculpt was bent "so she had a turning of the toes," while the legs of the production sculpt are completely straightened, like "telephone poles";

- The calves of the exploratory sculpt had more material than the smaller production sculpt calves;

- The feet of the exploratory sculpt were much bigger in volume than the production sculpt.

*See* 1/25/11 (Vol. 2) Tr. 90:24-99:21 (Garcia Testimony); 3/15/11 (Vol. 2) Tr. 92: 22-94:14 (Leahy Testimony); 3/24/11 (Vol. 1) Tr. 43:6-52:14 (Vilppu Testimony). The overall purpose of these changes was to make a younger, more appealing doll for MGA's target age group—in other words, a completely different expression of the female form.

Looking at only the protectable elements of the preliminary sculpts made by Leahy, a reasonably jury could not find that the sculpts are virtually identical to the Bratz production sculpt. 3/24/11 (Vol. 1) Tr. 62:2-11 (Vilppu Testimony). Accordingly, the evidence cannot support a finding that the preliminary sculpts are infringed by the Bratz production sculpt.

### 2.  **Mattel Has Offered No Evidence That Any Other Bratz Production Sculpt Is Virtually Identical To The Preliminary Sculpts.**

As MGA launched Bratz line extensions and sub brands, the Bratz production sculpt changed.  Different sculpts were created by MGA as the brand expanded, from Bratz Boyz, to Lil' Bratz, to walking and talking Bratz, to Bratz Babyz and Lil' Angelz.  Mattel has put on no evidence that these sculpts, which diverge from the preliminary sculpt even more substantially than the final production sculpt (TX 17733), infringe.  Indeed, the testimony on this wide range of sculpts confirms that none are virtually identical to the preliminary sculpts as a matter of law (TX 1136A and TX 1141A).  *See* TX 35219 (images of a variety of different Bratz production sculpts); TX 18857 through TX 18873 (tangibles of numerous different Bratz production sculpts); 2/17/11 (Vol. 2) Tr. 9:19-39:17 (Larian Testimony); 2/17/11 (Vol. 3) Tr. 18:23-29:20 (Larian Testimony).  Yet, Mattel's proposed jury instructions remain vague, apparently seeking to cover this wide range of production sculpts.  Dkt. No. 9683 at 99.  Mattel's claim of infringement as to these other production sculpts must fail.

### 3.  **No Reasonable Jury Could Conclude That The First Generation Dolls and Formal Funk Dana Are Substantially Similar To The Protectable Elements Of The Pitchbook Drawings.**

Since the Kmart Drawings were created after Carter Bryant left Mattel, the only potential copyrights that the first generation Bratz dolls could be found to infringe are the pitchbook drawings (if Mattel is found to own the pitchbook

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

drawings) (TX 302).  The evidence cannot support a jury finding of infringement of these drawings.

As the Ninth Circuit held, "Mattel will have to show . . . that the Bratz dolls are substantially similar to Bryant's sketches *disregarding similarity in unprotectable ideas*."  *Mattel,* 616 F.3d at 915-916 (emphasis added).   At least the following ideas are unprotectable:

1.    fashion dolls with a bratty look or attitude;

2.    a young female fashion doll with exaggerated proportions;

3.    dolls sporting trendy clothing;

4.    exaggerated features, including an oversized or larger head and feet;

5.    larger eyes, thick lips, high cheekbones, slim arms, long legs, and slim torsos;

6.    lips that curve;

7.    the look of a girl who is wearing heavy makeup;

8.    oversized almond-shaped eyes;

9.    angular eyebrows;

10.   the dolls' resemblance to humans;

11.   the presence of hair, head, two eyes and other human features;

12.   human clothes, shoes and accessories;

13.   features necessary to depict a certain age, race, or ethnicity;

14.   "urban" or "rural" appearance;

15.   standard features relative to others (like a thin body or small waist);

16.   postures and poses that mimic the human form or are standard for the effective display of fashionable clothing;

17.   elements necessary to make a fashion doll capable of mass production on an efficient economic scale;

18.   elements necessary to satisfy the basic intended play pattern of a fashion doll, *i.e.*, taking off and putting on clothes and accessories;

19.   standard cosmetics techniques and placement, *i.e.*, blush on cheeks or eyeshadow on eyes.

*Mattel,* 616 F.3d at 915; Dkt. No. 9600 at 14-17, 28-29 n.9; *Feist Publ'ns, Inc. v. Rural Telephone Co.*, 499 U.S. 340, 349-50 (1991); *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 136 (2d Cir. 2004); *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 900-01 (9th Cir. 1987); *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442-43 (9th Cir. 1994); *Data East USA, Inc.*, 862 F.2d at 209; *Satava* at 323 F.3d at 807; *Cavalier v. Random House*, 297 F.3d 815, 824 (9th Cir. 2002); *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 207-08 (9th Cir. 1989); *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 740-42 (9th Cir. 1971); *Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983 (9th Cir. 2009); *Pivot Point Int'l, Inc. v. Charlene Prods., Inc.*, 372 F.3d 913, 922 (7th Cir. 2004).

Once all of these unprotectable elements are removed from consideration, the remaining expression is not substantially similar.  Indeed, the drawings and the first generation dolls express different people.  3/24/11 (Vol. 1) Tr. 62:14-17 (Vilppu Testimony).  MGA's execution in creating the first generation dolls was significantly different from what Bryant drew.  *Id.* at 62:21-24.

<u>Yasmin:</u>  The protectable elements of the first generation Yasmin doll (TX 17561) and the drawings of Lupe (TX 302-6, which is the same as TX 1-6, and TX 302-7, which is the same as TX 1-7) are not substantially similar.  As compared with TX 302-6, the hair is a different color and a different style.  The eyebrows and eyelids are different shapes—they are more natural and less exaggerated on the doll.  The drawing does not indicate any more than the tip of a nose, while the doll has a nose.  The lips are different, with a much larger upper lip on the drawing like a handlebar moustache.  The coloration of the face and makeup is different.  The fashions are different, with the doll intended to depict a "soft, romantic character," quite the opposite of the drawing.  1/26/11 (Vol. 1) Tr. 87:15-19 (Garcia Testimony).  All these elements make the drawing appear to depict an older

1   individual with harsher features than the doll, which is younger, sweeter and cuter

2   in comparison.  3/24/11 (Vol. 1) Tr. 58:19-60:1 (Vilppu Testimony); 1/26/11 (Vol.

3   1) Tr. 85:15-92:17 (Garcia Testimony).

4         Cloe:  The protectable elements of the first generation Cloe doll (TX 12286)

5   and the drawings of Zoe (TX 302-3, which is the same as TX 1-3, and TX 302-5,

6   which is the same as TX 1-5) are not substantially similar.  Again, the drawing and

7   doll appear to depict different people.  With respect to the hair, the drawing has

8   bangs while the doll does not, and the doll has a headband and longer hair.  The

9   drawing has rounder eyes with smaller pupils than the doll.  The drawing depicts

10  more make-up on the eyes and cheeks than the doll.  The nose is smaller and the

11  lips more oversized in the drawing than the doll.  In general, the doll is more natural

12  looking.   With respect to the fashions, the drawing has a long-sleeved purplish T-

13  shirt, while the doll has a sleeveless blue shirt with studs and "angel."  The drawing

14  has a knee-length purplish skirt, while doll has fringed, sparkle denim jeans

15  with a blue belt.  3/24/11 (Vol. 1) Tr. 57:15-58:18 (Vilppu Testimony); 1/26/11

16  (Vol. 1) Tr. 97:1-102:16 (Garcia Testimony).

17        Jade:  The protectable elements of the first generation Jade doll (TX 17551)

18  and the drawing of Jade (TX 302-11, which is the same as TX 1-11) are not

19  substantially similar.   The drawing eyes are very narrow and beady

20  (overexpressed), while the doll's eyes are not nearly so extreme.  Again, the

21  drawing does not have a substantial nose, and its lips are much larger. The drawing

22  has a red shirt, while the doll has a pink T-shirt with a long-sleeved polka dot

23  extension underneath.  The drawing has a skirt with retrographic printing, while the

24  doll has olive green long pants.  3/24/11 (Vol. 1) Tr. 55:20-57:14 (Vilppu

25  Testimony);1/26/11 (Vol. 1) Tr. 92:23-96:25 (Garcia Testimony).  Mr. Vilppu

26  commented that when dealing with the human anatomy, subtle differences convey a

27  different impression, and if he were doing of Jade the drawing and came up with

28

1   Jade the doll "I wouldn't get paid."  3/24/11 (Vol. 1) Tr. 57:6-14 (Vilppu

2   Testimony).

3       <u>Sasha:</u>  The protectable elements of the first generation Sasha doll (TX

4   17558) and the drawing of Hallidae (TX 302-8, which is the same as TX 1-8) are

5   not substantially similar.  The drawing showed hair in braids, while the doll has

6   long loose hair.  The pupils are much larger on the doll, while the drawing depicts a

7   low-cast eye.  The doll has feathery, prettier eyelashes, while the doll appears to

8   have more of a cat-eye.  Again, the drawing has a very small nose.  And as with the

9   other Bratz drawings, the drawing depicts an upper lip that resembles a handlebar

10  mustache with a square-ish bottom lip.  The coloration of the faces and makeup also

11  differ.  The bottom line is that the drawing and the doll look like different people.

12  3/24/11 (Vol. 1) Tr. 53:5-55:19 (Vilppu Testimony); 1/26/11 (Vol. 1) Tr. 103:10-

13  109:22 (Garcia Testimony).

14      In addition, all of the elements of fashion that could be protectable in the

15  drawing, were not original; they were part of a "moXie girl" ad in the August 1998

16  issue of Seventeen Magazine, including the hat, the striped shirt sleeves under a

17  vest, and a denim skirt with distinctive side pockets.  TX 17246-272 (girl in upper

18  right of ad).  The girl in the ad also has dark hair and large lips.  *Id.*

19      <u>Formal Funk Dana</u>: Comparing the drawing (TX 3-4, which is the same as

20  TX 5-84) to the doll (TX 17529) shows a lack of similarity of protectable elements.

21  The hair color and style are different.  The doll has stars painted in the pupil of her

22  eye.  As with the other drawings, this drawing lacks a significant nose and has a

23  prominent upper lip.  The drawing has a white top and a pink skirt with white trim,

24  while the doll has a champagne-colored top and skirt with glitter.  The purse in the

25  drawing appears to be structured like molded plastic, while the purse of the doll is a

26  pink satin fabric bag.  The doll has gloves, while the drawing does not.  The

27  drawing has a white wrap, while the doll has a rose pink colored wrap.  The

28  drawing has a large bouquet of long stemmed roses, while the doll has only a small

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1  corsage tied to her wrist.  The drawing has thick-soled shoes with high heels, while

2  the doll has blue shoes with a thin sole and no high heels.  1/26/11 (Vol. 1) Tr.

3  111:9-117:4 (Garcia Testimony).

4      When the protectable expression is compared, the first generation dolls and

5  Formal Funk Dana cannot be found to infringe any drawings of Carter Bryant.

6      For these reasons, the Court should grant MGA's motion for judgment as a

7  matter of law on Mattel's copyright claims with respect to the drawings.

8      **C.  No Reasonable Jury Could Conclude That Mattel's Copyright
       Claim Survives The Statute of Limitation.**

9

10      **1.  The Injury Rule Applies And Bars Mattel's Copyright
        Infringement Claim.**

11      The Copyright Act statute of limitations requires that civil infringement

12  actions be "commenced within three years after the claim accrued."  17 U.S.C. §

13  507(b).  Two approaches have developed as to when a claim "accrues":  (1) the

14  injury or infringement rule, under which a copyright infringement claim accrues

15  when the infringement occurs, regardless of the plaintiff's knowledge; and (2) the

16  discovery rule, which delays accrual until the plaintiff knows or should have known

17  of the infringement.

18      The Supreme Court has not resolved explicitly the accrual question as it

19  relates to the Copyright Act, but it has given clear indications of what it will do,

20  namely apply the injury/infringement rule.  In 2001, in *TRW, Inc. v. Andrews*, 534

21  U.S. 19 (2001), the Supreme Court rejected the previously recognized "general

22  rule" that accrual of a federal claim is governed by the discovery rule unless the

23  statute in question explicitly provides otherwise.  In *TRW*, the Supreme Court

24  reversed the Ninth Circuit's decision to apply the discovery rule to the Fair Credit

25  Reporting Act.  Noting that lower federal courts had applied the discovery accrual

26  rule when the statute at issue was silent, the Supreme Court clarified that it had

27  never adopted that position "as its own," and stated that "beyond doubt, we have

28  never endorsed the Ninth Circuit's view that Congress can convey its refusal to

adopt a discovery rule only by explicit command, rather than by implication from the structure or text of the particular statute." *Id.* at 27-28.  Instead, the Court pointed out, while the discovery rule might apply in certain extreme situations "where the cry for [such a] rule is loudest," such as fraud, latent disease or medical malpractice, those discrete exceptions do "not establish a general presumption applicable across all contexts." *Id.* at 27.  The Court examined Congress's intent with respect to the Fair Credit Reporting Act and held that the discovery rule did not apply. *Id.* at 28-33.

The Ninth Circuit, in deciding *Polar Bear Prods. Inc. v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004), failed to consider *TRW* and "concluded that § 507(b) permits damages occurring outside of the three-year window, so long as the copyright owner did not discover—and reasonably could not have discovered—the infringement before the commencement of the three-year limitation period." *Id.* at 706.  As the leading copyright treatise lamented, the Ninth Circuit did not discuss, or even mention, *TRW* in reaching its holding. *See* 3 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 12.05[B][2][a] at 12-150.5 (rev. ed. 2010) ("Nonetheless, *Polar Bear v. Timex* took no note of that shift in the law.").

After *TRW*, other courts to consider the implications of *TRW* on the application of the copyright statute of limitations have concluded that *TRW* mandates the application of the injury rule. *Auscape Int'l v. Nat'l Geographic Soc'y*, 409 F. Supp. 2d 235, 241 (S.D.N.Y. 2004), is the leading case on this issue. In *Auscape*, the court determined that "*TRW* requires examination of the statutory structure and legislative history in determining whether a discovery or injury rule should apply" in the copyright infringement context. *Id.* at 244; *see also Vasquez v. Torres-Negron*, 2007 WL 2244784, at *9 (S.D.N.Y. July 11, 2007) (agreeing "that *TRW* announces a rule of general applicability" and endorsing *Auscape*'s application of *TRW*).  After a thorough analysis of the legislative history of the

1  Copyright Act, the *Auscape* court concluded that the infringement/injury rule

2  should apply.  *See* 409 F. Supp. 2d at 244-47.

3       Specifically, the court concluded that "Congress, as well as participants in

4  the hearings, intended the three-year period to begin at the date of infringement."

5  *Id.* at 245.  Congress favored a limitations period accruing at the time of

6  infringement because "'copyright infringement by its very nature is not a secretive

7  matter.'  To the contrary, it is 'an act which normally involves the general

8  publication of the work or its public performance.'"  *Id.* (citing Congressional

9  hearing testimony).  In tying the statute of limitations to a "not [so] secretive

10  matter," Congress chose a framework premised on certainty and uniformity (*i.e.*,

11  ascertaining the date of infringement) rather than a system based on speculation

12  (*i.e.*, determining when a plaintiff knew or should have known about the

13  infringement).  *See id.* (noting "[t]he Senate Report makes clear that the relevant

14  Senate committee regarded a three-year period as sufficient to provide an 'adequate

15  opportunity' for the owner to commence his case precisely because copyright

16  owners generally receive 'reasonably prompt notice' of infringement.").

17       The *Auscape* court found further evidence that Congress intended claims to

18  accrue upon infringement in the fact that drafts of the Copyright Act included

19  tolling provisions for fraudulent concealment and other equitable doctrines such as

20  legal disability and absence from the United States.  *Id.* at 246.  "Had those

21  involved in the hearings thought that a discovery rule would govern accrual of an

22  infringement claim . . . a statutory exception for fraudulent concealment would have

23  been entirely superfluous."  *Id.* at 246-47; *see also TRW*, 534 U.S. at 33 ("We doubt

24  that Congress, when it [considered] a carefully worded exception to the main rule,

25  intended simultaneously to create a general discovery rule that would render that

26  exception superfluous.").  The court concluded that it was "strikingly clear that

27  Congress intended to adopt a three-year limitations period running from the date of

28

1   the infringement, as a discovery rule would have defeated its overriding goal of

2   certainty." *Auscape*, 409 F. Supp. 2d. at 247.

3        The MGA Parties respectfully submit that *Auscape* represents the analysis

4   that is most consistent with *TRW* and the Copyright Act.  *See* 3 NIMMER ON

5   COPYRIGHT § 12.05[B][2][b] at 12-150.9 ("Although only a district court opinion,

6   *Auscape* is the best articulation to date of how to compute the Copyright Act's

7   statute of limitations.  It is submitted that even courts in circuits which articulated

8   the discovery rule before the Supreme Court's decision in *TRW v. Andrews* should

9   now follow *Auscape*'s construction of that authority to adopt the injury rule.").

10  Consequently, this Court should adopt the *Auscape* analysis and apply the injury

11  rule for accrual of the statute of limitations on Mattel's copyright infringement

12  claims.

13       When the injury rule is applied here, Mattel's copyright infringement claim

14  accrued immediately upon the launch of the Bratz dolls in 2001, as that is when the

15  alleged injury occurred.  The statute of limitations period therefore expired in 2004.

16  Since Mattel did not even move to amend it claims to add its copyright

17  infringement claim until October 2006, its claim is barred.[17]

18              **2.    A Reasonable Jury Must Find Mattel's Copyright Claim
                        Barred Even if the Discovery Rule Applies.**

19

20       Even if the Court declines to apply the injury rule, Mattel's copyright claims

21  are still barred as a result of application of the discovery rule.  The overwhelming

22  _____

23  [17] Mattel's copyright infringement claims cannot benefit from the doctrine of
    relation back.  A copyright claim cannot relate back unless the copyrights were

24  registered at the time of the earlier complaint.  That is not the case here.  *See
    Brewer-Giorgio v. Producers Video, Inc.*, 216 F.3d 1281, 1285 (11th Cir. 2000)

25  (plaintiff cannot amend its complaint to add copyright claims where plaintiff failed
    to register its copyrights prior to filing of the original complaint, and the statute of

26  limitation expired before the registration); *Country Road Music, Inc. v. MP3.com,
    Inc.*, 279 F. Supp. 2d 325, 332-33 (S.D.N.Y. 2003) (copyright infringement claim

27  does not relate back to original complaint where plaintiff failed to register copyright
    within the limitations period). TX 13873, 13874, 13880 (registered October 30,

28  2006).

evidence, as set forth in full in the Bratz Trade Secret section, *see* Part II, is that Mattel was more than on notice of its claims against MGA well before November 20, 2003 (three years before it filed its motion to amend its counterclaims).  Indeed, by 2002, Mattel had visited Bratz at several Toy Fairs (TX 911; 1/20/11 (Vol. 2) Tr. 101:7-10; TX 25860; 3/22/11 (Vol. 2) Tr. 13:11-14:2); Mattel had received internal reports on the Bratz dolls (TX 9502, TX 9504); Mattel personnel had aroused suspicions about Carter Bryant and MGA and the Bratz dolls' similarities to Toon Teens and Diva Starz (1/19/11 (Vol. 1) Tr. 115:13-116:2; 3/10/11 (Vol. 1) Tr. 13:2-14:10; 3/17/11 (Vol. 2) Tr. 18:14-19:13; 21:14-22:2; TX 36091-3); Mattel had opened an investigation into Larian and MGA (TX 1195RS); Mattel's outside counsel was monitoring the web where Carter Bryant was expressly named as the creator of Bratz (TX 17252); Mattel's CEO Bob Eckert had received an anonymous letter which stated that Carter Bryant created Bratz while working at Mattel (TX 1193) and in July 2003, a *Wall Street Journal* article appeared about Bratz, identifying Mr. Larian as the President of MGA and Bryant as the creator of Bratz and received (TX 1C).

Clearly, even with an application of the discovery rule, it is clear that Mattel "discovered" it claim against MGA long before it decided to sue.  As a result of its delay, its claim is now barred.[18]

---

[18] This result applies to Mattel's claim for a declaration of ownership of the copyrights in Carter Bryant's Bratz works as well.  In the event that the Court finds that the injury rule applies to Mattel's infringement claim, it should also apply to Mattel's ownership claim, as it was at the time of launch that Mattel's purported "ownership" was first repudiated.  Similarly, if the discovery rule is held to apply, Mattel was on notice of its claim as early as 2001 or 2002—well before November 20, 2003.  As such, Mattel's ownership claim should be denied as a matter of law as well.

## X. MATTEL'S FAILURE TO PRESENT SUFFICIENT EVIDENCE OF DAMAGES MANDATES JUDGMENT AS A MATTER OF LAW ON MATTEL'S DAMAGES CLAIMS.

### A. Mattel Did Not Present Evidence That Would Allow A Reasonable Jury To Award MGA's Profits On Bratz To Mattel.

There is no evidence that allows a reasonable jury to award Mattel a disgorgement of MGA's profits on Bratz.  Mattel presented to evidence to establish that the entirety of the profits from Bratz are attributable to the Bratz trade secrets or copyrights.  Damages are recoverable to the extent they are reasonably certain, but they still must be proved.  *Davis v. Yageo Corp.*, 481 F.3d 661, 684 (9th Cir. 2007), citing *Toscano v. Greene Music*, 124 Cal. App. 4th 685, 695 (2004)); *Mendoyoma Inc. v. County of Mendocino*, 8 Cal. App. 3d 873, 880-81 (1970).  As such, allowing Mattel to present its unjust enrichment calculations to the jury is highly speculative and lacks foundation.

### B. Wagner's Attempts To Apportion MGA's Profits For Bratz Are Speculative And Is Too Unreliable For A Jury.

Wagner presents a fatally flawed and speculative apportionment theory of MGA's profits in a misguided attempt to offer some means of calculating damages to the jury.  Wagner's apportionment calculation does not allow a jury to determine a damages number without engaging in speculation.  As a result, Mattel is left without any admissible, non-speculative evidence supporting the recovery of unjust enrichment from MGA's profits on Bratz.

By comparing MGA's *incremental profits* with other companies' EBITs, Wagner is really comparing apples to oranges.  3/8/11 (Vol. 2) Tr. 62:13-63:22. This approach inflates MGA's profitability and also skews Bratz profit appearance through improper allocations of costs, making Bratz appear more profitable than it was and non-Bratz less profitable than it was.  It is this inflated number that Wagner then proceeds to use for his "benchmark" analysis, and it is this inflated

1   number that continues to artificially increase damages in a way that is purely

2   speculative and unreliable as a result.

3          Indeed, Wagner recognizes that he *could have* avoided this apples-to-oranges

4   comparison as he had the capability to measure Barbie incremental profit to Bratz

5   incremental profit, or total MGA EBIT to total "pure toy companies" EBIT.  3/8/11

6   (Vol. 2) Tr. 64:8-16.  However, he did not take that extra step, likely because doing

7   so would result in an award of no damages to Mattel.  3/8/11 (Vol. 2) Tr. 68:3-14.

8   In this quest for the largest number to put up for Mattel's damages claims, Wagner

9   made his method of apportionment unreliable, both by unfairly excluding fixed

10  expenses associated with Bratz while including such expenses for the "pure"

11  companies.  It also ignores numerous significant economic events in those

12  companies which skew their purportedly "pure" rate of return.  Wagner also ignores

13  any explanation which may discredit his benchmark analysis.  For example, he

14  admits that he did not give MGA any benefit for possibly being more efficient on a

15  single line basis with respect to Bratz, when comparing the total expenses for the

16  comparative expenses companies to the Bratz product line expenses. 3/8/11 (Vol. 2)

17  Tr. 64:22-65:7.

18         As shown, Wagner's apples-to-oranges comparison is not helpful to the jury

19  and is not tied to the evidence.  Wagner's calculations that would allow the jury to

20  award more than MGA's total EBIT to Mattel based on this apportionment theory

21  are fatally flawed as a result.  3/8/11 (Vol. 2) 61:21-25.  In similar lost profits cases,

22  courts require that the damages expert compare comparable companies and take

23  into account other factors that may affect the profitability of the companies.  Where

24  the damages expert fails to do this, courts uniformly reject the analysis.  As one

25  court reasoned, "To apply those arenas' average 'rates of return' indiscriminately to

26  [PBSC] is like arguing that because McDonald's franchises earn a certain average

27  rate of return, a particular franchise will perform to the average."  *Eleven Line, Inc.*

28  *v. North Texas State Soccer Assoc., Inc.*, 213 F.3d 198, 208-09 (5th Cir. 2000); *see*

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1  *also The Flintkote Co. v. Lysfjord*, 246 F.2d 368, 392-93 (9th Cir. 1957).  By not

2  taking into account other facts that may affect the profitability of MGA relative to

3  the other toy companies, Wagner improperly measured Bratz against a rate of return

4  that may or may not have been "normal."

**C.  <u>Wagner Fails To Apportion Damages Between Mattel's</u>**
   **<u>Purported Trade Secrets.</u>**

7  Wagner further fails to allocate any specific damages to Mattel's purported

8  trade secrets, thereby rendering his opinion regarding any trade secret damages

9  completely speculative.  Experts are required to disaggregate damages where

10  multiple acts of trade secret misappropriation are alleged.  Other courts have

11  affirmed rulings that an expert's damages testimony was "speculative and based

12  solely on conjecture" where the expert claimed that "any misappropriation of any

13  trade secret caused the exact same amount of damage" to the plaintiff.  *Children's*

14  *Broad. Corp. v. Walt Disney Co.,* 245 F.3d 1008, 1018 (8th Cir. 2001).  The

15  plaintiff in that case had alleged that the defendant misappropriated seven different

16  trade secrets; the jury found that only two of these were in fact trade secrets.  *Id.* at

17  1014.  The court reasoned that "[t]he assertion that any or all of the alleged

18  wrongful acts would have caused the same outcome is dubious" and observed that

19  such expert opinion is properly excluded because there is "simply too great an

20  analytical gap between the data and the opinion proffered." *Id.* at 1018 (quoting

21  *Gen'l Elec. Co. v. Joiner,* 522 U.S. 522, 146 (1997)).

22  In spite of clear case law to the contrary, Wagner admits that he has lumped

23  all of Mattel's purported trade secrets into one single calculation, and has not

24  provided numbers for damages related to a specific trade secret.  3/8/11 (Vol. 2) Tr.

25  30:25-31:6; 42:12-21.  In addition, Wagner also admitted that, included in that one

26  lump sum figure was *every* product with a Bratz name on it, not just those that

27  directly relate to what was in Bryant's pitchbook or one of the two sculpts at issue.

28  3/8/11 (Vol. 2) Tr. 47:22-49:17.  As a result, the jury would have to engage in

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1    speculation as to the corresponding damages associated with each of those trade

2    secrets.

3         Not only is Wagner not apportioning damages by each individual trade

4    secret, thereby allowing the jury to calculate damages for a single or several

5    combinations of trade secrets if only some are found to have been misappropriated,

6    but he is also further confusing the issue by being hugely overinclusive in his

7    damages number for trade secrets.  This type of speculative damages calculations,

8    based on a single lump sum regardless of what liability the jury finds, does not

9    provide any reasonable basis for a jury to award individual damages for each of the

10   trade secrets purportedly misappropriated.

11        **D.    Wagner's Unreliable Assumption That Intellectual Property
              Explains The Entirety Of The Bratz "Excess Profitability" Is**

12        **Inherently Speculative.**

13        The fundamental underpinning to Wagner's methodology is the unsupported

14   assumption that the entire "excess" of MGA's profits above "normal" industry

15   average is attributed to the intellectual property at issue.

16        Q:    Now, your benchmark methodology **assumes** there is some condition

17              causing Bratz to be excessively profitab[le], right?

18        A:    Correct.

19        Q:    Basically you **assumed** that it was the intellectual property in this case.

20        A:    **That's my assumption**.

21   3/8/11 (Vol. 2) Tr. 68:15-21 (emphasis added).  Mattel did not prove this

22   assumption to be reliable.  Indeed, Wagner's assumption is contrary to the trial

23   evidence, including his own testimony.

24        Q:    Now, you do agree that MGA was able to accomplish a lot without

25              Carter Bryant, right?

26        A:    Do you mean in connection with Bratz or their other product lines?

27        Q:    In connection with Bratz?

28        A:    I think they did add some value to Bratz, yes.

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

| | | |
|---|---|---|
| 1 | Q: | MGA developed different themes for Bratz dolls, right? |
| 2 | A: | They did. |
| 3 | Q: | MGA developed new characters for Bratz dolls? |
| 4 | A: | That's true as well. |
| 5 | Q: | New fashions? |
| 6 | A: | Yes. |
| 7 | Q: | Hair styles? |
| 8 | A: | They did. |
| 9 | Q: | In fact, many of the Bratz branded products that you have included in |
| 10 | | your trade secret unjust enrichment analysis were developed without |
| 11 | | any input from Carter Bryant whatsoever? |
| 12 | A: | I agree with that statement. |

3/8/11 (Vol. 2) Tr. 49:24-50:20.  Wagner's own statements above indicate that MGA added value to the Bratz brand.  Conversely, it simply isn't true that all of MGA's profitability is attributed to the intellectual property in issue, or that all of the claimed excess profitability, however it might be determined or imagined, can be attributed by assumption to the intellectual property.

In fact, the law of the case is to the contrary to Wagner's assumption.  MGA not only "added value," as Wagner admitted, MGA's success was "overwhelmingly the result of MGA's legitimate efforts."  *Mattel*, 616 F.3d at 911.

> Even assuming that MGA took some ideas wrongfully, it added tremendous value by turning the ideas into products and, eventually, a popular and highly profitable brand.  The value added by MGA's hard work and creativity dwarfs the value of the original ideas Bryant brought with him, even recognizing the significance of those ideas.

*Mattel*, 616 F.3d at 911.  In the assessment of the cause of any "excess," the "overwhelming" contribution of MGA's "legitimate efforts" must be credited.  Wagner's disregard of the law of the case renders his opinion not only unreliable, but also completely speculative in nature.

1    This failure to separate lawful from allegedly unlawful conduct has been

2    roundly rejected.  *See MicroStrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344,

3    1353-56 (Fed. Cir. 2006) (expert failed to consider significant factors that might

4    have contributed to the losses); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969

5    F.2d 410, 415-16 (7th Cir. 1992) ("The expert should have tried to separate the

6    damages that resulted from the lawful entry of a powerful competitor [the

7    defendant] from the damages that resulted from particular forms of misconduct

8    allegedly committed by that competitor, of which the theft of the mailing list,

9    however morally reprehensible, was the slightest."); *Hilderman v. Enea Teksci,*

10   *Inc.*, 2010 WL 546140, at *2 (S.D. Cal. Feb. 10, 2010) (no basis for concluding that

11   the entirety of defendant's profits is attributable to the value of the misappropriated

12   trade secrets); *KW Plastics v. United States Can Co.*, 131 F. Supp. 2d 1289, 1294-

13   95 (M.D. Ala. 2001) (unjust enrichment in trade secrets case excluded where expert

14   assumed that "each and every penny that KW gained constitutes unjust

15   enrichment.").

16   **E.    Mattel's Unjust Enrichment Theory Requires Speculative Leaps Of Faith That Find No Support In The Evidence Or The Law Of**
17   **The Case.**

18   As the Court explained in its March 4, 2011 order addressing Wagner's

19   opinions:

20   Even if the Bratz concept, sketches, and sculpt were trade
     secrets that MGA misappropriated, the unjust enrichment from
21   the use of the trade secret does not include the profits generated
     by MGA's "hard work," "creativity," and "legitimate efforts."
22   This is because not all enrichment is unjust: "A person is
     enriched if he has received a benefit.  A person is unjustly
23   enriched if the retention of the benefit would be unjust."
     Restatement of Restitution, section 1, comment a.  It is not
24   unjust for a defendant like MGA to retain the "fruits of [its]
     own labors or legitimate efforts."  To the contrary, "it is not
25   equitable [to] forc[e] MGA to hand over its sweat equity."

26   Dkt. No. 10130 (March 4, 2011 Order) at 2-3 (citations omitted).  As discussed,

27   MGA's added value dwarfs any value that was conceivably delivered by the

28   intellectual property in issue, but Mattel's unjust enrichment contention, based on.

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1    Wagner's assumption, is that all of the excess Bratz profits are based on the

2    intellectual property in issue.  Wagner's assumption is not supported by the

3    evidence, and it cannot provide a basis for an award of unjust enrichment to Mattel.

4            For various reasons, the intellectual property in issue could not have

5    delivered the lion's share of MGA's Bratz profits, or all of any "excess" profits that

6    might have been earned, even putting aside the Ninth Circuit's determination that it

7    did not.  The Jade name, which was included in Mattel's case when Wagner

8    testified, pertains to a subset of the revenue and profit in issue.  3/8/11 (Vol. 2) Tr.

9    30:12-14.  The drawings are, as a matter of law, not infringed by most of the Bratz

10   dolls.  The Bratz name and concept fall within the class of trade secrets that must be

11   disclosed to be exploited, and as a result can support no more than "head start" or

12   "first to market" value.  3/8/11 (Vol. 2) Tr. 43:10-44:4.  Moreover, the Bratz name

13   as relevant to Mattel's claim is not the powerful brand identity MGA built.  And the

14   sculpt, the protectable features of which would not be perceived by many buyers,

15   was never sold separately.  3/8/11 (Vol. 2) Tr. 53:11-54:24.  Additionally, as

16   admitted by Wagner, there was large variability in the performance of Bratz

17   products, even though they all had arguably the same intellectual property

18   components:

19       Q:    Now, there were thousands of different products that

20             were sold under the Bratz brand, true?

21       A:    That's true.

22       Q:    And the performance of those different products varied,

23             true?

24       A:    They did.

25       Q:    In particular, there were many female fashion dolls, correct?

26       A:    There were.

27       Q:    And many of them even used that original sculpt that you included in

28             your calculation, true?

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

| | | |
|---|---|---|
| 1 | A: | I think there were about 2,427 SKU's that did. |
| 2 | Q: | All right.  And of those 2,427 SKU's using the female sculpt, there |
| 3 | | was quite a range of performance, true? |
| 4 | A: | I agree with that. |
| 5 | Q: | And you did not study the variability of performance of those products |
| 6 | | as part of your analysis, did you? |
| 7 | A: | I did not. |
| 8 | Q: | So even though they used the same sculpt, some of those products sold |
| 9 | | well and some of them sold poorly, true? |
| 10 | A: | I agree with that. |
| 11 | Q: | Even though they had the same IP, some of them sold well and some |
| 12 | | of them sold poorly, true? |
| 13 | A: | That is true. |
| 14 | Q: | Which means there was something else in the equation, right? |
| 15 | A: | I agree with that. |

16   3/9/11 (Vol. 1) Tr. 78:15-79:16.

17        Although Wagner agrees that there is more to the equation, Mattel's damage

18   case does not account for the rest of the equation.  Instead, it substitutes assumption

19   for evidence, and, despite the Ninth Circuit opinion, stubbornly clings to the idea

20   that MGA's success was "overwhelmingly" the product of something other than

21   MGA's legitimate efforts.  This is a purely self-serving assumption, and as such,

22   district courts have determined that this type of testimony is speculative and

23   inadmissible.  *Cartel Asset Management v. Owen Financial Corp.*, 249 Fed. Appx.

24   63, 80 (10th Cir. 2007) (citing *Champagne Metals v. Ken-Mac, Inc.*, 458 F.3d 1073,

25   1080 n. 4 (10th Cir. 2006) ("[I]t [is] not 'manifestly unreasonable' for the district

26   court to conclude that [the expert's] opinions lacked foundation because they were

27   based on 'the self-serving statements of an interested party.'").

28

### F.   Mattel's Lost Profits Claim Is Speculative And Lacks Foundation.

#### 1.   Mr. Wagner Has No Foundation for His Lost Profits Analysis as Mattel Failed To Introduce Any Financial Documents Into Evidence.

Putting aside methodology issues, Mattel has an even larger problem when considering the speculative nature of Wagner's damages.  Namely, Mattel has completely failed to introduce *any* financial document that reflects Mattel's lost profits, thereby leaving Wagner without any foundation to prove an award of damages based on lost profits.  All of Wagner's many iterations of his schedules related to lost profits rely on Mattel's financial data.  Failure to introduce financial records into evidence means that none of Wagner's testimony with regard to those schedules can be considered by the jury as it would be purely speculative in nature.  Therefore, Wagner cannot properly present any calculations related to damages for Mattel's lost profits as *none* of the information upon which he relies has been entered into evidence.

In addition to Mattel's financials, Wagner's regression analysis, a large component of his lost profits calculations, is based on NPD data.  3/8/11 (Vol. 1) Tr. 102:21-103:2.  No Mattel witness had introduced any NPD data into evidence.  Therefore, Wagner cannot properly present his regression analysis related to lost profits as none of the underlying data upon which he relies has been entered into evidence.  His damages cannot be proved as a result, and the Ninth Circuit has held that damages that cannot be proved cannot be recovered.  *Davis,* 481 F.3d at 684 (internal citations omitted).  Thus, Wagner, left without Mattel's own financial and NPD data upon which his reports and multiple schedules rely, cannot properly submit any of his calculations related to lost profits to the jury as a result.

1

2

**2.** <u>**Wagner's Testimony Does Not Provide A Reasonable Basis**</u>
<u>**For An Award Of Lost Profits Damages.**</u>

3      Notwithstanding the prior section, even if found to be admissible, Wagner's

4  testimony cannot provide a basis for an award of damages unless it is (a) reasonably

5  tied to the liability case made by Mattel and (b) provides a reasonable basis on

6  which the jury could determine the extent to which, if at all, any wrongful acts

7  proved by Mattel resulted in harm to Mattel or unjust enrichment of MGA.  There

8  are two specific failings in this regard in Mattel's lost profits case.

9      First, Wagner's testimony is not sufficient to provide a basis for a finding of

10 a causal relationship between MGA's Bratz sales and Mattel's alleged lost Barbie

11 sales.   At most, Wagner claims a relationship between the two, but that is not

12 sufficient to demonstrate the "but for" cause and effect relationship necessary to

13 support an award of damages.  3/8/11 (Vol. 1) Tr. 109:5-23.  Indeed, Wagner's

14 regression analysis ignores factors known to exist in the market which he admits

15 could have also caused a decline in Barbie sales during the time period covered by

16 his analysis, including, among other factors, the fact that Barbie was already

17 declining in sales prior to Bratz entering the market.  This is a classic example of an

18 expert opinion "which is connected to existing data only by the *ipse dixit* of the

19 expert."  *Joiner*, 522 U.S. at 146.  In short, "there is simply too great an analytical

20 gap between the data and the opinion proffered" and the opinion must be excluded.

21 *Id.*

22      Wagner's attempts to solely attribute Barbie's lost profits to Bratz sales

23 through his regression analysis is speculative at best, and provides no proof of any

24 causal relationship.  Regression analysis establishes at most a correlation, which is

25 not the equivalent of a causal relationship.  *Norfolk & Western Ry. Co. v. Ayres*,

26 538 U.S. 135, 173 (2003) ("Correlation is not causation."); *United States v.*

27 *Valencia*, 600 F.3d 389, 425 (5th Cir. 2010) ("Evidence of mere correlation, even a

28

MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT
CV-04-9049 DOC (RNBx)

1   strong correlation, is often spurious and misleading when masqueraded as causal

2   evidence, because it does not adequately account for other contributory variables.").

3       Wagner's analysis is also insufficient to provide a basis on which the volume

4   of lost sales could be computed, if it is assumed that liability exists.  Wagner

5   presents non-Bratz market share figures for Barbie and competitive products, and

6   assumes that the share of Bratz sales claimed by Barbie and the other products

7   would equal the shares they achieved when competing only against each other.

8   This is a matter of proof, not assumption, but Mattel did not present any evidence

9   that would allow a rational determination by the jury that it is so.

10      Wagner's assumption must be based on the proposition that the demand for

11  Bratz as compared to Barbie and the other non-Bratz products is interchangeable

12  with the demand for Barbie as compared to the other non-Barbie products.  *Cf. BIC*

13  *Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993).

14  However, it is irrational to assume that buyers of Bratz, the "anti-Barbie," would

15  respond to Barbie in the same proportion that non-Bratz buyers respond to Barbie

16  and other products.  The but for market assumed by Wagner is not similar to a

17  simple two-competitor market in which both practice a patented invention and

18  demand is driven by the invention.  *See Utah Med. Prod., Inc. v. Graphic Controls*

19  *Corp.*, 350 F.3d 1376, 1385 (Fed. Cir. 2003) (lost profits calculation in patent cases

20  is more accurate in a two-supplier market).

21      Whatever the precise dimensions of the demand variables may be, it was

22  incumbent on Mattel to present evidence that would allow a non-speculative

23  determination by the jury.  Instead, Mattel offered only Wagner's assumption that

24  demand is identical.  This is the type of speculation and supposition that is not

25  sufficient to support an award of damages.  *See Sanchez-Corea v. Bank of Am.*, 38

26  Cal. 3d 892, 907 (1985) ("Evidence of lost profits must be unspeculative and in

27  order to support a lost profits award the evidence must show with reasonable

28

1   certainty both their occurrence and the extent thereof.") (citation omitted); *Resort*

2   *Video, Ltd. v. Laser Video, Inc.*, 35 Cal. App. 4th 1679, 1697-98 (1995).

3       **G.  The Trial Evidence Requires A Reduction Of Any Damages**
        **Otherwise Due Mattel Based On Mattel's My Scene Mitigation**
4       **Efforts.**

5       "A plaintiff who suffers damage as a result of either a breach of contract or a

6   tort has a duty to take reasonable steps to mitigate those damages and will not be

7   able to recover for any losses which could have been thus avoided."  *Shaffer v.*

8   *Debbas*, 17 Cal. App. 4th 33, 41 (1993); *see, also Geddes & Smith, Inc. v. St. Paul*

9   *Mercury Indem. Co.*, 63 Cal. 2d 602, 605 (1965); *Guerrieri v. Severini*, 51 Cal. 2d

10  12, 23 (1958);  *W W Leasing Unlimited v. Torok Exploration, Mining & Const. Co.*,

11  575 F.2d 1259, 1261 (9th Cir. 1978) ("Settled legal principles require a wronged

12  party to mitigate damages to the degree possible."); CACI 3931.  If the plaintiff acts

13  in mitigation of its damages, the mitigation principle requires that the amount of

14  any actual earnings be deducted from the plaintiff's recovery.  *Brandon & Tibbs v.*

15  *George Kevorkian Accountancy Corp.*, 226 Cal. App. 3d 442, 467 (1990).

16      The trial evidence shows that Mattel's My Scene dolls were an effort to

17  mitigate the impact of Bratz on Mattel by targeting older girls.  Mattel CEO Robert

18  Eckert confirmed that My Scene was an attempt to compete with Bratz.  3/2/11

19  (Vol. 1) Tr. 113:14-17.  Wagner also acknowledged that My Scene was specifically

20  introduced as a response to Bratz.  3/9/11 (Vol. 1) Tr. 85:16-18.  Lily Martinez,

21  who testified that she "created My Scene," understood her goal as "trying to capture

22  an older girl" on a "very expedited, very aggressive schedule," because "Bratz was

23  doing really well, and we didn't have anything that really captured the older girl."

24  1/19/11 (Vol. 2) Tr.  47:21, 133:22-134:9, 135:24-136:10; TX 34639.

25      Mattel achieved substantial revenue and profit it would not have had if not

26  for MGA's introduction of Bratz and Mattel's response.  But for Bratz, Mattel

27  would not have created My Scene and would not have earned the profits that My

28  Scene created.  Therefore, any damages due Mattel for Bratz-related conduct must

be reduced by the profit earned by My Scene.  Mattel's My Scene sales were approximately $750,000,000. 3/3/11 (Vol. 2) Tr. 54:2555:6 (Eckert Testimony).

The MGA Parties are entitled to judgment as a matter of law that (1) Mattel mitigated its damages by marketing the My Scene dolls in response to Bratz and (2) the profits earned from My Scene must be offset against any Bratz-related damages otherwise due Mattel.

**CONCLUSION**

For the foregoing reasons, the MGA parties are entitled to Judgment As A Matter Of Law.

Dated:  April 4, 2011                    Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP


By:    _*Annette L. Hurst*_____
                    ANNETTE L. HURST
                    Attorneys for MGA Parties