UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL, INC., et al.,
                    Plaintiffs,
      vs.

                                    CV-04-9049-DOC
MGA ENTERTAINMENT, INC.,   STATUS CONFERENCE
et al.,
                    Defendants.

    --------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

Sunday, April 3, 2011

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    APPEARANCES OF COUNSEL:

2    For Plaintiff MATTEL, INC., ET AL.:

3    JOHN B. QUINN
     MICHAEL T. ZELLER
4    WILLIAM PRICE
     QUINN EMANUEL URQUHART & SULLIVAN, LLP
5    865 South Figueroa Street, 10th Floor
     Los Angeles, CA  90017
6    (213) 443-3000

7    For Defendant MGA ENTERTAINMENT, INC., ET AL.:

8    THOMAS MCCONVILLE
     ORRICK HERRINGTON & SUTCLIFFE LLP
9    4 Park Plaza, Suite 1600
     Irvine, CA  92614
10   (949) 567-6700

11   ANNETTE HURST
     ORRICK, HERRINGTON & SUTCLIFFE LLP
12   The Orrick Building
     405 Howard Street
13   San Francisco, CA  94105
     (415) 773-4585
14
     KELLER RACKAUCKAS LLP
15   JENNIFER L. KELLER
     18500 Von Karman Avenue, Suite 560
16   Irvine, CA
     (949) 476-8700
17

18

19

20

21

22

23

24

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

3

1

2                                    INDEX

3                                                               PAGE

4    STATUS CONFERENCE                                            4

5    DEFENSE
     WITNESS:             DIRECT   CROSS   REDIRECT   RECROSS
6

7    JAMES MALACKOWSKI     8(K)    12(P)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                  SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   SANTA ANA, CALIFORNIA; SUNDAY, APRIL 3, 2011; 4:30 P.M.

 2           (Jury not present.)

 3           THE COURT:  We are back on the record.  All

 4   counsel are present.  Mr. O'Brien, I will have an order for

 5   you this evening so each of you know where you stand in

 6   terms of Mr. Moore.

 7           Second, I am not going to allow Mr. Eckert's

 8   testimony to be bifurcated.  He is on the stand.  Mr. Moore

 9   has been off the stand for three days or four days.  I want

10   Mr. Larian and I want Mr. Eckert testifying in one unified

11   time, if possible.

12           Second, let me address this to Mr. Quinn and to

13   Mr. Zeller.  My specific order was that you were to print

14   out the questions concerning rebuttal witnesses.  You

15   haven't done that.  I am ready to make that phone call to

16   the attorney.  But until I see those questions, especially

17   when he is being called on redirect because of the drawings

18   that haven't been put on, I want to see what those questions

19   are.

20           You are not precluded from an affirmative defense,

21   but you have got to let me see what that is.  He is not

22   coming back because the first question counsel is going to

23   ask me is how long and when, and he's entitled to that.  And

24   he's entitled to my good faith when I am picking up the

25   phone and going that extra mile for litigants in my court to
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    have you comply with my order.
 2            So I will place it in five minutes, five hours, or
 3    tomorrow morning, but I want to see the affirmative
 4    questions you are going to ask concerning your affirmative
 5    defenses, and I want to see the questions.  Do you have
 6    them?
 7            MR. ZELLER:  We do.
 8            THE COURT:  Excellent.  That probably resolves the
 9    problem.  Let me look at them in chambers.  Did you have
10    them before?
11            MR. ZELLER:  We did.
12            THE COURT:  That would have saved a whole
13    frustration on my part.  Thank you.  All right.
14            Let me go back and look at these.  As long as I
15    can represent that he is being asked questions on the
16    drawings primarily that he testified to at the first trial,
17    that has always been and will always be my representation.
18            In fact, I can't imagine having the parties placed
19    in that position in this kind of trial on that kind of
20    issue, but the binder that was handed to me were a bunch of
21    just black-and-white duplicates, quite frankly.
22            Number two, I have always anticipated that Carter
23    Bryant would come back, quite frankly, for a brief period of
24    time.  But you have got to govern your time concerning your
25    affirmative defense with him, and I have got to get some
```

1    representation about how long he is going to be on the

2    stand, because when I pick up the phone and call counsel in

3    a few moments if he's in -- do you have his home, cell?

4              MR. ZELLER:  We do, Your Honor.

5              THE COURT:  All right.  Then give me some time to

6    look at that.

7              Number two, you have both gone back and forth

8    about what you wanted concerning your -- I will place the

9    call.  Let me look at the questions.  I think I will be

10   satisfied.  Apparently you have gone back and forth in terms

11   of the trade secrets and how they were going to be

12   delineated, so I am going to hand out a special verdict

13   form.  It's not complete.  We have been working on this most

14   of the day, as well as the Rule 50 motions concerning Mr.

15   Machado, as well as the meetings with the special master

16   concerning Mr. Moore, as well as your instructions.

17             I am really, really trying to get these

18   instructions to you as quick as possible.  I just don't know

19   if it's going to be tonight or as late as tomorrow night.

20   These are not necessarily proposed.  These are basically

21   final.  And although I haven't delineated enough lines for

22   each of the items, they are not to be changed.

23             In other words, we will go on the record and hear

24   your complaints, but you have got a lot of work to do now in

25   terms of filling out your trade secret misappropriations, et

1   cetera.  I was going to attach appendices as was requested

2   by Mr. Quinn with a yes or no, so I have basically gone down

3   each and every item, and you'll fill them in.

4           So I'll see you in just a moment.  I want to

5   review these questions.

6           MS. HURST:  Can I have that page back that we gave

7   you with the ones that were not in evidence, because I

8   didn't keep a copy of that?

9           THE COURT:  Yes, you can.  Now, remember.  If you

10  ever reach a stipulation, an agreement between you, I'm

11  listening.

12          MS. HURST:  I think we have agreed those were not

13  in evidence.

14          THE COURT:  No.  No.  Concerning the special

15  verdict forms.  And eventually when I get the jury

16  instructions to you, if the sides basically stipulate, I am

17  willing to listen to your thoughts.

18          I'll be back in a few moments.

19          *(Recess taken)*

20          THE COURT:  We are back on the record.  Mr.

21  Malackowski is present.  Mr. Malackowski was previously

22  sworn.  Counsel, your questions.

23          MS. HURST:  Your Honor, we don't have this in our

24  system to project it, but we do have copies for counsel and

25  the Court.

| | |
|---|---|
| 1 | THE COURT:  That's fine.  I have been through most |
| 2 | of these before, so it's not going to be too difficult to |
| 3 | follow. |
| 4 | JAMES MALACKOWSKI, DEFENSE WITNESS, PREVIOUSLY SWORN |
| 5 | DIRECT EXAMINATION |
| 6 | BY MS. KELLER: |
| 7 | Q   Mr. Malackowski, would you tell us how the new |
| 8 | information that you gained has affected your opinion in |
| 9 | this case and explain to the Court any changes to the charts |
| 10 | that you have before you. |
| 11 | THE COURT:  First of all, chart 3 has changed; |
| 12 | right? |
| 13 | THE WITNESS:  Yes, Your Honor. |
| 14 | THE COURT:  Just show me on chart 3 what's |
| 15 | changed. |
| 16 | THE WITNESS:  Specifically the bottom-up approach |
| 17 | is decreased from $133 million to $91 million. |
| 18 | THE COURT:  Just a moment.  Just a minute. |
| 19 | *(Pause in proceedings)* |
| 20 | THE COURT:  Okay.  What else?  Chart 4 has |
| 21 | changed; hasn't it? |
| 22 | THE WITNESS:  No. |
| 23 | THE COURT:  No.  Same.  Chart 5, same.  Chart 6 -- |
| 24 | I am doing that for memory.  I've got your old charts in the |
| 25 | back, and I apologize.  Chart 6, the same; isn't it? |

```
 1                THE WITNESS:  Correct.

 2                THE COURT:  Now, chart 7 has changed.  You have

 3    got 26 products.  I think you had 28 before; didn't you?

 4                THE WITNESS:  We had 18.

 5                THE COURT:  18.  My apologies.  Okay.  Explain

 6    chart 7 to me.

 7                THE WITNESS:  Your Honor, if you recall the

 8    bottom-up approach last time was built upon two data points

 9    extrapolated to the 32 products.  We received additional

10    information, so now we have information on 22 products and I

11    reduced the total bottom-up calculation from 32 to 26 in

12    total.  So I have data for 22 and I am estimating four.

13                THE COURT:  This is hilarious.  The reason I seem

14    to have such a good memory is because I just noticed they're

15    also marked in yellow concerning the new pages.

16    BY MS. KELLER:

17    Q    So in your calculations, then, Mattel actually got a

18    benefit?

19    A    Yes, ma'am.

20    Q    Okay.

21                THE COURT:  And what is it again?  Explain it to

22    me one more time.

23                THE WITNESS:  If you recall, last time, Your

24    Honor, I had data for Chilling Out and Bling Bling.  And I

25    used that data to effectively calculate bottom-up damages
```

| | |
|---|---|
| 1 | for 32 products.  I now have actual sales data for 22, and I |
| 2 | have reduced my total population from 32 down to 26. |
| 3 | THE COURT:  Okay.  Excellent.  Counsel, why don't |
| 4 | you take him through this. |
| 5 | BY MS. KELLER: |
| 6 | Q    Okay.  So you went from two specific data points to 22 |
| 7 | data points; right? |
| 8 | A    Yes. |
| 9 | Q    Methodology remained the same? |
| 10 | A    Yes.  There were no changes to methodology. |
| 11 | Q    And the -- |
| 12 | THE COURT:  Just a moment.  When you say data |
| 13 | points, I am simply looking at the 26 products, then? |
| 14 | THE WITNESS:  Yes, Your Honor. |
| 15 | THE COURT:  Okay.  So let's take page 7. |
| 16 | THE WITNESS:  Yes, sir. |
| 17 | THE COURT:  There you had two data points before. |
| 18 | Now you have got 26? |
| 19 | THE WITNESS:  Now I have 22 and I'm only |
| 20 | estimating four; where before I had two and I was estimating |
| 21 | 30. |
| 22 | THE COURT:  So you're only estimating four. |
| 23 | Excellent.  Thank you.  I'm sorry, counsel. |
| 24 | BY MS. KELLER: |
| 25 | Q    Do you want to just go through your charts? |

1  A     Chart 7 did change to reflect the 26 products.  The

2  next change is chart 8, although the methodology in the

3  graph is the same.  The number for head-start damages for

4  the Winter Wonderland product increased slightly to the

5  $5,773,000 that is shown.

6       The next chart that changed, Your Honor, was chart 9.

7  This was the Bling Bling data point that I had before with

8  more complete information.  The chart itself remains the

9  same, but the total went down slightly to $16,391,000.

10           Your Honor, chart 10 represents a new

11  product-by-product summary for the 26 products.

12           THE COURT:  Okay.

13           THE WITNESS:  And then finally there is detail

14  behind that chart also for the same products showing the

15  total by product.

16           THE COURT:  Which is number 11?

17           THE WITNESS:  Yes, sir.

18           THE COURT:  Okay.  And then the rest of the charts

19  look to me to be the same.

20           THE WITNESS:  Yes, sir.

21           THE COURT:  Okay.  I didn't have any fault with

22  your methodology before.  Let's see if there are any

23  questions on cross-examination.  Mr. Price.

24           MR. PRICE:  Thank you, Your Honor.

25                       CROSS-EXAMINATION

1   BY MR. PRICE:

2   Q    Just a couple of questions to see if I can understand.

3   You said there were 22 products and you estimated four?

4   A    Yes, sir.

5   Q    What four did you estimate?

6   A    If you go to, I believe, chart 11, the last chart I

7   referred you to, you will see in the head-start damages

8   column there are four products that say "see average below."

9             THE COURT:  Just a moment.  Okay.  I am going to

10  name them for just a moment.  They should be Girls Night In,

11  MyScene Pajama Party, MyScene Outdoors Camping or Barbie

12  Camping Family, MyScene Mobile Phone, and MyScene Spring

13  Break.

14            THE WITNESS:  Correct.

15            THE COURT:  Thank you.

16  BY MR. PRICE:

17  Q    And you said before you had two data points; now you

18  have 22.  What data points are we talking about?  Are we

19  talking revenue or the head-start period or a combination?

20  A    Really it's a combination of the head-start period,

21  revenue, monthly, start for revenue, and profitability.

22  Q    What information did you have that changed the

23  head-start period?

24  A    In particular it would have been the monthly sales

25  data.

1    Q    How did that affect your head-start period?

2    A    Well, it depends on products.  Certain products I

3    excluded them because the first monthly sales for Mattel was

4    more than a year after the toy fair, so I removed those

5    products from consideration, which is why we decreased by

6    four.

7         There were other products when I had the monthly detail

8    where I could see that there was overlap where the pets

9    products, for example, instead of looking at three different

10   pets products, I was able to determine there was only one

11   pets product.  So that eliminated two.  So those are some

12   examples.

13   Q    And the backup to this you said is going to be

14   available sometime tonight?

15   A    The backup -- I apologize -- was sent to you about 4:30

16   with the summary charts, the backup being the head-start

17   calculation by product with the lost revenue, the

18   profitability, et cetera.  There is further backup which is

19   the actual detailed profit calculations.  We had to pull

20   that from manual documents, so I want to double-check that

21   one last time.

22   Q    Okay.  Mr. Malackowski, I will tell you we haven't

23   gotten anything.  We checked with the people who supposedly

24   got it, but I have been told it's being sent again.

25              THE COURT:  Well, we'll wait.

```
 1              MS. LOCK:  We have given you a binder, but I
 2    guess --
 3              THE COURT:  Let's clear up the record.  If you
 4    don't have it, take the time to get it and take the time to
 5    go over it.
 6              MR. PRICE:  Is it all in the binder that you just
 7    gave us?
 8              MS. LOCK:  Yes.
 9              MR. PRICE:  Okay.  I just need to go through the
10    methodology at this point.
11              THE COURT:  Are you sure?
12              MR. PRICE:  Yes -- as long as our expert has
13    enough time to look at the backup, and that could take --
14              THE COURT:  Mr. Wagner, do you have it?  You've
15    got that binder?  Okay.
16              MS. KELLER:  Your Honor, the methodology is the
17    same.  It has not changed.  The only thing that's --
18              THE COURT:  I found that it was appropriate on the
19    last occasion.
20              MS. KELLER:  The only thing that has changed is
21    the data that he's plugged in, which we got from Mattel.
22              MR. PRICE:  Your Honor, I don't need to ask any
23    more questions about this part of the methodology.  I do
24    want to ask a couple questions about a part we did not get
25    to last time.  We didn't finish --
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1              THE COURT:  I don't know what that was because we
 2    didn't get to it, so why don't you ask your questions.
 3    BY MR. PRICE:
 4    Q   If you look at your charts, Mr. Malackowski, you've
 5    got --
 6              THE COURT:  I apologize.  That's why we didn't get
 7    there.
 8              MR. PRICE:  Yeah.  We discovered we needed new
 9    information.
10    BY MR. PRICE:
11    Q   I just wanted to ask you, if you look at the unjust
12    enrichment chart at page 20, we went over this part where
13    you have that apportionment factor.  Do you see that?  I
14    think it's slide 20.
15              MS. KELLER:  We have it in the system now, Your
16    Honor, if you want it projected.  It might make it easier
17    for everybody to be able to see it.
18              THE COURT:  Thank you.
19    BY MR. PRICE:
20    Q   I think you talked with the Court how under unjust
21    enrichment, this apportionment factor represents -- why
22    don't you tell us.  What does that represent for unjust
23    enrichment?
24    A   It's basically the division of profits between the
25    intellectual property at issue and the sweat equity.
```

1   Q    Okay.  And it's your understanding that for unjust

2   enrichment, you need to subtract the sweat equity from the

3   intellectual property; correct?

4   A    I understand that it's fair to do so, yes, sir.

5   Q    Okay.  Now, if you would look at slide 23, and that's

6   your calculation of lost profits, Mattel's lost profits for

7   the trade secret misappropriation; correct?

8   A    Yes, sir.

9   Q    Okay.  And it's your understanding that for trade

10  secret misappropriation lost profit, you do not subtract --

11  that it would be inappropriate to subtract sweat equity;

12  correct?

13  A    Correct.  Yes, sir.

14  Q    But the numbers for your sweat equity under --

15          THE COURT:  I'm sorry.  Would you repeat that

16  question again.  I don't have realtime up and running.

17          MR. PRICE:  Sure.

18  BY MR. PRICE:

19  Q    That is, for calculating damages for lost profit due to

20  trade secret misappropriation, it would be inappropriate to

21  subtract sweat equity.  And I think Mr. Malackowski said he

22  understands that.

23  A    Correct.

24  Q    So in chart 20 for unjust enrichment, you reduced the

25  profits by 20 percent and 12 percent, respectively, to

```
 1   subtract sweat equity; correct?
 2   A    Correct.
 3           THE COURT:  Just a moment.  He did that under
 4   trade secret at 12 percent; copyright, 20 percent?
 5           MR. PRICE:  Right.  But this is for the unjust
 6   enrichment.
 7           THE COURT:  No.  No. This is for the lost profit.
 8   Are you on 23 or 20?
 9           MR. PRICE:  I am going back and forth.
10           THE COURT:  Well, I didn't -- let me catch up with
11   you.  I was on lost profit with the last question.
12           MR. PRICE:  Right.
13           THE COURT:  Now you're over on unjust enrichment?
14           MR. PRICE:  Yes.  I am comparing the two.
15   BY MR. PRICE:
16   Q    So under slide 20, of course, you did calculations for
17   sweat equity for apportionment for unjust enrichment and
18   reduced the damages; correct?
19   A    Yes, sir.
20   Q    That's slide 20.  Slide 23, which is lost profit where
21   you're not supposed to reduce the damages by sweat equity,
22   we have the same numbers, 20 percent and 12 percent, which
23   you used to reduce lost profits; correct?
24   A    The numbers are coincidentally the same, but it's a
25   different calculation, a different purpose.
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    Q    Well, you used the same factors; right?

2    A    I used the same factors to determine what the demand

3    would be for the intellectual property instead of using

4    market-share figures as Mr. Wagner used.  Yes, sir.

5    Q    And you said it's actually no coincidence that they are

6    the exact same numbers, 20 percent and 12 percent; right?

7    A    Correct, because it's getting to the same fact of what

8    is the demand for these features.

9    Q    And here you call it demand factor in slide 23.  In

10   your report did you call it demand factor or apportionment?

11   A    No.  I called it apportionment as well, but to be

12   clearer I made the distinction.

13   Q    So your report reflects that for lost profits, you did

14   an apportionment of 20 percent and 12 percent, the exact

15   same numbers you used for the apportionment for unjust

16   enrichment; correct?

17   A    Well, to be very clear, the numbers are the same and I

18   did use the same word, which was really in hindsight a

19   mistake.  I should have used two different words because

20   they are two different meanings.  But the evidence that I

21   cite to I believe is appropriate for both, because the

22   evidence is determining the demand for the intellectual

23   property.

24        Mr. Wagner used market share, saying the demand for the

25   IP would just be based upon what people bought

| | |
|---|---|
| 1 | traditionally.  And I looked at that, too, and it's very |
| 2 | consistent, I think as the next chart shows.  But I thought |
| 3 | this was the most specific data to determine what sales |
| 4 | Mattel would have kept. |
| 5 | MR. PRICE:  Your Honor, that's the end of my |
| 6 | examination.  We'd obviously like to argue. |
| 7 | THE COURT:  Counsel, questions? |
| 8 | MS. KELLER:  Nothing further. |
| 9 | THE COURT:  Fine.  Now, we paid the same courtesy |
| 10 | to Mr. Wagner.  I know counsel were still getting some |
| 11 | slides at 2:00, and I got some at 7:30 in the morning.  Do |
| 12 | you think you will be presenting any more slides to us?  And |
| 13 | I am not finding fault with that. |
| 14 | THE WITNESS:  Your Honor, I anticipate that my |
| 15 | team will have finished their final check and the numbers |
| 16 | may tweak, but it would just be picking up a reference error |
| 17 | by 8:00 p.m. or 10:00 p.m. tonight at the latest. |
| 18 | THE COURT:  Well, we will still be here, so don't |
| 19 | worry about that.  Now, I will be here at 7:00 tomorrow.  I |
| 20 | will meet Mr. Zeller, per usual, Mr. McConville, per usual, |
| 21 | 7:30.  That way if you have some additional slides, I would |
| 22 | like to see them, just so there is nobody caught by |
| 23 | surprise. |
| 24 | THE WITNESS:  I think that's fair. |
| 25 | THE COURT:  Okay.  You may step down.  Thank you |

```
 1   very much, sir.
 2              MR. PRICE:  Mr. Zeller would like to argue the
 3   Daubert issue, particularly with respect to apportionment.
 4              THE COURT:  Okay.  Mr. Zeller.
 5              MR. ZELLER:  There is one particular issue that I
 6   think needs to be focused on that's part of the expert
 7   opinion that is offered here, and this is reflected on slide
 8   19.  This is Exhibit 37165-19.
 9              The Court will recall that when Mr. Malackowski
10   was asked about these factors -- as a matter of fact, the
11   Court ultimately drew this out of Mr. Malackowski -- he
12   acknowledged that there was no methodology known in his
13   field supported by anything that allowed him to take these
14   factors and average them.
15              THE COURT:  And average them.
16              MR. ZELLER:  What I would say, Your Honor, is that
17   Mr. Malackowski also did pretty much along the same lines of
18   what Mr. Wagner did that the Court found would not go to the
19   jury, which was these factors that are referenced here are
20   basically Georgia Pacific factors, now under a different
21   name.
22              Mr. Malackowski actually on the stand, you will
23   recall, said substantially the same as Mr. Wagner did at one
24   point, which is, well, I won't call them Georgia Pacific
25   factors even though these are in fact in some ways worse
```

```
 1    because these factors are not only averaged in a way that is

 2    unsupported by anything in these experts' field but

 3    essentially this taking the Georgia Pacific factors and

 4    cherry-picking certain of them.  So in many respects that

 5    methodology is even worse.

 6            But at its core what we are really still talking

 7    about is an application of the Georgia Pacific factors.  The

 8    further layer on this is that you'll recall that Mr.

 9    Malackowski actually acknowledged that what he was

10    essentially doing was taking one of the Georgia Pacific

11    factors -- namely, how do experts in the field or how does

12    an expert apportion these numbers -- and said, well, because

13    I am an expert, I am going to do it.  So he has basically

14    just literally reduced this to ipse dixit, which is the very

15    thing that Daubert does not allow.

16            So, Your Honor --

17            THE COURT:  Certainly to the Georgia Pacific

18    factor.  What about time contribution?  I don't recall that.

19    We've got to go back and look at Georgia Pacific.  I used to

20    know it well, but I don't have it memorized.

21            MR. ZELLER:  Right.  And I am not suggesting that

22    they track one by one, but its essence -- in fact, Mr.

23    Malackowski on the stand, you will recall, tried to defend

24    the very core of this by saying, well, Georgia Pacific

25    allows an expert such as myself to offer an opinion.  And
```

1   that's the very ipse dixit that -- that is not allowed under

2   Daubert.

3          THE COURT:  I thought that he had specifically

4   stated that he was not relying upon Georgia Pacific, and I

5   was very careful to ask him that question.

6          MR. ZELLER:  He said he would not call them

7   Georgia Pacific factors, but in many respects -- I don't

8   even want to get too much into the semantics of that, Your

9   Honor, because in some ways this is worse.  This is worse

10  than trying to rely on Georgia Pacific factors because at

11  least Georgia Pacific factors have a history behind them.

12         And while obviously we recognize that the Court

13  has found that it's not appropriate to apply those factors

14  in this particular context of a trade secret case or to the

15  copyright infringement claims, nevertheless at least Georgia

16  Pacific has a track record and a history in certain areas.

17         THE COURT:  Patent.

18         MR. ZELLER:  Yeah, patent, of course.  And

19  certainly what's being offered here are literally factors

20  that don't have that kind of pedigree and certainly don't

21  have the pedigree in trade secret or copyright cases.  He

22  has simply taken these factors, given them this name, said

23  because one of the traditional ways that Courts will look at

24  this kind of analysis is hearing from an expert.  I am an

25  expert; therefore I am offering this.

1           But he acknowledged at the end of the day there is

2   no support for this methodology, and he cannot cite any

3   support for this methodology because it doesn't exist.  In

4   many respects to us this is the most troubling aspect of

5   where we are with his report, particularly given the Court's

6   prior ruling, which we think completely applies here, that

7   MGA itself advocated where Mr. Wagner was not allowed to

8   offer a comparable opinion.  Respectfully we submit that

9   this is an even clearer case of that.

10          The only other thing I would note, Your Honor, is

11  that -- I didn't see it in these slides, but at one point it

12  appeared that he was going to offer some kind of opinion on

13  unfair competition.  He had in there the Kohl's analysis.

14          THE COURT:  It's still there, counsel.  It's on

15  page -- just a moment.  It's on 12.

16          MR. ZELLER:  Thank you, Your Honor.  Yes.  We

17  certainly don't think that this is appropriate to be in

18  front of a jury at this point.  Number one, the Court has

19  said that obviously there is not even going to be an

20  advisory verdict on this.

21          Number two, this is not restitution, which is the

22  only thing that would potentially be available for purposes

23  of 17200.  This is by its terms so-called damages suffered

24  by MGA.  So we don't think it's appropriate as a

25  methodology, and we certainly don't think it's appropriate

1    that it be in front of the jury.

2              THE COURT:  Counsel.

3              MR. PRICE:  Your Honor, if I could add one other

4    thing, is that as we showed in comparing slides 20 and 23,

5    Mr. Malackowski subtracts sweat equity from unjust

6    enrichment, which is appropriate.  But then he does the same

7    thing for lost profit using the same factors and the exact

8    same numbers and just gives it a different name -- demand

9    factor.

10             THE COURT:  Just a moment.  Let me turn to those

11   two slides for just a moment.  On 23, repeat your argument.

12   And then 20, I think, is the other slide; isn't it?

13             MR. PRICE:  Yes.  Mr. Malackowski in slide 20 does

14   the apportionment for sweat equity on an unjust enrichment

15   analysis.  And, of course, Mr. Zeller just talked about

16   whether or not that's methodologically sound, but you are

17   entitled to subtract sweat equity on unjust enrichment.

18             Whereas, on 23 which is his analysis for lost

19   profit, he uses the exact same numbers, 20 percent and 12

20   percent, using the same factors.  In his report he called it

21   apportionment, and now he just gave a different name to it,

22   demand factor, to reduce damages.  It's basically allocating

23   sweat equity for lost profit, which is inappropriate.

24             THE COURT:  All right.

25             MS. KELLER:  We are going to try the team approach

1    here as well, Your Honor, since Mattel did.

2             Your Honor, first of all, Mr. Malackowski has made

3    it abundantly clear that he's not using any Georgia Pacific

4    analysis.  We're kind of hearing a bit of a circular logic

5    here because on the one hand we're hearing he is using

6    Georgia Pacific.  No, he's not.

7             On the other hand we're hearing -- and, you know,

8    he's not using specific factors that have been established

9    by case law, which of course he can't do in this case, nor

10   could anybody, because the apportionment analysis is case

11   specific.  In each case you have got to look at the relevant

12   quantitative factors showing the relative contribution of

13   the IP in issue.

14            So here, for example, investment rates are one of

15   the things looked at, but investment rates are not a Georgia

16   Pacific factor.  Time contributions, not a Georgia Pacific

17   factor.  You know, we've got -- the only way that this could

18   be fairly done was the financial quantification of the

19   contributions by MGA to the Bratz products.

20            It's kind of ironic that Mattel is complaining

21   because the calculations, if you look at chart 25, having

22   reworked the calculations, our damages have actually gone

23   down based on the more specific factors that were used.  And

24   Mattel can't really attack Mr. Malackowski for doing a

25   straight average of his apportionment factors because if you

```
 1    look at Mr. Wagner's analysis, Mr. Wagner, his analysis was

 2    far more unconventional and unusual.  He averaged the

 3    company ebits for 17 companies without any explanation at

 4    all, and in fact used companies in his analysis for

 5    comparison purposes that manufactured the gamut of toys

 6    rather than fashion dolls.

 7              So the bottom line is you're not going to find

 8    case law, a statute, a treatise, or any other authority

 9    which explains which apportionment factors have to be

10    weighed more than others in this situation.  It's case

11    specific.

12              I would ask Ms. Hurst to comment as well if I

13    could.

14              MS. HURST:  As the Court will recall, the Wagner

15    benchmark methodology survived a Daubert attack and despite

16    the apples-to-oranges comparison of product line

17    profitability to whole company profitability.  If that could

18    survive a reliability attack, then Mr. Malackowski's

19    analysis meets the standard and many orders of magnitude

20    greater liability.

21              These are not Georgia Pacific factors.  Just

22    because it says license rates on it doesn't make it a

23    Georgia Pacific factor.  What these are are quantitative

24    methods of trying to value market demand, to get at an

25    economic analysis that in some respects are the same in both
```

```
 1    instances, which is why it is appropriate to use the same
 2    analyses in both instances, because what you're trying to do
 3    is measure the best way you can the factors that lead to
 4    consumption.
 5           The business choices that are made value those
 6    consumption factors, and so all of these different methods
 7    reflect business choices that were quantitative, that
 8    actually happened, and that reflect market reality.  And
 9    that is all very reliable in terms of looking at these
10    various ways of understanding what elements in each case
11    contributed to the consumer demand.
12           So these were business choices made
13    contemporaneously that reflected economic reality.  They are
14    based on actual data, not counter-factual assumptions, and
15    that more than meets the Daubert standard.  And the fact
16    that they are considered in two different ways, one for
17    purposes of apportionment and one as demand factors for lost
18    profits, there is nothing wrong with that because it's the
19    same way of measuring what ultimately comes down to a
20    similar economic reality under two different forms of
21    calculation.
22           So, you know, basically Mattel's attack comes down
23    to the notion that you had a range of numbers, and he
24    decided to average them because they are all legitimate
25    methods of measuring the same thing.  And rather than
```

```
 1    arbitrarily picking one, he chose an average.  But that's
 2    exactly what Mr. Wagner did.  He repeatedly chose averages
 3    in his benchmark methodology, and he chose, you know, I will
 4    pick a Hasbro Jakks average, I'll pick a 17-company average,
 5    I will go just with Mattel.  It's the same thing.
 6            So this absolutely is proper.  It doesn't violate
 7    the Court's order that we are not using Georgia Pacific
 8    factors.  It is absolutely reliable and meets the standard
 9    and should be before the jury.
10            THE COURT:  Thank you.
11            Mr. Malackowski, if you have additional charts, I
12    want to extend to each of you -- you and Mr. Wagner the same
13    courtesy.  Get them to me either later tonight or by
14    tomorrow morning, and get them to Mr. Wagner also and to one
15    of the counsel through your counsel so there is as little
16    surprise as possible.
17            MR. ZELLER:  Your Honor, could I just reference
18    the Court to the page numbers of his testimony that I
19    believe will show the Court what it is that Mr. Malackowski
20    did in terms of averaging and that he acknowledged that
21    there was no support for this.
22            I would refer the Court to the Daubert hearing
23    transcript page 61, lines 9 through 25; and then page 127,
24    lines 3 through 15; and then page 130, line 20, through 131,
25    line 18.
```

1            THE COURT:  I will look at those.  Also, I have

2     the right to go over the charts tonight.  If I need to

3     exclude charts after everybody leaves, I will tell you

4     tomorrow morning.  Okay?

5            MR. PRICE:  Again, there is no response to chart

6     23, which is the lost profits analysis.  I think the Court

7     needs to look at that.

8            MS. HURST:  I'm sorry.  There was a response to

9     that.  The response is that you are measuring the same

10    thing, which is consumer demand, in different ways --

11    actually in the same way, but it makes sense to do it that

12    way.

13            I understand that they may not agree, but that is

14    a response and it's an appropriate one that demonstrates the

15    reliability of the methodology.

16            THE COURT:  Well, I am going to have the ruling

17    out concerning Mr. Moore this evening, and each of you know

18    how we're going to proceed.  I am tentatively going to tell

19    both of you that in all likelihood I am going to find that

20    this is privileged information, and you should be expected

21    now to proceed accordingly.

22            I have spent most of the day both with the special

23    master who conducted an in-camera hearing next door,

24    reviewing his work, discussing this with him, and taking the

25    time to write a rather lengthy opinion.  So I will probably

1    publish that later this evening, but I would like to get

2    that to some counsel.

3              So I am going to ask you Mr. Quinn and Mr.

4    McConville if you would remain.  I have a couple more things

5    to do just to solidify that in the back to make certain I

6    still feel that this is privileged information or

7    attorney/client privilege, not work product.

8              So if you will excuse me for just a moment -- I

9    think I ought to get whoever is up tomorrow -- Ms. Keller?

10             MS. KELLER:  Yes, Your Honor.

11             THE COURT:  And Mr. Price.

12             MR. PRICE:  Well, if we're still doing Eckert --

13             THE COURT:  Who is doing Mr. Eckert?  Well, who

14   wants to go home and who wants to stay?

15             MR. PRICE:  I would like to see what my expert has

16   to say about this.

17             THE COURT:  Okay.  Why doesn't everybody remain,

18   then, for a few moments.  I'll be back in just a moment.

19             MS. HURST:  Your Honor, are we going to address

20   this verdict form tonight or --

21             THE COURT:  Oh, yeah.  We're going to start in

22   with it tonight, because --

23             MS. HURST:  Understood.

24             MR. PRICE:  Your Honor, I would like to go back to

25   the office with my expert and go through the binders.

```
 1            THE COURT:  Wait just a moment.  I will be back
 2   with all of you in just a moment.
 3            (Recess taken)
 4            THE COURT:  We are on the record, and Ms. Hurst is
 5   present.
 6            Ms. Hurst, you wanted to speak to the Court on the
 7   record about the special verdict form and so did Mr. Zeller.
 8            MS. HURST:  Okay.  The Court has offered two
 9   blocks, one and two questions:  Has Mattel proven that it
10   owns the following --
11            THE COURT:  Just go to the page number on the
12   bottom.
13            MS. HURST:  Page 1.
14            THE COURT:  Okay.  Page 1.
15            MS. HURST:  Two separate blocks for:  Has Mattel
16   proven that it owns the following items?
17            THE COURT:  Bratz and Jade.
18            MS. HURST:  No.  There is block one.  There is
19   original four sketches and pitch book, and in block two,
20   there's a bunch of other trial exhibits listed.
21            THE COURT:  Just a moment.  Let me get another
22   copy of this.
23            (Pause in proceedings)
24            THE COURT:  Now, understand that this chart is not
25   complete.  In other words, I'm trying to get something out
```

```
 1   tonight to give you a general idea where I'm going.
 2            But let's take question one:  Has Mattel proven
 3   that it owns the following items?  That's the block you're
 4   referring to?
 5            MS. HURST:  Right.  And I had one with:  2.  Has
 6   it proven the following items blocks on it?  I was just
 7   going to say there is no reason for there to be No. 2.
 8            THE COURT:  There are not.  In other words, it's
 9   going to come all the way across the page.  Like I said, I'm
10   trying to get something out tonight, because otherwise it's
11   going to be Tuesday night, maybe Wednesday night.
12            MS. HURST:  Understood.  You know we raised the
13   bona fide purchaser issue.  And if the Court is just going
14   to ask a general question, has Mattel proven that it owns,
15   then we do think they should be instructed on bona fide
16   purchaser, because that's part of the ownership question.
17            THE COURT:  Okay.
18            MS. HURST:  On the next block, which is:  Has
19   Mattel proven that it owns the ideas for the names Bratz and
20   Jade, the name Jade is not in docket number 9801.  So we
21   think that they have dropped or waived that claim, and it
22   should not be included.
23            THE COURT:  Okay.  Just a moment.  Okay.
24            MS. HURST:  On page 2 in question 6, which is the
25   chart --
```

1          THE COURT:  And I'm sorry.  The charts just aren't

2   aligned yet.  This is obviously supposed to go over to the

3   next page.

4          MS. HURST:  Right.  These are typos.  The Court

5   probably wouldn't catch them anyway, but in 6 and 7 the word

6   for is missing in front of that.

7          THE COURT:  For the amount?

8          MS. HURST:  For that product's infringement.

9          THE COURT:  For that product's infringement.  And

10  in 7, for that.  Thank you.

11          MS. HURST:  Question 7 -- I'm sorry.  I forgot.

12  On the first page, Your Honor, at the bottom it should be if

13  you answered no to all of the above, then go to question 8.

14          THE COURT:  Just a moment.  At the bottom of page

15  1 after question 3?

16          MS. HURST:  Yes.

17          THE COURT:  Just a moment.  So basically it would

18  be:  If you answer no to questions 1, 2, and 3 --

19          MS. HURST:  Actually, if you answered no to

20  questions 1 and 2, it should be:  Go to question 8.

21          THE COURT:  Obviously.  Please -- now, if you

22  answer yes, please continue.  If you answer yes to questions

23  1 and 2, please continue.

24          MS. HURST:  Now, Your Honor, on question 3, we

25  have got an issue here between questions 3 and 8 where --

```
 1              THE COURT:  Just a moment.  This request is put
 2    actually before question 3; isn't it?
 3              MS. HURST:  I was just going to address that.
 4    Question 8 is the trade secret question, but it doesn't have
 5    the concept of ownership in it.  So it wasn't clear to me
 6    whether the Bratz trade secrets ownership question was going
 7    to be here in box 3 or whether the Court was going to ask
 8    about ownership in question 8.
 9              THE COURT:  Eight.  No, no.  I didn't say 8
10    definitively.  In other words, ownership.
11              MS. HURST:  Right.  Somewhere we have to ask the
12    question about ownership of the Bratz trade secrets.
13              THE COURT:  Just a moment.  Where would you
14    suggest that take place?
15              MS. HURST:  I think that should be in 3, because
16    then you can put out the six buckets there, and the idea for
17    the name Bratz is one of them, and the Bratz concept and the
18    other Bratz concept, and whatever the other six buckets are
19    from 9801.
20              THE COURT:  Please proceed.  I will work on this
21    after you leave tonight.
22              MS. HURST:  All right.  So then on question 7,
23    which is the statute-of-limitations question --
24              THE COURT:  I am by the way going to drop down
25    2001 so it's on the same line as April 27 so it's the same,
```

1   or fit those into one box across it obviously.

2            MS. HURST:  Right.  So obviously, as the Court

3   knows, we have said before we think it should just be an up

4   or down, is Mattel's claim for copyright infringement barred

5   by the statute of limitations, having preserved that

6   position and moving on to the Court's formulation.

7            I think there are numerous additional dates that

8   should be included if the Court really wants to try to

9   preserve all of the possible relation back dates for

10  purposes of both this Court's post-trial review and

11  appellate review.  In particular, December 8, 2001, should

12  be included because that's three years before MGA's --

13           THE COURT:  Show me where you would put that.

14           MS. HURST:  I would just put them in chronological

15  order.  I would add a column for each of the following dates

16  that I'm about to identify.

17           THE COURT:  We are in number 9; correct?

18           MS. HURST:  Seven.  We're in 7.

19           THE COURT:  I thought you took me over to trade

20  secret misappropriation.  I was completely confused.

21           MS. HURST:  Sorry, Your Honor.

22           THE COURT:  Now we're back on page 3, question 7?

23           MS. HURST:  Right.  So we're in the copyright

24  statute-of-limitations question.  And the Court wants to

25  have date choices so it can decide the relation back and

1  equitable tolling issues later, as I understand it.  So I
2  would propose that the following additional dates be added:
3  December 8, 2001, which is three years before MGA's
4  intervention if Mattel plans to argue intervention as a
5  relevant date.  Obviously we don't think it is, but if they
6  intend to argue that, then -- and April 14, 2002, should be
7  added because that's three years before MGA's complaint, and
8  it's certainly our position that that would be the earliest
9  possible date based on relation back of the counterclaims to
10  MGA's complaint.
11          Your Honor, also we think that the standard is
12  misstated here in the question.  It should be:  On or before
13  the following dates, did Mattel discover or should it have
14  discovered through the exercise of reasonable diligence
15  facts that would have caused a reasonable person to suspect
16  that MGA, MGA Hong Kong, or Isaac Larian had infringed any
17  Mattel copyright?
18          THE COURT:  Okay.
19          MS. HURST:  Moving on to page 4, question 8, as I
20  identified earlier, there is an ownership on the Bratz trade
21  secrets that has to be addressed somewhere.
22          THE COURT:  Once again where are you suggesting
23  that take place?
24          MS. HURST:  Well, I would put the six buckets in
25  question 3 on page 1.

```
 1              THE COURT:  Just a moment.  Okay.
 2              MS. HURST:  Then you would be able to keep the
 3     concepts of ownership and trade secret separate if you did
 4     it --
 5              THE COURT:  Ms. Keller, Mr. Price just left.  Good
 6     night.
 7              MS. KELLER:  Well, I was kind of interested in --
 8              THE COURT:  Well, it's totally up to you.  I am
 9     not going to spend too long tonight on it, but I'm going to
10     hear it very briefly, just a quick run-through.
11              MS. KELLER:  I appreciate it.  Thank you.
12              MS. HURST:  So if not in block 3, then it should
13     go here in question 8, and it should be:  Has Mattel proven
14     that any of the items listed below in question 9 are trade
15     secrets and are owned by Mattel?
16              THE COURT:  Okay.
17              MS. HURST:  Then moving to question 10.
18              THE COURT:  More relevant dates?
19              MS. HURST:  More relevant dates.
20              THE COURT:  Same dates?
21              MS. HURST:  Yes, because trade secret and
22     copyright are both three-year statutes.
23              THE COURT:  Okay.
24              MS. HURST:  This one again should have the:  On or
25     before the following dates did Mattel discover or should it
```

 1 | have discovered through the exercise of reasonable diligence
 2 | facts that would have caused a reasonable person to suspect
 3 | that MGA Entertainment, Isaac Larian, had misappropriated
 4 | any of the claimed trade secrets?
 5 |          On that, Your Honor, I am going to just refer the
 6 | Court to the actual language of CACI 4421, the instruction.
 7 | That's exactly the way that instruction is worded, so that's
 8 | the basis for that language.
 9 |          THE COURT:  Okay.
10 |          MS. HURST:  In 11 I am assuming the Court is
11 | asking the improper means question about the Bratz trade
12 | secrets.  And if that's correct in there, I think there are
13 | only six buckets in docket 9801, so that would be the first
14 | six rows.
15 |          THE COURT:  Just a moment.  Repeat that.  I didn't
16 | have realtime.  Page 6, question 11.
17 |          MS. HURST:  Page 6, question 11 says listed in
18 | rows 1 through 9.  If the Court is asking the wrongful
19 | acquisition --
20 |          THE COURT:  Just a moment.  Okay.  Go ahead.
21 |          MS. HURST:  On the assumption that the Court there
22 | was asking the question about the Bratz trade secrets and
23 | those are going to be the first ones listed, then docket
24 | 9801 has six buckets and there should be six rows.
25 |          THE COURT:  Just a moment.  Okay.

1          MS. HURST:  Even under the bifurcated --

2          THE COURT:  Where are you now?

3          MS. HURST:  I am still on page 6.  Even under the

4   bifurcated regime that you are in, we still have to ask the

5   predicate question for the award of enhanced damages in the

6   first phase.

7          So the question here should be added -- let me be

8   clear.  As you will see in our JMOL when we file it, we

9   don't think there is any basis for asking this question or

10  for this issue to go to the jury.  But having said that, if

11  the Court disagrees, the question:  Has Mattel proven by

12  clear and convincing evidence that MGA or Isaac Larian acted

13  willfully and maliciously in the misappropriation of any of

14  the claimed trade secrets?  Yes or no.

15         THE COURT:  Okay.

16         MS. HURST:  Our next comment is on page 9,

17  question 14.

18         THE COURT:  Okay.

19         MS. HURST:  I think that should be November 20.

20         THE COURT:  Okay.

21         MS. HURST:  Again, the language should be

22  conformed to that language that I proposed, a reasonable

23  person would suspect, blah, blah, blah -- based on CACI

24  4421.

25         THE COURT:  Okay.

```
 1              MS. HURST:  Also the willfully and maliciously,
 2   clear and convincing evidence, willfully and maliciously
 3   question should be added here.
 4              THE COURT:  Should be added here also.
 5              MS. HURST:  Yes.  Moving to page 10, we would
 6   object to including Carter Bryant with the others in 15 and
 7   16.  If the Carter Bryant obligation to disclose is going to
 8   be included as a theory that goes to the jury, because
 9   that's a very different theory of liability than the
10   conflicts with activities provisions.
11              THE COURT:  In other words, you want it separated
12   out?
13              MS. HURST:  Yes.
14              THE COURT:  Okay.
15              MS. HURST:  After 16, there should be a stop if
16   no.
17              THE COURT:  I'm sorry?
18              MS. HURST:  After 16, there should be:  Stop here
19   if your answer was no to all of the above.
20              THE COURT:  And if yes, continue on?
21              MS. HURST:  Right.  The way 17 is worded, it
22   assumes that Mattel has proven damages.  I mean, it doesn't
23   even have an if any.  We especially contest here --
24              THE COURT:  Just a moment.
25              MS. HURST:  Okay.
```

| | |
|---|---|
| 1 | THE COURT:  I see. |
| 2 | MS. HURST:  With respect to this question and all |
| 3 | the other damages questions, we believe it should be two |
| 4 | questions:  Has the plaintiff proven by a preponderance of |
| 5 | the evidence damages basically?  And then the second |
| 6 | question should be:  If so, then what amount?  But if the |
| 7 | Court is only going to do one question, then at a minimum 17 |
| 8 | can't assume that some amount should be awarded. |
| 9 | THE COURT:  You dropped your voice.  I couldn't |
| 10 | hear. |
| 11 | MS. HURST:  I'm sorry.  We think it should be two |
| 12 | questions for damages:  Has the plaintiff proven by a |
| 13 | preponderance of the evidence? |
| 14 | THE COURT:  Okay. |
| 15 | MS. HURST:  Then:  If so, what amount? |
| 16 | THE COURT:  Okay. |
| 17 | MS. HURST:  But if the Court is only going to ask |
| 18 | one question then 17 is improper because it assumes in the |
| 19 | way it's worded that some amount should be awarded or has |
| 20 | been proven. |
| 21 | THE COURT:  Okay. |
| 22 | MS. HURST:  In question 18 the date April 14, |
| 23 | 2003, should be added.  That's two years prior to MGA's |
| 24 | complaint. |
| 25 | THE COURT:  I'm sorry.  What date? |

```
 1              MS. HURST:  April 14, 2003.  Actually I am not
 2   sure why the Court is using a November 23rd date.
 3              THE COURT:  It should be November 20th.
 4              MS. HURST:  Yes.
 5              THE COURT:  Okay.
 6              MS. HURST:  I think it should just be November
 7   20th, 2004, because that's two years prior to.
 8              THE COURT:  And not the 2003?
 9              MS. HURST:  Right.
10              THE COURT:  So it should read April 27, 2000, to
11   April 14, 2003 and November 20th, 2004.
12              MS. HURST:  Yes.  And I guess we should add the
13   December date as well, which would be December 8th in this
14   case, 2002, because that would be two years prior to the
15   intervention.
16              THE COURT:  Okay.
17              MS. HURST:  Then, Your Honor, again preserving our
18   JMOL position that no punitive theory should go to the jury,
19   if one is going to, then there should be an additional
20   question here:  Has Mattel proven by clear and convincing
21   evidence that MGA or Mr. Larian acted with malice,
22   oppression, or fraud?  So this is the Civil Code 3294(a)
23   definition here.
24              THE COURT:  Okay.  All right.  Mr. Zeller.
25              MR. ZELLER:  The first thing I would like to offer
```

1    to the Court is an insert for the additional exhibit numbers

2    that we believe go as part of what is currently question 1.

3              THE COURT:  Okay.

4              MR. ZELLER:  Has Mattel proven that it owns the

5    following items?  It obviously contemplates that there will

6    be additional exhibits, and we are providing here a list of

7    the other Carter Bryant drawings that we believe are at

8    issue and which we have laid a predicate for ownership to.

9              THE COURT:  I will get those later on tonight.  In

10   fact, we will place one more call tonight to the attorney if

11   we can before we leave.

12             MR. ZELLER:  We can provide that to the Court in

13   Word format as well.

14             THE COURT:  All right.  What else?

15             MR. ZELLER:  There are some issues that I won't

16   address unless the Court wishes me to, which are kind of

17   general issues that MGA was raised previously.  We have

18   already argued about those, and we don't believe absent

19   further questions by the Court that there is anything worth

20   discussing on that.

21             I do think that adding these additional dates will

22   be confusing.  I don't think that they add anything, in

23   particular the date about three years prior to MGA's

24   intervention.

25             THE COURT:  Let's go to the page once again.  This

1    should be page 3.

2              MR. ZELLER:  Yes, page 3.

3              THE COURT:  And the first would be at 7.

4              MR. ZELLER:  Right.  And we do agree that it

5    should be a November 20th, 2002, date.

6              THE COURT:  Now, what about ownership?

7              MR. ZELLER:  I think it can be -- ownership is a

8    different concept obviously in trade secret law than it is

9    for purposes of the declaratory relief claim.  I think that

10   probably the best way of capturing it is simply to say:  Has

11   Mattel proven that the following are trade secrets of

12   Mattel?

13             THE COURT:  Okay.  What else?

14             MR. ZELLER:  Simply because the jury will be

15   looking in vain for any kind of instruction on what does it

16   mean to own a trade secret, and then that's -- so adding

17   that word in there may potentially cause some confusion.

18             On page 2 -- and I believe that this is part of

19   the chart on question number 6.  Having the jury identify

20   the specific creative works that the product infringes may

21   be a very laborious and long task, and I'm not sure that it

22   adds necessarily a lot, given that if the jury were to find

23   that Mattel owns a number of these items or perhaps all of

24   them the way it did in the first trial, this would be very,

25   very time consuming and not add a lot for the jury.

```
 1              THE COURT:  Just a minute.  Now, are you referring
 2   to page 2, 6, which would be Larian damages?
 3              MR. ZELLER:  No.  This is specifically item 6 on
 4   page 2, subparagraph 1, which is the specific --
 5              THE COURT:  Oh, just a moment.  Let me get this
 6   record clear.
 7              MR. ZELLER:  Sure.
 8              THE COURT:  You're referring to question 6,
 9   subparagraph 1.  You're not referring to subparagraph 6?
10              MR. ZELLER:  That's correct.
11              THE COURT:  All right.  Just a moment.  Okay.
12              MR. ZELLER:  So that's subparagraph 1 of question
13   6.  And then it's reflected in the second box on the chart
14   below as:  Creative works infringed by product.
15              THE COURT:  Repeat that.
16              MR. ZELLER:  That is the question 6, sub 1, which
17   is the specific creative works that the product infringes.
18   And then it says:  Identify the creative works by writing in
19   their corresponding exhibit numbers into column 2.  And then
20   below is column 2 which states:  Creative works infringed by
21   product.
22              THE COURT:  All right.  Okay.  Page 3, November
23   20, 2002.
24              MR. ZELLER:  Right.
25              THE COURT:  Do you know that November 20th, 2003,
```

1    has any --

2             MR. ZELLER:  Bear with me for a moment, Your

3    Honor.

4             *(Plaintiff's counsel conferring)*

5             MR. ZELLER:  I do, Your Honor.  I think it has to

6    do with the fact that under current Ninth Circuit law,

7    copyright infringement is a rolling statute of limitations.

8    So it would have a bearing on not whether Mattel could

9    recover, but of course it would have a bearing on whether

10   there is a year of damages that it could recover or of

11   disgorgement of MGA profits.

12            THE COURT:  Okay.  What about December 8th, 2001?

13            MR. ZELLER:  That was the date that I addressed

14   earlier.  That's the three years before MGA's intervention

15   that was proposed.  I am unaware of any case identifying

16   that as being the significant or legally relevant date for

17   any purpose under the statute of limitations.

18            THE COURT:  April 14th, 2002.

19            MR. ZELLER:  That one I don't have -- I think that

20   one is better founded because of the possible relation back

21   to MGA's complaint for some of these claims.

22            THE COURT:  So let me repeat back.  You agree with

23   April 27th, 2001.  You agree with November 20th, 2002.  You

24   agree with November 20th, 2003.  You agree with April 14th,

25   2002.  You disagree with December 8th, 2001?

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1              MR. ZELLER:  That's correct.
 2              THE COURT:  Okay.  Next.
 3              MR. ZELLER:  There is authority on this
 4   proposition of what MGA is asking the language to be changed
 5   to.  The Court's language here for the
 6   statute-of-limitations question is absolutely correct.
 7   There is federal authority that says that the word suspicion
 8   is just legally wrong, and it would obviously be very
 9   misleading to the jury because that is not the appropriate
10   legal standard, and obviously it would induce error.
11              THE COURT:  Okay.
12              MR. ZELLER:  The next point deals with the
13   tortious interference claim, intentional interference with
14   contractual relations, page 10.  I know MGA advocated for an
15   instruction here that told the jury to stop if it finds no
16   as to liability.
17              It would seem to make sense that while we have
18   this jury, regardless of how that is answered, that the jury
19   then proceed to at least answer the statute-of-limitations
20   question, because then the Court will have it available.
21              THE COURT:  Just a moment.  Let me make a note.
22   Okay.  Should I put a statute-of-limitations question
23   earlier?
24              MR. ZELLER:  Right.  That's question number 18 for
25   the intentional interference with contractual relations.
```

```
 1              THE COURT:  Should I move it up?
 2              MR. ZELLER:  No.  I wouldn't say that you move it
 3    up.  I would suggest that it simply say that for 15 and 16,
 4    if you answer questions 15 and 16 no --
 5              THE COURT:  -- please proceed to question 18?
 6              MR. ZELLER:  Correct.  Exactly.  So they could
 7    just skip over the damages.
 8              THE COURT:  Any disagreement with that, Ms. Hurst?
 9              MS. HURST:  I actually think it should be moved up
10    because -- I mean, that's where we think we should just get
11    a straight question on the statute of limitations and then
12    tell them to stop if they say the defense is applicable.
13              THE COURT:  But the point is we both agree that we
14    need to get the statute-of-limitations issue resolved.
15              MS. HURST:  You mean, should they answer it
16    anyway?  I don't know why they would answer it if they find
17    no liability.  That doesn't make any sense to me.  I mean,
18    this is not a case where if there's any argument, that they
19    would have to find liability.
20              THE COURT:  Mr. Zeller, back to you.
21              MR. ZELLER:  It just seems out of an abundance of
22    caution, while we have this jury, to get as many factual
23    findings out of them as possible rather than live to regret
24    not asking the question later on.
25              THE COURT:  Okay.
```

```
 1              MS. HURST:  If I may, it doesn't make any sense --
 2              THE COURT:  Let me stay with Mr. Zeller now.  I
 3    want just one person, Mattel.
 4              MS. HURST:  All right.
 5              MR. ZELLER:  We don't think it makes sense to
 6    break up, as MGA was proposing, two questions for damages.
 7    First, has it been proven?  Number two, in what amount?  I
 8    think just one question where it's obviously stated
 9    neutrally, you know, what amount do you award to Mattel,
10    Inc., and against MGA Entertainment or Isaac Larian, if any,
11    for intentional interference with contractual relations, and
12    that similar language be mirrored in the other ones rather
13    than having it broken down into two potentially confusing
14    questions.
15              The other issue that we had -- and I think I
16    understand what the answer to this is -- but this is
17    paragraph -- question number 13, which is MGA's trade secret
18    misappropriation chart.  And although the chart goes up to
19    31, I assume --
20              THE COURT:  It extends on.  I just used that as an
21    example.
22              MR. ZELLER:  Understood.
23              THE COURT:  The same thing with Mattel.  I just
24    wanted to get a format out tonight and get it discussed as
25    early as possible to save you some midnight hours.
```

1          MR. ZELLER:  And then I think as the final set of

2     issues here, we do agree that there should be predicate

3     questions for punitive damages, willful infringement, and

4     willful misappropriation of trade secret.

5          We think that there should be, as the Court knows,

6     questions on the findings of joint and several liability.

7     And then also we believe that there should be questions

8     addressed to fraudulent concealment.

9          THE COURT:  Okay.  Now, Mr. Quinn, let me hear

10    from you.  I haven't read your brief, but instead of keeping

11    you around for all hours tonight, I will go back and read it

12    later tonight.

13         MR. QUINN:  Last Friday, Your Honor, there was an

14    issue, the Court will recall, about the production of some

15    documents relating to the Kohl's transaction.  The Court

16    entered an order that found that these had been -- the Court

17    believed these documents were responsive to some earlier

18    document requests which had been the subject of an order

19    from Judge Infante.

20         We had asked the Court if we could have a chance

21    to respond to that because we hadn't really.  So we have

22    prepared a brief responding to that.  In a nutshell, Your

23    Honor, we don't think these documents were responsive to the

24    earlier -- those two paragraphs, the earlier requests

25    identified in the order.  All we are talking about here is

 1    whether the jury is going to be informed as to the timing of

 2    when the production is.

 3            We have no issue if they want to use these

 4    documents with any witness.  We just think at this late date

 5    to tell the jury or to suggest to the jury that we did

 6    something wrong, that we produced documents late --

 7            THE COURT:  Is that new brief in the back?

 8            MR. QUINN:  Yes.  Well, it's in the brief that

 9    you've got on your desk.

10            Now, among other things, Your Honor, there is a

11    real question about whether in fact MGA -- the predicate is

12    -- the paragraph 64 of Judge Infante's order is, you know,

13    discussions about terminating a relationship and whether

14    these documents come within the scope of that.

15            There is a real question, notwithstanding what MGA

16    has said and the evidence and Mr. Larian's testimony,

17    whether in fact they were shut out of Kohl's in 2005 and

18    2006.  There is evidence in the record that they continued

19    to make sales to Kohl's in those years.  I am referring to

20    trial exhibit in evidence 24747.  This is cited in our

21    brief.

22            THE COURT:  Okay.

23            MR. QUINN:  I just -- we also have a motion to

24    require MGA -- they have never have produced the documents

25    relating to their sales to Kohl's.  We have filed a motion

1    now requesting that they produce that.  I will also tell the

2    Court that we have a senior vice-president of Kohl's who is

3    coming out here and will be prepared to testify.

4            We are making, I think, a mountain out of a

5    molehill.  I just don't think there is any reason to tell

6    the jury about the timing of production.  If they are told

7    about the timing of the production because the Court

8    believes that somehow that has some bearing on Mr. Larian's

9    credibility when he was up there before, we are requesting

10   that the Court also tell the jury that there is no issue

11   concerning the propriety of the timing of the production.

12   In other words, say something to negate any suggestion that

13   Mattel did anything wrong.

14           I am prepared to come in early if the Court would

15   entertain further discussion of this after reading the

16   brief, prepared to come in early tomorrow morning or come

17   back later on tonight.

18           We have this motion requesting MGA to produce

19   documents relating to their sales to Kohl's which we have

20   filed.

21           THE COURT:  Okay.  Thank you.  I appreciate it.

22   All right.  Now --

23           MR. MCCONVILLE:  I can respond if you want to hear

24   it now.

25           THE COURT:  Please.

1              MR. MCCONVILLE:  Your Honor, these documents fall

2      squarely within not only the document request but the order

3      issued by Judge Infante.  So the fact that they were not

4      produced did leave Mr. Larian on the witness stand unable to

5      defend himself when they said:  You have no evidence that

6      Mattel interfered with your contractual relations; right?

7              So these documents demonstrate that Mr. Larian's

8      credibility, the reason it was attacked was because Mattel

9      hadn't complied with its discovery obligations even pursuant

10     to court order.

11             With regard to their motion to compel that they

12     just filed, I mean, the Court has told us before in this

13     case -- and we have asked for additional discovery during

14     the course of the process -- that discovery is closed.  So

15     if discovery is closed, discovery is closed.

16             MR. QUINN:  The problem with that, Your Honor,

17     there is nothing in this document production that suggests

18     or supports the theory that there was in fact some agreement

19     between Mattel and Kohl's to exclude MGA.  I mean, actually

20     these documents, these documents support the notion that

21     Kohl's came to Mattel and said:  We have had it with MGA.

22     Would you do a deal with us?

23             One of these documents that's in this batch is the

24     e-mail dated December 16, 2004, from a Tom Mascal of Kohl's

25     to Julie Shevlon of Mattel.  This is the opening contact

1     from Kohl's to Mattel, and he says:  Julie, I would like to

2     explore a potential huge opportunity for you, meaning

3     Mattel.  As you are well aware, I have zero love for Bratz.

4     In my humble opinion this is a fad that is done.  What would

5     Mattel think about me throwing out Bratz and replacing the

6     space with our friend Barbie?

7            And it's unintelligible here, is the kicker is if

8     I throw them out, I will need some help with markdowns on

9     old Bratz.  We can talk money later.  They come to us and

10    want to talk about doing the deal about putting more Barbie

11    on the shelf.  You know, we love this document.  The

12    customer comes to us.  We don't think that this supports in

13    any way their theory.  We wish we had had this document to

14    introduce.

15           I again come back to the point, Your Honor, that

16    their own spreadsheets, their own financial records in

17    evidence show that in these years they continued to make

18    sales to Kohl's in 2005 and 2006.  So this is a complex

19    issue with a lot of subplots to it.

20           If we are going to get into it, fine, but I think

21    it's premature to be telling the jury that we failed to

22    timely produce documents until this record is more fully

23    developed.

24           MR. MCCONVILLE:  Your Honor, this isn't complex.

25           THE COURT:  Just a moment.  I am hearing from Mr.

1    Quinn.

2              MR. QUINN:  I'm done, Your Honor.

3              MR. MCCONVILLE:  This isn't complex, Your Honor.

4    The documents that refer to sales were Little Tykes sales.

5    They weren't MGA sales.  That's issue one.

6              Issue two, if they are happy about the document,

7    they could have produced it earlier under the Court order.

8    We are delighted with the document because the following

9    e-mail which Mr. Quinn didn't quote is an e-mail internal to

10   Mattel.  It's Exhibit 37112, which says in conclusion -- it

11   includes the notion that the competition will not be

12   represented in the toy department, and concludes:  Note, we

13   must respond no later than Monday, 12/27, or they will

14   maintain the competition.  No extensions.

15             So it sounds like they've got an artful argument.

16   That's what advocacy is all about.  We enjoy these documents

17   and we think we got the better part of the argument on that

18   one.

19             THE COURT:  Now, if you'd remain for just a

20   moment.  Give me just a few minutes.  I want to have you in

21   a good position concerning Mr. Moore for both parties

22   tomorrow.  He is coming up very quickly after Mr. Eckert, I

23   assume.  Is he who you are calling back after Eckert?

24             MS. HURST:  Yes.

25             THE COURT:  Okay.

```
 1              MS. HURST:  Your Honor, could I add a couple of
 2    points on the verdict form that I forgot the first time
 3    through?  Just very quickly.
 4              THE COURT:  Sure.
 5              MS. HURST:  On question 6, subparts 5 --
 6              THE COURT:  Just a moment.  Question 6, part 5.
 7              MS. HURST:  Subparts 5 through 8 that needs the
 8    if-any language.
 9              THE COURT:  Well, it's there.
10              MS. HURST:  No.  The damages are assumed to be
11    owed rather than the option of zero being indicated by some
12    language.
13              THE COURT:  Just a minute.  The amount of damages,
14    if any.
15              MS. HURST:  Oh, that's not on the one I have.
16    Maybe the Court has a different version.
17              THE COURT:  Let me see.  Let me see the version
18    you've got.  I am going to print this out one more time.  We
19    are not done with the discussions.
20              Hold on a minute.  I want to place a call again to
21    this attorney for a minute.  Off the record.
22              (Off-the-record discussion)
23              THE COURT:  Are either one of you opposed to the
24    chart itself?  That's the only question I have.  Are either
25    counsel opposed to the chart itself?
```

1           MS. HURST:  Which chart?

2           THE COURT:  Any of the charts.

3           MS. HURST:  Not in their present form, but I do

4    disagree that the column for infringed be removed because

5    there are so many choices here, and some of them clearly

6    would be wrong, so we need to exclude those possibilities.

7           MR. ZELLER:  Other than that column that I called

8    out to the Court, I think we are comfortable with the charts

9    and certainly the concepts of laying it out that way.  The

10   one thing I neglected to do earlier was cite the Court --

11   which I am sure the Court is aware of -- to the exact

12   language of the statute of limitations, which we think is

13   absolutely appropriate and what the Court has in the verdict

14   form.

15          It's verbatim from the Uniform Trade Secret Act of

16   California, Section 3426.6, which says:  An action for

17   misappropriation must be brought within three years after

18   the misappropriation is discovered or by the exercise of

19   reasonable diligence should have been discovered.

20          THE COURT:  Last chance.  Do you want this going

21   to the jury on what I am going to call damages, unjust

22   enrichment, lost profits, or are either of you considering

23   royalty?

24          MS. HURST:  No.  It should go to the jury on

25   damages.

58

1          MR. ZELLER:  Well, we have talked about that

2    earlier.  We think reasonable royalty should go to the jury

3    as an option as well.  We think it would be lost profits,

4    unjust enrichment, disgorgement and royalty.

5          THE COURT:  All right.  Thank you.

6          (Thereupon, the proceedings were concluded.)

7                         -oOo-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                              CERTIFICATE

6

7              I hereby certify that pursuant to Section 753,

8    Title 28, United States Code, the foregoing is a true and

9    correct transcript of the stenographically reported

10   proceedings held in the above-entitled matter and that the

11   transcript page format is in conformance with the

12   regulations of the Judicial Conference of the United States.

13

14   Date:  April 4, 2011

15

16

17                          Sharon A. Seffens 4/4/11
                         _____
18                          SHARON A. SEFFENS, U.S. COURT REPORTER

19

20

21

22

23

24

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER