1            **UNITED STATES DISTRICT COURT**

2            **CENTRAL DISTRICT OF CALIFORNIA**

3         **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    - - - - - - -

5
   MATTEL, INC., et al.,              )
6                                     )
             Plaintiffs,              )
7                                     )
        vs.                           ) No. CV 04-9049 DOC
8                                     )    Day 45
   MGA ENTERTAINMENT, INC., et al.,   )    Volume 1 of 4
9                                     )
                                      )
10           Defendants.              )
   _____)

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    Jury Trial

16                Santa Ana, California

17               Monday, April 4, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-04-04 D45V1

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 2 of 158   Page ID #:315897
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

2

```
1    APPEARANCES OF COUNSEL:

2

     FOR PLAINTIFF MATTEL, INC., ET AL.:
3
               QUINN EMANUEL URQUHART & SULLIVAN
4              BY:  JOHN QUINN
                    WILLIAM PRICE
5                   MICHAEL T. ZELLER
                    Attorneys at Law
6              865 South Figueroa Street
               10th Floor
7              Los Angeles, California 90017
               (213) 443-3000
8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12             ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
               BY:  THOMAS S. McCONVILLE
13                  Attorney at Law
               4 Park Plaza
14             Suite 1600
               Irvine, California 92614
15             (949) 567-6700

16             - AND -

17             ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
               BY:  ANNETTE L. HURST
18                  Attorney at Law
               405 Howard Street
19             San Francisco, California 94105
               (415)773-5700
20
               - AND -
21
               KELLER RACKAUCKAS
22             BY:  JENNIFER KELLER
                    Attorney at Law
23             18500 Von Karman Avenue
               Suite 560
24             Irvine, California 92612
               (949) 476-8700
25
```

Case 2:04-cv-09049-DOC-RNB Document 10395 Filed 04/06/11 Page 3 of 158 Page ID #:315898
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4

5             LAW OFFICES OF MARK E. OVERLAND
              By:  MARK E. OVERLAND
                    Attorney at Law
6             100 Wilshire Boulevard
              Suite 950
7             Santa Monica, California 90401
              (310) 459-2830

8             - AND -

9
              SCHEPER KIM & HARRIS LLP
10            BY:  ALEXANDER H. COTE
                    Attorney at Law
11            601 West 5th Street
              12th Floor
12            Los Angeles, California 90071
              (213) 613-4660

13

14   ALSO PRESENT:

15            MGA ENTERTAINMENT, INC.
              BY:  JEANINE PISONI
16                  Attorney at Law
              16360 Roscoe Boulevard
17            Suite 105
              Van Nuys, California 91406

18

19            ROBERT A. ECKERT, MATTEL CEO

20            ISAAC LARIAN, MGA CEO

21            KEN KOTARSKI, Mattel Technical Operator

22            MIKE STOVALL, MGA Technical Operator

23

24

25

Case 2:04-cv-09049-DOC-RNB Document 10395 Filed 04/06/11 Page 4 of 158 Page ID #:315899
CV 04-9049 DOC – 4/4/2001 – Day 45, Volume 1 of 4

4

1

2                              **I N D E X**

3      **WITNESSES**                **DIRECT   CROSS   REDIRECT   RECROSS**

4      ECKERT, Robert A.

5      By Ms. Keller                                    6

6      By Mr. Overland                                           74

7      By Mr. Quinn                                              85

8      By Ms. Keller (further)                       112

9      By Mr. Quinn (further)                                    121

10

11

12

13                             **EXHIBITS**

14     **EXHIBIT NO.**                **IDENTIFICATION**      **IN EVIDENCE**

15       1703      Copyright for dolls                  15
16                 (Portuguese)

17       7506      Mattel 2005 Annual                   48
                   report and 10-K

18       7506-8   Page 8 of Exhibit 7506               48

19       8572      E-mail from Ms. Foster               31
20                 dated 6/29/2004

21       8972      E-mail from Ms. Brothers             28
                   to Mr. Eckert dated
22                 11/28/2006

23       9222      Bain and Company                     44
                   7/29/2004 preliminary
24                 findings

25       9819      MGA Royalty Payment Log             122

1                        **EXHIBITS (Continued)**

2     **EXHIBIT NO.**                    **IDENTIFICATION**      **IN EVIDENCE**

3       20525    E-mail from Mr. Eckert                         101
                 to Ms. Brothers
4
        37112    E-mail from Ms.                                 55
5                Spaulding to Mr.
                 Bousquette, Mr. Cleary
6                and Mr. Vollero dated
                 12/22/2004
7
        37113    E-mail from Mr. Maskel                          53
8                to Ms. Scholvin dated
                 12/16/2004
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:04-cv-09049-DOC-RNB  Document 10395  Filed 04/06/11  Page 6 of 158  Page ID #:315901
CV 04-9049 DOC – 4/4/2001 – Day 45, Volume 1 of 4

6

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, MONDAY, APRIL 4, 2011**             |
|       | 2  | **Day 45, Volume 1 of 4**                                    |
|       | 3  | (8:31 a.m.)                                                   |
| 08:31 | 4  | *(In the presence of the jury.)*                             |
| 08:31 | 5  | THE COURT:  Okay.  We're back in session.  The               |
| 08:31 | 6  | jury's present.  Mr. Eckert is present.                      |
| 08:31 | 7  | Good morning.                                                |
| 08:31 | 8  | All counsel are present.  Mr. Larian is present.            |
| 08:31 | 9  | And, Counsel, if you would like to continue your            |
| 08:31 | 10 | redirect, please.                                            |
| 08:31 | 11 | MS. KELLER:  Thank you, Your Honor.                         |
| 10:21 | 12 | **ROBERT A. ECKERT, MGA'S WITNESS, PREVIOUSLY SWORN**       |
| 10:21 | 13 | **RESUMED THE STAND**                                        |
| 08:31 | 14 | **REDIRECT EXAMINATION**                                     |
| 08:31 | 15 | BY MS. KELLER:                                               |
| 08:31 | 16 | Q.   Mr. Eckert, you testified last Friday that -- we were  |
| 08:31 | 17 | talking about the Market Intelligence department.  And you  |
| 08:31 | 18 | testified last Friday that you have actually visited a      |
| 08:31 | 19 | research library that once existed at Mattel on the ninth   |
| 08:32 | 20 | floor, but is now on the eighth floor.  Do you remember     |
| 08:32 | 21 | that?                                                        |
| 08:32 | 22 | A.   I do.                                                   |
| 08:32 | 23 | Q.   That was the Market Intelligence library, correct?     |
| 08:32 | 24 | A.   Yes, I believe it is.                                   |
| 08:32 | 25 | Q.   You described it as a mere storage closet, similar to a|

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

7

| | | |
|---|---|---|
| 08:32 | 1 | storage closet you have on the fifteenth floor where you |
| 08:32 | 2 | keep toys, right? |
| 08:32 | 3 | A.   Yes. |
| 08:32 | 4 | Q.   And you said it just has some brown file folders with |
| 08:32 | 5 | catalogs of toy company products, right? |
| 08:32 | 6 | A.   That's what I remember seeing there, yes. |
| 08:32 | 7 | Q.   And you said it was information that might be |
| 08:32 | 8 | publically available, true? |
| 08:32 | 9 | A.   Yes. |
| 08:32 | 10 | Q.   And that you had no reason to think that there was any |
| 08:32 | 11 | information there in that storage closet that wasn't |
| 08:32 | 12 | provided to retailers, members of the press, and otherwise |
| 08:32 | 13 | made available at toy fairs, right? |
| 08:32 | 14 | A.   That I don't know. |
| 08:32 | 15 | Q.   I'm talking about your testimony on Friday. |
| 08:32 | 16 | A.   I don't remember that question and answer. |
| 08:32 | 17 | Q.   Could you take a look at trial transcript, Volume -- I |
| 08:33 | 18 | guess we don't have that, so we won't be taking a look at |
| 08:33 | 19 | it. |
| 08:33 | 20 | THE COURT:  You don't have to do anything.  It's |
| 08:33 | 21 | their responsibility to hand it right to you. |
| 08:33 | 22 | BY MS. KELLER: |
| 08:33 | 23 | Q.   But you know, don't you, that the entire Market |
| 08:33 | 24 | Intelligence library was actually carted off in boxes to an |
| 08:33 | 25 | outside law firm and has been there since the material was |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

8

| 08:33 | 1 | turned over to them in 2006?  You know that, right? |
| 08:33 | 2 | MR. QUINN:  Lacks foundation. |
| 08:33 | 3 | THE COURT:  Overruled. |
| 08:33 | 4 | THE WITNESS:  No, I don't. |
| 08:33 | 5 | BY MS. KELLER: |
| 08:33 | 6 | Q.   You don't know that your outside counsel, at the |
| 08:33 | 7 | direction of the Law Department at Mattel, came in and |
| 08:33 | 8 | carted off 35 boxes full of competitor information? |
| 08:33 | 9 | A.   No, I don't. |
| 08:33 | 10 | Q.   Have you visited the boxes at outside counsel's office |
| 08:33 | 11 | to see what was actually in the market intelligence library |
| 08:33 | 12 | before it was whisked away? |
| 08:33 | 13 | MR. QUINN:  Your Honor, this assumes facts.  Lacks |
| 08:33 | 14 | any foundation. |
| 08:34 | 15 | THE COURT:  Overruled. |
| 08:34 | 16 | THE WITNESS:  No, I have not. |
| 08:34 | 17 | BY MS. KELLER: |
| 08:34 | 18 | Q.   Did you inquire of anybody, "What happened to all of |
| 08:34 | 19 | the information we had on the ninth floor?" |
| 08:34 | 20 | A.   No. |
| 08:34 | 21 | Q.   So you -- did you just visit the eighth floor storage |
| 08:34 | 22 | closet on your own, or were you directed to do so? |
| 08:34 | 23 | A.   Um, I went with another gentleman. |
| 08:34 | 24 | Q.   Who was -- |
| 08:34 | 25 | A.   And with an attorney. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

9

| 08:34 | 1  | Q.   So you were directed to go look at the storage closet |
| 08:34 | 2  | so you could come in here and say the market intelligence |
| 08:34 | 3  | library was just a storage closet, basically, right? |
| 08:34 | 4  | A.   No.  I was curious about it because I was asked about |
| 08:34 | 5  | it in my deposition. |
| 08:34 | 6  | Q.   And as the CEO of the firm, of course, of the company, |
| 08:34 | 7  | you were entitled to know the whole scoop about that |
| 08:34 | 8  | library, right? |
| 08:34 | 9  | A.   Yes. |
| 08:34 | 10 | Q.   Including the fact that it had been carted away from |
| 08:34 | 11 | Mattel and now existed somewhere else? |
| 08:34 | 12 | MR. QUINN:  Assumes facts. |
| 08:34 | 13 | THE COURT:  "Carted away" is argumentative. |
| 08:34 | 14 | Sustained. |
| 08:34 | 15 | BY MS. KELLER: |
| 08:34 | 16 | Q.   Including the fact that it had been removed in the form |
| 08:35 | 17 | of 35 separate boxes and taken to a law firm away from the |
| 08:35 | 18 | building; you were entitled to know that, right? |
| 08:35 | 19 | A.   Yes. |
| 08:35 | 20 | Q.   Have you asked? |
| 08:35 | 21 | A.   No, I have not. |
| 08:35 | 22 | Q.   Did you ask anybody, "This storage closet that I'm |
| 08:35 | 23 | viewing right now, does this contain all the materials that |
| 08:35 | 24 | were up on the ninth floor?" |
| 08:35 | 25 | A.   No, I did not. |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 10 of 158   Page ID #:315905
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

10

| 08:35 | 1 | Q. Do you want to know? |
| 08:35 | 2 | A. I'm curious now. |
| 08:35 | 3 | Q. Well, you're just hearing it for the first time from |
| 08:35 | 4 | me? |
| 08:35 | 5 | A. No. I believe I heard it on Friday, as well. |
| 08:35 | 6 | Q. From whom? |
| 08:35 | 7 | A. From the Judge, His Honor. |
| 08:35 | 8 | Q. And since hearing from His Honor about the 35 boxes, |
| 08:35 | 9 | did you, over the weekend, decide to go visit the boxes so |
| 08:35 | 10 | that you could now find out what had once been in your ninth |
| 08:35 | 11 | floor market intelligence library? |
| 08:35 | 12 | A. No, I did not. |
| 08:35 | 13 | Q. Did you ask to? |
| 08:35 | 14 | A. No. |
| 08:36 | 15 | Q. You know, don't you, that when you testified here that |
| 08:36 | 16 | you visited this eighth floor storage closet and there was |
| 08:36 | 17 | very little in it, that that was creating a misleading |
| 08:36 | 18 | impression; when, in fact, the materials had been removed |
| 08:36 | 19 | from it? |
| 08:36 | 20 | MR. QUINN: This is argumentative. |
| 08:36 | 21 | THE COURT: Sustained. |
| 08:36 | 22 | BY MS. KELLER: |
| 08:36 | 23 | Q. Do you believe that that creates a misleading |
| 08:36 | 24 | impression on your part? |
| 08:36 | 25 | MR. QUINN: Same objection. |

| | | |
|---|---|---|
| 08:36 | 1 | THE COURT:  Sustained. |
| 08:36 | 2 | BY MS. KELLER: |
| 08:36 | 3 | Q.   So, Mr. Eckert, just to complete the loop on this |
| 08:36 | 4 | point, is it true that the first time you knew that the |
| 08:36 | 5 | market intelligence library had been taken away from Mattel |
| 08:36 | 6 | by Mattel's outside counsel was when you heard it in Court, |
| 08:36 | 7 | either from MGA's attorneys or from His Honor? |
| 08:36 | 8 | MR. QUINN:  Assumes facts.  Lacks foundation. |
| 08:37 | 9 | THE COURT:  Overruled. |
| 08:37 | 10 | THE WITNESS:  That's right. |
| 08:37 | 11 | BY MS. KELLER: |
| 08:37 | 12 | Q.   And having learned that, you did nothing to inquire |
| 08:37 | 13 | further? |
| 08:37 | 14 | A.   That's correct. |
| 08:37 | 15 | Q.   Were you worried yourself that the testimony that you |
| 08:37 | 16 | had given might have left a misleading impression after you |
| 08:37 | 17 | heard that? |
| 08:37 | 18 | MR. QUINN:  Objection. |
| 08:37 | 19 | THE COURT:  You can argue this, Counsel.  I'm |
| 08:37 | 20 | going to sustain the objection. |
| 08:37 | 21 | No.  Strike that.  I'm going to reverse that.  You |
| 08:37 | 22 | can ask him about his own questions.  My apologies. |
| 08:37 | 23 | BY MS. KELLER: |
| 08:37 | 24 | Q.   Okay.  After you testified about the market |
| 08:37 | 25 | intelligence being located in this storage closet on the |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:37 | 1 | eighth floor containing relatively little and then heard |
| 08:37 | 2 | from MGA and His Honor about the fact that these 35 boxes |
| 08:37 | 3 | had been removed to your outside counsel's offices, were you |
| 08:37 | 4 | concerned that perhaps your testimony on Friday could have |
| 08:38 | 5 | left a misleading impression? |
| 08:38 | 6 | MR. QUINN: This assumes facts, Your Honor, as to |
| 08:38 | 7 | what the boxes are and where they were from. |
| 08:38 | 8 | THE COURT: Overruled. You can answer the |
| 08:38 | 9 | question. |
| 08:38 | 10 | THE WITNESS: No. I saw what I saw. |
| 08:38 | 11 | BY MS. KELLER: |
| 08:38 | 12 | Q. Okay. Just to be clear. You weren't concerned that |
| 08:38 | 13 | your testimony Friday on that subject might have left a |
| 08:38 | 14 | misleading impression? |
| 08:38 | 15 | A. No. That's correct. What I saw in the storage closet |
| 08:38 | 16 | is what I saw in the storage closet and what I reported. |
| 08:38 | 17 | There may have been something there prior to that, but I |
| 08:38 | 18 | wasn't aware of that. |
| 08:38 | 19 | Q. And you took no steps whatsoever to find out, correct? |
| 08:38 | 20 | A. That's correct. |
| 08:38 | 21 | Q. Now, last Friday you remember being asked if you knew |
| 08:38 | 22 | what Mr. Machado was alleged to have downloaded; do you |
| 08:38 | 23 | recall that? |
| 08:38 | 24 | A. Yes, I do. |
| 08:38 | 25 | Q. And you testified that what you saw in a line list here |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

13

| | | |
|---|---|---|
| 08:39 | 1 | in Court was not only the FOB, or so-called A-list price, |
| 08:39 | 2 | but what your product actually cost. |
| 08:39 | 3 | Do you recall saying -- stating that? |
| 08:39 | 4 | A.   It was either the cost or the margin.  But I recall |
| 08:39 | 5 | some internal profitability numbers, yes. |
| 08:39 | 6 | Q.   You said that what you saw in a line list here was not |
| 08:39 | 7 | only the FOB, or A-list price, but your product cost. |
| 08:39 | 8 | Do you recall that testimony? |
| 08:39 | 9 | A.   I may have. |
| 08:39 | 10 | Q.   I'm talking about what you said. |
| 08:39 | 11 | A.   Yeah, I don't remember the specific words, but it's |
| 08:39 | 12 | possible I said that.  Certainly, I -- I recall something |
| 08:39 | 13 | with our margins, or in fact, I think I remember even |
| 08:39 | 14 | operating income, which is the bottom line profits of a |
| 08:39 | 15 | product. |
| 08:39 | 16 | Q.   You remember saying, quote, "That is what we pay for |
| 08:39 | 17 | the good from the vendor or our own internal plant that's |
| 08:39 | 18 | making the good that we in turn sale to the retailer," |
| 08:39 | 19 | closed quotes. |
| 08:39 | 20 | Is that what you said? |
| 08:40 | 21 | A.   Yes, could be. |
| 08:40 | 22 | Q.   Could be or is? |
| 08:40 | 23 | A.   It is. |
| 08:40 | 24 | Q.   And you also said that you saw information about |
| 08:40 | 25 | estimated prices or projected prices months or even a year |

CV 04-9049 DOC – 4/4/2001 – Day 45, Volume 1 of 4

14

| | | |
|---|---|---|
| 08:40 | 1 | in advance, right? |
| 08:40 | 2 | A.   That's right.  I believe it had either the A-price or |
| 08:40 | 3 | the FOB price. |
| 08:40 | 4 | Q.   And you said you never disclose your product cost |
| 08:40 | 5 | outside of Mattel, right? |
| 08:40 | 6 | A.   True. |
| 08:40 | 7 | Q.   Please look at Exhibit 7104. |
| 08:40 | 8 | *(Document provided to the witness.)* |
| 08:40 | 9 | BY MS. KELLER: |
| 08:40 | 10 | Q.   And this is the line list you were discussing? |
| 08:40 | 11 | A.   Yes. |
| 08:40 | 12 | Q.   And where does it say anything on this document about |
| 08:40 | 13 | what the product actually cost Mattel? |
| 08:41 | 14 | A.   If you go to 7104-406, in the one, two, three, four, |
| 08:41 | 15 | five -- sixth column, where it has "margin at EA," that's |
| 08:41 | 16 | the price less the cost. |
| 08:41 | 17 | Q.   Well, that doesn't list your product cost from the |
| 08:41 | 18 | manufacturer, though, correct? |
| 08:41 | 19 | A.   No, it doesn't list that number, but that -- it can't |
| 08:41 | 20 | be derived without having that number. |
| 08:41 | 21 | Q.   Well, except that your margin is something that is |
| 08:42 | 22 | going to be based on a suggested retail price that may or |
| 08:42 | 23 | may not happen, correct? |
| 08:42 | 24 | A.   No.  Our margin is based on our price to the retailer. |
| 08:42 | 25 | Q.   That's retailer margin, right? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 15 of 158   Page ID #:315910
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

15

| | | |
|---|---|---|
| 08:42 | 1 | A.   No.   Our price is -- our margin is based on our price |
| 08:42 | 2 | to the retailer less our cost.  So when we're talking in |
| 08:42 | 3 | this document about our margin, that's our price less our |
| 08:42 | 4 | cost.  That's not -- that has nothing to do with the retail |
| 08:42 | 5 | price. |
| 08:42 | 6 | Q.   Let's look at Exhibit 1703, if we can. |
| 08:42 | 7 | *(Document provided to the witness.)* |
| 08:42 | 8 | THE WITNESS:  I have it. |
| 08:42 | 9 | BY MS. KELLER: |
| 08:42 | 10 | Q.   You see this document bears a Mattel Bates stamp? |
| 08:42 | 11 | A.   It does. |
| 08:42 | 12 | Q.   That means it was produced by Mattel.  That's your |
| 08:42 | 13 | understanding, correct? |
| 08:42 | 14 | A.   Yes, it is. |
| 08:42 | 15 | Q.   And if -- |
| 08:42 | 16 | MS. KELLER:  Your Honor, I would move -- I think |
| 08:42 | 17 | 1703 is already in evidence. |
| 08:42 | 18 | THE COURT:  It's re-received if it's not. |
| 08:43 | 19 | *(Exhibit No. 1703 received in evidence.)* |
| 08:43 | 20 | *(Document displayed.)* |
| 08:43 | 21 | BY MS. KELLER: |
| 08:43 | 22 | Q.   And you see that this is a copyright, if we look at the |
| 08:43 | 23 | first page, for a Jade doll, correct? |
| 08:43 | 24 | A.   Uh, not speaking Portuguese, but sounds good to me. |
| 08:43 | 25 | Q.   Well, just read what's underneath the doll's feet. |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 16 of 158   Page ID #:315911
CV 04-9049 DOC – 4/4/2001 – Day 45, Volume 1 of 4

16

| | | |
|---|---|---|
| 08:43 | 1 | A.   Yes. |
| 08:43 | 2 | Q.   Does that say, "Jade"? |
| 08:43 | 3 | A.   It does. |
| 08:43 | 4 | Q.   If you look at the last paragraph -- last two |
| 08:43 | 5 | paragraphs you see the word "Jade" again? |
| 08:43 | 6 | A.   I do. |
| 08:43 | 7 | Q.   And under "*Autor*," A-U-T-O-R, we see Carter H. Bryant, |
| 08:43 | 8 | right? |
| 08:43 | 9 | A.   Yes. |
| 08:43 | 10 | Q.   And then if you look at the date, September 26, 2002. |
| 08:43 | 11 | A.   Yes. |
| 08:43 | 12 | Q.   And if you take a look at the second page -- |
| 08:44 | 13 | *(Document displayed.)* |
| 08:44 | 14 | BY MS. KELLER: |
| 08:44 | 15 | Q.   -- you see the same information with the name "Sasha," |
| 08:44 | 16 | right? |
| 08:44 | 17 | A.   I do. |
| 08:44 | 18 | Q.   Also, "Carter Bryant" listed? |
| 08:44 | 19 | A.   That's correct. |
| 08:44 | 20 | Q.   And also registered 26th of September 2002, right? |
| 08:44 | 21 | A.   Yes. |
| 08:44 | 22 | Q.   And if we look at the top, who's registering it, we see |
| 08:44 | 23 | that it's being registered by ABC International Traders, |
| 08:44 | 24 | Inc. dba -- doing business as MGA Entertainment, right? |
| 08:44 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 08:44 | 1 | Q.   And same thing is true for the preceding one, the Jade |
| 08:44 | 2 | doll, correct? |
| 08:44 | 3 | A.   That's correct. |
| 08:44 | 4 | Q.   And then if we go to page 3, we see the same |
| 08:44 | 5 | information being registered on the same date for the Yasmin |
| 08:44 | 6 | doll? |
| 08:44 | 7 | (Document displayed.) |
| 08:44 | 8 | THE WITNESS:  Correct. |
| 08:44 | 9 | BY MS. KELLER: |
| 08:44 | 10 | Q.   And if we go to page 4, we see the same information |
| 08:45 | 11 | being registered on the same date for the Cloe doll? |
| 08:45 | 12 | (Document displayed.) |
| 08:45 | 13 | THE WITNESS:  Correct. |
| 08:45 | 14 | BY MS. KELLER: |
| 08:45 | 15 | Q.   And if we go to the fifth page, we now see in English |
| 08:45 | 16 | registration of the drawing of the character Sasha, right? |
| 08:45 | 17 | (Document displayed.) |
| 08:45 | 18 | THE WITNESS:  Yes. |
| 08:45 | 19 | BY MS. KELLER: |
| 08:45 | 20 | Q.   Also by MGA, right? |
| 08:45 | 21 | A.   Correct. |
| 08:45 | 22 | Q.   Also dated September 26, 2002? |
| 08:45 | 23 | A.   Correct. |
| 08:45 | 24 | Q.   And if we go to page 7, we see the English translation |
| 08:45 | 25 | of the request to register Cloe. |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

18

| | | |
|---|---|---|
| 08:45 | 1 | (Document displayed.) |
| 08:45 | 2 | THE WITNESS: Correct. |
| 08:46 | 3 | BY MS. KELLER: |
| 08:46 | 4 | Q. By MGA, correct? |
| 08:46 | 5 | A. Correct. |
| 08:46 | 6 | Q. And then if we go to page 8 -- |
| 08:46 | 7 | (Document displayed.) |
| 08:46 | 8 | BY MS. KELLER: |
| 08:46 | 9 | Q. -- again, we see some English translation for the |
| 08:46 | 10 | registration of Cloe, correct? |
| 08:46 | 11 | A. Yes. |
| 08:46 | 12 | Q. And that's September 26, 2002? |
| 08:46 | 13 | A. Correct. |
| 08:46 | 14 | Q. And then if we go to page 10, we see the English |
| 08:46 | 15 | version of that registration for Yasmin? |
| 08:46 | 16 | (Document displayed.) |
| 08:46 | 17 | THE WITNESS: Yes. |
| 08:46 | 18 | BY MS. KELLER: |
| 08:46 | 19 | Q. And that's, again, being registered by MGA |
| 08:46 | 20 | Entertainment? |
| 08:46 | 21 | A. Correct. |
| 08:46 | 22 | Q. And the page 11 of that one -- |
| 08:46 | 23 | (Document displayed.) |
| 08:46 | 24 | BY MS. KELLER: |
| 08:46 | 25 | Q. -- in English, also discloses Carter Bryant as the |

| 08:46 | 1 | author? |
| 08:46 | 2 | A.   Yes. |
| 08:46 | 3 | Q.   And if we go to pages 12 and 13 -- |
| 08:46 | 4 | *(Document displayed.)* |
| 08:47 | 5 | BY MS. KELLER: |
| 08:47 | 6 | Q.   -- we see the English translation of the registration |
| 08:47 | 7 | by MGA of the Jade character, right? |
| 08:47 | 8 | A.   Yes. |
| 08:47 | 9 | Q.   Also dated September 26th, 2002, and listing Carter |
| 08:47 | 10 | Bryant as the author, correct? |
| 08:47 | 11 | A.   Yes. |
| 08:47 | 12 | Q.   And did you undertake to find out when it was that |
| 08:47 | 13 | Mattel obtained those documents? |
| 08:47 | 14 | A.   No, I did not. |
| 08:47 | 15 | Q.   Now, if we could turn to a different topic. |
| 08:47 | 16 | We've already seen that Mattel's code of conduct sets |
| 08:47 | 17 | forth principles about Mattel's responsibilities to its |
| 08:47 | 18 | competitors. |
| 08:47 | 19 | And if we could go back to Exhibit 20327. |
| 08:47 | 20 | *(Document provided to the witness.)* |
| 08:48 | 21 | MS. KELLER:  Page 12. |
| 08:48 | 22 | *(Document displayed.)* |
| 08:48 | 23 | THE WITNESS:  I have that. |
| 08:48 | 24 | BY MS. KELLER: |
| 08:48 | 25 | Q.   And page 12, under "Our Responsibility to Competitors," |

DEBBIE GALE, U.S. COURT REPORTER

08:48  1    we've already looked at the first point about, "Gathering

08:48  2    Competitive Information."  And that says that, "Mattel does

08:48  3    not seek to obtain competitive information by illegal or

08:48  4    unethical means, and we do not knowingly use any information

08:48  5    obtain in this manner."

08:48  6         Now, go down to the second bullet point.  "Fair

08:48  7    Competition and Antitrust."

08:48  8         "Mattel competes aggressively and fairly in each market

08:48  9    in which it operates and is dedicated to compliance with the

08:48  10   applicable antitrust and competition laws in all its

08:48  11   worldwide activities and locations.

08:48  12        "Antitrust laws are designed to prohibit agreements

08:48  13   among companies that would fix prices, divide markets,

08:48  14   allocate customers, limit production, or otherwise impede or

08:49  15   destroy market forces.  We must strictly comply with the

08:49  16   antitrust laws of all countries, states, and localities in

08:49  17   which we conduct Mattel business."

08:49  18        And, Mr. Eckert, you know that particularly in the

08:49  19   United States, antitrust laws are designed to prevent unfair

08:49  20   competition, right?

08:49  21   A.   I wouldn't confine it to the United States, but yes.

08:49  22   Q.   But particularly here.  I mean, we were the origin

08:49  23   worldwide of antitrust laws, weren't we?

08:49  24   A.   I don't know.

08:49  25   Q.   Back in the days of Teddy Roosevelt, the trust buster.

| | | |
|---|---|---|
| 08:49 | 1 | Do you remember that? |
| 08:49 | 2 | A.    I do. |
| 08:49 | 3 | Q.    And so in the United States, would you agree that |
| 08:49 | 4 | robust competition is kind of -- is almost an American |
| 08:49 | 5 | principle? |
| 08:49 | 6 | A.    It is. |
| 08:49 | 7 | Q.    And protecting robust competition is enshrined in our |
| 08:50 | 8 | laws, isn't it? |
| 08:50 | 9 | A.    Yes, it is. |
| 08:50 | 10 | Q.    Now, you were Mattel's 30(b)(6) witness regarding the |
| 08:50 | 11 | topic of Mattel's practice of communicating with its |
| 08:50 | 12 | licensees about actual or potential MGA licenses. |
| 08:50 | 13 |      You recall that? |
| 08:50 | 14 | A.    I recall there was a debate about whether or not I was |
| 08:50 | 15 | a 30(b)(6) witness, but yes, I did -- I was deposed on that |
| 08:50 | 16 | topic. |
| 08:50 | 17 | Q.    You were Mattel's 30(b)(6) witness regarding that |
| 08:50 | 18 | topic, correct? |
| 08:50 | 19 | A.    That's my understanding of the resolution of the |
| 08:50 | 20 | debate, yes. |
| 08:50 | 21 | Q.    So that's a yes? |
| 08:50 | 22 | A.    Yes, it is. |
| 08:50 | 23 | Q.    Now, you testified that the practices included the -- |
| 08:50 | 24 | threatening existing licensees that you would terminate the |
| 08:50 | 25 | relations at once if they did not stop dealing with MGA, |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 22 of 158   Page ID #:315917
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

22

| | | |
|---|---|---|
| 08:50 | 1 | right? |
| 08:50 | 2 | A.   No.   You know that section is completely out of |
| 08:51 | 3 | context.   And you know that. |
| 08:51 | 4 | Q.   Did you ever -- you being Mattel -- engage in practices |
| 08:51 | 5 | that include threatening existing licensees that you would |
| 08:51 | 6 | terminate their relations at once if they did not stop |
| 08:51 | 7 | dealing with MGA? |
| 08:51 | 8 | A.   No, we did not do that. |
| 08:51 | 9 | Q.   And I would ask you to look at your deposition of |
| 08:51 | 10 | October 4th, 2010. |
| 08:51 | 11 | *(Document provided to the witness.)* |
| 08:51 | 12 | BY MS. KELLER: |
| 08:51 | 13 | Q.   Page 249, line 25. |
| 08:51 | 14 | THE COURT:   Page 249. |
| 08:51 | 15 | MS. KELLER:   249, line 25, through 250, line 4. |
| 08:51 | 16 | MR. QUINN:   This is completely out of context, |
| 08:52 | 17 | Your Honor. |
| 08:52 | 18 | THE COURT:   Counsel, the passages before would |
| 08:52 | 19 | need to be looked at. |
| 08:52 | 20 | MR. QUINN:   Beginning at -- if I may, Your Honor, |
| 08:52 | 21 | page -- |
| 08:52 | 22 | THE COURT:   That's okay, Counsel.   I can read. |
| 08:52 | 23 | MR. QUINN:   All right. |
| 08:52 | 24 | THE COURT:   Probably minimally at line 11. |
| 08:52 | 25 | Now, Mr. Quinn. |

| 08:52 | 1 | MR. QUINN:  Really, it begins at page 248, line 9. |
| 08:52 | 2 | The whole series puts that answer in context. |
| 08:52 | 3 | THE COURT:  Just a moment. |
| 08:52 | 4 | Counsel, you can read over to page 250, line 4, |
| 08:52 | 5 | but I agree the question would begin at page 248, line 9. |
| 08:53 | 6 | MS. KELLER:  Okay.  Be happy to read that. |
| 08:53 | 7 | (Reading:) |
| 08:53 | 8 | "QUESTION:  Did you investigate whether there had |
| 08:53 | 9 | been any communications between Mattel and Smith & Brooks |
| 08:53 | 10 | regarding any potential arrangement between Smith & Brooks |
| 08:53 | 11 | and MGA? |
| 08:53 | 12 | "ANSWER:  No, I didn't specifically investigate |
| 08:53 | 13 | anything that had -- anything regarding Smith & Brooks. |
| 08:53 | 14 | "QUESTION:  Did you investigate anything regarding |
| 08:53 | 15 | any communications that may have occurred between Mattel and |
| 08:53 | 16 | Zeon? |
| 08:53 | 17 | "ANSWER:  No.  Again, other than THQ, I talked |
| 08:53 | 18 | about the specific policies and practices and views without |
| 08:53 | 19 | regard to specific licenses (sic). |
| 08:53 | 20 | "QUESTION:  Did you investigate any communications |
| 08:53 | 21 | between Mattel and Gemma? |
| 08:53 | 22 | "ANSWER:  Gemma? |
| 08:53 | 23 | "QUESTION:  G-E-M -- pardon me, G-E-M-M-A.  Maybe |
| 08:53 | 24 | it's Gemma.  I don't know. |
| 08:53 | 25 | "ANSWER:  No, I did not. |

08:53   1          "QUESTION:  I may have asked you this before the

08:53   2   break, but did you investigate any communications between

08:53   3   Mattel and Euromic?

08:54   4          "ANSWER:  I would say asked and answered.  But no,

08:54   5   I did not.

08:54   6          "QUESTION:  I told you that doesn't work.

08:54   7          "ANSWER:  I tried, though.  I got it in, and I'm

08:54   8   right.  Check the record.

08:54   9          "QUESTION:  You undoubtedly are.

08:54   10         "Did you investigate whether it was true that

08:54   11  Niels Bokholst of Euromic received a call from the regional

08:54   12  manager of Mattel, who had heard rumors indicating that

08:54   13  Euromic signed up with MGA and was quite upset about it and

08:54   14  told Mr. Bokholst point-blank that Mattel would discontinue

08:54   15  relations with Euromic if Euromic did not stop dealing with

08:54   16  MGA at once?

08:54   17         "ANSWER:  No.  Again, I didn't investigate

08:54   18  specific company allocations -- or allegations about

08:54   19  specific companies.  I did investigate broadly what the

08:54   20  practices are -- or policies are and their experiences were.

08:54   21         "QUESTION:  Well, did the practices include

08:54   22  threatening existing licensees that you would terminate

08:54   23  their relations at once if they did not stop dealing with

08:55   24  MGA?

08:55   25         "ANSWER:  Yes, I believe it did."

DEBBIE GALE, U.S. COURT REPORTER

| 08:55 | 1 | BY MS. KELLER: |
| 08:55 | 2 | Q.   So while you didn't inquire as to any specifics, what |
| 08:55 | 3 | you found out was that Mattel had, among other things, |
| 08:55 | 4 | practices of threatening existing licensees that their |
| 08:55 | 5 | relations with Mattel would be terminated at once if they |
| 08:55 | 6 | did not stop dealing with MGA, correct? |
| 08:55 | 7 | A.   No.  That is what I said.  That is not the question I |
| 08:55 | 8 | thought I was answering.  I'm sure you know later in the |
| 08:55 | 9 | deposition that was all clarified.  No. |
| 08:55 | 10 | And I have now investigated every one of these |
| 08:55 | 11 | allegations, and there isn't one case in which we threatened |
| 08:55 | 12 | to terminate a license. |
| 08:55 | 13 | Q.   It was not until after a break, when you talked to your |
| 08:55 | 14 | lawyer and your lawyer began questioning you, that you |
| 08:55 | 15 | changed your answer, correct? |
| 08:55 | 16 | A.   If you read the next sentence, my lawyer heard the |
| 08:56 | 17 | question and answer properly.  I didn't.  You're correct. |
| 08:56 | 18 | We clarified it at the end when we were allowed to. |
| 08:56 | 19 | Q.   You came back and took it back, right? |
| 08:56 | 20 | A.   That's correct. |
| 08:56 | 21 | Q.   But then -- |
| 08:56 | 22 | A.   My statement was incorrect. |
| 08:56 | 23 | Q.   But then you testified that you believed you had |
| 08:56 | 24 | properly answered the question in the first place, right? |
| 08:56 | 25 | A.   I heard the question -- |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

26

| | | |
|---|---|---|
| 08:56 | 1 | Q.   Sir -- |
| 08:56 | 2 | A.   I'm trying to answer your question. |
| 08:56 | 3 | Q.   Do you hear my question? |
| 08:56 | 4 | A.   I'm trying to answer your question. |
| 08:56 | 5 | Q.   Here's my question.  Specifically about whether you |
| 08:56 | 6 | testified to something.  That's my question.  Did you then |
| 08:56 | 7 | testify that you believed you had properly answered the |
| 08:56 | 8 | question in the first place? |
| 08:56 | 9 | A.   I thought I did at the time.  Ultimately, I knew I |
| 08:56 | 10 | didn't.  When you look at the question and answer, those |
| 08:56 | 11 | aren't connected properly.  And I'm sure you read that in |
| 08:56 | 12 | the deposition. |
| 08:56 | 13 | MS. KELLER:  Your Honor, I would ask that -- to be |
| 08:56 | 14 | allowed to read page 267, line 22, to 268 line 9. |
| 08:57 | 15 | THE COURT:  Just a moment. |
| 08:57 | 16 | 267, line what? |
| 08:57 | 17 | MS. KELLER:  267, line 22, through 268, line 9. |
| 08:57 | 18 | Actually, we should start earlier.  We should start probably |
| 08:57 | 19 | at line 12. |
| 08:57 | 20 | MR. QUINN:  It's not impeaching, Your Honor. |
| 08:58 | 21 | THE COURT:  No.  You may read, Counsel.  It |
| 08:58 | 22 | doesn't matter.  You can read from line 12 or line 21. |
| 08:58 | 23 | Mr. Quinn, you can get into this on recross. |
| 08:58 | 24 | MS. KELLER:  (Reading:) |
| 08:58 | 25 | "QUESTION:  Did you understand, after coming back |

| | | |
|---|---|---|
| 08:58 | 1 | from the break, that Mr. Quinn would be asking you questions |
| 08:58 | 2 | about the licensing practices? |
| 08:58 | 3 | "ANSWER:  No, I did not. |
| 08:58 | 4 | "QUESTION:  So it just came as a complete surprise |
| 08:58 | 5 | to you that Mr. Quinn asked you questions? |
| 08:58 | 6 | "ANSWER:  Yes. |
| 08:58 | 7 | "QUESTION:  And that was because you thought you |
| 08:58 | 8 | were going to correct your answer; is that right? |
| 08:58 | 9 | "ANSWER:  No. |
| 08:58 | 10 | "QUESTION:  So you didn't think you needed to |
| 08:58 | 11 | correct your answer when you came back from the break? |
| 08:58 | 12 | "ANSWER:  That's correct.  I -- I requested the |
| 08:58 | 13 | opportunity to clarify with you because I thought I properly |
| 08:58 | 14 | answered the question, and I wanted to make sure you heard |
| 08:58 | 15 | what it was I had to say. |
| 08:58 | 16 | "QUESTION:  You thought you properly answered |
| 08:58 | 17 | question? |
| 08:58 | 18 | "ANSWER:  My memory -- as I remember it, I believe |
| 08:58 | 19 | I did properly answer the question. |
| 08:58 | 20 | "QUESTION:  Okay. |
| 08:59 | 21 | "ANSWER:  I wanted to confirm that." |
| 08:59 | 22 | BY MS. KELLER: |
| 08:59 | 23 | Q.   Now, Mr. Eckert, you know that you yourself have talked |
| 08:59 | 24 | within Mattel about killing deals with licensees who were |
| 08:59 | 25 | doing business with MGA, right? |

CV 04-9049 DOC – 4/4/2001 – Day 45, Volume 1 of 4

28

| | | |
|---|---|---|
| 08:59 | 1 | A.   Um, I talked about killing proposed deals of -- inside |
| 08:59 | 2 | Mattel, yes. |
| 08:59 | 3 | Q.   Well, you talked about killing deals with licensees who |
| 08:59 | 4 | were doing business with MGA, right? |
| 08:59 | 5 | A.   I talked about killing a proposed deal, that's correct. |
| 08:59 | 6 | The deal was never killed. |
| 08:59 | 7 | Q.   You talked about killing deals with licensees just |
| 08:59 | 8 | because they were also doing business with MGA, yes? |
| 08:59 | 9 | A.   A proposed deal, yes. |
| 09:00 | 10 | MS. KELLER:  If we could see Exhibit 8972. |
| 09:00 | 11 | (Document provided to the witness.) |
| 09:00 | 12 | BY MS. KELLER: |
| 09:00 | 13 | Q.   And you recognize this as an e-mail to you? |
| 09:00 | 14 | A.   I do. |
| 09:00 | 15 | Q.   From Ellen Brothers, CC Neil Friedman, and he was |
| 09:00 | 16 | president of Mattel Brands at the time, correct? |
| 09:00 | 17 | A.   That's correct. |
| 09:00 | 18 | Q.   And this is dated November 28, 2006. |
| 09:00 | 19 | MS. KELLER:  Your Honor, I move admission of 8972. |
| 09:00 | 20 | THE COURT:  Received. |
| 09:00 | 21 | (Exhibit No. 8972 received in evidence.) |
| 09:00 | 22 | (Document displayed.) |
| 09:00 | 23 | BY MS. KELLER: |
| 09:00 | 24 | Q.   And if we look at the bottom of this e-mail, dated |
| 09:00 | 25 | November 28, 2006, we see: |

| | | |
|---|---|---|
| 09:00 | 1 | "Bob, |
| 09:00 | 2 | "We have been discussing with several different |
| 09:00 | 3 | companies the opportunity to make a Kit interactive game to |
| 09:00 | 4 | coincide with the release of the Kit movie next year.  THQ |
| 09:00 | 5 | is the company we propose to work with on this project. |
| 09:01 | 6 | Mandana called to let us know that Neil has issues with THQ |
| 09:01 | 7 | due to their alliance with Bratz.  We think THQ is the best |
| 09:01 | 8 | company for AG to work with on this initiative and will put |
| 09:01 | 9 | the requisite paperwork in place so confidential information |
| 09:01 | 10 | is not shared.  Is there anything else I should know prior |
| 09:01 | 11 | to kickoff of this partnership?" |
| 09:01 | 12 | And the issues that Neil had with THQ consisted of the |
| 09:01 | 13 | fact that THQ was a licensee for Bratz, right? |
| 09:01 | 14 | A.   That's right. |
| 09:01 | 15 | Q.   And if we look at your answer on the top, your answer |
| 09:01 | 16 | is "Neil, do you want me to kill or let it slide?" |
| 09:01 | 17 | And those were your words, right? |
| 09:01 | 18 | A.   That wasn't my answer, which is in a separate document. |
| 09:01 | 19 | That was my -- those were my words to Neil Friedman, yes. |
| 09:01 | 20 | Q.   That's what I'm asking.  Those were your words to Neil |
| 09:02 | 21 | Friedman:  "Do you want me to kill this or let it slide?" |
| 09:02 | 22 | Right? |
| 09:02 | 23 | A.   That's correct. |
| 09:02 | 24 | Q.   And THQ is now Mattel's licensee, correct? |
| 09:02 | 25 | A.   It is and has been for some time. |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

30

| | | |
|---|---|---|
| 09:02 | 1 | Q.    It's no longer MGA's licensee, correct? |
| 09:02 | 2 | A.    Well, it was as of 2008.  I don't know with whom they |
| 09:02 | 3 | license today. |
| 09:02 | 4 | Q.    Well, you know that MGA is out with them and Mattel is |
| 09:02 | 5 | in, right? |
| 09:02 | 6 | A.    No, I don't know that.  I know as recently as 2008 both |
| 09:02 | 7 | companies -- and I believe even Hasbro at the time -- were |
| 09:02 | 8 | licensing with THQ.  I don't know the status of MGA's deals |
| 09:02 | 9 | today. |
| 09:02 | 10 | Q.    You were here when Mr. Friedman testified that he paid |
| 09:02 | 11 | no attention to competitors of Barbie because he was so |
| 09:02 | 12 | focused on improving Barbie.  Do you remember that? |
| 09:02 | 13 | A.    No, I don't remember that. |
| 09:02 | 14 | Q.    You were present in the courtroom? |
| 09:02 | 15 | A.    I was. |
| 09:02 | 16 | Q.    You heard everything he had to say? |
| 09:02 | 17 | A.    I'm sure I did. |
| 09:03 | 18 | Q.    And in this e-mail you were offering to kill the deal |
| 09:03 | 19 | if Mr. Friedman wanted to, right? |
| 09:03 | 20 | A.    I certainly offered to talk to him about it, yes. |
| 09:03 | 21 | Q.    You were offering to the kill the deal if Mr. Friedman |
| 09:03 | 22 | wanted you to.  That's what it says? |
| 09:03 | 23 | A.    Yes. |
| 09:03 | 24 | Q.    And you were ready, then, to discontinue a license with |
| 09:03 | 25 | Mattel because the licensee also represented Bratz, right? |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

31

| 09:03 | 1 | A.   No.  This was a proposed deal.  This was not a license |
| 09:03 | 2 | deal between American Girl and THQ. |
| 09:03 | 3 | Q.   Bottom line, you were ready to discontinue a license |
| 09:03 | 4 | with Mattel just because the licensee also represented |
| 09:03 | 5 | Bratz, correct? |
| 09:03 | 6 | A.   That's not what that says.  That's incorrect. |
| 09:03 | 7 | Q.   Let's look at a different exhibit.  Exhibit 8572. |
| 09:04 | 8 | *(Document provided to the witness.)* |
| 09:04 | 9 | Q.   And this is an e-mail from Janalee Foster, dated |
| 09:04 | 10 | June 29, 2004? |
| 09:04 | 11 | A.   I have it. |
| 09:04 | 12 | Q.   And this is distributed to a wide number of people, |
| 09:04 | 13 | including Matt Bousquette.  And if you go to 8572-7, the |
| 09:04 | 14 | very last thing in the document, you see -- I'm sorry, 8572, |
| 09:04 | 15 | page 2. |
| 09:04 | 16 | A.   I have that. |
| 09:04 | 17 | Q.   You see "To distribution," and your name is included, |
| 09:04 | 18 | correct? |
| 09:04 | 19 | A.   It is. |
| 09:04 | 20 | MS. KELLER:  Your Honor, I'd move 8572 into |
| 09:04 | 21 | evidence. |
| 09:04 | 22 | THE COURT:  Received. |
| 09:04 | 23 | *(Exhibit No. 8572 received in evidence.)* |
| 09:04 | 24 | *(Document displayed.)* |
|  | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:05 | 1 | BY MS. KELLER: |
| 09:05 | 2 | Q.   And on page 1 the subject is "Notes from Target/Mattel |
| 09:05 | 3 | strategic partnership meeting."  And it says, "Attached are |
| 09:05 | 4 | the notes from the Target/Mattel Strategic Partnership |
| 09:05 | 5 | Meeting on June 24th, 2004. |
| 09:05 | 6 | And then let's go to page 2. |
| 09:05 | 7 | A.   So we're TX3? |
| 09:05 | 8 | Q.   We're on 8572-2. |
| 09:05 | 9 | A.   Okay. |
| 09:05 | 10 | Q.   And in that first column we see you listed as having |
| 09:05 | 11 | attended that meeting.  And there were a number of people -- |
| 09:05 | 12 | a number of Mattel executives attended that meeting with |
| 09:05 | 13 | some Target people, correct? |
| 09:05 | 14 | A.   Yes. |
| 09:05 | 15 | Q.   And Target was a very important customer of Mattel's, |
| 09:05 | 16 | correct? |
| 09:05 | 17 | A.   Yes. |
| 09:06 | 18 | Q.   And if we go to the very last page of this document, |
| 09:06 | 19 | page 7, we also see you listed again on the distribution |
| 09:06 | 20 | list for the document, right? |
| 09:06 | 21 | A.   Yes. |
| 09:06 | 22 | Q.   And if we go back to page 1, we see the Target |
| 09:06 | 23 | attendees include somebody named Kari Jones? |
| 09:06 | 24 | A.   Yes. |
| 09:06 | 25 | Q.   And then, if we look at page 6, we see, "Mattel's |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

33

| | | |
|---|---|---|
| 09:06 | 1 | Corporate Goal: |
| 09:07 | 2 | "Achieve plan. |
| 09:07 | 3 | "Fix dolls. |
| 09:07 | 4 | "Learning products.  New strategic plan. |
| 09:07 | 5 | "Turn Barbie around." |
| 09:07 | 6 | And if we go down under "Matt Comments" -- and Matt was |
| 09:07 | 7 | Matt Bousquette, correct? |
| 09:07 | 8 | A.   Yes. |
| 09:07 | 9 | Q.   President of Mattel Brands, right? |
| 09:07 | 10 | A.   At the time, yes. |
| 09:07 | 11 | Q.   And it says, "Matt Comments: |
| 09:07 | 12 | "Core profit model on business, Barbie in particular. |
| 09:07 | 13 | We should plan together. |
| 09:07 | 14 | "Differentiation.  We, as a vendor, want to be treated |
| 09:07 | 15 | differently than the other guys." |
| 09:07 | 16 | And the "other guys" include MGA with Bratz, right? |
| 09:07 | 17 | A.   Yes. |
| 09:07 | 18 | Q.   "We want to do it bigger than the others, larger |
| 09:07 | 19 | playing field, give us," quote, "unfair benefit," closed |
| 09:07 | 20 | quote.  Quote, "Place unfair bets on us for unfair |
| 09:08 | 21 | benefits," closed quotes. |
| 09:08 | 22 | Now, you understand the reason these are in quotes is |
| 09:08 | 23 | that the notetaker was taking down verbatim what was being |
| 09:08 | 24 | said by Mr. Bousquette, right? |
| 09:08 | 25 | A.   I don't.  But that's possible. |

DEBBIE GALE, U.S. COURT REPORTER

34

| | | |
|---|---|---|
| 09:08 | 1 | Q.   Isn't that usually what happens when a notetaker puts |
| 09:08 | 2 | things in quotation marks? |
| 09:08 | 3 | A.   Yes. |
| 09:08 | 4 | Q.   And Mr. Bousquette was specifically asking Target in |
| 09:08 | 5 | this meeting to give Mattel unfair advantages for unfair |
| 09:08 | 6 | benefits, right? |
| 09:08 | 7 | A.   That's what this says, yes. |
| 09:08 | 8 | Q.   And there's nothing in here about Bob Eckert |
| 09:08 | 9 | intervening and saying, no, that's wrong; we don't want to |
| 09:08 | 10 | do anything anticompetitive, correct? |
| 09:08 | 11 | A.   That's right.  I would have said, "Place large bets on |
| 09:08 | 12 | us for large benefits."  Better way of saying it. |
| 09:08 | 13 | Q.   Instead of "unfair benefit, place unfair bets on us for |
| 09:09 | 14 | unfair benefits." |
| 09:09 | 15 | And then look at Target's response by Kari. |
| 09:09 | 16 | "Target wants to grow top vendors.  Can't promise |
| 09:09 | 17 | anything, but let's talk." |
| 09:09 | 18 | And the unfair benefits that Mr. Bousquette had in mind |
| 09:09 | 19 | included moving Bratz products to the back of shelves and |
| 09:09 | 20 | Barbie products up front, right? |
| 09:09 | 21 | A.   No, I don't know that. |
| 09:09 | 22 | Q.   Did you inquire at the time, "Mr. Bousquette, I want to |
| 09:09 | 23 | know what are the unfair benefits that you want us to get?" |
| 09:09 | 24 | A.   No, I don't think I did. |
| 09:09 | 25 | Q.   You didn't see anything wrong with Mattel, because of |

| | | |
|---|---|---|
| 09:09 | 1 | its size, asking a retailer for an unfair benefit against a |
| 09:09 | 2 | competitor, correct? |
| 09:09 | 3 | A.   Again, I would say, "place large bets for large |
| 09:09 | 4 | benefits."  I think it is wrong to compete unfairly. |
| 09:10 | 5 | Q.   But we're not talking about anybody in here saying |
| 09:10 | 6 | large bets.  We're talking about somebody saying, "unfair |
| 09:10 | 7 | benefits --" specifically, "give us unfair benefit, place |
| 09:10 | 8 | unfair bets on us for unfair benefits." |
| 09:10 | 9 | Unfair, that would mean something that is not fair, |
| 09:10 | 10 | right? |
| 09:10 | 11 | A.   Yes, it would. |
| 09:10 | 12 | Q.   That would mean essentially that the playing field is |
| 09:10 | 13 | not level if something is unfair, right? |
| 09:10 | 14 | A.   Yes. |
| 09:10 | 15 | Q.   And that, in this meeting with Target, according to |
| 09:10 | 16 | these notes, is specifically what Mattel, with you present |
| 09:10 | 17 | in the room, was seeking, right? |
| 09:10 | 18 | A.   It appears that's what Matt Bousquette said. |
| 09:10 | 19 | Q.   With you sitting there, right? |
| 09:10 | 20 | A.   Yes. |
| 09:10 | 21 | Q.   So in that case, you were not insulated from what |
| 09:10 | 22 | Mr. Bousquette was saying because you were sitting right |
| 09:11 | 23 | there in the room, correct? |
| 09:11 | 24 | A.   Yes. |
| 09:11 | 25 | Q.   Now, you don't know if Mattel's merchandisers ever |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 36 of 158   Page ID #:315931
CV 04-9049 DOC – 4/4/2001 – Day 45, Volume 1 of 4

36

| | | |
|---|---|---|
| 09:11 | 1 | removed MGA products and replaced them with Mattel products |
| 09:11 | 2 | on retail shelves, correct? |
| 09:11 | 3 | A.   No, I believe that did happen in Florida at a Walmart, |
| 09:11 | 4 | if I've read the documents correctly. |
| 09:11 | 5 | Q.   How about -- |
| 09:11 | 6 | A.   At least that was the assertion. |
| 09:11 | 7 | Q.   How about just shoving Bratz products to the backs of |
| 09:11 | 8 | shelves or the backs of stores and moving Barbie products |
| 09:11 | 9 | up?  You know that happened, right? |
| 09:11 | 10 | A.   No. |
| 09:11 | 11 | MS. KELLER:  If we could see Exhibit 8120. |
| 09:11 | 12 | (Document provided to the witness.) |
| 09:11 | 13 | BY MS. KELLER: |
| 09:11 | 14 | Q.   This is an e-mail chain.  And you see a Mattel Bates |
| 09:11 | 15 | stamp at the bottom of that? |
| 09:11 | 16 | A.   I do. |
| 09:12 | 17 | Q.   And this is an e-mail chain from Heather Hocut of |
| 09:12 | 18 | Walmart.  She was the Walmart buyer, correct? |
| 09:12 | 19 | A.   She was either the Walmart buyer or the assistant buyer |
| 09:12 | 20 | at the time. |
| 09:12 | 21 | Q.   And this was sent July 7, 2006, to Connie Hibbert and |
| 09:12 | 22 | Erika Ashbrook of Mattel? |
| 09:12 | 23 | A.   Yes. |
| 09:12 | 24 | Q.   "Subject:  Merchandisers"? |
| 09:12 | 25 | A.   Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 37 of 158   Page ID #:315932
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

37

| | | |
|---|---|---|
| 09:12 | 1 | MS. KELLER:  Your Honor, I'd move 8120 into |
| 09:12 | 2 | evidence. |
| 09:12 | 3 | THE COURT:  Is he on this chain? |
| 09:12 | 4 | MS. KELLER:  He is not, Your Honor. |
| 09:12 | 5 | MR. QUINN:  Lacks foundation. |
| 09:12 | 6 | MS. KELLER:  Oh, I'm sorry.  It has a Mattel Bates |
| 09:12 | 7 | stamp, Your Honor.  And I believe he was a 30(b)(6) witness |
| 09:12 | 8 | on this. |
| 09:12 | 9 | THE COURT:  Overruled. |
| 09:12 | 10 | MR. QUINN:  Not on this topic, Your Honor, not |
| 09:12 | 11 | relating to licensing. |
| 09:12 | 12 | THE COURT:  Thank you. |
| 09:12 | 13 | Thank you. |
| 09:12 | 14 | *(Document displayed.)* |
| 09:12 | 15 | BY MS. KELLER: |
| 09:12 | 16 | Q.   And if you look at the e-mail, the first e-mail from |
| 09:13 | 17 | Heather Hocut, we see: |
| 09:13 | 18 | "I keep getting complaints that the merchandisers are |
| 09:13 | 19 | moving the Barbie modular to the front counters and moving |
| 09:13 | 20 | Bratz to the back counters.  If I catch anyone doing this |
| 09:13 | 21 | again, then the merchandisers will be pulled from the stores |
| 09:13 | 22 | in all areas.  Please send me what your action plans back |
| 09:13 | 23 | today. |
| 09:13 | 24 | "Heather Hocut, Buyer." |
| 09:13 | 25 | THE COURT:  Now, ladies and gentlemen, let me |

| 09:13 | 1 | caution you once again.  We don't have these parties on this |
| 09:13 | 2 | e-mail chain.  This is not for the truth of the matter |
| 09:13 | 3 | asserted. |
| 09:13 | 4 | Because there's no ability to cross-examine.  It |
| 09:13 | 5 | simply goes to Mr. Eckert's knowledge or conduct. |
| 09:13 | 6 | Okay.  Counsel. |
| 09:13 | 7 | BY MS. KELLER: |
| 09:13 | 8 | Q.   So this is Heather Hocut of Walmart complaining to |
| 09:13 | 9 | Mattel about Mattel merchandisers moving Barbie to the front |
| 09:14 | 10 | counters and moving Bratz to the back counters, correct? |
| 09:14 | 11 | A.   Yes. |
| 09:14 | 12 | Q.   And saying that if she catches anyone doing this again, |
| 09:14 | 13 | the merchandisers are going to be pulled from the stores in |
| 09:14 | 14 | all areas, right? |
| 09:14 | 15 | A.   Yes. |
| 09:14 | 16 | Q.   And if we look at the response -- this is from Connie |
| 09:14 | 17 | Hibbert at Mattel. |
| 09:14 | 18 | And who's Connie Hibbert? |
| 09:14 | 19 | A.   I don't know at the time.  I don't know. |
| 09:14 | 20 | Q.   "To Heather Hocut and Erika Ashbrook, CC Bill Ganey." |
| 09:14 | 21 | And it says, "I apologize that this has happened as the reps |
| 09:14 | 22 | have never been directed to move Bratz or any categories. |
| 09:14 | 23 | If you will supply me with the store numbers, I can confront |
| 09:14 | 24 | those particular reps assigned to the stores and ensure that |
| 09:14 | 25 | this doesn't happen again.  I'll then follow up with a |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 39 of 158   Page ID #:315934
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

39

| | | |
|---|---|---|
| 09:14 | 1 | directive to all reps." |
| 09:14 | 2 | And then if we look at the top, Heather Hocut replies |
| 09:15 | 3 | back -- the Walmart person -- and says, "It is coming from |
| 09:15 | 4 | all over.  While I was in Florida, I was told by a |
| 09:15 | 5 | department manager that this was happening.  I have heard |
| 09:15 | 6 | about this in Texas.  Now California." |
| 09:15 | 7 | So from reading this, Mr. Eckert, it would appear that |
| 09:15 | 8 | Mattel was systematically, at least in those three states, |
| 09:15 | 9 | according to Walmart, trying to move the Bratz product to |
| 09:15 | 10 | the back of the store and Mattel product to the front, |
| 09:15 | 11 | correct? |
| 09:15 | 12 | MR. QUINN:  Your Honor, this is not for the truth. |
| 09:15 | 13 | THE COURT:  This is not for the truth of matter |
| 09:15 | 14 | asserted.  Mr. Eckert may not beware of these allegations. |
| 09:15 | 15 | They may, in fact, not be true. |
| 09:15 | 16 | But he's the -- just as Mr. Larian was testifying |
| 09:15 | 17 | about his company, Mr. Eckert is testifying about his |
| 09:15 | 18 | company. |
| 09:15 | 19 | BY MS. KELLER: |
| 09:15 | 20 | Q.   And, Mr. Eckert, you're the captain of the ship at |
| 09:15 | 21 | Mattel, right? |
| 09:15 | 22 | A.   That's right. |
| 09:15 | 23 | Q.   And so I would imagine that given the fact that you are |
| 09:16 | 24 | the guardian of corporate ethics, that you have directed |
| 09:16 | 25 | that anything like this be brought to your immediate |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

40

| | | |
|---|---|---|
| 09:16 | 1 | attention, right? |
| 09:16 | 2 | A.    No, I have not. |
| 09:16 | 3 | Q.    So if your merchandisers are engaging in |
| 09:16 | 4 | anticompetitive behavior with one of the major retailers in |
| 09:16 | 5 | the nation, Walmart, you don't have any method in place for |
| 09:16 | 6 | you to be told about that, correct? |
| 09:16 | 7 | A.    No.  And you know in this instance we asked them for |
| 09:16 | 8 | specifics.  You know the chain goes beyond what you've |
| 09:16 | 9 | showed me.  And we were never able to get from Walmart what |
| 09:16 | 10 | stores are we talking about, so we couldn't remedy if it if |
| 09:16 | 11 | it happened. |
| 09:16 | 12 | Q.    If what I'm hearing is correct, though, you're telling |
| 09:16 | 13 | me you never even got involved in it? |
| 09:16 | 14 | A.    That's correct. |
| 09:16 | 15 | Q.    You're telling me you never even knew about it, right? |
| 09:16 | 16 | A.    That's right. |
| 09:16 | 17 | Q.    You're telling me, for example, that this is not the |
| 09:17 | 18 | kind of activity that you, even as CEO, want brought to your |
| 09:17 | 19 | attention, right? |
| 09:17 | 20 | A.    That's right, 'cause we could never find out from |
| 09:17 | 21 | Walmart what happened where and when. |
| 09:17 | 22 | Q.    Well, you didn't direct any such investigation, did |
| 09:17 | 23 | you? |
| 09:17 | 24 | A.    That's correct. |
| 09:17 | 25 | Q.    You didn't personally say, "Rich de Anda, I want you |

DEBBIE GALE, U.S. COURT REPORTER

| 09:17 | 1 | coming up to my office.  You're a skilled investigator. |
| 09:17 | 2 | You've been, you know, top guy at LAPD homicide.  You know |
| 09:17 | 3 | how to investigate.  I want you to get to the bottom of |
| 09:17 | 4 | this."  You didn't do that, did you? |
| 09:17 | 5 | A.   That's correct. |
| 09:17 | 6 | Q.   And Walmart is your largest customer by far, right? |
| 09:17 | 7 | A.   It is. |
| 09:17 | 8 | Q.   Shouldn't Walmart's serious complaints about |
| 09:17 | 9 | anticompetitive behavior by your people come directly to |
| 09:17 | 10 | you? |
| 09:17 | 11 | A.   No. |
| 09:17 | 12 | Q.   And aren't you the person within the corporation who is |
| 09:17 | 13 | directly responsible for reporting under the Sarbanes-Oxley |
| 09:17 | 14 | Act -- for reporting any kind of anticompetitive or |
| 09:18 | 15 | antitrust activity going on within Mattel? |
| 09:18 | 16 | A.   Under Sarbanes-Oxley, yes, I am. |
| 09:18 | 17 | Q.   And so shouldn't you -- since you're the person |
| 09:18 | 18 | certifying whether any such activity has occurred on behalf |
| 09:18 | 19 | of your corporation, you need to know that it is in order to |
| 09:18 | 20 | give full disclosure to the Securities and Exchange |
| 09:18 | 21 | Commission, right? |
| 09:18 | 22 | A.   No.  I'm certifying that the records are accurate and |
| 09:18 | 23 | there's been no material fraud.  And this has nothing to do |
| 09:18 | 24 | with anything of that nature. |
| 09:18 | 25 | Q.   But you're also required to -- to report any potential |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 42 of 158   Page ID #:315937
CV 04-9049 DOC – 4/4/2001 – Day 45, Volume 1 of 4

42

09:18  1    violations of antitrust laws, are you not?

09:18  2    A.    I'm sure we are, yes.

09:18  3    Q.    And so in order to report it, you have to know about

09:18  4    it, right?

09:18  5    A.    That's right.

09:18  6    Q.    And so if you insulate yourself from knowing about it,

09:18  7    then you can't report it, right?

09:18  8    A.    That's right.  Not that I've been insulated from this.

09:18  9    Q.    Well, again, as captain of the ship, as the head

09:18  10   person, as the guy responsible for reporting, not just to

09:19  11   the federal government, but to all of your shareholders

09:19  12   about what's going on in your company, you need to know if

09:19  13   your largest customer is complaining to you that your people

09:19  14   in three states are engaging in anticompetitive activity,

09:19  15   right?

09:19  16   A.    That's why we asked the customer:  Tell us what

09:19  17   happened where.  That's why we sent out the directive again.

09:19  18   But we never found out.  Walmart –– Heather was never able

09:19  19   to say, "Here's what happened," as opposed to just stories

09:19  20   swirling around.

09:19  21   Q.    It was all something from which you were insulated,

09:19  22   right?

09:19  23   A.    No.  It is all something which I wasn't aware because

09:19  24   it didn't amount to anything.

09:19  25   Q.    And when we talk about the unfair benefits that Mattel

| 09:19 | 1 | was trying to get -- in the meeting in Target, "place unfair |
| 09:19 | 2 | bets on us for unfair benefits," the meeting you were in, |
| 09:19 | 3 | you were attending, that's another type of anticompetitive |
| 09:20 | 4 | behavior, isn't it? |
| 09:20 | 5 | A.   Unfair, yes, but the words he uses were a poor choice |
| 09:20 | 6 | of words.  I don't -- I don't make the leap from un-- from |
| 09:20 | 7 | unacceptable words to unacceptable behavior. |
| 09:20 | 8 | Q.   Well, don't you think when somebody says to Target, one |
| 09:20 | 9 | of your largest retailers, your president of Mattel Brands |
| 09:20 | 10 | with the CEO sitting right there -- when that person says we |
| 09:20 | 11 | want you to give us unfair benefits -- place unfair bets for |
| 09:20 | 12 | us for unfair benefits; we want a bigger playing field than |
| 09:20 | 13 | the others; we want to be treated differently than the other |
| 09:20 | 14 | guys -- I mean, surely you know that you are asking for an |
| 09:20 | 15 | anticompetitive unfair advantage from Target, right? |
| 09:20 | 16 | A.   He is selling.  He never asked for -- he never was |
| 09:20 | 17 | looking for unfair things.  It was a poor choice of words. |
| 09:21 | 18 | You could have disputed the word "large" in there and it |
| 09:21 | 19 | would have been fine.  It's a bad choice of words. |
| 09:21 | 20 | Q.   This is what he's talking about directly to Target's |
| 09:21 | 21 | buyer.  That's the purpose of the meeting, is to talk to |
| 09:21 | 22 | Target's buyer about what you wanted, an unfair advantage. |
| 09:21 | 23 | That was the reason you had the meeting, Mr. Eckert, was it |
| 09:21 | 24 | not? |
| 09:21 | 25 | A.   No.  Those are the words he used.  That is not why we |

| | | |
|---|---|---|
| 09:21 | 1 | had the meeting. |
| 09:21 | 2 | Q.   Um, the meeting with Target, one goal was to try to get |
| 09:21 | 3 | more shelf space any way you could so you could freeze Bratz |
| 09:21 | 4 | out, right? |
| 09:21 | 5 | A.   No. |
| 09:21 | 6 | Q.   Let's look at another exhibit, 9222. |
| 09:22 | 7 | (Document provided to the witness.) |
| 09:22 | 8 | BY MS. KELLER: |
| 09:22 | 9 | Q.   This is the Bain and Company preliminary findings, |
| 09:22 | 10 | July 29, 2004, where Mattel had Bain study why Bratz was so |
| 09:22 | 11 | successful versus Barbie.  Do you recall that? |
| 09:22 | 12 | A.   I recall the study, and I thought it was more of an MGA |
| 09:22 | 13 | corporate study.  But I do recall the study, yes. |
| 09:22 | 14 | MS. KELLER:  Your Honor, I'd move 9222 in |
| 09:22 | 15 | evidence. |
| 09:22 | 16 | THE COURT:  Received. |
| 09:22 | 17 | (Exhibit No. 9222 received in evidence.) |
| 09:22 | 18 | (Document displayed.) |
| 09:22 | 19 | BY MS. KELLER: |
| 09:22 | 20 | Q.   And this was a study that Mattel paid for, right? |
| 09:22 | 21 | A.   Yes. |
| 09:22 | 22 | Q.   Paid quite a bit of money for, right? |
| 09:22 | 23 | A.   Yes. |
| 09:22 | 24 | Q.   And Bain is a very respected consultancy, isn't it? |
| 09:22 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 09:22 | 1 | Q.   Considered really top of the top of the consultancies |
| 09:22 | 2 | out there in this field, correct? |
| 09:22 | 3 | A.   It's among the top of the top, yes. |
| 09:23 | 4 | Q.   And if you go to page 20. |
| 09:23 | 5 | *(Document displayed.)* |
| 09:23 | 6 | THE WITNESS:  I have that. |
| 09:23 | 7 | BY MS. KELLER: |
| 09:23 | 8 | Q.   At the top it says, "Three factors are critical to |
| 09:23 | 9 | Bratz' success in any given market." |
| 09:23 | 10 | And if we go down under "Findings," "Competitive |
| 09:23 | 11 | Environment," it says, "Bratz does well in markets where it |
| 09:23 | 12 | has first-mover advantage and advertises heavily. |
| 09:23 | 13 | "Spain:  Entered first, advertised heavily; quickly |
| 09:23 | 14 | gained share. |
| 09:23 | 15 | "Germany:  MyScene was already present at Bratz entry |
| 09:23 | 16 | and aggressively blocked Bratz; Bratz had 1 percent share in |
| 09:23 | 17 | 2003. |
| 09:23 | 18 | And if you go over to "Perspectives" right next to |
| 09:23 | 19 | that, a Mattel Europe marketing manager is quoted as saying, |
| 09:24 | 20 | "MyScene was already in Germany when Bratz entered.  We will |
| 09:24 | 21 | block their success by putting up huge displays and securing |
| 09:24 | 22 | extra shelf space right before their launch." |
| 09:24 | 23 | MR. QUINN:  Your Honor, that's hearsay, the |
| 09:24 | 24 | quotation within the document. |
| 09:24 | 25 | THE COURT:  It is. |

| | | |
|---|---|---|
| 09:24 | 1 | Ladies and gentlemen, it's hearsay once again. |
| 09:24 | 2 | It's not for the truth of the matter asserted.  It's to show |
| 09:24 | 3 | conduct, state of mind. |
| 09:24 | 4 | So remember, we don't have this person here |
| 09:24 | 5 | subject to cross-examination. |
| 09:24 | 6 | BY MS. KELLER: |
| 09:24 | 7 | Q.   And if we go back again to the column labeled |
| 09:24 | 8 | "Competitive Environment," we see that comment reflected in |
| 09:24 | 9 | "MyScene was already present at Bratz entry and aggressively |
| 09:24 | 10 | blocked Bratz." |
| 09:24 | 11 | So if you compare those two in Spain, where there was |
| 09:24 | 12 | no aggressive move by Mattel to block Bratz, it quickly |
| 09:25 | 13 | gained market share; but in Germany, where Mattel |
| 09:25 | 14 | aggressively moved to take away shelf space and put up huge |
| 09:25 | 15 | displays and block Bratz, Bratz only got 1 percent.  That's |
| 09:25 | 16 | an anticompetitive practice, is it not, Mr. Eckert? |
| 09:25 | 17 | A.   No.  I -- I heard you say "take away shelf space in |
| 09:25 | 18 | Germany."  That's not how I read this.  How I read this is |
| 09:25 | 19 | we grew our shelf space in Germany.  There's nothing |
| 09:25 | 20 | anticompetitive about that. |
| 09:25 | 21 | Q.   Let's go back to "Perspectives." |
| 09:25 | 22 | "We have blocked their success by putting up huge |
| 09:25 | 23 | displays and securing extra shelf space right before their |
| 09:25 | 24 | launch." |
| 09:25 | 25 | MR. QUINN:  Your Honor, this is being asked as if |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 47 of 158   Page ID #:315942
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

47

| | | |
|---|---|---|
| 09:25 | 1 | it's in for truth. |
| 09:25 | 2 | THE COURT:  Well, let me remind the jury it's not |
| 09:25 | 3 | for the truth of the matter.  It's simply concerning conduct |
| 09:26 | 4 | or state of mind concerning Mr. Eckert and Mattel. |
| 09:26 | 5 | Counsel. |
| 09:26 | 6 | BY MS. KELLER: |
| 09:26 | 7 | Q.   So securing extra shelf space right before their launch |
| 09:26 | 8 | is a little more than a business just happening to grow |
| 09:26 | 9 | organically.  It's finding out there's going to be a launch, |
| 09:26 | 10 | grabbing all the shelf space you can so they're blocked. |
| 09:26 | 11 | They don't have any shelves to put their product on, right? |
| 09:26 | 12 | A.   No.  The retailer can always decide to put their |
| 09:26 | 13 | product on a shelf.  It is our job to get as much shelf |
| 09:26 | 14 | space for products as we can, and it's their job to get as |
| 09:26 | 15 | much shelf space for their product as they can.  The fact |
| 09:26 | 16 | that we were successful is not anticompetitive. |
| 09:26 | 17 | Q.   Now, let's look at Exhibit 7506, and that's the 2005 |
| 09:26 | 18 | annual report and 10-K for Mattel, correct? |
| 09:27 | 19 | *(Document provided to witness.)* |
| 09:27 | 20 | THE WITNESS:  Yes, it is. |
| 09:27 | 21 | BY MS. KELLER: |
| 09:27 | 22 | Q.   And the title you gave this one was "Play to Win," |
| 09:27 | 23 | correct? |
| 09:27 | 24 | A.   Yes. |
| 09:27 | 25 | MS. KELLER:  Your Honor, I'd move 7506 into |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 48 of 158   Page ID #:315943
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

48

| | | |
|---|---|---|
| 09:27 | 1 | evidence. |
| 09:27 | 2 | THE COURT:  Received. |
| 09:27 | 3 | *(Exhibit No. 7506 received in evidence.)* |
| 09:27 | 4 | *(Document displayed.)* |
| 09:27 | 5 | BY MS. KELLER: |
| 09:27 | 6 | Q.   Let's go to -- |
| 09:27 | 7 | MS. KELLER:  Your Honor, it's so huge, I think |
| 09:27 | 8 | we'll just move page 8 into evidence at this time. |
| 09:27 | 9 | THE COURT:  Page 8 is received. |
| 09:27 | 10 | *(Exhibit No. 7506-8 received in evidence.)* |
| 09:27 | 11 | *(Document displayed.)* |
| 09:27 | 12 | BY MS. KELLER: |
| 09:27 | 13 | Q.   On 7506, page 8, we see a picture of you, right? |
| 09:27 | 14 | THE WITNESS:  Excuse me.  Could we just blow this |
| 09:27 | 15 | up a little bit?  My copy doesn't read, so if we're going to |
| 09:27 | 16 | read -- |
| 09:27 | 17 | *(Technician complies.)* |
| 09:27 | 18 | THE WITNESS:  Great.  Thank you.  Yes, it is. |
| 09:27 | 19 | BY MS. KELLER: |
| 09:27 | 20 | Q.   Can you read that now? |
| 09:27 | 21 | A.   Yes. |
| 09:27 | 22 | Q.   So the title you gave this was "Play to Win," right? |
| 09:27 | 23 | A.   Correct. |
| 09:27 | 24 | Q.   And, in fact, there was a picture of you there, |
| 09:27 | 25 | correct? |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

49

| | | |
|---|---|---|
| 09:27 | 1 | A.   Yes. |
| 09:27 | 2 | Q.   And this page -- the whole document was "Play to Win," |
| 09:27 | 3 | but this page is "Play Fair," right? |
| 09:28 | 4 | A.   That's correct. |
| 09:28 | 5 | Q.   And one of the things that you say is, "When we win, we |
| 09:28 | 6 | do it fairly," right? |
| 09:28 | 7 | A.   Correct. |
| 09:28 | 8 | Q.   But sometimes playing to win clashes with playing fair, |
| 09:28 | 9 | does it not, Mr. Eckert? |
| 09:28 | 10 | A.   It could. |
| 09:28 | 11 | Q.   And when you compete with your competitors in the toy |
| 09:28 | 12 | business to get shelf space at retailers, sometimes that |
| 09:28 | 13 | play to win runs smack up against play fair, right? |
| 09:28 | 14 | A.   No. |
| 09:28 | 15 | Q.   You want shelf space for your products, right? |
| 09:28 | 16 | A.   We do, just as any manufacturer does, yes. |
| 09:28 | 17 | Q.   And generally speaking, a reduction in shelf space is |
| 09:28 | 18 | bad news, right? |
| 09:28 | 19 | A.   Generally, yes. |
| 09:28 | 20 | Q.   If a retailer takes a portion of its shelf space from |
| 09:28 | 21 | your products and gives it to a competitor, that can result |
| 09:28 | 22 | in lost sales to Mattel, right? |
| 09:28 | 23 | A.   Yes. |
| 09:28 | 24 | Q.   And you might sell the same amount of product, assuming |
| 09:28 | 25 | you have any shelf space at all, maybe, right? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 50 of 158   Page ID #:315945
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

50

09:29  1    A.    Correct.

09:29  2    Q.    But if you have no shelf space, then no doubt about it,

09:29  3    you're going to lose sales compared to your competitors,

09:29  4    right?

09:29  5    A.    At that particular store, yes.

09:29  6    Q.    Or that particular chain of stores, if it's a store --

09:29  7    a chain-wide policy, right?

09:29  8    A.    Yes.

09:29  9    Q.    And if we look at Exhibit 26612.

09:29  10              *(Document provided to the witness.)*

09:29  11         MS. KELLER:  Already in evidence.

09:29  12              *(Document displayed.)*

09:29  13   BY MS. KELLER:

09:29  14   Q.    This is a January 27, 2005 e-mail from Milt Zablow to

09:29  15   Jerry Cleary, subject line, "Kohl's.  Great news Barbie."

09:29  16   E-mail says, "It's final.  Kohl's has agreed to the

09:29  17   following:  Double Barbie's retail space to 8 feet for a

09:29  18   minimum of two years.

09:29  19        "The competitor will not be represented in their toy

09:29  20   department for two years.

09:29  21        "Incremental Barbie tower versus '04.

09:30  22        "Minimum 9.5 million Barbie '05 shipping.  36 percent

09:30  23   increase versus '04.

09:30  24        "Minimum 10.5 Barbie '06 shipping, 10.5 increase versus

09:30  25   '05.

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 51 of 158   Page ID #:315946
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

51

| | | |
|---|---|---|
| 09:30 | 1 | "Plus incremental presence for Little Mommy segment |
| 09:30 | 2 | will now be positioned on the back wall. |
| 09:30 | 3 | "Let's congratulate Julie Scholvin for this outstanding |
| 09:30 | 4 | accomplishment." |
| 09:30 | 5 | Now, when it says the competitor will not be |
| 09:30 | 6 | represented in their toy department for two years, you knew |
| 09:30 | 7 | that to be MGA, right? |
| 09:30 | 8 | A.   Uh, yes. |
| 09:30 | 9 | Q.   In fact, you sat here listening to testimony about this |
| 09:30 | 10 | e-mail, correct? |
| 09:30 | 11 | A.   I did. |
| 09:30 | 12 | Q.   And you heard testimony from Mr. Larian on it? |
| 09:30 | 13 | A.   I did. |
| 09:30 | 14 | Q.   You heard testimony from your senior vice president of |
| 09:30 | 15 | Corporate Strategy and Corporate Development, Andrew |
| 09:31 | 16 | Vollero, right? |
| 09:31 | 17 | A.   Yes. |
| 09:31 | 18 | Q.   And you know, don't you, that Mattel bought Kohl's |
| 09:31 | 19 | agreement to keep MGA out of its toy department for two |
| 09:31 | 20 | years, correct? |
| 09:31 | 21 | A.   No. |
| 09:31 | 22 | Q.   Correct? |
| 09:31 | 23 | A.   No. |
| 09:31 | 24 | Q.   Mattel paid Kohl's off to the tune of $1,250,000 to do |
| 09:31 | 25 | that, right? |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

52

09:31  1   A.   No.

09:31  2   Q.   You know MGA and Mr. Larian were not aware of that deal

09:31  3   that Mattel did with Kohl's, right?

09:31  4   A.   I know Mr. Larian had quite a storm with Kohl's, yes.

09:31  5   Q.   Well, you know that Mattel never produced any documents

09:31  6   about its deal with Kohl's besides Exhibit 26612 that's on

09:31  7   the screen.  You know that in this litigation, you had never

09:31  8   produced any additional documents about that, right?

09:32  9        MR. QUINN:  Your Honor, that misstates the

09:32  10  evidence.

09:32  11       THE COURT:  Overruled.

09:32  12       THE WITNESS:  Yeah.  From what I understand, there

09:32  13  was no allegation about Kohl's until, I believe, 2010, and

09:32  14  that's when I think documents were produced.  I could be

09:32  15  wrong on production.

09:32  16  BY MS. KELLER:

09:32  17  Q.   Have you looked at any of the orders that have been

09:32  18  issued about what you were to produce and not produce?

09:32  19  A.   No.

09:32  20  Q.   Have you looked to see, for example, if there was an

09:32  21  order issued by a judge, ordering to produce all of this

09:32  22  type of material?

09:32  23  A.   No, I have not.

09:32  24  Q.   Have you asked?

09:32  25  A.   Uh, I have not asked that specific question.

| | | |
|---|---|---|
| 09:32 | 1 | Q. Wouldn't you want to see with your own eyes what was in |
| 09:32 | 2 | black and white about what the Court had ordered Mattel to |
| 09:32 | 3 | produce? |
| 09:32 | 4 | A. No. I'm sure there's been a lot of orders provided in |
| 09:32 | 5 | this case, and I -- and I don't read them. |
| 09:32 | 6 | Q. You know that Mattel didn't produce the additional |
| 09:33 | 7 | documents I'm about to ask you about until last Thursday |
| 09:33 | 8 | night by order of the Court, right? |
| 09:33 | 9 | A. Yes. |
| 09:33 | 10 | Q. Let's look at Exhibit 37113. |
| 09:33 | 11 | (Document provided to the witness.) |
| 09:33 | 12 | BY MS. KELLER: |
| 09:33 | 13 | Q. This is a December 16, 2004 e-mail from Tom Maskel at |
| 09:33 | 14 | Kohl's.com to Julie Scholvin. And we know Julie Scholvin is |
| 09:33 | 15 | the same person we saw being congratulated in the last |
| 09:33 | 16 | exhibit, 2216, the January 27, 2005 e-mail announcing that |
| 09:33 | 17 | Kohl's had agreed the competitor would not be represented in |
| 09:33 | 18 | their toy department for two years, correct? |
| 09:33 | 19 | A. Yes. |
| 09:33 | 20 | MS. KELLER: Your Honor, I would move 37113 into |
| 09:33 | 21 | evidence. |
| 09:33 | 22 | THE COURT: Received. |
| 09:34 | 23 | (Exhibit No. 37113 received in evidence.) |
| 09:34 | 24 | (Document displayed.) |
| | 25 | |

| | | |
|---|---|---|
| 09:34 | 1 | BY MS. KELLER: |
| 09:34 | 2 | Q.  Now, Tom Maskel was the buyer for Kohl's, right? |
| 09:34 | 3 | A.  Yes. |
| 09:34 | 4 | Q.  And the subject line of this December 16, 2004, e-mail |
| 09:34 | 5 | says, "Huge Opportunity.  Julie, I would like to explore a |
| 09:34 | 6 | potential huge opportunity with you.  As you are well aware, |
| 09:34 | 7 | I have zero love for Bratz.  In my humble opinion, this is |
| 09:34 | 8 | just a fad that is done.  As you are aware, we have |
| 09:34 | 9 | approximately 4 feet of POG space designated for Bratz this |
| 09:34 | 10 | Spring.  What would Mattel think about me throwing out Bratz |
| 09:34 | 11 | and replacing the space with our friend Barbie? |
| 09:34 | 12 | "Here is the kicker:  If I throw them out, I will need |
| 09:34 | 13 | some help with markdowns on old Bratz.  We can talk money |
| 09:34 | 14 | later.  I think you would agree this might be a nice |
| 09:34 | 15 | opportunity for Mattel to take back a little market share. |
| 09:34 | 16 | Before you pass this on, please give me a call to discuss so |
| 09:35 | 17 | we are clear on some of the details." |
| 09:35 | 18 | And this opportunity was discussed within Mattel, |
| 09:35 | 19 | correct? |
| 09:35 | 20 | A.  Yes. |
| 09:35 | 21 | Q.  And if we could see Exhibit 37112. |
| 09:35 | 22 | *(Document provided to the witness.)* |
| 09:35 | 23 | THE WITNESS:  I have it. |
| 09:35 | 24 | BY MS. KELLER: |
| 09:35 | 25 | Q.  This is a December 22, 2004 e-mail from Sharon |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

55

| | | |
|---|---|---|
| 09:35 | 1 | Spaulding to Matt Bousquette, Jerry Cleary, and Drew |
| 09:35 | 2 | Vollero, correct? |
| 09:35 | 3 | A.   Yes. |
| 09:35 | 4 | Q.   And "Subject:  Kohl's Barbie Opportunity"? |
| 09:35 | 5 | MS. KELLER:  Your Honor, I would move 37112 into |
| 09:35 | 6 | evidence. |
| 09:35 | 7 | THE COURT:  Received. |
| 09:35 | 8 | *(Exhibit No. 37112received in evidence.)* |
| 09:35 | 9 | *(Document displayed.)* |
| 09:35 | 10 | BY MS. KELLER: |
| 09:35 | 11 | Q.   And, of course, we have heard Drew Vollero testify |
| 09:35 | 12 | about the Kohl's deal just last week, right? |
| 09:35 | 13 | A.   Yes. |
| 09:35 | 14 | Q.   So this is from Sharon Spaulding to Matt Bousquette, |
| 09:35 | 15 | Jerry Cleary, and Drew Vollero.  Kohl's Barbie opportunity. |
| 09:36 | 16 | And Mr. Bousquette and Mr. Cleary were direct reports |
| 09:36 | 17 | to you, right? |
| 09:36 | 18 | A.   No. |
| 09:36 | 19 | Q.   Mr. Bousquette was a direct report to you, correct? |
| 09:36 | 20 | A.   Yes. |
| 09:36 | 21 | Q.   And Drew Vollero, as we said, you were here, hearing |
| 09:36 | 22 | him testify about this matter, correct? |
| 09:36 | 23 | A.   Yes. |
| 09:36 | 24 | Q.   And the e-mail says, "Discussed incremental retail |
| 09:36 | 25 | presence opportunity for Kohl's with Tom Maskel, buyer. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 56 of 158   Page ID #:315951
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

56

09:36  1    Please see his verbiage below."

09:36  2        And he says a number of things.  Believes competition

09:36  3    is a fad.  Will go away.  Tired of supporting a business on

09:36  4    the down trend.  Sales just average.  Barbie the brand will

09:36  5    always be there, et cetera.

09:36  6        Now, go down under "Mattel Opportunities."

09:37  7        "Double Barbie space to 8 feet.

09:37  8        "Incremental tower versus '03.

09:37  9        "Two-year program.

09:37  10       "Competition will not be represented in toy

09:37  11   department."

09:37  12       And then under "Requests":

09:37  13       "Seeks to cover '04 margin shortfall, 1,274,000.  Seeks

09:37  14   markdown money to make room for Barbie, 340.  Total,

09:37  15   1,614,000.

09:37  16       "Competitor offered 850K to offset loss.  Wants a

09:37  17   million four.  I think I can close at a million two, a

09:37  18   million three.  Payable '05 after 1/31."

09:37  19       Then it says, "Must respond no later than Monday 12/27,

09:37  20   or they will maintain competition.  No extensions."

09:37  21       So Kohl's was telling Mattel as of December 22nd, 2004,

09:38  22   that you had five days to agree to their request to give

09:38  23   them money in return for them shutting out Bratz, correct?

09:38  24   A.  No, for a program that we built for them, which

09:38  25   promoted our products.  The result of that was they no

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

57

| | | |
|---|---|---|
| 09:38 | 1 | longer carried Bratz. |
| 09:38 | 2 | Q.   And people within Mattel discussed what it would be |
| 09:38 | 3 | worth to get MGA out of Kohl's toy department for two years, |
| 09:38 | 4 | right? |
| 09:38 | 5 | A.   No. |
| 09:38 | 6 | Q.   In your eyes the opportunity presented was to double |
| 09:38 | 7 | Barbie's space to 8 feet by taking all of Bratz's 4 feet of |
| 09:38 | 8 | space, right? |
| 09:38 | 9 | A.   No.  It was to double Barbie's space, yes. |
| 09:38 | 10 | Q.   And get rid of your competition completely.  Wipe them |
| 09:38 | 11 | out of Kohl's for two years, right? |
| 09:38 | 12 | A.   No.  Again, that was the result of the program we put |
| 09:38 | 13 | together for Barbie, which promoted Barbie and succeeded. |
| 09:38 | 14 | Q.   And it just happened to be part of a deal to pay Kohl's |
| 09:38 | 15 | money in return for Kohl's shutting out Bratz.  I mean, |
| 09:39 | 16 | that's what this talks about, right? |
| 09:39 | 17 | A.   What all of this talks about is there is a tremendous |
| 09:39 | 18 | storm, as we've seen here, between MGA and Kohl's, and |
| 09:39 | 19 | Mattel ends up being the port for that storm.  We are the |
| 09:39 | 20 | ones who give them the program to promote our products and |
| 09:39 | 21 | it works, and they build their margin, which is what they |
| 09:39 | 22 | want to do. |
| 09:39 | 23 | Q.   And you've had several days now to prepare for this |
| 09:39 | 24 | testimony, correct? |
| 09:39 | 25 | A.   I've had weeks to prepare for this testimony. |

DEBBIE GALE, U.S. COURT REPORTER

58

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 09:39 | 1  | Q.   Well, but since MGA only had the documents as of |
| 09:39 | 2  | Thursday night, you didn't know you'd be confronted with |
| 09:39 | 3  | them until the last few days, right? |
| 09:39 | 4  | A.   I didn't see the specific documents; that's correct. |
| 09:39 | 5  | Q.   Well, you knew we didn't have them as well, correct? |
| 09:39 | 6  | A.   No.  I've been learning about the Kohl's situation for |
| 09:39 | 7  | months, but you're right, I don't know about -- I didn't |
| 09:39 | 8  | have the specific documents. |
| 09:39 | 9  | Q.   Let's look at the bottom line of Exhibit 37112: "Must |
| 09:39 | 10 | respond no later than Monday 12/27, or they will maintain |
| 09:40 | 11 | competition, no extensions." |
| 09:40 | 12 | A.   Right. |
| 09:40 | 13 | Q.   That meant if you didn't agree to pay them the money |
| 09:40 | 14 | they wanted by Monday 12/27, they were gonna continue to |
| 09:40 | 15 | keep Bratz in their stores, right? |
| 09:40 | 16 | A.   Sure.  If we couldn't put together a program that was |
| 09:40 | 17 | profitable for Kohl's, that gave them the port for this |
| 09:40 | 18 | storm, then they were gonna continue with the competition; |
| 09:40 | 19 | that's right. |
| 09:40 | 20 | Q.   If you did not pay them money, they would keep Bratz on |
| 09:40 | 21 | the shelves, true? |
| 09:40 | 22 | A.   If we didn't put together a program that was profitable |
| 09:40 | 23 | for them, that paid them money, that's the result of it, |
| 09:40 | 24 | yes. |
| 09:40 | 25 | Q.   If you didn't pay them money to keep Bratz off the |

| | | |
|---|---|---|
| 09:40 | 1 | shelves, Bratz was gonna stay on the shelves.  That's what |
| 09:40 | 2 | this document says? |
| 09:40 | 3 | A.   No. |
| 09:40 | 4 | Q.   Isn't it? |
| 09:40 | 5 | A.   We did not pay them money to keep Bratz off the |
| 09:40 | 6 | shelves. |
| 09:40 | 7 | Q.   And -- |
| 09:40 | 8 | A.   That's a fact.  We paid them money to promote Barbie, |
| 09:41 | 9 | to give Barbie more shelf space, and it worked out for them. |
| 09:41 | 10 | They clearly increased their profitability in that space. |
| 09:41 | 11 | That's what a retailer is supposed to do. |
| 09:41 | 12 | Q.   What you did is you took the money that they suggested |
| 09:41 | 13 | you pay them to get Bratz off the shelves, and you framed it |
| 09:41 | 14 | in a different way.  You framed it as a Barbie promotional |
| 09:41 | 15 | program, right? |
| 09:41 | 16 | A.   Which is exactly what it was. |
| 09:41 | 17 | Q.   And so because you called this a Barbie promotional |
| 09:41 | 18 | program and paid them what they wanted, they agreed and the |
| 09:41 | 19 | deal went ahead, right? |
| 09:41 | 20 | A.   And their business grew and our business grew.  That's |
| 09:41 | 21 | good, yes. |
| 09:41 | 22 | Q.   You paid Kohl's to get rid of Bratz for two years? |
| 09:41 | 23 | A.   No.  'cause you've also shown that document of exactly |
| 09:41 | 24 | what we paid Kohl's to do.  We paid Kohl's to expand their |
| 09:41 | 25 | Barbie business, to increase their sales of Barbie, increase |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

60

| | | |
|---|---|---|
| 09:41 | 1 | their purchases from us, and promote our products, and it |
| 09:41 | 2 | worked.  There's nothing anticompetitive about that. |
| 09:42 | 3 | Q.   Let's go back to Exhibit 26612, the one you gave us, |
| 09:42 | 4 | the one we've had for a while, not just last Thursday night. |
| 09:42 | 5 | *(Document displayed.)* |
| 09:42 | 6 | MR. QUINN:  Your Honor, this is argumentative. |
| 09:42 | 7 | THE COURT:  Sustained. |
| 09:42 | 8 | MR. QUINN:  Move to strike the comments. |
| 09:42 | 9 | THE COURT:  Strike the comments.  Ladies and |
| 09:42 | 10 | gentlemen, disregard the comments. |
| 09:42 | 11 | BY MS. KELLER: |
| 09:42 | 12 | Q.   Let's look at Exhibit 26612, which Mattel produced a |
| 09:42 | 13 | while ago. |
| 09:42 | 14 | This document doesn't say one word about Mattel paying |
| 09:42 | 15 | Kohl's anything to keep Bratz off the shelves, right? |
| 09:42 | 16 | A.   That's correct. |
| 09:42 | 17 | Q.   It doesn't say anything even about a Barbie promotional |
| 09:42 | 18 | program that comes out to the same amount of money that |
| 09:42 | 19 | Kohl's had been demanding in Exhibit 37112, correct? |
| 09:42 | 20 | A.   That's correct. |
| 09:42 | 21 | Q.   This makes it look like Kohl's has simply agreed to do |
| 09:42 | 22 | the things they're doing without any payment, right? |
| 09:43 | 23 | A.   No.  That's -- we provide promotional allowances to all |
| 09:43 | 24 | customers, so it may not say those words, but there is |
| 09:43 | 25 | advertising and promotional allowances in every sale we |

CV 04-9049 DOC – 4/4/2001 – Day 45, Volume 1 of 4

61

09:43  1    make.

09:43  2    Q.   The document you produced to us is a document that

09:43  3    doesn't mention one word about paying Kohl's anything,

09:43  4    right?

09:43  5    A.   Correct.

09:43  6         MR. QUINN:  Assumes there's only one document,

09:43  7    Your Honor.

09:43  8         THE COURT:  Overruled.

09:43  9         THE WITNESS:  Correct.

09:43  10   BY MS. KELLER:

09:43  11   Q.   Now, the documents 37112, 37113, and the other

09:43  12   documents that Mattel turned over last Thursday night, those

09:43  13   were the first time that MGA and Mr. Larian got to see what

09:43  14   the terms of Mattel's deal with Kohl's were, right?

09:43  15   A.   No.  He and I both saw the terms of that deal here in

09:43  16   Court last week.

09:43  17   Q.   The first time that MGA and Mr. Larian learned that you

09:44  18   and Kohl's got together and agreed to freeze Bratz out of

09:44  19   Kohl's for two years in return for a payoff was Thursday

09:44  20   night, right?

09:44  21        MR. QUINN:  Argumentative.  Misstate the evidence.

09:44  22        THE COURT:  Well, ladies and gentlemen, it's the

09:44  23   word "payoff" that's causing the issue.  That will be for

09:44  24   you to decide.

09:44  25        I'll allow the question.  The import is last

| | | |
|---|---|---|
| 09:44 | 1 | Thursday night. |
| 09:44 | 2 | THE WITNESS:  The answer is no. |
| 09:44 | 3 | BY MS. KELLER: |
| 09:44 | 4 | Q.   Is this Mattel's idea of competing fairly, Mr. Eckert? |
| 09:44 | 5 | A.   Uh, we competed very fairly with Kohl's.  We earned |
| 09:44 | 6 | their business.  Their business grew.  Their profits grew. |
| 09:44 | 7 | They're very happy with Barbie.  They're still very happy |
| 09:44 | 8 | with Barbie, and this to me is a success story of a |
| 09:44 | 9 | relationship.  This is how you the should treat a customer |
| 09:44 | 10 | as opposed to leaving them with stale merchandise that they |
| 09:44 | 11 | can't sell.  They can sell Barbie and make money on Barbie |
| 09:44 | 12 | and they have. |
| 09:44 | 13 | Q.   Is this an example of Mattel's dedication to compliance |
| 09:45 | 14 | with the applicable antitrust and anticompetition laws in |
| 09:45 | 15 | every place where Mattel does business? |
| 09:45 | 16 | A.   It is.  If you look at the terms of that deal, it's |
| 09:45 | 17 | absolutely in compliance. |
| 09:45 | 18 | Q.   You sat here in this courtroom and you watched while |
| 09:45 | 19 | Mr. Larian was cross-examined about whether he had any |
| 09:45 | 20 | documents whatsoever to substantiate his contention that |
| 09:45 | 21 | there was a payoff between Mattel and Kohl's to keep Bratz |
| 09:45 | 22 | off the shelf.  You remember that cross-examination? |
| 09:45 | 23 | MR. QUINN:  It misstates the record, Your Honor. |
| 09:45 | 24 | THE COURT:  Overruled. |
| 09:45 | 25 | And I'll let one counsel refer to it as a business |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 63 of 158   Page ID #:315958
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

63

| | | |
|---|---|---|
| 09:45 | 1 | transaction if they want to; the other, as a payoff.  You'll |
| 09:45 | 2 | be the judge, ladies and gentlemen of the jury. |
| 09:45 | 3 | THE WITNESS:  Yes, I saw all of that testimony |
| 09:45 | 4 | about the problems between Kohl's and MGA. |
| 09:45 | 5 | BY MS. KELLER: |
| 09:45 | 6 | Q.   I know that's how you want to characterize it, sir, but |
| 09:45 | 7 | I'm not asking you that question. |
| 09:45 | 8 | MR. QUINN:  Move to strike the preamble, |
| 09:45 | 9 | Your Honor. |
| 09:45 | 10 | THE COURT:  Stricken. |
| 09:45 | 11 | BY MS. KELLER: |
| 09:45 | 12 | Q.   You sat here and you heard Mr. Larian cross-examined |
| 09:45 | 13 | and asked, "Isn't it true you don't have one shred of |
| 09:46 | 14 | evidence to back up your contention that there was some sort |
| 09:46 | 15 | of deal between Mattel and Kohl's to keep Bratz off the |
| 09:46 | 16 | shelf?"  You were here and you heard your lawyers do that, |
| 09:46 | 17 | right? |
| 09:46 | 18 | MR. QUINN:  Misstates the record, Your Honor. |
| 09:46 | 19 | THE COURT:  Overruled. |
| 09:46 | 20 | MR. QUINN:  Misstates the questions. |
| 09:46 | 21 | THE COURT:  Overruled. |
| 09:46 | 22 | THE WITNESS:  I was here during that testimony.  I |
| 09:46 | 23 | don't remember that specific question, but I do remember the |
| 09:46 | 24 | subject. |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 64 of 158   Page ID #:315959
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

64

09:46  1    BY MS. KELLER:

09:46  2    Q.   You know, the gist of the cross-examination was,

09:46  3    "Mr. Larian, you don't have any one shred of evidence to

09:46  4    back up that contention," right?

09:46  5    A.   No.  The gist of the cross-examination was, "Mr. Larian

09:46  6    you have a problem at Kohl's, right?"  And Mr. Larian kept

09:46  7    saying, "No.  There's no business issue at Kohl's."

09:46  8         In fact, from all the documents I saw, there was

09:46  9    tremendous dissatisfaction with MGA by Kohl's.

09:46  10   Q.   At the time you were sitting here listening to

09:46  11   Mr. Larian's cross-examination, you knew full well that

09:46  12   there were documents that Mattel had never produced showing

09:46  13   that it paid Kohl's money to throw Bratz out and replace its

09:47  14   designated shelf space with Barbie, correct?

09:47  15   A.   No.

09:47  16   Q.   And you heard Mr. Price ask Mr. Larian questions like,

09:47  17   "Certainly coming here and telling the jury that there were

09:47  18   no business reasons, no issues between you and Kohl's,

09:47  19   before saying that, you'd want to make sure you knew the

09:47  20   facts," right?

09:47  21   A.   Yes.

09:47  22   Q.   Remember that?

09:47  23        And things like, "So didn't you want to know what the

09:47  24   facts actually were about Kohl's when you told the jury

09:47  25   there was no business issue between you and Kohl's," right?

09:47  1  A.   Yes.

09:47  2  Q.   And what you knew, but Mr. Larian didn't know for sure

09:47  3  until last Thursday night, was that Mattel had numerous

09:47  4  communications with Kohl's which showed Mattel negotiated to

09:47  5  throw Bratz out, not just from its designated space at

09:47  6  Kohl's, but out of Kohl's entirely, right?

09:47  7  A.   No.  The -- the -- what I saw here was documents that

09:48  8  support Kohl's was dissatisfied with MGA and wanted to

09:48  9  promote Barbie.  And we satisfied that customer.  There's

09:48  10  nothing wrong with that.  There's nothing wrong with doing

09:48  11  what the customer wants in the case of building our brand.

09:48  12  That's what we did.

09:48  13  Q.   So it's okay under the antitrust laws of the

09:48  14  United States to pay a fee to a customer to throw a

09:48  15  competitor out?

09:48  16          MR. QUINN:  This is argumentative.

09:48  17  BY MS. KELLER:

09:48  18  Q.   Is that okay?

09:48  19          MR. QUINN:  Argumentative.  Legal conclusion.

09:48  20          THE COURT:  Sustained.

09:48  21  BY MS. KELLER:

09:48  22  Q.   Is it your belief that it is compatible with the

09:48  23  antitrust laws that you as the CEO are required to report

09:48  24  compliance with to the SEC and to your shareholders -- is it

09:48  25  your belief that paying a competitor (sic) a fee to throw a

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

66

| | | |
|---|---|---|
| 09:48 | 1 | competitor's products off the shelves is legal? |
| 09:48 | 2 | A.   No. |
| 09:48 | 3 | Q.   Now, you know that Mr. Vollero's name is all over these |
| 09:49 | 4 | documents that have been produced last Thursday night, |
| 09:49 | 5 | right? |
| 09:49 | 6 | A.   He was on the document that you and I recently covered. |
| 09:49 | 7 | Q.   Well, the whole group of documents, that I assume that |
| 09:49 | 8 | you reviewed, that were produced Thursday night? |
| 09:49 | 9 | A.   I see his name on at least three of them. |
| 09:49 | 10 | Q.   And you -- again, you heard him testify last week about |
| 09:49 | 11 | the Kohl's deal, right? |
| 09:49 | 12 | A.   Yes. |
| 09:49 | 13 | Q.   And you heard him testify in his capacity as Senior |
| 09:49 | 14 | Vice President of Corporate Strategy and Corporate |
| 09:49 | 15 | Development, right? |
| 09:49 | 16 | A.   Yes. |
| 09:49 | 17 | Q.   And you sat here while Mr. Vollero testified that he |
| 09:49 | 18 | didn't know if Kohl's was even selling Bratz in 2004. |
| 09:49 | 19 | Remember that? |
| 09:49 | 20 | A.   Not specifically. |
| 09:50 | 21 | Q.   If you take a look at Mr. Vollero's trial testimony at |
| 09:50 | 22 | page 112 -- do we have that? |
| 09:50 | 23 | MR. QUINN:  Your Honor, up to this point, there |
| 09:50 | 24 | haven't been -- |
| 09:50 | 25 | THE COURT:  I'm not going to allow it, Counsel. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 67 of 158   Page ID #:315962
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

67

| 09:50 | 1  | You can refresh his recollection, but you cannot simply read |
| 09:50 | 2  | the trial testimony in. |
| 09:50 | 3  | MS. KELLER:  Are you aware that Mr. Vollero in |
| 09:50 | 4  | this trial testified -- |
| 09:50 | 5  | MR. QUINN:  Same objection, Your Honor. |
| 09:50 | 6  | THE COURT:  Sustained. |
| 09:50 | 7  | You can ask him if this refreshes his recollection |
| 09:50 | 8  | concerning Mr. Vollero's testimony. |
| 09:50 | 9  | Ladies and gentlemen, what I'm trying to preclude |
| 09:50 | 10 | from both sides is just rereading testimony back.  You've |
| 09:51 | 11 | heard the testimony.  We've got a reporter.  So when you go |
| 09:51 | 12 | back into your deliberations, if you're interested in any |
| 09:51 | 13 | particular part, you'll make that request and we can have it |
| 09:51 | 14 | reread. |
| 09:51 | 15 | BY MS. KELLER: |
| 09:51 | 16 | Q.   If you can take a look at page 113, lines 6 through 13. |
| 09:51 | 17 | *(Document provided to the witness.)* |
| 09:51 | 18 | MR. QUINN:  What is the date? |
| 09:51 | 19 | MS. KELLER:  March 29, 2011. |
| 09:51 | 20 | THE WITNESS:  Okay.  I've seen it. |
| 09:51 | 21 | BY MS. KELLER: |
| 09:51 | 22 | Q.   So while you were here in Court, you heard Mr. Vollero |
| 09:51 | 23 | say -- |
| 09:51 | 24 | MR. QUINN:  Same objection, Your Honor. |
| 09:51 | 25 | THE COURT:  Sustained. |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 68 of 158   Page ID #:315963
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

68

| | | |
|---|---|---|
| 09:51 | 1 | BY MS. KELLER: |
| 09:51 | 2 | Q.   It would be a lie for someone to testify that -- |
| 09:51 | 3 | MR. QUINN:  Objection. |
| 09:51 | 4 | THE COURT:  Sustained. |
| 09:52 | 5 | We're not going to get into Mr. Eckert commenting |
| 09:52 | 6 | upon Mr. Vollero.  I've precluded that along the line for |
| 09:52 | 7 | both sides. |
| 09:52 | 8 | MS. KELLER:  Your Honor, as a party admission by |
| 09:52 | 9 | Mr. Vollero. |
| 09:52 | 10 | THE COURT:  Well, Mr. Vollero is available, isn't |
| 09:52 | 11 | he? |
| 09:52 | 12 | MR. QUINN:  They've said they're going to call |
| 09:52 | 13 | him. |
| 09:52 | 14 | THE COURT:  Well, I am not sure if they are, or if |
| 09:52 | 15 | you are, or if he's even coming back.  I think I'm going to |
| 09:52 | 16 | preclude this for the time being anyway. |
| 09:52 | 17 | (To the jury:) It's comparing and contrasting by |
| 09:52 | 18 | both sides.  Each party's been involved in this.  And you'll |
| 09:52 | 19 | have the transcripts -- strike that.  You'll have the |
| 09:52 | 20 | testimony available to you through rereading.  So when you |
| 09:52 | 21 | get back in your jury deliberation room, if you decide you |
| 09:52 | 22 | want to have somebody's testimony reread, you'll have to |
| 09:52 | 23 | give us a little bit of time because we've had five |
| 09:52 | 24 | reporters up here, maybe even a day, but we'll get that back |
| 09:52 | 25 | to whatever you need.  Okay? |

| | | |
|---|---|---|
| 09:52 | 1 | Counsel. |
| 09:52 | 2 | BY MS. KELLER: |
| 09:52 | 3 | Q.   Let me ask a different question.  If you are sitting in |
| 09:52 | 4 | this courtroom as the CEO of Mattel and you see one of your |
| 09:53 | 5 | executives get up on the witness stand and testify to |
| 09:53 | 6 | something that you know is a lie, do you feel it's your |
| 09:53 | 7 | responsibility -- |
| 09:53 | 8 | MR. QUINN:  Objection.  Relevance.  Argumentative. |
| 09:53 | 9 | THE COURT:  Overruled. |
| 09:53 | 10 | THE WITNESS:  You and I are reading that answer |
| 09:53 | 11 | very differently.  He did not lie at all based on what I |
| 09:53 | 12 | just read. |
| 09:53 | 13 | BY MS. KELLER: |
| 09:53 | 14 | Q.   My question is, as CEO of Mattel, if you watch a Mattel |
| 09:53 | 15 | executive get up on the witness stand and lie, is it your |
| 09:53 | 16 | obligation to correct it? |
| 09:53 | 17 | MR. QUINN:  Relevance, Your Honor. |
| 09:53 | 18 | THE COURT:  Overruled. |
| 09:53 | 19 | THE WITNESS:  Yes. |
| 09:53 | 20 | THE COURT:  (To the jury:) Now, you're not to |
| 09:53 | 21 | assume that anybody's lying.  But the code for both |
| 09:53 | 22 | companies really rests in a sense with Mr. Larian and |
| 09:53 | 23 | Mr. Eckert. |
| 09:53 | 24 | BY MS. KELLER: |
| 09:53 | 25 | Q.   And, for example, if somebody was asked if he |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

70

| | | |
|---|---|---|
| 09:53 | 1 | participated in a deal to exclude another company -- |
| 09:54 | 2 | MR. QUINN:  Objection, Your Honor. |
| 09:54 | 3 | THE COURT:  Yeah.  Sustained, Counsel. |
| 09:54 | 4 | I'm not going to allow the comparing and |
| 09:54 | 5 | contrasting.  It's just being asked a different way.  So |
| 09:54 | 6 | we're done with this area now.  It's unduly consumptive of |
| 09:54 | 7 | time.  It's precluded. |
| 09:54 | 8 | That can be argued. |
| 09:54 | 9 | BY MS. KELLER: |
| 09:54 | 10 | Q.   Mr. Eckert, for the whole period of time that you were |
| 09:54 | 11 | at Mattel, you had -- until it came to light in this lawsuit |
| 09:54 | 12 | and was shut down to some degree, you had a Market |
| 09:54 | 13 | Intelligence Department using false pretenses to sneak into |
| 09:54 | 14 | competitors' showrooms and steal confidential information, |
| 09:54 | 15 | correct? |
| 09:54 | 16 | A.   Yes, as I heard it, that went on from 1992 to about |
| 09:54 | 17 | 2004 or '5; that's correct. |
| 09:54 | 18 | Q.   Well, it went on until the lawsuit between Mattel and |
| 09:54 | 19 | MGA, right? |
| 09:54 | 20 | A.   It went on until 2004 or '5. |
| 09:54 | 21 | Q.   It went on until Mattel attorneys got involved in |
| 09:55 | 22 | trying to figure out what would have to be disclosed to MGA, |
| 09:55 | 23 | right? |
| 09:55 | 24 | MR. QUINN:  Argumentative. |
| 09:55 | 25 | THE COURT:  Overruled. |

| | | |
|---|---|---|
| 09:55 | 1 | THE WITNESS:  No.  No, it went on until |
| 09:55 | 2 | Mr. Villasenor's supervisor told him he couldn't -- his |
| 09:55 | 3 | second supervisor told him he couldn't do it. |
| 09:55 | 4 | BY MS. KELLER: |
| 09:55 | 5 | Q.   After MGA sued you, right?  Well after? |
| 09:55 | 6 | A.   No, I don't -- I'm not sure that's the case.  I think |
| 09:55 | 7 | MGA sued us in 2005, and I don't remember whether |
| 09:55 | 8 | Mr. Villasenor's exit was 2005 or '6. |
| 09:55 | 9 | Q.   Your general counsel knew all about it, right? |
| 09:55 | 10 | A.   He certainly knew some elements, yes. |
| 09:55 | 11 | Q.   Your legal department knew all about it, right? |
| 09:55 | 12 | A.   Yes. |
| 09:55 | 13 | Q.   Senior executives at Mattel knew all about it, right? |
| 09:55 | 14 | A.   No. |
| 09:55 | 15 | Q.   Matt Bousquette, Sujata Luther, Matt Turetzky, to name |
| 09:55 | 16 | a few, knew all about it, right? |
| 09:56 | 17 | A.   No. |
| 09:56 | 18 | Q.   Well, you heard Matt Turetzky say he knew about it, |
| 09:56 | 19 | right? |
| 09:56 | 20 | A.   Yes. |
| 09:56 | 21 | Q.   And you've seen documents showing Matt Bousquette knew |
| 09:56 | 22 | about it, right? |
| 09:56 | 23 | A.   No. |
| 09:56 | 24 | Q.   And you know Sujata Luther admitted knowing about it, |
| 09:56 | 25 | right? -- in this trial? |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 72 of 158   Page ID #:315967
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

72

| | | |
|---|---|---|
| 09:56 | 1 | A.   No, I don't remember that. |
| 09:56 | 2 | Q.   But you yourself were insulated from knowing anything |
| 09:56 | 3 | about it? |
| 09:56 | 4 | A.   No, but I wasn't aware of it. |
| 09:56 | 5 | Q.   And in fact, even after you were sued by MGA and |
| 09:56 | 6 | Mr. Villasenor started to blow the whistle, you didn't know |
| 09:56 | 7 | anything about it, right? |
| 09:56 | 8 | A.   Uh, that's correct. |
| 09:56 | 9 | Q.   You were having weekly management meetings with Alan |
| 09:56 | 10 | Kaye, head of human resources, and Mr. Normile, the head of |
| 09:56 | 11 | your legal department, correct? |
| 09:56 | 12 | A.   Yes. |
| 09:56 | 13 | Q.   And they never told you, right? |
| 09:56 | 14 | A.   That's correct. |
| 09:56 | 15 | Q.   And this is right around the same time Mattel is |
| 09:57 | 16 | freezing Bratz out with retailers, right? |
| 09:57 | 17 | A.   No. |
| 09:57 | 18 | Q.   Working secret deals with them to pay them to throw |
| 09:57 | 19 | Bratz out, right? |
| 09:57 | 20 | A.   No. |
| 09:57 | 21 | Q.   Threatening licensees with cutting them off if they did |
| 09:57 | 22 | business with MGA, right? |
| 09:57 | 23 | A.   No. |
| 09:57 | 24 | Q.   Your merchandisers were pushing Bratz to the back of |
| 09:57 | 25 | shelves and back of retail stores such as Walmart, right? |

| 09:57 | 1 | A.   That may have happened in one instance. |
| 09:57 | 2 | Q.   And is this the unwavering integrity that you brought |
| 09:57 | 3 | with you from Kraft? |
| 09:57 | 4 | A.   Accusations don't -- don't mean a lot to me. |
| 09:57 | 5 | Q.   And you're saying that you didn't learn anything about |
| 09:57 | 6 | it until MGA's attorneys asked you a question about it in a |
| 09:57 | 7 | deposition, right? |
| 09:57 | 8 | A.   That's correct. |
| 09:57 | 9 | Q.   Until then, not one person at Mattel had told you, |
| 09:57 | 10 | correct? |
| 09:57 | 11 | A.   That's correct. |
| 09:57 | 12 | Q.   And so of course, not knowing anything about it, how |
| 09:57 | 13 | could you possibly report it to anybody else like |
| 09:57 | 14 | shareholders or the federal government, right? |
| 09:57 | 15 | A.   No, that's not at all relevant. |
| 09:58 | 16 | MS. KELLER:  Nothing further. |
| 09:58 | 17 | THE COURT:  Mr. Quinn, do you want to take a |
| 09:58 | 18 | recess or proceed? |
| 09:58 | 19 | MR. QUINN:  Maybe take a recess just to do the |
| 09:58 | 20 | changeover. |
| 09:58 | 21 | MR. OVERLAND:  Your Honor. |
| 09:58 | 22 | THE COURT:  I'm sorry.  Mr. Overland has |
| 09:58 | 23 | questions. |
| 09:58 | 24 | How long will you be, Mr. Overland? |
| 09:58 | 25 | MR. OVERLAND:  Ten minutes. |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 74 of 158   Page ID #:315969
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

74

| 09:58 | 1 | THE COURT:  How do you feel?  Recess? |
| 09:58 | 2 | Ten minutes, Mr. Overland, or whatever time |
| 09:58 | 3 | period, sir, that you care to use. |
| 09:58 | 4 | **RECROSS-EXAMINATION** |
| 09:58 | 5 | BY MR. OVERLAND: |
| 09:58 | 6 | Q.   Mr. Eckert, you told us Friday and then again today |
| 09:58 | 7 | about some of the things that Mr. Machado supposedly did in |
| 09:58 | 8 | Mexico.  Do you remember those? |
| 09:58 | 9 | A.   Yes. |
| 09:58 | 10 | Q.   Were you ever present in Mexico to watch Mr. Machado do |
| 09:58 | 11 | anything? |
| 09:58 | 12 | A.   No, I was not. |
| 09:59 | 13 | Q.   Have you ever spoken to Mr. Machado? |
| 09:59 | 14 | A.   No, I have not. |
| 09:59 | 15 | Q.   Have you ever seen Mr. Machado before this trial? |
| 09:59 | 16 | A.   No. |
| 09:59 | 17 | Q.   So all the information that you got about which you |
| 09:59 | 18 | have testified came from somebody else, right? |
| 09:59 | 19 | A.   Uh, or it came from Mr. Machado. |
| 09:59 | 20 | Q.   Did you talk to him? |
| 09:59 | 21 | A.   No, but I watched him. |
| 09:59 | 22 | Q.   In court? |
| 09:59 | 23 | A.   Yes. |
| 09:59 | 24 | Q.   Okay.  Let's leave that aside for a moment. |
| 09:59 | 25 | With respect to the information that you gave us, you |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 75 of 158   Page ID #:315970
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

75

| | | |
|---|---|---|
| 09:59 | 1 | say you had two sources, Mr. Machado's testimony, right? |
| 09:59 | 2 | A.   Correct. |
| 09:59 | 3 | Q.   And that was in court here, right? |
| 09:59 | 4 | A.   That's correct. |
| 09:59 | 5 | Q.   Did you ever see Mr. Machado testify at any other time |
| 09:59 | 6 | other than here? |
| 09:59 | 7 | A.   No, I have not. |
| 09:59 | 8 | Q.   And your other source was what other people told you, |
| 09:59 | 9 | right? |
| 09:59 | 10 | A.   Or documents. |
| 09:59 | 11 | Q.   And what other people told about those documents, |
| 09:59 | 12 | correct? |
| 09:59 | 13 | A.   Well, I saw documents and people told me about the |
| 09:59 | 14 | documents; that's correct. |
| 09:59 | 15 | Q.   You don't know where those documents came from other |
| 09:59 | 16 | than what people told you, correct? |
| 10:00 | 17 | A.   That's correct. |
| 10:00 | 18 | Q.   And these people -- you don't have to tell us who these |
| 10:00 | 19 | are.  Did you ever ask these people that told you about the |
| 10:00 | 20 | documents or what Mr. Machado had done, whether they had |
| 10:00 | 21 | personally observed Mr. Machado do anything? |
| 10:00 | 22 | A.   No, I did not ask them. |
| 10:00 | 23 | Q.   Did you ever find out whether they had personally |
| 10:00 | 24 | observed Mr. Machado do anything? |
| 10:00 | 25 | A.   No, I haven't inquired of that. |

10:00  1   Q.   Did you ever ask 'em who their source was for what they
10:00  2   told you that Mr. Machado supposedly did?
10:00  3   A.   Well, I know the source of the documents, but not the
10:00  4   source of what he did.
10:00  5   Q.   Maybe you didn't understand my question.
10:00  6        Did you ever ask them what their source was about what
10:00  7   they told you that Mr. Machado supposedly did?
10:00  8   A.   No, I did not.
10:00  9   Q.   Did you ever find out what their source was?
10:00  10  A.   Uh, I know the source of the documents, but not their
10:00  11  source of their -- of the discussions, no.
10:00  12  Q.   And when you say you know the source of documents,
10:00  13  that's because they told you that, correct?
10:01  14  A.   That's correct.
10:01  15  Q.   Other than that, you have no idea where those documents
10:01  16  came from, correct?
10:01  17  A.   That's right.
10:01  18  Q.   Now, you -- you remember Mr. Machado testifying here on
10:01  19  March 8th.  That was a Tuesday?
10:01  20  A.   I don't remember the date, but I know he testified
10:01  21  here.
10:01  22  Q.   Were you here for all his testimony?
10:01  23  A.   I don't know.
10:01  24  Q.   How many days did you watch him testify?
10:01  25  A.   May have been two.  Certainly one.  Might have been

| | | |
|---|---|---|
| 10:01 | 1 | two. |
| 10:01 | 2 | Q.   So you don't know whether you were here for his entire |
| 10:01 | 3 | testimony? |
| 10:01 | 4 | A.   That's correct. |
| 10:01 | 5 | Q.   Now, you talked a little bit about Exhibit 7104.  You |
| 10:01 | 6 | remember that? |
| 10:01 | 7 | THE COURT:  That exhibit should be placed in front |
| 10:01 | 8 | of him. |
| 10:01 | 9 | *(Document provided to the witness.)* |
| 10:02 | 10 | *(Document displayed.)* |
| 10:02 | 11 | THE WITNESS:  I do. |
| 10:02 | 12 | BY MR. OVERLAND: |
| 10:02 | 13 | Q.   And that's one that you were especially concerned |
| 10:02 | 14 | about, right? |
| 10:02 | 15 | A.   Yes. |
| 10:02 | 16 | Q.   And -- |
| 10:02 | 17 | A.   Among others, yes. |
| 10:02 | 18 | Q.   But you were especially concerned about this one, |
| 10:02 | 19 | correct? |
| 10:02 | 20 | A.   I was concerned about several.  This is among those. |
| 10:02 | 21 | Q.   Okay.  And you were told by your sources as to where |
| 10:02 | 22 | this exhibit came from, that Mr. Machado had this, correct? |
| 10:02 | 23 | A.   Um, that this came off of, I believe, the CD, yes. |
| 10:02 | 24 | That's correct. |
| 10:02 | 25 | Q.   And do you know whether there was ever a hard copy of |

| | | |
|---|---|---|
| 10:02 | 1 | that found anywhere? |
| 10:02 | 2 | A.   I don't know.  I know there were documents in MGA |
| 10:02 | 3 | offices.  I don't know which ones were or weren't. |
| 10:02 | 4 | Q.   Okay.  I'm asking specifically about 7104, sir.  Do you |
| 10:02 | 5 | know whether or not there was a hard copy of that exhibit |
| 10:03 | 6 | found anywhere in the Mexico offices? |
| 10:03 | 7 | A.   No, I do not. |
| 10:03 | 8 | Q.   And do you know whether Mr. Machado ever looked at |
| 10:03 | 9 | Exhibit 7104? |
| 10:03 | 10 | A.   No, I do not. |
| 10:03 | 11 | Q.   Were you present for his testimony when he testified |
| 10:03 | 12 | that he never even saw it? |
| 10:03 | 13 | A.   Uh, no. |
| 10:03 | 14 | Q.   You've been with Mattel since 2000, right? |
| 10:03 | 15 | A.   That's correct. |
| 10:03 | 16 | Q.   And during that time, have you learned what Mattel's |
| 10:03 | 17 | profit margins are? |
| 10:03 | 18 | A.   Yes. |
| 10:03 | 19 | Q.   And you know that from your experience, correct? |
| 10:03 | 20 | A.   That's correct. |
| 10:03 | 21 | Q.   You don't have to look at any documents to try to |
| 10:03 | 22 | determine what Mattel's profit margins are.  They're pretty |
| 10:03 | 23 | constant, aren't they? |
| 10:03 | 24 | A.   No, they're not.  They vary quite a bit, but I'm |
| 10:03 | 25 | familiar with them. |

| | | |
|---|---|---|
| 10:03 | 1 | Q.    And that's because you've been there since 2000, right? |
| 10:03 | 2 | A.    I have been there since 2000. |
| 10:04 | 3 | Q.    How long was Mr. Machado with Mattel Servicios before |
| 10:04 | 4 | he left? |
| 10:04 | 5 | A.    Um, I believe he was with Mattel from perhaps '96 or |
| 10:04 | 6 | 1998 to 2004.  Maybe -- I'm -- maybe 1996 to 2004. |
| 10:04 | 7 | Q.    So approximately eight years? |
| 10:04 | 8 | A.    That would be right, if I'm correct. |
| 10:04 | 9 | Q.    And during that time, uh, somebody -- in your |
| 10:04 | 10 | experience, somebody that's with Mattel during that period |
| 10:04 | 11 | of time, would that person also know what the profit margins |
| 10:04 | 12 | are for Mattel? |
| 10:04 | 13 | A.    Sure.  In that range, we've gone from making no profit, |
| 10:04 | 14 | that is, losing money, to making profit.  There's been quite |
| 10:04 | 15 | a bit of variation, but our profit margins are public. |
| 10:04 | 16 | Q.    Well, when I say "profit margin," I mean what you make |
| 10:04 | 17 | when you say -- sell to a retailer or to one of your |
| 10:04 | 18 | customers. |
| 10:04 | 19 | A.    Not a specific toy.  That's not public at all at any |
| 10:05 | 20 | time.  We -- we announce those results at the company level |
| 10:05 | 21 | or at a very large division level, like our entire |
| 10:05 | 22 | international business across all products.  We don't ever |
| 10:05 | 23 | disclose that about a product, that is, the price and the |
| 10:05 | 24 | cost and the margin, ever. |
| 10:05 | 25 | Q.    I understand you don't disclose it, but you know what |

| | | |
|---|---|---|
| 10:05 | 1 | it is, right? |
| 10:05 | 2 | A.   I can find it. |
| 10:05 | 3 | Q.   But you know what it is? |
| 10:05 | 4 | A.   No, I don't.  I don't know what our profit margin is by |
| 10:05 | 5 | item, by customer, by region of the world, by country.  I |
| 10:05 | 6 | don't know that, but one can access that. |
| 10:05 | 7 | Q.   And somebody, for example, who's working in Mexico |
| 10:05 | 8 | would know that because that's part of his duties, isn't it? |
| 10:05 | 9 | A.   No. |
| 10:05 | 10 | Q.   It's not part of his duties? |
| 10:05 | 11 | A.   I'm sure, as you've seen, there's tremendous |
| 10:05 | 12 | variability of the margin by product.  And I doubt that our |
| 10:05 | 13 | sales people in any country know it off the top of their |
| 10:05 | 14 | head.  It is in the document. |
| 10:05 | 15 | Q.   You say you doubt that.  Have you talked to anybody in |
| 10:05 | 16 | Mexico that is in sales and asked them whether they know off |
| 10:06 | 17 | the top of their head what the profit is with respect to a |
| 10:06 | 18 | specific item? |
| 10:06 | 19 | A.   No, I have not. |
| 10:06 | 20 | Q.   So you don't know whether they know or not; isn't that |
| 10:06 | 21 | right? |
| 10:06 | 22 | A.   That's correct. |
| 10:06 | 23 | Q.   And somebody who's worked ten years or eight years in |
| 10:06 | 24 | Mexico in sales, when that's all they do, wouldn't you |
| 10:06 | 25 | expect that person to know how much they're gonna charge a |

| | | |
|---|---|---|
| 10:06 | 1 | customer of Mattel in order to make a profit? |
| 10:06 | 2 | A.   No.  We make about 8,000 products a year, so we're |
| 10:06 | 3 | gonna do that over eight years?  64,000 products?  I can't |
| 10:06 | 4 | imagine anybody that would know the relationship of the |
| 10:06 | 5 | price to the cost and the margin across that database.  The |
| 10:06 | 6 | data exists, but people don't have this on the top of their |
| 10:06 | 7 | head. |
| 10:06 | 8 | Q.   Have you ever talked to anybody to find out if they |
| 10:06 | 9 | did? |
| 10:06 | 10 | A.   I have not.  I'm just assuming people can't remember |
| 10:06 | 11 | that kind of data. |
| 10:06 | 12 | Q.   Okay.  And how many -- how many different dolls were |
| 10:07 | 13 | sold in Mexico -- let's take a year -- in 2003? |
| 10:07 | 14 | A.   I don't know, but it would be probably -- of Barbie |
| 10:07 | 15 | products, probably in the neighborhood of 500 to a thousand. |
| 10:07 | 16 | Q.   Are you guessing? |
| 10:07 | 17 | A.   I am. |
| 10:07 | 18 | Q.   So you have no idea? |
| 10:07 | 19 | A.   No, it's an informed guess, but I'm guessing. |
| 10:07 | 20 | Q.   Well, tell me approximately how many Barbie products |
| 10:07 | 21 | were sold in Mattel by Mexico in 2003. |
| 10:07 | 22 | A.   I can't tell you that number. |
| 10:07 | 23 | Q.   'Cause you don't know? |
| 10:07 | 24 | A.   I do -- I don't know. |
| 10:07 | 25 | Q.   Okay.  Now, you also expressed some concern with |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

82

| | | |
|---|---|---|
| 10:07 | 1 | respect to documents that were taken because of the |
| 10:07 | 2 | marketing information in it.  You remember that? |
| 10:07 | 3 | A.   Yes. |
| 10:07 | 4 | Q.   And when I say "documents that were taken," I mean |
| 10:08 | 5 | copied in Mexico, right? |
| 10:08 | 6 | A.   Uh, downloaded in Mexico. |
| 10:08 | 7 | Q.   Okay.  And the reason you were concerned is because you |
| 10:08 | 8 | thought that, jeez, if they know what our marketing strategy |
| 10:08 | 9 | is with respect to Barbie in Mexico, then they can copy that |
| 10:08 | 10 | at MGA, correct? |
| 10:08 | 11 | A.   Or it can influence how they compete, yes, that's |
| 10:08 | 12 | correct. |
| 10:08 | 13 | Q.   What was the marketing budget in Mexico for Barbie? |
| 10:08 | 14 | A.   I don't know. |
| 10:08 | 15 | Q.   What was the marketing budget for Bratz at MGA in |
| 10:08 | 16 | Mexico in 2004? |
| 10:08 | 17 | A.   I don't know. |
| 10:08 | 18 | Q.   Any idea? |
| 10:08 | 19 | A.   No. |
| 10:08 | 20 | Q.   Were they the same? |
| 10:08 | 21 | A.   No, I don't believe they were. |
| 10:08 | 22 | Q.   Did Bratz have a larger marketing budget? |
| 10:08 | 23 | A.   No. |
| 10:08 | 24 | Q.   Smaller? |
| 10:08 | 25 | A.   Yes. |

| 10:08 | 1 | Q.   How much? |
| 10:08 | 2 | A.   I don't know. |
| 10:08 | 3 | Q.   Do you have any idea what the Mattel marketing budget |
| 10:08 | 4 | was in Mexico in, let's say, from 2002 to 2004? |
| 10:09 | 5 | A.   No, I do not. |
| 10:09 | 6 | MR. OVERLAND:  Thank you.  That's all, sir. |
| 10:09 | 7 | THE COURT:  Why don't we take a recess at this |
| 10:09 | 8 | time.  Take it for 20 minutes.  We'll come and get you at |
| 10:09 | 9 | 10:30.  You're admonished not to discuss this matter amongst |
| 10:09 | 10 | yourselves, nor form or express any opinion concerning this |
| 10:09 | 11 | case. |
| 10:09 | 12 | Have a nice recess. |
| 10:09 | 13 | *(Jury recesses at 10:09 a.m.)* |
| 10:09 | 14 | THE COURT:  Mr. Eckert, if you would like to step |
| 10:09 | 15 | down, sir. |
| 10:09 | 16 | *(Witness steps down for recess.)* |
| 10:09 | 17 | THE COURT:  Counsel, 10:30 promptly, please. |
| 10:09 | 18 | *(Recess held at 10:09 a.m.)* |
| 10:27 | 19 | *(Proceedings resumed at 10:27 a.m.)* |
| 10:27 | 20 | *(Outside the presence of the jury.)* |
| 10:27 | 21 | THE COURT:  We're on the record out of the |
| 10:27 | 22 | presence of the jury Peter Bonis just called back, who's |
| 10:27 | 23 | counsel for Carter Bryant.  He's trying to get ahold of |
| 10:27 | 24 | Carter Bryant and is representing he'll do his best to have |
| 10:27 | 25 | him here tomorrow.  But the phones are cut off at the old |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

84

| | | |
|---|---|---|
| 10:27 | 1 | phone number, so he's sending him an e-mail. |
| 10:27 | 2 | I've represented to him, in light of the |
| 10:27 | 3 | discussion we've had, and the questions, he'll be on the |
| 10:27 | 4 | stand no more than half an hour to 45 minutes at the most. |
| 10:27 | 5 | So I've asked him to keep contact with the Court.  He didn't |
| 10:27 | 6 | get our phone call on Sunday until today. |
| 10:27 | 7 | So I expect he'll be here. |
| 10:27 | 8 | Okay. |
| 10:27 | 9 | MS. KELLER:  Your Honor, I was handed a list of |
| 10:28 | 10 | licensees -- list of common licensees in 2010 that Mr. Quinn |
| 10:28 | 11 | intends to ask about with Mr. Eckert.  And, apart from the |
| 10:28 | 12 | fact that this is 2010, Ms. Hurst tells me that the -- at |
| 10:28 | 13 | the deposition, that Mr. Eckert did not -- didn't recall any |
| 10:28 | 14 | of these. |
| 10:28 | 15 | MS. HURST:  He wasn't prepared to talk. |
| 10:28 | 16 | MS. KELLER:  Wasn't prepared to talk about them |
| 10:28 | 17 | and never gave any deposition testimony about it. |
| 10:28 | 18 | THE COURT:  I'll allow brief -- one more small |
| 10:28 | 19 | round between the two of you.  But Mr. Eckert's entitled to |
| 10:28 | 20 | testify about what the practice was, what actions he took in |
| 10:28 | 21 | terms of any activities that he didn't approve of as CEO; |
| 10:28 | 22 | and if this was a mess, how he cleaned it up. |
| 10:28 | 23 | And that's rather consistent with some of the |
| 10:28 | 24 | testimony concerning the code of conduct, each message he |
| 10:29 | 25 | was sending out each year.  If that extends to 2010, so be |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:29 | 1 | it.  You can point out that this was not the activity in |
| 10:29 | 2 | 2004, when he was CEO. |
| 10:29 | 3 | So if we're going to go beyond and get in more |
| 10:29 | 4 | licensees it will be one more small round. |
| 10:29 | 5 | Mr. Eckert, if you would be kind enough, sir. |
| 10:29 | 6 | Thank you very much. |
| 10:29 | 7 | *(Witness resumes the stand.)* |
| 10:30 | 8 | *(In the presence of the jury.)* |
| 10:30 | 9 | THE COURT:  We're back in session.  All counsel |
| 10:30 | 10 | are present.  Mr. Eckert's present and on the stand. |
| 10:31 | 11 | Sir, if you would be seated. |
| 10:31 | 12 | Counsel -- Mr. Larian, if you be seated also. |
| 10:31 | 13 | And, Counsel, this would be recross by Mr. Quinn |
| 10:31 | 14 | on behalf of Mattel. |
| 10:31 | 15 | MR. QUINN:  Thank you, Your Honor. |
| 10:31 | 16 | **RECROSS-EXAMINATION** |
| 10:31 | 17 | BY MR. QUINN: |
| 10:31 | 18 | Q.  You were asked some questions about antitrust laws, |
| 10:31 | 19 | Mr. Eckert. |
| 10:31 | 20 | Is it your understanding that under the U.S. antitrust |
| 10:31 | 21 | laws, a customer is required to continue buying product from |
| 10:31 | 22 | a company if they are losing money on that product? |
| 10:31 | 23 | A.  No, that's not my understanding of the law. |
| 10:31 | 24 | Q.  Now, you were asked some questions about Mr. Price's |
| 10:31 | 25 | examination of Mr. Larian, and also his testimony last week |

| | | |
|---|---|---|
| 10:31 | 1 | on this Kohl's issue. |
| 10:31 | 2 | Do you recall those questions? |
| 10:31 | 3 | A.   Yes. |
| 10:31 | 4 | Q.   And do you recall Mr. Larian saying that it was a |
| 10:31 | 5 | mystery to him why Kohl's stopped buying from MGA because |
| 10:31 | 6 | there were no business issues?  Do you recall that |
| 10:31 | 7 | testimony? |
| 10:31 | 8 | MS. KELLER:  I'm gonna object, Your Honor.  If |
| 10:32 | 9 | we're not allowed to comment on other witness's trial |
| 10:32 | 10 | testimony. |
| 10:32 | 11 | THE COURT:  No.  He's just refreshing his |
| 10:32 | 12 | recollection. |
| 10:32 | 13 | Overruled. |
| 08:31 | 14 | BY MR. QUINN: |
| 10:32 | 15 | Q.   Do you recall Mr. Larian testifying on questions from |
| 10:32 | 16 | Ms. Keller that it was a mystery to him why Kohl's stopped |
| 10:32 | 17 | buying from MGA because there were no business issues? |
| 10:32 | 18 | Do you recall that? |
| 10:32 | 19 | A.   I do recall him saying there were no business issues. |
| 10:32 | 20 | I don't know if I heard him use the word "a mystery." |
| 10:32 | 21 | Q.   And then you were asked some questions about |
| 10:32 | 22 | Mr. Price's examination of Mr. Larian.  And do you recall |
| 10:32 | 23 | Mr. Price asked Mr. Larian a series of questions, and we |
| 10:32 | 24 | looked at some e-mails, about margins and requests for |
| 10:32 | 25 | markdowns, and the fact that Kohl's was not making money on |

| | | |
|---|---|---|
| 10:32 | 1 | Bratz products? |
| 10:32 | 2 | Do you recall those questions? |
| 10:32 | 3 | A.   I do. |
| 10:32 | 4 | Q.   Leading up to an e-mail where Mr. Larian said, "F 'em." |
| 10:32 | 5 | Do you recall that? |
| 10:33 | 6 | A.   I do. |
| 10:33 | 7 | Q.   If we could take a look at Exhibit 24004.  And before |
| 10:33 | 8 | we put that up, let me ask:  In response to one of |
| 10:33 | 9 | Ms. Keller's questions, you said something about it's |
| 10:33 | 10 | common -- we set up a promotional program, some type of |
| 10:33 | 11 | program for Kohl's, and that that's a common thing to do. |
| 10:33 | 12 | Do you recall that? |
| 10:33 | 13 | A.   Yes, I do. |
| 10:33 | 14 | Q.   Could you please explain to us what a promotional-type |
| 10:33 | 15 | program is, what you were referring to? |
| 10:33 | 16 | A.   These are allowances that provide retailers with funds |
| 10:33 | 17 | to promote and sell products.  So, as an example, yesterday |
| 10:33 | 18 | I saw an ad for Folgers coffee in Walgreens, at a low -- as |
| 10:33 | 19 | a discounted price.  Folgers is participating in that |
| 10:33 | 20 | promotion by providing discounts to Walgreens, so that it |
| 10:33 | 21 | can feature Folgers at a low price. |
| 10:33 | 22 | That's very common in the business. |
| 10:34 | 23 | Q.   Is that common in the food business, in the toy |
| 10:34 | 24 | business, and in other lines of work, too -- that |
| 10:34 | 25 | manufacturers will provide an allowance for advertising-type |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 88 of 158   Page ID #:315983
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

88

| | | |
|---|---|---|
| 10:34 | 1 | expense? |
| 10:34 | 2 | A.   That's correct. |
| 10:34 | 3 | Q.   And that's something that Mattel has done many times? |
| 10:34 | 4 | A.   Yes. |
| 10:34 | 5 | Q.   And is that the -- can you tell us whether or not |
| 10:34 | 6 | that's the type of program that Mattel set up for Kohl's? |
| 10:34 | 7 | A.   Yes.  Promote the products, display the products on the |
| 10:34 | 8 | shelf, feature the products, promote the products, sell the |
| 10:34 | 9 | products, so that they can buy more products from us. |
| 10:34 | 10 | That's how we make the money. |
| 10:34 | 11 | Q.   So let's take a look at Exhibit 24004, which is in |
| 10:34 | 12 | evidence. |
| 10:34 | 13 | (Document provided to the witness.) |
| 10:34 | 14 | (Document displayed.) |
| 10:34 | 15 | BY MR. QUINN: |
| 10:34 | 16 | Q.   And we looked at this last week.  Do you recall seeing |
| 10:34 | 17 | that? |
| 10:34 | 18 | A.   Yes. |
| 10:34 | 19 | Q.   So, I mean, actually, it wouldn't be true to say that |
| 10:34 | 20 | the only document that MGA had about Mattel's relationship |
| 10:34 | 21 | with Kohl's was that e-mail from Mr. Zablow? |
| 10:34 | 22 | That would not be correct, would it? |
| 10:34 | 23 | A.   That's correct. |
| 10:34 | 24 | Q.   Because this document we've looked at before, we looked |
| 10:35 | 25 | at it with Mr. Larian, and it's in evidence, correct? |

| | | |
|---|---|---|
| 10:35 | 1 | A.   I don't know whether we've seen it with Mr. Larian, but |
| 10:35 | 2 | I have seen this document here. |
| 10:35 | 3 | Q.   And could you explain what these different points are |
| 10:35 | 4 | here.  What is this?  Is this the terms of the program?  The |
| 10:35 | 5 | arrangement that Mattel entered into with Kohl's? |
| 10:35 | 6 | A.   Yes.  This is the agreement between Mattel and Kohl's |
| 10:35 | 7 | related to the 2005 and -6 sales program. |
| 10:35 | 8 | Q.   And just on a high level, what are the points of that |
| 10:35 | 9 | agreement? |
| 10:35 | 10 | A.   There's three points.  One is an advertising allowance. |
| 10:35 | 11 | Again, that goes to "Please feature our products, and here |
| 10:35 | 12 | are discounts that can be used to advertise our products." |
| 10:35 | 13 | Two is the return program.  When somebody returns a toy |
| 10:35 | 14 | to the retailer, Kohl's, there's no need for Kohl's to send |
| 10:35 | 15 | it back to us.  There's an agreed-to refund amount. |
| 10:35 | 16 | Three is the Barbie program.  Here's what we're looking |
| 10:35 | 17 | for in terms of shelf space in Barbie, incremental space |
| 10:36 | 18 | outside of the normal shelf, and the quantities you need to |
| 10:36 | 19 | buy in order to earn the funds. |
| 10:36 | 20 | Q.   And if we look at another document that's in evidence, |
| 10:36 | 21 | Exhibit 24005. |
| 10:36 | 22 | *(Document displayed.)* |
| 10:36 | 23 | BY MR. QUINN: |
| 10:36 | 24 | Q.   24005, could you tell us what this document is? |
| 10:36 | 25 | A.   This is -- it appears to be the more specific version |

90

| | | |
|---|---|---|
| 10:36 | 1 | of that for the year 2006.  So it goes into those |
| 10:36 | 2 | components, as well as others, such as how we're gonna pay |
| 10:36 | 3 | for freight to their stores and those sorts of things. |
| 10:36 | 4 | Q.   Is there anything in either of these documents that |
| 10:36 | 5 | says that Bratz is to be excluded from Kohl's stores? |
| 10:36 | 6 | A.   No. |
| 10:36 | 7 | Q.   If -- who decides -- whose decision is it what products |
| 10:36 | 8 | are going to appear on shelf space within a store? |
| 10:36 | 9 | A.   Retailer decides what products it wants to carry and |
| 10:36 | 10 | what products it doesn't want to carry. |
| 10:36 | 11 | Q.   And if there were -- if the retailer decides that they |
| 10:37 | 12 | want to devote this particular shelf space to Barbie |
| 10:37 | 13 | products, does that mean that Bratz won't appear anywhere in |
| 10:37 | 14 | the store? |
| 10:37 | 15 | A.   No.  Bratz can appear in some other shelf space; and |
| 10:37 | 16 | presumably in this case it did, to sell the products that |
| 10:37 | 17 | Kohl's was stuck with. |
| 10:37 | 18 | Q.   And in addition to shelf space, are there other types |
| 10:37 | 19 | of displays that are common to all department stores or all |
| 10:37 | 20 | toy stores? |
| 10:37 | 21 | A.   Yes. |
| 10:37 | 22 | Q.   And what are those? |
| 10:37 | 23 | A.   In this particular case, it's called "wings," where |
| 10:37 | 24 | they have physical space that are on displays -- or in a |
| 10:37 | 25 | supermarket or toy store or Walmart or Target, as you're |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 91 of 158   Page ID #:315986
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

91

| | | |
|---|---|---|
| 10:37 | 1 | walking down the aisle, those end-aisle displays, those are |
| 10:37 | 2 | the kinds of promotions we're talking about. |
| 10:37 | 3 | Q.   Are those also called "end caps"? |
| 10:37 | 4 | A.   Yes. |
| 10:37 | 5 | Q.   End caps.  And we've also heard the term "towers"? |
| 10:37 | 6 | A.   Similar. |
| 10:37 | 7 | Q.   Is that something that has a meaning in the retail |
| 10:37 | 8 | business? |
| 10:37 | 9 | A.   It does in some retailers, not all.  But again, it's a |
| 10:37 | 10 | freestanding unit that displays products. |
| 10:38 | 11 | Q.   So that's another type of unit or space where product |
| 10:38 | 12 | can be shown apart from the shelves; is that correct? |
| 10:38 | 13 | A.   Yes. |
| 10:38 | 14 | Q.   Now, Ms. Keller asked you some questions about MGA's |
| 10:38 | 15 | designated space at Kohl's.  Do you recall being asked |
| 10:38 | 16 | questions about MGA's designated space? |
| 10:38 | 17 | A.   Not in that term, but I know she asked me questions. |
| 10:38 | 18 | Q.   I mean, if there were an agreement that there would be |
| 10:38 | 19 | MGA designated space and Mattel designated space, and that |
| 10:38 | 20 | couldn't change, would that be competitive, in your mind? |
| 10:38 | 21 | A.   Uh, sure, it would be competitive. |
| 10:38 | 22 | Q.   And would it be proper to enter into an agreement where |
| 10:38 | 23 | you just divide markets? |
| 10:38 | 24 | A.   No. |
| 10:38 | 25 | Q.   I mean, would that be a violation of the antitrust |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 92 of 158   Page ID #:315987
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

92

| | | |
|---|---|---|
| 10:38 | 1 | laws, in your understanding? |
| 10:38 | 2 | A.    Yes. |
| 10:38 | 3 | Q.    Do you believe that the arrangement that Mattel entered |
| 10:38 | 4 | into with Kohl's was pro competitive? |
| 10:38 | 5 | A.    Yes, I do. |
| 10:38 | 6 | Q.    And why? |
| 10:38 | 7 | A.    Because it had a problem with another manufacturer.  It |
| 10:39 | 8 | was not a good business relationship, based on the documents |
| 10:39 | 9 | I've seen here.  They came to us with an opportunity to |
| 10:39 | 10 | expand our business.  We capitalized on that opportunity. |
| 10:39 | 11 | Our business with Kohl's grew.  Their profits grew.  That |
| 10:39 | 12 | relationship continues today. |
| 10:39 | 13 | Q.    You say, "They came to us."  Ms. Keller asked you some |
| 10:39 | 14 | questions about Exhibit 37113. |
| 10:39 | 15 |             MR. QUINN:  If we could put that up on the screen. |
| 10:39 | 16 |                (Document provided to the witness.) |
| 10:39 | 17 |                (Document displayed.) |
| 10:39 | 18 |             MR. QUINN:  And I'd offer this.  I'm not sure this |
| 10:39 | 19 | is in evidence.  I'd offer it, Your Honor.  It's the e-mail |
| 10:39 | 20 | from Tom Maskel at Kohl's to Julie Scholvin. |
| 10:39 | 21 |             THE COURT:  Received. |
| 10:39 | 22 |                (Exhibit No. 37113 previously received in |
| 10:39 | 23 |         evidence at page 53.) |
| 10:39 | 24 |                (Document displayed.) |
| 10:39 | 25 |             MR. QUINN:  Thank you, Your Honor. |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 93 of 158   Page ID #:315988
CV 04-9049 DOC – 4/4/2001 – Day 45, Volume 1 of 4

93

| | | |
|---|---|---|
| 10:39 | 1 | THE COURT:  And under the same circumstances: |
| 10:39 | 2 | (To the jury:) Once again, the same warning as the |
| 10:39 | 3 | prior document that I allowed in on behalf of MGA.  This |
| 10:39 | 4 | document I'm going to allow in on behalf of Mattel, also; |
| 10:39 | 5 | but once again, it's hearsay.  Okay?  It's not for the |
| 10:39 | 6 | truth.  It's to show the conduct by Mr. Eckert and/or |
| 10:40 | 7 | Mattel. |
| 10:40 | 8 | MR. QUINN:  Thank you, Your Honor. |
| 10:40 | 9 | BY MR. QUINN: |
| 10:40 | 10 | Q.   So is this -- this is an e-mail from Mr. Maskel of |
| 10:40 | 11 | Kohl's to Julie Scholvin of Mattel; is that correct? |
| 10:40 | 12 | A.   Yes. |
| 10:40 | 13 | Q.   And is it your understanding this is one of the |
| 10:40 | 14 | documents that was provided to MGA last Thursday? |
| 10:40 | 15 | A.   Correct. |
| 10:40 | 16 | Q.   And just, by the way, on that, is it your understanding |
| 10:40 | 17 | that millions and millions of documents have been produced |
| 10:40 | 18 | in this case by both sides? |
| 10:40 | 19 | A.   Yes. |
| 10:40 | 20 | Q.   And is -- you say -- is it your understanding that |
| 10:40 | 21 | Kohl's reached out to Mattel to ask whether a business |
| 10:40 | 22 | arrangement could be entered into with Mattel that would be |
| 10:40 | 23 | attractive to Kohl's? |
| 10:40 | 24 | A.   Yes.  This appears to be the opening salvo of the |
| 10:40 | 25 | negotiation. |

94

| | | |
|---|---|---|
| 10:40 | 1 | Q.   And this says, "Julie, I would like to explore a |
| 10:40 | 2 | potential huge opportunity with you.  As you're well aware, |
| 10:40 | 3 | I have zero love for Bratz.  In my humble opinion, this is a |
| 10:40 | 4 | fad that is done.  As you're aware, we have approximately |
| 10:41 | 5 | 4 feet of POG" -- |
| 10:41 | 6 | What is POG? |
| 10:41 | 7 | A.   In this case, it would be planogram, shelf space. |
| 10:41 | 8 | Q.   -- "designated for Bratz this Spring.  What would |
| 10:41 | 9 | Mattel think about me throwing out Bratz and replacing the |
| 10:41 | 10 | space with our friend Barbie? |
| 10:41 | 11 | "Here is the kicker.  If I throw them out, I'll need |
| 10:41 | 12 | some help with markdowns on old Bratz.  We can talk dollars |
| 10:41 | 13 | later.  I think you would agree this might be a nice |
| 10:41 | 14 | opportunity for Mattel to take back a little market share. |
| 10:41 | 15 | Before you pass this on, please give me a call to discuss so |
| 10:41 | 16 | we are clear on some of the details." |
| 10:41 | 17 | And you said this was the opening salvo.  Is this what |
| 10:41 | 18 | ultimately resulted in Mattel offering a program to Kohl's |
| 10:41 | 19 | in return for getting more of that shelf space at Kohl's? |
| 10:41 | 20 | A.   Among other things, yes. |
| 10:41 | 21 | Q.   And whose decision was it about whether to accept that? |
| 10:41 | 22 | A.   Kohl's. |
| 10:41 | 23 | Q.   And if a customer comes to you and says, uh, "If you |
| 10:41 | 24 | can give us a really good business deal, we're gonna devote |
| 10:42 | 25 | more space to you, rather than someone else, rather than |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

95

10:42   1   your competitor," what do you say?

10:42   2   A.   If it's a good deal for us, we take it.

10:42   3   Q.   And it says they're asking for help with old Bratz.

10:42   4   What did you understand that to mean?

10:42   5   A.   I would read that to mean the product we talked about

10:42   6   that Kohl's had bought from MGA that it was unable to sell

10:42   7   at that time.

10:42   8   Q.   All right.  You were asked some questions about whether

10:42   9   Mattel directed retail merchandisers to move Bratz products

10:42   10  from shelves at Walmart.

10:42   11      Do you recall those questions?

10:42   12  A.   I do.

10:42   13  Q.   And you were shown Exhibit 8120.

10:42   14          MR. QUINN:  If we could put that up on the screen.

10:42   15          *(Document provided to the witness.)*

10:42   16          *(Document displayed.)*

10:42   17          MR. QUINN:  And, Ken, if we could enlarge that

10:42   18  middle e-mail from Connie Hibbert.

10:42   19          *(Technician complies.)*

10:42   20  BY MR. QUINN:

10:42   21  Q.   Connie Hibbert works for Mattel?

10:43   22  A.   Yes.

10:43   23  Q.   And she's the one who received this report from Heather

10:43   24  Hocut of Walmart?

10:43   25  A.   Yes, among others.

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

96

| | | |
|---|---|---|
| 10:43 | 1 | Q.   About -- something about this -- the idea that some |
| 10:43 | 2 | Bratz merchandise had been moved.  Do you see that? |
| 10:43 | 3 | A.   I do. |
| 10:43 | 4 | Q.   And she writes, "I apologize that this has happened as |
| 10:43 | 5 | the reps have never been directed to move Bratz or any |
| 10:43 | 6 | categories.  If you will supply me with the store numbers, I |
| 10:43 | 7 | can confront these particular reps assigned to the stores |
| 10:43 | 8 | and ensure that this doesn't happen again.  I'll then follow |
| 10:43 | 9 | up with a directive to all reps." |
| 10:43 | 10 | You see that? |
| 10:43 | 11 | A.   I do. |
| 10:43 | 12 | Q.   And is it your -- was Mattel ever able to track down |
| 10:43 | 13 | where this happened or supposedly happened? |
| 10:43 | 14 | A.   No.  We asked again for specifics so that we could |
| 10:43 | 15 | track it down, and Walmart was unable to provide them to us. |
| 10:43 | 16 | Q.   If we could take a look at Exhibit 9156. |
| 10:44 | 17 | (Document displayed.) |
| 10:44 | 18 | BY MR. QUINN: |
| 10:44 | 19 | Q.   Do you know whether a directive was ever sent to all |
| 10:44 | 20 | Mattel retail merchandisers reminding them of their -- |
| 10:44 | 21 | MR. QUINN:  This is not in evidence yet, I don't |
| 10:44 | 22 | think. |
| 10:44 | 23 | (Document removed.) |
| 10:44 | 24 | (Document provided to the witness.) |
| | 25 | |

| | | |
|---|---|---|
| 09:01 | 1 | BY MR. QUINN: |
| 10:44 | 2 | Q.   Do you know whether a directive was ever sent to all |
| 10:44 | 3 | Mattel merchandisers reminding them of their |
| 10:44 | 4 | responsibilities to respect competitive product on the |
| 10:44 | 5 | shelves? |
| 10:44 | 6 | A.   It was sent. |
| 10:44 | 7 | Q.   And can you identify Exhibit 9156? |
| 10:44 | 8 | A.   Yes. |
| 10:44 | 9 | Q.   Is that an e-mail from a Bill Ganey to Heather Hocut? |
| 10:44 | 10 | A.   Yes, it is. |
| 10:44 | 11 | MR. QUINN:  We'd offer this, Your Honor. |
| 10:44 | 12 | THE COURT:  I'm going to receive this, but once |
| 10:44 | 13 | again not for the truth. |
| 10:44 | 14 | (To the jury:)  Hopefully, this will show conduct, |
| 10:44 | 15 | so I'm being rather liberal for both parties, letting in |
| 10:44 | 16 | what would normally be hearsay.  But it pertains to this |
| 10:44 | 17 | whole subject concerning Kohl's. |
| 10:45 | 18 | MR. QUINN:  Thank you, Your Honor. |
| 10:45 | 19 | If we could put that up on the screen. |
| 10:45 | 20 | *(Document displayed.)* |
| 10:45 | 21 | MR. QUINN:  And if we could enlarge that, Ken. |
| 10:45 | 22 | *(Technician complies.)* |
| 10:45 | 23 | BY MR. QUINN: |
| 10:45 | 24 | Q.   Who is Bill Ganey? |
| 10:45 | 25 | A.   Bill Ganey is our senior-most person at Mattel who |

| | | |
|---|---|---|
| 10:45 | 1 | calls on Walmart. |
| 10:45 | 2 | Q.   And this is an e-mail that he has sent to Heather Hocut |
| 10:45 | 3 | at Walmart and copied some other people at Mattel? |
| 10:45 | 4 | A.   That's correct. |
| 10:45 | 5 | Q.   And he says, "Heather, a directive has been sent to all |
| 10:45 | 6 | Mattel retail merchandisers reminding them of their |
| 10:45 | 7 | responsibility regarding competitive product.  This stems |
| 10:45 | 8 | from your e-mail last week informing us of a reported |
| 10:45 | 9 | unauthorized adjustments in the fashion doll aisle.  We |
| 10:45 | 10 | cannot uncover any evidence or reports that this has |
| 10:45 | 11 | happened. |
| 10:45 | 12 |      "Again, can you give us a store number.  We want to |
| 10:45 | 13 | talk directly to the store to understand what happened.  Did |
| 10:45 | 14 | you hear this from a WMT" -- that's presumably Walmart -- |
| 10:45 | 15 | "employee or from a Mattel competitor?" question -- |
| 10:45 | 16 |      Do you see that? |
| 10:46 | 17 | A.   I do. |
| 10:46 | 18 | Q.   And so far as you know, was Mattel ever able to track |
| 10:46 | 19 | down the details of this alleged accident? |
| 10:46 | 20 | A.   We were unable to track it down. |
| 10:46 | 21 | Q.   Is that -- that type of conduct, having merchandisers |
| 10:46 | 22 | actually moving product around on shelves in a store, is |
| 10:46 | 23 | that something that you would approve of? |
| 10:46 | 24 | A.   They can move our product around in stores.  We promote |
| 10:46 | 25 | them.  That's what they are supposed to do.  We don't |

| | | |
|---|---|---|
| 10:46 | 1 | approve of them handling other company's products. |
| 10:46 | 2 | Q.   You were asked some questions about a proposed license |
| 10:46 | 3 | with THQ, specifically Exhibit 8972.  If we could take a |
| 10:46 | 4 | look at that exhibit, which is in evidence. |
| 10:46 | 5 | *(Document provided to the witness.)* |
| 10:46 | 6 | *(Document displayed.)* |
| 07:00 | 7 | BY MR. QUINN: |
| 10:46 | 8 | Q.   And the bottom e-mail is from Ellen Brothers to you |
| 10:46 | 9 | with a copy to Neil Friedman. |
| 10:46 | 10 | Can you tell us what this incident is about here? |
| 10:46 | 11 | A.   Um, yes.  Ellen Brothers, who runs our American Girl |
| 10:47 | 12 | business unit, was considering entering into a licensing |
| 10:47 | 13 | arrangement with THQ.  When she learned that THQ also |
| 10:47 | 14 | represented MGA, she brought it to our attention, given the |
| 10:47 | 15 | fact that we've had a lot of issues of confidential |
| 10:47 | 16 | information moving from Mattel to MGA.  And, in fact, by |
| 10:47 | 17 | this time, the lawsuits had been filed -- uh, wanted to make |
| 10:47 | 18 | sure that we were aware of the situation and pass judgment |
| 10:47 | 19 | on it. |
| 10:47 | 20 | Q.   So she raised an issue:  This company, THQ, has a |
| 10:47 | 21 | license with MGA.  "Do we want to enter into a Mattel |
| 10:47 | 22 | license with the same company?"  Is that basically it? |
| 10:47 | 23 | A.   Yes. |
| 10:47 | 24 | Q.   And that was the proposition that was being at least |
| 10:47 | 25 | considered or discussed? |

CV 04-9049 DOC – 4/4/2001 – Day 45, Volume 1 of 4

100

| 10:47 | 1 | A.   Yes. |
|---|---|---|
| 10:47 | 2 | Q.   Within Mattel? |
| 10:47 | 3 | A.   Yes. |
| 10:47 | 4 | Q.   And at the top, do you respond -- you forward this to |
| 10:47 | 5 | Neil Friedman, and you say, "Do you want me to kill this or |
| 10:47 | 6 | let it slide?" |
| 10:47 | 7 | Do you see that? |
| 10:47 | 8 | A.   Yes. |
| 10:48 | 9 | Q.   Why did you raise that? |
| 10:48 | 10 | A.   To see what -- whether he thought this was going to be |
| 10:48 | 11 | a problem or not or -- you know, we are concerned about |
| 10:48 | 12 | confidential information.  With some licensees we have no |
| 10:48 | 13 | issues because we know they do a very good job maintaining |
| 10:48 | 14 | each company's confidentiality.  But I didn't know anything |
| 10:48 | 15 | about this case. |
| 10:48 | 16 | Q.   And what actually happened here? |
| 10:48 | 17 | A.   Um, I told Ellen to go ahead with the deal. |
| 10:48 | 18 | MR. QUINN:  If we could take a look at |
| 10:48 | 19 | Exhibit 20525. |
| 10:48 | 20 | *(Document provided to the witness.)* |
| 10:48 | 21 | BY MR. QUINN: |
| 10:48 | 22 | Q.   Is this an e-mail -- the follow-up e-mail from you to |
| 10:48 | 23 | Ellen Brothers? |
| 10:48 | 24 | A.   It is. |
| 10:48 | 25 | MR. QUINN:  We'd offer that, Your Honor. |

DEBBIE GALE, U.S. COURT REPORTER

| 10:48 | 1 | THE COURT: Received. With the same admonition to |
| 10:48 | 2 | the jury -- I'm sorry. This from Mr. Eckert? |
| 10:48 | 3 | MR. QUINN: Yes. |
| 10:48 | 4 | THE COURT: My apologies. This is received. |
| 10:48 | 5 | MR. QUINN: Thank you, Your Honor. |
| 10:48 | 6 | *(Exhibit No. 20525 received in evidence.)* |
| 10:48 | 7 | *(Document displayed.)* |
| 10:48 | 8 | BY MR. QUINN: |
| 10:48 | 9 | Q. And your response to Ms. Brothers is, "Go ahead with |
| 10:48 | 10 | the deal, if you wish," correct? |
| 10:49 | 11 | A. Yes. |
| 10:49 | 12 | Q. And did -- Mattel entered into a license with THQ, |
| 10:49 | 13 | correct? |
| 10:49 | 14 | A. Yes. |
| 10:49 | 15 | Q. Knowing that THQ also had a license with MGA? |
| 10:49 | 16 | A. That's correct. |
| 10:49 | 17 | Q. Now, just generally, what types of -- in deciding |
| 10:49 | 18 | whether to -- Mattel to enter -- whether it's gonna enter |
| 10:49 | 19 | into a license with a company that also has licenses with |
| 10:49 | 20 | competitors, what types of issues or concerns would Mattel |
| 10:49 | 21 | have? |
| 10:49 | 22 | A. Um, well, in general, we prefer exclusivity, so that we |
| 10:49 | 23 | know that our information stays proprietary, and we get the |
| 10:49 | 24 | focus of the other company's resources exclusively on our |
| 10:49 | 25 | business. But that's also not practical. |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 102 of 158   Page ID #:315997
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

102

| | | |
|---|---|---|
| 10:49 | 1 | And the ability of the licensee to sell the product |
| 10:49 | 2 | trumps exclusivity, if you will. And so it's important to |
| 10:49 | 3 | make sure that the licensee is the right person to sell our |
| 10:50 | 4 | products. And if they also sell a competitor's products, |
| 10:50 | 5 | that there are sufficient firewalls to prevent confidential |
| 10:50 | 6 | information from moving from one company to another. |
| 10:50 | 7 | Q.   Does Mattel have a policy across-the-board, that it's |
| 10:50 | 8 | not going to enter into licenses with companies that also |
| 10:50 | 9 | have licenses with competitors? |
| 10:50 | 10 | A.   We do not. And I've checked that with a dozen people |
| 10:50 | 11 | around the world about our licenses. It is a case-by-case |
| 10:50 | 12 | basis to see if the company has the bandwidth, if you will, |
| 10:50 | 13 | to sell more than one brand in the category, and how they |
| 10:50 | 14 | treat the information and what kind of information they |
| 10:50 | 15 | have. |
| 10:50 | 16 | Q.   And does Mattel also enter into besides -- in addition |
| 10:50 | 17 | to THQ, does Mattel also enter into licenses with other |
| 10:50 | 18 | companies that have licenses with MGA? |
| 10:50 | 19 | A.   Yes. |
| 10:50 | 20 | Q.   And can you name some -- have you done some research on |
| 10:50 | 21 | this? You're a 30(b)(6) witness on licensing, you've |
| 10:51 | 22 | recently learned. |
| 10:51 | 23 | A.   I have. |
| 10:51 | 24 | Q.   And have you actually done some research to find out -- |
| 10:51 | 25 | first off, roughly, do you know how many licenses -- license |

CV 04-9049 DOC – 4/4/2001 – Day 45, Volume 1 of 4

103

| | | |
|---|---|---|
| 10:51 | 1 | arrangements Mattel has around the world? |
| 10:51 | 2 | A.   Um, hundreds or a thousand, perhaps. |
| 10:51 | 3 | Q.   And more than you could learn about individually in any |
| 10:51 | 4 | detailed way? |
| 10:51 | 5 | A.   Correct. |
| 10:51 | 6 | Q.   But have you done some research to try to determine |
| 10:51 | 7 | whether or not, besides THQ, there are other companies that |
| 10:51 | 8 | Mattel has a license with that, near as you can tell, MGA |
| 10:51 | 9 | also has a license with? |
| 10:51 | 10 | A.   I have. |
| 10:51 | 11 | Q.   And do you have a list of those companies? |
| 10:51 | 12 | A.   I do. |
| 10:51 | 13 | Q.   And can you tell us what those companies are? |
| 10:51 | 14 | MS. KELLER:  I'm going to object:  No foundation, |
| 10:51 | 15 | the "near as you can tell," Your Honor. |
| 10:51 | 16 | THE COURT:  Well, "as near as you can tell," |
| 10:51 | 17 | strike it. |
| 10:51 | 18 | BY MR. QUINN: |
| 10:51 | 19 | Q.   Let me ask, did you do some research to try to |
| 10:51 | 20 | determine what companies Mattel has licenses with that MGA |
| 10:51 | 21 | also has licenses with? |
| 10:51 | 22 | A.   I did. |
| 10:51 | 23 | Q.   And tell us what research you did? |
| 10:52 | 24 | A.   I looked at documents that were produced in this case, |
| 10:52 | 25 | provided by MGA, on its list of licensees in the year 2010, |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:52 | 1 | for example.  And I looked at a list of Mattel licensees for |
| 10:52 | 2 | that same time period, and compared to see if there were |
| 10:52 | 3 | overlaps.  And there were indeed some. |
| 10:52 | 4 | Q.   And can you tell us what those overlaps were.  That is |
| 10:52 | 5 | to say, companies that have -- Mattel has a license |
| 10:52 | 6 | arrangement with, who also MGA has a license with. |
| 10:52 | 7 | A.   Among others, it would include Colgate Palmolive, or |
| 10:52 | 8 | Brunswick Corporation. |
| 10:52 | 9 | Q.   Any others? |
| 10:52 | 10 | A.   There were probably 15 or 20 others. |
| 10:52 | 11 | Q.   Do you have something that could refresh your |
| 10:52 | 12 | recollection as to what those other companies are? |
| 10:52 | 13 | A.   I do. |
| 10:52 | 14 | MS. KELLER:  I'm going to object as to the source |
| 10:52 | 15 | of the document, unless he personally prepared it. |
| 10:52 | 16 | THE COURT:  Overruled. |
| 10:52 | 17 | BY MR. QUINN: |
| 10:52 | 18 | Q.   Do you have a document there that will help you refresh |
| 10:52 | 19 | your recollection as to which companies have licenses with |
| 10:52 | 20 | both companies? |
| 10:52 | 21 | A.   I do. |
| 10:53 | 22 | Q.   And other than Brunswick and Colgate Palmolive, what |
| 10:53 | 23 | others have you found? |
| 10:53 | 24 | THE COURT:  Now, this is in this year, 2010? |
| 10:53 | 25 | MR. QUINN:  Let me ask -- |

CV 04-9049 DOC – 4/4/2001 – Day 45, Volume 1 of 4

105

| | | |
|---|---|---|
| 10:53 | 1 | THE COURT:  No, no. |
| 10:53 | 2 | Mr. Eckert, is this 2010? |
| 10:53 | 3 | THE WITNESS:  It is, Your Honor. |
| 10:53 | 4 | THE COURT:  Then, Counsel, what's the relevance? |
| 10:53 | 5 | Aren't we back in the 2004/2005/2006 time frame? |
| 10:53 | 6 | MR. QUINN:  I don't know.  I think I've heard the |
| 10:53 | 7 | allegation that Mattel does this even today.  That's the |
| 10:53 | 8 | allegation. |
| 10:53 | 9 | THE COURT:  Well, I'll let you ask some questions. |
| 10:53 | 10 | BY MR. QUINN: |
| 10:53 | 11 | Q.   Can you give us the names of those other companies? |
| 10:53 | 12 | A.   Sure.  Do you want me to read them? |
| 10:53 | 13 | Q.   If you would. |
| 10:53 | 14 | A.   Al Srad Limited, Alligator Books Limited, Alpa, |
| 10:53 | 15 | Alta Tecnologia, Andromeda, Brewster Wallcovering, Brunswick |
| 10:53 | 16 | Bowling & Billiards, C&M Licensing Limited, Caprice |
| 10:53 | 17 | Australia, Character Linens, Colgate Palmolive, Hy-Pro |
| 10:54 | 18 | International, Jacques Hau, H-A-U, Pacific Importacao, |
| 10:54 | 19 | Parragon, Style Eyes of California, Tarna Enterprises, THQ, |
| 10:54 | 20 | TMI, ZAK, Z-A-K, Designs. |
| 10:54 | 21 | Q.   Do you know whether or not -- do you know whether or |
| 10:54 | 22 | not MGA entered into a license with THQ in 2008? |
| 10:54 | 23 | A.   They did. |
| 10:54 | 24 | Q.   And do you know whether that license is still in effect |
| 10:54 | 25 | today? |

| | | |
|---|---|---|
| 10:54 | 1 | A. I do not. |
| 10:54 | 2 | Q. You were asked some questions about your deposition. |
| 10:54 | 3 | And counsel read an answer to a question where she asked |
| 10:54 | 4 | you: |
| 10:54 | 5 | "Well, did the practices include threatening existing |
| 10:54 | 6 | licensees that you would terminate their relations at once |
| 10:54 | 7 | if they did not stop dealing with MGA?" |
| 10:55 | 8 | And the answer was, "Yes, I believe it did." |
| 10:55 | 9 | Do you recall that? |
| 10:55 | 10 | A. I do. |
| 10:55 | 11 | Q. At that time were you being asked what you had done to |
| 10:55 | 12 | investigate certain issues that you understood you had been |
| 10:55 | 13 | told to educate yourself on? |
| 10:55 | 14 | A. Yes. During the deposition, there were a series of |
| 10:55 | 15 | questions that started with "Did you investigate," next |
| 10:55 | 16 | question, "Did you investigate," next question, "Did you |
| 10:55 | 17 | investigate." Then we had the question that didn't start |
| 10:55 | 18 | with "Did you investigate," which I heard wrong, to assume |
| 10:55 | 19 | it did start with "Did you investigate." |
| 10:55 | 20 | My investigation did cover that. |
| 10:55 | 21 | Q. So your investigation did include where there was a |
| 10:55 | 22 | practice of threatening licensees, that Mattel would |
| 10:55 | 23 | terminate their relations at once if they did not stop |
| 10:55 | 24 | dealing with MGA, that's something you investigated? |
| 10:55 | 25 | A. That's what I investigated. And that's the question I |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

107

| | | |
|---|---|---|
| 10:55 | 1 | thought I was answering.  And I was wrong.  I was answering |
| 10:55 | 2 | a different question and didn't realize it. |
| 10:55 | 3 | MS. KELLER:  Objection.  This is -- I object to |
| 10:56 | 4 | the improper correcting of deposition testimony. |
| 10:56 | 5 | THE COURT:  Overruled. |
| 10:56 | 6 | MS. KELLER:  The witness had the opportunity, |
| 10:56 | 7 | Your Honor. |
| 10:56 | 8 | THE COURT:  All right.  I understand. |
| 10:56 | 9 | We'll just continue on now. |
| 10:56 | 10 | BY MR. QUINN: |
| 10:56 | 11 | Q.   Did you, in fact, look into the issue as to whether |
| 10:56 | 12 | Mattel threatened -- has a practice of threatening existing |
| 10:56 | 13 | licensees, that Mattel would terminate their relations at |
| 10:56 | 14 | once if they did not stop dealing with MGA? |
| 10:56 | 15 | Is that something you looked into? |
| 10:56 | 16 | A.   I did. |
| 10:56 | 17 | Q.   And what did you find out? |
| 10:56 | 18 | A.   I found then, and I've gone into more specifics since |
| 10:56 | 19 | then to find out that I can -- I found no circumstance in |
| 10:56 | 20 | which we've threatened a licensee that we would not do |
| 10:56 | 21 | business with them if it did business with MGA. |
| 10:56 | 22 | Q.   And in that same deposition, just 15 pages later, did I |
| 10:56 | 23 | ask you questions to clarify the -- your answer? |
| 10:57 | 24 | A.   You did. |
| 10:57 | 25 | MR. QUINN:  And, Your Honor, I will request |

| 10:57 | 1 | permission to read from page 262, line 22, to 263, line 13. |
| 10:57 | 2 | This is October 4, 2010. |
| 10:57 | 3 | THE COURT:  262. |
| 10:57 | 4 | MR. QUINN:  262, line 22, to 263, line 13. |
| 10:57 | 5 | THE COURT:  Just a moment. |
| 10:58 | 6 | MS. KELLER:  I'm sorry.  Mr. Quinn, what date is |
| 10:58 | 7 | this? |
| 10:58 | 8 | MR. QUINN:  October 4th. |
| 10:58 | 9 | THE COURT:  Just a moment.  It goes down -- oh, |
| 10:58 | 10 | till line 13. |
| 10:58 | 11 | MR. QUINN:  Yes. |
| 10:58 | 12 | THE COURT:  Yes, you may read. |
| 10:58 | 13 | MR. QUINN:  Reading. |
| 10:58 | 14 | "QUESTION:  You recall that Ms. Hurst asked you a |
| 10:58 | 15 | question about whether there was a practice at Mattel |
| 10:58 | 16 | regarding threatening existing licensees if they did |
| 10:58 | 17 | business with MGA?  Do you recall questions to that effect? |
| 10:58 | 18 | "I do. |
| 10:58 | 19 | "Was it your -- is it your understanding that |
| 10:58 | 20 | there is a practice at Mattel of threatening or terminating |
| 10:58 | 21 | licensees if they do business with MGA? |
| 10:59 | 22 | "ANSWER:  Yeah.  I recall answering the question |
| 10:59 | 23 | that did my investigation -- that did my investigation cover |
| 10:59 | 24 | those things, and my investigation did cover those things, |
| 10:59 | 25 | in my opinion. |

| | | |
|---|---|---|
| 10:59 | 1 | "All right. |
| 10:59 | 2 | "All right. (sic.) |
| 10:59 | 3 | "And Mattel does not have such a practice." |
| 10:59 | 4 | BY MR. QUINN: |
| 10:59 | 5 | Q.   At the beginning of your exam, you were asked some |
| 10:59 | 6 | questions about the library that you went to on the ninth |
| 10:59 | 7 | floor, and there were some 35 boxes that you were also asked |
| 10:59 | 8 | about. |
| 10:59 | 9 | Do you recall those questions? |
| 10:59 | 10 | A.   Yes.  Although it was the eighth floor. |
| 10:59 | 11 | Q.   Eighth floor.  Do you know whether or not, after |
| 10:59 | 12 | Mr. Villasenor hired a lawyer and made a claim and demanded |
| 10:59 | 13 | $3 million, whether Mattel retained outside counsel to |
| 10:59 | 14 | represent it and had the contents of Mr. Villasenor's office |
| 10:59 | 15 | taken to that law firm?  Do you know? |
| 11:00 | 16 | MS. KELLER:  Objection.  Misstates the evidence. |
| 11:00 | 17 | THE COURT:  Sustained. |
| 11:00 | 18 | BY MR. QUINN: |
| 11:00 | 19 | Q.   The 35 boxes that Ms. Keller referred to, do you know |
| 11:00 | 20 | where they came from at Mattel? |
| 11:00 | 21 | A.   No, I do not. |
| 11:00 | 22 | Q.   And then you were asked some questions about a |
| 11:00 | 23 | copyright registration down in Brazil. |
| 11:00 | 24 | MR. QUINN:  If we could look at, for example, |
| 11:00 | 25 | Exhibit 1703-5, which is one of the English translations. |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

110

| 11:00 | 1 | *(Document displayed.)* |
| 11:00 | 2 | THE WITNESS:  Yes. |
| 11:00 | 3 | BY MR. QUINN: |
| 11:00 | 4 | Q.   And if we look at the next page, dash 6. |
| 11:00 | 5 | *(Document displayed.)* |
| 11:00 | 6 | BY MR. QUINN: |
| 11:00 | 7 | Q.   It indicates -- oh, I'm sorry -- on dash 5. |
| 11:00 | 8 | *(Document displayed.)* |
| 11:00 | 9 | BY MR. QUINN: |
| 11:00 | 10 | Q.   It indicates that this is a copyright on a drawing, |
| 11:00 | 11 | correct? |
| 11:00 | 12 | A.   It does. |
| 11:00 | 13 | Q.   And it indicates that the *"autor"* or the artist who did |
| 11:00 | 14 | that drawing on the next page, dash 6 -- |
| 11:00 | 15 | *(Document displayed.)* |
| 11:01 | 16 | BY MR. QUINN: |
| 11:01 | 17 | Q.   -- was Carter Bryant, correct? |
| 11:01 | 18 | A.   Yes. |
| 11:01 | 19 | Q.   And were you here for Mr. Larian's testimony where he |
| 11:01 | 20 | indicated that they did this registration because there was |
| 11:01 | 21 | a doll in Brazil that they thought infringed Carter Bryant's |
| 11:01 | 22 | drawings? |
| 11:01 | 23 | MS. KELLER:  Objection.  Improper question. |
| 11:01 | 24 | Again, we're referring now to testimony, which the |
| 11:01 | 25 | Court hasn't permitted. |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

111

| | | |
|---|---|---|
| 11:01 | 1 | THE COURT:  Just a moment.  Now we'll strike that |
| 11:01 | 2 | comment by Counsel. |
| 11:01 | 3 | Ladies and gentlemen, you're to disregard that. |
| 11:01 | 4 | The realtime went down.  We'll stop the time clock |
| 11:01 | 5 | running.  If you want to visit for a moment or stand up and |
| 11:01 | 6 | stretch, go ahead. |
| 11:01 | 7 | *(Pause in the proceedings at 11:01 a.m.)* |
| 11:01 | 8 | *(The following proceedings were had at sidebar.)* |
| 11:03 | 9 | THE COURT:  Okay.  We're at sidebar.  And I didn't |
| 11:03 | 10 | hear the prior question properly.  Could you read that back |
| 11:03 | 11 | to me, Debbie. |
| 11:03 | 12 | *(Record read.)* |
| 11:03 | 13 | THE COURT:  Sustained. |
| 11:03 | 14 | MS. KELLER:  Your Honor, the Court has repeatedly |
| 11:03 | 15 | ruled that we can't get into the accused product through |
| 11:03 | 16 | foreign litigation, and we offered this in the same way some |
| 11:03 | 17 | of the documents were offered for other purposes. |
| 11:03 | 18 | MR. QUINN:  I don't know what that means.  They |
| 11:03 | 19 | opened the door on this. |
| 11:03 | 20 | THE COURT:  No, they haven't. |
| 11:03 | 21 | Okay.  Let's go. |
| 11:04 | 22 | *(End of sidebar proceedings.)* |
| 11:04 | 23 | *(In the presence of the jury.)* |
| 11:04 | 24 | THE COURT:  Then, once again, we're back on the |
| 11:04 | 25 | record. |

| | | |
|---|---|---|
| 11:04 | 1 | Mr. Quinn. |
| 11:04 | 2 | MR. QUINN:  Nothing further, Your Honor. |
| 11:04 | 3 | THE COURT:  Now, Ms. Keller? |
| 11:04 | 4 | MS. KELLER:  Thank you, Your Honor. |
| 11:04 | 5 | THE COURT:  I've granted each counsel a brief |
| 11:04 | 6 | colloquy.  Mr. Larian was on the stand quite a period of |
| 11:04 | 7 | time.  And Mr. Eckert is going to have some additional |
| 11:04 | 8 | questions asked at this time. |
| 11:04 | 9 | **REDIRECT EXAMINATION** |
| 11:04 | 10 | BY MS. KELLER: |
| 11:04 | 11 | Q.   Mr. Eckert, you read from a list you said were common |
| 11:04 | 12 | licensees of MGA and Mattel 2010.  Do you remember that? |
| 11:04 | 13 | A.   I do. |
| 11:04 | 14 | Q.   You said you personally researched that list, right? |
| 11:04 | 15 | A.   I did. |
| 11:04 | 16 | Q.   And who gave you the materials from which you |
| 11:04 | 17 | researched it? |
| 11:04 | 18 | A.   One of the Quinn Emanuel lawyers. |
| 11:05 | 19 | Q.   And did they give you a whole box of materials, or did |
| 11:05 | 20 | they just hand you a couple of documents? |
| 11:05 | 21 | A.   Uh, it was a rather large document.  It was a document, |
| 11:05 | 22 | but it probably had over a hundred pages. |
| 11:05 | 23 | Q.   And you said it was produced by MGA? |
| 11:05 | 24 | A.   Yes, one of them was. |
| 11:05 | 25 | Q.   What exhibit number? |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

113

| 11:05 | 1 | A. I don't know. |
| 11:05 | 2 | Q. Where is it? |
| 11:05 | 3 | A. I don't know. |
| 11:05 | 4 | Q. What happened to it after you looked at it? |
| 11:05 | 5 | A. Oh, I'm sure it exists. |
| 11:05 | 6 | Q. You can't tell us what it was? |
| 11:05 | 7 | A. Yeah, I can tell you what it was. |
| 11:05 | 8 | Q. What was the title of the document? |
| 11:05 | 9 | A. I don't remember. |
| 11:05 | 10 | Q. What was the year the document was dated? |
| 11:05 | 11 | A. Uh, I don't remember. |
| 11:05 | 12 | Q. You didn't do anything to verify that what you |
| 11:05 | 13 | testified to about these lists of common licenses was true, |
| 11:05 | 14 | did you? |
| 11:05 | 15 | A. No. I looked at each list, and I compared the two |
| 11:05 | 16 | lists, and determined which one -- which licensees were |
| 11:06 | 17 | common. I did do that. |
| 11:06 | 18 | Q. You looked at an old list from MGA, right? |
| 11:06 | 19 | A. I looked at a list that covered licensees through 2010. |
| 11:06 | 20 | Q. Well, let's start with the top of your list. |
| 11:06 | 21 |    Al Srad Limited, what do they make? |
| 11:06 | 22 | A. I don't know. |
| 11:06 | 23 | Q. Where are they? |
| 11:06 | 24 | A. I don't know. |
| 11:06 | 25 | Q. They're in Dubai, aren't they? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 4/4/2001 – Day 45, Volume 1 of 4

114

| 11:06 | 1 | A.   I don't know. |
| 11:06 | 2 | Q.   Were you aware that their license with MGA was |
| 11:06 | 3 | canceled? |
| 11:06 | 4 | A.   No. |
| 11:06 | 5 | Q.   And that they had no license with MGA in 2010? |
| 11:06 | 6 | A.   No.   The document I saw said that they did, in fact, |
| 11:06 | 7 | have a license through 2010. |
| 11:06 | 8 | Q.   The document you saw, that you can't remember the title |
| 11:06 | 9 | of, don't know the date of, and don't have, right? |
| 11:06 | 10 | A.   That's correct. |
| 11:06 | 11 | Q.   That the Quinn Emanuel lawyers gave you? |
| 11:06 | 12 | A.   That's correct. |
| 11:06 | 13 | Q.   The next -- |
| 11:06 | 14 | A.   The MGA-produced list of licensees. |
| 11:06 | 15 | Q.   The next one on the list was Alligator Books Limited. |
| 11:06 | 16 | Where are they located? |
| 11:06 | 17 | A.   I don't know. |
| 11:06 | 18 | Q.   What do they do? |
| 11:06 | 19 | A.   I don't know. |
| 11:06 | 20 | Q.   Are you aware that in 2010 their license was also |
| 11:07 | 21 | canceled? |
| 11:07 | 22 | A.   No. |
| 11:07 | 23 | Q.   What is Alpa? |
| 11:07 | 24 | A.   I don't know. |
| 11:07 | 25 | Q.   What do they do? |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 115 of 158   Page ID #:316010
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

115

| 11:07 | 1 | A.   I don't know. |
| 11:07 | 2 | Q.   Where are they located? |
| 11:07 | 3 | A.   I don't know. |
| 11:07 | 4 | Q.   And Mattel has a license with them, and you have no |
| 11:07 | 5 | idea what they do? |
| 11:07 | 6 | A.   We have a license with probably a thousand different |
| 11:07 | 7 | licensees, and I don't know what they all do. |
| 11:07 | 8 | Q.   Are you aware that there was no common license with MGA |
| 11:07 | 9 | in the year 2010? |
| 11:07 | 10 | A.   No, I'm not.  According to the documents I read, there |
| 11:07 | 11 | was. |
| 11:07 | 12 | Q.   That you don't know the title of, and can't tell us |
| 11:07 | 13 | where they came from, other than they were given to you by |
| 11:07 | 14 | the Quinn Emanuel lawyers? |
| 11:07 | 15 | A.   That it was an MGA exhibit; yes, that's correct. |
| 11:07 | 16 | Q.   And you don't even know the date on it, correct? |
| 11:07 | 17 | A.   That's correct. |
| 11:07 | 18 | Q.   And Brunswick Bowling & Billiards Corporation, are you |
| 11:07 | 19 | aware that in 2010 they had no license with MGA? |
| 11:07 | 20 |           MR. QUINN:  This assumes facts, Your Honor. |
| 11:07 | 21 |           THE COURT:  Overruled. |
| 11:07 | 22 |           THE WITNESS:  No, I'm not. |
| 11:07 | 23 | BY MS. KELLER: |
| 11:07 | 24 | Q.   Colgate Palmolive.  Big company, right? |
| 11:07 | 25 | A.   It is. |

| | | |
|---|---|---|
| 11:07 | 1 | Q.   Are you aware that in 2010 they had no license with |
| 11:07 | 2 | MGA? |
| 11:07 | 3 | A.   No, I'm not. |
| 11:08 | 4 | Q.   Hy-Pro International Limited.  Where's that located? |
| 11:08 | 5 | A.   I don't know. |
| 11:08 | 6 | Q.   What do they do? |
| 11:08 | 7 | A.   I don't know. |
| 11:08 | 8 | Q.   What's the license that you have for them? |
| 11:08 | 9 | A.   I don't know. |
| 11:08 | 10 | Q.   What's the license MGA had? |
| 11:08 | 11 | A.   I don't know. |
| 11:08 | 12 | Q.   Are you aware that in 2010 MGA had no license with |
| 11:08 | 13 | them? |
| 11:08 | 14 | A.   No. |
| 11:08 | 15 | Q.   What's Parragon GmbH? |
| 11:08 | 16 | A.   I don't know. |
| 11:08 | 17 | Q.    are they located? |
| 11:08 | 18 | A.   I don't know. |
| 11:08 | 19 | Q.   What license do you have -- |
| 11:08 | 20 | A.   Other than it would be Germany. |
| 11:08 | 21 | Q.   What license do you -- what does Mattel license to |
| 11:08 | 22 | them? |
| 11:08 | 23 | A.   I don't know. |
| 11:08 | 24 | Q.   What about MGA? |
| 11:08 | 25 | A.   I don't know. |

| 11:08 | 1 | Q.   Are you aware that in 2010 MGA had no licensed products |
| 11:08 | 2 | with them? |
| 11:08 | 3 | A.   No. |
| 11:08 | 4 | Q.   What about ZAK Designs?  What do they do? |
| 11:08 | 5 | A.   I don't know. |
| 11:08 | 6 | Q.   Where are they located? |
| 11:08 | 7 | A.   I don't know. |
| 11:08 | 8 | Q.   What common products did you have that were licensed |
| 11:08 | 9 | with the two of them? |
| 11:08 | 10 | A.   I don't know. |
| 11:08 | 11 | Q.   So, basically, if I understand this, you were given |
| 11:08 | 12 | lists by your lawyers over here, and you sat down and |
| 11:08 | 13 | compared one to the other, found anyplace that the same |
| 11:09 | 14 | company appeared on both lists, and then you got up here and |
| 11:09 | 15 | testified that all these people had common licenses, right? |
| 11:09 | 16 | A.   And that the terms ran through 2010. |
| 11:09 | 17 | Q.   And you don't know whether that's true or not, right? |
| 11:09 | 18 | A.   I -- I know what I saw.  I don't know whether they |
| 11:09 | 19 | canceled the license, but I do know that they had active |
| 11:09 | 20 | licenses with these people through 2010. |
| 11:09 | 21 | Q.   You actually don't know that of your personal |
| 11:09 | 22 | knowledge, right? |
| 11:09 | 23 | A.   That's correct. |
| 11:09 | 24 | Q.   You were given a list to read, right? |
| 11:09 | 25 | A.   I was given an MGA-produced document to read. |

| | | |
|---|---|---|
| 11:09 | 1 | Q.   You did no research.  You said you did research. |
| 11:09 | 2 | You didn't look anything up yourself, did you? |
| 11:09 | 3 | A.   I did.  I went through books of -- I went through a |
| 11:09 | 4 | book of MGA licensees, and compared it to list of Mattel |
| 11:09 | 5 | licensees. |
| 11:09 | 6 | Q.   Did you even call anybody back at Mattel and say, "Hey, |
| 11:09 | 7 | what's the product we license with these guys and what's the |
| 11:09 | 8 | product MGA licenses with these guys?" |
| 11:09 | 9 | A.   No, I didn't. |
| 11:10 | 10 | Q.   You were asked an example about Folgers coffee having a |
| 11:10 | 11 | promotion.  And you said it's very common for manufacturers |
| 11:10 | 12 | to have promotions, right? |
| 11:10 | 13 | A.   Yes. |
| 11:10 | 14 | Q.   And to give a store a real good deal on a product in |
| 11:10 | 15 | order to sell its product, right? |
| 11:10 | 16 | A.   Yes. |
| 11:10 | 17 | Q.   But it would be a violation of the antitrust laws, |
| 11:10 | 18 | would it not, if Folgers said to Albertsons, "We'll give you |
| 11:10 | 19 | a real good deal on our product, but we're also gonna pay |
| 11:10 | 20 | you to take Maxwell House off your shelves."  That would be |
| 11:10 | 21 | a violation of antitrust laws, right? |
| 11:10 | 22 | A.   Yes. |
| 11:10 | 23 | Q.   And you can't -- in fact, it's a violation of the |
| 11:10 | 24 | antitrust laws to link any kind of pricing on your product |
| 11:10 | 25 | with getting rid of a competitor entirely, right? |

| | | |
|---|---|---|
| 11:10 | 1 | A.   That, I don't know. |
| 11:10 | 2 | Q.   How long have you been a CEO altogether? -- not just of |
| 11:10 | 3 | this company, but of Kraft? |
| 11:11 | 4 | A.   Roughly 13 or 14 years. |
| 11:11 | 5 | Q.   And in that period of time, has it ever been the |
| 11:11 | 6 | position of the companies that you worked for that it was |
| 11:11 | 7 | okay to pay a retailer to get rid of a competitor's products |
| 11:11 | 8 | altogether? |
| 11:11 | 9 | A.   That's right.  My position has been it's never been the |
| 11:11 | 10 | case.  And the two companies which I've worked for, I've |
| 11:11 | 11 | never heard of any circumstance where that happened, |
| 11:11 | 12 | including in this case. |
| 11:11 | 13 | Q.   Because you can just call it a business promotion, |
| 11:11 | 14 | right? |
| 11:11 | 15 | A.   No.  Look at the terms of the arrangement between |
| 11:11 | 16 | Kohl's and Mattel.  It was a business promotion that |
| 11:11 | 17 | benefited Kohl's, improved its profitability, and benefited |
| 11:11 | 18 | Mattel.  There's nothing wrong with us building business |
| 11:11 | 19 | like that. |
| 11:11 | 20 | MS. KELLER:  Let's look at TX37112. |
| 11:11 | 21 | (Document provided to the witness.) |
| 11:11 | 22 | (Document displayed.) |
| 11:59 | 23 | BY MS. KELLER: |
| 11:11 | 24 | Q.   And this is the December 22, 2004 e-mail from Sharon |
| 11:12 | 25 | Spaulding to Matt Bousquette Jerry Cleary, Drew Vollero: |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 120 of 158   Page ID #:316015
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

120

| | | |
|---|---|---|
| 11:12 | 1 | "Subject:  Kohl's Barbie Opportunity." |
| 11:12 | 2 | And let's look at the very bottom line, after all the |
| 11:12 | 3 | discussion about how the competition would not be |
| 11:12 | 4 | represented in the toy department.  Let's look at the very |
| 11:12 | 5 | bottom line: |
| 11:12 | 6 | "Note:  Must respond no later than Monday 12/27 or they |
| 11:12 | 7 | will maintain competition." |
| 11:12 | 8 | A.   That's right. |
| 11:12 | 9 | Q.   "No extensions." |
| 11:12 | 10 | A.   It's Kohl's unilateral decision on whether or not they |
| 11:12 | 11 | are going to promote MGA products. |
| 11:12 | 12 | Q.   Mr. Eckert, this means that, if you don't pay them -- |
| 11:12 | 13 | agree to pay them by Monday 12/27, Bratz is still gonna be |
| 11:12 | 14 | on the shelves, right? |
| 11:12 | 15 | A.   No.  And, in fact, during that period of time, I'm sure |
| 11:12 | 16 | there was still Bratz on the shelf.  It was just old Bratz |
| 11:12 | 17 | that was being sold by Kohl's. |
| 11:13 | 18 | Q.   "They will maintain competition." |
| 11:13 | 19 | A.   Which is their absolute right to maintain any product |
| 11:13 | 20 | they want to sell. |
| 11:13 | 21 | Q.   And unless you paid them, they were going to keep on |
| 11:13 | 22 | doing that. |
| 11:13 | 23 | A.   Which is their right.  They can keep on doing that |
| 11:13 | 24 | whether or not we paid them.  That is Kohl's unilateral |
| 11:13 | 25 | decision. |

| 11:13 | 1 | Q.   But it is not your right to pay them to get rid of a |
| 11:13 | 2 | competitor, whether they suggest it or not, sir -- |
| 11:13 | 3 | A.   I agree -- |
| 11:13 | 4 | Q.   -- correct? |
| 11:13 | 5 | A.   I agree with that. |
| 11:13 | 6 | MS. KELLER:  Nothing further. |
| 11:13 | 7 | THE COURT:  Recross by -- well, re-recross by |
| 11:13 | 8 | Mr. Quinn. |
| 11:13 | 9 | **FURTHER RECROSS-EXAMINATION** |
| 11:13 | 10 | BY MR. QUINN: |
| 11:13 | 11 | Q.   You were asked some questions about MGA -- common |
| 11:13 | 12 | licensees that MGA and Mattel have in common. |
| 11:13 | 13 | If we could look at exhibit -- and you indicated that |
| 11:13 | 14 | lawyers had shown you various MGA documents, correct? |
| 11:13 | 15 | A.   Correct. |
| 11:13 | 16 | MR. QUINN:  If we could look at Exhibit 9819. |
| 11:14 | 17 | *(Document provided to the witness.)* |
| | 18 | BY MR. QUINN: |
| 11:14 | 19 | Q.   Is this one of the documents -- |
| 11:14 | 20 | A.   Yes. |
| 11:14 | 21 | Q.   -- that you were shown in coming up with that list of |
| 11:14 | 22 | common licensees? |
| 11:14 | 23 | MR. QUINN:  I'd offer that, Your Honor? |
| 11:14 | 24 | THE COURT:  Received. |
| 11:14 | 25 | THE WITNESS:  It is. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 122 of 158   Page ID #:316017
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

122

| | | |
|---|---|---|
| 11:14 | 1 | MS. KELLER:  Your Honor, I haven't seen this. |
| 11:14 | 2 | THE COURT:  Oh, just a moment. |
| 11:14 | 3 | MS. KELLER:  Could I have the document? |
| 11:14 | 4 | MR. QUINN:  It's in the binder. |
| 11:14 | 5 | MS. KELLER:  Could I have a moment. |
| 11:14 | 6 | MR. QUINN:  If we could offer that in evidence, |
| 11:14 | 7 | Your Honor. |
| 11:14 | 8 | THE COURT:  Received. |
| 11:14 | 9 | *(Exhibit No. 9819 received in evidence.)* |
| 11:14 | 10 | *(Document displayed.)* |
| 11:14 | 11 | BY MR. QUINN: |
| 11:14 | 12 | Q.  Do you see where it says, up in the upper left-hand |
| 11:14 | 13 | corner, "MGA Entertainment"? |
| 11:14 | 14 | A.  Yes. |
| 11:14 | 15 | Q.  And under that, "ROW/Licensing/Pay Log," do you see |
| 11:14 | 16 | that? |
| 11:14 | 17 | A.  I do. |
| 11:14 | 18 | Q.  And the second column is labeled "Licensees."  Do you |
| 11:14 | 19 | see that? |
| 11:14 | 20 | A.  Yes. |
| 11:14 | 21 | Q.  And if you could turn to page 31 of that document. |
| 11:14 | 22 | *(Document displayed.)* |
| 11:14 | 23 | THE WITNESS:  Yes. |
| 11:14 | 24 | BY MR. QUINN: |
| 11:14 | 25 | Q.  And if you look at the first 20 or so rows of the |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

123

| | | |
|---|---|---|
| 11:14 | 1 | document, does it appear that Al Srad Limited was a licensee |
| 11:14 | 2 | of MGA in 2010? |
| 11:15 | 3 | MS. KELLER:  Objection.  Misstates the document. |
| 11:15 | 4 | THE COURT:  I'll need a copy of this now, also. |
| 11:15 | 5 | It's too small for the Court to read on the projector. |
| 11:15 | 6 | THE WITNESS:  Yes, I believe this is outstanding |
| 11:15 | 7 | payments.  Down at the bottom, you see there were payments |
| 11:15 | 8 | due on -- in 2009.  I don't know if they continued the |
| 11:15 | 9 | contract into 2010. |
| 11:15 | 10 | MS. KELLER:  Your Honor, this document does not |
| 11:15 | 11 | discuss whether any license existed or was canceled at any |
| 11:15 | 12 | given time.  It doesn't say when this was produced, other |
| 11:15 | 13 | than on the front page, it looks like maybe 2007 or -- 8. |
| 11:16 | 14 | THE COURT:  Just a moment.  Both of you, just a |
| 11:16 | 15 | minute. |
| 11:16 | 16 | Counsel, which line are you referring to? |
| 11:16 | 17 | MR. QUINN:  It's highlighted on the screen, |
| 11:16 | 18 | Your Honor, the date there, and the name. |
| 11:16 | 19 | THE COURT:  Thank you. |
| 11:16 | 20 | Thank you.  Just a moment. |
| 11:16 | 21 | This 9819-0001? |
| 11:16 | 22 | MR. QUINN:  9819, and then it should be a dash 31, |
| 11:16 | 23 | page 31. |
| 11:16 | 24 | THE COURT:  I'm on page 1.  Just a moment. |
| 11:16 | 25 | MR. QUINN:  Page 31. |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

124

| | | |
|---|---|---|
| 11:16 | 1 | THE COURT:  31.  Just a moment. |
| 11:17 | 2 | Does somebody have a magnifying glass? |
| 11:17 | 3 | THE WITNESS:  I know that drill. |
| 11:17 | 4 | THE COURT:  I can't -- counsel, I can't -- just a |
| 11:17 | 5 | moment. |
| 11:17 | 6 | MR. QUINN:  Your Honor, I'm just calling attention |
| 11:17 | 7 | to the name that's highlighted. |
| 11:17 | 8 | THE COURT:  But the date is what I can't read, and |
| 11:17 | 9 | I can't -- |
| 11:17 | 10 | Just a moment.  I'll be right with you. |
| 11:17 | 11 | MR. QUINN:  It's highlighted on the screen, |
| 11:17 | 12 | Your Honor. |
| 11:17 | 13 | Could we stop the clock? |
| 11:17 | 14 | THE COURT:  We'll stop the clock. |
| 11:17 | 15 | Stop the clock for a minute. |
| 11:18 | 16 | Would the two of you come up here for each side |
| 11:18 | 17 | and make sure I've circled the right notation. |
| 11:20 | 18 | (To the jury:) Ladies and gentlemen, would you go |
| 11:20 | 19 | back in the jury room for just a moment.  I'm going to |
| 11:20 | 20 | search through a couple documents.  You're admonished not to |
| 11:20 | 21 | discuss this matter amongst yourselves, nor form or express |
| 11:20 | 22 | any opinion concerning this case. |
| 11:20 | 23 | *(Jury exits courtroom at 11:20 a.m.)* |
| 11:20 | 24 | *(Outside the presence of the jury.)* |
| 11:20 | 25 | THE COURT:  We're on the record outside the |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 125 of 158   Page ID #:316020
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

125

| 11:20 | 1 | presence of the jury. |
| 11:20 | 2 | Mr. Eckert, if you would have a seat. |
| 11:21 | 3 | Counsel for both parties, what are these documents |
| 11:21 | 4 | that Mr. Eckert was shown? |
| 11:21 | 5 | MS. KELLER:  This is a payment log.  This TX9819 |
| 11:21 | 6 | is a payment log.  And it had -- it was a document that was |
| 11:21 | 7 | created -- I can't tell if it was 2007 or 2008. |
| 11:21 | 8 | THE COURT:  Now, how do you know if it was created |
| 11:21 | 9 | 2007 or 2008? |
| 11:21 | 10 | Is it by the numbers, Mr. Eckert, that appear on |
| 11:21 | 11 | this document; do you know? |
| 11:21 | 12 | THE WITNESS:  I don't know, Your Honor. |
| 11:21 | 13 | THE COURT:  Okay.  Just a moment.  I'll be right |
| 11:21 | 14 | back with you. |
| 11:21 | 15 | Counsel, is it simply because of the internal |
| 11:21 | 16 | dates on the document? |
| 11:21 | 17 | MS. KELLER:  No. |
| 11:21 | 18 | THE COURT:  How do I know it was created 2007? |
| 11:21 | 19 | MS. KELLER:  Well, I can't say from looking at the |
| 11:21 | 20 | document itself that it was. |
| 11:21 | 21 | What we do know -- |
| 11:21 | 22 | THE COURT:  Well, just a moment. |
| 11:21 | 23 | It's an MGA document.  So take your time with |
| 11:21 | 24 | Mr. Larian.  Have a consultation between all of you. |
| 11:22 | 25 | In fact, Nancy, why don't you tell the jury to go |

| | | |
|---|---|---|
| 11:22 | 1 | to lunch and to come back at 12:30. |
| 11:22 | 2 | THE CLERK:  Okay. |
| 11:22 | 3 | MS. KELLER:  The biggest problem, Your Honor, |
| 11:22 | 4 | is -- we're going to try to find out exactly when it was |
| 11:22 | 5 | created, but the biggest problem with this is that licensees |
| 11:22 | 6 | can cancel. |
| 11:22 | 7 | THE COURT:  Let's do this one at a time.  That |
| 11:22 | 8 | avalanche effect.  Let's start very slowly with when the |
| 11:22 | 9 | document was created. |
| 11:22 | 10 | MS. KELLER:  I would like to hear the foundation |
| 11:22 | 11 | for that from Mr. Quinn, since he offered it as a basis for |
| 11:22 | 12 | this witness's opinion. |
| 11:22 | 13 | THE COURT:  Apparently, it was just given to |
| 11:22 | 14 | Mr. Eckert.  So when was this -- well, just a moment. |
| 11:22 | 15 | It's an MGA document. |
| 11:22 | 16 | MS. KELLER:  But there's no foundation for it to |
| 11:22 | 17 | be used in the manner it's been used, none whatsoever. |
| 11:22 | 18 | We're going to try to find out; but if we're trying to find |
| 11:22 | 19 | out, they certainly don't have any foundation. |
| 11:22 | 20 | THE COURT:  Well, just a moment now.  I've been |
| 11:22 | 21 | rather liberal allowing evidence in concerning Mr. Eckert |
| 11:22 | 22 | and Mr. Larian.  And here's the point; here's what I'm |
| 11:23 | 23 | hearing:  That, by 2010, there are some documents that exist |
| 11:23 | 24 | that seem to indicate that the licensing agreement was to |
| 11:23 | 25 | extend into 2010.  And the reason we know that is that |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

127

| | | |
|---|---|---|
| 11:23 | 1 | payments were allegedly going to be received. |
| 11:23 | 2 | So now my question is this: Do these documents |
| 11:23 | 3 | internally -- well, it says "Beginning" and "End." |
| 11:23 | 4 | So let's just go down any column. Let's go to |
| 11:23 | 5 | 9819-00031. Let's go down the "Beginning" and "End." |
| 11:23 | 6 | Do you see the "End"? |
| 11:23 | 7 | MR. QUINN: Yes. |
| 11:23 | 8 | THE COURT: Okay. Let's put the "End" up on the |
| 11:23 | 9 | screen for just a moment. |
| 11:24 | 10 | Now, let's blow that up. |
| 11:24 | 11 | *(Document displayed.)* |
| 11:24 | 12 | THE COURT: I can see why Judge Trott had trouble |
| 11:24 | 13 | reading these. I'm having trouble reading these kind of |
| 11:24 | 14 | documents. |
| 11:24 | 15 | MS. KELLER: I'm sorry, Your Honor. What page is |
| 11:24 | 16 | that? |
| 11:24 | 17 | THE COURT: Go to 9819-00031. Now we're gonna |
| 11:24 | 18 | blow up that page so we can read it. |
| 11:24 | 19 | *(Technician complies.)* |
| 11:24 | 20 | THE COURT: That's not blowing it up. |
| 11:24 | 21 | MR. QUINN: That's about as much -- it's already |
| 11:24 | 22 | blown up, Your Honor. I think that's as good as Ken can do. |
| 11:24 | 23 | THE COURT: All right. |
| 11:24 | 24 | MR. QUINN: If you'd like him to enlarge that |
| 11:24 | 25 | date. |

| 11:24 | 1 | THE COURT:  Just a moment. |
| 11:24 | 2 | Is there anything internally on this document, |
| 11:24 | 3 | other than the beginning or ending of these license |
| 11:24 | 4 | agreements, which I assume is the "Beginning" in the first |
| 11:24 | 5 | column -- I'm sorry -- the fourth column, and the "Ending" |
| 11:24 | 6 | in the second column, that indicates some internal payment |
| 11:24 | 7 | during this period of time. |
| 11:25 | 8 | So let's go over "Date Paid" for a moment on the |
| 11:25 | 9 | same line. |
| 11:25 | 10 | We'll see the sum of 258,000, correct? |
| 11:25 | 11 | Now counsel can't read it. |
| 11:25 | 12 | And it's going to look like, internally, there was |
| 11:25 | 13 | a "Date Paid" of May 28, 2009. |
| 11:25 | 14 | Is that correct, Mr. Quinn? |
| 11:25 | 15 | MR. QUINN:  Yes, Your Honor. |
| 11:25 | 16 | THE COURT:  Ms. Keller? |
| 11:25 | 17 | MS. KELLER:  I'm -- I can't read it, Your Honor. |
| 11:25 | 18 | THE COURT:  Well, Mr. McConville, help her with |
| 11:25 | 19 | one of your eyes. |
| 11:25 | 20 | Now, all we have to do to find out the relevant |
| 11:25 | 21 | dates and whether this exists is look down the "Date Paid" |
| 11:25 | 22 | column. |
| 11:25 | 23 | Mr. Quinn, are you looking? |
| 11:25 | 24 | MR. QUINN:  Yes. |
| 11:25 | 25 | THE COURT:  You seem rather relaxed.  I wouldn't |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

129

| | | |
|---|---|---|
| 11:25 | 1 | be so relaxed, if I was either you or Ms. Keller right now. |
| 11:25 | 2 | Look at the documents. |
| 11:25 | 3 | Now I want each of you to find a "Date Paid" for |
| 11:25 | 4 | any of these 20 companies that Mr. Eckert named in 2010. |
| 11:26 | 5 | This is a simple example: Now, watch. Watch. |
| 11:26 | 6 | Very simple. Because if you have -- now this is higher |
| 11:26 | 7 | math. If you have a "Date Paid" in 2010, it may mean that |
| 11:26 | 8 | the license was still in existence. But if you have a "Date |
| 11:26 | 9 | Paid" in only 2008 or 2009, 2010 is completely irrelevant. |
| 11:26 | 10 | Or you could be carrying money on the books and have the |
| 11:26 | 11 | license having been terminated. |
| 11:26 | 12 | But, you know, who can answer that? |
| 11:26 | 13 | Mr. Larian. |
| 11:26 | 14 | MR. QUINN: Your Honor, I don't see a 2010 "Date |
| 11:26 | 15 | Paid" here. |
| 11:26 | 16 | THE COURT: I don't either. |
| 11:26 | 17 | So why do I assume then on those selected licenses |
| 11:26 | 18 | that these are still in existence with thousands of licenses |
| 11:27 | 19 | in 2010? |
| 11:27 | 20 | MR. QUINN: Your Honor, what we're hearing from |
| 11:27 | 21 | Mr. Larian is that this license was canceled at some point. |
| 11:27 | 22 | THE COURT: No. I'm not hearing anything about |
| 11:27 | 23 | that from Ms. Larian. |
| 11:27 | 24 | MR. QUINN: Well, that's what we're hearing from |
| 11:27 | 25 | Ms. Keller. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:27 | 1 | THE COURT: Ms. Keller. But that's not evidence. |
| 11:27 | 2 | So this is all speculation. |
| 11:27 | 3 | First of all, Mr. Eckert, you've been put in a |
| 11:27 | 4 | position apparently of testifying to 2010. I want you to be |
| 11:27 | 5 | comfortable. |
| 11:27 | 6 | Go down this list and find any payment in 2010. |
| 11:27 | 7 | And, Counsel, search through 2010 on any of the |
| 11:27 | 8 | 20 companies that he named. |
| 11:27 | 9 | MR. QUINN: Your Honor, this document -- |
| 11:27 | 10 | THE COURT: No. We're not taking time now. We're |
| 11:27 | 11 | searching. We're looking. |
| 11:27 | 12 | MR. QUINN: It relates to only one of the |
| 11:27 | 13 | companies, Your Honor. |
| 11:27 | 14 | THE COURT: I know. |
| 11:27 | 15 | MR. QUINN: This whole document only relates to |
| 11:28 | 16 | one. |
| 11:28 | 17 | THE COURT: I understand that. We're going to go |
| 11:28 | 18 | through. We're not going to have this avalanche effect |
| 11:28 | 19 | again. |
| 11:28 | 20 | Mr. Eckert may have been put in a very unfair |
| 11:28 | 21 | position, frankly -- or we can go through all 20 of those, |
| 11:28 | 22 | and he can step down for a moment and come back to the |
| 11:28 | 23 | stand. But it's very easy to search out. |
| 11:28 | 24 | Also, it's very easy to find out if licenses were |
| 11:28 | 25 | in effect. |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

131

| | | |
|---|---|---|
| 11:28 | 1 | MR. QUINN: Your Honor, we have pulled some of |
| 11:28 | 2 | the -- this is a more difficult one, and I'll withdraw the |
| 11:28 | 3 | questions regarding this document, because it's, obviously, |
| 11:28 | 4 | very difficult to read. |
| 11:28 | 5 | THE COURT: No. You don't have to do that. I |
| 11:28 | 6 | just want to know. |
| 11:28 | 7 | Now, I want to know about 2010, and I want to know |
| 11:28 | 8 | about this specific license. What's the name of the company |
| 11:28 | 9 | in 9819? |
| 11:28 | 10 | MR. QUINN: It is Al Srad Limited. |
| 11:28 | 11 | THE COURT: Okay. Now, when you refer to this |
| 11:28 | 12 | document, though, it has a number of companies interspersed. |
| 11:28 | 13 | So Al Srad Limited is just one of the companies. |
| 11:29 | 14 | MR. QUINN: But that's the only relevant one here |
| 11:29 | 15 | in this document. |
| 11:29 | 16 | THE COURT: Well, just a moment. |
| 11:29 | 17 | Well, then where else are we going to look? |
| 11:29 | 18 | Because there's testimony about 20 different licenses and |
| 11:29 | 19 | hundreds of pages apparently that were reviewed. |
| 11:29 | 20 | MR. QUINN: We have the backup documents for each |
| 11:29 | 21 | of them. |
| 11:29 | 22 | THE COURT: What happened here? Was he just given |
| 11:29 | 23 | a summary? |
| 11:29 | 24 | MR. QUINN: No. He was -- he was given -- |
| 11:29 | 25 | THE COURT: Mr. Eckert, you may step down. You |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 132 of 158   Page ID #:316027
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

132

| 11:29 | 1 | can take the book with you, if you want to, and be more |
| 11:29 | 2 | comfortable at the table. |
| 11:29 | 3 | *(Witness steps down and joins counsel.)* |
| 11:29 | 4 | MS. KELLER:  Your Honor, from our perspective the |
| 11:29 | 5 | problem is there's zero foundation for this witness.  He's |
| 11:29 | 6 | given documents.  He doesn't know how they were produced, |
| 11:29 | 7 | when they were produced, who produced them.  They just have |
| 11:29 | 8 | an MGA stamp on them.  And from that, he's asked to find in |
| 11:30 | 9 | a column a company, and then testify that they had common |
| 11:30 | 10 | licenses.  And from what he said on the stand, he personally |
| 11:30 | 11 | doesn't know anything.  He doesn't even know what these |
| 11:30 | 12 | companies are, what they do, what the respective licenses |
| 11:30 | 13 | were supposed to be. |
| 11:30 | 14 | He's done nothing but take foundationless |
| 11:30 | 15 | documents and compare them and come up with a conclusion |
| 11:30 | 16 | that he's now testified to, to the jury.  He doesn't even |
| 11:30 | 17 | know what they are. |
| 11:30 | 18 | MR. QUINN:  Your Honor, he was a 30(b)(6) witness |
| 11:30 | 19 | on licensing practices.  The question is will Mattel |
| 11:30 | 20 | retaliate and refuse to license a company which also has a |
| 11:30 | 21 | license arrangement with MGA? |
| 11:30 | 22 | He's a 30(b)(6) witness.  That's among the things |
| 11:30 | 23 | that he's supposed to be knowledgeable about. |
| 11:30 | 24 | We pulled the MGA documents reflecting their |
| 11:30 | 25 | licensees.  And this first one we've started with is a |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

133

| | | |
|---|---|---|
| 11:30 | 1 | difficult one to read. |
| 11:30 | 2 | THE COURT: No, no. I'm getting better at it. |
| 11:30 | 3 | I've got to squint. But I'm going down the "Date Paid." |
| 11:31 | 4 | And we can go through page 1. |
| 11:31 | 5 | Do you see any date in 2010? |
| 11:31 | 6 | I see one on January 15, 2010, for Better Sourcing |
| 11:31 | 7 | Worldwide, which is not a company Mr. Eckert testified to. |
| 11:31 | 8 | MR. QUINN: No, Your Honor. |
| 11:31 | 9 | THE COURT: None on that page. Page 2 -- |
| 11:31 | 10 | MR. QUINN: Your Honor, this is only as to common |
| 11:31 | 11 | licensees. So the only one that was relevant here -- |
| 11:31 | 12 | THE COURT: No. Just a moment. |
| 11:31 | 13 | Page 2 -- I want to see what's occurring here -- |
| 11:31 | 14 | any in 2010? |
| 11:31 | 15 | Mr. Quinn? |
| 11:31 | 16 | MR. QUINN: I am -- I can't see any, Your Honor. |
| 11:31 | 17 | But we're not claiming that any of them are common |
| 11:31 | 18 | licensing. |
| 11:31 | 19 | THE COURT: Bear with me. |
| 11:31 | 20 | Page 3 -- because when I find "2010," I'm going to |
| 11:31 | 21 | move right back to the company and see what company he's |
| 11:32 | 22 | testifying to. |
| 11:32 | 23 | Page 3, any 2010? |
| 11:32 | 24 | I don't see any, but I want Mr. Quinn and |
| 11:32 | 25 | Ms. Keller to participate. |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

134

| | | |
|---|---|---|
| 11:32 | 1 | MS. KELLER:  Your Honor, even -- |
| 11:32 | 2 | THE COURT:  No.  I understand, Counsel.  I'll |
| 11:32 | 3 | invite your arguments from both sides in just a moment. |
| 11:32 | 4 | I want just the foundational prospect, to begin |
| 11:32 | 5 | with, whether there's even any relevance just to begin with, |
| 11:32 | 6 | with 2010, before we get into the -- |
| 11:32 | 7 | I'm going to send this off to Judge Trott.  He |
| 11:32 | 8 | ought to be as amused as I am about this, after the hearing |
| 11:32 | 9 | on the appeal, and the size of these documents.  But these |
| 11:32 | 10 | documents pertain to MGA -- or to Mattel in this fashion, so |
| 11:33 | 11 | they're hard to read. |
| 11:33 | 12 | All right.  Page 3. |
| 11:33 | 13 | MR. QUINN:  Your Honor, we have some "clean |
| 11:33 | 14 | kills."  We have MGA license agreement. |
| 11:33 | 15 | THE COURT:  I'm on page 3. |
| 11:33 | 16 | Mr. Quinn, I'm waiting for you. |
| 11:33 | 17 | MR. QUINN:  There are none on page 3, Your Honor. |
| 11:33 | 18 | THE COURT:  Okay.  Page 4. |
| 11:33 | 19 | MR. QUINN:  I'm not seeing any 2010 dates. |
| 11:34 | 20 | THE COURT:  Page 5. |
| 11:34 | 21 | There's one on page 5.  There's the "Due Date," |
| 11:34 | 22 | but I don't see the "Date Paid." |
| 11:34 | 23 | Do you see any 2010? |
| 11:34 | 24 | MR. QUINN:  No, I'm not seeing one, Your Honor. |
| 11:34 | 25 | THE COURT:  Now, look over at the last line. |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

135

| | | |
|---|---|---|
| 11:34 | 1 | There's a "Date Paid," and then the last line seems to say |
| 11:34 | 2 | "Amount Paid"; is that correct? |
| 11:34 | 3 | MR. QUINN:  Yes. |
| 11:34 | 4 | THE COURT:  Okay.  Look down at -- |
| 11:35 | 5 | MS. KELLER:  Your Honor, I have -- |
| 11:35 | 6 | THE COURT:  "ZAK Designer."  Count down to the |
| 11:35 | 7 | very small lines -- so the Circuit sees what the Court's |
| 11:35 | 8 | being presented with in a rapid fashion -- and look at what |
| 11:35 | 9 | appears to be "Amount Paid," very last column, which might |
| 11:35 | 10 | be a "10." |
| 11:35 | 11 | MS. KELLER:  Your Honor, what page are you looking |
| 11:35 | 12 | at? |
| 11:35 | 13 | THE COURT:  I'm looking at page 5. |
| 11:35 | 14 | MS. KELLER:  Your Honor, we can give you more |
| 11:35 | 15 | information on what this actually is now. |
| 11:35 | 16 | THE COURT:  I'm sure you can. |
| 11:35 | 17 | MS. KELLER:  It's a royalty payment. |
| 11:35 | 18 | THE COURT:  I'm not inviting that now.  Did you |
| 11:35 | 19 | notice that? |
| 11:35 | 20 | I'm on page 5.  I want to see any "Date Paid" on |
| 11:35 | 21 | page 10 -- or page 5, any 2010 date from either one of you? |
| 11:35 | 22 | MR. QUINN:  We don't see one, Your Honor. |
| 11:35 | 23 | THE COURT:  Okay.  Page 6.  And if you see a 2010 |
| 11:36 | 24 | date that relates to any of these companies that were named |
| 11:36 | 25 | as having joint licenses in 2010, I want you to call that to |

DEBBIE GALE, U.S. COURT REPORTER

136

11:36    1   my attention.

11:36    2          MR. QUINN:  There's one.  The only one we've seen

11:36    3   is on page 1, Your Honor.  But this list is not of joint

11:36    4   licensees.  This is not what this document is, Your Honor.

11:36    5          THE COURT:  All right.

11:36    6          Now, I've at least established that there's

11:36    7   nothing that has anything to do with 2010.

11:36    8          What is this, Ms. Keller?

11:36    9          MS. KELLER:  It is a royalty --

11:36   10          THE COURT:  It comes from MGA.

11:36   11          MS. KELLER:  It is a royalty payment log.

11:36   12          THE COURT:  Just a moment.

11:36   13          This as royalty payment log?

11:36   14          MS. KELLER:  It's a royalty payment log that was

11:36   15   kept by a gentleman named Spencer Woodman.  And Leah Marks

11:36   16   testified about this, that that's what it reflects.

11:36   17          It is royalty payments due and owing to MGA.

11:37   18          THE COURT:  Just a minute.

11:37   19          Now, this is what the Court's confronted with,

11:37   20   upon review:

11:37   21          From Mattel's position, they believe that this is

11:37   22   relevant and 20 companies may be named and we're to assume

11:37   23   that these licenses, based upon these documents, extend all

11:37   24   the way through 2010, which seems to be an irrelevant year

11:37   25   to the Court anyway.

| | | |
|---|---|---|
| 11:37 | 1 | From MGA's perspective, they're trying to get in |
| 11:37 | 2 | front of the jury that these don't stand for licensing |
| 11:37 | 3 | arrangements; although they certainly say "Beginning" and |
| 11:37 | 4 | "End."  And they're trying to create the inference that |
| 11:37 | 5 | these were, in fact, terminated or canceled. |
| 11:37 | 6 | The Court's guess is it's someplace possibly in |
| 11:37 | 7 | between; that the avalanche effect from Mattel is an attempt |
| 11:37 | 8 | to get in 20 companies, when, in fact, there may be 2010 |
| 11:38 | 9 | companies that exist but in a smaller number.  And the |
| 11:38 | 10 | inference from MGA is that none of these exist. |
| 11:38 | 11 | Now, Mr. Quinn, how many of these exist?  Because |
| 11:38 | 12 | you say you've got a "clean kill." |
| 11:38 | 13 | Which companies? |
| 11:38 | 14 | MR. QUINN:  I have MGA license agreements. |
| 11:38 | 15 | THE COURT:  Well, that's kind of like "I have" -- |
| 11:38 | 16 | MR. QUINN:  Okay. |
| 11:38 | 17 | THE COURT:  Now, which companies? |
| 11:38 | 18 | MR. QUINN:  I'm about to list the names of the |
| 11:38 | 19 | companies. |
| 11:38 | 20 | THE COURT:  That's what I was asking.  Few words. |
| 11:38 | 21 | Now production:  Which companies in 2010 had joint |
| 11:38 | 22 | licensing agreements? |
| 11:38 | 23 | MR. QUINN:  Jacques Hau PTY Limited. |
| 11:38 | 24 | THE COURT:  Now, just a moment. |
| 11:38 | 25 | Jacques Hau was not listed by Mr. Eckert. |

| | | |
|---|---|---|
| 11:38 | 1 | MR. QUINN:  I believe it was. |
| 11:38 | 2 | THE COURT:  Mr. Eckert, check your list. |
| 11:38 | 3 | THE WITNESS:  It is. |
| 11:38 | 4 | THE COURT:  Thank you very much, sir. |
| 11:38 | 5 | Jacques Hau.  Excellent. |
| 11:38 | 6 | Who's the next one? |
| 11:38 | 7 | MR. QUINN:  Parragon Books Limited. |
| 11:39 | 8 | THE COURT:  Parragon Books Limited. |
| 11:39 | 9 | THE WITNESS:  I have "Parragon GmbH," Your Honor. |
| 11:39 | 10 | THE COURT:  Okay.  Excellent. |
| 11:39 | 11 | MR. QUINN:  Style Eyes of California. |
| 11:39 | 12 | THE COURT:  Style Eyes of California.  Okay. |
| 11:39 | 13 | MR. QUINN:  ZAK Designs. |
| 11:39 | 14 | THE COURT:  ZAK designs. |
| 11:39 | 15 | Is that part of ZAK Hau (sic)?  Or do we know?  We |
| 11:39 | 16 | don't know. |
| 11:39 | 17 | MS. KELLER:  No. |
| 11:39 | 18 | THE COURT:  What's the next one? |
| 11:39 | 19 | MR. QUINN:  Brunswick Bowling. |
| 11:39 | 20 | THE COURT:  Which I do recall was named.  Okay. |
| 11:39 | 21 | And so far, Mr. Eckert, are all these on your |
| 11:39 | 22 | list? |
| 11:39 | 23 | THE WITNESS:  Yes, sir. |
| 11:39 | 24 | THE COURT:  Thank you, sir. |
| 11:39 | 25 | Next one? |

| | | |
|---|---|---|
| 11:39 | 1 | MR. QUINN:  Character Linens. |
| 11:39 | 2 | THE COURT:  Character Linens. |
| 11:39 | 3 | Okay. |
| 11:39 | 4 | MR. QUINN:  Hy-Pro Asia. |
| 11:39 | 5 | THE COURT:  Hy-Pro Asia. |
| 11:39 | 6 | THE WITNESS:  I have, Your Honor, "Hy-Pro |
| 11:39 | 7 | International." |
| 11:39 | 8 | THE COURT:  Thank you.  Okay. |
| 11:40 | 9 | MR. QUINN:  And the others are not -- you have to |
| 11:40 | 10 | sort of piece together the documents. |
| 11:40 | 11 | THE COURT:  Oh, I can piece together.  Trust me. |
| 11:40 | 12 | MR. QUINN:  These will be the only ones I want to |
| 11:40 | 13 | offer, Your Honor. |
| 11:40 | 14 | MS. KELLER:  May we respond? |
| 11:40 | 15 | THE COURT:  No.  Just a moment.  I promise you, we |
| 11:40 | 16 | have all the time in the world. |
| 11:40 | 17 | Then we've reduced the list from how many, |
| 11:40 | 18 | Mr. Eckert, we were initially presented with? |
| 11:40 | 19 | THE WITNESS:  20. |
| 11:40 | 20 | THE COURT:  20.  So from then, then this is the |
| 11:40 | 21 | subject matter, at best, of 7. |
| 11:40 | 22 | All right.  Now, Ms. Keller, your turn. |
| 11:40 | 23 | MS. KELLER:  Well, this is apparently not a very |
| 11:40 | 24 | "fresh kill."  And, of course, Mr. Eckert has no idea |
| 11:40 | 25 | what -- |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

140

| 11:40 | 1 | THE COURT:  No, no.  This is not argument now. |
| 11:40 | 2 | I'm going to cut you off just like I did Mr. Quinn. |
| 11:40 | 3 | MS. KELLER:  Then, I'll just address the |
| 11:40 | 4 | companies. |
| 11:40 | 5 | THE COURT:  Very quickly. |
| 11:40 | 6 | MS. KELLER:  Hy-Pro sued us, and we settled.  Part |
| 11:41 | 7 | of the settlement was canceling the license. |
| 11:41 | 8 | THE COURT:  What date was it canceled? |
| 11:41 | 9 | MS. KELLER:  I don't have the settlement document |
| 11:41 | 10 | right in front of me. |
| 11:41 | 11 | THE COURT:  Well, just reach over to Mr. Larian. |
| 11:41 | 12 | MS. KELLER:  It was in 2010, though, that it was |
| 11:41 | 13 | canceled. |
| 11:41 | 14 | THE COURT:  2010.  Okay. |
| 11:41 | 15 | MS. KELLER:  Settled.  They sued us I guess before |
| 11:41 | 16 | that.  ZAK -- |
| 11:41 | 17 | THE COURT:  Just a moment.  We're not going to get |
| 11:41 | 18 | the avalanche effect.  We're going to go very slowly now. |
| 11:41 | 19 | 2010.  So this existed -- this joint licensing |
| 11:41 | 20 | agreement existed in 2010 for some period of time? |
| 11:41 | 21 | MS. KELLER:  It was canceled by settlement. |
| 11:41 | 22 | THE COURT:  In 2010.  So since 2010 has more than |
| 11:41 | 23 | one month, it existed for some period of time. |
| 11:41 | 24 | In other words, the whole import of this is the |
| 11:41 | 25 | same problem that's repeatedly occurred; and that is, |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

141

| 11:41 | 1 | somehow, because there are joint licensing arrangements in |
|---|---|---|
| 11:41 | 2 | 2010, this is supposedly going to affect this jury |
| 11:42 | 3 | concerning what appears to be the critical time of Bratz |
| 11:42 | 4 | back in 2002, 2005. |
| 11:42 | 5 | MS. KELLER:  Mr. Larian informs me that the -- |
| 11:42 | 6 | THE COURT:  Take your time.  You might get |
| 11:42 | 7 | Mr. McConville out of the way.  He seems to be in the way. |
| 11:42 | 8 | MS. KELLER:  Well, we're trying to pull up lawsuit |
| 11:42 | 9 | case numbers. |
| 11:42 | 10 | Mr. Larian informs me that the license was |
| 11:42 | 11 | canceled in 2009, and the lawsuit was settled in 2010. |
| 11:42 | 12 | THE COURT:  Okay.  Now, just a moment. |
| 11:42 | 13 | Now, we'll go back to ZAK (sic) Hau. |
| 11:42 | 14 | MS. KELLER:  And that is Los Angeles County |
| 11:42 | 15 | Superior Court Case BC435536. |
| 11:42 | 16 | THE COURT:  43 what? |
| 11:42 | 17 | MS. KELLER:  It was -- |
| 11:42 | 18 | THE COURT:  Just repeat the numbers. |
| 11:42 | 19 | MS. KELLER:  BC435536. |
| 11:42 | 20 | THE COURT:  And what position is Mr. Larian and |
| 11:42 | 21 | MGA in at the present time with ZAK Hau in -- well, last |
| 11:43 | 22 | year. |
| 11:43 | 23 | MS. KELLER:  That's the ZAK case. |
| 11:43 | 24 | THE COURT:  Well, I know that.  Let me ask again. |
| 11:43 | 25 | MS. KELLER:  The lawsuit is still going. |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 142 of 158   Page ID #:316037
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

142

| 11:43 | 1 | THE COURT: Okay. |
|---|---|---|

11:43   1          THE COURT: Okay.

11:43   2          MS. KELLER: But they -- they have declared the

11:43   3   license to be void.

11:43   4          THE COURT: When?

11:43   5          MS. KELLER: We'll find out for you, Your Honor.

11:43   6   But it was not in effect last year, Mr. Larian tells me.

11:43   7          THE COURT: We'll find out.

11:43   8          Parragon Books Limited.

11:43   9          MS. KELLER: Parragon Books Limited, Mr. Larian

11:43   10  tells me, sued and canceled their license.

11:43   11         THE COURT: Who sued?

11:43   12         MS. KELLER: They settled -- Parragon settled.

11:43   13  Apparently that license was canceled as of --

11:43   14         THE COURT: What date?

11:43   15         MS. KELLER: -- as of the end of 2009.

11:43   16         THE COURT: 2009, it was canceled?

11:43   17         MS. KELLER: That's what I'm being told by

11:43   18  Mr. Larian.

11:43   19         THE COURT: Okay. We'll see.

11:43   20         Style Eyes of California.

11:43   21         MS. KELLER: That we don't have any information

11:43   22  about.

11:43   23         THE COURT: Okay. You'll get that.

11:44   24         ZAK Designs.

11:44   25         MS. KELLER: ZAK Designs is the one we were just

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 143 of 158   Page ID
#:316038
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

143

| | | |
|---|---|---|
| 11:44 | 1 | talking about. |
| 11:44 | 2 | THE COURT:  No.  We were talking about ZAK Hau. |
| 11:44 | 3 | MS. KELLER:  Oh, you mean Jacques Hau? |
| 11:44 | 4 | THE COURT:  Jacques Hau. |
| 11:44 | 5 | MS. KELLER:  Jacques Hau Clothing we were not |
| 11:44 | 6 | talking about.  We don't have that information. |
| 11:44 | 7 | THE COURT:  Okay.  So I'm going back to |
| 11:44 | 8 | ZAK Designs, and I'm going to repeat back to you the |
| 11:44 | 9 | following: |
| 11:44 | 10 | That ZAK Designs, in Los Angeles case No. 435536, |
| 11:44 | 11 | the license is void. |
| 11:44 | 12 | And what do you believe is date that that license |
| 11:44 | 13 | was voided on? |
| 11:44 | 14 | MS. HURST:  Jacques. |
| 11:44 | 15 | MS. KELLER:  No.  We're on ZAK right now, not |
| 11:44 | 16 | Jacques. |
| 11:44 | 17 | THE COURT:  We're not ZAK, not Jacques.  I heard |
| 11:44 | 18 | that. |
| 11:44 | 19 | Mr. Larian, Mr. Eckert, I just want you to see how |
| 11:45 | 20 | we spend our nights and weekends.  This is how we spend our |
| 11:45 | 21 | nights and weekends as a Court family. |
| 11:45 | 22 | So we'll go through there again very slowly so I |
| 11:45 | 23 | don't care about counsel's frustration. |
| 11:45 | 24 | MS. KELLER:  ZAK Designs is the lawsuit number |
| 11:45 | 25 | that we gave you, Your Honor. |

11:45  1                THE COURT:  435536.  License void.

11:45  2                MS. KELLER:  12/29/09, termination letter from

11:45  3      ZAK.

11:45  4                THE COURT:  Excellent.

11:45  5                Okay.  Hy-Pro International, I'm going to repeat

11:45  6      back:  It was canceled in 2009 or '10?

11:45  7                Let's go back to Hy-Pro International.  Take your

11:45  8      time.

11:45  9                In other words, gentlemen, both of your

11:45  10     credibilities are at stake, quite frankly.  And I, quite

11:46  11     frankly, think it's an entirely collateral matter.  But it

11:46  12     came up very quickly, and now each of you gentlemen are in

11:46  13     the position -- not that this evidence matters that much --

11:46  14     each of you gentlemen now finds yourself in the position

11:46  15     where your credibility's at stake.

11:46  16                So, on Mr. Eckert's part, he has 20 documents that

11:46  17     he's reviewed.

11:46  18                And now Mr. Larian's in the position of

11:46  19     confronting 7 documents that this has been narrowed to, and

11:46  20     whether, in fact, these are in effect in 2010.

11:46  21                And the issue is:  It has nothing to do with the

11:46  22     licensing arrangements back in 2000 to 2005; for instance,

11:46  23     but the end result is, now we're into a credibility test.

11:46  24                MS. KELLER:  It's actually worse than that,

11:46  25     Your Honor, because, really, Mr. Eckert's credibility isn't

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 145 of 158   Page ID #:316040
CV 04-9049 DOC – 4/4/2001 – Day 45, Volume 1 of 4

145

| 11:46 | 1 | being put on the line.  He's just saying -- |
| 11:46 | 2 | THE COURT:  Thank you, Counsel. |
| 11:46 | 3 | MS. KELLER:  He's regurgitating -- |
| 11:46 | 4 | THE COURT:  We're going to continue on. |
| 11:46 | 5 | MS. KELLER:  Hy-Pro.  We received a termination |
| 11:47 | 6 | letter either December '08 or December '09. |
| 11:47 | 7 | THE COURT:  Okay.  Just a moment. |
| 11:47 | 8 | MS. KELLER:  But before 2010. |
| 11:47 | 9 | THE COURT:  Just a moment.  2008, 2009.  Just a |
| 11:47 | 10 | minute. |
| 11:47 | 11 | Now I want to make certain my notes are absolutely |
| 11:47 | 12 | correct. |
| 11:47 | 13 | You believe that Parragon Books was settled in |
| 11:47 | 14 | 2009, and there was a cancellation of that license; is that |
| 11:47 | 15 | correct? |
| 11:47 | 16 | MS. KELLER:  Yes. |
| 11:47 | 17 | THE COURT:  Style Eyes of California, you didn't |
| 11:47 | 18 | have information.  Take your time, pull it up, and let's see |
| 11:47 | 19 | if any of these licenses are in effect. |
| 11:47 | 20 | MS. KELLER:  Style Eyes.  We just don't have that |
| 11:47 | 21 | one in our database here, Your Honor.  We could have gotten |
| 11:48 | 22 | it, but we weren't -- |
| 11:48 | 23 | THE COURT:  We'll find it for both sides. |
| 11:48 | 24 | Brunswick Bowling. |
| 11:48 | 25 | MS. KELLER:  Mr. Larian tells me that that license |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 146 of 158   Page ID #:316041
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

146

| | | |
|---|---|---|
| 11:48 | 1 | was canceled by Brunswick.  Trying to find it. |
| 11:49 | 2 | THE COURT:  I can probably check back in my own |
| 11:49 | 3 | records.  I have a huge amount of these lawsuits, in terms |
| 11:49 | 4 | of cancellation of licenses.  But I'm going to let you |
| 11:49 | 5 | perfect your own record first, because I know that those |
| 11:50 | 6 | lawsuits are also coming to this Court from retailers who |
| 11:50 | 7 | canceled out in terms of the worldwide injunction. |
| 11:50 | 8 | And the question now is, does this also open the |
| 11:50 | 9 | door for this worldwide injunction?  And now the question |
| 11:50 | 10 | then becomes, if it opens the door for the worldwide |
| 11:50 | 11 | injunction and the various cancellation of retailers, that |
| 11:50 | 12 | the jury now knows what the first verdict was. |
| 11:50 | 13 | MS. KELLER:  Your Honor, I think the easy -- |
| 11:50 | 14 | THE COURT:  No.  I'm going to do this one at a |
| 11:50 | 15 | time.  The Circuit's going to have an absolute pristine |
| 11:50 | 16 | record about what's occurring here. |
| 11:51 | 17 | MS. KELLER:  We have a termination letter from |
| 11:52 | 18 | Hy-Pro, Your Honor, in December 2008. |
| 11:52 | 19 | THE COURT:  Just a moment. |
| 11:52 | 20 | Okay.  Canceled in 2008.  Thank you. |
| 11:52 | 21 | You might as well start pulling all these |
| 11:52 | 22 | documents for both sides because it's going to be subject to |
| 11:52 | 23 | another round.  Apparently, this is being reduced from 20 to |
| 11:52 | 24 | 7 in contention.  And of those 7 -- |
| 11:52 | 25 | MR. QUINN:  Your Honor, we can go through the |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 147 of 158   Page ID #:316042
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

147

| | | |
|---|---|---|
| 11:52 | 1 | spreadsheet and the backup documents for the others.  I'm |
| 11:52 | 2 | just -- it's the usage of time. |
| 11:52 | 3 | THE COURT:  No, Counsel.  It involves too much. |
| 11:52 | 4 | It involves the credibility of both of these gentlemen. |
| 11:53 | 5 | MS. KELLER:  We have just found the ZAK |
| 11:53 | 6 | termination letter, 12/29/08. |
| 11:53 | 7 | THE COURT:  12/29/08? |
| 11:53 | 8 | MS. KELLER:  Yes, Your Honor.  And just so the |
| 11:53 | 9 | Court knows, Ms. Hurst has found a spreadsheet reflecting |
| 11:53 | 10 | that, but we haven't yet located the actual letter.  We'll |
| 11:53 | 11 | see if we can find that, as well. |
| 11:53 | 12 | THE COURT:  All right.  Keep going down the list. |
| 11:53 | 13 | MS. KELLER:  And the Hy-Pro contract ran from |
| 11:53 | 14 | January 1st, 2007, to July 31st, 2009. |
| 11:53 | 15 | THE COURT:  Just a moment. |
| 11:53 | 16 | So Hy-Pro International, also known as Hy-Pro |
| 11:53 | 17 | Asia -- is that what it's being referred to? |
| 11:53 | 18 | MS. KELLER:  Yes, Your Honor. |
| 11:53 | 19 | THE COURT:  The contract ran from what date? |
| 11:53 | 20 | MS. KELLER:  January 1st, 2007, to July 31st, |
| 11:53 | 21 | 2009. |
| 11:53 | 22 | And they apparently filed a lawsuit May 10, 2010, |
| 11:53 | 23 | and dismissed June 8, 2010.  'Cause they wanted their money |
| 11:54 | 24 | back. |
| 11:54 | 25 | THE COURT:  Okay.  So, in other words, there's no |

148

| | | |
|---|---|---|
| 11:54 | 1 | cancellation in 2010, because the contract ended in 2009, |
| 11:54 | 2 | July 31st, 2009 on Hy-Pro? |
| 11:54 | 3 | MS. KELLER: Yes. They canceled December 8th, |
| 11:54 | 4 | even before it ended. |
| 11:54 | 5 | THE COURT: I see. |
| 11:54 | 6 | MS. KELLER: And then they sued us. But the term |
| 11:54 | 7 | of the contract itself would have expired before 2010. |
| 11:54 | 8 | THE COURT: Okay. That's Hy-Pro, allegedly. |
| 11:54 | 9 | You'll have to gather those documents. |
| 11:55 | 10 | I know with the worldwide injunction that |
| 11:55 | 11 | Judge Larson signed that almost all the retailers abandoned |
| 11:55 | 12 | Mr. Larian and MGA when that injunction went into effect. |
| 11:55 | 13 | MS. KELLER: That's correct, Your Honor. |
| 11:55 | 14 | THE COURT: But I don't know specifically if |
| 11:55 | 15 | that's true. Some may have carried on. So we're going to |
| 11:55 | 16 | go down each one of these. And I don't need further comment |
| 11:55 | 17 | by counsel right now from either side. |
| 11:55 | 18 | I want to know the next contract, and when it was |
| 11:56 | 19 | terminated or if it was. |
| 12:06 | 20 | MS. KELLER: Your Honor, we just confirmed with |
| 12:06 | 21 | Spencer Woodman, who's the person who keeps the license log, |
| 12:06 | 22 | that the royalty payment -- I'm sorry -- who keeps the |
| 12:07 | 23 | royalty payment log reflected in 9819, that the royalty |
| 12:07 | 24 | payment log does not reflect whether licenses are current. |
| 12:07 | 25 | And it doesn't reflect whether they're terminated before the |

| | | |
|---|---|---|
| 12:07 | 1 | end of the period through which they were originally |
| 12:07 | 2 | supposed to run. |
| 12:07 | 3 | THE COURT:  All right.  Put that in simple terms |
| 12:07 | 4 | for me.  Does that mean that with Character Linen, we don't |
| 12:07 | 5 | know if there's a license in effect in 2010? |
| 12:07 | 6 | MS. KELLER:  That's a different issue. |
| 12:07 | 7 | I'm talking about Exhibit 9819. |
| 12:07 | 8 | THE COURT:  I am too.  Now I'm going to ask my |
| 12:07 | 9 | question again. |
| 12:07 | 10 | MS. KELLER:  Yes.  We don't know from this whether |
| 12:07 | 11 | a license is in effect in 2010. |
| 12:07 | 12 | THE COURT:  All right.  You do not know at the |
| 12:07 | 13 | present time; is that correct? |
| 12:07 | 14 | MS. KELLER:  We can't tell from this Exhibit 9819 |
| 12:07 | 15 | if a license is in effect in 2010. |
| 12:07 | 16 | THE COURT:  I understand that.  But I hold MGA |
| 12:07 | 17 | responsible for this information.  So I'm going to go up my |
| 12:07 | 18 | list very carefully, and you're going to listen and answer |
| 12:08 | 19 | my questions. |
| 12:08 | 20 | Style Eyes of California. |
| 12:08 | 21 | MS. KELLER:  I'm going to let Ms. Hurst address |
| 12:08 | 22 | these, because she's been going through our database. |
| 12:08 | 23 | THE COURT:  I would encourage Ms. Hurst to answer |
| 12:08 | 24 | my questions, then. |
| 12:08 | 25 | Style Eyes of California. |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 150 of 158   Page ID #:316045
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

150

| 12:08 | 1 | MS. KELLER: And, Your Honor, part of the delay is |
|---|---|---|
| 12:08 | 2 | we're communicating back and forth with MGA right now -- |
| 12:08 | 3 | THE COURT: That's fine. |
| 12:08 | 4 | MS. KELLER: -- the legal department. |
| 12:08 | 5 | THE COURT: It sounds like we're allegedly coming |
| 12:08 | 6 | from 20 down to 7. And if the information's accurate, we |
| 12:08 | 7 | are one, two, three, four -- of the 7, if your information |
| 12:08 | 8 | is accurate, which I don't contend it is, then we're down to |
| 12:08 | 9 | three. |
| 12:08 | 10 | MR. QUINN: Your Honor, we have the backup for the |
| 12:08 | 11 | others, as well. It's just not -- you have to go through a |
| 12:09 | 12 | spreadsheet, which we can do. |
| 12:09 | 13 | THE COURT: But remember that avalanche effect. |
| 12:09 | 14 | MR. QUINN: I don't want to start an avalanche |
| 12:09 | 15 | rolling. |
| 12:09 | 16 | THE COURT: I warned both of you about that, and a |
| 12:09 | 17 | long time ago. I'll let you present for either side any |
| 12:09 | 18 | credible evidence. But this, unfortunately, is getting into |
| 12:09 | 19 | a real credibility dispute between now Mr. Larian's |
| 12:09 | 20 | licenses, and Mr. Eckert's perception of licenses. And this |
| 12:09 | 21 | is going to have import with the jury on what, quite |
| 12:09 | 22 | frankly, appears to be a collateral matter. But you've both |
| 12:09 | 23 | found your way into this morass. |
| 12:09 | 24 | MS. KELLER: Your Honor, we did not offer -- |
| 12:09 | 25 | THE COURT: No. I'm done with it now. |

| | | |
|---|---|---|
| 12:09 | 1 | Get me the information.  Because either, at this |
| 12:09 | 2 | point, the Court strikes the entire testimony, which then |
| 12:09 | 3 | leaves Mr. Eckert looking non-credible, when in good faith |
| 12:09 | 4 | he's handed, by counsel, a list, you know, summarily |
| 12:10 | 5 | prepared, which is no fault of Mr. Eckert's, if this was |
| 12:10 | 6 | ill-prepared by counsel -- it may be absolutely accurate; |
| 12:10 | 7 | may be very well-prepared; and I'm trying to find that out, |
| 12:10 | 8 | and you're going to give me that time.  Or it makes |
| 12:10 | 9 | Mr. Larian look like he is perjurious, that the duality of |
| 12:10 | 10 | these licenses, in fact, didn't exist. |
| 12:10 | 11 | So, right now it appears that the parties are |
| 12:10 | 12 | disputing a notion of license cancellations, or whether |
| 12:10 | 13 | licenses existed. |
| 12:10 | 14 | We got into this morass because Mattel is claiming |
| 12:10 | 15 | many licensees are -- have a dual -- a duality, if you will, |
| 12:10 | 16 | with MGA and Mattel; in other words, that licensee is |
| 12:10 | 17 | pushing both products simultaneously. |
| 12:10 | 18 | MGA claims that, besides Kohl's, apparently, the |
| 12:10 | 19 | other license cancellations were, for a variety of reasons, |
| 12:10 | 20 | including lawsuits and including a worldwide injunction, |
| 12:11 | 21 | which isn't in front of this jury -- Mattel focused on the |
| 12:11 | 22 | year 2010, which seems rather irrelevant to the Court.  But |
| 12:11 | 23 | I allowed it in good faith. |
| 12:11 | 24 | Now we started with 20.  If the information from |
| 12:11 | 25 | MGA is accurate and Mr. Quinn's representation is accurate, |

Case 2:04-cv-09049-DOC-RNB  Document 10395  Filed 04/06/11  Page 152 of 158  Page ID #:316047
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

152

| | | |
|---|---|---|
| 12:11 | 1 | we're down to 7.  But Mr. Quinn needs more time to verify |
| 12:11 | 2 | that.  Perhaps we have more than the 7.  MGA contends that |
| 12:11 | 3 | most of these 7 were canceled and not in effect in 2010, and |
| 12:11 | 4 | is trying to give the Court some verbal information, which I |
| 12:11 | 5 | am not accepting; but at least on their record, they believe |
| 12:11 | 6 | Parragon Books Limited was settled in 2009; and ZAK Designs |
| 12:11 | 7 | in Los Angeles, Case No. 435536, the license was voided on |
| 12:11 | 8 | December 29th of 2008. |
| 12:11 | 9 | They've alleged that Brunswick Bowling is canceled, but |
| 12:11 | 10 | I don't have specific information.  And the Hy-Pro |
| 12:12 | 11 | International, also testified to as Hy-Pro Asia, the |
| 12:12 | 12 | contract never ran to 2010; and, in fact, it ran from |
| 12:12 | 13 | January 1st, 2007, to July 31st, 2009, and it was canceled |
| 12:12 | 14 | in December of 2008. |
| 12:12 | 15 | If you're information's correct, that leaves only three |
| 12:12 | 16 | in contention that are unexplained. |
| 12:12 | 17 | MR. QUINN:  Well, we haven't actually withdrawn |
| 12:12 | 18 | any of the 20, Your Honor.  We're going only off the |
| 12:12 | 19 | documents that MGA produced to us. |
| 12:12 | 20 | THE COURT:  I understand that.  Both of you |
| 12:12 | 21 | stepped into a collateral matter that now involves your |
| 12:12 | 22 | client's respective credibility.  And we'll take the time. |
| 12:12 | 23 | MS. HURST:  Okay.  I have additional information |
| 12:12 | 24 | for the Court. |
| 12:12 | 25 | THE COURT:  Okay. |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 153 of 158   Page ID #:316048
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

153

| 12:12 | 1 | MS. HURST:  With respect to Brunswick, after |
| 12:12 | 2 | lengthy negotiations triggered by recall notices sent in the |
| 12:12 | 3 | Fourth Quarter of 2009, they were terminated in February of |
| 12:13 | 4 | 2010. |
| 12:13 | 5 | THE COURT:  Okay. |
| 12:13 | 6 | MS. HURST:  Same for -- actually, these are all |
| 12:13 | 7 | the same.  Same for Character Linens. |
| 12:13 | 8 | THE COURT:  Just a moment. |
| 12:13 | 9 | License terminated in 2010? |
| 12:13 | 10 | MS. HURST:  February of 2010.  And that's before |
| 12:13 | 11 | the end of the term.  In other words, it did not go through |
| 12:13 | 12 | its full term. |
| 12:13 | 13 | THE COURT:  I understand.  Okay. |
| 12:13 | 14 | Any others?  I have Style Eyes of California left |
| 12:13 | 15 | and Jacques Hau. |
| 12:13 | 16 | MS. HURST:  Style Eyes, notice of termination in |
| 12:13 | 17 | February of 2010.  Same issue related to the recall. |
| 12:13 | 18 | THE COURT:  The recall. |
| 12:13 | 19 | Most of these -- I'm assuming a good portion of |
| 12:14 | 20 | these are pursuant to the recall. |
| 12:14 | 21 | MS. HURST:  That's right.  There were disputes |
| 12:14 | 22 | with all of them as a result of the recall, and then there |
| 12:14 | 23 | were negotiations where they were refusing to pay for many |
| 12:14 | 24 | months. |
| 12:14 | 25 | THE COURT:  Counsel, I'm aware of this.  I'm still |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 154 of 158   Page ID #:316049
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

154

| 12:14 | 1 | gathering cases from across the district on this. |

12:14  2      So Jacques Hau?

12:14  3      MS. HURST:  Your Honor, there were negotiations

12:14  4  with Jacques Hau that finally resulted in the termination

12:14  5  letter sent February 2010.

12:14  6      THE COURT:  Okay.  Now I'm going to repeat back to

12:14  7  you.

12:14  8      Jacques Hau terminated February 2010.

12:14  9      Style Eyes of California terminated February 2010.

12:14  10     Brunswick Bowling terminated 2010.

12:14  11     Character Linen terminated 2010.

12:14  12     Parragon Books Limited canceled after settlement

12:14  13  in 2009.

12:15  14     ZAK Designs, Los Angeles Case No. 435536, license

12:15  15  voided December 29, 2008.

12:15  16     And Hy-Pro International, the contractual space

12:15  17  was January 1st, 2007, to July 31st, 2009.  It never fell

12:15  18  within the time period.  It was canceled December 2008.

12:15  19     Is that what your information disclosed?

12:15  20     MS. HURST:  I believe that's correct.

12:15  21     THE COURT:  Okay.

12:15  22     Mr. Quinn, your opportunity to add back any of the

12:15  23  other 20.

12:15  24     MR. QUINN:  Again, we're just going on the MGA

12:15  25  documents that we've received.  There is -- we have an MGA

| | | |
|---|---|---|
| 12:15 | 1 | termination of merchandising agreement with Alligator Books, |
| 12:15 | 2 | dated March 16, 2010. |
| 12:15 | 3 | THE COURT: Okay. Alligator Books, and that's |
| 12:15 | 4 | March 16, 2010. My guess is that these are really pursuant |
| 12:15 | 5 | to the worldwide injunction that occurred. |
| 12:15 | 6 | MR. QUINN: Well, this is a termination by MGA. |
| 12:15 | 7 | THE COURT: Probably because of settlements and |
| 12:16 | 8 | discussions, but I don't know that. I just know that these |
| 12:16 | 9 | cases are continually piling in from Judge Larson's |
| 12:16 | 10 | injunction. |
| 12:16 | 11 | MR. QUINN: May I have just -- Your Honor, we |
| 12:16 | 12 | don't dispute there are -- I'm sure there are cancellations. |
| 12:16 | 13 | We didn't get any of those documents. We have only the |
| 12:16 | 14 | documents that we've sought to present here, the |
| 12:16 | 15 | spreadsheets and the license agreement. |
| 12:16 | 16 | THE COURT: I understand that. |
| 12:16 | 17 | It's a trap, though, that everybody's walked into. |
| 12:16 | 18 | And now Mr. Eckert's on the stand, you know, with these |
| 12:16 | 19 | prepared documents and his credibility is at stake in front |
| 12:16 | 20 | of this jury. And it may be very, very unfair that he's put |
| 12:16 | 21 | in that position, but that's a document apparently handed |
| 12:16 | 22 | over by counsel. |
| 12:16 | 23 | MR. QUINN: We gave him these MGA documents. |
| 12:16 | 24 | THE COURT: Now, just a moment. Thank you very |
| 12:16 | 25 | much. |

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 156 of 158   Page ID #:316051
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

156

| | | |
|---|---|---|
| 12:16 | 1 | By the same token, Mr. Larian's credibility is at |
| 12:16 | 2 | stake on what seems to be a collateral matter, and the |
| 12:16 | 3 | impression is that we've got this duality of licenses taking |
| 12:16 | 4 | place, when, in fact, that may not be the case at all that |
| 12:17 | 5 | MGA and Mattel never shared. |
| 12:17 | 6 | So Ms. Zeller (sic) and Mr. Quinn, get up out of |
| 12:17 | 7 | your chairs and go to the lectern. Solve that for your |
| 12:17 | 8 | clients before I do. |
| 12:17 | 9 | In other words, I'm going to give you one chance |
| 12:17 | 10 | to control this, 'cause each your clients are in a very, |
| 12:17 | 11 | very bad position in front of this jury right now. And |
| 12:17 | 12 | that's the responsibility of counsel for both sides, for my |
| 12:17 | 13 | record. |
| 12:18 | 14 | Counsel, also remember, I can go back and start |
| 12:18 | 15 | taking judicial notice of these files. And I don't think |
| 12:18 | 16 | either one of you want me to be in that position because, if |
| 12:18 | 17 | the Court speaks, it will speak with authority. |
| 12:18 | 18 | MS. KELLER: Your Honor, we're in discussions |
| 12:18 | 19 | about just crafting something. |
| 12:18 | 20 | THE COURT: Good. Go back to the lectern and |
| 12:18 | 21 | craft it. The jury's coming out in 12 minutes. |
| 12:19 | 22 | *(Live reporter switch at 12:19 p.m.)* |
| 12:20 | 23 | *(Further proceedings reported by Jane Sutton* |
| 12:20 | 24 | *Rule in Volume II.)* |
| 12:20 | 25 | |

CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

157

12:20    1                       -oOo-

12:20    2

Case 2:04-cv-09049-DOC-RNB   Document 10395   Filed 04/06/11   Page 158 of 158   Page ID #:316053
CV 04-9049 DOC - 4/4/2001 - Day 45, Volume 1 of 4

158

12:20   1                              -oOo-

12:20   2

12:20   3                           CERTIFICATE

12:20   4

12:20   5          I hereby certify that pursuant to Section 753,

12:20   6   Title 28, United States Code, the foregoing is a true and

12:20   7   correct transcript of the stenographically reported

12:20   8   proceedings held in the above-entitled matter and that the

12:20   9   transcript page format is in conformance with the

12:20  10   regulations of the Judicial Conference of the United States.

12:20  11

12:20  12   Date:  April 4, 2011

12:20  13

12:20  14
12:20
12:20  15   _____
12:20        DEBBIE GALE, U.S. COURT REPORTER
12:20  16   CSR NO. 9472, RPR

12:20  17

       18

       19

       20

       21

       22

       23

       24

       25