1

1           **UNITED STATES DISTRICT COURT**

2           **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    - - - - - - -

5

6    MATTEL, INC., ET AL.,              )
                                        )
7             Plaintiffs,               )
                                        )
8         vs.                           ) No. CV 04-9049-DOC
                                        )    Day 45
9    MGA ENTERTAINMENT, INC., ET AL.,   )    Volume 2 of 4
                                        )
10            Defendants.               )
     _____)

11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                     Jury Trial

17                Santa Ana, California

18               Monday, April 4, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     ll-04-04 MattelV2

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR PLAINTIFFS MATTEL, INC., ET AL.:

 4           QUINN, EMANUEL, URQUHART & SULLIVAN
             By:  JOHN B. QUINN
 5                MICHAEL T. ZELLER
                  WILLIAM PRICE
 6                Attorneys at Law
             865 South Figueroa Street
 7           10th Floor
             Los Angeles, California 90017-2543
 8           (213) 443-3000

 9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11           ORRICK, HERRINGTON & SUTCLIFFE, LLP
             BY:  THOMAS S. MC CONVILLE
12                Attorney at Law
             4 Park Plaza
13           Suite 1600
             Irvine, California 92614
14           (949) 567-6700

15           – AND –

16           ORRICK, HERRINGTON & SUTCLIFFE, LLP
             BY:  ANNETTE L. HURST
17                Attorney at Law
             405 Howard Street
18           San Francisco, California 94105
             (415) 773-5700

19           – AND –

20
             KELLER RACKAUCKAS, LLP
21           BY:  JENNIFER L. KELLER
                  Attorney at Law
22           18500 Von Karman Avenue
             Suite 560
23           Irvine, California 92612
             (949) 476-8700

24

25
```

```
 1   APPEARANCES OF COUNSEL (Continued):

 2

 3   FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4           SCHEPER, KIM & OVERLAND, LLP
             BY:  ALEXANDER H. COTE
 5               Attorney at Law
             601 West Fifth Street
 6           12th Floor
             Los Angeles, California 90071
 7           (213) 613-4660

 8           - AND -

 9           LAW OFFICES OF MARK E. OVERLAND
             BY:  MARK E. OVERLAND
10               Attorney at Law
             100 Wilshire Boulevard
11           Suite 950
             Santa Monica, California 90401
12           (310) 459-2830

13

14   Also Present:

15           ISAAC LARIAN, MGA CEO
             ROBERT ECKERT, Mattel CEO
16           LILY MARTINEZ, Mattel Employee
             KEN KOTARSKI, Mattel Technical Operator
17           MIKE STOVALL, MGA Technical Operator
             RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan
18           KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe
             WARRINGTON PARKER, Orrick Herrington & Sutcliffe
19           MELANIE PHILLIPS, Orrick Herrington & Sutcliffe
             FRANK RORIE, Orrick Herrington & Sutcliffe
20           DIANA RUTOWSKI, Orrick Herrington & Sutcliffe
             DENISE MINGRONE, Orrick Herrington & Sutcliffe
21

22

23

24

25
```

**I N D E X**

**EXAMINATION**

| Witness Name | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| ECKERT, ROBERT | | | | |
| By Ms. Keller | | | 5 | |
| MOORE, MICHAEL | | | | |
| By Ms. Keller | 7 | | 121 | |
| By Mr. Zeller | | 67 | | |

**EXHIBITS**

| Exhibit | Identification | Evidence |
|---|---|---|
| Plaintiffs' No. 10, pages 2 through 18 | | 94 |
| Defendants' No. 11342 | | 67 |
| Plaintiffs' No. 24825 | | 97 |
| Defendants' No. 36091-31 | | 13 |
| Defendants' No. 36091-33 | | 19 |
| Defendants' No. 37006 | | 48 |
| Defendants' No. 37006-12 | | 56 |

1              SANTA ANA, CALIFORNIA, MONDAY, APRIL 4, 2011

2                       DAY 45, VOLUME 2 OF 4

3                           (12:32 p.m.)

4              *(The following proceedings is taken in the*

5         *presence of the jury.)*

6              THE COURT:  We are on the record.

7              All counsel are present, the parties are present,

8    the jury and the alternates are present.

9              Ladies and gentlemen, there's been a stipulation

10   agreed to by both parties.  Both MGA and Mattel have agreed

11   it would be unduly consumptive of time to go into all of the

12   surrounding details regarding any common licenses in 2010.

13   Mr. Eckert's testimony regarding common licensees in 2010

14   is, therefore, stricken, and you are to disregard it.  This

15   stipulation is without any prejudice to either of the

16   parties in this matter; is that understood?

17              *(No audible response.)*

18              THE COURT:  Thank you very much.

19              Counsel, Mr. Quinn?

20              **ROBERT ECKERT, DEFENSE WITNESS, RESUMED**

21              **FURTHER REDIRECT EXAMINATION (Continued)**

22   BY MR. QUINN:

23   Q    Mr. Eckert, you were here in court when you saw those

24   series of e-mail communications between Kohl's and MGA; do

25   you recall those e-mails that went back and forth?

Case 2:04-cv-09049-DOC-RNB   Document 10396   Filed 04/06/11   Page 6 of 132   Page ID #:316059
CV 04-9049-DOC - 04/04/2011 - Day 45, Vol. 2 of 4

6

1    A    I do.

2    Q    Now, at the time that Mattel negotiated its arrangement

3    with Kohl's, it wasn't aware of those -- the e-mail exchange

4    and that history between MGA and Kohl's, correct?

5    A    That's correct.

6    Q    But Kohl's -- but Mattel did become aware of

7    Exhibit 37113, the e-mail from Tom Maskel to Julie

8    Shevlin --

9    A    Yes.

10   Q    -- do you see that?

11   A    I do.

12   Q    And you did become aware, as it states here, that

13   Kohl's has zero love for Bratz, correct?

14   A    Yes.

15         MR. QUINN:  Nothing further.

16         THE COURT:  Now, I want to make certain.

17   Everybody satisfied with the questions?

18         *(No audible response.)*

19         THE COURT:  Counsel?

20         MS. KELLER:  Yes, your Honor.

21         THE COURT:  Counsel?

22         MR. QUINN:  Yes, your Honor.

23         THE COURT:  Okay.

24         Mr. Eckert, thank you very much.  You may step

25   down.

 1               Counsel, your next witness, please.

 2               MS. KELLER:  We will recall Michael Moore, your

 3      Honor.

 4               THE COURT:  Okay.  Mr. Moore.

 5               Mr. Moore, if you'd step forward, we are going to

 6      re-swear you, sir.  If you'd raise your right hand, please.

 7               **MICHAEL MOORE, DEFENSE WITNESS, RESWORN**

 8               THE WITNESS:  I do.

 9               THE COURT:  Thank you, Mr. Moore.  If you'd please

10      be seated, once again.

11               And once again, after you are seated, will you

12      reintroduce yourself to the jury, please.

13               THE WITNESS:  Yes.  My name is Michael Christopher

14      Moore.

15               THE COURT:  Mr. Moore, will you spell your last

16      name, please.

17               THE WITNESS:  M-o-o-r-e.

18               THE COURT:  I believe this is still direct

19      examination, am I correct?

20               MS. KELLER:  Yes, your Honor, thank you.

21               THE COURT:  Direct examination by Ms. Keller on

22      behalf of MGA and Mr. Larian.

23                       **DIRECT EXAMINATION**

24      BY MS. KELLER:

25      Q    Mr. Moore, it's been a few days since you've been on

1   the witness stand.  You are an in-house attorney at Mattel,

2   correct?

3   A    Yes.

4   Q    And before you left the witness stand, we were talking

5   about, among other things, the use of the code NHB to

6   describe MGA; do you recall that?

7   A    I know about the code NHB, yes.

8   Q    And that was -- that was a term that you used in --

9   after the Wall Street Journal came out in July of 2003, you

10  began using the term NHB as a name for the overall project

11  of looking into the content of the Wall Street Journal

12  article, right?

13  A    Yes.

14  Q    In other words, when you were referring to MGA, you

15  would use NHB, right?

16          MR. ZELLER:  The question is compound, now.

17          THE COURT:  Overruled.

18          THE WITNESS:  Well, I understood the term NHB to

19  be an acronym for North Hills Bratz, and that I was to use

20  it for the overall project of looking into the contents of

21  the Wall Street Journal article.  Later on it could --

22  BY MS. KELLER:

23  Q    It was to be used in place of MGA, correct?

24  A    Well, later on it was used that way sometimes, yes.

25  Q    And after the Wall Street Journal article came out in

Case 2:04-cv-09049-DOC-RNB   Document 10396   Filed 04/06/11   Page 9 of 132   Page ID #:316062
CV 04-9049-DOC - 04/04/2011 - Day 45, Vol. 2 of 4

9

1   July of 2003, and you were looking into the content of the

2   article, you used a term NHB as a name for the overall

3   project of looking into the contents of that article, right?

4   A    Yes, I did.

5   Q    And that was on the instruction of Mr. Normile,

6   correct?

7   A    Yes.

8   Q    And he wanted you to use the term NHB in all documents

9   about this subject, including e-mails, true?

10           MR. ZELLER:  Foundation as to "he wanted."

11           THE COURT:  Well, Mr. Normile.  Overruled.

12           THE WITNESS:  Yeah, he asked that I use the term

13   NHB in connection with documents and communications.

14   BY MS. KELLER:

15   Q    Regarding MGA?

16   A    Again, my understanding was it was the overall project

17   of looking into the Wall Street Journal article, but yes, it

18   then became a substitute for MGA.

19   Q    And since -- last week we also discussed the fact that

20   you claimed you had spoken to no one at Mattel who suspected

21   in 2001 that Mr. Bryant was working on Bratz at the time he

22   was working for Mattel; do you recall that?

23   A    I'm not sure I recall that specific language, but at

24   the time I didn't know of anyone who knew that Carter Bryant

25   worked for MGA at the time he was working for Mattel.

1    Q    Okay.  Different question.  Is it true that you spoke

2    to no one at Mattel who suspected in 2001 that Mr. Bryant

3    was working on Bratz at a time when he was working for

4    Mattel; is that true?

5    A    At the time, yes, I hadn't spoken to anybody who

6    suspected that Carter Bryant worked on -- on Bratz while he

7    was working at Mattel.

8    Q    Okay.  When you say "at the time," what are you talking

9    about?

10   A    Well --

11   Q    At what time?

12   A    Yeah, I'm talking about the summer of 2003.

13   Q    Okay.  So --

14   A    And -- go ahead.

15   Q    And so when you were interviewing people in the summer

16   of 2003, you are saying that you had not spoken to anyone at

17   Mattel who suspected back in 2001 that Mr. Bryant was

18   working on Bratz at the time he was working for Mattel,

19   true?

20   A    I hadn't spoken to anybody who -- who knew in 2001 or

21   had suspected it.

22   Q    And we're talking about you hadn't spoken to anybody

23   when you were doing your round of interviews in 2003, true?

24   A    True.

25   Q    And I asked you about, among others, Jill Norquist,

Case 2:04-cv-09049-DOC-RNB   Document 10396   Filed 04/06/11   Page 11 of 132   Page ID #:316064
CV 04-9049-DOC - 04/04/2011 - Day 45, Vol. 2 of 4

11

1    Anne Parducci, Elise Cloonan, Carmen Monteagudo, Mina

2    Mirkazemi and Sheila Kyaw; do you recall that?

3    A    I do.

4         MS. KELLER:  If we could have Exhibit 36091.

5    BY MS. KELLER:

6    Q    This document is entitled "QA Draft NHB, QA"

7    abbreviated for version, "Version '02."  Do you recognize

8    this as the NHB talking points?

9    A    Yes, I remember seeing these as talking points, yes.

10        MS. KELLER:  And your Honor, I'd move to admit

11   36091.

12        THE COURT:  Received.

13   BY MS. KELLER:

14   Q    And you see in the top left-hand corner it says,

15   "Privileged and confidential, attorney-client work product,

16   April 23rd, 2004."

17        MS. KELLER:  And your Honor, I am going to be

18   moving to admit specific pages rather than the whole lengthy

19   document.

20        THE COURT:  Okay.

21   BY MS. KELLER:

22   Q    Now, let's look at -- now, the reason this says

23   "Privileged and confidential, attorney-client work product"

24   up in the left-hand corner is because attorneys in the

25   in-house legal department contributed to this, true?

1    A    My understanding is that outside PR firms were retained

2    by counsel, and that's why.  And also, yes, it -- attorneys

3    did contribute to this.

4    Q    I mean, it's not your understanding that PR firms, in

5    general, can produce a document like this and is stamped

6    "Privileged and confidential, attorney-client work product"

7    on it, right?

8    A    Well, it depends on the circumstances.  I see no reason

9    why they couldn't.

10   Q    Do you think a PR firm working on something like this

11   alone would be within its -- would be acting ethically if it

12   stamped "attorney-client privilege" on something it was

13   working on?

14   A    Yes.

15   Q    So even if no attorney is involved, PR firms are within

16   their rights to stamp attorney-client privilege on things

17   they produce for a client?

18            MR. ZELLER:  This is argumentative, at this point.

19            THE COURT:  Overruled.

20            THE WITNESS:  I'm not saying that.  If they have a

21   good basis to put "attorney-client privilege" and it's

22   properly done, then sure, they can do it.

23   BY MS. KELLER:

24   Q    Okay.  Let's turn to 36091, page 31.

25        You've seen this exhibit before, correct?

1    A    I have.

2              MS. KELLER:  Move page 31 into evidence, your

3    Honor.

4              THE COURT:  Received.

5              *(Defendants' Exhibit 36091-31 is received in*

6         *evidence.)*

7    BY MS. KELLER:

8    Q    This has that same privileged, attorney-client work

9    product stamp on it, and it says "General talking points."

10         Now, you saw language like that contained in this

11   document, on this page, around April of 2004, correct?

12   A    I did.

13   Q    And your understanding is that the document was

14   prepared by the corporate communications group, or someone

15   working for them, right?

16   A    Yes.

17   Q    And you, yourself, spoke with them and talked with them

18   about the case, right?

19   A    Yes.  There were several discussions, and I was one of

20   the contributors to the discussion.

21   Q    They had to have information, the corporate

22   communications group and people working with them, they

23   needed information or they couldn't even have come up with

24   these general talking points, right?

25   A    Well, there were discussions that provided PR and

Case 2:04-cv-09049-DOC-RNB   Document 10396   Filed 04/06/11   Page 14 of 132   Page ID #:316067
CV 04-9049-DOC - 04/04/2011 - Day 45, Vol. 2 of 4

14

1    corporate communications with information, yes.

2    Q    Right, they had to have the facts first before they

3    could craft talking points about the facts, right?

4    A    We had to start with some understanding.

5    Q    Of facts, yes?

6    A    Of what happened, sure.

7    Q    Okay.  And you were one of the people who supplied them

8    with the information they needed, right?

9    A    Yes.

10   Q    Now, if we look at -- and the purpose of this was to --

11   to come up with information that could be stated, for

12   example, at a press conference or in a press release, right,

13   about the case?

14   A    I think -- I'm not sure that that's actually the

15   purpose for it, but it was intended to be something that

16   could be addressed to the press, and I don't think this was

17   a press statement of some kind that would end up being a

18   media statement.

19   Q    Well, but the point is Mattel executives, Mr. Eckert

20   included, needed to have talking points to use if the press

21   asked them questions about the case, right?

22              MR. ZELLER:  Lacks foundation.

23              THE COURT:  Overruled.

24   BY MS. KELLER:

25   Q    Correct?

```
 1    A    Well, I'm not sure what Mr. Eckert needed, but these
 2    would be provided, just in case.
 3    Q    They would be made available to him to use, right?
 4              MR. ZELLER:  Foundation.
 5              THE COURT:  Overruled.
 6              THE WITNESS:  Yeah, I don't know what was provided
 7    to Mr. Eckert.
 8    BY MS. KELLER:
 9    Q    Well, you know Mr. Eckert is a spokesman of the company
10    as CEO, right?
11    A    He can speak for the company.
12    Q    He's the public face of the company, right?
13    A    Well, he's not the only one who speaks to the press and
14    other people.
15    Q    I understand that, but ultimately the buck stops with
16    him, doesn't it?
17    A    Well, he's the CEO, so he does speak to people.
18    Q    He's the captain of the ship, right?
19    A    I'm not going to deny that, no.
20    Q    When there are quarterly earnings calls, and he has to
21    talk to analysts and shareholders, he's the guy who does
22    that, right?
23    A    Well, it's him and possibly a couple others, sure.
24    Q    Haven't you seen many documents of that nature where
25    he's talking on the earnings calls, right?
```

1    A    I understand he's talked on the earnings calls, yes.

2    Q    Somebody has to go and testify before Congress about an

3    issue involving Mattel.  Mr. Eckert is generally the person

4    who does that, right?

5    A    Well, that doesn't happen very often, but I know he's

6    done that.

7    Q    If there are meetings with shareholders where

8    shareholders are upset or angry about something, it's

9    Mr. Eckert who goes and addresses them, right?

10   A    Not necessarily, but he has.

11   Q    If something has to be explained to the board of

12   directors, something controversial is going on and somebody

13   has to explain it to the board, it's Mr. Eckert who does

14   that, right?

15   A    I don't know.  I haven't been to a board of directors'

16   meeting.

17   Q    So these talking points were for Mattel executives,

18   including Mr. Eckert, to use if there were press inquiries,

19   right?

20           MR. ZELLER:  Assumes facts, misstates the

21   testimony.

22           THE COURT:  Overruled.

23           THE WITNESS:  I don't know if they were for

24   Mr. Eckert specifically, no.

25

1    BY MS. KELLER:

2    Q    I didn't say that.  I said these were for Mattel

3    executives to use, including Mr. Eckert, if necessary, when

4    dealing with the media, correct?

5    A    It's something that executives could have used, yes.

6    Q    That was the purpose of creating the talking points,

7    true?

8    A    Well, you are asking me for my knowledge.  I was

9    involved in talking with the PR folks, the corporate

10   communication folks at the time.  I did not take the lead on

11   creating these, so you are asking me something that I'm not

12   sure of, but I'm sure that -- that this was for executives

13   to use.

14   Q    That's what I was asking you.  You know what talking

15   points are, right?

16   A    Yes.

17   Q    And you know that they are created for executives to

18   use, right?

19            MR. ZELLER:  I'm going to ask that the comment

20   "that's what I was asking" be struck -- "strucken."

21            THE COURT:  Overruled.

22            MR. ZELLER:  "Stricken," right?

23            *(Laughter.)*

24   BY MS. KELLER:

25   Q    You understand me, correct?

1    A    That talking points are for executives?

2    Q    Have you been instructed to try to take up as much time

3    as possible in your answers in that there is a clock running

4    down?

5    A    Absolutely not.

6    Q    Have you been instructed not to give a "yes" or "no"

7    answer to any question I ask you?

8    A    No.

9    Q    You understand that these talking points were drafted

10   for executives to use in case there were media inquiries

11   about the case, true?

12   A    They were for media inquiries, and I believe the

13   executives, sure, would be included in those who would be

14   speaking to the media.

15   Q    So the answer is "yes"?

16   A    Yes.

17   Q    Yes?

18   A    Yes, it was for executives to use if -- if they were to

19   use them.

20   Q    Now, if we look at page 33 under -- this is under the

21   "General talking points," and it says, "Why now, two

22   reasons."

23        Second paragraph, "After Mr." --

24            (Attorney discussion held off the record.)

25            MS. KELLER:  Oh, I'm sorry, your Honor.  We have

1   to move to admit page 33.

2           THE COURT:  It hasn't gone up on the screen, yet.

3   It's received.

4           (Defendants' Exhibit 36091-33 is received in

5       evidence.)

6   BY MS. KELLER:

7   Q    Okay.  Still under "General talking points," it says --

8   paragraph 3 says, "Why now, two reasons."  And if you look

9   at the second bullet, it says, "After Mr. Bryant left, the

10  design studio suspected that Mr. Bryant may have had a

11  conflict of interest while he was working at Mattel."

12          And you, before these talking points were produced, had

13  already interviewed a number of people from the design

14  center, correct?

15  A    I did.

16  Q    And, in fact, you interviewed Ivy Ross, for example, on

17  several occasions, right?

18  A    I did.

19  Q    Lily Martinez, correct?

20  A    Yes.

21  Q    And this talking point was based on information that

22  you provided, that "After Mr. Bryant left, the design studio

23  suspected that Mr. Bryant may have had a conflict of

24  interest while he was working at Mattel."  So that was based

25  on information that you provided, correct?

1   A    Well, I'm not sure exactly what information the drafter

2   of this document took to create that, but I was part of the

3   discussions, like I said, surrounding the creation of this

4   document.  Other attorneys contributed as well.

5   Q    You were the one who interviewed people in the Mattel

6   design center, right?

7   A    I was one of them, yes.

8   Q    You had a meeting with Rene Pasko on July 8th, 2003,

9   right?

10  A    I did.

11  Q    You had a phone conversation with Julia Jensen on

12  July 8th, 2003, true?

13  A    I did.

14  Q    You had a phone conversation with Lily Martinez on

15  July 18th, 2003, correct?

16  A    I did.

17  Q    You had a meeting with Diane McMillen on July 18th,

18  2003, true?

19  A    That's true.

20  Q    You had either a phone conversation with Ivy Ross or

21  received a voice mail left by her on August 12th, 2003,

22  right?

23  A    Yes.

24  Q    You had a phone conversation with Bernie Malquion on

25  August 15th, 2003, correct?

1    A    I'm guessing those are the dates that I had a
2    conversation with Bernie.
3    Q    You had a meeting with Ivy Ross on August 6th, 2003,
4    correct?
5    A    I think -- I had a meeting with Ivy Ross.  I had a
6    couple of them.  I'm not sure that's the right date.
7    Q    August 6th and August 11th of 2003, right?
8    A    Yes, August 11th, sure.
9    Q    And August 6th?
10   A    Okay.  I'm not remembering the right date, but sure.
11   Q    You had either a phone conversation with her or you
12   received a voice mail message left by her on August 11th,
13   2003, right?
14   A    I believe that's right, yes.
15   Q    You had phone conversations with Raime Quick on
16   July 25th, 2003 and August 15th of 2003, right?
17   A    Yes, I had two conversations with Raime, at least, and
18   those were the dates.
19   Q    So you -- these were all people that you interviewed in
20   the design center in July and up to mid-August of 2003,
21   correct?
22   A    Well, Raime wasn't in the design center, but they were
23   people from the design center, generally.
24   Q    And you knew, as a result of your interviews, that
25   these people were suspicious about Carter Bryant having

1   created Bratz from the very time he left the design center

2   in October of 2000, right?

3   A    No, that's absolutely not true.

4   Q    You knew that people like Jill Norquist, Anne Parducci

5   and others had had long-standing suspicions dating at least

6   from 2001 that Mr. Bratz -- that Mr. Bryant had been

7   involved in some way in the creation of Bratz, correct?

8   A    No, that's -- what I understand -- these suspicions

9   referred to here, you know, I don't know exactly what the

10  drafter meant, but the suspicions that were talked about

11  were mainly and -- and only the -- from the design studio,

12  the suspicions that sometime after Carter Bryant left, and

13  it wasn't immediately, that there was a suspicion that

14  Carter Bryant had lied about where he was going, or when he

15  was leaving Mattel.

16  Q    After Mr. Bryant left, the design studio suspected that

17  Mr. Bryant may have had a conflict of interest while he was

18  working at Mattel.  You knew that from people like Jill

19  Norquist, right?

20  A    At this point, I hadn't spoken with Jill Norquist.

21  Q    Anne Parducci?

22  A    I had not spoken with Anne Parducci.

23  Q    And all of the people that you had interviewed in the

24  design center, correct?

25  A    I hadn't understood -- I'm sorry, what's your question?

1    Q    Let's look back again at 36091.

2    A    Okay.

3    Q    That portion, "After Mr. Bryant left, the design studio

4    suspected that Mr. Bryant may have had a conflict of

5    interest while he was working at Mattel," that information

6    came from you, correct?

7    A    No, I never said anything like this.  The only

8    suspicion that, again, I would spoke -- would speak of is

9    the suspicion that when Carter Bryant left, sometime after

10   he left, people began to suspect that he had lied about

11   where he was going.

12   Q    Well, you certainly were aware that Ivy Ross knew that

13   Mr. Bryant had designed Bratz no later than mid-March 2002,

14   right?

15   A    Well, she had suspected that he had, that's what --

16   Q    Well, she had filed an investigative report with the

17   Mattel security department then, right?

18   A    There was an investigative report at that time.

19   Whether she filed it or not, that's not what I understand.

20   Q    Well, part of your job was to look into this, right?

21   A    (No audible response.)

22   Q    Didn't you look at the investigation logs from your own

23   security department?

24   A    Well, I spoke with Rich de Anda.

25   Q    And you knew that Ivy Ross had filed an investigative

1    report with the Mattel security department saying that she

2    knew that Mr. Bryant had designed Bratz, and you knew that

3    she had done that no later than mid-March of 2002, correct?

4    A    No.  I didn't see the security file until after the

5    lawsuit was filed.  But I did understand that -- that there

6    was an investigation into whether Bratz was a copyright

7    infringement of Toon Teenz.

8    Q    I'm not talking about that issue, whether it was a

9    copyright infringement of Toon Teenz.  I'm asking

10   specifically, you knew that Ivy Ross had made a report to

11   the investigate -- made an investigative report with the

12   Mattel security department no later than mid-March of 2002

13   saying that she believed Mr. Bryant had designed Bratz,

14   right?

15              MR. ZELLER:  I move to strike the preamble.  It's

16   argumentative.

17              THE COURT:  Overruled.

18              THE WITNESS:  No.  In 2003, what I knew or

19   understood from Ivy Ross is that there was an investigation

20   into whether Toon Teenz -- or Bratz infringed Toon Teenz,

21   and that Lily Martinez and Cassidy Park were possibly

22   involved in that, and Ivy only heard this from them.

23   BY MS. KELLER:

24   Q    And you never asked to see your own company's security

25   department's written information; is that true?

```
 1              MR. ZELLER:  This is vague as to time.

 2              THE COURT:  Time, Counsel?

 3    BY MS. KELLER:

 4    Q    When you were doing your investigation in 2003, are you

 5    saying that you never even went down to security to see what

 6    written documentation they had; is that what you are saying?

 7    A    Well, I spoke to Rich de Anda.

 8    Q    Did you ask to see whatever they had in writing?

 9    A    I didn't ask to see whatever they had in writing, but I

10    spoke to Rich de Anda.

11    Q    Did you ask to see what was they had in writing; "yes"

12    or "no"?

13              MR. ZELLER:  This is getting into the substance of

14    a communication.

15              THE COURT:  With de Anda?

16              MR. ZELLER:  Yes.

17              THE COURT:  Overruled.

18              THE WITNESS:  Well --

19    BY MS. KELLER:

20    Q    Did you ask to see what was they had in writing?

21    That's a "yes" or "no."

22    A    I didn't ask to see whatever they had in writing, sure.

23    Q    But you said you did ask to speak to Rich de Anda,

24    right?

25    A    I did.
```

1    Q    And you must be aware that Mr. de Anda also had

2    possession of information that Mr. Bryant had designed

3    Bratz, and that he had that information no later than

4    mid-2002, right?

5    A    Well, he had information that people suspected that

6    Carter Bryant may have created Bratz, but --

7    Q    And you had that information in 2002, right, or he had

8    information that people thought that -- he had the

9    information in 2002, correct?

10   A    Well, there was an investigation filed in 2002 that

11   related to whether Bratz was an infringement -- or Toon

12   Teenz was an infringement of Bratz, but yeah, that file

13   exists.

14   Q    Now, let me move on to a different --

15        (Attorney discussion held off the record.)

16   BY MS. KELLER:

17   Q    Now, I want to turn to the topic of Mr. Villasenor,

18   rather.

19        You personally collected documents from Mr. Villasenor

20   in 2005 and 2006, correct?

21   A    Yes, in 2005.

22   Q    And you turned those over to outside counsel, correct?

23   A    I did.

24   Q    And other than you, yourself, the people involved in

25   collecting documents were outside counsel and Jill Thomas?

1    A    And some paralegals, yes.

2    Q    And you understand that things were done to collect

3    documents from Mr. Villasenor's area, the area where he

4    worked, true?

5    A    That's true.

6    Q    And also from what was considered to be the market

7    intelligence library, correct?

8    A    I didn't know about the market intelligence library at

9    the time, so I didn't know that.

10   Q    Well, you now know that 35 boxes containing material

11   collected from Mr. Villasenor, whether from his work area or

12   not, were transported to an outside law firm's office,

13   correct?

14           MR. ZELLER:  That assumes facts.

15           THE COURT:  Overruled.

16           THE WITNESS:  I understand there were boxes, and I

17   was told there were 35.

18   BY MS. KELLER:

19   Q    And they were removed from Mattel's premises and taken

20   to Mattel's outside counsel, right?

21   A    I -- I don't have an understanding of how exactly it

22   happened, but there are 35 boxes that were outside counsel's

23   firm.

24   Q    Somehow they ended up there, right?

25   A    Yes.

1   Q    And these were never taken back from outside counsel,

2   correct?

3   A    (No audible response.)

4   Q    In other words, you never had outside counsel examine

5   them and then said, okay, now give them back to us so we can

6   put them back where they came from, correct?

7          MR. ZELLER:  The question is vague.

8          THE WITNESS:  I don't know.  Jill Thomas was

9   managing that whole part of the case.

10  BY MS. KELLER:

11  Q    Well, the 35 documents never came back to Mattel, as

12  far as you know, right?

13  A    As far as I know, but I don't -- I wasn't managing that

14  part.

15  Q    Now, as an experienced lawyer for Mattel and an

16  experienced lawyer in general -- how many years have you

17  been a lawyer now?

18  A    Since 1996.

19  Q    Okay.  So 15 years, right?

20  A    Yes, that's the math, I guess.  I just thought about

21  it.

22  Q    And one thing lawyers had to take before they're

23  allowed to sit for the bar exam, they had to -- well, when

24  they sit for the bar exam, they have to take and past

25  something called the "professional responsibility exam,"

1   right?

2   A    Well, there's an ethics component, yes.  I don't know

3   exactly what it's called.

4   Q    And we have to take that test and pass it, right?

5   A    (No audible response.)

6   Q    Professional responsibility?

7   A    Well, yeah, I understand there is an ethical component,

8   sure.

9   Q    It's a separate exam, right?

10  A    Well, it's been 15 years, and I'm not sure exactly what

11  it's called.  I don't remember.

12  Q    It's been 33, and I remember.

13        THE COURT:  Move to strike.  Disregard comment by

14  Counsel.

15  BY MS. KELLER:

16  Q    So one of the things that you know as an attorney is

17  that you're not permitted to directly approach or contact a

18  witness who is already represented by counsel, true?

19  A    I understand that.

20  Q    And there is actually a rule of professional conduct

21  governing that, right?

22  A    I believe that's true, yes.

23  Q    And where you know that somebody is already represented

24  by an attorney, the attorney is supposed to contact the

25  witness through his or her attorney, right?

Case 2:04-cv-09049-DOC-RNB   Document 10396   Filed 04/06/11   Page 30 of 132   Page ID #:316083
CV 04-9049-DOC – 04/04/2011 – Day 45, Vol. 2 of 4

30

1    A    Yes, and that's how I've operated.

2    Q    And you also know that an attorney should not contact a

3    witness who's already represented by counsel to try to

4    suggest that the witness dump that lawyer and get a

5    different one, right?

6    A    In your hypothetical, yes.

7    Q    Well, no, it's not even a hypothetical.  Just as a

8    rule, it would be improper, as a matter of professional

9    responsibility, to contact a witness who is already

10   represented by a lawyer and suggest that that witness fire

11   the first lawyer and get a different one that you want them

12   to get, right?

13          MR. ZELLER:  This is argumentative about

14   "hypothetical" and "rule," that there is some difference.

15          THE COURT:  Overruled.

16   BY MS. KELLER:

17   Q    You know that would be improper to do, right?

18   A    Yes, if I knew somebody was being represented by a

19   lawyer, I wouldn't contact that person.  I would contact the

20   lawyer, being a lawyer myself.

21   Q    And it's actually common knowledge among lawyers that

22   they are not supposed to contact represented people

23   directly, right?

24   A    I would think so, yes.

25   Q    And that would even include somebody who is an

1   employee, if the employee is represented by separate counsel

2   in litigation, you are not supposed to contact that employee

3   first without contacting that person's attorney, right?

4   A    Well, if they were represented, and it was an adverse

5   situation -- if somebody had an attorney for a will and

6   worked at Mattel and that had nothing to do with Mattel,

7   then I certainly can contact the employee, but, you know,

8   otherwise, I'm not sure what you are getting --

9   Q    Well, what I'm getting at is if Mattel is involved in a

10  major lawsuit, and one of Mattel's employees has gotten a

11  lawyer in connection with that major lawsuit, you know you

12  shouldn't be contacting the employee directly, you should go

13  through the lawyer, right?

14  A    Yes.

15  Q    And you know that Margaret Leahy is an important

16  witness in this case, correct?

17  A    Yes, I do.

18  Q    She was the sculptress who made sculpts for the first

19  generation Bratz dolls, rights?

20  A    Yes.

21  Q    And that was before her last sculpt was sent to

22  Hong Kong to be further altered and produced, right?

23           MR. ZELLER:  This is getting into argument.  Lacks

24  foundation.

25           THE COURT:  Overruled.

1    BY MS. KELLER:

2    Q    You know that, right?

3    A    I don't know what Margaret Leahy did.

4    Q    Well, you know that Margaret Leahy's husband, Daniel

5    Leahy, is a Mattel employee, right?

6    A    Yes, I do.

7    Q    And around June 2004, shortly after Mattel sued Carter

8    Bryant in April of 2004, you left a voice mail message for

9    Margaret Leahy on her answering machine, right?

10   A    I did.

11   Q    And you told her you were from Mattel, and you wanted

12   to talk to her about some work, right?

13   A    I left her a voice mail message, and that sounds close

14   to what I said, yes.

15   Q    She called you back, and you told her that Mattel would

16   pay for her to have a lawyer in connection with the Carter

17   Bryant lawsuit, right?

18   A    No, I didn't say that.

19   Q    Did you tell her that Mattel would pay for her to have

20   a lawyer?

21   A    No.  There were two conversations.  In the first

22   conversation I had with Margaret Leahy, I asked her if I

23   could speak to her about Bratz and this issue, and she said,

24   "I'm not sure I'm represented."  I said, "Please find out

25   and let me know."

 1   Q    You told her Mattel would pay for her to have a lawyer,

 2   right?

 3           MR. ZELLER:  Vague as to which conversation, at

 4   this point.

 5           THE COURT:  Overruled.

 6           THE WITNESS:  No, I did not tell her that.

 7   BY MS. KELLER:

 8   Q    Now, after you spoke with her, she retained the firm of

 9   Sidley, Austin, Brown & Wood to represent her, right?

10   A    I learned that.

11   Q    And because you knew that an attorney is not permitted

12   to directly approach or contact a witness who is already

13   represented by counsel, you knew that you were not supposed

14   to approach Margaret Leahy directly, right?

15   A    I didn't learn that she had retained Sidley Austin

16   until several months after I contacted her.

17   Q    You went ahead and contacted her knowing she had

18   counsel, right?

19   A    No, I did not.

20   Q    You offered to pay for her to be represented by another

21   lawyer, right, a different one than the one she had

22   retained?

23   A    No.

24   Q    You then contacted her husband, Daniel Leahy, Mattel

25   employee, to convey the same improper offer, correct?

```
 1              MR. ZELLER:  This is argumentative.  It's

 2   improper.

 3              THE COURT:  Sustained as to improper.

 4              Rephrase the question.

 5   BY MS. KELLER:

 6   Q    After Margaret Leahy said "no," you contacted Daniel

 7   Leahy to convey the same offer through him, right?

 8              MR. ZELLER:  This assumes facts, and it's getting

 9   into the substance of a conversation.

10              THE COURT:  Overruled, Counsel.

11              Answer the question, sir.

12              THE WITNESS:  Margaret Leahy never told me that

13   she had a lawyer or told me that she didn't want to talk to

14   me.

15   BY MS. KELLER:

16   Q    You contacted her husband, and you made disparaging

17   remarks to him about her counsel, right?

18   A    I didn't -- I contacted her husband, Daniel Leahy, when

19   I had no understanding of whether she was represented or

20   not.

21   Q    You repeated Mattel's offer that you would provide and

22   pay for an attorney for her, right?

23   A    No.  I approached Daniel Leahy only because I did not

24   know that Margaret was represented at all, and I still

25   didn't know what he might independently know as an employee
```

1   of Mattel, my company.

2          MS. KELLER:  If we could see Exhibit 18572R.

3   BY MS. KELLER:

4   Q    Do you recognize this as a letter from Sidley Austin to

5   Mattel's outside counsel --

6          MR. ZELLER:  Your Honor, the Court's already ruled

7   on this.  The Court has already ruled on this previously.

8          MS. KELLER:  That was through Leahy, your Honor.

9          THE COURT:  Let me see the document.

10         MR. ZELLER:  And it is hearsay, as well.

11         MS. KELLER:  Similar to the Eve Wagner letter,

12  your Honor, I think you wanted us to defer it to counsel?

13         MR. ZELLER:  There was an actual ruling on this,

14  your Honor.

15         THE COURT:  You can ask him if he's aware of this,

16  Counsel.  Show it to him to see if it will refresh his

17  recollection.  I don't know if I'm going to receive it,

18  though, so I don't put it up on the board yet.

19         THE WITNESS:  I don't remember seeing this letter.

20  BY MS. KELLER:

21  Q    And the letter was -- it specifically mentioned you,

22  right?

23  A    Yes.

24  Q    And it specifically mentioned your contact with

25  Margaret Leahy, right?

1    A    Well, it references me, but I don't think it's accurate

2    at all.

3            THE COURT:  Just a moment.  This is hearsay, and

4    it's not for the truth of the matter asserted.  It's to

5    refresh your recollection, and let's see what his answers

6    are, concerning these questions, okay.

7    BY MS. KELLER:

8    Q    Okay.  You said you recognized the letter, right?

9    A    Yes.

10   Q    And it was dated January 5th, 2005, right?

11   A    Yes.

12   Q    And it's from Sidley Austin, correct?

13   A    Yes.

14   Q    And it is --

15           THE COURT:  Counsel, we're not going to get into

16   the contents of the letter.  You can ask him if this is a

17   correct rendition or not, and if it's not, you can call a

18   witness from Sidney Austin.  If it is, then don't answer the

19   question.

20   BY MS. KELLER:

21   Q    Did you see a letter objecting to your contact with

22   Margaret Leahy when she was represented by counsel?

23           MR. ZELLER:  This is getting into the substance of

24   it.  It's hearsay.

25           THE COURT:  Overruled.

 1              Answer the question, please.

 2              THE WITNESS:  I saw this letter that was telling

 3    me not to have contact with Daniel Leahy.

 4    BY MS. KELLER:

 5    Q    And did this letter also tell you that the firm

 6    represented Margaret Leahy, and that you should be

 7    contacting them and not her, in the first paragraph?

 8    A    Yes.

 9    Q    And that this law firm was also complaining that you

10    had had contact with Margaret Leahy --

11              MR. ZELLER:  Objection.

12              MS. KELLER:  -- right?

13              THE COURT:  Now, this isn't for the truth, okay?

14    BY MS. KELLER:

15    Q    Is that true?

16              THE COURT:  Just a moment.

17              Ladies and gentlemen of the jury, this is not for

18    the truth.  I'll let them ask questions about the letter and

19    about his conduct in relation to it, but it's hearsay.

20              Counsel?

21              THE WITNESS:  Could you repeat the question?

22    BY MS. KELLER:

23    Q    The letter complained that you had had contact with

24    Margaret Leahy even though you had previously been advised

25    by her that she was represented by counsel, that was the

1   complaint in the letter, right?  Looking at the first

2   sentence --

3   A    Yes, that's the complaint in the letter.

4   Q    -- second paragraph.

5   A    I see it.

6   Q    And there was also a complaint about contact with

7   Ms. Leahy's husband to convey the same offer, right?

8   A    Yes, I see that, too.

9   Q    And there were also complaints that you had made

10  disparaging remarks about the law firm, right?

11         MR. ZELLER:  This is, again, just publishing the

12  letter, at this point.

13         THE COURT:  Overruled.

14         THE WITNESS:  Yes.

15  BY MS. KELLER:

16  Q    There were also complaints that you had repeated

17  Mattel's offer to provide Ms. Leahy with a lawyer, right?

18  A    (No audible response.)

19  Q    Looking at the first paragraph?

20  A    I see that, yes.

21  Q    And there were also complaints that those kinds of

22  communications could suggest that Mattel was trying to

23  interfere with a witness' selection of counsel through

24  pressure on a family member who was employed by Mattel,

25  right?  Looking at the last line of the first page.

1    A    Yes, that's right.  These are just allegations made.

2    Q    And --

3              THE COURT:  Ladies and gentlemen -- just a moment.

4              You are to disregard this, Counsel, unless there

5    is a follow-up, question, and the follow-up question has to

6    be did he make these statements or not.  Otherwise, I'm

7    going to strike this entire line of questioning, so -- he

8    has the right to answer this.

9    BY MS. KELLER:

10   Q    And I believe you said that you had had contact with

11   Daniel Leahy, right?

12   A    Yes.

13   Q    And what was Daniel Leahy's job title?

14   A    I don't know exactly, but he worked in audio design in

15   our design center.

16   Q    He didn't work on dolls, right?

17   A    Sometimes audio is in dolls, so yes, I think he did

18   work on --

19   Q    Well, he didn't work on sculpting dolls, right?

20   A    All I knew is he was in audio.  That's what I knew.  I

21   didn't know that he was, at all, a sculptor.

22   Q    He wasn't a doll designer, right?

23   A    Well, he designed audio for dolls, so that's partly a

24   doll designer.

25   Q    He wasn't a doll designer, right?

Case 2:04-cv-09049-DOC-RNB   Document 10396   Filed 04/06/11   Page 40 of 132   Page ID #:316093
CV 04-9049-DOC - 04/04/2011 - Day 45, Vol. 2 of 4

40

1   A    Well, as you're -- as you're -- I don't know how you

2   define "doll designer."  He was designing for dolls.

3   Q    Well, you said all you knew, I thought, was that he

4   was, quote, "in audio," unquote, right?

5   A    Right, and I understand what that department generally

6   does.

7   Q    Audio is involved with a lot of Mattel's toys dolls and

8   non-dolls, right?

9   A    True.

10  Q    And you really don't know if he worked on dolls at all,

11  right, of your personal knowledge, you don't know, true?

12  A    I have a recollection that he does work on dolls.

13  Q    The reason you contacted him was because of his

14  connection with his wife, Margaret Leahy, right?

15  A    The reason that I contacted him is because -- for two

16  reasons:  One, I wanted to know what he independently knew

17  about any of the facts involved in this matter, and

18  secondly, I wanted to know, you know, if his wife was

19  represented or not, because I had not heard.

20  Q    And he told you that she was, right?

21  A    No.

22  Q    No one told you she was represented by counsel?

23          MR. ZELLER:  Objection.  Vague as to time.

24          THE COURT:  Overruled.

25          THE WITNESS:  What Daniel Leahy told me was that

1   he was uncomfortable talking to me.  He didn't want to talk

2   and didn't say anything, and I respected that, and I left

3   him alone, after that point.

4   BY MS. KELLER:

5   Q    Did you interview any of Daniel Leahy's coworkers?

6            MR. ZELLER:  Your Honor, if she's not going to ask

7   the question that the Court directed her to, I move to

8   strike.

9            THE COURT:  Yeah, Counsel, I think if this area is

10  going to be gone into, that the critical question is whether

11  he said any of these things or he conducted himself in this

12  way, and that's, thus far, missing in any follow-up

13  question.  I think you've listened to the fact that he

14  contacted her husband and that there were conversations, but

15  the part that's missing is disparaging remarks.

16           MS. KELLER:  Okay.

17           THE COURT:  And that hasn't been asked directly

18  and --

19           MS. KELLER:  I'll ask --

20           THE COURT:  -- in other words, intent was to

21  interfere with the selection of Counsel.

22  BY MS. KELLER:

23  Q    Okay.  You contacted Margaret Leahy twice, you said,

24  right?

25  A    I did.

1  Q    And you said neither time did she tell you she had

2  counsel, right?

3  A    Well, the first time she said she had a lawyer for

4  another matter, and she wasn't sure whether this particular

5  lawyer represented her on this matter.  I asked her to find

6  out.

7  Q    And she didn't call you back, right?

8  A    She didn't call me back, no.

9  Q    And would you take that to mean that she didn't want to

10 talk to you about it?

11 A    I wasn't sure.  I followed up with her a couple days

12 later.

13 Q    And you told her Mattel would provide her a lawyer,

14 right?

15 A    I asked her, "Do you have a lawyer?"  She still didn't

16 know.

17 Q    And you told her that Mattel will give you one, right?

18 A    I said that "Mattel could provide one if you don't have

19 one."

20 Q    And she said, "No, thank you.  I do not want a lawyer

21 provided by Mattel," right?

22 A    No.  She said she was very uncomfortable, and that

23 ended the conversation.

24 Q    And after she had mentioned she had a lawyer on another

25 matter, and she was really uncomfortable talking to you, you

1   then went to her husband, an employee at Mattel, right?

2   A    About a month later, I approached Daniel Leahy to find

3   out whether Margaret was represented and to find out what he

4   knew independently about the whole matter that we're looking

5   at.

6   Q    And Mr. Leahy told you he didn't want to talk to you,

7   is that what you are telling us?

8   A    He said he felt uncomfortable.  He didn't want to talk.

9   Q    So you made no disparaging remarks about her current

10  attorney to him, without even knowing she had an attorney or

11  not, right?

12  A    I didn't know she had an attorney.

13  Q    And this letter that was sent by Sidley & Austin, did

14  you write a response to it?

15  A    I asked outside counsel to address it.

16  Q    Well, I'm asking about you.  Did you write a letter and

17  say, "I did no such thing.  I have been wrongly accused?"

18  A    I personally did not write a letter back to Sidley &

19  Austin, but I made it clear that this -- the statements made

20  in that letter were completely wrong.

21  Q    Well, the statements made in this letter were serious

22  allegations of professional misconduct, right?

23  A    Well, they would allege misconduct, yes.

24  Q    They are serious, right?  Trying to intimidate a

25  witness, directly contacting a represented party when you

1   know better, those are serious allegations, aren't they?

2   A    I would consider them serious, yes.

3   Q    And so, you know, all of us who are lawyers are always

4   concerned about any aspersions being cast on our

5   professional character, right?

6   A    Absolutely.

7   Q    We don't want complaints to the State Bar flying out

8   that aren't true, right?

9   A    True.  No complaint to the State Bar was ever made.

10  Q    Yeah, but you didn't know that at the time when this

11  letter arrived, you didn't know they weren't going to send

12  it to the State Bar, right?

13  A    I didn't know what they were going to do.

14  Q    Exactly, and you didn't sit down and write a letter

15  yourself saying, "I am outraged.  This never happened.  I

16  would never do such a thing.  I am fully aware of my

17  professional responsibilities, and this is malarkey," or

18  whatever we've called that as lawyers.  I mean, you didn't

19  do that, did you?

20  A    Well, first --

21  Q    Mr. Moore, did you do that?

22          THE COURT:  Just a moment.

23          Finish your answer, sir.

24          THE WITNESS:  First, this letter was not addressed

25  to me, and I didn't personally write a letter back to

Case 2:04-cv-09049-DOC-RNB   Document 10396   Filed 04/06/11   Page 45 of 132   Page ID #:316098
CV 04-9049-DOC – 04/04/2011 – Day 45, Vol. 2 of 4

45

1   Sidley & Austin, but I did ask outside counsel to address

2   it.

3   BY MS. KELLER:

4   Q    The only person who knew what you had or hadn't done

5   was you, not outside counsel, right?

6   A    Outside counsel and I had a conversation about it, so

7   they knew.

8   Q    I'm saying the only person who had personal knowledge

9   of what you did or didn't do was you, right?

10  A    It was me and Daniel Leahy and Margaret Leahy.

11  Q    Right, and they had a different version, apparently, of

12  what happened than you did, right?

13          MR. ZELLER:  Objection.

14          THE COURT:  Overruled.

15          THE WITNESS:  Well, this is a different version,

16  that's for sure.

17  BY MS. KELLER:

18  Q    And outside counsel -- if anybody got disciplined by

19  the State Bar, it wasn't going to be outside counsel, it

20  would be you, right?

21  A    With respect to this?  If --

22  Q    That's right.

23  A    If it was the improper conduct, I would be the one,

24  yes.

25  Q    And so you were the person to sit down and write a

```
 1    letter and say, "None of these things happened.  I deny
 2    this.  This is wrong.  This is an attack on my good
 3    character as a lawyer," and you didn't do that, did you?
 4    A    Well, the way the -- the way the letter was
 5    addressed --
 6    Q    Sir --
 7              THE COURT:  Just a moment.
 8              Finish your answer, sir.
 9              THE WITNESS:  Okay.  Thank you.
10              The letter was addressed to outside counsel, and
11    that's how Sidley & Austin chose to route it, and so I
12    didn't respond.  I asked outside counsel to respond.
13    BY MS. KELLER:
14    Q    Don't you think most attorneys attacked for violating
15    the rules of professional responsibility, knowing that they
16    could even be disciplined for having done what they're
17    accused of, would want to respond in person?
18    A    Well, I certainly wanted a response to this letter,
19    yes, but I don't know if, in person, is the right way to go.
20    Certainly offensive to me.
21    Q    Now, this wasn't the last of your dealings with Daniel
22    Leahy, right?
23    A    I'm not sure what you mean.
24              MR. ZELLER:  Your Honor, she still hasn't asked
25    those questions, and we certainly said even the allegations
```

1   she did ask about were -- were untrue.  I ask that the

2   motion to strike be granted.

3           THE COURT:  Sustained, Counsel.  Those questions

4   have now been asked.

5           MS. KELLER:  What question is it that counsel

6   believes I should ask?

7           THE COURT:  That's the end of it.

8           Now, ask your next question.

9   BY MS. KELLER:

10  Q    You are basically saying all of the allegations against

11  you in this letter are false, right?

12  A    Yes.

13  Q    You never improperly suggested to Margaret Leahy that

14  she should get another lawyer provided by Mattel, right?

15  A    That's right.

16  Q    You never made any disparaging remarks when you

17  contacted her husband about her current counsel because you

18  didn't even know she had a lawyer, right?

19  A    That's right.

20  Q    And you never intended for a moment to interfere with

21  her selection of counsel, right?

22  A    When I spoke to Daniel Leahy and he said he was

23  uncomfortable, I didn't approach him again about the

24  subject.

25  Q    And by the same token, you never sat down and wrote a

1   letter saying, "I hotly deny these allegations, they're

2   lies."

3   A    As I said, I didn't write a letter.  I asked outside

4   counsel to respond.

5   Q    Now, this wasn't the last of your dealings with Daniel

6   Leahy, was it?

7   A    On this particular subject, it was.

8   Q    If we go to Exhibit 37006, page 14, and we go to the

9   e-mail at the bottom of the page.  This is from you to

10   Richard de Anda dated September 9th, 2007, right?

11   A    I see that, yes.

12        MS. KELLER:  Your Honor, I move to admit 37006.

13        THE COURT:  Received.

14        *(Defendants' Exhibit No. 37006 is received in*

15     *evidence.)*

16        MR. ZELLER:  Your Honor, just a moment.  It's not

17   in our binder.

18        THE COURT:  Well, lately a few things haven't been

19   in each other's binders.

20        MR. ZELLER:  This may be privilege.  If this is

21   communication --

22        THE COURT:  Can I see this document for just a

23   moment?

24        Stop the time clock for me, Jane, for just a

25   moment.

Case 2:04-cv-09049-DOC-RNB   Document 10396   Filed 04/06/11   Page 49 of 132   Page ID #:316102
CV 04-9049-DOC - 04/04/2011 - Day 45, Vol. 2 of 4

49

```
 1              MS. KELLER:  Your Honor, this was --

 2              THE COURT:  Just a minute.  I don't need a

 3    conversation.

 4              Who is Jaime Elias?

 5              MS. KELLER:  An investigator.

 6              MR. ZELLER:  These are Mattel personnel.  These

 7    are privileged, your Honor.

 8              THE COURT:  No, it's not.  Overruled.

 9    BY MS. KELLER:

10    Q    If you look at the bottom of the page where it says,

11    "From Michael Moore to Rich de Anda.  Subject:  MGA Bryant

12    Case, Sheila Kyaw," and then it says, "Confidential and

13    privileged.  Hi Rich" --

14              THE COURT:  Well, just a moment.  Take that down

15    for just a minute.

16              Ladies and gentlemen, let me discuss this with

17    counsel.  I want to be cautious for just a moment.  We'll

18    come back and get you in just a moment.

19              (The following proceedings is taken outside

20         the presence of the jury.)

21              THE COURT:  Sir, if you'd please wait outside for

22    just a moment.  Thank you for your courtesy.

23              All right.  The jury isn't present.

24              At the bottom of this page, this is what's

25    concerning me.  It seems like an investigative task.  Is
```

CV 04-9049-DOC - 04/04/2011 - Day 45, Vol. 2 of 4

50

1    this a work product privilege or an attorney-client

2    privilege that you are claiming?

3            MR. ZELLER:  It is both, your Honor, at this

4    juncture, in 2007.

5            MS. KELLER:  Your Honor, that objection was

6    previously made.  The Court ordered these documents produced

7    as part of the investigation documents, and when the Court

8    ordered them produced, it seems, at least to us, implicit

9    that the Court made a finding that they were not privileged

10   because they were produced to us in the same way that many

11   documents that we had claimed privilege on have been

12   produced to the other side and used in this trial.

13           THE COURT:  All right.  Counsel, why don't each of

14   you go use the restroom in just a moment.  I'll come back

15   and get you in about 15 minutes, okay?

16           Thank you.  Let me read this.

17           We are in recess.

18           MS. KELLER:  And your Honor, there's another

19   one --

20           (Interruption in the proceedings.)

21           MS. KELLER:  It's 37006, page 12 and 13 --

22           THE COURT:  Okay.  37006, page 12.  Let me have

23   that document also.

24           MS. KELLER:  37006-00012 and -13.

25           THE COURT:  Hand it to me.

1            Counsel, you'll meet me in 10 minutes.

2            (Recess.)

3            (The following proceedings is taken outside

4       the presence of the jury.)

5            THE COURT:  All right.  We are back on the record.

6  All parties are present.

7            Mattel has raised both an attorney-client

8  privilege and work product objection to 37006-0012, -13 and

9  -14 and -15.  Both objections were overruled in this Court's

10  order compelling the production of these documents.  These

11  documents merely reference communication from Mattel's legal

12  department to Mattel's security department that direct that

13  certain computer hard drives be imagined in connection with

14  Mattel's litigation with Carter Bryant.  This was ordered to

15  be turned over by this Court a substantial period of time

16  ago.

17            Mattel previously argued to remind all counsel for

18  both MGA and Mattel in the context of the Larian e-mail to

19  Craig Holden that mere directions from a client to an

20  attorney, or vice versa, are not privileged because they are

21  not connected with the rendering of legal advice.

22            Mattel was not only correct in their motion, as

23  the Court ruled in their favor in those circumstances, but

24  Mattel is also now estopped from arguing to the contrary in

25  the same set of circumstances.  Moreover, these are not

Case 2:04-cv-09049-DOC-RNB   Document 10396   Filed 04/06/11   Page 52 of 132   Page ID #:316105
CV 04-9049-DOC – 04/04/2011 – Day 45, Vol. 2 of 4

52

1    protected by the Work Product Doctrine, as I previously

2    found when I ordered their production, because they do not

3    reflect an attorney's mental processes or understandings.

4              Even if they were, which they are not, the

5    Substantial Need Doctrine would, nonetheless, apply because

6    these e-mails demonstrate the extent of Mattel's

7    investigation and the individuals investigated, and they

8    also have the potential to impeach the notion that Mattel

9    did not pursue Ms. Leahy's husband.  Now, I previously made

10   those rulings, and they were quite clear when I ordered

11   their production, so that catches me a little by surprise.

12   I'm going to bring the jury back in session.

13             MR. ZELLER:  Can I also --

14             THE COURT:  I'll pay you courtesy, Mr. Zeller,

15   but --

16             MR. ZELLER:  I just simply want to point out, your

17   Honor, that this is an e-mail exchange from 2007.  It's well

18   after the lawsuit is filed.  It's going to get us into

19   preservation issues.  I mean, that's obviously where I'm

20   going to have to go with this because that's what this is

21   about.  It's not about Leahy.  This is not contact with

22   Leahy, which is, by the way, what MGA's counsel represented

23   this document shows, and that's not true.  What it shows is

24   it's a direction to security to go and image hard drives,

25   which is being done for preservation.  So this is not

1     relevant to the issue that's at hand, here, and, you know --

2     and so it's not relevant to certainly the investigation or

3     statute of limitations.  This is after the suit.

4              THE COURT:  I think we have developed a pattern of

5     what you are going to do.  I think we've had this discussion

6     before, haven't we, about what you are going to do?

7              MR. ZELLER:  No, your Honor --

8              THE COURT:  You are going to follow my directions

9     and rulings for both parties; is that understood?

10             MR. ZELLER:  Of course, but my point is --

11             THE COURT:  It sounds a little presumptuous on

12    your part about what you are going to do.

13             MR. ZELLER:  I apologize.  I misphrased it, your

14    Honor, but --

15             THE COURT:  You didn't misphrase it, but it's

16    repeated.

17             MR. ZELLER:  My point simply is is that that's

18    where the logical --

19             THE COURT:  It may after we have a discussion.

20             MR. ZELLER:  It's just simply to point out that

21    this is irrelevant, it causes confusion, prejudice and it

22    wastes time.  I apologize for phrasing it the way I did

23    because I'm not being presumptuous.  I obviously know that

24    the Court will allow me or not allow me to ask questions.

25    I'm just saying that this will get us -- if the Court allows

 1    it --

 2              THE COURT:  We'll have a discussion about that, as

 3    we have with all of these issues.  But right now, I

 4    previously made this ruling.  It's why it was produced, and

 5    I took the time to go through this hearing with you, sent

 6    out a written order in this regard, spent numerous hours

 7    with this.  So it's overruled.

 8              Now, if you are going to go into that area, once

 9    again, I'll pay you the courtesy of listening where we are

10    going, but I am getting a little frustrated with both

11    parties about presuming what they are going to do.

12              *(The following proceedings is taken in the*

13         *presence of the jury.)*

14              THE COURT:  We are back on the record.  Mr. Moore

15    is seated, once again.

16              And Counsel, if you'd like to continue with your

17    examination, please.

18              MS. KELLER:  Yes.

19              **MICHAEL MOORE, DEFENSE WITNESS, RESUMED**

20                   **DIRECT EXAMINATION (Continued)**

21    BY MS. KELLER:

22    Q    Showing you Exhibit 37006 --

23    A    Okay.

24              MS. KELLER:  And your Honor, I move to admit that.

25              THE COURT:  Received.

1   BY MS. KELLER:

2   Q    If you'll look at the bottom of the page, it's dated

3   September 9th, 2007, from you to Richard de Anda, subject is

4   MGA Bryant case, Sheila Kyaw.  Under that it says

5   "Confidential and privileged."

6        "Hi Rich," is it Jaime?

7   A    Yes.

8   Q    "In connection with the Bryant litigation, we'd like to

9   have Sheila Kyaw's computer imaged remotely.  Are you able

10  to assist with this," and then on the next page it says,

11  "many thanks again," and you are the person signing it,

12  right?

13  A    Yes.

14  Q    So this is seven years after Mr. Bryant had left

15  Mattel, right?

16  A    Yes, that's right, just about.

17  Q    And this is the person who was -- who had done face

18  painting on a dummy doll for him, for Carter Bryant?

19  A    She had done some face painting for him, yes.

20  Q    And so you are asking security to copy her hard drive

21  and do it remotely.  In other words, she wouldn't know,

22  right?

23  A    Well, she -- she might know.  I can't remember if I

24  told her or not, but it was mainly for convenience purposes.

25  Because otherwise, the computer would have to be removed

 1    from her desk.

 2    Q    Well, did you speak with counsel at the break?

 3    A    No.

 4    Q    Let's look at the next --

 5    A    About my testimony, no.

 6    Q    Let's look at 37006-12, and do you recognize this as an

 7    e-mail on which you were copied September 18th, 2007, and

 8    then an e-mail at the top, which you are replying the same

 9    day?

10    A    Yes, I see that.

11              MS. KELLER:  Your Honor, I move to admit 37006-12.

12              THE COURT:  Received.

13              *(Defendants' Exhibit No. 37006-12 is received*

14         *in evidence.)*

15    BY MS. KELLER:

16    Q    And if you look at the bottom e-mail, it is from Adelle

17    Jones to Yeira Fierro, it looks like, cc Michael Moore.

18    "Subject:  NHB computer images.  Importance:  High.

19    Sensitivity:  Confidential."  And it says, "Mattel

20    confidential information."

21        "Yeira, can you please image the following computers

22    and advise when they are complete.  Daniel Leahy, Leahydan,

23    Sheila Kyaw, kyawshel," or I can't tell.

24        And then if we look at the top, you are forwarding it

25    to Jaime Elias and just saying, "FYI."  And it's also got

1   the same forward NHB in the subject line, "NHB computer

2   images."

3        And Mr. Elias works with Rich de Anda, right?

4   A    He does.

5   Q    So again, seven years after the fact, after Mr. Bryant

6   has left Mattel, you are copying Mr. Leahy's and Ms. Kyaw's

7   hard drives, right?

8   A    Yes, we're imagining the hard drives of these

9   individuals, that's correct, in connection with our overall

10  obligations to preserve evidence.

11  Q    And that would include all his e-mails, right?

12  A    Not necessarily, no.

13  Q    Any that he saved, right?

14  A    If they were on his computer, they would be included,

15  yes.

16  Q    Including onces with his wife, right?

17  A    Again, if it was on his computer -- whatever was on his

18  computer was imaged.

19  Q    And you didn't have any information that Daniel Leahy

20  had done anything wrong, right?

21  A    No, I didn't know that he had done anything.

22  Q    And in fact, you had no information, whatsoever, to

23  suggest that Daniel Leahy had done anything wrong, correct?

24  A    No.  I thought he might have relevant information or

25  that, you know, to satisfy our obligations to preserve

1   evidence, that we would -- it would be smart to image all

2   the computers that we needed to.  We imaged hundreds of

3   computers.

4   Q    To satisfy your obligation to preserve evidence, so it

5   wasn't that you wanted to spy him, right?

6   A    Absolutely not.

7   Q    You were preserving evidence for this case, right?

8   A    Yes.

9   Q    So you could turn it over in a timely manner, right?

10  A    We were preserving documents.

11  Q    Daniel Leahy had done nothing wrong as of

12  September 18th, 2007, from any investigation that you had

13  done, am I right?

14  A    I was unaware of whether he did anything wrong.

15  Q    You had no evidence, zero evidence, that Daniel Leahy

16  had done anything wrong, correct?

17           MR. ZELLER:  This is argumentative.

18           THE COURT:  Sustained.

19  BY MS. KELLER:

20  Q    You decided to image his hard drive just because you

21  could, right?

22  A    No.

23  Q    Because Mattel has the capability to look at the

24  complete hard drive of any employee at Mattel at any time,

25  right?

```
 1              MR. ZELLER:  Assumes facts.

 2              THE COURT:  Well, just a moment.

 3              MS. KELLER:  I'll rephrase it, your Honor.

 4              THE COURT:  Yeah.

 5    BY MS. KELLER:

 6    Q    Your investigation department can access any computer

 7    at Mattel on Mattel's system remotely at any time, right?

 8              MR. ZELLER:  Vague as to time.

 9              THE COURT:  From what years, Counsel?

10              MS. KELLER:  From 2000 to 2010, or even to today.

11              THE COURT:  You can answer that question.

12    BY MS. KELLER:

13    Q    Right?

14    A    No, not from 2000.  In fact, the ability to image a

15    computer remotely really only became available around 2007.

16    Q    Okay.  If you wanted to take a computer hard drive,

17    say, at night when an employee wasn't there and copy it, you

18    could do that in 2000, right?

19    A    Well, I don't know.  Probably, if the technology was

20    available.

21    Q    Well, you know it was, right?

22    A    In 2000?

23    Q    Yep.

24    A    No, I did not know it was.

25    Q    You had a very sophisticated electronic monitoring
```

1    program at Mattel even in 2000, right?

2    A     I was unaware of that at all.

3    Q     Well, for example, you could monitor every incoming and

4    outgoing telephone call from every extension at Mattel?

5              THE COURT:  What time?

6              MS. KELLER:  In 2000.

7              MR. ZELLER:  Assumes facts.

8              THE COURT:  Overruled.

9              THE WITNESS:  With respect to telephone calls,

10   they were logged, but the log was very rudimentary, crude in

11   terms of what information it would collect.  For example, it

12   didn't collect caller ID type of information.

13   BY MS. KELLER:

14   Q     It gave you the incoming phone number, right?

15             THE COURT:  Excuse me, this is in the year 2000,

16   right?

17             MS. KELLER:  Yes.

18             THE COURT:  Is this the conversation going on

19   between the two of you?

20             MS. KELLER:  Yes.

21             THE COURT:  The year 2000.

22             THE WITNESS:  Yes.  As far as I am aware, and I've

23   spoken to IT people about this, in 2000, there was an

24   ability to understand what calls were being made out but not

25   what calls were being received in, and it's very, again,

Case 2:04-cv-09049-DOC-RNB   Document 10396   Filed 04/06/11   Page 61 of 132   Page ID #:316114
CV 04-9049-DOC - 04/04/2011 - Day 45, Vol. 2 of 4

61

1    rudimentary.  Maybe that's not the right word, but in terms

2    of what information was collected by the log, it would be

3    extension, it would be duration of call, and that's about

4    it.

5    BY MS. KELLER:

6    Q    Phone number, it was phone number called?

7    A    That's true.

8    Q    And you know, in fact, that you went back, you, Mattel,

9    went back and collected all Carter Bryant's phone logs for

10   the year 2000, all the ones except October, right?

11             MR. ZELLER:  Question is vague as to time.

12             THE COURT:  Overruled.

13             THE WITNESS:  Yeah, I went to go preserve all the

14   logs that related to Carter Bryant.

15   BY MS. KELLER:

16   Q    And you knew that even then, in the year 2000, you

17   could copy a hard drive, right?

18             MR. ZELLER:  Still vague as to time.

19             THE COURT:  Overruled.

20             THE WITNESS:  I joined Mattel in December of 2000,

21   so I don't know what Mattel could do during that year.

22   BY MS. KELLER:

23   Q    You know that Mattel has very powerful technical and IT

24   capabilities, right?

25             THE COURT:  Time period again, Counsel?

1    BY MS. KELLER:

2    Q    Whole period, from 2000 to 2011, Mattel has had very

3    powerful IT capabilities, right?

4                MR. ZELLER:  The question is vague.

5                THE COURT:  Do you understand the question, sir?

6                THE WITNESS:  Not really, your Honor.

7                THE COURT:  Reask it.

8    BY MS. KELLER:

9    Q    Mattel has had state of the art IT capabilities from

10   2000 to 2011, right?

11               MR. ZELLER:  Still vague.

12               THE COURT:  I'm sorry?

13               MR. ZELLER:  Still vague.  It's not tied to

14   anything.  It's just --

15               THE COURT:  Yeah, are we talking about telephone,

16   computer imaging?  What are we talking about?

17               Sustained.

18   BY MS. KELLER:

19   Q    You know that Mattel has a really well-trained security

20   department, right?

21   A    Well, I know they are trained, yes.

22   Q    Well, you know that most of them are ex police

23   officers, right?

24   A    A few of them are.

25   Q    And some of them are ex detectives, right?

1    A    Yes.

2    Q    And some of them are ex head detectors, right?

3    A    Rich de Anda was head of organization in the police

4    department, yes.

5    Q    And you know that they also hire outside investigation

6    firms, right?

7    A    That Mattel's investigative team that hires outside

8    investigative firms?

9    Q    Yes.

10   A    Uh-huh, yes.

11   Q    And in fact, anytime something is seen as being beyond

12   the capability of the in-house investigators, Mattel has the

13   resources to hire an outside investigation agency, right?

14   A    We've hired outside forensic investigators, if that's

15   what you mean.

16   Q    You have hired outside forensic investigators to do

17   things like figure out when a particular type of ink was

18   used, right?

19   A    Yeah, outside counsel has done that, sure.

20   Q    You've had -- your in-house investigators have hired

21   outside investigators to have people followed and

22   videotaped, right?

23   A    Well, I'm unaware of any specifics about that.

24   Q    You know that you have -- that your in-house

25   investigators have hired outside people who have them

1   followed and videotaped, right; you know that?

2   A    Yeah, I understand there's been some videotaping done

3   of people.

4   Q    Any -- for -- even if it's -- even if there's no

5   evidence a person has done anything wrong, correct?

6            MR. ZELLER:  This is argumentative.

7            THE COURT:  Sustained.

8   BY MS. KELLER:

9   Q    The bottom line, Mr. Moore, is that you know that if

10  Mattel wants to do a thorough investigation of anyone,

11  Mattel has the resource to get it done, right?

12  A    Well, we can conduct an investigation, sure.

13  Q    You have the resources to get the best quality

14  investigation just about that you are going to see in any

15  corporation in this country done, right?

16  A    Well, I think we do a pretty good job investigating.

17  Q    You pride yourself on that, right?

18  A    Personally?

19  Q    You, Mattel.

20  A    I'm fairly humble, but Mattel, I don't know what Mattel

21  prides itself on.  That's not -- it's a business.

22  Q    You, Mattel, pride yourself on keeping your trade

23  secrets secret, right?

24            MR. ZELLER:  Question is vague as to Mattel.

25            THE COURT:  Sustained.

 1    BY MS. KELLER:

 2    Q    You pride yourself on the degree of security employed

 3    at Mattel, right?

 4              THE COURT:  And that's an individual question to

 5    you.

 6              THE WITNESS:  Okay.  I think our security is

 7    pretty tight.

 8              MS. KELLER:  Nothing further.

 9              THE COURT:  Now, cross-examination.

10              This is Mr. Zeller on behalf of Mattel.

11              MS. KELLER:  Your Honor, I'm sorry, I have one

12    last -- I just have one last thing I forgot to ask.

13              THE COURT:  Mr. Zeller, do you mind?

14              MR. ZELLER:  No problem.

15    BY MS. KELLER:

16    Q    Mr. Moore, I want to show you trial Exhibit 11342.

17         Do you have the document?

18    A    Yes.  I have a registration, it looks like.

19    Q    And do you recognize this as a Certificate of

20    Registration from the United States Patent and Trademark

21    Office?

22    A    I do.

23    Q    Please turn to page 3.

24    A    I'm there.

25    Q    Do you recognize that as a trademark registration for

1   the Bratz name and design?

2   A    I do.

3   Q    And do you see that this is -- the owner listed in the

4   left column is MGA Entertainment?

5   A    Yes.

6   Q    And then below it says, "By assignment, change of name,

7   Lovins, Inc."?

8   A    Yes.

9         MS. KELLER:  Your Honor, I would move to admit

10   11342.

11        THE COURT:  Received.

12        MR. ZELLER:  No foundation with this witness.

13        THE COURT:  Well, does it have an official stamp

14   on it?  I don't have it in front of me.

15        MS. KELLER:  It does.

16        THE COURT:  Why don't you show it to Mr. Zeller.

17        Is there a certification on it?

18        MR. ZELLER:  Well, no.  This is not an actual

19   certified -- it's a photocopy.  I don't know where the

20   original certification is.

21        THE COURT:  All right.

22        MS. KELLER:  We will get a certified copy, your

23   Honor.

24        THE COURT:  I'll take it subject to a motion to

25   strike, but we'll need an authenticated copy.

1          MS. KELLER:  We'll get a certified copy, your

2    Honor, but subject to that, it's admitted.

3          THE COURT:  All right.  Thank you.

4          MS. KELLER:  Thank you.

5          *(Defendants' Exhibit No. 11342 is received in*

6      *evidence.)*

7          THE COURT:  Now, Mr. Zeller, cross-examination,

8    please.

9                    **CROSS-EXAMINATION**

10   BY MR. ZELLER:

11   Q    If you'd please take a look at Exhibit 1C.

12         MR. ZELLER:  Actually, we need Ms. Juarez.

13         There you are.  Thank you.

14         This is Exhibit 1C.  It's in evidence, your Honor.

15         THE COURT:  Thank you.

16   BY MR. ZELLER:

17   Q    And this is a Wall Street Journal article from

18   July 18th, 2003?

19   A    Yes.

20   Q    In redacted form, obviously.

21   A    Yes.

22   Q    And if you'd take a look at the next page.  If we can

23   look at that text.

24        And you see here that it says, in substance, in the

25   first part that MGA stated that Carter Bryant was the

1    designer of the Bratz dolls; do you see that part?

2    A    I'm sorry, am I looking at page 2?

3    Q    Yes.

4    A    Yes, it says MGA says Bratz was designed by Carter

5    Bryant.

6    Q    Now, as far as you know, was that the first time that

7    MGA ever said publicly in any kind of mainstream media that

8    Carter Bryant was, in fact, the creator of Bratz?

9            MS. KELLER:  Objection.  No foundation.

10           THE COURT:  Overruled.

11           THE WITNESS:  Yes, this is the first time.

12   BY MR. ZELLER:

13   Q    Well, as a matter of fact, I mean, you had in the

14   aftermath of this Wall Street Journal article, you did do an

15   investigation to try and see what information you could find

16   out about Carter Bryant publicly, right?

17   A    Yes.

18   Q    And so you looked at other publications, you looked at

19   other documents that were available publicly to see if you

20   could find information that was earlier dated that was

21   publicly disclosed about Carter Bryant?

22   A    Yes.

23   Q    And -- and so then this is the first time you recall in

24   those publications seeing, as a matter of public record, MGA

25   actually saying that Carter Bryant was the designer of

Case 2:04-cv-09049-DOC-RNB  Document 10396  Filed 04/06/11  Page 69 of 132  Page ID #:316122
CV 04-9049-DOC - 04/04/2011 - Day 45, Vol. 2 of 4

69

1   Bratz?

2   A    Yes, this is the first time.

3   Q    All right.  And then you'll see that there is some

4   additional information in this article, which ends with a

5   quote from Mr. Larian or a statement attributed to

6   Mr. Larian where he says that the Bratz dolls came to his

7   attention as a result of a sort of fashion doll contest in

8   late 1999?

9   A    Yes, I see that.

10          MS. KELLER:  I'm going to object to the

11  characterization of that as being a quote.  Move to strike

12  that.

13          THE COURT:  Just a moment.

14          MR. ZELLER:  I said it was attributed to him as a

15  statement.

16          THE COURT:  Overruled.

17          THE WITNESS:  Yes, I see that.

18  BY MR. ZELLER:

19  Q    All right.  And when you first saw this, was there some

20  significance to you about that 1999 date?

21  A    There was.

22  Q    And what was that?

23  A    Well, I understood that Larian, who is claiming, it

24  seems here, to say the Bratz designs in 1999 -- well, the

25  significance really is that Carter Bryant was working for

1    Mattel in 1999.

2    Q    And you'll see there, also, in the article that there's

3    a reference to a similar Mattel project; do you see that

4    reference?

5    A    (No audible response.)

6    Q    This is still in the redacted.  It's in the text that

7    you have in front of you.

8    A    Yes.

9    Q    And did you have an understanding as to what that

10   project of Mattel was that was referenced here?

11   A    I understood this to refer to the Toon Teenz project.

12   Q    Now, in this time period of July of 2003 --

13        MS. KELLER:  Objection.  Move to strike as without

14   foundation.

15        THE COURT:  Is this -- Counsel, reask the

16   question.  Is this his personal belief that he believed this

17   pertained to Toon Teenz and not Bratz?  In other words, just

18   reask the question.

19        MR. ZELLER:  Yes, sir.

20   BY MR. ZELLER:

21   Q    You'll see that there are a couple of different

22   references here.  One is about Bratz, and the -- it also

23   refers there to a project that was internal to Mattel; do

24   you see that part?

25        MS. KELLER:  Your Honor, we are objecting to

1    misstatements of the article.

2              THE COURT:  I'm going to sustain the objection,

3    Counsel, but if there is any part of the redacted article,

4    we can open that back up.

5              MR. ZELLER:  Well --

6    BY MR. ZELLER:

7    Q    Let me try and ask this instead.  Was this -- during

8    this July of 2003 time period, was this the only public

9    information that you understood had come from MGA about the

10   origins of Bratz?

11             MS. KELLER:  Objection, again, your Honor.  No

12   foundation.

13             THE WITNESS:  In July of --

14             THE COURT:  No, overruled.

15             You can answer.  This is, you know, your memory of

16   what occurred, so you may answer.

17   BY MR. ZELLER:

18   Q    Apart from the Wall Street Journal article.

19   A    Right, there were other articles that referenced the

20   origins of Bratz after this.

21   Q    In about the same time period of July of 2003?

22   A    Yes.

23   Q    If you would please take a look at Exhibit 631R.

24   A    Okay.

25   Q    And do you recognize this as a redacted version of a

1    BusinessWeek article with a cover date of July 28th, 2003?

2    A    I do.

3         MS. KELLER:  Your Honor, I believe the Court has

4    excluded this article already.

5         THE COURT:  I did, Counsel, but if, in fact, he

6    had -- can reference this article, and this is something

7    that he personally read and relied upon --

8         MR. ZELLER:  It goes to state of mind, your Honor.

9         THE COURT:  - then I'm going to open this area up,

10   Counsel.

11        MR. ZELLER:  Thank you.

12   BY MR. ZELLER:

13   Q    So if you could --

14        MR. ZELLER:  I would move -- there is a redacted

15   version of this, your Honor, but with the salient parts, I

16   would move into evidence, your Honor?

17        MS. KELLER:  There is no deposition of this

18   reporter.

19        THE COURT:  I understand that.

20        MS. KELLER:  And --

21        THE COURT:  I'll take this up after -- just a

22   moment.  I'll take this up after court, but you can ask him

23   about this article, okay?

24   BY MR. ZELLER:

25   Q    Focusing your attention on this BusinessWeek article

1   with the cover date of July 28th, 2003, that's something you

2   read in the July of 2003 time period?

3   A    Oh, yes.

4   Q    And what -- what information was stated and if it came

5   to your attention that bore on this investigation you were

6   doing about what the origins of Bratz were?

7         MS. KELLER:  Objection.  Hearsay, and his state of

8   mind is irrelevant.

9         THE COURT:  Now, remember that this is hearsay.

10  We have a newspaper article that's being written by

11  somebody, so it's not for the truth of the matter, but I'm

12  going to let it come in, or at least these lines of

13  questions concerning his conduct and what his state of mind

14  is.

15        Overruled, Counsel.

16        You can answer the question, sir.

17        THE WITNESS:  Okay.  When I read this article, I

18  read that Isaac Larian got the idea for Bratz from his kids,

19  and that confused me at that time in terms of the origins of

20  Bratz, if -- you know, vis-a-vis, the -- in relation to the

21  Wall Street Journal article.

22  BY MR. ZELLER:

23  Q    And was it your understanding from reading the article

24  that Mr. Larian was actually interviewed for the article?

25  A    Yes.

1   Q    And if you could, please, tell us who the author was of

2   that BusinessWeek article.

3   A    The author is Christopher Palmeri.  That's right,

4   Christopher Palmeri.

5   Q    I'd like to direct your attention to Exhibit 24862 and

6   24861.

7        Let's start with 24861, do you recognize what this is?

8              MR. ZELLER:  Oh, you don't have it up there?

9              Okay.  We'll come back to that, then, when we get

10  the documents up there.

11  BY MR. ZELLER:

12  Q    I'll try this, Exhibit 15987.

13       And by the way, before we get into that, you are

14  obviously a lawyer.  Is it your understanding that Mattel

15  could have sued Carter Bryant or MGA based on the

16  allegations of the Wall Street Journal article?

17  A    No, we couldn't have filed a claim based on the Wall

18  Street Journal article.

19  Q    As a lawyer, was it your understanding that Mattel

20  could file a lawsuit against Carter Bryant or MGA based on

21  an anonymous letter?

22             MS. KELLER:  Objection.  Calls for an opinion

23  without any foundation.

24             THE COURT:  He can -- he can state his personal

25  opinion in this matter, but remember, it's his personal

 1    opinion, okay, when a lawsuit can be filed or not.

 2             I'll allow limited inquiry, Counsel.

 3             THE WITNESS:  Yeah, I wouldn't file a lawsuit just

 4    based on an anonymous letter.

 5    BY MR. ZELLER:

 6    Q    And why is that?

 7    A    Well, it's an anonymous letter without any supporting

 8    evidence or any hard facts about who wrote the letter, and

 9    there would be no understanding of really what the letter

10    meant without knowing who wrote it.

11    Q    And you understand, generally, including from this

12    proceeding, that what's admissible in court is evidence,

13    right?

14    A    Yes.

15    Q    Not some accusation in a newspaper article or an

16    anonymous letter as proving facts, right?

17    A    Yes.

18    Q    If you could, please take a look at Exhibit 15987.

19             MS. KELLER:  Objection, your Honor.  The Court has

20    previously excluded this.

21             THE COURT:  I have, but you can refer to it.

22             Is this an article?

23             MS. KELLER:  No.

24             THE COURT:  Let me see it for just a moment.

25             MR. ZELLER:  I don't think that it's correct that

Case 2:04-cv-09049-DOC-RNB   Document 10396   Filed 04/06/11   Page 76 of 132   Page ID #:316129
CV 04-9049-DOC – 04/04/2011 – Day 45, Vol. 2 of 4

76

1    the Court has excluded it.

2            THE COURT:  Stop the clock for just a moment.

3            Sustained.

4            MR. ZELLER:  Your Honor, this goes to note the

5    course of conduct.  This is how he found out.

6            THE COURT:  Let me see that one more time.

7            Just keep the clock stopped, Jane.

8            MR. ZELLER:  I mean, we are talking about state of

9    mind at this point.

10           THE COURT:  Counsel.

11           Counsel, certain parts of this letter is

12   appropriate concerning knowledge about when you found out,

13   overruled.

14           That pertains to that, Counsel.

15           MR. ZELLER:  Right, I won't obviously go into all

16   of it --

17           THE COURT:  Counsel, that pertains to the article.

18   I'm allowing it.

19           MR. ZELLER:  Okay.

20   BY MR. ZELLER:

21   Q    If you'd please take a look at Exhibit 15987.  Do you

22   recognize this as a letter that you've seen previously?

23   A    Yes.

24   Q    And please tell us, generally speaking, what it is.

25   A    This is a letter from a lawyer who represented a

 1   company in Hong Kong who had been sued by MGA for

 2   infringement of the Bratz dolls.

 3            MR. ZELLER:  I would move into evidence 15987.

 4            THE COURT:  I will not receive that.  As I said,

 5   you can inquire into the notice from the Wall Street Journal

 6   article, which is on the second page, first paragraph, it's

 7   split with the first page, and how he got it.

 8            MR. ZELLER:  Well, I --

 9            THE COURT:  You can inquire about the notice, but

10   the document obviously is not coming in, Counsel.

11            MR. ZELLER:  The only part that I'm -- I'm

12   actually not even asking about the Wall Street Journal

13   article part.  It's rather just -- it's the contact.  That's

14   all.

15            THE COURT:  The contact is fine.

16            MR. ZELLER:  Okay.

17            THE COURT:  He had contact with the lawyer, the

18   lawyer notified him about.

19            MR. ZELLER:  Right.

20            THE COURT:  But the letter is not coming in.

21            MR. ZELLER:  Okay.  Understood.

22   BY MR. ZELLER:

23   Q    The company that contacted you that this lawyer was

24   acting for in Hong Kong was a company called "Cityworld"?

25   A    That's right.

```
 1   Q    And the lawyer's name was Danny Yu?

 2   A    Yes.

 3   Q    And generally speaking, this letter that came to your

 4   attention, Mr. Yu said that he had seen the Wall Street

 5   Journal article?

 6   A    Yes.

 7   Q    And was interested in potentially sharing some

 8   information that -- that his client, Cityworld, had about

 9   MGA?

10   A    Yes.

11   Q    And what's the date of that letter?

12   A    The letter is dated September 4th, 2003.

13   Q    And you saw this letter at some point after that?

14   A    Yes, after this.

15   Q    About how much longer after?

16   A    It might have been as much as 10 days after.

17             THE COURT:  Ten days after the date on the top?

18             THE WITNESS:  Yes, your Honor.

19             THE COURT:  Okay.

20   BY MR. ZELLER:

21   Q    And that's because it looks like it was mailed to

22   Mattel from Hong Kong?

23   A    Yes, that's right.

24   Q    And then it's actually addressed to Bob Normile, your

25   boss?
```

1    A    It's addressed to head of the legal department, which

2    is Bob Normile, my boss.

3    Q    And Mr. Normile then gave you this letter and asked you

4    to follow up, in some way, on it?

5              MS. KELLER:  Objection.  Leading the witness.

6              THE COURT:  Overruled.

7              THE WITNESS:  Yeah, he showed me the letter and

8    asked me to follow up.

9              THE COURT:  Let me remind you, ladies and

10   gentlemen of the jury, this, as well as some of the letters

11   that have gone back and forth between counsel, is absolute

12   hearsay.  They can't come in, but I'm allowing counsel to

13   inquire about the content of these letters.  In this

14   particular case, it's when the witness, Mr. Moore, got

15   notice, from his perspective, or first became aware from his

16   perspective of some the activities of the Bratz or creation

17   of Bratz, so it's admitted for that limited purpose.  But

18   the document itself won't be before you and many of the

19   letters that are hearsay from both sides will not be before

20   you.

21             Counsel?

22   BY MR. ZELLER:

23   Q    It was your understanding from this letter that

24   Cityworld had received some information directly from MGA in

25   the Hong Kong litigation?

1    A    Yes.

2    Q    And without going into every bit of the episode, why

3    don't you just tell us generally what happened after you

4    were given this assignment by Mr. Normile to follow up on

5    the letter.

6    A    Okay.  After seeing the letter, I contacted outside

7    counsel and wanted to look into who Cityworld was, what was

8    going on in Hong Kong and whether I could get out of

9    Hong Kong any information about the lawsuit that was

10   referenced in the letter.

11   Q    And what do you mean by that, "get out of Hong Kong any

12   of the information referenced in the letter"?

13   A    Well, I was looking to see if in the Hong Kong court

14   system I could access the legal filings that were public so

15   that I could view the claims made by MGA and any statements

16   in the claims that would help me understand what was going

17   on with the origin of Bratz at all.

18   Q    It was your understanding, generally speaking, that

19   this lawsuit involving Cityworld, MGA had sued Cityworld

20   over the Bratz dolls?

21   A    That was my understanding, and that was one other

22   reason I wanted to find out what was going on in Hong Kong,

23   because I wanted to confirm that this was even true.

24   Q    And you were able to get out of the public portions of

25   the Hong Kong court files any details about the lawsuit

1    between MGA and Cityworld?

2    A    Not many, not many details.

3    Q    Is it your understanding that, generally speaking, the

4    files in Hong Kong, the court files are not public?

5             MS. KELLER:  Objection.  No foundation.

6             THE COURT:  Overruled.

7             You can state your answer.

8             THE WITNESS:  Yes.  My understanding is that in

9    Hong Kong, very limited amounts of information are available

10   to the general public about lawsuits that are going on in

11   Hong Kong and -- I mean, very limited.

12   BY MR. ZELLER:

13   Q    All right.  Did it eventually come to pass that you had

14   a meeting with the people at Cityworld and Mr. Yu?

15   A    Yes.

16   Q    And that was the November 24th, 2003 meeting I think

17   you mentioned at some point in your testimony last week?

18   A    Yes, that's right.

19   Q    And this was a meeting that was actually in Hong Kong

20   with them?

21   A    Yes.

22   Q    If you could, please, take a look at Exhibit 15986.

23   A    Okay.

24   Q    Do you recognize this as an agreement between Mattel

25   and Cityworld?

1    A    I do.

2           MR. ZELLER:  I would move Exhibit 15986 into

3    evidence.

4           MS. KELLER:  Objection, your Honor.  This is all

5    subject -- this is all part of the Court's prior ruling.

6           THE COURT:  Well, if it goes to notice, Counsel, I

7    may allow it.  I just don't have it in front of me.  As long

8    as it's notice, and I don't want to take your time, so we

9    can take it up this evening.

10          MR. ZELLER:  All of this is notice.

11          MS. KELLER:  We disagree, your Honor.

12          THE COURT:  And it depends upon the content, and

13   since I can't get to it quickly enough.  I've already made a

14   ruling, and I'll hold to that ruling, but as far as notice

15   is concerned, it's entirely appropriate.

16          All right.  Which portion are you interested in,

17   Counsel?

18          MR. ZELLER:  The entirety of this document,

19   because it shows the meeting date and what information was

20   shared.

21          THE COURT:  No.  There are certain other

22   information that I've already ruled on.  I think in

23   paragraph -- just looking at it quickly, in paragraph 1A,

24   isn't it?

25          MR. ZELLER:  We can redact it.

```
 1              THE COURT:  Yeah, I'm inclined to allow the
 2    document in, but I'm going to hold to that prior ruling.  So
 3    if you can get it -- you can refer to it as notice, but
 4    until it's properly excised, it's denied.
 5    BY MR. ZELLER:
 6    Q    What's the date of the agreement?
 7    A    The date is November 24th, 2003.
 8    Q    And that was the actual date of the meeting you had
 9    with Mr. Yu and the Cityworld representatives at Hong Kong?
10    A    Yes.
11    Q    And that's on the first page, that date is reflected on
12    the first page of the agreement?
13    A    It is.
14    Q    And then there is, attached to that agreement, an
15    Exhibit A?
16    A    Yes.
17    Q    And that Exhibit A identifies the information that was
18    received by you concerning MGA and Bratz at that meeting on
19    November 24, 2003?
20    A    Yes, this was the information that I received.
21              MR. ZELLER:  If I could at least display that
22    page, your Honor?
23              THE COURT:  Absolutely.  That will give you the
24    dates, and that will give you the notice.
25
```

1    BY MR. ZELLER:

2    Q    And so what this shows is that there were portions of

3    three documents that Cityworld provided you?

4    A    Yes.

5    Q    And the first one there is an affidavit of Mr. Larian?

6    A    Yes.

7    Q    And is your understanding that this is something that

8    was filed by MGA in the Hong Kong litigation against

9    Cityworld?

10   A    Yes, that's my understanding.

11   Q    Now, was this something that you were able to get out

12   of the public court files of Hong Kong?

13   A    No.

14   Q    So the first time you received that document from any

15   source was at the meeting in Hong Kong?

16   A    That's right.

17   Q    And then the second document that's listed here is a

18   affirmation of Lee, L-e-e, a Chinese name; do you see that?

19   A    Yes, I see that.

20   Q    And you understand, now, that that's a Steven Lee who

21   was the managing director of MGA Hong Kong?

22   A    Yes.

23   Q    And this was another document that you received, at

24   least in part, from Cityworld at this meeting?

25   A    Yes.

CV 04-9049-DOC - 04/04/2011 - Day 45, Vol. 2 of 4

85

1    Q    And you understood this, too, was a document that came

2    out of -- a document submitted by MGA in the Cityworld

3    litigation?

4    A    Yes.

5    Q    Now, was that document public?

6    A    No.

7             MS. KELLER:  Objection.  Again, no foundation for

8    his understanding whether it's public or not.

9             THE COURT:  Overruled.

10            This is his understanding of what's public in

11   Hong Kong or not.  You'll give that the weight you decide is

12   appropriate as a jury.

13   BY MR. ZELLER:

14   Q    And then the third item is a copy of the statement of

15   claim; do you see that?

16   A    I see that.

17   Q    And that's another piece of information that you

18   received?

19   A    That's right.

20   Q    If you could please turn your attention to Exhibit 10.

21   A    Okay.

22   Q    Do you recognize this as the Lee affirmation that we

23   were just discussing?

24   A    I do.

25            MR. ZELLER:  I would move Exhibit 10 into

 1    evidence.

 2            MS. KELLER:  Objection, your Honor.  This is

 3    already been excluded by the Court.

 4            THE COURT:  Once again, Counsel, it goes to

 5    notice.  It's entirely appropriate.

 6            MS. KELLER:  Well, the date may, your Honor.

 7            THE COURT:  Well, the date will be.  In fact, it's

 8    exactly what I'm going to allow, but if you step over the

 9    line concerning my prior ruling, and the problem is I've

10    been given a series of documents.

11            No, this is sustained.

12            MR. ZELLER:  Your Honor, it's purely --

13            THE COURT:  It's sustained, Counsel.

14            MR. ZELLER:  Can I have a side bar, then, your

15    Honor?  This is --

16            THE COURT:  No, absolutely not.  If you

17    appropriately give me the documents, but you can see what's

18    been given to me.

19            MR. ZELLER:  This is what he received in

20    Hong Kong.

21            THE COURT:  Thank you.

22            Sustained.

23            Now, the first page will be entirely appropriate

24    if it's dated, Counsel.

25            MR. ZELLER:  It's what he received in Hong Kong,

1    your Honor.

2              THE COURT:  All right.  Thank you.

3              *(Attorney discussion held off the record.)*

4              MR. ZELLER:  Also, your Honor, everything is

5    already in evidence, except the first page already.  This is

6    just how he received it.

7              THE COURT:  Well, the problem is, Counsel, I don't

8    recall these other documents coming into evidence.

9              MR. ZELLER:  They are the Bryant drawings.

10             THE COURT:  Well, all right.

11             Counsel, the objection is sustained.  We'll take

12   it up after work or after close of business today with the

13   jury.

14   BY MR. ZELLER:

15   Q    Well, you received at this meeting, this Exhibit 10, it

16   has attached to it Carter Bryant drawings --

17   A    Yes.

18   Q    -- of Bratz?

19             MS. KELLER:  Objection as to the characterization

20   and objection to describing the attachments.  The Court has

21   ruled it's not coming in, and they have not come in in this

22   form, your Honor.

23             THE COURT:  I agree.  Sustained.

24             MR. ZELLER:  Can we have a recess?

25             THE COURT:  No.

1    BY MR. ZELLER:

2    Q    Is this --

3            MR. ZELLER:  I really can't go on in my

4    examination further without discussing this, your Honor.

5            THE COURT:  Time is running.  I made my ruling.

6    BY MR. ZELLER:

7    Q    Prior to November 24, 2003, had you ever received a

8    copy of any Carter Bryant drawings of Bratz?

9    A    No.

10   Q    And did you receive such drawings at the Cityworld

11   meeting?

12   A    Yes.

13           MS. KELLER:  Same objection, your Honor.

14           THE COURT:  Just a moment.

15           You can answer that question "yes" or "no," and

16   your answer was?

17           THE WITNESS:  Yes.

18           THE COURT:  All right.

19           Now, Counsel, I'm not precluding you from the fact

20   that he received the Carter Bryant drawings.  I'm precluding

21   you from presenting them.

22           MR. ZELLER:  These are the operative documents

23   that he received.  It shows notice.

24           THE COURT:  I think instead of us getting into

25   this public conversation, why don't I excuse you for just a

1    moment.

2            You are admonished not to discuss this matter

3    amongst yourselves, nor to form or express any opinion

4    concerning this case.

5            All right.  Counsel, I'll take a recess for a few

6    moments, and I'll meet you in private.

7            *(Recess.)*

8            *(The following proceedings is taken outside*

9        *the presence of the jury.)*

10           THE COURT:  Let's go back on the record.

11           All right.  We are back on the record.  All

12   counsel are present.

13           All right.  I'm not going to change my ruling on

14   the face page of this filing because it would open the door

15   to a long discussion about whether the Bratz dolls are

16   similar to the allegedly infringing dolls in the Cityworld

17   litigation.

18           But I will, Mr. Zeller, nevertheless, allow you to

19   ask the question about when Mr. Moore first saw the Carter

20   Bryant drawings with the notarization at the bottom of

21   September 18th, 2000, now that I've seen them and had an

22   opportunity to look at them.

23           I should note that this specific type of notice is

24   irrelevant, potentially, though, to the statute of

25   limitations, which begins to run at the moment that a

Case 2:04-cv-09049-DOC-RNB  Document 10396  Filed 04/06/11  Page 90 of 132  Page ID #:316143
CV 04-9049-DOC - 04/04/2011 - Day 45, Vol. 2 of 4

90

1    reasonable person would have suspected the wrongdoing.  It

2    is MGA's position that the 2002 letter should have given

3    Mattel enough suspicion to start investigating the potential

4    wrongdoing, and that investigation could have lasted up to

5    three years under the Copyright Act and Trade Secrets Act

6    and the ultimate lawsuit would have still been timely.  But

7    it is Mattel's position that no reasonable person would have

8    suspected the wrongdoing at issue until the formation -- or

9    until the information from the Cityworld litigation came to

10   light.

11           I think the ultimate fact, finally after having

12   been able to review these, is that these drawings and the

13   fact that Mr. Moore received these drawings when he did can

14   help either party, and therefore, that fact is irrelevant.

15   On the one hand, I think it supports MGA's position that

16   given all of the background, Mattel should have filed the

17   lawsuit right after when it saw these drawings.  On the

18   other hand, it supports Mattel's position that not only

19   these drawings created the suspicion necessary to start the

20   period during which the law expects the party to investigate

21   its claim.

22           For that reason, I'm going to receive the drawings

23   as you've requested, but I will not allow -- Mr. Quinn,

24   listen to me very carefully, I will not allow any

25   comparisons between these drawings and the products at issue

 1    in the Cityworld litigation; do you understand what I've

 2    said?

 3              MR. QUINN:  Yes.

 4              THE COURT:  Will you obey that admonition?

 5              MR. QUINN:  Of course.

 6              THE COURT:  Okay.

 7              Mr. Zeller, do you understand that?

 8              MR. ZELLER:  I do.

 9              THE COURT:  Ms. Keller, do you?

10              MS. KELLER:  I do.

11              MR. MC CONVILLE:  Yes, sir.

12              THE COURT:  All right.  Now, this argument is

13    precluded, and I caution you, do not enter that area during

14    your closing arguments.

15              MR. ZELLER:  May I be heard on the first page?  I

16    mean, this is not to make comparisons, your Honor.  It is to

17    explain why Mattel did not sue in April of 2004 and name

18    MGA.

19              THE COURT:  You know, if you pay me the courtesy

20    of having given the opportunity to listen to you after the

21    jury leaves tonight, I'll reconsider that, but I'm not

22    making any representation, and when it's just given to the

23    Court, and I've already made the ruling, you are on

24    dangerous ground, and that's not going to create a good

25    impression in front of the jury, and I think that's your

Case 2:04-cv-09049-DOC-RNB   Document 10396   Filed 04/06/11   Page 92 of 132   Page ID #:316145
CV 04-9049-DOC - 04/04/2011 - Day 45, Vol. 2 of 4

92

 1   responsibility.  I already made the ruling, hadn't I,

 2   Mr. Zeller, concerning the first page; "yes" or "no"?

 3            MR. ZELLER:  No, your Honor.

 4            THE COURT:  I had not?

 5            MR. ZELLER:  No, not as to Mr. Moore's information

 6   of what he received in the Cityworld meeting.  The Court has

 7   made a number of points about the Hong Kong litigation, but

 8   MGA is talking about statute of limitations, here.  We are

 9   not offering it for any other purpose, other than to show

10   what Mr. Moore received and what information he had at the

11   time.

12            THE COURT:  I will consider it after the jury

13   leaves, but these interruptions I think are, quite frankly,

14   something that you are placing yourself in a position in

15   terms of confrontation with the Court, and I'm not choosing

16   this confrontation.  What's really occurring here is when

17   you are pushing so hard to get an exhibit in, and I can't go

18   back and look at that exhibit, that's what's causing the

19   problem.  And when you make the statement that you can't

20   proceed any further unless I make the ruling, it's going to

21   go against you because you are not giving me the time.  Now,

22   you know I rethink everything at night.  I'll give you the

23   time to make your record.  You know many documents have come

24   in, but when you push in front of the jury, it's a really

25   difficult position, and that's your responsibility.

 1          MR. ZELLER:  Understood.

 2          THE COURT:  I don't -- well, I hope you do.  I

 3   hope that this isn't carrying over to the jury, but it's

 4   been very, very frustrating, quite frankly, and I think for

 5   both of us.  And if you give me that time, I'll consider it,

 6   but when you make the statement you can't go any further,

 7   you place yourself in jeopardy, so that's your

 8   responsibility, and I'm sorry that that's happening to you.

 9          MR. ZELLER:  I apologize.

10          THE COURT:  All right.  Get the jury.

11          Mr. Moore, thank you.

12          (The following proceedings is taken in the

13      presence of the jury.)

14          THE COURT:  Okay.  The jury is present, the

15   alternates, all counsel, the parties.

16          Ladies and gentlemen, after a discussion with all

17   counsel out of your presence, I'm going to receive the

18   attached drawings dated September 18th, 2000 into evidence.

19   The first page of that document is not being received by the

20   Court.

21          Now, some of these documents are not dated on that

22   same date, but I've had a chance, now, to look at them in

23   chambers, so they will be there for your consideration.

24          Counsel, if you'd like to continue.

25          MR. ZELLER:  Thank you, your Honor, and for the

1    record, that's pages 2 through 18 of Exhibit 10?

2         THE COURT:  I think so.  The dated pages,

3    certainly.  Most of them are dated September 18th, but I

4    want time, once again, to look at them, Counsel, so --

5         MR. ZELLER:  Yes, understood.

6         *(Plaintiffs' Exhibit 10, pages 2 through 18,*

7         *are received in evidence.)*

8              **MICHAEL MOORE, DEFENSE WITNESS, RESUMED**

9                   **CROSS-EXAMINATION (Continued)**

10   BY MR. ZELLER:

11   Q    If you'd please look at Exhibit 10, you'll recognize

12   these as drawings of Bratz that you received from Cityworld

13   at the Hong Kong meeting in November of 2003?

14   A    Yes, I do.

15   Q    And if we could take a look at a couple of these.

16        MR. ZELLER:  If you'd please pull up page 5.

17   BY MR. ZELLER:

18   Q    This is an example of one of the drawings that you

19   received?

20   A    Yes.

21   Q    And you understood from the information you received at

22   the -- at the meeting that these were Carter Bryant

23   drawings?

24   A    Yes.

25   Q    All right.  You'll see that this one has a circle C,

1    8/1998 date on it?

2    A    Yes.

3    Q    Now, back in the November of 2004 time period, when you

4    first saw these drawings, did that date have any

5    significance to you?

6    A    It did.

7    Q    And what was that significance?

8    A    Well, 8/1998 is a date that Carter Bryant did not work

9    at Mattel.

10   Q    And what did that mean for purposes of your

11   investigation going back to the Wall Street Journal article

12   where it was that statement about a sort of fashion doll

13   design contest in 1999?

14   A    Well, that it was possible that based on this date,

15   there was a little confusion.  It could look like there was

16   a claim made in here that drawings were -- drawings were

17   created in 8/1998.

18   Q    Now, at the time no lawsuit had been filed between

19   Mattel and MGA?

20   A    That's right.

21   Q    Or Mattel and Carter Bryant?

22   A    That's right.

23   Q    So at that time, did you have access to discovery or

24   depositions?

25   A    No.

1    Q    Those sort of things could only be taken after a

2    lawsuit is filed?

3    A    That's right.

4    Q    And back in the November of 2003 time period, did you

5    know, one way or another, whether the date 8/1998 on this

6    and some of the other Bratz drawings was a correct date or

7    an incorrect date as to when the drawings were made?

8    A    I didn't know.

9    Q    And in these drawings that we have here as part of

10   Exhibit 10, that's the first time at this meeting in

11   Hong Kong that you ever saw any Carter Bryant drawings of

12   Bratz?

13   A    Yes.

14   Q    Directing your attention to Exhibit 24825, do you

15   recognize this as something else you received at the

16   November 24th, 2003 meeting with Cityworld?

17   A    I do.

18   Q    And what is it?

19   A    This is a contract, an agreement between MGA and Carter

20   Bryant.

21        MR. ZELLER:  All right.  And your Honor, I move in

22   Exhibit 24825, with the exception of the face page, which we

23   can talk about later.

24        THE COURT:  Received.

25        (Plaintiffs' Exhibit No. 24825 is received in

1        *evidence.)*

2    BY MR. ZELLER:

3    Q     And so this is a copy of the Carter Bryant agreement

4    with MGA that was dated as of September 18th, 2000?

5              MS. KELLER:  Objection.  Misstates the evidence.

6              THE COURT:  Just a moment.

7              MS. KELLER:  I assume the reference is the front

8    page, line --

9              THE COURT:  Well, yeah, I'll allow this in, but

10   I'm not sure it's September 18th.  It's dated

11   September 18th, but on the last page, there is no date.

12             MR. ZELLER:  Well, I said actually dated as of

13   September 18th, 2000.

14             THE COURT:  What's dated as of?

15   BY MR. ZELLER:

16   Q     Let me try it this way.  Mr. Moore, you see it's dated

17   as of September 18th, 2000 on the front page of this

18   agreement?

19   A     I do.

20   Q     And did that date have some significance to you when

21   you first saw it at this meeting?

22   A     Yes.

23   Q     And what was the significance?

24   A     Well, with this date, Carter Bryant I knew was still

25   employed by Mattel.

1    Q    All right.  Now, was this the first time that you had

2    ever seen an agreement between Carter Bryant and MGA?

3    A    Yes.

4    Q    Now, if we can go back for a moment to Exhibit 10, page

5    5.

6         And you'll see that underneath the signature of Isaac

7    Larian, it says, "Contract date, 9/18/00"?

8    A    I see that.

9    Q    And that was information that you received for the

10   first time ever at that meeting?

11   A    Yes, it was.

12   Q    And is it the case that based upon the copy of this

13   contract between Carter Bryant and MGA that you received

14   that was dated as of September 18th, 2000, that Mattel then

15   subsequently filed a lawsuit against Carter Bryant?

16   A    Yes, that's right.

17   Q    And that was on April 27th, 2003?

18   A    April 27th, 2004.

19   Q    I'm sorry, 2004.

20        And after that, did you appear -- or did you attend a

21   deposition of Carter Bryant in the case?

22   A    I did.

23   Q    And when did that take place?

24   A    It was in November of 2004.

25   Q    And was there information that Mr. Bryant gave at that

Case 2:04-cv-09049-DOC-RNB   Document 10396   Filed 04/06/11   Page 99 of 132   Page ID #:316152
CV 04-9049-DOC - 04/04/2011 - Day 45, Vol. 2 of 4

99

1    deposition that you were learning for the first time?

2    A    Yes.

3    Q    And learning for the first time with respect to what it

4    is that MGA and Mr. Larian had known back in the 2000 time

5    period?

6    A    That's right, I never heard from Carter Bryant before.

7    Q    And what is it that you understood or what information

8    did you learn from the Carter Bryant deposition in November

9    of 2004 that was relevant to MGA and Mr. Larian, in your

10   view?

11   A    Well, I learned that Carter Bryant, when meeting

12   Mr. Larian, had told Mr. Larian that he was an employee of

13   Mattel.

14   Q    And why did that, as a lawyer, have significance to

15   you?

16          MS. KELLER:  And I'm going to object that this is

17   improper expert opinion, unless the work product and the

18   attorney-client privileges are being waived.

19          THE COURT:  Counsel?

20          MR. ZELLER:  They are not being waived.  They've

21   gotten into this subject.  This is his course of conduct

22   that we're talking about, and his understanding.

23          MS. KELLER:  He's being asked for his -- why it

24   had significance to him, and that it had significance to

25   him.  He's being asked legal significance.

```
 1              THE COURT:  That, potentially, could cause a
 2    waiver.  I'm concerned about that, and I don't want you
 3    walking into that at the present time, so it's -- just a
 4    moment.
 5              It's enough, probably, that you learned Carter
 6    Bryant, through the depos, was an employee of Mattel.
 7              MR. ZELLER:  I can certainly rephrase this.
 8              THE COURT:  Okay.  It's up to you.
 9    BY MR. ZELLER:
10    Q    Prior to the time that Mr. Bryant's deposition was
11    taken in November of 2004, did you have any information or
12    knowledge that Mr. Larian and MGA knew back in the September
13    and October 2000 time period that at that time Mr. Bryant
14    was a Mattel employee?
15    A    It was then that I learned what Carter Bryant told
16    Mr. Larian, that he was a Mattel employee.
17              MS. KELLER:  And I'm going to have a hearsay
18    objection, your Honor.  I'm assuming that this is just
19    offered for the witness' --
20              THE COURT:  Yeah, it's --
21              MS. KELLER:  -- conduct.
22              THE COURT:  It's hearsay.  It only goes to his
23    conduct and to his state of mind.  It's for no other
24    purpose.
25
```

1   BY MR. ZELLER:

2   Q    Now, you also know that Mr. Larian didn't first sit for

3   a deposition in this case until July 18th, 2006?

4   A    Yes.

5   Q    And you know that Mattel wanted to take his deposition

6   sooner than that, right?

7          MS. KELLER:  Objection, your Honor.  This is

8   irrelevant.

9          THE COURT:  It's irrelevant.  Sustained.

10  BY MR. ZELLER:

11  Q    Well, was there information -- well, let me ask this:

12  Prior to the time that Mr. Larian sat for deposition on

13  July 18th, 2006, do you know if Mattel had any way of

14  knowing whether or not Mr. Larian agreed that he was aware

15  that Carter Bryant was a Mattel employee back in September

16  of 2000?

17         MS. KELLER:  Objection.  Calls for speculation,

18  conclusion, vague, other people's --

19         THE COURT:  I'm not -- I think I need to speak to

20  all counsel again about that area.  That's potentially a

21  waiver.

22         MR. ZELLER:  Well, I can certainly move on from

23  this topic and --

24         THE COURT:  I'll -- I'll leave that to you,

25  Counsel.  You can ask the question if you'd like, but --

1   BY MR. ZELLER:

2   Q    Well, do you know whether or not anyone from MGA sat

3   for deposition and provided information that MGA had in a

4   deposition prior to Mr. Larian's deposition in July of 2006?

5          MS. KELLER:  Your Honor, I'm going to object that

6   this is irrelevant.  It's -- it's opening up a lot of timing

7   issues in the litigation that --

8          THE COURT:  Sustained.  We can discuss this

9   afterwards, and Mr. Moore can be available tomorrow.

10  BY MR. ZELLER:

11  Q    Going back, then, to the Carter Bryant deposition from

12  November of 2004, did you also learn during that deposition

13  that Carter Bryant had told MGA and Mr. Larian that he had a

14  contract of some kind with Mattel?

15  A    Yes.

16  Q    And was that the first time that that information had

17  come to your attention?

18  A    Yes.

19  Q    Directing your attention to Exhibit 18572R, which is

20  the letter from Sidley & Austin that you were asked about --

21          MR. ZELLER:  That should be -- it's one of the

22  exhibits he was asked about previously in his examination.

23          THE WITNESS:  Okay.

24  BY MR. ZELLER:

25  Q    You'll see what this letter is dated January 5th, 2005?

1   A    Yes.

2   Q    And it's from a law firm called Sidley Austin?

3   A    Yes.

4   Q    And that's a law firm that represents MGA?

5              MS. KELLER:  Objection.  No foundation and on --

6              THE COURT:  Well, Counsel, I don't know what time

7   period.

8              MR. ZELLER:  During this 2005 time period.

9              THE COURT:  I don't know.  Can the two of you

10  reach a stipulation, then?  I'm not sure.  I just don't

11  recall.

12             MS. KELLER:  We don't think it's true, your Honor,

13  for one thing.

14             THE COURT:  I just don't know, Counsel.  I can't

15  take that.

16             MR. ZELLER:  Well, the witness may know or he may

17  not know.

18             THE COURT:  Do you know if this is true?

19             THE WITNESS:  I had an understanding that was

20  true.

21             THE COURT:  Well, sustained.

22             Just give me some proof, show me a document.

23             MR. ZELLER:  There was testimony by Mr. Marlow on

24  this.  Sidley & Austin represented Mr. Marlow as he

25  testified to --

```
 1              THE COURT:  Not MGA, Counsel.

 2              MR. ZELLER:  And MGA, too.

 3              THE COURT:  I'm asking for proof.

 4              MR. ZELLER:  Well --

 5              THE COURT:  Just show me, and I'd have no problem

 6   with it.  I just don't know.

 7   BY MR. ZELLER:

 8   Q    Mr. Moore, was it your understanding that Sidley &

 9   Austin, in sending you this letter, was being paid by MGA?

10              MS. KELLER:  Objection.  No foundation.

11              THE COURT:  Sustained.

12   BY MR. ZELLER:

13   Q    Did you have an understanding as to who was paying

14   Margaret Leahy's fees in 2005?

15              MS. KELLER:  Objection.  No foundation.  No

16   personal knowledge.

17              THE COURT:  Do you have any personal knowledge of

18   this?

19              THE WITNESS:  No.

20              THE COURT:  Okay.

21   BY MR. ZELLER:

22   Q    Did you have any contact with Margaret Leahy after

23   January 5th of 2005 when this letter was sent?

24   A    No.

25   Q    Did anyone from Sidley Austin write you or anyone
```

1    representing Mattel that you know of after this letter

2    saying that you had contacted her again?

3    A    No.

4    Q    In fact, do you know whether Sidley Austin responded to

5    the letter that outside counsel sent in response to this

6    letter?

7    A    I don't know.

8    Q    It is your understanding that outside counsel responded

9    to the letter that Sidley & Austin sent and said it was

10   incorrect, right?

11           MS. KELLER:  Objection, your Honor.  That's

12   calling for hearsay and having seen the --

13           THE COURT:  Overruled.

14           You can answer the question.  If you know that

15   outside counsel responded, you can answer that question.

16           THE WITNESS:  Yes, I understood that outside

17   counsel responded.

18   BY MR. ZELLER:

19   Q    And did Ms. Leahy or MGA or MGA's lawyers ever go and

20   make a complaint to the State Bar and say -- said that you

21   had violated your obligations in some way?

22   A    No.

23   Q    Directing your attention to Exhibit 37006.  This is the

24   e-mail that you were asked about concerning imaging of hard

25   drives.

1    A    Okay.

2    Q    And so this e-mail that you were asked about from

3    Adelle Jones --

4         MR. ZELLER:  And if we can actually pull this up.

5    BY MR. ZELLER:

6    Q    -- dated September 18th, 2007, who is Adelle Jones?

7    A    Adelle Jones is a paralegal that reported to me.

8    Q    And here you are giving this direction -- or I'm sorry,

9    she's passing along a direction of, "Can you please image

10   the following computers and advise when they're complete?"

11   And then they have Daniel Leahy and then Sheila Kyaw; do you

12   see that?

13   A    Yes.

14   Q    And in this time period, in September of 2007, you were

15   asked -- this is seven years after Carter Bryant left; do

16   you recall those questions?

17   A    Yes.

18   Q    In fact, this was after the lawsuit between Mattel and

19   Carter Bryant and MGA had already started, right?

20   A    That's right.

21   Q    And -- and you were working on the lawsuit when you

22   were asking for these hard drive images?

23   A    Yes.

24         MS. KELLER:  Object.

25         THE COURT:  Overruled.

1          You can answer the question.

2          THE WITNESS:  Yes, I was working on the lawsuit.

3    BY MR. ZELLER:

4    Q    And generally speaking, in fact, one thing that you've

5    done, now, for several years in this litigation, in this

6    very lawsuit, has been to preserve evidence on Mattel's

7    behalf?

8    A    Yes.

9    Q    And tell us, generally speaking, what does that

10   involve?  This is a very general level.

11   A    A very general level?  Well, it involves insuring that

12   electronic information is kept of all kinds, e-mails, hard

13   drives, that documents are collected and preserved,

14   preserved and collected, and any information that's relevant

15   to the case is preserved.

16   Q    And as part of that, you -- you imaged hard drives?

17   A    Yes.

18   Q    That's, in fact, reflected in this e-mail?

19   A    That's right.

20   Q    And in approximately how many hard drives in the course

21   of this lawsuit are you aware of that Mattel has imaged?

22   A    Well over a hundred.

23   Q    You were asked questions about whether or not Mr. Leahy

24   did anything wrong to have his hard drive imaged.  Is it the

25   case that a Mattel employee who has relevant information, or

1    potentially relevant information to this lawsuit, is under

2    an obligation, as you understand it, to at least try and

3    preserve evidence?

4    A    Yes.  It's not a matter of whether somebody did

5    something wrong.

6    Q    So if someone is potentially a witness, for example, is

7    it your understanding that that person should -- should

8    attempt to preserve documents and e-mails and other evidence

9    that he or she has?

10   A    Yes.

11   Q    And is that part of what you've done is your job there

12   at Mattel?

13   A    Yes.

14   Q    You were asked a question, in fact, about this document

15   in some way reflecting further contact that you had with

16   Daniel Leahy.  Does that show -- does this e-mail show

17   further contact that you had with Dan Leahy?

18   A    No.

19   Q    Did you, in fact, talk to Dan Leahy further and ask him

20   about this lawsuit?

21   A    No, not about this matter.

22   Q    You were asked about interviews you had done in this

23   case, and in particular, you were asked about interviews of

24   Sheila Kyaw and another Mattel employee Carmen; do you

25   recall that?

1    A    I do.

2    Q    And when did you take -- when did you actually conduct

3    those interviews?

4    A    I conducted those interviews after the Carter Bryant

5    deposition in November of 2004.

6    Q    And why did you do it at that time?

7    A    Because it was at the Carter Bryant deposition that I

8    learned that Sheila Kyaw and Carmen Monteagudo may have

9    information.

10   Q    So it was Carter Bryant that had mentioned them in his

11   deposition?

12   A    That's right.

13   Q    And prior to that time, had you heard about them or

14   interviewed them?

15   A    I hadn't interviewed them before, no.

16   Q    All right.  You were asked about interviewing an Elise

17   Cloonan.  Was she even at Mattel after 2003?

18   A    No.

19   Q    When you tried to contact her, did you find out that

20   she was represented by MGA counsel?

21   A    I -- I found out that her boyfriend in the design

22   center was represented by counsel, and I had the

23   understanding that they were being paid for or provided by

24   either Bryant or MGA.

25   Q    And then you were asked questions about Mercedeh Ward.

 1   Was there some reason why you couldn't go and talk to her

 2   after the lawsuit was filed?

 3   A    Yes.

 4   Q    Is it because she went back to MGA in 2005?

 5   A    Yes.

 6   Q    You were asked last week by Ms. Keller to bring your

 7   interview notes; do you remember that?

 8   A    I do.

 9   Q    Did you, in fact, bring them to court?

10   A    I did.

11   Q    Are you familiar with some Brazilian registrations,

12   Exhibits 1703 and 1703A?

13        She'll provide them to you.

14             MR. ZELLER:  They are already in evidence, your

15   Honor.

16             THE WITNESS:  Oh, I see.  Yes.

17   BY MR. ZELLER:

18   Q    And you were asked questions about these registrations.

19   When is it that Mattel obtained copies of these

20   registrations, these Brazilian registrations?

21   A    It wasn't until November or in the fall of 2004.

22   Q    That was also after the lawsuit was filed?

23   A    Yes.

24   Q    Do you have an understanding as to why it was that it

25   took some time to obtain copies of these registrations?

1    A    Well, I tried to obtain copies of the registrations

2    earlier, but the Brazilian copyright office, this particular

3    one, was on strike, I was told.

4              MS. KELLER:  Objection.  That's hearsay.  Move to

5    strike.

6              THE COURT:  Sustained.  Stricken.

7    BY MR. ZELLER:

8    Q    Well, you made efforts to try and get the registrations

9    prior to November 2004?

10   A    I did.

11   Q    And did you have an understanding that MGA was involved

12   in a lawsuit with a company called Estrella down in Brazil?

13   A    Yes, I heard that.

14   Q    Did you try and get any of the court filings from that

15   case?

16   A    I did.

17   Q    And did you find -- did you find whether you could get

18   copies of those filings or not?

19             MS. KELLER:  Objection.  No foundation.

20             THE COURT:  Just a moment.

21             You can answer that question.  Overruled.

22             THE WITNESS:  I was told that the --

23             MS. KELLER:  Objection.  Hearsay.

24             THE COURT:  Sustained.

25             The question was, "And did you find whether you

```
 1    could get copies of those filings or not?"

 2              THE WITNESS:  Yes, I found out.

 3              THE COURT:  Thank you.

 4              MR. ZELLER:  This is just offered for state of

 5    mind and notice, your Honor.

 6              MS. KELLER:  State of mind is irrelevant, your

 7    Honor.

 8              THE COURT:  This will go to his conduct, though.

 9    This is hearsay, but it will show whatever efforts he is

10    testifying to that he made or did not make.  Overruled.

11    BY MR. ZELLER:

12    Q    Were you able to get information out of the Brazilian

13    court system as it pertained to this lawsuit between MGA and

14    Estrella there?

15    A    I was not.

16    Q    What was your understanding as to why not?

17              MS. KELLER:  Objection.  No foundation.

18              THE COURT:  Overruled.

19              THE WITNESS:  That the case files for this

20    particular matter were sealed.

21    BY MR. ZELLER:

22    Q    And what do you mean by "sealed"?

23    A    That they were not public, and I was unable to get any

24    copies of anything related to the case.

25    Q    You were asked about some other interviews that you
```

1    did --

2            THE COURT:  Now, just a moment.  That's not for

3    the truth of the matter.  We don't know if they are sealed

4    or not sealed, but this is his conduct, his effort and why

5    he did or didn't make this effort.

6    BY MR. ZELLER:

7    Q    You were asked some questions about some of the

8    interviews that you conducted in the summer of 2003.  Do you

9    recall the list that Ms. Keller went through?

10   A    Yes.

11   Q    And one interview that you were asked about from July

12   of 2003 was with a Rene Pasko?

13   A    Yes.

14   Q    Was that interview that you did with Rene Pasko, was it

15   for this case?

16   A    No.  It was for another matter I was working on at the

17   time.

18   Q    And what was the other case?

19   A    The other case was a case involving --

20           MS. KELLER:  Objection.  Irrelevant, then.

21           THE COURT:  Sustained.

22   BY MR. ZELLER:

23   Q    Just so the record is clear, the interview that

24   Ms. Keller asked you about with Rene Pasko is not for this

25   case, it's another case?

1    A    Right.  When I conducted the interview, it wasn't for

2    this case.

3              THE COURT:  My apologies, Counsel.  I had

4    forgotten that.  You can ask in that area.

5    BY MR. ZELLER:

6    Q    And that other matter was a case against a European toy

7    company called Simba?

8    A    Yeah, there was a German toy company called Simba, and

9    we were anticipating litigation against Simba, which was

10   filed very shortly thereafter that interview.

11   Q    So that was a separate lawsuit that isn't this lawsuit?

12   A    Completely separate.

13   Q    All right.  And Ms. Keller also asked you about an

14   interview with a Julia Jensen that you conducted also about

15   the same time in early July of 2003?

16   A    Yes.

17   Q    And was that for this case or any matter involving MGA,

18   or was that also for the Simba case?

19   A    Well, I was trying to understand what was going on in

20   relation to the Simba case.  I didn't understand we had a

21   case at all at this time with respect to MGA or Bryant.

22   Q    By the way, in the course of your investigation, did

23   you ever find out whether Carter Bryant had a work computer

24   assigned to him at Mattel?

25   A    I found out.

1   Q    And what did you find out on that?

2   A    I found out that he was not.

3   Q    So there was no hard drive to collect or examine?

4   A    There was no computer assigned to Carter Bryant.

5   Q    You were asked some questions about Sal Villasenor?

6   A    (No audible response.)

7   Q    And you -- you were asked questions about a contact

8   that you had with him prior to December of 2005, when he

9   sent the e-mail saying that he was under stress and then

10  went out on a stress leave?

11  A    Okay, yes.

12  Q    And you were asked about a number of communications or

13  contacts that you had with Mr. Villasenor, both casual as

14  well as professional; do you recall that?

15  A    Yes.

16  Q    Now, initially when you have these communications with

17  Mr. Villasenor, was it your understanding that MGA had

18  actually even sued over toy fair allegations at that time in

19  2005?

20  A    I didn't have that understanding specifically, no.

21  Q    By your understanding, when did MGA first make

22  allegations about sneaking into a toy fair as part of its

23  claims?

24          MS. KELLER:  Objection.  Irrelevant.

25          THE COURT:  Just a moment.

```
 1              MS. KELLER:  If we didn't know about it.

 2              THE COURT:  Just a moment.

 3              MS. KELLER:  And irrelevant anyway, your Honor.

 4              THE COURT:  Just a moment.

 5              Sustained.

 6   BY MR. ZELLER:

 7   Q    Well, back in the 2005 and prior time period when you

 8   were having conversations with Sal Villasenor, and remember

 9   you were asked all these questions by Ms. Keller about how

10   those communications were for this lawsuit; do you remember

11   her asking those questions?

12   A    Yes.

13   Q    For purposes of this lawsuit back in the 2005 and

14   earlier time period, was it your understanding that the toy

15   fair allegations had been made by MGA?

16              MS. KELLER:  Objection.  Irrelevant.

17              THE COURT:  I don't understand the question,

18   Counsel, I'm sorry.  Sustained.

19              MR. ZELLER:  If I may, she had opened up this area

20   by suggesting --

21              THE COURT:  No.  Thank you.

22              MR. ZELLER:  Okay.

23   BY MR. ZELLER:

24   Q    Let's maybe start at the beginning.

25        There was a time period when you had communications
```

Case 2:04-cv-09049-DOC-RNB   Document 10396   Filed 04/06/11   Page 117 of 132   Page ID #:316170
CV 04-9049-DOC - 04/04/2011 - Day 45, Vol. 2 of 4

117

1   with Mr. Villasenor; do you recall that?

2   A    Yes.

3   Q    And you were asked questions by Ms. Keller about those

4   early communications, and she was saying to you --

5           THE COURT:  Well, give me a time period to refresh

6   my recollection.

7           MR. ZELLER:  It's prior to December of 2005.

8           THE COURT:  Okay.

9           MR. ZELLER:  The communications prior to that.

10          THE COURT:  Those 10 to 20 occasions?

11          MR. ZELLER:  Right.

12          THE COURT:  Between July and December?

13          MR. ZELLER:  Yes.

14          THE COURT:  All right.

15  BY MR. ZELLER:

16  Q    And recall how you were being asked questions about

17  during that time period in 2005, you were communicating with

18  Mr. Villasenor about this case; do you recall that?

19  A    Yes.

20  Q    It's -- it's true that this case at that time did not

21  involve allegations about sneaking into toy fairs, as MGA

22  claims, right?

23          THE COURT:  You can answer that question.

24          THE WITNESS:  Yes.

25          THE COURT:  Okay.

1          MS. KELLER:  Your Honor, we object to the

2    characterization "as MGA claims."  We didn't know about it

3    yet.

4          THE COURT:  Well, sustained.  We'll strike "as MGA

5    claims."

6          MR. ZELLER:  No.  I mean, as MGA claims in this

7    lawsuit.

8          THE COURT:  It's sustained, Counsel.

9          MR. ZELLER:  Okay.

10   BY MR. ZELLER:

11   Q    When you were having contact with Mr. Villasenor and

12   discussing this case, this litigation, in the 2005 time

13   period, what were you doing, generally speaking, with

14   Mr. Villasenor?

15   A    I was conducting an interview in connection with the

16   allegations being made by MGA in order to assess any

17   information that people might have or documents that need to

18   be collected.

19   Q    And what kinds of documents did you understand

20   Mr. Villasenor to have that related to the litigation that

21   MGA had filed as it existed at that time back in 2005?

22   A    Well, I collected some price lists from Mr. Villasenor.

23   Q    Anything else?

24   A    Other information that he sent around to the company,

25   generally, about Bratz and things of that nature.

1    Q    Well, focusing your attention, then, on the lawsuit at

2    that time, were your communications with Mr. Villasenor have

3    anything to do with allegations that MGA had made in this

4    lawsuit back at that period about sneaking into toy fairs?

5            MS. KELLER:  Objection.

6            THE COURT:  Sustained.  Sustained, Counsel.

7    BY MR. ZELLER:

8    Q    Is it true that your communications and your focus with

9    Mr. Villasenor was on discovery in connection with Bratz and

10   not toy fair?

11   A    My communications with Mr. Villasenor were about MGA's

12   allegations and Bratz and allegations that have been made in

13   the April 2005 complaint.

14   Q    You were asked questions about why it is that you

15   didn't undertake certain kinds of investigations concerning

16   Mr. Villasenor's activities; do you recall that?

17   A    Yes.

18   Q    Now, at some point outside counsel took over the

19   Villasenor matter; is that right?

20   A    Yes, outside counsel -- I asked outside counsel to get

21   involved.

22   Q    And one of those outside lawyers, in fact, was counsel

23   who is not involved in litigation named Eve Wagner?

24   A    Yes.  I didn't ask Eve Wagner to join.  That was

25   Ms. Thomas.

1    Q    No.  I understand.  I'm not asking about who engaged.

2    I'm just trying to make sure I understand that at some

3    point, the matter was turned over to Eve Wagner and Paul

4    Hastings, right?

5    A    Yes.

6    Q    And at that point, were they the ones who took over the

7    investigation in the litigation pertaining to those claims?

8    A    The claims that Sal Villasenor made --

9    Q    Now, is it your understanding as a -- as an in-house

10   lawyer that there's an allegation of wrongdoing or an

11   investigation to be conducted of some kind that the company

12   goes to the FBI or a prosector or has them conduct an

13   investigation?

14   A    That's not my understanding of how it works.

15   Q    In fact, are you aware of MGA ever going to the FBI or

16   a prosector or some outside governmental agency to

17   investigate them?

18            MS. KELLER:  Objection.  This is completely

19   without foundation.  Argumentative.

20            THE COURT:  Sustained.

21            MS. KELLER:  And I ask that counsel be instructed

22   not to do it again.

23            THE COURT:  Well, Counsel, I think we're going to

24   move on to another area, now.

25

1    BY MR. ZELLER:

2    Q    Are you aware of any company in the toy industry going

3    to the FBI or the SEC or a prosecutor or some other outside

4    governmental agency to go and have an investigation done?

5    A    I've never heard of that.

6            MR. ZELLER:  Nothing further, your Honor.

7            THE COURT:  Redirect.

8                    **REDIRECT EXAMINATION**

9    BY MS. KELLER:

10   Q    So toy companies, if they think there is any

11   wrongdoing, they don't go to the FBI, right?

12   A    No, that's not the way the process works.

13   Q    Unless it's somebody going to work for MGA, and then

14   you go to the FBI, right?

15           MR. ZELLER:  This misstates the testimony.

16           THE COURT:  Overruled.

17           THE WITNESS:  I am not sure what you mean.

18   BY MS. KELLER:

19   Q    Do you know a man named Jorge Castilla; does that name

20   ring a bell?

21   A    Yes.

22   Q    You guys decided when he left Mattel to go to MGA that

23   you were going to follow him, right, observe him, mirror his

24   hard drive, monitor his phone, download everything and give

25   it all to the FBI, and that's what you did, isn't it?

Case 2:04-cv-09049-DOC-RNB   Document 10396   Filed 04/06/11   Page 122 of 132   Page ID #:316175
CV 04-9049-DOC – 04/04/2011 – Day 45, Vol. 2 of 4

122

 1   A     Well, Jorge Castilla, I understand, has pled guilty.

 2   Q     You went to the FBI, didn't you?

 3   A     I wasn't involved in that particular investigation, but

 4   I understand the FBI was involved.

 5   Q     Do you know that Mattel turned him into the FBI, right?

 6   A     I don't know how that came about.

 7   Q     And as far as -- as far as not filing a lawsuit when

 8   you just don't have enough information, you know that the

 9   standard for the statute of limitations is when Mattel

10   discovers facts or should have discovered facts that would

11   cause a reasonable person to be suspicious; you know that,

12   don't you?

13           MR. ZELLER:  This misstates the law, and it's

14   legal argument.

15           THE COURT:  Overruled.

16           THE WITNESS:  Yeah, it's not my understanding.

17   BY MS. KELLER:

18   Q     You know that the standard for the statute of

19   limitations is not when Mattel has ironclad proof, right?

20   A     Well --

21           MR. ZELLER:  It's argument.

22           THE COURT:  Overruled.

23   BY MS. KELLER:

24   Q     Correct?

25   A     I know that you don't have to actually, you know, have

1    somebody witness something, but you do need facts.

2    Q    You are an intellectual property lawyer, right?

3    A    Yes.

4    Q    And you actually know hat the statute of limitations is

5    about, right?

6    A    In --

7              MR. ZELLER:  The question is overbroad.

8              THE COURT:  Overruled.

9    BY MS. KELLER:

10   Q    You know what the statute of limitations is, right?

11             THE COURT:  About what, trade secret

12   misappropriation, Counsel, copyright; what?

13             MS. KELLER:  Either, either or both.

14   BY MS. KELLER:

15   Q    You know that the standard is when Mattel discovered

16   facts or should have discovered facts that would cause a

17   reasonable person to be suspicious, that's when the statute

18   starts running, right?

19             MR. ZELLER:  Misstates the law.

20             THE COURT:  Overruled.

21             THE WITNESS:  No, that's not my understanding.

22             THE COURT:  And I'll instruct you on the law at

23   the end of the case concerning this.

24   BY MS. KELLER:

25   Q    And to file a lawsuit, you just have to have a

 1    reasonable basis to believe in good faith that you have a

 2    claim, right?

 3    A    You do have to have evidence to support a claim.

 4    Q    You have to have a reasonable basis to believe in good

 5    faith that you have a claim, correct?

 6              MR. ZELLER:  This is asked and answered and

 7    misstates the law.

 8              THE COURT:  No.  Overruled.

 9    BY MS. KELLER:

10    Q    Right?

11    A    Well, you have to have evidence to support a claim.

12    Q    Like you did when you sued Ron Brawer?  What evidence

13    did you have?

14              MR. ZELLER:  This is compound.

15              THE COURT:  Yeah, sustained.

16              MR. ZELLER:  Argumentative.

17              THE COURT:  Sustained.

18    BY MS. KELLER:

19    Q    What evidence did you have when you sued Ron Brawer?

20              MR. ZELLER:  Lacks foundation as to "you," too.

21              THE COURT:  Well, speaking of this gentlemen if

22    he's involved in that lawsuit, you can answer the question.

23              THE WITNESS:  Okay.  I was tangentially involved,

24    and I understood that Ron Brawer was -- well, he did not

25    agree to abide by the Code of Conduct, and the -- what he

 1   was sued for was called "dec relief," to get him to agree

 2   that he was bound by the obligations that others were bound

 3   by in the company.

 4   BY MS. KELLER:

 5   Q    So you had no evidence of wrongdoing, whatsoever, by

 6   him, correct?

 7            MR. ZELLER:  Argumentative.

 8            THE COURT:  Overruled.

 9   BY MS. KELLER:

10   Q    Correct?

11   A    Well, we sought dec relief.

12   Q    Not my question.  You had no evidence of any wrongdoing

13   of Ron Brawer, right?

14   A    Well, he would not sign an obligation.

15   Q    You had no evidence he did anything wrong, am I

16   correct?

17            MR. ZELLER:  Misstates the law.

18            THE COURT:  Overruled.

19            THE WITNESS:  Well, we had evidence that he

20   wouldn't sign an agreement that obligated him to keep

21   secrets -- keep the company's trade secrets.

22   BY MS. KELLER:

23   Q    So if an employee of Mattel's won't sign something

24   Mattel wants them to sign, that's evidence for you to sue

25   the person, right?

```
 1              MR. ZELLER:  This is argumentative.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  Well, there is awareness that he had

 4    made himself privy to a lot of Mattel's trade secrets, so it

 5    was of great concern.

 6    BY MS. KELLER:

 7    Q    Like anybody who worked at Mattel would, ever?

 8    A    Well, he's --

 9              MR. ZELLER:  It's argumentative.

10              THE COURT:  In its present form, sustained.

11    BY MS. KELLER:

12    Q    Here is my question, and it's a simple question, okay?

13    Does Mattel have the right --

14              MR. ZELLER:  Move to strike the preamble.

15              THE COURT:  Just a moment.  The first part is

16    stricken.  Just reask the question.

17    BY MS. KELLER:

18    Q    Does Mattel have the right to sue a departing employee

19    who will not sign documents Mattel wants him to sign; "yes"

20    or "no"?

21              MR. ZELLER:  The question is overbroad.

22              THE COURT:  Overruled.

23              THE WITNESS:  Well, it depends if we were

24    justified in this case.

25
```

1   BY MS. KELLER:

2   Q    Does Mattel have the right to sue an employee who is

3   leaving just because he won't sign documents Mattel wants

4   him to sign?

5   A    I think in the case of Ron Brawer, we could.

6   Q    And you had no evidence that he had done anything

7   wrong, correct?

8            MR. ZELLER:  This is asked and answered.  Lacks

9   foundation.

10           THE COURT:  Overruled.

11           THE WITNESS:  Well, he wouldn't sign what was

12  required of him to sign, and he had agreed to sign before he

13  left.

14  BY MS. KELLER:

15  Q    What was required of him to sign by Mattel, right?

16  A    Well, again, I had a tangential relationship to that

17  case, and so you are asking me for my understanding of it.

18  At that point, I think there was Code of Conduct or there

19  was some new agreement that he needed to sign.

20  Q    Even after Mr. Brawer was followed around for two weeks

21  and videotaped by investigators, you still had no proof,

22  whatsoever, that he had done anything wrong, correct?

23           MR. ZELLER:  This lacks foundation as to this

24  witness.

25           THE COURT:  Overruled.

```
 1              THE WITNESS:  I don't know if we had evidence
 2    then.
 3    BY MS. KELLER:
 4    Q    You know he was followed around and videotaped for a
 5    couple of weeks, correct?
 6    A    I know that he was videotaped.  I don't know the
 7    duration.
 8    Q    You know you found nothing -- you know that Mattel's
 9    investigators found nothing wrong, even after videotaping
10    and following him all that time, right?
11    A    Well, I don't think that they saw in the videotapes
12    that he had done anything wrong, but I don't know.
13    Q    So he was sued because he went to work for a
14    competitor, and he refused to sign a piece of paper that
15    Mattel wanted him to sign, giving up a lot of his rights,
16    correct?
17              MR. ZELLER:  Misstates the record.
18              THE COURT:  Overruled.
19              THE WITNESS:  Well, not exactly.
20    BY MS. KELLER:
21    Q    Pretty exactly, right, Mr. Moore?
22              THE COURT:  It's argumentative, Counsel.  Restate
23    the question.
24    BY MS. KELLER:
25    Q    You sued him because he refused to sign a piece of
```

1   paper that Mattel wanted him to sign that would have given

2   up a lot of his rights, correct?

3   A    Again, my understanding was that he wouldn't agree to

4   be bound by the Code of Conduct, things of that nature that

5   he had agreed to.

6   Q    And the "Code of Conduct" title at the top of the paper

7   was on top of a brand new inventions agreement, a brand new

8   really broad proprietary information agreement and a lot of

9   other things, right?

10           MR. ZELLER:  This is argumentative and misstates

11  the record.

12           THE COURT:  Sustained.

13  BY MS. KELLER:

14  Q    Now, Mattel's designers and executives were suspicious

15  of wrongdoing by the spring of 2002, correct?

16  A    (No audible response.)

17  Q    They were suspicious of wrongdoing by Carter Bryant by

18  the spring of 2002, right?

19           MR. ZELLER:  Is she withdrawing the first

20  question?  It's unclear what she's asking.

21           THE COURT:  Overruled.

22           You can answer.

23           THE WITNESS:  Yeah, I understood that there was a

24  suspicion that Carter Bryant might have created Bratz, and

25  also that he lied about where he was going when he was

1    leaving Mattel.

2    BY MS. KELLER:

3    Q    In fact, he expressly refused to tell Mattel where he

4    was going to work, true?

5    A    He wouldn't tell anybody, as far as I'm aware.

6    Q    He wouldn't tell Mattel, correct?  I'm not talking

7    about anybody.  I'm talking about Mattel.  Right?

8             MR. ZELLER:  Objection as to Mattel.

9             THE COURT:  Overruled.

10   BY MS. KELLER:

11   Q    Correct?

12   A    Yeah, I didn't hear that he told anybody at Mattel.

13   Q    You heard that he didn't tell Mattel where he was

14   going, right?

15   A    He didn't tell people at Mattel where he was going.

16   Q    And he was asked by people at Mattel where he was

17   going, right?

18   A    Yes.

19   Q    And refused to say, true?

20   A    True.

21   Q    And that made people suspicious, right?

22   A    Some.

23   Q    And, in fact, Mr. Turetzky had done a memo for

24   Mr. Bosick by August of 2001, right?

25             MR. ZELLER:  This assumes facts.

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  I'm not sure what you are referring

 3     to.

 4     BY MS. KELLER:

 5     Q    Trial Exhibit 26701A, which is in evidence.

 6          Do you see that before you?

 7     A    Yes.

 8     Q    And that memo reported on MGA, MGA Hong Kong and Isaac

 9     Larian, did it not?

10     A    Well, I'm only seeing the e-mail right now.  I don't

11     have the exhibit in front of me.  I'm looking at the screen.

12              THE COURT:  Just a moment.  They'll get that for

13     you.

14              THE WITNESS:  Thank you.

15              (Live reporter switch with Denise Paddock.)

16                        -oOo-

17

18

19

20

21

22

23

24

25
```

Case 2:04-cv-09049-DOC-RNB  Document 10396  Filed 04/06/11  Page 132 of 132  Page ID #:316185
CV 04-9049-DOC - 04/04/2011 - Day 45, Vol. 2 of 4

132

1                          -oOo-

2                        **CERTIFICATE**

3

4            I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  April 5, 2011

12

13

14       _____

15       JANE C.S. RULE, U.S. COURT REPORTER
         CSR NO. 9316

16

17

18

19

20

21

22

23

24

25