UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

- - - - - - -

# CERTIFIED TRANSCRIPT

MATTEL, INC., et al.,                )
                                     )
                    Plaintiffs,      )
                                     )
          vs.                        )
                                     )
MGA ENTERTAINMENT, INC., et al.,     )   No. CV 04-9049-DOC (RNBx)
                                     )      Day 45
                                     )      Volume 3 of 4
                    Defendants.      )
_____)


REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
SANTA ANA, CALIFORNIA
MONDAY, APRIL 4, 2011


Denise Paddock, CSR 10199, CMRS, RMR, CRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
transcripts@ocrecord.com www.ocrecord.com
040411 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 45 V3
04/04/2011

**APPEARANCES OF COUNSEL:**

FOR PLAINTIFF MATTEL, INC., ET AL.:

     QUINN EMANUEL URQUHART & SULLIVAN LLP
     BY: JOHN QUINN
         WILLIAM PRICE
         MICHAEL T ZELLER
         Attorneys at Law
     865 S Figueroa Street, 10th Floor
     Los Angeles, CA 90017-2543
     213-443-3000

FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

     ORRICK HERRINGTON & SUTCLIFFE LLP
     BY: THOMAS S McCONVILLE
         Attorney at Law
     4 Park Plaza, Suite 1600
     Irvine, CA 92614
     949-567-6700

     - AND -

     ORRICK HERRINGTON & SUTCLIFFE LLP
     BY: ANNETTE L HURST
         Attorney at Law
     405 Howard Street
     San Francisco, CA 94105
     415-773-5700

     KELLER RACKAUCKAS LLP
     BY:  JENNIFER L KELLER
         Attorney at Law
     18500 Von Karman Avenue, Suite 560
     Irvine, CA 92612
     949-476-8700

1   **APPEARANCES OF COUNSEL (Continued):**

2

3

4     FOR CARLOS GUSTAVO MACHADO GOMEZ:

5           LAW OFFICES OF MARK E OVERLAND
            BY: Mark E Overland
6               Attorney at Law
            100 Wilshire Boulevard, Suite 950
7           Santa Monica, CA 90401
            310-459-2830
8
            -AND-
9
            SCHEPER KIM AND HARRIS LLP
10          BY: ALEXANDER H COTE
                Attorney at Law
11          601 West Fifth Street, 12th Floor
            Los Angeles, CA 90071-2025
12          213-613-4655

13          ALSO PRESENT:

14          MGA ENTERTAINMENT, INC.
            BY: JEANINE PISONI
15              Attorney at Law
            16360 Roscoe Boulevard, Suite 105
16          Van Nuys, California 91406

17

18   ALSO PRESENT:

19          KEN KOTARSKI, Mattel Technical Operator

20          MIKE STOVALL, MGA Technical Operator

21

22

23

24

25

UNITED STATES DISTRICT COURT

## CHRONOLOGICAL INDEX

040411 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 45 V3
CV 04-9049 DOC

**WITNESS:**                                                             **PAGE:**

**MICHAEL MOORE**
REDIRECT EXAMINATION RESUMED
BY MS. KELLER..........................................................   6
RECROSS-EXAMINATION
BY MR. ZELLER..........................................................  20

**JAMES EDWARD MALACKOWSKI**
DIRECT EXAMINATION
BY MS. KELLER..........................................................  37


 **PROCEEDINGS:**
Open court - jury present.............................................   6
Open court - jury not present.........................................  28
Recess taken..........................................................  36
Open court - jury present.............................................  36
Open court - jury not present.........................................  68
Open court - jury not present.........................................  68
Recess taken..........................................................  68
Adjournment...........................................................  68

## ALPHANUMERIC INDEX

040411 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 45 V3
CV 04-9049 DOC

**WITNESS:**                                                                        PAGE:

**JAMES EDWARD MALACKOWSKI**
DIRECT EXAMINATION
BY MS. KELLER.........................................    37

**MICHAEL MOORE**
REDIRECT EXAMINATION RESUMED
BY MS. KELLER.........................................     6
RECROSS-EXAMINATION
BY MR. ZELLER.........................................    20

|  |  |
|---|---|
| 1 | SANTA ANA, CALIFORNIA; MONDAY, APRIL 4, 2011, |
| 2 | Day 45, Volume 3 of 4 |
| 3 | P.M. SESSION |
| 4 | (Open court - jury present.) |
| 15:27 5 | THE COURT:  Can you read the screen or is that |
| 6 | blurry? |
| 7 | THE WITNESS:  Yes, I can. |
| 8 | THE COURT:  All right.  Then, Counsel, proceed. |
| 9 | **MICHAEL MOORE,** |
| 15:27 10 | witness, called by Defendant(s), previously sworn |
| 11 | **REDIRECT EXAMINATION RESUMED** |
| 12 | BY MS. KELLER: |
| 13 | Q.   That memo reported on MGA, MGA Hong Kong and |
| 14 | Isaac Larian; right? |
| 15:27 15 | A.   Yes, it talks about MGA and Isaac Larian. |
| 16 | Q.   And it talks about concerns regarding confidential |
| 17 | information; right? |
| 18 | MR. ZELLER:  This lacks foundation. |
| 19 | THE COURT:  Overruled. |
| 15:28 20 | Q.   BY MS. KELLER:  Correct? |
| 21 | A.   It looks like there is some concern about how similar |
| 22 | their products are -- they are to ours, and -- |
| 23 | Q.   And you talked to Mr. Turetzky, didn't you? |
| 24 | A.   I talked to him about this case later on, not in 2001, |
| 15:28 25 | 2002 or 2003. |

1   Q.   You talked to Mr. Turetzky, among other things, about

2   this memo; right?

3            MR. ZELLER:  This is getting into privilege.

4            THE COURT:  Overruled.

15:28 5   Q.   BY MS. KELLER:  Correct?

6   A.   I didn't.

7   Q.   This memo reports on MGA, MGA Hong Kong and Isaac Larian

8   and talks about concerns regarding confidential information;

9   true?

15:28 10  A.   True.

11  Q.   This memo was dated August 21st, 2001, and it's from

12  Matthew Turetzky to Jerome Bossick.

13            And who was Jerome Bossick, again?

14  A.   Well, Jerry Bossick is an executive at Mattel.

15:29 15  Q.   And this memo talks about whether MGA and Larian may

16  have copied Mattel products; right?  Specifically it talks

17  about Bratz bearing significant resemblance to Diva Starz in

18  both appearance and attitude.

19            Look at Page 26701(a), Page 3, "product lineup."

15:29 20           And it says "even Website has some similarity."

21            Do you see that?

22  A.   That's on Page 3?

23  Q.   Page 3.

24  A.   Oh, I see.  Yes, I see that.

15:29 25  Q.   And so this is back in August of 2001, Mattel executives

UNITED STATES DISTRICT COURT

```
 1    were talking about concerns that MGA and Isaac Larian and MGA

 2    Hong Kong had confidential information from Mattel; right?

 3    A.   Well, this is more a concern about how closely they're

 4    following our product line.

 5    Q.   And Mattel's designers were suspicious because they

 6    thought Bratz might have plagiarized Toon Teens; right?

 7    A.   There was a concern that Bratz was a copy of Toon Teens

 8    in some way.

 9    Q.   And if you look at Trial Exhibit 1195, which is in

10    evidence, Page 66.

11    A.   Okay.

12    Q.   And this is back in 2002; right?

13    A.   From 2002, yes.

14    Q.   And this is March 28th, 2002, that Cassidy Park is

15    suggesting that Carter Bryant -- it says "met with Cassidy

16    Park to get more info on MGA issue.  She suggested

17    Carter Bryant as illustrator, former employee, who may have

18    plagiarized design of Lilly Martinez and created 'Bratz'

19    dolls for MGA," and that's March 28th, 2002; right?

20    A.   I see that.

21    Q.   So you didn't have to fly to Hong Kong to get this

22    information.

23         You could get it in the design studio; you could

24    get it from Mattel employees; you could get it from Mattel

25    executives; right?
```

1        MR. ZELLER:  The question is vague as to "this

2   information."

3        THE COURT:  Overruled.

4        THE WITNESS:  Well, I'm unclear about the

15:32 5   connection you're trying to make.

6        This investigation was about whether Bratz was a

7   plagiarism of Toon Teens, not the case that's before us now.

8   Q.  BY MS. KELLER:  You did not need to fly to Hong Kong in

9   2000 and -- well, the other thing is if you wanted to get

15:32 10  information from MGA employees -- Mattel employees, all you

11  needed to do was send an e-mail to distribution and you

12  could -- you could send an e-mail to every employee in the

13  company at once asking them if they had any information about

14  Carter Bryant; right?

15:32 15  A.  Well, it's -- it's possible, but I've never, ever seen

16  that done with respect to gathering information about a

17  particular individual.

18  Q.  All you had to do was send an e-mail to every employee

19  saying, please tell us anything you know about Carter Bryant

15:32 20  and any involvement he may have had working on Bratz while he

21  was at Mattel, and you could reach how many thousands of

22  people instantly?

23  A.  That's -- that's not something that I think we would

24  have done.  We did an investigation that looked at who knew

15:33 25  Carter Bryant, what possibly he could have done, where were

CV 04-9049 DOC - 04/04/2011  Volume 3 of 4

```
 1    his drawings.
 2    Q.   Well, I'm not asking whether it's something you would
 3    have done or might have done; it's something you could have
 4    done if you had chosen to; right?
15:33  5         MR. ZELLER:  Move to strike the preamble.
 6         THE COURT:  Sustained.
 7    Q.   BY MS. KELLER:  It's something you could have done had
 8    you chosen to; right?
 9    A.   It's possible to send an e-mail to everybody, but the
15:33 10    type of e-mail you're talking about I've never heard of ever
11    being done.
12    Q.   And Mattel knew back in 2000 -- I think you said that
13    the Wall Street Journal article was the first time you had
14    seen any mention of Carter Bryant as the person who came up
15:34 15    with Bratz in a publication.
16         Do you remember that?
17         MR. ZELLER:  Misstates the question that was asked.
18         THE COURT:  Overruled.
19         THE WITNESS:  In the Wall Street Journal article,
15:34 20    that was first time I had ever seen MGA acknowledged
21    publically that Carter Bryant was the designer of Bratz.
22    Q.   BY MS. KELLER:  But you knew that the Internet existed
23    in 2002; right?
24    A.   Yes.
15:34 25    Q.   And you knew, in fact, that Mattel monitored various
```

1    Websites that had to do with MGA and Bratz; right?

2    A.   No.  I think that overstates the case.

3    Q.   You knew that MGA -- that Mattel monitored Websites

4    having to do with MGA and Bratz; true?

15:34 5   A.   Well, there are Websites out there.  I'm sure Mattel

6    people looked at them.  But "monitoring" it, I don't know

7    that's true.

8    Q.   And -- and, in fact, the first time that Mattel

9    consulted with outside counsel with regard to any matter

15:35 10  concerning Bratz was with respect to a letter dated 2002 that

11   related to an MGA Website; right?

12          MR. ZELLER:  That misstates the record.

13          THE COURT:  Just restate the question.

14   Q.   BY MS. KELLER:  Is it true that Mattel first consulted

15:35 15  outside counsel on any matter concerning Bratz after

16   discovering mention of Bratz on an MGA Website?

17          MR. ZELLER:  That assumes facts.

18          THE COURT:  Overruled.

19          THE WITNESS:  Yeah, I don't know what the first

15:35 20  time any Mattel counsel contacted outside counsel for about

21   Bratz or MGA.

22   Q.   BY MS. KELLER:  There is a February 7th, 2002, letter

23   that you saw that related to an MGA Website; true?

24   A.   You -- you'd have to show me the letter for me to

15:36 25  confirm.

```
 1    Q.   Take a look at Exhibit 17252.  This is File 2.

 2            Do you see 17252 in front of you?

 3    A.   Yes.

 4    Q.   And that's a letter from the law firm of Quinn Emanuel

15:37 5    to Isaac Larian; right?

 6    A.   Yes.

 7    Q.   And it says that, "Dear Mr. Larian:  We are counsel to

 8    Mattel, Inc.  We are writing to request that

 9    MGA Entertainment immediately and permanently cease

15:37 10   infringing Mattel's Barbie and Diva Starz trademarks.

 11           "The marks are being infringed by the Bratz Yahoo!

 12   Discussion Group Websites.  Enclosed is a copy of the

 13   homepage from one such Website.  The "key words" designated

 14   by MGA include BARBIE and DIVA STARZ.  Thus when Internet

15:37 15  users search Yahoo! for discussion groups related to Mattel's

 16   BARBIE and DIVA STARZ dolls, the Bratz discussion group sites

 17   are identified."

 18           Now, the reason that the lawyer at Quinn Emanuel

 19   was able to write this letter was because Mattel was

15:38 20  monitoring the Bratz Yahoo! discussion group Websites; right?

 21           MR. ZELLER:  That assumes facts; lacks foundation.

 22           THE COURT:  Do you know the answer, sir, to that

 23   question?

 24           THE WITNESS:  No, I don't.

15:38 25           THE COURT:  All right.
```

1    Q.   BY MS. KELLER:  In fact, is it true that Mattel first

2    consulted with outside counsel on any matter regarding Bratz

3    on this very issue, this letter that we are just looking at?

4    A.   This is the first letter that I've seen.  I didn't -- I

15:38 5    don't know of any other time or earlier than this.

6    Q.   So when you saw this letter, then, you said, well, this

7    is the first time Mattel consulted outside counsel with

8    regard to any matter concerning Bratz; right?

9          MR. ZELLER:  It's irrelevant; misstates the

15:38 10    testimony.

11          THE COURT:  Just a minute.

12          MR. ZELLER:  What he said to himself.

13          THE COURT:  All right.

14          MR. ZELLER:  It's ambiguous also.

15:39 15          THE COURT:  I don't have realtime up.  Could you

16    read that question back to me.

17          (Record read.)

18          THE COURT:  Sustained.

19    Q.   BY MS. KELLER:  To your knowledge, is this the first

15:39 20    time Mattel consulted outside counsel with regard to any

21    matter concerning Bratz?

22    A.   As far as I'm aware, this is the earliest letter I ever

23    saw regarding Bratz sent by an outside lawyer at the time.

24    Q.   And if we look at Page 3 here, we see it's a copy of

15:39 25    Yahoo! Group's Website; right?

UNITED STATES DISTRICT COURT

1    A.    Yes.

2    Q.    And the description says "Bratz world for all you Bratz

3    and Bratz doll lovers."

4          And then if we go to Page 4 we see group e-mail

15:40 5    addresses at the bottom that there are a number of Websites

6    and addresses lists; right?

7    A.    Yes.

8    Q.    And it's routine for trademark lawyers to monitor the

9    Internet for unauthorized use of trademarks; correct?

15:40 10          MR. ZELLER:  The question's vague.

11          THE COURT:  Do you understand the question, sir?

12          THE WITNESS:  No.

13          THE COURT:  Repeat it, then.

14    Q.    BY MS. KELLER:  It is routine for trademark lawyers to

15:40 15    monitor the Internet or have it monitored for unauthorized

16    use of trademarks; true?

17          MR. ZELLER:  The question's vague.

18          THE COURT:  Overruled.

19          You can answer that question.

15:40 20          THE WITNESS:  It's done sometimes.

21    Q.    BY MS. KELLER:  It's routine, isn't it?

22    A.    Well, it's done sometimes.

23    Q.    If it's a big company it's routine, isn't it?

24          MR. ZELLER:  Objection to "big companies."

15:40 25          THE COURT:  Well, no.  Overruled.

CV 04-9049 DOC - 04/04/2011 Volume 3 of 4

```
 1              You can answer that question.
 2              THE WITNESS:  Yeah, I'm not sure what you mean by
 3       "routine," but it's done sometimes.
 4       Q.   BY MS. KELLER:  Mattel regularly monitors the Internet
15:40 5       for unauthorized uses of its marks; right?
 6       A.   Information comes in about infringements that are on the
 7       Internet, but in terms of me setting aside time to monitor
 8       the Internet or anybody that I know of, I -- that -- that
 9       doesn't happen.
15:41 10      Q.   Information comes in because Mattel has people do that,
 11      monitor the Internet for unauthorized uses of its trademarks;
 12      right?
 13      A.   No, not -- not that I'm aware.
 14      Q.   Isn't the notion that Bratz plagiarized Toon Teens
15:41 15      exactly what your lawyers are claiming in this suit?
 16              MR. ZELLER:  Misstates the position.
 17              THE COURT:  Sustained.  Sustained.
 18      Q.   BY MS. KELLER:  Well, isn't it what is claimed as having
 19      inspired Carter Bryant to design Bratz?
15:41 20      A.   No, not that I'm aware.  I mean -- no.
 21      Q.   Isn't that supposed to be how we know the relevant dates
 22      here, that Carter Bryant made Bratz in 1999 instead of 1998
 23      because he must have been inspired by Toon Teens?
 24              MR. ZELLER:  This is just argument.
15:42 25              THE COURT:  Sustained.
```

UNITED STATES DISTRICT COURT

1           MS. KELLER:  Let's look at Exhibit 4507.

2           THE COURT:  Is this already received, Counsel?

3           MS. KELLER:  It is.

4           And this is a March 12th e-mail involving a guy

15:43  5   named David Dess.

6           And if we look --

7           MR. ZELLER:  There's no foundation for this

8    witness.

9           THE COURT:  Are you aware of this letter, sir?

15:43 10    THE WITNESS:  No.

11          THE COURT:  Counsel, sustained.

12          This will turn into argument if he's not aware of

13   it.

14   Q.  BY MS. KELLER:  Have you never seen, in connection with

15:43 15   this lawsuit, an e-mail from a gentleman named David Dess,

16   publishing on the Internet information about Carter Bryant as

17   a designer of Bratz?

18          MR. ZELLER:  That assumes facts.

19          THE COURT:  Overruled.

15:43 20    THE WITNESS:  I have not seen it.

21   Q.  BY MS. KELLER:  Not to this day?

22   A.  I'm looking at this letter.  This would be the first

23   day.

24   Q.  So this -- despite your investigation, you never got a

15:43 25   hold of that?  Is that true?

```
 1              MR. ZELLER:  This assumes facts.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  Like I said, I have not seen this

 4    letter.

15:43  5    Q.  BY MS. KELLER:  Your information that Hong Kong files

 6    were private, you don't speak Chinese?

 7              MR. ZELLER:  The predicate misstates testimony.

 8              THE COURT:  That "you don't speak Chinese?"

 9              MR. ZELLER:  No, no.  She said the files are

15:44 10    private, is what she said.

11              MS. KELLER:  Let's go back.

12              THE COURT:  Just a moment.

13              MS. KELLER:  I'll rephrase, Your Honor.

14    Q.  BY MS. KELLER:  You remember testifying that there's

15:44 15    very little information available to the public in Hong Kong

16    lawsuit files?  Do you remember that?

17    A.  Yes.

18    Q.  Do you speak Chinese?

19    A.  No.

15:44 20    Q.  Did you personally communicate with court staff in

21    Hong Kong?

22    A.  No.

23    Q.  You got that information from outside counsel; right?

24    A.  I got that information because I asked outside counsel

15:44 25    to do all they could to find out what was available in
```

1    Hong Kong.  What they sent me was not the full file.

2    Q.    Did you understand my question?

3    A.    I think I did.

4    Q.    You got the information that it was tough to get things

5    from the Hong Kong files from outside counsel; right?

6              MR. ZELLER:  Misstates the testimony.

7              THE COURT:  Overruled.

8              THE WITNESS:  Yes; I understood it from outside

9    counsel.

10   Q.    BY MS. KELLER:  So you don't have any person go down to

11   the courthouse?

12   A.    No.

13   Q.    So you don't know from personal knowledge; right?

14             MR. ZELLER:  It's just argument.

15             THE COURT:  No; overruled.

16             THE WITNESS:  No, I didn't do it myself.

17   Q.    BY MS. KELLER:  You got all the information about that

18   from outside counsel; true?

19   A.    Well, we had outside counsel in Hong Kong which isn't

20   representing us in this case.

21             THE COURT:  All right.

22             Now, Ladies and Gentlemen, I'm going to caution

23   you.  Before I admitted this testimony I thought that this

24   gentleman had personally made an inquiry.  Now I'm hearing

25   that that's not the case; he got it from outside counsel.

 1              I'm going to doubly caution you that this is

 2      hearsay.  I'm allowing it only for his conduct and his

 3      investigation purposes, but under these circumstances it

 4      lacks foundation.

15:46  5      Q.   BY MS. KELLER:  And your understanding about how hard it

 6      is to get information out of Brazil, you don't speak

 7      Portuguese; right?

 8      A.   No, I don't.

 9      Q.   You didn't personally contact the court there; correct?

15:46 10      A.   No, I did not.

 11      Q.   You got that, too, personally from outside counsel?

 12      A.   Yeah, in Brazil.  Outside counsel that I was using in

 13      Brazil.

 14      Q.   So --

15:46 15              THE COURT:  Just a moment.

 16              But did you make that personal inquiry down in

 17      Brazil?

 18              THE WITNESS:  I personally inquired of outside

 19      counsel.

15:46 20              THE COURT:  In Brazil?

 21              THE WITNESS:  Yes.

 22              THE COURT:  Outside counsel in Brazil?

 23              THE WITNESS:  Yes, outside counsel.  My

 24      Brazilian --

15:46 25              THE COURT:  That's okay.

 1              You can ask the question, then; and you can respond

 2     because there you made a personal inquiry.

 3     Q.   BY MS. KELLER:  And --

 4              THE COURT:  Unlike Hong Kong where you got that

15:46 5     information from outside counsel here in the United States.

 6              THE WITNESS:  I see, yes.

 7              THE COURT:  All right.  The Hong Kong lacks

 8     foundation.

 9              Brazil, you can inquire about.

15:47 10              MS. KELLER:  I don't think I have anything further,

 11     Your Honor.

 12              THE COURT:  Then recross by Mr. Zeller.

 13                      **RECROSS-EXAMINATION**

 14     BY MR. ZELLER:

15:47 15     Q.   You have personally reviewed the Hong Kong court filings

 16     that you were able to obtain personally; right?

 17              MS. KELLER:  Objection.

 18              THE COURT:  Overruled.

 19              If you got those files or a portion of them, we

15:47 20     need to know.

 21              THE WITNESS:  I reviewed them.

 22              MS. KELLER:  Objection as to foundation where he

 23     got them, Your Honor.

 24              From the court?

15:47 25              MR. ZELLER:  We'll get to that, I promise.

1          THE COURT:  Next question.

2     Q.   BY MR. ZELLER:  And those court filings that you

3     reviewed from Hong Kong, were they in English or in Chinese?

4     A.   They were in English.

15:47 5     Q.   And, in fact, it's your general understanding that court

6     proceedings there in Hong Kong, following English law,

7     generally, are conducted in English; right?

8     A.   That's right.

9     Q.   And you were asked some questions about how you knew

15:48 10     about these Hong Kong court filings.

11          You actually asked the outside Hong Kong lawyers to

12     go down to the Hong Kong courts and see and collect what

13     court filings MGA was involved with that could be obtained

14     publically; right?

15:48 15     A.   Yes.  I asked outside counsel to get whatever court

16     filings they could get.

17          THE COURT:  Well, just a moment.  Is this outside

18     Hong Kong counsel or United States counsel?

19          That's where we're getting into the difficulty.

15:48 20          THE WITNESS:  I -- I see.

21          THE COURT:  In other words, in Brazil, you've

22     testified that you had a conversation with outside counsel in

23     Brazil.

24          THE WITNESS:  Yes.

15:48 25          THE COURT:  The confusion's being caused is did you

Case 2:04-cv-09049-DOC-RNB   Document 10397   Filed 04/06/11   Page 22 of 68   Page ID #:316207
CV 04-9049 DOC - 04/04/2011   Volume 3 of 4

22

```
 1    have the conversation with outside counsel here in the

 2    United States or did you personally make a phone call to

 3    outside counsel in Hong Kong?

 4              THE WITNESS:  Yes.  Okay.

15:49 5         The answer is, is that I actually asked outside US

 6    counsel to ask Hong Kong counsel; however -- however, I

 7    followed up directly with Hong Kong counsel and I understood

 8    that.

 9              THE COURT:  That clears it up.

15:49 10        Thank you.

 11   Q.   BY MR. ZELLER:  And -- and then at some point you

 12   actually reviewed the court filings that the Hong Kong

 13   lawyers were able to get out of the public court files there

 14   in Hong Kong that pertained to MGA?

15:49 15  A.   Yes.

 16   Q.   And among those court files, I think you've said, there

 17   was copies of the public filings.  There was no copy of the

 18   Carter Bryant agreement dated as of September 18th, 2000?

 19   A.   That's right; there was no copy.

15:49 20  Q.   Were there -- were there copies of any Carter Bryant

 21   Bratz' drawings that were available through these public

 22   court filings in Hong Kong?

 23   A.   No, there were no drawings.

 24   Q.   You were asked a number of questions about -- well, you

15:50 25  know, you could have just simply sent out a blast e-mail to
```

```
 1    35,000 Mattel employees or otherwise looked in Mattel for

 2    copies of what was being referred to as "this information"?

 3          Do you recall those questions?

 4    A.   Yes.

15:50 5    Q.   Now, focusing on the information that you received at

 6    this Hong Kong meeting in November of 2004, first the

 7    Carter Bryant Bratz drawings, do you know who had those

 8    drawings?  Was there anyone at Mattel, that you're aware of,

 9    who ever had those drawings?

15:50 10   A.   No.

11    Q.   And, in fact, it's your understanding that the parties

12    who had the Carter Bryant Bratz drawings were MGA and

13    Carter Bryant?

14    A.   That's what I understood.

15:50 15   Q.   And then with respect to Carter Bryant's contract with

16    MGA that was dated as of September 18, 2000, do you have any

17    reason to think that anyone at Mattel had a copy of that

18    agreement in their files?

19          MS. KELLER:  Objection; calls for speculation.

15:51 20          THE COURT:  Overruled.

21          You can answer that question.

22          THE WITNESS:  I have no reason to think that

23    anybody had that agreement.

24    Q.   BY MR. ZELLER:  Who -- who -- who is it you expect had

15:51 25   copies of the agreement between Carter Bryant and MGA?
```

1   A.    MGA and Carter Bryant.

2   Q.    You -- you were asked a number of questions about the

3   lawsuit against Ron Brawer and whether or not there was any

4   evidence of wrongdoing on his part.

15:51  5         Do you recall those questions?

6   A.    Yes.

7   Q.    Did you generally understand that the lawsuit that was

8   brought against Mr. Brawer was for something called

9   "declaratory relief"?

15:51  10  A.    Yes.

11  Q.    And is it the case -- and you know, as a lawyer, that

12  declaratory relief doesn't require proof of wrongdoing, it

13  only requires that there be a dispute about something; right?

14  A.    That's what I understand, yes.

15:52  15  Q.    And -- and you understand, generally, as a lawyer, that

16  declaratory relief is when a party comes to court and asks

17  the judge to make a legal ruling about rights, whether

18  someone has legal rights or doesn't have legal rights?

19         Is that right?

15:52  20  A.    That's right.

21  Q.    And is it the case that if someone has access to

22  confidential information but refuses to acknowledge that he

23  has any obligation to keep that information confidential,

24  that a declaratory relief lawsuit can be properly brought?

15:52  25         MS. KELLER:   Objection; assumes facts not in

UNITED STATES DISTRICT COURT

 1    evidence that there wasn't an existing agreement in place.

 2              THE COURT:  Just a moment.

 3              (Pause in the proceedings.)

 4              THE COURT:  Well, Counsel, it assumes that it's

15:53 5    confidential information, et cetera.

 6              I think the first question's appropriate.

 7              "And if you -- and you understand, generally, as a

 8    lawyer, that declaratory relief is when a party comes to

 9    court and asks the judge to make a legal ruling about rights,

15:53 10   whether someone has legal rights or doesn't have legal

 11   rights?

 12              "Is that right?

 13              "Answer:  That's right."

 14              The second question's sustained.

15:53 15            MR. ZELLER:  Let me try this this way.

 16   Q.   It's your understanding that Mr. Brawer, by virtue of

 17   his position there at Mattel, had access to Mattel trade

 18   secrets and Mattel confidential information?

 19   A.   Yes.

15:54 20   Q.   And it was also your understanding that there was an

 21   issue between Mattel and Mr. Brawer regarding whether or not

 22   he had obligations to keep that information confidential;

 23   right?

 24              MS. KELLER:  Objection; that assumes facts not in

15:54 25   evidence.

 1          THE COURT:  No, you both inquired into Brawer.

 2          You can ask these questions.

 3          THE WITNESS:  Yes.  I understand it's a dispute.

 4   Q.   BY MR. ZELLER:  And is it your understanding that under

15:54  5   those circumstances that Mattel can properly bring a

 6   declaratory relief suit asking a judge to resolve this

 7   dispute?

 8          THE COURT:  Sustained as to "properly."  They can

 9   bring a declaratory relief suit, but "properly" is for the

15:54 10   jury to decide.

11          That assumes facts not in evidence.

12          MR. ZELLER:  Then I'll rephrase if without it,

13   then.

14   Q.   Is it your understanding under those circumstances that

15:54 15   a declaratory relief lawsuit can be brought in which the

16   parties asked the court to make a decision about who's right

17   in the dispute?

18   A.   Yes.

19          MR. ZELLER:  Nothing further, Your Honor.

15:55 20          THE COURT:  Okay.

21          Then, Mr. Moore, if you'd step down, please.

22          MS. KELLER:  I'm sorry.

23          THE COURT:  Or just a moment.

24          Did you have additional questions?

15:55 25          MS. KELLER:  I just had one.

```
 1              THE COURT:  Well, show it to counsel and let's see.
 2              I think usually we've gone back and forth and I
 3      think that this resolves it.
 4              Mr. Moore, I'm going to ask you to be subject to
 5      recall until next Friday, but if you'd remain until 5:00 this
 6      evening.
 7              THE WITNESS:  Yes, sir.
 8              THE COURT:  Thank you very much.
 9              Wait out in the hallway.
10              MR. ZELLER:  I guess I have no objection.
11              THE COURT:  Just a moment.
12              Any objection?  Because otherwise the rules are the
13      rules -- twice -- and I've let that go additional times with
14      Mr. Larian and Mr. Eckert.
15              Thank you, Mr. Moore.
16              All right.
17              Your next witness, please.
18              MS. KELLER:  Your Honor, we have one matter that we
19      need to bring up with the court first before we call our next
20      witness.
21              THE COURT:  You probably needed a recess anyway,
22      didn't you?
23              All right.  The jury needs a recess.
24              You are admonished not to discuss this matter
25      amongst yourselves or to form or express any opinions about
```

```
 1    the case.

 2              I'm going to ask you to stay a little past

 3    5:00 tonight.  We're on track to get this case to you and I

 4    want to get this case to you later this week.

 5              If you would go back in the jury room and, Counsel,

 6    if you would be seated.

 7              (Open court - jury not present.)

 8              THE COURT:  All right.  Counsel, if you'd be

 9    seated.

10              First of all, the rules are pretty uniformly

11    applied.  Once we're done with cross, recross, that's it.

12              The only person I've made exception to is

13    Mr. Eckert, Mr. Larian, sometimes Mr. Carter Bryant.  But

14    those are the key witnesses in the case.

15              Otherwise we'll hold to that.

16              What do you want to bring up with the court,

17    Counsel?

18              MS. HURST:  Your Honor, it's this Jade trademark,

19    whether the Jade name is in or out, so we know whether to do

20    the request for judicial notice.  That's all it is.

21              It's not on 9801.  We understood the court had

22    limited them to 9801.  We don't want to take the time on the

23    judicial notice, if it's unnecessary, but we're about to rest

24    after Malackowski.

25              So if it is, let's do it.
```

1          THE COURT:  I've got time this evening.  There's no

2    reason to hold this up.

3          In other words, Malackowski's not going to be done.

4          MS. KELLER:  I think Mr. Malackowski has to talk

15:57 5    about that, though, if, one way or the other, the value --

6          THE COURT:  Well, I don't have it received in

7    evidence yet, do I?

8          I mean, that's my problem.

9          MS. HURST:  I mean, you did grant the judicial

15:57 10   notice.

11         THE COURT:  I did grant --

12         MS. HURST:  You did grant it.

13         I -- we either have to spend time reading it and

14   getting all the exhibits admitted or if they're not pressing

15:57 15   the Jade thing any longer, which we can't get a straight

16   answer about --

17         THE COURT:  Let's just get a response so we know

18   what to do and we'll move on, proceeding with Jade or not.

19         It makes a difference in my instructions also,

15:58 20   which I'm not going to give to either party until I finally

21   get these answers.

22         So you haven't seen the special verdicts.  You

23   haven't seen the instructions yet, and I'd like to get them

24   to you tonight, but all I'm required to do is to get them to

15:58 25   you before you argue, since everything else seems to be

 1   coming in between 2:00 and 7:30 in the morning, but I'll do

 2   my best, but counsel will have to --

 3           MS. KELLER:  Your Honor, this was raised the last

 4   time.  This isn't --

15:58  5           THE COURT:  We're finding out.

 6           MR. ZELLER:  We're not going to assert Jade.

 7           THE COURT:  That resolves it, then.

 8           Then why don't you take a 15-minute recess.  Why

 9   don't we meet at a-quarter-after.  Mr. Malackowski will be on

15:58 10   at that time.

 11           MR. ZELLER:  Can I let Mr. Vollero go as well?

 12   He's been on --

 13           THE COURT:  I don't know.  Here's my problem.

 14           All these agreements are being made by the parties.

15:59 15   I'm the last to know.  I'm happy to make phone calls for all

 16   of you.  And I've done so for Carter Bryant again this

 17   morning, I believe, and has anybody heard from his counsel

 18   today after I -- he called my chambers just during the recess

 19   and I was fortunate enough just to literally walk by and have

15:59 20   my judicial assistant hand me the phone.

 21           He -- his comment was he didn't know where

 22   Carter Bryant was; he was doing his absolute best.  He could

 23   count on us, try to get Carter Bryant here, but all the

 24   phones had been disconnected.  He was sending an e-mail and

15:59 25   he was going to try to get him here tomorrow.

CV 04-9049 DOC - 04/04/2011 Volume 3 of 4

31

1          I indicated that the case was going to conclude on

2    Wednesday, so that's the best effort I can make to getting

3    him here.

4          Second, if you want to set any record concerning

15:59 5    Kuemmerle, this would be the appropriate time; and I'd be

6    happy to talk to you about that because I thought she was

7    supposed to testify March 23rd, then I thought she was

8    supposed to testify March 30th, and then I heard from counsel

9    she was on call and going to testify March 31st, and lo and

16:00 10   behold I find out last evening, on Sunday evening, that she's

11   refusing to come to court and going to Hong Kong.

12          Now, that just leaves the court in a helpless

13   position because I've tried to accommodate, but I'm quite

14   capable of putting a couple people in jail for disobeying my

16:00 15   order.

16          I just don't think the federal courts want to exert

17   their influence over Ms. Kuemmerle who has already been on

18   the witness stand.  But if you want to make a record of that

19   I'm happy to listen to this.

16:00 20          MR. ZELLER:  I think at this point, Your Honor, it

21   is water under the bridge.  We'll try and deal with it.

22          THE COURT:  You've got your e-mail.  It's come in,

23   not for the truth, and I'm not precluding you, of course,

24   from going into the opposite, sneaking into the showrooms,

16:00 25   and I think that there's an abundant amount of evidence

UNITED STATES DISTRICT COURT

         1    but -- for both parties.

         2           Now, what else are loose strings out there?  What

         3    keeps this case moving?  What problems do we have with any

         4    additional witnesses?

16:01    5           Carter Bryant -- I've already indicated informally

         6    to Mr. Zeller this morning of what questions were appropriate

         7    and what questions weren't, and they're very limited.

         8           MR. ZELLER:  Well, the -- the question I had about

         9    Mr. Vollero was that MGA had indicated that they were going

16:01   10    to call him, but it sounds like their next witness is

        11    Mr. Malackowski.  We just don't know the order at this point.

        12           THE COURT:  Let's find out.

        13           MS. KELLER:  We are not going to call Mr. Vollero.

        14           THE COURT:  Can he be released for all time and

16:01   15    forever?

        16           MS. KELLER:  Yes.

        17           THE COURT:  He's the first person to be released

        18    for all time and forever.

        19           And I'd like to start releasing these witnesses

16:01   20    now.  There has been enough inconvenience to them.

        21           What else after Mr. Malackowski?

        22           MS. HURST:  On the rebuttal witnesses, Your Honor,

        23    we got a new list this morning that dropped a number of

        24    people but also added some people that were not on the

16:01   25    offer-of-proof filing.

Case 2:04-cv-09049-DOC-RNB   Document 10397   Filed 04/06/11   Page 33 of 68   Page ID #:316218
CV 04-9049 DOC - 04/04/2011 - Volume 3 of 4

33

1          THE COURT:  I haven't seen that.

2          MS. HURST:  Yeah.  It's just an e-mail that we got,

3     so we're just trying to get a sense of which of these are

4     going to get called.

16:02  5          THE COURT:  Remember, I'm the final decider of

6     that.

7          MS. HURST:  I know.

8          THE COURT:  And this case is basically over.

9          I represented that we'd try to get Carter Bryant

16:02 10    back and I placed those phone calls and I've represented that

11    Malackowski or Wagner would testify in rebuttal, but he has

12    to be the first rebuttal witness called so that there can't

13    be a claim that you've run out of time for either side.  And

14    if you're going to call any surrebuttal witness, the first

16:02 15    witness that you must call is Mr. Malackowski, that way

16    nobody's posturing with oh, we're out of time, we couldn't

17    recall our damages expert.

18          So those are the first people on rebuttal or

19    surrebuttal, or you waived that witness.

16:02 20          Carter Bryant, I think, has Questions 1 through 5,

21    and I don't have my notes with me, but I've indicated to

22    Mr. Zeller.

23          So, Mr. Quinn, as far as the infringement, you're

24    allowed to go into that.  I think they're 1 through 5, but

16:02 25    I'm not going to be held to that number.

1         I circulated and indicated to counsel what those

2    were.

3         Mr. Price, you can go into the remaining exhibits

4    that weren't received that you believe were appropriate

16:03  5    during the first trial and I'm going to let you do that.

6    I've precluded everything else.

7         Now, I'm also allowing you to get into some of

8    the -- if you have time -- to some of the sneaking into the

9    showrooms.  Different people are coming, but I want to know

16:03 10    who those are and I want to be able to go over those

11    questions with you, because they're not going to be

12    expansive.  And I'd always thought that this was the main

13    import of the rebuttal testimony.

14         Now, also, you're pretty close, quite frankly.

16:03 15    Each of you about 115 hours at this point.

16         MR. MCCONVILLE:  114.

17         THE COURT:  So has anybody heard from Mr. Bryant's

18    counsel?

19         MR. ZELLER:  We have not.

16:03 20         THE COURT:  Okay.  Why don't we take until 10

21    after.  Let me go back and check to see if I've gotten any

22    phone call.

23         Now, also, this evening, I want to go over the

24    first page.  You know I'm always willing to listen.

16:03 25         Listen to me, Mr. Zeller.

 1          Whenever you're pushing for something to come into

 2    evidence that I haven't had time to thoughtfully consider,

 3    plus something that I consider goes against a prior ruling

 4    that I made concerning Mr. Quinn, that's just a difficult

 5    position with me.

 6          MR. ZELLER:  My apologies.

 7          I didn't perceive --

 8          THE COURT:  No, no.

 9          Let me apologize to you.  It's my position that --

10    where I need to back off.  But it just puts me in absolutely

11    an untenable position because I've made X ruling and I'm

12    being to asked to reverse that right in the front of the

13    jury.  You're going to get an automatic "no"; but if you give

14    me time I'll thoughtfully consider that --

15          MR. ZELLER:  And that was just the piece I was

16    missing, Your Honor.

17          THE COURT:  -- and once you gave me ten minutes, I

18    thoughtfully considered it and you got it in.

19          Understood?

20          MR. ZELLER:  Understood.

21          THE COURT:  And we'll talk about Page 1.

22          I'm not making any representation, but with

23    40,000-plus documents, in light of the testimony my position

24    changed in terms of those drawings dated September 18th as

25    the case developed; but I don't want to cross over the line,

 1    which is why I need to have a conversation with Mr. Price and

 2    Mr. Quinn.

 3              So I think we've had that conversation now.

 4              So it's just a difficult place to be with both

16:05  5    counsel and, quite frankly, the frustration I think with all

 6    counsel towards the court is sometimes my frustration back to

 7    each of you is simply because -- and according you this

 8    luxury, quite frankly, of getting in documents literally and

 9    then up on the screen at the time, it puts me in an untenable

16:05 10    position if I can't see those documents quickly and I can't

11    get to those volumes and listen.

12              So it's as good as all of us can do.

13              Now, I'll see you all in six minutes.

14              (Recess taken.)

16:17 15    (Open court - jury present.)

16              THE COURT:  All right.  Then we're back in session;

17    all counsel are present and the parties.

18              They've both been excused for the day and they will

19    be called tomorrow.

16:17 20              Counsel, will you call your next witness, please.

21              MS. KELLER:  James Malackowski, Your Honor.

22              THE COURT:  Sir, if you would step forward.

23              Sir, why don't you just come up to the witness

24    stand and then we'll swear you in.

16:17 25              If you would be seated, sir.

         1                  Now would you raise your right hand.

         2                  **JAMES EDWARD MALACKOWSKI,**

         3                  witness, called by Defendant(s), sworn

         4                  THE COURT:  Thank you, sir.

16:17    5                  Would you state your full name for the record.

         6                  THE WITNESS:  James Edward Malackowski.

         7                  THE COURT:  And would you spell your last name,

         8       sir.

         9                  THE WITNESS:  M-a-l-a-c-k-o-w-s-k-i.

16:17   10                  THE COURT:  Thank you.

        11                  This would be direct examination by Ms. Keller.

        12                  MS. KELLER:  Thank you, Your Honor.

        13                         **DIRECT EXAMINATION**

        14       BY MS. KELLER:

16:17   15       Q.   Mr. Malackowski, can you please tell us where you work.

        16       A.   Ocean Tomo, LLC, in Chicago.

        17       Q.   And what is your position at Ocean Tomo?

        18       A.   I am the founder and chief executive officer.

        19       Q.   Can you tell us what Ocean Tomo does?

16:17   20       A.   Ocean Tomo is a financial service firm.  We refer to it

        21       as a merchant bank but basically we deal with business issues

        22       concerning intellectual property, patents, trademarks, trade

        23       secrets and copyrights, one of those services being expert

        24       work, calculation of damages, like we're doing today.

16:17   25       Q.   Does Ocean Tomo do other work aside from expert services

1   for litigation?

2   A.   Yes.   We have five business groups, the first being

3   expert work, including valuation; the second being equity

4   research and intellectual property research; the third being

16:17   5   investments, investing in public companies with strong

6   intellectual property; fourth is risk management, fifth,

7   insurance; and, lastly, transaction or brokerage work.

8   Q.   How many trials have you testified in before today?

9   A.   Approximately three dozen.

16:17  10   Q.   And when you do testify, what kind of issues do you deal

11   with?

12   A.   The issues I deal with are always business issues from

13   profits and revenues to commercial success, competition,

14   corrective advertising, for example.

16:17  15   Q.   You -- you testified on various issues, including

16   related to intellectual property; right?

17   A.   Yes.

18   Q.   And can you explain a little bit -- most of us don't do

19   this on a daily basis -- can you explain a little bit what

16:17  20   that means, you know, damages including business valuations,

21   for example, lost profits?

22   A.   Sure.

23        Usually, most cases of this type of infringement

24   are misappropriation cases.

16:17  25        Basically, one party believes that they own some

1    exclusive rights to an invention or a trademark or a

2    copyright that has been taken by someone else, and so my job

3    is to figure out, but for the taking, what would have been

4    the additional sales that would have been earned and what

16:17 5    would have been the profits on those additional sales.  And

6    so that's a very typical assignment for us.

7            In other assignments outside of litigation, people

8    bring to our office new inventions or brands or ideas all the

9    time and they ask us to value them; what's this worth?  I

16:17 10    want to raise venture capital; what can I get?

11            So that's a typical assignment.

12    Q.   Have you also testified in depositions?

13    A.   Yes.  Probably more than a hundred depositions over the

14    last 20, 25 years.

16:17 15    Q.   Are you actually charging MGA for these services?

16    A.   My firm does charge.

17            My hourly rate is similar to lawyers.  It's about

18    $595 an hour.

19    Q.   And are there other -- other Ocean Tomo consultants

16:17 20    helping you on the case?

21    A.   There are.  In this matter already there are a large

22    number.  Two of them are in this room; Mr. Webster and

23    Mr. Dominick.  They have been helping me throughout this

24    project.

16:17 25    Q.   Do you have any idea how much you've billed on this

1    particular trial?

2    A.    Yes.  It's expensive.  It's been a very significant

3    estimate.  I would say it's in excess of a million dollars.

4    Q.    Now, can you tell us about your educational background.

16:17 5    A.    Yes.

6          I attended the University of Notre Dame, which is

7    about an hour from where I grew up, majored in accountancy

8    and philosophy and had a degree in business administration.

9    Q.    And when you graduated from the University of Notre

16:18 10    Dame, did you receive any honors at graduation?

11    A.    Yes.  I was eighth in my class, so *Summa Cum Laude*.

12    Q.    Does that mean the highest honors?

13    A.    Not valedictorian; but short of that, yes.

14    Q.    Do you have any professional certifications?

16:18 15    A.    Yes.  I am a certified public accountant.  I'm a

16    certified licensing professional and I have a certificate in

17    financial forensics which is the investigation of historical

18    financial and accounting issues.

19    Q.    And who gives the certificate in financial forensics?

16:18 20    A.    The American Institute of Certified Public Accountants.

21    Q.    When did you start Ocean Tomo?

22    A.    I started Ocean Tomo in 2003, so we're about to hit our

23    eighth anniversary.

24    Q.    And before Ocean Tomo?

16:18 25    A.    Before Ocean Tomo I worked at a number of

UNITED STATES DISTRICT COURT

1    different firms.

2          Following graduation I actually wanted to be a

3    lawyer, but ended up going into the accounting business,

4    working for a firm that calculated damages for lawsuits just

16:18 5    like this.

6          Three years later I started my own practice.  We

7    started with five people, to not only calculate intellectual

8    property damages, but also to do the valuation question.  And

9    that business became very successful.  We went from five

16:19 10   through growth and merger to just under 300 when we sold that

11   practice and I moved on to the banking industry.

12         And so I worked for one of Chicago's largest

13   investment firms and one of Chicago's oldest investment

14   branches before starting Ocean Tomo.

16:19 15   Q.   Have you held any other jobs relating to intellectual

16   property?

17   A.   Yes.  Outside of my employer, I teach.  I'm an adjunct

18   instructor with a number of universities, my alma mater, as

19   well as the Illinois Institute of Technology, and others.

16:19 20         And then I'm asked to be a director for companies,

21   large ones and small ones, to help advise them on the

22   management of their patents, trademarks, copyrights and

23   intellectual property.

24   Q.   And have you actually taught intellectual property

16:20 25   valuation and litigation at the University of Notre Dame?

UNITED STATES DISTRICT COURT

1    A.    As well as many other schools, yes.

2    Q.    Have you published any articles relating to the subject

3    of damages in intellectual property cases?

4    A.    Yes.  I'm often asked to write and speak as well, so

16:20 5    I've written a number of articles.  I've spoken literally

6    more than a hundred times at professional conferences.  And

7    probably even more fun than that is I've been asked to be a

8    commentator for cable news so, Fox, CNBC, Bloomberg

9    television, a number of those channels.

16:20 10   Q.    Have you received any awards for the work you've done?

11   A.    Yes, I personally have.

12          The IP Hall of Fame, it's not as fancy as football,

13   but it's kind of the same thing, they get a group together.

14   A number of, you know, 40 -- under 40-type awards.  But more

16:20 15   important than that, my firm has been recognized for some of

16   the innovative work that we have done and one of the things

17   we're proudest of is today we're a Harvard Business School

18   case study for the innovation that we do, and we're a

19   University of California Berkeley case study, as well as

16:21 20   others.

21   Q.    Do you belong to any professional organizations?

22   A.    Yes, a long list.  The only ones that are probably

23   really relevant are the American Institute of Certified

24   Public Accountants, the Economic Club of Chicago, and the

16:21 25   Licensing Executive Society, LES, and that's an organization

Case 2:04-cv-09049-DOC-RNB   Document 10397   Filed 04/06/11   Page 43 of 68   Page ID
#:316228
CV 04-9049 DOC - 04/04/2011   Volume 3 of 4

43

1   I'm currently president-elect of.  We have about 14,000

2   members in 32 countries and it's a professional organization

3   for transferring intellectual property, the licensing or

4   exchange of patents, trademarks and copyrights.

16:21  5          MS. KELLER:  Your Honor, we'd offer Mr. Malackowski

6   as an expert witness in damages in this case.

7          THE COURT:  You may proceed.

8   Q.   BY MS. KELLER:  Mr. Malackowski, please describe for the

9   jury what your assignment was from MGA in this case?

16:21 10  A.   May I address the jury directly?

11          MS. KELLER:  With His Honor's permission.

12          THE COURT:  You mean, is he going to look at them?

13          (Laughter.)

14          MS. KELLER:  Yes.  Actually notice that they're

16:22 15  there.

16          THE COURT:  Both you and Mr. Wagner can look at the

17  jury.

18          THE WITNESS:  Thank you, sir.

19          THE COURT:  Mr. Wagner is also here, I believe, so

16:22 20  he'll probably be recalled as well.

21          So both of you can.

22          THE WITNESS:  My assignment in this case really

23  comprised three different components.  The first was to

24  calculate MGA's damages against Mattel, and those are damages

16:22 25  for the alleged trade secret misappropriation, basically what

1    happened at the toy fairs, and unfair competition, basically

2    what happened with some of the retailers.

3           My second assignment was to review the work that

4    Mr. Wagner had done for Mattel's damages and make any

16:22 5    corrections that I thought were necessary, and that's both

6    for his trade secret claims against MGA and for the copyright

7    claims against MGA.

8           And then, third, perhaps even most important, was

9    to calculate mitigation, and "mitigation" being the effort by

16:22 10    Mattel to limit their harm from the claimed misappropriation

11    by MGA; so what did they do to respond when Bratz came into

12    the marketplace?

13    Q.    BY MS. KELLER:  Now, to be clear, your assignment is not

14    to tell the jury whether Mattel did something wrong or MGA

16:23 15    did something wrong; right?

16    A.    Correct.  That's the jury's job.  That's liability,

17    which I assume for purposes of my calculations.

18           I assume both that Mattel is found to win their

19    liability case and that MGA is found to win its liability

16:23 20    case.

21    Q.    And what is your opinion intended to do?

22    A.    My opinion is really to provide useful business and

23    accounting information to quantify the amount of profits if,

24    in fact, the jury agrees with my assumptions of liability.

16:23 25    Q.    And that's in either direction; correct?

1    A.    In either direction; yes, ma'am.

2    Q.    So let's start with MGA's trade secret claims against

3    Mattel.  Okay?

4    A.    Yes.

16:23 5    Q.    What do you understand to be the factual allegations

6    underlying MGA's trade secret claims against Mattel?

7    A.    Well, in some ways it's very straightforward.

8          MGA is alleging that over a period of time, from

9    1999 to 2006, Mattel used deceptive practices to enter into

16:24 10   the toy fairs and obtain business information that was useful

11   to them in the marketplace that was, in fact, a trade secret

12   of MGA's.

13         And that information included data regarding the

14   appearance of products, the operation of products or the play

16:24 15   pattern, advertising, FOB, or industry pricing as well as

16   other aspects the product.

17         And then not only that -- the allegation is not

18   only that they entered the toy fair under deceptive practices

19   and obtained that information, but that they then used that

16:24 20   information in their business, disseminating it widely

21   throughout the Mattel organization for business advantage.

22   Q.    Now, have you prepared a chart that summarizes those

23   trade secrets?

24   A.    Yes, ma'am.

16:25 25   Q.    And let's take a look at Slide 3719-0002.

 1          Can you tell us what this slide represents?

 2     A.   Yes.  This slide shows on an annual basis each of the

 3     trade secrets that are at issue.

 4          If you were to count each of the little boxes,

16:25 5     there's 114 of them because there's 114 asserted trade

 6     secrets.  Obviously, some of them are colored in blue.

 7          Of the boxes on the chart, I found that 73 of them

 8     actually became Bratz products in the marketplace, and that's

 9     essentially all of the ones that are shaded.

16:26 10         Of the 73 that Bratz introduced to the market, I

 11    found that there were 32 that had a competitive MyScene

 12    product, and those are the boxes that are shown in the dark

 13    blue.

 14    Q.   Now, do you have an understanding as to where these 114

16:26 15    unreleased MGA products came from?

 16    A.   Yes.  I took them from the toy fair reports.

 17    Q.   Those were Mattel's documents?

 18    A.   Yes.  Each of these 114 MGA products were described in

 19    Mattel business records, which are called "toy fair reports."

16:26 20    I imagine there has been a lot of discussion about that so

 21    far.

 22    Q.   So you didn't just assume, then, that Mattel had

 23    information about these unreleased products based on what the

 24    lawyers for MGA told you; right?

16:26 25    A.   Correct.  I did not simply assume it.

1    Q.   What was the economic consequence of Mattel's having

2    access to the 114 unreleased products, the misappropriation

3    of trade secrets.  What was the economic consequence of that?

4    A.   The economic effect is very straightforward.

16:27 5         They were -- Mattel -- was more successful with its

6    MyScene line of products than it would have been had it not

7    received the information from the toy fairs.  And my job is

8    to calculate that.

9    Q.   Mr. Malackowski, why focus on MyScene?

16:27 10   A.   A couple of reasons.  One is that the MyScene product

11   targets the same age group, older girls; two, most

12   importantly, when you look at the actual business records of

13   Mattel and MGA, it's obvious that they view those as the

14   competitive products.  They're looking at the strategy for

16:27 15   competing with each other for MyScene versus Bratz.

16         And then, lastly, I also had the ability to look at

17   the time period and they're launching products at about the

18   same time that are similar.

19   Q.   And MyScene, like Bratz, was a fashion doll that

16:27 20   targeted older girls?

21   A.   Yes.

22   Q.   MyScene was launched after Bratz?

23   A.   Yes, it was.

24   Q.   And competed around the same time frame?

16:28 25   A.   It was launched shortly after Bratz, in response to

1    Bratz, and then competed throughout -- through today.

2            MR. PRICE:  Your Honor, I'm going to move to strike

3    the subject as hearsay.  It doesn't have anything to do with

4    his damages calculation.

16:28 5            THE COURT:  Overruled.

6    Q.   BY MS. KELLER:  Did you remove any documents that

7    confirmed your conclusions about MyScene?

8    A.   Yes.  The documents that were confirming for me included

9    Mattel records monitoring the launch and reach of Bratz

16:28 10   products, Mattel records that analyzed individual Bratz

11   themes and their success in the marketplace, and then

12   documents within Mattel that basically acknowledged the

13   success of those efforts.

14   Q.   And based on the evidence that you reviewed, did you

16:28 15   form any conclusion about what Mattel was doing in a

16   systematic sense with respect to MyScene and Bratz?

17            MR. PRICE:  I'll object.  That's beyond the expert

18   damages calculation, Your Honor.  That's talking about

19   liability.

16:29 20           THE COURT:  Just a moment.

21            I don't understand the question, Counsel.

22            I'm going to sustain it.

23   Q.   BY MS. KELLER:  Let me ask you, if -- if it were

24   determined that Mattel was systematically taking Bratz' trade

16:29 25   secrets at the annual toy fairs, how would that benefit

Case 2:04-cv-09049-DOC-RNB   Document 10397   Filed 04/06/11   Page 49 of 68   Page ID
#:316234
CV 04-9049 DOC - 04/04/2011 - Volume 3 of 4

49

1    Mattel's MyScene Fashion Doll product line economically?

2    A.   It results in greater sales and profitability for the

3    MyScene product over its lifecycle.

4    Q.   Let's turn to MGA's trade secret damages.

16:29 5        Have you prepared a slide that summarizes the

6    damages that you calculated relating to MGA's trade secret

7    claim against Mattel?

8    A.   Yes.  The slide that's up on the screen summarizes three

9    calculations that I made.

16:30 10       The first calculation referred to as "Top Down 1"

11   generates $202 million in damages.

12        The second one, which is really the lower portion

13   of that bar is $149 million.  And then I also considered an

14   alternative approach, a bottom-up approach, that resulted in

16:30 15   $88 million of damages.

16   Q.   What do those numbers represent?  I mean, "top down"

17   "bottom up"; what does that mean?

18   A.   All three numbers represent the enhanced profitability

19   of MyScene.

16:30 20       The top-down approach looks at MyScene product in

21   total, and the bottom-up approach looks at it product by

22   product for those products that I had competing data.

23   Q.   When you say "enhanced profits" does that include all

24   the profits Mattel has ever made from selling MyScene?

16:31 25   A.   No.  That's an excellent point.

1       The conclusions that I show on the part -- on --

2  on -- on this chart do not represent "total" MyScene profits

3  over this time.  They only represent a portion of those

4  profits, the portion that is due to the asserted trade

16:31 5  secrets or what was obtained at the toy fair.

6       As we'll see shortly, much of the profit has been

7  left with Mattel.

8  Q.   So you've actually subtracted out the profits that

9  Mattel would have earned anyway, without the trade secrets

16:31 10  from MGA; right?

11  A.   Correct.

12  Q.   And looking at these numbers, would you add these

13  numbers together?

14  A.   No.  Again, another good question.

16:31 15       These are alternatives, so in my view the proper

16  damages ranges between 88 million and 202 million, and as we

17  described how I made those calculations, I -- I think,

18  ultimately, it will be for the jury to decide which, if any,

19  of them, are correct.

16:32 20  Q.   And please tell us how you calculated your range of $88

21  to $202 million.

22  A.   We can start with the 202 million.  That's the largest

23  number -- and there are charts that explain this -- but

24  basically I looked at the MyScene sales and profits from the

16:32 25  entire time period and then I determined what those sales and

1    profits would have been had Mattel not had access to the

2    trade secrets in the MGA showrooms.

3        And intuitively you would expect they would be

4    lower.  And, in fact, my analysis shows that they would have

16:32  5  been significantly lower and the 202 million represents the

6    difference.

7        The 149 million is basically the same calculation,

8    except I use a different benchmark, a different measure, to

9    show what the sales should have been.

16:32 10       And then in total I said, let's look one at a time,

11   let's build up toward that total based on what we know and so

12   the 88 million is comprised of 26 different products where I

13   looked at the specific benefits that were obtained from the

14   different toy fairs.

16:33 15       And it doesn't reach all the way to the 202.

16   That's to be expected.  It's a subset of that data.

17   Q.    So the top-down approach, that looks at the overall

18   product line?

19   A.    Yes.

16:33 20  Q.    And the bottom-up approach, that looks at the products

21   item by item?

22   A.    It looks at a subset of the products item by item,

23   specifically the profits that were in the market competing

24   and, frankly, that I found data for.

16:33 25  Q.    Okay.  To be clear, then, before we go any further into

UNITED STATES DISTRICT COURT

1    those two approaches, the 88 to 202 million are Mattel's --

2    are those Mattel's profits from MyScene or what are known as

3    Mattel's "unjust enrichment" we call it? -- legally.

4    A.   Well, to be very clear, they represent a portion of

16:34 5    Mattel's profits from MyScene, that portion which is the

6    unjust enrichment, the portion of profits that should not

7    have occurred, and so that's what MGA would seek to take

8    back.

9    Q.   Let's first talk about your top-down approach in a

16:34 10    little more detail.

11         Can you please explain again what you are trying to

12    measure in the top-down approach.

13    A.   Yes.  And there is a chart, if I could explain.

14    Q.   Let's have that chart, if we could.

16:34 15    A.   So this is the first calculation for the top-down

16    approach, and in some ways it's pretty straightforward.

17         The large blue mountain, or pyramid, represents the

18    actual MyScene profits from 2002 through 2009.

19         What I have done is I've determined if they had not

16:34 20    obtained the trade secrets, what should those profits have

21    been and how can we measure them?  And so the light blue

22    section within the chart represents my first conclusion as to

23    what MyScene's profits would have been had Mattel not

24    misappropriated the trade secrets.

16:35 25         And so the question is, well, how do you come up

UNITED STATES DISTRICT COURT

1    with that figure?

2         And so what I did is I looked at the actual MyScene

3    revenues for 2002, I looked at the projections that Mattel

4    made for 2003 and I made a calculation of what should have

16:35 5    happened in 2003.  That's the second data point in the small

6    blue chart.

7         And then I went back to Mattel business records to

8    see how they performed on other dolls, other fashion dolls

9    that were targeting the older girl; and, specifically, as the

16:35 10   note on the bottom says, I looked at Generation Girlz,

11   Diva Starz, and Flavas.

12        And by using Mattel's actual experience for those

13   other dolls and assuming that MyScene would have been equally

14   as successful, I calculate what the MyScene sales would have

16:36 15   been had they not entered those toy fairs, and then you

16   simply take the difference.

17        So the total chart represents 348 million in

18   profits, the small chart of what should have happened is 146

19   million, and the difference is the enhanced profitability of

16:36 20   202 million that represents the unjust enrichment.

21   Q.   Okay.  So, then, to be clear, under the top-down

22   approach, you're letting Mattel keep profits from MyScene

23   consistent with Mattel's historical performance with

24   Generation Girlz, Diva Starz and Flavas?

16:36 25   A.   Exactly right.

1   Q.    And those are all fashion dolls targeting older girls?

2         Is that why you used them?

3   A.    Exactly.

4   Q.    So Mattel would keep everything in the light blue area?

16:37   5   A.    Right; Mattel would retain the 146 million in profits.

6   Q.    Why didn't you just compare MyScene and why didn't you

7   just use Barbie instead of MyScene?

8   A.    Well, for some of the reasons we talked about before.

9   Barbie is targeted towards primarily younger girls and,

16:37 10   importantly, the business records of Mattel and MGA show that

11   the competition is between Bratz and MyScene.

12         And the dolls that I did use, the Generation Girlz,

13   the Diva Starz and the Flavas, those are Mattel's dolls that

14   are targeted for that same demographic, that same older girl,

16:37 15   and so it is a better comparison for Barbie or certainly

16   other companies.

17   Q.    So Barbie-to-Bratz is not as good a comparison in terms

18   of who the target market is as compared to MyScene-to-Bratz?

19   A.    Correct.

16:38 20   Q.    Now, in calculating enhanced profits, are you comparing

21   Mattel's MyScene profits to the profits of other toy

22   companies that make things like, say, fire engines,

23   Tonka Trucks, LEGOs, that kind of thing?

24   A.    No.  I think as will become clear later, one of the

16:38 25   disagreements I have with Mr. Wagner, Mattel's expert, is I

1    believe his benchmarks are too far afield; that the best

2    benchmark is to get as close as possible to the data that

3    you're trying to compare.  And, clearly, in my opinion,

4    MyScene is much closer to Mattel fashion dolls for older

16:38  5    girls than it is to trucks or products by an independent toy

6    company.

7    Q.   And in making your calculations, are you assuming that

8    Mattel would have never come up with another Fashion Doll

9    aimed at older girls?

16:38 10    A.   No, of course not.  That's why I allow them to have

11    146 million of profitability.

12    Q.   Okay.  So you're assuming that Mattel would have sold

13    millions of dollars worth of dolls?

14    A.   Yes, just without the benefit of the MGA trade secrets.

16:39 15    Q.   Okay.  Now, tell me about why you made that assumption,

16    the assumption that Mattel would have sold millions of

17    dollars worth of dolls anyway?

18    A.   A number of reasons.

19         One is I believe the business records suggest that

16:39 20    they were going to do something to respond to Bratz.

21         Two is I think it is a conservative measure of

22    damage.  It gives the benefit of the doubt to Mattel.

23    Q.   So your approach leaves Mattel, then, with what is known

24    as its "sweat equity" in MyScene; right?

16:39 25    A.   Yes.  In fact, if you think about it that way, of the

Case 2:04-cv-09049-DOC-RNB   Document 10397   Filed 04/06/11   Page 56 of 68   Page ID #:316241
CV 04-9049 DOC - 04/04/2011 Volume 3 of 4

56

1    348 million shown on this chart, I have measured 202 million

2    to be associated with the trade secrets and 146 million to be

3    associated with the sweat equity.

4    Q.   Now, that "sweat equity," that's another one that not

16:40 5    all of us use in daily life.

6         Can you explain what you mean by "sweat equity"

7    that a company puts into a product as opposed to just, say,

8    the initial intellectual property that it is looking at?

9    A.   Yes.  With virtually any product -- and dolls are no

16:40 10   different -- there is the concept or idea, the intellectual

11   property that protects that, such as copyrights or trade

12   secrets or in other cases, patents -- but that's not

13   sufficient to bring a product to market.  There is a lot of

14   business effort that goes into finishing the product,

16:40 15   designing the advertising, executing, hiring distributors and

16   so there's a lot of sweat equity or there's a lot of

17   contribution made by the party even if they took the trade

18   secrets, and so I've tried to apportion out between the two.

19   Q.   Now, you also came out -- came up with a second approach

16:40 20   that you called the "top-down" approach; right?

21   A.   Yes.  There's another chart up on the screen that shows

22   this alternative.

23   Q.   Okay.  And can you please tell us what this chart

24   represents?

16:41 25   A.   Yes.

1          This chart is fairly straightforward.

2          The large section is the same as before.  The

3    dark-blue region has not changed, but you can see the portion

4    below it is now much more significant; it's much larger.

16:41  5          And what this chart does is recognizes that, you

6    know, there's something different about MyScene than those

7    other dolls.  It was more successful.

8          And so now what I've done is I've simply said, let

9    Mattel retain a measure of success based upon MyScene's

16:41 10    historical performance, but let's start with the projections

11    they had for 2003 and assume they basically would follow the

12    pattern of success of MyScene, so you can see the top blue

13    line kind of matches the light-blue line beneath it.

14          And because I'm allowing Mattel to have greater

16:42 15    success, they retain a larger piece of the pie, so they now

16    retain 199 million and therefore the profit to be disgorged

17    or to award as damages decreases and so it reduces to

18    149 million instead of the 202 we just looked at.

19    Q.   Does this top-down approach still leave profits with

16:42 20    Mattel for all their sweat equity that they invested in

21    MyScene?

22    A.   Yes.  Even more so than what we looked at a moment ago.

23    Q.   Are your numbers calculated in a very liberal sense or

24    in a very conservative sense?

16:42 25    A.   Just so there's no confusion, my numbers are calculated

1   to give the benefit of the doubt to Mattel, conservative from

2   my point of view.

3   Q.   So if we go back to Slide 37189-3, this shows the first

4   two numbers, 202 and 149 million, for your top-down approach

16:43 5   that we just looked at.

6   A.   Correct.

7   Q.   And then let's talk about the 88 million or the

8   bottom-up approach.  Okay?

9         Can you describe again, what does the "bottom-up"

16:43 10   mean?

11   A.   So the bottom-up approach, first and foremost, is a

12   subset of what we just discussed.  It is a piece of the

13   MyScene business.

14         Second, it's based upon specific products.

16:43 15         So rather than looking at overall sales projections

16   for MyScene, I really wanted to go back and really see on a

17   product-by-product basis where was the additional money made?

18         And the way that I did that was by what's called a

19   "head start," basically looking at the advantage Mattel got

16:43 20   in the market by having access to the playbook or the trade

21   secrets so they could react quicker, bring products to market

22   quicker.

23   Q.   And what do you mean by "head start damages"?

24   A.   Well, there is a chart that illustrates, but "head

16:44 25   start" is a well-recognized methodology for calculating trade

UNITED STATES DISTRICT COURT

1    secret damages, and perhaps if we go to the next chart I can

2    explain what we have.

3           So in many respects a head start is about timing.

4    It's about when information was known.

16:44  5           So on this chart we have in February of Year 1 the

6    date that the trade secret in our example was stolen.

7           Now, in May of Year 1 the owner of the trade secret

8    actually went to market and launched a product.

9           Well, at that point much of the trade secrets were

16:44 10   publicly disclosed and no longer a secret.

11           Well, what would have happened had the secret not

12    been stolen?

13           And so if you look to the second portion of the

14    chart, what we can see in the third box is the actual product

16:44 15   launch using the trade secret.  So the alleged taker went to

16    market in November of Year 1.

17           Well, what would have happened is they should not

18    have got to market then, because they should not have had the

19    benefit of those early months, understanding the secrets.

16:45 20   They rather should have got to market a few months later in

21    February of '02.

22           And so what a head start approach does is it

23    focuses on the profits that the alleged infringer made during

24    that head-start period.

16:45 25   Q.   Can you tell the jury how you calculated the head-start

1    damages for each of the Mattel MyScene products that you

2    looked at.

3    A.   Yes.  It's a very fact-specific approach.  You go back

4    to the date of the toy fair, the date the product was

16:45 5    launched, the profits of the given product, and you can

6    calculate, essentially, what's shown on this chart of what

7    was the benefit received.

8    Q.   And if we go back to the second slide, I think that --

9    you talked about that a little earlier.

16:45 10    A.   Yes.  And so as it relates to this slide, I start by

11    focusing on the dark-blue boxes or the 32 products where I

12    know there are competitive MyScene and Mattel products in the

13    market.

14    Q.   Okay.  And then for 32 of these Bratz products that are

16:46 15    dark blue, you were able to identify 32 matching MyScene

16    products?

17    A.   Yes.

18    Q.   And then of those 32, how many did you get to calculate

19    a head-start benefit for?

16:46 20    A.   Almost all of them, not quite.

21         Chart 7 shows that ultimately I could find the

22    information I needed for 26, and so I started with 114.  I

23    narrowed it to 73 Bratz products.  I narrowed that to 32

24    products that compete, and for those 32, I believe that a

16:46 25    head start can be calculated for 26 of them.

1    Q.   And what's the next thing you did for your bottom-up

2    analysis?

3    A.   So for each of those 26 products there was data for 22

4    where I could actually calculate the profits of the head

16:46 5    start, and that totaled just under 75 million.  It was

6    $74.9 million.

7    Q.   What happened to the four remaining matching MyScene

8    products?

9    A.   Well, there were four products that I could not find the

16:47 10   Mattel accounting data and so I simply used an average of the

11   ones I could find that calculate those.  And when you add in

12   the average for the four, the total bottom-up approach was

13   $88.5 million.

14   Q.   Can you take us through a couple of examples of how you

16:47 15   came up with your head-start damages.

16   A.   Yes.  I'll take you through two.

17   Q.   So the chart on the screen is the first example, and

18   this is for the MyScene Chillin' Out product, which I found

19   to compete with the Bratz Winter Wonderland product.

16:47 20         And so if you look at the chart, this one is pretty

21   straightforward?

22         So in February of '03 at the toy fair,

23   Bratz Winter Wonderland product is shown.  Three months

24   later, in May of 2003, Bratz sells the first

16:48 25   Winter Wonderland product.  I find the first sales invoice.

1        But in a very short period of time after that,

2   MyScene released its competitive product on July 18th, and

3   what my conclusion was is that the release on July 18th

4   occurred and benefitted from the information that was seen at

16:48 5   the toy fair.  And but for the information at the toy fair,

6   the MyScene product should have come out in October.

7        Now, when you calculate the profits associated with

8   that head start with that benefit for MyScene Chillin' Out,

9   it's $5,773,000.

16:48 10        THE COURT:  Counsel, as we get closer to 5:00, you

11   pick the logical time that's a logical break, and then we'll

12   break.

13   Q.   BY MS. KELLER:  So when you say on this chart

14   "Bratz Winter Wonderland shown at toy fair," you're not

16:49 15   talking about the public part that was released to anybody

16   who wanted it, you're talking about the private, unreleased

17   product information that is shown in the private showroom;

18   correct?

19   A.   Right.

16:49 20        MR. PRICE:  Objection; that assumes facts.  He's

21   not a liability witness.

22        THE COURT:  Overruled.

23   Q.   BY MS. KELLER:  For purposes of doing calculations?

24        THE COURT:  Overruled.

16:49 25        THE WITNESS:  Correct; that is based upon

1    my assumptions.

2              THE COURT:  Remember, these are based upon

3    assumptions.  I want to instruct you about experts; that you

4    are free to accept or reject their assumptions or opinions in

16:49  5    this case.

6    Q.    BY MS. KELLER:  So let's go to the next slide.

7    A.    So the next slide is focused on My Bling Bling, which I

8    found to be competitive with Bratz Diamonds.

9              This one is a little bit different.  I call this a

16:49 10    "carryover."

11              The first one on the chart is actually a MyScene

12    product, that there was actually a MyScene Bling Bling

13    product on the market, though it was without the real-gem

14    ring for the girl.

16:50 15              I assume, again, that's probably been discussed.

16              In February at the toy fair in the private

17    showrooms, Bratz introduces its Diamondz product that

18    included the real-gem ring.

19              They sell that product in May of 2006, and one

16:50 20    month later MyScene launches a competitive product also with

21    a real gem.  And what my analysis showed is that but for the

22    alleged misappropriation of trade secrets, the MyScene

23    product should not have launched in June with the competitive

24    trade secret, but rather, again, three months later in

16:50 25    September.

1        And so when you calculate the benefit of that head

2   start for My Bling Bling, it's $16,391,000.

3   Q.   Do you have a slide to show the numbers that you came up

4   with for the 26 matching MyScene products?

16:51 5   A.   Yes, that's the next chart.

6   Q.   And tell us about this chart.

7   A.   So I simply repeated the analysis I just shared with you

8   for the 22 products that I had data, and then I used averages

9   for the other four.

16:51 10        And you can see for each and every one of the

11   MyScene products what is the head start damages, and then

12   when you total them, it totals to the 88.486 million or

13   88-and-a-half million.

14   Q.   And that 88-and-a-half million dollars does not

16:51 15   represent all of the profits that Mattel earned for those

16   products; right?

17   A.   Correct.  And -- and that's a really important point.

18        The head-start damages are limited to that period

19   of the head start and then maybe a little ramp up afterwards,

16:51 20   but not the entire life of any one of these products.

21        So it is the portion that represents the value of

22   the trade secrets as opposed to the value of the sweat

23   equity.

24   Q.   Now, in the -- in the earlier slide we saw that MGA had

16:52 25   114 trade secrets and here we're only looking at 26.

UNITED STATES DISTRICT COURT

1          Are you saying that there are no damages relating

2     to the others?

3     A.   No, I'm not saying that.

4          I'm saying in the bottom-up approach, I couldn't

16:52  5    make the specific calculations because of the data I had, but

6     the other trade secret damages would be included in the total

7     top-down analysis.

8     Q.   If the jury finds that some of the unreleased Bratz

9     products were not trade secrets, do you provide any way for

16:52 10    the jury to award damages for the other Bratz trade secrets?

11    A.   Yes.  To the extent that the jury finds that any one of

12    the line items shown on that screen should not be included,

13    you simply strike it off and subtract it from either the

14    88.5 million or the 149 or the 202.

16:52 15    Q.   Now, one of the steps you had to take was to determine

16    which of the 73 MGA Bratz products shown at the toy fair

17    competed with a Mattel MyScene product; right?

18    A.   Yes.

19    Q.   And do you have any ex- -- you said there were 26

16:53 20    competitive MyScene products that matched up with 26

21    unreleased Bratz products; correct?

22    A.   Right.

23    Q.   Do you have any experience in determining competitive

24    products?

16:53 25    A.   Substantial.  In every piece of assignment, whether

UNITED STATES DISTRICT COURT

1    you're valuing intellectual property or calculating damages,

2    you have to look at what is the competitive product in the

3    market or what is the alternative product in the market.  So

4    whether it be expert work like this, valuation opinions,

16:53 5    appraisals or investment decisions, I and those that work for

6    my firm routinely assess competitive products.

7    Q.    So you do it sometimes in the context of a lawsuit;

8    right?

9    A.    Sometimes.

16:53 10   Q.    Other times somebody comes to you and says, hey, I have

11   this incredible intellectual property and I want you to value

12   it for me and tell me what it's worth so I can sell it;

13   right?

14   A.    Right.  And often they think it's worth a whole lot

16:54 15   until you show them the competitive product; yes.

16   Q.    All right.  And then you're also involved in valuation

17   for investment purposes; right?

18   A.    Correct.

19   Q.    Now, what did you do in this case in terms of looking at

16:54 20   Mattel sales-and-marketing documents?

21   A.    Well, in order to determine competitive products in this

22   case, it was even more involved than that.

23         It began by looking at the business records of both

24   companies to see what they considered to be competitive.  It

16:54 25   included public research to see if there were products with

 1    similar styles or themes that were sold, and it included an

 2    analysis of time; were those products sold at or about the

 3    same time.

 4          Once that was complete, then ultimately I went back

16:54 5    and interviewed the MGA executives who have this as part of

 6    their day job and confirmed that my analysis was, in fact,

 7    consistent and accurate.

 8    Q.   Did you do any independent research on Bratz products

 9    and MyScene products having similar themes?

16:55 10   A.   Yes.  We did research as to what products were

 11   available, when they were available, for example.

 12   Q.   Did you look, for example, at what Bratz products were

 13   shown at toy fairs and when those products were released?

 14   A.   Yes.

16:55 15   Q.   And did you look at Mattel's sales-and-marketing

 16   documents that showed what Mattel thought about which MyScene

 17   product competed with which Bratz product?

 18   A.   Absolutely.

 19          MS. KELLER:  Your Honor, I think this would be a

16:55 20   good time.

 21          THE COURT:  It would be a good time.

 22          All right.  You are admonished not to discuss this

 23   matter amongst yourselves nor form or express any opinion

 24   concerning the case.

16:55 25          We'll see you at 8:30 tomorrow.

CV 04-9049 DOC - 04/04/2011   Volume 3 of 4

```
 1              Please drive safe.

 2              (Open court - jury not present.)

 3              THE COURT:  Thank you, sir.

 4              You may step down.

16:55  5        We'll stay on the record.

 6              (Open court - jury not present.)

 7              THE COURT:  The jury's no longer present; counsel

 8     are present.

 9              First, Mr. Zeller, Mr. McConville, have you placed

16:56 10   a call to counsel for Carter Bryant?  Do we have any word at

 11    all?

 12             MR. ZELLER:  If I can just check.

 13             THE COURT:  Okay.  Why don't you join Mr. Zeller.

 14             (Recess taken.)

17:09 15        (Adjournment at 16:56 to resume on Monday,

 16    April 4, 2011 at 5:15 p.m.  Next session reported by

 17    Maria Beesley.)

 18

 19

 20

 21

 22

 23

 24

 25
```