1

1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    - - - - - - -

5

   MATTEL, INC., et al.,              )
6                                      )
              Plaintiffs,              )
7                                      )
         vs.                           ) No. CV 04-9049 DOC
8                                      )    Day 46
   MGA ENTERTAINMENT, INC., et al.,    )    Volume 1 of 5
9                                      )
                                       )
10            Defendants.              )
   _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    Jury Trial

16                Santa Ana, California

17              Tuesday, April 5, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141

24

25   04cv9049 Mattel 2011-04-05 D46V1

1    **APPEARANCES OF COUNSEL:**

2

     FOR PLAINTIFF MATTEL, INC., ET AL.:
3
               QUINN EMANUEL URQUHART & SULLIVAN
4              BY:  JOHN QUINN
                    WILLIAM PRICE
5                   MICHAEL T. ZELLER
                    Attorneys at Law
6              865 South Figueroa Street
               10th Floor
7              Los Angeles, California 90017
               (213) 443-3000
8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12             ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
               BY:  THOMAS S. McCONVILLE
13                  Attorney at Law
               4 Park Plaza
14             Suite 1600
               Irvine, California 92614
15             (949) 567-6700

16             - AND -

17             ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
               BY:  ANNETTE L. HURST
18                  Attorney at Law
               405 Howard Street
19             San Francisco, California 94105
               (415)773-5700
20
               - AND -
21
               KELLER RACKAUCKAS
22             BY:  JENNIFER KELLER
                    Attorney at Law
23             18500 Von Karman Avenue
               Suite 560
24             Irvine, California 92612
               (949) 476-8700
25

Case 2:04-cv-09049-DOC-RNB   Document 10418   Filed 04/07/11   Page 3 of 72   Page ID #:316374
CV 04-9049 DOC – 4/5/2011 – Day 46, Volume 1 of 5

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4

5            LAW OFFICES OF MARK E. OVERLAND
             By:  MARK E. OVERLAND
                  Attorney at Law
6            100 Wilshire Boulevard
             Suite 950
7            Santa Monica, California 90401
             (310) 459-2830
8
             – AND –
9
             SCHEPER KIM & HARRIS LLP
10           BY:  ALEXANDER H. COTE
                  Attorney at Law
11           601 West 5th Street
             12th Floor
12           Los Angeles, California 90071
             (213) 613-4660
13

14   ALSO PRESENT:

15           MGA ENTERTAINMENT, INC.
             BY:  JEANINE PISONI
16                Attorney at Law
             16360 Roscoe Boulevard
17           Suite 105
             Van Nuys, California 91406
18

19           ROBERT A. ECKERT, MATTEL CEO

20           ISAAC LARIAN, MGA CEO

21           KEN KOTARSKI, Mattel Technical Operator

22           MIKE STOVALL, MGA Technical Operator

23           RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

24

25

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

4

**I N D E X**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MALACKOWSKI, James | | | | |
| By Ms. Heller | 26 | | | |

**EXHIBITS**

| EXHIBIT NO. | IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| TX00010-0002-00018 Corresponding exhibit to Exh. No. 1489 | | 5 |
| 11342   Certification | | 7 |
| TX24825 Agreement with Mr. Bryant dated 8/18/2000 | | 6 |
| 24825-00001  Face page of court filing in Hong Kong | | 6 |

DEBBIE GALE, U.S. COURT REPORTER

5

|       |    |                                                                |
|-------|----|----------------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, TUESDAY, APRIL 5, 2011**              |
|       | 2  | **Day 46, Volume 1 of 5**                                      |
|       | 3  | (8:31 a.m.)                                                    |
| 08:30 | 4  | *(Outside the presence of the jury.)*                          |
| 08:31 | 5  | THE COURT:  All right.  We're on the record.  All              |
| 08:31 | 6  | counsel are present.  The parties are present.                 |
| 08:31 | 7  | The jury and alternates are not present.                       |
| 08:31 | 8  | First of all, concerning TX00010-00001, that will              |
| 08:32 | 9  | not be received.  It's unacceptable hearsay.  There is a       |
| 08:32 | 10 | description of the document stating copies of 17 initial       |
| 08:32 | 11 | concept and design drawings of Carter Bryant -- of Bratz       |
| 08:32 | 12 | dolls made by Mr. Bryant in the year 2000.                     |
| 08:32 | 13 | But TX00010-0002-00018 are received, which is also             |
| 08:32 | 14 | corresponding No. 1489.                                         |
| 08:32 | 15 | *(Exhibit No. TX00010-2-18 received in*                        |
| 08:32 | 16 | *evidence.)*                                                   |
| 08:32 | 17 | THE COURT:  Mr. Zeller, those are the documents               |
| 08:32 | 18 | you were asking the Court to consider.                         |
| 08:32 | 19 | And after I was able to take the recess, I've                 |
| 08:32 | 20 | received those, I believe, last evening.  Those are the        |
| 08:32 | 21 | drawings.  Those bear the markings on the bottom which will    |
| 08:32 | 22 | show September 18th, 2000, which comports with Mr. Moore's     |
| 08:32 | 23 | testimony about the date he received them and put them on      |
| 08:32 | 24 | notice.                                                         |
| 08:32 | 25 | In addition, TX24825 will be received.                         |

08:32   1          *(Exhibit No. TX24825 received in evidence.)*

08:32   2          THE COURT:  That is another Court document.

08:32   3          I don't see any prejudicial information on the

08:33   4   front of this.  This is simply a copy of the agreement

08:33   5   between Mr. Carter Bryant and the plaintiff.  It's dated

08:33   6   August 18th, 2000.

08:33   7          Now, this document is a document that simply,

08:33   8   then, comports with Mr. Moore's testimony.  Mr. Moore's

08:33   9   testimony was that when he received these Hong Kong

08:33   10  documents, this gave him some notice.

08:33   11          The difficulty is that although MGA objects, this

08:33   12  standard of the likelihood of suspicion -- and I'm

08:33   13  misstating the standard, of course -- but when a person

08:33   14  becomes suspicious is almost a sliding scale; it's a word of

08:33   15  art, and how definite that suspicion becomes transcends over

08:33   16  some period of time.

08:33   17          The copyright -- strike that.

08:33   18          The trademark law is very explicit about a

08:34   19  reasonable person's suspicion.  It's a very hard standard.

08:34   20  But by the same token, I don't think that this should be

08:34   21  precluded from Mattel and Mr. Moore's testimony.

08:34   22          Therefore, the face page of 24825-00001 is

08:34   23  received.

08:34   24          *(Exhibit No. 24825-00001 received in*

08:34   25      *evidence.)*

| | | |
|---|---|---|
| 08:34 | 1 | THE COURT:  And that comports with 24825, which is |
| 08:34 | 2 | the 2002 court filing in Hong Kong. |
| 08:34 | 3 | Now, concerning the certification, 11342, there |
| 08:34 | 4 | was an objection by Mattel yesterday.  You represented that |
| 08:34 | 5 | you'd have that certification to the Court.  You showed me |
| 08:34 | 6 | the certification last evening informally.  You showed it to |
| 08:34 | 7 | Mr. Zeller. |
| 08:34 | 8 | Is there any objection to that being received by |
| 08:34 | 9 | either party? |
| 08:34 | 10 | MR. ZELLER:  We think it's irrelevant. |
| 08:34 | 11 | THE COURT:  Counsel? |
| 08:34 | 12 | MS. HURST:  We would like it admitted, Your Honor. |
| 08:34 | 13 | THE COURT:  It's received as well. |
| 08:34 | 14 | *(Exhibit No. 11342 received in evidence.)* |
| 08:34 | 15 | THE COURT:  Now, that should conclude the exhibits |
| 08:34 | 16 | which were trailing from yesterday. |
| 08:35 | 17 | I'm prepared and came in very early this morning |
| 08:35 | 18 | and worked last evening after you left, and I was very |
| 08:35 | 19 | dissatisfied with the conversation that the Court found |
| 08:35 | 20 | itself a part of.  I'm a judge and I'm not going to enter |
| 08:35 | 21 | into the negotiations between the parties.  If you reach a |
| 08:35 | 22 | private negotiation between the two of you, that's up to |
| 08:35 | 23 | you.  But I don't want either one of you thinking that I'm |
| 08:35 | 24 | browbeating either one of you or that there's a loose end or |
| 08:35 | 25 | that I'm going to be part of those negotiations.  I'm not. |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

8

| | | |
|---|---|---|
| 08:35 | 1 | So first, obviously, Wagner may be presented in |
| 08:35 | 2 | rebuttal.  And in surrebuttal, Malackowski can be presented. |
| 08:35 | 3 | MR. ZELLER:  Your Honor, we did reach an |
| 08:35 | 4 | agreement, if we can tell the Court about it.  All counsel |
| 08:35 | 5 | has agreed. |
| 08:35 | 6 | THE COURT:  All counsel have? |
| 08:35 | 7 | MR. ZELLER:  Yes. |
| 08:35 | 8 | THE COURT:  I want to make certain, though, that |
| 08:35 | 9 | there are no loose ends.  I don't want to be a party to this |
| 08:35 | 10 | agreement.  And I want lead counsel entering into this and |
| 08:35 | 11 | privy to this, because last evening I'm not holding you to |
| 08:35 | 12 | any of the conversations that you were involved in. |
| 08:36 | 13 | I'm prepared to go down each list in terms of |
| 08:36 | 14 | rebuttal and surrebuttal and make my rulings.  If you've |
| 08:36 | 15 | reached an agreement, fine.  But let me start with Carter |
| 08:36 | 16 | Bryant, because that may be determinative if you want to |
| 08:36 | 17 | hold to your agreement. |
| 08:36 | 18 | I think there are three key people in this matter. |
| 08:36 | 19 | Does your agreement reach Carter Bryant also? |
| 08:36 | 20 | MS. HURST:  Yes. |
| 08:36 | 21 | THE COURT:  It does? |
| 08:36 | 22 | MS. HURST:  If they can get him back, yes. |
| 08:36 | 23 | THE COURT:  Well, I'm going to take the position |
| 08:36 | 24 | now, and then you can decide if you really have an |
| 08:36 | 25 | agreement. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

9

| | | |
|---|---|---|
| 08:36 | 1 | There are three key people in this case, as far as |
| 08:36 | 2 | the Court's concerned:  Mr. Larian, Mr. Eckert, and Carter |
| 08:36 | 3 | Bryant. |
| 08:36 | 4 | Carter Bryant is not free to absent himself from |
| 08:36 | 5 | this Court.  He's not free to cut off communication.  He's |
| 08:36 | 6 | not free to cut off his phones.  And, therefore, I'm |
| 08:36 | 7 | prepared to issue a warrant for his arrest. |
| 08:36 | 8 | Now, the problem for this Court is as follows: |
| 08:36 | 9 | This Court was not informed until Thursday evening, |
| 08:36 | 10 | Mr. Zeller -- Mr. Zeller? |
| 08:36 | 11 | MR. ZELLER:  I'm listening, Your Honor. |
| 08:36 | 12 | THE COURT:  -- Thursday evening that you might be |
| 08:36 | 13 | having a problem with Carter Bryant, which gives the Court |
| 08:36 | 14 | no opportunity at that time to take action.  It's awfully |
| 08:37 | 15 | late in the game. |
| 08:37 | 16 | This Court's made extraordinary efforts on both of |
| 08:37 | 17 | your behalf, from browbeating, quite frankly, MGA to |
| 08:37 | 18 | bringing Kuemmerle back and forcing Carter Bryant to come |
| 08:37 | 19 | into Court.  His initial position was he wasn't coming to |
| 08:37 | 20 | Court.  And it was only through the threat of a warrant for |
| 08:37 | 21 | his arrest that he finally came to this Court, in my |
| 08:37 | 22 | opinion. |
| 08:37 | 23 | That would have put both parties -- and I think |
| 08:37 | 24 | Mattel would have been significantly, at that time, |
| 08:37 | 25 | prejudiced by not having Carter Bryant present. |

| 08:37 | 1 | And I don't think, Mr. Price, for the seven days |
| 08:37 | 2 | you spent with Carter Bryant, that you could have |
| 08:37 | 3 | accomplished whatever you tried to without his presence. |
| 08:37 | 4 | And snippets of depositional testimony, |
| 08:37 | 5 | interrogatories, wouldn't have given demeanor, et cetera, |
| 08:37 | 6 | wouldn't have let the judgment calls be made by the jury in |
| 08:37 | 7 | terms of truthfulness or not.  So I took a hard position. |
| 08:37 | 8 | Concerning Kuemmerle, for instance, with MGA, you |
| 08:37 | 9 | were kind enough to bring Ms. Kuemmerle back.  I had to |
| 08:38 | 10 | threaten her with arrest, because apparently she's a citizen |
| 08:38 | 11 | of the United States, but the information I got was that she |
| 08:38 | 12 | was prepared to stay in Brazil. |
| 08:38 | 13 | In addition to that, I took a strong position with |
| 08:38 | 14 | the parties so that upon Circuit review they can hopefully |
| 08:38 | 15 | understand that I absolutely intended to hold to no |
| 08:38 | 16 | depositional testimony in this matter. |
| 08:38 | 17 | And the reason for that was different parties |
| 08:38 | 18 | would complain at different times, but this was an |
| 08:38 | 19 | impossible trial based upon snippets of Judge Larson's |
| 08:38 | 20 | trial, the depositional testimony, counsel picking and |
| 08:38 | 21 | choosing the 20-some days that Mr. Larian was on the stand |
| 08:38 | 22 | selectively picking parts, the numerous days that Mr. Eckert |
| 08:38 | 23 | was on the stand, picking different parts of each of your |
| 08:38 | 24 | testimony.  You saw what happened to each of you when you |
| 08:38 | 25 | got on the stand, where each of you believed that your |

CV 04-9049 DOC – 4/5/2011 – Day 46, Volume 1 of 5

11

| | | |
|---|---|---|
| 08:38 | 1 | testimony was being taken out of context when you intended |
| 08:38 | 2 | an answer, but you saw the result of that.  And at least in |
| 08:38 | 3 | front of a jury, gentlemen, you had a chance to explain your |
| 08:39 | 4 | position:  "I answered one way in this way.  I didn't intend |
| 08:39 | 5 | that answer.  Later on, after talking to my counsel or |
| 08:39 | 6 | recalling something, I recalled, you know, the correct |
| 08:39 | 7 | answer." |
| 08:39 | 8 | I want to assure you gentlemen, without you being |
| 08:39 | 9 | here and without all of these witnesses being here, each of |
| 08:39 | 10 | these witnesses would have found themselves in the very |
| 08:39 | 11 | uncomfortable position that I think you did for seven days, |
| 08:39 | 12 | Mr. Larian, on the stand, and you did for three days, |
| 08:39 | 13 | basically, on the stand. |
| 08:39 | 14 | And you can see what happens.  I think now you |
| 08:39 | 15 | have a flavor of what would have happened to each of these |
| 08:39 | 16 | witnesses who were being called for the respective parties |
| 08:39 | 17 | and how unfair that would have been unless the Court was, |
| 08:39 | 18 | quite frankly, pretty onerous and pretty ornery about |
| 08:39 | 19 | getting people in here. |
| 08:39 | 20 | I hold to my standards.  I absolutely intend that |
| 08:39 | 21 | there's not going to be any depositional testimony, and |
| 08:39 | 22 | turning around at that point, unless you reach a private |
| 08:39 | 23 | agreement, is something I'm not going to do.  It just makes |
| 08:39 | 24 | the rules I set whimsical, and I'm not going to abrogate |
| 08:40 | 25 | those standards. |

| 08:40 | 1 | And I'll say to the reviewing Court, I understand |
| 08:40 | 2 | that this Court has the discretion to bring parties in, but |
| 08:40 | 3 | unless there's an agreement between the parties, I'm |
| 08:40 | 4 | prepared to issue a warrant for Mr. Bryant's arrest for the |
| 08:40 | 5 | following reasons: |
| 08:40 | 6 | Mr. Bryant is absolutely a critical and key |
| 08:40 | 7 | witness. His initial position with this Court was that he |
| 08:40 | 8 | was not going to appear. |
| 08:40 | 9 | This Court personally, at the behest of both |
| 08:40 | 10 | Counsel, took the extraordinary remedy, which I've rarely |
| 08:40 | 11 | done, of calling Mr. Bryant's attorney, who called |
| 08:40 | 12 | Mr. Bryant, who, upon threat of a warrant, apparently |
| 08:40 | 13 | decided to appear. He was placed on call by this Court. |
| 08:40 | 14 | That means he's on call. He's not free to cut off |
| 08:40 | 15 | communication, and he's not free to bargain with this Court. |
| 08:40 | 16 | Now, what's a tragedy in this is the following. |
| 08:40 | 17 | In going over the records this morning, it's not |
| 08:40 | 18 | prejudicial that -- or last evening, as well -- it's not |
| 08:41 | 19 | prejudicial to Mattel that they're not able to present |
| 08:41 | 20 | through Mr. Bryant Questions 1 through 5, which I'm allowing |
| 08:41 | 21 | about Winter Wonderland; that can be accomplished through a |
| 08:41 | 22 | number of witnesses, so that isn't a reason to bring |
| 08:41 | 23 | Mr. Bryant back. |
| 08:41 | 24 | But this Court was faced with Exhibit 5, which, |
| 08:41 | 25 | quite frankly, was an exhibit which was duplicative. The |

Case 2:04-cv-09049-DOC-RNB   Document 10418   Filed 04/07/11   Page 13 of 72   Page ID #:316384
CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

13

| | | |
|---|---|---|
| 08:41 | 1 | original drawings were sitting right back in the room.  And |
| 08:41 | 2 | apparently counsel decided either intentionally or |
| 08:41 | 3 | inadvertently not to use the original drawings. |
| 08:41 | 4 | The difficulty with that is that they're |
| 08:41 | 5 | available.  After a trial of this length, that mistake |
| 08:41 | 6 | should not go unremedied.  It's so simple.  These drawings |
| 08:41 | 7 | are there.  The jury should be looking at the original |
| 08:41 | 8 | drawings.  And the Court was not going to allow an exhibit, |
| 08:41 | 9 | which was a telephone book, which was strictly duplicative. |
| 08:41 | 10 | It gave the impressions that he had hundreds, if not |
| 08:41 | 11 | thousands of drawings when, in fact, he has a limited |
| 08:41 | 12 | amount.  They're in color.  And for comparison purposes, we |
| 08:41 | 13 | need the originals. |
| 08:42 | 14 | But Mr. Price asked if that was sufficient. |
| 08:42 | 15 | Mr. Price, I made the record that that was sufficient.  That |
| 08:42 | 16 | didn't mean it was going to be received, but I can see how |
| 08:42 | 17 | that might be misread and that you might feel that you're |
| 08:42 | 18 | disadvantaged.  I don't think that that's fair.  Therefore, |
| 08:42 | 19 | he's coming back. |
| 08:42 | 20 | Now, in light of that, I'm hoping to reach counsel |
| 08:42 | 21 | this morning because the warrant's going to go out at |
| 08:42 | 22 | 10:00 o'clock this morning. |
| 08:42 | 23 | Once I issue a warrant, I don't recall it. |
| 08:42 | 24 | But that places you in the position that this |
| 08:42 | 25 | trial is coming to the end today or maybe, at the worst, |

| | | |
|---|---|---|
| 08:42 | 1 | tomorrow.  That's it. |
| 08:42 | 2 | So I've made every effort to get him back, and you |
| 08:42 | 3 | can determine what you want to do in terms of compromise, |
| 08:42 | 4 | et cetera, because, otherwise, the record stands. |
| 08:42 | 5 | So I'm going to take a recess.  If you have an |
| 08:42 | 6 | agreement, terrific; if not, I'm ready to make rulings, and |
| 08:42 | 7 | I'm ready to go down each rebuttal witness, state my reasons |
| 08:42 | 8 | why they will be called or why they won't be called, and |
| 08:42 | 9 | each surrebuttal witness, with the exception of one |
| 08:42 | 10 | surrebuttal witness, depending upon my rulings, that I can't |
| 08:42 | 11 | make a ruling on yet because I'm not certain if these people |
| 08:43 | 12 | will be, in fact, available to Mattel. |
| 08:43 | 13 | Now, is there anything else that you wish to |
| 08:43 | 14 | state?  Otherwise, I'm going to give you a few moments to |
| 08:43 | 15 | talk. |
| 08:43 | 16 | A bench warrant's going to be issued for Carter |
| 08:43 | 17 | Bryant at this time, Nancy.  In fact, I'm going to hold it |
| 08:43 | 18 | until 12:00 noon today.  At that time it will be issued |
| 08:43 | 19 | automatically. |
| 08:43 | 20 | Unless there's an agreement between you concerning |
| 08:43 | 21 | the transcript form, et cetera; otherwise, it's the power of |
| 08:43 | 22 | this Court, quite frankly, and I intend to implement it with |
| 08:43 | 23 | Carter Bryant.  He's one of the key people. |
| 08:43 | 24 | But I'm not intending to hold up this trial.  This |
| 08:43 | 25 | case is coming to an end.  This American jury's been serving |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

15

| | | |
|---|---|---|
| 08:43 | 1 | now for 47 days, hardworking men and women, so you'll have |
| 08:43 | 2 | to figure it out. |
| 08:43 | 3 | So, Mr. Quinn, how long do you need to discuss |
| 08:43 | 4 | this, if at all?  And if not, I'm ready to get the jury. |
| 08:43 | 5 | MR. QUINN:  Maybe five minutes, Your Honor. |
| 08:43 | 6 | THE COURT:  Five minutes.  Okay.  See you in five |
| 08:43 | 7 | minutes. |
| 08:43 | 8 | Ms. Keller, five minutes? |
| 08:43 | 9 | MS. KELLER:  That's fine, Your Honor. |
| 08:43 | 10 | THE COURT:  Okay.  If you can work it out, fine. |
| 08:43 | 11 | If you can't, I'll make my rulings. |
| 08:43 | 12 | *(Pause in the proceedings at 8:43 a.m.)* |
| 08:48 | 13 | *(Proceedings resumed at 9:01 a.m.)* |
| 08:48 | 14 | *(Outside the presence of the jury.)* |
| 09:01 | 15 | THE COURT:  All right.  We're back on the record. |
| 09:01 | 16 | Counsel, any thought before the Court proceeds? |
| 09:01 | 17 | MS. KELLER:  Your Honor, I spoke with Mr. Quinn, |
| 09:01 | 18 | and apparently Mattel no longer wants to agree on the |
| 09:01 | 19 | witness list. |
| 09:01 | 20 | THE COURT:  That's fine.  There's no reason for |
| 09:02 | 21 | you to agree. |
| 09:02 | 22 | I think we should end the case as we started. |
| 09:02 | 23 | MR. QUINN:  Your Honor, if I could. |
| 09:02 | 24 | THE COURT:  No.  No, I'm ready to make the rulings |
| 09:02 | 25 | for both sides. |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

16

| | | |
|---|---|---|
| 09:02 | 1 | MR. QUINN:  Your Honor, just for the record, the |
| 09:02 | 2 | Court has expressly ruled that Mattel was not permitted in |
| 09:02 | 3 | its case-in-chief to call witnesses or elicit testimony |
| 09:02 | 4 | relating to MGA's counterclaims.  As the Court said on |
| 09:02 | 5 | March 24, "Because I thought it was very, very clear from |
| 09:02 | 6 | the beginning that my ruling was that Mattel could respond |
| 09:02 | 7 | in kind, but they could only respond at the conclusion of |
| 09:02 | 8 | your case."  And as a result, we have not yet had an |
| 09:02 | 9 | opportunity to call any witnesses to testify concerning |
| 09:02 | 10 | MGA's counterclaims, for which MGA seeks hundreds of |
| 09:02 | 11 | millions of dollars. |
| 09:02 | 12 | Instead, we've been limited to the |
| 09:02 | 13 | cross-examination of the witnesses that MGA has chosen to |
| 09:02 | 14 | call. |
| 09:02 | 15 | We have, obviously, Your Honor -- and I do want to |
| 09:02 | 16 | thank the Court -- I think everybody has indeed benefited |
| 09:02 | 17 | from the Court's efforts in the way the Court has extended |
| 09:03 | 18 | itself to get witnesses here, but we now find ourselves in a |
| 09:03 | 19 | situation where we have five, six hours left in which to put |
| 09:03 | 20 | on our defense case.  And, um, we would like to use that |
| 09:03 | 21 | time to call those defense witnesses to respond to the |
| 09:03 | 22 | counterclaims. |
| 09:03 | 23 | THE COURT:  The case will probably be ending |
| 09:03 | 24 | today, Counsel, but I'll address both of you in just a |
| 09:03 | 25 | moment. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

17

09:03  1          MR. QUINN:  All right.  So we would like an

09:03  2   opportunity, Your Honor, to put on a detailed offer of proof

09:03  3   with respect to the witnesses that we would like to call in

09:03  4   defense of MGA's counterclaims.

09:03  5          THE COURT:  Okay.  Are both of you ready for the

09:03  6   rulings?

09:03  7          MS. KELLER:  Yes, Your Honor.

09:03  8          THE COURT:  And these are tentative rulings.  You

09:03  9   know I'll always listen one more time, but that will be

09:03  10  during the lunch hour.

09:03  11         And, actually, I'm somewhat appreciative of all

09:03  12  counsel.  I don't want either one of you to feel that you're

09:03  13  being forced into different stipulations.  Let's end the

09:03  14  case as we began, and that is, with no agreements.

09:03  15         *(Laughter in the courtroom.)*

09:04  16         THE COURT:  And that's what's so wonderful about

09:04  17  our system.  It's an adversarial system that's supposed to

09:04  18  seek the truth.

09:04  19         First, if the warrant goes out at noon and the

09:04  20  case ends today, then the parties will be left in the

09:04  21  position with the Court's extraordinary efforts but nothing

09:04  22  else.  The bare record as it stands.  Is that understood by

09:04  23  everybody?

09:04  24         Mr. Price?

09:04  25         MR. PRICE:  I understand what you're saying.

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

18

| | | |
|---|---|---|
| 09:04 | 1 | THE COURT: Okay. Counsel? |
| 09:04 | 2 | MS. KELLER: Yes, Your Honor. |
| 09:04 | 3 | THE COURT: All right. Then, in other words, |
| 09:04 | 4 | those drawings remain as is. The Court can't make any |
| 09:04 | 5 | better effort than it's made. I will eventually pick |
| 09:04 | 6 | Mr. Bryant up on a warrant, and I will not recall it. But |
| 09:04 | 7 | unfortunately, he'll be dragged all way to California |
| 09:05 | 8 | because he's in contempt, but the case will have ended. And |
| 09:05 | 9 | I want all parties to be aware of that. |
| 09:05 | 10 | Now, second, the Court has indicated and I hope |
| 09:05 | 11 | you heard my message that this case was basically over. |
| 09:05 | 12 | Did -- was there any different thought than what I conveyed |
| 09:05 | 13 | yesterday? |
| 09:05 | 14 | Ms. Keller? |
| 09:05 | 15 | MS. KELLER: No, Your Honor. |
| 09:05 | 16 | MR. QUINN: There was -- |
| 09:05 | 17 | THE COURT: Mr. Quinn? |
| 09:05 | 18 | MR. QUINN: There was a different thought. We |
| 09:05 | 19 | thought we would be able to put on our defense case to the |
| 09:05 | 20 | counterclaim. |
| 09:05 | 21 | THE COURT: You heard me loud and clear, didn't |
| 09:05 | 22 | you? |
| 09:05 | 23 | MR. QUINN: Actually, no. |
| 09:05 | 24 | THE COURT: The case is basically over. |
| 09:05 | 25 | When I came into this case, I was faced with the |

Case 2:04-cv-09049-DOC-RNB Document 10418 Filed 04/07/11 Page 19 of 72 Page ID #:316390
CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

19

| | | |
|---|---|---|
| 09:05 | 1 | following, and that was a series of private agreements |
| 09:05 | 2 | between counsel. |
| 09:05 | 3 | First, it was represented to the Court partway |
| 09:05 | 4 | through the case that Mattel was in the position of |
| 09:06 | 5 | anticipating, and apparently there was an agreement reached |
| 09:06 | 6 | that would shape Mattel and MGA's respective cases. |
| 09:06 | 7 | Mattel apparently was not to anticipate the -- |
| 09:06 | 8 | what I call "breaking into the showrooms" until MGA |
| 09:06 | 9 | presented their case. And once MGA presented their |
| 09:06 | 10 | evidence, then MGA would be free and have the opportunity -- |
| 09:06 | 11 | I'm sorry -- Mattel would then be free to have the |
| 09:06 | 12 | opportunity to respond. And the reason for that is it |
| 09:06 | 13 | placed Mattel in the position, Mr. Zeller, of anticipating. |
| 09:06 | 14 | And MGA kept objecting at the time. So it's my |
| 09:06 | 15 | understanding that you two had reached a private agreement |
| 09:06 | 16 | in that regard. |
| 09:06 | 17 | Was that your agreement? |
| 09:06 | 18 | MR. QUINN: No, Your Honor, it was not. |
| 09:06 | 19 | THE COURT: Well, I'm not privy to that agreement. |
| 09:07 | 20 | MR. QUINN: No. Actually, it was not just |
| 09:07 | 21 | showrooms, but it was their entire affirmative case. |
| 09:07 | 22 | Everything. |
| 09:07 | 23 | THE COURT: I disagree with that. |
| 09:07 | 24 | MR. QUINN: It's pretty -- well, March 24 trial |
| 09:07 | 25 | transcript, page 121, the Court indicated -- |

| | | |
|---|---|---|
| 09:07 | 1 | THE COURT:  I'm not going to bicker with you. |
| 09:07 | 2 | These are the rulings, sir. |
| 09:07 | 3 | MR. QUINN:  Okay.  The Court said, and I quote, |
| 09:07 | 4 | "My ruling was that Mattel could respond in kind, but they |
| 09:07 | 5 | could only respond at the conclusion of the case.  I had a |
| 09:07 | 6 | specific order on this.  I would let Mattel take this in |
| 09:07 | 7 | rebuttal, because there was a request at one time by MGA to |
| 09:07 | 8 | shape their own case."  So the Court actually made a ruling |
| 09:07 | 9 | on this. |
| 09:07 | 10 | THE COURT:  That's correct.  That referred to the |
| 09:07 | 11 | showrooms, and that's all it referred to. |
| 09:07 | 12 | MR. QUINN:  With respect, Your Honor, I do not |
| 09:07 | 13 | believe that's true. |
| 09:07 | 14 | THE COURT:  Then read the preceding line. |
| 09:07 | 15 | Let me make the rulings tentatively, Mr. Quinn. |
| 09:07 | 16 | It may resolve the problem, okay, partially, but you and I |
| 09:07 | 17 | have a disagreement about that. |
| 09:08 | 18 | Regardless, I think the fairest way to proceed is |
| 09:08 | 19 | this way: |
| 09:08 | 20 | First, I'm going to stay with the e-mails.  You |
| 09:08 | 21 | may call Sarah Allen.  The reason you may call Sarah Allen |
| 09:08 | 22 | is because she will testify that she was not present at the |
| 09:08 | 23 | Nuremberg Toy Fair, which Exhibit No. 9869 -- which is |
| 09:08 | 24 | already in evidence -- tends to state. |
| 09:08 | 25 | So she has the right to say that she was not |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

21

| | | |
|---|---|---|
| 09:08 | 1 | present at that time. |
| 09:08 | 2 | But she may not extend beyond the Nuremberg Toy |
| 09:08 | 3 | Fair unless there's a foundation that she's also attending |
| 09:08 | 4 | New York and the other showrooms. |
| 09:08 | 5 | Now, is she attending other showrooms? |
| 09:08 | 6 | MR. ZELLER:  I don't think we know the answer to |
| 09:08 | 7 | that, but we don't intend to ask. |
| 09:08 | 8 | THE COURT:  Okay.  Nuremberg, I think that's fair. |
| 09:08 | 9 | Sarah Allen can testify. |
| 09:08 | 10 | MR. ZELLER:  We're going to ask her -- |
| 09:08 | 11 | THE COURT:  Thank you very much. |
| 09:08 | 12 | Second, Ms. Gronich can testify.  The reason that |
| 09:09 | 13 | she can testify is because Mattel's legal department has |
| 09:09 | 14 | been repeatedly attacked as being complicit in their |
| 09:09 | 15 | knowledge of recently unaccounted for 35 boxes, amongst |
| 09:09 | 16 | other things.  And at least Mr. Sal Villasenor's market |
| 09:09 | 17 | intelligence cubicle has been transferred.  I'm not certain |
| 09:09 | 18 | if that's the entire library or just a portion of it. |
| 09:09 | 19 | Mattel, in turn, has a right to respond if this is |
| 09:09 | 20 | occurring in like kind to or by MGA.  But that's very |
| 09:09 | 21 | limited testimony. |
| 09:09 | 22 | Plus, this person has already been known to the |
| 09:09 | 23 | Court.  Gronich was a witness that was going to be called by |
| 09:09 | 24 | MGA initially, was going to be called later by Mattel.  This |
| 09:09 | 25 | witness does not catch the Court by surprise.  In fact, I've |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

22

| | | |
|---|---|---|
| 09:09 | 1 | gone over the exhibits, and Gronich can testify, but it's |
| 09:10 | 2 | very limited. |
| 09:10 | 3 | Also for my record, this is a witness, I think in |
| 09:10 | 4 | fairness when both legal departments are potentially |
| 09:10 | 5 | involved -- or at least the insinuation is -- that requires |
| 09:10 | 6 | some balance.  Mattel initially resisted any further |
| 09:10 | 7 | discovery about any of Mattel's activities extending beyond |
| 09:10 | 8 | the breaking into showrooms beyond that of MGA, and sneaking |
| 09:10 | 9 | into other competitors' showrooms.  And this Court |
| 09:10 | 10 | cautiously approved the special master's recommendation, and |
| 09:10 | 11 | I've held to that because of the agreement of the parties. |
| 09:10 | 12 | But subsequently, these documents may all show MGA's |
| 09:10 | 13 | activities.  This deal has been struck by the parties, and I |
| 09:10 | 14 | don't think the Court will undo it unnecessarily at this |
| 09:10 | 15 | time and expand this beyond the agreement between MGA and |
| 09:10 | 16 | Mattel. |
| 09:10 | 17 | MS. KELLER:  Your Honor, may we inquire as to one |
| 09:10 | 18 | issue? |
| 09:10 | 19 | THE COURT:  Not yet. |
| 09:10 | 20 | Mr. Potgiesser.  I'm concerned about |
| 09:10 | 21 | Mr. Potgiesser.  I'm not certain about Mr. Potgiesser |
| 09:11 | 22 | because I think Mr. Potgiesser hears hearsay testimony. |
| 09:11 | 23 | He's an employee of an MGA subsidiary in Germany, and his |
| 09:11 | 24 | deposition, in my reading, was absolutely full of hearsay |
| 09:11 | 25 | about what other employees told him regarding European toy |

| | | |
|---|---|---|
| 09:11 | 1 | show activities. |
| 09:11 | 2 | I think the bottom line is that MGA in this case |
| 09:11 | 3 | has, and not Mattel -- has the claim related to toy fair |
| 09:11 | 4 | misconduct. And Mr. Potgiesser's testimony is certainly not |
| 09:11 | 5 | relevant to an unclean hands defense, nor is it relevant to |
| 09:11 | 6 | whether any of the information at the New York Toy Fair is |
| 09:11 | 7 | confidential since he never went to that toy fair. So I'm |
| 09:11 | 8 | inclined tentatively -- and I'll hear from counsel over the |
| 09:11 | 9 | lunch hour -- to exclude Mr. Potgiesser. |
| 09:11 | 10 | The third is Jolicoeur. I think that Mattel is |
| 09:11 | 11 | entitled to present as an affirmative defense, Mr. Quinn, |
| 09:11 | 12 | which is your concern, that there's a 30(b) expert for MGA |
| 09:12 | 13 | who basically negates the trade secrets that Mattel seeks to |
| 09:12 | 14 | insert in front of this jury. And therefore, I'm giving you |
| 09:12 | 15 | the very limited opportunity with Allen in terms of the |
| 09:12 | 16 | e-mail and Gronich, who's the head of their legal |
| 09:12 | 17 | department, and Ms. -- or Mr. Jolicoeur to complete your |
| 09:12 | 18 | case in both, in terms of affirmative defenses. |
| 09:12 | 19 | Now, that should resolve all your problems no |
| 09:12 | 20 | matter what our disagreement on the record is. It's the |
| 09:12 | 21 | matter of the depth you're able to get into it, not your |
| 09:12 | 22 | inability to get into it. |
| 09:12 | 23 | Therefore, you have the right to attack, because |
| 09:12 | 24 | it was represented to me -- no, I'm not done yet. |
| 09:12 | 25 | I'm speaking now. |

Case 2:04-cv-09049-DOC-RNB  Document 10418  Filed 04/07/11  Page 24 of 72  Page ID #:316395
CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

24

| | | |
|---|---|---|
| 09:12 | 1 | You have the right to attack, but only on a |
| 09:12 | 2 | limited sense.  You remember the representations of |
| 09:13 | 3 | Mr. Zeller.  There was one and possibly two showrooms broken |
| 09:13 | 4 | into by MGA.  And that's been consistent.  And it didn't |
| 09:13 | 5 | cover the allegations set forth by MGA.  They have the only |
| 09:13 | 6 | claim going forward in this.  Mattel does not have a claim. |
| 09:13 | 7 | So I think it's fair, but, quite frankly, I almost negated |
| 09:13 | 8 | it. |
| 09:13 | 9 | What you cannot do, though, is I'm not allowing |
| 09:13 | 10 | the testimony of Mr.-- just a minute -- Johnson.  This is |
| 09:13 | 11 | 24341-002.  It starts with "Tom, with each present day." |
| 09:13 | 12 | This is hearsay.  It's also cumulative of Kohl's issue. |
| 09:13 | 13 | Mike Johnson was never made known to this Court, unlike |
| 09:13 | 14 | Gronich, who I've gone over time and time again.  He was on |
| 09:13 | 15 | no person's witness list. |
| 09:14 | 16 | In addition to that, you're not precluded.  You |
| 09:14 | 17 | can call the person who wrote the e-mail that we discussed |
| 09:14 | 18 | last evening.  And you can talk about whether this was a |
| 09:14 | 19 | business decision, so you're not foreclosed, but you have to |
| 09:14 | 20 | get that person here. |
| 09:14 | 21 | In addition, this was a late disclosure of |
| 09:14 | 22 | information.  I've made my record on that.  You've made your |
| 09:14 | 23 | motion for reconsideration, and that's denied.  That door is |
| 09:14 | 24 | foreclosed from you now. |
| 09:14 | 25 | So tentatively, you have the following: |

Case 2:04-cv-09049-DOC-RNB   Document 10418   Filed 04/07/11   Page 25 of 72   Page ID #:316396
CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

25

| | | |
|---|---|---|
| 09:14 | 1 | You have the ability to present Allen.  You have |
| 09:14 | 2 | the ability to present Gronich.  You have the ability to |
| 09:14 | 3 | present Jolicoeur.  You will not be presenting Johnson. |
| 09:14 | 4 | In surrebuttal, you may present Malackowski.  You |
| 09:15 | 5 | may recall de Anda in response to Allen or Gronich.  It's |
| 09:15 | 6 | the same subject area.  And I may allow you to recall |
| 09:15 | 7 | someone else concerning whatever testimony is elicited from |
| 09:15 | 8 | Jolicoeur, so it's on the same subject. |
| 09:15 | 9 | Now, that's absolutely consistent, because I made |
| 09:15 | 10 | no representation that I would give each of you up to the |
| 09:15 | 11 | 120 hours.  My intent was to conclude the case after your |
| 09:15 | 12 | expert witnesses, and my intent was to limit you to the |
| 09:15 | 13 | breaking in of the showrooms, because that was, in fact, |
| 09:15 | 14 | your agreement as presented to the Court.  And it was shaped |
| 09:15 | 15 | by both parties. |
| 09:15 | 16 | It was agreed that MGA could shape their first |
| 09:15 | 17 | case -- case first, but that Mattel could respond.  And |
| 09:15 | 18 | Mattel will be able to respond, but they'll be able to |
| 09:15 | 19 | respond to those persons who are actually involved in the |
| 09:15 | 20 | breaking into the showroom. |
| 09:15 | 21 | Second, Mr. Quinn, I agree with you, so we're not |
| 09:15 | 22 | quibbling over the transcript, you can present the 30(b)(6) |
| 09:16 | 23 | witness that -- Mr. Johnson (sic), I believe -- concerning |
| 09:16 | 24 | the affirmative defense concerning the nontrade secrets. |
| 09:16 | 25 | MR. QUINN:  I think you're talking about |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

26

| | | |
|---|---|---|
| 09:16 | 1 | Mr. Jolicoeur. |
| 09:16 | 2 | THE COURT:  Mr. Jolicoeur.  My apologies, not |
| 09:16 | 3 | Johnson.  Johnson's precluded. |
| 09:16 | 4 | MR. QUINN:  The Court doesn't want any response to |
| 09:16 | 5 | this now? |
| 09:16 | 6 | THE COURT:  Not now. |
| 09:16 | 7 | Let's get the jury. |
| 09:17 | 8 | *(In the presence of the jury.)* |
| 09:17 | 9 | THE COURT:  Counsel, if you would be seated.  The |
| 09:18 | 10 | parties are present.  The jury and alternates are present. |
| 10:21 | 11 | **JAMES MALACKOWSKI, MGA'S WITNESS, PREVIOUSLY SWORN** |
| 10:21 | 12 | **RESUMED THE STAND** |
| 09:18 | 13 | THE COURT:  Mr. Malackowski is on the witness |
| 09:18 | 14 | stand. |
| 09:18 | 15 | This is continued direct examination by Ms. Keller |
| 09:18 | 16 | on behalf of MGA. |
| 09:18 | 17 | MS. KELLER:  Thank you, Your Honor. |
| 09:18 | 18 | **DIRECT EXAMINATION (Continued)** |
| 09:18 | 19 | BY MS. KELLER: |
| 09:18 | 20 | Q.   Mr. Malackowski, before we move on, I'd like to review |
| 09:18 | 21 | with you a couple of the graphics that we were looking at |
| 09:18 | 22 | yesterday just so we can kind of all get back on track with |
| 09:18 | 23 | what you were saying. |
| 09:18 | 24 | A.   Sure. |
| 09:18 | 25 | Q.   If you could look at Slide 3 of 37189, the MGA trade |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

27

| | | |
|---|---|---|
| 09:18 | 1 | secret damages. |
| 09:18 | 2 | *(Document displayed.)* |
| 09:18 | 3 | BY MS. KELLER: |
| 09:18 | 4 | Q.   Can you explain again what you're talking about in |
| 09:18 | 5 | these graphics? |
| 09:18 | 6 | A.   Yes.  This is a summary chart, if you recall, that |
| 09:18 | 7 | shows my calculation for MGA's assertion of trade secret |
| 09:18 | 8 | misappropriation and, specifically, the two methodologies |
| 09:18 | 9 | that I utilized.  The first was a top-down or benchmark |
| 09:18 | 10 | approach, where I looked at the actual MyScene sales and |
| 09:19 | 11 | determined what the sales should have been but for the |
| 09:19 | 12 | alleged taking of the trade secrets at the toy fair. |
| 09:19 | 13 | The second approach I used was to look on a |
| 09:19 | 14 | product-by-product basis to add up the head-start benefit |
| 09:19 | 15 | for 26 of the various trade secrets. |
| 09:19 | 16 | Both the top-down approach and the bottom-up approach |
| 09:19 | 17 | represents only a portion of the total profit of MyScene or |
| 09:19 | 18 | of the specific products.  It represents the portion |
| 09:19 | 19 | attributed to the sweat equity. |
| 09:19 | 20 | Q.   And the sweat equity yesterday you defined as going |
| 09:19 | 21 | beyond the initial intellectual property, whatever that is. |
| 09:19 | 22 | A.   Yeah.  And to be clear -- I mean, I think I misspoke. |
| 09:19 | 23 | The portion of the damages represents the value of the |
| 09:19 | 24 | intellectual property as separate from the sweat equity.  We |
| 09:20 | 25 | split them apart. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 4/5/2011 – Day 46, Volume 1 of 5

28

| | | |
|---|---|---|
| 09:20 | 1 | Q.   Okay.  And just review briefly that concept for us |
| 09:20 | 2 | again.  You've got the initial intellectual property? |
| 09:20 | 3 | A.   Yes. |
| 09:20 | 4 | Q.   And then you've got the sweat equity.  What's the sweat |
| 09:20 | 5 | equity again? |
| 09:20 | 6 | A.   Well, the sweat equity represents the contribution that |
| 09:20 | 7 | in this case Mattel made through its efforts to launch the |
| 09:20 | 8 | MyScene product and to be successful with MyScene, as |
| 09:20 | 9 | distinct from the value of the intellectual property of MGA |
| 09:20 | 10 | which they learned at the toy fairs. |
| 09:20 | 11 | Q.   Okay.  So MGA's intellectual property that they learned |
| 09:20 | 12 | at the toy fairs -- and you're only talking about the things |
| 09:20 | 13 | that they learned at the toy fairs that were confidential |
| 09:20 | 14 | and proprietary.  You're not talking about anything they |
| 09:20 | 15 | learned from, say, a public area where they could just pick |
| 09:20 | 16 | up a catalog? |
| 09:20 | 17 |         MR. PRICE:  Object.  This witness has no |
| 09:20 | 18 | foundation for that. |
| 09:20 | 19 |         THE COURT:  Overruled. |
| 09:20 | 20 |         THE WITNESS:  Correct. |
| 09:20 | 21 | BY MS. KELLER: |
| 09:20 | 22 | Q.   Okay.  Now, let's take a look at chart -- or Slide 8, |
| 09:20 | 23 | and this was one of the examples that you used of the |
| 09:21 | 24 | so-called head-start approach.  Okay? |
| 09:21 | 25 |         *(Document displayed.)* |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

29

| | | |
|---|---|---|
| 09:21 | 1 | THE WITNESS:  Yes. |
| 09:21 | 2 | BY MS. KELLER: |
| 09:21 | 3 | Q.   And for this one, you used the Bratz Winter Wonderland |
| 09:21 | 4 | and its counterpart from Mattel, MyScene Chillin Out.  And |
| 09:21 | 5 | can you explain this chart, please? |
| 09:21 | 6 | A.   Correct.  This is the most straightforward case of a |
| 09:21 | 7 | head-start period.  It's a case where the Bratz product was |
| 09:21 | 8 | first shown at the toy fair.  And then MyScene product was |
| 09:21 | 9 | introduced at a later point in time.  And so what this chart |
| 09:21 | 10 | illustrates is the head start that Mattel received by |
| 09:21 | 11 | capturing the trade secret information at the toy fair. |
| 09:21 | 12 | And specifically what this chart shows you is that |
| 09:21 | 13 | rather than releasing MyScene Chillin Out in July of 2003, |
| 09:21 | 14 | alternatively, it should have been released some three |
| 09:21 | 15 | months later in October, which would be the end of a natural |
| 09:21 | 16 | design cycle. |
| 09:21 | 17 | Q.   So if they had waited to find out about Bratz Winter |
| 09:22 | 18 | Wonderland until it actually came to the market and it was |
| 09:22 | 19 | no longer a trade secret, that would be one thing.  But this |
| 09:22 | 20 | is taking into account the head start that they got by |
| 09:22 | 21 | getting the information in advance, right? |
| 09:22 | 22 | A.   Specifically, information about the product, its |
| 09:22 | 23 | pricing, its play pattern, et cetera. |
| 09:22 | 24 | Q.   And can we look at Slide 10 again. |
| 09:22 | 25 | *(Document displayed.)* |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

30

| | | |
|---|---|---|
| 09:22 | 1 | BY MS. KELLER: |
| 09:22 | 2 | Q.   And this is the design where you break out all the |
| 09:22 | 3 | different MyScene products. |
| 09:22 | 4 | Now, for some of these Mattel products, is it possible |
| 09:22 | 5 | that the development of the product started before Mattel |
| 09:22 | 6 | saw MGA's trade secrets at the toy fairs? |
| 09:22 | 7 | A.   Not only is it possible, in many cases they did.  It's |
| 09:22 | 8 | what I call the carry-forward product.  The Bling Bling |
| 09:22 | 9 | example is one that we had shown.  In fact, it was already |
| 09:22 | 10 | in the market.  MyScene Bling Bling was in the market before |
| 09:23 | 11 | the Diamondz product was shown at the toy fair.  Yet there |
| 09:23 | 12 | was confidential information at the toy fair that was still |
| 09:23 | 13 | of value to Mattel. |
| 09:23 | 14 | And there's several products like that. |
| 09:23 | 15 | Q.   Would Mattel -- would Mattel still get an economic |
| 09:23 | 16 | benefit from seeing MGA's trade secrets at the toy fair even |
| 09:23 | 17 | if it already had a product in development? |
| 09:23 | 18 | A.   Yes, of course. |
| 09:23 | 19 | Q.   And would you explain that? |
| 09:23 | 20 | A.   Well, the reason -- I think the testimony you've |
| 09:23 | 21 | already heard that they go to the toy fair -- um, that |
| 09:23 | 22 | buyers go to the toy fairs to meet the product and to |
| 09:23 | 23 | understand the pricing, the advertising schedule, to look at |
| 09:23 | 24 | what are called "sizzles," which are videos showing the |
| 09:23 | 25 | product and how it's used. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

31

| | | |
|---|---|---|
| 09:23 | 1 | And so there is information disclosed in the |
| 09:23 | 2 | confidential rooms of the toy fair that goes beyond what you |
| 09:23 | 3 | see in press releases or even what you may see on the shelf, |
| 09:23 | 4 | and it refers to future plans. |
| 09:23 | 5 | And so I've considered all of that. |
| 09:24 | 6 | Q.   And for some of these Mattel products, is it possible |
| 09:24 | 7 | that Mattel sold the products before Mattel saw MGA's trade |
| 09:24 | 8 | secrets at the toy fair? |
| 09:24 | 9 | A.   Yes.  Bling is an example.  The Stylin It collection is |
| 09:24 | 10 | an example, where even though they had a product on the |
| 09:24 | 11 | shelf, there was new information, future business |
| 09:24 | 12 | strategies, future advertising plans disclosed at the toy |
| 09:24 | 13 | fair.  It's like getting the playbook of the opposing team. |
| 09:24 | 14 | Even though you know who the players are, it's still very |
| 09:24 | 15 | valuable competitive information. |
| 09:24 | 16 | Q.   Now, does your top-down and bottom-up analysis attempt |
| 09:24 | 17 | to quantify the economic benefits that Mattel received from |
| 09:24 | 18 | taking MGA's trade secrets from private showrooms over a |
| 09:24 | 19 | seven-year period? |
| 09:24 | 20 | A.   Yes. |
| 09:24 | 21 | Q.   Now, I'd like to turn to a new area, and this is the |
| 09:24 | 22 | area of MGA's claim for unfair competition.  You're aware of |
| 09:25 | 23 | that claim, right? |
| 09:25 | 24 | A.   Correct.  That was the second part of my assignment for |
| 09:25 | 25 | calculating MGA damages. |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

32

| | | |
|---|---|---|
| 09:25 | 1 | Q.   And what figure did you calculate for that? |
| 09:25 | 2 | A.   The unfair competition damages are 4.294 million. |
| 09:25 | 3 | 4,294,000. |
| 09:25 | 4 | Q.   And what are -- is that as a result of Mattel's |
| 09:25 | 5 | interference with Kohl's, the retailer Kohl's? |
| 09:25 | 6 | A.   That's exactly right.  It's very specific to the |
| 09:25 | 7 | activities that occurred at Kohl's, the retailer, in 2005 |
| 09:25 | 8 | and 2006.  And there are a couple of graphics that |
| 09:25 | 9 | illustrate that. |
| 09:25 | 10 | Q.   Let's look at Slide 11. |
| 09:25 | 11 | (Document displayed.) |
| 09:25 | 12 | BY MS. KELLER: |
| 09:25 | 13 | Q.   Now, can you explain to us what this slide depicts? |
| 09:25 | 14 | A.   Yes.  I believe this is a slide that's been presented |
| 09:25 | 15 | before, but it depicts the actual MGA sales to Kohl's over a |
| 09:25 | 16 | period of time.  And you obviously note in the 2005 and 2006 |
| 09:26 | 17 | period, when the alleged unfair competition is asserted to |
| 09:26 | 18 | have occurred, something changed.  The sales dropped |
| 09:26 | 19 | dramatically. |
| 09:26 | 20 | And so my analysis was focused on what those sales and |
| 09:26 | 21 | profits would have been had the unfair competition not |
| 09:26 | 22 | occurred. |
| 09:26 | 23 | Q.   And again, you're -- for purposes of your analysis, |
| 09:26 | 24 | you're assuming that the sales drop was due to unfair |
| 09:26 | 25 | competition, but you're not the person who's gonna be making |

| | | |
|---|---|---|
| 09:26 | 1 | that decision, right? |
| 09:26 | 2 | A.   Correct. |
| 09:26 | 3 | Q.   Okay.  What did you do next to determine the harm to |
| 09:26 | 4 | MGA? |
| 09:26 | 5 | A.   If you look at the next slide. |
| 09:26 | 6 | *(Document displayed.)* |
| 09:26 | 7 | THE WITNESS:  When I went back and evaluated the |
| 09:26 | 8 | MGA sales in its entirety for all customers and I removed |
| 09:26 | 9 | any effect of Kohl's to see what would have been the |
| 09:26 | 10 | performance at Kohl's if they had followed the same pattern |
| 09:26 | 11 | as the rest of the market.  And what this chart shows is |
| 09:26 | 12 | that MGA sales to Kohl's would have continued, and it would |
| 09:26 | 13 | have been a relatively even increase over time. |
| 09:27 | 14 | But I didn't stop there.  Next I went to the |
| 09:27 | 15 | Mattel documents to determine whether or not Mattel |
| 09:27 | 16 | benefited at Kohl's. |
| 09:27 | 17 | And what I found is in 2005 Mattel had a |
| 09:27 | 18 | 36 percent increase in sales, and in 2006 they had another |
| 09:27 | 19 | 10 percent increase in sales.  So I was able to look at what |
| 09:27 | 20 | MGA lost and confirm it by looking at what Mattel gained. |
| 09:27 | 21 | BY MS. KELLER: |
| 09:27 | 22 | Q.   Now, as part of your assignment, did you also review |
| 09:27 | 23 | the opinion of Mr. Wagner, the Mattel damages expert? |
| 09:27 | 24 | A.   I did. |
| 09:27 | 25 | Q.   And Mr. Wagner gave his opinion about the amount of |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

34

| | | |
|---|---|---|
| 09:27 | 1 | damages a jury should award if it finds that Mattel has |
| 09:27 | 2 | proven its claims against MGA, right? |
| 09:27 | 3 | A.   Correct. |
| 09:27 | 4 | Q.   Now, looking at Mr. Wagner's opinions, what issues were |
| 09:27 | 5 | you focused on in your analysis? |
| 09:27 | 6 | A.   So now we're making a large transition.  We're no |
| 09:27 | 7 | longer focusing on the MGA claim for damages, but we're |
| 09:28 | 8 | going to talk about Mattel's claim for damages and the |
| 09:28 | 9 | corrections to those. |
| 09:28 | 10 |     And so what Mr. Wagner focused on was, one, the |
| 09:28 | 11 | copyright claims related to the 64 doll drawings and the |
| 09:28 | 12 | sculpts; two, the trade secret claims; three, the |
| 09:28 | 13 | distributions that were made to Mr. Larian; and then fourth, |
| 09:28 | 14 | and in many ways most appropriately, mitigation. |
| 09:28 | 15 | Q.   What's mitigation? |
| 09:28 | 16 | A.   Again, mitigation is the benefit Mattel achieved by |
| 09:28 | 17 | responding to the alleged misappropriation, or in this case, |
| 09:28 | 18 | it's specifically the benefit they achieved from launching |
| 09:28 | 19 | MyScene in response to Bratz. |
| 09:28 | 20 | Q.   Did you look at all at Mr. Wagner's opinion about the |
| 09:28 | 21 | nondoll trade secrets?  So, for example, things like -- I |
| 09:28 | 22 | mean, you can give us some examples. |
| 09:28 | 23 | A.   Um, yes, at various points in my assignment, I looked |
| 09:29 | 24 | at all of his calculations.  Now I'm focused on the sculpt |
| 09:29 | 25 | and the name, as well. |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

35

| | | |
|---|---|---|
| 09:29 | 1 | Q.   Your conclusions about Mattel's damages are |
| 09:29 | 2 | significantly lower than Mr. Wagner's.  And could you |
| 09:29 | 3 | explain -- please explain to us why that is. |
| 09:29 | 4 | A.   As we'll see in more detail, I made a number of very |
| 09:29 | 5 | significant corrections.  The first correction I made was to |
| 09:29 | 6 | look at the relevant products.  In the most extreme |
| 09:29 | 7 | comparison, my copyright analysis is focused on the first |
| 09:29 | 8 | four dolls plus Formal Funk Dana and Ooh-La-La Cloe because |
| 09:29 | 9 | they shared the same outfits. |
| 09:29 | 10 | In the other extreme, Mr. Wagner's trade secret |
| 09:29 | 11 | calculation is focused on the entire Bratz line.  And |
| 09:29 | 12 | there's a chart that illustrates how dramatic that |
| 09:29 | 13 | difference can be. |
| 09:29 | 14 | (Document displayed.) |
| 09:29 | 15 | THE WITNESS:  The second difference is that I |
| 09:29 | 16 | looked at the head-start advantage also as it relates to |
| 09:29 | 17 | Mattel's claims.  In other words, what head start did MGA |
| 09:30 | 18 | benefit? |
| 09:30 | 19 | Third -- and this one's a little more technical, |
| 09:30 | 20 | but Mr. Wagner bases his analysis on regression, statistical |
| 09:30 | 21 | studies of looking at Bratz versus the entire fashion doll |
| 09:30 | 22 | market.  I dug a little deeper and found that Mattel |
| 09:30 | 23 | actually conducted similar but much more specific studies |
| 09:30 | 24 | internally.  They're called cannibalization studies.  So |
| 09:30 | 25 | they went and specifically determined what effect is Bratz |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

36

| | | |
|---|---|---|
| 09:30 | 1 | going to have on our sales, and I used that information, |
| 09:30 | 2 | which I think is better information. |
| 09:30 | 3 | And I think, lastly, there's this issue of |
| 09:30 | 4 | apportionment, or the dividing of the role of the |
| 09:30 | 5 | intellectual property to the role of the sweat equity. |
| 09:30 | 6 | And as you'll see, what Mr. Wagner did for |
| 09:30 | 7 | apportionment is he looked at other toy companies.  He |
| 09:30 | 8 | looked at groups of up to 17 different toy companies which |
| 09:31 | 9 | make a lot of products besides fashion dolls. |
| 09:31 | 10 | And what I tried to do, again, was dig a little |
| 09:31 | 11 | deeper, be as specific as possible to these companies and |
| 09:31 | 12 | these products.  And we'll walk through that analysis, but |
| 09:31 | 13 | when you use specific fashion-doll or Carter Bryant-based |
| 09:31 | 14 | apportionment, the results are very different. |
| 09:31 | 15 | BY MS. KELLER: |
| 09:31 | 16 | Q.   Now, when you say that you limited your analysis to the |
| 09:31 | 17 | relevant products, what do you mean? |
| 09:31 | 18 | A.   And so there's a chart that I was referring to that |
| 09:31 | 19 | might be helpful. |
| 09:31 | 20 | Q.   Okay.  And that would be Slide 13. |
| 09:31 | 21 | *(Document displayed.)* |
| 09:31 | 22 | THE WITNESS:  So if you look at this chart, you |
| 09:31 | 23 | can begin to understand why our numbers are so very |
| 09:31 | 24 | different.  The tallest mountain in the back, that |
| 09:31 | 25 | represents all of the Bratz sales in total.  The smallest |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:31 | 1 | mountain in the front, that represents the first four dolls, |
| 09:31 | 2 | plus Formal Funk Dana and Ooh-La-La Cloe. |
| 09:31 | 3 | And so I focused my copyright analysis on the |
| 09:32 | 4 | specific dolls at issue, the first four.  And I focused my |
| 09:32 | 5 | trade secret analysis on the first four characters.  That's |
| 09:32 | 6 | the light blue second mountain in.  And that's because the |
| 09:32 | 7 | trade secrets extended beyond just the first four dolls and |
| 09:32 | 8 | their outfits to all versions of those dolls or characters. |
| 09:32 | 9 | What Mr. Wagner does primarily is -- for his |
| 09:32 | 10 | copyright claim, he looks at all core fashion dolls, so he |
| 09:32 | 11 | extends to all products, uh, less a few SKU's, but that's |
| 09:32 | 12 | essentially the green mountain.  So that makes him a little |
| 09:32 | 13 | bit larger, but certainly larger than the blue line.  And |
| 09:32 | 14 | then for this trade secret claim, he takes everything, and |
| 09:32 | 15 | frankly, that's one of the reasons why his numbers are so |
| 09:32 | 16 | much bigger than mine. |
| 09:32 | 17 | BY MS. KELLER: |
| 09:32 | 18 | Q.   And when you say that Mr. Wagner, Mattel's expert, |
| 09:32 | 19 | looks at all of Bratz, you mean -- you mean everything?  I |
| 09:32 | 20 | mean, everything with the name "Bratz" on it, right? |
| 09:32 | 21 | A.    Including nondoll products.  I mean everything. |
| 09:32 | 22 | Q.   So if it's a sleeping bag, a lunch pail, uh, the Bratz |
| 09:33 | 23 | Babyz, Bratz -- no matter how much later it came or how far |
| 09:33 | 24 | removed from the original dolls, he includes it? |
| 09:33 | 25 | A.    Everything. |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

38

| | | |
|---|---|---|
| 09:33 | 1 | Q.   Okay.  Okay.  Now, do you disagree with Mr. Wagner |
| 09:33 | 2 | about which sales to use for calculating Mattel's damages? |
| 09:33 | 3 | A.   Um, yes.  So again, this is the first big difference as |
| 09:33 | 4 | to what is the appropriate sales base.  And I look at, |
| 09:33 | 5 | again, the first four dolls, plus Formal Funk Dana and |
| 09:33 | 6 | Ooh-La-La Cloe in the original outfits as the basis of my |
| 09:33 | 7 | copyright claim.  And I look at sales for the first four |
| 09:33 | 8 | characters as the basis for the trade secrets claim. |
| 09:33 | 9 | Q.   Now, you mentioned the term "head start" again.  Can |
| 09:33 | 10 | you explain what that means in the context of Mattel's trade |
| 09:33 | 11 | secret claims against MGA? |
| 09:34 | 12 | A.   Yes.  And so the next chart illustrates that. |
| 09:34 | 13 | *(Document displayed.)* |
| 09:34 | 14 | THE WITNESS:  You have to look at it both ways. |
| 09:34 | 15 | So when I looked at the MGA damages -- as you recall, I had |
| 09:34 | 16 | a top-down approach and a bottom-up approach based on head |
| 09:34 | 17 | start.  I'm doing the same here. |
| 09:34 | 18 | So I wanted to understand what was the head-start |
| 09:34 | 19 | benefit that MGA received by allegedly misappropriating the |
| 09:34 | 20 | trade secrets with Carter Bryant.  And so I started by going |
| 09:34 | 21 | back to the calendar.  What happened when.  As it shows on |
| 09:34 | 22 | this chart, in August of 2000, when Mr. Bryant met with |
| 09:34 | 23 | Paula Garcia, and in October of 2000, they signed the |
| 09:34 | 24 | consulting agreement. |
| 09:34 | 25 | But what to me is significant is what else |

Case 2:04-cv-09049-DOC-RNB   Document 10418   Filed 04/07/11   Page 39 of 72   Page ID #:316410
CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

39

| | | |
|---|---|---|
| 09:34 | 1 | happened at that time.  And if you looked in the September |
| 09:34 | 2 | date, the second box on the chart, Mattel launched Diva |
| 09:34 | 3 | Starz.  And it's my understanding that Diva Starz is a |
| 09:34 | 4 | product that may include all of the asserted trade secrets. |
| 09:35 | 5 | So now we have publicly disclosed on the market |
| 09:35 | 6 | all the information.  And this is fundamentally different |
| 09:35 | 7 | than pricing and advertising strategies in a toy fair |
| 09:35 | 8 | because these trade secrets are focused on the look of the |
| 09:35 | 9 | doll. |
| 09:35 | 10 | And so I then looked into the future and |
| 09:35 | 11 | understood when MGA first launched its product.  And as you |
| 09:35 | 12 | see by the red line, it was in April/May of 2001.  So my |
| 09:35 | 13 | analysis was:  But for the help of Carter Bryant and access |
| 09:35 | 14 | to the Mattel intellectual property, MGA should not have |
| 09:35 | 15 | entered the market that quickly. |
| 09:35 | 16 | They would have had to go out and hire someone |
| 09:35 | 17 | else instead of Carter Bryant, and that would have pushed |
| 09:35 | 18 | back the time they could get to market. |
| 09:35 | 19 | Now, we're very fortunate in this case because |
| 09:35 | 20 | Mattel actually hired a consulting firm called Bain & |
| 09:35 | 21 | Company to help determine what is the typical launch period |
| 09:36 | 22 | of MGA.  And so I used that document to push back to the end |
| 09:36 | 23 | of September or the beginning of October what the launch |
| 09:36 | 24 | date should have been. |
| 09:36 | 25 | So simply, Mattel launched Bratz in April/May |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

40

| | | |
|---|---|---|
| 09:36 | 1 | 2001.  But for the trade secrets, they wouldn't have |
| 09:36 | 2 | launched it until September/October 2001.  And that period |
| 09:36 | 3 | represented by the red line is profits that's attributable |
| 09:36 | 4 | to the Mattel intellectual property and not the MGA sweat |
| 09:36 | 5 | equity.  And so I removed that.  I make that calculation. |
| 09:36 | 6 | BY MS. KELLER: |
| 09:36 | 7 | Q.   And when you said, "Mattel launched Bratz," I think you |
| 09:36 | 8 | meant MGA? |
| 09:36 | 9 | A.   MGA. |
| 09:36 | 10 | Q.   We've all done that in this trial.  Don't feel bad. |
| 09:36 | 11 | Okay.  And so Mattel's Diva Starz is a fashion doll |
| 09:36 | 12 | aimed at older girls, right? |
| 09:36 | 13 | A.   It is. |
| 09:36 | 14 | Q.   And may include all the elements of the Bratz concept |
| 09:36 | 15 | trade secret, right? |
| 09:36 | 16 | A.   Correct. |
| 09:36 | 17 | MR. PRICE:  That's beyond this witness's |
| 09:37 | 18 | expertise. |
| 09:37 | 19 | THE COURT:  Just a moment. |
| 09:37 | 20 | MR. PRICE:  If he's assuming it, that's one thing. |
| 09:37 | 21 | THE COURT:  Just a minute. |
| 09:37 | 22 | MS. KELLER:  Okay.  I'll rephrase. |
| 09:37 | 23 | BY MS. KELLER: |
| 09:37 | 24 | Q.   If you assume that Mattel's Diva Starz project included |
| 09:37 | 25 | the elements of the Bratz concept trade secrets -- okay -- |

| | | |
|---|---|---|
| 09:37 | 1 | the edgy, multi-ethnic, hip, you know, large head, |
| 09:37 | 2 | disproportionate features, big eyes, all of that -- and |
| 09:37 | 3 | Mattel released Diva Starz in September of 2000, then as I |
| 09:37 | 4 | understand it, you're saying that without Carter Bryant's |
| 09:37 | 5 | drawings, you're concluding it would have taken MGA an |
| 09:37 | 6 | additional five months to develop a fashion doll comparable |
| 09:37 | 7 | to Bratz after it saw Diva Starz on the market and saw all |
| 09:37 | 8 | the concepts associated with it, right? |
| 09:37 | 9 |        MR. PRICE:  I'll object.  That's beyond his |
| 09:37 | 10 | expertise as to whether MGA would come up with something |
| 09:38 | 11 | similar. |
| 09:38 | 12 |        THE COURT:  Overruled. |
| 09:38 | 13 |        THE WITNESS:  Correct.  I make the assumption that |
| 09:38 | 14 | all the items are included in Diva Starz.  I have a list of |
| 09:38 | 15 | them.  And I made the calculation based upon the Bain study |
| 09:38 | 16 | and internal correspondence from customers talking about the |
| 09:38 | 17 | desire for a doll. |
| 09:38 | 18 | BY MS. KELLER: |
| 09:38 | 19 | Q.   And you're not saying that -- you're not assuming that |
| 09:38 | 20 | MGA would have come up with an identical doll to Bratz, |
| 09:38 | 21 | right? |
| 09:38 | 22 | A.   Just the opposite.  It would have been a doll without |
| 09:38 | 23 | the intellectual property of Carter Bryant. |
| 09:38 | 24 | Q.   Okay.  Now, based on the five-month head-start period, |
| 09:38 | 25 | what did you calculate as the amount of damages that Mattel |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

42

| | | |
|---|---|---|
| 09:38 | 1 | would be entitled to if Mattel won on its underlying claim? |
| 09:38 | 2 | A.   The next chart makes that calculation. |
| 09:38 | 3 | Q.   That's Chart 15? |
| 09:38 | 4 | A.   Yes. |
| 09:38 | 5 | *(Document displayed.)* |
| 09:38 | 6 | THE WITNESS:  And so this chart is pretty straight |
| 09:38 | 7 | forward.  It shows the MGA revenues during that period of |
| 09:38 | 8 | time that we talked about, where the red line was.  It shows |
| 09:38 | 9 | the profits that MGA earned on those revenues.  And then I |
| 09:39 | 10 | added back what it would cost to hire another consultant. |
| 09:39 | 11 | And then the total represents 7.23 million.  $7,230,000 of |
| 09:39 | 12 | damage. |
| 09:39 | 13 | BY MS. KELLER: |
| 09:39 | 14 | Q.   Okay.  Now, as an alternative to the head-start |
| 09:39 | 15 | damages, you also calculated damages for both Mattel's trade |
| 09:39 | 16 | secret and copyright claims using MGA's apportioned profits, |
| 09:39 | 17 | like Mr. Wagner did? |
| 09:39 | 18 | A.   Yes. |
| 09:39 | 19 | A benchmark approach, just like I did for my top-down |
| 09:39 | 20 | approach. |
| 09:39 | 21 | Q.   And again, this would be assuming that Mattel won on |
| 09:39 | 22 | its underlying claim, right? |
| 09:39 | 23 | A.   Yes. |
| 09:39 | 24 | Q.   And that the jury would be having to decide what |
| 09:39 | 25 | damages to award, right? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

43

| | | |
|---|---|---|
| 09:39 | 1 | A.    Correct. |
| 09:39 | 2 | Q.    And so you've already mentioned that one difference |
| 09:39 | 3 | between your numbers and Mr. Wagner's is that your damages |
| 09:39 | 4 | are limited to six dolls for copyright and four characters |
| 09:39 | 5 | for trade secrets; is that right? |
| 09:39 | 6 | A.    That is the first significant difference, yes. |
| 09:40 | 7 | Q.    Okay.  And can you explain that, please? |
| 09:40 | 8 | A.    It goes to the products that I understand are alleged |
| 09:40 | 9 | to contain the intellectual property.  So the first four |
| 09:40 | 10 | dolls are alleged to contain embodiments of the 64 drawings |
| 09:40 | 11 | or the sculpts, and then the first four characters are as |
| 09:40 | 12 | well. |
| 09:40 | 13 | Q.    And so you think Mr. Wagner's numbers are |
| 09:40 | 14 | overinclusive? |
| 09:40 | 15 | A.    Significantly.  As you said, they include sleeping bags |
| 09:40 | 16 | and other products. |
| 09:40 | 17 | Q.    Now, another area where you disagree with Mr. Wagner is |
| 09:40 | 18 | this area of apportionment; is that right? |
| 09:40 | 19 | A.    Correct.  We use very different benchmarks. |
| 09:40 | 20 | Q.    Would you explain to the jury what apportionment is. |
| 09:40 | 21 | A.    Yes.  So apportionment is now, again, looking at -- |
| 09:40 | 22 | say, at the relevant sales in total -- so the six dolls or |
| 09:40 | 23 | the characters -- and determining what portion of those |
| 09:40 | 24 | profits should be apportioned or allocated to the |
| 09:40 | 25 | intellectual property and what portion of those profits |

44

| | | |
|---|---|---|
| 09:41 | 1 | should be apportioned to sweat equity. |
| 09:41 | 2 | Q.   And did you review Mr. Wagner's method of doing that -- |
| 09:41 | 3 | of apportioning the Bratz profits using industry benchmarks |
| 09:41 | 4 | or yardsticks? |
| 09:41 | 5 | A.   Yes. |
| 09:41 | 6 | Q.   Um, did you find his analysis to be flawed? |
| 09:41 | 7 | A.   I have significant disagreements with the benchmarks |
| 09:41 | 8 | that he used. |
| 09:41 | 9 | Q.   And would you please explain that. |
| 09:41 | 10 | A.   So Mr. Wagner's benchmarks first start with simple |
| 09:41 | 11 | averages of profitability, of EBIT, or net profitability, |
| 09:41 | 12 | for other companies -- for up to 17 different companies that |
| 09:41 | 13 | sell products well beyond dolls. |
| 09:41 | 14 | What's difficult about that is not only that they're |
| 09:41 | 15 | different companies, but the size of the companies and the |
| 09:41 | 16 | volume of individual products varies greatly.  Bratz, as we |
| 09:41 | 17 | know, was a hugely successful line of products.  And so not |
| 09:41 | 18 | only do we have a different firm, but we have quantity |
| 09:42 | 19 | effects, as we call it, economies of scale that need to be |
| 09:42 | 20 | taken into account. |
| 09:42 | 21 | The second, and probably as an accountant the one that |
| 09:42 | 22 | I'm most concerned about is Mr. Wagner compares different |
| 09:42 | 23 | levels of profitability. |
| 09:42 | 24 | So when he looks at Bratz profit, he compares a high |
| 09:42 | 25 | level of profitability, a contribution margin, an |

Case 2:04-cv-09049-DOC-RNB  Document 10418  Filed 04/07/11  Page 45 of 72  Page ID #:316416
CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

45

| | | |
|---|---|---|
| 09:42 | 1 | incremental profit they call it. |
| 09:42 | 2 | Q.   Okay.  You're losing us. |
| 09:42 | 3 | A.   So -- |
| 09:42 | 4 | Q.   What are incremental profits? |
| 09:42 | 5 | A.   So let me explain it this way.  To an accountant, |
| 09:42 | 6 | profit can mean a lot of different things, and it depends |
| 09:42 | 7 | upon what cost you deduct to get there. |
| 09:42 | 8 | Mr. Wagner uses a measure of profits for Bratz that's |
| 09:42 | 9 | very high.  It deducts relatively few fixed costs.  But then |
| 09:42 | 10 | he compares that to the bottom line profit of all these |
| 09:42 | 11 | other toy companies, which have substantially all the fixed |
| 09:42 | 12 | costs.  So as an accountant, that alone is gonna make the |
| 09:42 | 13 | Bratz products look really profitable and, therefore, to |
| 09:43 | 14 | Mr. Wagner, make it look like the intellectual property was |
| 09:43 | 15 | the main contributor of the profits. |
| 09:43 | 16 | Q.   What do you mean by fixed costs? |
| 09:43 | 17 | A.   So there are certain costs that don't change with |
| 09:43 | 18 | additional sales.  The cost of the main office, for example. |
| 09:43 | 19 | And there are other costs that do change:  The cost of the |
| 09:43 | 20 | material to make the doll.  And I think you have to make |
| 09:43 | 21 | sure you're comparing similar profit sets.  And in my |
| 09:43 | 22 | opinion, Mr. Wagner did not. |
| 09:43 | 23 | Q.   And you said he didn't account for the effect of volume |
| 09:43 | 24 | and scale.  Does that mean that when you're making much more |
| 09:43 | 25 | of something, it gets cheaper to make it? |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

46

| | | |
|---|---|---|
| 09:43 | 1 | A.   That's exactly right. |
| 09:43 | 2 | Q.   Okay. |
| 09:43 | 3 | A.   Exactly right.  It's that simple. |
| 09:43 | 4 | Q.   So if I'm making one doll and going out and having to |
| 09:43 | 5 | get all the parts to make the one doll, it's gonna be a lot |
| 09:43 | 6 | more expensive than if I'm making a half a million of 'em? |
| 09:43 | 7 | A.   Correct. |
| 09:43 | 8 | Q.   And, uh, finally there was another disagreement that |
| 09:43 | 9 | you had about whether Mr. Wagner -- how he attributed the |
| 09:44 | 10 | success of Bratz.  Okay? |
| 09:44 | 11 | A.   So Mr. Wagner looks at his benchmarks and says that all |
| 09:44 | 12 | of the excess profit that Bratz made must all be due to the |
| 09:44 | 13 | intellectual property -- must all be due to the claimed |
| 09:44 | 14 | Mattel intellectual property.  And I don't think that's |
| 09:44 | 15 | correct.  And I think if you look a little deeper, you'll |
| 09:44 | 16 | find out that it's not consistently due to the Mattel |
| 09:44 | 17 | intellectual property.  And there's a couple charts that |
| 09:44 | 18 | show that. |
| 09:44 | 19 | Q.   Okay.  So again, to try to translate, Mr. Wagner says |
| 09:44 | 20 | if Mattel wins on its underlying claim and he's computing |
| 09:44 | 21 | damages -- Mr. Wagner is saying that what Carter Bryant |
| 09:44 | 22 | provided -- okay? -- the drawings and the sculpts that they |
| 09:44 | 23 | claim are the intellectual property -- that basically that's |
| 09:44 | 24 | responsible for all of the reason that Bratz was more |
| 09:44 | 25 | profitable than comparable products, right? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:45 | 1 | A.   That's exactly, right. |
| 09:45 | 2 | Q.   So they're not giving it -- so he's not giving what you |
| 09:45 | 3 | think is sufficient weight to the sweat equity of MGA? |
| 09:45 | 4 | A.   I don't think he dug sufficiently far enough, and |
| 09:45 | 5 | therefore, he didn't see that there is variation.  You can't |
| 09:45 | 6 | say everything is due to the intellectual property. |
| 09:45 | 7 | Q.   So you have to look at marketing, advertising, |
| 09:45 | 8 | packaging, all sorts of things, right? |
| 09:45 | 9 | A.   Correct. |
| 09:45 | 10 | Q.   And on this last point, do you have any analysis that |
| 09:45 | 11 | shows, uh, how you dispute Mr. Wagner's assertion that the |
| 09:45 | 12 | Bratz success above the industry average was due just to the |
| 09:45 | 13 | intellectual property part of it? |
| 09:45 | 14 | A.   Yes.  There are two slides that show the variation. |
| 09:45 | 15 | Q.   Okay.  Let's look at -- let's look at Slide 16. |
| 09:45 | 16 | *(Document displayed.)* |
| 09:45 | 17 | THE WITNESS:  So the slide is actually very |
| 09:45 | 18 | simple.  This is for each SKU for each product:  What were |
| 09:46 | 19 | the total sales; what was the total volume. |
| 09:46 | 20 | BY MS. KELLER: |
| 09:46 | 21 | Q.   Back up and tell us again what an SKU is. |
| 09:46 | 22 | A.   An SKU is called a stock keeping unit.  When you go to |
| 09:46 | 23 | the store and see the bar codes, each bar code represents a |
| 09:46 | 24 | product, or an SKU. |
| 09:46 | 25 | Q.   And when you say "all the products," are these all |

Case 2:04-cv-09049-DOC-RNB  Document 10418  Filed 04/07/11  Page 48 of 72  Page ID #:316419
CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

48

| | | |
|---|---|---|
| 09:46 | 1 | Bratz fashion dolls? |
| 09:46 | 2 | A.   Yes.  So I have 866 of them on the chart. |
| 09:46 | 3 | Q.   Okay.  And continue, if you would. |
| 09:46 | 4 | A.   So what I wanted to test was Mr. Wagner's conclusion |
| 09:46 | 5 | that everything was due to the intellectual property and |
| 09:46 | 6 | that all Bratz can be treated the same.  And if all Bratz |
| 09:46 | 7 | were the same because the IP made all the difference, the |
| 09:46 | 8 | intellectual property, I would have expected the performance |
| 09:46 | 9 | of the products to be very consistent.  Each product would |
| 09:46 | 10 | have sold about the same because it had the same IP as its |
| 09:46 | 11 | basis.  Well, obviously, that's not the case.  The products |
| 09:46 | 12 | vary greatly.  Why?  Because of all the elements of sweat |
| 09:46 | 13 | equity that MGA added, all of the input on advertising, |
| 09:47 | 14 | final design, pricing, schematics, et cetera. |
| 09:47 | 15 | Q.   Fashions? |
| 09:47 | 16 | A.   Exactly. |
| 09:47 | 17 | Q.   Accessories? |
| 09:47 | 18 | A.   Yes. |
| 09:47 | 19 | Q.   Okay.  So if it was all due to the Carter Bryant's |
| 09:47 | 20 | drawings and the initial sculpts, then all the dolls should |
| 09:47 | 21 | be selling exactly the same, right? |
| 09:47 | 22 | A.   Correct. |
| 09:47 | 23 | Q.   And they're not -- and they don't? |
| 09:47 | 24 | A.   Obviously not. |
| 09:47 | 25 | Q.   They have a wide variation.  We see some little dots |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

49

| 09:47 | 1 | down there at the bottom and then some way at the top? |
| 09:47 | 2 | A.   Some were big successes; others didn't sell so well, |
| 09:47 | 3 | but they shared the same intellectual property. |
| 09:47 | 4 | Q.   So you then are concluding that it's MGA's efforts that |
| 09:47 | 5 | were responsible for that difference? |
| 09:47 | 6 | A.   Correct.  And I think the next chart really highlights |
| 09:47 | 7 | that point. |
| 09:47 | 8 | MS. KELLER:  Let's go to chart 17. |
| 09:47 | 9 | *(Document displayed.)* |
| 09:47 | 10 | THE WITNESS:  So Chart 17 simply shows the sales |
| 09:47 | 11 | by theme.  And here's where you can really tell that one of |
| 09:47 | 12 | the main contributors was the themes of the doll, and that |
| 09:47 | 13 | some themes like Style it were very successful, and other |
| 09:48 | 14 | MGA Bratz themes were not very successful at all. |
| 09:48 | 15 | And that explains the variation.  Well, that is |
| 09:48 | 16 | representative of MGA's sweat equity, not the intellectual |
| 09:48 | 17 | property. |
| 09:48 | 18 | And so, to me, this confirms that one size doesn't |
| 09:48 | 19 | fit all.  Mr. Wagner's broad benchmarks don't properly |
| 09:48 | 20 | calculate the harm. |
| 09:48 | 21 | BY MS. KELLER: |
| 09:48 | 22 | Q.   So this -- this title, "Variability of Unit Sales of |
| 09:48 | 23 | Core Fashion Dolls by Theme," you've just -- you're taking |
| 09:48 | 24 | the dolls that had the original -- that were, you know, the |
| 09:48 | 25 | original sculpts, right? |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

50

| | | |
|---|---|---|
| 09:48 | 1 | A.   Correct. |
| 09:48 | 2 | Q.   Based on those, and -- but they're all different |
| 09:48 | 3 | themes? |
| 09:48 | 4 | A.   Correct. |
| 09:48 | 5 | Q.   And some of them sold great, and some of them sold |
| 09:48 | 6 | terribly -- not terribly but not great. |
| 09:48 | 7 | A.   Not so great. |
| 09:48 | 8 | Q.   Not so great.  And that's what this shows? |
| 09:48 | 9 | A.   Exactly. |
| 09:48 | 10 | Q.   So, again, you're concluding, well, if it were all -- |
| 09:48 | 11 | if -- if Mr. Wagner's analysis is that the excess |
| 09:49 | 12 | profitability of Bratz over what other industry profits are |
| 09:49 | 13 | was all due to those Carter Bryant drawings and the sculpts, |
| 09:49 | 14 | then we shouldn't see this? |
| 09:49 | 15 | A.   No.  If it really was all due to the intellectual |
| 09:49 | 16 | property, they should have all generally performed the same. |
| 09:49 | 17 | Of course, that's not the case. |
| 09:49 | 18 | Q.   Okay.  Now, have you come up with a better way to |
| 09:49 | 19 | apportion the value between the claimed -- what Mattel says |
| 09:49 | 20 | is its intellectual property and MGA's sweat equities? |
| 09:49 | 21 | A.   I believe so.  I think that's the next chart, where I |
| 09:49 | 22 | look specifically at what actually happened and what the |
| 09:49 | 23 | accounting data shows. |
| 09:49 | 24 | *(Document displayed.)* |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

| 09:49 | 1 | BY MS. KELLER: |
|-------|---|----------------|
| 09:49 | 2 | Q.   And this is, again, if Mattel wins on its underlying |
| 09:49 | 3 | claim, here's how you would look at the damages, right? |
| 09:49 | 4 | A.   Correct.  Here's how I would apportion between |
| 09:49 | 5 | intellectual property and sweat equity. |
| 09:49 | 6 | Q.   Okay.  Can you explain this Slide 18? |
| 09:49 | 7 | A.   So I'll go through each one of these line items and |
| 09:49 | 8 | explain generally what I'm calculating. |
| 09:49 | 9 | So the first line represents license rates.  And so |
| 09:50 | 10 | this is simple.  Carter Bryant and MGA negotiated an |
| 09:50 | 11 | agreement to obtain rights to the intellectual property he |
| 09:50 | 12 | brought to the table, what's been accused, plus other |
| 09:50 | 13 | things.  And they paid him 3 percent. |
| 09:50 | 14 | MGA then added to that intellectual property through |
| 09:50 | 15 | their sweat equity, through their themes and their |
| 09:50 | 16 | strategies, and in some cases, they went and licensed that |
| 09:50 | 17 | bundle to third parties, to put on sleeping bags or other |
| 09:50 | 18 | products.  And so we have two market data points.  We know |
| 09:50 | 19 | how much they paid Carter Bryant.  We know how much third |
| 09:50 | 20 | parties paid for everything.  And so you can calculate, |
| 09:50 | 21 | relatively speaking, how important was the Carter Bryant |
| 09:50 | 22 | data. |
| 09:50 | 23 | And so what this shows is that when looking at the |
| 09:50 | 24 | first six dolls, it's 21 percent is due to the intellectual |
| 09:50 | 25 | property.  21.8. |

Case 2:04-cv-09049-DOC-RNB   Document 10418   Filed 04/07/11   Page 52 of 72   Page ID #:316423
CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

52

09:50    1        And when looking at the first four characters, it's

09:50    2    13.2.

09:51    3    Q.    Okay.  And the next thing you have on here is

09:51    4    investment rates.  What does that mean?

09:51    5    A.    Investment rates is similar.  I looked at the amount of

09:51    6    money that was paid to Carter Bryant as opposed to the total

09:51    7    amount of money that MGA invested in developing these

09:51    8    products.  And when you compute it for copyrights, it's

09:51    9    36.7 percent attributable to the intellectual property.  And

09:51    10   for trade secrets, it's 16.8 percent.

09:51    11   Q.    Okay.  And again, you're not looking at everything that

09:51    12   ever had a Bratz name on it that was ever made, right?

09:51    13   A.    I'm trying to be as specific as possible to the dolls

09:51    14   subject to copyrights and trade secrets.

09:51    15   Q.    Okay.  And the next thing on here is profit rates.

09:51    16   What does that mean?

09:51    17   A.    Here's just a comparison of the money paid to Carter

09:51    18   Bryant versus the profit that was actually earned.  And the

09:51    19   money paid to Carter Bryant represented 11 percent of the

09:51    20   profit for copyright and 6.8 percent of the profit for trade

09:51    21   secret.

09:51    22   Q.    Okay.  And again, that's based on -- this is all based

09:51    23   on those first four dolls plus the two others?

09:52    24   A.    For copyright and then for the first four characters

09:52    25   for trade secrets.

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

53

| | | |
|---|---|---|
| 09:52 | 1 | Q.   Okay.  And the next thing says "product profit." |
| 09:52 | 2 | What's that? |
| 09:52 | 3 | A.   This is, I think, an interesting one.  It's simply |
| 09:52 | 4 | looking at the profitability of the Bratz products versus |
| 09:52 | 5 | another fashion doll that MGA had called "Moxie." |
| 09:52 | 6 | From an accounting perspective, you have to be a little |
| 09:52 | 7 | careful here.  You have to make sure you look at the total |
| 09:52 | 8 | period for Bratz, because there were significant changes in |
| 09:52 | 9 | plastic costs, frankly, and other costs over time.  But when |
| 09:52 | 10 | you properly account for that, what we find is that Bratz |
| 09:52 | 11 | was more profitable than Moxie by 13 and a half percent. |
| 09:52 | 12 | And so that 13 and a half percent represents, perhaps, the |
| 09:52 | 13 | value of the intellectual property, the maximum value. |
| 09:52 | 14 | Q.   And you've got time contribution. |
| 09:52 | 15 | A.   This one is straightforward for copyright.  I simply |
| 09:52 | 16 | went back and looked at the number of hours that Carter |
| 09:53 | 17 | Bryant spent working on the project versus the number of |
| 09:53 | 18 | hours that the rest of the MGA team spent, and Mr. Bryant |
| 09:53 | 19 | spent 21 percent of the time. |
| 09:53 | 20 | Q.   And then you've got an average on here.  So you took |
| 09:53 | 21 | all these different quantitative factors and you averaged |
| 09:53 | 22 | them? |
| 09:53 | 23 | A.   Yes.  So the starting point with me was an arithmetic |
| 09:53 | 24 | average, very much like Mr. Wagner averaged his third-party |
| 09:53 | 25 | companies.  I started at that point. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

54

| 09:53 | 1 | Q.   Now, I want to go back to the concept of sweat equity. |
|---|---|---|
| 09:53 | 2 | Again, we were talking about that, when you're allocating. |
| 09:53 | 3 | Sweat equity also includes the capital investment by |
| 09:53 | 4 | MGA, right? |
| 09:53 | 5 | A.   Correct. |
| 09:53 | 6 | Q.   So how much money MGA sank into developing Bratz. |
| 09:53 | 7 | A.   Correct.  Which was very significant. |
| 09:53 | 8 | Q.   And it also -- sweat equity would also include MGA's |
| 09:53 | 9 | independent contribution of intellectual property, right? |
| 09:53 | 10 | A.   Their own creative ideas, yes. |
| 09:53 | 11 | Q.   Okay.  And, for example, their own changes to the |
| 09:54 | 12 | sculpts, their own fashions, their own -- you know, all the |
| 09:54 | 13 | things that they did.  Their own concepts of what these |
| 09:54 | 14 | dolls' personalities were.  All that, right? |
| 09:54 | 15 | A.   All of that. |
| 09:54 | 16 | Q.   And it would also include -- sweat equity would also |
| 09:54 | 17 | include the brand value built up by MGA over time? |
| 09:54 | 18 | A.   Correct.  As distinct from the actual name "Bratz," |
| 09:54 | 19 | there's a lot of value based upon the advertising and |
| 09:54 | 20 | promotion over time, yes. |
| 09:54 | 21 | Q.   And -- and the sweat equity would also include the way |
| 09:54 | 22 | MGA executed all these ideas over time, right? |
| 09:54 | 23 | A.   Yes. |
| 09:54 | 24 | Q.   Okay.  Now, so in addition to quantitative factors, did |
| 09:54 | 25 | you also look as what are called "qualitative factors"? |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

55

| | | |
|---|---|---|
| 09:54 | 1 | A.   Yes.  So in addition to simply averaging the data, I |
| 09:54 | 2 | went back for confirmation in the business records and in |
| 09:55 | 3 | the testimony that I could review to see if these were the |
| 09:55 | 4 | right metrics and, if anything, were they too high or biased |
| 09:55 | 5 | low -- too low. |
| 09:55 | 6 | And what I found is, frankly, they are the right -- and |
| 09:55 | 7 | they're about accurate, maybe a little high, so I simply |
| 09:55 | 8 | rounded them and used 20 percent for copyright and |
| 09:55 | 9 | 12 percent for trade secret. |
| 09:55 | 10 | Q.   And based on those considerations, what damage figures |
| 09:55 | 11 | have you calculated for copyright and trade secret after |
| 09:55 | 12 | apportionment?  And again, this is assuming -- this is what |
| 09:55 | 13 | Mattel's claiming -- Mattel's claim damages if Mattel won. |
| 09:55 | 14 | Okay? |
| 09:55 | 15 | A.   Correct.  So just based upon these two big differences |
| 09:55 | 16 | I have with Mr. Wagner alone, which products to use and |
| 09:55 | 17 | which apportionment or benchmarks to use, I prepared a chart |
| 09:55 | 18 | showing the unjust enrichment. |
| 09:55 | 19 | Q.   Okay.  And the unjust enrichment is a legal term, |
| 09:55 | 20 | right? |
| 09:55 | 21 | A.   It's a term for the damages earned as a result of the |
| 09:55 | 22 | misappropriation. |
| 09:55 | 23 | Q.   Okay.  Let's look at Slide 19. |
| 09:56 | 24 | *(Document displayed.)* |
| | 25 | |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

56

| | | |
|---|---|---|
| 09:56 | 1 | BY MS. KELLER: |
| 09:56 | 2 | Q.   What -- why is the copyright apportionment factor of |
| 09:56 | 3 | 20 percent higher than the trade secret apportionment of |
| 09:56 | 4 | 12 percent? |
| 09:56 | 5 | A.   Um, that's really a measure of time.  In the beginning, |
| 09:56 | 6 | the copyrights relate very closely to the original four |
| 09:56 | 7 | dolls and their original outfits.  But over time, as MGA |
| 09:56 | 8 | invested more sweat equity into the first four characters, |
| 09:56 | 9 | the relative importance of the intellectual property would |
| 09:56 | 10 | naturally decline, which is why the copyrights have a higher |
| 09:56 | 11 | apportionment factor. |
| 09:56 | 12 | Q.   And by comparison, what percentage of profits does |
| 09:56 | 13 | Mr. Wagner apportion to either the copyrights or the trade |
| 09:56 | 14 | secrets? |
| 09:56 | 15 | A.   Well, he uses the same factors for both.  And he uses |
| 09:56 | 16 | 44 up to 76 percent of profits being attributable to the |
| 09:56 | 17 | Carter Bryant drawings and sculpts.  And so that explains |
| 09:56 | 18 | why our numbers, in part, are so very different. |
| 09:57 | 19 | Q.   So the difference between your apportionment |
| 09:57 | 20 | percentages and Mr. Wagner's are basically what you believe |
| 09:57 | 21 | are errors in his methodology? |
| 09:57 | 22 | A.   Correct.  I simply think he needed to dig deeper and be |
| 09:57 | 23 | specific to these products rather than looking at |
| 09:57 | 24 | third-party companies. |
| 09:57 | 25 | Q.   Now, for profits that MGA earned from the Bratz |

| | | |
|---|---|---|
| 09:57 | 1 | copyrights and trade secrets, do you have a chart to |
| 09:57 | 2 | summarize your damage opinions?  And again, this is assuming |
| 09:57 | 3 | if Mattel won. |
| 09:57 | 4 | A.   Correct.  And that's the chart that's -- |
| 09:57 | 5 | Q.   Number 20? |
| 09:57 | 6 | A.   -- up on the screen. |
| 09:57 | 7 | *(Document displayed.)* |
| 09:57 | 8 | THE WITNESS:  So what this chart shows is really a |
| 09:57 | 9 | summary of what we just looked through, which is that the |
| 09:57 | 10 | head start for the trade secrets was $7 million.  And that |
| 09:57 | 11 | the portion of MGA profits that's due to the intellectual |
| 09:57 | 12 | property is $2 million for the copyrights and 33 million for |
| 09:57 | 13 | the trade secrets. |
| 09:57 | 14 | BY MS. KELLER: |
| 09:57 | 15 | Q.   So under your analysis, if Mattel's able to prove its |
| 09:58 | 16 | copyright case as distinct from its trade secrets case, you |
| 09:58 | 17 | believe Mattel would be entitled to no more than $2 million |
| 09:58 | 18 | of Bratz profits for the first six dolls? |
| 09:58 | 19 | A.   Correct. |
| 09:58 | 20 | Q.   And if Mattel were able to prove its trade secrets |
| 09:58 | 21 | case, you think Mattel should be entitled to between |
| 09:58 | 22 | 7 million and 33 million for all generations of the first |
| 09:58 | 23 | four dolls, right? |
| 09:58 | 24 | A.   That's exactly right. |
| 09:58 | 25 | Q.   Now let's -- let's move to the topic of preliminary |

58

| | | |
|---|---|---|
| 09:58 | 1 | sculpts and the Bratz name. |
| 09:58 | 2 | You know that Mr. Wagner did some calculations for |
| 09:58 | 3 | that, right? |
| 09:58 | 4 | A.   Yes. |
| 09:58 | 5 | Q.   And let's look at Slide 21.  We got that up? |
| 09:58 | 6 | *(Document displayed.)* |
| 09:58 | 7 | BY MS. KELLER: |
| 09:58 | 8 | Q.   Um, so tell us, what critique do you have about |
| 09:58 | 9 | Mr. Wagner's estimate of damages for the two preliminary |
| 09:58 | 10 | sculpts in the Bratz name? |
| 09:58 | 11 | A.   So there's one additional copyright element and one |
| 09:59 | 12 | additional trade secret element.  So for copyrights we have |
| 09:59 | 13 | to also look at the sculpt.  For trade secrets we also have |
| 09:59 | 14 | to look at the name, because the sculpt is already included |
| 09:59 | 15 | in the four characters. |
| 09:59 | 16 | And so because they don't sell sculpts in the market, |
| 09:59 | 17 | in my opinion, the proper approach to use is a cost |
| 09:59 | 18 | approach.  What did MGA save by not having to develop the |
| 09:59 | 19 | sculpt on their own or to develop the Bratz name on their |
| 09:59 | 20 | own? |
| 09:59 | 21 | And the cost approach is one of the three most common |
| 09:59 | 22 | methods of making these calculations. |
| 09:59 | 23 | Q.   Okay.  So you say they don't sell sculpts in the store. |
| 09:59 | 24 | So if I'm gonna go buy a toy for my child, I don't go to |
| 09:59 | 25 | Toys R Us and buy a naked sculpt? |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

59

| | | |
|---|---|---|
| 09:59 | 1 | A.   Of course.  Of course not. |
| 09:59 | 2 | Q.   All right.  So then you're saying that the value, or |
| 09:59 | 3 | the damages, for the sculpts, if Mattel wins on that point |
| 09:59 | 4 | and it's decided that Mattel owns the sculpts, should be |
| 09:59 | 5 | limited to the cost of producing those sculpts, right? |
| 09:59 | 6 | A.   Correct. |
| 10:00 | 7 | Q.   And what is the cost you calculated for that? |
| 10:00 | 8 | A.   So I simply went back to the accounting schedules and |
| 10:00 | 9 | added up what it actually cost to produce a sculpt, and it's |
| 10:00 | 10 | just under $20,000, so I showed that amount. |
| 10:00 | 11 | And likewise, I went back to the county records to |
| 10:00 | 12 | determine what it cost to develop a new doll name, and here |
| 10:00 | 13 | I saw that for Moxie they spent just under $10,000.  There's |
| 10:00 | 14 | also evidence to suggest that Brats with an "S," was |
| 10:00 | 15 | purchased on a list for a couple hundred bucks, but I |
| 10:00 | 16 | included the whole 10,000. |
| 10:00 | 17 | Q.   You're talking about the testimony of Steve Linker? |
| 10:00 | 18 | A.   Yes. |
| 10:00 | 19 | Q.   In this trial?  Okay. |
| 10:00 | 20 | Did you also do an analysis of Mr. Wagner's opinion |
| 10:00 | 21 | about lost profits? |
| 10:00 | 22 | A.   Yes. |
| 10:00 | 23 | Q.   And let's look at Slide 22. |
| 10:00 | 24 | *(Document displayed.)* |
| 10:00 | 25 | MS. KELLER:  Your Honor, I wonder, before we go |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

60

| | | |
|---|---|---|
| 10:00 | 1 | on, would this be a good time for a break? |
| 10:00 | 2 | THE COURT:  This would be fine. |
| 10:00 | 3 | You're admonished not to discuss this matter |
| 10:00 | 4 | amongst yourselves, nor form or express any opinion |
| 10:00 | 5 | concerning this case.  Have a nice recess.  We'll come and |
| 10:01 | 6 | get you in just a moment. |
| 10:01 | 7 | *(Jury recesses at 10:00 a.m.)* |
| 10:01 | 8 | THE COURT:  Sir, you may step down. |
| 10:01 | 9 | *(Witness steps down.)* |
| 10:01 | 10 | *(Outside the presence of the jury.)* |
| 10:01 | 11 | THE COURT:  Counsel, why don't lead counsel |
| 10:01 | 12 | remain.  Everybody else take a break. |
| 10:01 | 13 | So, Ms. Keller, why don't you remain.  Mr. Quinn, |
| 10:01 | 14 | you can remain for just a moment.  I think, Mr. Zeller, |
| 10:01 | 15 | you'll need to remain.  Everybody else can take a break. |
| 10:01 | 16 | And Ms. Hurst. |
| 10:01 | 17 | MS. HURST:  I should stay. |
| 10:01 | 18 | THE COURT:  Let's place one more call, if we can, |
| 10:01 | 19 | to counsel before the warrant goes out so we have no doubts |
| 10:01 | 20 | that he's been informed.  We're going to place the call from |
| 10:01 | 21 | the court, pay him every courtesy.  We'll hold the warrant |
| 10:01 | 22 | until 12:00 noon today, but then he's on notice. |
| 10:01 | 23 | THE CLERK:  I checked your voicemail.  You don't |
| 10:01 | 24 | have a message from him. |
| 10:01 | 25 | THE COURT:  I know.  We want to phone him. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10418   Filed 04/07/11   Page 61 of 72   Page ID #:316432
CV 04-9049 DOC – 4/5/2011 – Day 46, Volume 1 of 5

61

| | | |
|---|---|---|
| 10:01 | 1 | Mike, do you have his number?  Let's put him on |
| 10:02 | 2 | the speaker phone. |
| 10:02 | 3 | He's the genesis of this, so let's get him in |
| 10:02 | 4 | here.  He started it. |
| 10:02 | 5 | All right.  Any discussion, Jennifer, when I talk |
| 10:02 | 6 | to him? |
| 10:02 | 7 | John, any suggestion when I talk to Mr. Bonis? |
| 10:02 | 8 | Any thoughts?  I mean, he's the genesis of this. |
| 10:02 | 9 | MR. QUINN:  I would think when he hears the "W" |
| 10:02 | 10 | word. |
| 10:02 | 11 | THE COURT:  We'll make one more try, then I'm |
| 10:02 | 12 | going to issue it, because, I mean, he started it.  Here he |
| 10:03 | 13 | is, you know.  So that's where we're ending up. |
| 10:03 | 14 | *(Peter Bonis joins the proceedings telephonically.)* |
| 10:03 | 15 | THE CLERK:  Okay. |
| 10:03 | 16 | THE COURT:  Hi, Peter. |
| 10:03 | 17 | MR. BONIS:  Hello, Your Honor. |
| 10:03 | 18 | THE COURT:  This is Judge Carter.  I want this on |
| 10:03 | 19 | the record.  I'm in Court with all counsel, and this time I |
| 10:03 | 20 | need to put this on the record.  But first of all, let me |
| 10:03 | 21 | express to you on behalf of the Court and all counsel who |
| 10:03 | 22 | are here.  Mr. Quinn, say hello. |
| 10:03 | 23 | MR. QUINN:  Hello. |
| 10:03 | 24 | THE COURT:  And Ms. Keller. |
| 10:03 | 25 | MS. KELLER:  Mr. Bonis, hello. |

Case 2:04-cv-09049-DOC-RNB   Document 10418   Filed 04/07/11   Page 62 of 72   Page ID #:316433
CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

62

| | | |
|---|---|---|
| 10:03 | 1 | THE COURT:  Our appreciation.  I've literally |
| 10:03 | 2 | narrowed this down to 16 questions that Carter Bryant was |
| 10:03 | 3 | going to be asked.  Have you had any contact with Carter |
| 10:03 | 4 | Bryant? |
| 10:03 | 5 | MR. BONIS:  I have not, Your Honor. |
| 10:03 | 6 | THE COURT:  All right.  I know that you've made |
| 10:03 | 7 | every effort.  He doesn't have the right to voluntarily |
| 10:03 | 8 | absent himself.  He was ordered to be available to the |
| 10:03 | 9 | Court.  This is no reflection on you, Mr. Bonis.  You're |
| 10:03 | 10 | extraordinary counsel, and you've made every effort.  I'm |
| 10:03 | 11 | going to be forced to issue a warrant for his arrest. |
| 10:03 | 12 | I'm going to hold that for two hours, but it will |
| 10:03 | 13 | automatically issue at 12:00 o'clock our time. |
| 10:04 | 14 | MR. BONIS:  Okay. |
| 10:04 | 15 | THE COURT:  If there's anything further you can |
| 10:04 | 16 | do.  He would have to be here literally by tomorrow morning, |
| 10:04 | 17 | because the case will conclude late today or tomorrow at the |
| 10:04 | 18 | latest.  And this is extraordinary because we're 47 days in |
| 10:04 | 19 | trial. |
| 10:04 | 20 | MR. BONIS:  That's okay.  Listen, I don't know if |
| 10:04 | 21 | you can answer this question.  This is simply about the |
| 10:04 | 22 | mechanics. |
| 10:04 | 23 | I sent -- like I said, I sent him a FedEx letter. |
| 10:04 | 24 | You know, are you sending the marshals to his house in |
| 10:04 | 25 | Missouri?  Are we gonna do that? |

Case 2:04-cv-09049-DOC-RNB   Document 10418   Filed 04/07/11   Page 63 of 72   Page ID #:316434
CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

63

| | | |
|---|---|---|
| 10:04 | 1 | THE COURT:  I'll issue a warrant.  The marshals |
| 10:04 | 2 | will take their own method.  I'll bring him here on a |
| 10:04 | 3 | Contempt of Court citation. |
| 10:04 | 4 | MR. BONIS:  Okay.  Do whatever you need to do. |
| 10:04 | 5 | I'll see what I can do. |
| 10:04 | 6 | THE COURT:  Okay.  If you call us back |
| 10:04 | 7 | immediately, of course we'd like to avoid it, but it will |
| 10:04 | 8 | issue in two hours. |
| 10:04 | 9 | MR. BONIS:  Does anyone there know what the -- I |
| 10:04 | 10 | haven't been able to get ahold of him.  I've been leaving |
| 10:04 | 11 | messages with various family members. |
| 10:04 | 12 | Does anyone there know what the flight schedule |
| 10:05 | 13 | is? |
| 10:05 | 14 | THE COURT:  No.  But, you know, I would be |
| 10:05 | 15 | extraordinary, you know, progressive or liberal or |
| 10:05 | 16 | accommodating or whatever, if we can simply get him here. |
| 10:05 | 17 | It simply involves a number of drawings that he |
| 10:05 | 18 | testified to in the first trial, that, quite frankly, Mattel |
| 10:05 | 19 | neglected to ask him about.  There are literally twelve |
| 10:05 | 20 | questions, but I think Mattel has the right to ask them. |
| 10:05 | 21 | And they attempted to get them in through an exhibit that |
| 10:05 | 22 | was a black-and-white photograph.  But with this length of |
| 10:05 | 23 | trial, it just seems extraordinarily inappropriate to the |
| 10:05 | 24 | Court that at least these exhibits aren't in front of the |
| 10:05 | 25 | jury. |

| 10:05 | 1 | And I'll tell you what they are.  They're -- |
| 10:05 | 2 | literally, he's going to be on the stand probably 15 minutes |
| 10:05 | 3 | at the most, maybe 20. |
| 10:05 | 4 | Please turn to TX5-76.  Do you recognize this as a |
| 10:05 | 5 | Bratz drawing that you drew? |
| 10:05 | 6 | Please turn to TX5-77.  Do you recognize this as a |
| 10:06 | 7 | Bratz drawing that you drew? |
| 10:06 | 8 | Please turn to TX5-78.  Do you recognize this as a |
| 10:06 | 9 | Bratz drawing that you drew? |
| 10:06 | 10 | TX10579.  Do you recognize this as a Bratz drawing |
| 10:06 | 11 | that you drew? |
| 10:06 | 12 | Please turn to 15172.  Do you recognize this as a |
| 10:06 | 13 | Bratz drawing that you drew? |
| 10:06 | 14 | TX5-7 or 5-14.  Do you recognize this as a Bratz |
| 10:06 | 15 | drawing that you drew? |
| 10:06 | 16 | TX5-18.  Do you recognize this as a Bratz drawing |
| 10:06 | 17 | that you drew? |
| 10:06 | 18 | TX-5 -- or TX5-19.  Do you recognize this as a |
| 10:06 | 19 | Bratz drawing that you drew? |
| 10:06 | 20 | TX5-28.  Do you recognize this as a Bratz drawing |
| 10:06 | 21 | that you drew? |
| 10:06 | 22 | TX5-95.  Do you recognize this as a Bratz drawing |
| 10:06 | 23 | that you drew? |
| 10:06 | 24 | TX5-96.  Do you recognize this as a Bratz drawing |
| 10:06 | 25 | that you drew? |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

65

| 10:07 | 1 | And TX-59.  Do you recognize this as a Bratz |
| 10:07 | 2 | drawing that you drew? |
| 10:07 | 3 | Every other question is being excluded by the |
| 10:07 | 4 | Court.  If he is here -- although I don't find that there's |
| 10:07 | 5 | any prejudice to Mattel; they can potentially present this |
| 10:07 | 6 | through a different witness -- he would also be asked:  You |
| 10:07 | 7 | worked on a project called Winter Wonderland while you were |
| 10:07 | 8 | at Mattel, correct?  Answer:  Yes or no. |
| 10:07 | 9 | Please turn to TX1329.  Did you recognize this as |
| 10:07 | 10 | a collection of drawings you did while employed by Mattel? |
| 10:07 | 11 | Number 3.  You see where it says Winter |
| 10:07 | 12 | Wonderland.  This was a theme that you were working on at |
| 10:07 | 13 | Mattel for the collector group, correct? |
| 10:07 | 14 | Question No. 4.  The collector group was trying to |
| 10:07 | 15 | come up with a holiday-themed doll using different song |
| 10:07 | 16 | titles such as Silver Bells, Winter Wonderland, Toyland. |
| 10:07 | 17 | And the last question:  In fact, as you can |
| 10:07 | 18 | remember, Mattel has always done winter-themed dolls.  Yes |
| 10:07 | 19 | or no. |
| 10:07 | 20 | That's the extent of the questions. |
| 10:07 | 21 | MR. BONIS:  Okay.  Well, thanks for the heads-up. |
| 10:07 | 22 | Let me see what I can do.  If I find him about 2:00 or |
| 10:08 | 23 | 3:00 o'clock, I'll certainly call the Court, and I assume |
| 10:08 | 24 | you could recall the warrant. |
| 10:08 | 25 | THE COURT:  Would you?  I would recall the warrant |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 10418   Filed 04/07/11   Page 66 of 72   Page ID #:316437
CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

66

| | | |
|---|---|---|
| 10:08 | 1 | and be courteous about that, but at some point, I have to |
| 10:08 | 2 | issue it. I was placed in this position, quite frankly, |
| 10:08 | 3 | because Mattel first alerted me last Thursday that there may |
| 10:08 | 4 | be a problem. I didn't know what that problem was. I then |
| 10:08 | 5 | ordered Mattel to produce to me a specific list of |
| 10:08 | 6 | questions, which I quite frankly grew frustrated with |
| 10:08 | 7 | because I'd not received them. Actually, Mattel had them |
| 10:08 | 8 | Sunday afternoon and for whatever reason didn't disclose |
| 10:08 | 9 | those to the Court until Sunday late in the afternoon when I |
| 10:08 | 10 | finally, quite frankly, lost my patience. |
| 10:08 | 11 | Finally, these were produced and I saw the |
| 10:08 | 12 | questions after I had ordered them to be produced. So I |
| 10:08 | 13 | find myself in this unenviable position of a person who's |
| 10:08 | 14 | supposed to be on call, who's necessary concerning these |
| 10:08 | 15 | drawings. Quite frankly, Mattel was trying to use black and |
| 10:08 | 16 | whites. They had the colored drawings in the first |
| 10:09 | 17 | instance, could have gotten them. By the same token, they |
| 10:09 | 18 | came in at the first trial. And it's rather ridiculous that |
| 10:09 | 19 | the jury would be comparing black-and-white drawings to |
| 10:09 | 20 | colored drawings. So literally, as I represented to you, |
| 10:09 | 21 | he's probably on the stand with those questions a minimum of |
| 10:09 | 22 | 15 minutes and/or -- and a maximum of 20 minutes and we're |
| 10:09 | 23 | done. |
| 10:09 | 24 | MR. BONIS: Okay. Well, like I said, let me see |
| 10:09 | 25 | what I can do. Like I said, I haven't heard from him. But |

| | | |
|---|---|---|
| 10:09 | 1 | I've been leaving messages with various family members. |
| 10:09 | 2 | THE COURT:  Well, whatever you can do, tell him |
| 10:09 | 3 | the warrant's going to issue in two hours.  The problem is, |
| 10:09 | 4 | I hate to inform you of this:  I don't recall things.  Once |
| 10:09 | 5 | I have to do that, he will be coming here in custody, |
| 10:09 | 6 | unfortunately. |
| 10:09 | 7 | MR. BONIS:  Okay.  Well –– |
| 10:09 | 8 | THE COURT:  Just do your best.  We are all trying |
| 10:09 | 9 | to do our best, and hopefully, we avoid this. |
| 10:09 | 10 | MR. BONIS:  Okay. |
| 10:09 | 11 | THE COURT:  But he doesn't have the right to cut |
| 10:09 | 12 | off his phones and not to communicate.  That's not the kind |
| 10:09 | 13 | of on-call status he was represented to be –– he was |
| 10:10 | 14 | represented to be available to the Court, and he must be |
| 10:10 | 15 | available to the Court.  He's a primary person, and he |
| 10:10 | 16 | should be asked these limited questions. |
| 10:10 | 17 | MR. BONIS:  Okay. |
| 10:10 | 18 | THE COURT:  Okay.  I want to thank you.  You've |
| 10:10 | 19 | been extremely courteous, extremely professional.  Why don't |
| 10:10 | 20 | we contact you in two hours just to make certain that we've |
| 10:10 | 21 | paid you the ultimate courtesy, and at that time the warrant |
| 10:10 | 22 | will go out. |
| 10:10 | 23 | MR. BONIS:  Okay.  Thank you. |
| 10:10 | 24 | THE COURT:  Thank you. |
| 10:10 | 25 | MR. BONIS:  Bye-bye. |

Case 2:04-cv-09049-DOC-RNB   Document 10418   Filed 04/07/11   Page 68 of 72   Page ID #:316439
CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

68

| 10:10 | 1 | *(Telephonic proceedings concluded.)* |
| 10:10 | 2 | THE COURT: All right. Now, Counsel, anything |
| 10:10 | 3 | further? |
| 10:10 | 4 | MR. QUINN: No, Your Honor. |
| 10:10 | 5 | MS. KELLER: Your Honor, one of the things that |
| 10:10 | 6 | we're going to have to ask Mr. Bryant is timing, when those |
| 10:10 | 7 | were made. It's gonna take -- it's gonna take some time for |
| 10:10 | 8 | us. |
| 10:10 | 9 | MR. QUINN: Vague as to time. |
| 10:10 | 10 | MS. KELLER: I think it's going to be vague as to |
| 10:10 | 11 | time, unless Mattel asked him when they were made. |
| 10:10 | 12 | THE COURT: I understand that. But I'm |
| 10:10 | 13 | representing what the questions will be from Mattel, at |
| 10:10 | 14 | least. I thought it would be 15 to 20 minutes. If it turns |
| 10:10 | 15 | out to be 40 minutes, so be it. |
| 10:10 | 16 | MS. KELLER: We're just saying that we think |
| 10:11 | 17 | Mattel should have to ask when they were made because the |
| 10:11 | 18 | questions are going to be vague as to time, and we don't |
| 10:11 | 19 | think we should be in the position because of their lapse of |
| 10:11 | 20 | having to burn up time. Because he may not remember. We |
| 10:11 | 21 | may have to go with the trial transcript questions. |
| 10:11 | 22 | THE COURT: I'll require that. Mattel's calling |
| 10:11 | 23 | him back. They should have asked when they were made to |
| 10:11 | 24 | begin with. So those will be a required question by Mattel. |
| 10:11 | 25 | But we'll unfortunately have to issue this warrant. |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

69

| | | |
|---|---|---|
| 10:11 | 1 | MR. ZELLER:  Can we address that?  Because the |
| 10:11 | 2 | fact is, is that we have other evidence in the record that |
| 10:11 | 3 | we believe establishes the timing.  Carter Bryant's gonna |
| 10:11 | 4 | say, as he normally does, I did it before Mattel or after. |
| 10:11 | 5 | If they want to elicit that, that's -- that is their |
| 10:11 | 6 | business.  But we already have circumstantial evidence in |
| 10:11 | 7 | the record as to the dates of all these drawings, and |
| 10:11 | 8 | that's -- that's been our position on this.  And, you know, |
| 10:11 | 9 | we don't, obviously, think that it's even material what |
| 10:11 | 10 | Carter Bryant says. |
| 10:11 | 11 | THE COURT:  Well, you both have a record from the |
| 10:11 | 12 | first trial, don't you? |
| 10:11 | 13 | MS. KELLER:  Yes.  But it would take question by |
| 10:12 | 14 | question.  And see, we budgeted our time.  We actually did |
| 10:12 | 15 | budget it pretty carefully. |
| 10:12 | 16 | THE COURT:  Well -- |
| 10:12 | 17 | MS. KELLER:  But we didn't expect that they would |
| 10:12 | 18 | be missing that element of proof and then have to redo it |
| 10:12 | 19 | later.  We didn't budget for that.  So if we have to take |
| 10:12 | 20 | 20, 25 minutes to go through the trial transcript -- because |
| 10:12 | 21 | I'm guessing we'll probably get a lot of "I don't recalls," |
| 10:12 | 22 | 'cause that's what we heard before, and we have to go |
| 10:12 | 23 | through one by one by one.  We may be out of time. |
| 10:12 | 24 | MR. ZELLER:  I think the Court will recall that |
| 10:12 | 25 | Mr. Bryant fought with us.  He just agreed with anything |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

70

| | | |
|---|---|---|
| 10:12 | 1 | that Ms. Keller asked.  So the idea that somehow we should |
| 10:12 | 2 | have to basically burn up a bunch of time for questions that |
| 10:12 | 3 | apparently MGA would want to ask him, which he will, just as |
| 10:12 | 4 | a matter of course, agree with anyway -- |
| 10:12 | 5 | THE COURT:  Let's do this.  Let's see if we can |
| 10:12 | 6 | get Mr. Bryant here without a warrant, first of all.  The |
| 10:12 | 7 | warrant's going to issue, though, by 12:00 noon.  We've just |
| 10:12 | 8 | informed his counsel of that.  He'll do the best to get |
| 10:12 | 9 | ahold of family members. |
| 10:12 | 10 | Number 2, let's work that out equitably.  There's |
| 10:13 | 11 | got to be fair resolution between both parties so you both |
| 10:13 | 12 | have enough time to ask him those critical questions about |
| 10:13 | 13 | "When did you make these drawings?" because that's critical. |
| 10:13 | 14 | There are only three important witnesses in this case, after |
| 10:13 | 15 | all. |
| 10:13 | 16 | MS. KELLER:  Your Honor, there's one other |
| 10:13 | 17 | housekeeping matter.  And I'm afraid to say that the parties |
| 10:13 | 18 | have agreed, because it -- maybe not. |
| 10:13 | 19 | THE COURT:  I don't want to finish off that way. |
| 10:13 | 20 | I'm just joking with you, Counsel. |
| 10:13 | 21 | MS. KELLER:  Well, this is -- this is -- I think |
| 10:13 | 22 | of this as a housekeeping matter.  Maybe the Court won't. |
| 10:13 | 23 | THE COURT:  I'm just joking with you. |
| 10:13 | 24 | MS. KELLER:  But in addition to some of tangibles, |
| 10:13 | 25 | we have photographs of some of the tangibles, and we didn't |

CV 04-9049 DOC - 4/5/2011 - Day 46, Volume 1 of 5

71

| | | |
|---|---|---|
| 10:13 | 1 | move all those in, but I think both parties are in agreement |
| 10:13 | 2 | that we would like to have those photographs so... |
| 10:13 | 3 | MR. PRICE:  I thought the question is can we use |
| 10:13 | 4 | the photographs in -- |
| 10:13 | 5 | MS. KELLER:  Closing. |
| 10:13 | 6 | MR. PRICE:  -- closing, rather than have all the |
| 10:13 | 7 | actual -- |
| 10:13 | 8 | THE COURT:  What I meant is, if you ever reach an |
| 10:13 | 9 | agreement, I'll probably abide by it. |
| 10:13 | 10 | MR. PRICE:  And -- and, yeah, we agree to that. |
| 10:13 | 11 | THE COURT:  Why don't we write that down. |
| 10:13 | 12 | MS. KELLER:  We will write it down. |
| 10:14 | 13 | THE COURT:  Since we've agreed, then disagreed, |
| 10:14 | 14 | and then agreed, et cetera, gone back and forth.  Let's |
| 10:14 | 15 | write it down. |
| 10:14 | 16 | Here comes Mr. Quinn.  He's ready to write now. |
| 10:14 | 17 | MS. KELLER:  We actually could use just a really |
| 10:14 | 18 | quick bathroom break. |
| 10:14 | 19 | THE COURT:  Okay.  Let's take a break. |
| 10:14 | 20 | *(Recess held at 10:14 a.m.)* |
| 10:14 | 21 | *(Further proceedings reported by Maria* |
| 10:14 | 22 | *Dellaneve in Volume II.)* |
| 10:14 | 23 | -oOo- |
| 10:14 | 24 | |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

10:14    1                        -oOo-

10:14    2

10:14    3                     CERTIFICATE

10:14    4

10:14    5         I hereby certify that pursuant to Section 753,

10:14    6    Title 28, United States Code, the foregoing is a true and

10:14    7    correct transcript of the stenographically reported

10:14    8    proceedings held in the above-entitled matter and that the

10:14    9    transcript page format is in conformance with the

10:14   10    regulations of the Judicial Conference of the United States.

10:14   11

10:14   12    Date:  April 5, 2011

10:14   13

10:14   14
10:14
10:14   15    _____
10:14
10:14   16          DEBBIE GALE, U.S. COURT REPORTER
              CSR NO. 9472, RPR
10:14   17

        18

        19

        20

        21

        22

        23

        24

        25