Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL INC., et al.,               )
                                   )
                  Plaintiff,       )
                                   )      DAY 46
           vs.                     ) No. CV 04-9049-DOC
                                   )      VOLUME 2 OF 5
MGA ENTERTAINMENT, INC.,           )
                                   )
                  Defendant.       )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

TUESDAY, APRIL 5, 2011




Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

1    **APPEARANCES OF COUNSEL:**

2    **FOR THE PLAINTIFF:**  QUINN EMANUEL URQUHART OLIVER & SULLIVAN
                             BY:  MICHAEL ZELLER, ESQ.
3                            and  JOHN QUINN, ESQ.
                             865 S. FIGUEROA
4                            10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
5                            (213)443-3000

6

     FOR THE DEFENDANTS:  ORRICK, HERRINGTON & SUTCLIFFE
7                         BY:  ANNETTE HURST, ESQ.
                          405 HOWARD STREET
8                         SAN FRANCISCO, CALIFORNIA 94105
                          (415)773-5700
9

10

     FOR THE DEFENDANTS:  ORRICK HERRINGTON & SUTCLIFFE
11                        BY:  THOMAS MCCONVILLE, ESQ.
                          4 PARK PLAZA
12                        SUITE 1600
                          IRVINE, CALIFORNIA 92614
13                         (949)567-6700

14

                          KELLER RACKAUCKAS
15                        BY:  JENNIFER KELLER, ESQ.
                          18500 VON KARMAN AVENUE
16                        SUITE 560
                          IRVINE, CALIFORNIA 92612
17

18

     FOR CARLOS MACHADO GOMEZ: LAW OFFICES OF MARK E. OVERLAND
19                        BY:  MARK OVERLAND, ESQ.
                          100 WILSHIRE BLVD
20                        SUITE 950
                          SANTA MONICA, CA. 90401
21                        (310) 459-2830

22

23

24

25

```
1                        - AND -

2                        SCHEPER KIM & HARRIS LLP
                         BY:  ALEXANDER COTE, ESQ.
3                        601 WEST 5TH STREET_12TH FLOOR
                         LOS ANGELES, CA. 90071
4                        (213) 613-4660

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         I N D E X

2
     PLAINTIFF'S                                                      VOIR
3    WITNESS                 DIRECT   CROSS   REDIRECT   RECROSS   DIRE

4    JAMES MALACKOWSKI          5       18

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

efa98463-65b2-4a8a-99c6-130713d9590d

1          SANTA ANA, CALIFORNIA; TUESDAY, APRIL 5, 2011

2                              -oOo-

3          **THE COURT:**  Jury is present, the alternates, all

4     counsel, parties.  Thank you for your courtesy.

5          Counsel, if you would like to continue with your direct

6     examination.

7                    DIRECT EXAMINATION (RESUMED)

8     BY MS. KELLER

9     **Q**    Mr. Malackowski, you also analyzed another opinion that

10    Mr. Wagner gave; right?

11    **A**    Correct.

12    **Q**    And we're talking here about the area called "lost profits";

13    right?

14    **A**    Yes.

15    **Q**    And Mr. Wagner came up with an analysis, assuming Mattel won,

16    of what Mattel's lost profits would be; right?

17    **A**    Correct.

18    **Q**    Okay.  Let's look at slide 22.  And tell us, please, how you

19    arrived at the numbers we see here?

20    **A**    It's pretty straightforward.  I first determine what sales

21    are potentially lost as a result of the alleged theft of the trade

22    secrets.  And then second, I have to determine what percentage of

23    those sales would have been captured by Mattel.

24          So, for the first factor, I look to the Mattel

25    documents, and they calculate the sales that would change as a

1    result of Bratz.  It's called their cannibalization studies.

2    That's the first line.  And once I determine the profits on those

3    sales, I use similar or the same demand factors to show how

4    important the dolls' trade secrets were for customers.

5    **Q**    What is a demand factor?

6    **A**    It's a measure of what percentage of customers would have

7    continued to buy the Mattel products seeking out the trade

8    secrets.

9    **Q**    And you got there how?

10   **A**    Same as we did before.  I looked to the detailed accounting

11   records for MGA, Carter Bryant versus their investment, etcetera.

12   **Q**    So you looked at the cannibalization studies that Mattel

13   itself had done?

14   **A**    Correct.

15   **Q**    To determine the impact on Barbie of Bratz sales?

16   **A**    Yes.  So basically Mattel said there is going to be, for the

17   first four dolls, $14 million at risk; $14 million we can

18   potentially lose.  And for the first four characters, there would

19   be $74 million we could potentially lose.  And of those amounts, I

20   next calculated how much of that would have stayed with Mattel as

21   opposed to other players in the market or a new Bratz-like product

22   at MGA.

23           So the total is, for copyright, 2.8 million in lost

24   profit damages; and for trade secrets, 8.9 million.

25   **Q**    How do your demand factors of 20 percent and 12 percent

 1   compare to Mr. Wagner's market share analysis?

 2   **A**   My factors are significantly lower for one important reason,

 3   and this is probably the third big difference between myself and

 4   Mr. Wagner.  Mr. Wagner believes that Bratz and MGA would exit the

 5   market; that they would not have any competitive fashion doll.

 6   And I believe that they would have produced a different doll,

 7   simply without the trade secrets at issue.  And so --

 8            **MR. PRICE:**  Object to his belief on that issue.  That's

 9   beyond his expertise.  If he's assuming that, that's something

10   else.

11            **THE COURT:**  It's an assumption.  Overruled.

12            **THE WITNESS:**  So based upon that assumption, my lost

13   profits are significantly lower than Mr. Wagner's, which are in

14   excess of $300 million.

15   BY MS. KELLER

16   **Q**   Let's look at slide 24.  Would you explain that slide,

17   please?

18   **A**   So the reason Mr. Wagner's numbers are so high is because he

19   bases his analysis on Barbie market share.  The top blue -- pink

20   bars.  And my analysis is based upon the 12 and 20 percent, which

21   are shown on the black and gray line.  So one thing I wanted to do

22   was to test the use of market share.  So I went back and looked

23   not at overall market share like Mr. Wagner did, but specifically

24   at the share of Barbie sales sold to girls age 9 to 11.  So the

25   right segment of the market.

1          And when you look to that segment of the market, which

2    is represented by the blue bars, you can see it's very consistent

3    with the 12 to 20 percent that I used and much, much lower than

4    the pink bars, up to 70 percent, that Mr. Wagner used.

5    **Q**    So you looked at the age-group of girls that Bratz actually

6    competed for; right?

7    **A**    Bratz and My Scene, yes.

8    **Q**    As opposed to, say, adding in the 3 to 5 year olds and that

9    kind of age-group?

10   **A**    Exactly.

11   **Q**    So you tried to do more of an apples-to-apples comparison, so

12   to speak?

13   **A**    I believe I have the most comparable data.

14   **Q**    Now, your lost profit numbers are really different from

15   Mr. Wagner's lost profit numbers I think for another reason as

16   well; right?

17   **A**    Well, I think the last big reason is shown on the next slide,

18   in that Mr. Wagner admitted he did not take into account the

19   decline in Barbie.

20          **MR. PRICE:**  I object.  That misstates Mr. Wagner's

21   testimony.

22          **THE COURT:**  Overruled.

23   BY MS. KELLER

24   **Q**    So, in your opinion, he failed to consider that Barbie was

25   already in decline for three years before Bratz entered the

Page 9

1    market; correct?

2    **A**    Correct.

3    **Q**    And continued to decline due to some internal problems at

4    Mattel?

5    **A**    Reasons unrelated to MGA and Bratz.

6    **Q**    Have you looked at any documents that support your statement?

7    **A**    Yes.  In addition to looking at the actual sales data, I

8    looked to the internal business records of Mattel.

9    **Q**    And this slide that we see here, slide 23, can you please

10   explain what this slide shows?

11   **A**    What this slide shows is the sales of Barbie over time.  And

12   obviously, you can see that they peaked in 1999, but then they

13   immediately started to decline.  And they started to decline well

14   before Bratz entered the market in August of 2001.  So something

15   else was happening that was causing the decline in Barbie besides

16   Bratz.

17          And I don't believe that Mr. Wagner fully took that into

18   account, which explains why in part his numbers are so much

19   higher, because he assumed the decline was substantially due to

20   the 64 drawings and the two sculpts that are at issue.

21   **Q**    So Mr. Wagner's opinion that Bratz caused -- Bratz alone

22   caused Barbie's market share to decline, do you agree or disagree

23   with that?

24          **MR. PRICE:**  Object.  That misstates Mr. Wagner's

25   opinion.

Page 10

1          **THE COURT:**  Overruled.

2          **THE WITNESS:**  I disagree.

3    BY MS. KELLER

4    **Q**    Let's look at the next slide, slide 25, and let's see what

5    your lost profits are on your summary of Mattel's claimed damages.

6          Can you explain this chart, please?

7    **A**    Yes.  So this chart simply puts all the information we talked

8    about on one page.  So it looks at originally the head-start of

9    7 million that we first talked about for Bratz.  It looks at the

10   portion of the MGA profits that should be taken away, the 2 to

11   33 million.  It looks at the Bratz name and the Bratz sculpt, 10

12   to 20,000.  Then it adds the numbers we just calculated, 3 million

13   for lost profits for Barbie for copyright, and 9 million for the

14   trade secret claim.

15   **Q**    Okay.  Let's turn to a different topic.

16         Do you also calculate the amount of distributions to

17   Isaac Larian as an individual?  Because he is named as an

18   individual here, not just MGA; right?

19   **A**    I understand that.

20   **Q**    So one of the things that has been talked about is the amount

21   of distributions to Mr. Larian.  In other words, money that he was

22   paid by the company; right?

23   **A**    Correct.

24   **Q**    And did you calculate the amount of distributions to

25   Mr. Larian that might be considered for damages?

efa98463-65b2-4a8a-99c6-130713d9590d

1   **A**   Yes.  I was specifically asked to calculate what portion of

2   those distributions would be due to the drawings and the sculpts.

3   **Q**   And this, again, is assuming that Mattel won to begin with?

4   **A**   Correct.

5   **Q**   Can you describe this chart 26 for us?

6   **A**   So what this chart shows is the distribution amount that's

7   attributable to the copyright and trade secret claim, and it's a

8   pretty straightforward calculation.  You take the total

9   distributions made, the percentage of those that were made to

10  Mr. Larian, and then you simply allocate for these six dolls, or

11  these four characters, as compared to all of MGA, because the

12  distributions are for the entire company.

13  **Q**   And we when we talk about distributions, we're talking about

14  shareholder distributions of the private company?

15  **A**   Correct.  This is a private company, and its distributions to

16  its owners.

17  **Q**   Now, is MGA considered what is called an S corporation, a

18  subchapter S corporation?

19  **A**   It is.

20  **Q**   And what does that mean exactly?

21  **A**   It means that the corporation itself doesn't pay taxes, but

22  all of the obligations to pay taxes flows through to its owners.

23  So that's an S corp. as compared to what is called a C corp.

24  **Q**   So the shareholders, if they get a distribution, they're

25  responsible for paying income taxes on the profits that the

Page 12

1   company has earned; right?

2   **A**    They're responsible for the profits regardless -- paying

3   taxes regardless if they get the distributions.

4   **Q**    And one of the things you were asked to look at was how much

5   money in distributions that Mr. Larian was said to have received

6   from MGA that actually was sent directly to the IRS; correct?

7   **A**    Yes.  I totaled up the distributions from pay stubs and from

8   checks and check registers.

9   **Q**    Okay.  And what did you find?

10  **A**    I found that $154 million was distributed directly to the

11  taxing authorities for the account of Mr. Larian.

12  **Q**    Okay.  When you say "taxing authorities"?

13  **A**    The IRS specifically.

14  **Q**    So that was $154 million that never went into Mr. Larian's

15  pocket; correct?

16  **A**    Correct.  Unless there were refunds, and I looked for those

17  and I saw none.

18  **Q**    Now, I want to turn to the topic of mitigation.

19          You explained that before a little bit, but can you

20  explain again what mitigation is?

21  **A**    Yes.  So this is a very important concept.  It's the notion

22  that we have to calculate the benefit Mattel received from trying

23  to limit its harm.  So how did Mattel react when it determined

24  that its trade secrets were stolen?  What did they do to reduce

25  their damages?

efa98463-65b2-4a8a-99c6-130713d9590d

Page 13

1          And what I calculated is the profits that they earned by

2    introducing My Scene in direct response to the alleged trade

3    secret theft and introduction of Bratz.

4    Q    Now, you have calculated the mitigation in this case to be

5    $256 million?

6    A    Yes.

7    Q    What's that based on?

8    A    It is a calculation of the My Scene sales over time as shown

9    on a chart.  I think the next chart illustrates that.

10   Q    Okay.

11   A    The shape of this chart looks familiar to what we talked

12   about before, but I simply looked at the My Scene sales over time,

13   and I calculated the profit on a year-by-year basis.  When you

14   totaled it up, Mattel earned $256 million by selling My Scene in

15   response to Bratz.

16   Q    And what was the basis for your calculation again?

17   A    It was based upon the documents that I reviewed showing that

18   My Scene was a direct response to the launch of Bratz.

19   Q    So My Scene was introduced specifically to compete with

20   Bratz?

21   A    It was.

22   Q    And do you understand that Mr. Wagner also agrees that My

23   Scene was launched in response to Bratz?

24   A    This is one area where we do agree.  I think Mr. Wagner and I

25   both point to the same documents, like the Bratz brief and the

1   internal presentations showing that My Scene was in direct

2   response, and he concurs.

3   **Q**    Is the bottom line, your opinion, that the mitigation benefit

4   that you have calculated to Mattel actually exceeds any measure of

5   potential damages that Mattel might have?

6   **A**    Yes.  So this is a really important point.  The success of

7   fashion dolls targeted towards older girls surprised everybody and

8   was really significant.  So the sales that Mattel received and the

9   profits that they received from My Scene actually is greater than

10  the damages that were incurred because of sales lost due to Bratz.

11  Everybody benefited because the market expanded.

12  **Q**    So because of mitigation, then Mattel would have no damages?

13  **A**    I think ultimately that's a decision for the jury or legal,

14  but in my opinion, no.

15  **Q**    Did Mr. Wagner consider mitigation?

16  **A**    Mr. Wagner testified that he did, and I went back to test

17  that conclusion and I don't believe that it's fully considered.

18  **Q**    Let's look at slide 28.  Can you explain this?

19  **A**    So very simply, Mr. Wagner testified that he considered

20  mitigation by including My Scene data in his charts.  And so I

21  tested that by going and removing from his analysis the

22  consideration of My Scene.  And when I found that he removed it,

23  the numbers actually went down.

24          So by taking away My Scene, his damages would be lower

25  than by including them.  And because his damages are higher by

efa98463-65b2-4a8a-99c6-130713d9590d

1    including My Scene, it isn't a consideration of mitigation, it's

2    an additional element of damage.

3            And so I think when you look at it in entirety, not just

4    pieces, you'll find that he has not considered properly

5    mitigation.

6    **Q**    Okay.  I'm completely lost.  Can you explain that again, but

7    go a little more slowly?

8    **A**    So we need to do two things.  We need to calculate the actual

9    damage that Mattel is entitled to, but we also need to calculate

10   the benefit they receive from mitigation, or from reducing My

11   Scene.

12           I do that in two separate pieces.  I calculate the

13   damages up to 33 million, for example, for trade secret.  And then

14   I calculate the mitigation, which is a much bigger number

15   suggesting that there is no damage.

16           Mr. Wagner contends that he did it all at once, all

17   together.  And I needed to test that.  So if you remove his

18   consideration of My Scene, what should happen to his claim?  Well,

19   you would expect that his claim for damages would go up because he

20   removed the consideration of mitigation.  But it doesn't go up; it

21   goes down.  And therefore he didn't fully consider mitigation.

22   **Q**    Okay.  Mr. Malackowski, did you prepare a slide summarizing

23   your conclusions of what the damages could be if Mattel won?  In

24   other words, did you prepare a slide summarizing your damages for

25   Mattel's claims?

efa98463-65b2-4a8a-99c6-130713d9590d

Page 16

1   **A**    Yes.  The next chart.

2   **Q**    And that's chart 29?

3   **A**    Yes.  So this is all of the data that we looked at with

4   regard to Mattel's claims.  The head-start, the profits that are

5   due to the intellectual property, the name, the sculpt, the lost

6   profits, and finally the mitigation.

7           So this chart represents all the numbers we spent an

8   hour or so talking about.  It's a lot of data, but that's

9   everything.

10  **Q**    Looking at the bottom line concerning mitigation, can you

11  tell the members of the jury what conclusion to draw from your

12  calculation for damages relating to Mattel's claims against MGA?

13  **A**    Once you correct Mattel's claims against MGA, I don't see any

14  scenario where their damages exceed the amount of mitigation due

15  to that expansion of the market.

16  **Q**    Did you test your conclusions for reasonableness with respect

17  to both your opinions about MGA's damages and your opinions about

18  Mattel's potential damages?

19  **A**    Yes.  When you are done with analysis of this type, one thing

20  that we teach people in the firms, take a step back and look at

21  the overall conclusions, and does it make sense.

22          And Mr. Wagner does the same thing.  In fact, there is a

23  chart that he prepared that I think is very helpful to illustrate

24  this point.

25  **Q**    We don't have that in our database, so Mr. Stovall is going

efa98463-65b2-4a8a-99c6-130713d9590d

1    to put that on the Elmo for me.

2             This is Mr. Wagner's own graphic?

3    **A**    It is.

4    **Q**    And, Mr. Malackowski, does this slide, in your opinion,

5    accurately reflect unjust enrichment calculations -- I'm sorry --

6    yeah, that you have made for MGA and Mattel?

7    **A**    Yes.  So this chart is divided into two halves.  The first

8    half looks at MGA's trade secret claim.  And this is focused on

9    the top-down approach.  And it shows that MGA should get

10   202 million and Mattel should get to keep 146 million.

11            So more than half should be taken away and given to MGA.

12   Now, compare that to the damages associated with the Mattel trade

13   secrets, the 64 drawings and the two sculpts.  And there, of the

14   702 million or 700-plus profits made by MGA and Bratz, I'm saying

15   only 33 should be taken away.

16            And so you have got to step back and say does that make

17   sense.  How is it that in the first instance I say you should

18   award over half of the profit, but when it comes to Mattel, I'm

19   saying just take a small piece?  And the reason is the Mattel

20   trade secrets are focused on the drawings and the sculpt taken at

21   one point in time before there were products in the market.  And

22   compare that to the MGA trade secrets, which are taken over a

23   period of seven-plus years for 114 products while they were in the

24   market, while they were being refined in the market, and while

25   sales were not zero and just a projection, but were sales were

Page 18

1    billions of dollars at the time.

2            And so when I sit back and I look at this, at first I

3    might say, well, there's a small piece of the pie for Mattel.  But

4    it makes sense when you look at the timing and you understand the

5    value of the trade secrets when they were allegedly taken, and the

6    state of the market when they were taken.

7    **Q**    I'm sufficiently confused now that I have no further

8    questions.

9            **MR. PRICE:**  Could we have five minutes?

10           **THE COURT:**  Absolutely.

11           You are admonished not to discuss this matter among

12   yourselves or form or express an opinion concerning the case.  Why

13   don't you take 15 minutes.

14           Mr. Price, is that enough time?

15           **MR. PRICE:**  Yes.

16                          (Jury out.)

17               (Recess taken, from 10:45 to 11:01.)

18           **THE COURT:**  Back in session.  All counsel are present,

19   the parties are present.

20           Counsel, thank you for your courtesy.  This is

21   cross-examination by Mr. Price on behalf of Mattel.

22                        CROSS-EXAMINATION

23   BY MR. PRICE

24   **Q**    Good morning, Mr. Malackowski.

25   **A**    Good morning, sir.

Page 19

1   **Q**    First I want to ask you, I just want to make sure that I had

2   this right.  You testified that Mr. Wagner admitted that he did

3   not, in his conclusions, take into account any other factor for

4   decline in Mattel sales except for Bratz.  Was that what you just

5   told the jury?

6   **A**    No.  Specifically I believe his testimony is he did not study

7   the decline in Bratz, from his second deposition, I think.

8   **Q**    No, no.  My question was, is it your statement to the jury

9   that Mr. Wagner admitted he did not take into account any other

10  factors except for Bratz in the decline of Mattel's sales in the

11  time period?

12          **MS. KELLER:**  I would object to the argumentative form of

13  the question.

14          **THE COURT:**  Overruled.

15          **THE WITNESS:**  No.  That's not my testimony.  My

16  testimony is he did not study the reasons for the decline in

17  Barbie.  And that's what he says in his deposition.

18  BY MR. PRICE

19  **Q**    Did you read his trial testimony where he supplemented his

20  calculations?

21  **A**    Of course.

22  **Q**    And did you -- let me ask you this:

23          You testified at the beginning that, of course, you are

24  doing this for a fee?

25  **A**    My firm is being paid for this work, absolutely.

1   **Q**    And in connection with your work, you reviewed Mr. Wagner's

2   prior testimony; correct?

3   **A**    Yes.

4   **Q**    You reviewed his testimony in the first trial; correct?

5   **A**    I reviewed, I believe, all of Mr. Wagner's testimony.

6   **Q**    And his reports for the first trial?

7   **A**    I believe I reviewed all of his reports.

8   **Q**    And you reviewed -- it was a Mr. Meyer of Navigant

9   Consulting, you reviewed the reports and testimony of MGA's expert

10  at that first trial?

11  **A**    My staff has.  I reviewed his report.  I don't know that I

12  reviewed his testimony.  I may have reviewed part of it.

13  **Q**    Did you use any part of Mr. Meyer's testimony or analysis?

14  Let me rephrase that.

15          Did you rely on Mr. Meyer's testimony or analysis in the

16  first trial as to MGA's damages in reaching your conclusions?

17          **MS. KELLER:**  Objection.  Court's prior ruling.

18          **THE COURT:**  Sustained.

19  BY MR. PRICE

20  **Q**    You mentioned that you had been paid a million or so coming

21  up to this trial.  Do you know how much Mr. Meyer had been paid

22  for coming up to that trial?

23          **MS. KELLER:**  Objection.  Same objection, Your Honor.

24          **THE COURT:**  Sustained.

25

Page 21

1    BY MR. PRICE

2    **Q**    It's fair to say you didn't do any work until after the first

3    trial; correct?

4    **A**    I didn't even know this issue existed at that point.

5    **Q**    So let's talk about the overall conclusion that you -- if we

6    could put up the slide that you were looking at, right at the end,

7    the pie chart.

8            Let me ask you this:  So your conclusion is that if

9    Mattel is liable; that is, if it went into the trade shows and

10   took something which are secrets, that weren't known to others,

11   that the damages are between 88 to 202 million; right?

12   **A**    Correct.

13   **Q**    And that if MGA is liable; that is, assuming that Mattel is

14   correct, that they took the design of Bratz -- Bratz, about the

15   second most successful doll in the history of fashion dolls?

16   **A**    I think it is, yes.

17   **Q**    So if MGA is liable, they took that concept and exploited it,

18   then your conclusion is that they did us a favor because we ended

19   up making more money than we would have otherwise; that's your

20   conclusion?

21   **A**    I don't know I would phrase it they did anybody a favor, but

22   they expanded the market, and so the benefit they received from

23   sales from My Scene exceed any measure of damage.

24   **Q**    You say you wouldn't say did them a favor, but you are

25   testifying that as a result of MGA's assumed wrongful conduct in

efa98463-65b2-4a8a-99c6-130713d9590d

Page 22

1  your analysis, that Mattel profited as a result of that wrongful

2  conduct; right?  That's what you are saying?

3  **A**   Yes, sir.

4  **Q**   Now, let's talk about your analysis of MGA's damages.  And

5  let's start first with, I think it's the second slide in your

6  deck.  It's what you call the 114 trade secrets.

7        Just to be clear, what you are doing here is you or

8  someone went to these reports and looked to see what products were

9  mentioned in these toy fair reports; right?

10 **A**   Generally, yes.  Not only did we look to the toy fair

11 reports, but I confirmed it against what are called

12 interrogatories or it's where MGA sets out exactly what they claim

13 are the trade secrets, and I matched the list.

14 **Q**   Well, I don't want to talk about matching it.  I want to talk

15 about the list of trade secrets.

16       Basically for every one of these, we'll see something in

17 some internal toy fair report at Mattel that reflects these Bratz

18 products; right?

19 **A**   Yes, sir.

20 **Q**   And those reports show usually something taken out of MGA's

21 catalog that they handed out at the toy fair; correct?

22       **MS. KELLER:**  Objection.  Assumes facts not in evidence.

23       **THE COURT:**  Overruled.

24       **THE WITNESS:**  In some cases there are photographs, and

25 other cases there are simple descriptions or the author's

efa98463-65b2-4a8a-99c6-130713d9590d

Page 23

1  interpretation of what they saw, yes.

2  BY MR. PRICE

3  **Q**   You said the author's interpretation.   Did you compare what

4  was in the toy fair reports of Mattel to the catalogs that MGA had

5  at toy fairs?

6  **A**   In part, yes.

7  **Q**   In making those comparisons, did you see there was

8  similarities between those catalogs and what Mattel reported in

9  those toy fair reports?

10 **A**   Of course, yes.

11 **Q**   Now, you have highlighted some stuff in the -- if you look at

12 what better shows color, it looks dark blue and light blue,

13 although on the big one it looks more gray and light blue.

14           And for the ones in white, you could not find a product

15 that Mattel came out with that matched or was similar to something

16 in the toy fair; correct?

17 **A**   No, that's not correct.   The ones in white represent products

18 other than Bratz.   And my study was focused only on Bratz.   So I,

19 frankly, didn't even look at the others.   There was one product,

20 but outside from that, I didn't look.

21 **Q**   So we look at the light blue, and the light blue are Bratz

22 dolls; correct?

23 **A**   Yes.

24 **Q**   And they are dolls which, in doing a match, no one at MGA,

25 anyway, told you that those light blue products matched a later

Page 24

1   Mattel product?

2   **A**   I think that's correct.  Yes, sir.

3   **Q**   So let's focus on the dark blue, or what looks like the gray

4   ones here.  And obviously, I guess the concept is that some secret

5   that Mattel learned at the toy fair is related somehow to those

6   products?

7   **A**   Correct.

8   **Q**   And someone then had to go through MGA's products and kind of

9   put them up next to a Mattel product and decide, oh, this Mattel

10  product has sufficient similarities to this MGA product, that it

11  appears to be related to that; right?

12  **A**   No, I don't think that's necessary.  That may have happened,

13  but you don't even have to look in some cases at the products at

14  all.  You can look at what was known for advertising and pricing

15  and other information about MGA products alone.  But in some cases

16  they made those comparisons, that's right.

17  **Q**   I'm trying to figure out here.  So you say, for example, that

18  Bratz Rock Angel is matched with My Scene Goes Hollywood; correct?

19  That's in your analysis and your slides on page 33.

20  **A**   Okay.  Yes.

21  **Q**   So if we look at -- if you look at Exhibit 24888, which is

22  Bratz Rock Angel, and you look at 24887, one of the SKU's in your

23  report from My Scene Goes Hollywood, and someone had to look at

24  these two to see if one, the Mattel one is the result of the

25  other, the Bratz one; correct?

efa98463-65b2-4a8a-99c6-130713d9590d

Case 2:04-cv-09049-DOC-RNB   Document 10419   Filed 04/07/11   Page 25 of 77   Page ID #:316468

1    **A**    Well, I'm not saying that someone didn't do that, but if you

2    look to the actual toy fair report that talk about the trade

3    secrets, in this case -- and I'm looking at my page -- it said,

4    "The appearance, operation, intended play pattern, and plans to

5    advertise on television for Bratz Rock Angelz," and then it

6    doesn't even show a picture of the Bratz product in this example.

7    It takes a section of the catalog without a photograph.

8            So in this case I can't tell you that someone did a

9    physical comparison.  It's not necessary.

10   **Q**    It's not necessary.  You need to find the Mattel product that

11   exists because of something that was shown at toy fair; correct?

12   **A**    Not necessarily that it exists.  Bling is a good example.  My

13   Bling Bling existed before the toy fair.  But at the toy fair they

14   found out that Bratz was going to introduce a real ring for the

15   girl with a diamond chip.  That was the competitive response, not

16   the existence of the product.

17   **Q**    So what is your analysis that My Scene Goes Hollywood is a

18   competitive response to something learned at the toy fair for

19   Bratz Rock Angel?

20   **A**    Can I move these and look that up real quick?  So in this

21   example I looked at two products of My Scene.  One was My Scene

22   Hollywood and the other was My Scene Rock Out.  And I found out --

23   I looked for the actual sales data.  What I learned is that there

24   weren't actually sales of Rock Out, that Mattel never introduced

25   that product, but they did introduce My Scene Hollywood.

1        So I spoke to MGA's vice president of research and vice

2   president of operations, and in the documents found that Rock Out

3   noted competition with My Scene Hollywood specifically.  So I was

4   able to go back to the business records and see that the parties

5   themselves thought that these products were competitive, and

6   that's the asserted trade secret.  So that was the basis of my

7   conclusion.

8   **Q**    So that was Mattel's e-mails?

9   **A**    I don't have the e-mail here.  I can't tell you exactly which

10  one it was.  I just have reference to the documents.

11  **Q**    And you said that -- so for part of your analysis, you are

12  relying on the hearsay opinion of someone at MGA who has told you

13  that what we see in the gray here, or dark blue on 37189-0002,

14  that somehow that resulted in My Scene Goes Hollywood being sold;

15  correct?

16  **A**    So to be clear --

17  **Q**    You talked to someone at MGA who told you these two products

18  were related; correct?

19  **A**    Well, I interviewed two people at MGA who confirmed that my

20  comparison of them based upon the asserted trade secret, the

21  business records, my analysis of the historical sales over time,

22  and the business documents was reasonable.

23  **Q**    So just to be clear, you think you're in a better position

24  than a member of the jury to look at these two products, or to

25  look at the Mattel product and compare it to the toy fair report

1    and tell us whether or not that Mattel product uses the trade

2    secrets in the toy fair report?  You are saying you are in a

3    better position to do that?

4         **MS. KELLER:**  Objection.  Argumentative.

5         **THE COURT:**  Argumentative in its present form, but you

6    can re-ask.  It's proper.  I believe he testified, made a

7    similarity comparison, so it's proper.

8    BY MR. PRICE

9    **Q**    You made a similarity comparison; correct?

10   **A**    As I described through the business records.

11   **Q**    Did you make a similarity comparison, sir?

12   **A**    Yes, sir.

13   **Q**    You did a similarity comparison on the look of the product;

14   correct?

15   **A**    In this example, no.  I based it upon the allegations in the

16   trade secrets, the business records saying they were competitive,

17   the timing of introduction, and my interviews.

18         I didn't personally, necessarily look at one product

19   versus the other and see if the face or hair looked the same.

20   **Q**    Is there any product where you looked at the Mattel product

21   and compared it to what was revealed at the toy fair where you did

22   a comparison to determine whether or not the Mattel product was,

23   in fact, based upon some sort of trade secret that was at the toy

24   fair?  Have you done that with any product?

25   **A**    I have looked at a lot of these products and dolls.  My

1   analysis is not based necessarily on --

2   **Q**    Is the answer no?

3           **MS. KELLER:**  Objection, Your Honor.  May the expert

4   finish his opinion, please?

5           **THE COURT:**  Finish your opinion.

6           **THE WITNESS:**  My analysis is not necessarily based upon

7   comparing two physical products.  It's comparing what the

8   companies thought were competitive when they were introduced, if

9   there were generally themes that were same -- a winter theme

10  versus a winter theme.  But my expertise -- and I don't pretend to

11  take away from the jury of comparing the hair and the face paint

12  and the outfits.  That's beyond my scope.

13  BY MR. PRICE

14  **Q**    So the answer is no; right?  Let me repeat the question.

15          In identifying these, as you said, 32 Mattel products

16  and comparing to MGA products, did you compare the look of the

17  products to see whether or not the appearance of the product

18  reflects any of the trade secrets that were revealed at the toy

19  fair?  Did you do that comparison of the physical looks, "yes" or

20  "no"?

21          **MS. KELLER:**  Objection.  Assumes facts not in evidence

22  that all the trade secrets were physical appearance of the dolls.

23          **THE COURT:**  Overruled.

24          **THE WITNESS:**  Yeah, I looked at every one of the dolls.

25  I made that physical comparison.  But that's not the basis for my

1   opinion.  It may have reinforced my opinion, confirmed my opinion,

2   but mine was based on a business analysis for the reason I

3   described.

4   BY MR. PRICE

5   **Q**   On your business analysis, for example -- first of all, let's

6   get back.  There are various portions here.  I just want to look

7   at the appearance.  Okay.  The products themselves.

8           Did you base of your opinions about this match on the

9   physical appearance of the Mattel doll compared to what was in the

10  toy fair report?  "Yes" or "no," did you base your opinion on that

11  comparison?

12          **MS. KELLER:**  Objection, Your Honor.  It can't be

13  answered "yes" or "no."

14          **THE COURT:**  Overruled.

15          Answer the question.

16          **THE WITNESS:**  Yes, there would be consideration of that.

17  BY MR. PRICE

18  **Q**   I thought you just told the jury you didn't base it on

19  comparing the products?

20          **MS. KELLER:**  Objection.  Argumentative.  And I will

21  object.

22          **THE COURT:**  Strike that, counsel.  Just re-ask the

23  question.

24  BY MR. PRICE

25  **Q**   Didn't you just tell the jury that's not your expertise; that

Page 30

1   you relied on business records?

2   **A**   So, yes, that's what I said.  But your question is did I do

3   any of the comparison and did that form part of the basis of my

4   work.  It did.  That was part of the investigation I did.  I, of

5   course, looked at these dolls.  I, of course, looked at their

6   images on the internet.  But in the end what I focused on was

7   looking at whether or not they were asserted to be competitive

8   trade secrets, whether or not they shared similar characteristics

9   such as a winter theme, whether or not they were launched at the

10  appropriate competitive time, and my interviews with the vice

11  president of operations and the vice president of research.

12  **Q**   And I guess you have done a lot of research to make those

13  comparisons, certainly up through last week; correct?

14  **A**   Well, it was my staff a lot more than me, but a lot of time

15  was spent, yes.

16  **Q**   Do you remember last week you also did a match of Mattel

17  versus MGA products; right?  Let me rephrase that.

18          A couple weeks ago you did a chart which matched MGA and

19  Mattel products in term of what Mattel product reflected an MGA

20  trade secret; correct?

21  **A**   Yes, sir.

22  **Q**   And as of about a week ago, you said the competing MGA Mattel

23  product Bratz Rock Angelz was My Scene Rock Out; correct?

24  **A**   I think just explained to the jury a moment ago I looked at

25  Rock Out and My Scene Hollywood, but I was given sales data over

efa98463-65b2-4a8a-99c6-130713d9590d

1   the weekend, frankly, and I revised my analysis because there was

2   no sales for Rock Out.

3   **Q**    Actually, you conclude there was no head-start for Rock Out.

4   **A**    Yes, sir.

5   **Q**    But it was still listed as a comparison, and there were

6   damages associated with it as of last week?

7   **A**    Well, that's an interesting point, because you can have trade

8   secret benefits just from the taking, even if you don't launch a

9   competitive product, because you know the playbook.

10           You may say, well, this is what company A is doing.  I'm

11   not going to launch the exact same.  I'll look for something that

12   I think is better.  So I considered that, yes.

13   **Q**    No.  You were calculating this is part of your head-start

14   analysis.  Do you recall that?  You calculated the head-start

15   benefit for My Scene Rock Out even though it wasn't released?

16   **A**    Two weeks ago you mean, or before the data this weekend?

17   Yes.  And I updated it.

18   **Q**    Before the monthly data.  You were relying on yearly data

19   before; right?

20   **A**    Generally speaking, I think that's fair.

21   **Q**    By the way, to look at another example, if you look at Bratz

22   Sportz 24784, and My Scene Vespa, that's another one of the item

23   comparisons that goes into your damages analysis; that is, the

24   sales for the My Scene Vespa you say are part of the damages to

25   MGA because Bratz Sportz was shown at a trade show; right?

Page 32

1    **A**    Correct.  But here you have picked another example where if

2    you go back to the toy fair reports, there is not an image.  It's

3    a description.

4    **Q**    Okay.  So the toy fair report had a description.  And if you

5    can compare 24784 to 36787 -- do we have that?

6           So, this is part of your damages analysis; that is, the

7    sale of the My Scene's Vespa you say was somehow based on Bratz

8    Sportz; correct?

9    **A**    Maybe I'm not following you, because if you look at my

10   analysis, I compare the My Scene Vespa to the Bratz Motorcycle.

11   **Q**    That's a different comparison.  If you look at 37189,

12   page 33, you see third from the -- fourth from the bottom, you

13   have Bratz Sportz compared to My Scene Miami Getaway.  Do you see

14   that?

15   **A**    Right.  I'm not comparing it to Vespa.

16   **Q**    That's My Scene Getaway that's in the SKU's.  If you look at

17   what you are comparing it to, it says "My Scene Miami Getaway."

18   What we have at Exhibit 36717 is one of the products you included

19   in your damages analysis for the My Scene Miami Getaway; right?

20   **A**    Yes, sir.

21   **Q**    And that's the 36 -- 24784 to 36717; correct?

22   **A**    This is the Vespa Getaway.

23   **Q**    It's the My Scene Getaway, which is part -- if you look at

24   your schedule, that's part of your damages; isn't it?

25           **MS. KELLER:**  Objection.  Argumentative.  Misstates the

Page 33

1    evidence.

2              THE COURT:  Just a moment.

3              You can answer the question, sir.

4              THE WITNESS:  I do make the comparison of the November 4

5    My Scene Miami Getaway product.  Is that what this product is?

6    BY MR. PRICE

7    Q    I'm asking if you look at the detail behind your charts where

8    you calculate the damages from My Scene Miami Getaway, you include

9    the My Scene with the Vespa; correct?  Part of My Scene Miami

10   Getaway?

11   A    Well, the product changes over time.  So if this is the

12   November 4 -- I mean the November 2004 product, I can confirm

13   that.

14             THE COURT:  Are we certain that these are the correct --

15   what are being flashed up in front of the jury?

16             MR. PRICE:  Those are the exhibit numbers, Your Honor.

17   BY MR. PRICE

18   Q    It says "Bratz Sport New York 2005."  Do you see that?

19   That's the date of toy fair; right?

20   A    Yes.

21   Q    And you have the My Scene Miami Getaway.  MGA first -- the

22   competing product -- the invoice date of November 2004 as MGA

23   first invoice date?

24   A    Correct.

25   Q    Well, you would agree that in comparing products, the look of

Page 34

1   products, to see if they are taking a product look as a trade

2   secret, or even a description, that the jury is in as good a

3   position as you to make those kind of look comparisons?

4   **A**    I think ultimately it's completely the responsibility.

5   That's the determination of liability.

6   **Q**    And you have no particular expertise in just comparing one

7   look of something to another as opposed to what the jury has;

8   right?

9           **MS. KELLER:**  Your Honor, can I request that these

10  noncomparisons be taken down?

11          **THE COURT:**  I'm going to have the actual product put up

12  in front of him.  That's my concern.  I don't know what is being

13  put up on the board.

14          **MR. PRICE:**  He has the two products, Your Honor.

15          **THE COURT:**  Let's put the actual product in front of

16  him.

17  BY MR. PRICE

18  **Q**    Let me ask you about your bottom -- top-down analysis.

19  **A**    Yes.

20  **Q**    Starting with slide 4.  And is it correct that your belief is

21  that the top-down approach is largely, if not universally,

22  accounted for by the head-start?

23  **A**    The top-down approach does include head-start benefits, but

24  it includes other competitive benefits as well.  The bottom-up

25  head-start is a subset.

1   **Q**    Did you testify that the top-down approach is "largely, if

2   not universally, accounted for by the head-start"?

3   **A**    It is largely accounted for by the head-start benefits.

4   **Q**    That would be duplicative of head-start?

5   **A**    Yes.  You would not award both the bottom-up and the

6   top-down.  It's one or the other, clearly.

7   **Q**    We're looking at that dark blue area which you say is the

8   amount attributable to the trade secrets; correct?

9   **A**    Yes.

10  **Q**    And let's talk about that.  You said one trade secret might

11  be whether or not another product is going to be advertised;

12  correct?

13  **A**    For example?

14  **Q**    And did you look and see, of the products that Mattel did

15  which you claim there is a match for, how many were actually

16  advertised by MGA or by Mattel?  Did you look at that, "yes" or

17  "no"?

18  **A**    Yes.

19  **Q**    And did you find an overlap between what was at the toy fair

20  and what was done?

21  **A**    I don't understand that question.  Were the commercials the

22  same, is that your question?

23  **Q**    Did you look at the toy fair information and see whether or

24  not MGA, in fact, advertised what it said it was going to

25  advertise or didn't advertise what it didn't say it was going to

Page 36

1   advertise?

2   **A**    The only thing I looked at was holistically their ad spend,

3   and it is listed by product as well, yes.

4   **Q**    My question is did you compare to the products that you were

5   listing as the 32 -- did you compare that with what was said at

6   the toy fair?

7   **A**    In general, but I did not rely upon the media spend.

8   **Q**    You did a head-start analysis.  So did you do a specific

9   analysis to see if there was any value to what was said at this

10  toy fair about advertising, versus what was done, versus what

11  Mattel did?  Do you do any specific analysis for that?

12  **A**    Well, I think in total this is an analysis of those benefits,

13  but I did not compare when MGA ran a commercial versus when Mattel

14  ran a commercial.

15  **Q**    And did you do a comparison of whether MGA said there was a

16  retail price suggested, or an FOB price compared with Mattel's

17  prices and do an analysis like you did with head-start on whether

18  there was any quantifiable competitive advantage there?

19  **A**    No, I don't believe that's necessary.  Knowing your

20  competitor's price is a benefit even if you match it or underprice

21  it or overprice it.

22          So it wouldn't tell me -- if I know that you are going

23  to charge $10, if I charge $9 or $10 isn't the point.  The point

24  is you now know what I am going to charge customers before the

25  marketplace does.

efa98463-65b2-4a8a-99c6-130713d9590d

1   **Q**    And my question is whether or not you did as you -- my

2   question is whether or not, as you did with head-start, you did a

3   separate analysis to see whether or not there was actually any

4   benefit, whether or not Mattel priced higher, or lower, or the

5   same, or even whether MGA priced what it said it was going to

6   price?  Did you do any specific analysis of that?

7   **A**    I did analysis to see if Mattel benefited from pricing data.

8   I only found generally that they applauded the effort to get such

9   data.  I did not do a comparison of what MGA said they would sell

10  at the toy fair to what Mattel ultimately sold theirs for, because

11  I don't think that's going to tell you anything.  Because the

12  benefit is just knowing your competitor's price.  You can charge

13  the same or lower as you wish.

14  **Q**    So let's look at how you did do the top-down.  And you start

15  with an analysis of the year 2003 for both your top-down

16  approaches.  That is, you make an estimate of what portion of 2003

17  sales are attributable to trade secrets and what are attributable

18  to My Scene being My Scene; correct?

19  **A**    Well, to be more specific, I start with 2002, that's the

20  first data point on the chart, and then I make a projection or

21  look to projections for 2003.

22  **Q**    And so -- and having made that projection, you use that 2003

23  number and then you apply a growth rate to that -- one growth rate

24  in top-down one; another growth rate in top-down two?

25  **A**    That's exactly right.

1   **Q**   Let's look at that -- have you testified already about how

2   you did that 2003 projection which is the basis for the

3   application of the growth rate?

4   **A**   No, but I'm happy to explain.

5   **Q**   Let's talk about that.

6         In 2002, Mattel sold $17 million worth of My Scene;

7   correct?

8   **A**   Approximately, yes.

9   **Q**   And that was only part of the year; right?

10  **A**   It was late in the year, yes.  I think it was started

11  October.

12  **Q**   So you are going to now do a projection -- or look at 2003.

13  And to determine what Mattel would have sold without trade

14  secrets, you doubled 17 million to get 34 million; right?

15  **A**   It's much more involved.

16  **Q**   Mathematically, you doubled the 17 million; right?

17  **A**   Well, again, there is more involved than that.  I started by

18  doubling sales to account for a full year.  I then increased them

19  for the international portion.  And then I confirmed that against

20  the internal projections and found it was right in line.

21  **Q**   I'm doing this a step at a time.  First you took the

22  17 million and doubled it?

23  **A**   Yes, sir.

24  **Q**   That was to reflect the full year rather than just a part of

25  a year; right?

efa98463-65b2-4a8a-99c6-130713d9590d

1    **A**    Correct.

2    **Q**    And then you did a ratio of international to U.S. sales to

3    come up with an international sales; correct?

4    **A**    Correct.

5    **Q**    And you added those two and got $100 million; right?

6    **A**    Yes.

7    **Q**    And then you noted that the actual My Scene sales were

8    166 million; right?

9    **A**    Yes.

10   **Q**    And then you -- so basically you took 2002 data, assumed it

11   would be the same in 2003 without, quote, trade secrets?

12   **A**    Well, it accelerated greatly because international sales

13   expanded so much in 2003, but it's based upon 2002, yes.

14   **Q**    And then everything over that 100 million you awarded to --

15   you said was as a result of MGA's trade secrets?

16   **A**    For that year, yes.

17   **Q**    And having gotten that, you then just applied a growth rate

18   to get through the rest of the years?

19   **A**    Well, I applied a benchmark either of the My Scene sales or

20   the other Mattel products targeting older girls.  Generation

21   Girls, Flavas, etcetera.

22   **Q**    And you said you checked that with Mattel's internal

23   documents for projections.

24          And first let me ask you this:  Is it correct that MGA,

25   for the second year of the Bratz, projected 105 million and ended

efa98463-65b2-4a8a-99c6-130713d9590d

Page 40

1   up selling 191 million?

2   **A**   Yes.  As I mentioned, it was far more successful than people

3   expected.

4   **Q**   If you looked at what you looked at for Mattel, I'd like to

5   look at 24733.  And you see that's one of the internal Mattel

6   projections that you relied on; correct?

7   **A**   This is one of two.  This is the later projection that

8   occurred at the end of 2002.  And I had an earlier projection as

9   well.

10  **Q**   Well, specifically you looked at 24733 at page 10; is that

11  right?

12  **A**   Yes, sir.  Right in the middle of the page there is a figure

13  of 116 million, which is one of the data points I considered.

14  **Q**   And this was done before the 2003 toy fair; correct?

15  **A**   The date of the document references year-end data.  So I

16  think that's generally fair.  Year-end 2002 data.

17  **Q**   So before getting any of the trade secrets from the 2003 toy

18  fair, Mattel is estimating $116 million in sales for 2003; right?

19  **A**   Well, there is reference in the 2001 toy fair reports about

20  Bratz.  I don't know if I agree with the premise to your question,

21  but yes, I believe this is an end of 2002 document.

22  **Q**   You threw in the thing about Bratz.  You understand there is

23  no claim in this case at all --

24          **MS. KELLER:**  Objection.  Argumentative.

25

efa98463-65b2-4a8a-99c6-130713d9590d

Page 41

1   BY MR. PRICE

2   **Q**    There is no claim in this case at all that My Scene was a

3   copyright infringement or somehow wrongfully copyright Bratz.  You

4   understand that?

5              **MS. KELLER:**  Objection.  Argumentative.

6              **THE COURT:**  Overruled.

7              **THE WITNESS:**  I'm not saying that at all.  In fact, if

8   you go to the second page of the document, it refers directly to

9   the Bratz launch.  So they obviously knew about that and the Bratz

10  product when they made this projection.

11  BY MR. PRICE

12  **Q**    And my question, then, was, it's true that this projection of

13  116 million was done before learning of the, quote, trade secrets

14  that you say -- or assuming Mattel learned that at the New York

15  Toy Fair; right?  Before the toy fair in 2003?

16             **MS. KELLER:**  Objection.  Vague, and vague as to time.

17             **THE COURT:**  Do you understand the question?

18             **THE WITNESS:**  I think he is saying was this document

19  prepared before the toy fair.  And the only thing I know about the

20  date of this document, Your Honor, is that it refers to year-end

21  2002 data.  The toy fair was in February.  I don't see a date to

22  know if this was prepared January 1st or March or April 1.

23  BY MR. PRICE

24  **Q**    So if you look at, then, 01805, and you see this is the Bratz

25  brief dated November 14, 2003.

efa98463-65b2-4a8a-99c6-130713d9590d

Page 42

1           Do you see that?

2   **A**    Yes.

3   **Q**    And that's the second projection that you looked at as a kind

4   of a reality check on your $100 million going to Mattel and

5   66 million going to MGA for 2003?

6   **A**    Yes, sir.

7   **Q**    And on page 6 it says, "In 2003 My Scene will generate

8   85 million in sales."

9           Do you see that?

10  **A**    Specifically, "In 2003 My Scene will generate 85 million in

11  sales.  Awareness and ownership levels are impressive worldwide."

12  **Q**    And as of -- this is in November of 2003; right?

13  **A**    November 14.

14  **Q**    So this is, according to your interpretation, projecting

15  85 million, where the earlier one projected 116?

16  **A**    Exactly.  In fact, most fashion dolls actually trend off in

17  the follow-on years, which is what you saw for Generation Girls

18  and Flava.  So this is not surprising.

19  **Q**    But this is November 2003.  By that time Mattel had already

20  sold just in the U.S. over $70 million in My Scene; right?

21  **A**    Right.  But if you look to the other fashion dolls, it's not

22  at all unusual for the first year to be your best.  That's when

23  it's trendy and a hot product, and it often goes downhill after

24  that.

25  **Q**    My question was in 2003.  This is November 2003.  2003, where

efa98463-65b2-4a8a-99c6-130713d9590d

Page 43

1    you estimate that My Scene would just have done 100 million

2    without the trade secrets.  In 2003, by the time this says

3    projections of 85 million, they had already sold in 2003 over

4    79 million in just the United States?

5    **A**    I'm not understanding the question.  I accept what you say.

6    **Q**    So if by this time in November '93 Mattel had already sold

7    about 79 million just in the United States, this tells you this is

8    not a projection of worldwide sales; right?

9    **A**    No, it doesn't tell you that.  The document refers to a

10   projection number.  It refers to the fact that the product has

11   been successful on a worldwide basis.  It's consistent with the

12   prior year projections slightly down.  I have looked through this

13   document to see if there are other projections for international.

14   I have not found them.  I don't believe they're there.  It's

15   something that I have considered.

16   **Q**    So you have considered that actual sales by November 2003

17   were over 70 million.  They were obviously international sales as

18   well; right?

19   **A**    But by November --

20   **Q**    By November 2003, there were actual sales in the U.S. of over

21   70 million; correct?

22   **A**    I accept that.  I don't have the number in front of me.

23   **Q**    If you did some ratio for international, that's going to go

24   higher than the 70 million plus?

25            **MS. KELLER:**  Objection.  Assumes facts not in evidence

efa98463-65b2-4a8a-99c6-130713d9590d

Page 44

1    that there were international sales.

2            THE COURT:  Just a moment.  Do you understand the

3    question?

4            THE WITNESS:  I do.  I think he is getting to the final

5    question.  I think I understand.

6            THE COURT:  All right, then answer the question.

7            THE WITNESS:  I don't find any of that inconsistent

8    because of what we know about the pattern of dolls.  By November,

9    most of the sales had already occurred because things were shipped

10   for the holiday season and what we know about international sales.

11           So I understand the data and I think it's consistent

12   with the conclusions.

13   BY MR. PRICE

14   **Q**   If you look at your top-down where you have all that dark

15   blue area, there were seven SKU's in 2007?

16   **A**   Small number, yes.

17   **Q**   And in 2003, there were about 177 SKU's for My Scene?

18   **A**   From an SKU basis.  But it's not 10 times the number of

19   product.  Each variant get its own SKU.  Sometimes stores have

20   special SKU's, for example.

21   **Q**   40 of the 177 were associated with those dark blue or gray

22   Bratz products you concluded; correct?

23   **A**   I think 32.  Maybe you misspoke.

24   **Q**   I'm talking about SKU's.  Just 32 of the 177 or was it 40?

25   **A**   I don't have that data in front of me.  I don't recall.

Page 45

1    **Q**    And in connection with the growth rate in the first one, you

2    are comparing it to the growth rate of My Scene -- Diva Starz,

3    Generation Girls and Flava?

4    **A**    Correct.

5    **Q**    Do you agree that growth rate might be due, in some portion

6    at least, to the way the doll actually looks; correct?

7    **A**    I agree with that.

8    **Q**    So if you look at Diva Starz, 17383, if you could show that

9    to the jury.

10          So you looked at one thing, the growth rate of Diva

11   Starz, to compare it to My Scene?

12   **A**    I don't want to be difficult, but this is not a fair

13   comparison.  There are a number of Diva Star lines.  This one

14   looks the least like the other products.  But there are others

15   with a much more proportionate head.

16          **THE COURT:**  I'm going to ask you to take down the

17   photograph that you are showing.  I want the actual product up

18   there.

19          **MR. PRICE:**  It's in his hands.

20          **THE COURT:**  Take that off the screen.  The actual

21   tangibles will go up.

22   **BY MR. PRICE:**

23   **Q**    Let's show you My Scene, 28319.  And what you are saying is

24   that there are Diva Starz that look more like My Scene than the

25   17383?

efa98463-65b2-4a8a-99c6-130713d9590d

Page 46

1    **A**    I think that's true.

2    **Q**    And that the difference in sales of those products could not

3    be attributable to the way they look?

4    **A**    Well, in part it is.  That's why I did the top-down scenario

5    two, where I took specifically into account My Scene.  And if the

6    jury feels that's a better benchmark, they should go with the

7    lesser number.

8    **Q**    And you also used the growth rate of Generation Girls; right?

9    **A**    Yes.

10   **Q**    And of Flava?

11   **A**    Yes, sir.

12   **Q**    And again, those products have different-sized heads than My

13   Scene; right?

14   **A**    Of course.

15   **Q**    Different-sized eyes?

16   **A**    I would presume so.

17   **Q**    Different noses?

18   **A**    I can accept that.  They're different dolls, but they're

19   targeted towards the same audience.  Old-fashioned girls.

20   **Q**    And you understood that Mattel was trying to reach that

21   market; correct?

22   **A**    Yes.

23   **Q**    And it came out with various products to reach that market;

24   correct?

25   **A**    Yes.

Page 47

1          **THE COURT:**  Now, you can put both of these up on the

2     screen if you want, counsel.

3     BY MR. PRICE

4     **Q**     And that they kept trying to come out with new products to

5     appeal to that market; correct?

6     **A**     Well, yes.  A lot of this case is about how they tried

7     through the MGA information.

8     **Q**     Well, My Scene --

9          **THE COURT:**  Just a moment.  These aren't correct,

10    counsel.  Take these down, please.  We'll use tangibles then so

11    they are correct, because the photographs aren't matching up with

12    the tangibles.  That's the problem.

13         So, counsel, I'll allow you to put the photographs up,

14    but make sure they match up with your tangibles.

15         **MR. PRICE:**  I have been told they do, Your Honor, but we

16    can put the tangibles up.

17         **THE COURT:**  That's fine.  But I don't believe that the

18    first ones did.  That's what's causing the problem.

19         **MR. PRICE:**  I think everybody can see those pretty good.

20    BY MR. PRICE

21    **Q**     So the second top-down, instead of using growth rates on the

22    100 versus 66 million in 2003 of those products, you use the

23    growth rate that My Scene had?

24    **A**     Yes.

25    **Q**     And I guess in the analysis those two lines would never

1    really intersect.  They would go out to infinity?

2    **A**    That's right.

3    **Q**    So let's talk about your bottom up.

4          Now, your head-start analysis, head-start is a period

5    that's limited to when the information is secret; correct?

6    **A**    That is the focus of the head-start period.  The actual

7    damages may extend a little further to take into account a

8    ramp-up.

9    **Q**    So if, for example, there is a two-week period between

10   learning of some information and it not being secret anymore, the

11   head-start would be two weeks plus some ramp-up; right?

12   **A**    Generally speaking, yes.

13   **Q**    So you obviously then try to collect all the information you

14   could about when certain information in the toy fair reports were

15   actually known to the public by press releases or news articles or

16   things like that?

17   **A**    Yes.  And in many cases we find there are press releases even

18   before the toy fair describing in some of that information.

19   **Q**    How many of those press releases did you collect?

20   **A**    Several dozen.

21   **Q**    How many news articles?

22   **A**    Not as many.  Half a dozen that I recall, maybe more.

23   **Q**    So you actually knew about what was in the public with

24   respect to some description of the product when you did your

25   analysis; correct?

Page 49

1    **A**    Generally, yes.

2    **Q**    So let's look, for example, at page 9, which is the My Scene

3    Bling Bling.

4              And first you note that My Scene Bling Bling was

5    released before the 2006 toy fair without a real gem?

6    **A**    Correct.

7    **Q**    In fact, you saw evidence -- let's see, if you look at

8    20803 -- which is in evidence, Your Honor -- you saw evidence

9    where Mr. Larian, in 2005, was finding out -- acquiring

10   information about My Scene Bling Bling; correct?

11   **A**    I have seen this document, yes.

12   **Q**    And there is, at the toy fair, there is a Bratz diamonds

13   which has a real gem, a diamond; right?

14   **A**    Specifically a real gem in a ring for the girl to wear.

15   **Q**    And by the way, is that typical, that when jewelry, girls

16   wear rings?

17   **A**    I think historically if you look at these business records,

18   they talk about dripping with faux jewels, but it was jewels for

19   the doll, not jewels for the little girl.

20   **Q**    And this was obviously going to be a fairly -- if it's a real

21   gem, it wasn't going to be a -- never mind.

22             And then you also saw at 9879 a Reuters article -- this

23   is in evidence, Your Honor -- at the time of the toy fair?

24   **A**    Yes I have seen in document as well.

25             **MS. KELLER:**  I'm going to object to this line of

efa98463-65b2-4a8a-99c6-130713d9590d

1    questioning.  He is not saying he's an expert on liability.  He

2    said he didn't determine liability.  These questions all go to

3    liability.

4              THE COURT:  I don't think I allowed e-mails from either

5    Mr. Wagner or Mr. Malackowski so far, did I?

6              MR. PRICE:  I don't know.

7              THE COURT:  Concerning e-mails and items.

8              MR. PRICE:  He is calculating head-start.  So public

9    information is relevant to his analysis.

10             THE COURT:  Isn't Mr. Malackowski also involved in

11   head-start?

12             MR. PRICE:  Mr. Wagner did not calculate head-start, no.

13             THE COURT:  Overruled.

14             MS. KELLER:  Your Honor?

15             THE COURT:  Counsel?

16             MS. KELLER:  If I could, this was exactly asked -- we

17   attempted to ask this of Mr. Wagner and it was foreclosed because

18   he was like not testifying as to liability, only as to damages if

19   liability were to be found.

20             MR. PRICE:  I'll clarify.

21             MS. KELLER:  It was not permitted.

22             THE COURT:  I agree we are getting back into the

23   e-mails, etcetera, on the comparison.  I think I'm allowing them

24   both for a very limited purpose, calculation of damages.

25             I think I cut MGA off from this road.  I think I'm going

1   to cut Mattel off from the same road.  Why don't we take this

2   document down.

3   BY MR. PRICE

4   **Q**    Let me lay the foundation.

5           As the damages expert --

6           **THE COURT:**  No foundation.  Just going off.

7   BY MR. PRICE

8   **Q**    Was it your responsibility, Mr. Malackowski, to calculate the

9   head-start period?  Not liability, but what the head-start period

10  was?

11  **A**    Yes.

12  **Q**    And in doing that, did you look at public information as well

13  as invoice dates?

14  **A**    The head-start period was based upon the date of the toy fair

15  to the date of the first MGA sale.

16  **Q**    And so my question was, did you also look and see what the

17  head-start was at what the public information was concerning what

18  MGA had shown as its toy fair?  Did you do that for a head-start

19  analysis, "yes" or "no"?

20  **A**    No.

21          **MS. KELLER:**  Your Honor, this is trying to do the same

22  thing a different way.

23          **THE COURT:**  I'll let you ask the questions.  I think

24  these should be the ground rules.

25          With both experts I have allowed them to put up their

efa98463-65b2-4a8a-99c6-130713d9590d

1   charts to explain their economic theory of damages and how they

2   arrived at it.  But I think with MGA I cut them off from being

3   able to -- and Mattel I cut them off, and both MGA, I'm going to

4   cut them off from putting up documents, e-mails, etcetera, and

5   walking back through the case.

6          All right, counsel.

7          **THE WITNESS:**  The answer to your question is no, the

8   period of the head-start was not calculated using press releases.

9   BY MR. PRICE

10  **Q**   Or news articles?

11  **A**   Correct.

12  **Q**   Since you didn't do that, let me go on to something else.

13         You did a calculation with respect to Kohl's?

14  **A**   Yes.

15  **Q**   MGA sales to Kohl's.  And it's your belief that the MGA sales

16  to Kohl's you calculated would be double counting with the

17  top-down analysis; correct?

18  **A**   Correct.  And that's an excellent point.  I would not add my

19  top-down numbers to the Kohl's numbers, but you can add the Kohl's

20  numbers up to the bottom-up number.  It's a product-specific

21  calculation.

22  **Q**   And the Kohl's analysis where you have on page 12, the

23  but-for sales lost to Mattel -- let me take you to slide 11.

24         You see in 2007 where it says 7,823,000?

25  **A**   Of course.

Page 53

1   **Q**    Did you break that out between Little Tikes and Little Bratz

2   as opposed to the Bratz teenage dolls?

3   **A**    That information does exist.  This is a chart that was used

4   earlier in the trial, so it's not my chart.  But I know that that

5   information is around.

6   **Q**    So, are you relying on this chart for your calculations?

7   **A**    I'm relying on this chart to show the period of unfair

8   activity and what happened to MGA's overall sales.  So it's not

9   used in my calculation.  It's used to illustrate the harm.

10  **Q**    Do you know when MGA acquired Little Tikes?

11  **A**    I certainly have seen that data.  If you refresh my

12  recollection, I would appreciate it.

13  **Q**    Sitting here today you don't know whether or not the 2007

14  sales to Kohl's by MGA consists of Little Tikes, Little Bratz or

15  the main Bratz dolls and what proportion; correct?

16  **A**    Let's be clear, I understand it includes all the above.  I

17  have looked at that.  The Little Tikes acquisition I believe was

18  right about this time.  And there is some dispute as to what was

19  under the stewardship of MGA, what was not.  That was not part of

20  my direct calculation.  I don't have those statistics at my

21  fingers.

22  **Q**    Is it your belief based upon this chart that in 2007 Kohl's

23  began selling large quantities of Bratz dolls, meaning the teenage

24  Bratz dolls, Cloe, Yazmin, etcetera?

25  **A**    It is my belief that starting in 2007 Kohl's began to acquire

efa98463-65b2-4a8a-99c6-130713d9590d

Page 54

1    Bratz dolls.  I would have to go back to the accounting records to

2    give you the apportion.

3    **Q**    And you haven't done that in your analysis?

4    **A**    Well, I have looked at a lot of accounting records.  My

5    memory is just not good enough to tell you as I sit here.

6    **Q**    Let's go then to your calculation of Mattel's damages.  And I

7    want to go first to slide 14.

8            And this is your head-start?

9    **A**    Yes.

10   **Q**    And you looked at historical data to see how many fashion

11   dolls MGA had created prior to Mr. Bryant arriving with the Bratz

12   designs; correct?

13   **A**    Generally I'm familiar.

14   **Q**    And that number was -- what time frame is that by the way?

15   Between when MGA began in the doll business and the date that Mr.

16   Bryant showed up with the Bratz designs?

17   **A**    I don't recall.  I would go back to Mr. Larian's testimony or

18   others who talked about that.

19   **Q**    Over a decade?

20   **A**    I think that's right.

21   **Q**    And how many fashion dolls have they come up with on their

22   own before then?

23   **A**    The ones that I have here are starting with my damage period.

24   So I have a number of doll products, but they're all later.  I

25   don't have the date in front of me for the earlier products.

Page 55

1   **Q**   So in this analysis your belief is that if Mr. Bryant had

2   never gone to MGA with the Bratz designs, that MGA would have

3   nonetheless come out with a fashion doll with traits similar to

4   Bratz?

5   **A**   Well, specifically it's my understanding that Diva Star

6   include all of the elements of the asserted trade secrets.  If the

7   jury finds such, then calculating head-start damages pursuant to

8   the head-start approach, you would look from that point forward,

9   which is what I have done.

10  **Q**   And the Diva Starz -- let's go to that 17383, which I think

11  you still have in front of you.

12  **A**   Yes, I do.

13  **Q**   You understand that --

14         **THE COURT:**  Put the tangible up so the jury can see it.

15  BY MR. PRICE

16  **Q**   You understand that part of a trade secret is the way

17  elements are combined; correct?  Were you asked to assume that a

18  trade secret includes the way elements are combined?

19  **A**   So, I do know from my background in the industry that it can

20  include that.  My understanding is that the disclosed items of

21  trade secrets included whether or not it was a multi-ethnic group,

22  whether it was hip, urban, edgy, etcetera.  Whether it had large

23  over-sized head and feet, large eyes, large lips, small nose,

24  small bodies, etcetera.  And I believe it's MGA's position when

25  you tick through that whole list, they are embodied within Diva

efa98463-65b2-4a8a-99c6-130713d9590d

Page 56

1    Starz.

2           If this jury finds that, then you start head-start

3    calculation from that point.

4    **Q**    Do you see yourself as an advocate as an expert?

5    **A**    No, I'm trying to be an educator.

6    **Q**    So my question was that the trade secret can be the way

7    certain elements are combined.  You agree with that?

8    **A**    I think that's ultimately a legal question.  That's my

9    general understanding, that it can include that.

10   **Q**    And you reviewed documents, I assume, where you saw that MGA

11   said that the combination that was Bratz was unique; that there

12   was nothing like it.  Did you see things like that?

13          **MS. KELLER:**  Your Honor, I'm going to object.  This is

14   argumentative and this is an unfair comparison of the law of

15   disclosed elements.  It's not fair to the expert.

16          **THE COURT:**  Overruled.

17          You can answer the question.

18   BY MR. PRICE

19   **Q**    Did you review documents where MGA was saying that these

20   Bratz designs were revolutionary, unique?

21   **A**    Sure --

22          **MS. KELLER:**  Your Honor, I'm going to object again.  We

23   were prevented from asking Mr. Wagner about the disclosed elements

24   of Diva Starz; asking him anything about that.

25          **THE COURT:**  If we're going to open up this area, I'll

1    open it up for you for both of you.  Mr. Wagner is going to be

2    back on the stand.  I'm going to open this entire area to both

3    sides.  So I'm going to allow you to go there, I'm going to allow

4    the other side to go there also.

5    BY MR. PRICE

6    **Q**    My question, did you see MGA communications where they

7    thought Bratz were unique compared to anything else on the market?

8    **A**    Yes.  They actually won a number of awards for their product

9    that described them as being unique.  I don't know that that

10   relates to the trade secret liability issue.  That's a legal

11   question for the jury.

12   **Q**    So on your 3718900014, your assumption -- what you are saying

13   is if the jury finds that MGA would have created something as

14   successful as Bratz after -- because Diva Starz was on the market

15   and it can see Diva Starz, that there would then be a head-start

16   and you can calculate the damages from that head-start; is that

17   right?

18   **A**    No.  I think you misunderstand.  I'm not assuming whatever

19   they developed would be as successful as Bratz.  This is a

20   calculation to take away profits, unjust enrichment.  All I'm

21   saying is if you find the elements of the trade secrets are

22   contained in this product, for example, then you should take away

23   everything associated with the head-start based upon what Bratz

24   actually did, all of their profit during that head-start period.

25   And it's $7.2 million.

efa98463-65b2-4a8a-99c6-130713d9590d

1          It doesn't matter for this calculation whether the next

2    product is as successful or not.  That goes to the alternative

3    benchmark calculation, the 33 million.

4    **Q**    You have no opinion and have not done analysis as to whether

5    or not MGA would have come out with a fashion doll that has

6    elements similar to either Diva Starz or Bratz if Mr. Bryant

7    hadn't shown up at their door in the summer of 2000; correct?  You

8    don't have an expert opinion on that; right?

9    **A**    Well, I have testified that one of the differences between

10   Mr. Wagner and myself is I saw evidence and believe that MGA would

11   have launched a competing product.  Mr. Wagner does not believe

12   so.

13          I base that upon, in part, documents that I have seen

14   from customers asking for such a product and the testimony that I

15   read.  But I don't think that's necessarily an opinion that I need

16   for my calculations.  So I'm just trying to be as direct to your

17   question as possible.

18   **Q**    In doing that analysis, to be fair, though, you did look to

19   see whether or not MGA had ever done a fashion doll in its entire

20   history before Mr. Bryant showed up because you wanted to do a

21   fair analysis.  So you did look at that?

22   **A**    Well, I understand that, but that really doesn't speak to

23   this analysis, because this analysis is to take away whatever

24   profit MGA made during this period regardless of what happened

25   before or what happens later.  It's to disgorge what they actually

Page 59

1   earned during the head-start.

2   **Q**   It's a head-start to something else.  It's a head-start to

3   producing a fashion doll?

4           **MS. KELLER:**  Objection.  Argumentative.

5           **THE COURT:**  Overruled.

6           **THE WITNESS:**  That's true.  There are a lot of profits

7   that came later that relate to sweat equity.  But under the

8   head-start method, there isn't really a debate over this.  You

9   look at the profits that were earned during the head-start and you

10  take them away.  That's the unjust enrichment calculation.

11  BY MR. PRICE

12  **Q**   On Page 17 you do an analysis here.  Variability of sales of

13  the fashion dolls.  Do you see that?

14  **A**   I do.

15  **Q**   You familiar with Ferrari?

16  **A**   I'm a huge car guy.  So, yes.

17  **Q**   You know they make cars in yellow and red and even green?

18  **A**   Occasionally green, but lots of colors.

19  **Q**   And if you did an analysis of those colors, they sell

20  differently?

21  **A**   Red is the best seller.

22  **Q**   Even though yellow is the original; right?

23  **A**   Original road car.

24  **Q**   So which one do you own?

25  **A**   The original race car was red actually.

efa98463-65b2-4a8a-99c6-130713d9590d

1  **Q**    So if you did an analysis of the Ferrari, a particular model,

2  599, and you did it by color, you would see different sales?

3  **A**    Yes.

4  **Q**    Now, let's go to your unjust enrichment calculations.  And if

5  we look at slide 19, now this unjust enrichment is how much MGA

6  profited; right?

7  **A**    Correct.

8  **Q**    And for profits 2001, 2010, under "trade secret" you have

9  $273.7 million; right?

10  **A**    For the first four characters, yes, sir.

11  **Q**    And is it your belief then -- let's look at, for example,

12  17529, which is a Bratz Formal Funk Dana.  So it's your

13  understanding that MGA -- just tell me "yes" or "no" -- would have

14  sold and created that doll and made profits on that doll even if

15  it had not seen what you were assuming are the trade secrets that

16  Mr. Bryant took to them in 2000?

17          **MS. KELLER:**  Your Honor, we object.  This misstates the

18  testimony and is argumentative.

19          **THE COURT:**  Overruled.

20          **THE WITNESS:**  Can you go back to the last chart that you

21  had up?

22  BY MR. PRICE

23  **Q**    No.  I'm asking about this one.  I have got the time issue

24  here, so I need to ask the questions, you need to answer them.

25          So my question is -- if you mean chart 19?

Page 61

1    **A**    The one you just had up.

2    **Q**    Trade secret.  First four characters, Sasha Jade, Yazmin,

3    Cloe?

4    **A**    To answer your question, no, it doesn't mean that.  I include

5    Formal Funk Dana as a measure of damages under copyright

6    specifically.

7    **Q**    And I'm talking about trade secret.  Okay?  So I'm asking

8    you, is it your opinion, your belief that MGA would have made

9    profits on that doll, Bratz Formal Funk Diva, if Mr. Bryant had

10   not shown up at MGA and given them the trade secrets you are

11   assuming he gave them?

12   **A**    And he didn't give them the copyright either?

13   **Q**    We're talking about trade secret right now.  Trade secret,

14   which is he brings them this combination of elements, these

15   characters, these story lines, he brings them that in summer 2000.

16   With me so far?

17   **A**    Yes, sir.

18   **Q**    If he hadn't done that, if that event hadn't happened, is it

19   your testimony that MGA would have sold and made a profit on Bratz

20   Formal Funk Diva?

21   **A**    No, they would have had a different line of dolls that didn't

22   embody the trade secrets.  It would have been different.  It

23   wouldn't have been exactly the same.

24   **Q**    And that's based upon their history before Formal Funk Diva,

25   which is they had never made a fashion doll or came up with a

efa98463-65b2-4a8a-99c6-130713d9590d

Page 62

1    design in the entire history of the company?

2              THE COURT:  Sustained, counsel.  This is economic

3    analysis.

4    BY MR. PRICE

5    Q    Your economic analysis though is based on the assumption that

6    MGA would have come up with these other fashion dolls in the Bratz

7    line or something like them even if Mr. Bryant hadn't revealed

8    trade secrets.  We're assuming liability.

9              MS. KELLER:  Misstates the evidence, Your Honor.

10             THE COURT:  I'll let you answer the question, sir, so we

11   can move on.

12             THE WITNESS:  If I understand your question, my

13   assumption is that Bratz would have remained in -- MGA would have

14   remained in the business of selling fashion dolls to older girls,

15   yes.

16   BY MR. PRICE

17   Q    Now, you said you did research on this.  Can you give me the

18   name of one fashion doll that MGA created in all the years prior

19   to Mr. Bryant coming and showing them to Bratz?

20   A    You asked me this question.  I told you I don't have in front

21   of me the research prior to the time period I'm studying.  We have

22   charts in our office where we go through, put on a timeline all

23   the various dolls.  I clearly have it.  I just don't recall.

24   Q    You can't recall a name, but do you recall that prior to Mr.

25   Bryant showing up at MGA, MGA had, in fact, found a design of a

efa98463-65b2-4a8a-99c6-130713d9590d

Page 63

1   fashion doll that it wanted and did bring to market?

2          **MS. KELLER:**  Objection.  Misstates the testimony and it

3   is misstating the testimony completely, Your Honor.

4          **THE COURT:**  Well, you'll recall the testimony from

5   Carter Bryant and other persons in the trial concerning what was

6   created or what wasn't created.  We have a whole set of people

7   testifying from both MGA and Mattel.  Let me allow the question

8   and let's move on.

9          **MS. KELLER:**  Your Honor, if I could.  We would also need

10  the definition of "fashion doll."  If you remember, Ivy Ross's was

11  totally different.

12         **THE COURT:**  That's why we have redirect examination.

13         Counsel, ask your question.

14  BY MR. PRICE

15  **Q**   You just told the jury you had these charts in your office

16  and my question was, prior to Mr. Bryant going to MGA, is it your

17  belief -- you can't name a name -- that MGA did a fashion doll?

18  **A**   I honestly don't recall.  I have a chart of all their

19  products.  It's before my damage period.  If you tell me which

20  ones they were, I'd be happy to tell you if I recall them.

21  **Q**   I have no names for you.  That's the point.

22         Could we take the break now, Your Honor?

23         **THE COURT:**  Absolutely.  You are admonished not to

24  discuss this matter amongst yourselves or form or express any

25  opinion concerning the case.  Come back at 1:00 o'clock but be

Page 64

1    patient with me.  I need to spend a little time with counsel over

2    the lunch time on some unrelated matters.

3              We'll see you at one and hopefully we'll get started

4    then, but I'm not positive.

5                            (Jury out.)

6              **THE COURT:**  Ms. Hurst and Mr. Zeller, the marshal is

7    present.  I want you to give the latest information concerning

8    Carter Bryant's address to the marshal.

9              Steve, if you would take this for just a moment and then

10   remain in the court.  I need may need Mike up also, but I want to

11   get Carter Bryant's last and best address.

12             All right, counsel, we're still on the record, we're

13   still in session.  Please be seated.

14             Counsel, besides Mr. Zeller and Ms. Hurst.  All right.

15             Now, I want to go over the request for rebuttal and

16   surrebuttal very slowly with counsel.  This came to the Court, of

17   course, at the last moment.  We sat all day Sunday until I

18   received this.  I want to go through each of these requests for

19   both rebuttal and surrebuttal and now provide you the time.

20             I have given you a little bit of my thoughts last

21   evening then you quickly reached an agreement.  I didn't feel good

22   about that discussion without lead counsel here, and I don't want

23   to be a part of that discussion.  I make decisions.  I don't enter

24   into bartering agreements between counsel.

25             First, Mattel has submitted a list of proposed witnesses

efa98463-65b2-4a8a-99c6-130713d9590d

Page 65

1   that includes Sarah Allen, Carter Bryant, Daphne Gronich, Michael

2   Johnson, Susanna Kuemmerle, Stephen Kwan, Didier Pietri, Patrick

3   Potgeisser, Lisa Saunders, Jackie Schaffhauser, Denise Van Patten

4   and Simon Waldren.

5         And Mattel argues that these witnesses are necessary to

6   both defend again MGA's affirmative claims and rebut MGA's defense

7   to Mattel's affirmative claims.

8         Mattel filed an offer of proof with this Court and a

9   supplemental offer of proof even though the Court has not

10  precluded Mattel from introducing evidence in defense against

11  MGA's claim or to rebut MGA's defenses to Mattel's claim.

12        I'm going to conclude that a number of Mattel's proposed

13  witnesses are not relevant to either Mattel's defenses or it's

14  rebuttal to MGA's defenses as some of these are.  But I want to

15  hear from you and I want to go down each of those so each of you

16  have a chance to say the record, because my thoughts were

17  tentative and you know I'll always consider your arguments.

18        I want to first begin with Susanna Kuemmerle.  My

19  initial belief was that she is irrelevant to Mattel's defense to

20  MGA's claim for trade secret misappropriation.

21        MR. QUINN:  We're withdrawing the request for Ms.

22  Kuemmerle.

23        THE COURT:  She was submitted to me in this binder.  I

24  want to be absolutely certain of that.

25        MR. QUINN:  Yes, we are.  We're trying to narrow this as

efa98463-65b2-4a8a-99c6-130713d9590d

Page 66

1    absolutely narrow as we can.

2           **THE COURT:**  All right.  I'll take this off the list

3    then.

4           Second, Lisa Saunders' testimony about retailers'

5    failure to take efforts to keep confidential the information in

6    planogram rooms is even less relevant.  Tentatively, MGA does not

7    claim that Mattel misappropriated information from retailer

8    planogram rooms and it may even lack standing to bring such a

9    claim.  Moreover, the fact that MGA may have shared some of its

10   product information with retailers does not diminish the trade

11   secret status of the information.

12          I cite to you the Supreme Court's decision in Key One

13   Oil which is directly on point.  In that case, the Court

14   recognized that trade secret law does not exist to promote secrecy

15   but, in fact, to promote disclosure and encourage companies to

16   share confidential information with licensees and other companies

17   without fear that they will be left without any recourse under the

18   law in the event their expectation of privacy is betrayed.

19          However, MGA's efforts, if any, to maintain the secrecy

20   of the information is still relevant to whether it took reasonable

21   efforts to maintain the secrecy of its information, and

22   Ms. Saunders can be questioned about that topic.

23          I want each of you to make a record of that, tell me why

24   you disagree.  And, of course, I'm open to your arguments today.

25          Let me begin with Mr. Quinn.

efa98463-65b2-4a8a-99c6-130713d9590d

Page 67

1          MR. QUINN:  Your Honor --

2          THE COURT:  I'd already made that indication concerning

3    Saunders and I already told you what the limitations were.

4          MR. QUINN:  Your Honor, Ms. Saunders is MGA's vice

5    president of sales.  We would offer -- as offer of proof we would

6    offer to call her to examine her concerning MGA's sharing of

7    claimed purported trade secret information in the months before

8    toy fair without any expectation of confidentiality; the lack of

9    confidentiality of product information including price list and

10   pricing information that MGA has been claiming are trade secrets;

11   MGA's admission of press into its showrooms at toy fairs; and

12   MGA's acquisition of Mattel information from planogram rooms and

13   retailers; and that her understanding that such disclosures in

14   planogram rooms occur prior to toy fair so that, therefore, that

15   information is public by the time of toy fair.

16         THE COURT:  Now, will you show me in the book prepared

17   for me what questions you propose to ask her?

18         MR. QUINN:  It's a lengthy list, Your Honor.  This is

19   all in the nature of defense, not rebuttal.  I can read it.  It is

20   a several-page exam of questions.  I believe this has already been

21   provided to the Court in camera.

22         THE COURT:  Which questions are you proposing?  All of

23   them?  There are 76 questions.  They're probably going to use most

24   of your time.  That's why I'm asking you.

25         MR. QUINN:  Your Honor, obviously it would have to

efa98463-65b2-4a8a-99c6-130713d9590d

Page 68

1    depend on how it goes on the stand, and we would have to react to

2    the situation on the stand.  It would not be possible for us,

3    given the time we have, to ask all of these questions.  But I

4    don't think I can tell the Court which ones we would ask until we

5    had a chance to hear some of her answers.

6              **THE COURT:**  Which order are you going to call her in?

7              **MR. QUINN:**  I'm sorry?

8              **THE COURT:**  Which order would you call her in?  We'll

9    come back to her.

10             Sarah Allen concerning trial exhibit --

11             Counsel, do you want to respond on behalf of MGA?

12             **MS. HURST:**  Your Honor, Ms. Saunders, in our view, all

13   of those stated topics would be cumulative of testimony that's

14   already come in, and also would be cumulative of other proposed

15   rebuttal witnesses including Mr. Jolicoeur.  And also it doesn't

16   rebut -- or it doesn't defend against the claim.

17             **THE COURT:**  Next, Sarah Allen.  I had already ruled that

18   Sarah Allen could be questioned by Mattel concerning trial exhibit

19   9869.  And I had informed both Ms. Hurst and Mr. Zeller that

20   informally and informed you of that this morning.

21             And Ms. Allen purports to report from the Nuremberg Toy

22   Fair.  MGA has put this e-mail issue and suggested that Ms. Allen

23   was gathering information in a nefarious manner.  And this Court

24   finds and will have ruled informally that Mattel is entitled to

25   rebut that inference by calling Ms. Allen and asking her to

Page 69

1   explain the circumstances of the e-mail.

2           I don't know if we have a complete record of this

3   because counsel were leaving last night, but it was represented to

4   me by Mr. Zeller that she wasn't even at the Nuremberg Toy Fair.

5           Now, Mr. Quinn.

6           MR. QUINN:  Yes, Your Honor.  She is a public relations

7   professional affiliated with Mattel UK.

8           THE COURT:  Steve, stick around for just a moment.  I'm

9   going to need you, so just have a seat.

10          MR. QUINN:  And Mattel offers, as an offer of proof,

11  would examine her regarding the e-mail the Court referenced,

12  Exhibit 9869, discussing the Nuremberg Toy Fair which Mr. Stockton

13  was questioned about when he was on the stand, questioned by MGA.

14          THE COURT:  Okay.  And so far I have allowed her

15  testimony and let now MGA make the record why she shouldn't be

16  presented in rebuttal.

17          MS. HURST:  It sounds like it's all hearsay, Your Honor.

18  If she wasn't there, she can't say whether somebody violated a

19  confidentiality agreement to get the information; whether there

20  was a security guard at the door; how they got in.

21          I mean, she is going to be coming and testifying solely

22  based on hearsay.  The person who should be coming is whoever

23  supplied her the information.  If they're going to come and say

24  she didn't --

25          THE COURT:  Concerning Daphne Gronich who is familiar to

Page 70

1   this Court.  Ms. Gronich was initially going to be called by

2   Mattel in their case-in-chief, then she was going to be called by

3   MGA.  Finally, apparently she'll be making an appearance in this

4   Court.  But I have also indicated both informally to Mr. Zeller

5   and Ms. Hurst -- and each counsel can correct me if I'm wrong --

6   that I would allow her to testify.  And I also made that tentative

7   decision this morning and on the record.  But she is called for

8   the limited purpose -- pay attention to this now, counsel -- of

9   asking whether MGA used investigators to pose as buyers in Hong

10  Kong and obtain information about the potential infringement of

11  the Bratz copyrights.

12          However, I'm going to preclude the admission of court

13  documents from that litigation as I have previously because the

14  documents discuss comparisons between allegedly infringing work in

15  Hong Kong and the Bratz works, thereby confusing the factfinder

16  with another jurisdiction's copyright infringement standard and

17  diluting the force of this Court's instructions about the

18  protectable and unprotectable elements of the Bratz works.

19          Neither counsel have been precluded from this area, but

20  I want to have a real conversation with you about where we're

21  going on this.

22          Now, what is not understandable about that ruling to

23  either party?

24          **MR. QUINN:**  I think I understand what the Court is

25  saying.  If I could make an offer of proof with respect to Ms.

1    Gronich.  She is MGA's former general counsel.  We wish to examine

2    her concerning MGA's investigation into theft of Mattel trade

3    secrets by certain of its employees and MGA's knowledge of the

4    market intelligence activities of Sal Villaseñor including the

5    interview of Mr. Villaseñor and MGA's effort to hire

6    Mr. Villaseñor.

7            Mattel would also intend to examine Ms. Gronich

8    concerning MGA's repeated use of fake buyers to obtain information

9    using false identities to obtain prices and FOB prices from its

10   competitors in Hong Kong under false pretenses as well as MGA's

11   video surveillance.

12           **THE COURT:**  All right now, I think on the last point I

13   just allowed you to do that, didn't I?

14           **MR. QUINN:**  That's what I understood.

15           **THE COURT:**  So the only extension I have heard of your

16   request are the hiring efforts that MGA may have made concerning

17   Sal Villaseñor.

18           **MR. QUINN:**  Also, there is a question --

19           **THE COURT:**  Let's go one by one now.

20           **MR. QUINN:**  So one, MGA's investigation into the theft

21   of Mattel trade secrets by certain of its employees; one.

22           Two, MGA's knowledge and timing of its knowledge of the

23   market intelligence activity of Sal Villaseñor.

24           Three, MGA's efforts to hire Mr. Villaseñor.

25           And then the use of buyers to enter into toy fair

Page 72

1    showrooms under false pretenses to obtain prices and other

2    information.

3              **THE COURT:**  Isn't she your best overall witness on

4    behalf of Mattel?  Doesn't she balance out, in a sense, Normile,

5    Hill, Thomas and Moore?

6              **MR. QUINN:**  If she will answer questions.  I don't know

7    how it will go.

8              **THE COURT:**  I don't either.  All right.

9              You can certainly ask about the -- I'll extend it.  You

10   can certainly ask about the efforts to hire Sal Villaseñor,

11   because from my memory you have an e-mail, and in that e-mail it

12   shows that there is an inference that Sal Villaseñor is

13   communicating with MGA.  And he has, quote, unquote, not

14   worthwhile information, but the import of that is that he has --

15   well, let's say the ability to gain worthwhile information.  And

16   if MGA is aware of that, they're basically hiring the same

17   interesting person who Mattel employed.

18             Now what exhibit is that, counsel?  Mr. Quinn?  What

19   e-mail am I referring to?  39,814.  I'm just kidding you.  Why

20   don't you find it for me.  Call it up real quick.  I can picture

21   it.  I don't have the number up here.

22             **MR. QUINN:**  Also, Your Honor, MGA --

23             **THE COURT:**  It's in the bottom right.

24             **MR. QUINN:**  Yes.  MGA also, there has been extensive

25   examination of Mattel witnesses about the quality of Mattel's

efa98463-65b2-4a8a-99c6-130713d9590d

1    investigations into trade secret theft, including Mattel's lawyers

2    Ms. Thomas, Mr. Normile, Mr. Moore.  We would like to examine Mr.

3    Gronich on the subject of MGA's investigation into theft of Mattel

4    trade secrets by MGA employees.

5         **THE COURT:**  Fine.  Let me hear from MGA so both of you

6    have a complete record and I'll make some final rulings in just a

7    moment.

8         **MS. HURST:**  Your Honor, Ms. Gronich was previously

9    listed by Mattel on its witness list and she could have been

10   called in its case-in-chief to talk about MGA's investigation of

11   the alleged theft of any Mattel employee trade secrets.  That is

12   not proper rebuttal.

13        **THE COURT:**  I think it is.  I had already indicated, I

14   think, informally to you on last night, Monday night, that Mattel

15   was entitled because of the agreement reached between both of you,

16   not with the Court, that MGA could shape their case first in terms

17   of trade secret misappropriation that applied to sneaking into MGA

18   facilities, planogram rooms.  And because of that agreement

19   between the two of you, I then had represented to both of you that

20   Mattel could respond after you shaped your case.

21        **MS. HURST:**  That's not what I objected to.  They're

22   trying to call him to talk about investigations and -- her to talk

23   about investigation into Mexico, Castilla.  All that stuff.  That

24   stuff they could have done during that case-in-chief.  That's what

25   we're objecting to.

1      **THE COURT:**  My apologies.  She is limited to the purpose

2   I always intended, and that is that you shaped your trade secret

3   misappropriation case.  Apparently you reached an agreement

4   between the parties so that Mattel wasn't having to anticipate --

5   by the way I think it was a good agreement between the parties.

6   So I'm not finding fault.  In fact, I'm commending both parties.

7      I think it makes it more understandable to the jury and

8   the Mattel is not precluded from questioning Daphne Gronich.  But

9   it is limited to this, what I call sneaking in and posing as

10  buyers.  And I'm going to extend that.  You're right.  If it

11  extends beyond Hong Kong, and if she has knowledge, Mr. Quinn,

12  just as Mr. Normile or Mr. Moore or whatever investigative

13  efforts, you can extend that to what I call the sneaking in of the

14  Mattel facilities by MGA.

15      You can also extend that into any hiring of Sal

16  Villaseñor.  If in fact, he's engaged in this kind of activity and

17  the jury draws a logical inference he is doing this on Mattel's

18  part, certainly the hiring of this person the jury infer

19  intentional effort by MGA to engage in the same kind of the

20  conduct even though I don't have proof of that.

21      **MS. HURST:**  Your Honor, she was not on any of the

22  e-mails concerning Mr. Villaseñor.  It would be completely without

23  foundation.  And given this is a lawyer, that's particularly

24  troublesome.

25      **THE COURT:**  The problem is that the attorney-client

efa98463-65b2-4a8a-99c6-130713d9590d

1  privilege may be asserted again.  So we may have to talk to her

2  about that.  She is going to be allowed to be called.  I can shape

3  that in a few moments, but you need to know who is waiting out in

4  the hallway today and tomorrow.  Gronich is going to be allowed,

5  Allen is going to be allowed.

6         Now, you are entitled to call -- the next witness is

7  Stephen Kwan.  I was puzzled by Stephen Kwan until last evening

8  and this morning.  I anticipated that eventually any agreement

9  between the two of you might fall apart, with possibly the Court's

10 help.  So if you want to call Stephen Kwan to rebut MGA's

11 suggestion that My Scene Bling Bling used the trade secret

12 information obtained from MGA's showrooms, he apparently was a

13 member of the product development team that came up with Bling

14 Bling product and he has personal knowledge whether it was created

15 as a result of Mattel's independent, legitimate effort.

16         Do you want to call Stephen Kwan?

17         **MR. QUINN:**  Yes, Your Honor.

18         **THE COURT:**  Okay.  Concerning your proposal -- let me

19 hear from MGA.  I'm trying to create a record for both of you

20 instead of the tentative ruling --

21         **MS. HURST:**  Whatever.

22         **THE COURT:**  -- cumulative, irrelevant.

23         **MS. HURST:**  I don't care if they want to call their own

24 employees.

25         **THE COURT:**  Have an avalanche effect, I'm just kidding

efa98463-65b2-4a8a-99c6-130713d9590d

Page 76

1    you.  This won't be the turning point in the case for both

2    parties.  Let's get through this.  You have got a lot to go.  You

3    have got a lot to go.

4              Didier Pietri.  I think Mattel's use of her is

5    completely irrelevant.  The fact that MGA used the term "NHB" to

6    refer to itself has nothing to do with the propriety of Mattel

7    using the term and the fact that the use of the statute of

8    limitations defense is an issue.

9              I just absolutely don't understand last evening or this

10   morning what the relevance is.

11             So let me turn to Mr. Quinn.

12             **MR. QUINN:**  Didier Pietri is MGA's former chief

13   operating officer.  We would examine him concerning MGA -- there

14   has been a suggestion made that the substitution code -- that NHB

15   is a substitution code and there is something sinister or

16   suspicious about the fact that a code was used.  Mr. Didier would

17   testify concerning MGA's own use of NHB as a code name for itself

18   and the appropriateness of such code name.

19             These issues were raised by MGA in the examination of

20   Mattel witnesses Robert Normile and Jill Thomas, among others.

21             **THE COURT:**  I think it's completely irrelevant.  I'm

22   going to preclude it, counsel.

23   (Whereupon there was a change in reporters and JANE SUTTON RULE

24   reported the 12:30 session.)

25                            -oOo-

Page 77

1                            CERTIFICATE

2

3           I hereby certify that pursuant to Section 753, Title 28,

4    United States Code, the foregoing is a true and correct transcript

5    of the stenographically reported proceedings held in the

6    above-entitled matter.

7

8    Date:  APRIL 5, 2011

9

10

11   MARIA DELLANEVE, U.S. COURT REPORTER
     CSR NO. 9132

12

13

14

15

16

17

18

19

20

21

22

23

24

25

efa98463-65b2-4a8a-99c6-130713d9590d