1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

– – – – – – –


MATTEL, INC., ET AL.,          )
                               )
          Plaintiffs,          )
                               )
     vs.                       ) No. CV 04-9049-DOC
                               )     Day 46
MGA ENTERTAINMENT, INC., ET AL., )   Volume 3 of 5
                               )
          Defendants.          )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial

Santa Ana, California

Tuesday, April 5, 2011


Jane C.S. Rule, CSR 9316
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-7755

11-04-05 MattelV3

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR PLAINTIFFS MATTEL, INC., ET AL.:

 4             QUINN, EMANUEL, URQUHART & SULLIVAN
               By:  JOHN B. QUINN
 5                  MICHAEL T. ZELLER
                    WILLIAM PRICE
 6                  Attorneys at Law
               865 South Figueroa Street
 7             10th Floor
               Los Angeles, California 90017-2543
 8             (213) 443-3000

 9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  THOMAS S. MC CONVILLE
12                  Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             - AND -

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  ANNETTE L. HURST
17                  Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700
19
               - AND -
20
               KELLER RACKAUCKAS, LLP
21             BY:  JENNIFER L. KELLER
                    Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25
```

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4             SCHEPER, KIM & OVERLAND, LLP
               BY:  ALEXANDER H. COTE
 5                  Attorney at Law
               601 West Fifth Street
 6             12th Floor
               Los Angeles, California 90071
 7             (213) 613-4660

 8             - AND -

 9             LAW OFFICES OF MARK E. OVERLAND
               BY:  MARK E. OVERLAND
10                  Attorney at Law
               100 Wilshire Boulevard
11             Suite 950
               Santa Monica, California 90401
12             (310) 459-2830

13

14    Also Present:

15             ISAAC LARIAN, MGA CEO
               ROBERT ECKERT, Mattel CEO
16             LILY MARTINEZ, Mattel Employee
               KEN KOTARSKI, Mattel Technical Operator
17             MIKE STOVALL, MGA Technical Operator
               RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan
18             KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe
               WARRINGTON PARKER, Orrick Herrington & Sutcliffe
19             MELANIE PHILLIPS, Orrick Herrington & Sutcliffe
               FRANK RORIE, Orrick Herrington & Sutcliffe
20             DIANA RUTOWSKI, Orrick Herrington & Sutcliffe
               DENISE MINGRONE, Orrick Herrington & Sutcliffe
21             PETER BONIS, Attorney for Carter Bryant
                    (Via Teleconference.)
22

23

24

25
```

4

**I N D E X**


**EXAMINATION**

| Witness Name | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MALACKOWSKI, JAMES | | | | |
|   By Mr. Price | | 51 | | 63 |
|   By Ms. Keller | | | 54 | |
| | | | | |
| WAGNER, MICHAEL | | | | |
|   By Mr. Price | 71 | | | |

Case 2:04-cv-09049-DOC-RNB   Document 10420   Filed 04/07/11   Page 5 of 101   Page ID #:316525
CV 04-9049-DOC – 04/05/2011 – Day 46, Vol. 3 of 5

5

```
 1              SANTA ANA, CALIFORNIA, TUESDAY, APRIL 5, 2011

 2                       DAY 46, VOLUME 3 OF 5

 3                           (12:27 p.m.)

 4              (Live reporter switch with Maria Dellaneve.)

 5              (The following proceedings is taken outside

 6         the presence of the jury.)

 7              THE COURT:  Mattel's request to call Jackie

 8    Schaffhauser is tentatively granted, subject to argument,

 9    because apparently she can authenticate the exhibits that

10    Mattel seeks to admit into evidence.  I went over each of

11    those exhibits this morning very early.  I didn't quite

12    understand where Mattel was going when it was presented this

13    initial book on Sunday, and then I thought you reached

14    agreements last evening, so I went over those exhibits.  I

15    think that's appropriate, but let me hear from Mr. Quinn

16    first and then Ms. Hurst.

17              MR. QUINN:  Ms. Schaffhauser is a supervisor in

18    Mattel's trade finance department.  We'd offer her testimony

19    as a custodian of records to admit several MyScene shipping

20    invoices that reflect the earliest date of particular

21    MyScene products that MGA claims damages on and to show that

22    the claim trade secret theft regarding those products is --

23    can't be right in view of the timing that those documents

24    reflect.

25              THE COURT:  Okay.  Now, MGA.
```

1        MR. MC CONVILLE:  Your Honor, we understand that

2   the practice has been in the past, as we did with other

3   witnesses, that you just can't put a binder in front of them

4   and say, "Are these the documents?" and move them in.

5        THE COURT:  Right.

6        MR. MC CONVILLE:  There has to be some showing as

7   to what these documents are and why they were --

8        THE COURT:  That's why we are going through each

9   one of them.

10       MR. MC CONVILLE:  Okay.  Thank you.

11       THE COURT:  We are just going to be putting up

12  binders, now, because everybody is rushed for time, so --

13  everybody has had adequate notice along the way, but Mattel

14  will be allowed to call Jackie Schaffhauser.

15       Denise Van Patten, I had a chance to look at her

16  again this morning also, and I think she concerns whether

17  MGA took reasonable efforts to maintain secrecy of

18  information in its toy fair showrooms.  Isn't she the

19  journalist?

20       MR. QUINN:  Your Honor, we've withdrawn that

21  request.

22       THE COURT:  I was about to let you call her.

23       (Laughter.)

24       MR. PRICE:  It's a trade off.

25       MR. QUINN:  Can we swap her for --

1          THE COURT:  No, we can't swap -- okay.

2          MR. QUINN:  Nevermind.  We don't want to --

3          THE COURT:  Okay.  You withdraw Van Patten, all

4     right.

5          Simon Waldron, who is a complete confusion to me,

6     if you two really want to do this, I want to tell you how

7     we --

8          MR. QUINN:  We've withdrawn him as well, your

9     Honor.

10          THE COURT:  Well, let me make my record.

11          MR. QUINN:  Okay.

12          THE COURT:  Because if I'm spending time from 4:00

13     this morning sitting here in my little chair, I get to say a

14     few words.

15          I miss you, both of you, this morning.  I should

16     have gotten you in here with me.

17          Now, this concerns AcceleRacers, and the effort

18     was to rebut MGA's claim that AcceleRacers used information

19     obtained from MGA showrooms.  Apparently Mr. Waldron has

20     personal knowledge about that issue having worked on those

21     products, so if Counsel, you want it, you've got it.  I'm

22     sure this will be the turning point of the case for both of

23     you.

24          MR. QUINN:  We don't need it, your Honor.

25          THE COURT:  Okay.  Then are you withdrawing him?

```
1              MR. QUINN:  Yes.

2              THE COURT:  Along with Van Patten?

3              MR. QUINN:  Yes, your Honor.

4              THE COURT:  And Didier -- well, I've already ruled

5    on Didier.  She's irrelevant.

6              All right.  The next one that I've had some real

7    struggle about is this Michael Johnson, and this is causing

8    a lot of confusion on my part.  It pertains to Kohl's, and

9    it pertains to TX24341.

10             If you'd get that out, please.

11             MR. QUINN:  We have it, your Honor.

12             THE COURT:  Okay.  You both have to explain this

13   to me again, because what I heard in our discussion before I

14   got cut off with the supposed agreement between counsel was

15   that Mr. Johnson -- and the letter begins, "tom," and it's a

16   small T; is that correct, counsel?  Do you see at the bottom

17   page --

18             MR. QUINN:  Yes, yes, correct.

19             THE COURT:  -- "tom"?

20             MR. QUINN:  Yes.

21             THE COURT:  All right.  Now, MGA's position was

22   that another witness should be called, not Mr. Johnson, and

23   Mr. Zeller's position informally was that Mr. Johnson should

24   be called because it explained the turmoil that Mr. Eckert's

25   testified to and a number of other witnesses concerning the
```

Case 2:04-cv-09049-DOC-RNB   Document 10420   Filed 04/07/11   Page 9 of 101   Page ID #:316529
CV 04-9049-DOC - 04/05/2011 - Day 46, Vol. 3 of 5

9

 1    Kohl's issue, and whether Kohl's was, in a sense, taken off

 2    the market by unfair practices through Mattel for the two

 3    years in question, which is reflected on this last chart in

 4    an earlier exhibit, which is 37189.  So if each of you would

 5    get those out, please.  It pertains to 2005 and 2006 in a

 6    series of e-mails that the most damaging being -- just a

 7    moment.

 8            This is Document Number M2033674, and it's the

 9    e-mail from Tom Maskel to Julie Scholvin dated

10    December 16th, 2004.  I've already made my record about this

11    e-mail.

12            Now, counsel, "Julie, I would like to explore a

13    potential huge opportunity with you, as you are well aware I

14    have zero love for Bratz.  In my humble opinion, this is a

15    fad that is done.  As you are aware, we have approximately

16    4 feet of POG space designated for Bratz this spring.  What

17    would Mattel think about me throwing out Bratz and replacing

18    the space with our friend Barbie?  Here is the kicker:  If I

19    throw them out, I will need some help with markdowns and" --

20    I'm sorry, "on old Bratz.  We can talk," two dollar signs,

21    "later."

22            And I'll give you a copy of this, Jane, in a

23    moment.

24            "I think you will agree that this might be a nice

25    opportunity for Mattel to take back a little market share.

Case 2:04-cv-09049-DOC-RNB  Document 10420  Filed 04/07/11  Page 10 of 101  Page ID #:316530
CV 04-9049-DOC - 04/05/2011 - Day 46, Vol. 3 of 5

10

 1    Before you pass this on, please give me a call to discuss so

 2    we are clear on some of the details."

 3            Now, later on there is another associated e-mail

 4    that comes before this, if you'd pull that document up for

 5    the Court.

 6            MR. QUINN:  I'm sorry, your Honor, which --

 7            THE COURT:  There is another associated e-mail.

 8    Mr. Zeller knows what it is.

 9            It's Number 80,555.  I'm just joking, for the

10    record, so it's not confused.

11            *(Attorney discussion held off the record.)*

12            THE COURT:  It's the one basically associated that

13    starts talking about the two-year period of time in taking

14    off the market.  What happens is these e-mails get tied

15    together.  I'm sure you'll find it very quickly, Mr. Quinn.

16            MR. MC CONVILLE:  It comes later, your Honor.

17            THE COURT:  Mr. McConville, I know you have it at

18    your disposal.  Give it to me.

19            MR. MC CONVILLE:  Exhibit 26612.

20            THE COURT:  Let me have it.

21            Okay.  Now, this is from Zablow to Cleary, and

22    what MGA is trying to do is trying to tie together the

23    freezing out, from their perspective.

24            "It's final, Kohl's has agreed to the following:

25    Double Barbies retail space 8 feet for a minimum of 2 years.

1    A competitor will not be represented in their toy department

2    for two years, incremental Barbie tower versus '04, minimum

3    9.5 million Barbie '05 shipping, 36 percent increase versus

4    '04, minimum 10.5 million Barbie '06 shipping, 10.5 percent

5    increase versus '05" --

6              No, this isn't the one.  This is one of them.

7              Well, anyway, you'll find it.  There's another --

8    remember the bottom, two years, explicit e-mail?

9              MR. MC CONVILLE:  That one had two years in it,

10   your Honor.

11             THE COURT:  That one has.  There is another one.

12             MR. MC CONVILLE:  There is another exhibit, 37112.

13             THE COURT:  Put that up.

14             There we go, perfect.

15             Now, this is from Sharon Spaulding to Matt

16   Bousquette, Vollero, Spaulding; do you see there?

17             MR. QUINN:  Yes.

18             THE COURT:  All right.  Now, for the record, what

19   Mattel and MGA are contesting is that the whole issue

20   concerning Kohl's and the turmoil in the market, the e-mails

21   that Mattel brings to the jury showing Mr. Larian's

22   unwillingness to reduce, if you will, the price of Bratz at

23   the same time MGA brings to the table a series of e-mails

24   that, from MGA's perspective, appears that at least people

25   within the Mattel organization are trying to freeze Bratz

1    and MGA out of the Kohl's market, which is conducive to

2    Mr. Larian's testimony about the sudden complete dissipation

3    of Kohl's in 2005 and 2006.  Of course, Mattel counters with

4    the fact that he's not willing to reduce his retail price

5    where he says retailers usually ask probably more than once

6    a day.

7            Apparently, Johnson is being offered because of

8    the unfair competition claims arising out of the

9    relationship between Mattel and Kohl's, and you represented

10   to me that Mr. Johnson had personal knowledge of whether MGA

11   suffered any injury, and for the first time, just as I

12   received for the first time M2033674 upon the Court's order,

13   I now have 24341, which I'm seeing for the first time on --

14   Sunday?  Sunday?

15           MR. QUINN:  I think that's right, your Honor.

16   That may have been when we first showed it to the Court.

17           MR. MC CONVILLE:  This was a document that was

18   produced by MGA a long time ago.  It's an MGA document, your

19   Honor.  We produced the Kohl's documents years and years

20   ago, and these documents you are seeing for the first time

21   were documents that Mattel produced for the first time a

22   couple days ago.

23           THE COURT:  Okay.  What Mattel's interested in is

24   the following:  "Tom, with each passing week, the Bratz

25   business continues to be a huge disaster" -- strike that.

1    Strike the word "a."

2            It says, "Continues to be huge disaster.  The

3    sales decrease to plan is a disgrace, and the margins an

4    even bigger disgrace with the worse yet to come, when we are

5    forced to take perms on these bloated inventories.  A quick

6    glance at the numbers illustrate a margin shortfall that

7    will eventually surpass $2 million.  This shortfall will

8    only" -- strike that.

9            "This shortfall will not only obviously impact

10   your season/year, but will also destroy this division's

11   margin performance and my boss's as well.  That is

12   completely unacceptable.  I need to understand by Monday,

13   December 13th, exactly what the plan is to address this

14   situation.  The impact of this shortfall will be

15   devastating, if not corrected.  We have many opportunities

16   for upside with this, but not if their business is going to

17   ruin the profitability of this division.  We have been able

18   to keep our toy business running in a company that would

19   prefer to use the space for ready-to-wear by hitting all of

20   our sales and margin commitments.  The minute we break that

21   commitment, we risk losing all that we have worked so hard

22   to build.  We can't let that happen.  I'm counting on you to

23   correct the situation by December 13th.  Mike Johnson."

24           This is part of an e-mail string that then brings

25   in Tom Maskel --

 1           MR. QUINN:  It's addressed to Maskel.  It's from

 2   Johnson to Maskel.

 3           THE COURT:  Johnson to Maskel, thank you.

 4           And then back on the first page, apparently to

 5   Holly Chabot, who is writing a note to Holly Chabot?

 6           MR. MC CONVILLE:  Correct.

 7           THE COURT:  Am I reading that correctly?

 8           MR. MC CONVILLE:  Yes.

 9           THE COURT:  Now, I want to tell you both that I am

10   absolutely confused by this e-mail and the request by

11   Mattel.

12           MR. QUINN:  Can I try and address the confusion?

13           THE COURT:  Please.

14           And this was raised, I think, on Monday night,

15   Ms. Hurst?

16           MS. HURST:  Right.

17           THE COURT:  Yeah.

18           Mr. Zeller?  I don't understand it.

19           MR. QUINN:  Your Honor, Mike Johnson is a vice

20   president, senior vice president at Kohl's.  He has, for

21   many years, including during this time period, been in

22   charge of the children's apparel and toys department.

23           Tom Maskel, the other person whose name we've seen

24   on these e-mails, is no longer with Kohl's.

25           THE COURT:  Now, just a moment.  Bring up this

1    last e-mail for a moment.  I want to see the one -- the very

2    last one.

3              MR. QUINN:  What's the number, your Honor?

4    24341-1.

5              THE COURT:  Mr. Quinn, what's the number?

6              No, that's not the one.

7              MR. MC CONVILLE:  37112.

8              THE COURT:  There we go.  Now, bring that up for

9    just a moment.

10             What's the tie in between Julie Scholvin, when I

11   look at the cc, and Mr. Johnson?  I don't understand.

12             MR. QUINN:  This man, Maskel, reports to, works

13   for Johnson.  Johnson supervises Maskel.  It's an offer of

14   proof that he has intimate knowledge of what was going on

15   here.  Maskel was acting at his direction.  He would

16   testify, your Honor, that before this initial contact with

17   Mattel to Julie Scholvin, Kohl's had already decided to stop

18   doing business with MGA.  Let --

19             THE COURT:  Just a moment.  Let me repeat this

20   back so I try to understand it.

21             That even before the December 22nd, 2004, e-mail

22   that appears, from MGA's perspective, to be a freeze out,

23   that Kohl's had already decided to stop doing business with

24   MGA; is that correct?

25             MR. QUINN:  Yes.  In fact, even before the first

Case 2:04-cv-09049-DOC-RNB   Document 10420   Filed 04/07/11   Page 16 of 101   Page ID #:316536
CV 04-9049-DOC – 04/05/2011 – Day 46, Vol. 3 of 5

16

1   contact with Mattel --

2           THE COURT:  Call Mr. Johnson into my court.

3           MS. HURST:  What?

4           THE COURT:  I want to hear that from him.

5           MR. QUINN:  He's back at the office.

6           MS. HURST:  Your Honor, can we just, for the

7   record --

8           THE COURT:  Just a minute.  I want to hear the

9   whole offer of proof.  I need it explained to me.

10          MR. QUINN:  Okay.  He would say that they had

11  decided that this business, the Bratz business, Kohl's

12  customers just didn't like Bratz.  It wasn't selling, they

13  were losing a lot of money on it, they had -- they couldn't

14  get an accommodation from MGA, and they had made a decision

15  that they were not going to do business -- they are not

16  going to continue to carry Bratz.

17          THE COURT:  Now, just a moment.

18          Then why is -- who is Sharon Spaulding?

19          MR. QUINN:  Well, you are looking at an e-mail

20  here that's entirely among Mattel people, so this is after

21  Kohl's has reached out to Mattel and said, "Have we got a

22  deal" -- "Can we do a deal?"

23          THE COURT:  Well, let me repeat that back to you.

24          Is it a timing issue?  In other words, what I'm

25  getting involved in, it sounds like, from your perspective

```
 1    is the decision has already been made, but this information

 2    now is circulating around Mattel as if it's the gospel.

 3              MR. QUINN:  No, no.  No, no, that's not it.

 4              THE COURT:  I'm going to repeat it back to you one

 5    more time.

 6              MR. QUINN:  Okay.  I heard that, and I'm just

 7    saying that's not it.

 8              THE COURT:  This is causing me absolute confusion,

 9    which is why it's not being received so far.

10              If Johnson makes the decision on Kohl's part not

11    to do business with MGA prior to December 22nd, 2004, it

12    sounds to me that that hasn't gotten into the Mattel

13    decision-making framework.  In other words, what we have is

14    this circulation going on inside Mattel based upon some

15    information, and it appears that information is -- well, we

16    know Matt Bousquette is with Mattel, right?

17              MR. QUINN:  I assume that Kohl's is not being

18    completely transparent about their decision-making with

19    Mattel.  They want to negotiate a deal with Mattel, so they

20    don't tell Mattel.  They say, "Hey, if we can't strike a

21    deal, we are going to stick with the competition."  Johnson

22    will say, "Our customers don't likes Bratz.  We weren't

23    going to stick with Bratz anyway."

24              He will also say that these types of promotional

25    arrangements that they entered into with Mattel are
```

1    commonplace.  They have them with a lot of different

2    suppliers.  It happens every day in the industry, that they

3    weren't bought out, that Mattel did not make a payment, that

4    there was no understanding that Bratz could not be in

5    Kohl's.  In other words, he will, you know -- he will

6    address this village that's been presented to us, this

7    completely one-sided false perspective that there was an

8    exclusionary deal and some payoff.  Here is another party to

9    the transaction saying, "No, we weren't paid off.  We made

10   this decision, and we made it for our own business reasons,

11   and, in fact, we continued to buy MGA product."  That's the

12   offer of proof.

13            THE COURT:  Okay.  Now, just a moment.

14            What documents that position?  In other words,

15   what document do I have from Kohl's, before Mr. Johnson gets

16   on the stand, that says, you know, on December 1st of 2004,

17   we decided not to do business with Mattel, especially since

18   he has not been on any witness list so far.  This has just

19   been presented to me.

20            MR. QUINN:  No party served a subpoena on Kohl's,

21   nobody did.  The only documents we have -- Kohl's documents

22   are documents that were in the file of MGA and the file of

23   Mattel's.  We have this document, 24341-2, the Johnson to

24   Maskel e-mail only because it was forwarded to MGA, and MGA

25   produced it.

1          THE COURT:  All right.

2          Now, let me hear from MGA.

3          MS. HURST:  Your Honor, this -- Mr. Johnson was

4   never listed on any witness list.  We were never able to

5   take discovery of Kohl's because the original e-mail showing

6   there was a deal produced after the discovery cutoff.  Then

7   when we moved to court to compel, the Court initially denied

8   it and we understand that, but now it's completely unfair to

9   let this witness come sailing in here when we've never had a

10  chance to depose him, and we don't have their Kohl's

11  documents because of their discovery default case; that's

12  just not fair.  And what they were trying to do is pick and

13  choose the witness who is not subject to cross-examination.

14          So first of all, we don't think what they're

15  saying rebuts the inference that there was a deal at all.

16  In fact --

17          THE COURT:  Why wouldn't I simply require each of

18  you to bring in the person, Tom Maskel?  He's the author of

19  this e-mail.

20          MR. QUINN:  No, Johnson is the author, but Maskel

21  doesn't work for Kohl's anymore.  He doesn't work for

22  Kohl's.

23          THE COURT:  So what?  I mean --

24          MR. QUINN:  I mean, he's a -- a third-party who's

25  gone on with his life, and he's in Wisconsin.  The issue

Case 2:04-cv-09049-DOC-RNB   Document 10420   Filed 04/07/11   Page 20 of 101   Page ID #:316540
CV 04-9049-DOC - 04/05/2011 - Day 46, Vol. 3 of 5

20

 1    here, your honor, is what was the nature of the deal between

 2    Kohl's and Mattel?  This is the man who is in charge of that

 3    department.  He can address that issue.

 4            And I'll remind the Court that MGA made Kohl's an

 5    issue.  They've served something for the first time saying

 6    that there was -- they thought there was something fishy,

 7    and it was part of their unfair competition claim, this

 8    Kohl's transaction, on the last day of the -- on the day of

 9    the discovery cutoff.  That's the first time they ever

10    flagged that as an issue.

11            THE COURT:  Okay.

12            MGA?

13            MS. HURST:  If the issue is whether there was an

14    agreement between Mattel and Kohl's, which is what should be

15    the issue, then they can call a Mattel employee to discuss

16    that.  They had Julie Scholvin on their list.  She's on all

17    these e-mails.  She could be called to come and explain it.

18    Not Mike Johnson, not a third party, not somebody that we've

19    never had a depo or any discovery of --

20            THE COURT:  I want to be certain because this has

21    caused some mass confusion.  This is one witness that I

22    initially foreclosed, quite frankly, because I didn't --

23    initially foreclosed simply because I didn't understand at

24    all what Mr. Johnson had to do with this matter.

25            I'm going to let you take a 10-minute recess

1    before we start at 1:00, but I want Mr. Johnson available to

2    the Court.  I'm not satisfied, frankly, and I want to tell

3    you tentatively that I'm not foreclosing you from this area,

4    but -- and you can certainly, at least, call Mr. Maskel on

5    this, and you can certainly call Julie Scholvin back, who

6    you have within your purview.  But I don't know, with this

7    late date, with no depositions, et cetera, that I'm going to

8    do that, so I'm just putting you on warning.  This is not a

9    final ruling, and I'll speak to Mr. Johnson, and I'll be

10   cautious with this, but at the last moment this being in

11   front of the Court --

12          MR. QUINN:  I appreciate that, your Honor, but I

13   suggest, respectfully, it wouldn't be serving the interest

14   of justice to submit this issue and not hear at all from the

15   other party to this transaction, which they have suggested,

16   if they haven't an outright asserted, was a competition or

17   antitrust violation and --

18          THE COURT:  The door is not closed at all.

19          MR. QUINN:  -- and they called that lady from

20   Little Tikes who was not on their witness list, and that

21   went down, so --

22          THE COURT:  You're just going back and forth

23   between the two of you.  We can set a record how each party

24   has --

25          MR. QUINN:  But at least, your Honor, I hope I can

1    be sufficiently clear that the Court understands the import

2    of this witness' testimony.

3            THE COURT:  Yeah, for the first time I do.  Quite

4    frankly, I have to share with you that I had no idea after

5    the discussion with Mr. Zeller and Ms. Hurst about that time

6    it broke up with, you know, a tentative bargaining going on,

7    even as I left the court, between the parties, so I think

8    it's a much more clearer understanding on my part.  I really

9    didn't know why she was on the list.  But I'm really putting

10   you on warning that this is causing me some concern.

11   Discovery is basically closed.  You've got Scholvin

12   available, the other gentleman available --

13           MR. QUINN:  We don't have the other gentleman

14   available.

15           THE COURT:  You have Scholvin available to explain

16   what's going on in these e-mails.

17           MR. QUINN:  Well, not from -- he can't explain

18   Kohl's perspective.  That's the problem with Scholvin.  We

19   have MGA people saying what this deal was.  We have Mattel

20   people saying what this deal was.  We don't have the other

21   party who was supposedly corrupted by Mattel saying what

22   this deal was, and saying why they made the decision that

23   they made.  And again, the offer of proof is they decided

24   they weren't going to carry Bratz anymore before they ever

25   even communicated with Mattel.

```
 1            THE COURT:  What seems out of balance to me is

 2   this:  Scholvin should be on the stand on behalf of Mattel

 3   and explaining this e-mail if the other gentleman is on the

 4   stand explaining the import of this e-mail, Mr. Johnson.

 5   That gives the jury a full and complete look.  Why would

 6   Schovlin write an e-mail like this?  Because the inference

 7   is that Mattel is freezing out MGA concerning the Kohl's

 8   account.  Now, that may be completely wrong.  Maybe an

 9   independent decision was made, but if we have both parties

10   in balance explaining their perception, you haven't called

11   Scholvin, you haven't called Scholvin, and you're now

12   presenting Johnson at the 11th hour.

13            MR. QUINN:  We can call Scholvin, we'll put her up

14   or they can call her or we'll make her available.

15            THE COURT:  No.

16            MR. QUINN:  I -- I just think it would be a big

17   mistake to preclude us from hearing from someone at Kohl's

18   who can speak to the nature of this transaction.  Otherwise,

19   we're just hearing both sides arguing what was in Kohl's

20   head and why Kohl's made the decision it did, and we won't

21   be hearing from Kohl's itself.

22            MR. MC CONVILLE:  Your Honor, it's not what's in

23   Kohl's head.  It's what in Mattel's head, and we've got an

24   examination on that; two years, keep them out, boasting

25   about it.  That's the nature of the evidence right now.  So
```

 1    it's not a matter of what's in Kohl's head, it's what's in

 2    their documents and their e-mails, and that's what the

 3    evidence is right now.

 4           MR. QUINN:  Yeah.  Well, MGA will say, of course,

 5    that Scholvin, like any other Mattel witness who addresses

 6    this and says there isn't anti-competitively and buy them

 7    off, they will say that Mattel was lying, and we expect them

 8    to say that.

 9           THE COURT:  Here is the problem without a

10    deposition.

11           Mr. Larian, you experienced this, and Mr. Eckert,

12    you experienced this.  Remember the questions for each of

13    you gentlemen, just to put yourself in the position of

14    witnesses, what happened in 2004?  I mean, with your busy

15    schedules, can you recall everything?

16           Now, I'm going to be presented some executive from

17    a company.  The decision may have been made prior to

18    December 22nd, and it may not have, and I'd like to see some

19    documentation.  I'd like to see something that says, "I am

20    not going to do business with MGA," because this person now

21    is looking back, he's -- hold on.  He's not subject to any

22    deposition, there is no adversarial process, nobody has had

23    a chance to figure out if he's really got a memory or not,

24    if there's supporting documentation, and we are just

25    throwing him up on the stand.

```
 1          MR. QUINN:  Well, your Honor, both of these
 2   companies -- he's a customer today of both these companies.
 3   Both companies, Mattel and MGA, have ongoing relationships
 4   with Kohl's.
 5          THE COURT:  It's not that.  It's the fact that we
 6   have a deposition for one reason, and that is we test the
 7   witness' memory, we find out if there are documents to
 8   support it.  He's looking back six years at the last moment.
 9          Now, I'm going to keep an open mind, but I'm
10   telling you right now that it's an uphill climb for me at
11   this late date.
12          MR. QUINN:  He's here and they can depose him and
13   cross-examine him and challenge his memory, you know, be our
14   guess.
15          THE COURT:  No.  I'm happy to talk to him also.  I
16   want to see some documents.
17          MR. MC CONVILLE:  Your Honor?
18          THE COURT:  I want to see documents that say, "We
19   aren't doing business with MGA."
20          MR. MC CONVILLE:  Just to address the one point
21   where, you know -- are we sure that his memory is going to
22   be fresh?  If you look at the e-mail that's on the screen,
23   the last sentence says, "We must respond by 12/27, or they
24   will maintain competition, no extensions."  This flies in
25   the face of what this man's -- the offer of proof is, and we
```

1   can cross-examine him with this Mattel document, but I can

2   hear a foundation objection already.

3          MR. QUINN:  No, I won't object.  They can

4   cross-examine -- we will not object to him being

5   cross-examined by using any document.

6          MR. MC CONVILLE:  And he will say, "I don't know.

7   This isn't my document.  This isn't my understanding."

8          MR. QUINN:  The whole point is, your Honor, they

9   were posturing.  They don't go to Mattel and say, "We'd like

10  to negotiate a deal with you, and by the way, we ended our

11  relationship with MGA, so we have no alternatives right now.

12  We have to cut a deal with you."  No, they didn't do that.

13  They postured.  They said, you know, "You've got to do a

14  good deal with something we like, and we need it by this

15  date or we're staying with MGA."  It's not inconsistent.

16  It's, in fact, what you think a rational businessman would

17  do.  He wouldn't come into the negotiation and say, "I want

18  to do a deal with you, and by the way, I don't have an

19  alternative now"; it's how it's done.

20          MS. KELLER:  Your Honor, the problem is that all

21  of this could have been hashed out a long time ago if Mattel

22  had produced the Kohl's documents.

23          THE COURT:  Right.

24          MS. KELLER:  They didn't.  They sandbagged us.

25  They got produced at the last second, and now -- and we have

 1  tried to react, we've tried to craft our strategy as we went
 2  along, we tried to catch what was being thrown at us by the
 3  last second, but now we're at the end of the case, you know,
 4  and here comes some guy we've never had a chance to test or
 5  examine or anything else.  I don't know right now as we sit
 6  here if there are more documents out there we don't know
 7  about, and we don't have the chance to find out.  And we've
 8  made our decisions, we've cast our strategy, we've done
 9  everything.  We're a day from the case being over, and this
10  guy pops up for the first time; it just isn't fair.
11          MR. QUINN:  You know, I've just been handed new
12  Kohl's documents which MGA produced today, MGA23946420
13  through 24, so --
14          MR. MC CONVILLE:  That's what you ordered us to
15  do.
16          MR. QUINN:  So they are handing us new things now.
17          THE COURT:  Well, like I said, we might as well
18  end the case the way we started for both sides.  You've both
19  been coequally --
20          MR. MC CONVILLE:  And just on that point, your
21  Honor, that was in response to a motion to compel that they
22  filed, which we didn't even respond to, and you ordered us
23  to find the documents and produce them, so --
24          MR. QUINN:  Somehow I think they must think that
25  the documents are good for them, that they voluntarily

Case 2:04-cv-09049-DOC-RNB   Document 10420   Filed 04/07/11   Page 28 of 101   Page ID #:316548
CV 04-9049-DOC - 04/05/2011 - Day 46, Vol. 3 of 5

28

```
 1    produced something and --

 2              THE COURT:  No, no.

 3              MS. HURST:  No, that's not what happend.

 4              MR. MC CONVILLE:  There is a court order, and we

 5    complied.

 6              (Interruption in the proceedings.)

 7              THE COURT:  Both of you, stop.

 8              I set that order before midnight.  Look at the

 9    docket on it.  The reason you didn't get it Monday is

10    because apparently it wasn't sent out by us early Monday.

11    It's on a 11-numeraled order, and it orders you to produce

12    it today.  That's why you are getting the documents.

13              MR. QUINN:  I apologize.

14              THE COURT:  Well, apologize to them.

15              MR. QUINN:  I am apologizing to Tom and Annette

16    and Jennifer and my esteemed colleagues from across the

17    aisle, here.

18              THE COURT:  Now, I'm going to go get the jury in a

19    couple minutes; is that okay?

20              MS. KELLER:  Can we just have long enough to get

21    something to line our stomach and go to the bathroom?

22              THE COURT:  Sure.

23              MR. QUINN:  We didn't get through this list, your

24    Honor, of witnesses.

25              THE COURT:  Well, just a moment.  That's the list
```

1   that was given to me.  I'll hand you back the notebook that

2   I got because these witnesses come tumbling --

3          MR. QUINN:  Well --

4          THE COURT:  No, no.  Just a moment.  Take my

5   notebook for just a moment, here you go, and tell me, at the

6   last moment, what other witnesses you have in mind.

7          MR. QUINN:  Well, there's Dennis Jolicoeur that

8   we've talked about.

9          THE COURT:  How about if I say you can produce

10  him?

11         MR. QUINN:  All right.  I'm not assuming -- I'm

12  not taking anything for granted, your Honor.  I've learned

13  that.

14         THE COURT:  I've always said you can have the

15  affirmative defense.

16         MR. QUINN:  All right.

17         THE COURT:  All right?

18         MR. QUINN:  So that's Jolicoeur.  We've talked

19  about Johnson.  Kenneth Plevan, which we've asked them

20  about.

21         MR. MC CONVILLE:  No.

22         MS. HURST:  No.

23         THE COURT:  This is the gentleman from Germany, I

24  believe?

25         MR. QUINN:  No, no.

```
 1              THE COURT:  Potgeisser?

 2              MR. QUINN:  No.  This is a partner at Skadden Arps

 3   who knew as of January of 2008 about Sal Villasenor and his

 4   activities.  The suggestion's been made before the jury that

 5   we hid this from them, we buried the document; do you

 6   remember that line of questions from Ms. Keller?  We buried

 7   the document from 2005 until 2010.  Mr. Plevan knew about

 8   Sal Villasenor's activities as of January 2008.

 9              THE COURT:  From Skadden Arps?

10              MR. QUINN:  Yes, because in a deposition, he

11   starts asking about it.  So we don't want to get into

12   privileged materials, your Honor, but "When did you know it,

13   and who did you learn it from?"  So that's --

14              THE COURT:  Okay.  Now, what's our time going to

15   be up here?

16              MR. QUINN:  And then we have a custodian of

17   records, Sally Dail, who is an HR person who we want to

18   get --

19              THE COURT:  Can you look inside my binder?

20              MR. QUINN:  Personnel records, files --

21              THE COURT:  No.  Mr. Quinn --

22              MR. QUINN:  I don't know that the custodian of

23   records aren't in here, your Honor, but if you recall when

24   we close our case --

25              THE COURT:  Slow down and read the names inside
```

1   the binder.  What did I order?  I ordered each witness and

2   the questions, and I didn't get that until Sunday.

3           MR. QUINN:  I see this, your Honor, but --

4           THE COURT:  No, no. just go through it.  Just read

5   the names.

6           MR. QUINN:  You want me to read this out loud?

7           THE COURT:  Yeah, I want a record of what's being

8   presented to me as more requests come in.

9           MR. QUINN:  I'm not sure -- you want me to read

10  these pencil marks here or the tabs?

11          THE COURT:  The tabs.

12          MR. QUINN:  The tabs, your Honor, Allen, Bryant,

13  Gronich, Johnson, Kuemmerle, Kwan, Pietri, Potgeisser,

14  Saunders, Schauffhauser, Waldron, Van Patten, but it does

15  not include this person, because when we closed our case,

16  there was an agreement and an understanding, and I thought

17  the Court endorsed it, that we can call the custodian of

18  records to clean up any documents that we needed for our

19  affirmative case.  That was put on the record.  It's heavily

20  negotiated.  It was like the third agreement in history

21  between --

22          THE COURT:  Who is this person?

23          MR. QUINN:  All right.  This person is Sally

24  Dail --

25          THE COURT:  Okay.

 1          MR. QUINN:  -- manager in Mattel's human resources

 2   department, and she will introduce various human resources'

 3   personnel records pursuant to the parties' stipulation to

 4   allow Mattel to present a custodian to admit these records

 5   after it rests its case.

 6          THE COURT:  Thank you.

 7          Now, who else so I'm not surprised?  Is there

 8   anybody else that we've missed?

 9          MR. QUINN:  That is the universe, your Honor.

10          THE COURT:  Okay.  Now, can somebody go and mark

11   up the time?  Because what has to happen is what can't

12   happen on rebuttal and surrebuttal is this:  Mattel can't

13   use three-quarters of the time with you reacting and not

14   being able to put on a surrebuttal witness, so I've got to

15   split that.  In other words, there has to be X-amount of

16   time that you get to put on your witnesses in your rebuttal,

17   and X-amount of time you get to put on your witnesses in

18   surrebuttal; otherwise, this is what will happen, and that's

19   why I've been waiting to see where you are.

20          What will happen is the party who is designated as

21   the plaintiff, whichever one of you is the plaintiff, ends

22   up using up the whole four minutes and the other party

23   simply has to react.  It doesn't work that way.  It gets

24   split right down the middle from whatever time we have left,

25   and that's why when I'm going through all these witnesses,

Case 2:04-cv-09049-DOC-RNB   Document 10420   Filed 04/07/11   Page 33 of 101   Page ID #:316553
CV 04-9049-DOC - 04/05/2011 - Day 46, Vol. 3 of 5

33

1   now you've got to give me your surrebuttal witnesses, and

2   I've got a couple of decisions to make.

3          Johnson, right now, isn't looking --

4          MR. QUINN:  Your Honor, that's not fair.  This is

5   our defense case.  This is our defense case to their

6   counterclaims.  I understand the analysis if it's rebuttal

7   and surrebuttal, but this -- what we are talking about is

8   our defense to their counterclaims.  We shouldn't have to

9   split our time equally from our defense case and their

10  surrebuttal; it's apples and oranges.

11         THE COURT:  Here is what's irrational about that

12  and illogical.  You could literally run the time on MGA and

13  never have their damages expert get back up in surrebuttal,

14  and you've had adequate warning all along the way to guard

15  your time.  You've had Mr. Larian up on the stand for

16  seven-and-a-half days.

17         MR. QUINN:  Yeah, but we were ordered we could not

18  address their affirmative claims until after their case.

19         THE COURT:  You are being allowed to address their

20  affirmative claims.  I'm granting you the witnesses.

21         MR. QUINN:  But we have only a tiny amount of time

22  left, and we can't -- we shouldn't be hobbled by having to

23  split that with surrebuttal.

24         THE COURT:  And MGA is just as hobbled.  You both

25  had adequate notice all the way along.  If they want to

 1   spend seven-and-a-half days with Mr. Larian and you want to

 2   spend four days or three days with Mr. Eckert, so be it.

 3   You've spent six or seven days with Mr. Bryant.  You've had

 4   plenty of notice.

 5           Now, eventually I'll try to be as lenient as I can

 6   with both of you, but I'm not budging on the time, and

 7   somehow that has to be worked out fairly so both sides can

 8   get your experts back up on that stand.  That's why you have

 9   to start picking and choosing, frankly.

10           MR. QUINN:  Okay.  Mr. Johnson is here, your

11   Honor, if you'd like to meet him.

12           THE COURT:  No.  I'll meet him later on.  I'm

13   going back to jury work.  He can just remain in the hallway

14   because we're going back to work in just a moment.

15           MS. HURST:  Your Honor, can we respond to the

16   custodian of record, because that is not an accurate

17   statement of what happened?

18           THE COURT:  Okay.

19           MS. HURST:  We never agreed that they can have a

20   big pile of documents just come flying in without any

21   supporting testimony, and that's what they are going to try

22   to do.  So, you know, they have -- we filed our JMAL and,

23   you know, we filed it, and they have a whole bunch of

24   documents, which are a total failure of proof for them.

25   They didn't put in the contracts of the seamstresses.  They

1    didn't put in the contract of Ryan Tumaliuan.  They didn't

2    put in a bunch of copyright registrations.  They didn't put

3    in Bryant drawings.  They have a fundamental failure of

4    proof on about half of their damages claims, and now they

5    want to come flying in here at the end when there is no time

6    left with the so-called custodian of records and try to fix

7    all of these enormous gaping ridiculous holes in their case,

8    and that is not fair, and we never agreed that they could

9    use a custodian of record for a big pile of documents to

10   come flying in here that are elements of their claims

11   without any supporting testimony.

12           MR. QUINN:  This is an HR person who will

13   introduce HR documents.

14           THE COURT:  Nobody is foreclosed.

15           Now I understand who Ms. Dail is, but by the same

16   token, you have to go through those documents, and what's

17   not fair, and I've warned you both along the way, I don't

18   know how many times I've said this on the record, guard your

19   time and be judicious about it.  So I've given you free

20   reign, and, in fact, multiple questions asked of the same

21   witness.  I can think of Mr. Larian being asked over and

22   over again the same questions.  Mr. Eckert to a certain

23   extent, but not as brutally, probably, as Mr. Larian; the

24   same questions.

25           So you've all had plenty of time.  You've had a

Case 2:04-cv-09049-DOC-RNB   Document 10420   Filed 04/07/11   Page 36 of 101   Page ID
#:316556
CV 04-9049-DOC - 04/05/2011 - Day 46, Vol. 3 of 5

36

1    chance to demonstrate the credibility or non-credibility of

2    witnesses.  I think the record is absolutely clear, and

3    somehow this is going to be split equitably in terms of

4    rebuttal and surrebuttal.

5           Now, you are not being foreclosed.  You can

6    present the witnesses.  You may have to make some choices,

7    and MGA may have to make choices.

8           MR. QUINN:  I have no problem with splitting

9    rebuttal and surrebuttal, equitably, but defense should be

10   treated differently since we were under an order that we

11   couldn't address their case -- we couldn't call witnesses on

12   their case until they rested.

13          THE COURT:  The difficult thing is you took 86

14   hours in the presentation of your case of the 120, and MGA,

15   if you look back, took about 60-some hours.

16          Now, it's hard for me to understand that argument

17   because all of a sudden, after warning and warning and

18   telling both parties, and this is coequal to both of you,

19   that you may be running out of time.  You chose to take on

20   each other's witnesses for a prolonged period of time and

21   unnecessarily so on some occasions.

22          MR. QUINN:  We are not asking for anymore time.

23   We know the answer to that.  We are not asking for that, and

24   we are not asking that rebuttal and surrebuttal shouldn't be

25   divided equally, but we are saying that defense is in a

1  separate category because we couldn't call a witness to

2  address their affirmative claims until they rested.  It's

3  reflected many times on the record that those were the

4  rules.

5          THE COURT:  I'm not precluding you.  You have an

6  opportunity here, and you are not foreclosed in any way.

7  You have enough time, also, if you'd just do it quickly and

8  professionally.  You can put Sarah Allen on, you can put

9  Daphne Gronich on, you can put Stephen Kwan on, if you want

10 to, you can put Jackie Schaffhauser, you can put -- well,

11 I'm still concerned about Lisa Saunders, but if you want

12 Lisa Saunders concerning showrooms, that's fine.

13         Potgeisser, no.  Potgeisser is a series of hearsay

14 statements coming from a deposition.  And Johnson, I really

15 want to do some thinking about Johnson.

16         MR. QUINN:  Your Honor, may I make an offer of

17 proof as to Potgeisser?

18         THE COURT:  Certainly.

19         MR. QUINN:  Mr. Potgeisser is MGA's managing

20 director for its Benelux and Nordic operations --

21         THE COURT:  Counsel, you are reading.  I know who

22 Potgeisser is and his depo.

23         MR. QUINN:  No.  For the record, Mattel would, if

24 it had the opportunity, examine him on the topics that would

25 include the lack of confidentiality of product information,

 1    including pricing information once it's been shared with

 2    retailers, an important issue in this case, MGA's failure to

 3    require confidentiality agreements at toy fairs until 2009,

 4    NDA signing, an important issue in this case, and MGA

 5    employees infiltration of Mattel showrooms at toy fair

 6    without permission on numerous occasions just -- thus,

 7    showing that MGA itself in its conduct does not think that

 8    you are getting -- stealing trade secret information by

 9    infiltrating toy fairs.

10         Thank you, your Honor.

11         THE COURT:  Now, my guess is that you're both

12    starting in what I call appellate purposes.  That's what's

13    really occurring.  The formulation of a record that you've

14    run out of time is somehow each party -- and I expect MGA

15    will do the same thing to the Court.  You've both been on

16    notice from the beginning.  And Potgeisser is a series of

17    hearsay statements, Counsel.

18         MR. QUINN:  No, he has personal knowledge, your

19    Honor, but again, we are not asking for more time.  I mean,

20    we are only going to have four or five hours.  We've spent

21    three months, here, on this case.  I respectfully think it's

22    a mistake to run the risk of excluding our ability to call

23    the defense witnesses we want to call in the small amount of

24    time that we're going to have.  It's going to be up to us to

25    do it, as the Court says, professionally and quickly.

```
 1          THE COURT:  You don't have Cart Blanche, neither

 2   Mattel nor MGA, and so I haven't made my record concerning

 3   Potgeisser, but I will now.

 4          Potgeisser is irrelevant to your defense to MGA's

 5   claim for trade secret misappropriation.  He's an MGA

 6   executive who apparently has a lot of secondhand knowledge

 7   about employees at MGA, and I'll refer the Circuit to his

 8   depositional testimony, and MGA subsidiaries and accessing

 9   and disclosing information about forthcoming Mattel

10   products.

11          Mattel wants to call Mr. Potgeisser to testify

12   about these activities, but it is MGA, not Mattel, that has

13   a trade secret misappropriation claim predicated upon

14   misconduct at toy fairs.  In fact, the Circuit ought to be

15   reaching out and wondering why this Court has even allowed

16   these counterattacks by Mattel upon MGA when there's

17   specific claims by MGA against Mattel.  I think I've been

18   very generous in allowing this.

19          Mr. Potgeisser has secondhand knowledge.  It's not

20   relevant to an unclean hands defense, which Mattel has

21   previously pointed out must arise and lie in particular

22   transaction that gives rise to the claim, nor is this

23   testimony relevant to whether the information at MGA toy

24   fair showrooms derived independent economic value from not

25   being generally known.  I think, indeed, the fact that MGA
```

 1    gathered such data from retailers may even support MGA's

 2    argument that the information was extremely valuable.

 3          Allowing in this testimony is tantamount to allow

 4    MGA to question Mattel about whether Mattel recruited MGA

 5    employees that stole trade secrets. It's not tangential.

 6    It's irrelevant and extremely confusing to the fact-finder,

 7    which would lead to them to believe that Mattel is also

 8    bringing a claim based on toy fair misconduct, which Mattel

 9    is not, only MGA is. And apart from channeling hearsay,

10    Potgeisser lacks foundation to testify about misconduct by

11    other MGA personnel, and I'm going to excuse this gentleman.

12          Now, Johnson is still on the table, Counsel, and I

13    think if you move quickly, you can certainly get Sarah Allen

14    in, Daphne Gronich, which solves your

15    sneaking-into-the-showroom problem. You've got Stephanie

16    Kwan. You've got Jackie Schauffhauser. You've got your

17    custodian of records, and I need to do more thinking about

18    Johnson. Oh, and you also have Stephen Kwan, which is more

19    than adequate.

20          Now, Counsel, do you want a restroom break?

21          MR. MC CONVILLE: Yes, please.

22          THE COURT: Okay. I'm going to go get the jury in

23    10 minutes. Please be prompt.

24          *(Discussion held off the record.)*

25          *(Peter Bonis is present via teleconference.)*

 1              THE COURT:  Hello, how are you?

 2              MR. BONIS:  How are you?

 3              THE COURT:  Listen, we are on the record.  I've

 4     got counsel here.  The marshals are here.

 5              Steve, will you identify yourself.

 6              THE MARSHAL:  Steve Beirne of the U.S. Marshals

 7     Office.

 8              THE COURT:  Listen, I didn't want to do the issue

 9     without checking one more final time.

10              MR. BONIS:  Your Honor, he just changed his phone

11     number.  But the problem is he's -- he's traveling, and I

12     don't see how I can even get a flight to go today because

13     he's out of St. Louis, out of the area, and I just don't

14     think he knew this was coming.

15              THE COURT:  If -- I, you know, I understand that.

16     I didn't get this until the last moment either, quite

17     frankly.

18              MR. BONIS:  I am not finger-pointing.

19              THE COURT:  No, no.  If he's not avoiding us, that

20     makes a difference in terms of my approach.  He's the last

21     person, including any witness, that I want to take this

22     action with.

23              Can he be here at any time tomorrow?  We'll take

24     him out of order.

25              MR. BONIS:  Your Honor, I honestly -- okay.  After

1    I talked to him, the call got dropped because he was out in

2    the boonies.  I did some checking.  I don't know -- I mean,

3    I have not been able to talk to him again, but I did talk to

4    him briefly, and I don't -- to be honest with you, I don't

5    think he can get there before 4:00.  I'm not a travel agent,

6    you know what I mean?  But I said I can try and find --

7              THE COURT:  Can you ask him to make the attempt?

8              MR. BONIS:  Yes, I'll ask him.

9              THE COURT:  Because we've got a jury literally

10   sitting here waiting for him.  He's one of the last

11   witnesses before we can send this to the jury, and it needs

12   to go to the jury, I mean, as of tomorrow, but --

13             MR. BONIS:  I understand, but I'll certainly ask

14   him, your Honor.

15             THE COURT:  Okay.  Ask him to make every effort,

16   and tell him he'll be on the stand a very short time.

17             MR. BONIS:  I will, but I just don't know

18   logistically how this is going to work.

19             THE COURT:  Okay.  I appreciate it.  It changes my

20   entire approach and perspective.

21             Can we call you back in a couple of hours?

22             MR. BONIS:  Sure.  Is there any possibility we can

23   do this via telephone link?  I just don't know --

24             THE COURT:  A teleconference out of St. Louis, if

25   we could hook that up and beam him into the courtroom, I

```
 1    would certainly consider that to get the case moving.  And
 2    so if he could get back to St. --
 3                Ms. Hurst is shaking her head "no."
 4                Here is the problem.  Counsel both informed me
 5    that they can't get the original documents in front of him.
 6    That's the problem.
 7                MR. BONIS:  Okay.
 8                THE COURT:  And there was so much confusion at the
 9    last trial concerning what was created and the date of
10    creation on the original drawings that he has to be at least
11    be able to look at the original drawings.
12                MR. BONIS:  Okay.
13                THE COURT:  Okay?  So any help he can do, because
14    we are just literally just sitting here, thousands of
15    dollars a day --
16                I'm sorry, just a moment.
17                MS. HURST:  I was just suggesting that Mattel
18    should book a ticket for them so --
19                THE COURT:  Mattel is going to book the ticket for
20    them immediately.  It will be waiting for him at the
21    airport, but we need to coordinate with you, Counsel.
22                MR. BONIS:  No.  I understand.  Just let me talk
23    to him, your Honor.  Call me back this afternoon.
24                THE COURT:  Sure.  We'll call you back in two
25    hours.  Thank you very much.  We appreciate it.
```

```
 1              MR. BONIS:  Thank you.

 2              (Videoconference ended.)

 3              (Discussion held off the record.)

 4              THE COURT:  Okay.  Mr. Zeller, don't feed me that

 5    information off the record.

 6              MS. HURST:  Can I go get something to eat now?

 7              THE COURT:  Sure.

 8              MR. ZELLER:  Yes, your Honor, just very briefly.

 9    I just want to make it clear that we had contacted Mr. Bonis

10    some period of time ago to forewarn him that if the Court

11    would permit it, that we would anticipate potentially

12    calling Mr. Bryant back, and there was the rebuttal

13    case/defense case that was approaching.  So we -- what we

14    received, then, finally from Mr. Bonis last week, was a

15    message back saying that he would not do anything unless the

16    Court made a personal call, and that's what I conveyed to

17    your Honor and --

18              THE COURT:  Just a moment.  I'm going to complete

19    that record.  When did you convey that to the Court,

20    Mr. Zeller?  I'd like that on the record.

21              MR. ZELLER:  There is no question I did that on

22    Thursday, your Honor, after we heard back from Mr. Bonis.

23    He was not returning our calls.

24              THE COURT:  Just a moment.  Thursday night?

25              MR. ZELLER:  Yes.
```

1          THE COURT:  And what did I ask you to do

2     concerning all of your rebuttal witnesses?

3          MR. ZELLER:  Your Honor, you told us to prepare

4     in-camera questions.

5          THE COURT:  And why did I ask that?

6          MR. ZELLER:  So you can review them.

7          THE COURT:  Why did I want to review them?

8          MR. ZELLER:  So you could see what the subjects

9     were and whether or not the Court believes that we should be

10    able to call them.

11         THE COURT:  And that's the first time the

12    confusion came to light over Exhibit 5.  That's the first

13    time I was shown a binder that were black and white

14    duplicates that we said we would discuss that evening, and

15    neither Mattel nor MGA approached the Court that evening, so

16    weeks went by without this Court being notified.  I never

17    received those exhibits.  I never represented I would

18    receive those exhibits.  They were a series of duplicates.

19    The only thing I got from Mr. Price was, "Your Honor, is

20    this satisfactory?"  And I said, "Yes, we'll discuss that

21    this evening."  That was not a receipt.  I'm being

22    extraordinarily generous on this.

23         MR. ZELLER:  I understand.  I'm not -- I'm not

24    talking about any of that right now.

25         THE COURT:  Yes, you are.

1          MR. ZELLER:  No, I'm not.

2          THE COURT:  No, no.  You are setting a record, and

3    I'm going to set a record back, and the record really is

4    that you didn't get these files to the Court until Sunday,

5    and it was only, frankly, after I got frustrated, about

6    4:00, I didn't even know you had those prepared.  And then I

7    get a binder Sunday night.  I've been waiting -- were you

8    here Saturday?

9          MR. ZELLER:  Yes, we were, your Honor.

10          THE COURT:  Did I get the binder on Saturday?

11          MR. ZELLER:  I offered it.

12          THE COURT:  You did?

13          MR. ZELLER:  I did, your Honor.

14          THE COURT:  You did?  Well, no just a moment.  My

15    apologies to you.  If you offered that binder to me, you

16    have my apologies.

17          MR. ZELLER:  I did.

18          THE COURT:  I want that on the record.  I don't

19    recall that binder, but I accept that.  So let's clear the

20    record.

21          MR. ZELLER:  But your Honor, I'm actually not even

22    addressing any of that.  I simply wanted the Court to know

23    that we did not spring this on Mr. Bonis.  That was all I

24    was attempting to convey, that we had attempted to contact

25    him before all this arose, and I just didn't want the Court,

```
 1    particularly after Ms. Hurst was sort of suggesting that we,

 2    "we," Mattel, were somehow behind this.

 3              THE COURT:  No.  I have the feeling, now, that

 4    records are being set by Mattel and MGA and the time frames,

 5    et cetera, so you have to understand that the Court's been

 6    very helpful to you in terms of getting Carter Bryant here

 7    who wasn't even going to come.  And, quite frankly, you've

 8    neglected to comply, frankly, and you should have had the

 9    originals.  They were right there, right in the back, and

10    you moved in some drawings when you could have had the

11    originals, you neglected them, and you haven't given me any

12    time at all, Mr. Zeller, so I reached out the moment I

13    could, that was Sunday night, wasn't it that we placed the

14    call?

15              MR. ZELLER:  It was, your Honor, and I'm

16    absolutely appreciative of all that of the Court; there is

17    no question.  I am simply commenting that Mr. Bonis sounded

18    on the phone that this was sprung on him and it wasn't.

19    That was the only point I attempted to make.  It had nothing

20    to do with all that's happened with the Court.  We deeply

21    appreciate all of the work and effort that the Court has put

22    into this, including by talking to Mr. Bonis some more.  But

23    I just wanted it to be clear because he was suggesting that

24    the first time he had heard of this was when the Court

25    called him, and that's all I was attempting to correct.
```

Case 2:04-cv-09049-DOC-RNB   Document 10420   Filed 04/07/11   Page 48 of 101   Page ID #:316568
CV 04-9049-DOC – 04/05/2011 – Day 46, Vol. 3 of 5

48

```
 1              THE COURT:  I don't believe that.  I accept your

 2      representation that you talked to Mr. Bonis before, but you

 3      have to understand when you come to me on -- when you come

 4      to me on Thursday, and I'm asking you to prepare your

 5      exhibits and your rebuttals so I could see they are

 6      appropriate, both for Mattel and MGA, of course I'm willing

 7      to help.  I mean, it's extraordinary.  Judges never make

 8      phone calls, frankly.  And I couldn't reach out until I saw

 9      that rebuttal list.  And to this day, Carter Bryant is

10      coming back for a very limited information that, frankly,

11      both of you could stipulate to.

12              Now, what I've received out of your presence,

13      Mr. Quinn, Mr. Price, is I've just spoken to the attorney,

14      and Carter Bryant is more than willing to come.  He's out in

15      the boonies someplace, and the cell phone call got dropped.

16      So it's not avoidance.  It's the fact that he's been gone.

17              So under those circumstances, counsel is working

18      desperately, and you are ordered to get a plane flight in

19      order for him immediately.

20              MR. ZELLER:  We will.

21              THE COURT:  That's your responsibility.

22              And since we've been setting records back and

23      forth, do you want to say anything else, Mr. Zeller?

24              MR. ZELLER:  No, your Honor.  I simply --

25              THE COURT:  On behalf of MGA, do you want to say
```

1    anything?

2            MR. MC CONVILLE:  Just, your Honor, we don't

3    believe calling Carter Bryant, for whatever purpose, is

4    neither defense nor rebuttal, and if they need him for that

5    other piece of information, I'm sure there is somebody else

6    at MGA -- or at Mattel that could provide that information.

7            THE COURT:  Well, I think also Mattel is bringing

8    him back and, quite frankly, Exhibit 5 should never have

9    been referred to.  The original drawings were always

10   available to Mattel.

11           And Mr. Price, you apparently reached out to

12   Exhibit 5 when you had the original drawings right in the

13   back.

14           MR. PRICE:  That's what was produced to us at his

15   deposition.  That's what he referred to.

16           THE COURT:  All of the original drawings were

17   sitting back in the back, and all of the original drawings

18   came from the first trial.  And I don't see how comparisons

19   could be made, anyway, off of a black and white.  Most of

20   these are duplicates.

21           MR. PRICE:  Five is almost all black and white.

22           THE COURT:  All black and white, except for a few,

23   and 50 percent of them are duplicates.  40 percent?

24   42-and-a-half percent?  38.9?  I'm just kidding you,

25   Mr. Price.

 1          But I do think that regardless of the mistake that

 2   was made, and it was a mistake, frankly, that you ought to

 3   be entitled to get that in with the original drawings, so

 4   I'm bringing you back here, and that way Mattel won't suffer

 5   because of the lack of the original drawings.  Plus, I don't

 6   see how the jury can consider this unless they have the

 7   original drawings, quite frankly.

 8          Now, is there anything else that counsel would

 9   like to say?

10          MR. MC CONVILLE:  No, your Honor.

11          MR. PRICE:  No, your Honor.

12          MR. QUINN:  No, your Honor.

13          MR. ZELLER:  No.

14          THE COURT:  Okay.  Counsel, just a couple minutes,

15   then.

16          *(Recess.)*

17          *(The following proceedings is taken in the*

18      *presence of the jury.)*

19          THE COURT:  All right.  Then all counsel are

20   present, all parties.  The jury is present.  The alternates

21   are present.  The witness is present.

22          Please be seated.

23          Thank you for your courtesy, Counsel.  Please be

24   seated.

25          And this is Mr. Price continuing cross-examination

 1   of Mr. Malackowski.

 2            **JAMES MALACKOWSKI, DEFENSE WITNESS, RESUMED**

 3                 **CROSS-EXAMINATION (Continued)**

 4   BY MR. PRICE:

 5   Q    Mr. Malackowski, earlier I put up in front of you, it

 6   was 24784, which is Bratz Sports, and 36717, which is that

 7   MyScene Miami Getaway doll on a vespa; do you remember that?

 8   A    I do.

 9   Q    Okay.  And there seemed to be some confusion as to

10   whether or not those were products that you were matching,

11   and I'd like you to, if you could --

12            THE COURT:  No, no.  Those are appropriate.  It's

13   just that three went up in a row.  What you couldn't see,

14   there were three in a row, and finally this one went up, and

15   this is the appropriate one.

16            Now we've got it.

17   BY MR. PRICE:

18   Q    I just want to clarify that these are the two you're

19   comparing.  If you'd look at Exhibit 24311 --

20            MR. PRICE:  And is that in front of --

21            THE COURT:  There we go.

22   BY MR. PRICE:

23   Q    And do you have that in front of you?

24   A    I do.

25   Q    Do you see that's a trade secret chart filed by MGA?

1    A    It is.

2    Q    Okay.  And you had input in -- in this chart, correct?

3    A    I've reviewed the chart.  I relied upon the chart.  I

4    don't know if it's fair to say that I had input.  It's

5    ultimately a legal document.

6    Q    Okay.  Well, if you look at 26, 24311-0026; do you have

7    that in front of you, page 26?

8    A    Yes.

9    Q    And do you see there is a column that has the MGA

10   document or Mattel multi-media documents or other items that

11   reflect unauthorized use; do you see that?

12   A    I do.

13   Q    Which is the MGA, quote, "trade secret," correct?

14   A    Includes the MGA trade secrets, yes.

15   Q    And you see the bottom left, there is a picture there

16   of that Bratz Bowlin', 24784?

17   A    Yes, sir.

18          MR. PRICE:  And if we can show the demonstrative

19   again so we can make sure.

20          Okay.  It's up on the screen?

21   BY MR. PRICE:

22   Q    And then to the right, there is Mattel products that

23   reflect the unauthorized use of the secrets; do you see

24   that?

25   A    Well, there is one product of that line.  There are

1   other products as well.

2   Q    We are comparing these two.  And Column C, there is an

3   identification of the Mattel products that reflect

4   unauthorized use of trade secrets, right?

5   A    Well, that's one product.  There are other Miami

6   Getaway products that show tennis racquets or show exercise

7   outfits or other sporting goods.  They don't all have vespas

8   in them, so it includes a number of them.  There's some

9   right back here.

10  Q    But I need you to answer my question, which is the one

11  with the vespa that we've put up is -- it is one of the

12  products that MGA is saying reflects unauthorized use of

13  trade secrets, correct?

14  A    It is one of, yes, but it's not --

15  Q    That's not my question.  It's actually one of two shown

16  in this chart, correct?

17  A    It's one of two, but again --

18        THE COURT:  Sir, just answer the question.

19        THE WITNESS:  Yes, sir.

20  BY MR. PRICE:

21  Q    There seems to be some confusion.  So you now admit,

22  for example, as part of your damages analysis, the sales of

23  the MyScene Miami Getaway doll on a vespa is one of the two

24  products that was chosen for a comparison, at least from the

25  MGA trade secret chart?

1    A    It's one of two products in the chart.  It's one of

2    many products in the sales database.

3    Q    Okay.  And it would be possible based upon on your

4    chart for the jury actually to compare, would it, the

5    so-called MGA trade secret list and the Mattel product its

6    tied to?

7    A    Well, it would be possible to compare from this chart

8    these two products, but you would go back and look at the

9    other products as well to make the other comparisons.

10          MR. PRICE:  No further questions.

11          THE COURT:  Redirect by Ms. Keller on behalf of

12   MGA and Mr. Larian.

13                      **REDIRECT EXAMINATION**

14   BY MS. KELLER:

15   Q    As long as we are on the topic of these couple of dolls

16   that you were just looking at, Mr. Malackowski, during

17   Mr. Price's initial exam you were asked to look at a MyScene

18   Miami doll with a vespa and then a Bratz Sports doll,

19   correct?

20   A    Correct.

21   Q    And TA7 -- TA -- Trial Exhibit 17378 is a MyScene Miami

22   doll; is that right?

23   A    I need to check the number.

24          This one right here, yes.

25   Q    And there is no vespa in 17378, right?

55

 1   A     No.  This is a Miami Getaway MyScene doll that talks

 2   about, "Who says stylin' isn't a sport?"  And it says,

 3   "Sporty goes Glam."  So this is one of the same line of

 4   products that competes with the Bratz Sports.

 5   Q     Okay.  So you've got the Bratz sports themed products,

 6   and you have the MyScene Miami sports products, right?

 7   A     The Miami Getaway products, which includes a number of

 8   sports, tennis, cheerleading and the like.

 9   Q     Okay.  So is that -- is MyScene Miami sports theme and

10   the Bratz sports theme, those were competing dolls, correct?

11   A     Correct, that was my conclusion.

12   Q     And that's consistent with the analysis that you did

13   with Slide 33 that we saw a little earlier?

14   A     Yes, it is.

15   Q     Now, you weren't hired to compare dolls, right?

16   A     No, ma'am.

17   Q     You are not a doll expert?

18   A     I am not.

19   Q     And probably not even a guy who really enjoys dolls

20   that much?

21   A     I have a seven-year-old daughter who loves them, but

22   that's the extent of it.

23   Q     And in this courtroom, Mr. Price referred to our

24   limited time that we've got.  What you're telling us about

25   your conclusions and what they are based on, the basis for

1    your conclusions here, you've only been able to tell us a

2    little bit about the fraction of the actual work you did on

3    this case, right?

4    A    Absolutely.  There are many, many, many more notebooks

5    that describe the works we've done.

6    Q    And have you looked at hundreds or thousands of pages

7    of material?

8    A    Tens of thousands.

9    Q    And how many people altogether in your company have

10   worked on this project with you?

11   A    More than 10.  Maybe more than a dozen.

12   Q    And this is over a long period of time?  Roughly how

13   long?

14   A    More than six months, maybe closer to a year.

15   Q    So your conclusions, then, aren't just based on looking

16   at a couple of packages of dolls, right?

17   A    Of course not.

18   Q    Now, you were also asked a lot of questions about

19   individual items, and that's part of what's known as your

20   "bottom-up" analysis, right?

21   A    Yes.

22   Q    And "bottom-up" analysis means you just took all of the

23   individual products, and you looked at those as the basis of

24   your ultimate conclusions, right?

25   A    All the ones I could find.  There may be others, but

1   yes.

2   Q    And then the "top-down" analysis that you did, that was

3   based on looking at individual products and adding those up

4   that was based on overall sales data, right?

5   A    Correct.

6   Q    And the methods that you used to calculate these

7   damages, were these particularly controversial methods or

8   these methods that were used, for example, in business

9   valuation all the time?

10  A    Well, they are not controversial at all.  Both the head

11  start and the benchmark for apportionment analysis is used

12  in litigation of this type by me frequently, and the same

13  similar approach is certainly the benchmark used when you

14  make a valuation, an appraisal or even make investment

15  decisions.

16  Q    There was a Ferrari example that was used with respect

17  to your Slide 17; do you remember that?

18  A    Yes.

19           MS. KELLER:  And could we put Slide 17 up.

20  BY MS. KELLER:

21  Q    And I think Mr. Price's point is the red Ferrari is a

22  lot more popular than the green Ferrari, right?

23  A    That's exactly my point as well.  For example,

24  technology in an engine that someone stole from you, that

25  doesn't explain why the cars sold.  Some sold because of the

1    color and design of the car and other things, and it's no

2    different with Ferraris, frankly.

3    Q    And these dolls that you were looking at, they weren't

4    just identical dolls but different color flesh, right?

5    A    Clearly, they were all unique themes with particular

6    accessories and particular designs.

7    Q    So it's more akin to different models of a car rather

8    than the same car only in different colors, right?

9    A    I think that's true.

10   Q    And let's look at your final chart again, if we can,

11   the -- let's see.

12            MS. KELLER:  Mr. Stovall is always ahead of me.

13            Let's look at the 29th slide.

14   BY MS. KELLER:

15   Q    This is your conclusion on Mattel's damage, right?

16   A    Yes, it is.

17   Q    And can you go over that with us one more time?

18   A    Sure.  The chart is broken in three sections, as you

19   can see from the black horizontal lines.

20        The first section relates to the profits that MGA made,

21   or the unjust enrichment, the share that should be taken

22   away because of the intellectual property.  And I've

23   calculated that by looking at either the head start, or it's

24   called "discouragement of the MGA profits," the profits that

25   are not due to their sweat equity but the profits that are

 1    due to the drawings and the sculpts.  And then I've also

 2    calculated using the cost approach, the value of the name

 3    and the sculpt, so that represents one measure of damage.

 4        An alternative to taking away some of MGA's profits is

 5    to award Mattel's lost profits.  They are almost the

 6    opposite side of the same coin, but they are different.  And

 7    so for lost profits, I have calculated for copyright and

 8    trade secrets, the profits that are associated with the

 9    dolls, the drawings and the sculpts, and including the

10    demand factor.  Of the profits that's associated with the

11    drawings and the sculpt, what percentage of those would have

12    been kept by Mattel, because they wouldn't have kept them

13    all because there are other competitors in the marketplace.

14    And then I calculated the distribution that Mr. Larian

15    received for those same reasons.

16        And then there's a third section, which really stands

17    on its own, which is what is the benefit that Mattel

18    received trying to reduce its damages, its mitigation.  And

19    because the introduction of Bratz expanded the market and

20    the pie got bigger, significantly bigger, this is a very

21    unusual case where everybody benefited from that.  And, in

22    fact, the mitigation or the value of the profits on MyScene,

23    exceed the profits or the damages that were lost.

24    Q    And when you say the pie got bigger, it's because that

25    neglected older girl market was tapped into?

1    A    Really for the first time, yes.

2    Q    Okay.  So that's your analysis of Mattel's potential

3    damages in the event Mattel won the underlying liability

4    issue.

5         Now, let's turn back to Slide 3, and this is your

6    calculation of MGA's trade secret damages.  And you've

7    actually given two choices here, the bottoms-up choice is

8    actually the lower damages figure for MGA than the top down?

9    A    Correct.

10   Q    Okay.  And can you explain again what those two -- what

11   those two graphs represent?

12   A    Yes.  So now we're no longer talking about the Carter

13   Bryant drawings or sculpts.  Now we've shifted completely to

14   talk about the 114 products or trade secrets from the toy

15   fairs that are owned by MGA, and I measured their damage in

16   two ways.  One is to look at the sales of MyScene over time

17   and determine what those sales would have been had they not

18   entered the toy fair and received the alleged trade secrets.

19   And had they not done that, in my opinion, the sales and

20   profits would have been lower.  And the amount for the

21   top-down approach of 149 million to 202 million represents

22   that additional profit that Mattel made.

23        The second is the bottom-up approach.  This looks not

24   at the total picture but a subset.  It looks at those 26

25   products that I could find data for where I calculated the

1    head-start benefit, how much quicker did Mattel bring their

2    MyScene products to market because they had access to MGA's

3    trade secrets?  On average, it's about four months of

4    product, and when you calculate the head start on a

5    product-by-product basis and add it up, it totals

6    88 million.

7    Q    You were also asked a bunch of questions about how you

8    were doing calculations as recently as last week, or even a

9    few days ago.  Why was that?

10   A    As recently as yesterday.  What happened is there were

11   some matters with the Court on Thursday, and as a result of

12   that, there was an order for Mattel --

13            MR. PRICE:  Your Honor, I object for him to talk

14   about the order.

15            THE COURT:  It's sustained.

16            Through no fault by either party, the gentleman

17   received some information that he needed to complete his

18   calculations on --

19            Friday night?

20            THE WITNESS:  On Thursday night.

21            THE COURT:  Thursday night?

22            Counsel, will you both stipulate to that?

23            MR. PRICE:  Yes.

24            THE COURT:  Counsel, will you stipulate?

25            MS. KELLER:  Yes.

1          THE COURT:  All right.

2    BY MS. KELLER:

3    Q    And that information was information that you needed

4    from Mattel, right?

5    A    Correct.

6    Q    It wasn't that we gave it to you at the last second,

7    right?

8          MR. PRICE:  Your Honor, objection.  We've had the

9    stipulation.

10         THE COURT:  Yeah, we are going to enter a

11   stipulation.  I don't want this to reflect on other party.

12   Both experts, you should know, have been calculating and

13   recalculating.

14         Can we enter into that stipulation?

15         MR. PRICE:  Yes.

16         THE COURT:  So Mattel and MGA have both been

17   supplying information, both experts have been calculating

18   and recalculating, and it's no fault of either Mr. Wagner

19   and no fault of Mr. Malackowski.  They both got information

20   that helped them both with their calculations very recently,

21   and I think that's sufficient.

22         MS. KELLER:  Nothing further, your Honor.

23         THE COURT:  Is that acceptable?

24         MR. PRICE:  Yes.

25         THE COURT:  Counsel, is that acceptable?

 1              MS. KELLER:  (No audible response.)

 2              THE COURT:  Well --

 3              MS. KELLER:  I will -- whatever the Court wishes,

 4      your Honor.

 5              THE COURT:  Well, just a moment.

 6              Just one moment, Mr. Price.

 7              Stop the time clock running.

 8              MR. PRICE:  Pardon?

 9              THE COURT:  Stop the time clock running.

10          I don't want either expert to be damaged of their

11      opinion to you because of late information.  I don't want

12      you to be influenced.  It's the information itself that's

13      appropriate, and both experts have enough information to

14      calculate the damages, or at least to present their

15      viewpoint.

16          Remember, you don't need to accept the opinion of

17      any expert or either expert.  You'll be the jury and the

18      judge on this matter.  And I think for the time being, I'm

19      going to leave it with that posture for you, okay?

20          All right.  Mr. Price.

21                          **RECROSS-EXAMINATION**

22      BY MR. PRICE:

23      Q   Mr. Malackowski, you just said that you only did 26

24      products because you didn't have information on the entire

25      32, that 26 is where you found the data?

1   A     Actually, I found data on 22 extrapolated to 26.

2   Q     Okay.  I thought that you excluded those 6 from 26 to

3   32 because you found that monthly sales for those products

4   were either more than a year after the toy fair or there was

5   an overlap, for example in the pets products?

6   A     That's true, too.  I think you are confusing this

7   issue.  There were 32 that I found competitive information

8   on, 22 that I found actual sales data for, and I calculated

9   on 26 because I estimated 4.

10  Q     Right, but -- but -- the subtraction from the previous

11  32 -- you had it estimated for 32 at one point, right?

12  A     Yes.

13  Q     And you took those six off because the sales showed

14  sales more than a year where there was overlapping product,

15  right?

16  A     And to be very clear, it was sales of dolls more than a

17  year after the toy fair.  If it was sales of accessory

18  products with plastic molding and electronics, for example,

19  I didn't have that limitation.

20  Q     And you were asked about -- again about the MyScene

21  Getaway doll and vespa and whether that was many examples;

22  do you recall that question?

23  A     Of course.

24  Q     I just want -- if you look at 24311, that's that trade

25  secret chart, page 26?

1    A    I have it still.

2    Q    Okay.  And you see the picture, the only picture

3    there -- I'm not saying this is limiting.  I am just saying

4    that I didn't randomly select this.  The only picture there

5    is of a MyScene Getaway doll -- is a MyScene Getaway doll on

6    a vespa, correct?

7    A    That's true.

8    Q    And you were asked about the Ferraris, green, red,

9    yellow, which you know more about dolls, but you would agree

10   that a buyer in the market probably wouldn't have bought a

11   green Ford instead of a green Ferrari if it wanted a

12   Ferrari; you'd agree with that?

13   A    Of course, generally speaking.  Ford GT would be a good

14   example, but --

15   Q    Yeah, I meant to do a Mustang.

16        And with respect to sports-related themes, did you do

17   an analysis over the years to see how often Barbie has had

18   sports-related themes and what the cycle is and how often it

19   has sports-related themes over the years?

20             MS. KELLER:  Objection.  Beyond the scope.

21             THE COURT:  Sustained.

22             MR. PRICE:  He testified about sports themes.

23             THE COURT:  Well, what do you want to ask?

24             MR. PRICE:  Whether or not he did an analysis of

25   how often in the past Barbie has done sports themes and the

Case 2:04-cv-09049-DOC-RNB   Document 10420   Filed 04/07/11   Page 66 of 101   Page ID #:316586
CV 04-9049-DOC - 04/05/2011 - Day 46, Vol. 3 of 5

66

1    cycle.

2              THE COURT:  Ask the question.

3              THE WITNESS:  The only analysis I did in that

4    regard is to look at the invoices for the products at issue

5    on this exhibit to see if I could tell the differential

6    between vespas and tennis racquets and cheerleading outfits.

7    BY MR. PRICE:

8    Q    I am sure you could.

9         Thank you.

10             THE COURT:  Any other questions?

11             *(No audible response.)*

12             THE COURT:  Thank you very much, sir.  If you'd

13   step down, please.

14             THE WITNESS:  Thank you.

15             THE COURT:  And you are more than welcome to

16   remain in the courtroom because I think that, in a few

17   moments, MGA is resting.

18             THE WITNESS:  Thank you, your Honor.

19             THE COURT:  And Mr. Wagner will be testifying in

20   just a moment.

21             And one expert is allowed to be available when the

22   other expert testifies, so I think you are going to hear

23   from both of these gentlemen.

24             And I think I have a way we can solve the

25   equitable problems that came up over lunch in terms of time,

1    okay?

2           Counsel on MGA?

3           MS. KELLER:  Subject to the request for judicial

4    notice we filed this morning, MGA rests.

5           THE COURT:  I've been on the bench most of the

6    day, so I apologize I haven't gotten my mail.

7           MS. KELLER:  If we can just reserve that.

8           THE COURT:  It's reserved.

9           All right.  MGA is resting, and you are going to

10   be up and down a number of times today, so it's your

11   exercise.

12          If you'd go back to the back for just a moment.  I

13   want to talk to counsel about something that just dawned on

14   me that might help both counsel.

15          *(The following proceedings is taken outside*

16      *the presence of the jury.)*

17          THE COURT:  Now, have a seat for a moment.  I want

18   this on the record.

19          See if this would be fair to both sides, okay?

20          You know historically that I've often wanted

21   experts called back to back because I know that the jury

22   will readily understand what Mr. Wagner and what

23   Mr. Malackowski said.

24          *(Laughter.)*

25          THE COURT:  Both of them will be pretty clear to

1    the jury.  And -- but my thought is this:  Time is going to

2    be the time, but will this work for both of you?  Why don't

3    you both make an agreement since you both have to get your

4    experts on the stand, that's the requirement because that's

5    what you both wanted, your experts on the stand for rebuttal

6    and surrebuttal, that Mr. Wagner testify followed

7    immediately by Mr. Malackowski, and that way you'd know what

8    time you had remaining, because otherwise, you'll run into

9    the problem for surrebuttal of potentially having time run,

10   unless you are reserving it.

11           And then you, Mr. Quinn, would have a clear run

12   with whatever time you have, and it would, quite frankly,

13   make a lot more sense because that way the jury will

14   understand the back to back.

15           Now, you don't have to do that, but --

16           MR. MC CONVILLE:  Can we talk for a second, your

17   Honor?

18           THE COURT:  Sure.  And that way when they are back

19   to back, maybe we can make sure the jury is absolutely clear

20   about what's being said.

21           *(Attorney discussion held off the record.)*

22           THE COURT:  And if you don't want to agree, that's

23   fine.  It was just a suggestion.

24           *(Attorney discussion held off the record.)*

25           THE COURT:  That way nobody has to guess about the

1    time, because the only representation for the record by the

2    Court is that each of you would get your experts back up,

3    and you've read me a March transcript, to which I'll hold

4    to.  You'll have a chance to present your affirmative

5    defenses, but within the time period for both sides.

6             Now, the only disagreement, Mr. McConville, the

7    only disadvantage, of course, is the obvious one, because

8    you don't know what Mr. Wagner is going to say.

9             MR. MC CONVILLE:  Right.

10            THE COURT:  Mr. Wagner, do you know what you are

11   going to say?

12            I'm just joking with you.

13            *(Laughter.)*

14            THE COURT:  Excellent.  I am sure you will both be

15   clairvoyant.

16            So you can make that judgment determination after

17   he testifies if you want to.  You don't have to make that

18   judgment determination now.

19            MR. MC CONVILLE:  Okay.

20            THE COURT:  Okay?  And that way if you are caught

21   by absolute surprise, if you think Mr. Price has

22   misrepresented to you in some way, and there is some

23   earth-shaking new knowledge that's been forthcoming, I doubt

24   it, but -- okay?  And we can take a recess after that if you

25   want for 20 minutes or half an hour if you decide to go back

Case 2:04-cv-09049-DOC-RNB   Document 10420   Filed 04/07/11   Page 70 of 101   Page ID #:316590
CV 04-9049-DOC – 04/05/2011 – Day 46, Vol. 3 of 5

70

1    to back.

2            MR. MC CONVILLE:  Okay.

3            THE COURT:  That way everybody knows the time, you

4    all know what's left on the clock.  And it's the only thing

5    I think would be equitable without getting into what's

6    occurring, and that's because of posturing by both sides

7    that they need more time.  I knew what was coming.

8            MR. MC CONVILLE:  We don't need more time.  We are

9    happy with the time.

10           MS. HURST:  In fact, we want to give an hour back.

11           THE COURT:  Now, does Ms. Keller need to be

12   present?  I know she's ill.  And she doesn't need to be

13   present from my standpoint.

14           MR. MC CONVILLE:  Let me go check.

15           THE COURT:  Why don't we take 15 minutes and make

16   sure.  I think she's in the bathroom.

17           *(Recess.)*

18           *(The following proceedings is taken in the*

19       *presence of the jury.)*

20           THE COURT:  All right.  We are back on the record.

21           All counsel are present.  The alternates are

22   present.

23           And Counsel, thank you for your courtesy.  If

24   you'd please be seated.

25           MGA has now rested their case subject to some

1    discussions regarding some evidentiary items.  But to keep

2    the case moving, counsel have agreed to present the first

3    witness on behalf of Mattel.

4            MR. PRICE:  Yes, we call Michael Wagner, recall

5    Michael Wagner.

6            THE COURT:  Thank you, sir.  Will you raise your

7    right hand.

8        **MICHAEL WAGNER, PLAINTIFFS' WITNESS, RESWORN**

9            THE WITNESS:  I do.

10           THE COURT:  If you'd please be seated in the

11   witness box, and would you please introduce yourself to the

12   jury.

13           THE WITNESS:  My name is Michael Wagner, and I'm

14   the damages expert for Mattel.

15           THE COURT:  Thank you.

16           Counsel, Mr. Price.

17                    **DIRECT EXAMINATION**

18   BY MR. PRICE:

19   Q   Mr. Wagner, first let me ask you, you recall you did

20   a -- a calculation for damages equal to Mattel's lost

21   profits as a result of Bratz, correct?

22   A   I did.

23   Q   And in doing that calculation of lost profits, did you

24   take into account Mattel's -- the decline of Barbie in the

25   marketplace that was otherwise going on?

1   A     I did.

2   Q     And could you -- do you have the slides in front of you

3   or --

4   A     I do not, but I know it's Slide 11.

5             MR. PRICE:  If we can put up 24294-0011.

6   BY MR. PRICE:

7   Q     This is the chart we showed on the Barbie actuals and

8   lost sales in 2001 through 2009, correct?

9   A     It is.

10  Q     Can you explain to me how your analysis of Barbie's

11  lost profits takes into account what else was going on in

12  the marketplace at the time?

13  A     Well, the blue bars are the actual sales of Barbie in

14  each year of the damage period, and the red portion on top

15  of the bars are the lost sales that I'm estimating.  And

16  even when you look at the total bars, clearly you can see

17  those are declining, and my methodology did incorporate the

18  fact that Barbie was losing market share during this entire

19  time period.

20  Q     Let me ask you about Mr. Malackowski's analysis.

21            MR. PRICE:  If we can go to -- it's 37189, and

22  there's a top-down analysis at 37189-0004.

23  BY MR. PRICE:

24  Q     Now, do you have any issues -- now, this is

25  Mr. Malackowski's damage analysis, assuming that Mattel

1    stole and used trade secrets.  Do you have any issues with

2    this analysis?

3    A    I have a number of issues, yes.

4    Q    Could you explain them to me, please.

5    A    Yes.  First, how he arrived at the real core of what I

6    call this damage analysis, and it was somewhat explained in

7    his cross-examination of how he assumed that but for the

8    theft of the trade secrets, the sales of MyScene in 2003

9    would have been $100 million, and the actual sales of

10   MyScene in 2003 is 166 million.  And he assumes that the

11   only thing that explains the difference between those two

12   sales numbers is the theft of the trade secrets, and I don't

13   believe that's correct, based on the methodology that he has

14   employed.

15   Q    So that blue area, then, going forward, how is that

16   calculated?

17   A    Well, he then -- the top down one uses three different

18   Mattel doll lines for the older girls and looks at their

19   track record and uses that to predict what would happen to

20   MyScene.

21   Q    So getting back into that 2003 core assumption, do you

22   have any understanding as to why Mr. Malackowski allocated

23   66 million of the 166 million of sales in 2003 to MGA?

24   A    Well, I understand how he did it, which was on

25   Exhibit 18-4 of his work product, but I don't understand how

 1    that explains that those sales would all be attributable to

 2    the trade secrets.

 3    Q    And why do you say that?

 4    A    That is just the mechanical approach.  He assumed and

 5    he tried to calculate basically a steady amount of sales in

 6    2003 as existed in 2002, adjusting for the fact that 2002

 7    wasn't a full year of sales.  And there's really no basis to

 8    do that.  He had two yardsticks that bracketed that hundred

 9    million that he believes supports that calculation; I don't

10    agree with that.

11    Q    So for 2003, then, what he did was basically do 2002

12    again but assume it was a full year?

13    A    That's what he attempted to do, yes.

14    Q    And he said that would be the amount tripled to

15    Mattel's efforts, right?

16    A    Correct, he assumed that without the theft of the trade

17    secrets, sales would be flat between year one and year two.

18    Q    So anything over that hundred million that would have

19    been a full year of 2002, anything over that hundred million

20    in 2003, he allocates to MGA?

21    A    Correct.

22    Q    And then just uses a -- a -- a growth factor to go

23    forward, right?

24    A    That's what he does.

25    Q    And he says -- he brackets it by using Mattel

1    documents.

2         I'd like you to look at Exhibit 24733-10.  It's 24733,

3    and then it's page -00010.  Is this one of the bracketing

4    documents you're referring to?

5    A    It is.

6    Q    Okay.

7         MR. PRICE:  And I think this is already in

8    evidence, your Honor.  If we could put up the first page,

9    24733-1.

10   BY MR. PRICE:

11   Q    And this is a MyScene analysis; do you see that?

12   A    I do.

13   Q    And then go to page 10 --

14        MS. HURST:  This is not in evidence, your Honor.

15        MR. PRICE:  It's not?

16        THE COURT:  I was going to say that's not in

17   evidence.

18   BY MR. PRICE:

19   Q    In that case, just look at page 10, you heard me

20   discuss this with Mr. Malackowski during the cross?

21   A    I did.

22   Q    And could you tell us why you believe this would not be

23   a basis for assuming that 2003 sales would be the same as

24   2002.

25   A    Well, the main reason is that there is a prediction of

1   about $116 million worth of sales, and Mattel tried to

2   estimate these sales both in the United States and in the

3   international market, and about $67 million of the sales

4   would be in the U.S. and about 40- --

5           MS. HURST:  Your Honor, I object.  Move to strike.

6   He's publishing the hearsay documents that's not in

7   evidence.

8           THE COURT:  You can respond to the other expert.

9   I'll allow you to.

10          THE WITNESS:  Thank you, your Honor.

11          And about 49 million is international sales, so I

12  want to understand really before the year 2003 is happening,

13  they are actually making sales, where they are predicting

14  their sales are going to be.  And then I want to look at

15  what actually happens in 2003, because if their theory is

16  correct, the trade secrets used in all of the sales of the

17  MyScene SKUs that are at issue, and those sales are

18  occurring both in the U.S. and international, and you expect

19  this increase in sales to be the same in the U.S. and the

20  international, if that's their only explanation for this

21  increase, and I found that was not true.

22  BY MR. PRICE:

23  Q    And this -- this projection of 116 million, was that

24  before the supposed theft of trade secrets?

25  A    It was.  It was early -- it's actually very late in the

Case 2:04-cv-09049-DOC-RNB   Document 10420   Filed 04/07/11   Page 77 of 101   Page ID #:316597
CV 04-9049-DOC - 04/05/2011 - Day 46, Vol. 3 of 5

77

1    year 2002.

2    Q    So what's the other -- so late 2002 there is a

3    projection that the 2003 sales would be 116 million,

4    correct?

5    A    That's correct.

6    Q    Have you seen projections for MGA from your one year to

7    two for Bratz?

8    A    Yes.

9    Q    And what did those show?

10   A    It showed a significant expected increase in sales

11   between the first year and the second year.

12   Q    And was it more than expected?

13   A    It was much more than expected.

14   Q    So you've got the 116 million projection in late 2002.

15   What's the other document that Mr. Malackowski used to

16   justify his hundred-million-dollar figure?

17   A    He used a document prepared in November of 2003 that

18   was discussing the entry of Bratz into the marketplace.

19   Q    And that's to the 1805.  If you'd look at page 6.

20        And what is your -- your issue with Mr. Malackowski's

21   using 01805?

22   A    Well, this document in the fourth paragraph down

23   says -- at least there is a figure of $85 million in sales

24   in 2003, and if Mr. Malackowski had really understood the

25   purpose of this document and the date it was prepared, he

1    would know that there's no way in the world when this is

2    one-and-a-half months before the end of the year, Mattel is

3    going to know what its sales are basically in 2003, and we

4    know their actual sales are 166 million.  There is no way in

5    the world that late of the year they are going to be

6    predicting their total worldwide sales around 85 million.

7    And if someone was doing that, they didn't have access to

8    the actual information, which I doubt.

9        This is actually very close to the U.S. sales number

10   that actually occurred, and I believe actually this is just

11   U.S. sales.  Even though the sentence -- the next sentence

12   talks about worldwide, I believe that was a reflection of

13   their estimate for only the U.S. sales from MyScene in 2003,

14   because it's only prepared a month and a half before the end

15   of the year.

16   Q    So if you go with Mr. Malackowski's interpretation,

17   Mattel was projecting more sales before it went to the toy

18   fair than it was after?

19   A    That's correct, after 11 months of very successful

20   sales during the year.

21   Q    And does that make sense to you?

22   A    It doesn't make sense to me.

23   Q    Now, if we go back to page 4 of 37189-0004, after

24   allocating 66 million to MGA in 2003, how does

25   Mr. Malackowski then arrive at this growth rate?

1  A    Well, he looks at what is the actual growth rate in

2  years one, two and three for three other product lines that

3  Mattel sold, and that was Generation Girls, Diva Starz and

4  Flavas.

5  Q    Is that fair?

6  A    I don't think so.  It is, I agree, also dolls to older

7  girls sold by Mattel, but they are very different dolls from

8  MyScene.  They did not have the creative genius that MyScene

9  had.  They did not look the same as MyScene, and assume that

10 those other three product lines are what would have been

11 MyScene sales, I don't think is fair.

12 Q    Does Mr. Malackowski adjust in any way for whether or

13 not MyScene is just a better doll design than Generation

14 Girls, Diva Starz or Flavas?

15 A    He does not.

16 Q    Now, Mr. Malackowski testified that he took into

17 account Mattel's sweat equity, that is the amount of work

18 that went into making the dolls he says were done because of

19 the trade secrets.  Do you believe that Mr. Malackowski took

20 into account sweat equity?

21 A    He clearly did not, based on this analysis.

22 Q    And why do you say that?

23 A    Well, just look at the last three years of this damage

24 analysis.  And he had stated that one of the reasons why his

25 rate for trade secrets of 12 percent allocation is smaller

Case 2:04-cv-09049-DOC-RNB   Document 10420   Filed 04/07/11   Page 80 of 101   Page ID #:316600
CV 04-9049-DOC - 04/05/2011 - Day 46, Vol. 3 of 5

80

1    than 20 percent is because trade secrets span a longer

2    period of time and give MGA more chances to develop their

3    themes, their sweat equity, so over time is clearly lower.

4    But look at this analysis.  The last three years of this

5    damage claim, he gives zero sweat equity to Mattel.  That

6    makes no sense if you believe his approach is valid when he

7    does it for his client.

8         So clearly this can't reflect any sweat equity in the

9    years where he calculates significant damages, and that's

10   the out years, after Mattel in a lot of their SKUs are not

11   accused -- are developing themes and ideas and refreshing

12   their product line.  He gives them zero credit for that, and

13   that is not reflected in the sweat equity.

14   Q    But does he subtract sweat equity when he calculates

15   Mattel's damages?

16   A    He does.

17   Q    So he doesn't do it in calculating MGA's, what they are

18   trying to get from Mattel, but he does subtract it from

19   calculating what Mattel should get from MGA?

20   A    Well, I don't want to speak for Mr. Malackowski.  I

21   think he believes he takes it into consideration, but just

22   looking at his results tells you that can't be true.

23   Q    If you'd look at page 2 of 37189, do you see where this

24   has the list of alleged trade secrets, and in 2006, it has

25   one, and that's Bratz Diamondz; do you see that?

1  A    I do.

2  Q    Okay.  And do you recall the damages analysis included

3  something called a "head start," that is seeing that

4  information would give you a head start in going forward; do

5  you remember that?

6  A    I do.

7  Q    So if we go back now to 37189-0004 -- so the last trade

8  secret that was used according to Mr. Malackowski's chart

9  was in 2006, right?

10  A    Right, and it's only one and -- one SKU, one product

11  within the MyScene product line.

12  Q    And so using a head-start analysis, assuming there was

13  a head start of four months, would you expect these damages

14  that he's -- he's awarding here or suggesting?

15  A    No.  I would think that the damage should stop in 2007,

16  and everything that's in the blue bar, the dark blue bar,

17  actually should be the light blue bar.

18  Q    Now, let me ask you about the -- the top-down approach,

19  Top-Down 2, which is 37189-0005, and this one again starts

20  with that analysis in 2003?

21  A    It's identical.  He does the $66 million worth of what

22  he believes are unjust sales, the exact same methodology.

23  Q    So what's the only difference after 2003, then?

24  A    That he actually uses MyScene's actual growth rates to

25  both his higher data point of 166 million and his lower data

1   point of 100 million after he does adjust for two product

2   lines that he believes stole trade secrets, which was Bling

3   Bling and Chillin' Out.

4   Q    And what issues, if any, are there with that analysis?

5   A    Well, if you start from the wrong point, this analysis

6   is not going to give you a good answer.  And also it assumes

7   you really are never going to completely catch up.  It's

8   really not a head start because mathematically, these lines

9   will never converge; damages will go on forever.

10  Q    And you said if you start with the wrong point, that

11  being --

12  A    That being -- there's actually $66 million worth of

13  additional sales in 2003 because of the theft of some themes

14  in some trade shows.

15  Q    That's calculations that you disagree with?

16  A    It is.

17  Q    Now, let's talk about the bottom-up approach.

18        MR. PRICE:  And if we can go to Slide 10.

19  BY MR. PRICE:

20  Q    And first, Mr. Malackowski testified that he could only

21  find revenues of the 22 out of the 26 products where he made

22  a match, or someone made a match between Bratz and MyScene

23  revenues.  Were you able to find revenues?

24  A    I could find revenues for 31 out of the 32 product

25  lines.

1    Q     Why couldn't you find revenues for the other one?

2    A     Because it's not a product that Mattel sells.  One of

3    these products is actually a cell phone, and Mattel doesn't

4    sell cell phones.  You have to go to a telecom company to

5    buy a cell phone, and a manufacturer like Nokia to actually

6    get this Mattel product.  So this is a licensed product.  So

7    you are not going to find sales revenues of this product.

8    And then to calculate that like he does all of the other

9    product lines, it's just wrong.

10         You shouldn't have done that.

11   Q     So what issues do you have with respect to the -- if

12   any, with respect to the head-start analysis?

13   A     Well, first off, he says he only got revenue

14   information for 22.  He had revenue information for 28, and

15   what he did, though, is what he found -- he just did get

16   this information recently, and I'm not faulting him for

17   that, but he now realized that for six of his product lines,

18   his heads-up theory didn't make any sense, so he dropped

19   them from the damage claims.  But as far as the head-start

20   damages, for trade secret damages to have any meaning at

21   all, the trade secret has to remain secret.  That's why it's

22   called a "trade secret" damage.

23         Mr. Malackowski had a very mechanical approach for

24   every one of these products that he calculates damages for.

25   The date of the theft of the trade secret is the toy fair

1   for that particular year for that product, and his date of

2   when the public disclosure would occur is always just the

3   first invoice date for that product by MGA when they

4   introduced it to the marketplace.  But there are other

5   events that could make the trade secret not secret if there

6   is other ways it becomes public, he didn't take that into

7   consideration on any of these product lines, and that's why

8   I have a major disagreement with this approach.

9   Q    So I guess what you are saying to the extent

10  Mr. Malackowski looked at articles or -- or press reports,

11  he should have done some analysis to see if that affected

12  the head start?

13  A    Well, I heard his testimony that he did look at that

14  information, and it did impact his opinion, but I don't see

15  how it he took it into consideration.  He didn't adjust any

16  of these damage claims differently.  Every damage claim is

17  calculated exactly the same way.  You have slightly

18  different numbers because in the real world, some of these

19  were more successful than other products, but the approach

20  is identical for all products.  And nowhere does it reflect

21  that there is any public information that enclose either all

22  of the trade secrets or some of them.  He didn't reduce his

23  calculation in any way.

24          *(Attorney discussion held off the record.)*

25

1    BY MR. PRICE:

2    Q    So I don't know if this is in your binder or not, but

3    let's find out.

4         So for example, one of the Bratz -- if you look at

5    37189-0003; do you have that?

6    A    I don't.

7    Q    I'm sorry, 37189, it's Mr. Malackowski's slides?

8    A    Oh, I'm sorry.  I have his slides, I'm sorry.

9    Q    And it's page 33-00033.

10   A    I have that, I'm sorry.  I have that document.

11   Q    And one of the items that he talks about is, for

12   example, Lil' Bratz Loungin' Loft; do you see that?  That's

13   under "competitive intelligence trade secrets"?

14   A    I do.  It's the top one.

15   Q    And if you would look at Exhibit 20943, and

16   particularly at page 2 and 3.

17            MR. PRICE:  And this is in evidence, your Honor.

18   BY MR. PRICE:

19   Q    Do you see this is an article "Fashion Doll Scene"?

20   A    I do.

21   Q    And page 2 talks about Lil' Bratz; do you see that?

22   A    I do, and it talks about Lil' Bratz Loungin' Loft as

23   well.

24   Q    And it talks about that being a fold-out doll house; do

25   you see that?

1   A    I do.

2   Q    Okay.  And then if you look at the -- the -- and it

3   even talks about Lil' Bratz with the vespa scooter and

4   Loungin' Loft with six rooms, lots of accessories, accessory

5   sets, furniture, textiles, et cetera; do you see that?

6   A    It does.  It says that all on page 2 and then pictures

7   on page 3.

8   Q    And the date of this is January 7, 2003?

9   A    Yes.  This is the month before the toy fair where these

10  alleged trade secrets were taken.

11  Q    And there is another exam there in his chart, a Girls

12  Nite Out, and that's one, two, three, four, five, six --

13  seven down from the chart?

14  A    It is.

15  Q    And if you look at Exhibit 20261.

16       And in particular page 2.

17  A    Could you repeat the exhibit number, please?

18  Q    Yeah, 20261-0002.

19  A    The tab I have just has one page, so it might be in the

20  wrong tab.

21  Q    Okay.  Well, the top -- this is in evidence.  It

22  appears to be a business wire about MGA Entertainment with

23  new doll lines.  And do you have page 2?

24  A    No, I don't have the right -- I don't have the right

25  document here in front of me.

```
 1              MR. PRICE:  May I approach, your Honor?

 2              THE COURT:  Certainly.

 3              THE WITNESS:  I have it now, thank you.

 4   BY MR. PRICE:

 5   Q    Do you see if has "Girls Nite Out" on the second page?

 6   A    It does.

 7              MR. PRICE:  And this is in evidence, your Honor.

 8              And we can show page 2.

 9              There we go.

10   BY MR. PRICE:

11   Q    That's the part where it describes the product?

12   A    There is a paragraph that describes what Girls Nite Out

13   is.

14   Q    And what's the date of that?

15   A    It's February 11th, 2004, right before the 2004 toy

16   fair.

17   Q    Okay.  So did you go through his list on page 33 of --

18   of his charts of -- I'm sorry, 37189, and check to see

19   whether there were some already out or more than a year

20   later or -- or had publicity; did you do that kind of

21   analysis?

22   A    I did.

23   Q    Okay.  Could you tell us what you found?

24   A    Well, what I found is that out of these 26 products

25   that 7 of the products that are accused, Bratz actually
```

Case 2:04-cv-09049-DOC-RNB   Document 10420   Filed 04/07/11   Page 88 of 101   Page ID #:316608
CV 04-9049-DOC - 04/05/2011 - Day 46, Vol. 3 of 5

88

1    introduced their product before the toy fair.  That means

2    clearly you know what the product looks like.  You clearly

3    know what theme they are in, you can find information of

4    what the sales prices are.  So all that information is

5    available before the toy fair.  For five of the products, I

6    found that Mattel actually sold the, quote, "matched

7    product" before the toy fair, so clearly they didn't get the

8    idea for that product from sneaking into a toy fair.

9        I found another five products that Mattel actually

10   started developing the product they introduced on the date

11   again before the toy fair existed, so clearly they were

12   thinking about that product before the toy fair.

13       I found one product where the product development did

14   not begin until after the first sale of the Bratz product,

15   which was the key public event that Mr. Malackowski uses.

16            MS. HURST:  Your Honor, is this now a liability

17   expert?  I'd like to move to strike all of that.

18            THE COURT:  It's the same problem for both of you.

19            We've gone far beyond these experts in economic

20   damages, as you can see.

21            But why don't we just finish this off, okay?  And

22   Counsel, I'll just open up this area.

23            MS. HURST:  Well, your Honor, I mean, it's just --

24            MR. PRICE:  It's a head start, that's his

25   analysis.

```
 1              MS. HURST:  No.  This is liability testimony.
 2              THE COURT:  Yeah.  Let's just finish this off
 3    quickly, okay?
 4              Counsel?
 5    BY MR. PRICE:
 6    Q    Go ahead.
 7    A    Then I find five products that Mattel's, quote,
 8    "competitive," or similar product, were introduced more than
 9    a year after the Bratz first invoice, so clearly they had
10    time to develop those products.
11              THE COURT:  Let me caution you, this is not for
12    the truth of the matter asserted, and either of the experts
13    testifying in this regard is not for the truth.  This is the
14    basis of his opinion concerning damages, and it's for that
15    limited purpose.
16              Counsel?
17              MS. HURST:  Your Honor, this is all based on
18    hearsay.  I really have to move to strike because there is
19    no basis for the opinion.
20              MR. PRICE:  He's an expert on what the head start
21    is.
22              THE COURT:  I'll let you continue, Counsel.
23    BY MR. PRICE:
24    Q    I'm sorry.
25    A    There's two products where there is public disclosure
```

Case 2:04-cv-09049-DOC-RNB   Document 10420   Filed 04/07/11   Page 90 of 101   Page ID #:316610
CV 04-9049-DOC - 04/05/2011 - Day 46, Vol. 3 of 5

90

1    before the toy fair, which I think we've been over right

2    before these questions.

3    Q    Let me ask you, is there overlap?  I know you did the

4    analysis and came to the public disclosure.  Is there

5    overlap in that?  In other words, are there news articles,

6    press releases for more than two?

7    A    Yes, actually there are -- on many of these products,

8    there are multiple reasons why there was public information

9    before the date of first invoice.

10   Q    And what else did you find in looking at the head

11   start?

12   A    I've now basically eliminated 25 of the 26 products.

13   The only product that I have not eliminated is Chillin' Out

14   that I can find no information in the record or from public

15   sources that Mattel would have found out about that theme

16   before the first sale.

17   Q    And that's assuming that Mattel used some information

18   to do Chillin' Out?

19   A    Clearly, and I'm not making -- I can't make that

20   determination, but I would assume that MGA could establish

21   that.

22   Q    So you are assuming that is a trade secret?

23   A    Yes.

24   Q    And that's what's revealed in toy fairs is a trade

25   secret for this analysis?

1    A    I am.

2    Q    So I think on MyScene Chillin' Out, there is a

3    $5.8 million in damages; do you agree with that?

4    A    I do not.

5    Q    Why not?

6    A    Because Mr. Malackowski I don't think included all of

7    the costs that he should even if you believe his calculation

8    of head-start revenues is appropriate.  He didn't subtract

9    one penny of design cost for this product, and Mattel

10   designed this product, and it's clearly in their accounting

11   records.  He doesn't have one penny of sales, general and

12   administrative expenses in this calculation, and he also has

13   no cost related to licensing this product.  All of those

14   areas I believe you need to establish the incremental costs

15   to do this product line, and since he did not put any costs

16   in, I think he has overstated the lost profits.

17   Q    So if the Bratz product came out before the toy fair,

18   or if there was a press release or -- or news article about

19   the product before -- before the toy fair, that if Mattel

20   was in the mind to copy, it wouldn't have to wait until the

21   toy fair to learn about it, right?

22   A    I believe that's correct.

23   Q    And you said for a number of those, the Mattel product

24   came out much later.  How does that impact your view as to

25   whether or not there should be damages awarded for that,

1   assuming there was a trade secret?

2   A    Well, the design cycle of Mattel is far shorter than a

3   year for a new them.  It's not a new doll line.  It's just a

4   theme.  And they could easily have developed that theme

5   within a year of seeing that product in the marketplace

6   being sold by Bratz.

7   Q    Let me talk to you now about -- by the way, do you

8   think that Mr. Malackowski's bottom-up approach supports or

9   refutes this top-down analysis?

10  A    Well, I think it refutes it.  These are the products

11  that they have been able to identify that possibly benefited

12  from trade secrets, and even if you accepted his number,

13  it's significantly lower than his top-down approach, which

14  really does not have what I believe is a firm foundation as

15  to the starting point of his analysis tied to the facts of

16  this case.

17  Q    So let me ask you something about his comments on --

18  well, his analysis of what Mattel's damages would be,

19  assuming that Mattel prevails.

20       And I want to first start with his head-start analysis

21  for -- for Bratz, and I think that's on Slide 14, it kind of

22  gives the concept.  And do you have any issues with respect

23  to this measure of damages, assuming that Mattel had the

24  trade secret of the Bratz dolls and that that was given to

25  Mr. Larian, and that Mr. Larian exploited that -- that to

1   make profit?

2   A    I do.

3   Q    And what are your issues?

4   A    That Mr. Malackowski is assuming that if Carter Bryant

5   had not disclosed this information to MGA, that by just

6   looking at Diva Starz, a product that was not successful at

7   all, that somehow MGA would come out with the second most

8   successful doll line in the history of the world.  When the

9   evidence is that this is the very first fashion doll MGA

10  ever sold, so they have no track record in this industry.

11  And to make that assumption, there could be only a

12  five-month delay in developing a product that would have the

13  same level of success as Bratz does not make sense to me.

14  Q    And now we talked about the head start, and, of course,

15  he calculates that on page 15, and that's where he says the

16  total damages using this analysis, assuming MGA is liable,

17  is $7.23 million; do you agree with that?

18  A    No.

19  Q    And why not?

20  A    Well, again, I don't believe that even if you believe

21  MGA would have come out with another fashion doll, you would

22  have anywhere near the success of Bratz, and unless you make

23  that assumption, this damage claim makes no sense.

24  Q    Well, let's go to his next issue, which is

25  apportionment, and I'd like you to take a look at page 16

1   and 17.  And you see he uses this analysis, or he talked

2   about this analysis in terms of the impact of the trade

3   secret nature of -- of -- of Mr. Bryant's work as compared

4   to sweat equity, or something like that.  Do you read this

5   data to support a conclusion that very little of Bratz

6   success is due to the intellectual property?

7   A     I don't.

8   Q     And why not?  Could you explain?

9   A     I agree with Mr. Malackowski that in the real world

10  when you develop different themes or different styles or

11  different clothing for these dolls, some are going to

12  resinate and some are not.  And all this shows is that the

13  sweat equity of MGA sometimes works and sometimes doesn't,

14  but the core of this Bratz doll is what I understand is what

15  Mattel is alleging was taken from them, and that's common to

16  all of the dolls.  So I'm not troubled by the fact that

17  there is some variability.  I would expect it.  I would

18  never expect that every single doll would be just as

19  successful as every other one within the same doll line.

20  That's true at Mattel, not every Barbie theme is successful,

21  but the reason why people buy Barbie dolls is because it's

22  an icon in the industry, and it resinates with young girls.

23       And I think that's also true for Bratz.  The Bratz

24  concept resinated.  It was the right doll at the right time.

25  And I think the only thing that's uncommon with all these

1    themes is that core idea.

2    Q    But when Mr. Malackowski then goes into his analysis of

3    what Mattel's damages would be, he does something called an

4    apportionment factor; that is, trying to apportion sweat

5    equity versus intellectual property, correct?

6    A    He does, and that's on his Chart 18.

7    Q    And if -- before we get to 18, if you'd look at 19,

8    just so we can see how that works, you see -- now, this is

9    for unjust enrichment, that is for what MGA made that it

10   should discourage, right?

11   A    He does.

12   Q    Okay.  And here we have, for example, MGA profits, and

13   under trade secret, I'll select that one, for example, it

14   says first four characters, it shows a profit of $273.7

15   million; do you see that?

16   A    I do.

17   Q    Now, would -- if you made the definition broader, that

18   is, if you found that the unique combination Carter Bryant

19   brought to MGA, assume that was a trade secret, and assume

20   that, you know, MGA wouldn't have sold the subsequent

21   generation dolls, and made the subsequent dolls but for

22   knowing that, would that number have increased?

23   A    It would.

24   Q    And how so?

25   A    Well, if you make the assumption that the later

1  generations of the doll would not have existed but for the

2  success of the earlier dolls, then they are all related.

3  It's -- it's approximate causation.

4  Q    Now --

5        MS. HURST:  Your Honor, I object and move to

6  strike that as a legal conclusion and the ultimate issue for

7  the fact-finder.

8        THE COURT:  Counsel, it appears to be, doesn't it?

9        MR. PRICE:  Let me rephrase it.

10       MS. HURST:  Can I have that stricken, your Honor?

11       THE COURT:  I'll strike the answer and strike the

12  question.

13 BY MR. PRICE:

14 Q    Why did you use -- in your analysis, why did you look

15 beyond the first four characters?  What was your rational?

16 A    My rational, and I have to look at, as a damage expert,

17 both the causation of the damages based on the liabilities

18 that are at issue and the amount of damages.  And based on

19 my professional experience and judgment that the subsequent

20 generations, all accessories, none of those would have been

21 sold in the quantities they were but for the success of the

22 first generation of these dolls.

23 Q    Now, if we go to this apportionment factor, after

24 arriving at a number, he only then gives a certain percent

25 of, in this case, MGA's profits; do you see that?

1   A    I do.

2   Q    And the rational for that is contained on page 18?

3   A    It is.

4   Q    And to lower that apportionment factor number, the less

5   that Mattel would keep of MGA's profits, right?

6   A    That is the mathematical effect.

7   Q    So if we look at page 18, do you believe that this is

8   an appropriate methodology of -- of quantifying what MGA's

9   sweat equity was with respect to MGA's profits?

10  A    Well, these five different methods or allocation

11  factors are appropriate.  I don't think they are

12  appropriately applied by Mr. Malackowski.

13  Q    So let's talk about the application, then.  Tell us why

14  you don't think these were properly applied.

15  A    Well, we could lump the first three into one criticism.

16  All of them require in the numerator of his calculation to

17  get his fraction or his percentage, the same number, and

18  that's the royalty rate that Mr. Carter (sic) negotiated the

19  use of his ideas by MGA, and that rate was 3 percent.  What

20  you have to appreciate is that --

21  Q    Let me stop you because I made the same mistake

22  numerous times.  You mean Mr. Bryant?

23  A    I'm sorry.

24  Q    You said Mr. Carter.

25  A    I'm sorry.  Mr. Bryant.

1    Q    Which I do all the time.

2         And so these calculations lead to a percentage, a

3    division of some sort, right?

4    A    Right, it's a numerator divided by a denominator.

5    Q    And this is supposed to be calculated in the but-for

6    world, assuming these are Mattel's trade secrets, correct?

7    A    Correct.

8    Q    Then how do you -- how do you allocate, correct?

9    A    Correct.

10   Q    So this is assuming that Mr. Bryant doesn't own those

11   secrets, right?

12   A    That is correct.

13   Q    So the first three methods, though, as the numerator,

14   you use 3 percent, which is what -- could you tell us what

15   you use?

16   A    Yes, it's the 3 percent rate that Mr. Carter (sic)

17   negotiated with Mr. Larian --

18   Q    Bryant.

19   A    -- to pay him for the use of this intellectual

20   property.

21        Mr. Bryant.

22   Q    Thank you.  Numbers, but not anything else.

23        So if that 3 percent in the but-for world, if Mattel

24   were going to license this property, is it your belief

25   Mattel would have only been able to get the same royalty

1    rate that Mr. Bryant got, using -- under the assumption,

2    using property that didn't even belong to him?

3    A    No.

4    Q    And why is that?

5    A    First off, my understanding of Mr. Bryant is that he

6    never negotiated a license before in his life.  He never has

7    been able to get someone to buy his ideas and pay him a

8    royalty rate.  He is not a sophisticated licensor of

9    intellectual property.  He was negotiating with Mr. Larian

10   and other executives at MGA who are sophisticated.  They

11   already had licensing deals with many major companies.

12           MS. HURST:  Your Honor, this goes into areas

13   prohibited by prior rulings.

14           THE COURT:  Sustained.

15           MS. HURST:  Move to strike.

16           THE COURT:  Well just a moment.  No, I'm going to

17   allow it because we've got licensing and licensing.

18   Counsel, if you look at your chart, we've got licensing on

19   the first factor of the five factor averaging, which comes

20   out to 12.6.

21           Overruled.

22           MR. PRICE:  Right.  They are the first three here.

23           THE COURT:  First three.  Go ahead.

24           THE WITNESS:  And the other thing is Mr. Bryant

25   isn't going to get any value from his ideas and drawings

1   except for licensing.  He's not a producer of fashion dolls.

2   He doesn't have a doll company, so that's the only way he

3   can monetize his intellectual property.  Mattel is a

4   negotiator for these apportionment factors.  They are a very

5   sophisticated licensor of intellectual property.  They

6   average between 10 and 12 percent royalty rates when they

7   license their intellectual property not to competitors but

8   to partners.  People that are going to be adding to their

9   sales of Barbie dolls.

10          Here, they are going to license to someone who is

11  going to take sales away from them, so they are going to

12  require even a higher royalty rate than what they got from

13  their other licensees, so to use 3 percent for this

14  calculation makes no sense.  And actually, if you use the

15  rates you should use, they more support the apportion

16  factors that I came up with, not Mr. Malackowski's.

17  BY MR. PRICE:

18  Q    So again, this is suppose to measure what Mattel would

19  have gotten if it wanted to license its property, correct?

20  A    Correct.

21  Q    And Mr. Malackowski was using what Mr. Bryant was

22  using?

23  A    That's his sole basis.

24          *(Live reporter switch with Maria Dellaneve.)*

25                      -oOo-

1                              -oOo-

2                          **CERTIFICATE**

3

4           I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  April 6, 2011

12

13

14      _____

        JANE C.S. RULE, U.S. COURT REPORTER
15      CSR NO. 9316

16

17

18

19

20

21

22

23

24

25