Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING


MATTEL INC., et al.,            )
                                )
                Plaintiff,      )
                                )    DAY 46
        vs.                     ) No. CV 04-9049-DOC
                                )    VOLUME 4 OF 5
MGA ENTERTAINMENT, INC.,        )
                                )
                Defendant.      )
_____)



REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

TUESDAY, APRIL 5 , 2011




Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

1    **APPEARANCES OF COUNSEL:**

2    **FOR THE PLAINTIFF:**   QUINN EMANUEL URQUHART OLIVER & SULLIVAN
                              BY:  MICHAEL ZELLER, ESQ.
3                             and  JOHN QUINN, ESQ.
                              865 S. FIGUEROA
4                             10TH FLOOR
                              LOS ANGELES, CALIFORNIA 90017
5                             (213)443-3000

6

     FOR THE DEFENDANTS:   ORRICK, HERRINGTON & SUTCLIFFE
7                          BY:  ANNETTE HURST, ESQ.
                           405 HOWARD STREET
8                          SAN FRANCISCO, CALIFORNIA 94105
                           (415)773-5700
9

10

     FOR THE DEFENDANTS:   ORRICK HERRINGTON & SUTCLIFFE
11                         BY:  THOMAS MCCONVILLE, ESQ.
                           4 PARK PLAZA
12                         SUITE 1600
                           IRVINE, CALIFORNIA 92614
13                          (949)567-6700

14

15

16

     FOR CARLOS MACHADO GOMEZ: LAW OFFICES OF MARK E. OVERLAND
17                         BY:  MARK OVERLAND, ESQ.
                           100 WILSHIRE BLVD
18                         SUITE 950
                           SANTA MONICA, CA. 90401
19                         (310) 459-2830

20

21
                           - AND -
22
                           SCHEPER KIM & HARRIS LLP
23                         BY:  ALEXANDER COTE, ESQ.
                           601 WEST 5TH STREET_12TH FLOOR
24                         LOS ANGELES, CA. 90071
                           (213) 613-4660
25

En-dash

1                         I N D E X

2

| DEFENDANT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| MICHAEL WAGNER | 5 | 23 | 39 | 40 | |
| JAMES MALACKOWSKI | 42 | 44 | | | |

3   DEFENDANT'S                                                    VOIR
    WITNESS                  DIRECT   CROSS   REDIRECT   RECROSS   DIRE

4   MICHAEL WAGNER             5       23       39         40

5

6
    JAMES MALACKOWSKI         42       44
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        SANTA ANA, CALIFORNIA; TUESDAY, APRIL 5, 2011

2                          -oOo-

3                DIRECT EXAMINATION (RESUMED)

4    BY MR. PRICE

5    **Q**    Now, is it your experience that if you are trying to get paid

6    for something, you tend to get a better payment if you have people

7    competing for the property?

8    **A**    That happens.

9    **Q**    So that you could go to Hasbro and say I want this much; you

10   can go to Jakks and say they're offering me this, what would you

11   offer me, things like that?

12   **A**    In the real world people do that.

13   **Q**    Now, in this 3 percent, that Mr. Bryant got from MGA, would

14   it have any impact on whether that number should be used in this

15   analysis if you assume that the only company he went to with --

16   under these assumptions -- Mattel's property was MGA and did not

17   go to any other company?

18   **A**    I don't know the facts of that.  I thought I did try to shop

19   his ideas to other companies.

20   **Q**    So I'm just asking you assuming in 2000 that he didn't try to

21   shop to anyone but MGA, that he didn't try to play companies off

22   each other, how would that effect your analysis?

23   **A**    I need more facts to know.

24   **Q**    Do you -- if Mattel owned the property, as the assumption, is

25   it your understanding that Mattel would be able to look at the

Page 5

1   market and see who would pay the highest price?

2   **A**    Clearly they would do that.

3   **Q**    Now, we were talking about the first three which are all

4   based on the 3 percent.  Now we have one that is called the

5   product profit and 13.5 percent as something to be considered in

6   apportioning for sweat equity.

7          Is this an appropriate sort of analysis?

8   **A**    I believe it's appropriate if done correctly.

9   **Q**    And do you believe this one was done correctly?

10  **A**    I do not.

11  **Q**    Why is that?

12  **A**    That he compared Bratz profits to Moxie's profits, a product

13  line that is not accused in this case, that was an idea of MGA's.

14  The problem with this analysis is that he only has two years of

15  information for Moxie; its first year and its second year for its

16  profits.  He has 10 years of information for Bratz.

17          So to give you a simple example, if you have children --

18  and I have children, not this age now but they were at one time.

19  At one time I had a two-year-old and a ten-year-old.  He is, like,

20  comparing the abilities of a two-year-old against a ten-year-old

21  and that's just not appropriate.  He has the same time periods for

22  the -- what is a good comparison is let's compare a two-year-old

23  Moxie to a two-year-old Bratz.  And if you do that, and you look

24  at the profit margins, it's a very different percentage than what

25  he came up with.

1    **Q**    Let's explain what is going on here.  He is comparing gross

2    margin Bratz to Moxie for what purpose?  What is the rationale?

3    **A**    Well, if Bratz has a higher profit margin than Moxie, then he

4    will attribute that to the intellectual property.

5    **Q**    And that's because?

6    **A**    Which is fair.

7    **Q**    So that's because Moxie is MGA's intellectual property?

8    **A**    It is.

9    **Q**    So it's basically assuming, well, you should do that well

10   with Bratz intellectual property?

11   **A**    Well, if Bratz does better than that, it has to be due to

12   something else, and that something else would be Mattel's IP.  So

13   that's the methodology.

14   **Q**    You think that's appropriate?

15   **A**    I do.

16   **Q**    But you think he used the wrong numbers?

17   **A**    I do.

18   **Q**    And did you prepare a chart to illustrate that?

19   **A**    I do.  It's my chart two.

20   **Q**    24896-00003.  So this is comparison of Bratz and Moxie gross

21   margin.  And let's start with the right, actually.  It has Moxie

22   gross margin.  What does this show?

23   **A**    The red bar shows the gross profit of Moxie in its first

24   year, and it's 49.7 percent profit rate.  The blue bar is the

25   profit rate for Moxie in its second year of introduction.  It

Page 7

1    drops to 35.1 percent.

2    **Q**    So how did Mr. Malackowski use these figures to get a profit

3    margin to compare to the Bratz gross margin?

4    **A**    He used more than just the first two years.  He compared an

5    average of the first two years' profits Moxie against 10 years of

6    profits for Bratz.  The out years for Bratz, it's really on a

7    decline and the profit margins are declining significantly.

8              And that is just not what I have heard many times called

9    in this case an apples to apples comparison.

10   **Q**    So, if you compared -- on the left here you have Bratz gross

11   margin in its first two years; correct?

12   **A**    I do.  In the first year Bratz had a 67.1 percent gross

13   profit.  And in the second year it just dropped a little to

14   63.3 percent.

15   **Q**    And you believe that those first two years should be compared

16   to Moxie's first two years to see what portion of Bratz's profits

17   are due to the intellectual property of Mattel?

18   **A**    I do.

19   **Q**    How would that change the apportionment factor?

20   **A**    Well, in the first year Bratz is 35 percent more profitable

21   than Moxie.  And the second year it's 80 percent more profitable

22   than Moxie.  So clearly there is a lot more value in the profits

23   being sold, or Bratz sales than Moxie sales.

24              If you actually just use the first two years, instead of

25   having a 13.5 percent apportionment it would be 35 percent

Page 8

1   approximately.

2   **Q**    If we could go to back to 37189-00018.  So you'd have a much

3   higher number here for the product profit?

4   **A**    I do if I think you used all the data appropriately that you

5   have.

6   **Q**    Finally, we have time contribution, which is the relative

7   time contribution of Mr. Bryant compared to the contributions of

8   others developing Bratz.

9            Do you believe that's an appropriate methodology?

10  **A**    Well, it is, but it shouldn't be time.

11  **Q**    What should it be?

12  **A**    Well, when you use time, you assume that everybody's time has

13  exactly the same value, and that just isn't true in the business

14  world.  Mr. Larian's time is extremely valuable.  He is a very

15  able executive.  But if he spent an hour time, do you think that

16  has the same value as the lowest paid employee of MGA?  I don't

17  think so.

18           Let's look at what Carter Bryant got for his hours.  He

19  got $35 million.  If you calculate the salary for these other

20  people that are calculating this thing, I guarantee you, almost

21  100 percent of the value of Bratz would go to the IP if you did

22  this correctly by value, time times income from what you earn from

23  your time.

24  **Q**    And could you tell from Mr. Malackowski's -- his analysis, by

25  the way, whether he included the time contribution from Mr.

1   Bryant, assuming that Mattel wins the case, that he included a

2   time contribution of Mr. Bryant working on Bratz while he was

3   employed at Mattel?

4   **A**   He did not.

5   **Q**   Now, that apportionment factor, if you use that analysis, you

6   are going to get a low number; right?

7   **A**   He gets a very low number.

8   **Q**   And that's going to really reduce Mattel's damages?

9   **A**   It does.

10  **Q**   If you look at slide 22 then, where this is Mattel's lost

11  profits.  Do you see that?

12  **A**   I do.

13  **Q**   Now, we're talking about not what MGA made, but what Mattel

14  didn't make because Bratz was out there; right?

15  **A**   That is correct.

16  **Q**   And if we look at the first -- again, the top part here, you

17  see it has trade secret and copyright.  And let me talk to you

18  about the trade secret.

19         Again, if you go beyond those first four characters, you

20  are going to get a larger number under profits; right?

21  **A**   You would.

22  **Q**   And you see it says "cannibalized Barbara profits"?

23  **A**   I do.

24  **Q**   Do you agree that that is an appropriate analysis that

25  Mr. Malackowski made on cannibalized Barbie profit?

Page 10

1    **A**    No.

2    **Q**    Why not?

3    **A**    Mr. Malackowski only really had one cannibalization study

4    that he used for this ten-year damage period, and that study was

5    done in early 2002 which is a period that Bratz hadn't even been

6    on the market for a year.  No one at that time knew how successful

7    it was going to be.

8              If he had cannibalization studies for every year of the

9    damage study, I think it would be a terrific source.  But for him

10   to make the assumption that that study is appropriate for a

11   ten-year damage period is not appropriate in my mind, because it

12   was not measuring the cannibalization in subsequent years where,

13   although initially Bratz is only sold to the 9- to 11-year-old

14   market, eventually they sold far more product to the 6- to

15   8-year-old market.

16             It was really going to the core of Barbie's business.

17   If he had a cannibalization study done in the middle of this

18   damage period, he would not have the results that he has.

19   **Q**    So when you say you relied on a study after just the first of

20   year of Bratz, I would like you to look at 37189, and particularly

21   page 22.

22   **A**    I'm there.

23   **Q**    And this is -- I'm sorry.  If you look at 266544.  26544.

24             **THE COURT:**  We're all getting goofy with numbers.  We're

25   all making a joke.

1    BY MR. PRICE

2    **Q**    Hopefully the third time is a charm.

3          26554, which is in evidence.  And you see this is a

4    cannibalization study dated January 14, 2002.

5          Do you see that?

6    **A**    I do.

7    **Q**    And Bratz was on the market beginning summer of 2001?

8    **A**    That is correct.  So it's only about seven months of their

9    history where this cannibalization study is used for the entire

10   damage period, which is almost a decade.

11   **Q**    In applying -- in doing his calculations for the cannibalized

12   Barbie profits, does he use the numbers that are in this document

13   which came into existence only several months after Bratz was on

14   the market?

15   **A**    He does.

16   **Q**    Does he use any other numbers in doing his calculations for

17   the cannibalization profits in terms of what share for what

18   age-group other than this January 14, 2002?

19   **A**    I don't believe so.

20   **Q**    If you would look at 01807.  Is this the one with the house

21   on fire?

22   **A**    Yes.

23   **Q**    So, this is the -- if we can show that, I'm sure that is in

24   evidence.  This is the 2005 house on fire document in 2004.

25          Do you see that?

Page 12

1   **A**    I do.

2   **Q**    And if you would look at page 3.  You see there is a section,

3   "Bratz is gaining share with core 5- to 8-year-olds.  Since

4   November, Bratz's penetration has grown from 66 percent to

5   80 percent with 5- to 6-year-olds, 80 to 84 percent with 7- to

6   8-year-olds."

7           Do you see that?

8   **A**    I do.

9   **Q**    And what -- do you have an understanding as to what that

10  reflects?

11  **A**    Yes.  It's increased penetration at this younger age group by

12  the Bratz doll.

13  **Q**    Is that what you found in your analysis?

14  **A**    Yes.

15  **Q**    And what does Mr. Malackowski assume in his calculation of

16  Mattel's lost profits with respect to sales to the younger age

17  groups?

18  **A**    He doesn't assume there is much penetration, if any, to that

19  group.

20  **Q**    You heard him also say that he had reservations about your

21  regression analysis.

22          Is your aggression analysis, in your opinion, how does

23  it compare to Mr. Malackowski's approach?

24  **A**    I used data from the entire damage period to make my

25  estimate, not just a point estimate in the very first year of the

Page 13

1    damage period.  I think it's a better methodology.

2    **Q**    Now, if you look at Mr. Malackowski's calculations for,

3    again, lost Mattel profit, and we go to slide -- stay on slide 22,

4    you have told us that if you change this population, the number is

5    going to get bigger; correct?

6    **A**    It would.

7    **Q**    And on Mattel's lost profits, did you subtract from Mattel's

8    lost profits MGA's sweat equity?

9    **A**    I did not.

10   **Q**    And why did you not subtract from Mattel's lost profits --

11   not MGA's profit -- but why did you not subtract from Mattel's

12   lost profits as a result of this assumed misappropriation, why did

13   you not subtract MGA's sweat equity?

14   **A**    Because in no lost profits damage claim I have ever done

15   would I do that because it's a but-for causation test, and it's

16   but for the alleged illegal violation would this sales in profits

17   have been earned.  There is no apportionment done in that type of

18   analysis.

19           **MS. HURST:**  Your Honor, again, I object and move to

20   strike.  That was a legal conclusion.  It's the ultimate issue.

21           **THE COURT:**  Sustained.  Stricken, counsel.

22   BY MR. PRICE

23   **Q**    Were you here when Mr. Malackowski testified on other

24   occasions?

25   **A**    I have been.

1   **Q**    And do you recall whether or not he agreed that for lost

2   profits you don't subtract sweat equity apportionment?

3           **MS. HURST:**  Objection.  Hearsay.  Mischaracterized the

4   testimony.

5           **THE COURT:**  Sustained.

6   BY MR. PRICE

7   **Q**    So if you look at Mattel's lost profits, if you subtracted

8   sweat equity -- that is, the effort that MGA is putting into using

9   the assumed misappropriated information -- basically, it would be

10  the more you -- the better you are at hurting us, the less your

11  damages are?

12  **A**    That would be correct.

13  **Q**    So, in other words, if I take your secret and I do a really

14  good job of reducing your profits, would it be appropriate to

15  subtract the sweat equity for doing a really good job for reducing

16  your profits?

17  **A**    Not in my opinion.

18  **Q**    And by the way, when you look at the documents in the case,

19  did you find support for your conclusion that Bratz sales were, in

20  fact, impacting, significantly impacting Mattel's profits?  That

21  there was a relationship between Bratz sales and Barbie sales?

22          **MS. HURST:**  Object to that to the extent it calls for

23  publication and hearsay.

24          **THE COURT:**  Sustained.

25

Page 15

1    BY MR. PRICE

2    **Q**    Well, when you testified earlier you said that you looked at

3    documents to see whether or not there was causation.

4         Do you recall that?

5    **A**    I talked about that in my earlier examination in this trial.

6    **Q**    And what kind of documents did you look at to see that there

7    was causation?  That is, that a Bratz sale impacted a Barbie sale?

8         **MS. HURST:**  Objection.  Calls for hearsay.

9         **THE COURT:**  No, we got into this.  I'm going to let you

10   answer that question.  I'm going to reverse my ruling.  Thank you.

11        **THE WITNESS:**  I looked at Mattel documents, I looked at

12   MGA documents, and I looked at third party industry observers who

13   were commenting upon what was happening in the fashion doll

14   industry.

15   BY MR. PRICE

16   **Q**    And what was your conclusion after looking at those sources?

17   **A**    That they all were saying that Bratz was taking market share

18   and sales away from Mattel.

19   **Q**    Now, we looked at the earlier slide where Mr. Malackowski

20   calculates unjust enrichment which is MGA's profits, and that's

21   slide 19.  And you see it has those apportionment factors of

22   20 percent and 12 percent in connection with that calculation.

23        Do you see that?

24   **A**    I do.

25   **Q**    But then if you go to slide 22 for Mattel's lost profits, you

1    have the same numbers, but this time it's called a demand factor.

2             Do you see that?

3    **A**    I do.

4    **Q**    Is that anything different than an apportionment of sweat

5    equity to Mattel's lost profits?

6    **A**    It is not.

7    **Q**    And did you look at Mr. Malackowski's calculations?

8    **A**    I did.  It's the exact same calculation.

9    **Q**    So, if you use this demand factor, you would be rewarding MGA

10   for doing a good job at causing Mattel to lose profits as a result

11   of the theft of trade secrets?

12   **A**    You would.

13   **Q**    If you would look at slide 24, turning to his slide entitled

14   "Lost Profits Demand Factor Comparison," do you agree with this

15   calculation?

16   **A**    I do not.

17   **Q**    Why not?

18   **A**    First off, it only focuses, again, on the 9- to 11-year-old

19   segment, and that isn't the right segment to look at for this

20   entire damage period.  You have to add to that the 5 to 8 segment.

21   And, really, even into the very youngest girls over time are

22   buying this product.  So I think it is not a fair comparison.

23   **Q**    If you would look at slide 27.  You see Mr. Malackowski

24   calculates My Scene worldwide profits of 256 million, and do you

25   believe that's a correct calculation?

1   **A**     No.

2   **Q**     Why not?

3   **A**     Well, first off, he is saying you should subtract this from

4   my calculation of lost profits.  First off, I think I have already

5   taken in consideration the impact of My Scene.  But even if you

6   didn't, you have to realize that I restricted my lost profits

7   damage calculation to Mattel to only six countries.  My Scene

8   profits are sales to 140 countries.  If I calculated damages to

9   all 140 countries, then even if you thought this was appropriate,

10  then and only then could you use these figures.

11          But I don't think this is an appropriate methodology,

12  and I do believe, based on the methodology that I employed, I

13  already considered what, if any, mitigation was necessary.

14  **Q**     Could you explain to the jury -- it's been a while -- what

15  methodology you used to account for any mitigation efforts by

16  Mattel?

17  **A**     The first thing, and probably most important is that excluded

18  any lost profits for any expansion of the market.  And again, My

19  Scene was, at least initially, oriented towards that segment of

20  the market as was Bratz.  So I have already taken that into

21  consideration.

22          **MR. QUINN:**  Your Honor, I think we need a time-out.

23          **THE COURT:**  Ladies and gentlemen, you are admonished not

24  to discuss this matter amongst yourselves or form or express any

25  opinion about the case.  Have a nice recess.

Page 18

```
 1                        (Jury out.)

 2           THE COURT:  We're back on the record.

 3           Mr. Price, about how much longer do you think you'll

 4   have?

 5           MR. PRICE:  I think about 10 minutes.

 6           THE COURT:  Take a couple hours.

 7              (LAUGHTER)

 8           THE COURT:  I'm just joking.  Listen, for both of you,

 9   it's your time.  If you choose to spend it with these experts,

10   that's fine.  The same offer to MGA, take a couple hours, three or

11   four.

12           MR. PRICE:  I'm still under my budget.

13           THE COURT:  It's fine.  I'm not criticizing.  I'm just

14   saying we have been through this -- Mr. Larian, how many days were

15   you on the stand?

16           MR. LARIAN:  Eight.

17           THE COURT:  Mr. Eckert, how about you?

18           MR. ECKERT:  Ten.

19           THE COURT:  Well, that was the deposition he.  Was on

20   there for 28.

21           But anyway, I'm just trying to joke with you, but I'm

22   not.  I'm just saying time is running out.  So you are placing

23   your fate in your own hands.  And I can see the rationale.

24   Apparently the papers are starting to come in from one or both

25   sides that somehow the Court will be accused of not giving you
```

Page 19

1    enough time; that you have run out of time.  I'm already hearing

2    that already.  I put you all on notice from the beginning.

3            So let me address Mr. Quinn and Ms. Keller who is not

4    here.  Nonsense.  Have a nice recess.

5            **MR. QUINN:**  Your Honor, we haven't said that you -- we

6    haven't asked for more time.

7            **THE COURT:**  I just saw some papers in the back, Mr.

8    Quinn, yes, you have.

9                    (Recess taken, from  3:17 to 3:35.)

10           **THE COURT:**  The jury is present, the alternates are

11   present, all counsel are present.

12           Counsel, thank you for your courtesy.

13           If you would please be seated.  Mr. Wagner is present.

14   Continued direct examination by Mr. Price.

15   BY MR. PRICE

16   **Q**    If you could look again at 3718-00022, which is the Mattel

17   lost profit analysis and that the demand factor we were talking

18   about.  Are the factors that Mr. Malackowski used appropriate for

19   a demand factor?

20   **A**    No.

21   **Q**    Could you explain to the jury why not?

22   **A**    You have to understand what demand is.  And demand is first

23   the desire to buy a product.  You then also have to have the

24   ability to pay for the product.  And the third element is you have

25   to have a willingness to pay.

1          There are people that may desire a product.  I hear talk

2     about Ferraris.  And some people may have the ability to buy those

3     types of cars, but still you may think, "I just don't get enough

4     value for spending that how much money for the car," so they won't

5     buy the Ferrari.  But you have to establish all three of those

6     elements to establish demand.

7          And the apportionment factors that Mr. Malackowski came

8     up with are appropriate for apportioning IP among assets.  They

9     don't answer one of those three questions that need to be answered

10    about demand.

11    **Q**    Did you see any inconsistencies in Mr. Malackowski's approach

12    to MGA's damages as opposed to Mattel?

13    **A**    I did.

14    **Q**    What were those?

15    **A**    Well, when he calculates MGA's damages, he gives a very large

16    percentage of the profits to MGA.  And you have got to realize

17    that the MGA trade secrets wasn't the core idea for a doll.  It's

18    stealing information, or supposedly stealing information for trade

19    shows to help them develop maybe a theme or two, or maybe decide

20    some pricing.  But it's not really the core of the product.  And

21    he comes up with a very large percentage of those profits should

22    go to his client.

23          And then when he calculates Mattel's damages, if I

24    understand their allegations, it's the core to the success of the

25    Bratz product line, he gives a very small sliver of that profits

Page 21

1   to Mattel.  And I think that's inconsistent.

2   **Q**   And finally, you had talked about the My Scene.  We were

3   talking about the My Scene, quote, mitigation.  And you talked

4   about the market expansion.

5           In your analysis did you subtract an amount of money

6   which you attributed to this market expansion resulting from

7   Bratz?

8   **A**   I did.

9   **Q**   And how much did you subtract to account from what you

10  measured as the market expansion effect?

11  **A**   For the ten-year damage period of $1.4 billion.

12  **Q**   And in your analysis what percentage increase is there in

13  Mattel profits as a result of your Mattel lost profit analysis?

14  **A**   Less than 10 percent.

15  **Q**   Nothing further.

16          **THE COURT:**  Cross-examination.  Or do you need a break

17  at this point?  Want a brief break?

18          **MS. HURST:**  Yes.

19          **THE COURT:**  Sorry you have to be up and down so much,

20  but nobody know when we're finishing and starting, so let's take a

21  brief break.  You admonished not to discuss this matter among

22  yourselves or form or express any opinion concerning the case.

23                          (Jury out.)

24          **THE COURT:**  Counsel, if you need to use the restroom or

25  anything, five or 10 minutes, and you tell us when you are ready

Page 22

1    to start with cross.

2                    (Recess taken, from  3:40 to 3:46.)

3            **THE COURT:**  Back in session.  The jury is present, all

4    counsel are present.

5            Thank you for your courtesy, counsel.

6            Mr. Wagner is present.  This is cross-examination by Ms.

7    Hurst on behalf of MGA and Mr. Larian.

8                         CROSS-EXAMINATION

9    BY MS. HURST

10   **Q**    Good afternoon, Mr. Wagner.

11   **A**    Good afternoon Ms. Hurst.

12   **Q**    You said that in your view the head-start analysis was

13   inappropriate because it would not be fair to assume that MGA

14   could have been just as successful by looking at Diva Starz;

15   right?

16   **A**    I don't think I said that, no.

17   **Q**    Oh, okay.  Well --

18           **MR. PRICE:**  Object as vague as to which head-start.

19   There are two.

20   BY MS. HURST

21   **Q**    I apologize.  Let me try again.

22           You criticized Mr. Malackowski's opinion on head-start

23   damages for the Bratz trade secrets; right?

24   **A**    I did.

25   **Q**    And I apologize if I misspoke.

1          One of the reasons that you criticized that was because

2   you said that Mr. Malackowski was assuming that MGA could have

3   been just as successful by looking at Diva Starz; right?

4   **A**    I did say that.

5   **Q**    And you said that Diva Starz was not successful at all;

6   right?

7   **A**    I did say that.

8   **Q**    Now, are you aware that Mr. Eckert testified at length in

9   this trial that, in fact, Diva Starz was a very successful

10  product?

11          **MR. PRICE:**  Object to the characterization.

12          **THE COURT:**  Well, overruled.  Well, very successful, I

13  don't know --

14          **MR. PRICE:**  Or at length.

15          **THE COURT:**  Lent?

16          **MR. PRICE:**  Length.  It's hard to pronounce.

17          **MS. HURST:**  Length.

18              (LAUGHTER)

19  BY MS. HURST:

20  **Q**    Did you read Mr. Eckert's trial testimony before coming and

21  testifying that Diva Starz was not successful at all?

22  **A**    I did not.

23  **Q**    So, when you considered whether MGA had any track record for

24  success in fashion dolls oriented towards tweens, you must have

25  also considered whether Carter Bryant had any track record for

Page 24

1   success in fashion dolls oriented towards tweens; right, Mr.

2   Wagner?

3   **A**    I did.

4   **Q**    So you could tell me how successful Benefit Ball Barbie was

5   with the tween crowd; right?

6   **A**    I'm not aware of that product.

7   **Q**    And Carter Bryant's Between Takes Barbie, was that super

8   successful with the tween set?

9   **A**    I'm not familiar with that product either.

10  **Q**    How about the Birds of Beauty Swan Barbie, how successful was

11  that with the tweens?

12  **A**    I have no idea.

13  **Q**    Bon Voyage Barbie, I bet that was super successful with the

14  tween crowd, huh?

15  **A**    How much you want to bet?

16  **Q**    How about Cala Lily Barbie, that one sounds like it really

17  went over well with tweens; right?

18  **A**    The way you phrased your question, I assume it did not.

19  **Q**    Duchess of Diamonds, Emerald Jewels, Enchanted Mermaids,

20  Fairy of the Garden Barbie, all those Carter Bryant designs were

21  super successful with tweens; right, Mr. Wagner?

22  **A**    To answer your multiple compound question, I don't know.

23  **Q**    You don't know whether any Carter Bryant design before Bratz

24  was successful in the tween market; isn't that true?

25  **A**    That's true.  The only successful product I'm aware of is

Page 25

1    Bratz.

2    **Q**    And that was the one MGA made; right?

3    **A**    I agree with that.

4    **Q**    Could we look at Exhibit 37189, please.  Now, Mr. Wagner, you

5    said it was not surprising at all to you to find this degree of

6    variability in the sales; right?

7    **A**    I did say that.

8    **Q**    And if we look at slide 17, you said it would not be

9    surprising at all to find that degree of variability in the

10   themes; right?

11   **A**    I don't think I said that, but I would say that now.

12   **Q**    But you do believe that the only thing common to all of these

13   themes is that core idea; right?

14   **A**    I did say that.

15   **Q**    And what core idea was that exactly?

16   **A**    It's the exact way of combining all those elements that

17   became the Bratz doll.

18   **Q**    The Bratz doll?

19   **A**    That's what I said.

20   **Q**    Could we see Exhibit 302, please.

21        Is Exhibit 302 what you mean by that exact combination

22   of elements?

23   **A**    I think that combination is expressed in this document, yes.

24   **Q**    Let me ask you something.  Did MGA ever sell this document?

25   **A**    No.

Page 26

1    **Q**    Did MGA sell this document in the first year that it produced

2    Bratz?

3    **A**    If you listened to my last answer, it couldn't be in any

4    year.

5    **Q**    Didn't sell this document in the second year it produced

6    Bratz; right?

7    **A**    It did not.

8    **Q**    In fact, MGA changed its dolls every single year, didn't it?

9    **A**    You would have to define how you mean "change their dolls."

10   I think the doll stayed the same.  I think they had different

11   themes and they had different clothes and different styles.  But

12   no, I believe the doll did stay the same for a considerable period

13   of time.

14   **Q**    You mean the body underneath; right?

15   **A**    Correct.

16   **Q**    But the face paint changed; right?

17   **A**    It did.

18   **Q**    The number of eyelashes changed; right?

19   **A**    It probably did.

20   **Q**    The eye color changed; right?

21   **A**    I would assume they came up with different eye colors.

22   **Q**    Makeup changed?

23   **A**    Yes.

24   **Q**    Hair changed; right?

25   **A**    I agree with that.

1  **Q**    And year after year after year, MGA made those changes;

2  right?

3  **A**    I agree with that.

4  **Q**    Because in business you have to refresh your product all the

5  time, especially in the toy industry; right?

6  **A**    I agree with that statement.

7  **Q**    And the success year after year after year depends on being

8  able to execute every single year; right?

9  **A**    That's a correct statement.

10 **Q**    And that's why you said, when you were talking about

11 Mr. Malackowski's use of the cannibalization study, that no one

12 could have known at seven months into the life of this product

13 that it would be that big a success; right?

14 **A**    I did say that, and I agree with that statement.

15 **Q**    But in hindsight, you think Bratz was exactly the right doll

16 at the right time; true?

17 **A**    I do.

18 **Q**    You said that in calculating Mattel's lost profits, that's

19 nearly 400 million it's claiming; right?

20 **A**    It's less than that, yes.

21 **Q**    But what, 383 million Mattel is claiming lost profits,

22 something like that?

23 **A**    I don't refresh my recollection exactly.  But no, I thought

24 it was like more like 323 or something like that.

25 **Q**    323 million in lost profits, it's not a small number, you

Page 28

1  would agree with me?

2  **A**   I would agree with you there.

3  **Q**   You said that you have already taken into account mitigation

4  because you took into account market by Bratz?

5  **A**   That is one of the reasons, yes.

6  **Q**   Can you show me anywhere in your six reports where the word

7  "mitigation" appears?

8  **A**   I think it only appears in my deposition.  I don't think I

9  used those words in my reports.

10 **Q**   In fact, you never described your Bratz market expansion

11 opinion as mitigation in any of your reports; isn't that true?

12 **A**   That's true.  I don't normally use the word "mitigation" in a

13 report where I calculate damages.  In fact, I can't recall in 37

14 years ever using that word.

15 **Q**   Because it's not your job to deduct; right, Mr. Wagner?

16 **A**   No.  I think it is my job to consider that, but I don't think

17 I've ever used those words.  In effect, I take into consideration,

18 but I don't think I have ever used that word, because most time I

19 calculate damages between the but-for world and the actual world,

20 and the actual world normally is the mitigation.

21 **Q**   But you agree that mitigation -- that is, efforts to avoid

22 harm -- is an appropriate consideration; right?

23 **A**   I do as a damage expert.

24 **Q**   In other words, if you are standing there watching your house

25 burn, and you have got the hose in your hands, and you can turn it

Page 29

1    on and spray the house without getting hurt, you are supposed to

2    do that; right?  That's the economically reasonable thing to do;

3    right, Mr. Wagner?

4    **A**    In my opinion it is.

5    **Q**    If someone does turn on the hose and put out the fire, they

6    don't go to the insurance company and claim the whole thing burned

7    down; right?

8    **A**    Depends on how successful they were with the hose.

9    **Q**    That would be insurance fraud; right?  To go claim the whole

10   house burned down when it was only the garage.  You got it while

11   it was still in the garage?

12          **MR. PRICE:**  Argumentative.

13          **THE COURT:**  It's a little argumentative.  Sustained.

14   BY MS. HURST

15   **Q**    You agree that My Scene was a response to Bratz; right?

16   **A**    I do.

17   **Q**    Do you dispute Mr. Malackowski's calculation of 256 million

18   in worldwide profits for My Scene?

19   **A**    I do.

20   **Q**    You think his calculation -- I mean, I know you quarrel with

21   his use of all 140 countries, but do you think his calculation is

22   wrong, too?

23   **A**    I think the profit margin is reasonable in that calculation.

24   **Q**    You said that you disagreed -- let's move to MGA's claim for

25   damages now.  We have been talking about Mattel's claim for

Page 30

1    damages for a moment.  Let's move to MGA's claim for damages.

2              You said that it would not be fair to look at Generation

3    Girls and Diva Starz and Flava when considering Mr. Malackowski's

4    top-down approach because none of those would reflect the creative

5    genius of My Scene; is that right?

6    **A**    I said that.

7    **Q**    And what was the creative genius of My Scene exactly?

8    **A**    That, again, Mattel, using known elements in their design

9    center came up with those ideas.  It became that doll.  And

10   obviously it's a very attractive doll and did sell well.

11   **Q**    And they took those design elements -- you said they were

12   known design elements; is that right?

13   **A**    That is my understanding.

14   **Q**    And they put them together after seeing the success of Bratz

15   in the older-girl set?

16   **A**    I agree with that, yes.

17   **Q**    So, there was more than one way to put together those known

18   design elements to appeal to the tween crowd; right?

19   **A**    I agree with that.

20   **Q**    And you said that, in your view, MGA's trade secret claim

21   isn't worth much because for a trade secret to have any value at

22   all it has to stay secret; is that right?

23   **A**    I didn't say it exactly that way, but I agree with the gist

24   of what you are saying.

25   **Q**    And so in your view does that mean that things that are

81c2712a-b7d0-468d-8223-bad66d8dde26

Page 31

1   designed to be disclosed can never have value as a trade secret?

2   **A**    I do not agree with that.

3   **Q**    Because they can still be valuable secrets for the period of

4   time when they're secret; right?

5   **A**    I agree with that.

6   **Q**    And that's exactly this time when you are supposed to use the

7   head-start methodology; isn't that right, Mr. Wagner?

8   **A**    I do agree with that, yes.

9   **Q**    So, you made an analysis of the products on Mr. Malackowski's

10  bottom-up damages; right?

11  **A**    I did.

12  **Q**    And in your view you felt that he did not reduce his

13  calculation in any way for other public disclosures of the trade

14  secret; right?

15  **A**    That is correct.

16  **Q**    One of the examples you gave was Girls Nite Out; is that

17  true?

18  **A**    Yes.

19  **Q**    Please take a look at that Exhibit 20621, page 2.  We'll blow

20  it up on the screen there.

21          Can you see that?

22  **A**    I can.

23  **Q**    I think it's in Mattel's binder.  Okay.  So it says -- and

24  this is the public disclosure that you were relying on as part of

25  your opinion that the damages for this product should not have

Page 32

1   been included; right?

2   **A**   Yes.

3   **Q**   And it says, "It's Saturday night and that can only mean one

4   thing.  It's Bratz night out.  Join the girls as they party it up

5   at the cafes and the clubs, as they paint the town red-hot red."

6           So far have we learned anything about Girls Nite Out and

7   what it looks like?

8   **A**   To answer your compound question, yes and no.

9   **Q**   It says "Each Brat comes three night-life looks that can only

10  be described as funkalish."

11          You see that?

12  **A**   I do.

13  **Q**   Can you tell me exactly what "funkalish" looks like, Mr.

14  Wagner?

15  **A**   I can't even tell you what it means.

16  **Q**   "Add over 30 accessories.  A unique 'party-night' accessory,

17  real eyelashes and body glitter for extra shine beneath the

18  strobes." Right?

19  **A**   It says that.

20  **Q**   What is the unique party-night accessory?

21  **A**   That's not described.

22  **Q**   What are the other 29 or 30 accessories?

23  **A**   It could be the real eyelashes and body glitter.  And it

24  could also be other things besides those two things.

25  **Q**   You don't know what they are by reading this; right?

Page 33

1   **A**     I don't, no.

2   **Q**     Can you tell me which of the dolls are offered as part of the

3   Girls Nite Out package by reading this?

4   **A**     Not this document alone, no.

5   **Q**     Can you tell me what they were wearing in Girls Nite Out by

6   looking at this?

7   **A**     Only some general ideas, not the exact look.

8   **Q**     Party clothes apparently?

9   **A**     Yes.

10  **Q**     How many different ways of executing party clothes on fashion

11  dolls are there, Mr. Wagner?

12  **A**     A lot.

13  **Q**     You also compared the Bratz Sportz and the My Scene Getaway

14  products; is that right?

15  **A**     I believe so, yes.

16  **Q**     Please take a look at 24784 and 17378.  You see there on the

17  left is the Bratz Sportz and on the right is the My Scene?

18          **THE COURT:**  Could we use the tangibles?  I want to make

19  sure these are the right exhibits.

20  BY MS. HURST

21  **Q**     Did the photos match the two dolls that you are holding, Mr.

22  Wagner?

23  **A**     They appear to, to me, yes.

24  **Q**     And you understand that Mr. Malackowski included these as one

25  of his pairs in his bottom-up damages analysis; right?

Page 34

1   **A**   I do.

2   **Q**   Let me ask you something.  On the right there in the Miami

3   Getaway, you see how she is talking?

4   **A**   I do.

5   **Q**   What is she saying there?

6   **A**   "Who says style isn't a sport?"

7   **Q**   Now, do you know whether that sports positioning was present

8   on the package of Miami Getaway before Mattel's employees snuck

9   into MGA's showroom?

10  **A**   I have no facts to inform me of that question.

11  **Q**   And you would agree with me, wouldn't you, that if Mattel

12  were able to alter its packaging to emphasize the sporting nature

13  of the Miami Getaway product, that that would be an advantage that

14  it could gain using trade secret information?

15          **MR. PRICE:**  Object.  Not claimed and lack of foundation

16  that that happened.

17          **THE COURT:**  Overruled.

18          **THE WITNESS:**  I do think if you established everything

19  else you need to establish, that could be an advantage, yes.

20  BY MS. HURST

21  **Q**   And that wouldn't take you the whole lead time for the whole

22  doll to do something like that; right?

23  **A**   No.

24  **Q**   It's basically your view that the information in the toy

25  fairs was available elsewhere and that's why the damage

Page 35

1    calculation of Mr. Malackowski is overstated; right?

2              **MR. PRICE:**  Objection.  Misstates testimony.

3              **THE COURT:**  Overruled.

4              **THE WITNESS:**  At least to a large extent, yes.

5    BY MS. HURST

6    **Q**    Do you think it would be economically rational for Mattel's

7    employees to risk criminal prosecution by falsifying credentials

8    to sneak into MGA's showrooms for information that lacked any

9    value?

10             **MR. PRICE:**  Objection.  Assumes facts not in evidence.

11             **THE COURT:**  I'm not -- just a moment.  Don't answer

12   that.

13             Objection?

14             **MR. PRICE:**  Yes.

15             **THE COURT:**  Sustained.

16   BY MS. HURST

17   **Q**    In your opinion would it be economically rational for Mattel

18   employees to engage in conduct such as falsifying credentials for

19   which they could lose their jobs, be subject to other legal

20   claims, in order to obtain value -- information that lacked any

21   value?

22             **MR. PRICE:**  The latter part assumes facts.

23             **THE COURT:**  Well, that's what you are going to

24   eventually establish.  I think you can argue that, counsel.  I

25   don't know how the damages expert comments on that.  It doesn't

1  rationalize damages, does it?

2          **MS. HURST:**  He offered opinions that the information had

3  no value, Your Honor.  And he just confirmed that's his opinion.

4          **MR. PRICE:**  He offered information about --

5          **THE COURT:**  Could I borrow both counsel for just a

6  moment.

7              (The following proceedings were held at sidebar.)

8          **THE COURT:**  We're on the record at sidebar and the

9  question, counsel, is?

10         **MS. HURST:**  Can I just make my -- let me just talk for a

11  second, if that's okay with the Court.

12         **THE COURT:**  It is, but I think it was basically is there

13  an economic advantage for going into the showrooms.

14         **MS. HURST:**  What he said on direct, he went through 30B

15  products and said seven had this problem, and five had this

16  problem and seven had that problem, and five had that problem.

17  And what it all boiled down to, there was no value.

18         **THE COURT:**  There was one product.

19         **MS. HURST:**  There was one.  And he just confirmed in

20  response my question that the gist of that testimony was that this

21  information was already public and therefore lacked any value.

22             And so I think I'm entitled to test that, especially

23  since he is actually offering as opinion, not even just as an

24  assumption.  I'm entitled to test that with him and ask him

25  whether the conduct, it would be economically rational in light of

Page 37

1    his analysis and assumption.

2           MR. PRICE:  He hasn't testified about motivation.  What

3    he said on these products that came out before the trade fair,

4    this came out years afterwards for the analysis for the

5    head-start, and this was public.  He can't testify about

6    motivations or anything like that.  He can testify about the

7    facts.

8           THE COURT:  It negates public, though -- what he did was

9    he took that gigantic leap that it was public.  It was a place,

10   quite frankly, he should have never gone and it opened up this

11   whole Pandora's Box.

12          You can ask the question, counsel, but it's certainly

13   gone far beyond economic analysis.

14              (End sidebar.)

15          THE COURT:  Back on the record in the presence of the

16   jury.

17   BY MS. HURST

18   Q   In your view, would it be economically rational for Mattel's

19   employees to falsify credentials risking legal reprisals for

20   information of no value?

21          MR. PRICE:  That assumes facts not in evidence; legal

22   reprisals, the risk, etcetera.  That's not the question.

23          THE COURT:  It's gotten into a whole area, but there has

24   been testimony about public, what is not public, what is

25   economically rational.

1          Ask that, counsel, and move on.  You can ask the

2     question.

3                THE WITNESS:  No.

4           **MS. HURST:**  No further questions.

5           **THE COURT:**  All right.  Redirect examination by Mr.

6     Price.  Do you need a recess?

7           **MR. PRICE:**  No, I'm fine.

8           **THE COURT:**  Okay.

9                     REDIRECT EXAMINATION

10    BY MR. PRICE

11    **Q**    You were asked about MGA making a fashion doll once it saw

12    Diva Starz.

13               Do you recall that?

14    **A**    I do.

15    **Q**    You have looked at historically what MGA has done with its

16    products; correct?

17    **A**    I have.

18    **Q**    Before Carter Bryant did -- looking at the market, can you

19    find that anyone at MGA demonstrated the creative genius to come

20    up with a fashion doll that appealed to the tween market?

21    **A**    No.

22    **Q**    And you were asked some questions about Girls Nite Out.  And

23    if you would look at slide 33 of 37189.  Girls Nite Out is -- the

24    toy fair is New York 2004.  Do you see that?  It's seven down and

25    highlighted on the monitor there.

Page 39

1   **A**    I see that.

2   **Q**    And then it has an invoice date for the first MGA sale of

3   before the toy fair; correct.

4   **A**    Correct, it's November 2003, which is about two to three

5   months before the toy fair.  So everything would be known about

6   that product by the toy fair.

7   **Q**    And you were asked about Bratz Sportz.  That's four up from

8   the bottom.  And you see that says toy fair, at least, 2005 in New

9   York; correct?

10  **A**    It does.  And the release date of that product to the public

11  was November 2004.  Again, two to three months before the toy

12  fair.

13  **Q**    Thank you.

14           **THE COURT:**  And recross.

15                     RECROSS-EXAMINATION

16  BY MS. HURST

17  **Q**    Those release dates you were using were the invoice dates; is

18  that right?

19  **A**    Yes.

20  **Q**    And terms of payment on those are net 30?  Net 60?  Net 90?

21  **A**    I don't know what the terms are.  Invoice date normally is

22  shipment date of a product.

23  **Q**    When they ship it from Hong Kong, sometimes it takes two

24  months before it even gets to the retailer; right?

25  **A**    That's possible.

Page 40

1   **Q**     It's on the water for a while; right?

2   **A**     If it's on the water, that length of time would be two

3   months.

4   **Q**     And it goes and sits in Walmart's distribution center and it

5   could be there for any length of time before they put it on the

6   shelf; right?

7   **A**     Not at Walmart.  They are just-in-time inventory.  It would

8   be right on the shelves.

9   **Q**     But you used invoice date as the public release date?

10  **A**     Correct.

11          **MS. HURST:**  No further questions.

12          **THE COURT:**  Mr. Wagner, you may step down and

13  Mr. Malackowski may be testifying shortly.  You are welcome to

14  remain.

15          Counsel, do you want to start with Mr. Malackowski

16  tonight or do you want to start tomorrow?

17          **MS. HURST:**  Why don't we confer a moment.

18          **THE COURT:**  Counsel have agreed for rebuttal and

19  surrebuttal they're going to put on their two experts

20  back-to-back.  So in a sense if Mr. Malackowski testifies this

21  evening or early tomorrow morning, it's just so we have the two

22  experts back-to-back and that will resolve the issue between.

23          **MS. HURST:**  We would like to proceed with

24  Mr. Malackowski.  I might need like a five-minute break.

25          **THE COURT:**  Why don't we take a break.  You are

1   admonished not to discuss this matter or form or express any

2   opinion.

3              If you are not ready to proceed --

4         **MS. HURST:**  We're okay.

5              (Recess taken, from 4:17 to 4:27.)

6         **THE COURT:**  Back in session.  The jury is present,

7   alternates are present, all counsel.

8              Counsel, thank you for your courtesy.

9              And there has been an agreement between the parties that

10  they'll call the experts back-to-back in rebuttal and surrebuttal.

11             So counsel on behalf of MGA and Mr. Larian.

12        **MS. HURST:**  All right, Your Honor.  The last round,

13  Mr. Malackowski.

14        **THE COURT:**  Mr. Malackowski, return to the stand.  Sir,

15  if you would raise your right hand.

16         JAMES MALACKOWSKI, DEFENDANT'S WITNESS, SWORN

17        **THE COURT:**  Please be seated.  Once again re-introduce

18  yourself to the jury, please.

19        **THE WITNESS:**  James Malackowski, MGA's damages expert.

20        **THE COURT:**  Counsel, direct examination on behalf of MGA

21  and Mr. Larian.

22                        DIRECT EXAMINATION

23  BY MS. HURST

24  **Q**   Were you present throughout Mr. Wagner's testimony?

25  **A**   Yes, I was.

Page 42

1   **Q**    And was there anything that you heard that caused you to

2   change any of your opinions?

3   **A**    No.  I was familiar with his criticisms, many of which I

4   addressed in my direct testimony.  And there is nothing that he

5   just presented that I believe requires adjustment in my

6   calculations or causes me to change my analysis or, frankly, was

7   new to me.

8   **Q**    Let's focus on mitigation specifically.

9         It is your opinion that there were 256 million in

10  profits from My Scene; right?

11  **A**    Exactly.

12  **Q**    And that that would wipe out any Mattel damages award; right?

13  **A**    That it's greater than any reasonable measure of Mattel

14  damages, yes.

15  **Q**    And you heard Mr. Wagner say that he took mitigation into

16  account through his market expansion analysis?

17  **A**    I heard what he said.  I mean, he talked about addressing the

18  My Scene product by looking at market expansion.  And looking at

19  what happened in the market is not looking at what Mattel did to

20  limit their harm.  They're two different concepts.  It's not

21  mitigation.

22  **Q**    So, in your view did Mr. Wagner take My Scene mitigation into

23  account in calculating lost profits?

24  **A**    No, he did not.  And I know that to be the case because when

25  I removed the My Scene data from his calculation -- and we talked

Page 43

1   about this the last time I was up here -- it does not generate a

2   result that shows mitigation.  So the numbers themselves belie

3   that position, in my view.

4           **MS. HURST:**  No further questions.

5           **THE COURT:**  Cross-examination.

6                          CROSS-EXAMINATION

7   BY MR. PRICE

8   **Q**   Mr. Malackowski, on those invoice dates before the toy fair,

9   is it your understanding that the retailer sees the product before

10  he buys it, "yes" or "no"?

11  **A**   Those are my dates.  Yes, I believe the retailer will see the

12  product before they buy it.

13  **Q**   And is it your understanding they have these planogram rooms,

14  kind of pre-toy fair things in, like, the November time frame

15  before the toy fair?

16          **MS. HURST:**  Objection.  Beyond the scope.  Calls for

17  hearsay.

18          **THE COURT:**  Overruled.  I'll open this up and let you

19  both have an opportunity with each other.

20          **THE WITNESS:**  I am familiar with the planogram rooms.  I

21  don't know that they're always before the toy fair.  In many cases

22  they come later.  But yes, I am aware that they have essentially

23  mock stores where the manufactures can meet with the retailers.

24  BY MR. PRICE

25  **Q**   That's done for most retailers before the toy fair, like late

Page 44

1     in the year, November?

2     **A**     I think it's throughout the year.   I can't tell you precisely

3     when most of them happen.

4     **Q**     In providing your testimony about how long something is

5     secret, did you take into account the testimony of MGA's 30(B)(6)

6     witness on their trade secret claims?

7             **MS. HURST:**   Objection.   Misstates the witness' opinions.

8     Mischaracterizes the testimony.

9             **THE COURT:**   You can ask that question.   Overruled.

10            **THE WITNESS:**   I believe there was more than the one

11    30(B)(6) witness, generally.   Can you remind me of whose testimony

12    you're referring to?

13    BY MR. PRICE

14    **Q**     Mr. Jolicoeur?

15    **A**     Yes.

16    **Q**     And do you know whether or not Mr. Jolicoeur testified --

17            **MS. HURST:**   Objection to the publication.   Hearsay.

18            **THE COURT:**   No.   You can testify.   Mr. Jolicoeur is

19    going to testify.

20            **MS. HURST:**   So they can ask him then, Your Honor.

21    BY MR. PRICE

22    **Q**     You relied in part --

23            **THE COURT:**   Let's find out if he did.

24    BY MR. PRICE

25    **Q**     Did you rely at all on MGA's 30(B)(6) witness, their

Page 45

1   corporate representative, as to when MGA thinks that something has

2   become public?  Did you rely on Mr. Jolicoeur for that?

3   **A**    No.  The only thing I relied on Mr. Jolicoeur for -- he's the

4   CFO -- was the accounting data.

5   **Q**    Is there a reason why you wouldn't rely on Mr. Jolicoeur,

6   MGA's corporate representative on trade secret claim, why wouldn't

7   you rely on his testimony as to the time frame that something is

8   secret?

9           **MS. HURST:**  Objection.  Argumentative.

10          **THE COURT:**  Overruled.  You can answer the question.

11          **THE WITNESS:**  Because as I understand that testimony, it

12   speaks to the liability issue, which is whether or not they are

13   trade secrets, which is a matter for the jury.

14   (Whereupon there was a change in reporters and SHARON SEFFENS

15   reported the 4:30 session.)

16

17                              -oOo-

18

19                           CERTIFICATE

20

21          I hereby certify that pursuant to Section 753, Title 28,

22   United States Code, the foregoing is a true and correct transcript

23   of the stenographically reported proceedings held in the

24   above-entitled matter.

25

1   Date:  APRIL 5, 2011

2

3   

4   MARIA DELLANEVE, U.S. COURT REPORTER
    CSR NO. 9132

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

81c2712a-b7d0-468d-8223-bad66d8dde26