1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL, INC., et al.,
                    Plaintiffs,
        vs.

                                CV-04-9049-DOC
MGA ENTERTAINMENT, INC.,        DAY 46
et al.,                         Volume 5 of 5
                    Defendants.

        --------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

Tuesday, April 5, 2011

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   APPEARANCES OF COUNSEL:

 2   For Plaintiff MATTEL, INC., ET AL.:

 3   JOHN B. QUINN
     MICHAEL T. ZELLER
 4   WILLIAM PRICE
     QUINN EMANUEL URQUHART & SULLIVAN, LLP
 5   865 South Figueroa Street, 10th Floor
     Los Angeles, CA  90017
 6   (213) 443-3000

 7   For Defendant MGA ENTERTAINMENT, INC., ET AL.:

 8   THOMAS MCCONVILLE
     ORRICK HERRINGTON & SUTCLIFFE LLP
 9   4 Park Plaza, Suite 1600
     Irvine, CA  92614
10   (949) 567-6700

11   ANNETTE HURST
     ORRICK, HERRINGTON & SUTCLIFFE LLP
12   The Orrick Building
     405 Howard Street
13   San Francisco, CA  94105
     (415) 773-4585
14

15   FOR CARLOS GUSTAVO MACHADO GOMEZ:

16   MARK E. OVERLAND
     100 Wilshire Boulevard, Suite 950
17   Santa Monica, CA  90401
     (310) 459-2830
18

19   ALEXANDER COTE
     SCHEPER KIM AND HARRIS LLP
20   601 West Fifth Street, 12th Floor
     Los Angeles, CA  90071-2025
21   (213) 613-4655

22   ALSO PRESENT:

23   MGA ENTERTAINMENT, INC.
     JEANINE PISONI
24   16360 Roscoe Boulevard, Suite 105
     Van Nuys, CA  91406
25
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   ALSO PRESENT:

2   ROBERT ECKERT, MATTEL CEO

3   ISAAC LARIAN, MGA CEO

4   KEN KOTARSKI, Mattel Technical Operator

5   MIKE STOVALL, MGA Technical Operator

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1

 2                              INDEX

 3                                                   PAGE

 4   PLAINTIFF'S
     WITNESSES:              DIRECT      CROSS    REDIRECT    RECROSS
 5

 6   SARAH ALLEN            9(Q)         17(H)    25(Q)       27(H)

 7
     PLAINTIFF'S
 8   EXHIBITS:                     MARKED          RECEIVED

 9    (None)

10   DEFENSE
     WITNESSES:             DIRECT    CROSS    REDIRECT    RECROSS
11
     JAMES MALACKOWSKI
12      (Continued)               5(P)      5(H)       6(P)

13   DEFENSE
     EXHIBITS:                     MARKED          RECEIVED
14

15    (None)

16

17

18

19

20

21

22

23

24

25
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    SANTA ANA, CALIFORNIA; TUESDAY, APRIL 5, 2011; 4:30 P.M.
 2              (Jury present.)
 3        JAMES MALACKOWSKI, DEFENSE WITNESS, PREVIOUSLY SWORN
 4                  CROSS-EXAMINATION (Continued)
 5    BY MR. PRICE:
 6    Q    A head start would only last until something is no
 7    longer a secret; right?
 8    A    Plus a little bit of ramp-up as we've talked about,
 9    yes.
10             MR. PRICE:  Okay.  Nothing else.
11             THE COURT:  Redirect.
12                     REDIRECT EXAMINATION
13    BY MS. HURST:
14    Q    Planogram rooms, those are like mock store shelves, as
15    you understand it?
16    A    Yes.  That is my understanding, where they put either
17    real product -- or in many cases with MGA, white boxes so
18    you can't even see the real product or competitors can't see
19    the real product.
20             MR. PRICE:  Object.  That's vague as to time when
21    MGA started doing that.
22             THE COURT:  Overruled.
23    BY MS. HURST:
24    Q    And in its packaging on the shelf to see how much space
25    it takes up; right?
```

1   A     Correct.

2   Q     A lot of times there is not even any product in there;

3   right?

4   A     Correct.

5   Q     And in MGA's case, as you pointed out, MGA started

6   using white boxes; right?

7              MR. PRICE:  Objection.  Vague as to the time.

8              THE COURT:  Overruled.

9              THE WITNESS:  Correct.  A planogram room is like a

10  mock display so the retailers know how everything is going

11  to fit in the store.

12             MR. PRICE:  Objection.  Beyond the scope of the

13  question.

14             THE COURT:  Overruled.

15             MS. HURST:  That's fine.  No further questions.

16             THE COURT:  Recross.

17                      RECROSS-EXAMINATION

18  BY MR. PRICE:

19  Q     Is it correct that MGA didn't use white boxes until

20  2006 at K-Mart?

21  A     I don't recall the date from memory.  I know it was in

22  response to some competitive concerns.

23  Q     And whether it's a planogram or not, you do expect that

24  if someone is invoiced for a product, the person buying the

25  product has seen the product?

1    A    Yeah, but that's not a public disclosure necessarily.

2    Q    Do you know whether or not that's a public disclosure

3    according to MGA's 30(b)(6) witness on trade secrets?

4    A    That goes back to that's not what I relied upon,

5    because I think that goes to liability.  So I don't have an

6    opinion.

7    Q    But you did lean to that position?

8    A    Of course.

9    Q    And you ignored that in determining your head start?

10   A    No, I did not ignore it.  There is a lot of things in

11   the deposition that speak to issues outside of my analysis,

12   that being one example.

13   Q    Well, you looked at analyst reports in your analysis.

14   That is what market analysts said about Barbie and Bratz?

15           MS. HURST:  Objection.  Beyond the scope.  I

16   didn't ask anything about analyst reports.

17           THE COURT:  Sustained.

18           MR. PRICE:  Nothing further.

19           THE COURT:  Sir, you may step down.

20           THE WITNESS:  Thank you, Your Honor.

21           *(Witness excused)*

22           THE COURT:  Now, can we start excusing witnesses,

23   counsel, like the damages experts?  Can we just start

24   releasing people one by one?

25           MR. PRICE:  Yes.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1              MR. QUINN:  Yes.

 2              MS. HURST:  Agreed.

 3              THE COURT:  So, Mr. Wagner and Mr. Malackowski,

 4    you're both excused from these proceedings.  Thank you very

 5    much, gentlemen.

 6              On behalf of Mattel, your next witness.

 7              MR. QUINN:  We are prepared to call Sarah Allen.

 8              THE COURT:  Sarah Allen.  Now, we took one of

 9    MGA's surrebuttal witnesses

10              out of order.  Now I am going to go through

11    rebuttal with Mattel and then surrebuttal with MGA.  But we

12    put the two experts back to back, so you had Mr. Wagner for

13    Mattel, Mr. Malackowski for MGA.  Both parties agreed.  Now

14    we are back to Mattel.

15              Would you be kind enough to raise your right hand,

16    please.

17              SARAH ALLEN, PLAINTIFF'S WITNESS, SWORN

18              THE COURT:  Would you come up in the jury box,

19    please.  There is an entrance close to the well.  If you

20    would be seated.

21              Would you state your full name for the jury.

22              THE WITNESS:  Sarah Allen.

23              THE COURT:  And would you spell your last name.

24              THE WITNESS:  A-l-l-e-n.

25              THE COURT:  This is direct examination by Mr.
```

1   Quinn on behalf of Mattel.

2           MR. QUINN:  Thank you, Your Honor.

3                   DIRECT EXAMINATION

4   BY MR. QUINN:

5   Q    Your name is Sarah Allen?

6   A    Correct.

7   Q    You live in London, England?

8   A    I do.

9   Q    And you work for your own company, Springall and Allen

10  Partnership?

11  A    Correct.

12  Q    And through that company you contract out services to

13  Mattel UK; is that correct?

14  A    Yes.

15  Q    You have had this arrangement for, like, 20 years?

16  A    Yes.

17          THE COURT:  I'm sorry, Mr. Quinn.  Could I get my

18  binder back?  I passed it down to each of you with my notes

19  on it.

20          Thank you very much.  I appreciate it.  Please

21  proceed.

22  BY MR. QUINN:

23  Q    And what generally are the types of services that you

24  provide to Mattel UK?

25  A    Public relations work.

1    Q    And in February of 2009 were you working for Mattel UK

2    through your company?

3    A    Yes, I was.

4    Q    Doing this type of work?

5    A    Yes.

6    Q    Over your career how many different toy fairs would you

7    say you have attended approximately?

8    A    Approximately probably 17, 18.

9    Q    Did you attend the Nuremberg Toy Fair in Germany in

10   February of 2009?

11   A    No, I didn't personally attend.

12           MR. QUINN:  Could we please take a look at Exhibit

13   9869 already in evidence, Your Honor.

14           If we could put that up on the screen and enlarge

15   that, Ken.

16   BY MR. QUINN:

17   Q    The first e-mail in the chain is from you?

18   A    Yes, it is.

19   Q    It's dated February 9, 2009.  Who are the people you

20   are sending this e-mail to?

21   A    They are UK marketing people and then also the

22   directors of the UK operation.

23   Q    Who is David Allmark there, the name we see at the top?

24   He has forwarded this on to Brian Stockton.  Can you tell us

25   who he is.

| | |
|---|---|
| 1 | A    He is the general manager of the UK. |
| 2 | Q    For Mattel UK? |
| 3 | A    Yes. |
| 4 | Q    You wrote in this e-mail:  Just picked up some bits and |
| 5 | pieces from the MGA stand in Nuremberg. |
| 6 |      To be clear, you were not yourself at the Nuremberg Toy |
| 7 | Fair -- |
| 8 | A    No, I wasn't. |
| 9 | Q    -- is that correct? |
| 10 | A    That's correct. |
| 11 | Q    How did you pick up these bits and pieces that you are |
| 12 | referring to? |
| 13 | A    I was given the information from a UK journalist. |
| 14 | Q    And this is a journalist who had been to the toy fair? |
| 15 | A    Yes. |
| 16 | Q    You wrote:  New concept that was behind closed doors, |
| 17 | Moxie Girlz.  Apparently this is a common terminology in the |
| 18 | U.S., meaning a girl with attitude.  They're positioning |
| 19 | this as the natural successor to Bratz and is the latest |
| 20 | fashion doll collection that will be launched autumn/winter. |
| 21 |      Do you see that? |
| 22 | A    Yes, I do. |
| 23 | Q    Where did you get that information? |
| 24 | A    The journalist. |
| 25 | Q    Again, the same journalist? |

1    A    Yes.

2    Q    Did you have a regular working relationship with this

3    journalist?

4    A    Yes, I did.

5    Q    How often would you speak to this journalist?

6    A    Once or twice a month.

7    Q    And do you only talk about toy fairs with this

8    journalist or other things as well?

9    A    No.  We would talk about general toy industry things,

10   you know, just state of the market.

11   Q    Did this journalist ever come to Mattel's Toy Fair

12   showroom?

13   A    Yes, he did.

14   Q    How would that happen?

15   A    We would invite him for a preview of product.

16   Q    What would be the reason for inviting the journalist

17   into Mattel's Toy Fair showroom for a preview of product?

18           MS. HURST:  Objection.  Relevance.

19           THE COURT:  Overruled.

20           THE WITNESS:  He writes to the leading toy title,

21   so we would always entertain him at the Mattel showroom to

22   show him the new products that would be launched later on

23   that year.  So we would do that twice a year, for the

24   spring/summer launch and the autumn/winter launch.

25   BY MR. QUINN:

1  Q     Is that unusual to deal with the press in that way at

2  toy fairs?

3  A     No.

4  Q     You said here that:  New concept that was behind closed

5  doors.  What did you mean by behind closed doors?

6            MS. HURST:  Objection.  Calls for hearsay.

7            THE COURT:  Overruled.  Now, just a moment.  Are

8  you writing this e-mail?

9            THE WITNESS:  Yes.

10            THE COURT:  Overruled.  You can answer the

11  question.  I'm sorry.

12            THE WITNESS:  I do.

13            THE COURT:  You do.

14            THE WITNESS:  Okay.  Sorry.  To me it meant that

15  the Moxie Girlz were in a separate area from the main MGA

16  stand.

17            MS. HURST:  Objection.  Move to strike based on

18  hearsay.  She said she wasn't present.

19            THE COURT:  But these are your words?  You wrote:

20  New concept that was behind closed doors, Moxie Girlz?

21            THE WITNESS:  Yes.

22            THE COURT:  So these are your words?  You're

23  writing this e-mail?

24            THE WITNESS:  I am writing the e-mail.

25            THE COURT:  You can tell us what you meant by

```
 1   that.
 2              THE WITNESS:  Yes.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  So the journalist gave me the
 5   information, and then I just reported it back on the e-mail.
 6              THE COURT:  I see.  Technically this is hearsay
 7   because she is receiving it from the journalist, but I
 8   believe a journalist -- will the journalist testify?
 9              MR. QUINN:  The journalist will not testify, Your
10   Honor.
11              THE COURT:  Then it's hearsay and not for the
12   truth the matter asserted.  But these are her words, so
13   you can't accept that this is truthful or untruthful.  It's
14   just hearsay.  We don't have -- it's not for the truth of
15   the matter.
16              That's very complicated, and I stumbled over that,
17   and I apologize to you as a witness and to the jury.
18              MR. QUINN:  Thank you for the hearsay rule.  We
19   got it from you.
20   BY MR. QUINN:
21   Q    In the last line there you say:  "Sorry, not much
22   detail but something to keep an eye on."
23        Do you see that?
24   A    Yes, I do.
25   Q    What did you mean by that?
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   A    Basically that it was just some general information
 2   that wasn't particularly significant but was just something
 3   that we would be aware of.
 4   Q    In your experience is the information that is provided
 5   at toy fairs confidential?
 6            MS. HURST:  Objection.  Improper opinion
 7   testimony.
 8            THE COURT:  Sustained.
 9   BY MR. QUINN:
10   Q    In your understanding what is the purpose of a toy
11   fair?
12            MS. HURST:  Objection.  Cumulative.
13            THE COURT:  Well, it depends.  Which toy fair?
14   Which booth?  Be more specific.  If you narrow that down, I
15   will allow the question.  Where?  What booth?
16   BY MR. QUINN:
17   Q    The toy fairs you have attended, what is your
18   understanding of what the purpose is, why exhibitors exhibit
19   at toy fairs?
20            MS. HURST:  Objection.  Vague.
21            THE COURT:  Sustained.
22   BY MR. QUINN:
23   Q    Are you aware of -- how about the New York Toy Fair?
24   Have you ever attended the New York Toy Fair?
25   A    Yes, I have.
```

1    Q     How many times have you been to the New York Toy Fair?

2    A     Seven or eight.

3    Q     Have you attended Mattel's Toy Fair booth there?

4    A     Yes, I have.

5    Q     Have you attended other toy company manufacturers'

6    booths there?

7    A     Not in New York, but I have in London.

8    Q     All right.  And when you have gone to the New York Toy

9    Fair, you have gone as a Mattel representative?

10   A     That's correct.

11   Q     What is your understanding about why Mattel exhibits at

12   the New York Toy Fair?

13             MS. HURST:  Objection.  Irrelevant to MGA's claim.

14             THE COURT:  It is, but you can tell us about

15   Mattel.  What does Mattel do?

16             THE WITNESS:  In my experience from toy fairs that

17   I have attended, it's about showing retailers and buyers for

18   that retail industry the new product that you plan to launch

19   later on in the year.  It's really about getting retailers

20   to buy the product and to get excited about the product.

21   And, you know, everybody thinks they have got the next hit

22   for Christmas.

23   BY MR. QUINN:

24   Q     As part of it also do you work with journalists as

25   well?

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   A     Yes.

 2   Q     There are journalists who cover the toy industry?

 3   A     Absolutely.

 4   Q     And people who write blogs who cover the toy industry?

 5   A     Yes.

 6   Q     Is part of your job to work with them to try to get

 7   publicity out about Mattel's new products?

 8   A     Absolutely, yes.

 9   Q     And press releases are issued and available there also

10   at toy fairs?

11   A     Yes.

12            MR. QUINN:  Thank you for coming.  Nothing

13   further.

14            THE COURT:  Cross-examination.

15                  CROSS-EXAMINATION

16   BY MS. HURST:

17   Q     Good afternoon, Ms. Allen.

18   A     Good afternoon.

19   Q     My name is Annette Hurst, and I represent MGA and Mr.

20   Larian.  You have heard of MGA; right?

21   A     I have.

22   Q     You have a consulting arrangement with Mattel?

23   A     Yes, I do.

24   Q     And that's lasted for 20 years, you said?

25   A     Nearly.  Nineteen and a half.
```

```
 1    Q    Are they your biggest client?
 2    A    Yes.
 3    Q    And you came all the way from London for this?
 4    A    Yes.
 5    Q    Did Mattel pay for your air fare to come here?
 6    A    Yes.
 7    Q    And are they paying for your time spent to come here
 8    and testify?
 9    A    Originally, no.
10    Q    Do you expect you will bill them for consulting after
11    coming here for this trip to testify?
12    A    You know, I have been here a lot longer than I had
13    anticipated, so I am sure there will be some recompensation
14    for my time.
15    Q    You came here on a business trip and extended to come
16    and testify?  Is that the story?
17    A    No.  I came to clarify the e-mail.
18    Q    Okay.  You were not at the MGA showroom in Nuremberg;
19    right?
20    A    No.
21    Q    So you don't know if there was a security guard there;
22    right?
23    A    No.
24    Q    You don't know if people were required to sign
25    nondisclosure agreements in order to get in; right?
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   A     That's correct.

 2             MS. HURST:  Could we see 9869?

 3   BY MS. HURST:

 4   Q     You sent this e-mail on February 9, 2009; isn't that

 5   right?

 6   A     That's correct.

 7   Q     How close in time did you send the e-mail to when you

 8   received the information?

 9   A     I can't recollect specifically, but I think it would be

10   either that day or the day after.

11   Q     Who was the journalist you spoke to?

12   A     John Walsh.

13   Q     Who does he work for?

14   A     He is the publisher of Toys 'n' Playthings in the UK.

15   Q     Is that a magazine?

16   A     Yes.

17   Q     Now, why did you send this e-mail?

18   A     Because it was general information that I had received,

19   so I was just passing it on.

20   Q     You thought it would be valuable to Mattel; right?

21   A     It's general information that, you know, I would

22   receive within the course of my work talking to different

23   journalists.

24   Q     Well, there is a lot of general information out there;

25   right?
```

```
1    A    Yes.
2    Q    Do you send an e-mail to the head of Mattel's UK
3    operation every time you get a piece of general information?
4    A    I may well, yes.
5    Q    How many e-mails a day do you send to the head of
6    Mattel's UK operation?
7    A    Depending on the information.
8    Q    Well, how many?
9    A    I couldn't give you a specific number.
10   Q    Well, hundreds?
11   A    No.
12   Q    Can you tell me how many e-mails you sent to the head
13   of Mattel's UK operation on February 9th, 2009?
14   A    No.
15   Q    You sent this e-mail because you thought the
16   information would be useful to Mattel; isn't that right?
17   A    I just passed on the information that I had received.
18   Q    And you thought it would be useful; isn't that true?
19   A    I just passed on the information I had received.
20   Q    So thinking back to your state of mind there on
21   February 9, 2009, when you sent the information, you thought
22   it would be useful to Mattel; isn't that right?
23   A    I just simply passed on the information that I had
24   received.
25   Q    So you didn't think it would be useful?  You thought it
```

| | |
|---|---|
| 1 | was useless information that you were troubling the head of |
| 2 | Mattel's UK operation with; is that right? |
| 3 | A    I received the information, and I just passed it on. |
| 4 | Q    How much revenue does your consultancy receive from |
| 5 | Mattel usually on an annual basis? |
| 6 | A    I would probably earn between 100,000 and 150,000 a |
| 7 | year. |
| 8 | Q    Is that pounds or dollars? |
| 9 | A    Pounds. |
| 10 | Q    Okay.  How much of that personally do you take home? |
| 11 | A    That would be a take-home salary. |
| 12 | Q    Okay.  Based on Mattel revenues? |
| 13 | A    Based on the work I do for Mattel? |
| 14 | Q    Yes.  Is that right? |
| 15 | A    Yes. |
| 16 | Q    And you said:  Sorry not much detail but something to |
| 17 | keep an eye on. |
| 18 |      Is that right? |
| 19 | A    That's correct. |
| 20 | Q    You apologized for not having more information; right? |
| 21 | A    I simply passed on the information that I had received. |
| 22 | Q    You apologized for not having more information; right? |
| 23 | A    I simply passed it on. |
| 24 | Q    Okay.  "Sorry."  That's an apology; right? |
| 25 | A    I just passed on the information. |

```
 1   Q    Is the word sorry usually an apology, Ms. Allen?

 2   A    You know, I just passed on the information.

 3             MS. HURST:  Your Honor, could I have a direction

 4   that the witness answer the question.

 5             THE COURT:  Yes.

 6             THE WITNESS:  Okay.

 7   BY MS. HURST:

 8   Q    Ms. Allen, is the word sorry usually taken as an

 9   apology?

10   A    I just simply passed the information on.

11   Q    You see the word sorry there in your e-mail; right?

12   A    I do.

13   Q    Okay.  Let's just focus on that word; al right?  You

14   got it?  The word sorry; right?  Do you understand?

15   A    I do understand.

16   Q    You wrote the word sorry, right, in the e-mail?

17   A    Yes.

18   Q    And the word sorry usually means an apology; right, Ms.

19   Allen?

20   A    I simply passed on the information.

21   Q    Okay.  Yes or no, Ms. Allen.  Does the word sorry in

22   your parlance usually mean an apology?

23   A    Within the context of that e-mail, I simply passed on

24   the information.

25   Q    Is that an answer that you scripted out beforehand that
```

1    you would give in response to every single question that you

2    were asked today?

3    A    No.

4    Q    Are you sure?

5    A    Positive.

6    Q    How many times did you meet with Mattel's lawyers

7    before you came to testify?

8    A    Twice.

9    Q    How long total?

10   A    Two hours.

11   Q    It took you two hours to get ready to talk about a

12   seven-line e-mail; is that right?

13   A    I've come all the way from the UK.  I am not familiar

14   with the U.S. system.

15   Q    Okay.  And in that two hours of preparation, you

16   determined that you would respond to virtually every

17   question, "I just passed on the information I received"; is

18   that right?

19   A    No.

20   Q    So let me ask you again.  Do you see the word sorry

21   there, Ms. Allen?

22   A    Yes.

23   Q    That's a word you have used before; isn't it?

24   A    I simply passed on the information.

25   Q    Are you married?

```
 1   A     Yes, I am.

 2   Q     Do you ever apologize to your husband?

 3            MR. QUINN:  Relevance.

 4            THE COURT:  Nobody does that, counsel.  I am just

 5   joking.

 6   BY MR. QUINN:

 7   Q     When you apologize to people, do you usually use the

 8   words, I'm sorry?

 9            THE COURT:  By the way, that's a joke for the

10   record, but it's not intended to influence anything.

11            All right, counsel.  I'm sorry.  Your question.

12   BY MS. HURST:

13   Q     When you apologize, do you ordinarily use the words,

14   I'm sorry?

15   A     It depends on the context.

16   Q     Have you ever used the words, I'm sorry, to apologize,

17   Ms. Allen?

18   A     I'm sure I have.

19   Q     Here you were apologizing for not having more

20   information to offer; right?

21   A     I was just simply passing on the information that I

22   had.

23            MS. HURST:  Okay.  No further questions.

24            THE COURT:  Counsel, redirect.

25                    REDIRECT EXAMINATION
```

```
 1   BY MR. QUINN:

 2   Q    Do you know an Elton John song, Sorry is the Hardest

 3   Word?  It seems to be the hardest word.

 4            THE COURT:  Counsel is just saying that.  Let's

 5   move on.  Counsel, your question.

 6   BY MR. QUINN:

 7   Q    When you wrote this e-mail, was it your understanding

 8   that you were passing on confidential, proprietary

 9   information?

10   A    No.

11   Q    This was information you had received from a

12   journalist; is that correct?

13            MS. HURST:  Objection.  Leading.

14            THE COURT:  It is leading, counsel.

15   BY MR. QUINN:

16   Q    Is this information you had received from a journalist?

17   A    Yes, it was.

18   Q    Somebody who was attending the toy fair to write public

19   things about what they saw?

20            MS. HURST:  Objection.  Lacks foundation.

21            THE COURT:  Sustained.

22   BY MR. QUINN:

23   Q    Well, you told us the publication that this journalist

24   is with?

25   A    Yes.
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
1    Q    And what's the name of that publication?

2    A    Toys 'n' Playthings.

3    Q    It was your understanding he went to the Nuremberg Toy

4    Fair to write for this publication, Toys 'n' Playthings?

5    A    Yes.

6              MS. HURST:  Objection.  Hearsay.  Lacks

7    foundation.  Move to strike.

8              THE COURT:  It's hearsay.  She can cast her

9    opinion about where she believes he is, but we don't have

10   him present with us.

11   BY MR. QUINN:

12   Q    So you do know where this person works?

13   A    Yes.

14   Q    For this publication, Toys 'n' Playthings?

15   A    Yes.  And in my experience that's why he would be at

16   the toy fair.

17   Q    And is it your understanding that this journalist was

18   invited into MGA's showroom at Nuremberg?

19             MS. HURST:  Objection.  Hearsay.

20             THE COURT:  Sustained.

21   BY MR. QUINN:

22   Q    Did the journalist tell you how they got into the

23   showroom?

24             MS. HURST:  Objection.  Hearsay.

25             THE COURT:  Sustained.
```

1    BY MR. QUINN:

2    Q    Do you have any reason to think that the journalist

3    broke into MGA's showroom?

4              MS. HURST:  Objection.  Hearsay.

5              THE COURT:  Sustained.

6              MR. QUINN:  Nothing further.

7              THE COURT:  Recross.

8                     RECROSS-EXAMINATION

9    BY MS. HURST:

10   Q    Ms. Allen, would you falsify credentials in order to

11   gain access to somewhere you were not invited?

12   A    No.

13   Q    Do you think that would be proper conduct?

14   A    To falsify a document?

15   Q    Yes.

16   A    Is it proper conduct?

17   Q    Yes.  Is that something you would do?

18   A    No.

19   Q    You don't know whether someone falsified credentials,

20   got into MGA's Nuremberg showroom, on then passed on this

21   information; do you?

22   A    From my understanding there would be no need for a

23   journalist to do that.  He represents the toy industry.

24   Q    But you weren't there; right?

25   A    I wasn't personally there.

1  Q    You weren't there; right?

2  A    No, but I was just reporting back what the journalist

3  told me.

4  Q    Right.  And you have no idea because you weren't there,

5  right, how he got the information?

6  A    No.  But he attends toy fairs.

7  Q    Sure.  And did he falsify credentials to get into MGA's

8  showrooms?

9          MR. QUINN:  I don't think she got to finish her

10  answer.

11          THE COURT:  Did you finish your answer, Ms. Allen?

12          THE WITNESS:  Sorry.  I am not sure.

13  BY MS. HURST:

14  Q    She is sorry.  Was that an apology, Ms. Allen?

15          THE COURT:  Strike that question.

16  BY MS. HURST:

17  Q    You have no idea how John Walsh got the information;

18  isn't that true?

19  A    It would be my understanding that he would have been

20  invited on to MGA's stand.  He is a leading UK journalist.

21  His industry is to talk to toy manufacturers about their

22  products.

23  Q    That's your assumption; right?

24  A    In my experience, yes.

25  Q    Would you knowingly pass on information that someone

 1    had stolen by sneaking into a showroom?

 2    A    No.

 3    Q    If you knew someone had snuck into a showroom and got

 4    this information using fake credentials, you wouldn't have

 5    passed it on; right?

 6    A    Correct.

 7    Q    Is that something Mattel ever paid you to do?

 8    A    No.

 9    Q    Are you aware that Mattel paid others to do that for

10    about 20 years?

11              MR. QUINN:  Objection.

12              THE WITNESS:  No.

13    BY MS. HURST:

14    Q    Were there any Mattel market intelligence employees at

15    the Nuremberg Toy Fair in 2009?

16    A    Not to my knowledge.

17    Q    Do you know?

18    A    No.

19    Q    Was there anyone paid by Mattel to attend the Nuremberg

20    Toy Fair in 2009?

21              MR. QUINN:  Beyond the scope and argument.

22              THE COURT:  Beyond the scope.  Sustained.

23    BY MS. HURST:

24    Q    Was Sharon Rahimi paid by Mattel to attend the

25    Nuremberg Toy Fair in 2009?

```
1              MR. QUINN:  Same objection.

2              THE COURT:  Sustained.

3    BY MS. HURST:

4    Q   Did Sharon Rahimi give the information to John Walsh

5    that you just passed on?

6              MR. QUINN:  Same objection.

7              THE COURT:  Sustained.  Let's move on, counsel.

8              MS. HURST:  No further questions.

9              THE COURT:  Now, may we excuse Ms. Allen?

10             MR. QUINN:  Yes.

11             THE COURT:  Ms. Allen, thank you very much for

12   your attendance.

13             (Witness excused).

14             THE COURT:  Ladies and gentlemen, why don't you go

15   home tonight.  We will stay here.  You are admonished not to

16   discuss this matter amongst yourselves or form any opinions

17   in the case.  We'll see you tomorrow at 8:30.  Please drive

18   safely.

19             I think we will probably be releasing you a little

20   bit early tomorrow.  I think you will probably be released a

21   little bit early Thursday.  And I expect to instruct you on

22   Thursday, and I think that we'll hear argument on this case

23   on Friday.

24             Okay.  Have a nice evening.

25             (Jury excused)
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1              THE COURT:  Counsel, if you would be seated.
 2   Thank you for the courtesy.
 3              Let's do the following.  Let's clear a couple of
 4   things up.  I don't want the -- ask Ms. Thomas to come in
 5   for just a moment.  She was just here, and I want to make
 6   certain you are both agreeing to this so that there's no
 7   accusation on passing information to rebuttal witnesses.
 8   Let's get that cleared up.  Ask her just to come in for a
 9   moment so Mattel is not accused of something that didn't
10   occur.
11              Ms. Thomas, come on in and join us for just a
12   moment.  I think all counsel are going to stipulate that you
13   be present and you have been.  I just want to make certain
14   that the accusation is not made by one of the parties that
15   you're here passing information, because we're still with
16   rebuttal.  So let me clear that up on the record.  Hopefully
17   we can keep you present; but if not, we're going to exclude
18   you.  Okay?
19              Now, counsel, we have a couple rebuttal witnesses
20   left.  Can we start releasing witnesses now one at a time?
21   Ms. Allen was the last witness.
22              MR. MCCONVILLE:  Yes, sir.
23              THE COURT:  Okay.  Now, any objection to Ms.
24   Thomas?  Or if she's present, is there going to be an
25   accusation by MGA that she is passing information back to --
```

1    see, I used to sit in your seat.  So everything that you

2    have done, I've done myself.

3              MR. MCCONVILLE:  I can't say that we won't ask the

4    question as to whether or not you have met with Ms. Thomas.

5    I think that's a fair question.

6              THE COURT:  I can see that coming, so I just

7    caution Mattel.  You are laying yourself wide open for a

8    question about Ms. Thomas being here, and I just suggest

9    that she not be present.

10             MR. QUINN:  We are comfortable with it.

11             THE COURT:  Ms. Thomas, this is to protect you and

12   the integrity of the process.  I can hear the question

13   coming now:  Was Ms. Thomas present, and did she pass

14   information to you as one of the rebuttal witnesses?

15             MR. QUINN:  Your Honor, we don't have a problem.

16   We are prepared to run that risk.  If they have no

17   objection, we would like her to be here.

18             THE COURT:  That's up to them.

19             MR. MCCONVILLE:  We have no objection to her being

20   present, with the understanding we are going to ask the

21   question.

22             THE COURT:  I will leave that in Mattel's hands,

23   then, because I know the question is coming.  I used to sit

24   where both counsel are for a lot of years.

25             All right.  Then, counsel, let's send Mr. Larian

```
 1    home and Mr. Eckert.  Thank you for your attendance.  We'll
 2    see you tomorrow.
 3               Counsel, why don't we get busy tonight.
 4               MR. QUINN:  Your Honor, at the risk of sounding
 5    like a broken record, would you like Mr. Johnson to continue
 6    to wait here in the building?
 7               THE COURT:  Believe it or not, Mr. Quinn, I'm
 8    going to get to a about 10 questions in just a moment.
 9               MR. QUINN:  All right.  I was just asking.
10               THE COURT:  Now, we need to call counsel before we
11    proceed any further and see how we're doing with --
12               MR. QUINN:  Mr. Bryant?
13               THE COURT:  Thank you, Mr. Quinn.  I wasn't going
14    to say Carter, but thank you for helping me.  So let's get
15    on the phone right now and informally see how he is doing,
16    because it's going to tell us how much time we have
17    tomorrow.  And I want to give you back as much time as I can
18    for your concluding arguments.
19               MR. QUINN:  Okay.  We have about three hours and
20    25 minutes left, according to my calculation.
21               THE COURT:  And, Diane, could I get you and
22    whoever you are working with -- I am not sure who you're
23    working with.
24               MR. QUINN:  For what, Judge?
25               THE COURT:  We just want to get the time up.  We
```

```
 1    didn't get a lot done today, but I want everybody to be
 2    aware of where we are.  I think we'll get it all in.
 3               MR. MCCONVILLE:  Jimmy has been in charge of our
 4    timekeeping.
 5               THE COURT:  Thank you very much, Jimmy.  Counsel,
 6    we have Mr. Johnson, who you brought
 7               over.  Are there any final comments from either
 8    party concerning Mr. Johnson?
 9               MR. QUINN:  Nothing, Your Honor.
10               MR. MCCONVILLE:  No, Your Honor.
11               THE COURT:  All right.  Well, we may be shortly
12    learning about antitrust law in great detail.  I am going to
13    joke with both of you, although it's not a joking matter.
14    You've got the Harvard school of antitrust analysis, and
15    you've got the Chicago school.  And hopefully we will never
16    get there.
17               The Kohl allegations relate to an unfair
18    competition claim which requires an incipient violation of
19    antitrust laws.  Go research it.  The Clayton Act provides
20    that it shall be unlawful for any person engaged in commerce
21    in the course of such commerce to make a sale or contract
22    for sale of goods or fix a price charge therefore or
23    discount from or rebate upon such price on the condition,
24    agreement, or understanding that the purchase thereof shall
25    not use or deal in the goods of a competitor.  It is
```

1    irrelevant whether the retailer or contracting party induces

2    the conduct.

3           It is still wrongful for Mattel to violate the

4    Sherman Act.  In other words, quote, they made me do is, is

5    not a defense to the Clayton Act.  Thus, Mr. Johnson's

6    communications with Mattel are irrelevant.  It does not

7    matter what Kohl wanted to do or not to do.  It is Mattel's

8    intent that is the key.

9           Now, I am precluding Mr. Johnson.  You may call

10   Julie Skolden, and she may testify concerning her knowledge.

11   That is relevant under the Clayton Act and under unfair

12   competition.  Now, that's my ruling.

13          MR. QUINN:  Just so the Court is clear, Mr.

14   Johnson would testify there was no such conduct.  There was

15   no discussion, no agreement that Kohl's would not do

16   business with MGA.  And indeed there was no gap in Kohl's

17   business dealings with MGA, that they dealt continuously

18   with MGA, contrary to the bar chart the jury has seen.

19          THE COURT:  All right.  Thank you.  Now, I am

20   going to meet you in one hour so you have a chance for

21   dinner.  That will be at, what, 6:30?

22          MS. HURST:  Thank you, Your Honor.

23          THE COURT:  You all have a good dinner.

24          *(Recess taken at 5:15 p.m.; proceedings*

25          *resumed at 7:00 p.m.)*

1          THE COURT:  We are on record.  All counsel are

2    present.  Now I'm going to give you my tentative thoughts.

3          You have submitted objections on behalf of MGA to

4    the tentative instructions, and these are, I think, my

5    tentative rulings at least at this time.  And you know I am

6    always willing to listen to you.

7          MS. HURST:  Can we have argument before?

8          THE COURT:  Well, let me give you my tentative

9    thoughts.  How do you know what you're arguing?

10          MS. HURST:  Okay.

11          THE COURT:  So you're requesting an instruction

12    about adhesion contracts.

13          MS. HURST:  We don't need that one.

14          THE COURT:  Well, I'm just going to make my

15    record, though.  Okay?  It's entirely redundant of my

16    tentative instruction that any ambiguities in the contract

17    should be resolved against the drafter.

18          MGA has proposed that the jury be instructed that

19    the rule of construction should, quote, apply more strongly

20    in the case of adhesion contracts, but that is not at all a

21    clear instruction upon which the jury can rely.  It also

22    lacks any basis in the law.

23          And to the extent that MGA implicitly is seeking

24    to have the contract invalidated an unconscionable, you

25    already waived the unconscionability defense during the

```
1    argument on the motions in limine.  So I tentatively decided
2    to deny this instruction.
3           MS. HURST:  The thing that got filed this morning
4    was overbroad, and that's why I was going to make a comment
5    first.  There is only about four that we really care about.
6           THE COURT:  We are going to go through each one of
7    them.  It will only take a moment.  You're going to bear
8    with me.  Do you want that instruction?
9           MS. HURST:  I accept the Court's ruling.
10          THE COURT:  Okay.  Second, you are seeking an
11   instruction about an employee's right of mobility and right
12   to obtain new employment.  None of the authorities that you
13   have cited to me in support of this instruction concern a
14   claim as here for intentional interference with contractual
15   relations.
16          These cases are all addressed to tort claims for
17   breach of fiduciary duty or breach of duty of loyalty,
18   neither of which are at issue in this case, and I don't
19   understand why I would give that instruction.
20          MS. HURST:  I think section 16600 is, you know,
21   policy of California law that is applicable here to the
22   intentional interference claim, so --
23          THE COURT:  All right.  Mr. Zeller.
24          MR. ZELLER:  I don't think we really have much to
25   add from what we have said before.  I know we have discussed
```

1    the particulars of the tortious interference claim

2    previously.

3              THE COURT:  Okay.  Next you are seeking an

4    instruction about the probative competition.  This is a BAJI

5    instruction that is an affirmative defense to a claim for

6    intentional interference with contractual relations.  It

7    does initially appear to be relevant and there may be, I

8    think, some merit to instructing the jury on this defense.

9    So I want to open this one up for both parties to argue.

10             MS. HURST:  This is one that I was going to say

11   that we really think is applicable under Stewart versus

12   Ragland.  We think we are entitled to it.  There is a form

13   instruction.  We are happy to live with the form

14   instruction.  It's clearly a contract terminable at will.

15   That's the circumstances under which it implies.

16             If we get this one, then that, you know, probably

17   takes care of the employee right of mobility problem as

18   well, frankly, but we do feel very strongly that we are

19   entitled to this one.

20             THE COURT:  Mr. Zeller.

21             MR. ZELLER:  If I may just have a moment to look

22   at the standard instruction.

23             THE COURT:  Sure.

24             MR. ZELLER:  I didn't see from looking at the

25   Court's instruction that there was one in there already.

```
 1              THE COURT:  I didn't include it.  That's my fault.
 2              MR. ZELLER:  I wasn't suggesting that at all.
 3    I'll take a look at the form.  I'm not sure as a matter of
 4    general principle --
 5              THE COURT:  Let me go through these and we'll come
 6    back to it.
 7              MR. ZELLER:  Okay.
 8              THE COURT:  Let me go through just a laundry list
 9    of instructions for a moment and then collect all of your
10    thoughts.
11              Next, MGA seeks an instruction on the mitigation
12    of damages.  This instruction appears at CACI 3931, and it
13    applies to tort claims.  My concern is whether this
14    instruction is applicable to the facts of the intentional
15    interference with contractual relations claim on these facts
16    at least.  And is this an argument that Mattel should have
17    hired other employees to make up for its loss of services?
18    I don't know why we're --
19              MS. HURST:  We are requesting it on the copyright
20    and on the trade secret claims.  I mean, we don't think they
21    have damages at all on the intentional interference claim,
22    so, I mean, just to be clear.  But we are entitled to it as
23    a defense for both the trade secret and copyright claims.
24              THE COURT:  Mr. Zeller, what are your thoughts?
25              MR. ZELLER:  I would also like to look at the
```

     1    standard instruction on that before responding.

     2              THE COURT:  Let's come back to it in a moment.

     3    There's no rush.  That's why I am doing it tonight instead

     4    of at the last moment.

     5              Next, you've requested that the Court instruct the

     6    jury on the copyright preemption defense.  I don't believe

     7    there is any basis for the jury to make this kind of legal

     8    determination.  The proposed instruction also ignores the

     9    extra element test for determining whether the right

    10    protected by the state law trade secret claim is identical

    11    to the one protected by the Copyright Act.

    12              My special verdict makes clear, or at least it

    13    will, that such an extra element may exist if there is

    14    evidence of inducement since it's well established that

    15    claims for aiding and abetting breach of fiduciary duty are

    16    not preempted by the Copyright Act.

    17              For that I am citing Briarpatch Limited, LP,

    18    versus Phoenix Pictures, at 373 F.3d 296-307.  It's a Second

    19    Circuit 2004 case that you can both look at.  That cites

    20    Computer Associates International, Inc., versus Altai, Inc.,

    21    982 F.2d 693-717, 1992.  Those claims as MGA has elsewhere

    22    argued are identical to claims for trade secret

    23    misappropriation that are predicated upon the acquisition of

    24    a trade secret through inducing the breach of a duty to

    25    maintain secrecy.

```
 1                So let me get your thoughts on that.

 2                MS. HURST:  I mean, we don't agree that any duty

 3     to maintain secrecy is a fiduciary duty.  You know, they

 4     have argued consistently that preemption is an affirmative

 5     defense.  If it is an affirmative defense, we think that the

 6     Court should instruct on it.  It's clearly a theory of the

 7     case.

 8                Today Mr. Wagner testified that the value that

 9     Carter Bryant offered was only that specific combination of

10     things that was in those drawings.  That's the basis for the

11     instruction.  Extra element test or no extra element test,

12     when one witness after witness got up there and admitted

13     that the value really was in the specific expression, we are

14     entitled to have the jury charged on preemption and decide

15     whether there's any difference between a copyrightable

16     expression and the so-called trade secret.

17                It would be really a shame not to charge the jury

18     on this and ask them that question:  Do you find that the

19     so-called trade secret and the copyrights are really the

20     same thing? when we have got a Ninth Circuit opinion out

21     there limiting the viable scope of the copyrights, which

22     would clearly apply to the trade secrets as well; and we are

23     going to go up again and not know what the jury's answer on

24     this was.

25                I mean, they argued in the Ninth Circuit before.
```

```
 1    They've tried to argue that the name was an integral part of

 2    the drawings and all sorts of things that there weren't jury

 3    findings on.  And it's going to happen again.  We're going

 4    to be arguing in post-trial motions about preemption.  We're

 5    going to be arguing on appeal on preemption.  We should have

 6    the benefit of the jury's view on this.

 7              THE COURT:  Mr. Zeller.

 8              MR. ZELLER:  I will resist the temptation to argue

 9    the merits of preemption at this point.  Obviously we

10    disagree with that.  The bottom line, I think, here for

11    purposes of today is that this is just not a jury question.

12    I am unaware of any authority that preemption is a proper

13    question to present to the jury.  From our view it's clearly

14    for the Court.

15              THE COURT:  I am baffled by this.  I sensed from

16    the very beginning that I was willing to give both parties

17    the opportunity to go up on trade secret misappropriation

18    and copyright and that those were opportunities for each of

19    you, but an opportunity for the Circuit also.

20              I think we have seen the Circuit struggling with

21    this very question, so I don't know any place or any

22    precedent for the jury to make that determination.  Now, a

23    District Court could potentially.  But if this Court decided

24    that that was the appropriate remedy, the benefit to Mattel

25    if they prevailed on their trade secret misappropriation
```

1    claim is that they could say that the District Court was

2    wrong, and that would be preserved in their trade secret

3    misappropriation.  So Mattel then is able to not be

4    precluded from getting the answers or the damages verdict

5    that you believe you are entitled to on the trade secret

6    misappropriation.

7            If the Court preempted this, so be it.  If the

8    Circuit preempts it, but so be it.  But then the Supreme

9    Court has a clear indication and Mattel then is able to

10   argue all the way along that preemption was not appropriate.

11           This is a very unsettled area.  I think that this

12   is really one of most fascinating aspects of this case,

13   frankly.  And I don't know why I would take that away from

14   Mattel.  I don't even know if the jury would understand that

15   concept.  I don't know how I would instruct them.  I think

16   that that's uniquely a judicial determination, and I think

17   the prejudice lies to Mattel in taking that from them.

18           I think that that's Mr. Zeller's initial argument

19   also, and that's your right to a jury trial on those issues.

20   I think I made those comments consistently along the way,

21   that you had the right to get to the jury on trade secret

22   misappropriation, that preemption was not automatic.  I may

23   decide that at a later point if I believe that that's

24   appropriate, send it up to the Circuit.  But that's a Court

25   determination.

```
 1              MR. ZELLER:  One thing I would add on this, too,
 2    is there is certainly the potential for confusion.  But also
 3    at this stage -- I mean, no one has put on evidence in front
 4    of this jury that would allow them to make the sort of --
 5    really make an intelligent informed decision on this issue.
 6              I mean, we're obviously all down to four hours or
 7    less on each side.  To then force the parties and
 8    particularly Mattel to try and articulate to the jury
 9    through its remaining time why we think that there are
10    differences between the trade secrets and the copyrights --
11    which we certainly do and are happy to discuss that at the
12    appropriate juncture -- would, I think, be additionally
13    prejudicial.
14              THE COURT:  I am not certain, frankly, without the
15    Circuit's guidance, I would be sending the idea of ideas to
16    the jury.  I mean, quite frankly I do believe there is a
17    strong leg for having a Court determine that.  But I think
18    that the wisdom of the Circuit prevails, so it's probably a
19    good idea to send it to the jury in this case.
20              MS. HURST:  Your Honor, just to be clear, we are
21    asking for a finding on the predicate that we say, the
22    factual predicate that is necessary for application of the
23    preemption defense, and that is whether the copyright and
24    the trade secret have the same value.  In other words, is
25    there any difference?  Does the jury find that the trade
```

```
 1   secret really adds any value as to what's protected by
 2   copyright?
 3           THE COURT:  Let's play with that for just a
 4   moment.  If I ask that question, why aren't I suggesting to
 5   the jury that they do?  So let me take that concept and
 6   let's play with this.
 7           The Court now says:  Ladies and gentlemen of the
 8   jury, does the copyright have the same value as the trade
 9   secret?  Well, first of all, why should it?  You have got
10   two conflicting and clashing theories of damages.  You took
11   my car; you added a new bumper.  You are supposed to give
12   back the sweat equity?  A lot of people would disagree with
13   that.  They'd just say:  Give me back my car.
14           That's no different than trade secret
15   misappropriation.  I think I am actually suggesting to the
16   jury that they have that finding by instructing them.  Do
17   they have the same value?  I am assuming that if they reach
18   a different verdict, for instance, if they say trade secret
19   misappropriation, $100 million; but they say copyright,
20   $30 million.  They obviously have a different value.  So I
21   don't understand what I would be instructing them on.
22           MS. HURST:  See, that's exactly the problem.  They
23   might just pick different numbers because the expert offered
24   a different number.  We don't really know, and there is a
25   basis for --
```

1          THE COURT:  Which expert?  Could you understand

2    either one of them?

3          MS. HURST:  Well, let's not go there tonight.  But

4    anyway, I mean, this is exactly the problem.  We have had

5    witness after witness testify what was already publicly

6    known, their trade secrets down to the specific combination

7    of ideas, and it's the same thing as the copyright.  The

8    jury can make a determination about that, and should.

9          You know, fair use is a defense in copyright

10   that's a mixed question of law and fact, and the jury has to

11   make factual findings in a fair use case, and the Court has

12   got to, you know, apply the law.  This is no different.

13         A preemption may be a pure legal question, but the

14   factual predicate for preemption is something that this jury

15   has spent the last four months hearing about, and this is no

16   surprise.  We requested this instruction from the outset.

17   I'm not saying the wording of it is exactly right, but I

18   believe we are entitled to ask the jury the question,

19   whether there is anything additional in the trade secret

20   than the copyright; because otherwise the Court's analysis,

21   just because they come up with different numbers, is exactly

22   the kind of problem with inconsistency we are going to be

23   facing.

24         THE COURT:  Let me play with that one more time

25   just so I understand it.  By me asking the jury if there is

1   anything different in the trade secret misappropriation

2   damages than the copyright, aren't I saying that you should

3   assume as ladies and gentlemen of the jury that they are the

4   same unless you find a difference?

5           I don't know why we start from that predicate.  I

6   don't know why the jury can't legitimately sit down and say

7   there is a difference.  It almost suggests that is there any

8   difference in the trade secret misappropriation than the

9   copyright.  As a juror, I am thinking I should find the same

10  damages unless I can justify going above it.  So I find

11  $30 million for copyright and I just switch over to

12  $30 million for trade secret.  I don't know why that

13  question isn't asked in a pristine way and then the District

14  Court and the Circuit can struggle with this whole concept

15  of preemption.

16          MS. HURST:  I don't think it's a damages question

17  what I am asking right now.  I am just saying is the

18  inherent value in the intellectual property the same or

19  different, given what is in the prior art.  I don't think it

20  has to be asked in a leading way that suggests the answer,

21  as the Court is suggesting.  I am sure there is a way we can

22  ask the question without doing what the Court is concerned

23  about.

24          The fundamental question here is:  Based on prior

25  art, based on everything they've heard, do they find -- and

| | |
|---|---|
| 1 | this is not really a damages issue, per se, because that |
| 2 | then takes into question liability as well -- do they find |
| 3 | there is economic value that's any different? |
| 4 | THE COURT:  All right.  Well, let me think about |
| 5 | it.  I am inclined to not do this.  But if I'm going to |
| 6 | surprise you, I will of course come back out later tonight. |
| 7 | Now, Mr. McConville, what do you think? |
| 8 | MR. MCCONVILLE:  I was just thinking, Judge, is |
| 9 | there some way to construct a question that says whatever it |
| 10 | is they have identified as a trade secret, do you find that |
| 11 | the same as the copyright. |
| 12 | THE COURT:  Mr. Quinn, what do you think? |
| 13 | MR. QUINN:  I have never heard of this issue ever |
| 14 | going to a jury anywhere. |
| 15 | THE COURT:  Okay.  Next, MGA requests an |
| 16 | instruction that damages stop when the claimed trade secret |
| 17 | is disclosed by someone else after its misappropriation. |
| 18 | On the facts of this case, this instruction is |
| 19 | swallowed whole by the existing instruction that a trade |
| 20 | secret must have been secret at the time of the |
| 21 | misappropriation.  That's because MGA does not allege that |
| 22 | Mattel's claimed trade secrets were disclosed after Bryant |
| 23 | took the information to MGA.  Rather, MGA claims that Diva |
| 24 | Starz, which was produced before Bryant's departure, |
| 25 | disclosed the claimed trade secret. |

```
 1          If the jury agrees, then it won't even get to any
 2   lead time damages theory because it will have concluded that
 3   Bryant's trade secrets weren't secret.  If the jury,
 4   however, disagrees, then there was no subsequent disclosure
 5   of the claimed trade secret.
 6          This sort of instruction is simply not relevant, I
 7   think, to these facts, but it has relevance to a situation
 8   like the Coca-Cola formula, which remains a secret of all
 9   times.
10          Now, I want to hear from both of you on that.
11          MS. HURST:  Your Honor, the factual predicate of
12   the Court's ruling is incorrect.  Diva Starz was not
13   released until September or October.  It was released either
14   contemporaneously or shortly after Mr. Bryant's disclosure.
15   And it was not public, as far as we understand, until then.
16   I mean, that's exactly the kind of situation that's at issue
17   here.
18          And given that the facts are in dispute, I mean, I
19   think saying that the factual predicate is all one way is
20   not a basis for refusing the instruction.
21          THE COURT:  Mr. Zeller.
22          MR. ZELLER:  Number one, I agree with the Court
23   that this doesn't add anything, and it's already subsumed
24   within the instruction that the Court is going to give in
25   material part.
```

1              Number two, with respect to this assertion that

2    Diva Starz was not public until later, that's just not

3    correct.  Diva Starz, in fact, was publicly disclosed and

4    put in photographs and in other ways, press releases, at the

5    New York Toy Fair in February of 2000.  So that was prior to

6    the episode with Carter Bryant in September of 2000 going to

7    MGA, at least as early as that time, and pitching his

8    information, you know, the trade secrets that we contend

9    have been misappropriated.

10              The other problem with this is that it really does

11    risk serious confusion by the jury, and that's my main

12    concern, that perhaps one can articulate principles of law

13    that we lawyers might very well like to debate.  But sending

14    that to a jury is just going to cause them massive

15    confusion.

16              And particularly here where our claim -- and just

17    focusing for a moment on lost profits.  Our lost profits

18    theory of damages exists regardless of when that trade

19    secret was disclosed.  The harm to us by our theory is that

20    Carter Bryant disclosed a Mattel trade secret to MGA which

21    MGA then put into production.  I mean, once that started,

22    our losses began.  It made no difference when the trade

23    secret actually became public at that point.  The damage

24    continues on.

25              That's why trying to parse that principle in front

```
 1    of the jury is just going to be simply too confusing at this
 2    point, because certainly the counter to the kind of argument
 3    about the damages stop when disclosed by others is that in
 4    fact it's not an absolute rule.  I mean, the damages to
 5    Mattel continue and they are recoverable.
 6                THE COURT:  MGA is requesting a comparative fault,
 7    basic standard of care, and apportionment of responsibility
 8    instruction on the trade secret misappropriation claim.
 9                The theory appears to be that Mattel's failure to
10    immediately discipline its employees makes Mattel liable for
11    some of the harm it has suffered.  I think my concern is
12    that it seems like a mitigation instruction or reasonable
13    efforts to maintain secrecy instruction in disguise but
14    doesn't appear to be a proper application of the comparative
15    fault doctrine under California law.
16                That doctrine, of course, would apply if Mattel
17    had somehow misappropriated its own trade secrets.  So you
18    are certainly welcome to argue that on behalf of MGA.
19                MS. HURST:  We're fine as long as we get
20    mitigation.
21                MR. ZELLER:  I will submit it on that particular
22    one.  At some point we can go back to mitigation, but
23    obviously we don't think mitigation is warranted.
24                THE COURT:  And I think the next instruction that
25    I noted was MGA is offering an estoppel instruction, but
```

```
 1    this seems to be an equitable defense and I am not going to
 2    seek an advisory verdict on it.
 3              Any comments from either counsel?
 4              MR. ZELLER:  We believe estoppel is an equitable
 5    defense.
 6              THE COURT:  All right.
 7              MS. HURST:  I think bona fide purchaser should go
 8    to the jury.
 9              THE COURT:  Okay.  Now, I will throw the
10    discussion open in just a moment, but let's go over the
11    special verdict for just a moment.
12              On page 1 I want to make certain the name Jade is
13    no longer in play and agreed to.
14              MR. ZELLER:  That's correct.
15              THE COURT:  All right.  I didn't correct that last
16    statement.  It's my fault.
17              On page 2 you can see the changes.  Because I have
18    changed the numbering system, it's proceed to question four.
19    And you can see the changes for just a moment and make any
20    comments you want on page 2.
21              MS. HURST:  No comments here.
22              THE COURT:  Mr. Zeller.
23              MR. ZELLER:  I believe that on questions three and
24    four, I think that there are some TX references that we
25    think should be revised.
```

1          THE COURT:  Okay.  Why don't you just write them

2     in for me so I can see them.

3          MR. ZELLER:  Yes.

4          THE COURT:  All right.  Let's go on for a moment

5     and just get a broad overview and then come back.

6          On page 3 you can see just a number of the

7     formatted bullets in numbering.  Here is where we run into

8     the first problem that I am concerned about.  It's on page

9     3, question six.

10         First of all, I am going to accept the argument

11    that we had off the record for a moment so we perpetuate

12    this argument, but I am really concerned, however this turns

13    out, that it only gives the jury a series of choices.  And

14    if a juror thinks that he or she is supposed to check one of

15    these boxes, every one of these boxes is what I call bad for

16    Mattel in terms of the statute of limitations.

17         Your theory has always been that this was 2004.

18    It was minimally the Wall Street Journal.  In fact, it was

19    after that when Carter Bryant was deposed.  So the end

20    result is I think a juror is going to take a look at this,

21    whichever way I go, without a 2004 date.  And it's like you

22    have got five choices; four of those are bad.

23         It seems to me that either the dates should be cut

24    down minimally; or, number two, there should be some thought

25    about including a 2004 date.  I am really concerned about

 1    this, and I am not concerned from a legal standpoint.  I am

 2    concerned from a practical juror's standpoint.

 3            So I really want you to take a moment with this,

 4    because whatever we do here, we are going to do throughout

 5    the instructions.

 6            Also, with Mattel I eventually want you to look --

 7    skip over for a moment to -- well, we will get to it in just

 8    a moment.  We will go page by page.

 9            Take your time with this one.  This is the one I

10    am really concerned about.  Now, counsel, we are on page 3

11    and a new proposal that the Court has put out to both

12    counsel, but that, of course, is just a tentative thought.

13    I need to struggle with this relation-back concept.

14            On behalf of MGA, Ms. Hurst.

15            MS. HURST:  Thank you, Your Honor.  As indicated

16    off the record, we think that this problem has been created

17    because the Court is trying to avoid having to choose a

18    relation-back date at this point, which we understand.  But

19    we're entitled to yes or no, barred by the statute of

20    limitations.  And avoiding the -- choosing a relation-back

21    date is what's creating the problem that is perceived by the

22    Court.

23            We do not think that this is going to cause any

24    greater chance for inconsistency and that the Court should

25    just -- I mean, the Court can say:  Fill out every box.  The

1    Court can give an instruction that says:  Read from left to

2    right, and once you have picked a date, stop.  I mean, there

3    are lots of ways to give extra instructions about the box

4    that solve the concerns that the Court has.

5            November 23rd, 2002, is irrelevant.  It's not a

6    date tied to the filing of any pleading.  I understand from

7    the off-the-record commentary that Mr. Quinn asserts the

8    entitlement to put that date on there because of a stay.

9    That's a question of equitable tolling.  The Court said it

10   was going to reserve the question of equitable tolling to

11   itself.

12           With respect to burden of proof, before we went

13   off the record, Mr. Quinn argued that the burden is on

14   defendant.  That is incorrect.  When you are asserting the

15   benefit of a delayed discovery rule as a plaintiff, the

16   burden is on you.

17           For the trade secret claim I'd cite CACI 4421,

18   which clearly says the burden is on the plaintiff.  For the

19   copyright claim, under federal law the rule is that a

20   nonstatutory delayed discovery rule places the burden on the

21   plaintiff.  For that I cite the Ninth Circuit case of

22   O'Connor versus Boeing North America, Inc., 311 F.3d 1139,

23   2002.

24           THE COURT:  Let me ask something.  I want to take

25   April 14th, 2002, hypothetically, and I want to assume that

1  the jury writes yes in each of the three boxes on the first

2  form I gave you.  Why wouldn't I go on and simply instruct

3  the jury that once they make that determination, that they

4  would write yes on November 23rd and yes on November 20th,

5  2003?

6           MS. HURST:  You could.

7           THE COURT:  I mean, in other words, it simplifies

8  the whole thing.  Ladies and gentlemen, whatever date you

9  choose, everything --

10          MS. HURST:  -- after that, say yes.

11          THE COURT:  -- after that, say yes.  Now, that

12  takes all the confusion away.

13          So let me say it again.  I just came up with this

14  idea, and it's only 8:30.  The only confusion is this:  The

15  confusion is that I don't want them to check like, say,

16  November 23rd, 2002, and then go over to November 20th,

17  2003, and check no because it's inconsistent.

18          But the way this form would read is:  Once you

19  make your decision about a yes as to any of these dates, any

20  dates after that you should mark yes.  That gives you all

21  your dates, so you are not precluded from a date.  It gives

22  you absolute clarity with no inconsistency.  It takes away

23  that person that says, oh, I chose April 14th, 2002.  I

24  guess I only get one choice, so I am going to go over to

25  November 23rd, 2002, and mark no.  Then I am going to go

```
 1    over to November 20th, 2003, and mark no -- which on the
 2    face of it appears to be inconsistent.
 3              Now we have to send the jury back.  The person
 4    who's on the prevailing end of that will say:  Judge, don't
 5    send it back.
 6              Why wouldn't that work?
 7              MR. QUINN:  It does work.
 8              MS. HURST:  It works.
 9              THE COURT:  It works.  Hold on.  It works.  Okay.
10    I am just going to put this concept down
11              right now:  Once you make a choice and answer yes
12    to a date, then all dates after that should also be marked
13    yes.
14              Now, I will clean that up in fancy legal language,
15    but I want to be very simple.  That's the concept, then.
16    Let me work on that.  I will give it to you tomorrow again.
17    After you leave tonight, I will have some time to do some
18    word processing.
19              MR. ZELLER:  Just one quick thing on the date,
20    Your Honor.  The date we currently have down on the verdict
21    form as April 14, 2002, apparently should actually be April
22    13th, 2002, because it's tied to MGA's complaint which was
23    actually filed on April 13th, 2005.
24              THE COURT:  Fine.  That's the turning point right
25    there.
```

| | |
|---|---|
| 1 | MR. ZELLER:  That one day.  I just figure we have |
| 2 | enough possibilities here. |
| 3 | THE COURT:  Okay.  Page 4.  I didn't make any |
| 4 | changes on page 4.  And page 5 I am, you know, obviously |
| 5 | waiting. |
| 6 | Page 6, once again I'll be consistent on page 6 |
| 7 | and put the same language that I put -- that I am going to |
| 8 | eventually put on page 3, question six.  The same language |
| 9 | will be when you check one of these boxes, basically |
| 10 | everything after. |
| 11 | Now, I want to go over to page 8.  Give me MGA -- |
| 12 | just a moment.  I was trying to make up an additional |
| 13 | question.  Let me address you, Mr. Quinn, and you, Mr. |
| 14 | Zeller, about an additional question, if you'll notice. |
| 15 | In other words, I think the predicate question |
| 16 | should be, first, are they even trade secrets?  If they |
| 17 | check no, you prevail.  The second question really is:  Has |
| 18 | MGA Entertainment proven Mattel misappropriated any of the |
| 19 | items that qualify as trade secrets in column one of the |
| 20 | chart in question, number 16? |
| 21 | Now, that gives you two opportunities in a sense. |
| 22 | I think it's the appropriate way to view it.  Otherwise you |
| 23 | are just presuming trade secret misappropriation and you're |
| 24 | running it together. |
| 25 | So if they check no -- now, I took your language, |

1    Ms. Hurst, if you notice, and went right back to the

2    statute.  But I made it co-equal in all the statute.  Then

3    on page --

4            MR. QUINN:  Your Honor, is the latest version the

5    one with track changes?

6            THE COURT:  Yes.  It's this one.

7            MR. QUINN:  Somehow we don't --

8            MR. ZELLER:  You might have picked up ours.  I'm

9    not sure.  Match it up and see if it's the same.

10           MS. HURST:  Your Honor, I notice the and/or is

11   still in the willfully maliciously.

12           THE COURT:  Let me get my copy back.  Match this

13   up.  Do you want to go through the instructions one by one

14   now?

15           MS. HURST:  Well, I've got one more omitted one

16   that I want to talk about.

17               (Off-the-record discussion)

18           THE COURT:  I want to talk to you about jury

19   instructions, and specifically I want to turn one

20   instruction before you start with your comments.  It's an

21   instruction I wrote a note on and then xeroxed off for you.

22   It's back -- do you see the handwritten note?

23           MS. HURST:  Yes.  It's the remedies for trade

24   secret misappropriation, Your Honor.

25           THE COURT:  Thank you.  Remedies for trade secret

1    misappropriation.  There we go.

2          MS. HURST:  It's about 10 pages from the back.

3          THE COURT:  I think I have got a cleaned-up copy

4    that I took it off of, so just a moment.  I actually had it

5    handwritten for a long time.  Let me see your copy.  I am

6    going to come over with you for a moment.

7          (Off-the-record discussion)

8          THE COURT:  My question is why am I giving this

9    last paragraph?  First of all, I think if they reach

10   liability, trust me, they are going to come out with some

11   damages amount.  By giving this last paragraph, what it

12   really says to them is:  Well, if you can't come up with a

13   damages amount or if it's too hard for you, then the Court

14   will calculate a reasonable royalty.

15         So my first question is:  Do you want me to

16   calculate a reasonable royalty?

17         MS. HURST:  I agree you should not give the

18   paragraph.  And, no, we don't want a calculation of a

19   reasonable royalty unless and until the jury comes back with

20   a liability verdict unaccompanied by any remedy.

21         THE COURT:  Now, just a moment.  If they came back

22   with a liability verdict accompanied by any remedy because

23   it was just too complicated to figure out, wouldn't the jury

24   say this to the themselves:  This is too complicated to

25   figure out, so I am not going to reach a liability verdict?

```
 1     It's just reverse.  I think --

 2               MS. HURST:  No.

 3               THE COURT:  You don't think so?

 4               MS. HURST:  No.

 5               MR. MCCONVILLE:  It's an element they've got to

 6     prove.

 7               THE COURT:  I know that.  You're thinking like a

 8     lawyer.

 9               MR. ZELLER:  Just the fact of damage, though.

10               THE COURT:  Okay.  Now, what does Mattel want me

11     to do?

12               MR. ZELLER:  Well, I think, as you know, our

13     position is that the royalty issue should go to the jury.  I

14     mean, we think that particularly on copyright the jury

15     itself should have the option of awarding a royalty.  But we

16     understand the Court has disagreed with us on that.  So with

17     that premise, I don't think the paragraph should be given to

18     the jury.

19               THE COURT:  You both agree?

20               MR. MCCONVILLE:  Yes.

21               MR. ZELLER:  I do want to make clear, however,

22     that where you say my inclination is not to award any

23     royalty in a subsequent proceeding, that's not entirely

24     consistent with my understanding of where we were, given

25     what the Court had previously ruled, because I had
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    understood that the Court would have available to it as an
2    option --
3               THE COURT:  I thought you liked it here and you
4    wanted to try another case.
5               MR. ZELLER:  I certainly do.  And for the record,
6    we are joking, as anyone here would know.  But my only
7    concern is that it sounds like the Court is now saying that
8    that no one would be deciding a royalty.
9               THE COURT:  That's what I want to inquire about.
10   If they can't reach -- if they reach liability but they
11   can't reach damages, you are both in agreement you want me
12   to take the paragraph out?
13              MS. HURST:  Right.
14              MR. ZELLER:  Right.
15              THE COURT:  Okay.  Now, what are you going to do
16   if they can't reach damages -- which I think is a small
17   probability, quite frankly.  If they reach liability, they
18   will come up with some damage number regardless of the
19   process.  I am sure the experts were very helpful, but --
20              MS. HURST:  It's going to be $200 for that Bratz
21   name.
22              THE COURT:  But the end result is do you want to
23   make the decision at that time?  In other words, after -- if
24   they can't come up, do you want to just reserve that?
25              MS. HURST:  Yes.  They would have to make a motion

```
 1   and say that they were entitled to royalty for the following
 2   200 reasons --
 3             THE COURT:  And that could decide it then.
 4             MS. HURST:  -- and then we would respond that --
 5             THE COURT:  Okay.  Then I am not going to hold to
 6   this.  I need to keep a wide-open mind on that subject.  And
 7   you have got to tell me whether you want a new trial or not.
 8             MR. ZELLER:  Your Honor, without waiving our
 9   position on this is a jury issue in the first instance, we
10   do agree that given the Court's ruling on this, that
11   paragraph should not go to the jury.
12             Frankly, if the jury were to not come up with a
13   damages award, then I think frankly then we would all have
14   to simply address the Court as to what the options are as to
15   whether or not there needed to be a further trial on just
16   damages, or whether we would submit it to the Court simply
17   to decide royalty, or whether the Court regardless of what
18   the parties' position is will simply say, "I'll decide a
19   royalty."
20             I mean, I think all those options would be open.
21             THE COURT:  Let's take those options then if we
22   have to face them.  There is no reason to decide them now;
23   right?
24             MS. HURST:  Agreed.
25             THE COURT:  I just need to keep an open mind on
```

```
 1    it.
 2              MR. ZELLER:  Agreed.
 3              THE COURT:  Now, what else concerning the
 4    instructions?  And then I'm going to let you go home for the
 5    night.
 6              MS. HURST:  Your Honor, the other significant
 7    omitted instruction that we need to address is the reduction
 8    to practice.  We either need an instruction from the Court
 9    on reduction to practice, or we need the request for
10    judicial notice that we filed today.
11              Everybody in this courtroom knows that reduction
12    to practice is a legal term of art, and we have put in
13    evidence that it's a term of art that even copyright lawyers
14    do not know.  So we are entitled -- you know, we are not
15    saying they are going to be instructed to treat it as a term
16    of art and to take that definition.  What we are saying is
17    in conjunction with the instruction, choose a technical
18    meaning unless proven otherwise.
19              We also have to give them what the technical
20    meaning is, and this is clearly a legal term of art.  So
21    either we would like the jury to be instructed by way of
22    judicial notice -- but this is really a legal fact -- or by
23    way of instruction, one way or the other.
24              What we proposed in our request for judicial
25    notice today is the term, quote, reduction to practice, end
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    quote, is a legal term of art in the law.  Two, as used in
 2    the law --
 3              THE COURT:  Now, are you reading from an
 4    instruction?
 5              MS. HURST:  I am reading from the request for
 6    judicial notice, but the instruction would be the same.  We
 7    gave a copy to Your Honor this morning.
 8              THE COURT:  Of course you did, and it's in the
 9    stack of 32 motions.
10              MS. HURST:  I have got an extra.  It's coming up
11    now.
12              THE COURT:  Hold on.  I've got it.  I've got it.
13              MS. HURST:  And this could be an instruction.  It
14    could either be something the Court reads to the jury or
15    becomes part of the other request for judicial notice that
16    is going to be marked as an exhibit, or the Court can put it
17    in an instruction.  Either way.
18              THE COURT:  I understand.  Let me go back and look
19    at it tonight and make a decision.
20              MS. HURST:  Okay.
21              THE COURT:  Let me hear from Mattel.
22              MR. ZELLER:  Obviously we think this is
23    inappropriate.  Number one, the term reduce to practice or
24    other terms within the contract are not susceptible of just
25    one meaning under even the Ninth Circuit ruling.  I mean, to
```

1    basically take -- well, let me not get ahead of myself.  The

2    reason why we are here and the reason why the contract is

3    going to the jury is because the Ninth Circuit has said

4    that's what is appropriate in this case.

5              To basically dictate to the jury that there is

6    only one meaning to reduce to practice is, I think, counter

7    to what the Ninth Circuit has contemplated here.  There is

8    plenty of evidence in the record as to how it is that people

9    interpret those terms.

10             I mean, we have heard the testimony of the

11   witnesses.  That is not the so-called patent law meaning

12   that MGA wants to impose upon it.  What is inappropriate,

13   too, is a matter of judicial notice here, because what they

14   are really asking is for the Court to take judicial notice

15   about the meaning of this contract.

16             I mean, that's the only reason why that request

17   would have significance, is for MGA to say that the Court is

18   taking judicial notice that reduction to practice, giving it

19   really the force of law by the Court or even as an

20   instruction as they are proposing here, but basically the

21   Court telling the jury that reduction to practice as a

22   matter of law is a patent term of art that has a certain

23   meaning.  I mean, that really takes away the very issue that

24   these contract interpretation matters are supposed to go to

25   the jury.

1          Mr. Kay, for example, he testified what his

2    understanding was of this term.

3          THE COURT:  So the bottom line from Mattel is no

4    instruction?

5          MR. ZELLER:  Correct.  And certainly it's not even

6    a matter of judicial notice either.  I mean, we think that

7    would be just as problematic, because MGA will then say in

8    closing:  Look, the Court has taken judicial notice of the

9    meaning of this, which will, of course, signal to the jury

10   that the Court is telling them that's what this means.

11         THE COURT:  So under no circumstances --

12         MR. ZELLER:  They are going to be confined or

13   should be confined, I should say, in the closing to arguing

14   the evidence at trial.  Ivy Ross, Alan Kay, others they

15   cross-examined, questioned, on that very term.

16         THE COURT:  Okay.  MGA.

17         MS. HURST:  CACI 316 which the Court is giving

18   says interpretation, meaning of technical words.  You should

19   assume that the parties intended technical words used in the

20   contract to have the meaning that is usually given to them

21   by people who work in that technical field unless you decide

22   that the parties clearly used the words in a different

23   sense.

24         Everybody in this room knows that reduction to

25   practice is a technical phrase.  Not only that, but this

1    contract was drafted by lawyers, and we know that this is a

2    patent law term.  So the Court has got to instruct that this

3    is a choice.

4           Now, what Mr. Zeller said is just false.  We are

5    not saying the Court is instructing them that this is

6    definitely what it means.  That's decidedly what we are not

7    doing.  We are saying give 316 and then provide them with

8    the information that they would need to apply 316 if they

9    decide it has a technical meaning.

10          No one has provided that information.  We are

11   entitled to it.  It's absolutely true, and they've created a

12   misleading impression by having Alan Kay, who wouldn't know

13   reduction to practice from a hole in the ground, come in

14   here and give his opinion post facto not even informed by

15   the drafting of the contract.  That's outrageously

16   prejudicial.

17          I mean, this is a theory that we are entitled to

18   an instruction on, one way or the other.  If they don't like

19   request for judicial notice, then the Court should supply

20   the information by way of instruction if they think judicial

21   notice is putting too much of the judicial imprimatur on it.

22   But we have got to get it one way or the other.

23          THE COURT:  Mr. Zeller.

24          MR. ZELLER:  Obviously this argument conflates a

25   number of different issues.  Number one, no one has

```
 1    testified and there is no evidence that a technical meaning
 2    was intended.  What she has pointed to is the fact that
 3    these contracts were drafted by lawyers.  Well, if that were
 4    sufficient -- I mean, virtually every contract at some point
 5    is drafted by a lawyer.  That's hardly surprising, and
 6    certainly there is no reason to think that the technical
 7    field that's involved here is the technical field of law,
 8    and certainly not patent law.
 9              THE COURT:  Just a moment.  Okay.  Please
10    continue.
11              MR. ZELLER:  The argument that is being made also
12    suggests that the contract only applies to patents.  There
13    is no testimony by any witness in this case that so states;
14    and moreover, it would be contrary to the language of the
15    agreement itself.
16              The Court will recall that the language of the
17    contract, the Carter Bryant inventions agreement, makes it
18    very clear that what is assigned are inventions, whether
19    patentable or unpatentable.
20              THE COURT:  I am going to go back and do some
21    research on it tonight.
22              MR. ZELLER:  Okay.
23              THE COURT:  I will write something tentative
24    tonight.  That's something I hadn't paid attention to, and I
25    apologize.  I just saw that today, and frankly I haven't had
```

 1    a chance to read it.  So that's some homework for me right

 2    now.

 3            Let me send you on your way tonight.  I will

 4    word-process this again this evening and I'll get a copy out

 5    to you tomorrow morning again to look at during the day.

 6    Let's have a brief meeting tomorrow night.

 7            MR. ZELLER:  And there is some instructions I know

 8    that we proposed on issues.  If I could just give the Court

 9    a list -- I know we've submitted things.  We submitted

10    proposed instructions.  But just to put them on the Court's

11    radar screen, one is fraudulent concealment.  We do think

12    that the jury should be instructed on that.

13            We think that there should be a joint and several

14    liability instruction.

15            THE COURT:  Okay.

16            MR. ZELLER:  There is an instruction that we have

17    filed -- and this is docket 10387.

18            THE COURT:  10387.

19            MR. ZELLER:  That's a proposed instruction on

20    telling the jury to disregard the alleged unfair

21    competition.  It's explained to the jury that it's not a

22    matter that they will decide but the Court will.

23            We have also -- I know that there has been back

24    and forth previously about the party admissions

25    instructions.  Just to remind the Court, this was originally

1    filed as docket 10051.

2              THE COURT:  Just a moment.  Docket 10051.  Okay.

3              MR. ZELLER:  Right.  The Court will recall that

4    the concern was that one of the standard instructions says

5    that testimony can only be considered for purposes of

6    credibility, which, of course, is not a complete statement.

7              Obviously if it is a party admission, the

8    deposition testimony that came in by way of impeachment even

9    can obviously be considered for all purposes.  So that was

10   the reason, the genesis of our request that a party

11   admission instruction be given to make that portion of it

12   complete so that the jury doesn't think that, say, for

13   example, when an officer of one of the parties has been

14   confronted and they are shown the deposition testimony where

15   they made an admission, that that could only be considered

16   for purposes of credibility rather than affirmatively

17   establishing a proposition.

18             THE COURT:  Okay.

19             MS. HURST:  May I respond on that one?

20             THE COURT:  Not yet.  I want to speak to Mattel

21   now.

22             MR. ZELLER:  And then there is another

23   instruction, which is 10389.  It really pertains to the

24   misappropriation, trade secret misappropriation, and

25   copyright as well.  Mr. Quinn is pointing out to me

1    concerning the liability of affiliates, which I know is an

2    issue that we had discussed at one point.

3              Then we also requested instructions on this issue

4    about privileged communications, and that's docket 10281.

5              THE COURT:  Just a moment.  10821?

6              MR. ZELLER:  10281.

7              THE COURT:  10281.  Okay.

8              MR. ZELLER:  Then finally, there was a

9    work-for-hire instruction that we had proposed, and that is

10   10134.

11             THE COURT:  10134.  Let me go back and look at

12   those tonight.

13             MR. ZELLER:  Sure.  And we can obviously provide

14   copies of all of those again as well.

15             THE COURT:  And I will get something out

16   tentatively for discussion tomorrow night on those also.

17             Okay.  Is that it?

18             MR. ZELLER:  That's it.  Yes.

19             THE COURT:  Okay.

20             MS. HURST:  I am just going to respond briefly on

21   the party admissions request.

22             THE COURT:  Fraudulent concealment?

23             MS. HURST:  Oh, you want me to go down?

24             THE COURT:  Sure.

25             MS. HURST:  Fraudulent concealment, we object.

```
 1                THE COURT:  Okay.  Liability.
 2                MS. HURST:  We object.
 3                THE COURT:  Docket number 10387, that's the
 4    disregard the unfair competition issue; that the Court will
 5    decide it.
 6                MS. HURST:  I am not sure exactly what that one
 7    says.  We may need to do something along those lines.
 8                THE COURT:  Party admissions.
 9                MS. HURST:  We object to that one.  The general
10    rule is the testimony comes in for all purposes unless
11    there's a limiting instruction.  And their definition of
12    admissions and agency is completely inconsistent with Rule
13    801.  So that one is really -- it's unnecessary.
14                THE COURT:  10389.
15                MS. HURST:  That's another version of alter ego
16    which the Court has already said it's going to consider.
17    It's not appropriate.
18                THE COURT:  Privileged communication, 10281.
19                MS. HURST:  Let me take a look at that one.  We
20    might want to do something there, too.
21                THE COURT:  Work for hire, 10134.
22                MS. HURST:  We object.  There is a form
23    instruction on this.  The Court has already given it.
24                THE COURT:  Okay.  Why don't we get you home.
25                (Off-the-record discussion)
```

| | |
|---|---|
| 1 | MR. QUINN:  Judge, one of the document custodians |
| 2 | we had intended to use really doesn't have sufficient |
| 3 | knowledge about three documents that we wanted to get in. |
| 4 | These are production schedule documents for some of these |
| 5 | accused products, Mattel products.  We want to call a John |
| 6 | Marine, is the man's name, who has knowledge of these -- |
| 7 | THE COURT:  Of those three? |
| 8 | MR. QUINN:  -- three documents. |
| 9 | THE COURT:  Fine.  In other words, you have got to |
| 10 | do it with two instead of one; right? |
| 11 | MR. QUINN:  Yes. |
| 12 | THE COURT:  That's good.  Let me look at this. |
| 13 | I'm sure it's going to be fine. |
| 14 | MS. HURST:  What's his name?  How do you spell it? |
| 15 | THE COURT:  John Marine, like in the Marines. |
| 16 | Okay. |
| 17 | MR. MCCONVILLE:  Judge, there was one issue with |
| 18 | regard to a proposed witness, Lisa Saunders.  She is the one |
| 19 | who, as I understand the proffer, will discuss planogram |
| 20 | rooms. |
| 21 | THE COURT:  Yeah.  This is the testimony about the |
| 22 | retailers' efforts or failure to take efforts to keep |
| 23 | confidential the information about these planogram rooms. |
| 24 | We are all over the place on these planogram rooms.  Nobody |
| 25 | really know, it sounds like to me, whether they are |

 1   confidential or not or when they are.

 2           MR. MCCONVILLE:  There has been a stipulation by

 3   the parties that planogram rooms --

 4           THE COURT:  That they are not, unless shown

 5   differently.

 6           MR. QUINN:  Well, that stipulation only related to

 7   the planogram rooms referred to in a certain collection of

 8   e-mails that Mr. Price and Ms. Hurst agreed on.

 9           THE COURT:  And she is going to specifically say

10   the planogram rooms for?

11           MR. QUINN:  For K-Mart.  She is the MGA director

12   of sales.  She's responsible for K-Mart.

13           THE COURT:  Well, at least for K-Mart.

14           MR. QUINN:  K-Mart, yes.  And she will testify

15   about that.

16           THE COURT:  Not Wal*Mart?

17           MR. QUINN:  No.  I think just K-Mart.

18           THE COURT:  Not Target.

19           MR. QUINN:  I actually haven't gotten all the way

20   through her deposition, but think it's only K-Mart.

21           MR. ZELLER:  It is only K-Mart.  I can confirm

22   that.

23           THE COURT:  Okay.  Let me go back.  I don't want

24   to say something and then back out of it.  So let me go back

25   and just look at her -- I probably have her depo right in

 1    the back.  I can skim through it tonight also.

 2            MR. MCCONVILLE:  Judge, our position is it's not

 3    in dispute and it's cumulative of whatever else is --

 4            MR. QUINN:  If they will stipulate that the K-Mart

 5    planogram is before the New York Toy Fair, that they didn't

 6    start doing the white boxes in their planograms until 2006,

 7    and that they regularly got information from retailers --

 8    these are the sorts of things that she is going to say.

 9            THE COURT:  That's what you alluded to today, the

10    white boxes before 2006.

11            MR. QUINN:  They are trying to say we protected

12    our product in the planogram rooms.  This woman will say

13    that didn't start until 2006, which is outside the time

14    period we are concerned about here.

15            THE COURT:  That's why limiting her just to the

16    stealing of trade secrets didn't make sense to you?

17            MR. QUINN:  Exactly.  And she will testify that

18    everybody sees what's in K-Mart's planogram, and that starts

19    before the New York Toy Fair.

20            THE COURT:  And it's limited to K-Mart?

21            MR. QUINN:  Yes.

22            MR. MCCONVILLE:  Anyhow, Judge, the reason I

23    brought it up is because it wasn't clear to me whether the

24    Court has said she could --

25            THE COURT:  With that representation -- you have

1    got to remember the mass confusion, because I was just

2    reading questions, which is exactly what I asked for is

3    questions.  So it caused me a lot of confusion, frankly.

4              MR. ZELLER:  We could have put what we would hope

5    the answers would be in there, but we don't control them.

6              THE COURT:  You have the right to get it

7    tentatively -- and I don't want to back out of what I'm

8    saying, but just tentatively and off the top of my head it

9    appears to me if it's limited to K-Mart, that you are not

10   limited to that stipulation for planogram rooms across the

11   board.  Each of you have the right to show some are open and

12   some are closed and if it's K-Mart and white boxes on that

13   occasion.  But it's limited.  It can't sound like it's

14   across the board.

15             Okay, good-night.

16                            -oOo-

17

18

19

20

21

22

23

24

25

1

2

3

4                              CERTIFICATE

5

6               I hereby certify that pursuant to Section 753,

7    Title 28, United States Code, the foregoing is a true and

8    correct transcript of the stenographically reported

9    proceedings held in the above-entitled matter and that the

10   transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13   Date:  April 6, 2011

14

15

16                         Sharon A. Seffens 4/6/11
                           _____
17                         SHARON A. SEFFENS, U.S. COURT REPORTER

18

19

20

21

22

23

24

25