QUINN EMANUEL URQUHART & SULLIVAN, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  William C. Price (Bar No. 108542)
  (williamprice@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Mattel, Inc. and Mattel de Mexico, S.A. de C.V.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| MATTEL, INC., a Delaware corporation, et al.,<br><br>Plaintiff,<br><br>vs.<br><br>MGA ENTERTAINMENT, INC., a California corporation, et al.,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 DOC (RNBx)<br><br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. David O. Carter<br><br>**MATTEL'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW RE MGA PARTIES' MISAPPROPRIATION OF TRADE SECRETS CLAIM PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50(a)**<br><br>Trial Date:  January 18, 2011 |

MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW RE MGA'S TRADE SECRET CLAIM

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on a date and time to be determined by the Court, before the Honorable David O. Carter, plaintiffs Mattel, Inc. and Mattel de Mexico, S.A. de C.V. (collectively, "Mattel") will, and hereby do, move the Court pursuant to <u>Federal Rule of Civil Procedure</u> 50(a) for judgment as a matter of law in favor of Mattel as to each of the purported trade secrets included in MGA's First Counterclaim-In-Reply for Trade Secret Misappropriation under Cal. Civ. Code §3426 *et seq.* Those alleged trade secrets, listed individually according to MGA's Court-ordered disclosure, and including those that MGA purported to add at trial, are the following:

1.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Mobile.

2.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Styl' It Collection.

3.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Boys.

4.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Winterwonderland Collection.

5.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Formal Funk Collection.

6.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Runway Formal Funk Collection.

7.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz FM Limo.

8.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Motorcycle.

9.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Pet Assortment.

10.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz City Playsets.

11.     The appearance, operation, intended play pattern and plans to advertise on television for Lil' Bratz Slumber Party.

12.     The appearance, operation, intended play pattern and plans to advertise on television for Lil' Bratz Spring Break.

13.     The appearance, operation, intended play pattern and plans to advertise on television for Lil' Bratz Loungin' Loft.

14.     The appearance, operation, intended play pattern and plans to advertise on television for Lil' Bratz Vehicle Assortment.

15.     The appearance, operation, intended play pattern and plans to advertise on television for Lil' Bratz Deluxe Mall Playset.

16.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Petz.

17.     The appearance, operation, intended play pattern and plans to advertise on television for Lil' Bratz Dance Party.

18.     The appearance, operation, intended play pattern and plans to advertise on television for Dazzlin' Disco Cafe.

19.     The appearance, operation, intended play pattern and plans to advertise on television for Sun Kissed Summer.

20.     The appearance, operation, intended play pattern and plans to advertise on television for Girls Nite Out.

21.     The appearance, operation, intended play pattern and plans to advertise on television for Wild Life Safari Collection.

22.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Diamondz.

23.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Sportz.

24.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz Virtual Buddiez Petz.

25.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz Live In Concert.

26.    The appearance, operation, intended play pattern and plans to advertise on television for Midnite Dance.

27.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz Campfire.

28.    The appearance, operation, intended play pattern and plans to advertise on television for Wild Wild West.

29.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz Rock Angels.

30.    The appearance, operation, intended play pattern and plans to advertise on television for Holiday 2005.

31.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz Phone.

32.    The appearance, operation, intended play pattern and plans to advertise on television for Funk Fashion Makeover game.

33.    The appearance, operation, intended play pattern and plans to advertise on television for Hopscotch Heather.

34.    The appearance, operation, intended play pattern and plans to advertise on television for Dream Baby.

35.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz.

36.    The appearance, operation, intended play pattern and plans to advertise on television for Jumpin Jenny.

37.    The appearance, operation, intended play pattern and plans to advertise on television for Scooter Samantha.

38. The appearance, operation, intended play pattern and plans to advertise on television for Hello Kitty Be Beautiful Matchmaker Journal and Virtual Crush.

39. The appearance, operation, intended play pattern and plans to advertise on television for iCandy.

40. The appearance, operation, intended play pattern and plans to advertise on television for Liar Liar.

41. The appearance, operation, intended play pattern and plans to advertise on television for Monkey See Monkey Do.

42. The appearance, operation, intended play pattern and plans to advertise on television for A New Breed and Palm Puppies.

43. The appearance, operation, intended play pattern and plans to advertise on television for Hello Kitty Scooter.

44. The appearance, operation, intended play pattern and plans to advertise on television for Insecto Bots.

45. The appearance, operation, intended play pattern and plans to advertise on television for Monster Surgery.

46. The appearance, operation, intended play pattern and plans to advertise on television for My Beautiful Mermaid.

47. The appearance, operation, intended play pattern and plans to advertise on television for Hulk Two-Way Radios.

48. The appearance, operation, intended play pattern and plans to advertise on television for Musikids.

49. The appearance, operation, intended play pattern and plans to advertise on television for Lil' Bratz Boyz.

50. The appearance, operation, intended play pattern and plans to advertise on television for My Beautiful Ballerina.

51. The appearance, operation, intended play pattern and plans to advertise on television for Pia Back to School.

52.     The appearance, operation, intended play pattern and plans to advertise on television for Jumpin' on the Bed Bouncin' Baby.

53.     The appearance, operation, intended play pattern and plans to advertise on television for Rachel Lul A Bye Baby.

54.     The appearance, operation, intended play pattern and plans to advertise on television for RC Street Flyer Samantha.

55.     The appearance, operation, intended play pattern and plans to advertise on television for Walk 'n Go Jo Jo.

56.     The appearance, operation, intended play pattern and plans to advertise on television for Bead Palace.

57.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Stylin' Dance Party.

58.     The appearance, operation, intended play pattern and plans to advertise on television for Alien Racers.

59.     The appearance, operation, intended play pattern and plans to advertise on television for Micro Blast Jet Skis.

60.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Luscious Lamp/Alarm Clocks.

61.     The appearance, operation, intended play pattern and plans to advertise on television for Flower Fairies.

62.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Internet Café Playset.

63.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Retro Cafe.

64.     The appearance, operation, intended play pattern and plans to advertise on television for Lil' Bratz Transforming Bedroom.

65.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Girls Night Out.

66.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz Kidz.

67.    The appearance, operation, intended play pattern and plans to advertise on television for High School Cool.

68.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz Rodeo.

69.    The appearance, operation, intended play pattern and plans to advertise on television for Passion for Fashion.

70.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz Baby Sisterz.

71.    The appearance, operation, intended play pattern and plans to advertise on television for Talking Bratz.

72.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz Costume.

73.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz on Ice.

74.    The appearance, operation, intended play pattern and plans to advertise on television for Holiday Doll.

75.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz Play Sportz Teamz.

76.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz Couture.

77.    The appearance, operation, intended play pattern and plans to advertise on television for Story Time Princess Collection Fashion Dolls.

78.    The appearance, operation, intended play pattern and plans to advertise on television for Story Time Classics Collection Mini Dolls.

79.    The appearance, operation, intended play pattern and plans to advertise on television for Yummi-Land Soda Pop Girls.

80.     The appearance, operation, intended play pattern and plans to advertise on television for Marvel Super Heroes Die-Cast Vehicles.

81.     The appearance, operation, intended play pattern and plans to advertise on television for Spider-Man & Friends Crime Cruiser R/C.

82.     The appearance, operation, intended play pattern and plans to advertise on television for Spider-Man Fire Rescue R/C.

83.     The appearance, operation, intended play pattern and plans to advertise on television for Land Sea R/C AXI Trespass.

84.     The appearance, operation, intended play pattern and plans to advertise on television for 6 Foot Bratz Puzzles.

85.     The appearance, operation, intended play pattern and plans to advertise on television for I-Petz.

86.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Mobile Phones.

87.     The appearance, operation, intended play pattern and plans to advertise on television for Muichiz.

88.     The appearance, operation, intended play pattern and plans to advertise on television for Baby Bratz.

89.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Pretty N' Punk.

90.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Fabulous.

91.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Treasures.

92.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz direct to video movie with Twentieth Century Fox.

93.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz music album with Universal Music Enterprises.

94.    The appearance, operation, intended play pattern and plans to advertise on television for Livin' Bratz.

95.    The appearance, operation, intended play pattern and plans to advertise on television for Giddy Up Girl.

96.    The appearance, operation, intended play pattern and plans to advertise on television for Toby.

97.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz Babies.

98.    The appearance, operation, intended play pattern and plans to advertise on television for Lil' Bratz.

99.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz plug and play.

100.    The appearance, operation, intended play pattern and plans to advertise on television for Lil' Bratz Stylin' Sticker Maker.

101.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz Candyz.

102.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz DynaMite.

103.    The appearance, operation, intended play pattern and plans to advertise on television for Petz Campfire.

104.    The appearance, operation, intended play pattern and plans to advertise on television for Oooh La La.

105.    The appearance, operation, intended play pattern and plans to advertise on television for Ponyz.

106.    The appearance, operation, intended play pattern and plans to advertise on television for Twiinz.

107.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz digital camera.

108.   The appearance, operation, intended play pattern and plans to advertise on television for Bratz miniature radio.

109.   The appearance, operation, intended play pattern and plans to advertise on television for Bratz MP3 player.

110.   The appearance, operation, intended play pattern and plans to advertise on television for Bratz furniture.

111.   The appearance, operation, intended play pattern and plans to advertise on television for Bratz doll display.

112.   The appearance, operation, intended play pattern and plans to advertise on television for Bratz bath and beauty products.

113.   The appearance, operation, intended play pattern and plans to advertise on television for Bratz stationery.

114.   The appearance, operation, intended play pattern and plans to advertise on television for Bratz remote control Kendall.

115.   Bratz Flashback Fever (identified as a trade secret per Isaac Larian's trial testimony).

116.   Price lists, including the pricing to retailers/FOB pricing for the products above (identified as a trade secret per Isaac Larian's trial testimony).

Mattel moves for judgment as to each of these trade secrets on the grounds that, as a group, they were all shown to retailers, who MGA knew discussed them with third parties, and that no reasonable steps were taken to prevent their disclosure. Considered on a trade secret-by- trade secret basis, each of the alleged secrets suffers from additional and fatal defects: no evidence *at all* was introduced as to misappropriation as to 26 of these trade secrets, which were not included on any report compiled by Mr. Villasenor; 65 of the trade secrets were the subject of press releases or press stories before or at the time of the toy fairs where they were allegedly misappropriated, meaning that they were not secrets and were not wrongfully misappropriated by Mattel; 6 of the supposed trade secrets had already

1  been shipped to retailers in advance of the toy fairs; and virtually every one of the

2  trade secrets reflected a generic theme—such as Hollywood or Prom or animal pets—

3  and MGA presented no evidence explicitly identifying the trade secret supposedly

4  contained in these generic products.  In addition, MGA's testimony as to any harm

5  suffered was literally limited to 26 trade secrets, a defect not cured by Mr.

6  Malackowski's plainly flawed "holistic" approach,  meaning that the jury has

7  absolutely no basis for assigning damages as to 89 of the products other than literally

8  picking a number from the air.   Thus, even if these claims are not barred by  the

9  statute of limitation or laches, and even if they were properly added six years into the

10  case (and Mattel preserves its claims on these points),  MGA  clearly failed to meet

11  its burden to establish trade secret misappropriation as to each of the 116 claimed

12  "secrets."

13          This Motion is based upon this notice of Motion and accompanying

14  memorandum of points and authorities, the detailed chart included as Appendix A,

15  the evidence introduced at trial, all other pleadings and papers on file in this action,

16  and all other matters of which the Court may take judicial notice.

17  DATED:  April 7, 2011            QUINN EMANUEL URQUHART &
                                     SULLIVAN. LLP
18

19                                   By /s/ John B. Quinn
20                                      John B. Quinn
                                        Attorneys for Mattel, Inc., and Mattel de
21                                      Mexico. S.A. de C.V.

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES .............................................. 1

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF FACTS ......................................................................................... 4

ARGUMENT .............................................................................................................. 9

I.    EACH OF MGA'S ALLEGED TRADE SECRETS WAS SHARED
      WITH MULTIPLE RETAILERS BOTH BEFORE AND DURING
      THE TOY FAIRS WHERE THEY WERE ALLEGEDLY
      MISAPPROPRIATED ...................................................................................... 9

II.   NONE OF MGA'S TRADE SECRETS CAN SURVIVE SCRUTINY
      ON A TRADE SECRET BY TRADE SECRET BASIS .............................. 11

      A.    No Evidence At All of Misappropriation Was Introduced as to 26
            of the Supposed Trade Secrets ........................................................... 12

      B.    The Evidence is Undisputed that at least 65 of the Supposed
            Trade Secrets Were the Subject of Press Releases or Press
            Stories Prior to or at the Time of the Toy Fairs .............................. 12

      C.    The Evidence is Undisputed that 6 of the Products which MGA
            Claims were Trade Secrets at the time of the Toy Fair Were
            Already in the Stream of Commerce ................................................... 14

      D.    No Reasonable Jury Could Find that MGA's "Execution" of a
            Generic Theme Made it into a Trade Secret where MGA Failed
            to Offer Any Evidence as to What was Unique about its
            Execution .............................................................................................. 15

      E.    MGA's Belated Claims of Additional Trade Secrets at Trial are
            Improper under California Law and Without Merit . .......................... 17

III.  NO REASONABLE JURY COULD ASSESS DAMAGES AS TO
      ALL BUT 26 OF MGA'S CLAIMED TRADE SECRETS. ........................... 18

CONCLUSION ......................................................................................................... 20

1

## **<u>TABLE OF AUTHORITIES</u>**

2

<u>Page</u>

3

### **<u>Cases</u>**

4

Cypress Semiconductor Corp. v. Superior Court,
  163 Cal. App. 4th 575 (2008).........................................................................10, 11

5

6

De Lage Landen Operational Servs., LLC v. Third Pillar Sys., Inc.,
  693 F. Supp. 2d 423 (E.D. Pa. 2010) ...................................................................10

7

Kewanee Oil Co. v. Bicron Corp.,
  416 U.S. 470 (1974) .............................................................................................16

8

9

Pixion, Inc. v. PlaceWare, Inc.,
  421 F. Supp. 2d 1233 (N.D. Cal. 2005) ...............................................................17

10

Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.,
  923 F. Supp. 1231 (N.D. Cal. 1995) ....................................................................10

11

12

Ruckelshaus v. Monsanto Co.,
  467 U.S. 986 (1984) .............................................................................................10

13

Stromback v. New Line Cinema,
  384 F.3d 283 (6th Cir. 2004)................................................................................11

14

15

VSL Corp. v. Gen. Techs. Inc.,
  1997 WL 654103 (N.D. Cal. Jul. 21, 1997).........................................................10

16

17

Walker v. Univ. Books, Inc.,
  602 F.2d 859 (9th Cir. 1979)................................................................................16

18

### **<u>Statutes</u>**

19

20

Cal. Civ. Code § 3426.1 .............................................................................................11

21

Fed. R. Civ. P. 50(a) ....................................................................................................1

22

23

24

25

26

27

28

## Memorandum of Points and Authorities

### Preliminary Statement

Pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, Mattel respectfully asks this Court to grant it judgment as a matter of law ("JMOL") on MGA's trade secret misappropriation claim.  In its required disclosures, MGA listed 114 items that were allegedly shown at toy fairs between 1999-2006 which Mattel allegedly misappropriated.  At trial MGA purported to add additional product and pricing information to MGA's trade secret claim.   No reasonable jury could conclude that Mattel is liable for misappropriating any of these alleged trade secrets.

*First*, as to all of the products, Mr. Larian's own testimony, supported by other MGA executives, establishes as a matter of law that the items and information in toy fair showrooms was not secret, and MGA knew that.  The very purpose of these toy fairs was to publicize and promote products, and MGA knew the retailers to which it showed its alleged trade secrets would then discuss such information with outsiders, including competing manufacturers.  Nor did MGA, having shown all of its product to retailers who it understood would "talk", take reasonable steps to protect their secrecy.  MGA was only able to produce one sign-in sheet that even included boilerplate language—of the more than 30 toy fairs held during the 8 years at issue—notwithstanding Mr. Larian's testimony that he directed people to look "everywhere" for sign-in sheets.  These facts, coupled with the testimony that supposedly secret catalogues were everywhere at the toy fairs, that retailers regularly provided information to other manufacturers, and that supposedly secret products were routinely shown in K-Mart's planogram conducted each year before the New York toy fair, renders Mr. Larian's testimony that everything in its showrooms was "confidential" insufficient as a matter of law to establish misappropriation under California law.

*Second,* as the chart included as Appendix A to this motion details, every one of the so-called secrets, considered individually, suffers from additional defects fatal

to a trade secrets claim.  Indeed, many of the supposed secrets suffer from multiple defects.  Those defects include:

1. MGA's failure to introduce *any evidence at all* of misappropriation as to 26 of the products at issue.  Three of these products were never even mentioned in any of Mr. Villasenor's reports.  As to the remaining 23, they were supposedly shown at toy fairs in 2006—after Mr.Villasenor left Mattel.  In short, for 26 supposed secrets, MGA introduced not one word of evidence supporting its claimed misappropriation, which amounts to a complete failure of proof.

2.  The undisputed evidence that 65 of the so-called trade secrets were not secret at all, but were the subject of *press releases or press stories* before or within days of the toy fair where they were shown.  In many cases, the evidence makes clear that the source of these stories was MGA itself.  No reasonable jury could find that products described in detail in press releases or press stories were secret.

3.  The undisputed evidence that MGA *actually shipped* supposedly secret products to retailers *prior* to the toy fairs in question, with no requirement or understanding that they be kept confidential.  Prior shipment destroys any claim that the items involved derived independent value from being secret.

4. Mr. Larian's own admission that virtually all of the products were based on *generic themes* which "many, many, many, many toy companies" have done.  Where a theme is known to everyone in the industry, and the public—for instance the Winter Wonderland, Hollywood Celebrity, Pop Starz, Slumber Party, Dating, Sweetheart, Prom, Costumes, or Cowgirlz themes—products incorporating such themes cannot, without more detail, be considered secret.  MGA did not do so.  While  Mr. Larian testified that it was the particular way the theme is "executed" that qualifies as a trade secret, MGA presented no evidence as to what elements in its execution were actually particular, novel and secret.  Indeed, as to many of these generically themed products that depend, in MGA's own view, on their "execution," MGA did not even introduce the product into evidence during the trial.   No

reasonable jury could conclude that in the absence of any testimony as to what the trade secret was supposed to be, products incorporating generic themes also incorporated trade secrets.

5.  MGA itself has repeatedly acknowledged that pricing information is not a trade secret.  Yet at trial, Mr. Larian attempted to claim otherwise to buttress MGA's failing claims.  Even if it was proper to change trade secret claims at trial, and Mattel asserted and continues to assert that it is not, MGA's own testimony conclusively undermines this claim.

6.  MGA's expert did not even purport to offer the jury any evidence (much less credible evidence) of damages as to 89 of the 115 products at issue.  Proof of damages is required in order to assess damages; juries are not free to simply pick a number from the air in the absence of testimony or proof that would permit a non-speculative award.  Accordingly, even if such trade secrets could be included in the verdict form with respect to liability, no reasonable jury could possibly assess any damages as to them.  MGA's expert's attempt to compensate for the absence of any damage calculation by a "holistic" approach fails to cure this defect, instead advancing a number that is literally untethered to any of the products at issue.

In ruling on summary judgment, this Court held "[i]t is for the fact-finder to resolve whether MGA's efforts to maintain the secrecy of its trade secret information to retailers and journalists could have been accompanied by an 'implied obligation to not use or disclose it' for a specified period of time. … A reasonable fact-finder could certainly conclude that the tremendous investment that Mattel made in the development of its market intelligence group belies the suggestion that Mattel could have simply examined MGA's press releases for the information disseminated at toy fairs about MGA's forthcoming products."  Dkt. 9600 at 161 (citations omitted).

The evidence at trial contradicts the assumptions on which the Court based its summary judgment order.  Even if the Court was right in denying summary judgment

1  (Mattel respectfully submits it was not),[1] the evidence at trial establishes that the

2  information and products MGA now claims as trade secrets were in fact not secret,

3  that MGA did not take reasonable efforts to maintain their secrecy, and that they

4  cannot be the subject of any damage award.  Based on the proof at trial, no reasonable

5  jury could find for MGA as to any of the 116 trade secrets that are arguably at issue.[2]

6

7                                   **Statement of Facts**

8         MGA claims as trade secrets the "appearance, operation, intended play pattern

9  and plans to advertise on television" of 115 different products displayed at toy fairs

10 between 1999 to 2006 as well as certain pricing information.[3]  This list is based solely

11 on the items included in Mr. Villasenor's reports, many of which were simply cut and

12 pasted from prior or contemporaneous press releases or press stories.  But 26 of these

13 products were not even included in his reports: three were never mentioned at all, and

14 23 others were from the 2006 New York toy fair, which took place after he had left

15 the company.[4] The report from that toy fair explicitly stated that it was based solely

16 on public information,[5] and MGA offered *no proof* contradicting that claim; tellingly,

17 _____

18 [1]   Mattel incorporates herein and preserves its summary judgment motion and the
    arguments therein.  See Mattel Inc.'s Corrected Notice of Motion and Motion for
19 Partial Summary Judgment on MGA's Counterclaims-in-Reply and Memorandum of
    Points and Authorities in Support Thereof, dated 11/18/2010, dkt. 9343 at i-v, 30-6,
20 65-82; Mattel, Inc.'s Reply in Support of Motion for Partial Summary Judgment on
    MGA's Counterclaims-in-Reply, dated 12/14/2010, dkt. 9517 at 1-13, 42-52.
    [2]   Mattel continues to maintain, and preserves for future consideration, all of its
21 prior submissions regarding MGA's trade secrets claim, including that MGA should
    not have been allowed to add this claim six years into this case, just before trial,
22 despite having full knowledge of it years earlier; that it should not have been
    permitted to add new trade secrets claims mid-trial; that it should not have been
23 permitted to offer wholly new damages theories mid-trial as to dozens of additional
    claimed trade secrets for which it offered no damages opinions at all before trial; that
24 MGA's claim is barred by the statute of limitations and laches; and that these claims
    do not relate back to earlier filings.  Finally, Mattel hereby preserves the argument
25 that if MGA's own copyright preemption arguments as to Mattel's claims were to be
    accepted (they should not be), MGA's trade secret claims would be preempted by
    copyright.
26 [3]   See Docket No. 9948 (MGA's Trade Secret Chart Filed Pursuant to the Court's
    February 1, 2011 Order); see also 3/24/11 Trial Tr., Vol. 2, at 113:5-24, 129:2-
27 130:14.
    [4]   See TX 9566-3; see also 3/23/11 Trial Tr., Vol. 2, at 48:19-49:4.
28 [5]   See TX 9566-3.

the product descriptions in Mattel's report actually duplicate the typographical errors included in descriptions in a publicly available blog about the products MGA showed at New York Toy Fair.[6]  Even as to those products that mentioned in Mattel reports, MGA failed entirely to identify what the actual trade secret was in an otherwise generic product.  MGA's claim that misappropriation was established as to eight of its trade secrets by matching Mattel products cannot be squared with the undisputed evidence that the Mattel products were manufactured before, or years after, the supposedly matching MGA products; and in any case many of them look absolutely nothing like the MGA product.  And MGA has simply ignored the undisputed proof that products it claims as trade secrets were shipped to retailers before their showing at the toy fairs, or were the subject of press release or press stories at the very time MGA claimed they were secret, or were displayed by retailers in advance of the toy fairs, all with no requirement—explicit or implicit—that their confidentiality must be maintained.

In presenting its trade secret case at trial, MGA made no effort to meet the requirements of trade secret law on an item-by-item basis.  Painting with a brush of unprecedented breadth, it relied almost entirely on Mr. Larian's sweeping assertion that everything in its showrooms was "confidential."  But even Mr. Larian, on cross-examination, acknowledged the inherent defects in that argument.  The entire purpose of the toy fairs where Mattel allegedly misappropriated information is to publicize new products.[7]  The New York Toy Fair is "like a big Las Vegas show" with "thousands of people coming in and out of different showrooms, looking at product."[8]  The attendees include retailers, analysts, distributors, licensees, and even reporters and members of the press.[9]  MGA itself was the source of numerous press stories

---

[6]  Compare TX 9566-6 to TX 9882-6 ("Sheridan, and then Sasha, Jade Yasmin and Cloe").
[7]  See 3/22/11 Trial Tr., Vol. 1, at 135:11-16.
[8]  3/17/11 Trial Tr., Vol. 2 at 35:17-39:23.
[9]  See 3/17/11 Trial Tr., Vol. 2 at 35:17-39:23.

about products it now claims were secret; as to others, while the source of the information is not known, it is undisputed that supposedly "secret" products were described in press stories (which Mr. Villasenor then cut and pasted).  MGA even invited at least one Mattel representative into its supposedly confidential showroom.[10]  Larian concedes the purpose of going to toy fairs was "to promote and sell our products."[11]

It is undisputed that the retailers who obtain the same information Mattel allegedly obtained at these toy fairs are not expected to keep it confidential.  Larian "expects retailers to talk."[12]  In his experience, retailers "go ahead and share information from MGA with other people in the industry".[13]  He admits that even when asked not to do so, retailers disclose information they obtain from manufacturers.[14]  "[P]ractically speaking" Larian knew retailers would share the information he gave them with others in the industry.[15]  MGA's Ron Brawer agrees that "there's certainly a significant amount of leakage from the moment that you start telling retailers what the FOB cost is of a product,"[16] and MGA's Susana Kuemmerle concedes that price lists are not trade secrets and that retailers share them with competitors "all the time."[17]

In fact, MGA itself routinely received information from retailers about unreleased products that were being shown in Mattel toy fair showrooms.[18]  Larian admits he "personally" got such information.[19]  He did not believe he was using a retailer to steal "trade secrets" when he asked them to get him catalogs and price lists

---

[10]  See TX 9344-2.
[11]  3/24/11 Trial Tr., Vol. 2, at 22:16-23:1.
[12]  3/25/11 Trial Tr., Vol. 2, at 37:18-38:4; see also 3/25/11 Trial Tr., Vol. 1 at 103:11-105:24.
[13]  3/25/11 Trial Tr., Vol. 1, at 88:20-89:17.
[14]  See 3/24/11 Trial Tr., Vol. 2, a 67:9-16.
[15]  3/25/11 Trial Tr., Vol. 1, at 88:20-89:17.
[16]  3/31/11 Trial Tr., Vol. 2, at 41:10-42:9.
[17]  2/24/11 Trial Tr., Vol. 2, at 35:12-36:8.
[18]  See, e.g., TX 9533; 3/24/11 Trial Tr., Vol. 2, at 67:22-25; 3/25/11 Trial Tr., Vol. 1, at 112:9-16.
[19]  See 3/24/11 Trial Tr., Vol. 2, at 67:9-16.

1  of MGA's competitors, including Mattel, from a toy fair.[20]  Nor did Larian discipline

2  MGA employees or investigate the circumstances at all when he learned they had

3  gained access to a Mattel showroom at toy fair and prepared and disseminated a

4  detailed report of what they saw.[21]  Instead, such behavior earned accolades.[22]

5      MGA also made no attempt to prevent its so-called secrets from being shared,

6  despite knowing about it.  Mr. Villasenor's practices were known to senior officials at

7  MGA since at least 2004, if not earlier—Ron Brawer, a senior MGA executive since

8  2004, testified that Mr. Villasenor told him when they both still worked for Mattel

9  that he used false identification to gain entry to competitor showrooms.[23]  But despite

10  that knowledge, no additional security measures were put in place by Mr. Brawer or

11  anyone else at MGA.   Indeed, MGA actually interviewed Villasenor for a job,

12  knowing of his activities.[24]  This is consistent with the proof that MGA employees

13  infiltrated Mattel's toy fair showrooms with Larian's encouragement.[25]

14      MGA's knowing disclosures to retailers, and its failure to take measures to

15  protect its claimed information, are flat out inconsistent with the legal requirement of

16  protecting the secrecy of a trade secret.  The most that MGA could offer was a single

17  2005 Hong Kong Toy Fair sign in sheet with boilerplate language at the top[26]—the

18  only such sign in sheet that MGA put into evidence for the more than 30 toy fairs that

19  happened during the years at issue, even though Larian directed people to search

20

21      [20]  See 3/25/11 Trial Tr., Vol. 1 at 103:11-105:24.
      [21]  See Trial Tr. at 3/25/11 Trial Tr., Vol. 1, at 108:8-113:25; see also TX 9533,
22  TX 24748.
      [22]  See TX 9539.
      [23]  See 3/31/2011 Trial Tr., Vol. 1, at 77:15 – 77:18.
23      [24]  See TX 9293; 3/23/2011 Trial Tr., Vol.1, at 69:25-72:19; see also 3/31/2011
   Trial Tr., Vol. 1, at 85:4-11.
24      [25]  See, e.g., TX 9334 (in which an MGA employee advised Larian that "i [sic]
   tried to steal a line list from the mattel showroom, but all i was able to get was a
25  licensee list and marketing one sheet, passed both to marcy."  Larian replied "[g]ood
   job guys!"); see also TX 9528 (in which an MGA employee shares with MGA
26  executives Larian, Ron Brawer and Paula Garcia in January 2005 information MGA
   obtained from Toy Fair regarding numerous Mattel products, including their
27  advertising plans and pricing, for the upcoming Fall 2005 season); 3/25/11 Trial Tr.,
   Vol.1, at 118:10-121:22.
      [26]  TX 36635, 3/24/11 Trial Tr., Vol. 2, at 58:3-22.
28

1  "everywhere" for such sign-in sheets.[27]  Indeed, Larian admitted that prior to this

2  2005 toy fair, MGA did not have a sign-in sheet that even included such boilerplate

3  language.[28]  Such steps are plainly insufficient; reasonable steps means specific steps,

4  and while this Court at summary judgment suggested that an implicit understanding

5  might be enough, MGA offered no actual evidence of such an understanding.

6  Instead, the only evidence MGA produced shows that it understood that retailers did

7  not consider showroom products to be confidential.

8      In short, no reasonable jury could find that *everything* in MGA's showrooms

9  derived independent value from its secrecy, and no reasonable jury could conclude

10  that MGA took reasonable steps to protect the secrecy of *everything* in its

11  showrooms; the undisputed evidence establishes otherwise.  Nor, for that matter,

12  could a reasonably jury even find that Mattel acquired everything it is alleged to have

13  acquired: the uncontroverted facts show that Mattel did not obtain information from

14  any MGA toy fair showroom in 2006.[29]  Mattel's 2006 Competitive Product

15  Overview states plainly that it was "created by collecting content from a variety of

16  press releases, news articles and widely accessible websites.  All included content is

17  publicly available and can be directly sourced by request.  None of this information

18  either obtained or sought from any third party."[30]  MGA presented no evidence to

19  contradict this.  Sal Villasenor denies ever entering an MGA toy fair showroom, and

20  he did not attend <u>any</u> toy fairs in 2006.[31]  The only Mattel employee who testified that

21  she entered an MGA showroom without revealing that she was a Mattel employee,

22

23

_____

24  [27]  Trial Tr., 3/24/11, Vol. 2 at 62:2-65:5.
    [28]  Id.

25  [29]  In fact, the only year for which MGA presented evidence that Mattel gained
    access to an MGA showroom was 2002.  See 3/29/11 Trial Tr., Vol. 1, at 22:9-15

26  (employee did not attend any toy fair except in 2002), 25:25-26:3 (employee entered
    an MGA showroom in 2002); see also Trial Tr., 3/23/11, Vol. 1, at 76:20-77:7

27  (employee never entered an MGA showroom).
    [30]  TX 9566-3.

28  [31]  3/23/11 Trial Tr., Vol. 2, at 48:19-49:4, 76:20-77:7.

1  Carey Plunkett, stated that the only instance in which she did this was 2002.[32]  Thus,
2  MGA cannot show any misappropriation for the 22 products that it claims were
3  displayed in its toy fair showrooms in 2006.

4        Given these severe evidentiary shortcomings, MGA's only hope would have
5  been to introduce evidence, product by product, identifying what it claimed was the
6  trade secret, how its execution was indeed unique, and the reasonable steps it took to
7  preserve the secrecy of that product.  Yet MGA did not even try to do that.  Between
8  the products that were never even mentioned, those that were never introduced, the
9  ones that were previously shipped and publicly discussed, not to mention those for
10  which MGA cannot show any evidence of access to its showroom, all of its claims
11  fail on their face.  How is a jury to find that a product it never heard a word of
12  testimony about, and never saw until the trial was over, if then, was a trade secret
13  based on its particular execution?  No reasonable jury could.  How is a jury to find
14  that a product that was touted in a press release or described in a press story at the
15  very time it was supposedly misappropriated was indeed secret?  Such products
16  cannot be misappropriated as a matter of law.  Even Mr. Malackowski only purports
17  to address some 26 of the trade secrets claimed by MGA, and many of the so-called
18  matches he relies on to support his damage estimates cannot survive even the most
19  minimal scrutiny.  As for the rest, he relies on a "top down" approach that fails to
20  provide the jury any reliable basis to assess damages.

21                                    **Argument**
22  **I.     EACH OF MGA'S ALLEGED TRADE SECRETS WAS SHARED**
23          **WITH MULTIPLE RETAILERS BOTH BEFORE AND DURING THE**
24          **TOY FAIRS WHERE THEY WERE ALLEGEDLY**
25          **MISAPPROPRIATED**
26        Displaying products at trade shows is *exactly* the type of conduct that destroys

27  _____
28  [32]  See 3/29/11 Trial Tr., Vol. 1, at 22:9-15 (employee did not attend any toy fair
      (footnote continued)

1  any sort of confidentiality.  Knowing that retailers talk all the time, knowing that they
2  share information with other manufacturers, MGA voluntarily showed its claimed
3  secrets to all manner of retailers; its reasonable steps to ensure non-disclosure were
4  limited to a single sign-in sheet with boilerplate language at one out of more than 30
5  toy fairs between 1999 and 2006.

6          By disclosing its purported trade secrets to retailers and many others who
7  visited its showrooms without confidentiality obligations, MGA forfeited any claim
8  to trade secret protection.  <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. 986, 1002 (1984)
9  ("If an individual discloses his trade secret to others who are under no obligation to
10 protect the confidentiality of the information ... his property right is extinguished.");
11 <u>VSL Corp. v. Gen. Techs. Inc.</u>, 1997 WL 654103, at *3 (N.D. Cal. Jul. 21, 1997)
12 (granting summary judgment on trade secret claim because "[plaintiff] displayed the
13 duct at trade shows and distributed marketing information about the duct which
14 provided drawings and measurements . . . [Plaintiff] never required that anyone sign a
15 confidentiality agreement before being given samples and other data.") (citations
16 omitted); <u>De Lage Landen Operational Servs., LLC v. Third Pillar Sys., Inc.</u>, 693 F.
17 Supp. 2d 423, 440 (E.D. Pa. 2010) ("Where a plaintiff has freely disclosed the
18 information without the protection of a confidentiality agreement, it cannot claim a
19 trade secret.") (citing <u>Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.</u>, 923
20 F. Supp. 1231, 1254 (N.D. Cal. 1995)); <u>Cypress Semiconductor Corp. v. Superior</u>
21 <u>Court</u>, 163 Cal. App. 4th 575, 588 (2008) ("A trade secret loses its protected status if
22 the owner does not undertake reasonable efforts to keep it secret.").

23         Moreover, even if MGA did seek to keep its claimed information secret—and
24 it did not—*it knew full well* that the information would not remain secret, and to the
25 contrary would be disclosed to competitors, once it was given to retailers.  Yet MGA
26 took no additional steps to protect the information.  This is simply inconsistent with a
27 
28 except in 2002), 25:25-26:3 (employee entered an MGA showroom in 2002).

claim of trade secret misappropriation.  But it is fully consistent with other practices of MGA: using outside vendors who were not required to sign non-disclosure agreements;[33] displaying products in public planogram rooms prior to toy fairs; and even issuing press releases about unreleased products being shown at toy fairs in advance of the fairs.  As a matter of law, showing products to retailers with the knowledge and expectation that the product information will be further disclosed to competitors cuts off any expectation of privacy or secrecy as to that information.

## II.  NONE OF MGA'S TRADE SECRETS CAN SURVIVE SCRUTINY ON A TRADE SECRET BY TRADE SECRET BASIS

MGA's decision to rely almost entirely on Mr. Larian's broad and unsupportable claim of total confidentiality is not surprising; indeed, it was necessary given that none of the supposed trade secrets can survive the individualized scrutiny that California law requires.  Every one of the 116 supposed trade secrets, upon the closer scrutiny that the law requires and that MGA eschewed, fails—in many cases on multiple grounds—the dual test established by CUTSA: that it derived its value from not being known; and that reasonable steps were taken to preserve its secrecy.  Cal. Civ. Code § 3426.1 ("'Trade secret' means information . . . that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."); see also Stromback v. New Line Cinema, 384 F.3d 283, 305 (6th Cir. 2004) ("The essence of a trade secret is that it derives its value from secrecy."); Cypress Semiconductor Corp. v. Superior Court, 163 Cal. App. 4th 575, 588 (2008) ("A trade secret loses its protected status if the owner does not undertake reasonable efforts to keep it secret.").  It was MGA's burden to establish that these requirements were met as to each of the claimed trade secrets.  No reasonable jury

---

[33]  2/10/11 Trial Tr., Vol. 1, at 98:1-23; see also 2/25/11 Trial Tr., Vol. 1, at 18:6- (footnote continued)

MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW RE MGA'S TRADE SECRET CLAIM

could find that burden was satisfied.

**A.     No Evidence At All of Misappropriation Was Introduced as to 26 of the Supposed Trade Secrets**

Literally no evidence at all of misappropriation was introduced as to 26 of the claimed secrets.[34]   None.   Three of these supposed trade secrets were not even included in any Mattel report.  Twenty-three others were included in the 2006 New York Toy Fair report, which not only contained an explicit statement—consistent with the evidence—that the report was based exclusively on public documents, but was also compiled after Mr. Villasenor left Mattel in 2005.   Trade secret law requires proof of improper acquisition, disclosure, or use.  As to these 26 supposed secrets, MGA produced not one shred of evidence of misappropriation.  Even if these 26 products were trade secrets—and Mattel maintains they were not—a reasonable jury simply could not find that they were misappropriated in the absence of any evidence at all of acquisition.

**B.     The Evidence is Undisputed that at least 65 of the Supposed Trade Secrets Were the Subject of Press Releases or Press Stories Prior to or at the Time of the Toy Fairs**

The public release of MGA's claimed trade secret information is inconsistent with the requirement of secrecy.  Given that the purpose of toy fairs is to promote products, it is unsurprising that many of its claimed trade secrets were actually disclosed in the press before, during or immediately after the toy fairs at which they were allegedly misappropriated.   Indeed, MGA itself affirmatively sought such coverage, issuing press releases and participating in interviews as to its products.  Mr. Larian acknowledged that some of the information was made public about the products at issue before toy fair.[35]   He further admitted that he could not say which

19:1, 43:21-46:14.
[34]   See Appendix A at Trade Secret Nos. 18, 22, 36, 66-87, 97..
[35]   See Trial Tr., Vol. 1, at 150:22-151:2.

1  of MGA's "trade secrets" were *not* the subject of a press release or article at the time

2  of toy fair.[36]

3       For example, MGA identifies "the appearance, operation, intended play

4  pattern and plans to advertise on television for Sun-Kissed Summer" as one of its

5  misappropriated trade secrets.  However, an internal Mattel email dated February

6  11, 2004 regarding the upcoming product is literally copied word for word from an

7  MGA press release of the same date:

8       "The summer's just getting started and it's already a scorcher! Join the Bratz

9       as they kick off the season with a super stylin' day at the beach ... and by the

10       pool!  Each girl comes with three distinct beach looks, and her own unique

11       summer party accessories like a surfboard, a beach towel, and a tote.  The

12       Splash 'N' Dance Pool(TM) is a 5-in-1 playset that features a real working

13       pool, a stylin' sundeck/dance floor, a smoothie bar, a fashion runway and a

14       chill-out balcony for catching a cool view!  And to this over 30 themed

15       accessories, and you've got a party that's bound to last all summer long!  And

16       don't forget to join the Boyz(TM) Sun-Kissed Summer(TM) for more Kickin-

17       cool style!"[37]

18  The Mattel email and MGA press release also contain identical descriptions of Bratz

19  Girls Nite Out, another product MGA claims was misappropriated. [38]   Any

20  information disseminated in MGA's own press release cannot be a trade secret.

21       In another instance, MGA identifies "the appearance, operation, intended play

22  pattern and plans to advertise on television for Bratz Mobile" as one of its

23  misappropriated trade secrets.  An internal Mattel report dated March 20, 2002

24  includes a photograph of Bratz Mobile and describes the product's features as "a

25

26  [36]  See Trial Tr., Vol. 1, at 14:3-17.
27  [37]  Compare TX 9284 (E-mail from Stephanie Page, dated February 11, 2004) to
   TX 23894 (MGA Press Release, dated February 11, 2004); see also 3/18/2011 Trial
   Tr., Vol. 2, at 16:15-22:22.
28  [38]  Id.; see also Dkt. 9948 at 22.

working FM radio, an opening trunk, glove compartment and doors, wheels that move and turn, and a moving stick shift and steering wheel."[39]   That was not a secret: a February 25, 2002 magazine article includes the same photo and describes the product's features as "a real working FM radio, a stick shift that moves; an opening trunk, glove compartment, and doors; wheels that move; and a turning steering wheel."[40]   The publication of the photograph of the car and the detailed description of its features in the magazine article negate any claim that these elements were trade secret.  As a matter of law, MGA's trade secret claim must fail with respect to these and to the remaining products, detailed in Appendix A, which were the subjects of press releases or articles pre-dating or contemporaneous with toy fair.[41]

### C.   The Evidence is Undisputed that 6 of the Products which MGA Claims were Trade Secrets at the time of the Toy Fair Were Already in the Stream of Commerce

It is uncontested that a product that has already been released to the market cannot be a trade secret.[42]   Nonetheless, MGA claims as trade secrets elements of 6 products that were shipped to retailers prior to the toy fair at which MGA alleges misappropriation.  For instance, MGA claims that Mattel misappropriated Bratz Petz at the 2004 New York Toy Fair in February 2004;[43] however, Bratz Petz had shipped to retailers for sale on the market three months earlier.[44]   In another instance, both the MGA product, Bratz Sun-Kissed Summer, and the accused Mattel product, My Scene Jammin' in Jamaica were on retailer shelves in December 2003—two months *before* the toy fair at which MGA alleges Mattel

---

[39]   TX 9507-143 (Mattel memo dated March 20, 2002).
[40]   TX 20951 (License! Magazine, dated February 25, 2002); see also 3/23/11 Trial Tr., Vol. 1, at 108:22-110:7.
[41]   See Appendix A at Trade Secret Nos. 1, 11, 13, 16, 19-35, 41, 42, 44, 45, 50, 55, 58, 59, 60, 61, 64-75, 80-85, 92-94, 99, 102, 104-114.
[42]   2/22/11 Trial Tr., Vol. 1, at 125:16-126:6.
[43]   See Dkt. 9948 at 11.
[44]   See TX 24603-2.

1  misappropriated secret information about Sun-Kissed Summer.[45]  Not only was the

2  information about Sun-Kissed Summer public by the date of toy fair, the accused

3  My Scene product was already manufactured and on the market,[46] proving—by

4  MGA's own admission -- that its own product was not at all unique.  MGA's trade

5  secret claims with respect to these products and the remaining products, detailed in

6  Appendix A, which were available prior to the relevant toy fair or which pre-date

7  the accused Mattel product by years, fail as a matter of law. [47]

8        **D.    No Reasonable Jury Could Find that MGA's "Execution" of a**

9             **Generic Theme Made it into a Trade Secret where MGA Failed to**

10            **Offer Any Evidence as to What was Unique about its Execution**

11        Larian testified that "many, many, many, many companies" have done stock

12  themes such as "Hollywood Celebrity, Pop Starz, Slumber Party, Dating,

13  Sweetheart, Prom, Costumes, Cowgirlz" and that it was MGA's particular execution

14  that was "different."[48]  But MGA made no attempt to prove its allegedly unique

15  execution of the 115 products for which it seeks trade secret protection.  Mr. Larian,

16  the only MGA witness who even addressed individual trade secrets, discussed only

17  eight of them.   Even if Mr. Malackowski's damage testimony is assumed to have

18  not only assessed harm but also identified the trade secrets at issue, and even

19  assuming no overlap between his list and Mr. Larian's list of eight, that would bring

20  the total only to 34, leaving the jury to simply guess as to the other 81.  Worse still,

21  Mr. Larian's own testimony—even as to the eight he addressed—was plainly

22  insufficient.  For instance, Larian identified Alien Racers as "a remote control car"

23  that "boys really liked" and "girls didn't."[49]  That is hardly sufficient to provide the

24

25  _____

   [45] See TX 24671-6, TX 24671-11.

26  [46] See TX 24671-11.

   [47] See Appendix A at Trade Secret Nos. 2, 19, 20, 23, 25, 65.

27  [48] 2/17/11 Trial Tr., Vol. 2, at 6:13-15 ("Many, many, many, many toy
   companies have done those themes over many years.  It's the way we executed them
   that was different.")

28  [49] 3/24/11 Trial Tr., Vol. 2, at 124:14-16.

1   jury with any information as to how this particular race car represented a unique
2   execution of a common theme.  A generic remote control race car that boys like is
3   not a trade secret.  <u>Walker v. Univ. Books, Inc.</u>, 602 F.2d 859, 865 (9th Cir. 1979)
4   (holding that obvious improvements to fortune telling cards did not constitute trade
5   secrets and agreeing with the district court that "vague and obvious" information
6   cannot constitute a trade secret "as a matter of law.") (quotations omitted).  <u>See also</u>
7   <u>Kewanee Oil Co. v. Bicron Corp</u>.,  416 U.S. 470, 476 (1974) (finding that although
8   "[n]ovelty, in the patent law sense, is not required for a trade secret . . . some
9   novelty will be required if merely because that which does not possess novelty is
10  usually known; secrecy, in the context of trade secrets, thus implies at least minimal
11  novelty.").  According to Larian, Bratz Petz was a line of animal toys.[50]  Animal
12  toys—absent something unique demonstrating at least "minimal novelty"—cannot
13  be a trade secret, and MGA's failure even to address the issue, much less answer it
14  as to virtually every product, introduced at trial or not, dooms its claim.

15      Similarly, MGA represented in its Court-ordered February 4, 2011 filing that
16  My Scene Bling Bling copied MGA's Bratz Diamondz "dense glitter print on
17  fashions, fur stole jackets, glittery, small hand purses, jewelry for customers to
18  wear," which MGA apparently considered to be trade secrets—aspects of its
19  supposedly unique execution.[51]  But Mattel released My Scene Bling Bling on the
20  market nearly a year before Bratz Diamondz.[52]  In fact, Larian personally directed
21  individuals to buy My Scene Bling Bling product in October 2005.[53]  MGA's
22  admission that its claim to trade secret misappropriation is based on a supposed
23  match with a Mattel product that actually predates it does not prove
24  misappropriation, but just the opposite: if a matching Mattel product was on the

---

[50]  See 3/24/11 Trial Tr., Vol. 2, at 122:18-123:9.
[51]  See Dkt. 9948.
[52]  See 3/25/11 Trial Tr., Vol. 1, at 66:8-17.
[53]  See TX 20803; 3/25/11 Trial Tr., Vol. 1, at 66:18-67:11.

1  market years before, no reasonable jury could find, based on MGA's own
2  admissions, that the later, matching MGA product was unique or novel.

3      At trial, Larian attempted to revise MGA's claim on Bratz Diamondz,
4  testifying that it was their use of a real gem that was the supposed trade secret that
5  Mattel misappropriated by including real gems on a later line of My Scene Bling
6  Bling.[54]  But the evidence is uncontested that MGA widely publicized the fact that
7  Bratz Diamondz would use a real gem prior to the date of the toy fair at which MGA
8  claims Mattel illicitly gained that information. [55]  When shown the article including
9  this supposed "secret" at trial, Larian admitted that he "didn't mean to leave the
10  impression with the jury that this big deal about having the diamond chip on the doll
11  was a trade secret until the doll came out"[56]—leaving the jury with absolutely no
12  basis to find anything even minimally novel about the product.

13      **E.    MGA's Belated Claims of Additional Trade Secrets at Trial are**
14           **Improper under California Law and Without Merit .**

15      MGA did not raise its claim of trade secret misappropriation until six years into
16  the trial.   Even when it did, it listed—on all its required disclosures—only 114
17  products.   Nonetheless, on March 24, 2011, MGA asserted through Isaac Larian
18  newly minted trade secret allegations for the first time in this case, plainly "limit[ing]
19  [Mattel's] ability to defend against the trade secret claim," Pixion, Inc. v. PlaceWare,
20  Inc., 421 F. Supp. 2d 1233, 1242 (N.D. Cal. 2005).

21      Even if the Court allows MGA to add these new trade secrets, the claims are
22  clearly without merit.   No reasonable juror could find trade secret misappropriation
23  with respect to Bratz Flashback Fever—a newly claimed product—and Bratz Formal

24

---

25  [54]  See 3/24/11 Trial Tr., Vol. 2, 127:8-128:20.
    [55]  MGA publicized its Bratz Diamondz product—including its allegedly unique
26  feature of a real gem—in an interview with Reuters published on February 9, 2006—
    nearly a week before the February 12-15, 2006 New York Toy Fair from which
27  Mattel allegedly stole this "trade secret." See TX 9879; 3/25/11 Trial Tr., Vol. 1, at
    67:19-69:18.
    [56]  3/25/2011 Trial Tr., Vol. 1, at 67:15-69:18; see also TX 9879.
28

Funk Runway Disco—for which it amended its claim.  For example, Larian claimed that My Scene Roller Girls impermissibly copied Bratz Flashback Fever, after Mattel gained access to MGA's product at New York Toy Fair.  But the Mattel product was not released until two full years after the MGA product—two years after the supposed trade secret was available in toy stores across America—completely undercutting MGA's claim to have suffered any damage.[57]

In the same testimony, and contrary to prior representations by MGA's counsel and its Rule 30(b)(6) witness, Larian claimed that "FOB cost,"[58] "price lists," [59] and "pricing" [60] were among MGA's "confidential" misappropriated information and that this pricing information was part of MGA's trade secret claim. But no reasonable jury could credit such a claim in light of Larian's own testimony and that of his senior sales staff.  MGA's Susana Kuemmerle testified that manufacturer price lists are not trade secret and that retailers share them with competitors "all the time."[61]  MGA executive Ron Brawer testified that "there's certainly a significant amount of leakage from the moment that you start telling retailers what the FOB cost is of a product."[62]  Larian himself testified that he did not believe he was stealing trade secrets when he asked a retailer to get for him catalog and price lists of MGA's competitors, including Mattel, from toy fair.[63]

## III.   NO REASONABLE JURY COULD ASSESS DAMAGES AS TO ALL BUT 26 OF MGA'S CLAIMED TRADE SECRETS.

MGA should be foreclosed from seeking damages with respect to all but the 26 products addressed by Mr. Malackowski. [64]  Mattel is, therefore, entitled to judgment

---

[57] Compare TX 24580-10 (My Scene Roller Girls introduced December 2006) to TX 24671-003 (Bratz Flashback Fever introduced July 2004).
[58] 3/24/11 Trial Tr., Vol. 2 at 108:21-109:10; 110:19-111:9
[59] Id. at 41:6-13.
[60] Id. at 113:5-24.
[61] 2/24/11 Trial Tr., Vol. 1, at 35:12-36:8.
[62] 3/31/11 Trial Tr., Vol. 2, at 41:10-42:9.
[63] See 3/25/11 Trial Tr., Vol. 1, at 103:11-105:24; see also TX 22225.
[64] TX 37189-10, 33.

1  as a matter of law with respect to any damages claim relating to the alleged
2  misappropriation of the other products.  A jury is not permitted to pick numbers from
3  the air.  Mr. Malackowski's effort to address this problem by proposing a number
4  based on a "holistic" and "top down" approach is fatally flawed, and provides the
5  jury with no basis whatsoever for assigning damages to individual trade secrets, as
6  they are required to do.  Indeed, the evidence is uncontradicted that at least 16 of the
7  products addressed by Mr. Larian or Mr. Malackowski could not possibly have
8  caused any damage to MGA because the supposedly matching (and damage-causing)
9  Mattel product in fact came out before, at the same time as, or years after the MGA
10 products whose secret elements were supposedly misappropriated.  For instance,
11 MGA accused a Mattel product, My Scene Roller Girls, of copying trade secrets of
12 MGA's Bratz Flashback Fever.  But the MGA product was publicly available for
13 years before the My Scene product was released;[65] if the Mattel product "matched,"
14 as MGA claims, it matched a publicly released doll, which could cause no damage.
15 Similarly, MGA accused My Scene Jammin' in Jamaica of copying trade secrets of
16 Bratz Sun-Kissed Summer, but *both* the My Scene product and the Bratz product
17 were on retailer shelves in December 2003—two months *before* the toy fair at which
18 MGA alleges Mattel misappropriated secret information about Sun-Kissed Summer.[66]
19 If these two products "matched" as MGA claims, they were two publicly released
20 dolls, which could cause no damage.

21

22

23

24

25

26
_____

[65]  Compare TX 24580-10 (My Scene Roller Girls introduced December 2006) to
27 TX 24671-003 (Bratz Flashback Fever introduced July 2004).; see also 3/25/11 Trial
Tr., Vol. 1, at 83:9-86:18.
[66]  See TX 24671-6, TX 24671-11.
28

MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW RE MGA'S TRADE SECRET CLAIM

1

### <u>Conclusion</u>

2     For the foregoing reasons, Mattel respectfully requests that the Court grant

3   Mattel's motion for judgment as a matter of law regarding the MGA Parties'

4   misappropriation of trade secrets claim.

5

6   DATED:  April 7, 2011             QUINN EMANUEL URQUHART &
                                      SULLIVAN. LLP
7

8                                     By /s/ John B. Quinn
9                                        John B. Quinn
                                         Attorneys for Mattel, Inc., and Mattel de
10                                       Mexico. S.A. de C.V.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28