```
           UNITED STATES DISTRICT COURT

         CENTRAL DISTRICT OF CALIFORNIA

      HONORABLE DAVID O. CARTER, JUDGE PRESIDING

              - - - - - - -
```

# CERTIFIED TRANSCRIPT

```
MATTEL, INC., et al.,            )
                                 )
                 Plaintiffs,     )
                                 )
           vs.                   )
                                 )
MGA ENTERTAINMENT, INC., et al., )  No. CV 04-9049-DOC (RNBx)
                                 )    Day 47
                                 )    Volume 2 of 4
                 Defendants.     )
_____)
```

```
            REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS
                         JURY TRIAL
                    SANTA ANA, CALIFORNIA
                   WEDNESDAY, APRIL 6, 2011
```

Denise Paddock, CSR 10199, CMRS, RMR, CRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
transcripts@ocrecord.com www.ocrecord.com
040611 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 47 V2
04/06/2011

**APPEARANCES OF COUNSEL:**

FOR PLAINTIFF MATTEL, INC., ET AL.:

      QUINN EMANUEL URQUHART & SULLIVAN LLP
      BY: JOHN QUINN
          WILLIAM PRICE
          MICHAEL T ZELLER
          Attorneys at Law
      865 S Figueroa Street, 10th Floor
      Los Angeles, CA 90017-2543
      213-443-3000

FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: THOMAS S McCONVILLE
          Attorney at Law
      4 Park Plaza, Suite 1600
      Irvine, CA 92614
      949-567-6700

      - AND -

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: ANNETTE L HURST
          Attorney at Law
      405 Howard Street
      San Francisco, CA 94105
      415-773-5700

      KELLER RACKAUCKAS LLP
      BY:  JENNIFER L KELLER
          Attorney at Law
      18500 Von Karman Avenue, Suite 560
      Irvine, CA 92612
      949-476-8700

1    **APPEARANCES OF COUNSEL (Continued):**

2

3

4      FOR CARLOS GUSTAVO MACHADO GOMEZ:

5              LAW OFFICES OF MARK E OVERLAND
               BY: Mark E Overland
6                  Attorney at Law
               100 Wilshire Boulevard, Suite 950
7              Santa Monica, CA 90401
               310-459-2830
8
               -AND-
9
               SCHEPER KIM AND HARRIS LLP
10             BY: ALEXANDER H COTE
                   Attorney at Law
11             601 West Fifth Street, 12th Floor
               Los Angeles, CA 90071-2025
12             213-613-4655

13             ALSO PRESENT:

14             MGA ENTERTAINMENT, INC.
               BY: JEANINE PISONI
15                 Attorney at Law
               16360 Roscoe Boulevard, Suite 105
16             Van Nuys, California 91406

17

18   ALSO PRESENT:

19             KEN KOTARSKI, Mattel Technical Operator

20             MIKE STOVALL, MGA Technical Operator

21

22

23

24

25

UNITED STATES DISTRICT COURT

## CHRONOLOGICAL INDEX

040611 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 47 V2
CV 04-9049 DOC

**WITNESS:**                                                    **PAGE:**

**DENNIS JOLICOEUR**
DIRECT EXAMINATION RESUMED
BY MR. ZELLER.............................................   7
CROSS-EXAMINATION
BY MR. MCCONVILLE........................................  23
REDIRECT EXAMINATION
BY MR. ZELLER............................................  32
RECROSS-EXAMINATION
BY MR. MCCONVILLE........................................  46

**LISA SUZANNE SAUNDERS**
DIRECT EXAMINATION
BY MR. QUINN.............................................  52
CROSS-EXAMINATION
BY MR. MCCONVILLE........................................  68
REDIRECT EXAMINATION
BY MR. QUINN.............................................  74
RECROSS-EXAMINATION
BY MR. MCCONVILLE........................................  79

**JOHN MARINE**
DIRECT EXAMINATION
BY MR. ZELLER............................................  81


**PROCEEDINGS:**
Open court - jury present..............................   7
Open court - jury not present..........................  88
Noon recess was taken..................................  94
Recess taken........................................... 103
Adjournment............................................ 103

## CHRONOLOGICAL INDEX

040611 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 47 V2
CV 04-9049 DOC

**PAGE:**

**EXHIBIT(S) RECEIVED INTO EVIDENCE:**

| Exhibit | | Page |
|---|---|---|
| 4944 | ........................................ | 65 |
| 9650 | ........................................ | 49 |
| 9653 | ........................................ | 76 |
| 9822 | ........................................ | 43 |
| 23718 | ........................................ | 10 |
| 23770 | ........................................ | 13 |
| 24882, 24890, and 24499 | ........................................ | 84 |
| 37197 | ........................................ | 30 |

## ALPHANUMERIC INDEX

040611 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 47 V2
CV 04-9049 DOC

**WITNESS:**                                                    <u>PAGE:</u>

**DENNIS JOLICOEUR**
DIRECT EXAMINATION RESUMED
BY MR. ZELLER........................................       7
CROSS-EXAMINATION
BY MR. MCCONVILLE....................................      23
REDIRECT EXAMINATION
BY MR. ZELLER........................................      32
RECROSS-EXAMINATION
BY MR. MCCONVILLE....................................      46

**JOHN MARINE**
DIRECT EXAMINATION
BY MR. ZELLER........................................      81

**LISA SUZANNE SAUNDERS**
DIRECT EXAMINATION
BY MR. QUINN.........................................      52
CROSS-EXAMINATION
BY MR. MCCONVILLE....................................      68
REDIRECT EXAMINATION
BY MR. QUINN.........................................      74
RECROSS-EXAMINATION
BY MR. MCCONVILLE....................................      79

|   |   |
|---|---|
| 1 | SANTA ANA, CALIFORNIA; WEDNESDAY, APRIL 6, 2011, |
| 2 | Day 47, Volume 2 of 4 |
| 3 | A.M. SESSION |
| 4 | (Open court - jury present.) |
| 10:02 5 | THE COURT:  We're back in session and counsel are |
| 6 | present and we're on the record. |
| 7 | You're going to hear rumors about the federal |
| 8 | government potentially shutting down Thursday night. |
| 9 | (Laughter.) |
| 10:02 10 | THE COURT:  So don't get that circle started that |
| 11 | we're -- we're in session, we're arguing this matter, so; |
| 12 | okay. |
| 13 | All counsel are present, the attorneys are present |
| 14 | and the witness is present. |
| 10:02 15 | Mr. Zeller, this is your continued direct |
| 16 | examination. |
| 17 | MR. ZELLER:  Thank you, Your Honor. |
| 18 | **DENNIS JOLICOEUR,** |
| 19 | witness, called by Plaintiff(s), sworn |
| 10:03 20 | **DIRECT EXAMINATION RESUMED** |
| 21 | BY MR. ZELLER: |
| 22 | Q.  Now, you testified previously that MGA's policy is that |
| 23 | it doesn't allow members of the press to, while they're |
| 24 | invited into the showroom, to take pictures of the unreleased |
| 10:03 25 | products; is that true? |

1    A.    Yes, that's our general policy.

2    Q.    And the reason why journalists don't need to take

3    photographs of the unreleased products is because MGA gives

4    them photographs of its unreleased products at New York Toy

10:03  5    Fair; correct?

6    A.    That's too broad a statement; incorrect.

7    Q.    It has done that; correct?

8    A.    It -- it -- on occasion it has handed out pictures of

9    specific products, but not of the product line as a whole.

10:03 10    Q.    Well, isn't it true that MGA has regularly created

11    compact discs, CDs, filled with photos of unreleased products

12    and handed them out to the press at New York Toy Fair?

13          MR. MCCONVILLE:  Objection; compound.

14          THE COURT:  Overruled.

10:03 15          THE WITNESS:  That's incorrect.  It has

16    occasionally done so, not regularly done so.

17    Q.    BY MR. ZELLER:  Well, tell us what years at New York Toy

18    Fair it's done so?

19          Well, actually, let me rephrase that.

10:04 20          Please tell us the years at New York Toy Fair that

21    MGA attended, actually went to New York Toy Fair, where it

22    did not give out any photographs on CDs of its unreleased

23    products?

24          MR. MCCONVILLE:  Objection.

10:04 25          Objection; no foundation.

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  Without educating myself specifically
 3    on that question I couldn't answer it correctly.
 4    Q.   BY MR. ZELLER:  You can't -- you can't tell us even one
10:04 5    single year specifically; is that true?
 6    A.   I can't answer that question correctly without doing
 7    research.  I just can't do it.
 8    Q.   And you didn't -- you didn't educate yourself about that
 9    prior to the time that you testified as a 30(b)(6); is that
10:04 10   true?
11              MR. MCCONVILLE:  Objection; assumes --
12              THE COURT:  Overruled.
13              THE WITNESS:  You know I'm -- I'm not sure I even
14    thought of that question, so the answer is "no."
10:04 15   Q.   BY MR. ZELLER:  Please take a look at Exhibit 23718.
16              (Pause in the proceedings.)
17    Q.   BY MR. ZELLER:  You recognize this is an e-mail that
18    MGA's produced concerning New York Toy Fair CDs for the
19    press?
10:05 20   A.   Yes.
21              MR. ZELLER:  I'd move Exhibit 23718 into evidence.
22              MR. MCCONVILLE:  Objection; no foundation with this
23    witness.
24              THE COURT:  Can I see that document.
10:05 25              Thank you very much.
```

UNITED STATES DISTRICT COURT

```
 1              (Pause in the proceedings.)

 2              THE COURT:  Overruled.

 3              (Exhibit(s) 23718, received.)

 4              Now, once again, this isn't for the truth of the

10:05  5   matter asserted.

 6              He's been designated a 30(b)(6) witness.  He can

 7   testify on these subjects if he has knowledge.

 8              Counsel.

 9   Q.   BY MR. ZELLER:  You'll see this is an e-mail dated

10:05 10   January 23rd, 2001, an internal MGA e-mail; right?

11   A.   It would appear so.

12   Q.   It's from Dave Malacrida, the head of PR that we talked

13   about; right?

14   A.   Yes.

10:06 15   Q.   And this is before New York Toy Fair; correct?

16   A.   It would appear so.

17   Q.   And this is entitled "NYTF CDs for Press"; correct?

18   A.   Yes.

19   Q.   And then it says "the following high-res images are

10:06 20   needed to be burned on 50 CDs, MAC format, for NYTF."

21              And then it continues on.

22              Do you see that?

23   A.   Yes.

24   Q.   And it talks about some other information and it says,

10:06 25   "this will be our NYTF" media kit.  These CDs are needed in
```

1   New York at the showroom by Wednesday the 7th of February."

2       Do you see that?

3   A.   Yes.

4   Q.   So you understand these are photographs of products

10:07 5   being prepared by MGA so they can be handed out to the press

6   at New York Toy Fair in 2001; correct?

7   A.   Yes.

8   Q.   And then it goes on to say "here are the images needed,"

9   and then it has listed "Bratz, Palm Puppies, Insectobots,

10:07 10   Scooter Samantha," and it continues on.

11       Do you see that?

12   A.   Yes.

13   Q.   And all these at the time were so-called "unreleased

14   products"; correct?

10:07 15   A.   I wouldn't be able to testify to that.  It's certainly a

16   select list, not a comprehensive list of products.

17       It is certainly -- but I could not tell you if

18   these were -- some of these are old products or continuing

19   products or if they were all new products.  I just don't

10:07 20   know.

21   Q.   But you don't even know whether or not any of these

22   products were confidential or trade secret at MGA as of

23   January 23rd, 2001, of the products that are listed here.

24       Is that true?

10:07 25   A.   I don't know one way or the other if they were old

UNITED STATES DISTRICT COURT

1    products or new products.  I just don't know.

2    Q.   But you are aware that MGA, for example, has accused

3    Mattel of stealing information, trade secret information,

4    about Insectobots from New York Toy Fair in 2001; correct?

10:08 5    A.   I've read the complaint; yes.

6    Q.   And Scooter Samantha is another one that it claimed;

7    correct?

8    A.   I believe so.

9    Q.   And it's your testimony as MGA's 30(b)(6) witness on

10:08 10    MGA's trade secret claims, you can't even tell us whether, as

11    of January 23rd, 2001, these products were confidential or

12    unreleased or something else; is that true?

13         MR. MCCONVILLE:  Objection; predicate.

14         He is not a 30(b)(6) witness at this trial.

10:08 15         THE COURT:  Overruled.

16         I'm not certain if he is or isn't at this point,

17    Counsel.

18         I haven't seen those documents.  But you can answer

19    the question if you have knowledge of this.

10:09 20         THE WITNESS:  I couldn't tell you going back to

21    2001 --

22    Q.   BY MR. ZELLER:  So not even --

23    A.   -- what these products were at all.

24    Q.   Please take a look at Exhibit 23770.

10:09 25         MR. MCCONVILLE:  Mike, what was the number?

UNITED STATES DISTRICT COURT

```
 1              I'm sorry.

 2              MR. ZELLER:  This is 23770.

 3   Q.   BY MR. ZELLER:  Do you recognize this as an e-mail that

 4   is dated January 19, 2000, that MGA's produced?

10:09 5   A.   I -- I only know what it is.  I've not seen this before.

 6              MR. ZELLER:  I would move this into evidence,

 7   Your Honor.

 8              MR. MCCONVILLE:  No foundation, Your Honor.

 9              THE COURT:  Could I see the document, please.

10:10 10              (Pause in the proceedings.)

11              THE COURT:  All right.  So once again it's hearsay.

12   I'm going to receive it, though, so the witness can testify

13   in his 30(b)(6) capacity.

14              (Exhibit(s) 23770, received.)

10:10 15   Q.   BY MR. ZELLER:  You recognize this as an e-mail, an

16   internal MGA e-mail, involving MGA's head of PR, from the

17   January 19, 2000, time period; correct?

18   A.   Cindy Kabler, you're talking about?

19   Q.   Dave Malacrida.

10:10 20   A.   Well, it says it's from Cindy Kabler.

21   Q.   I said he was on it.

22              It's to him; correct?

23   A.   Yes; I see Dave Malacrida's name now.

24   Q.   And it's entitled "product photos"?

10:10 25   A.   Yes.
```

```
 1    Q.   And it says "based on our toy fair experience, we would
 2    like to make MGA product photos available to media in
 3    electronic format on disc."
 4           Do you see that?
 5    A.   If you don't mind, I'm putting on my glasses.
 6           Yes.
 7    Q.   And then it goes on to talk about particular products
 8    that MGA intends to highlight:  "My Dream Baby,"
 9    "Me and My Shadow," "Commandobot," and so on.
10           Do you see that?
11    A.   Yes.
12    Q.   And you understand this is another instance of MGA
13    putting together a CD of product photos to hand out to the
14    press at New York Toy Fair; correct?
15    A.   Yes.  But, again, I don't know if these products are new
16    or old.  I just read the e-mail.  That's all I can say.
17    Q.   Well, you're not denying that unreleased product photos
18    are handed out to the press on these CDs, are you?
19           MR. MCCONVILLE:  Objection; no foundation.
20           THE COURT:  Overruled.
21           THE WITNESS:  I don't know what was handed to the
22    press.  I just know what's in this e-mail.
23    Q.   BY MR. ZELLER:  Well, and by the way, do you have any
24    idea why MGA didn't collect and produce those CDs in this
25    case?
```

UNITED STATES DISTRICT COURT

```
 1              MR. MCCONVILLE:  Objection; argumentative.

 2              THE COURT:  Overruled.

 3              You can ask -- or you can answer the question.

 4              THE WITNESS:  I know that we produced whatever we

 5    could.  Why we had no copies of this I don't know.  They may

 6    not.

 7    Q.  BY MR. ZELLER:  Do you have any explanation as to why

 8    not a single one of these media kits, of these photographs of

 9    products that MGA handed out to the press at MGA toy fair was

10    not produced to Mattel in this case?

11              Do you have any explanation for that?

12              MR. MCCONVILLE:  Objection.

13              Objection; argumentative.  And we intend to examine

14    on the same issue with this witness.

15              THE COURT:  Fine.

16              You can answer the question.

17              THE WITNESS:  It would not strike me as unusual

18    given the dating of this that they simply didn't exist.

19    Q.  BY MR. ZELLER:  Well, you certainly know it's an

20    important issue as to MGA's claims as to whether or not the

21    information that it's claiming was trade secret was released

22    to the press at the time of -- or prior to New York Toy Fair;

23    correct?

24    A.  We're talking about 2000.  I don't think we were sued

25    until 2004.  It doesn't strike me as surprising that for a
```

```
 1    small company that these things simply didn't exist after a

 2    period of time.

 3    Q.    That's not my question.

 4          My question is that, first of all, you know MGA is

 5    making these claims against Mattel on trade secret; correct?

 6    A.    Yes.

 7    Q.    And my -- my question is, is that you know that if

 8    photos or other information is given to the press at the time

 9    of or before New York Toy Fair, whatever that information is

10    could not be trade secret by that time; correct?

11          MR. MCCONVILLE:   Objection; compound; misstates the

12    evidence.

13          THE COURT:   Do you understand the question, sir?

14          THE WITNESS:   I think it draws for a legal

15    conclusion what --

16          MR. MCCONVILLE:   And calls for a legal conclusion.

17          (Laughter.)

18          THE COURT:   If you understand the question, you can

19    answer or I'll have counsel reask.

20          THE WITNESS:   In layman's terms, an element that

21    was made public, that element would be -- would be in the

22    public domain, but that's just "an element" and I'm hoping no

23    one's trying to infer just because a picture's out there

24    that's the same as having revealed all trade secrets around a

25    product.
```

1    Q.   BY MR. ZELLER:  Whatever's revealed in the photograph

2    that's given to the press is not a trade secret at

3    that time; correct?

4            MR. MCCONVILLE:  Objection; calls for a legal

10:14  5    conclusion.

6            THE COURT:  Overruled.

7            THE WITNESS:  That particular element would then be

8    public.

9    Q.   BY MR. ZELLER:  You agree that MGA products cannot be

10:14 10    trade secrets once they are shipped to retailers; correct?

11   A.   No, I don't agree to that.

12   Q.   Well, isn't it true that you believe that once something

13   is entered into the commercial stream, that product is no

14   longer a trade secret?

10:15 15   A.   Many times I've tried to make clear that it's when it

16   actually arrives at the -- at the -- on the consumer's

17   shelve -- shelf.  There's a substantial lag in time between

18   when a product ships from Hong Kong it actually ends up on a

19   consumer shelf.  First it has to cross the ocean, then it has

10:15 20   to be picked up by the retailer, it has to go from the

21   retailer's distribution center, it has to go from the

22   distribution center to the store, it has to be put on the

23   shelf, and that is a lag time that -- that -- that is often

24   months long.

10:15 25   Q.   Please take a look at your November 11th, 2010,

```
 1    deposition at 6623, Lines 17 through 6624, Line 2.
 2    A.    Yes.
 3    Q.    It's November 1st, 2010.
 4          THE COURT:  What's the date again?
 5          MR. ZELLER:  November 1st, 2010.
 6          THE COURT:  Okay.  Thank you.
 7          And, I'm sorry, what page?
 8          It just says "November 11th, 2010"?
 9          MR. ZELLER:  Yes, I'm sorry.
10          November 1st, 2010.  My apologies.
11          November 1st, 2010.
12          THE COURT:  Okay.  November 1st, 2010.
13          MR. ZELLER:  And this is --
14          THE COURT:  At 6623?
15          MR. ZELLER:  Yes, 6623.
16          THE COURT:  Okay.  Thank you.
17          MR. ZELLER:  Line 17 through 6624.
18          THE COURT:  I'm going to give this back.  It's
19    taking too much time off the clock.  Thank you.
20          Stop the clock for just a moment.
21          (Time stopped.)
22          THE COURT:  Okay.  What lines, Counsel?
23          MR. ZELLER:  This is 6623, Line 17, through 6624,
24    Line 2.
25          (Pause in the proceedings.)
```

         1              MR. MCCONVILLE:  For completeness, Your Honor, it

         2     should be Line 4, on Page 6623.

         3              MR. ZELLER:  That's a different subject and he can

         4     read it on his time.

10:18    5              THE COURT:  Just a moment, Counsel.

         6              (Pause in the proceedings.)

         7              THE COURT:  No.  Line 4 is inclusive.

         8              Line 4 through Line 2 may be read.

         9              MR. ZELLER:  Can at least some of the time come out

10:18   10     of MGA's if I'm going to read it?

        11              THE COURT:  No; it's a brief paragraph and it's

        12     inclusive of it, Counsel.  It's part of the answer.

        13              Now the time clock starts again.

        14              (Start Time.)

10:19   15              MR. ZELLER:  (Reading.)

        16              "THE WITNESS:  Due to our policy, I believe it was

        17     confidential as of the end of the toy fair, that it remained

        18     confidential until we shipped it into the commercial stream,

        19     so, yes, it's confidential by the end of the toy fair.

10:19   20              "Question:  What publicity did MGA do for

        21     Hopscotch Heather prior to the time that the product was

        22     shipped?

        23              "Answer:  I do not know the totality of the

        24     publicity that was done relative to Hopscotch Heather prior

10:19   25     to the time the product was shipped.

UNITED STATES DISTRICT COURT

1          "Question:  Is it your testimony that all 114 items

2     here were, in fact, kept not public -- nonpublic by MGA and

3     that members of the public did not have information about the

4     appearance, operation, intended play pattern, and plans to

10:19 5    advertise on television with respect to those products up

6     until the time that they were shipped to retailers?"

7          "Answer:  Based on our policy, yes, that is my

8     testimony, that they were, in fact, confidential until the

9     time that they shipped."

10:19 10        Do you see that?

11    A.   Yes, I do see that.

12    Q.   Now, isn't it true that once the product is shipped --

13    what you mean by "shipped" is that it's put in the hands of a

14    retailer; correct?

10:20 15   A.   That's not quite correct.

16              I amplified that answer on many occasions after

17    this --

18              MR. ZELLER:  Your Honor, I move to strike.  That's

19    not responsive to my question.

10:20 20             My question is about what he means by "shipped."

21              THE COURT:  Finish your answer, sir.

22              THE WITNESS:  All right.

23              I amplified the answer on many times and indicated

24    that what I meant by "shipped" was that it not only had to

10:20 25   arrive at the retailers but it had to arrive on the shelf for

UNITED STATES DISTRICT COURT

 1   the consumer to see and for the consumer to purchase.

 2          Until it was on the store shelf it remained

 3   "confidential."  And I did amplify that on a number of

 4   occasions.

10:20  5   Q.   BY MR. ZELLER:  What steps does MGA take to ensure that

 6   when products are in transit they are still kept confidential

 7   and not released to anyone?

 8          Please tell us all the steps that it takes.  Let's

 9   list them.

10:20 10   A.   I can't.

11   Q.   Because you don't know of any; correct?

12   A.   I'm not in logistics, sir.

13   Q.   Well, isn't it true that once MGA puts the product into

14   the hands of a retailer -- which, by the way, is done

10:21 15   typically called FOB, "freight on board"; correct?

16   A.   "FOB" indicates the point at which ownership transfers.

17   Q.   It's put into the hands of the retailer in Hong Kong,

18   for example; right?

19   A.   It can be put into the --

10:21 20   Q.   And then the retailers take over the shipping from

21   there; correct?

22   A.   Not all retailers.  It can happen that way, yes.

23   Q.   Once MGA puts the products into the hands of the

24   retailers it has no control over what those retailers do with

10:21 25   the products; true?

UNITED STATES DISTRICT COURT

```
 1              MR. MCCONVILLE:  Objection; overbroad.

 2              THE COURT:  Do you understand the question?

 3              THE WITNESS:  No.

 4              THE COURT:  Just reask the question.

 5    Q.   BY MR. ZELLER:  MGA gives -- sells products to

 6    retailers; right?

 7    A.   That's correct.

 8    Q.   Once they are actually in the hands of the retailers,

 9    the retailers are actually free to do with them what they

10    want, show them to other people, show them to competitors, do

11    anything with those products that they have bought; correct?

12              MR. MCCONVILLE:  Objection; misstates the

13    testimony.

14              THE COURT:  Overruled.

15              THE WITNESS:  I would guess the retailers can -- if

16    they own it, they can do what they want with it.

17              MR. ZELLER:  Nothing further.

18              THE COURT:  Cross-examination by Mr. McConville on

19    behalf of MGA and Mr. Larian.

20              MR. MCCONVILLE:  If we could, Your Honor, for a

21    rule of completeness, I would like to play -- I would like to

22    read the deposition testimony from Mr. Jolicoeur on --

23              THE COURT:  I need the same courtesy.  I need this

24    handed to me.

25              I'm not going to search for pages.
```

Line timestamps: 10:21 (5), 10:21 (10), 10:22 (15), 10:22 (20), 10:22 (25)

|    |    |
|----|----|
| 1 | MR. MCCONVILLE:  I assume the clock will stop as |
| 2 | well. |
| 3 | THE COURT:  It's only stopped on one occasion and, |
| 4 | no, it won't. |
| 10:22 5 | MR. MCCONVILLE:  November 12 -- |
| 6 | THE COURT:  It will only stop for my record because |
| 7 | you asked for a more complete reading. |
| 8 | MR. MCCONVILLE:  I'm sorry, Your Honor. |
| 9 | November 12, Line -- Page 720 -- 7222, Line -- |
| 10:23 10 | Line 7 to 13. |
| 11 | THE COURT:  Just a moment. |
| 12 | (Pause in the proceedings.) |
| 13 | THE COURT:  The answer is complete if it's also |
| 14 | read through Page 7223, Line 2. |
| 10:24 15 | MR. MCCONVILLE:  Okay. |
| 16 | You know what, never mind. |
| 17 | **CROSS-EXAMINATION** |
| 18 | BY MR. MCCONVILLE: |
| 19 | Q.  Mr. Jolicoeur, you've been asked a lot of questions |
| 10:24 20 | today about something that you're a 30(b)(6). |
| 21 | Do you remember those questions? |
| 22 | A.  Some of them; yes. |
| 23 | Q.  And isn't it true, sir, that you were a 30(b)(6) on |
| 24 | behalf of MGA for many, many days; right? |
| 10:24 25 | MR. ZELLER:  Objection; irrelevant. |

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10439   Filed 04/08/11   Page 24 of 103   Page ID #:316964
CV 04-9049 DOC - 04/06/2011 Volume 2 of 4

24

1          THE WITNESS:  Yes.

2          THE COURT:  Once again, ladies and gentlemen, let

3     me counsel you the number of days are totally unimportant for

4     both sides.

10:24 5          These witnesses have been on the stand days and

6     days and days for both sides, so, Counsel, both sides.

7     Q.   BY MR. MCCONVILLE:  During the course of your

8     preparation as a 30(b)(6) you reviewed many, many, many

9     documents; true?

10:25 10   A.   Thousands of pages.

11    Q.   And so sitting on the witness stand, you don't have

12    total, absolute recall of all the documents that you've seen;

13    correct?

14    A.   That would be impossible.

10:25 15   Q.   And sitting on the witness stand today, you don't recall

16    a specific answer you may have given in the many days you

17    were a 30(b)(6); correct?

18    A.   That's correct.

19    Q.   And it's -- and I believe one of the topics you've been

10:25 20   designated to testify to relates to MGA's historical practice

21    as it relates to, for example, press CDs; right?

22    A.   Correct.

23    Q.   And when did you start at MGA?

24    A.   November of 2009, just before Thanksgiving.

10:25 25   Q.   So why don't we take a look at 23770, which

1    you were shown.

2              What's the date of this e-mail?

3    A.   January 19, 2000.

4    Q.   And so that was approximately nine years before you

10:26  5    began working at MGA; correct?

6    A.   Yes.

7    Q.   And you were asked questions about why it was that

8    certain documents were not produced or why these CDs were not

9    produced.

10:26 10             Do you remember that question?

11   A.   That's correct.

12   Q.   Are you aware that MGA was unable to file its claim

13   relating to these toy fair allegations until Mattel produced

14   the documents in 2010?

10:26 15             MR. ZELLER:  Objection; this is argument.

16             THE COURT:  Overruled.

17             You both opened up this door now.

18             THE WITNESS:  That is correct.

19             THE COURT:  I'm going to limit it to these

10:26 20   documents.  That's as far as it's going.

21             THE WITNESS:  That is correct.

22             THE COURT:  Now we're done with that line of

23   questioning.

24             MR. MCCONVILLE:  Okay.

10:26 25             THE COURT:  That's it for both sides.

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
|       | 1  | Do you hear me?                                             |
|       | 2  | MR. MCCONVILLE:  I'm done.                                  |
|       | 3  | THE COURT:  Do you hear me?                                 |
|       | 4  | MR. ZELLER:  Yes, sir.                                      |
| 10:26 | 5  | THE COURT:  I'm trying to keep counsel and the law          |

firms out of these respective disagreements and the

bickerings that have gone on.  And once I opened it up the

other side responded on a limited basis.

It's not important; it's irrelevant.

All right.  Counsel, now let's move on for both

sides.

Q.   BY MR. MCCONVILLE:  Mr. Jolicoeur, you were asked some

questions about Exhibit 24867.

If we could put that up in front of you, please.

And this was an e-mail discussing a videotaping at

MGA's showrooms.

Do you remember those questions?

A.   Yes.

Q.   And you remember this e-mail?

A.   Yes.

Q.   You had testified about what's called an "embargo" with

the media.

Let me ask you this, can you describe what an

embargo is on the media?

A.   Yes; and I'm proud to say I was a member of the media

1    for more than 20 years.

2           That's when you're given some information by a

3    party and you're told that you're only -- in advance you're

4    told that you'll only be allowed to have that information if

10:27  5    you don't publish until a certain date.

6    Q.   And so the media agrees?

7    A.   Otherwise -- if the media doesn't agree then they're not

8    given the information.

9    Q.   Okay.  So let's take a look at this particular e-mail,

10:28 10    in fact.

11           It starts off with "we met at the toy fair -- my

12    production crew was videotaping at your showroom."

13           Do you see that?

14    A.   Yes.

10:28 15    Q.   And let's go to the next paragraph.

16           It says, "I was wondering if you could e-mail me

17    releases for more information about the Bratz Diamondz line

18    and any other new Bratz items for spring/fall 2006."

19           Do you see that?

10:28 20    A.   Correct.

21    Q.   So is it your understanding that if a video crew had

22    unfettered access to MGA's showroom that it would need

23    follow-up information?

24    A.    If they had unfettered access they probably would not

10:28 25    need additional information --

1    Q.    Okay.

2    A.    -- they would have it already.

3    Q.    And based on your understanding of what the media crew

4    or what -- let me ask a better question; sorry.

10:28  5          What sort of access does the media get to MGA's

6    showrooms?

7    A.    They get exactly the access that MGA wishes to allow,

8    which means it's limited to a specific product or item and

9    may or may not even include visuals, depending upon how

10:29  10   confidential MGA wishes to be.

11   Q.    And do you believe that a press release reflects MGA's

12   trade secrets?

13   A.    No.  It -- it's only one element.

14          What's really important is that -- and the reason

10:29  15   retailers go to trade shows is because they know that just

16   getting a press release or a sell sheet is not enough.  What

17   retailers come to trade shows for, specifically, to be able

18   to touch, feel, see, see how an item really works, how it

19   really looks, because everybody knows that a two-dimensional

10:30  20   item doesn't count for much.  In many cases the packaging is

21   things that they want to see.

22          There's so much more to be gained by being up close

23   and personal and talking to salespeople about the product,

24   research that might have been done, that the press release or

10:30  25   the sell sheet is really just a very small part of what

CV 04-9049 DOC - 04/06/2011 - Volume 2 of 4

```
 1    anybody would consider the trade secrets around the product.
 2    Q.   Do you remember being asked questions about a
 3    Denise van Patton?
 4    A.   Yes.
10:30  5    Q.   I'd like to put in front of you Exhibit 37197.
 6              THE COURT:  Can I see that document.
 7              MR. MCCONVILLE:  That was one of the ones I handed
 8    to you.
 9              THE COURT:  Thank you very much.
10:30 10              THE WITNESS:  Yes.
11              THE COURT:  Well, just a moment.  Hand that to me
12    again.
13         You may have handed it to me, but I am being handed
14    lots of documents, apparently.
10:31 15         And so I'm going to give you back, both sides, all
16    the documents you've given me this morning.  Each of you can
17    sort them out.
18         Thank you very much.
19         (Discussion held off the record.)
10:31 20    Q.   BY MR. MCCONVILLE:  I'm going to ask you to just look at
21    the bottom of this document.
22    A.   Yes.
23    Q.   Paragraph 7.
24    A.   Yes.
10:31 25    Q.   And you'll see that this appears to be an article by
```

1    Denise van Patton?

2    A.    That's correct.

3    Q.    And you'll see at the bottom her explanation for why it

4    is people need to go to toy fairs; right?

10:31  5    A.    Yes.

6    Q.    And it's because --

7          MR. ZELLER:  This is hearsay, Your Honor.

8          THE COURT:  I'll receive it also for the same

9    limited purpose and that's to show conduct in the industry.

10:32 10          (Exhibit(s) 37197, received.)

11          THE COURT:  Now, once again, Ladies and Gentlemen,

12    same admonition, not for the truth of the matter asserted.

13          MR. MCCONVILLE:  Just go to Bullet 7, please, at

14    the bottom.

10:32 15          THE WITNESS:  Yes.

16    Q.    BY MR. MCCONVILLE:  And it says, "Why are big fairs

17    necessary in the Internet age?

18          "Big fairs, such as toy fairs that bring together

19    an entire industry plus the media, are essential.  Sure, toy

10:32 20    buyers could simply surf online or through catalogs for new

21    dolls and toys, but there is nothing like the impact of

22    seeing the dolls and the toys for oneself when making buying

23    decisions, and the impact of having everything all under one

24    roof.  Plus, fairs such as this are essential for media buzz

10:32 25    for new products and for keeping the industry in

```
 1    the media's sight."
 2              Do you see that?
 3    A.   Yes, I do.
 4    Q.   Is that consistent with your understanding of the
10:33 5    purpose of toy fairs?
 6    A.   She may have been more eloquent than I did, but, yes.
 7    Unless you actually see a product, see how it works, feel it,
 8    the packaging around it and all those other elements, it's --
 9    that's much, much more than just a press release.
10:33 10    Q.   You were also asked some questions about Exhibit 9418,
11    which was admitted for a limited purpose.
12              You were asked questions about this document
13    reflecting -- let's go to the second e-mail, and there it is.
14              Gersende Costaz -- and can you read the e-mail
10:34 15    address for Gersende Costaz, please.
16    A.   Well, it's his name:  gersende.costaz@hasbro.fr.
17    Q.   And who is this e-mail from?
18    A.   I gather it's from Gersende Costaz.
19    Q.   From Hasbro; right?
10:34 20    A.   Hasbro; yes, Hasbro.
21    Q.   And so it looks here, it says, "Dear Sandrine, find
22    enclosed the Barbie analysis we have done after
23    Paris Toy Fair on their new segmentation & AW05 line."
24              Did I read that correctly?
10:34 25    A.   Yes, you did.
```

1    Q.   And from your review of this document does it appear

2    that Hasbro is sending information to MGA?

3    A.   It would appear so.

4            MR. MCCONVILLE:  No further questions.

10:34  5            THE COURT:  Redirect by Mr. Zeller on behalf of

6    Mattel.

7                        **REDIRECT EXAMINATION**

8    BY MR. ZELLER:

9    Q.   You understood, when you were testifying as MGA's

10:35 10    corporate representative, something we call a 30(b)(6)

11    witness, your testimony on the subjects you were designated

12    for concerning the trade secrets of MGA that are being

13    claimed in this case was binding on MGA; correct?

14            MR. MCCONVILLE:  Objection; misstates the evidence.

10:35 15            THE COURT:  Overruled.

16            Answer the question.

17            THE WITNESS:  "Binding"?

18            Was binding --

19            MR. ZELLER:  Binding.  Binding on MGA.

10:35 20            THE WITNESS:  What I understood was I was to

21    testify as truthfully as I could and I did so in every

22    instance.

23    Q.   BY MR. ZELLER:  So you had no understanding when you

24    were designated by MGA as its corporate designee on the trade

10:35 25    secret subjects that your testimony was binding

1    on the company?

2              Is that true?

3              MR. MCCONVILLE:  Objection; calls for a legal

4    conclusion.

10:35  5          THE COURT:  Overruled; it's his state of mind.

6              You can answer the question.

7              THE WITNESS:  I would assume if I made a mistake

8    and ponied up to the table that everyone would understand

9    that I made a mistake.

10:36 10          I certainly tried to make no mistakes and respect

11    the court and proceedings.

12              You know, the "binding" aspect is, as far as I'm

13    concerned, I had an obligation to tell the truth and -- but

14    if for any reason I -- I -- I made a mistake, that I would

10:36 15    pony up to the table and admit that as well.

16    Q.  BY MR. ZELLER:  You were asked questions about starting

17    in 2009.

18              Do you recall that?  The fact that you started with

19    MGA around 2009.

10:36 20    A.  Right around Thanksgiving; yes.

21    Q.  But you understood as a corporate representative

22    testifying for MGA, you were required, you were obligated, to

23    educate yourself and talk to other people so you would have

24    the knowledge of the company to testify about what the

10:36 25    company knew, going back over ten years; correct?

1    A.    I did as good a job as I possibly could.  I tried hard.

2    Q.    I'm not asking if you tried hard, I'm asking did you

3    understand that?

4    A.    Yes.

10:37 5    Q.    Now, is it true that MGA has no record of what products

6    it showed to the press at New York toy fairs?

7    A.    That's a very broad question.  I don't believe that's

8    true.

9              THE COURT:  Answer the question, sir.

10:37 10              MR. MCCONVILLE:  This goes back into production,

11    Your Honor.

12              THE COURT:  Answer the question, sir.

13              THE WITNESS:  Honestly, Judge, I don't know how to

14    answer the question.

10:37 15              I think we had some records.  I'm not sure if we

16    have all the records.  I don't think we have all the records,

17    so some records are probably missing.

18    Q.    BY MR. ZELLER:  Well, please identify for us, then, by

19    name, even one product that you're willing to tell us about

10:37 20    that MGA showed to the press at New York Toy Fair.

21              MR. MCCONVILLE:  Objection; argumentative.

22              THE COURT:  Overruled.

23              MR. MCCONVILLE:  Lacks foundation.

24              THE COURT:  Overruled.

10:38 25              THE WITNESS:  I -- I believe it may have showed

 1    that Diamondz product that we talked about, but my memory is

 2    not encyclopedic.

 3              I don't know.

 4    Q.   BY MR. ZELLER:  I'm not asking for an encyclopedic

10:38 5    listing.

 6              I'm asking, for one, you've told us Diamondz was

 7    shown to the press at New York Toy Fair; correct?

 8    A.   I think it may have been.

 9    Q.   Well, can you name any others?

10:38 10    A.   Off the top of my head, no.

11    Q.   Did MGA ever keep records reflecting what products it

12    showed to the press at New York Toy Fair?

13    A.   I don't know.

14    Q.   You were asked questions about the Denise van Patton

10:39 15    description of the New York Toy Fair.

16              Do you recall that?

17    A.   Yes.

18    Q.   And -- and -- and, of course, her description emphasizes

19    that it's a media event; correct?

10:39 20    A.   She mentions that as one of the reasons for the event.

21    Q.   Well, she says "fairs such as this are essential for

22    media buzz for new products."

23              Do you see that?

24    A.   Yes.

10:39 25    Q.   And that's true, isn't it?

Case 2:04-cv-09049-DOC-RNB   Document 10439   Filed 04/08/11   Page 36 of 103   Page ID #:316976
CV 04-9049 DOC - 04/06/2011 Volume 2 of 4

36

1    A.    I believe that's true, yes.

2    Q.    And, by the way, does MGA claim that touching or feeling

3    any of its 114 products was a trade secret in this case?

4          Had you ever heard that?

10:39  5  A.    I -- I think that relates to the fact that part of the

6    trade secrets are the appearance of the product, how it

7    works, how they move, yes, and how they feel.  It's all part

8    of the trade secrets.

9    Q.    So the -- the -- the feeling of the products is a trade

10:40 10 secret?

11          Is that -- is that your testimony?

12    A.    That's part of the trade secrets; yes.

13          MR. MCCONVILLE:  Objection.

14    Q.    BY MR. ZELLER:  And also you mention the packaging.

10:40 15        Do you recall that?

16    A.    That could be.

17    Q.    Well, is MGA claiming packaging, as you understand it,

18    as part of its trade secrets in this case?

19    A.    I'm -- I'm not a lawyer, so I really don't know, but --

10:40 20 Q.    Well --

21    A.    -- but from my standpoint the packaging around a

22    product, in fact, you know, is confidential.

23    Q.    Then you'll certainly be able to tell us, then, the

24    products that MGA claims Mattel misappropriated the packaging

10:40 25 of as trade secrets; right?

| | |
|---|---|
| 1 | You can list those for us? |
| 2 | A.   I cannot do that, no. |
| 3 | Q.   Can you name one? |
| 4 | A.   I can't. |
| 10:40 5 | Q.   And the reason why is, is even as MGA's corporate |
| 6 | designee you knew that MGA was not claiming any packaging as |
| 7 | part of its trade secrets in this case; true? |
| 8 | MR. MCCONVILLE:  Objection, Your Honor; this goes |
| 9 | into a prior court ruling. |
| 10:41 10 | THE COURT:  Sustained. |
| 11 | Q.   BY MR. ZELLER:  And is it -- is it true that any |
| 12 | articles that were published about MGA's unreleased products |
| 13 | by the press during New York toy fairs was a violation of |
| 14 | some embargo? |
| 10:41 15 | A.   That's -- I don't know. |
| 16 | Q.   Can you name any of them that were published in |
| 17 | violation of an embargo? |
| 18 | A.   I -- I -- I can't point to a specific press release; no. |
| 19 | Q.   Let's take a look at Exhibit 9882. |
| 10:42 20 | You recognize this as a blog entry.  It talks about |
| 21 | everything in MGA's New York Toy Fair showroom for 2006 that |
| 22 | was published on the Internet; right? |
| 23 | A.   I can't tell you when it was published.  I don't know |
| 24 | anything about this than what I've seen here. |
| 10:42 25 | It -- it appears to be some blog site |

1     about Bratz dolls.

2          MR. MCCONVILLE:  Objection; no foundation.

3     Q.  BY MR. ZELLER:  Well, you testified about this at your

4     deposition; true?

10:42  5   A.  Right; and much as I did then, I don't know much about

6     it.  I don't have any of the Metadata around it, so I don't

7     know when it actually went live or -- or anything.  I just

8     know -- I believe what I testified to at the time, and it's

9     the same today, is that I only know what's in these pages.

10:42 10   Q.  And what these pages reflect is that someone was in

11    MGA's toy fair showroom and published a public blog with

12    pictures and full descriptions of -- of numerous products in

13    MGA's toy fair showroom in 2006; correct?

14          MR. MCCONVILLE:  Objection; no foundation.

10:43 15          This is the subject of a court -- a prior court

16    ruling.

17          THE COURT:  Just a moment.

18          These are some of the three disputed documents that

19    we were going to discuss?

10:43 20          MR. MCCONVILLE:  Yes.

21          THE COURT:  You can ask the witness, Mr. Jolicoeur,

22    about this.

23    Q.  BY MR. ZELLER:  So I assume that MGA --

24    A.  Can I answer the last question?

10:43 25    Q.  Please.

1   A.   The answer would be that I would not be able to tell you

2   when it was published without seeing any Metadata on this.

3        It would not be uncommon for a report on a 2006 toy

4   fair to come out substantially after the toy fair when, in

10:43   5   fact, those items were public.

6        So without knowing a lot more information, I cannot

7   testify as to when this occurred.  It could have occurred

8   months after the toy fair; it could have occurred concurrent

9   to the toy fair.

10:43   10       I don't know one way or the other.

11  Q.   Does the information in Exhibit 9882, any of it, was a

12  trade secret of MGA as of the time of New York Toy Fair in

13  2006; yes or no?

14  A.   You know, I couldn't tell you right now.  I could not

10:44   15  tell you.

16  Q.   So it's true that there was detailed information about

17  the contents of MGA's New York Toy Fair showroom published on

18  the Internet on a blog and you, as MGA's corporate designee

19  on the protection of its trade secrets, can't tell us whether

10:44   20  MGA did anything to investigate whether or not this was its

21  trade secrets being disclosed?

22       MR. MCCONVILLE:  Objection; misstates the

23  testimony.

24       THE WITNESS:  Again, I don't even know when this

10:44   25  was published.

UNITED STATES DISTRICT COURT

1    Q.   BY MR. ZELLER:  That's the point:  You don't know.

2         MGA took no steps to protect the information that

3    was at its New York Toy Fair showroom; correct?

4    A.   I think that's an assumption that's incorrect.

10:44 5    Q.   Well, what did MGA do when it came to its attention that

6    there was this blog that published in detail everything that

7    was in its New York Toy Fair showroom in 2006?

8         MR. MCCONVILLE:  Objection; assumes facts not in

9    evidence.

10:45 10        THE COURT:  Sustained.

11   Q.   BY MR. ZELLER:  Did MGA do anything once it learned that

12   there was this information about its New York Toy Fair

13   showroom being published on the Internet?

14   A.   I don't know if MGA ever learned about this until I saw

10:45 15   it in 2010 or '11.

16   Q.   Well, when you saw it were you alarmed that it was

17   disclosing MGA trade secrets?

18        MR. MCCONVILLE:  Objection; argumentative.

19        THE COURT:  Overruled; answer the question.

10:45 20        THE WITNESS:  As of 2010 I was not alarmed.  It was

21   a historic -- something that happened way back when.  I have

22   no clue as to when it was published, how it happened.  I

23   don't know when MGA found out about it or if it ever knew

24   about it.

10:45 25        These things I do not know.

```
 1   Q.   Well, you know about it and you knew about it at the
 2   time of your deposition; correct?
 3   A.   I knew about it in November, I think, of 2010 or
 4   sometime thereabouts, but that's four years after this.
 5   Q.   Well, once MGA found out that this information was
 6   published on the Internet about all these products it had in
 7   its New York Toy Fair showroom in 2006, did MGA sue anyone
 8   over it?
 9             MR. MCCONVILLE:  Objection; argumentative.
10             THE COURT:  Sustained.
11   Q.   BY MR. ZELLER:  Did MGA search out for the person who
12   published that to accuse them of trade secret theft?
13             MR. MCCONVILLE:  Objection; argumentative; no
14   foundation.
15             THE COURT:  Sustained, Counsel.
16             Here's the disagreement between both of you,
17   apparently.
18             This is one of the documents in contention this
19   morning, one of the three documents?
20             MR. ZELLER:  It is; it is.
21             THE COURT:  It's a timing issue between the two of
22   you.
23             I just need to know, you know, when this came out.
24             I don't know if it came out before or during the
25   New York Toy Fair or if it came out months afterwards.
```

UNITED STATES DISTRICT COURT

 1          MR. ZELLER:  Well, if I can answer that.

 2          THE COURT:  Well, if I can get some information

 3    sidebar on that then maybe I can let this come into evidence.

 4          If not, then it's -- it's irrelevant.

10:47  5    Q.  BY MR. ZELLER:  Mr. Jolicoeur, can you tell us for a

 6    fact that this blog, 9882, was not published in February of

 7    2006?

 8    A.  I can't tell you anything about this other than what's

 9    on these pages.  I have no knowledge.

10:47 10    Q.  And one last question, does MGA create media buzz for

11    its new -- new products by press embargoes?

12    A.  Well, it certainly has.  A good example is the one that

13    you pointed out with HGTV.  We set a press embargo on that

14    and, you know, with a nice video coming out exactly when we

10:47 15    would want to, which is during the Christmas season.  So

16    that's a perfect example of our having done so; so, yes.

17          THE COURT:  Counsel, I'm going to allow --

18          You're the 30(b)(6) witness; is that correct?

19          THE WITNESS:  Yeah.

10:47 20          THE COURT:  I'm going to allow this into evidence,

21    Counsel, with this admonition.  Obviously the dispute between

22    the parties is, you know, when this came out, was it

23    confidential or nonconfidential?  But this is MGA's 30(b)(6)

24    witness, just like Mattel had a witness.

10:48 25          MR. MCCONVILLE:  There's no foundation

Case 2:04-cv-09049-DOC-RNB  Document 10439  Filed 04/08/11  Page 43 of 103  Page ID #:316983
CV 04-9049 DOC - 04/06/2011 - Volume 2 of 4

43

1    for this witness.

2              THE COURT:  He's a 30(b)(6).

3              He can attempt to answer the questions.

4              If he doesn't know, you can be the judge of whether

10:48 5    it came out or not.

6              The record's going to be incomplete.

7              It's received.

8              (Exhibit(s) 9822, received.)

9              MR. ZELLER:  If we could pull up the first page of

10:48 10   9882.

11             THE COURT:  This is not to make the assumption that

12    it came out and that it was confidential, ladies and

13    gentlemen, or that it came out months later or before the toy

14    fair.  We just don't know.

10:48 15   Q.   BY MR. ZELLER:  You'll see that this article, this blog

16    entry begins, "Walking into the MGA showroom at toy fair

17    2006, the first thing you want to do is run to the

18    Genie-and-Princess themed bedroom set and throw your stuff

19    down and call 'my room!'"

10:48 20            Do you see that?

21    A.   That's what it says, yes.

22    Q.   And you understand from reading this that this is the

23    report of somebody who was actually in MGA's toy fair

24    showroom in 2006; correct?

10:48 25            MR. MCCONVILLE:  Objection; no foundation.

| | | |
|---|---|---|
| | 1 | THE COURT:  Overruled. |
| | 2 | THE WITNESS:  I would not be able to say that. |
| | 3 | Again, I've been a member of the press for |
| | 4 | 20 years.  Some members of the press are scrupulously honest; |
| 10:49 | 5 | others, in particular, the trade press, are much less so. |
| | 6 | They put one toe into a showroom they'd say that they were in |
| | 7 | the showroom. |
| | 8 | They may have collected hearsay and put it together |
| | 9 | into an article; they may not have. |
| 10:49 | 10 | I can't vet this article because I don't know how |
| | 11 | it was created, who created it.  I just can't do that. |
| | 12 | Q.  BY MR. ZELLER:  It says, "Walking into the MGA showroom |
| | 13 | at toy fair." |
| | 14 | Do those words have any meaning to you? |
| 10:49 | 15 | A.  It doesn't mean it was -- |
| | 16 | MR. MCCONVILLE:  Objection; argumentative. |
| | 17 | THE COURT:  Overruled. |
| | 18 | THE WITNESS:  That does not mean it was so. |
| | 19 | It could mean that someone else walked into the |
| 10:49 | 20 | showroom and told this reporter about it and this reporter |
| | 21 | was misrepresenting it.  I just don't know.  I can't |
| | 22 | judge the validity of this article. |
| | 23 | Q.  BY MR. ZELLER:  You're speculating; correct? |
| | 24 | A.  I don't want to speculate, is the point.  You're |
| 10:50 | 25 | speculating; I'm trying not to. |

```
 1    Q.   Does it make sense to you --

 2            MR. MCCONVILLE:  Objection; argumentative.

 3            THE COURT:  Sustained, Counsel; just reask the

 4    question.

10:50 5    Q.  BY MR. ZELLER:  Can you think of any reasons why someone

 6    would publish an article called "Toy Fair (2006)" and have

 7    detailed information about what it is that was in the MGA toy

 8    fair showroom and then only publish that article months and

 9    months later?

10:50 10   A.   Yes, I can.

11    Q.   Do you know why this person would have done such a

12    thing?

13            MR. MCCONVILLE:  Objection; calls for speculation.

14            THE COURT:  Overruled.

10:50 15           Overruled; you can answer it.

16            THE WITNESS:  I can't speculate on why they would

17    have done it.  I have no idea why they would have done it.  I

18    don't know -- I have no idea how this was created.  I don't

19    know about the blog; I don't know when it was published; I

10:50 20   can't speculate.

21    Q.   BY MR. ZELLER:  You can't account for any of that, can

22    you?

23    A.   I've said so many times, yes.  I can't account for it.

24    I don't know.

10:51 25           MR. ZELLER:  Nothing further.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  Recross by Mr. McConville on behalf of

2     MGA.

3                    **RECROSS-EXAMINATION**

4     BY MR. MCCONVILLE:

10:51  5     Q.   So, Mr. Jolicoeur, this blog that's been admitted, you

6     don't know whether a Mattel employee snuck into an MGA

7     showroom, got the information and published it on the

8     Internet; right?

9     A.   I absolutely don't know that.

10:51 10          MR. ZELLER:  Your Honor, this is argument.

11          THE COURT:  This whole area has diminished,

12     Ladies and Gentlemen.

13          So ask your question and then let's move on.

14          MR. MCCONVILLE:  Sure.

10:51 15     Q.   You don't know, for example, whether an employee of

16     Mattel posed as a retailer to get into a --

17          MR. ZELLER:  There's no foundation.

18          THE COURT:  Let's stay away from that, that

19     anyone --

10:51 20          MR. MCCONVILLE:  Okay.

21          THE COURT:  You can make your arguments later for

22     both sides.

23          MR. MCCONVILLE:  Okay.

24     Q.   So, for example, you don't know if someone posing as a

10:51 25     member of the press entered an MGA showroom and stole

```
 1    confidential information and then published it on the
 2    Internet; right?
 3    A.    I don't know.
 4          MR. ZELLER:  Assumes facts.
10:51  5    Q.    BY MR. MCCONVILLE:  You don't know that?
 6    A.    I don't know.
 7    Q.    And you don't know, for example, whether someone posing
 8    as a retailer got into an MGA showroom, stole information and
 9    then published it on the Internet; right?
10:52 10   A.    I don't know.
11    Q.    And just to be clear, you aren't a 30(b)(6) witness on
12    the Internet, are you?
13    A.    No.
14    Q.    And you never were; right?
10:52 15   A.    I never was.
16    Q.    And if you could do me a huge favor and just go to the
17    bottom-right corner of that document --
18    A.    Yes.
19    Q.    -- and can you just read for me the date of publication
10:52 20   of that, where it's printed on the bottom of that document.
21          Could you read it for me.
22          MR. ZELLER:  Your Honor, that misstates the
23    document as to publication.
24          THE COURT:  Overruled.
10:52 25          THE WITNESS:  10/17/2010, which is October 17.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  Ladies and gentlemen, you can't take

2     that as the publication date for a 2006.  It just shows when

3     somebody pulled it off the Internet in all likelihood.

4     Q.   BY MR. MCCONVILLE:  In fact, Mr. Jolicoeur, you don't

10:52  5     know when this document was created; right?

6     A.   I have no clue.

7          MR. MCCONVILLE:  Can I have just a second.

8          (Pause in the proceedings.)

9          MR. MCCONVILLE:  Your Honor, I'm going to try to --

10:53 10     I've just been handed an exhibit.

11          THE COURT:  Now, Ladies and Gentlemen, let me

12     explain what's happening.

13          Up to this point the court's gone over every

14     exhibit until we started rebuttal and surrebuttal, and what

10:53 15     you're seeing is a lot more time being consumed because I

16     have to see the exhibits, and that's because rebuttal and

17     surrebuttal came so quickly for both sides.

18          So, otherwise, every exhibit was gone over during

19     the trial and that's why I'm taking the time to see each one

10:53 20     of these exhibits now.

21          Just a moment, Counsel.

22          (Pause in the proceedings.)

23          THE COURT:  Counsel.

24          MR. ZELLER:  I do have an objection.

10:54 25          This is -- this is outside the scope.

| | |
|---|---|
| 1 | This is about Nuremberg, which has not been asked |
| 2 | about. |
| 3 | THE COURT:  Overruled; it's the whole general area, |
| 4 | Counsel. |
| 10:54 5 | Q.  BY MR. MCCONVILLE:  Mr. Jolicoeur, I'd like to put in |
| 6 | front of you Exhibit 9650, please. |
| 7 | A.  Yes. |
| 8 | Q.  And please take your time to review that document. |
| 9 | THE COURT:  Now, once again, this is not for the |
| 10:54 10 | truth of the matter asserted. |
| 11 | MR. MCCONVILLE:  And let me know when you've had a |
| 12 | chance to review that document. |
| 13 | THE WITNESS:  Yes, I have had the time to review |
| 14 | the document. |
| 10:54 15 | Q.  BY MR. MCCONVILLE:  And is this an e-mail at the top |
| 16 | from Isaac Larian to Stephan Brune, among others? |
| 17 | A.  Yes.  It's an e-mail chain that includes both Isaac and |
| 18 | Stephan Brune. |
| 19 | MR. MCCONVILLE:  Your Honor, I'll move this into |
| 10:54 20 | evidence. |
| 21 | THE COURT:  I'll receive it, but not for the truth |
| 22 | of the matter.  It's hearsay, once again. |
| 23 | (Exhibit(s) 9650, received.) |
| 24 | Q.  BY MR. MCCONVILLE:  And you'll see at the bottom -- |
| 10:55 25 | well, Mr. Jolicoeur, what you did -- one of the things you |

 1   did as a 30(b)(6) witness was investigate the precautions

 2   that MGA takes at its show fairs -- showrooms; correct?

 3   A.   Correct.

 4   Q.   So if you look at the bottom, the first e-mail in the

10:55  5   chain from Isaac Larian dated January 22, 2009, it says

 6   "Stephan, please make sure we have a guard exclusively for

 7   Moxi stationed right there.  No one without appointment

 8   should be allowed.  Everyone must sign NDA."

 9        What's an "NDA"?

10:55 10   A.   That's a nondisclosure agreement.

 11   Q.   "No exception.  Absolutely NO cell phone or PDA with

 12   camera or camera's allowed inside."

 13        You testified about that previously as one of MGA's

 14   policies; correct?

10:55 15   A.   That's correct.

 16   Q.   And it goes on to say, "I am very concerned about the

 17   competition finding out about this line and I know they will

 18   try everything."

 19        Did I read that correctly?

10:55 20   A.   Yes.

 21   Q.   And you understand the "competition" to be Mattel;

 22   correct?

 23   A.   That is correct.

 24        MR. MCCONVILLE:  No further questions.

10:56 25        THE COURT:  We're starting to excuse all witnesses

| | |
|---|---|
| 1 | at this point, I think.  Just a moment. |
| 2 | Counsel, may he be excused? |
| 3 | MR. MCCONVILLE:  Yes, sir. |
| 4 | THE COURT:  All right. |
| 10:56  5 | Thank you very much, sir.  You may step down. |
| 6 | THE WITNESS:  Thank you. |
| 7 | THE COURT:  Counsel, your next witness, please. |
| 8 | MR. QUINN:  Mattel calls Lisa Saunders. |
| 9 | THE COURT:  Would you step forward, please. |
| 10:56 10 | Now would you raise your right hand, please. |
| 11 | **LISA SUZANNE SAUNDERS,** |
| 12 | witness, called by Plaintiff(s), sworn |
| 13 | THE COURT:  Thank you. |
| 14 | If you'd walk quickly along the side of the court, |
| 10:56 15 | please, just because you're on a running time clock, and if |
| 16 | you'd be seated. |
| 17 | Would you state your full name for the jury, |
| 18 | please. |
| 19 | THE WITNESS:  Lisa Suzanne Saunders. |
| 10:57 20 | THE COURT:  And would you spell your last name, |
| 21 | please. |
| 22 | THE WITNESS:  S-a-u-n-d-e-r-s. |
| 23 | THE COURT:  Thank you. |
| 24 | Direct examination by Mr. Quinn of Mattel. |
| 25 | //                                              // |

UNITED STATES DISTRICT COURT

**DIRECT EXAMINATION**

1

2    BY MR. QUINN:

3    Q.   Good morning, Ms. Saunders.

4         My name is John Quinn and I represent Mattel.

10:57 5         You're employed by MGA --

6    A.   Yes, I am.

7    Q.   -- where you are vice president of sales?

8    A.   Yes, I am.

9    Q.   And you've been at MGA since 2000?

10:57 10   A.   2001.

11   Q.   2001.

12        And you've been in that position of vice president

13   of sales that entire time?

14   A.   Yes, I have.

10:57 15   Q.   You have attended the New York Toy Fair back in the 2001

16   to 2004 time frame?

17   A.   Yes.

18   Q.   And when you were there at -- at the New York time --

19   New York Toy Fair in that time period you went to MGA's

10:58 20   showroom; correct?

21   A.   Yes, I did.

22   Q.   And there you saw hundreds of people go through the

23   showroom?

24   A.   Yes.

10:58 25   Q.   And that included members of the media and press?

| | |
|---|---|
| 1 | A.   Yes. |
| 2 | Q.   Who were there, you understood it, so they could |
| 3 | publicize the products that they saw? |
| 4 | A.   As I understood it, yes. |
| 10:58  5 | Q.   And you also -- you're -- you're involved with something |
| 6 | called "Plan-O-Grams"; correct? |
| 7 | A.   Yes, I am. |
| 8 | Q.   And a Plan-O-Gram, that's -- that's kind of a pretend |
| 9 | shopping aisle that a retailer sets up to kind of lay out how |
| 10:58 10 | they're going to put the product on the shelves in a store |
| 11 | many, many months later? |
| 12 | A.   Correct. |
| 13 | Q.   All right.  So in the case of K-Mart, for example, you |
| 14 | have a lot of involvement with K-Mart and their Plan-O-Gram |
| 10:58 15 | planning; correct? |
| 16 | A.   Correct. |
| 17 | Q.   And the K-Mart Plan-O-Gram, this "pretend aisle" where |
| 18 | the products are all laid out, that actually starts -- you |
| 19 | actually start setting that up in December; correct? |
| 10:59 20 | MR. MCCONVILLE:  Objection; vague as to which |
| 21 | season. |
| 22 | MR. QUINN:  For the following fall. |
| 23 | THE COURT:  Overruled. |
| 24 | Q.   BY MR. QUINN:  For the following, I think -- |
| 10:59 25 | Useful clarification, thank you, Mr. McConville. |

UNITED STATES DISTRICT COURT

1          THE COURT:  I think this is 2001, so it would be

2     fall 2000.

3     Q.   BY MR. QUINN:  So, for example, for the fall 2001 time

4     period, K-Mart would start setting up their Plan-O-Gram in

10:59  5     December 2000; correct?

6     A.   Usually December or January.

7     Q.   All right.  And -- and so in December and January

8     they're actually setting up their Plan-O-Gram; correct?

9     A.   Correct.

10:59 10     Q.   Loading in the products that they anticipate having on

11     the shelves?

12     A.   Packaging or products.

13     Q.   Right; and at the time that those products are put on

14     the shelves in the Plan-O-Gram, a lot of those products are,

10:59 15     at that point, unreleased; correct?

16     A.   Correct.

17     Q.   So these are not things that are yet on the shelves,

18     correct, out in the store?

19     A.   Correct.

10:59 20     Q.   And, actually, in the case of K-Mart, this Plan-O-Gram

21     process, that's actually done even before the New York Toy

22     Fair; correct?

23     A.   Correct.

24     Q.   And we can always remember when New York Toy Fair is

11:00 25     because it's around Valentine's Day; correct?

1    A.    Correct.

2    Q.    So in the case of K-Mart, obviously, that's a major

3    retailer; correct?

4    A.    Correct.

11:00 5    Q.    Compared to a lot of other retailers out there they

6    carry a lot of different products; correct?

7    A.    Correct.

8    Q.    And a lot of different products from different toy

9    companies; correct?

11:00 10    A.    Correct.

11    Q.    Including Mattel?

12    A.    Including Mattel.

13    Q.    And MGA?

14    A.    And MGA.

11:00 15    Q.    And you, yourself, would visit this K-Mart Plan-O-Gram

16    and you would see your competitors' unreleased products there

17    on the shelf; right?

18          MR. MCCONVILLE:  Objection; compound.  Vague as to

19    time.

11:00 20          THE COURT:  Overruled.

21          This is New York, I assume, 2000?

22          MR. QUINN:  The K-Mart Plan-O-Gram.

23          THE COURT:  In New York 2000?  Any time?

24    Q.    BY MR. QUINN:  Any time?

11:00 25    A.    Yes.

1    Q.   So you would see -- and there's nothing wrong with

2    this -- you would go to the K-Mart Plan-O-Gram, even before

3    New York Toy Fair, and you would see Mattel unreleased

4    product there on the shelves?

11:01 5  A.   Usually in a packaging format.

6    Q.   Right; but you -- you would see prototypes and you would

7    see what the products were; correct?

8    A.   Not necessarily prototypes.  Usually packaging.

9    Q.   But you'd be able to see the packaging and you'd be able

11:01 10  to get ideas about what new products Mattel was coming up

11   with?

12   A.   Correct.

13   Q.   And you would share that information sometimes with

14   Mr. Larian?

11:01 15  A.   Correct.

16   Q.   Because he would ask you to get that; correct?

17   A.   Correct.

18   Q.   And there's nothing wrong with that; right?

19   A.   Correct.

11:01 20  Q.   Because it's your view that the Plan-O-Gram is public

21   domain; correct?

22   A.   Correct.

23   Q.   So it's perfectly fine for -- even before New York Toy

24   Fair for persons like yourself to go into the K-Mart

11:01 25  Plan-O-Gram and see what other unreleased products are there

     1    on the shelves and to share that information within your

     2    company; correct?

     3    A.    Correct.

     4    Q.    And you would expect that other companies do that as

11:01 5    well; true?

     6    A.    True.

     7    Q.    Because you know representatives of other toy

     8    manufacturers like Mattel do just what you do, they go to the

     9    Plan-O-Gram; right?

11:02 10   A.    Correct.

    11    Q.    And they have an opportunity to see unreleased MGA

    12    product; correct?

    13    A.    Correct.

    14    Q.    Now, starting in 2006 or -- or -- or thereabouts, MGA

11:02 15   started to put its product in what are called "white boxes";

    16    right?

    17    A.    We didn't actually ever put product out.  It was just

    18    packaging.

    19    Q.    Okay.

11:02 20   A.    And it was approximately 2004, from what I read in my

    21    e-mails.

    22    Q.    Right; but at -- at -- you testified about this at your

    23    deposition?

    24    A.    Yes.

11:02 25   Q.    And at least at your deposition your best recollection

1    then was 2006; correct?

2    A.   Correct.

3    Q.   All right.  That was your previous testimony?

4    A.   Correct.

11:02 5    Q.   All right.  And these -- prior to that, so far as you

6    knew, MGA didn't take any steps to protect the

7    confidentiality of the information concerning its products

8    which was in the Plan-O-Gram room; correct?

9    A.   We just took steps.  We just showed packaging; we never

11:03 10   showed product.

11   Q.   Well, there was information concerning unreleased

12   products in the Plan-O-Gram room; correct?

13   A.   From MGA?

14   Q.   Yes.

11:03 15   A.   Yes.

16   Q.   All right.  And prior to 2006 which, at least, in your

17   deposition you thought that they started to use white boxes,

18   MGA took no steps that you are aware of to maintain the

19   confidentiality of the information in the Plan-O-Gram room;

11:03 20   correct?

21   A.   We did.  We put on our packaging that it was

22   confidential.

23            (Pause in the proceedings.)

24   Q.   BY MR. QUINN:  Actually, it would be true -- it's true,

11:03 25   isn't it, that MGA provides in the past or has provided

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 10439   Filed 04/08/11   Page 59 of 103   Page ID #:316999
CV 04-9049 DOC - 04/06/2011 Volume 2 of 4

59

 1   actual physical product or a mockup of the product in the

 2   Plan-O-Gram room; correct?

 3   A.   No, it is not true.  We never --

 4   Q.   If you could take a look at your deposition, Page 56,

11:04  5   Line 1.

 6           THE COURT:  Just a moment.

 7           MR. QUINN:  1 to 9.

 8           (Pause in the proceedings.)

 9           THE WITNESS:  Yes; we had physical product in the

11:04 10   past that was carried-forward product from the season before.

11           MR. QUINN:  I guess that moots my request,

12   Your Honor.

13   Q.   BY MR. QUINN:  When you were asked that question at your

14   deposition you didn't say this was product from the past that

11:04 15   was carried forward from the year before?

16           MR. MCCONVILLE:  Objection; it's not her fault she

17   wasn't asked the right question.

18           MR. QUINN:  Can we not have speaking objections.

19           THE COURT:  Ladies and Gentlemen, we're going to

11:05 20   strike that entirely.

21           You got a checkbook handy?

22           MR. MCCONVILLE:  Sorry.

23           THE COURT:  Both of you; okay.

24           I'm warning you, both of you.

11:05 25           MR. QUINN:  May I proceed, Your Honor?

```
 1              THE COURT:  No.

 2              Just a moment.

 3              (Pause in the proceedings.)

 4              THE COURT:  All right.  Now proceed.

11:05  5   Q.   BY MR. QUINN:  It's true, isn't it, that when you were

 6   asked about that at your deposition you did not say that the

 7   product or the mockup of the product was left over from the

 8   season before, did you?

 9   A.   You are correct.

11:05 10   Q.   All right.  In fact, it wouldn't make any sense to talk

11   about a "mockup" of a product from the season before, would

12   it?

13   A.   Yes, it would.  If it were carried forward to the next

14   season, it would.

11:05 15   Q.   Now, you told us that you thought that -- I was asking

16   you about measures that MGA took to protect -- protect

17   confidentiality of the product prior to the introduction of

18   white boxes which you said, at least in your deposition, was

19   in 2006.

11:06 20              It would be true to say that prior to that --

21   actually, the introduction of the white boxes was the first

22   time that MGA took any steps to try to keep confidential the

23   products, the -- the prototypes that were in the Plan-O-Gram

24   rooms; isn't that true?

11:06 25   A.   Correct; the actual packaging, yes.
```

```
 1                 MR. QUINN:  Your Honor --
 2     Q.   It's true that introducing the white boxes was actually
 3     the first time MGA took steps to try to keep confidential the
 4     products or the prototypes that were in the Plan-O-Gram
11:06 5   rooms; true?
 6     A.   True; there were never any prototypes in the Plan-O-Gram
 7     room.
 8     Q.   There were never any prototypes in the Plan-O-Gram room?
 9     A.   No, sir.
11:06 10                MR. QUINN:  Your Honor, I'd request permission to
11     read from the deposition at Page 101, Line 19.
12                 THE COURT:  Please don't answer that question for
13     just a moment.
14                 Let me read; okay?
11:07 15                THE WITNESS:  Sure.
16                 THE COURT:  Thank you.
17                 101, Line what?
18                 MR. QUINN:  101, 19 to 102, 16.
19                 (Pause in the proceedings.)
11:07 20                THE COURT:  Well, you don't want 102, 16, Counsel,
21     do you -- oh, yes, I'm sorry.  My apologies.
22                 MR. QUINN:  19 to 24, Your Honor.
23                 THE COURT:  Just a moment.
24                 19 to 24?
11:07 25                MR. QUINN:  Yes.
```

```
 1                    THE COURT:  Just a moment.

 2                    Page -- on 102, Line 24.

 3                    MR. QUINN:  I'm sorry; 102, 19 to --

 4          101, 19 to 102, 16.

11:08  5              THE COURT:  16?

 6                    MR. QUINN:  Yes.

 7                    THE COURT:  All right.  Thank you.

 8                    Now just a moment.

 9                    (Pause in the proceedings.)

11:08 10             MR. MCCONVILLE:  It's not inconsistent.

11                    (Pause in the proceedings.)

12                    THE COURT:  Counsel, I don't see the inconsistency.

13          Q.   BY MR. QUINN:  Did -- prior to the introduction of the

14          white boxes, did MGA put up a curtain or do anything else to

11:08 15    cover up what products were prototypes were in the

16          Plan-O-Gram room?

17          A.   No.

18          Q.   So there were prototypes in the Plan-O-Gram room?

19          A.   No, there were no prototypes in the Plan-O-Gram room;

11:08 20    only packaging.

21          Q.   In response to that question you didn't say there were

22          no prototypes, at your deposition --

23                    MR. MCCONVILLE:  Objection; he's publishing a

24          deposition.

11:09 25              THE COURT:  Just a moment.
```

         1          What line again, Counsel?  Let me reread this to be

         2   sure.

         3          MR. QUINN:  It's -- it's -- it's at Lines --

         4   Page 102, Lines 9 to 16.

11:09    5          THE COURT:  102 --

         6          (Pause in the proceedings.)

         7          THE COURT:  Counsel, I'm going to let you read from

         8   Line 19, as you requested, just --

         9          MR. QUINN:  All right.

11:10   10          THE COURT:  -- just so there's no equivocation, to

        11   Line 16, as you requested, and then counsel can ask questions

        12   on redirect.

        13   Q.   BY MR. QUINN:  (Reading.)

        14          "Question:  And so, in other words, the shift over

11:10   15   to the white boxes was the first time when MGA was taking

        16   steps to try and keep confidential the products or the -- the

        17   prototypes that were in the Plan-O-Gram rooms?

        18          "Answer:  Yes.

        19          "Question:  And to be clear, I'm talking about the

11:10   20   Plan-O-Gram rooms that you're familiar with there at K-Mart;

        21   right?  You understood that.

        22          "Answer:  Yes, I did.

        23          "Question:  And prior to that time MGA didn't do

        24   anything, that you're aware of, to, as you were saying

11:10   25   before, put behind a curtain or otherwise cover up what

1    products or prototypes were there in the Plan-O-Gram room;

2    right?

3            "Answer:  Yes."

4    Q.   And if we could --

11:11 5          THE COURT:  No, Counsel, read further.  Read down

6    to Line 21, and I think that will be --

7            MR. QUINN:  I'm sorry, what --

8            THE COURT:  Keep reading down to Line 21.  That

9    would be a complete answer, I would think -- well, it goes on

11:11 10   to the next page, also, but read down to 21.

11           MR. MCCONVILLE:  There's no answer.

12           MR. QUINN:  Okay.  It's just a --

13           THE COURT:  No, there's no answer.

14           Well, it's over on the next page, but, all right,

11:11 15   Counsel, that's sufficient.  They can ask on redirect.

16   Q.   BY MR. QUINN:  If we could take a look at Exhibit 4944,

17   if we could place that before you, and do you recognize this

18   as an e-mail string among people at MGA -- including

19   yourself?  I think you're on the bottom e-mail here on

11:11 20   Page 2.

21           THE WITNESS:  Yes.

22           MR. QUINN:  We'd offer that, Your Honor.

23           MR. MCCONVILLE:  Your Honor, I think this is beyond

24   the proffered scope of what the witness was going to testify

11:12 25   to.

1          THE COURT:  Yeah, it is, Counsel.

2          MR. QUINN:  Your Honor, "POG" is an abbreviation

3     for Plan-O-Gram, which is on Page -2.

4          THE COURT:  Give me time to read it because I'm on

11:12  5   Page 1.

6          MR. QUINN:  So -2 at the bottom --

7          THE COURT:  Just a moment, Counsel.  I'll take the

8     time to read it.

9          No, that portion can be received, Counsel.

11:13 10        (Exhibit(s) 4944, received.)

11         (Pause in the proceedings.)

12    Q.   BY MR. QUINN:  So if we could take a look at Page -2, at

13    the bottom there's an e-mail from Mr. Larian to Mark Robinson

14    and others including yourself; correct?

11:13 15   A.   Correct.

16    Q.   And this is dated January 31, 2003; right?

17    A.   Correct.

18    Q.   And he writes, "As you go to the POG" -- is that an

19    abbreviation for "Plan-O-Gram"?

11:13 20   A.   It is.

21    Q.   -- "and talk to buyers, please let us know what our

22    competitors are doing in fashion dolls, minidolls, large

23    dolls:  Mattel."

24          Do you see that?

11:13 25   A.   Yes, I do.

1  Q.   And that's the type of request you would get from time

2  to time?

3  A.   Yes.

4  Q.   And you would send -- and you would share that

11:13 5  information because, as you've said, anything that's in the

6  Plan-O-Gram room, that's public domain; correct?

7  A.   Correct.

8  Q.   And you understood that Mr. Larian was asking you

9  whether, in the Plan-O-Gram, you could get any information

11:14 10  about competitors' products that hadn't yet been released;

11  correct?

12  A.   Not necessarily that had not been released but

13  competitors' products; yes.

14  Q.   But including products that had not yet been released?

11:14 15  A.   Yes.

16  Q.   And he says here "also talk to buyers."

17       I mean, you have discussed with buyers at K-Mart,

18  for example, and gotten information from buyers at K-Mart

19  about unreleased Mattel products; correct?

11:14 20       MR. MCCONVILLE:  Objection; beyond the scope of

21  what this witness was called for.

22       THE COURT:  No, you can answer the question.

23       THE WITNESS:  Very limited.

24  Q.   BY MR. QUINN:  But you have done that and you know

11:14 25  buyers talk; correct?

1    A.    Yes.

2    Q.    And once a buyer -- once a retailer knows that

3    information, you have to assume that there is a risk that

4    other people are going to learn about it; correct?

11:14  5    A.    Correct.

6    Q.    And you -- you would expect that K-Mart has -- K-Mart

7    buyers have discussed with people at Mattel information about

8    unreleased MGA products; right?

9            MR. MCCONVILLE:  Objection; calls for speculation.

11:15 10            THE COURT:  Sustained.

11    Q.    BY MR. QUINN:  Well, you do know that you have gotten

12    information about unreleased Mattel products from buyers;

13    correct?

14    A.    Yes.

11:15 15    Q.    If we could switch to a different topic now, and if I

16    could ask that Exhibit 24907 be placed before you.

17            MR. MCCONVILLE:  Your Honor, this goes beyond the

18    scope.

19            THE COURT:  No, Counsel, this is --

11:15 20            MR. QUINN:  This was --

21            THE COURT:  Let me see this exhibit.  These are the

22    two areas that I'm allowing in rebuttal, Counsel.  Let's be

23    certain.

24            So when you say "new topic" that's what concerns

11:15 25    me, so let me see where we're going.

|   |   |
|---|---|
| 1 | MR. QUINN:  I will say, though, Your Honor, these |
| 2 | documents were just produced to us within the last 24 hours. |
| 3 | THE COURT:  It doesn't matter. |
| 4 | That concludes her testimony, Counsel. |
| 11:16  5 | Those are the two areas I've allowed you to go |
| 6 | into. |
| 7 | MR. QUINN:  Thank you, Your Honor. |
| 8 | Nothing further. |
| 9 | THE COURT:  Cross-examination. |
| 11:16  10 | **CROSS-EXAMINATION** |
| 11 | BY MR. MCCONVILLE: |
| 12 | Q.  Ms. Saunders, you were asked some questions concerning |
| 13 | Plan-O-Grams. |
| 14 | Do you remember those questions? |
| 11:16  15 | A.  Yes. |
| 16 | Q.  Could you please describe for us, based on your |
| 17 | experience, what it is MGA displays in the K-Mart |
| 18 | Plan-O-Gram? |
| 19 | MR. QUINN:  Objection as to time, Your Honor. |
| 11:16  20 | THE COURT:  Overruled. |
| 21 | This is generally speaking, Plan-O-Gram rooms. |
| 22 | MR. MCCONVILLE:  Okay.  I'll put a time frame on |
| 23 | it. |
| 24 | THE COURT:  Well, I -- I -- I'm sorry.  You're |
| 11:16  25 | correct, with some limitation. |

```
 1              MR. MCCONVILLE:  Right.

 2              THE COURT:  I don't mean today.  This has to be

 3      back in the past.

 4              MR. MCCONVILLE:  Understood.

11:16  5   Q.   Ms. Saunders, how long have you worked at MGA?

 6   A.   Ten years.

 7   Q.   And in those ten years have you called on K-Mart as a

 8      customer for MGA?

 9   A.   Yes, I have.

11:17 10   Q.   And from -- let's go from the year 2000 to the year --

11      well, let me -- let me start over.

12              At some point MGA began using what's known as

13      "white boxes" and "Plan-O-Grams."

14              Do you remember those questions?

11:17 15   A.   Yes, I do.

16   Q.   And you were asked questions at your deposition

17      concerning the date on which that happened.

18              Do you remember those questions?

19   A.   Yes, I do.

11:17 20   Q.   And you ballparked it as 2006 at your deposition.

21              Do you recall that?

22   A.   Yes.

23   Q.   And since that time have you gone and looked to find out

24      when it was MGA used white boxes?

11:17 25   A.   Yes, I have.
```

UNITED STATES DISTRICT COURT

1    Q.   And what's the date MGA began using white boxes in the

2    K-Mart Plan-O-Gram?

3    A.   2004.

4            THE COURT:  I'm sorry; I couldn't hear you.

11:17 5          THE WITNESS:  2004.

6            THE COURT:  2004.

7    Q.   BY MR. MCCONVILLE:  Okay.  So I'm going to get to an

8    explanation of what a "white box" is.

9            I needed that for time.

11:17 10         So from 2000 and 2004 can you describe for me what

11   it was that MGA displayed in a K-Mart Plan-O-Gram?

12   A.   Colored packaging.

13   Q.   Okay.  And -- color packaging of what?

14   A.   I'm sorry; it's actual dimensional packaging of the

11:18 15  product, not the actual product within the package.

16   Q.   So, for example, do we have a -- an exhibit up there

17   that's a -- that's a tangible?

18           What's the exhibit number on that, please,

19   Ms. Rutowski?

11:18 20         MR. RUTOWSKI:  12286.

21   Q.   BY MR. MCCONVILLE:  So do you have Exhibit 12286 in

22   front of you?

23   A.   Yes, I do.

24   Q.   So can you please describe for us what's actually

11:18 25  displayed in the K-Mart Plan-O-Gram room and use this

1     as an example.

2     A.    It would just be the package without the doll, without

3     the writing.  It would just say "Bratz" and what theme it was

4     in writing and an item number, but no doll inside, no

11:18  5     pictures inside, and it would be this trapezoidal package.

6     Q.    And why would a retailer who is trying to plan retailer

7     space want to know the shape of the package?

8     A.    Because they need to know what kind of space that they

9     have for the fall, going into -- with other products and

11:19 10     space.

11     Q.    And you also said, I believe, that, in addition to

12     packaging that was displayed in the Plan-O-Grams, at least

13     through 2004, there also might have been something called

14     "carry-forward products"?

11:19 15     A.    Yes, sir.

16     Q.    Please tell us what carry-forward product is.

17     A.    Carry-forward product is any product we had produced the

18     season before.

19     Q.    Okay.  So if you walk into a K-Mart Plan-O-Gram, as I

11:19 20     understand it, you'd see a -- a -- an empty box that would

21     have some writing on it and the last year's product; is that

22     right?

23     A.    Yes.

24     Q.    At least that's what MGA displayed in the Plan-O-Gram

11:19 25     room; correct?

|     |     |
| --- | --- |
| 1 | A.    Correct. |
| 2 | Q.    And I believe you said in 2004 MGA began using something |
| 3 | called "white boxes"; is that right? |
| 4 | A.    Yes, sir. |
| 11:20  5 | Q.    So please tell us what a "white box" is? |
| 6 | A.    It's exactly how a package would look but it would be a |
| 7 | plain white box or it would be colored based on what the |
| 8 | theme of the actual item was. |
| 9 | Q.    So as I understand it, in 2004 MGA transitioned to |
| 11:20 10 | something that didn't even have the name of the product on |
| 11 | it? |
| 12 | A.    No, it did not. |
| 13 | Q.    And so it just had a plain white box; is that right? |
| 14 | A.    Plain white box with an item number. |
| 11:20 15 | Q.    And how -- did MGA continue to use the white-box method |
| 16 | in the K-Mart Plan-O-Gram? |
| 17 | A.    For a while, yes. |
| 18 | Q.    And has it transitioned from the white box to something |
| 19 | else in the K-Mart Plan-O-Gram? |
| 11:20 20 | A.    As of today it's also colored packaging. |
| 21 | Q.    And when you say "colored packaging" you mean just the |
| 22 | package itself without the doll inside? |
| 23 | A.    Correct. |
| 24 | Q.    You were asked some questions about whether or not |
| 11:21 25 | prototypes would be in the K-Mart Plan-O-Gram. |

1              Do you remember those questions?

2    A.    Vaguely.

3    Q.    So tell me, are prototypes in the K-Mart

4    Plan-O-Gram room?

11:21  5              Does MGA put prototypes in the K-Mart Plan-O-Gram

6    room?

7    A.    No, they do not.

8    Q.    And why not?

9    A.    Because we don't want to see -- we don't want the

11:21 10   competition to see what we are doing for the next season.

11   Q.    And what is a "prototype"?

12   A.    A prototype is a sample of an item that we're shipping

13   for the next season so that the buyer can see exactly what

14   they're getting for the product.

11:21 15   Q.    And the prototype would be of an unreleased product

16   that -- that -- that MGA plans to put into the market; is

17   that right?

18   A.    Yes, it would.

19   Q.    How -- let me ask you this.  How many prototypes does

11:21 20   MGA make of a particular product?

21   A.    One or two at the max.

22   Q.    So, could -- and how many retailer customers does MGA

23   have?

24   A.    Oh, several hundred.

11:22 25   Q.    So if you only have one or two prototypes could you

CV 04-9049 DOC - 04/06/2011 - Volume 2 of 4

1    actually put a prototype in -- in a K-Mart Plan-O-Gram room?

2    A.   No, we could not.

3    Q.   And the -- the unreleased product -- well, let me ask

4    you a question.  Is one of the reasons that you use just the

11:22 5    packaging in the Plan-O-Gram is because you don't yet have a

6    final unreleased product to put in the package?

7    A.   Correct.

8    Q.   And the -- so at a Plan-O-Gram room the -- the --

9    anybody who enters this domain can see an MGA trapezoidal box

11:22 10   and last year's products; is that right?

11   A.   You are correct.

12           MR. MCCONVILLE:  Just one second.

13           (Pause in the proceedings.)

14           MR. MCCONVILLE:  Thank you, Ms. Saunders.

11:22 15          No further questions.

16           THE COURT:  Redirect by Mr. Quinn on behalf of

17   Mattel.

18                    **REDIRECT EXAMINATION**

19   BY MR. QUINN:

11:23 20   Q.   Ms. Saunders, it's true, isn't it, that you -- you,

21   yourself, would actually go into the Plan-O-Gram room and put

22   the MGA product or the mockup of the product there on the

23   shelf?

24   A.   Yes.

11:23 25   Q.   All right.  And that would include both an MGA product

1    and also the mockup of the product?

2    A.    Any carry-forward product or mockup of the product.

3    Q.    And you would actually have it shipped there and you

4    personally would place it on the shelves?

11:23 5    A.    Yes.

6    Q.    If we could take a look at Exhibit 9653, is this an

7    e-mail from Mr. Larian to you and others dated May 31, 2003?

8             MR. MCCONVILLE:  Objection; this goes beyond what

9    this witness was called for.

11:23 10             MR. QUINN:  I don't think so, Your Honor.

11             THE COURT:  If pertains to a Plan-O-Gram room, it

12    does not.

13             If this is just opening up an area that I didn't

14    allow for rebuttal purposes, it does.

11:24 15             I'm going to trust your discretion, Mr. Quinn.

16             Ask your question, if that's the case.

17             MR. QUINN:  It relates to buyers, but I can't say

18    that it relates to Plan-O-Gram itself, Your Honor.

19             One question.

11:24 20             THE COURT:  Ask your question.

21             MR. QUINN:  All right.  After I've gotten it into

22    evidence?

23             THE COURT:  I'll receive it.

24             MR. QUINN:  We offer Exhibit 9653.

11:24 25             THE COURT:  Well, no, I'm not going to receive

1    that, but the question is?

2    Q.   BY MR. QUINN:  Would Mr. Larian --

3              MR. MCCONVILLE:  Objection; publishing hearsay.

4              THE COURT:  No, just a minute.

11:24  5              I'll allow you to ask your question.

6              Just to be certain that you get these documents,

7    I'm going to accept it with the same admonition, not for the

8    truth.

9              Ask your question, Mr. Quinn.

11:24 10              MR. QUINN:  Is it received, Your Honor, or no?

11              THE COURT:  Received.

12              (Exhibit(s) 9653, received.)

13              MR. QUINN:  Thank you.

14              And so we would put that up on the screen.

11:25 15              And, Ken, if you could blow that up at the top.

16    Q.   Mr. Larian has written you here, "We need to find out

17    from reps and buyers what MyScene products are they doing

18    next week."

19              Do you see that?

11:25 20    A.   Yes, I do.

21    Q.   And I think we know who "buyers" are.

22              Who are "reps"?

23    A.   Reps are manufacturers' representatives that represent

24    our company for various customers.

11:25 25    Q.   Right; and this was a reasonable request for Mr. Larian

1    to make because everybody knows that retailers talk; correct?

2    A.    Correct.

3    Q.    And it's -- it's -- you're not saying that K-Mart buyers

4    agree to buy a product before they've actually seen it?

11:25  5    A.    No, I'm not saying that.

6    Q.    All right.  And, finally, are you aware of any instance

7    where you saw Mattel change a price point or any feature of a

8    Mattel product as a result of information that Mattel learned

9    about a MGA product at a toy fair?

11:26 10              MR. MCCONVILLE:  Whoo, compound.

11              THE COURT:  No, no.

12              Do you understand the question?

13              THE WITNESS:  I -- I -- I really don't; I'm sorry.

14              THE COURT:  Okay.

11:26 15    Q.    BY MR. QUINN:  Are you aware of any instances where you

16    observed -- let me back up for a second.

17              As part of your job, you keep an eye on what the

18    competition is doing; correct?

19    A.    Correct.

11:26 20    Q.    Including Mattel?

21    A.    Correct.

22    Q.    And are you aware of any instances where you saw that

23    Mattel changed a product or a price point as a result of, you

24    thought, something that MGA was showing at the New York Toy

11:26 25    Fair?

1           MR. MCCONVILLE:  Objection; no foundation.

2           THE COURT:  Can you answer that question or do you

3   know?

4           THE WITNESS:  Not really.

11:26  5    THE COURT:  (Shook head.)

6   Q.   BY MR. QUINN:  You went to New York Toy Fair; you've

7   told us that.

8   A.   In the past I have, yes.

9   Q.   Right; and you've told us you keep an eye on the

11:27 10  competition; right?

11  A.   Yes.

12  Q.   And my question to you is whether you've ever observed

13  any instances where you thought, gee, Mattel changed that

14  price or that product because of something we showed at the

11:27 15  New York Toy Fair?

16          MR. MCCONVILLE:  Objection; beyond the scope;

17  beyond what she's called for; compound.

18          THE COURT:  Just to be certain, can you answer that

19  question?

11:27 20         THE WITNESS:  Not really.

21  Q.   BY MR. QUINN:  Let me ask this this way --

22          THE COURT:  It's sustained, Counsel.

23          MR. QUINN:  It's sustained?

24          THE COURT:  It's sustained.

11:27 25         MR. QUINN:  Then I'm done.

UNITED STATES DISTRICT COURT

1            THE COURT:  Recross.

2                  **RECROSS-EXAMINATION**

3    BY MR. MCCONVILLE:

4    Q.   Ms. Saunders, you were asked, I think in response to a

11:27  5    question, you said that in the Plan-O-Gram room, in the

6    K-Mart Plan-O-Gram room, that MGA displays carry-forward

7    products; right?

8    A.   Yes.

9    Q.   And I think you told Mattel counsel also something

11:27 10   called a mockup?

11   A.   Yes.

12   Q.   Is the mockup the same thing as the packaging?

13   A.   The packaging, yes.

14   Q.   So it's not a mocked-up product; right?

11:28 15   A.   No, it isn't.

16   Q.   You were asked some questions about Exhibit 9653.

17            If we could just put that up there, please.

18            And this is an e-mail from Mr. Larian to you, among

19   others.

11:28 20           Could you read the date of that e-mail for me,

21   please.

22   A.   5/31/2003.

23   Q.   So that's well after the New York Toy Fair; correct?

24   A.   Yes.

11:28 25   Q.   If you could also -- you were asked a question about

CV 04-9049 DOC - 04/06/2011 Volume 2 of 4

1    whether or not buyers can make decisions about purchasing

2    based on the package in the Plan-O-Gram room.

3            Do you remember that question?

4    A.   Yes.

11:28 5   Q.   Can you please tell us when it is that K-Mart retailers

6    are invited to see MGA products before they make a decision

7    to purchase?

8    A.   They usually come to the LA showroom in October.

9    Q.   So the LA showroom --

11:28 10  A.   For -- for -- sorry, for fall product.

11   Q.   Okay.  So K-Mart is invited to the MGA facility in

12   California --

13   A.   Yes.

14   Q.   -- to review MGA's plans for the upcoming year; is that

11:29 15  right?

16   A.   Yes.

17            MR. MCCONVILLE:  No further questions.

18            THE COURT:  Now can we excuse Ms. Saunders,

19   Counsel?

11:29 20           MR. QUINN:  Yes, Your Honor.

21            THE COURT:  Counsel?

22            MR. MCCONVILLE:  Yes.

23            THE COURT:  Thank you very much for your time.

24            You are excused from these proceedings.

11:29 25           And, Counsel, your next witness, please.

UNITED STATES DISTRICT COURT

```
 1          MR. ZELLER:  Mattel calls John Marine.

 2          THE COURT:  Okay.  John Marine.

 3          (Pause in the proceedings.)

 4          THE COURT:  Sir, if you'd come forward, please,

11:29 5  because we are on a time clock, and now would you raise your

 6  right hand, sir.

 7                      JOHN MARINE,

 8           witness, called by Plaintiff(s), sworn

 9          THE COURT:  Thank you, sir.

11:29 10         If you'd come quickly along the side of the jury

11  railings, please.

12          And if you would be seated, sir, and would you

13  state your full name for the jury and please spell your last

14  name.

11:30 15         THE WITNESS:  John Marine; M-a-r-i-n-e.

16          THE COURT:  Thank you.

17          Direct examination by Mr. Zeller on behalf of

18  Mattel.

19                  DIRECT EXAMINATION

11:30 20  BY MR. ZELLER:

21  Q.  Good morning, Mr. Marine.

22          Where do you work?

23  A.  I work at Mattel.

24  Q.  And what's your current position there?

11:30 25  A.  Vice president product development for girls.
```

CV 04-9049 DOC - 04/06/2011 - Volume 2 of 4

```
 1   Q.   And how long have you been with Mattel?

 2   A.   I've been with Mattel for over 19 years.

 3   Q.   And you -- you work in the girls' product development

 4   department?

11:30 5   A.   Correct.

 6   Q.   And you've worked in that department the whole time at

 7   Mattel?

 8   A.   No, I have not.  I --

 9   Q.   What other departments have you worked in?

11:30 10   A.   I started in Hot Wheels, then worked in action play,

11   then in preschool and then in girls' and then in Barbie and

12   now back in girls.

13   Q.   And so how long have you been working in the girls'

14   product development department?

11:30 15   A.   About 15 years.

16   Q.   And -- and while working in that department, have you

17   become familiar with something called a "detailed product

18   schedule"?

19   A.   Yes, I have.

11:31 20   Q.   And this is a -- a -- an internal Mattel document that's

21   created as a matter of course there at Mattel?

22   A.   Correct.

23   Q.   If you could please take a look at three documents here.

24   These are Exhibits 24882, 24890, and 24499.

11:31 25   A.   Okay.
```

UNITED STATES DISTRICT COURT

```
 1    Q.    And do you recognize these documents?

 2    A.    Yes, I do.

 3    Q.    Please tell us what they are.

 4    A.    These documents are used to track and monitor a project

 5    from the concept start all the way through production.

 6    Q.    And, generally speaking, what's the purpose of these

 7    documents?

 8    A.    The purpose of these is to make sure that a product

 9    is -- is -- the -- the milestones and deliverables for those

10    milestones are executed on time so that the product can get

11    to market in -- in time and on schedule.

12    Q.    And what do you mean by "milestones"?

13    A.    "Milestones" meaning there are various internal

14    milestones whether we call it a "rough concept review" or a

15    "concept approval" or an "executive approval" and then

16    following from that there are items like toolettes, where

17    we're making tooling, and then from there, final engineering

18    pilots, production pilots and productions starts, all those

19    milestones that go up into creation and development of a toy.

20    Q.    So these are all steps in the design and development

21    of -- of a toy?

22    A.    Correct.

23    Q.    And dolls?

24    A.    Yes.

25    Q.    And in these forms that we've been talking about, these
```

 1    three exhibits here, these are created and kept in the

 2    regular course of Mattel's business?

 3    A.    Yes, they are.

 4    Q.    And is there a process that's associated with creating

11:32  5    these forms?

 6    A.    The process that's associated is that these documents

 7    will be created at the start of a project right when the

 8    concept is being generated, then they will then be reviewed

 9    at a weekly team meeting and make sure that all the -- the

11:33 10    milestones are being met or updated, if they are not, and

 11    determine how to course-correct a product to make sure that

 12    it's --

 13          THE COURT:  Just move the microphone a little

 14    closer, sir.

11:33 15    Q.    BY MR. ZELLER:  And what is it that happens with these

 16    forms after the product is actually designed, developed and

 17    manufacturing begins?

 18    A.    They are kept on our servers.

 19          MR. ZELLER:  I would move Exhibits 24882, 24890,

11:33 20    and 24499 into evidence.

 21          THE COURT:  Received.

 22          (Exhibit(s) 24882, 24890, and 24499, received.)

 23    Q.    BY MR. ZELLER:  And maybe we could just talk briefly

 24    about an example here.

11:33 25          Let's look at the first one, which is 24499.

1      And then, so, at the top this shows that it relates

2  to a product that's part of the MyScene line?

3  A.   Yes.

4  Q.   Something that was called "Spring Break" at the time?

11:34 5  A.   Yes.

6  Q.   And then, generally speaking, what's the kind of

7  information that's reflected here on -- on the first page?

8  A.   On the first page on this, this is actually the

9  financials for that product and that's really to -- to remind

11:34 10  the team during those team meetings of what the product is

11  about, what it is -- what's the A price, what's the volume

12  behind it and it really establishes the importance of that

13  product for the brand.

14  Q.   And then focusing on the second page here, what does

11:34 15  this generally reflect?

16  A.   These are actually -- let me just take a look at this so

17  I'm not stating something wrong -- these are actually the

18  durations for the various milestones that occur.

19      So as you can see, "design start," "rough concept

11:34 20  start," in the very top box and from there down it's

21  basically going through what's our current schedule and

22  what's our committed schedule and the variances that are

23  between those to make sure we can produce it on time.

24  Q.   And so, for example, just to pick one here on this

11:35 25  document, the design start has a date of June 24th, 2002?

1    A.    Correct.

2    Q.    And is there some difference between "current" and

3    "commit"?

4    A.    Well, "current" -- "commit" is something that you would

11:35  5    say, we're going to commit to a particular date, and

6    "current" might be if we're deviating from that date.

7          And I know the terminology may sound strange, but

8    that's -- that's what it is.

9    Q.    So is "commit" closer to, then, what actually happened?

11:35  10   A.    "Current" is what actually happened.

11   Q.    And it shows here that there are milestones that include

12   product design, soft goods and purchase parts, packaging,

13   tooling and sculpting?

14   A.    Correct.

11:35  15   Q.    And do these documents that we've been talking about

16   reflect the true and accurate design and development dates

17   for the -- the documents that these relate to?

18   A.    Yes, they do.

19          MR. ZELLER:  Nothing further, Your Honor.

11:36  20          THE COURT:  Cross-examination.

21          Ms. Hurst on behalf of MGA and Mr. Larian.

22          (Pause in the proceedings.)

23          (Discussion held off the record.)

24          MS. HURST:  No questions.

11:36  25          THE COURT:  All right.

CV 04-9049 DOC - 04/06/2011 Volume 2 of 4

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | May the witness be excused, Counsel?                         |
|        | 2  | MR. QUINN:  Yes, Your Honor.                                 |
|        | 3  | MS. HURST:  Yes, Your Honor.                                 |
|        | 4  | THE COURT:  Thank you very much, sir.                        |
| 11:36  | 5  | And, Counsel, your next witness, please.                     |
|        | 6  | MR. QUINN:  Your Honor, I wonder if it might be              |
|        | 7  | possible to take an early lunch today.                       |
|        | 8  | THE COURT:  This would be a good time for an early           |
|        | 9  | lunch.                                                        |
| 11:37  | 10 | Counsel, would you agree?                                    |
|        | 11 | MS. HURST:  Sure.                                            |
|        | 12 | THE COURT:  All right.  Why don't you come back in           |
|        | 13 | five hours; just kidding.                                    |
|        | 14 | (Laughter.)                                                  |
| 11:37  | 15 | THE COURT:  Let me talk to counsel.                          |
|        | 16 | Why don't you come back at 1:00.                             |
|        | 17 | This case is within an hour -- hour and a half for           |
|        | 18 | both sides are concluding.                                   |
|        | 19 | So let me just see where we're at in terms of all            |
| 11:37  | 20 | the evidentiary items.                                       |
|        | 21 | Please come back at 1:00.                                    |
|        | 22 | You are admonished not to discuss this matter                |
|        | 23 | amongst yourselves nor form or express any opinions about the|
|        | 24 | case.                                                         |
| 11:37  | 25 | Thank you very much.  Have a nice lunch.                     |

UNITED STATES DISTRICT COURT

1          And, Counsel, if you would be seated.

2          (Open court - jury not present.)

3          THE COURT:  The jury's no longer present.

4          Mr. Zeller, have a seat.

11:37  5          I want to place one more call to Mr. Bryant's

6     attorney and this would be a good time to do it.

7          Let's get an estimated time of arrival.  He told

8     the court that he would be here on Friday.  We hope to speed

9     that process.

11:38 10          The problem is by the time the marshals get him it

11    could be a week just in transit to get him here if I have to

12    issue the warrant.

13          I told counsel I'd hold it until 12:00 today and

14    that warrant's ready to go with the last-known address.  I'm

11:38 15    going to issue that warrant regardless and then Mr. Bryant

16    can have that withdrawn when he appears.

17          I want to get any last-minute e-mail traffic,

18    though, that you're picking up from either counsel concerning

19    his counsel and Mr. Bryant's efforts to get to the court.

11:38 20          Apparently he's willing to comply.  It appears,

21    though, it's holding up this court.

22          So check your BlackBerrys.

23          MR. ZELLER:  I -- I did.

24          The only update I have is -- is that he was not on

11:39 25    the flights we had booked for him.

CV 04-9049 DOC - 04/06/2011 Volume 2 of 4

```
 1              THE COURT:  We knew that.  We knew that as of

 2      8:00 this morning.  That's not news.

 3              I had placed a call to counsel for Mr. Bryant about

 4      8:10.

11:39  5              Now, apparently he has to drive about 300 miles and

 6      maybe it was wise he wasn't driving yesterday with the

 7      information that the court had received from his counsel.

 8              (Pause in the proceedings.)

 9              THE COURT:  Any information?

11:39 10              MS. HURST:  Nothing here.

11              MR. MCCONVILLE:  No.

12              THE COURT:  All right.  Let's -- why don't we just

13      place a call to Mr. Bryant's counsel one more time and -- and

14      what's the gentleman's name again?  I keep forgetting.

11:40 15              THE CLERK:  Peter Bonis.

16              THE COURT:  Peter Bonis.  It affects the time

17      counsel are arguing, also, which we had planned for Friday.

18              (Telephonic hearing:)

19              THE COURT:  Hi, Peter.

11:40 20              MR. BONIS:  Hi, Your Honor.

21              THE COURT:  This is Judge Carter.

22              Listen, last time we were not being transcribed,

23      this time we are because all counsel are in court, and I just

24      want to pay you the courtesy and once again state on the

11:41 25      record, because we were not on the record at 8:10, how much
```

UNITED STATES DISTRICT COURT

1    appreciation this court has for your efforts as counsel.  So

2    I don't want any of what's occurring or potentially occurring

3    to reflect upon you.

4            Do you have the latest information for all counsel?

11:41 5    We've got seven attorneys standing by and a jury --

6            MR. BONIS:  I can tell you -- let me tell you the

7    situation and I've managed to get ahold of the client.

8            Tell me how you want to handle it.

9            THE COURT:  Okay.

11:41 10           MR. BONIS:  Now, I was not really aware of where

11    they were.  I knew they weren't home.

12           As of yesterday, they left Sunday night or Monday

13    morning and they had gone to some place about 300 miles away

14    from where they live for a party, a birthday party of some

11:41 15   type.

16           When I spoke to them yesterday they were both --

17    let's just say they had become acquainted with the fruit of

18    the grape.

19           THE COURT:  Okay.

11:41 20           MR. BONIS:  They were in no condition to drive

21    back.

22           THE COURT:  Well, first of all, I want to thank

23    you, that although I wanted them here I'm glad they're not on

24    the public highways.  Let's get that on the record

11:42 25   immediately.

 1          MR. BONIS:  Carter is such a phobic flyer that if

 2    he shows up and you try to put him on the stand he's going to

 3    show up, my guess is, loaded with Xanax or something, because

 4    that's the only way he can fly.

11:42  5          Now, I did speak with him, and they indicated they

 6    were willing to do this but they weren't really sure how they

 7    were going to logistically -- and I know the court has its

 8    own schedule and --

 9          THE COURT:  Listen, I think I'm going to -- if I

11:42 10   can get absolute cooperation, he's the critical --

 11   I'm sorry -- he's one of the critical witnesses, but

 12   certainly this drama started with Carter Bryant, it's almost

 13   poetic that it's ending with Carter Bryant; but I do

 14   represent to you he's on the stand a very short period of

11:42 15   time because, frankly, there are very few questions that are

 16   going to be asked and they primarily concern documents that,

 17   quite frankly, should have been asked the first time he was

 18   on the stand.

 19          The originals were available to counsel, but it's

11:43 20   just not fair at this, you know, after three months that even

 21   if a mistake was made that they shouldn't be able to refer to

 22   them.

 23          So -- so what's your best guess?

 24          Let me work with you, Peter, and -- and see what we

11:43 25   can do.

Case 2:04-cv-09049-DOC-RNB   Document 10439   Filed 04/08/11   Page 92 of 103   Page ID #:317032
CV 04-9049 DOC - 04/06/2011 - Volume 2 of 4

92

1          MR. BONIS:  Well, I'm -- I'm -- I guess all I --

2     listen, I know that -- here's -- it's not so much my best

3     guess.

4          I know they're going to have to go -- I know they

11:43 5   will have to go home and get clothes, and the other question

6     that came up was -- and I know this is expensive and it's

7     probably not something -- but if Richard could -- could come

8     with him so we avoid the passing out in the airport like we

9     did last time --

11:43 10       THE COURT:  Yes.  Yeah, we'll get a dual ticket; is

11    that correct, Counsel?

12         MR. ZELLER:  Yes.

13         MR. QUINN:  Yes.

14         MR. BONIS:  Okay.  Let me do this, then.

11:43 15       If -- I will -- I will call them now and as soon as

16    I have something -- because I spoke with him like, literally,

17    about a half an hour ago and they said "what's going on?" and

18    I told them.

19         I will call them now and I will call back your

11:44 20   "Nancy person" and leave them a message and then if you have

21    a problem just call me and I'll straighten it out.

22         I think that's the best way to proceed.

23         THE COURT:  How -- how soon?  The ticket is

24    absolutely waiting at the airport.  We'll get two tickets.

11:44 25       I know that he allegedly collapsed last time and

1    was taken to the hospital, so --

2              MR. BONIS:  It wasn't allegedly.  His mother and

3    Richard flew out to get him.

4              THE COURT:  Oh, I see.  Okay, well, if he

11:44  5    collapsed, if he wants to bring a friend, either his mother

6    or somebody else to make sure he gets here I think at this

7    point all parties are amenable.

8              MR. BONIS:  The one thing I don't know is if it

9    will be Thursday or Friday.

11:44  10             THE COURT:  If you could get him here Thursday all

11    of us would be appreciative because this is scheduled for

12    argument on Friday.

13             MR. BONIS:  Okay.  Now, my only other question is

14    does it work if it's sometime Thursday afternoon?

11:44  15             THE COURT:  Yes.

16             MR. BONIS:  I don't want to promise that I can get

17    him there at 9:00 tomorrow morning.

18             THE COURT:  Yes, it does.  I will bend every rule

19    in terms of at least the hours that I'm setting and we will

11:45  20    make it Thursday afternoon if he can get here, get him on the

21    stand.

22             MR. BONIS:  Okay.  Let me -- I'm going to need to

23    call him and I will call your court clerk as soon as I'm done

24    speaking to him.

11:45  25             THE COURT:  Okay; Peter, listen, once again on the

 1    record I want to personally thank you, Peter, for

 2    all your efforts.

 3          MR. BONIS:  It's my pleasure, Your Honor.  I'm

 4    happy to help.

11:45  5          THE COURT:  We'll be back to you.

 6          We're just going to sit here, Peter, and we'll

 7    probably call you back in about one hour; okay?

 8          Thanks a lot, Peter.

 9          MR. BONIS:  Thank you.

11:45 10          THE COURT:  As you can hear, he's going to be here

11    and apparently it's good he didn't respond to the court's

12    order because it might have been a public-safety concern

13    driving on the highway.  So why don't you go to lunch and why

14    don't you meet me at 12:45 and we'll place a call back to

11:45 15    counsel.

16          Now, who else do you have from Mattel?

17          And let's get the time up on the board from Rachel

18    and Jimmy and see where we stand and let me retain Mr. Zeller

19    and Ms. Hurst for just a moment so there's no disagreement

11:46 20    about the time constraints.

21          All right.  Have a nice lunch.

22          We'll see you at 12:45.

23          (Noon recess was taken.)

24          THE COURT:  We're going to start with Schoffhauser.

11:50 25          (Pause in the proceedings.)

1          THE COURT:  Schoffhauser was in the original

2     binding with me and these are shipping invoices.

3          And these are shipping invoices for MyScene

4     products; is that correct?

11:51  5          MR. ZELLER:  That's correct.

6          THE COURT:  I thought I had originally allowed

7     Schoffhauser and I'm not sure now, so I want to review for

8     the record.

9          I want MGA to make their objections.

11:51 10          MR. MCCONVILLE:  I'm sorry, Judge?

11          THE COURT:  I thought I had previously allowed what

12     had been referred to as a number of what I call "clerical

13     items."

14          Mr. Quinn had made that representation to me a

11:51 15     significant period of time ago and this morning I was

16     informed instead of one person who originally was Mr. Dail

17     who I was told about but didn't make the link to him being a

18     clerk, this morning I was told that there were three people

19     needed.

11:52 20          And, in fact, I was introduced to three very, very

21     nice young attorneys for the firm of Quinn Emanuel who

22     were -- I was asked informally to allow them to put on this

23     evidence.

24          Mr. McConville was here.  I've declined to do so

11:52 25     because I thought that that engendered potential sympathy and

CV 04-9049 DOC - 04/06/2011 - Volume 2 of 4

```
 1    I'll restrict it to lead counsel with no affront to those
 2    young counsel.
 3            Now, instead, Dail and/or those three young
 4    counsel, should have been known to the court.
11:52  5            But what's the purpose?  What are these?
 6            They're MyScene products; is that correct?
 7            MR. QUINN:  Right; they are MyScene products and
 8    these invoices will reflect the first ship date, so it's when
 9    these --
11:52 10            THE COURT:  So that's simply in response to their
11    case.
12            MR. QUINN:  Yes.
13            THE COURT:  Okay.  Now, just a moment.
14            I'm not sure what or wasn't said.
11:53 15            We're done.
16            And that's appropriate rebuttal because --
17            MR. QUINN:  I would say this is not rebuttal, but
18    defense, because they have these MyScene products which they
19    purport to match with their trade secrets and the timing on
11:53 20    some of these will show that their theory doesn't make sense
21    in view of when these products were actually shipped.
22            THE COURT:  We should be able to put on a defense,
23    an affirmative defense to their claims because there has been
24    counterclaims -- well, claims and counterclaims.
11:53 25            MR. QUINN:  Yes.
```

1          THE COURT:  It's going to be allowed.

2          Mr. Dail --

3          MR. QUINN:  I think it's "Ms." Dail, Your Honor.

4          THE COURT:  Ms. Dail.

11:53  5          Do you want her first name, Ms. Hurst?

6          MS. HURST:  No, we have that, Your Honor.

7          THE COURT:  Okay.  Ms. Dail.  She's not on my list,

8    but she must have been the clerk you were referring to

9    before --

11:54  10          MR. QUINN:  She's an HR person.

11          THE COURT:  And what's she doing?

12          MR. QUINN:  She was just going to put in some

13   personnel files.

14          THE COURT:  Which personnel files?

11:54  15          MR. QUINN:  The seamstresses and Tumaliuan.

16          Anybody else?

17          MR. ZELLER:  There may be some -- there's some for

18   Brisbois and some of the others who Jeff -- these are the

19   personnel files of the sample makers Tumaliuan, Cooney,

11:54  20   Brawer and some of the other people who have figured in the

21   case who we were just talking about.

22          THE COURT:  Now, just a moment.

23          Is your concern that you were missing the contracts

24   for the intentional interference claim?

11:54  25          MR. ZELLER:  Right; that's the -- and I -- I

 1    perhaps was overbroad when I said "personnel files."

 2           These are -- these are their contracts, in

 3    particular, this agreement.

 4           THE COURT:  I want to see exactly what you're going

11:55  5    to put in.

 6           Show them to opposing counsel first.

 7           MR. ZELLER:  They have the binders.

 8           MR. QUINN:  They have a binder, Your Honor.

 9           MS. HURST:  I've got the binder.

11:55 10    THE COURT:  I don't, so my apologies.

11           Thank you very much.

12           Mr. Quinn, if you would give me those.

13           What I don't want are just personnel files flying

14    in.

11:55 15    MR. QUINN:  This is a list that Chris is bringing

16    you tonight.

17           THE COURT:  Thank you very much.

18           The intentional interference claim is, obviously,

19    up to this time, missing the contract.

11:56 20    And tell me why this is rebuttal.

21           MR. QUINN:  This is not rebuttal.

22           This would be pursuant to the express agreement on

23    the record at the close of our case, that we could call a

24    document's custodian to deal with the particular documents,

11:56 25    among others, that we were closing subject to that.

Case 2:04-cv-09049-DOC-RNB   Document 10439   Filed 04/08/11   Page 99 of 103   Page ID #:317039
CV 04-9049 DOC - 04/06/2011 - Volume 2 of 4

99

1      THE COURT:  Okay; and what's the third genesis?

2  Every time I hear an attorney, I'm concerned.

3      MS. HURST:  Your Honor, could I respond on that?

4      THE COURT:  Certainly.

11:56 5      MS. HURST:  We did not agree that they could call a

6  document custodian to admit substantive evidence without

7  testimony, which is what they're trying to do here.

8      There has been no witnesses from Mattel to come and

9  establish the facts that would support the claims of breach,

11:57 10  and the contracts don't belong in the case without that

11  testimony.

12      This is just like the thumbdrive for Brisbois.

13  They're trying to put in Brisbois records, Castilla --

14  nobody's come -- Cooney -- I mean, they're just -- and the

11:57 15  seamstresses.  They're going to try to put in the seamstress

16  contracts.  This is part of their case-in-chief and they

17  needed to put on substantive testimony.  This is not just a

18  matter of authenticating records.

19      These things can't all just come flying in with an

11:57 20  avalanche with no substantive testimony relating them to the

21  claims of the case.  This is improper.

22      MR. QUINN:  I think there is sufficient testimony

23  in the record to support those claims, Your Honor.

24      We are not going to ask substantive questions of

11:57 25  these witnesses.  It's merely to authenticate the documents.

1          I think there's ample testimony to support a

2     conclusion that there was a breach of, for example, the

3     seamstresses' contracts.  That's for the jury to decide.

4          MS. HURST:  Your Honor, the only witness who

11:58 5     testified on that was Peter Marlow.  There was not a single

6     Mattel person to come in here and testify that they failed to

7     perform in their duties in any way.

8          Not only that, but in this binder are also 1995 and

9     1999 codes of conduct which nobody's come to testify about,

11:58 10    they're going to try to offer for the interpretation of the

11    contracts.  I mean this is -- this is crazy.  This is -- this

12    was part of their case-in-chief, and -- and they did not

13    offer sponsoring testimony as to the import or relevance of

14    these documents.

11:58 15         THE COURT:  What I anticipated was pursuant to the

16    contractual interference claim that the contracts were

17    missing.

18          All right.  Let me find out what Jennison is

19    allegedly going to do.

11:59 20         MR. ZELLER:  He is the person who actually did the

21    copyright registrations for Mattel with the US copyright

22    office that pertain to the -- the drawings and other Bratz

23    works that are at issue and the subject of Mattel's copyright

24    claim.

11:59 25         MGA has taken the position that we need to

     1    introduce into evidence the registrations.

     2          Frankly, I think it's unnecessary, but simply to

     3    avoid any debate over this -- and this is continuation of our

     4    records cleanup that was part of our case -- Mr. Jensen can

11:59 5    testify as to these generations and other documents filed

     6    with the copyright office.

     7          I would say an alternative, to go to the court's

     8    question:  Why can't they just be judicially noticed?  I

     9    think they can be.

12:00 10          We actually have the certified copies here for the

     11   court and those are the ones we would offer as well and they

     12   are -- they have the seals on them, the ribbons, the whole

     13   bit.

     14          So based on, at least as we understand, the ground

12:00 15   rules right now, we think that they should just simply be

     16   judicially noticed and admitted on that basis so we don't

     17   have to have them testify.

     18          THE COURT:  And for the record, in turn MGA would

     19   complain that that courtesy wasn't paid to MGA by Mattel;

12:00 20   correct?

     21          MS. HURST:  Well, Section 411 requires these to be

     22   admitted.

     23          I mean, it's a jurisdictional defect.  These should

     24   have been put in during their case-in-chief and it's going to

12:00 25   be confusing to the jury to look at a copyright registration

1    where they're claiming registration of the Bratz drawings.

2         The jury's not going to understand that at all and

3    putting up a witness, then, you know, we could have had

4    testimony about it, we could have explained it, and now here

12:00 5    they come and it's going to be totally confusing and, you

6    know, frankly, it's ridiculous that they get to go cure all

7    their problems in their case-in-chief in response to our

8    motion for judgment.

9         You know, the purpose of the motion for judgment is

12:01 10   not for them to come flying in with a motion for evidence

11   without sponsoring testimony at the last minute when they're

12   out of time.

13        MR. ZELLER:  For the record, Your Honor -- the

14   agreement -- this is on the record and we can get the

12:01 15   language -- the agreement at the close of our case was that

16   even the things that are not in evidence that we would be

17   getting in through a custodian can still be used in

18   opposition to the JMAL, so there's no prejudice at all to

19   MGA.

12:01 20        THE COURT:  I would just like to be correct.  I

21   would like to pull that and see that for a moment.

22        MR. ZELLER:  I actually think that --

23        THE COURT:  Let's just take the time.  Let's just

24   pull it so we have a clear, clear record.

12:01 25        MR. ZELLER:  Sure.

CV 04-9049 DOC - 04/06/2011 - Volume 2 of 4

```
 1            THE COURT:  And I'll come right back with you.

 2            Why don't you go take a restroom break or

 3      15 minutes, pull that, why don't you get it, read right into

 4      the record and see what it says; okay?  And that way we won't

 5      be bickering.

 6                  (Recess taken.)

 7                  (Adjournment at 12:06 to resume on Wednesday,

 8      April 6, 2011 at 12:30.  Next session reported by

 9      Jane Sutton-Rule.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT