1

1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3       **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    – – – – – – –

5

6    MATTEL, INC., ET AL.,              )
                                        )
7            Plaintiffs,                )
                                        )
8        vs.                            ) No. CV 04-9049-DOC
                                        )    Day 47
9    MGA ENTERTAINMENT, INC., ET AL.,   )    Volume 3 of 4
                                        )
10           Defendants.                )
     _____)

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                      Jury Trial

17                 Santa Ana, California

18              Wednesday, April 6, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-04-06 MattelV3

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 2 of 90   Page ID #:317045
CV 04-9049-DOC – 04/06/2011 – Day 47, Vol. 3 of 4

2

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART & SULLIVAN
               By:  JOHN B. QUINN
5                   MICHAEL T. ZELLER
                    WILLIAM PRICE
6                   Attorneys at Law
               865 South Figueroa Street
7              10th Floor
               Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  THOMAS S. MC CONVILLE
12                  Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             – AND –

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  ANNETTE L. HURST
17                  Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700
19
               – AND –
20
               KELLER RACKAUCKAS, LLP
21             BY:  JENNIFER L. KELLER
                    Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 3 of 90   Page ID #:317046
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

3

```
1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4              SCHEPER, KIM & OVERLAND, LLP
               BY:  ALEXANDER H. COTE
5                  Attorney at Law
               601 West Fifth Street
6              12th Floor
               Los Angeles, California 90071
7              (213) 613-4660

8              - AND -

9              LAW OFFICES OF MARK E. OVERLAND
               BY:  MARK E. OVERLAND
10                 Attorney at Law
               100 Wilshire Boulevard
11             Suite 950
               Santa Monica, California 90401
12             (310) 459-2830

13

14   Also Present:

15             ISAAC LARIAN, MGA CEO
               ROBERT ECKERT, Mattel CEO
16             LILY MARTINEZ, Mattel Employee
               KEN KOTARSKI, Mattel Technical Operator
17             MIKE STOVALL, MGA Technical Operator
               RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan
18             KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe
               WARRINGTON PARKER, Orrick Herrington & Sutcliffe
19             MELANIE PHILLIPS, Orrick Herrington & Sutcliffe
               FRANK RORIE, Orrick Herrington & Sutcliffe
20             DIANA RUTOWSKI, Orrick Herrington & Sutcliffe
               DENISE MINGRONE, Orrick Herrington & Sutcliffe
21             PETER BONIS, Attorney for Carter Bryant
                   (Via Teleconference.)

22

23

24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 4 of 90   Page ID #:317047
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

4

1                          **I N D E X**

2

3

4                        **EXAMINATION**

5

6    **Witness Name**        **Direct**    **Cross**    **Redirect**    **Recross**

7    SCHOLVIN, JULIE
         By Mr. Quinn           64                        81
8        By Mr. McConville                   71                          84

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:04-cv-09049-DOC-RNB  Document 10440  Filed 04/08/11  Page 5 of 90  Page ID #:317048
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

5

```
 1            SANTA ANA, CALIFORNIA, WEDNESDAY, APRIL 6, 2011

 2                      DAY 47, VOLUME 3 OF 4

 3                         (12:30 p.m.)

 4            (The following proceedings is taken outside

 5        the presence of the jury.)

 6            THE COURT:  All right.  We're back on the record

 7    with counsel present.

 8            First, it may be, Ms. Hurst, that Mattel is

 9    calling records custodial as to remedy the several of the

10    defects identified in your recently filed motion for

11    judgment as a matter of law.

12            And you are arguing that it's prejudicial, but

13    that's not necessarily true because your arguments are still

14    preserved for purposes of an eventual and potential appeal.

15            Second, the parties have referred to an

16    on-the-record stipulation that was reached at the end of

17    Mattel's case in chief, and I'm going to read that into the

18    record.

19            At that time there were certain binders of

20    exhibits that Mattel sought to admit into evidence.  The

21    question now is what were in those binders that were being

22    displayed at that hearing.

23            I'm going to read to you from the March 10th, 2011

24    trial transcript, and the relevant discussion is found in

25    Volume 3, and I'll read the relevant portion, which begins
```

1    with begins with the following:

2         The Court:  "The jury is not present.  The

3    alternates are not present.

4         Mr. Quinn:  "Your Honor, we are ready to rest

5    subject to these document custodian issues.  We have someone

6    on the Mattel side as well as on the MGA side.  We are not

7    sure whether the Court wants us to rest and be prepared

8    subject to that or whether we should be trying to nail down

9    these custodian issues."

10        The Court:  "It's up to the two of you."

11        Mr. Quinn:  "We have, as the Court knows, we have

12    been endeavoring, making efforts in that regard in

13    conversation with MGA's counsel for some time and --"

14        The Court:  "The record should reflect that the

15    dispute between counsel is this:  MGA is willing to

16    stipulate to the foundation but not the authenticity,

17    Counsel?"

18        Ms. Hurst:  "It's argument about admissibility and

19    relevance."

20        The Court:  "I think that is going to be Mattel's

21    position with your documents, so it's simply a matter of

22    whether they can come into evidence or not.  It's simply a

23    matter for argument.  The relevancy of some of those

24    documents may be in question between counsel.  Frankly, I

25    don't know that is going to make any difference concerning

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 7 of 90   Page ID #:317050
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

7

1    Rule 50.  In fact, my intent probably is to reserve most of

2    those, although I do want to hear from Mr. Cote and

3    Mr. Overland, certainly if you'd like, concerning Rule 50,

4    and I want to afford you a briefing schedule.  I'm open to

5    any suggestion.  Mr. Quinn and Ms. Hurst?"

6            Ms. Hurst:  "The only concern I have is that of

7    course we have been discussing large binders of MGA

8    documents, and we don't have any concern at all about those

9    in terms of foundation and their authenticity, or whatever,

10   but this is the first time I've ever heard them talking

11   about a Mattel custodian of records for their own documents.

12           "So now if we are talking about they have got a

13   whole bunch of their documents and they want to put in

14   without any sponsoring witness, I don't know what that

15   means.  As far as our documents are concerned, as we have

16   indicated, we will stipulate.  You know, it's just an

17   argument about admissibility.  We will stipulate to

18   authenticity.  It's just argument about admissibility and

19   relevance."

20           The Court:  "You keep referring to your

21   documents."

22           Ms. Hurst:  "Right."

23           The Court:  "That's a little self-serving from

24   what I'm hearing."

25           Ms. Hurst:  "No, no.  I mean MGA documents.  I

1    don't mean are in the sense of things we want to offer.  I

2    just mean things that have an MGA Bates stamp on it, that's

3    all I mean."

4              The Court:  "In other words, if it has an MGA

5    Bates stamp, and it's been turned over to Mattel, the

6    authenticity is not in question."

7              Ms. Hurst:  "Right, with the exception of the

8    Mexican CD, but we've been around the block on that."

9              The Court:  "And that was not a favorable ruling

10   to you.  I received that."

11             Ms. Hurst:  "Correct."

12             The Court:  "So the question is what am I going to

13   do to let in?  Knowing Mr. Zeller and counsel, what

14   telephone books do you have for me?  I'm just joking,

15   Mr. Zeller.  How much material is in dispute between the two

16   of you?"

17             Mr. Zeller:  "It's the materials that I started to

18   go through.  It's probably about three binders, I would say,

19   of materials.  We've actually been talking to, I think,

20   Mr. McConville and others about both our materials and

21   theirs."

22             The Court:  "Now, would it be acceptable, then, to

23   both parties that I simply delay that receipt and that

24   discussion so we can keep the case moving, and does it make

25   any substantial difference in terms of your Rule 50?  In

1    other words, if I rule against you on behalf of Mattel, how

2    damaging is that?  And if I rule against MGA on that portion

3    of the materials, how damaging is that?

4              "What I don't want to do is to be caught in a

5    bind, and that is the expectation that this is coming in,

6    and you could have called persons to substantiate it.

7    That's not fair to Mattel, and MGA is going to find

8    themselves in the same coequal position with their

9    documents.  Meanwhile, the clock keeps running."

10         Mr. Zeller:  "Part of it has to do with this

11   indirect response to the Court's question about how

12   damaging, probably the principal issue where it would be,

13   the principal category is really this product."

14         The Court:  "The 1,300 exhibits?"

15         Mr. Zeller:  "Yes, in the sense of you recall in

16   summary judgment, MGA did make that into an issue about us

17   not putting all that in.  We obviously, then, dealt with it,

18   but I don't want to have a reprisal of that situation."

19         Ms. Hurst:  "We stipulated to the admissibility of

20   that.  We've gone beyond authenticity on the product.  We've

21   agreed it's coming in on behalf of both parties, and we are

22   going to set it up in the room."

23         The Court:  "By the way, I've got another room for

24   you or an even better room.  It's actually a room that I

25   think will not only hold the jury, but will also hold your

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 10 of 90   Page ID #:317053
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

10

 1     product."

 2            Now, let me skip down on page 12 of that Docket

 3     Number 10185, which is number 305 -- or 308591.

 4            I'm going to skip over to page 14.  The rest is

 5     about the jury room, Mr. Machado, et al.

 6            I think Ms. Hurst comments are the next pertinent

 7     comments.

 8            Ms. Hurst:  "I hope I state this correctly.  The

 9     agreement is, they are resting subject to the contents of

10     the binders that have been identified directly to the Court.

11     We can make our Rule 50 motions.  They can point to contents

12     of those binders in opposition to the motions, and we can

13     have our dispute about relevance or admissibility, or

14     whatever in that context.  If necessary, they can later call

15     custodial witnesses out of order, should it become

16     necessary."

17            The Court:  "Mr. Zeller, is that fair?"

18            Mr. Zeller:  "That is."

19            The Court:  "Okay."

20            Ms. Hurst:  "And the time is convenient and not

21     disruptive."

22            Now, first, I think MGA's counsel, Ms. Hurst,

23     initially stated her disinclination to create the records --

24     or to a records custodian authenticating documents that run

25     to the heart of this case, and later stipulated to only the

 1    contents of the binders.  So that leaves a pretty vague

 2    record because Mattel will probably say these are the

 3    contents of the binders contained in all of the exhibits

 4    that they are trying to get in, and regardless of the

 5    pending Rule 50 motion.  But I think it would be patently

 6    absurd, now, and prejudicial to preclude Mattel from

 7    admitting its copyright registrations and contracts and any

 8    other documents.  However, the key thing for me is exactly

 9    what Ms. Hurst alluded to, and that is percipient witnesses'

10    testimony about these documents.

11            It's simply what's been pointed out is the risk of

12    prejudice and confusion is immense if a records custodian

13    simply testifies about the documents.  As to the copyright

14    registrations, the jury may conclude that they are

15    presumptively valid even though that was the central issue

16    of fact that the jury must resolve.  Thus, I think

17    Mr. Michael Moore is the appropriate witness to testify

18    about these registrations, especially since he's already

19    testified back in mid-2002 that he was integral in the

20    process of filing these registrations.  And that should give

21    the jury the proper impression about the validity of the

22    registrations, which is at issue, and the registrations were

23    only filed in context of this litigation.

24            I think that fairly strikes a balance between the

25    binder being waived at the Court and concerning the heart of

CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

12

 1   the case.

 2              Second, as to the contracts, Alan Kaye is the

 3   proper witness.  I think that also strikes to the heart of

 4   the case, and I want to read to you from page 85 of the

 5   summary judgment order, so why don't you get that out; turn

 6   to page 85.

 7              MS. HURST:  Your Honor, while we're getting

 8   that --

 9              THE COURT:  No.  Let me finish my portion.

10              All right.  I'll read to you.  It's from the

11   summary judgment on page 85.

12              "Mattel may argue that the sample

13   makers/seamstresses engage in business -- in a business

14   competitive from Mattel, but the term "business" is

15   ambiguous.  It could refer to any activity that generates

16   revenue for the individuals, but it could also be read more

17   restrictively to refer to a competitive enterprise in which

18   Cabrera, Morales and Salazar are certainly not engaged.

19   Neither party has presented the intrinsic evidence capable

20   of resolving the ambiguity, leaving this issue for the

21   fact-finder to resolve."

22              Now, I suggest it's appropriate to get in the

23   copyright certificates, but it causes a lot of confusion in

24   this regard without the explanation because the jury is

25   going to be confused without its percipient witness about

```
 1    how these occurred, and that's what Ms. Hurst warned about
 2    in terms of the heart of the case.
 3            The second is these contracts, that's bearing the
 4    glaring deficiency.  I think it's almost ridiculous, though,
 5    to take it from Mattel on the intentional interference even
 6    at this late date.  The appeal could be preserved.  MGA may
 7    have a good appealable right.  It frankly makes very little
 8    difference because the damages are so inconsequential on
 9    this.  But everyone has been on notice that we should have
10    been dealing with these contracts, and counsel were warned
11    about that.  I don't really intend to have this case come
12    spinning back from the Circuit on that minutia.
13            Finally, I don't like the state of this record.
14    Three binders were being discussed between the parties.
15    They were apparently presented to the Court.  I didn't go
16    through those page by page, thousands of documents, and I'm
17    certain Mattel will represent that all these documents were
18    in the three binders, but the custodian of records was never
19    agreed to as the proper methodology for introducing these.
20            So now you make your records, and then I want to
21    call the attorney, once again, as I promised concerning
22    Carter Bryant.
23            (Interruption in the proceedings.)
24            THE COURT:  MGA?
25            MS. HURST:  Your Honor, the copyright
```

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 14 of 90   Page ID #:317057
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

14

 1    registrations are not in the binder.

 2              THE COURT:  They are not?

 3              MS. HURST:  No.

 4              MR. ZELLER:  That's not correct.

 5              MS. HURST:  And remember, I know the Court -- they

 6    are complaining about technical requirements over there.

 7    Remember that bona fide purchaser defense where they are

 8    asserting a statutory technicality --

 9              THE COURT:  I see.

10              MS. HURST:  -- and we are entitled to assert

11    statutory technicalities or even, more important,

12    fundamental evidentiary requirements as well.  They have

13    asserted that to their advantage, and we are entitled to do

14    so as well.  We've been deprived of an entire affirmative

15    defense on the basis of a statutory technicality, your

16    Honor.

17              The copyright registrations are not in that

18    binder.  I have it here, if the Court wishes --

19              THE COURT:  Just a moment.  Were the copyright

20    registrations in the binder?

21              MR. ZELLER:  They absolutely were, along with the

22    recordation documents.  That is simply false, and she knows

23    it.  We have discussed these registrations endlessly now.

24    And the other thing I would point out, your Honor, I

25    actually think to resolve the very issue that MGA's

 1   complaining about, namely, the confusion among the jury, is

 2   that the Court could take judicial notice of the certified

 3   copies of the materials, they can be put into evidence, and

 4   we don't even have to talk to the jury about them.  And the

 5   reason I say that is because, number one, these

 6   registrations and recordations are already in the court

 7   record.  To the extent that summary -- subject matter

 8   jurisdiction is required or it needs to have the

 9   registrations and the recordations in the trial court's

10   records, they are already there.  They were admitted at the

11   first trial.  They've been admitted at other stages of the

12   litigation.  They are already a matter of record.  The only

13   issue is that they are not a matter of record in this trial

14   record.  That's it.

15            So this can be resolved very simply by the Court

16   either ruling it doesn't need to go in front of the jury,

17   that the Court's subject matter jurisdiction is satisfied

18   because we do have these registrations.  That's an issue I

19   think clearly for the Court, there is no dispute about

20   subject matter jurisdiction --

21            THE COURT:  So this can be taken from the jury?

22            MR. ZELLER:  I agree, yes.  They can be done by

23   judicial notice.

24            THE COURT:  Counsel, I know your concern.  The

25   difficulty is that if we start spinning this in front of the

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 16 of 90   Page ID #:317059
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

16

1    jury, they are going to think that the later -- I mean, you

2    understand the issue.

3              MS. HURST:  I do.

4              THE COURT:  It's going to cause some jury

5    confusion, which is why I would require a percipient

6    witness, but the stipulation that was entered into was

7    pretty vague.  I think we all have to admit where we were.

8    I mean, each of you have a legitimate argument.

9              Ms. Hurst, you have a legitimate argument that

10   this strikes to the heart.

11             Mattel, you have a legitimate argument that these

12   were all in our binders.  And I really don't want it to come

13   spinning back from the Circuit on this minutia, because just

14   quite frankly, as long as it's not confusing to the jury, it

15   just doesn't matter, but --

16             MS. HURST:  Your Honor, the Mattel copyright

17   registrations are not in the binders.

18             THE COURT:  Now how do I verify that or not?

19             MS. HURST:  MGA's copyright registrations are in

20   the MGA binders, but the Mattel copyright registrations are

21   not in the Mattel binders.  So I assume when Mr. Zeller

22   accuses me of making a falsehood, he's referring to those

23   other registrations.

24             THE COURT:  Okay.  The problem is I gave all of my

25   binders back to counsel, now.

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 17 of 90   Page ID #:317060
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

17

1          MS. HURST:  Your Honor, on the issue --

2          THE COURT:  No.  Just a moment.  That's easy to

3    resolve.  Just give me my binders back, the ones in my

4    court, right?  Right?

5          MR. ZELLER:  Right.

6          THE COURT:  Okay.  So put my three binders back.

7          MS. HURST:  These were Quinn Emanuel binders, so I

8    would ask them.

9          THE COURT:  Ask Chris to come over.

10         And I want to see those three binders that you've

11   got, and I want them kept right here in court.  I want to

12   see the Court copy of those binders.  Just put them right

13   here.

14         MR. ZELLER:  Excuse me, your Honor, I'm not sure

15   if you ever took possession of them, because I remember

16   sitting at counsel table and I had the binders, and I, at

17   various times, tried to go through them one by one, and I

18   know the Court never was inclined to do that, so --

19         THE COURT:  I just saw three binders, and I don't

20   recall going through those because we were moving on, trying

21   to keep all of the witnesses in the hallway testifying at

22   the time, so I don't recall these three binders.

23         MR. ZELLER:  It's just when you were saying the

24   Court's copy, that's what triggered this because I -- I

25   don't know --

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 18 of 90   Page ID #:317061
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

18

1           THE COURT:  Well, I'm not certain that I ever had

2       a copy.  I just saw three binders, so I assume there was a

3       copy for the Court, but I never looked through them, so I

4       don't know how to resolve this dispute between the two of

5       you.

6           MR. ZELLER:  I mean, your Honor, I would go with

7       the method I suggested, which is it's a subject matter

8       jurisdiction issue.  That's the only thing they have raised.

9       We have the certified copies right here for the Court.  They

10      can be admitted or simply the Court can take notice of the

11      fact --

12          THE COURT:  And this issue can be taken from the

13      jury?

14          MR. ZELLER:  I agree, absolutely.

15          THE COURT:  And that doesn't cause any jury

16      confusion, does it?

17          MR. ZELLER:  Right, it doesn't cause the confusion

18      because --

19          THE COURT:  Let me hear from Ms. Hurst because I

20      think her primary concern on this is simply jury confusion.

21      It looks like Mattel's registering and, therefore, they are

22      owners; therefore, the confusion because it strikes to the

23      heart of the case, the very thing you feared.

24          MS. HURST:  Yeah, and I also just don't think it's

25      right to let them rest their case and fail another element

1   of their proof and then come back and put it in later.  Call

2   me crazy, I just don't think that's right.

3           THE COURT:  I -- I understand that position.  By

4   the same token, if this were -- if these were in the

5   binders, then I've got the nebulous record with Mattel

6   saying, "Oh, we always depended upon being able to put this

7   in through our custodian."

8           Well, no, this isn't proper custodian testimony.

9   This just doesn't come rolling in, and it certainly doesn't

10  come rolling in through three young associates, let alone

11  esteemed counsel.  So I don't know how to resolve that

12  dispute between the two of you because I didn't see the

13  binders.

14          MS. HURST:  Your Honor, on the contracts as well,

15  I mean, I think that I made it clear on the record that day

16  that we were reserving on relevance and admissibility

17  without a sponsoring witness.

18          THE COURT:  Well, we are not jumping yet.  Let's

19  stay with the certificates.  One thing at a time.  That's

20  what's always happening between the parties.  Let me resolve

21  this first.

22          Now, as far as the contracts are concerned,

23  there's never been any mystery that these contracts should

24  be before the jury.  Once again, this is a de minimis amount

25  of money.  I just don't want this to come spinning back,

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 20 of 90   Page ID #:317063
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

20

1    quite frankly, from the Circuit over something that

2    everybody has realized has been in existence the entire

3    time, and in fact, for some reason, I was under the

4    impression that this has already come in through personnel

5    files.  When I check my records and started looking, they

6    had not.

7            MS. HURST:  And your Honor, it's not just a de

8    minimis amount of damages, there are no damages.  The Court

9    should grant the JMAL on this claim.  That will solve the

10   problem.  It's not going to come spinning back for granting

11   a JMAL when they've got no causation of harm, whatsoever.

12           THE COURT:  On suppression?

13           MS. HURST:  Well, no, even on just on intentional

14   interference.  No one has come here and testified that

15   Mattel was harmed in any way.  The damages expert didn't put

16   up a number.  The Court is well within its rights to just

17   grant the -- Ryan Tumaliuan, where is the evidence of harm?

18   Ana Cabrera, where is the evidence of harm to Mattel?

19           THE COURT:  It's funny you're saying that.  That's

20   exactly the issue I was going to deal with tonight and look

21   at, once again, but I was waiting, waiting and waiting.

22           Now, the problem is I don't think I want a

23   defective record that if I did grant a JMAL on this that the

24   contracts were in.  I don't like that record.  That's simply

25   a technicality.  I think that if these contracts were in

```
 1   these binders, you have the right to a complete record in
 2   that regard.
 3           MS. HURST:  Yeah, I think the contracts -- I'm not
 4   saying the contracts aren't in the binders.  There are some
 5   contracts in the binders.  I don't know if they are all in
 6   there, but there is definitely some of them is in there.
 7           THE COURT:  I'm going to assume that Mr. Zeller is
 8   correct, that the contracts are in the binders.
 9           MR. ZELLER:  They are.
10           THE COURT:  All right.  Now, that leaves the
11   certificates and it leaves the Codes of Conduct.  What is
12   surprising about the Codes of Conduct?  We've been
13   discussing those forever.  They've been read by Ms. Keller
14   over and over again to Mr. Eckert.
15           MS. HURST:  No.  These are the '95 and '99
16   employee handbooks.  '95 and '99 employee handbooks.
17           THE COURT:  No.  Let's not jump around for just a
18   moment.  Let's take them one by one, if you want to.
19           Let's go down and just go to the 2003 Code of
20   Conduct with Trueba, 8146.
21           MS. HURST:  Where is it?  What is the Court
22   referencing?  I apologize.
23           THE COURT:  Sally Dail, I thought you had a copy
24   of what they were trying to get in.
25           MS. HURST:  I do, but that's not what -- okay,
```

 1   8146.

 2          MR. MC CONVILLE:  There it is.

 3          MS. HURST:  Great.  So you want --

 4          THE COURT:  Before we go any further, I'm going to

 5   call counsel back, Mr. Peter --

 6          THE CLERK:  Bonis.

 7          THE COURT:  -- Bonis.

 8          *(Peter Bonis is present via teleconference.)*

 9          THE COURT:  Hi, Peter.

10          MR. BONIS:  Hi.

11          THE COURT:  Hi.  We're on the record still, and

12   I've got all counsel here.  Do you have any updated news for

13   us?

14          MR. BONIS:  Yeah.  Well, they can come -- they

15   need to leave from St. Louis from (inaudible).

16          THE COURT:  Okay.  Then we'll cut the two tickets

17   from St. Louis, Peter, and when would they fly out; tomorrow

18   morning?

19          MR. BONIS:  Yeah, I think that's the plan, but

20   that should get them in there sometime noon-ish, with the

21   time change and everything.

22          THE COURT:  Are they going to fly into LAX or

23   Orange County?

24          MR. BONIS:  I think they can fly -- I'm pretty

25   sure they can fly into Orange County like they did last

```
 1   time.
 2           THE COURT:  I think they can.  I've got Mr. Zeller
 3   and Ms. Hurst here.  Can we set up those two plane tickets
 4   out of St. Louis?
 5           MR. ZELLER:  Yes, sir.
 6           THE COURT:  Okay.
 7           Peter, we are going to set up those two tickets
 8   out of St. Louis.  Now, there's no -- is there any chance
 9   they can come tonight, or are they not in the condition to
10   be able to come?
11           MR. BONIS:  You know, your Honor, I -- I didn't
12   ask him --
13           THE COURT:  No, let's be safe, Peter.  Let's just
14   take it tomorrow morning out of St. Louis, but we need to
15   check flight schedules, and we need to get back to you and
16   get him out of St. Louis just as early as possible with no
17   missed flights.
18           MR. ZELLER:  And who else is coming with him?
19           THE COURT:  Who else is coming with him so we get
20   a full name so we can cut the tickets?
21           MR. BONIS:  I have the name of your -- I have the
22   name of the person who was arranging the tickets before.
23   I'll get that information to her directly.  I don't -- I'm
24   sorry, I don't know -- I don't know the (inaudible) either.
25           THE COURT:  Okay.  Listen, Peter, can we call you
```

CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

24

```
 1    about, oh, between 3:00 and 5:00 today just to make sure
 2    absolutely nothing's going wrong with this?
 3              MR. BONIS:  I'm fine with that, your Honor.
 4              The other thing is I -- I -- I made -- I -- I
 5    think the big selling point is that they're limited to those
 6    questions you read to me the other day.
 7              THE COURT:  That's correct.
 8              MR. BONIS:  I'm more concerned about that than
 9    anything else.
10              THE COURT:  No.  There's a limitation.  It's on
11    winner -- winner --
12              Mr. Quinn?
13              MR. QUINN:  Winter Wonderland.
14              THE COURT:  Winter Wonderland, and the question
15    concerning each of these documents that were neglected in
16    the first round, that's it.
17              MR. QUINN:  Your Honor?
18              MR. BONIS:  That's what I told him, and that's
19    fine, but part of it is because I think they are just afraid
20    that --
21              THE COURT:  Yeah.  Listen, Mattel has less than an
22    hour left, and the other side has -- MGA has about three
23    hours left, that's it, so --
24              Mr. Quinn, hold on.
25              Just a minute, Peter.
```

```
 1            MR. QUINN:  Your Honor, I smell a rat because I
 2   heard reference to Richard coming and the mother coming and,
 3   you know, in the first trial their depositions were played.
 4   They testified that they saw these drawings in 1998, and
 5   they were -- they did not appear live.  Did I hear from
 6   Mr. Bonis -- I noticed he didn't answer your question as to
 7   who was coming.  Did I hear earlier that Richard Irmen and
 8   his mother are coming?  Because if that's what they've got
 9   up their sleeve, then we need to talk about that.  That's
10   not surrebuttal, and I would like to know if that's the
11   plan.
12            THE COURT:  No, they are not getting on the stand.
13            MR. BONIS:  No, no, no.
14            THE COURT:  No, no, no.  The representation by
15   Peter was never that they were coming on surrebuttal.  Hold
16   on, and let's make awfully certain of that.
17            MR. BONIS:  No, no, your Honor.
18            THE COURT:  No, no, Peter.  Just a moment.  I want
19   to speak to MGA's counsel.
20            MS. HURST:  We'll be happy to stipulate that
21   neither of them are testifying if Mattel does as well.
22            THE COURT:  Yeah, so you don't have to worry about
23   the rat anymore, okay, Peter?  It's all fine.  I'm just
24   joking with you.  But they can bring whoever, you know, they
25   want to support him.  I would just suggest, though, that
```

 1    really the -- the parties are out of time, quite frankly.

 2    This is case is basically over, but this is -- and this

 3    is -- this is one witness who has to testify about these

 4    drawings, or my feeling is that if it I was on the Circuit,

 5    I would be wondering why.  Quite frankly, it was a mistake

 6    on Mattel's part.  They had the originals.  They used either

 7    inadvertently, or whatever, some duplicate black and whites,

 8    and the originals were sitting right back in the -- from the

 9    first trial, but it's a silly thing to have to do all of

10    this over again, Peter, because of a couple drawings.

11              MR. BONIS:  Anyway, as long as that's it at this

12    point.  I don't --

13              THE COURT:  That's it.

14              MR. BONIS:  I'm just afraid he's going to spend

15    another three days on the stand.

16              THE COURT:  No, he's not here for three days,

17    believe me.  If you get him by noon, he's done.

18              MR. BONIS:  Okay.

19              THE COURT:  But he has to be here, Peter.  I mean,

20    there's two ways to do it, and I just wanted to thank you

21    that I didn't have to do it the unpleasant way.

22              MR. BONIS:  That's fine.

23              THE COURT:  Okay.  Now, I'll represent to you that

24    I will continue to hold the warrant.  I don't want the drama

25    of the warrant issuing, then the press picks it up, quite

 1   frankly, and, you know, off we go.

 2             MR. BONIS:  Okay.

 3             THE COURT:  Okay?

 4             MR. BONIS:  I'll be there tomorrow.

 5             THE COURT:  That's terrific.  I look forward to

 6   seeing you, and, once again on the record, I just want to

 7   express my deep appreciation.

 8             I'll look for you about 1:00, then, right?

 9             MR. BONIS:  I'll go with that, your Honor.  If

10   things change I'll notify whoever it is.

11             THE COURT:  Yeah, if anything changes, I need to

12   know today because I'm literally bringing a jury back just

13   to sit, and these -- these counsel are arguing on Friday,

14   and what it's caused me to have to do now is I'm going to

15   have to instruct on Monday, because we are set up to go with

16   people coming from everywhere to hear this argument, and

17   counsel, now, are going to be disadvantaged because I'll

18   instruct after they argue.

19             MR. BONIS:  Okay.

20             THE COURT:  Okay?

21             MR. BONIS:  Okay.  I -- I don't know what -- I

22   don't know what the plane arrangements are yet, and that's

23   all.

24             THE COURT:  Well, listen, why don't we contact you

25   then, again, in an hour or so?  Nothing can go wrong on

1   this, okay?

2           MR. BONIS:  All right.  Well, I don't know what

3   the plane --

4           THE COURT:  Well, Mike, you are going to get those

5   two tickets out, two tickets --

6           MR. ZELLER:  I'm writing the e-mail right now.

7           THE COURT:  -- to St. Louis.

8           He's e-mailing now.  They're open-ended tickets,

9   okay, so -- and I don't know the flight schedule either, but

10  to get him here by noon, I don't know if anybody has

11  checked, Peter, have they?

12          MR. BONIS:  Well, no, your Honor, but when I

13  looked, there was a flight you could catch out of Missouri

14  and you changed planes, and then you got in -- you got in to

15  Orange County.

16          THE COURT:  Oh, that's great.  Thank you for

17  making that effort.  I sure appreciate it.

18          MR. BONIS:  Yeah, and so I'm anticipating that

19  that's probably still doable.

20          THE COURT:  Okay.  We'll call you between 3:00 and

21  5:00, then, Peter, just so that all of us are set to go.  I

22  just -- I can't bring the jury back and just have them sit.

23          MR. BONIS:  No, no, no.  That's fine.  No problem.

24          THE COURT:  Okay.  Thank you very much, Peter.

25          MR. BONIS:  Okay.  I'll talk to you later.

CV 04-9049-DOC – 04/06/2011 – Day 47, Vol. 3 of 4

29

```
 1              THE COURT:  I'll talk to you soon, bye bye.
 2              (Teleconference ended.)
 3         MR. ZELLER:  And my office will call him.
 4              THE COURT:  Okay.  Thank you, Mr. Zeller.
 5         All right.  Counsel, let me take a few moments.
 6    I'll have the jury sit back there.  I've heard your
 7    arguments in this regard.  Anything else you'd like to say
 8    briefly?
 9              MR. ZELLER:  If we could just get a decision,
10    then, on the copyright registrations because, frankly, that
11    is one of the main outstanding issues here.  We have the
12    originals, the certified originals here.
13         The Court will recall that it's taken judicial
14    notice of certified copies of such records at MGA's behest.
15    We actually didn't oppose that.  She suggested that somehow
16    we made an issue out of that.  We didn't oppose that.  Those
17    are proper subjects of request for judicial notice.
18              THE COURT:  I'm wondering if it just isn't wise to
19    take this issue from the jury, but that, in a sense, harms
20    MGA and their appellate rights, but by this time, there's so
21    many appealable issues for both sides that --
22              (Laughter.)
23              THE COURT:  All right.  Counsel, I'll be right
24    back with both of you.  Why don't you remain seated.
25              (Recess.)
```

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 30 of 90   Page ID #:317073
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

                                                                                            30

 1              THE COURT:  Back on the record.

 2              Now, the Codes of Conduct, et cetera, and some of

 3    these other items, let's be absolutely clear, some of this

 4    may be irrelevant.  This is a relevancy issue for the Court

 5    to decide, document by document, which we can do tonight.

 6    Is that where you both are as you stipulated to at the end

 7    of the --

 8              MS. HURST:  Where I am is that I'm -- I intend to

 9    object that some of these are not proper to come in without

10    sponsoring witness testimony or it may be inadmissible for

11    other reasons, but we are not attacking authenticity.

12    That's what we've always understood.

13              THE COURT:  But which ones are you concerned

14    about?  For instance, the contracts I would think would be a

15    concern to both of you because if the contracts simply come

16    in, one of you may want a percipient witness about what

17    these contracts allegedly mean.

18              MS. HURST:  Yes, that's one of our concerns.

19              THE COURT:  Okay.

20              MS. HURST:  These codes --

21              THE COURT:  Now, if I believed that these

22    contracts were appropriate and in the binder, the problem is

23    if your JMAL had any credence, I wouldn't want to grant -- I

24    would not want to grant a JMAL without those documents in

25    the record.  It sounds like a technicality.  By the same

1    token, if it doesn't have credence, I would be just as

2    inclined to believe that these contracts should be in the

3    record regardless.  We've referred to them time and time

4    again.  It's been a glaring deficiency, quite frankly.  I

5    wondered where they were.  But at this late date, I think

6    Mattel is prejudiced in that regard on, quite frankly, a

7    claim that has very little money, if any, and it's causing

8    confusion.  This case, quite frankly, is a trade secret

9    misappropriation copyright matter.

10            Now, any additional thoughts before I go back in

11   chambers, because when I come out, there will be a final

12   ruling.

13            MS. HURST:  I'm sorry, your Honor, but there is no

14   way that Mattel can claim prejudice from its own failure to

15   meet basic evidentiary requirements.  As the Court has said

16   repeatedly, this has been known for a long time.

17            THE COURT:  Right, but Mattel's position at the

18   end of their case was, and I read that, "We have a number of

19   documents in these three binders, and subject to, we're

20   resting."

21            Now, that creates a record that has ambiguity in

22   it.  So I want to tell both of you that I'm inclined to let

23   these contracts in, and the Circuit can deal with that if

24   there is prejudice to MGA on an appeal.  I think Mattel's

25   prejudiced in terms of these contracts always being known.

```
 1            As far as the Code of Conduct is concerned, I'm
 2   going to tell you each what I'm going to do.  I'm going to
 3   confine that to the relevant time periods, so if there is a
 4   Code of Conduct that's coming in, it's going to minimally be
 5   2002 up to some appropriate date, but it's not going to go
 6   back to 1995 or 1994 -- well, unless -- let me rethink that.
 7   If Carter Bryant was subject to a Code of Conduct that are
 8   synonymous in '95 when he first went to work, '96 and '97,
 9   it may be relevant.  Let me rethink that.
10            MS. HURST:  But that's exactly why the failure to
11   put it on with a sponsoring witness is so prejudicial to us.
12   It's too late, now, for us to do anything about that, and
13   there is no ambiguity at all about my statements that we
14   reserve the position that these documents could only come in
15   with appropriate sponsoring witnesses.
16            THE COURT:  Well, then, I don't see why Mr. Kaye,
17   which I'm foreseeing, why isn't Mr. Kaye back here
18   testifying about this or Mr. Moore?
19            MS. HURST:  This is not rebuttal.
20            THE COURT:  Okay.  Now, just a moment.  We've
21   moved again.  The argument now has gone from without an
22   appropriate sponsoring witness, and I just read you a
23   tentative thought that I would require the appropriate
24   sponsoring witness.  So now it's not rebuttal.  I hear you.
25   Assume you lose.
```

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 33 of 90   Page ID #:317076
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

33

1          MS. HURST:  We have put on our entire --

2          THE COURT:  No, I'm --

3          MS. HURST:  -- case and rested it.

4          THE COURT:  Okay.  If you want to rest on that

5    record, that will be the record.

6          MS. HURST:  We put on our entire case.  We've

7    rested our defense.  I have no idea what Alan Kaye is going

8    to come in here and say when we have three hours left and no

9    ability to get witnesses and respond to it from 1995 and

10   1999.

11         We've cross-examined every Mattel witness who

12   could have testified inconsistent with Mr. Kaye.  What's

13   that allowing them to do is come and put on one side of the

14   story and give us no ability to then systematically

15   cross-examine, either during their case or ours.  There is a

16   reason why you are supposed to put your elements of your

17   case in chief on in your case in chief, so that the defense

18   has a chance to respond.  There is no way we can respond

19   now.  It's just -- it's giving them a license to put on one

20   side of the story.

21         THE COURT:  Why isn't it sufficient that

22   Mr. Eckert testify to the Code of Conduct and why

23   shouldn't -- excuse me, the introduction of the Code of

24   Conduct be limited to what I view is the relevant time

25   frame, and that is the time of his employment when he was

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 34 of 90   Page ID #:317077
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

34

1    aware of this code in 2000?  In other words, we have a lot

2    of testimony about the Code of Conduct.  In fact, Ms. Keller

3    went over it time and time again.

4              MS. HURST:  And those have been admitted.  I'm

5    only talking about the ones that aren't in evidence, and

6    it's really the employee handbooks more than the Code of

7    Conduct, frankly.

8              THE COURT:  Okay.

9              Mr. Zeller?

10             MR. ZELLER:  It's sort of the point.  I mean,

11   they've had, as the Court is pointing out, a tremendous

12   amount of time and opportunity that they have actually used

13   to cross-examine people on these -- these documents.  By the

14   way, the Court will see, I think, that they are really

15   making a mountain out of a mole hill.  I mean, many of these

16   documents, as the Court knows, and, in fact, this is MGA's

17   whole point, they are formed documents.  They don't change

18   that much.  In fact, if you recall, Ms. Keller went through,

19   just to focus on the contracts for a moment, every version

20   of the agreements going back to 1975.  So there is not going

21   to be a surprise to show, say, for example, Maria Salazar

22   signed an inventions agreement and to put it into evidence,

23   it's that non-controversial, and it's simply to establish

24   that that's what the employee did.

25             Now, you know, MGA, I don't even want to try to

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 35 of 90   Page ID #:317078
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

35

1    pretend I understand the scope of what they want to do with

2    the witness at this stage, but the reality is is that

3    substantively, they've already done all of this.

4            THE COURT:  Why -- why is this causing a concern

5    between the two of you when my belief is that the employee

6    agreements, although I haven't seen them, are probably the

7    same for Morales and Cabrera as they are for Carter Bryant;

8    am I incorrect about that?

9            *(No audible response.)*

10           THE COURT:  Why don't we get them out and look at

11   them.

12           MR. ZELLER:  Sure.

13           MS. HURST:  Well, as your Honor has pointed out --

14           THE COURT:  No, no.  Just a moment, Counsel.  I

15   want to see them.  Enough words for a moment.

16           Would you line them up on the table over there?  I

17   want to see the Cabrera, Beatriz Morales and Maria Salazar

18   agreements, and I'd like you to get out Carter Bryant's

19   January 4th, 1999 inventions agreement.  I want to compare

20   them.  I'll be right back.

21           And Counsel, I want you both -- in fact, not

22   "want," you're ordered to come to the table and take a look

23   at each of them, and I want you to tell me if they are

24   identical or if they're different from one another.

25           MS. HURST:  Your Honor, I'm going to go use the

```
 1     restroom.  I'll be right back.

 2               (Recess.)

 3               THE COURT:  Back on the record.

 4               What year did MGA register their copyrights?

 5               MS. HURST:  MGA registered copyrights over a

 6     number of years.

 7               THE COURT:  I thought it was 2002 and 2003.

 8               MS. HURST:  No.  I think you are thinking of

 9     trademarks, your Honor.

10               THE COURT:  Okay.  Answer my question, then,

11     because I don't know.  That's why I'm asking.

12               MS. HURST:  At least beginning in 2001.

13               THE COURT:  On Bratz?

14               MS. HURST:  Right.

15               THE COURT:  What time period?

16               MS. HURST:  I mean, there were registrations, and

17     then there were amendments to registrations, and then there

18     were additional registrations.

19               THE COURT:  How were those received in evidence?

20               MS. HURST:  They weren't.

21               THE COURT:  Are they pending?

22               MS. HURST:  I think so.  That's part of my

23     problem.

24               THE COURT:  Hold on.  Are you requesting that they

25     be brought into evidence?
```

1        MS. HURST:  No, we are objecting to them being

2   brought into evidence without sponsoring witnesses to

3   explain it.

4        THE COURT:  No.  I'm talking about MGA's copyright

5   registrations.

6        MS. HURST:  We don't need those in evidence.

7        THE COURT:  Are they in evidence now?

8        MS. HURST:  Only -- no.  Only a few are.  There

9   are 505, 507, 509 and 511 are the ones that are in right

10  now, and that's all we care about.  We are not looking to

11  admit anymore.

12       THE COURT:  You were the moving party behind those

13  registrations?  In other words, you wanted those copyrights

14  into evidence?

15       MS. HURST:  No.  Actually, I think Mattel offered

16  them first during their case.

17       THE COURT:  What year did Mattel register, 2005,

18  2006?

19       MR. ZELLER:  Two time periods.  The first one was

20  2006, and then the subsequent wave of registrations was July

21  of 2008.

22       THE COURT:  So in front of the jury, if these

23  registrations come in in total, would it appear that the

24  first registration -- the first copyright registrations were

25  from MGA?

1          MR. ZELLER:  Datewise, yes.

2          THE COURT:  And the second registrations were from

3    Mattel?

4          MR. ZELLER:  Correct.

5          THE COURT:  Let me be naive and ask why either one

6    of you would want to get into that situation with a jury.

7    Jurors who are not familiar with copyright might think the

8    following, unlike lawyers.

9          It looks like MGA registered first, and if

10   copyrights mean anything, therefore ownership belongs to

11   MGA, because they are going to attach some validity to these

12   registrations, and it's going to put, potentially, Mattel in

13   the position of looking like that you were the second person

14   in.

15         Now, MGA is concerned about the confusion, but it

16   cuts both ways.

17         The First to Register Rule might apply in their

18   mind, subsequent registrations might have validity, and

19   neither one of you are going to be able to argue that

20   because there is nothing from the Copyright Office in front

21   of the jury.  Do you understand how the jurors can spin that

22   either way?

23         *(No audible response.)*

24         THE COURT:  Now, unfortunately you think like

25   lawyers, you don't think like jurors.  So I want to talk to

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 39 of 90   Page ID #:317082
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

39

1    Mr. Quinn and I want to speak to Ms. Keller only, now.

2    Since you are lead counsel, you have to argue this.

3            Do you understand the problem for the jury?

4            MR. QUINN:  I understand what -- yes, I understand

5    what the Court's described.  My understanding is that we've

6    proposed that this not be a jury issue at all, that this

7    is -- it's in the record for jurisdictional purposes, and

8    it's not something that needs to be argued or mentioned to

9    the jury.

10           THE COURT:  You only brought in the four or five

11   copyrights on the issue of Carter Bryant's attestation.

12           MR. QUINN:  You mean in terms of the registrations

13   that we brought into evidence?

14           THE COURT:  That's correct.

15           MR. QUINN:  As I recall, there were two things

16   that we did with those.  First, there were some dating

17   issues, the Court may recall --

18           THE COURT:  I do.

19           MR. QUINN:  -- there were dates.

20           And second, some were described as derivative

21   works, that the dolls were a derivative of the drawings,

22   which, of course, is our point.  And the registrations, you

23   described them in those terms, so that's why we brought in

24   those registrations.

25           THE COURT:  And if I allowed in the documents that

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 40 of 90   Page ID #:317083
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

40

```
 1   Mattel is requesting, if MGA makes the same request, why

 2   wouldn't I then allow in the documents that MGA's

 3   requesting?  It plays both ways.  You don't know what the

 4   jury is thinking.  They can think that MGA registered first,

 5   and that would be extraordinarily damaging, but if you are

 6   bringing in the copyrights in wholesale fashion, MGA has the

 7   right to bring in these copyrights in wholesale fashion.  So

 8   I want you to take a moment on both sides and really think

 9   about where you are at on that issue.  And that's one of

10   those trials within a trial that I've been trying to avoid

11   with explanations to the copyright.

12            Now, Ms. Keller, let me talk to you.

13            MS. KELLER:  Do you want me to speak?

14            THE COURT:  I do.

15            MS. KELLER:  We don't want them.  We haven't asked

16   for them, and we don't want them.  We don't think it's

17   necessary or germane to the jury.  We think it could confuse

18   them.

19            This is Mattel registering our product.  We think

20   that that cause this jury to think that they belong to

21   Mattel.  And, once again, this --

22            THE COURT:  Just a moment.  I really want Mattel

23   to think this out, because as soon as those came in, if they

24   did, if they did, I would expect MGA to counter, and while

25   all the copyright registrations in at a earlier time.
```

```
 1              MS. KELLER:  Your Honor --

 2              THE COURT:  Now just a moment.

 3              MS. KELLER:  Your Honor, there is more to our

 4    argument.

 5              THE COURT:  No.  I'm going to give you lots more

 6    in just a moment; I promise you.

 7              Mr. Zeller's been suggesting that this be taken

 8    from the jury.  In other words, we not get into this area.

 9              MR. QUINN:  As we -- yes, your Honor, and we don't

10    think it needs to go to the jury.  We don't think it needs

11    to go in the volumes of evidence that go into the jury room.

12              THE COURT:  Then why aren't you two in agreement?

13    These are --

14              MR. QUINN:  I -- I think we should be.  They are

15    saying that --

16              THE COURT:  No, no.  Just a moment.  That these

17    aren't requested by Mattel.  Remember the whole --

18              MR. QUINN:  These are requested.  We want to put

19    these in.

20              THE COURT:  I know you do.

21              MR. QUINN:  They are saying it's a subject matter

22    of jurisdictional defect if we don't have these

23    registrations in.  That's MGA's stated position.

24              THE COURT:  Can I decide that issue?

25              MR. QUINN:  Yes.
```

```
 1            THE COURT:  Can I decide this issue, to stop the
 2   confusion with the jury?
 3            MS. KELLER:  Here is the problem, if I can
 4   respond?
 5            THE COURT:  Now.
 6            MS. KELLER:  MGA filed a JMAL.  All this
 7   last-minute avalanches, as the Court calls it, and all of
 8   this running around and trying to rearrange evidence, get
 9   evidence in, pull evidence back, is because they are
10   responding to our JMAL.  Instead of writing a response, they
11   are responding with conduct trying to fix everything.  They
12   put in a copyright registration that makes it clear that
13   this was a work made for hire -- not a work made for hire.
14   They don't want that in anymore.  They want to pull it back.
15   They think they made a mistake.  They realized that because
16   of our JMAL.
17            THE COURT:  I understand.
18            MS. KELLER:  That was their decision.  This is a
19   high-powered team of lawyers from Quinn Emanuel.  They made
20   their decisions.  We've relied on their decisions.  And
21   that's been true in many different ways, your Honor.  That's
22   been true in terms of the witness lineup that we had, who we
23   planned to call, how we planned to budget and use our time
24   and what we planned to argue.  And now for them to
25   willy-nilly be trying to put in phone books full of
```

1    documents that they've left out and pull back documents that

2    they put in that they don't like is something that we don't

3    think the Court should be engaged in.

4                THE COURT:  Now, second, what about these

5    contracts, what catches the parties and causes prejudice?  I

6    understand on the intentional interference, they were never

7    submitted.  It's a glaring defect.  They are obviously

8    responding.  Mattel's responding to MGA's JMAL motion.  I've

9    always wondered where these contracts were.

10               How does this cause prejudice to MGA?  What ashame

11   that this would go to the Circuit on an intentional

12   interference claim that is so glaring and so defective.

13               MS. KELLER:  Well, it shouldn't.  The short answer

14   is it shouldn't.  It should be dumped.  They didn't make it.

15   They failed in their proof.  And what they want to do now,

16   again, is to put in these contracts with no sponsoring

17   witness, so we have no opportunity to ask these witnesses,

18   and we have shaped our case --

19               THE COURT:  No.  I understand that.

20               MS. KELLER:  We have shaped our case because at

21   the close of their evidence, they hadn't called them.  Had

22   they called them, questions could have been asked of them

23   about what these contracts meant, for example, what they

24   believed was covered, whether they thought nights and

25   weekends were covered.  The seamstresses is who I'm talking

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 44 of 90   Page ID #:317087
CV 04-9049-DOC – 04/06/2011 – Day 47, Vol. 3 of 4

44

 1    about now.

 2            THE COURT:  I know.

 3            MS. KELLER:  Whether they thought they were barred

 4    from nights and weekend work.  And so none of that came in.

 5    So now these contracts are going to come flying in with no

 6    sponsoring witness, no evidence about what the seamstresses

 7    thought they meant, and whether counsel argues it or not,

 8    and I fully intend to expect that they will, because "after

 9    all, we all know that it's common in the industry that

10    everybody understands X, Y and Z."  And even if they don't

11    argue it, people are going to see those contracts, they are

12    going to see the language in them, and I've got to say,

13    "Well, here is another example."

14            Sponsoring witnesses needed to be put on the

15    stand.  This is not a proper subject for just a housekeeping

16    custodian to do.  You know, it just isn't.  And this is --

17    at some point, I truly believe that each party should be

18    held responsible for its own failure of proof.  I mean,

19    really, how long have we had -- how long has Mattel been

20    litigating this case with the same law firm?  At some point,

21    instead of saying, "MGA, you're going to have to agree that

22    they can fix it," or that, you know, the Court's going to

23    have to fix it for them, they should be held accountable.

24            THE COURT:  How much, regardless of this constant

25    argument on MGA's part, is this intentional interference

Case 2:04-cv-09049-DOC-RNB  Document 10440  Filed 04/08/11  Page 45 of 90  Page ID #:317088
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

45

1   worth?  It's worth about two weeks.

2          Now, regardless of MGA's argument, it's worth

3   about two weeks of salary, maybe three weeks.  We're

4   fighting over, what, 25- to $50,000, at most?

5          MS. KELLER:  Right now, there is no evidence, so

6   right now --

7          THE COURT:  No, no.  I'm not going to hear that

8   for a moment.  That's not my question.  I'm asking a very

9   practical question for a moment.

10         How much are we fighting over on intentional

11  interference?  Less than $50,000, and it's causing mass

12  confusion.

13         MR. QUINN:  Well, Mr. Zeller is doing some

14  calculations, your Honor, but the short to what Ms. Keller

15  just said is that MGA agreed that what was in the binders

16  was deferred.  We didn't have to move it into our case.

17  Ms. Hurst agrees that these contracts were in the binders;

18  it's as simple as that.  There is no dispute that the

19  contracts were in the binders.

20         MS. HURST:  That is not what we agreed.

21         THE COURT:  That's not what was agreed to.

22         I'll read that right back into the record as, I

23  did over the lunchtime.  In fact, why don't we just make a

24  record, and I'll come back and get the transcript again and

25  read it to all of you one more time.

```
 1              (Recess.)

 2              THE COURT:  All right.  Let's go back on the

 3     record, then.

 4              I need to see the copyright registrations, but I

 5     want to read to you, once again, what your alleged

 6     agreements were.

 7              The parties referred during their arguments to an

 8     on-the-record stipulation that was reached at the end of

 9     Mattel's case in chief.  I want the Circuit to understand

10     that there is a disagreement concerning certain binder

11     exhibits that Mattel sought to admit into evidence, and the

12     question is, potentially, what were in those binders.

13              They were displayed to the Court, but amongst the

14     hundreds of binders I looked at, apparently those were not

15     given to the Court, or were they given to the Court?

16              MR. MC CONVILLE:  I -- I don't recall, your Honor.

17              THE COURT:  Mr. Quinn?

18              MR. QUINN:  My understanding is they were not.

19              THE COURT:  Okay.  The transcript that I re-pulled

20     read as follows:

21              The Court:  "The jury is not present.  The

22     alternates are not present.

23              Mr. Quinn:  "Your Honor, we are ready to rest

24     subject to these document custodian issues.  We have someone

25     on the Mattel side as well as on the MGA side.  We are not
```

 1   sure whether the Court wants us to rest and be prepared

 2   subject to that or whether we should be trying to nail down

 3   these custodian issues."

 4           The Court:  "It's up to the two of you."

 5           Mr. Quinn:  "We have, as the Court knows, we have

 6   been endeavoring, making efforts in that regard in

 7   conversation with MGA's counsel for some time and --"

 8           The Court:  "The record should reflect that the

 9   dispute between counsel is this:  MGA is willing to

10   stipulate to the foundation but not the authenticity,

11   Counsel?"

12           Ms. Hurst:  "It's argument about admissibility and

13   relevance."

14           The Court:  "I think that is going to be Mattel's

15   position with your documents, so it's simply a matter of

16   whether they can come into evidence or not.  It's simply a

17   matter for argument.  The relevancy of some of those

18   documents may be in question between counsel.  Frankly, I

19   don't know that is going to make any difference concerning

20   Rule 50.  In fact, my intent probably is to reserve most of

21   those, although I do want to hear from Mr. Cote and

22   Mr. Overland, certainly if you'd like, concerning Rule 50,

23   and I want to afford you a briefing schedule.  I'm open to

24   any suggestion.  Mr. Quinn and Ms. Hurst?"

25           Ms. Hurst:  "The only concern I have is that of

1   course we have been discussing large binders of MGA

2   documents, and we don't have any concern at all about those

3   in terms of foundation and their authenticity, or whatever,

4   but this is the first time I've ever heard them talking

5   about a Mattel custodian of records for their own documents.

6           "So now if we are talking about they have got a

7   whole bunch of their documents and they want to put in

8   without any sponsoring witness, I don't know what that

9   means.  As far as our documents are concerned, as we have

10  indicated, we will stipulate.  You know, it's just an

11  argument about admissibility.  We will stipulate to

12  authenticity.  It's just argument about admissibility and

13  relevance."

14          The Court:  "You keep referring to your

15  documents."

16          Ms. Hurst:  "Right."

17          The Court:  "That's a little self-serving from

18  what I'm hearing."

19          Ms. Hurst:  "No, no.  I mean MGA documents.  I

20  don't mean are in the sense of things we want to offer.  I

21  just mean things that have an MGA Bates stamp on it, that's

22  all I mean."

23          The Court:  "In other words, if it has an MGA

24  Bates stamp, and it's been turned over to Mattel, the

25  authenticity is not in question."

 1          Ms. Hurst:  "Right, with the exception of the

 2   Mexican CD, but we've been around the block on that."

 3          The Court:  "And that was not a favorable ruling

 4   to you.  I received that."

 5          Ms. Hurst:  "Correct."

 6          The Court:  "So the question is what am I going to

 7   do to let in?  Knowing Mr. Zeller and counsel, what

 8   telephone books do you have for me?  I'm just joking,

 9   Mr. Zeller.  How much material is in dispute between the two

10   of you?"

11          Mr. Zeller:  "It's the materials that I started to

12   go through.  It's probably about three binders, I would say,

13   of materials.  We've actually been talking to, I think,

14   Mr. McConville and others about both our materials and

15   theirs."

16          The Court:  "Now, would it be acceptable, then, to

17   both parties that I simply delay that receipt and that

18   discussion so we can keep the case moving, and does it make

19   any substantial difference in terms of your Rule 50?  In

20   other words, if I rule against you on behalf of Mattel, how

21   damaging is that?  And if I rule against MGA on that portion

22   of the materials, how damaging is that?

23          "What I don't want to do is to be caught in a

24   bind, and that is the expectation that this is coming in,

25   and you could have called persons to substantiate it.

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 50 of 90   Page ID #:317093
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

50

 1   That's not fair to Mattel, and MGA is going to find

 2   themselves in the same coequal position with their

 3   documents.  Meanwhile, the clock keeps running."

 4           Mr. Zeller:  "Part of it has to do with this

 5   indirect response to the Court's question about how

 6   damaging, probably the principal issue where it would be,

 7   the principal category is really this product."

 8           The Court:  "The 1,300 exhibits?"

 9           Mr. Zeller:  "Yes, in the sense of you recall in

10   summary judgment, MGA did make that into an issue about us

11   not putting all that in.  We obviously, then, dealt with it,

12   but I don't want to have a reprisal of that situation."

13           Ms. Hurst:  "We stipulated to the admissibility of

14   that.  We've gone beyond authenticity on the product.  We've

15   agreed it's coming in on behalf of both parties, and we are

16   going to set it up in the room."

17           The Court:  "By the way, I've got another room for

18   you, or even a better room.  It's actually a room that I

19   think will not only hold the jury but will also hold your

20   product."

21           And then we went on for two more pages discussing

22   the jury room, and we came back to Mr. Machado in writing a

23   letter to the judge in Mexico asking if he would release

24   Mr. Machado for a limited period to the United States.

25           Finally, this colloquy between all of you ends on

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 51 of 90   Page ID #:317094
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

51

 1    page 14 of Docket Number 10185.

 2            Ms. Hurst:  "I hope I state this correctly.  The

 3    agreement is, they are resting subject to the contents of

 4    the binders that have been identified directly to the Court.

 5    We can make our Rule 50 motions.  They can point to contents

 6    of those binders in opposition to those motions, and we can

 7    have our dispute about relevance or admissibility, or

 8    whatever in that context.  If necessary, they can later call

 9    custodial witnesses out of order, should it become

10    necessary."

11            So you're both right and you're both wrong.

12            Whatever were in those three binders, it could be

13    argued to this Court that that was an agreement.  It can

14    also be argued that that was not an agreement at all, that

15    what it was was a limited agreement as to what were in those

16    binders concerning authenticity and relevance, but that

17    percipient witnesses still had to be called concerning each

18    of these issues.

19            So now the disagreement is concerning the

20    certificates of registration, or I'm sorry, the copyright

21    registrations.  Mr. Zeller claims that those were in the

22    binders, and Ms. Hurst claims that they were not in the

23    binders; is that correct?

24            Mr. Zeller?

25            MR. ZELLER:  It is.

```
 1                  THE COURT:  Ms. Hurst?

 2                  MS. HURST:  The Mattel copyright registrations --

 3                  THE COURT:  That's right.

 4                  MS. HURST:  -- are not in the binders.

 5                  THE COURT:  Mr. Zeller?

 6                  MR. ZELLER:  These were -- actually, there was a

 7      separate binder that had nothing but our --

 8                  THE COURT:  No.  Just a moment.  In the three

 9      binders.

10                  MR. ZELLER:  Correct.

11                  THE COURT:  I want to see those three binders.

12                  MR. ZELLER:  We will have to try and find them,

13      but -- I mean, it's been a while.

14                  MS. HURST:  We have our copy right there for the

15      Court, your Honor.  They were prepared by Quinn Emanuel.

16      This is what they handed us.

17                  MR. ZELLER:  There is more than one version of

18      those binders, as Ms. Hurst knows.

19                  MS. HURST:  No.

20                  THE COURT:  Hold on.  The three binders, were

21      copyright registrations in those three binders?

22                  MR. ZELLER:  Yes, sir.  It was a separate binder

23      that had --

24                  THE COURT:  Well, so one of the three binders has

25      just copyright registrations.
```

```
 1              MR. ZELLER:  There was --

 2              THE COURT:  Will both of you come up for a moment

 3    and look at these three binders that Orrick was given.

 4              MR. ZELLER:  Well, I can tell you already these

 5    aren't the correct binders.  They are not called "Proposed

 6    MGA documents for admission to stipulation."  There were

 7    three binders of Mattel documents.  They had -- in fact, you

 8    can see right here, Volume 1 of 2, Volume 2 of 2.  This one

 9    doesn't have volume numbers on it because there were more

10    than this.

11              THE COURT:  And there are three Mattel binders?

12              MR. ZELLER:  Correct.

13              THE COURT:  Three Mattel binders?

14              MS. HURST:  No, that's not our understanding.

15              THE COURT:  Just show me the three Mattel binders.

16    That's all I need.

17              MR. ZELLER:  We'll get them.

18              THE COURT:  Good.

19              All right.  Now, the second thing is are there any

20    differences between the contracts for Morales, Salazar and

21    Cabrera and the contract that Carter Bryant signed?

22              MR. MC CONVILLE:  Yes.

23              THE COURT:  Okay.  What are those differences?

24              MR. MC CONVILLE:  Cabrera and Salazar signed

25    agreements in '95 and '96 --
```

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 54 of 90   Page ID #:317097
CV 04-9049-DOC – 04/06/2011 – Day 47, Vol. 3 of 4

54

1           THE COURT:  Did they contain the word "ideas" in

2      them?

3           MR. MC CONVILLE:  The -- no, but then Cabrera

4      later signed an '04 agreement, which had the word "ideas" in

5      it.

6           THE COURT:  Okay.  And that's the only difference

7      for Cabrera.

8           Is the '95 agreement the same as the agreement

9      that Carter Bryant signed in 1999?

10          MR. ZELLER:  The terms are identical.

11          THE COURT:  Mr. McConville?

12          MR. MC CONVILLE:  I'm sorry, which one, your

13     Honor?

14          THE COURT:  When Cabrera signed her agreement in

15     '95, are those terms identical to the terms that Carter

16     Bryant signed on January 4th of 1999; "yes" or "no"?

17          MR. MC CONVILLE:  Yes.

18          THE COURT:  Concerning Morales, when did Morales

19     sign her inventions agreement?

20          MR. ZELLER:  2000.

21          MR. MC CONVILLE:  And 2004.

22          THE COURT:  Is there any difference between the

23     2000 agreement signed by Morales and the January 4th, 1999

24     agreement signed by Carter Bryant?

25          MR. ZELLER:  No.  It's identical terms and

1    identical format.

2             THE COURT:  Mr. McConville?

3             MR. MC CONVILLE:  True, but she also has an '04

4    agreement, which is different.

5             THE COURT:  Is there any difference in

6    Cabrera's -- strike that.

7             When did Cabrera sign her agreement?

8             MR. ZELLER:  1995 was the first one.

9             THE COURT:  And Salazar?

10            MR. ZELLER:  1996.

11            THE COURT:  Salazar, any difference between the

12   agreement she signed in '96 and Carter Bryant on January 4th

13   of 1999?

14            MR. ZELLER:  The terms are identical.  Different

15   format, same terms.

16            THE COURT:  All right.  These contracts are going

17   to be received.  You can submit them through your custodian

18   of records, and if there's a dispute, you can call back a

19   percipient witness on this.

20            MS. KELLER:  Your Honor, may I just be heard?

21            THE COURT:  Yes, make your record on that.

22            MS. KELLER:  Well, these are contracts that the

23   Ninth Circuit has already found to be ambiguous and has

24   already said the interpretation of whether there is a

25   contract that covers the subject matter is to be determined

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 56 of 90   Page ID #:317099
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

56

 1    by what the parties' intentions were.

 2          We don't have the evidence of what these

 3    seamstresses' intentions were.  We don't have that.  And so

 4    there is no way to say if there is interference or not with

 5    a valid contract because Mattel has not produced evidence of

 6    that.  And putting in the contracts themselves without the

 7    sponsoring witness at this late date is really damaging.  We

 8    shaped our case based on that not having happened.

 9    That's -- we shaped our case and made our JMAL based on that

10    not having happened.

11          I think there's a potential for great confusion,

12    great prejudice to MGA by letting these come in right now.

13          THE COURT:  Well, it certainly gives you an issue

14    right for appeal.

15          MR. MC CONVILLE:  If I could supplement that as

16    well as, your Honor.  The issue with Carter Bryant related

17    to ideas, these people are accused of having secondary jobs,

18    and there is a different paragraph that relates to the

19    secondary jobs.

20          THE COURT:  No, no.  I'm going to stay now.  See,

21    we're jumping again.  I only want to talk to you about the

22    '95 or '96 contracts.  I just asked if they were the same,

23    and I received the response that they were.  Now, you are

24    saying that there is a secondary paragraph, but you are, in

25    all likelihood, referring to 2004; is that correct?

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 57 of 90   Page ID #:317100
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

57

 1          MR. MC CONVILLE:  They signed different agreements

 2   for Ms. Cabrera and Ms. Morales, they signed agreements that

 3   were similar to Carter Bryant's, and they signed ones that

 4   were different from Carter Bryant's because they signed them

 5   later.

 6          THE COURT:  I understand that.  Let me say that

 7   again.  You are now re-referencing me to 2004, aren't you?

 8          MR. MC CONVILLE:  Correct.

 9          THE COURT:  Then you could have answered that.  I

10   was very clear with my first question.  I said you're

11   jumping to 2004 --

12          MR. MC CONVILLE:  Oh, I'm sorry.

13          THE COURT:  -- and we went into a long lawyer-like

14   obfuscation, so I'm going to say it again.  We're jumping,

15   now, to 2004, and that's the added paragraph, isn't it?

16          MR. MC CONVILLE:  Yes.

17          THE COURT:  Okay.

18          MS. KELLER:  Your Honor, the prejudice to Mattel

19   would be very small in this case.  The Court's already noted

20   that in terms of dollars, very small.  The potential for

21   confusion and prejudice to MGA here is very high.

22          MR. QUINN:  Your Honor, we don't accept the

23   proposition that it's very small, as there have been

24   discussions about the -- in connection with the jury

25   instructions that the seamstresses' efforts and the tortious

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 58 of 90   Page ID #:317101
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

58

 1    interference with their contracts, the jury can conclude

 2    that that was part of the lost profits calculation that

 3    relating to the Bratz product.

 4            These contracts have been -- these very forms of

 5    contracts have been the subject of testimony.  Mr. Kaye and

 6    others were examined about this language, the exact same

 7    language.  They could have called the seamstresses.  We

 8    didn't have to call the seamstresses.  We put in through our

 9    witnesses our understanding of what these contracts mean.

10    It's the very same contracts, the very same language.

11            It was up -- you know, if they wanted to make some

12    type of argument that there was no -- that they could not be

13    liable for interference because there was no breach or there

14    was no interference, and they thought that the seamstresses'

15    intentions and understanding would contribute to their

16    argument, they could have called the seamstresses.  We

17    weren't required to call the seamstresses.  We are required

18    to put in our understanding of these contracts, which is

19    what we did.

20            And again, what these -- there's no dispute, I

21    take it, that these contracts were in those binders where --

22    you know, the issue to be discussed, as I heard it, was

23    admissibility and relevance.  There was no dispute about

24    authentication.  And I take it there is no issue about

25    relevance to these contracts.  They are clearly relevant.

1   The only issue I'm hearing is what type of witness they

2   should come in through.

3          THE COURT:  I think I'm going to send the jury

4   home in just a moment so we can discuss this.

5          Do we have any other witnesses we can call today

6   besides these --

7          MR. QUINN:  Yes.  We can call Jackie Schaffhauser,

8   who is the custodian for the invoices.

9          THE COURT:  We can also do that tomorrow.

10          MR. QUINN:  We can also do that tomorrow.

11          THE COURT:  Who else?  In other words, you are

12   basically out of time.

13          MR. QUINN:  Yes, we are, basically.

14          We can also call Ms. Scholvin, who is on the

15   Kohl's transaction.  She is the one that Mr. Meskal sends

16   the e-mail to.

17          THE COURT:  Okay.  And she's here?

18          MR. QUINN:  She's here.

19          THE COURT:  And Mr. Bryant's going to be here by

20   tomorrow afternoon, apparently.

21          So you've got Julie Scholvin, and you have two

22   potential --

23          MR. QUINN:  Jackie Schaffhauser.  She's for the

24   MyScene invoices.

25          THE COURT:  And?

Case 2:04-cv-09049-DOC-RNB  Document 10440  Filed 04/08/11  Page 60 of 90  Page ID #:317103
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

60

```
 1          MR. QUINN:  Sally Dail is the HR person.

 2          THE COURT:  And?

 3          MR. QUINN:  And then we have the --

 4          What's the lawyer's name?

 5          MR. ZELLER:  Jenesen.

 6          MR. QUINN:  Mr. Jenesen, John Jenesen, who is the

 7     lawyer who we seek to put the copyright registrations

 8     through, if that's necessary.

 9          THE COURT:  And then finally, you have --

10          MR. QUINN:  Carter Bryant.

11          THE COURT:  Now, that's way over the time period.

12          MR. QUINN:  We think we can do it in the 55

13     minutes we have left, your Honor.  57.

14          THE COURT:  Now, I want a more complete record

15     concerning the prejudice to MGA tonight, and I want to see

16     these certificates, and I want to see these three binders.

17     I also want to develop a better record, and frankly, I

18     disagree with Mattel.  I think we are talking about a de

19     minimis amount of money.  It doesn't make any difference in

20     terms of legal rulings, but this is a very limited claim,

21     probably worth no more than $50,000.

22          All right.  Is there any reason why we can't call

23     Julia Scholvin this evening, at least, and at least move

24     through her before I go back in chambers and start going

25     through these documents one by one?
```

```
 1              Now, what's going to happen to counsel is because
 2    apparently everybody is coming from everywhere to hear your
 3    final arguments on Friday.  It looks like I am going to be
 4    instructing on Monday, and you are going to be arguing on
 5    Friday, because I am not going to now change the schedule
 6    around, so we'll do our best if I can instruct beforehand,
 7    but there is no requirement that I have to.
 8              MS. KELLER:  We will have the jury instructions,
 9    though, before argument, will we not?
10              THE COURT:  We had them last night, and we'll have
11    them again tonight.
12              MS. KELLER:  A complete set of final instructions?
13              THE COURT:  Just speak to your colleague, there.
14              MS. KELLER:  No, I'm talking about --
15              THE COURT:  Oh, yeah, absolutely.  We could have
16    finalized them last night.
17              Mr. Overland?
18              MR. OVERLAND:  Can I add something to the
19    documents that are in the binders?
20              There are a number of documents there relating to
21    Mexico.  There is an objection to that on the grounds that
22    that's improper rebuttal, and there is no defense at all
23    with respect to Mexico documents.
24              THE COURT:  I understand.
25              All right.  Let's do the following.  Can we at
```

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 62 of 90   Page ID #:317105
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

62

1    least get Julie Scholvin on and off the stand today and then

2    send the jury home?  Would that be acceptable to all

3    parties?

4            Our disagreement and concerns between the parties

5    doesn't concern Julie Scholvin, certainly.

6            MS. HURST:  Yes.  Can we release Ms. Gronich,

7    then, since it sounds like they're not going to call her?

8            THE COURT:  Let's find out.

9            (Interruption in the proceedings.)

10           THE COURT:  Have her remain one more day, just in

11   case, after all this effort.

12           MS. HURST:  Well, then can we call her this

13   afternoon since she's here and ready to go?  If they're

14   going to call her, they can call her.

15           THE COURT:  Certainly.  We'll call Gronich, if you

16   are going to use her, and we're going to call Scholvin.

17   That's just a matter of common courtesy.

18           Now, let's bring in Julie Scholvin.

19           Go get the jury for me.

20           (The following proceedings is taken in the

21      presence of the jury.)

22           THE COURT:  Well, first, the jury is back in

23   session.  All counsel are present.

24           Thank you for your courtesy.

25           Counsel, thank you for your courtesy.

```
 1              First of all, let me apologize.  The delay is
 2     entirely my responsibility, and I want to inform you of
 3     that.  It has nothing do with the performance of counsel for
 4     both sides.
 5              Counsel, would you like to call your next witness
 6     in rebuttal, please.
 7              MR. QUINN:  Yes, your Honor.  We call Julie
 8     Scholvin.
 9              THE COURT:  Ms. Scholvin, if you'd step forward,
10     please.
11              And now will you raise your right hand, please.
12              JULIE SCHOLVIN, PLAINTIFFS' WITNESS, SWORN
13              THE WITNESS:  Yes, I do.
14              THE COURT:  Thank you.  If you'd walk along the
15     side of the jury railing, please, and would you be
16     comfortably seated, and after you are seated, will you state
17     your full name for the jury and then spell your last name,
18     please.
19              THE WITNESS:  My name is Julie Scholvin,
20     S-c-h-o-l-v-i-n.
21              THE COURT:  Thank you.
22              This is direct examination by Mr. Quinn on behalf
23     of Mattel.
24              MR. QUINN:  Thank you, your Honor.
25
```

CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

64

```
 1                     DIRECT EXAMINATION

 2   BY MR. QUINN:

 3   Q    You work for Mattel?

 4   A    Yes, I do.

 5   Q    And how long have you worked at Mattel?

 6   A    I worked for Mattel just over 13 years.

 7   Q    What is your position there?

 8   A    I'm a senior account manager.

 9   Q    And as a senior account manager, what do you do?

10   A    I'm a sales rep.  I sell Mattel products.

11   Q    And are there particular accounts that you're

12   responsible for?

13   A    Yes.  I'm responsible for the Kohl's account.

14   Q    And were you responsible for the Kohl's account back in

15   the 2004 time frame?

16   A    Yes, I was.

17   Q    And what are your duties with respect to Kohl's?

18   A    I work with the buyer primarily, and we pick the toys

19   that the buyer is going to list each year.

20   Q    And who makes the decisions about what toys the buyer

21   at Kohl's is going to list, as you put it?

22   A    The buyer makes the decisions.

23   Q    And in terms of shelf space, who makes the decision

24   about how much shelf space Mattel products will get?

25   A    The buyer makes that decision as well.
```

CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

65

1    Q    And who did you deal with back at Kohl's back in the

2    2004 time frame?

3    A    I worked with Tom Maskel, who was the buyer, and then I

4    also worked with Mike Johnson, who was Tom's boss.  He was

5    the divisional merchandise manager.

6    Q    If we could look at Exhibit 24828.  24828, do you

7    recognize this as an e-mail that you received from

8    Mr. Maskel back in December of 2004?

9    A    Yes, I do.

10   Q    And he indicates to you that he wants to explore a

11   potential huge opportunity with you; do you see that there?

12   A    That's correct, yes.

13   Q    He makes a -- there is a reference in here to POG

14   space.  He says, and I quote, "As you are aware, we have

15   approximately 4 feet of POG space designated for Bratz this

16   spring"; do you see that?

17   A    Yes, I do.

18   Q    What is POG space?

19   A    It refers to planogram.  A planogram is the layout of

20   the fixtures within the department.  Basically it's where

21   the toys get placed.

22   Q    So we've heard of planograms where -- which are like

23   imaginary store aisles.  Is that also referred to as the

24   aisles in the actual stores, sometimes?

25   A    Well, this is -- the planogram is primarily those

1    fixtures in department, but there is out-of-department space

2    as well.

3    Q    Okay.  So he indicates that he's got 4 feet of

4    planogram space designated for Bratz this spring.  Do you

5    know many feet of planogram space Kohl's had in its toy

6    department for a fashion dolls back in 2004?

7    A    Yes, 8 feet.

8    Q    8 feet total.

9         And if a doll is not sold in the toy department, does

10   that mean that Kohl's does not offer the doll somewhere else

11   in the department store?

12   A    No, it does not.

13   Q    Kohl's department stores are very large?

14   A    Yes, they are.

15   Q    Can you tell us how large Kohl's is?  Do you have some

16   idea?

17   A    The corporation Kohl's?

18   Q    Yes.

19   A    Yes.  It's about an 18 billion-dollar company.

20   Q    And how does that compare to Mattel?

21   A    I believe they are a 5 billion-dollar company.  They

22   are about three, three-and-a-half times larger than us.

23   Q    So getting back to places in the Kohl's department

24   store where fashion dolls can be sold, what are the places

25   besides this planogram shelving?

1    A    We have out-of-department space, so those could be

2    towers, bulk stacks, wing malls, primarily promotional

3    vehicles that we used to do featured product.

4    Q    So those are other appliances, or what do you call

5    those?

6    A    Fixtures, just other out-of-department vehicles to

7    merchandise product.

8            MR. QUINN:  Your Honor, I think this exhibit is in

9    evidence under another number, 24828.

10            THE COURT:  24828.

11            MR. MC CONVILLE:  37113.

12            MR. QUINN:  37113, thank you Mr. McConville.

13            If we can put 37113 up on the screen.  It's the

14    e-mail from Mr. Maskel.

15    BY MR. QUINN:

16    Q    So the planogram space that's in the toy department for

17    fashion dolls is not the only place where fashion dolls can

18    be displayed and sold at Kohl's?

19    A    Correct.

20    Q    Now, getting -- were you involved in negotiations with

21    Kohl's about expanding Mattel product and fashion dolls in

22    the planogram space at Kohl's?

23    A    Yes, I was.

24    Q    And what was the -- your role in those negotiations?

25    A    I worked with the buyer and then conveyed his interest

1    in expanding the space to my sales management and to our --
2    also to finance.
3    Q    And that buyer was Mr. Maskel?
4    A    Correct.
5    Q    So offering this additional space was Kohl's to
6    Mattel's, so it was Kohl's idea, not Mattel's; is that
7    through?
8    A    That's true.
9    Q    At any part of these negotiations was it ever discussed
10   that one term of the deal would be that MGA products would
11   be excluded from Kohl's?
12   A    No, that was not discussed.
13   Q    At any point in the process, was it ever discussed that
14   Bratz product would be excluded from Kohl's?
15   A    No, that was not discussed.
16   Q    If we could look at Exhibit 24004, which is in evidence
17   and placed on the screen.
18        Can you identify this document?
19   A    Yes.  This was the contract that we had in place
20   between Kohl's and Mattel for 2005 and 2006.
21   Q    It indicates in paragraph 3 that Kohl's can earn
22   $1,250,000?
23   A    Yes, that's correct.
24   Q    And what would Kohl's have to do to get that money from
25   Mattel?

1   A    Kohl's needed to maintain 8 feet of Barbie in the

2   planogram space, and they also had the specific shipping

3   milestones that they had to hit.  They had to hit

4   9.5 million in shipping in 2005 in Barbie, 10.5 million in

5   2006, and then they also, in each of those calendar years,

6   had to give us either a tower incrementally or a wing wall,

7   and then also our "Little Mommy" product needed to be listed

8   and merchandised on the back wall.

9   Q    Is there anything in this agreement that excludes or

10  prevents from carrying -- excludes or prevents Kohl's from

11  carrying any MGA product?

12  A    No, there's not.

13  Q    Or carrying from carrying Bratz product?

14  A    No, there's not.

15  Q    Or displaying or selling Bratz outside of this 8 feet

16  of planogram space?

17  A    No.

18  Q    And do you have occasion to -- and I assume you visit

19  Kohl's stores, as part of your job?

20  A    Yes.

21  Q    And back in the 2004, 2005, 2006 time frame, did you

22  visit Kohl's stores?

23  A    Yes, I did.

24  Q    And during that time frame, did you see MGA product for

25  sale in Kohl's stores?

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 70 of 90   Page ID #:317113
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

70

1    A    I did.

2    Q    Continuously?

3    A    Yes.

4    Q    Including Bratz?

5    A    Yes.

6    Q    All right.  And does -- do you know whether Kohl's does

7    business with MGA today?

8    A    Yes, they do.

9    Q    If you could look at Exhibit 26612.  This is in

10   evidence, an e-mail from Mr. Zablow, and it says -- he

11   writes, "The competitor will not be represented in their toy

12   department for two years"; do you see that?

13   A    I do.

14   Q    And what did you understand that reference to mean, to

15   the toy department for two years?

16   A    In the -- in the actual fashion doll space within the

17   8 feet.

18   Q    All right.  But not -- they weren't -- Kohl's could

19   still sell and display MGA and Bratz product elsewhere

20   outside those -- those 8 feet, correct?

21   A    Correct.

22            MR. QUINN:  Nothing further.

23            THE COURT:  Cross-examination by Mr. McConville on

24   behalf of MGA and Mr. Larian.

25

| | |
|---|---|
| 1 | **CROSS-EXAMINATION** |
| 2 | BY MR. MC CONVILLE: |
| 3 | Q    Is it Schlovin? |
| 4 | A    It's Scholvin. |
| 5 | Q    Scholvin. |
| 6 | A    Yes. |
| 7 | Q    Ms. Scholvin, the products you've seen sold by Kohl's, |
| 8 | the MGA product you've seen sold by Kohl's currently, it's |
| 9 | Little Tikes products, correct? |
| 10 | A    Correct. |
| 11 | Q    There is no Bratz dolls being sold to Kohl's currently, |
| 12 | correct? |
| 13 | A    I haven't seen them, no. |
| 14 | Q    And you are aware of your competition at Kohl's, |
| 15 | right? |
| 16 | A    Pardon me? |
| 17 | Q    You are aware of who else sells dolls at Kohl's, |
| 18 | right? |
| 19 | A    Yes. |
| 20 | Q    So let's look at Exhibit 37113, please.  This is in |
| 21 | front of you on the screen, whichever is easier for you to |
| 22 | look at. |
| 23 |      This is an e-mail that you described from Tom Maskel; |
| 24 | is that right? |
| 25 | A    Yes. |

1    Q    And you'll see what he's talking about here is -- a

2    huge opportunity for Mattel, right?

3    A    Right.

4    Q    And that he has zero love for Bratz, correct?

5    A    Correct.

6    Q    And that in his humble opinion, Bratz was a fad and is

7    done, right?

8    A    Yes.

9    Q    So in 2004, that was Mr. Maskel's statement to you,

10   right?

11   A    Right.

12   Q    And then it says, "As you are aware, we have

13   approximately 4 feet of POG space designated for Bratz this

14   spring," right?

15   A    Correct.

16   Q    And I think your testimony was that the POG space is

17   referencing the shelf space at the toy department; is that

18   right?

19   A    Yes.

20   Q    In the actual store, right?

21   A    Yeah, in the toy department footage, yes.

22   Q    In the toy department, okay, because we've had some

23   testimony about planograms being separate from the store.  I

24   just wanted to make sure I understood that.

25        The next sentence says, "What would Mattel think about

CV 04-9049-DOC – 04/06/2011 – Day 47, Vol. 3 of 4

73

```
 1    me throwing out Bratz and replacing the space with our
 2    friend Barbie," right?
 3    A    Right.
 4    Q    And at this time, did Barbie have the other 4 feet of
 5    the retail space at Kohl's?
 6    A    No.
 7    Q    There were 8 feet total?
 8    A    Oh, there's 8 feet total, yes, I'm sorry.
 9    Q    Right.  And so Barbie had the 4 feet?
10    A    Barbie had 4 feet and Bratz had 4 feet.
11    Q    Okay.  And then the next sentence is, "Here is the
12    kicker:  If I throw them out, I will need some help with
13    markdowns on old Bratz.  We can talk money later," right?
14    A    Yes.
15    Q    And then the point of this was for Mattel to take back
16    a little market share, right?
17    A    That's what it says, yes.
18    Q    And then you -- well let, me ask you this:  Who is
19    Sharon Spaulding?
20    A    Sharon Spaulding was Milt Zablow's secretary.
21    Q    Okay.  And you had conversations or communicated with
22    Sharon Spaulding about this Kohl's negotiation?
23    A    No, I did not communicate with Sharon.
24    Q    Okay.  Let's take a look at Exhibit 37112, please.
25         I don't know if that's in evidence or not, but do you
```

1    have that document in front of you?

2    A    Yes.

3    Q    Oh, it is in evidence, okay.

4         So if we take a look at this, this is an e-mail from

5    Sharon Spaulding, right?

6    A    Uh-huh.

7    Q    And it's --

8              THE COURT:  Go up to the top.  I want to see who

9    is on the top, Counsel.

10             MR. MC CONVILLE:  Sure.  I'm sorry.

11   BY MR. MC CONVILLE:

12   Q    From Sharon Spaulding to Matt Bousquette, Jerry Cleary,

13   Drew Vollero, right?

14   A    Yes.

15   Q    And cc you --

16   A    Correct.

17   Q    -- and Tamara Crum, right?

18   A    Yes.

19   Q    And the date of this e-mail is approximately six days

20   after the note you received from Tom Maskel about the huge

21   opportunity, right?

22   A    Right.

23   Q    And Sharon Spaulding, did she oftentimes send e-mails

24   on behalf of Milt Zablow?

25   A    I don't know.

1    Q    Okay, but she's Milt Zablow's secretary, is that what

2    you said?

3    A    Yes.

4    Q    Okay.  Was she involved in negotiating the Kohl's deal?

5    A    No, she wasn't.

6    Q    Okay.  So let's go to the text of this e-mail, and it

7    says, the first sentence, "Discussed incremental retail

8    presence opportunity for Kohl's with Tom Maskel," right?

9    A    Right.

10   Q    And the "incremental retail space opportunity" we're

11   talking about is the 4 feet of Bratz space, correct?

12   A    Correct.

13   Q    And then it says below it, a bullet point says, "Tired

14   of supporting a business on the downward" -- "on the

15   downward; sales just average"; is that right?  Did I read

16   that correctly?

17   A    Yes.

18   Q    And you understood that in 2004, this was Tom Maskel's

19   belief, right?

20   A    Yes.

21   Q    And do you know the most successful year for Bratz

22   sales?

23   A    I don't.

24   Q    2007, does that sound right to you?

25   A    I'm not sure.

1    Q    Okay.

2         And then we go down to the bottom, to the next line

3    that says, "Mattel opportunities, double Barbie space to

4    8 feet," right?

5    A    Yes.

6    Q    And that's what you've described, correct?

7    A    Correct.

8    Q    You also discussed the tower program, right?

9    A    Yes.

10   Q    And then it says, "This will be a two-year program"; do

11   you see that?

12   A    Yes.

13   Q    So the idea, here, was for two years, Barbie would

14   replace Bratz on the shelf, right?

15   A    Yes, we were expanding the Barbie space to 8 feet for

16   the two-year period.

17   Q    And then it goes on to say that, "The competition will

18   not be represented in the toy department," right?

19   A    Yes.

20   Q    So the idea, here, was to exclude Bratz from Kohl's toy

21   department, right?

22   A    No, the idea was never to exclude Bratz or MGA.  It was

23   to expand Barbie.

24   Q    And you understood there were 8 feet total of space,

25   right?

1    A    In the -- in the planogram in the fashion doll section,

2    yes.

3    Q    Right.  So there's 8 feet total space for the dolls to

4    be sold in the toy department, right?

5    A    Right.

6    Q    And 4 feet belonged to Barbie in 2004, right?

7    A    Right.

8    Q    And 4 feet belonged to Bratz in 2004, correct?

9    A    Correct.

10   Q    And what we are discussing here is an opportunity to

11   increase Barbie's space by 4 feet, right?

12   A    Right.

13   Q    And that would mean that Bratz would no longer be on

14   those 4 feet, correct?

15   A    In that 4 feet, correct.

16   Q    And then if we go down to the -- under "requests," it

17   says, "Seeks to cover '04 margin shortfall 1 point" -- or

18   "1,274," I think that's millions; do you think that's right?

19   A    Yes.

20   Q    So it's 1,274,000, "Seeks markdown money to make room

21   for Barbie," right?

22   A    Yes.

23   Q    340,000?

24   A    Correct.

25   Q    For a total offer of that Kohl's is suggesting to

1   Mattel of $1,614,000, right?

2   A    Right.  I didn't have this specific number conversation

3   with Tom, but Milt apparently did.

4   Q    And then you'll see that the next sentence says, "The

5   competitor," and you understood the competitor at this point

6   was Bratz, correct?

7   A    Yes.

8   Q    "The competitor offered $850,000 to offset the loss,"

9   right?

10  A    Yes, that's what it says.

11  Q    So if we see the bottom note, it says, "Note, we must

12  respond no later than Monday 12/27 or they will maintain

13  competition, no extensions," right?

14  A    Yes, that's what it says.

15  Q    So the idea behind this e-mail, as you understood it,

16  was for $1.614 million, the competition would be excluded,

17  right?

18  A    No, that's not correct.

19  Q    And then ultimately, you did, in fact, reach a deal,

20  "you" being Mattel, reached a deal with Kohl's, correct?

21  A    We executed a contract together, yes.

22  Q    Right, and in the contract we -- Mattel's counsel went

23  over some of those terms of the contract with you, right?

24  A    Right.

25  Q    And he asked you if you saw anywhere where it said that

```
 1    Bratz would be excluded, right?

 2    A    I'm sorry, did he ask me if I had seen that?

 3    Q    Let me ask a better question.

 4    A    Okay.

 5    Q    He went over the terms of the contract, right?

 6    A    Yes.

 7    Q    And he -- and he showed you portions that did not

 8    indicate that Bratz would be excluded, right?

 9    A    Right, we never had any exclusive -- exclusion terms in

10    our contract.

11    Q    I understood it was not in the contract, right?

12    A    Right.

13    Q    So the final news is in Exhibit 26612, right?

14             MR. MC CONVILLE:  If we could look at that one.

15    BY MR. MC CONVILLE:

16    Q    And this is an e-mail from Milt Zablow.  It's in

17    evidence.  And this is congratulating you on an outstanding

18    accomplishment, right?

19    A    Yes.

20    Q    And one of the outstanding accomplishments that Milt

21    Zablow describes is that the competitor will not be

22    represented in their toy department for two years, correct?

23    A    That's what it says, referring to the 8 feet of space.

24    Q    Right, because there's 8 feet total, right?

25    A    Yes.
```

CV 04-9049-DOC – 04/06/2011 – Day 47, Vol. 3 of 4

80

1    Q    And Barbie was going to take all 8 feet, right?

2    A    Right.

3    Q    And part of that agreement to get the 8 feet was to pay

4    $1.25 million, right?

5    A    Well, there are many things in the contract, not just

6    the space.  There is also the shipping milestones and the

7    other perimeters that we talked about.

8    Q    I understand.

9         Part of the terms of the agreement was that Mattel

10   would pay Kohl's 1.25 million to have all 8 feet of toy

11   space shelf, correct?

12   A    Yes.

13   Q    And although it's not reflected on the face of the

14   contract, you were congratulated on doing a great job for

15   making it happen, right?

16   A    For expanding the Barbie business, yes.

17   Q    You were asked some questions about whether or not you

18   saw Bratz dolls being sold in 2005 and 2006, right?

19   A    Right.

20   Q    You understood that that was Bratz product that Kohl's

21   had already purchased, right?

22   A    Yes.

23   Q    So it wasn't --

24   A    It was -- I'm sorry.  They were still selling through

25   the inventory, yes.

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 81 of 90   Page ID #:317124
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

81

```
 1   Q    Right, so they weren't buying new product from MGA

 2   because they were selling the old product, right?

 3   A    I know they were selling the old product, but I don't

 4   know that he -- if he did or didn't purchase any new

 5   product.

 6   Q    Have you ever heard of a doll called Lalaloopsy?

 7   A    No.

 8              MR. MC CONVILLE:  No further questions.

 9              THE COURT:  Redirect examination by Mr. Quinn on

10   behalf of Mattel.

11                    REDIRECT EXAMINATION

12   BY MR. QUINN:

13   Q    Can Kohl's decide to have -- devote more than 8 feet of

14   shelf space to fashion dolls?

15   A    Yes.

16   Q    And can Kohl's decide to enlarge the toy department?

17   A    Yes.

18   Q    And there's -- you indicated that this 8 feet of space,

19   that's not the only place where fashion dolls could be sold

20   in a Kohl's department store?

21   A    Right, that's correct.

22   Q    And Mr. McConville asked you a question about the

23   Barbie space versus the Bratz space.  Whose space is that?

24   A    It's Kohl's space.

25   Q    And does Kohl's seek, in your experience, seek to put
```

1    profitable products on its space?

2    A    Yes.

3    Q    Does Kohl's tell you what margins they are getting on

4    your products?

5    A    Yes, they do.

6    Q    And is that common in the industry that the retailer

7    will tell the manufacturer what margins they are getting?

8    A    Yes.  They give us monthly reports showing us where our

9    margin targets are.

10   Q    Both what their targets are and actually what market

11   margins they're getting on your product?

12   A    Exactly, the targets and the actual performance.

13   Q    And based on your conversations with Kohl's, do you

14   know how Bratz was performing at Kohl's?

15             MR. MC CONVILLE:  Objection.  Hearsay.

16             MR. QUINN:  State of mind, your Honor.

17             THE COURT:  Overruled.

18             You can answer that question.

19             THE WITNESS:  Tom had shared with me on several

20   occasions that Bratz was performing poorly at Kohl's.

21   BY MR. QUINN:

22   Q    And for Kohl's customers, the truth is MyScene didn't

23   do very well at Kohl's either?

24   A    That's correct.

25   Q    But Barbie did?

1   A    Barbie did.

2   Q    These tween dolls didn't do so well?

3   A    Right, our MyScene brand segment of Barbie was also not

4   performing well at Kohl's.

5   Q    And if we can go back and look at Exhibit 37112 and

6   enlarge that last line where it says, "Must respond no later

7   than Monday, December 27th, or they will maintain

8   competition, no extensions," does that -- does it make any

9   sense to you from a business standpoint that there would

10  have been such a deadline placed for December 27th with no

11  extensions?

12  A    No.  Tom and I never discussed that date, and we

13  didn't, in fact, even talk until later.

14  Q    Are you aware of any deadline that Kohl's or Mattel

15  would have faced that would have explained that deadline?

16  A    No.

17  Q    Do you believe that perhaps Mr. Zablow was trying to

18  motivate somebody within Mattel to approve this deal?

19         MR. MC CONVILLE:  Objection.  Speculative.

20         THE COURT:  Sustained.

21  BY MR. QUINN:

22  Q    Does it sometimes happen that -- would a deal like this

23  have to be approved by Mattel's finance department?

24  A    Yes.

25  Q    And does it sometimes happen that salespeople have to

```
 1    try to persuade the finance department to approve a deal?

 2    A     Yes.

 3    Q     And approve a deal quickly?

 4    A     Yes.

 5            MR. QUINN:  Nothing further.

 6            THE COURT:  Recross-examination.

 7            MR. MC CONVILLE:  Just leave that document up,

 8    please.

 9                    RECROSS-EXAMINATION

10    BY MR. MC CONVILLE:

11    Q     So let's go to that last sentence.

12          So who is Milt Zablow?

13    A     He was vice president of sales.

14    Q     Was he your boss?

15    A     Yes.

16    Q     So what your boss is communicating is that there is a

17    deadline for responding or Kohl's will maintain the

18    competition, right?

19    A     Yes.

20    Q     And the competition you understood to be MGA, right?

21    A     Correct.

22    Q     And the goal of this transaction was to make sure that

23    Mattel got all 8 feet of space at -- that Mattel got all

24    8 feet of space in the toy department for Barbie dolls,

25    right?
```

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 85 of 90   Page ID #:317128
CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

85

1    A    Yes.

2    Q    And as a result of that transaction, Mattel paid

3    $1.25 million, right?

4    A    Yes.

5    Q    And got the 8 feet of space, correct?

6    A    Yes.

7    Q    To the exclusion of Bratz, right?

8    A    Well, it was to expand Barbie, and there were other

9    perimeters involved.

10   Q    Right.  So Bratz was excluded, right?

11   A    From the 8 feet of fashion doll space, yes.

12   Q    And let me ask you this:  You know that till this day,

13   Barbie still has all 8 feet of space at Kohl's, correct?

14   A    Correct.

15         MR. MC CONVILLE:  No further questions.

16         THE COURT:  All right.  We are going to start

17   releasing witnesses, or keep releasing witnesses.

18         Can we release, Counsel?  Can we --

19         MR. QUINN:  Yes.

20         MR. MC CONVILLE:  Yes.

21         THE COURT:  Thank you very much for attending.

22   You may step down.

23         Counsel, the other witness we discussed?

24         MR. QUINN:  We can release her, your Honor.

25         THE COURT:  Okay.  Why don't you release her.

```
 1              MS. HURST:  Will do.

 2              THE COURT:  Now, I believe, subject to our

 3    discussion, that would conclude the witnesses for today.

 4              Is that correct, Mr. McConville and Mr. --

 5              MR. QUINN:  Yes, your Honor.

 6              MR. MC CONVILLE:  Yes, sir.

 7              THE COURT:  All right.

 8              I warned you we might be sending you home early,

 9    and we are going to send you home early today.  I think you

10    are going home early tomorrow also.  Well, don't count on

11    that, but I'd like to send you home early tomorrow.

12              These days are going to be chopped up today and

13    tomorrow.  You are going to have long lunch hours or short

14    lunch hours, and I can't tell yet, exactly, but the case is

15    coming to a conclusion on Thursday.  That will be your last

16    day hearing evidence.

17              You are admonished not to discuss this matter

18    amongst yourselves, nor form or express any opinion

19    concerning this case.  We'll see you tomorrow morning at

20    8:30.

21              Thank you very much.

22              (The following proceedings is taken outside

23        the presence of the jury.)

24              THE COURT:  All right.  Counsel, if you'd be

25    seated for just a moment.
```

 1            Let's send Mr. Larian and Mr. Eckert home, if

 2     they'd like to leave.

 3            Mr. Eckert, Mr. Larian, if you'd like to leave,

 4     you're more than welcome to, and you're more than welcome to

 5     stay if you'd like to.  I'll leave that to each of your

 6     choices.

 7            In a few moments, we're going to call back Carter

 8     Bryant's attorney.  I just want to make certain that

 9     whatever contact we're having, he's on the way.  I feel very

10     foolish holding a warrant if, in fact, I've got

11     representations of cooperation, and then at the last moment

12     he's not appearing.  That would cause the Court --

13            MR. ZELLER:  I understand from my office that

14     Mr. Bryant and whoever else is coming with him intend to be

15     on a plane today and will be actually arriving late tonight,

16     10:30, 10:35.

17            THE COURT:  It may be possible to call him, then,

18     as early as tomorrow morning, but we'll see.  I need to

19     speak to his attorney.

20            Is his attorney aware of this?

21            MR. ZELLER:  He is on those e-mails, yes.

22            THE COURT:  Okay.

23            Now, the second thing is I want to sort out the

24     disagreement between the two of you concerning these

25     binders, and I don't want to even make tentative rulings on

1  this for a moment, but the one tentative ruling I'm fairly

2  convinced of that I'm going to make is that the contracts

3  will be coming in.  The question is whether they come in

4  through a percipient witness and whether there's even time

5  to get a percipient witness, and that's what I've got to

6  struggle with.  And I don't think it's necessarily fair that

7  Mr. Kaye is the person without Beatriz Morales or Salazar

8  being able to respond, and both parties, of course, haven't

9  called the seamstresses.

10        Second, I'm not overly concerned about the Code of

11  Conduct.  If you represent to me that the Code of Conduct

12  was inside these binders, this has been discussed so many

13  times that it has a de minimis effect, and I'm not really

14  concerned about their admission, quite frankly.  I think

15  that that was a good faith representation.

16        I'm deeply concerned about this copyright, and I'm

17  deeply concerned about the work for hire, and what is

18  presently in front of the jury is a document labeled --

19  well, it's "Carter Bryant not work for hire."

20        What document is that?  Let's put that up on the

21  board.  In fact, I'd like to take a moment.  I'd like to see

22  and have you gather all of the copyright registrations that

23  are in evidence.

24        Ms. Hurst, you've already done that for me.  Thank

25  you.  It's appreciated.

CV 04-9049-DOC - 04/06/2011 - Day 47, Vol. 3 of 4

89

1          Now, I'd like to see all of the copyright

2    registrations -- thank you -- that Mattel proposes to put

3    into evidence.

4          MR. ZELLER:  Right here.

5          THE COURT:  Now, I'd like to see the three binders

6    for a moment, although I don't think the judicial officer

7    should be making decisions based upon disputes between

8    counsel of this nature.  I want to see the three binders.

9          MR. ZELLER:  And they are coming.

10         THE COURT:  I'll take a recess.  You just all sit

11   here until I see the three binders that you think were

12   shown.

13         *(Recess.)*

14                         -oOo-

15

16

17

18

19

20

21

22

23

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10440   Filed 04/08/11   Page 90 of 90   Page ID #:317133
CV 04-9049-DOC – 04/06/2011 – Day 47, Vol. 3 of 4

90

```
 1                          -oOo-

 2                        CERTIFICATE

 3

 4         I hereby certify that pursuant to Section 753,

 5    Title 28, United States Code, the foregoing is a true and

 6    correct transcript of the stenographically reported

 7    proceedings held in the above-entitled matter and that the

 8    transcript page format is in conformance with the

 9    regulations of the Judicial Conference of the United States.

10

11    Date:  April 7, 2011

12

13

14                      _____

15                      JANE C.S. RULE, U.S. COURT REPORTER
                        CSR NO. 9316

16

17

18

19

20

21

22

23

24

25
```