1        **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA**

3        **SOUTHERN DIVISION AT SANTA ANA**

4        HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6

MATTEL, INC., ET AL.,              )

7                                   )

            PLAINTIFFS,             )

8                                   )

            vs.                     ) CV NO. 04-9049-DOC

9                                   ) DAY 48

MGA ENTERTAINMENT, INC., ET AL.,   ) VOLUME 3 of 3

10                                  )

            DEFENDANTS.             )

11 _____ )

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                        JURY TRIAL

16                   SANTA ANA, CALIFORNIA

17                 THURSDAY, APRIL 7, 2011

18                        6:02 P.M.

19

20              **DEBORAH D. PARKER, CSR 10342**

21              **OFFICIAL COURT REPORTER**
                **UNITED STATES DISTRICT COURT**

22              **411 WEST FOURTH STREET**
                **SUITE 1-053**

23              **SANTA ANA, CALIFORNIA 92701**
                **(714) 542-8409**

24              **D.PARKER@IX.NETCOM.COM**

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1   APPEARANCES OF COUNSEL:

 2        FOR THE PLAINTIFF, MATTEL, INC.:

 3                         JOHN QUINN (NOT PRESENT)
                           WILLIAM PRICE (NOT PRESENT)
 4                         MICHAEL T. ZELLER
                           QUINN EMANUEL URQUHART
 5                         & SULLIVAN, LLP
                           865 S. FIGUEROA STREET
 6                         10TH FLOOR
                           LOS ANGELES, CALIFORNIA 90017
 7                         (213) 443-3000

 8
          FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:
 9
                           THOMAS S. MC CONVILLE
10                         ORRICK HERRINGTON & SUTCLIFFE, LLP
                           4 PARK PLAZA
11                         SUITE 1600
                           IRVINE, CALIFORNIA 92614
12                         (949) 567-6700

13
                           ANNETTE L. HURST
14                         ORRICK HERRINGTON & SUTCLIFFE, LLP
                           THE ORRICK BUILDING
15                         405 HOWARD STREET
                           SAN FRANCISCO, CALIFORNIA 94105
16                         (415) 773-5700

17
                           JENNIFER L. KELLER(NOT PRESENT)
18                         KELLER RACKAUCKAS, LLP
                           18500 VON KARMAN AVENUE
19                         SUITE 560
                           IRVINE, CALIFORNIA 92612
20                         (949) 476-8700

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1   APPEARANCES OF COUNSEL:

 2        FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

 3                              MARK E. OVERLAND (NOT PRESENT)
                               LAW OFFICES OF MARK E. OVERLAND
 4                              100 WILSHIRE BOULEVARD
                               SUITE 950
 5                              SANTA MONICA, CALIFORNIA 90401
                               (310) 459-2830
 6

 7                              ALEXANDER H. COTE (NOT PRESENT)
                               SCHEPER KIM & HARRIS, LLP
 8                              601 WEST FIFTH STREET
                               12TH FLOOR
 9                              LOS ANGELES, CALIFORNIA 90071
                               (213) 613-4660
10

11
     ALSO PRESENT:
12
                               JEANINE PISONI (NOT PRESENT)
13                              MGA ENTERTAINMENT, INC.
                               16360 ROSCOE BOULEVARD
14                              SUITE 105
                               VAN NUYS, CALIFORNIA 91406
15

16

17

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1     SANTA ANA, CALIFORNIA; THURSDAY, APRIL 7, 2011; 6:02 A.M.

 2                              -oOo-

 3         (The following proceedings were had outside the

 4          presence of the jury:)

 5               THE COURT:  Let's go on the record for a moment.

 6               I'm with Mr. Zeller and Ms. Hurst and

 7     Mr. McConville.

 8               And we're going to go through a list of items

 9     tonight, so lead counsel are in the position of argue the

10     matter tomorrow morning.

11               We're going to start with the 400 tangibles.  Both

12     counsel are checking on these tangibles to see if there's an

13     agreement; and if there is, we'll get a stipulation on the

14     record this evening.  We also want to make certain the

15     markings are correct for the tangibles, and that's really

16     between Diane and Chris, probably; right?

17               Second, there's a request concerning the

18     procedural history which is -- it's Mattel's request for

19     judicial notice regarding additional case procedure history.

20               There was an earlier stipulation by counsel, but

21     this is going to be Docket No. 1039 --

22               I'm sorry, let me do that again.  Docket

23     No. 10367.

24               Is that correct, counsel?

25               MR. ZELLER:  Yes.
```

DEBORAH D. PARKER, U.S. COURT REPORTER

```
 1            THE COURT:  All right.  And I thought the parties
 2   had entered into relevant procedural history that you were
 3   willing to stipulate to, but Mr. Quinn had asked the court
 4   to take judicial notice.
 5            MR. ZELLER:  Some additional procedural facts.
 6   Because the parties had stipulated to a procedural history
 7   up to a certain point which was, I think, the 2005.
 8            THE COURT:  And he wants to extend that beyond
 9   July 12th, 2007.
10            MR. ZELLER:  That's right.
11            THE COURT:  All right.  And he wants to extend
12   that through July 12th, Mattel's second amended answer and
13   counterclaim lodged, adding additional claims against MGA
14   Entertainment, Inc., Isaac Larian, Carter Bryant, Hong Kong
15   Limited, MGA Mexico and Gustavo Machado, a February 4th,
16   2008 court-imposed stay on all discovery, except as to the
17   claims related to the ownership of the Bratz work.  That
18   stay remaining in effect until July -- strike that,
19   January 6th, 2009, Docket 4640.
20            That's been marked as trial Exhibit 22914.  I
21   don't think 22914 came into evidence.
22            Third, April 8, 2009, Mattel's third amended
23   answer, counterclaim was lodged with the court marked Trial
24   Exhibit 24885, adding additional claims against MGA
25   Entertainment, Isaac Larian, Carter Bryant, MGA
```

1    Entertainment, MGA Mexico and Gustavo Machado.

2           The next is April 12, 2010, Mattel's fourth

3    amended answer, counterclaim lodged with the court, marked

4    Trial Exhibit 24886, adding additional claims against MGA

5    Entertainment.

6           And August 6th, 2010, MGA Entertainment filing its

7    reply to fourth amended answer and counterclaim marked as

8    Trial Exhibit No. 34961.

9           By the way, April 12, 2010, Mattel's fourth

10   amended answer, counterclaim was 24886.

11          And then attached are each of these claims.

12          Unless there's a stipulation, I would never allow

13   the claims, the amended claims in front of the jury.

14          MR. ZELLER:  I don't think that was the point.

15   It's rather the facts of these, rather than the pleadings

16   themselves.  The pleadings were simply provided.

17          THE COURT:  The pages 1 and 2 and 3, how is it

18   relevant from both your standpoint to this proceeding?  I

19   don't understand.

20          MR. ZELLER:  Well, I think one reason is, is that

21   it notes that there was another stay of the proceedings

22   which we think is relevant information to the jury knowing

23   when facts were discovered or should have been discovered.

24          I mean, there will be an assumption, I think, on

25   the jury's part that you can find out any number of things

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1   just through the legal process.

2           THE COURT:  But isn't that confusing?

3           The stay that was granted was a stay as to

4   discovery.  It wasn't a stay as to the case, from my memory.

5   Judge --

6           MR. ZELLER:  I'm talking about the second stay.

7           THE COURT:  Show me.

8           MR. ZELLER:  This was the one that was

9   February 8th, 2008 until January 6th, 2009.

10          THE COURT:  So is that the critical part?

11          MR. ZELLER:  Yes.  That's one of the --

12          THE COURT:  This is the phase two discovery stage.

13          MR. ZELLER:  Right.  The phase two discovery.

14          THE COURT:  What happened in phase two discovery?

15  That was simply a discovery stay again, just like

16  Judge Manella, wasn't it?

17          MR. ZELLER:  We have a different view about what

18  Judge Manella's stay involved.  But with respect to the

19  second stay, the one from 2008 to 2009, that was a discovery

20  stay.

21          THE COURT:  Let me take that into chambers for a

22  moment.

23          Thank you.

24          MGA's position?

25          MS. HURST:  It's irrelevant.  It's years after the

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1  latest date the jury is being asked to consider on the
 2  verdict form.  They are not considering equitable tolling.
 3  And there is no way for them to tell from this what the
 4  significance of it would be, if any.
 5          All of the claims that are at issue the court has
 6  ruled were already in the cases as of the time of that stay.
 7  So it's completely irrelevant, and it's confusing and
 8  prejudicial.
 9          THE COURT:  All right.  What's the next item of
10  evidence?  And then, I'll come back out and invite argument,
11  if I have any concerns for either of you -- by either of
12  you.
13          What's the next item that we need to look at?
14          MR. ZELLER:  The next one is the Sal Villansenor
15  production, which is Exhibit 27464.
16          THE COURT:  27464.  Could I see that?
17          MR. ZELLER:  Yes, I have a copy of it here.
18      (Pause.)
19          THE COURT:  And what is it?
20          MR. ZELLER:  The issue is, is that there is a
21  disagreement about what's been admitted.
22          At some point, Ms. Keller first did offer
23  particular pages into evidence, and I can list those for the
24  record:  Pages 4, 5, 92, 129, 158, 181 and 182.
25          THE COURT:  Okay.
```

1          MR. ZELLER:  And she said -- and we'll get the

2     transcript to reflect this.  But Ms. Keller said in front of

3     the jury that this was Sal Villansenor's personnel file, a

4     Mattel document.  In fact, it says "production."  It says

5     "entire production."

6          Then, there was an effort on MGA's part to move

7     the entirety of it into evidence and your Honor indicated

8     that it would, of course, have to be gone through.

9          Now there, apparently, there is a dispute.  MGA

10    has, I believe, taken the position -- and they can speak for

11    themselves -- at least as I understand it, they think the

12    entirety of this comes in, rather than selected pages.  We

13    think that, obviously, it would be inappropriate for the

14    entirety to come in.

15          It has information such as -- and completely

16    irrelevant information, but also Jon Corey's business card.

17    I mean, just all manner -- that, of course, has not been --

18    the history in this case has not been entire productions or

19    even entire voluminous documents come into evidence without

20    going through it really line by line.  And we just don't

21    think it's appropriate that the entirety of this comes into

22    evidence and goes back to the jury room.

23          MS. HURST:  Your Honor, on page 67, on March 22nd.

24          THE COURT:  Just a moment.  Page 67.

25          MS. HURST:  March 22nd.

10

```
 1              THE COURT:  March 22nd.

 2              MS. HURST:  Day 37, Volume II.

 3              THE COURT:  Day 37.

 4              MS. HURST:  And at 67, 15 to 22, the court

 5    received it subject to personal information, Social Security

 6    numbers and the like.  So it was only the limited sort of

 7    redactions that we've been making.

 8              MR. ZELLER:  The record will reflect --

 9              MS. HURST:  Mr. Zeller, I did not interrupt you.

10    I would appreciate it, if you would do the same.

11              MR. ZELLER:  She should read the transcript --

12              THE COURT:  I'm going to read the transcript for

13    both of you.

14              Docket number on it?  Oh, I'm sorry.

15              It's March 22, page 67; correct?

16              MS. HURST:  Right.  Volume II.

17              THE COURT:  Volume II.

18              67, 15 through 67, 22; correct?

19              MS. HURST:  Right.

20              THE COURT:  That will be easily resolved.  I'll go

21    back and read it.

22              What's the next issue?

23              MS. HURST:  Or 24.

24              MR. ZELLER:  The next issue are two of the

25    articles that were initially offered through Carey
```

1     Plunkett -- and this was the --

2              The court will recall there were three items that

3     were still in dispute:  One was the 2006 blog article; and

4     then were two newspaper articles that we had moved into

5     evidence.  The court issued an order setting up a procedure,

6     basically, requiring MGA within a certain period of time to

7     object.  They did.

8              I eventually saw that they did object.  One item

9     has now been moved into evidence through Mr. Jolicoeur; and

10    then, there are two that remain, and they are Exhibits 20315

11    which is an article from the *Wall Street Journal*, dated

12    February 17th, 2006.

13             We've redacted it so that all that remains is

14    information concerning certain products that MGA has

15    asserted are trade secret in this case.

16             And then, the second article is from *Playthings*,

17    dated February --

18             THE COURT:  What's the exhibit number on that?

19             MR. ZELLER:  This is Exhibit 20588.  And it is a

20    February 1st, 2006*, Playthings* article.  And we have

21    redacted virtually all of it.  It's a rather lengthy

22    article.

23             THE COURT:  Can I have that also?

24             MR. ZELLER:  Yes.

25             THE COURT:  I will return it to you.

```
 1              MR. ZELLER:  Let me just find that particular
 2    page, because there are several that are -- in fact, most of
 3    them are redacted.  There is one page that is not that has
 4    the salient text that's posted on it.
 5              THE COURT:  Off the record for just a moment,
 6    Deborah.
 7         (Off the record.)
 8              THE COURT:  We're on the record.
 9              On 24916, the court had previously received the
10    Moxie girl application.
11              What's your next one?
12              MR. ZELLER:  The next item was the parties'
13    exhibit lists, and I can get some examples for the court.
14              THE COURT:  No, no.  I need specifics.
15              MR. ZELLER:  I know.  And I was going to show
16    you -- if you hold on a minute.
17              MS. HURST:  While he's looking for that, here's
18    the issue.  We've stipulated to this every single week for
19    the last three months, and now they want to change all the
20    descriptions, 90 percent of the descriptions.
21              MR. ZELLER:  Well, it's not 98 percent.
22              THE CLERK:  The descriptions on the exhibit list
23    were an issue and, therefore, they can't finalize and give
24    me a final --
25              THE COURT:  Were they stipulating all the way,
```

```
 1   Kathy?

 2              THE CLERK:  This is the first I've heard.

 3              The understanding was they e-mailed a joint list

 4   every Monday to me, and they were to immediately raise per

 5   your instruction if there was any dispute.  And I've heard

 6   nothing until today.

 7              THE COURT:  So this is the first time --

 8              THE CLERK:  Until today.

 9              MR. ZELLER:  If I can explain.

10              THE COURT:  Sure.

11              MR. ZELLER:  What we were looking at was the

12   numbers of the exhibits of what was admitted and what was

13   not.  This is a document that MGA for convenience was

14   controlling, so they were writing descriptions into these,

15   which literally now have a variety argumentative

16   descriptions, such as:  *E-mail reflecting Matt Bousquette's*

17   *appropriation of confidential MGA pricing information from*

18   *TRU.*

19              These are highly argumentative.  We have raised

20   this with MGA previously, and they have refused to change

21   them.  So, I mean, from our perspective what we at least

22   made to the court, what mattered was, is this evidence in

23   evidence or not?  It was not the descriptions.  The

24   descriptions have nothing to do with the enterprise of the

25   court.
```

```
 1              Now, to the extent that this exhibit list is going
 2   to go back now to the jury --
 3              THE CLERK:  No, it doesn't.
 4              THE COURT:  Exhibit list doesn't go to the jury.
 5   The jury will never see the exhibit list.
 6              MR. ZELLER:  Then, that is not an issue.
 7              MR. MCCONVILLE:  We thought it was stipulated to,
 8   so --
 9              THE COURT:  Let's get out of this quarrel.  It's a
10   very easy one.
11              This is just an exhibit list for Kathy and the
12   court.  The description is inconsequential.  The jury will
13   never see it.
14              MR. ZELLER:  If the jury is not going to see it --
15   understanding that we don't agree with these
16   characterizations of the documents -- then that should
17   resolve it.
18              THE COURT:  Does that resolve it for MGA?
19              MR. MCCONVILLE:  Yes.
20              THE COURT:  Mr. Zeller?
21              MR. ZELLER:  Yes.
22              THE COURT:  Now, Kathy, does that resolve it for
23   the --
24              THE CLERK:  It does.  I'll go back and check on
25   the tangibles.
```

```
 1              THE COURT:  Make sure the tangibles are in order
 2     and make sure the numbering is acceptable; if not, let's get
 3     the parties out because a lot of the younger people have
 4     been doing the work back there.
 5              Next one, Mike.
 6              MR. ZELLER:  And then, the third -- the next issue
 7     is that there are three documents pertaining to Mexico that
 8     are the subject of a dispute as to what is exactly in and
 9     what isn't.
10              And if you could just bear with me.  We have them
11     here.
12          (Pause.)
13              MS. HURST:  We'll agree they're in.
14              MR. ZELLER:  What the court will recall is, is
15     that there's the CD.  And so, what --
16              THE COURT:  I've received it over MGA's objection.
17              MR. ZELLER:  Right.  The way that this was going
18     to go back to the jury was, is we -- obviously, they're not
19     going to have equipment to read it.  So the idea was that we
20     were going to print off, make hard copies of the documents
21     that were asserting our trade secrets from the CD.
22              So it's a subset of what's on the CD.  It's not
23     the whole -- it's not a printout of everything on it.  So
24     it's just the subset of what it is that we're saying are
25     trade secret, which are 35 documents, approximately.
```

```
 1              And so, of those there were three that were still
 2    in dispute in some way but, apparently, now those will --
 3              MS. HURST:  No, that's not a fair
 4    characterization.  The ones that were marked and identified
 5    and testified to about a witness, which are the three that
 6    we've just said we have no problem with.  What they are
 7    trying to do is put six boxes of paper that was never marked
 8    and identified as paper or testified to by any witness,
 9    simply because it's on the CD.  That we strenuously object
10    to.
11              THE COURT:  This will be resolved by transcript.
12    That's all I need is simply the court's ruling on that.  And
13    let me take that back.  Refer me to the pages respectively
14    where we discussed this.  Let's see what the agreements or
15    nonagreements were.  Let's see what the court's ruling was
16    at the time, okay?
17              Very simple.
18              MR. ZELLER:  This is --
19              THE COURT:  Take your time with that.  I'll be
20    right back.  I'm going to go and check the assembly room
21    down the hall, okay?
22              Just sort out those portions where that comes up
23    on the record for me, so I do know.  Simple as that.
24         (Pause.)
25              THE COURT:  We're on the record.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              I want to go through some of the nits.  No changes
 2   on the instructions; and if there is, then you'll make your
 3   record.
 4              In other words, the instructions are frozen now.
 5   But, first, in Instruction 2, there was no period at the end
 6   of the second paragraph.
 7              Can I add that period?
 8              MR. ZELLER:  Yes.
 9              THE COURT:  Instruction 2, there was an accidental
10   letter "L" in front of the word "misappropriated" in
11   paragraph 4.  I propose to delete this accidental letter.
12              MR. ZELLER:  That's fine.
13              MR. MCCONVILLE:  Yes.
14              THE COURT:  By the way, the jury never knew these
15   things.  They haven't seen the instructions yet.  I just
16   want to --
17              I did not read the abbreviation "Inc." when
18   referring to the parties in delivering Instruction 2.  So is
19   there any need to reread Instruction 2, or are you
20   satisfied?
21              MR. ZELLER:  I'm satisfied.
22              MR. MCCONVILLE:  Satisfied.
23              THE COURT:  Okay.  In Instructions 3 and 4, I
24   added the word "that" between "means," and "you" when I read
25   the instruction accidentally.  I said:  *It means that you*
```

1    *must be persuaded by the evidence,* instead of the literal

2    instruction:  *It means you must be persuaded by the*

3    *evidence.*

4            Are there any concerns by either party?

5            MR. ZELLER:  No, sir.

6            MR. MCCONVILLE:  No, sir.

7            THE COURT:  Instruction 9 –– and by the way, the

8    reason I'm tracking this, I had a law clerk, as you saw,

9    sitting here reading along, making notes, which I usually do

10   so I can correct any misstatements.

11           In instruction 9, I said:  *What they say in their*

12   *opening statements and closing arguments.*  The instruction

13   simply says "opening and closing statements."

14           Is there any concern, or would you like that

15   instruction reread?

16           MR. ZELLER:  No concerns.

17           MR. MCCONVILLE:  No concerns.

18           THE COURT:  I don't think there are going to be to

19   any of them, frankly, but I just want to make certain that

20   the literal daily transcription is acceptable.

21           In Instruction 9, my clerk noted that I added the

22   word "tomorrow" after the word "times."  I don't propose any

23   change to the written instruction.

24           Is there any concern if I added that word and the

25   transcript reflects it?

```
 1              MR. ZELLER:  No concerns.

 2              MR. MCCONVILLE:  No.

 3              THE COURT:  In paragraph three, on Instruction 9,

 4    I added the word "and" before the phrase when I give a

 5    limiting instruction.

 6              I don't propose any changes to the written

 7    instruction.  Is there any concern about adding that word

 8    during the reading?

 9              MR. MCCONVILLE:  No.

10              MR. ZELLER:  No.

11              THE COURT:  On Instruction 11, I added the word

12    "either."

13              MR. ZELLER:  I'm sorry.  Which one again?

14              THE COURT:  On Instruction 11, I added the word

15    "either" between -- on the first sentence.  I said:

16    Evidence may be either direct or circumstantial.

17              The instruction literally reads:  Evidence may be

18    direct or circumstantial.

19              Is there any concern about that?

20              MR. ZELLER:  No concerns.

21              MR. MCCONVILLE:  No.

22              THE COURT:  Instruction 17, I used the word "that"

23    in the last sentence.  I said Much weight to give to the

24    testimony of that witness and for no other reason.

25              The instruction reads:  Much weight to give to the
```

1    *testimony of the witness.*

2            I don't propose any change to the written

3    instruction.  Any concern?

4            MR. ZELLER:  No.

5            MR. MCCONVILLE:  None.

6            THE COURT:  Instruction 21, according to the

7    clerk's notes -- and, by the way, I'll have to check the

8    daily tomorrow to see if that's correct.

9            But the notes show that Instruction 21, I omitted

10   the words "in the case."  So what I read was the following:

11   *Certain charts and summaries not received in evidence have*

12   *been shown to you, in order to help explain the contents of*

13   *books, records, documents or other evidence.*

14           Now, the full sentence is "in the case."  Any

15   concern?

16           MR. ZELLER:  No.

17           MR. MCCONVILLE:  None.

18           THE COURT:  The Instruction 32, I got tired of

19   reading "HK" and started reverting to saying ""Hong Kong,"

20   because I thought it made more sense.  So that was a

21   conscious decision on my part.  I want to know if MGA feels

22   that they've been harmed or disenfranchised in any way?

23           MR. MCCONVILLE:  No, sir.

24           THE COURT:  And Mattel.  I think you would prefer

25   it, wouldn't you?

```
 1              MR. ZELLER:  No concerns.

 2              THE COURT:  Yeah.  Instruction 33, I said "the

 3    assignee" instead of "an assignee."

 4              Any concerns?

 5              MR. MCCONVILLE:  None.

 6              MR. ZELLER:  No.

 7              THE COURT:  Okay.  And Instruction 45, the word

 8    "final" appears in front of "production sculpts" in the

 9    first paragraph.

10              Just a moment.  I think that because we were

11    trying to get these instructions ready, you know, once again

12    as of 1:30, Instruction No. 45, the word "final" appears in

13    front of production sculpts in the first paragraph.

14    Possibly, Instruction 45 should not have included the word

15    "final," since the word "final" is not otherwise used in the

16    instructions to refer to those sculpts.

17              So I'm wondering if you want to delete the word

18    "final" that goes back to the jury.

19              MR. ZELLER:  Yes, we would propose that the term

20    be deleted.  I don't think there's any need to reread the

21    instruction to the jury, but I think the written version

22    should delete the term.

23              THE COURT:  And MGA?

24              MR. MCCONVILLE:  We would prefer it to say

25    "final."
```

```
 1              THE COURT:  Let me come back in just a moment on
 2    the record on that.
 3              In Instruction No. 46 -- just a moment.
 4         (Pause.)
 5              THE COURT:  Instruction 46, the written
 6    instruction included the word "claims" in paragraph 4, okay.
 7    I'm wondering if we should delete the word "claims" in the
 8    actual written instructions that go back.  I don't think
 9    that there's any harm, but I think we've read this now, and
10    I just want to see what your thoughts are.
11              MR. ZELLER:  I'm sorry.  I'm still not entirely
12    sure where this is.
13              THE COURT:  It's in Instruction 46, and it's --
14    I'm wrong.  It's not an issue.  Okay.
15              MR. MCCONVILLE:  You were asking about bolding.
16    There's bolding on that one.
17              THE COURT:  Yes, we need to unbold all this with
18    your consent.
19              MR. ZELLER:  Yes.
20              MR. MCCONVILLE:  That's fine.
21              THE COURT:  So we'll unbold.
22              In Instruction 46 -- these are just clerk notes.
23    I want to make sure that whatever you heard was appropriate.
24    I always have the clerk --
25              Mike, I always have the clerk listen when I'm
```

reading, so these are a clerk's notes.  It doesn't mean that

they're accurate.  But Rachel informed me *when listing what*

*protectable elements, do not include before the second*

*element in the list.*  I accidentally added the word "an"

before the word "expression."  So I said "an expression"

instead of "expression."

        I don't propose any changes to the written

instruction, but I want to know if you're --

        MR. MCCONVILLE:  That's fine.

        MR. ZELLER:  No concern.

        THE COURT:  Okay.  Instruction 46, I was also told

I accidentally said *conducting the second type of the*

*objective or extrinsic test.*  The word "type" was supposed

to be "step."

        So I don't propose any changes to the written

instruction, but the daily may have the word "type" instead

of "step."

        MR. ZELLER:  *Which says in conducting the second*

*step*?

        THE COURT:  Exactly.

        MR. ZELLER:  *The second type*?

        THE COURT:  Yes.

        MR. ZELLER:  No concern.

        MR. MCCONVILLE:  No concern.

        THE COURT:  Okay.  And Instruction 46, I added the

```
 1    letters "TX" before "17551."  I saw that that was just
 2    word-processed incorrectly.  So I propose to add the letters
 3    "TX" before "17551" to the written instructions.
 4              MR. MCCONVILLE:  That's fine.
 5              THE COURT:  And to always add the words "TX" when
 6    referring to an exhibit.
 7              Is that acceptable?
 8              MR. ZELLER:  It is.
 9              MR. MCCONVILLE:  Fine.
10              THE COURT:  Then I'll go back and word-process
11    that and show you that tomorrow morning when you come in.
12              In 47 and 48, which are the protectable and
13    unprotectable elements instruction, there is a disparity
14    between the location of the term "almond-shaped" that I
15    noticed when I was reading.
16              So let's go to that instruction for just a moment.
17    It appears in the "idealized features" description in
18    Instruction No. 47, but in the "exaggerated features" box of
19    Instruction -- but in the idealized --
20              Oh, I see.  In Instructions 47 and 48, which are
21    the protectable and unprotectable elements instructions,
22    there's a disparity between the location and only the
23    location -- which the jury hasn't seen yet -- of the term
24    "almond-shaped."  It appears in the "idealized features"
25    description in Instruction No. 47, but in the "exaggerated
```

```
 1   features" box of Instruction 48.

 2              So I propose to change the Instruction 48 by

 3   referring to "almond-shaped eyes" in the "idealized

 4   features" box instead of the "exaggerated features" box.

 5              MR. ZELLER:  I'm not sure I'm entirely following

 6   that.

 7              No. 47 is the one that you would revise then, so

 8   that "almond-shaped eyes" would go into the subsequent box

 9   "idealized features"?

10              Obviously, our concerns about this chart, in

11   general, we have no objection to the court --

12              THE COURT:  It's a correct reading.  It's just in

13   the wrong box.  The jury hasn't seen it yet, so I would like

14   to be consistent.

15              MR. MCCONVILLE:  That's fine.

16              THE COURT:  In addition, "high cheekbones" is

17   mentioned in Instruction No. 48 as an "idealized feature,"

18   but not in Instruction No. 47.  So I propose to have the

19   words "high cheekbones" to the list of "idealized features"

20   in Instruction 47.

21              MR. MCCONVILLE:  That's fine.

22              MR. ZELLER:  Without waiving our position overall

23   on this, we have no objection to the court conforming this

24   to make them consistent.

25              THE COURT:  Okay.  In instruction 49, I have
```

```
 1   substituted the word "analytical" for the word "analytic" in
 2   the first paragraph.  I don't propose any changes to the
 3   instruction.  But I hope when the daily record will probably
 4   reflect because I said the word "analytical" for the word
 5   "analytic."
 6              Any concerns by either party?
 7              MR. ZELLER:  No concern.
 8              MR. MCCONVILLE:  No.
 9              THE COURT:  In instruction 52, I said "First Four
10   Generation dolls" instead of "four" first.
11              I don't propose any changes to the instructions.
12              Is there any concern by either party?
13              MR. ZELLER:  No.
14              MR. MCCONVILLE:  Judge, the exhibit --
15              THE COURT:  That was 52.
16              MR. MCCONVILLE:  There was a typo we noted.
17              THE COURT:  Okay.  Excellent.  Thank you.
18              MR. MCCONVILLE:  The second paragraph that begins
19   with the word "Mattel."
20              THE COURT:  *Is entitled to recover*?
21              MR. MCCONVILLE:  *Actual damages it suffered, if
22   any,* and then after that comma, it should be "as a result."
23              THE COURT:  Thank you.  "As a result."  Okay.
24              Instruction No. 59, my clerk informed me that I
25   added the word "the" between the words "obtain" and "value".
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              So I read:  Or to people who could obtain the
 2   value from knowing it, as opposed to reading:  Or to people
 3   who could obtain value from knowing it.
 4              Is there any concern?
 5              MR. MCCONVILLE:  None.
 6              MR. ZELLER:  No.
 7              THE COURT:  In Instruction 62, I said the word
 8   "licensing" instead of "license" in No. 3.
 9              I don't propose any change to the written
10   instructions.
11              Is there any concern?
12              MR. ZELLER:  No concern.
13              MR. MCCONVILLE:  That's fine.
14              THE COURT:  In Instruction 63 for 2-A, I said the
15   word "information" instead of "knowledge."  I don't propose
16   any word to the written instruction, and I'm happy to reread
17   any of these.
18              Is there any concern on 63?
19              MR. MCCONVILLE:  No.
20              THE COURT:  Okay.  Instructions 63 and 64, there
21   should be a semicolon and the word "or" at the end of the
22   paragraph in subpoint 2-D.
23              So I'm wondering if we should add a semicolon and
24   the word "or" to the written instructions of 63 and 64?
25              MR. ZELLER:  Agreed.
```

```
 1                MR. MCCONVILLE:  That's fine.

 2                THE COURT:  Okay.  Instruction 65 in the third

 3     line, I've substituted the word "or" for "and."  I don't

 4     propose any changes, and I'm happy to reread that.

 5                So I read:  Information has independent economic

 6     value if it gives the owner an actual or potential business

 7     advantage over others who do not know the information or who

 8     could obtain economic value from its disclosure or use.

 9                It should have read who do not know the

10     information and who could obtain economic value.

11                Is there any concern by either party?

12                MR. MCCONVILLE:  None.

13                MR. ZELLER:  No concern.

14                THE COURT:  Okay.  On Instruction No. 69 --

15                Just a moment.  I want to get my clerk back, who

16     is tracking all that.

17                Just a second, Deborah.

18        (Pause.)

19                THE COURT:  Let's go back to 69.  In the paragraph

20     that starts with the word "willfully," I said "engaged," the

21     past tense form of the verb.  What I meant to say "engage,"

22     The present tense form of the verb.

23                I do not propose to change any changes to the

24     written instruction.

25                Any concern by counsel?
```

```
 1              MR. MCCONVILLE:  None.

 2              MR. ZELLER:  None.

 3              THE COURT:  Rachel, thank you for tracking me.  I

 4     want that on the record.

 5              Instruction No. 77, in the first line, I said you

 6     should elect one person, instead of "you should elect one

 7     member."

 8              I don't propose any changes.  I don't think that

 9     causes counsel any concern; but if it does, please let me

10     know.

11              MR. ZELLER:  No concern.

12              MR. MCCONVILLE:  None.

13              THE COURT:  Instruction 78, after the word

14     "bailiff" I added "or clerk."

15              And the reason I did that is sometimes the bailiff

16     takes them to lunch and normally they will inform us, but

17     sometimes he'll come and get the clerk who will go back, and

18     the bailiff doesn't literally bring it to me; Kathy or Nancy

19     someone does.

20              Any problem with that?

21              MR. MCCONVILLE:  None.

22              MR. ZELLER:  No.

23              THE COURT:  Instruction 78 -- by the way, for the

24     record and for Rachel who is here, just leave the

25     instruction as it is, okay?
```

1              Instruction 78, I added the phrase "you ask" after

2    the word "question."  It is not necessary to change the

3    written instruction.

4              Is there any concern?

5              MR. MCCONVILLE:  No concern.

6              MR. ZELLER:  No concern.

7              THE COURT:  And finally 78, I mistakenly said:  *Do*

8    *not disclose any vote count in any note to the jury*, instead

9    of:  *Do not disclose any vote count in any note to the*

10   *court.*

11             Now, I'm laughing hilariously and the record

12   should reflect that counsel thinks it's pretty funny also.

13             If you want me to reread that I think it's

14   self-explanatory, but I'm happy to.

15             MR. MCCONVILLE:  That's fine, your Honor.

16             MR. ZELLER:  We're fine with that as well.

17             THE COURT:  Thank you.

18             Well, then, I think there is one question I've got

19   on No. 46.  Let me come back and then --

20             Just a second.  I'll be right back with you.

21        *(Pause.)*

22             THE COURT:  Okay.  Mike, Annette, on Instruction

23   No. 46, I want you to track this closely.

24             Instruction 46, I accidentally included the words

25   "claims it in paragraph 4."

1        Do you see that?

2        MR. MCCONVILLE:  Yes.

3        THE COURT:  Okay.  The words "claims it" should be

4    removed and replaced with the words "has proven," because

5    the filtration of unprotectable elements should only be

6    performed as to works that Mattel actually owns.

7        MR. MCCONVILLE:  It would be, Mattel has proven it

8    owns?

9        THE COURT:  Uh-huh.

10        MR. ZELLER:  We're fine with that.

11        MR. MCCONVILLE:  That's fine.

12        THE COURT:  Now, would you like me to reread any

13    of these instructions, or the entire packet again?

14        MR. ZELLER:  No.

15        MR. MCCONVILLE:  No.

16        THE COURT:  I found it scintillating.

17        MS. HURST:  I'm almost done.  One more insert.

18        MR. MCCONVILLE:  So, Judge, we have agreed to a

19    number of non-typo-type changes.  I don't know how you want

20    us to deal with those.

21        THE COURT:  Well, let me see what those are and

22    then see if we need a rereading; and if we do, or you have

23    requests --

24        Let's go through and see what the agreements are

25    amongst counsel.

 1             And, Rachel, would you take some good notes for me

 2    as well.

 3             MR. MCCONVILLE:  Judge, do you want to go off the

 4    record?  We can show you and figure out and then put it on

 5    the record?

 6             THE COURT:  Sure.  Sure.  Rachel, why don't you

 7    come over.

 8        *(Pause.)*

 9             MR. ZELLER:  So the parties had agreed Instruction

10    No. 37, subject to the court's approval, should be modified

11    as follows:  Under subsection 2, where it says *Mattel is the*

12    *author of the work,* the following words would be inserted:

13    *Under the work made for hire, capital I, Instruction,*

14    *parenthesis, Instruction No. 39, close parenthesis.*

15             And then there was a second one, subject to the

16    court's approval, Instruction No. 74 --

17             Oh, yes.  Well, I'll come back to that.

18    Instruction No. 74, third line, should be:  *Mattel's*

19    *contractual relations with* and then insert the word "Bryant"

20    comma.

21             And then, we're going to take out the word -- same

22    instruction -- the word "Tumaliuan," T-U-M-A-L-I-U-A-N,

23    whose name will come out in every place where it appears.

24    Sometimes it's set forth as Ryan Tumaliuan.  And then

25    changes would be conformed in instances where --

```
 1              THE COURT:  Okay.  Just a moment.  Are you two
 2    stipulating to that?
 3              MR. MCCONVILLE:  Yes.
 4              MR. ZELLER:  Yes, we are.
 5              THE COURT:  Because it requires stipulation which
 6    the court granted, which is why when Mr. Zeller made the
 7    comment before I wasn't at leave to change the instruction.
 8              MR. ZELLER:  Understood.  So we have discussed it
 9    and we agree they will come out.
10              And then, his name would also come out in
11    Instruction No. 72, 74 as we discussed and then, his name
12    would also come off of the verdict form.
13              MR. MCCONVILLE:  We stipulate to those.
14         (Pause.)
15              THE COURT:  We're on the record.
16              I've heard the prior concerns.  I think the issue
17    has come down to the submission of thumb drive on the
18    Brisbois backpack.  In addition, the Machado --
19              MR. ZELLER:  CD.
20              THE COURT:  -- CD and the Businessweek article.
21              Now, tentatively, I'm inclined to hold to my
22    opinion that there is no authentication concerning the
23    Brisbois hard -- thumb drive.  And, tentatively, I think
24    that Mattel should be given access to the ability to put the
25    disc in a mode so that the jury could play that disc from
```

1    Mexico MGA offices and, tentatively, I think that you can

2    display any actual hard documents found on Trueba, Vargas,

3    on Machado's desk or inside the MGA offices.

4            But I don't think it's appropriate that 35 boxes

5    go into the jury room in a downloaded form when the fact is

6    that there was a disc that Machado was apparently working

7    off of and some hard documents that he represented that you

8    had.

9            So what would you like, on behalf of Mattel?  Do

10   you want the ability in the jury room to bring up the disc

11   for the jurors?  If so, I'm going to make certain I

12   accommodate that.

13           MR. ZELLER:  Mr. McConville and I discussed -- we

14   attempted to resolve this and come to an agreement.  At

15   least one part that we've agreed upon were that the three

16   exhibits that were bound up in this, as part of the dispute

17   and whether they were admitted, in fact, should be deemed

18   admitted.

19           THE COURT:  Which exhibits are those so I have a

20   good record?

21           MR. ZELLER:  Those are the Exhibits 7080.

22           THE COURT:  7080.

23           MR. ZELLER:  7119.

24           THE COURT:  7119.

25           MR. ZELLER:  And 8431.

```
 1              THE COURT:  8431.

 2              MR. MCCONVILLE:  8471, Mike.

 3              THE COURT:  8471.  Now, does that contain that

 4    document that was the worldwide Mattel pricing strategy

 5    global strategy?

 6              MR. ZELLER:  No, this was a different document.

 7    8471 is something that's called a 2004 plan versus actual

 8    sales.

 9              THE COURT:  Okay.  What's 7119?

10              MR. ZELLER:  That was one of those, what were

11    called bid, B-I-D, reports.

12              THE COURT:  And what was 7080?

13              MR. ZELLER:  That was another what is called bid

14    report.

15              THE COURT:  Right.  Now, what remains as a

16    dispute?  Because any hard copy document relating to Mattel

17    should be viewable by the jury and the disc should be

18    viewable, and the court is happy to supply a computer.

19              MR. ZELLER:  I think that if the -- we were

20    prepared to print off hard copies of the subset of documents

21    that are really at issue that have been received into

22    evidence, have been discussed which we think have

23    evidentiary value, so it doesn't get into the issues such as

24    photographs of -- you know, hypothetically, I mean, I don't

25    know exactly about what we would consider personal
```

1     information on this disc but, hypothetically, pictures of a

2     family member, or something.

3              So we are prepared to cut down that universe of

4     what the jury would get by way of submitting hard copy

5     exhibits along with screen shots of the files on the CD.

6     And I can provide your Honor with what this looks like.

7     That was -- that was sort of our thinking on this.

8              MGA -- This is from my discussion with

9     Mr. McConville -- is fine sending a hard copy set.  I can

10    promise the court it's not 35 boxes.  It's a much smaller

11    universe than that.  But the area of disagreement simply

12    came down to whether or not there would be a screen shot of

13    the files on the CD.

14             Now, I mean, my perspective is, is that the jury

15    would be able to see that anyway.  So I think where we end

16    up is, is that we submit the CD.

17             THE COURT:  Okay.  CD and I supply the computer.

18             MR. ZELLER:  Yes.

19             THE COURT:  Mr. McConville.

20             MR. MCCONVILLE:  That's fine, your Honor.

21             Just so I follow up on what Mr. Zeller said.  What

22    we proposed was printing up hard copies of exhibits that

23    were actually shown to witnesses from the CD.

24             THE COURT:  I will bow to your respective wisdom.

25    I just want to make certain that the jury can view the

 1    documents, but I don't want them to come into a forum where

 2    only one party is objecting.  Now, MGA has already objected.

 3    That objection has been overruled.  So we're past that

 4    point, and --

 5              With any dispute between the two of you, I was

 6    just going to supply the computer and let the disks in.

 7              MR. MCCONVILLE:  That's fine.

 8              THE COURT:  And any hard copy document where there

 9    is testimony, you and Mr. McConville should get together and

10    that should go in also.

11              MR. MCCONVILLE:  That's fine.

12              THE COURT:  Is that acceptable to both of you?

13              MR. MCCONVILLE:  Yes, sir.

14              MR. ZELLER:  Yes.

15              THE COURT:  Does that resolve that issue?

16              MR. ZELLER:  It does.

17              MR. MCCONVILLE:  I'm sorry.  I want to make sure I

18    fully understand.

19              So the hard copy documents that were referred to

20    while witnesses were on the witness stand will now not go to

21    the jury and they'll just have the CD?

22              THE COURT:  If there's a hard copy document

23    sitting on a desk, that copy goes to the jury.

24              MR. MCCONVILLE:  Okay.

25              THE COURT:  If there is a document referred to on

1    the disc but there was no hard copy sitting on the desk, the

2    jury should have the ability to view that document.

3              MR. MCCONVILLE:  On the CD?

4              THE COURT:  On the CD.

5              Now, the difficulty is -- and what I was concerned

6    about -- was you have MGA Mexico no longer in the case.  You

7    got personal photographs, potentially.  I've offered to go

8    through that so my record is complete with counsel, how many

9    times?  Three or four times?

10             Nobody has taken the court up on that.  And so,

11   you've left me in a position with providing the best access,

12   and I think the best access for Mattel is to have that

13   computer back there.

14             MR. ZELLER:  And also, your Honor, I think we

15   should be allowed to provide hard copy documents of the

16   Mattel trade secret documents that are being claimed, that

17   were shown to witnesses that are from the CD.  An example

18   would be the 2004 preliminary Barbie --

19             THE COURT:  Didn't I receive those at the time?

20             MR. ZELLER:  You did.

21             THE COURT:  If I received those documents and you

22   took them off of the computer and you showed them in court

23   in hard copy form, even though they're off the computer, I'm

24   going to allow you to do that.  I was hearing from both of

25   you that there was just going to be a general download of 35

```
 1    to 40 documents.  And my impression was that they were going
 2    to be five or six boxes that went in with extraneous
 3    material.  So every document that you referred to, even if
 4    it's on the CD, as long as I admitted it at the time, you
 5    can put that into hard copy form to the jury.
 6              In addition, you can put every actual hard copy
 7    found on somebody's desk to the jury.  In addition, I will
 8    supply a computer, if Mattel requests.
 9              MR. MCCONVILLE:  Okay.  Thank you.  That's fine.
10              We've obviously had objections to the CD's before,
11    but I understand the process.
12              Thank you.
13              THE COURT:  Now, that's one.
14              MR. ZELLER:  The second item --
15              THE COURT:  Now, the second item is this Brisbois
16    thumb drive.  And I don't believe that that is
17    authenticated, and I've continually warned the parties about
18    this.  And I have said to Mattel repeatedly, *Please either*
19    *call Brisbois,* and I've said this to MGA, *I will even supply*
20    *telephone conferencing.*
21              I've put out every potential warning in the world
22    and none of the parties have chosen to do that.  Now, I
23    understand there's a stipulation concerning the chain of
24    custody of the backpack, Brisbois hard drive.  But that does
25    not resolve authentication.
```

```
 1            The problem for the court is I think you've got
 2    independent evidence that MGA is going to object to in just
 3    a moment.
 4            Is that correct, Mr. McConville?
 5            MR. MCCONVILLE:  Yes, your Honor.
 6            THE COURT:  Excellent.  And the claim is going to
 7    be:  Judge, the best this was for Mattel was it was
 8    confidential.  The documents do not match the trade secrets.
 9            That may not be --
10            Mr. Zeller, listen to me.
11            MR. ZELLER:  I am.
12            THE COURT:  That may not be the point.  It's one
13    of the points concerning a specific trade secret, but it's
14    also the fact that the downloads are taking place.  People
15    are getting increased wages, although I refused to accept
16    Kinrich's (ph) chart for a number of reasons.  I think that
17    that's a demonstrative, and I've ruled as such.  And now I
18    have got great concerns about Kinrich's chart, because
19    Brawer is not, included, amongst others.  Regardless, that
20    ship has sailed.  Kinrich is not coming in, in terms of that
21    demonstrative.
22            But the court can't chop up this case.  I'm faced
23    with Machado and how far Mattel should be able to argue;
24    MGA, how far Kohl's should be able to argue; Brisbois, who
25    you have independent information about through de Anda and
```

1    Maryman and how far Mattel should be able to argue.  At this

2    late stage, these witnesses can't be chopped up and sliced

3    in a sense, because all of their testimony overlaps.  Much

4    of it has to do with credibility.  It's the same ruling on

5    Kohls I think that applies to Brisbois.  So you're not

6    precluded from arguing Brisbois to the jury with the

7    evidence you have, but this tape is not authenticated, and

8    I'm not going to receive it.

9            Now, third, the most difficult issue for me is the

10   *Businessweek* magazine.  Now, you know I have some concerns

11   about Mr. Moore's testimony, and I have expressed that.  But

12   that came in camera.  First, this article is being offered

13   from a *Businessweek* article that's been excised.  But I just

14   want to start with not even the admissibility, but what's

15   been excised.  I want to take the last line that still

16   remains:  *As Eckert is finding out, sometimes the best idea*

17   *is right in front of you.*

18           That is irrelevant hearsay.  And what it does is

19   by the insertion of that line, it really allows a party to

20   argue that but for Carter Bryant the impression is that the

21   idea was right in front of him, and he chose not to use it.

22   Eckert may or may not have been aware of Carter Bryant's

23   existence within the Mattel family.

24           Well, I recognize this has a duality.  The duality

25   is that I'm a little fearful tomorrow I'm going to hear

1    exactly and that is, *This happened.  See the article.*

2    *Here's the statement.*  But the court is also faced with

3    Moore's that this and the *Wall Street Journal* article put

4    him on notice, or at least suspicion, or rolling suspicion

5    that in 2003, he read this and Bratz is supposedly created

6    by Larian.  And what the article says is, quote:  *Like they*

7    *say in business school, no risk, no reward,* end of quote,

8    *says Isaac Larian, CSO of privately held MGA.  He should*

9    *know.  He got the idea from Bratz after seeing his own kids*

10   *run around in navel-bearing tops and hiphuggers.*

11            Now, it's technically hearsay.  It's being offered

12   for a nonhearsay purpose, and that's notice.  What confronts

13   the court is the realization that it may be argued in a

14   sense for the truth, although it's offered for a nonhearsay

15   purpose.  By the same token, statutes of limitations is a

16   knockout blow.  And we're dealing with statute of

17   limitations since this is a defense, in this particular

18   instance, I'm not certain that I'm going to preclude it,

19   because of for the purpose it's being offered for.

20            And there have been so many instances of not for

21   the truth of the matter asserted in different e-mails.

22   Although I'm fearful and suspicious, frankly, by the same

23   token, this is statute of limitations.  This is the end of

24   the case.

25            Now, finally, I'll talk to both of you about this,

```
 1    because this is the closest call I'm making tonight.  I
 2    don't think backpack was a close call, frankly.  And I don't
 3    believe that the Brisbois tape -- and I don't believe that
 4    the Machado disc was a close call.  This is a close call.
 5    And one of my concerns is -- and one of the things I want to
 6    compliment you about, counsel, is this:  We could have
 7    worded the jury instructions as such:  If you find on this
 8    date or before, there was -- and I'm misstating the
 9    standard, but reasonable suspicion.  And that was the second
10    question.  And if the jury found on that date or before,
11    that's the end of the case.  We never had to go on.
12              But I think it's been worded in such a way that
13    we're going to get a lot of answers to some very -- I mean,
14    great questions, I think, for society about how workers are
15    treated, what invention agreements mean, how companies
16    regard their intellectual property.  The jury -- the way
17    we've worded this in the special instruction -- will never
18    know what the implication is of what they're signing.  We'll
19    know in terms of the court's interpretation.
20              So I'm right on the fence on this, to tell you the
21    truth.  And I really want to hear from Ms. Hurst tonight,
22    and I want to hear from you because I previously precluded
23    it.  Now, I've got Mr. Moore who's testifying specifically
24    that this is one of the articles that he read.
25              So I'm going to start with Ms. Hurst, and then
```

1    I'll come to Mr. Zeller, Ms. Hurst and Mr. Zeller.

2         MS. HURST:  Your Honor, it's not -- before we even

3    get to the hearsay question, the problem is this sentence is

4    not authenticated as a statement of Isaac Larian.

5         THE COURT:  No quotes around it.

6         MS. HURST:  There's no quotes around it, and it

7    doesn't match the e-mail.

8         THE COURT:  You know, I've discarded that e-mail.

9    I don't believe it necessarily matches --

10        MS. HURST:  So --

11        THE COURT:  It doesn't matter, in other words.

12   It's either for a nonhearsay purpose, or it's hearsay.

13        MS. HURST:  Well, what I understood was that

14   Mattel was offering the e-mail to authenticate the

15   statement.  And the problem with that theory is, it simply

16   doesn't match.  And the statement is not --

17        THE COURT:  Just a moment.  Is this e-mail already

18   in evidence?

19        MS. HURST:  Yes.

20        THE COURT:  So the e-mail is already in evidence.

21   They may be arguing that tomorrow, but I doesn't -- I'm not

22   sure it matches either.

23        MS. HURST:  It doesn't.  And for the very issue

24   that we have here, it's materially different.  The e-mail

25   says:  *We describe you as an 49-year-old Iranian immigrant,*

*trained as a civil engineer, who modeled Bratz after your*

*own children who wear midriff-bearing shirts, low-rise jeans*

*and baseball caps.*

Now, this is in July of 2003.  Of course, many,

many versions of Bratz have now been released.

THE COURT:  Just a moment.  Let me play with that

concept.

What's difference or different is what the

children are wearing?

MS. HURST:  No.  No.  Please --

THE COURT:  Okay.

MS. HURST:  *Who modeled Bratz* is the difference.

In the e-mail, it says:  *Who modeled Bratz after*

*his own children.*

In the article, it says:  *He got the idea for*

*Bratz.*

That's an origin statement.  *Who modeled Bratz* is

not an origin statement.  That's, I brought out dolls who

are wearing things like my kids.  *Who got the idea for Bratz*

is an origin statement, and it's not authenticated.  And the

e-mail doesn't authenticate it.  At best, what you have here

is a reporter taking something and shaping it in a way than

in ordinary circumstances would be meaningless.  But in this

situation is meaningful.

THE COURT:  That's a distinction you draw, because

1    one of the very similarities are his children.

2           MS. HURST:  Right.  But it's true that his

3    children were involved.  So that's not really the issue.

4    The issue is:  Where did the idea come from originally?

5           And what they want to say is that this article was

6    an origin statement by Isaac Larian, dispelling the notion

7    that Carter Bryant was the creator of Bratz.  And they want

8    to even take it one step forward and argue that this was

9    deliberate and that it was an attempt to mislead Mattel and

10   others about whether Carter Bryant was the origin of Bratz.

11          It's not authenticated as a statement of

12   Isaac Larian.  Both, because it's not even in quotes but

13   also because it doesn't match the thing that they're

14   claiming can authenticate it.  So, it's extremely -- I mean,

15   it's not authenticated.  Even if it's being offered for a

16   nonhearsay purpose, it can't come in.

17          And what's worse is, you got -- you know, it's not

18   authenticated.  And then, they're going to argue that based

19   on this, Mr. Larian was trying to mislead people.  I mean,

20   that's what they did the last time.  So we know that's what

21   they're going to do.

22          And, frankly, your Honor --

23          THE COURT:  Did this article come in the last

24   trial?

25          MR. ZELLER:  Yes, it did.

```
 1              THE COURT:  Just a moment.

 2              I'm not bound by another judge's ruling.  Under

 3     what theory did the article come in at the last trial?

 4              MR. ZELLER:  It came under -- in under the theory

 5     that it was for a nonhearsay purpose; namely, showing notice

 6     and the information that Mattel had on hand during this time

 7     period in 2003 and going directly to the statute of

 8     limitations.  That's really why there is an issue here.

 9              And if I may, just one quick point.

10              THE COURT:  Let Ms. Hurst finish for just a

11     moment; and then, I'll swing back to you, I promise.

12              MS. HURST:  The other thing is, this is dated

13     July 28th.  And the Wall Street Journal article is

14     July 18th.  The Wall Street Journal article says

15     Carter Bryant is the creator of Bratz.  All due respect,

16     given the 2002 investigation, what Mr. Moore testified he

17     was already doing at this point -- which includes

18     interviewing dozens of people -- it's just not reasonable

19     for them to argue that this somehow dispelled him of his

20     notice and frankly, even if it did, it can't be laid at our

21     feet.  That's just unreasonable.  They wanted to go all the

22     way into an inauthentic, arguing we're trying to commit

23     fraud, all the way out there at the extreme, when what you

24     have, really, is an ironclad case that they've already been

25     on notice for 15, 16 months.
```

 1              And that's just really prejudicial to Mr. Larian.

 2    Because we know that concealment is one of their significant

 3    themes and that credibility is really an important issue in

 4    this case.  So they get this thing that's not authenticated,

 5    and they in effect argue that he's trying to deliberately

 6    mislead when they're already on notice by any reasonable

 7    legal measure.

 8              THE COURT:  Let me turn to Mattel.

 9              MR. ZELLER:  I mean, it's obvious from the tenor

10    of the argument and substance that what they're really

11    saying is, the jury shouldn't have this evidence.  And the

12    jury shouldn't be given a complete picture so that it can,

13    in fact, reach the conclusion that MGA is so -- feels so

14    entitled to impose upon the jury.

15              THE COURT:  Was Larian questioned about this

16    article?

17              MR. ZELLER:  I'm sorry?

18              THE COURT:  Was Larian questioned in this case

19    about this article?

20              MR. ZELLER:  I know we attempted to, and they

21    objected, so we were not allowed to.  We did question him

22    about Exhibit 4941, which is the e-mail between him and

23    Paul Palmeri, P-A-L-M-E-R-I.  And so, that was the route

24    that we ended up going, because we were not allowed because

25    of MGA's objection to ask him about the *Businessweek*

1    article.  And of course, what's critical here -- and I don't

2    want to lose sight of this -- is that MGA, of course, wants

3    to say, *This was all obvious, apparently, that they,*

4    *in fact, did steal Bratz.*  I mean, there's, obviously, a

5    dramatic tension in their positions.  We didn't steal Bratz,

6    but everyone should have known we did by 2001, or 2002.  So

7    they can make those arguments all they want to the jury.

8         The bottom line is, is that Michael Moore, who is

9    the person they put on the hot seat for this whole thing,

10   sees different pieces of information.  There's the

11   *Wall Street Journal* article, July 18th and notwithstanding

12   the fact that the cover story of the *Businessweek* article

13   was dated July 28th, 2003.  As everybody knows articles come

14   out at least a week before their cover.  So these are coming

15   out, more or less, contemporaneously and they contain two

16   potentially conflicting statements.  One of them says

17   Carter Bryant created Bratz and even suggests that, perhaps,

18   he did so as -- that there was, sort of, a fashion doll

19   contest from late 1999 and as a statement that's attributed

20   to Larian.

21        The *Businessweek* article says fairly point

22   blank -- and it doesn't matter if it's in quotes or not,

23   because it's information that's being imparted to Mr. Moore

24   that matters.  The statement that is being imported --

25   imparted, and it says:  *Isaac Larian got the idea from*

1   *Bratz, after seeing his own kids run around* and so on.

2           The jury is certainly entitled to hear that there

3   were public potentially conflicting statements about the

4   origins of Bratz at this time.  Because remember, one of the

5   key criticisms that MGA is going to make -- and this is

6   going to be tomorrow.  You will hear it tomorrow, which is:

7   *Well, Mattel sued Carter Bryant.  In April of 2004, it*

8   *certainly knew it had a claim against MGA.  That's one date*

9   *you need to pick.  Because whenever it knew that it had a*

10  *claim against Carter Bryant, it for sure knew it had one*

11  *against MGA.*

12          And, frankly, your Honor, I agree that this --

13  this is a credibility issue, and this is one reason why it's

14  important that something corroborating be put in to help

15  establish Mr. Moore's testimony.

16          THE COURT:  If it's a credibility issue concerning

17  Mr. Larian, isn't that hearsay?  If it's a credibility issue

18  concerning Mr. Moore but really notice to Mr. Moore, then

19  your argument is, it's for a nonhearsay purpose.

20          MR. ZELLER:  No.  What I'm saying is, is that the

21  jury is entitled to see the actual information that

22  Mr. Moore was receiving rather than having it filtered

23  through his testimony.  That's what's going to occur.

24          THE COURT:  And the end result is, it has to be

25  for a nonhearsay purpose.  It has to be that it put him on

1   notice in terms of the statute of limitations.

2         MR. ZELLER:  Right.  And the fact is, is that --

3   remember, I mean, ultimately, what we're trying to do is

4   look at what was the state of information that Michael Moore

5   and others had at this particular time.

6         THE COURT:  Now, I want to assume that I don't let

7   this in and that resolves it.  Now, I assume that I let this

8   in.  The problem is, if this came into evidence, the jury

9   has never been cautioned that this is for a nonhearsay

10  purpose.  Now, if I cautioned the jury, it gives it added

11  weight.  If I don't caution the jury, the end result is,

12  counsel feel free to argue that this is for the truth of the

13  matter asserted.  What should the court do then?  Should I

14  break into the argument and say, *Ladies and gentlemen, this*

15  *is not for the truth of the matter asserted*?

16         In other words, assume this came in for a moment

17  but assume it came in for the moment on notice.  Then, I

18  should be putting counsel on notice that if the argument

19  crosses over the line, if this is a truthful statement, that

20  the court should be breaking in during final argument

21  because this wasn't brought up to the court in a fashion

22  where I could receive it and caution them as I have all the

23  other documents and said, *Ladies and gentlemen of the jury,*

24  *this is hearsay.  We don't have the people here, but this*

25  *e-mail is being received* --

52

```
1          MR. ZELLER:  -- limited purpose.

2          THE COURT:  -- limited purpose.

3          So it puts the court in a position of either

4    remaining silent, which I'm not inclined to do, because

5    there is no opportunity for me to give them the same

6    admonition where counsel for the other side can get up and

7    argue, Remember the judge's instruction.  This came in.  It

8    came in a notice.  It has to do with a newspaper article.

9    It's hearsay.

10          And the other side is entitled to say, You should

11   remember that admonition.  So if I allow this in, you have

12   to be on notice that if Mr. Price gets up and tries to cross

13   the line, or Mr. Quinn, then I think the court has to

14   instruct because you've given me no other option for either

15   side.

16          Now, Judge Larson let this in.  That doesn't mean

17   that Judge Carter should.  But what I can't have is a

18   crossing of the line.  What I don't want is a record, I

19   don't want a record that the court precluded an offer based

20   upon a nonhearsay purpose that puts Mr. Moore on the record

21   concerning statute of limitations, which is a fatal blow to

22   Mattel.  But the court shouldn't be in a box either by

23   specifically instructing.  And if I specifically instruct

24   concerning this document, if I just come out of the box

25   tomorrow morning and say, By the way, last night this one
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    *article I highlighted,* it's just like a big red light.

2    That's just not appropriate, so --

3            MR. ZELLER:  One thing, perhaps -- I actually hear

4    the court's concern on this.  And one thing I would first

5    say is that when Mr. Moore was testifying about it, the

6    court did provide the admonition.  I'm not suggesting that's

7    an appropriate substitute, but the court certainly did

8    already tell the jury that this information was not for the

9    truth.  And I would agree that I think it's entirely within

10   the court's discretion.  If it appears that it's being used

11   for a hearsay purpose --

12           THE COURT:  Yeah, I just --

13           MR. ZELLER:  -- that instruction would be

14   warranted.  I frankly think it can be done in a way that's

15   not terribly dramatic.

16           THE COURT:  Well, let's just start with the easy

17   part, and this is not accepted yet.  After you both leave,

18   I'm going to go back and think about it for a while.  I want

19   some quiet time in chambers, and I'm going to excuse you

20   tonight.

21           But, minimally, you see the sentence as *Eckert is*

22   *finding out sometimes the best ideas are right in front of*

23   *you* --

24           MR. ZELLER:  We should agree.

25           THE COURT:  -- that's stricken.

```
 1              Now, the second thing is, it may have a duality
 2    but it's difficult.  Because although Ms. Hurst, you
 3    argue -- now, I'm going to turn to you for a moment.
 4              Although you argue that it's so clear about Moore,
 5    your statute of limitations is a knockout blow.  I mean,
 6    it's that important.  I initially held this out, I believe,
 7    hadn't I?
 8              MS. HURST:  I mean, your Honor, it's not a
 9    knockout blow the way the verdict form is constructed.  No
10    offense, but the latest date on there is November 2003.
11              So this is almost irrelevant from that
12    perspective.  By the time you get to November 2003, you know
13    they've got their meeting with Citywide in Hong Kong.
14    They're looking at -- I mean, this is --
15              But what it is, is it's terrible for Mr. Larian.
16    There is no way to admit this after the close of evidence
17    with a limiting instruction.  Evidence is closed.  They
18    could have raised this article any day before the close of
19    evidence and then the court would have been in a position to
20    admit it and give a very strong admonition and even explain
21    it, that it's not even, you know -- it's not even -- you
22    can't even assume Mr. Larian said this.  There is no
23    evidence that he did.  It's only for Mr. Moore's state of
24    mind.
25              But now there's no way to do that.
```

 1           THE COURT:  After I sustained the objection, when

 2     was this next brought to my attention in either written

 3     motion, or oral argument?

 4           In other words, there have been so many briefings

 5     that have come in.  I want to make certain I'm not missing a

 6     docket number.  Is this the first time that I've dealt with

 7     this *Businessweek* article since Mr. Moore referred to it?

 8           MR. ZELLER:  We have not filed a submission on it.

 9     There's no written submission on this.  But we did raise it

10     later on that same day when Mr. Moore testified.  And, by

11     the way, he didn't testify that long ago.  I don't recall

12     the exact day.  For some of this time is difficult to track

13     at this point.  But he has testified pretty recently about

14     this, and we did raise it on that day.  And, of course, it

15     was raised during the testimony.  So this is one of, I

16     think, three articles.  There were two from Plunkett that

17     we're still in process that we're dealing with, and this one

18     from Mr. Moore.

19           THE COURT:  Refresh my recollection concerning the

20     other two articles and what they said.

21           MR. MCCONVILLE:  Are you talking about the

22     Plunkett articles?

23           THE COURT:  I don't care.  Whatever newspaper

24     articles refer to the genesis or creation of Bratz.  Now,

25     I've got an e-mail that certainly is arguable from Mattel's

1    perspective.

2            What else does Mr. Larian refer to in the press

3    that's before the jury about how Bratz was created,

4    specifically, his being the creator?

5            MR. ZELLER:  Well, there is -- there's the *Wall*

6    *Street Journal* article which credits Mr. Bryant.

7            THE COURT:  That's not my question.  That's

8    totally irrelevant to me.  I'm going to ask the question

9    again:  What other article in the press or magazine has

10   Mr. Larian claiming that he is the creator of Bratz?

11           MR. ZELLER:  There are other documents that are in

12   the record stating --

13           THE COURT:  Which documents?

14           MR. ZELLER:  But they are not articles or

15   magazines.

16           MR. MCCONVILLE:  They are articles.

17           THE COURT:  I'm speaking to Mr. Zeller.

18           MR. MCCONVILLE:  I'm sorry.

19           THE COURT:  Which articles from Mr. Zeller's

20   standpoint, or articles?

21           MR. ZELLER:  I would have to double-check on the

22   articles and magazines.  Frankly, they're just not coming to

23   mind.

24           Apparently, Mr. McConville recalls.

25           THE COURT:  Mr. McConville.

1          MR. MCCONVILLE:  Your Honor, there was -- as I

2     recall, the day that this -- the 4941 was discussed was the

3     day after there were a stack of newspaper articles that they

4     attempted to get in through Mr. Larian, including something

5     from the Kansas City *Ledger,* I recall.  Something along

6     those lines.  There was a -- there was another magazine

7     article.

8          THE COURT:  Just a moment.  Kansas City *Ledger*

9     didn't come in.  But in those series of articles, whether

10    Mr. Larian made a statement, or those newspapers were

11    picking up a statement allegedly made to one newspaper, like

12    *Associated Press* -- you make a statement to *Associated Press*

13    and you'll find that on the byline across the world.

14         Now, what articles came into evidence where

15    Mr. Larian claimed he was a creator of Bratz?

16         MR. MCCONVILLE:  I know they are there.

17         MR. ZELLER:  I think Mr. McConville is recalling

18    that somewhere initially discussed --

19         THE COURT:  I'm sorry.  What articles do we have

20    in which, which are before the jury, Mr. Larian claims he's

21    the creator of Bratz?  In other words, is this cumulative?

22    Is this redundant?  Is this the first and only piece of

23    evidence if it was argued for the truth, which would be

24    inappropriate?

25         MR. ZELLER:  I'm double-checking, your Honor.

1                THE COURT:  Let's just find it.

2                MS. HURST:  In the *Kansas City Star*, it says --

3                THE COURT:  Is this received -- was this received

4     in evidence?

5                MS. HURST:  Never mind.  That one is not in.

6                THE COURT:  You see, at that time when this was

7     first presented to the court for my record, this appeared to

8     be hearsay, and I continually sustained objections based

9     upon hearsay.  But before the court at that time, I didn't

10    have this article for presentation on a statute of

11    limitations basis where Mr. Moore had taken the stand and

12    there was an offer for a nonhearsay purpose.

13               It's the timing that's also causing a problem.  I

14    have no ability to instruct the jury.  And if I take this

15    one article just before argument and now state:  *Ladies and*

16    *gentlemen, there's a previously received item of evidence*

17    *outside your presence.  It's going to be a newspaper*

18    *article, but it's not for the truth of the matter asserted,*

19    that heightens whatever perception MGA believes would befall

20    MGA and Mr. Larian if it was received.

21               By the same token, if I receive it for a

22    nonhearsay purpose notice to Mr. Moore, then the court's

23    only choice is, if Mr. Price or Mr. Quinn steps over the

24    line to continually interrupt -- Mr. Zeller, listen to me --

25    to continually interrupt Mr. Quinn or Mr. Price, which makes

```
 1   it appear that the court is taking a position, because
 2   they've crossed the line.  Now, if a court does that, it's
 3   devastating to a party.  Absolutely devastating.  Because it
 4   makes it look like you're not playing by the rules when,
 5   in fact, I admitted it for a nonhearsay purpose and if
 6   properly counseled to the jury, I wouldn't have to cut into
 7   that argument.  And it's the timing that is so frustrating
 8   to the court.  Although you raised it the first day of Mr.
 9   Moore's testimony, I have not received it at that time for a
10   nonhearsay purpose.  I thought it was coming in for the
11   truth, and I just don't have the transcript in front of me
12   right now, so we can look back and see that specific
13   objection.
14            So let's go back to it and let's look at the
15   transcript for a moment, okay?
16            MR. MCCONVILLE:  For Mr. Moore?
17            THE COURT:  I want to see Mr. Moore, and I want to
18   see this article, and I want to see how the objection was
19   handled by the court.  I want to see what the offer of proof
20   was at the time.
21            And with all the thousands of calls I've made,
22   possibly, this should have been received, if I was going to
23   receive it, for a nonhearsay purpose at that time and I
24   should have instructed the jury.
25            So, now, let's get on our computers.
```

```
 1          (Pause.)

 2              THE COURT:  I want to go back to the testimony of

 3     Mr. Larian and the Kansas City Star and Businessweek

 4     magazine and the Wall Street Journal and try to refresh all

 5     our recollections.  I thought --

 6              Where is Mr. McConville?

 7          (Pause.)

 8              THE COURT:  Let's go back on the record.

 9              My memory is that initially I had received these,

10     and Ms. Hurst, refresh my recollection.  Initially after

11     receiving these articles and Mr. Zeller refreshed my

12     recollection, I believe we had a hearing.  And at that

13     hearing I allowed the articles where a deposition had taken

14     place and the reporter had testified.

15              MR. ZELLER:  You did.

16              THE COURT:  And I did not allow the articles where

17     a reporter had not testified viewing that those were,

18     in fact, hearsay.  And one of those was Businessweek.

19              MS. HURST:  Hearsay and they lacked

20     authentication.

21              THE COURT:  Just a moment.

22              Now, the reason I think that is, because on

23     page -- back on Mr. Price's testimony, we got to

24     Businessweek magazine on page 85, Day 16, Volume 3.  And

25     that was one of the articles, Businessweek magazine was one
```

1  of the many articles that we were discussing.  And --

2  Ms. Hurst, I usually received those.  I don't have the

3  transcript in front of me or all of them, because I believe

4  there had been depositions of all the reporters.

5          And then, I realize that there had not been, as

6  you thought there had been and I withdrew 16 of these as

7  hearsay.

8          Was one of those, Counsel, *Businessweek*?

9          MS. HURST:  Yes.

10          MR. ZELLER:  Yes.  And there has never been a

11  deposition of the *Businessweek* reporter.

12          THE COURT:  So now the added argument is from your

13  perspective that it should come in once again for notice?

14          MR. ZELLER:  Correct.

15          THE COURT:  I want to hear one more argument on

16  backpack, again.  I thought I was done, and I've been

17  reflecting in chambers.  This is the Brisbois thumb drive of

18  the -- I want to hear once again what the nexus is to

19  Mr. Larian.  What is in my record that says that this isn't

20  just a random download?  Mr. Zeller.

21          MR. ZELLER:  I've have to double-check that this

22  is in the record.

23          THE COURT:  I want to stay with my record.  I want

24  to go to a deposition -- I want to go to testimony in the

25  record that links Mr. Larian as he is linked in Machado.  As

1    he is linked to Machado.  There I've got a nexus.

2            What do I have here in this record before this

3    jury that allows me to bring in what appears to be a random

4    download?

5            Now, I recognize, and I've stated to you, that you

6    are not precluded from talking about confidential

7    information over Mr. McConville's objection, because you got

8    Maryman and de Anda -- but links this back to Larian.  Maybe

9    there is an article about MGA, but how does that link it

10   back to Larian?

11           MR. ZELLER:  If I could have a moment to check the

12   record.

13           THE COURT:  Just go check -- check it.  I don't

14   want to make a mistake about this, and I want to reopen it

15   for argument.  And I want my record to reflect that I

16   continually asked that Brisbois be brought down here or

17   teleconferenced in.

18       *(Pause.)*

19           THE COURT:  In other words, I'm giving you one

20   more opportunity, okay?  I really want this record checked,

21   and/or if there's any evidence of authentication, I can

22   remember none.  I've put everyone on notice about this

23   repeatedly.

24           So give me a Larian link, or give me

25   authentication case, either one.  Anything in the record.

1          (Pause.)

2               MR. MCCONVILLE:  We just word searched

3     Mr. Larian's trial testimony.  He was not asked about

4     Brisbois at all.  No, I'm asking for the entire record.

5     Besides Maryman and de Anda, which you know I'm allowing

6     over your objection, argument by Mattel.

7               Do you understand that, Mr. Zeller?

8               MR. ZELLER:  I do.

9               THE COURT:  What I'm looking for is something that

10    would allow a thumb drive, backpack belonging to Brisbois to

11    come in when appeared to have been authenticated, and/or I

12    don't even have the substitute of a nexus or link to Larian.

13    That's what's concerning me.

14         (Pause.)

15              THE COURT:  Okay.  I'm going to come back in one

16    more minute -- not one minute.  I'll come back in just a few

17    moments and let you search the record.

18              MR. ZELLER:  Thank you.

19              THE COURT:  Okay.

20         (Pause.)

21              THE COURT:  And, finally, Ms. Hurst, regardless,

22    as I contemplate these two last issues, regardless of your

23    concern about this being argued for the truth, in light of

24    the court's admonition, if that is attempted in front of the

25    jury, why isn't this article -- or why shouldn't this

1   *Businessweek* article be allowed now for a nonhearsay purpose

2   for notice to Moore?

3          You've only argued Moore's lack of credibility, or

4   that Moore knew much earlier.  That's a jury determination.

5          MS. HURST:  I've argued -- well, first, I've

6   argued the issue is not hearsay.  The issue is that

7   Mr. Larian never said it.  And it's going to be attributed

8   to him, even if it's not offered for the truth.  And there's

9   no way to let it in now without shining a big spotlight on

10  it.

11         THE COURT:  Was he asked about this article what

12  pages?

13         In other words, I see on page 84 where Mr. Larian

14  is asked, in Day 16, Volume III, on February 10th, 2011

15  about 5:05 p.m.:

16      QUESTION*:  Did you tell anyone in the press -- I*

17      *mean, not -- I know you might forget the Kansas*

18      *City Press, did you tell anybody from Bratz, based*

19      *on your comments from your family or seeing young*

20      *girls play?*

21      *ANSWER:  Not just based on that.*

22      *QUESTION:  If you'd look at Exhibit 631R.*

23      *ANSWER:  Is this the Kansas City?*

24      *QUESTION:  No.  We're going to a different -- And*

25      *do you recognize this?  It's Businessweek* magazine

```
 1        dated July 28, 2003 with an article on the heavily
 2        redacted article on Bratz.
 3        ANSWER:  I see, on page 3, something that I cannot
 4        read.
 5        QUESTION:  Did you say to Businessweek, 'Like they
 6        say in business school, no risk, no reward'?
 7        ANSWER:  I probably said that, yes.
 8        QUESTION:  Did you say that you got the idea for
 9        Bratz after seeing your own kids run around --
10        it's hard to read -- something in hiphuggers?
11            MS. KELLER:  Your Honor, may the record
12        reflect that that also was not in quotes?
13            THE COURT:  May I see that, please?
14            MS. KELLER:  May we also lodge a hearsay objection
15    as well, your Honor?
16            THE COURT:  Certainly.  Counsel, I can't read
17    this.
18            MR. PRICE:  It's difficult, but it can be read.
19    We'll try to get a better copy.
20            THE COURT:  Well, perhaps some of it can be read,
21    but I'll have to be able to read it.
22            MR. PRICE:  Your Honor, maybe this is a good time
23    to break -- I was going to end up on this article -- and
24    then we can try to find a better copy?
25            THE COURT:  All right.  Why don't we send you home
```

1    *this evening.  Let me see if I can read this.*

2              THE COURT:  Then, we had the hearing that evening.

3              After that hearing, were there any questions that

4    were we asked about the *Businessweek* article?

5              MS. HURST:  No, because that was when we had the

6    hearing and then, the court didn't allow the ones --

7              THE COURT:  And then this came up again for the

8    first time with Mr. Moore.  Okay.

9              MS. HURST:  For credibility purposes, for

10   Mr. Larian, in the e-mail, it did say *No risk, No reward,*

11   but it didn't say he got the idea for Bratz in the fashion

12   described in the article.

13             And so there's no way now for us to have this come

14   in with a limiting instruction, and we're faced with a

15   terrible choice of:  Do we have to get up and argue this in

16   closing and point out there's a discrepancy between the

17   e-mail and the article and that Mr. Larian never said this

18   and we didn't get a deposition of the reporter to ask him,

19   why did he change it?

20             You know, I mean I understand that their argument

21   is, it goes to Mr. Moore's notice.  But Mr. Moore testified

22   about his notice.  He basically got to publish through his

23   answers.  And that's sufficient.  His testimony is in the

24   record.  He's described his state of mind.

25             THE COURT:  Now, it's consistent also with the

1    court's ruling on this with Mr. Moore.

2         I'll start the April 4th, Day 45, Volume 2 of 4,

3    page 72, line 1:

4        QUESTION:  *And do you recognize this as a redacted*

5        *Businessweek* article with a cover date of

6        July 28th, 2003?

7        *ANSWER:  I do.*

8         *MS. KELLER:  Your Honor, I believe the court has*

9    *excluded this article already.*

10        *THE COURT:  I did, Counsel, but if, in fact, he*

11   *had -- can reference this article, and this is something*

12   *that he personally read and relied upon --*

13        *MR. ZELLER:  It goes to state of mind, your Honor.*

14        *THE COURT:  -- then I'm going to open this area*

15   *up, Counsel.*

16        *MR. ZELLER:  Thank you.*

17       *QUESTION:  So if you could --*

18        *MR. ZELLER:  I would move -- there is a redacted*

19   *version of this, your Honor, but with the salient parts, I*

20   *would move it into evidence, your Honor.*

21        *MS. KELLER:  There is no deposition of this*

22   *reporter.*

23        *THE COURT:  I understand that.*

24        *MS. KELLER:  And --*

25        *THE COURT:  I'll take up this after -- just a*

1    *moment.  I'll take this up after court, but you can ask him*

2    *about this article, okay?*

3    THE COURT:  So I gave you permission, Mr. Zeller,

4    as an aside, to ask about the article.  But I never received

5    this article.

6    MR. ZELLER:  Right.

7    QUESTION*:  Focus your attention on this*

8    *Businessweek article with the cover date of*

9    *July 28, 2003, that's something you read in the*

10   *July of 2003 time period?*

11   *ANSWER:  Oh, yes.*

12   *QUESTION:  And what -- what information was stated*

13   *and if it came to your attention that bore on this*

14   *article (sic) that you were doing about what the*

15   *origins of Bratz were?*

16   *MS. KELLER:  Objection.  Hearsay, and his state of*

17   *mind is irrelevant.*

18   *THE COURT:  Now, remember that this is hearsay.*

19   *We have a newspaper article that's being written by somebody*

20   *so it's not for the truth of the matter, but I'm going to*

21   *let it come in, or at least these lines of questions*

22   *concerning his conduct and what his state of mind is.*

23   *Overruled, Counsel.*

24   *Can you answer the question, sir.*

25   *THE WITNESS:  Okay.  When I read this article, I*

*read that Isaac Larian got the idea for Bratz from his kids,*

*and that confused me at that time in terms of the origins of*

*Bratz, if -- you know, vis-à-vis, the -- in relation to the*

*Wall Street Journal article.*

    *QUESTION:  And that was your understanding from*

    *reading the article that Mr. Larian was actually*

    *interviewed for the article?*

    *ANSWER:  Yes.*

       THE COURT:  So same consistency.  In other words,

I don't believe I ever varied after I made that ruling about

depositional testimony.  And you weren't precluded from

asking the questions.  And it was allowed for state of mind

conduct, and I should have said frankly "notice."  I missed

that.

       All right.  Now --

       MR. ZELLER:  One thing I'm very concerned about

tomorrow is this:  What's in the record is this e-mail

between Mr. Palmeri and Mr. Larian.

       THE COURT:  That's Exhibit -- 4914?

       MR. ZELLER:  Yes.  And you heard it here already,

which is that they're going to roast Michael Moore tomorrow

during closing, and they are going to say that he lied.  And

he lied under oath because -- in fact, what we really know

what Chris Palmeri said in this article as reflected in this

e-mail.  He didn't say in this e-mail that Isaac Larian got

1    the idea for Bratz, but rather that Mr. Larian said that he

2    had, quote, modeled, end quote.  They're going to roast

3    Michael Moore over this tomorrow.  You just watch.

4              And this is why it is important for the jury --

5              THE COURT:  Let me understand this.  Let me repeat

6    that back to you.

7              You're concerned that they will attack Moore's

8    credibility because the difference that Ms. Hurst just

9    argued and pointed out, and that was that he will say

10   that -- just a minute.

11        *(Pause.)*

12             THE COURT:  They read that *Isaac Larian got the*

13   *idea for Bratz from his kids and that confused me at the*

14   *time in terms of the origins of Bratz.*

15             And they'll attack him, saying that he's perjured

16   himself, or he's noncredible, because we describe you as a

17   49-year-old Iranian immigrant, trained as a civil engineer,

18   who modeled Bratz after your own children who wear midriff

19   bearing shirts, low-rise jeans and baseball caps.

20             MR. ZELLER:  Correct.

21             THE COURT:  Okay, Ms. Hurst.

22             MS. HURST:  I think that's probably, the last

23   point we would need to go to, *roast Mr. Moore* for lack of

24   credibility --

25             THE COURT:  No, no, that doesn't answer the

```
 1   question.
 2          MS. HURST:  Look, your Honor, I don't know exactly
 3   what Ms. Keller is going to say in closing argument, but I
 4   do know this:  This is not a subjective standard.  It is a
 5   reasonable person standard.  And Mr. Moore is only one agent
 6   of Mattel, and it's everything Mattel knew, measured against
 7   a reasonable person standard.
 8          We're not focused on Mr. Moore's subjective state
 9   of mind.  It's not even the right legal test to be focused
10   on Mr. Moore's subjective state of mind.  So I highly
11   doubt --
12          THE COURT:  Are you going to attack Mr. Moore, as
13   far as this e-mail is concerned and this article?
14          MS. HURST:  I think it's extremely unlikely.
15          THE COURT:  Well --
16          MS. HURST:  And, your Honor, frankly, they
17   shouldn't be trying to extract concessions from us about our
18   closing arguments based on evidentiary rulings.
19          THE COURT:  I don't think they are.  I'm asking
20   the questions.  I don't think they can extract anything from
21   the court, neither can you.  That's improper.
22          I want to go back to it:  You don't know, then, do
23   you, because you're not making the closing argument?
24          MS. HURST:  Well, if we could get this all done, I
25   could probably find out.  But I don't know.  I mean --
```

1            I mean, look, Mr. Moore lacks credibility for a

2    lot of reasons, but he never saw this e-mail.  So I don't

3    see how that can be a basis for attacking his credibility.

4            THE COURT:  Is there anything further on the

5    record tonight?

6            MR. MCCONVILLE:  Do you want to know about

7    Brisbois, your Honor?

8            We did a word search of Brisbois over the

9    transcripts that we had, and her name came up, and de Anda,

10   Maryman and Kinrich, who's the one who testified about

11   salaries, the expert.

12           So none of these people have percipient knowledge

13   of what it is Brisbois did, to answer your question.

14       *(Pause.)*

15           THE COURT:  All right, Counsel.  What about the

16   special verdicts?

17           MS. HURST:  We need to finish them tonight,

18   please.

19           THE COURT:  I'm running out of resources now, as

20   far as the court reporter.

21           MS. HURST:  I understand.  But we can't argue this

22   case tomorrow without a finalized verdict form.

23           THE COURT:  Well, then, finish it.

24           MS. HURST:  I'm doing my best.

25           THE COURT:  How far along are we?

```
 1              MS. HURST:  I'm waiting for their additional

 2    comments.

 3              We've been done, as far as we are concerned, for

 4    quite some time.

 5              MR. ZELLER:  I appreciate --

 6              THE COURT:  No, no.  Thank you.  Stop.  Stop.

 7              How long will it take, from your perspective?

 8              MR. ZELLER:  Ten to 15 minutes.

 9              THE COURT:  Okay.  That's it.

10              Deborah, hang with me for 15 minutes.  I've got

11    time estimates.

12         (Pause.)

13              THE COURT:  All right.  We're on the record.

14              Is this draft acceptable to -- well, to MGA?

15              MS. HURST:  This document is acceptable to us, but

16    there remain about four issues in dispute.

17              THE COURT:  All right.  Acceptable, Mr. Zeller?

18              MR. ZELLER:  Is this the draft that was just

19    e-mailed?

20              THE COURT:  Yes.

21              MR. ZELLER:  No, it's not.

22              THE COURT:  All right.  And what are the issues in

23    dispute?

24              MR. ZELLER:  Well, just going in order, the first

25    one is, is that --
```

74

```
 1                 Let me make sure I'm looking at the right one.
 2                 MS. HURST:  Why don't I -- I've got the list of
 3       issues.
 4                 MR. ZELLER:  I actually want to work off the
 5       verdict form, or the verdict form that was e-mailed to you.
 6                 MS. HURST:  I actually didn't e-mail it.  I gave
 7       it to him in a hard copy at your request.
 8                 THE COURT:  Regardless.  What are the four issues?
 9                 MR. ZELLER:  The first one is:  There's a label
10       "original four sketches" in the first box.  We think that's
11       loaded.  It tracks, basically, Carter Bryant's claim.
12       Something more neutral, like "the four notebook sketches"
13       was something that we proposed.
14                 THE COURT:  Just a moment.  The four --
15                 MR. ZELLER:  -- notebook.
16                 THE COURT:  -- notebook sketches.
17                 MR. ZELLER:  Right.
18                 THE COURT:  And that is, obviously, Mattel's
19       suggestion.
20                 MGA's suggested words are:  The original four
21       sketches.
22                 The next dispute.
23                 MR. ZELLER:  The next issue is, is that Item 2, or
24       Question No. 2:  *Has Mattel proven that it owns the*
25       *following?*
```

1          The first entry is:  *The idea for the name Bratz.*

2          Since we're going back to 9801, we think that it

3    ought to track the language that's actually in 9801, and it

4    doesn't simply -- it doesn't just simply say*:  The idea for*

5    *the name Bratz.*  It states:  *The name "Bratz" used in*

6    *connection with a multi-ethnic group of hip, urban, edgy,*

7    *trendy teenage girls, fashion dolls and accessories,*

8    *collectively known as Bratz, including designs, oversized*

9    *head and feet, large eyes, large lips and small, almost*

10   *nonexisting nose and small bodies.  The dolls are four high*

11   *school multi-ethnic friends with attitude.  Each have*

12   *distinctive names, nicknames, fashions, personalities, book*

13   *stories and icons, descriptive of the doll's personal*

14   *mascot.*

15         THE COURT:  And where did that language come from

16   again?

17         MR. ZELLER:  That language was one of our buckets

18   from Docket No. 9801.

19         THE COURT:  Oh, I see.  I'm sorry.

20         MR. QUINN:  Your Honor, may I respond to that?

21         THE COURT:  Yes.

22         MS. HURST:  This question is not about the trade

23   secrets.  The trade secrets are in Question 9.

24         This question is about the contract.  And even if

25   they get a "no" on their trade secret in Question 9, we have

```
 1    to resolve the issue of the idea for the name.  This
 2    language has been agreed.  Mr. Quinn wanted it this way.
 3    It's been, probably, three weeks now that it's been worded
 4    this way.
 5             And the court had repeatedly rejected that we were
 6    putting the trade secrets in Question 2.  Rather we are
 7    putting the ideas, in Question 2.
 8             THE COURT:  Let me work on this after you both
 9    leave tonight.  It will be ultimately my decision.  I
10    understand the distinction between the two of you.
11             What's your third?
12             MS. GLASER:  Your Honor, we can't argue tomorrow
13    without this.
14             THE COURT:  You'll meet with me at 7:00 o'clock.
15             Counsel, stop it.  That's an order.  That's not a
16    request.  My court reporter is done this evening.  If you
17    continue on, I'm simply leaving the bench.  You'll be here
18    at 7:00.  End of discussion.
19             What is your third issue?
20             MR. ZELLER:  Your Honor, the third issue is the
21    inclusion -- this is simply the ownership question, whether
22    it's Question 1 or Question 2.  But it's referenced to the
23    three-dimensional item presented on December 1st, 2000.
24             I had understood the court's prior decision to
25    mean that that would not be an article; that would be in the
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

infringement questions.  But MGA has taken the position that

it should be out of the declaratory relief claim question as

well.

I didn't understand the court's rulings to extend

that far.  But we do think it is appropriate that there be a

determination as to who owned that item.

THE COURT:  All right.  Briefly.

MS. HURST:  It doesn't exist, and it will just

create inconsistency and confusion to include it.

THE COURT:  Thank you.

Your fourth disagreement.

MR. ZELLER:  The next one is in the context of --

in the context of Question 9, and this is the trade secret

misappropriation question.  And more specifically, it is the

one that is the chart.

THE COURT:  Just a moment, Counsel.  Quickly, now.

I'm closing this out now.

MR. ZELLER:  In the chart, there are -- let me --

I apologize.

It's going to take me a moment, because it's a

little unwieldy at the moment.  There are a series of --

this begins in bucket No. 9, in the chart.  And it's

entitled:  "International Overview Strategic Plan Meetings."

And this particular item is TX 24033.  And then, it

continues to repeat the same description, exhibit by

1  exhibit, all the way through item or entry, I should say,

2  80.

3            So MGA has segmented into separate entries each

4  and every forecasting and inventory management document with

5  a separate description and TX number there, so that it

6  literally extends for dozens of entries.

7            Our view is and what we had proposed -- and our

8  chart is set up this way -- is that it has one description

9  which is, in fact, forecasting inventory management

10 documents and then it just simply has the list of the TX

11 numbers, so that they are one entry.

12            THE COURT:  Okay.  All right.  And the next issue?

13            MS. HURST:  May I respond on that point?

14            THE COURT:  Briefly.

15            MS. HURST:  They listed them as separate trade

16 secrets.  9801, we did all our allocation and damages and

17 everything else, argument, on that basis.  And under 02

18 Micro, that's a material legal event.  They shouldn't be

19 able to be permitted to lump it together now into a single

20 trade secret; if they are, then we request the ability to

21 lump all ours together into a single trade secret as well.

22            THE COURT:  Next issue.

23            Counsel, I'll work on this after you leave now.

24 This is my final ruling now.

25            MS. HURST:  Your Honor, I request that we postpone

DEBORAH D. PARKER, U.S. COURT REPORTER

1    final argument until Monday.  If the court has not completed

2    the verdict form, your Honor, we cannot reasonably present

3    our closing argument.

4           THE COURT:  Counsel, that's the last point.  The

5    court is only required to give you the law and the

6    instructions.  I'm not required to give you a verdict form.

7           MS. HURST:  Your Honor, in a case of this

8    complexity, the verdict form is a critical aspect of the

9    presentation and explanation to the jury.

10          THE COURT:  All right.

11          MS. HURST:  I believe it would be reversible error

12   not to finalize it in advance of the closing arguments.

13          THE COURT:  Oh, I'll have it finalized.

14          MS. HURST:  Your Honor, reasonably and time to

15   make the argument.

16          THE COURT:  It will be reasonably.  We have been

17   at this for two-and-a-half weeks with noncooperation from

18   both parties, and this will be finalized.  And it will be

19   finalized before tomorrow morning when you meet me at

20   7:00 o'clock, Counsel, which is my order.

21          Now, this is my final ruling tonight:  The

22   probative/prejudice balance is dynamic and can change over

23   the course of a trial and even during an argument.  I'm

24   referring to Mr. Moore.

25          Mr. Moore has testified about the article, and the

 1    contents of the article.  And the actual text of the article

 2    is cumulative on the substance of what was said.  The text

 3    of the article is only probative on one issue, and that is

 4    Moore's credibility of this particular point of what the

 5    contents of the article were.

 6            I've gone over all of the transcripts in chambers

 7    and in addition, I have gone over the e-mails, once again,

 8    4941, that Mattel fears Mr. Moore will be attacked upon.

 9            At this time, Moore's credibility on particular

10    issue has not been attacked, so the privilege of the article

11    to Mr. Larian -- I'm sorry, so the prejudice of the article

12    to Mr. Larian and MGA substantially outweighs its probative

13    value.  However, if Mr. Moore's credibility on this

14    particular issue about the contents of the article is

15    attacked by MGA's counsel -- and I don't mean in a leading

16    way by Mattel, during closing argument -- then the scale

17    shifts and the probative value may outweigh the prejudicial

18    effect.

19            I'm cautioning MGA that I will strongly consider

20    admitting the article for the purposes of Mattel's rebuttal,

21    if Mr. Moore's credibility on this particular issue is

22    attacked.

23            This is not bargaining, as Ms. Hurst has alluded

24    to, but it is the law because the probative/prejudicial

25    balance under 403 is dynamic and changes according to the

1    circumstances.

2         My rulings thus far have been absolutely

3    consistent upon review concerning which articles would come

4    in and which articles wouldn't.  I have held to the standard

5    consistently that the articles were actually received into

6    evidence were those articles where a deposition had taken

7    place and we had a lengthy hearing.  I have allowed

8    questioning of these other articles.  And I think it would

9    be highly unfair if this is the one area of Mr. Moore's

10   credibility is singled out.  So I simply leave that to MGA

11   and Mattel, and I'm watching.

12        All right.  Now, I'm going to continue to work

13   with you tonight, but I am not working with you with my

14   court reporter present.

15        Anything that we need to reserve, in terms of a

16   record will be on the record tomorrow morning at

17   7:00 o'clock.  You will have your completed forms,

18   Ms. Hurst, this evening before you leave, whatever time it

19   is.  And I have the right to informally tell you without a

20   court reporter here, once again, at midnight, who is not my

21   court reporter this time and is not able to continue.

22        And, Ms. Hurst, you make your record.

23        MS. HURST:  I thank your Honor for the opportunity

24   to continue this evening and will be happy to make our

25   record in the morning.

```
 1              Thank you.
 2              THE COURT:  All right.  Now, I don't know why the
 3    frustration is looming on your part, other than your being
 4    so tired.
 5              MS. HURST:  I just misunderstood the court.
 6              THE COURT:  And when I say I'm letting my court
 7    reporter go, she's going.
 8              MS. HURST:  Understood, your Honor.  I
 9    misunderstood the court.  Obviously, I apologize.
10              THE COURT:  Deborah, good night.  Thank you.
11         (Pause.)
12              THE COURT:  Okay.  I'm going to make my rulings.
13    And all counsel are present.  It's about midnight, and I'm
14    going to release the court reporter in a few moments.
15              First, I want it very clear that, first of all, I
16    apologize to Ms. Hurst and Mr. Zeller for this evening about
17    any frustration of all us, I'm sure.  We're all up until
18    2:00 and 3:00 and 4:00 last time.  I think everybody is
19    tired.  Our lead trial counsel have the luxury of being
20    home, while they prepare.
21              But I want to make clear, I do reject the notion
22    that these minutia changes to verdict form are all that
23    critical to your argument, at least tomorrow.  You have a
24    basic idea of what the form will look like.  It can be
25    distributed on Monday, if we have to, and you can easily
```

1   argue to the jury about how they should complete the form.

2   I have no idea how these tiny disputes really inhibit the

3   parties from planning ahead.  But we will complete it

4   tonight.  But that depends upon you.

5           First, the label will be original four sketches --

6   I'm sorry.  The label will not be original four sketches but

7   will be just "four sketches."

8           Second, it will remain "idea for the name Bratz."

9   And the reason, Mr. Zeller, is twofold:  First of all,

10  Mr. Quinn and all of us agreed to it.

11          Number two, but more importantly, that is the only

12  basis on which you could get a potential constructive trust.

13  However, why don't we just get rid of the second row, which

14  is the concept because now the concept is already in the

15  trade secret's chart.  And I'll leave that to you to discuss

16  with Ms. Hurst.  Now, I'm done.  There's not going to be

17  anything else on the record.  That's it.

18          Third, I'm not going to instruct on September 18,

19  2003 dimensional object.

20          Fourth, each forecasting document will be listed

21  separately.

22          And, finally, I have a suggestion.  You may want

23  to think about putting all the charts to the back of the

24  instructions for the jury's ease.  For example, if the jury

25  answers "no" to the two threshold questions on the trade

1    secret claim, it's extremely erroneous to have to flip

2    through five pages of charts to get to the next claim.  I'll

3    leave that to you.

4           I'll meet you, if you like, at 7:00 o'clock or

5    7:30 but I don't have court reporter services available to

6    me.  You'll able to argue the matter tomorrow.

7           Good night.

8           MR. ZELLER:  Thank you.

9        *(At 11:45 p.m., proceedings were adjourned.)*

10

11                          —oOo—

12

13                        CERTIFICATE

14           I hereby certify that pursuant to Section 753,

15    Title 28, United States Code, the foregoing is a true and

16    correct transcript of the stenographically reported

17    proceedings held in the above—entitled matter and that the

18    transcript page format is in conformance with the

19    regulations of the Judicial Conference of the United States.

20

21    Date:  April 8, 2011

22

23

24           _____

25                        Deborah D. Parker, Official Reporter

*DEBORAH D. PARKER, U.S. COURT REPORTER*