1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3      **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                  – – – – – – –

5

   MATTEL, INC., et al.,            )
6                                    )
              Plaintiffs,            )
7                                    )
         vs.                         ) No. CV 04-9049 DOC
8                                    )    Day 49
   MGA ENTERTAINMENT, INC., et al.,  )    Volume 1 of 3
9                                    )
                                     )
10            Defendants.            )
   _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  Jury Trial

16              Santa Ana, California

17              Friday, April 8, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141

24

25   04cv9049 Mattel 2011-04-08 D49V1

Case 2:04-cv-09049-DOC-RNB  Document 10449  Filed 04/12/11  Page 2 of 125  Page ID #:317645
CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

2

1   **APPEARANCES OF COUNSEL:**

2

    FOR PLAINTIFF MATTEL, INC., ET AL.:

3
                QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
4               BY:  JOHN QUINN
                     WILLIAM PRICE
5                    MICHAEL T. ZELLER
                     Attorneys at Law
6               865 South Figueroa Street
                10th Floor
7               Los Angeles, California 90017
                (213) 443-3000
8

9

10

11  FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12              ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
                BY:  THOMAS S. McCONVILLE
13                   Attorney at Law
                4 Park Plaza
14              Suite 1600
                Irvine, California 92614
15              (949) 567-6700

16              - AND -

17              ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
                BY:  ANNETTE L. HURST
18                   Attorney at Law
                405 Howard Street
19              San Francisco, California 94105
                (415)773-5700
20
                - AND -
21
                KELLER RACKAUCKAS
22              BY:  JENNIFER KELLER
                     Attorney at Law
23              18500 Von Karman Avenue
                Suite 560
24              Irvine, California 92612
                (949) 476-8700
25

**APPEARANCES OF COUNSEL (Continued):**

FOR CARLOS GUSTAVO MACHADO GOMEZ:

        LAW OFFICES OF MARK E. OVERLAND
        By:  MARK E. OVERLAND
           Attorney at Law
        100 Wilshire Boulevard
        Suite 950
        Santa Monica, California 90401
        (310) 459-2830

        - AND -

        SCHEPER KIM & HARRIS LLP
        BY:  ALEXANDER H. COTE
           Attorney at Law
        601 West 5th Street
        12th Floor
        Los Angeles, California 90071
        (213) 613-4660

ALSO PRESENT:

        MGA ENTERTAINMENT, INC.
        BY:  JEANINE PISONI
           Attorney at Law
        16360 Roscoe Boulevard
        Suite 105
        Van Nuys, California 91406

        ROBERT ECKERT, Mattel CEO

        ISAAC LARIAN, MGA CEO

        KEN KOTARSKI, Mattel Technical Operator

        MIKE STOVALL, MGA Technical Operator

Case 2:04-cv-09049-DOC-RNB   Document 10449   Filed 04/12/11   Page 4 of 125   Page ID #:317647
CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

4

# **I N D E X**

**PROCEEDINGS**                                                    **PAGE**

Closing Argument by Mr. Price for Mattel            7

Closing argument by Mr. Quinn for Mattel           97

Court Security Officers sworn                             122

|  |  |  |
|---|---|---|
|  | 1 | **SANTA ANA, CALIFORNIA, FRIDAY, APRIL 8, 2011** |
|  | 2 | **Day 49, Volume 1 of 3** |
|  | 3 | (8:36 a.m.) |
| 08:36 | 4 | *(Outside the presence of the jury.)* |
| 08:36 | 5 | THE COURT:  Well, Counsel, it's time for your |
| 08:36 | 6 | closing arguments, and I'm going to summon the jury now. |
| 08:37 | 7 | *(In the presence of the jury.)* |
| 08:38 | 8 | THE COURT:  We're in session.  Counsel, thank you |
| 08:38 | 9 | for your courtesy.  If you'd please be seated. |
| 08:38 | 10 | The jury is present.  The alternates are present. |
| 08:38 | 11 | All counsel are present. |
| 08:38 | 12 | Ladies and gentlemen, we've been on quite a |
| 08:38 | 13 | journey for the last almost 50 days.  This is the concluding |
| 08:39 | 14 | day of argument and the last opportunity that you'll have to |
| 08:39 | 15 | hear counsel, other than eventually when we are in court and |
| 08:39 | 16 | a verdict is reached. |
| 08:39 | 17 | Out of your presence, I publicly commented about |
| 08:39 | 18 | the extraordinary effort of counsel representing both sides, |
| 08:39 | 19 | and their support staff.  The Court is deeply appreciative |
| 08:39 | 20 | of their efforts, and they've worked very, very hard on your |
| 08:39 | 21 | behalf.  And you have worked very, very hard and will work |
| 08:39 | 22 | very, very hard on their behalf. |
| 08:39 | 23 | This is a closing argument.  What counsel say is |
| 08:39 | 24 | not evidence.  It is not evidence.  It is not evidence. |
| 08:39 | 25 | It's a summary of their respective positions, and therefore, |

Case 2:04-cv-09049-DOC-RNB   Document 10449   Filed 04/12/11   Page 6 of 125   Page ID #:317649
CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

6

08:39  1    you'll have all of the evidence to consider.

08:39  2              But counsel -- there will be counsel's argument on

08:40  3    behalf of Mattel initially.  There will be argument on

08:40  4    behalf of MGA and Mr. Larian.  And then a brief rebuttal

08:40  5    argument by Mattel's counsel.

08:40  6              They can split their arguments amongst counsel, if

08:40  7    they choose.  They each have three hours.  The opening

08:40  8    argument may be as long as two hours and 40 minutes, but

08:40  9    we'll take a break and counsel, Mr. Quinn and Mr. Price, may

08:40  10   change positions during their argument.  They have the

08:40  11   Court's permission to do so.

08:40  12             We'll switch tables.  Remember each party is suing

08:40  13   each other, and maybe 20 percent of the fairness of a trial

08:40  14   has nothing to do with the evidence.  It has sometimes

08:40  15   subjective impressions that occur.  It is never captured on

08:40  16   the record.  So you've seen me consistently switch tables

08:40  17   from what would normally be plaintiff's table to defendant's

08:41  18   table.  And plaintiff, for the purposes of their opening

08:41  19   argument, will be Mattel.

08:41  20             They'll switch tables, and when MGA and Mr. Larian

08:41  21   argue their portion, they will sit at that table.  Mattel

08:41  22   will sit at the other table.

08:41  23             But the rebuttal argument lies with Mattel.

08:41  24             And they switch back for that closing argument by

08:41  25   Mr. Quinn.

08:41   1               Counsel, Mr. Price, good morning.  Your closing

08:41   2      argument, please.

08:41   3               MR. PRICE:  Thank you, Your Honor.

08:41   4          **CLOSING ARGUMENT BY MR. PRICE FOR MATTEL**

08:41   5               MR. PRICE:  This is the first time I've had a

08:41   6      chance to talk to you and I'm grateful for it.  I may or may

08:41   7      not be eloquent enough to present Mattel's case, but I know

08:41   8      I'm not eloquent enough to thank you for your service.  It

08:41   9      has been an incredible sacrifice for you:  Days, weeks,

08:42  10      months.  It's -- it's been not just obviously for the

08:42  11      parties but for the judicial system, you know, for the way

08:42  12      the country works really.  And it has just been

08:42  13      awe-inspiring to see you here and to pay that close

08:42  14      attention for that long.

08:42  15               You know, I've -- I know that I've probably closed

08:42  16      my eyes in this trial more than all of you combined.  That

08:42  17      might not be true 'cause I can't see you when my eyes are

08:42  18      closed.  But you've paid extraordinary attention.

08:42  19               And the great thing about having all of you, of

08:42  20      course, is that you're a group so that if someone misses

08:42  21      something, someone else will get it, and together you form

08:42  22      the best decision-making body we have really in the world.

08:42  23               So I want to thank you for that.  And I know that

08:42  24      others will too, and probably more eloquent than I, but

08:42  25      thank you.

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:42 | 1 | So let me talk to you about the evidence. |
| 08:43 | 2 | A JUROR:  The sound is -- |
| 08:43 | 3 | MR. PRICE:  Okay.  Let me get closer here.  Is it |
| 08:43 | 4 | working okay? |
| 08:43 | 5 | A JUROR:  We cannot hear as well as when you |
| 08:43 | 6 | spoke, Your Honor. |
| 08:43 | 7 | THE COURT:  You could hear me very well, but you |
| 08:43 | 8 | can't hear him? |
| 08:43 | 9 | MR. PRICE:  Oh. |
| 08:43 | 10 | THE COURT:  He'll speak louder. |
| 08:43 | 11 | MR. PRICE:  I'll speak louder. |
| 08:43 | 12 | THE COURT:  Or we'll have to go back to the |
| 08:43 | 13 | lectern, which I'm graciously trying to let both counsel |
| 08:43 | 14 | use. |
| 08:43 | 15 | MR. PRICE:  I'll get as close to this as I can. |
| 08:43 | 16 | Is this better? |
| 08:43 | 17 | A JUROR:  Yes. |
| 08:43 | 18 | MR. PRICE:  Okay.  The case really is about |
| 08:43 | 19 | transforming a company and about building a brand by using |
| 08:43 | 20 | another company's confidential innovation and ideas.  And |
| 08:43 | 21 | that's wrong.  And Mr. Larian has told you it's wrong.  Let |
| 08:43 | 22 | me show you some of his testimony.  And he said -- he was |
| 08:43 | 23 | asked, "In fact, at the time of September 2000, you knew it |
| 08:43 | 24 | would be inappropriate for MGA to create a business based |
| 08:43 | 25 | upon Mattel's confidential information; you knew that would |

Case 2:04-cv-09049-DOC-RNB   Document 10449   Filed 04/12/11   Page 9 of 125   Page ID #:317652
CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

9

08:43  1   be inappropriate?"

08:43  2           And he said, "Or anybody else's confidential

08:43  3   information, yes, that would be wrong."

08:44  4           And he went on to say, "And one of the reasons is

08:44  5   because it was your thought that MGA shouldn't try to create

08:44  6   a profitable brand if the inspiration of that was something

08:44  7   which is Mattel's confidential information; yes or no?"

08:44  8           You might have heard that phrase a few times in

08:44  9   the trial.

08:44  10          And he said, "Yes."

08:44  11          And you heard lots of testimony from Mr. Larian

08:44  12  and others that they built this brand, that they did a great

08:44  13  job building Bratz.

08:44  14          And the point is you're not supposed to do that.

08:44  15  You're not supposed to compete with another company with its

08:44  16  own information.  You're not supposed to build that brand.

08:44  17  It's wrong.  And the reason it's wrong is that if you can --

08:44  18  if you can use another company's confidential designs and

08:44  19  innovation, then competition will die.

08:44  20          Now, I'm gonna go through the evidence to show you

08:44  21  that Carter Bryant made those Bratz designs while he was a

08:44  22  designer at Mattel, and that if he did, that Mattel owns

08:45  23  them.  By the way, that latter thing I just said, in any

08:45  24  other context but this trial, Mr. Larian and MGA would agree

08:45  25  that if Mr. Larian (sic) did his doll designs at Mattel they

08:45   1   belong to Mattel.  In any other context.  And that's

08:45   2   because, if the rule were otherwise, you couldn't have a

08:45   3   company depending on innovation and ideas.

08:45   4          I mean, companies invest money.  They build

08:45   5   buildings.  They assemble people.  They create an

08:45   6   environment where from time to time -- and you can't tell

08:45   7   when -- you're gonna have this flash of an innovative flare.

08:45   8          You're gonna have a lot of dead ends.  You know,

08:45   9   you're gonna spend money doing things that don't work.

08:45  10   You're gonna have Flavas.

08:45  11          But if you're getting those people together and

08:45  12   you're investing in them and you're funding them and you're

08:46  13   trying to create that environment, and when you have that

08:46  14   flash of innovation, that flare of innovation, you have it,

08:46  15   and then an employee can say, "I'm gonna go across the

08:46  16   street and give this to someone else and get paid for it."

08:46  17   If you do that, then competition dies.  Then there's no

08:46  18   reason for a company to exist and make that investment.

08:46  19          It's sort of like a -- drug companies, you know,

08:46  20   how they spend -- come out with products year after year

08:46  21   which saves lives, which extend lives.  But, you know, there

08:46  22   are a lot of dead ends.  They spend a lot of money on drugs

08:46  23   that kill a lot of rats and aren't useful, but then they

08:46  24   come up with something.  And if an employee who came up with

08:46  25   that and is working for that company could then just take it

08:46   1   across the street and sell it for themselves, then those

08:46   2   companies couldn't exist.

08:46   3           And in this case, if a company like Mattel can be

08:47   4   burned by an opportunist who has no fashion doll designers,

08:47   5   no fashion doll design, and really not even the company or

08:47   6   the ability at that time to make a fashion doll, then

08:47   7   innovation will stop.

08:47   8           You can't afford for your own designs to be used

08:47   9   against you.  You compete in this marketplace by your own

08:47  10   product, by using your own product, not the other guy's.

08:47  11           And so let me take you through where MGA was

08:47  12   before they met Carter Bryant and -- and what was going on

08:47  13   at Mattel, to kind of set the stage for the theft of

08:47  14   Mattel's property.

08:47  15           And you remember MGA's situation in 2000, prior to

08:47  16   September of 2000.  It had declared bankruptcy in 1997.  In

08:47  17   2000/2001, it had lost money.  That's if you look at

08:47  18   Exhibit 16532.

08:48  19           Mr. Larian had a business, but he was not in the

08:48  20   business of making fashion dolls.  You saw a lot of the

08:48  21   dolls that they made.  You saw a lot of electronic kind of

08:48  22   dolls that -- that sang and wouldn't stop singing at one

08:48  23   point in the trial, and that's not a fashion doll.  They had

08:48  24   never done one.  In fact, you remember Ms. Garcia said when

08:48  25   she left Mattel and went to MGA, she had never heard of

08:48   1    them.  You heard Mr. Bryant say he had never heard of MGA.

08:48   2           MGA had been in existence for -- by 2000, how many

08:48   3    years?  15, 16, 17 years?  I don't remember exactly how

08:48   4    long, and they had never had that -- that, you know, flash

08:48   5    of innovation with respect to a fashion doll.

08:48   6           Now, you heard Ms. Garcia say, "Oh, you know, I

08:48   7    left Mattel and I -- I was thinking about this.  This was

08:48   8    really on my mind.  I would have come up with something like

08:48   9    Bratz even if Carter Bryant hadn't been around."  But, you

08:49   10   know, she said, "I didn't actually mention it to anybody

08:49   11   because I was so busy."

08:49   12          And what the evidence shows is that she and

08:49   13   Ms. O'Connor met with Carter Bryant on about August 17 -- or

08:49   14   August 18th.  That's Slide 11328.  That's one of those

08:49   15   planners -- I mean, Exhibit 11328.  That's August 18th.  Yet

08:49   16   she admitted that she didn't talk to Mr. Larian about this

08:49   17   kind of fashion doll until just a couple of days before

08:49   18   September 1st.  And this was her testimony, is that the

08:49   19   first time she told Mr. Larian that she was interested in a

08:49   20   multi-ethnic doll, hip, trendy was just a couple of days

08:49   21   before September 1st.

08:49   22          And Mr. Larian, you recall, told you, "Well, I --

08:49   23   I had sort of a fashion doll contest before we met

08:49   24   Mr. Bryant."  But Ms. Garcia testified that she had never

08:49   25   heard of such a contest.  And Ms. O'Connor said that, you

DEBBIE GALE, U.S. COURT REPORTER

08:49  1    know, she doesn't remember such a contest.

08:50  2           So it's pretty much undisputed that before

08:50  3    Mr. Bryant talked to MGA, MGA had never produced, tried to

08:50  4    produce, come up with a design that was a fashion doll.

08:50  5    They weren't that type of company.

08:50  6           In fact, you recall in the last few days hearing

08:50  7    testimony about there being Bratz bicycles and Bratz

08:50  8    sleeping bags and Bratz umbrellas, which you get when you --

08:50  9    when you create a brand and you have something that is

08:50  10   valuable, and people will license the right to make things

08:50  11   for you, like sleeping bags, and put that name on it.  Well,

08:50  12   prior to Mr. Bryant showing up at MGA, MGA had never

08:50  13   licensed a product to anyone.  And that's Exhibit 630-2.

08:51  14          And this is one of those e-mail interviews that

08:51  15   Mr. Larian did.  And he was talking to the press.  "Had you

08:51  16   been a licensor before?" -- meaning had anyone wanted to

08:51  17   license anything you had, where they're paying you to use

08:51  18   the name -- and he said, "No, this is the first time.  But

08:51  19   we have been a licensee many times."  And that means, for

08:51  20   example, he would get the right from Marvel Comic Group or

08:51  21   from Disney or something to make their product.

08:51  22          And so before Mr. Bryant showed up, no fashion

08:51  23   doll, no fashion doll designs, no fashion doll designers, no

08:51  24   ability to create a product that anyone would want to

08:51  25   license.  Like I said, Ms. Garcia and Mr. Bryant never heard

DEBBIE GALE, U.S. COURT REPORTER

08:51  1    of MGA before they went to them.

08:51  2          So where was Mattel at this time frame?  Well,

08:51  3    sales of Barbie had peaked in 1997.  That's undisputed.  And

08:51  4    sales had gone down, and Mattel knew that there was an

08:52  5    opportunity in the tween market.  You heard Ms. Luther

08:52  6    testify.  And she said that prior to 2000, she had

08:52  7    identified the vulnerability in the eight- to ten-year-old

08:52  8    market and they had introduced products to try to address

08:52  9    that vulnerability.  And you recall there was testimony at

08:52  10   this time, the '99 time frame, the CEO of Mattel was Jill

08:52  11   Barad.  And you heard people from both sides say how she was

08:52  12   kind of a genius with product.

08:52  13         And so Mattel's best designers in their

08:52  14   collaborative effort were trying to address this, and they

08:52  15   came out with Diva Starz and Generation Girls.  And this was

08:52  16   based on research.

08:52  17         You remember Ms. Luther testifying in response to

08:52  18   questions from MGA that somewhere in the world every day

08:52  19   there is some sort of focus group being done at Mattel.  So

08:52  20   they were trying to address this market, but -- but, you

08:52  21   know, by September of 2000 that flash of innovation

08:53  22   hadn't -- hadn't really struck.  Except it had.  It had

08:53  23   struck in Mattel's design center with one of Mattel's

08:53  24   designers, who would come up with the idea of Bratz to

08:53  25   address that market segment.

08:53   1          Bratz was created at Mattel.

08:53   2          And let me talk to you now about the evidence

08:53   3   about it being created at Mattel.  And before I get into the

08:53   4   details of that, I want to talk to you about this.  You've

08:53   5   heard Mr. Larian's testimony.  You've heard Mr. Bryant's

08:53   6   testimony about the date he created Bratz.

08:53   7          Here is one thing you know about Mr. Larian and

08:53   8   Mr. Bryant, and that is that they're willing to get together

08:53   9   and make false statements under penalty of perjury in order

08:53  10   to get the rights to something, the intellectual property

08:53  11   rights, the right to use something.  And what they're

08:54  12   specifically willing to make false statements about is a

08:54  13   date so they can get those rights.

08:54  14          Do you remember the communication between MGA's

08:54  15   counsel and Carter Bryant about that removable footwear

08:54  16   patent?  And this is Exhibit 11898.

08:54  17          And there was a letter sent to Mr. Bryant with an

08:54  18   enclosed declaration, and it said, "Our patent application

08:54  19   was filed on February 24, 2003.  So a release back in 2001

08:54  20   would be anticipatory, while a release in the fall of 2002

08:54  21   would be within the one-year grace period."

08:54  22          Now, you don't have to be a lawyer to realize what

08:54  23   he's saying is:  If we release this product in 2001, that's

08:54  24   bad.  We're trying to get a patent.  But if we came out in

08:54  25   2002, that's good.  There's a grace period.

Case 2:04-cv-09049-DOC-RNB   Document 10449   Filed 04/12/11   Page 16 of 125   Page ID #:317659
CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

16

08:54   1           And this declaration was sent to Mr. Bryant.
08:54   2   Mr. Larian will tell you he knew nothing about this.  But
08:54   3   Mr. Larian controls his lawyers.  He's a hands-on guy.  And
08:54   4   the patent that they were applying for was for Mr. Larian,
08:55   5   to say he owned the concept.
08:55   6           And what was critical was, when was it created.
08:55   7   And if you look at the declaration itself, that's
08:55   8   Exhibit 502.
08:55   9           Now, Mr. Bryant, you know, said he's the doll
08:55   10  designer.  And he described how these dolls had strap-type
08:55   11  shoes and a snap-on feature at the ankle so you could put on
08:55   12  different footgear.  And the shoes match the coloring of the
08:55   13  skin tone on the exposed areas of the feet, and that was
08:55   14  matched to the coloring of the lower leg of the dolls.
08:55   15          And if you recall when Mr. Bryant was on the stand
08:55   16  and, in fact, when Ms. Garcia was on the stand, she held and
08:55   17  he held a 2001 doll and pointed out to you how every one of
08:55   18  those features was on the 2001 Bratz.
08:55   19          But MGA and Isaac Larian wasn't going to get a
08:55   20  patent unless they said, "Oh, it didn't come out until
08:56   21  2002," unless there was false testimony about a date.  And
08:56   22  if you look at paragraph 4, this is Mr. Bryant, under
08:56   23  penalty of perjury, saying, I was actively involved with the
08:56   24  release of the Bratz dolls of the configuration as set forth
08:56   25  in paragraph 3 above.  And this release did not occur until

08:56    1    the Fall of year 2002.

08:56    2              And here's what Mr. Bryant said about that

08:56    3    declaration:

08:56    4              "So the statement you made to support MGA in

08:56    5    getting patent rights on the Bratz dolls -- the statement

08:56    6    you made in paragraph 4 is false?

08:56    7              "ANSWER:  Yes.

08:56    8              "And you made that false statement because MGA

08:56    9    suggested it was necessary for you to make that statement

08:56   10    for them to get patents payments on the interchangeable

08:56   11    footwear for the Bratz dolls?

08:56   12              "Yes.

08:56   13              "And you made that statement under penalty of

08:56   14    perjury, right?

08:56   15              "ANSWER:  Yes."

08:56   16              If we can go on --

08:56   17              "And in that situation, what you were making false

08:56   18    testimony about was a date, right?

08:56   19              "Uh, yes.

08:56   20              "And it was suggested that you testify falsely

08:56   21    about a date so that MGA could get patent rights, correct?

08:57   22              "ANSWER:  Yes."

08:57   23              And you recall Mr. Larian, on a patent for that

08:57   24    packaging, he testified or stated under penalty of perjury

08:57   25    he was the only inventor, when, in fact, he wasn't.  And he

08:57   1   came and told you, "Oh, that's a mistake.  I think it was
08:57   2   Ms. Storer who actually invented that."
08:57   3           So all I'm saying to you, ladies and gentlemen, is
08:57   4   that when -- when MGA says you should believe this because
08:57   5   Isaac Larian says it's true, you should believe this because
08:57   6   Carter Bryant says it's true, what I'm suggesting is you
08:57   7   need proof.
08:57   8           Because they are willing to say things that aren't
08:57   9   true under penalty of perjury so they can get an advantage.
08:57  10   In this case, get patent rights.
08:57  11           So let me talk now about the issue of:  If these
08:57  12   designs were created at Mattel, does Mattel own them?
08:58  13           And as I said, in any other context but this,
08:58  14   Mr. Larian would be telling you, "Yeah, that's true, 'cause
08:58  15   that's true with MGA too."  In fact, you recall he took the
08:58  16   stand and he -- uh, he said, "Well, I wouldn't enforce such
08:58  17   an agreement."  But when he was shown MGA's contract, which
08:58  18   says basically the same thing that Mattel says with its
08:58  19   employees -- when he was shown their contract, here's what
08:58  20   he -- and by the way, that's Exhibit 1117, which is MGA's
08:58  21   contract -- but when he was shown that, he said the
08:58  22   following:
08:58  23           This is -- "Now, you said regardless of the
08:58  24   contract.  You understand what your contract says is that if
08:58  25   it relates to your business, an employee -- an employee

Case 2:04-cv-09049-DOC-RNB   Document 10449   Filed 04/12/11   Page 19 of 125   Page ID #:317662
CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

19

08:58  1   comes up with a design, it still belongs to you even if they

08:58  2   claim they did it in the shower before they came to work?"

08:58  3          And he said, "That's correct.  That's what the

08:58  4   contract says."

08:59  5          And, folks, you know, that's what it has to be

08:59  6   intended to say.  You're hiring people who do creative work,

08:59  7   who do designs.  You remember Ms. Garcia saying that she did

08:59  8   creative work and that she would do it at nights.  You can't

08:59  9   turn that process off.

08:59  10          Mr. Bryant was a designer.  He couldn't -- you

08:59  11   can't turn the process off so you can say, "Oh, it's

08:59  12   5:00 o'clock.  I'm no longer thinking of designs which have

08:59  13   anything to do with my employer."  Or, "If I think of some

08:59  14   great thing, you know, it's -- it doesn't have anything to

08:59  15   do with my work."

08:59  16          That's the way it has to work, or else that guy

08:59  17   that discovers a cure for cancer after a company has spent

08:59  18   hundreds of millions pursuing other leads can just say, "Oh,

08:59  19   I came up with this while I was in the shower.  You know,

08:59  20   I'm gonna take it and benefit myself."

08:59  21          Now, Mr. Bryant twice signed contracts with

08:59  22   Mattel.  He signed one in November of '95.  You remember he

08:59  23   was gone from Mattel in that time period from between, I

08:59  24   think, April '98 to December '98.  And then he signed a

09:00  25   contract in January of '99.  They both had the same

Case 2:04-cv-09049-DOC-RNB   Document 10449   Filed 04/12/11   Page 20 of 125   Page ID #:317663
CV 04-9049 DOC – 4/8/2011 - Day 49, Volume 1 of 3

20

09:00   1    provisions about inventions.

09:00   2            And let me show you the '99 contract.  This is

09:00   3    Exhibit 9924.  Now, you'll have the actual original with

09:00   4    you.

09:00   5            But if we look at this, it says, "I agree to

09:00   6    communicate to the company promptly and as fully as

09:00   7    practicable all inventions and" -- boy, I'm a long way away

09:00   8    from this, so it's kind of hard for me to see.  Actually, if

09:00   9    someone can get me a copy so I can have it in front of me

09:00   10   too.  I thought we had better resolution here.  It says,

09:00   11   "conceived or reduced to practice."  And conceived,

09:00   12   obviously, is conception.  You know, it comes to your mind.

09:00   13   Reduced to practice is the other end of that time frame.

09:00   14   Either I think of it when I put it down on paper or

09:00   15   whatever.  And it says, "at any time during my employment by

09:00   16   the company."  And I'm gonna get to those words in a second:

09:01   17   "During my employment by the company."

09:01   18           And then there's a definition of inventions in

09:01   19   paragraph B, which inventions includes but isn't limited to

09:01   20   discoveries, improvements, processes, developments, designs,

09:01   21   et cetera.

09:01   22           And then there's a provision C which specifically

09:01   23   relates to whether it's done on your own time or not.  And

09:01   24   it says, "Any provision in this agreement requiring me to

09:01   25   assign my rights in any invention does not apply to an

| | |
|---|---|
| 09:01 | 1 |
| 09:01 | 2 |
| 09:01 | 3 |
| 09:01 | 4 |
| 09:01 | 5 |
| 09:01 | 6 |
| 09:01 | 7 |
| 09:01 | 8 |
| 09:01 | 9 |
| 09:02 | 10 |

1  invention which qualifies under" -- the California Labor

2  Code.  And it says -- that section provides that "the

3  requirement to assign shall not apply to an invention that

4  the employee developed entirely on his or her own time

5  without using the employer's equipment, supplies,

6  facilities, or trade secret information except -- except for

7  those inventions that either:  One, relate at the time of

8  conception or reduction to practice of the invention to the

9  employer's business or actually or demonstrably anticipated

10  research or development."

11           And it says, "Two, or result from any work

12  performed by the employee for the employer."

13           So again, you're not a lawyer, you know, but what

14  it says is if -- if you're working on something, even on

15  your on time, if it's related to your employer's business --

16  Mattel's in the business of making toys -- you know, then it

17  is assigned to your employer.

18           And, by the way, again, that makes sense.  That's

19  what's fair in this context.  And, in fact, Mr. Bryant --

20           Let's move to Slide 51, Ken.

21           You remember Mr. Bryant didn't recall much.  Took

22  an hour and a half, two hours before he would say yes or no

23  when he first took the stand.

24           But -- I'm sorry, Ken.  It's the 327 -- Slide 327.

25           But we asked Mr. Bryant about this.  I said, "It's

09:03    1    fair for Mattel to say, look, you come up with a design that

09:03    2    relates to our business.  It belongs to us, even if you do

09:03    3    it after 5:00 p.m. on the weekends, because we are hiring

09:03    4    you for that, and you can't turn it off then."

09:03    5            And he says:

09:03    6            "ANSWER:  Are you asking me if that's my

09:03    7    understanding now or then?"

09:03    8            And the question is, "You see how that's fair?

09:03    9            And he said, "I do."

09:03    10           Not only is it fair, it's what the contract says.

09:03    11   And not only is it what the contract says, Mr. Bryant --

09:03    12   you've heard these allegations.  This was -- was shoved

09:03    13   under his nose.  He couldn't talk to anyone about it.

09:03    14           Well, that's not what he said, and that's not what

09:03    15   the documents show.  Because he was sent Exhibit 13, which

09:03    16   is his offer letter, on December 11, 1998.  That's about

09:03    17   three weeks before he signed his confidentiality agreement.

09:03    18           And that offer letter talks about you have to sign

09:03    19   the confidential information and inventions agreement, and

09:03    20   enclosed the packet with forms to activate his employment,

09:04    21   including the confidential information and inventions

09:04    22   agreement.  And then it also said, "You can call me anytime

09:04    23   if you have any questions."

09:04    24           And Mr. Bryant testified --

09:04    25           Now we can put up Slide 51.

09:04   1            He testified about this.  "Well, you said, yes,
09:04   2   your recollection is you got it, correct?"
09:04   3            And the testimony is about the confidentiality and
09:04   4   inventions agreement.
09:04   5            "Yes."
09:04   6            "And you got this around December 11, 1998,
09:04   7   correct?
09:04   8            "ANSWER:  Yes.
09:04   9            "So you had an opportunity to review it ahead of
09:04  10   time?
09:04  11            "Uh, yes, I did."
09:04  12            So this, in any other context, really would not be
09:04  13   controversial.  MGA's agreements say the same thing.  That's
09:04  14   how you create innovation and competition, with these sorts
09:04  15   of agreements.  It's only in this context when it's
09:04  16   challenged.
09:04  17            And by the way, Ms. Garcia knew.  She had been at
09:04  18   Mattel.  Here's what she said:  "You knew that Mattel's
09:05  19   agreements provided that if he," referring to Carter Bryant,
09:05  20   "was a Mattel employee and created drawings while he was a
09:05  21   Mattel employees, they belonged to Mattel, right?
09:05  22            "ANSWER:  Yes."
09:05  23            And maybe that's why, when she took the stand, she
09:05  24   said, you know, in this meeting in September 2000,
09:05  25   Mr. Bryant said he works for Mattel, and also in the

09:05    1    August 17 or 18 meeting, I, Ms. Garcia, "Oh, I didn't hear

09:05    2    that.  I didn't know that he worked at Mattel at that time

09:05    3    until 2004."  Some four years later.  Maybe she said that

09:05    4    because, "Gosh, I've got to say that because I know that

09:05    5    he's sitting there talking to me and his designs belong to

09:05    6    Mattel."

09:05    7            So there was a lot of time spent trying to mislead

09:05    8    you on this.  First of all -- and you heard the jury

09:05    9    instructions where that is a question whether ideas are

09:05   10    covered.  Well, in this case, Carter Bryant's ideas were his

09:06   11    designs, designs that are specifically in the contract.  And

09:06   12    Carter Bryant acknowledged that.

09:06   13            If we can put up his testimony.

09:06   14            "Your job, by the way, was to come up with ideas

09:06   15    and then designs related to those ideas?

09:06   16            "Yes.

09:06   17            "I mean, do you see a distinction between designs

09:06   18    and ideas?

09:06   19            "Um, no, not necessarily.

09:06   20            "Because one of your jobs is to put your ideas to

09:06   21    some sort of design, correct?

09:06   22            "Yes."

09:06   23            And the contract is meant to include the thoughts

09:06   24    related to toy designs.  The concepts, the designs that are

09:06   25    created while you're working and collaborating and working

09:06    1    with everybody at Mattel.  That's what it says.  That's what

09:06    2    Mr. Bryant understood.

09:06    3            So there's the "Are ideas included?" sort of red

09:06    4    herring.  His designs include -- they are the manifestation

09:07    5    of his ideas.  Specifically in the contract.

09:07    6            The second thing that you heard a lot of testimony

09:07    7    about was this "during my employment."  You know, is it

09:07    8    after 5:00?  Is it on weekends?  And you saw what MGA's

09:07    9    contract said.  What Mr. Larian knew it said.  You saw what

09:07   10    Ms. Garcia understood.

09:07   11            Uh, we've talked about how that is obviously what

09:07   12    has to happen for there to be competition, innovation.  But

09:07   13    there was the suggestion, oh, other contracts said "during

09:07   14    the period of my employment."  So that means something, and

09:07   15    therefore Mattel's contract doesn't really say "during my

09:07   16    employment."

09:07   17            I mean, it doesn't really say "after 5:00."

09:07   18            But you saw there's the provision which says "If

09:07   19    it's on your own time and it relates to our business, it's

09:07   20    assigned to us."

09:07   21            But what you also have is Mr. Bryant's testimony.

09:07   22    You remember he was on the stand and I was saying things

09:07   23    like you had health benefits during your employment, and did

09:07   24    those apply after 5:00 p.m. and on the weekends.  And then

09:08   25    after a string of those questions, we asked him the

Case 2:04-cv-09049-DOC-RNB   Document 10449   Filed 04/12/11   Page 26 of 125   Page ID #:317669
CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

26

09:08    1    following:
09:08    2             And this is, "In your mind, there's no difference
09:08    3    between 'during my employment' and 'during the period of my
09:08    4    employment,' correct?"
09:08    5             And he said, "Uh, yes.  There's no difference
09:08    6    between that phraseology."
09:08    7             And it was clear to him; it was clear in the
09:08    8    contract:  They mean the same thing.  The contract doesn't
09:08    9    say you assign to me designs you come up with during
09:08   10    business hours.  Even though after business hours, you're
09:08   11    still a designer for Mattel and you can't cut off that
09:08   12    creative process.  It can't mean anything else.
09:08   13             Here's the ironic thing.  Here's the strange
09:08   14    thing.  MGA doesn't say and Mr. Bryant don't (sic) say, at
09:08   15    least in this trial, that Mr. Bryant came up with ideas or
09:08   16    his designs on nights and weekends.  They said he did it in
09:08   17    1998, in that narrow period when he wasn't working with
09:08   18    Mattel at all.
09:08   19             This whole area about whether the contract would
09:09   20    cover what he did at Mattel is something, again, would not
09:09   21    be controversial with MGA, except in this case, where
09:09   22    they're trying to get away with stealing Mattel's property.
09:09   23             Now, remember, I said they say it was created in
09:09   24    1998.  When were the Bratz design and concept created?  And
09:09   25    this is a fascinating area.

09:09    1          It's also, I'd suggest, we've shown you

09:09    2    conclusively, not just more probably than not, that these

09:09    3    designs were created after Carter Bryant joined Mattel in

09:09    4    January of 1999.

09:09    5          Now, first, Mr. Bryant will tell you, "Oh, I did

09:09    6    this in 1998." But you saw him. You saw him testify. You

09:09    7    saw him tell you how at least on two occasions he testified

09:09    8    falsely under oath so that he could get an advantage.

09:09    9          He's a little bit loose with the truth. And knows

09:10   10    he has to say he did it in 1998 if he's going to make

09:10   11    millions on these and take them from the Mattel design

09:10   12    center.

09:10   13          So you've got to look at the objective evidence.

09:10   14    And here's what you know. You've seen some drawings, for

09:10   15    example, exhibits --

09:10   16          I'm going to go to Exhibits 10-3 and 10-8 first,

09:10   17    Ken, which are 338 and 339.

09:10   18          You've seen some drawings that have a '98 date on

09:10   19    them.

09:10   20          And these color drawings. And this isn't the best

09:10   21    color copy, but this is Exhibit 10, where it has that August

09:10   22    '98 date on 'em.

09:10   23          Well, here's what Mr. Bryant told you -- admitted.

09:10   24    There is not a single drawing that exists of Bratz that has

09:10   25    the date '98 on it that was actually put there in 1998. He

09:10  1   couldn't identify a single one.

09:10  2           So how can we date these drawings, then?

09:10  3           Notarized.  You know, if you notarize something,

09:10  4   you know what that means?  It means that on the date it's

09:10  5   notarized it exists.  That's what a notarization means.  You

09:11  6   go to a notary.  Here, it's this date.  Notarize it on this

09:11  7   date.  And so we have a number of documents notarized

09:11  8   August 26, 1999, when Mr. Bryant took some Bratz drawings to

09:11  9   Ms. Prince, you recall.  August 26, 1999.  They were in

09:11  10  existence on that date.

09:11  11          And by the way, do you know one way you know that

09:11  12  Mr. Bryant knew that if he created these at Mattel, they

09:11  13  belonged to Mattel?  One way he knew that is that when he

09:11  14  went to Ms. Prince -- you heard Ms. Prince's testimony -- he

09:11  15  didn't come in and say, "I'm doing these for something

09:11  16  called Alaska Momma."  I'm going to send these out.  What he

09:11  17  did instead is he went to her and said --

09:11  18          In fact, this is Slide 64, Ken.

09:11  19          He went and said to her, "I need some

09:12  20  documentation that I did these drawings before I started at

09:12  21  Mattel.  I don't want anyone to think I did them while I was

09:12  22  at Mattel."  You remember he had the conversation with her

09:12  23  in the office:

09:12  24          "I want you -- I want to come by and talk to you.

09:12  25          "What is it about?

09:12   1          "I don't want to tell you."

09:12   2          You know, she didn't know what he was gonna do

09:12   3   when he walked in.  Uh, what he wanted to do was get

09:12   4   evidence he did this in 1998.

09:12   5          Now, why would he want -- why would that be so

09:12   6   important to him?  Because he knew -- he knew how important

09:12   7   it was.

09:12   8          He would only own them if he did it in 1998,

09:12   9   during that small time frame.

09:12   10         So he -- if he did that in that time frame,

09:12   11  though, wouldn't he have had something notarized or

09:12   12  copyrighted?  How many copyrights did he -- remember he had

09:12   13  a lot of copyrights on those songs?  He didn't send it to

09:12   14  himself, kind of a poor man's copyright.  He didn't --

09:12   15  what's another way of doing this?  He didn't have evidence

09:12   16  that he went to any other company -- a letter to some to

09:13   17  company in 1998 saying, "Hey, I want to sell you these."

09:13   18         There is no evidence it was in 1998.

09:13   19         In August 1999, we have those documents that

09:13   20  existed then, after he was back at Mattel.  And he was, in

09:13   21  Ms. Prince's words, concerned.

09:13   22         And then you look at all the documents -- it's all

09:13   23  the rest of the documents except for those dated '99 -- all

09:13   24  the documents that are not notarized at all.

09:13   25         All the ones -- if you're gonna go to a notary and

| | | |
|---|---|---|
| 09:13 | 1 | say, "I wanna to prove I did this at Mattel," you'd give her |
| 09:13 | 2 | all the documents you had, right?  You'd give her the |
| 09:13 | 3 | drawings you had done. |
| 09:13 | 4 | Now, as it happened, it only shows those drawings |
| 09:13 | 5 | existed in August of '99.  Look at all the other drawings |
| 09:13 | 6 | you have in this case.  For example, 302. |
| 09:13 | 7 | Slides 74, Ken. |
| 09:13 | 8 | And which, by the way, he put "copyright 2000" on. |
| 09:14 | 9 | You've got the entire pitch drawings.  You've got |
| 09:14 | 10 | all these color drawings.  You've got -- and the verdict |
| 09:14 | 11 | form lists all the drawings that were done that clearly |
| 09:14 | 12 | didn't exist as of August 26, 1999. |
| 09:14 | 13 | And then, of course, there's some documents that |
| 09:14 | 14 | he put the '99 date on them in 1999. |
| 09:14 | 15 | And those are Exhibits 777, 1328, and 1327. |
| 09:14 | 16 | So when you -- when you look at the drawings |
| 09:14 | 17 | themselves, there's nothing to corroborate this story of |
| 09:14 | 18 | Mr. Bryant's that, "Oh, I did this in this narrow time frame |
| 09:14 | 19 | when they would not be Mattel's." |
| 09:14 | 20 | And then we have -- do we have the notebook? |
| 09:14 | 21 | The notebook. |
| 09:14 | 22 | The notebook. |
| 09:14 | 23 | Exhibit 1155.  Now, when Mr. Bryant -- oh, these |
| 09:14 | 24 | notebooks by the way -- |
| 09:14 | 25 | Do we have 539, 540? |

09:15  1          These notebooks, it's not all the pages that were

09:15  2     originally in the notebook.  And Mr. Bryant testified --

09:15  3     Mr. Bryant testified that he created -- he said the first

09:15  4     Bratz drawings -- and here you have them, 539, 540, I think

09:15  5     there's 541 and 542.  He says these are the first time he

09:15  6     tried to do Bratz.

09:15  7          And you see it's ripped out of a notebook.  And

09:15  8     when he first testified -- and by the way, so Mr. Bryant

09:15  9     thought you could never trace these to this notebook.  They

09:15  10    were ripped from it.  And when he first testified, he said,

09:15  11    "By the way, I think that notebook is long gone."

09:15  12          And we can do Slide 78.

09:15  13          "In 2004, you testified that notebook from which

09:15  14    the original Bratz drawings came had been thrown away."

09:15  15          And so what Mr. Bryant didn't know when this

09:16  16    notebook was produced to us -- 'cause we asked for his

09:16  17    notebooks -- what he didn't know was that those drawings

09:16  18    could be traced to this notebook.

09:16  19          And this evidence is undisputed.  You heard

09:16  20    Mr. Cunningham talk about how when you -- when you draw on

09:16  21    something, you make an impression.  And depending on the

09:16  22    kind of ink or pencil you use, you'll make an impression on

09:16  23    the pages near it.  And he testified that there's no

09:16  24    question that Exhibits 539 and 541 were in this notebook.

09:16  25          You heard from MGA's expert, Mr. Lyter, say, I

| | | |
|---|---|---|
| 09:16 | 1 | have -- I have no issue with those conclusions of |
| 09:16 | 2 | Mr. Cunningham. |
| 09:16 | 3 | In fact, after all this analysis was done, |
| 09:16 | 4 | Mr. Bryant testified -- Slide 86 -- that as of June 18 -- |
| 09:16 | 5 | June 17th, it was his understanding by -- "by that time |
| 09:16 | 6 | that -- what you say are the original Bratz drawings came |
| 09:16 | 7 | out of the notebook, 1155-C? |
| 09:17 | 8 | "ANSWER: Yes." |
| 09:17 | 9 | It's indisputable. |
| 09:17 | 10 | So what's the notebook tell you?  Well, we went |
| 09:17 | 11 | through this for a while with Mr. Bryant. |
| 09:17 | 12 | And one thing, what you see in here are -- are |
| 09:17 | 13 | notations.  At page 57 of this, you're gonna see notations |
| 09:17 | 14 | that look like banking records. |
| 09:17 | 15 | I think that's Slide -- here we go. |
| 09:17 | 16 | So you're gonna find this in the notebook.  You |
| 09:17 | 17 | see where it says "13.02, July 16th and July 15th."  These |
| 09:17 | 18 | are banking records that relate to his banking accounts in |
| 09:17 | 19 | what year?  1999. |
| 09:17 | 20 | And if you compare 'em to Exhibit 13649, those are |
| 09:17 | 21 | his banking records.  And Mr. Bryant, on the stand, admitted |
| 09:17 | 22 | that -- definitively, that the notes he had in here, that |
| 09:17 | 23 | page was in his notebook was written in 1999.  And we had |
| 09:17 | 24 | him compare the banking records.  It's not just the $13.02. |
| 09:18 | 25 | There were a number of entries.  I mean, it's from his 1999 |

09:18  1    records.

09:18  2            Well, what else is in here?  There are these

09:18  3    pictures, a kind of drawings, and, uh, and we'll show you

09:18  4    one.  It's 1155C27.  Now, look at this drawing.  This is,

09:18  5    you know, a first sketch.  And then we showed him

09:18  6    Exhibit 10756, and this is another sketch.  It says,

09:18  7    "sapphire."  And then we've got Exhibit 13657, and when you

09:18  8    look at the original here -- when you go back and look at

09:18  9    the original, you'll see it's dated in February of 1999,

09:18  10   after he joined Mattel.

09:18  11           And Mr. Bryant said that this seems to be a

09:18  12   progression of the same drawing.

09:18  13           And here's his testimony.  "It looks like some

09:18  14   kind of progression.  This appears to be a progression."

09:18  15           And then finally, he's shown a drawing he did in

09:19  16   February of 1999, while he was at Mattel, because that's

09:19  17   when he had that -- that assignment to do -- to do this

09:19  18   Jewel Barbie.

09:19  19           And here's an example of -- of an attempt to

09:19  20   mislead you.  Because MGA got up and put in a lot of

09:19  21   drawings that were done in '98, first part of '98, including

09:19  22   Exhibit 10736.  We see this dress with the three tiers.

09:19  23           And then even as of yesterday -- as of yesterday,

09:19  24   they put in -- uh, what was it? -- 10565.  You recall that?

09:19  25   Well, Mr. Bryant, we showed him that on redirect, and here's

09:19  1   what he said about those drawings:

09:19  2          "Uh, you can see the difference between this type

09:19  3   of gown and the ones that you had in your 1998 drawings" --

09:19  4   and by that type of gown, we're talking about the ones in

09:19  5   his notebook.

09:19  6          "Yes.

09:19  7          "And they're quite different, right?

09:20  8          "Uh, yes.

09:20  9          "And different than the sketches you have in this

09:20  10  black notebook?"

09:20  11         The sketches in this black notebook relate to

09:20  12  1999.  And showing you these hoop skirt as opposed to long

09:20  13  flowing is just an attempt to deceive.  And Mr. Bryant tells

09:20  14  you that himself.

09:20  15         And here you're going to find his -- a note from

09:20  16  his brother.  That's 1155-C-87, which --

09:20  17         "Mom and Dad, thanks for everything.  It was

09:20  18  great.  We look forward to seeing you in the next few

09:20  19  weeks -- be back been again in the next few weeks."

09:20  20         And Mr. Bryant said his brother was like a

09:20  21  ten-hour drive away from Missouri, and that this, then, if

09:20  22  "We're gonna see you in the next few weeks," probably would

09:20  23  be the Thanksgiving and Christmas time frame.  Right?  And

09:20  24  so what do we see when we look at Mr. Bryant's records, his

09:20  25  bank records?  He's making ATM withdrawals in Missouri in

09:20  1    November and Christmas of 1999.

09:21  2              Another one.  Large angel.  Now, this is one my

09:21  3    favorites.  Here's why.  If you look at 1155-C-13, you'll

09:21  4    see this note.  Notes:  Ideas on large angels.  Shimmery

09:21  5    hair stuff, Ken hair, stained glass, empire waist -- I

09:21  6    didn't know what that was till Ms. Martinez told me.  And he

09:21  7    did this project at Mattel in 1999.

09:21  8              But then you recall in his examination by MGA,

09:21  9    they asked him the following.

09:21  10             This is at Slide 117 here, and 18.

09:21  11             "Now, let's discuss your August '98 angel project.

09:21  12   Do you remember what I'm talking about?  Angel project for

09:21  13   Ashton Drake?

09:21  14             "Uh, yes."

09:21  15             And then at 118, they showed him something which

09:21  16   said, "Angel Project, actual illustrations begun August 11,

09:21  17   '98," et cetera.

09:21  18             '98.  Do you remember that?  He's like, uh -- oh,

09:21  19   this angel thing, this could be the 1998.  And that was an

09:22  20   intentional attempt to misled you.

09:22  21             Because look at that note.  1155-C-13.  What does

09:22  22   it say about this angel project?

09:22  23             That's Slide 116.

09:22  24             Shimmery hair stuff, Ken hair.  Well, when

09:22  25   Mr. Bryant was asked, when he got back up, about this,

09:22  1    here's what he testified to:

09:22  2                Slide 119.

09:22  3                "In 2004, you testified this page in your notebook

09:22  4    related to a Mattel project in '99, right?  And that's

09:22  5    because it talks about shimmery hair stuff and stained

09:22  6    glass.  These were all ideas you had for a '99 project at

09:22  7    Mattel in large angel, correct?

09:22  8                "ANSWER:  I believe so, yes.

09:22  9                "QUESTION:  So this is something in the notebook

09:22 10    that we can definitively say is 1999, right?

09:22 11                "ANSWER:  I believe so, yes."

09:22 12                So why were you told about a 1998 project with

09:22 13    Ashton Drake which has nothing to do with this note in his

09:23 14    notebook?

09:23 15                Because the notebook where he said he did the

09:23 16    original Bratz drawings, this stuff is from after he joined

09:23 17    Mattel, not in 1998.

09:23 18                Uh, they asked him about -- Mr. Cunningham also

09:23 19    saw an outline in here, something that had been a Rainy Day

09:23 20    Rascals kind of project.  I don't know if you remember that.

09:23 21                Not yet, Ken.

09:23 22                And, uh -- and Mr. Bryant said, "Oh, I did those

09:23 23    in 1998."  But, you know, what?  There's a red notebook.

09:23 24    Exhibit 1154.  And on page 20 of that notebook, what you'll

09:23 25    see is what Ken just put up, which is this Rainy Day

09:23  1   Rascals, "Whenever I need you, there you are."  And the bank

09:23  2   records in that notebook say 2000.  And you'll remember that

09:23  3   testimony when we showed him the notebook, when we showed

09:23  4   him the bank records.  And the red notebook is 2000.

09:24  5        Also in this notebook, by the way -- in the red

09:24  6   notebook -- I'm sorry.  In the red notebook, you'll find --

09:24  7   page 37, you'll find an initial drawing of -- you remember

09:24  8   the prayer angels drawing Mr. Bryant did for MGA in August

09:24  9   of 2000?  Right at the end.  You'll see a sketch of one of

09:24  10  those.

09:24  11       The objective evidence.  The only evidence you can

09:24  12  trust, because you can't trust what Mr. Bryant says about

09:24  13  dates, is that these drawings were created in 1999.

09:24  14       In fact, MGA, when it had lawsuits half a world

09:24  15  away in Hong Kong, made statements to the courts there about

09:24  16  this.  When were these drawings created?

09:24  17       And Exhibit 10175, there's a paragraph in evidence

09:24  18  there.  And this is by MGA's counsel:

09:24  19       "The design of the Bratz dolls were originally

09:24  20  created by Mr. Carter Bryant in 1999 and subsequently

09:25  21  amended."  And then it says, "Copies are at Schedule 1."

09:25  22       And I think if you look at Slide 136, there's in

09:25  23  evidence Schedule 1 and the drawings.  That's Exhibit 10175.

09:25  24       If we can kind of flip through those.

09:25  25       You recognize these, don't you?  That's from the

09:25   1    original sketchbook.  That's from the original -- I mean,

09:25   2    the original pitch book.  1999.

09:25   3              And look at the changes.  I want to show you the

09:25   4    changes in Mr. Bryant's drawing of what he says is Bratz.

09:25   5              If we put up 48-B-2, this is a -- in evidence.  It

09:25   6    is one of the -- I think it's Slide 351.

09:25   7              This is one of Ms. Martinez's decal drawings, I

09:25   8    think.  Uh, you remember she testified that, you know, in

09:26   9    the design center, there's all this collaboration; people

09:26   10   see each other's work.  And -- and she did something like

09:26   11   this.  It was Cool Skating Barbie at this point, and that

09:26   12   decal actually went on the market in 1999 on a Barbie, the

09:26   13   Cool Skating Barbie.

09:26   14             Now, I want you to look at what Mr. Bryant says

09:26   15   was one of the original Bratz drawings.  And that's

09:26   16   Exhibit 5-41.  Let's look at that one.

09:26   17             And you can see how 5-41 is -- there aren't the

09:26   18   big eyes.  It's not the big head.  It's in that fashion pose

09:26   19   that you see a lot, with the hands on the hips.  You know.

09:26   20   Right?

09:26   21             So what did Mr. Bryant's drawings become?  Well,

09:26   22   look, for example, at 10-8.  Remember, this was in his pitch

09:26   23   book.

09:26   24             It says August '98, but that wasn't when that was

09:27   25   put there.  That was in his pitch book in September of 2000.

09:27  1          And if you look at those -- and we can put those

09:27  2    exhibits, the exhibits themselves, the pictures next to each

09:27  3    other.  This is what he says he originally did.  This is

09:27  4    what was done within Mattel, and this is kind of what he

09:27  5    came up with when he went to MGA.

09:27  6          Now, here's where there's been an attempt to

09:27  7    really be confusing, and quite frankly, it might have been

09:27  8    confusing 'cause we haven't had the chance really to talk to

09:27  9    you about this.  Everyone's been saying or suggesting we're

09:27  10   saying Toon Teens infringes.  Toon Teens was originally --

09:27  11   was kind of created -- Lily tried to create it based upon

09:27  12   this decal.  Someone said that's a great decal.  And

09:27  13   Mattel's never made that claim.  It is not an appropriate

09:27  14   claim.  You got those copyright infringement instructions.

09:27  15   I mean, you can be inspired by something.  That does not

09:27  16   mean that you are copying it.

09:27  17          So all this shows is that we believe that this

09:28  18   drawing is more evidence that this drawing was done in 1999.

09:28  19          Wasn't necessarily done while he was at Mattel,

09:28  20   you know -- but look at the inspiration, the change from

09:28  21   Exhibit 541 to 10-8.  You get the larger head.  You get the

09:28  22   larger eyes.  You get the larger feet.  You get the pose.

09:28  23   Again, it's just part of the evidence that the Bratz design

09:28  24   concepts came out of that Mattel design center, along with

09:28  25   all the other objective evidence.

09:28  1          Remember, there was testimony about *Seventeen*

09:28  2    Magazine?  You're going to have two, *Seventeen* Magazines

09:28  3    back there.  I hope you enjoy the reading.  There is one in

09:28  4    '98, Exhibit 17246.  That has a Steve Madden ad in it at

09:28  5    page 115.  And Mr. Bryant said, "Oh, that inspired me."

09:28  6          Now, this is the '99 one, Ken.

09:28  7          Here we go.

09:28  8          "That inspired me to do it.  That's how you know

09:28  9    it was in '98.  Even though I have no witness verifying it,

09:29  10   I have no documents verifying it, that shows it was '98."

09:29  11         But he also said, "Well, that *Seventeen* Magazine

09:29  12   in '98 is not my magazine."  The attorneys went out and saw

09:29  13   it.  And you can flip through any *Seventeen* magazine and

09:29  14   find something that you can say, "Ah, that inspired me."

09:29  15         But, you know, in '99 when he went to Ms. Leahy,

09:29  16   the sculptor, and he gave her his drawings, he gave her also

09:29  17   a Steve Madden ad.  Which one?  Well, he gave her -- if you

09:29  18   look at 10179, I think it's page 33.  He gave her this:  An

09:29  19   August '99 Steve Madden ad.

09:29  20         You know -- you know.  And I'll let you decide

09:29  21   which one actually could have possibly influenced him to do

09:29  22   Bratz while he was sitting there in the Mattel design

09:29  23   center.

09:30  24         What did he do while he was at Mattel in '99?  He

09:30  25   created these designs relating to a doll.  His intention was

Case 2:04-cv-09049-DOC-RNB   Document 10449   Filed 04/12/11   Page 41 of 125   Page ID #:317684
CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

41

09:30  1    always for it to be a doll.  He created this concept.  He

09:30  2    even created a prototype while he was there at Mattel.  He

09:30  3    used the parts from Mattel.  He went to a face painter and

09:30  4    said, "Hey, can you do me a favor and paint a face on this

09:30  5    doll?"  He went to a hair rooter.  "Can you do me a favor

09:30  6    and root some hair?"  'Cause that's the kind of

09:30  7    collaborative process it was at Mattel.

09:30  8           And he put together a prototype so he could

09:30  9    present, and say, "This is what I want to sell."  Is he

09:30  10   trying it make something ugly?  A Frankenstein prototype?

09:30  11   Ms. O'Connor said it was beautiful.

09:30  12          It was done right in the Mattel design center.

09:30  13          And when he was on the stand, what did Mr. Bryant

09:30  14   say about that?

09:30  15          And I want to put up Slide 152.

09:30  16          We talked about those folks he went to, to do face

09:31  17   painting and the hair painting.  Elise Cloonan, a roommate.

09:31  18          "You betrayed that trust?

09:31  19          "Well, thinking about it now, yes.

09:31  20          "And you betrayed the trust of Elise Cloonan also?

09:31  21          "ANSWER:  Yes.

09:31  22          "And you betrayed the trust of Mattel also?

09:31  23          "ANSWER:  Yes."

09:31  24          And, you know, when he said he betrayed Mattel, I

09:31  25   don't think he meant Mr. Eckert.  You know, who he meant was

09:31  1    Lily Martinez and Ivy Ross and the people who worked at that

09:31  2    design center and created toys together.

09:31  3         And, you know, there's been some suggestion that

09:31  4    Ms. Martinez is not the appropriate representative of Mattel

09:31  5    for this trial; that Mr. Eckert is.  And I'm gonna tell you

09:31  6    I think that's dead wrong.

09:31  7         She's the one he betrayed, one of the ones he

09:31  8    betrayed.  The colleagues who are coming together to make

09:31  9    these designs.

09:32  10        And, you know, you've seen me up here with all

09:32  11   these Post-it notes.  You know, I'd say the ones from Lily

09:32  12   probably come up to my knee, the ones from Mr. Quinn

09:32  13   certainly go over my head, and the ones from Mr. Eckert are

09:32  14   only about this big, but I paid really close attention to

09:32  15   'em.

09:32  16            (Laughter in the courtroom.)

09:32  17        MR. PRICE:  And here's the amazing thing:  The

09:32  18   story has changed.  You know, this "I did it in '98."  Well,

09:32  19   there came a time -- now, '98, the story wasn't nights and

09:32  20   weekends; he wasn't at Mattel.  But there came a time when

09:32  21   Mr. Larian was corresponding with his counsel.  And he sent

09:32  22   her a note saying, not that these were done in '98.  Here's

09:32  23   what he sent her.

09:32  24        This is Exhibit 9855, Slide 312.

09:32  25        It says, "Carter, the inventor" -- that word

09:32   1   "inventor" -- "has a roommate, Richard" -- that refers to

09:33   2   Richard Irmen -- "who witnessed Carter designing and

09:33   3   developing the Bratz line at his free time outside Mattel on

09:33   4   weekends or evenings."

09:33   5          Well, you read this; it sounds like he's saying

09:33   6   that Carter Bryant's working at Mattel, but doing it on

09:33   7   nights and weekends outside Mattel.  Well, by "outside

09:33   8   Mattel," do you mean thousands and thousands of miles

09:33   9   outside Mattel?

09:33   10         Well, he's fronting this story, Mr. Larian, in

09:33   11  June of 2001.  "Hey, he did it outside Mattel nights and

09:33   12  weekends."

09:33   13         The problem with that story is you've seen the

09:33   14  contracts.  You know what the employers expect.  You know

09:33   15  what Mr. Larian expects.  That doesn't work.  The nights and

09:33   16  weekends doesn't work, because Mattel is gonna own those

09:33   17  designs if you're a designer at Mattel creating toy designs

09:33   18  whenever you do them while you're employed at Mattel.

09:33   19         Now, Mr. Larian said, "Oh, what I meant there by

09:34   20  outside Mattel, I meant in 1998," uh, when he wasn't, uh,

09:34   21  working at The Gap.  Here's the problem with that.  Richard

09:34   22  Irman did not live with Mr. Bryant in 1998.  He was not in

09:34   23  Missouri in 1998.  Mr. Bryant testified to that.

09:34   24         That's Slide 353.

09:34   25         "The time you were in Missouri was December '97,

| | | |
|---|---|---|
| 09:34 | 1 | thereabouts? |
| 09:34 | 2 | "Uh-huh, yes. |
| 09:34 | 3 | "And you lived there until after Christmas of '98? |
| 09:34 | 4 | "Yes. |
| 09:34 | 5 | "And the only time Mr. Irman resided with you was |
| 09:34 | 6 | after Christmas of 1998? |
| 09:34 | 7 | "I believe so, yes." |
| 09:34 | 8 | So the only time Mr. Irman would have seen him |
| 09:34 | 9 | working on these nights and weekends was when Mr. Bryant |
| 09:34 | 10 | worked at Mattel. |
| 09:34 | 11 | So this story about nights and weekends outside |
| 09:34 | 12 | Mattel then has shifted back to 1998 because that's the only |
| 09:35 | 13 | way Mr. Bryant or Mr. Larian would own them. |
| 09:35 | 14 | So we have these designs, which, by the way, |
| 09:35 | 15 | Ms. Garcia said were -- let's look at Slide 285 -- amazing, |
| 09:35 | 16 | unique, unlike anything they had seen before. |
| 09:35 | 17 | And I think that's 285, but I could be wrong. |
| 09:35 | 18 | So here is Mr. Larian's story about that.  Here's |
| 09:35 | 19 | her testimony: |
| 09:35 | 20 | "They showed you on September 1st, and you thought |
| 09:35 | 21 | they were amazing? |
| 09:35 | 22 | "Yes. |
| 09:35 | 23 | "You thought they were incredible? |
| 09:35 | 24 | "Yes. |
| 09:35 | 25 | "You thought they were unique? |

09:35  1            "Yes.

09:35  2            "They were unique compared to anything that was

09:35  3  out there on the market?

09:35  4            "Yes.  You didn't look at them and say, 'Oh, look

09:35  5  Sailor Moon; Oh, look, Betty Boop.'  You know, these were

09:35  6  unique."

09:35  7            And actually, she saw them in August.

09:35  8            Actually, she saw them earlier, because you hear

09:36  9  the testimony of Anna Rhee, which was, "It was like in July

09:36  10  when I was asked to do a face paint on Bratz.  It was early

09:36  11  in the summer of 2000."

09:36  12            But here's what happens, then, when -- according

09:36  13  to Mr. Larian -- Mr. Bryant comes in, he has his pitch book,

09:36  14  Exhibit 302.  And you've seen those drawings time and time

09:36  15  again.  The front page of that says, "Copyright 2000."

09:36  16            It is the most suspicious circumstance you can

09:36  17  imagine.  You have a Mattel designer coming in to a

09:36  18  competitor, presenting them with Mattel designs.

09:36  19            At that time the only thing Mr. Larian knew about

09:36  20  Carter Bryant, the only things he knew is that Carter Bryant

09:36  21  created designs he did not own.  Because the only thing he

09:36  22  knew about him was that he was a Mattel designer from the

09:37  23  Mattel design center, under contract with Mattel to create

09:37  24  designs.  That's the only thing he knew.

09:37  25            And so he comes and presents this to Mr. Bryant --

| | | |
|---|---|---|
| 09:37 | 1 | I mean to Mr. Larian -- Mr. Bryant presents to Mr. Larian, |
| 09:37 | 2 | and Mr. Larian knew that if Carter Bryant didn't own these |
| 09:37 | 3 | designs, then he couldn't own them.  He knew under these |
| 09:37 | 4 | circumstances -- and by the way, he admitted this was just a |
| 09:37 | 5 | red flag.  If you look at -- I think it's Slide 176 -- we |
| 09:37 | 6 | have his -- |
| 09:37 | 7 | "Raise a red flag for you, that you had a doll |
| 09:37 | 8 | designer from a competitor presenting you with doll designs? |
| 09:37 | 9 | "Yes." |
| 09:37 | 10 | So now you've got to ask yourself, did Mr. Larian |
| 09:37 | 11 | care?  And did he know the answer, really, that these |
| 09:37 | 12 | belonged to Mattel? |
| 09:37 | 13 | Did he care? |
| 09:37 | 14 | Well, here you have the most suspicious |
| 09:37 | 15 | circumstances possible.  All you know is that the guy works |
| 09:38 | 16 | at a job where it's his job to create designs that belong to |
| 09:38 | 17 | Mattel.  And it seems like if you were told, "Oh, I created |
| 09:38 | 18 | them in 1998," an honest person would want proof.  Not just |
| 09:38 | 19 | for yourself, but for the rest of the world.  Because |
| 09:38 | 20 | remember, if someone else comes and says, "They're ours," |
| 09:38 | 21 | you've got to prove that they're not; that Carter Bryant had |
| 09:38 | 22 | them. |
| 09:38 | 23 | You know, you buy a car from someone, you don't |
| 09:38 | 24 | just say write down this is your car; you get a pink slip. |
| 09:38 | 25 | You return a shirt to Target, they ask you for a receipt. |

09:38  1        And here's Mr. Larian, he's going to invest

09:38  2   millions of dollars.  He's going to build the brand.  He's

09:38  3   going to transform his company.  And he admits to you he

09:38  4   didn't ask 'em a question about, "Do you have any proof that

09:38  5   in that narrow time frame you did it?"

09:38  6        It reminds me of a joke, not a very good one, but

09:38  7   where there's a prosecutor prosecuting someone for murder.

09:39  8   A body hadn't been found, but there's great evidence.  And

09:39  9   in the middle of the trial, the prosecutor gets a note and

09:39  10  says, "Your Honor, I'm sorry, we're prosecuting Mr. Smith

09:39  11  for murder, but I just got a note that at 10:25 that the

09:39  12  victim's gonna walk into this room at 10:35, in just like

09:39  13  five seconds, and five, four, three, two, one."  Everybody

09:39  14  is looking at the door, except for the defendant, 'cause he

09:39  15  knows she's dead.

09:39  16       Now, it's not a true story, but there's a lot of

09:39  17  truth to it.

09:39  18       Mr. Larian didn't look at the door.  He didn't

09:39  19  say, "Do you have proof?"  He didn't care.  He knew these

09:39  20  were owned by Mattel.  And, in fact, Mr. Larian testified

09:39  21  this is -- that he didn't care.

09:39  22       This is Slide 173.

09:39  23       "Wouldn't have been a problem if Carter Bryant had

09:39  24  created or made any of his drawings when he was employed by

09:39  25  Mattel, in your view?

48

09:40  1          "ANSWER:  No.

09:40  2          "QUESTION:  Why not?

09:40  3          "Because I don't think, whether it's MGA or

09:40  4     Mattel, we own the people, especially the creative people,

09:40  5     forever."

09:40  6          He didn't do what any honest person would do.

09:40  7     What did he do?  He said, I got more than his word.  I got

09:40  8     his representation.  "I got his warranty," which is just

09:40  9     another way of saying, "You have my word."

09:40  10         In fact, Mr. Larian sat here and told you under

09:40  11    oath -- look at Exhibit -- Slide, I think, 178 -- that he

09:40  12    contacted an attorney, or he had Ms. O'Connor contact 'em.

09:40  13    And his lawyer was told to make sure 100 percent what Carter

09:40  14    Bryant was saying is true, 'cause we don't want to have an

09:40  15    issue or lawsuit with Mattel or anybody else.

09:40  16         Well, here's the thing.  Mr. Rosenbaum, who he's

09:40  17    talking about, wasn't assigned to find out whether it was

09:40  18    true.  He was assigned to write up a contract.  Contracts

09:40  19    have in them representations and warranties in the

09:41  20    situation.

09:41  21         You know, MGA knew that it wasn't going to do them

09:41  22    any good.  You know, if you couldn't prove these were Carter

09:41  23    Bryant's, Carter Bryant's representations aren't going to

09:41  24    help.  His warranty just means he's in the same boat as you

09:41  25    are.

09:41    1        And by the way, Mr. Larian knew that Mr. Bryant

09:41    2   could never reimburse him for damages if these didn't belong

09:41    3   to him.  This is a standard contract.

09:41    4        Mr. Rosenbaum could not talk to Mr. Bryant

09:41    5   directly, so he talked to his attorney.  And the attorney

09:41    6   wrote and said -- and Mr. Larian is copied on this -- Yes, I

09:41    7   looked at the timeline; it's 1998.  He didn't ask the

09:41    8   attorney:  Is there any proof other than what your client

09:41    9   says?  Do you have any notarizations?  Do you have any

09:41   10   copyrights?  Do you have anything?

09:41   11        And by the way, we're not talking ink samples,

09:41   12   handwriting.  That's another absurdity.  We're talking what

09:41   13   someone would do if they wanted to prove this.

09:41   14        Rosenbaum didn't ask for that.  And you heard

09:42   15   Mr. Rosenbaum, and here's what he said:

09:42   16        "Did they tell you -- at some point Mr. Larian had

09:42   17   tasked you to make 100 percent sure that Carter Bryant had

09:42   18   created his intellectual property in 1998?

09:42   19        "ANSWER:  No."

09:42   20        Slide 180.

09:42   21        "And so you were never asked to make 100 percent

09:42   22   sure that whatever it was that Mr. Bryant was purporting to

09:42   23   convey to MGA was, in fact, owned by Mr. Bryant; you just

09:42   24   weren't asked to do that?

09:42   25        "ANSWER:  Correct.

09:42  1        "And did anyone at MGA ever tell you that they
09:42  2   were relying on any investigation you did to determine
09:42  3   whether or not Mr. Bryant's intellectual property actually
09:42  4   belonged to him?
09:42  5        "ANSWER:  No.
09:42  6        "When you -- were you asked to do an investigation
09:42  7   so you can give an opinion as to who was -- actually owned
09:42  8   whatever property it was that Mr. Bryant was conveying to
09:42  9   MGA?
09:42  10        "I was not.
09:42  11        "And so you were never asked to make 100 percent
09:42  12   sure that whatever it was that Mr. Bryant was purporting to
09:42  13   convey to MGA was in fact owned by Mr. Bryant?  You just
09:43  14   weren't asked to do that?
09:43  15        "ANSWER:  That's correct."
09:43  16        But Mr. Larian is willing to say anything to say
09:43  17   that he gave -- cared whether this was Mattel's property,
09:43  18   when the only thing he knew was that that was Carter
09:43  19   Bryant's job to make doll designs that belonged to Mattel.
09:43  20        I'm getting a little cotton mouth.  Good time for
09:43  21   a break?
09:43  22        THE COURT:  It's a good time for a break, Counsel.
09:43  23        You're admonished not to discuss this matter
09:43  24   amongst yourselves, nor form or express any opinion
09:43  25   concerning the case.

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:43 | 1 | We'll come get you promptly at 10:00 o'clock. |
| 09:43 | 2 | Have a nice recess. |
| 09:43 | 3 | Counsel, why don't you take a recess.  We'll see |
| 09:43 | 4 | you promptly.  The doors will be open, and the jury will be |
| 09:43 | 5 | seated at 10:00 o'clock. |
| 09:43 | 6 | *(Recess held at 9:43 a.m.)* |
| 10:03 | 7 | *(Proceedings resumed at 10:03 a.m.)* |
| 10:03 | 8 | *(In the presence of the jury.)* |
| 10:03 | 9 | THE COURT:  All right.  We're back in session. |
| 10:04 | 10 | The jury's present.  The alternates are present. |
| 10:04 | 11 | Counsel, thank you for your courtesy; if you would |
| 10:04 | 12 | be seated. |
| 10:04 | 13 | This is the continuing direct examination by |
| 10:04 | 14 | Mr. -- strike that -- |
| 10:04 | 15 | MR. PRICE:  And then you did what? |
| 10:04 | 16 | *(Laughter in the courtroom.)* |
| 10:04 | 17 | THE COURT:  -- continuing closing argument by |
| 10:04 | 18 | Mr. Price. |
| 10:04 | 19 | MR. PRICE:  Ladies and gentlemen, what I just |
| 10:04 | 20 | described to you, as to what Mr. Larian did, is not |
| 10:04 | 21 | something that any honest toymaker would do. |
| 10:04 | 22 | It is no coincidence that Mr. Bryant did not take |
| 10:04 | 23 | his designs to anybody else.  He'd never heard of MGA.  He |
| 10:04 | 24 | was introduced by Veronica Marlow. |
| 10:04 | 25 | If he'd gone to any company that was being honest, |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:04 | 1 | they would have said, "You're a designer with a competitor, |
| 10:04 | 2 | telling me about toy designs.  And I just have your word for |
| 10:04 | 3 | it that you didn't do it when you worked for competitor" -- |
| 10:04 | 4 | and that last stint, by the way, was from January 4, 1999 to |
| 10:05 | 5 | October 19, 2000 -- his last stint at Mattel.  They would |
| 10:05 | 6 | have said, "Get out of here." |
| 10:05 | 7 | And you heard Mr. Friedman and others at Mattel |
| 10:05 | 8 | tell you they wouldn't do that.  They would say, "We're not |
| 10:05 | 9 | listening to you, because you are currently doing designs |
| 10:05 | 10 | for a competitor, and they own the designs you do." |
| 10:05 | 11 | You heard all his testimony that Mattel relies on |
| 10:05 | 12 | representations and warranties because it's dealing with |
| 10:05 | 13 | designer houses.  And they say the designers bring stuff to |
| 10:05 | 14 | us -- you know, that designer houses own them.  It's like |
| 10:05 | 15 | Mattel would own Carter Bryant's. |
| 10:05 | 16 | They deal with 'em over a period of years.  They |
| 10:05 | 17 | have that trust.  And you know something?  Mattel is taking |
| 10:05 | 18 | a bit of a risk.  I mean, if someone came forward and said, |
| 10:05 | 19 | "No, that designer, that designer house doesn't own this; I |
| 10:05 | 20 | do," there's a risk Mattel would have to say, "Oops.  We've |
| 10:05 | 21 | gotta pay you some money." |
| 10:05 | 22 | But they deal with people that they've dealt with, |
| 10:05 | 23 | that they trust, with designer houses, with designers they |
| 10:06 | 24 | know.  And they would never -- and no company would ever |
| 10:06 | 25 | deal with a current competitive designer working for a |

Case 2:04-cv-09049-DOC-RNB   Document 10449   Filed 04/12/11   Page 53 of 125   Page ID #:317696
CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

53

10:06   1    competitor doing designs.  They can't identify you one.

10:06   2           And did Carter Bryant go in the market with these

10:06   3    designs in 2000?  You know, did he try to get the best he

10:06   4    could by playing off Hasbro and Jakks versus MGA?

10:06   5           No.  'Cause he couldn't.

10:06   6           And what he gave them -- you're gonna see a --

10:06   7    your gonna get a verdict form.  It's gonna identify the

10:06   8    trade secrets that we're claiming.  And it's rather wordy, a

10:06   9    couple of them.  And they encompass these designs as

10:06   10   encompassed by the Bratz.

10:06   11          It says, first, "A multi-ethnic group of hip,

10:06   12   urban, edgy, trendy teenage girl fashion dolls and

10:06   13   accessories, collectively known as Bratz, including designs

10:06   14   for" -- and it goes on and gives it detail with the

10:06   15   distinctive names, the fashions, the personalities, the back

10:07   16   stories.  You know, it is what Carter Bryant conveyed or

10:07   17   showed Mr. Larian.

10:07   18          It's not Betty Boop.  It's not Diva Starz.  Yes,

10:07   19   they have some of those individual, you know, elements.  It

10:07   20   is this collection done the way Mr. Bryant did it, which

10:07   21   was, according to everybody, amazing, unique, unlike

10:07   22   anything.  It was that -- that innovative flash.  It was.

10:07   23          So do you have other evidence that Mr. Larian is

10:07   24   the type of guy who would join in business with Mr. Bryant,

10:07   25   even though he knew that what Mr. Bryant was doing was wrong

Case 2:04-cv-09049-DOC-RNB   Document 10449   Filed 04/12/11   Page 54 of 125   Page ID #:317697
CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

54

| | | |
|---|---|---|
| 10:07 | 1 | and in breach of his contract with Mattel? |
| 10:07 | 2 | Yes, you do know that because that's exactly what |
| 10:07 | 3 | he did.  That's exactly what he did. |
| 10:07 | 4 | You recall the testimony that in September of 2000 |
| 10:07 | 5 | Mr. Bryant showed these drawings.  There was a rush.  I |
| 10:08 | 6 | mean, they wanted to make a brand out of this -- MGA did. |
| 10:08 | 7 | They wanted to make something to show to the retailers. |
| 10:08 | 8 | Hong Kong Toy Fair was in February.  It's right around the |
| 10:08 | 9 | corner.  And you heard from a number of witnesses -- |
| 10:08 | 10 | Ms. O'Connor, I think, even Mr. Larian -- that -- and |
| 10:08 | 11 | Mr. Rosenbaum -- that there was a rush to get things done |
| 10:08 | 12 | because you wanted something to present to the retailers. |
| 10:08 | 13 | Mr. Larian had decided we want to make this a |
| 10:08 | 14 | brand.  So what do we have to do to get this process going? |
| 10:08 | 15 | And what they had to do was use Mr. Bryant, while |
| 10:08 | 16 | he still worked at Mattel. |
| 10:08 | 17 | And I'm not just talking about after October 4th. |
| 10:08 | 18 | You'll recall October 4th, Mr. Bryant gave his notice, and |
| 10:08 | 19 | stayed at Mattel until October 19th.  He's still a Mattel |
| 10:08 | 20 | employee.  I'm talking, even earlier. |
| 10:08 | 21 | You remember, in August, by the way -- you |
| 10:08 | 22 | remember, in August, he was hired by Ms. Garcia to do the |
| 10:08 | 23 | eyes for Prayer Angels.  Now, that appears to be assisting a |
| 10:08 | 24 | competitor.  And Mr. Bryant knows that's wrong.  Ms. Garcia |
| 10:08 | 25 | knows that is wrong. |

| | | |
|---|---|---|
| 10:09 | 1 | And then after this meeting, MGA didn't have the |
| 10:09 | 2 | ability to get this thing going in time for Hong Kong Toy |
| 10:09 | 3 | Fair.  All that MGA brought to the table at this point was |
| 10:09 | 4 | an appetite.  So Mr. Bryant had to get things going with the |
| 10:09 | 5 | knowledge of Mr. Larian and Ms. Garcia. |
| 10:09 | 6 | So, for example, Mr. Bryant, he's still at Mattel. |
| 10:09 | 7 | He works four hours a day for MGA, and -- from early |
| 10:09 | 8 | September until -- at least until this -- October 10th, when |
| 10:09 | 9 | Ms. Garcia, or Treantafelles at the time, says, "I would say |
| 10:09 | 10 | that Carter has worked an average about four hours a day. |
| 10:09 | 11 | And we began working on this line the first part of |
| 10:09 | 12 | September." |
| 10:09 | 13 | Now, of course, Ms. Garcia says that was a |
| 10:09 | 14 | mistake. |
| 10:09 | 15 | And Mr. Larian's response was, "I don't want 'em |
| 10:09 | 16 | to be paid until after his contract."  But Mr. Bryant wasn't |
| 10:09 | 17 | on an hourly basis.  Yeah.  He was working four hours a day |
| 10:09 | 18 | for MGA in September while he's still working for Mattel, |
| 10:09 | 19 | before he's given notice. |
| 10:10 | 20 | What else does he do?  He goes -- he writes to a |
| 10:10 | 21 | hair vendor on behalf of MGA.  This is September 18th. |
| 10:10 | 22 | Where he says, "The company I'm working with is called MGA |
| 10:10 | 23 | Entertainment."  And he signs it, "MGA Entertainment." |
| 10:10 | 24 | Mr. Bryant testified under oath, "I wasn't trying |
| 10:10 | 25 | to give them the impression I worked for MGA Entertainment," |

CV 04-9049 DOC – 4/8/2011 – Day 49, Volume 1 of 3

56

| | | |
|---|---|---|
| 10:10 | 1 | and he this testified, "Well, that was a knowingly false |
| 10:10 | 2 | rep- –– statement under oath." |
| 10:10 | 3 | He goes to the sculptor, Ms. Leahy, and he –– he |
| 10:10 | 4 | starts on the sculpt.  This is all in September.  You |
| 10:10 | 5 | remember she created that big brown thing, which didn't look |
| 10:10 | 6 | much like his drawings.  Remember the grayish –– I guess |
| 10:10 | 7 | it's grayish –– and she had to work on it again? |
| 10:10 | 8 | He goes to the sculpter.  He works with Veronica |
| 10:10 | 9 | Marlow to do the patterns.  All of this he's doing in |
| 10:10 | 10 | September to get this started.  And he's telling Ms. Garcia |
| 10:10 | 11 | and Mr. Larian he's doing this.  And that's his testimony, |
| 10:10 | 12 | Slide 167: |
| 10:10 | 13 | "You were working for MGA in September of 2000 to |
| 10:11 | 14 | help launch this Bratz doll line, correct? |
| 10:11 | 15 | "ANSWER:  Yes. |
| 10:11 | 16 | "And Mr. Larian and Ms. Garcia knew that? |
| 10:11 | 17 | "ANSWER:  Yes." |
| 10:11 | 18 | They're in cahoots with this guy when he steals |
| 10:11 | 19 | the Mattel Design Center (sic).  They have to be, 'cause |
| 10:11 | 20 | they don't have the resources to really get this started |
| 10:11 | 21 | without him. |
| 10:11 | 22 | Mr. Rosenbaum explained, by the way, that his |
| 10:11 | 23 | contract, that he signs with MGA –– he actually signs it |
| 10:11 | 24 | October 4th –– well, remember, it's Exhibit 14.  It says |
| 10:11 | 25 | "Dated as of September 18," which is, by the way, when he |

10:11   1   contacted the hair vendor, and Mr. Rosenbaum explained,

10:11   2   because, in his opinion, all the essential terms were agreed

10:11   3   to on that date.  That's not a date we put on there.

10:11   4           So what did he create -- Mr. Bryant create before

10:11   5   he left Mattel, October 19th?

10:11   6           Well, first, you've got the sculpt.  And, you

10:11   7   remember, all these sculpts were paraded in front of you:

10:11   8   Baby Bratz sculpts, dog sculpts, horse sculpts, right?

10:12   9   Well, the sculpts for the core teenage fashion dolls have

10:12   10   always remained the same.  Ms. Garcia told you that.  And

10:12   11   that's, uh --

10:12   12           "You were testifying that after 2000 that you

10:12   13   developed new characters for the Bratz girls, correct?

10:12   14           "ANSWER:  Yes.

10:12   15           "And those characters had the same sculpt for the

10:12   16   face.

10:12   17           "Yes.

10:12   18           "Did they have the same body sculpt?

10:12   19           "ANSWER:  Yes."

10:12   20           And Mr. Wagner, in his damages calculations with

10:12   21   the sculpts went through and identified, based upon

10:12   22   Ms. Garcia's testimony and Mr. Larian's testimony, you know,

10:12   23   what these production dolls -- what sculpts they were, which

10:12   24   ones were the original sculpt.

10:12   25           So Leahy -- you recall her testifying -- she said

58

10:12   1    that she did the sculpt basically all by herself.  And

10:12   2    you've heard the phrase, "Success has a thousand fathers,

10:12   3    and failure is an orphan"?  Uh, well, this is an example of

10:12   4    where a lot of people are coming up saying, "I fathered

10:12   5    this," and Ms. Leahy is one of them.  She stood before you

10:12   6    and said, you know, "Here's this drawing Carter Bryant did

10:13   7    for me to do my sculpt."  Well, here's this drawing Carter

10:13   8    Bryant did.  "I did not use it to do my sculpt.  He drew

10:13   9    this of my sculpt."

10:13   10          Doesn't make much sense.  Why would he draw her

10:13   11   sculpt?

10:13   12          The Exhibit you're seeing now, Exhibit 323, page

10:13   13   32, comes from Mr. Linker's packet.  Mr. Linker was given

10:13   14   this.  I think it was around October 17th.  Remember, he was

10:13   15   to do the packaging?  He had this before Mr. Bryant left

10:13   16   Mattel, October 19, 2000.

10:13   17          Ms. Leahy says, "Oh, that came after, sometime in

10:13   18   late, late October, early November."  It's simply not true.

10:13   19   And here's how you really know it's not true:  That's

10:13   20   because -- for one thing, Ms. Garcia testifies this drawing

10:13   21   was done before October 19, 2000.  It was done before

10:13   22   Mr. Bryant left Mattel, not late October, early November.

10:13   23          And then you look at Ms. Leahy's version of this.

10:13   24   It's Exhibit 1129.  This is her version.  And you see she's

10:14   25   written on it.  She's written rations/proportions so that

10:14   1   she can use this drawing to do her sculpt.  And the sculpt

10:14   2   that she did was based on this drawing.  It is a derivative

10:14   3   work of this drawing.

10:14   4          And you were told yesterday that a copyright owner

10:14   5   is entitled to exclude others from creating derivative works

10:14   6   based upon the owner's copyrighted work.  And that refers to

10:14   7   work based on one or more pre-existing works.

10:14   8          She bases her sculpt on this.  And you remember

10:14   9   seeing those molds that were dated October 23rd?  And that's

10:14   10  the mold from which she created -- I think it's

10:14   11  Exhibit 1141?  Well, the mold's the 23rd.  She had to do it

10:14   12  before the mold to have the sculpt to put into the mold to

10:14   13  create the mold.

10:14   14         The 23rd is -- I think, that's a Monday.  Carter

10:15   15  Bryant left on Thursday.  You know, it's not like he rushed

10:15   16  to do everything in four days.  I mean, the evidence is this

10:15   17  was done before Carter Bryant left Mattel.  It had to have

10:15   18  been.

10:15   19         And was this the, quote, "final sculpt"?

10:15   20         Well, Mr. Bryant, who was looking and overseeing

10:15   21  this, because it's his vision, said, "That's what I

10:15   22  understood" -- and that was Slide 190 -- that the sculpt,

10:15   23  created from his drawing, he thought became the final

10:15   24  sculpt.

10:15   25         Now, there were other sculpts.  Because this is

| | |
|---|---|
| 10:15 | 1 |
| 10:15 | 2 |
| 10:15 | 3 |
| 10:15 | 4 |
| 10:15 | 5 |
| 10:15 | 6 |
| 10:15 | 7 |
| 10:16 | 8 |
| 10:16 | 9 |
| 10:16 | 10 |

1   the aesthetic sculpt, you had to do a different sort of arm,

2   maybe; a different sort of leg.  But I want you to go and

3   compare Exhibit 1141, which is the one that Mattel owns --

4   because it was Carter Bryant's work, or a derivative while

5   he was at Mattel -- and compare that to any of the -- any of

6   the sculpts from any of the dolls, the Bratz dolls.

7          You had to take its clothes off.  And I can't do

8   demonstratives.  We're not doing demonstratives in closing.

9   We can show you testimony in evidence, but not

10  demonstratives.  Compare the two.

11         So they needed Mr. Bryant to do a sculpt.  They

12  needed Mr. Bryant to do the fashion drawings.  And do you

13  remember Exhibits 1107 -- I know you know 'em by name --

14  1107, 1108, 1109 and 1110?  These are the fashion drawings

15  Mr. Bryant said he did.

16         Now, of course, he comes in here and he says, "I

17  did them sometime in November."  Well, of course, he has to

18  say that 'cause he doesn't want you to believe he did them

19  while he was still working at Mattel.  I mean, one thing,

20  they're obviously derivative of the first drawings he did,

21  and so they are Mattel's properties.

22         But here's how you know they were done before he

23  left Mattel.  You need the designs before you actually do

24  the fashions.  Right?  And that's what Mr. Bryant testified

25  to -- Slide 206 -- that before you can actually do the

DEBBIE GALE, U.S. COURT REPORTER

10:16    1    fashions, create them, you have to have the fashion designs.

10:17    2         We know from Ms. Garcia's internal e-mails that

10:17    3    the final fashions were done by October 24th.  And that's

10:17    4    Exhibit 1236, where she writes to Hong Kong, "We have

10:17    5    finalized the fashion designs, and I am releasing the

10:17    6    following final design packages."

10:17    7         Of course, the testimony here is, "Oh, that was a

10:17    8    mistake, too."  She makes a lot of mistakes on dates when

10:17    9    those dates show that something is Mattel's property.

10:17   10         Now, so we asked Ms. Garcia, "Well, these designs,

10:17   11    were they rushed by Mr. Bryant between October 19th and

10:17   12    October 24th?  And so, basically, if Carter Bryant's last

10:17   13    day was October 19, you're not saying that on those four

10:17   14    days -- four full days before October 24th -- he did those

10:17   15    final designs in a rush over just that small time period?

10:17   16         "ANSWER:  No, I'm not saying that."

10:17   17         So here we have her e-mail, the 24th.  We've got

10:17   18    the final fashion designs.  She's not saying Mr. Bryant

10:17   19    rushed those drawings in five days.  He was working on them

10:18   20    throughout October while he was at Mattel.  And the proof's

10:18   21    in the pudding:  You don't have the fashions until you have

10:18   22    the designs.

10:18   23         And what was happening in that time frame?  The

10:18   24    sample makers were actually creating and working on the

10:18   25    designs before Carter Bryant left Mattel.

62

10:18   1            And if you look at Exhibit 606.  Here we have one

10:18   2   page which talks about between September 29 and

10:18   3   October 20th, but I think -- let's go to the -- it's the

10:18   4   next page.  Yes.  Here we go.

10:18   5            This is between October 13th and October 20th.

10:18   6   And on the left you have 81 hours doing sewing and

10:18   7   pattern-making support.  These things are actually being

10:18   8   created prior to October 19th.

10:18   9            Eighty-one hours of work -- from what?  From those

10:18   10  designs which are a derivative of what you saw in September:

10:19   11  Mattel's work, the Bratz designs.

10:19   12           And when I said that MGA didn't have designer --

10:19   13  didn't have doll designs for fashion dolls, you know, didn't

10:19   14  have the ability to do this until Mr. Bryant, well, the

10:19   15  fashions are critical in the fashion design.  They are

10:19   16  essential.  And who did MGA use to actually make those

10:19   17  fashions?  Three Mattel sample makers working for Veronica

10:19   18  Marlow.

10:19   19           Now -- and Larian said, "Oh, they're a dime a

10:19   20  dozen."  Yeah.  "You can get these people anywhere.

10:19   21  Thousands of these sample makers."

10:19   22           That is simply not true.  Mr. Linker told you they

10:19   23  are highly skilled.  Ms. Garcia said the following, at 196:

10:19   24           "And the sample makers in this industry -- toy

10:19   25  industry, are -- is it fair to say they are very skilled?

10:19   1          "ANSWER:  Yes.

10:19   2          "And it's difficult to find good sample makers?

10:20   3          "ANSWER:  Yes."

10:20   4          And yesterday you heard the write-ups of the three

10:20   5   sample makers, those women.  They were excellent sample

10:20   6   makers.  They were rare finds.  You saw e-mails from

10:20   7   Ms. Garcia saying, "I can't find any."

10:20   8          You know, these were important people -- important

10:20   9   people for -- for MGA to get to the Hong Kong Toy Fair with

10:20  10   something.  Because if they didn't, they would -- they were

10:20  11   gonna lose a year.  Right?  It wouldn't come out in 2001

10:20  12   unless they got publicized before then.

10:20  13          So how important is this?  How important is

10:20  14   actually using Mattel's sample makers to get this off the

10:20  15   ground also?  How important a fact is it?  It's important

10:20  16   enough that Mr. Larian himself testified falsely under oath

10:20  17   about it, and told someone else to, as well.

10:20  18          If you'd look at Exhibit 24306, this is an e-mail

10:20  19   from Mr. Larian to Craig Holden, at the bottom, and then

10:20  20   from Craig Holden to him.  Craig Holden was the attorney

10:21  21   working within MGA.  You didn't hear from him at the trial.

10:21  22   But here's what Mr. Larian wrote, January 19, 2008:

10:21  23          "Make sure Paula is prepped and doesn't know that

10:21  24   Veronica was using Mattel's seamstress."  Because she's

10:21  25   about to have her deposition taken.  She's about to testify

10:21   1   under oath.

10:21   2       By the way, Veronica Marlow -- Paula Garcia's best

10:21   3   friend.  Before she was Paula Garcia, she was Paula

10:21   4   Treantafelles.  When she got married, she became Paula

10:21   5   Garcia.  And at that time, Veronica Marlow gave her an

10:21   6   $8,000 wedding gift.  They were close.

10:21   7       Is it really conceivable that MGA didn't know that

10:21   8   the Mattel seamstresses were used?  Of course, Ms. Marlow

10:21   9   will now deny it.  Mr. Marlow.  Ms. Garcia, she was told to

10:21   10   deny it under oath.

10:21   11       And Mr. Larian did such a good job of convincing

10:21   12   Ms. Garcia to testify falsely under oath that he did it,

10:22   13   too.  'Cause you see this -- let's stick on that for a

10:22   14   second.  This is in -- Ken, let's go back to the -- this is

10:22   15   in January 2008.  Mr. Larian, at this time, knows that MGA

10:22   16   is using, through Veronica Marlow, Mattel employees to do

10:22   17   these critical samples, the fashions.

10:22   18       So he's -- testifies after this.  And what does he

10:22   19   say?  And here's what happened here.  And if we look at what

10:22   20   he wrote, it says:

10:22   21       "'Make sure Paula is prepped and doesn't know that

10:22   22   Veronica was using Mattel's seamstress.'  That's what you

10:22   23   actually wrote to your employee, correct?

10:22   24       "ANSWER:  Yes.

10:22   25       "And then afterwards you, yourself, testified that

10:22  1    you had no idea that Veronica Marlow was using Mattel

10:22  2    seamstresses, right?"

10:22  3           And we actually read that testimony to you.  He

10:22  4    not only told Ms. Garcia not to tell the truth, he also

10:22  5    didn't tell the truth under oath.

10:23  6           And because of this effort, because of using

10:23  7    Mr. Bryant and his connections, and using the Mattel

10:23  8    seamstresses, and using Mr. Bryant's creativity, they made a

10:23  9    brand.  They did licensing.  They made the doll.  The only

10:23  10   issue in making the brand -- the only issue was whether or

10:23  11   not those first dolls would sell.

10:23  12          MGA did a business plan, and I think it was March

10:23  13   of 2001, and that's Exhibit 13520.  And they were talking --

10:23  14   you remember MGA was called "ABC" at that time?  And they're

10:23  15   talking about leveraging the Bratz brand.  And the

10:23  16   statement -- third to last sentence there -- "The only risk

10:23  17   involved is that the Bratz dolls do not sell through at

10:23  18   retail.  However, preliminary research with young girls

10:23  19   indicates that will not be the case."

10:23  20          And, by the way, that is what the research

10:23  21   indicated.  These dolls -- I mean -- I mean, even the

10:23  22   drawings were loved by girls.  And you remember Mattel did

10:24  23   research every day.  They researched things to the hilt.

10:24  24          They would have researched this, too.  And they

10:24  25   would have gotten a solution to the problem that Ms. Luther

10:24   1   had identified and they were trying to solve with Diva Starz

10:24   2   and Generation Girls.

10:24   3        So having done all this, having taken Mattel's

10:24   4   property, taken its trade secrets to compete with Mattel,

10:24   5   to, for the first time, have a brand, have a licensee, have

10:24   6   a fashion doll, what do they tell you now?  "Well, you know,

10:24   7   that's what we did.  But those dolls that we came out with

10:24   8   look nothing like the drawings."

10:24   9        Ladies and gentlemen, Mr. Larian and MGA, they

10:24   10  were in the business of making what Carter Bryant brought

10:24   11  into MGA.  That was their business.  That was their goal.

10:25   12       Paula Garcia, if you look at Exhibit 1001 -- I'm

10:25   13  sorry -- 10001, you know, in one of her interviews said that

10:25   14  "The four girls were already concepted when presented by the

10:25   15  inventor during our first meeting.  I thought they were

10:25   16  incredible.  I tried to stay true to this inventor's

10:25   17  vision."

10:25   18       And think about what happened after October of

10:25   19  2000.  First, MGA goes to those pre-toy fair meetings with

10:25   20  retailers in November.  They would like to present

10:25   21  prototypes, but they don't have them.  They're still rushed.

10:25   22  Right?

10:25   23       What do they go and present them with -- to

10:25   24  retailers, to say, "You're gonna want to buy this doll?"

10:25   25  They present Carter Bryant's drawings.  And Mr. Larian

| | | |
|---|---|---|
| 10:25 | 1 | admitted to that on the stand, as, by the way, did |
| 10:25 | 2 | Ms. Garcia, when they went to those meetings in November -- |
| 10:25 | 3 | this particular one was Kmart.  What they used to sell the |
| 10:25 | 4 | dolls were Carter Bryant's drawings. |
| 10:25 | 5 | Mr. McConville was asking questions of Ms. Garcia |
| 10:26 | 6 | about how long it took to do this.  And this was the |
| 10:26 | 7 | question and answer that came while MGA's counsel was asking |
| 10:26 | 8 | questions.  That's Slide 216. |
| 10:26 | 9 | "Ms. Garcia, you -- hold on.  I apologize.  This |
| 10:26 | 10 | process by which MGA took the drawings, used the drawings |
| 10:26 | 11 | that Carter Bryant had presented and developed into the |
| 10:26 | 12 | first generation doll that was sold, how long did that |
| 10:26 | 13 | process take -- just the first generation?" |
| 10:26 | 14 | And she says, "It took seven months." |
| 10:26 | 15 | There's no question that the entire goal of this |
| 10:26 | 16 | was to make those drawings into a three-dimensional doll. |
| 10:26 | 17 | And what happens then after that?  You have the |
| 10:26 | 18 | Hong Kong Toy Fair.  What did they show at the Hong Kong Toy |
| 10:26 | 19 | Fair?  This is Exhibit 911.  And they have those doll |
| 10:26 | 20 | prototypes, which look -- I mean, if you look at them, they |
| 10:26 | 21 | look exactly like the dolls that came out.  And what do they |
| 10:26 | 22 | put all around there?  Look at the bottom there.  They put |
| 10:27 | 23 | all those drawings by Carter Bryant. |
| 10:27 | 24 | Are they trying to mislead the buyers? |
| 10:27 | 25 | And if you'd just look at them.  I mean, look |

Case 2:04-cv-09049-DOC-RNB   Document 10449   Filed 04/12/11   Page 68 of 125   Page ID #:317711
CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

68

| | | |
|---|---|---|
| 10:27 | 1 | at -- for example, we have Exhibit 407 -- I'm sorry -- 1107. |
| 10:27 | 2 | And then there's Exhibit 504, which is the doll.  You can |
| 10:27 | 3 | look at those exhibits together.  There's Exhibit 1108.  And |
| 10:27 | 4 | you can go back there and compare that to Exhibit 17 -- is |
| 10:27 | 5 | it 558? -- which is a doll.  You can compare those.  You can |
| 10:27 | 6 | look at Exhibit 1109, and compare that to 12286.  You can |
| 10:27 | 7 | compare those.  You can compare 1110 to 17561. |
| 10:27 | 8 | And the question's are these derivatives of those |
| 10:27 | 9 | drawings?  Sure like they were -- like they were trying to |
| 10:27 | 10 | be in business with Carter Bryant making what he presented. |
| 10:28 | 11 | And, in fact, again, in these lawsuits that were |
| 10:28 | 12 | filed in Hong Kong, there's certain statements in there that |
| 10:28 | 13 | you heard that MGA made to the Court there. |
| 10:28 | 14 | And one thing they said, for example, was that -- |
| 10:28 | 15 | if we can look at 954 -- that "We're producing LSC-3, copies |
| 10:28 | 16 | of 17 initial concept drawings of the first four Bratz dolls |
| 10:28 | 17 | designed by Carter Bryant."  It goes on to describe them and |
| 10:28 | 18 | says the success of Bratz dolls ensured a lucrative business |
| 10:28 | 19 | of supplying accessories, et cetera.  Yeah.  And it did.  It |
| 10:28 | 20 | was a very lucrative business. |
| 10:28 | 21 | And then, also in this lawsuit -- this is at |
| 10:28 | 22 | page 952 -- page 7 -- they talk about -- of course, the |
| 10:28 | 23 | designs were originally created by Mr. Bryant.  And I |
| 10:28 | 24 | believe there's a Slide 222.  And this is where they talk |
| 10:28 | 25 | about, you know, how they were created.  Well, Anna Rhee |

| | | |
|---|---|---|
| 10:28 | 1 | came in and did the face painting, you know, once it was in |
| 10:29 | 2 | MGA.  And that product -- she came back, she did face |
| 10:29 | 3 | painting.  What did she use?  Her face painting was based on |
| 10:29 | 4 | and originated from the initial concept drawings of |
| 10:29 | 5 | Mr. Bryant. |
| 10:29 | 6 | And, by the way, this comparison I'm doing with |
| 10:29 | 7 | you right now really has nothing to do with trade secrets. |
| 10:29 | 8 | It has to do with copyright infringement claims.  'Cause you |
| 10:29 | 9 | have to see, you know, whether or not there are elements |
| 10:29 | 10 | that were copied from the dolls to the drawings. |
| 10:29 | 11 | For the trade secrets, it is this concept, this |
| 10:29 | 12 | idea, this combination.  Did MGA make money as a result of |
| 10:29 | 13 | that?  And they did.  Because they never would have done a |
| 10:29 | 14 | fashion doll.  They hadn't for umpteen years.  It wasn't |
| 10:29 | 15 | till Mr. Bryant showed them something amazing, unique that |
| 10:29 | 16 | they each went on this path and then leveraged it -- |
| 10:29 | 17 | leveraged that information, leveraged that secret to make a |
| 10:30 | 18 | brand. |
| 10:30 | 19 | Now they tried to hide this.  MGA tried to hide |
| 10:30 | 20 | from the world what they were doing.  Now, it's at different |
| 10:30 | 21 | levels.  One is -- by the way, Mr. Larian tells you three |
| 10:30 | 22 | things.  You've heard three things from him: |
| 10:30 | 23 | One, "We never tried to hide Mr. Bryant." |
| 10:30 | 24 | Two, "We tried to hide his name because he was |
| 10:30 | 25 | shy." |

| | | |
|---|---|---|
| 10:30 | 1 | Three, "We tried to hide him because we didn't |
| 10:30 | 2 | want him to be poached by other people." |
| 10:30 | 3 | He's told you all those things.  One thing we know |
| 10:30 | 4 | he tried to do is he initially tried to hide that Carter |
| 10:30 | 5 | Bryant worked on Bratz.  And, by the way, there's nothing |
| 10:30 | 6 | wrong with him working on Bratz while he's at MGA, if he |
| 10:30 | 7 | does it at MGA.  But they tried to control even that |
| 10:30 | 8 | information. |
| 10:30 | 9 | You remember Exhibit 4942, which is February 6, |
| 10:30 | 10 | 2003, several years after this came out.  This was Dee Dee |
| 10:31 | 11 | Valencia writing to Mr. Larian saying, you know, "We want to |
| 10:31 | 12 | do these collector dolls where it has the name of the |
| 10:31 | 13 | designer on it."  And, you know, Mattel had done one of 'em |
| 10:31 | 14 | for Carter Bryant, had his picture and kind of a |
| 10:31 | 15 | description. |
| 10:31 | 16 | And she's saying, "Okay.  If we do this, signed |
| 10:31 | 17 | by" question mark, question mark, question mark, "I know we |
| 10:31 | 18 | want to keep Carter under wraps." |
| 10:31 | 19 | And Isaac Larian does write back, "What are you |
| 10:31 | 20 | talking about?  This is absurd."  He writes back, "Good |
| 10:31 | 21 | idea." |
| 10:31 | 22 | Then we have an interview that he did with -- |
| 10:31 | 23 | Mr. Larian did with Mr. Palmeri.  And we have the e-mail |
| 10:31 | 24 | exchange in evidence where -- you remember how they would |
| 10:31 | 25 | send those -- you know, those questions and answers to -- by |

Case 2:04-cv-09049-DOC-RNB  Document 10449  Filed 04/12/11  Page 71 of 125  Page ID #:317714
CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

71

10:31   1   e-mail to Ms. Garcia or Mr. Larian and say, "Do you have any

10:31   2   comment?  Anything need to be corrected?  Do you want to

10:31   3   answer?"

10:31   4           And here, Mr. Palmeri says that, you know, "We've

10:31   5   got this story running that -- you know, we describe you as

10:32   6   a 49-year-old Iranian immigrant, trained as a civil

10:32   7   engineer, who modeled Bratz after your own children, who

10:32   8   were wearing midriff-baring shirts, low-rise jeans and

10:32   9   baseball caps."

10:32  10           Well, if you look at those drawings, they seemed

10:32  11   to have all those.  Mr. Bryant's drawings, they have the

10:32  12   midriff-baring shirts and the jeans.  But Mr. Larian was

10:32  13   taking credit for it.

10:32  14           The first time there is a public mention is in

10:32  15   July of 2003, and that's Exhibit 332.  That's the

10:32  16   *Wall Street Journal* article.  And, by the way, one of their

10:32  17   responses to this is, "How could we have been trying to keep

10:32  18   this secret?  We filed a registration in Brazil that had --

10:32  19   that said" -- you remember, only English words were "Carter

10:32  20   Bryant" and -- well, there were a couple you could figure

10:32  21   out, right?  Ah, "so therefore, we weren't trying to hide

10:32  22   it."

10:32  23           Well, two things:  One, Mr. Larian couldn't tell

10:32  24   you whether or not that was actually, you know, a secret or

10:32  25   not, whether or not you could find that in a Brazilian

Case 2:04-cv-09049-DOC-RNB   Document 10449   Filed 04/12/11   Page 72 of 125   Page ID #:317715
CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

72

10:32    1    office without going through a lot of hoops.

10:32    2            We asked him, "All the countries in the world, did

10:33    3    you do that anywhere else?"  He couldn't tell you.  He also

10:33    4    told you that he sued in Brazil, and that registration has a

10:33    5    drawing by Carter Bryant.  And what did they sue?  They sued

10:33    6    because of dolls, not because of selling, you know, the

10:33    7    drawings.  I mean, that's what MGA thought of the drawings:

10:33    8    That that gave them a right to sue because somebody else's

10:33    9    dolls looked like Bratz.

10:33   10            So we've got this, you know, "We prefer that

10:33   11    people don't even know that he worked on Bratz."  But more

10:33   12    importantly, critically essential, they wanted to make sure

10:33   13    that no one knew that Carter Bryant worked on Bratz while he

10:33   14    was at Mattel.

10:33   15            And, by the way, that is now undisputed.  Look at

10:33   16    all that stuff that happened in September -- I mean, just at

10:33   17    the very least -- and through October 19.  And you'll --

10:33   18    you've seen Exhibit 1932, which is a document drawn up

10:33   19    within MGA where it has -- you know, they're going through

10:33   20    all the MGA employees that were at Mattel.  And they list --

10:34   21    if you can go to the blow-up slide a little bit, Ken.  Just

10:34   22    blow that up.

10:34   23            You see, it has:

10:34   24            "Names:  Carter Bryant, Product Designer.

10:34   25            "MGA Dates:"  Question mark to the present.

10:34  1        "Mattel Dates:  Don't ask."

10:34  2        Now, is' this so that's -- has an explanation?

10:34  3  No.  Because look at Exhibit 7055.

10:34  4        This is an e-mail string between Victoria O'Connor

10:34  5  and Isaac Larian.  Isaac had spoken to a journalist and he

10:34  6  had said that Bratz was born in September of 2000, "Nine

10:34  7  months to develop, like a baby."

10:34  8        And, you see, there's a problem with September of

10:34  9  2000.  Carter Bryant worked for Mattel in December of 2000.

10:34  10  And so -- and, by the way, before the first trial, that's

10:35  11  all -- the part of the e-mail we had, was that "born

10:35  12  September 2000."  We didn't have the rest.  And you'll look

10:35  13  at this e-mail, and there -- no mention of attorneys.

10:35  14        So then we get this from Victoria O'Connor:

10:35  15  "Don't you think we should say Bratz was born in October

10:35  16  when a certain person was no longer with their company?"

10:35  17        The answer from Mr. Larian:  "Good point.

10:35  18  Thanks."

10:35  19        This is something they did not want known.  In

10:35  20  fact, when -- when Ms. O'Connor sent Mr. Bryant's contract

10:35  21  to Mr. Larian's attorney, he asked Ms. O'Connor to white-out

10:35  22  the header that would show it was sent from Mattel.  And if

10:35  23  you look at Exhibit 13383, which is what was to Ms. Glaser,

10:35  24  you'll see there's no fax header from Mattel.  It doesn't

10:35  25  say "Dated as of September 18th" either.

| 10:35 | 1 | They were trying to hide what Carter Bryant did. |
| 10:36 | 2 | They didn't want anyone to know he did -- he worked on Bratz |
| 10:36 | 3 | while he was at Mattel, because that's where you draw the |
| 10:36 | 4 | line. |
| 10:36 | 5 | Now, let me talk to you now about how Mattel |
| 10:36 | 6 | discovered this. |
| 10:36 | 7 | You know when Bratz came out, there were people in |
| 10:36 | 8 | the design center who said, "You know, that looks like |
| 10:36 | 9 | something Lily Martinez did."  And you saw the investigative |
| 10:36 | 10 | file.  That complaint was made, you know.  And, uh, if you |
| 10:36 | 11 | look at Exhibit 1195-RS, Mr. de Anda started a file.  This |
| 10:36 | 12 | is in March of 2002.  And it says, "Information received |
| 10:36 | 13 | from design center staff, Evelyn Veal and Ivy Ross, that MGA |
| 10:36 | 14 | Entertainment, headed by a person known as Isaac Larian, has |
| 10:37 | 15 | recently hired a number of former Mattel employees, and is |
| 10:37 | 16 | manufacturing products that appear to be Mattel designs." |
| 10:37 | 17 | So that's his description.  But then he goes and |
| 10:37 | 18 | interviews.  See what's this about.  And you'll see that at |
| 10:37 | 19 | 1195-RS-66, 231, where he interviews Cassidy Park about |
| 10:37 | 20 | this.  And she says there's a belief that, you know, Carter |
| 10:37 | 21 | Bryant was an illustrator and that he has plagiarized |
| 10:37 | 22 | designs by Lily Martinez, and he conceived Bratz for MGA. |
| 10:37 | 23 | Now, this is that -- he left MGA, and -- but what |
| 10:37 | 24 | he did, "looks like it's a plagiarization of something we |
| 10:37 | 25 | did."  And that's what Mr. De Anda finds out is -- is the |

| | | |
|---|---|---|
| 10:37 | 1 | rumor here.  Right? |
| 10:37 | 2 | Well, as Mr. de Anda said -- we're talking about |
| 10:37 | 3 | plagiarizing.  We're talking about copying.  We're talking |
| 10:37 | 4 | about you leave Mattel.  You create something.  Is it so |
| 10:37 | 5 | close to what you saw at Mattel that you have a right to |
| 10:37 | 6 | sue?  That it's wrong.  And it was sent to Legal. |
| 10:38 | 7 | And you'll be able to see, you know, these Bratz |
| 10:38 | 8 | dolls.  This is 17751, Jade.  And you'll have a few Diva |
| 10:38 | 9 | Starz and Toon Teens back there. |
| 10:38 | 10 | Do we have Toon Teens? |
| 10:38 | 11 | There, that's Toon Teens, which wasn't released. |
| 10:38 | 12 | I mean, the Barbie skating decal was, that that |
| 10:38 | 13 | was based on.  That was released in 1999.  So -- so the |
| 10:38 | 14 | world knew about that.  And the conclusion was you can't say |
| 10:38 | 15 | this is a copy.  You can't sue for that.  There was no |
| 10:38 | 16 | suspicion that he did this at Mattel.  You're entitled to |
| 10:38 | 17 | leave and do something great. |
| 10:38 | 18 | In fact, Ms. Garcia testified -- this is Slide |
| 10:39 | 19 | 238: |
| 10:39 | 20 | "Is there anything suspicious if someone leaves |
| 10:39 | 21 | your company, goes to another company and creates a great |
| 10:39 | 22 | product?" |
| 10:39 | 23 | She says, "No, that wouldn't cause suspicion. |
| 10:39 | 24 | There's no wrongdoing in that." |
| 10:39 | 25 | Mr. Larian said the same thing:  There's no |

10:39  1    wrongdoing in that.  And that's at Slide 236.

10:39  2           "Would it raise suspicion if a designer from MGA

10:39  3    left MGA, started working for Mattel, and then came up with

10:39  4    a brilliant toy design?"

10:39  5           "No.  It does not.  Happens all the time."

10:39  6           So there were people in the design center who knew

10:39  7    that Carter Bryant was working on Bratz -- or suspected --

10:39  8    and thought these were too similar.  You look at them.  You

10:39  9    could look at them.

10:39  10          Do we have the Toon Teens picture?  Do we have

10:39  11   one?

10:39  12          There -- uh, it's funny because MGA says -- and

10:39  13   Mr. Larian says Mattel is litigious and sues at the drop of

10:39  14   a hat.  No.  We did what was responsible.  We interviewed.

10:39  15   We found out what the complaint was about.  You know, people

10:40  16   make great designs, then leave companies, and that's not

10:40  17   close enough to be a copyright infringement.

10:40  18          So then what happens little later?

10:40  19          It's -- Mattel gets an anonymous letter.  And

10:40  20   that's Exhibit 6678.  And this is sent to "CEO."  Doesn't

10:40  21   even say Mr. Eckert.  It says, "I have information I think

10:40  22   Mattel should investigate," and he talks about "Carter

10:40  23   Bryant was working with Mattel to design dolls.  One of the

10:40  24   dolls he was working on, on designing, was the Bratz dolls."

10:40  25          And then it goes on to say MGA stole that.  And,

Case 2:04-cv-09049-DOC-RNB   Document 10449   Filed 04/12/11   Page 77 of 125   Page ID #:317720
CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

77

| | | |
|---|---|---|
| 10:40 | 1 | you see, there's a note to de Anda saying, "Richard" -- you |
| 10:40 | 2 | know, I mean, basically, look into this "and I would start |
| 10:40 | 3 | with Ivy," I think is what it said.  Yeah, "I would start |
| 10:40 | 4 | with Ivy."  And Mr. de Anda would tell you, you know, he'd |
| 10:40 | 5 | opened the first investigation, he had this one.  It says a |
| 10:40 | 6 | lot, but adds nothing; it doesn't add facts.  He'd talked to |
| 10:41 | 7 | Ivy Ross.  He'd talked to these folks at Mattel.  And this |
| 10:41 | 8 | seems to indicate that Mr. Bryant was working on a Bratz |
| 10:41 | 9 | line at Mattel.  There was no evidence of that.  Again a |
| 10:41 | 10 | dead-end. |
| 10:41 | 11 | Now, at this time, by the way, Bratz is doing |
| 10:41 | 12 | really well in the marketplace.  Right?  I mean, Bratz is |
| 10:41 | 13 | hurting Mattel.  You've seen all those e-mails that we're |
| 10:41 | 14 | losing money, you know; that Mattel is being hurt, you know. |
| 10:41 | 15 | Mattel doesn't sue just because there's a rumor. |
| 10:41 | 16 | Mattel doesn't sue because there's an anonymous accusation. |
| 10:41 | 17 | In fact, Mr. Larian said that he wouldn't sue based upon an |
| 10:41 | 18 | anonymous accusation.  That's at Slides 329 and 330. |
| 10:41 | 19 | "You know, what if a designer had been working for |
| 10:41 | 20 | a competitor and got an anonymous note saying he designed it |
| 10:41 | 21 | while at MGA, no identification, would that raise your |
| 10:41 | 22 | suspicion? |
| 10:41 | 23 | "It would.  I would go and ask people, You know |
| 10:41 | 24 | anything about this? |
| 10:41 | 25 | "And would you do anything beyond that? |

| | | |
|---|---|---|
| 10:41 | 1 | "Probably not.  I don't know.  I haven't been |
| 10:42 | 2 | faced with that situation." |
| 10:42 | 3 | Then he went on to say that he wouldn't sue based |
| 10:42 | 4 | upon an anonymous accusation.  It wouldn't be responsible |
| 10:42 | 5 | to. |
| 10:42 | 6 | So then what happens?  Then, in November of 2003, |
| 10:42 | 7 | shortly after that *Wall Street Journal* article comes out, |
| 10:42 | 8 | Mr. Moore -- Mattel lawyer -- is contacted by some folks in |
| 10:42 | 9 | Hong Kong.  "We got some things that might be of interest to |
| 10:42 | 10 | you."  He actually goes to Hong Kong to meet with these |
| 10:42 | 11 | folks.  It's, I think, November 24, 2003.  And what do they |
| 10:42 | 12 | show him?  They show him Exhibit 24825, which is the Carter |
| 10:42 | 13 | Bryant -- a copy of the Carter Bryant contract with MGA, |
| 10:42 | 14 | dated as of September 18, 2000. |
| 10:42 | 15 | Well, that's when he worked at Mattel. |
| 10:42 | 16 | They showed him Exhibit 10.  And these are the |
| 10:42 | 17 | drawings that were filed in Hong Kong.  And before this, no |
| 10:43 | 18 | one at Mattel had seen these drawings. |
| 10:43 | 19 | Go back -- go back one, Ken. |
| 10:43 | 20 | That drawing, for example -- you know, when you |
| 10:43 | 21 | compare it to the Toon Teens decal and then to what |
| 10:43 | 22 | Mr. Bryant said was his original, wow!  That looks kind of |
| 10:43 | 23 | similar.  We'd never seen this. |
| 10:43 | 24 | At the time, "at the time" we knew we had a |
| 10:43 | 25 | fact -- not a rumor -- we had a fact that Carter Bryant had |

| | | |
|---|---|---|
| 10:43 | 1 | done something wrong.  We didn't know if MGA knew.  You |
| 10:43 | 2 | couldn't tell that from this.  But we knew Carter Bryant had |
| 10:43 | 3 | done something wrong, and so we sued him.  We sued him |
| 10:43 | 4 | because it looked like he had been doing this while he was |
| 10:43 | 5 | at Mattel and had breached his duty, breached his contract. |
| 10:43 | 6 | And, by the way, Mr. Larian knows that's what |
| 10:43 | 7 | prompted this.  And there's an e-mail from his brother, |
| 10:43 | 8 | Farhad.  It's 21714.  It's from Farhad to Ms. Glaser, who |
| 10:44 | 9 | then forwarded it to Mr. Larian, where he says, "Mattel |
| 10:44 | 10 | filed the attached in court.  MGA filed its Bratz-related |
| 10:44 | 11 | case in Hong Kong long before I find -- filed mine." |
| 10:44 | 12 | I mean, curious why this signed agreement does not |
| 10:44 | 13 | have Bates numbers, and where Mattel obtained it from.  Is |
| 10:44 | 14 | it possible that MGA filed this in the Hong Kong action and |
| 10:44 | 15 | Mattel obtained it from there? |
| 10:44 | 16 | And we asked Mr. Larian about this, and here was |
| 10:44 | 17 | his testimony.  He said: |
| 10:44 | 18 | "Now, you became aware that Carter Bryant's |
| 10:44 | 19 | contract with MGA had become available to Mattel, correct? |
| 10:44 | 20 | "ANSWER:  Yes. |
| 10:44 | 21 | "And that was in connection with some litigation |
| 10:44 | 22 | in Hong Kong, right? |
| 10:44 | 23 | "ANSWER:  Yes.  Or litigation from my brother, uh, |
| 10:44 | 24 | either one." |
| 10:44 | 25 | Your Honor, would it be okay to take a personal |

Case 2:04-cv-09049-DOC-RNB   Document 10449   Filed 04/12/11   Page 80 of 125   Page ID #:317723
CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

80

| | | |
|---|---|---|
| 10:44 | 1 | break now? |
| 10:44 | 2 | THE COURT:  It's a good time for a break. |
| 10:44 | 3 | All right.  Ladies and gentlemen, we'll come and |
| 10:44 | 4 | get you promptly at 11:00 o'clock.  You're admonished not to |
| 10:44 | 5 | discuss this matter amongst yourselves, nor form or express |
| 10:44 | 6 | any opinion concerning the case. |
| 10:45 | 7 | We'll see you at 11:00 o'clock.  Counsel, we'll |
| 10:45 | 8 | resume promptly at 11:00.  The doors will open. |
| 10:53 | 9 | *(Recess held at 10:45 a.m.)* |
| 11:00 | 10 | *(Proceedings resumed at 11:00 a.m.)* |
| 11:00 | 11 | *(In the presence of the jury.)* |
| 11:00 | 12 | THE COURT:  We're back in session.  The jury's |
| 11:00 | 13 | present.  The alternates are present, all counsel.  If you |
| 11:00 | 14 | would be seated. |
| 11:00 | 15 | Mr. Price, your continuing closing argument. |
| 11:00 | 16 | **CLOSING ARGUMENT BY MR. PRICE FOR MATTEL  (Resumed)** |
| 11:00 | 17 | MR. PRICE:  November 24, 2003, that's a critical |
| 11:00 | 18 | date. |
| 11:00 | 19 | Mattel saw facts, not rumors, facts that Carter |
| 11:00 | 20 | Bryant had breached his contract, breached his duty of |
| 11:00 | 21 | loyalty.  The drawings, they had a '98 date on them, that |
| 11:01 | 22 | wasn't when he was working at Mattel, so they didn't know, |
| 11:01 | 23 | so they sued Carter Bryant for doing what we had the facts |
| 11:01 | 24 | that we knew he did, which was breaching his contract. |
| 11:01 | 25 | And once we're able to question him under oath, he |

11:01   1   was able to tell us Isaac Larian knew he was a Mattel

11:01   2   employee when he worked for MGA and when he -- when he -- on

11:01   3   September 18th, as of the effective date of the contract,

11:01   4   and he told us what he did during that month and up to

11:01   5   October 19th.

11:01   6          The reason that's important is you're going to be

11:01   7   asked when Mattel, you know, should have known facts that

11:01   8   would reasonably "suspect" it to do something.

11:01   9          And MGA has -- has taken a somewhat schizophrenic

11:01   10  position in this case.  First they said, "We didn't do

11:01   11  anything wrong.  You never should have suspected us of doing

11:01   12  anything wrong.  This is just a sham."  But they've also

11:01   13  said, "Mattel is litigeous and sues at the drop of a hat."

11:02   14         And yet they say, "In your investigations, you

11:02   15  didn't do enough;" and, "By the way, how dare you do what

11:02   16  you did?"

11:02   17         Do you remember the investigation that Mr. de Anda

11:02   18  did in 2002 on whether or not there was plagiarization of

11:02   19  something Lily Martinez had done?  And do you remember the

11:02   20  questioning about, "Look, in this investigation, you went to

11:02   21  MGA's parking lot.  You searched Mr. Larian's name on this,

11:02   22  uh, service that you can use, if you're a private detective,

11:02   23  and get information about someone, personal information,"

11:02   24  and do you remember her basically saying, "How dare you do

11:02   25  that?" but also saying, "Oh, that wasn't enough.  If you had

Case 2:04-cv-09049-DOC-RNB   Document 10449   Filed 04/12/11   Page 82 of 125   Page ID #:317725
CV 04-9049 DOC – 4/8/2011 – Day 49, Volume 1 of 3

82

11:02  1    done more, you would have -- you would have discovered this

11:02  2    earlier.  It's your fault.  You shouldn't be able to sue."

11:02  3          Now, here's the instruction you're gonna see --

11:02  4    or, actually, that you were given.  I'm sorry.  And it's

11:02  5    about the statute of limitations.  This is on the trade

11:03  6    secrets.  There's a lightly different one.  There are

11:03  7    different ones for different claims.

11:03  8          But it says, "Mattel must prove by a preponderance

11:03  9    of the evidence that it did not timely discover, nor with

11:03  10   reasonable diligence should have discovered, facts that

11:03  11   would have caused a reasonable person to suspect that MGA

11:03  12   and/or Isaac Larian had misappropriated the Bratz-related

11:03  13   concepts."

11:03  14         This is whether you had discovered facts after

11:03  15   doing something reasonable.  It's not a hindsight test.

11:03  16   This isn't like -- I don't know how many of you guys saw

11:03  17   *Sixth Sense*, but -- those of you didn't, I'm not gonna tell

11:03  18   you the ending.  All I'll say is you go, "Oh, my gosh."  And

11:03  19   people went to see that movie again and again because they

11:03  20   wanted to see, Were their clues to this?  And when you watch

11:03  21   it again, you go, "Oh my gosh, there were."  There were

11:03  22   clues.  But that's not the test.  The test is whether you

11:03  23   had facts that would reasonably -- think you -- you would do

11:03  24   something.

11:03  25         And look at the first accusation, the accusation

11:04  1    in 2002 about plagiarizing.  There were no facts that were

11:04  2    covered in that investigation that Carter Bryant or MGA did

11:04  3    anything wrong, no facts, despite going to the parking lot,

11:04  4    despite doing more than any reasonable person would do.

11:04  5           With the anonymous letter, there were no facts.

11:04  6    There were no facts discovered that would lead someone to

11:04  7    think MGA/Carter Bryant did something wrong.  And what we're

11:04  8    looking for here is facts.

11:04  9           And there was no reason to think, for example,

11:04  10   that a woman who was a face painter at Mattel, you know, had

11:04  11   done face painting for Mr. Bryant when he said, "Hey, could

11:04  12   you help me out?"  Or a hair rooter.  If the letter had

11:04  13   said, "Hey, you should -- this is what happened," you might

11:04  14   investigate those facts.

11:04  15          What Mattel did was what a reasonable

11:04  16   investigation would be, which is interview the people at the

11:05  17   design center who would know.  Was there a Bratz project at

11:05  18   Mattel?  Do these things look sufficiently alike?

11:05  19          We investigated the facts and MGA cannot seriously

11:05  20   say that we did not take this seriously.

11:05  21          Instead, they say, "You did too much.  It's

11:05  22   outrageous.  You should think Mattel is bad."

11:05  23          And then they say, "You didn't do enough."

11:05  24          The only thing we didn't -- the only thing we

11:05  25   didn't put behind this -- these investigations is more than

DEBBIE GALE, U.S. COURT REPORTER

84

| | |
|---|---|
| 11:05 | 1 |
| 11:05 | 2 |
| 11:05 | 3 |
| 11:05 | 4 |
| 11:05 | 5 |

we did.  I mean, you can take what we did and always say,

"Ah, you could have done more."  It's not a perfect

investigation.  It's a reasonable investigation.  That's

what the jury instruction says:  You need to do a reasonable

investigation.

We went and interviewed the people who would know

whether or not it was rumor or whether there's a fact.  And

the law doesn't require, you know, scorched earth.  It

doesn't require tailing someone.  It doesn't require, uh,

sending e-mails to ten thousand people.  It requires what's

reasonable.  It doesn't require what, knowing the answer,

you could have gone back and found.

MGA's trying to say there's a technicality here.

We didn't want you to know it.  We tried to make sure you

didn't know it.  But if you'd scorched the earth, you might

have found it out.

And, by the way, what could we have done?  I mean,

send e-mails to 30,000 people?  Well, that would kind of

trash someone's reputation, wouldn't it?  It's not a

reasonable step.  Videotape Carter Bryant?  Show he's

working at MGA?  Nothing wrong with that.  Look at Carter

Bryant's phone records?  Well, you know, in hindsight, if

look at his phone records in September 2000 and they show

calls, then, oh, well, knowing that he started working for

them then, that would be relevant.

11:07   1      But you can look for another job when you're

11:07   2   working at Mattel.  This is another one of those red

11:07   3   herrings that you've seen, and one of those "Let's get you

11:07   4   distracted."

11:07   5      Mattel has never said you can't look for another

11:07   6   job when you're working at Mattel.  You can't assist a

11:07   7   competitor.  You can't go and try to make their competitive

11:07   8   product successful while you're at Mattel.

11:07   9      And, finally, it makes no sense that Mattel would

11:07   10   wait.  You've seen the evidence that in 2002 -- I mean,

11:07   11   people at Mattel were beside themselves.  They didn't know

11:07   12   that this innovation, this flash of genius had occurred in

11:07   13   the Mattel design center.  They knew they were getting their

11:07   14   behinds kicked by this new doll.  They were losing money.

11:07   15   It makes no sense they would wait if there was a reasonable

11:08   16   basis to believe that Carter Bryant had done these secretly

11:08   17   while he was at Mattel, and then worked for MGA at the same

11:08   18   time he was at Mattel.

11:08   19      It wouldn't make sense to let MGA earn hundreds of

11:08   20   millions of dollars and then sue and hope that years and

11:08   21   years and years later, you know, we'd get a verdict.

11:08   22      It is a distraction.  November 24, 2003, that's

11:08   23   the date.  And you'll be asked about that date.  And what

11:08   24   happened after that?  In April 2004, in Mexico, three people

11:08   25   leave Mattel Mexico.  And they -- we learned right after

DEBBIE GALE, U.S. COURT REPORTER

| | |
|---|---|
| 11:08 | 1 |
| 11:08 | 2 |
| 11:08 | 3 |
| 11:08 | 4 |
| 11:08 | 5 |

11:08  1  they leave, they have downloaded the most important

11:08  2  documents you can download.  They had downloaded the line

11:08  3  list for the next year.  This isn't a list that's shared

11:08  4  with retailers and the press.  This is something internal to

11:08  5  Mattel.  It's Exhibit 7104.

11:08  6        It is, Mr. Larian admitted, the most secret thing

11:09  7  you can think about.  What are you going to do, you know,

11:09  8  over almost a year from now?  'Cause this is done in 2004,

11:09  9  early 2004.  They downloaded POS information, which Mattel

11:09  10  had bought from Walmart for a significant sum.

11:09  11        Uh, we weren't allowed to search MGA offices.  The

11:09  12  police searched the MGA offices in October of 2005.  That's

11:09  13  a long time afterwards, by the way.  And they found these

11:09  14  materials.  And, of course, Mr. Machado says, "Oh, well, you

11:09  15  know, it's just a coincidence 'cause I had that at my

11:09  16  apartment until right before the search, and then I took

11:09  17  those documents to -- to MGA.  That's why they happened to

11:09  18  be there."  You know, that's why you found witches where

11:09  19  witches were suspected in the witch hunt.

11:09  20        And you saw Mr. Kinrich's analysis that those

11:09  21  executives who left Mattel or people went to -- Mattel to

11:09  22  MGA, compared to -- who downloaded material versus those who

11:09  23  didn't had a 49 percent pay increase versus a 12.5.

11:10  24        And, you know, I guess you've seen these T-shirts

11:10  25  that say, uh, you know:  Just because you're paranoid

DEBBIE GALE, U.S. COURT REPORTER

11:10  1  doesn't mean people aren't out to get you.

11:10  2          Well, by 2004, Mattel knew that Carter Bryant had

11:10  3  been working for MGA while he was at Mattel.  They took

11:10  4  Carter Bryant's deposition.  They -- these folks had left

11:10  5  Mattel for MGA and Mexico, stealing these documents.  Mattel

11:10  6  thought it was under siege.

11:10  7          And so when you have a Mr. Brawer, after that --

11:10  8  for example, Mr. Brawer refusing to say, "I'm going to be

11:10  9  bound by the code of conduct.  I will keep your information

11:10 10  confidential," and he's a senior executive, well, you get

11:10 11  worried.

11:10 12          And so, yeah, at that time -- at that time they --

11:10 13  they video-surveiled him and his family.  And, as Mr. Eckert

11:10 14  said, that's a little disturbing that there was some parts

11:11 15  of his family, you know, there was that two-week period.

11:11 16  But by that time it -- it looked like we were being stolen

11:11 17  blind.

11:11 18          And, by the way, that lawsuit against Mr. Brawer,

11:11 19  it's in evidence.  It isn't, "You did something wrong."

11:11 20          It is, "You won't agree you're bound.  We want a

11:11 21  declaration from the Court that you are bound.  Not that we

11:11 22  think that you've done something wrong so far, but we just

11:11 23  want the Court to say, 'There's a dispute between you guys.

11:11 24  You're bound by this agreement going forward.  You won't

11:11 25  tell MGA.'"  And eventually it's what Mr. Brawer agreed to.

DEBBIE GALE, U.S. COURT REPORTER

| | |
|---|---|
| 11:11 | 1 |
| 11:11 | 2 |
| 11:11 | 3 |
| 11:11 | 4 |
| 11:11 | 5 |
| 11:11 | 6 |
| 11:11 | 7 |
| 11:12 | 8 |
| 11:12 | 9 |
| 11:12 | 10 |
| 11:12 | 11 |
| 11:12 | 12 |
| 11:12 | 13 |
| 11:12 | 14 |
| 11:12 | 15 |
| 11:12 | 16 |
| 11:12 | 17 |
| 11:12 | 18 |
| 11:12 | 19 |
| 11:12 | 20 |
| 11:12 | 21 |
| 11:12 | 22 |
| 11:12 | 23 |
| 11:12 | 24 |
| 11:12 | 25 |

So I've talked to you about the theft.  I want to talk to you briefly about -- about the damages, because we're not showing you demonstratives.  And it's a little complicated, but there are two portions to the damages.

One is Mattel's lost profits.  That is, you know, if MGA did a great job at stealing this, the better the job they did, the more we lost.  You know, so them doing a good job actually makes our damages more.

And you heard Mr. Wagner say that, if you take the market and you take into account Mattel's drop in market share -- I mean, every year you take that into account, because you're -- you're calculating based upon the market share Mattel actually has.  So if it's lower in 2005 than 2000, you take that into account.  So you take into account "burning house" and all of that.

If you take that into account and you look at a market that was expanded because there was this new doll, and you subtract that out -- and they subtracted out 1.4 billion in sales by MGA.  And how was Mattel hurt?  And he did the calculation that showed you that Mattel would have earned about ten percent more in profit to about $323.7 million, a ten percent increase, if there had not been this theft and this active attempt to compete with Mattel with Mattel's own innovation.

Now Mr. Malackowski, you know, he testified, and

11:13   1    he said, you know, uh, he assumes that Bratz didn't impact

11:13   2    any of Barbie's sales in the three-to-five age group.  Why?

11:13   3    Well, because there was a Bratz -- a Mattel study in January

11:13   4    of 2002, just a few months after Bratz was on the market.

11:13   5    And that's Exhibit 180 -- I'm sorry -- I don't know if I

11:13   6    have that exhibit here.  Uh, but -- uh, I don't remember the

11:13   7    number.  But it basically says at that time it had an impact

11:13   8    in the three- to five-year-old market.  But it did.  And

11:13   9    Mr. Malackowski just ignored the subsequent evidence.

11:13   10           He ignored, for example, Exhibit 1807-3.  That's

11:13   11   the "House on Fire" document, which talks about Bratz

11:13   12   gaining share with five- to eight-year-olds, and it being

11:13   13   66 percent to 80 percent, if I'm reading that correctly.

11:13   14           Uh, with five- to six-year-olds and seven- to

11:13   15   eight-year-olds, Mr. Wagner did an analysis.  He concluded

11:13   16   actually by 2006 -- and his testimony here is on Slide

11:13   17   383 -- 2006, that -- if you look at that time period,

11:14   18   six- to eight-year-old girls want to emulate nine- to

11:14   19   eleven-year-old girls.  And overall, there are more Bratz

11:14   20   dolls sold in the six-to-eight age category.  And after

11:14   21   2006, there are many sales to three- to five-year-olds as

11:14   22   there are nine to eleven.

11:14   23           And MGA might say, "Oh, well, that's this other

11:14   24   Bratz stuff.  It's Bratz Babies.  It's Bratz -- whatever.

11:14   25   It shouldn't be anything.  You shouldn't be competing with

11:14  1   us with your brand if you built that brand based upon our

11:14  2   confidential information."

11:14  3          And that's what Mr. Larian said.  I showed you his

11:14  4   quote right when we began this.  You can't hurt your

11:14  5   competitor.  You can't compete with them by exploiting their

11:14  6   information.  So that's one area.  It's Mattel's profits as

11:14  7   a result of the trade secret theft.  323.7.

11:14  8          Now, another area of damages and -- and, uh, they

11:14  9   can't be duplicative.  I mean, that, you know -- you know,

11:14  10  you don't add these two.  It's either profits or, uh -- or

11:15  11  MGA's profits for trade secrets.

11:15  12         So on MGA's profits, Mr. Wagner calculated there

11:15  13  was $734.9 million in profits by MGA when you subtract out

11:15  14  all the costs and everything.  And for -- for, uh, unjust

11:15  15  enrichment, MGA's profits, you do have to take into account,

11:15  16  "Well, did MGA contribute to the profits themselves?"

11:15  17         And so he came up with a model that said, "Look,

11:15  18  MGA has not had a successful doll between 2000 and 2009,

11:15  19  except for Bratz."  They had the same people, same creative

11:15  20  people.  So if you wanted to, you could say, "Look, it's the

11:15  21  intellectual property."  That's what distinguishes Bratz

11:15  22  from everything else MGA has done.  And so there should be

11:15  23  no apportionment.

11:15  24         But he said, "Look, let's look at other companies

11:15  25  and see how they have done and only the difference over that

| | | |
|---|---|---|
| 11:15 | 1 | will be, you know, what -- what Mattel is entitled 'cause |
| 11:15 | 2 | that will be the intellectual property."  And his |
| 11:16 | 3 | calculations, depending upon whether you use all toy |
| 11:16 | 4 | companies, or Jakks and Hasbro, or just Mattel, where I |
| 11:16 | 5 | think for trade secrets were 544.8 million or 410 million or |
| 11:16 | 6 | 314. |
| 11:16 | 7 | Now, you know the way Mr. Malackowski comes up |
| 11:16 | 8 | with a much smaller number is he says trade secrets don't |
| 11:16 | 9 | cover anything but the first few dolls.  Well, you wouldn't |
| 11:16 | 10 | be doing any of this if you hadn't stole that concept.  You |
| 11:16 | 11 | wouldn't be doing Fiona or anyone -- Meygan, you know -- if |
| 11:16 | 12 | you hadn't started by stealing that concept. |
| 11:16 | 13 | And for his allocation you recall he uses what |
| 11:16 | 14 | Carter Bryant got as kind of a thing to allocate.  He got |
| 11:16 | 15 | 3 percent royalty.  Carter Bryant didn't shop this around |
| 11:16 | 16 | 'cause he new he couldn't.  Carter Bryant had no choice but |
| 11:16 | 17 | to try to get royalties on this, really, from MGA. |
| 11:16 | 18 | Mattel would never have let someone else -- |
| 11:16 | 19 | wouldn't have licensed anyone else to compete against them |
| 11:16 | 20 | with their own product.  It's just inappropriate way to |
| 11:17 | 21 | apportion. |
| 11:17 | 22 | Now for copyright, if you look at just the core |
| 11:17 | 23 | dolls and the sculpt, and you -- there's an instruction on |
| 11:17 | 24 | there being indirect profits from copyright infringement. |
| 11:17 | 25 | If you look at those core dolls with the sculpt, it's |

11:17   1    190 million, 149, and 109.  If you include -- that's the

11:17   2    core dolls and the sculpt.

11:17   3           If you just looked at the four dolls and then

11:17   4    Ooh-La-La, uh, and Formal Funk, it goes way down.  It goes

11:17   5    to 19.9 million, 22.1 or 17.1.  Those are the -- those are

11:17   6    the ranges, depending upon what you use as an apportionment

11:17   7    factor.  But this was much more than that.  This case was

11:17   8    stealing a brand, exploiting information MGA would never

11:17   9    have had, never did have.  They just hadn't been successful

11:17   10   in this area, and they couldn't have been successful, would

11:17   11   not have been successful, if they hadn't exploited Mattel's

11:17   12   trade secrets, Carter Bryant, sample makers.

11:18   13          I'm going to take a few seconds here to say the

11:18   14   attempts to distract you have been overwhelming.  You heard

11:18   15   talk about Mattel killing babies; suggestions there was

11:18   16   evidence of that.  You heard that.  And the Judge instructed

11:18   17   you there is no -- he hasn't prevented anyone from putting

11:18   18   in evidence.  MGA has not presented him with any admissible

11:18   19   evidence of that.  You are to disregard it.  But that

11:18   20   suggestion was made that the company kills babies for

11:18   21   profit.  Why would that be made?  Mr. Eckert was on the

11:18   22   stand:

11:18   23          "You killed babies.  Admit it."

11:18   24          "Can I go into something I shouldn't go into?"

11:18   25          There was nothing to go into.  The Judge told you

DEBBIE GALE, U.S. COURT REPORTER

11:18   1   that.  MGA was -- would -- had the opportunity to do that.

11:18   2   There was no evidence of that.

11:18   3        You heard about, uh, Mr. Aginsky being engaged in

11:18   4   chemical warfare.  No evidence of that.

11:18   5        While Mr. Eckert was on the stand, one of the

11:18   6   things they did was they asked him -- and, just want to do

11:19   7   this quickly -- Ken -- they asked him, you know, whether or

11:19   8   not, if someone does something before they joined Mattel,

11:19   9   does it belong to Mattel.  And he said, "Generally not."

11:19   10        And he was -- continued asking about this.

11:19   11        "Well, uh, you know, if she walks to Mattel and

11:19   12   she's had ideas from ten years earlier and she does nothing

11:19   13   with those ideas, we don't have rights?

11:19   14        He kept being pressed.  And so -- so, "according

11:19   15   to you, any employee reading this should know that a drawing

11:19   16   made ten years earlier belongs to Mattel, right?"

11:19   17        "ANSWER:  No.  Again, I don't necessarily think a

11:19   18   drawing made ten years prior belongs to Mattel."

11:19   19        And he goes on and he says, "Well, it may.  We

11:19   20   may" -- and then explains it.

11:19   21        "I think an employee or prospective employee

11:19   22   reading these documents should understand if they have

11:19   23   created ideas, designs, inventions related to the toy

11:19   24   business before they came to Mattel, they could have issues.

11:20   25   They could -- particularly if they worked on those products

CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

94

| | | |
|---|---|---|
| 11:20 | 1 | at Mattel, it seems to me you would have a right to go all |
| 11:20 | 2 | the way back to the invention itself." |
| 11:20 | 3 | That's what he said.  He said, "No, generally |
| 11:20 | 4 | not." |
| 11:20 | 5 | But if you bring it in, and then you work on it, |
| 11:20 | 6 | we're not gonna let you come in and say, "Hey, I've worked |
| 11:20 | 7 | on this idea at Mattel.  I've developed this.  Ha-ha, it's |
| 11:20 | 8 | not yours.  You owe me royalty." |
| 11:20 | 9 | Go to the next line.  He goes -- she asked, later |
| 11:20 | 10 | that day, "If I create these drawings, are they gonna belong |
| 11:20 | 11 | to Mattel? |
| 11:20 | 12 | "No.  My answer is trying to be simple.  If an |
| 11:20 | 13 | employee -- a prospective employee has created things |
| 11:20 | 14 | related to the toy business, regardless of when it's done, |
| 11:20 | 15 | and comes to work at Mattel, I think that person -- know |
| 11:20 | 16 | that if he or she is gonna work at those ideas at Mattel, |
| 11:20 | 17 | Mattel does have a right all the way back to those ideas." |
| 11:20 | 18 | Now that's not the case here.  Mr. Bryant did |
| 11:20 | 19 | these in 1999.  But you saw the progression:  "Generally |
| 11:20 | 20 | not," "they may," and here's the circumstance where they |
| 11:21 | 21 | may. |
| 11:21 | 22 | And the next day he's on the stand, the question |
| 11:21 | 23 | is, "Wait a minute.  Yesterday you said Mattel owns those |
| 11:21 | 24 | ideas." |
| 11:21 | 25 | And he said, "No." |

DEBBIE GALE, U.S. COURT REPORTER

11:21   1            "Today your testimony is that only if somebody had
11:21   2   created something before coming to work at Mattel and then
11:21   3   came to Mattel and worked on that same toy concept, would it
11:21   4   belong to Mattel, right?"
11:21   5            And that question was made with sarcasm and
11:21   6   disapproval.
11:21   7            He says, "I see no inconsistency between what I
11:21   8   said yesterday and what I said today."  It was an attempt to
11:21   9   make him look ridiculous and overreaching.  Attempt to make
11:21   10  you think he was ridiculous and overreaching, when he simply
11:21   11  said what the contract says.
11:21   12           There have been many attempts, many attempts to
11:21   13  deceive you and distract you from the fact that this may
11:21   14  have been one of the biggest intellectual property hoists
11:21   15  that's ever occurred.
11:21   16           Now, at this point, I'm gonna give the stand to
11:21   17  Mr. Quinn, who's gonna talk about MGA's case, which is
11:21   18  somewhat related to this, in the sense that MGA's saying
11:22   19  that, you know, that Mattel went into their showrooms when
11:22   20  they shouldn't have, along with thousands of people,
11:22   21  including retailers and the press, and got a sneak peak at
11:22   22  what MGA should not have been doing in the first place,
11:22   23  which was exploiting the Bratz dolls and the Bratz brand.
11:22   24           So if we could take five, Your Honor?
11:22   25           THE COURT:  We can.

96

| | | |
|---|---|---|
| 11:22 | 1 | Ladies and gentlemen, you're admonished not to |
| 11:22 | 2 | discuss this matter amongst yourselves, nor form or express |
| 11:22 | 3 | any opinion. |
| 11:22 | 4 | We'll come and get you in just a moment. |
| 11:22 | 5 | Now, if I could see maybe Ms. -- Mr. Zeller and |
| 11:22 | 6 | Ms. Hurst for just a moment. |
| 11:22 | 7 | *(Jury recesses at 11:22 a.m.)* |
| 11:22 | 8 | *(Outside the presence of the jury.)* |
| 11:22 | 9 | THE COURT:  All right.  For the record, I want you |
| 11:22 | 10 | to compute the time.  You each have 180 minutes.  I promised |
| 11:23 | 11 | 20 minutes in rebuttal to Mattel. |
| 11:23 | 12 | You have approximately used 126 minutes of the 180 |
| 11:23 | 13 | minutes, so I want you on notice about that now so you use |
| 11:23 | 14 | your time wisely.  And I will hold each party to that agreed |
| 11:23 | 15 | amount of time:  180 minutes exactly for both of you. |
| 11:23 | 16 | Understood?  Understood? |
| 11:23 | 17 | All right.  Have your associates come up here and |
| 11:23 | 18 | calculate the exact time with Debbie. |
| 11:23 | 19 | Have a nice recess.  We'll come and get you |
| 11:23 | 20 | actually at 11:30, in exactly 7 minutes. |
| 11:23 | 21 | *(Recess held at 11:23 a.m.)* |
| 11:31 | 22 | *(Proceedings resumed at 11:31 a.m.)* |
| 11:31 | 23 | *(In the presence of the jury.)* |
| 11:32 | 24 | THE COURT:  We're back in session.  The jury's |
| 11:32 | 25 | present.  The alternates are present.  Counsel thank you for |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:32 | 1 | your courtesy. |
| 11:32 | 2 | This is Mr. Quinn taking over with closing |
| 11:32 | 3 | argument on behalf of Mattel. |
| 11:32 | 4 | **CLOSING ARGUMENT BY MR. QUINN FOR MATTEL** |
| 11:32 | 5 | MR. QUINN: Good morning, ladies and gentlemen. |
| 11:32 | 6 | Mattel has been sued by MGA for stealing what MGA |
| 11:32 | 7 | says are its trade secrets at toy fairs. |
| 11:32 | 8 | The information that is shared and disclosed at |
| 11:32 | 9 | toy fairs is not secret. Toy fairs are fairs, where there |
| 11:32 | 10 | are showrooms, where products are shown, the purpose of |
| 11:32 | 11 | which is to promote the product, to sell the product, to |
| 11:32 | 12 | show it to retailers and buyers. |
| 11:32 | 13 | Mr. Brawer told us that. His testimony there on |
| 11:32 | 14 | the screen. |
| 11:32 | 15 | The purpose is to announce new products and to get |
| 11:32 | 16 | orders. And, of course, retailers and buyers are invited |
| 11:33 | 17 | into these showrooms. And the evidence is overwhelming that |
| 11:33 | 18 | what you tell retailers, what you tell buyers is not |
| 11:33 | 19 | confidential. Retailers talk to each other and they share |
| 11:33 | 20 | that information. |
| 11:33 | 21 | Mr. Larian told us this. He knows that they talk. |
| 11:33 | 22 | He knows that if information goes to a retailer, it goes to |
| 11:33 | 23 | the world. He says that's the general rule. They will talk |
| 11:33 | 24 | to you. That's how information is collected in this |
| 11:33 | 25 | industry. |

Case 2:04-cv-09049-DOC-RNB   Document 10449   Filed 04/12/11   Page 98 of 125   Page ID #:317741
CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

98

| | | |
|---|---|---|
| 11:33 | 1 | But the best source of this information was MGA's |
| 11:33 | 2 | designated representative, Mr. Jolicoeur who testified |
| 11:33 | 3 | earlier this week.  He was a designated representative, a |
| 11:33 | 4 | corporate representative on what is trade secret and what |
| 11:33 | 5 | measures MGA takes to protect its trade secret information. |
| 11:33 | 6 | And he was asked, although he initially denied it, his |
| 11:33 | 7 | deposition testimony was read to you, and he acknowledged |
| 11:34 | 8 | that if information is released to the retailer, it is |
| 11:34 | 9 | released to the public.  If you give it to retailers, it's |
| 11:34 | 10 | in the stream of information that's out there.  It's no |
| 11:34 | 11 | longer under control. |
| 11:34 | 12 | And you will -- you've had a -- one of the jury |
| 11:34 | 13 | instructions that's been read to you is Jury Instruction |
| 11:34 | 14 | No. 58, which is up there on the screen, relating to trade |
| 11:34 | 15 | secrets and the definition of a trade secret, and it has a |
| 11:34 | 16 | definition under the law.  And not surprisingly, that |
| 11:34 | 17 | definition requires repeatedly that the information was, in |
| 11:34 | 18 | fact, secret, and that reasonable measures were taken to |
| 11:34 | 19 | keep the information secret. |
| 11:34 | 20 | Now, MGA knows that information can be obtained in |
| 11:34 | 21 | this way.  They take advantage of it, too.  That's how they |
| 11:34 | 22 | learn about their competitor's products. |
| 11:34 | 23 | Ms. Saunders, MGA's director of sales told you, |
| 11:34 | 24 | this week when she testified, that she's gotten information |
| 11:35 | 25 | about unreleased Mattel products from buyers, and that |

DEBBIE GALE, U.S. COURT REPORTER

11:35    1    there's nothing wrong with that, because that information is

11:35    2    out there and it's shared.

11:35    3          MGA knows if you really do want to keep

11:35    4    information secret at a toy fair, there are ways to do that.

11:35    5    You have separate, specific closed rooms with names only,

11:35    6    specific people that are permitted to go there.

11:35    7          Let's take a look at Exhibit 12844.  And this is

11:35    8    an internal MGA e-mail.  And if we could go to the next

11:35    9    slide where there's discussion about -- Slide 8, Ken --

11:35   10    there's discussion here about -- when it says here -- it

11:36   11    says in this internal e-mail that "Our marketing" -- "In the

11:36   12    marketing meeting, it was decided that showing our key

11:36   13    product too early would open ourselves up to be copied by

11:36   14    our competitors.  So for confidentiality reasons, we'd like

11:36   15    to remove the following products from being shown on

11:36   16    November 7th."

11:36   17          And then it goes on down below.  It says, "In

11:36   18    Hong Kong, Isaac would like to have a separate, closed

11:36   19    showroom with the above product in it.  That showroom is to

11:36   20    be viewed by the following people only."  And then there are

11:36   21    specific names of two people at Walmart.

11:36   22          So MGA knows people go into showrooms.  Retailers

11:36   23    go.  And they see what's there, and they talk about what's

11:36   24    there.  And there are specific measures that can be taken:

11:36   25    Names only for specific people, if you want to have a

| | | |
|---|---|---|
| 11:36 | 1 | separate closed room to protect that information and keep it |
| 11:36 | 2 | from not getting out there. |
| 11:37 | 3 | And you'll have -- you have a jury instruction |
| 11:37 | 4 | that helps you understand this.  It's Jury Instruction No. |
| 11:37 | 5 | 60.  I won't take the time to show it to you now, but it |
| 11:37 | 6 | dealt with what are reasonable measures; that reasonable |
| 11:37 | 7 | measures have to be taken if you want to preserve the |
| 11:37 | 8 | secrecy of information, if you want to claim that it is |
| 11:37 | 9 | trade secret.  This might be an example of such a reasonable |
| 11:37 | 10 | measure.  If you really do expect to maintain secrecy, and |
| 11:37 | 11 | you don't want people talking about it. |
| 11:37 | 12 | Even this, though -- even closed information in |
| 11:37 | 13 | closed rooms in toy fair booths gets out.  And we've seen |
| 11:37 | 14 | that.  Mr. Larian has been the beneficiary of that. |
| 11:37 | 15 | If we can to take a look at Exhibit 9553, which is |
| 11:37 | 16 | an e-mail from Angelika Sternberg of MGA's German office, |
| 11:37 | 17 | about Get Connected Barbie.  And she talks about information |
| 11:37 | 18 | that's been obtained from customers about a new Mattel |
| 11:38 | 19 | product.  "They show it as a top secret theme in a closed |
| 11:38 | 20 | door -- in a closed room at toy fair," and it has |
| 11:38 | 21 | information about the price point there. |
| 11:38 | 22 | Mr. Larian testified about this -- this particular |
| 11:38 | 23 | e-mail.  And he acknowledged that he understood that to mean |
| 11:38 | 24 | that he was getting information about a new Barbie product |
| 11:38 | 25 | that was in a closed room at a toy fair. |

| | | |
|---|---|---|
| 11:38 | 1 | Again, this type of information, even in a closed |
| 11:38 | 2 | room, is shared.  And Mr. Larian benefits from that, as |
| 11:38 | 3 | well.  That's just the way this industry works. |
| 11:38 | 4 | And, of course -- of course, the press is invited |
| 11:38 | 5 | to toy fairs.  That is the point.  You want to get the word |
| 11:38 | 6 | out about your new products.  Ms. Saunders told you that. |
| 11:38 | 7 | If we could look at Slide 14. |
| 11:38 | 8 | This was her testimony that she had attended the |
| 11:38 | 9 | New York Toy Fair in 2004 -- 2001 to 2004, and she saw |
| 11:39 | 10 | hundreds of people there.  She went to MGA's showroom, |
| 11:39 | 11 | including members -- saw members of the media and press |
| 11:39 | 12 | there.  And she understood they are there to publicize the |
| 11:39 | 13 | product. |
| 11:39 | 14 | Mr. Larian said he saw -- there was so much press. |
| 11:39 | 15 | He's been shown an exhibit about press and asked, "Do you |
| 11:39 | 16 | keep track of it?"  He says, "No, you can't.  There is just |
| 11:39 | 17 | so much press." |
| 11:39 | 18 | And we saw this week Exhibit 23718 about CDs that |
| 11:39 | 19 | are actually prepared as media kits about products that are |
| 11:39 | 20 | going to be released, and that they're given with |
| 11:39 | 21 | photographs and information about the products.  So it's |
| 11:39 | 22 | clear that that's the point of those things -- to share it |
| 11:39 | 23 | with the press. |
| 11:39 | 24 | Now, MGA knows that sharing this kind of |
| 11:39 | 25 | information with the press creates a problem for their |

| | | |
|---|---|---|
| 11:39 | 1 | claim.  So what did we hear from Mr. Jolicoeur when he was |
| 11:39 | 2 | on the stand this week.  He initially suggested that, "Well, |
| 11:40 | 3 | information can be embargoed.  We've shared the information |
| 11:40 | 4 | with the press, but it's only many with the understanding |
| 11:40 | 5 | that they won't publish it until some other date." |
| 11:40 | 6 | But Zeller followed up on that and asked him, "Can |
| 11:40 | 7 | you give us an example of when that's ever happened?"  This |
| 11:40 | 8 | is their designee, the person that they've designated to be |
| 11:40 | 9 | their corporate representative and to speak for MGA on this |
| 11:40 | 10 | subject.  And he could not identify a single occasion where |
| 11:40 | 11 | that had happened. |
| 11:40 | 12 | You don't have the press there in your showroom to |
| 11:40 | 13 | keep your secrets; you -- obviously, you have the press |
| 11:40 | 14 | there to get word out about your products. |
| 11:40 | 15 | And this is -- this -- really, I think, MGA |
| 11:40 | 16 | understands that this is fatal.  The fact that the press is |
| 11:40 | 17 | there, they're invited, they share information, that's why |
| 11:40 | 18 | they're there, that is fatal to their claims. |
| 11:40 | 19 | And, you know, we actually saw something that I |
| 11:40 | 20 | think was a little bit dishonest that was done on the -- |
| 11:41 | 21 | when MGA's counsel was questioning Mr. Jolicoeur this week. |
| 11:41 | 22 | He was being questioned by MGA's counsel about Exhibit 9882. |
| 11:41 | 23 | It was about that web posting concerning Toy Fair 2006.  And |
| 11:41 | 24 | there was a question about "When did this first come out?" |
| 11:41 | 25 | And he's -- Mr. Jolicoeur was saying, "Well, it could have |

| | | |
|---|---|---|
| 11:41 | 1 | been months later, could have been years later.  I don't |
| 11:41 | 2 | know." |
| 11:41 | 3 | He wasn't -- on the face of it, I submit, if you |
| 11:41 | 4 | read that, it's pretty clear somebody is contemporaneously |
| 11:41 | 5 | in a blog reporting what they've seen in the MGA showroom. |
| 11:41 | 6 | But Mr.-- Mr. McConville, when -- asked about |
| 11:41 | 7 | this.  Then asked Mr. Jolicoeur -- called his attention to |
| 11:41 | 8 | the date in the lower right, and tried to suggest to you |
| 11:41 | 9 | that the date of this article was October 17th, 2010, when I |
| 11:41 | 10 | think it was obvious to everyone that was the print date, |
| 11:41 | 11 | the date when that was printed out. |
| 11:42 | 12 | And that is the length that they have to go to try |
| 11:42 | 13 | to create a case for you that the press does not publicize |
| 11:42 | 14 | your products. |
| 11:42 | 15 | It's not just the press, but catalogs are |
| 11:42 | 16 | available in toy fairs.  Mr. Larian knows this.  You've seen |
| 11:42 | 17 | Exhibit 22 -- 22225, this e-mail from Mr. Larian, where he's |
| 11:42 | 18 | asking -- he's actually recruiting somebody else to collect |
| 11:42 | 19 | catalogs for him. |
| 11:42 | 20 | He says, "Just as a favor -- I need a favor at |
| 11:42 | 21 | New York Toy Fair.  Can you please get me a copy of catalog |
| 11:42 | 22 | and price lists for the following companies" -- blank, |
| 11:42 | 23 | blank, blank, blank, "and Mattel."  And this was |
| 11:42 | 24 | Mr. Larian's testimony about that.  And he acknowledged that |
| 11:42 | 25 | that's exactly what he was doing. |

| 11:42 | 1 | This type of information -- catalogs, price |
| 11:42 | 2 | lists -- are there and they are shared. |
| 11:43 | 3 | So what was their position then?  There was kind |
| 11:43 | 4 | of an acknowledgment, "Okay.  We do share this information. |
| 11:43 | 5 | We do share it with the press.  Maybe we can't tell you that |
| 11:43 | 6 | we always embargo it, but we have people sign nondisclosure |
| 11:43 | 7 | agreements," that people who come in actually sign and they |
| 11:43 | 8 | promise that they're not gonna share this information. |
| 11:43 | 9 | What was the proof on that?  What was the proof |
| 11:43 | 10 | that at the MGA toy fair they maintained secrets by having |
| 11:43 | 11 | people sign nondisclosure agreements? |
| 11:43 | 12 | None were produced to you, except for one.  That |
| 11:43 | 13 | was Exhibit 36635, which you were told was from the |
| 11:43 | 14 | Hong Kong Toy Fair in January 2005.  No other witness |
| 11:43 | 15 | testified to you that these nondisclosures agreements are |
| 11:43 | 16 | entered into, other than Mr. Larian.  That's the only basis |
| 11:43 | 17 | you have for believing that they ever -- that MGA ever |
| 11:43 | 18 | required that these be signed. |
| 11:43 | 19 | The only two -- only two people in this trial who |
| 11:43 | 20 | were asked about it, who went to MGA's showroom, and were |
| 11:44 | 21 | asked whether they signed nondisclosure agreements were |
| 11:44 | 22 | Mr. Ramano -- and this was his testimony -- and Carey |
| 11:44 | 23 | Plunkett -- and this was her testimony. |
| 11:44 | 24 | So there isn't any evidence, other than the one |
| 11:44 | 25 | document they showed you and Mr. Larian's word that people |

11:44  1   are required to enter into agreements in order to get into

11:44  2   the MGA showroom.

11:44  3          Everything that is taken out of those showrooms,

11:44  4   MGA's and others, is in the stream of commerce.  It's in the

11:44  5   industry.  It's public -- all the words, all the tangibles,

11:44  6   the catalogs, the price lists.  So what was their fallback

11:44  7   position on this?

11:44  8          And this was very carefully calculated.  Their

11:44  9   fallback position on this -- and it became kind of a

11:44  10  mantra -- is:  All right.  Well, it's not the tangibles that

11:44  11  are taken out, because we really can't -- concede we can't

11:44  12  really disagree with that.  People take that.  The press is

11:44  13  there.  This information is publicized.  It's the feel.

11:45  14  It's the touch of the toys.

11:45  15         Did you recall that?  This became kind of a

11:45  16  mantra.

11:45  17         If we could look, Ken, at 26, 27, Mr. Larian's

11:45  18  testimony.  They went out of the way to elicit this

11:45  19  testimony that, "Okay.  It's the feel and the touch."

11:45  20         28, 29, here their counsel even suggested that it

11:45  21  was the smell, like maybe the smell of the plastic of the

11:45  22  toy, that somehow this is the trade secret that doesn't get

11:45  23  out.

11:45  24         And then, in case you didn't get it, finally,

11:45  25  Slide 30, Mr. Larian was asked, "Well, in your view, what

| | | |
|---|---|---|
| 11:45 | 1 | was the most important thing that Mr. Villasenor and his |
| 11:45 | 2 | colleagues were able to get in terms of business |
| 11:45 | 3 | information?" |
| 11:45 | 4 | They repeated it again:  "Well, they touched. |
| 11:45 | 5 | They played.  They looked." |
| 11:45 | 6 | Well, think about this for a minute:  Carey |
| 11:45 | 7 | Plunkett who went there, she -- and we'll talk about her |
| 11:45 | 8 | some more -- she was just like any other buyer, treated like |
| 11:46 | 9 | any other to buyer.  And she too -- she couldn't pass along |
| 11:46 | 10 | the touch, the feel, the smell of the toys.  That type of |
| 11:46 | 11 | feeling couldn't be communicated.  This is the claimed trade |
| 11:46 | 12 | secret? |
| 11:46 | 13 | You can look at Mr. Villasenor's toy fair reports. |
| 11:46 | 14 | Well, you see any reference to touch?  Feel?  Smell? |
| 11:46 | 15 | This is the claimed trade secret? |
| 11:46 | 16 | In fact, it turned out that Ms. Plunkett's |
| 11:46 | 17 | testimony was that she couldn't -- Slide 31 -- she was asked |
| 11:46 | 18 | "Well, could you feel the product?" |
| 11:46 | 19 | And she said, "No." |
| 11:46 | 20 | And you recall Mr. Larian was -- there was |
| 11:46 | 21 | testimony that Mr. Larian said he had reviewed some of these |
| 11:46 | 22 | videos that were created at Mattel about -- from |
| 11:46 | 23 | Mr. Villasenor's toy fair reports.  You recall that?  And it |
| 11:46 | 24 | was asked: |
| 11:46 | 25 | "Did you see in there any instances of people at |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:46 | 1 | Mattel reporting on the touch, feel, the play pattern of the |
| 11:46 | 2 | toy?" -- which is what they're now saying is the trade |
| 11:47 | 3 | secret. |
| 11:47 | 4 | And they could only cite to you that one example. |
| 11:47 | 5 | Do you recall that?  That ribbon that you could twirl.  And |
| 11:47 | 6 | apparently, like, the harder you twirled it, the louder the |
| 11:47 | 7 | music was.  And that wasn't an MGA product.  So again, each |
| 11:47 | 8 | time they have a fallback position, but each time it doesn't |
| 11:47 | 9 | make sense. |
| 11:47 | 10 | The law only protects secrets. |
| 11:47 | 11 | Take a look at slide 32, the jury instruction. |
| 11:47 | 12 | There's a secrecy requirement.  You have to prove that |
| 11:47 | 13 | something is trade secret.  I won't spend -- it was read to |
| 11:47 | 14 | you yesterday.  You'll have the jury instructions with you |
| 11:47 | 15 | in the jury room. |
| 11:47 | 16 | But let me talk to you about Ms. Plunkett.  Slide |
| 11:47 | 17 | 33.  This is Exhibit 9358, Ms. Plunkett's business card. |
| 11:47 | 18 | And what was done here was wrong.  She used a fake business |
| 11:48 | 19 | card for a store that didn't exist.  She did this once back |
| 11:48 | 20 | in 2002, and that was wrong to do. |
| 11:48 | 21 | But how was she treated and what did she get?  She |
| 11:48 | 22 | would only get the same information that a real buyer or a |
| 11:48 | 23 | real retailer would get.  She got the public information |
| 11:48 | 24 | that retailers get.  It's not like she got into some special |
| 11:48 | 25 | name-only Walmart room, like I showed you earlier.  She |

| | | |
|---|---|---|
| 11:48 | 1 | wasn't pretending that she was a big shot.  She was just a |
| 11:48 | 2 | buyer -- pretending to be a buyer, which she should not have |
| 11:48 | 3 | done, and she got the information, the public information, |
| 11:48 | 4 | that any buyer would have gotten.  It's an unsavory way to |
| 11:48 | 5 | get unrestricted information.  It was unseemly.  It was |
| 11:48 | 6 | lazy.  It was wrong.  But she did not get trade secrets. |
| 11:48 | 7 | She was not making a greater effort to get more. |
| 11:48 | 8 | She making -- she was making less of an effort to get no |
| 11:49 | 9 | more than any other buyer or retailer would get. |
| 11:49 | 10 | You have Jury Instruction No. 70, which deals with |
| 11:49 | 11 | misappropriation of trade secrets, and the defense of |
| 11:49 | 12 | "Information was readily ascertainable by proper means." |
| 11:49 | 13 | This means if that information is out there, if |
| 11:49 | 14 | retailers have it, and it's in the stream of commerce, it's |
| 11:49 | 15 | not trade secrets.  It not protectable. |
| 11:49 | 16 | Now, Mr. Villasenor's activities, it's clear that |
| 11:49 | 17 | MGA knew about this, knew no later than 2004, when |
| 11:49 | 18 | Mr. Brawer joined MGA.  He testified he knew that |
| 11:49 | 19 | Mr. Villasenor had this practice of himself and using -- |
| 11:49 | 20 | recruiting other people to use fake business cards. |
| 11:49 | 21 | And Mr. Larian testified he knew about this for |
| 11:49 | 22 | several years.  This was his testimony.  Slide 35.  He had |
| 11:49 | 23 | known about it for several years as of 2009. |
| 11:49 | 24 | Mr. Brawer knew about it.  He -- actually you saw |
| 11:50 | 25 | these documents.  Uh, he recommended Mr. Villasenor for a |

11:50  1    job at MGA.  And you've seen slide -- Exhibit 22395,

11:50  2    Mr. Brawer's e-mail to Mr. Machado -- of all people --

11:50  3    saying that Mr. Villasenor is somebody that we ought to look

11:50  4    at potentially recruiting.  He's good at getting competitive

11:50  5    information.  They knew about this and they did nothing.

11:50  6          You have to ask yourself why would they do

11:50  7    nothing?  The reason is it's not remarkable.  It was an

11:50  8    unsavory way of getting public information.  Mr. Villasenor

11:50  9    was just tricking his way into showrooms to get information

11:50  10   that could otherwise be derived by, you know, harder work,

11:50  11   talking to people, working the network.

11:50  12         You didn't have to be dishonest in order to get

11:50  13   this information.  The information was already public.  And

11:50  14   that's why Mr. Brawer says he never even bothered to tell

11:51  15   Mr. Larian.  This was his testimony, when he was being

11:51  16   asked, says, "No, I never even told him."  He -- imagine

11:51  17   this for a minute.  He's in the New York Toy Fair showroom.

11:51  18   He's got Mr. Larian next to him.  He now works for MGA.  He

11:51  19   knows Mr. Villasenor is out there and does these things.

11:51  20         And Mr. Price asked him, "Well, did you look left,

11:51  21   look right, ask yourself which of the people here must be

11:51  22   the Mattel spy who's here using a fake business card?"

11:51  23         He said, "No," you know, never occurred to him to

11:51  24   do that.

11:51  25         And Mr. Villasenor made his toy fair presentations

| | | |
|---|---|---|
| 11:51 | 1 | back at Mattel, and he made these reports to people at |
| 11:51 | 2 | Mattel of information that he knew, and they knew, was |
| 11:51 | 3 | publicly available.  He knew that sharing this information |
| 11:51 | 4 | would not convey that he had used misrepresentations to get |
| 11:51 | 5 | it. |
| 11:51 | 6 | He was asked about this.  This is Slide 40.  He |
| 11:52 | 7 | says, you know, "You've got all these people out there. |
| 11:52 | 8 | You're making these presentations.  You didn't think this |
| 11:52 | 9 | conveyed to them that you were doing anything unethical or |
| 11:52 | 10 | wrong? |
| 11:52 | 11 | "No," he didn't.  Because he knew that this is |
| 11:52 | 12 | information that's available out there in the marketplace. |
| 11:52 | 13 | And then, finally, he was told by John Louie that |
| 11:52 | 14 | he had to stop.  And this is -- if we can take a look at |
| 11:52 | 15 | Slide 41.  "You better stop representing yourself."  When he |
| 11:52 | 16 | heard -- and when Mr. Louie heard about it -- and he felt |
| 11:52 | 17 | that if he didn't stop, he was gonna lose his job.  And we |
| 11:52 | 18 | all know what the next thing was.  He wrote an e-mail, |
| 11:52 | 19 | threatened a claim, went out on stress, asked for -- asked |
| 11:52 | 20 | for $3 million. |
| 11:52 | 21 | And what you also know is, since then, 2005, |
| 11:52 | 22 | Mattel hasn't collected information this way.  In fact, |
| 11:52 | 23 | Mr. Eckert's testimony was Mattel doesn't send people to toy |
| 11:52 | 24 | fairs to collect information like this.  And what that tells |
| 11:52 | 25 | you is you can collect competitive information, this same |

DEBBIE GALE, U.S. COURT REPORTER

11:53     1    information, from public sources honestly.

11:53     2        You also heard testimony about planograms and how

11:53     3    planograms -- you know, public -- you know, you see the

11:53     4    products in the planograms.  It's public information there,

11:53     5    in some instances, even before the New York Toy Fair, where

11:53     6    they see each others' product.

11:53     7        Ms. Saunders told you that what's in the planogram

11:53     8    is public domain.  MGA gets information from planograms.

11:53     9    And that's even before the New York Toy Fair, which is in --

11:53    10    in February.  And this includes information on unreleased

11:53    11    products.

11:53    12        That was Ms. Saunders' testimony.  And she

11:53    13    testified it's perfectly fine to go in there, see -- you

11:53    14    know, other buyers do it, other competitors do it, and see

11:53    15    that products are there; that they see, as she said here in

11:53    16    her testimony, products and packages even before the

11:53    17    New York Toy Fair.

11:53    18        Now, in her testimony on the stand here, this was

11:53    19    her -- her testimony at deposition, where she said she saw

11:54    20    competitors' products and packages and they saw ours.  She

11:54    21    said, "By 'products and packages,' I meant boxes."  I'll

11:54    22    leave it to you to assess the credibility to that.

11:54    23        She also said -- and she had said in her

11:54    24    deposition that MGA started in 2004 using white boxes so you

11:54    25    couldn't see what the products were -- or that they had

| | | |
|---|---|---|
| 11:54 | 1 | started in 2006.  She said she had reviewed her e-mails and |
| 11:54 | 2 | realized that actually that practice started in 2004.  You |
| 11:54 | 3 | weren't shown those e-mails and so I -- you know, I -- of |
| 11:54 | 4 | all -- you've seen hundreds of e-mails in this case, |
| 11:54 | 5 | perhaps.  I think you've got to know that if they had |
| 11:54 | 6 | e-mails indicating that they started using white boxes in |
| 11:54 | 7 | planograms so that you couldn't see MGA product, they would |
| 11:54 | 8 | have shown you those e-mails. |
| 11:54 | 9 | It's clear that MGA, Mr. Larian collect |
| 11:54 | 10 | information from planograms.  This is Exhibit 8931.  With |
| 11:54 | 11 | Mr. Larian here actually directing someone, you know, "When |
| 11:54 | 12 | you talk to planograms -- when you go to the planogram or to |
| 11:55 | 13 | buyers, please check out -- please check out the information |
| 11:55 | 14 | and what our competition is doing and report back." |
| 11:55 | 15 | So these are -- at least in the case of the Kmart |
| 11:55 | 16 | planogram, this is even before the New York Toy Fair, which |
| 11:55 | 17 | makes -- really turns Mr.-- raises serious questions about |
| 11:55 | 18 | Mr. Malackowski's analysis. |
| 11:55 | 19 | You remember, he says -- he says he's measuring a |
| 11:55 | 20 | head start. |
| 11:55 | 21 | If we could look at Slide 49, which he says runs |
| 11:55 | 22 | from the time of the New York Toy Fair until a child sees it |
| 11:55 | 23 | on the shelf.  He says that's the "head start" period; that |
| 11:55 | 24 | it's a secret up to then. |
| 11:55 | 25 | And then, of course, he was asked, "Well, did you |

| | | |
|---|---|---|
| 11:55 | 1 | ever go look, see -- and see what information was actually |
| 11:55 | 2 | publicly out there about the product, because you would |
| 11:55 | 3 | agree" -- and he said he would agree, if there's public |
| 11:55 | 4 | information about the product before its on the shelf, that |
| 11:55 | 5 | it's no longer public -- it's no -- it can't possibly be |
| 11:55 | 6 | secret.  And he said that, no, he didn't even do that. |
| 11:56 | 7 | But what we have here, in the case of the |
| 11:56 | 8 | planograms is -- you know, maybe it's a reverse head start. |
| 11:56 | 9 | The information is out there even before the toy fair. |
| 11:56 | 10 | Uh, we also heard information about FOB prices. |
| 11:56 | 11 | The suggestion was that that is trade secret information, as |
| 11:56 | 12 | well.  You also heard that price information is shared by |
| 11:56 | 13 | everyone. |
| 11:56 | 14 | If we could take a look at Slide 51.  Retailers |
| 11:56 | 15 | share price information and they do it when they negotiate. |
| 11:56 | 16 | It's -- they play toy companies off of each other.  Prices |
| 11:56 | 17 | are routinely shared.  Mr. Eckert told you how you can |
| 11:56 | 18 | derive an FOB price.  Toy companies, the retailers will tell |
| 11:56 | 19 | you what their margin is.  They'll tell you how you're doing |
| 11:56 | 20 | against the margin.  And they will tell you -- you know the |
| 11:56 | 21 | retail price, you know the margin, you can figure out the |
| 11:56 | 22 | FOB price.  It's a simple calculation. |
| 11:57 | 23 | So let me turn now to what -- what were the |
| 11:57 | 24 | alleged trade secrets that were stolen here. |
| 11:57 | 25 | I suspect there must be a question in your mind |

DEBBIE GALE, U.S. COURT REPORTER

| 11:57 | 1 | exactly what is it.  Is it the feel?  Is it the touch?  Is |
| 11:57 | 2 | it the smell?  Is it the look of product?  They've told you |
| 11:57 | 3 | that there are 114 trade secrets stolen. |
| 11:57 | 4 | Folks, when you go back to the jury room, you will |
| 11:57 | 5 | not find a single piece of evidence that will identify for |
| 11:57 | 6 | you what those trade secrets are.  They didn't identify for |
| 11:57 | 7 | you a feature.  They didn't identify for you a particular |
| 11:57 | 8 | case where Mattel adjusted a price in response to an alleged |
| 11:57 | 9 | disclosure of a price. |
| 11:57 | 10 | They talked about advertising plans.  Did they |
| 11:57 | 11 | tell you of a single case where there was an advertising |
| 11:57 | 12 | plan that was taken and then Mattel, in reaction to that, |
| 11:57 | 13 | they adduced evidence that Mattel had changed its |
| 11:57 | 14 | advertising plans?  It's their burden to prove this.  And |
| 11:57 | 15 | what they've don't here is just throw 114 things up against |
| 11:58 | 16 | the wall and say these are all trade secrets, but haven't |
| 11:58 | 17 | proven to you exactly what any of 'em "is," or shown any |
| 11:58 | 18 | kind of use or reaction to those alleged trade secrets on |
| 11:58 | 19 | the part of Mattel. |
| 11:58 | 20 | They -- in the case of something like 26 products, |
| 11:58 | 21 | they said, "Well, we found a matching Mattel product."  But |
| 11:58 | 22 | what -- they didn't show you that the so-called matching |
| 11:58 | 23 | Mattel product didn't come out earlier, that it didn't come |
| 11:58 | 24 | out a year later, that it wasn't the subject of an MGA press |
| 11:58 | 25 | release.  They couldn't do that. |

11:58   1          In fact, Mr. Larian was asked about that.  If we

11:58   2    can turn to Slide 1 in the other deck.

11:58   3          He was asked whether he could say whether any of

11:58   4    these trade secrets was not the subject of a press release

11:58   5    at the time of the toy fair.  And his answer to that was

11:58   6    that he could not.  And that's because, almost all of them,

11:59   7    we've been able to prove had already been publicly

11:59   8    disclosed.

11:59   9          For example, MGA claims that Mattel stole the

11:59   10   trade secret information about a new MGA product called

11:59   11   "Alien Racers" in mid February 2004 at the New York Toy

11:59   12   Fair.  But a comparison of MGA's own February 11, 2004 press

11:59   13   release makes clear that the information was already public,

11:59   14   that they had issued a press release at the toy fair, and

11:59   15   that Mattel stole nothing.

11:59   16         Can we call up that Slide 2, Ken?

11:59   17         TECHNICIAN:  Give me just a moment.

11:59   18         MR. QUINN:  All right.

11:59   19         From Mr. Villasenor's report from that toy fair,

11:59   20   he describes it as a -- "Set in a mythical universe.  The

11:59   21   ultimate power source is key.  Speed is power.  Line will

11:59   22   debut with transforming RC action."

12:00   23         But MGA's press release, which came out at the

12:00   24   time of the toy fair, weeks earlier -- this is Slide 3 --

12:00   25   says the very exact same thing.  Mr. Villasenor had just

DEBBIE GALE, U.S. COURT REPORTER

12:00  1    grifted from the press release.

12:00  2           Mr. Jolicoeur, when presented with this -- this is

12:00  3    Slide 4 -- had to acknowledge that the -- all the

12:00  4    information in Mr. Villasenor's report, MGA itself had

12:00  5    already released back in February -- on February 11, 2004.

12:00  6           If we could go back to that Slide 1, Ken, in this

12:00  7    deck.

12:00  8           This is where Mr. Larian told you he couldn't tell

12:00  9    you that any of those products were not part of an article

12:00  10   or a press release that had already been issued.

12:00  11          It's their burden.  It's their burden, ladies and

12:00  12   gentlemen, to establish that these were secret.

12:00  13          Another example -- and I obviously can't go

12:00  14   through all these.  But they claim that Mattel snuck into

12:01  15   MGA showrooms in New York and Nuremberg in 2005, and stole

12:01  16   the idea for Bratz Virtual Buddies Pets.  This is one of

12:01  17   their 114 claimed trade secrets.  They point to this

12:01  18   Exhibit 26755-12 from Mr. Villasenor's report, but this very

12:01  19   same information appears on Slide 6 in their -- in their own

12:01  20   press release, Exhibit 9350-3.

12:01  21          In fact, Mr. Villasenor admitted that all he did

12:01  22   in this case was to cut and paste the February 19, 2005

12:01  23   article and circulate it as an e-mail.

12:01  24          And he was -- he admitted he was showing off.

12:01  25   This is the one he recalled -- you remember, the DEFCON

12:01  1    Alert?  Slide 7.  DEFCON Alert, Level 1.  And we showed you
12:01  2    that that -- it was just an MGA press release and nothing
12:02  3    more.
12:02  4         And he admitted that he was just trying to make
12:02  5    his superiors think he was getting valuable information by
12:02  6    prowling on the Internet.  That's Slide 8.
12:02  7         They also claim that we misappropriated the doll
12:02  8    line Bratz Diamondz when it was being shown at the 2006
12:02  9    New York Toy Fair, but Mr. Larian -- and Mr. Larian claimed
12:02  10   that the trade secret feature of that doll would be the fact
12:02  11   that it came out with a real diamond, and that the real
12:02  12   diamond was a big deal, in Mr. Larian's words.  That was his
12:02  13   testimony.  But as he had to admit, the big deal had already
12:02  14   been made public by -- in an MGA press release on
12:02  15   February 8, 2006.  And he acknowledged that -- if we could
12:02  16   take a look at Slide 11 -- that that's exact -- that the
12:02  17   information was already in the press release.
12:02  18        I can't go through them all.  There were a lot of
12:02  19   news articles that came in and press releases.  But at least
12:02  20   65 of the supposed trade secrets were disclosed by MGA's own
12:03  21   press releases.
12:03  22        Another alleged trade secret that Mattel
12:03  23   supposedly stole was the Bratz Wintertime Wonderland
12:03  24   product.  You remember Mr. Larian got a little emotional
12:03  25   about this one.  He said the MyScene Chillin Out was a

12:03   1    knockoff of the Wintertime Wonderland.  He said he was

12:03   2    shocked that MyScene could come up with the same idea in

12:03   3    such a short period of time.  It was his testimony he was

12:03   4    shocked.

12:03   5            Folks, nobody could be shocked that a fashion doll

12:03   6    would come out with a winter-themed doll.  Barbie has been

12:03   7    doing that for 50 years.  I won't -- the slides are in

12:03   8    evidence -- or the catalogs are in evidence.

12:03   9            Maybe, Ken, we could quickly go through Slide 13,

12:03   10   14 -- these are from the '63 catalog, the '66 catalog, the

12:03   11   '74 catalog, the 1992 catalog, the '99 catalog.

12:03   12           You can go forward two years and look at Bratz'

12:04   13   2003 Winterline -- Wintertime Wonderland product.  That's

12:04   14   Slide 19.  You'll see that she has a lot of the same

12:04   15   accessories and features that those previous Barbie products

12:04   16   had:  A sled; a pair of gloves; soft, fury, white material.

12:04   17           You know, so it's not surprising Bratz' Wintertime

12:04   18   Wonderland product uses elements that you would expect to

12:04   19   have in a doll that comes out around Christmastime when a

12:04   20   lot of dolls are sold.

12:04   21           I mean, Carter Bryant had worked on -- Carter

12:04   22   Bryant worked on designing Bratz' Wintertime Wonderland

12:04   23   doll.  He testified that at the beginning of this case.

12:04   24   That's slide 26.  He worked on all of those.

12:04   25           But what he didn't testify to back then, and he

| | | |
|---|---|---|
| 12:04 | 1 | only testified to yesterday, was that he had worked on a |
| 12:04 | 2 | Winter Wonderland Barbie doll when he was at Mattel. |
| 12:04 | 3 | But, finally, let's look at the MyScene Chill Out |
| 12:05 | 4 | doll from that same year, 2003.  Slide 20.  And you'll see |
| 12:05 | 5 | she also has a snowboard, instead of a sled.  She has |
| 12:05 | 6 | goggles and white fur.  All these same elements, they are |
| 12:05 | 7 | generic. |
| 12:05 | 8 | Where's the trade secret? |
| 12:05 | 9 | Where's the trade secret? |
| 12:05 | 10 | Ask them to tell you where the trade secret is. |
| 12:05 | 11 | These are common themes that have been done time |
| 12:05 | 12 | and time again, and you'll see them in the Barbie catalogs. |
| 12:05 | 13 | There are only, you know, four seasons, after all. |
| 12:05 | 14 | You expect also to have a -- in the summer, a beach theme, |
| 12:05 | 15 | a, you know, Sun-Kissed Summer theme.  You'll have a date |
| 12:05 | 16 | night theme.  You'll have a prom theme. |
| 12:05 | 17 | Where again is the trade secret?  Ask yourselves. |
| 12:05 | 18 | They been deliberately vague about that. |
| 12:05 | 19 | If we could look at Mr. Testim- -- at Mr. Larian's |
| 12:05 | 20 | testimony again.  Slide 12.  You ask yourself -- he said he |
| 12:05 | 21 | was shocked to see that there was a MyScene winter-themed |
| 12:05 | 22 | doll come out.  He's a professional in the toy business, who |
| 12:06 | 23 | have other professionals and work -- who work for him. |
| 12:06 | 24 | You can assess the credibility of that claim that |
| 12:06 | 25 | he was actually shocked to see that Mattel would come out |

12:06   1   with a similarly themed doll.

12:06   2          There's example after example.  Dolls -- you know,

12:06   3   one of the trade secrets that they claim is the Roller

12:06   4   Boogie 80's doll, where they claim that MyScene copied

12:06   5   Bratz.  You will see that that has been done time and time

12:06   6   again.  And that, in fact, the doll that they compare it to

12:06   7   came out two years before.  The MyScene product they

12:06   8   suggested was copied from the Bratz Roller Boogie product.

12:06   9   That's Exhibit 36684.  Slide 23.  Actually, came out before

12:06   10  the Bratz product did.

12:06   11         And the year before, there had been a similar

12:07   12  Bratz, you know, roller -- the year before MGA did their

12:07   13  2004 Roller Boogie doll, MyScene had already done one with

12:07   14  the very same elements as we see in the Bratz version.

12:07   15         If we could take a look at Slide 24, the Mattel

12:07   16  catalog for 2003, the year before.  Slide 24.

12:07   17         You will see the very same elements.  They all

12:07   18  have -- these roller dolls, they have some things in common:

12:07   19  They have a small open jacket.  You see a T-shirt.  You see

12:07   20  short shorts.  You see legwarmers.

12:07   21         So, you know, you have to ask yourself why

12:07   22  Claim 114 trade secrets, and then not prove to you what the

12:07   23  secrets were?  Was it the smell?  The touch?  The taste?

12:07   24         Will they actually get up here and say this one

12:07   25  was copied by this one?  This was the specific head start?

| | | |
|---|---|---|
| 12:07 | 1 | This is the specific feature of this product that Mattel |
| 12:08 | 2 | stole here?  Here is the advertising plan that Mattel used |
| 12:08 | 3 | and seized?  Here is the price adjustment that they made? |
| 12:08 | 4 | They didn't do any of that. |
| 12:08 | 5 | They didn't do any of that, and I suggest to you |
| 12:08 | 6 | there is a reason they didn't do any of that, and that's |
| 12:08 | 7 | because this claim against Mattel is the biggest effort of |
| 12:08 | 8 | all to distract your attention from the theft of a brand. |
| 12:08 | 9 | It's a poor excuse, a poor effort to try to level |
| 12:08 | 10 | the playing field and make you think -- you know, hope that |
| 12:08 | 11 | they can persuade you Mattel's just as bad. |
| 12:08 | 12 | But it's transparent, and the evidence isn't |
| 12:08 | 13 | there.  They have not proved any trade secrets, and they |
| 12:08 | 14 | have not proved that Mattel stole anything. |
| 12:08 | 15 | Thank you. |
| 12:08 | 16 | THE COURT: All right.  Thank you, Mr. Quinn. |
| 12:08 | 17 | And stop the clock for just a moment. |
| 12:08 | 18 | Now let me talk to you members of the jury. |
| 12:09 | 19 | I'm going to bring the two CSO's in.  Nancy, I'm |
| 12:09 | 20 | going to swear the two CSO's.  I need two CSO's, Nancy. |
| 12:09 | 21 | There's one.  It's good to see you again. |
| 12:09 | 22 | (To the jury:)  I'm going to have the CSO's take |
| 12:09 | 23 | you to lunch.  That way you're apart during this process. |
| 12:09 | 24 | And, well let me talk to you.  There is the other |
| 12:09 | 25 | gentleman.  It's good to see both of you again. |

CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

122

| | | |
|---|---|---|
| 12:09 | 1 | Gentlemen, would you come forward.  Would you |
| 12:09 | 2 | please raise your right hand, please.  Nancy will administer |
| 12:09 | 3 | an oath to you. |
| 12:09 | 4 | *(Court Security Officers sworn.)* |
| 12:09 | 5 | THE COURT:  All right.  Now, we're going to take |
| 12:09 | 6 | you down for lobster and filet mignon.  And that's just a |
| 12:09 | 7 | joke for the record, because, apparently, the federal |
| 12:10 | 8 | government may shut down at 12:00 midnight tonight. |
| 12:10 | 9 | *(Laughter in the courtroom.)* |
| 12:10 | 10 | THE COURT:  Let me assure you of two things:  Both |
| 12:10 | 11 | parties -- cause we make nonpolitical statements -- are, I |
| 12:10 | 12 | assume, in good faith with whatever's occurring in |
| 12:10 | 13 | Washington DC.  That's for the legislative branch and the |
| 12:10 | 14 | executive branch.  I assure you, the American justice system |
| 12:10 | 15 | will be in session on Monday.  And I'm ordering search |
| 12:10 | 16 | lights now for illumination, and air conditioning may be |
| 12:10 | 17 | outside in the great outdoors. |
| 12:10 | 18 | But remember, America functioned for many, many |
| 12:10 | 19 | years without all the accruements that we have.  And we did |
| 12:10 | 20 | justice for hundreds and hundreds of years here without some |
| 12:10 | 21 | of the niceties the taxpayers have been nice enough, quite |
| 12:10 | 22 | frankly -- you -- to give to us.  So we'll just be fine. |
| 12:10 | 23 | Okay? |
| 12:10 | 24 | So whatever you hear about rumors, et cetera, we |
| 12:10 | 25 | will be in session.  And you should count on being in |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 12:10 | 1 | session on Monday.  Okay? |
| 12:10 | 2 | Now, you go have a nice lunch.  Don't discuss this |
| 12:10 | 3 | matter amongst yourselves, nor form or express any opinion. |
| 12:11 | 4 | We'll bring you back at 1:15.  Let's give a couple |
| 12:11 | 5 | extra minutes to Counsel. |
| 12:11 | 6 | *(Jury recesses for lunch at 12:11 p.m.)* |
| 12:11 | 7 | THE COURT:  Counsel, if you would be seated for |
| 12:11 | 8 | just a moment. |
| 12:11 | 9 | *(Outside the presence of the jury.)* |
| 12:11 | 10 | THE COURT:  All right. |
| 12:11 | 11 | Counsel -- the jury's no longer present -- we'll |
| 12:11 | 12 | resume promptly at 1:15. |
| 12:11 | 13 | Mike and Annette, if you would just calculate |
| 12:11 | 14 | whatever time was used by Mattel.  You're on the same |
| 12:11 | 15 | standard.  You can call your recesses when you want to, just |
| 12:11 | 16 | like Mr. Price and Mr. Quinn.  You can call them within 45 |
| 12:11 | 17 | minutes, or an hour, or an hour and 15 minutes, when you get |
| 12:11 | 18 | to a logical breaking point. |
| 12:11 | 19 | You're held to the same standard, and I want an |
| 12:11 | 20 | accounting time-wise on MGA's part.  Meanwhile, you'll |
| 12:11 | 21 | switch sides now.  When you come back, MGA will be seated at |
| 12:11 | 22 | the plaintiff's table, because you have claims.  Mattel will |
| 12:12 | 23 | be seated at the defendant's table. |
| 12:12 | 24 | Have a nice lunch.  We'll resume promptly at 1:15. |
| 12:12 | 25 | *(Lunch recess held at 12:12 p.m.)* |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 4/8/2011 - Day 49, Volume 1 of 3

124

12:12    1            *(Further proceeding reported by Sharon*

12:12    2     *Seffens in Volume II.)*

12:12    3                     -oOo-

12:12    4

         5

         6

         7

         8

         9

   10

   11

   12

   13

   14

   15

   16

   17

   18

   19

   20

   21

   22

   23

   24

   25

-oOo-

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  April 9, 2011

_____
DEBBIE GALE, U.S. COURT REPORTER
CSR NO. 9472, RPR