1

                    UNITED STATES DISTRICT COURT

                   CENTRAL DISTRICT OF CALIFORNIA

                          SOUTHERN DIVISION

                              - - -

        THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING


        MATTEL, INC., et al.,
                        Plaintiffs,
             vs.
                                        CV-04-9049-DOC
        MGA ENTERTAINMENT, INC.,   DAY 49
        et al.,                    Volume 2 of 3
                        Defendants.

        -------------------------


                 REPORTER'S TRANSCRIPT OF PROCEEDINGS

                       Santa Ana, California

                       Friday, April 8, 2011



                          SHARON A. SEFFENS, RPR
                          United States Courthouse
                          411 West 4th Street, Suite 1-1053
                          Santa Ana, CA  92701
                          (714) 543-0870


         SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

2

```
 1    APPEARANCES OF COUNSEL:

 2    For Plaintiff MATTEL, INC., ET AL.:

 3    JOHN B. QUINN
      MICHAEL T. ZELLER
 4    WILLIAM PRICE
      QUINN EMANUEL URQUHART & SULLIVAN, LLP
 5    865 South Figueroa Street, 10th Floor
      Los Angeles, CA  90017
 6    (213) 443-3000

 7    For Defendant MGA ENTERTAINMENT, INC., ET AL.:

 8    THOMAS MCCONVILLE
      ORRICK HERRINGTON & SUTCLIFFE LLP
 9    4 Park Plaza, Suite 1600
      Irvine, CA  92614
10    (949) 567-6700

11    ANNETTE HURST
      ORRICK, HERRINGTON & SUTCLIFFE LLP
12    The Orrick Building
      405 Howard Street
13    San Francisco, CA  94105
      (415) 773-4585
14
      KELLER RACKAUCKAS LLP
15    JENNIFER L. KELLER..
      18500 Von Karman Avenue, Suite 560
16    Irvine, CA
      (949) 476-8700
17

18    FOR CARLOS GUSTAVO MACHADO GOMEZ:

19    MARK E. OVERLAND
      100 Wilshire Boulevard, Suite 950
20    Santa Monica, CA  90401
      (310) 459-2830
21

22    ALEXANDER COTE
      SCHEPER KIM AND HARRIS LLP
23    601 West Fifth Street, 12th Floor
      Los Angeles, CA  90071-2025
24    (213) 613-4655

25
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    ALSO PRESENT:

 2    MGA ENTERTAINMENT, INC.
      JEANINE PISONI
 3    16360 Roscoe Boulevard, Suite 105
      Van Nuys, CA  91406
 4

 5    ALSO PRESENT:

 6    ROBERT ECKERT, MATTEL CEO

 7    ISAAC LARIAN, MGA CEO

 8    KEN KOTARSKI, Mattel Technical Operator

 9    MIKE STOVALL, MGA Technical Operator

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1

2                              INDEX

3                                                          PAGE

4     CLOSING ARGUMENT BY MS. KELLER                        5

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 12:42:16 | 1 | SANTA ANA, CALIFORNIA; FRIDAY, APRIL 8, 2011; 1:15 P.M. |
| 01:17:28 | 2 | *(Jury present)* |
| 01:17:28 | 3 | THE COURT:  We are back in session.  All counsel |
| 01:17:28 | 4 | are present, and the jury is present.  Mr. Larian by Ms. |
| 01:17:28 | 5 | Keller. |
| 01:17:28 | 6 | MS. KELLER:  Good afternoon.  I, too, want to |
| 01:17:28 | 7 | thank you on behalf of all of us -- Ms. Hurst, Mr. |
| 01:17:28 | 8 | McConville, Mr. Larian, MGA, and our whole trial team, which |
| 01:17:28 | 9 | you probably have figured out by now is good sized, as is |
| 01:17:28 | 10 | Mattel's.  They have worked very, very hard, and you have |
| 01:17:28 | 11 | worked unbelievably hard.  I think all of us are astonished |
| 01:17:28 | 12 | that you're all still here after all this time and that you |
| 01:17:28 | 13 | are still listening despite the fact that we know a lot of |
| 01:17:28 | 14 | this has been laborious and boring. |
| 01:17:28 | 15 | You know, really the two greatest democratic |
| 01:17:28 | 16 | institutions in our nation are the ballot box and the jury |
| 01:17:28 | 17 | box.  And we have heard a whole lot about how the CEOs are |
| 01:17:28 | 18 | the place where the buck stops, but it's not really.  It |
| 01:17:28 | 19 | stops with you. |
| 01:17:28 | 20 | You are sitting here in the United States District |
| 01:17:28 | 21 | Court, and you're representing the American people, all of |
| 01:17:28 | 22 | you.  You are standing in for your fellow citizens, and the |
| 01:17:28 | 23 | decision that you have to make in this case is not just |
| 01:17:28 | 24 | about the facts of this case.  It's not just about MGA, and |
| 01:17:28 | 25 | it's not just about Mattel. |

01:17:28  1              It involves an even bigger principle.  Do we want

01:17:28  2       American business to have a level playing field where an

01:17:28  3       entrepreneur can come in with innovation, hard work, risk

01:17:28  4       taking, new energy, new ideas, grow a company and be

01:17:28  5       successful?  Or do we want to allow giant corporations to be

01:17:28  6       so powerful that they can crush smaller competitors, stifle

01:17:28  7       competition, and even own their employees, own them and own

01:17:28  8       their ideas?

01:17:28  9              If that happens, the loser isn't just going to be

01:17:28  10      MGA.  It's really going to be all of us because it will be

01:17:28  11      American consumers who lose; it will be American workers who

01:17:28  12      lose, and we are going to see less and less of what has made

01:17:28  13      this country the most powerful business engine in the world

01:17:28  14      -- competition, even against Barbie.

01:17:28  15              So, you know, this has been a long trial, and we

01:17:28  16      only have a short period of time -- it may seem like a long

01:17:28  17      period of time to you, but we only have a short period of

01:17:28  18      time to go everything over.  You will see when you go back

01:17:28  19      into the jury room the giant number of exhibits and dolls

01:17:28  20      and sculpts and all these things that you're going to have

01:17:28  21      back there.  And you're going to have your very own

01:17:28  22      planogram.

01:17:28  23              But I can't go over every one of those things.

01:17:28  24      You know, I don't need to, because in a long trial my

01:17:28  25      feeling is the truth comes out.  In a short trial an

01:17:28  1   individual witness can have his testimony distorted or an

01:17:28  2   individual witness can have her e-mails taken out of

01:17:28  3   context.  But in a long trial where you are really seeing

01:17:28  4   all the evidence, all the witnesses, you get a real feeling

01:17:28  5   for what is the truth, and you don't need to have 1,500

01:17:28  6   exhibits read to you to know it.

01:17:28  7           Now, what I told you in opening statement was

01:17:28  8   this.  I said this case is about how the world's biggest toy

01:17:28  9   company tried to crush the only competitor to ever challenge

01:17:28  10  Barbie in the marketplace.  I told you that the evidence

01:17:28  11  would show that MGA did not steal the idea of Bratz or any

01:17:28  12  Mattel fashion doll playbook; that MGA invested millions of

01:17:28  13  dollars, thousands of hours of labor, the creativity of a

01:17:28  14  team of professionals who made all the right creative and

01:17:28  15  business decisions, and made Bratz into a brand, the

01:17:28  16  successful brand it became.

01:17:28  17          I told you that I would show you that Mattel

01:17:28  18  ruthlessly used its power to keep retailers from carrying

01:17:28  19  Bratz, that Mattel refused to do business with vendors who

01:17:28  20  ordered products from MGA; that we would show you that

01:17:28  21  Mattel pressured stores to put Bratz products in bad shelf

01:17:28  22  locations; that Mattel engaged in corporate espionage and

01:17:28  23  cover-ups, spying on MGA; and that years after Bratz became

01:17:28  24  a huge success, Mattel claimed in this lawsuit that it had

01:17:28  25  owned Bratz all along and was entitled to all the profits

01:17:28   1    that MGA had earned.

01:17:28   2         That's exactly what we have proven to you.  That's

01:17:28   3    what the evidence showed really happened.  Please keep in

01:17:28   4    mind again, as I reminded you in the opening statement, that

01:17:28   5    the parties here are Mattel, MGA and Isaac Larian, not

01:17:28   6    Carter Bryant.  Mattel already settled with Carter Bryant.

01:17:28   7         So really what we have seen throughout Mattel's

01:17:28   8    conduct is bullying, plain and simple, bullying.  We have

01:17:28   9    seen bullying of their own employees.  We have seen

01:17:28   10   relentless bullying of Carter Bryant, relentless to the

01:17:28   11   point where he is now a very depressed man who clearly has a

01:17:28   12   lot of emotional and physical problems where he has been

01:17:28   13   almost broken by all this.

01:17:28   14        You know, you hear, oh, well, people have lots of

01:17:28   15   depositions taken, and it's not a big deal.  Imagine

01:17:28   16   yourself subjected to the relentlessness of a Bill Price

01:17:28   17   cross-examining you day in and day out, and day in and day

01:17:28   18   out, and day in and day out; the same questions over and

01:17:28   19   over with a slight twist each time until finally an answer

01:17:28   20   can be gotten that can be displayed in closing argument, a

01:17:28   21   little snippet taken out of context.

01:17:28   22        It is and it was exhausting, but he is not the

01:17:28   23   only one who was bullied.  They bullied three seamstresses

01:17:28   24   who worked for them who years after the fact they fired when

01:17:28   25   it came out in a deposition that they had worked at night in

01:17:28  1    their garages sitting at their sewing machines and sewing

01:17:28  2    patterns, not anything they stole from Mattel, unlike what

01:17:28  3    Mr. Eckert told you.  He didn't know.  You all heard the

01:17:28  4    evidence.  All they did was sew the patterns that they were

01:17:28  5    given by Veronica Marlow, that's it, to try to earn a little

01:17:28  6    extra money for their families.

01:17:28  7            They bullied Ron Brawer just because he went to

01:17:28  8    work for MGA, and it's emblematic of what they do.  You

01:17:28  9    know, he's not the only one.  Followed, e-mails looked at,

01:17:28  10   phone records gathered, wife and children videotaped, sued.

01:17:28  11   Oh, no big deal.  It was just a lawsuit for declaratory

01:17:28  12   relief.  No big deal.  We just wanted to make sure he

01:17:28  13   followed our code of conduct.  What?  They wanted to try and

01:17:28  14   get him on his way out to sign a new contract that was so

01:17:28  15   broad that it identified as a proprietary confidential

01:17:28  16   secret of Mattel all their personnel.

01:17:28  17           So if somebody said to Ron Brawer, "Hey, do you

01:17:28  18   know Joan Smith?" and he said, "Yeah.  She's a secretary.

01:17:28  19   She's a secretary over at Mattel," then he has violated his

01:17:28  20   agreement.  And they entitled it at the top Code of Conduct.

01:17:28  21   And you've heard that repeated over and over like you are

01:17:28  22   too stupid to know that just repeating code of conduct over

01:17:28  23   and over doesn't make it so.  You know what it included.

01:17:28  24   You saw it up on the screen.

01:17:28  25           So there is this incredible history of bullying

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

01:17:28   1    their own employees, anybody who dares to leave, and then

01:17:28   2    one little upstart competitor.  And they have tried to

01:17:28   3    absolutely crush MGA and Mr. Larian.  And the themes of

01:17:28   4    these companies are really embodied in their CEOs.

01:17:28   5            You know, Mr. Larian is a character.  He is an

01:17:28   6    immigrant, creative, loves toys, is still a little bit of a

01:17:28   7    kid.  You can see how he loves toys.  You can see how he

01:17:28   8    knows toys.  He came to this country with nothing like so

01:17:28   9    many of our ancestors or we ourselves, came here with

01:17:28   10   nothing but $750 and a blanket at age 17, put himself

01:17:28   11   through Cal State-L.A., starting selling toys out of the

01:17:28   12   trunk of his car, and by hard work and tremendous energy and

01:17:28   13   intelligence and creativity got to where he is today.

01:17:28   14           And he is a fighter.  He is a fighter.  That

01:17:28   15   document that you saw where they were spying on him --

01:17:28   16   Richard de Anda, the head of their security, described him

01:17:28   17   as having a big ego and wanting to be in control and having

01:17:28   18   a short fuse.  You saw all this in the trial.  You saw the

01:17:28   19   short fuse, and you saw that Mattel's lawyers were very

01:17:28   20   adept in knowing how to push his buttons.

01:17:28   21           And after all these years of going through what he

01:17:28   22   went through, of being relentlessly, relentlessly harassed,

01:17:28   23   his fuse has gotten even shorter.  It really has.  He is a

01:17:28   24   human being, and he acts like one.  But he's a human being

01:17:28   25   in other ways, too.  He bought that company, Little Tykes,

01:17:28  1    in Ohio.  You heard about it.  It's in Hudson, Ohio.

01:17:28  2    Everybody told him, you know, you can't have a toy company

01:17:28  3    in American anymore and make a profit.  You just can't.  You

01:17:28  4    have to move it.  And they were going to move it to Mexico.

01:17:28  5            Then Mr. Larian went and he visited Little Tykes,

01:17:28  6    and he looked at those people in that town and he realized

01:17:28  7    what it was going to do to them, and he couldn't do it.  He

01:17:28  8    is not a suit.  He couldn't do it.  He couldn't take away

01:17:28  9    those people's livelihoods and community, and he left it

01:17:28  10   there and worked and worked and worked to make Little Tykes

01:17:28  11   successful.  And it became successful.

01:17:28  12           And you know with all their resources, if that

01:17:28  13   wasn't the truth, Mattel would have had witness after

01:17:28  14   witness up there trashing Mr. Larian.  But it was the truth,

01:17:28  15   and the only thing they could do was try to get out of one

01:17:28  16   of the MGA employees that years afterwards got a three- or

01:17:28  17   four-million-dollar loan from the state of Ohio.  Big deal.

01:17:28  18   And that was Ms. Howstein who told you that.

01:17:28  19           The culture at Mattel is really different.  It's

01:17:28  20   all about profit.  MGA wants to make a profit, too, but it's

01:17:28  21   not all about profit.  At Mattel it's all about profit.

01:17:28  22   They own you.  They own your voice mails.  Cameras are on

01:17:28  23   you all the time.  It's creepy.  It is creepy.  You refuse

01:17:28  24   to sign an overbroad and possibly illegal document demanding

01:17:28  25   that you give up your rights forever, and they follow you

01:17:28   1    and your wife and kids for two weeks, and they sue you.

01:17:28   2             If you are a competitor, they stake out your

01:17:28   3    offices, infiltrate your private toy fair showrooms with

01:17:28   4    spies.  They distribute a how-to-steal manual to their

01:17:28   5    employees.  It's been around for years.  They pack hundreds

01:17:28   6    of employees into a theater to hear all about the trade

01:17:28   7    secrets that they've stolen.

01:17:28   8             But don't get caught.  If you get caught, you

01:17:28   9    know, it's going to be like the old Mission Impossible.  You

01:17:28  10    know, the secretary will disavow any knowledge of your

01:17:28  11    actions.  All of a sudden no one even knows market

01:17:28  12    intelligence exists.

01:17:28  13             They didn't even know there was such a department.

01:17:28  14    And if there was one, it only had two people in it.  If it

01:17:28  15    had more people, well, everything they were doing was public

01:17:28  16    anyway, which really explains why they spent hundreds of

01:17:28  17    thousands of dollars every year flying these people to toy

01:17:28  18    fairs with fake IDs and putting them up at hotels.

01:17:28  19             So you have got Mr. Eckert, who has got plausible

01:17:28  20    deniability of everything.  Oh, I would never condone it.

01:17:28  21    But it's all information that anybody could get their hands

01:17:28  22    on.  It's just a lazy man's way out.

01:17:28  23             Mattel's lawyers all the way up to the general

01:17:28  24    counsel, you know, denying knowing anything about it even

01:17:28  25    after they were told, hiding documents, concealing the

```
01:17:28   1    truth, engaging in cover-ups.  And what happens when Mr.
01:17:28   2    Eckert decides maybe it would be more profitable to get rid
01:17:28   3    of employees?  They're gone.  I mean, the first year he is
01:17:28   4    there, he shuts down the last remaining factory in America
01:17:28   5    that Mattel had that made toys, the last one.
01:17:28   6             And he was so cavalier about it that he didn't
01:17:28   7    even know if it was in Kentucky, in Tennessee.  He didn't
01:17:28   8    even know how many people were involved.  Didn't know.  And
01:17:28   9    do you know what he called it?  A head count reduction.  I
01:17:28   10   mean, it was really hard to get him to say those people were
01:17:28   11   let go and their jobs were eliminated.  I mean, it was a
01:17:28   12   head count reduction.  It was a consolidation.
01:17:28   13            So these are two really different companies --
01:17:28   14   very, very different.  But don't we in this country want to
01:17:28   15   encourage competition and entrepreneurship.  The answer is
01:17:28   16   yes, and you're going to see that in the law that you're
01:17:28   17   going to be given, that you were already read, and you'll
01:17:28   18   have a copy of it.  You're going to see that our country
01:17:28   19   encourages competition and makes it hard for people to say
01:17:28   20   they own ideas and they own concepts and they own another
01:17:28   21   human being.
01:17:28   22            So, you know, in contrast to the incredibly
01:17:28   23   systematic way Mattel went about deliberately stealing their
01:17:28   24   competitors' information, not just ours but all their
01:17:28   25   competitors', we just happen to be in the lawsuit against
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

01:17:28   1    them because we had such a successful fashion doll.  But the

01:17:28   2    others, too, you know, Hasbro, all the competitors.

01:17:28   3              Now, contrast that with Mr. Larian.  We are

01:17:28   4    hearing he is just as bad.  Let's look at Exhibit 4944,

01:17:28   5    which is a January 31st, 2003, e-mail.  This is the one that

01:17:28   6    was shown to you a little while ago by Mr. Quinn.  He is

01:17:28   7    saying as you go to POG, which is planogram, or talk to

01:17:28   8    buyers, please check and let me know what your competitor is

01:17:28   9    doing in fashion dolls, mini dolls, large doll.  He doesn't

01:17:28   10   know.  He is hoping to get a little intel if people happen

01:17:28   11   to be talking about it.

01:17:28   12             Why doesn't he know?  Because he doesn't have an

01:17:28   13   in-house program to steal information.  You're not going to

01:17:28   14   see e-mails like this from Mattel where they say, hey, you

01:17:28   15   know, see if so and so will tell us what our competitors are

01:17:28   16   coming out with.  They don't need to.  They have already got

01:17:28   17   the whole playbook for every one of them.

01:17:28   18             So here Carter Bryant came up with the idea and he

01:17:28   19   came up with the original drawings.  MGA, not Mattel,

01:17:28   20   invested time, sweat, and money.  MGA, not Mattel, took the

01:17:28   21   risks necessary to bring this product to market.  MGA, not

01:17:28   22   Mattel, was the innovator here.

01:17:28   23             MGA personnel figured out how to turn those 2-D

01:17:28   24   drawings into 3-D dolls.  MGA spotted the market that was

01:17:28   25   abandoned practically by Mattel.  Their Barbie sales were

01:17:28  1    going down, but they had just decided older girls weren't

01:17:28  2    going to buy fashion dolls.  I mean, they said they were

01:17:28  3    getting older younger, and that was that.  They just kept

01:17:28  4    pushing Barbie like a big bloated, complacent, monopolistic

01:17:28  5    corporation.  They didn't need to innovate.  They had a

01:17:28  6    monopoly.

01:17:28  7              But MGA figured out there was a new niche out

01:17:28  8    there for tweens, for older girls who were sick of babyish

01:17:28  9    Barbies.  So Isaac Larian invested millions of dollars.  He

01:17:28  10   mortgaged his house.  He put everything on the line, and now

01:17:28  11   Mattel wants to take every dime.

01:17:28  12             We were accused of overreaching by our learned

01:17:28  13   counsel for Mattel.  Overreaching.  Here was the quote we

01:17:28  14   just heard.  "This was perhaps the biggest intellectual

01:17:28  15   property heist of all time."  Heist, like a train robbery.

01:17:28  16   "This was theft of a brand."  Theft of a brand?  What brand?

01:17:28  17   We built the brand.

01:17:28  18             There is an old saying among trial lawyers that if

01:17:28  19   you don't have the facts, you pound on the law.  If you

01:17:28  20   don't have the law, you pound on the facts.  And if you

01:17:28  21   don't have either one, you pound on the table.  And we have

01:17:28  22   heard a lot of pounding on the table from Mattel.

01:17:28  23             Now, in addition, Mattel is claiming that you

01:17:28  24   should give it hundreds of millions of dollars based on a

01:17:28  25   contract which on its face forbids that kind of recovery,

01:17:28   1   based on a trade secret claim that is a square peg in a

01:17:28   2   round hole.  And you're going to see that when we go through

01:17:28   3   the law.  The reason they are doing that, the reason they

01:17:28   4   are saying this is a trade secret, is because the amount of

01:17:28   5   money they can recover is so much bigger.

01:17:28   6          If they are limited to copyright and you found

01:17:28   7   that they were entitled to damages, they could only get

01:17:28   8   damages for the first four dolls and two more.  That's it.

01:17:28   9   But by claiming this was a trade secret, they are claiming

01:17:28   10  that they are entitled to everything we ever did for years.

01:17:28   11  I mean everything -- every line extension, every doll, Bratz

01:17:28   12  pets, Bratz boys.  I mean, every lunch pail, everything

01:17:28   13  belongs to Mattel.

01:17:28   14         It's all because Mattel didn't want to fight fair

01:17:28   15  and square and beat MGA in the marketplace because it

01:17:28   16  couldn't.  So when we talk about thievery, who's trying to

01:17:28   17  steal here?  Not us.  Mattel is trying to steal everything

01:17:28   18  MGA has made of this initial set of drawings.

01:17:28   19         Now, for the last two hours you heard Mr. Price

01:17:28   20  tell you that MGA was engaged in a conspiracy.  Right?  I

01:17:28   21  mean, all these people were in a conspiracy -- Carter

01:17:28   22  Bryant, Mr. Larian, Margaret Leahy, Paula Garcia.  They were

01:17:28   23  all in a conspiracy.  Not a very good conspiracy.

01:17:28   24         I mean, one of the quotes you heard was from Paula

01:17:28   25  Garcia that she didn't know until much later, 2004, that

01:17:28  1    Carter Bryant had been a Mattel employee.  But Mr. Larian

01:17:28  2    immediately said he knew he was a Mattel employee.  He knew

01:17:28  3    that when he was negotiating with him.  That's why he went

01:17:28  4    the extra mile to try to make sure that Carter Bryant really

01:17:28  5    owned these ideas, not just by getting the usual reps and

01:17:28  6    warranties but having a lawyer look into it for him and by

01:17:28  7    quizzing Carter Bryant about when the drawings were made.

01:17:28  8             Now, in contrast to what we said in opening

01:17:28  9    statement, Mr. Quinn said, among other things in opening

01:17:28  10   statement, there will be no evidence of anything improper

01:17:28  11   being done by Mattel at Kohl's.  You heard plenty that was

01:17:28  12   improper being done.  You heard Kohl's and Mattel getting

01:17:28  13   together so that Mattel would buy MGA out of Kohl's for a

01:17:28  14   two-year period.

01:17:28  15            Mr. Quinn in his opening statement said MGA made

01:17:28  16   Carter Bryant a double agent of the highest order, or should

01:17:28  17   I say the lowest.  Who's overreaching here?  You saw Carter

01:17:28  18   Bryant for yourselves.  You saw him examined endlessly.  He

01:17:28  19   is just a little guy.  He is not a lawyer.  He is not

01:17:28  20   in-house counsel.  He is a creative guy.  He is not somebody

01:17:28  21   who, subjected to endless cross-examination, is going to be

01:17:28  22   able to endure it and be clever and come up with the perfect

01:17:28  23   answer that will fit onto the screen in the perfect way.  No

01:17:28  24   one has said anything to the contrary about him.

01:17:28  25            Mr. Quinn in opening statement essentially said

01:17:28   1    that Mr. Bryant ripped Lily Martinez and Tune Teens off, but

01:17:28   2    Mattel also characterized him at the same time as a

01:17:28   3    brilliant celebrated designer whose name adorned his own

01:17:28   4    collectibles doll, Grant Entrance Barbie.  So which is he?

01:17:28   5    A brilliant designer or a rip-off artist?  There is

01:17:28   6    absolutely no proof he took anything from Lily Martinez and

01:17:28   7    the hideous Tune Teens dolls.  And you take a look at them

01:17:28   8    when you get back in your jury room, and you're going to see

01:17:28   9    exactly.

01:17:28   10           So Carter Bryant did not use or need Lily Martinez

01:17:28   11   to draw a standard fashion pose with the arms out, which is

01:17:28   12   what they're saying he copied.  He had been drawing that

01:17:28   13   pose for 20 years.  He had done it in 1982.  We can see

01:17:28   14   Exhibit 1541-106.  Let's look at 1541-124.  It's another one

01:17:28   15   with the arms out.  Then if we look up to 1998, Exhibit

01:17:28   16   10739, 10740, 10741, he had been drawing this pose for 20

01:17:28   17   years.  And there is nothing special about that pose because

01:17:28   18   there is no jury instruction that such poses are so common

01:17:28   19   that they can't be owned -- so uncommon that they can't be

01:17:28   20   owned.

01:17:28   21           Let's look at what the evidence actually showed.

01:17:28   22   By 1997 Mr. Bryant was fed up with his little cubicle at

01:17:28   23   Mattel.  He gave notice in December of 1997, and he returned

01:17:28   24   to Missouri.  For a short period of time he worked part time

01:17:28   25   freelancing basically as an independent contractor for

01:17:28  1   Mattel while living with his parents in Kimberling City,

01:17:28  2   Missouri.  In April of '98 he stopped working for Mattel at

01:17:28  3   all.

01:17:28  4          During the following months he did his own design

01:17:28  5   work] made greeting cards, came up with doll ideas, and did

01:17:28  6   freelance work for Ashton Drake, which made high-end dolls.

01:17:28  7   And examples of his work during that period included the

01:17:28  8   Rainy Day Rascals card line -- which we're going to talk

01:17:28  9   about a little more in a minute -- drawn in 1998, and the

01:17:28  10  idea of Sabrina, a transformable fashion doll, also in 1998.

01:17:28  11         So he is driving home in August '98 and he goes by

01:17:28  12  Kickapoo High, and what does he see?  He sees high school

01:17:28  13  kids, and he's attracted by their energy.  He has also seen

01:17:28  14  ads in magazines -- Paris Blues ad, Steven Madden shoe ad, a

01:17:28  15  Dixie Chicks album ad in 1998, and an issue of Seventeen.

01:17:28  16         All this kind of comes together when he sees the

01:17:28  17  kids and their energy and fleshes out their figures and

01:17:28  18  faces, comes up with this idea of four multi-ethnic, hip,

01:17:28  19  trendy friends, and the Bratz name comes to him after he

01:17:28  20  puts his drawings on paper.

01:17:28  21         The concept was on paper, and the idea formed and

01:17:28  22  started taking shape.  So the first few drawings were in

01:17:28  23  Springfield, Missouri, the ones Mattel claims it owns.

01:17:28  24         If we could see 539.  Do you have that over there

01:17:28  25  somewhere?  And 540, 541, 542.  And here we have got the

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

01:17:28  1      originals, and you're going to have a chance to look at

01:17:28  2      those back in the jury room as well.  By then he had done

01:17:28  3      the master drawings -- I'm sorry.  His first sketches were

01:17:28  4      in late August, and he stopped working on them sometime in

01:17:28  5      September.  By then he had done the master drawings, faces,

01:17:28  6      and bodies.

01:17:28  7              Now, he says all this happened in 1998 outside of

01:17:28  8      his employment with Mattel, which didn't start up again

01:17:28  9      until January 4th, 1999.  He has been completely ridiculed

01:17:28  10     for saying that.  He has been accused of being a liar

01:17:28  11     repeatedly by Mattel, because they know that if they can't

01:17:28  12     disprove that, they're out.  They are out of luck.  They

01:17:28  13     don't have any right to anything involving Bratz.  They know

01:17:28  14     that under the law.

01:17:28  15             There is no evidence whatsoever that he had any

01:17:28  16     contact associated with anybody at MGA before July of 2000

01:17:28  17     when he asked Veronica Marlow for leads because he wanted to

01:17:28  18     pitch these Bratz ideas that he had come up with back in

01:17:28  19     Missouri.

01:17:28  20             So he meets with Victoria O'Connor and Paula

01:17:28  21     Garcia on August 19th, 2000, to pitch his idea.  As you

01:17:28  22     know, he meets with Mr. Larian on September 1st.  In the

01:17:28  23     two-week interim, without telling anybody, he comes up with

01:17:28  24     this dummy doll idea.

01:17:28  25             Now, this is one of the things that Mattel is

01:17:28   1   pinning its claim on, okay, this dummy doll; that this is
01:17:28   2   how Bratz was created in the Mattel Design Center, that this
01:17:28   3   was where Bratz took shape and was born.  Nothing could be
01:17:28   4   further from the truth.
01:17:28   5          He does ask Sheila Kiara and Carmen Monteagudo to
01:17:28   6   help him as a personal favor, one to do the face painting
01:17:28   7   and the other one to do the hair rooting.  You have heard
01:17:28   8   him really spun around on that.  You saw some testimony.
01:17:28   9   You know, "you betrayed their trust."  And you all saw how
01:17:28  10   that statement was squeezed out of him.
01:17:28  11          Mr. Bryant, you would agree that friendship is
01:17:28  12   based on trust?  Yes.  And these two women were your
01:17:28  13   friends?  Yes.  That means they trusted you?  Yes.  And you
01:17:28  14   know what happened because you know what happened with
01:17:28  15   Mattel.  You know what Mattel did to you?  Yes.  So you
01:17:28  16   betrayed their trust.  You exposed them to all these
01:17:28  17   terrible things happening.  You betrayed their trust.
01:17:28  18          That took a long time of asking him questions over
01:17:28  19   and over and over and over again.  Then you see that put up
01:17:28  20   on the board.  That's an example of how things have been
01:17:28  21   taken out of context.  So the one thing -- I mean, Mr.
01:17:28  22   Bryant has been spun around.  I mean, I think you could
01:17:28  23   probably get him to say that he's 90 years old if you worked
01:17:28  24   at it, because he is exhausted emotionally, he's exhausted
01:17:28  25   mentally, and he's exhausted physically.

01:17:28  1        But there is one thing he has never ever, ever

01:17:28  2    waivered on.  He created these drawings in 1998 back in

01:17:28  3    Missouri, those original drawings.  And all he did with them

01:17:28  4    after that was put the head and the body together and color

01:17:28  5    them in.  Those drawings were from Missouri.

01:17:28  6        And no matter what anybody did, even after he

01:17:28  7    settled and had nothing to lose anymore, he was done.

01:17:28  8    Mattel had basically destroyed him.  He could have said,

01:17:28  9    just to get them off his back, okay.  I did them in 1999.

01:17:28  10   But he wouldn't.  He has always said the same thing.  He has

01:17:28  11   been consistent.

01:17:28  12        You know the resources Mattel has.  You know if

01:17:28  13   anybody had seen him working on those in 1999, anybody, they

01:17:28  14   would be in here.  If anybody had seen him drawing those

01:17:28  15   initial drawings in 1999, you would know about it.  I mean,

01:17:28  16   this corporation has probably the most elaborate and

01:17:28  17   sophisticated and intrusive investigation apparatus of just

01:17:28  18   about any company you are going to ever see.

01:17:28  19        So Mr. Bryant assures Mr. Larian that he has done

01:17:28  20   these in '98, and he specifically said he didn't do them as

01:17:28  21   part of his work at Mattel.  All MGA needed to do at that

01:17:28  22   point was get from him what are called reps and warranties,

01:17:28  23   but Mr. Larian did more.  He had their lawyer, David

01:17:28  24   Rosenbaum, talk to Bryant's attorney who specialized in

01:17:28  25   intellectual property law, and she told them she had

01:17:28   1    investigated the timeline, and it did not belong to Mattel.

01:17:28   2            Now, Mr. Rosenbaum didn't know what due diligence

01:17:28   3    she did, and much has been made out of that.  But you never

01:17:28   4    do.  If somebody says, "I have done my due diligence with my

01:17:28   5    client, and I can assure you that he is telling the truth

01:17:28   6    about this," you accept that because you have no choice

01:17:28   7    really.  I mean, you can't go talk to the person himself.

01:17:28   8    He is represented by counsel.

01:17:28   9            I guess really what Mattel is saying is that any

01:17:28  10    employee, whoever works at Mattel and then leaves and then

01:17:28  11    comes up with an incredible idea later or has come up with

01:17:28  12    it before and executes it later, is radioactive.  No one can

01:17:28  13    ever hire that person, because if they do and if the concept

01:17:28  14    gets turned into an actual toy and becomes a big hit, they

01:17:28  15    are going to come after them.

01:17:28  16            So even after the assurance from lawyers, Mr.

01:17:28  17    Larian asks for and receives these reps and warranties.  Tim

01:17:28  18    Kilpin, a Mattel executive who Mattel, including Mr. Eckert,

01:17:28  19    tried to hire away from Disney knowing he had a specific

01:17:28  20    contact for a fixed term, unlike Mr. Bryant who was at-will

01:17:28  21    and could quit any day and Mattel could fire him any day,

01:17:28  22    Mr. Kilpin was never asked for his employment contract for a

01:17:28  23    specific term.

01:17:28  24            In fact, what he said was that when they have an

01:17:28  25    inventor who licenses something to Mattel, all they give is

01:17:28  1    reps and warranties.  And that's it, unless they find out

01:17:28  2    there is a copyright or a patent.  And they don't just deal

01:17:28  3    with inventor houses.  They deal with individuals, too.

01:17:28  4    They don't know who all is in the inventor houses or where

01:17:28  5    they have worked or what they have done.

01:17:28  6            So that's just standards.  That what's the toy

01:17:28  7    industry does.  And everybody relied on him, including

01:17:28  8    Victoria O'Connor.  You probably remember her.  She was

01:17:28  9    called by Mattel, and she said that she had never heard of a

01:17:28 10    requirement in the toy industry that a company like MGA do

01:17:28 11    any independent investigation of claims of ownership.  Even

01:17:28 12    Mattel doesn't do any more.

01:17:28 13            Now, let's talk about what Mr. Bryant testified to

01:17:28 14    about 1998.  Okay.  Without fail every time he was asked, he

01:17:28 15    said he created the Bratz idea and the original drawings,

01:17:28 16    always.  And he said that he came up with the -- he put the

01:17:28 17    drawings together on his own time, nights and weekends, and

01:17:28 18    colorized them even during the time he was at Mattel.

01:17:28 19            Remember he had the light box at home, and he put

01:17:28 20    the original master drawings together.  That's absolutely

01:17:28 21    consistent with what he told Ramona Prince on August 26,

01:17:28 22    1999, before there was ever any lawsuit, okay, before there

01:17:28 23    was ever any meeting with MGA, before he had ever even heard

01:17:28 24    of MGA or laid eyes on Isaac Larian.

01:17:28 25            He told Ramona Prince that.  If you want to talk

01:17:28  1   about somebody who doesn't have a dog in this fight, Ramona

01:17:28  2   Prince is a special ed teacher in Mississippi.  She does not

01:17:28  3   care.  She has not seen Carter Bryant in years and years and

01:17:28  4   years.  If Mr. Bryant was so afraid he was doing something

01:17:28  5   so terribly wrong, why did he have the drawings notarized by

01:17:28  6   the secretary to the head of Barbie Collectibles? because

01:17:28  7   that's what she was.  She was secretary to this guy Ron

01:17:28  8   Longsworth.  Why not go to some other notary public?

01:17:28  9           He told you what he did.  He wanted a record that

01:17:28  10  he created these drawings before he sent them off to Alaska

01:17:28  11  MaMa.  He didn't want to just send them off without a record

01:17:28  12  that he had created them, so he went to Ramona Prince.  What

01:17:28  13  incentive does she have to lie for him?

01:17:28  14          But look at what Mattel did to try to prove that

01:17:28  15  she was lying.  It's unbelievable.  Document examiners, ink

01:17:28  16  examiners.  We were ridiculed for pointing out that Mr.

01:17:28  17  Aginsky's degree was from the institute of chemical defense,

01:17:28  18  but it was.  He wasn't an ink guy originally.  He worked in

01:17:28  19  the Soviet Union where he wasn't subjected to an adversarial

01:17:28  20  process like we have here.  He wasn't subjected to the kind

01:17:28  21  of cross-examination we have here.

01:17:28  22          And apparently he didn't think he had to follow

01:17:28  23  the laws like what we've got here because when there was a

01:17:28  24  federal court order for him not to take samples of that

01:17:28  25  document without the other side being present, he did it

```
01:17:28   1    anyway.  He just did it anyway because it was convenient for
01:17:28   2    him.
01:17:28   3            So what did they get?  They get Mr. Cunningham,
01:17:28   4    who told you that he looked at the document but couldn't say
01:17:28   5    whether the line from 1998 Missouri was added later or not,
01:17:28   6    even after conducting every test under the sun.  So Mattel
01:17:28   7    then brought in Dr. Aginsky.  He did four different tests,
01:17:28   8    and he couldn't find anything that distinguished among the
01:17:28   9    inks.  So then he turned to the gas chromatograph, and
01:17:28  10    finally he says, ah, I found a trace of menthol.
01:17:28  11            But as it turns out according to our expert that
01:17:28  12    he was either incompetent or he deliberately obscured the
01:17:28  13    idea that menthol is not soluble in water, and this was a
01:17:28  14    water-based ink.  So, you know, this is the length Mattel
01:17:28  15    went to to try to prove that Ramona Prince was a liar.
01:17:28  16            I don't know if you remember the testimony of Dr.
01:17:28  17    Lyter who used to work for the Secret Service and his work
01:17:28  18    for the federal government and is an eminent guy, but after
01:17:28  19    all these years, you know, Dr. Lyter couldn't find any
01:17:28  20    evidence of menthol.
01:17:28  21            After all these years and hundreds of thousands of
01:17:28  22    dollars invested, can you really say that there is something
01:17:28  23    amiss with that one line in Ramona Prince's notary book?  I
01:17:28  24    mean, that's what they are asking you to do.  And Isaac
01:17:28  25    Larian somehow must have been involved in all this before
```

01:17:28   1    agreeing to enter into a consulting agreement with someone

01:17:28   2    who repeatedly assured him he had done the drawings in 1998.

01:17:28   3           So if there was any information that Ramona Prince

01:17:28   4    phonied up her notary book, you would have heard about it.

01:17:28   5    Is she also a double agent of the lowest order?  She must

01:17:28   6    have signed her own Mattel inventions agreement, right, if

01:17:28   7    everybody at Mattel knew that you're never allowed to do

01:17:28   8    anything nights and weekends?  How come she didn't say,

01:17:28   9    "Carter, this is terrible.  You're betraying Mattel.  I

01:17:28  10    can't notarize this for you"?  She didn't say anything of

01:17:28  11    the sort.

01:17:28  12           So not a single witness who saw Carter Bryant

01:17:28  13    creating these drawings at Mattel in 1999.  That Mattel

01:17:28  14    Design Center, full of people.  Not one person came in and

01:17:28  15    said, yeah, I saw him working on it there.  Not one or

01:17:28  16    2,000.  And remember, it is not MGA's burden.  It is

01:17:28  17    Mattel's burden to prove that these drawings were not

01:17:28  18    created in 1998.

01:17:28  19           Their whole argument now boils down to this:

01:17:28  20    There are notes about a 1999 bank statement in the notebook

01:17:28  21    where Mr. Bryant drew the original Bratz drawings.  There

01:17:28  22    are sketches of what appear to be gowns.  One of them

01:17:28  23    resembles Sapphire Jewel Barbie, a drawing Bryant dated

01:17:28  24    February '99.  You heard all this from Mr. Price.  And

01:17:28  25    Mattel concludes that means these drawings, these Bratz

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

01:17:28   1   original drawings, had to be done in '99, too.  But that's

01:17:28   2   not true.

01:17:28   3         Now, Mr. Quinn said in the opening statement:  We

01:17:28   4   have the yearbooks from Kickapoo High School 1997, '98, '99.

01:17:28   5   You will get to see them.  The kids aren't out there in

01:17:28   6   Kimberling City -- it's not hip, urban, multi-ethnic.  They

01:17:28   7   didn't have oversized clothes, big baggy jeans, as Mr.

01:17:28   8   Bryant claimed.

01:17:28   9         Well, they fly in the vice principal of Kickapoo

01:17:28  10   High, Sarah Odom, and here is what she says.  She is asked:

01:17:28  11         "Question:  Do you believe that, for example, like

01:17:28  12   MTV gets broadcast in Springfield?

01:17:28  13         "Answer:  Yes, unfortunately.  Sorry.

01:17:28  14         "Question:  You say unfortunately.  Why is that

01:17:28  15   unfortunate?

01:17:28  16         "Answer:  Today as an assistant principal,

01:17:28  17   probably not so much as a teacher, because I wanted to be

01:17:28  18   that cool teacher.  But as an assistant principal, saggy

01:17:28  19   pants, I don't want to see a young man's underwear walking

01:17:28  20   down the hallway, you know, things of that nature."

01:17:28  21         So Mattel tried to present Kickapoo High as some

01:17:28  22   sort of hick backwater out of Ozzie and Harriet where the

01:17:28  23   kids wouldn't even have baggy jeans.  Is Sarah Odom lying,

01:17:28  24   too?  Is she another conspirator?

01:17:28  25         Let's talk about the notebook that these drawings

01:17:28   1    came out of, 1155-C.  Mr. Bryant told you he didn't have a

01:17:28   2    practice of having a particular notebook each year, so the

01:17:28   3    work he did in '97 would be not necessarily contained in a

01:17:28   4    notebook that said 1997.  He didn't have notebooks

01:17:28   5    identified for only 1998 work or only 1999 or 2000 or 2001.

01:17:28   6    He picked up whatever notebook was lying around, and he

01:17:28   7    would use that.

01:17:28   8            Now, there are some fashion sketches from 1155-C,

01:17:28   9    that notebook, and this is 5.  And then there is -- you are

01:17:28  10    going to have this back in the jury room to look at -- 7,

01:17:28  11    17, 19, and 21.  Here are other gown drawings Mr. Bryant

01:17:28  12    did, all dated January 28th, 1998.

01:17:28  13            Let's look at 10737, 10738, 10739, 10740, 10741,

01:17:28  14    and 10742.  That's why Mr. Bryant thought his fashion

01:17:28  15    drawings in this exhibit looked like rough sketches of

01:17:28  16    initial ideas he had for a Jewel Barbie project in 1998 when

01:17:28  17    he was working part time as an independent contractor for

01:17:28  18    Mattel in Missouri at the beginning of 1998.

01:17:28  19            Let's look at Exhibit 10565.  Here is another gown

01:17:28  20    drawing.  Let's see what it says on the right-hand side.

01:17:28  21    Sixteen hours, 4:00 p.m., 1/26/98.  The reason Mr. Bryant

01:17:28  22    put his hours on there was because this was drawn at a time

01:17:28  23    when he was working part time as an independent contractor

01:17:28  24    for Mattel in January 1998.

01:17:28  25            So he was doing sketches of gowns in 1998.  He

01:17:28   1    could have been sketching gowns in this notebook in 1998.

01:17:28   2    It doesn't prove anything that there are gowns in here.

01:17:28   3    That doesn't prove that this was made in 1999, so that's a

01:17:28   4    red herring.

01:17:28   5           Now, here is another Mattel argument about this

01:17:28   6    notebook, 1155-C, page 87.  You just heard that discussed

01:17:28   7    where Wade Bryant's brother, Lisa, his wife, Christopher and

01:17:28   8    Allison, their children, write a note in the notebook:  Mom

01:17:28   9    and Dad, thanks for everything, et cetera.  Everybody agrees

01:17:28   10   that note had to be written in Missouri.

01:17:28   11          Mattel's theory is that Mr. Bryant brought this

01:17:28   12   notebook back from California for Thanksgiving or Christmas

01:17:28   13   in 1999.  How about something more logical?  I mean, isn't

01:17:28   14   it more reasonable to think that this notebook could have

01:17:28   15   been lying around his parents' home at the time when he was

01:17:28   16   living there and that that's why the note from the relatives

01:17:28   17   ended up in the notebook, because they wrote it in the

01:17:28   18   notebook in the parents' home in 1998?

01:17:28   19          Do you remember Mr. Cunningham's testimony?  He

01:17:28   20   actually confirmed what Carter Bryant said about the Bratz

01:17:28   21   drawings.  Mr. Cunningham, you remember, was the questioned

01:17:28   22   document examiner that Mattel got to try to see if he could

01:17:28   23   get some of these pages that weren't really visible, to see

01:17:28   24   if he could get any indentations off those pages.  What he

01:17:28   25   said was he found that the four original Bratz drawings --

01:17:28  1    539, 540, 541, and 542 -- were made at about the same time

01:17:28  2    and about the same time that Mr. Bryant did the Rainy Day

01:17:28  3    Rascals card sketches.  Those were done in 1998 when he was

01:17:28  4    not working for Mattel.  He was working freelance, and he

01:17:28  5    was trying to get into the greeting card industry.

01:17:28  6             Mr. Cunningham said, you know, as a questioned

01:17:28  7    document examiner, he sees people skipping around in

01:17:28  8    notebooks all the time and not going sequentially one, two,

01:17:28  9    three, and four.

01:17:28  10             So after months of trial with all the testimony

01:17:28  11    before you, with all these experts, with all these people

01:17:28  12    having been grilled, with all these depositions having been

01:17:28  13    taken, with these gazillions of dollars having been spent,

01:17:28  14    with these experts, you know, Mr. Aginsky, Mr. Cunningham,

01:17:28  15    they still haven't proven that this notebook contained

01:17:28  16    drawings that were made in 1999.  They haven't proven it.

01:17:28  17             I mean -- and if you can't figure it out, having

01:17:28  18    sat here all these months and having the benefit of

01:17:28  19    hindsight, knowing now what all the facts are, having

01:17:28  20    listened to all this expert testimony, if you can't figure

01:17:28  21    it out, how on earth was Mr. Larian to have figured it out?

01:17:28  22    How could he know better than to believe Carter Bryant's

01:17:28  23    lawyer and his own lawyer who looked into it?  That's what

01:17:28  24    he did.  He relied on his counsel, who relied on Carter

01:17:28  25    Bryant's counsel, and it looks like Carter Bryant was

01:17:28   1   telling the truth.

01:17:28   2              If you examine this dispassionately and you look

01:17:28   3   at the evidence dispassionately and you don't spin it and

01:17:28   4   take a line here or there out of context, it looks like

01:17:28   5   1998.

01:17:28   6              Your Honor, would this be a good time for a brief

01:17:28   7   break?

01:17:28   8              THE COURT:  All right.  You are admonished not to

01:17:28   9   discuss this matter amongst yourselves, nor form or express

01:17:28  10   any opinion concerning the case.  We will come and get you

01:17:28  11   about 1:15.

01:17:28  12              Counsel, would that be sufficient?

01:17:28  13              MS. KELLER:  2:15, Your Honor.

01:17:28  14              THE COURT:  2:15.

01:17:28  15              *(Recess taken.)*

01:17:28  16              *(Jury present.)*

01:17:28  17              THE COURT:  We are back in session.  All counsel

01:17:28  18   present.  The jury is present.

01:17:28  19              Ms. Keller, you may continue.

01:17:28  20              MS. KELLER:  Thank you, Your Honor.  So Mattel has

01:17:28  21   two different causes of action, they are called.  It's kind

01:17:28  22   of like a count in a criminal case, only in a civil case we

01:17:28  23   call them causes of action, that are related to Bratz.  One

01:17:28  24   is trade secret misappropriation, and the other one is

01:17:28  25   copyright infringement.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
01:17:28   1          Now, each of those have what is called elements
01:17:28   2   that have to be proven by Mattel.  An element is kind of
01:17:28   3   like ingredients in a recipe.  I mean, it's really sort of a
01:17:28   4   dumb analogy, but, you know, if you're going to make
01:17:28   5   chocolate cake, you've got to have flour.  You've got to
01:17:28   6   have some kind of fat.  You've got to have chocolate.
01:17:28   7   You've got to have sugar.  You've got to have baking powder.
01:17:28   8   And if you don't have one of those, you're going to have
01:17:28   9   something, but it is not going to be chocolate cake.
01:17:28  10          Here these are elements that Mattel has to prove.
01:17:28  11   So for trade secret misappropriation, first of all, it has
01:17:28  12   to be a secret.  Secondly, it has to have owned the trade
01:17:28  13   secret.  It has to prove that the information was secret at
01:17:28  14   the time that it's claimed to have been misappropriated.  It
01:17:28  15   has to prove that the information had value, actual or
01:17:28  16   potential, from not being known; and that the trade secret
01:17:28  17   was misappropriated, meaning it was used or disclosed by
01:17:28  18   someone who knew that the information was somebody else's
01:17:28  19   trade secret.
01:17:28  20          Trade secret -- I actually agree with Mr. Price,
01:17:28  21   amazingly enough, on one thing.  That's that the right
01:17:28  22   analogy where trade secret really belongs in the law is,
01:17:28  23   say, the drug company example.  Somebody is employed by,
01:17:28  24   let's say, Abbott Labs and is a scientist, a chemist, and is
01:17:28  25   working for months and months and months and months on
```

01:17:28  1    trying to come up with a new drug.  And Abbott Labs takes it

01:17:28  2    through clinical trials, and they finally think they're on

01:17:28  3    the verge of releasing this great new blockbuster drug.  And

01:17:28  4    one of the people working on it takes the formulation,

01:17:28  5    sneaks it out, and gives it to a competitor.

01:17:28  6           That is trade secret misappropriation.  That's

01:17:28  7    what the law is designed to prevent, because obviously, you

01:17:28  8    know, you have to protect a company's intellectual property

01:17:28  9    that they have poured resources into.  Of course, the irony

01:17:28 10    here is we're the ones who poured the resources into

01:17:28 11    producing what we produced.

01:17:28 12           The second cause of action they have is called

01:17:28 13    copyright infringement.  I am going to apologize in advance

01:17:28 14    because this stuff is hard, but it is understandable.  It's

01:17:28 15    just a little boring, and it's going to take a little time

01:17:28 16    to go through.  You are all sort of used to that by now,

01:17:28 17    some of the boring stuff.  But it is in plain English that

01:17:28 18    can be understood, I promise.

01:17:28 19           So the elements of copyright infringement are

01:17:28 20    really two:  That the plaintiff proves it owns a valid

01:17:28 21    copyright.  And here Mattel would have to prove that MGA and

01:17:28 22    Isaac Larian copied what are called original elements from

01:17:28 23    the copyrighted work.

01:17:28 24           Now, if you're like me, not a copyright lawyer,

01:17:28 25    you probably thought when you heard the term copyright that

01:17:28  1    that was something that had a little C circled, had to be

01:17:28  2    registered with the Copyright Office.  But as it turns out,

01:17:28  3    that's not the case.  You know, you create something; you

01:17:28  4    own the copyright to it.  We will be talking about that in a

01:17:28  5    little bit.  I mean, that's a very simplified explanation.

01:17:28  6    But you don't have to actually have registered it to own a

01:17:28  7    copyright.

01:17:28  8           So Mattel has got kind of a house of cards here

01:17:28  9    because everything is built on its claim that it owns all

01:17:28  10   these -- everything that flowed from the Carter Bryant work

01:17:28  11   because of his 1999 confidential information and inventions

01:17:28  12   agreement that was signed January 4th, 1999.

01:17:28  13          So to find ownership by Mattel for either trade

01:17:28  14   secret misappropriation or copyright infringement, first,

01:17:28  15   Mattel has to prove that that 1999 inventions agreement gave

01:17:28  16   Mattel ownership of the trade secrets and the copyrights.

01:17:28  17          And by the way, that doesn't even have to do with

01:17:28  18   1998.  That's completely separate.  If you find that he

01:17:28  19   created this in 1998, you are done.  There is no copyright

01:17:28  20   infringement.  There is no trade secret misappropriation.

01:17:28  21          But in addition to that, completely separate from

01:17:28  22   that, Mattel has to prove that Mr. Bryant's 1999 inventions

01:17:28  23   agreement gave Mattel ownership of these trade secrets and

01:17:28  24   copyrights.  So if Mattel fails to prove this, it loses.

01:17:28  25   You don't have to go any further on the trade secret

01:17:28  1    misappropriation claim or the copyright claim.  And all that

01:17:28  2    would be left then is Mattel has a third, much smaller cause

01:17:28  3    of action for what's called intentional interference with

01:17:28  4    contract.  And we will be getting to that in a little bit.

01:17:28  5            Here comes the really boring part, but you've seen

01:17:28  6    some of this before.  Exhibit 9924 is the inventions

01:17:28  7    agreement.  If you look at paragraph 2-A, this is January

01:17:28  8    4th, 1999.  You see:  I agree to communicate to the company

01:17:28  9    as promptly and fully as practicable all inventions

01:17:28 10    conceived or reduced to practice by me alone or jointly with

01:17:28 11    others at any time during my employment by the company.  I

01:17:28 12    hereby assign to the company and/or its nominees all my

01:17:28 13    right, title, and interest in such inventions, and all my

01:17:28 14    right, title, and interest in any patents, copyrights,

01:17:28 15    patent applications, or copyright applications based

01:17:28 16    thereon.

01:17:28 17            Then it goes on:  I will assist the company in

01:17:28 18    every proper way, et cetera.  Now, there are jury

01:17:28 19    instructions that define the two disputed terms in the 1999

01:17:28 20    agreement.  The first is instruction 24 concerning

01:17:28 21    inventions and ideas.  Mattel must prove that the term

01:17:28 22    inventions includes ideas.

01:17:28 23            Well, ideas is not in this contract.  It's not

01:17:28 24    there.  And as you will see, it is in other Mattel

01:17:28 25    contracts, different dates.  Mattel is telling you this is a

01:17:28   1   highly technical, hypertechnical, hyperlegalistic argument.

01:17:28   2   This, folks, is a contract, which is by definition a highly

01:17:28   3   legalistic document that is supposed to spell out everything

01:17:28   4   relevant clearly so everybody can understand it.

01:17:28   5           Now, let's look at the second disputed term, and

01:17:28   6   that's in instruction number 25.  That concerns "at any time

01:17:28   7   during my employment."  The parties dispute whether the term

01:17:28   8   also extends beyond the scope of Carter Bryant's employment

01:17:28   9   and includes nights and weekends.

01:17:28  10           This is not something that is easily resolved.

01:17:28  11   You have to resolve it.  All of you have to make that

01:17:28  12   decision.  So this idea that it's a no-brainer, huh-uh, not

01:17:28  13   at all.  This is a disputed term.  I think it will be clear

01:17:28  14   to you that MGA should prevail, but it's going to take some

01:17:28  15   work.

01:17:28  16           Now, the term "at any time during my employment"

01:17:28  17   in the agreement, the 1999 agreement, refers to the scope of

01:17:28  18   Carter Bryant's employment between January 4th, 1999, and

01:17:28  19   October 19th, 2000.  In order to own any of Carter Bryant's

01:17:28  20   inventions under this agreement, Mattel has to prove that

01:17:28  21   Carter Bryant's Bratz-related inventions were conceived,

01:17:28  22   thought of for the first time, or reduced to practice

01:17:28  23   between January 4th, 1999, and October 19th, 2000.  This is

01:17:28  24   what the instruction is that His Honor has given you,

01:17:28  25   conceived or reduced to practice during that time after he

01:17:28   1     had come back from Missouri and is working for Mattel.

01:17:28   2              And there is more.  Another ingredient in that

01:17:28   3     cause of action is that Mattel has to prove that the

01:17:28   4     inventions were conceived or reduced to practice at any time

01:17:28   5     during his employment with Mattel either because they were

01:17:28   6     conceived or reduced to practice during the scope of Carter

01:17:28   7     Bryant's employment, or the term at any time during my

01:17:28   8     employment extends outside the scope of his employment and

01:17:28   9     includes nights and weekends.

01:17:28  10              Now, are you confused enough?  Let's just go over

01:17:28  11     it one more time.  Mattel has to prove that the

01:17:28  12     Bratz-related inventions were conceived or reduced to

01:17:28  13     practice during that period we talked about, and that they

01:17:28  14     were conceived or reduced to practice during the scope of

01:17:28  15     his employment; or that the term that we saw, at any time

01:17:28  16     during my employment, extends beyond working hours, nights

01:17:28  17     and weekends, and to tasks not performed for Mattel.

01:17:28  18              So all this that Mattel is telling you, oh, this

01:17:28  19     is -- everybody understand this.  Everybody knows it.  No,

01:17:28  20     they don't understand it.  No, they don't know it.  And it's

01:17:28  21     a very difficult burden.  They have a number of hurdles to

01:17:28  22     overcome.

01:17:28  23              Now, you are guided a little bit by a very old

01:17:28  24     principle in Anglo-American law.  If we look at instruction

01:17:28  25     number 26, you see that in deciding what the terms of the

01:17:28   1    contract mean, you must decide what the parties intended at

01:17:28   2    the time the contract was created, not some other person,

01:17:28   3    not a third party, but the parties.  That would be Carter

01:17:28   4    Bryant and Mattel.  What did they intend?  If there is an

01:17:28   5    ambiguity, you have to look at what the parties intended.

01:17:28   6    It says you can consider the usual and ordinary meaning of

01:17:28   7    the language used in the contract as well as the

01:17:28   8    circumstances surrounding the making of the contract.

01:17:28   9             And instruction number 27, you should assume the

01:17:28  10    parties intended the words in the contract to have their

01:17:28  11    usual and ordinary meaning unless you decide that the

01:17:28  12    parties intended the words to have a special meaning.

01:17:28  13    Carter Bryant didn't intend these words to have any special

01:17:28  14    meaning.  You know, he was signing what was stuck under his

01:17:28  15    nose in front of him and told that he had to sign it.

01:17:28  16             Instruction 28 says:  If there is a technical term

01:17:28  17    in a contract, you should give the meaning that is usually

01:17:28  18    used by people who work in that technical field unless you

01:17:28  19    decide the parties clearly used the words in a different

01:17:28  20    sense.

01:17:28  21             And then we have got another instruction -- this

01:17:28  22    is a really common-sense one.  It says the construction of a

01:17:28  23    contract is to be taken as a whole.  In other words, you

01:17:28  24    don't pluck out one word or two words or three words and do

01:17:28  25    an ah-hah.  You look at the whole thing in deciding what it

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

01:17:28   1    means.

01:17:28   2            Then if you look -- this is another one that is a

01:17:28   3    very well-enshrined principle in law, instruction 31.  It

01:17:28   4    says that in cases -- and this is sort of legalese, but it

01:17:28   5    says:  In cases of uncertainty, not removed by the preceding

01:17:28   6    rules, the ones we just read, the language of a contract

01:17:28   7    should be interpreted most strongly against the party who

01:17:28   8    caused the uncertainty to exist.  This is also known as

01:17:28   9    construing a contract against the drafter.

01:17:28  10            Okay.  What does that mean?  That means if you are

01:17:28  11    the person who draws up the contract, especially if you are

01:17:28  12    a powerful entity, you have drawn up this boilerplate

01:17:28  13    contract and you stuck it under somebody's nose to sign.

01:17:28  14    You are the drafter.  You are the one who drew it up and

01:17:28  15    wrote it.  In this case we have heard it was Mattel's legal

01:17:28  16    department that had created these contracts for human

01:17:28  17    resources.

01:17:28  18            If there is an uncertainty, if there is an

01:17:28  19    ambiguity, your decision has to be to decide it against

01:17:28  20    Mattel.  That's because if you are the one drawing up the

01:17:28  21    contract, you are responsible for it; you are sticking it

01:17:28  22    under somebody else's nose to sign.  You have got to live

01:17:28  23    with that language because you created the language.  You

01:17:28  24    put it there.  So it's really common sense.

01:17:28  25            Of course, this whole case is about uncertainty of

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

01:17:28  1   what this language means.  So you should draw every single

01:17:28  2   conclusion where you are uncertain about how to resolve it

01:17:28  3   against Mattel.

01:17:28  4           Now, what about what Carter Bryant thought?  What

01:17:28  5   did he testify to?  He said he thought that ideas he had

01:17:28  6   before he got to Mattel and any work he did on those ideas

01:17:28  7   at home after work or on weekends belonged to him.  That's

01:17:28  8   what he thought.  And other people obviously thought that,

01:17:28  9   too.  Margaret Leahy told you people, you know, they were

01:17:28  10  moonlighting all the time.  And she was a very credible

01:17:28  11  witness.

01:17:28  12          He thought Mattel owned the work he was assigned

01:17:28  13  as part of his job at Barbie Collectibles.  So he figured if

01:17:28  14  I am working on Barbie Collectibles, whether it's gowns or a

01:17:28  15  design or skin tone or a theme, that belongs to Mattel.  And

01:17:28  16  that makes sense.  It should belong to Mattel.  That's what

01:17:28  17  they are paying him to do.

01:17:28  18          But he thought what he did on his own time in his

01:17:28  19  free time at nights and on weekends was his own idea and he

01:17:28  20  owned it.  That's what he thought, and that contract does

01:17:28  21  not tell him any differently.  No matter how many people

01:17:28  22  from Mattel troop in to say it does, it doesn't.

01:17:28  23          He didn't think that any idea he had that had

01:17:28  24  anything at all to do with toys was owned by Mattel.  And

01:17:28  25  his 1999 Mattel form inventions agreement, as we discussed,

01:17:28   1    makes no reference to ideas.  That's not an accident.
01:17:28   2    Earlier versions from 1975 to 1994 did include the word
01:17:28   3    ideas.  The lawyers for Mattel had put ideas in those
01:17:28   4    contracts.  So if you look at 9077, for example, from 1975,
01:17:28   5    it talks about "my interest in any and all inventions,
01:17:28   6    improvement, and ideas," that those would collectively be
01:17:28   7    proprietary subject matter.
01:17:28   8             Between 1975 and '93 nothing changed.  If we look
01:17:28   9    at 9089, that's an agreement used by Mattel in 1993.  And
01:17:28  10    that first paragraph still says "my interest in any and all
01:17:28  11    inventions, improvement, and ideas are Mattel's proprietary
01:17:28  12    subject matter."  But in 1994 Mattel took out the word
01:17:28  13    ideas.  If we look at 9090, which is the inventions
01:17:28  14    agreement from 1994, there is a new definition of
01:17:28  15    inventions.  It now says:  The term inventions includes but
01:17:28  16    is not limited to all discoveries, improvements, processes,
01:17:28  17    developments, design, know-how, data, computer programs, and
01:17:28  18    formulae, whether patentable on unpatentable.
01:17:28  19             We asked the head of human resources at Mattel,
01:17:28  20    Alan Kaye, why the change.  He did not know.  So Mr.
01:17:28  21    Bryant's 1999 agreement omits the word ideas.
01:17:28  22             Now, talk about intentions, just a few weeks
01:17:28  23    before Mattel sued Mr. Bryant in 2004, they rewrote the
01:17:28  24    inventions agreement and they reinserted the word ideas.
01:17:28  25    Exhibit 15815 is that new confidentiality and inventions

01:17:28   1    agreement.  And all of a sudden on page 1, back in here is

01:17:28   2    ideas.  And Alan Kaye couldn't explain the reason for this

01:17:28   3    either.

01:17:28   4             But the reason is obvious, and you know what it

01:17:28   5    is.  They realized -- they looked at Carter Bryant's

01:17:28   6    agreement and they realized, uh-oh, we didn't have ideas in

01:17:28   7    here.  We better put it back in for all the later contracts.

01:17:28   8    But it was Mattel that had chosen to take it out, and Mattel

01:17:28   9    as the drafter of the contract has to live with the language

01:17:28  10    Mattel chose.

01:17:28  11             So Mattel now says forget about the fact that we

01:17:28  12    took ideas out.  We really meant for it to be in there, and

01:17:28  13    anybody would know it's included.  You heard Mr. Price tell

01:17:28  14    you ideas equal designs.  After cross-examining Mr. Bryant

01:17:28  15    for an endless period of time and spinning him around, which

01:17:28  16    you all saw, he got Carter Bryant to say:  I guess ideas and

01:17:28  17    designs, I guess they are the same.

01:17:28  18             They are obviously not the same.  You all know

01:17:28  19    that.  An idea is in your head.  A design is something that

01:17:28  20    you have actually executed in some fashion.  But Mr. Bryant

01:17:28  21    after lengthy cross-examination did say the words that you

01:17:28  22    saw on the screen.

01:17:28  23             Now, later when I asked him, you know, did you

01:17:28  24    really mean to say that?  I mean, aren't they different?  He

01:17:28  25    said that, yeah, they are different.  They're not the same.

01:17:28  1    And they're obviously not.  If you looked in a dictionary,

01:17:28  2    you can see they're not the same.

01:17:28  3          Now let's turn to -- and why is this so important

01:17:28  4    to Mr. Price, to say, oh, Carter Bryant said they were the

01:17:28  5    same?  Because you saw in the jury instructions that if you

01:17:28  6    give words their plain ordinary meaning, which you are

01:17:28  7    supposed to do unless the parties intended something

01:17:28  8    different, then we win.  You are supposed to give words

01:17:28  9    their plain ordinary meaning unless the parties intended

01:17:28  10   something different.

01:17:28  11         There is no way that Carter Bryant sat down and

01:17:28  12   analyzed this contract in 1999 and said, hmm, the word ideas

01:17:28  13   is not in here.  But designs and ideas, I equate them.  I

01:17:28  14   think they're the same.  That didn't happen.  So if you use

01:17:28  15   the plain ordinary language, ideas are not in there.

01:17:28  16         Now, let's turn to the next disputed area --

01:17:28  17   during employment versus during the period of my employment.

01:17:28  18   Does this sound like lawyer talk or what?  I know it does,

01:17:28  19   but words are important in contracts.  Lawyers spend years

01:17:28  20   learning how to draft contracts with extreme precision to

01:17:28  21   include what they want to include and exclude what they want

01:17:28  22   to exclude.

01:17:28  23         His 1999 agreement assigned inventions made during

01:17:28  24   his employment.  Now, again, from 1975 to '93 the Mattel

01:17:28  25   agreements used the words at any time during the period of

| | | |
|---|---|---|
| 01:17:28 | 1 | my employment with the company.  If we look at 9077, a 1975 |
| 01:17:28 | 2 | Mattel employee patent and confidence agreement -- they |
| 01:17:28 | 3 | called them in those days -- you see that language, during |
| 01:17:28 | 4 | the period of my employment. |
| 01:17:28 | 5 |         If we go back to Exhibit 9089, the 1993 version, |
| 01:17:28 | 6 | paragraph one still says:  At any time during the period of |
| 01:17:28 | 7 | my employment.  But 1994, the words at any time during the |
| 01:17:28 | 8 | period of my employment with the company were removed and |
| 01:17:28 | 9 | replaced with at any time during my employment. |
| 01:17:28 | 10 |         So now if we look at 9090, which is the 1994 |
| 01:17:28 | 11 | agreement, there it is.  So Alan Kaye again couldn't explain |
| 01:17:28 | 12 | why at any time during the period of my employment got |
| 01:17:28 | 13 | changed to at any time during my employment.  During my |
| 01:17:28 | 14 | employment sure sounds like during my job, you know, my job |
| 01:17:28 | 15 | at Mattel.  During the period of my employment sure sounds |
| 01:17:28 | 16 | like during the dates I was employed at Mattel. |
| 01:17:28 | 17 |         Again, if that seems legalistic or ambiguous, it |
| 01:17:28 | 18 | gets construed against the drafter of the agreement.  That's |
| 01:17:28 | 19 | Mattel.  That means when it comes to interpreting that term, |
| 01:17:28 | 20 | we win, because Mattel could have changed it and made it |
| 01:17:28 | 21 | read clearly.  So Carter Bryant's 1999 inventions agreement |
| 01:17:28 | 22 | said at any time during my employment with the company, by |
| 01:17:28 | 23 | the company, and not at any time during the period of my |
| 01:17:28 | 24 | employment. |
| 01:17:28 | 25 |         And guess what.  In 2004 right when they are |

01:17:28   1   getting ready to sue him, they realize uh-oh, you know, this
01:17:28   2   isn't very specific.  The contract lawyers are looking at it
01:17:28   3   saying, hmm, this could be problematic.  They put it back
01:17:28   4   in.  So in 2004 here it comes.  Now, it's during the period
01:17:28   5   of your employment with your employer.
01:17:28   6            And if we go back to that same -- 15815, the 2004
01:17:28   7   agreement, here we see ideas, and we see the phrase or
01:17:28   8   reduced to practice during my period of employment with
01:17:28   9   Mattel, whether or not in the course of my employment with
01:17:28  10   Mattel.  So again, during the period of my employment gets
01:17:28  11   added back in right before they sue Carter Bryant, because
01:17:28  12   they realize they have a problem with the wording in his
01:17:28  13   contract, and they want to cure it in future contracts.
01:17:28  14            But now they're saying again ignore these words,
01:17:28  15   too.  Ignore the fact that we chose to take them out.  MGA
01:17:28  16   is just being legalistic about this, as if contracts are not
01:17:28  17   documents that are intended to be legal documents.
01:17:28  18            So that's not all Mattel added to the revamped
01:17:28  19   2004 agreement.  They expanded conceived or reduced to
01:17:28  20   practice.  As of 2004 it now said:  Conceive, create --
01:17:28  21   15815.  It now says:  Conceive, create, develop, or reduce
01:17:28  22   to practice during my period of employment with Mattel
01:17:28  23   whether or not in the course of my employment with Mattel.
01:17:28  24            So now they are saying, okay, during the period of
01:17:28  25   my employment, during the dates essentially of my

01:17:28   1    employment, and whether or not it's in the course of my

01:17:28   2    employment.  So even if it isn't something I am doing in the

01:17:28   3    course of my job, Mattel still owns it.  But that's not what

01:17:28   4    Mr. Bryant's agreement said.  Mr. Bryant's agreement just

01:17:28   5    said conceived or reduced to practice.

01:17:28   6            Now, you think this is something that Carter

01:17:28   7    Bryant was capable of figuring out?  Mattel's own head of

01:17:28   8    intellectual property during the early 2000s testified here.

01:17:28   9    Do you remember Michelle McShane?  She was a vice president

01:17:28  10    of Mattel, secretary to the board of directors, and said she

01:17:28  11    herself did not know what the term reduced to practice

01:17:28  12    means.

01:17:28  13            This is an intellectual property lawyer who is the

01:17:28  14    head of their intellectual property group, and she didn't

01:17:28  15    know what it meant.  How the heck is Carter Bryant supposed

01:17:28  16    to have known what it meant?  We have heard radically

01:17:28  17    different interpretations of what reduced to practice means.

01:17:28  18    Okay.  Reduced to practice, what does that mean?  Does that

01:17:28  19    mean made a sketch?  No, it doesn't.

01:17:28  20            It means put in -- well, Ivy Ross was the best

01:17:28  21    person to describe it.  Do you remember of Ivy Ross?  She

01:17:28  22    was the creative person at Mattel who did Project Platypus

01:17:28  23    and tried to get everybody's creative juices going again in

01:17:28  24    the corporation because they had kind of not been going for

01:17:28  25    a while.  She brought in the clowns and, you know, union

01:17:28  1    analysts and all these people.

01:17:28  2              So Ivy Ross was asked for her definition, and she

01:17:28  3    said reduced to practice are things that actually come to

01:17:28  4    fruition or to made, meaning not every idea you think of

01:17:28  5    ends up getting made.  So even if it's not brought to

01:17:28  6    market, the company would own them.

01:17:28  7              So Mr. Eckert and Alan Kaye, who still work at

01:17:28  8    Mattel, they said reduced to practice means being put in

01:17:28  9    tangible form.  But Ivy Ross, who was an executive at

01:17:28 10    Mattel, said, no.  It means brought to fruition.  In other

01:17:28 11    words, the idea is made concrete and becomes a reality.

01:17:28 12              So Mattel's own witnesses either don't know what

01:17:28 13    the term means, like Michelle McShane, or they give it

01:17:28 14    radically different definitions.  And Mattel drafted the

01:17:28 15    agreement.  So under the law, if it's ambiguous, you have to

01:17:28 16    find against the interpretation that Mattel wants.  You have

01:17:28 17    to construe it against the drafter of the agreement.

01:17:28 18              If conceived or reduced to practice was so clear

01:17:28 19    in Mr. Bryant's agreement, why did Mattel change it and

01:17:28 20    replace it with conceive, create, develop, or reduce to

01:17:28 21    practice during my period of employment with Mattel, whether

01:17:28 22    or not in the course of my employment with Mattel?

01:17:28 23              Mattel now realized it needed to cover all its

01:17:28 24    bases and wanted to latch onto any idea that an employee

01:17:28 25    ever had, even if not in the course of the employee's

01:17:28   1   employment with Mattel.  They recognized there was this huge

01:17:28   2   gap in the 1999 contract language.  And Mr. Bryant may have

01:17:28   3   developed his drawings at home in 1999 or 2000 when he

01:17:28   4   colorized them, but he didn't conceive of them -- he

01:17:28   5   conceived of them in 1998, and he didn't reduce them to

01:17:28   6   practice.

01:17:28   7           They didn't get reduced to practice until 2000

01:17:28   8   after MGA reduced them to practice.  It was MGA that took

01:17:28   9   the idea that he conceived and went to work reducing it to

01:17:28  10   practice, making an actual doll.  So his contract didn't

01:17:28  11   cover this.

01:17:28  12           This idea that this is one of the greatest

01:17:28  13   intellectual property heists of all time, stolen from

01:17:28  14   Mattel, is not true.  It just isn't.  It's a huge, huge

01:17:28  15   overreaching, the attempt to come up with this gotcha and

01:17:28  16   snatch everything that MGA made based on language in the

01:17:28  17   contract that simply doesn't support it.

01:17:28  18           So whatever definition you give to reduced to

01:17:28  19   practice in the 1999 inventions agreement, Mattel did not

01:17:28  20   own Mr. Bryant's ideas.  If it just means put in tangible or

01:17:28  21   concrete form, that's what Mr. Bryant did in 1998 when he

01:17:28  22   had his idea and put pen to paper.  And if it means what Ms.

01:17:28  23   Ross said, comes to fruition, then he conceived the idea in

01:17:28  24   1998, and it was reduced to practice in 2001 when the Bratz

01:17:28  25   dolls were released.

01:17:28  1          This is not just a legalism.  This is really

01:17:28  2   crucial, and this is why it is so carefully defined in the

01:17:28  3   jury instructions that you're getting.  That is a huge, huge

01:17:28  4   key dispute in this case.  But either way, no matter which

01:17:28  5   way you look at it, the idea, drawings, and concepts do not

01:17:28  6   belong to Mattel, and Mattel knows this.

01:17:28  7          Instruction number 29 tells you you have to

01:17:28  8   consider the whole contract, not just little bits and pieces

01:17:28  9   as we talked about.  It instructs you to use each part to

01:17:28 10   help interpret the whole contract so all the parts make

01:17:28 11   sense together.

01:17:28 12          Now, let's look at the trade secret part of Carter

01:17:28 13   Bryant's 1999 invention agreement.  Now we're talking about

01:17:28 14   trade secrets.  Provisions related to trade secrets:  I

01:17:28 15   acknowledge that the company possesses and will continue to

01:17:28 16   develop and acquire valuable proprietary information as

01:17:28 17   defined below, including information that I may develop and

01:17:28 18   acquire as a result of my employment with the company.  As a

01:17:28 19   result of my employment.

01:17:28 20          Again, lawyers labor for hundreds, thousands of

01:17:28 21   hours over contracts, I mean, trying to spell out everything

01:17:28 22   in minute detail.  So, as a result of my employment with the

01:17:28 23   company, that goes back to the example that I and Mr. Price

01:17:28 24   used about the scientist at the drug company sitting there

01:17:28 25   and coming up a formula.  That would be as a result of his

01:17:28    1    employment.  The company is paying him to work on that

01:17:28    2    formula.  So if he took that that was made as a result of

01:17:28    3    his employment, then that's a trade secret, and the value of

01:17:28    4    the proprietary information it says depends on it remaining

01:17:28    5    confidential.  The company depends on me to maintain that

01:17:28    6    confidentiality, and I accept that position of trust.

01:17:28    7            Well, Carter Bryant, his job was Barbie

01:17:28    8    Collectibles.  Okay.  Mattel is actually acknowledging here

01:17:28    9    that the trade secrets it's asking Mr. Bryant to keep

01:17:28   10    confidential were the ones he developed and acquired as a

01:17:28   11    result of his employment with Mattel.  And all that

01:17:28   12    mattered, in other words, were any inventions he made in the

01:17:28   13    course of his employment.  That's why Mattel had to fix that

01:17:28   14    form inventions agreement in 2004, because Mattel knew that

01:17:28   15    the 1999 inventions agreement didn't cover ideas an employee

01:17:28   16    came up with that were not the result of his employment with

01:17:28   17    the company -- the result.

01:17:28   18            If you need more proof that Mattel knew full well

01:17:28   19    that Mr. Bryant didn't do the Bratz drawings in the course

01:17:28   20    of his employment, Mattel had its in-house intellectual

01:17:28   21    property lawyer, Michael Moore, copyright Carter Bryant's

01:17:28   22    drawings in late October of 2006.  If you look at Exhibit

01:17:28   23    13873, 13874, 13880, when you go to page 2 of any of these,

01:17:28   24    at the far left-hand side it says:  Was this contribution a

01:17:28   25    work made for hire?  That's another legal term.  That's what

01:17:28  1    we call a term of art.  It has specific meaning in the law,

01:17:28  2    and it's defined for you in the jury instructions.  Was this

01:17:28  3    a work made for hire?  And the no box was ticked by Mattel.

01:17:28  4            A work made for hire is work prepared by an

01:17:28  5    employee within the scope of his or her employment or when

01:17:28  6    carrying out the employer's business.  So Mattel prepared

01:17:28  7    copyright claims -- they had an intellectual property lawyer

01:17:28  8    do that -- of the Bratz drawings where it said the Bratz

01:17:28  9    drawings were not created when Bryant was carrying out

01:17:28  10   Mattel business.  I mean, it couldn't be more clear, and

01:17:28  11   you're going to get the instruction on work made for hire.

01:17:28  12   That's what it says.

01:17:28  13           So what did Mattel's own witnesses say?  Bob

01:17:28  14   Eckert, you know, I was given a bad time for asking him

01:17:28  15   these questions about whether Mattel might own something I

01:17:28  16   created when I was 18 and had sitting in a drawer for 40

01:17:28  17   years.  But if you look at volume 1 of 4 of his trial

01:17:28  18   testimony, page 66, 7 through 10, he says -- I said:

01:17:28  19           "Question:  So if I am 18 years old and I create a

01:17:28  20   drawing, now 40 years later at 58 I go to work for Mattel,

01:17:28  21   Mattel may own those drawings I made when I was 18; right?

01:17:28  22           "Answer:  Yes, I believe it may."

01:17:28  23           Now, Lily Martinez, what did she have to say?

01:17:28  24   Lily Martinez she said that she did not believe any of her

01:17:28  25   fashion ideas and concepts belong to Mattel just because she

01:17:28  1    had become a Mattel employee.  She considered her drawings

01:17:28  2    from design school to be her separate property.  Even though

01:17:28  3    she went to work at Mattel doing designs, they are hers, she

01:17:28  4    said, unless she used them for Barbie.

01:17:28  5            This is Mattel's corporate representative who is

01:17:28  6    also a doll designer, and she is saying:  Unless I use those

01:17:28  7    ideas for Barbie, they belong to me.  And if she did

01:17:28  8    something before she got to Mattel, it would belong to her

01:17:28  9    and not Mattel.  So this is supposed to be so clear, but

01:17:28  10   Lily Martinez herself believes that if it's something she

01:17:28  11   did before she got to Mattel, it's hers.

01:17:28  12           Alan Kaye, the head of human resources, his

01:17:28  13   definition of conceived an idea an employee had before

01:17:28  14   coming to Mattel is not covered by the agreement.  So if he

01:17:28  15   conceived of something, if he thought of, had the idea for

01:17:28  16   something before he joined the company, not covered; right?

01:17:28  17   Correct.

01:17:28  18           Matt Turetzky said no one at Mattel ever told him

01:17:28  19   ideas he had before working at Mattel belonged to Mattel,

01:17:28  20   and he's a high-placed Mattel corporate executive.

01:17:28  21           "Question:  Did anybody tell you during that

01:17:28  22   process that Mattel might very well own any idea that was in

01:17:28  23   your head that you had come up with prior to ever being

01:17:28  24   employed at Mattel?

01:17:28  25           "Answer:  I don't recall that part."  And he goes

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
01:17:28   1   on.
01:17:28   2            Alan Kaye, again, human resources, said he is not
01:17:28   3   aware of any human resources employee ever explaining this
01:17:28   4   agreement to anyone.  They didn't have any training in
01:17:28   5   explaining it, and they didn't even want to have the
01:17:28   6   employees attempting to explain it.
01:17:28   7            So Carter Bryant, when he testified he did not
01:17:28   8   have a real clear concept of this contract during his
01:17:28   9   employment, that it was never explained to him fully, he was
01:17:28  10   telling you the truth.  Mr. Kaye and Bob Eckert said they
01:17:28  11   won't hire anybody who doesn't sign it, so he had to sign it
01:17:28  12   if he wanted to work there.
01:17:28  13            Back to Margaret Leahy.  She said it was common
01:17:28  14   for Mattel employees to moonlight, do creative work outside
01:17:28  15   of Mattel.  She said it was her supervisor, Michael Hebden,
01:17:28  16   who told her how to get outside sculpting jobs to earn more
01:17:28  17   money.  Did Mattel bring him in to say, no, that's not true?
01:17:28  18   No, they did not.
01:17:28  19            So the bottom line here on this part is Mattel's
01:17:28  20   inventions agreements were so ambiguous that even Mattel
01:17:28  21   employees who were supposed to troop in here and tell you
01:17:28  22   the party line couldn't.  They couldn't do it -- this
01:17:28  23   crystal-clear agreement.  Even their corporate
01:17:28  24   representative couldn't do it.
01:17:28  25            So here's again the conclusion, you have to
```

```
01:17:28   1    construe that contract that it's ambiguous against the
01:17:28   2    drafter] that's Mattel.  The agreement was only intended to
01:17:28   3    cover information Bryant developed or acquired as a result
01:17:28   4    of his employment with the company, which was Barbie
01:17:28   5    Collectibles business, nothing more.
01:17:28   6            The Bratz idea conceived in 1998 reduced to
01:17:28   7    practice when the Bratz product was released in 2001.  And
01:17:28   8    even by the definition of reduced to practice that the head
01:17:28   9    of the corporation, Bob Eckert, gave you, and Alan Kaye, an
01:17:28  10    idea conceived in 1998 and reduced to practice right away in
01:17:28  11    1998 when Mr. Bryant drew the original sketches -- that was
01:17:28  12    their idea of reduced to practice -- not covered.  It
01:17:28  13    doesn't belong to Mattel.
01:17:28  14            So the inventions agreement does not cover
01:17:28  15    anything Bratz related.  It doesn't cover it, period.  This
01:17:28  16    is going -- you're going to get this special verdict form
01:17:28  17    about the size of the white pages, and it is really big.  A
01:17:28  18    special verdict form is a form that asks you a bunch of
01:17:28  19    questions, and you answer yes or no.  You fill in boxes.
01:17:28  20    There are boxes for damages.  I don't think that's been
01:17:28  21    finalized yet, but you will probably get it on Monday.
01:17:28  22            What you are going to see is on the first page
01:17:28  23    where you are asked if Mattel owns any of these things, you
01:17:28  24    just check no, and you're done with the Bratz -- you are
01:17:28  25    done with that Bratz issue.  They are some other issues that
```

01:17:28   1    you will have to decide, but that one, you will be done.

01:17:28   2               Your Honor, would it be break time?

01:17:28   3               THE COURT:  This is a good time.  Ladies and

01:17:28   4    gentlemen, you are admonished not to discuss this matter

01:17:28   5    amongst yourselves, nor form or express any opinions

01:17:28   6    concerning the case.  We will come and get you in 15

01:17:28   7    minutes.  Counsel, 15 minutes, is that acceptable?

01:17:28   8               MS. KELLER:  Yes, Your Honor.

01:17:28   9               (Recess taken.)

01:17:28   10              (Jury present.)

01:17:28   11              MS. KELLER:  So I think we have already discussed

01:17:28   12   that under Mr. Bryant's 1999 inventions agreement, Mattel

01:17:28   13   doesn't own either the Bratz concept or the Bratz name.

01:17:28   14   Those are the two things they are claiming.  They are

01:17:28   15   claiming the Bratz concept and the Bratz name.  This is

01:17:28   16   under their trade secret claim.  Remember.  It's a different

01:17:28   17   claim for copyright and you will see it when you get to the

01:17:28   18   jury instructions.

01:17:28   19              So even if you were to find that Mattel somehow,

01:17:28   20   some way owned the concept, there was nothing secret about

01:17:28   21   it.  Remember, it has to be a secret.  It has to stay a

01:17:28   22   secret.  And the minute it's disclosed, it's no longer a

01:17:28   23   trade secret.  It can be a lot of other things, but it's not

01:17:28   24   a trade secret.  So there was nothing secret about the Bratz

01:17:28   25   name, which they're claiming is their trade secret.  And

01:17:28   1   there is nothing secret about the concept of a bratty doll.

01:17:28   2          The name Bratz was actually suggested by an

01:17:28   3   independent contractor, Steve Linker.  I don't know if you

01:17:28   4   remember him, way back when.  Steve Linker in meetings at

01:17:28   5   Mattel suggested the name, and Ivy Ross had the Mattel legal

01:17:28   6   department look into it.  I know this is going way back, but

01:17:28   7   the Mattel legal department looked into it and found it was

01:17:28   8   not available.

01:17:28   9          A company called Lovins already had a Bratz,

01:17:28  10   B-r-a-t-z, trademark.  Mattel's legal department knew this

01:17:28  11   back in 1999 or 2000, because that's when they looked into

01:17:28  12   it for Ivy Ross.  And when Lovins objected to MGA's use of

01:17:28  13   the Bratz trademarks, you remember again way back MGA

01:17:28  14   actually had to buy the Lovins trademark in order to settle

01:17:28  15   the dispute.

01:17:28  16          So it couldn't be Mattel's trade secret if it

01:17:28  17   already was owned by Lovins.  MGA bought the trademark from

01:17:28  18   Lovins and granted a license back to Lovins so that Lovins

01:17:28  19   could sell licensed clothing at Costco under the Bratz name.

01:17:28  20   So that is gone.  I mean, that cannot be a secret and it

01:17:28  21   cannot be a trade secret if it's publicly known and publicly

01:17:28  22   disclosed.

01:17:28  23          And the name Beverly Hills Bratz, B-r-a-t-z, was

01:17:28  24   trademark for dolls.  If you look at Exhibit 34814, the

01:17:28  25   Beverly Hills Bratz was trademarked on -- no.  It was filed

01:17:28   1    November 25th, 1991.  So the Bratz name was not a secret of

01:17:28   2    anyone's.  Neither was the Bratz bratty doll concept.

01:17:28   3            Now, this next part is going to sound ridiculous

01:17:28   4    to you until you get back and really look at the jury

01:17:28   5    instructions, and then it won't seem so ridiculous.

01:17:28   6            We are going to talk for a minute about Diva

01:17:28   7    Starz, those really weird-looking little dolls that Mattel

01:17:28   8    sold.  We're not saying that Diva Starz and Bratz were the

01:17:28   9    same.  We're not saying that one is a knockoff.  We're not

01:17:28   10   saying they looked alike.

01:17:28   11           Under the law, though, they attempt to capture the

01:17:28   12   same concepts.  And remember, the trade secret is the name

01:17:28   13   and the concept.  That's what the claimed trade secret is.

01:17:28   14   So the fact that Diva Starz dolls look weird and Bratz

01:17:28   15   personally, I think, are very cute, is beside the point.  It

01:17:28   16   doesn't matter.  It's the concept that matters.

01:17:28   17           This same concept is why people like Ivy Ross and

01:17:28   18   Cassidy Park thought Bratz had something to do with Tune

01:17:28   19   Teens, even though when you see the Tune Teens doll in the

01:17:28   20   back, you're going to say this looks nothing in any way like

01:17:28   21   Bratz.  They don't look alike, but they have a lot of the

01:17:28   22   same features.  They have a big head, big eyes, big feet.

01:17:28   23           And if you remember Adrienne Fontanella who

01:17:28   24   testified, who was the president of the girls' division at

01:17:28   25   Mattel, and said Diva Starz was a fashion doll with a big

01:17:28   1    head, oversized feet, with fashion play, hair play, and

01:17:28   2    talking.  Diva Starz had multi-ethnic friends.  Diva Starz

01:17:28   3    was hip, urban, edgy, trendy, teenage-girl fashion dolls

01:17:28   4    with accessories, 14 friends each with their own

01:17:28   5    personality, ultra-trendy look, and cool attitude.

01:17:28   6            So that concept cannot be a trade secret.  It just

01:17:28   7    can't be, because Mattel produced that doll in 2000 and

01:17:28   8    disclosed it.  The minute the doll hits the shelves, trade

01:17:28   9    secret is disclosed.  Okay.  So there is nothing proprietary

01:17:28   10   then, no trade secret for a multi-ethnic, hip, urban, edgy,

01:17:28   11   trendy, teenage-girl fashion dolls and accessories with

01:17:28   12   large, oversized heads and feet, large eyes, large lips,

01:17:28   13   small, almost nonexistent noses, small bodies, high school

01:17:28   14   friends attitude, all that stuff, already disclosed with a

01:17:28   15   different doll.  So it can't be a trade secret.

01:17:28   16           So that -- between the name and the concept, those

01:17:28   17   are out.  Now, it's really -- it wasn't the concept that

01:17:28   18   made the doll.  It was MGA's execution of the concept.

01:17:28   19   There were so many people involved in executing that concept

01:17:28   20   -- in the early stages of manufacturing the prototype, in

01:17:28   21   fashion design, in marketing and advertising, all the

01:17:28   22   different sculpts that they went through, a whole team in

01:17:28   23   Hong Kong shepherding the project through.  That was all

01:17:28   24   MGA's doing, all of it.  Not Mattel's.

01:17:28   25           It was not a heist, one of the biggest

01:17:28  1    intellectual property heists.  It couldn't be.  It wasn't

01:17:28  2    Mattel's property.  Mattel didn't own it.  Mattel didn't

01:17:28  3    develop it.  Mattel didn't do anything with it.

01:17:28  4          Now, there is another issue you are going to be

01:17:28  5    asked to decide when you get that very large verdict form.

01:17:28  6    You are going to be asked to decide the

01:17:28  7    statute-of-limitations issue.  Okay.  This is an issue about

01:17:28  8    when Mattel knew or reasonably should have suspected that

01:17:28  9    Carter Bryant did these dolls.  So here is -- and you are

01:17:28  10   going to be given several boxes to check off.  You are going

01:17:28  11   to have to decide what's the earliest date on or before

01:17:28  12   which Mattel -- and you're going to get all the language

01:17:28  13   from the jury instructions -- knew or reasonably should have

01:17:28  14   suspected.  Not knew but should have suspected.

01:17:28  15         What happened here is Mattel knew very early on

01:17:28  16   that Carter Bryant had designed this doll, and they waited

01:17:28  17   and didn't do anything.  They waited until Bratz was a huge

01:17:28  18   success.  It was no coincidence that the complaint against

01:17:28  19   Carter Bryant was filed April 2004, right when those

01:17:28  20   house-on-fire documents that you saw were flying around.

01:17:28  21   Okay.

01:17:28  22         I mean, it was full-blown panic at Mattel because

01:17:28  23   it turned out Bratz wasn't a fad.  It was a huge seller, and

01:17:28  24   they didn't know what to do about it because despite all the

01:17:28  25   creative genius that you have heard about, you know,

01:17:28   1    supposedly MGA stole all these creative Mattel employees.

01:17:28   2    Well, Mattel had thousands and thousands of employees.  They

01:17:28   3    had a hangar full of people doing design work, but they

01:17:28   4    weren't able to compete successfully against MGA.

01:17:28   5          So the whole what-happened-to-Barbie thing from

01:17:28   6    Mr. Eckert was on everybody's mind.  When they couldn't cope

01:17:28   7    in the marketplace when it turned out this wasn't just a

01:17:28   8    fad, they sued Carter Bryant, and they waited until November

01:17:28   9    of 2006 to sue MGA.  They knew way, way, way before that

01:17:28   10   that Carter Bryant had designed Bratz.  And the earlier they

01:17:28   11   knew it, the worse for Mattel.

01:17:28   12          As I said, you're going to have these boxes to

01:17:28   13   check.  But what you're going to see is they absolutely knew

01:17:28   14   no later than March 2002.  The only question is:  How much

01:17:28   15   earlier did they know?  Because that's when Mattel

01:17:28   16   officially opened an investigative file identifying Larian

01:17:28   17   and MGA as a suspect in the theft of proprietary

01:17:28   18   information.  That's when they interviewed Ivy Ross, senior

01:17:28   19   vice president, and vice-president Cassidy Park in charge of

01:17:28   20   the Design Center.  And as Richard de Anda testified, they

01:17:28   21   all knew that Bryant had designed the Bratz dolls for MGA.

01:17:28   22          So they were investigating a theft of proprietary

01:17:28   23   information.  That means trade secrets.  What they suspected

01:17:28   24   is that Bryant and Larian and MGA had somehow taken

01:17:28   25   proprietary information from Mattel.  Don't let them get

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

01:17:28  1    away with the excuse that, oh, well, we thought that might

01:17:28  2    be a copyright infringement of Tune Teens, but we had no

01:17:28  3    idea that it was anything more.  That's not true.  They by

01:17:28  4    their own documents are saying that they thought MGA and

01:17:28  5    Larian had stolen their trade secrets.

01:17:28  6            Just before then, on February 5, 2002, we saw this

01:17:28  7    letter from Quinn Emanuel to Mr. Larian demanding that he

01:17:28  8    remove references to Mattel's products on one of the Bratz

01:17:28  9    fan sites.  This is early March 2002.  This same website

01:17:28  10   revealed Bryant's role as the Bratz creator.  Obviously

01:17:28  11   Mattel management and/or its lawyers monitoring these

01:17:28  12   websites had long suspected this.

01:17:28  13           Do you really think any of this came as a surprise

01:17:28  14   to Mattel?  I mean, that just defies logic.  Carmen

01:17:28  15   Monteagudo, Sheila Kiara, Elise Klunin, all knew in 2000.

01:17:28  16   Do you really think they didn't tell anybody when this doll

01:17:28  17   became a huge hit?  You don't think they told anybody in the

01:17:28  18   Design Center?  I mean, it makes no sense.

01:17:28  19           And reasonably knew or reasonably should have

01:17:28  20   known, all de Anda needed to do was send his people down to

01:17:28  21   the Design Center and interview people.  He didn't have to

01:17:28  22   even send an e-mail to however many thousand employees.  Go

01:17:28  23   to the Design Center.  They already knew or suspected,

01:17:28  24   reasonably suspected, that Carter Bryant had designed the

01:17:28  25   dolls.  They were getting complaints about it from Lily

```
01:17:28   1    Martinez and Ivy Ross.

01:17:28   2              The NHB talking-points document said that -- that

01:17:28   3    was the PR document that I was asking Attorney Michael Moore

01:17:28   4    about.  That said that after Bryant left Mattel in October

01:17:28   5    of 2000, Mattel employees in the Design Center suspected

01:17:28   6    that Bryant had a, quote, conflict of interest while he was

01:17:28   7    working at Mattel.

01:17:28   8              What would that mean?  A conflict of interest

01:17:28   9    meaning he was doing work for somebody else, and the only

01:17:28  10    somebody else was MGA.  That's what the conflict of interest

01:17:28  11    means.  That's the NHB talking points.  Jill Nordquist said

01:17:28  12    she didn't believe Bryant when he said he was not going to

01:17:28  13    work for a competitor and wouldn't tell her where he was

01:17:28  14    going to work.  She was convinced of it.

01:17:28  15              In 2001 Jill Nordquist said she learned from two

01:17:28  16    to three people in the Mattel Design Center about Bryant's

01:17:28  17    involvement and work on the Bratz doll.  This is Mattel's

01:17:28  18    own employee, in 2001.  And she discussed this information,

01:17:28  19    went higher up, talked about it with the senior vice

01:17:28  20    president, Anne Parducci.  So by August 2001 Mattel had

01:17:28  21    begun investigating MGA, MGA Hong Kong, and Isaac Larian --

01:17:28  22    by August 2001.

01:17:28  23              On August 21st, 2001, Mattel Vice-President Matt

01:17:28  24    Turetzky issued report to Senior Vice-President Jerome

01:17:28  25    Bossick detailing information on MGA, MGA Hong Kong, and Mr.
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

01:17:28  1   Larian.  Mattel believed MGA was copying Mattel products.

01:17:28  2   And Mattel had September 2000 phone records showing calls

01:17:28  3   from Mr. Bryant to MGA.  So they surely were or should have

01:17:28  4   been on notice from September 2000.

01:17:28  5           Mr. Price told you they didn't have any facts, so

01:17:28  6   they couldn't have sued sooner.  But all they had to do was

01:17:28  7   go to the Design Center.  They could have all the facts they

01:17:28  8   wanted.  According to Mr. Price, Mr. Bryant corrupted --

01:17:28  9   that was his word, corrupted -- the Mattel Design Center and

01:17:28  10  converted it into MGA's design center.  That's a lot of

01:17:28  11  hyperbole.  I mean, that is really quite the exaggeration.

01:17:28  12          But let's adopt it for a minute.  Let's say that

01:17:28  13  that happened.  If that's true, then that couldn't have

01:17:28  14  happened without everybody knowing about it.  Right?  Mattel

01:17:28  15  wants to have its cake and eat it, too.  Elise Klunin knew.

01:17:28  16  Carmen Monteagudo knew.  Sheila Kiara knew.  Jill Nordquist

01:17:28  17  thought Carter Bryant was lying.

01:17:28  18          Years later when Mattel finally turned over their

01:17:28  19  investigation documents in the middle of this trial, we

01:17:28  20  found out that Mattel knew all along, too.  There it is

01:17:28  21  right in the investigation file where they describe one of

01:17:28  22  their investigation targets, Nina Mercazini.  She was a

01:17:28  23  designer in Mattel's Design Center, and she was the sister

01:17:28  24  of Merceda Ward, remember, who worked for MGA.  Here it

01:17:28  25  shows that Mattel knew or at the very least should have

01:17:28  1    known all along that Merceda Ward, quote, went to MGA to

01:17:28  2    work with Carter Bryant, unquote.

01:17:28  3              We all know that was October 2000 when Merceda

01:17:28  4    Ward went to MGA.  All they had to do was talk to their own

01:17:28  5    employees.  That's all they had to do.  And they either did

01:17:28  6    talk to them or they should have talked to them, and they

01:17:28  7    would have found out or did find out -- we don't really know

01:17:28  8    -- everything that they are now claiming Carter Bryant did

01:17:28  9    wrong, because Mattel's theory of this case, as Mr. Quinn

01:17:28  10   told you in the opening statement, is that Carter Bryant

01:17:28  11   turned Mattel's Design Center into MGA's design center.  And

01:17:28  12   as I said, you can't do that without people knowing about

01:17:28  13   it.

01:17:28  14             So finally, if Mr. Larian and MGA were trying to

01:17:28  15   conceal Carter Bryant's identity, they did a pretty crummy

01:17:28  16   job of it.  Everybody knew no later than March 2002, and in

01:17:28  17   September of 2002 MGA filed in Brazil copyright

01:17:28  18   registrations covering Bratz, disclosing Carter Bryant as

01:17:28  19   the author.  You saw that.  And at some point they sure were

01:17:28  20   publicly available because Michael Moore got a hold of them.

01:17:28  21   And you know Mattel monitors its intellectual property very

01:17:28  22   carefully worldwide.

01:17:28  23             So now, to talk about the issue of copyright

01:17:28  24   infringement.  The relevant jury instruction on copyright

01:17:28  25   infringement begins -- it's instruction number 36, and it

01:17:28  1    says that anyone who copies original elements of the

01:17:28  2    copyrighted work during the term of the copyright without

01:17:28  3    the owner's permission infringes the copyright.  Well,

01:17:28  4    that's a hard concept.  Okay.  So if you copy original

01:17:28  5    elements in a copyrighted work during the term of the

01:17:28  6    copyright without the owner's permission, that infringes the

01:17:28  7    copyright.

01:17:28  8           Well, we have already established that under

01:17:28  9    Carter Bryant's contract, Mattel does not own any of the

01:17:28  10   Carter Bryant drawings or sculpt.  If you accept that, the

01:17:28  11   copyright analysis is over.  But if you do find that the

01:17:28  12   contract gives Mattel some rights or could give Mattel some

01:17:28  13   rights, there are several more steps that you have to go to.

01:17:28  14           First, Mattel has to prove it owns every item it

01:17:28  15   says has been infringed -- every single drawing, every

01:17:28  16   single sculpt.  So it wouldn't be enough for you to find,

01:17:28  17   okay, those first drawings, you know, maybe they were made

01:17:28  18   -- maybe they met every hurdle.  You know, maybe they really

01:17:28  19   were -- maybe they have proven they were '99.  Maybe they

01:17:28  20   have proven the contract covers them.  But Mattel has to

01:17:28  21   prove that Carter Bryant was the author of all the items

01:17:28  22   Mattel it is claiming.

01:17:28  23           Then Mattel has to prove infringement.  So this is

01:17:28  24   very complex.  But when you take a look at the instruction,

01:17:28  25   you're going to see that copyright law is designed so people

01:17:28   1   can draw inspiration from one another's work.  You can use

01:17:28   2   somebody else's work to draw inspiration as long as the

01:17:28   3   product isn't too similar.  Otherwise, we would never have

01:17:28   4   any competition.  We would all still be using Nokia

01:17:28   5   candy-bar phones, because if it had a phone with an earpiece

01:17:28   6   and a mouthpiece and buttons on it with numbers, we'd say,

01:17:28   7   well, nobody can make any other phone that has those

01:17:28   8   attributes.  And that's not the law.

01:17:28   9          Really when we're talking about copyright, we're

01:17:28  10   talking about things like movies, films, TV shows.  You're

01:17:28  11   talking about creative works.  For example, Romeo and Juliet

01:17:28  12   is probably a good example.  Romeo and Juliet has been

01:17:28  13   around for a long time, but it has been expressed in very

01:17:28  14   different ways.  There's all different movies about it.

01:17:28  15   West Side Story was based on it.  There is even a movie out

01:17:28  16   right now called Gnomeo and Juliet.  And that's all fine.

01:17:28  17   None of those -- those are all independent expressions of an

01:17:28  18   original idea.

01:17:28  19          So if you look at instruction 35, copyright law

01:17:28  20   allows the author of an original work to prevent others from

01:17:28  21   copying the way or form the author used to express the ideas

01:17:28  22   in the author's work, but only the particular expression of

01:17:28  23   an idea can be copyrighted.  Copyright law does not give the

01:17:28  24   author the right to prevent others from copying or using the

01:17:28  25   underlying ideas, such as procedures, processes, systems,

01:17:28  1    methods of operation, concepts, principles, or discoveries.

01:17:28  2            Then it goes on that the right to exclude others

01:17:28  3    from copying extends only to how the author expressed the

01:17:28  4    idea in the copyrighted work.  Copyright is not violated

01:17:28  5    when somebody uses an idea from a copyrighted work as long

01:17:28  6    as the particular expression of that idea is not copied.

01:17:28  7            Okay.  That's another difficult concept; right?

01:17:28  8    So let's take the example of a flower.  The idea of a flower

01:17:28  9    can be expressed in a million different ways.  Parts of the

01:17:28  10   idea, the flower has petals, leaves, and a stem.  Right?

01:17:28  11   Those are not copyrightable because those are not a specific

01:17:28  12   expression of an idea.  That's just every flower has those

01:17:28  13   things.

01:17:28  14           But if somebody wants to draw a flower with

01:17:28  15   petals, leaves, and a stem, you are going to get many

01:17:28  16   different specific expressions of that idea of a flower.  So

01:17:28  17   the specific expression of the flower drawing could be

01:17:28  18   copyrightable.  I could create a unique drawing of a flower

01:17:28  19   that is expressed in a certain way, and I could copyright

01:17:28  20   it, but I can't copyright the idea of a flower.  Anybody can

01:17:28  21   use it.  It's just the expression of it that's

01:17:28  22   copyrightable.

01:17:28  23           That's why -- the reason I am mentioning that is

01:17:28  24   because no one can own the concept of a bratty fashion doll.

01:17:28  25   It's just too common.  Anyone can use it.  The Court has

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

01:17:28   1    already considered the Carter Bryant drawings and the Bratz

01:17:28   2    dolls and has identified exactly what it thinks encompasses

01:17:28   3    the idea for a bratty fashion doll, a part anyone can use.

01:17:28   4    And the test is not whether at the end of the line the final

01:17:28   5    sculpt and dolls borrowed ideas or looks from Carter

01:17:28   6    Bryant's drawings or have similar traits, or are based on

01:17:28   7    the sketches.

01:17:28   8             The test is a lot more stringent for copyright for

01:17:28   9    the same reason we talked about with the flower, because the

01:17:28   10   law protects the ability of people to copy and to borrow, to

01:17:28   11   improve on other people's ideas.  You know, we had an

01:17:28   12   iPhone.  Now we've got the Android.  I mean, we are

01:17:28   13   constantly improving on existing ideas.

01:17:28   14            The test is whether the final sculpt to find

01:17:28   15   infringement of a copyright meets the test that you see in

01:17:28   16   the copyright instruction, and that's going to be -- that is

01:17:28   17   going to make it very clear to you that no one can own the

01:17:28   18   idea of a bratty fashion doll.

01:17:28   19            Now, let's say you find the 1999 inventions

01:17:28   20   agreement gives Mattel rights in some Bratz drawing on some

01:17:28   21   basis.  It doesn't include everything.  It's not a gotcha.

01:17:28   22   It's not, okay, boom.  One drawing, Mattel owns everything.

01:17:28   23   That's not it.  Let's look at Exhibit 5-89.  This is a

01:17:28   24   drawing Mattel claims it owns and claims is infringed by the

01:17:28   25   early sculpts.  But you heard testimony from Margaret Leahy

01:17:28  1    and Paula Garcia that this drawing was done after several

01:17:28  2    versions of that so-called exploratory sculpt were done.

01:17:28  3    And this drawing was done by Carter Bryant after he left

01:17:28  4    Mattel, and it actually shows one of Margaret Leahy's later

01:17:28  5    sculpts, specifically the one that she completed on October

01:17:28  6    23rd, 2000.

01:17:28  7              So Mattel can't own this drawing, and it can't be

01:17:28  8    used as the basis for a copyright infringement claim, and it

01:17:28  9    can't own Exhibits 1107, 1108, 1109, or 1110.  These are the

01:17:28  10   so-called K-Mart drawings.  You were shown these a little

01:17:28  11   earlier by Mr. Price.  These are the K-Marts drawings done

01:17:28  12   for a K-Mart meeting in November of 2000.

01:17:28  13             Mattel claims it owns these drawings.  It even

01:17:28  14   tries to say these are the drawings you should use to

01:17:28  15   compare to the Bratz dolls for copyright infringement

01:17:28  16   analysis.  They're not.  Mattel does not own these drawings

01:17:28  17   and cannot, because Paula Garcia and Carter Bryant testified

01:17:28  18   that these drawings were created for a sales pitch to K-Mart

01:17:28  19   in November, well after Carter Bryant left Mattel.

01:17:28  20             They were drawn to depict the dolls as MGA was

01:17:28  21   planning to market them at the time.  The fashions in those

01:17:28  22   drawings look nothing like what Carter Bryant presented in

01:17:28  23   the pitch book, and you heard why.  Paula Garcia was the one

01:17:28  24   deciding, along with Carter Bryant, what the fashions should

01:17:28  25   look like on the ultimate Bratz dolls.  These drawings and

01:17:28   1    ultimate Bratz fashions were designed and are owned by MGA.

01:17:28   2            The evidence has also shown Mattel doesn't own the

01:17:28   3    early sculpts.  They're also claiming they own those.  If

01:17:28   4    you look at Exhibit 1136, Margaret Leahy testified as to how

01:17:28   5    she created this sculpt.  She was told to, quote, do her

01:17:28   6    magic with this sculpt.  She was unable to use Carter

01:17:28   7    Bryant's drawings to do so.  She was paid by MGA to work on

01:17:28   8    this, and it's MGA that owns this sculpt, not Mattel.

01:17:28   9            The evidence is overwhelming, but even more

01:17:28  10    overwhelming if we look at Exhibit 1141.  This was created

01:17:28  11    around October 23rd, 2000, after Carter Bryant left Mattel.

01:17:28  12    Again, Margaret Leahy testified how she created this sculpt

01:17:28  13    based on input from MGA and her own creativity.  She did not

01:17:28  14    rely on Carter Bryant's drawings and she couldn't rely on

01:17:28  15    them.  They weren't giving her any guidance.

01:17:28  16            Most of the comments she got were from Merceda

01:17:28  17    Ward, the engineer, and Paula Garcia.  She didn't even meet

01:17:28  18    with Mr. Bryant after she got the comments from MGA.  There

01:17:28  19    is no way Mattel can own this sculpt.

01:17:28  20            Now, if you look at instruction number 38,

01:17:28  21    copyright infringement authorship, this says that the

01:17:28  22    creator of an original work is called the author of the

01:17:28  23    work.  An author originates or masterminds the original work

01:17:28  24    controlling the whole work's creation and causing it to come

01:17:28  25    into being.  So Carter Bryant would have to mastermind the

01:17:28  1    original work and control the whole work's creation, the

01:17:28  2    whole creation of the doll.  He would have to be the

01:17:28  3    mastermind of all of that.

01:17:28  4              Others may help or make valuable or creative

01:17:28  5    contributions to a work; however, such a contributor cannot

01:17:28  6    be the author of the work unless that contributor caused the

01:17:28  7    work to come into being.  One must translate an idea into a

01:17:28  8    fixed tangible expression in order to be the author of the

01:17:28  9    work.  Merely giving an idea to another does not make the

01:17:28  10   giver an author of a work embodying the idea.

01:17:28  11             Mattel keeps confusing the issue of the sketches

01:17:28  12   with the issue of the doll.  They want to say that if they

01:17:28  13   can prove ownership of any sketch, that means they own the

01:17:28  14   dolls.  And it's not true.  If you look at this jury

01:17:28  15   instruction, you can see exactly why.  I mean, Mr. Price

01:17:28  16   told you that Mattel owns the sculpt because Carter Bryant

01:17:28  17   was overseeing this because it was his vision.  There is a

01:17:28  18   reason Mr. Price didn't go into the law on this subject,

01:17:28  19   because the law makes clear he is exactly wrong about who is

01:17:28  20   the author of that sculpt and therefore the owner of it.

01:17:28  21   And if he's not the author of the sculpt, certainly under no

01:17:28  22   circumstances could Mattel possibly own it.

01:17:28  23             Margaret Leahy, Paula Garcia, and Carter Bryant

01:17:28  24   all told you that Carter Bryant's role in the sculpting

01:17:28  25   process was to make suggestions, and the law says that the

01:17:28  1   author of a copyrighted work is the mastermind who controls

01:17:28  2   the whole work's creation and causes it to come into being.

01:17:28  3          The author of those dolls was MGA.  MGA was the

01:17:28  4   mastermind in the creation of the sculpt.  MGA exercised

01:17:28  5   creative and financial control.  MGA paid for it, hired

01:17:28  6   Leahy to sculpt it, and Garcia supervised her work.  They

01:17:28  7   all agree, all of them, that all Carter Bryant did at that

01:17:28  8   point was make suggestions.  And we know that merely giving

01:17:28  9   an idea to another does not make the giver an author of a

01:17:28  10  work embodying that idea.

01:17:28  11         So now, you can only move to the next step, the

01:17:28  12  infringement analysis for those items that Mattel has proven

01:17:28  13  that it owns.  Copyright instructions sometimes seem

01:17:28  14  impossible to understand, but here is what it boils down to.

01:17:28  15  You will hear there is something called an extrinsic test

01:17:28  16  and something called an intrinsic test.

01:17:28  17         What they do is they say that Mattel must prove

01:17:28  18  that the final production sculpts, not the preliminary one

01:17:28  19  or the next one but the final ones from which the dolls were

01:17:28  20  produced, the first four generation Bratz dolls and the two

01:17:28  21  subsequent generation Bratz dolls, were substantially

01:17:28  22  similar to any works in which Mattel has proven it owns a

01:17:28  23  copyright.

01:17:28  24         The term substantial similarity has a legal

01:17:28  25  meaning.  Works of art may be similar in the lay person's

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

01:17:28  1    sense of the term, but that is not the sort of similarity

01:17:28  2    relevant under copyright law.  So again, to prove that two

01:17:28  3    works are substantially similar, Mattel must prove

01:17:28  4    similarities in expression, not ideas.

01:17:28  5            We distinguish between what's not protectable

01:17:28  6    because it's part of the idea and what's protectable because

01:17:28  7    it's part of an expression of the idea.  You're going to be

01:17:28  8    looking at instruction number 45 where the Court does all

01:17:28  9    the work for you and tells you what is protectable and what

01:17:28 10    is unprotectable, fortunately, because that's a tough

01:17:28 11    analysis if you are not used to copyright law.

01:17:28 12            And the Court has already considered the Carter

01:17:28 13    Bryant drawings and the Bratz dolls and has identified

01:17:28 14    exactly what encompasses the idea for a bratty fashion doll

01:17:28 15    that anybody can use without violating copyright.  If we

01:17:28 16    look at number 47, it's going to identify for you exactly

01:17:28 17    what's protectable and what's not.

01:17:28 18            So the precise combination of features, for

01:17:28 19    example, like the combination of a particular hairstyle,

01:17:28 20    face paint, makeup, outfits, precise body proportions, might

01:17:28 21    be protectable; but stuff like exaggerated features, long

01:17:28 22    limbs, you know, fashion-forward female with an attitude, is

01:17:28 23    not.  So you will see that the things in the right-hand

01:17:28 24    column are not protected.

01:17:28 25            Now, if we go to instruction number 48, we are

01:17:28  1   going to look at protectable and unprotectable elements of

01:17:28  2   the sculpts and the sculpt sketches.  You're going to see

01:17:28  3   the same thing there.  The Court has already done that

01:17:28  4   initial analysis for you, and what you have to decide is the

01:17:28  5   issue of ownership.

01:17:28  6          If we look at instruction number 47, it's going to

01:17:28  7   spell out for you exactly what standard to apply.  And when

01:17:28  8   you are comparing the preliminary sculpt to the final Bratz

01:17:28  9   production doll body, you have to ask whether the doll body

01:17:28  10  is virtually identical to the preliminary sculpt, virtually

01:17:28  11  identical.

01:17:28  12         Take a look at these two that are being held up

01:17:28  13  here.  Just as the expression sounds, this means the two

01:17:28  14  things have to be almost like a xerox copy, one of the

01:17:28  15  other, for copyright infringement.  So when you're comparing

01:17:28  16  Exhibit 1136, Margaret Leahy's preliminary sculpt, to

01:17:28  17  Exhibit 17733, the final production sculpt, you basically

01:17:28  18  apply a xerox standard.  All you have to do is look at these

01:17:28  19  to see how different they are.

01:17:28  20         When you compare Mr. Bryant's Bratz drawings to

01:17:28  21  the finished dolls, then you have to decide whether the

01:17:28  22  dolls are substantially similar to the sketches, not whether

01:17:28  23  they kind of look the same but whether they meet that test.

01:17:28  24         In making that comparison, if the clothes, the

01:17:28  25  hairstyle, the makeup, the shoes, the accessories, are

01:17:28   1   different in the dolls and in the drawings, they are not

01:17:28   2   substantially similar.

01:17:28   3            Your Honor, would this be a good time for a break?

01:17:28   4            THE COURT:  All right.  You are admonished not to

01:17:28   5   discuss this matter amongst yourselves, nor form or express

01:17:28   6   any opinions concerning the case.  We will come and get you

01:17:28   7   in 15 minutes.

01:17:28   8            *(Recess taken.)*

01:17:28   9            *(Jury present.)*

01:17:28  10            THE COURT:  We are on the record.  Counsel are

01:17:28  11   present.  The jury is present, alternates present.  If you

01:17:28  12   would please be seated.  Thank you for your courtesy.

01:17:28  13            Any concern you have, Ms. Keller has one hour

01:17:28  14   left, and then Mr. Quinn has 20 minutes.  I know some of you

01:17:28  15   have a fuss.  I am the bad person.  I am insisting that the

01:17:28  16   arguments be completed in one day.  So if you are angry at

01:17:28  17   me, fine, but not at counsel.  They put so much effort in

01:17:28  18   both sides that they need your absolute attention.  Thank

01:17:28  19   you.

01:17:28  20            Counsel.

01:17:28  21            MS. KELLER:  Thank you, Your Honor.  So we have

01:17:28  22   talked about how to find for Mattel to

01:17:28  23            win on the sculpts, they have to be virtually

01:17:28  24   identical.  The production sculpt that they use has to be

01:17:28  25   virtually identical, like a xerox of the exploratory sculpt.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

01:17:28  1    And it's not even close.  They lose on that, period.  I

01:17:28  2    don't care how much invective or how many accusations may be

01:17:28  3    flung or what accusations may be flung at the lawyers or how

01:17:28  4    dishonest we may be accused of being or whatever, forget all

01:17:28  5    that.  Look at the evidence.  They lose.

01:17:28  6              Now, as far as the dolls, the copyright comparison

01:17:28  7    is different, and you will see that the jury instruction

01:17:28  8    talks about substantial similarity.  Substantial similarity

01:17:28  9    includes fashions and an overall feeling about the doll.  So

01:17:28  10   let's just look at one comparison, because you're going to

01:17:28  11   have a chance to make all the comparisons yourselves.

01:17:28  12             But let's just look at one.  This is a

01:17:28  13   side-by-side of Lupe, Yasmin, 302B-6 and 17561.  These

01:17:28  14   changes that we have talked about are probably best embodied

01:17:28  15   in the transition from Lupe to Yasmin.  As you heard Mr.

01:17:28  16   Vilppu, one of the world's foremost experts in drawing the

01:17:28  17   human form, these are simply not the same person.

01:17:28  18             Now, the legal test is very complicated for

01:17:28  19   copyright infringement, but what you're going to see is that

01:17:28  20   only again the specific expression of the drawings is

01:17:28  21   protected, and these are just very, very different.

01:17:28  22             So MGA was free to use ideas without infringing

01:17:28  23   any copyright even if Mattel had owned it, the original one,

01:17:28  24   which it did not.  And this is very important.  You cannot

01:17:28  25   give Mattel a monopoly over the human form -- arms, legs,

01:17:28  1   eyes, mouth, eyebrows.  You can't, and this is the why the

01:17:28  2   copyright law is written the way it is.  You can't have any

01:17:28  3   one company owning the human body and preventing anybody

01:17:28  4   else from using it to compete.

01:17:28  5        So Mr. Price only showed you the K-Mart fashion

01:17:28  6   drawings made for those meetings in early November after Mr.

01:17:28  7   Bryant left Mattel, and the reason he didn't compare the

01:17:28  8   original drawings and the dolls is because if you do that,

01:17:28  9   you're not going to find any infringement.  The fashions

01:17:28  10  were changed completely.  The hairstyle was changed

01:17:28  11  completely.  The jaw was changed from kind of a va va voom

01:17:28  12  to a younger, sweeter person.

01:17:28  13       And when you look at the law, you're going to see

01:17:28  14  this is not substantially similar in the original elements.

01:17:28  15  So sneaking in that November K-Mart drawing was really

01:17:28  16  pretty unfair because that's not the comparison that you

01:17:28  17  make.

01:17:28  18       Now, I am going to just skip over this really

01:17:28  19  quickly.  There is going to be a cause of action for

01:17:28  20  intentional inference with contract.  Basically that's

01:17:28  21  trying to punish us because the seamstresses wanted to work

01:17:28  22  a second job.  Carter Bryant is in there, too, but that

01:17:28  23  cause of action only yields if you found it to be true,

01:17:28  24  which it isn't.  When you read it, you will see why not.  I

01:17:28  25  am skipping over it because at most they would get the

01:17:28   1   two-week difference in Carter Bryant's wages, that Mattel

01:17:28   2   supposedly would have lost two weeks' worth of value of his

01:17:28   3   services.

01:17:28   4            I don't know even how you would figure the

01:17:28   5   seamstresses.  It doesn't really make sense, but just so

01:17:28   6   that you will know, it does exist and you will be

01:17:28   7   considering it.

01:17:28   8            There is also going to be a cause of action for

01:17:28   9   this non-Bratz claim that they have for trade secret

01:17:28   10  misappropriation from Mexico.  You were told in the opening

01:17:28   11  statement that Mr. Machado downloaded volumes of Mattel

01:17:28   12  trade secrets when he left Mattel Mexico.  But Mr. Larian,

01:17:28   13  the evidence unequivocally establishes, unequivocally, that

01:17:28   14  he told everybody, "Don't bring anything with you.  I don't

01:17:28   15  want anything from Mattel.  Don't use anything from Mattel."

01:17:28   16  He made them sign statements that they wouldn't bring

01:17:28   17  anything from Mattel.

01:17:28   18           And if they did, it was against his express

01:17:28   19  directions.  There is not any conflict in the evidence on

01:17:28   20  that, and I think you're going to find that even what was

01:17:28   21  taken is not very material, not very important.

01:17:28   22           Now, this is probably the most important part of

01:17:28   23  my remarks before I close, and that's the MGA trade secret

01:17:28   24  misappropriation that you have heard about.  This is -- this

01:17:28   25  is the evidence that you heard that Mattel since 1992 has

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
01:17:28   1   been systematically using fake IDs and posing as retailers
01:17:28   2   to get into showrooms.
01:17:28   3          Mr. Villasenor talked about how when he rejoined
01:17:28   4   what became known as the market intelligence department
01:17:28   5   around 1999, he personally began using those fake business
01:17:28   6   cards to get into competitors' showrooms at toy fairs, and
01:17:28   7   he continued the practice until at least 2005.  So for six
01:17:28   8   or seven years he was engaged in the practice of using false
01:17:28   9   identity information to get into competitors' private
01:17:28  10   showrooms.
01:17:28  11          Many others engaged in it all the way up the chain
01:17:28  12   to vice presidents like Matt Turetzky, and all the way up to
01:17:28  13   Matt Bousquette, who you heard was involved in this
01:17:28  14   according to Mr. Villasenor.  And we didn't hear any
01:17:28  15   rebuttal about that from Mr. Bousquette; did we?  Mattel had
01:17:28  16   the ability to bring him in here and say, "No, that's not
01:17:28  17   true.  I, as president of Mattel Brands, didn't know
01:17:28  18   anything about this."  He couldn't really do that because
01:17:28  19   there was too much documentary evidence that he did.
01:17:28  20          But all the people involved in this included --
01:17:28  21   just that we know of, just in the time period we looked at
01:17:28  22   -- Mr. Villasenor, Jeff Lange, Candace Chiang, Bennett Wolk,
01:17:28  23   Matt Turetzky, Carey Plunkett, Tyler Snyder, Kelly Ossier,
01:17:28  24   Sharon Rahini, Drew Valero, Michael Shore, and Jerry
01:17:28  25   Pilgrim.  And you even saw that Mattel had a preexisting
```

01:17:28   1   manual on how to do this, and that was Exhibit 9640, which

01:17:28   2   tells people how to go about stealing competitors'

01:17:28   3   information from their private showrooms.

01:17:28   4            We saw the e-mail dated December 22nd, 2005, from

01:17:28   5   Mr. Villasenor, Exhibit 9484AR, where he said he was worried

01:17:28   6   about criminal conduct.  And they ridiculed for him for

01:17:28   7   that, saying that this was only about a lawsuit.  But, you

01:17:28   8   know, Mattel was obviously worried about it, too.

01:17:28   9            This is a company that doesn't mind spending

01:17:28  10   enormous sums of money prosecuting lawsuits -- enormous.

01:17:28  11   They were not worried about little Mr. Villasenor costing

01:17:28  12   them money.  When Jill Thomas said that's why they settled

01:17:28  13   it, you should have all been rolling your eyes, because that

01:17:28  14   is obviously not how Mattel operates.

01:17:28  15            They settled with him because they wanted it to

01:17:28  16   stay a secret.  They didn't want anybody to know about it.

01:17:28  17   They didn't want it to hurt Mattel's image, and they didn't

01:17:28  18   want to get sued.  They wanted to be the high and mighty

01:17:28  19   talking about their code of conduct and how saintly they

01:17:28  20   are, knowing all the while that this is what they were

01:17:28  21   doing.

01:17:28  22            And all those years they got all this intelligence

01:17:28  23   that their competitors didn't know they were getting, and

01:17:28  24   they got complete intelligence.  They didn't just get a

01:17:28  25   rumor from a retailer or something relayed back.  They got

01:17:28  1    price lists and they got catalogues.  They got into places

01:17:28  2    they never should have been able to get into.

01:17:28  3            Did you see Mr. Villasenor even reprimanded?  No.

01:17:28  4    He got paid and he got bonuses.  Was Mr. Turetzky even

01:17:28  5    reprimanded?  No.  He got paid, too.  Every single person on

01:17:28  6    that list on and on got bonuses and promotions while they

01:17:28  7    engaged in all these illegal practices.

01:17:28  8            The only consequence was those two watered-down

01:17:28  9    disappointment letters which were just -- to characterize

01:17:28  10   them as reprimands would just be -- it would stretch the

01:17:28  11   imagination to the breaking point.  It didn't call out their

01:17:28  12   conduct.  It didn't say what they supposedly did wrong.

01:17:28  13   This was all public information, and they were just getting

01:17:28  14   it the lazy way?

01:17:28  15           If this was all public information, Mattel would

01:17:28  16   not have been going to the lengths it went to to get it.

01:17:28  17   That is something that you know from your own common sense.

01:17:28  18   No matter how much bluster you hear here, you know, every

01:17:28  19   one of you, that if this was all information that they could

01:17:28  20   have obtained by just doing a little more work the legal

01:17:28  21   way, they would have been doing it.  It wasn't information

01:17:28  22   they could get.

01:17:28  23           They are getting things like MGA's FOB prices that

01:17:28  24   they had no other way to get.

01:17:28  25           THE COURT:  Counsel, could I interrupt you for a

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

01:17:28  1    moment with my apologies.  There is a whole room of people

01:17:28  2    next door.  Could we just stop the time for a moment?

01:17:28  3              This video went out, and they can't hear.  Do you

01:17:28  4    mind if we just fix that for a moment?  Would that be

01:17:28  5    acceptable, Mr. Quinn?  Ms. Keller?

01:17:28  6              MS. KELLER:  Yes, Your Honor.

01:17:28  7              MR. QUINN:  Yes, Your Honor.

01:17:28  8              THE COURT:  And I apologize.

01:17:28  9              *(Pause in proceedings)*

01:17:28  10             THE COURT:  Counsel, you may resume.

01:17:28  11             MS. KELLER:  You even heard Mr. Wagner, Mattel's

01:17:28  12   damages expert, when he was asked:  In your view would it be

01:17:28  13   economically rational for Mattel's 19 employees to falsify

01:17:28  14   credentials, risking legal reprisals, for information of no

01:17:28  15   value?  And he said no.  Even he had to admit the answer was

01:17:28  16   no.

01:17:28  17             Then you heard Mr. Quinn say:  Well, it's publicly

01:17:28  18   available.  It's just the lazy way.  But if it wasn't, well,

01:17:28  19   we didn't take reasonable steps, reasonable measures to

01:17:28  20   protect the secrecy of our information.

01:17:28  21             That's their fallback position.  Well, it's either

01:17:28  22   publicly available, or if it wasn't, you didn't take

01:17:28  23   reasonable measures to protect the secrecy of the

01:17:28  24   information.  And he said:  And, you know, Mr. Romano wasn't

01:17:28  25   even asked to sign a nondisclosure agreement.  Well, look at

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

01:17:28   1    Exhibit 36079, Mr. Romano's declaration, where he said he

01:17:28   2    had to agree to keep the information confidential about

01:17:28   3    Bratz in the showroom.  That's under penalty of perjury.

01:17:28   4              MR. PRICE:  Your Honor, I object.  My

01:17:28   5    understanding is that's not in evidence.  Never has been.

01:17:28   6    And I apologize if I'm interrupting and I'm wrong.

01:17:28   7              MS. KELLER:  It was read in, Your Honor.

01:17:28   8              THE COURT:  Just a minute.  Stop the clock.  Do

01:17:28   9    you two want to consult for just a moment?  Otherwise I'll

01:17:28  10    take the time.  Why don't you two just talk privately for

01:17:28  11    just a moment.

01:17:28  12              (Counsel conferring)

01:17:28  13              MS. KELLER:  It was read into evidence that Mr.

01:17:28  14    Romano had to agree to keep the information confidential

01:17:28  15    shown about Bratz in the showroom.  You saw sign-in sheets

01:17:28  16    for the showroom, and the retailers had to agree to keep the

01:17:28  17    information confidential or they weren't allowed in.  Most

01:17:28  18    importantly, we got to decide whether to reveal information.

01:17:28  19    We got to decide whether to segment off parts of the

01:17:28  20    showroom and only show it to certain people.  We got to

01:17:28  21    decide who to let in.  And you know that the people to

01:17:28  22    register for the toy fair had to get badges.  Okay.  So

01:17:28  23    their information had to be vetted by the toy industry

01:17:28  24    association, which is why they had to have proof of business

01:17:28  25    or fake invoices or those sorts of things to get in.

01:17:28  1          Now, you were here in the courtroom when Mr.

01:17:28  2  Zeller cross-examined Mr. Jolicoeur and literally called him

01:17:28  3  a liar when he said that MGA embargoed press sometimes and

01:17:28  4  restricted their ability to publish information until a

01:17:28  5  later time.  But what he was doing is he was showing him a

01:17:28  6  document.  It was an e-mail, 24867, but he was only showing

01:17:28  7  him part of it.

01:17:28  8          He was showing him part of an e-mail where an HGTV

01:17:28  9  reporter was being shown the MGA showroom, and he was trying

01:17:28 10  to force Mr. Jolicoeur to answer a question without seeing

01:17:28 11  the whole e-mail, but Mr. Jolicoeur kept looking at the

01:17:28 12  e-mail.  He was being accused by Mr. Zeller of literally

01:17:28 13  making up that this piece was agreed not to air until

01:17:28 14  December.  And the Court, you will remember, ordered Mr.

01:17:28 15  Zeller to read the entire document.

01:17:28 16          Sure enough, the document establishes that HGTV

01:17:28 17  would not be airing its show until December of 2006.  So,

01:17:28 18  yes, the media was allowed in the showroom in February to

01:17:28 19  film, but there was an embargo until December.  And even

01:17:28 20  though it was right in the e-mail itself, Mr. Zeller was

01:17:28 21  accusing Mr. Jolicoeur of lying about that until he was

01:17:28 22  forced to show the whole e-mail.

01:17:28 23          He asked him at one point:  Mr. Jolicoeur, you

01:17:28 24  just made that answer up on the spot; didn't you?  That was

01:17:28 25  after Mr. Jolicoeur had said:  I think it's important to

01:17:28  1    note that the December 2006 airing date, which is almost 11

01:17:28  2    months from February, so it's clear that in this particular

01:17:28  3    case MGA was allowing this because by the time this aired,

01:17:28  4    all of these goods would have been on the store shelves.  So

01:17:28  5    this doesn't seem to violate any kind of MGA policy.

01:17:28  6              And Mr. Zeller said:  Mr. Jolicoeur, you just made

01:17:28  7    that answer up on the spot; didn't you?  Mr. Jolicoeur said:

01:17:28  8    I read this e-mail last night and picked it up immediately.

01:17:28  9    It's something you would pick up immediately.

01:17:28  10             So that was attempt on Mr. Zeller's part to say

01:17:28  11   that Mr. Jolicoeur was a liar when he said that there would

01:17:28  12   be press embargoes.  And when he tried to question him, to

01:17:28  13   cut off the document so you didn't see the part where it was

01:17:28  14   embargoed until February, you don't do that if the facts are

01:17:28  15   on your side.  You just don't.

01:17:28  16             You know, if you have a document that establishes

01:17:28  17   that, you use it.  If you have a document and you

01:17:28  18   misleadingly question a witness about it and to that degree,

01:17:28  19   it shows desperation.  It really does.  But fortunately you

01:17:28  20   got to hear the whole thing.

01:17:28  21             And, yeah, of course, MGA and every toy company

01:17:28  22   provides information to the press about their toys.  Sure

01:17:28  23   they do.  They want to get the publicity, and they issue

01:17:28  24   press releases.  But they decide what's in them, and they

01:17:28  25   don't give -- you know, they ridiculed this business about

01:17:28   1    the touch and the feel of the doll and how it looks in

01:17:28   2    person up close.

01:17:28   3            Well, that's the reason people go to toy fairs

01:17:28   4    instead of just looking on the internet.  I mean, you have

01:17:28   5    all seen that yourself in your own lives.  You can see any

01:17:28   6    kind of object you want to buy on the internet, and then you

01:17:28   7    see it in person and it either looks better or worse in

01:17:28   8    person.  That's why people go to toy fairs.  There is

01:17:28   9    nothing to ridicule about it.

01:17:28   10           Yes, we issued press releases, but most of them

01:17:28   11   don't have photos.  None of them have the FOB prices.  And

01:17:28   12   Mr. Quinn ridiculed that, too, acting like, well, they can't

01:17:28   13   show one instance where Mattel changed a price because of

01:17:28   14   learning about our FOB price.  How would we?

01:17:28   15           You know, Mattel's got our whole playbook.  They

01:17:28   16   can make all their adjustments.  They're not going to put

01:17:28   17   out something saying we were going to release this product

01:17:28   18   at $19.95.  But now that we have seen the FOB price, we're

01:17:28   19   lowering it to $17.95.  They're not going to do that.

01:17:28   20   They're not going to leave that paper trail, and they

01:17:28   21   didn't.

01:17:28   22           But even the journalists themselves said that the

01:17:28   23   reason people travel around the world from these toy fairs

01:17:28   24   is to come touch and feel the product.  They want you to

01:17:28   25   think this information is available in these public

01:17:28   1    planogram rooms.  But as you heard from Ms. Saunders just

01:17:28   2    this week, only mockup packaging was shown by MGA of

01:17:28   3    unreleased products.  The only products that were on the

01:17:28   4    shelves in those planograms were already released.

01:17:28   5            Since 2004 MGA has gone to even greater efforts of

01:17:28   6    using white boxes with only the SKU number.  Mr. Quinn

01:17:28   7    ridiculed that, too, and made it sound like Lisa Saunders

01:17:28   8    was lying when she said she had reviewed her e-mails dating

01:17:28   9    back to 2004 and had realized we actually started using the

01:17:28  10    white boxes in the planogram rooms earlier, just the plain

01:17:28  11    white box to take up space.

01:17:28  12            But the documents show that we were using white

01:17:28  13    boxes, for example, in the target planogram as early as

01:17:28  14    2000.  This was an exhibit that Mattel offered to you and

01:17:28  15    got testimony from Ms. Garcia about for a different reason.

01:17:28  16    It's Exhibit 320.  It's Ms. Garcia's notes on an October

01:17:28  17    2000 e-mail with Steve Linker.

01:17:28  18            So Mattel offered this document to prove to you

01:17:28  19    that MGA was working on Bratz before Mr. Bryant left Mattel

01:17:28  20    when they were offering it for that purpose.  They love this

01:17:28  21    document but apparently they forgot all about its contents

01:17:28  22    when they were calling yet another of our employees a liar.

01:17:28  23    I mean, this shows the use of the white boxes back in 2000.

01:17:28  24            In Exhibit 36633 the buyer from Target confirmed

01:17:28  25    in 2004 that MGA was using white boxes in separate planogram

01:17:28  1   rooms, so the documents show MGA was using them for years.

01:17:28  2   Mr. Quinn is just dead wrong.  And I am not going to stand

01:17:28  3   here and say that he is a liar or that he's dishonest or

01:17:28  4   anything else.  He's just wrong.  Okay?

01:17:28  5           Mr. Quinn also told you there was no evidence of

01:17:28  6   what the trade secrets were that Mattel stole, but you saw

01:17:28  7   page after page after page of Mattel toy fair reports with

01:17:28  8   pictures, descriptions, and FOB pricing of MGA's unreleased

01:17:28  9   products.

01:17:28  10          You heard how these reports and oral presentations

01:17:28  11  were given to hundreds of executives, including key

01:17:28  12  departments in design and marketing.  You saw several

01:17:28  13  examples of how Mattel used that information to produce

01:17:28  14  competing products.

01:17:28  15          No longer engaged in this practice?  Look at Mr.

01:17:28  16  Larian's e-mail about keep Moxie a secret, Exhibit 9650.

01:17:28  17  Look at Mr. Larian's efforts at the Nuremberg Toy Fair,

01:17:28  18  Exhibit 9869.  He wants guards posted and everybody to sign

01:17:28  19  nondisclosure agreements.  He wants to keep everybody out.

01:17:28  20          Somehow Mattel got the information anyway.  Or

01:17:28  21  Sarah Allen, you remember her, just passing along

01:17:28  22  information.  Just passing along information.  That's what

01:17:28  23  they do.  They deny it.  They say the department doesn't

01:17:28  24  exist.  If it does, it's just a couple people.  If it's more

01:17:28  25  than a couple people, it was public anyway.  If worse comes

01:17:28  1    to worse, we were just passing information along.

01:17:28  2            So what they are telling you really is they are

01:17:28  3    saying that there is nothing anybody can do about it, you

01:17:28  4    know, that they can't be punished for doing this, that they

01:17:28  5    can't be assessed any damages because they have shown you a

01:17:28  6    website that says 2006 at the top that had some information

01:17:28  7    on it.  We don't know when it was published or by whom.  For

01:17:28  8    all we know, it could have been one of the Mattel people who

01:17:28  9    snuck in.  We don't know.

01:17:28  10           They don't know either.  They have shown you some

01:17:28  11   press releases.  They have shown you various other things,

01:17:28  12   and they have ridiculed the idea that this was valuable

01:17:28  13   information.  It was darn valuable.  It was our whole

01:17:28  14   playbook -- all our plans, all our prices, everything,

01:17:28  15   pictures, the works.  And they got in and saw the items in

01:17:28  16   person.

01:17:28  17           So is it really the case that you can't do

01:17:28  18   anything about that?  Is it really the case that you just

01:17:28  19   have to let that go?  Is it an exaggeration to actually call

01:17:28  20   that corporate espionage?  I don't think so.  You should do

01:17:28  21   something about it, because it's not right.

01:17:28  22           You heard Mr. Eckert himself expressing disgust

01:17:28  23   that anybody would do that and saying it's wrong.  Of

01:17:28  24   course, he doesn't know.  He never knows about any of these

01:17:28  25   things, that all the top executives are insulated.

01:17:28  1          What happens is anytime anything happens at Mattel
01:17:28  2   that they want to bury, you know where it goes.  It goes to
01:17:28  3   legal.  What does legal do with it?  It goes to outside
01:17:28  4   counsel.  And then where?  Maybe to another outside counsel.
01:17:28  5   And then where?  Maybe to another outside counsel.
01:17:28  6          It's like the 35 boxes of documents that were in
01:17:28  7   that market intelligence library.  Those things were
01:17:28  8   actually shipped off site to outside counsel, and then Mr.
01:17:28  9   Eckert was directed -- he's been insulated.  He doesn't know
01:17:28 10   anything about it, never heard of it, never been up there.
01:17:28 11   And he's directed to go up and look at what is now left.
01:17:28 12   But he's not told apparently.  At least that's the
01:17:28 13   contention.  He is not told.  The CEO of the company in this
01:17:28 14   significant trial -- I think it was one of the great
01:17:28 15   intellectual property heists of all time, I think we heard.
01:17:28 16   They don't tell him, oh, by the way, we carted off the 35
01:17:28 17   boxes to outside counsel.  So go up and take a look at this
01:17:28 18   broom closet with virtually nothing in it so you can come
01:17:28 19   back and tell this jury what you saw.
01:17:28 20          And he gets on the stand and says, "I actually
01:17:28 21   went up and took a look at it myself.  It was a storage
01:17:28 22   closet, you know.  Very little in it."  That's what he
01:17:28 23   actually was trying to sell to you.  That's what Mattel was
01:17:28 24   trying to sell to you.
01:17:28 25          You want to talk about dishonest?  Now I will say

01:17:28  1     it.  That's dishonest, knowing as they did that all those 35

01:17:28  2     boxes that we only recently found out about had been taken

01:17:28  3     off site and then deliberately having their CEO, the public

01:17:28  4     face of company, tell all of you that there is nothing to

01:17:28  5     it.  Went up and it was just a storage closet.  That, I will

01:17:28  6     say, is dishonest.

01:17:28  7             But we have an adversary system in this country.

01:17:28  8     We get a chance to cross-examine, and we have a neutral

01:17:28  9     judge who is going to enforce the laws so you have the

01:17:28  10    information.  Finally somebody has the information.

01:17:28  11            You are going to see an instruction number 69.  It

01:17:28  12    talks about punitive damages for trade secret

01:17:28  13    misappropriation, for willful and malicious

01:17:28  14    misappropriation.  This isn't for accidental stuff.  This

01:17:28  15    isn't for a rogue employee here or there.  This isn't for

01:17:28  16    somebody asking if anybody knows of any information.

01:17:28  17            This is something a lot more than that.  This says

01:17:28  18    the purposes of punitive damages are to punish a wrongdoer

01:17:28  19    for the conduct that harmed the claimant and to discourage

01:17:28  20    similar conduct in the future.  Do you want to make sure

01:17:28  21    that American business plays by the rules?  This is the way

01:17:28  22    to do it.

01:17:28  23            In order to recover punitive damages, a claimant

01:17:28  24    must prove by clear and convincing evidence that the

01:17:28  25    defendant acted willfully and maliciously.  You must

01:17:28   1   determine whether the defendant acted willfully and

01:17:28   2   maliciously, but you will not be asked to determine the

01:17:28   3   amount of any punitive damages.  The Court will calculate

01:17:28   4   the amount later.  That means Judge Carter would do that,

01:17:28   5   based on your finding.

01:17:28   6          Willfully means that the defendant acted with a

01:17:28   7   purpose of willingness to commit the act or engage in the

01:17:28   8   conduct in question and the conduct was not reasonable under

01:17:28   9   the circumstances at the time and was not undertaken in good

01:17:28  10   faith.

01:17:28  11          How could this conduct have been undertaken in

01:17:28  12   good faith?  How could it ever have been reasonable?  Even

01:17:28  13   Mr. Eckert told you it was wrong.  It was ethically wrong

01:17:28  14   and it was morally wrong.  And you should not excuse Mattel

01:17:28  15   because they deliberately insulate their top executives so

01:17:28  16   they can have plausible deniability that they know anything

01:17:28  17   about it.

01:17:28  18          When it says maliciously, means that the defendant

01:17:28  19   acted with an intent to cause injury or that the defendant's

01:17:28  20   conduct was despicable and was done with a willful and

01:17:28  21   knowing disregard for the rights of others.  Well, was it

01:17:28  22   ever.  It was done with the purpose of violating the rights

01:17:28  23   of others.  That was the purpose.  Despicable conduct is

01:17:28  24   conduct so vile, base, or wretched that it would be looked

01:17:28  25   down on and despised by ordinary, decent people.

01:17:28  1          You are ordinary, decent people.  Some of you are
01:17:28  2  probably extraordinary.  But you know what's right and
01:17:28  3  wrong, and you know that when a major corporation like
01:17:28  4  Mattel does something like this, it is something that would
01:17:28  5  be looked down upon and despised by ordinary, decent people,
01:17:28  6  apparently including Mr. Eckert.
01:17:28  7          A defendant acting with knowing disregard if it
01:17:28  8  was aware of the probable consequences of its conduct and
01:17:28  9  deliberately failed to avoid those consequences.  Well, they
01:17:28 10  sure acted with knowing disregard.  They knew all about it,
01:17:28 11  and they knew about it at high levels, even if Mr. Eckert
01:17:28 12  was insulated.
01:17:28 13          On the special verdict form, you should answer yes
01:17:28 14  to this.  Now, you have heard a lot of numbers from damages
01:17:28 15  experts on both sides.  You have heard a lot of fancy terms
01:17:28 16  thrown around like regression analysis, head start, and
01:17:28 17  apportionment.  I was not able to keep up with a lot of it.
01:17:28 18  I did not major in math.  I was a history major.
01:17:28 19          But let's take a step back and look at what these
01:17:28 20  damages are really all about.  On Mattel's side what we are
01:17:28 21  talking about here is a set of drawings that Carter Bryant
01:17:28 22  did over 10 years ago.  When Mr. Bryant first showed up on
01:17:28 23  MGA's doorstep with those drawings, there was no sculpt, no
01:17:28 24  dolls, no packaging, no accessories, no line extensions.  It
01:17:28 25  was just an idea put down on some pieces of paper.  Those

01:17:28  1    pieces of paper had four girls with four names.  That's what

01:17:28  2    Carter Bryant brought with him.  And they were really cute

01:17:28  3    drawings.  But that's all.  That's all they were.

01:17:28  4              Based on those piece of paper, Mattel's damages

01:17:28  5    expert, Michael Wagner, wants you to award Mattel hundreds

01:17:28  6    of millions of dollars.  For Mattel's trade secrets Mr.

01:17:28  7    Wagner starts with every penny of profit that MGA has ever

01:17:28  8    earned from any product ever made or licensed with the Bratz

01:17:28  9    name on it.  This includes sleeping bags, Bratz boys, Bratz

01:17:28 10    pets, Bratz kids, stationery, cell phones, and a whole host

01:17:28 11    of products that have nothing to do with those original

01:17:28 12    drawings.

01:17:28 13              For Mattel's copyright Mr. Wagner asked you to

01:17:28 14    award to Mattel all the profits from all the female Bratz

01:17:28 15    dolls MGA has ever made over the last 10 years.  You have

01:17:28 16    heard testimony about how the Bratz dolls have changed over

01:17:28 17    the years, how the fashions have changed, how the hairstyles

01:17:28 18    have changed, the face paint has changed; the accessories

01:17:28 19    that come with the dolls have changed; the themes have

01:17:28 20    changed, long after Carter Bryant was out of the picture and

01:17:28 21    in fact back in Missouri.

01:17:28 22              You have heard Mr. Wagner admit that refreshing

01:17:28 23    your product every year is critical to the success of

01:17:28 24    fashion dolls, but he ignores all of that when he calculates

01:17:28 25    Mattel's copyright damages because the goal here is to

01:17:28  1      destroy MGA.

01:17:28  2              Now, you will probably hear Mattel tell you that

01:17:28  3      Mr. Wagner did consider all of MGA's efforts and that he

01:17:28  4      gives MGA credit for its sweat equity.  But that's not true.

01:17:28  5      For the trade secrets Mr. Wagner gives MGA less than a

01:17:28  6      quarter of the profits it's earned on these dolls, and in

01:17:28  7      some cases he even leaves the company with negative profits.

01:17:28  8      Negative profits.

01:17:28  9              This is overreaching, and it's overreaching of the

01:17:28  10     type we have seen throughout this case.  Again, in a long

01:17:28  11     trial like this, you know, you get a real feeling for the

01:17:28  12     truth.  In a long trial like this, you get to know who is

01:17:28  13     being honest with you and who isn't, who's overreaching and

01:17:28  14     who is not.

01:17:28  15             MGA is not given any credit for any hard work or

01:17:28  16     any creativity that went into building the Bratz brands, and

01:17:28  17     there is a good reason for them to want to do that.

01:17:28  18     Alternatively Mr. Wagner says you should give Mattel

01:17:28  19     hundreds of millions of dollars that Barbie lost in profits,

01:17:28  20     which, his whole premise is based on this statistical

01:17:28  21     regression that Barbie suffered at the hands of Bratz.

01:17:28  22             But you have seen the real-world evidence.  Barbie

01:17:28  23     sales started to decline in 1998, three years before the

01:17:28  24     first Bratz doll was ever sold.  You've seen Mattel internal

01:17:28  25     marketing research and board presentations talking about how

01:17:28   1    Barbie was losing relevance with girls, how the market was

01:17:28   2    saturated, and how girls had buckets of Barbies in their

01:17:28   3    closets, how Mattel retailers like K-Mart were facing real

01:17:28   4    economic problems, and how Mattel's house was on fire, and

01:17:28   5    Mattel had to do something to fix it.

01:17:28   6            But Mr. Wagner wants you to believe that all of

01:17:28   7    Barbie's failing was due to Bratz.  What happened here is

01:17:28   8    Barbie lost the race.  I'm sorry, but Barbie is maybe a

01:17:28   9    little younger than I am, but she's at the 50-year mark, you

01:17:28  10    know, and little Bratz was sprinting right past her.

01:17:28  11            Mr. Wagner's hundred of millions of dollars are

01:17:28  12    basically saying that Barbie should be awarded first place

01:17:28  13    because Bratz should not have been allowed to compete

01:17:28  14    against Barbie, shouldn't have been permitted, period.

01:17:28  15    That's not how capitalism is supposed to work.  It's not how

01:17:28  16    competition is supposed to work.

01:17:28  17            And it's not even tied to reality, because as even

01:17:28  18    Mr. Wagner admits, there is more than one way to put the

01:17:28  19    same design elements that Carter Bryant came up with in

01:17:28  20    another doll to appeal to the tween crowd, which is exactly

01:17:28  21    what MGA was looking to do.

01:17:28  22            Now, what about Mr. Malackowski, our expert?

01:17:28  23    Mattel had an obligation to put forward numbers based on

01:17:28  24    real-world evidence, not some imaginary world based on Mr.

01:17:28  25    Wagner's regression analysis with all the negative damages,

01:17:28   1    you know, negative profits awarded.  The real-world evidence

01:17:28   2    says that if Mattel is entitled to damages, it should be

01:17:28   3    based on the drawings of those four girls in the original

01:17:28   4    outfits that Carter Bryant brought to MGA.  That's only if

01:17:28   5    you found that Mattel should win.  That's what Mr.

01:17:28   6    Malackowski's numbers are based on.

01:17:28   7            So even if you thought that Mattel owned Carter

01:17:28   8    Bryant's drawings, the amount of MGA's profits to be awarded

01:17:28   9    to Mattel are a maximum of $2 million for copyright and

01:17:28  10    $7 million for trade secrets, not these crazy numbers that

01:17:28  11    we have been hearing, really crazy numbers designed to

01:17:28  12    destroy MGA and not to compensate Mattel.

01:17:28  13            Mr. Wagner also told you that Mattel is entitled

01:17:28  14    to a share of the money that Mr. Larian got from Bratz, even

01:17:28  15    the money that was used to pay taxes.  If you find that

01:17:28  16    Mattel is entitled to any of the money that Mr. Larian

01:17:28  17    earned from Bratz, then you heard Mr. Malackowski tell you

01:17:28  18    the maximum that Mattel would be entitled to for copyright

01:17:28  19    would be $400,000, and $13 million for trade secrets.

01:17:28  20            What about the Bratz name and sculpts?  This is

01:17:28  21    the name that Mattel rejected, do you remember, because

01:17:28  22    Adrienne Fontanella, the former head of the girls' division,

01:17:28  23    thought that she didn't like what the word connoted.  Mr.

01:17:28  24    Eckert said that he didn't think it was consistent with

01:17:28  25    Mattel's values.  And you heard that Steve Linker, an

01:17:28  1     independent consultant working for Mattel, got $200 for a
01:17:28  2     list of fashion doll names aimed at tweens which included
01:17:28  3     the name Bratz.
01:17:28  4              Now, finally, you have heard testimony that it
01:17:28  5     cost MGA $20,000 to come up with the true preliminary
01:17:28  6     sculpts, so that's what they're worth is $20,000.
01:17:28  7              The bottom line, though, is Mattel is entitled to
01:17:28  8     zero damages, even if you thought that Mattel somehow owned
01:17:28  9     Carter Bryant's drawings, and that's because of a product
01:17:28  10    called MyScene.  You heard all about the fact that MyScene
01:17:28  11    was specifically originated to compete with Bratz.  It
01:17:28  12    wasn't until Bratz captured that older girl market that
01:17:28  13    Mattel said, wow, they're on to something, and marketed a
01:17:28  14    competing product with many similar features.
01:17:28  15              So what happened as a result?  Mattel made $263
01:17:28  16    million of profits they wouldn't have made otherwise.  So at
01:17:28  17    best, they have zero damages.
01:17:28  18              MS. KELLER:  Your Honor, could we take a brief
01:17:28  19    break?
01:17:28  20              THE COURT:  Yes.  You are admonished not to
01:17:28  21    discuss this matter amongst yourselves, nor form or express
01:17:28  22    any opinions concerning the case.
01:17:28  23              Counsel, can we take 10 minutes, do you think?
01:17:28  24    Counsel, 10 minutes or 15?
01:17:28  25              MS. KELLER:  Ten minutes would be fine.

```
01:17:28   1              THE COURT:  All right.  In 10 minutes we'll come
01:17:28   2   and get you.
01:17:28   3              (Recess taken.)
01:17:28   4                         -oOo-
01:17:28   5
01:17:28   6
01:17:28   7
01:17:28   8
01:17:28   9
01:17:28  10
01:17:28  11
01:17:28  12
01:17:28  13
01:17:28  14
01:17:28  15
01:17:28  16
01:17:28  17
01:17:28  18
01:17:28  19
01:17:28  20
01:17:28  21
01:17:28  22
01:17:28  23
01:17:28  24
01:17:28  25
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

01:17:28  1

01:17:28  2

01:17:28  3

01:17:28  4

01:17:28  5                        CERTIFICATE

01:17:28  6

01:17:28  7           I hereby certify that pursuant to Section 753,

01:17:28  8    Title 28, United States Code, the foregoing is a true and

01:17:28  9    correct transcript of the stenographically reported

01:17:28 10    proceedings held in the above-entitled matter and that the

01:17:28 11    transcript page format is in conformance with the

01:17:28 12    regulations of the Judicial Conference of the United States.

01:17:28 13

01:17:28 14    Date:  April 9, 2011

01:17:28 15

01:17:28 16
01:17:28                           Sharon A. Seffens 4/9/11
01:17:28 17                        _____
01:17:28                           SHARON A. SEFFENS, U.S. COURT REPORTER
01:17:28 18

01:17:28 19

        20

        21

        22

        23

        24

        25

                SHARON SEFFENS, U.S. DISTRICT COURT REPORTER