CV 04-9049-DOC – 04/08/2011 – Day 49, Vol. 3 of 3

1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3      HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4               – – – – – – –

5

6    MATTEL, INC., ET AL.,              )
                                        )
7              Plaintiffs,              )
                                        )
8         vs.                           ) No. CV 04-9049-DOC
                                        )    Day 49
9    MGA ENTERTAINMENT, INC., ET AL.,   )    Volume 3 of 3
                                        )
10            Defendants.               )
     _____)

11

12

13

14

15       REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  Jury Trial

17              Santa Ana, California

18              Friday, April 8, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-04-08 MattelV3

Case 2:04-cv-09049-DOC-RNB   Document 10451   Filed 04/12/11   Page 2 of 30   Page ID #:317871
CV 04-9049-DOC - 04/08/2011 - Day 49, Vol. 3 of 3

2

```
1   APPEARANCES OF COUNSEL:

2

3   FOR PLAINTIFFS MATTEL, INC., ET AL.:

4             QUINN, EMANUEL, URQUHART & SULLIVAN
          By:   JOHN B. QUINN
5               MICHAEL T. ZELLER
                WILLIAM PRICE
6               Attorneys at Law
          865 South Figueroa Street
7         10th Floor
          Los Angeles, California 90017-2543
8         (213) 443-3000

9

10  FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11            ORRICK, HERRINGTON & SUTCLIFFE, LLP
          BY:   THOMAS S. MC CONVILLE
12              Attorney at Law
          4 Park Plaza
13        Suite 1600
          Irvine, California 92614
14        (949) 567-6700

15            - AND -

16            ORRICK, HERRINGTON & SUTCLIFFE, LLP
          BY:   ANNETTE L. HURST
17              Attorney at Law
          405 Howard Street
18        San Francisco, California 94105
          (415) 773-5700
19
              - AND -
20
          KELLER RACKAUCKAS, LLP
21        BY:   JENNIFER L. KELLER
                Attorney at Law
22        18500 Von Karman Avenue
          Suite 560
23        Irvine, California 92612
          (949) 476-8700

24

25
```

```
1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4             SCHEPER, KIM & OVERLAND, LLP
              BY:  ALEXANDER H. COTE
5                  Attorney at Law
              601 West Fifth Street
6             12th Floor
              Los Angeles, California 90071
7             (213) 613-4660

8             – AND –

9             LAW OFFICES OF MARK E. OVERLAND
              BY:  MARK E. OVERLAND
10                 Attorney at Law
              100 Wilshire Boulevard
11            Suite 950
              Santa Monica, California 90401
12            (310) 459-2830

13

14   Also Present:

15            ISAAC LARIAN, MGA CEO
              ROBERT ECKERT, Mattel CEO
16            LILY MARTINEZ, Mattel Employee
              KEN KOTARSKI, Mattel Technical Operator
17            MIKE STOVALL, MGA Technical Operator
              RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan
18            KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe
              WARRINGTON PARKER, Orrick Herrington & Sutcliffe
19            MELANIE PHILLIPS, Orrick Herrington & Sutcliffe
              FRANK RORIE, Orrick Herrington & Sutcliffe
20            DIANA RUTOWSKI, Orrick Herrington & Sutcliffe
              DENISE MINGRONE, Orrick Herrington & Sutcliffe
21            PETER BONIS, Attorney for Carter Bryant

22

23

24

25
```

**I N D E X**


**CLOSING ARGUMENTS**

                                                      Page

By Ms. Keller                                          5

By Mr. Quinn                                          12

Case 2:04-cv-09049-DOC-RNB   Document 10451   Filed 04/12/11   Page 5 of 30   Page ID #:317874
CV 04-9049-DOC - 04/08/2011 - Day 49, Vol. 3 of 3

5

1              SANTA ANA, CALIFORNIA, WEDNESDAY, APRIL 6, 2011

2                     DAY 49, VOLUME 3 OF 3

3                          (4:53 p.m.)

4              *(The following proceedings is taken in the*

5        *presence of the jury.)*

6              THE COURT:  Okay.  We are back in session.

7              The jury and alternates are present.  All counsel

8    are present.

9              Thank you for your courtesy, counsel.

10             Ms. Keller, your concluding arguments.

11             MS. KELLER:  Thank you, your Honor.

12             **DEFENDANTS' CLOSING ARGUMENT (Continued)**

13             MS. KELLER:  One thing I want to correct.  I

14   misspoke a minute ago.  I was saying that Mr. Malackowski

15   computed that if you found that Mattel was entitled to any

16   money that Mr. Larian earned from Bratz, that it would be a

17   maximum of 400,000 for copyrights and 1. -- 13 million for

18   trade secrets, and it should be 1.3 million, a much lower

19   figure.

20             You are going to also hear from Mattel that they

21   are asking for damages for trade secrets that consisted of

22   information that Mr. Castilla downloaded, if you remember

23   him way back when.  Mr. Castilla, you should find absolutely

24   zero damages on any of those because, among other things,

25   Mr. Castilla was immediately intercepted by Mattel.

1         If you remember the testimony of Ms. Owens, they

2    called the FBI -- you know, Mr. Castilla was leaving.  He

3    was going to go to MGA.  They checked his computer and saw

4    that he had downloaded information, and they immediately

5    called the FBI.  The FBI intercepted him, and she said that

6    it was her belief that none of the information that he

7    downloaded ever even got to MGA, so there can't be any use

8    of misappropriated trade secrets that we never even got.

9         And it was interesting because you'll remember the

10   in-house attorney, Michael Moore, when I asked him about

11   Mr. Villasenor and all the others why it was that when the

12   in-house legal department became aware of it, they didn't

13   contact the FBI, he said, "We never do that, we never

14   contact the FBI."  What he should have said was, "We never

15   contact the FBI if our employees are doing something illegal

16   to benefit us, but if we think they are doing something to

17   benefit somebody else, we will call them immediately,"

18   because that's what happened.

19        Now, what about MGA's damages?  Unlike Mattel's

20   trade secret claims, which are based on an incident that

21   occurred over 10 years ago in one case, the intercepted

22   items from Mr. Castilla that were never used, documents from

23   Mexico that included such things as lists from retailers

24   that couldn't possibly be trade secrets because they were

25   actually already in the possession of Walmex Mexico, which

Case 2:04-cv-09049-DOC-RNB   Document 10451   Filed 04/12/11   Page 7 of 30   Page ID #:317876
CV 04-9049-DOC - 04/08/2011 - Day 49, Vol. 3 of 3

7

 1    is how they got to Mattel, so they don't even meet the

 2    definition of a trade secret.

 3         MGA has real damages from Mattel's market

 4    intelligence groups systematic infiltration of our private

 5    showrooms at the New York toy fair seven straight years.

 6    And unlike Mattel's trade secret claims, which were based on

 7    drawings, which at the time hadn't even been turned into a

 8    product, MGA's trade secret claims relate directly to over a

 9    hundred products that were about to become active in the

10    marketplace, they were already made, about to compete

11    against Mattel's products.

12         Now, you've heard testimony about Mr. Villasenor

13    calling up MGA and pretending to be someone else to try to

14    get information from MGA.  You've also seen evidence that

15    Mattel unlawfully gained information about the unreleased

16    products, the look and feel, the new themes, the outfits,

17    the accessories, the play pattern, the intended operation of

18    the toys; the advertising plans, or media tie-ins, the FOB

19    pricing, all of that, they heard -- they got all of that

20    from us.  And this type of information, you've heard

21    testimony about a competitor's unreleased products is

22    considered almost the holy grail of the toy industry; this

23    is really the information you want because you can

24    successfully compete if you've got all of that.

25         Mattel argues that it was no big deal that it

Case 2:04-cv-09049-DOC-RNB  Document 10451  Filed 04/12/11  Page 8 of 30  Page ID #:317877
CV 04-9049-DOC - 04/08/2011 - Day 49, Vol. 3 of 3

8

1    lied, falsified names and business cards because all they

2    got was public information.  We've gone through that.  But

3    they got MGA's whole playbook.  It's really like saying, you

4    know, it may be in a football game that it's no advantage to

5    get the other team's playbook because you know they're going

6    to run a offense.  You know an offense is coming, but you

7    certainly don't know what their whole playbook is.  They got

8    our whole playbook.  It's like saying it's no big deal that

9    somebody pretending to be your doctor rummages through all

10   of your medical records because, "Hey, the disease you have

11   is public information anyway."

12            And why in the world would Mattel employees risk

13   potential criminal prosecution to steal this information if

14   you could just Google it on the internet?  You couldn't.  As

15   Mr. Malackowski explains, Mattel got an unfair competitive

16   advantage from the trade secrets.  He spent months with a

17   team -- a large number of people, and he combed through

18   information.  He combed through hundreds or thousands of

19   pages, actually, he said, of information about Mattel's

20   marketing, MGA's marketing, the products on both sides.  He

21   really did a very thorough analysis.  And what he said was

22   that Mattel pulled in 149 to $202 million in additional

23   profits above what it should normally have earned by

24   stealing our trade secrets for seven years straight.  And he

25   didn't give you a sky-high figure.  He gave you a range of

Case 2:04-cv-09049-DOC-RNB   Document 10451   Filed 04/12/11   Page 9 of 30   Page ID #:317878
CV 04-9049-DOC – 04/08/2011 – Day 49, Vol. 3 of 3

9

1    149 million to 202 million.  That's the amount you should

2    award to MGA.

3           He also explained that for that 149 to 202 million

4    of profits, he could specifically link $88 million in

5    damages on a theme-by-theme comparison with Bratz and

6    MyScene.  And as to the rest, he had to average the lost

7    profits.

8           So you saw Mr. Malackowski's charts where he told

9    you how much in profits Mattel earned by stealing MGA's

10   trade secrets, and Mr. Wagner was not able to refute a

11   single one of those numbers.  I'm just going to give you a

12   few of the numbers because I'm not going to go through 114

13   of them.  But for stealing MGA's Bratz Diamondz trade

14   secrets, Mattel earned enhanced profits of 16.4 million on

15   MyScene Bling Bling.  For stealing MGA's Bratz Rock Angels

16   trade secrets, Mattel earned enhanced profits of

17   10.3 million on MyScene goes Hollywood.  For stealing MGA's

18   Sun-Kiss Summer trade secrets, Mattel earned enhanced

19   profits of 9.2 million on MyScene Jammin in Jamaica, Guava

20   Gulch.  For stealing MGA's Bratz Formal Funk collection

21   trade secrets, Mattel earned enhanced profits of 6.3 million

22   on MyScene On-the-Town.  For stealing MGA's Bratz Motorcycle

23   trade secrets, Mattel earned enhanced profits of 4.7 million

24   on MyScene Vespa.

25           It's just not true that all these ideas were

Case 2:04-cv-09049-DOC-RNB   Document 10451   Filed 04/12/11   Page 10 of 30   Page ID #:317879
CV 04-9049-DOC - 04/08/2011 - Day 49, Vol. 3 of 3

10

1    already out there.  They certainly weren't, at least not in

2    the form that Mattel got them, where they could position

3    their products to compete head to head in every single

4    respect with our products.

5           And you heard Mr. Malackowski testify that the

6    average amount of enhanced profits Mattel earned by stealing

7    MGA's trade secrets was 3.4 million each as to the other

8    products.  And unlike Mr. Wagner, Mr. Malackowski's numbers

9    are not based in an imaginary world where its competitor is

10   not allowed to compete.  You'll remember in my Wagner's

11   world, the competitor could never produce a competing

12   products.  His numbers are based on Mattel's and MGA's

13   actual financials and their design and development

14   documents, which he poured over.  His numbers are based on

15   specific trade secrets, and they are based on the tens of

16   thousands of documents and products that he reviewed.

17          So we think we have established as well as it

18   could ever be established, when you are trying to go back

19   and figure out the advantage that your competitor got from

20   having your whole playbook, what that advantage was.  We

21   think we established it, and we hope that you will agree

22   with us.

23          Ladies and gentlemen, it is truly a privilege to

24   have been able to address you today.  I know that I speak,

25   again, for our whole trial team and Mr. Larian and MGA,

1   Ms. Hurst and Mr. McConville and I, we really can't thank

2   you enough for your service for the disruption of your

3   lives, for the many inconveniences that you've had to put

4   up, being away from your work, your school, your family,

5   your friends and coming in here to do really probably the

6   greatest service to democracy you are going to do, except

7   for when you go to vote, and maybe even more significant

8   because this is a role that you are going to have in really

9   setting the tone for American business; enforcing the rules

10  that American businesses are supposed to play by and not

11  being misled just because you have a giant corporation with

12  awesome power and bullying tactics trying to shut down its

13  smaller competitor.

14          Thank you, ladies and gentlemen.

15          THE COURT:  Now, I'm going to ask you to take a

16  15-minute recess.  I want the rebuttal to be prepared and

17  give counsel a chance, okay, to be prepared, so 15 minutes,

18  and we'll come and get you in 15 minutes, okay?

19          Please don't discuss this matter or form or

20  express any opinion about the case.

21          (Recess.)

22          (The following proceedings is taken in the

23      presence of the jury.)

24          THE COURT:  Back on the record.

25          The jury and alternates are present.

1          Counsel, thank you for your courtesy.  It's 5:15.

2          Mr. Quinn, you have 20 minutes.  Your argument,

3     Mr. Quinn.

4          MR. QUINN:  Thank you, your Honor.

5                **PLAINTIFFS' CLOSING ARGUMENT**

6          MR. QUINN:  Thanks for your attention, folks.

7     Now, we absolutely agree with Ms. Keller, please do enforce

8     the rules.  Mr. Larian gave you a very common sense rule

9     that I think we can all understand.  You can't compete, you

10    shouldn't compete, you shouldn't build a brand with someone

11    else's confidential information.  No evidence, no evidence

12    has ever been presented to you in this trial that MGA ever

13    would have come up with Bratz or anything like Bratz before

14    Carter Bryant came on the scene at MGA; there is no evidence

15    of it.  It's those designs that matter.  It's those designs

16    that transferred MGA.

17          Diva Starz versus Bratz, you know, we heard from

18    Ms. Keller that she said, you know, it's the -- she kind

19    of -- they both have large feet, large heads, things like

20    that, and she kind of finds the Bratz cuter, that's exactly

21    the point; you can have those same elements, but it's the

22    particular expression, the particular design that is

23    protected.  The trade secret is in that particular

24    combination.  There was no public disclosure of that

25    particular Bratz unique combination, which became the Bratz

1    doll.

2            The question is, didn't Mattel own doll designs

3    that were created by a doll designer at Mattel?  That is the

4    question that you have to ask yourself.  And there was a lot

5    of discussion about the inventions agreement, and, you know,

6    there was a lot of discussion about the concept of the term

7    "ideas" and whether that's in or not.  Folks, the word

8    "design" is there.  You will see that squarely in the

9    agreement.  We embrace that.  We own the designs.  That's

10   what the agreement said.

11           You are asked in -- and the jury instructions ask

12   you to use your common sense in interpreting that contract.

13   Number 26, Instruction 26, look at the intentions of the

14   party; number 27, give them their ordinary meaning; number

15   29, interpret the contract as a whole.  What's the ordinary

16   meaning?  What's the sensible meaning here?  Does it make

17   sense for an employer to engage a doll designer with the

18   understanding that that doll designer, if they come up with

19   the next great design for a doll, they are free to take it

20   across the street and take it someplace else.  That's not

21   common sense, we know that.

22           Does it cover ideas?  Of course it covers ideas as

23   well.  Ms. Keller slipped up a couple of times when she said

24   it covers things that are conceived or, you know, things

25   thought of.  Of course, "conceived" means "ideas," things

Case 2:04-cv-09049-DOC-RNB   Document 10451   Filed 04/12/11   Page 14 of 30   Page ID #:317883
CV 04-9049-DOC - 04/08/2011 - Day 49, Vol. 3 of 3

14

 1   thought of, but we don't have to go that far.  It clearly

 2   covers -- it clearly covers designs.

 3          I noticed -- I'm not going to spend any time on

 4   "the period of my employment" issue.  I noticed Ms. Keller

 5   never talked about that section involving the California

 6   Labor Code.  You all know what I'm referring to by now,

 7   which says that "Things on my own time, if it involves my

 8   employer's line of business, my employer owns."  That's the

 9   beginning and end of that discussion.

10          And -- and I still don't understand, why are they

11   arguing nights and weekends and things when they say he

12   created this back in 1998?  I mean, it seems to be kind of

13   an inconsistency in -- in their position here.

14          I'm not going to talk a lot about copyright.  We

15   got an interesting tour through the law of copyright here.

16   You know, I think when you don't have the facts on your

17   side, I think we saw an example of pounding the law, and we

18   heard a lot about copyright law.  I will only say this:

19   Please look at Exhibits 558, 559, 561 and 563; 558, 559, 561

20   and 563.  I'm sure you've forgotten them.  They came in

21   early in the trial through Lucy Arant, who is the trademark

22   lawyer for MGA.  She filed -- she was involved in filing

23   those copyright registrations, and they identify, those

24   other registrations for the Jade, Sasha, Cloe and Yasmin

25   dolls, and they identify those dolls as being derivative

1    works, derivative of the drawings; that's MGA, that's what

2    they filed with the government.  Take a look at it, then

3    look at the derivative works instruction, Instruction Number

4    42.  It tells you whoever owns those drawings, owns the

5    derivative works; i.e. owns the dolls.

6         We heard, you know, that we didn't prove that

7    these were made in 1999.  Well, what do you know from

8    Mr. Bryant?  You know he told us that every single drawing

9    that has a year 1998 on it, he admits that 1998 number, or

10   year, was not put on there in 1998.  And you have in

11   evidence drawings which he said -- which have "1999" on

12   them, which he admits he put on them in 1999.  Those are

13   Exhibits 777, 1328 and 1327.  Mr. Price, I think, used those

14   this morning.

15        Rainy Day Rascals, they showed you a Rainy Day

16   Rascal drawing which they said he was only doing that in

17   1998.  Take a look at Exhibit --

18        Or maybe we can put this up, Ken.  It's part of

19   the new batch, Number 4 in evidence.

20        -- Exhibit 10624-1, Carter Bryant was drawing

21   Rainy Day Rascals in 1999.

22        That black notebook, folks, what did she tell you?

23   She said ignore the fact that the bank statements tie up

24   specifically to notes from 1999, ignore the fact that the

25   trip with the family ties up specifically to a trip that he

1    had there.  Ignore the fact that, you know, those drawings

2    were put -- by Mr. Cunningham could be placed right back

3    into that.  Ignore it, still, she says.  We haven't proved

4    that it was created in 1999.  Instead what did they do?

5    They showed you some drawings of some dresses which were

6    very different than the ones in the notebook.  You know what

7    I'm talking about?  They were like the cake drawings,

8    layered cake with big ruffles and tears, they look -- and

9    they have dates of 1998 on them, they look nothing like the

10   drawings they showed you that were in the that notebook.  It

11   was another effort to deceive you.

12            What else have we heard?  "You should have sued us

13   sooner.  You waited too long."  That's really the argument

14   on the statute of limitations, that "You should have sued us

15   before you had facts that proved that Carter Bryant had

16   reached his obligations."  We got those facts, folks, on

17   November 24, 2003; undisputed.  That's when Michael Moore,

18   after he got an inquiry from a lawyer in Hong Kong who was

19   representing Cityworld who had been sued by them, and they

20   had somehow -- I'm sure they regret it now -- filed that

21   contract and those drawings with the court in Hong Kong and

22   gave them to the other side.  And those lawyers thought,

23   "Hmm, they saw that Wall Street Journal article, put two and

24   two together.  Mattel might be interested in seeing this."

25   Contacted El Segundo, Moore went there, and he saw them for

1    the first time.  There was a fact, a contract dated during a

2    period when Carter Bryant was still working for Mattel.

3           We're not obligated.  Nobody is obligated to bring

4    a lawsuit based on suspicions or rumors.  Yes, there were

5    suspicions when Mr. Bryant left.  He wasn't direct about

6    where he was going.  People thought he wasn't telling the

7    truth, but that's not what you bring a lawsuit on.  Again,

8    more deception, try to confuse the issue, all these people

9    in the --

10          I'm getting there.

11          (Laughter.)

12          MR. QUINN:  You know, all the -- you know, all

13   these people in the design center knew that he was involved

14   in Bratz.  You know, this person knew and this person knew,

15   and there were these rumors.  They ignored the question

16   which, I am sure -- the distinction which, I'm sure, you all

17   appreciate.  This is an insult to your intelligence.  The

18   question isn't when did they know that Carter Bryant was

19   involved in Bratz, it's when did Mattel know he created

20   Bratz while employed by Mattel so that Mattel would own it

21   pursuant to the terms of that inventions agreement.

22          Look, if he leaves and creates something, that's

23   his.  He owns it.  We've never taken any different position.

24   People -- sure, there were rumors, there were suspicions,

25   but we didn't know that he created it.  We didn't have the

1   facts to support that claim until November 23rd, 2003.  I

2   don't think we want to establish a precedent or send a

3   message that you better sue on suspicions or somebody is

4   going to say, you know, you waited too long.

5         Mr. Rosenbaum, the lawyer, they said, "Oh, we did

6   due diligence.  We did the best we could.  We hired a

7   lawyer, and he had a lawyer."  Ms. Keller ignored

8   everything, in her closing argument now, just ignored

9   everything that Mr. Rosenbaum told you when he was on the

10  stand and being examined by Mr. Price.  Ignored that he said

11  he gave no opinion.  Ignored that he said he did no

12  investigation.  All he did, all he did was talk to

13  Mr. Bryant and then talk to his lawyer.  That's no different

14  than saying, "When did you create these?"  "I created these

15  in 1998."  That's what the lawyer passed along.  That's what

16  they are telling us was the due diligence.

17        Whatever other circumstance, you know, you might

18  say that's enough.  When you have a doll designer who is

19  employed by a toy company that makes dolls, and he works in

20  the design center, and he comes to you and says, "I've got

21  some designs to sell," doesn't that send alarm bells off?

22  You need to do more than ask him, "When did you create

23  these?"  And they accepted his word that he created them in

24  1998.  They did nothing to investigate his representation

25  that he created these in 1998.

Case 2:04-cv-09049-DOC-RNB   Document 10451   Filed 04/12/11   Page 19 of 30   Page ID
#:317888
CV 04-9049-DOC – 04/08/2011 – Day 49, Vol. 3 of 3

19

```
 1              What have we seen here?  What's -- what's -- what
 2      has the evidence shown?  The evidence has shown a systematic
 3      theft of intellectual property by MGA over a period of years
 4      on multiple occasions by multiple people.  You've heard
 5      about Mr. Castilla, who you heard pled guilty, pled guilty.
 6      The "three amigos" in Mexico, Brisbois in Canada downloading
 7      of information.  You saw Mr. Kinrich's analysis; 40 percent
 8      more.  Hired over a hundred Mattel employees, 40 percent
 9      more to the downloaders.  This isn't coincidence.  This
10      isn't an accident.  There was deliberate ongoing systematic
11      threat -- theft.  Yes, that's not, "Please enforce the rules
12      here."  That's not proper competition.
13              They appeal to you with these cheap kinds of
14      things:  Big company, bullying, you know, crushing people.
15      Eckert, you know, doesn't know anything, doesn't want to
16      hear anything.  This is an appeal to your -- your
17      prejudices.  It's not an appeal to your intellect.  It's not
18      an appeal to your reason.  It's a hoping that they can fool
19      you, and that's what their whole case has been.
20              You have heard about employees leaving Mattel to
21      go to MGA.  They stole Mattel's five years' strategic plan,
22      including forecasting information, the entire 2005 Barbie
23      line list for over a year before it was shared with
24      retailers, thousands of pages of information in Mexico.  Now
25      that's a playbook.  That's a theft of a playbook.  That's a
```

Case 2:04-cv-09049-DOC-RNB   Document 10451   Filed 04/12/11   Page 20 of 30   Page ID #:317889
CV 04-9049-DOC - 04/08/2011 - Day 49, Vol. 3 of 3

20

1   real taking.

2           Their counterclaims against us, it was wrong.  It

3   was wrong for people to misrepresent themselves.  It was

4   wrong, and it was stupid, and it was unnecessary, and it

5   stopped.  But I've got to tell you, I challenged them to get

6   up here and identify to you one trade secret.  Are you any

7   more enlightened than you were when I stood up here this

8   morning?  What was it, a beach-themed doll, a winter-themed

9   doll?  Is that a secret?  A Bratz CD, a motor scooter, you

10  know, what was it?  They didn't identify anything.  They've

11  taken -- here is 114 things, thrown it up against the wall,

12  see what sticks.  It's that cynical.  It's that cynical,

13  their whole case.  And you just heard a smear, another

14  smear, 35 boxes taken from the library and hidden.  There

15  was no evidence of that.  You don't know where those 35

16  boxes came from.  You don't know if they came out of a

17  competitive intelligence library.  For all you know, those

18  were 35 boxes taken from Mr. Villasenor's office or someone

19  else's office that was preserved for this litigation.  It's

20  just -- it's absolutely just a smear.

21          Mr. Wagner said that, you know -- remember

22  Mr. Malackowski who says, "I'm an expert on comparing

23  things."  He says, "I'm not a doll expert."  Apparently,

24  he's an expert on comparing things, anything.  And he's

25  found matches, whatever that means, between various press

Case 2:04-cv-09049-DOC-RNB   Document 10451   Filed 04/12/11   Page 21 of 30   Page ID #:317890
CV 04-9049-DOC - 04/08/2011 - Day 49, Vol. 3 of 3

21

1   releases.

2           You saw that Mr. Wagner said, "Look, almost all of

3   these were already public."  I think they even agree that

4   something can't be a secret if it's already public.

5   Mr. Wagner said, "Look, these are all" -- "can be accounted.

6   They were either press releases or that MGA had actually

7   sold it before the toy fair, or, you know, Mattel's product,

8   which he purportedly matches it to, came out before or a

9   year after"; do you recall that testimony?  Mr. Malackowski

10  then got up on the stand and made no response to any of

11  that.

12          You don't take your playbook and show it to the

13  press.  You don't take your playbook and show it to

14  strangers from unknown toy companies, because that's what

15  Carey Plunkett and the other people who did this were --

16  they were strangers using a phony name or a phony name of a

17  toy company that was nonexistent.  And what do we know?  We

18  know with that phony name and that phony business card, you

19  could go in and get into MGA's showroom, and they would show

20  you whatever they had there.  What does that tell you about

21  whether that's trade secret, that they would take a

22  stranger, someone that they didn't know and say, "Here is

23  our line for next year."  It's not secret.

24          They also referred to the fact that Mr. Villasenor

25  called up a PR person at MGA and got some information, what

1    was sent to them, and he called under an assumed name.  What

2    does that tell you?  That information that was sent doesn't

3    sound, to me, like the PR person at MGA thought that was

4    very confidential.  They just know the phones rang, there is

5    a stranger on the other end of the phone, and they -- they

6    sent them the information.  That's not -- that's not trade

7    secret.

8            You've got Brawer who goes over in 2004.  He knows

9    about Sal.  He told you that.  He does nothing, says

10   nothing, doesn't tell Larian.  In fact, sends around his

11   resume suggesting this guy is good in getting competitive

12   information.  Again, it was a slovenly stupid practice, but

13   what's happened here is they have seized on it and tried to

14   make a case out of it and tried to persuade you that this is

15   of the same order that you should be as concerned about this

16   as the theft of the Bratz idea, concept and doll line.

17   That's all it is.

18           Again, you did not hear anything about any trade

19   secret.  You didn't -- they were unable to -- she didn't --

20   you would think that if it's, you know, the look of the doll

21   or it's the look of the product, wouldn't she have shown you

22   something?  They have all those.  It's all on the computer,

23   we all know that.  They could put it up on the screen.  It

24   would have been easy for her to do.  They can't do it.  They

25   didn't identify anything to you that is secret because there

Case 2:04-cv-09049-DOC-RNB   Document 10451   Filed 04/12/11   Page 23 of 30   Page ID #:317892
CV 04-9049-DOC - 04/08/2011 - Day 49, Vol. 3 of 3

23

1    isn't anything.

2         She said, "Why would Mattel spend hundreds of

3    thousands of dollars sending people every year to toy

4    fairs?"  There was no evidence of that, hundreds of

5    thousands of dollars spent every year.  19 employees, she

6    said, who did this.  There was no evidence that 19 employees

7    did this.  This is plainly false.  Again, a cynical effort

8    to manipulate you.  Reflect, please, on the evidence, and

9    you'll be able to see through it.

10        In terms of damages, Mr. Wagner did take into

11   account the market expansion, and he subtracted 1.4 billion

12   from his damages number and attributed that to Bratz, left

13   that on -- on the table on their side of the ledger in his

14   analysis.  Mr. Malackowski tells you that apparently Mattel

15   owes MGA a favor, you know, that they, you know, stole the

16   concept and brought out this doll, grew the market and we

17   should be thanking them.  It simply makes no sense at all.

18        I can't believe I finished early.

19        (Laughter.)

20        MR. QUINN:  You know, you've heard -- this man

21   here, Bob Eckert, he can't go to work tomorrow and tell

22   somebody "I want you to create the next great fashion doll"

23   and give that instruction; he can't do that.  This lady

24   here, Lily Martinez, can't get out of bed tomorrow morning

25   and say, "Today is the day I'm going to create the next

Case 2:04-cv-09049-DOC-RNB   Document 10451   Filed 04/12/11   Page 24 of 30   Page ID #:317893
CV 04-9049-DOC – 04/08/2011 – Day 49, Vol. 3 of 3

24

1    great new fashion doll." Creativity doesn't work that way.

2    All you can do is try to develop it in an environment at a

3    place like Mattel at a design center where you bring people

4    together with talent, creativity, a willingness to trust and

5    to work together to lay the ground work for that kind of

6    inspiration to happen, and for those great and great new

7    products to grow and blossom. That's it. That's all you

8    can do.

9          And you know, we took some criticism for the fact

10   that, you know, Barbie has been great and, you know, for 50

11   years has been in a decline, and how come we haven't come up

12   with another great new fashion doll if we are so creative at

13   Mattel. But you know, we did. It worked. The ground work

14   was laid. You had Lily Martinez there, brand new right out

15   of design school, got this assignment of doing this logo to

16   go on the Cool Skating Barbie, had somebody who saw that and

17   said, "That's a great idea. Why don't you see if we can

18   turn that into a doll?" And she did. She developed a

19   prototype for the Toon Teenz doll. And Carter Bryant was

20   there, and he saw that, and he was inspired by that.

21          You saw that evolution this morning that Mr. Price

22   showed you. And the system worked, the next new great

23   fashion doll sprung to life in the Mattel design center, but

24   because of Mr. Bryant's deception, lack of integrity and the

25   fact that he was willing to ignore his obligations to

1    Mattel, and he fell into the hands of Mr. Larian, that

2    product, which otherwise would have been brought out by

3    Mattel, was brought out by MGA.

4           We're not asking you to take from MGA everything

5    that has been made, all the money that they've made.  We've

6    been clear about that, but it's not too late for you to do

7    justice here and to return to Mattel what is rightfully

8    Mattel's.

9           Thank you very much.

10          THE COURT:  Well, ladies and gentlemen, we're

11   going to send you home, but we are going to ask you to come

12   back.

13          I'm going to ask all of you, if you'd just be

14   seated in the audience.  We're still in session.  Thank you

15   for your courtesy.

16          We are going to reconvene on Monday at 8:30, and I

17   know you've fallen into a habit pattern of Tuesdays, but

18   now, once we start the deliberation process, it's got to be

19   every day unless there is sickness, illness, or something of

20   that nature, and then, of course, one of the alternate

21   jurors would take your place by a lot.  But we need the

22   alternate jurors back Monday also.  And we're going to ask

23   you to assemble back in the jury room, with counsel's

24   permission, just as a group for a moment.  And then at that

25   time, with the special verdict form, I think we can further

1    give the jury the special verdict form on that date; would

2    that be acceptable Ms. Keller?

3              MS. KELLER:  Yes, your Honor.

4              THE COURT:  Mr. Quinn?

5              MR. QUINN:  Yes, your Honor.

6              THE COURT:  Okay.  I don't think tonight, Friday

7    night about 5:45 is a good time to do that, so I'll further

8    instruct you on that day.

9              Now, my instruction this evening is that you're

10   admonished not to discuss this matter amongst yourselves,

11   nor even form or express any opinion concerning the case.

12   This case will get some press notoriety, so therefore, if

13   you recognize this in any type of media, et cetera, please

14   turn that off immediately.

15             Now, counsel, is there anything further that you

16   want me to say to the jury this evening before we excuse

17   them for the weekend, except "thank you"?

18             MR. QUINN:  Thank you, your Honor.

19             MS. KELLER:  Thank you, your Honor.

20             THE COURT:  Thank you.  We'll see you Monday at

21   8:30.

22             *(The following proceedings is taken outside*

23        *the presence of the jury.)*

24             THE COURT:  Counsel, if you'd please be seated for

25   just a moment.  If we can take one minute.

```
 1              I know that the special verdict form may still be,
 2     counsel, still may be being formatted.  We've gone over
 3     that.  I believe that's the final form.  Do you want to take
 4     that up this evening, because I've heard that there's a
 5     couple parties going on?
 6              (Laughter.)
 7              THE COURT:  And I've been graciously invited by
 8     Mr. Quinn and Ms. Keller to join in the respective parties,
 9     but the Court will decline by appreciation.
10              But if we can just take a moment.  I've met so
11     many of the young associates out in the various law firms,
12     and it's been a pleasure to see all of you, but especially
13     if Chris is still here and Diane.
14              I would just like to make a record and have you
15     both stand for a moment.  You two have absolutely been
16     supportive, and I'd just like you introduced on my record
17     anyway.
18              A couple of these young people have been carrying
19     the boxes, you know, doing the work, transporting them for
20     your respective team.
21              And why don't you, Chris, just recognize him.
22              And then another counsel, if we could ask
23     Mr. Overland to come back over for just a moment.  I talked
24     to Mr. Zeller when I saw him come in, and I talked to
25     Annette Hurst, and it's exemplary.  I think he came in with
```

Case 2:04-cv-09049-DOC-RNB   Document 10451   Filed 04/12/11   Page 28 of 30   Page ID #:317897
CV 04-9049-DOC - 04/08/2011 - Day 49, Vol. 3 of 3

28

1    what he would perceive would be a victory lap because of the

2    Rule 15 motion.  And I think the impression upon the jury

3    was one if they saw him here, because he's such a high

4    profile person, that it causes a little bit of imbalance, so

5    if you don't mind --

6            Mr. Overland, I'd like to publicly commend you.

7            MR. OVERLAND:  Oh, stop.  Stop.

8            THE COURT:  No.  Just a moment.

9            Lesser counsel would have demanded to be present.

10   This is an open court.  It's a democracy, for goodness

11   sakes, but I think just in terms of keeping the balance,

12   it's -- it's -- you really have the highest ethics.  I think

13   he's appreciated by Mattel, and I think he's appreciated

14   also by MGA.

15           So now you're welcome, and thank you very much.

16   If you would please have a seat for a moment.

17           All right.  Now, let's do this:  Why don't you

18   meet me -- you've been here for three and a half months,

19   Mr. Overland, and it's been nice to have you back, and also

20   Mr. Cote.  Do you want to meet me at 7:00 so we don't do any

21   word processing this weekend?

22           Now, I'll be here this weekend, and come on by,

23   I'll keep the light on for you, but I'm going on to the next

24   case, and I have a lot of work to do this weekend.  But I

25   don't see why I'm going to bring you back in here, you know,

1    or keep you any longer on Friday night.

2          Mr. Zeller, you and Ms. Hurst have been exemplary.

3    You were here again until 1:30 or something last night, if

4    not later, and 2:00 or 3:00 the night before, and along with

5    Mr. McConville and Mr. Quinn.

6          So let's do this:  Do you want me to just recess

7    this evening without any further ado?

8          MR. MC CONVILLE:  Yes, sir, please.

9          MS. HURST:  Please.

10         THE COURT:  Okay.  The last order of the Court is

11   as follows:  The senior partners are to drive the associates

12   and junior partners and be the designated driver tonight and

13   not have a drink.

14         *(Laughter.)*

15         THE COURT:  Go have a wonderful weekend all of

16   you, okay?

17         *(Recess.)*

18                          -oOo-

19

20

21

22

23

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10451   Filed 04/12/11   Page 30 of 30   Page ID #:317899
CV 04-9049-DOC – 04/08/2011 – Day 49, Vol. 3 of 3

30

1                              -oOo-

2                          **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5   Title 28, United States Code, the foregoing is a true and

6   correct transcript of the stenographically reported

7   proceedings held in the above-entitled matter and that the

8   transcript page format is in conformance with the

9   regulations of the Judicial Conference of the United States.

10

11  Date:  April 9, 2011

12

13

14        _____

15        JANE C.S. RULE, U.S. COURT REPORTER
          CSR NO. 9316

16

17

18

19

20

21

22

23

24

25