QUINN EMANUEL URQUHART & SULLIVAN, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  William C. Price (Bar No. 108542)
  (williamprice@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:   (213) 443-3000
Facsimile:    (213) 443-3100

Attorneys for Mattel, Inc. and Mattel de Mexico, S.A. de C.V.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| MATTEL, INC., a Delaware corporation, <br><br> Plaintiff, <br><br> vs. <br><br> MGA ENTERTAINMENT, INC., a California corporation, et al., <br><br> Defendant. <br><br> AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 DOC (RNBx) <br><br> Consolidated with <br> Case No. CV 04-09059 <br> Case No. CV 05-02727 <br><br> Hon. David O. Carter <br><br> **MATTEL'S CORRECTED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING MGA'S UNFAIR COMPETITION CLAIM (CAL. BUS. & PROF. CODE § 17200) AND MATTEL'S RELATED DEFENSES** <br><br> Trial Date:   January 18, 2011 |

00505.07975/4116228.1

1

2

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     PROPOSED FINDINGS OF FACT ............................................................. 1

    A.    Background ........................................................................................ 1

    B.    Kohl's ................................................................................................ 6

    C.    THQ ................................................................................................. 16

    D.    Early Light ...................................................................................... 17

    E.    Bandai ............................................................................................. 18

    F.    MGA's Unfair Competition Claim ................................................. 19

II.    PROPOSED CONCLUSIONS OF LAW ............................................... 22

    A.    Unfair Competition In Violation Of § 17200 ................................ 22

    B.    MGA Cannot Prove Its Unfair Competition Claim ....................... 23

         1.    MGA Lacks Standing To Pursue Its UCL Claim .......................... 23

         2.    MGA Cannot Prove An Incipient Violation of Antitrust Law or Policy ........................................................................................ 24

         3.    MGA Cannot Prove Any Claim For Restitution ........................... 30

         4.    MGA's UCL Claim Is Barred By The Competition Privilege ....... 33

         5.    MGA's Unclean Hands Precludes Any Equitable Remedy ........... 35

         6.    MGA's UCL Claim Is Superseded By CUTSA ............................ 36

CONCLUSION ............................................................................................. 38

1

# TABLE OF AUTHORITIES

Page

## Cases

Adler v. Federal Republic of Nigeria,
219 F.3d 869 (9th Cir. 2000) ....................................................................... 37

Bank of the West v. Superior Court,
2 Cal. 4th 1254 (1992)......................................................................... 30, 31

Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners,
52 Cal. App. 4th 867 (1997) ....................................................................... 33

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,
429 U.S. 477 (1977) ................................................................................... 25

Cascade Health Solutions v. PeaceHealth,
515 F.3d 883 (9th Cir. 2008) ..................................................................... 25

Cel-Tech. Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,
20 Cal. 4th 163 (1999)................................................... 24, 25, 26, 29, 30

Chavez v. Whirlpool Corp.,
93 Cal. App. 4th 363 (2001) ....................................................................... 26

Colgan v. Leatherman Tool Group, Inc.,
135 Cal. App. 4th 663 (2006) ..................................................................... 30

Cortez v. Purolator Air Filtration Prods. Co.,
23 Cal. 4th 163 (2000)................................................................................. 36

El Aguila Food Prods., Inc. v. Gruma Corp.,
301 F. Supp. 2d 612 (S.D. Tex. 2003).......................................................... 26

Fireman's Fund Ins. Cos. v. Big Blue Fisheries, Inc.,
143 F.3d 1172 (9th Cir. 1998) ..................................................................... 32

F.D.I.C. v. Craft,
157 F.3d 697 (9th Cir. 1998) ................................................................. 32, 33

FTC v. H.J. Heinz Co.,
246 F.3d 708 (D.C. Cir. 2001)..................................................................... 26

FTC v. H.J. Heinz Co.,
116 F. Supp. 2d 190 (D.D.C 2000).............................................................. 26

Inline, Inc. v. A.V.L. Holding Co.,
125 Cal. App. 4th 895 (2005) ............................................................... 31, 32

K.C. Multimedia, Inc. v. Bank of America Tech. & Operations, Inc.,
171 Cal. App. 4th 939 (2009) .................................................................. 37, 38

Kendall-Jackson Winery Ltd. v. Sup. Ct.,
76 Cal. App. 4th 970 (1999) ........................................................................ 36

Korea Supply Co. v. Lockheed Martin Corp.,
29 Cal. 4th 1134 (2003) ............................................................ 30, 31, 32

Kwikset Corp. v. Superior Court,
51 Cal. 4th 310 (2011) ................................................................................ 23

Oculus Innovative Sciences, Inc. v. Prodinnv, S.A. de C.V.,
2010 WL 4774659 (N.D. Cal. Nov. 16, 2010) ................................... 31, 32

Omega Envtl., Inc. v. Gilbarco, Inc.,
127 F.3d 1157 (9th Cir. 1997) .............................................................. 27, 28

Pegasus Satellite Television, Inc. v. DirecTV, Inc.,
318 F. Supp. 2d 968 (C.D. Cal. 2004) ................................................. 31, 32

People's Choice Wireless, Inc. v. Verizon Wireless,
131 Cal. App. 4th 656 (2005) ...................................................................... 26

R.J. Reynolds Tobacco Co. v. Philip Morris Inc.,
199 F. Supp. 2d 362 (M.D.N.C. 2002) ....................................................... 28

San Francisco Design Center Assocs. v. Portman Cos.,
41 Cal. App. 4th 29 (1995) ......................................................................... 33

Tampa Elec. Co. v. Nashville Coal Co.,
365 U.S. 320 (1961) .................................................................................... 27

Ticconi v. Blue Shield of California Life & Health Ins. Co.,
160 Cal.App.4th 528 (2008) ........................................................................ 34

U.S. v. Rodrigues,
229 F.3d 842 (9th Cir. 2000) ...................................................................... 31

## Statutes

Business and Professions Code § 17001 ........................................................ 25

Business and Professions Code § 17200 ................................................. passim

Business and Professions Code § 17203 .......................................... 30, 31, 32

Business and Professions Code § 17204  ...................................................... 23

Fed. R. Civ. P. 52 ............................................................................................ 1

1

### **Miscellaneous**

Restatement (Second) of Torts § 768 ............................................................. 34

MATTEL'S CORRECTED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR MGA'S 17200 CLAIM

Mattel, Inc. ("Mattel") respectfully submits the following proposed findings of fact and conclusions of law regarding MGA's statutory unfair competition claim, pursuant to Fed. R. Civ. P. 52; Local Rule 52-1 et seq. and the Court's Order dated April 14, 2011.

# I.   PROPOSED FINDINGS OF FACT

Based upon the evidence presented at trial, the Court makes the following findings of fact:

## A.   Background

1.     Mattel, Inc. ("Mattel") is a toy company based in Southern California.  TX 00013-00001; TX 7501; TX 7502; TX 18395-00004,-00024; 3/1/11 Trial Tr. Vol. 1 (Eckert) at 122:15-18; 3/8/11 Trial Tr. Vol. 1 (Cavassuto) at 28:2-8.

2.     Robert Eckert is, and at all relevant times was, the Chief Executive Officer of Mattel.  3/1/11 Trial Tr. Vol. 1 (Eckert) at 114:25-115:7; 3/2/11 Trial Tr. Vol. 1 (Eckert) at 7:24-8:1.

3.     Mattel sells toys to retailers and other businesses that sell toys to the ultimate consumers. TX 7502-00014; TX 18395-00008; 3/18/11 Trial Tr. Vol. 2 (Kilpin) at 39:6-15.

4.     Mattel sells toys under brand names that include BARBIE, HOT WHEELS and MATCHBOX.  TX 18395-00029; 3/1/11 Trial Tr. Vol. 1 (Eckert) at 133:3-134:10, 135:16-23.

5.     Mattel licenses to other businesses ("licensees") the right to use the names and images associated with some of its brands in exchange for royalty payments.  TX 7501-00004; TX 7502-00010; TX 18395-00009; 3/1/11 Trial Tr. Vol. 1 (Eckert) at 145:23-146:14.

6.     MGA Entertainment, Inc. ("MGA") is a toy company based in Southern California.  TX 00015-00001; TX 00017-00001; TX 21068; 1/26/11 Trial Tr. Vol. 1 (Garcia) at 6:18-25; 2/1/11 Trial Tr. Vol. 2 (Bryant) at 55:9-15.

7.     Isaac Larian is and, at all relevant times was, the Chief Executive Officer of MGA. TX 4941; TX 13520-0010-11; 2/8/11 Trial Tr. Vol. 1 (Larian) at 129:10-129:17.

8.  MGA sells its toys to retailers and other businesses that sell toys to the ultimate consumers.  TX 00497-00020-21; 2/11/11 Trial Tr. Vol. 4 (Larian) at 7:2-12; 2/16/11 Trial Tr. Vol. 1 (Larian) at 86:7-24; 3/24/11 Trial Tr. Vol. 2 (Larian) at 22:16-23:1; 4/6/11 Trial Tr. Vol. 2 (Jolicoeur) at 22:5-7.

9.  MGA sells toys under names that include Bratz, Little Tikes, Zapf, Moxie Girlz, Rescue Pets, and Lalaloopsy.  TX 36644; 2/11/11 Trial Tr. Vol. 3 (Larian) at 45:4-47:13, 53:8-54:6; 3/24/11 Trial Tr. Vol. 2 (Larian) at 139:13-16; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 71:7-10; 3/8/11 Trial Tr. Vol. 1 (Wagner) at 96:11-98:23.

10.  MGA also licenses to other businesses ("licensees") the right to use the name and images associated with some of its products in exchange for royalty payments.  TX 13520-0013; TX 00497-00014; TX 09819; TX 21235-00029-30; 2/9/11 Trial Tr. Vol. 3 (Larian) at 41:18-43:15; 2/16/11 Trial Tr. Vol. 1 (Larian) at 17:9-18:6.

11.  Mattel and MGA are competitors.  They offer competing toy products to retailers and other businesses that sell toys directly to consumers.  TX 13520-0014-17; 1/20/11 Trial Tr. Vol. 1 (Garcia) at 16:12-14; 2/9/11 Trial Tr. Vol. 3 (Larian) at 47:8-11; 2/22/11 Trial Tr. Vol. 2 (Rosenbaum) at 99:16-23; 3/25/11 Trial Tr. Vol. 1 (Larian) at 90:21-22; 3/29/11 Trial Tr. Vol. 1 (Vollero) at 115:19-:25.

12.  Both Mattel's and MGA's customers include mass merchandisers like Wal-Mart, Target and Kmart; toy stores like Toys 'R Us; and department stores like Sears, J.C. Penney, and Kohl's.  TX 7540; TX 11146; TX 11152; TX 11203; TX 11336; TX 11690; TX 16925; TX 24719; TX 31177; TX 31178; TX 31179; TX 31180; TX 31181; TX 31182; TX 31183; TX 31184; 2/11/11 Trial Tr. Vol. 3 (Larian) at 22:2-6; 2/16/11 Trial Tr. Vol. 1 (Larian) at 104:1-7; 3/18/11 Trial Tr. Vol. 2 (Kilpin) at 39:6-15; 3/24/11 Trial Tr. Vol. 2 (Larian) at 157:12-160:8; 4/4/11 Trial Tr. Vol. 1 (Eckert) at 41:6-7.

13.  Mattel and MGA also compete for licensees and for production capacity in Asia, where most of each companies' toys are manufactured.  TX 18395-006; 3/17/11 Trial Tr. Vol. 1 (Fontanella) at 127:2-128:10; 3/22/11 Trial Tr. Vol. 1 at (Debrowski) at 8:8-25.

14.     Mattel and MGA introduce new toys each year.  These new toys, with any pre-existing toys, are compiled into a "line" for the upcoming toy season, typically either Spring or Fall.  TX 7104; TX 11203; TX 11276; TX 16786; TX 18395-008; 2/18/11 Trial Tr. Vol. 2 (Larian) at 40:4-41:1; 3/9/11 Trial Tr. Vol. 2 (Nordquist) at 84:12-85:1.

15.     Mattel and MGA present the "line" to their respective retail customers between nine months and a year before they will be offered for sale on a retailer's shelf. TX 11203; 2/8/11 Trial Tr. Vol. 1 (Maurus) at 120:25-122:7; 3/9/11 Trial Tr. Vol. 2 (Nordquist) at 91:3-92:6; 3/25/11 Trial Tr. Vol. 1 (Larian) at 43:3-44:3.

16.     Mattel and MGA then pursue orders from the retail customers for the toys offered in the "line" for that season.  2/8/11 Trial Tr. Vol. 1 (Maurus) at 16:1-18, 120:25-122:7; 3/17/11 Trial Tr. Vol. 2 (Fontanella) at 51:8-17; 3/24/11 Trial Tr. Vol. 2 (Larian) at 22:16-23:1.

17.     From the products offered in the "line" for each season, the retail customers pick and chose which toys they will purchase based on which they believe will be most profitable.  The retailer customers do not purchase toys that they do not believe will make money.  3/25/11 Trial Tr. Vol. 1 (Larian) at 25:25-26:9; 3/29/11 Trial Tr. Vol. 1 (Vollero) at 128:23-129:19, 130:16-132:6.

18.     Mattel and MGA each offer incentives to retail customers to obtain larger orders (either more product or additional products); better placement for their respective products in stores; additional or incremental space allocated to their products within retail stores; and better or priority placement in retailer advertisements, among others.  TX 11146; TX 11690; TX 24358; TX 24359; TX 24004; TX 24005; 2/16/11 Trial Tr. Vol. 2 (Larian) at 7:16-8:16; 3/29/11 Trial Tr. Vol. 1 (Vollero) at 132:7-21; 4/4/11 Trial Tr. Vol. 1 (Eckert) at 87:7-88:10.

19.     These incentives include, but are not limited to, incentive payments if targets are met, promotional investment, advertising allowances, and return programs. TX 8936; TX 9424; TX 11146; TX 24358; TX 24359; TX 24004; TX 24005; TX 27284; TX 27289;

1  TX 24792; 2/16/11 Trial Tr. Vol. 2 (Larian) at 7:16-8:16; 4/4/11 Trial Tr. Vol. 1 (Eckert)
2  at 87:7-90:3.

3       20.     Once the terms of sales for a season are reached, then the terms, including the
4  terms of the incentives, spending commitments and targets applicable to any such
5  incentives are embodied in an agreement of some type, generally applicable to a particular
6  season or year.  TX24004; TX 24005; 3/29/11 Trial Tr. Vol. 1 (Vollero) at 132:7-21.

7       21.     Both Mattel and MGA have introduced toy products that have not been
8  profitable, either for them or for retail customers.  TX 24335; TX 24336; TX 24337A; TX
9  24338; TX 24339; TX 24342; TX 24346; TX 24347; 3/2/11 Trial Tr. Vol. 1 (Eckert) at
10 123:23-124:6; 1/26/11 Trial Tr. Vol. 1 (Garcia) at 66:16-25; 2/4/11 Trial Tr. Vol. 1
11 (O'Connor) at 126:14-127:7; 2/11/11 Trial Tr. Vol. 3 (Larian) at 66:3-15.

12      22.     Retailers control the allocation of space for products, including toy products,
13 in their stores.  3/24/11 Trial Tr. Vol. 2 (Larian) at 77:7-23; 3/29/11 Trial  Tr. Vol. 1
14 (Vollero) at 148:6-14.

15      23.     The allocation of space to particular products at a retailer is called a
16 planogram.  Planograms are set by the retailer, not product suppliers such as Mattel or
17 MGA.  TX 24342; 3/24/11 Trial Tr. Vol. 2 (Larian) at 77:7-23; 3/29/11 Trial  Tr. Vol. 1
18 (Vollero) at 148:6-14.

19      24.     For toys, planograms are created and set by the retailer before toys are placed
20 on retailer shelves for the Spring or Fall seasons.  4/6/11 Trial Tr. Vol. 2 (Saunders) at
21 53:5-54:23; 2/16/11 Trial Tr. Vol. 2 (Larian) at 121:23-123:22.

22      25.     Retailers inform Mattel and MGA of the profitability or "margin" that they
23 expect to earn for each product.  Retail customers also provide Mattel and MGA with
24 information about the sales and profitability or "margin" performance for each of the
25 products that they purchase.  3/25/11 Trial Tr. Vol. 1 (Larian) at 40:3-23; 3/29/11 Trial Tr.
26 Vol. 1 (Vollero) at 129:24-130:8, 130:16-132:6; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 82:3-
27 12.

28

-4-
MATTEL'S CORRECTED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR MGA'S
17200 CLAIM

26.     Kohl's provides to Mattel and to MGA information about each company's product's respective sales and margin performance. TX 24338; TX 24339; TX 24342; TX 24346; TX 24347; 3/25/11 Trial Tr. Vol. 1 (Larian) at 24:19-26:16; 3/25/11 Trial Tr. Vol. 1 (Larian) at 26:17-29:1; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 82:3-12.

27.     After the planogram for toys is set for a particular season, depending on the sales or margin performance of a product or products, retailers revise orders, revise prices offered to consumers and change the placement of toys within the store to maximize revenue and profitability.   TX 24336; TX 24342; TX 24337A; 2/11/11 Trial Tr. Vol. 3 (Larian) at 65:6-14; 3/25/11 Trial Tr. Vol. 1 (Larian) at 18:13-23:18, 29:2-17, 31:4-33:23; 34:11-35:1.

28.     Retailers do not continue to purchase products that cause the retailer to lose money. TX 24337A; 2/11/11 Trial Tr. Vol. 3 (Larian) at 65:6-14; 3/29/11 Trial Tr. Vol. 1 (Vollero) at 128:23-129:19; 4/1/11 Trial Tr. Vol. 2 (Eckert) at 34:6-13.

29.     When a retailer loses money on a particular product, it replaces that product with others that it expects to be profitable or more profitable.  3/29/11 Trial Tr. Vol. 1 (Vollero) at 128:23-129:19; 4/1/11 Trial Tr. Vol. 2 (Eckert) at 34:6-13.

30.     When a retailer purchases a product that loses money or that does not sell, it reduces the price on that product (which causes a reduction in the expected margin) in an effort to induce customers to purchase it.  In some circumstances, the prices must be reduced so much that the retailer sells the product at a loss.  TX 24347; 2/11/11 Trial Tr. Vol. 3 (Larian) at 65:6-14.

31.     If the retailer sells products below the expected margin, then the retail customer approaches the suppliers, in this case Mattel and MGA, and seeks money from them in the form of cash payments or other incentives to offset the reduced profitability or losses.  Industry practice is for the retail customer and the supplier to negotiate the terms of any such payment or incentives. TX 24335; TX 24336; TX 24338; TX 24339; TX 24342; TX 24347; 2/11/11 Trial Tr. Vol. 4 (Larian) at 6:7-22; 2/16/11 Trial Tr. Vol. 2

1   (Larian) at 7:16-8:16; 3/25/11 Trial Tr. Vol. 2 (Larian) at 15:9-25; 3/29/11 Trial Tr. Vol. 1

2   (Vollero) at 130:16-132:6.

3       32.     MGA sold Bratz products in the following quantities for the identified years:

4   over $500 million for 2003, over $500 million for 2004, over $500 million for 2005, over

5   $600 million for 2006, over $500 million for 2007, and over $250 million for 2008.  TX

6   27331; TX 27261; TX27262; TX 27263; TX 27264; TX 27265;  2/17/11 Trial Tr. Vol. 1

7   (Larian) at 125:8-127:7.

8       **B.    Kohl's**

9       33.     Kohl's is a department store with approximately 1100 stores throughout the

10  nation.  3/29/11 Trial Tr. Vol. 1 (Vollero) at 111:25-112:6, 118:21-119:9.

11      34.     Kohl's sells products, including toys purchased from MGA and Mattel, to

12  consumers.  3/24/11 Trial Tr. Vol. 2 (Larian) at 159:20-160:3; 3/29/11 Trial Tr. Vol. 1

13  (Vollero) at 111:25-112:6, 118:21-119:9; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 66:15-22.

14      35.     Between 2004 and 2007, MGA employees Holly Chabot and Karen Quadrio

15  had responsibility for the Kohl's account for MGA.  See, e.g., TX 24354; TX 24338; TX

16  24339; TX 24342; TX 24347; TX 24358; TX 24719.

17      36.     In addition, at least during 2004 through 2007, MGA hired  a company called

18  The Northern Group to represent it in connection with placing Kohl's.  See, e.g., TX

19  24335; TX 24336; TX 24358.

20      37.     Mr. Larian received communications from The Northern Group employees

21  Mike Hein and Dean Goodman who dealt directly with Kohl's buyers on MGA's behalf.

22  TX 24335; TX 24358; 3/25/11 Trial Tr. Vol. 1 (Larian) at 19:8-20:7.

23      38.     Julie Scholvin is Mattel's account representative who has had primary

24  responsibility for the Kohl's account since 2004.  4/6/11 Trial Tr. Vol. 3 (Scholvin) at

25  64:3-16.

26      39.     The Kohl's buyer with responsibility for toys in 2004 and 2005 was Tom

27  Maskel.  In 2005, Jen Serra became the Kohl's toy buyer.  Both reported to Mike Johnson,

28

00505.07975/4116228.1

MATTEL'S CORRECTED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR MGA'S 17200 CLAIM

1  a Kohl's Senior Vice-President with responsibility for Children's Apparel, Accessories
2  and Toys. TX 24358; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 65:1-5, 67:20-68:4.

3      40.     Kohl's annual sales revenues are approximately $18 billion. 3/29/11 Trial Tr.
4  Vol. 1 (Vollero) at 118:21-119:9; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 66:15-22.

5      41.     Kohl's sales revenues are more than three times larger than Mattel's sales
6  revenues.  3/29/11 Trial Tr. Vol. 1 (Vollero) at 147:23-148:5; 4/6/11 Trial Tr. Vol. 3
7  (Scholvin) at 66:15-22.

8      42.     Kohl's toy department is small relative to both its sales and the size of its
9  stores.  TX 24342; 3/25/11 Trial Tr. Vol. 1 (Larian) at 29:2-17, 31:4-33:23.

10     43.     Kohl's decides which products it will sell in its stores, where those products
11  will be displayed for sale in its stores, and the prices that it will charge consumers for
12  those products. 3/25/11 Trial Tr. Vol. 1 (Larian) at 18:23-19:2; 3/29/11 Trial  Tr. Vol. 1
13  (Vollero) at 131:3-19, 148:6-14; 4/4/11 Trial Tr. Vol. 1 (Eckert) at 90:7-17;  4/6/11 Trial
14  Tr. Vol. 3 (Scholvin) at 64:20-25, 81:22-82:2.

15     44.     Kohl's sells toys both in its toy department and outside of that department.
16  Kohl's sells toys outside the top department on towers, bulk stacks, wing walls, and other
17  out-of-department fixtures.  4/6/11 Trial Tr. Vol. 3 (Scholvin) at 66:23-67:19.

18     45.     Kohl's expects to generate a profit on the toys that it sells to consumers.
19  3/25/11 Trial Tr. Vol. 1 (Larian) at 25:25-26:23; 3/29/11 Trial Tr. Vol. 1 (Vollero) at
20  129:20-23, 151:3-10; TX 24342; 3/25/11 Trial Tr. Vol. 1 (Larian) at 29:2-17, 31:4-33:23;
21  TX 24354; 3/25/11 Trial Tr. Vol. 1 (Larian) at 38:13-40:1.

22     46.     Kohl's reported to Mattel Kohl's margin targets for Mattel products that
23  Kohl's had purchased, and later reported to Mattel the actual margin performance of those
24  products.  Separately, Kohl's reported to MGA Kohl's margin targets for MGA products
25  that Kohl's had purchased, and later reported to MGA the actual margin performance of
26  those products.  4/6/11 Trial Tr. Vol. 3 (Scholvin) at 82:3-12; 3/29/11 Trial Tr. Vol. 1
27  (Vollero) at 129:24-130:8; TX 24342; 3/25/11 Trial Tr. Vol. 1 (Larian) at 29:2-17, 31:4-
28  33:23; TX 24354; 3/25/11 Trial Tr. Vol. 1 (Larian) at 38:13-40:1.

47.   MGA introduced at trial no agreement of any type regarding the sale of any MGA product, including Bratz products, to Kohl's for any year.

48.   In 2004, Kohl's had purchased products from MGA including Bratz dolls worth approximately $5.1 million from which Kohl's had a 22% or approximately $1.12 million margin expectation.  TX 24342; TX 31180-00014; TX 36738; 3/25/11 Trial Tr. Vol. 2 (Larian) at 12:22-13:13; 3/25/11 Trial Tr. Vol. 1 (Larian) at 31:4-33:8.

49.   In 2004, BARBIE products were sold on four feet of shelf space in the Kohl's toy department and also outside the toy department.  4/6/11 Trial Tr. Vol. 3 (Scholvin) at 72:9-73:10.

50.   In 2004, BARBIE and Bratz products were sold side-by-side in the toy department at Kohl's.   4/6/11 Trial Tr. Vol. 3 (Scholvin) at 73:7-10.

51.   In 2004, Kohl's made money on BARBIE products.  4/4/11 Trial Tr. Vol. 1 (Eckert) at 54:21-57:22; 62:4-12; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 82:12-83:4.

52.   Kohl's stops buying from suppliers and stops selling to consumers a particular toy or brand that fails to meet the retailer's margin requirements.  3/29/11 Trial Tr. Vol. 1 (Vollero) at 128:23-129:19.

53.   In 2004, Kohl's consumers did not purchase the expected quantity of Bratz, so Kohl's lost money on Bratz products.  TX 24338; TX 24339; 3/25/11 Trial Tr. Vol. 1 (Larian) at 24:19-26:16; 3/25/11 Trial Tr. Vol. 1 (Larian) at 26:17-29:1; TX 24354; 3/25/11 Trial Tr. Vol. 1 (Larian) at 38:13-40:1.

54.   Kohl's consumers did not like and did not purchase Bratz products.  TX 24338; TX 24339; 3/25/11 Trial Tr. Vol. 1 (Larian) at 24:19-29:1; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 82:12-83:4.  Mattel's MYSCENE brand segment, also directed to the older "tween" market, did not perform well with Kohl's consumers.  4/6/11 Trial Tr. Vol. 3 (Scholvin) at 82:12-83:4.

55.   Kohl's recognized that the Bratz products were not selling well as early as August 2004, when Kohl's asked MGA provide markdown dollars for Fall 2003 items that

1   were not selling.  MGA refused.  TX 24335; 3/25/11 Trial Tr. Vol. 1 (Larian) at 18:13-
2   21:4.

3        56.    As of September 2004, Kohl's again asked for approximately $60,000 in
4   markdown dollars to offset the losses that it was taking on the Bratz products.  MGA
5   again refused.  TX 24336; 3/25/11 Trial Tr. Vol. 1 (Larian) at 21:5-23:18.

6        57.    As of November 2004, Kohl's losses continued to grow and it anticipated
7   missing expected Bratz product sales by 70 percent, resulting in expected margin losses
8   totaling $372,000 by that time.  TX 24338; 3/25/11 Trial Tr. Vol. 1 (Larian) at 24:19-
9   26:16.

10       58.    In December 2004, Mr. Hein, of The Northern Group, forwarded to Holly
11  Chabot, at MGA, an e-mail from Kohl's merchandise planner for toys, Alan Anker.  Mr.
12  Hein detailed Kohl's "bleak" forecasted sales, markdowns, and year-end financial results
13  for Bratz products, writing that "This obviously will affect our business in 2005, but to
14  what extent will depend on what we can do to help the situation.  The buyer is anxious to
15  find out the status on the advertising help that we discussed." TX 24339, 3/25/11 Trial Tr.
16  Vol. 1 (Larian) at 26:17-29:1.

17       59.    Through late December 2004, MGA continued to discuss internally Kohl's
18  requests for financial assistance to offset its increasing losses on Bratz products.

19       60.    A December 16, 2004 e-mail from Mr. Hein to Ms. Chabot reads that Kohl's
20  requested $1 million from MGA in order to offset the estimated shortfall of $1.87 million
21  in gross margin dollars.  Mr. Hein wrote:

22           The buyer made it clear that he needs the help he has requested to get the
23           margin up to 12 % so he can proceed with MGA in 2005.  They are currently
24           preparing orders for the 47 new stores opening in March-April and they're
25           awaiting our decision before placing the orders.  Kohl's does business with a
26           very limited list of toy vendors because their depts. are so small and we have
27           become a key vendor in a very short time period.  Our decision on this
28           request from Kohl's is very important to the future of our relationship.

-9-
MATTEL'S CORRECTED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR MGA'S
17200 CLAIM

1  TX 24342; 3/25/11 Trial Tr. Vol. 1 (Larian) at 29:2-17, 31:4-33:23.

2       61.   Similarly, a later December 17, 2004 e-mail from Ms. Chabot to Ron Brawer

3  and Lisa Saunders regarding Kohl's request reads that Kohl's was "currently selling the

4  dolls at 40% below . . . They are moving slowly—on an average of 3% a week before last

5  week."  TX 24346; 3/25/11 Trial Tr. Vol. 1 (Larian) at 34:11-35:1.

6       62.   Rather than addressing Kohl's losses on the Bratz dolls, on December 19,

7  2004 Mr. Larian conditioned any assistance to Kohl's on Kohl's agreement to purchase

8  more non-performing Bratz dolls.  He wrote, "Get him to buy our Casino Line and CE line

9  and we will give let [sic] him take $550,000 at 10% of 2005 purchases (e.g. buy $5.5

10 million to get it)."  TX 24347; 3/25/11 Trial Tr. Vol. 1 (Larian) at 35:2-36:14.

11      63.   Mr. Larian never called anyone at Kohl's to address the deterioration of

12 MGA's relationship with Kohl's based on the poor performance of the Bratz dolls.

13 3/25/11 Trial Tr. Vol. 1 (Larian) at 36:21-25.

14      64.   MGA and Kohl's reached no agreement at that time, and Kohl's continued to

15 negotiate with MGA in 2005.

16      65.   For example, on September 20, 2005, Kohl's wrote to MGA and the Northern

17 Group:  "Attached is a brief spreadsheet detailing the margin deficit in 2004 and the

18 markdowns we had taken on Bratz in Spring 2005.  Overall we were about $1MM in cost

19 dollars short of making our margin plan with Bratz."  TX 24354-00006; 3/25/11 Trial Tr.

20 Vol. 1 (Larian) at 38:13-40:1.

21      66.   In October 2005, Mr. Larian was not willing to approach the amount of

22 markdown assistance that Kohl's was asking for.  TX 24354; 3/25/11 Trial Tr. Vol. 1

23 (Larian) at 41:21-43:2.

24      67.   On November 2, 2005, Mr. Goodman sent MGA's Karen Quadrio an email

25 regarding a conversation with Kohl's buyer Jen Serra.  Mr. Goodman wrote:  "While the

26 buy in $$ was an important piece of the puzzle, Kohls larger concern is that both sides are

27 able to come together with a business plan that accommodates Kohl's margins [sic]

28 needs."  TX 24357; 3/25/11 Trial Tr. Vol. 1 (Larian) at 43:3-44:3.

68.    MGA tried to set up a meeting with Kohl's for December 2005 but no meeting occurred because MGA was still unwilling to address Kohl's losses on the Bratz dolls.  On November 22, 2005, Mr. Goodman wrote to Ms. Quadrio:

> Kohls is not going to give MGA an appt in December.  Jen said that without a substantial change/increase in the dollar buy-in and program margins they are not going to be able to move forward.  I have talked to her several times since NY about the next step and in person a couple of times and she has made it clear that Kohls feels strongly about their position they laid out to us last month and at this point feel MGA is the one that must decide if they want to have a presence in the toy department.  It looks like the lines have been drawn.

TX 24358; 3/25/11 Trial Tr. Vol. 1 (Larian) at 44:8-46:6.

69.    Later that day, Ms. Quadrio asked Mr. Larian for approval to offer Kohl's a proposal that would require Kohl's to buy $2.5 million of Bratz products from MGA against a $250,000 credit allowance.  TX 24358; 3/25/11 Trial Tr. Vol. 1 (Larian) at 46:7-16.

70.    Mr. Larian responded to Ms. Quadrio, "Yes.  Go ahead.  If they still say no, fuck'm.  I don't want them at our showroom."  TX 24358; 3/25/11 Trial Tr. Vol. 1 (Larian) at 46:17-47:1.

71.    Despite MGA's refusal to meet Kohl's request for over $1 million from MGA to offset losses from poorly selling Bratz dolls, Kohl's continued to sell MGA products, including Bratz products.

72.    MGA products were not excluded from Kohl's stores.  MGA products, including Bratz product, were continuously on sale to consumers in Kohl's stores from 2004 through 2006.  4/6/11 Trial Tr. Vol. 3 (Scholvin) at 69:18-70:5.

73.    MGA's daily ship report for the month ending October 2006 shows that MGA invoiced Kohl's for $1,254,000 worth of products, including Little Tikes, Bratz and

1    other MGA products, as of October 1, 2006.  TX 24747; 3/25/11 Trial Tr. Vol. 1 (Larian)

2    at 53:20-54:24.

3         74.    The same report shows the total amount MGA invoiced to Kohl's in 2006

4    was $5,911,677.  TX 24747; 3/25/11 Trial Tr. Vol. 1 (Larian) at 54:25-55:16.

5         75.    A November 28, 2007 e-mail from Ms. Quadrio to Mr. Larian reports that

6    sales of MGA products at Kohl's for Thanksgiving weekend was $1,044,000 for 2006 and

7    $1,500,000 for 2007.  TX 24719; 3/25/11 Trial Tr. Vol. 1 (Larian) at 49:2-52:10.

8         76.    Mr. Maskell, the Kohl's buyer, had told Ms. Scholvin on several occasions

9    that Bratz products were performing poorly at Kohl's.  4/6/11 Trial Tr. Vol. 3 (Scholvin)

10   at 82:13-20.

11        77.    Because it was losing money on Bratz products, had Bratz products from

12   2004 that it had to sell, and Kohl's did not view MGA's responses to Kohl's losses as

13   meaningful, Kohl's decided by December 2004 not to purchase additional Bratz products

14   from MGA for 2005 but instead to continue to sell its existing Bratz inventory.  TX

15   24358; 3/25/11 Trial Tr. Vol. 1 (Larian) at 44:8-47:1; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at

16   80:17-81:5.

17        78.    On December 16, 2004, after Kohl's made that decision, Kohl's buyer Tom

18   Maskell approached Mattel's sales representative for Kohl's, Julie Scholvin, to discuss a

19   potential business opportunity that would increase shelf space that Kohl's provided for

20   BARBIE products.  TX 37113; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 65:6-12.

21        79.    It was Kohl's idea, not Mattel's, to offer additional shelf space to Mattel for

22   BARBIE.  TX 37113; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 67:13-68:8.

23        80.    In connection with this, Kohl's sought Mattel's help with markdowns on

24   Bratz products that Kohl's had purchased from MGA but was unable to sell as of that

25   time.  TX 37113; 4/4/11 Trial Tr. Vol. 1 (Eckert) at 92:13-95:7.

26        81.    At the time of Mattel's negotiations with Kohl's, Mattel was unaware of the

27   history between MGA and Kohl's and their email exchanges introduced at trial.  4/4/11

28   Trial Tr. Vol. 2 (Eckert) at 5:23-6:5.

-12-

82.     On January 27, 2005, Kohl's and Mattel entered into a contract entitled "2005-2006 Mattel Basic Program - Kohl's." TX 24004.

83.     Kohl's and Mattel entered into a second contract on July 21, 2006, entitled "2006 Kohl's/Mattel Sales Benefit Program."   TX 24005; 3/29/11 Trial Tr. Vol. 1 (Vollero) at 127:21-128:11.

84.     The 2005 and 2006 contracts are a promotional type program that provides Kohl's with funds to promote, display and sell Mattel products.  TX 24004; TX 24005; 4/4/11 Trial Tr. Vol. 1 (Eckert) at 87:7-90:3.

85.     The 2005 agreement provided that Kohl's could earn $1,250,000 from Mattel if it "maintain[ed] a minimum of 8ft. of Barbie planogram space for entire year 2005 and 2006"; "maintain[ed] a minimum shipping volume of $9.5 million dollars in Mattel Barbie branded items (domestic and/or import) in calendar year 2005; and a minimum shipping volume of $10.5 million in Mattel Barbie branded items (domestic and/or import) in calendar year 2006"; "an incremental wing wall or tower in each calendar year 2005 & 2006"; and "Mattel's Little Mommy segment will have placement at Kohl's and be merchandised on the back wall." TX 24004; 3/29/11 Trial Tr. Vol. 1 (Vollero) at 124:12-127:14.  The 2006 agreement contained similar terms. TX 24005; 3/29/11 Trial Tr. Vol. 1 (Vollero) at 133:5-21.

86.     Nothing in the contracts between Kohl's and Mattel states that MGA will not be represented at Kohl's. TX 24004; TX 24005; 3/29/11 Trial Tr. Vol. 1 (Vollero) at 127:15-20.

87.     Nothing in the contracts between Kohl's and Mattel states that Bratz product is to be excluded from Kohl's stores.  TX 24004; TX 24005; 4/4/11 Trial Tr. Vol. 1 (Eckert) at 90:4-6.

88.     Nothing in the contracts between Kohl's and Mattel reflects payment of a "slotting fee" to Kohl's.  TX 24004; TX 24005; 3/29/11 Trial Tr. Vol. 1 (Vollero) at 132:23-133:1.  Mattel did not pay Kohl's a "slotting fee" for shelf space. 3/29/11 Trial Tr. Vol. 1 (Vollero) at 120:15-17.

89.     Mattel never pressured Kohl's to exclude Bratz from its stores in 2005 or 2006.  3/29/11 Trial Tr. Vol. 1 (Vollero) at 118:3-6, 118:10-12, 118:21-119:9, 119:25-120:9.

90.     Mattel did not pay Kohl's to keep Bratz products out of Kohl's stores. 3/29/11 Trial Tr. Vol. 1 (Vollero) at 120:18-20; 4/4/11 Trial Tr. Vol. 1 (Eckert) at 51:18-52:1, 58:9-59:11, 59:22-60:2.

91.     Mattel never understood that it would be able to exclude Bratz from Kohl's for two years by pressuring Kohl's.  3/29/11 Trial Tr. Vol. 1 (Vollero) at 118:3-6.

92.     An e-mail dated January 27, 2005 from Milt Zablow of Mattel states: "It's Final!  Kohl's has agreed to the following:  -DOUBLE Barbie;s [sic] Retail Space to 8 ft. for a minimum of 2 years  -The Competitor will NOT BE REPRESENTED in their Toy dept. for 2 years  -Incremental Barbie Tower vs. '04 –Minimum $9.5mm Barbie '05 shipping -36% INCREASE vs '04  -Minimum $10.5mm Barbie '06 shipping – 10.5% increase vs '05  Plus -Incremental presence for Lil Mommy- Segment will now be positioned on the BACK WALL!!!"  TX 26612.  A separate email dated December 22, 2004 from Sharon Spaulding of Mattel states in relevant part:  "Competition will not be represented in [Kohl's] Toy Dept."  TX 37112.

93.     In fact, the competitor, MGA, was represented in the Kohl's toy department and elsewhere in the store.  MGA products, including Bratz dolls, continued to be sold at Kohl's even after Kohl's agreed to provide eight feet of shelf space to BARBIE products. 3/29/11 Trial Tr. Vol. 1 (Vollero) at 122:7-124:1; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 69:18-70:5.

94.     Mattel's agreement with Kohl's was not anti-competitive, but instead allowed Kohl's to build its margin and take credit for the poor performance of Bratz at Kohl's. 4/4/11 Trial Tr. Vol. 1 (Eckert) at 54:21-57:22; 62:4-12.

95.     At no time during 2005 did Kohl's inform Mr. Larian that it had an exclusive relationship with Mattel and it was no longer interested in MGA business.  3/25/11 Trial Tr. Vol. 2 (Larian) at 21:7-10.

MATTEL'S CORRECTED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR MGA'S
17200 CLAIM

96.     Kohl's continued to purchase MGA products in 2005 and 2006.  TX 24747; 3/25/11 Trial Tr. Vol. 1 (Larian) at 53:20-54:24; 3/25/11 Trial Tr. Vol. 1 (Larian) at 54:25-55:16; TX 24719; 3/25/11 Trial Tr. Vol. 1 (Larian) at 49:2-52:10.  Kohl's continued to negotiate the purchase of additional Bratz products with MGA during 2005 and 2006.  TX 24354; 3/25/11 Trial Tr. Vol. 1 (Larian) at 38:13-40:1; TX 24359; TX 24747.

97.     The eight feet of shelf space that Kohl's agreed to provide for BARBIE products is not the only place in Kohl's stores where Kohl's sells fashion dolls.  Kohl's also sells products, including fashion dolls, on towers, bulk stacks, wings or end caps and other fixtures in its stores.  4/4/11 Trial Tr. Vol. 1 (Eckert) at 90:18-91:13; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 66:23-67:19.  Kohl's continued to sell Bratz dolls to consumers during 2005 and 2006 when Kohl's placed and sold BARBIE products from those eight feet of shelf space.  4/6/11 Trial Tr. Vol. 3 (Scholvin) at 69:18-70:5.

98.     Additionally, Kohl's could decide to enlarge the toy department or devote more shelf space to fashion dolls at any time.  4/6/11 Trial Tr. Vol. 3 (Scholvin) at 81:13-21.

99.     MGA's sole claim for monetary relief for Mattel's unfair competition claim is a lost profits claim in the amount of $4.294 million related solely to its Kohl's allegation.  4/5/2011 Trial Tr. Vol. 1 (Malackowski) at 31:21-32:9.

100.    MGA's claimed measure of damages is what MGA's "sales and profits would have been [to Kohl's] had the unfair competition not occurred."  4/5/2011 Trial Tr. Vol. 1 (Malackowski) at 32:20-22.

101.    MGA's damages theory is based on all sales of MGA products to Kohl's, including Little Tikes, Little Bratz and other MGA products, not just Bratz dolls.  4/5/2011 Trial Tr. Vol. 2 (Malackowski) at 53:13-21.

102.    MGA presented no evidence at trial of alleged anticompetitive conduct with respect to Kohl's that occurred after 2006.

103.    MGA presented no evidence whether any Bratz products were purchased by Kohl's in 2007 or thereafter, or if so, in what quantity.

00505.07975/4116228.1

104.   MGA presented no evidence that Kohl's purchased and sold Bratz products in 2007 or thereafter, or whether Kohl's made money on those Bratz products.

**C.   <u>THQ</u>**

105.   THQ is a video game company.

106.   Both Mattel and MGA license their intellectual property to licensees that they have in common, including THQ.  4/4/11 Trial Tr. Vol. 1 (Eckert) at 102:16-104:10.

107.   Mattel enters into licensing agreements with companies that also have licensing agreements with competitors.  <u>See, e.g.</u>, TX 20525; 4/4/11 Trial Tr. Vol. 1 (Eckert) at 100:16-101:16.

108.   When deciding whether to license intellectual property to companies that also have licensing agreements with competitors, a significant consideration is whether the licensee will respect and protect the confidentiality of Mattel's proprietary information. 4/4/11 Trial Tr. Vol. 1 (Eckert) at 101:17-102:15.

109.   In November 2006, Ellen Brothers, the head of Mattel's American Girl business unit, emailed Robert Eckert, Mattel's CEO, and Neil Friedman, the head of Mattel's Mattel Brands business unit.  Ms. Brothers was considering entering into a licensing arrangement with THQ and wanted to bring it to Mr. Eckert's attention "given the fact that [Mattel has] had a lot of issues of confidential information moving from Mattel to MGA."  4/4/11 Trial Tr. Vol. 1 (Eckert) at 99:2-100:3; TX 8972.

110.   Mr. Eckert forwarded Ms. Brothers' email to Mr. Friedman and wanted to know "whether [Mr. Friedman] though this was going to be a problem or not" in light of Mattel's confidentiality concerns.  Mr. Eckert asked Mr. Friedmen whether he wanted Mr. Eckert to "kill" the deal between American Girl and THQ based on that concern.  4/4/11 Trial Tr. Vol. 1 (Eckert) at 100:4-15.

111.   The deal was not "killed," and American Girl entered into a licensing agreement with THQ, knowing that THQ was also a licensee of MGA.  TX 20525; 4/4/11 Trial Tr. Vol. 1 (Eckert) at 100:16-101:16.

00505.07975/4116228.1

112.   Mr. Eckert investigated whether Mattel had terminated any licenses because the licensee also dealt with MGA.  Mr. Eckert discovered no instances in which Mattel had done so.  4/4/11 Trial Tr. Vol. 1 (Eckert) at 107:11-21.

113.   MGA offered no evidence that it suffered any injury in fact or lost any money or property as a result of any alleged Mattel conduct with respect to any licensee, including THQ, much less any evidence that consumers were impacted by any such Mattel conduct.   4/4/11  Trial  Tr.  Vol.  3  (Malackowski);  4/5/11  Trial  Tr.  Vols.  1-4 (Malackowski).

### D.   **Early Light**

114.   Early Light is a Chinese manufacturer that manufactures toys for both MGA and Mattel. 3/17/11 Trial Tr. Vol. 1 (Fontanella) at 127:2-128:10; 3/22/11 Trial Tr. Vol. 1 at (Debrowski) at 8:8-25.

115.   No Mattel representative ever told anyone at Early Light to stop manufacturing toys for MGA.  3/22/11 Trial Tr. Vol. 1 (Debrowski) at 14:12-16:14; 3/17/11 Trial Tr. Vol. 1 (Fontanella) at 127:25-134:15.

116.   Tom Debrowski is Mattel's Executive Vice President of Worldwide Operations. 3/22/11 Trial Tr. Vol. 1 (Debrowski) at 7:11-18.

117.   As Mattel's Executive Vice President of Worldwide Operations, Mr. Debrowski oversees the manufacturing of Mattel's products and is familiar with Early Light, one of the largest toy manufacturers in China. 3/22/11 Trial Tr. Vol. 1 (Debrowski) at 8:1-13.

118.   Mr. Debrowski was and is familiar with the security precautions that Early Light took to separate its manufacturing of Mattel products from its manufacturing of competitor products to ensure that Mattel's intellectual property remained confidential. 3/22/11 Trial Tr. Vol. 1 (Debrowski) at 14:12-16:14.

119.   Based on his knowledge, Mr. Debrowski concluded that Early Light could support both Mattel and MGA without compromising Mattel's confidential information. 3/22/11 Trial Tr. Vol. 1 (Debrowski) at 9:1-11:2, 14:12-16:14.

-17-

120.   In 2001, Adrienne Fontanella, the president of the Girls division at Mattel from 1999 through February 2003, told Mr. Debrowski to tell Early Light that it should no longer manufacture products for MGA.  3/17/11 Trial Tr. Vol. 1 (Fontanella) at 127:8-128:10; 3/22/11 Trial Tr. Vol. 1 (Debrowski) at 9:1-11:2.

121.   Ms. Fontanella acknowledged that Mr. Debrowski was responsible for Mattel's manufacturing plants. Ms. Fontanella visited China only once on behalf of Mattel, during which she went on a very quick tour through a number of factories. 3/17/11 Trial Tr. Vol. 1 (Fontanella) at 128:24-130:15.

122.   Ms. Fontanella was concerned about a manufacturer of a competitor having access to Mattel's proprietary information but she trusted Mr. Debrowski to research and find out if Mattel should be concerned. Id. at 133:3-24.

123.   Because Mr. Debrowski was confident in Early Light's protection of Mattel's confidential information, he did not communicate Ms. Fontanella's conversation to any Early Light representative.  3/22/11 Trial Tr. Vol. 1 (Debrowski) at 14:12-15:19.

124.   After Ms. Fontanella's conversation with Mr. Debrowski, Early Light continued to manufacture Bratz products and continued to do so throughout Ms. Fontanella's tenure at Mattel.  3/17/11 Vol. 2 (Fontanella) at 33:1-16.

125.   MGA presented no evidence that it suffered any injury in fact or lost any money or property as a result of any Mattel conduct with respect to any company that manufactured both Mattel and MGA products, including Early Light, much less any evidence that consumers were impacted by any such Mattel conduct.  4/4/11 Trial Tr. Vol. 3 (Malackowski); 4/5/11 Trial Tr. Vols. 1-4 (Malackowski).

### E.   **Bandai**

126.   Bandai is a toy company based in Japan that has distributed Mattel and MGA toys in locations around the world where MGA and Mattel, respectively, do not have an established means of distribution.  2/17/11 Trial Tr. Vol. 1 (Larian) at 32:5-8; 3/17/11 Trial Tr. Vol. 1 (Fontanella) at 111:19-119:11; TX 34833.

127.   MGA presented no evidence that Mattel threatened Bandai or asked Bandai to stop distributing MGA products.

128.   Ms. Fontanella explained that when a Mattel distributor also distributed product competitive to Mattel's, this was a concern because Mattel wants the distributor's total focus on Mattel's product, not a product "directly competitive" to Mattel's.   In addition, the distributor has access "early on" to "proprietary" Mattel information. 3/17/11 Trial Tr. Vol. 1 (Fontanella) at 118:8-19; TX 34833.

129.   Bandai continued to distribute Bratz products throughout Ms. Fontanella's tenure at Mattel.  3/17/11 Trial Tr. Vol. 2 (Fontanella) at 33:17-34:6.

130.   MGA presented no evidence that Mattel threatened or asked any distributor of Mattel and MGA products not to distribute MGA products.

131.   MGA presented no evidence that MGA suffered any injury in fact or lost any money or property as a result of any Mattel conduct with respect to any company that distributed both Mattel and MGA products, including Bandai, much less any evidence that consumers were impacted by any such Mattel conduct.   4/4/11 Trial Tr. Vol. 3 (Malackowski); 4/5/11 Trial Tr. Vols. 1-4 (Malackowski).

### F.   MGA's Unfair Competition Claim

132.   Except as set forth above, MGA presented no competent evidence to support its previously identified factual bases for its statutory unfair competition claim, including that:

    (1)   Mattel allegedly demanded its employees sign oppressive intellectual property assignment agreements in order to shore up and preserve its dominant market position;

    (2)   Mattel allegedly engaged in efforts to undermine MGA's business and to "kill" Bratz, including pursuing litigation to drain MGA's financial resources;

    (3)   Mattel allegedly regularly threatens, manipulates, intimidates, and improperly influences its employees and third parties, including

MATTEL'S CORRECTED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR MGA'S 17200 CLAIM

retailers, distributors, and law enforcement officials, to prevent them from working with MGA and to intimidate former employees;

(4)    Mattel allegedly has threatened and pressured distributors and retailers not to distribute Bratz products;

(5)    Mattel allegedly has tampered with retail displays and disseminated false information about the retail market;

(6)    Mattel allegedly has intimidated former Mattel employees who have gone to work for MGA by sending threatening letters warning them not to disclose publicly-available information about Mattel;

(7)    Mattel allegedly has threatened and warned companies not to license MGA properties or risk retribution from Mattel;

(8)    Mattel allegedly has threatened and warned raw goods suppliers and toy manufacturers not to supply goods to MGA or to make MGA products or they would lose business from Mattel;

(9)    Mattel allegedly engaged in efforts to create negative publicity or press about MGA, MGA products, Bryant, Larian or MGA employees, including practices relating to NPD and consumer organizations TIA and CARU;

(10)   Mattel allegedly engaged in unfair practices relating to MGA's relationship with NPD, including pressuring NPD to terminate its relationship with MGA;

(11)   Mattel allegedly engaged in efforts to fund or commission market research or studies that portray Bratz or MGA products negatively;

(12)   Mattel allegedly engaged in efforts to interfere with MGA's acquisition of or investment in Zapf Creation AG;

(13)   Mattel allegedly engaged in efforts to include negative references to MGA or Bratz on Mattel's "We Believe In Girls" website;

(14)  Mattel allegedly engaged in efforts or intended to interfere with business dealings or contractual relations between MGA and Smoby Group;

(15)  Mattel allegedly influenced Nickelodeon to reject MGA advertisements or to limit time slots for advertisements;

(16)  Mattel allegedly assisted parties in lawsuits against MGA;

(17)  Mattel allegedly contacted persons under false pretenses in order to question them about Bratz and this lawsuit;

(18)  Mattel allegedly coerced employees to sign restrictive covenants and non-compete agreements and other efforts to prevent MGA from hiring them;

(19)  Mattel allegedly delayed filing suit against Bryant because Mattel wanted Bryant to testify in an unrelated Mattel case;

(20)  Mattel allegedly falsely inflated its BARBIE sales figures in an effort to mislead the public and retailers; and

(21)  Mattel allegedly improperly initiated and influenced criminal investigations of its former employees, including Janine Brisbois and Jorge Castilla.

See April 13, 2005 Complaint in Case No. 05-2727, Dkt. 1; Am. MSJ Order, Dkt. 9600, at 110:7-16; MGA's Objections and Responses to Mattel's Second Set of Interrogatories (Phase 2), dated November 2, 2009, at 8-51, 104-160.

133.   MGA elicited testimony regarding alleged tampering with retail displays at Walmart, but the trial exhibit MGA offered was not "admitted" for the truth and all testimony was ruled hearsay, and not for the truth that any alleged tampering occurred. TX 8120; 4/4/11 Trial Tr. Vol. 1 (Eckert) at 36:11-38:6, 39:12-18.

134.   Moreover, Mr. Eckert testified that Mattel followed up with Walmart regarding the allegations in TX 8120 but Walmart did not provide any specific information to substantiate these allegations.  4/4/11 Trial Tr. Vol. 1 (Eckert) at 40:3-11.

135.   MGA did not present any evidence showing that MGA suffered any injury in fact or lost any money or property as a result of any Mattel conduct with respect to any alleged tampering with retail displays, much less any evidence that consumers were impacted by any such Mattel conduct.  4/4/11 Trial Tr. Vol. 3 (Malackowski); 4/5/11 Trial Tr. Vols. 1-4 (Malackowski).

136.   MGA introduced no evidence that Mattel had market power in any properly determined relevant market.

137.   MGA introduced none of the evidence that Court's are required to consider in determining what the relevant product and geographic markets are for purposes of determining market power.

138.   MGA introduced no evidence that Mattel either restricted output or charged supracompetitive prices for any product that it offered for sale.

139.   Mattel and MGA's legal claims and counterclaims were tried to a jury from January 18, 2011 to April 8, 2011.

140.   On April 21, 2011, the jury rendered a verdict on those legal claims and counterclaims.  Case No. 04-9049, Dkt. 10518.

## II.   PROPOSED CONCLUSIONS OF LAW

For the reasons set forth below, the Court hereby makes the following conclusions of law and finds that MGA has failed to prove its claim against Mattel for unfair competition in violation of California Business & Professions Code § 17200.  The Court hereby directs entry of judgment for Mattel and against MGA on MGA's statutory unfair competition claim.

### A.   Unfair Competition In Violation Of § 17200

141.   The California Unfair Competition Law ("UCL"), California Business & Professions Code § 17200 et seq., prohibits "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.

**B.** **MGA Cannot Prove Its Unfair Competition Claim**

142.   After full consideration of the testimony of the witnesses, exhibits, all other evidence, the arguments of counsel and all other matters presented to the Court, the Court concludes that MGA has failed to prove its unfair competition claim.

**1.** **MGA Lacks Standing To Pursue Its UCL Claim**

143.   MGA was required to prove it had standing to bring its UCL claim in that it suffered lost money or property within the meaning of Section 17200. Cal. Bus. and Prof. Code § 17204 (requiring proof of "injury in fact" as a result of unfair competition); Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 323 (2011) ("Proposition 64 requires that a plaintiff have lost money or property to have standing to sue. The plain import of this is that a plaintiff now must demonstrate some form of economic injury.") (internal citation and quotation omitted).

144.   At summary judgment, the Court found there was a genuine issue of material fact as to whether MGA lost money as a result of Mattel's alleged obstruction of its relationships with licensees and distributors. Dkt. 9600 at 110:28-111:1. The Court reasoned that MGA's licenses with retailers were "property" for purposes of MGA's UCL claim. See id. at 111.

145.   At trial, MGA presented no evidence that MGA lost money or property as a result of Mattel's alleged obstruction of MGA's relationships with retailers, licensees, distributors or manufacturers.

146.   MGA's expert testified at trial that MGA's damages for its unfair competition claim are $4.294 million. According to MGA's expert, the sole basis for this damages calculation is Mattel's alleged misconduct with Kohl's in 2005 and 2006. MGA's expert testified that his damages calculation is based on his analysis of what MGA's sales and profits would have been in 2005 and 2006 but for Mattel's alleged unfair competition concerning Kohl's. See 4/5/11 Trial Tr. Vol. 1 (Malackowski) at 31:21-33:20.

147.   MGA failed to present any evidence of harm at trial to support its expert's damages analysis for Kohl's. Moreover, MGA's expert admitted that he did not break out

1  sales for Little Tikes and Little Bratz as opposed to the Bratz teenage dolls in calculating
2  MGA's alleged but-for sales lost to Mattel.  <u>See</u> 4/5/11 Trial Tr. Vol. 2 (Malackowski) at
3  52:12-54:5.

4      148.  It is uncontested that MGA suffered no harm as a result of any alleged
5  conduct by Mattel with respect to licensees, manufacturers or distributors.  At trial, the
6  sole basis for the damages number MGA's expert submitted to the jury was Mattel's
7  alleged misconduct with the retailer Kohl's.  <u>See</u> 4/4/11 Trial Tr. Vol. 3 (Malackowski),
8  4/5/11 Trial Tr. Vols. 1-4 (Malackowski).

9      149.  MGA had no right for its products to placed for sale at Kohl's.  MGA
10  offered no evidence of a contract to that effect.  Findings of Fact ¶ 47.  Moreover,
11  MGA had no reasonable or legitimate expectation of any future placement of Bratz
12  products at Kohl's because Kohl's lost at least $1 million dollars on the Bratz dolls it
13  purchased in 2004.  Findings of Fact ¶¶ 55-70.

14      150.  The record is devoid of any instance in which MGA's relationship with
15  any licensee, distributor or manufacturer was impacted by any action by Mattel.  The
16  only evidence that MGA presented showed the opposite:  MGA shared licensees with
17  Mattel, including THQ; MGA and Mattel shared at least one common manufacturer,
18  Early Light; and MGA and Mattel shared at least one common distributor, Bandai.
19  Findings of Fact ¶¶ 111, 129.

20      151.  Because MGA lacks standing to assert a claim under the UCL, judgment
21  shall be entered for Mattel and against MGA on this claim.

22      **2.**      <u>**MGA Cannot Prove An Incipient Violation of Antitrust Law or**</u>
23      <u>**Policy**</u>

24      152.  MGA had the burden of proving that Mattel engaged in an "unfair" act or
25  practice in violation of Section 17200.  <u>See</u> Dkt. 9600 at 111.

26      153.  In order to prove "unfairness" under the UCL, MGA was required to
27  satisfy the following test the California Supreme Court adopted in <u>Cel-Tech.</u>
28  <u>Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.</u>, 20 Cal. 4th 163, 187 (1999):  "When

1  a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or

2  practice invokes section 17200, the word "unfair" in that section means conduct that

3  threatens an incipient violation of an antitrust law, or violates the policy or spirit of one

4  of those laws because its effects are comparable to or the same as a violation of the

5  law, or otherwise significantly threatens or harms competition."  Cel-Tech. Commc'ns,

6  Inc., 20 Cal. 4th at 187.  See also Dkt. 9600 at 111.

7      154.   The hallmark of the federal and state competition laws is the protection of

8  consumers and competition, not individual competitors.  Brunswick Corp. v. Pueblo

9  Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977) (quoting Brown Shoe Co. v. United

10 States, 370 U.S. 294, 320 (1962) (The antitrust laws "were enacted for 'the protection

11 of competition not competitors.'"); see also Cascade Health Solutions v. PeaceHealth,

12 515 F.3d 883, 901 (9th Cir. 2008) (noting the "Supreme Court's long and consistent

13 adherence to the principle that the antitrust laws protect the process of competition,

14 and not the pursuits of any particular competitor").

15     155.   A showing of mere harm to a competitor's interests is insufficient.  See Cel-

16 Tech. Commc'ns, Inc., 20 Cal. 4th at 186 ("the 'antitrust laws ... were enacted for 'the

17 protection of competition, not competitors.' (Cargill, Inc. v. Monfort of Colorado, Inc.

18 (1986) 479 U.S. 104, 115 [107 S.Ct. 484, 491-492, 93 L.Ed.2d 427], original italics.) . . .

19 Injury to a competitor is not equivalent to injury to competition; only the latter is the

20 proper focus of antitrust laws. (See Atlantic Richfield Co. v. USA Petroleum Co. (1990)

21 495 U.S. 328, 344 [110 S.Ct. 1884, 1894-1895, 109 L.Ed.2d 333]; Brunswick Corp. v.

22 Pueblo Bowl-O-Mat, Inc. (1977) 429 U.S. 477, 488-489 [97 S.Ct. 690, 697-698, 50

23 L.Ed.2d 701]; § 17001 [the purpose of the antitrust law is 'to foster and encourage

24 competition' by prohibiting 'practices by which fair and honest competition is destroyed

25 or prevented'].).").

26     156.   "If the same conduct is alleged to be both an antitrust violation and an

27 'unfair' business act or practice for the same reason—because it unreasonably restrains

28 competition and harms consumers—the determination that the conduct is not an

-25-

unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers." <u>Chavez v. Whirlpool Corp.</u>, 93 Cal. App. 4th 363, 375 (2001) (affirming judgment of dismissal); <u>see also</u> <u>Cel-Tech.</u>, 20 Cal. 4th at 184 (prohibiting courts from applying "purely subjective notions of fairness" but requiring courts to determine unfairness "within the meaning of the unfair competition law").

157.   In <u>Cel-Tech.</u>, the California Supreme Court suggested that guidance from the FTC may be appropriate as to what is and is not unfair competition.   <u>See</u> <u>Cel-Tech. Comms., Inc.</u>, 20 Cal. 4th at 185-86.

158.   In <u>FTC. v. H.J. Heinz Co.</u>, the Federal Trade Commission took the position that slotting fees, among other forms of competition by wholesalers, benefit competition and have a positive effect on consumer prices.   The D.C. Circuit held the FTC made a *prima facie* showing in this regard.   <u>FTC v. H.J. Heinz Co.</u>, 246 F.3d 708, 712, 719 (D.C. Cir. 2001) (holding district court erred in refusing to enjoin proposed merger of makers of Beech-Nut and Heinz brand baby foods, where FTC argued that competition between the two manufacturers, including payment of slotting fees in exchange for shelf space, reduced the ultimate price to the consumer); <u>see</u> <u>FTC v. H.J. Heinz Co.</u>, 116 F. Supp. 2d 190, 197 (D.D.C 2000).   Other authorities hold that slotting fees, advertising and promotional allowances and other allowances and discounts to retailers are pro-competitive and not exclusionary as a matter of law because other competitors engage in them.   <u>See, e.g.</u>, <u>El Aguila Food Prods., Inc. v. Gruma Corp.</u>, 301 F. Supp. 2d 612, 620, 629-31 (S.D. Tex. 2003).

159.   A company may choose with whom it wishes to deal and unilaterally may refuse to deal with a distributor or a customer for business reasons without violating the antitrust laws or the policy or spirit of those laws.   <u>People's Choice Wireless, Inc. v. Verizon Wireless</u>, 131 Cal. App. 4th 656, 663 (2005) (affirming judgment of dismissal) ("Nearly a century ago, the Supreme Court recognized that, subject to antitrust laws such as the Sherman Act, there is a 'long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to

1  parties with whom he will deal.' (<u>United States v. Colgate & Company</u> (1919) 250 U.S.

2  300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (<u>Colgate</u>).)  That theme has continued life.  (<u>See</u>

3  <u>Dimidowich v. Bell & Howell</u> (9th Cir. 1986) 803 F.2d 1473, 1478 [stating that a

4  'manufacturer may choose those with whom it wishes to deal and unilaterally may refuse

5  to deal with a distributor or customer for business reasons without running afoul of the

6  antitrust laws'].").

7      160.  Because "[t]here are . . . well-recognized economic benefits to exclusive

8  dealing arrangements, including the enhancement of interbrand competition," exclusive

9  dealing arrangements are analyzed under the rule of reason.  <u>Omega Envtl., Inc. v.</u>

10  <u>Gilbarco, Inc.</u>, 127 F.3d 1157, 1162 (9th Cir. 1997) ("We thus analyze challenges to

11  exclusive dealing arrangements under the antitrust rule of reason.").

12      161.  "Only those arrangements whose 'probable' effect is to 'foreclose

13  competition in a substantial share of the line of commerce affected' violate Section 3." <u>Id.</u>

14  (quoting <u>Tampa Elec. Co. v. Nashville Coal Co.</u>, 365 U.S. 320, 327 (1961)) (internal

15  citations omitted).

16      162.  In order to establish exclusive dealing under a rule of reason analysis, "the

17  competition foreclosed by the contract must be found to constitute a substantial share of

18  the relevant market." <u>Tampa Elec. Co.</u>, 365 U.S. at 328.  "That is to say, the opportunities

19  for other traders to enter into or remain in that market must be significantly limited" and

20  will be "judged on a comparative basis . . . when  weighed against the total volume of that

21  product in the relevant market." <u>Id.</u> at 328-29 (internal citations and quotations omitted).

22      163.  "To determine substantiality in a given case, it is necessary to weigh the

23  probable effect of the contract on the relevant area of effective competition, taking into

24  account the relative strength of the parties, the proportionate volume of commerce

25  involved in relation to the total volume of commerce in the relevant market area, and the

26  probable immediate and future effects which pre-emption of that share of the market

27  might have on effective competition therein. *It follows that a mere showing that the*

28

1   *contract itself involves a substantial number of dollars is ordinarily of little consequence*."
2   Id. at 329 (emphasis added).

3       164. In addition, the Ninth Circuit recognizes that "exclusive dealing
4   arrangements imposed on distributors rather than end-users are generally less cause for
5   anticompetitive concern." Omega Envtl., Inc., 127 F.3d at 1163. "If competitors can
6   reach the ultimate consumers of the product by employing existing or potential alternative
7   channels of distribution, it is unclear whether such restrictions foreclose from competition
8   any part of the relevant market. See generally ABA Antitrust Section, Monograph No. 8,
9   Vertical Restrictions Upon Buyers Limiting Purchases of Goods from Others, 92 (1982);
10  Richard M. Steuer, Exclusive Dealing in Distribution, 69 Cornell L. Rev. 101, 118-124
11  (1983); Herbert Hovenkamp, Federal Antitrust Policy § 10.8 at 391 (1994) (foreclosure of
12  even 'a large percentage of one mode of distribution will have little anticompetitive effect
13  if another mode is available.')." Id.

14      165. In R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362
15  (M.D.N.C. 2002), the district court granted summary judgment against competitors of
16  Philip Morris who complained that its merchandising program violated federal antitrust
17  laws. The 4th Circuit affirmed. R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 67 Fed.
18  Appx. 810 (4th Cir. 2003). Specifically, other tobacco companies complained, as MGA
19  does here, that Philip Morris engaged in unfair competition because it made "promotional
20  payments . . . .to retailers in exchange for favorable display, advertising, and promotional
21  space within retailers' stores." R.J. Reynolds, 199 F. Supp. 2d at 370. The court rejected
22  plaintiff's argument that Philip Morris retailer programs foreclosed a substantial share of
23  the relevant market, id. at 388, because, among other things (a) plaintiffs' market share
24  increased, like Bratz did, during the relevant time period, (b) plaintiffs revenues increased,
25  like MGA's, during the relevant time period, (c) the merchandising agreements are of
26  short term duration, as are Mattel's one-year agreements with Kohl's, and (d) all retailers,
27  including Kohl's, sold MGA's products. Id. at 391-93.

28

166.   MGA failed to present any competent evidence at trial regarding its broad unfair competition allegations, other than its allegations concerning Kohl's and Mattel's alleged interference with licensees, a single manufacturer and a single distributor. Findings of Fact ¶¶ 132-135.

167.   MGA has not met its burden with respect to Kohl's or alleged interference with licensees, manufacturers or distributors.  MGA failed to present any evidence at trial sufficient to establish that Mattel's conduct with respect to Kohl's or any licensees, manufacturers or distributors "threaten[ed] an incipient violation of an antitrust law, or violate[d] the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."  Cel-Tech. Commc'ns, Inc., 20 Cal. 4th at 187.

168.   There is no evidence showing that Mattel engaged in exclusive dealing.  Even if there were, as a matter of law, simply entering into an exclusive dealing arrangement alone would not violate the antitrust laws.  In any event, the evidence shows no such arrangement existed here.  Kohl's, an $18 billion dollar corporation much larger than Mattel, was unhappy with MGA due to the poor performance of MGA products in 2004. Findings of Fact ¶¶ 40, 41, 48-55. When Kohl's repeatedly sought assistance from MGA to offset mounting losses, MGA refused or offered counter-proposals that were unacceptable to Kohl's.  Findings of Fact ¶¶ 56-70.  As the relationship between Kohl's and MGA deteriorated, MGA knew that failure to address Kohl's concerns would affect MGA's future business with Kohl's.  Findings of Fact ¶¶ 58, 60, 62, 67, 70.   It is therefore unsurprising that Kohl's, faced with $1 million in margin losses on Bratz, approached Mattel in December 2004 with a potential business opportunity that involved, among other terms, (1) increasing BARBIE's shelf space by 4 feet in Kohl's toy department; and (2) assistance with markdowns for Kohl's old Bratz inventory. Findings of Fact ¶¶ 77-80. Moreover, MGA failed to present any evidence at trial that the 2005 and 2006 contracts between Kohl's and Mattel, or any other conduct by Mattel in connection with Kohl's, even comes close to meeting the requisite showing of unfair competition

-29-

under <u>Cel-Tech.</u>  Findings of Fact ¶¶ 84-94.  There is no evidence of harm to competition or consumers.  Findings of Fact ¶¶ 94, 98, 136-38.  Indeed, Kohl's continued to sell MGA products, including Bratz, in 2005 and 2006.  Findings of Fact ¶¶ 71-75.   Moreover, MGA sold over $500 million and over $600 million of Bratz dolls respectively, in those years.  Finding of Fact ¶ 32.  This alone confirms that MGA continued to have numerous distribution channels open to it.

169.   There is no evidence in the trial record of any interference with MGA's relationship with any licensee, manufacturer or distributor, much less evidence of harm to competition.   There is no evidence that any licensee, manufacturer or distributor terminated or modified its relationship with MGA, much less did so as the result of any conduct of Mattel.  Findings of Fact ¶¶ 105-31.  MGA even recognized this fact in that it did not present at trial any purported loss or damage that it allegedly suffered as a result of alleged interference with licensees, manufacturers or distributors.  Findings of Fact ¶¶ 113, 125, 131.

### 3.   <u>MGA Cannot Prove Any Claim For Restitution</u>

170.   California Business and Professions Code § 17203 does not permit the recovery of damages.  <u>See</u> <u>Bank of the West v. Superior Court</u>, 2 Cal. 4th 1254, 1266 (1992); <u>see also</u> <u>Cel-Tech Commc'ns, Inc.</u>, 20 Cal.4th at 179 ("Plaintiffs may not receive damages, much less *treble* damages, or attorney fees" under the UCL) (emphasis in original).

171.   The restitutionary relief available under the UCL permits a court to "restore to any person in interest any money or property, real or personal, which may have been acquired by means of … unfair competition."  <u>Cal. Bus. & Prof. Code</u> § 17203.

172.   The goal of restitution under the UCL is "to restore the status quo by returning to the plaintiff funds *in which he or she had an ownership interest*."  <u>Korea Supply Co. v. Lockheed Martin Corp.</u>, 29 Cal. 4th 1134, 1149 (2003) (emphasis added).

173.   Restitution under the UCL is only available where the sum at issue can "clearly be traced to particular funds or property in the defendant's possession."  <u>Colgan</u>

1  v. Leatherman Tool Group, Inc., 135 Cal. App. 4th 663, 699 (2006).  See also See Bank of

2  the West, 2 Cal. 4th at 1266 (holding that the only "nonpunitive monetary relief available"

3  under the UCL "is disgorgement of money wrongfully obtained").

4  174.   Restitution may not include any profits earned by Mattel that MGA may

5  claim were earned as a result of Mattel's unfair competition.  Nor may restitution include

6  any profits MGA claims it lost.  See Cal. Bus. & Prof. Code § 17203; Oculus Innovative

7  Sciences, Inc. v. Prodinnv, S.A. de C.V., 2010 WL 4774659, at *5 (N.D. Cal. Nov. 16,

8  2010) (finding that disgorgement of profits is "not an available remedy under the UCL.");

9  Korea Supply Co., 29 Cal. 4th 1134 at 1149 (holding sole monetary relief available under

10  section 17203 is restitution, and that "[a]ny award that plaintiff would recover from

11  defendants would not be restitutionary as it would not replace any money or property that

12  defendants took directly from plaintiff"); Inline, Inc. v. A.V.L. Holding Co., 125 Cal.

13  App. 4th 895, 904-05 (2005) (rejecting various forms of requested recovery because not

14  restitutionary, including consequential losses and fair market value of property sold);

15  Pegasus Satellite Television, Inc. v. DirecTV, Inc., 318 F. Supp. 2d 968, 979 (C.D. Cal.

16  2004) (one competitor does not have a vested interest in the profits of another).

17  175.   Property, as used in Section 17203, refers to a vested property interest, not

18  merely an expectation of a future business.  Korea Supply Co., 29 Cal.4th at 1149-50

19  (holding that an expectancy of payment from a third party is a contingent right that cannot

20  be recovered through a UCL claim).  See U.S. v. Rodrigues, 229 F.3d 842, 846 (9th Cir.

21  2000) (finding that under the federal Victim and Witness Protection Act of 1982,

22  restitution was not available for a contingent loss in which the company had only an

23  expectancy interest; restitution could only be recovered for the loss of a vested interest).

24  176.   MGA presented no evidence showing that Mattel engaged in unfair

25  competition.  There is no evidence showing that Mattel engaged in exclusive dealing or

26  any other conduct with respect to Kohl's that harmed competition or consumers.  There is

27  no evidence showing that Mattel interfered with MGA's relationship with any licensee,

28  manufacturer or distributor, much less evidence of harm to competition.  There is no

competent evidence supporting the previously identified factual bases for MGA's unfair competition claim set forth above.

177.   MGA has failed to prove it has any claim for restitution.  MGA asserts it is entitled to "lost profits" it would have earned in 2005 and 2006 but for Mattel's alleged conduct concerning Kohl's.  Findings of Fact ¶¶ 99-100.  But MGA failed to prove at trial any loss of "money or property that defendants took directly from [MGA]" or "money or property in which [MGA] has a vested interest."  Findings of Fact ¶¶ 43-70.

178.   MGA adduced no evidence that it had any "vested interest" in the placement of its products on Kohl's shelves.  It introduced no agreement with Kohl's of any type for any year.  Finding of Fact 47.  Rather, it had to compete for shelf space at Kohl's by offering products that would appeal to the Kohl's consumer and generate profits for Kohl's.  Bratz dolls did neither of those things.  Findings of Fact 17, 28, 29.  Accordingly, Mattel did not deprive MGA of any "property" as that term is used in section 17203.

179.   Moreover, the foregoing authorities make clear that restitution may not include any profits MGA claims it lost.  See Korea Supply Co., 29 Cal. 4th at 1149; Oculus Innovative Sciences, Inc.,  2010 WL 4774659, at *5; Inline, Inc., 125 Cal. App. 4th at 904-05; Pegasus Satellite Television, Inc., 318 F. Supp. 2d at 979.

180.   Even if MGA had proven it was entitled to some amount of restitution, its damages analysis is fatally flawed because MGA's expert failed to apportion damages for the teenage Bratz dolls versus Little Tikes and Little Bratz.  Findings of Fact ¶ 101.  There is no principled basis to identify any damages.  Only Bratz dolls were allegedly excluded, but the damages analysis MGA offered is not limited to Bratz dolls or any amount of money for the Bratz dolls identified.

181.   Appellate courts reverse lost profits awards based on speculation or unsupported by evidence.  See, e.g., Fireman's Fund Ins. Cos. v. Big Blue Fisheries, Inc., 143 F.3d 1172, 1174 (9th Cir. 1998) ("We uphold the district court's finding that the Big Blue's use of radar was non-negligent, but reverse the district court's demurrage award because it is unsupported by the record."); F.D.I.C. v. Craft, 157 F.3d 697, 704-705 (9th

1  Cir. 1998) (holding that speculative damages that have not been established at trial are not

2  recoverable).

3          182.   MGA's own records show that Kohl's purchased and sold MGA products in

4  its stores in both 2005 and 2006.  Finding of Fact ¶¶ 71-75.  In addition, MGA failed to

5  show that Kohl's purchased any Bratz dolls in 2007, 2008 or 2009, or if they did, the

6  value of any such purchases.  Finding of Fact ¶¶ 102-04.  Because MGA's expert failed to

7  limit or apportion damages for the teenage Bratz dolls, as opposed to Little Tikes, Little

8  Bratz or any other MGA product, the Court has no evidence from which to determine (a)

9  whether MGA in fact lost profits on Bratz dolls sales in 2005 and 2006, or (b) the amount

10 of any such lost profits.  Findings of Fact ¶¶ 99-104.

11         183.   Accordingly, MGA is not entitled to any monetary relief for its UCL claim.

12              **4.     MGA's UCL Claim Is Barred By The Competition Privilege**

13         184.   MGA's UCL claim is barred in whole or in part by the competition privilege.

14 See Mattel's Fourth Am. Answer And Counterclaims, Dkt. 7714, at 25 (Eleventh

15 Affirmative Defense); Mattel's Fourth Am. Proposed Jury Instructions, Dkt. 9683, at 237-

16 38.

17         185.   The competition privilege protects one from liability for inducing a third

18 person not to enter into a prospective contractual relation with a business competitor.  See

19 Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners, 52 Cal.

20 App. 4th 867, 880-81 (1997) ("California law has long recognized a 'competition

21 privilege' which protects one from liability for inducing a third person not to enter into a

22 prospective contractual relation with a business competitor.") (internal citations and

23 quotations omitted); San Francisco Design Center Assocs. v. Portman Cos., 41 Cal. App.

24 4th 29, 42-43 (1995) ("In order to defeat the privilege the defendant's conduct must be

25 unlawful or illegitimate.  That is, when a claimant charges its competitor with interference

26 with prospective economic advantage and the competitor raises the competition privilege

27 as a defense, the claimant must show the competitor's conduct violated a statute or

28 constituted a tort such as fraud or unfair competition.  The defendant's conduct must be

independently actionable."); <u>Restatement (Second) of Torts</u> § 768 ("(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if (a) the relation concerns a matter involved in the competition between the actor and the other and (b) the actor does not employ wrongful means and (c) his action does not create or continue an unlawful restraint of trade and (d) his purpose is at least in part to advance his interest in competing with the other.").

186.   To prevail on the affirmative defense of competition privilege, Mattel must prove by a preponderance of the evidence that (a) the relation between MGA and third parties, including retailers, licensees, manufacturers and distributors, concerns a matter involved in the competition between Mattel and MGA, (b) Mattel did not employ improper means, and (c) Mattel's purpose was at least in part to advance its interest in competition with MGA.

187.   Mattel has presented evidence at trial that the relation between MGA and Kohl's concerns a matter involved in the competition between Mattel and MGA. Findings of Fact ¶¶ 11, 12, 77, 78.

188.   Mattel has also proven that it did not employ improper means. Neither the 2005 nor the 2006 contracts with Kohl's contain any exclusionary provision or reference to MGA. Findings of Fact ¶¶ 84-88. MGA produced no evidence that the practical effect of either agreement would have been to foreclose MGA from competing for business at Kohl's. Findings of Fact ¶¶ 84-98.

189.   MGA did not prove that the 2005 and 2006 agreements or any other agreement with Kohl's harmed consumers. Kohl's continued to carry MGA products at its stores in 2005 and 2006. Findings of Fact ¶¶ 71-75.

190.   Finally, there is ample evidence that Mattel's purpose in entering into the 2005 and 2006 contracts with Kohl's was at least in part to advance its interest in

MATTEL'S CORRECTED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR MGA'S 17200 CLAIM

1    competition with MGA.  Mattel sought to increase representation of BARBIE at Kohl's

2    and engaged in lawful negotiations with Kohl's to do so.  Findings of Fact ¶¶ 78-95.

3        191.   With respect to MGA's claim that Mattel interfered with its relationships

4    with licensees, manufacturers and distributors, MGA presented no evidence of

5    interference.  Findings of Fact ¶¶ 105-31.

6        192.   MGA's UCL claim fails on the merits for the reasons discussed above.  Even

7    if MGA had proven all of the elements of its UCL claim, the Court would nonetheless

8    dismiss it because Mattel has prevailed on its affirmative defense of competition privilege.

9            **5.    MGA's Unclean Hands Precludes Any Equitable Remedy**

10       193.   Mattel asserts that MGA should not be able to recover restitution or

11   injunctive relief against Mattel because MGA has unclean hands and is not entitled to

12   any equitable remedy.  See Mattel's Fourth Am. Answer And Counterclaims, Dkt.

13   7714, at 24 (Fourth Affirmative Defense); Mattel's Fourth Am. Proposed Jury

14   Instructions, Dkt. 9683, at 226-27.

15       194.   While "equitable defenses may not be asserted to wholly defeat a UCL

16   claim since such claims arise out of unlawful conduct," the California Supreme Court

17   held in Cortez v. Purolator Air Filtration Prods. Co., 23 Cal. 4th 163, 179-80 (2000),

18   that  equitable considerations may "guide the court's discretion in fashioning the

19   equitable remedies authorized by section 17203."  Cortez, 23 Cal. 4th at 179.  "What

20   would otherwise be equitable defenses may be considered by the court when the court

21   exercises its discretion over which, if any, remedies authorized by section 17203

22   should be awarded."  Id. at 179-80.

23       195.   Under Cortez, "the trial court has the discretion to consider equitable

24   defenses such as unclean hands in creating the remedies authorized by Business and

25   Professions Code section 17203."  See, e.g., Ticconi v. Blue Shield of California Life

26   & Health Ins. Co., 160 Cal.App.4th 528, 544-45 (2008) (citing Cortez, 23 Cal. 4th at

27   179, 182).

28

196.    The doctrine of unclean hands requires that a plaintiff act fairly in the matter for which he seeks a remedy.  See Kendall-Jackson Winery Ltd. v. Sup. Ct., 76 Cal. App. 4th 970, 978 (1999) ("The defense of unclean hands arises from the maxim, 'He who comes into Equity must come with clean hands.'  The doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy.  He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim.") (internal citations and quotations omitted).

197.    The doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." Adler v. Federal Republic of Nigeria, 219 F.3d 869, 877 (9th Cir. 2000) (quoting Precision Instr. Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945)).

198.    MGA alleges Mattel is liable for unfair competition based upon its conduct with the retailer Kohl's, but there is ample evidence MGA was offering money to Kohl's for the same shelf space.  Findings of Fact ¶¶ 62, 68-70.  MGA did so at a time when Kohl's was facing severe margin losses due to poorly performing Bratz products, yet MGA conditioned its offers of money to Kohl's in 2004 and 2005 on minimum purchase requirements for more non-performing MGA products.  Findings of Fact ¶¶ 55-70.   This conduct relates directly to MGA's unfair competition allegations against Mattel.  If Mattel's conduct is a "bribe" or "slotting fee" then MGA equally should be precluded from any equitable relief under the unclean hands doctrine.  Adler, 219 F.3d at 877;  Kendall-Jackson Winery Ltd., 76 Cal. App. 4th at 978.

### 6.    MGA's UCL Claim Is Superseded By CUTSA

199.    California's Uniform Trade Secrets Act ("CUTSA") "occupies the field" of common law claims based on the misappropriation of a trade secret.  K.C. Multimedia, Inc. v. Bank of America Tech. & Operations, Inc., 171 Cal. App. 4th 939, 954 (2009).

200.   The Act's language "implicitly preempts alternative civil remedies based on trade secret misappropriation." K.C. Multimedia, 171 Cal. App. 4th at 954 (citation omitted).

201.   A claim cannot simply depend on a "different theory of liability" to survive CUTSA's supersessive effect. See id. at 957-959 & n. 7 (distinguishing rule set forth in Powell Prods., Inc. v. Marks, 948 F. Supp. 1469, 1474 (D. Colo. 1996) (allowing a claim based on trade secret misappropriation to survive if the claim "requires an [element] [] which is not an element of a misappropriation claim")).

202.   The claim must be based on more than "the same nucleus of facts as the misappropriation of trade secrets claim for relief." K.C. Multimedia, 171 Cal. App. 4th at 958 (quoting Digital Envoy, Inc. v. Google, Inc., 370 F. Supp. 2d 1025, 1035 (N.D. Cal. 2005)).

203.   The Court has previously concluded that CUTSA supersedes claims, including the statutory unfair competition claims in this case, based upon the misappropriation of trade secret information. See Am. MSJ Order, Dkt. 9600, at 91; Order on Mtns. In Limine, Dkt. 9669, at 22; Order Regarding Advisory Opinion on Claims for Violations of Cal. Bus. & Prof. Code § 17200, Dkt. 10319, at 1-2. See also K.C. Multimedia, 171 Cal. App. 4th at 961 (holding that "appellant's statutory unfair competition claim" was preempted by CUTSA where "[a]s a factual basis for its claim, appellant alleges the same conduct that gives rise to trade secrets claim").

204.   None of the evidence presented at trial regarding alleged misappropriation of MGA information, including without limitation from toy fairs, can properly be part of MGA's UCL claim. See Am. MSJ Order, Dkt. 9600, at 91; Order on Mtns. In Limine, Dkt. 9669, at 22; Order Regarding Advisory Opinion on Claims for Violations of Cal. Bus. & Prof. Code § 17200, Dkt. 10319, at 1-2. See also K.C. Multimedia, 171 Cal. App. 4th at 961.

MATTEL'S CORRECTED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR MGA'S 17200 CLAIM

1

## **Conclusion**

2      Mattel respectfully requests that the Court adopt the forgoing findings of fact and

3  conclusions of law, and that judgment to be entered for Mattel and against MGA on

4  MGA's statutory unfair competition claim, and that no restitution or other relief, including

5  injunctive relief, be awarded to MGA on this claim.

6

7  DATED:   April 26, 2011              QUINN      EMANUEL      URQUHART &
                                        SULLIVAN. LLP
8

9
                                        By /s/ John B. Quinn
10                                         John B. Quinn
                                           Attorneys for Mattel, Inc., and Mattel de
11                                         Mexico. S.A. de C.V.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28