QUINN EMANUEL URQUHART & SULLIVAN, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  William C. Price (Bar No. 108542)
  (williamprice@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:   (213) 443-3000
Facsimile:    (213) 443-3100

Attorneys for Mattel, Inc., and Mattel de Mexico, S.A. de C.V.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MATTEL, INC., a Delaware corporation, and Mattel de Mexico, S.A. de C.V., a Mexico business entity, <br><br> Plaintiff, <br><br> vs. <br><br> MGA ENTERTAINMENT, INC., a California corporation, et al., <br><br> Defendant. <br> _____ <br> AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 DOC (RNBx) <br> Consolidated with <br> Case No. CV 04-09059 <br> Case No. CV 05-02727 <br><br> **MATTEL'S OBJECTIONS TO MGA PARTIES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW RE MATTEL'S UNFAIR COMPETITION CLAIM** |

00505.07975/4120226.5

I.  **ARGUMENT: IN LIGHT OF THE VERDICT, THE COURT NEED NOT ADOPT MGA'S PROPOSED FINDINGS OF FACT AND INSTEAD MAY RELY ON THE JURY'S DISPOSITIVE FINDINGS**

Mattel sought relief under California Business and Professions Code § 17200 ("UCL") based on MGA's interference with contractual relations and on MGA's commercial bribery.  MGA has proposed findings of fact on these claims. However, these findings are unnecessary in light of the jury's findings.  In deciding Mattel's UCL claim, the Court is bound by these findings.  Los Angeles Police Protective League v. Gates, 995 F.2d 1469, 1473-1474 (9th Cir. 1993) (reversing denial of equitable relief because the district court's factfinding was contrary to the implicit findings of the jury); Floyd v. Laws, 929 F.2d 1390, 1397 (9th Cir. 1991) ("it would be a violation of the seventh amendment right to jury trial for the court to disregard a jury's finding of fact."); Miller v. Fairchild Indus., 885 F.2d 498, 507 (9th Cir. 1989) (where equitable claims are "based on the same facts" as legal claims tried to a jury, "the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations"); see also EchoStar Satellite Corp. v. NDS Group PLC, 2008 WL 4596644, at *4 (C.D. Cal. Oct. 15, 2008) (in deciding a claim under § 17200, the "Court is bound by the explicit and implicit findings of the jury").

Here, among other findings, the jury found against Mattel on its claim of intentional interference with Mattel's contracts with Cabrera, Morales and Salazar. The jury also found that Mattel's claim of intentional interference with contract as to Bryant accrued before specified dates.  In light of the jury's findings, which are dispositive of the UCL issues, Mattel is not seeking further relief under the UCL, and there is no need for the Court to make additional findings of fact.  For these reasons, Mattel did not submit proposed findings of fact on its UCL claim.  The Court should not make findings of fact on this claim because the issue is moot.  Though Mattel reserves all rights, including its rights to appeal, additional findings of fact by the Court at this stage run the risk of being inconsistent with the verdict, and should not be made.

1     Should the Court elect to make findings of fact with respect to Mattel's

2   UCL claim, Mattel objects to MGA's proposed findings of fact as set forth below.

3   **II.     OBJECTIONS TO PROPOSED FINDINGS OF FACT**

4         **PROPOSED FINDING OF FACT 14:**  On April 20, 2011, the jury

5   returned a verdict on Mattel's claims against MGA and Mr. Larian.  The jury found in

6   favor of MGA and Mr. Larian on all of Mattel's claims with the exception of Mattel's

7   claim that MGA and Mr. Larian intentionally interfered with Mattel's contract with

8   Carter Bryant.  Dkt. No. 10518 (Jury Verdict).  Significantly, the jury found in favor of

9   MGA and Mr. Larian with respect to Mattel's intentional interference claim relating to

10  Ms. Cabrera, Ms. Morales, and Ms. Salazar (collectively the "Seamstresses"). *Id*.

11        **MATTEL RESPONSE 14:**  Mattel reserves all rights on appeal, and

12  objects to MGA's mischaracterization of Cabrera, Morales and Salazar as

13  "seamstresses."

14

15        **PROPOSED FINDING OF FACT 15:**  Peter Marlow is an individual

16  and the bookkeeper and business manager for Ms. Veronica Marlow.  2/24/2011 (Vol.

17  2) Tr. 103:2-5, 115:16-17 (P. Marlow Testimony).  Mr. Marlow submitted invoices to

18  MGA for the independent contractor services performed by Ms. Marlow. *Id*. at 103:2-

19  5.

20        **MATTEL RESPONSE 15:**  Mattel objects to this proposed finding of

21  fact.  The services Veronica Marlow provided to MGA involved the work of Beatriz

22  Morales, Ana Cabrera and Maria Salazar (collectively "samplemakers").  Veronica

23  Marlow paid the samplemakers to work on Bratz fashions for the benefit of MGA

24  while they were employed by Mattel.  2/25/2011 Trial Tr., Vol 1 (Marlow) at 18:6-

25  19:1.  MGA ultimately paid the samplemakers' compensation for their work on Bratz

26  for Ms. Marlow.  2/25/2011 Trial Tr., Vol 1 (Marlow) at 18:23-19:5.

27

28        **PROPOSED FINDING OF FACT 16:**  Veronica Marlow is an

1  individual, a former employee of Mattel, and former independent contractor of MGA.

2  *Id*. at 103:25-104:15, 2/25/2011 (Vol. 1) Tr. 76:23-77:3 (P. Marlow Testimony).  As an

3  independent contractor, Ms. Marlow provided fashion samples for Bratz dolls from

4  October 2000 through mid-2005.  2/24/2011 (Vol. 2) Tr. 102:8-12 (P. Marlow

5  Testimony), 2/25/2011 (Vol. 1) Tr. 18:23-19:5 (P. Marlow Testimony).

6          **MATTEL RESPONSE 16:**  Mattel objects to this proposed finding of

7  fact.  The samplemakers created fashion samples for Bratz dolls, which Ms. Marlow

8  provided to MGA while the samplemakers were employed by Mattel.  2/25/2011 Trial

9  Tr., Vol 1 (Marlow) at 18:6-19:1.  Additionally, the evidence specifically shows that

10  Marlow billed MGA for 81 hours of work on Bratz fashions between October 13 and

11  20, 2000.  2/24/2011 Trial Tr., Vol. 2 (Marlow) at 105:4-106:17; 1/20/2011 Trial Tr.,

12  Vol. 2 (Garcia) at 20:7-20; TX 606.

13

14          **PROPOSED FINDING OF FACT 17:**  To prepare these fashion

15  samples, Ms. Marlow worked with three different seamstresses who had day jobs at

16  Mattel.  Ms. Cabrera worked with Ms. Marlow from October 2000 through mid-2005,

17  while employed by Mattel.  2/25/2011 (Vol. 1) Tr. 18:10-15 (P. Marlow Testimony).

18  Ms. Morales worked with Ms. Marlow from October 2001 through mid-2005, while

19  employed by Mattel.  *Id*. at 18:16-22.  Both Ms. Cabrera and Ms. Morales worked with

20  Ms. Marlow from Ms. Cabrera's garage.  *Id*. at 85:23-86:5.  Ms. Cabrera and Ms.

21  Morales were both fired by Mattel in 2008, three years after their relationship with Ms.

22  Marlow ended, when Mattel learned of this previous conduct.  3/30/2011 (Vol. 1) Tr.

23  83:10-84:15, 86:16-22 (Thomas Testimony).

24          **MATTEL RESPONSE 17:**  Mattel objects to this proposed finding of

25  fact.  Mattel objects to a finding that the samplemakers' employment was merely a

26  "day job."  No evidence to this effect was adduced at trial.  To the contrary, the

27  undisputed evidence was that the samplemakers were full-time Mattel employees with

28  confidentiality agreements, conflict of interest agreement and benefits.  4/7/2011 Trial

1   Tr., Vol. 1 (Dail) at 25:3-37:8; TX 24134-046-047 (Cabrera 1995 Confidentiality and
2   Inventions Agreement); TX 24135-039 (Morales 2000 Confidentiality and Inventions
3   Agreement); TX 35193-037-038 (Salazar 1996 Confidentiality and Inventions
4   Agreement); TX 24134-044-045 (Cabrera Conflict of Interest Questionnaire); TX
5   24135-038 (Morales Conflict of Interest Questionnaire); TX 35193-035-036 (Salazar
6   Conflict of Interest Questionnaire); TX 24134-037-038 (Cabrera was salaried
7   employee with benefits); TX 24135-032-034 (Morales was salaried employee with
8   benefits); TX 35193-0040 (Salazar was salaried employee with merit increases).
9   There is no basis in the record for the Court to make any finding that these jobs were
10  "day jobs," with the implicit suggestion that this limited the scope of the
11  samplemakers' duties to Mattel.

12          Additionally, Cabrera and Morales's work on Bratz for MGA was
13  extensive.  Cabrera worked on at least 150 Bratz dolls while she was employed by
14  Mattel, and Morales worked on approximately 100 Bratz dolls while she was
15  employed by Mattel.  2/25/2011 Trial Tr., Vol. 1 (Marlow) at 39:3-41:20, 45:15-24;
16  TX 13223.  Second, Cabrera and Morales were fired for breaching their employment
17  agreements with Mattel, which prohibited them from working for a competitor while
18  employed by Mattel.  TX 24134-046-047 (Cabrera 1995 Confidentiality and
19  Inventions Agreement); TX 24135-039 (Morales 2000 Confidentiality and Inventions
20  Agreement); TX 35193-037-038 (Salazar 1996 Confidentiality and Inventions
21  Agreement).   There is no dispute that their simultaneous work for Mattel and MGA
22  was inappropriate – Larian admitted that working simultaneously for Mattel and MGA
23  would be wrong.  2/9/2011 Trial Tr., Vol. 1 (Larian) at 31:5-17.  In any event, the
24  termination of the samplemakers has no relevance to Mattel's claim for purposes of the
25  Court's findings of fact.

26

27          **PROPOSED FINDING OF FACT 18:**  Ms. Salazar worked with Ms.
28  Marlow beginning in October 2000 and was laid off by Mattel in March 2001.  *Id*. at

18:6-9; 4/7/2011 (Vol. 1) Tr. 49:4- 14 (Dail Testimony).  Ms. Salazar worked on Ms. Marlow's projects from her garage.  2/25/2011 (Vol. 1) Tr. 61:25-62:10, 84:23-85:6 (P. Marlow Testimony).

**MATTEL RESPONSE 18:**  Mattel objects to this finding of fact.  Contrary to MGA's proposed finding that Ms. Salazar worked from her garage, Ms. Salazar's timesheets show that she worked on the first generation of Bratz dolls during daytime hours when she should have been working at Mattel.  TX 5723; 1/20/2011 Trial Tr., Vol. 2 at 30:5-8 (Garcia).  Specifically, the timesheets show she worked 7 hours on Friday 10/13/2000, 10.5 hours on Wednesday 10/18/2000, 13 hours on Friday 11/24/2000 and 9 hours on Thursday 11/30/2000.  Id.

**PROPOSED FINDING OF FACT 20:**  There is no evidence that Ms. Salazar, Ms. Cabrera or Ms. Morales failed to perform their work for Mattel.  There is no evidence that Ms. Salazar, Ms. Cabrera or Ms. Morales received money from Mattel for work that they failed to perform.

**MATTEL RESPONSE 20:**  Mattel objects to this proposed finding of fact.  It is contrary to the above-cited evidence regarding the samplemaker's simultaneous employment by Mattel and MGA, and there is evidence that the samplemakers were working for MGA at times when they should have been working for Mattel.  1/20/2011 Trial Tr., Vol. 2 (Garcia) at 30:5-8; TX 5723.  Moreover, MGA's efforts to conceal the samplemakers' work for MGA – including Larian's instruction to MGA attorney Craig Holden to "make sure Paula [Garcia] is preped and doesn't know Veronica was using Mattel seamsters" – shows MGA's own awareness that this work was detrimental to Mattel.  3/10/2011 Trial Tr., Vol. 2 (Larian) at 28:25-31:2; TX 24305; TX 24306.

**PROPOSED FINDING OF FACT 21:**  Mattel did not present evidence of restitutionary damage relating to its employment relationships with Ms. Salazar, Ms.

1   Cabrera or Ms. Morales.

2   **MATTEL RESPONSE 21:**  Mattel objects to this proposed finding of

3   fact.  MGA's employment of the samplemakers provided MGA with a "head start" on

4   its sales of Bratz, without which MGA would not have had Bratz doll samples in time

5   for the 2001 Hong Kong Toy Fair.  2/4/2011 Trial Tr., Vol. 1 (O'Connor) at 61:11-

6   62:3.  Internal MGA documents show that MGA was looking for samplemakers to

7   support the development of Bratz in October 2000, just weeks prior to the Hong Kong

8   Toy Fair in January 2000.  TX 11641.  Additionally, Mattel provided extensive

9   testimony regarding MGA profits unjustly obtained through the exploitation of Bratz.

10  3/8/2011 Trial Tr., Vol. 1 (Wagner) at 121:25-130:19; 3/8/2011 Trial Tr., Vol. 2

11  (Wagner) at 5:6-11:25.

12

13  **PROPOSED FINDING OF FACT 23:**  Carter Bryant was an employee

14  of Mattel for two separate periods.  The second period was from January 4, 1999 to

15  October 19, 2000.  1/28/2011 (Vol. 1) Tr. 62:11-13 (Bryant Testimony); 2/1/2011

16  (Vol. 3) Tr. 7:9-16 (Bryant Testimony).

17  **MATTEL RESPONSE 23:**  Mattel objects to this finding of fact.

18  Bryant's first period of employment with Mattel was from November 1995 through

19  April 1998.  1/27/2011 Trial Tr., Vol. 3 (Bryant) at 90:4-19.  Bryant was not employed

20  by Mattel from April 28, 1998 through January 4, 1999, then was employed until

21  October 19, 2000, when Bryant eventually left Mattel.  Id. at 92:17-93:13.

22

23  **PROPOSED FINDING OF FACT 24:**  Mr. Bryant received a salary for

24  the work he performed at Mattel.  TX 13.

25  **MATTEL RESPONSE 24:**  Mattel objects to this proposed finding of

26  fact.  To the extent it suggests that the employment agreement between Mattel and

27  Bryant involved only payment of a salary, it is incorrect.  Bryant received a salary and

28  other benefits as a Mattel employee, in exchange for which he agreed to design dolls

and other products for Mattel.  TX 13; 2/3/2011 Trial Tr., Vol. 1 (Bryant) at 93:14-
94:8; 1/18/2011 Trial Tr., Vol. 2 (Ross) at 110:14-24; 1/28/2011 Trial Tr., Vol. 2
(Bryant) at 81:13-86:25;  2/2/2011 Trial Tr., Vol. 2 (Bryant) at 31:23-32:9.  Moreover,
in connection with both of his periods of employment with Mattel, Bryant signed a
Confidential Information and Inventions Agreement.  TX 23; TX 9924.

**PROPOSED FINDING OF FACT 25:**  There is no evidence that Mr.
Bryant failed to perform his work at Mattel. Mattel also did not present evidence that
Mr. Bryant received money from Mattel for work that he failed to perform.

**MATTEL RESPONSE 25:**  Mattel objects to this proposed finding of
fact.  Starting at least as early as September 2000, while he was still employed by
Mattel, Bryant directed the production of the first generation of Bratz dolls for MGA.
Jan. 28, 2011 Trial Tr., Vol. 1 (Bryant) at 96:17-25 (Bryant started working on Bratz
shortly after Sept. 14); 108:7-13 (Bryant had discussions with Garcia in mid-
September regarding Bratz); 108:23-109:1 (Bryant informed Garcia and Larian he was
obtaining hair samples); id., Vol. 2 (Bryant) at 90:7-18 (Larian and Garcia knew
Bryant was a Mattel designer in Sept. 2000 when he was helping launch Bratz); Feb. 3,
2011 Trial Tr., Vol. 1 (Bryant) at 108:18-109:7 (Bryant worked on Bratz, not solely
Mattel projects, in early October); 129:14-20 (Bryant worked on Bratz from October 4-
19 in Mattel design center).  Bryant did not give preference to his work for Mattel
while he was simultaneously working for MGA.  Bryant's contract with MGA
specifically required that Bryant work for MGA on a "top priority basis," effective
September 18, 2000, more than a month before Bryant left Mattel.  TX 15.

In June 2000, Bryant directed face painter Anna Rhee to paint Bratz doll
heads for MGA and discussed the issue secretly with Ms. Rhee during business hours
at the Mattel Design Center. Jan. 27, 2011 Trial Tr., Vol. 1 (Rhee) at 74:22-75:15;
81:16-82:21; TX 201.  Months before he left Mattel, Bryant instructed Ms. Rhee to use
a code name on her invoices and submit them to MGA. Jan. 27, 2011 Trial Tr., Vol. 1

1  (Rhee) at 81:16-82:21; 83:1-84:1; 89:1-13.  Ms. Rhee has confirmed that these June

2  2000 invoices were in fact for her work on Bratz doll heads.  Jan. 27, 2011 Trial Tr.,

3  Vol. 1 (Rhee) at 85:14-18; 86:8-87:6; <u>id.</u>, Vol. 3 at 26:12-27.

4         Also while still employed by Mattel, Bryant worked with MGA-paid

5  sculptor Margaret Leahy to create a sculpt for the first generation Bratz dolls.  Bryant

6  testified that his role "was to try to make the final sculpt look as close as [he] could to

7  [his] vision."  Feb. 3, 2011 Trial Tr., Vol. 2 at 29:17-19.  Bryant gave Ms. Leahy a

8  sculpt drawing, which he created while a Mattel employee, to guide the sculpting

9  process (TX 5-89) and he worked with her on the sculpt, giving his input throughout

10  the process.  Feb. 1, 2011 Trial Tr., Vol. 1 (Bryant) at 17:2-7; Jan. 28, 2011 Trial Tr.,

11  Vol. 2 at 17:18-22; 21:13-15.  Ms. Leahy created the final Bratz sculpt "from

12  [Bryant's] drawing"  (Feb. 1, 2011 Trial Tr., Vol. 1 (Bryant) at 12:12-14; TX 5-89;

13  Feb. 3, 2011 Trial Tr., Vol. 2 (Bryant) at 27:13-15; 29:5-12) and Ms. Leahy's notes

14  confirm Bryant's direction of the sculpting process, and she incorporated Bryant's

15  changes and comments.  <u>See</u> TX 1137-14; March 15, 2011 Trial Tr., Vol. 2 at 11:17-

16  25; 13:7-9; 16:11-19.

17         Bryant also induced Mattel employees to work on Bratz, including Sheila

18  Kyaw, who painted a doll's head during the summer of 2000 (Jan. 28, 2011 Trial Tr.,

19  Vol. 1 (Bryant) at 83:2- 85:10), Elise Cloonan, who worked on the Bratz logo (<u>id.</u> at

20  75:25-77:16), and Carmen Monteagudo, who rooted hair on a doll's head prior to the

21  pitch meeting with Mr. Larian.  Jan. 28, 2011 Trial Tr., Vol. 2 (Bryant) at  8:2- 10:17.

22  Bryant approached Ms. Kyaw and Ms. Monteagudo to help him during the workday at

23  Mattel.  Feb. 3, 2011 Trial Tr., Vol. 2 (Bryant) at 35:18- 36:10; Feb. 1, 2011 Trial Tr.,

24  Vol. 2 (Bryant) 77:7- 78:4 (while still employed by Mattel, Bryant asks Ms. Kyaw to

25  do face painting for Bratz); <u>id.</u> at 80:11-81:13 (while still employed by Mattel, Bryant

26  asks Ms. Monteagudo to do hair rooting for Bratz).  Bryant hid from these Mattel

27  employees that they were assisting him with a project for a Mattel competitor.  Feb. 3,

28  2011 Trial Tr., Vol. 2 (Bryant) at 8:20- 9:16.

1    Bryant also used Mattel resources to design the Bratz dolls.  Bryant used a

2 head found in the Mattel Design Center for the Bratz prototype (Feb. 1, 2011 Trial Tr.,

3 Vol. 2 (Bryant) at 69:21-74:7) and the prototype Bryant presented to MGA at a pitch

4 meeting in late August 2000 included BARBIE parts.  Feb. 4, 2011 Trial Tr., Vol. 1

5 (O'Connor) at 50:14-20.  Bryant also used Mattel's phones and fax machines to

6 coordinate the design of the Bratz dolls, including by calling MGA from Mattel's

7 Design Center.  Feb. 3, 2011 Trial Tr., Vol. 2 (Bryant) at 36:11-36:22; Jan. 28, 2011

8 Trial Tr., Vol. 1 (Bryant) at 92:2-11; TX 1309.  And Bryant created the color poster

9 board Bratz drawings while employed by Mattel.  Jan. 28, 2011 Trial Tr., Vol. 1

10 (Bryant) at 15:15-22; 86:2-14; Feb. 1, 2011 Trial Tr., Vol. 1 (Bryant) at 99:14-100:2;

11 Feb. 3, 2011 Trial Tr., Vol. 2 (Bryant) at 34:14-19.

12    At trial, MGA admited that the foregoing conduct was in violation of

13 Bryant's agreements with Mattel.  Ms. Garcia, a former Mattel employee herself, knew

14 of and understood Bryant's obligations to Mattel, and admitted that it was wrong for

15 Bryant to work with MGA on Bratz or any other competing doll while he was still

16 employed by Mattel.  Jan. 20, 2011 Trial Tr., Vol. 2 (Garcia) at 12:9-24; id. at Vol. 1

17 (Garcia) at 18:7-12; 19:6-16; 23:2-6; 24:8-15; 34:2-7; 42:8-12; 49:20-23; 48:22-49:5.

18 Mr. Larian similarly admitted that he understood that if any employee worked for

19 MGA and Mattel at the same time, the employee would be breaching his obligations.

20 Feb. 9, 2011 Trial Tr., Vol. 1 (Larian) at 31:5-32:1.  And Victoria O'Connor, a former

21 MGA executive, admitted that MGA knew it would be a problem if Bryant had worked

22 on Bratz at Mattel and that she specifically raised this concern with Mr. Larian and Ms.

23 Garcia.  Feb. 4, 2011 Trial Tr., Vol. 1 (O'Connor) at 55:16-56:22.  Despite this, and

24 knowing that Bryant was employed by Mattel at the time, Mr. Larian decided to begin

25 work with Bryant  on Bratz immediately after the pitch meeting on September 1, 2000.

26 Feb. 4, 2011 Trial Tr., Vol. 1 (O'Connor) at 60:2-25.

27    MGA also took steps to conceal that Mr. Bryant worked for them.  For

28 example, Larian gave conflicting and inaccurate accounts concerning the creation of

1   Bratz.  Feb. 4, 2011 Trial Tr., Vol. 1 at 97:12-17; TX 4941.  Larian also imposed a gag

2   order at MGA as to any reference to Bryant, instructing MGA employees that no one

3   should mention Mr. Bryant because there was concern that Mattel might actually own

4   Bratz.  Feb. 4, 2011 Trial Tr., Vol. 1 (O'Connor) at 97:18-23; 102:11-103:4; id. at Vol.

5   2 (O'Connor) at 84:25-85:13.  At one point, O'Connor suggested to Larian that they

6   should tell a reporter Bratz was "born in October [2000] when a certain person was no

7   longer with their company," to which Larian responded, "good point."  TX 7055.  For

8   years, Larian and MGA concealed the timing and fact of Bryant's creation of Bratz.

9   TX 4924; TX 7055; Feb. 9, 2011; Trial Tr., Vol. 2 (Larian) at 6:5-10:15.

10

11          **PROPOSED FINDING OF FACT 26:**  Mattel did not present evidence

12  of restitutionary damage relating to its employment relationship with Mr. Bryant.

13          **MATTEL RESPONSE 26:**  Mattel objects to this proposed finding of

14  fact.  In Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1149 (2003),

15  the California Supreme Court confirmed that restitution under the UCL is limited to

16  "money or property that defendants took directly from plaintiff" or "money or property

17  in which [plaintiff] had a vested interest."  Id.  This is because the goal of restitution

18  under the UCL is "to restore the status quo by returning to the plaintiff funds in which

19  he or she had an ownership interest."  Id.  Accordingly, restitution is only available

20  under the UCL where the sum at issue can "clearly be traced to particular funds or

21  property in the defendant's possession."  Colgan v. Leatherman Tool Group, Inc., 135

22  Cal. App. 4th 663, 699 (2006); see also Kwikset Corp. v. Superior Court, 51 Cal. 4th

23  310, 323 (2011) ("A restitution order against a defendant thus requires both that money

24  or property have been lost by a plaintiff, on the one hand, and that it have been

25  acquired by a defendant, on the other.").

26          As set forth immediately above, Bryant created Bratz while still working

27  for Mattel.  Additionally, Mattel presented extensive testimony regarding MGA profits

28  unjustly obtained through its exploitation of Bratz.  3/8/2011 Trial Tr., Vol. 1

(Wagner) at 121:25-130:19; 3/8/2011 Trial Tr., Vol. 2 (Wagner) at 5:6-11:25.

### III.    OBJECTIONS TO CONCLUSIONS OF LAW

**CONCLUSION OF LAW 3:**  The statute of limitations for a claim pursuant to § 17200 is four years. Cal. Bus. & Prof. Code § 17208.

**MATTEL RESPONSE 3:**  Mattel objects to this proposed conclusion of law.  Under Cal. Bus. & Prof. Code § 17208, "[a]ny action to enforce any cause of action pursuant to this chapter shall be commenced within four years after the cause of action accrued."

**CONCLUSION OF LAW 6:**  Mattel's intentional interference with contract claims relating to Mr. Bryant, Ms. Cabrera, Ms. Morales, and Ms. Salazar were decided by the jury.  The jury found MGA and Mr. Larian liable with respect to Mr. Bryant's contract with Mattel, but not for interference with the contracts of Ms. Cabrera, Ms. Morales, and Ms. Salazar.  The finding with regard to Ms. Cabrera, Ms. Morales, and Ms. Salazar is binding on this Court and precludes a finding that the actions of MGA or Mr. Larian with respect to Ms. Cabrera, Ms. Morales, and Ms. Salazar constitute a § 17200 violation.

**MATTEL RESPONSE 6:**  Though Mattel reserves all rights to appeal the jury's verdict and absent relief vacating those findings, the Court is bound by the jury's findings with respect to intentional interference with Mattel's contracts with Ms. Cabrera, Ms. Morales or Ms. Salazar.

**CONCLUSION OF LAW 7:**  As for Mr. Bryant, as noted below, there are no recoverable damages.  Moreover, the claim is barred by the statute of limitations.  See Dkt. No. 10518 (Jury Verdict) at 28.

**MATTEL RESPONSE 7:**  Though Mattel reserves all rights to appeal the jury's verdict and absent relief vacating those findings, the Court is bound by the

1  jury's findings with respect to Mattel's claim for interference with Bryant's contract.
2  Mattel denies that there is no evidence of recoverable injury, as set forth herein at 13
3  (Mattel Response to Proposed Finding of Fact 26).

4

5       **CONCLUSION OF LAW 10:**  Mattel has not proven that MGA
6  provided any Mattel employee with money or anything of value in return for the
7  employee using his or her position at Mattel to benefit MGA.

8       **MATTEL RESPONSE 10:**  Mattel objects to this proposed conclusion
9  of law.  The trial record shows that MGA paid Bryant's expenses on the Bratz project.
10 Jan. 20, 2011 Trial Tr., Vol. 1 (Garcia) at 53:24-54:1; see also id. at 61:23-62:5.  In
11 return, Bryant used his position as a designer at Mattel to induce Mattel employees to
12 work on Bratz, including Sheila Kyaw, who painted a doll's head during the summer
13 of 2000 (Jan. 28, 2011 Trial Tr., Vol. 1 (Bryant) at 83:2- 85:10), Elise Cloonan, who
14 worked on the Bratz logo (id. at 75:25-77:16), and Carmen Monteagudo, who rooted
15 hair on a doll's head prior to the pitch meeting with Mr. Larian.  Jan. 28, 2011 Trial
16 Tr., Vol. 2 (Bryant) at  8:2- 10:17.  Bryant approached Ms. Kyaw and Ms. Monteagudo
17 to help him during the workday at Mattel.  Feb. 3, 2011 Trial Tr., Vol. 2 (Bryant) at
18 35:18- 36:10; Feb. 1, 2011 Trial Tr., Vol. 2 (Bryant) 77:7- 78:4 (while still employed
19 by Mattel, Bryant asks Ms. Kyaw to do face painting for Bratz); id. at 80:11-81:13
20 (while still employed by Mattel, Bryant asks Ms. Monteagudo to do hair rooting for
21 Bratz).  Bryant hid from these Mattel employees that they were assisting him with a
22 project for a Mattel competitor.  Feb. 3, 2011 Trial Tr., Vol. 2 (Bryant) at 8:20- 9:16.
23 MGA also paid Bryant for his work on Bratz during the time when he was a Mattel
24 employee.  TX 305; 1/20/2011 Trial Tr., Vol. 1 (Garcia) at 108:20-111:19, 107:16-
25 108:19.

26

27      **CONCLUSION OF LAW 11:**  With respect to the Seamstresses, there is
28 no evidence that the work that they performed for Ms. Marlow had any relation to their

jobs at Mattel.  The mere fact that they sewed fashions for both Mattel and Ms. Marlow does not establish that they intended to "injure or defraud" Mattel.  Rather, the Seamstresses were engaged in business activities outside of their work hours at Mattel, which is not forbidden under Penal Code § 641.3.  Moreover, an employee's right to perform work outside of his or her primary employment is specifically codified in Labor Code § 2863.

**MATTEL RESPONSE 11:**  Mattel objects to this proposed conclusion of law.  There is evidence of an intent to injure and defraud Mattel, as the samplemakers' work for MGA was in breach of their agreements with Mattel, which prohibited them from working for a competitor while working for Mattel.  TX 24134-046-047 (Cabrera 1995 Confidentiality and Inventions Agreement); TX 24134-031-035 (Cabrera 2004 Confidentiality and Inventions Agreement); TX 24135-039 (Morales 2000 Confidentiality and Inventions Agreement); TX 24135-024-028 (Morales 2004 Confidentiality and Inventions Agreement).  There is no dispute that their simultaneous work for Mattel and MGA was inappropriate – Larian admitted that working simultaneously for Mattel and MGA would be wrong.  2/9/2011 Trial Tr., Vol. 1 (Larian) at 31:5-17.   MGA's intent to co-opt the samplemakers to injure Mattel and interfere with Mattel's employment relationship with these individuals, including their contracts with Mattel, also goes to MGA's intent to "injure or defraud" Mattel under the commercial bribery statute.

Additionally, Labor Code § 2863 only states that an "employee who has any business to transact on his own account, similar to that intrusted to him by his employer, shall always give the preference to the business of the employer."  It does not excuse the samplemakers' breach of their Mattel contracts, and, in any event, evidence in the trial record shows that the samplemakers did not give preference to Mattel.  For example, Ms. Salazar's timesheets show that she worked on the first generation of Bratz dolls during daytime hours when she would have been working at Mattel.  TX 5723; 1/20/2011 Trial Tr., Vol. 2 at 30:5-8 (Garcia).  Specifically, the

1  timesheets show she worked 7 hours on Friday 10/13/2000, 10.5 hours on Wednesday

2  10/18/2000, 13 hours on Friday 11/24/2000 and 9 hours on Thursday 11/30/2000.  Id.

3

4  **CONCLUSION OF LAW 12:**  With respect to Mr. Bryant, Mattel's

5  claim also fails.  In so far as Mattel's claim relates to work done by Mr. Bryant for

6  MGA's benefit while he was a Mattel employee, it fails for the same reason Mattel's

7  claim regarding the Seamstresses fails – there is no evidence that Mr. Bryant intended

8  to "injure or defraud" Mattel.  Rather, Mr. Bryant was using his skills for business

9  activities outside his employment with Mattel.  Even if Mattel had forbidden its

10  employees from doing this contractually, "moonlighting" does not amount to

11  commercial bribery.

12  **MATTEL RESPONSE 12:**  Mattel objects to this proposed conclusion

13  of law.  Contrary to MGA's claim that Bryant "was using his skills for business

14  activities outside his employment with Mattel" as opposed to attempting to "injure or

15  defraud" Mattel, the evidence shows that Bryant used his position as a designer at

16  Mattel to induce Mattel employees to unknowingly work on Bratz.  These employees

17  included Sheila Kyaw, who painted a doll's head during the summer of 2000 (Jan. 28,

18  2011 Trial Tr., Vol. 1 (Bryant) at 83:2- 85:10), Elise Cloonan, who worked on the

19  Bratz logo (id. at 75:25-77:16), and Carmen Monteagudo, who rooted hair on a doll's

20  head prior to the pitch meeting with Mr. Larian.  Jan. 28, 2011 Trial Tr., Vol. 2

21  (Bryant) at  8:2- 10:17.  Bryant approached Ms. Kyaw and Ms. Monteagudo to help

22  him during the workday at Mattel.  Feb. 3, 2011 Trial Tr., Vol. 2 (Bryant) at 35:18-

23  36:10; Feb. 1, 2011 Trial Tr., Vol. 2 (Bryant) 77:7- 78:4 (while still employed by

24  Mattel, Bryant asks Ms. Kyaw to do face painting for Bratz); id. at 80:11-81:13 (while

25  still employed by Mattel, Bryant asks Ms. Monteagudo to do hair rooting for Bratz).

26  Bryant hid from these Mattel employees that they were assisting him with a project for

27  a Mattel competitor.  Feb. 3, 2011 Trial Tr., Vol. 2 (Bryant) at 8:20- 9:16.

28  MGA's intent to co-opt Bryant to injure Mattel and interfere with Mattel's

1   employment relationship with these individuals, including their contracts with Mattel,

2   also goes to MGA's intent to "injure or defraud" Mattel under the commercial bribery

3   statute.

4

5          **CONCLUSION OF LAW 13:**  Mattel has not established "unlawful"

6   conduct with respect to commercial bribery.

7          **MATTEL RESPONSE 13:**  Mattel objects to this proposed conclusion

8   of law.  As set forth in Responses 10-12 above, the evidence in the trial record

9   supports the conclusion that MGA and Larian engaged in commercial bribery of

10  Bryant and the samplemakers.

11

12         **CONCLUSION OF LAW 15:**  Mattel has not proven an unfair act or

13  practice.  Neither the "moonlighting" of the Seamstresses and Mr. Bryant nor MGA's

14  entering into a contract with Mr. Bryant for the development of the Bratz dolls

15  threatens an incipient violation of an antitrust law, or violates the policy or spirit of one

16  of those laws because its effects are comparable to or the same as a violation of law, or

17  otherwise significantly threatens or harms competition.

18         **MATTEL RESPONSE 15:**  Mattel objects to MGA's

19  mischaracterization of the samplemakers' and Bryant's conduct as "moonlighting."

20  MGA's interference with contract and commercial bribery, if proven, would have

21  established anticompetitive "unfair" conduct by MGA in violation of the three prongs

22  set forth in <u>Cel-Tech</u>.  Additionally, regardless of whether this conduct is also "unfair,"

23  it is unlawful as discussed in Mattel's Responses to Proposed Findings of Fact 15-26

24  and Proposed Conclusions of Law 4-13.  Mattel also objects to MGA's unsupported

25  contention that admittedly employing a competitive employee in violation of his

26  contractual obligations to his employer does not "significantly threaten[] or harm[]

27  competition."

28

1   **CONCLUSION OF LAW 16:**  Further, California has a "settled
2   legislative policy in favor of open competition and employee mobility.  The law
3   protects Californians and ensures that 'every citizen shall retain the right to pursue
4   lawful employment and enterprise of their choice.'"  *Edwards v. Arthur Anderson LLP*,
5   44 Cal. 4th 937, 946 (2008) (citations omitted).  A state with law that so strongly
6   supports employee mobility cannot be read to support a limitation on secondary
7   employment or future employment in the manner that Mattel posits.  *See* Cal. Bus. &
8   Prof. Code § 16600; Cal. Labor Code § 2863.  Actions protected under Business and
9   Professions Code § 16600 and Labor Code § 2863 cannot be the basis for a finding of
10  "unfair" conduct under § 17200.  *See Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th
11  363, 375 (2002) ("conduct that the courts have determined to be permissible . . . cannot
12  be deemed 'unfair' under the unfair competition law.").

13  **MATTEL RESPONSE 16:**  Mattel objects to MGA's contention that
14  Bryant's and the samplemaker's conduct fall within the scope of Business and
15  Professions Code § 16600 or Labor Code § 2863.  To the contrary, MGA went far
16  beyond any safe harbor by surreptitiously paying Bryant and the samplemakers to
17  make and create products to compete with Mattel, even while still being employed by
18  Mattel.  There is no "safe harbor" under California law for such conduct. Fowler v.
19  Varian Associates, Inc.,196 Cal.App.3d 34, 41 (1987) (employer had good cause for
20  discharge based on employee's refusal to disclose his information about and his
21  assistance in obtaining financing for an enterprise organized to become employer's
22  direct competitor); see also Puritas Laundry Co. v. Green, 15 Cal. App. 654, 660
23  (1911) ("[W]hen a servant becomes engaged in a business which necessarily renders
24  him a competitor, a rival of his master, no matter how much or how little time he
25  devotes to it, he has an interest against his duty.").

26

27  **CONCLUSION OF LAW 17:**  Mattel has not shown that MGA or Mr.
28  Larian engaged in "unfair" conduct under § 17200.  Moreover, the jury's findings in

MATTEL'S OBJECTIONS TO MGA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  favor of MGA and Mr. Larian with regard to Mattel's claims of intentional

2  interference with the contract of the Seamstresses binds the Court and precludes a

3  finding that MGA or Mr. Larian engaged in "unfair" conduct with regard to the

4  Seamstresses.

5         **MATTEL RESPONSE 17:**  Mattel objects to this proposed conclusion

6  of law.  As discussed above in Mattel's Responses to Proposed Findings of Fact 15-26

7  and Proposed Conclusions of Law 4-13, the evidence shows that MGA and Larian

8  engaged in unlawful conduct, regardless of whether that conduct was also "unfair."

9

10        **CONCLUSION OF LAW 19:**  The conduct at issue in Mattel's unfair

11  competition claim – secondary employment of Mattel employees – does not impact

12  members of the public.  Thus, Mattel has not shown that MGA engaged in conduct that

13  is likely to deceive members of the public.  In addition, there is no evidence of

14  fraudulent conduct by MGA or Mr. Larian.

15        **MATTEL RESPONSE 19:**  Mattel objects to this proposed conclusion

16  of law.  MGA mischaracterizes Bryant's and the samplemakers' conduct as "secondary

17  employment."  MGA knowingly employed Mattel employees and hid the fact of their

18  employment with MGA from Mattel.  With respect to the samplemakers, Larian

19  directed MGA attorney Craig Holden to "make sure Paula [Garcia] is preped and

20  doesn't know Veronica was using Mattel seamsters," showing their employment with

21  MGA was not merely secondary employment.  3/10/2011 Trial Tr., Vol. 2 (Larian) at

22  28:25-31:2; TX 24305; TX 24306.

23        Bryant worked on Bratz for MGA at least as of June 2000, and both

24  Larian and Garcia knew he was a Mattel employee at the time. Jan. 27, 2011 Trial Tr.,

25  Vol. 1 (Rhee) at 81:16-82:21; 89:1-13; Jan. 27, 2011 Trial Tr., Vol. 1 (Rhee) at 81:16-

26  82:21; 83:1-84:1; Jan. 28, 2011 Trial Tr., Vol. 1 (Bryant) at 86:21-23; <u>id.</u> Vol. 2 at

27  90:7-18; Feb. 3, 2011 Trial Tr. Vol. 2 (Bryant) at 19:16-25; Feb. 8, 2011 Trial Tr., Vol.

28  2 (Larian) at 32:21-33:1.  At least as of September 1, 2000, Bryant actually told MGA

and its employees that he was a Mattel employee.  Jan. 27, 2011 Trial Tr., Vol. 4 (Bryant) at 23:16-24:3; Jan. 28, 2011 Trial Tr., Vol. 2 (Bryant) at 49:1-4; Feb. 3, 2011 Trial Tr., Vol. 2 (Bryant) at 19:16-25; Feb. 8, 2011 Trial Tr., Vol. 2 (Larian) at 41:15-21 (Larian knew Bryant was employed by Mattel).  Garcia knew that while he was still employed by Mattel, Bryant was meeting with hair vendors on Bratz, working with Margaret Leahy on a Bratz sculpt during September 2000 and otherwise working with MGA on Bratz.  Jan. 20, 2011 Trial Tr., Vol. 1 (Garcia) at 50:25-51:9; 51:25-52:6; Jan. 26, 2011 Trial Tr., Vol. 2 (Garcia) at 20:12-20.

Despite this, and knowing that Bryant was employed by Mattel at the time, Mr. Larian decided to begin work with Bryant  on Bratz immediately after the pitch meeting on September 1, 2000.  Feb. 4, 2011 Trial Tr., Vol. 1 (O'Connor) at 60:2-25.  MGA also took steps to conceal that Mr. Bryant worked for them.  For example, Larian gave conflicting and inaccurate accounts concerning the creation of Bratz.  Feb. 4, 2011 Trial Tr., Vol. 1 at 97:12-17; TX 4941.  Larian also imposed a gag order at MGA as to any reference to Bryant, instructing MGA employees that no one should mention Mr. Bryant because there was concern that Mattel might actually own Bratz.  Feb. 4, 2011 Trial Tr., Vol. 1 (O'Connor) at 97:18-23; 102:11-103:4; id. at Vol. 2 (O'Connor) at 84:25-85:13.  At one point, O'Connor suggested to Larian that they should tell a reporter Bratz was "born in October [2000] when a certain person was no longer with their company," to which Larian responded, "good point."  TX 7055.

**CONCLUSION OF LAW 20:**  Mattel first alleged its unfair competition claim in its Amended Answer and Counterclaims that it sought leave to file on November 20, 2006.  Dkt. No. 89 (Motion for Leave to Amend); Dkt. No. 143 (Amended Answer and Counterclaims).  Assuming that the operative date for the purposes of determining the statute of limitations is November 20, 2006 (the date on which Mattel sought leave to file its Amended Answer and Counterclaims), Mattel's claim is barred by the statute of limitations.  The jury determined that Mattel

1  discovered or should have discovered its claim of intentional interference with contract

2  by April 27, 2002, Dkt. No. 10518 at 28, which is more than four years prior to the

3  time that Mattel sought leave to file its unfair competition claim.

4            **MATTEL RESPONSE 20:**  Though Mattel reserves all rights to appeal

5  the jury's verdict and absent relief vacating those findings, the Court is bound by the

6  jury's findings with respect to Mattel's claim for intentional interference with contract.

7

8            **CONCLUSION OF LAW 21:**  As a result, Mattel's claim is barred by

9  the statute of limitations.

10            **MATTEL RESPONSE 21:**  Though Mattel reserves all rights to appeal

11  the jury's verdict and absent relief vacating those findings, the Court is bound by the

12  jury's findings with respect to Mattel's claim for intentional interference with contract.

13

14            **CONCLUSION OF LAW 24:**  Mattel has not shown that it has an

15  interest in money or property that was acquired by MGA or Mr. Larian as a result of

16  any claimed unfair competition.  Mr. Bryant, Ms. Cabrera, Ms. Morales, and Ms.

17  Salazar were not the "property" of Mattel, nor could Mattel own their skills.

18            **MATTEL RESPONSE 24:**  Mattel objects that this purported conclusion

19  of law mischaracterizes Mattel's claim.  If it had prevailed, Mattel would have been

20  entitled, inter alia, to restitution of money paid to Bryant and the samplemakers while

21  they were covertly working for MGA.  Mattel would have also been entitled to

22  restoration of the efforts expended by its employees who were defrauded into assisting

23  Bryant.  Further, Mattel would have been entitled to restoration of its Bratz product,

24  which rightfully belonged to Mattel but which was taken from it through MGA's

25  misconduct.

26

27            **CONCLUSION OF LAW 25:**  To the extent Mattel has claimed it is

28  entitled to the Bratz line of dolls or any lost profits under its unfair competition claim,

1    Mattel's claims are doubly barred.  First, Mattel is not seeking restitutionary damages.

2    Dkt. No. 7676 at ¶ 204 (requesting "lost profits" and "compensatory and exemplary

3    damages").  This is evidenced, in part, by the fact that Mattel is seeking the same

4    damages under its § 17200 claim damages that it sought in connection with its other

5    tort claims.  *Id*. at ¶¶ 164-165, 204.  Under such circumstances, courts have rejected a

6    party's attempt to obtain relief under § 17200 by using the expediency of changing the

7    label on the relief sought.  *See Korea Supply*, 29 Cal. 4th at 1150-51 (explaining that a

8    party is not seeking restitution where restitution claim matches damages claimed for

9    intentional interference with prospective economic advantage); *United States v. Sequel*

10   *Contractors, Inc.*, 402 F. Supp. 2d 1142, 1156 (C.D. Cal. 2005) (noting that plaintiff

11   was not seeking restitution where it was requesting the same monetary relief for its tort

12   claims as its 17200 claim).  Second, any claim of ownership of Bratz by Mattel is

13   wholly barred by the jury finding that Mattel does not own Bratz under any of Mattel's

14   legal theories.

15        **MATTEL RESPONSE 25:**  Though Mattel reserves all rights to appeal

16   the jury's verdict and absent relief vacating those findings, the Court is bound by the

17   jury's findings with respect to Mattel's ownership of Bratz.

18

19        **CONCLUSION OF LAW 27:**  Mattel has not demonstrated that the

20   conduct at issue is likely to recur.  The challenged conduct at issue happened between

21   six and eleven years ago.  Further, the employees whose conduct is at issue no longer

22   work for Mattel and have not for years.  Mr. Bryant and Ms. Salazar have not worked

23   for Mattel in more than a decade, and Mattel fired Ms. Cabrera and Ms. Morales three

24   years ago.

25        **MATTEL RESPONSE 27:**  Though Mattel reserves all rights to appeal

26   the jury's verdict and absent relief vacating those findings, Mattel concedes in

27   accordance with the verdict that it is not entitled to an injunction.

28

1    **CONCLUSION OF LAW 28:**  Moreover, an injunction that regulates

2    MGA's conduct with respect to other Mattel employees is neither warranted by the

3    facts nor appropriate in light of California's strong public policy in favor of employee

4    mobility.

5    **MATTEL RESPONSE 28:**  Though Mattel reserves all rights to appeal

6    the jury's verdict and absent relief vacating those findings, Mattel concedes in

7    accordance with the verdict that it is not entitled to an injunction.

8

9    DATED:  May 3, 2011                    QUINN EMANUEL URQUHART &
                                            SULLIVAN. LLP
10

11                                          By /s/ Michael T. Zeller
                                               Michael T. Zeller
12                                             Attorneys for Mattel, Inc. and Mattel de
                                               Mexico. S.A. de C.V.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28