QUINN EMANUEL URQUHART & SULLIVAN, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  William C. Price (Bar No. 108542)
  (williamprice@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:   (213) 443-3000
Facsimile:    (213) 443-3100

Attorneys for Mattel, Inc. and Mattel de Mexico, S.A. de C.V.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MATTEL, INC., a Delaware corporation,<br><br>                  Plaintiff,<br><br>        vs.<br><br>MGA ENTERTAINMENT, INC., a California corporation, et al.,<br><br>                  Defendant.<br><br>―――――――――――――<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 DOC (RNBx)<br><br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. David O. Carter<br><br>**MATTEL'S OBJECTIONS TO MGA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING MGA'S UNFAIR COMPETITION CLAIM (CAL. BUS. & PROF. CODE § 17200)**<br><br>Trial Date:   January 18, 2011 |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................ 1

I.   MGA MISCHARACTERIZES THE EVIDENCE REGARDING THE RELEVANT MARKET AND MARKET POWER ............................................ 1

    A.   MGA Presented No Evidence From Which The Court Can Determine The Relevant Market.................................................................. 1

    B.   MGA Offered No Evidence From Which The Court Could Conclude That Mattel Had Market Power In Any Properly Defined Relevant Market ............................................................................... 3

II.  MGA MISCHARACTERIZES THE EVIDENCE REGARDING MATTEL'S TRANSACTION WITH KOHL'S................................................ 4

III. MATTEL HAS NO EXCLUSIVITY POLICY REGARDING ITS THIRD PARTY LICENSEES AND VENDORS AND EVEN IF ONE EXISTED, MGA WOULD BE UNABLE TO RECOVER DAMAGES BASED ON SUCH A POLICY ................................................................. 7

    A.   Mattel Has No Policy Of Exclusivity With Third-Party Vendors And Licensees ............................................................................... 7

    B.   Even If Such A Policy Existed, It Would Not Be Unfair Under The UCL ............................................................................................ 9

    C.   MGA Offered No Evidence That It Was Harmed By Any Exclusivity Arrangements Between Mattel And Third-Party Licensees And Vendors ....................................................................... 11

IV.  MGA MISSTATES CALIFORNIA UNFAIR COMPETITION LAW ............. 12

V.   MGA IS NOT ENTITLED TO RESTITUTION ................................................. 14

VI.  MGA IS NOT ENTITLED TO AN INJUNCTION ........................................... 17

CONCLUSION.......................................................................................................... 20

1

# <u>TABLE OF AUTHORITIES</u>

**Page**

## <u>Cases</u>

<u>Atl. Richfield Co. v. USA Petroleum Co.</u>,
  495 U.S. 328 (1990) ............................................................... 9

<u>Bank of the West</u>,
  2 Cal. 4th 1254 (1992) ......................................................... 15

<u>Breakdown Servs., Ltd. v. Now Casting, Inc.</u>,
  550 F. Supp. 2d 1123 (C.D. Cal. 2007) .............................. 1, 2

<u>Brown Shoe Co. v. United States</u>,
  370 U.S. 294 (1962) ............................................................... 2

<u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>,
  429 U.S. 477 (1977) ............................................................... 9

<u>Cal. Serv. Station & Auto. Repair Ass'n v. Union Oil Co. of Cal.</u>,
  232 Cal. App. 3d 44 (1991) ................................................. 19

<u>Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.</u>,
  824 F.2d 665 (8th Cir. 1987) ............................................... 17

<u>Cel-Tech. Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.</u>,
  20 Cal. 4th 163 (1999) ............................................ 9, 10, 11, 18

<u>Chavez v. Whirlpool Corp.</u>,
  93 Cal. App. 4th 363 (2001) ................................................ 10

<u>Colgan v. Leatherman Tool Group, Inc.</u>,
  135 Cal. App. 4th 663 (2006) .............................................. 15

<u>Conwood Co., L.P. v. U.S. Tobacco Co.</u>,
  290 F.3d 768 (6th Cir. 2002) ........................................... 13, 14

<u>Dimidowich v. Bell & Howell</u>,
  803 F.2d 1473 (9th Cir. 1986) .......................................... 10, 11

<u>DocMagic, Inc. v. Ellie Mae, Inc.</u>,
  745 F. Supp. 2d 1119 (N.D. Cal. 2010) ................................. 1

<u>El Aguila Food Prods., Inc. v. Gruma Corp.</u>,
  301 F. Supp. 2d 612 (S.D. Tex. 2003) .................................. 14

<u>Fisherman's Wharf Bay Cruise Corp. v. Superior Court</u>,
  114 Cal. App. 4th 309 (2003) .............................................. 13

MATTEL'S OBJECTIONS TO MGA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR
MGA'S 17200 CLAIM

FTC v. H.J. Heinz Co.,
    246 F.3d 708 (2001) ................................................................................. 14

Inline, Inc. v. A.V.L. Holding Co.,
    125 Cal. App. 4th 895 (2005) ................................................................ 16

Korea Supply Co. v. Lockheed Martin Corp.,
    29 Cal. 4th 1134 (2003) .............................................................. 14, 16, 17

Kwikset Corp. v. Superior Court,
    51 Cal. 4th 310 (2011) ............................................................................ 15

Madrid v. Perot Sys. Corp.,
    130 Cal. App. 4th 440 (2005) ................................................................ 19

Newcal Indus., Inc. v. Ikon Office Solution,
    513 F.3d 1038 (9th Cir. 2008) ................................................................. 2

Oculus Innovative Scis., Inc. v. Prodinnv, S.A. de C.V.,
    318 F. Supp. 2d 968 (C.D. Cal. 2004) .................................................. 16

Omega Env't, Inc. v. Gilbarco, Inc.,
    127 F.3d 1157 (9th Cir. 1997) ............................................................... 10

Pegasus Satellite Television, Inc. v. DirecTV, Inc.,
    51 F.3d 1421 (9th Cir. 1995) ................................................................. 16

People's Choice Wireless, Inc. v. Verizon Wireless,
    131 Cal. App. 4th 656 (2005) ................................................................ 10

Rebel Oil Co., Inc. v. Atl. Richfield Co.,
    51 F.3d 1421 (9th Cir. 1995) ................................................................... 3

R.J. Reynolds Tobacco Co. v. Philip Morris Inc.,
    199 F. Supp. 2d 362 (M.D.N.C. 2002) ................................................. 14

Schmidt v. Lessard,
    414 U.S. 473 (1974) ................................................................................ 17

Spectrum Sports, Inc. v. McQuillan,
    506 U.S. 447 (1993) ................................................................................ 18

Sun Microsystems, Inc. v Microsoft Corp.,
    188 F.3d 1115 (9th Cir. 1999) ............................................................... 19

Tampa Elec. Co. v. Nashville Coal Co.,
    365 U.S. 320 (1961) ................................................................................ 12

Theme Promotions, Inc. v. News America Mktg. FSI,
    546 F.3d 991 (9th Cir. 2008) ...................................................................... 13, 18, 19

United States v. Colgate & Co.,
    250 U.S. 300 (1919) ...................................................................................... 10, 11

United States ex rel. N. Maltese & Sons, Inc. v. Juno Constr. Corp.,
    759 F.2d 253 (2d Cir. 1985) ................................................................................ 6

United States v. Sequel Contractors, Inc.,
    402 F. Supp. 2d 1142 (C.D. Cal. 2005) ............................................................ 17

**Statutes**

15 U.S.C. § 14 ............................................................................................................ 12

Cal. Bus. and Prof. Code § 17200 ...................................................................... *passim*

Fed. R. Civ. P. 65(d) ................................................................................................. 17

**Miscellaneous**

Phillip Areeda and Herbert Hovenkamp, <u>Antitrust Law:  An Analysis of Antitrust
    Principles and Their Application</u> Vol. VII (3d ed.) ................................................ 11

00505.07975/4122557.1

MATTEL'S OBJECTIONS TO MGA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR
MGA'S 17200 CLAIM

**Preliminary Statement**

Pursuant to <u>Fed. R. Civ. P.</u> 52 and <u>Local Rule</u> 52-7, Mattel, Inc. ("Mattel") respectfully submits the following objections to MGA's proposed findings of fact and conclusions of law regarding MGA's statutory unfair competition claim (Dkt. No. 10525). MGA's proposed findings of fact are unsupported by evidence and omit key evidence that proves MGA's claim to be meritless. MGA's proposed conclusions of law misstate the applicable law. MGA erroneously seeks lost profit damages, which a court may not award an unfair competition claimant. In addition, MGA asks for an injunction to which MGA has no right because it has not proven that Mattel is likely to pressure Kohl's not to carry Bratz dolls again, seven years after it is alleged to have done so the first time. MGA also seeks an injunction that is fatally overbroad and vague, asking the Court to order Mattel not to "enter[ ] into arrangements with retailers with the intent to exclude MGA products." Mattel respectfully requests that the Court reject MGA's proposed findings of fact and conclusions of law and that the Court adopt those proposed by Mattel. (Dkt. No. 10531).

**I.    MGA MISCHARACTERIZES THE EVIDENCE REGARDING THE RELEVANT MARKET AND MARKET POWER**

**A.    MGA Presented No Evidence From Which The Court Can Determine The Relevant Market**

Absent any economic analysis whatsoever, MGA asks the Court to conclude that there exists an undefined "fashion doll market." MGA's Proposed Findings of Fact ¶ 3, MGA's Proposed Findings of Law ¶ 15 (Dkt. No. 10525). The Court must reject MGA's invitation to make such findings when MGA presented absolutely no evidence at trial as to the relevant market for antitrust purposes. <u>DocMagic, Inc. v. Ellie Mae, Inc.</u>, 745 F. Supp. 2d 1119, 1147 (N.D. Cal. 2010) ("[Plaintiff] has not alleged facts showing that [defendant's] conduct violated the Sherman Act by posing a dangerous threat of monopoly in the DPS market. As a result, any claims [plaintiff] might be asserting under the UCL's unfair prong necessarily fail as well."); <u>Breakdown Servs., Ltd. v. Now Casting, Inc.</u>, 550 F. Supp. 2d 1123, 1142 (C.D. Cal. 2007) (holding that "in a case where plaintiff's § 17200

1  claim is predicated on antitrust violations that fail to withstand summary judgment, the §

2  17200 claim must also fail").

3      It appears that at least one principal reason that MGA seeks this proposed finding

4  and conclusion – and perhaps the sole reason – is that MGA seeks to apply the finding and

5  conclusion in its recently filed antitrust action (Case No. 11-01063).  In that action, MGA

6  alleges that "[t]he relevant product market is fashion dolls, which are dolls in the 9-12"

7  tall range and which are designed to be dressed with fashion clothes and accessories.

8  Fashion dolls are purchased almost exclusively by girls, and for these girls there is no

9  reasonably interchangeable substitute for such dolls."  See Complaint, Dkt. No. 1 (Case

10  No. 11-01063) ¶ 50.

11      A properly defined product market "must encompass the product at issue as well as

12  all economic substitutes for the product."  Newcal Indus., Inc. v. Ikon Office Solution, 513

13  F.3d 1038, 1045 (9th Cir. 2008).  The boundaries of the relevant product market are

14  determined by the "interchangeability of use" or "cross-elasticity of demand" between the

15  product and its substitutes.  Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962).

16  In Brown Shoe, the Supreme Court identified several "practical indicia" commonly used

17  to define an economically distinct submarket, including "industry or public recognition of

18  the submarket as a separate economic entity, the product's peculiar characteristics and

19  uses, unique production facilities, distinct customers, distinct prices, sensitivity to price

20  changes, and specialized vendors."  370 U.S. at 325.  At trial, MGA failed to offer any of

21  the economic indicia identified in Brown Shoe, let alone undertake the bare minimum

22  analysis of economic substitutes.

23      MGA offered no economic analysis at all – from an expert or otherwise – in support

24  of its purported definition of the relevant market.  MGA did not offer evidence that the

25  market in which BARBIE competes, whatever that is, is limited to fashion dolls.  To the

26  contrary, MGA offered evidence proving that fashion dolls are not the relevant market

27  because Barbie lost market share to electronics, video games, and board games.  See, e.g.,

28  TX 8172; 3/11/11 Trial Tr. Vol. 1 (Luther) at 48:11-49:22.

-2-

1   As a result, MGA's proffered finding that "Barbie had approximately ninety percent

2   share of the fashion doll market," MGA Proposed Findings of Fact ¶ 3, is meaningless

3   because no trial evidence supports a finding that such a market even exists, much less

4   whether that is the relevant market for antitrust purposes, and the only evidence of product

5   substitutability proves that a market defined by fashion dolls is economically wrong.

6   **B.**      **MGA Offered No Evidence From Which The Court Could Conclude**

7          **That Mattel Had Market Power In Any Properly Defined Relevant**

8          **Market**

9   MGA also invites the Court to draw the baseless conclusion that Mattel held a

10  "dominant" market position.  MGA's Proposed Findings of Fact ¶ 3, Findings of Law ¶ 8

11  (Dkt. No. 10525).  To begin with, market power cannot be assessed absent a valid market

12  definition.  Moreover, at trial, MGA presented neither direct nor circumstantial evidence

13  of market power.   Direct evidence of market power is "direct proof of the injury to

14  competition which a competitor with market power may inflict," and it takes the form of

15  "evidence of restricted output and supracompetitive prices."  Rebel Oil Co., Inc. v. Atl.

16  Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995).  MGA offered no proof of restricted

17  output or increased prices.

18  To prove market power using circumstantial evidence, "a plaintiff must: (1) define

19  the relevant market, (2) show that the defendant owns a dominant share of that market,

20  and (3) show that there are significant barriers to entry and show that existing competitors

21  lack the capacity to increase their output in the short run."  Id.  As discussed, MGA

22  entirely failed to offer any economic proof of the relevant market.  Moreover, MGA did

23  not introduce a shred of economic evidence demonstrating barriers to entry or the inability

24  of competitors to increase output.  As with the MGA's proposed finding of the market

25  definition, there is no basis for any finding that Mattel had market power for antitrust

26  purposes or otherwise.  The Court cannot decide market power or market definition in any

27  event because doing so would violate Mattel's Seventh Amendment rights, as discussed in

28  Mattel's supporting memorandum of points and authorities.  See Dkt. No. 10527 at 9-13.

## II.   MGA MISCHARACTERIZES THE EVIDENCE REGARDING MATTEL'S TRANSACTION WITH KOHL'S

No evidence supports MGA's proposed findings that Kohl's agreed to give Mattel shelf space "that Kohl's had allotted to MGA for its Bratz dolls" or that "in exchange for Mattel's payment of $1.25 million to Kohl's . . . MGA's shelf space for Bratz products was reduced completely." MGA's Proposed Findings of Fact ¶¶ 7, 10 (Dkt. No. 10525).

MGA relies upon the fact that Kohl's had a total of eight feet of shelf space, and the 2005 contract between Kohl's and Mattel increased Mattel's shelf space from four feet to eight. Id. ¶¶ 6-7. MGA also relies upon an email dated December 16, 2004 from Kohl's buyer Tom Maskel that says Kohl's had "approx 4' of POG space designated for Bratz this spring." Id. ¶ 8. Neither one shows that MGA had a property right for purposes of its UCL claim, as the Court contemplated in its summary judgment order. MGA introduced at trial no agreement of any type regarding the sale of any MGA product, including Bratz products, to Kohl's for any year. Mattel's Corrected Proposed Findings of Fact and Conclusions of Law ¶ 47 (Dkt. No. 10531).

The evidence shows that because Kohl's was losing money on Bratz products, had Bratz products from 2004 that it had to sell, and Kohl's did not view MGA's responses to Kohl's losses as meaningful, Kohl's decided by December 2004 not to purchase additional Bratz products from MGA for 2005 because it had to sell its existing Bratz inventory. See id. ¶ 77. It was only after Kohl's made that decision that Kohl's buyer Tom Maskel approached Mattel's sales representative Julie Scholvin on December 16, 2004. See id. ¶ 78. MGA had no "vested interest" in the placement of MGA products at Kohl's. Rather, MGA had to compete for shelf space at Kohl's by offering products that would appeal to the Kohl's consumer and generate profits for Kohl's. Bratz dolls did neither of those things. See id. ¶¶ 17, 28, 29, 53, 54.

The evidence does not show that Mattel caused Kohl's to stop buying Bratz. MGA's proposed findings of fact ignore the overwhelming evidence that Kohl's declined to purchase Bratz dolls in 2005 for one reason only, because its Bratz business was a

disaster, causing Kohl's to lose at least $1 million.  <u>See</u> <u>id.</u> ¶¶ 33-70.  In 2004, Kohl's sold BARBIE and Bratz products side-by-side in its toy department. <u>See</u> <u>id.</u> ¶ 50.  While Kohl's made money on BARBIE products, Kohl's lost money on Bratz products because consumers did not purchase the expected quantity of Bratz.  <u>See</u> <u>id.</u> ¶¶ 51-54.  In 2004, Kohl's purchased products from MGA including Bratz dolls worth approximately $5.1 million from which Kohl's had a 22% or approximately $1.12 million margin expectation. <u>See</u> <u>id.</u> ¶ 48.  Earlier in the year, Kohl's and MGA knew that Bratz products were not selling well at Kohl's.  In response, Kohl's sought assistance from MGA to offset mounting losses.  MGA refused or offered counter-proposals that were unacceptable to Kohl's. <u>See</u> <u>id.</u> ¶¶ 55-70.  The relationship between Kohl's and MGA deteriorated – to the point where Mr. Larian's response to Kohl's in a November 2005 e-mail was "f[ ]k'm.  I don't want them at our showroom" – and MGA knew that failure to address Kohl's concerns would affect MGA's future business with Kohl's. <u>See</u> <u>id.</u>  ¶¶ 58, 60, 62, 67, 70. It is therefore unsurprising that Kohl's, faced with $1 million in losses on Bratz, approached Mattel in December 2004 with a potential business opportunity to sell a profitable product line, BARBIE, on four feet of shelf space, that had been selling an unprofitable product line, Bratz.  <u>See</u> <u>id.</u> ¶¶ 77-80.  Nothing in the 2005 or 2006 contracts between Kohl's and Mattel provides for any exclusion of any MGA products from Kohl's. <u>See</u> <u>id.</u> ¶¶ 86-91.

MGA asks the Court to find that Mattel "admitted" that as a result of its deal with Kohl's, Kohl's decided to no longer carry Bratz and Bratz dolls no longer appeared on the eight feet of shelf space in the toy department allocated to fashion dolls.  MGA's Proposed Findings of Fact ¶¶ 8, 12-13 (Dkt. No. 10525).  This is false for two reasons.  First, as discussed above, it was Bratz deplorable performance at Kohl's that caused Kohl's to stop buying Bratz.  Second, MGA was represented in the Kohl's toy department and elsewhere in the store.  MGA product, including Bratz dolls, continued to be sold at Kohl's even after Kohl's agreed to provide eight feet of shelf space to BARBIE products.  <u>See</u> Mattel's Corrected Proposed Findings of Fact and Conclusions of Law ¶ 93 (Dkt. No. 10531).

1  Kohl's continued to purchase MGA products in 2005 and 2006. See id. ¶ 96.  Kohl's also

2  continued to negotiate the purchase of additional Bratz products with MGA in 2005 and

3  2006. See id. Tellingly, MGA omits evidence showing that the eight feet of shelf space

4  Kohl's agreed to provide for BARBIE products is not the only place in Kohl's stores

5  where Kohl's sells fashion dolls.  Moreover, Kohl's continued to sell Bratz dolls to

6  consumers during 2005 and 2006 when Kohl's placed and sold BARBIE products from

7  those eight feet of shelf space. See id. ¶¶ 97-98.

8         Finally, MGA asks the Court to find that it suffered (and to award MGA) $4.294

9  million in lost profits for 2005 and 2006.  MGA's Proposed Findings of Fact ¶ 16,

10  Proposed Findings of Law ¶¶ 10-12 (Dkt. No. 10525).  MGA suffered no harm from

11  Mattel and MGA's claimed damages are unsupported by any evidence.  MGA's claim is

12  that Bratz dolls were excluded from Kohl's.  MGA's damages theory, however, is based

13  on the claimed exclusion of all MGA products to Kohl's, including Little Tikes, Little

14  Bratz and other MGA products, not just Bratz dolls.  See Mattel's Corrected Proposed

15  Findings of Fact and Conclusions of Law ¶ 101 (Dkt. No. 10531).  The spreadsheets that

16  MGA relies upon to show its sales to Kohl's in 2004-2006 show only a single total –

17  without any product-by-product breakdown – making it impossible to determine whether

18  the alleged losses were due to Bratz dolls, or Little Bratz, or Little Tikes or any other

19  MGA manufactured product.  See MGA's Proposed Findings of Fact ¶ 14 (Dkt. No.

20  10525) (citing TX 31180, 31181, 31182).  Moreover, MGA presented no evidence at trial

21  of alleged anticompetitive conduct with respect to Kohl's after 2006, or any evidence of

22  Bratz products Kohl's purchased in 2007 or any time thereafter.  See Mattel's Corrected

23  Proposed Findings of Fact and Conclusions of Law ¶¶ 102-04 (Dkt. No. 10531).

24  Accordingly, the Court has no evidence from which to determine whether MGA in fact

25  lost profits on Bratz dolls sales in 2005 and 2006, or the amount of any such lost profits.

26  See United States ex rel. N. Maltese & Sons, Inc. v. Juno Constr. Corp., 759 F.2d 253,

27  255-56 (2d Cir. 1985) (vacating judgment and finding error of law where district court in

28  bench trial improperly calculated damages).

III.   **MATTEL HAS NO EXCLUSIVITY POLICY REGARDING ITS THIRD PARTY LICENSEES AND VENDORS AND EVEN IF ONE EXISTED, MGA WOULD BE UNABLE TO RECOVER DAMAGES BASED ON SUCH A POLICY**

A.   **Mattel Has No Policy Of Exclusivity With Third-Party Vendors And Licensees**

MGA's proposed Findings of Fact ¶ 18 reads that "Mattel had a policy of terminating its relationships with third-party vendors and licensees that also did business with MGA." That finding is unsupported by the evidence.

First, MGA selectively and inaccurately quotes Mr. Eckert's testimony to support that fact. He explained: "in general, we prefer exclusivity, *so that we know that our information stays proprietary*, and we get the focus of the other company's resources exclusively on our business. *But that's also not practical*." 4/4/11 Trial Tr. Vol. 1 (Eckert) at 101:22-25 (emphasis added) (MGA omissions in bold); compare Dkt. No. 10525 at 4:20-23. MGA's proposed findings of fact ¶¶ 18-20 disregard Mr. Eckert's testimony that Mattel does not have a "policy across-the board that it's not going to enter into licenses with companies that also have licenses with competitors." 4/4/11 Trial Tr. Vol. 1 (Eckert) at 102:7-10.

Second, to be very clear, the proof on which MGA relies is an e-mail message in which Mr. Eckert is discussing "killing" a deal between *Mattel* and THQ, not *MGA* and THQ. TX 8972; 4/4/11 Trial Tr. Vol. 1 (Eckert) at 101:12-16. If such a deal were "killed," then MGA would benefit from its continued exclusivity with THQ. Only THQ, not MGA, could potentially complain.

Third, while Mr. Eckert conceded that exclusivity with third parties would be ideal, it is not Mattel's policy nor is that how Mattel conducts its business. Mr. Eckert testified that Mattel entered into a license with THQ–the licensee referred to in Eckert's email. 4/4/11 Trial Tr. Vol. 1 (Eckert) at 101:12-16; TX 20525. Other Mattel officers testified about Mattel's long-standing relationships with other manufacturers, distributors and

-7-

licensees who work for both Mattel and MGA simultaneously.  3/22/11 Trial Tr. Vol. 1 (Debrowski) at 8:21-25 (testifying that Mattel has worked with Early Light for over 20 years even though Early Light also works for MGA); 3/17/11 Trial Tr. Vol. 2 (Fontanella) at 33:21-34:6 (testifying that Mattel had a continuing relationship with Bandai, even though it distributed MGA products).  Accordingly, no evidence supports the proposed findings that Mattel has or had a policy of exclusivity with third-party vendors and licensees.

MGA contends that Mr. Eckert was impeached at trial with his 30(b)(6) deposition testimony regarding whether Mattel's practices include threatening existing licensees. MGA's Proposed Findings of Fact ¶ 20 (Dkt. No. 10525).  That is wrong.  Mr. Eckert testified at trial that Mattel did not engage in a practice of threatening existing licensees that Mattel would terminate relations if they did not stop dealing with MGA.  4/4/11 Trial Tr. Vol. 1 (Eckert) at 21:23-22:8.  MGA's counsel attempted to impeach Mr. Eckert but was unsuccessful.  The context of Mr. Eckert's deposition testimony makes this clear.  At his deposition, Mr. Eckert explained that he investigated if Mattel had a policy of interfering with MGA's efforts to attract licenses and concluded they did not:

"QUESTION:  You undoubtedly are.

"Did you investigate whether it was true that Niels Bokholst of Euromic received a call from the regional manager of Mattel, who had heard rumors indicating that Euromic signed up with MGA and was quite upset about it and told Mr. Bokholst point-blank that Mattel would discontinue relations with Euromic if Euromic did not stop dealing with MGA at once?

"ANSWER:  No.  Again, I didn't investigate specific company allocations -- or allegations about specific companies.  *I did investigate broadly what the practices are -- or policies are and their experiences were.*

1    "QUESTION:  Well, did the practices include

2    threatening existing licensees that you would terminate

3    their relations at once if they did not stop dealing with

4    MGA?

5    "ANSWER:  **Yes, I believe it did.**"

6    4/4/11 Trial Tr. Vol. 1 (Eckert) at 24:9-25 (emphasis added).  Mr. Eckert explained that he

7    misheard the question and answer and properly corrected his statement at the deposition.

8    <u>Id.</u> at 25:2-22.   Mr. Eckert testified he has since "investigated every one of these

9    allegations, and there isn't one case in which [Mattel] threatened to terminate a license."

10   <u>Id.</u> at 25:10-12.  MGA further mischaracterizes the record because Mr. Eckert was never

11   designated as a 30(b)(6) witness on MGA's Topic No. 9, which sought a designee

12   regarding communications between Mattel and its licensees or potential licensees

13   regarding potential or actual licenses with MGA.  <u>See</u> Mattel's Trial Brief Re Whether

14   Robert Eckert Was A Rule 30(b)(6) Witness (Dkt. No. 10243).

15   **B.    <u>Even If Such A Policy Existed, It Would Not Be Unfair Under The UCL</u>**

16   To prove that Mattel, a competitor of MGA, engaged in "unfairness" under the

17   UCL, MGA had to prove that Mattel engaged in "conduct that threatens an incipient

18   violation of an antitrust law, or violates the policy or spirit of one of those laws because its

19   effects are comparable to or the same as a violation of the law, or otherwise significantly

20   threatens or harms competition."  <u>Cel-Tech. Commc'ns, Inc. v. Los Angeles Cellular Tel.</u>

21   <u>Co.</u>, 20 Cal. 4th 163, 187 (1999).  <u>See</u> <u>also</u> Dkt. No. 9600 at 111.  A showing of mere

22   harm to a competitor's interests is insufficient.  <u>See</u> <u>Cel-Tech.</u>, 20 Cal. 4th at 186 ("the

23   'antitrust laws ... were enacted for 'the protection of competition, not competitors.'")

24   (citing <u>Cargill, Inc. v. Monfort of Colorado, Inc.</u>, 479 U.S. 104, 115 (1986)).  Injury to a

25   competitor is not equivalent to injury to competition; only the latter is the proper focus of

26   antitrust laws.  <u>See</u> <u>Atl. Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 344 (1990);

27   <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 488-89 (1977).  Likewise, if

28   the antitrust laws permit the questioned conduct, then the unfair competition claim fails.

-9-

1  See Chavez v. Whirlpool Corp., 93 Cal. App. 4th 363, 375 (2001) (affirming judgment of

2  dismissal) ("If the same conduct is alleged to be both an antitrust violation and an 'unfair'

3  business act or practice for the same reason—because it unreasonably restrains

4  competition and harms consumers—the determination that the conduct is not an

5  unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward

6  consumers."); see also Cel-Tech. Commc'ns, Inc., 20 Cal. 4th at 184 (prohibiting courts

7  from applying "purely subjective notions of fairness" but requiring courts to determine

8  unfairness "within the meaning of the unfair competition law").

9      A company may choose with whom it wishes to deal and unilaterally may refuse to

10 deal with a distributor or a customer without violating the antitrust laws or the policy or

11 spirit of those laws.  People's Choice Wireless, Inc. v. Verizon Wireless, 131 Cal. App.

12 4th 656, 663 (2005) (affirming judgment of dismissal) ("Nearly a century ago, the

13 Supreme Court recognized that, subject to antitrust laws such as the Sherman Act, there is

14 a 'long recognized right of [a] trader or manufacturer engaged in an entirely private

15 business, freely to exercise his own independent discretion as to parties with whom he will

16 deal.'") (quoting United States v. Colgate & Co., 250 U.S. 300, 307 (1919)); see also

17 Dimidowich v. Bell & Howell, 803 F.2d 1473, 1478 (9th Cir. 1986) (stating that a

18 "manufacturer may choose those with whom it wishes to deal and unilaterally may refuse

19 to deal with a distributor or customer for business reasons without running afoul of the

20 antitrust laws").

21     Accordingly, even though MGA introduced no evidence that Mattel has had a

22 policy of terminating relationships with vendors that worked with MGA (or even

23 terminated any vendor), such a policy would be lawful under the applicable competition

24 laws.  Omega Env't, Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1161-65 (9th Cir. 1997)

25 (finding, as a matter of law, manufacturer's policy that it would "'continue to do business

26 with service station equipment distributors who [s]ell only the Gilbarco line of retail

27 dispensers'" did not violate the Clayton Act or other antitrust laws); Cel-Tech Commc'ns,

28 Inc., 20 Cal. 4th at 182 ("If the Legislature has permitted certain conduct or considered a

situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor."); see Colgate, 250 U.S. at 307; Dimidowich, 803 F.2d at 1478; Phillip Areeda and Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, Vol. IIIB (3d ed.) at 270 (concluding that businesses should be able to refuse to work with particular suppliers or customers "for both policy and doctrinal reasons").

## C. MGA Offered No Evidence That It Was Harmed By Any Exclusivity Arrangements Between Mattel And Third-Party Licensees And Vendors

MGA presented no evidence that any Mattel conduct impacted its relationship with any vendor, much less proved that any Mattel conduct caused any harm or loss of revenue by losing a vendor. See Mattel's Corrected Proposed Findings of Fact and Conclusions of Law ¶¶ 105-31 (Dkt. No. 10531). MGA presented no evidence that it lost or could not get agreements with licensees, manufacturers or distributors, or that Mattel's conduct impacted MGA's relationship with any licensee, distributor or manufacturer. See 4/4/11 Trial Tr. Vol. 3 (Malackowski); 4/5/11 Trial Tr. Vols. 1-4 (Malackowski) (MGA presented no evidence that MGA suffered any injury in fact or lost any money or property as a result of any Mattel conduct with respect to any company that manufactured, distributed, or licensed both Mattel and MGA products, including Early Light, Bandai, and THQ, much less any evidence that consumers were impacted by any such Mattel conduct); 3/22/11 Trial Tr. Vol. 1 (Debrowski) at 8:21-25 (testifying that Mattel has worked with Early Light for over 20 years even though Early Light also works for MGA); 3/17/11 Trial Tr. Vol. 2 (Fontanella) at 33:21-34:6 (testifying that Mattel had a continuing relationship with Bandai, even though it distributed MGA products). To the contrary, the evidence actually proves that Mattel and MGA shared a number of major third-party licensees.

## IV.   MGA MISSTATES CALIFORNIA UNFAIR COMPETITION LAW

MGA's citation to section 14 of Title 15 of the U.S. Code in Proposed Finding of Law ¶ 5 materially misstates the applicable law.  The Court should not adopt it.  MGA's proposed finding reads:

> The federal Cartwright [sic] Act prohibits contracts that provide a discount "on the condition, agreement, or understanding that the . . . purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor."  Dkt. No. 10525 at 6:2-5.

MGA omits a significant condition that the statute imposes, namely that such agreements are prohibited only if the complainant proves that such an agreement may "substantially lessen competition or tend to create a monopoly in any line of commerce."  15 U.S.C. § 14.

Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320 (1961), which discusses a challenge to an exclusive dealing contract under Section 3 of the Clayton Act (15 U.S.C. § 14), is directly on point, and is fatal to MGA's unfair competition claim regarding Kohl's.  The Court in Tampa Elec. reversed the appellate court's affirmation that a long-term requirements contract violated section 3 of the Clayton Act because there was no showing of substantial foreclosure of a relevant market.  The Court required proof that the allegedly improper contract "foreclose[d] competition in a substantial share of the line of commerce affected."  Id. at 327.  This required proof of the line of commerce and the market area "on the basis of facts peculiar to the case."  Id. at 327.  As discussed in Part I above, MGA has made no showing regarding the definition of the relevant market.  Such a failure, the Court held, "requires reversal" because "the relevant market is the prime factor in relation to which the ultimate question, whether the contract forecloses competition in a substantial share of the line of commerce involved, must be decided."  Id. at 329.

In addition, MGA presented no evidence of *substantial* foreclosure.  The Court held that foreclosure of less than 1 percent of the relevant market is "insubstantial" and

MATTEL'S OBJECTIONS TO MGA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR MGA'S 17200 CLAIM

1  affirmed the validity of the exclusive contract at issue on that basis. Id. at 333 (holding

2  that "the proportionate volume of the total relevant coal product as to which the

3  challenged contract pre-empted competition, less than 1% is, conservatively speaking,

4  quite insubstantial"). Here, MGA has not proven that the $4.294 million in damages that

5  MGA seeks for 2005 and 2006 is more than one percent (1%) of its own sales of Bratz

6  dolls for those two years (in excess of $500 million and $600 million respectively), much

7  less one percent of the as yet undefined relevant market.

8      Like the Clayton Act, the Cartwright Act prohibits exclusive dealing contracts that

9  "foreclose[d] competition in a substantial share of the affected line of commerce."

10  Fisherman's Wharf Bay Cruise Corp. v. Superior Court, 114 Cal. App. 4th 309, 335

11  (2003).  As a result, the Cartwright Act, like the Clayton Act, requires proof of both the

12  relevant market and that the substantial foreclosure of competition in that market.  Id. at

13  335; see Theme Promotions, Inc. v. News Am. Mktg. FSI, 546 F.3d 991, 1001 (9th Cir.

14  2008) (addressing the Cartwright Act).  As above, MGA provided no evidence of the

15  relevant market or substantial foreclosure of that market.  Less than one percent of MGA's

16  own sales of the product more than meets the "de minimus level of foreclosure [that] is

17  certainly insufficient as a matter of law to sustain a claim under section 16720" for

18  exclusive dealing.  Fisherman's Wharf Bay Cruise Corp., 114 Cal. App. 4th at 336.[1]

19      The Conwood case, which MGA cites in Proposed Finding of Law ¶ 8 (Dkt. No.

20  10525), has no bearing here.  The Sixth Circuit affirmed a jury verdict finding a violation

21  of Section 2 of the Sherman Act because United States Tobacco Company ("USTC")

22  admitted it had market power in the relevant market (nationwide moist snuff) and the jury

23  found that USTC had interfered with competitors' ability to compete at hundreds of

24  thousands of retailers nationwide in an attempt to obtain a monopoly and exclude or

25  destroy competition from the relevant market.  Conwood Co., L.P. v. U.S. Tobacco Co.,

---

[1]   Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 767-68 (1984), which MGA cites in Proposed Conclusion of Law ¶ 7 (Dkt. No. 10525) is simply irrelevant, given that Monsanto involves price fixing, an allegation that MGA has not made in this case.

-13-

290 F.3d 768, 781-82, 784 (6th Cir. 2002) ("At issue in this case are 300,000 separate retail establishments across the country."). In contrast, MGA has presented no evidence of the relevant market or proved that Mattel has market power in that market. See Part I, supra. Further, the allegations here relate to two agreements with a single retailer, hardly substantial foreclosure of MGA's Bratz sales, much less foreclosure of MGA's ability to compete at a substantial portion of retailers. And, while USTC's agreements with retailers are hardly discussed in Conwood, Mattel's agreements with Kohl's are not anticompetitive. See El Aguila Food Prods., Inc. v. Gruma Corp., 301 F. Supp. 2d 612, 616 (S.D. Tex. 2003); R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362 (M.D.N.C. 2002). See generally Dkt. No. 10531, Part II.B.

MGA's citation to the 1999 testimony of a functionary of the Federal Trade Commission on slotting fees, which he admits is his own and not the position of the FTC, has neither persuasive nor precedential value. See Slotting Allowances and the Antitrust Laws, October 20, 1999 Testimony of the Federal Trade Commission Before the House Committee on the Judiciary  (reading that "my oral presentation and my answers to any questions that you ask will be my own," and not that of the FTC), available at http://www.ftc.gov/os/1999/10/slotting991020.htm.  First, it is limited to food product placement in supermarkets, not the placement of toys at mass market retailers.  Id. Second, as reported in FTC v. H.J. Heinz Co., 246 F.3d 708, 712, 719 (2001), the FTC later took the position that slotting fees in the supermarket space promote competition.

Because MGA's proposed Conclusions of Law are not accurate, the Court should not adopt them.

## V.   MGA IS NOT ENTITLED TO RESTITUTION

MGA is not entitled to any restitution from Mattel because MGA has no claim for lost money or property in which MGA had a vested interest or that Mattel took directly from MGA.  In Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1149 (2003), the California Supreme Court confirmed that restitution under the UCL is limited to "money or property that defendants took directly from plaintiff" or "money or property

1   in which [plaintiff] has a vested interest." <u>Id.</u> This is because the goal of restitution under

2   the UCL is "to restore the status quo by returning to the plaintiff funds in which he or she

3   has an ownership interest." <u>Id.</u> Accordingly, restitution is only available under the UCL

4   where the sum at issue can "clearly be traced to particular funds or property in the

5   defendant's possession." <u>Colgan v. Leatherman Tool Group, Inc.</u>, 135 Cal. App. 4th 663,

6   699 (2006); <u>see also</u> <u>Kwikset Corp. v. Superior Court</u>, 51 Cal. 4th 310, 323 (2011) ("A

7   restitution order against a defendant thus requires both that money or property have been

8   lost by a plaintiff, on the one hand, and that it have been acquired by a defendant, on the

9   other."). MGA has failed to make a showing that the "lost profits" that it claims to have

10   missed out on are monies in the possession of Mattel to which MGA has a rightful claim

11   because they were once in MGA's possession. Moreover, MGA admits in its submission

12   for Mattel's UCL claim that "lost profits" are barred by the UCL because they are not

13   restitutionary. <u>See</u> MGA's Proposed Conclusions of Law Re Mattel's Unfair Competition

14   Claim ¶ 25 (Dkt. No. 10524).

15       Further, MGA has presented no evidence supporting any monetary award of any

16   type for Mattel's alleged unfair competition with any third party vendors or licensees. <u>See</u>

17   Mattel's Corrected Proposed Findings of Fact and Conclusions of Law ¶¶ 105-31 (Dkt.

18   No. 10531). MGA admits as much, failing to identify any evidence in its submission.

19   There is no evidentiary basis to make any monetary award to MGA for that alleged

20   conduct.

21       Although MGA's damages expert, Mr. Malackowski presented a damages theory

22   with respect to Kohl's (<u>id.</u> ¶¶ 99-100), it is not a theory of restitution. His Kohl's-related

23   damages theory does not even contemplate former MGA funds in the hands of Mattel, and

24   therefore fails because it lacks a necessary predicate for awarding any restitution. <u>See</u>

25   <u>Bank of the West</u>, 2 Cal. 4th 1254, 1266 (1992) (holding that the only "nonpunitive

26   monetary relief available" under the UCL "is the disgorgement of money that has been

27   wrongfully obtained"). He did not trace to Mattel any amount of property or particular

28   funds belonging to MGA. <u>See</u> Mattel's Corrected Proposed Findings of Fact and

1   Conclusions of Law ¶¶ 99-100 (Dkt. No. 10531).  MGA points to a single email from
2   Kohl's buyer Tom Maskel that states "we have approx 4' of POG space designated for
3   Bratz this spring."  MGA's Proposed Findings of Fact ¶ 11 (Dkt. No. 10525) (citing TX
4   37113).  Yet MGA introduced at trial no agreement of any type regarding the sale of any
5   MGA product, including Bratz products, to Kohl's for any year.  <u>See</u> Mattel's Corrected
6   Proposed Findings of Fact and Conclusions of Law ¶ 47 (Dkt. No. 10531).  For purposes
7   of a UCL claim, "property" cannot be an expectation of continued placement of non-
8   performing products on a retailer's shelf, particularly where the retailer has unfettered
9   discretion to make that election.  <u>See id.</u> ¶¶ 22-27.  Moreover, MGA had no reasonable
10  expectation of future placement of Bratz on 4 feet of shelf space in the toy department at
11  Kohl's in 2005.  <u>See id.</u> ¶¶ 55-70.

12        MGA's Kohl's damages theory is nothing more than a generic damages claim
13  seeking alleged lost profits from sales of Bratz dolls at Kohl's in 2005 and 2006 – a
14  remedy that by definition is not restitutionary and is not available under the UCL.  <u>See</u>
15  <u>Oculus Innovative Scis., Inc. v. Prodinnv, S.A. de C.V.</u>, 2010 WL 4774659, at *5 (N.D.
16  Cal. Nov. 16, 2010) (finding that disgorgement of profits is "has been held not to be
17  available as a remedy under the UCL"); <u>Korea Supply Co.</u>, 29 Cal. 4th at 1149 (holding
18  sole monetary relief available under section 17203 is restitution, and that "[a]ny award
19  that plaintiff would recover from defendants would not be restitutionary as it would not
20  replace any money or property that defendants took directly from plaintiff"); <u>Inline, Inc. v.</u>
21  <u>A.V.L. Holding Co.</u>, 125 Cal. App. 4th 895, 904-05 (2005) (rejecting various forms of
22  requested recovery because not restitutionary, including consequential losses and fair
23  market value of property sold); <u>Pegasus Satellite Television, Inc. v. DirecTV, Inc.</u>, 318 F.
24  Supp. 2d 968, 979 (C.D. Cal. 2004) (one competitor does not have a vested interest in the
25  profits of another).  <u>See also</u> MGA's Proposed Conclusions of Law Re Mattel's Unfair
26  Competition Claim ¶ 25 (Dkt. No. 10524) (asserting Mattel's UCL claim is barred
27  because "lost profits" and "compensatory and exemplary damages" are not restitutionary,
28  and because "courts have rejected a party's attempt to obtain relief under § 17200 by

-16-

1  using the expediency of changing the label on the relief sought") (citing <u>Korea Supply</u>

2  <u>Co.</u>, 29 Cal. 4th at 1150-51; <u>United States v. Sequel Contractors, Inc.</u>, 402 F. Supp. 2d

3  1142, 1156 (C.D. Cal. 2005) (dismissing UCL claim because claimant sought damages,

4  not restitution)).

5  **VI.   MGA IS NOT ENTITLED TO AN INJUNCTION**

6  MGA seeks to permanently enjoin Mattel from "entering into arrangements with

7  retailers with the intent to exclude MGA products."  MGA's Proposed Findings of Law at

8  9 (Dkt. 10525).  MGA's request must be rejected.  MGA has failed to prove any injury-in-

9  fact.  Even if it had, MGA's requested relief is impermissibly vague, overbroad, and will

10  irreparably harm competition.

11  Rule 65(d) requires that every injunction "describe in reasonable detail--and not by

12  referring to the complaint or other document--the act or acts restrained or required." <u>Fed.</u>

13  <u>R. Civ. P.</u> 65(d).  Because the purpose of <u>Rule</u> 65(d) is to provide fair and precisely drawn

14  notice to the party against whom the injunction has issued as to what is actually

15  prohibited, broad language in an injunction that essentially requires a party to obey the

16  law in the future is disfavored.  <u>See</u> <u>Calvin Klein Cosmetics Corp. v. Parfums de Coeur,</u>

17  <u>Ltd.</u>, 824 F.2d 665, 669 (8th Cir. 1987) (vacating injunctive relief that "too broadly

18  require[d] [defendant] to guess at what kind of conduct would be deemed trademark

19  infringement") (citing <u>Granny Goose Foods, Inc. v. Bhd. of Teamsters</u>, 415 U.S. 423, 444

20  (1974)); <u>Schmidt v. Lessard</u>, 414 U.S. 473, 476 (1974) ("basic fairness requires that those

21  enjoined receive explicit notice of precisely what conduct is outlawed").  MGA's

22  requested relief fails because it is impermissibly overbroad.  It provides no detail

23  whatsoever as to what acts are to be enjoined, what might constitute an "arrangement,"

24  who the unnamed "retailers" might be, what constitutes "intent to exclude MGA

25  products," or how such "intent" could even be ascertained and distinguished from non-

26  offending agreements with retailers.  MGA's requested relief does not even come close to

27  the specificity <u>Rule</u> 65 requires.

28

1      MGA also ignores the requirement that "any finding of unfairness to competitors

2   under section 17200 be tethered to some legislatively declared policy or proof of some

3   actual or threatened impact on competition."  Cel-Tech Commc'ns, Inc., 20 Cal.4th at

4   186-87.  Here, MGA contends it is entitled to an injunction unlimited in scope and

5   duration without reference to any specific evidence because "MGA and Mattel continue to

6   compete for shelf space in the fashion doll market, as well as other toy categories."

7   MGA's Proposed Findings of Law ¶ 15 (Dkt. No. 10525).  That is preposterous.  MGA's

8   request for relief does not mention Kohl's or any other retailer for which MGA is

9   asserting a purported claim of injury.  MGA has made no showing of any injury, and

10  indeed presented no evidence of any alleged unfair competition concerning Kohl's that

11  occurred after 2006.  The material events of MGA's claim occurred over *seven* years ago,

12  in late 2004 and the first weeks of 2005.  See Mattel's Corrected Proposed Findings of

13  Fact and Conclusions of Law ¶ 102 (Dkt. No. 10531).  MGA ignores all of the evidence

14  demonstrating causation is lacking for any alleged Kohl's-related injury in 2005 and 2006.

15  Mattel's Corrected Proposed Findings of Fact and Conclusions of Law ¶¶ 33-70 (Dkt. No.

16  10531).  Moreover, MGA's own documents confirm it sold millions of dollars worth of

17  products to Kohl's after 2006.  See, e.g., (2007) TX 31183-00072; (2008) TX 31184-

18  00068.  MGA's proposed injunction is not tethered to these or any other facts presented at

19  trial.

20      MGA's proposed injunction also fails because MGA has presented no evidence of

21  antitrust injury or market definition in support.  The Supreme Court has recognized the

22  purpose of antitrust laws "is not to protect businesses from the working of the market; it is

23  to protect the public from the failure of the market."  Spectrum Sports, Inc. v. McQuillan,

24  506 U.S. 447, 458 (1993).  Accordingly, the Ninth Circuit has upheld the denial of a UCL

25  injunction that would hinder, rather than promote, competition in the market.  See Theme

26  Promotions, Inc., 546 F.3d at 1009-10 (affirming denial of UCL injunction where the

27  record "was sufficiently ambiguous with respect to the market definition [and] sufficiently

28  ambiguous with respect to the antitrust injury, that it would not reasonably support an

-18-

1  injunction going forward"). The same holds true here. MGA's failure to present evidence

2  or market definition and antitrust injury is fatal to its claim for an injunction.

3       MGA asserts it has shown "a *risk* that the conduct here will recur." MGA's

4  Proposed Findings of Law ¶ 15 (Dkt. No. 10525) (emphasis added). But there is no

5  evidence Mattel engaged in any wrongdoing with retailers in the first place, let alone any

6  ongoing conduct or conduct likely to recur. <u>Sun Microsystems, Inc. v Microsoft Corp.</u>,

7  188 F.3d 1115, 1123 (9th Cir. 1999) (vacating UCL injunction where defendant

8  discontinued the conduct at issue and plaintiff made no showing the conduct was likely to

9  recur) ("under California law [Cal. Bus. & Prof. Code § 17200], . . . a plaintiff cannot

10  receive an injunction for past conduct *unless he shows that the conduct will probably*

11  *recur*") (emphasis added); <u>Madrid v. Perot Sys. Corp.</u>, 130 Cal. App. 4th 440, 464 (2005)

12  (UCL injunction is only available if the unlawful or unfair practice "is ongoing or likely to

13  recur"); <u>Cal. Serv. Station & Auto. Repair Ass'n v. Union Oil Co. of Cal.</u>, 232 Cal. App.

14  3d 44, 57 (1991) ("Injunctive relief will be denied if, at the time of the order of judgment,

15  there is no reasonable probability that the past acts complained of will recur"). MGA does

16  not cite to any evidence in support of its claim there is a "risk" that alleged unfair

17  competition will recur. There is none. Allegations based upon conduct dating back more

18  than *seven* years ago do not evidence any such "risk." MGA cannot dispute this, having

19  taken the position that "[a]n injunction is only available under § 17200 if the unlawful

20  practice 'is ongoing or likely to recur'" and unfair conduct occurring "between six and

21  eleven years ago" is unlikely to recur. <u>See</u> MGA's Proposed Conclusions of Law Re

22  Mattel's Unfair Competition Claim ¶¶ 26-27 (Dkt. 10524) (quoting <u>Madrid</u>, 130 Cal. App.

23  4th at 463).

24       MGA has made no showing of any violation of Section 17200, there is no ongoing

25  wrongful business conduct, and MGA's ill-conceived proposal to enjoin Mattel from

26  entering into "arrangements with retailers with the intent to exclude" would irreparably

27  harm competition and consumers. MGA's proposed conclusions of law for an injunction

28  must be rejected.

## <u>Conclusion</u>

Mattel respectfully requests that the Court adopt Mattel's proposed findings of fact and conclusions of law, and that judgment to be entered for Mattel and against MGA on MGA's statutory unfair competition claim, and that no restitution or other relief, including injunctive relief, be awarded to MGA on this claim.

DATED:   May 3, 2011              QUINN EMANUEL URQUHART &
                                  SULLIVAN. LLP


                                  By /s/ John B. Quinn
                                     John B. Quinn
                                     Attorneys for Mattel, Inc., and Mattel de
                                     Mexico. S.A. de C.V.