# Exhibit D

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-Q

---

**(Mark One)**

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the quarterly period ended March 31, 2011**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number 001-05647**

---

# MATTEL, INC.
**(Exact name of registrant as specified in its charter)**

| **Delaware** | **95-1567322** |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**333 Continental Blvd.**
**El Segundo, CA 90245-5012**
**(Address of principal executive offices)**

**(310) 252-2000**
**(Registrant's telephone number)**

**(Former name, former address and former fiscal year, if changed since last report)**

**NONE**

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒        No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒        Accelerated filer ☐        Non-accelerated filer ☐        Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange

Act).   Yes  ☐     No  ☒

Number of shares outstanding of registrant's common stock, $1.00 par value, as of April 21, 2011:

347,588,073 shares

**Table of Contents**

## MATTEL, INC. AND SUBSIDIARIES

|  |  | **Page** |
|---|---|---|
| **PART I** |  |  |
| Item 1. | Financial Statements | 3 |
|  | Consolidated Balance Sheets | 3 |
|  | Consolidated Statements of Operations | 4 |
|  | Consolidated Statements of Cash Flows | 5 |
|  | Notes to Consolidated Financial Statements | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 23 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 32 |
| Item 4. | Controls and Procedures | 33 |
| **PART II** |  |  |
| Item 1. | Legal Proceedings | 34 |
| Item 1A. | Risk Factors | 34 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 34 |
| Item 3. | Defaults Upon Senior Securities | 34 |
| Item 5. | Other Information | 34 |
| Item 6. | Exhibits | 35 |
|  | **Signature** | 36 |

2

Exhibit D - Page 203

**Table of Contents**

## PART I—FINANCIAL INFORMATION

**Item 1.   Financial Statements.**

### MATTEL, INC. AND SUBSIDIARIES
### CONSOLIDATED BALANCE SHEETS

| | March 31, 2011 | March 31, 2010 | December 31, 2010 |
|---|---|---|---|
| | | (Unaudited; in thousands, except share data) | |
| **ASSETS** | | | |
| **Current Assets** | | | |
| Cash and equivalents | $ 1,049,363 | $ 871,891 | $ 1,281,123 |
| Accounts receivable, net | 758,620 | 661,881 | 1,146,106 |
| Inventories | 607,199 | 429,638 | 463,838 |
| Prepaid expenses and other current assets | 336,530 | 337,905 | 335,543 |
| Total current assets | 2,751,712 | 2,301,315 | 3,226,610 |
| **Noncurrent Assets** | | | |
| Property, plant, and equipment, net | 494,055 | 492,221 | 484,705 |
| Goodwill | 828,032 | 820,557 | 824,007 |
| Other noncurrent assets | 908,258 | 889,123 | 882,411 |
| **Total Assets** | $ 4,982,057 | $ 4,503,216 | $ 5,417,733 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| **Current Liabilities** | | | |
| Current portion of long-term debt | $ 250,000 | $ 50,000 | $ 250,000 |
| Accounts payable | 300,251 | 246,276 | 406,270 |
| Accrued liabilities | 471,280 | 412,321 | 642,211 |
| Income taxes payable | 18,634 | 14,713 | 51,801 |
| Total current liabilities | 1,040,165 | 723,310 | 1,350,282 |
| **Noncurrent Liabilities** | | | |
| Long-term debt | 950,000 | 700,000 | 950,000 |
| Other noncurrent liabilities | 474,479 | 484,284 | 488,867 |
| Total noncurrent liabilities | 1,424,479 | 1,184,284 | 1,438,867 |
| **Stockholders' Equity** | | | |
| Common stock $1.00 par value, 1.0 billion shares authorized; 441.4 million shares issued | 441,369 | 441,369 | 441,369 |
| Additional paid-in capital | 1,678,266 | 1,683,718 | 1,706,461 |
| Treasury stock at cost; 94.3 million shares, 76.8 million shares, and 92.3 million shares, respectively | (1,939,664) | (1,502,202) | (1,880,692) |
| Retained earnings | 2,656,023 | 2,364,509 | 2,720,645 |
| Accumulated other comprehensive loss | (318,581) | (391,772) | (359,199) |
| Total stockholders' equity | 2,517,413 | 2,595,622 | 2,628,584 |
| **Total Liabilities and Stockholders' Equity** | $ 4,982,057 | $ 4,503,216 | $ 5,417,733 |

*The accompanying notes are an integral part of these financial statements.*

3

Exhibit D - Page 204

**Table of Contents**

### MATTEL, INC. AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF OPERATIONS

|  | For the Three Months Ended | |
|---|---|---|
|  | March 31, 2011 | March 31, 2010 |
|  | (Unaudited; in thousands, except per share amounts) | |
| **Net Sales** | $ 951,856 | $ 880,082 |
| Cost of sales | 478,709 | 448,230 |
| **Gross Profit** | 473,147 | 431,852 |
| Advertising and promotion expenses | 101,849 | 94,169 |
| Other selling and administrative expenses | 334,540 | 292,456 |
| **Operating Income** | 36,758 | 45,227 |
| Interest expense | 18,816 | 13,623 |
| Interest (income) | (3,163) | (2,452) |
| Other non-operating (income) expense, net | (156) | 774 |
| **Income Before Income Taxes** | 21,261 | 33,282 |
| Provision for income taxes | 4,654 | 8,440 |
| **Net Income** | $ 16,607 | $ 24,842 |
| **Net Income Per Common Share—Basic** | $ 0.05 | $ 0.07 |
| Weighted average number of common shares | 349,072 | 363,231 |
| **Net Income Per Common Share—Diluted** | $ 0.05 | $ 0.07 |
| Weighted average number of common and potential common shares | 352,707 | 366,144 |
| **Dividends Declared Per Common Share** | $ 0.23 | $ — |

*The accompanying notes are an integral part of these financial statements.*

4

Exhibit D - Page 205

**Table of Contents**

## MATTEL, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | For the Three Months Ended | |
| --- | --- | --- |
| | March 31, 2011 | March 31, 2010 |
| | (Unaudited; in thousands) | |
| **Cash Flows From Operating Activities:** | | |
| Net income | $ 16,607 | $ 24,842 |
| Adjustments to reconcile net income to net cash flows used for operating activities: | | |
| Depreciation | 35,998 | 36,670 |
| Amortization | 3,507 | 3,891 |
| Deferred income taxes | (22,105) | (4,988) |
| Share-based compensation | 10,972 | 12,829 |
| Increase (decrease) from changes in assets and liabilities: | | |
| Accounts receivable | 401,256 | 75,459 |
| Inventories | (129,933) | (76,710) |
| Prepaid expenses and other current assets | 17,036 | 2,368 |
| Accounts payable, accrued liabilities, and income taxes payable | (322,376) | (333,188) |
| Other, net | (52,806) | 14,220 |
| Net cash flows used for operating activities | (41,844) | (244,607) |
| **Cash Flows From Investing Activities:** | | |
| Purchases of tools, dies, and molds | (28,439) | (17,843) |
| Purchases of other property, plant, and equipment | (17,336) | (6,322) |
| Proceeds from sale of other property, plant, and equipment | 316 | 251 |
| Proceeds from (payments for) foreign currency forward exchange contracts | 36,287 | (11,133) |
| Net cash flows used for investing activities | (9,172) | (35,047) |
| **Cash Flows From Financing Activities:** | | |
| Payments of short-term borrowings | — | (1,950) |
| Payment of credit facility renewal costs | (6,899) | — |
| Share repurchases | (100,142) | — |
| Payment of dividends on common stock | (80,128) | — |
| Proceeds from exercise of stock options | 14,001 | 31,486 |
| Other, net | (13,099) | 4,261 |
| Net cash flows (used for) provided by financing activities | (186,267) | 33,797 |
| **Effect of Currency Exchange Rate Changes on Cash** | 5,523 | 751 |
| **Decrease in Cash and Equivalents** | (231,760) | (245,106) |
| **Cash and Equivalents at Beginning of Period** | 1,281,123 | 1,116,997 |
| **Cash and Equivalents at End of Period** | $1,049,363 | $ 871,891 |

*The accompanying notes are an integral part of these financial statements.*

5

Table of Contents

## MATTEL, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (Unaudited)

**1.  Basis of Presentation**

The accompanying unaudited consolidated financial statements and related disclosures have been prepared in accordance with accounting principles generally accepted in the United States of America applicable to interim financial information and with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X. In the opinion of management, all adjustments, consisting of only those of a normal recurring nature, considered necessary for a fair presentation of the financial position and interim results of Mattel, Inc. and its subsidiaries ("Mattel" or the "Company") as of and for the periods presented, have been included. Because Mattel's business is seasonal, results for interim periods are not necessarily indicative of those that may be expected for a full year.

The year-end balance sheet data was derived from audited financial statements, however, the accompanying interim notes to the consolidated financial statements do not include all disclosures required by accounting principles generally accepted in the United States of America.

The financial information included herein should be read in conjunction with Mattel's consolidated financial statements and related notes in its 2010 Annual Report on Form 10-K.

**2.  Accounts Receivable**

Accounts receivable are net of allowances for doubtful accounts of $21.3 million, $20.5 million, and $21.8 million as of March 31, 2011, March 31, 2010, and December 31, 2010, respectively.

**3.  Inventories**

Inventories include the following:

|  | March 31, 2011 | March 31, 2010 | December 31, 2010 |
|---|---|---|---|
|  |  | (In thousands) |  |
| Raw materials and work in process | $    82,900 | $    65,295 | $    68,095 |
| Finished goods | 524,299 | 364,343 | 395,743 |
|  | $  607,199 | $  429,638 | $  463,838 |

**4.  Property, Plant, and Equipment**

Property, plant, and equipment, net include the following:

|  | March 31, 2011 | March 31, 2010 | December 31, 2010 |
|---|---|---|---|
|  |  | (In thousands) |  |
| Land | $    26,760 | $    26,646 | $    26,796 |
| Buildings | 252,517 | 243,425 | 249,542 |
| Machinery and equipment | 822,072 | 777,828 | 809,723 |
| Tools, dies, and molds | 607,753 | 581,946 | 589,156 |
| Capital leases | 23,271 | 23,271 | 23,271 |
| Leasehold improvements | 181,719 | 180,673 | 177,141 |
|  | 1,914,092 | 1,833,789 | 1,875,629 |
| Less: accumulated depreciation | (1,420,037) | (1,341,568) | (1,390,924) |
|  | $  494,055 | $  492,221 | $  484,705 |

6

Exhibit D - Page 207

**Table of Contents**

5. **Goodwill**

Goodwill is allocated to various reporting units, which are either at the operating segment level or one reporting level below the operating segment level, for purposes of evaluating whether goodwill is impaired. Mattel's reporting units are: Mattel Girls Brands US, Mattel Boys Brands US, Fisher-Price Brands US, American Girl Brands, and International. Mattel tests its goodwill for impairment annually in the third quarter, and whenever events or changes in circumstances indicate that the carrying value may exceed its fair value.

The change in the carrying amount of goodwill by reporting unit for the three months ended March 31, 2011 is shown below. Brand-specific goodwill held by foreign subsidiaries is allocated to the US reporting units selling those brands, thereby causing foreign currency translation impact for the US reporting units.

| | December 31, 2010 | Impact of Currency Exchange Rate Changes | March 31, 2011 |
|---|---|---|---|
| | | (In thousands) | |
| Mattel Girls Brands US | $ 31,071 | $ 754 | $ 31,825 |
| Mattel Boys Brands US | 130,658 | 59 | 130,717 |
| Fisher-Price Brands US | 215,879 | 148 | 216,027 |
| American Girl Brands | 207,571 | — | 207,571 |
| International | 238,828 | 3,064 | 241,892 |
| | $ 824,007 | $ 4,025 | $ 828,032 |

6. **Other Noncurrent Assets**

Other noncurrent assets include the following:

| | March 31, 2011 | March 31, 2010 | December 31, 2010 |
|---|---|---|---|
| | | (In thousands) | |
| Deferred income taxes | $ 497,194 | $ 485,809 | $ 477,320 |
| Nonamortizable identifiable intangibles | 122,223 | 122,223 | 122,223 |
| Identifiable intangibles (net of amortization of $66.4 million, $72.0 million, and $64.2 million, respectively) | 89,196 | 90,997 | 91,359 |
| Other | 199,645 | 190,094 | 191,509 |
| | $ 908,258 | $ 889,123 | $ 882,411 |

7. **Accrued Liabilities**

Accrued liabilities include the following:

| | March 31, 2011 | March 31, 2010 | December 31, 2010 |
|---|---|---|---|
| | | (In thousands) | |
| Advertising and promotion | $ 48,922 | $ 42,396 | $ 59,586 |
| Taxes other than income taxes | 44,941 | 35,547 | 68,686 |
| Royalties | 36,376 | 40,307 | 95,785 |
| Derivatives payable | 25,850 | 8,389 | 11,082 |
| Other | 315,191 | 285,682 | 407,072 |
| | $ 471,280 | $ 412,321 | $ 642,211 |

7

**Table of Contents**

8. **Product Recalls**

During 2007, Mattel recalled products with high-powered magnets that may become dislodged and other products, some of which were produced using non-approved paint containing lead in excess of applicable regulatory and Mattel standards. During the second half of 2007, additional products were recalled, withdrawn from retail stores, or replaced at the request of consumers as a result of safety or quality issues (collectively, the "2007 Product Recalls").

Following the announcement of the 2007 Product Recalls, a number of lawsuits were filed against Mattel with respect to the recalled products, which are more fully described in Note 14 to the Consolidated Financial Statements in Mattel's 2010 Annual Report on Form 10-K. During the three months ended March 31, 2010, based on actual experience to date under the settlement program related to the above-described product liability related litigation, Mattel reduced its estimate of these settlement costs, which had the effect of reducing other selling and administrative expenses by $7.5 million. During the three months ended March 31, 2011, there were no changes to Mattel's 2007 product recall and reserve estimates.

Although management is not aware of any additional quality or safety issues that are likely to result in material recalls or withdrawals, there can be no assurance that issues will not be identified in the future.

9. **Seasonal Financing**

Mattel maintains and periodically amends or replaces its domestic unsecured committed revolving credit facility with a commercial bank group that is used as a back-up facility to Mattel's commercial paper program, which is used as the primary source of financing for the seasonal working capital requirements of its domestic subsidiaries. The revolving credit facility was amended and restated on March 8, 2011 to, among other things, (i) extend the maturity date of the credit facility to March 8, 2015, (ii) increase aggregate commitments under the credit facility to $1.4 billion, with an "accordion feature," which allows Mattel to increase aggregate availability under the credit facility to $1.6 billion under certain circumstances, (iii) decrease the applicable interest rate margins to a range of 0.25% to 1.50% above the applicable base rate for base rate loans, and 1.25% to 2.50% above the applicable London Interbank Borrowing Rate for Eurodollar rate loans, in each case depending on Mattel's senior unsecured long-term debt rating, and (iv) decrease commitment fees to a range of 0.15% to 0.40% of the unused commitments under the credit facility.

The borrowing capacity of the amended facility is $1.4 billion for four years, which exceeds the $1.1 billion for one year remaining on the facility prior to the amendment. The proportion of unamortized debt issuance costs from the prior facility renewal related to creditors involved in both the prior facility and amended facility, and borrowing costs incurred as a result of the amendment were deferred and will be amortized over the term of the amended facility.

In connection with the execution of the amendment of the domestic unsecured revolving credit facility, Mattel terminated its $300.0 million domestic receivables sales facility, which was a sub-facility of the domestic unsecured committed revolving credit facility.

Mattel is required to meet financial covenants at the end of each quarter and fiscal year, using the formulae specified in the credit facility agreement to calculate the ratios. Mattel was in compliance with such covenants at the end of the three months ended March 31, 2011.

The domestic unsecured committed revolving credit facility is a material agreement and failure to comply with the financial covenant ratios may result in an event of default under the terms of the facility. If Mattel defaulted under the terms of the domestic unsecured committed revolving credit facility, its ability to meet its seasonal financing requirements could be adversely affected.

**Table of Contents**

**10.  Long-term Debt**

Long-term debt includes the following:

| | March 31, 2011 | March 31, 2010 | December 31, 2010 |
|---|---|---|---|
| | | (In thousands) | |
| Medium-term notes due June 2011 to November 2013 | $ 150,000 | $ 200,000 | $ 150,000 |
| 2006 Senior Notes due June 2011 | 200,000 | 200,000 | 200,000 |
| 2008 Senior Notes due March 2013 | 350,000 | 350,000 | 350,000 |
| 2010 Senior Notes due October 2020 and October 2040 | 500,000 | — | 500,000 |
| | 1,200,000 | 750,000 | 1,200,000 |
| Less: current portion | (250,000) | (50,000) | (250,000) |
| Total long-term debt | $ 950,000 | $ 700,000 | $ 950,000 |

In September 2010, Mattel issued $250.0 million of unsecured 4.35% senior notes ("4.35% Senior Notes") due October 1, 2020 and $250.0 million of unsecured 6.20% senior notes ("6.20% Senior Notes") due October 1, 2040 (collectively, "2010 Senior Notes"). Interest on the 2010 Senior Notes is payable semi-annually beginning April 1, 2011. Mattel may redeem all or part of the 2010 Senior Notes at any time or from time to time at its option at a redemption price equal to the greater of (i) 100% of the principal amount of the notes being redeemed plus accrued and unpaid interest to the redemption date, and (ii) a "make-whole" amount based on the yield of a comparable US Treasury security plus 25 basis points in respect of the 4.35% Senior Notes and 40 basis points in respect of the 6.20% Senior Notes.

In May 2010 and October 2010, Mattel repaid $40.0 million and $10.0 million, respectively, of its Medium-term notes in connection with their scheduled maturities.

**11.  Other Noncurrent Liabilities**

Other noncurrent liabilities include the following:

| | March 31, 2011 | March 31, 2010 | December 31, 2010 |
|---|---|---|---|
| | | (In thousands) | |
| Benefit plan liabilities | $ 224,264 | $ 250,548 | $ 257,195 |
| Noncurrent tax liabilities | 113,618 | 108,372 | 113,526 |
| Other | 136,597 | 125,364 | 118,146 |
| | $ 474,479 | $ 484,284 | $ 488,867 |

**12.  Comprehensive Income (Loss)**

The components of comprehensive income, net of tax, are as follows:

| | For the Three Months Ended | |
|---|---|---|
| | March 31, 2011 | March 31, 2010 |
| | (In thousands) | |
| Net income | $ 16,607 | $ 24,842 |
| Currency translation adjustments | 53,178 | (29,076) |
| Defined benefit pension plans net prior service cost and net actuarial loss | 2,533 | 2,341 |
| Net unrealized (losses) gains on derivative instruments: | | |
| Unrealized holding (losses) gains | (14,353) | 11,739 |
| Reclassification adjustment for realized (gains) losses included in net income | (740) | 2,758 |
| | (15,093) | 14,497 |
| | $ 57,225 | $ 12,604 |

9

**Table of Contents**

The components of accumulated other comprehensive loss are as follows:

|  | March 31, 2011 | March 31, 2010 | December 31, 2010 |
|---|---|---|---|
|  | (In thousands) | | |
| Currency translation adjustments | $ (168,580) | $ (251,717) | $ (221,758) |
| Defined benefit pension and other postretirement plans, net of tax | (131,781) | (139,676) | (134,314) |
| Net unrealized loss on derivative instruments, net of tax | (18,220) | (379) | (3,127) |
|  | $ (318,581) | $ (391,772) | $ (359,199) |

*Currency Translation Adjustments*

Mattel's reporting currency is the US dollar. The translation of its net investment in subsidiaries with non-US dollar functional currencies subjects Mattel to currency exchange rate fluctuations in its results of operations and financial position. Assets and liabilities of subsidiaries with non-US dollar functional currencies are translated into US dollars at fiscal period-end exchange rates. Income, expense, and cash flow items are translated at weighted average exchange rates prevailing during the fiscal period. The resulting currency translation adjustments are recorded as a component of accumulated other comprehensive loss within stockholders' equity. For the three months ended March 31, 2011, currency translation adjustments resulted in a net gain of $53.2 million, with gains primarily from the strengthening of the Euro, Mexican peso, Brazilian real, and British pound sterling against the US dollar. For the three months ended March 31, 2010, currency translation adjustments resulted in a net loss of $29.1 million, with losses primarily from the weakening of the Euro and British pound sterling, partially offset by the strengthening of the Mexican peso against the US dollar.

**13.  Derivative Instruments**

Mattel seeks to mitigate its exposure to foreign currency transaction risk by monitoring its foreign currency transaction exposure for the year and partially hedging such exposure using foreign currency forward exchange contracts. Mattel uses foreign currency forward exchange contracts as cash flow hedges primarily to hedge its purchases and sales of inventory denominated in foreign currencies. These contracts generally have maturity dates up to 18 months. These derivative instruments have been designated as effective cash flow hedges, whereby the unsettled hedges are reported in Mattel's consolidated balance sheets at fair value, with changes in the fair value of the hedges reflected in other comprehensive income ("OCI"). Realized gains and losses for these contracts are recorded in the consolidated statements of operations in the period in which the inventory is sold to customers. Additionally, Mattel uses foreign currency forward exchange contracts to hedge intercompany loans and advances denominated in foreign currencies. Due to the short-term nature of the contracts involved, Mattel does not use hedge accounting for these contracts, and as such, changes in fair value are recorded in the period of change in the consolidated statements of operations. As of March 31, 2011, March 31, 2010, and December 31, 2010, Mattel held foreign currency forward exchange contracts with notional amounts of approximately $1.4 billion, $1.1 billion, and $1.1 billion, respectively.

10

Exhibit D - Page 211

Table of Contents

The following table presents Mattel's derivative assets and liabilities:

| | | Asset Derivatives | | |
| --- | --- | --- | --- | --- |
| | Balance Sheet Classification | Fair Value | | |
| | | March 31, 2011 | March 31, 2010 | December 31, 2010 |
| | | | (In thousands) | |
| **Derivatives designated as hedging instruments:** | | | | |
| | Prepaid expenses and other | | | |
| Foreign currency forward exchange contracts | current assets | $ 6,073 | $ 12,188 | $ 8,200 |
| Foreign currency forward exchange contracts | Other noncurrent assets | 298 | 83 | 579 |
| **Total derivatives designated as hedging instruments** | | $ 6,371 | $ 12,271 | $ 8,779 |
| **Derivatives not designated as hedging instruments:** | | | | |
| | Prepaid expenses and other | | | |
| Foreign currency forward exchange contracts | current assets | $ 3,394 | $ 2,590 | $ 8,799 |
| **Total** | | $ 9,765 | $ 14,861 | $ 17,578 |

| | | Liability Derivatives | | |
| --- | --- | --- | --- | --- |
| | Balance Sheet Classification | Fair Value | | |
| | | March 31, 2011 | March 31, 2010 | December 31, 2010 |
| | | | (In thousands) | |
| **Derivatives designated as hedging instruments:** | | | | |
| Foreign currency forward exchange contracts | Accrued liabilities | $25,850 | $ 8,389 | $ 11,082 |
| Foreign currency forward exchange contracts | Other noncurrent liabilities | 1,114 | — | 101 |
| **Total derivatives designated as hedging instruments** | | $26,964 | $ 8,389 | $ 11,183 |

The following tables present the classification and amount of gains and losses, net of taxes, from derivatives reported in the consolidated statements of operations:

| | For the Three Months Ended March 31, 2011 | | For the Three Months Ended March 31, 2010 | | |
| --- | --- | --- | --- | --- | --- |
| | Amount of Gain (Loss) Recognized in OCI | Amount of Gain (Loss) Reclassified from Accumulated OCI to Statements of Operations | Amount of Gain (Loss) Recognized in OCI | Amount of Gain (Loss) Reclassified from Accumulated OCI to Statements of Operations | Statements of Operations Classification |
| | | | (In thousands) | | |
| **Derivatives designated as hedging instruments:** | | | | | |
| Foreign currency forward exchange contracts | $ (14,353) | $ 740 | $ 11,739 | $ (2,758) | Cost of sales |

11

Exhibit D - Page 212

**Table of Contents**

The net gain (loss) of $0.7 million and $(2.8) million reclassified from accumulated OCI to the statements of operations for the three months ended March 31, 2011 and 2010, respectively, are offset by the changes in cash flows associated with the underlying hedged transactions.

|  | Amount of Gain (Loss) Recognized in the Statements of Operations | | |
| --- | --- | --- | --- |
|  | For the Three Months Ended March 31, 2011 | For the Three Months Ended March 31, 2010 | Statements of Operations Classification |
|  | (In thousands) | | |
| **Derivatives not designated as hedging instruments:** | | | |
| Foreign currency forward exchange contracts | $      29,182 | $      (12,397) | Non-operating income/expense |
| Foreign currency forward exchange contracts | 1,700 | 1,632 | Cost of sales |
| **Total** | $      30,882 | $      (10,765) | |

The net gain (loss) of $30.9 million and $(10.8) million recognized in the statements of operations for the three months ended March 31, 2011 and 2010, respectively, are offset by foreign currency transaction gains and losses on the related hedged balances.

## 14.  Fair Value Measurements

The following table presents information about Mattel's assets and liabilities measured and reported in the financial statements at fair value on a recurring basis and indicates the fair value hierarchy of the valuation techniques utilized to determine such fair value. The three levels of the fair value hierarchy are as follows:

- Level 1 – Valuations based on unadjusted quoted prices in active markets for identical assets or liabilities that the entity has the ability to access.

- Level 2 – Valuations based on quoted prices for similar assets or liabilities, quoted prices in markets that are not active, or other inputs that are observable or can be corroborated by observable data for substantially the full term of the assets or liabilities.

- Level 3 – Valuations based on inputs that are unobservable, supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

Mattel's financial assets and liabilities include the following:

|  | March 31, 2011 | | | |
| --- | --- | --- | --- | --- |
|  | Level 1 | Level 2 | Level 3 | Total |
|  | (In thousands) | | | |
| **Assets:** | | | | |
| Foreign currency forward exchange contracts (a) | $ — | $ 9,765 | $ — | $ 9,765 |
| Auction rate securities (b) | — | — | 21,000 | 21,000 |
| Total assets | $ — | $ 9,765 | $21,000 | $30,765 |
| **Liabilities:** | | | | |
| Foreign currency forward exchange contracts (a) | $ — | $26,964 | $ — | $26,964 |

12

Exhibit D - Page 213

Table of Contents

| | | March 31, 2010 | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| | | (In thousands) | | |
| **Assets:** | | | | |
| Foreign currency forward exchange contracts (a) | $ — | $ 14,861 | $ — | $ 14,861 |
| **Liabilities:** | | | | |
| Foreign currency forward exchange contracts (a) | $ — | $ 8,389 | $ — | $ 8,389 |

| | | December 31, 2010 | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| | | (In thousands) | | |
| **Assets:** | | | | |
| Foreign currency forward exchange contracts (a) | $ — | $ 17,578 | $ — | $ 17,578 |
| Auction rate securities (b) | — | — | 21,000 | 21,000 |
| Total assets | $ — | $ 17,578 | $21,000 | $ 38,578 |
| **Liabilities:** | | | | |
| Foreign currency forward exchange contracts (a) | $ — | $ 11,183 | $ — | $ 11,183 |

(a)   The fair value of the foreign currency forward exchange contracts is based on dealer quotes of market forward rates and reflects the amount that Mattel would receive or pay at their maturity dates for contracts involving the same notional amounts, currencies, and maturity dates.

(b)   The fair value of the auction rate securities is estimated using a discounted cash flow model based on (i) estimated interest rates, timing, and amount of cash flows, (ii) credit spreads, recovery rates, and credit quality of the underlying securities, and (iii) illiquidity considerations.

During 2010, Mattel adopted ASU 2010-11, *Derivatives and Hedging (Topic 815): Scope Exception Related to Embedded Credit Derivatives* , and elected the fair value option under this standard, which resulted in an $8.7 million, net of taxes, adjustment to beginning retained earnings relating to auction rate securities that contain embedded credit derivatives, that were previously reported at amortized cost.

The following table presents information about Mattel's assets measured and reported at fair value on a recurring basis using significant Level 3 inputs:

| | Level 3 |
|---|---|
| | (In thousands) |
| **Balance at December 31, 2010** | $    21,000 |
| Unrealized change in fair value | — |
| **Balance at March 31, 2011** | $    21,000 |

### 15.   Fair Value of Financial Instruments

Mattel's financial instruments include cash and equivalents, accounts receivable and payable, short-term borrowings, and accrued liabilities. The carrying amount of these instruments approximates fair value because of their short-term nature.

The estimated fair value of Mattel's long-term debt, including the current portion, was $1.23 billion (compared to a carrying amount of $1.20 billion) as of March 31, 2011, $799.7 million (compared to a carrying amount of $750.0 million) as of March 31, 2010, and $1.23 billion (compared to a carrying amount of $1.20 billion) as of December 31, 2010. The estimated fair values have been calculated based on broker quotes or rates for the same or similar instruments.

13

Table of Contents

The fair value related disclosures for Mattel's derivative financial instruments are included in Note 13, "Derivative Instruments", and Note 14, "Fair Value Measurements".

## 16.  Earnings Per Share

Unvested share-based payment awards that contain nonforfeitable rights to dividends or dividend equivalents (whether paid or unpaid) are participating securities and are included in the computation of earnings per share pursuant to the two-class method. Certain of Mattel's restricted stock units ("RSUs") are considered participating securities because they contain nonforfeitable rights to dividend equivalents.

Under the two-class method, net income is reduced by the amount of dividends declared in the period for each class of common stock and participating securities. The remaining undistributed earnings are then allocated to common stock and participating securities as if all of the net income for the period had been distributed. Basic earnings per common share excludes dilution and is calculated by dividing net income allocable to common shares by the weighted average number of common shares outstanding for the period. Diluted earnings per common share is calculated by dividing net income allocable to common shares by the weighted average number of common shares for the period, as adjusted for the potential dilutive effect of non-participating share-based awards. The following table reconciles earnings per common share for the three months ended March 31, 2011 and 2010:

|  | For the Three Months Ended | |
| --- | --- | --- |
|  | March 31, 2011 | March 31, 2010 |
|  | (In thousands, except per share amounts) | |
| **Basic:** | | |
| Net income | $      16,607 | $      24,842 |
| Less net income allocable to participating RSUs (a) | (201) | (295) |
| Net income available for basic common shares | $      16,406 | $      24,547 |
| Weighted average common shares outstanding | 349,072 | 363,231 |
| Basic net income per common share | $      0.05 | $      0.07 |
| **Diluted:** | | |
| Net income | $      16,607 | $      24,842 |
| Less net income allocable to participating RSUs (a) | (199) | (293) |
| Net income available for diluted common shares | $      16,408 | $      24,549 |
| Weighted average common shares outstanding | 349,072 | 363,231 |
| Weighted average common equivalent shares arising from: | | |
|      Dilutive stock options and non-participating RSUs | 3,635 | 2,913 |
| Weighted average number of common and potential common shares | 352,707 | 366,144 |
| Diluted net income per common share | $      0.05 | $      0.07 |

(a)  *During the three months ended March 31, 2011 and 2010, Mattel allocated a proportionate share of both dividends and undistributed earnings to participating RSUs.*

The calculation of potential common shares assumes the exercise of dilutive stock options and vesting of non-participating RSUs, net of assumed treasury share repurchases at average market prices. Nonqualified stock options and non-participating RSUs totaling 0.1 million and 1.8 million shares were excluded from the calculation of diluted net income per common share for the three months ended March 31, 2011 and 2010, respectively, because they were antidilutive.

14

Exhibit D - Page 215

Table of Contents

### 17. Employee Benefit Plans

Mattel and certain of its subsidiaries have qualified and nonqualified retirement plans covering substantially all employees of these companies, which are more fully described in Note 6 to the Consolidated Financial Statements in its 2010 Annual Report on Form 10-K.

A summary of the components of net periodic benefit cost for Mattel's defined benefit pension plans is as follows:

|  | For the Three Months Ended | |
|  | March 31, 2011 | March 31, 2010 |
|---|---|---|
|  | (In thousands) | |
| Service cost | $ 3,213 | $ 3,317 |
| Interest cost | 7,329 | 8,155 |
| Expected return on plan assets | (6,302) | (7,239) |
| Amortization of prior service cost | 461 | 438 |
| Recognized actuarial loss | 3,636 | 3,668 |
|  | $ 8,337 | $ 8,339 |

A summary of the components of net periodic benefit cost for Mattel's postretirement benefit plans is as follows:

|  | For the Three Months Ended | |
|  | March 31, 2011 | March 31, 2010 |
|---|---|---|
|  | (In thousands) | |
| Service cost | $ 20 | $ 22 |
| Interest cost | 437 | 627 |
| Recognized actuarial loss | 36 | 149 |
|  | $ 493 | $ 798 |

During the three months ended March 31, 2011, Mattel made cash contributions totaling approximately $28 million and $1 million to its defined benefit pension and postretirement benefit plans, respectively.

### 18. Share-Based Payments

Mattel has various stock compensation plans, which are more fully described in Note 9 to the Consolidated Financial Statements in its 2010 Annual Report on Form 10-K. In May 2010, Mattel's stockholders approved the Mattel, Inc. 2010 Equity and Long-Term Compensation Plan ("the 2010 Plan"). Upon approval of the 2010 Plan, Mattel terminated the Mattel, Inc. 2005 Equity Compensation Plan ("the 2005 Plan"), except with regard to grants then outstanding under the 2005 Plan. All equity compensation grants are now being made under the 2010 Plan. Under the 2010 Plan, Mattel has the ability to grant nonqualified stock options, incentive stock options, stock appreciation rights, restricted stock, RSUs, performance awards, dividend equivalent rights, and shares of common stock to officers, employees, and other persons providing services to Mattel. Stock options are granted with exercise prices at the fair market value of Mattel's common stock on the applicable grant date and expire no later than ten years from the date of grant. Both stock options and time-vesting RSUs generally provide for vesting over a period of three years from the date of grant.

Exhibit D - Page 216

**Table of Contents**

Compensation expense, included within other selling and administrative expenses, related to stock options and RSUs is as follows:

| | For the Three Months Ended | |
| --- | --- | --- |
| | March 31, 2011 | March 31, 2010 |
| | (In thousands) | |
| Stock option compensation expense | $ 3,089 | $ 2,684 |
| RSU compensation expense | 7,883 | 10,145 |
| | $ 10,972 | $ 12,829 |

As of March 31, 2011, total unrecognized compensation cost related to unvested share-based payments totaled $65.7 million and is expected to be recognized over a weighted-average period of 2.1 years.

Mattel uses treasury shares purchased under its share repurchase program to satisfy stock option exercises and the vesting of RSUs. Cash received for stock option exercises for the three months ended March 31, 2011 and 2010 was $14.0 million and $31.5 million, respectively.

## 19.  Other Selling and Administrative Expenses

Other selling and administrative expenses include the following:

| | For the Three Months Ended | |
| --- | --- | --- |
| | March 31, 2011 | March 31, 2010 |
| | (In thousands) | |
| Design and development | $ 43,146 | $ 41,395 |
| Identifiable intangible asset amortization | 2,167 | 2,552 |

## 20.  Foreign Currency Transaction Gains and Losses

Currency exchange rate fluctuations may impact Mattel's results of operations and cash flows. Mattel's currency transaction exposures include gains and losses realized on unhedged inventory purchases and unhedged receivables and payables balances that are denominated in a currency other than the applicable functional currency. Gains and losses on unhedged inventory purchases and other transactions associated with operating activities are recorded in the components of operating income to which they relate in the consolidated statements of operations. For hedges of intercompany loans and advances, which do not qualify for hedge accounting treatment, the gains or losses on the hedges resulting from changes in fair value as well as the offsetting transaction gains or losses on the related hedged items, along with unhedged items, are recognized in non-operating income (expense), net in the consolidated statements of operations. Inventory purchase and sale transactions denominated in the Euro, British pound sterling, and Mexican peso are the primary transactions that cause foreign currency transaction exposure for Mattel.

Currency transaction (losses) gains included in the consolidated statements of operations are as follows:

| | For the Three Months Ended | |
| --- | --- | --- |
| | March 31, 2011 | March 31, 2010 |
| | (In thousands) | |
| Operating income | $ (11,555) | $ 9,865 |
| Other non-operating income (expense), net | (25) | (2,032) |
| Net transaction (losses) gains | $ (11,580) | $ 7,833 |

16

Exhibit D - Page 217

Table of Contents

## 21.   Income Taxes

Mattel's provision for income taxes was $4.7 million for the three months ended March 31, 2011, as compared to $8.4 million for the three months ended March 31, 2010. Mattel recognized discrete tax expense of $0.3 million during the three months ended March 31, 2010, primarily related to reassessments of prior years' tax exposure based on the status of audits and tax filings in various jurisdictions, settlements, and enacted tax law changes. There were no discrete tax items recognized during the three months ended March 31, 2011.

During the three months ended March 31, 2010, Mattel reached a resolution with the Internal Revenue Service ("IRS") regarding all open issues relating to the examination of Mattel's US federal income tax returns for the years 2006 and 2007. The resolution did not have a material impact on Mattel's first quarter 2010 consolidated financial statements.

## 22.   Contingencies

With regards to the claims against Mattel described below, Mattel intends to defend itself vigorously. Except as more fully described below, management cannot reasonably determine the scope or amount of possible liabilities that could result from an unfavorable settlement or resolution of these claims. However, it is possible that an unfavorable resolution of these claims could have a material adverse effect on Mattel's financial condition and results of operations, and there can be no assurance that Mattel will be able to achieve a favorable settlement or resolution of these claims.

*Litigation Related to Carter Bryant and MGA Entertainment, Inc.*

In April 2004, Mattel filed a lawsuit in Los Angeles County Superior Court against Carter Bryant ("Bryant"), a former Mattel design employee. The suit alleges that Bryant aided and assisted a Mattel competitor, MGA Entertainment, Inc. ("MGA"), during the time he was employed by Mattel, in violation of his contractual and other duties to Mattel. In September 2004, Bryant asserted counterclaims against Mattel, including counterclaims in which Bryant sought, as a putative class action representative, to invalidate Mattel's Confidential Information and Proprietary Inventions Agreements with its employees. Bryant also removed Mattel's suit to the United States District Court for the Central District of California. In December 2004, MGA intervened as a party-defendant in Mattel's action against Bryant, asserting that its rights to Bratz properties are at stake in the litigation.

Separately, in November 2004, Bryant filed an action against Mattel in the United States District Court for the Central District of California. The action sought a judicial declaration that Bryant's purported conveyance of rights in Bratz was proper and that he did not misappropriate Mattel property in creating Bratz.

In April 2005, MGA filed suit against Mattel in the United States District Court for the Central District of California. MGA's action alleges claims of trade dress infringement, trade dress dilution, false designation of origin, unfair competition, and unjust enrichment. The suit alleges, among other things, that certain products, themes, packaging, and/or television commercials in various Mattel product lines have infringed upon products, themes, packaging, and/or television commercials for various MGA product lines, including Bratz. The complaint also asserts that various alleged Mattel acts with respect to unidentified retailers, distributors, and licensees have damaged MGA and that various alleged acts by industry organizations, purportedly induced by Mattel, have damaged MGA. MGA's suit alleges that MGA has been damaged in an amount "believed to reach or exceed tens of millions of dollars" and further seeks punitive damages, disgorgement of Mattel's profits and injunctive relief.

In June 2006, the three cases were consolidated in the United States District Court for the Central District of California. On July 17, 2006, the Court issued an order dismissing all claims that Bryant had asserted against Mattel, including Bryant's purported counterclaims to invalidate Mattel's Confidential Information and Proprietary Inventions Agreements with its employees, and Bryant's claims for declaratory relief.

17

Table of Contents

In November 2006, Mattel asked the Court for leave to file an Amended Complaint that included not only additional claims against Bryant, but also included claims for copyright infringement, RICO violations, misappropriation of trade secrets, intentional interference with contract, aiding and abetting breach of fiduciary duty and breach of duty of loyalty, and unfair competition, among others, against MGA, its CEO Isaac Larian, certain MGA affiliates and an MGA employee. The RICO claim alleged that MGA stole Bratz and then, by recruiting and hiring key Mattel employees and directing them to bring with them Mattel confidential and proprietary information, unfairly competed against Mattel using Mattel's trade secrets, confidential information, and key employees to build their business. On January 12, 2007, the Court granted Mattel leave to file these claims as counterclaims in the consolidated cases, which Mattel did that same day.

Mattel sought to try all of its claims in a single trial, but in February 2007, the Court decided that the consolidated cases would be tried in two phases, with the first trial to determine claims and defenses related to Mattel's ownership of Bratz works and whether MGA infringed those works. On May 19, 2008, Bryant reached a settlement agreement with Mattel and is no longer a defendant in the litigation. In the public stipulation entered by Mattel and Bryant in connection with the resolution, Bryant agreed that he was and would continue to be bound by all prior and future Court Orders relating to Bratz ownership and infringement, including the Court's summary judgment rulings.

The first phase of the first trial, which began on May 27, 2008, resulted in a unanimous jury verdict on July 17, 2008 in favor of Mattel. The jury found that almost all of the Bratz design drawings and other works in question were created by Bryant while he was employed at Mattel; that MGA and Isaac Larian intentionally interfered with the contractual duties owed by Bryant to Mattel, aided and abetted Bryant's breaches of his duty of loyalty to Mattel, aided and abetted Bryant's breaches of the fiduciary duties he owed to Mattel, and converted Mattel property for their own use. The same jury determined that defendants MGA, Larian, and MGA Entertainment (HK) Limited infringed Mattel's copyrights in the Bratz design drawings and other Bratz works, and awarded Mattel total damages of approximately $100 million against the defendants. On December 3, 2008, the Court issued a series of orders rejecting MGA's equitable defenses and granting Mattel's motions for equitable relief, including an order enjoining the MGA party defendants from manufacturing, marketing, or selling certain Bratz fashion dolls or from using the "Bratz" name. The Court stayed the effect of the December 3, 2008 injunctive orders until further order of the Court and entered a further specified stay of the injunctive orders on January 7, 2009.

The parties filed and argued additional motions for post-trial relief, including a request by MGA to enter judgment as a matter of law on Mattel's claims in MGA's favor and to reduce the jury's damages award to Mattel. Mattel additionally moved for the appointment of a receiver. On April 27, 2009, the Court entered an order confirming that Bratz works found by the jury to have been created by Bryant during his Mattel employment were Mattel's property and that hundreds of Bratz female fashion dolls infringe Mattel's copyrights. The Court also upheld the jury's award of damages in the amount of $100 million and ordered an accounting of post-trial Bratz sales. The Court further vacated the stay of the December 3, 2008 orders, except to the extent specified by the Court's January 7, 2009 modification.

MGA appealed the Court's equitable orders to the Court of Appeals for the Ninth Circuit. On December 9, 2009, the Ninth Circuit heard oral argument on MGA's appeal and issued an order staying the District Court's equitable orders pending a further order to be issued by the Ninth Circuit. The Ninth Circuit opinion vacating the relief ordered by the District Court was issued on July 22, 2010. The Ninth Circuit stated that, because of several jury instruction errors it identified, a significant portion—if not all—of the jury verdict and damage award should be vacated.

In its opinion, the Ninth Circuit found that the District Court erred in concluding that Mattel's Invention agreement unambiguously applied to "ideas;" that it should have considered extrinsic evidence in determining the application of the agreement; and if the conclusion turns on conflicting evidence, it should have been up to the jury to decide. The Ninth Circuit also concluded that the District Judge erred in transferring the entire brand

18

**Table of Contents**

to Mattel based on misappropriated names and that the Court should have submitted to the jury, rather than deciding itself, whether Bryant's agreement assigned works created outside the scope of his employment and whether Bryant's creation of the Bratz designs and sculpt was outside of his employment. The Court then went on to address copyright issues which would be raised after a retrial, since Mattel "might well convince a properly instructed jury" that it owns Bryant's designs and sculpt. The Ninth Circuit stated that the sculpt itself was entitled only to "thin" copyright protection against virtually identical works, while the Bratz sketches were entitled to "broad" protection against substantially similar works; in applying the broad protection, however, the Ninth Circuit found that the lower court had erred in failing to filter out all of the unprotectable elements of Bryant's sketches. This mistake, the Court said, caused the lower court to conclude that all Bratz dolls were substantially similar to Bryant's original sketches.

Judge Stephen Larson, who presided over the first trial, retired from the bench during the course of the appeal, and the case was transferred to Judge David O. Carter. After the transfer, Judge Carter granted Mattel leave to file a Fourth Amended Answer and Counterclaims which focused on RICO, trade secret and other claims, and added additional parties, and subsequently granted in part and denied in part a defense motion to dismiss those counterclaims. Later, on August 16, 2010, MGA asserted several new claims against Mattel in response to Mattel's Fourth Amended Answer and Counterclaims, including claims for alleged trade secret misappropriation, an alleged violation of RICO, and wrongful injunction. Mattel moved to strike and/or dismiss these claims, as well as certain MGA allegations regarding Mattel's motives for filing suit. The Court granted that motion as to the wrongful injunction claim, which it dismissed with prejudice, and as to the allegations about Mattel's motives, which it struck. The Court denied the motion as to MGA's trade secret misappropriation claim and its claim for violations of RICO.

The Court resolved summary judgment motions in late 2010. Among other rulings, the Court dismissed both parties' RICO claims; dismissed Mattel's claim for breach of fiduciary duty and portions of other claims as "preempted" by the trade secrets act; dismissed MGA's trade dress infringement claims; dismissed MGA's unjust enrichment claim; dismissed MGA's common law unfair competition claim; and dismissed portions of Mattel's copyright infringement claim as to "later generation" Bratz dolls.

Trial of all remaining claims began in early January 2011. During the trial, and before the case was submitted to the jury, the Court granted MGA's motions for judgment as to Mattel's claims for aiding and abetting breach of duty of loyalty and conversion. The Court also granted a defense motion for judgment on portions of Mattel's claim for misappropriation of trade secrets relating to thefts by former Mattel employees located in Mexico.

The jury reached verdicts on the remaining claims in April 2011. In those verdicts, the jury ruled against Mattel on its claims for ownership of Bratz-related works, for copyright infringement, and for misappropriation of trade secrets. The jury ruled for MGA on its claim of trade secret misappropriation as to 26 of its claimed trade secrets and awarded $88.5 million in damages. The jury ruled against MGA as to 88 of its claimed trade secrets. The jury found that Mattel's misappropriation was willful and malicious. The Court will determine whether an award of exemplary damages is appropriate, which may not exceed twice the $88.5 million award of compensatory damages. Additionally, attorney's fees may be awarded; however, the amount, if any cannot be determined at this time.

Mattel does not believe that it is probable that any of the damages awarded to MGA will be sustained based on the evidence presented at trial and, accordingly, a liability has not been accrued for this matter. Judgment has not yet been entered, and post-trial motions and appeals have not yet been filed. The Court has stated that it will address the parties' post-trial motions, including motions for a new trial, for judgment as a matter of law, for exemplary damages, and for attorneys' fees and costs, in May 2011.

The Court will rule separately on the parties' claims for unfair competition under California Business & Professions Code Section 17200. In February 2011, MGA commenced litigation in the United States District Court for the Central District of California alleging that Mattel's conduct in response to MGA's sale of Bratz

19

**Table of Contents**

violated both the federal antitrust statute and the California Business & Professions Code, and constituted abuse of process under California law. Mattel believes these claims are without merit. Mattel has moved to dismiss these claims and intends to vigorously defend against them.

*Litigation Related to Gunther-Wahl Productions, Inc.*

In April 1998, Mattel was sued in the Los Angeles County Superior Court by Gunther-Wahl Productions, Inc. ("Gunther-Wahl"), a producer of animated television shows, and Candy Wahl, the wife of the principal of Gunther-Wahl ("Gunther-Wahl I"). The lawsuit alleges that Mattel breached an implied contract with Gunther-Wahl arising from a pitch of an animated television show, in that Mattel allegedly used plaintiffs' ideas without compensating plaintiffs for the use of the ideas. Mattel denies that it used any of plaintiffs' ideas in any Mattel product. A jury trial was held in early 2000, which resulted in a judgment in favor of Mattel on every claim. On December 5, 2002, the California Court of Appeal reversed the judgment in favor of Mattel, and remanded the matter for a new trial. During the pendency of the Gunther-Wahl I appeal, plaintiffs filed an additional lawsuit against Mattel alleging Mattel further breached the implied contract by using plaintiffs' ideas in products released subsequent to the trial without compensating plaintiffs ("Gunther-Wahl II"). Between September 2004 and March 2008 and between December 2008 and March 2010, both Gunther-Wahl I and II were stayed as a result of a bankruptcy proceeding filed by one of the principals of Gunther-Wahl. In November 2008, while the stay was lifted, Mattel filed potentially case dispositive motions in both lawsuits. In the fourth quarter of 2010, the Court denied Mattel's motions. During that quarter, plaintiffs also expanded the list of Mattel products which they contend wrongfully use their ideas and form the basis for their alleged damages. Plaintiffs are seeking royalty-based damages on Mattel's entire Fairytopia line of products, as well as numerous other products. Trial was originally scheduled to begin in the first quarter of 2011, but in March 2011, the lawsuits were assigned to a new judge for purposes of trial. The new judge has not yet set a trial date. While awaiting the start of trial, the parties have engaged in settlement discussions, and believe there is a high probability that the lawsuits will settle prior to trial. The proposed settlement would include a payment from Mattel to plaintiffs in the amount of $7.5 million, which has been accrued as a contingent loss reserve at March 31, 2011. If the lawsuits are not settled, Mattel anticipates that trial will occur sometime in the third quarter of 2011.

### 23.   Segment Information

*Description of Segments*

Mattel's operating segments are separately managed business units and are divided on a geographic basis between domestic and international. Mattel's domestic operating segments include:

*Mattel Girls & Boys Brands* —including Barbie ® fashion dolls and accessories ("Barbie ®"), Polly Pocket ®, Little Mommy ®, Disney Classics ®, and Monster High ® (collectively "Other Girls Brands"), Hot Wheels ®, Matchbox ®, Battle Force 5 ®, and Tyco R/C ® vehicles and play sets (collectively "Wheels"), and CARS™, Radica ®, Toy Story ®, Max Steel ®, WWE ® Wrestling, and Batman ® products, and games and puzzles (collectively "Entertainment").

*Fisher-Price Brands* —including Fisher-Price ®, Little People ®, BabyGear™, and View-Master ® (collectively "Core Fisher-Price ®"), Dora the Explorer ®, Go Diego Go! ®, Thomas and Friends ®, Sing-a-ma-jigs ™, and See 'N Say ® (collectively "Fisher-Price ® Friends"), and Power Wheels ®.

*American Girl Brands* —including My American Girl ®, the historical collection, and Bitty Baby ®. American Girl Brands products are sold directly to consumers via its catalogue, website, and proprietary retail stores. Its children's publications are also sold to certain retailers.

Additionally, the International segment sells products in all toy categories, except American Girl Brands.

20

**Table of Contents**

*Segment Data*

    The following tables present information about revenues, income, and assets by segment. Mattel does not include sales adjustments such as trade discounts and other allowances in the calculation of segment revenues (referred to as "gross sales"). Mattel records these adjustments in its financial accounting systems at the time of sale to each customer, but the adjustments are not allocated to individual products. For this reason, Mattel's chief operating decision maker uses gross sales by segment as one of the metrics to measure segment performance. Such sales adjustments are included in the determination of segment income from operations based on the adjustments recorded in the financial accounting systems. Segment income from operations represents operating income, while consolidated income from operations represents income from operations before income taxes as reported in the consolidated statements of operations. The corporate and other category includes costs not allocated to individual segments, including charges related to incentive compensation, share-based payments, and corporate headquarters functions managed on a worldwide basis, and the impact of changes in foreign currency rates on intercompany transactions.

| | For the Three Months Ended | |
|---|---|---|
| | March 31, 2011 | March 31, 2010 |
| | (In thousands) | |
| **Revenues** | | |
| Domestic: | | |
|     Mattel Girls & Boys Brands US | $ 303,765 | $ 259,306 |
|     Fisher-Price Brands US | 172,659 | 183,249 |
|     American Girl Brands | 72,954 | 70,206 |
| Total Domestic | 549,378 | 512,761 |
| International | 491,731 | 447,513 |
| Gross sales | 1,041,109 | 960,274 |
| Sales adjustments | (89,253) | (80,192) |
| Net sales | $ 951,856 | $ 880,082 |
| **Segment Income** | | |
| Domestic: | | |
|     Mattel Girls & Boys Brands US | $ 61,337 | $ 40,854 |
|     Fisher-Price Brands US | 2,262 | 12,292 |
|     American Girl Brands | 4,138 | 3,000 |
| Total Domestic | 67,737 | 56,146 |
| International | 52,603 | 39,901 |
| | 120,340 | 96,047 |
| Corporate and other expenses (a) | (83,582) | (50,820) |
| Operating income | 36,758 | 45,227 |
| Interest expense | 18,816 | 13,623 |
| Interest (income) | (3,163) | (2,452) |
| Other non-operating (income) expense, net | (156) | 774 |
| Income before income taxes | $ 21,261 | $ 33,282 |

(a)   *Corporate and other expense includes (i) share-based compensation expense of $11.0 million and $12.8 million for the three months ended March 31, 2011 and 2010, respectively, (ii) $7.5 million reduction to the legal settlement reserve for product liability related litigation for the three months ended March 31, 2010 , (iii) $7.5 million proposed Gunther-Wahl Productions legal settlement for the three months ended March 31, 2011, and (iv) legal fees associated with MGA litigation matters.*

**Table of Contents**

|  | March 31, 2011 | March 31, 2010 | December 31, 2010 |
|---|---|---|---|
|  |  | (In thousands) |  |
| **Assets** |  |  |  |
| Domestic: |  |  |  |
|     Mattel Girls & Boys Brands US | $ 296,132 | $ 226,109 | $ 380,998 |
|     Fisher-Price Brands US | 214,629 | 202,263 | 322,134 |
|     American Girl Brands | 74,727 | 60,533 | 67,435 |
| Total Domestic | 585,488 | 488,905 | 770,567 |
| International | 692,438 | 546,067 | 779,875 |
|  | 1,277,926 | 1,034,972 | 1,550,442 |
| Corporate and other | 87,893 | 56,547 | 59,502 |
| Accounts receivable and inventories, net | $ 1,365,819 | $ 1,091,519 | $ 1,609,944 |

Mattel sells a broad variety of toy products, which are grouped into three major categories: Mattel Girls & Boys Brands, Fisher-Price Brands, and American Girl Brands. The table below presents worldwide revenues by category:

|  | For the Three Months Ended | |
|---|---|---|
|  | March 31, 2011 | March 31, 2010 |
|  | (In thousands) | |
| **Worldwide Revenues** |  |  |
| Mattel Girls & Boys Brands | $ 656,376 | $ 573,112 |
| Fisher-Price Brands | 309,866 | 316,193 |
| American Girl Brands | 72,954 | 70,206 |
| Other | 1,913 | 763 |
| Gross sales | 1,041,109 | 960,274 |
| Sales adjustments | (89,253) | (80,192) |
| Net sales | $ 951,856 | $ 880,082 |

**24.   Subsequent Events**

On April 15, 2011, Mattel announced that the Board of Directors approved a second quarter dividend of $0.23 per common share. The dividend is payable on June 17, 2011 to stockholders of record on May 25, 2011.

22

**Table of Contents**

**Item 2.     Management's Discussion and Analysis of Financial Condition and Results of Operations.**

The following discussion should be read in conjunction with the consolidated financial information and related notes that appear in Part I, Item 1, of this Quarterly Report. Mattel's business is seasonal; therefore, results of operations are comparable only with corresponding periods.

**Factors That May Affect Future Results**
(Cautionary Statement Under the Private Securities Litigation Reform Act of 1995)

Mattel is including this Cautionary Statement to make applicable and take advantage of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995 (the "Act") for forward-looking statements. This Quarterly Report on Form 10-Q includes forward-looking statements within the meaning of the Act. Forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts. They often include words such as "believes," "expects," "anticipates," "estimates," "intends," "plans," "seeks" or words of similar meaning, or future or conditional verbs, such as "will," "should," "could," "may," "aims," "intends," or "projects." A forward-looking statement is neither a prediction nor a guarantee of future events or circumstances, and those future events or circumstances may not occur. Investors should not place undue reliance on the forward-looking statements, which speak only as of the date of this Form 10-Q. These forward-looking statements are all based on currently available operating, financial, economic and competitive information and are subject to various risks and uncertainties. The Company's actual future results and trends may differ materially depending on a variety of factors, including, but not limited to, the risks and uncertainties detailed in Item 1A. "Risk Factors" in Mattel's 2010 Annual Report on Form 10-K.

**Overview**

Mattel designs, manufactures, and markets a broad variety of toy products worldwide, which are sold to its customers and directly to consumers. Mattel's business is dependent in great part on its ability each year to redesign, restyle, and extend existing core products and product lines, to design and develop innovative new products and product lines, and to successfully market those products and product lines. Mattel plans to continue to focus on its portfolio of traditional brands that have historically had worldwide appeal, to create new brands utilizing its knowledge of children's play patterns, and to target customer and consumer preferences around the world.

Mattel believes its products are among the most widely recognized toy products in the world. Mattel's portfolio of brands and products are grouped in the following categories:

*Mattel Girls & Boys Brands* —including Barbie ® fashion dolls and accessories ("Barbie ®"), Polly Pocket ®, Little Mommy ®, Disney Classics ®, and Monster High ® (collectively "Other Girls Brands"), Hot Wheels ®, Matchbox ®, Battle Force 5 ®, and Tyco R/C ® vehicles and play sets (collectively "Wheels"), and CARS™, Radica ®, Toy Story ®, Max Steel ®, WWE ® Wrestling, and Batman ® products, and games and puzzles (collectively "Entertainment").

*Fisher-Price Brands* —including Fisher-Price ®, Little People ®, BabyGear™, and View-Master ® (collectively "Core Fisher-Price ®"), Dora the Explorer ®, Go Diego Go! ®, Thomas and Friends ®, Sing-a-ma-jigs ™, and See 'N Say ® (collectively "Fisher-Price ® Friends"), and Power Wheels ®.

*American Girl Brands* —including My American Girl ®, the historical collection, and Bitty Baby ®. American Girl Brands products are sold directly to consumers via its catalogue, website, and proprietary retail stores. Its children's publications are also sold to certain retailers.

Mattel's objective is to continue to create long-term stockholder value by generating strong cash flow and deploying it in a disciplined and opportunistic manner as outlined in Mattel's capital and investment framework (see "Liquidity and Capital Resources—Capital and Investment Framework"). To achieve this objective, management has established three overarching strategies.

The first strategy is to deliver consistent growth by continuing the momentum in its core brands, optimizing entertainment partnerships, building new franchises, and working to expand and leverage its international footprint.

23

**Exhibit D - Page 224**

Table of Contents

The second strategy is to build on the progress it has made on improving operating margins through at least sustaining the gross margins and delivering another round of cost savings.

The third strategy is to generate significant cash flow and continue its disciplined, opportunistic, and value-enhancing deployment.

*First Quarter 2011 Overview*

Mattel's results for the first quarter of 2011 include a net sales increase of 8%, as compared to the first quarter of 2010. Net sales during the first quarter of 2011 reflects growth both domestically and internationally from sales of products tied to core brands, Mattel's new entertainment properties, and our new line, Monster High ®. Additionally:

- Gross profit, as a percentage of net sales, increased from 49.1% in the first quarter of 2010 to 49.7% in 2011, primarily due to pricing increases, partially offset by higher product costs.

- Operating income in the first quarter of 2011 was $36.8 million, as compared to $45.2 million in 2010. The decrease in operating income is primarily due to higher litigation and legal-related costs and higher employee-related costs in other selling and administrative expenses, partially offset by higher sales and gross margins.

- Net income in the first quarter of 2011 was $16.6 million, as compared to $24.8 million in 2010. The decrease in net income is primarily due to lower operating income and higher interest expense as a result of higher overall borrowings.

- Mattel's Operational Excellence 2.0 program generated gross savings of approximately $5 million during the first quarter of 2011.

**Results of Operations**

*Consolidated Results*

Net sales for the first quarter of 2011 were $951.9 million, up 8% as compared to $880.1 million in 2010, with favorable changes in currency exchange rates of 1 percentage point. Net income for the first quarter of 2011 was $16.6 million, or $0.05 per diluted share, as compared to $24.8 million, or $0.07 per diluted share, in 2010. Net income for the first quarter of 2011 was negatively impacted by higher other selling and administrative expenses and higher interest expense, partially offset by higher sales and gross margins.

The following table provides a summary of Mattel's consolidated results for the first quarter of 2011 and 2010 (in millions, except percentage and basis point information):

| | For the Three Months Ended March 31, | | | | Year/Year Change | |
| | 2011 | | 2010 | | | |
| | | % of Net | | % of Net | | Basis Points |
| | Amount | Sales | Amount | Sales | % | of Net Sales |
|---|---|---|---|---|---|---|
| Net sales | $951.9 | 100.0% | $880.1 | 100.0% | 8% | — |
| Gross profit | $473.1 | 49.7% | $431.9 | 49.1% | 10% | 60 |
| Advertising and promotion expenses | 101.8 | 10.7 | 94.2 | 10.7 | 8% | — |
| Other selling and administrative expenses | 334.5 | 35.1 | 292.5 | 33.2 | 14% | 190 |
| Operating income | 36.8 | 3.9 | 45.2 | 5.1 | –19% | –120 |
| Interest expense | 18.8 | 2.0 | 13.6 | 1.5 | 38% | 50 |
| Interest (income) | (3.2) | –0.3 | (2.5) | –0.3 | 29% | — |
| Other non-operating (income) expense, net | (0.1) | | 0.8 | | | |
| Income before income taxes | $ 21.3 | 2.2% | $ 33.3 | 3.8% | –36% | –160 |

24

Table of Contents

*Sales*

Net sales for the first quarter of 2011 were $951.9 million, up 8% as compared to $880.1 million in 2010, with favorable changes in currency exchange rates of 1 percentage point. Gross sales within the US increased 7% in the first quarter of 2011, as compared to 2010, and accounted for 53% of consolidated gross sales in the first quarter of 2011 and 2010. Gross sales in international markets increased 10% in the first quarter of 2011, as compared to 2010, with favorable changes in currency exchange rates of 2 percentage points.

Worldwide gross sales of Mattel Girls & Boys Brands increased 15% in the first quarter of 2011 to $656.4 million, with favorable changes in currency exchange rates of 1 percentage point. Domestic gross sales of Mattel Girls & Boys Brands increased 17% and international gross sales increased 12%, with favorable changes in currency exchange rates of 1 percentage point. Worldwide gross sales of Barbie ®increased 14%, with favorable changes in currency exchange rates of 2 percentage points. Domestic gross sales of Barbie ® were flat and international gross sales increased 23%, with favorable changes in currency exchange rates of 2 percentage points. Worldwide gross sales of Other Girls products increased 38%, with unfavorable changes in currency exchange rates of 1 percentage point, driven primarily by sales of Monster High™ products and higher sales of Disney Princess™ products, partially offset by lower sales of Polly Pocket ®products. Worldwide gross sales of Wheels products increased 4%, with favorable changes in currency exchange rates of 1 percentage point, driven primarily by higher sales of Hot Wheels ®products. Worldwide gross sales of Hot Wheels ® increased 6%, with favorable changes in currency exchange rates of 1 percentage point. Worldwide gross sales of Entertainment products increased 13%, with favorable changes in currency exchange rates of 1 percentage point, driven primarily by sales of CARS™, Green Lantern ®, and Toy Story ® 3 products.

Worldwide gross sales of Fisher-Price Brands decreased 2% in the first quarter of 2011 to $309.9 million, with favorable changes in currency exchange rates of 1 percentage point. Domestic gross sales of Fisher-Price Brands decreased 6% and international gross sales increased 3%, with favorable changes in currency exchange rates of 1 percentage point. Worldwide gross sales of Core Fisher-Price ® were flat, with favorable changes in currency exchange rates of 1 percentage point. Domestic gross sales of Core Fisher-Price ® decreased 4% and international gross sales increased 5%, with favorable changes in currency exchange rates of 1 percentage point. Worldwide gross sales of Fisher-Price ® Friends decreased 13%, with favorable changes in currency exchange rates of 1 percentage point, driven primarily by the discontinuation of Sesame Street ® products, partially offset by higher sales of Thomas and Friends ® , Dora the Explorer ®, and Mickey Mouse ® Clubhouse products. Domestic gross sales of Fisher-Price ® Friends decreased 20% and international gross sales decreased 4%, with favorable changes in currency exchange rates of 2 percentage points.

American Girl Brands gross sales increased 4% in the first quarter of 2011 to $73.0 million, driven primarily by Kanani™, the 2011 Girl of the Year ®doll, and the benefit of two new American Girl ®stores in Lone Tree, Colorado, and Overland Park, Kansas, which opened in late March 2010 and September 2010, respectively.

*Cost of Sales*

Cost of sales as a percentage of net sales was 50.3% in the first quarter of 2011, as compared to 50.9% in 2010. Cost of sales increased by $30.5 million, or 7%, from $448.2 million in the first quarter of 2010 to $478.7 million in 2011, as compared to an 8% increase in net sales. Within cost of sales, product costs increased by $26.0 million, or 7%, from $354.1 million in the first quarter of 2010 to $380.1 million in 2011; freight and logistics expenses increased by $2.2 million, or 4%, from $58.4 million in the first quarter of 2010 to $60.6 million in 2011; and royalty expense increased by $2.3 million, or 6%, from $35.7 million in the first quarter of 2010 to $38.0 million in 2011.

*Gross Profit*

Gross profit as a percentage of net sales was 49.7% in the first quarter of 2011, as compared to 49.1% in 2010. The increase in gross profit as a percentage of net sales was driven primarily by pricing, partially offset by higher product costs.

25

Exhibit D - Page 226

**Table of Contents**

*Advertising and Promotion Expenses*

   Advertising and promotion expenses remained flat at 10.7% of net sales in the first quarter of 2011 and 2010.

*Other Selling and Administrative Expenses*

   Other selling and administrative expenses were $334.5 million, or 35.1% of net sales, in the first quarter of 2011, as compared to $292.5 million, or 33.2% of net sales, in 2010. The dollar increase is driven primarily by higher legal costs and the impact of legal settlement activity, as well as higher employee-related costs, including merit and other compensation expense.

*Non-Operating Items*

   Interest expense increased from $13.6 million in the first quarter of 2010 to $18.8 million in 2011, driven primarily by interest expense associated with the $500.0 million of senior notes issued in September 2010. Interest income increased from $2.5 million in the first quarter of 2010 to $3.2 million in 2011, driven primarily by higher average invested cash balances, partially offset by lower average interest rates. The change in other non-operating income/expense primarily relates to foreign currency exchange gains/losses.

*Provision for Income Taxes*

   Mattel's provision for income taxes was $4.7 million for the three months ended March 31, 2011, as compared to $8.4 million in the three months ended March 31, 2010. Mattel recognized discrete tax expense of $0.3 million during the three months ended March 31, 2010, primarily related to reassessments of prior years' tax exposure based on the status of audits and tax filings in various jurisdictions, settlements, and enacted tax law changes. There were no discrete tax items recognized during the three months ended March 31, 2011.

   During the three months ended March 31, 2010, Mattel reached a resolution with the IRS regarding all open issues relating to the examination of Mattel's US federal income tax returns for the years 2006 and 2007. The resolution did not have a material impact on Mattel's first quarter 2010 consolidated financial statements.

*Business Segment Results*

   Mattel's reportable segments are separately managed business units and are divided on a geographic basis between domestic and international. The Domestic segment is further divided into Mattel Girls & Boys Brands US, Fisher-Price Brands US, and American Girl Brands.

*Mattel Girls & Boys Brands US*

   Mattel Girls & Boys Brands US gross sales were $303.8 million in the first quarter of 2011, up $44.5 million or 17%, as compared to $259.3 million in 2010. Within this segment, gross sales of Barbie ® products remained flat and gross sales of Other Girls products increased 54%, driven primarily by sales of Monster High™ products and higher sales of Disney Princess™ products. Gross sales of Wheels products increased 2%, driven primarily by higher sales of Hot Wheels ® products, partially offset by lower sales of Matchbox ® products. Gross sales of Entertainment products increased 29%, driven primarily by increased sales of CARS ™ and WWE ® Wrestling products. Cost of sales increased 12% in the first quarter of 2011, as compared to an 18% increase in net sales, primarily due to higher unit sales volume, product costs, and royalty expense. Gross margin improvement was primarily due to favorable product mix and lower freight and logistics costs, partially offset by higher product costs and royalties.

   Mattel Girls & Boys Brands US segment income increased $20.4 million, or 50%, from $40.9 million in the first quarter of 2010 to $61.3 million in 2011, driven primarily by higher sales volume and higher gross margin.

26

Table of Contents

*Fisher-Price Brands US*

Fisher-Price Brands US gross sales were $172.7 million in the first quarter of 2011, down $10.5 million or 6%, as compared to $183.2 million in 2010. Within this segment, gross sales of Core Fisher-Price ® products decreased 4%. Gross sales of Fisher-Price ® Friends products decreased 20%, driven primarily by the discontinued Sesame Street ® license. Cost of sales decreased 2% in the first quarter of 2011, as compared to a 7% decrease in net sales, primarily due to lower unit sales volume and lower royalty expense, partially offset by higher product costs. Gross margin decreased primarily due to higher product costs and unfavorable product mix, partially offset by lower royalty expense.

Fisher-Price Brands US segment income decreased $10.0 million, from $12.3 million in the first quarter of 2010 to $2.3 million in 2011, driven primarily by lower sales volume and lower gross margin.

*American Girl Brands*

American Girl Brands gross sales were $73.0 million in the first quarter of 2011, up $2.8 million or 4%, as compared to $70.2 million in 2010, driven primarily by higher sales of Kanani™, the 2011 Girl of the Year ® doll, and the benefit of new stores in Colorado and Kansas. Cost of sales increased 4% in the first quarter of 2011, as compared to a 4% increase in net sales, primarily due to higher unit sales volume. Gross margin for the first quarter of 2011 was flat with the first quarter of 2010.

American Girl Brands segment income increased $1.1 million, from $3.0 million in the first quarter of 2010 to $4.1 million in 2011, driven primarily by higher sales volume, partially offset by higher other selling and administrative expenses, mainly from the opening of the two new American Girl ® stores.

*International*

The following table provides a summary of percentage changes in gross sales within the International segment for the first quarter of 2011 versus 2010:

| Non-US Regions: | % Change in Gross Sales | Impact of Change in Currency (in % pts) |
|---|---|---|
| Total International | 10 | 2 |
| Europe | 2 | −1 |
| Latin America | 28 | 7 |
| Asia Pacific | 19 | 4 |
| Other | 10 | 3 |

International gross sales were $491.7 million in the first quarter of 2011, up $44.2 million or 10%, as compared to $447.5 million in 2010, with favorable changes in currency exchange rates of 2 percentage points. Gross sales of Mattel Girls & Boys Brands increased 12%, with favorable changes in currency exchange rates of 1 percentage point. Gross sales of Barbie ® products increased 23%, with favorable changes in currency exchange rates of 2 percentage points. Gross sales of Other Girls products increased 24%, with no impact from currency exchange rates, driven primarily by the launch of Monster High™ internationally and higher sales of Disney Princess™ products. Gross sales of Wheels products increased 7%, with favorable changes in currency exchange rates of 3 percentage points. Gross sales of Entertainment products decreased 3%, with favorable changes in currency exchange rates of 1 percentage point. Gross sales of Fisher-Price Brands increased 3%, with favorable changes in currency exchange rates of 1 percentage point. Gross sales of Core Fisher-Price ® products increased 5%, with favorable changes in currency exchange rates of 1 percentage point. Gross sales of Fisher-Price ® Friends products decreased 4%, with favorable changes in currency exchange rates of 2 percentage points. Cost of sales increased 9% in the first quarter of 2011, as compared to a 10% increase in net sales, primarily due to higher unit sales volume and product costs. Gross margin improvement was primarily due to price increases, partially offset by higher product costs.

Table of Contents

International segment income increased $12.7 million, or 32%, from $39.9 million in the first quarter of 2010 to $52.6 million in 2011, driven primarily by higher sales volume and higher gross margin.

### Operational Excellence 2.0

The first phase of Mattel's cost savings program, Global Cost Leadership, delivered cumulative net savings of approximately $212 million in 2009 and 2010, which equated to cumulative gross savings of $225 million. During 2011, Mattel initiated the second phase of its cost savings program, Operational Excellence 2.0, which targets additional cumulative cost savings of approximately $150 million by the end of 2012. The cost savings are expected to include a reduction of approximately $75 million in legal costs, which will lower other selling and administrative expenses, and approximately $75 million of structural cost savings executed through a handful of important initiatives, which will be reflected in gross profit, advertising and promotion expenses, and other selling and administrative expenses. The major initiatives within Mattel's Operational Excellence 2.0 program include:

- The creation of global brand teams and reorganization to a North America division,
- Additional procurement initiatives designed to fully leverage Mattel's global scale,
- SKU efficiency, and
- Packaging optimization.

Mattel recognized Operational Excellence 2.0 gross savings of approximately $5 million in the first quarter of 2011. While some of the positive impact will be seen in 2011, Mattel expects to realize the majority of the $150 million savings goal in 2012, given the timing of investment costs and timelines required to complete the initiatives.

### Income Taxes

Mattel's provision for income taxes was $4.7 million for the three months ended March 31, 2011, as compared to $8.4 million for the three months ended March 31, 2010. Mattel recognized discrete tax expense of $0.3 million during the three months ended March 31, 2010, primarily related to reassessments of prior years' tax exposure based on the status of audits and tax filings in various jurisdictions, settlements, and enacted tax law changes. There were no discrete tax items recognized during the three months ended March 31, 2011.

During the three months ended March 31, 2010, Mattel reached a resolution with the IRS regarding all open issues relating to the examination of Mattel's US federal income tax returns for the years 2006 and 2007. The resolution did not have a material impact on Mattel's first quarter 2010 consolidated financial statements.

### Liquidity and Capital Resources

Mattel's primary sources of liquidity are its cash and equivalents balances, access to short-term borrowing facilities, including Mattel's commercial paper program and its $1.4 billion domestic unsecured committed revolving credit facility, and issuances of long-term debt securities. Cash flows from operating activities could be negatively impacted by decreased demand for Mattel's products, which could result from factors such as adverse economic conditions and changes in public and consumer preferences, or by increased costs associated with manufacturing and distribution of products or shortages in raw materials or component parts. Additionally, Mattel's ability to issue long-term debt and obtain seasonal financing could be adversely affected by factors such as global economic crises and tight credit environments, an inability to meet its debt covenant requirements, which include maintaining consolidated debt-to- earnings before interest, taxes, depreciation, and amortization ("EBITDA") and interest coverage ratios, or a deterioration of Mattel's credit ratings. Mattel's ability to conduct its operations could be negatively impacted should these or other adverse conditions affect its primary sources of liquidity.

28

**Table of Contents**

*Current Market Conditions*

Mattel is exposed to financial market risk resulting from changes in interest and foreign currency rates. Mattel believes that it has ample liquidity to fund its business needs, including beginning of year cash and equivalents, cash flows from operations, and access to the commercial paper market and the Company's $1.4 billion domestic unsecured committed revolving credit facility, which the Company uses for seasonal working capital requirements. As of March 31, 2011, since Mattel utilized the commercial paper market to meet its short-term borrowing needs, Mattel had available incremental borrowing resources totaling $1.4 billion under its unsecured committed revolving credit facility, and Mattel has not experienced any limitations on its ability to access this source of liquidity. Market conditions could affect certain terms of other debt instruments that Mattel enters into from time to time.

Mattel monitors the third-party depository institutions that hold the company's cash and equivalents. Mattel's emphasis is primarily on safety and liquidity of principal, and secondarily on maximizing the yield on those funds. Mattel diversifies its cash and equivalents among counterparties and securities to minimize risks.

Mattel is subject to credit risks relating to the ability of its counterparties of hedging transactions to meet their contractual payment obligations. The risks related to creditworthiness and nonperformance have been considered in the fair value measurements of Mattel's foreign currency forward exchange contracts. Mattel closely monitors its counterparties and takes action, as necessary, to manage its counterparty credit risk.

Mattel expects that some of its customers and vendors may experience difficulty in obtaining the liquidity required to buy inventory or raw materials. Mattel monitors its customers' financial condition and their liquidity in order to mitigate Mattel's accounts receivable collectibility risks, and customer terms and credit limits are adjusted, if necessary. Additionally, Mattel uses a variety of financial arrangements to ensure collectibility of accounts receivable of customers deemed to be a credit risk, including requiring letters of credit, factoring or purchasing various forms of credit insurance with unrelated third parties, or requiring cash in advance of shipment.

Mattel sponsors defined benefit pension plans and postretirement benefit plans for employees of the company. Actual returns below the expected rate of return, along with changes in interest rates that affect the measurement of the liability, would impact the amount and timing of Mattel's future contributions to these plans.

*Capital and Investment Framework*

To guide future capital deployment decisions, with a goal of maximizing stockholder value, Mattel's Board of Directors in 2003 established the following capital and investment framework:

- To maintain approximately $800 million to $1 billion in year-end cash available to fund a substantial portion of seasonal working capital;

- To maintain a year-end debt-to-capital ratio of about 25%;

- To invest approximately $180 million to $200 million in capital expenditures annually to maintain and grow the business;

- To make strategic opportunistic acquisitions; and

- To return excess funds to stockholders through dividends and share repurchases.

Over the long term, assuming cash flows from operating activities remain strong, Mattel plans to use its free cash flows to invest in strategic acquisitions and to return funds to stockholders through cash dividends and share repurchases. Mattel's share repurchase program has no expiration date and repurchases will take place from time to time, depending on market conditions. The ability to successfully implement the capital deployment plan is directly dependent on Mattel's ability to generate strong cash flows from operating activities. There is no assurance that Mattel will continue to generate strong cash flows from operating activities or achieve its targeted goals for investing activities.

Table of Contents

*Operating Activities*

Cash flows used for operating activities were $41.8 million in the first quarter of 2011, as compared to $244.6 million in 2010. The decrease in cash flows used for operating activities was primarily due to the collection of $300 million of domestic receivables not factored in 2010, partially offset by higher working capital usage.

*Investing Activities*

Cash flows used for investing activities were $9.2 million in the first quarter of 2011, as compared to $35.0 million in 2010. The decrease in cash flows used for investing activities was primarily due to higher net proceeds received relating to settled foreign currency forward exchange contracts, partially offset by higher purchases of tools, dies, and molds and other property, plant, and equipment.

*Financing Activities*

Cash flows used for financing activities were $186.3 million in the first quarter of 2011, as compared to $33.8 million provided by financing activities in 2010. The increase in cash flows used for financing activities was primarily due to share repurchases and dividend payments made during the three months ended March 31, 2011.

*Seasonal Financing*

Mattel maintains and periodically amends or replaces its domestic unsecured committed revolving credit facility with a commercial bank group that is used as a back-up facility to Mattel's commercial paper program, which is used as the primary source of financing for the seasonal working capital requirements of its domestic subsidiaries. The revolving credit facility was amended and restated on March 8, 2011 to, among other things, (i) extend the maturity date of the credit facility to March 8, 2015, (ii) increase aggregate commitments under the credit facility to $1.4 billion, with an "accordion feature," which allows Mattel to increase the aggregate availability under the credit facility to $1.6 billion under certain circumstances, (iii) decrease the applicable interest rate margins to a range of 0.25% to 1.50% above the applicable base rate for base rate loans, and 1.25% to 2.50% above the applicable London Interbank Borrowing Rate for Eurodollar rate loans, in each case depending on Mattel's senior unsecured long-term debt rating, and (iv) decrease commitment fees to a range of 0.15% to 0.40% of the unused commitments under the credit facility. In connection with the execution of the amendment of the domestic unsecured committed revolving credit facility, Mattel terminated its $300.0 million domestic receivables sales facility, which was a sub-facility of the domestic unsecured committed revolving credit facility.

Mattel is required to meet financial covenants at the end of each quarter and fiscal year, using the formulae specified in the credit agreement to calculate the ratios. Mattel was in compliance with such covenants at the end of the first quarter of 2011. As of March 31, 2011, Mattel's consolidated debt-to-EBITDA ratio, as calculated per the terms of the credit agreement, was 1.1 to 1 (compared to a maximum allowed of 3.0 to 1) and Mattel's interest coverage ratio was 15.3 to 1 (compared to a minimum required of 3.50 to 1).

The domestic unsecured committed revolving credit facility is a material agreement and failure to comply with the financial covenant ratios may result in an event of default under the terms of the facility. If Mattel defaulted under the terms of the domestic unsecured committed revolving credit facility, its ability to meet its seasonal financing requirements could be adversely affected.

To finance seasonal working capital requirements of certain foreign subsidiaries, Mattel avails itself of individual short-term credit lines with a number of banks. Mattel expects to extend the majority of these credit lines throughout 2011.

In April 2011, a major credit rating agency changed Mattel's long-term credit rating from BBB to BBB+, and maintained its short-term credit rating of A-2 and outlook at stable. In May 2010, another major credit rating agency changed Mattel's long-term credit rating from BBB to BBB+ and its outlook from stable to positive.

30

Table of Contents

Mattel believes its cash on hand, amounts available under its domestic unsecured committed revolving credit facility, and its foreign credit lines will be adequate to meet its seasonal financing requirements in 2011.

*Financial Position*

Mattel's cash and equivalents decreased by $231.8 million to $1.0 billion at March 31, 2011, as compared to December 31, 2010. The decrease was driven primarily by the timing and amount of accounts payable and accrued liabilities payments, seasonal increases in inventory, $100.1 million of share repurchases, and $80.1 million of first quarter dividend payments. The decrease was partially offset by the collection of $300 million of domestic receivables not factored in 2010 and proceeds received from the exercise of stock options.

Accounts payable and accrued liabilities decreased by $277.0 million to $771.5 million at March 31, 2011, as compared to December 31, 2010. The decrease was driven primarily by the timing and amount of payments for various liabilities, including incentive compensation, advertising obligations, and royalties.

The current portion of long-term debt totaled $250.0 million at March 31, 2011 and December 31, 2010.

A summary of Mattel's capitalization is as follows:

| | March 31, 2011 | | March 31, 2010 | | December 31, 2010 | |
|---|---|---|---|---|---|---|
| | (In millions, except percentage information) | | | | | |
| Medium-term notes | $ 100.0 | 2% | $ 150.0 | 4% | $ 100.0 | 2% |
| 2006 Senior Notes | — | — | 200.0 | 5 | — | — |
| 2008 Senior Notes | 350.0 | 9 | 350.0 | 9 | 350.0 | 9 |
| 2010 Senior Notes | 500.0 | 13 | — | — | 500.0 | 12 |
| Total noncurrent long-term debt | 950.0 | 24 | 700.0 | 18 | 950.0 | 23 |
| Other noncurrent liabilities | 474.5 | 12 | 484.3 | 13 | 488.9 | 12 |
| Stockholders' equity | 2,517.4 | 64 | 2,595.6 | 69 | 2,628.6 | 65 |
| | $3,941.9 | 100% | $3,779.9 | 100% | $4,067.5 | 100% |

Total noncurrent long-term debt totaled $950.0 million at March 31, 2011 and December 31, 2010. Mattel expects to satisfy its future long-term capital needs through the generation of corporate earnings and issuance of long-term debt instruments, as needed.

Other noncurrent liabilities decreased $14.4 million at March 31, 2011, as compared to December 31, 2010, due primarily to reductions in long-term defined benefit pension plan obligations as a result of contributions made to the plans.

Stockholders' equity of $2.52 billion decreased $78.2 million from March 31, 2010, primarily as a result of share repurchases and Mattel's first quarter dividend payment, partially offset by the impact of foreign currency translation adjustments and net income.

Mattel's debt-to-total-capital ratio, including short-term borrowings and current portion of long-term debt, increased from 22.4% at March 31, 2010 to 32.3% at March 31, 2011 due primarily to the $500.0 million issuance of senior notes in September 2010. Mattel's objective is to maintain a year-end debt-to-capital ratio of approximately 25%.

**Litigation**

See Part II, Item 1 "Legal Proceedings."

Table of Contents

### Application of Critical Accounting Policies and Estimates

Mattel's critical accounting policies and estimates are included in its Annual Report on Form 10-K for the year ended December 31, 2010, and did not change during the first three months of 2011.

### Non-GAAP Financial Measure

In this Quarterly Report on Form 10-Q, Mattel includes a non-GAAP financial measure, gross sales, which it uses to analyze its continuing operations and to monitor, assess and identify meaningful trends in its operating and financial performance. Net sales, as reported in the consolidated statements of operations, include the impact of sales adjustments, such as trade discounts and other allowances. Gross sales represent sales to customers, excluding the impact of sales adjustments.

Consistent with its segment reporting, Mattel presents changes in gross sales as a metric for comparing its aggregate, business unit, brand and geographic results to highlight significant trends in Mattel's business. Changes in gross sales are discussed because, while Mattel records the detail of such sales adjustments in its financial accounting systems at the time of sale, such sales adjustments are generally not associated with individual products, making net sales less meaningful. A reconciliation of gross sales to the most directly comparable GAAP financial measure, net sales, is as follows:

|  | For the Three Months Ended | |
| --- | --- | --- |
|  | March 31, 2011 | March 31, 2010 |
|  | (In thousands) | |
| Revenues |  |  |
| Domestic: |  |  |
| Mattel Girls & Boys Brands US | $ 303,765 | $259,306 |
| Fisher-Price Brands US | 172,659 | 183,249 |
| American Girl Brands | 72,954 | 70,206 |
| Total Domestic | 549,378 | 512,761 |
| International | 491,731 | 447,513 |
| Gross sales | 1,041,109 | 960,274 |
| Sales adjustments | (89,253) | (80,192) |
| Net sales | $ 951,856 | $880,082 |

### Item 3.    Quantitative and Qualitative Disclosures About Market Risk.

*Foreign Currency Exchange Rate Risk*

Currency exchange rate fluctuations may impact Mattel's results of operations and cash flows. Inventory purchase and sale transactions denominated in the Euro, British pound sterling, and Mexican peso were the primary transactions that caused foreign currency transaction exposure for Mattel. Mattel seeks to mitigate its exposure to market risk by monitoring its currency transaction exposure for the year and partially hedging such exposure using foreign currency forward exchange contracts primarily to hedge its purchase and sale of inventory, and other intercompany transactions denominated in foreign currencies. These contracts generally have maturity dates of up to 18 months. For those intercompany receivables and payables that are not hedged, the transaction gains or losses are recorded in the consolidated statement of operations in the period in which the exchange rate changes as part of operating income or other non-operating (income) expense, net based on the nature of the underlying transaction. Transaction gains or losses on hedged intercompany inventory transactions are recorded in the consolidated statement of operations in the period in which the inventory is sold to customers. In addition, Mattel manages its exposure to currency exchange rate fluctuations through the selection of currencies used for international borrowings. Mattel does not trade in financial instruments for speculative purposes.

Exhibit D - Page 233

Table of Contents

Mattel's financial position is also impacted by currency exchange rate fluctuations on translation of its net investment in subsidiaries with non-US dollar functional currencies. Assets and liabilities of subsidiaries with non-US dollar functional currencies are translated into US dollars at fiscal period-end exchange rates. Income, expense, and cash flow items are translated at weighted average exchange rates prevailing during the fiscal year. The resulting currency translation adjustments are recorded as a component of accumulated other comprehensive loss within stockholders' equity. Mattel's primary currency translation exposures for the first quarter of 2011 were related to its net investment in entities having functional currencies denominated in the Euro, Mexican peso, Brazilian real, and British pound sterling.

There are numerous factors impacting the amount by which Mattel's financial results are affected by foreign currency translation and transaction gains and losses resulting from changes in currency exchange rates, including, but not limited to, the level of foreign currency forward exchange contracts in place at a given time and the volume of foreign currency denominated transactions in a given period. However, assuming that such factors were held constant, Mattel estimates that a 1 percent change in the US dollar Trade-Weighted Index would impact Mattel's net sales by approximately 0.5% and its full year earnings per share by approximately $0.01 to $0.02.

## Item 4.    Controls and Procedures.

### Evaluation of Disclosure Controls and Procedures

As of March 31, 2011, Mattel's disclosure controls and procedures were evaluated to provide reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, as appropriate, in a timely manner that would alert them to material information relating to Mattel that would be required to be included in Mattel's periodic reports and to provide reasonable assurance that such information was recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Robert A. Eckert, Mattel's principal executive officer, and Kevin M. Farr, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of March 31, 2011.

### Changes in Internal Control Over Financial Reporting

Mattel made no changes to its internal control over financial reporting or in other factors that materially affected, or were reasonably likely to have materially affected, its internal control over financial reporting during the quarter ended March 31, 2011.

Table of Contents

# PART II—OTHER INFORMATION

**Item 1.      Legal Proceedings.**

The content of Note 22, "Contingencies" to the Consolidated Financial Statements of Mattel in Part I of this Quarterly Report on Form 10-Q is hereby incorporated by reference in its entirety in this Item 1.

**Item 1A.   Risk Factors.**

There have been no material changes to the risk factors disclosed under Part I, Item 1A. "Risk Factors" in Mattel's 2010 Annual Report on Form 10-K.

**Item 2.      Unregistered Sales of Equity Securities and Use of Proceeds.**

*Recent Sales of Unregistered Securities*

During the first quarter of 2011, Mattel did not sell any unregistered securities.

*Issuer Purchases of Equity Securities*

This table provides certain information with respect to Mattel's purchases of its common stock during the first quarter of 2011:

| Period | Total Number of Shares (or Units) Purchased | Average Price Paid per Share (or Unit) | Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | Maximum Number (or Approximate Dollar Value) of Shares (or Units) that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| January 1—31 | | | | |
| Repurchase program (1) | — | $    — | — | $    463,621,007 |
| Employee transactions (2) | 855 | 23.52 | N/A | N/A |
| February 1—28 | | | | |
| Repurchase program (1) | 1,984,687 | 25.27 | 1,984,687 | 413,477,752 |
| Employee transactions (2) | 803,267 | 25.71 | N/A | N/A |
| March 1—31 | | | | |
| Repurchase program (1) | 1,982,200 | 25.22 | 1,982,200 | 363,479,090 |
| Employee transactions (2) | 54,183 | 25.19 | N/A | N/A |
| Total | | | | |
| Repurchase program (1) | 3,966,887 | $    25.24 | 3,966,887 | 363,479,090 |
| Employee transactions (2) | 858,305 | 25.67 | N/A | N/A |

(1)  Repurchases will take place from time to time, depending on market conditions. Mattel's share repurchase program has no expiration date.

(2)  Includes the sale of restricted shares for employee tax withholding obligations that occur upon vesting.

*N/A Not applicable.*

**Item 3.      Defaults Upon Senior Securities.**

None.

**Item 5.      Other Information.**

None.

34

Mattel, Inc. - Quarterly Report

Page 36 of 55

Table of Contents

**Item 6.    Exhibits.**

| Exhibit No. | Exhibit Description |
|---|---|
| 10.1* | Form of Grant Agreement for Long-Term Incentive Program Performance-Based Restricted Stock Units for Senior Executives under the Mattel, Inc. 2010 Equity and Long-Term Compensation Plan for Certain Executive Officers with Employment Agreements and Certain Executive Officers Participating in the Mattel, Inc. Executive Severance Plan |
| 10.2* | Form of Grant Agreement for Long-Term Incentive Program Performance-Based Restricted Stock Units for Senior Executives under the Mattel, Inc. 2010 Equity and Long-Term Compensation Plan |
| 12.0* | Computation of Earnings to Fixed Charges |
| 31.0* | Certification of Principal Executive Officer dated April 27, 2011 pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.1* | Certification of Principal Financial Officer dated April 27, 2011 pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.0** | Certification of Principal Executive Officer and Principal Financial Officer dated April 27, 2011 pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 [1] |
| 101.INS** | XBRL Instance Document |
| 101.SCH** | XBRL Taxonomy Extension Schema Document |
| 101.CAL** | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF** | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB** | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE** | XBRL Taxonomy Extension Presentation Linkbase Document |

\*    *Filed herewith.*
\*\*    *Furnished herewith.*

*(1)    This exhibit should not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934.*

35

Exhibit D - Page 236

**Table of Contents**

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934 as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

MATTEL, INC.
*Registrant*

By: _____/s/ H. Scott Topham_____

H. Scott Topham
Senior Vice President and Corporate
Controller (Duly authorized officer and
chief accounting officer)

Date: April 27, 2011

36

**Exhibit 10.1**

**Grant Agreement for**
**Long-Term Incentive Program Performance-Based Restricted Stock Units**
**for Senior Executives**
**under the Mattel, Inc. 2010 Equity and Long-Term Compensation Plan**

This is a Grant Agreement between Mattel, Inc. (" Mattel ") and the individual (the " Holder ") named in the Notice of Grant of Restricted Stock Units (the " Notice ") attached hereto as the cover page of this Grant Agreement.

**Recitals**

Mattel has adopted the 2010 Equity and Long-Term Compensation Plan (the " Plan ") for the granting to selected employees of awards based upon shares of Common Stock of Mattel. In accordance with the terms of the Plan, the Compensation Committee of the Board of Directors (the " Committee ") has approved the execution of this Grant Agreement between Mattel and the Holder. Capitalized terms used herein without definition shall have the meanings assigned to such terms in the Plan.

**Restricted Stock Units**

    **1. Grant .** Mattel grants to the Holder the number of restricted stock units based on shares of Common Stock set forth in the Notice (the " Units "), subject to adjustment, forfeiture and the other terms and conditions set forth below, as of the effective date of the grant (the " Grant Date ") specified in the Notice. The number of Units specified in the Notice reflects the target number of Units that may be earned by the Holder. The Company and the Holder acknowledge that the Units (a) are being granted hereunder in exchange for the Holder's agreement to provide services to the Company after the Grant Date, for which the Holder will otherwise not be fully compensated, and which the Company deems to have a value at least equal to the aggregate par value of the Shares, if any, that the Holder may become entitled to receive under this Agreement, and (b) will, except as provided in Sections 4 and 5 hereof, be forfeited by the Holder if the Holder's termination of employment occurs before the Settlement Date (as defined in Section 7, below), and are further subject to cancellation (and any shares of Common Stock or cash delivered in settlement of the Units are subject to recapture) if the Holder engages in certain conduct detrimental to the Company, in each case as more fully set forth in this Grant Agreement and the Plan.

    **2. Performance Criteria .** Subject to the Holder's continuous employment through the Settlement Date and subject to Section 6 below, the Holder will earn a number of Units on the Settlement Date determined based on the achievement of annual goals related to net operating profit after taxes less a capital charge and net sales (the " Company Performance Measures ") and the relative total shareholder return (" TSR ") during the period beginning on January 1, 2011 and ending on December 31, 2013 (the " Performance Cycle "), in each case, as determined by the Committee.

**3. Dividend Equivalent Rights** . The Units are granted with Dividend Equivalent rights, as set forth in this Section 3. As of each payment date for any cash dividend or distribution with respect to the Common Stock with a record date on or after the commencement date of the Performance Cycle and before all of the Units are settled or forfeited as set forth below, the Holder shall be credited (without interest) with an additional number of Units, in whole or in fractions thereof, in an amount determined by dividing (i) the aggregate cash dividends that would have been paid on such dividend payment date in respect of the number of shares of Common Stock underlying the Units actually earned by the Holder in accordance with this Agreement, by (ii) the Common Stock closing price on the ex-dividend date (two trading days prior to the record date). All such additional Units shall be subject to the same terms and conditions (including vesting conditions and Dividend Equivalent rights) applicable to the Units in respect of which they were credited and shall be settled in accordance with, and at the time of, settlement of the Units to which they are related, in accordance with Section 7.

**4. Consequences of Termination of Employment** . The consequences of the Holder's termination of employment during the Performance Cycle and before a Change in Control shall be as follows:

i. In the case of a termination of the Holder's employment with the Company (a " Termination of Employment ") by the Company for Cause, the Units shall be forfeited as of the date of the Termination of Employment. For purposes of this Agreement, the Holder's Termination of Employment shall be considered to be for " Cause " if it is a termination for "Cause" pursuant to an Individual Agreement to which the Holder is a party that is then in effect or, if there is no Individual Agreement in effect that defines "Cause", "Cause" shall have the meaning set forth in the Plan.

ii. In the case of a Termination of Employment as a result of the Holder's death or Disability after June 30, 2011, the number of Units earned shall be determined based on actual achievement of the Company Performance Measures through the most recently completed fiscal year prior to such Termination of Employment and TSR (calculated as if the most recently completed fiscal year prior to such Termination of Employment had been the end of the Performance Cycle). Any Units which become earned pursuant to this Section 4.ii shall be settled on or within 60 days after the date of such Termination of Employment, but in no event later than the Settlement Date, in accordance with Section 7. Notwithstanding anything in this Section 4.ii to the contrary, in the case of a Termination of Employment as a result of the Holder's death or Disability on or after July 1, 2011 and before 2012, the number of Units earned shall be based on 100% of the target award level payout for the 2011 fiscal year, to be settled on or within 60 days after such Termination of Employment, but in no event later than March 15, 2012. [ **For Mr. Eckert:** For purposes of this Agreement, "Disability" shall have the meaning set forth in an Individual Agreement to which the Holder is a party that is then in effect.]

-2-

iii.   In the case of a Termination of Employment (a) as a result of the Holder's Retirement, (b) by the Company other than for Cause (as defined in Section 4.i, above), or (c) by the Holder for Good Reason (as defined below), the number of Units earned shall be determined as follows: first, the Committee shall determine the number of Units earned based on actual achievement of the Company Performance Measures and TSR following the end of the Performance Cycle; and second, the number of Units so obtained shall be multiplied by a fraction, the numerator of which is the total number of full months elapsed from the first day of the Performance Cycle to the date of the Holder's Termination of Employment and the denominator of which is the total number of months in the Performance Cycle. Such number of Units shall then be settled in accordance with Section 7 as for all other holders whose awards are settled on the Settlement Date. For purposes of Sections 4 and 5, the Holder's Termination of Employment shall be considered to be for "Good Reason" if it is a termination for "Good Reason" pursuant to an Individual Agreement to which the Holder is a party that is then in effect.

iv.   In all other cases, the Units shall be forfeited as of the date of the Termination of Employment.

**5. <u>Change in Control</u>** . If a Change in Control occurs and the Holder has remained continuously employed by the Company until at least immediately prior to the Change in Control, the Units shall not vest in accordance with the terms of Section 18 of the Plan and the number of Units earned shall be determined as follows:

i.   If the Committee reasonably determines in good faith, prior to the occurrence of the Change in Control, that the Units will not be honored or assumed, or new rights that substantially preserve the terms of the Units substituted therefor, by the Holder's employer (or the parent of such employer) immediately following the Change in Control, the number of Units earned shall equal the greater of (a) the number that equals 100% of the target award level payout and (b) the number that would have been earned based on actual achievement of the Company Performance Measures through the most recently completed fiscal year prior to such Change in Control and TSR (calculated as if the most recently completed fiscal year prior to such Change in Control had been the end of the Performance Cycle).

ii.   If the Committee determines that the Units have been assumed and, before the Settlement Date, the Holder has a Termination of Employment by the Company without Cause or by the Holder for Good Reason within the 24-month period immediately following a Change in Control, the number of Units earned shall equal the greater of (a) the number that equals 100% of the target award level payout and (b) the number that would have been earned based on actual achievement of the Company Performance Measures through the most recently completed fiscal year prior to such Termination of Employment and TSR

-3-

(calculated as if the most recently completed fiscal year prior to such Termination of Employment had been the end of the Performance Cycle).

Any Units which are earned pursuant to this Section 5 shall be settled on or within 60 days after the Change in Control or Termination of Employment, as applicable, but in no event later than the Settlement Date, in accordance with Section 7.

**6. Termination, Rescission and Recapture .** The Holder specifically acknowledges that the Units and any Common Stock or cash delivered in settlement thereof are subject to the provisions of Section 19 of the Plan, entitled "Termination, Rescission and Recapture," which can cause the forfeiture of the Units and/or the recapture of any Common Stock and/or cash delivered in settlement thereof and/or the proceeds of the sale of any such Common Stock. Except as provided in the next sentence, as a condition of the settlement of Units, the Holder will be required to certify that he or she is in compliance with the terms and conditions of the Plan (including the conditions set forth in Section 19 of the Plan) and, if a Termination of Employment has occurred, to state the name and address of his or her then-current employer or any entity for which the Holder performs business services and his or her title, and shall identify any organization or business in which the Holder owns a greater-than-five-percent equity interest. Section 19 of the Plan is inapplicable, and accordingly such certification shall not be required, after a Termination of Employment of the Holder that occurs within the 24-month period after a Change in Control.

**7. Payout of Units .** Within 15 business days following the Committee's certification of the Company Performance Measures and TSR for the Performance Cycle in the fiscal year following the end of the Performance Cycle, but in no event later than March 15th of such fiscal year (the " Settlement Date "), subject to Section 9 below, the Company shall settle each earned Unit by delivering to the Holder one share of Common Stock or a cash payment equal to the Fair Market Value of a share of Common Stock, as the Company may in its sole discretion determine (and the Company may settle some Units in Common Stock and some in cash). In the case of Units settled by delivery of Common Stock, the Company shall (a) issue or cause to be delivered to the Holder (or the Holder's Heir, as defined below, if applicable) one or more unlegended stock certificates representing such shares, or (b) cause a book entry for such shares to be made in the name of the Holder (or the Holder's Heir, if applicable). In the case of the Holder's death, the cash and/or Common Stock to be delivered in settlement of Units as described above shall be delivered to the Holder's beneficiary or beneficiaries (as designated in the manner determined by the Committee), or if no beneficiary is so designated or if no beneficiary survives the Holder, then the Holder's administrator, executor, personal representative, or other person to whom the Units are transferred by means of the Holder's will or the laws of descent and distribution (such beneficiary, beneficiaries or other person(s), the " Holder's Heir ").

**8. Code Section 409A .** The Company intends that the Units shall not constitute "deferred compensation" within the meaning of Section 409A of the Code and this Grant Agreement shall be interpreted based on such intent. In view of uncertainty surrounding Section 409A of the Code, however, if Mattel determines after the Grant Date that an amendment to this

-4-

Grant Agreement is necessary or advisable so that the Units will not be subject to Section 409A of the Code, or alternatively so that they comply with Section 409A of the Code, it may make such amendment, effective as of the Grant Date or at any later date, without the consent of the Holder.

Notwithstanding anything in this Grant Agreement to the contrary, to the extent that any payment or benefit constitutes non-exempt "nonqualified deferred compensation" for purposes of Section 409A of the Code, and such payment or benefit would otherwise be payable or distributable hereunder by reason of the Holder's Termination of Employment, all references to the Holder's Termination of Employment shall be construed to mean a "separation from service," as defined in Treasury Regulation Section 1.409A-1(h) (a " Separation from Service " ), and the Holder shall not be considered to have a Termination of Employment unless such termination constitutes a Separation from Service with respect to the Holder.

**9. Tax Withholding .** The Company shall withhold from the cash and/or Common Stock delivered in settlement of Units shares of Common Stock having a Fair Market Value on the Settlement Date, and/or cash, equal to the amount necessary to satisfy the minimum required withholding, if any, of any income tax, social tax, or other taxes (but rounding up to the nearest whole number of shares). If any such taxes are required to be withheld at a date earlier than the Settlement Date, then notwithstanding any other provision of this Grant Agreement, the Company may (i) satisfy such obligation by causing the forfeiture of a number of Units having a Fair Market Value, on such earlier date, equal to the amount necessary to satisfy the minimum required amount of such withholding, or (ii) make such other arrangements with the Holder for such withholding as may be satisfactory to the Company in its sole discretion.

**10. Compliance with Law .**

i.   No shares of Common Stock shall be issued and delivered pursuant to a Unit unless and until all applicable registration requirements of the Securities Act of 1933, as amended, all applicable listing requirements of any national securities exchange on which the Common Stock is then listed, and all other requirements of law or of any regulatory bodies having jurisdiction over such issuance and delivery, shall have been complied with. In particular, the Committee may require certain investment (or other) representations and undertakings in connection with the issuance of securities in connection with the Plan in order to comply with applicable law.

ii.  If any provision of this Grant Agreement is determined to be unenforceable or invalid under any applicable law, such provision will be applied to the maximum extent permitted by applicable law, and shall automatically be deemed amended in a manner consistent with its objectives to the extent necessary to conform to any limitations required under applicable law. Furthermore, if any provision of this Grant Agreement is determined to be illegal under any applicable law, such provision shall be null and void to the extent necessary to comply with applicable

-5-

law, but the other provisions of this Grant Agreement shall remain in full force and effect.

**11.** **Assignability** . Except as may be effected by designation of a beneficiary or beneficiaries in such manner as may be determined by the Committee, or as may be effected by will or other testamentary disposition or by the laws of descent and distribution, any attempt to assign the Units before they are settled shall be of no effect.

**12.** **Certain Corporate Transactions** . In the event of certain corporate transactions, the Units shall be subject to adjustment as provided in Section 17 of the Plan.

**13.** **No Additional Rights** .

i.  Neither the granting of the Units nor their settlement shall (a) affect or restrict in any way the power of the Company to undertake any corporate action otherwise permitted under applicable law, (b) confer upon the Holder the right to continue performing services for the Company, or (c) interfere in any way with the right of the Company to terminate the services of the Holder at any time, with or without Cause.

ii.  The Holder acknowledges that (a) this is a one-time grant, (b) the making of this grant does not mean that the Holder will receive any similar grant or grants in the future, or any future grants at all, and (c) this grant does not in any way entitle the Holder to future grants under the Plan, if any, and the Company retains sole and absolute discretion as to whether to make any additional grants to the Holder in the future and, if so, the quantity, terms, conditions and provisions of any such grants.

iii.  Without limiting the generality of subsections i. and ii. immediately above and subject to Sections 4 and 5 above, if the Holder's employment with the Company terminates, the Holder shall not be entitled to any compensation for any loss of any right or benefit or prospective right or benefit relating to the Units or under the Plan which he or she might otherwise have enjoyed, whether such compensation is claimed by way of damages for wrongful dismissal or other breach of contract or by way of compensation for loss of office or otherwise.

**14.** **Rights as a Stockholder** . Neither the Holder nor the Holder's Heir shall have any rights as a stockholder with respect to any shares represented by the Units unless and until shares of Common Stock have been issued in settlement thereof.

-6-

**15.** __Data Privacy Waiver__ . By accepting the grant of the Units, the Holder hereby agrees and consents to:

i.    the collection, use, processing and transfer by Mattel and its Subsidiaries (collectively, the " Group ") of certain personal information about the Holder (the " Data ");

ii.    any members of the Group transferring Data amongst themselves for the purposes of implementing, administering and managing the Plan;

iii.    the use of such Data by any such person for such purposes; and

iv.    the transfer to and retention of such Data by third parties in connection with such purposes.

For the purposes of clause (i) above, " Data " means the Holder's name, home address and telephone number, date of birth, other employee information, any tax or other identification number, details of all rights to acquire Common Stock granted to the Holder and of Common Stock issued or transferred to the Holder pursuant to the Plan.

**16.** __Compliance with Plan__ . The Units and this Grant Agreement are subject to, and the Company and the Holder agree to be bound by, all of the terms and conditions of the Plan as it shall be amended from time to time, which are incorporated herein by reference. No amendment to the Plan shall adversely affect the Units or this Grant Agreement without the consent of the Holder. In the case of a conflict between the terms of the Plan and this Grant Agreement, the terms of the Plan shall govern.

**17.** __Effect of Grant Agreement on Individual Agreements__ . Notwithstanding the provisions of any Individual Agreement, (i) in the case of a conflict between the terms of the Holder's Individual Agreement and this Grant Agreement, the terms of the Grant Agreement shall govern, and (ii) the vesting and settlement of Units shall in all events occur in accordance with this Grant Agreement to the exclusion of any provisions contained in an Individual Agreement regarding the vesting or settlement of the Units, and any such Individual Agreement provisions shall have no force or effect with respect to the Units.

**18.** __Governing Law__ . The interpretation, performance and enforcement of this Grant Agreement shall be governed by the laws of the State of Delaware without regard to principles of conflicts of laws. The Holder may only exercise his or her rights in respect of the Plan to the extent that it would be lawful to do so, and the Company would not, in connection with this Grant Agreement, be in breach of the laws of any jurisdiction to which the Holder may be subject. The Holder shall be solely responsible to seek advice as to the laws of any jurisdiction to which he or she may be subject, and participation by the Holder in the Plan shall be on the basis of a warranty by the Holder that the Holder may lawfully so participate without the Company being in breach of the laws of any such jurisdiction.

-7-

**Exhibit 10.2**

**Grant Agreement for**
**Long-Term Incentive Program Performance-Based Restricted Stock Units**
**for Senior Executives**
**under the Mattel, Inc. 2010 Equity and Long-Term Compensation Plan**

This is a Grant Agreement between Mattel, Inc. (" Mattel ") and the individual (the " Holder ") named in the Notice of Grant of Restricted Stock Units (the " Notice ") attached hereto as the cover page of this Grant Agreement.

**Recitals**

Mattel has adopted the 2010 Equity and Long-Term Compensation Plan (the " Plan ") for the granting to selected employees of awards based upon shares of Common Stock of Mattel. In accordance with the terms of the Plan, the Compensation Committee of the Board of Directors (the " Committee ") has approved the execution of this Grant Agreement between Mattel and the Holder. Capitalized terms used herein without definition shall have the meanings assigned to such terms in the Plan.

**Restricted Stock Units**

**1. Grant .** Mattel grants to the Holder the number of restricted stock units based on shares of Common Stock set forth in the Notice (the " Units "), subject to adjustment, forfeiture and the other terms and conditions set forth below, as of the effective date of the grant (the " Grant Date ") specified in the Notice. The number of Units specified in the Notice reflects the target number of Units that may be earned by the Holder. The Company and the Holder acknowledge that the Units (a) are being granted hereunder in exchange for the Holder's agreement to provide services to the Company after the Grant Date, for which the Holder will otherwise not be fully compensated, and which the Company deems to have a value at least equal to the aggregate par value of the Shares, if any, that the Holder may become entitled to receive under this Agreement, and (b) will, except as provided in Sections 4 and 5 hereof, be forfeited by the Holder if the Holder's termination of employment occurs before the Settlement Date (as defined in Section 7, below), and are further subject to cancellation (and any shares of Common Stock or cash delivered in settlement of the Units are subject to recapture) if the Holder engages in certain conduct detrimental to the Company, in each case as more fully set forth in this Grant Agreement and the Plan.

**2. Performance Criteria .** Subject to the Holder's continuous employment through the Settlement Date and subject to Section 6 below, the Holder will earn a number of Units on the Settlement Date determined based on the achievement of annual goals related to net operating profit after taxes less a capital charge and net sales (the " Company Performance Measures ") and the relative total shareholder return (" TSR ") during the period beginning on January 1, 2011 and ending on December 31, 2013 (the " Performance Cycle "), in each case, as determined by the Committee.

**3. <u>Dividend Equivalent Rights</u>** . The Units are granted with Dividend Equivalent rights, as set forth in this Section 3. As of each payment date for any cash dividend or distribution with respect to the Common Stock with a record date on or after the commencement date of the Performance Cycle and before all of the Units are settled or forfeited as set forth below, the Holder shall be credited (without interest) with an additional number of Units, in whole or in fractions thereof, in an amount determined by dividing (i) the aggregate cash dividends that would have been paid on such dividend payment date in respect of the number of shares of Common Stock underlying the Units actually earned by the Holder in accordance with this Agreement, by (ii) the Common Stock closing price on the ex-dividend date (two trading days prior to the record date). All such additional Units shall be subject to the same terms and conditions (including vesting conditions and Dividend Equivalent rights) applicable to the Units in respect of which they were credited and shall be settled in accordance with, and at the time of, settlement of the Units to which they are related, in accordance with Section 7.

**4. <u>Consequences of Termination of Employment</u>** . The consequences of the Holder's termination of employment during the Performance Cycle and before a Change in Control shall be as follows:

i. In the case of a termination of the Holder's employment with the Company (a " <u>Termination of Employment</u> ") by the Company for Cause, the Units shall be forfeited as of the date of the Termination of Employment.

ii. In the case of a Termination of Employment as a result of the Holder's death or Disability after June 30, 2011, the number of Units earned shall be determined based on actual achievement of the Company Performance Measures through the most recently completed fiscal year prior to such Termination of Employment and TSR (calculated as if the most recently completed fiscal year prior to such Termination of Employment had been the end of the Performance Cycle). Any Units which become earned pursuant to this Section 4.ii shall be settled on or within 60 days after the date of such Termination of Employment, but in no event later than the Settlement Date, in accordance with Section 7. Notwithstanding anything in this Section 4.ii to the contrary, in the case of a Termination of Employment as a result of the Holder's death or Disability on or after July 1, 2011 and before 2012, the number of Units earned shall be based on 100% of the target award level payout for the 2011 fiscal year, to be settled on or within 60 days after such Termination of Employment, but in no event later than March 15, 2012.

iii. In the case of a Termination of Employment as a result of the Holder's Retirement, the number of Units earned shall be determined as follows: first, the Committee shall determine the number of Units earned based on actual achievement of the Company Performance Measures and TSR following the end of the Performance Cycle; and second, the number of Units so obtained shall be multiplied by a fraction, the numerator of which is the total number of full months elapsed from the first day of the Performance Cycle to the date of the Holder's Termination of Employment and the denominator of which is the total number of

-2-

months in the Performance Cycle. Such number of Units shall then be settled in accordance with Section 7 as for all other holders whose awards are settled on the Settlement Date.

    iv.    In all other cases, the Units shall be forfeited as of the date of the Termination of Employment.

    **5. <u>Change in Control</u>** . If a Change in Control occurs and the Holder has remained continuously employed by the Company until at least immediately prior to the Change in Control, the Units shall not vest in accordance with the terms of Section 18 of the Plan and the number of Units earned shall be determined as follows:

    i.    If the Committee reasonably determines in good faith, prior to the occurrence of the Change in Control, that the Units will not be honored or assumed, or new rights that substantially preserve the terms of the Units substituted therefor, by the Holder's employer (or the parent of such employer) immediately following the Change in Control, the number of Units earned shall equal the greater of (a) the number that equals 100% of the target award level payout and (b) the number that would have been earned based on actual achievement of the Company Performance Measures through the most recently completed fiscal year prior to such Change in Control and TSR (calculated as if the most recently completed fiscal year prior to such Change in Control had been the end of the Performance Cycle).

    ii.    If the Committee determines that the Units have been assumed and, before the Settlement Date, the Holder has a Termination of Employment by the Company without Cause or by the Holder for Good Reason (as defined below) within the 24-month period immediately following a Change in Control, the number of Units earned shall equal the greater of (a) the number that equals 100% of the target award level payout and (b) the number that would have been earned based on actual achievement of the Company Performance Measures through the most recently completed fiscal year prior to such Termination of Employment and TSR (calculated as if the most recently completed fiscal year prior to such Termination of Employment had been the end of the Performance Cycle).

    Any Units which are earned pursuant to this Section 5 shall be settled on or within 60 days after the Change in Control or Termination of Employment, as applicable, but in no event later than the Settlement Date, in accordance with Section 7. For purposes of this Section 5, the Termination of Employment shall be considered to be for " <u>Good Reason</u> " if, without the Holder's express written consent, there is a material diminution in the duties, authority or responsibilities of the Holder, provided that the Holder gives the Company written notice of the intent to terminate employment within 60 days of the occurrence of such event and the Company fails to cure such event (to the extent curable) within 30 days of its receipt of such notice. If such event is not cured, the Holder must terminate employment within 120 days following the initial occurrence of the event giving rise to termination for Good Reason.

-3-

Exhibit D - Page 247

**6. Termination, Rescission and Recapture .** The Holder specifically acknowledges that the Units and any Common Stock or cash delivered in settlement thereof are subject to the provisions of Section 19 of the Plan, entitled "Termination, Rescission and Recapture," which can cause the forfeiture of the Units and/or the recapture of any Common Stock and/or cash delivered in settlement thereof and/or the proceeds of the sale of any such Common Stock. Except as provided in the next sentence, as a condition of the settlement of Units, the Holder will be required to certify that he or she is in compliance with the terms and conditions of the Plan (including the conditions set forth in Section 19 of the Plan) and, if a Termination of Employment has occurred, to state the name and address of his or her then-current employer or any entity for which the Holder performs business services and his or her title, and shall identify any organization or business in which the Holder owns a greater-than-five-percent equity interest. Section 19 of the Plan is inapplicable, and accordingly such certification shall not be required, after a Termination of Employment of the Holder that occurs within the 24-month period after a Change in Control.

**7. Payout of Units .** Within 15 business days following the Committee's certification of the Company Performance Measures and TSR for the Performance Cycle in the fiscal year following the end of the Performance Cycle, but in no event later than March 15th of such fiscal year (the " Settlement Date "), subject to Section 9 below, the Company shall settle each earned Unit by delivering to the Holder one share of Common Stock or a cash payment equal to the Fair Market Value of a share of Common Stock, as the Company may in its sole discretion determine (and the Company may settle some Units in Common Stock and some in cash). In the case of Units settled by delivery of Common Stock, the Company shall (a) issue or cause to be delivered to the Holder (or the Holder's Heir, as defined below, if applicable) one or more unlegended stock certificates representing such shares, or (b) cause a book entry for such shares to be made in the name of the Holder (or the Holder's Heir, if applicable). In the case of the Holder's death, the cash and/or Common Stock to be delivered in settlement of Units as described above shall be delivered to the Holder's beneficiary or beneficiaries (as designated in the manner determined by the Committee), or if no beneficiary is so designated or if no beneficiary survives the Holder, then the Holder's administrator, executor, personal representative, or other person to whom the Units are transferred by means of the Holder's will or the laws of descent and distribution (such beneficiary, beneficiaries or other person(s), the " Holder's Heir ").

**8. Code Section 409A .** The Company intends that the Units shall not constitute "deferred compensation" within the meaning of Section 409A of the Code and this Grant Agreement shall be interpreted based on such intent. In view of uncertainty surrounding Section 409A of the Code, however, if Mattel determines after the Grant Date that an amendment to this Grant Agreement is necessary or advisable so that the Units will not be subject to Section 409A of the Code, or alternatively so that they comply with Section 409A of the Code, it may make such amendment, effective as of the Grant Date or at any later date, without the consent of the Holder.

-4-

Notwithstanding anything in this Grant Agreement to the contrary, to the extent that any payment or benefit constitutes non-exempt "nonqualified deferred compensation" for purposes of Section 409A of the Code, and such payment or benefit would otherwise be payable or distributable hereunder by reason of the Holder's Termination of Employment, all references to the Holder's Termination of Employment shall be construed to mean a "separation from service," as defined in Treasury Regulation Section 1.409A-1(h) (a " Separation from Service " ), and the Holder shall not be considered to have a Termination of Employment unless such termination constitutes a Separation from Service with respect to the Holder.

**9.** **Tax Withholding** . The Company shall withhold from the cash and/or Common Stock delivered in settlement of Units shares of Common Stock having a Fair Market Value on the Settlement Date, and/or cash, equal to the amount necessary to satisfy the minimum required withholding, if any, of any income tax, social tax, or other taxes (but rounding up to the nearest whole number of shares). If any such taxes are required to be withheld at a date earlier than the Settlement Date, then notwithstanding any other provision of this Grant Agreement, the Company may (i) satisfy such obligation by causing the forfeiture of a number of Units having a Fair Market Value, on such earlier date, equal to the amount necessary to satisfy the minimum required amount of such withholding, or (ii) make such other arrangements with the Holder for such withholding as may be satisfactory to the Company in its sole discretion.

**10.** **Compliance with Law** .

i.     No shares of Common Stock shall be issued and delivered pursuant to a Unit unless and until all applicable registration requirements of the Securities Act of 1933, as amended, all applicable listing requirements of any national securities exchange on which the Common Stock is then listed, and all other requirements of law or of any regulatory bodies having jurisdiction over such issuance and delivery, shall have been complied with. In particular, the Committee may require certain investment (or other) representations and undertakings in connection with the issuance of securities in connection with the Plan in order to comply with applicable law.

ii.    If any provision of this Grant Agreement is determined to be unenforceable or invalid under any applicable law, such provision will be applied to the maximum extent permitted by applicable law, and shall automatically be deemed amended in a manner consistent with its objectives to the extent necessary to conform to any limitations required under applicable law. Furthermore, if any provision of this Grant Agreement is determined to be illegal under any applicable law, such provision shall be null and void to the extent necessary to comply with applicable law, but the other provisions of this Grant Agreement shall remain in full force and effect.

**11.** **Assignability** . Except as may be effected by designation of a beneficiary or beneficiaries in such manner as may be determined by the Committee, or as may be effected by

-5-

will or other testamentary disposition or by the laws of descent and distribution, any attempt to assign the Units before they are settled shall be of no effect.

**12. Certain Corporate Transactions** . In the event of certain corporate transactions, the Units shall be subject to adjustment as provided in Section 17 of the Plan.

**13. No Additional Rights** .

i.   Neither the granting of the Units nor their settlement shall (a) affect or restrict in any way the power of the Company to undertake any corporate action otherwise permitted under applicable law, (b) confer upon the Holder the right to continue performing services for the Company, or (c) interfere in any way with the right of the Company to terminate the services of the Holder at any time, with or without Cause.

ii.  The Holder acknowledges that (a) this is a one-time grant, (b) the making of this grant does not mean that the Holder will receive any similar grant or grants in the future, or any future grants at all, and (c) this grant does not in any way entitle the Holder to future grants under the Plan, if any, and the Company retains sole and absolute discretion as to whether to make any additional grants to the Holder in the future and, if so, the quantity, terms, conditions and provisions of any such grants.

iii. Without limiting the generality of subsections i. and ii. immediately above and subject to Sections 4 and 5 above, if the Holder's employment with the Company terminates, the Holder shall not be entitled to any compensation for any loss of any right or benefit or prospective right or benefit relating to the Units or under the Plan which he or she might otherwise have enjoyed, whether such compensation is claimed by way of damages for wrongful dismissal or other breach of contract or by way of compensation for loss of office or otherwise.

**14. Rights as a Stockholder** . Neither the Holder nor the Holder's Heir shall have any rights as a stockholder with respect to any shares represented by the Units unless and until shares of Common Stock have been issued in settlement thereof.

**15. Data Privacy Waiver** . By accepting the grant of the Units, the Holder hereby agrees and consents to:

i.   the collection, use, processing and transfer by Mattel and its Subsidiaries (collectively, the " Group ") of certain personal information about the Holder (the " Data ");

ii.  any members of the Group transferring Data amongst themselves for the purposes of implementing, administering and managing the Plan;

-6-

iii.   the use of such Data by any such person for such purposes; and

iv.   the transfer to and retention of such Data by third parties in connection with such purposes.

For the purposes of clause (i) above, " Data " means the Holder's name, home address and telephone number, date of birth, other employee information, any tax or other identification number, details of all rights to acquire Common Stock granted to the Holder and of Common Stock issued or transferred to the Holder pursuant to the Plan.

16.  **Compliance with Plan** . The Units and this Grant Agreement are subject to, and the Company and the Holder agree to be bound by, all of the terms and conditions of the Plan as it shall be amended from time to time, which are incorporated herein by reference. No amendment to the Plan shall adversely affect the Units or this Grant Agreement without the consent of the Holder. In the case of a conflict between the terms of the Plan and this Grant Agreement, the terms of the Plan shall govern.

17.  **Effect of Grant Agreement on Individual Agreements** . Notwithstanding the provisions of any Individual Agreement, (i) in the case of a conflict between the terms of the Holder's Individual Agreement and this Grant Agreement, the terms of the Grant Agreement shall govern, and (ii) the vesting and settlement of Units shall in all events occur in accordance with this Grant Agreement to the exclusion of any provisions contained in an Individual Agreement regarding the vesting or settlement of the Units, and any such Individual Agreement provisions shall have no force or effect with respect to the Units.

18.  **Governing Law** . The interpretation, performance and enforcement of this Grant Agreement shall be governed by the laws of the State of Delaware without regard to principles of conflicts of laws. The Holder may only exercise his or her rights in respect of the Plan to the extent that it would be lawful to do so, and the Company would not, in connection with this Grant Agreement, be in breach of the laws of any jurisdiction to which the Holder may be subject. The Holder shall be solely responsible to seek advice as to the laws of any jurisdiction to which he or she may be subject, and participation by the Holder in the Plan shall be on the basis of a warranty by the Holder that the Holder may lawfully so participate without the Company being in breach of the laws of any such jurisdiction.

19.  **Certain Provisions Applicable to Tax Residents of Hong Kong** . If the Holder is a tax resident of Hong Kong, the following provisions apply, notwithstanding any other provision of this Grant Agreement:

This grant of the Units is made to the Holder only, and these documents are for private circulation only. The contents of the Plan, the Notice, this Grant Agreement and any related materials have not been reviewed by any regulatory authority in Hong Kong. The Holder is advised to exercise caution in relation to the offer. If the Holder is in any doubt about any of the contents of this document, he or she should obtain independent professional advice.

-7-

**EXHIBIT 12.0**

### MATTEL, INC. AND SUBSIDIARIES
### COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES

| (Unaudited; in thousands, except ratios) | For the Three Months Ended March 31, 2011 | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2010 | 2009 | 2008 | 2007 | 2006 |
| **Earnings Available for Fixed Charges:** | | | | | | |
| Income from continuing operations before income taxes | $ 21,261 | $846,825 | $660,047 | $487,964 | $703,398 | $683,756 |
| Add: Non-controlling interest losses in consolidated subsidiaries | — | — | 222 | 262 | 255 | 271 |
| Add: | | | | | | |
| Interest expense | 18,816 | 64,839 | 71,843 | 81,944 | 70,974 | 79,853 |
| Appropriate portion of rents (a) | 7,931 | 34,544 | 34,439 | 29,833 | 28,245 | 25,724 |
| Earnings available for fixed charges | $ 48,008 | $946,208 | $766,551 | $600,003 | $802,872 | $789,604 |
| **Fixed Charges:** | | | | | | |
| Interest expense | $ 18,816 | $ 64,839 | $ 71,843 | $ 81,944 | $ 70,974 | $ 79,853 |
| Appropriate portion of rents (a) | 7,931 | 34,544 | 34,439 | 29,833 | 28,245 | 25,724 |
| Fixed charges | $ 26,747 | $ 99,383 | $106,282 | $111,777 | $ 99,219 | $105,577 |
| Ratio of earnings to fixed charges | 1.79 X | 9.52 X | 7.21 X | 5.37 X | 8.09 X | 7.48 X |

(a)   *Portion of rental expenses that is deemed representative of an interest factor, which is one-third of total rental expense.*

**EXHIBIT 31.0**

**CERTIFICATIONS**

I, Robert A. Eckert, certify that:

    1. I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;

    2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

    3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

    4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

        (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

    5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

        (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

        (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: April 27, 2011

By:                     /s/ Robert A. Eckert

**Robert A. Eckert**
**Chairman and Chief Executive Officer**
**(Principal executive officer)**

Mattel, Inc. - Quarterly Report

**EXHIBIT 31.1**

### CERTIFICATIONS

I, Kevin M. Farr, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: April 27, 2011

By: _____ /s/ Kevin M. Farr _____

**Kevin M. Farr**
**Chief Financial Officer**
**(Principal financial officer)**

**EXHIBIT 32.0**

## CERTIFICATION PURSUANT TO
## 18 U.S.C. SECTION 1350,
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Mattel, Inc. a Delaware corporation (the "Company"), on Form 10-Q for the quarter ended March 31, 2011, as filed with the Securities and Exchange Commission (the "Report"), Robert A. Eckert, Chairman and Chief Executive Officer, and Kevin M. Farr, Chief Financial Officer, of the Company, do each hereby certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 1350) that, to his knowledge:

(1)   the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: April 27, 2011

By:   _____/s/ Robert A. Eckert_____
**Robert A. Eckert**
**Chairman and Chief Executive Officer, Mattel, Inc.**


_____/s/ Kevin M. Farr_____
**Kevin M. Farr**
**Chief Financial Officer, Mattel, Inc.**