# Exhibit E

# (Part 2 of 2)

Exhibit 10.18

# AMENDMENT
## TO
## AMENDED AND RESTATED EXECUTIVE EMPLOYMENT AGREEMENT

**WHEREAS,** Mattel, Inc. ("Mattel") and Neil B. Friedman (the "Executive") have entered into an Amended and Restated Executive Employment Agreement dated January 31, 2000 as amended February 10, 2000, as amended November 14, 2000, as amended March 17, 2005, and as amended March 27, 2007 (the "Agreement");

**WHEREAS,** pursuant to Section 12 of the Agreement, Mattel and the Executive may amend the Agreement pursuant to a written instrument executed by the Executive and Mattel; and

**WHEREAS,** as a result of the enactment in 2004 of Section 409A of the Internal Revenue Code of 1986, as amended from time to time (the "Code"), the Company and the Executive desire to amend the Agreement to evidence the intention that the terms of the Agreement be exempt from or comply with Section 409A of the Code.

**NOW, THEREFORE,** pursuant to Section 12 of the Agreement, the Agreement is hereby amended, effective as of December 31, 2008, as follows:

1. **Capitalized Terms.** Capitalized terms that are not defined in this Amendment shall have the meanings ascribed thereto in the Agreement.

2. All references to New York, New York in the Agreement shall be amended to refer to Los Angeles, California.

3. The first sentence of Section 4(a) of the Agreement shall be amended by adding the following proviso at the end thereof to read as follows:

    "; *provided*, further, that all such payments in respect of the Executive's death pursuant to this Section 4(a) shall be paid to the Executive's estate no later than March 15th of the calendar year following the calendar year in which the Executive dies, including, if applicable, a final lump sum payment on March 15th (or the last business day immediately prior thereto) of the calendar year following the Executive's death, such that the aggregate of such payments in respect of the continued Base Salary equals 50% of the Executive's annual Base Salary at the rate in effect at the time of death."

4. The first paragraph of Section 4(c) of the Agreement shall be amended in its entirety to read as follows:

"(c) Good Reason. The Executive may terminate his employment for Good Reason. For purposes of this Agreement, "Good Reason" means the good faith determination by the Executive that any one or more of the following have occurred, *provided* that (i) the Executive provides Mattel with written notice of the Good Reason event within ninety (90) days of the initial existence of such event, (ii) such event is not remedied by Mattel within thirty (30) days following the delivery of written notice of such Good Reason event and (iii) the Executive actually terminates his employment within two (2) years following the initial existence of such Good Reason event:"

5. Section 4(c)(i) of the Agreement shall be amended in its entirety to read as follows:

"(i) without the express written consent of the Executive, any material diminution in any of the duties, authority, or responsibilities of the Executive as contemplated by Section 2 of this Agreement;"

6. Section 4(c)(iii) of the Agreement shall be amended in its entirety to read as follows:

"(iii) any other action or inaction that constitutes a material breach of this Agreement by Mattel;"

7. Section 4(c)(iv) of the Agreement shall be amended in its entirety to read as follows:

"(iv) any failure by Mattel to obtain the assumption and agreement to perform this Agreement by a successor as contemplated by Section 11(b), except where such assumption and agreement occurs by operation of law; or"

8. Section 4(d)(i) of the Agreement shall be amended in its entirety to read as follows:

"(i) the acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 35% or more of either (i) the then outstanding shares of common stock of Mattel (the "Outstanding Company Common Stock") or (ii) the

2

combined voting power of the then outstanding voting securities of Mattel entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); *provided, however,* that for purposes of this subsection (i), the following shall not constitute a Change of Control: (a) any acquisition directly from Mattel, (b) any acquisition by Mattel or any corporation controlled by Mattel, (c) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by Mattel or any corporation controlled by Mattel, (d) any acquisition by a Person of 35% or more of either the Outstanding Company Common Stock or the Outstanding Company Voting Securities as a result of an acquisition of common stock of Mattel by Mattel which, by reducing the number of shares of common stock of Mattel outstanding, increases the proportionate number of shares beneficially owned by such Person to 35% or more of either the Outstanding Company Common Stock or the Outstanding Company Voting Securities; *provided, however,* that if a Person shall become the beneficial owner of 35% or more of either the Outstanding Company Common Stock or the Outstanding Company Voting Securities by reason of a share acquisition by Mattel as described above and shall, after such share acquisition by Mattel, become the beneficial owner of any additional shares of common stock of Mattel, then such acquisition shall constitute a Change of Control or (e) any acquisition pursuant to a transaction which complies with clauses (a), (b) and (c) of subsection (iii) of this Section 4(d); or"

9. Section 4(d)(iii)(b) of the Agreement shall be amended in its entirety to read as follows:

"(b) no Person (excluding any employee benefit plan (or related trust) of Mattel or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 35% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination and"

10. The final paragraph of Section 4(d) of the Agreement shall be deleted in its entirety and replaced with the following sentence:

3

Exhibit E - Page 395

M 0932391

"As soon as practicable after a Change of Control, Mattel shall notify the Executive that a Change of Control has occurred."

11. The final sentence of Section 5(a) of the Agreement shall be amended in its entirety to read as follows:

"As of the Date of Termination, the Executive's family shall be entitled to continued healthcare coverage as in effect from time to time on the same terms and conditions as such insurance is available to active employees of Mattel and financial counseling benefits through the vendor engaged and paid for by Mattel until the third anniversary of the Date of Termination."

12. The first paragraph of Sections 5(d)(i) and 5(e)(i) of the Agreement shall be amended in their entirety to read as follows:

"(i) Mattel shall pay to the Executive in a lump sum in cash on the 55th day after the Date of Termination (or the first business day thereafter) the aggregate of the following amounts:"

13. Sections 5(d)(i)(B), 5(d)(i)(C), 5(e)(i)(B) and 5(e)(i)(C) of the Agreement shall be amended by adding the phrase, "subject to Section 5(f)," at the beginning of such provisions.

14. Sections 5(d)(iv) and 5(e)(iii) of the Agreement shall be amended in their entirety to read as follows:

"(iv) Mattel shall, promptly upon submission by the Executive of supporting documentation, pay or reimburse to the Executive any costs and expenses paid or incurred by the Executive during the Employment Period which would have been payable under Section 3(e) if his employment had not terminated."

15. Sections 5(d)(v)(A) and 5(e)(iv)(A) of the Agreement shall be amended in their entirety to read as follows:

"(A) a monthly amount equal to the applicable COBRA premium for the level of coverage that the Executive has as of the Date of Termination (i.e., single, single plus one, or family) under Mattel's medical, dental, prescription drug and vision care group insurance as in effect from time to time, which payment shall be paid in advance on the first

4

payroll day of each month, commencing with the month immediately following the Executive's Date of Termination; *provided, however*, that any such payments otherwise payable to the Executive within the first 54 days following the Date of Termination shall not be paid on the otherwise scheduled payment date but shall instead accumulate and be and on the 55th day following the Date of Termination. During such period, subject to the Executive's continued payment of premiums, Mattel will make available to the Executive and the Executive's eligible dependents, at the Executive's cost (in an amount equal to the COBRA premium cost therefor), coverage under Mattel's medical, dental, prescription drug and vision care group insurance (which shall be concurrent with any health care continuation benefits to which the Executive or his eligible dependents are entitled under COBRA);"

16. Sections 5(d)(v)(E) and 5(e)(iv)(E) of the Agreement shall be amended in their entirety to read as follows:

"(E) membership in one city or country club and related expenses. Mattel shall cause the membership to be transferred to the Executive at no cost to the Executive, provided that such transfer shall occur no later than March 15th of the calendar year following the calendar year in which the Date of Termination occurs."

17. Sections 5(d)(vi) and 5(e)(v) of the Agreement shall be amended by adding the following proviso at the end thereof to read as follows:

"; *provided, however*, that such credit for additional years of service and age shall not accelerate the time of payment under such arrangements in a manner that would result in the imposition of tax, interest and/or penalties upon the Executive under Section 409A of the Code ("Section 409A")."

18. The first paragraph of Section 5(e) of the Agreement shall be amended in its entirety to read as follows:

"(e) Change of Control. Except as provided below, if, within 18 months following a Change of Control, (x) the Executive terminates his employment for Good Reason , (y) Mattel or the surviving entity terminates the Executive's employment other than for Cause or Disability or (z) the Executive terminates his employment for any reason within

5

Exhibit E - Page 397

M 0932393

the 30 day period immediately following the six (6) month anniversary of a Change of Control (the "Window Period"):"

19. A new Section 5(f) shall be added to the Agreement to read as follows:

"(f) <u>Limitation on Certain Payments</u>. Notwithstanding the provisions of Sections 5(d) or 5(e), in the event of a Change of Control, the Executive's right to receive the lump sum cash payment following a termination of employment pursuant to Section 5(d)(i)(B), 5(d)(i)(C), 5(e)(i)(B) or 5(e)(i)(C) shall terminate on March 15th of the calendar year following the calendar year in which the Window Period commenced, and no such amount shall be payable thereafter. Subject to the preceding sentence, if a Change of Control occurs during the Employment Period, then (regardless of when the Employment Period would otherwise end under any other provision of this Agreement) Section 5(e), and all other parts of this Agreement which relate to Section 5(e), shall continue to apply to the Executive for 18 months after the Change of Control."

20. A new Section 5(g) shall be added to the Agreement to read as follows:

"(g) <u>Effect of Deferral Elections</u>. If any payment payable pursuant to Section 5 or Section 13 is subject to a valid deferral election under the terms of another plan or arrangement maintained by Mattel, the payment of such amount shall be in accordance with the provisions of such deferred compensation plan or arrangement (including the Executive's deferral elections regarding the form and timing of such deferrals)."

21. The final sentence of Section 9 of the Agreement shall be amended in its entirety to read as follows:

"The Executive shall not be entitled to any severance payments or other benefits to which the Executive would otherwise be entitled under subsections (b), (d) and (e) of Section 5 of this Agreement unless (i) the Executive complies with the covenants set forth in Section 10 and (ii) the Executive executes the Release and such Release becomes irrevocable within fifty-five (55) days following the Executive's Date of Termination."

6

22. The second sentence of Section 14(a) of the Agreement shall be amended in its entirety to read as follows:

"Notwithstanding the foregoing provisions of this Section 14(a), if it shall be determined that the Executive is entitled to a Gross-Up Payment, but that the Parachute Value of Payments (as defined below) does not exceed 110% of the Safe Harbor Amount (as defined below), then no Gross-Up Payment shall be made to the Executive and the Agreement Payments (as defined below), in the aggregate, shall be reduced (but not below zero) such that the Parachute Value of all Payments equals the Safe Harbor Amount."

23. Section 14(a) of the Agreement shall be amended by adding the following language at the end thereof to read as follows:

"If a reduction in the Agreement Payments is necessary so that the Parachute Value of all Payments equals the Safe Harbor Amount and none of the Payments is a "deferral of compensation" within the meaning of and subject to Section 409A ("Nonqualified Deferred Compensation"), then the reduction shall occur in the manner the Executive elects in writing prior to the date of payment. If any Payment constitutes Nonqualified Deferred Compensation or the Executive fails to elect an order, then the reduction shall occur in the following order: (i) cancellation of acceleration of vesting on any equity awards for which the exercise price exceeds the then fair market value of the underlying equity; (ii) reduction in the benefits described in Section 5 (e)(iv) (with such reduction being applied to the benefits in the manner having the least economic impact to the Executive and, to the extent the economic impact is equivalent, such benefits shall be reduced in the reverse order of when the benefits would have been provided to the Executive, that is, benefits payable later shall be reduced before benefits payable earlier); (iii) reduction of cash payments (with such reduction being applied to the payments in the reverse order in which they would otherwise be made, that is, later payments shall be reduced before earlier payments); (iv) cancellation of acceleration of vesting of equity awards not covered under (i) above; *provided, however*, that in the event that acceleration of vesting of equity awards is to be cancelled, such acceleration of vesting shall be cancelled in the reverse order of the date of grant of such equity awards, that is,

7

Exhibit E - Page 399

M 0932395

later equity awards shall be canceled before earlier equity awards."

24. The second sentence of Section 14(b) of the Agreement shall be amended by adding the following proviso at the end thereof to read as follows:

"*provided, however,* that any Gross-Up Payment shall in all events be paid no later than the end of the Executive's taxable year immediately following the Executive's taxable year in which the Excise Tax (and any income or other related taxes or interest or penalties thereon) on a Payment are remitted to the Internal Revenue Service or any other applicable taxing authority or, in the case of amounts relating to a claim described in Section 14(c) that does not result in the remittance of any federal, state, local and foreign income, excise, social security and other taxes, the calendar year in which the claim is finally settled or otherwise resolved."

25. The third sentence of Section 14(b) of the Agreement shall be amended in its entirety to read as follows:

"Any determination by the Accounting Firm shall be binding upon Mattel and the Executive, including any determination by the Accounting Firm of the amount that equals 110% of the Safe Harbor Amount and any amount of cutback in benefits necessary because Payments are calculated to have a Parachute Value between 100% and 110% of the Safe Harbor Amount."

26. The second sentence of the proviso following Section 14(c)(iv) of the Agreement shall be amended in its entirety to read as follows:

"Without limitation on the foregoing provisions of this Section 14(c), Mattel shall control all proceedings taken in connection with such contest and, at its sole option, may pursue or forgo any and all administrative appeals, proceedings, hearings and conferences with the applicable taxing authority in respect of such claim and may, at its sole option, either pay the tax claimed to the appropriate taxing authority on behalf of the Executive and direct the Executive to sue for a refund or contest the claim in any permissible manner, and the Executive agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one or more appellate courts, as Mattel shall determine; *provided,*

8

M 0932396

*however*, that if Mattel pays such claim and directs the Executive to sue for a refund, Mattel shall indemnify and hold the Executive harmless, on an after-tax basis, from any Excise Tax or income tax (including interest or penalties with respect thereto) imposed with respect to such payment or with respect to any imputed income with respect to such payment; and further provided that any extension of the statute of limitations relating to payment of taxes for the taxable year of the Executive with respect to which such contested amount is claimed to be due is limited solely to such contested amount."

27. Section 14(d) of the Agreement shall be amended in its entirety to read as follows:

"(d) If, after the receipt by the Executive of a Gross-Up Payment or payment by Mattel of an amount on the Executive's behalf pursuant to Section 14(c), the Executive becomes entitled to receive any refund with respect to the Excise Tax to which such Gross-Up relates or with respect to such claim, the Executive shall (subject to Mattel's complying with the requirements of Section 14(c)) promptly pay to Mattel the amount of such refund (together with any interest paid or credited thereon after taxes applicable thereto). If, after payment by Mattel of an amount on the Executive's behalf pursuant to Section 14(c), a determination is made that the Executive shall not be entitled to any refund with respect to such claim and Mattel does not notify the Executive in writing of its intent to contest such denial of refund prior to the expiration of 30 days after such determination, then the amount of such payment shall offset, to the extent thereof, the amount of Gross-Up Payment required to be paid."

28. Section 14(e) of the Agreement shall be amended in its entirety to read as follows:

"(e) Notwithstanding any other provision of this Section 14, Mattel may withhold and pay over to the Internal Revenue Service or any other applicable taxing authority for the benefit of the Executive all or any portion of the Gross-Up Payment that it determines in good faith that it is or may be in the future required to withhold, and the Executive hereby consents to such withholding."

9

29. The address to which notices and communications intended for the Executive shall be delivered pursuant to Section 15(b) of the Agreement shall be revised to be:

"Mr. Neil B. Friedman
MATTEL, INC.
333 Continental Blvd.
El Segundo, CA 90245"

30. A new Section 16 shall be added to the Agreement to read as follows:

"16. <u>Section 409A</u>.

(a) It is the parties' intention that the reimbursements, payments and benefits to which the Executive could become entitled in connection with the Executive's employment under this Agreement be exempt from or comply with Section 409A and the regulations and other guidance promulgated thereunder. The provisions of this Section 16 shall qualify and supersede all other provisions of this Agreement as necessary to fulfill the foregoing intention. If the Executive or Mattel believes, at any time, that any of such reimbursement, payment or benefit is not exempt or does not so comply, the Executive or Mattel will promptly advise the other party and will negotiate reasonably and in good faith to amend the terms of such arrangement such that it is exempt or complies (with the most limited possible economic effect on the Executive and on Mattel) or to mitigate any additional tax, interest and/or penalties that may apply under Section 409A if exemption or compliance is not practicable. Mattel agrees that it will not, without the Executive's prior written consent, knowingly take any action, or knowingly refrain from taking any action, other than as required by law, that would result in the imposition of tax, interest and/or penalties upon the Executive under Section 409A, unless such action or omission is pursuant to the Executive's written request.

(b) To the extent applicable, each and every payment to be made pursuant to Section 5 or Section 13 of this Agreement shall be treated as a separate payment and not as one of a series of payments treated as a single payment for purposes of Treasury Regulation Section 1.409A-2(b)(2)(iii).

10

(c) If the Executive is a "specified employee" (determined by Mattel in accordance with Section 409A and Treasury Regulation Section 1.409A-3(i)(2)) as of the date that the Executive experiences a "separation from service" with Mattel, as defined for purposes of Section 409A (a "Separation from Service"), and if any reimbursement, payment or benefit to be paid or provided under this Agreement or otherwise both (i) constitutes Nonqualified Deferred Compensation and (ii) cannot be paid or provided in a manner otherwise provided herein without subjecting the Executive to additional tax, interest and/or penalties under Section 409A, then any such reimbursement, payment or benefit that is payable during the first six (6) months following the Date of Termination shall be paid or provided to the Executive in a lump sum cash payment to be made on the earlier of (x) the Executive's death and (y) the first business day of the seventh (7th) month immediately following the Executive's Separation from Service.

(d) Except to the extent any reimbursement, payment or benefit to be paid or provided under this Agreement does not constitute Nonqualified Deferred Compensation, (i) the amount of expenses eligible for reimbursement or the provision of any in-kind benefit (as defined in Section 409A) to the Executive during any calendar year will not affect the amount of expenses eligible for reimbursement or provided as in-kind benefits to the Executive in any other calendar year (subject to any lifetime and other annual limits provided under Mattel's health plans), (ii) the reimbursements for expenses for which the Executive is entitled shall be made on or before the last day of the calendar year following the calendar year in which the applicable expense is incurred and (iii) the right to payment or reimbursement or in-kind benefits may not be liquidated or exchanged for any other benefit.

(e) Any reimbursement, payment or benefit to be paid or provided under Section 5 hereof or otherwise to be paid or provided due to a Separation from Service that is exempt from Section 409A pursuant to Treasury Regulation Section 1.409A-1(b)(9)(v) will be paid or provided to the Executive only to the extent the expenses are not incurred or the benefits are not provided beyond the last day of the Executive's second taxable year following

11

the Executive's taxable year in which the Separation from Service occurs; *provided, however* that Mattel shall reimburse such expenses no later than the last day of the third taxable year following the Executive's taxable year in which the Executive's Separation from Service occurs.

(f) It is the parties' intention that the definition of Good Reason and the separation-from-service procedures specified in Section 4(c) hereof satisfy the conditions set forth in Treasury Regulation Section 1.409A-1(n)(2) for a termination for Good Reason to be treated as an "involuntary separation from service" for purposes of Section 409A.

(g) Subject to Section 9, any reimbursement, payment or benefit to be paid or provided under this Agreement that constitutes Nonqualified Deferred Compensation due upon a termination of employment shall be paid or provided to the Executive only in the event of a Separation from Service."

31. **Ratification and Confirmation.** Except as specifically amended hereby, the Agreement is hereby ratified and confirmed in all respects and remains in full force and effect.

32. **Governing Law.** This Amendment shall be governed by, and construed in accordance with, the laws of the State of California, without reference to principles of conflict of laws.

33. **Headings.** Section headings are for convenience only and shall not be considered a part of this Amendment.

34. **Counterparts.** This Amendment may be executed (including by facsimile transmission confirmed promptly thereafter by actual delivery of executed counterparts) in counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.

(Signature Page Follows)

Exhibit E - Page 404

M 0932400

**IN WITNESS WHEREOF,** Mattel and the Executive have caused this Amendment to be executed, effective as of December 31, 2008.

**MATTEL, INC.**

/s/ ROBERT A. ECKERT
Name: Robert A. Eckert
Title: Chairman & CEO


Dated: December 19, 2008


**EXECUTIVE**

/s/ NEIL B. FRIEDMAN
Name: Neil B. Friedman
Dated: December 20, 2008

Exhibit 10.23

# AMENDMENT
## TO
## AMENDED AND RESTATED EXECUTIVE EMPLOYMENT AGREEMENT

**WHEREAS,** Mattel, Inc. ("Mattel") and Kevin M. Farr (the "Executive") have entered into an Amended and Restated Executive Employment Agreement dated March 28, 2000, as amended April 6, 2000, as amended July 20, 2000, as amended March 6, 2002, as amended March 17, 2005 (the "Agreement");

**WHEREAS,** pursuant to Section 12 of the Agreement, Mattel and the Executive may amend the Agreement pursuant to a written instrument executed by the Executive and Mattel; and

**WHEREAS,** as a result of the enactment in 2004 of Section 409A of the Internal Revenue Code of 1986, as amended from time to time (the "Code"), the Company and the Executive desire to amend the Agreement to evidence the intention that the terms of the Agreement be exempt from or comply with Section 409A of the Code.

**NOW, THEREFORE,** pursuant to Section 12 of the Agreement, the Agreement is hereby amended, effective as of December 31, 2008, as follows:

1. **Capitalized Terms.** Capitalized terms that are not defined in this Amendment shall have the meanings ascribed thereto in the Agreement.

2. The first sentence of Section 4(a) of the Agreement shall be amended by adding the following proviso at the end thereof to read as follows:

"; *provided*, further, that all such payments in respect of the Executive's death pursuant to this Section 4(a) shall be paid to the Executive's estate no later than March 15th of the calendar year following the calendar year in which the Executive dies, including, if applicable, a final lump sum payment on March 15th (or the last business day immediately prior thereto) of the calendar year following the Executive's death, such that the aggregate of such payments in respect of the continued Base Salary equals 50% of the Executive's annual Base Salary at the rate in effect at the time of death."

3. The first paragraph of Section 4(c) of the Agreement shall be amended in its entirety to read as follows:

"(c) Good Reason. The Executive may terminate his employment for Good Reason. For purposes of this Agreement, "Good Reason" means the good faith determination by the Executive that any one or more of the

Exhibit E - Page 406

M 0932402

following have occurred, *provided* that (i) the Executive provides Mattel with written notice of the Good Reason event within ninety (90) days of the initial existence of such event, (ii) such event is not remedied by Mattel within thirty (30) days following the delivery of written notice of such Good Reason event and (iii) the Executive actually terminates his employment within two (2) years following the initial existence of such Good Reason event:"

4. Section 4(c)(i) of the Agreement shall be amended in its entirety to read as follows:

"(i) without the express written consent of the Executive, any material diminution in any of the duties, authority, reporting structure or responsibilities of the Executive as contemplated by Section 2 of this Agreement;"

5. Section 4(c)(iii) of the Agreement shall be amended in its entirety to read as follows:

"(iii) any other action or inaction that constitutes a material breach of this Agreement by Mattel;"

6. Section 4(c)(iv) of the Agreement shall be amended in its entirety to read as follows:

"(iv) any failure by Mattel to obtain the assumption and agreement to perform this Agreement by a successor as contemplated by Section 11(b), except where such assumption and agreement occurs by operation of law; or"

7. Section 4(d)(i) of the Agreement shall be amended in its entirety to read as follows:

"(i) the acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 35% or more of either (i) the then outstanding shares of common stock of Mattel (the "Outstanding Company Common Stock") or (ii) the combined voting power of the then outstanding voting securities of Mattel entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); *provided, however*, that for purposes of this

2

Exhibit E - Page 407

M 0932403

subsection (i), the following shall not constitute a Change of Control: (a) any acquisition directly from Mattel, (b) any acquisition by Mattel or any corporation controlled by Mattel, (c) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by Mattel or any corporation controlled by Mattel, (d) any acquisition by a Person of 35% or more of either the Outstanding Company Common Stock or the Outstanding Company Voting Securities as a result of an acquisition of common stock of Mattel by Mattel which, by reducing the number of shares of common stock of Mattel outstanding, increases the proportionate number of shares beneficially owned by such Person to 35% or more of either the Outstanding Company Common Stock or the Outstanding Company Voting Securities; *provided, however*, that if a Person shall become the beneficial owner of 35% or more of either the Outstanding Company Common Stock or the Outstanding Company Voting Securities by reason of a share acquisition by Mattel as described above and shall, after such share acquisition by Mattel, become the beneficial owner of any additional shares of common stock of Mattel, then such acquisition shall constitute a Change of Control or (e) any acquisition pursuant to a transaction which complies with clauses (a), (b) and (c) of subsection (iii) of this Section 4(d); or"

8. Section 4(d)(iii)(b) of the Agreement shall be amended in its entirety to read as follows:

"(b) no Person (excluding any employee benefit plan (or related trust) of Mattel or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 35% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination and"

9. The final paragraph of Section 4(d) of the Agreement shall be deleted in its entirety and replaced with the following sentence:

"As soon as practicable after a Change of Control, Mattel shall notify the Executive that a Change of Control has occurred."

3

Exhibit E - Page 408

M 0932404

10. The final sentence of Section 5(a) of the Agreement shall be amended in its entirety to read as follows:

"As of the Date of Termination, the Executive's family shall be entitled to continued healthcare coverage as in effect from time to time on the same terms and conditions as such insurance is available to active employees of Mattel and financial counseling benefits through the vendor engaged and paid for by Mattel until the third anniversary of the Date of Termination."

11. The first paragraph of Sections 5(d)(i) and 5(e)(i) of the Agreement shall be amended in their entirety to read as follows:

"(i) Mattel shall pay to the Executive in a lump sum in cash on the 55th day after the Date of Termination (or the first business day thereafter) the aggregate of the following amounts:"

12. Sections 5(d)(i)(C), 5(e)(i)(B) and 5(e)(i)(C) of the Agreement shall be amended by adding the phrase, "subject to Section 5 (f)," at the beginning of such provisions.

13. Sections 5(d)(iv) and 5(e)(iii) of the Agreement shall be amended in their entirety to read as follows:

"(iv) Mattel shall, promptly upon submission by the Executive of supporting documentation, pay or reimburse to the Executive any costs and expenses paid or incurred by the Executive during the Employment Period which would have been payable under Section 3(e) if his employment had not terminated."

14. Sections 5(d)(v)(I) and 5(e)(iv)(I) of the Agreement shall be amended in their entirety to read as follows:

"(A) a monthly amount equal to the applicable COBRA premium for the level of coverage that the Executive has as of the Date of Termination (i.e., single, single plus one, or family) under Mattel's medical, dental, prescription drug and vision care group insurance as in effect from time to time , which payment shall be paid in advance on the first payroll day of each month, commencing with the month immediately following the Executive's Date of Termination; *provided, however*, that any such payments otherwise payable to the Executive within the first 54 days following the Date of Termination shall not be paid on the

4

Exhibit E - Page 409

M 0932405

otherwise scheduled payment date but shall instead accumulate and be and on the 55th day following the Date of Termination. During such period, subject to the Executive's continued payment of premiums, Mattel will make available to the Executive and the Executive's eligible dependents, at the Executive's cost (in an amount equal to the COBRA premium cost therefor), coverage under Mattel's medical, dental, prescription drug and vision care group insurance (which shall be concurrent with any health care continuation benefits to which the Executive or his eligible dependents are entitled under COBRA);"

15. Sections 5(d)(iv)(V) and 5(e)(iv)(V) of the Agreement shall be amended in their entirety to read as follows:

"(V) membership in one city or country club and related expenses. Mattel shall cause the membership to be transferred to the Executive at no cost to the Executive, *provided* that such transfer shall occur no later than March 15th of the calendar year following the calendar year in which the Date of Termination occurs."

16. Sections 5(d)(vi) and 5(e)(v) of the Agreement shall be amended by adding the following proviso at the end thereof to read as follows:

"*provided*, *however*, that such credit for additional years of service and age shall not accelerate the time of payment under such arrangements in a manner that would result in the imposition of tax, interest and/or penalties upon the Executive under Section 409A ("Section 409A") of the Internal Revenue Code of 1986, as amended (the "Code")."

17. The first paragraph of Section 5(e) of the Agreement shall be amended in its entirety to read as follows:

"(e) Change of Control. Except as provided below, if, within 18 months following a Change of Control, (x) the Executive terminates his employment for Good Reason, (y) Mattel or the surviving entity terminates the Executive's employment other than for Cause or Disability or (z) the Executive terminates his employment for any reason within the 30-day period immediately following the six (6) month anniversary of a Change of Control (the "Window Period"):"

18. A new Section 5(f) shall be added to the Agreement to read as follows:

5

Exhibit E - Page 410

M 0932406

"(f) Limitation on Certain Payments. Notwithstanding the provisions of Sections 5(d) or 5(e), in the event of a Change of Control, the Executive's right to receive the lump sum cash payment following a termination of employment pursuant to Section 5(d)(i)(C), 5(e)(i)(B) or 5(e)(i)(C) shall terminate on March 15th of the calendar year following the calendar year in which the Window Period commenced, and no such amount shall be payable thereafter. Subject to the preceding sentence, if a Change of Control occurs during the Employment Period, then (regardless of when the Employment Period would otherwise end under any other provision of this Agreement) Section 5(e), and all other parts of this Agreement which relate to Section 5(e), shall continue to apply to the Executive for 18 months after the Change of Control."

19. A new Section 5(g) shall be added to the Agreement to read as follows:

"(g) Effect of Deferral Elections. If any payment payable pursuant to Section 5 or Section 13 is subject to a valid deferral election under the terms of another plan or arrangement maintained by Mattel, the payment of such amount shall be in accordance with the provisions of such deferred compensation plan or arrangement (including the Executive's deferral elections regarding the form and timing of such deferrals)."

20. The final sentence of Section 9 of the Agreement shall be amended in its entirety to read as follows:

"The Executive shall not be entitled to any severance payments or other benefits to which the Executive would otherwise be entitled under subsections (b), (d) and (e) of Section 5 of this Agreement unless (i) the Executive complies with the covenants set forth in Section 10 and (ii) the Executive executes the Release and such Release becomes irrevocable within fifty-five (55) days following the Executive's Date of Termination."

21. The second sentence of Section 14(a) of the Agreement shall be amended in its entirety to read as follows:

"Notwithstanding the foregoing provisions of this Section 14(a), if it shall be determined that the Executive is entitled to a Gross-Up Payment, but that the Parachute Value of Payments (as defined below) does not exceed 110% of the Safe Harbor Amount (as defined below), then no Gross-Up

6

Payment shall be made to the Executive and the Agreement Payments (as defined below), in the aggregate, shall be reduced (but not below zero) such that the Parachute Value of all Payments equals the Safe Harbor Amount."

22. Section 14(a) of the Agreement shall be amended by adding the following language at the end thereof to read as follows:

"If a reduction in the Agreement Payments is necessary so that the Parachute Value of all Payments equals the Safe Harbor Amount and none of the Payments is a "deferral of compensation" within the meaning of and subject to Section 409A ("Nonqualified Deferred Compensation"), then the reduction shall occur in the manner the Executive elects in writing prior to the date of payment. If any Payment constitutes Nonqualified Deferred Compensation or the Executive fails to elect an order, then the reduction shall occur in the following order: (i) cancellation of acceleration of vesting on any equity awards for which the exercise price exceeds the then fair market value of the underlying equity; (ii) reduction in the benefits described in Section 5(e)(iv) (with such reduction being applied to the benefits in the manner having the least economic impact to the Executive and, to the extent the economic impact is equivalent, such benefits shall be reduced in the reverse order of when the benefits would have been provided to the Executive, that is, benefits payable later shall be reduced before benefits payable earlier); (iii) reduction of cash payments (with such reduction being applied to the payments in the reverse order in which they would otherwise be made, that is, later payments shall be reduced before earlier payments); (iv) cancellation of acceleration of vesting of equity awards not covered under (i) above; *provided, however,* that in the event that acceleration of vesting of equity awards is to be cancelled, such acceleration of vesting shall be cancelled in the reverse order of the date of grant of such equity awards, that is, later equity awards shall be canceled before earlier equity awards."

23. The second sentence of Section 14(b) of the Agreement shall be amended by adding the following proviso at the end thereof to read as follows:

"*provided, however*, that any Gross-Up Payment shall in all events be paid no later than the end of the Executive's taxable year immediately following the Executive's taxable

7

Exhibit E - Page 412

M 0932408

year in which the Excise Tax (and any income or other related taxes or interest or penalties thereon) on a Payment are remitted to the Internal Revenue Service or any other applicable taxing authority or, in the case of amounts relating to a claim described in Section 14(c) that does not result in the remittance of any federal, state, local and foreign income, excise, social security and other taxes, the calendar year in which the claim is finally settled or otherwise resolved."

24. The third sentence of Section 14(b) of the Agreement shall be amended in its entirety to read as follows:

"Any determination by the Accounting Firm shall be binding upon Mattel and the Executive, including any determination by the Accounting Firm of the amount that equals 110% of the Safe Harbor Amount and any amount of cutback in benefits necessary because Payments are calculated to have a Parachute Value between 100% and 110% of the Safe Harbor Amount."

25. The second sentence of the proviso following Section 14(c)(iv) of the Agreement shall be amended in its entirety to read as follows:

"Without limitation on the foregoing provisions of this Section 14(c), Mattel shall control all proceedings taken in connection with such contest and, at its sole option, may pursue or forgo any and all administrative appeals, proceedings, hearings and conferences with the applicable taxing authority in respect of such claim and may, at its sole option, either pay the tax claimed to the appropriate taxing authority on behalf of the Executive and direct the Executive to sue for a refund or contest the claim in any permissible manner, and the Executive agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one or more appellate courts, as Mattel shall determine; *provided, however,* that if Mattel pays such claim and directs the Executive to sue for a refund, Mattel shall indemnify and hold the Executive harmless, on an after-tax basis, from any Excise Tax or income tax (including interest or penalties with respect thereto) imposed with respect to such payment or with respect to any imputed income with respect to such payment; and further provided that any extension of the statute of limitations relating to payment of taxes for the taxable year of the Executive with respect to

8

which such contested amount is claimed to be due is limited solely to such contested amount."

26. Section 14(d) of the Agreement shall be amended in its entirety to read as follows:

"(d) If, after the receipt by the Executive of a Gross-Up Payment or payment by Mattel of an amount on the Executive's behalf pursuant to Section 14(c), the Executive becomes entitled to receive any refund with respect to the Excise Tax to which such Gross-Up relates or with respect to such claim, the Executive shall (subject to Mattel's complying with the requirements of Section 14(c)) promptly pay to Mattel the amount of such refund (together with any interest paid or credited thereon after taxes applicable thereto). If, after payment by Mattel of an amount on the Executive's behalf pursuant to Section 14(c), a determination is made that the Executive shall not be entitled to any refund with respect to such claim and Mattel does not notify the Executive in writing of its intent to contest such denial of refund prior to the expiration of 30 days after such determination, then the amount of such payment shall offset, to the extent thereof, the amount of Gross-Up Payment required to be paid."

27. Section 14(e) of the Agreement shall be amended in its entirety to read as follows:

"(e) Notwithstanding any other provision of this Section 14, Mattel may withhold and pay over to the Internal Revenue Service or any other applicable taxing authority for the benefit of the Executive all or any portion of the Gross-Up Payment that it determines in good faith that it is or may be in the future required to withhold, and the Executive hereby consents to such withholding."

28. The definition of "Agreement Payment" in Section 14(f) shall be amended by striking the phrase "and any payment relating to the Loan Agreement."

29. A new Section 16 shall be added to the Agreement to read as follows:

"16. Section 409A.

(a) It is the parties' intention that the reimbursements, payments and benefits to which the Executive could become entitled in connection with the Executive's employment under this Agreement be exempt

9

from or comply with Section 409A and the regulations and other guidance promulgated thereunder. The provisions of this Section 16 shall qualify and supersede all other provisions of this Agreement as necessary to fulfill the foregoing intention. If the Executive or Mattel believes, at any time, that any of such reimbursement, payment or benefit is not exempt or does not so comply, the Executive or Mattel will promptly advise the other party and will negotiate reasonably and in good faith to amend the terms of such arrangement such that it is exempt or complies (with the most limited possible economic effect on the Executive and on Mattel) or to mitigate any additional tax, interest and/or penalties that may apply under Section 409A if exemption or compliance is not practicable. Mattel agrees that it will not, without the Executive's prior written consent, knowingly take any action, or knowingly refrain from taking any action, other than as required by law, that would result in the imposition of tax, interest and/or penalties upon the Executive under Section 409A, unless such action or omission is pursuant to the Executive's written request.

(b) To the extent applicable, each and every payment to be made pursuant to Section 5 or Section 13 of this Agreement shall be treated as a separate payment and not as one of a series of payments treated as a single payment for purposes of Treasury Regulation Section 1.409A-2(b)(2)(iii).

(c) If the Executive is a "specified employee" (determined by Mattel in accordance with Section 409A and Treasury Regulation Section 1.409A-3(i)(2)) as of the date that the Executive experiences a "separation from service" with Mattel, as defined for purposes of Section 409A (a "Separation from Service"), and if any reimbursement, payment or benefit to be paid or provided under this Agreement or otherwise both (i) constitutes Nonqualified Deferred Compensation and (ii) cannot be paid or provided in a manner otherwise provided herein without subjecting the Executive to additional tax, interest and/or penalties under Section 409A, then any such reimbursement, payment or benefit that is payable during the first six (6) months following the Date of Termination shall be paid or provided to the Executive in a lump sum cash payment to be made on the earlier of (x) the Executive's death and (y) the first business day of the

10

Exhibit E - Page 415

M 0932411

seventh (7th) month immediately following the Executive's Separation from Service.

(d) Except to the extent any reimbursement, payment or benefit to be paid or provided under this Agreement does not constitute Nonqualified Deferred Compensation, (i) the amount of expenses eligible for reimbursement or the provision of any in-kind benefit (as defined in Section 409A) to the Executive during any calendar year will not affect the amount of expenses eligible for reimbursement or provided as in-kind benefits to the Executive in any other calendar year (subject to any lifetime and other annual limits provided under Mattel's health plans), (ii) the reimbursements for expenses for which the Executive is entitled shall be made on or before the last day of the calendar year following the calendar year in which the applicable expense is incurred and (iii) the right to payment or reimbursement or in-kind benefits may not be liquidated or exchanged for any other benefit.

(e) Any reimbursement, payment or benefit to be paid or provided under Section 5 hereof or otherwise to be paid or provided due to a Separation from Service that is exempt from Section 409A pursuant to Treasury Regulation Section 1.409A-1(b)(9)(v) will be paid or provided to the Executive only to the extent the expenses are not incurred or the benefits are not provided beyond the last day of the Executive's second taxable year following the Executive's taxable year in which the Separation from Service occurs; *provided, however* that Mattel shall reimburse such expenses no later than the last day of the third taxable year following the Executive's taxable year in which the Executive's Separation from Service occurs.

(f) It is the parties' intention that the definition of Good Reason and the separation-from-service procedures specified in Section 4(c) hereof satisfy the conditions set forth in Treasury Regulation Section 1.409A-1(n)(2) for a termination for Good Reason to be treated as an "involuntary separation from service" for purposes of Section 409A.

(g) Subject to Section 9, any reimbursement, payment or benefit to be paid or provided under this Agreement that constitutes Nonqualified Deferred Compensation due upon a termination of

11

Exhibit E - Page 416

M 0932412

employment shall be paid or provided to the Executive only in the event of a Separation from Service."

30. **Ratification and Confirmation.** Except as specifically amended hereby, the Agreement is hereby ratified and confirmed in all respects and remains in full force and effect.

31. **Governing Law.** This Amendment shall be governed by, and construed in accordance with, the laws of the State of California, without reference to principles of conflict of laws.

32. **Headings.** Section headings are for convenience only and shall not be considered a part of this Amendment.

33. **Counterparts.** This Amendment may be executed (including by facsimile transmission confirmed promptly thereafter by actual delivery of executed counterparts) in counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.

(Signature Page Follows)

12

**IN WITNESS WHEREOF,** Mattel and the Executive have caused this Amendment to be executed, effective as of December 31, 2008.

**MATTEL, INC.**

/s/ ROBERT A. ECKERT
Name: Robert A. Eckert
Title:   Chairman & CEO

Dated: December 19, 2008

**EXECUTIVE**

/s/ KEVIN M. FARR
Name: Kevin M. Farr

Dated: December 22, 2008

**Exhibit E - Page 418**

M 0932414

Exhibit 10.27

# AMENDMENT
## TO
## AMENDED AND RESTATED EXECUTIVE EMPLOYMENT AGREEMENT

**WHEREAS,** Mattel, Inc. ("Mattel") and Thomas A. Debrowski (the "Executive") have entered into an Amended and Restated Executive Employment Agreement dated November 13, 2000, as amended March 17, 2005 and as amended October 11, 2005 (the "Agreement");

**WHEREAS,** pursuant to Section 12 of the Agreement, Mattel and the Executive may amend the Agreement pursuant to a written instrument executed by the Executive and Mattel; and

**WHEREAS,** as a result of the enactment in 2004 of Section 409A of the Internal Revenue Code of 1986, as amended from time to time (the "Code"), the Company and the Executive desire to amend the Agreement to evidence the intention that the terms of the Agreement be exempt from or comply with Section 409A of the Code.

**NOW, THEREFORE,** pursuant to Section 12 of the Agreement, the Agreement is hereby amended, effective as of December 31, 2008, as follows:

1. **Capitalized Terms.** Capitalized terms that are not defined in this Amendment shall have the meanings ascribed thereto in the Agreement.

2. The first sentence of Section 4(a) of the Agreement shall be amended by adding the following proviso at the end thereof to read as follows:

"; *provided*, further, that all such payments in respect of the Executive's death pursuant to this Section 4(a) shall be paid to the Executive's estate no later than March 15th of the calendar year following the calendar year in which the Executive dies, including, if applicable, a final lump sum payment on March 15th (or the last business day immediately prior thereto) of the calendar year following the Executive's death, such that the aggregate of such payments in respect of the continued Base Salary equals 50% of the Executive's annual Base Salary at the rate in effect at the time of death."

3. The first paragraph of Section 4(c) of the Agreement shall be amended in its entirety to read as follows:

"(c) Good Reason. The Executive may terminate his employment for Good Reason. For purposes of this Agreement, "Good Reason" means the good faith determination by the Executive that any one or more of the

M 0932415

following have occurred, provided that (i) the Executive provides Mattel with written notice of the Good Reason event within ninety (90) days of the initial existence of such event, (ii) such event is not remedied by Mattel within thirty (30) days following the delivery of written notice of such Good Reason event and (iii) the Executive actually terminates his employment within two (2) years following the initial existence of such Good Reason event:"

4. Section 4(c)(i) of the Agreement shall be amended in its entirety to read as follows:

"(i) without the express written consent of the Executive, any material diminution in any of the duties, authority, reporting structure or responsibilities of the Executive as contemplated by Section 2 of this Agreement;"

5. Section 4(c)(iii) of the Agreement shall be amended in its entirety to read as follows:

"(iii) any other action or inaction that constitutes a material breach of this Agreement by Mattel;"

6. Section 4(c)(iv) of the Agreement shall be amended in its entirety to read as follows:

"(iv) any failure by Mattel to obtain the assumption and agreement to perform this Agreement by a successor as contemplated by Section 11(b), except where such assumption and agreement occurs by operation of law; or"

7. Section 4(d)(i) of the Agreement shall be amended in its entirety to read as follows:

"(i) the acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 35% or more of either (i) the then outstanding shares of common stock of Mattel (the "Outstanding Company Common Stock") or (ii) the combined voting power of the then outstanding voting securities of Mattel entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); *provided, however*, that for purposes of this

2

Exhibit E - Page 420

M 0932416

subsection (i), the following shall not constitute a Change of Control: (a) any acquisition directly from Mattel, (b) any acquisition by Mattel or any corporation controlled by Mattel, (c) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by Mattel or any corporation controlled by Mattel, (d) any acquisition by a Person of 35% or more of either the Outstanding Company Common Stock or the Outstanding Company Voting Securities as a result of an acquisition of common stock of Mattel by Mattel which, by reducing the number of shares of common stock of Mattel outstanding, increases the proportionate number of shares beneficially owned by such Person to 35% or more of either the Outstanding Company Common Stock or the Outstanding Company Voting Securities; *provided, however*, that if a Person shall become the beneficial owner of 35% or more of either the Outstanding Company Common Stock or the Outstanding Company Voting Securities by reason of a share acquisition by Mattel as described above and shall, after such share acquisition by Mattel, become the beneficial owner of any additional shares of common stock of Mattel, then such acquisition shall constitute a Change of Control or (e) any acquisition pursuant to a transaction which complies with clauses (a), (b) and (c) of subsection (iii) of this Section 4(d); or"

8. Section 4(d)(iii)(b) of the Agreement shall be amended in its entirety to read as follows:

"(b) no Person (excluding any employee benefit plan (or related trust) of Mattel or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 35% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination and"

9. The final paragraph of Section 4(d) of the Agreement shall be deleted in its entirety and replaced with the following sentence:

"As soon as practicable after a Change of Control, Mattel shall notify the Executive that a Change of Control has occurred."

3

10. The final sentence of Section 5(a) of the Agreement shall be amended in its entirety to read as follows:

"As of the Date of Termination, the Executive's family shall be entitled to continued healthcare coverage as in effect from time to time on the same terms and conditions as such insurance is available to active employees of Mattel and financial counseling benefits through the vendor engaged and paid for by Mattel until the second anniversary of the Date of Termination."

11. The first paragraph of Sections 5(d)(i) and 5(e)(i) of the Agreement shall be amended in their entirety to read as follows:

"(i) Mattel shall pay to the Executive in a lump sum in cash on the 55th day after the Date of Termination (or the first business day thereafter) the aggregate of the following amounts:"

12. Sections 5(d)(i)(C) and 5(e)(i)(C) of the Agreement shall be amended by adding the phrase, "subject to Section 5(f)," at the beginning of such provisions.

13. Sections 5(d)(iv) and 5(e)(iii) of the Agreement shall be amended in their entirety to read as follows:

"Mattel shall, promptly upon submission by the Executive of supporting documentation, pay or reimburse to the Executive any costs and expenses paid or incurred by the Executive during the Employment Period which would have been payable under Section 3(e) if the Executive's employment had not terminated."

14. Sections 5(d)(v)(A) and 5(e)(iv)(A) of the Agreement shall be amended in their entirety to read as follows:

"(A) a monthly amount equal to the applicable COBRA premium for the level of coverage that the Executive has as of the Date of Termination (i.e., single, single plus one, or family) under Mattel's medical, dental, prescription drug and vision care group insurance as in effect from time to time , which payment shall be paid in advance on the first payroll day of each month, commencing with the month immediately following the Executive's Date of Termination; *provided, however,* that any such payments otherwise payable to the Executive within the first 54 days following the Date of Termination shall not be paid on the otherwise scheduled payment date but shall instead

4

Exhibit E - Page 422

M 0932418

accumulate and be and on the 55th day following the Date of Termination. During such period, subject to the Executive's continued payment of premiums, Mattel will make available to the Executive and the Executive's eligible dependents, at the Executive's cost (in an amount equal to the COBRA premium cost therefor), coverage under Mattel's medical, dental, prescription drug and vision care group insurance (which shall be concurrent with any health care continuation benefits to which the Executive or his eligible dependents are entitled under COBRA);"

15. Sections 5(d)(v)(D) and 5(e)(iv)(E) of the Agreement shall be amended in their entirety to read as follows:

"membership in one city or country club and related expenses. Mattel shall cause the membership to be transferred to the Executive at no cost to the Executive, provided that such transfer shall occur no later than March 15th of the calendar year following the calendar year in which the Date of Termination occurs."

16. The first paragraph of Section 5(e) of the Agreement shall be amended in its entirety to read as follows:

"(e) Change of Control. Except as provided below, if, within 18 months following a Change of Control, (x) the Executive terminates the Executive's employment for Good Reason, (y) Mattel or the surviving entity terminates the Executive's employment other than for Cause or Disability or (z) the Executive terminates his employment for any reason within the 30 day period immediately following the six (6) month anniversary of a Change of Control (the "Window Period"):"

17. Section 5(e)(v) of the Agreement shall be amended by adding the following proviso at the end thereof to read as follows:

"*provided*, *however*, that such credit for additional years of service and age shall not accelerate the time of payment under such arrangements in a manner that would result in the imposition of tax, interest and/or penalties upon the Executive under Section 409A ("Section 409A") of the Internal Revenue Code of 1986, as amended (the "Code")."

18. A new Section 5(f) shall be added to the Agreement to read as follows:

5

"(f) <u>Limitation on Certain Payments</u>. Notwithstanding the provisions of Sections 5(d) or 5(e), in the event of a Change of Control, the Executive's right to receive the lump sum cash payment following a termination of employment pursuant to Section 5(d)(i)(C) or 5(e)(i)(C) shall terminate on March 15th of the calendar year following the calendar year in which the Window Period commenced, and no such amount shall be payable thereafter. Subject to the preceding sentence, if a Change of Control occurs during the Employment Period, then (regardless of when the Employment Period would otherwise end under any other provision of this Agreement) Section 5(e), and all other parts of this Agreement which relate to Section 5(e), shall continue to apply to the Executive for 18 months after the Change of Control."

19. A new Section 5(g) shall be added to the Agreement to read as follows:

"(g) <u>Effect of Deferral Elections</u>. If any payment payable pursuant to Section 5 is subject to a valid deferral election under the terms of another plan or arrangement maintained by Mattel, the payment of such amount shall be in accordance with the provisions of such deferred compensation plan or arrangement (including the Executive's deferral elections regarding the form and timing of such deferrals)."

20. The final sentence of Section 9 of the Agreement shall be amended in its entirety to read as follows:

"The Executive shall not be entitled to any severance payments or other benefits to which the Executive would otherwise be entitled under subsections (b), (d) and (e) of Section 5 of this Agreement unless (i) the Executive complies with the covenants set forth in Section 10 and (ii) the Executive executes the Release and such Release becomes irrevocable within fifty-five (55) days following the Executive's Date of Termination."

21. The second sentence of Section 13(a) of the Agreement shall be amended in its entirety to read as follows:

"Notwithstanding the foregoing provisions of this Section 13(a), if it shall be determined that the Executive is entitled to a Gross-Up Payment, but that the Parachute Value of Payments (as defined below) does not exceed 110% of the Safe Harbor Amount (as defined below), then no Gross-Up

6

Exhibit E - Page 424

M 0932420

Payment shall be made to the Executive and the Agreement Payments (as defined below), in the aggregate, shall be reduced (but not below zero) such that the Parachute Value of all Payments equals the Safe Harbor Amount."

22. Section 13(a) of the Agreement shall be amended by adding the following language at the end thereof to read as follows:

"If a reduction in the Agreement Payments is necessary so that the Parachute Value of all Payments equals the Safe Harbor Amount and none of the Payments is a "deferral of compensation" within the meaning of and subject to Section 409A ("Nonqualified Deferred Compensation"), then the reduction shall occur in the manner the Executive elects in writing prior to the date of payment. If any Payment constitutes Nonqualified Deferred Compensation or the Executive fails to elect an order, then the reduction shall occur in the following order: (i) cancellation of acceleration of vesting on any equity awards for which the exercise price exceeds the then fair market value of the underlying equity; (ii) reduction in the benefits described in Section 5(e)(iv) (with such reduction being applied to the benefits in the manner having the least economic impact to the Executive and, to the extent the economic impact is equivalent, such benefits shall be reduced in the reverse order of when the benefits would have been provided to the Executive, that is, benefits payable later shall be reduced before benefits payable earlier); (iii) reduction of cash payments (with such reduction being applied to the payments in the reverse order in which they would otherwise be made, that is, later payments shall be reduced before earlier payments); (iv) cancellation of acceleration of vesting of equity awards not covered under (i) above; *provided, however*, that in the event that acceleration of vesting of equity awards is to be cancelled, such acceleration of vesting shall be cancelled in the reverse order of the date of grant of such equity awards, that is, later equity awards shall be canceled before earlier equity awards."

23. The second sentence of Section 13(b) of the Agreement shall be amended by adding the following proviso at the end thereof to read as follows:

"*provided, however*, that any Gross-Up Payment shall in all events be paid no later than the end of the Executive's taxable year immediately following the Executive's taxable

7

Exhibit E - Page 425

M 0932421

year in which the Excise Tax (and any income or other related taxes or interest or penalties thereon) on a Payment are remitted to the Internal Revenue Service or any other applicable taxing authority or, in the case of amounts relating to a claim described in Section 13(c) that does not result in the remittance of any federal, state, local and foreign income, excise, social security and other taxes, the calendar year in which the claim is finally settled or otherwise resolved."

24. The third sentence of Section 13(b) of the Agreement shall be amended in its entirety to read as follows:

"Any determination by the Accounting Firm shall be binding upon Mattel and the Executive, including any determination by the Accounting Firm of the amount that equals 110% of the Safe Harbor Amount and any amount of cutback in benefits necessary because Payments are calculated to have a Parachute Value between 100% and 110% of the Safe Harbor Amount."

25. The second sentence of the proviso following Section 13(c)(iv) of the Agreement shall be amended in its entirety to read as follows:

"Without limitation on the foregoing provisions of this Section 13(c), Mattel shall control all proceedings taken in connection with such contest and, at its sole option, may pursue or forgo any and all administrative appeals, proceedings, hearings and conferences with the applicable taxing authority in respect of such claim and may, at its sole option, either pay the tax claimed to the appropriate taxing authority on behalf of the Executive and direct the Executive to sue for a refund or contest the claim in any permissible manner, and the Executive agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one or more appellate courts, as Mattel shall determine; *provided, however*, that if Mattel pays such claim and directs the Executive to sue for a refund, Mattel shall indemnify and hold the Executive harmless, on an after-tax basis, from any Excise Tax or income tax (including interest or penalties with respect thereto) imposed with respect to such payment or with respect to any imputed income with respect to such payment; and further provided that any extension of the statute of limitations relating to payment of taxes for the taxable year of the Executive with respect to

8

which such contested amount is claimed to be due is limited solely to such contested amount."

26. Section 13(d) of the Agreement shall be amended in its entirety to read as follows:

"(d) If, after the receipt by the Executive of a Gross-Up Payment or payment by Mattel of an amount on the Executive's behalf pursuant to Section 13(c), the Executive becomes entitled to receive any refund with respect to the Excise Tax to which such Gross-Up relates or with respect to such claim, the Executive shall (subject to Mattel's complying with the requirements of Section 13(c)) promptly pay to Mattel the amount of such refund (together with any interest paid or credited thereon after taxes applicable thereto). If, after payment by Mattel of an amount on the Executive's behalf pursuant to Section 13(c), a determination is made that the Executive shall not be entitled to any refund with respect to such claim and Mattel does not notify the Executive in writing of its intent to contest such denial of refund prior to the expiration of 30 days after such determination, then the amount of such payment shall offset, to the extent thereof, the amount of Gross-Up Payment required to be paid."

27. Section 13(e) of the Agreement shall be amended in its entirety to read as follows:

"(e) Notwithstanding any other provision of this Section 13, Mattel may withhold and pay over to the Internal Revenue Service or any other applicable taxing authority for the benefit of the Executive all or any portion of the Gross-Up Payment that it determines in good faith that it is or may be in the future required to withhold, and the Executive hereby consents to such withholding."

28. A new Section 15 shall be added to the Agreement to read as follows:

"15. Section 409A.

(a) It is the parties' intention that the reimbursements, payments and benefits to which the Executive could become entitled in connection with the Executive's employment under this Agreement be exempt from or comply with Section 409A and the regulations and other guidance promulgated thereunder. The provisions of this Section 15 shall qualify and supersede all other

9

provisions of this Agreement as necessary to fulfill the foregoing intention. If the Executive or Mattel believes, at any time, that any of such reimbursement, payment or benefit is not exempt or does not so comply, the Executive or Mattel will promptly advise the other party and will negotiate reasonably and in good faith to amend the terms of such arrangement such that it is exempt or complies (with the most limited possible economic effect on the Executive and on Mattel) or to mitigate any additional tax, interest and/or penalties that may apply under Section 409A if exemption or compliance is not practicable. Mattel agrees that it will not, without the Executive's prior written consent, knowingly take any action, or knowingly refrain from taking any action, other than as required by law, that would result in the imposition of tax, interest and/or penalties upon the Executive under Section 409A, unless such action or omission is pursuant to the Executive's written request.

(b) To the extent applicable, each and every payment to be made pursuant to Section 5 of this Agreement shall be treated as a separate payment and not as one of a series of payments treated as a single payment for purposes of Treasury Regulation Section 1.409A-2(b)(2)(iii).

(c) If the Executive is a "specified employee" (determined by Mattel in accordance with Section 409A and Treasury Regulation Section 1.409A-3(i)(2)) as of the date that the Executive experiences a "separation from service" with Mattel, as defined for purposes of Section 409A (a "Separation from Service"), and if any reimbursement, payment or benefit to be paid or provided under this Agreement or otherwise both (i) constitutes Nonqualified Deferred Compensation and (ii) cannot be paid or provided in a manner otherwise provided herein without subjecting the Executive to additional tax, interest and/or penalties under Section 409A, then any such reimbursement, payment or benefit that is payable during the first six (6) months following the Date of Termination shall be paid or provided to the Executive in a lump sum cash payment to be made on the earlier of (x) the Executive's death and (y) the first business day of the seventh (7th) month immediately following the Executive's Separation from Service.

10

M 0932424

(d) Except to the extent any reimbursement, payment or benefit to be paid or provided under this Agreement does not constitute Nonqualified Deferred Compensation, (i) the amount of expenses eligible for reimbursement or the provision of any in-kind benefit (as defined in Section 409A) to the Executive during any calendar year will not affect the amount of expenses eligible for reimbursement or provided as in-kind benefits to the Executive in any other calendar year (subject to any lifetime and other annual limits provided under Mattel's health plans), (ii) the reimbursements for expenses for which the Executive is entitled shall be made on or before the last day of the calendar year following the calendar year in which the applicable expense is incurred and (iii) the right to payment or reimbursement or in-kind benefits may not be liquidated or exchanged for any other benefit.

(e) Any reimbursement, payment or benefit to be paid or provided under Section 5 hereof or otherwise to be paid or provided due to a Separation from Service that is exempt from Section 409A pursuant to Treasury Regulation Section 1.409A-1(b)(9)(v) will be paid or provided to the Executive only to the extent the expenses are not incurred or the benefits are not provided beyond the last day of the Executive's second taxable year following the Executive's taxable year in which the Separation from Service occurs; *provided, however* that Mattel shall reimburse such expenses no later than the last day of the third taxable year following the Executive's taxable year in which the Executive's Separation from Service occurs.

(f) It is the parties' intention that the definition of Good Reason and the separation-from-service procedures specified in Section 4(c) hereof satisfy the conditions set forth in Treasury Regulation Section 1.409A-1(n)(2) for a termination for Good Reason to be treated as an "involuntary separation from service" for purposes of Section 409A.

(g) Subject to Section 9, any reimbursement, payment or benefit to be paid or provided under this Agreement that constitutes Nonqualified Deferred Compensation due upon a termination of employment shall be paid or provided to the Executive only in the event of a Separation from Service."

11

M 0932425

29. **Ratification and Confirmation.** Except as specifically amended hereby, the Agreement is hereby ratified and confirmed in all respects and remains in full force and effect.

30. **Governing Law.** This Amendment shall be governed by, and construed in accordance with, the laws of the State of California, without reference to principles of conflict of laws.

31. **Headings.** Section headings are for convenience only and shall not be considered a part of this Amendment.

32. **Counterparts.** This Amendment may be executed (including by facsimile transmission confirmed promptly thereafter by actual delivery of executed counterparts) in counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.

(Signature Page Follows)

12

Exhibit E - Page 430

M 0932426

**IN WITNESS WHEREOF,** Mattel and the Executive have caused this Amendment to be executed, effective as of December 31, 2008.

**MATTEL, INC.**

/s/ ROBERT A. ECKERT
Name: Robert A. Eckert
Title:   Chairman & CEO


Dated: December 19, 2008

**EXECUTIVE**

/s/ THOMAS A. DEBROWSKI
Name: Thomas A. Debrowski


Dated: December 19, 2008

13

Exhibit E - Page 431

M 0932427

**Exhibit 10.30**

December 16, 2008

Mr. Bryan Stockton

      Re:    <u>Amendment to Employment Letter</u>

Dear Bryan:

    Section 409A of the Internal Revenue Code is a new tax law that governs "non-qualified deferred compensation arrangements" that could impose an additional tax and penalties on some of the existing benefits and rights to which you could become entitled under your August 22, 2000 employment letter with Mattel, Inc. (the "Company") unless we amend those entitlements before the end of 2008. The purpose of this letter is to amend these entitlements to comply with or be exempt from Section 409A.

1.    **Amendments**

    **A.**    **Six-Month Delay**

    To the extent necessary to avoid the imposition of the additional tax and penalties under Section 409A, any payment or benefit under your employment letter that is "non-qualified deferred compensation" subject to Section 409A and is payable to you by reason of your termination of employment will (a) be made or provided to you only upon a "separation from service" as defined for purposes of Section 409A and (b) if you are a "specified employee" (within the meaning of Section 409A and as determined by the Company), not be made or provided until the first business day of the seventh month after the date of your separation from service (or your earlier death). Any payment under your employment letter shall be treated as a separate payment (and not a series of payments treated as a single payment) for purposes of Section 409A.

    **B.**    **Timing of Severance Payments**

    Any cash payments on account of your termination of employment shall be made on the 55th day following the end of your employment or the first business day thereafter, provided that you have executed and not revoked the release required under the terms of your employment letter, and such release becomes irrevocable within 55 days following your date of termination. The Company will furnish the form of release to you on or before the date that is two days after your termination of employment.

**C.   Reimbursements**

To the extent any expense reimbursement or in-kind benefit payable pursuant to your employment letter is determined to be subject to Section 409A, the amount of any such expenses eligible for reimbursement or the provision of any in-kind benefit in one calendar year shall not affect the expenses eligible for reimbursement or provided as in-kind benefits in any other taxable year (except under any lifetime limit applicable to expenses for medical care), in no event shall any expenses be reimbursed after the last day of the calendar year following the calendar year in which you incurred such expenses, and in no event shall any right to reimbursement or in-kind benefit be subject to liquidation or exchange for another benefit.

**2.   Other Actions**

It is our intention that the payments and benefits to which you could become entitled under your employment letter, as amended by this letter, comply with or be exempt from the requirements of Section 409A. If you or the Company believes, at any time, that any such benefit or right does not comply with Section 409A, you or the Company, as applicable, will promptly advise the other party and will negotiate reasonably and in good faith to amend the terms of such arrangement such that it complies (with the most limited possible economic effect on you and on the Company). The Company shall have no liability to you or otherwise if any amounts or benefits paid or provided under your employment letter, as amended by this letter, are subject to the additional tax and penalties under Section 409A.

**3.   General Provisions**

This letter amends your employment letter with the Company and, except as specifically amended hereby and as set forth in your letter agreement dated March 17, 2005, your employment letter is hereby ratified and confirmed in all respects and remains in full force and effect.

Please indicate your agreement with the terms and conditions set forth in this letter by signing and dating this letter in the space provided below and returning it to Alan Kaye no later than December 23, 2008.

Kind regards,

/s/ ROBERT A. ECKERT
By: Robert A. Eckert
Title: Chairman & CEO

Read, agreed, and
accepted December 16, 2008:

By: /s/ BRYAN C. STOCKTON
   Print Name: Bryan C. Stockton

2

Exhibit E - Page 433

M 0932429

Exhibit 10.32

# AMENDMENT NO. 1
## TO THE
## MATTEL INCENTIVE PLAN

**WHEREAS,** Mattel, Inc. ("Mattel") maintains the Mattel Incentive Plan (the "Plan");

**WHEREAS,** pursuant to Section 8.1 of the Plan, Mattel reserved the right to amend, modify or terminate the Plan at any time by action of the Board of Directors of Mattel (the "Board") or the Compensation Committee of the Board (the "Committee"); and

**WHEREAS,** in order to avoid certain adverse federal income tax consequences to participants in the Plan as a result of Section 409A of the Internal Revenue Code of 1986, as amended, the Committee desires to amend certain provisions of the Plan.

**NOW, THEREFORE,** pursuant to Section 8.1 of the Plan, the Plan is hereby amended, effective as of November 20, 2008, as follows:

1. **Capitalized Terms.** Capitalized terms that are not defined in this Amendment No. 1 shall have the meanings ascribed thereto in the Plan.

2. A new Section 2.5(e) of the Plan is added to the Plan to read as follows:

"Notwithstanding the foregoing, for each Bonus Opportunity made on or after January 1, 2009, each reference to '20%' or more of the Outstanding Company Common Stock or the Outstanding Company Voting Securities (or the outstanding shares of common stock of any corporation resulting from a Business Combination) in Sections 2.5(a) and (c) shall be deemed to read '35%'."

3. Section 5.4(a) of the Plan is amended in its entirety to read as follows:

"Unless otherwise directed by the Committee, each Bonus shall be paid no later than the 15th day of the third month following the end of the calendar year in which the Bonus is no longer subject to a 'substantial risk of forfeiture' (within the meaning of Code Section 409A)."

4. Section 5.4(b) of the Plan is amended in its entirety to read as follows:

"Subject to Section 5.2 and Article VII, unless otherwise specifically determined by the Committee or otherwise provided for in an employment agreement with the Company, a Participant shall be eligible for payment of a Bonus under the Plan only if the Participant is an active employee of the Company on the date of payment; provided, however, that for a Participant who is on a

leave of absence on the date of payment, Mattel's senior executive of Human Resources or his delegate shall have the discretion to determine the requirements for such Participant's return to active employee status in order to be eligible to receive the payment and the timing of such payment, but in no event shall such payment be made later than the last date permitted for such payment under Section 5.4(a)."

5. A new Section 5.4(d) is added to the Plan to read as follows:

"(d) Notwithstanding any other provision of the Plan to the contrary, if any Bonus payable under the Plan is subject to a valid deferral election under the terms of another plan or arrangement maintained by Mattel or its subsidiaries, the payment of such Bonus shall be in accordance with, and subject to, such deferral election."

6. The second sentence of Article VII of the Plan is amended in its entirety to read as follows:

"Notwithstanding the foregoing, in the case of a Participant who is a party to any individual agreement under which the Participant is or may become entitled to a bonus or other payment with respect to the CIC Period (any such bonus or other payment, a 'CIC Payment'), Mattel or its successor may make the right of such Participant to receive such interim cash payment conditional upon the execution by such Participant of a waiver of the right to receive such CIC Payment to the extent such CIC Payment would duplicate such interim cash payment and is not "deferred compensation" within the meaning of Code Section 409A; provided, however, that the Committee shall have the discretion to reduce or eliminate the interim cash payment by the CIC Payment under the individual agreement and pay only the excess of such interim cash payment over the CIC Payment and, in such case, the right of such Participant to receive a reduced interim cash payment shall not be conditional upon the execution by such Participant of a waiver of the right to receive such CIC Payment."

7. A new Section 8.5 of the Plan is added to read as follows:

"8.5. **Code Section 409A.** Mattel intends that the Bonuses under the Plan shall be exempt from Code Section 409A as short-term deferrals and shall not constitute 'deferred compensation' within the meaning of Code Section 409A (absent a valid deferral election under the terms of another plan or arrangement maintained by Mattel or its subsidiaries). The Plan shall be interpreted, construed

2

and administered in accordance with the foregoing intent, so as to avoid the imposition of taxes and penalties on Participants pursuant to Code Section 409A. Mattel shall have no liability to any Participant, any Participant's spouse or otherwise if the Plan or any amounts paid or payable hereunder are subject to the additional tax and penalties under Code Section 409A."

8. **Ratification and Confirmation.** Except as specifically amended hereby, the Plan is hereby ratified and confirmed in all respects and remains in full force and effect.

9. **Governing Law.** This Amendment No. 1 shall be governed by, and construed in accordance with, the laws of the State of Delaware.

10. **Headings.** Section headings are for convenience only and shall not be considered a part of this Amendment No. 1.

**IN WITNESS WHEREOF,** Mattel has caused this Amendment No. 1 to be executed, effective as of November 20, 2008.

MATTEL, INC.

By:      /s/ ALAN KAYE
Name: Alan Kaye
Title:   Senior Vice President, Human Resources

Dated: December 19, 2008

3

Exhibit 10.35

**MATTEL, INC.**
**DEFERRED COMPENSATION PLAN**
**FOR NON-EMPLOYEE DIRECTORS**
**(AS AMENDED AND RESTATED EFFECTIVE JANUARY 1, 2009)**

Table of Contents

| | | | Page |
|---|---|---|---|
| 1. | Eligibility | | 1 |
| 2. | Participation | | 1 |
| | (a) | Election to Participate | 1 |
| | (b) | Enrollment Form | 2 |
| | (c) | Duration of Deferral Election | 2 |
| 3. | Deferred Compensation Accounts | | 2 |
| | (a) | Investment Election | 2 |
| | (b) | No Actual Investment | 2 |
| | (c) | Crediting of Accounts Generally | 3 |
| | | (i) Subaccounts | 3 |
| | | (ii) Timing of Credits. | 3 |
| | | (iii) Performance | 3 |
| | (d) | Stock Equivalent Sub-Account and Restricted Stock Unit Sub-Account | 4 |
| | | (i) Dividends | 4 |
| | | (ii) Recapitalization or Reorganization of Company | 4 |
| | | (iii) Shares Subject to Plan | 4 |
| | (e) | Change of Investment Elections | 4 |
| | (f) | Administrative Discretion | 5 |
| | (g) | Compliance with the Exchange Act. | 5 |
| | (h) | Vesting of Amounts Credited to Restricted Stock Unit Sub-Account | 5 |
| | (i) | Interest Accrual Sub-Account | 5 |
| 4. | Distribution | | 6 |
| | (a) | Distribution Election | 6 |
| | (b) | Distribution Options | 6 |
| | (c) | Form of Distributions | 7 |
| | (d) | Death | 7 |
| | (e) | Installment Distributions | 7 |
| | (f) | Change in Control | 7 |
| | (g) | Hardship Distribution | 8 |
| 5. | Miscellaneous | | 8 |
| | (a) | Assignment Prohibited | 8 |
| | (b) | Benefits Unfunded | 8 |
| | (c) | Grantor Trust | 8 |
| | (d) | Account Statements | 9 |
| | (e) | Nonforfeitable Benefit | 9 |
| | (f) | Amendment | 9 |
| | (g) | Termination | 9 |
| | (h) | Withholding | 9 |
| | (i) | Governing Law | 10 |
| | (j) | Gender, Tense, and Headings | 10 |
| | (k) | Successors and Assigns | 10 |
| | (l) | Disputes | 10 |

Exhibit E - Page 438

M 0932434

Table of Contents
(continued)

| | | Page |
|---|---|---|
| (m) | Full Satisfaction | 10 |
| (n) | Plan Administrator | 10 |
| (o) | Section 409A Compliance. | 11 |
| 6. | Definitions | 11 |
| (a) | Account | 11 |
| (b) | Administrator | 11 |
| (c) | Beneficiary | 12 |
| (d) | Board | 12 |
| (e) | Change in Control | 12 |
| (f) | Code | 12 |
| (g) | Common Stock | 12 |
| (h) | Company | 12 |
| (i) | Deferrals | 12 |
| (j) | Director | 12 |
| (k) | Effective Date | 12 |
| (l) | Enrollment Form | 12 |
| (m) | Exchange Act | 12 |
| (n) | Fair Market Value | 12 |
| (o) | Hardship | 12 |
| (p) | Hardship Distribution | 13 |
| (q) | Interest Accrual Sub-Account | 13 |
| (r) | Investment Fund | 13 |
| (s) | Participant | 13 |
| (t) | Plan | 13 |
| (u) | Plan Year | 13 |
| (v) | Restatement Effective Date | 13 |
| (w) | Restricted Stock Unit Sub-Account | 13 |
| (x) | RSU Award | 13 |
| (y) | Severance | 14 |
| (z) | Stock Equivalent Sub-Account | 14 |
| (aa) | Valuation Date | 14 |

Exhibit E - Page 439

M 0932435

## MATTEL, INC.
## DEFERRED COMPENSATION PLAN
## FOR NON-EMPLOYEE DIRECTORS
### (AS AMENDED AND RESTATED EFFECTIVE JANUARY 1, 2009)

### PREAMBLE

Mattel, Inc., a Delaware corporation (the "**Company**"), hereby amends and restates the Mattel, Inc. Deferred Compensation Plan for Non-Employee Directors (this "**Plan**"), effective as of January 1, 2009 (the "**Restatement Effective Date**"). The Company adopted this Plan effective as of July 1, 1998, and previously amended this Plan effective as of August 17, 2000. The Company wishes to amend and restate this Plan to conform the written terms of this Plan to the requirements of Section 409A of the Internal Revenue Code of 1986, as amended from time to time (the "**Code**").

Words and phrases used in this Plan with the first letter capitalized shall have the meanings specified in <u>Section 6</u> unless otherwise specified.

### 1. Eligibility

Each Director is eligible to participate in this Plan and shall continue to be eligible to participate in this Plan until he or she ceases to be a Director, whether by reason of his or her Severance or death.

### 2. Participation

(a) **Election to Participate.** Prior to the beginning of any Plan Year and during the period specified by the Administrator from time to time, each eligible Director may elect to participate in this Plan by directing that all or any part of the compensation (including all of the Common Stock amount earned as an RSU Award) which would otherwise have been payable currently for services as a Director (including any periodic and/or annual retainer, Board and committee meeting fees (including any special committee fees) and any additional annual retainer payable for services as a chair or member of a committee of the Board but excluding expense reimbursements, amounts realized upon the exercise or vesting of equity-based compensation other than RSU Awards, or any other amounts paid to the Director) during such Plan Year shall be credited to his or her Account, subject to the terms of this Plan. In addition, newly elected or appointed Directors who have not performed services for the Company or its subsidiaries during the 24-month period ending on the date of the Director's election or appointment to the Board may make an "initial deferral election" (within the meaning of Treas. Reg. §1.409A-2(a)(7)) within 30 days of such election or appointment to the Board to have any Board and committee meeting fees (including any special committee fees, but not any periodic and/or annual retainer payable for the year of the Director's election or appointment to the Board) paid during the Plan Year for services to be performed after the election credited to his or her Account, subject to the terms of this Plan.

(b) **Enrollment Form.** Such an election to participate in this Plan shall be in the form of an enrollment form ("**Enrollment Form**") executed by the Participant and the Company and filed with the Administrator or its delegate. The specifications of this Plan (including the time and form of payment of amounts deferred hereunder) that apply to any Participant are contained in such separate Enrollment Form executed by the Company and the Participant. The Enrollment Form constitutes a part of this Plan and its terms are incorporated into this Plan. Any reference herein to an election, designation or other action by a Participant in writing shall be deemed to include an electronic election, designation or act made on the Internet to the extent permitted by applicable law.

(c) **Duration of Deferral Election.** An election related to fees otherwise payable in any Plan Year shall become irrevocable on the last business day prior to the beginning of such Plan Year or, with respect to any "initial deferral election" made by newly elected or appointed Directors within the "first year of eligibility" (all within the meaning of Treas. Reg. §1.409A-2(a)(7)), on the 30th day after becoming a Director and may not be modified or revoked thereafter unless otherwise permitted by the Administrator on terms consistent with Section 409A of the Code. An election shall be valid and effective only for the Plan Year with respect to which the election is made and a Participant may not change the amount of his or her Deferrals during a Plan Year. If a new election is not made with respect to any subsequent Plan Year under this Section 2, no part of the compensation payable for services as a Director with respect to such subsequent Plan Year shall be credited to the Participant's Account.

## 3. Deferred Compensation Accounts

(a) **Investment Election.** Except with respect to deferrals of Common Stock amounts earned as an RSU Award and subject to Section 3(i), Participants may elect, on a form or in the manner provided by the Administrator (any which form or manner shall set forth or provide an opportunity to elect different Investment Funds for different percentage increments of the amounts being deferred, in accordance with rules established by the Administrator), one or more Investment Funds to be used to determine the amount of earnings or losses to be credited to the Participant's Account. Although the Participant may designate the Investment Funds, the Administrator shall not be bound by such designation. The Administrator shall select from time to time, in its sole discretion, the Investment Funds to be available under this Plan. If a Participant fails to elect an Investment Fund, such Participant shall be deemed to have elected the default Investment Fund (as specified by the Administrator) for such Participant's Account. Any deferral of Common Stock amounts earned as an RSU Award shall be allocated to a Participant's Restricted Stock Unit Sub-Account.

(b) **No Actual Investment.** Notwithstanding any other provision of this Plan that may be interpreted to the contrary, the Investment Funds are to be used for measurement purposes only, and a Participant's election of any such Investment Fund, the allocation of such Participant's Account thereto, the calculation of additional amounts and the crediting or debiting of such amounts to a Participant's Account shall not be considered or construed in any manner as an actual investment of such Participant's

2

Exhibit E - Page 441

M 0932437

Account in any such Investment Fund. In the event that the Company or the trustee of the trust described in <u>Section 5(c)</u>, in its own discretion, decides to invest funds in any or all of the Investment Funds, no Participant shall have any rights in or to such investments. Without limiting the foregoing, a Participant's Account at all times shall be a bookkeeping entry only and shall not represent any investment made on his or her behalf by the Company. The Participant at all times shall remain an unsecured creditor of the Company.

    (c) **<u>Crediting of Accounts Generally.</u>**

       (i) **<u>Subaccounts.</u>** Each Participant's Account shall be divided into separate subaccounts ("**<u>investment fund subaccounts</u>**") each of which corresponds to an Investment Fund elected by or designated for the Participant pursuant to <u>Section 3(a)</u>. Subject to the limitations set forth in <u>Section 3(i)</u>, the Administrator shall credit the investment fund subaccounts of the Participant's Account with an amount equal to amounts deferred by the Participant in accordance with the Participant's Enrollment Form under <u>Section 2</u>.

       (ii) **<u>Timing of Credits.</u>**

         (A) Deferrals of any annual Board retainer and any additional annual retainer payable for services as a chair or member of a committee of the Board shall be credited to the investment fund subaccounts of the Participant's Account within five business days of the date of the annual meeting of stockholders of the Company.

         (B) Deferrals of any periodic Board retainer shall be credited to the investment fund subaccounts of the Participant's Account within five business days of the date upon which such retainer becomes payable;

         (C) Deferrals of Board and committee meeting fees (including any special committee fees) shall be credited on the last business day of the calendar quarter in which such fees otherwise would have been paid in cash.

         (D) Deferrals of Common Stock amounts earned as an RSU Award shall be credited on the date of grant of such RSU Award.

         (E) Any Deferrals credited to the Stock Equivalent Sub-Account or the Restricted Stock Unit Sub-Account shall be applied on the date specified in subsections (A), (B), (C) or (D), as applicable, to the hypothetical purchase of whole or fractional shares of the Common Stock, determined by dividing the amount of such compensation by the Fair Market Value of a share of Common Stock on the date the related compensation is or otherwise would be paid (or, with respect to subsection (D), such determination shall be made on the date of grant).

       (iii) **<u>Performance.</u>** A Participant's Account shall be credited or debited as of each business day based on the performance of each Investment Fund, as determined by the Administrator in its sole discretion based on the performance of the

3

Investment Funds themselves, until all amounts credited to such Participant's Account under this Plan have been distributed and the Participant's Account shall also be credited with an amount equal to any Deferrals and debited by amounts equal to all payments to the Participant and/or his or her Beneficiary.

(d) **Stock Equivalent Sub-Account and Restricted Stock Unit Sub-Account.**

(i) **Dividends.** The Participant's Stock Equivalent Sub-Account and Restricted Stock Unit Sub-Account shall also be credited on the date cash dividends are paid with a hypothetical number of whole or fractional shares of the Common Stock equivalent to the quotient of (i) any cash dividend payment on the number of shares of Common stock equal to the number of hypothetical shares of Common Stock in the Participant's Stock Equivalent Sub-Account or Restricted Stock Unit Sub-Account on the record date for such dividend and (ii) the Fair Market Value of a share of Common Stock on the applicable dividend payment date.

(ii) **Recapitalization or Reorganization of Company.** In the event of any change in outstanding Common Stock by reason of any stock dividend or split, recapitalization, merger, consolidation, combination or exchange of shares, spin-off or other similar corporate change affecting the Common Stock, the Administrator shall make such adjustments, if any, that it deems appropriate in the number of hypothetical shares of Common Stock then credited to Participants' Accounts. Any and all such adjustments shall be conclusive and binding upon all parties concerned.

(iii) **Shares Subject to Plan.** The maximum number of hypothetical shares of Common Stock that may be credited to the Stock Equivalent Sub-Account and the Restricted Stock Unit Sub-Account may not exceed two million shares in the aggregate. This number is subject to adjustment to take into consideration adjustment in the number of outstanding shares of Common Stock as described in the preceding Section 3(d)(ii).

(e) **Change of Investment Elections.** A Participant may elect to change the Investment Fund allocations of the Participant's Account (other than the Restricted Stock Unit Sub-Account) daily by filing an election, on a form or in the manner provided by the Administrator, which election specifies in whole percentages the amounts to be transferred and specifies the new Investment Fund; provided, however, that (x) amounts not credited to the Interest Accrual Sub-Account as of the Restatement Effective Date may not be transferred to the Interest Accrual Sub-Account at any time thereafter, (y) amounts not previously credited to the Stock Equivalent Sub-Account may not be transferred to the Stock Equivalent Sub-Account at any time other than in accordance with Section 3(g) and the Company's insider trading policy and (z) no amounts credited to the Stock Equivalent Sub-Account may be transferred to any other Investment Fund. Any election to change an Investment Fund shall be effective on the first business day following the receipt by the Administrator of such election. Participants who incur a Severance but have not yet commenced distributions under Section 4 or Participants or

4

Beneficiaries who are receiving installment payments may continue to make investment elections pursuant to this <u>Section 3(e)</u>, except as otherwise determined by the Administrator.

(f) **Administrative Discretion.** The Administrator may determine at any time in its sole discretion that no additional Deferrals shall be credited to the Stock Equivalent Sub-Account of any Participant. In the event all Stock Equivalent Sub-Accounts are frozen, the Administrator may permit any affected Participant to change such Participant's Investment Fund allocation with respect to future Deferrals.

(g) **Compliance with the Exchange Act.**

(i) Any Participant or Beneficiary who is subject to Section 16 of the Exchange Act shall have his or her Investment Fund elections under this Plan subject to the requirements of the Exchange Act, as interpreted by the Administrator. Any such Participant or Beneficiary who elects to have any portion of his or her Account invested in the Stock Equivalent Sub-Account may not make an election with the opposite effect under any other Company-sponsored plan until six months and one day following the original election. Any such Participant or Beneficiary who wishes to elect any change affecting the time or form of distribution of his or her Stock Equivalent Sub-Account or Restricted Stock Unit Sub-Account balance must first obtain the prior approval of the Administrator.

(ii) Notwithstanding any other provision of this Plan or any rule, instruction, Enrollment Form or other form, this Plan and any such rule, instruction or form shall be subject to any additional conditions or limitations set forth in any applicable exemptive rule under Section 16 of the Exchange Act (including any amendment to Rule 16b-3) and Rule 10b-5 promulgated under the Exchange Act that are requirements for the application of such exemptive rule. To the extent permitted by applicable law, such Plan provision, rule, instruction or form shall be deemed amended to the extent necessary to conform to such applicable exemptive rule.

(h) **Vesting of Amounts Credited to Restricted Stock Unit Sub-Account**. Amounts credited to a Participant's Restricted Stock Unit Sub-Account pursuant to <u>Sections 3(c)(ii)(D) and 3(d)(i)-(ii)</u> with respect to an RSU Award shall be subject to the same vesting schedule that applies to such RSU Award. In the event such Participant forfeits any portion of such RSU Award pursuant to the terms of the underlying RSU Award agreement, such Participant shall forfeit the corresponding unvested balance in his or her Restricted Stock Unit Sub-Account that is allocable to such RSU Award.

(i) **Interest Accrual Sub-Account**.

(i) Notwithstanding any other provisions of this Plan to the contrary, effective as of Restatement Effective Date, no new Deferrals shall be credited to a Participant's Interest Accrual Sub-Account.

5

Exhibit E - Page 444

M 0932440

(ii) Amounts credited to a Participant's Interest Accrual Sub-Account as of the Restatement Effective Date shall continue to be credited with interest following the Restatement Effective Date, with the rate of interest to be determined pursuant to the same determination process in effect on the Restatement Effective Date. Notwithstanding the foregoing, the Administrator, in its sole discretion, may change the rate of interest to be credited to the Interest Accrual Sub-Account at any time after the Restatement Effective Date, provided that any such change shall (a) apply only with respect to accruals of interest after the Administrator approves such change and (b) comply with Treasury Reg. §1.409A-1(o).

## 4. Distribution

(a) **Distribution Election.** At the time of election to participate in this Plan, a Participant shall also make elections with respect to the timing and method of distribution of his or her Account determined on a Plan Year basis except in connection with distributions on account of the Participant's death. Such elections shall be contained in the document referred to in Section 2(b), executed by the Participant and filed with the Administrator or its delegate.

(b) **Distribution Options.** A Participant may elect to receive payment of his or her Account determined on a Plan Year basis in (1) a single payment or (2) 10 annual installments. The election shall direct that the first installment (or the single payment if the Participant has so elected) be paid as soon as administratively practicable following the first business day of April of the Plan Year following either (i) the Plan Year in which the Participant has a Severance and ceases to be a Director of the Company, or (ii) the later of (x) the Plan Year in which the Participant has a Severance and ceases to be a Director of the Company or (y) the year in which the Participant attains the age specified in such election, which age shall not be later than age 72; provided, however, that if a Participant is a "specified employee" (within the meaning of Section 409A(a)(2)(B)(i) of the Code) as of the date of the Participant's Severance, the first installment payment or the single payment shall not be made until the later of (A) the date in April determined above or (B) the earlier of the first business day of the seventh (7th) month following such Severance or the date of the Participant's death. Each distribution shall be made pro-rata from (a) amounts not credited to the Participant's Stock Equivalent Sub-Account or the Restricted Stock Unit Sub-Account, (b) amounts credited to the Participant's Stock Equivalent Sub-Account and (c) vested amounts credited to the Participant's Restricted Stock Unit Sub-Account, each as determined on the applicable payment date (determined on a Plan Year basis). Each distribution shall be determined by multiplying the value of the Participant's Account as of the most recent Valuation Date (determined on a Plan Year basis) by a fraction. The numerator of the fraction shall be one (1) and the denominator of the fraction shall be the number of annual installments remaining to be paid (which, in the case of a single payment, shall be one (1)). For purposes of this Section 4(b), the value of the Stock Equivalent Sub-Account and the vested portion of the Restricted Stock Unit Sub-Account on any payment date shall be determined by multiplying the number of such hypothetical shares of Common Stock allocated to the Stock Equivalent Sub-Account and the vested portion

6

of the Restricted Stock Unit Sub-Account, respectively, by the Fair Market Value of a share of Common Stock as of the most recent Valuation Date. If no distribution election is made or if the distributable amount (determined on a Plan Year basis) is less than $5,000, the distribution shall be in a single payment. For purposes of the immediately preceding sentence, if a Participant elects to receive a distributable amount in the form of annual installments, the distributable amount shall be determined as of the most recent Valuation Date prior to the payment date of the first annual installment.

If a Participant dies after the date distributions commence pursuant to this Section 4(b), the Participant's Account shall continue to be distributed to the Participant's Beneficiary or Beneficiaries designated in writing by the Participant, or if no designation has been made, to the estate of the Participant, in accordance with the Participant's election under this Section 4(b).

(c) **Form of Distributions.** All distributions (other than distributions from the Stock Equivalent Sub-Account and the Restricted Stock Unit Sub-Account) shall be in cash. All distributions from the Stock Equivalent Sub-Account and the Restricted Stock Unit Sub-Account shall be in whole shares of Common Stock, with the number of such shares determined by dividing (i) the pro rata portion of the Account distributable from each such subaccount pursuant to Section 4(b), by (ii) the Fair Market Value of a share of Common Stock as of the most recent Valuation Date. In no event shall the Company be required to issue fractional shares in connection with a distribution of a Participant's Stock Equivalent Sub-Account or Restricted Stock Unit Sub-Account. The value of fractional hypothetical shares of Common Stock shall be distributed in cash, based on the Fair Market Value of a share of Common Stock as of the most recent Valuation Date.

(d) **Death.** If a Participant dies before the date distributions commence pursuant to Section 4(b), the Participant's Account (valued as of the most recent Valuation Date) shall be distributed to the Participant's Beneficiary or Beneficiaries designated in writing by the Participant, or if no designation has been made, to the estate of the Participant, in a single payment on the first business day of the Plan Year following the year of death.

(e) **Installment Distributions.** Installments subsequent to the first installment to the Participant, or to a Beneficiary or to the Participant's estate, shall be debited from a Participant's Account on the first business day of each succeeding Plan Year and paid promptly thereafter until the entire amount credited to the Participant's Account shall have been paid. The balance of the Account held pending distribution shall continue to be credited with earnings, determined in accordance with Section 3.

(f) **Change in Control.** If a Change in Control occurs, a Participant who has not received a complete distribution of the amounts credited to his or her Account as of the date of the Change in Control shall receive a distribution of all amounts remaining in the Participant's Account in a single payment on the first business day of the month following the month in which the Change in Control occurs and all Deferrals under this

7

Plan shall cease upon the Valuation Date immediately preceding the date the distribution is made to the Participant. For purposes of this Section 4(f), the amount of the Participant's Account shall be valued as of the Valuation Date (which valuation shall include any Deferrals credited upon such date) immediately preceding the date the distribution is made to the Participant pursuant to this Section.

(g) **Hardship Distribution.** A Participant shall be permitted to request a Hardship Distribution of all or a portion of such Participant's Account under this Plan prior to the applicable date of distribution, subject to the following restrictions:

(i) The request for a Hardship Distribution shall be made by filing such form and documentation as is required by the Administrator.

(ii) The Administrator shall have made a determination in its sole discretion that the circumstances giving rise to the requested distribution constitute a Hardship in accordance with Treas. Reg. §1.409A-3(i)(3)(i)-(iii).

(iii) The Hardship Distribution amount shall be valued as of the date the election form described in subsection (i) is approved by the Administrator and shall be paid as soon as administratively feasible thereafter. Any Hardship Distribution amount shall be limited to the maximum amount that may be distributed in compliance with Treas. Reg. §1.409A-3(i)(3)(ii).

(iv) The Administrator shall have the discretion, in the case of a Hardship Distribution petition, to cancel the applicable Participant's future Deferrals (which cancellation may be in addition to or instead of a Hardship Distribution) in accordance with Treas. Reg. §1.409A-3(j)(4)(viii).

## 5. Miscellaneous

(a) **Assignment Prohibited.** The right of a Participant to any deferred fees and/or earnings thereon shall not be subject to assignment by the Participant.

(b) **Benefits Unfunded.** Except as provided in Section 5(c), the benefits provided by this Plan shall be unfunded. All amounts payable under this Plan shall be paid from the general assets of the Company, and nothing contained in this Plan shall require the Company to set aside or hold in trust any amounts or assets for the purpose of paying benefits to any Participant or Beneficiary. This Plan shall create only a contractual obligation on the part of the Company, and each Participant shall have the status of a general unsecured creditor with respect to the benefit obligations hereunder or any other obligation of the Company to pay benefits pursuant hereto. Any funds of the Company available to pay benefits pursuant to this Plan shall be subject to the claims of general creditors of the Company, and may be used for any purpose by the Company.

(c) **Grantor Trust.** Although the Company is responsible for the payment of all benefits under this Plan, the Company may, in its discretion, contribute funds or assets (including insurance policies on the life of any or all Participants and securities issued by

8

the Company) to a grantor trust for the purpose of paying benefits under this Plan and to assist it in accumulating shares of Common Stock and cash needed to fulfill its obligations under this Plan; provided, however, that no funds or assets shall be contributed to any such trust if such contribution would violate applicable law or result in the imposition of the additional tax under Section 409A. Such trust may be irrevocable, but assets of the trust shall be subject to the claims of creditors of the Company, as the Company may deem necessary or advisable to prevent such funding from causing the Participants to be taxed on any such trust assets. To the extent any benefits provided under the terms of this Plan are actually paid from the trust, the Company shall have no further obligation with respect thereto. To the extent any benefits provided under the terms of this Plan are not paid from the trust, such benefits shall remain the obligation of and shall be paid by the Company. The Participants shall have the status of unsecured creditors insofar as their legal claim for benefits under this Plan and the Participants shall have no security interest or preferred claim in or to the assets of any such grantor trust.

(d) **Account Statements.** The Company (or its delegate) shall, at least annually at the end of each Plan Year, prepare and distribute written reports to the Participants and to the Administrator that set forth the amounts or the number of hypothetical shares of Common Stock credited to each Participant's Account.

(e) **Nonforfeitable Benefit.** Subject to Section 3(h), a Participant's interest in his or her Account shall at all times be 100% vested and nonforfeitable.

(f) **Amendment.** The Company shall have the right to amend this Plan in whole or in part from time to time by resolution of the Board, and to amend and cancel any amendments; provided, however, that no action under this Section shall cancel or reduce the amount of the Participant's previously accrued vested benefits. Any amendment shall be in writing and be adopted by the Board. The action of the Board adopting any amendment may, but is not required to, be evidenced by the execution of such amendment by a duly authorized officer of the Company. The Participants shall be bound thereby.

(g) **Termination.** The Company expects to continue this Plan indefinitely, but does not obligate itself to do so. The Company reserves the right to discontinue and terminate this Plan at any time, for any reason (including a change, or an impending change, in the tax laws of the United States or of any state), by resolution of the Board. Termination of this Plan shall be binding on the Participants, but in no event may such termination reduce the Participants' previously accrued vested benefits. If this Plan is terminated, the Participants' previously accrued vested benefits shall be paid in accordance with the terms of this Plan or on a schedule determined by the Administrator that complies with the applicable requirements of Treas. Reg. §1.409A-3(j)(4)(ix).

(h) **Withholding.** If the whole or any part of any Participant's benefit shall become liable for the payment of any estate, inheritance, income, employment or other tax which the Company is required to pay or withhold, the Company shall have the full power and authority to withhold and pay such tax out of any monies or other property in

9

M 0932444

its hand for the benefit of the Participant whose benefits hereunder are so liable to the extent permitted by Section 409A of the Code. Prior to making any payment, the Company may require such releases or other documents from any lawful taxing authority as it shall deem necessary. To the extent benefits paid hereunder are wages or compensation, the Company shall be entitled to deduct, withhold and pay any applicable income or employment taxes that it determines are required to be withheld by the Company from amounts otherwise payable to the Participant hereunder.

(i) **Governing Law.** This Plan shall be construed, governed and administered in all respects in accordance with the laws of the State of California without regard to principles of conflict of laws. If any provisions of this instrument shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remaining provisions hereof shall continue to be fully effective.

(j) **Gender, Tense, and Headings.** In this Plan, whenever the context so indicates, the singular or plural number and the masculine, feminine, or neuter gender shall be deemed to include the other. Headings and subheadings in this Plan are inserted for convenience of reference only and are not considered in the construction of the provisions hereof.

(k) **Successors and Assigns.** This Plan shall inure to the benefit of, and be binding upon, the Company, its successors and assigns and the Participants and their heirs, executors, administrators and legal representatives.

(l) **Disputes.** In the event of a dispute involving any individual's right to receive the benefit hereunder, the Company may enter an interpleader action. Payment of the benefit to a court of competent jurisdiction with proper notice to the appropriate parties in dispute shall be in full satisfaction of all claims against the Company as to this Plan.

(m) **Full Satisfaction.** Any payment to a Participant or Beneficiary in accordance with the provisions of this Plan shall, to the extent thereof, be in full satisfaction of all claims against the Company.

(n) **Plan Administrator.** The Administrator shall have discretionary authority to construe and interpret the terms of this Plan and to make all determinations relating to its administration, including the determination of disputed benefit claims, unless and until the Administrator delegates such authority to an individual or another committee as set forth below. Action of the Administrator may be taken with or without a meeting; provided, however, that any action shall be taken only upon the vote or other affirmative expression of a majority of the members qualified to vote with respect to such action. If a member of the Administrator is a Participant whose benefits are subject to this Plan, such member shall not participate in any decision which solely affects his or her status as a Participant. In the event the Administrator becomes deadlocked on the determination of any disputed benefit claim, the determination of such claim shall be

10

M 0932445

determined by the full Board. The Administrator or the Board, as the case may be, shall be authorized to adopt rules and procedures relating to its duties under this Plan.

The Administrator may delegate its administrative authority under this Plan to an individual or a committee of one or more individuals (who need not be a member of the Board), and the term "Administrator" shall apply to any person or persons to whom such authority has been delegated. If administration is delegated to an individual or a committee of one or more individuals, the individual or committee shall have, in connection with the administration of this Plan, the powers theretofore possessed by the Administrator, subject, however, to such resolutions not inconsistent with the provisions of this Plan, as may be adopted from time to time by the Administrator and except when the exercise of such authority would materially affect the cost of this Plan to the Company or materially increase benefits to Participants. The Administrator may terminate its delegation of administrative authority at any time and revest in the Administrator the administration of this Plan. Notwithstanding anything to the contrary in this Section 5(n), the Administrator may delegate its administrative authority under this Plan to an individual or committee without taking formal action pursuant to this Section 5(n), and any such delegate may act within the scope of its delegated authority without approval by the Administrator of any such act pursuant to this Section 5(n).

(o) **Section 409A Compliance**.

(i) Notwithstanding any other provisions of this Plan to the contrary and to the extent applicable, it is intended that this Plan comply with the requirements of Section 409A of the Code, and this Plan shall be interpreted, construed and administered in accordance with this intent, so as to avoid the imposition of taxes and penalties on Participants pursuant to Section 409A of the Code. The Company shall have no liability to any Participant, Beneficiary or otherwise if this Plan or any amounts paid or payable hereunder are subject to the additional tax and penalties under Section 409A of the Code.

(ii) Prior to the Restatement Effective Date, the Company operated this Plan in good faith compliance with Section 409A of the Code and certain Internal Revenue Service transitional rules then in effect. Written deferral and distribution elections made during, or with respect to, Plan Years 2005-2008 shall remain in effect hereunder, even to the extent that the specific election choices offered for such years may not be available under this Plan and/or specific election choices available under this Plan may not have been offered, provided that subsequent actions with respect to such elections (e.g., changes thereto, forms of distribution, claims procedures) shall be governed by the terms of this Plan.

## 6. Definitions

(a) **Account.** The record maintained by the Administrator to determine each Participant's interest under this Plan. Such Account shall be divided into subaccounts (on a Plan Year basis or such other basis determined by the Administrator (including as

11

Exhibit E - Page 450

M 0932446

provided in Section 3(c)(i)) and shall be reflected as a book reserve entry in the Company's accounting records.

(b) **Administrator.** The Compensation Committee of the Board or any delegate thereof.

(c) **Beneficiary.** The person or persons (natural or otherwise) last designated in writing by a Participant in accordance with Section 4(a) to receive any undistributed benefits under this Plan in the event of the Participant's death.

(d) **Board.** The Board of Directors of the Company.

(e) **Change in Control.** A "change in control event" described in Treas. Reg. §1.409A-3(i)(5).

(f) **Code.** Has the meaning ascribed to such term in the Preamble. Any reference to any section of the Code shall also be a reference to any successor provision and any Department of the Treasury regulation promulgated thereunder.

(g) **Common Stock.** The Company's common stock, par value $1.00 per share.

(h) **Company.** Has the meaning ascribed to such term in the Preamble. Any reference to the Company shall also be a reference to any successor corporation.

(i) **Deferrals.** The amount credited to the Participant's Account under this Plan to reflect his or her interest in this Plan attributable to his or her elective deferrals made pursuant to Section 2(a).

(j) **Director.** Any member of the Board who is not an employee of the Company or of any of its subsidiaries.

(k) **Effective Date.** The Effective Date of this Plan shall be July 1, 1998.

(l) **Enrollment Form.** The form executed by the Company and the Participant which sets forth the Participant's Deferral elections and other specifications of this Plan applicable to the Participant.

(m) **Exchange Act.** The Securities Exchange Act of 1934, as amended, and the applicable rules and regulations thereunder. Any references to any section of the Exchange Act shall also be a reference to any successor provision.

(n) **Fair Market Value.** The closing price of the Common Stock on the New York Stock Exchange at the close of normal trading hours for that day, or, if the New York Stock Exchange is closed on that day, the next preceding day on which the New York Stock Exchange was open.

12

Exhibit E - Page 451

M 0932447

(o) **Hardship**. A severe financial hardship to the Participant resulting from (i) an illness or accident of the Participant, the Participant's spouse, the Participant's Beneficiary or the Participant's dependent (as defined in Section 152 of the Code, without regard to Sections 152(b)(1), (b)(2) and (d)(1)(B)), (ii) loss of the Participant's property due to casualty, or (iii) other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the Participant. The events that would constitute a Hardship will depend upon the facts and circumstances of each case, but, in any case, a Hardship Distribution may not be made to the extent that such Hardship does not satisfy the requirements of Treas. Reg. §1.409A-3(i)(3)(i).

(p) **Hardship Distribution**. A distribution due to Hardship made in accordance with Section 4(g).

(q) **Interest Accrual Sub-Account**. An interest-bearing investment fund to which Deferrals and earnings thereon were credited prior to the Restatement Effective Date. As of the Restatement Effective Date, the Interest Accrual Sub-Account shall be governed by Section 3(e) and Section 3(i).

(r) **Investment Fund.** One or more of the investment funds selected by the Administrator pursuant to Section 3(a) which shall be used to determine the return to be credited to each Participant's Account. The Stock Equivalent Sub-Account and the Restricted Stock Unit Sub-Account shall be considered an Investment Fund for purposes of this Plan.

(s) **Participant.** A Director of the Company who completes an Enrollment Form and has not received a complete distribution of all amounts credited to his or her Account.

(t) **Plan.** The Mattel, Inc. Deferred Compensation Plan for Non-Employee Directors, as it may hereafter be amended.

(u) **Plan Year.** The period with respect to which the records of this Plan are maintained which shall be the twelve consecutive month period ending December 31.

(v) **Restatement Effective Date**. Has the meaning ascribed to such term in the Preamble.

(w) **Restricted Stock Unit Sub-Account.** An investment fund subaccount that is established for each Participant electing to defer all of his or her RSU Award and that is credited with the hypothetical purchase of whole or fractional shares of Common Stock to reflect amounts credited to such subaccount. The Participant shall not have any rights as a stockholder of the Company with respect to the hypothetical shares of Common Stock credited to the Restricted Stock Unit Sub-Account. Cash dividends, if any, shall be credited to a Participant's Restricted Stock Unit Sub-Account in accordance with Section 3(d)(i) and the number of hypothetical shares of Common Stock credited to Restricted Stock Unit Sub-Accounts shall be adjusted in accordance with Section 3(d)(ii).

13

Amounts credited to a Participant's Restricted Stock Sub-Account shall be subject to the vesting provisions set forth in Section 3(h).

(x) **RSU Award.** A "restricted stock unit" award made to a Participant under the Mattel, Inc. 2005 Equity Compensation Plan, as it may be amended from time to time, or any successor plan or arrangement.

(y) **Severance.** A Participant's "separation from service" within the meaning of Treas. Reg. §1.409A-1(h), whether voluntary or involuntary.

(z) **Stock Equivalent Sub-Account.** An investment fund subaccount that is credited with the hypothetical purchase of whole or fractional shares of Common Stock. The Participant shall not have any rights as a stockholder of the Company with respect to the hypothetical shares of Common Stock credited to the Stock Equivalent Sub-Account. Cash dividends, if any, shall be credited to a Participant's Stock Equivalent Sub-Account in accordance with Section 3(d)(i) and the number of hypothetical shares of Common Stock credited to Stock Equivalent Sub-Accounts shall be adjusted in accordance with Section 3(d)(ii).

(aa) **Valuation Date.** The last business day of each month within the Plan Year and such other dates as may be determined by the Administrator for valuing Participant Accounts.

**IN WITNESS WHEREOF,** the Company has caused this Plan to be executed by its duly authorized officer.

**MATTEL, INC.**

Dated:   12-19-08                                                    By:  /s/ ALAN KAYE

14

Exhibit E - Page 453

M 0932449

**Exhibit 10.36**

## MATTEL, INC.

## 2005 SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN

**(As amended and restated effective January 1, 2009)**

Exhibit E - Page 454

M 0932450

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| ARTICLE I | NAME, HISTORY AND PLAN PURPOSES | 1 |
| 1.1. | Name and History | 1 |
| 1.2. | Plan Purposes. | 1 |
| ARTICLE II | DEFINITIONS | 1 |
| 2.1. | Actuarial Equivalent or Actuarial Equivalence | 1 |
| 2.2. | Administrator | 2 |
| 2.3. | Beneficiary | 2 |
| 2.4. | Benefits | 2 |
| 2.5. | Benefit Base Amount | 2 |
| 2.6. | Board of Directors | 2 |
| 2.7. | Cause | 2 |
| 2.8. | CEO | 2 |
| 2.9. | Change in Control | 2 |
| 2.10. | Code | 3 |
| 2.11. | Company | 4 |
| 2.12. | Compensation | 4 |
| 2.13. | Compensation Committee | 4 |
| 2.14. | DCPEP | 4 |
| 2.15. | Determination Date | 4 |
| 2.16. | Disability | 4 |
| 2.17. | Effective Date | 5 |
| 2.18. | Eligible Employee | 5 |
| 2.19. | Employee | 5 |
| 2.20. | Employer | 5 |
| 2.21. | Employer PIP Amount | 5 |
| 2.22. | ERISA | 5 |
| 2.23. | Final Average Compensation | 5 |
| 2.24. | Forfeiture | 5 |
| 2.25. | HR Officer | 5 |
| 2.26. | Individual Agreement | 6 |
| 2.27. | Involuntary Termination | 6 |
| 2.28. | Month of Service | 6 |
| 2.29. | Eligibility Requirements | 6 |
| 2.30. | Participant | 6 |
| 2.31. | Payment Date | 6 |
| 2.32. | Plan | 6 |
| 2.33. | PIP | 6 |
| 2.34. | Recapture | 6 |
| 2.35. | Related Company | 6 |
| 2.36. | Service | 7 |

Exhibit E - Page 455

M 0932451

| | | |
|---|---|---|
| 2.37. | Termination | 7 |
| ARTICLE III | ELIGIBILITY, PARTICIPATION AND VESTING | 7 |
| 3.1. | Eligibility to Participate | 7 |
| 3.2. | Termination of Participation in Plan. | 7 |
| 3.3. | Vesting | 8 |
| ARTICLE IV | FUNDING OF BENEFITS | 8 |
| 4.1. | Funded Status of Benefits | 8 |
| 4.2. | Rights of Participants. | 8 |
| 4.3. | No Participant Contributions | 8 |
| ARTICLE V | BENEFITS | 8 |
| 5.1. | Reserved. | 8 |
| 5.2. | Benefits | 8 |
| 5.3. | Conditions | 9 |
| 5.4. | Reduction of Benefit | 9 |
| 5.5. | Forfeiture of Benefits | 9 |
| 5.6. | Forfeitures and Recapture. | 9 |
| 5.7. | Change in Control. | 11 |
| ARTICLE VI | PAYMENT OF BENEFITS | 11 |
| 6.1. | In-Service Withdrawals Prohibited | 11 |
| 6.2. | Loans | 11 |
| 6.3. | Commencement of Benefits | 11 |
| 6.4. | Normal Form of Distribution | 11 |
| 6.5. | Optional Forms of Distributions. | 12 |
| 6.6. | Lump Sums | 13 |
| 6.7. | Death Benefits. | 13 |
| 6.8. | Disability | 13 |
| 6.9. | Designation of Beneficiary | 14 |
| 6.10. | Delivery of Payments | 14 |
| 6.11. | Payees Under Legal Disability. | 14 |
| 6.12. | Withholding for Taxes | 14 |
| ARTICLE VII | OPERATION AND ADMINISTRATION OF THE PLAN | 14 |
| 7.1. | Appointment of Administrator | 14 |
| 7.2. | Administrator's Powers | 15 |
| 7.3. | Reporting and Disclosure | 15 |
| 7.4. | Notices and Communications. | 15 |
| 7.5. | Indemnification. | 16 |

Exhibit E - Page 456

M 0932452

| ARTICLE VIII | APPLICATION FOR BENEFITS | 16 |
|---|---|---|
| 8.1. | Application for Benefits | 16 |
| 8.2. | Content of Denial | 17 |
| 8.3. | Appeals. | 17 |
| 8.4. | Exhaustion of Remedies | 18 |
| 8.5. | Amendment to Claims Procedures and Limitations Period | 18 |
| ARTICLE IX | MISCELLANEOUS MATTERS | 19 |
| 9.1. | Amendment or Termination. | 19 |
| 9.2. | Effect of Merger of Company. | 19 |
| 9.3. | No Enlargement of Employee Rights. | 20 |
| 9.4. | Restrictions Against Alienation | 20 |
| 9.5. | Individual Agreements | 20 |
| 9.6. | Interpretation. | 20 |

Exhibit E - Page 457

M 0932453

# ARTICLE I

## NAME, HISTORY AND PLAN PURPOSES

1.1. <u>Name and History</u>. The Company (as defined below) hereby amends and restates the Mattel, Inc. 2005 Supplemental Executive Retirement Plan (the "<u>Plan</u>"), effective as of January 1, 2009 (the "<u>Restatement Effective Date</u>"). The Plan was originally established and adopted by the Company effective as of January 1, 2005 (the "<u>Effective Date</u>"). The Plan and the benefits provided hereunder are subject to Code Section 409A.

1.2. <u>Plan Purposes</u>.

(a) The purpose of the Plan is to enable the Company and Related Companies to attract and retain highly qualified executives and to align their long-term interests with those of the Company. The Plan provides benefits pursuant to Section 5.2 of the Plan to Participants who meet the requirements for such benefits set forth below (and to their Beneficiaries, as defined below), and death and disability benefits as set forth in Sections 6.7 and 6.8. All such benefits (collectively, "<u>Benefits</u>") are subject to Code Section 409A. Prior to the Restatement Effective Date, the Benefits were referred to as the "Part B Benefits" and any reference in an Individual Agreement or otherwise to Part B Benefits shall be deemed for purposes of the Plan to refer to the Benefits.

(b) The Plan is established for the purpose of providing pension benefits to a select group of management or highly compensated employees. The Benefits under the Plan shall be funded solely out of the general assets of the Company. Accordingly, it is intended that the Plan be exempt from the requirements of Parts 2, 3 and 4 of Subtitle B of Title I of ERISA pursuant to Sections 201(2), 301(a)(3), and 401(a)(1) of ERISA. It is expressly intended that ERISA preempt the application of state laws to the Plan, to the maximum extent permitted by Section 514 of ERISA.

# ARTICLE II

## DEFINITIONS

Whenever the following terms are used in the Plan, they shall have the meaning set forth in this Article II.

2.1. <u>Actuarial Equivalent or Actuarial Equivalence</u>. "<u>Actuarial Equivalent</u>" or "<u>Actuarial Equivalence</u>" shall mean the actuarial equivalent or actuarial equivalence, as the context requires, of lump sums and other forms of benefit payments, and for purposes of converting the Employer PIP Amount to a single life annuity form, using the mortality table in effect under Code Section 417(e)(3), and an interest rate equal to 6.5%, or such other mortality table and/or interest rate as the Company's Chief Financial Officer and the HR Officer may from time to time jointly determine; *provided, however,* that such mortality table and/or interest rate shall be reasonable within the meaning of Treas. Reg. § 1.409A-2(b)(2)(ii)(D); and, *provided, further,* that effective as of January 1, 2012, the interest rate used to calculate the actuarial equivalence of lump sum benefits will be the interest rate in effect under Code Section 417 (e)(3) on the first day of the month preceding the month in which the actuarial equivalence is being calculated.

Exhibit E - Page 458

M 0932454

2.2. Administrator. "Administrator" shall mean the individual or individuals designated to serve as such pursuant to Article VII.

2.3. Beneficiary. "Beneficiary" shall mean the person or persons designated under Section 6.9 to receive the Benefit payable in the event of the death of a Participant.

2.4. Benefits. "Benefits" shall have the meaning given in Section 1.2(a).

2.5. Benefit Base Amount. "Benefit Base Amount" for a Participant shall mean the sum of (a) the Participant's Employer PIP Amount and (b) with respect to any Participant set forth on Schedule A, an amount determined in accordance with the terms set forth on Schedule A.

2.6. Board of Directors. "Board of Directors" shall mean the Board of Directors of the Company.

2.7. Cause. "Cause" shall mean (a) "Cause" as defined in the Participant's Individual Agreement, or (b) if the Participant does not have an Individual Agreement or if it does not define "Cause" (or words of like import): (i) an act or acts of dishonesty on the Participant's part; (ii) a material violation by the Participant of the Participant's obligations to the Company or a Related Company; (iii) conduct by the Participant that involves moral turpitude or constitutes a felony; or (iv) fraudulent conduct by the Participant in connection with the business or affairs of the Company or a Related Company, regardless of whether said conduct is designed to defraud the Company, a Related Company or others.

2.8. CEO. "CEO" shall mean the Chief Executive Officer of the Company (or any officer serving in a substantially similar capacity if there is no Chief Executive Officer).

2.9. Change in Control. "Change in Control" shall mean:

(a) The acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person"), of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 35% or more of either (i) the then-outstanding shares of common stock of the Company (the "Outstanding Company Common Stock") or (ii) the combined voting power of the then-outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); *provided, however,* that for purposes of this subsection (a), the following shall not constitute a Change in Control: (A) any acquisition directly from the Company; (B) any acquisition by the Company or any corporation controlled by the Company; (C) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company; (D) any acquisition by a Person of 35% of either the Outstanding Company Common Stock or the Outstanding Company Voting Securities as a result of an acquisition of common stock of the Company by the Company which, by reducing the number of shares of common stock of the Company outstanding, increases the proportionate number of shares beneficially owned by such Person to 35% or more of either the Outstanding Company Common Stock or the Outstanding Company Voting Securities; *provided, however,* that if a Person shall become the beneficial owner of 35% or more of either the Outstanding Company Common Stock or the Outstanding Company Voting Securities by reason of a share acquisition by the Company as described above

2

M 0932455

and shall, after such share acquisition by the Company, become the beneficial owner of any additional shares of common stock of the Company, then such acquisition shall constitute a Change in Control; or (E) any acquisition pursuant to a transaction which complies with clauses (i), (ii) and (iii) of subsection (c) of this Section 2.9; or

(b) Individuals who, as of the date hereof, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board of Directors; *provided, however*, that any individual becoming a director subsequent to the date hereof whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board of Directors; or

(c) Consummation by the Company of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company or the acquisition of assets of another entity (a "Business Combination"), in each case, unless, following such Business Combination, (i) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then-outstanding shares of common stock and the combined voting power of the then-outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership immediately prior to such Business Combination of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be, (ii) no Person (excluding any employee benefit plan (or related trust) of the Company or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 35% or more of, respectively, the then-outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then-outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination and (iii) at least a majority of the members of the board of directors of the corporation resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination; or

(d) Approval by the shareholders of the Company of a complete liquidation or dissolution of the Company.

2.10. Code. "Code" shall mean the Internal Revenue Code of 1986, as amended, the Treasury Regulations thereunder and other relevant interpretive guidance issued by the Internal Revenue Service or the Treasury Department. Reference to any specific section of the Code

3

shall be deemed to include such regulations and guidance, as well as any successor provision of the Code.

2.11. <u>Company</u>. "<u>Company</u>" shall mean Mattel, Inc., and its successors and assigns.

2.12. <u>Compensation</u>. "<u>Compensation</u>" shall mean a Participant's Base Salary, Short-Term Bonus and SERP-Eligible Special Achievement Bonus, as determined on the basis of the calendar year, in accordance with the following rules.

(a) "<u>Base Salary</u>" shall mean the full salary and wages paid by an Employer by reason of services performed by an Employee, subject however to the following special rules:

(i) Except as specified in clause (ii) below, fringe benefits and contributions by the Employer to and benefits under any employee benefit shall not be taken into account in determining Compensation;

(ii) Amounts deducted pursuant to authorization by an Employee or pursuant to requirements of law shall be included in Compensation;

(iii) Amounts deferred by the Employee pursuant to any non-qualified deferred compensation plan, at the time they would have been paid, absent the deferral, regardless of whether such amounts are includable in the Employee's gross income for his or her current taxable year shall be taken into account in determining Compensation; and

(iv) Amounts included in any Employee's gross income with respect to fringe benefits, including but not limited to car allowances, life insurance and financial planning, shall not be taken into account in determining Compensation.

(b) "<u>SERP-Eligible Special Achievement Bonus</u>" shall mean any cash amount paid during the year at the discretion of the Compensation Committee that is designated by the Compensation Committee as such.

(c) "<u>Short-Term Bonus</u>" shall mean the amount paid during the year under the Mattel, Inc. Management Incentive Plan, the 2002 Mattel Incentive Plan, or any successor annual cash incentive plan.

2.13. <u>Compensation Committee</u>. "<u>Compensation Committee</u>" shall mean the Compensation Committee of the Board of Directors.

2.14. <u>DCPEP</u>. "DCPEP" shall mean the Mattel, Inc. Deferred Compensation and PIP Excess Plan, as amended from time to time, or any successor plan or arrangement.

2.15. <u>Determination Date</u>. "<u>Determination Date</u>" shall mean the earliest of the date of the Participant's Termination, Disability or death.

2.16. <u>Disability</u>. A Participant will be deemed to be "<u>Disabled</u>" if he or she is "disabled" as defined in Code Section 409A(a)(2) (C). For purposes of the foregoing, if the definition of

4

"disability" under the applicable group long-term disability plan of the Company (if any) complies with the requirements of Treas. Reg. § 1.409A-3(i)(4), the Participant will be Disabled for purposes of the Plan if there has been a determination that the Participant is permanently disabled and entitled to benefits under such policy.

2.17. Effective Date. "Effective Date" shall have the meaning given in Section 1.1(a).

2.18. Eligible Employee. "Eligible Employee" shall mean an Employee who is part of a select group of management or highly compensated employees within the meaning of ERISA.

2.19. Employee. "Employee" shall mean each person qualifying as a common-law employee of the Company or of a Related Company and scheduled to work full-time (at least 40 hours per week).

2.20. Employer. "Employer" shall mean the Company and any Related Company by which a Participant is employed.

2.21. Employer PIP Amount. "Employer PIP Amount" for any Participant shall mean the annual amount produced by converting (a) the lump sum amount equal to the sum of: (i) the sum of all contributions by the Employer (including, without limitation, any automatic or matching contributions) to a Participant's accounts under the PIP and the DCPEP (including earnings thereon) as of December 31, 2008, increased by interest from such date through the Determination Date, at the rate earned under the Morley Financial Services, Inc. Stable Value Fund (gross of fees) plus 1%, during that period, and (ii) for each payroll date after 2008, the matching contribution and company automatic contribution determined in accordance with the terms set forth on Schedule B, increased by interest from the applicable payroll date through the Determination Date, at the rate earned under the Morley Financial Services, Inc. Stable Value Fund (gross of fees) plus 1%, during that period, into (b) a single life annuity, payable monthly, that is the Actuarial Equivalent, as of the Determination Date, of such lump-sum amount. The formula for calculating the Employer PIP Amount set forth in this Section 2.21 (including Schedule B) may not be changed after December 31, 2008 for any Participant in the Plan as of such date. If the Morley Financial Services, Inc. Stable Value Fund terminates, the interest rate used for purposes of this Section 2.21 shall be the Galliard Capital Management Stable Value Separate Account Composite (net of fees).

2.22. ERISA. "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

2.23. Final Average Compensation. "Final Average Compensation" shall mean the annual average of the Participant's Compensation for the period of 36 consecutive months, out of the period of 120 consecutive months ending on the date of the Participant's Termination, Disability or death, for which the Participant's Compensation was highest.

2.24. Forfeiture. "Forfeiture" shall have the meaning given in Section 5.6(a).

2.25. HR Officer. "HR Officer" shall mean the most senior human resources executive of the Company.

5

M 0932458

2.26. Individual Agreement. "Individual Agreement" of a Participant shall mean any individual employment or severance agreement between an Employer and the Participant.

2.27. Involuntary Termination. "Involuntary Termination" of a Participant shall mean the Participant's Termination that (a) occurs by action of the Employer without Cause, (b) is expressly defined in the Participant's Individual Agreement as an Involuntary Termination for purposes of the Plan, (c) occurs by action of the Participant and, under the Participant's Individual Agreement, either (i) is considered to be for "Good Reason" (or words of like import) as defined in that Individual Agreement or (ii) has the same consequences as a termination by the Employer without Cause or by the Participant for Good Reason because it occurs during the 30-day period beginning six months after an event that is a "Change in Control," as defined in that Individual Agreement.

2.28. Month of Service. "Month of Service" shall mean a one-month period of Service (stated in terms of calendar months with credit given for the actual time served during partial months and not counted as full months).

2.29. Eligibility Requirements. "Eligibility Requirements" shall mean the requirements that a Participant must satisfy in order to be eligible to receive a Benefit.

2.30. Participant. "Participant" shall mean any Employee who becomes a Participant in accordance with Article III.

2.31. Payment Date. "Payment Date" shall mean, as applicable, (a) the first day of the month following the date that is six months after the Participant's Termination (determined in accordance with Code Section 409A(2)(B)(i)); *provided, however*, that if a New Election is made pursuant to Section 6.5(d) that requires the payment of Benefits to be delayed beyond the date determined in the immediately preceding sentence, the Payment Date shall be the first day of the month following such later date determined in accordance with Section 6.5(d); (b) a date as soon as practicable after the Participant's death during the calendar year in which the Participant's death occurred (or by such later date as would not result in the imposition of any additional tax under Code Section 409A); or (c) the final day of the twenty-fourth month of Disability.

2.32. Plan. "Plan" shall have the meaning given in Section 1.1(a).

2.33. PIP. "PIP" shall mean the Mattel, Inc. Personal Investment Plan, as amended from time to time, or any successor plan or arrangement.

2.34. Recapture. "Recapture" shall have the meaning given in Section 5.6(a).

2.35. Related Company. "Related Company" shall mean any corporation or other entity that, together with the Company, is treated as a single employer under Code Section 414(b) or (c), except that such determination shall be made by applying (a) Code Section 1563(a)(1), (2) and (3), for purposes of determining a controlled group of corporations under Code Section 414(b), using the language "at least 50 percent" instead of "at least 80 percent" each place it appears in Code Section 1563(a)(1), (2) and (3), and (b) Treas. Reg. § 1.414(c)-2, for purposes of determining trades or businesses (whether or not incorporated) that are under common control

6

M 0932459

for purposes of Code Section 414(c), using the language "at least 50 percent" instead of "at least 80 percent" each place it appears in Treas. Reg. § 1.414(c)-2.

2.36. Service. "Service" shall mean the period of time (stated in terms of Months of Service) during which the employment relationship between the Participant and an Employer has been maintained, and shall include periods of paid absence (not to exceed six months) and unpaid leave of absence (not to exceed six months) granted by the Employer (including leaves approved for military service or for birth or adoption of a child). Periods of service as a consultant, independent contractor or part-time employee (scheduled to work less than 40 hours per week) shall not count as Service. An Employee shall, if approved by the Compensation Committee, receive credit for service with a Related Company upon becoming a Participant hereunder, with credit measured from the date such Related Company was acquired, and may receive credit for periods of employment with prior employers, but only at the discretion of the Compensation Committee.

2.37. Termination. "Termination" shall mean a Participant's "separation from service" within the meaning of Code Section 409A(a)(2)(A)(i), but shall not include a Participant's death or Disability.

## ARTICLE III

## ELIGIBILITY, PARTICIPATION AND VESTING

3.1. Eligibility to Participate. Each Participant who participated in the Plan immediately prior to the Restatement Effective Date and who is an Eligible Employee on the Restatement Effective Date shall continue to be a Participant in the Plan on the Restatement Effective Date. Any other Eligible Employee who did not participate in the Plan immediately prior to the Restatement Effective Date may be designated as a Participant eligible for Benefits. Each such designation shall indicate the Participant's Eligibility Requirements, if any. Such designations shall be made by the CEO in his or her sole discretion, except that any such designation of the CEO shall be made by the Compensation Committee. For purposes of the Plan, a designation shall be effective on the date such action is or was taken by the CEO or such later date that is or was set by the CEO in such action.

3.2. Termination of Participation in Plan.

(a) A Participant may be designated as no longer eligible for Benefits by the Compensation Committee in its sole discretion, or, in the case of a Participant other than the CEO, by the CEO in his or her sole discretion, effective as of the date such designation is made or a later date specified therein. From and after such designation, notwithstanding any other provision of the Plan, for purposes of determining the affected Participant's Benefit, the Participant's Final Average Compensation and Months of Service shall be determined as if his or her Termination, Disability or death had occurred on the date such designation is effective, and his or her age on the date of his or her actual Termination, Disability or death shall be deemed, for purposes of Sections 5.4, 6.7 and 6.8, to equal the lesser of his or her actual age on that date or 55.

7

Exhibit E - Page 464

M 0932460

(b) In the event that it is determined that allowing any individual to continue participating in the Plan could cause the Plan to violate ERISA, such individual's participation in the Plan (and accrual of any Benefits hereunder) will cease as of the date of such determination, and any vested Benefit shall be distributed to such individual in accordance with the terms of the Plan.

3.3. Vesting. Notwithstanding anything in the Plan to the contrary, no Participant who commences participation in the Plan on or after the Restatement Effective Date shall be eligible to receive Benefits under the Plan unless the Participant completes at least 13 Months of Service following the date the Participant's designation as eligible for Benefits is effective.

## ARTICLE IV

### FUNDING OF BENEFITS

4.1. Funded Status of Benefits. Benefits shall not be funded, but shall be payable out of the general assets of the Company (or a Related Company) when due.

4.2. Rights of Participants.

(a) No Participant shall have a preferred claim on, or a beneficial ownership interest in, any assets of the Company (or a Related Company) prior to the time such assets are paid to him or her in the form of a Benefit.

(b) All rights created under the Plan shall be unsecured contractual rights of Participants against the Company or a Related Company. However, nothing in this document shall in any way diminish any rights of a Participant to pursue his or her rights as a general creditor of Company or a Related Company with respect to his or her Benefits under the Plan.

4.3. No Participant Contributions. No Participant contributions to the Plan are permitted.

## ARTICLE V

### BENEFITS

5.1. Reserved.

5.2. Benefits. A Participant's Benefit, subject to the conditions, limitations, elections and reductions set forth below, shall be payable monthly, in an annual amount, determined as of the Participant's Determination Date, and expressed as a single life annuity, equal to:

(a) 60% of the Participant's Final Average Compensation, determined as of the Determination Date, less

(b) the Participant's Benefit Base Amount.

8

Exhibit E - Page 465

M 0932461

5.3. <u>Conditions</u>. The following conditions must be met in order for a Participant who is eligible for a Benefit (or the Beneficiary thereof) to receive a Benefit in the event of his or her Termination:

 (a) Reserved.

 (b) The Participant's Termination must occur on or after the date on which the Participant has first attained age 55 and completed 60 Months of Service.

 (c) The Participant must satisfy any applicable Eligibility Requirements; *provided* that, unless otherwise specified in connection with the establishment of the Participant's Eligibility Requirements, they shall be waived in the event of the Participant's Involuntary Termination.

5.4. <u>Reduction of Benefit</u>. The Benefit of a Participant whose Termination occurs before the Participant has completed 180 Months of Service shall be the amount computed as set forth in Section 5.2, multiplied by a fraction, the numerator of which is the number of Months of Service completed by the Participant, and the denominator of which is 180. The Benefit of a Participant whose Termination occurs on or after the date on which the Participant attains age 55 and before the Participant attains age 60 shall be reduced, after any applicable reduction pursuant to the preceding sentence, by 0.4167% for each month by which the Participant's age at Termination is less than age 60.

5.5. <u>Forfeiture of Benefits</u>. Notwithstanding the foregoing provisions of the Plan, a Participant and his or her Beneficiary shall not be entitled to any Benefit from and after any date on which (i) the Participant's employment with the Company or a Related Company is terminated for Cause or (ii) the Company determines to impose a Forfeiture as set forth in Section 5.6.

5.6. <u>Forfeitures and Recapture</u>.

 (a) Benefits under the Plan are intended to align the Participants' long-term interests with the long-term interests of the Company and the Related Companies. If a Participant engages in certain activities discussed below, either during employment with the Employer or after such employment terminates for any reason, the Participant is acting contrary to the long-term interests of the Company and the Related Companies. Accordingly, the Company may determine that a Participant and his or her Beneficiary shall forfeit their rights to any as-yet-unpaid Benefit ("<u>Forfeiture</u>") and/or may decide to recapture any amounts previously paid to the Participant or Beneficiary ("<u>Recapture</u>"), as more fully described below.

 (b) Each Participant shall comply with any agreement or undertaking regarding inventions, intellectual property rights, and/or proprietary or confidential information or material that the Participant signed or otherwise agreed to in favor of the Company or any Related Company.

 (c) The Company believes that if a Participant engages in any of following activities in, or directed into, any State, possession or territory of the United States of America or any country in which the Company or any Related Company operates, sells products or does

9

Exhibit E - Page 466

M 0932462

business, then the Participant is acting contrary to the long-term interests of the Company and the Related Companies: (1) rendering services to or otherwise directly or indirectly engaging in or assisting, any organization or business that is or is working to become competitive with the Company and/or any of the Related Companies; or (2) soliciting any non-administrative employee of the Company and/or any Related Company to terminate employment with the Company or such Related Company, as applicable, or to perform services for any organization or business that is or is working to become competitive with the Company and/or any Related Company. The activities described in this Section 5.6(c) are collectively referred to as "Activities Against the Company's Interest."

(d) If the Company determines, in its sole and absolute discretion, that

(i) a Participant has violated any of the requirements of Section 5.6(b) or

(ii) at any time during his or her employment with the Employer, or within three years after his or her Termination or Disability, or at any time while receiving any Benefit, a Participant has engaged in any Activities Against the Company's Interest

(the date on which such violation or activity first occurred being referred to as the "Trigger Date"), then the Company may, in its sole and absolute discretion, impose a Forfeiture of any of the Participant's as-yet-unpaid Benefits and/or a Recapture of any or all Benefit payments made to the Participant, *provided* that such payments were made no earlier than 24 months before the Trigger Date. Within ten days after receiving notice from the Company that Recapture is being imposed as to any Benefit payment, the Participant shall pay to the Company the amount of the Benefit payment subject to the Recapture. It shall not be a basis for Forfeiture or Recapture if after a Participant's Termination or Disability, the Participant purchases, as an investment or otherwise, stock or other securities of such an organization or business, so long as (i) such stock or other securities are listed upon a recognized securities exchange or traded over-the-counter, and (ii) such investment does not represent more than a 5% equity interest in the organization or business.

(e) Upon Termination or Disability, and thereafter upon the request of the Administrator or the Company, the Participant shall certify on a form acceptable to the Company that he or she is in compliance with the terms and conditions of the Plan and shall state the name and address of the Participant's then-current employer or any entity for which the Participant performs business services and the Participant's title, and shall identify any organization or business in which the Participant owns a greater than 5% equity interest.

(f) Notwithstanding the foregoing provisions of this Section 5.6, the Company has sole and absolute discretion not to require Forfeiture and/or Recapture, and its determination not to require Forfeiture and/or Recapture with respect to any particular act by or payment to a particular Participant shall not in any way reduce or eliminate the Company's authority to require Forfeiture and/or Recapture with respect to any other act, payment or Participant.

10

(g) Nothing in this Section 5.6 shall be construed to impose obligations on any Participant to refrain from engaging in lawful competition with the Company or any Related Company after his or her Termination or Disability.

(h) All administrative and discretionary authority given to the Company under this Section 5.6 shall be exercised by the HR Officer or such other person or committee (including without limitation the Compensation Committee or the Administrator) as the Compensation Committee may designate from time to time.

(i) Notwithstanding any provision of this Section 5.6, if any provision of this Section 5.6 is determined to be unenforceable or invalid under any applicable law, such provision will be applied to the maximum extent permitted by applicable law, and shall automatically be deemed amended in a manner consistent with its objectives to the extent necessary to conform to any limitations required under applicable law. Furthermore, if any provision of this Section 5.6 is illegal under any applicable law, such provision shall be null and void to the extent necessary to comply with applicable law.

5.7. Change in Control. 

Notwithstanding any other provision of the Plan, upon a Change in Control, (a) the requirements of Section 5.3 shall cease to apply to those Participants who are employed by the Company or a Related Company on the date of the Change in Control, (b) the reduction in Section 5.4 shall continue to apply, provided that the second sentence therein shall apply to any Participant whose age at Termination is less than age 60 based on the Participant's actual age at Termination and (c) Section 5.6 shall cease to apply to any Participant whose Termination or Disability occurs within the period of 18 months following the Change in Control.

## ARTICLE VI

## PAYMENT OF BENEFITS

6.1. In-Service Withdrawals Prohibited. Participants are not entitled to receive their Benefits prior to Termination, Disability or death.

6.2. Loans. Participants may not borrow funds from the Plan.

6.3. Commencement of Benefits. A Participant's Benefit shall be paid or begin to be paid as soon as administratively practicable after the Participant's Payment Date.

6.4. Normal Form of Distribution. Unless a Participant elects otherwise as provided in Section 6.5, he or she shall receive his or her Benefits for his or her life only in the form of a single life annuity paid in monthly installments. All optional forms of distributions available under Section 6.5 shall be of Actuarially Equivalent value to the normal form of distribution as of the applicable Payment Date.

11

Exhibit E - Page 468

M 0932464

6.5. <u>Optional Forms of Distributions.</u>

(a) Period-Certain Term. An individual may elect, within 30 days of becoming a Participant or at such other time as may be permitted by the Administrator in a manner consistent with Code Section 409A, to receive his or her Benefit to be paid over one of the following period-certain terms—

(i) 15-year certain—A benefit paid in the form of monthly installments over a period of 15 years. If a Participant dies after receiving his or her first payment, the designated Beneficiary shall be entitled to such payments, if any, that remain to be made following the date of death.

(ii) 10-year certain—A benefit paid in the form of monthly installments over a period of 10 years. If a Participant dies after receiving his or her first payment, the designated Beneficiary shall be entitled to such payments, if any, that remain to be made following the date of death.

(b) *Life Benefit Form*. A Participant who does not have an outstanding election to receive his or her Benefit pursuant to Section 6.5(a) may elect, at any time prior to Termination, Disability or death or by such earlier time as may be required by Code Section 409A or the Administrator, to receive his or her Benefit in one of the following optional life benefit forms:

(i) 100% Joint and Survivor Annuity—A benefit which is payable for the life of the Participant and upon the Participant's death, if such Participant is survived by the spouse to whom such Participant was married at the annuity starting date, for the life of such spouse, in an amount equal to 100% of the Benefit payable to such Participant. The Benefit payable to such spouse shall not be terminated on account of such spouse's subsequent remarriage.

(ii) 50% Joint and Survivor Annuity—A benefit which is payable for the life of the Participant and upon the Participant's death, if such Participant is survived by the spouse to whom such Participant was married at the annuity starting date, for the life of such spouse, in an amount equal to 50% of the Benefit payable to such Participant. The Benefit payable to such spouse shall not be terminated on account of such spouse's subsequent remarriage.

(c) *Lump Sum Form*. An individual may elect, within 30 days of becoming a Participant or at such other time as may be permitted by the Administrator in a manner consistent with Code Section 409A, to receive his or her Benefit in the form of a lump-sum distribution.

(d) *Election Changes*. A Participant (i) who had previously made an election to receive his or her Benefit in one of the forms described in Sections 6.5(a) or (c) and wants to change such election (including to change such election to receive his or her Benefit pursuant to Section 6.5(b)) or had failed to make such an election within 30 days of becoming a Participant and wants to elect a form described in Sections 6.5(a) or (c) or (ii) who had previously made an election to receive his or her Benefit in one of the forms described in Section 6.5(b) and wants to change such election to receive his or her Benefit in one of the forms described in Sections 6.5(a)

12

or (c)), may do so by making a new election ("New Election"), *provided, however*, that (x) unless otherwise not required by Code Section 409A, such New Election shall not take effect until 12 months after the date the New Election is made, (y) if the Benefit payment is not triggered by death or Disability, payment of Benefits subject to the New Election shall not commence until five years after the date the payments would otherwise have begun and (z) the New Election is made at least 12 months before the date the first amount was scheduled to be paid.

6.6. Automatic Lump Sums. Notwithstanding Sections 6.7 and 6.8, if the Actuarial Equivalent of the amount payable to a Participant or Beneficiary on the Payment Date is fifty thousand dollars ($50,000) or less, it will automatically be paid in the form of a lump-sum distribution.

6.7. Death Benefits.

(a) If a Participant dies while employed by the Company or a Related Company after having attained age 45 and completed 60 Months of Service, but before having attained age 55, then subject to Section 5.6, the Participant's Beneficiary shall be entitled to a monthly benefit for 15 years, commencing on the Payment Date, in an amount equal to 55% of the Participant's Benefit computed under Section 5.2; *provided, however*, that for every month of age over age 45 attained by the Participant, the amount paid shall be increased by .1667% per Month of Service completed by the Participant.

(b) If a Participant dies while employed by the Company or a Related Company after having attained age 55 and completed 60 Months of Service, then subject to Section 5.6, the Participant's Beneficiary shall be entitled to a monthly benefit for 15 years, commencing on the Payment Date in an amount equal to 100% of the Participant's Benefit computed under Section 5.2; *provided, however*, that for each month by which the first payment precedes the date upon which the Participant would have attained age 60, the amount paid shall be reduced by 0.4167%.

(c) If a Participant dies after Termination or Disability, then subject to Section 5.6, his or her surviving Beneficiary shall be entitled to the payments hereunder, if any, that remain to be made during that portion of the original payout period (selected by the Participant in accordance herewith) following the date of death.

6.8. Disability. If a Participant becomes Disabled at any time after having attained age 45 and completed 60 Months of Service, then such Participant shall, in lieu of any other Benefit, be entitled to a benefit under this Section 6.8. Such disability benefit shall be equal to 55% of the amount of the Participant's Benefit computed under Section 5.2, but increased by .1667% per Month of Service for every month of the Participant's age in excess of 45 years but less than 60 years. Such disability benefit shall be payable as a single life annuity or, to the extent permitted under Section 6.5, a joint and survivor annuity (but not any other form of benefit), in each case commencing on the Payment Date, without regard to the age of the Participant at the time of the Disability. Notwithstanding the foregoing, each monthly payment of such disability benefit shall be reduced (but not below zero) by the amount of all disability benefit payments (if any) that the Participant receives for the same month under all applicable

13

group long-term disability plans of the Employer, to the extent such offset is permitted under Treas. Reg. § 1.409A-3(i)(1)(ii)(A).

6.9. <u>Designation of Beneficiary</u>. In the event Benefits are payable under the Plan on behalf of a deceased Participant who has a surviving spouse, the remaining Benefits will be paid to another Beneficiary only if the spouse consents in writing to such designation. If there is no designated Beneficiary or surviving spouse, the Benefits will be paid to the Participant's estate.

6.10. <u>Delivery of Payments</u>. All payments under the Plan shall be delivered in person or mailed to the last address of the Participant (or, in the case of the death of the Participant, to the last address of his or her Beneficiary). Each Participant shall be responsible for furnishing the Administrator with his or her current address and his or her current facsimile number (if any), and the name and current address of his or her Beneficiary, and such Beneficiary's current facsimile number (if any).

6.11. <u>Payees Under Legal Disability</u>.

(a) Every person receiving or claiming Benefits under the Plan shall be conclusively presumed to be mentally competent and of age until the Administrator receives written notice, in a form and manner acceptable to it, that such person is incompetent or a minor, and that a guardian, conservator, statutory committee, or other person legally vested with the care of his or her estate has been appointed. In the event that the Administrator finds that any person to whom a Benefit is payable under the Plan is unable to properly care for his or her affairs, or is a minor, then any payment due (unless a prior claim therefor shall have been made by a duly appointed legal representative) may be paid to the spouse, a child, a parent, or a brother or sister, or to any person deemed by the Administrator to have incurred expense for such person otherwise entitled to payment.

(b) In the event a guardian, conservator or statutory committee of the estate of any person receiving or claiming Benefits under the Plan shall be appointed by a court of competent jurisdiction, payment shall be made to such guardian, conservator or statutory committee, *provided* that proper proof of appointment is furnished in a form and manner suitable to the Administrator.

(c) Any payment made under the provisions of this Section 6.11 and otherwise in compliance with the Plan shall be a complete discharge of liability therefor under the Plan.

6.12. <u>Withholding for Taxes</u>. Any payments out of the Plan shall be reported to the applicable taxing authorities and may be subject to withholding for taxes that the Company determines are required by any applicable federal, state or other law.

**ARTICLE VII**

**OPERATION AND ADMINISTRATION OF THE PLAN**

7.1. <u>Appointment of Administrator</u>. The Administrator (which may, but need not, include a Participant) shall be appointed by the Compensation Committee.

14

7.2. <u>Administrator's Powers</u>. The Administrator shall have all powers, in his or her sole discretion, necessary to supervise the administration of the Plan and control its operations. In addition to any powers and authority conferred on the Administrator elsewhere in the Plan or by law, the Administrator may exercise the following powers and authority, in his or her sole discretion:

(a) To designate agents to carry out responsibilities relating to the Plan;

(b) To employ such legal, actuarial, accounting, clerical, and other assistance as he or she may deem appropriate in carrying out the provisions of the Plan;

(c) To establish rules and procedures from time to time for the conduct of the Administrator's business and the administration of the Plan;

(d) To administer, interpret, and apply the Plan and to decide all questions which may arise under the Plan; and

(e) To perform or cause to be performed such further acts as he or she may deem to be necessary, appropriate, or convenient in the administration of the Plan.

All actions and determinations by the Administrator shall be final, conclusive and binding upon all parties, to the maximum extent permitted by law.

7.3. <u>Reporting and Disclosure</u>. The Company (and not the Administrator) shall be responsible for the reporting and disclosure of information required to be reported or disclosed pursuant to ERISA or any other applicable law.

7.4. <u>Notices and Communications</u>.

(a) All applications, notices, designations, elections, and other communications from Participants shall be in writing, on forms prescribed by the Administrator. These documents shall be mailed or delivered to the office designated by the Administrator, and shall be deemed to have been given when received by such office.

(b) Each notice, report, remittance, statement, or other communication directed to a Participant or Beneficiary shall be in writing and may be delivered in person or by mail. An item shall be deemed to have been delivered and received by the Participant (i) three days after the date when it is deposited in the United States Mail with postage prepaid, (ii) one day after the date when it is sent by overnight delivery, courier or hand delivery service to the Participant or Beneficiary, and (iii) on the date on which it is sent by facsimile (with confirmation) to the Participant or Beneficiary, in each case at his or her last address or last facsimile number (as applicable) of record with the Administrator.

(c) Notwithstanding any other provision of the Plan, any reference herein to an application, notice, designation, election, report, statement or other communication in writing shall be deemed to include an electronic application, notice, designation, election, report, statement or other communication made on the Internet to the extent permitted by applicable law

15

and such electronic communication shall be deemed to have been delivered and received by the Participant on the date on which it is sent to the Participant or Beneficiary.

7.5. Indemnification.

(a) To the maximum extent permitted by law, the Company shall indemnify each member of the Board of Directors and of the Compensation Committee, the Administrator, and every other Employee with duties under the Plan, against expenses (including any amount paid in settlement) reasonably incurred by him or her in connection with any claims against him or her by reason of the performance of his or her duties under the Plan. The foregoing right of indemnification shall not apply with respect to matters as to which the individual acted fraudulently or in bad faith. Furthermore, the Company shall not be obligated to indemnify any person for any amount incurred through any settlement or compromise of any action unless the Company consents in writing to the settlement or compromise.

(b) The Company shall have the right to select counsel and to control the prosecution or defense of each matter in which indemnification under this Section 7.5 is sought or applies.

## ARTICLE VIII

## APPLICATION FOR BENEFITS

8.1. Application for Benefits. A Participant or a Beneficiary who believes that he or she is being denied a Benefit to which he or she is entitled under the Plan (a "Claimant") may file a written request for such Benefit with the Administrator as set forth below.

(a) The Administrator may require any Claimant to submit an application therefor, together with such other documents and information as the Administrator may require. The Administrator's interpretations, determinations and decisions with respect to any claim shall be made in its sole discretion based on the Plan and other relevant documents and shall be final, conclusive and binding on all persons.

(b) Within 90 days (45 days if the claim is on account of Disability) following receipt of the application and all necessary documents and information, the Administrator's authorized delegate reviewing the claim shall furnish the Claimant with written notice of the decision rendered with respect to the application.

(c) Should special circumstances require an extension of time for processing the claim, written notice of the extension shall be furnished to the Claimant prior to the expiration of the initial 90-day period (or 45-day period if the claim is on account of Disability).

(i) The notice shall indicate:

(A) the special circumstances requiring an extension of time, and

16

(B) the date by which a final decision is expected to be rendered.

(ii) In no event shall the period of the extension exceed 90 days from the end of the initial 90-day period (or, if the claim is on account of Disability, the period of the extension shall not exceed two additional 30-day periods from the initial 45-day period).

8.2. <u>Content of Denial</u>. In the case of a denial of the Claimant's claim for Benefits, the written notice shall set forth:

(a) The specific reason or reasons for the denial;

(b) References to the specific Plan provisions upon which the denial is based;

(c) A description of any additional information or material necessary for perfection of the application (together with an explanation of why the material or information is necessary);

(d) An explanation of the Plan's claims review procedure, including the time limits under Section 8.3 for appealing a denial, and a statement that the Claimant has the right to bring a civil action under Section 502(a) of ERISA following an adverse benefit determination on review; and

(e) In the case of an adverse claim on account of Disability, the information to the Claimant must also include, to the extent necessary, the information set forth in the Department of Labor Regulations § 2560.503-1(g)(1)(v) (or any successor provision).

8.3. <u>Appeals</u>.

(a) A Claimant may appeal a denial of his or her claim by following the appeal procedures set forth in this Section 8.3. Such appeal shall be made to and determined by the most senior human resources executive of the Company or such other person or committee (including without limitation the Compensation Committee or the Administrator) as the Compensation Committee may designate from time to time.

(b) The appeal must be made, in writing, as follows:

(i) if the claim is expressly rejected, within 60 days (180 days if the claim is on account of Disability) after the date of notice of the decision with respect to the application; or

(ii) if the claim has neither been approved nor denied within the applicable period provided in Section 8.1 above, within 60 days after the expiration of the period (180 days if the claim is on account of Disability).

(c) The Claimant may review all pertinent documents and submit issues and comments in writing in connection with the appeal.

17

Exhibit E - Page 474

M 0932470

(d) The decision regarding each appeal shall be made promptly, and not later than 60 days (45 days if the claim is on account of Disability) after the decision-maker's receipt of a request for review, unless special circumstances require an extension of time for processing. In such a case, a decision shall be rendered as soon as possible, but not later than 120 days (90 days if the claim is on account of Disability) after receipt of the request for review.

(e) The decision on review shall:

(i) be in writing;

(ii) include the specific reason or reasons for the decision;

(iii) be written in a manner designed to be understood by the Claimant;

(iv) contain references to the specific Plan provisions upon which the decision is based;

(v) include a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the claim;

(vi) include a statement that the Claimant has the right to bring a civil action under Section 502(a) of ERISA; and

(vii) in the case of an adverse claim on account of Disability, the information to the Claimant must also include, to the extent necessary, the information set forth in the Department of Labor Regulations § 2560.503-1(j)(5) (or any successor provision).

8.4. <u>Exhaustion of Remedies</u>. No legal action for Benefits under the Plan may be brought unless and until the Claimant has exhausted his or her remedies under this Article VIII. No such action may be brought later than four years from the date the claim arose. The Administrator's interpretations, determinations and decisions with respect to any claim shall be made in its sole discretion based on the Plan and other relevant documents and shall be final and binding on all persons.

8.5. <u>Amendment to Claims Procedures and Limitations Period</u>. The Administrator may at any time alter the claims procedure set forth above, provided that the revised claims procedure complies with ERISA and the regulations issued thereunder. The claims procedure set forth in this Article VIII is intended to comply with United States Department of Labor Regulations § 2560.503-1 and should be construed in accordance with such regulation. In no event shall the claims procedure be interpreted as expanding the rights of Claimants beyond what is required by United States Department of Labor Regulations § 2560.503-1.

18

# ARTICLE IX

## MISCELLANEOUS MATTERS

9.1. Amendment or Termination.

(a) Except as otherwise provided in this Section 9.1, the Compensation Committee may amend or terminate the Plan at any time by an instrument in writing executed in the name of the Company.

(b) Subject to Section 9.1(d) below, no amendment may be adopted that would (i) reduce the dollar value of a Participant's vested Benefit, (ii) eliminate a form of benefit payment, or (iii) delay the date on which a Participant's vested Benefit becomes payable, without the consent of the affected Participants; *provided* that a reduction in a Participant's Benefit resulting from a change in the mortality table or interest rate used in determining Actuarial Equivalence as permitted by Section 2.1 shall not require the Participant's consent.

(c) After the occurrence of a Change in Control, no amendment may be adopted that would affect Section 2.9, Section 5.7, this Section 9.1 or Section 9.6(d) of the Plan in a manner adverse to any Participant without that Participant's written consent.

(d) In the event of the termination of the Plan, (i) the requirements of Section 5.3 shall cease to apply to those Participants who are employed by the Company or a Related Company on the date of such termination, (ii) the reduction in Section 5.4 shall continue to apply, provided that the second sentence therein shall apply to any Participant whose age on the date of such termination is less than age 60 based on the Participant's actual age on such date, and (iii) Section 5.6 shall cease to apply; *provided, however,* that no termination of the Plan shall be effective for any Participant who has not completed the service requirement set forth in Section 3.3 until such Participant completes such service requirement. The termination of the Plan will not accelerate the date on which Benefits become payable under the Plan unless the payment of such Benefits is made in accordance with the applicable requirements of Treas. Reg. § 1.409A-3(j)(4)(ix).

(e) Notwithstanding any other provision of the Plan, the Plan may be amended at any time and in any manner that the Compensation Committee determines, in its sole and absolute discretion, to be necessary to ensure that the Plan and all Benefits thereunder comply with the requirements of Code Section 409A.

9.2. Effect of Merger of Company.

(a) In the event of a consolidation, merger, sale, liquidation, or other transfer of substantially all of the operating assets of the Company to any other company, the ultimate successor or successors to the business of the Company shall automatically be deemed to have elected to continue the Plan in full force and effect, in the same manner as if the Plan had been adopted by resolution of its board of directors.

(b) The presumption set forth in Section 9.2(a) above shall not apply if the successor, by resolution of its board of directors, elects not to so continue the Plan in effect. In

19

such a case, the Plan shall terminate as of the effective date set forth in the board resolution. The termination of the Plan will not accelerate the date on which Benefits become payable under the Plan unless the payment of such Benefits is in accordance with the applicable requirements of Treas. Reg. § 1.409A-3(j)(4)(ix).

9.3. No Enlargement of Employee Rights.

(a) The Plan is strictly a voluntary undertaking on the part of the Company and shall not be deemed to constitute a contract between the Company (or a Related Company) and any Employee, or to be consideration for, or an inducement to, or a condition of, the employment of any Employee.

(b) Nothing contained in the Plan shall be deemed to give any Employee the right to be retained in the employ of the Company (or a Related Company) or to interfere with the right of the Company (or a Related Company) to discharge any Employee at any time.

9.4. Restrictions Against Alienation. A Participant's Benefit under the Plan may not be assigned or alienated, either voluntarily or involuntarily.

9.5. Individual Agreements. In the case of a Participant whose terms of employment with the Company or a Related Company are subject to the provisions of an Individual Agreement, to the extent that the terms of the Individual Agreement provide the Participant with greater benefits than would otherwise be determined under the provisions of the Plan, the terms of the Individual Agreement shall prevail, to the extent set forth in a written agreement between the Company and to the Participant dated on or after the Effective Date.

9.6. Interpretation.

(a) Article and Section headings are for reference only and shall not be deemed to be part of the substance of this instrument or to enlarge or limit the contents of any Article or Section.

(b) Unless the context clearly indicates otherwise, masculine gender shall include the feminine, the singular shall include the plural, and the plural shall include the singular.

(c) In the case of any ambiguity, the Plan shall be construed in such a manner so as to comply with the provisions of ERISA, including the fact that it is intended that the Plan be exempt from the requirements of Parts 2, 3 and 4 of Subtitle B of Title I of ERISA pursuant to Sections 201(2), 301(a)(3), and 401(a)(1) of ERISA.

(d) Notwithstanding any other provisions of the Plan to the contrary and to the extent applicable, it is intended that the Plan comply with the requirements of Code Section 409A, and the Plan shall be interpreted, construed and administered in accordance with this intent, so as to avoid the imposition of taxes and penalties on Participants pursuant to Code Section 409A. The Company and the Related Companies shall have no liability to any Participant, Beneficiary or otherwise if the Plan or any amounts paid or payable hereunder are subject to the additional tax and penalties under Code Section 409A.

20

(e) Prior to the Restatement Effective Date, the Company operated the Plan in good faith compliance with Section 409A and certain Internal Revenue Service transitional rules then in effect. Unless subsequently changed in accordance with Section 6.5(d), written distribution elections prior to the Restatement Effective Date shall remain in effect hereunder, even to the extent that the specific election choices offered for such period may not be available under the terms of this Plan document and/or specific election choices available under this Plan document may not have been offered, provided that subsequent actions with respect to such elections (e.g., changes thereto, forms of distribution, claims procedures) shall be governed by the terms of this Plan document.

IN WITNESS WHEREOF, Mattel, Inc. has caused this instrument to be executed by its duly authorized officer, effective as of January 1, 2009.

**MATTEL, INC.**

By: /s/ ALAN KAYE
Name: Alan Kaye
Title:  Senior Vice President, Human Resources

21

**Schedule A**

**Calculation of Benefit Base Amount**

1.   For Neil Friedman, the amount included in the Benefit Base Amount pursuant to Section 2.5(b) shall be equal to $18,247.53 per month at age 65, subject to reduction pursuant to the terms of the Fisher-Price Pension Plan for retirement prior to age 65.

M 0932475

**Schedule B**

**Calculation of Employer PIP Amount**

For each calendar year after 2008, the amount of the matching contribution and company automatic contribution for purposes of calculating the Employer PIP Amount in accordance with Section 2.21 shall be determined as follows:

1. The matching contribution shall be an amount equal to 4% of Base Salary on each payroll date.

2. The company automatic contribution shall be an amount equal to a percentage of the Participant's Base Salary on each payroll date determined in accordance with the following schedule:

| Participant's Age as of the Applicable Payroll Date | Percentage of Base Salary |
|---|---|
| 20 but less than 30 years | 3% |
| 30 but less than 40 years | 4% |
| 40 but less than 45 years | 5% |
| 45 but less than 50 years | 6% |
| 50 but less than 55 years | 7% |
| 55 years and older | 8% |

Exhibit 10.44

ELEVENTH AMENDMENT TO

THE FISHER-PRICE PENSION PLAN

WHEREAS, Mattel, Inc. ("Mattel") sponsors the Fisher-Price Pension Plan for the benefit of eligible employees of Fisher-Price, Inc. and certain other subsidiaries; and

WHEREAS, the provisions of the Plan are set forth in a 1994 Restatement, as amended; and

WHEREAS, Mattel desires to amend the Plan to (i) add a joint and 75% survivor annuity optional form of benefit, (ii) change the actuarial assumptions used to calculate optional forms of benefit and (iii) revise the interest rate applicable to retroactive payments made as of a retroactive annuity start date; and

WHEREAS, in Section 9.1 of the Plan, Mattel reserved the right to amend the Plan at any time in whole or in part;

NOW, THEREFORE, to effect the foregoing, Mattel does hereby declare that the Plan be, and hereby is, amended as follows effective as of January 1, 2008:

1. The second sentence of the second paragraph of Section 4.1(a) shall be amended to read as follows:

"In calculating the actuarial equivalent of the accrued monthly pension benefit to which the Participant is entitled at his annuity starting date, equivalence for benefits as of an annuity starting date prior to January 1, 2008 shall be determined on the basis of the factors set forth in Schedule C. Equivalence for benefits as of an annuity starting date on or after January 1, 2008 shall be determined on the basis of the RP-2000 Mortality Table (weighted 50% for males and 50% for female) and 7% interest; provided that, in no event shall the resulting benefit payable as of such annuity starting date be less than the accrued monthly pension benefit as of December 31, 2007 payable as of such annuity starting date based on the assumptions in effect prior to January 1, 2008."

2. Section 4.3 shall be deleted in its entirety and replaced with the following:

"Section 4.3. Other Optional Forms.

(a) Joint and 75% Annuity Option. A Participant may elect to receive a retirement benefit payable monthly for the life of the Participant and upon the Participant's death, if such Participant is survived by the spouse to whom such Participant was married at the annuity starting date, for the life of such spouse, in an amount equal to 75% of the benefit payable to such Participant.

(b) Ten Years Certain Option. A Participant may elect to receive a retirement benefit payable monthly during his lifetime and terminating with the monthly payment coinciding with or next preceding the date of his death, with the provision that 120 monthly payments shall be made in any event to him or such beneficiary or beneficiaries as he may have designated. Such election shall be by written notice to the Company.

If a Participant and his beneficiary or beneficiaries die after the Participant has retired but before a total of 120 monthly payments have been made to the Participant and his beneficiary, a commuted lump sum payment shall be made to the estate of the last survivor of the Participant and his beneficiary or beneficiaries. The calculation of such commuted lump sum value shall be made based on the interest rate assumption set forth in Section 5.4. The designation of a beneficiary or beneficiaries under this option may be changed at any time, and a beneficiary receiving payments under this option may designate a beneficiary other than his estate.

(c) Required Minimum Distributions. Unless the Participant's spouse is the sole designated Beneficiary under this Section 4.3, and the form of distribution is a period certain and no life annuity, the period certain for an annuity distribution commencing during the Participant's lifetime may not exceed the applicable distribution period for the Participant under the Uniform Lifetime Table set forth in Section 1.401(a)(9)-9 of the Treasury regulations for the calendar year that contains the annuity starting date. If the annuity starting date precedes the year in which the Participant reaches age 70, the applicable distribution period for the Participant is the distribution period for age 70 under the Uniform Lifetime Table set forth in section 1.401(a)(9)-9 of the Treasury regulations plus the excess of 70 over the age of the Participant as of the Participant's birthday in the year that contains the annuity starting date. If the Participant's spouse is the Participant's sole designated Beneficiary and the form of distribution is a period certain and no life annuity, the period certain may not exceed the longer of the Participant's applicable distribution period, as determined under this section, or the joint life and last survivor expectancy of the Participant and the Participant's spouse as determined under the Joint and Last Survivor Table set forth in section 1.401(a)(9)-9 of the Treasury regulations, using the Participant's and spouse's attained ages as of the Participant's and spouse's birthdays in the calendar year that contains the annuity start date.

(d) Actuarial Equivalence Factors. Any optional form of benefit commencing as of an annuity starting date prior to January 1, 2008 shall be determined on the basis of the factors set forth in Schedule C. Any optional form of benefit commencing as of an annuity starting date on or after January 1, 2008 shall be determined on the basis of the RP-2000 Mortality Table (weighted 50% for males and 50% for female) and 7% interest; provided that, in no event shall the resulting benefit payable as of such annuity starting date be less than the

accrued benefit as of December 31, 2007 payable as of such annuity starting date based on the assumptions in effect prior to January 1, 2008."

3. The third sentence of Section 4.6 shall be amended to read as follows:

"Any interest paid in accordance with this Section prior to January 1, 2008, shall be calculated using the applicable interest rate used to determine the present value of a Participant's accrued monthly pension benefit under the Plan as of the Benefit Commencement Date as described in Section 5.4. Any interest paid in accordance with this Section on or after January 1, 2008, shall be calculated using the interest rate on 30-year Treasury securities in effect for the month of October preceding the first day of the Plan Year in which the Benefit Commencement Date occurs."

4. Except as expressly or by necessary implication amended hereby, the Plan shall continue in full force and effect.

IN WITNESS WHEREOF, Mattel has caused this instrument to be executed by its duly authorized officer this 19 day of December, 2008.

MATTEL, INC.

By:     /s/ ALAN KAYE
Name: Alan Kaye
Title:  Senior Vice President, Human Resources

Exhibit 10.46

## The Fisher-Price Excess Benefit Plan

The Fisher-Price Excess Benefit Plan (the "Plan") is continued with this document. The Plan was originally established June 28, 1991. Following a corporate reorganization in January, 1995, the Plan was continued by the newly formed and renamed corporate entities now known as Fisher-Price, Inc. and Mattel Operations, Inc. Beginning in January, 1998, the Plan was extended to Tyco Preschool, Inc. upon the inclusion of Tyco Preschool, Inc. as a covered employer under the Fisher-Price Pension Plan, as amended from time to time (the "Pension Plan"). The term "Company" as used in the Plan shall refer to each employer that has adopted and has employees participating in the Pension Plan. As a result of the enactment in 2004 of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), and the regulations and other guidance promulgated thereunder ("Section 409A"), the Company wishes to amend and restate the Plan effective as of January 1, 2009 to conform the written terms of the Plan to the requirements of Section 409A.

The Plan is intended to be an unfunded "excess benefit plan" within the meaning of Sections 3(36) and 4(b)(5) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"); *provided, however*, that, to the extent, if any, that the Plan provides benefits which cannot be provided by an "excess benefit plan," the Plan shall be considered and interpreted in all respects as an unfunded "top-hat" plan maintained primarily to provide deferred compensation benefits for a select group of management or highly compensated employees within the meaning of Sections 201(2), 301(a)(3) and 401(a)(1) of ERISA and therefore to be exempt from Parts 2, 3 and 4 of Subtitle B of Title I of ERISA to the maximum extent permissible under the provisions thereof. The purpose of the Plan is to provide benefits to certain participants in the Pension Plan in excess of the compensation limitation under Section 401(a)(17) of the Code ("Section 401(a)(17)") or the limitations on benefits imposed by Section 415 of the Code ("Section 415") and to make up for any loss in benefit under the Pension Plan as a result of the deferral of compensation by the Participant pursuant to a non-qualified deferred compensation plan.

Fisher-Price, Inc., on behalf of itself and the other Companies participating in the Pension Plan, hereby continues the terms and provisions of the Plan by restating the Plan as follows:

1. Each term used in the Plan and also used in the Pension Plan shall have the same meaning herein as under the Pension Plan.

2. If a Participant shall be entitled to receive a retirement benefit under the Pension Plan, the Participant will be entitled to a benefit payable under the Plan equal to:

    (a) the Participant's accrued monthly pension benefit (as calculated under the Pension Plan using the actuarial assumptions and methods then used under the Pension Plan) that such Participant would have been paid under the Pension Plan upon normal retirement (i) without regard to the limitation on benefits imposed by Section 401(a)(17) or Section 415 and (ii) by including any deferral of compensation by the Participant pursuant to a nonqualified deferred compensation plan as compensation for purposes of the Pension Plan, at the time such deferrals would have been paid absent

the deferral, provided that had the compensation been paid to the Participant it would have been treated as compensation for purposes of the Pension Plan, regardless of whether such amounts are includable in the Participant's gross income;

reduced by

(b)   the Participant's accrued monthly pension benefit under the Pension Plan.

Subject to the following paragraph, such amount shall be paid upon the later of (i) a Participant's "separation from service" within the meaning of Treas. Reg. §1.409A-1(h), whether voluntary or involuntary and (ii) the Participant's attainment of age 55; *provided, however*, that if a Participant is a "specified employee" (within the meaning of Section 409A(a)(2)(B)(i) of the Code) as of the date of the Participant's "separation from service" and the benefit under the Plan becomes payable as a result of such "separation from service," such amount shall not be paid prior to the first business day of the seventh month following the Participant's "separation from service" or, if earlier, during the calendar year in which the Participant's death occurred. Simple interest will be paid on the amount delayed hereunder from the date such payment would have been made to the Participant but for the proviso in the preceding sentence, to the date of actual payment, at the interest rate used to determine the benefit under the Plan. Any payment pursuant to this paragraph on account of the Participant's death will be paid to the Participant's surviving spouse or, if none, the Participant's estate.

If a Participant dies before payment of the benefit payable under the Plan (other than during any delay required pursuant to the proviso in the prior paragraph), such amount shall be paid to the Participant's surviving spouse or, if the Participant has no spouse, to the Participant's dependents, if such spouse or dependent is otherwise eligible for a death benefit under the Pension Plan. The amount of the benefit shall be calculated as set forth above in this Section 2, but substituting the corresponding survivor benefit under the Pension Plan for the Participant's pension benefit in both paragraphs (a) and (b), above. Such amount shall be paid upon the later of (i) the date the Participant would have reached age 55 or (ii) during the calendar year in which the Participant's death occurred.

Payment will be in the form of a single lump sum only. For purposes of the foregoing, the lump sum value shall be determined using the 1971 Group Annuity Mortality Tables (compiled on a unisex basis weighted 60% male and 40% female) and the interest rate shall be such rate as of the January 1 preceding the date of the distribution (or as of the date of the distribution if the rate is then less) used by the Pension Benefit Guaranty Corporation for purposes of determining the present value of a lump sum distribution on plan termination. Notwithstanding the immediately preceding sentence, the lump sum value of accruals after December 31, 2008 shall be determined on the same basis used for determining the value of lump sum distributions under the Pension Plan for such period.

3.  The Plan shall not be a funded plan for purposes of ERISA, and the Company shall not set aside any funds, or make any investments, for the specific purpose of making payments under the Plan in a manner that would cause the Plan to be considered funded under ERISA. Any payments hereunder shall be made out of the general assets of the Company. Notwithstanding the preceding, the Company may transfer funds to and may, but need not, make payments through any trust which it deems to comply with the preceding in order to meet its obligation under the Plan. Notwithstanding anything herein or in any trust providing benefits under the Plan to the contrary, no asset shall be set aside or transferred to any such trust if such set aside or transfer would violate applicable law or result in the imposition of the additional tax under Section 409A.

4.  Fisher-Price, Inc., by action of its Board of Directors, or a designated officer through authority delegated by such Board of Directors, shall have the right at any time to amend the Plan in any respect or to terminate the Plan; *provided, however*, that such amendment or termination shall not (i) reduce the benefits payable under the Plan below the benefits to which any person would have been entitled hereunder at the time of such amendment or termination or (ii) accelerate the payment of any amount from the date on which such amount otherwise is payable hereunder except as permitted pursuant to Treas. Reg. §1.409A-3(j).

5.  The Plan shall be administered, interpreted and construed by the Mattel Administrative Committee. The claims procedure applicable to claims and appeals under the Pension Plan shall apply to any claims under the Plan and appeals of any such denied claims.

6.  The interest of any Participant and the interest, if any, of any Participant's spouse or other beneficiary of any Participant's spouse or other beneficiary of any Participant may not be assigned or alienated either by voluntary or involuntary assignment or by operation of law.

7.  Neither the Plan nor any of its provisions shall be construed as giving any Participant a right to continue in the employ of the Company.

8.  Subject to the provisions of Section 4, the Plan shall terminate when the Pension Plan terminates; *provided, however*, that any distribution in respect of a termination pursuant to this Section 8 will be only in accordance with the provisions of Section 409A and Treas. Reg. §1.409A-3(j)(4)(ix).

9.  Notwithstanding any other provisions of the Plan to the contrary, it is intended that the Plan comply with the requirements of Section 409A regardless of whether amounts were deferred (within the meaning of Treas. Reg. 1.409A-6(a)(1)) on, prior to, or after January 1, 2005, and the Plan shall be interpreted, construed and administered in accordance with this intent, so as to avoid the imposition of taxes and penalties on Participants pursuant to Section 409A; *provided, however,* that amounts deferred as of December 31, 2004 with respect to Participants who terminated employment on or before December 31, 2004 and for whom no

amounts are deferred after December 31, 2004, are not intended to be subject to the provisions of Section 409A and such amounts shall continue to be subject to the terms and conditions of the Plan in effect prior to January 1, 2005. The Company shall have no liability to any Participant, Participant's spouse or otherwise if the Plan or any amounts paid or payable hereunder are subject to the additional tax and penalties under Section 409A. Prior to January 1, 2009, the Company operated the Plan in good faith compliance with Section 409A and certain Internal Revenue Service transitional rules then in effect.

IN WITNESS WHEREOF, the Plan is executed by a duly authorized officer of Fisher-Price, Inc.

FISHER-PRICE, INC.

By: /s/ ROBERT NORMILE
    Name: Robert Normile
    Title:  Senior Vice President and Secretary

Date: December 22, 2008

**Exhibit 10.48**

MATTEL, INC.
PERSONAL INVESTMENT PLAN
FIRST AMENDMENT TO THE JANUARY 1, 2006 RESTATEMENT

WHEREAS, Mattel, Inc. (the "Company") desires to amend the Plan to (i) revise the eligibility provisions for certain employees, (ii) add an automatic enrollment feature, (iii) make required legislative changes and (iv) make other desired revisions; and

NOW THEREFORE, the Plan is hereby amended effective as of January 1, 2008, unless otherwise specified herein, as follows:

1. Article II of the Plan is amended by the addition of the following Sections 2.3A and 2.3B immediately after Section 2.3:

"2.3A American Girl Flagship Store Employee.

'American Girl Flagship Store Employee' shall mean an Employee at an American Girl store in one of the following locations: Chicago, IL, Los Angeles, CA, or New York, NY.

2.3B American Girl Boutique and Bistro Employee.

'American Girl Boutique and Bistro Employee' shall mean an Employee at an American Girl Boutique and Bistro store in one of the following locations: Atlanta, GA, Boston, MA, Minneapolis, MN or Dallas, TX."

2. Section 3.1(a) of the Plan is amended to read as follows:

"(a) Every Eligible Employee who is not a Murray Hourly Employee, an American Girl Flagship Store Employee or an American Girl Boutique and Bistro Employee shall become eligible to participate in the Plan on the date he becomes an Eligible Employee. Every Eligible Employee who is a Murray Hourly Employee, an American Girl Flagship Store Employee or and American Girl Boutique and Bistro Employee shall become eligible to participate in the Plan on the later of (i) the date he becomes an Eligible Employee and (ii) the date he completes a period of service recognized under Section 2.48 of ninety (90) days."

3. The first paragraph of Section 5.1 of the Plan is designated paragraph "(a)" and a new Section 5.1(b) is added after Section 5.1(a) of the Plan to read as follows:

"(b) A Participant who is first hired or newly rehired on or after January 1, 2008 and who has not elected to have Compensation reduced in accordance with Section 5.1(a) shall be deemed to have elected under Section 5.1(a) to have Compensation reduced by two percent (2%) beginning as soon as administratively practicable following the date the Eligible Employee becomes a Participant. Unless a Participant elects otherwise, such deemed election to have Compensation reduced by two percent (2%) shall be automatically increased by one

**Exhibit E - Page 488**

**M 0932484**

percent (1%), effective as of the first April 1 after the initial deemed deferral election (provided that the first such automatic increase shall not be before April 1, 2009) and as of each April 1 thereafter until such election has been increased to a deemed deferral election of six percent (6%) of Compensation. Each Participant may elect at any time, in accordance with procedures established by the Committee or its designee, not to have Compensation so reduced, or to have Compensation reduced by a different percentage allowed under Section 5.2, which election shall become effective as soon as administratively practicable following receipt of the Participant election. Before-Tax Contributions made pursuant to this automatic election shall be invested in a default investment fund designated for such purpose by the Committee, unless the Participant elects to have such contributions invested otherwise in accordance with Article IV."

4. Effective January 1, 2006, the second sentence of Section 5.5(a) of the Plan is amended to read as follows and all references in Section 5.5 to "Non-Gap Period income" shall be changed to "income":

"If, pursuant to the determination by the Committee, any or all of a Participant's Before-Tax Contributions are not eligible for tax-deferral treatment, then any excess Before-Tax Contributions and any income for that Plan Year (and to the extent required by the Code, gains and income for the Plan Year in which distributed) allocable thereto shall be disposed of in accordance with (i) or (ii) below."

5. Effective January 1, 2007, the first sentence of Section 5.6(a) is amended to read as follows:

"In the event that due to error or otherwise, a Participant's Before-Tax Contributions under this Plan exceed the Deferral Limitation for any calendar year (but without regard to amounts of compensation deferred under any other plan), excess Before-Tax Contributions for the Plan Year, if any, together with any income allocable to such amount for such Plan Year (and to the extent required by the Code, gains and income for the Plan Year in which distributed) shall be distributed to the Participant on or before the first April 15 following the close of the calendar year in which such excess contribution is made."

6. Effective January 1, 2006, all references to "Non-Gap Period income" in Section 6.4 are changed to "income" and the following is added to the end of Section 6.4(c):

"Any distribution of an excess contribution pursuant to this Section 6.4 shall include any Trust gains or other income allocable to the distributed contribution while held in the Trust (but need not include Trust gains and income for the Plan Year in which distributed except to the extent required by the Code)."

IN WITNESS WHEREOF, Mattel, Inc. has caused this instrument to be executed by its duly authorized officer this 19 day of December, 2008, effective as of the dates set forth above.

MATTEL, INC.

By:    /s/ ALAN KAYE

Name: Alan Kaye

Title:  Senior Vice President, Human Resources

Exhibit E - Page 490

M 0932486

Exhibit 10.76

## AMENDMENT NO. 1
## TO THE
## MATTEL, INC. 2005 EQUITY COMPENSATION PLAN

**WHEREAS,** Mattel, Inc. ("Mattel") maintains the Mattel, Inc. 2005 Equity Compensation Plan (the "Plan");

**WHEREAS,** pursuant to Section 22 of the Plan, Mattel reserved the right to amend the Plan in whole or in part from time to time by action of the Board of Directors of Mattel (the "Board"); and

**WHEREAS,** as a result of the enactment in 2004 of Section 409A of the Internal Revenue Code of 1986, as amended from time to time (the "Code"), the Board desires to amend the Plan document to evidence the intention that the terms of the Plan comply with Section 409A of the Code.

**NOW, THEREFORE,** pursuant to Section 22 of the Plan, the Plan is hereby amended, effective as of November 20, 2008, as follows:

1. **Capitalized Terms.** Capitalized terms that are not defined in this Amendment No. 1 shall have the meanings ascribed thereto in the Plan.

2. Section 2(a) of the Plan is hereby amended in its entirety to read as follows:

" 'Affiliate' means a corporation or other entity controlled by, controlling or under common control with, Mattel, other than a Subsidiary. For purposes of determining eligibility for grants of Non-Qualified Stock Options and Stock Appreciation Rights or whether a Participant has experienced a 'separation from service' (as such term is defined and used in Code Section 409A), an Affiliate means a 'service recipient' (within the meaning of Code Section 409A); provided that such definition of 'service recipient' shall be determined by (a) applying Code Section 1563(a)(1), (2) and (3), for purposes of determining a controlled group of corporations under Code Section 414(b), using the language 'at least 50 percent' instead of 'at least 80 percent' each place it appears in Code Section 1563(a)(1), (2) and (3), and by applying Treasury Regulations Section 1.414(c)-2, for purposes of determining trades or businesses (whether or not incorporated) that are under common control for purposes of Code Section 414(c), using the language 'at least 50 percent' instead of 'at least 80 percent' each place it appears in Treasury Regulations Section 1.414(c)-2, and (b) where the use of the following modified definition is based upon legitimate business criteria, by applying Code Section 1563(a)(1), (2) and (3), for purposes of determining a

M 0932487

controlled group of corporations under Code Section 414(b), using the language 'at least 20 percent' instead of 'at least 80 percent' at each place it appears in Code Section 1563(a)(1), (2) and (3), and by applying Treasury Regulations Section 1.414(c)-2, for purposes of determining trades or businesses (whether or not incorporated) that are under common control for purposes of Code Section 414(c), using the language 'at least 20 percent' instead of 'at least 80 percent' at each place it appears in Treasury Regulations Section 1.414(c)-2."

3. Section 2(h) of the Plan is hereby amended in its entirety to read as follows:

" 'Change in Control' has the meaning given in Section 17(b), as modified by Section 17(c)."

4. Section 2(p) of the Plan is hereby amended in its entirety to read as follows:

" 'Disability': a Participant's Severance will be considered to have occurred because of Disability if: (i) in the case of a Participant who was (before his or her Severance) an employee of the Company, there has been a determination that the Participant is permanently disabled and entitled to benefits under the applicable group long-term disability plan of the Company or, if there is no such applicable plan, under a government plan or program applicable to the Participant; and (ii) in the case of a Participant who was (before his or her Severance) an Outside Director or other non-employee service provider, the Committee determines that the Participant's membership on the Board or status as a service provider has terminated as a result of his or her disability. Notwithstanding the foregoing, if a Severance that meets the foregoing definition of Disability is also a Retirement, it shall be treated for all purposes under the Plan as a Retirement and not a Disability. In addition, with respect to an Incentive Stock Option, Disability means a permanent and total disability as defined in Code Section 22(e)(3) and, with respect to all Grants, to the extent required by Code Section 409A, 'disability' within the meaning of Code Section 409A."

5. Section 2(uu) of the Plan is hereby amended in its entirety to read as follows:

" 'Severance' of a Participant means (i) for purposes of Grants made to a Participant as compensation for services as an employee of the Company, that the Participant has ceased to be an employee

2

of the Company for any reason, regardless of whether the Participant serves as an Outside Director and/or other service provider to the Company thereafter; (ii) for purposes of Grants made to a Participant as compensation for services as an Outside Director, that the Participant has ceased to be an Outside Director for any reason, and is neither employed by, nor providing services to, the Company in any other capacity; and (iii) for purposes of Grants made to a Participant as compensation for services in any capacity other than as an employee of the Company or an Outside Director, that the Participant has ceased (in the sole and absolute judgment and discretion of the Company) to provide such services, and is neither employed by the Company nor serving as an Outside Director. Severance shall be considered to occur at the close of business on the day on which the applicable relationship to the Company ends, whether or not that day is also the Participant's last day worked; provided, that the Company may in its sole discretion establish in writing a different date on which a particular Participant's Severance shall be considered to occur. If a Participant is employed by or providing services to a Subsidiary or Affiliate that ceases to be a Subsidiary or Affiliate for any reason (including, without limitation, as a result of a public offering, or a spinoff or sale by the Company, of the stock of a Subsidiary), the relationship of the Participant to the Company as an employee or service-provider, as applicable, shall be considered to have ended as a result of that cessation unless that relationship is transferred to Mattel or one of its continuing Subsidiaries or Affiliates in connection therewith. Notwithstanding the foregoing, with respect to any Grant subject to Code Section 409A (and not exempt therefrom), 'Severance' of a Participant means a Participant's 'separation from service' (as such term is defined and used in Code Section 409A)."

6. Section 2(yy) of the Plan is hereby amended in its entirety to read as follows:

" 'Substitute Grant' has the meaning given in Section 5(a). Such Substitute Grants shall be on such terms and conditions as the Committee may prescribe, subject to compliance with the Incentive Stock Option requirements of Code Section 422 and the nonqualified deferred compensation requirements of Code Section 409A, where applicable."

3

7. Section 8(d) of the Plan shall be deleted in its entirety.

8. Section 11(d) of the Plan is hereby amended in its entirety to read as follows:

"Restricted Stock Units. A Participant may not assign or alienate his or her interest in Restricted Stock Units, and shall not have any of the rights of a stockholder of Mattel with respect to the Restricted Stock Units unless and until shares of Common Stock are actually delivered to the Participant in settlement thereof. Except to the extent the Committee establishes otherwise for a Grant of Restricted Stock Units (for example, a Restricted Stock Unit that vests upon Retirement granted to a Participant whose Retirement could occur while the Restricted Stock Unit is outstanding), each Restricted Stock Unit shall be settled no later than the fifteenth day of the third month after the end of the calendar year in which such Restricted Stock Unit ceases to be subject to a 'substantial risk of forfeiture' within the meaning of Code Section 409A. To the extent that settlement of a Restricted Stock Unit is at a later date, the terms and conditions of the Restricted Stock Unit shall be established and interpreted in accordance with Section 20 below."

9. Section 12 of the Plan is hereby amended in its entirety to read as follows:

"The Committee may include Dividend Equivalents on shares of Common Stock that are subject to Grants, and may make separate Grants of Dividend Equivalents with respect to a specified number of hypothetical shares. The Committee shall specify in the Grant such terms as it deems appropriate regarding the Dividend Equivalents, including when and under what conditions the Dividend Equivalents shall be paid, whether any interest accrues on any unpaid Dividend Equivalents, and whether they shall be paid in cash or in shares of Common Stock or a combination thereof. In the case of Dividend Equivalents that are part of other Grants, the Committee may specify that they are payable currently or only when the Grant vests. Unless the Committee otherwise specifies in the Grant, Dividend Equivalents shall be paid to the Participant at least annually, not later than the fifteenth day of the third month following the end of the calendar year in which the Dividend Equivalents are credited (or, if later, the fifteenth day of the third month following the end of the calendar year in which the Dividend Equivalents are no longer subject to a 'substantial risk of forfeiture' within the meaning of Code Section 409A). Any Dividend Equivalents that are accumulated and paid after the date

4

M 0932490

specified in the preceding sentence may be treated separately from the right to other amounts under the Grant."

10. Section 16(a) of the Plan is hereby amended in its entirety to read as follows:

"In the event of (i) a stock dividend, declaration of an extraordinary cash dividend, stock split, reverse stock split, share combination, or recapitalization or similar event affecting the capital structure of Mattel (each, a 'Share Change'), or (ii) a merger, consolidation, acquisition of property or shares, separation, spinoff, reorganization, stock rights offering, liquidation, Disaffiliation, or similar event affecting Mattel or any of its Subsidiaries or Affiliates (each, a 'Corporate Transaction'), the Committee or the Board shall make such substitutions or adjustments as it deems appropriate and equitable to (A) the aggregate number and kind of shares of Common Stock or other securities reserved for Grants under the Plan, (B) the limitations set forth in Sections 5(a) and 5(d), (C) the number and kind of shares or other securities subject to outstanding Grants, (D) the maximum number and kind of shares of Common Stock or other securities to be granted pursuant to Section 13, and (E) the exercise price of outstanding Options and Stock Appreciation Rights."

11. Section 17(c) of the Plan is hereby amended in its entirety to read as follows:

"Notwithstanding the foregoing, (i) effective with respect to any Grant made on or after December 1, 2008, each reference to '20%' or more of the Outstanding Mattel Common Stock or the Outstanding Mattel Voting Securities (or the outstanding shares of common stock of any corporation resulting from a Business Combination) in Section 17(b) shall be deemed to read '35%' and (ii) if any Grant is subject to Code Section 409A, this Section 17 shall be applicable only to the extent specifically provided in the Grant and permitted pursuant to Section 20."

12. Section 20 of the Plan is hereby amended in its entirety to read as follows:

"(a) It is the intention of Mattel that no Grant shall be 'nonqualified deferred compensation' subject to Code Section 409A, unless and to the extent that the Committee specifically determines otherwise as provided below, and the Plan and the terms and conditions of all Grants shall be interpreted, construed and administered in accordance with this intent, so as to avoid the imposition of taxes and penalties on Participants pursuant to

5

M 0932491

Section 409A. The Company shall have no liability to any Participant or otherwise if the Plan or any grant, vesting, exercise or payment of any Grant hereunder are subject to the additional tax and penalties under Code Section 409A. Notwithstanding any other provision of the Plan to the contrary, with respect to any Grant that is subject to Code Section 409A, if a Participant is a 'specified employee' (as such term is defined in Code Section 409A and as determined by the Company) as of the Participant's Severance, any payments (whether in cash, Common Stock or other property) to be made with respect to the Grant upon the Participant's Severance will be accumulated and paid (without interest) on the earlier of (i) first business day of the seventh month following the Participant's 'separation from service' (as such term is defined and used in Code Section 409A) or (ii) the date of the Participant's death.

(b) The terms and conditions governing any Grants that the Committee determines will be subject to Code Section 409A, including any rules for elective or mandatory deferral of the delivery of cash or shares of Common Stock pursuant thereto and any rules regarding treatment of such Grants in the event of a Change in Control, shall be set forth in writing, and shall comply in all respects with Code Section 409A. Additionally, to the extent any Grant is subject to Code Section 409A, notwithstanding any provision of the Plan to the contrary, the Plan does not permit the acceleration of the time or schedule of any distribution related to such Grant, except as permitted by Code Section 409A.

(c) Notwithstanding any other provision of the Plan to the contrary, if a Change in Control occurs that is not a change in the ownership or effective control of the Company, or in the ownership of a substantial portion of the assets of the Company, within the meaning of Code Section 409A, and payment or distribution of a Grant that is 'nonqualified deferred compensation' subject to Code Section 409A would otherwise be made or commence on the date of such Change in Control (pursuant to the Plan, the Grant or otherwise), (i) the vesting of such Grant shall accelerate in accordance with the Plan and the Grant, (ii) such payment or distribution shall not be made or commence prior to the earliest date on which Code Section 409A permits such payment or distribution to be made or commence without additional taxes or penalties under Code Section 409A, and (iii) in the event any such payment or distribution is deferred in accordance with the immediately preceding clause (ii), such payment or distribution that would have been made prior to the deferred payment or commencement date, but for Code Section

6

409A, shall be paid or distributed on such earliest payment or commencement date, together, if determined by the Committee, with interest at the rate established by the Committee."

13. **Ratification and Confirmation.** Except as specifically amended hereby, the Plan is hereby ratified and confirmed in all respects and remains in full force and effect.

14. **Governing Law.** This Amendment No. 1 shall be governed by, and construed in accordance with, the laws of the State of Delaware.

15. **Headings.** Section headings are for convenience only and shall not be considered a part of this Amendment No. 1.

**IN WITNESS WHEREOF,** Mattel has caused this Amendment No. 1 to be executed, effective as of November 20, 2008.

**MATTEL, INC.**

By:    /s/ ALAN KAYE
Name:  Alan Kaye
Title:  Senior Vice President,
        Human Resources

Dated: December 19, 2008

7

M 0932493

**Exhibit 10.112**

**Mattel, Inc.**
**Summary of Compensation of**
**the Non-Employee Members of the**
**Board of Directors**

## Remuneration

### *Annual Board Retainer:*

Non-employee members of the Board (each, a "Director") receive a cash retainer of $100,000 per year.

- Retainer payable annually to new and continuing Directors, as of the date of the Annual Meeting of Stockholders (or, in the case of a new Director who joins the Board between the date of the Annual Meeting and the end of the calendar year, as of the date the Director joins the Board).

- Pursuant to the Mattel, Inc. 2005 Equity Compensation Plan (the "2005 Plan"), continuing Directors may elect in advance to receive all or a portion of the annual Board retainer in Mattel common stock.*

- Pursuant to the Mattel, Inc. Deferred Compensation Plan for Non-Employee Directors ("Director Plan"), continuing Directors may also elect in advance to defer all or part of their annual retainer under the Director Plan (see "Deferred Compensation" discussion below).*

- If no elections are made, the Director will receive the entire retainer in cash.

  * *If a Director elects to receive all or a portion of the annual Board retainer in Mattel common stock or elects to defer all or part of the annual retainer under the Director Plan, the number of shares (or the number of phantom shares in the Director Plan in the event of a deferral election) will be calculated based on the fair market value of Mattel common stock on the date of the Annual Meeting.*

  *If either election is made, it will be irrevocable with respect to the year for which it is made.*

1

January 2009

**Exhibit E - Page 498**

M 0932494

**Mattel, Inc.**
**Board of Directors – Compensation Summary**

*Committee Chair Retainer:*

Each non-employee Committee Chair receives a cash retainer per year:

- Audit—$20,000

- Compensation—$20,000

- Other Committees—$10,000

- Retainer payable annually to new and continuing Committee Chairs, as of the date of the Annual Meeting of Stockholders (or, in the case of a Director who is appointed as a Committee Chair between the date of the Annual Meeting and the end of the calendar year, as of the date upon which the Director is first appointed as a Committee Chair).

Continuing Directors may elect in advance to defer these fees under the Director Plan (see "Deferred Compensation" discussion that follows).

*Audit Committee Retainer:*

Each member of the Audit Committee receives a cash retainer of $10,000 per year.

- Retainer payable annually to new and continuing committee members, as of the date of the Annual Meeting of Stockholders (or, in the case of a Director who is appointed to the committee between the date of the Annual Meeting and the end of the calendar year, as of the date upon which the Director is first appointed to the committee).

Continuing Directors may elect in advance to defer these fees under the Director Plan (see "Deferred Compensation" discussion that follows).

*Annual Equity Grant:*

Pursuant to resolutions adopted by the Compensation Committee, upon the date of each Annual Meeting of Stockholders commencing with the 2009 Annual Meeting (or, in the case of a new Director who joins the Board between the date of the Annual Meeting and the end of the calendar year, as of the date the Director joins the Board), each new and continuing Director will be granted restricted stock units with dividend equivalent rights ("RSUs"), with the amount of RSUs determined as follows: each grant will have a dollar value of $100,000 on the date of grant, and the dollar value will be converted to a number of RSUs by dividing the dollar value by the fair market value of Mattel common stock on the date of grant, with the resulting amount rounded to the nearest number of whole RSUs. The RSUs will vest pro rata on a quarterly basis following the date of grant.

Exhibit E - Page 499

M 0932495

**Mattel, Inc.**
**Board of Directors – Compensation Summary**

Continuing Directors may elect to defer their RSU awards under the Director Plan (see "Deferred Compensation" discussion that follows).

**<u>Deferred Compensation</u>**

Directors may elect in advance to defer under the Director Plan:

- all or part of their annual retainer fees, and

- effective as of January 1, 2009, all of their annual RSU awards.

Elections to defer annual retainer fees and/or equity compensation may be made prior to the end of the calendar year immediately preceding the calendar year in which such annual retainer fees and equity compensation will be paid. Each such election will apply only for the upcoming calendar year. Newly-elected Directors may not defer any annual retainer fees or equity compensation received in the year of their election to the Board.

Effective as of January 1, 2009, annual retainer fees deferred under the Director Plan may be allocated to a number of investment options that mirror the investment funds available under the Company's management deferred compensation plan. RSUs deferred under the Director Plan will be credited to a Mattel stock equivalent account and amounts attributable to such RSU deferrals must be paid in the form of Mattel common stock.

Annual retainer fees and equity compensation deferred with respect to a calendar year (and earnings thereon) may be paid in a lump sum or installments over a period of 10 years commencing after the applicable Director ceases to serve on the Board or achieves a specified age set forth in his or her deferral election (which age cannot exceed 72). If a Director's plan-year balance is less than $5,000, distribution of such balance will be made in a lump sum. If a Director makes a deferral election with respect to his or her RSU award, the Director will not recognize income upon the vesting in the deferred RSUs.

In 2008, the Company amended the Director Plan to comply with Section 409A of the Internal Revenue Code and IRS regulations and guidance pursuant to Section 409A.

January 2009

Exhibit E - Page 500

M 0932496

**Mattel, Inc.**
**Board of Directors – Compensation Summary**

## Stock Ownership

The Board has, as part of its Guidelines on Corporate Governance, adopted policies regarding (i) director stock ownership, pursuant to which each Director is to achieve a target minimum level of stock ownership, in an amount equal to three times the annual Board retainer, within five years of joining the Board and (ii) director retention of shares obtained in exercises of stock options and upon vesting of RSUs. These policies are set forth in the Mattel, Inc. Board of Directors Amended and Restated Guidelines on Corporate Governance (the "Guidelines").

In September 2008, the Board provided then-current Directors with up to two additional years to achieve the target stock ownership level, as adjusted to reflect the increased annual retainer. Each Director with less than 5 years of service on the Board as of September 2008 may achieve the adjusted target stock ownership level by the later of (i) five years after the date upon which such Director joined the Board or (ii) two years following the September 2008 Board meeting.

## Miscellaneous/Other Benefits

### *Expense Reimbursement and Travel:*

Mattel will pay all appropriate expenses for Directors' travel on Board business. In most cases, and based on the Director's preference, Mattel will handle any travel arrangements, book airline and hotel reservations and cover billings. Directors are permitted to use aircraft leased by Mattel for purposes of travel on Board business. If the Director prefers, Mattel will reimburse appropriate travel expenses for travel on Board business, including ground transportation (such as taxis and airport limousines), first class air travel, the reasonable cost of charter flights, and, if the Director uses a non-Mattel private aircraft to travel on Mattel Board business, the amount reimbursable under applicable Federal Aviation Regulations, which generally would include variable trip-specific costs or direct operating costs of the travel on Mattel Board business, but not fixed costs such as management fees, capital costs or depreciation.

### *Charitable Gifts:*

Directors may recommend that the Mattel children's foundation make gifts of up to a total of $15,000 each year to one or more non-profit public charities. The foundation also matches up to $5,000 annually for any personal gifts made by the Director.

January 2009

Exhibit E - Page 501

M 0932497

**Mattel, Inc.**
**Board of Directors – Compensation Summary**

*Liability Insurance/Indemnification:*

Directors are provided with liability insurance under a directors, officers and corporate liability insurance policy. Directors are also provided with indemnification in accordance with the Company's bylaws and Delaware law.

5

January 2009

EXHIBIT 11.0

**MATTEL, INC. AND SUBSIDIARIES**

**COMPUTATION OF INCOME PER COMMON AND POTENTIAL COMMON SHARE**

| | For the Year | | | | |
|---|---|---|---|---|---|
| BASIC | 2008 | 2007 | 2006 | 2005 | 2004 |
| | (In thousands, except per share amounts) | | | | |
| Net income applicable to common shares ......... | $379,636 | $599,993 | $592,927 | $417,019 | $572,723 |
| **Applicable Shares for Computation of Net Income Per Share:** | | | | | |
| Weighted average common shares outstanding ...... | 360,757 | 384,450 | 382,921 | 407,402 | 419,235 |
| **Net Income Per Common Share—Basic** .......... | $ 1.05 | $ 1.56 | $ 1.55 | $ 1.02 | $ 1.37 |
| DILUTED | | | | | |
| Net income applicable to common shares ........ | $379,636 | $599,993 | $592,927 | $417,019 | $572,723 |
| **Applicable Shares for Computation of Net Income Per Share:** | | | | | |
| Weighted average common shares outstanding ...... | 360,757 | 384,450 | 382,921 | 407,402 | 419,235 |
| Weighted average potential common shares arising from: | | | | | |
| Dilutive stock options and restricted stock ..... | 2,432 | 6,162 | 3,501 | 3,637 | 3,858 |
| Weighted average number of common and potential common shares ................................ | 363,189 | 390,612 | 386,422 | 411,039 | 423,093 |
| **Net Income Per Common Share—Diluted** ........ | $ 1.05 | $ 1.54 | $ 1.53 | $ 1.01 | $ 1.35 |

EXHIBIT 12.0

**MATTEL, INC. AND SUBSIDIARIES**

**COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES**

| (Unaudited; in thousands, except ratios) | For the Year | | | | |
| | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|
| **Earnings Available for Fixed Charges:** | | | | | |
| Income from continuing operations before income taxes and cumulative effect of changes in accounting principles ...................... | $487,964 | $703,398 | $683,756 | $652,049 | $696,254 |
| Add: Minority interest losses (income) in consolidated subsidiaries ................... | 262 | 255 | 271 | 142 | (93) |
| Add: | | | | | |
|    Interest expense ........................ | 81,944 | 70,974 | 79,853 | 76,490 | 77,764 |
|    Appropriate portion of rents (a) ........... | 29,833 | 28,245 | 25,724 | 20,475 | 18,831 |
|    Earnings available for fixed charges ........ | $600,003 | $802,872 | $789,604 | $749,156 | $792,756 |
| **Fixed Charges:** | | | | | |
| Interest expense ............................. | $ 81,944 | $ 70,974 | $ 79,853 | $ 76,490 | $ 77,764 |
| Appropriate portion of rents (a) ................ | 29,833 | 28,245 | 25,724 | 20,475 | 18,831 |
|    Fixed charges ......................... | $111,777 | $ 99,219 | $105,577 | $ 96,965 | $ 96,595 |
|    Ratio of earnings to fixed charges ...... | 5.37X | 8.09X | 7.48X | 7.73X | 8.21X |

(a) *Portion of rental expenses which is deemed representative of an interest factor, which is one-third of total rental expense.*

M 0932500

EXHIBIT 21.0

## SUBSIDIARIES OF MATTEL, INC.

| Subsidiaries[1] | Jurisdiction in Which Organized | Percentage of Voting Securities Owned Directly or Indirectly By Parent[2] |
|---|---|---|
| American Girl Brands, LLC | Delaware | 100% |
| Mattel Asia Pacific Sourcing Limited | Hong Kong | 100% |
| Mattel de Venezuela, C.A. | Venezuela | 100% |
| Mattel Europa B.V. | The Netherlands | 100% |
| Mattel Europe Holdings B.V. | The Netherlands | 100% |
| Mattel Europe Marketing B.V. | The Netherlands | 100% |
| Mattel Finance, Inc. | Delaware | 100% |
| Mattel Foreign Holdings Ltd. | Bermuda | 100% |
| Mattel International Finance B.V. | The Netherlands | 100% |
| Mattel International Holdings B.V. | The Netherlands | 100% |
| Mattel Investment, Inc. | Delaware | 100% |
| Mattel Marketing Holdings Pte. Ltd. | Singapore | 100% |
| Mattel Overseas Operations Ltd. | Bermuda | 100% |
| Mattel Overseas, Inc. | California | 100% |
| Mattel Sales Corp. | California | 100% |

[1]   All of the subsidiaries listed above are included in the consolidated financial statements. Inactive subsidiaries and subsidiaries that, when considered in the aggregate, do not constitute a significant subsidiary have not been included in the above list.

[2]   Parent refers to Mattel, Inc. (a Delaware corporation) and excludes Directors' qualifying shares.

Exhibit E - Page 505

M 0932501

EXHIBIT 23.0

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We hereby consent to the incorporation by reference in the Registration Statements on Form S-3 (No. 333-134740) and Form S-8 (No. 33-51454, No. 333-01061, No. 333-03385, No. 333-32294, No. 333-47461, No. 333-64984, No. 333-67493, No. 333-79099, No. 333-75145, No. 333-89458, No. 333-101200, No. 333-125059 and No. 333-147472) of Mattel, Inc. and its subsidiaries of our report dated February 26, 2009 relating to the financial statements, financial statement schedule and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

*PricewaterhouseCoopers LLP*

PricewaterhouseCoopers LLP
Los Angeles, California
February 26, 2009

EXHIBIT 31.0

## CERTIFICATION

I, Robert A. Eckert, certify that:

1. I have reviewed this annual report on Form 10-K of Mattel, Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 26, 2009                    By: _____
                                                        Robert A. Eckert
                                              **Robert A. Eckert**
                                              **Chairman and Chief Executive Officer**
                                              **(Principal executive officer)**

**EXHIBIT 31.1**

## CERTIFICATION

I, Kevin M. Farr, certify that:

    1. I have reviewed this annual report on Form 10-K of Mattel, Inc.;

    2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

    3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

    4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

        (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

    5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

        (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

        (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  February 26, 2009         By:  _____

                                           **Kevin M. Farr**
                                          **Chief Financial Officer**
                                       **(Principal financial officer)**

M 0932504

EXHIBIT 32.0

## CERTIFICATIONS PURSUANT TO
## 18 U.S.C. SECTION 1350,
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

Each of the undersigned officers of Mattel, Inc., a Delaware corporation (the "Company"), does hereby certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Company's Annual Report on Form 10-K for the period ended December 31, 2008 (the "Annual Report"), which this statement accompanies, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2) Information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

This certificate is being furnished solely for purposes of Section 906 and is not being filed as part of the Annual Report.

Date: February 26, 2009                     By:  _____
                                                 Robert A. Eckert
                                                 Chairman and Chief Executive Officer, Mattel, Inc.

                                                 _____
                                                 Kevin M. Farr
                                                 Chief Financial Officer, Mattel, Inc.

Exhibit E - Page 509

M 0932505