QUINN EMANUEL URQUHART & SULLIVAN, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  William C. Price (Bar No. 108542)
  (williamprice@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Mattel, Inc. and Mattel de
Mexico, S.A. de C.V.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MATTEL, INC., a Delaware corporation, et al.,<br><br>        Plaintiff,<br><br>     vs.<br><br>MGA ENTERTAINMENT, INC., a California corporation, et al.,<br><br>        Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 DOC (RNBx)<br><br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. David O. Carter<br><br>**MATTEL'S NOTICE OF MOTION AND CORRECTED MOTION FOR JUDGMENT AS A MATTER OF LAW RE MGA'S CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50(B); AND**<br><br>**ALTERNATIVE MOTION FOR REMITTITUR AND/OR NEW TRIAL**<br><br>Trial Date:  January 18, 2011 |

00505.07975/4127636.2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 24, 2011, or on such other date and time as the Court may set, Mattel, Inc. will, and hereby does, move the above-entitled Court, before the Honorable David O. Carter, for judgment as a matter of law in favor of Mattel pursuant to Federal Rule of Civil Procedure 50(b), and renewing Mattel's prior request for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a), as to each of the purported trade secrets included in MGA's First Counterclaim-In-Reply for Trade Secret Misappropriation under Cal. Civ. Code §3426 *et seq.*, including specifically those listed below according to the trade secret numbers in question 16 of the Verdict Form, and additionally on MGA's claims for damages, on the grounds that there is no legally sufficient evidentiary basis for liability or damages:

1.    The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Mobile.

2.    The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Styl' It Collection.

4.    The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Winterwonderland Collection.

5.    The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Formal Funk Collection.

6.    The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Runway Formal Funk Collection.

7.    The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz FM Limo.

8.    The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Motorcycle.

9.    The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Pet Assortment.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

14.     The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Lil' Bratz Vehicle Assortment.

15.     The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Lil' Bratz Deluxe Mall Playset.

16      The appearance, operation, intended play pattern and plans to advertise on television for Bratz Petz.

18.     The appearance, operation, intended play pattern and plans to advertise on television for Dazzlin' Disco Cafe.

19.     The appearance, operation, intended play pattern and plans to advertise on television for Sun Kissed Summer.

20.     The appearance, operation, intended play pattern and plans to advertise on television for Girls Nite Out.

21.     The appearance, operation, intended play pattern and plans to advertise on television for Wild Life Safari Collection.

22.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Diamondz.

24.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Virtual Buddiez Petz.

27.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Campfire.

28.     The appearance, operation, intended play pattern and plans to advertise on television for Wild Wild West.

29.     The appearance, operation, intended play pattern and plans to advertise on television for Bratz Rock Angels.

41.     The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Monkey See Monkey Do.

49.     The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Lil' Bratz Boyz.

58.   The appearance, operation, intended play pattern and plans to advertise on television for Alien Racers.

65.   The appearance, operation, intended play pattern and plans to advertise on television for Girls Nite Out.[1]

66.   The appearance, operation, intended play pattern and plans to advertise on television for Bratz Kidz.

69.   The appearance, operation, intended play pattern and plans to advertise on television for Passion for Fashion.

In the alternative, and only should this Court decide that Mattel is not entitled to judgment as a matter of law as to liability or damages as to some or all of these 26 claimed trade secrets, Mattel moves pursuant to Fed. R. Civ. P. 60 for correction of the mathematical and duplication errors in the verdict form, and moves pursuant to Fed. R. Civ. P. 59 for remittitur of the damage awards, and/or for a new trial as to any of the 26 claimed trade secrets and/or damages awards, and only those claimed trade secrets and/or damages awards, as to which the Court does not grant judgment as a matter of law.

Among the other grounds set forth in the attached memorandum, which are incorporated herein, MGA failed to prove that the alleged trade secrets were secret or were the subject of reasonable efforts to maintain their secrecy; failed to prove they were misappropriated; and failed to prove any injury.  MGA publicly disclosed many of the trade secrets and failed to show that the specific product attributes it claimed as trade secrets were, in fact, protectable trade secrets.  MGA also failed to prove any misappropriation by Mattel, including because it failed to show that Mattel used MGA's information to MGA's detriment.  As to damages, the jury's awards are not supported by sufficient evidence, are arbitrary, and reflect awards for trade secrets for which no damages estimates were admitted.  Because there was not

1  a legally sufficient basis for any of the jury's findings of liability or damages,
2  judgment in favor of Mattel on MGA's claim for misappropriation should issue.
3  Alternatively, both the liability and damages verdicts are against the clear weight of
4  the evidence and are excessive, entitling Mattel to the remittitur and/or new trial
5  requested herein.

6       This motion is based on this Notice of Motion and Motion, the attached
7  Memorandum of Points and Authorities in support thereof, the trial transcripts and
8  exhibits, all pleadings and papers on file in this action, such other evidence or
9  arguments as may be presented to the Court, and such other matters of which this
10  Court may take judicial notice.

11

12  DATED:  May 6, 2011            QUINN EMANUEL URQUHART &
                               SULLIVAN. LLP

13

14                               By /s/ John B. Quinn
15                                 John B. Quinn
16                                 Attorneys for Mattel, Inc., and Mattel de
                               Mexico. S.A. de C.V.

17

18

19

20

21

22

23

24

25

26

27

28

---

[1]    Bratz Girls Nite Out is the same product as Girls Nite Out.  Thus, the jury found liability as to trade secrets of only 25, not 26 products.  See Section II.D infra.

-iv-

# **<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT ........................................................................................................... 5

I. MGA FAILED TO ESTABLISH LIABILITY AS TO ANY, LET ALONE ALL, OF THE 25 ALLEGED TRADE SECRETS ........................... 7

 A. The Evidence Shows That The Information At Issue Was Not Protectable As Trade Secrets ................................................................ 7

  1. The Items Displayed In Toy Fair Showrooms Are Not Secret, And MGA Did Not Take Reasonable Steps To Protect Their Secrecy ........................................................... 8

  2. MGA Failed To Show That Its Specific Claimed Product Attributes Were Protectable Trade Secrets ............................. 12

  3. Viewed Individually, The Claimed Trade Secrets Are Fatally Flawed .................................................................... 17

 B. Even If The Information Was Secret, MGA Failed To Prove Misappropriation ..................................................................... 23

  1. MGA Produced No Evidence Of Misappropriation For 3 Dolls Shown At The 2006 Toy Fair ........................................ 25

  2. There Is No Evidence Of Any "Matching" Mattel Product As To 17 of the 25 Products ................................................ 25

  3. The Evidence Shows That Mattel Did Not Use MGA's Claimed Trade Secrets In Connection With Mattel's Products, Whether "Matching" or Not ..................................... 27

  4. The Evidence Does Not Support A Finding That Mattel Used The Specific Components That MGA Claims Are Secrets .................................................................. 28

II. MGA FAILED TO PROVIDE EVIDENCE TO SUSTAIN THE JURY'S DAMAGES AWARD ...................................................... 30

 A. Background ................................................................................. 31

  1. Mr. Malackowski's Bottom Up Approach ............................. 32

  2. Mr. Malackowski's Top Down Approach ............................... 33

  3. The Jury's Damages Award ................................................ 35

B.   The Jury's Damages Awards Are Arbitrary, and Must Be Set
     Aside ............................................................................................... 36

     1.   There Is No Support For The Jury's Award of $3.4 Million
          Per Trade Secret ................................................................... 36

     2.   Mr. Malackowski's Chart Is Not Evidence and Merely
          Confirms the Arbitrariness of the Jury's Award ..................... 39

     3.   The Jury Improperly Awarded Damages On Five Trade
          Secrets For Which Mr. Malackowski Affirmatively
          Disclaimed Head Start Damages .............................................. 40

     4.   Mr. Malackowski's Damages Opinions  Wrongly Included
          Components That  Were Not Trade Secrets ................................ 41

     5.   Mr. Malackowski's Head Start Assumptions Were
          Contrary to the Evidence ........................................................ 42

     6.   Mr. Malackowski Failed to Consider Mattel's Sweat
          Equity  As To Any Products ..................................................... 45

C.   The Jury's Damages Awards Are Not Supported By Mr.
     Malackowski's "Top Down" Approach ................................................ 47

     1.   The Top Down Approach Provided No Guidance To the
          Jury On An Individual Trade Secret Basis ................................ 47

     2.   In Any Event, No Evidence of Causation Supports The
          Top Down Approach ................................................................ 50

D.   The Damages Award Must Be Reduced to Correct Mathematical
     Errors and Improper Duplication ......................................................... 53

E.   Because The Jury Damages Award Was Excessive In Any Event,
     The Court Should Order A New Trial Or Remittitur .......................... 53

III.   EACH OF THE 26 TRADE SECRETS FAILS WHEN EVALUATED
       ON A PRODUCT-BY-PRODUCT BASIS ..................................................... 54

     1.   "The appearance, operation, intended play pattern, plans to
          advertise on television and FOB pricing for Bratz Mobile" ....... 54

     2.   "The appearance, operation, intended play pattern, plans to
          advertise on television and FOB pricing for Bratz Styl' It
          Collection" ............................................................................. 56

     4.   "The appearance, operation, intended play pattern, plans to
          advertise on television and FOB pricing for Bratz
          WinterWonderland [sic] Collection" .......................................... 57

     5.   "The appearance, operation, intended play pattern, plans to
          advertise on television and FOB pricing for Bratz Formal
          Funk Collection" ..................................................................... 58

6.  "The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Runway Formal Funk Collection" ..................................................................... 59

7.  "The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz FM Limo" ............................................................................................... 61

8.  "The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Motorcycle" ..................................................................................... 62

9.  "The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Pet Assortment" ...................................................................................... 63

14.  "The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Lil' Bratz Vehicle Assortment"............................................................... 64

15.  "The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Lil' Bratz Deluxe Mall Playset" ..................................................................... 65

16.  "The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Petz" ........... 66

18.  "The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Dazzlin' Disco Café"............................................................................... 68

19.  "The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Sun Kissed Summer" ............................................................................ 69

20.  "The appearance, operation, intended play pattern and plans  to advertise on television for Girls Nite Out" ................. 71

21.  "The appearance, operation, intended play pattern and plans  to advertise on television for Wild Life Safari Collection" ...................................................................... 73

22.  "The appearance, operation, intended play pattern and plans  to advertise on television for Bratz Diamondz".............. 74

24.  "Appearance, operation, intended play pattern, and plans to  advertise on television for Bratz Virtual Buddiez Petz" ....... 76

27.  "Appearance, operation, intended play pattern, and plans to  advertise on television for Bratz Campfire"......................... 77

28.  "Appearance, operation, intended play pattern, and plans to  advertise on television for Wild Wild West" ...................... 79

00505.07975/4127636.2

-iii-

29.   "Appearance, operation, intended play pattern, and plans
to  advertise on television for Bratz Rock Angels" ................... 81

41.   "Appearance, operation, intended play pattern, plans to
advertise on television, and FOB pricing for Monkey See
Monkey Do"............................................................................. 84

49.   "Appearance, operation, intended play pattern, plans to
advertise on television, and FOB pricing for Lil' Bratz
Boys"...................................................................................... 85

58.   "Appearance, operation, intended play pattern, and plans
to  advertise on television for Alien Racers" ............................. 86

65.   "Appearance, operation, intended play pattern, and plans
to  advertise on television for Bratz Girls Nite Out" –
Duplicative Of Girls Nite Out (Verdict Form Question 16,
TS  No. 20)............................................................................. 88

66.   "Appearance, operation, intended play pattern, and plans
to  advertise on television for Bratz Kidz" ................................ 89

69.   "Appearance, operation, intended play pattern, and plans
to  advertise on television for Passion for Fashion" ................... 92

CONCLUSION............................................................................... 93

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>Cases</u>

<u>Abarca v. Merck & Co., Inc.</u>,
  2010 WL 4643642 (E.D. Cal. Nov. 9, 2010) ................................................ 40, 44

<u>Allied Chem. Corp. v. Daiflon, Inc.</u>,
  449 U.S. 33 (1980) .......................................................................................... 6

<u>Am. Paper & Packaging Prods., Inc. v. Kirgan</u>,
  183 Cal. App. 3d 1318 (1986) ....................................................................... 8

<u>American Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.</u>,
  135 F. Supp. 2d 1031 (N.D. Cal. 2001) ........................................................ 50

<u>Bracco Diagnostics, Inc. v. Amersham Health, Inc.</u>,
  627 F. Supp. 2d 384 (D. N.J. 2009) ............................................................... 52

<u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>,
  429 U.S. 477 (1977) ........................................................................................ 5

<u>Callaway Golf Co. v. Dunlop Slazenger Group Ams., Inc.</u>,
  318 F. Supp. 2d 205 (D. Del. 2004) .............................................................. 21

<u>Children's Broad. Corp. v. Walt Disney Co.</u>,
  245 F.3d 1008 (8th Cir. 2001) ....................................................................... 38

<u>City of Vernon v. Southern California Edison Co.</u>,
  955 F.2d 1361 (9th Cir. 1992) ....................................................................... 50

<u>Concord Boat Corp. v. Brunswick Corp.</u>,
  207 F.3d 1039 (8th Cir. 2000) ....................................................................... 50

<u>Cypress Semiconductor Corp. v. Superior Court</u>,
  163 Cal. App. 4th 575 (2008) ......................................................................... 8

<u>Cytodyn, Inc. v. Amerimmune Pharmaceuticals, Inc.</u>,
  160 Cal. App. 4th 288 (2008) ........................................................................ 23

<u>D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co.</u>,
  692 F.2d 1245 (9th Cir. 1982) ................................................................... 6, 53

<u>Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.</u>,
  773 F.2d 1506 (9th Cir.1985) ........................................................................ 47

<u>Eleven Line, Inc. v. N. Tex. Soccer Assoc., Inc.</u>,
  213 F.3d 198 (5th Cir. 2000) ......................................................................... 44

Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.,
    786 F.2d 1342 (9th Cir. 1985) ................................................................. 50

Fenner v. Dependable Trucking Co.,
    716 F.2d 598 (9th Cir. 1983) ................................................................... 53

In re First Alliance Mortg. Co.,
    471 F.3d 977 (9th Cir. 2006) ............................................................ 36, 38

Foradori v. Harris,
    523 F.3d 477 (5th Cir. 2008) ................................................................... 53

Gibson-Homans Co. v. Wall-Tite, Inc.,
    1992 WL 512411 (C.D. Cal. 1992) ......................................................... 24

Hilderman v. Enea Teksci, Inc.,
    2010 WL 546140 (S.D. Cal. Feb. 10, 2010) .......................................... 50

IQ Prods. Co. v. Pennzoil Prods. Co.,
    305 F.3d 368 (5th Cir. 2002) ................................................................... 37

Imax Corp. v. Cinema Tech., Inc.,
    152 F.3d 1161 (9th Cir. 1998) ................................................................ 13

In re Imperial Credit Industries, Inc. Securities Litigation,
    252 F. Supp. 2d 1005 (C.D. Cal. 2003) .................................................. 50

Kewanee Oil Co. v. Bicron Corp.,
    416 U.S. 470 (1974) ................................................................................. 13

Lakeside-Scott v. Multnomah County,
    556 F.3d 797 (9th Cir. 2009) ..................................................................... 5

Language Line Services, Inc. v. Language Services Associates, LLC,
    2010 WL 2764714 (N.D. Cal. July 13, 2010) ........................................ 23

Leegin Creative Leather Products, Inc. v. Belts by Nadim, Inc.,
    316 Fed. Appx. 573 (9th Cir. 2009) ....................................................... 50

Litton Sys., Inc. v. AT&T,
    700 F.2d 785 (2d Cir. 1983) ............................................................. 38, 47

Litton Sys., Inc. v. Honeywell, Inc.,
    1996 WL 634213 (C.D. Cal. 1996) ................................................... 37, 49

Marine Pile Drivers, LLC V. Welco, Inc.,
    988 So. 2d 878 (La. Ct. App. 2008) .......................................................... 9

McGlinchy v. Shell Chem. Co.,
    845 F.2d 802 (9th Cir. 1988) ................................................................... 47

MicroStrategy Inc. v. Business Objects, S.A.,
    429 F.3d 1344 (Fed. Cir. 2005) .................................................................. 50

Molski v. M.J. Cable, Inc.,
    481 F.3d 724 (9th Cir. 2007) ...................................................................... 6

Murphy v. City of Long Beach,
    914 F.2d  183 (9th Cir. 1990) ...................................................................... 6

O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.,
    399 F. Supp. 2d 1064 (N.D. Cal. 2005).............................................. 5, 37, 47, 48

PAI Corp. v. Integrated Sci. Solutions, Inc.,
    2009 WL 1106809 (N.D. Cal. 2009)............................................................ 5, 50

PMC, Inc. v. Kadisha,
    78 Cal. App. 4th 1368 (2000) .................................................................... 24

Peake v. Chevron Shipping Co.,
    2004 WL 1781008 (N.D. Cal. Aug. 10, 2004) ...................................................... 7

Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.,
    219 F.3d 895 (9th Cir. 2000) ...................................................................... 7

Prepaid Wireless Services, Inc. v. Southwestern Bell Wireless, Inc.,
    2002 WL 34367328 (S.D. Tex., 2002).............................................................. 50

QR Spex, Inc. v. Motorola, Inc.,
    2004 WL 5642907 (C.D. Cal. 2004) .............................................................. 15

Ruckelshaus v. Monsanto Co.,
    467 U.S. 986 (1984) ............................................................................ 8, 18

Sargent Fletcher, Inc. v. Able Corp., , 1665-66 (2003),
    110 Cal. App. 4th 1658 .......................................................................... 23

Schiller & Schmidt, Inc. v. Nordisco Corp.,
    969 F.2d 410 (7th Cir. 1992) ...................................................................... 50

Schiller & Schmidt, Inc. v. Wallace Computer Servs., Inc.,
    1991 WL 270170 (N.D. Ill. Apr. 26,1991)
    aff'd in part, vacated in part, 969 F.2d 410 (7th Cir. 1992) ................................... 46

Science of Skincare, LLC v. Phytoceuticals, Inc.,
    2009 WL 2050042 (C.D. Cal. July 7, 2009) ...................................................... 23

Sebastian Intern., Inc. v. Russolillo,
    2005 WL 1323127 (C.D. Cal. 2005) .............................................................. 50

Seymour v. Summa Vista Cinema, Inc.,
    809 F.2d 1385 (9th Cir. 1987) ...................................................................... 7

Silvaco Data Sys. v. Intel Corp.,
  184 Cal. App. 4th 210 (2010) .................................................................. 7, 23, 24

Snyder v. Freight, Const., Gen. Drivers, Warehousemen & Helpers,
  Local No. 287,
  175 F.3d 680 (9th Cir. 1999) ............................................................................ 6

Sokol Crystal Prods., Inc. v. DSC Commc'ns Corp.,
  15 F.3d 1427 (7th Cir. 1994) ......................................................................... 46

Strategic Directions Group v. Bristol-Myers Squibb,
  293 F.3d 1062 (8th Cir. 2002) ....................................................................... 13

Stromback v. New Line Cinema,
  384 F.3d 283 (6th Cir. 2004) ......................................................................... 12

Tax Track Sys. Corp. v. New Investor World, Inc.,
  478 F.3d 783 (7th Cir. 2007) ........................................................................... 8

United States ex rel Miss. Road Supply Co. v. H. R. Morgan, Inc.,
  542 F.2d 262 (5th Cir. 1976) ......................................................................... 52

United States v. Wood,
  943 F.2d 1048 (9th Cir. 1991) ....................................................................... 26

Universal Analytics v. MacNeal-Schwendler Corp.,
  707 F. Supp. 1170 (C.D. Cal. 1989), aff'd, 914 F.2d 1256 (9th Cir. 1990) ......... 13

VSL Corp. v. Gen. Techs. Inc.,
  1997 WL 654103 (N.D. Cal. Jul. 21, 1997) ..................................................... 9

Estate of Vane v. The Fair, Inc.,
  849 F.2d 186 (5th Cir. 1988) ......................................................................... 50

Walker v. Univ. Books, Inc.,
  602 F.2d 859 (9th Cir. 1979) ......................................................................... 13

Westinghouse Elec. Corp. v. CX Processing Labs., Inc.,
  523 F.2d 668 (9th Cir. 1975) ......................................................................... 52

Whyte v. Schlage Lock Co.,
  101 Cal. App. 4th 1443 (2002) ........................................................................ 9

Wilson v. Great Am. Indus., Inc.,
  979 F.2d 924 (2d Cir. 1992) .......................................................................... 36

In re Wolverton Assocs.,
  909 F.2d 1286 (9th Cir. 1990) ....................................................................... 36

1

## <u>**Statutes**</u>

2  <u>Cal. Civ. Code</u> § 3426.1 .......................................................................... 7, 12

3  <u>Cal. Civ. Code</u> § 3426.1(d) ......................................................................... 8

4  C.C.P. § 2019.210 ....................................................................................... 13

5  <u>Fed. R. Civ. P.</u> 50(a) ................................................................................... 5

6  <u>Fed. R. Civ. P.</u> 50(b) ................................................................................... 5

7  <u>Fed. R. Civ.</u> Proc. 59 ................................................................................... 6

8  <u>Fed. R. Civ. P.</u> 59(a) ................................................................................... 6

9

## <u>**Other Authority**</u>

10

11  Rest. 3d Unfair Competition (1995) § 40, com. c .................................... 24

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-v-

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

Mattel respectfully asks the Court to enter judgment as a matter of law in its favor on MGA's 26 toy fair-based trade secret claims, and in the alternative, for remittitur of those claims.  This is all that Mattel asks of this Court, despite its disagreements with many other aspects of the verdict.  With this motion, Mattel seeks to bring closure to this matter after six years and two trials.

The toy fair claims cannot stand as a matter of law, even taking all inferences in favor of the verdict.  They were an afterthought and then a laundry list.  MGA never made any effort to prove them one-by-one – or even group-by-group.  MGA did not introduce sufficient evidence to support liability or a $3.4 million verdict for any of them, much less an $88.5 million verdict for all of them combined.

The record deficiencies are numerous and overlapping.  Of the 26 supposed trade secrets on which the jury found misappropriation:

| | | |
|---|---|---|
| -- | 1 was a duplicate |
| -- | Only 2 were the subject of a damages estimate |
| -- | 3 came from a showroom that no one from Mattel ever set foot in |
| -- | 5 were shipped into commerce before they were allegedly misappropriated |
| -- | 5 others had been affirmatively dropped from MGA's damages claims |
| -- | 7 were never discussed at all in the record |
| -- | 7 have damages awards higher than MGA's highest damages claim for them |
| -- | 14 were disclosed in press articles before they were allegedly misappropriated |
| -- | 17 had no matching Mattel products |

1   --   26 had generic themes whose appearance, operation, and play

2   pattern were widely known.

3   These deficiencies fatally undermine the case for liability on each of the 26

4   claims. Toy fairs are not secret. Retailers talk. The press was invited. If MGA took

5   steps to ensure secrecy by having private rooms at toy fairs, it failed to prove that any

6   of these products was shown in a private room. If Mattel supposedly used these trade

7   secrets, MGA failed to show how.

8   These deficiencies equally fatally undermine the damages findings. MGA's

9   damages expert offered numbers untethered to anything the jury found. He testified

10   about only two of the 26 alleged trade secrets on which the jury found liability. He

11   looked at a different group of 26. He prepared a chart that was never in evidence, and

12   his chart never mentioned 11 of the jury's choices. And, even for the products in

13   both the expert's chart and the jury's verdict, the expert provided damages numbers

14   lower than $3.4 million. He also did not attach numbers to six of the supposed

15   secrets on the grounds that he couldn't calculate any damages at all from Mattel's

16   supposed "head start." The jury nevertheless awarded $3.4 million each on five of

17   those six. The damages assessments find so little basis in the record that they are

18   effectively numbers picked from another case.

19   The jury's assessment of liability and damages in the amount of $3.4 million

20   per trade secret for 26 specific trade secrets thus is not supported by the evidence, and

21   the verdict as to both liability and damages on the toy-fair trade secret claims should

22   be set aside as a matter of law. The jury's errors in answering Question 16 were the

23   product of inadequate proof by MGA, not inattention. The jury tried to reach

24   judgments, but MGA failed to provide them even minimally sufficient evidence to do

25   so. They used the only numbers they heard. But a jury verdict that is ungrounded in

26   evidence cannot stand, and this Court should enter judgment for Mattel.

27   As the memorandum below demonstrates in detail, each supposed "trade

28   secret" on which the jury reached a verdict for MGA is fatally undermined by the

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

following multiple and overlapping deficiencies, in addition to a number of defects that apply across the board to all the claimed trade secrets:

| Product | No testimony in record | Prior Ship | Prior Press/ Article | Shown at 2006 Toy Fair | No Matched Product |
|---|---|---|---|---|---|
| 1.[2] Bratz Mobile | | | X | | X |
| 2. Bratz Styl' It Collection | | | | | X |
| 4. Bratz Winter Wonderland Collection | | | | | |
| 5. Bratz Formal Funk Collection | | | | | X |
| 6. Bratz Runway Formal Funk Collection | | | | | |
| 7. Bratz FM Limo | | | | | X |
| 8. Bratz Motorcycle | | | | | |
| 9. Bratz Pet Assortment | | | | | X |
| 14. Lil' Bratz Vehicle Assortment | X | | | | X |
| 15. Lil' Bratz Deluxe Mall Playset | X | | | | X |
| 16. Bratz Petz | | X | X | | |
| 18. Dazzlin' Disco Café | X | X[3] | | | X |
| 19. Sun-Kissed Summer | | X | X | | X |
| 20/65. Girls Night Out[4] | | X | X | | |

---

[2]   This is the number of each product in question 16 of the Verdict Form.  Dkt. No. 10518 at 16-21.
[3]   Per Malackowski's chart.  See TX 37189-33.
[4]   Listed twice in Verdict Form at Question 16, Trade Secret Nos. 20 & 65.  Dkt. No. 10518 at 18, 21.

-3-

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

| Product | No testimony in record | Prior Ship | Prior Press/ Article | Shown at 2006 Toy Fair | No Matched Product |
|---|---|---|---|---|---|
| 21. Wild Life Safari Collection | | | X | | X |
| 22. Bratz Diamondz | | | X | X | |
| 24. Bratz Virtual Buddiez Petz | | | X | | X |
| 27. Bratz Campfire | | | X | | X |
| 28. Wild Wild West | | | X | | X |
| 29. Bratz Rock Angels | | X[5] | X | | |
| 41. Monkey See Monkey Do | X | | X | | X |
| 49. Lil' Bratz Boys | X | | | | X |
| 58. Alien Racers | | | X | | |
| 66. Bratz Kidz | X | | X | X | X |
| 69. Passion for Fashion | X | | X | X | X |

| Product | MGA affirmatively admitted no damages | No damages estimate in record | MGA claimed substantially lower damages |
|---|---|---|---|
| 1.[6] Bratz Mobile | | X | |
| 2. Bratz Styl' It Collection | X | X | |
| 4. Bratz Winter Wonderland Collection | | | |
| 5. Bratz Formal Funk Collection | | X | |
| 6. Bratz Runway Formal Funk Collection | X | X | |
| 7. Bratz FM Limo | | X | X |
| 8. Bratz Motorcycle | | X | |
| 9. Bratz Pet Assortment | X | X | |
| 14. Lil' Bratz Vehicle Assortment | | X | X |

---

[5]   Per Malackowski's chart.  See TX 37189-33.
[6]   This number is the one for each product in question 16 of the Verdict Form.  Dkt. No. 10518  at 16-21.

| Product | MGA affirmatively admitted no damages | No damages estimate in record | MGA claimed substantially lower damages |
|---|---|---|---|
| 15. Lil' Bratz Deluxe Mall Playset | | X | X |
| 16. Bratz Petz | | X | X |
| 18. Dazzlin' Disco Café | | X | X |
| 19. Sun-Kissed Summer | | X | |
| 20/65. Girls Night Out[7] | | X | X |
| 21. Wild Life Safari Collection | X | X | |
| 22. Bratz Diamondz | | | |
| 24. Bratz Virtual Buddiez Petz | X | X | |
| 27. Bratz Campfire | | X | |
| 28. Wild Wild West | | X | X |
| 29. Bratz Rock Angels | | X | |
| 41. Monkey See Monkey Do | | X | |
| 49. Lil' Bratz Boys | | X | |
| 58. Alien Racers | | X | |
| 66. Bratz Kidz | | X | |
| 69. Passion for Fashion | | X | |

## **Argument**

Under Fed. R. Civ. P. 50, a court may grant a JMOL motion "against a party on a claim or issue where the party has been 'fully heard on [that] issue during a jury trial' and the court finds that a 'reasonable jury would not have a legally sufficient evidentiary basis' to find for that party." PAI Corp. v. Integrated Sci. Solutions, Inc., 2009 WL 1106809, at * 4 (N.D. Cal. Apr. 23, 2009) (quoting Fed. R. Civ. P. 50(a) & (b)). A "reasonable inference" in favor of a verdict "cannot be supported by only threadbare conclusory statements instead of significant probative evidence." Lakeside-Scott v. Multnomah County, 556 F.3d 797, 802 (9th Cir. 2009); Willis v. Marion County Auditor's Office, 118 F.3d 542, 545 (7th Cir. 1997) ("a mere scintilla is not enough" to sustain a verdict for prevailing party). The sufficiency of the evidence with regard to each of MGA's claimed trade secrets should be evaluated separately. See O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc., 399 F. Supp. 2d

---

[7]   Listed twice in Verdict Form at Question 16, Trade Secret Nos. 20 & 65. Dkt. No. 10518  at 18, 21.

-5-

1064, 1076 (N.D. Cal. 2005) (cautioning against the "dangers of bundling" multiple allegations of trade secret theft together and instead considering sufficiency of evidence on a trade secret-by-trade secret basis).  JMOL may be granted as to less than entire claims, including as to the issue of damages.  See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,  429 U.S. 477, 489-90 (1977) ("Our review of the record, however, persuades us that a new trial on the damages claim is unwarranted. . . . Since respondents did not prove any cognizable damages . . . petitioner is entitled, in accord with its motion made pursuant to Rule 50(b), to judgment on the damages claim notwithstanding the verdict.").

The Court also has discretion to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a).  "The grant of a new trial is 'confided almost entirely to the exercise of discretion on the part of the trial court.'"  Murphy v. City of Long Beach, 914 F.2d 183, 186 (9th Cir. 1990) (quoting Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980)).  On a challenge to the weight of the evidence, the court "has 'the duty . . . to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence.'"  Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007) (quoting Murphy, 914 F.2d at 187).

Further, excessive and duplicative jury awards may be challenged on a motion for remittitur under Fed. R. Civ. P. 59.  See Snyder v. Freight, Const., Gen. Drivers, Warehousemen & Helpers, Local No. 287, 175 F.3d 680, 689 (9th Cir. 1999).  In such cases, the Court should remit the damages award to the "maximum amount sustainable by the proof."  D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co., 692 F. 2d 1245, 1249 (9th Cir. 1982) (affirming district court's remittitur). Remittitur, rather than a new trial, should be granted if the excessive award is based on the jury's method of calculation.  Id.  Where duplicative damages are awarded, "courts have opted to remit (i.e., to reduce) jury awards, recalculating damage

-6-

1   amounts based on the scope of the plaintiff's claims and the evidence adduced at

2   trial." <u>Peake v. Chevron Shipping Co.</u>, 2004 WL 1781008, at *3 (N.D. Cal. Aug. 10,

3   2004) (citing <u>Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.</u>, 219

4   F.3d 895, 905 (9th Cir. 2000), and <u>Seymour v. Summa Vista Cinema, Inc.</u>, 809 F.2d

5   1385, 1387 (9th Cir. 1987)).

6   **I.**   **MGA FAILED TO ESTABLISH LIABILITY AS TO ANY, LET**

7   **ALONE ALL, OF THE 25 ALLEGED TRADE SECRETS**

8   Under the applicable substantive law, "'Trade secret' means information . . .

9   that: (1) Derives independent economic value, actual or potential, from not being

10  generally known to the public or to other persons who can obtain economic value

11  from its disclosure or use; and (2) Is the subject of efforts that are reasonable under

12  the circumstances to maintain its secrecy."   <u>Cal. Civ. Code</u> § 3426.1.   To show

13  misappropriation, a plaintiff must show "(1) possession by the plaintiff of a trade

14  secret; (2) the defendant's misappropriation of the trade secret, meaning its wrongful

15  acquisition, disclosure, or use; and (3) resulting or threatened injury to the plaintiff."

16  <u>Silvaco Data Sys. v. Intel Corp.</u>, 184 Cal. App. 4th 210, 220 (2010).   MGA bore the

17  burden to prove each of these elements, and it failed to do so.   There is insufficient --

18  and in many cases absolutely no -- evidence to support the jury's verdicts as to the 25

19  products for which they found liability.

20  **A.**   **The Evidence Shows That The Information At Issue Was Not**

21  **Protectable As Trade Secrets**

22  Secrecy is the first requirement of every trade secret claim.   Nevertheless,

23  MGA introduced no evidence of secrecy other than Mr. Larian's sweeping,

24  conclusory assertion that everything in MGA's showrooms was "confidential."   Even

25  this bold pronouncement was refuted by Mr. Larian's own admissions that he knew

26  that retailers talk all the time and that he himself got information about his

27  competitors from toy fair showrooms and never thought that he was stealing trade

28  secrets in doing so.   MGA's other executives and agreed.   While Mr. Brawer insisted

that MGA divided its products between public and private areas in its showroom and that confidential products were under lock and key, MGA failed to show that any of the 25 products on the jury's list (the jury found liability as to 26 listed products, but two are duplicates of one another) had been displayed in a private showroom rather than a public one.

As detailed below, as to 3 of the 25 products on the jury's list, there was not one word of testimony.  MGA did not even attempt to identify any ostensibly unique elements as to nearly all the products.  The evidence is undisputed that 14 products were the subject of press releases or press stories before or contemporaneous with the toy fair, in some cases using the exact same language as found in the Mattel report or had already shipped for sale on retail shelves.

No rational trier of fact could possibly find that the matters at issue were secret. The sole witness to so testify was Mr. Larian, but in his testimony he repeatedly acknowledged that he knew otherwise, and there was no other evidence in the case to support such a hyperbolic premise.  When each claimed trade secret is considered individually, as the jury was told to do, the jury's verdict is contrary to the evidence and does not have a sufficient legal basis.

### 1.   The Items Displayed In Toy Fair Showrooms Are Not Secret, And MGA Did Not Take Reasonable Steps To Protect Their Secrecy

CUTSA requires both secrecy and reasonable steps to preserve secrecy.  Cal. Civ. Code § 3426.1(d); Am. Paper & Packaging Prods., Inc. v. Kirgan, 183 Cal. App. 3d 1318 (1986); Cypress Semiconductor Corp. v. Superior Court, 163 Cal. App. 4th 575, 588 (2008) ("A trade secret loses its protected status if the owner does not undertake reasonable efforts to keep it secret.").  "If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information . . . his property right is extinguished."  Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1002 (1984); Tax Track Sys. Corp. v. New Investor World, Inc., 478

F.3d 783, 788 (7th Cir. 2007) (plaintiff did not take reasonable efforts to keep memo confidential where it distributed it to 600-700 people and only sought confidentiality agreements from 190 of them); <u>Whyte v. Schlage Lock Co.</u>, 101 Cal. App. 4th 1443, 1454-1455 (2002) (plaintiff did not make reasonable efforts to maintain the secrecy of its trade secret information with respect to line review documents disclosed to retailer without a secrecy agreement).[8]   MGA's information was shared with both retailers and the press, and MGA clearly took insufficient measures to protect the secrecy of the information.   This undermines its claims as to all the claimed trade secrets.

It was undisputed at trial that retailers, who are the target of every toy fair, talk with each other and manufacturers about what they see at fairs.  Everyone, Mr. Larian included, expects retailers to talk and not keep such information confidential.[9] MGA's Lisa Saunders testified that once a retailer knows a toy manufacturer's information, there is a risk that other people are going to learn about it, and indeed she testified that she obtained information about unreleased *Mattel* products from retailers.[10]  MGA's Ron Brawer agreed that "there's certainly a significant amount of leakage from the moment that you start telling retailers what the FOB cost is of a product,"[11] and MGA's Susana Kuemmerle conceded that price lists are not trade secrets and that retailers share them with competitors "all the time."[12]

MGA itself routinely received information from retailers about unreleased

---

[8]   <u>See also</u> <u>VSL Corp. v. Gen. Techs. Inc.</u>, 1997 WL 654103, at *3 (N.D. Cal. Jul. 21, 1997) (granting summary judgment on trade secret claim because "[plaintiff] displayed the duct at trade shows and distributed marketing information about the duct which provided drawings and measurements . . . [Plaintiff] never required that anyone sign a confidentiality agreement before being given samples and other data.") (citations omitted); <u>Marine Pile Drivers, LLC V. Welco, Inc.</u>, 988 So.2d 878, 881-82 (La. Ct. App. 2008) (upholding finding that plaintiff failed to take reasonable efforts to maintain the secrecy of its barge design because "[t]he barge was marketed at trade shows and pictured on websites and in pamphlets").

[9]   3/25/11 Trial Tr. Vol. 2 (Larian) at 37:18-38:4; <u>see also</u> 3/25/11 Trial Tr. Vol. 1 (Larian) at 103:11-105:24.

[10]   4/6/11 Trial Tr. Vol. 2 (Saunders) at 66:24-67:14.

[11]   3/31/11 Trial Tr., Vol. 2, (Brawer) at 41:10-42:9.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

1  products that were being shown in Mattel toy fair showrooms.[13]  Larian admits he

2  "personally" got such information.[14]  He did not believe he was using a retailer to

3  steal "trade secrets" when he asked them to get him catalogs and price lists of MGA's

4  competitors, including Mattel, from a toy fair.[15]  Nor did Larian discipline MGA

5  employees or investigate the circumstances at all when he learned they had gained

6  access to a Mattel showroom at toy fair and prepared and disseminated a detailed

7  report of what they saw.[16]

8      Nor were retailers the only ones exposed to MGA's information.  MGA

9  welcomed the press to its showrooms, especially at the New York Toy Fair, where

10  the press was a major participant.[17]  It routinely issued press releases and cooperated

11  in news stories about its supposedly "secret" products; those write-ups then found

12  their way, verbatim, into Sal Villasenor's reports.  See Section III infra. To make it

13  even easier for the press, during the relevant years, MGA created compact discs –

14  called "press kits" or "media kits" – filled with photos of unreleased products and

15  handed them out to the press at MGA's showroom at New York Toy Fair.[18]  For

16  example, in late January 2001, MGA executives discussed the high-resolution images

17  of products included in the "media kit" to be distributed to "ALL print media" during

18  the New York Toy Fair in February of that same year "after they leave the

19  showroom."[19]  In another email, MGA executives discuss making product photos

20

21  _____

[12]  2/24/11 Trial Tr., Vol. 1, (Kuemmerle) at 35:12-36:16.

22  [13]  See, e.g., TX 9533; 3/24/11 Trial Tr. Vol. 2 (Larian) at 67:22-25; 3/25/11 Trial Tr., Vol. 1 (Larian) at 112:9-16.

[14]  See 3/24/11 Trial Tr. Vol. 2 (Larian) at 67:9-16.

23  [15]  See 3/25/11 Trial Tr. Vol. 1 (Larian) at 103:11-105:24.

[16]  See Trial Tr. at 3/25/11 Trial Tr., Vol. 1 (Larian) at 108:8-113:25; see also TX

24  9533; TX 24748.

[17]  See 4/6/11 Trial Tr. Vol. 2 (Saunders) at 52:15-53:4.

25  [18]  See 4/6/11 Trial Tr. Vol. 2 (Jolicoeur) at 8:10-16; see also TX 23718

[19]  Email dated 01/23/2001 from D. Malacrida to R. Harris (L. Ross and A. Storer

26  are copied), Subject "NYTF CD's for Press" (MGA2 0001221).  "The Following Hi-Res Images are needed to be burned on 50 CD's, MAC format, for NYTF. . . . [I]t is

27  what I need to distribute to ALL Print Media after they leave the showroom along with Our NYTF Releases.  **This will be our NYTF "Media Kit."**  These CD's are

28  needed in NY at the showroom by Wednesday the 7th of February.  Here are the (footnote continued)

-10-

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

available to the media in electronic format on a disc.[20]  MGA's Dennis Jolicoeur could not name a year in which MGA had **not** distributed such a CD (although none of the actual CDs were produced by MGA despite Court Orders clearly requiring them).[21]  Mr. Larian acknowledged that some information about the products was made public at issue before toy fair[22] and admitted he could not say which of MGA's "trade secrets" were **not** the subject of a press release or article at the time of toy fair.[23]

Despite this proof that MGA's information was *not* maintained as trade secrets, MGA offered evidence of a mere two steps it had supposedly taken to preserve secrecy for the more than 30 toy fairs that happened during the years at issue.  The first was a lone 2005 Hong Kong Toy Fair sign-in sheet with boilerplate language at the top[24] – the only such sign-in sheet that MGA introduced, even though Larian directed people to search "everywhere" for such sign-in sheets.[25]  But not a single one of the 25 products at issue was alleged to have been misappropriated at the Hong Kong Toy Fair, and Larian admitted that he did not recall any sign-in sheets that included even that boilerplate language prior to this 2005 toy fair.[26]

---

images needed: [lists, among others, six alleged trade secrets: Bratz, Palm Puppies, Insectobots, Scooter Samantha, Monkey See Monkey Do, Hello Kitty Scooter]." (emphasis added).

[20]  See also TX 23770, January 19, 2000 email to MGA executives suggesting that MGA makes product photos available to media in electronic format on a disc. Email dated 01/19/2000 from C. Kabler to V. O'Connor and D. Malacrida (K. Gillmour is copied), Subject "Product Photos." "Based on our Toy Fair experience, we would like to make MGA product photos available to media in electronic format on disk."

[21]  See 4/6/11 Trial Tr. Vol. 2 (Jolicoeur) at 8:10-9:14.
[22]  See 3/25/2011 Trial Tr., Vol. 1 (Larian) at 150:22-151:2.
[23]  See 3/25/2011 Trial Tr., Vol. 1 (Larian) at 14:3-17.
[24]  3/24/11 Trial Tr., Vol. 2 (Larian) at 58:3-22.
[25]  Trial Tr., 3/24/11, Vol. 2 at (Larian) 62:2-65:5.
[26]  Id.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

Second, MGA introduced evidence that certain "sensitive" products were shown in "separate room[s] completely locked."[27]  Moxxi was shown in that manner in 2009.[28]  Mr. Brawer testified that MGA "would create an area that was not visible to the rest of the showroom so that the press could come in and see those products."[29]  While admitting that the press were invited into the showroom, Mr. Jolicoeur gave the qualification that "someone being invited to the showroom is not the equivalent of being allowed to see everything that's in the showroom."[30]

In other words, MGA set up a system that made the precise location of its information the key to whether it could be a trade secret – in the "locked" room "sensitive" information was allegedly locked away, but the rest of the showrooms were not only available to retailers but also the press.  The problem for MGA is that MGA presented literally no evidence that any of the products for which the jury found misappropriation was a "sensitive" product maintained in a "completely locked" room that the press was not allowed to see or to which access was otherwise so limited.  This critical failure is dispositive.  It would not be sufficient even if MGA had made such a showing given the overwhelming proof of *non*-secrecy admitted at trial, but MGA's failure to show even this basic requirement for MGA's own theory undermines any claim that it took reasonable steps to maintain the secrecy of its information, and any claim that the information actually was secret.

## 2.   MGA Failed To Show That Its Specific Claimed Product Attributes Were Protectable Trade Secrets

To be protected, a trade secret must "[d]erive[] independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use."  Cal. Civ. Code § 3426.1; see also Stromback v. New Line Cinema, 384 F.3d 283, 305 (6th Cir. 2004)

---

[27]  3/24/11, Trial Tr. Vol 2 (Larian) at 66:12-67:8.
[28]  3/25/11 Trial Tr. Vol 2 (Larian) at 36:15-22.
[29]  3/30/11 Trial Tr. Vol. 2 (Brawer) at 100:10-19.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

1   ("The essence of a trade secret is that it derives its value from secrecy.").  As MGA

2   itself has repeatedly argued, California law also requires that specific trade secret

3   attributes be identified with specificity based upon reliable evidence.  See Imax

4   Corp. v. Cinema Tech., Inc., 152 F.3d 1161, 1164-1165 (9th Cir. 1998) (quoting

5   Universal Analytics v. MacNeal-Schwendler Corp., 707 F. Supp. 1170, 1177 (C.D.

6   Cal. 1989), aff'd, 914 F.2d 1256 (9th Cir. 1990)) ("The plaintiff 'should describe the

7   subject matter of the trade secret with sufficient particularity to separate it from

8   matters of general knowledge in the trade or of special knowledge of those persons

9   … skilled in the trade.'"); see also C.C.P. § 2019.210 (requiring identification of

10   trade secrets with "reasonable particularity.").  Although "[n]ovelty, in the patent

11   law sense, is not required for a trade secret . . . some novelty will be required if

12   merely because that which does not possess novelty is usually known; secrecy, in

13   the context of trade secrets, thus implies at least minimal novelty."  See Kewanee

14   Oil Co. v. Bicron Corp., 416 U.S. 470, 476 (1974).   "[V]ague and obvious"

15   information is not protected by trade secret law "as a matter of law." Walker v.

16   Univ. Books, Inc., 602 F.2d 859, 865 (9th Cir. 1979) (holding obvious

17   improvements to fortune telling cards were not trade secrets); see Strategic

18   Directions Group v. Bristol-Myers Squibb, 293 F.3d 1062, 1065 (8th Cir. 2002)

19   ("mere variations on widely used information cannot be trade secrets") (quotations

20   omitted).

21          Despite these requirements, MGA neither identified its claimed trade secret

22   attributes with specificity nor proved that those attributes derived independent value

23   from their secrecy.  Its claims fail for this reason as well.

24          There is no testimony *at all* as to 3 of the 25 products for which the jury

25   found liability.  In three months of trial, the words "Lil' Bratz Vehicle Assortment,"

26   "Lil' Bratz Deluxe Mall Playset," and "Dazzlin' Disco Café" were never once

27

28          [30]   4/6/11 Trial Tr. Vol. 1 (Jolicoeur) at 46:1-7.

uttered.  None of these products was admitted and no image of them was admitted. The sum total of the evidence for each is a single entry on a single page of a Mattel report.  The entries for each state:

- "Lil' Bratz Vehicle Assortment, Mini Coup, TV Advertised, Avail. July 2003, FOB HK=$9.99".[31]

- "Lil' Bratz Deluxe Mall Playset & Mall Stores, Mall Stores include: clothing store, music store, and shoe store, TV Advertised, Avail. July 2003, FOB HK=$39.99 Mall Playset, FOB HK=$14.99 Mall Stores".[32]

- "Dazzlin' Disco Cafe, A room cube for the Lil' Bratz that girls can decorate and design with accessories, magnetic wall pieces, working lights, and walls that reverse to reveal a new room."[33]

This obviously does not meet MGA's burden of identifying its claimed trade secrets with specificity and of proving that they derived independent value from their secrecy.  There was simply no evidence at all, as to these products, of what the elements of the trade secret were, of how each such element was unique, of what steps MGA took to keep those elements confidential, or of anything else.

While some other products were at least mentioned, the evidence was clearly insufficient to even identify the trade secrets with particularity, let alone show their protectability as trade secrets that derived value from secrecy.  For instance, with respect to Bratz Styl' It Collection, the only testimony consists of Mr. Larian testifying that the product is "[b]asically, same thing" as Bratz Strut It—a product which was not a subject of MGA's trade secret claim.[34]  No Bratz Styl' It dolls were the subject of any testimony, and the product itself was not even admitted until after the parties rested (when it was introduced as part of a stipulation admitting 399

---

[31] See TX 9275-0029.
[32] See TX 9275-0029.
[33] See TX 31530-00023.
[34] 2/17/2011 Trial Tr. Vol. 1 (Larian) at 103:7-17.

products without testimony).[35]  With respect to Bratz Pet Assortment, the only evidence in the record is a single entry on a single page of a Mattel report that states, "Bratz Pet Assortment, Four Versions TBD, Avail. July 2003, FOB HK=$10.25," and Mr. Villasenor's testimony that the Bratz Pet Assortment is listed on that page of the report.[36]  There is no image of the product in the report; no description of the product; and not even a description of the claimed trade secret components of the product, let alone a showing that they were trade secrets.  Again, this is plainly insufficient.

MGA may argue that some of the MGA products themselves were in evidence, but the mere admission of an MGA product does not state a case for the protectability of its distinct attributes as trade secrets.  Nearly all the products at issue were themed Bratz dolls – Bratz dolls with generic themes like "Winter Wonderland."[37]  As Mr. Larian himself admitted, every toy company uses the same themes in doll product design, including such themes as "winter wonderland," "prom," "girlfriends," "boyfriends," and "beach party."[38]  Such generic information is not protected by trade secret law.  See, e.g., QR Spex, Inc. v. Motorola, Inc., 2004 WL 5642907, *6 (C.D. Cal. 2004) (finding that "look and form" of eyewear concept was not unique, and thus not protectable as trade secret, and granting summary judgment in favor of defendant).  And while Mr. Larian testified that the attributes of a generically themed doll product can still obtain trade secret protection if the theme is "executed" in a "unique" way,[39] there is simply no evidence in the record that MGA's generically themed dolls were actually executed in such a unique way.

---

[35]  See Dkt. No. 10431 (Joint Stipulation Regarding Admission of Tangible Items, dated April 7, 2011) at 2.
[36]  See TX 9275-0020; see also 3/22/11 Trial Tr. Vol. 2 (Villasenor) at 98:22-25.
[37]  Dkt. No. 10518 (Verdict Form, dated April 20, 2011).
[38]  2/17/11 Trial Tr. Vol. 2 (Larian) at 6:13-15 ("Many, many, many, many toy companies have done those themes over many years.  It's the way we executed them that was different.").
[39]  Id.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

In fact, MGA only attempted to identify the specific trade secret attributes in what would otherwise be commonly themed dolls as to two products, and neither of those attempts withstands scrutiny.  First, testifying about "Bratz Diamondz," Larian identified the use of a real gem as the trade secret that Mattel misappropriated by including real gems on the My Scene Bling Bling line.[40]  However, MGA widely publicized the fact that Bratz Diamondz would use a real gem on February 9, 2006, *before* the 2006 New York Toy Fair.[41]  A Reuters news article dated February 9, 2006 reported MGA's "plans for the autumn also include Bratz Diamondz – dolls that come with a piece of jewelry with a real diamond chip."[42]  This "trade secret" was thus no secret at all.  MGA's prior claim that the trade secret is the "dense glitter print on fashions, fur stole jackets, glittery, small hand purses, jewelry for customers to wear" made in its February 4, 2011 disclosure (Dkt. 9948), was never substantiated by evidence, and in any case Mattel released My Scene Bling Bling with these same characteristics a year *before* MGA released Bratz Diamondz.[43]  Ironically, Larian personally directed MGA employees to buy the My Scene Bling Bling product in October 2005.[44]

Second, MGA also identified the alleged trade secret elements of Alien Racers, but the trade secrets it identified are inconsistent and substantially narrower than the trade secrets claimed on the verdict form.  Larian testified that Mattel's "Acceleracers" – a product he admitted had been on the market long before Alien Racers – changed its name after Mattel obtained confidential information about Alien Racers.[45]  But MGA publicly disclosed the name of the product *before* the toy fair, disqualifying the name "Acceleracers" as a trade secret.[46]  Moreover, the

---

[40]  3/24/11 Trial Tr. Vol. 2 (Larian) 127:8-128:20.
[41]  TX 9879; 3/25/11 Trial Tr., Vol. 1 (Larian) at 67:19-69:18.
[42]  TX 9879-00001.
[43]  Compare 17527 with TX 31331.
[44]  TX 20803; 3/25/11 Trial Tr. Vol. 1 (Larian) at 66:18-67:11.
[45]  3/24/11 Trial Tr. Vol. 2 (Larian) 125:1-20.
[46]  See TX 20621.

"name" of product does not fit in MGA's claimed trade secret for Alien Racers, which it claimed was of the product's "appearance, operation, intended play pattern, and plans to advertise on television."   A comparison of the appearance of the products makes clear that none of Alien Racer's claimed trade secret components is actually similar to Mattel's Acceleracers product: Alien racers is a large, remote controlled truck purportedly driven by "alien monsters" and Acceleracers is a small race car.[47]

The actual design of the Bratz doll had been publicly disclosed since 2001, when Bratz was first released, and its themes were generic.  MGA did not introduce substantial evidence that the claimed trade secret components of its products – their appearance, operation, intended play pattern, plans to advertise on television or FOB pricing – were trade secrets that derived value from their secrecy, nor did it even adequately identify those alleged trade secret elements of its products.  For this reason as well, it did not meet its burden.

### 3. <u>Viewed Individually, The Claimed Trade Secrets Are Fatally Flawed</u>

Even putting aside the overwhelming failures of proof discussed above, which apply to all the claimed trade secrets, the claimed trade secrets suffer gross defects when viewed individually, as set forth below and, in further detail, in Section III <u>infra</u>.

### (a) <u>There Is No Evidence At All As To 3 Products</u>

As discussed above, there is no evidence in the record at all as to 3 of the 25 products for which the jury found liability – namely, "Lil' Bratz Vehicle Assortment", "Lil' Bratz Deluxe Mall Playset" and "Dazzlin' Disco Café."  <u>See</u> Section I.A.2, <u>supra</u>.  The claims as to these three clearly fail.

---

[47] <u>Compare</u> TX 36688 <u>with</u> TX 36707.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

**(b)      Press Releases Or Press Stories Issued Prior To Or At The Time Of The Toy Fairs As To 14 of the 25 Products At Issue**

There is specific evidence, as to 14 of the 25 products, that the claimed trade secret information was disclosed not only to retailers but to the press before Mattel allegedly misappropriated it.  This is fatal.  Ruckelshaus, 467 U.S. at 1002 ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information . . . His property right is extinguished."); Section I.A.1, supra.

MGA identified "the appearance, operation, intended play pattern and plans to advertise on television for Sun-Kissed Summer" as one of its trade secrets that Mattel allegedly misappropriated and used.  But the supposedly critical internal Mattel email regarding the upcoming product is literally copied word for word from an MGA press release of the same date:

> The summer's just getting started and it's already a scorcher! Join the Bratz as they kick off the season with a super stylin' day at the beach ... and by the pool!  Each girl comes with three distinct beach looks, and her own unique summer party accessories like a surfboard, a beach towel, and a tote.  The Splash 'N' Dance Pool(TM) is a 5-in-1 playset that features a real working pool, a stylin' sundeck/dance floor, a smoothie bar, a fashion runway and a chill-out balcony for catching a cool view!  Add to this over 30 themed accessories, and you've got a party that's bound to last all summer long!  And don't forget to join the Boyz(TM) Sun-Kissed Summer(TM) for more Kickin-cool style![48]

---

[48]   Compare TX 9284 (E-mail from Stephanie Page, dated February 11, 2004) with TX 20621 (MGA Press Release, dated February 11, 2004); see also 3/18/2011 Trial Tr., Vol. 2, at 16:15-22:22.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

The relevant Mattel email and MGA press release also contain identical descriptions of Bratz Girls Nite Out, another product MGA claims was misappropriated.[49]  Both the email and the MGA press release identically read:

> It's Saturday night and that can only mean one thing: It's Bratz Nite
> Out!  Join the girls as they party it up at the cafes and the clubs as they
> paint the town red-hot red!  Each Bratz comes [with] three nightlife
> looks that can only be described as "funkalish"!  Add over 30
> accessories, a unique "party night" accessory, real eyelashes and body
> glitter for extra shine beneath the strobes!  Also included is a 3-D
> movin-groovin' collectible card to invite you to a night out you're sure
> never to forget![50]

MGA identified "the appearance, operation, intended play pattern and plans to advertise on television for Bratz Mobile" as another claimed trade secret.  The relevant internal Mattel report, dated March 20, 2002, includes a photograph of Bratz Mobile and describes the product's features as "a working FM radio, an opening trunk, glove compartment and doors, wheels that move and turn, and a moving stick shift and steering wheel."[51]  That indisputably was not a secret: a February 25, 2002 magazine article includes the same photo and describes the product's features as "a real working FM radio, a stick shift that moves; an opening trunk, glove compartment, and doors; wheels that move; and a turning steering wheel."[52]  The publication of the photograph of the car and the detailed description of its features in the magazine article negate any claim that these elements were trade secret.

---

[49]  Id.; see also Dkt. 9948 (MGA's Trade Secret Chart Filed Pursuant to the Court's February 1, 2011) at 22.
[50]  Compare TX 9284 (E-mail from Stephanie Page, dated February 11, 2004) to TX 20621 (MGA Press Release, dated February 11, 2004).
[51]  TX 9507-143 (Mattel memo dated March 20, 2002).
[52]  TX 20951 (License! Magazine, dated February 25, 2002); see also 3/23/11 Trial Tr. Vol. 1 (Villasenor) at 108:22-110:7.

1    In addition to these three examples, comparably stark defects apply to an

2  additional 11 claimed secrets.[53]  The claims as to these clearly fail. <u>See</u> Section III,

3  <u>infra</u>.

4    **(c)    <u>3 of the 25 Products Had Already Been Shipped To</u>**

5    **<u>Retailers By The Time Of The Toy Fairs</u>**

6    MGA has conceded that a product that has already been released to the

7  market cannot be a trade secret.[54]  Nonetheless, the jury found liability with respect

8  to three products (and found liability as to one of those twice, since the product was

9  duplicated on the verdict form), awarding a total of $13.6 million in damages, even

10  though the products were indisputably shipped to retailers prior to the toy fair at

11  which they were allegedly misappropriated.

12    MGA claims that Mattel misappropriated Bratz Petz at the 2004 New York

13  Toy Fair in February 2004.[55] Bratz Petz had shipped to retailers for sale on the

14  market three months earlier.[56]

15    Both the MGA product, Bratz Sun-Kissed Summer, and the accused Mattel

16  product, My Scene Jammin' in Jamaica, were on retailer shelves in December 2003

17  – two months *before* the toy fair at which MGA alleges Mattel misappropriated

18  secret information about Sun-Kissed Summer.[57]  Not only was the information about

19  Sun-Kissed Summer public by the date of toy fair, but the accused My Scene

20  product was already manufactured and on the market.[58]

21

22

23

24    [53]    Bratz Mobile, Bratz Petz, Sun Kissed Summer, Girls Nite Out, Wild Life

Safari Collection, Bratz Diamondz, Bratz Virtual Buddiez Petz, Bratz Campfire, Wild

25  Wild West, Bratz Rock Angelz, Monkey See Monkey Do, Alien Racers, Bratz Kidz, and Passion for Fashion.

26    [54]    2/22/11 Trial Tr. Vol. 1 at 125:16-126:6.

[55]    <u>See</u> Dkt. 9948 at 11.

27    [56]    <u>See</u> TX 24603-2.

[57]    <u>See</u> TX 24671-6, TX 24671-11.

28    [58]    <u>See</u> TX 24671-11.

1    The jury found liability with respect to Girls Night Out, twice,[59] but Girls
2    Night Out was introduced at retail in November 2003 – three months prior to the toy
3    fair at which MGA alleges Mattel misappropriated information relating to it.[60]
4    MGA's trade secret claims with respect to these products all fail as a matter of law.

5    **(d)**  **No Reasonable Juror Could Find That FOB Pricing Is**
6    **A Trade Secret**

7    MGA's claim that FOB pricing information is a protected trade secret
8    likewise fails as a matter of law.  FOB pricing is the wholesale price of a product
9    plus the discount retailers realize for shipping the product directly from Asia.[61]  Mr.
10   Larian testified that "FOB cost,"[62] "price lists,"[63] and "pricing"[64] were among
11   MGA's "confidential" information, but no reasonable jury could credit Larian's
12   conclusory assertions in light of Larian's own testimony and that of his senior sales
13   staff.  See Callaway Golf Co. v. Dunlop Slazenger Group Ams., Inc., 318 F. Supp.
14   2d 205, 215-16 (D. Del. 2004) (granting summary judgment on trade secrets
15   misappropriation counterclaim brought under CUTSA, in part because "conclusory
16   allegations" were insufficient to rebut defendant's evidence).   Ms. Susana
17   Kuemmerle testified that toy manufacturer price lists are *not* trade secrets and that
18   retailers share them with competitors "all the time."[65]  Mr. Brawer, who actually
19   dealt with the retailers for MGA, testified that "there's certainly a significant
20   amount of leakage from the moment that you start telling retailers what the FOB
21   cost is of a product."[66]  He also  explained that information shared with a retailer is
22   passed on to literally hundreds of others.[67]  Larian himself admitted he did not

[59]  See Dkt. No. 10518 at 18 & 21.
[60]  Compare TX 24671-2 with TX 9284.
[61]  4/1/11 Trial Tr. Vol. 2 (Eckert) at 12:24-13:23.
[62]  3/24/11 Trial Tr., Vol. 2 at 108:21-109:10; 110:19-111:9
[63]  Id. at 41:6-13.
[64]  Id. at 113:5-24.
[65]  2/24/11 Trial Tr., Vol. 1, at 35:12-36:8.
[66]  3/31/11 Trial Tr., Vol. 2 (Brawer) at 41:10-42:9.
[67]  3/31/11 Trial Tr., Vol. 2 (Brawer) at 39:7-40:9

1  believe he was stealing trade secrets when he asked a retailer to get catalogs and

2  price lists of MGA's competitors, including Mattel, from toy fairs for him.[68]  Mr.

3  Eckert explained, in testimony that was not contradicted, that one can easily

4  determine the FOB price of a product based on the retail price and the retailer's

5  margin, which retailers tell toy companies as a matter of course.[69]  Larian's bold,

6  conclusory statement that such information was confidential—made after MGA had

7  repeatedly disclaimed that FOB prices were trade secrets[70]—cannot be deemed

8  sufficient to support the verdict.

9          **(e)**     **No Reasonable Juror Could Find That Mattel**

10                      **Misappropriated The "Plans To Advertise On**

11                      **Television" Of At Least 12 Products For Which The**

12                      **Jury Found Mattel Liable For Trade Secret**

13                      **Misappropriation**

14          MGA presented no evidence regarding MGA's "plans to advertise on

15  television" for 10 of the 25 products for which the jury found liability.  For each of

16  these 10 products, the admitted Mattel report referencing the product is silent as to

17  plans to advertise the product on television.[71]  For at least two other products, any

18  "plans to advertise on television" were no longer trade secret by the date of toy fair

19  because the products—Bratz Petz and Sun-Kissed Summer—had already been

20  released to market and, presumably, advertised on television.[72]  Thus, no reasonable

21  juror could have found Mattel liable for misappropriating "plans to advertise on

22

23      [68]  See 3/25/11 Trial Tr., Vol. 1 (Larian) at 103:11-105:24; see also TX 22225.
        [69]  4/1/11 Trial Tr. Vol. 2 (Eckert) at 12:24-13:23.
        [70]  See Notice by MGA Entertainment, Inc. of Trade Secret Designation Pursuant

24  to Cal. Code Civ. Proc. § 2019.210, dated August 24, 2010 at 1; see also MGA
    Entertainment, Inc.'s Corrected Responses to Mattel, Inc.'s First Set of

25  Interrogatories, dated September 24, 2010, at 5-6; Phase 2 30(b)(6) Deposition of
    MGA (Jolicoeur), Vol. 27, dated November 1, 2010 at 6648:12-6649:7; Dkt. No.

26  9948.
        [71]  See TX 9507-143, TX 9275-020, TX 31530, TX 9284-01, TX 9284-02 , TX

27  26755-012, TX 26755-00010, TX 26755-00010, TX 26755-00010 and TX 23894-
    00002.

28

-22-

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

1   television" for any of the following products: Bratz Mobile, Bratz Pet Assortment,

2   Dazzlin Disco Café, Girls Nite Out, Wild Life Safari, Bratz Virtual Buddiez Petz,

3   Bratz Campfire, Wild Wild West, Bratz Rock Angels, Alien Racers, Bratz Petz and

4   Sun-Kissed Summer.

5   **B.   Even If The Information Was Secret, MGA Failed To Prove**

6   **Misappropriation**

7        Even assuming MGA could prove that any of its claimed trade secrets actually

8   were protected trade secrets at the time of the alleged misappropriation, MGA failed

9   to prove misappropriation.[73]  Liability for misappropriation requires not only a trade

10  secret, but also proof that "(2) the defendant acquired, disclosed, or used the

11  plaintiff's trade secret through improper means, and (3) the defendant's actions

12  damaged the plaintiff." Sargent Fletcher, Inc. v. Able Corp., 110 Cal. App. 4th 1658,

13  1665-66 (2003); see also Silvaco, 184 Cal. App. 4th at 220 (similar); Cytodyn, Inc. v.

14  Amerimmune Pharmaceuticals, Inc., 160 Cal. App. 4th 288, 297 (2008) (same);

15  Language Line Services, Inc. v. Language Services Associates, LLC, 2010 WL

16  2764714, at *3 (N.D. Cal. July 13, 2010) (same); Science of Skincare, LLC v.

17  Phytoceuticals, Inc., 2009 WL 2050042, at *5 (C.D. Cal. July 7, 2009) (granting

18  summary judgment on trade secret misappropriation claim where plaintiff identified

19  no damages resulting from trade secret misappropriation).  MGA has not shown any

20  of these elements – it has proven neither use nor damages or injury, and has not

21  shown misappropriation.

22       MGA's misappropriation case rested on the theory that Mattel was unjustly

---

[72]  See TX 24603-2, TX 24671-00006.
[73]  In addition, even if MGA proved misappropriation, under its own arguments, its trade secret claims are preempted by copyright law, both expressly and under the conflict preemption doctrine.  See, e.g., MGA Parties' Motion for reconsideration of the Court's Summary Judgment Ruling re Copyright Preemption, dated 1/1/11, Dkt. 9572 (arguing among other things that Mattel's Bratz trade secret claim is preempted by copyright because the elements of the trade secret are either protected by copyright and therefore "equivalent" to copyright rights or alternatively, by definition, are in the public domain and therefore not protectable by trade secret law).

1  enriched by its *use* of MGA's claimed trade secrets.  In fact, as discussed in detail in

2  Section I, MGA did not even seek damages from the jury; it sought to prove only

3  unjust enrichment through alleged use.  MGA sought to meet its burden of proving

4  Mattel's use of its trade secrets by "matching" MGA's claimed trade secrets with

5  Mattel products that allegedly incorporated the trade secret information, but it

6  woefully failed in that attempt.

7          To prove Mattel's use of MGA's trade secrets – or, for that matter, injury or

8  damages – MGA would need evidence that Mattel used MGA's information to

9  MGA's detriment, such as by incorporating MGA's information into a Mattel

10  product.  See, e.g., PMC, Inc. v. Kadisha, 78 Cal. App. 4th 1368, 1383 (2000)

11  ("Employing the confidential information in manufacturing, production, research or

12  development, marketing goods that embody the trade secret, or soliciting customers

13  through the use of trade secret information, all constitute use.") (citing Rest.3d Unfair

14  Competition (1995) § 40, com. c.)); Silvaco, 184 Cal. App. 4th at 224 ("One clearly

15  engages in the 'use' of a secret, in the ordinary sense, when one directly exploits it for

16  his own advantage, *e.g*., by incorporating it into his own manufacturing technique or

17  product.").  As MGA itself has argued (in opposing Mattel's trade secrets claim),

18  "[u]se or disclosure requires possession or control by defendant and conduct that

19  reduces the commercial value of the trade secret, *i.e*., *that the information actually be*

20  *used to the detriment of Mattel in the market*."  Dkt. 9084 at 67 (emphasis added); see

21  Gibson-Homans Co. v. Wall-Tite, Inc.,  1992 WL 512411, at *11-12 (C.D. Cal. Oct.

22  27, 1992) ("Since defendants have not used the formulas or otherwise impaired their

23  commercial benefit to plaintiff, no misappropriation has occurred.").

24

25

26

27

28

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

1.   **MGA Produced No Evidence Of Misappropriation For 3 Dolls Shown At The 2006 Toy Fair**

Three products at issue – Bratz Diamondz, Bratz Kidz and Passion for Fashion – were referenced in Mattel's 2006 Competitive Product Overview report.[74] MGA, however, presented no evidence that anyone from Mattel accessed or visited any MGA toy fair showroom in 2006.  Mr. Villasenor did not attend any toy fairs in 2006,[75] and indeed the report was compiled after Mr. Villasenor stopped working for Mattel.[76]  The only Mattel employee who testified that she entered an MGA showroom without revealing that she was a Mattel employee, Carey Plunkett, stated that the only instance in which she did so was 2002.[77]  Furthermore, the report contained an explicit statement, consistent with all the evidence, that it was "created by collecting content from a variety of press releases, news articles and widely accessible websites.  All included content is publicly available and can be directly sourced by request.  None of this information either obtained or sought from any third party."[78]  MGA presented no evidence to contradict this.  MGA's claims that Mattel misappropriated trade secret information from the 2006 New York toy fair, including information regarding Bratz Diamondz, Bratz Kidz and Passion for Fashion, are utterly unsupported by evidence.

2.   **There Is No Evidence Of Any "Matching" Mattel Product As To 17 of the 25 Products**

Of the 25 MGA products found to be trade secrets, MGA did not introduce ***any***

---

[74]   See TX 8522-06.
[75]   3/23/11 Trial Tr., Vol. 2 (Villasenor) at 48:19-49:4, 76:20-77:7.
[76]   3/23/11 Trial Tr. Vol. 1 (Villasenor) at 59:2-5; 3/23/11 Trial Tr. Vol. 2 (Villasenor) at 72:2-7.
[77]   See 3/29/11 Trial Tr., Vol. 1 (Plunkett) at 22:9-15 (employee did not attend any toy fair except in 2002), 25:25-26:3 (employee entered an MGA showroom in 2002).
[78]   TX 9566-3.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

evidence of use as to 17 of them.[79]  MGA's theory of use was that Mattel used MGA's information in "matching" Mattel products, leading to "head start" damages,[80] but as to 17 products there was no testimony about an ostensibly "matching" Mattel product at all, nor were any documents identifying any "matching" Mattel product admitted.   One of Mr. Malackowski's demonstrative charts, TX 37189-00033, at least mentioned 8 of these 17 products for which there is no evidence of "matches" or use.  But, as the Court is aware, that chart was not admitted at trial because MGA took the position that no demonstratives were to be admitted.  It therefore could not be considered by the jury and cannot be considered by the Court.  United States v. Wood,  943 F.2d 1048, 1053-1054 (9th Cir. 1991) (demonstrative charts should "not be admitted into evidence or otherwise be used by the jury during deliberations").  Indeed, the jury was specifically instructed that charts such as this one are not themselves evidence or proof of any facts:

> Certain charts and summaries not received in evidence have been shown to you in order to help explain the contents of books, records, documents, or other evidence in the case.  They are not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.[81]

There was, accordingly, no evidence at all of any ostensibly matching Mattel product that used MGA's information as to most of the trade secrets – 17 of the 25.  And indeed there is no reference on TX 37189-00033 to eleven trade secrets for which the jury found liability and awarded damages:  Bratz Mobile, Bratz Style It Collection, Bratz Runway Formal Funk Collection, Bratz Petz Assortment, Wild

---

[79]   Bratz Mobile, Bratz Style' It Collection, Bratz Formal Funk Collection, Bratz FM Limo, Bratz Petz Assortment, Lil' Bratz Vehicle Assortment, Lil' Bratz Delux Mall Playset, Dazzlin' Disco Café, Sun-Kissed Summer, Wild Life Safari Collection, Bratz Virtual Buddiez Petz, Bratz Campfire, Wild Wild West, Monkey See Monkey Do, Lil' Bratz Boys, Bratz Kidz, Passion for Fashion.
[80]   4/4/11 Trial Tr., Vol. 3 (Malackowski) at 58:9-60:17.
[81]   Instruction No. 21 (Charts and Summaries Not Received in Evidence).

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

1   Life Safari Collection, Bratz Virtual Buddiez Petz, Monkey See Monkey Do, Lil'
2   Bratz Boyz, Alien Racers, Bratz Kidz and Passion For Fashion.  Thus, even if the
3   non-admitted chart could be considered, *it* didn't even mention 11 of the products at
4   issue – as to those, there is not a shred of evidence of matching products or use,
5   admitted or non-admitted.[82]

6          **3.     The Evidence Shows That Mattel Did Not Use MGA's**
7                **Claimed Trade Secrets In Connection With Mattel's**
8                **Products, Whether "Matching" or Not**

9          As to all the trade secrets, whether "matching" products were evidenced or
10   not, MGA's attempt to show use failed as a matter of law.  Neither Mr. Larian's nor
11   Mr. Malackowski's testimony about these products, to the extent there is any as to
12   particular product, provided the jury with anything remotely resembling a
13   foundation to support MGA's conclusion that Mattel used MGA's information
14   during a "head start" period in bringing products to market.

15         To be relevant, a defendant's use must be of the claimed trade secret
16   information – here, the appearance, operation, plans to advertise and so on of each
17   specific product – and must occur while the information was secret.  No one disputes
18   that all of MGA's products and claimed trade secrets eventually became public; a
19   trade secret claim obviously cannot be based on the use of public information.  It was,
20   therefore, MGA's burden to prove that Mattel used the ostensibly confidential
21   information about (for example) the operation and play patterns of each of its
22   products *while that information was secret*, to MGA's detriment.  MGA did not meet
23   that burden.  The record does not contain critical information needed to make such a
24   showing, including such basic factors as when the Mattel product was developed and
25   released, whether that release was before or after the toy fair where MGA's
26   information was allegedly acquired, and, if after, how long after.

27   _____
28   [82]   See Verdict Form, dated Apr. 20, 2011 (Dkt. 10518), at 16-25 and TX 37189-
      (footnote continued)

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

Not only was such proof absent from the record, but in one instance the undisputed evidence showed that the accused Mattel product was released *before* the toy fair at which Mattel allegedly misappropriated MGA's information.[83]  As to these claims by MGA – that Mattel supposedly copied the Bratz Sun-Kissed Summer in its My Scene Jammin' In Jamaica Guava Gulch – the jury's verdict plainly cannot stand.

MGA's claims as to five other allegedly "matched" Mattel products that were released more than one year (and in some cases as long as 2 and a half years) *after* the toy fair at which the corresponding MGA trade secret was allegedly misappropriated, also renders impossible any claim that Mattel "used" MGA's purported trade secrets while they were trade secrets to develop the purportedly matching product.[84]

As to 2 other allegedly matching Mattel products – My Scene Pets/Soft Pets, and My Scene Outdoors Camping/Barbie Camping Family – there is no evidence of when the Mattel product was released at all, and thus no basis for a finding that Mattel "used" the corresponding MGA claimed trade secrets – Bratz Petz and Bratz Campfire – while they were trade secrets.  Here as well, MGA simply did not meet its burden, has not shown use, and has not shown injury or misappropriation.

### 4. The Evidence Does Not Support A Finding That Mattel Used The Specific Components That MGA Claims Are Secrets

Even if there were proof of use of some MGA information, the evidence does not support a finding that Mattel used the trade secret attributes of those products that MGA alleged.

---

00033.
[83]  See TX 24671-00011.
[84]  My Scene Club Birthday Car with Radio (matched with Bratz Mobile), My Scene Night on the Town (matched with Bratz Formal Funk Collection), My Scene Goes Hollywood Party Limo (matched with Bratz FM Limo), Bling Bling Limo (matched with Bratz FM Limo), My Scene Convertible/My Scene Delancey & Hudson Convertible (matched with Lil' Bratz Vehicle Assortment), and My Scene Mall Maniacs Playset (matched with Lil' Bratz Deluxe Mall Playset).  See Section III, infra.

For example, the jury found that a My Scene Chillin' Out doll copied a Bratz Winter Wonderland doll.  As shown above, see Section I.A supra, the winter theme for those products is generic and cannot be an MGA trade secret; Larian identified the fur handle on the packaging as the only unique characteristic of the product.[85] But even if that aspect of the product was an MGA trade secret, the undisputed evidence shows that Mattel did not misappropriate *that* feature in its product. Indeed, the only similarity between the products is that they both are brown-haired fashion dolls in winter clothes.[86]

MGA's claim likewise fails as to the claimed Bratz Motorcycle trade secret. MGA purported to "match" that product with the My Scene Delancey with Vespa product.  Larian testified that the misappropriated trade secret was the product's appearance – a motorcycle.[87]  But other than the raw fact that the products are both motorcycles (a generic product type that, as shown at TX 24471-14, Mattel has sold since at least 1978), there is no basis to find that Mattel "used" any aspect of the Bratz Motorcycle that could arguably be a trade secret of MGA.

Similarly, Mr. Malackowski matched (in his non-admitted demonstrative) My Scene Goes Hollywood with Bratz Rock Angels.[88]  Those products are nothing alike:  the Bratz Rock Angels theme is a music recording themed product (with a booth and a child-size microphone as accessories) and the clothing is "denim and pleather,"[89] while My Scene Goes Hollywood is a "red carpet"-themed doll, with glittery and glamorous outfits, and a director's chair and movie popcorn as accessories.[90]  Mr. Malackowski admitted he made no comparison of the appearance

---

[85]  See 2/17/2011 Trial Tr. Vol 2 (Larian) at 7:2-12; see also 3/24/2011 Trial Tr. Vol. 2 (Larian) at 117:5-118:15
[86]  Compare TX 36704 with TX 35265.
[87]  See 2/17/2011 Trial Tr. Vol. 2 (Larian) at 121:4-122:5.
[88]  TX 37189-00033.
[89]  TX 9350-00002.
[90]  See TX 8250 (unadmitted).

of the two products.[91]  The only evidence the jury heard about Bratz Rock Angels – that it is "another music theme" with a "little CD" and actual music,"[92] – provides an insufficient basis in evidence to support any finding that Mattel used MGA's claimed trade secret to develop any of its products.

As to all the claimed trade secrets, the evidence does not support a finding that Mattel's allegedly "matching" products embodied, incorporated or "used" in any manner MGA's claimed trade secrets.  MGA's failure to prove that Mattel used any of the claimed trade secret components while they were trade secrets merits the entry of judgment as a matter of law; there was no misappropriation, and no evidence of any injury or damages MGA suffered as a result of any misappropriation, as required for liability.[93]

## II.   MGA FAILED TO PROVIDE EVIDENCE TO SUSTAIN THE JURY'S DAMAGES AWARD

MGA also failed to establish its supposed damages of $3.4 million for each of the 26 (actually 25) supposed secret products.   The jury's additional awards of damages are literally supported by no evidence at all.  Mr. Malackowski testified to ostensible head-start damages only for *two* products.   The most MGA could potentially point to is a chart including 14 of these products that was never admitted into evidence and as such cannot support the verdict.   And even if the inadmissible chart is not only considered but considered sufficient, standing alone it still does not

---

[91]   4/5/2011, Trial Tr. Vol. 2 (Malackowski) at 27:9-19.
[92]   2/17/11, Trial Tr. Vol. 1 (Larian) at 108:18-112:19.
[93]   As Mattel has briefed before, and acknowledging the Court's prior rejection of this argument, Mattel also submits that MGA's trade secret claim should be rejected as time barred because it is not (and never was) compulsory and does not relate back to Mattel's November 20, 2006 pleading.  Dkt. 8737 at 10-11, 26-31; Dkt. 9343 at 65-76; Dkt. 10426 at 4 n.2.  No jury could find that MGA did not have reason to suspect its trade secret claim before August 16, 2007 – three years before that claim was first asserted.  Dkt. 8737 at 1-8; Dkt. 8763 at 17-18; Dkt. 9343 at 71-73; see also 3/31/11 Trial Tr. (Ronald Brawer), Vol. 1, at 80:10-81:3, 85:3-11; Vol. 2, at 6:15-9:21.  To the extent the date of accrual was a jury issue, the verdict form only asked the jury whether the claim accrued on or before November 20, 2003, which assumed, improperly in Mattel's view, that the claim relates back.  Dkt. 10518 at 26.

support the verdict for 8 of the 14, because the number on the chart is actually lower than the number awarded by jury.  Finally, and most tellingly, the jury awarded damages as to 5 products for which Mr. Malackowski affirmatively *disclaimed* any head-start damages.

Plainly, the jury simply took Mr. Malackowksi's overall $88.5 million damages opinion, divided it by 26, and awarded that number ($3.4 million) for each of the 26 products as to which it found liability – without regard to whether or not MGA even offered a head-start theory of damages for those products or not.  MGA's counsel invited this error during closing arguments, when she told the jury – misstating the evidence – that "Mr. Malackowski testif[ied] that the average amount of enhanced profits Mattel earned by stealing MGA's trade secrets was 3.4 million each as to the other products."[94]  Nothing permits such a simplistic averaging of damages, especially when the "average" numbers are based on 11 trade secrets for which the jury found no liability.  The jury's task, as the verdict form itself made plain, was to calculate Mattel's alleged unjust enrichment on a trade secret-by-trade secret basis.  The proof MGA introduced would not be sufficient to allow any jury to do so; the failing here is not in the jury, but in the proof they were given.

## A.    Background

MGA pursued no actual damages claim at trial, but solely an unjust enrichment remedy.  See Dkt. 9720 at 124 (MGA Proposed Jury Instruction re: "Misappropriation of Trade Secrets:  Essential Factual Elements," requiring proof that "the defendant was unjustly enriched as a result [of] his or her use or disclosure of the claimant's trade secrets").  MGA's damages expert, James Malackowski, testified to two different approaches for calculating damages for MGA's trade secret misappropriation claims – a "top down" approach and a "bottom up" approach.  Neither of these approaches supports the jury's damages verdicts.

---

[94]   4/8/11 Trial Tr., Vol. 3 (MGA closing argument), at 10:5-8.

### 1.   Mr. Malackowski's Bottom Up Approach

The bottom up approach was a "product-by-product" approach that purported to calculate "head start" damages for 26 of MGA's 114 claimed trade secrets.[95]  As Mr. Malackowski testified at trial, a head start approach "is about timing" and "when the information was known."[96] Mr. Malackowski's theory assumes an "actual product launch [by Mattel] using the trade secret" that resulted in unjust enrichment to Mattel;[97] and then "focuses on the profits that the alleged infringer made during the head start period,"[98] which is limited to the time period during which the trade secret remained secret.[99]

Mr. Malackowski's bottom up approach applied to 26 of the 114 products that MGA claimed had been misappropriated.  He narrowed the initial group of 114 to 73 for which there was a Bratz product; narrowed those 73 to 32 claimed trade secrets for which, according to Mr. Malackowski, "there are competitive My Scene and Mattel products in the market"; and, of those 32 supposed trade secrets, concluded that "a head start can be calculated for 26 of them."[100]  In reality, he ended up calculating a head start for only 22, and then using the average of those for his remaining four.[101]

In his testimony, however, Mr. Malackowski addressed only 2 of the 26 of the 114 – Bratz Diamondz and Bratz Winter Wonderland.[102]  On direct examination, Mr. Malackowski did not even mention of any of the other 24 claimed trade secrets or the "competitive" Mattel products with which he was matching them for purposes of his

---

[95]   4/5/11 Trial Tr., Vol. 1 (Malackowski), at 27:4-15; 4/5/11 Trial Tr., Vol. 3 (Malackowski), at 60:10-61:6; 4/4/11 Trial Tr., Vol. 3 (Malackowski), at 49:4-22, 50:20-51:24 and 58:7-22.

[96]   4/4/11 Trial Tr., Vol. 3 (Malackowski), at 58:23-59:4.

[97]   4/4/11 Trial Tr., Vol. 3 (Malackowski), at 58:23-59:24 (emphasis added).

[98]   4/4/11 Trial Tr., Vol. 3 (Malackowski), at 59:22-24

[99]   4/5/11 Trial Tr., Vol. 2 (Malackowski), at 48:3-8; see also 4/4/11 Trial Tr., Vol. 3 (Malackowski), at 59:3-4 ("So in many respects a head start is about timing. It's about when information was known.").

[100]   4/4/11 Trial Tr., Vol. 3 (Malackowski), at 59:25-60:25.

[101]   4/4/11 Trial Tr., Vol. 3 (Malackowski), at 59:25-61:13.

00505.07975/4127636.2

1   calculations, let alone the underlying release dates and financials which would be

2   necessary for anyone to even evaluate a head start award.   On cross-examination,

3   Mr. Malackowski was questioned about 2 more of the 26 claimed secrets (one of

4   which the jury did not even find liability for) and mentioned one other, but there was

5   no testimony about individual damages calculations for any of them.[103]

6        Beyond his testimony as to Bratz Diamondz and Bratz Winter Wonderland,

7   Mr. Malackowski's explained that he calculated head start damages for 22 claimed

8   trade secrets that totaled $74.9 million; he took the "average" for these 22 and

9   assigned it to the four for which he had no number; and then he totaled it up and got

10   $88.5 million.[104]   The jury was briefly shown a demonstrative chart listing 26 Bratz

11   products, a "Potential Competing My Scene Product," and a "Head Start Damages"

12   number for each.   The chart listed the "Average Head Start Damages" for 22 of the

13   26 products as $3.403 million, which was then assigned to 4 "Products for Which

14   Mattel Data is Unavailable."[105]   As discussed, the chart was never admitted into

15   evidence.  Except as to Bratz Diamondz and Bratz Winter Wonderland, there was not

16   one word of evidence as to the basis for any calculations, the amount of the damages

17   or even what the chart purported to show.  There was, in short, no basis for the jury to

18   apply the approach – particularly since it ultimately selected a *different* group of 26

19   products than the group from which the "average" number touted in MGA's closing

20   was derived.

21           **2.**    **Mr. Malackowski's Top Down Approach**

22        Mr. Malackowski's top down analysis purported to calculate damages for *all*

23   114 claimed trade secrets allegedly misappropriated by Mattel as a group.[106]   Rather

24

25

---

26     [102]  4/4/11 Trial Tr., Vol. 3 (Malackowski), at 61:14-64:2.

27     [103]  4/5/11 Trial Tr., Vol. 2 (Malackowski), at 24:17-34:4.
       [104]  4/4/11 Trial Tr., Vol. 3 (Malackowski), at 60:18-61:13.
       [105]  TX 37189-00033 (not admitted).

28     [106]  4/4/11 Trial Tr., Vol. 3 (Malackowski), at 64:24-65:7

than calculate damages on a "product-by-product" basis,[107] as the instructions and verdict form required, it attempted to measure the "enhanced profitability" to the My Scene product line "in total" from the alleged taking of all these trade secrets at toy fairs.[108]   By its terms, and according to Mr. Malackowski's own defense of it, this approach *only* applied if all of the 114 trade secrets are considered as a misappropriated group.

To come up with his actual number, Mr. Malackowski "looked at the actual My Scene sales and determined what the sales should have been but for the alleged taking of the trade secrets at the toy fair."[109]   To determine what My Scene sales "should have been" in 2003 but for the alleged taking of the trade secrets, Mr. Malackowski took domestic My Scene sales of $17 million from October to December 2002, the first four months My Scene was on the market, assumed no growth from 2002 to 2003, and so doubled them to arrive at "full year" but for sales of $34 million for 2003.   He then added an amount for international sales based on the historic ratio of domestic sales to international sales to arrive at a total of $100 million, and then checked that amount against Mattel's internal "projections" for My Scene sales in 2003. My Scene sales in 2003 were $166 million.   Without further analysis, Mr. Malackowski then deemed the entire difference between the $100 million in "projected" 2003 sales and the $166 million in actual 2003 sales to the trade secrets allegedly misappropriated that year.[110] He did not address any other possible explanations for the difference between the projections and the profits, including, for example, that Bratz expanded the market for dolls targeted to older age girls (as Mr. Malackowski himself testified)[111] or that sales would increase from 2002

---

[107]   4/4/11 Trial Tr., Vol. 3 (Malackowski), at 49:16-22, 51:17-24.
[108]   4/4/11 Trial Tr., Vol. 3 (Malackowski), at 49:16-22, 51:17-21.
[109]   4/5/11 Trial Tr., Vol. 1 (Malackowski), at 27:4-12; 4/4/11 Trial Tr., Vol. 3 (Malackowski), at 50:20-51:2.
[110]   4/5/11 Trial Tr., Vol. 2 (Malackowski), at 37:14-39:23; see also 3/19/11 Hearing Tr. (Malackowski Daubert Hearing), at 85:11-87:1.
[111]   4/5/11 Trial Tr., Vol. 2 (Malackowski), at 14:6-11.

-34-
MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

1   to 2003 because Mattel had more My Scene products on the market in 2003 than in

2   2002.[112]  He then repeated the same methodology for each subsequent year, but either

3   increased or decreased his $100 million in "but for" sales for 2003 by applying

4   certain assumed growth rates.[113]

5       In defending his top-down approach, Mr. Malackowski acknowledged the clear

6   limits of the approach: it did not permit the jury to "pick and choose" among the trade

7   secrets or allocate damages between the trade secrets "[o]n a specific product basis. . .

8   . *if the jury is going to start to knock out individual themes, I think they're focused*

9   *on the bottom up approach*."[114]

10          ### 3.   The Jury's Damages Award

11      The special verdict form required the jury to determine liability and award

12  damages on each of MGA's 114 claimed trade secrets on a trade secret-by-trade

13  secret basis.[115]  In response to question 16 on the special verdict form, the jury found

14  liability as to 26 specific claimed trade secrets and found no liability as to 88 specific

15  trade secrets.   For each of these 26 trade secrets, the jury awarded an identical

16  damages number – $3.4 million.  In response to question 17 on the special verdict

17  form, which asked for the total of all damages awarded in question 16, the jury wrote

18  $88.5 million.[116]

19      The jury's verdict appears to be an effort to correspond to the numbers urged

20  by Mr. Malackowski in his bottom up approach – $88.4 million for 26 trade secrets.

21  Basic arithmetic confirms that $3.4 million is simply the average arrived at by

22  dividing $88.5 million by 26.  Indeed, Mr. Malackowski's demonstrative – though

---

23

24      [112]  3/19/11 Hearing Tr. (Malackowski <u>Daubert</u> Hearing), at 85:11-87:18.
        [113]  4/5/11 Trial Tr., Vol. 2 (Malackowski), at 39:14-21.

25      [114]  <u>See</u> 3/19/11 Hearing Tr. (Malackowski <u>Daubert</u> hearing), at 88:21-89:16
    (emphasis added).

26      [115]  Verdict Form, dated Apr. 20, 2011 (Dkt. 10518), at 16-26.
        [116]  Verdict Form, dated Apr. 20, 2011 (Dkt. 10518), at 16-26.  Although the total

27  damages the jury calculated were $88.5 million, that figure is in error, as the Court
    recognized.  <u>See</u> 4/21/11 Trial Tr., at 84:20-85:4.  The actual total of the jury's 26

28  separate awards of $3.4 million each is $88.4 million.

not in evidence – claimed "Average Head Start Damages" of $3.403 million.  And, during closing argument, counsel for MGA told the jury – incorrectly – that "Mr. Malackowski testif[ied] that the average amount of enhanced profits Mattel earned by stealing MGA's trade secrets was 3.4 million each as to the other products."[117]  In fact, there was no such testimony.

While the numbers awarded by the jury (26 trade secrets and $88.5 million in total damages) correspond to Mr. Malackowski's bottom up approach, the individual trade secrets on which the jury found liability do not.  Mr. Malackowski's bottom up number of $88.5 million assumed liability on 26 specific trade secrets.  The jury found no liability as to 11 of those claimed trade secrets.  Instead, the jury found liability on 11 different trade secrets as to which Mr. Malackowski did not perform or testify about any calculation of damages.

### B. The Jury's Damages Awards Are Arbitrary, and Must Be Set Aside

#### 1. There Is No Support For The Jury's Award of $3.4 Million Per Trade Secret

The jury's verdict in this case violates one of the most basic requirements for damages awards.   "[A] factfinder's damages calculation must find support in the record."  In re Wolverton Assocs., 909 F.2d 1286, 1296 (9th Cir. 1990) (reversing because there "was not sufficient evidence to support the court's determination of damages"); In re First Alliance Mortg. Co., 471 F.3d 977, 1001 (9th Cir. 2006) (damages award "only based on speculation or guesswork" must be vacated); Wilson v. Great Am. Indus., Inc., 979 F.2d 924, 934 (2d Cir. 1992) ("Calculations of damages not finding adequate support in the record may not be affirmed on appeal.").  Far from supporting the jury's findings, the trial record confirms that the jury's award of $3.4 million for each of 26 specified trade secrets was arbitrary.

---

[117]  4/8/11  Trial Tr., Vol. 3 (MGA closing argument), at 10:5-8.

1       Of the 26 trade secrets for which the jury found liability, MGA's expert

2   testified to damages estimates for only two – Bratz Winter Wonderland, and Bratz

3   Diamondz.[118]  The record contains no testimony or evidence at all as to the benefits

4   Mattel purportedly gained (or the harm MGA purportedly suffered) from

5   misappropriation of the remaining 24 trade secrets.  The jury's decision to award $3.4

6   million for each of those 24 trade secrets was without any factual basis.

7       That the jury's damages awards total $88.4 million does not save them.

8   Although the award almost matches the  $88.5 million that Mr. Malackowski reached

9   for the 26 specific products he considered,[119] 11 of the 26 trade secrets found by the

10   jury do not match the trade secrets in Mr. Malackowski's analysis.  Those 11 are:

11   Bratz Mobile, Bratz Style It Collection, Bratz Runway Formal Funk Collection, Bratz

12   Petz Assortment, Wild Life Safari Collection, Bratz Virtual Buddiez Petz, Monkey

13   See Monkey Do, Lil' Bratz Boyz, Alien Racers, Bratz Kidz and Passion For

14   Fashion.[120]  Thus, the jury's $88.5 million total was based on a materially different

15   set of trade secrets than the ones Mr. Malackowski claimed totaled $88.5 million.[121]

16   The law is well-established that aggregate damages opinions cannot support a verdict

17   where only a subset of the conduct at issue is found to be actionable, including in

18   trade secret cases.  See O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc., 399 F.

19   Supp. 2d 1064, 1077 (N.D. Cal. 2005) ("After the jury concluded that MPS did not

20   misappropriate all of O2 Micro's trade secrets, Mr. Meyer's expert testimony

21   regarding damages for misappropriation of all trade secrets was useless to the jury"

22   and "the jury was then left without sufficient evidence, or a reasonable basis, to

---

[118]   4/4/11 Trial Tr., Vol. 3 (Malackowski) at 61:14-64:2.

[119]   4/4/11 Trial Tr., Vol. 3 (Malackowski), at 64:3-13 (explaining that the head start damages for the 26 products totals "88.486 million or 88-and-a-half million"); Trial Tr., dated Apr. 4, 2011, Vol. 3 (Malackowski), at 51:10-14 ("[T]he 88 million is comprised of 26 different products. . . .").

[120]   Compare Verdict Form, dated Apr. 20, 2011 (Dkt. 10518), at 16-25 and TX 37189-00033.

[121]   Compare Verdict Form, dated Apr. 20, 2011 (Dkt. 10518), at 16-25 and TX 37189-00033.

-37-

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

1 determine the unjust enrichment damages"); <u>Litton Sys., Inc. v. Honeywell, Inc.</u>,

2 1996 WL 634213, at *1 (C.D. Cal. 1996) (rejecting damages verdict in antitrust

3 action because "the aggregated damage study [plaintiff] presented to the jury was

4 seriously flawed in that it failed to disaggregate and apportion damages attributable to

5 particular conduct claimed to be anticompetitive and thus provided no basis for the

6 jury to adjust the single 'lump-sum' damage figure in the event that some, but not all,

7 of Honeywell's challenged conduct was found" to be unlawful); <u>see also</u> <u>IQ Prods.</u>

8 <u>Co. v. Pennzoil Prods. Co.</u>, 305 F.3d 368, 376-77 (5th Cir. 2002) (affirming exclusion

9 of opinion where expert considered combined effect of two allegedly tortious acts but

10 did not consider them independently, and one was not actionable); <u>Children's Broad.</u>

11 <u>Corp. v. Walt Disney Co.</u>, 245 F.3d 1008, 1018 (8th Cir. 2001) (excluding opinion

12 where expert "based his testimony on a report prepared with the assumption that

13 ABC Radio and Disney had engaged in a variety of wrongful conduct," and "[o]nly

14 three counts from the original complaint survived summary judgment, but [the

15 expert]'s damages theory remained the same"); <u>Litton Sys., Inc. v. AT&T</u>, 700 F.2d

16 785, 825 (2d Cir. 1983) ("[D]amage studies are inadequate when only some of the

17 conduct complained of is found to be wrongful and the damage study cannot be

18 disaggregated."). Here, of course, the jury did not even choose a subset of Mr.

19 Malackowski's trade secrets – it chose an entirely different set of 26 trade secrets.

20 Because the jury did not accept the liability assumptions on which Mr.

21 Malackowski's $88.5 million number depended, that aggregate number provides no

22 basis for the jury to determine damages.

23     Moreover, even if Mr. Malackowski's liability assumptions did match the

24 jury's actual findings (which they didn't), Mr. Malackowski's $88.5 million number

25 still would not support the verdict since it was a product of impermissible averaging

26 and addition.[122] While it rejected Mr. Malackowski's liability assumptions as to 11

27

28
_____

[122]   4/4/11 Trial Tr., Vol. 3 (Malackowski), at 60:18-61:13.

-38-

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

trade secrets, the jury appears to have arbitrarily assigned each of the 26 trade secrets as to which it found liability the pro-rated "average" of Mr. Malackowski's $88.5 million number.  That $88.5 million damages figure itself included damages from products as to which the jury found no liability, rendering the numbers wholly inapposite. This is impermissible.  A jury may not simply average damages figures derived from an erroneous damages figure (much less on involving different products) to arrive at an ultimate damages amount.  Where it does so, the damages verdict "cannot be said to be properly rooted in the evidence at trial."  In re First Alliance Mortg. Co., 471 F.3d 977, 1002-03 (9th Cir. 2006) (reversing denial of motion for remittitur where jury arrived at damage award by averaging the estimates of each party's damages experts, despite the fact that one of the expert's estimates was legally erroneous).

### 2.    Mr. Malackowski's Chart Is Not Evidence and Merely Confirms the Arbitrariness of the Jury's Award

MGA may attempt to argue that support for the jury's damages awards for the 24 trade secrets never mentioned at trial can be found in one of Mr. Malackowski's demonstrative charts, TX 37189-00033, but, as discussed, that chart was neither admitted nor admissible, and cannot be considered.  See supra.  In any event, a comparison of the verdict to the chart only further demonstrates the unfounded nature of the jury's damages award.  The jury found liability on 11 trade secrets that did not appear on the chart and for which MGA thus presented no individual damages calculation at all.[123]  Even as to the products the jury selected that appeared on Mr. Malackowski's chart, the jury did not award any of the specific amounts stated on the chart for specific trade secrets.  Instead, the jury awarded an average damage amount

---

[123]  See Verdict Form, dated Apr. 20, 2011 (Dkt. 10518), at 16-25 and TX 37189-00033.  There is no reference on TX 37189-00033 to the following eleven trade secrets for which the jury found liability and awarded damages:  Bratz Mobile, Bratz Style It Collection, Bratz Runway Formal Funk Collection, Bratz Petz Assortment, (footnote continued)

1  – $3.4 million – for each and every supposed trade secret.  For 8 of the 14 claimed

2  trade secrets on Mr. Malackowski's chart for which the jury found liability, Mr.

3  Malackowski's calculation is less – and in many cases substantially less – than the

4  $3.4 million average awarded by the jury.[124]  And for all the products, there is no

5  evidence in the record that the jury could use to actually calculate damages based on

6  Mattel's profits from sales of My Scene products because the data showing those

7  profits were never admitted.[125]

8         **3.**    **The Jury Improperly Awarded Damages On Five Trade**

9               **Secrets For Which Mr. Malackowski Affirmatively**

10               **Disclaimed Head Start Damages**

11        The arbitrary nature of the verdict is further confirmed by the jury's award of

12  $3.4 million in damages for each of five trade secrets that Mr. Malackowski himself

13  affirmatively stated that he couldn't assess head start damages for misappropriation.

14  On the eve of his testimony, Mr. Malackowski dropped 6 trade secrets for which he

15  had intended to present damages estimates because, he admitted, there was either no

16  head start benefit to Mattel or there was overlap with another trade secret for which

17  he had already calculated damages.[126]  The jury nonetheless awarded damages of $3.4

18  million each for 5 of these, namely, Bratz Styl' It Collection, Bratz Runway Formal

19  Funk Collection, Bratz Pet Assortment, Wild Life Safari Collection, and Bratz Virtual

---

21  Wild Life Safari Collection, Bratz Virtual Buddiez Petz, Monkey See Monkey Do, Lil' Bratz Boyz, Alien Racers, Bratz Kidz and Passion For Fashion.

22      [124] Compare damages awarded on Verdict Form (Dkt. 10518) with Head Start Damages on TX 37189-00033 for Bratz FM Limo, Lil' Bratz Vehicle Assortment,

23  Lil' Bratz Deluxe Mall Playset, Bratz Petz, Dazzlin' Disco Café, Girls Nite Out, and Wild Wild West.

24      [125] Mr. Malackowski testified that he calculated Mattel's profits from sales of MyScene products using MyScene monthly sales by SKU documents.  Trial Tr.,

25  dated Apr. 5, 2011, Vol. 2 (Malackowski), at 30:24-31:2 (used Mattel sales data as basis of calculations); 31:16-20 (considered monthly data).  These documents were

26  never admitted into evidence.  Mr. Malackowski's damages calculations therefore lack support in the record, and are insufficient.  See, e.g., Abarca v. Merck & Co.,

27  Inc., 2010 WL 4643642, *4 (E.D. Cal. Nov. 9, 2010) ("[A]n expert's opinion may not be based on assumptions of fact without evidentiary support, or on speculative or

28  conjectural factors") (quotations omitted).

-40-

1  Buddiez Petz.[127]  Thus, the jury awarded $17 million to MGA for trade secrets that

2  MGA's own damages expert dropped from his damages opinion because, under his

3  own theory, *there were no damages.*

### 4.  Mr. Malackowski's Damages Opinions  Wrongly Included Components That  Were Not Trade Secrets

6  For each of the 26 trade secrets for which the jury found liability, the

7  description of the trade secret on the verdict form includes the "appearance,

8  operation, intended play pattern" and "plans to advertise on television" relating to a

9  specific product.[128]  For 12 of the 26 trade secrets, the description also includes "FOB

10  pricing."[129]  Thus, each claimed MGA trade secret product embodies several distinct

11  components or distinct trade secrets.  Mr. Malackowski nevertheless did not attempt

12  to calculate damages based on Mattel's alleged use of the distinct components of the

13  trade secrets.  Instead, he assumed that all of the claimed components of the trade

14  secrets actually were trade secrets and were used by Mattel and calculated head start

15  damages based on that assumption.[130]

16  That assumption is additionally fatal to the damages opinions that

17  Malackowksi offered.  Even if there were sufficient evidence for the jury to find that

18  Mattel misappropriated *some* claimed trade secret components of the 26 specified

19  MGA products, there is no evidence that *all* the components actually were trade

20  secrets and were used by Mattel.  For example, even apart from the fact that MGA's

21

22  [126]  4/5/11 Trial Tr., Vol. 3 (Malackowksi), at 63:23-64:19.
   [127]  4/5/11 Trial Tr., Vol. 3 (Malackowksi), at 63:23-64:19; 4/3/11 Hearing Tr.
23  (Malackowski <u>Daubert</u> hearing), at 12:22-13:12; <u>Compare</u> TX 37189-00033 <u>with</u> TX
   36106-00005.
24  [128]  Verdict Form, dated Apr. 20, 2011 (Dkt. 10518), at 16-22.
   [129]  Verdict Form, dated Apr. 20, 2011 (Dkt. 10518), at 16-22.
25  [130]  <u>See</u> 4/4/11 Trial Tr., Vol. 3 (Malackowski), at 44:13-17, 45:5-21 (Mr.
26  Malackowski assumed liability "for purposes of [his] calculations" and understood
   the trade secrets to include information regarding "the appearance of products, the
27  operation of products or the play pattern, advertising, FOB, or industry pricing as
   well as other aspects the product."); 4/5/11 Trial Tr., Vol. 1 (Malackowski), at 29:17-
28  23 (testifying that "head start" damages for Bratz Winter Wonderland took into
   (footnote continued)

FOB pricing information is not a trade secret as shown <u>in</u> Section I.A, there is not a shred of evidence that Mattel used such pricing information for any product in any way. Even MGA's counsel acknowledged this lack of evidence.[131] Nor is there a shred of evidence that Mattel used, for any product and in any way, the claimed "plans to advertise" trade secrets. Yet Mr. Malackowski purported to calculate the benefits to Mattel from misappropriation of *all* the claimed components of the trade secrets, without differentiation and based on the assumption that all the components were viable trade secrets that Mattel used.

The assumptions underlying the calculations were unsubstantiated by any record evidence. Not all components of the claimed trade secrets were trade secrets (if any were), and not all were used (if any were). By failing to calculate damages as to each of the claimed trade secrets, and by instead lumping them together, Mr. Malackowski's testimony left the jury "without sufficient evidence, or a reasonable basis, to determine the unjust enrichment damages" associated with Mattel's taking and/or use of actual, protected trade secret information. <u>O2 Micro</u>, 399 F. Supp. 2d at 1077. MGA's head start damages as to all trade secrets fail for this reason as well.

### 5. <u>Mr. Malackowski's Head Start Assumptions Were Contrary to the Evidence</u>

As Mr. Malackowski testified, a head start approach is "a very fact-specific approach."[132] It "focuses on the profits that the alleged infringer made during the head start period,"[133] which must be limited to the time period when the trade secret

---

account "information about the product, its pricing, its play pattern, et cetera"). See also 4/5/11 Trial Tr., Vol. 1 (Malackowski), at 30:15-31:5.

[131] 4/8/11 Trial Tr., Vol. 2 (MGA closing argument), at 87:16-21 ("They're [Mattel] not going to put out something saying we were going to release this product at $19.95. But now that we have seen the FOB price, we're lowering it to $17.95. They're not going to do that. They're not going to leave that paper trail, and they didn't.").

[132] 4/4/11 Trial Tr., Vol. 3 (Malackowski), at 59:25-60:7.

[133] 4/4/11 Trial Tr., Vol. 3 (Malackowski), at 59:22-24

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

1   remains secret.[134]  As the Court has recognized, to calculate "head start" damages
2   "[y]ou have to calculate not only is the product secret, but then you have to take in
3   this added factor.  And I'm going to make it really simple.  How long is it secret?
4   What's that time period?"[135]  Mr. Malackowski admitted that if "there is a two-week
5   period between learning of some information and it not being secret anymore, the
6   head-start would be two weeks plus some ramp-up,"[136] and acknowledged that, as
7   MGA's damages expert, it was his responsibility to calculate "what the head-start
8   period was."[137]

9        Nevertheless, Mr. Malackowski did not engage in the "fact-specific" analysis
10   required to identify the head start period for any, let alone all, of the trade secrets he
11   analyzed.  Mr. Malackowski found that 11 of the trade secrets for which the jury
12   found liability were not even among the 25 claimed trade secrets for which "a head
13   start can be calculated"[138] – although the jury apparently assigned one based on his
14   analysis.  As for the 14 trade secrets where his list overlapped with the jury, Mr.
15   Malackowski testified that each of his head start period calculations assumed the
16   trade secret was, in fact, "secret" at the time of Mattel's alleged acquisition of it at a
17   toy fair and that the trade secret remained "secret" until MGA's first invoice of the
18   product embodying the trade secret.[139]  His calculations also assume that Mattel *used*
19   MGA's trade secrets during that head start period.[140]  But as the preceding sections
20   have detailed, these assumptions are unsupported by the record.

21        For example, the evidence shows that as to 7 of the 14 claimed trade secrets on
22   his demonstrative (Girls Night Out, Bratz Diamondz, Bratz Petz, Bratz Campfire,

---

24   [134]   4/5/11 Trial Tr., Vol. 2 (Malackowski), at 48:3-8; see also 4/4/11 Trial Tr.,
25   Vol. 3 (Malackowski), at 59:3-4 ("So in many respects a head start is about timing.
     It's about when information was known.").
26   [135]   See 3/19/11 Daubert Hearing Tr. at 95:22-96:3.
     [136]   4/5/11 Trial Tr., Vol. 2 (Malackowski), at 48:9-12.
27   [137]   4/5/11 Trial Tr., Vol. 2 (Malackowski), at 51:8-11.
     [138]   4/4/11 Trial Tr., Vol. 3 (Malackowski), at 60:18-25.
28   [139]   4/5/11 Trial Tr., Vol. 2 (Malackowski), at 51:12-15.

Sun-Kissed Summer, Wild Wild West and Bratz Rock Angelz), the claimed trade secret was *not* secret at the time of the toy fair because it had been advertised or sold before the toy fair.[141]   Mr. Malackowski's head start periods premised on the trade secrets being "secret" from the toy fair until the date of MGA's first invoice make no sense as to these 7 trade secrets because it is impossible for any head start period to run for a Mattel product when MGA disclosed the trade secret before Mattel's alleged misappropriation of it.   Moreover, as to all 14 claimed secrets, even assuming the trade secrets were "secret" at the time of the toy fair, there is no evidence from which the jury could conclude that they were not disclosed before the end of Mr. Malackowski's presumed head start period.   Indeed, Mr. Malackowski testified that he "believe[s] the retailer will see the product before they buy it"[142] – which means *before* the invoice dates that end Mr. Malackowski's head start periods.

Because the calculations of the head start periods were premised on assumptions that are unsupported by the evidence, the damages awards based on head start calculations cannot survive.   See, e.g., Eleven Line, Inc. v. N. Tex. Soccer Assoc., Inc., 213 F.3d 198, 209 (5th Cir. 2000) (reversing damages award where the evidence did not support the damages expert's assumptions:  "Damages assumptions that find no support in the actual facts of the case cannot support a verdict."); Abarca v. Merck & Co., Inc.,  2010 WL 4643642, at *4 (E.D. Cal. Nov. 9, 2010) ("[A]n expert's opinion may not be based on assumptions of fact without evidentiary support, or on speculative or conjectural factors") (quotations omitted).

---

[140]   4/4/11 Trial Tr., Vol. 3 (Malackowski), at 58:11-59:24; 4/5/11 Trial Tr., Vol. 3 (Malackowski), at 60:10-61:6.

[141]   See section I.A supra.  Mr. Malackowski's own analysis and demonstratives show that for 4 of the Bratz products for which the jury awarded damages – Girls Nite Out, Sun Kissed Summer, Dazzlin' Disco Café, and Bratz Rock Angelz – the MGA first invoice date pre-dated the toy fair at which the Bratz product was shown. See TX 37189-00033.

[142]   Trial Tr., dated Apr. 5, 2011, Vol. 4 (Malackowski), at 43:8-12.

6. **Mr. Malackowski Failed to Consider Mattel's Sweat Equity As To Any Products**

Finally, even putting aside all the other flaws, Mr. Malackowski's opinions cannot support the jury's damages awards because they suffer the very flaws identified by Judge Kozinski – they do not give any credit to Mattel for its sweat equity. The Court has previously stated, in connection with Mattel's expert's opinions regarding Mattel's trade secrets claim, that "it tentatively seems that Mattel would bear the burden of proving unjust enrichment *and unjust enrichment does not include sweat equity and business expenses, and Mattel would bear the burden of apportioning out those amounts*."[143] The Court also stated: "tentatively, [first it] seems that if you bear the burden of proving unjust enrichment and second unjust enrichment does not include sweat equity and business expenses, then you bear the burden of apportioning out those amounts."[144] As the Court noted, "[t]he Model Instruction CACI 4401 states that a trade secret plaintiff must prove unjust enrichment and that unjust enrichment does not include amounts unrelated to the trade secret misappropriation," and "the Ninth Circuit has cited in our case, with approval, the Dan B. Dobbs Treatise for the proposition that unjust enrichment does not include the fruits of a misappropriator's own labors or legitimate efforts."[145]

Mr. Malackowski admitted that Mattel's "business effort that goes into finishing the product, designing the advertising, executing, [and] hiring distributors"[146] contributed to the My Scene profits. But he did not in any way account for Mattel's sweat equity in the head start calculation. Instead, he attributed *all* of Mattel's profits during the head start period to Mattel's alleged misappropriation without recognizing *any* value contributed by Mattel during that

---

[143] 3/2/11 Hearing Tr., Vol. 4,  at 20:18-:22 (emphasis added).
[144] 3/2/11 Hearing Tr., Vol. 4, at 6:14-18.
[145] 3/2/11 Hearing Tr., Vol. 4, at 21:5-16.
[146] 4/4/11 Trial Tr., Vol. 3 (Malackowski), at 56:14-15.

period.[147]   He expressly had admitted at deposition that he conducted no such apportionment and sought to justify it based on his (mistaken) view there was no requirement to apportion damages during the head start period:  "I think I understand your question to be effectively, did I conduct an apportionment analysis for the head start.   And if that's your question, no.   As I understand the law and accepted methodology for head start, it's not necessary to apportion between the trade secret or other assets.   It's a but for event."[148]   And Mr. Malackowski then confirmed again at the Daubert hearing that "[e]verything but the head start is allocated to Mattel as their sweat equity" – i.e., that Mr. Malackowski allocated *all* of the profits during the head start period to MGA's alleged trade secrets.[149]

Mr. Malackowski's failure to give Mattel any credit for its own contributions during the head start period is erroneous as a matter of law.  The Court specifically instructed the jury that it must subtract from its unjust enrichment calculations the fruits of "Mattel's sweat equity, including [its] hard work, creativity, and legitimate efforts,"[150] but Mr. Malackowski provided it with no way to do so and instead offered only damages numbers that were inconsistent with the law.  His supposed answer – that he was not awarding MGA damages beyond the head start period itself[151] – ignores the fact that damages beyond the head start period are generally unavailable anyway as a matter of law (see Sokol Crystal Prods., Inc. v. DSC Commc'ns Corp., 15 F.3d 1427, 1433 (7th Cir. 1994) ("It is true that, where a misappropriation of a trade secret only gives a competitor a 'head start' in developing a product, damages should be limited to the injury suffered in that 'head start' period.") (citation omitted); Schiller & Schmidt, Inc. v. Wallace Computer Servs., Inc., 1991 WL

---

[147]   4/4/11 Trial Tr., Vol. 3 (Malackowski), at 64:14-23 ($88.5 million in profits during the head start period "is the portion that represents the value of the trade secrets as opposed to the value of the sweat equity").

[148]   Malackowski Depo. Tr. , dated Feb. 8, 2011, Vol. 2., at 390:23-391:4.

[149]   See 3/30/11 Daubert Hearing Tr, Vol. 3 (Malackowski), at 98:1-3.

[150]   See Jury Instruction No. 68.

270170, *6 (N.D. Ill. Apr. 26,1991) (a plaintiff "is only entitled to protection for the period of time it would take a legitimate competitor to acquire the secret information on his own"), <u>aff'd in part, vacated in part</u>, 969 F.2d 410 (7th Cir. 1992), as Mr. Malackowski himself recognized.[152]  The notion that limiting MGA's recovery *after* the damages period has ended represents a proper apportionment of Mattel's profits *during* the damages period is illogical and unsupported, and does not properly account for Mattel's sweat equity.

## C.   The Jury's Damages Awards Are Not Supported By Mr. Malackowski's "Top Down" Approach

### 1.   The Top Down Approach Provided No Guidance To the Jury On An Individual Trade Secret Basis

It is well-established that "damage studies are inadequate when only some of the conduct complained of is found to be wrongful and the damage study cannot be disaggregated." <u>AT & T</u>, 700 F.2d at 825; <u>O2 Micro</u>, 399 F. Supp. 2d at 1077.  Mr. Malackowski's top-down damages calculation was based on the assumption that *all* of MGA's trade secrets were misappropriated, and it provided the jury with no means to disaggregate damages for individual trade secrets.  Since the jury rejected MGA's trade secret claims as to 88 of the claimed secrets, the top-down damages analysis left the jury with no ability to award damages as to the remaining 25 – except by impermissibly speculating as to the amount to award.  A plaintiff "'must provide evidence such that the jury is not left to speculation or guesswork in determining the amount of damages to award.'" <u>McGlinchy v. Shell Chem. Co.</u>, 845 F.2d 802, 808 (9th Cir. 1988) (quoting <u>Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.</u>, 773 F.2d 1506, 1509 (9th Cir.1985)).  The top-down damages opinion offered by Mr. Malackowski provided no such evidence.

---

[151]   <u>See</u> 4/4/11 Trial Tr., Vol. 3 (Malackowski), at 64:14-23; 3/30/11 <u>Daubert</u> Hearing Tr, Vol. 3 (Malackowski), at 98:1-3.

1  O2 Micro illustrates this rule.  There, the jury awarded $12 million in unjust

2  enrichment damages after finding that 5 of the 11 claimed trade secrets were

3  misappropriated and that the misappropriation of only one of them resulted in the

4  defendant being unjustly enriched.   399 F. Supp. 2d at 1077.  Like Mr.

5  Malackowski, the plaintiff's damages expert had calculated unjust enrichment

6  damages assuming that *all* of the alleged trade secrets were misappropriated and had

7  failed to provide individual damages calculations for any of the individual trade

8  secrets.  Id. The expert's calculations were therefore found to be insufficient to

9  support the damages award:

> [The] expert testimony regarding damages for misappropriation of all
> trade secret[s] was useless to the jury. The jury was then left without
> sufficient evidence, or a reasonable basis, to determine the unjust
> enrichment damages. Thus, the jury's award of unjust
> enrichment damages was based on speculation and guesswork, not on evidence.

14  Id.

15  The same is true here.  Using the top down approach, the jury could calculate

16  damages for any individual trade secret (or for any combination short of the entire

17  114) based only on "speculation and guesswork, not on evidence," because there was

18  no evidence that would allow the jury to determine what portion of the top-down

19  damages number was attributable to each (or any) of the trade secrets as to which it

20  found liability.

21  Indeed, the Court anticipated this problem, and left no doubt of MGA's need to

22  address it, in ruling on the parties' motions for summary judgment:

> Mattel argues that MGA's expert has failed to substantiate any specific
> loss caused by the alleged misappropriation of information about 111 of
> the 114 products about which Mattel's employees allegedly fraudulently
> procured information.  MGA's expert witness instead provides a global
> calculation of the harm caused by all acts of misappropriation and then
> purports to provide exemplar calculations of the loss suffered as a result

---

[152]   4/4/11 Trial Tr., Vol. 3 (Malackowski), at 59:22-24; 4/5/11 Trial Tr., Vol. 2 (Malackowski), at 48:3-12.

of the misappropriation of information about 3 of the 114 products.  In such circumstances, the proper course of action is to wait and see whether "the jury conclude[s] that [Mattel] did not misappropriate all of [MGA's] trade secrets" and, if it does, the Court may examine whether "[MGA's] expert testimony regarding damages for misappropriation of all trade secret[s] was useless to the jury."  Monolithic Power Sys., 399 F. Supp. 2d at 1077.  This is an issue ill-fit for resolution at this stage.[153]

The jury has now determined that only 25 of the 114 trade secrets were misappropriated.  As in O2 Micro, Mr. Malackowski's top-down damages calculation provides no basis for the jury to determine damages on a trade secret-by-trade secret basis.

Mr. Malackowski would be hard-pressed to disagree.  At his Daubert hearing, he admitted that the top-down approach did not allow the jury to "pick and choose" among the trade secrets or allocate damages between the trade secrets. "On a specific product basis, they could not."  He told the Court that "if the jury is going to start to knock out individual themes, I think they're focused on the bottom up approach."[154] The only time he even suggested otherwise was at trial when he hazarded that if the jury found something not to be a trade secret it might  "strike it off and subtract it from" the top-down damages number,[155] but he offered no guidance, nor was there any in the record, about what number it would deduct from what.  There was simply

---

[153]   Dkt. 9600 at 161-162.
[154]   3/19/11 Hearing Tr. (Malackowski Daubert Hearing), at 88:21-89:16;  see also 4/4/11 Trial Tr., Vol. 3 (Malackowski), at 49:16-22, 51:17-24; 64:24-65:7 ("Q. Now, in the – in the earlier slide we saw that MGA had 114 trade secrets and here we're only looking at 26. Are you saying that there are no damages relating to the others?  A.   No, I'm not saying that.  I'm saying in the bottom-up approach, I couldn't make the specific calculations because of the data I had, but the other trade secret damages would be included in the total top-down analysis.").  At his Daubert hearing, Mr. Malackowski confirmed that his top-down approach assumed liability on all 114 claimed trade secrets.  3/19/11 Hearing Tr. (Malackowski Daubert Hearing), at 94:2-95:13.
[155]   4/4/11 Trial Tr., Vol. 3 (Malackowski), at 37:8-14. ("Q.  If the jury finds that some of the unreleased Bratz products were not trade secrets, do you provide any way for the jury to award damages for the other Bratz trade secrets?  A.   Yes.  To the extent that the jury finds that any one o  the line items shown on that screen should not be included, you simply strike it off and subtract it from either the 88.5 million or the 149 or the 202.")

-49-

1  no evidence from which the jury could have determined the value of the individual

2  trade secrets for which it found no liability in order to "strike [them] off and subtract

3  [them]."  This deficiency is dispositive.  The jury's damages verdict, whether viewed

4  product-by-product or collectively, is "unsustainable because it cannot be explained

5  in light of Litton's aggregated damage model."  <u>Litton Sys.</u>, 1996 WL 634213, at *1.

6  "The jury was simply unable, without resort to speculation and guesswork, to

7  determine by what amount [MGA's] single sum . . . should be reduced. . . ."  <u>Id.</u> at

8  *3.

9        ## 2.  <u>In Any Event, No Evidence of Causation Supports The Top</u>

10            <u>Down Approach</u>

11            Mr. Malackowski's top-down damages approach fails to support the verdict for

12  the independent reason that no causal connection between Mattel's alleged

13  misappropriation and the alleged excess profits has been shown.  As summarized

14  earlier, Mr. Malackowski's calculations of excess profits were based on the

15  assumption that what Mr. Malackowski considered "excess"  profits were entirely

16  due to misappropriation.[156]  But there was no proof supporting that assumption.  <u>See</u>,

17  <u>e.g.</u>, <u>Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.</u>,  786 F.2d 1342, 1350-

18  1352 (9th Cir. 1985) (superseded on other grounds) ("[Plaintiff] provided no evidence

19  on the amount of damages attributable only to the unlawful conduct. [Plaintiff's] utter

20  failure to make any segregation between damages attributable to lawful competition

21  and that attributable to the unlawful scheme  . . . requires reversal of the verdict and

22  remand for a new trial on the amount of damages."); <u>City of Vernon v. Southern</u>

23  <u>California Edison Co.</u>  955 F.2d 1361, 1372 (9th Cir. 1992) (plaintiff failed to offer

24  sufficient evidence where its expert's study "failed to segregate the losses, if any,

25  caused by acts which were not antitrust violations from those that were"); <u>Estate of</u>

26  <u>Vane v. The Fair, Inc.</u>, 849 F.2d 186, 188-90 (5th Cir. 1988) (affirming ruling that

27

28        [156]   4/5/11 Trial Tr., Vol. 2 (Malackowski), at 38:1-39:21.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

1   plaintiff did not establish a causal link between infringement and defendant's profits

2   where regression analysis was inadequate to isolate other possible causative factors);

3   Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1057 (8th Cir. 2000)

4   (rejecting expert opinion that "did not separate lawful from unlawful conduct" in

5   reaching opinions on causation); Schiller & Schmidt, Inc. v. Nordisco Corp., 969

6   F.2d 410, 415-16 (7th Cir. 1992) ("The expert should have tried to separate the

7   damages that resulted from the lawful entry of a powerful competitor [the defendant]

8   from the damages that resulted from particular forms of misconduct allegedly

9   committed by that competitor, of which the theft of the mailing list, however morally

10  reprehensible, was the slightest.").[157]

11          Despite this long-established law, Mr. Malackowski failed to take into account

12  *any* explanation for why My Scene sales could have exceeded his "baseline"

13  projected sales figures other than the alleged misappropriation.  He failed to consider

14

15  [157]  See also Leegin Creative Leather Products, Inc. v. Belts by Nadim, Inc., 316
16  Fed. Appx. 573, 575-576 (9th Cir. 2009) (affirming grant of new trial where plaintiff
    failed to establish causal connection between infringement and damages)
17  (unpublished); MicroStrategy Inc. v. Business Objects, S.A., 429 F.3d 1344, 1355
    (Fed. Cir. 2005) (upholding exclusion of expert who failed to attribute losses to
18  individual instances of misconduct); Sebastian Intern., Inc. v. Russolillo, 2005 WL
    1323127, at *7 (C.D. Cal. 2005) (rejecting damages expert who failed to show that
19  plaintiff's harm was "attributable to Defendants' [wrongful conduct] and not other
    causes unrelated to the alleged wrong"); In re Imperial Credit Industries, Inc.
20  Securities Litigation, 252 F. Supp. 2d 1005, 1015 (C.D. Cal. 2003) (excluding expert
    damages report which failed to distinguish and eliminate the "non-fraud related
21  influences"; "[a] proper measure of damages in the securities context thus requires
    elimination of that portion of the price decline or price difference which is unrelated
22  to the alleged wrong"); American Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.,
    135 F.Supp.2d 1031, 1042 (N.D. Cal. 2001) ("Plaintiffs cannot prove causation of
23  actual injury without Fisher's expert testimony, because only expert testimony can
    demonstrate that any injury to plaintiffs was caused by defendants' unlawful conduct,
24  and not because of lawful competition or other factors."); PAI Corp. v. Integrated
    Science Solutions, Inc., 2009 WL 1106809, at *16-17 (N.D. Cal. Apr. 23, 2009)
25  (granting new trial on damages where there was "scant" evidence that trade secret
    misappropriation "in fact played any significant part in" generating damages and
26  there was evidence that other causes contributed to the damages); Prepaid Wireless
    Services, Inc. v. Southwestern Bell Wireless, Inc., 2002 WL 34367328, at *3 (S.D.
27  Tex., 2002) (expert report defective where damages model failed to distinguish
    between lawful and unlawful conduct as possible causes of damages); Hilderman v.
28  Enea Teksci, Inc., 2010 WL 546140, at *2 (S.D. Cal. Feb. 10, 2010) (no basis for
    (footnote continued)

1  even his own testimony that sales of Bratz allegedly expanded the market for My

2  Scene, thereby resulting in increased sales.[158]  He failed to consider that excess sales

3  in 2003 over his "projection" based on the doubling 2002 actual sales may have been

4  due to the fact that the My Scene product line included many more products in 2003

5  than it did in 2002[159] and a host of other potential explanations for the increase in his

6  assumed "but for" sales including increased advertising expenditures, creative

7  marketing or general economic conditions.   Mr. Malackowski was required to

8  *analyze* whether there were other factors that could have caused the "excess" profits.

9  Instead, he simply *assumed* the causal nexus his testimony was supposed to establish.

10  Mr. Malackowski's testimony, based on the assumption that *all* Mattel profits in

11  excess of his arbitrary "baseline" were due to the alleged misappropriation, was

12  insufficient as a matter law.[160]

13

14

_____

15  concluding that the entirety of defendant's "goodwill" was attributable to the value of the misappropriated trade secrets).

16  [158]  4/5/11 Trial Tr., Vol. 2 (Malackowski), at 14:6-11 ("A Yes. So this is a really important point. The success of fashion dolls targeted towards older girls surprised

17  everybody and was really significant. So the sales that Mattel received and the profits that they received from My Scene actually is greater than the damages that were

18  incurred because of sales lost due to Bratz. *Everybody benefited because the market expanded.*" (emphasis added)).

19  [159]  3/19/11 Hearing Tr. (Malackowski <u>Daubert</u> Hearing), at 85:11-87:18; 4/5/11 Trial Tr., Vol. 2 (Malackowski), at 44:14-25.

20  [160]  Notably, Mr. Malackowski's opinions have been excluded by another court for failing to distinguish between actionable and non-actionable conduct – the very

21  issue which infects his opinions here:

22  The record demonstrates that Mr. Malackowski did not attempt to break down the injury to Bracco by particular ads or brochures.  The Court

23  recognizes this as an attempt to avoid having to apportion any amount of damage (under any of his multiple theories) to any particular

24  advertisement or type of advertisement.  Thus, if any of GEH's promotional efforts were proper, which this Court has found to be the

25  case, then Mr. Malackowski has failed to account for the market effects of these non-tortious efforts. Mr. Malackowski's failure to account for

26  the effects of non-tortious activity is fatal to the validity of his calculations since the Court finds the NEPHRIC article itself to not be a form of false advertising.

27  <u>Bracco Diagnostics, Inc. v. Amersham Health, Inc.</u>, 627 F. Supp. 2d 384, 442-44 (D. N.J. 2009).

28

**D.**     **The Damages Award Must Be Reduced to Correct Mathematical Errors and Improper Duplication**

As the Court observed at the time the verdict was read, the jury made a computation error in question 17, recording the sum of column 4 as $100,000 higher than the actual aggregate of the figures in column 4. See Trial Tr., dated Apr. 21, 2011, Vol. 1, at 84:20-85:4 ("THE COURT:  Now, let me inform counsel and the jury since I examined this in the solitude of my chambers, I think it's $100,000 high according to the calculation.  It should be $88.4 million . . . ").  The Court should correct the jury's mathematical error and reduce the sum in question 17 from $88.5 million to $88.4 million.  See e.g., United States ex rel Miss. Road Supply Co. v. H. R. Morgan, Inc., 542 F.2d 262, 269 (5th Cir. 1976) (finding no error where district reduced the jury's award pursuant to Rule 60 to correct "an error in [mathematical] computation [that] resulted in an award which was too large"); Westinghouse Elec. Corp. v. CX Processing Labs., Inc., 523 F.2d 668, 678 (9th Cir. 1975) (affirming reduction of jury's award "due to an earlier mathematical error that had caused an incorrect figure to be entered on the damage chart which the jury considered").

In addition, the Court should eliminate the duplication on the jury verdict form for "Bratz Girls Nite Out", which is listed first as "Girls Nite Out" on entry 20 of question 16 and later as "Bratz Girls Nite Out" on entry 65.  The jury awarded $3.4 million for both, resulting in an excess award of $3.4 million.[161]  See Foradori v. Harris, 523 F.3d 477, 503 (5th Cir. 2008) (remittitur appropriate where "certain identifiable sums included in the verdict should not have been there").

**E.**     **Because The Jury Damages Award Was Excessive In Any Event, The Court Should Order A New Trial Or Remittitur**

In any event, the jury's excessive award cannot stand because it is unsupported by the evidence.  Fenner v. Dependable Trucking Co., 716 F. 2d 598, 602-03 (9th Cir.

---

[161]  See id. at 18, 21.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

1983) (reversing and remanding for new trial where district court found jury award excessive in light of the evidence presented but nevertheless entered judgment for the excessive amount).  Where a verdict is excessive, remittitur is appropriate.  <u>Id.</u>  The Court should remit the damages award to the "maximum amount sustainable by the proof."  <u>D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co.</u>, 692 F. 2d 1245, 1249 (9th Cir. 1982).

## III.   EACH OF THE 26 TRADE SECRETS FAILS WHEN EVALUATED ON A PRODUCT-BY-PRODUCT BASIS

In addition to all the generally-applicable arguments made above, each trade secret for which the jury found liability fails for these specific reasons outlined below.

### 1.[162]   "The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Mobile"

<u>Bratz Mobile Was Not A Trade Secret At The Time of The Alleged Theft.</u> MGA claims that Mattel misappropriated the "appearance, operation, intended play pattern, plans to advertise on television and FOB pricing" of Bratz Mobile no earlier than mid-February 2002 from the MGA showroom at the 2002 New York Toy Fair.[163]  MGA never introduced a Bratz Mobile product into evidence.  It also was public by the time of the Mattel report that supposedly proved its misappropriation. A *February 14, 2002* Reuters article disclosed, "A Bratzmobile, which looks like a squared-off blue 1957 Cadillac with a built-in FM radio and a trunk that pops open, is part of this year's extended toy line."[164]  A *February 25, 2002* magazine article includes a photo of Bratz Mobile and describes the product's features as "a real working FM radio, a stick shift that moves; an opening trunk, glove compartment,

---

[162]   The paragraph number of each trade secret corresponds to the trade secret number of each in question 16 of the Verdict Form.

[163]   <u>See</u> 3/24/11 Trial Tr. Vol. 2 (Larian) at 92:2-22; <u>see also</u> 4/6/11 Trial Tr. Vol. 2 (Saunders) at 54:20-55:1.

[164]   <u>See</u> TX 23890 (Reuters article by Jan Paschal, dated February 14, 2002).

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

and doors; wheels that move; and a turning steering wheel."[165]  MGA claims that a *March 20, 2002* Mattel report regarding Bratz Mobile proves misappropriation.  But it contains precisely the same information about the "appearance, operation, and intended play pattern" as was contained in the earlier dated articles.[166]  The Mattel report includes a photo of Bratz Mobile and describes the product's features as "a working FM radio, an opening trunk, glove compartment and doors, wheels that move and turn, and a moving stick shift and steering wheel."[167]

MGA also introduced no evidence that Bratz Mobile was displayed in the private, locked-up section of the New York Toy Fair, rather than in public spaces where the press, by MGA's own admission, was welcome and admitted.

<u>MGA Presented No Evidence of Injury or Use</u>.  MGA presented no evidence that Mattel acquired, much less used, "plans to advertise on television" or "FOB pricing" of Bratz Mobile.[168]  The only Mattel product compared to the Bratz Mobile at trial was the Barbie New Volkswagen Beetle Purple.[169]  But the uncontradicted evidence shows that MGA copied the operation and intended play pattern from the Mattel car, <u>not</u> vice versa.  Larian directed Paula Garcia and others to read the competition comments and reviews on Amazon.com for the Barbie New Volkswagen Beetle Purple and to "make sure Bratz Mobile has working seat belts, car key, keys that lock and open trunk, stickers, etc.," like the Mattel product.[170]

<u>No Evidence Supports the $3.4 Million Award</u>.  Malackowski never mentioned the product.[171]  An MGA product called "FM Cruiser" appeared on a

---

[165]   TX 20951 (License! Magazine, dated February 25, 2002); <u>see also</u> 3/23/11 Trial Tr., Vol. 1, (Villasenor) at 108:22-110:7.
[166]   <u>Compare</u> TX 9507-143 <u>with</u> TX 20951.
[167]   TX 9507-143.
[168]   <u>See</u> TX 9507-143.
[169]   <u>See</u> TX 13974; <u>see also</u> 2/18/11 Trial Tr., Vol. 2, (Larian) at 38:20-40:3.
[170]   <u>See</u> TX 13974; <u>see also</u> 2/18/11 Trial Tr., Vol. 2, (Larian) at 38:20-40:3.
[171]   <u>See generally</u> 4/4/11 Trial Tr. Vol. 3; 04/5/11 Trial Tr. Vols. 1-5 (Malackowski).

Malackowski demonstrative that was not admitted.[172]  There is no evidence from which to determine whether this product was even the Bratz Mobile.   Even if MGA could show that these two products are the same, the non-admitted demonstrative chart provides no evidentiary basis for any award of damages, much less head start damages based on use of Bratz Mobile or FM Cruiser trade secrets before MGA disclosed either product.  Even if it did, the chart identified the claimed head start damages for the FM Cruiser trade secrets as $339,000, some $3 million less than what the jury awarded.[173]

## 2.   "The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Styl' It Collection"

Bratz Styl' It Collection Was Not A Trade Secret At The Time of The Alleged Theft.  Larian testified that Bratz Styl' It Collection is "[b]asically, same thing" as Bratz Strut It, which MGA did not claim was a trade secret.[174]  Bratz Styl' It Collection was not shown to the jury during his testimony.  MGA presented no evidence that MGA shielded this product from disclosure to the press who were regularly invited into MGA's New York Toy Fair showroom.

MGA Presented No Evidence of Injury or Use.  MGA presented no evidence of any use.  No supposedly matching Mattel product was introduced.  No timetables were offered.  There was simply no basis from which a jury could find that Mattel had any particular headstart on anything by virtue of whatever it was that was protectable about Styl' It.

No Evidence Supports the Jury's $3.4 Million Award.  Malackowski never mentioned Bratz Styl' It Collection, did not include it in his $88.5 million calculation or list it on his non-admitted trade secret chart identifying the 26 claimed

---

[172]  See TX 37189-33 (not admitted).
[173]  Compare TX 37189-33 (not admitted) with Dkt. No. 10518, (Verdict Form) at 16.

-56-
MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

1  bottom-up head start analysis.[175]  In fact, Mr. Malackowski affirmatively *dropped*

2  Bratz Styl' It Collection from his list because he admitted that he couldn't find any

3  headstart damages for the product (either because there was no benefit or because it

4  had already been accounted for).[176]

5                **4.**    **"The appearance, operation, intended play pattern, plans to**

6                          **advertise on television and FOB pricing for Bratz**

7                          **WinterWonderland [sic] Collection"**

8         <u>Bratz Winter Wonderland Collection Was Not A Trade Secret At The Time

9  of The Alleged Theft</u>.  Winter-themed dolls and their play pattern are not trade

10  secrets.  Mattel has sold dolls with winter themes since at least 1963.[177]  Carter

11  Bryant testified that he worked on a Barbie Winter Wonderland theme at Mattel

12  years before he designed the Bratz Winter Wonderland line while working for

13  MGA.[178]  Larian identified the fur handle on the product's packaging as the only

14  allegedly protectable characteristic of the product,[179] but MGA produced no

15  evidence that such a feature was ever either misappropriated or used, as discussed

16  further below.

17        MGA also presented no evidence that MGA protected this product from

18  disclosure to the press who were regularly invited into MGA's New York Toy Fair

19  showroom.

---

20

21  [174]  2/17/11 Trial Tr. Vol. 1 (Larian) at 103:7-17.
[175]  <u>See generally</u> 4/4/11 Trial Tr. Vol. 3; 04/5/11 Trial Tr. Vols. 1-5

22  (Malackowski); TX 37189-33 (not admitted).
[176]  <u>See</u> 4/5/11 Trial Tr. Vol. 3 (Malackowksi), at 63:23-64:19; <u>see also</u> 4/3/11

23  Hearing Tr. (Malackowski Daubert hearing), at 12:22-13:12; <u>also compare</u> TX
37189-00033 <u>with</u> TX 36106-00005.

24  [177]  <u>See, e.g.</u>, TX 24463-00002 (doll with skis in Mattel's 1963 catalog), TX
24464-00002 (doll with sled in Mattel's 1966 catalog), TX 24474-00002 (doll with

25  skis in Mattel's 1974 catalog), TX 24467-00002 (more winter theme dolls in Mattel's
1992 catalog), TX 24367-00025 (winter theme dolls with skis in Mattel's 2001

26  catalog).
[178]  <u>See</u> 4/7/11 Trial Tr. Vol. 2 (Bryant) at 8:3-7; <u>see also</u> 1/28/11 Trial Tr. Vol. 2

27  (Bryant), at 74:22-75:7.
[179]  <u>See</u> 2/17/11 Trial Tr. Vol 2 (Larian) at 7:2-12; <u>see also</u> 3/24/11 Trial Tr. Vol.

28  2 (Larian) at 117:5-118:15.

<u>MGA Presented No Evidence of Injury or Use</u>.  MGA introduced no Mattel winter-themed product that used a "fur handle."  The 2003 Mattel report—MGA's only claimed evidence of use of the appearance, operation and play pattern—includes no image of a Bratz Winter Wonderland doll or its packaging.[180]

At trial, Larian accused a My Scene Chillin' Out doll as having copied a Bratz Winter Wonderland doll.  But a visual inspection of the two dolls show that the only similarity between them is that they are both brown-haired fashion dolls in winter clothes.[181]  The My Scene doll does not have a box with a fur handle.

<u>No Evidence Supports the Jury's $3.4 Million Award</u>.  No evidence shows that each of the claimed components of the claimed trade secrets—"the appearance, operation, intended play pattern, plans to advertise on television and FOB pricing"—were trade secrets that were used by Mattel.  The assumptions underlying Mr. Malackowski's damages calculation are not satisfied, and his testimony, therefore, does not support the verdict.  Moreover, Mr. Malackowski's calculation did not deduct anything for Mattel's sweat equity contribution as the law requires it.

## 5. <u>"The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Formal Funk Collection"</u>

<u>Bratz Formal Funk Collection Was Not A Trade Secret At The Time of The Alleged Theft</u>.  Prom-themed dolls are not trade secrets.  Larian testified that this product had a prom theme, but neither he nor any other witness identified anything uniquely confidential about MGA's execution of a prom or formal theme,[182] which Mattel has done countless times.[183]

---

[180]  <u>See</u> TX 9275-0019.
[181]  <u>Compare</u> TX 36704 <u>with</u> TX 35265.
[182]  2/17/11 Trial Tr. Vol. 1 (Larian) at 103:18-104:5.
[183]  <u>See, e.g.</u>, Mattel 1983 catalog, TX 24432-7 (Dream Date Barbie and Dream Date Ken ("the perfect date for an evening on the town!").

1    MGA presented no evidence that MGA shielded this product from disclosure

2    to the press who were regularly invited into MGA's New York Toy Fair showroom.

3    <u>MGA Presented No Evidence of Injury or Use.</u>   The Mattel report that

4    references this product—dated two months after the 2003 toy fair—does not contain

5    a product photo or a description of its appearance, operation or intended play

6    pattern.[184]   MGA never introduced Mattel's Night on the Town product, and the

7    Court did not allow MGA to admit its Feb. 4, 2011 trade secret filing in which it

8    claimed that Night on the Town used the Formal Funk trade secrets.   Thus, the jury

9    had absolutely no evidence for finding that Mattel used MGA's Bratz Formal Funk

10   doll to get a head start doing anything.

11   <u>No Evidence Supports the Jury's $3.4 Million Award.</u>   Malackowski never

12   mentioned the product.[185]   The product appeared on a Malackowski demonstrative

13   chart that was not admitted.[186]   Even if the demonstrative was in evidence (and it

14   was not), the jury's damage award has no supporting evidence.   Malackowski

15   "matched" Bratz Formal Funk Collection with Mattel's Night on the Town, but

16   MGA never introduced Night on the Town.   The jury had no evidence to conclude

17   whether the product used Bratz Formal Funk Collection's purported trade secrets.

18   **6.**   **"The appearance, operation, intended play pattern, plans to**

19   **advertise on television and FOB pricing for Bratz Runway**

20   **Formal Funk Collection"**

21   <u>Bratz Runway Formal Funk Collection Was Not A Trade Secret At The Time</u>

22   <u>of The Alleged Theft.</u>   MGA claims that Mattel misappropriated "the appearance,

23   operation, intended play pattern, plans to advertise on television and FOB pricing of

24   Bratz Runway Formal Funk Collection" no earlier than mid-February 2003 from the

25

---

26   [184]   <u>See</u> TX 9275-0019.
     [185]   <u>See generally</u> 4/4/11 Trial Tr. Vol. 3; 04/5/11 Trial Tr. Vols. 1-5
27   (Malackowski).
     [186]   <u>See</u> TX 37189-33 (not admitted).

28

MGA showroom at the 2003 New York Toy Fair.[187]  Larian identified the only supposedly protectable element of the Bratz Runway Formal Funk playset copied by Mattel as its trapezoidal-shaped packaging.[188]  But MGA had sold millions of products in trapezoidal packaging before February 2003, when this non-secret was supposedly misappropriated.[189]

MGA additionally presented no evidence that it shielded this product from disclosure to the press who were regularly invited into MGA's New York Toy Fair showroom.

<u>MGA Presented No Evidence of Injury or Use</u>.  The Mattel report on which MGA bases its misappropriation allegation does not contain a photograph of the product, much less show its packaging.[190]  MGA presented no evidence showing that any Mattel product used Bratz Runway Formal Funk's appearance, operation, intended play pattern, plans to advertise on television and FOB pricing.

<u>No Evidence Supports the Jury's $3.4 Million Award</u>.  Mr. Malackowski never mentioned Bratz Runway Formal Funk Collection, did not include it in his $88.5 million calculation and did not include it in his non-admitted chart identifying the 26 claimed trade secrets in his bottom up head start analysis.[191]  In fact, Mr. Malackowski affirmatively dropped Bratz Runway Formal Funk Collection from his damage calculations because he couldn't find any head start damages, at least none that weren't already being taken into account in other claims.[192]

---

[187]  <u>See</u> 3/24/11 Trial Tr. Vol. 2 (Larian) at 92:2-22; <u>see also</u> 4/6/11 Trial Tr. Vol. 2 (Saunders) at 54:20-55:1.
[188]  3/24/11 Trial Tr. Vol 2 (Larian) at 118:16-119:11.
[189]  <u>See, e.g.</u>, TX 12286, TX 17551, TX 17558, and TX 17561.
[190]  <u>See</u> TX 9275-20.
[191]  <u>See generally</u> 4/4/11 Trial Tr. Vol. 3; 04/5/11 Trial Tr. Vols. 1-5 (Malackowski); See TX 37189-00033 (not admitted).
[192]  <u>See</u> 4/5/11 Trial Tr. Vol. 3 (Malackowksi), at 63:23-64:19; <u>see also</u> 4/3/11 Hearing Tr. (Malackowski Daubert hearing), at 12:22-13:12; <u>also compare</u> TX 37189-00033 <u>with</u> TX 36106-00005.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

### 7. "The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz FM Limo"

<u>Bratz FM Limo Was Not A Trade Secret At The Time of The Alleged Theft</u>. MGA claims that Mattel misappropriated "the appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz FM Limo"no earlier than mid-February 2003 from the MGA showroom at the 2003 New York Toy Fair.[193]  Larian testified that the limo was based on the prom theme, could hold four dolls inside and had an FM radio for music.[194]  None of this provides a basis from which a jury could identify MGA's unique execution—which could then be misappropriated, used, and cause damages.  A toy car that holds dolls is a generic concept.  MGA itself had released a toy car that also had an FM radio the year before, the Bratz Mobile.[195]

Furthermore, MGA presented no evidence that it shielded this product from disclosure to the press who were regularly invited into MGA's New York Toy Fair showroom.

<u>MGA Presented No Evidence of Injury or Use At The Time Of The Alleged Theft</u>.  In its February 4 trade secret chart, MGA claimed that Mattel's My Scene Limo used whatever the Bratz FM Limo trade secrets were.  But MGA never introduced the Mattel product at trial, which means that there was no evidence which could support head start damages.  Even more tellingly, the only admitted evidence shows that the accused My Scene product was released on the market more than two years after the toy fair at issue—long after any shred of secrecy, or claim of use, could remain.[196]

---

[193]  <u>See</u> 3/24/11 Trial Tr. Vol. 2 (Larian) at 92:2-22; <u>see also</u> 4/6/11 Trial Tr. Vol. 2 (Saunders) at 54:20-55:1.
[194]  2/17/11 Trial Tr. Vol. 3 (Larian) at 31:7-17.
[195]  <u>See</u> TX 20951.
[196]  <u>See</u> TX 24838-1.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

<u>No Evidence Supports the Jury's $3.4 Million Award</u>.   Mr. Malackowski never mentioned the product.[197]  The product appeared on a Malackowski chart that was not admitted.[198]  Even if the chart was a proper evidentiary basis (it is not), it identified the claimed head start damages for Bratz FM Limo at $1.449 million—less than half the $3.4 million awarded by the jury.[199]

## 8.   **"The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Motorcycle"**

<u>Bratz Motorcycle Was Not A Trade Secret At The Time of The Alleged Theft</u>.  In the only testimony purportedly identifying the trade secret, Larian testified that the misappropriated trade secret was the product's appearance—a motorcycle—which was supposedly copied not by another motorcycle, but by Mattel's My Scene Vespa product.[200]  This was the only evidence.   The concepts are completely different—one is a Barbie on a small Vespa scooter, the other is a Bratz character on a Harley Davidson motorcycle; the only similarity is that both have license plates, helmets and a kickstand.[201]  Mattel has sold a Barbie scooter with a helmet and retractable kickstand since at least 1978.[202]

MGA presented no evidence that MGA shielded this product from disclosure to the press who were regularly invited into MGA's New York Toy Fair showroom.

<u>MGA presented no evidence of injury or use</u>.   The "matched" My Scene product is visually dissimilar to the MGA product.[203]  No evidence was presented regarding the allegedly "matching" My Scene product's "operation, intended play

---

[197]    <u>See generally</u> 4/4/11 Trial Tr. Vol. 3; 04/5/11 Trial Tr. Vols. 1-5 (Malackowski).
[198]    <u>See</u> TX 37189-33 (not admitted).
[199]    <u>Compare</u> TX 37189-33 (not admitted) <u>with</u> Dkt. No. 10518, (Verdict Form) at 16.
[200]    2/17/11 Trial Tr. Vol. 2 (Larian) at 121:4-122:5.
[201]    <u>Compare</u> TX 36718 <u>with</u> TX 36717.
[202]    <u>See</u> Mattel 1978 catalog, TX 24471-14 (Barbie Starcycle Scooter).
[203]    <u>Compare</u> TX 36718 <u>with</u> TX 36717.

pattern, plans to advertise on television" or "FOB pricing."  As to the timing of the My Scene product, the only evidence presented was Larian's testimony that the two products "came out about the same time."[204]  There was simply no basis from which a jury could find that Mattel had a headstart.

No Evidence Supports the Jury's $3.4 Million Award.  The product was listed on a Malackowski demonstrative chart that was not admitted[205]—a chart that is not in evidence and that the jury was therefore told not to consider.[206]  No evidence shows that each of the claimed components of the claimed trade secrets— "the appearance, operation, intended play pattern, plans to advertise on television and FOB pricing"—were trade secrets that were used by Mattel.  The assumptions underlying Mr. Malackowski's damages calculation are not satisfied, and his testimony, therefore, does not support the verdict.  Moreover, Mr. Malackowski's calculation did not deduct anything for Mattel's sweat equity contribution which also undermines it.

### 9.    "The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Pet Assortment"

There Is A Complete Failure Of Evidence For Bratz Pet Assortment.  MGA did not introduce the product, an image of the product or a description of the product. The only evidence in the record is a single entry on a single page of a Mattel report that states: "Bratz Pet Assortment, Four Versions TBD, Avail. July 2003, FOB HK=$10.25" and Sal Villasenor's testimony confirming that, among other products, the Bratz Pet Assortment is listed on that page.[207]

MGA introduced no evidence of the trade secret, use of the trade secret or that the alleged misappropriation harmed MGA.  There is no record evidence that

---

[204] 3/24/22 Trial Tr. Vol. 2 (Larian) at 121:13-16.
[205] See TX 37189-33 (not admitted).
[206] See Jury Instruction No. 21.

supports the jury's finding of liability or the $3.4 million in damages.   Mr. Malackowski affirmatively dropped Bratz Pet Assortment as a trade secret for which he intended to present damages estimates because he admitted there was either no head start benefit to Mattel or there was overlap with another trade secret for which he had already calculated damages.[208]

### 14. "The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Lil' Bratz Vehicle Assortment"

There Is A Complete Failure Of Evidence For Lil' Bratz Vehicle Assortment. MGA did not introduce the product or an image of the product, much less prove trade secrets associated with it.   MGA introduced no testimony regarding this product in three months of trial and testimony by 64 witnesses.   The only evidence in the record is a single entry on a single page of a Mattel report that states: "Lil' Bratz Vehicle Assortment, Mini Coup, TV Advertised, Avail. July 2003, FOB HK=$9.99".[209] There is no evidence of what the trade secret elements were, much less evidence showing how any element of it was trade secret, what steps MGA took to keep each element of the trade secret confidential, or how Mattel allegedly used any such element.

MGA Presented No Evidence of Injury or Use.   MGA did not identify or introduce any Mattel product that it claimed used the "appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Lil' Bratz Vehicle Assortment."   MGA purported to identify such products on an un-admitted demonstrative prepared by MGA's damages expert—My Scene Convertible or My Scene Delancey & Hudson Convertible.   But there is no testimony about the

---

[207]   See TX 9275-0020; see also 3/22/11 Trial Tr. Vol. 2 (Villasenor) at 98:22-25.
[208]   See 4/5/11 Trial Tr. Vol. 3 (Malackowksi), at 63:23-64:19; see also 4/3/11 Hearing Tr. (Malackowski Daubert hearing), at 12:22-13:12; also compare TX 37189-00033 with TX 36106-00005.
[209]   See TX 9275-0029.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

comparison, no products in evidence to compare and no evidence regarding any aspect of these products or the timing of their release.[210]

No Evidence Supports the Jury's $3.4 Million Award. The only reference to the Lil' Bratz Vehicle Assortment is on Mr. Malackowski's un-admitted demonstrative.[211] The chart purported to "match" Lil' Bratz Vehicle Assortment with "My Scene Convertible or My Scene Delancey & Hudson Convertible", but MGA never introduce either My Scene product and no fact witness testified about the "match." Even if the jury could rely on the un-admitted chart, the claimed "head start damages" were only $2.386 million, over $1 million less than the $3.4 million award.[212]

### 15. "The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Lil' Bratz Deluxe Mall Playset"

There Is A Complete Failure Of Evidence For Lil' Bratz Deluxe Mall Playset. MGA did not introduce the product or an image of the product, much less prove trade secrets associated with it. MGA introduced no testimony regarding this product in three months of trial and testimony by 64 witnesses. The only evidence in the record is a single entry on a single page of a Mattel report that states: "Lil' Bratz Deluxe Mall Playset & Mall Stores, Mall Stores include: clothing store, music store, and shoe store, TV Advertised, Avail. July 2003, FOB HK=$39.99 Mall Playset, FOB HK=$14.99 Mall Stores".[213]

MGA Presented No Evidence of Injury or Use. MGA neither introduced nor identified any Mattel product that it claimed used the "appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Lil' Bratz

---

[210] See TX 37189-33 (not admitted).
[211] See TX 37189-33 (not admitted).
[212] Compare TX 37189-33 (not admitted) with Dkt. No. 10518, (Verdict Form) at 17.
[213] See TX 9275-0029.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

1  Deluxe Mall Playset." Malackowski's un-admitted chart "matched" "My Scene Mall

2  Maniacs Playset" with Lil' Bratz Deluxe Mall Playset,[214] but MGA never introduced

3  the My Scene product. Thus there is no evidence in the record regarding any

4  "match." The only record evidence proves that the "match" fails on timing alone.

5  The Mattel product that MGA identified was not released until three years after the

6  toy fair at which MGA alleges misappropriation, thus Malackowski's "headstart"

7  calculation fails.[215]

8     No Evidence Supports the Jury's $3.4 Million Award. The only source of any

9  information about Lil' Bratz Deluxe Mall Playset is Malackowski's un-admitted

10  demonstrative.[216] The un-admitted chart "matched" Lil' Bratz Deluxe Mall Playset

11  with "My Scene Mall Maniacs Playset."[217] MGA never introduced the "matched"

12  My Scene product and no fact witness testified about the match. Mr. Malackowski

13  did not testify about Lil' Bratz Deluxe Mall Playset. Even if his chart was in

14  evidence (and it was not), it lists "head start damages" of $796,000 for this product,

15  a fraction of the $3.4 million awarded.[218]

16       **16.**   **"The appearance, operation, intended play pattern, plans to**

17           **advertise on television and FOB pricing for Bratz Petz"**

18     Bratz Petz Was Not A Trade Secret At The Time of The Alleged Theft.

19  MGA claims that Mattel misappropriated "the appearance, operation, intended play

20  pattern and plans to advertise on television for Bratz Petz" no earlier than mid-

21  February 2004 from the MGA showroom at the 2004 New York Toy Fair.[219] MGA

22  disclosed Bratz Petz before Toy Fair. MGA shipped Bratz Petz to retailers to put on

23

---

24  [214]  <u>See</u> TX 37189-33 (not admitted).

    [215]  <u>See</u> TX 24841-00001 (April 12, 2006 invoice for Barbie My Scene Mall

25  Maniacs Sketchers Shoe Store Playset).

    [216]  <u>See</u> TX 37189-33 (not admitted).

26    [217]  <u>See</u> TX 37189-33 (not admitted).

    [218]  <u>Compare</u> TX 37189-33 (not admitted) <u>with</u> Dkt. No. 10518, (Verdict Form) at

27  17.[219]  <u>See</u> 3/24/11 Trial Tr. Vol. 2 (Larian) at 92:2-22; <u>see also</u> 4/6/11 Trial Tr. Vol.

28  2 (Saunders) at 54:20-55:1.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

store shelves two months earlier, in December 2003.[220]  MGA also issued a press release about Bratz Petz before Toy Fair.[221]  Mattel's "report" about Bratz Petz is a verbatim copy of MGA's press release.  The two documents read identically:

> "Say hello to Bratz Petz!  Introducing four cool catz pets with distinct fashion personalities that capture the fashion forward styles that their counterparts are world famous for.  With mix 'n' match fashion looks to dress 'em up, posable legs and a tail to show 'em off, these soft-feel plush pets are both lovable and fashionable!  Reow!"[222]

MGA did not identify any aspect about Bratz Petz that warranted trade secret protection.  Larian testified that Bratz Petz was a line of animal toys.[223]  Animal toys—absent something unique demonstrating at least "minimal novelty"—cannot be a trade secret.

MGA Presented No Evidence of Injury or Use.  Larian testified that My Scene Pet products came out "about the same time" as Bratz Petz.  That testimony is insufficient to how that My Scene Pets used any trade secret of Bratz Petz.  Neither Larian nor any other witness identified what about the My Scene product purportedly copied any trade secret of Bratz Petz.[224]

No Evidence Supports the Jury's $3.4 Million Award.  Malackowski never mentioned the product.[225]  The product appeared on a Malackowski demonstrative that was not admitted,[226] but the non-admitted chart provides no evidentiary basis for any award of damages.  Even if in evidence, Malackowski's "head start" theory fails because Bratz Petz was shipped to retailers and on the market in December 2003,

---

[220]   See TX 24603-2.
[221]   See TX 20621-00002 (MGA Press Release, from "New York, NY", dated February 11, 2004).
[222]   Compare TX 9284-00003 with TX 20621-00002 (MGA Press Release, from "New York, NY", dated February 11, 2004).
[223]   See 3/24/11 Trial Tr., Vol. 2, at 122:18-123:9.
[224]   3/24/11 Trial Tr. Vol. 2 at 123:13-22.
[225]   See generally 4/4/11 Trial Tr. Vol. 3; 04/5/11 Trial Tr. Vols. 1-5 (Malackowski).

1  months *before* the toy fair at which Mattel allegedly misappropriated these trade

2  secrets.[227]  The chart also identified the claimed head start damages for Bratz Petz as

3  only $245,000—a fraction of the jury's award of $3.4 million.[228]

4           **18.**    **"The appearance, operation, intended play pattern, plans to**

5                       **advertise on television and FOB pricing for Dazzlin' Disco**

6                       **Café"**

7           There is a complete failure of evidence with respect to Dazzlin' Disco Café.

8  MGA did not introduce the product, an image of the product or any meaningful

9  description of the product.  MGA introduced no testimony regarding this product in

10 three months of trial and testimony by 64 witnesses.  The only evidence in the record

11 is a single entry on a single page of a Mattel report that states: "Dazzlin' Disco Cafe,

12 A room cube for the Lil' Bratz that girls can decorate and design with accessories,

13 magnetic wall pieces, working lights, and walls that reverse to reveal a new room."[229]

14          MGA Presented No Evidence of Injury or Use.  MGA presented no evidence

15 that Mattel used the "appearance, operation, intended play pattern and plans to

16 advertise on television for Dazzlin' Disco Cafe."  Malackowski's un-admitted chart

17 "matched" Dazzlin' Disco Café with My Scene Sound Lounge,[230] but even if the

18 chart were in evidence, the "match" fails.  The chart shows that MGA shipped

19 Dazzlin' Disco Café to retailers before the toy fair where MGA alleges it was

20 misappropriated.[231]  In addition, because the Dazzlin' Disco Café Café is not in

21 evidence and nothing beyond the product itself is in evidence regarding My Scene

22 Sound Lounge, the jury has no way to make the "match" much less evaluate it.

23

24

---

25 [226]   See TX 37189-33 (not admitted).
   [227]   See TX 24603-2.
26 [228]   Compare TX 37189-33 (not admitted) with Dkt. No. 10518, (Verdict Form) at
   17.
27 [229]   See TX 31530-00023.
   [230]   TX 37189-33 (not admitted).
28 [231]   See TX 37189-33 (not admitted) (MGA First Invoice Date: January 04).

1    <u>No Evidence Supports the Jury's $3.4 Million Award</u>.  The only source of any
2    information about Dazzlin' Disco Cafe is Malackowski's un-admitted
3    demonstrative.[232]  The chart "matched" Dazzlin' Disco Cafe with "My Scene Sound
4    Lounge," but Mr. Malakowski provided no testimony about the product or his
5    damages calculation.  The jury never saw the products side-by-side, much less heard
6    testimony as to what "the appearance, operation, intended play pattern, plans to
7    advertise on television and FOB pricing" were of each, and if and how the My
8    Scene product allegedly was changed because of the MGA product.  Even if the
9    chart was evidence, it would prove that the head start theory fails on timing alone.
10   The chart shows that MGA shipped Dazzlin' Disco Café to retailers a month *before*
11   the toy fair at which Mattel at issue. [233]   And the jury awarded damages
12   exponentially higher than Malackowski's offered "head start damages" of a mere
13   $20,000.[234]

14        **19.   <u>"The appearance, operation, intended play pattern, plans to</u>
15             <u>advertise on television and FOB pricing for Sun Kissed</u>
16             <u>Summer"</u>**

17        <u>Sun Kissed Summer Was Not A Trade Secret At The Time of The Alleged</u>
18   <u>Theft</u>.  MGA claims that Mattel misappropriated "the appearance, operation, intended
19   play pattern and plans to advertise on television for Sun Kissed Summer" no earlier
20   than mid-February 2004 from the MGA showroom at the 2004 New York Toy
21   Fair.[235]  Sun-Kissed Summer was on retail shelves as of December 2003—months
22   before the 2004 Toy Fair.[236]

23        Sun-Kissed Summer was also the subject of an MGA press release

---

[232]   <u>See</u> TX 37189-33 (not admitted).
[233]   <u>See</u> TX 37189-33 (not admitted) (MGA First Invoice Date: January 04).
[234]   <u>Compare</u> TX 37189-33 (not admitted) <u>with</u> Dkt. No. 10518, (Verdict Form) at 17.
[235]   <u>See</u> 3/24/11 Trial Tr. Vol. 2 (Larian) at 92:2-22; <u>see also</u> 4/6/11 Trial Tr. Vol. 2 (Saunders) at 54:20-55:1.
[236]   <u>See</u> TX 24671-00006.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL
00505.07975/4127636.2

1  contemporaneous with Toy Fair.[237]  Mattel's report about Sun Kissed Summer—the

2  basis of MGA's claim of misappropriation—recited MGA's press release verbatim.

3  The two documents read:

> The summer's just getting started and it's already a scorcher!  Join the
>
> Bratz as they kick off the season with a super stylin' day at the
>
> beach…and by the pool!  Each girl comes with three distinct beach
>
> looks, and her own unique summer party accessories like a surfboard, a
>
> beach towel, and a tote.  The Splash 'N' Dance Pool is a 5-in-1 playset
>
> that features a real working pool, a stylin' sundeck/dance floor, a
>
> smoothie bar, a fashion runway and a chill-out balcony for catching a
>
> cool view!  Add to this over 30 themed accessories, and you've got a
>
> party that's bound to last all summer long!  And don't forget to invite
>
> the Boyz Sun-Kissed Summer for more Kickin-cool style![238]

14  <u>MGA Presented No Evidence of Injury or Use</u>.  MGA neither identified nor

15  introduced any Mattel product that it claimed used the "appearance, operation,

16  intended play pattern, plans to advertise on television and FOB pricing for Sun-

17  Kissed Summer."  Malackowski's un-admitted chart "matched" "Jammin in Jamaica

18  Guava Gulch" with Sun-Kissed Summer,[239] but MGA never introduced this My

19  Scene product, leaving no proof of Mattel's alleged use.  The only record evidence

20  proves that the "match" fails on timing alone.  The Mattel product that MGA

21  identified was on the market two months *before* the toy fair at which MGA alleges

22  misappropriation.[240]

23  <u>No Evidence Supports the Jury's $3.4 Million Award</u>.  Malackowski never

---

[237]  <u>See</u> TX 20621-00001 (MGA Press Release, from "New York, NY", dated February 11, 2004).

[238]  <u>Compare</u> TX 9284-00002 <u>with</u> TX 20621-00001 (MGA Press Release, from "New York, NY", dated February 11, 2004).

[239]  <u>See</u> TX 37189-33.

[240]  <u>See</u> TX 24671-00011.

1  mentioned the product.[241]  The product appeared on a Malackowski chart that was not

2  admitted.[242]  Even if the chart was in evidence, it disproves Malackowski's "head

3  start" calculation because Sun-Kissed Summer was on the market *before* the toy fair

4  at issue—with an introduction date of December 2003.[243]

### 20.   "The appearance, operation, intended play pattern and plans to advertise on television for Girls Nite Out"

7  "Girls Nite Out" Was Not a Trade Secret At The Time of The Alleged Theft.

8  MGA claims that Mattel misappropriated the "appearance, operation, intended play

9  pattern, and plans to advertise on television for Girls Nite Out" no earlier than mid-

10  February 2004 from the MGA showroom at the 2004 New York Toy Fair.[244]  MGA

11  shipped "Girls Nite Out" to retailers for sale to the public on November 25, 2003,

12  months before the February 2004 New York,[245] and NPD consumer sales data shows

13  that Girls Nite Out was introduced on retailer shelves as of November 2003.[246]

14  MGA also disclosed the "appearance, operation and intended play pattern" of

15  Girls Nite Out in a press release on February 11, 2004, ***before*** the New York Toy

16  Fair.  It reads:

17  It's Saturday night and that can only mean one thing: It's Bratz Nite

18  Out!  Join the girls as they party it up at the cafes and the clubs as they

19  paint the town red-hot red!  Each Bratz comes [with] three nightlife

20  looks that can only be described as "funkalish"!  Add over 30

21  accessories, a unique "party night" accessory, real eyelashes and body

22  glitter for extra shine beneath the strobes!  Also included is a 3-D

---

24  [241]  See generally 4/4/11 Trial Tr. Vol. 3; 04/5/11 Trial Tr. Vols. 1-5

25  (Malackowski).
    [242]  See TX 37189-33 (not admitted).
26  [243]  See TX 24671-00006.
    [244]  3/24/11 Trial Tr. Vol 2 (Larian) at 92:2-22; 04/06/11 Trial Tr. Vol. 2

27  (Saunders) at 54:20 – 55:1.
    [245]  TX 24603-00003.
28  [246]  TX 24671-00002, line 100.

movin-groovin' collectible card to invite you to a night out you're sure never to forget![247]

MGA claims that a Mattel e-mail regarding Girls Nite Out proves misappropriation; in fact, it merely recites MGA's press release verbatim.[248]

MGA Presented No Evidence of Injury or Use.  MGA presented no evidence that Mattel acquired, much less used any "plans to advertise [Girls Nite Out] on television."  MGA suggested that Mattel's My Scene Day and Nite copied Girls Nite Out, but the Mattel product came out a year after MGA's product.[249]  MGA provided no evidence that Mattel used any Girls Nite Out trade secret before MGA disclosed Girls Nite Out to the public.

No Evidence Supports the Jury's $3.4 Million Award.  MGA's damages expert Malackowski never mentioned the product.[250]  The product name is listed on a Malackowski chart that was not admitted.[251]  Even if this chart was a proper evidentiary basis (it is not), it identified the claimed head start damages for the Girls Nite Out trade secrets as $2.355 million, over $1 million dollars less than the jury's award.

Larian testified that a My Scene product – My Scene Day & Nite[252] – came out at "about the same time" to Girls Nite Out.[253]  The evidence shows that My Scene Day & Nite came out came more than a year *after* Girls Nite Out, thus defeating any evidence of a head start.[254]

---

[247]  TX 20621.
[248]  Compare TX 9284 with TX 20621.
[249]  See TX 24671-0002.
[250]  See generally 4/4/11 Trial Tr. Vol. 3; 04/5/11 Trial Tr. Vols. 1-5 (Malackowski).
[251]  TX 37189-00033.
[252]  TX 36695; TX 17379
[253]  3/24/11 Trial Tr., Vol. 2 (Larian) at 126:11-20.
[254]  See TX 24671-0002.

21.    **"The appearance, operation, intended play pattern and plans to advertise on television for Wild Life Safari Collection"**

Wild Life Safari Was Not a Trade Secret At The Time of The Alleged Theft.

MGA claims that Mattel misappropriated the "appearance, operation, intended play pattern, and plans to advertise on television for Wild Life Safari" no earlier than mid-February 2004 from the MGA showroom at the 2004 New York Toy Fair.[255] MGA disclosed the "appearance, operation and intended play pattern" of Wild Life Safari in a press release on February 11, 2004, *before* the New York Toy Fair.  The press release read:

> Hold on tight for an adventure like no other with Nevra, Fianna, and
> the long awaited return of Meygan as they sport the most ferocious
> fashions with thrilling accessories that girls all around the world will go
> wild for! Strap them in for a ride in the decked-out Wild-Life Safari
> Cruiser, complete with headlights and taillights that actually light up, a
> removable soft-top for convertible cruisin', and it's a Wild Ride that
> you just can't pass up![256]

MGA claims that a Mattel e-mail about Wild Life Safari proves misappropriation. Actually, the e-mail recites MGA's press release verbatim.[257]

The only evidence that this product even existed was Larian's testimony that the Wild Life character was about "promoting wildlife, going on safari" and that it was sold with binoculars, a bag, and a canteen.[258]  MGA did not show the product to the jury, it was admitted by stipulation with hundreds of other products at the close of trial.  See Dkt 10431.

---

[255]   3/24/11, Vol 2 (Larian) at 92:2-22; 04/06/11 Vol. 2  (Saunders) at 54:20 – 55:1.
[256]   TX 20621.
[257]   Compare TX 9284 with TX 20621.
[258]   2/17/11 Trial Tr. Vol 1 (Larian) at 96:24-97:11.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

<u>MGA Presented No Evidence of Injury or Use.</u>  MGA presented no evidence that Mattel acquired, much less used, any "plans to advertise [Wild Life Safari] on television."   MGA presented no evidence that Mattel used the "appearance, operation and intended play pattern" of Wild Life Safari in any product.   In its February 4, 2011 disclosure (which is not in evidence), MGA alleged that Mattel's My Scene Jungilicious copied MGA's Wild Life Safari theme.  Dkt. 9948.  Mattel did not use any Wild Life Safari trade secret in My Scene Jungilicious because Mattel did not introduce that product until 2007, three years after MGA had disclosed Wild Life Safari.[259]

<u>No Evidence Supports the Jury's $3.4 Million Award.</u>  Malackowski never mentioned the product and did not include it among the 26 trade secrets in his bottom up damages analysis.[260]  In fact, Mr. Malackowski affirmatively dropped Wild Life Safari as a trade secret for which he had intended to present damages estimates because he admitted there was either no head start benefit to Mattel or there was overlap with another trade secret for which he had already calculated damages.[261]

### 22.   **"The appearance, operation, intended play pattern and plans to advertise on television for Bratz Diamondz"**

<u>Bratz Diamondz Was Not a Trade Secret At The Time of The Alleged Theft.</u> MGA claims that Mattel misappropriated the "appearance, operation, intended play pattern, and plans to advertise on television for Bratz Diamondz" no earlier than February 12, 2006 from the MGA showroom at the 2006 New York Toy Fair.[262] Specifically, MGA claims that the use of a real gem is a trade secret that Mattel

---

[259]  TX 24847-01.
[260]   <u>See generally</u> 4/4/11 Trial Tr. Vol. 3; 04/5/11 Trial Tr. Vols. 1-5 (Malackowski); TX 37189-00033 (not admitted).
[261]   <u>See</u> 4/5/11 Trial Tr., Vol. 3 (Malackowksi), at 63:23-64:19; <u>see also</u> 4/3/11 Hearing Tr. (Malackowski Daubert hearing) at 12:22-13:12; <u>also compare</u> TX 37189-00033 <u>with</u> TX 36106-00005.
[262]   TX 8522-04; 04/06/11 Trial Tr. Vol. 2  (Saunders) at 54:20-55:1.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

misappropriated by including real gems with the My Scene Bling Bling line.[263] MGA widely publicized the fact that Bratz Diamondz would use a real gem on February 9, 2006, *before* the 2006 New York Toy Fair.[264]  A Reuters news article dated February 9, 2006 reported MGA's "plans for the autumn also include Bratz Diamondz – dolls that come with a piece of jewelry with a real diamond chip."[265]

Independently, because no Mattel employee attended the 2006 New York Toy Fair for purposes of collecting competitive information, much less going into MGA's showroom, the jury had no evidence from which to conclude that Mattel used "improper means" to acquire the alleged trade secrets.  See Section I.

MGA Presented No Evidence of Injury or Use.  MGA claims that My Scene Bling Bling copied the "appearance, operation [and] intended play pattern" of Bratz Diamondz.  If this trade secret is the real gem, as MGA maintained during trial, then MGA publicly disclosed that before the toy fair, disqualifying that as a trade secret. See supra.  Even if MGA is allowed to claim that the trade secret is the "dense glitter print on fashions, fur stole jackets, glittery, small hand purses, jewelry for customers to wear" – which was never articulated before the jury but which was claimed in MGA's February 4, 2011 disclosure that is not in evidence (Dkt. 9948) – the use claim fails.  Mattel released My Scene Bling Bling with these same characteristics a year before MGA released Bratz Diamondz.[266]  In fact, Larian personally directed individuals to buy My Scene Bling Bling product in October 2005.[267]

No Evidence Supports the Jury's $3.4 Million Award.  MGA presented no evidence showing that Bratz Diamondz's appearance, operation, intended play pattern, and plans to advertise on television were uniquely confidential, much less

---

[263] 3/24/11 Trial Tr., Vol. 2 (Larian) at 127:8-128:20.
[264] TX 9879; 3/25/11 Trial Tr., Vol. 1 (Larian) at 67:19-69:18.
[265] TX 9879-00001.
[266] Compare TX 17527 with TX 31331; see also TX 24848.
[267] TX 20803; 3/25/11 Trial Tr., Vol. 1 (Larian) at 66:18-67:11.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

that Mattel used those alleged trade secrets.   MGA presented no evidence that Mattel's alleged misappropriation of the Bratz Diamondz trade secrets damaged MGA or supported the $3.4 million award.

### 24.   "Appearance, operation, intended play pattern, and plans to advertise on television for Bratz Virtual Buddiez Petz"

Bratz Virtual Buddiez Petz Was Not a Trade Secret At The Time of The Alleged Theft.   MGA claims that Mattel misappropriated the "appearance, operation, intended play pattern, and plans to advertise on television for Bratz Virtual Buddiez Petz" no earlier than February 2005 from the MGA showroom at the 2005 Nuremberg Toy Fair.[268]   The Bratz Virtual Buddiez Petz trade secrets were disclosed in a February 19, 2005 ASM Zine internet article *during* the 2005 Nuremberg Toy Fair.[269]   MGA alleges that Mattel stole "Bratz Virtual Buddiez, a portable virtual pet rendition of the Bratz Petz."[270]   The ASM Zine article contained this exact information: "Bratz Virtual Buddiez, a portable virtual pet rendition of the Bratz Petz."[271]   Villasenor admitted that he copied the information regarding Virtual Buddiez from the February 19, 2005 article into the April 8, 2005 e-mail that MGA touts as proof of misappropriation.[272]

MGA Presented No Evidence of Injury or Use.   MGA presented no evidence that Mattel acquired, much less used, "plans to advertise [Bratz Virtual Buddiez Petz] on television."   In its February 4, 2011 disclosure that is not in evidence, MGA claimed that Mattel's Miami Getaway Soft Pets Assortment used MGA's Bratz Virtual Buddiez Petz theme.   See Dkt. 9948.   MGA did not introduce Miami Getaway Pets and provided no testimony on the match, leaving the jury with no evidence from which it could compare products and find use.   Nor was Bratz Virtual

---

[268]   3/25/11 Trial Tr., Vol. 1 (Larian) at 13:8-11.
[269]   TX 9350.
[270]   TX 26755-012.
[271]   TX 9350.
[272]   Compare TX 9350-00003 to TX 9291-00003.

-76-

1   Buddiez Petz shown to the jury – it was admitted at the end of trial with hundreds of

2   other products.  See Dkt 10431.

3   No Evidence Supports the Jury's $3.4 Million Award.  Mr. Malackowski did

4   not mention the product, did not include it in his bottom up head start damages

5   analysis, and did not identify it in his chart. [273]   In fact, Mr. Malackowski

6   affirmatively dropped Bratz Virtual Buddiez Petz as a trade secret for which he had

7   intended to present damages estimates because he admitted there was either no head

8   start benefit to Mattel or there was overlap with another trade secret for which he

9   had already calculated damages.[274]

10          **27.    "Appearance, operation, intended play pattern, and plans to**

11                 **advertise on television for Bratz Campfire"**

12   Bratz Campfire Was Not a Trade Secret At The Time of The Alleged Theft.

13   MGA claims that Mattel misappropriated the "appearance, operation, intended play

14   pattern, and plans to advertise on television for Bratz Campfire" no earlier than

15   February 2005 from the MGA showroom at the 2005 Nuremberg Toy Fair. [275]

16   MGA's Bratz Campfire trade secrets were disclosed in a February 19, 2005 ASM

17   Zine internet article *during* the 2005 Nuremberg Toy Fair.[276]  MGA claims that

18   Mattel stole the following: "Bratz Campfire – capitalizing on success of last years

19   winter sports themed dolls; Winter color, as well as hot red colors in campfire

20   shades.  The dolls also wear ugg-style boots with fur trim and suede; Corduroy tent

21   – jeep in hot red, with flame decals added on."[277]  This information was already

22   widely available by February 19, 2005:

23

24   [273]    See generally 4/4/11 Trial Tr. Vol. 3; 04/5/11 Trial Tr. Vols. 1-5 (Malackowski); TX 37189-00033 (not admitted).

25   [274]    See 4/5/11 Trial Tr., Vol. 3 (Malackowksi), at 63:23-64:19; see also 4/3/11

26   Hearing Tr. (Malackowski Daubert hearing) at 12:22-13:12; also compare TX 37189-00033 with TX 36106-00005.

27   [275]    3/25/11 Trial Tr. Vol. 1 (Larian) at 13:8-11.
    [276]    TX 9350; 3/25/11 Trial Tr. Vol. 1 (Larian) at 13:8-11.

28   [277]    TX 26755-00010.

The holiday line begins in earnest with the Bratz Campfire line, which capitalizes on the popularity of previous years' winter sports-themed dolls.  This time, the Bratz are camping out in style, with a corduroy tent and realistic camping accessories sized perfect to them.  The fashions incorporate a lot of *winter colors, as well as hot red colors in campfire shades.  The dolls also wear ugg-style boots with fur trim and suede.*  The car accessory for this line is a *jeep in hot red, with flame decals added on*.  There is also a complementary Petz Campfire line, featuring the stylized cat and dog friends of the Bratz.[278]

Mr. Villasenor admitted that he copied the information regarding Bratz Campfire from the February 19, 2005 article into the April 8, 2005 e-mail that MGA touts as proof of misappropriation.[279]

Bratz Campfire was not shown to the jury during trial, but admitted at the end of the trial with hundreds of other products.  See Dkt 10431. MGA's only evidence of this trade secret is Larian's testimony that Bratz Campfire is "about camping."[280]

MGA Presented No Evidence of Injury or Use.  MGA presented no evidence of use.  Malackowski's chart, which is not admitted, identified two Mattel products with camping themes that could use Bratz Campfire trade secrets:  My Scene Outdoors Camping and Barbie Camping Family.[281]  MGA never introduced these products.  The only camping-related Mattel product in evidence–the "Barbie, Stacie, Kelly Camp Gift Set"[282] –proves that Mattel did not misappropriate the Bratz Campfire trade secrets from MGA, but used this camping theme in 2001, years before MGA came out with any camping-theme product.[283]

---

[278]  TX 9350-00001 (emphasis added).
[279]  Compare TX 9350-00001 with TX 9291-00001.
[280]  2/17/11 Trial Tr. Vol 1 (Larian) at 108:13-109:19.
[281]  TX 37189-00033 (not admitted).
[282]  TX 24029.
[283]  2/18/11 Trial Tr., Vol. 2 (Larian) at 55:17-57:4.

No Evidence Supports the Jury's $3.4 Million Award.  Malackowski never mentioned the product.[284]  Malackowski identified no head start damages for Bratz Campfire trade secrets.  He improperly relied upon the average of purported head start damages for 22 other products.  The jury found no liability as to many of these products, thus rendering any average based on them unreliable and arbitrary.  See Section II, supra.

### 28.   "Appearance, operation, intended play pattern, and plans to advertise on television for Wild Wild West"

Wild Wild West Was Not a Trade Secret At The Time of The Alleged Theft. MGA claims that Mattel misappropriated the "appearance, operation, intended play pattern, and plans to advertise on television for Wild Wild West" no earlier than February 2005 from the MGA showroom at the 2005 Nuremberg Toy Fair.[285] MGA's Bratz Wild Wild West trade secrets, however, were disclosed in a February 19, 2005 ASM Zine internet article *during* the 2005 Nuremberg Toy Fair.[286]  MGA alleges Mattel stole the following information:

Theme: Wild Wild West

Fashions: Western garb with elements such as snakeskin, leather, denim, and metal studs

Pets: Horses with the inimitable Bratz-style eyes, with rhinestone and bead decorations on bridle

Accessories: Wild Wild West carriage.  The carriage is a funky mix of Old West (steer horns), Victorian cab, and Bratz glam (giant chromed wheels).[287]

This information was publicly disclosed by February 19, 2005:

---

[284]     See generally 4/4/11 Trial Tr. Vol. 3; 04/5/11 Trial Tr. Vols. 1-5 (Malackowski).
[285]   3/25/11 Trial Tr., Vol. 1 (Larian) at 13:8-11.
[286]   TX 9350.
[287]   TX 26755-00010.

-79-

1    Another line is the Wild Wild West line, featuring dolls in *western*

2    *garb with elements such as snake skin, leather, denim, and metal studs.*

3    This line also features *horses with the inimitable Bratz-style eyes, with*

4    *rhinestone and bead decorations on bridle.*  On display were a grey and

5    white horse, as well as a black horse displayed with the *Wild Wild West*

6    *carriage.  The carriage is a funky mix of Old West (steer horns),*

7    *Victorian cab, and Bratz glam (giant chromed wheels).*[288]

8    Mr. Villasenor's testimony was consistent with this proof that he copied the

9    information regarding Wild Wild West from the February 19, 2005 article into the

10   April 8, 2005 e-mail that MGA touts as proof of misappropriation.[289]

11       Nor was Wild Wild West shown to the jury during trial.  It was admitted at

12   the end of the trial with hundreds of other products.  <u>See</u> Dkt 10431.  MGA provided

13   no meaningful evidence that these were trade secrets, just Larian's testimony that

14   Bratz Campfire is "Like a cowboy theme.  It came with accessories.  Would be – we

15   had horses.  We had horse carriages.  It was a whole brand."[290]

16       <u>MGA Presented No Evidence of Injury or Use.</u>  MGA presented no evidence

17   that Mattel used the Wild Wild West trade secrets.   In its February 4, 2011

18   disclosure (Dkt. 9948) and in Mr. Malackowski's chart,[291] neither of which is

19   admitted, MGA identified Mattel's Barbie Cali Girl Horseback Riding Doll as using

20   the claimed trade secrets.  MGA never admitted the Mattel product, so the jury had

21   no evidence to find use the claimed Wild Wild West trade secrets.  To the contrary,

22   the admitted evidence proves that MGA copied Mattel.  Larian ordered his staff to

23   "see competition and fix" the flaws identified in the Wild Wild West, and by

24   "competition" he meant Mattel.[292]

25

26   [288]  TX 9350-00002 (emphasis added).
     [289]  Compare TX 9350-00002 to TX 9291-00002.
27   [290]  2/17/11 Trial Tr. Vol. 1 (Larian) at 110:25-111:7.
     [291]  TX 37189-00033.
28   [292]  TX 1321; 3/25/11 Trial Tr. Vol. 1 (Larian) at 61:13-62:15.

<u>No Evidence Supports the Jury's $3.4 Million Award</u>.   Malackowski never mentioned the product.[293]   The product is listed on Malackowski's (unadmitted) demonstrative but he provided no testimony about it.[294]   Even if the chart were evidence (it is not) it listed only $1.594 million in head start damages for the Wild Wild West product – about $2 million dollars less than the jury's award.

### 29.   <u>"Appearance, operation, intended play pattern, and plans to advertise on television for Bratz Rock Angels"</u>

<u>Bratz Rock Angels Was Not a Trade Secret At The Time of The Alleged Theft</u>.   MGA claims that Mattel misappropriated the "appearance, operation, intended play pattern, and plans to advertise on television for Bratz Rock Angels" no earlier than February 2005 from the MGA showroom at the 2005 Nuremberg Toy Fair.[295]   Malackowski's un-admitted chart shows that Bratz Angelz was first invoiced and shipped to retailers for placement on shelves in November 2004, months before the 2005 toy fair at which the trade secrets were allegedly misappropriated.[296]   MGA's Bratz Bratz Rock Angels trade secrets were disclosed in a February 19, 2005 ASM Zine internet article *during* the 2005 Nuremberg Toy Fair.[297]   MGA claims that Mattel misappropriated the following:

> Theme: Bratz Rock Angelz – big line for the year including lifestyle products
>
> Characters: new doll Roxxi with the Recording Booth playset
>
> Fashions: predominant colors and textures are black, white, and red, with a great deal of denim and pleather
>
> Accessories: Recording Booth playset – complete with a child-sized microphone that lets the child sing along; Car and a jet (cut-out stars on

---

[293]   <u>See generally</u> 4/4/11 Trial Tr. Vol. 3; 04/5/11 Trial Tr. Vols. 1-5 (Malackowski).
[294]   TX 37189-00033.
[295]   3/25/11 Trial Tr., Vol. 1 (Larian) at 13:8-11.
[296]   TX 37189-00033.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

1  the cockpit, making it vaguely reminiscent of early KISS make-up.)

2  Bratz styling heads.  This time, girls can not only play by styling hair

3  and putting on make-up … the torso and arms allow girls to do

4  manicures as well as apply temporary tattoos.  The jointed arms allow a

5  number of poses to be taken, as well.[298]

6  This information was already widely available by February 19, 2005:

7  The big theme for the year is Bratz Rock Angelz, which covers the doll

8  line, various toy and lifestyle-product tie-ins, a CG movie, and a CD

9  coming out in the Summer of 2005 with 12 original sounds from the

10  movie soundtrack . . . The *predominant colors and textures are black,*

11  *white, and red, with a great deal of denim and pleather.*  Besides the

12  four standard Bratz characters, *a new doll Roxxi will be available with*

13  *the Recording Booth playset* (complete with a child-sized microphone

14  that lets the child sing along.)  The Rock Angelz line also includes a

15  *car and a jet*, all in the Rock Anglez color schemes.  The *Jet has cut-*

16  *out stars on the cockpit, making it vaguely reminiscent of early KISS*

17  *make-up.*  Besides the items scaled to the dolls, the Rock Angelz line

18  includes anew version of the *Bratz styling heads.  This time, girls can*

19  *not only play by styling hair and putting on make-up… the torso and*

20  *arms allow girls to do manicures as well as apply temporary tattoos.*

21  *The jointed arms allow a number of poses to be taken, as well.*[299]

22  Villasenor admitted that he copied the information regarding Rock Angelz from the

23  February 19, 2005 article into the April 8, 2005 e-mail that MGA touts as proof of

24  misappropriation.[300]

25

26  _____

   [297]  TX 9350.

27  [298]  TX 26755-00010.
   [299]  TX 9350-00002 (emphasis added).

28  [300]  <u>Compare</u> TX 9350-00002 <u>to</u> TX 9291-00002.

1    <u>MGA Presented No Evidence of Injury or Use.</u>  MGA presented no evidence

2    that Mattel acquired, much less used, "plans to advertise [Bratz Rock Angels] on

3    television."  Malackowski identified My Scene Goes Hollywood (on an un-admitted

4    demonstrative) as the Mattel product that proved use of the Bratz Rock Angels trade

5    secrets. [301]   No testimony supports this conclusion; on cross-examination Mr.

6    Malackowski admitted that he made no comparison of the appearance of the two

7    products.[302]   Indeed, a comparison of the two products shows that they were nothing

8    alike:  Bratz Rock Angels theme is music recording (with a booth and a child-size

9    microphone as accessories) and the clothing is "denim and pleather,"[303] whereas My

10   Scene Goes Hollywood is a "red carpet" themed doll, with glittery and glamorous

11   outfits, and a director's chair and movie popcorn as accessories. [304]  But MGA

12   prevented the jury from making that comparison: no product or picture of "My

13   Scene Goes Hollywood" was ever admitted into evidence, and MGA did not show

14   Rock Angels to the jury during trial, but admitted it at the end of trial with hundreds

15   of other products. <u>See</u> Dkt 10431.  The only evidence the jury heard about Bratz

16   Rock Angels alleged trade secret identified it as "another music theme" with a "little

17   CD" and actual music,"[305] clearly insufficient to support a finding of use.

18   <u>No Evidence Supports the Jury's $3.4 Million Award</u>.  Mr. Malackowski

19   provided no testimony regarding his calculation of head start damages for this

20   product.  This product is listed on Mr. Malackowski's chart for his bottom up head

21   start damages analysis, but that chart is not evidence.[306]   Even if it were, the chart

22   shows that MGA released Bratz Rock Angelz in November 2003, three months

23   before the toy fair.

24

25   _____

[301]  TX 37189-00033.
26   [302]  4/5/11, Trial Tr. Vol. 2 (Malackowski) at 27:9-19.
[303]  TX 9350-00002.
27   [304]  See TX 8250 (unadmitted).
[305]  2/17/11, Trial Tr. Vol. 1 (Larian) at 112:13-19.
28   [306]  TX 37189-00033.

41.    **"Appearance, operation, intended play pattern, plans to advertise on television, and FOB pricing for Monkey See Monkey Do"**

Monkey See Monkey Do Was Not a Trade Secret At The Time of The Alleged Theft.    MGA claims that Mattel misappropriated the "appearance, operation, intended play pattern, plans to advertise on television, and FOB pricing for Monkey See Monkey Do" no earlier than mid-February 2001 from the MGA showroom at the 2001 New York Toy Fair.[307]

MGA never introduced Monkey See Monkey Do into evidence, much less proved that the product reflected any trade secrets.   The only testimony about Monkey See Monkey Do proved that it was an utter failure, selling only 5 units total.[308]   Even so, MGA publicly disclosed the Monkey See Monkey Do trade secrets in its own January 8, 2001 press release *before* the 2001 New York Toy Fair:

> Everyone is going to go bananas for **Monkey See/Monkey Do**, the
> state-of-the-art feature plush monkey with incredibly lifelike
> movements and sounds.  With 3 amazingly animated facial expressions
> and a function that allows the monkey to repeat back exactly whatever
> is said to it, this funky robotic monkey will have kids and adults going
> "ape!"[309]

The April 2001 Mattel report that MGA claims proves misappropriation contains a verbatim rendition of MGA's press release:

> Monkey See Monkey Do (MGA)

---

[307]    3/24/11 Trial Tr. Vol. 2 (Larian) at 92:2-22; 04/06/11 Trial Tr. Vol. 2 (Saunders) at 54:20-55:1.
[308]    2/11/11 Trial Tr. Vol. 3 (Larian) at 65:23-66:8; 2/16/11 Trial Tr. Vol. 1 (Larian) at 118:17-119:21; 2/16/11 Trial Tr. Vol. 2 (Larian) at 14:5-15:21; 2/16/11 Trial Tr. Vol. 2 (Larian) at 16:16-17:4.
[309]    TX 22389-02.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

1    * Monkey See/Monkey Do is a technologically-advanced plush

2    monkey that features lifelike movements and sounds, including 3

3    animated facial expressions.

4    * This monkey will repeat exactly what you say to it.

5    * TV Support is planned

6    "A" Cost $ 42.99.[310]

7    <u>MGA Presented No Evidence of Injury or Use.</u>  MGA presented no evidence

8    that Mattel used "plans to advertise on television, and FOB pricing for Monkey See

9    Monkey Do."  Nor did MGA present evidence that Mattel used the "appearance,

10   operation and intended play pattern" of Monkey See Monkey Do – MGA introduced

11   ***no*** evidence that any Mattel product adopted or incorporated any alleged Monkey

12   See Monkey Do trade secrets.

13   <u>No Evidence Supports the Jury's $3.4 Million Award.</u>  Malackwoski did not

14   mention the product, list it on his bottom up head start analysis chart, or provide the

15   jury with any calculations for it.[311]

16   **49.   <u>"Appearance, operation, intended play pattern, plans to</u>**

17   **<u>advertise on television, and FOB pricing for Lil' Bratz Boys"</u>**

18   <u>Lil' Bratz Boys Was Not a Trade Secret At The Time of The Alleged Theft</u>.

19   MGA never introduced this product into evidence.  Nor did any witness testify as to

20   the "appearance, operation, intended play pattern, plans to advertise on television,

21   and FOB pricing" for this product. The only testimony regarding this product was

22   about use of the same production sculpt as the original four dolls.[312]

23   <u>MGA Presented No Evidence of Injury or Use.</u>  MGA presented no evidence

24   that any Mattel product used the "appearance, operation, intended play pattern, plans

25

26   ───────────────
     [310]  TX 32836-00066.
27   [311]  <u>See generally</u> 4/4/11 Trial Tr. Vol. 3; 04/5/11 Trial Tr. Vols. 1-5
     (Malackowski); TX 37189-00033 (not admitted).
28   [312]  2/17/11 Trial Tr. Vol. 3 (Larian) at 24:14-25:21.

1  to advertise on television, and FOB pricing" of Lil' Bratz Boys.  This product was

2  never matched with any Mattel products to prove injury or use.

3      No Evidence Supports the Jury's $3.4 Million Award.  MGA's damages expert

4  Malackowski did not mention the product, provide the jury with any damages

5  calculations for it, or list it in his bottom up head start analysis chart that was not

6  admitted into evidence.[313]

7      **58.   "Appearance, operation, intended play pattern, and plans to**

8          **advertise on television for Alien Racers"**

9      "Alien Racers" Was Not a Trade Secret At The Time of The Alleged Theft.

10  MGA claims that Mattel misappropriated the "appearance, operation, intended play

11  pattern, and plans to advertise on television for Alien Racers" no earlier than mid-

12  February 2004 from the MGA showroom at the 2004 New York Toy Fair.[314]  MGA

13  publicly disclosed Alien Racers in a February 11, 2004 press release *before* the 2004

14  New York Toy Fair:

15          Set in a mythical universe, the struggle to win the ultimate power

16          source is key: Speed is Power!  Alien Racers will debut some of the

17          most ultra-designed, transforming R/C Action Vehicles complete with

18          their Action Figure character counterparts in high detail to create a

19          high-speed fantasy world like no other.  Also included is a CD-ROM to

20          further involve play by going deep inside the story.  In addition, Alien

21          Racers will become much more than a boys action toy, as it is being

22          developed as an entertainment property that will thrill and excite

23          through many different multi-media channels.[315]

24

25

---

26  [313]  See generally Trial Trans. 04/04/11, Vol. 3; 04/05/11, Vols. 1-5 (Malackowski); TX 37189-00033 (not admitted).

27  [314]  3/24/11 Trial Tr. Vol. 2 (Larian) at 92:2-22; 04/06/11 Trial Tr. Vol. 2 (Saunders) at 54:20 – 55:1.

28  [315]  TX 20621-00003.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

MGA CFO and Rule 30(b)(6) designee Jolicoeur admitted that any trade secret relating to Alien Racers and allegedly misappropriated by Mattel was publicly available during the toy fair in the press release above.[316]

The press release was copied for both a presentation at Mattel and an e-mail that MGA claims proves misappropriation:

> Set in a mythical universe, the ultimate power source is key; Speed is Power.  Line will debut Transforming R/C Action Vehicles complete with their action figure counterparts.  Also included is a CD-ROM to further involve play.  Alien Racers is being developed as an entertainment property through different multi-media channels.  Avail early Fall.[317]

MGA provided no particularized evidence that the Alien Racer's information was a trade secret.  Larian testified that Alien Racers was "a remote control car" that "boys really liked" and "girls didn't."[318]  No MGA witness testified about the "appearance, operation, intended play pattern, and plans to advertise on television" for this product.  The jury had no evidence to conclude that Alien Racers information was a trade secret or derived value from not being generally known.

<u>MGA Presented No Evidence of Injury or Use.</u>  MGA presented no evidence that Mattel acquired, much less used, "plans to advertise [Alien Racers] on television."  During his testimony, Larian testified that Mattel's "Acceleracers"[319]—a product he admitted had been on the market long before Alien Racers—changed its name after Mattel obtained the confidential information about Alien Racers.[320]  The name "Alien Racers" is not one of MGA's claimed trade secrets.  Even if it were, MGA publicly disclosed "Alien Racers" before the toy fair, disqualifying the name

---

[316]   4/6/11 Trial Tr. Vol. 1 (Jolicoeur) at 32:23-33:17.
[317]   TX 31530-00022. <u>Compare</u> TX 9284 <u>to</u> TX 20621.
[318]   3/24/11 Trial Tr. Vol. 2 (Larian) at 124:14-16.
[319]   TX 36688.
[320]   TX 36707; 3/24/11 Trial Tr. Vol. 2 (Larian) at 125:1-20.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

"Acceleracers" as a trade secret.[321]  There is no evidence in the record that Mattel's Acceleracers somehow used the claimed trade secrets: "appearance, operation, [and] intended play pattern" for Alien Racers.  A comparison of the appearance of the products makes this clear: Alien Racers is a large, remote controlled truck purportedly driven by "alien monsters"[322] and Acceleracers is a small race car designed to travel on a small race track.[323]

No Evidence Supports the Jury's $3.4 Million Award.  Malackowski did not testify about this product, provide the jury with any damages estimate for it, or list this product in his bottom up head start analysis chart (which was not admitted).[324]

## 65. "Appearance, operation, intended play pattern, and plans to advertise on television for Bratz Girls Nite Out" – Duplicative Of Girls Nite Out (Verdict Form Question 16, TS No. 20)

"Bratz Girls Nite Out" is the same product as "Girls Nite Out."  The "appearance, operation, intended play pattern, and plans to advertise on television for Girls Nite Out" are identical to the "appearance, operation, intended play pattern, and plans to advertise on television for Bratz Girls Nite Out."  The $3.4 million in damages that the jury awarded for "Bratz Girls Nite Out" (Verdict Form No. 20) duplicate the $3.4 million awarded for "Girls Nite Out."  (Verdict Form No. 65).  The Court also recognized this error.[325]  Mattel respectfully requests that the Court strike the duplicative $3.4 million award.  See Section II.D.  In addition, the [Bratz] Girls Nite Out trade secrets are not trade secrets for which MGA may recover damages for the reasons stated above.  See III.A.20, supra.

---

[321]   See TX 20621.
[322]   TX 36707.
[323]   TX 36688.
[324]   See generally 4/4/11 Trial Tr. Vol. 3; 04/5/11 Trial Tr. Vols. 1-5 (Malackowski). TX 37189-00032 (not admitted).
[325]   4/21/11 Trial Tr. (Verdict) at 145:23-146:11.

66.   **"Appearance, operation, intended play pattern, and plans to advertise on television for Bratz Kidz"**

Bratz Kidz Was Not a Trade Secret At The Time of The Alleged Theft. MGA claims that Mattel misappropriated the "appearance, operation, intended play pattern, and plans to advertise on television for Bratz Kidz" no earlier than mid-February 2006 from the MGA showroom at the 2006 New York Toy Fair.[326]

MGA publicly disclosed Bratz Kidz *during* the 2006 New York Toy Fair.[327] MGA alleged that Mattel's report shows the misappropriation of the following information:

> The new big line for the fall and will replace Lil' Bratz.  The line depicts the dolls as 8 to 9-year-olds.  The 6-inch Kidz dolls are shorter than the Bratz dolls and will have a more conservative child-like appearance.  In contrast to the short skirts and flirty, mid-riff baring tops that Bratz wear, Kidz will be dressed in long, flowing skirts and embellished jeans.  Playsets include a vanity with lip gloss, Laundromat, and scooter.  The line will also be backed by non-toy products such as luggage, a tandem bike, a sleepover camping set, and a telephone.  (MGA Entertainment).[328]

The same information and picture of the product—and more detail—was available in a blog written by a visitor of invited into the MGA New York Toy Fair showroom:

> The Big new line for Fall, with playsets and fashions, it's the first four girls but a world of it own and will be replacing the Lil Bratz line.  Yes sorry for fans of the Lil Bratz who actually did quite well, they are being phased out (Number one dolls last year in the UK) but the Kidz are adorable.  They have some beautiful playsets, including a vanity

---

[326]   TX 8522-04; 04/06/11 Trial Tr. Vol. 2  (Saunders) at 54:20-55:1.
[327]   TX 9882-00007, -00008.
[328]   TX 8522-00006.

1     with lip gloss, Laundromat, scooter and a tandem bike for real kidz.

2     Their motto is "A Passion for Friendship and Fashion" which actually

3     was coined by my friend at MGA.  Even people outside of the design

4     team pitch in with ideas![329]

5  The blog also pasted in an MGA press release that read:

6     New York (Reuters) – Yasmin, Cloe, Sasha and Jade are taking a trip

7     back in time – back to before anyone ever dreamed of the popularity

8     they eventually attained as the original Bratz bunch.  MGA

9     entertainment, which makes the edgy Bratz fashion dolls, known for

10     their large heads, pouty lips and flashy clothes, is expanding its product

11     line by adding Bratz Kidz, a line that depicts the dolls as 8- to 9-year

12     olds.  'These are the Bratz before they became the real Bratz," said

13     MGA Entertainment Chief Executive Isaac Larian in an interview.  But

14     the Kidz line, which Larian said could ring in retail sales of roughly

15     $150 million this year [] The 6-inch Kidz dolls are shorter than the

16     Bratz dolls and will have a more conservative, child-like appearance.

17     In contrast to the short skirts and flirty, mid-riff baring tops that Bratz

18     wear, Kidz will be dressed in long, flowing skirts and embellished

19     jeans.  While Bratz dolls, which children often identify as being 16 to

20     19 years old, are about 'fantasy,' Larian said Kidz are about reality and

21     producing a doll that resembles Bratz's core consumer – an 8 or 9 year

22     old girl.  The line will also be backed by non-toy products such as

23     luggage, a tandem bike, a sleepover camping set and a telephone.[330]

24  This blog, displaying a large banner "New York Toy Fair February 12 – 15, 2006,"

25  was published during the toy fair.[331]  MGA presented no evidence to contradict this,

26

27     [329]  TX 9882-00007.

        [330]  TX 9882-00008.

28     [331]  TX 9882-00001.

1    although MGA's counsel tried to mislead the jury by suggesting that the exhibit's

2    print date was the blog entry date.[332]

3         MGA provided almost no evidence as to the "appearance, operation, intended

4    play pattern, and plans to advertise on television" for this product.   The only

5    evidence regarding this product is testimony about the Bratz Kidz sculpt and

6    whether Bratz Kidz would exist without the original Carter Bryant drawings.[333]   The

7    only testimony potentially relating to any Bratz Kidz trade secret was Larian's

8    agreement that the Bratz Kidz themes "have been around for a while, but that

9    [MGA] addressed in some different fashion" and that these themes were successful

10   because of "the fashion; the way they were positioned; the look of the doll; the

11   packaging of the doll."[334]   The actual product was not shown to the jury during trial,

12   but was admitted at the end of trial with hundreds of other products.   <u>See</u> Dkt.

13   10431.

14        Independently, because no Mattel employee attended the 2006 New York Toy

15   Fair for purposes of collecting competitive information, much less going into

16   MGA's showroom, the jury had no evidence from which to conclude that Mattel

17   used "improper means" to acquire the alleged trade secrets.   <u>See</u> Section I.A <u>supra</u>.

18        <u>MGA Presented No Evidence of Injury or Use.</u>   MGA presented no evidence

19   that any Mattel product used the "appearance, operation, intended play pattern, and

20   plans to advertise on television" of Bratz Kidz.

21

22

23

24

―――――――――――――――

25   [332]   4/6/11 Trial Tr. Vol. 2  (Jolicoeur) at 47:16-48:3.
     [333]   2/1/11 Trial Tr. Vol 1 (Bryant) at 33:8-19; 02/03/11 Trial Tr. Vol 1 (Bryant)
26   at 30:13- 31:1; 2/11/11 Trial Tr. Vol 1 (Larian) at 63:3-14; 2/17/11 Trial Tr. Vol 1
     (Larian) at 128:20-129:18, 130:8-132:14, 134:2-8; 02/17/11 Trial Tr. Vol 2 (Larian)
27   at 26:21-27:6; 2/17/11 Trial Tr. Vol 2 (Larian) at 32:11-35:25; 2/18/11 Trial Tr. Vol 3
     (Larian) at 33:25-34:10.
28   [334]   2/17/11, Trial Tr. Vol 2 (Larian) at 33:14-19.

1   <u>No Evidence Supports the Jury's $3.4 Million Award</u>.  Malackowski did not

2   testify about the product, provide the jury with any damages calculation for it, or

3   include it in his bottom up head start analysis chart (which was not admitted).[335]

4               **69.     "Appearance, operation, intended play pattern, and plans to**

5                        **advertise on television for Passion for Fashion"**

6               <u>Passion for Fashion Was Not a Trade Secret At The Time of The Alleged</u>

7   <u>Theft</u>.    MGA claims that Mattel misappropriated the "appearance, operation,

8   intended play pattern, and plans to advertise on television for Passion for Fashion"

9   no earlier than mid-February 2006 from the MGA showroom at the 2006 New York

10  Toy Fair.[336]  Because no Mattel employee attended the 2006 New York Toy Fair for

11  purposes of collecting competitive information, much less going into MGA's

12  showroom, the jury had no evidence from which to conclude that Mattel used

13  "improper means" to acquire the alleged trade secrets.  <u>See</u> Section I.A <u>supra</u>.

14              MGA publicly disclosed Passion for Fashion *during* the 2006 New York Toy

15  Fair.[337]  MGA alleged that Mattel's misappropriated:  "Passion for Fashion: The

16  basic line, featuring front clasped babydoll length tops and dark jeans with a peak of

17  the tummy, will feature golden and coppery tones. (MGA Entertainment, fall)."[338]

18  MGA disclosed that exact information to a person in MGA's showroom who posted

19  on the web: "Passion for Fashion.  The basic line, but nothing basic about the look

20  very flirty and cute.   You'll even see some Big Babyz in similar looks.   Front

21  clasped babydoll length tops and jeans with a peak of tummy, Golden and coppery

22  tones.  Dark jeans.  Stylish contrast.  This line is Sasha, Cloe, Yasmin and Jade."[339]

23  This blog, displaying a large banner "New York Toy Fair February 12 – 15, 2006,"

24

25  ───────────────────
    [335]     <u>See generally</u> 4/4/11 Trial Tr. Vol. 3; 04/5/11 Trial Tr. Vols. 1-5

26  (Malackowski); TX 37189-00033 (not admitted).
    [336]     TX 8522-04; 04/06/11, Vol. 2  (Saunders) at 54:20 – 55:1.

27  [337]     TX 9882-00006.
    [338]     TX 8522-00006.

28  [339]     TX 9882-00006.

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL

was published during the toy fair.[340]  MGA presented no evidence to contradict this publication date, although MGA's counsel tried to mislead the jury by suggesting that the exhibit's print date was the blog entry date.[341]

MGA introduced no evidence of any unique or confidential "appearance, operation, [or] intended play pattern" for this product.  Larian referenced the "Passion for Fashion" only once, in a list of other products.[342]  The actual product was not shown to the jury during trial, but was admitted at the end of trial with hundreds of other products.  See Dkt 10431.

MGA Presented No Evidence of Injury or Use.  MGA presented no evidence that any Mattel product used the "appearance, operation, intended play pattern, and plans to advertise on television" of Passion for Fashion.

No Evidence Supports the Jury's $3.4 Million Award.  Malackowski did not testify about the product, provide the jury with any damages calculation for it, or include it in his bottom up head start analysis chart (which was not admitted).[343]

**Conclusion**

For the foregoing reasons, Mattel respectfully requests that the Court grant Mattel's motion.

DATED:  May 6, 2011                    QUINN EMANUEL URQUHART & SULLIVAN. LLP


                                       By /s/ John B. Quinn
                                       John B. Quinn
                                       Attorneys for Mattel, Inc., and Mattel de
                                       Mexico. S.A. de C.V.

---

[340]  TX 9882-00001.
[341]  4/6/11 Trial Tr. Vol. 2 (Jolicoeur) at 47:16-48:3.
[342]  2/17/11 Trial Tr. Vol. 1 (Larian)  at 121:20-123:19.
[343]  See generally 4/4/11 Trial  Tr. Vol. 3; 04/5/11 Trial  Tr. Vols. 1-5 (Malackowski); TX 37189-00033 (not admitted).

MATTEL'S CORRECTED RENEWED JMOL RE MGA'S TRADE SECRET CLAIM AND MOTION FOR A NEW TRIAL