ANNETTE L. HURST (State Bar No. 148738)
ahurst@orrick.com
WARRINGTON S. PARKER III (State Bar No. 148003)
wparker@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Telephone:  415-773-5700
Facsimile:   415-773-5759

WILLIAM A. MOLINSKI (State Bar No. 145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA  90017
Telephone:  213-629-2020
Facsimile:   213-612-2499

THOMAS S. MCCONVILLE (State Bar No. 155905)
tmcconville@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
4 Park Plaza, Suite 1600
Irvine, CA 92614-2258
Tel: (949) 567-6700/Fax: (949) 567-6710

Attorneys for MGA Parties

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual | Case No. CV 04-9049 DOC (RNBx) |
| Plaintiff, | Consolidated with Case No. CV 04-9059 and Case No. CV 05-2727 |
| v. | |
| MATTEL, INC., a Delaware corporation, | **MGA PARTIES' OBJECTIONS TO MATTEL'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW RE MGA'S UNFAIR COMPETITION CLAIM** |
| Defendant. | |
| AND CONSOLIDATED ACTIONS | |

1

**TABLE OF CONTENTS**

2

**Page(s)**

3   INTRODUCTION ........................................................................................1

4   OBJECTIONS TO MATTEL'S PROPOSED FINDINGS OF FACT .....................1

5       A.    Background....................................................................................1

6

7       B.    Kohl's........................................................................................15

8       C.    THQ...........................................................................................49

9       D.    Early Light.................................................................................53

10       E.    Bandai.......................................................................................54

11       F.    MGA's Unfair Competition Claim...............................................56

12   MGA OBJECTIONS TO MATTEL'S PROPOSED CONCLUSIONS OF

13   LAW..........................................................................................................61

14       B.    MGA Cannot Prove Its Unfair Competition Claim ...........................61

15           1.    MGA Lacks Standing To Pursue Its UCL Claim ...................61

16

17           2.    MGA Cannot Prove An Incipient Violation of Antitrust Law or Policy ........................................................69

18

19           3.    MGA Cannot Prove Any Claim For Restitution.....................88

20           4.    MGA's UCL Claim Is Barred By The Competition Privilege ..............................................................102

21

22           5.    MGA's Unclean Hands Precludes Any Equitable Remedy ...113

23           6.    MGA's UCL Claim Is Superseded By CUTSA....................117

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adler v. Federal Republic of Nigeria*,
  219 F.3d 869 (9th Cir. 2000)...................................................................115, 116

*Atlantic Richfield Co. v. USA Petroleum Co.*
  (1990) 495 U.S. 328...........................................................................................70

*Bank of the West v. Superior Court*,
  2 Cal. 4th 1254 (1992) ............................................................................... 88-97

*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners*,
  52 Cal. App. 4th 867 (1997).............................................................................103

*Brooke Group v. Brown & Williamson Tobacco, Inc.*,
  509 U.S. 209 (1993)...........................................................................................70

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)......................................................................................69, 70

*Cargill, Inc. v. Monfort of Colorado, Inc.*
  479 U.S. 104 (1986)...........................................................................................70

*Cascade Health Solutions v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008)..............................................................................69

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999) ............................................................................... 88-97

*Chavez v. Whirlpool Corp.*,
  93 Cal. App. 4th 363 (2001)...............................................................................71

*Colgan v. Leatherman Tool Group, Inc.*,
  135 Cal. App. 4th 663 (2006).............................................................................89

*Cortez v. Purolator Air Filtration Prods. Co.*,
  23 Cal. 4th 163 (2000) ..................................................... 113, 114, 115, 116

*Dimidowich v. Bell & Howell*
  803 F.2d 1473 (9th Cir. 1986).............................................................................73

*El Aguila Food Prods., Inc. v. Gruma Corp.,*
301 F. Supp. 2d 612 (S.D. Tex. 2003)...........................................................72

*F.D.I.C. v. Craft,*
157 F.3d 697 (9th Cir. 1998)........................................................................100

*Fireman's Fund Ins. Cos. v. Big Blue Fisheries, Inc.,*
143 F.3d 1172 (9th Cir. 1998)......................................................................100

*FTC v. Beech-Nut Packing Co.,*
275 U.S. 441 (1922).......................................................................................74

*FTC v. H.J. Heinz Co.,*
116 F. Supp. 2d 190 (D.D.C 2000) ..........................................................72, 73

*FTC v. H.J. Heinz Co.,*
246 F.3d 708 (D.C. Cir. 2001) .......................................................................72

*Inline, Inc. v. A.V.L. Holding Co.,*
125 Cal. App. 4th 895 (2005)....................................................................90, 97

*K.C. Multimedia, Inc. v. Bank of America Tech. & Operations, Inc.,*
171 Cal. App. 4th 939 (2009)..................................................................118, 119

*Kendall-Jackson Winery Ltd. v. Sup. Ct.,*
76 Cal. App. 4th 970 (1999)...................................................................113-119

*Korea Supply Co. v. Lockheed Martin Corp.,*
29 Cal. 4th 1134 (2003) ..........................................................................*passim*

*Kwikset Corp. v. Superior Court,*
51 Cal. 4th 310 (2011) ...........................................................................113-119

*Mattco Forge, Inc. v. Arthur Young & Co.,*
52 Cal. App. 4th 820 (1997)....................................................................113-119

*Magic Kitchen LLC v. Good Things Int'l, Ltd.,*
153 Cal. App. 4th 1144, 1167 (2007).......................................................61, 62

*Navellier v. Sletten,*
262 F.3d 923 (9th Cir. 2001) ..................................................................102-113

*Oculus Innovative Sciences, Inc. v. Prodinnv, S.A. de C.V.,*
2010 WL 4774659 (N.D. Cal. Nov. 16, 2010) ..........................................90, 97

*Omega Envtl., Inc. v. Gilbarco, Inc.,*
   127 F.3d 1157 (9th Cir. 1997)....................................................74, 79

*Pegasus Satellite Television, Inc. v. DirecTV, Inc.,*
   318 F. Supp. 2d 968 (C.D. Cal. 2004)......................................90, 97

*People's Choice Wireless, Inc. v. Verizon Wireless,*
   131 Cal. App. 4th 656 (2005)..........................................................73

*Powell Prods., Inc. v. Marks,*
   948 F. Supp. 1469 (D. Colo. 1996) ..............................................118

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.,*
   199 F. Supp. 2d 362 (M.D.N.C. 2002).....................................80, 81

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.,*
   67 Fed. Appx. 810 (4th Cir. 2003) .................................................80

*San Francisco Design Ctr. Assocs. v. Portman Cos.,*
   41 Cal. App. 4th 29 (1995)....................................................102-113

*State of California ex rel. Van de Kamp v. Texaco, Inc.,*
   46 Cal. 3d 1147 (1988) ...................................................................70

*Tampa Elec. Co. v. Nashville Coal Co.,*
   365 U.S. 320 (1961)........................................................................76

*Ticconi v. Blue Shield of California Life & Health Ins. Co.,*
   160 Cal.App.4th 528 (2008).........................................................114

*Toys "R" Us, Inc. v. FTC,*
   221 F.3d 928 (7th Cir. 2000).........................................................74

*U.S. v. Rodrigues,*
   229 F.3d 842 (9th Cir. 2000) .........................................................92

*U-Haul Int'l, Inc. v. Jartran, Inc.,*
   522 F. Supp. 1234.................................................................115, 116

*United States v. Colgate & Company*
   (1919) 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 ..........................73

*United States v. Parke, Davis & Co.,*
   362 U.S. 29 (1960)..........................................................................74

1

## STATUTES

2

15 U.S.C. § 14 .................................................................................. 70, 73

3

Cal. Bus. & Prof. Code § 16720 ...................................................... 70, 73

4

Cal. Bus. & Prof. Code § 16726 ...................................................... 70, 73

5

Cal. Bus. & Prof. Code § 17200 ................................................ 61, 62, 119

6

Cal. Bus. & Prof. Code § 17203 ...................................................... *passim*

7

Cal. Bus. & Prof. Code § 17204 ............................................................ 61

8

## OTHER AUTHORITIES

9

ABA Antitrust Section, Monograph No. 8, Vertical Restrictions Upon Buyers
    Limiting Purchases of Goods from Others ....................................... 79

10

Cal. Central District Local Rule 52-3 ................................................... 58

11

Herbert Hovenkamp, Federal Antitrust Policy § 10.8 (1994) ................ 79

12

Rest. (Second) Torts § 768 ......................................................... 102-113

13

Richard M. Steuer, Exclusive Dealing in Distribution, 69 Cornell L. Rev. 101
    (1983) ........................................................................................ 79

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

The MGA Parties' hereby object to Mattel's proposing findings of fact and conclusions of law regarding MGA's statutory unfair competition claim.

**OBJECTIONS TO MATTEL'S PROPOSED FINDINGS OF FACT**

**A.    Background**

2.  Robert Eckert is, and at all relevant times was, the Chief Executive Officer of Mattel.  3/1/11 Trail Tr. Vol. 1 (Eckert) at 114:25-115:7; 3/2/11 Trial Tr. Vol. 1 (Eckert) 7:24-8:1.

**MGA OBJECTIONS:**  MGA objects to this proposed finding of fact on the grounds that it is irrelevant.  Mr. Eckert is not a party in this matter.  Mattel has asserted this irrelevant fact here in hopes that a finding by this Court will somehow advantage Mattel in MGA's pending antitrust case against Mattel.

3.  Mattel sells toys to retailers and other businesses that sell toys to the ultimate consumers.  TX 7502-00014; TX 18395-00008; 3/18/11 Trial Tr. Vol. 2 (Kilpin) at 39:6-15.

**MGA OBJECTIONS:**  MGA objects to this proposed finding of fact on the grounds that it is irrelevant.  MGA objects to the inclusion of the term "other businesses" in this proposed finding of fact on the grounds that this phrase is vague and unsupported by the cited evidence.  It is unclear what Mattel means by "other businesses."  Further, the claim that Mattel sells toys to "other businesses that sell toys to the ultimate consumers" is not supported by the evidence cited.

5.  Mattel licenses to other business ("licensees") the right to use the names and images associated with some of its brands in exchange for royalty payments.  TX 7501-00004; TX 7502-00010; TX 18395-00009; 3/1/11 Trial Tr. Vol. 1 (Eckert) at 145:23-146:14.

**MGA OBJECTIONS:**  MGA objects to this proposed finding of fact on the

1  grounds that it is irrelevant.  MGA objects to this proposed finding of fact as vague.

2  It is unclear what Mattel means by "other businesses."

3

4       8.  MGA sells toys to retailers and other businesses that sell toys to the

5  ultimate consumers.  TX 00497-00020-21; 2/11/11 Trial Tr. Vol. 4 (Larian) at 7:2-

6  12; 2/16/11 Trial Tr. Vol. 1 (Larian) at 86:7-24; 3/24/11 Trial Tr. Vol. 2 (Larian) at

7  22:16- 23:1; 4/6/11 Trial Tr. Vol. 2 (Jolicoeur) at 22:5-7.

8       **MGA OBJECTIONS:**  MGA objects to this proposed finding of fact on the

9  grounds that it is irrelevant.  MGA objects to the inclusion of the term "other

10  businesses" in this proposed finding of fact on the grounds that this phrase is vague

11  and unsupported by the cited evidence.  It is unclear what Mattel means by "other

12  businesses."  Further, the claim that MGA sells toys to "other businesses that sell

13  toys to the ultimate consumers" is not supported by the evidence cited.

14

15       10.  MGA also licenses to other business ("licensees") the right to use the

16  name and images associated with some of its products in exchange for royalty

17  payments.  TX 13520-0013; TX 00497-00014; TX 09819; TX 21235-00029-30;

18  2/9/11 Trial Tr. Vol. 3 (Larian) at 41:18-43:15; 2/16/11 Trial Tr. Vol. 1 (Larian) at

19  17:9-18:6.

20       **MGA OBJECTIONS:**  MGA objects to this proposed finding of fact on the

21  grounds that it is irrelevant.  MGA objects to this proposed finding of fact as vague

22  and unsupported by the cited evidence.  It is unclear what Mattel means by "other

23  businesses."  MGA further objects to Mattel's reliance on TX 9819, which was

24  sponsored by Robert Eckert on April 4, 2011.  Mattel affirmatively withdrew all

25  testimony by Mr. Eckert on the subject of MGA's licensees on that day.  4/4/2011

26  Tr. (Vol. 2) at 5:9-16 (J. Carter admonition that Mr. Eckert's testimony regarding

27  licensees is stricken).

28

- 2 -

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

11.  Mattel and MGA are competitors.  They offer competing toy products to retailers and other businesses that sell toys directly to consumers.  TX 13520-0014-17; 1/20/11 Trial Tr. Vol. 1 (Garcia) at 16:12-14; 2/9/11 Trial Tr. Vol. 3 (Larian) at 47:8-11; 2/22/11 Trial Tr. Vol. 2 (Rosenbaum) at 99:16-23; 3/25/11 Trial Tr. Vol. 1 (Larian) at 90:21-22; 3/29/11 Trial Tr. Vol. 1 (Vollero) at 115:19-:25.

**MGA OBJECTIONS:**  MGA objects to the inclusion of the term "other businesses" in this proposed finding of fact on the grounds that this phrase is vague and unsupported by the cited evidence.  It is unclear what Mattel means by "other businesses."  Further, the statement that Mattel or MGA offer products to "other businesses that sell toys directly to consumers" is not supported by the evidence cited.

12.  Both Mattel's and MGA's customers include mass merchandisers like Wal-Mart, Target and Kmart; toy stores like Toys 'R Us; and department stores like Sears, J.C. Penney, and Kohl's.  TX 7540; TX 11146; TX 11152; TX 11203; TX 11336; TX 11690; TX 16925; TX 24719; TX 31177; TX 31178; TX 31179; TX 31180; TX 31181; TX 31182; TX 31183; TX 31184; 2/11/11 Trial Tr. Vol. 3 (Larian) at 22:2-6; 2/16/11 Trial Tr. Vol. 1 (Larian) at 104:1-7; 3/18/11 Trial Tr. Vol. 2 (Kilpin) at 39:6-15; 3/24/11 Trial Tr. Vol. 2 (Larian) at 157:12-160:8; 4/4/11 Trial Tr. Vol. 1 (Eckert) at 41:6-7.

**MGA OBJECTIONS:**  MGA objects to this proposed finding of fact on the grounds that it is irrelevant.  Moreover, MGA objects to the finding as vague in that Mattel uses the term "mass merchandisers" without defining that term  Moreover, it is vague because Mattel asserts that MGA customers include mass merchandisers "like" the stores enumerated without seeking to define the term "like" or limiting the scope of this asserted fact.

13.  Mattel and MGA also compete for licensees and for production capacity

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    in Asia, where most of each companies' toys are manufactured.  TX 18395-006;

2    3/17/11 Trial Tr. Vol. 1 (Fontanella) at 127:2-128:10; 3/22/11 Trial Tr. Vol. 1 at

3    (Debrowski) at 8:8-25.

4        **MGA OBJECTIONS:**  MGA objects to this proposed finding of fact on the

5    grounds that it is irrelevant.  MGA objects to this proposed finding of fact as

6    unsupported by the cited evidence and false.  The evidence cited, a Mattel 10-K and

7    testimony from two Mattel employees, does not support this statement of fact.

8    Further, the statement that "most" of each companies' toys are manufactured in

9    Asia is vague.  In fact, the record indicates that many of MGA's toys are

10   manufactured at its Little Tikes' plant in the United States.  2/11/2011 (Vol. 3) Tr.

11   19:4-10); 3/24/2011 (Vol. 2) Tr. 141:16-19 (Larian Testimony).

12

13       14.  Mattel and MGA introduce new toys each year.  These new toys, with

14   any pre-existing toys, are compiled into a "line" for the upcoming toy season,

15   typically either Spring or Fall.  TX 7104; TX 11203; TX 11276; TX 16786; TX

16   18395-008; 2/18/11 Trial Tr. Vol. 2 (Larian) at 40:4-41:1; 3/9/11 Trial Tr. Vol. 2

17   (Nordquist) at 84:12-85:1.

18       **MGA OBJECTIONS:**  MGA objects to this proposed finding of fact on the

19   grounds that it is irrelevant and vague.  It is unclear what Mattel means by "pre-

20   existing toys."  Further, the phrase "with any pre-existing toys" is vague because as

21   written this statement can encompass any number of previously released products,

22   whether or not intended to be part of a "line", and without any limitation in time or

23   scope.

24

25       15.  Mattel and MGA present the "line" to their respective retail customers

26   between nine months and a year before they will be offered for sale on a retailer's

27   shelf.  TX 11203; 2/8/11 Trial Tr. Vol. 1 (Maurus) at 120:25-122:7; 3/9/11 Trial Tr.

28   Vol. 2 (Nordquist) at 91:3-92:6; 3/25/11 Trial Tr. Vol. 1 (Larian) at 43:3-44:3.

1     **MGA OBJECTIONS:**  MGA objects to this proposed finding of fact as

2  vague, unsupported by the cited evidence and false.  Mattel's proposed finding of

3  fact is not supported by the evidence cited.  Further, there is testimony from

4  witnesses at trial that contradicts this timeline.  For example, Mr. Friedman testified

5  that Fisher Price, a Mattel subsidiary, would announce a product line to "a limited

6  group of retailers" in October, but that the information would not be disclosed to

7  the "general retail class" at that point in time.  3/11/2011 (Vol. 3) Tr. 64:3-16

8  (Friedman Testimony).  Mr. Larian testified that retailers were not shown lines

9  prior to toy fairs in at least 2001 and 2002.  3/25/2011 (Vol. 1) 124:13-125:9

10  (Larian Testimony).

11

12     16.  Mattel and MGA then pursue orders from the retail customers for the

13  toys offered in the "line" for that season.  2/8/11 Trial Tr. Vol. 1 (Maurus) at 16:1-

14  18, 120:25- 122:7; 3/17/11 Trial Tr. Vol. 2 (Fontanella) at 51:8-17; 3/24/11 Trial

15  Tr. Vol. 2 (Larian) at 22:16-23:1.

16     **MGA OBJECTIONS:**  MGA objects to this proposed finding of fact as

17  vague, unsupported by the cited evidence and false.  Mattel's proposed finding of

18  fact is not supported by the evidence cited.  Further, there is testimony from

19  witnesses at trial that contradicts this timeline.  For example, Mr. Friedman testified

20  that Fisher Price, a Mattel subsidiary, would announce a product line to "a limited

21  group of retailers" in October, but that the information would not be disclosed to

22  the "general retail class" at that point in time.  3/11/2011 (Vol. 3) Tr. 64:3-16

23  (Friedman Testimony).  Mr. Larian testified that retailers were not shown lines

24  prior to toy fairs in at least 2001 and 2002.  3/25/2011 (Vol. 1) 124:13-125:9

25  (Larian Testimony).

26

27     17.  From the products offered in the "line" for each season, the retail

28  customers pick and chose which toys they will purchase based on which they

1   believe will be most profitable.  The retail customers do not purchase toys that they

2   do not believe will make money.  3/25/11 Trial Tr. Vol. 1 (Larian) at 25:25-26:9;

3   3/29/11 Trial Tr. Vol. 1 (Vollero) at 128:23-129:19, 130:16-132:6.

4       **MGA OBJECTIONS**:  MGA objects to this proposed finding of fact as

5   speculative and unsupported by the evidence cited.  The evidence cited by Mattel,

6   testimony of MGA and Mattel employees, does not support this proposition.

7   Mattel's attempt to characterize the state of mind of retailers is improper.  No

8   retailers testified at trial.  Thus, there is no evidence in the record that can support

9   Mattel's assumption about retailers' decision-making processes regarding the

10  purchase of toy products.

11

12      18.  Mattel and MGA each offer incentives to retail customers to obtain

13  larger orders (either more product or additional products); better placement for their

14  respective products in stores; additional or incremental space allocated to their

15  products within retail stores; and better or priority placement in retailer

16  advertisements, among others.  TX 11146; TX 11690; TX 24358; TX 24359; TX

17  24004; TX 24005; 2/16/11 Trial Tr. Vol. 2 (Larian) at 7:16-8:16; 3/29/11 Trial Tr.

18  Vol. 1 (Vollero) at 132:7-21; 4/4/11 Trial Tr. Vol. 1 (Eckert) at 87:7-88:10.

19      **MGA OBJECTIONS**:  MGA objects to this proposed finding of fact on the

20  grounds that it is irrelevant, unsupported by the evidence cited and vague.  MGA

21  objects to the word "incentives" as vague.  With this fact, Mattel is trying to avoid

22  the import of its agreement with Kohl's that, in exchange for $1.25 million, Mattel

23  would receive MGA's shelf space in the fashion doll section of Kohl's toy

24  departments.  Such an agreement is unlawful and cannot be termed an "incentive."

25  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re

26  payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel

27  MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement);

28  TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

(Vollero Testimony).  Further, MGA objects to Mattel's attempt to equate Mattel and MGA's behavior.  Mattel systematically attempted to thwart MGA's Bratz line by interfering with MGA's relationships, from manufacturing to retail and there is no evidence of such systematic conduct by MGA.  *See* TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); TX 8972 (Eckert email to "kill the deal or let it slide"); TX 34833 (Mattel email re stopping Bandai's distribution of Bratz); TX 8120 (email re moving product at WalMart); TX 8572 (demanding "larger playing field" and an "unfair benefit" over MGA at Target); *see also* Mattel's Proposed Statement of Fact Nos. 109, 110, 120, 128, 133, 134.

19.  These incentives include, but are not limited to, incentive payments if targets are met, promotional investment, advertising allowances, and return programs.  TX 8936; TX 9424; TX 11146; TX 24358; TX 24359; TX 24004; TX 24005; TX 27284; TX 27289; TX 24792; 2/16/11 Trial Tr. Vol. 2 (Larian) at 7:16-8:16; 4/4/11 Trial Tr. Vol. 1 (Eckert) at 87:7-90:3.

**MGA OBJECTIONS:**  MGA objects to this proposed finding of fact on the grounds that it is irrelevant, unsupported by the evidence cited and vague.  MGA objects to the words and phrases "incentives", "incentive payments if targets are met," "promotional investment," "advertising allowances," and "return programs" as vague.  With this fact, Mattel is trying to avoid the import of its agreement with Kohl's that, in exchange for $1.25 million, Mattel would receive MGA's shelf space in the fashion doll section of Kohl's toy departments.  Such an agreement is unlawful and should not be termed an "incentive."  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-

2   Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

3   Further, MGA objects to Mattel's attempt to equate Mattel and MGA's behavior.

4   Mattel systematically attempted to thwart MGA's Bratz line by interfering with

5   MGA's relationships, from manufacturing to retail and there is no evidence of such

6   systematic conduct by MGA.  *See* TX 26612 (Zablow email re "Great News

7   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

8   TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

9   24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

10  agreement); TX 8972 (Eckert email to "kill the deal or let it slide"); TX 34833

11  (Mattel email re stopping Bandai's distribution of Bratz); TX 8120 (email re

12  moving product at WalMart); TX 8572 (demanding "larger playing field" and an

13  "unfair benefit" over MGA at Target); *see also* Mattel's Proposed Statement of Fact

14  Nos. 109, 110, 120, 128, 133, 134.

15

16       20.  Once the terms of sales for a season are reached, then the terms,

17  including the terms of the incentives, spending commitments and targets applicable

18  to any such incentives are embodied in an agreement of some type, generally

19  applicable to a particular season or year.  TX24004; TX 24005; 3/29/11 Trial Tr.

20  Vol. 1 (Vollero) at 132:7-21.

21       **MGA OBJECTIONS:**  MGA objects to this proposed finding of fact on the

22  grounds that it is irrelevant, unsupported by the evidence cited and vague.  MGA

23  objects to the words and phrases "incentives", "spending commitments", "targets

24  applicable" and "generally applicable to a particular season or year."  Mattel is

25  trying to avoid the import of its agreement with Kohl's that, in exchange for $1.25

26  million, Mattel would receive MGA's shelf space in the fashion doll section of

27  Kohl's toy departments.  Such an agreement is unlawful and should not be termed

28  an "incentive." TX 26612 (Zablow email re "Great News BARBIE"); TX 37112

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1  (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's

2  email offering Mattel MGA's planogram space for money); TX 24004 (2005

3  Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011

4  (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  Further, MGA objects to Mattel's

5  attempt to equate Mattel and MGA's behavior.  Mattel systematically attempted to

6  thwart MGA's Bratz line by interfering with MGA's relationships, from

7  manufacturing to retail and there is no evidence of such systematic conduct by

8  MGA.  *See* TX 26612 (Zablow email re "Great News BARBIE"); TX 37112

9  (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's

10  email offering Mattel MGA's planogram space for money); TX 24004 (2005

11  Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); TX 8972

12  (Eckert email to "kill the deal or let it slide"); TX 34833 (Mattel email re stopping

13  Bandai's distribution of Bratz); TX 8120 (email re moving product at WalMart);

14  TX 8572 (demanding "larger playing field" and an "unfair benefit" over MGA at

15  Target); *see also* Mattel's Proposed Statement of Fact Nos. 109, 110, 120, 128, 133,

16  134.

17

18       21.  Both Mattel and MGA have introduced toy products that have not been

19  profitable, either for them or for retail customers.  TX 24335; TX 24336; TX

20  24337A; TX 24338; TX 24339; TX 24342; TX 24346; TX 24347; 3/2/11 Trial Tr.

21  Vol. 1 (Eckert) at 123:23-124:6; 1/26/11 Trial Tr. Vol. 1 (Garcia) at 66:16-25;

22  2/4/11 Trial Tr. Vol. 1 (O'Connor) at 126:14-127:7; 2/11/11 Trial Tr. Vol. 3

23  (Larian) at 66:3-15.

24       **MGA OBJECTIONS:**  MGA objects to this proposed finding of fact on the

25  grounds that it is irrelevant.  Further, MGA objects to the words and phrases "them"

26  or "retail customers" as vague.

27

28       22.  Retailers control the allocation of space for products, including toy

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    products, in their stores.  3/24/11 Trial Tr. Vol. 2 (Larian) at 77:7-23; 3/29/11 Trial

2    Tr. Vol. 1 (Vollero) at 148:6-14.

3        **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

4    by the evidence cited and misleading and irrelevant.  Particularly, it is irrelevant

5    what "retailers" do generally.  It is misleading because a retailer's allocation of

6    space can be affected or controlled by the agreements that it enters into with

7    manufacturers, such as Kohl's 2005 and 2006 agreements with Mattel which

8    dedicated the eight feet of shelf space at Kohl's for fashion dolls to Barbie products

9    exclusively.  TX 24004, TX 24005; 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero

10   Testimony); TX 37113, 26612; 3/29/2011 (Vol. 1) Tr. 120:24-121:10, 121:22-

11   122:1 (Vollero Testimony), 4/4/2011 (Vol. 1) Tr. 56:21-57:1 (Eckert Testimony),

12   4/6/2011 (Vol. 3) Tr. 84:22-85:11 (Scholvin Testimony).

13

14       23.  The allocation of space to particular products at a retailer is called a

15   planogram.  Planograms are set by the retailer, not product suppliers such as Mattel

16   or MGA.  TX 24342; 3/24/11 Trial Tr. Vol. 2 (Larian) at 77:7-23; 3/29/11 Trial Tr.

17   Vol. 1 (Vollero) at 148:6-14.

18       **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

19   by the evidence cited and misleading and irrelevant.  Particularly, it is irrelevant

20   what "retailers" do generally.  It is misleading because a retailer's allocation of

21   space can be affected or controlled by the agreements that it enters into with

22   manufacturers, such as Kohl's 2005 and 2006 agreements with Mattel which

23   dedicated the eight feet of shelf space at Kohl's for fashion dolls to Barbie products

24   exclusively.  TX 24004, TX 24005; 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero

25   Testimony); TX 37113, 26612; 3/29/2011 (Vol. 1) Tr. 120:24-121:10, 121:22-

26   122:1 (Vollero Testimony), 4/4/2011 (Vol. 1) Tr. 56:21-57:1 (Eckert Testimony),

27   4/6/2011 (Vol. 3) Tr. 84:22-85:11 (Scholvin Testimony).

28

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

24. For toys, planograms are created and set by the retailer before toys are placed on retailer shelves for the Spring or Fall seasons. 4/6/11 Trial Tr. Vol. 2 (Saunders) at 53:5-54:23; 2/16/11 Trial Tr. Vol. 2 (Larian) at 121:23-123:22.

**MGA OBJECTIONS:** MGA objects to this proposed fact as unsupported by the evidence cited and misleading and irrelevant. Particularly, it is irrelevant what "retailers" do generally. It is misleading because a retailer's allocation of space can be affected or controlled by the agreements that it enters into with manufacturers, such as Kohl's 2005 and 2006 agreements with Mattel which dedicated the eight feet of shelf space at Kohl's for fashion dolls to Barbie products exclusively. TX 24004, TX 24005; 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony); TX 37113, 26612; 3/29/2011 (Vol. 1) Tr. 120:24-121:10, 121:22-122:1 (Vollero Testimony), 4/4/2011 (Vol. 1) Tr. 56:21-57:1 (Eckert Testimony), 4/6/2011 (Vol. 3) Tr. 84:22-85:11 (Scholvin Testimony).

25. Retailers inform Mattel and MGA of the profitability or "margin" that they expect to earn for each product. Retail customers also provide Mattel and MGA with information about the sales and profitability or "margin" performance for each of the products that they purchase. 3/25/11 Trial Tr. Vol. 1 (Larian) at 40:3-23; 3/29/11 Trial Tr. Vol. 1 (Vollero) at 129:24-130:8, 130:16-132:6; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 82:3- 12.

**MGA OBJECTIONS:** MGA objects to this proposed fact as unsupported by the evidence cited and misleading and irrelevant. Particularly, it is irrelevant what "retailers" do generally. Moreover, Mr. Larian testified that retailers do not provide their margins for each product to MGA. 3/25/2011 (Vol. 1) Tr. 40:3-5 (Larian Testimony).

26. Kohl's provides to Mattel and to MGA information about each company's product's respective sales and margin performance. TX 24338; TX

1   24339; TX 24342; TX 24346; TX 24347; 3/25/11 Trial Tr. Vol. 1 (Larian) at 24:19-

2   26:16; 3/25/11 Trial Tr. Vol. 1 (Larian) at 26:17-29:1; 4/6/11 Trial Tr. Vol. 3

3   (Scholvin) at 82:3-12.

4        **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

5   and irrelevant.  Moreover, Mr. Larian testified that retailers do not provide their

6   margins for each product to MGA.  3/25/2011 (Vol. 1) Tr. 40:3-5 (Larian

7   Testimony).  Kohl's, like all retailers, negotiates with manufacturers for more

8   favorable terms and to further such negotiations makes assertions regarding sales

9   and margin performance.  3/25/2011 (Vol. 1) 33:24-34:6 (Larian Testimony);

10  3/25/2011 (Vol. 2) 15:9-16:3 (Larian Testimony).

11

12       27.  After the planogram for toys is set for a particular season, depending on

13  the sales or margin performance of a product or products, retailers revise orders,

14  revise prices offered to consumers and change the placement of toys within the

15  store to maximize revenue and profitability.  TX 24336; TX 24342; TX 24337A;

16  2/11/11 Trial Tr. Vol. 3 (Larian) at 65:6-14; 3/25/11 Trial Tr. Vol. 1 (Larian) at

17  18:13-23:18, 29:2-17, 31:4-33:23; 34:11-35:1.

18       **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

19  by the evidence cited and misleading and irrelevant.  Particularly, it is irrelevant

20  what "retailers" do generally.  Mattel's attempt to characterize the state of mind of

21  retailers is improper.  No retailers testified at trial.  Thus, there is no evidence in the

22  record that can support Mattel's assumption about retailers' decision-making

23  processes regarding the placement of toys.

24

25       28.  Retailers do not continue to purchase products that cause the retailer to

26  lose money.  TX 24337A; 2/11/11 Trial Tr. Vol. 3 (Larian) at 65:6-14; 3/29/11

27  Trial Tr. Vol. 1 (Vollero) at 128:23-129:19; 4/1/11 Trial Tr. Vol. 2 (Eckert) at 34:6-

28  13.

1   **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

2   by the evidence cited and misleading and irrelevant.  Particularly, it is irrelevant

3   what "retailers" do generally.  Mattel's attempt to characterize the state of mind of

4   retailers is improper.  No retailers testified at trial.  Thus, there is no evidence in the

5   record that can support Mattel's assumption about retailers' decision-making

6   processes regarding purchasing toys.

7

8       29.  When a retailer loses money on a particular product, it replaces that

9   product with others that it expects to be profitable or more profitable.  3/29/11 Trial

10  Tr. Vol. 1 (Vollero) at 128:23-129:19; 4/1/11 Trial Tr. Vol. 2 (Eckert) at 34:6-13.

11      **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

12  by the evidence cited and misleading and irrelevant.  Particularly, it is irrelevant

13  what "retailers" do generally.  Mattel's attempt to characterize the state of mind of

14  retailers is improper.  No retailers testified at trial.  Thus, there is no evidence in the

15  record that can support Mattel's assumption about retailers' decision-making

16  processes regarding purchasing toys.

17

18      30.  When a retailer purchases a product that loses money or that does not

19  sell, it reduces the price on that product (which causes a reduction in the expected

20  margin) in an effort to induce customers to purchase it.  In some circumstances, the

21  prices must be reduced so much that the retailer sells the product at a loss.  TX

22  24347; 2/11/11 Trial Tr. Vol. 3 (Larian) at 65:6-14.

23      **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

24  by the evidence cited and misleading and irrelevant.  Particularly, it is irrelevant

25  what "retailers" do generally.  Mattel's attempt to characterize the state of mind of

26  retailers is improper.  No retailers testified at trial.  Thus, there is no evidence in the

27  record that can support Mattel's assumption about retailers' decision-making

28  processes regarding the pricing of toys.

1

2       31.  If the retailer sells products below the expected margin, then the retail

3   customer approaches the suppliers, in this case Mattel and MGA, and seeks money

4   from them in the form of cash payments or other incentives to offset the reduced

5   profitability or losses.  Industry practice is for the retail customer and the supplier to

6   negotiate the terms of any such payment or incentives.  TX 24335; TX 24336; TX

7   24338; TX 24339; TX 24342; TX 24347; 2/11/11 Trial Tr. Vol. 4 (Larian) at 6:7-

8   22; 2/16/11 Trial Tr. Vol. 2 (Larian) at 7:16-8:16; 3/25/11 Trial Tr. Vol. 2 (Larian)

9   at 15:9-25; 3/29/11 Trial Tr. Vol. 1 (Vollero) at 130:16-132:6.

10      **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

11  by the evidence cited, vague, and irrelevant, particularly as it is irrelevant what

12  "retailers" do generally.  Mattel's attempt to characterize the state of mind of

13  retailers is improper.  No retailers testified at trial.  Thus, there is no evidence in the

14  record that can support Mattel's assumption about retailers' decision-making

15  processes regarding reaction to sales.  MGA objects to the word "incentives" as

16  vague.  With this fact, Mattel is trying to avoid the import of its agreement with

17  Kohl's that, in exchange for $1.25 million, Mattel would receive MGA's shelf

18  space in the fashion doll section of Kohl's toy departments.  Such an agreement is

19  unlawful and should not be termed an "incentive."  TX 26612 (Zablow email re

20  "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz

21  shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for

22  money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-

23  Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

24  Further, MGA objects to Mattel's attempt to equate Mattel and MGA's behavior.

25  Mattel systematically attempted to thwart MGA's Bratz line by interfering with

26  MGA's relationships, from manufacturing to retail and there is no evidence of such

27  systematic conduct by MGA.  *See* TX 26612 (Zablow email re "Great News

28  BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

1    TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

2    24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

3    agreement); TX 8972 (Eckert email to "kill the deal or let it slide"); TX 34833

4    (Mattel email re stopping Bandai's distribution of Bratz); TX 8120 (email re

5    moving product at WalMart); TX 8572 (demanding "larger playing field" and an

6    "unfair benefit" over MGA at Target); *see also* Mattel's Proposed Statement of Fact

7    Nos. 109, 110, 120, 128, 133, 134.

8

9        32.  MGA sold Bratz products in the following quantities for the identified

10   years: over $500 million for 2003, over $500 million for 2004, over $500 million

11   for 2005, over $600 million for 2006, over $500 million for 2007, and over $250

12   million for 2008.  TX 27331; TX 27261; TX27262; TX 27263; TX 27264; TX

13   27265; 2/17/11 Trial Tr. Vol. 1 (Larian) at 125:8-127:7.

14       **MGA OBJECTIONS:**  MGA objects to this proposed fact as incorrect,

15   misleading, vague and irrelevant.  Since MGA's unfair competition claim stems

16   from Mattel's actions vis-à-vis a domestic retailer, Kohl's, it is unclear why Mattel

17   is citing to worldwide sales of Bratz.

18

19       **B.    Kohl's**

20       34.  Kohl's sells products, including toys purchased from MGA and Mattel,

21   to consumers.  3/24/11 Trial Tr. Vol. 2 (Larian) at 159:20-160:3; 3/29/11 Trial Tr.

22   Vol. 1 (Vollero) at 111:25-112:6, 118:21-119:9; 4/6/11 Trial Tr. Vol. 3 (Scholvin)

23   at 66:15-22.

24       **MGA OBJECTIONS:**  MGA objects to the proposed fact to the extent it

25   suggests that in 2005 and 2006, Kohl's purchased MGA Bratz related products

26   when the evidence establishes otherwise.  *See* TX 26612 (Zablow email re "Great

27   News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf

28   space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for

money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

36.  In addition, at least during 2004 through 2007, MGA hired a company called The Northern Group to represent it in connection with placing Kohl's. *See*, e.g., TX 24335; TX 24336; TX 24358.

**MGA OBJECTIONS:**  MGA objects to this proposed fact as incomprehensible.  MGA further objects to the proposed fact to the extent it suggests that in 2005 and 2006, Kohl's purchased MGA Bratz related products when the evidence establishes otherwise.  *See* TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony); 3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian Testimony).

40.  Kohl's annual sales revenues are approximately $18 billion.  3/29/11 Trial Tr. Vol. 1 (Vollero) at 118:21-119:9; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 66:15-22.

**MGA OBJECTIONS:**  MGA objects to this proposed fact as irrelevant and unsupported by direct evidence.  MGA further objects to this fact as vague as improperly unlimited in time and geographic scope.

41.    Kohl's sales revenues are more than three times larger than Mattel's sales revenues.  3/29/11 Trial Tr. Vol. 1 (Vollero) at 147:23-148:5; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 66:15-22.

**MGA OBJECTIONS:**  MGA objects to this proposed fact as irrelevant and unsupported the evidence and irrelevant.  MGA further objects to this fact as vague

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    as improperly unlimited in time and geographic scope.

2

3        42.   Kohl's toy department is small relative to both its sales and the size of

4    its stores.  TX 24342; 3/25/11 Trial Tr. Vol. 1 (Larian) at 29:2-17, 31:4-33:23.

5        **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

6    and irrelevant.  Further, MGA objects to the phrase "small relative to both its sales

7    and the size of its stores" as vague to the point of meaninglessness.

8

9        43.   Kohl's decides which products it will sell in its stores, where those

10   products will be displayed for sale in its stores, and the prices that it will charge

11   consumers for those products.  3/25/11 Trial Tr. Vol. 1 (Larian) at 18:23-19:2;

12   3/29/11 Trial Tr. Vol. 1 (Vollero) at 131:3-19, 148:6-14; 4/4/11 Trial Tr. Vol. 1

13   (Eckert) at 90:7-17; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 64:20-25, 81:22-82:2.

14       **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

15   by the evidence cited and misleading.  It is misleading because a retailer's

16   allocation of space can be affected or controlled by the agreements that it enters

17   into with manufacturers, such as Kohl's 2005 and 2006 agreements with Mattel

18   which dedicated eight feet of Kohl's shelf space to Barbie products exclusively.

19   TX 24004, TX 24005; 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony);

20   TX 37113, 26612; 3/29/2011 (Vol. 1) Tr. 120:24-121:10, 121:22-122:1 (Vollero

21   Testimony), 4/4/2011 (Vol. 1) Tr. 56:21-57:1 (Eckert Testimony), 4/6/2011 (Vol.

22   3) Tr. 84:22-85:11 (Scholvin Testimony).

23

24       44.   Kohl's sells toys both in its toy department and outside of that

25   department.  Kohl's sells toys outside the top department on towers, bulk stacks,

26   wing walls, and other out-of-department fixtures.  4/6/11 Trial Tr. Vol. 3 (Scholvin)

27   at 66:23-67:19.

28       **MGA OBJECTIONS:**  MGA objects to this finding of fact as irrelevant.  It

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   is irrelevant where Kohl's places toys for sale.  The evidence establishes that

2   Kohl's had eight feet of space in its toy department set aside for fashion dolls.

3   4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5 (Scholvin Testimony).  Barbie had four feet of

4   this shelf space and Bratz also had four feet.  *Id.* at 73:9-10, 77:6-9.  Mattel paid

5   Kohl's $1.25 million to occupy all eight feet of this space, including the four feet

6   that had been designated for Bratz.  TX 26612 (Zablow email re "Great News

7   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

8   TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

9   24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

10   agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  Moreover,

11   Mattel's own emails indicate the importance of having a presence in (or being

12   excluded from) the toy department.  TX 26612 (Zablow email re "Great News

13   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

14   *see also* TX 37113 (Kohl's email offering Mattel MGA's planogram space for

15   money).  The evidence further establishes that in 2005 and 2006 Kohl's purchased

16   no Bratz dolls from MGA for sale in its toy department (or elsewhere).  3/24/2011

17   (Vol. 2) Tr. 162:14-163:5 (Larian Testimony); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

18   (Vollero Testimony).

19

20       45.  Kohl's expects to generate a profit on the toys that it sells to consumers.

21   3/25/11 Trial Tr. Vol. 1 (Larian) at 25:25-26:23; 3/29/11 Trial Tr. Vol. 1 (Vollero)

22   at 129:20-23, 151:3-10; TX 24342; 3/25/11 Trial Tr. Vol. 1 (Larian) at 29:2-17,

23   31:4-33:23; TX 24354; 3/25/11 Trial Tr. Vol. 1 (Larian) at 38:13-40:1.

24       **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

25   by the evidence cited.  Mattel's attempt to characterize the state of mind of retailers

26   is improper.  No one from Kohl's testified at trial.  Thus, there is no evidence in the

27   record that can support Mattel's assumption about Kohl's decision making process

28   regarding purchasing toys.

MGA PARTIES' OBJECTIONS TO MATTEL'S
                     PROPOSED FINDINGS OF FACT AND LAW
                     CV-04-9049 DOC (RNBx)

1

2      46. Kohl's reported to Mattel Kohl's margin targets for Mattel products that

3   Kohl's had purchased, and later reported to Mattel the actual margin performance

4   of those products.  Separately, Kohl's reported to MGA Kohl's margin targets for

5   MGA products that Kohl's had purchased, and later reported to MGA the actual

6   margin performance of those products.  4/6/11 Trial Tr. Vol. 3 (Scholvin) at 82:3-

7   12; 3/29/11 Trial Tr. Vol. 1 (Vollero) at 129:24-130:8; TX 24342; 3/25/11 Trial Tr.

8   Vol. 1 (Larian) at 29:2-17, 31:4- 33:23; TX 24354; 3/25/11 Trial Tr. Vol. 1 (Larian)

9   at 38:13-40:1.

10      **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

11   by the evidence cited and irrelevant.  In fact, Mr. Larian testified that retailers do

12   not provide their margins to MGA.  3/25/2011 (Vol. 1) Tr. 40:3-5 (Larian

13   Testimony).  Kohl's, like all retailers, asked MGA for more favorable terms, and

14   made assertions regarding sales in order to further such negotiations.  3/25/2011

15   (Vol. 1) 33:24-34:6 (Larian Testimony); 3/25/2011 (Vol. 2) 15:9-16:3 (Larian

16   Testimony).

17

18      47. MGA introduced at trial no agreement of any type regarding the sale of

19   any MGA product, including Bratz products, to Kohl's for any year.

20      **MGA OBJECTIONS:**  MGA objects to this proposed fact as irrelevant and

21   misleading.  MGA introduced evidence at trial that MGA year in and year out had

22   four feet of shelf space allotted to it for Bratz-related products.  The evidence

23   establishes that Kohl's had eight feet of space in its toy department set aside for

24   fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5 (Scholvin Testimony).  Barbie

25   had four feet of this shelf space and Bratz also had four feet.  *Id.* at 73:9-10, 77:6-9.

26   Mattel paid Kohl's $1.25 million to occupy all eight feet of this space, including the

27   four feet that had been designated for Bratz.  TX 26612 (Zablow email re "Great

28   News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf

1    space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for

2    money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-

3    Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  The

4    evidence further establishes that in 2005 and 2006 Kohl's purchased no Bratz dolls

5    from MGA for sale in its toy department (or elsewhere).  3/24/2011 (Vol. 2) Tr.

6    162:14-163:5 (Larian Testimony); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero

7    Testimony).

8

9         48.  In 2004, Kohl's had purchased products from MGA including Bratz

10   dolls worth approximately $5.1 million from which Kohl's had a 22% or

11   approximately $1.12 million margin expectation.  TX 24342; TX 31180-00014; TX

12   36738; 3/25/11 Trial Tr. Vol. 2 (Larian) at 12:22-13:13; 3/25/11 Trial Tr. Vol. 1

13   (Larian) at 31:4-33:8.

14        **MGA OBJECTIONS:**  MGA objects to the proposed fact to the extent it

15   identifies Kohl's margin expectation.  That fact is irrelevant.

16

17        51.  In 2004, Kohl's made money on BARBIE products.  4/4/11 Trial Tr.

18   Vol. 1 (Eckert) at 54:21-57:22; 62:4-12; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 82:12-

19   83:4.

20        **MGA OBJECTIONS:**  MGA objects to the proposed fact as irrelevant.

21   Further, Mattel is relying on hearsay evidence.  *See*, *e.g.*, 4/6/11 (Vol. 3) Tr. 82:12-

22   83:4 (Scholvin Testimony) (J. Carter specifically overruling hearsay objection

23   based on assertion from Mattel's counsel that the statement goes to "State of mind,

24   your Honor.").

25

26        52.  Kohl's stops buying from suppliers and stops selling to consumers a

27   particular toy or brand that fails to meet the retailer's margin requirements.  3/29/11

28   Trial Tr. Vol. 1 (Vollero) at 128:23-129:19.

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

2    by the evidence cited.  Further, Mattel's attempt to characterize the state of mind of

3    retailers is improper.  No one from Kohl's testified at trial.  Thus, there is no

4    evidence in the record that can support Mattel's assumption about Kohl's decision

5    making process regarding purchasing or sales of toys.

6

7        53.  In 2004, Kohl's consumers did not purchase the expected quantity of

8    Bratz, so Kohl's lost money on Bratz products.  TX 24338; TX 24339; 3/25/11

9    Trial Tr. Vol. 1 (Larian) at 24:19-26:16; 3/25/11 Trial Tr. Vol. 1 (Larian) at 26:17-

10   29:1; TX 24354; 3/25/11 Trial Tr. Vol. 1 (Larian) at 38:13-40:1.

11   **MGA OBJECTIONS:**  MGA objects to this proposed fact as false and

12   unsupported by the evidence.  There is no competent evidence of Kohl's expected

13   sales of Bratz dolls.  Kohl's, like all retailers, asked MGA for more favorable terms,

14   and made assertions regarding sales in order to further such negotiations.

15   3/25/2011 (Vol. 1) 33:24-34:6 (Larian Testimony); 3/25/2011 (Vol. 2) 15:9-16:3

16   (Larian Testimony).

17

18       54.  Kohl's consumers did not like and did not purchase Bratz products.  TX

19   24338; TX 24339; 3/25/11 Trial Tr. Vol. 1 (Larian) at 24:19-29:1; 4/6/11 Trial Tr.

20   Vol. 3 (Scholvin) at 82:12-83:4.  Mattel's MYSCENE brand segment, also directed

21   to the older "tween" market, did not perform well with Kohl's consumers.  4/6/11

22   Trial Tr. Vol. 3 (Scholvin) at 82:12-83:4.

23   **MGA OBJECTIONS:**  MGA objects to this proposed fact as false and

24   unsupported by the evidence.  Mattel's assertion about the tastes of Kohl's

25   customers is unsupported by the record.  Moreover, Mattel's assertion that Kohl's

26   customers "did not purchase Bratz products" is contradicted by the record which

27   reflects that MGA's sales of Bratz were increasing at Kohl's in the 2002 through

28   2004 time period.  3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian Testimony); TX

- 21 -

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   24342 (indicating that MGA's Bratz shelf-space in Kohl's toy department increased

2   from three to four feet from 2003 to 2004).  Mattel, however, is relying on second-

3   hand hearsay, which was not admitted for the truth, to substantiate this alleged

4   "fact."  *See*, *e.g.*, 4/6/11 (Vol. 3) Tr. 82:12-83:4 (Scholvin Testimony) (J. Carter

5   specifically overruling hearsay objection based on assertion from Mattel's counsel

6   that the statement goes to "State of mind, your Honor.").  Such evidence is

7   inherently untrustworthy.  Kohl's, like all retailers, asked MGA for more favorable

8   terms, and made assertions regarding sales in order to further such negotiations.

9   3/25/2011 (Vol. 1) 33:24-34:6 (Larian Testimony); 3/25/2011 (Vol. 2) 15:9-16:3

10  (Larian Testimony).

11

12      55.  Kohl's recognized that the Bratz products were not selling well as early

13  as August 2004, when Kohl's asked MGA provide markdown dollars for Fall 2003

14  items that were not selling. MGA refused.  TX 24335; 3/25/11 Trial Tr. Vol. 1

15  (Larian) at 18:13- 21:4.

16      **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

17  by the record, false, and irrelevant.  Kohl's, like all retailers, asked MGA for more

18  favorable terms, and made assertions regarding sales in order to further such

19  negotiations.  3/25/2011 (Vol. 1) 33:24-34:6 (Larian Testimony); 3/25/2011 (Vol.

20  2) 15:9-16:3 (Larian Testimony).  Moreover, MGA engaged in good faith

21  negotiations with Kohl's regarding the purchase of future Bratz products.  See, e.g.,

22  TX 24354, 24357, TX 24358; see also Mattel's Proposed Finding of Fact Nos. 55-

23  61, 64-69.  However, the evidence establishes that MGA was prevented from

24  maintaining its four feet of shelf space due to Mattel's agreement to illegally pay

25  Kohl's $1.25 million to exclude MGA products from that space.  TX 26612

26  (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment

27  to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's

28  planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

56.  As of September 2004, Kohl's again asked for approximately $60,000 in markdown dollars to offset the losses that it was taking on the Bratz products. MGA again refused.  TX 24336; 3/25/11 Trial Tr. Vol. 1 (Larian) at 21:5-23:18.

**MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported by the record and irrelevant.  Kohl's, like all retailers, asked MGA for more favorable terms, and made assertions regarding sales in order to further such negotiations.  3/25/2011 (Vol. 1) 33:24-34:6 (Larian Testimony); 3/25/2011 (Vol. 2) 15:9-16:3 (Larian Testimony).  Moreover, MGA engaged in good faith negotiations with Kohl's regarding the purchase of future Bratz products.  *See, e.g.*, TX 24354, 24357, TX 24358; *see also* Mattel's Proposed Finding of Fact Nos. 55-61, 64-69.  However, the evidence establishes that MGA was prevented from maintaining its four feet of shelf space due to Mattel's agreement to illegally pay Kohl's $1.25 million to exclude MGA products from that space.  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

57.  As of November 2004, Kohl's losses continued to grow and it anticipated missing expected Bratz product sales by 70 percent, resulting in expected margin losses totaling $372,000 by that time.  TX 24338; 3/25/11 Trial Tr. Vol. 1 (Larian) at 24:19- 26:16.

**MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported by the record and irrelevant.  Kohl's, like all retailers, asked MGA for more

favorable terms, and made assertions regarding sales in order to further such negotiations.  3/25/2011 (Vol. 1) 33:24-34:6 (Larian Testimony); 3/25/2011 (Vol. 2) 15:9-16:3 (Larian Testimony).

58.  In December 2004, Mr. Hein, of The Northern Group, forwarded to Holly Chabot, at MGA, an e-mail from Kohl's merchandise planner for toys, Alan Anker.  Mr. Hein detailed Kohl's "bleak" forecasted sales, markdowns, and year-end financial results for Bratz products, writing that "This obviously will affect our business in 2005, but to what extent will depend on what we can do to help the situation.  The buyer is anxious to find out the status on the advertising help that we discussed."  TX 24339, 3/25/11 Trial Tr. Vol. 1 (Larian) at 26:17-29:1.

**MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported by the record.  Kohl's, like all retailers, asked MGA for more favorable terms, and made assertions regarding sales in order to further such negotiations.  3/25/2011 (Vol. 1) 33:24-34:6 (Larian Testimony); 3/25/2011 (Vol. 2) 15:9-16:3 (Larian Testimony).  Moreover, MGA engaged in good faith negotiations with Kohl's regarding the purchase of future Bratz products.  *See, e.g.*, TX 24354, 24357, TX 24358; *see also* Mattel's Proposed Finding of Fact Nos. 55-61, 64-69.  However, the evidence establishes that MGA was prevented from maintaining its four feet of shelf space due to Mattel's agreement to illegally pay Kohl's $1.25 million to exclude MGA products from that space.  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

59.  Through late December 2004, MGA continued to discuss internally Kohl's requests for financial assistance to offset its increasing losses on Bratz

1    products.

2        **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

3    and irrelevant.  MGA engaged in good faith negotiations with Kohl's regarding the

4    purchase of future Bratz products.  *See, e.g.*, TX 24354, 24357, TX 24358; *see also*

5    Mattel's Proposed Finding of Fact Nos. 55-61, 64-69.  However, the evidence

6    establishes that MGA was prevented from maintaining its four feet of shelf space

7    due to Mattel's agreement to illegally pay Kohl's $1.25 million to exclude MGA

8    products from that space.  TX 26612 (Zablow email re "Great News BARBIE");

9    TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113

10   (Kohl's email offering Mattel MGA's planogram space for money); TX 24004

11   (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement);

12   3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

13

14       60.  A December 16, 2004 e-mail from Mr. Hein to Ms. Chabot reads that

15   Kohl's requested $1 million from MGA in order to offset the estimated shortfall of

16   $1.87 million in gross margin dollars. Mr. Hein wrote:

17           The buyer made it clear that he needs the help he has requested to
             get the margin up to 12 % so he can proceed with MGA in 2005.
18           They are currently preparing orders for the 47 new stores opening
             in March-April and they're awaiting our decision before placing the
19           orders.  Kohl's does business with a very limited list of toy vendors
             because their depts. are so small and we have become a key vendor
20           in a very short time period.  Our decision on this request from
             Kohl's is very important to the future of our relationship.
21

22   TX 24342; 3/25/11 Trial Tr. Vol. 1 (Larian) at 29:2-17, 31:4-33:23.

23

24       **MGA OBJECTIONS:**  MGA objects to this proposed fact as irrelevant.

25   Kohl's, like all retailers, asked MGA for more favorable terms, and made assertions

26   regarding sales in order to further such negotiations.  3/25/2011 (Vol. 1) 33:24-34:6

27   (Larian Testimony); 3/25/2011 (Vol. 2) 15:9-16:3 (Larian Testimony).  Moreover,

28   MGA engaged in good faith negotiations with Kohl's regarding the purchase of

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   future Bratz products.  However, the evidence establishes that MGA was prevented

2   from maintaining its four feet of shelf space due to Mattel's agreement to illegally

3   pay Kohl's $1.25 million to exclude MGA products from that space.  TX 26612

4   (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment

5   to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's

6   planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX

7   24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

8   (Vollero Testimony).

9

10      61.  Similarly, a later December 17, 2004 e-mail from Ms. Chabot to Ron

11   Brawer and Lisa Saunders regarding Kohl's request reads that Kohl's was

12   "currently selling the dolls at 40% below . . . They are moving slowly—on an

13   average of 3% a week before last week."  TX 24346; 3/25/11 Trial Tr. Vol. 1

14   (Larian) at 34:11-35:1.

15      **MGA OBJECTIONS:**  MGA objects to this proposed fact as irrelevant.

16   Kohl's, like all retailers, asked MGA for more favorable terms, and made assertions

17   regarding sales in order to further such negotiations.  3/25/2011 (Vol. 1) 33:24-34:6

18   (Larian Testimony); 3/25/2011 (Vol. 2) 15:9-16:3 (Larian Testimony).  Moreover,

19   MGA engaged in good faith negotiations with Kohl's regarding the purchase of

20   future Bratz products.  See, e.g., TX 24354, 24357, TX 24358; see also Mattel's

21   Proposed Finding of Fact Nos. 55-61, 64-69.  However, the evidence establishes

22   that MGA was prevented from maintaining its four feet of shelf space due to

23   Mattel's agreement to illegally pay Kohl's $1.25 million to exclude MGA products

24   from that space.  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112

25   (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's

26   email offering Mattel MGA's planogram space for money); TX 24004 (2005

27   Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011

28   (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1

2        62.  Rather than addressing Kohl's losses on the Bratz dolls, on December

3   19, 2004 Mr. Larian conditioned any assistance to Kohl's on Kohl's agreement to

4   purchase more non-performing Bratz dolls.  He wrote, "Get him to buy our Casino

5   Line and CE line and we will give let [sic] him take $550,000 at 10% of 2005

6   purchases (e.g. buy $5.5 million to get it)."  TX 24347; 3/25/11 Trial Tr. Vol. 1

7   (Larian) at 35:2-36:14.

8        **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

9   by the record and false.  Kohl's, like all retailers, asked MGA for more favorable

10  terms, and made assertions regarding sales in order to further such negotiations.

11  3/25/2011 (Vol. 1) 33:24-34:6 (Larian Testimony); 3/25/2011 (Vol. 2) 15:9-16:3

12  (Larian Testimony).  Moreover, MGA engaged in good faith negotiations with

13  Kohl's regarding the purchase of future Bratz products.  See, e.g., TX 24354,

14  24357, TX 24358; see also Mattel's Proposed Finding of Fact Nos. 55-61, 64-69.

15  However, the evidence establishes that MGA was prevented from maintaining its

16  four feet of shelf space due to Mattel's agreement to illegally pay Kohl's $1.25

17  million to exclude MGA products from that space.  TX 26612 (Zablow email re

18  "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz

19  shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for

20  money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-

21  Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

22

23       63.  Mr. Larian never called anyone at Kohl's to address the deterioration of

24  MGA's relationship with Kohl's based on the poor performance of the Bratz dolls.

25  3/25/11 Trial Tr. Vol. 1 (Larian) at 36:21-25.

26       **MGA OBJECTIONS:**  MGA objects to this proposed fact as irrelevant and

27  unsupported by the record with respect to the assertion that MGA's relationship

28  with Kohl's "deteriorate[ed] . . . based on the poor performance of the Bratz dolls."

1  Kohl's, like all retailers, asked MGA for more favorable terms, and made assertions

2  regarding sales in order to further such negotiations.  3/25/2011 (Vol. 1) 33:24-34:6

3  (Larian Testimony); 3/25/2011 (Vol. 2) 15:9-16:3 (Larian Testimony).  Moreover,

4  MGA engaged in good faith negotiations with Kohl's regarding the purchase of

5  future Bratz products.  See, e.g., TX 24354, 24357, TX 24358; see also Mattel's

6  Proposed Finding of Fact Nos. 55-61, 64-69.  However, the evidence establishes

7  that MGA was prevented from maintaining its four feet of shelf space due to

8  Mattel's agreement to illegally pay Kohl's $1.25 million to exclude MGA products

9  from that space.  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112

10 (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's

11 email offering Mattel MGA's planogram space for money); TX 24004 (2005

12 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011

13 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

14

15      64.  MGA and Kohl's reached no agreement at that time, and Kohl's

16 continued to negotiate with MGA in 2005.

17      **MGA OBJECTIONS:**  MGA objects to this proposed fact as irrelevant.

18 MGA engaged in good faith negotiations with Kohl's regarding the purchase of

19 future Bratz products.  However, the evidence establishes that MGA was prevented

20 from maintaining its four feet of shelf space due to Mattel's agreement to illegally

21 pay Kohl's $1.25 million to exclude MGA products from that space.  TX 26612

22 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment

23 to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's

24 planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX

25 24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

26 (Vollero Testimony).

27

28      65.  For example, on September 20, 2005, Kohl's wrote to MGA and the

1 Northern Group: "Attached is a brief spreadsheet detailing the margin deficit in

2 2004 and the markdowns we had taken on Bratz in Spring 2005. Overall we were

3 about $1MM in cost dollars short of making our margin plan with Bratz." TX

4 24354-00006; 3/25/11 Trial Tr. Vol. 1 (Larian) at 38:13-40:1.

5 **MGA OBJECTIONS:** MGA objects to this proposed fact as irrelevant.

6 Kohl's, like all retailers, asked MGA for more favorable terms, and made assertions

7 regarding sales in order to further such negotiations. 3/25/2011 (Vol. 1) 33:24-34:6

8 (Larian Testimony); 3/25/2011 (Vol. 2) 15:9-16:3 (Larian Testimony). Moreover,

9 MGA engaged in good faith negotiations with Kohl's regarding the purchase of

10 future Bratz products. See, e.g., TX 24354, 24357, TX 24358; see also Mattel's

11 Proposed Finding of Fact Nos. 55-61, 64-69. However, the evidence establishes

12 that MGA was prevented from maintaining its four feet of shelf space due to

13 Mattel's agreement to illegally pay Kohl's $1.25 million to exclude MGA products

14 from that space. TX 26612 (Zablow email re "Great News BARBIE"); TX 37112

15 (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's

16 email offering Mattel MGA's planogram space for money); TX 24004 (2005

17 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011

18 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

19

20 66. In October 2005, Mr. Larian was not willing to approach the amount of

21 markdown assistance that Kohl's was asking for. TX 24354; 3/25/11 Trial Tr. Vol.

22 1 (Larian) at 41:21-43:2.

23 **MGA OBJECTIONS:** MGA objects to this proposed fact as unsupported

24 by the record and false. Kohl's, like all retailers, asked MGA for more favorable

25 terms, and made assertions regarding sales in order to further such negotiations.

26 3/25/2011 (Vol. 1) 33:24-34:6 (Larian Testimony); 3/25/2011 (Vol. 2) 15:9-16:3

27 (Larian Testimony). Moreover, MGA engaged in good faith negotiations with

28 Kohl's regarding the purchase of future Bratz products. See, e.g., TX 24354,

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1 | 24357, TX 24358; see also Mattel's Proposed Finding of Fact Nos. 55-61, 64-69.

2 | However, the evidence establishes that MGA was prevented from maintaining its

3 | four feet of shelf space due to Mattel's agreement to illegally pay Kohl's $1.25

4 | million to exclude MGA products from that space.  TX 26612 (Zablow email re

5 | "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz

6 | shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for

7 | money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-

8 | Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

10 |     67.  On November 2, 2005, Mr. Goodman sent MGA's Karen Quadrio an

11 | email regarding a conversation with Kohl's buyer Jen Serra. Mr. Goodman wrote:

12 | "While the buy in $$ was an important piece of the puzzle, Kohls larger concern is

13 | that both sides are able to come together with a business plan that accommodates

14 | Kohl's margins [sic] needs."  TX 24357; 3/25/11 Trial Tr. Vol. 1 (Larian) at 43:3-

15 | 44:3.

16 |     **MGA OBJECTIONS:**  MGA objects to this proposed fact as irrelevant.

17 | Kohl's, like all retailers, asked MGA for more favorable terms, and made assertions

18 | regarding sales in order to further such negotiations.  3/25/2011 (Vol. 1) 33:24-34:6

19 | (Larian Testimony); 3/25/2011 (Vol. 2) 15:9-16:3 (Larian Testimony).  Moreover,

20 | MGA engaged in good faith negotiations with Kohl's regarding the purchase of

21 | future Bratz products.  See, e.g., TX 24354, 24357, TX 24358; see also Mattel's

22 | Proposed Finding of Fact Nos. 55-61, 64-69.  However, the evidence establishes

23 | that MGA was prevented from maintaining its four feet of shelf space due to

24 | Mattel's agreement to illegally pay Kohl's $1.25 million to exclude MGA products

25 | from that space.  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112

26 | (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's

27 | email offering Mattel MGA's planogram space for money); TX 24004 (2005

28 | Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

2

3       68.  MGA tried to set up a meeting with Kohl's for December 2005 but no

4   meeting occurred because MGA was still unwilling to address Kohl's losses on the

5   Bratz dolls.  On November 22, 2005, Mr. Goodman wrote to Ms. Quadrio:

6           Kohls is not going to give MGA an appt in December. Jen said that
            without a substantial change/increase in the dollar buy-in and
7           program margins they are not going to be able to move forward.  I
            have talked to her several times since NY about the next step and in
8           person a couple of times and she has made it clear that Kohls feels
            strongly about their position they laid out to us last month and at
9           this point feel MGA is the one that must decide if they want to have
            a presence in the toy department.  It looks like the lines have been
10          drawn.

11  TX 24358; 3/25/11 Trial Tr. Vol. 1 (Larian) at 44:8-46:6.

12      **MGA OBJECTIONS:**  MGA objects to this proposed fact irrelevant.

13  Kohl's, like all retailers, asked MGA for more favorable terms, and made assertions

14  regarding sales in order to further such negotiations.  3/25/2011 (Vol. 1) 33:24-34:6

15  (Larian Testimony); 3/25/2011 (Vol. 2) 15:9-16:3 (Larian Testimony).  Moreover,

16  MGA engaged in good faith negotiations with Kohl's regarding the purchase of

17  future Bratz products.  See, e.g., TX 24354, 24357, TX 24358; see also Mattel's

18  Proposed Finding of Fact Nos. 55-61, 64-69.  However, the evidence establishes

19  that MGA was prevented from maintaining its four feet of shelf space due to

20  Mattel's agreement to illegally pay Kohl's $1.25 million to exclude MGA products

21  from that space.  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112

22  (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's

23  email offering Mattel MGA's planogram space for money); TX 24004 (2005

24  Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011

25  (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

26

27      69.  Later that day, Ms. Quadrio asked Mr. Larian for approval to offer

28  Kohl's a proposal that would require Kohl's to buy $2.5 million of Bratz products

1   from MGA against a $250,000 credit allowance.  TX 24358; 3/25/11 Trial Tr. Vol.

2   1 (Larian) at 46:7- 16.

3   **MGA OBJECTIONS:**  MGA objects to this proposed fact as irrelevant.

4   Kohl's, like all retailers, asked MGA for more favorable terms, and made assertions

5   regarding sales in order to further such negotiations.  3/25/2011 (Vol. 1) 33:24-34:6

6   (Larian Testimony); 3/25/2011 (Vol. 2) 15:9-16:3 (Larian Testimony).  Moreover,

7   MGA engaged in good faith negotiations with Kohl's regarding the purchase of

8   future Bratz products.  See, e.g., TX 24354, 24357, TX 24358; see also Mattel's

9   Proposed Finding of Fact Nos. 55-61, 64-69.  However, the evidence establishes

10  that MGA was prevented from maintaining its four feet of shelf space due to

11  Mattel's agreement to illegally pay Kohl's $1.25 million to exclude MGA products

12  from that space.  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112

13  (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's

14  email offering Mattel MGA's planogram space for money); TX 24004 (2005

15  Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011

16  (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

17

18  70.  Mr. Larian responded to Ms. Quadrio, "Yes. Go ahead.  If they still say

19  no, fuck'm.  I don't want them at our showroom."  TX 24358; 3/25/11 Trial Tr.

20  Vol. 1 (Larian) at 46:17-47:1.

21  **MGA OBJECTIONS:**  MGA objects to this proposed fact as irrelevant.

22  Kohl's, like all retailers, asked MGA for more favorable terms, and made assertions

23  regarding sales in order to further such negotiations.  3/25/2011 (Vol. 1) 33:24-34:6

24  (Larian Testimony); 3/25/2011 (Vol. 2) 15:9-16:3 (Larian Testimony).  Moreover,

25  MGA engaged in good faith negotiations with Kohl's regarding the purchase of

26  future Bratz products.  See, e.g., TX 24354, 24357, TX 24358; see also Mattel's

27  Proposed Finding of Fact Nos. 55-61, 64-69.  However, the evidence establishes

28  that MGA was prevented from maintaining its four feet of shelf space due to

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   Mattel's agreement to illegally pay Kohl's $1.25 million to exclude MGA products

2   from that space.  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112

3   (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's

4   email offering Mattel MGA's planogram space for money); TX 24004 (2005

5   Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011

6   (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

7

8       71.  Despite MGA's refusal to meet Kohl's request for over $1 million from

9   MGA to offset losses from poorly selling Bratz dolls, Kohl's continued to sell

10   MGA products, including Bratz products.

11   **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

12   and misleading.  Mattel cites no evidence in support of this purported fact, nor

13   could it.  The undisputed evidence shows that Kohl's did not purchase any new

14   Bratz products from MGA in 2005 and 2006, as a result of Mattel's agreement with

15   Kohl's that, in exchange for $1.25 million, Mattel would occupy all eight feet of

16   shelf space in Kohl's toy department set aside for fashion dolls, including four feet

17   previously allocated to MGA's Bratz dolls.  TX 26612 (Zablow email re "Great

18   News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf

19   space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for

20   money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-

21   Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  The

22   evidence further establishes that in 2005 and 2006 Kohl's purchased no Bratz dolls

23   from MGA for sale in its toy department (or elsewhere).  3/24/2011 (Vol. 2) Tr.

24   162:14-163:5 (Larian Testimony); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero

25   Testimony).

26

27       72.  MGA products were not excluded from Kohl's stores. MGA products,

28   including Bratz product, were continuously on sale to consumers in Kohl's stores

1    from 2004 through 2006.  4/6/11 Trial Tr. Vol. 3 (Scholvin) at 69:18-70:5.

2        **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

3    and misleading.  The undisputed evidence shows that Kohl's did not purchase any

4    new Bratz products from MGA in 2005 and 2006, as a result of Mattel's agreement

5    with Kohl's that, in exchange for $1.25 million, Mattel would occupy all eight feet

6    of shelf space in Kohl's toy department set aside for fashion dolls, including four

7    feet previously allocated to MGA's Bratz dolls.  TX 26612 (Zablow email re "Great

8    News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf

9    space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for

10   money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-

11   Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  Ms.

12   Scholvin's testimony does not establish that Bratz products were continuously on

13   sale to customers in Kohl's stores from 2004 to 2006.  The evidence establishes that

14   in 2005 and 2006 Kohl's purchased no Bratz dolls from MGA for sale in its toy

15   department (or elsewhere).  3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian

16   Testimony); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  Moreover,

17   Mattel's own emails indicate the importance of having a presence in (or being

18   excluded from) the toy department.  TX 26612 (Zablow email re "Great News

19   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

20   *see also* TX 37113 (Kohl's email offering Mattel MGA's planogram space for

21   money).

22

23        73.  MGA's daily ship report for the month ending October 2006 shows that

24   MGA invoiced Kohl's for $1,254,000 worth of products, including Little Tikes,

25   Bratz and other MGA products, as of October 1, 2006.  TX 24747; 3/25/11 Trial Tr.

26   Vol. 1 (Larian) at 53:20-54:24.

27        **MGA OBJECTIONS:**  MGA objects to this proposed fact as false.  As

28   Mattel is well aware, MGA did not own Little Tikes in October 2006.  2/10/2011

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    (Vol. 2) Tr. 33:21-34:7 (Larian Testimony), 3/8/2011 (Vol. 1) Tr. 96:11-25

2    (Wagner testimony) 3/24/2011 (Vol. 2) Tr. 139:13-16 (Larian Testimony),

3    3/25/2011 (Vol. 2) Tr. 14:1-24, 53:6-13 (Larian Testimony), 3/30/2011 (Vol. 2) Tr.

4    46:25-47:6, 47:24-48:4 (Hauenstein Testimony).  Accordingly, any sales to Kohl's

5    for Little Tikes products in 2006 were not MGA sales, but rather Little Tikes sales.

6    3/25/2011 (Vol. 2) Tr. 14:1-24 (Larian).  As Mr. Larian testified at trial, Little Tikes

7    previous sales records were incorporated in MGA's system after MGA purchased

8    Little Tikes.  *Id.*  However, the incorporation of these Little Tikes sales figures into

9    MGA's system does not change the fact that Little Tikes sales prior to being

10   purchased by MGA were not MGA sales, let alone Bratz sales.  Mattel's repeated

11   attempts to distort this data cannot change the fact that these sales are Little Tikes'

12   sales.  The evidence establishes that in 2005 and 2006 Kohl's purchased no Bratz

13   dolls from MGA for sale in its toy department (or elsewhere).  3/24/2011 (Vol. 2)

14   Tr. 162:14-163:5 (Larian Testimony); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero

15   Testimony).

16

17        74.  The same report shows the total amount MGA invoiced to Kohl's in

18   2006 was $5,911,677.  TX 24747; 3/25/11 Trial Tr. Vol. 1 (Larian) at 54:25-55:16.

19        **MGA OBJECTIONS:**  MGA objects to this proposed fact as false.  As

20   Mattel is well aware, MGA did not own Little Tikes in October 2006.  2/10/2011

21   (Vol. 2) Tr. 33:21-34:7 (Larian Testimony), 3/8/2011 (Vol. 1) Tr. 96:11-25

22   (Wagner testimony) 3/24/2011 (Vol. 2) Tr. 139:13-16 (Larian Testimony),

23   3/25/2011 (Vol. 2) Tr. 14:1-24, 53:6-13 (Larian Testimony), 3/30/2011 (Vol. 2) Tr.

24   46:25-47:6, 47:24-48:4 (Hauenstein Testimony).  Accordingly, any sales to Kohl's

25   for Little Tikes products in 2006 were not MGA sales, but rather Little Tikes sales.

26   3/25/2011 (Vol. 2) Tr. 14:1-24 (Larian).  As Mr. Larian testified at trial, Little Tikes

27   previous sales records were incorporated in MGA's system after MGA purchased

28   Little Tikes.  *Id.*  However, the incorporation of these Little Tikes sales figures into

1   MGA's system does not change the fact that Little Tikes sales prior to being

2   purchased by MGA were not MGA sales, let alone Bratz sales.  Mattel's repeated

3   attempts to distort this data cannot change the fact that these sales are Little Tikes'

4   sales.  The evidence establishes that in 2005 and 2006 Kohl's purchased no Bratz

5   dolls from MGA for sale in its toy department (or elsewhere).  3/24/2011 (Vol. 2)

6   Tr. 162:14-163:5 (Larian Testimony); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero

7   Testimony).

8

9        75.  A November 28, 2007 e-mail from Ms. Quadrio to Mr. Larian reports

10   that sales of MGA products at Kohl's for Thanksgiving weekend was $1,044,000

11   for 2006 and $1,500,000 for 2007. TX 24719; 3/25/11 Trial Tr. Vol. 1 (Larian) at

12   49:2-52:10.

13        **MGA OBJECTIONS:**  MGA objects to this proposed fact as false and

14   misleading.  As Mattel is well aware, MGA did not own Little Tikes in October

15   2006.  2/10/2011 (Vol. 2) Tr. 33:21-34:7 (Larian Testimony), 3/8/2011 (Vol. 1) Tr.

16   96:11-25 (Wagner testimony) 3/24/2011 (Vol. 2) Tr. 139:13-16 (Larian

17   Testimony), 3/25/2011 (Vol. 2) Tr. 14:1-24, 53:6-13 (Larian Testimony), 3/30/2011

18   (Vol. 2) Tr. 46:25-47:6, 47:24-48:4 (Hauenstein Testimony).  Accordingly, any

19   sales to Kohl's for Little Tikes products in 2006 were not MGA sales, but rather

20   Little Tikes sales.  3/25/2011 (Vol. 2) Tr. 14:1-24 (Larian).  As Mr. Larian testified

21   at trial, Little Tikes previous sales records were incorporated in MGA's system

22   after MGA purchased Little Tikes.  *Id.*  However, the incorporation of these Little

23   Tikes sales figures into MGA's system does not change the fact that Little Tikes

24   sales prior to being purchased by MGA were not MGA sales, let alone Bratz sales.

25   Mattel's repeated attempts to distort this data cannot change the fact that these sales

26   are Little Tikes' sales.  The evidence establishes that in 2005 and 2006 Kohl's

27   purchased no Bratz dolls from MGA for sale in its toy department (or elsewhere).

28   3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian Testimony); 3/29/2011 (Vol. 1) Tr.

MGA PARTIES' OBJECTIONS TO MATTEL'S
                                                      PROPOSED FINDINGS OF FACT AND LAW
                                                      CV-04-9049 DOC (RNBx)

1  121:22-122:1 (Vollero Testimony).

2

3       76. Mr. Maskell, the Kohl's buyer, had told Ms. Scholvin on several

4  occasions that Bratz products were performing poorly at Kohl's.  4/6/11 Trial Tr.

5  Vol. 3 (Scholvin) at 82:13-20.

6       **MGA OBJECTIONS:**  MGA objects to this proposed fact as based wholly

7  on hearsay.  Mattel's reliance on out-of-court statements by Kohl's representatives

8  is misplaced, as such comments are hearsay and not admissible for the truth of the

9  matter asserted.  4/6/11 (Vol. 3) Tr. 82:12-83:4 (Scholvin Testimony) (J. Carter

10  specifically overruling hearsay objection based on assertion from Mattel's counsel

11  that the statement goes to "State of mind, your Honor.").  The Court was clear in its

12  limitation of the admissibility of emails from Kohl's buyers as admissible only for

13  state of mind.  *Id.*

14

15       77. Because it was losing money on Bratz products, had Bratz products from

16  2004 that it had to sell, and Kohl's did not view MGA's responses to Kohl's losses

17  as meaningful, Kohl's decided by December 2004 not to purchase additional Bratz

18  products from MGA for 2005 but instead to continue to sell its existing Bratz

19  inventory.  TX 24358; 3/25/11 Trial Tr. Vol. 1 (Larian) at 44:8-47:1; 4/6/11 Trial

20  Tr. Vol. 3 (Scholvin) at 80:17-81:5.

21       **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

22  and speculative.  No one from Kohl's testified at trial.  Thus, there is no evidence in

23  the record that can support Mattel's assumption about Kohl's decision making

24  process regarding purchasing toys.  Kohl's, like all retailers, asked MGA for more

25  favorable terms, and made assertions regarding sales in order to further such

26  negotiations.  3/25/2011 (Vol. 1) 33:24-34:6 (Larian Testimony); 3/25/2011 (Vol.

27  2) 15:9-16:3 (Larian Testimony).  With this fact, Mattel is trying to avoid the

28  import of its agreement with Kohl's that, in exchange for $1.25 million, Mattel

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    would receive MGA's shelf space in the fashion doll section of Kohl's toy

2    departments.  Such an agreement is unlawful.  TX 26612 (Zablow email re "Great

3    News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf

4    space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for

5    money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-

6    Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

7    Moreover, Mattel's representation that "Kohl's decided by December 2004 not to

8    purchase additional Bratz products from MGA for 2005 but instead to continue to

9    sell its existing Bratz inventory" is contradicted by the evidence.  For example,

10   Mattel's own internal emails indicate that Mattel believed that Kohl's was still

11   negotiating with MGA at the same time it was negotiating with Mattel.  TX 37112

12   (Spalding email re payment to Kohl's for Bratz shelf space, indicating that a timely

13   response was necessary or Kohl's would keep the "competition").  The statement in

14   this finding of fact that "Kohl's decided by December 2004 not to purchase

15   additional Bratz products from MGA for 2005" is directly contracted by Mattel's

16   Proposed Finding of Fact Nos. 59-61, 64-70.

17

18       78.  On December 16, 2004, after Kohl's made that decision, Kohl's buyer

19   Tom Maskell approached Mattel's sales representative for Kohl's, Julie Scholvin,

20   to discuss a potential business opportunity that would increase shelf space that

21   Kohl's provided for BARBIE products.  TX 37113; 4/6/11 Trial Tr. Vol. 3

22   (Scholvin) at 65:6-12.

23       **MGA OBJECTIONS:**  MGA objects to the statement "after Kohl's made

24   that decision" in the proposed fact as unsupported by the evidence.  For example,

25   Mattel's own internal emails indicate that Mattel believed that Kohl's was still

26   negotiating with MGA at the same time it was negotiating with Mattel.  TX 37112

27   (Spalding email re payment to Kohl's for Bratz shelf space, indicating that a timely

28   response was necessary or Kohl's would keep the "competition").  With this fact,

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   Mattel is trying to avoid the import of its agreement with Kohl's that, in exchange

2   for $1.25 million, Mattel would receive MGA's shelf space in the fashion doll

3   section of Kohl's toy departments.  Such an agreement is unlawful despite the

4   euphemistic and vague term "potential business opportunity that would increase

5   shelf space."  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112

6   (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's

7   email offering Mattel MGA's planogram space for money); TX 24004 (2005

8   Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011

9   (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  The statement in this finding of

10  fact that Kohl's decided to not to purchase additional Bratz products prior to

11  December 16, 2004 is directly contracted by Mattel's Proposed Finding of Fact

12  Nos. 59-61, 64-70.

13

14       79.  It was Kohl's idea, not Mattel's, to offer additional shelf space to Mattel

15  for BARBIE.  TX 37113; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 67:13-68:8.

16       **MGA OBJECTIONS:**  MGA objects to this proposed fact as irrelevant.

17  With this fact, Mattel is trying to avoid the import of its agreement with Kohl's

18  that, in exchange for $1.25 million, Mattel would receive MGA's shelf space in the

19  fashion doll section of Kohl's toy departments.  Such an agreement is unlawful

20  despite the euphemistic and vague term "potential business opportunity that would

21  increase shelf space."  TX 26612 (Zablow email re "Great News BARBIE"); TX

22  37112 (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113

23  (Kohl's email offering Mattel MGA's planogram space for money); TX 24004

24  (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement);

25  3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

26

27       80.  In connection with this, Kohl's sought Mattel's help with markdowns on

28  Bratz products that Kohl's had purchased from MGA but was unable to sell as of

- 39 -

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    that time.  TX 37113; 4/4/11 Trial Tr. Vol. 1 (Eckert) at 92:13-95:7.

2      **MGA OBJECTIONS:**  MGA objects to this proposed fact as irrelevant and

3    misleading.  With this fact, Mattel is trying to avoid the import of its agreement

4    with Kohl's that, in exchange for $1.25 million, Mattel would receive MGA's shelf

5    space in the fashion doll section of Kohl's toy departments.  Such an agreement is

6    unlawful despite the euphemistic and vague term "help with markdowns."  TX

7    26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re

8    payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel

9    MGA's planogram space for money); TX 54004 (2005 Mattel-Kohl's agreement);

10    TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

11    (Vollero Testimony).

12

13      81.  At the time of Mattel's negotiations with Kohl's, Mattel was unaware of

14    the history between MGA and Kohl's and their email exchanges introduced at trial.

15    4/4/11 Trial Tr. Vol. 2 (Eckert) at 5:23-6:5.

16      **MGA OBJECTIONS:**  MGA objects to this proposed fact as contradicted

17    by the evidence and irrelevant.  Mattel's internal emails indicated that it was aware

18    of ongoing negotiations between Kohl's and MGA.  TX 37112.  Any disavowal of

19    knowledge of such negotiations by Mr. Eckert, who was not personally involved in

20    Mattel's negotiations with Kohl's, should be given little weight.  With this fact,

21    Mattel is trying to avoid the import of its agreement with Kohl's that, in exchange

22    for $1.25 million, Mattel would receive MGA's shelf space in the fashion doll

23    section of Kohl's toy departments.  Such an agreement is unlawful.  TX 26612

24    (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment

25    to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's

26    planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX

27    24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

28    (Vollero Testimony).

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1

2          84.  The 2005 and 2006 contracts are a promotional type program that

3  provides Kohl's with funds to promote, display and sell Mattel products.  TX

4  24004; TX 24005; 4/4/11 Trial Tr. Vol. 1 (Eckert) at 87:7-90:3.

5          **MGA OBJECTIONS:**  MGA objects to this proposed fact as false and

6  misleading.  As is reflected in Mattel's own correspondence, the agreement at issue

7  was intended to exclude Bratz from the shelves of the toy department at Kohl's.

8  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re

9  payment to Kohl's for Bratz shelf space); *see also* TX 37113 (Kohl's email offering

10  Mattel MGA's planogram space for money).  With this fact, Mattel is trying to

11  avoid the import of its agreement with Kohl's that, in exchange for $1.25 million,

12  Mattel would receive MGA's shelf space in the fashion doll section of Kohl's toy

13  departments.  Such an agreement is unlawful despite the euphemistic and vague

14  term "potential business opportunity that would increase shelf space."  TX 26612

15  (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment

16  to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's

17  planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX

18  24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

19  (Vollero Testimony).

20

21          88.  Nothing in the contracts between Kohl's and Mattel reflects payment of

22  a "slotting fee" to Kohl's.  TX 24004; TX 24005; 3/29/11 Trial Tr. Vol. 1 (Vollero)

23  at 132:23-133:1.  Mattel did not pay Kohl's a "slotting fee" for shelf space. 3/29/11

24  Trial Tr. Vol. 1 (Vollero) at 120:15-17.

25          **MGA OBJECTIONS:**  MGA objects to this proposed fact as false and

26  misleading.  With this fact, Mattel is trying to avoid the import of its agreement

27  with Kohl's that, in exchange for $1.25 million, Mattel would receive MGA's shelf

28  space in the fashion doll section of Kohl's toy departments.  Such an agreement is

1   unlawful.  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112

2   (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's

3   email offering Mattel MGA's planogram space for money); TX 24004 (2005

4   Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011

5   (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  Moreover, Mattel's own

6   communications reflect its understanding that MGA's Bratz product would be

7   excluded from the toy department for 2005 and 2006 as a result of Mattel's

8   agreement with Kohl's.  TX 26612 (Zablow email re "Great News BARBIE"); TX

9   37112 (Spalding email re payment to Kohl's for Bratz shelf space); *see also* TX

10  37113 (Kohl's email offering Mattel MGA's planogram space for money).  MGA

11  also objects to Mattel's use of the term "slotting fee" without defining it as vague.

12

13      89.  Mattel never pressured Kohl's to exclude Bratz from its stores in 2005 or

14  2006.  3/29/11 Trial Tr. Vol. 1 (Vollero) at 118:3-6, 118:10-12, 118:21-119:9,

15  119:25- 120:9.

16      **MGA OBJECTIONS:**  MGA objects to this proposed fact as false and

17  misleading.  MGA objects to Mattel's use of the term "pressured Kohl's" as vague.

18  Mattel paid Kohl's $1.25 million to exclude MGA's Bratz dolls from the toy

19  department in 2005 and 2006.  TX 26612 (Zablow email re "Great News

20  BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

21  TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

22  24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

23  agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  Moreover,

24  Mattel's own communications reflect its understanding that MGA's Bratz product

25  would be excluded from the toy department for 2005 and 2006 as a result of

26  Mattel's agreement with Kohl's.  TX 26612 (Zablow email re "Great News

27  BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

28  *see also* TX 37113 (Kohl's email offering Mattel MGA's planogram space for

1    money).

2

3        90.  Mattel did not pay Kohl's to keep Bratz products out of Kohl's stores.

4    3/29/11 Trial Tr. Vol. 1 (Vollero) at 120:18-20; 4/4/11 Trial Tr. Vol. 1 (Eckert) at

5    51:18- 52:1, 58:9-59:11, 59:22-60:2.

6        **MGA OBJECTIONS:**  MGA objects to this proposed fact as false and

7    misleading.  Mattel paid Kohl's $1.25 million to exclude MGA's Bratz dolls from

8    the toy department in 2005 and 2006.  TX 26612 (Zablow email re "Great News

9    BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

10   TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

11   24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

12   agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  Moreover,

13   Mattel's own communications reflect its understanding that MGA's Bratz product

14   would be excluded from the toy department for 2005 and 2006 as a result of

15   Mattel's agreement with Kohl's.  TX 26612 (Zablow email re "Great News

16   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

17   *see also* TX 37113 (Kohl's email offering Mattel MGA's planogram space for

18   money).

19

20       91.  Mattel never understood that it would be able to exclude Bratz from

21   Kohl's for two years by pressuring Kohl's.  3/29/11 Trial Tr. Vol. 1 (Vollero) at

22   118:3-6.

23       **MGA OBJECTIONS:**  MGA objects to this proposed fact as false and

24   misleading.  MGA objects to Mattel's use of the term "pressuring Kohl's" as vague.

25   Mattel paid Kohl's $1.25 million to exclude MGA's Bratz dolls from the toy

26   department in 2005 and 2006.  TX 26612 (Zablow email re "Great News

27   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

28   TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

2   agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  Moreover,

3   Mattel's own communications reflect its understanding that MGA's Bratz product

4   would be excluded from the toy department for 2005 and 2006 as a result of

5   Mattel's agreement with Kohl's.  TX 26612 (Zablow email re "Great News

6   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

7   *see also* TX 37113 (Kohl's email offering Mattel MGA's planogram space for

8   money).  These emails also reflect the importance of having toys for sale in the toy

9   department.  *Id.*

10

11      93.  In fact, the competitor, MGA, was represented in the Kohl's toy

12  department and elsewhere in the store.  MGA products, including Bratz dolls,

13  continued to be sold at Kohl's even after Kohl's agreed to provide eight feet of

14  shelf space to BARBIE products.  3/29/11 Trial Tr. Vol. 1 (Vollero) at 122:7-124:1;

15  4/6/11 Trial Tr. Vol. 3 (Scholvin) at 69:18-70:5.

16      **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported,

17  misleading, and irrelevant.  The undisputed evidence shows that Kohl's did not

18  purchase any new Bratz products from MGA in 2005 and 2006, as a result of

19  Mattel's agreement with Kohl's that, in exchange for $1.25 million, Mattel would

20  occupy all eight feet of shelf space in Kohl's toy department set aside for fashion

21  dolls, including four feet previously allocated to MGA's Bratz dolls.  TX 26612

22  (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment

23  to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's

24  planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX

25  24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

26  (Vollero Testimony).  Ms. Scholvin's testimony does not establish that Bratz

27  products were continuously on sale to customers in Kohl's stores from 2004 to

28  2006.  Moreover, Mattel's own emails indicate the importance of having a presence

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   in (or being excluded from) the toy department.  TX 26612 (Zablow email re "Great

2   News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf

3   space); *see also* TX 37113 (Kohl's email offering Mattel MGA's planogram space

4   for money).  Finally, the evidence establishes that in 2005 and 2006 Kohl's

5   purchased no Bratz dolls from MGA for sale in its toy department (or elsewhere).

6   3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian Testimony); 3/29/2011 (Vol. 1) Tr.

7   121:22-122:1 (Vollero Testimony).

8

9       94.  Mattel's agreement with Kohl's was not anti-competitive, but instead

10  allowed Kohl's to build its margin and take credit for the poor performance of Bratz

11  at Kohl's.  4/4/11 Trial Tr. Vol. 1 (Eckert) at 54:21-57:22; 62:4-12.

12      **MGA OBJECTIONS:**  MGA objects to this proposed fact as an improper

13  fact (because it is truly a legal conclusion), false and misleading.  Mattel paid

14  Kohl's $1.25 million to exclude MGA's Bratz dolls from the toy department in

15  2005 and 2006.  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112

16  (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's

17  email offering Mattel MGA's planogram space for money); TX 24004 (2005

18  Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011

19  (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  Mattel's internal correspondence

20  reflects the fact that the intent of the agreement was to exclude MGA's Bratz

21  produce from the toy department for 2005 and 2006.  TX 26612 (Zablow email re

22  "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz

23  shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for

24  money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-

25  Kohl's agreement); *see also* 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero

26  Testimony).  *See* MGA's objections to Mattel's Proposed Conclusions of Law,

27  below.  *See also* Dkt. No. 10525 (MGA's Proposed Findings of Fact and

28  Conclusions of Law regarding MGA's 17200 claim).

1

2       96.  Kohl's continued to purchase MGA products in 2005 and 2006.  TX

3  24747; 3/25/11 Trial Tr. Vol. 1 (Larian) at 53:20-54:24; 3/25/11 Trial Tr. Vol. 1

4  (Larian) at 54:25-55:16; TX 24719; 3/25/11 Trial Tr. Vol. 1 (Larian) at 49:2-52:10.

5  Kohl's continued to negotiate the purchase of additional Bratz products with MGA

6  during 2005 and 2006.  TX 24354; 3/25/11 Trial Tr. Vol. 1 (Larian) at 38:13-40:1;

7  TX 24359; TX 24747.

8      **MGA OBJECTIONS:**  MGA objects to this proposed fact as false.  Mattel

9  is citing to Little Tikes sales to support this proposed fact.  However, as Mattel is

10  well aware, MGA did not own Little Tikes in October 2006.  2/10/2011 (Vol. 2) Tr.

11  33:21-34:7 (Larian Testimony), 3/8/2011 (Vol. 1) Tr. 96:11-25 (Wagner testimony)

12  3/24/2011 (Vol. 2) Tr. 139:13-16 (Larian Testimony), 3/25/2011 (Vol. 2) Tr. 14:1-

13  24, 53:6-13 (Larian Testimony), 3/30/2011 (Vol. 2) Tr. 46:25-47:6, 47:24-48:4

14  (Hauenstein Testimony).  Accordingly, any sales to Kohl's for Little Tikes products

15  in 2006 were not MGA sales, but rather Little Tikes sales.  3/25/2011 (Vol. 2) Tr.

16  14:1-24 (Larian).  As Mr. Larian testified at trial, Little Tikes previous sales records

17  were incorporated in MGA's system after MGA purchased Little Tikes.  *Id.*

18  However, the incorporation of these Little Tikes sales figures into MGA's system

19  does not change the fact that Little Tikes sales prior to being purchased by MGA

20  were not MGA sales, let alone Bratz sales.  Mattel's repeated attempts to distort this

21  data cannot change the fact that these sales are Little Tikes' sales.  Finally, the

22  evidence establishes that in 2005 and 2006 Kohl's purchased no Bratz dolls from

23  MGA for sale in its toy department (or elsewhere).  3/24/2011 (Vol. 2) Tr. 162:14-

24  163:5 (Larian Testimony); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero

25  Testimony).

26

27      97.  The eight feet of shelf space that Kohl's agreed to provide for BARBIE

28  products is not the only place in Kohl's stores where Kohl's sells fashion dolls.

1   Kohl's also sells products, including fashion dolls, on towers, bulk stacks, wings or

2   end caps and other fixtures in its stores.  4/4/11 Trial Tr. Vol. 1 (Eckert) at 90:18-

3   91:13; 4/6/11 Trial Tr. Vol. 3 (Scholvin) at 66:23-67:19.  Kohl's continued to sell

4   Bratz dolls to consumers during 2005 and 2006 when Kohl's placed and sold

5   BARBIE products from those eight feet of shelf space.  4/6/11 Trial Tr. Vol. 3

6   (Scholvin) at 69:18-70:5.

7        **MGA OBJECTIONS:**  MGA objects to this proposed fact as contradicted

8   by the evidence and irrelevant.  The evidence establishes that Kohl's had eight feet

9   of space in its toy department set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr.

10  73:4-8, 77:3-5 (Scholvin Testimony).  Barbie had four feet of this shelf space and

11  Bratz also had four feet.  *Id.* at 73:9-10, 77:6-9.  Moreover, Mattel's own emails

12  indicate the importance of having a presence (or being excluded from the toy

13  department and that its agreement with Kohl's would exclude MGA's Bratz from

14  the toy department.  TX 26612 (Zablow email re "Great News BARBIE"); TX

15  37112 (Spalding email re payment to Kohl's for Bratz shelf space); *see also* TX

16  37113 (Kohl's email offering Mattel MGA's planogram space for money).  The

17  evidence further establishes that in 2005 and 2006 Kohl's purchased no Bratz dolls

18  from MGA for sale in its toy department (or elsewhere).  3/24/2011 (Vol. 2) Tr.

19  162:14-163:5 (Larian Testimony); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero

20  Testimony).

21

22        99.  MGA's sole claim for monetary relief for Mattel's unfair competition

23  claim is a lost profits claim in the amount of $4.294 million related solely to its

24  Kohl's allegation.  4/5/2011 Trial Tr. Vol. 1 (Malackowski) at 31:21-32:9.

25        **MGA OBJECTIONS:**  MGA objects to this proposed fact as false.  MGA's

26  relief claim is one of restitution based upon Mattel's unjust enrichment due to its

27  unlawful agreement with Kohl's.  4/5/2011 (Vol. 1) Tr. 33:14-20 (Malackowski

28  Testimony).  MGA's loss of sales corresponds with Mattel's increased sales (*i.e.* its

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    unjust enrichment), as Mattel's increased sales are directly tied to MGA's loss of

2    sales for its four feet of allocated planogram space.  *Id.* at 32:1-33:20.

3

4        100.  MGA's claimed measure of damages is what MGA's "sales and profits

5    would have been [to Kohl's] had the unfair competition not occurred."  4/5/2011

6    Trial Tr. Vol. 1 (Malackowski) at 32:20-22.

7        **MGA OBJECTIONS:**  MGA objects to this proposed fact as false.  MGA's

8    relief claim is one of restitution based upon Mattel's unjust enrichment due to its

9    unlawful agreement with Kohl's.  4/5/2011 (Vol. 1) Tr. 33:14-20 (Malackowski

10   Testimony).  MGA's loss of sales corresponds with Mattel's increased sales (*i.e.* its

11   unjust enrichment), as Mattel's increased sales are directly tied to MGA's loss of

12   sales for its four feet of allocated planogram space.  *Id.* at 32:1-33:20.

13

14       101.  MGA's damages theory is based on all sales of MGA products to

15   Kohl's, including Little Tikes, Little Bratz and other MGA products, not just Bratz

16   dolls.  4/5/2011 Trial Tr. Vol. 2 (Malackowski) at 53:13-21.

17       **MGA OBJECTIONS:**  MGA objects to this fact as false.  Again, Mattel's

18   claim that MGA's Kohl's sales figures are skewed by Little Tikes falls flat based

19   upon the acquisition date.  Mr. Malackowski's damages determination is based

20   upon Mattel's increased sales for the four feet of shelf space that had been

21   designated for MGA's Bratz dolls.  4/5/2011 (Vol. 1) Tr. 33:14-20 (Malackowski

22   Testimony); *see also* TX 26612 (identifying increase in sales equal to $4.294

23   million).  Further, to the extent that Mr. Malackowski's damages figure is

24   confirmed by looking at MGA's projected sales, the damages calculation ends in

25   2006.  As MGA did not acquired Little Tikes until the end of 2006, Little Tikes

26   sales numbers could not skew projections for the years 2005 and 2006.  2/10/2011

27   (Vol. 2) Tr. 33:21-34:7 (Larian Testimony), 3/8/2011 (Vol. 1) Tr. 96:11-25

28   (Wagner testimony) 3/24/2011 (Vol. 2) Tr. 139:13-16 (Larian Testimony),

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    3/25/2011 (Vol. 2) Tr. 14:1-24, 53:6-13 (Larian Testimony), 3/30/2011 (Vol. 2) Tr.

2    46:25-47:6, 47:24-48:4 (Hauenstein Testimony).

3

4       **C.**     **THQ**

5       105. THQ is a video game company.

6       **MGA OBJECTIONS:** MGA objects to this proposed fact as unsupported.

7    Mattel did not cite any evidence in support of this proposed fact. MGA also objects

8    to this fact as irrelevant.

9

10       106. Both Mattel and MGA license their intellectual property to licensees

11    that they have in common, including THQ. 4/4/11 Trial Tr. Vol. 1 (Eckert) at

12    102:16-104:10.

13       **MGA OBJECTIONS:** MGA objects to this proposed finding of fact as

14    unsupported. MGA further objects to Mattel's reliance on Mr. Eckert's testimony

15    regarding common licensees. Mattel affirmatively withdrew all testimony by Mr.

16    Eckert on the subject of common licensees. 4/4/2011 Tr. (Vol. 2) at 5:9-16 (J.

17    Carter admonition that Mr. Eckert's testimony regarding licensees is stricken).

18

19       107. Mattel enters into licensing agreements with companies that also have

20    licensing agreements with competitors. See, e.g., TX 20525; 4/4/11 Trial Tr. Vol. 1

21    (Eckert) at 100:16-101:16.

22       **MGA OBJECTIONS**: MGA objects to this proposed finding of fact as

23    unsupported. MGA further objects to Mattel's reliance on Mr. Eckert's testimony

24    regarding common licensees. Mattel affirmatively withdrew all testimony by Mr.

25    Eckert on the subject of common licensees. 4/4/2011 Tr. (Vol. 2) at 5:9-16 (J.

26    Carter admonition that Mr. Eckert's testimony regarding licensees is stricken).

27    MGA also objects to this fact as irrelevant.

28

108.  When deciding whether to license intellectual property to companies that also have licensing agreements with competitors, a significant consideration is whether the licensee will respect and protect the confidentiality of Mattel's proprietary information.  4/4/11 Trial Tr. Vol. 1 (Eckert) at 101:17-102:15.

**MGA OBJECTIONS**:  MGA objects to this proposed fact as false and misleading.  Mattel had a policy of terminating its relationships with third-party vendors and licensees that also did business with MGA.  TX 8972; 4/4/2011 (Vol. 1) Tr. 27:23-28:9, 101:17-25 (Eckert Testimony) ("[I]n general, we prefer exclusivity . . . and we get the focus of the other company's resources exclusively on our business."); 3/22/2011 (Vol. 1) Tr. 8:8-9:24 (Debrowski Testimony).  In a 30b6 deposition, Mr. Eckert was asked whether Mattel's "practices include threatening existing licensees that you would terminate their relations at once if they did not stop dealing with MGA," and he answered "Yes, I believe it did."  *Id.* at 24:21-25.  While Mr. Eckert attempted to explain away this prior testimony, *id.* at 106:2-107:2, his explanation was not credible based upon the deposition transcript in full, *id.* at 25:2-27:21.  Furthermore, Mr. Eckert personally emailed other Mattel executives about "killing a deal" as a result of a third-party's relationship with MGA.  TX 8972; 4/4/2011 (Vol. 1) Tr. 27:23-28:9 (Eckert Testimony).

109.  In November 2006, Ellen Brothers, the head of Mattel's American Girl business unit, emailed Robert Eckert, Mattel's CEO, and Neil Friedman, the head of Mattel's Mattel Brands business unit.  Ms. Brothers was considering entering into a licensing arrangement with THQ and wanted to bring it to Mr. Eckert's attention "given the fact that [Mattel has] had a lot of issues of confidential information moving from Mattel to MGA."  4/4/11 Trial Tr. Vol. 1 (Eckert) at 99:2-100:3; TX 8972.

**MGA OBJECTIONS:**  MGA objects to this proposed fact as false and

1   misleading.  Mattel had a policy of terminating its relationships with third-party

2   vendors and licensees that also did business with MGA.  TX 8972; 4/4/2011 (Vol.

3   1) Tr. 27:23-28:9, 101:17-25 (Eckert Testimony) ("[I]n general, we prefer

4   exclusivity . . . and we get the focus of the other company's resources exclusively

5   on our business."); 3/22/2011 (Vol. 1) Tr. 8:8-9:24 (Debrowski Testimony).  In a

6   30b6 deposition, Mr. Eckert was asked whether Mattel's "practices include

7   threatening existing licensees that you would terminate their relations at once if

8   they did not stop dealing with MGA," and he answered "Yes, I believe it did."  *Id.*

9   at 24:21-25.  While Mr. Eckert attempted to explain away this prior testimony, *id.*

10  at 106:2-107:2, his explanation was not credible based upon the deposition

11  transcript in full, *id.* at 25:2-27:21.  Furthermore, Mr. Eckert personally emailed

12  other Mattel executives about "killing a deal" as a result of a third-party's

13  relationship with MGA.  TX 8972; 4/4/2011 (Vol. 1) Tr. 27:23-28:9 (Eckert

14  Testimony).

15

16      110.  Mr. Eckert forwarded Ms. Brothers' email to Mr. Friedman and wanted

17  to know "whether [Mr. Friedman] though this was going to be a problem or not" in

18  light of Mattel's confidentiality concerns. Mr. Eckert asked Mr. Friedmen (sic)

19  whether he wanted Mr. Eckert to "kill" the deal between American Girl and THQ

20  based on that concern.  4/4/11 Trial Tr. Vol. 1 (Eckert) at 100:4-15.

21      **MGA OBJECTIONS:**  MGA objects to this proposed fact as false and

22  misleading.  Mattel had a policy of terminating its relationships with third-party

23  vendors and licensees that also did business with MGA.  TX 8972; 4/4/2011 (Vol.

24  1) Tr. 27:23-28:9, 101:17-25 (Eckert Testimony) ("[I]n general, we prefer

25  exclusivity . . . and we get the focus of the other company's resources exclusively

26  on our business."); 3/22/2011 (Vol. 1) Tr. 8:8-9:24 (Debrowski Testimony).  In a

27  30b6 deposition, Mr. Eckert was asked whether Mattel's "practices include

28  threatening existing licensees that you would terminate their relations at once if

1    they did not stop dealing with MGA," and he answered "Yes, I believe it did." *Id.*

2    at 24:21-25.  While Mr. Eckert attempted to explain away this prior testimony, *id.*

3    at 106:2-107:2, his explanation was not credible based upon the deposition

4    transcript in full, *id.* at 25:2-27:21.  Furthermore, Mr. Eckert personally emailed

5    other Mattel executives about "killing a deal" as a result of a third-party's

6    relationship with MGA.  TX 8972; 4/4/2011 (Vol. 1) Tr. 27:23-28:9 (Eckert

7    Testimony).

8

9        112.  Mr. Eckert investigated whether Mattel had terminated any licenses

10   because the licensee also dealt with MGA.  Mr. Eckert discovered no instances in

11   which Mattel had done so.  4/4/11 Trial Tr. Vol. 1 (Eckert) at 107:11-21.

12       **MGA OBJECTIONS:**  MGA objects to this proposed fact as false and

13   misleading.  Mattel had a policy of terminating its relationships with third-party

14   vendors and licensees that also did business with MGA.  TX 8972; 4/4/2011 (Vol.

15   1) Tr. 27:23-28:9, 101:17-25 (Eckert Testimony) ("[I]n general, we prefer

16   exclusivity . . . and we get the focus of the other company's resources exclusively

17   on our business.");  3/22/2011 (Vol. 1) Tr. 8:8-9:24 (Debrowski Testimony).  In a

18   30b6 deposition, Mr. Eckert was asked whether Mattel's "practices include

19   threatening existing licensees that you would terminate their relations at once if

20   they did not stop dealing with MGA," and he answered "Yes, I believe it did." *Id.*

21   at 24:21-25.  While Mr. Eckert attempted to explain away this prior testimony, *id.*

22   at 106:2-107:2, his explanation was not credible based upon the deposition

23   transcript in full, *id.* at 25:2-27:21.  Furthermore, Mr. Eckert personally emailed

24   other Mattel executives about "killing a deal" as a result of a third-party's

25   relationship with MGA.  TX 8972; 4/4/2011 (Vol. 1) Tr. 27:23-28:9 (Eckert

26   Testimony).  Mattel also demanded preferential treatment from Target, insisting

27   "[w]e, as a vendor, want to be treated differently than the other guys" and

28   demanded a "larger playing field" and an "unfair benefit" over MGA.  TX 8572;

1    4/4/11 Vol. 1 Tr. 32:1-35:24 (Eckert).

2

3        113.  MGA offered no evidence that it suffered any injury in fact or lost any

4    money or property as a result of any alleged Mattel conduct with respect to any

5    licensee, including THQ, much less any evidence that consumers were impacted by

6    any such Mattel conduct.  4/4/11 Trial Tr. Vol. 3 (Malackowski); 4/5/11 Trial Tr.

7    Vols. 1-4 (Malackowski).

8        **MGA OBJECTIONS:**  MGA objects to this proposed fact as false.  MGA

9    introduced evidence at trial to show that Mattel systematically attempted to thwart

10   MGA's Bratz line by interfering with MGA's relationships, from manufacturing to

11   retail.  *See, e.g.*, TX 26612 (Zablow email re "Great News BARBIE"); TX 37112

12   (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's

13   email offering Mattel MGA's planogram space for money); TX 24004 (2005

14   Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); TX 8972

15   (Eckert email to "kill the deal or let it slide"); TX 34833 (Mattel email re stopping

16   Bandai's distribution of Bratz); TX 8120 (email re moving product at WalMart);

17   TX 8572 (demanding "larger playing field" and an "unfair benefit" over MGA at

18   Target); *see also* Mattel's Proposed Statement of Fact Nos. 109, 110, 120, 128, 133,

19   134.

20

21        **D.    Early Light**

22        125.  MGA presented no evidence that it suffered any injury in fact or lost

23   any money or property as a result of any Mattel conduct with respect to any

24   company that manufactured both Mattel and MGA products, including Early Light,

25   much less any evidence that consumers were impacted by any such Mattel conduct.

26   4/4/11 Trial Tr. Vol. 3 (Malackowski); 4/5/11 Trial Tr. Vols. 1-4 (Malackowski).

27        **MGA OBJECTIONS:**  MGA objects to this proposed fact as false.  MGA

28   introduced evidence at trial to show that Mattel systematically attempted to thwart

1    MGA's Bratz line by interfering with MGA's relationships, from manufacturing to

2    retail.  *See, e.g.*, TX 26612 (Zablow email re "Great News BARBIE"); TX 37112

3    (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's

4    email offering Mattel MGA's planogram space for money); TX 24004 (2005

5    Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); TX 8972

6    (Eckert email to "kill the deal or let it slide"); TX 34833 (Mattel email re stopping

7    Bandai's distribution of Bratz); TX 8120 (email re moving product at WalMart);

8    TX 8572 (demanding "larger playing field" and an "unfair benefit" over MGA at

9    Target); *see also* Mattel's Proposed Statement of Fact Nos. 109, 110, 120, 128, 133,

10   134.

11

12        **E.    Bandai**

13        127.  MGA presented no evidence that Mattel threatened Bandai or asked

14   Bandai to stop distributing MGA products.

15        **MGA OBJECTIONS:**  MGA objects to this proposed fact as false.  As

16   indicated in TX 34833, when Mattel found out that Bandai was distributing Bratz

17   on behalf of MGA, Mattel "raised the issue with Bandai senior management" and

18   pressured Bandai to terminate its relationship with MGA.  *Id.;* 3/17/2011 (Vol. 1)

19   117:22-23 (Fontanella Testimony).  Further, Mattel hoped to "include some

20   terminology in the revised contract [with Bandai] that will preclude them from

21   entering into future distribution agreements of this nature."  TX 34833.

22

23        128.  Ms. Fontanella explained that when a Mattel distributor also distributed

24   product competitive to Mattel's, this was a concern because Mattel wants the

25   distributor's total focus on Mattel's product, not a product "directly competitive" to

26   Mattel's. In addition, the distributor has access "early on" to "proprietary" Mattel

27   information.  3/17/11 Trial Tr. Vol. 1 (Fontanella) at 118:8-19; TX 34833.

28        **MGA OBJECTIONS:**  MGA objects to this proposed fact as false.  As

1    indicated in TX 34833, when Mattel found out that Bandai was distributing Bratz

2    on behalf of MGA, Mattel "raised the issue with Bandai senior management" and

3    pressured Bandai to terminate its relationship with MGA.  *Id.*  Ms. Fontanella

4    admitted that Mattel was attempting to leverage Bandai not to distribute Bratz.

5    3/17/2011 (Vol. 1) 117:22-23 (Fontanella Testimony).  Further, Mattel hoped to

6    "include some terminology in the revised contract [with Bandai] that will preclude

7    them from entering into future distribution agreements of this nature."  TX 34833.

8

9         130.  MGA presented no evidence that Mattel threatened or asked any

10   distributor of Mattel and MGA products not to distribute MGA products.

11        **MGA OBJECTIONS:**  MGA objects to this proposed fact as unsupported

12   and false.  MGA introduced evidence at trial to show that Mattel systematically

13   attempted to thwart MGA's Bratz line by interfering with MGA's relationships,

14   from manufacturing to retail.  *See, e.g.*, TX 26612 (Zablow email re "Great News

15   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

16   TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

17   24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

18   agreement); TX 8972 (Eckert email to "kill the deal or let it slide"); TX 34833

19   (Mattel email re stopping Bandai's distribution of Bratz); TX 8120 (email re

20   moving product at WalMart); TX 8572 (demanding "larger playing field" and an

21   "unfair benefit" over MGA at Target); *see also* Mattel's Proposed Statement of Fact

22   Nos. 109, 110, 120, 128, 133, 134.

23

24        131.  MGA presented no evidence that MGA suffered any injury in fact or

25   lost any money or property as a result of any Mattel conduct with respect to any

26   company that distributed both Mattel and MGA products, including Bandai, much

27   less any evidence that consumers were impacted by any such Mattel conduct.

28   4/4/11 Trial Tr. Vol. 3 (Malackowski); 4/5/11 Trial Tr. Vols. 1-4 (Malackowski).

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

**MGA OBJECTIONS:**  MGA objects to this proposed fact as irrelevant and misleading.  MGA introduced evidence at trial to show that Mattel systematically attempted to thwart MGA's Bratz line by interfering with MGA's relationships, from manufacturing to retail.  *See, e.g.*, TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); TX 8972 (Eckert email to "kill the deal or let it slide"); TX 34833 (Mattel email re stopping Bandai's distribution of Bratz); TX 8120 (email re moving product at WalMart); TX 8572 (demanding "larger playing field" and an "unfair benefit" over MGA at Target); *see also* Mattel's Proposed Statement of Fact Nos. 109, 110, 120, 128, 133, 134.  Further, MGA introduced evidence of Mattel's anticompetitive agreement with Kohl's that, in exchange for $1.25 million, Mattel would receive MGA's shelf space in the fashion doll section of Kohl's toy departments.  TX 26612.  Such an agreement is unlawful.  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

### F.   MGA's Unfair Competition Claim

132.  Except as set forth above, MGA presented no competent evidence to support its previously identified factual bases for its statutory unfair competition claim, including that:

> (1)   Mattel allegedly demanded its employees sign oppressive intellectual property assignment agreements in order to shore up and preserve its dominant market position;

1

2

       (2)    Mattel allegedly engaged in efforts to undermine MGA's business and to "kill" Bratz, including pursuing litigation to drain MGA's financial resources;

3

       (3)    Mattel allegedly regularly threatens, manipulates, intimidates, and improperly influences its employees and third parties, including retailers, distributors, and law enforcement officials, to prevent them from working with MGA and to intimidate former employees;

4

5

       (4)    Mattel allegedly has threatened and pressured distributors and retailers not to distribute Bratz products;

6

7

       (5)    Mattel allegedly has tampered with retail displays and disseminated false information about the retail market;

8

9

       (6)    Mattel allegedly has intimidated former Mattel employees who have gone to work for MGA by sending threatening letters warning them not to disclose publicly-available information about Mattel;

10

11

       (7)    Mattel allegedly has threatened and warned companies not to license MGA properties or risk retribution from Mattel;

12

13

       (8)    Mattel allegedly has threatened and warned raw goods suppliers and toy manufacturers not to supply goods to MGA or to make MGA products or they would lose business from Mattel;

14

15

16

       (9)    Mattel allegedly engaged in efforts to create negative publicity or press about MGA, MGA products, Bryant, Larian or MGA employees, including practices relating to NPD and consumer organizations TIA and CARU;

17

       (10)   Mattel allegedly engaged in unfair practices relating to MGA's relationship with NPD, including pressuring NPD to terminate its relationship with MGA;

18

19

       (11)   Mattel allegedly engaged in efforts to fund or commission market research or studies that portray Bratz or MGA products negatively;

20

21

       (12)   Mattel allegedly engaged in efforts to interfere with MGA's acquisition of or investment in Zapf Creation AG;

22

       (13)   Mattel allegedly engaged in efforts to include negative references to MGA or Bratz on Mattel's "We Believe In Girls" website;

23

       (14)   Mattel allegedly engaged in efforts or intended to interfere with business dealings or contractual relations between MGA and Smoby Group;

24

25

       (15)   Mattel allegedly influenced Nickelodeon to reject MGA advertisements or to limit time slots for advertisements;

26

       (16)   Mattel allegedly assisted parties in lawsuits against MGA;

27

28

       (17)   Mattel allegedly contacted persons under false pretenses in order to question them about Bratz and this lawsuit;

1        (18)   Mattel allegedly coerced employees to sign restrictive covenants

2   and non-compete agreements and other efforts to prevent MGA from hiring them;

3        (19)   Mattel allegedly delayed filing suit against Bryant because

4   Mattel wanted Bryant to testify in an unrelated Mattel case;

     (20)   Mattel allegedly falsely inflated its BARBIE sales figures in an

5   effort to mislead the public and retailers; and

6        (21)   Mattel allegedly improperly initiated and influenced criminal

7   investigations of its former employees, including Janine Brisbois and Jorge Castilla.

8   See April 13, 2005 Complaint in Case No. 05-2727, Dkt. 1; Am. MSJ Order, Dkt.

9   9600, at 110:7-16; MGA's Objections and Responses to Mattel's Second Set of

10  Interrogatories (Phase 2), dated November 2, 2009, at 8-51, 104-160.

11      **MGA OBJECTIONS:**  MGA objects to this proposed fact as improper

12  under Local Rule 52-3 which states that findings of fact shall "not make reference

13  to allegations contained in pleadings."  MGA further objects to this proposed fact as

14  false and irrelevant.  MGA introduced evidence at trial to show that Mattel

15  systematically attempted to thwart MGA's Bratz line by interfering with MGA's

16  relationships, from manufacturing to retail.  *See, e.g.*, TX 26612 (Zablow email re

17  "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz

18  shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for

19  money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-

20  Kohl's agreement); TX 8972 (Eckert email to "kill the deal or let it slide"); TX

21  34833 (Mattel email re stopping Bandai's distribution of Bratz); TX 8120 (email re

22  moving product at WalMart); TX 8572 (demanding "larger playing field" and an

23  "unfair benefit" over MGA at Target); 3/30/11 Vol. 2 Tr. 82:22-84:3, 84:15-17,

24  85:4-86:3 (Brawer testimony) (detailing discussions at Mattel about ensuring with

25  factories that "the best supply chain possible is available to Mattel and there were

26  limitations to MGA"); TX 1807 ("House on Fire" presentation declares "This is

27  war and sides must be taken.  Barbie stands for good.  All others stand for evil.");

28  *see also* Mattel's Proposed Statement of Fact Nos. 109, 110, 120, 128, 133, 134.

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    Mattel had a policy of terminating its relationships with third-party vendors and

2    licensees that also did business with MGA.  TX 8972; 4/4/2011 (Vol. 1) Tr. 27:23-

3    28:9, 101:17-25 (Eckert Testimony) ("[I]n general, we prefer exclusivity . . . and

4    we get the focus of the other company's resources exclusively on our business.");

5    3/22/2011 (Vol. 1) Tr. 8:8-9:24 (Debrowski Testimony).  In a 30b6 deposition, Mr.

6    Eckert was asked whether Mattel's "practices include threatening existing licensees

7    that you would terminate their relations at once if they did not stop dealing with

8    MGA," and he answered "Yes, I believe it did."  *Id.* at 24:21-25.  While Mr. Eckert

9    attempted to explain away this prior testimony, *id.* at 106:2-107:2, his explanation

10   was not credible based upon the deposition transcript in full, *id.* at 25:2-27:21.

11   Furthermore, Mr. Eckert personally emailed other Mattel executives about "killing

12   a deal" as a result of a third-party's relationship with MGA.  TX 8972; 4/4/2011

13   (Vol. 1) Tr. 27:23-28:9 (Eckert Testimony).  Mattel also demanded preferential

14   treatment from Target, insisting "[w]e, as a vendor, want to be treated differently

15   than the other guys" and demanded a "larger playing field" and an "unfair benefit"

16   over MGA.  TX 8572; 4/4/11 (Vol. 1) Tr. 32:1-35:24 (Eckert Testimony).  Ron

17   Brawer declined to sign an employment agreement with Mattel based upon his

18   belief that its provisions were overbroad.  3/31/2011 (Vol. 2) Tr. 19:24-20:8

19   (Brawer Testimony).  When Mr. Brawer eventually resigned from Mattel, Mattel

20   had Ron Brawer *and his family* placed under surveillance.  3/31/2011 (Vol. 1) Tr.

21   9:6-24, 10:22-11:4 (Brawer Testimony).  Even with the surveillance turning up no

22   evidence of wrongdoing, Mattel filed a lawsuit against Mr. Brawer.  TX 34676;

23   3/31/2011 (Vol. 1) Tr. 13:13-23 (Brawer Testimony).  Mattel also contacted Ms.

24   Leahy's husband, a Mattel employee, when Ms. Leahy declined Mattel's offer to

25   provide her with a lawyer in this action.  3/15/2011 (Vol. 2) Tr. 5:24-7:10 (Leahy

26   Testimony).

27

28        136.  MGA introduced no evidence that Mattel had market power in any

1    properly determined relevant market.

2        **MGA OBJECTIONS:**  MGA objects to this proposed finding of fact on the

3    grounds that it is irrelevant.  MGA further objects to this proposed fact as false.

4    Since her introduction in 1959, Barbie has enjoyed largely unrivaled dominance

5    over the fashion doll market.  (3/1/2011 (Vol. 1) Tr. 125:18-19 (Eckert Testimony).

6    As late as 2000, Barbie had approximately ninety percent share of the fashion doll

7    market.  3/1/2011 (Vol. 2) Tr. 22:7-19 (Eckert Testimony).

8

9        137.  MGA introduced none of the evidence that Court's [sic] are required to

10   consider in determining what the relevant product and geographic markets are for

11   purposes of determining market power.

12       **MGA OBJECTIONS:**  MGA objects to this proposed finding of fact on the

13   grounds that it is irrelevant.  MGA further objects to this proposed fact as false.

14   Since her introduction in 1959, Barbie has enjoyed largely unrivaled dominance

15   over the fashion doll market.  (3/1/2011 (Vol. 1) Tr. 125:18-19 (Eckert Testimony).

16   As late as 2000, Barbie had approximately ninety percent share of the fashion doll

17   market.  3/1/2011 (Vol. 2) Tr. 22:7-19 (Eckert Testimony).  MGA introduced

18   evidence at trial to show that Mattel systematically attempted to thwart MGA's

19   Bratz line by interfering with MGA's relationships, from manufacturing to retail.

20   *See, e.g.*, TX 26612 (Zablow email re "Great News BARBIE"); TX 37112

21   (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's

22   email offering Mattel MGA's planogram space for money); TX 24004 (2005

23   Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); TX 8972

24   (Eckert email to "kill the deal or let it slide"); TX 34833 (Mattel email re stopping

25   Bandai's distribution of Bratz); TX 8120 (email re moving product at WalMart);

26   TX 8572 (demanding "larger playing field" and an "unfair benefit" over MGA at

27   Target); *see also* Mattel's Proposed Statement of Fact Nos. 109, 110, 120, 128, 133,

28   134.  Further MGA introduced evidence Mattel entered into an agreement with

1  Kohl's that, in exchange for $1.25 million, Mattel would receive MGA's shelf

2  space in the fashion doll section of Kohl's toy departments.  TX 26612.  Such an

3  agreement is unlawful.  TX 26612 (Zablow email re "Great News BARBIE"); TX

4  37112 (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113

5  (Kohl's email offering Mattel MGA's planogram space for money); TX 24004

6  (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement);

7  3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

8

9       **MGA OBJECTIONS TO MATTEL'S PROPOSED CONCLUSIONS OF
10                                    LAW**

11          **B.      MGA Cannot Prove Its Unfair Competition Claim**

12          142.    After full consideration of the testimony of the witnesses, exhibits, all

13  other evidence, the arguments of counsel and all other matters presented to the

14  Court, the Court concludes that MGA has failed to prove its unfair competition

15  claim.

16          **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as false.

17  *See* MGA's Objections to Mattel's Proposed Conclusions of Law, below; *see also*

18  Dkt. No. 10525 (MGA's Proposed Findings of Fact and Conclusions of Law

19  regarding MGA's 17200 claim).

20

21          **1.      MGA Lacks Standing To Pursue Its UCL Claim**

22          143.  MGA was required to prove it had standing to bring its UCL claim in

23  that it suffered lost money or property within the meaning of Section 17200.  Cal.

24  Bus. and Prof. Code § 17204 (requiring proof of "injury in fact" as a result of unfair

25  competition); Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 323 (2011)

26  ("Proposition 64 requires that a plaintiff have lost money or property to have

27  standing to sue.  The plain import of this is that a plaintiff now must demonstrate

28  some form of economic injury.") (internal citation and quotation omitted).

1    **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as

2    contrary to law.  The California Supreme Court has confirmed that "While the

3    voters clearly intended to restrict UCL standing, they just as plainly preserved

4    standing for those who *had* had business dealings with a defendant and had lost

5    money or property as a result of the defendant's unfair business practices."  *Kwikset*

6    *Corp. v. Superior Court*, 51 Cal. 4th 310, 321 (2011).  The Court went on to explain

7    that the concept of "economic injury" is expansive under  section 17200:

8        There are innumerable ways in which economic injury from unfair
         competition may be shown. A plaintiff may (1) surrender in a transaction
9        more, or *acquire in a transaction less, than he or she otherwise would have*;
         (2) have a present or future property interest diminished; (3) be deprived of
10       money or property to which he or she has a cognizable claim; or (4) be
         required to enter into a transaction, costing money or property, that would
11       otherwise have been unnecessary. … Neither the text of Proposition 64 nor
         the ballot arguments in support of it purport to define or limit the concept of
12       "lost money or property," nor can or need we supply an exhaustive list of the
         ways in which unfair competition may cause economic harm. It suffices to
13       say that, in sharp contrast to the state of the law before passage of
         Proposition 64, a private plaintiff filing suit now must establish that he or she
14       has personally suffered such harm.

15   *Id.* at 323 (emphasis added) (internal citations omitted).  Accordingly, the Court

16   found that "nothing in the text of Proposition 64 or its supporting arguments

17   suggests the requirement was intended to be quantitatively more difficult to satisfy

18   [than federal injury in fact]" and "the quantum of lost money or property necessary

19   to show standing is only so much as would suffice to establish injury in fact."  *Id.* at

20   324.

21       MGA has presented evidence that, absent Mattel's agreement with Kohl's,

22   MGA would have had shelf space for Bratz in Kohl's toy department and, as a

23   result, sales of Bratz to Kohl's in 2005 and 2006.  TX 26612 (Zablow email re

24   "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz

25   shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for

26   monetary compensation); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005

27   (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero

28   Testimony); *see also* Dkt. No. 10525 (MGA's Proposed Findings of Fact and

1    Conclusions of Law regarding MGA's 17200 claim).  Accordingly, MGA has

2    shown economic injury sufficient to establish injury in fact and standing.

3

4        145.  At trial, MGA presented no evidence that MGA lost money or property

5    as a result of Mattel's alleged obstruction of MGA's relationships with retailers,

6    licensees, distributors or manufacturers.

7        **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as not a

8    legal conclusion and false.  The evidence at trial established that Mattel entered into

9    an agreement with Kohl's to pay Kohl's $1.25 million in exchange for Barbie

10   obtaining shelf space that had been Bratz.  TX 26612 (Zablow email re "Great

11   News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf

12   space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for

13   money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-

14   Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

15   Mattel's internal correspondence reflects the fact that the intent of the agreement

16   was to exclude MGA's Bratz produce from the toy department for 2005 and 2006.

17   TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re

18   payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel

19   MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement);

20   TX 24005 (2006 Mattel-Kohl's agreement); *see also* 3/29/2011 (Vol. 1) Tr. 121:22-

21   122:1 (Vollero Testimony).  As a result, Kohl's purchased no new Bratz products

22   from MGA in either 2005 or 2006.  3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian

23   Testimony); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  On the

24   other hand, Kohl's Barbie purchases increased by more than $4 million in the 2005

25   and 2006 period.  TX 22612, TX 24004, TX 24005.  Mattel's increased sales are

26   directly tied to MGA's loss of shelf-space stemming from Mattel's agreement with

27   Kohl's.  TX 26612 (Zablow email re "Great News BARBIE"); 3/29/2011 (Vol. 1)

28   Tr. 121:22-122:1 (Vollero Testimony); 4/5/2011 (Vol. 1) Tr. 32:1-33:20

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    (Malackowski Testimony).  Thus, MGA has established "actual monetary losses

2    suffered as a result of" Mattel's interference with MGA's relationships with

3    retailers "whose business is the backbone of a toy manufacturers success."  Dkt.

4    No. 9600 (Am. Order re MSJ) at 111; *see also* Dkt. No. 10525 (MGA's Proposed

5    Findings of Fact and Conclusions of Law regarding MGA's 17200 claim).

6

7        146.  MGA's expert testified at trial that MGA's damages for its unfair

8    competition claim are $4.294 million.  According to MGA's expert, the sole basis

9    for this damages calculation is Mattel's alleged misconduct with Kohl's in 2005

10   and 2006.  MGA's expert testified that his damages calculation is based on his

11   analysis of what MGA's sales and profits would have been in 2005 and 2006 but

12   for Mattel's alleged unfair competition concerning Kohl's.  See 4/5/11 Trial Tr.

13   Vol. 1 (Malackowski) at 31:21-33:20.

14       **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as not a

15   legal conclusion and false.  MGA's relief claim is one of restitution based upon

16   Mattel's unjust enrichment due to its unlawful agreement with Kohl's.  4/5/2011

17   (Vol. 1) Tr. 33:14-20 (Malackowski Testimony).  MGA's loss of sales corresponds

18   with Mattel's increased sales (*i.e.* its unjust enrichment), as Mattel's increased sales

19   are directly tied to MGA's loss of sales for its four feet of allocated planogram

20   space.  *Id.* at 32:1-33:20; *see also* Dkt. No. 10525 (MGA's Proposed Findings of

21   Fact and Conclusions of Law regarding MGA's 17200 claim).

22

23       147.  MGA failed to present any evidence of harm at trial to support its

24   expert's damages analysis for Kohl's.  Moreover, MGA's expert admitted that he

25   did not break out sales for Little Tikes and Little Bratz as opposed to the Bratz

26   teenage dolls in calculating MGA's alleged but-for sales lost to Mattel.  *See* 4/5/11

27   Trial Tr. Vol. 2 (Malackowski) at 52:12-54:5.

28       **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as not a

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   legal conclusion and false.  The evidence at trial established that Mattel entered into

2   an agreement with Kohl's to pay Kohl's $1.25 million in exchange for Barbie

3   obtaining shelf space that had been Bratz.  TX 26612 (Zablow email re "Great

4   News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf

5   space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for

6   money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-

7   Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

8   Mattel's internal correspondence reflects the fact that the intent of the agreement

9   was to exclude MGA's Bratz produce from the toy department for 2005 and 2006.

10  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re

11  payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel

12  MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement);

13  TX 24005 (2006 Mattel-Kohl's agreement); *see also* 3/29/2011 (Vol. 1) Tr. 121:22-

14  122:1 (Vollero Testimony).  As a result, Kohl's purchased no new Bratz products

15  from MGA in either 2005 or 2006.  3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian

16  Testimony); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  On the

17  other hand, Kohl's Barbie purchases increased by more than $4 million in the 2005

18  and 2006 period.  TX 22612, TX 24004, TX 24005.  Mattel's increased sales are

19  directly tied to MGA's loss of shelf-space stemming from Mattel's agreement with

20  Kohl's.  TX 26612 (Zablow email re "Great News BARBIE"); 3/29/2011 (Vol. 1)

21  Tr. 121:22-122:1 (Vollero Testimony); 4/5/2011 (Vol. 1) Tr. 32:1-33:20

22  (Malackowski Testimony).  MGA's relief claim is one of restitution based upon

23  Mattel's unjust enrichment due to its unlawful agreement with Kohl's.  4/5/2011

24  (Vol. 1) Tr. 33:14-20 (Malackowski Testimony).  MGA's loss of sales corresponds

25  with Mattel's increased sales (*i.e.* its unjust enrichment), as Mattel's increased sales

26  are directly tied to MGA's loss of sales for its four feet of allocated planogram

27  space.  *Id.* at 32:1-33:20; *see also* Dkt. No. 10525 (MGA's Proposed Findings of

28  Fact and Conclusions of Law regarding MGA's 17200 claim).

1

2       148.  It is uncontested that MGA suffered no harm as a result of any alleged

3  conduct by Mattel with respect to licensees, manufacturers or distributors.  At trial,

4  the sole basis for the damages number MGA's expert submitted to the jury was

5  Mattel's alleged misconduct with the retailer Kohl's.  See 4/4/11 Trial Tr. Vol. 3

6  (Malackowski), 4/5/11 Trial Tr. Vols. 1-4 (Malackowski).

7       **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as not a

8  legal conclusion, unsupported and contrary to the evidence in the case.  MGA

9  introduced evidence at trial to show that Mattel systematically attempted to thwart

10  MGA's Bratz line by interfering with MGA's relationships, from manufacturing to

11  retail.  *See, e.g.*, TX 26612 (Zablow email re "Great News BARBIE"); TX 37112

12  (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's

13  email offering Mattel MGA's planogram space for money); TX 24004 (2005

14  Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); TX 8972

15  (Eckert email to "kill the deal or let it slide"); TX 34833 (Mattel email re stopping

16  Bandai's distribution of Bratz); TX 8120 (email re moving product at WalMart);

17  TX 8572 (demanding "larger playing field" and an "unfair benefit" over MGA at

18  Target); *see also* Mattel's Proposed Statement of Fact Nos. 109, 110, 120, 128, 133,

19  134.  Further MGA introduced evidence Mattel entered into an agreement with

20  Kohl's that, in exchange for $1.25 million, Mattel would receive MGA's shelf

21  space in the fashion doll section of Kohl's toy departments.  TX 26612; *see also*

22  Dkt. No. 10525 (MGA's Proposed Findings of Fact and Conclusions of Law

23  regarding MGA's 17200 claim).

24

25       149.  MGA had no right for its products to placed for sale at Kohl's. MGA

26  offered no evidence of a contract to that effect.  Findings of Fact ¶ 47.  Moreover,

27  MGA had no reasonable or legitimate expectation of any future placement of Bratz

28  products at Kohl's because Kohl's lost at least $1 million dollars on the Bratz dolls

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   it purchased in 2004.  Findings of Fact ¶¶ 55-70.

2        **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as

3   unsupported and contrary to the evidence in the case.  Kohl's initial email to Mattel

4   confirms that "we have approx 4' of POG space designated for Bratz this spring."

5   TX 37113.  As a result of Mattel's agreement to pay Kohl's for the shelf space,

6   MGA lost this previously designated shelf space (and the corresponding sales

7   volume to Kohl's).  TX 26612.  Moreover, MGA's relief claim is one of restitution

8   based upon Mattel's unjust enrichment due to its unlawful agreement with Kohl's.

9   4/5/2011 (Vol. 1) Tr. 33:14-20 (Malackowski Testimony).  MGA's loss of sales

10  corresponds with Mattel's increased sales (*i.e.* its unjust enrichment), as Mattel's

11  increased sales are directly tied to MGA's loss of sales for its four feet of allocated

12  planogram space.  *Id.* at 32:1-33:20; *see also* Dkt. No. 10525 (MGA's Proposed

13  Findings of Fact and Conclusions of Law regarding MGA's 17200 claim).

14

15        150.  The record is devoid of any instance in which MGA's relationship with

16  any licensee, distributor or manufacturer was impacted by any action by Mattel.

17  The only evidence that MGA presented showed the opposite: MGA shared

18  licensees with Mattel, including THQ; MGA and Mattel shared at least one

19  common manufacturer, Early Light; and MGA and Mattel shared at least one

20  common distributor, Bandai.  Findings of Fact ¶¶ 111, 129.

21        **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as not a

22  legal conclusion, unsupported and contrary to the evidence in the case.  MGA

23  introduced evidence at trial to show that Mattel systematically attempted to thwart

24  MGA's Bratz line by interfering with MGA's relationships, from manufacturing to

25  retail.  *See, e.g.*, TX 26612 (Zablow email re "Great News BARBIE"); TX 37112

26  (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's

27  email offering Mattel MGA's planogram space for money); TX 24004 (2005

28  Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); TX 8972

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   (Eckert email to "kill the deal or let it slide"); TX 34833 (Mattel email re stopping

2   Bandai's distribution of Bratz); TX 8120 (email re moving product at WalMart);

3   TX 8572 (demanding "larger playing field" and an "unfair benefit" over MGA at

4   Target); *see also* Mattel's Proposed Statement of Fact Nos. 109, 110, 120, 128, 133,

5   134.  Further MGA introduced evidence Mattel entered into an agreement with

6   Kohl's that, in exchange for $1.25 million, Mattel would receive MGA's shelf

7   space in the fashion doll section of Kohl's toy departments.  TX 26612; *see also*

8   Dkt. No. 10525 (MGA's Proposed Findings of Fact and Conclusions of Law

9   regarding MGA's 17200 claim); *see also* MGA's Objections to Mattel's Finding of

10  Fact Nos. 111, 119.

11

12      151.  Because MGA lacks standing to assert a claim under the UCL,

13  judgment shall be entered for Mattel and against MGA on this claim.

14      **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as

15  contrary to the evidence in this case.  In ruling on the parties' motions for summary

16  judgment, the Court identified an issue of fact relating to" whether MGA lost

17  money as a result of MGA's obstruction of its relationships . . . ."  Dkt. No. 9600

18  (Am. Order re MSJ) at 110-11.  The evidence at trial established that Mattel entered

19  into an agreement with Kohl's to pay Kohl's $1.25 million in exchange for Barbie

20  obtaining shelf space that had been Bratz.  TX 26612 (Zablow email re "Great

21  News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf

22  space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for

23  money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-

24  Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

25  Mattel's internal correspondence reflects the fact that the intent of the agreement

26  was to exclude MGA's Bratz produce from the toy department for 2005 and 2006.

27  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re

28  payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel

- 68 -

1   MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement);

2   TX 24005 (2006 Mattel-Kohl's agreement); *see also* 3/29/2011 (Vol. 1) Tr. 121:22-

3   122:1 (Vollero Testimony).  As a result, Kohl's purchased no new Bratz products

4   from MGA in either 2005 or 2006.  3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian

5   Testimony); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  On the

6   other hand, Kohl's Barbie purchases increased by more than $4 million in the 2005

7   and 2006 period.  TX 22612, TX 24004, TX 24005.  Mattel's increased sales are

8   directly tied to MGA's loss of shelf-space stemming from Mattel's agreement with

9   Kohl's.  TX 26612 (Zablow email re "Great News BARBIE"); 3/29/2011 (Vol. 1)

10  Tr. 121:22-122:1 (Vollero Testimony); 4/5/2011 (Vol. 1) Tr. 32:1-33:20

11  (Malackowski Testimony).  *See* MGA's objections to Mattel's Proposed

12  Conclusion of Law Nos. 143, 145-150; *see also* Dkt. No. 10525 (MGA's Proposed

13  Findings of Fact and Conclusions of Law regarding MGA's 17200 claim).

14

15      **2.      MGA Cannot Prove An Incipient Violation of Antitrust Law or**

16  **Policy**

17      154.  The hallmark of the federal and state competition laws is the protection

18  of consumers and competition, not individual competitors.  Brunswick Corp. v.

19  Pueblo  Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977) (quoting Brown Shoe Co. v.

20  United States, 370 U.S. 294, 320 (1962) (The antitrust laws "were enacted for 'the

21  protection of competition not competitors.'"); see also Cascade Health Solutions v.

22  PeaceHealth, 515 F.3d 883, 901 (9th Cir. 2008) (noting the "Supreme Court's long

23  and consistent adherence to the principle that the antitrust laws protect the process

24  of competition, and not the pursuits of any particular competitor").

25      **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as

26  contrary to law.  The federal Clayton Act prohibits contracts that provide a discount

27  "on the condition, agreement or understanding that the . . . purchaser thereof shall

28  not use or deal in the goods, wares, merchandise, machinery, supplies, or other

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    commodities of a competitor." 15 U.S.C. § 14. The California Cartwright Act

2    prohibits every trust for anticompetitive purposes and defines "trust" as "a

3    combination of capital, skills, or acts by two or more persons," for anticompetitive

4    purposes. Bus. & Prof. Code §§ 16720, 16726. The Clayton Act and Cartwright

5    Act have the common purpose of protecting and promoting competition. *Brooke*

6    *Group v. Brown & Williamson Tobacco, Inc.*, 509 U.S. 209, 251 (1993); *State of*

7    *California ex rel. Van de Kamp v. Texaco, Inc.*, 46 Cal. 3d 1147, 1153 (1988).

8

9        155.   A showing of mere harm to a competitor's interests is insufficient. See

10   Cel¬Tech. Commc'ns, Inc., 20 Cal. 4th at 186 ("the 'antitrust laws ... were enacted

11   for 'the protection of competition, not competitors.' (Cargill, Inc. v. Monfort of

12   Colorado, Inc. (1986) 479 U.S. 104, 115 [107 S.Ct. 484, 491-492, 93 L.Ed.2d 427],

13   original italics.) . . . Injury to a competitor is not equivalent to injury to

14   competition; only the latter is the proper focus of antitrust laws. (See Atlantic

15   Richfield Co. v. USA Petroleum Co. (1990) 495 U.S. 328, 344 [110 S.Ct. 1884,

16   1894-1895, 109 L.Ed.2d 333]; Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc. (1977)

17   429 U.S. 477, 488-489 [97 S.Ct. 690, 697-698, 50 L.Ed.2d 701]; § 17001 [the

18   purpose of the antitrust law is 'to foster and encourage competition' by prohibiting

19   'practices by which fair and honest competition is destroyed or prevented'].).").

20       **MGA OBJECTIONS:** MGA objects to this proposed conclusion as

21   contrary to law. The federal Clayton Act prohibits contracts that provide a discount

22   "on the condition, agreement or understanding that the . . . purchaser thereof shall

23   not use or deal in the goods, wares, merchandise, machinery, supplies, or other

24   commodities of a competitor." 15 U.S.C. § 14. The California Cartwright Act

25   prohibits every trust for anticompetitive purposes and defines "trust" as "a

26   combination of capital, skills, or acts by two or more persons," for anticompetitive

27   purposes. Bus. & Prof. Code §§ 16720, 16726. Moreover, MGA has shown more

28   than "mere harm to a competitor's interest." *See* Dkt. No. 10525 (MGA's

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    Proposed Findings of Fact and Conclusions of Law regarding MGA's 17200

2    claim).

3

4        156.  "If the same conduct is alleged to be both an antitrust violation and an

5    'unfair' business act or practice for the same reason—because it unreasonably

6    restrains competition and harms consumers—the determination that the conduct is

7    not an unreasonable restraint of trade necessarily implies that the conduct is not

8    'unfair' toward consumers."  Chavez v. Whirlpool Corp., 93 Cal. App. 4th 363, 375

9    (2001) (affirming judgment of dismissal); see also Cel-Tech., 20 Cal. 4th at 184

10   (prohibiting courts from applying "purely subjective notions of fairness" but

11   requiring courts to determine unfairness "within the meaning of the unfair

12   competition law").

13       **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as

14   inapplicable and contrary to law.  *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363

15   (2001) is a consumer unfair competition case.  The California Supreme Court made

16   clear in *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163

17   (1999) that competitor unfair competition cases are unique and judged by a separate

18   standard.  *Id.* at 187.  A competitor's conduct "threatens an incipient violation of an

19   antitrust law, or violates the policy or spirit of one of those laws because its effects

20   are comparable to or the same as a violation of the law, or otherwise significantly

21   threatens or harms competition" is unlawful.  *Id.*

22

23       157. In Cel-Tech., the California Supreme Court suggested that guidance

24   from the FTC may be appropriate as to what is and is not unfair competition.  See

25   Cel-Tech. Comms., Inc., 20 Cal. 4th at 185-86.

26       **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as

27   misleading and contrary to law.  The *Cel-Tech* Court did not suggest that the FTC

28   should be looked to for guidance, but rather federal court decisions "arising under

the 'parallel' section 5 of the Federal Trade Commission Act. . . . *decisions of the federal court* on the subject are more than ordinarily persuasive.'" *Cel-Tech*, 20 Cal. 4th at 185 (emphasis added) (citations omitted). The Court went on to explain that "Our notice of federal law under section 5 means only that *federal cases* interpreting the prohibition against 'unfair methods of competition' may assist us in determining whether a particular challenged act or practice is unfair under the test we adopt. *We do not deem the federal cases controlling or determinative, merely persuasive.*" *Cel-Tech*, 20 Cal. 4th at 186, fn.11 (emphasis added).

158.  In <u>FTC. v. H.J. Heinz Co.</u>, the Federal Trade Commission took the position that slotting fees, among other forms of competition by wholesalers, benefit competition and have a positive effect on consumer prices. The D.C. Circuit held the FTC made a *prima facie* showing in this regard. <u>FTC v. H.J. Heinz Co.</u>, 246 F.3d 708, 712, 719 (D.C. Cir. 2001) (holding district court erred in refusing to enjoin proposed merger of makers of Beech-Nut and Heinz brand baby foods, where FTC argued that competition between the two manufacturers, including payment of slotting fees in exchange for shelf space, reduced the ultimate price to the consumer); <u>see</u> <u>FTC v. H.J. Heinz Co.</u>, 116 F. Supp. 2d 190, 197 (D.D.C 2000). Other authorities hold that slotting fees, advertising and promotional allowances and other allowances and discounts to retailers are pro-competitive and not exclusionary as a matter of law because other competitors engage in them. <u>See</u>, <u>e.g.</u>, <u>El Aguila Food Prods., Inc. v. Gruma Corp.</u>, 301 F. Supp. 2d 612, 620, 629-31 (S.D. Tex. 2003).

**MGA OBJECTIONS:**  MGA objects to this proposed conclusion as misleading and irrelevant. The position of the FTC is not the key issue, but rather the holding of the federal court. In none of the cases cited by Mattel does a Court hold that "slotting fees" are per se permissible or even pro-competition. In fact, in *FTC v. H.J. Heinz Co.*, 116 F. Supp. 2d 190, the Court found that there was no

1  evidence introduced to support the claim that slotting fees provided a benefit to

2  consumers. *Id.* at 197.

3

4       159.  A company may choose with whom it wishes to deal and unilaterally

5  may refuse to deal with a distributor or a customer for business reasons without

6  violating the antitrust laws or the policy or spirit of those laws.  People's Choice

7  Wireless, Inc. v. Verizon Wireless, 131 Cal. App. 4th 656, 663 (2005) (affirming

8  judgment of dismissal) ("Nearly a century ago, the Supreme Court recognized that,

9  subject to antitrust laws such as the Sherman Act, there is a 'long recognized right

10  of [a] trader or manufacturer engaged in an entirely private business, freely to

11  exercise his own independent discretion as to parties with whom he will deal.'

12  (United States v. Colgate & Company (1919) 250 U.S. 300, 307, 39 S.Ct. 465, 63

13  L.Ed. 992 (Colgate).) That theme has continued life. (See Dimidowich v. Bell &

14  Howell (9th Cir. 1986) 803 F.2d 1473, 1478 [stating that a 'manufacturer may

15  choose those with whom it wishes to deal and unilaterally may refuse to deal with a

16  distributor or customer for business reasons without running afoul of the antitrust

17  laws'].").

18      **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

19  inapposite to Mattel's agreement with Kohl's.  Both federal and California law

20  make agreements to restrain trade unlawful.  15 U.S.C. § 14 (prohibiting contracts

21  that provide a discount "on the condition, agreement or understanding that the . . .

22  purchaser thereof shall not use or deal in the goods, wares, merchandise,

23  machinery, supplies, or other commodities of a competitor."); Bus. & Prof. Code §§

24  16720, 16726 (prohibiting acts by two or more persons for anticompetitive

25  purposes).  Under the *Colgate* doctrine, a party may *unilaterally* refuse to deal with

26  another party without committing any sort of violation.  *United States v. Colgate &

27  Co.*, 250 U.S. 300, 307 (1919).  However, the *Colgate* doctrine does not apply to

28  agreements between two parties to exclude a third party.  *See, e.g., FTC v. Beech-*

1   *Nut Packing Co.*, 275 U.S. 441, 453 (1922) (holding that a party "may not,

2   consistently with the [antitrust laws], go beyond the exercise of this right, and by

3   contracts or combinations, express or implied, unduly hinder or obstruct free trade

4   and nature flow of commerce in the channels of interstate trade."); *United States v.*

5   *Parke, Davis & Co.*, 362 U.S. 29, 33-34 (1960); *Toys "R" Us, Inc. v. FTC*, 221 F.3d

6   928 (7th Cir. 2000).

7

8       160.  Because "[t]here are . . . well-recognized economic benefits to

9   exclusive dealing arrangements, including the enhancement of interbrand

10  competition," exclusive dealing arrangements are analyzed under the rule of reason.

11  Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1162 (9th Cir. 1997) ("We

12  thus analyze challenges to exclusive dealing arrangements under the antitrust rule

13  of reason.").

14      **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as

15  misleading and irrelevant.  Under California law, a competitor's may not engage in

16  conduct that "threatens an incipient violation of an antitrust law, or violates the

17  policy or spirit of one of those laws because its effects are comparable to or the

18  same as a violation of the law, or otherwise significantly threatens or harms

19  competition." *Cel-Tech*, 20 Cal. 4th at 187.  Contrary to this legal standard,

20  Mattel's proposed conclusion pretends that for a finding of unfair competition, a

21  party must substantively prove an antitrust violation.

22

23      161.  "Only those arrangements whose 'probable' effect is to 'foreclose

24  competition in a substantial share of the line of commerce affected' violate Section

25  3." Id.  (quoting Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961))

26  (internal citations omitted).

27      **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as

28  misleading and irrelevant.  Under California law, a competitor's may not engage in

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   conduct that "threatens an incipient violation of an antitrust law, or violates the

2   policy or spirit of one of those laws because its effects are comparable to or the

3   same as a violation of the law, or otherwise significantly threatens or harms

4   competition." *Cel-Tech*, 20 Cal. 4th at 187.  Contrary to this legal standard,

5   Mattel's proposed conclusion pretends that for a finding of unfair competition, a

6   party must substantively prove an antitrust violation.

7         Since her introduction in 1959, Barbie has enjoyed largely unrivaled

8   dominance over the fashion doll market.  (3/1/2011 (Vol. 1) Tr. 125:18-19 (Eckert

9   Testimony).  As late as 2000, Barbie had approximately ninety percent share of the

10  fashion doll market.  3/1/2011 (Vol. 2) Tr. 22:7-19 (Eckert Testimony).  The

11  evidence at trial established that Kohl's had eight feet of space in its toy department

12  set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5 (Scholvin

13  Testimony).  Barbie had four feet of this shelf space and Bratz also had four feet.

14  *Id.* at 73:9-10, 77:6-9.  Mattel paid Kohl's $1.25 million to occupy all eight feet of

15  this space, including the four feet that had been designated for Bratz.  TX 26612

16  (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment

17  to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's

18  planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX

19  24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

20  (Vollero Testimony).  Mattel's internal correspondence reflects the fact that the

21  intent of the agreement was to exclude MGA's Bratz produce from the toy

22  department for 2005 and 2006.  TX 26612 (Zablow email re "Great News

23  BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

24  TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

25  24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

26  agreement).  Further, Mattel admitted that, as a result of its agreement with Kohl's,

27  Kohl's did not carry any 2005 or 2006 Bratz products.  3/29/2011 (Vol. 1) Tr.

28  121:22-122:1 (Vollero Testimony).  This evidence establishes that Mattel's conduct

1    "otherwise significantly threatens or harms competition."

2

3        162.   In order to establish exclusive dealing under a rule of reason analysis,

4    "the competition foreclosed by the contract must be found to constitute a substantial

5    share of the relevant market." <u>Tampa Elec. Co.</u>, 365 U.S. at 328.  "That is to say,

6    the opportunities for other traders to enter into or remain in that market must be

7    significantly limited" and will be "judged on a comparative basis . . . when weighed

8    against the total volume of that product in the relevant market." <u>Id</u>. at 328-29

9    (internal citations and quotations omitted).

10       **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as

11   misleading and irrelevant.  Under California law, a competitor's may not engage in

12   conduct that "threatens an incipient violation of an antitrust law, or violates the

13   policy or spirit of one of those laws because its effects are comparable to or the

14   same as a violation of the law, or otherwise significantly threatens or harms

15   competition." *Cel-Tech*, 20 Cal. 4th at 187.  Contrary to this legal standard,

16   Mattel's proposed conclusion pretends that for a finding of unfair competition, a

17   party must substantively prove an antitrust violation.

18       Since her introduction in 1959, Barbie has enjoyed largely unrivaled

19   dominance over the fashion doll market.  (3/1/2011 (Vol. 1) Tr. 125:18-19 (Eckert

20   Testimony).  As late as 2000, Barbie had approximately ninety percent share of the

21   fashion doll market.  3/1/2011 (Vol. 2) Tr. 22:7-19 (Eckert Testimony).  The

22   evidence at trial established that Kohl's had eight feet of space in its toy department

23   set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5 (Scholvin

24   Testimony).  Barbie had four feet of this shelf space and Bratz also had four feet.

25   *Id.* at 73:9-10, 77:6-9.  Mattel paid Kohl's $1.25 million to occupy all eight feet of

26   this space, including the four feet that had been designated for Bratz.  TX 26612

27   (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment

28   to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's

1  planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX

2  24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

3  (Vollero Testimony).  Mattel's internal correspondence reflects the fact that the

4  intent of the agreement was to exclude MGA's Bratz produce from the toy

5  department for 2005 and 2006.  TX 26612 (Zablow email re "Great News

6  BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

7  TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

8  24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

9  agreement).  Further, Mattel admitted that, as a result of its agreement with Kohl's,

10  Kohl's did not carry any 2005 or 2006 Bratz products.  3/29/2011 (Vol. 1) Tr.

11  121:22-122:1 (Vollero Testimony).  This evidence establishes that Mattel's conduct

12  "otherwise significantly threatens or harms competition."

13

14      163.   "To determine substantiality in a given case, it is necessary to weigh

15  the probable effect of the contract on the relevant area of effective competition,

16  taking into account the relative strength of the parties, the proportionate volume of

17  commerce involved in relation to the total volume of commerce in the relevant

18  market area, and the probable immediate and future effects which pre-emption of

19  that share of the market might have on effective competition therein.  *It follows that*

20  *a mere showing that the contract itself involves a substantial number of dollars is*

21  *ordinarily of little consequence*."  Id. at 329 (emphasis added).

22      **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as

23  misleading and irrelevant.  Under California law, a competitor's may not engage in

24  conduct that "threatens an incipient violation of an antitrust law, or violates the

25  policy or spirit of one of those laws because its effects are comparable to or the

26  same as a violation of the law, or otherwise significantly threatens or harms

27  competition."  *Cel-Tech*, 20 Cal. 4th at 187.  Contrary to this legal standard,

28  Mattel's proposed conclusion pretends that for a finding of unfair competition, a

1    party must substantively prove an antitrust violation.

2          Since her introduction in 1959, Barbie has enjoyed largely unrivaled

3    dominance over the fashion doll market.  (3/1/2011 (Vol. 1) Tr. 125:18-19 (Eckert

4    Testimony).  As late as 2000, Barbie had approximately ninety percent share of the

5    fashion doll market.  3/1/2011 (Vol. 2) Tr. 22:7-19 (Eckert Testimony).  The

6    evidence at trial established that Kohl's had eight feet of space in its toy department

7    set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5 (Scholvin

8    Testimony).  Barbie had four feet of this shelf space and Bratz also had four feet.

9    *Id.* at 73:9-10, 77:6-9.  Mattel paid Kohl's $1.25 million to occupy all eight feet of

10   this space, including the four feet that had been designated for Bratz.  TX 26612

11   (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment

12   to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's

13   planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX

14   24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

15   (Vollero Testimony).  Mattel's internal correspondence reflects the fact that the

16   intent of the agreement was to exclude MGA's Bratz produce from the toy

17   department for 2005 and 2006.  TX 26612 (Zablow email re "Great News

18   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

19   TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

20   24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

21   agreement).  Further, Mattel admitted that, as a result of its agreement with Kohl's,

22   Kohl's did not carry any 2005 or 2006 Bratz products.  3/29/2011 (Vol. 1) Tr.

23   121:22-122:1 (Vollero Testimony).  This evidence establishes that Mattel's conduct

24   "otherwise significantly threatens or harms competition."

25

26          164.   In addition, the Ninth Circuit recognizes that "exclusive dealing

27   arrangements imposed on distributors rather than end-users are generally less cause

28   for anticompetitive concern."  Omega Envtl., Inc., 127 F.3d at 1163.  "If

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   competitors can reach the ultimate consumers of the product by employing existing

2   or potential alternative channels of distribution, it is unclear whether such

3   restrictions foreclose from competition any part of the relevant market.  <u>See</u>

4   <u>generally</u> ABA Antitrust Section, Monograph No. 8, Vertical Restrictions Upon

5   Buyers Limiting Purchases of Goods from Others, 92 (1982); Richard M. Steuer,

6   Exclusive Dealing in Distribution, 69 Cornell L. Rev. 101, 118-124 (1983); Herbert

7   Hovenkamp, Federal Antitrust Policy § 10.8 at 391 (1994) (foreclosure of even 'a

8   large percentage of one mode of distribution will have little anticompetitive effect if

9   another mode is available.')."  Id.

10   **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as

11   misleading and irrelevant.  Under California law, a competitor's may not engage in

12   conduct that "threatens an incipient violation of an antitrust law, or violates the

13   policy or spirit of one of those laws because its effects are comparable to or the

14   same as a violation of the law, or otherwise significantly threatens or harms

15   competition."  *Cel-Tech*, 20 Cal. 4th at 187.  Contrary to this legal standard,

16   Mattel's proposed conclusion pretends that for a finding of unfair competition, a

17   party must substantively prove an antitrust violation.

18   Since her introduction in 1959, Barbie has enjoyed largely unrivaled

19   dominance over the fashion doll market.  (3/1/2011 (Vol. 1) Tr. 125:18-19 (Eckert

20   Testimony).  As late as 2000, Barbie had approximately ninety percent share of the

21   fashion doll market.  3/1/2011 (Vol. 2) Tr. 22:7-19 (Eckert Testimony).  The

22   evidence at trial established that Kohl's had eight feet of space in its toy department

23   set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5 (Scholvin

24   Testimony).  Barbie had four feet of this shelf space and Bratz also had four feet.

25   *Id.* at 73:9-10, 77:6-9.  Mattel paid Kohl's $1.25 million to occupy all eight feet of

26   this space, including the four feet that had been designated for Bratz.  TX 26612

27   (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment

28   to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX

2   24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

3   (Vollero Testimony).  Mattel's internal correspondence reflects the fact that the

4   intent of the agreement was to exclude MGA's Bratz produce from the toy

5   department for 2005 and 2006.  TX 26612 (Zablow email re "Great News

6   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

7   TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

8   24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

9   agreement).  Further, Mattel admitted that, as a result of its agreement with Kohl's,

10  Kohl's did not carry any 2005 or 2006 Bratz products.  3/29/2011 (Vol. 1) Tr.

11  121:22-122:1 (Vollero Testimony).  This evidence establishes that Mattel's conduct

12  "otherwise significantly threatens or harms competition."

13

14      165.  In R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d

15  362 (M.D.N.C. 2002), the district court granted summary judgment against

16  competitors of Philip Morris who complained that its merchandising program

17  violated federal antitrust laws.  The 4th Circuit affirmed. R.J. Reynolds Tobacco

18  Co. v. Philip Morris Inc., 67 Fed. Appx. 810 (4th Cir. 2003).  Specifically, other

19  tobacco companies complained, as MGA does here, that Philip Morris engaged in

20  unfair competition because it made "promotional payments . . . .to retailers in

21  exchange for favorable display, advertising, and promotional space within retailers'

22  stores." R.J. Reynolds, 199 F. Supp. 2d at 370.  The court rejected plaintiff's

23  argument that Philip Morris retailer programs foreclosed a substantial share of the

24  relevant market, id. at 388, because, among other things (a) plaintiffs' market share

25  increased, like Bratz did, during the relevant time period, (b) plaintiffs revenues

26  increased, like MGA's, during the relevant time period, (c) the merchandising

27  agreements are of short term duration, as are Mattel's one-year agreements with

28  Kohl's, and (d) all retailers, including Kohl's, sold MGA's products. Id. at 391-93.

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as

2    misleading and irrelevant.  Under California law, a competitor's may not engage in

3    conduct that "threatens an incipient violation of an antitrust law, or violates the

4    policy or spirit of one of those laws because its effects are comparable to or the

5    same as a violation of the law, or otherwise significantly threatens or harms

6    competition." *Cel-Tech*, 20 Cal. 4th at 187.  Contrary to this legal standard,

7    Mattel's proposed conclusion pretends that for a finding of unfair competition, a

8    party must substantively prove an antitrust violation.

9           Since her introduction in 1959, Barbie has enjoyed largely unrivaled

10   dominance over the fashion doll market.  (3/1/2011 (Vol. 1) Tr. 125:18-19 (Eckert

11   Testimony).  As late as 2000, Barbie had approximately ninety percent share of the

12   fashion doll market.  3/1/2011 (Vol. 2) Tr. 22:7-19 (Eckert Testimony).  The

13   evidence at trial established that Kohl's had eight feet of space in its toy department

14   set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5 (Scholvin

15   Testimony).  Barbie had four feet of this shelf space and Bratz also had four feet.

16   *Id.* at 73:9-10, 77:6-9.  Mattel paid Kohl's $1.25 million to occupy all eight feet of

17   this space, including the four feet that had been designated for Bratz.  TX 26612

18   (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment

19   to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's

20   planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX

21   24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

22   (Vollero Testimony).  Mattel's internal correspondence reflects the fact that the

23   intent of the agreement was to exclude MGA's Bratz produce from the toy

24   department for 2005 and 2006.  TX 26612 (Zablow email re "Great News

25   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

26   TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

27   24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

28   agreement).  Further, Mattel admitted that, as a result of its agreement with Kohl's,

1   Kohl's did not carry any 2005 or 2006 Bratz products.  3/29/2011 (Vol. 1) Tr.

2   121:22-122:1 (Vollero Testimony).  This evidence establishes that Mattel's conduct

3   "otherwise significantly threatens or harms competition."

4

5        166.   MGA failed to present any competent evidence at trial regarding its

6   broad unfair competition allegations, other than its allegations concerning Kohl's

7   and Mattel's alleged interference with licensees, a single manufacturer and a single

8   distributor.  Findings of Fact ¶¶ 132-135.

9        **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as

10  unsupported and false.  MGA introduced evidence that Mattel systematically

11  attempted to thwart MGA's Bratz line by interfering with MGA's relationships,

12  from manufacturing to retail and there is no evidence of such systematic conduct by

13  MGA.  *See* TX 26612 (Zablow email re "Great News BARBIE"); TX 37112

14  (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's

15  email offering Mattel MGA's planogram space for money); TX 24004 (2005

16  Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); TX 8972

17  (Eckert email to "kill the deal or let it slide"); TX 34833 (Mattel email re stopping

18  Bandai's distribution of Bratz); TX 8120 (email re moving product at WalMart);

19  TX 8572 (demanding "larger playing field" and an "unfair benefit" over MGA at

20  Target); *see also* Mattel's Proposed Statement of Fact Nos. 109, 110, 120, 128, 133,

21  134.  *See* MGA's objections to Mattel's Finding of Fact Nos. 132-135.

22

23       167.   MGA has not met its burden with respect to Kohl's or alleged

24  interference with licensees, manufacturers or distributors.  MGA failed to present

25  any evidence at trial sufficient to establish that Mattel's conduct with respect to

26  Kohl's or any licensees, manufacturers or distributors "threaten[ed] an incipient

27  violation of an antitrust law, or violate[d] the policy or spirit of one of those laws

28  because its effects are comparable to or the same as a violation of the law, or

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1  otherwise significantly threatens or harms competition." <u>Cel-Tech. Commc'ns,</u>

2  <u>Inc.</u>, 20 Cal. 4th at 187.

3       **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as

4  unsupported and false.  Since her introduction in 1959, Barbie has enjoyed largely

5  unrivaled dominance over the fashion doll market.  (3/1/2011 (Vol. 1) Tr. 125:18-

6  19 (Eckert Testimony).  As late as 2000, Barbie had approximately ninety percent

7  share of the fashion doll market.  3/1/2011 (Vol. 2) Tr. 22:7-19 (Eckert Testimony).

8  The evidence at trial established that Kohl's had eight feet of space in its toy

9  department set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5

10  (Scholvin Testimony).  Barbie had four feet of this shelf space and Bratz also had

11  four feet.  *Id.* at 73:9-10, 77:6-9.  Mattel paid Kohl's $1.25 million to occupy all

12  eight feet of this space, including the four feet that had been designated for Bratz.

13  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re

14  payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel

15  MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement);

16  TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

17  (Vollero Testimony).  Mattel's internal correspondence reflects the fact that the

18  intent of the agreement was to exclude MGA's Bratz produce from the toy

19  department for 2005 and 2006.  TX 26612 (Zablow email re "Great News

20  BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

21  TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

22  24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

23  agreement).  Further, Mattel admitted that, as a result of its agreement with Kohl's,

24  Kohl's did not carry any 2005 or 2006 Bratz products.  3/29/2011 (Vol. 1) Tr.

25  121:22-122:1 (Vollero Testimony).  As a result of this agreement with Mattel,

26  Kohl's purchased no new Bratz products from MGA in either 2005 or 2006.

27  3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian Testimony); 3/29/2011 (Vol. 1) Tr.

28  121:22-122:1 (Vollero Testimony).  MGA introduced additional evidence that

- 83 -

1   Mattel systematically attempted to thwart MGA's Bratz line by interfering with

2   MGA's relationships, from manufacturing to retail and there is no evidence of such

3   systematic conduct by MGA.  *See* TX 26612 (Zablow email re "Great News

4   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

5   TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

6   24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

7   agreement); TX 8972 (Eckert email to "kill the deal or let it slide"); TX 34833

8   (Mattel email re stopping Bandai's distribution of Bratz); TX 8120 (email re

9   moving product at WalMart); TX 8572 (demanding "larger playing field" and an

10  "unfair benefit" over MGA at Target); *see also* Mattel's Proposed Statement of Fact

11  Nos. 109, 110, 120, 128, 133, 134.  This evidence establishes that Mattel's conduct

12  "otherwise significantly threatens or harms competition."

13

14       168.   There is no evidence showing that Mattel engaged in exclusive

15  dealing.  Even if there were, as a matter of law, simply entering into an exclusive

16  dealing arrangement alone would not violate the antitrust laws.  In any event, the

17  evidence shows no such arrangement existed here.  Kohl's, an $18 billion dollar

18  corporation much larger than Mattel, was unhappy with MGA due to the poor

19  performance of MGA products in 2004.  Findings of Fact ¶¶ 40, 41, 48-55.  When

20  Kohl's repeatedly sought assistance from MGA to offset mounting losses, MGA

21  refused or offered counter-proposals that were unacceptable to Kohl's.  Findings of

22  Fact ¶¶ 56-70. As the relationship between Kohl's and MGA deteriorated, MGA

23  knew that failure to address Kohl's concerns would affect MGA's future business

24  with Kohl's.  Findings of Fact ¶¶ 58, 60, 62, 67, 70.  It is therefore unsurprising that

25  Kohl's, faced with $1 million in margin losses on Bratz, approached Mattel in

26  December 2004 with a potential business opportunity that involved, among other

27  terms, (1) increasing BARBIE's shelf space by 4 feet in Kohl's toy department; and

28  (2) assistance with markdowns for Kohl's old Bratz inventory.  Findings of Fact ¶¶

1   77-80.  Moreover, MGA failed to present any evidence at trial that the 2005 and

2   2006 contracts between Kohl's and Mattel, or any other conduct by Mattel in

3   connection with Kohl's, even comes close to meeting the requisite showing of

4   unfair competition under Cel-Tech.  Findings of Fact ¶¶ 84-94.  There is no

5   evidence of harm to competition or consumers. Findings of Fact ¶¶ 94, 98, 136-38.

6   Indeed, Kohl's continued to sell MGA products, including Bratz, in 2005 and 2006.

7   Findings of Fact ¶¶ 71-75.  Moreover, MGA sold over $500 million and over $600

8   million of Bratz dolls respectively, in those years.  Finding of Fact ¶ 32.  This alone

9   confirms that MGA continued to have numerous distribution channels open to it.

10   **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as

11   unsupported and false.  Under California law, a competitor's may not engage in

12   conduct that "threatens an incipient violation of an antitrust law, or violates the

13   policy or spirit of one of those laws because its effects are comparable to or the

14   same as a violation of the law, or otherwise significantly threatens or harms

15   competition." *Cel-Tech*, 20 Cal. 4th at 187.

16   Contrary to this legal standard, Mattel's proposed conclusion pretends that

17   for a finding of unfair competition, a party must substantively prove an antitrust

18   violation.  Since her introduction in 1959, Barbie has enjoyed largely unrivaled

19   dominance over the fashion doll market.  (3/1/2011 (Vol. 1) Tr. 125:18-19 (Eckert

20   Testimony).  As late as 2000, Barbie had approximately ninety percent share of the

21   fashion doll market.  3/1/2011 (Vol. 2) Tr. 22:7-19 (Eckert Testimony).  The

22   evidence at trial established that Kohl's had eight feet of space in its toy department

23   set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5 (Scholvin

24   Testimony).  Barbie had four feet of this shelf space and Bratz also had four feet.

25   *Id.* at 73:9-10, 77:6-9.  Mattel paid Kohl's $1.25 million to occupy all eight feet of

26   this space, including the four feet that had been designated for Bratz.  TX 26612

27   (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment

28   to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX

2   24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

3   (Vollero Testimony).  Mattel's internal correspondence reflects the fact that the

4   intent of the agreement was to exclude MGA's Bratz produce from the toy

5   department for 2005 and 2006.  TX 26612 (Zablow email re "Great News

6   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

7   TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

8   24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

9   agreement).  Further, Mattel admitted that, as a result of its agreement with Kohl's,

10  Kohl's did not carry any 2005 or 2006 Bratz products.  3/29/2011 (Vol. 1) Tr.

11  121:22-122:1 (Vollero Testimony).  As a result of this agreement with Mattel,

12  Kohl's purchased no new Bratz products from MGA in either 2005 or 2006.

13  3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian Testimony); 3/29/2011 (Vol. 1) Tr.

14  121:22-122:1 (Vollero Testimony).  *See also* MGA's objections to Mattel's Finding

15  of Fact Nos. 32, 40, 41, 48-70, 77-80, 84-94, 98, 136-38, above.

16

17      169.   There is no evidence in the trial record of any interference with

18  MGA's relationship with any licensee, manufacturer or distributor, much less

19  evidence of harm to competition.  There is no evidence that any licensee,

20  manufacturer or distributor terminated or modified its relationship with MGA,

21  much less did so as the result of any conduct of Mattel. Findings of Fact ¶¶ 105-31.

22  MGA even recognized this fact in that it did not present at trial any purported loss

23  or damage that it allegedly suffered as a result of alleged interference with

24  licensees, manufacturers or distributors.  Findings of Fact ¶¶ 113, 125, 131.

25      **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as

26  unsupported and false.  Since her introduction in 1959, Barbie has enjoyed largely

27  unrivaled dominance over the fashion doll market.  (3/1/2011 (Vol. 1) Tr. 125:18-

28  19 (Eckert Testimony).  As late as 2000, Barbie had approximately ninety percent

1   share of the fashion doll market.  3/1/2011 (Vol. 2) Tr. 22:7-19 (Eckert Testimony).
2   The evidence at trial established that Kohl's had eight feet of space in its toy
3   department set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5
4   (Scholvin Testimony).  Barbie had four feet of this shelf space and Bratz also had
5   four feet.  *Id.* at 73:9-10, 77:6-9.  Mattel paid Kohl's $1.25 million to occupy all
6   eight feet of this space, including the four feet that had been designated for Bratz.
7   TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re
8   payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel
9   MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement);
10  TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1
11  (Vollero Testimony).  Mattel's internal correspondence reflects the fact that the
12  intent of the agreement was to exclude MGA's Bratz produce from the toy
13  department for 2005 and 2006.  TX 26612 (Zablow email re "Great News
14  BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);
15  TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX
16  24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's
17  agreement).  Further, Mattel admitted that, as a result of its agreement with Kohl's,
18  Kohl's did not carry any 2005 or 2006 Bratz products.  3/29/2011 (Vol. 1) Tr.
19  121:22-122:1 (Vollero Testimony).  This evidence establishes that Mattel's conduct
20  "otherwise significantly threatens or harms competition."  As a result of this
21  agreement with Mattel, Kohl's purchased no new Bratz products from MGA in
22  either 2005 or 2006.  3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian Testimony);
23  3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  MGA introduced
24  additional evidence that Mattel systematically attempted to thwart MGA's Bratz
25  line by interfering with MGA's relationships, from manufacturing to retail and
26  there is no evidence of such systematic conduct by MGA.  *See* TX 26612 (Zablow
27  email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's
28  for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1  space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006

2  Mattel-Kohl's agreement); TX 8972 (Eckert email to "kill the deal or let it slide");

3  TX 34833 (Mattel email re stopping Bandai's distribution of Bratz); TX 8120

4  (email re moving product at WalMart); TX 8572 (demanding "larger playing field"

5  and an "unfair benefit" over MGA at Target); *see also* Mattel's Proposed Statement

6  of Fact Nos. 109, 110, 120, 128, 133, 134.

7

8            **3.    MGA Cannot Prove Any Claim For Restitution**

9       170.   California Business and Professions Code § 17203 does not permit the

10  recovery of damages.  See Bank of the West v. Superior Court, 2 Cal. 4th 1254,

11  1266 (1992); see also Cel-Tech Commc'ns, Inc., 20 Cal.4th at 179 ("Plaintiffs may

12  not receive damages, much less *treble* damages, or attorney fees" under the UCL)

13  (emphasis in original).

14       **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

15  misleading.  Relief available for unfair competition includes "the disgorgement of

16  money that has been wrongfully obtained, or in the language of the statue, and

17  order 'restor[ing] . . . money . . . which may have been acquired by means of unfair

18  competition.'"  *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992).

19

20       172.   The goal of restitution under the UCL is "to restore the status quo by

21  returning to the plaintiff funds *in which he or she had an ownership interest*."

22  Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1149 (2003)

23  (emphasis added).

24       **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

25  misleading.  Restitution for unfair competition "'is not limited only to the return of

26  money or property that was once in the possession of that person.'  Instead

27  restitution is broad enough to allow a plaintiff to recover money or property in

28  which he or she has a vested interest."  *Korea Supply Co. v. Lockheed Martin*

1   *Corp.*, 29 Cal. 4th 1134, 1149 (2003) (citations omitted).  Relief available for unfair

2   competition includes "the disgorgement of money that has been wrongfully

3   obtained . . . ."  *Bank of the West*, 2 Cal. 4th at 1266.

4

5       173.  Restitution under the UCL is only available where the sum at issue can

6   "clearly be traced to particular funds or property in the defendant's possession."

7   Colgan  v. Leatherman Tool Group, Inc., 135 Cal. App. 4th 663, 699 (2006).  See

8   also See Bank of the West, 2 Cal. 4th at 1266 (holding that the only "nonpunitive

9   monetary relief available" under the UCL "is disgorgement of money wrongfully

10  obtained").

11      **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

12  misleading.  Relief available for unfair competition includes "the disgorgement of

13  money that has been wrongfully obtained . . . ."  *Bank of the West*, 2 Cal. 4th at

14  1266.  The evidence at trial established that Kohl's had eight feet of space in its toy

15  department set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5

16  (Scholvin Testimony).  Barbie had four feet of this shelf space and Bratz also had

17  four feet.  *Id.* at 73:9-10, 77:6-9.  In December 2004, Kohl's initial email to Mattel

18  regarding its toy departments confirms that "we have approx 4' of POG space

19  designated for Bratz this spring."  TX 37113.  As a result of Mattel's agreement to

20  pay Kohl's for the shelf space, MGA lost this previously designated shelf space

21  (and the corresponding sales volume to Kohl's to Mattel).  TX 26612 (Zablow

22  email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's

23  for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram

24  space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006

25  Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero

26  Testimony).  Mattel's internal correspondence reflects the fact that the intent of the

27  agreement was to obtain Bratz' shelf-space for 2005 and 2006.  TX 26612 (Zablow

28  email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram

2   space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006

3   Mattel-Kohl's agreement).  Mattel also admitted that as a result of its deal with

4   Kohl's Bratz dolls no longer appeared on the eight feet of shelf space in the toy

5   department allocated to fashion dolls.  4/6/2011 (Vol. 3) Tr. 84:22-85:11 (Scholvin

6   Testimony); *see also* 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

7

8          174.   Restitution may not include any profits earned by Mattel that MGA

9   may claim were earned as a result of Mattel's unfair competition.  Nor may

10  restitution include any profits MGA claims it lost.  See Cal. Bus. & Prof. Code §

11  17203; Oculus Innovative  Sciences, Inc. v. Prodinnv, S.A. de C.V., 2010 WL

12  4774659, at *5 (N.D. Cal. Nov. 16, 2010) (finding that disgorgement of profits is

13  "not an available remedy under the UCL."); Korea Supply Co., 29 Cal. 4th 1134 at

14  1149 (holding sole monetary relief available under section 17203 is restitution, and

15  that "[a]ny award that plaintiff would recover from defendants would not be

16  restitutionary as it would not replace any money or property that defendants took

17  directly from plaintiff"); Inline, Inc. v. A.V.L. Holding Co., 125 Cal. App. 4th 895,

18  904-05 (2005) (rejecting various forms of requested recovery because not

19  restitutionary, including consequential losses and fair market value of property

20  sold); Pegasus Satellite Television, Inc. v. DirecTV, Inc., 318 F. Supp. 2d 968, 979

21  (C.D. Cal. 2004) (one competitor does not have a vested interest in the profits of

22  another).

23          **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

24  misleading.  Relief available for unfair competition includes "the disgorgement of

25  money that has been wrongfully obtained . . . ."  *Bank of the West*, 2 Cal. 4th at

26  1266.  The evidence at trial established that Kohl's had eight feet of space in its toy

27  department set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5

28  (Scholvin Testimony).  Barbie had four feet of this shelf space and Bratz also had

MGA PARTIES' OBJECTIONS TO MATTEL'S
                    PROPOSED FINDINGS OF FACT AND LAW
                    CV-04-9049 DOC (RNBx)

1    four feet.  *Id.* at 73:9-10, 77:6-9.  In December 2004, Kohl's initial email to Mattel

2    regarding its toy departments confirms that "we have approx 4' of POG space

3    designated for Bratz this spring."  TX 37113.  As a result of Mattel's agreement to

4    pay Kohl's for the shelf space, MGA lost this previously designated shelf space

5    (and the corresponding sales volume to Kohl's to Mattel).  TX 26612 (Zablow

6    email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's

7    for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram

8    space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006

9    Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero

10   Testimony).  Mattel's internal correspondence reflects the fact that the intent of the

11   agreement was to obtain Bratz' shelf-space for 2005 and 2006.  TX 26612 (Zablow

12   email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's

13   for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram

14   space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006

15   Mattel-Kohl's agreement).  Mattel also admitted that as a result of its deal with

16   Kohl's Bratz dolls no longer appeared on the eight feet of shelf space in the toy

17   department allocated to fashion dolls.  4/6/2011 (Vol. 3) Tr. 84:22-85:11 (Scholvin

18   Testimony); *see also* 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

19   Kohl's had purchased $5.089 million in Bratz inventory from MGA in 2004.  TX

20   31180 at p. 14, ln. 398.  Kohl's purchased $646,230 worth of MGA products in

21   2005 and $140,468 in 2006.  TX 31181 at p. 16, ln. 421 and TX 31182 at p. 11, ln.

22   151 (respectively); 3/24/2011 (Vol. 2) Tr. 162:13-19 (Larian Testimony).  Kohl's

23   did not buy any Bratz products in 2005 or 2006.  3/24/2011 (Vol. 2) Tr. 162:14-

24   163:5 (Larian Testimony).  Mattel's sales at Kohl's increased 36% in 2005 and an

25   additional 10% in 2006.  TX 26612.

26

27       175.  Property, as used in Section 17203, refers to a vested property interest,

28   not merely an expectation of a future business.  <u>Korea Supply Co.</u>, 29 Cal.4th at

1   1149-50 (holding that an expectancy of payment from a third party is a contingent

2   right that cannot be recovered through a UCL claim).  See U.S. v. Rodrigues, 229

3   F.3d 842, 846 (9th Cir. 2000) (finding that under the federal Victim and Witness

4   Protection Act of 1982, restitution was not available for a contingent loss in which

5   the company had only an expectancy interest; restitution could only be recovered

6   for the loss of a vested interest).

7      **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

8   misleading.  Relief available for unfair competition includes "the disgorgement of

9   money that has been wrongfully obtained . . . ."  *Bank of the West*, 2 Cal. 4th at

10  1266.  The evidence at trial established that Kohl's had eight feet of space in its toy

11  department set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5

12  (Scholvin Testimony).  Barbie had four feet of this shelf space and Bratz also had

13  four feet.  *Id.* at 73:9-10, 77:6-9.  In December 2004, Kohl's initial email to Mattel

14  regarding its toy departments confirms that "we have approx 4' of POG space

15  designated for Bratz this spring."  TX 37113.  As a result of Mattel's agreement to

16  pay Kohl's for the shelf space, MGA lost this previously designated shelf space

17  (and the corresponding sales volume to Kohl's to Mattel).  TX 26612 (Zablow

18  email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's

19  for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram

20  space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006

21  Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero

22  Testimony).  Mattel's internal correspondence reflects the fact that the intent of the

23  agreement was to obtain Bratz' shelf-space for 2005 and 2006.  TX 26612 (Zablow

24  email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's

25  for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram

26  space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006

27  Mattel-Kohl's agreement).  Mattel also admitted that as a result of its deal with

28  Kohl's Bratz dolls no longer appeared on the eight feet of shelf space in the toy

department allocated to fashion dolls. 4/6/2011 (Vol. 3) Tr. 84:22-85:11 (Scholvin Testimony); *see also* 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony). Kohl's had purchased $5.089 million in Bratz inventory from MGA in 2004. TX 31180 at p. 14, ln. 398. Kohl's purchased $646,230 worth of MGA products in 2005 and $140,468 in 2006. TX 31181 at p. 16, ln. 421 and TX 31182 at p. 11, ln. 151 (respectively); 3/24/2011 (Vol. 2) Tr. 162:13-19 (Larian Testimony). Kohl's did not buy any Bratz products in 2005 or 2006. 3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian Testimony). Mattel's sales at Kohl's increased 36% in 2005 and an additional 10% in 2006. TX 26612.

176.   MGA presented no evidence showing that Mattel engaged in unfair competition. There is no evidence showing that Mattel engaged in exclusive dealing or any other conduct with respect to Kohl's that harmed competition or consumers. There is no evidence showing that Mattel interfered with MGA's relationship with any licensee, manufacturer or distributor, much less evidence of harm to competition. There is no competent evidence supporting the previously identified factual bases for MGA's unfair competition claim set forth above.

**MGA OBJECTIONS:** MGA objects to this proposed conclusion as unsupported and false. The evidence at trial established that Kohl's had eight feet of space in its toy department set aside for fashion dolls. 4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5 (Scholvin Testimony). Barbie had four feet of this shelf space and Bratz also had four feet. *Id.* at 73:9-10, 77:6-9. Mattel paid Kohl's $1.25 million to occupy all eight feet of this space, including the four feet that had been designated for Bratz. TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony). Mattel's internal correspondence

reflects the fact that the intent of the agreement was to exclude MGA's Bratz produce from the toy department for 2005 and 2006.  TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement).  Further, Mattel admitted that, as a result of its agreement with Kohl's, Kohl's did not carry any 2005 or 2006 Bratz products.  3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  As a result of this agreement with Mattel, Kohl's purchased no new Bratz products from MGA in either 2005 or 2006. 3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian Testimony); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  Further, MGA introduced evidence that Mattel systematically attempted to thwart MGA's Bratz line by interfering with MGA's relationships, from manufacturing to retail and there is no evidence of such systematic conduct by MGA.  *See* TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement); TX 8972 (Eckert email to "kill the deal or let it slide"); TX 34833 (Mattel email re stopping Bandai's distribution of Bratz); TX 8120 (email re moving product at WalMart); TX 8572 (demanding "larger playing field" and an "unfair benefit" over MGA at Target); *see also* Mattel's Proposed Statement of Fact Nos. 109, 110, 120, 128, 133, 134.  *See* MGA's objections to Mattel's Finding of Fact Nos. 132-135.

177.   MGA has failed to prove it has any claim for restitution. MGA asserts it is entitled to "lost profits" it would have earned in 2005 and 2006 but for Mattel's alleged conduct concerning Kohl's.  Findings of Fact ¶¶ 99-100.  But MGA failed to prove at trial any loss of "money or property that defendants took directly from

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1  [MGA]" or "money or property in which [MGA] has a vested interest."  Findings

2  of Fact ¶¶ 43-70.

3  **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as false

4  and unsupported.  Relief available for unfair competition includes "the

5  disgorgement of money that has been wrongfully obtained . . . ."  *Bank of the West*,

6  2 Cal. 4th at 1266.  The evidence at trial established that Kohl's had eight feet of

7  space in its toy department set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8,

8  77:3-5 (Scholvin Testimony).  Barbie had four feet of this shelf space and Bratz

9  also had four feet.  *Id.* at 73:9-10, 77:6-9.  In December 2004, Kohl's initial email

10  to Mattel regarding its toy departments confirms that "we have approx 4' of POG

11  space designated for Bratz this spring."  TX 37113.  As a result of Mattel's

12  agreement to pay Kohl's for the shelf space, MGA lost this previously designated

13  shelf space (and the corresponding sales volume to Kohl's to Mattel).  TX 26612

14  (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment

15  to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's

16  planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX

17  24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

18  (Vollero Testimony).  Mattel's internal correspondence reflects the fact that the

19  intent of the agreement was to obtain Bratz' shelf-space for 2005 and 2006.  TX

20  26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re

21  payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel

22  MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement);

23  TX 24005 (2006 Mattel-Kohl's agreement).  Mattel also admitted that as a result of

24  its deal with Kohl's Bratz dolls no longer appeared on the eight feet of shelf space

25  in the toy department allocated to fashion dolls.  4/6/2011 (Vol. 3) Tr. 84:22-85:11

26  (Scholvin Testimony); *see also* 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero

27  Testimony).  Kohl's had purchased $5.089 million in Bratz inventory from MGA in

28  2004.  TX 31180 at p. 14, ln. 398.  Kohl's purchased $646,230 worth of MGA

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1  products in 2005 and $140,468 in 2006.  TX 31181 at p. 16, ln. 421 and TX 31182

2  at p. 11, ln. 151 (respectively); 3/24/2011 (Vol. 2) Tr. 162:13-19 (Larian

3  Testimony).  Kohl's did not buy any Bratz products in 2005 or 2006.  3/24/2011

4  (Vol. 2) Tr. 162:14-163:5 (Larian Testimony).  Mattel's sales at Kohl's increased

5  36% in 2005 and an additional 10% in 2006.  TX 26612.

6

7      178.   MGA adduced no evidence that it had any "vested interest" in the

8  placement of its products on Kohl's shelves. It introduced no agreement with

9  Kohl's of any type for any year. Finding of Fact 47.  Rather, it had to compete for

10 shelf space at Kohl's by offering products that would appeal to the Kohl's

11 consumer and generate profits for Kohl's. Bratz dolls did neither of those things.

12 Findings of Fact 17, 28, 29.  Accordingly, Mattel did not deprive MGA of any

13 "property" as that term is used in section 17203.

14     **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as false

15 and unsupported.  Relief available for unfair competition includes "the

16 disgorgement of money that has been wrongfully obtained . . . ." *Bank of the West*,

17 2 Cal. 4th at 1266.  The evidence at trial established that Kohl's had eight feet of

18 space in its toy department set aside for fashion dolls. 4/6/2011 (Vol. 3) Tr. 73:4-8,

19 77:3-5 (Scholvin Testimony).  Barbie had four feet of this shelf space and Bratz

20 also had four feet.  *Id.* at 73:9-10, 77:6-9.  In December 2004, Kohl's initial email

21 to Mattel regarding its toy departments confirms that "we have approx 4' of POG

22 space designated for Bratz this spring."  TX 37113.  As a result of Mattel's

23 agreement to pay Kohl's for the shelf space, MGA lost this previously designated

24 shelf space (and the corresponding sales volume to Kohl's to Mattel).  TX 26612

25 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment

26 to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's

27 planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX

28 24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

1   (Vollero Testimony).  Mattel's internal correspondence reflects the fact that the
2   intent of the agreement was to obtain Bratz' shelf-space for 2005 and 2006.  TX
3   26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re
4   payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel
5   MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement);
6   TX 24005 (2006 Mattel-Kohl's agreement).  Mattel also admitted that as a result of
7   its deal with Kohl's Bratz dolls no longer appeared on the eight feet of shelf space
8   in the toy department allocated to fashion dolls.  4/6/2011 (Vol. 3) Tr. 84:22-85:11
9   (Scholvin Testimony); *see also* 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero
10  Testimony).  Kohl's had purchased $5.089 million in Bratz inventory from MGA in
11  2004.  TX 31180 at p. 14, ln. 398.  Kohl's purchased $646,230 worth of MGA
12  products in 2005 and $140,468 in 2006.  TX 31181 at p. 16, ln. 421 and TX 31182
13  at p. 11, ln. 151 (respectively); 3/24/2011 (Vol. 2) Tr. 162:13-19 (Larian
14  Testimony).  Kohl's did not buy any Bratz products in 2005 or 2006.  3/24/2011
15  (Vol. 2) Tr. 162:14-163:5 (Larian Testimony).  Mattel's sales at Kohl's increased
16  36% in 2005 and an additional 10% in 2006.  TX 26612.

17

18      179.  Moreover, the foregoing authorities make clear that restitution may not
19  include any profits MGA claims it lost.  See Korea Supply Co., 29 Cal. 4th at 1149;
20  Oculus Innovative Sciences, Inc., 2010 WL 4774659, at *5; Inline, Inc., 125 Cal.
21  App. 4th at 904-05; Pegasus Satellite Television, Inc., 318 F. Supp. 2d at 979.

22      **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as false.
23  Relief available for unfair competition includes "the disgorgement of money that
24  has been wrongfully obtained . . . ."  *Bank of the West*, 2 Cal. 4th at 1266.  The
25  evidence at trial established that Kohl's had eight feet of space in its toy department
26  set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5 (Scholvin
27  Testimony).  Barbie had four feet of this shelf space and Bratz also had four feet.
28  *Id.* at 73:9-10, 77:6-9.  In December 2004, Kohl's initial email to Mattel regarding

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   its toy departments confirms that "we have approx 4' of POG space designated for

2   Bratz this spring." TX 37113.  As a result of Mattel's agreement to pay Kohl's for

3   the shelf space, MGA lost this previously designated shelf space (and the

4   corresponding sales volume to Kohl's to Mattel). TX 26612 (Zablow email re

5   "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz

6   shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for

7   money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-

8   Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

9   Mattel's internal correspondence reflects the fact that the intent of the agreement

10  was to obtain Bratz' shelf-space for 2005 and 2006.  TX 26612 (Zablow email re

11  "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz

12  shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram space for

13  money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-

14  Kohl's agreement).  Mattel also admitted that as a result of its deal with Kohl's

15  Bratz dolls no longer appeared on the eight feet of shelf space in the toy department

16  allocated to fashion dolls.  4/6/2011 (Vol. 3) Tr. 84:22-85:11 (Scholvin Testimony);

17  *see also* 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  Kohl's had

18  purchased $5.089 million in Bratz inventory from MGA in 2004.  TX 31180 at p.

19  14, ln. 398.  Kohl's purchased $646,230 worth of MGA products in 2005 and

20  $140,468 in 2006.  TX 31181 at p. 16, ln. 421 and TX 31182 at p. 11, ln. 151

21  (respectively); 3/24/2011 (Vol. 2) Tr. 162:13-19 (Larian Testimony).  Kohl's did

22  not buy any Bratz products in 2005 or 2006.  3/24/2011 (Vol. 2) Tr. 162:14-163:5

23  (Larian Testimony).  Mattel's sales at Kohl's increased 36% in 2005 and an

24  additional 10% in 2006.  TX 26612.  MGA's relief claim is one of restitution based

25  upon Mattel's unjust enrichment due to its unlawful agreement with Kohl's.

26  4/5/2011 (Vol. 1) Tr. 33:14-20 (Malackowski Testimony).  MGA's loss of sales

27  corresponds with Mattel's increased sales (*i.e.* its unjust enrichment), as Mattel's

28  increased sales are directly tied to MGA's loss of sales for its four feet of allocated

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   planogram space.  *Id.* at 32:1-33:20.

2

3   180.   Even if MGA had proven it was entitled to some amount of restitution,

4   its damages analysis is fatally flawed because MGA's expert failed to apportion

5   damages for the teenage Bratz dolls versus Little Tikes and Little Bratz.  Findings

6   of Fact ¶ 101.  There is no principled basis to identify any damages.  Only Bratz

7   dolls were allegedly excluded, but the damages analysis MGA offered is not limited

8   to Bratz dolls or any amount of money for the Bratz dolls identified.

9   **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as false.

10  The evidence at trial established that Kohl's had eight feet of space in its toy

11  department set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5

12  (Scholvin Testimony).  Barbie had four feet of this shelf space and Bratz also had

13  four feet.  *Id.* at 73:9-10, 77:6-9.  In December 2004, Kohl's initial email to Mattel

14  regarding its toy departments confirms that "we have approx 4' of POG space

15  designated for Bratz this spring."  TX 37113.  As a result of Mattel's agreement to

16  pay Kohl's for the shelf space, MGA lost this previously designated shelf space

17  (and the corresponding sales volume to Kohl's to Mattel).  TX 26612 (Zablow

18  email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's

19  for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram

20  space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006

21  Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero

22  Testimony).  Mattel's internal correspondence reflects the fact that the intent of the

23  agreement was to obtain Bratz' shelf-space for 2005 and 2006.  TX 26612 (Zablow

24  email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's

25  for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram

26  space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006

27  Mattel-Kohl's agreement).  Mattel also admitted that as a result of its deal with

28  Kohl's Bratz dolls no longer appeared on the eight feet of shelf space in the toy

1  department allocated to fashion dolls.  4/6/2011 (Vol. 3) Tr. 84:22-85:11 (Scholvin

2  Testimony); *see also* 3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).

3  Kohl's had purchased $5.089 million in Bratz inventory from MGA in 2004.  TX

4  31180 at p. 14, ln. 398.  Kohl's purchased $646,230 worth of MGA products in

5  2005 and $140,468 in 2006.  TX 31181 at p. 16, ln. 421 and TX 31182 at p. 11, ln.

6  151 (respectively); 3/24/2011 (Vol. 2) Tr. 162:13-19 (Larian Testimony).  Kohl's

7  did not buy any Bratz products in 2005 or 2006.  3/24/2011 (Vol. 2) Tr. 162:14-

8  163:5 (Larian Testimony).  Mattel's sales at Kohl's increased 36% in 2005 and an

9  additional 10% in 2006.  TX 26612.  MGA's relief claim is one of restitution based

10  upon Mattel's unjust enrichment due to its unlawful agreement with Kohl's.

11  4/5/2011 (Vol. 1) Tr. 33:14-20 (Malackowski Testimony).  MGA's loss of sales

12  corresponds with Mattel's increased sales (*i.e.* its unjust enrichment), as Mattel's

13  increased sales are directly tied to MGA's loss of sales for its four feet of allocated

14  planogram space.  *Id.* at 32:1-33:20.

15

16      181.   Appellate courts reverse lost profits awards based on speculation or

17  unsupported by evidence.  See, e.g., Fireman's Fund Ins. Cos. v. Big Blue

18  Fisheries, Inc., 143 F.3d 1172, 1174 (9th Cir. 1998) ("We uphold the district court's

19  finding that the Big Blue's use of radar was non-negligent, but reverse the district

20  court's demurrage award because it is unsupported by the record."); F.D.I.C. v.

21  Craft, 157 F.3d 697, 704-705 (9th Cir. 1998) (holding that speculative damages that

22  have not been established at trial are not recoverable).

23      **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as

24  irrelevant.  Mattel also admitted that as a result of its deal with Kohl's Bratz dolls

25  no longer appeared on the eight feet of shelf space in the toy department allocated

26  to fashion dolls.  4/6/2011 (Vol. 3) Tr. 84:22-85:11 (Scholvin Testimony); *see also*

27  3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  Kohl's had purchased

28  $5.089 million in Bratz inventory from MGA in 2004.  TX 31180 at p. 14, ln. 398.

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    Kohl's purchased $646,230 worth of MGA products in 2005 and $140,468 in 2006.

2    TX 31181 at p. 16, ln. 421 and TX 31182 at p. 11, ln. 151 (respectively); 3/24/2011

3    (Vol. 2) Tr. 162:13-19 (Larian Testimony).  Kohl's did not buy any Bratz products

4    in 2005 or 2006.  3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian Testimony).

5    Mattel's sales at Kohl's increased 36% in 2005 and an additional 10% in 2006.  TX

6    26612.  MGA's relief claim is one of restitution based upon Mattel's unjust

7    enrichment due to its unlawful agreement with Kohl's.  4/5/2011 (Vol. 1) Tr. 33:14-

8    20 (Malackowski Testimony).  MGA's loss of sales corresponds with Mattel's

9    increased sales (*i.e.* its unjust enrichment), as Mattel's increased sales are directly

10   tied to MGA's loss of sales for its four feet of allocated planogram space.  *Id.* at

11   32:1-33:20.

12

13        182.   MGA's own records show that Kohl's purchased and sold MGA

14   products in its stores in both 2005 and 2006.  Finding of Fact ¶¶ 71-75.  In addition,

15   MGA failed to show that Kohl's purchased any Bratz dolls in 2007, 2008 or 2009,

16   or if they did, the value of any such purchases.  Finding of Fact ¶¶ 102-04.  Because

17   MGA's expert failed to limit or apportion damages for the teenage Bratz dolls, as

18   opposed to Little Tikes, Little Bratz or any other MGA product, the Court has no

19   evidence from which to determine (a) whether MGA in fact lost profits on Bratz

20   dolls sales in 2005 and 2006, or (b) the amount of any such lost profits.  Findings of

21   Fact ¶¶ 99-104.

22        **MGA OBJECTIONS:**  MGA objects to this proposed conclusion as

23   unsupported and intentionally false.  This conclusion is based on Little Tikes sales.

24   As Mattel is well aware, MGA did not own Little Tikes in October 2006.

25   2/10/2011 (Vol. 2) Tr. 33:21-34:7 (Larian Testimony), 3/8/2011 (Vol. 1) Tr. 96:11-

26   25 (Wagner testimony) 3/24/2011 (Vol. 2) Tr. 139:13-16 (Larian Testimony),

27   3/25/2011 (Vol. 2) Tr. 14:1-24, 53:6-13 (Larian Testimony), 3/30/2011 (Vol. 2) Tr.

28   46:25-47:6, 47:24-48:4 (Hauenstein Testimony).  Accordingly, any sales to Kohl's

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    for Little Tikes products in 2006 were not MGA sales, but rather Little Tikes sales.

2    3/25/2011 (Vol. 2) Tr. 14:1-24 (Larian). As Mr. Larian testified at trial, Little Tikes

3    previous sales records were incorporated in MGA's system after MGA purchased

4    Little Tikes. *Id.* However, the incorporation of these Little Tikes sales figures into

5    MGA's system does not change the fact that Little Tikes sales prior to being

6    purchased by MGA were not MGA sales, let alone Bratz sales. Mattel's repeated

7    attempts to distort this data cannot change the fact that these sales are Little Tikes'

8    sales.

9        The evidence establishes that Kohl's had purchased $5.089 million in Bratz

10   inventory from MGA in 2004. TX 31180 at p. 14, ln. 398. Kohl's purchased

11   $646,230 worth of MGA products in 2005 and $140,468 in 2006. TX 31181 at p.

12   16, ln. 421 and TX 31182 at p. 11, ln. 151 (respectively); 3/24/2011 (Vol. 2) Tr.

13   162:13-19 (Larian Testimony). Kohl's did not buy any Bratz products in 2005 or

14   2006. 3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian Testimony); 3/29/2011 (Vol. 1)

15   Tr. 121:22-122:1 (Vollero Testimony). Mattel's sales at Kohl's increased 36% in

16   2005 and an additional 10% in 2006.

17

18       183.   Accordingly, MGA is not entitled to any monetary relief for its UCL

19   claim.

20       **MGA OBJECTIONS:** MGA objects to the proposed conclusion as false.

21   *See* MGA's Objections to Mattel's Conclusion of Law Nos. 170-183.

22

23             **4.     MGA's UCL Claim Is Barred By The Competition Privilege**

24

25       184.   MGA's UCL claim is barred in whole or in part by the competition

26   privilege. See Mattel's Fourth Am. Answer And Counterclaims, Dkt. 7714, at 25

27   (Eleventh Affirmative Defense); Mattel's Fourth Am. Proposed Jury Instructions,

28   Dkt. 9683, at 237- 38.

1    **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

2    unsupported by California law and irrelevant.  The competition privilege is not an

3    affirmative defense to unfair competition.  The "competition privilege" was

4    historically an affirmative defense to a claim of intentional interference with

5    prospective economic advantage.  *See San Francisco Design Ctr. Assocs. v.*

6    *Portman Cos.*, 41 Cal. App. 4th 29, 33 (1995) ("The competition privilege is an

7    affirmative defense to the tort of interference with prospective economic

8    advantage"); *Navellier v. Sletten*, 262 F.3d 923, 937-38 (9th Cir. 2001) ("California

9    recognizes a 'competition privilege' which protects one from liability for inducing a

10   third person not to enter into a prospective contractual relation with a business

11   competitor."); Rest. (Second) Torts § 768.  One way to defeat the privilege was to

12   demonstrate that "the competitor's conduct violated a statute or constituted a fraud

13   such as unfair competition."  *Id.* at 43.  By definition, if someone has violated the

14   unfair competition statute, their conduct cannot be protected by the competition

15   privilege.

16

17        185.   The competition privilege protects one from liability for inducing a

18   third person not to enter into a prospective contractual relation with a business

19   competitor.  See Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square

20   Venture Partners, 52 Cal. App. 4th 867, 880-81 (1997) ("California law has long

21   recognized a 'competition privilege' which protects one from liability for inducing

22   a third person not to enter into a prospective contractual relation with a business

23   competitor.") (internal citations and quotations omitted); San Francisco Design

24   Center Assocs. v. Portman Cos., 41 Cal. App. 4th 29, 42-43 (1995) ("In order to

25   defeat the privilege the defendant's conduct must be unlawful or illegitimate.  That

26   is, when a claimant charges its competitor with interference with prospective

27   economic advantage and the competitor raises the competition privilege as a

28   defense, the claimant must show the competitor's conduct violated a statute or

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   constituted a tort such as fraud or unfair competition.  The defendant's conduct

2   must be independently actionable."); Restatement (Second) of Torts § 768 ("(1)

3   One who intentionally causes a third person not to enter into a prospective

4   contractual relation with another who is his competitor or not to continue an

5   existing contract terminable at will does not interfere improperly with the other's

6   relation if (a) the relation concerns a matter involved in the competition between the

7   actor and the other and (b) the actor does not employ wrongful means and (c) his

8   action does not create or continue an unlawful restraint of trade and (d) his purpose

9   is at least in part to advance his interest in competing with the other.").

10       **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

11   unsupported by California law, misleading and irrelevant.  Mattel's conclusion

12   implies that the competition privilege applies to claims other than intentional

13   interference with prospective economic advantage.  It does not.  *See, e.g.*, *San*

14   *Francisco Design Ctr. Assocs.*, 41 Cal. App. 4th at 33 ("The competition privilege

15   is an affirmative defense to the tort of interference with prospective economic

16   advantage"); *Navellier*, 262 F.3d at 937-38 (9th Cir. 2001) ("California recognizes

17   a 'competition privilege' which protects one from liability for inducing a third

18   person not to enter into a prospective contractual relation with a business

19   competitor."); Rest. (Second) Torts § 768.

20

21       186.   To prevail on the affirmative defense of competition privilege, Mattel

22   must prove by a preponderance of the evidence that (a) the relation between MGA

23   and third parties, including retailers, licensees, manufacturers and distributors,

24   concerns a matter involved in the competition between Mattel and MGA, (b) Mattel

25   did not employ improper means, and (c) Mattel's purpose was at least in part to

26   advance its interest in competition with MGA.

27       **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

28   unsupported by California law, misleading and irrelevant.  Mattel's conclusion

1    implies that the competition privilege applies to claims other than intentional

2    interference with prospective economic advantage.  It does not.  *See, e.g.*, *San*

3    *Francisco Design Ctr. Assocs.*, 41 Cal. App. 4th at 33 ("The competition privilege

4    is an affirmative defense to the tort of interference with prospective economic

5    advantage"); *Navellier*, 262 F.3d at 937-38 (9th Cir. 2001) ("California recognizes

6    a 'competition privilege' which protects one from liability for inducing a third

7    person not to enter into a prospective contractual relation with a business

8    competitor."); Rest. (Second) Torts § 768.

9

10        187.   Mattel has presented evidence at trial that the relation between MGA

11   and Kohl's concerns a matter involved in the competition between Mattel and

12   MGA.  Findings of Fact ¶¶ 11, 12, 77, 78.

13        **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

14   unsupported by California law, misleading and irrelevant.  Mattel's conclusion

15   implies that the competition privilege applies to claims other than intentional

16   interference with prospective economic advantage.  It does not.  *See, e.g.*, *San*

17   *Francisco Design Ctr. Assocs.*, 41 Cal. App. 4th at 33 ("The competition privilege

18   is an affirmative defense to the tort of interference with prospective economic

19   advantage"); *Navellier*, 262 F.3d at 937-38 (9th Cir. 2001) ("California recognizes

20   a 'competition privilege' which protects one from liability for inducing a third

21   person not to enter into a prospective contractual relation with a business

22   competitor."); Rest. (Second) Torts § 768.

23

24        188.   Mattel has also proven that it did not employ improper means. Neither

25   the 2005 nor the 2006 contracts with Kohl's contain any exclusionary provision or

26   reference to MGA.  Findings of Fact ¶¶ 84-88. MGA produced no evidence that the

27   practical effect of either agreement would have been to foreclose MGA from

28   competing for business at Kohl's. Findings of Fact ¶¶ 84-98.

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

2    unsupported by California law, misleading and irrelevant.  Mattel's conclusion

3    implies that the competition privilege applies to claims other than intentional

4    interference with prospective economic advantage.  It does not.  *See, e.g.*, *San*

5    *Francisco Design Ctr. Assocs.*, 41 Cal. App. 4th at 33 ("The competition privilege

6    is an affirmative defense to the tort of interference with prospective economic

7    advantage"); *Navellier*, 262 F.3d at 937-38 (9th Cir. 2001) ("California recognizes

8    a 'competition privilege' which protects one from liability for inducing a third

9    person not to enter into a prospective contractual relation with a business

10   competitor."); Rest. (Second) Torts § 768.

11          The evidence at trial established that Kohl's had eight feet of space in its toy

12   department set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5

13   (Scholvin Testimony).  Barbie had four feet of this shelf space and Bratz also had

14   four feet.  *Id.* at 73:9-10, 77:6-9.  Mattel paid Kohl's $1.25 million to occupy all

15   eight feet of this space, including the four feet that had been designated for Bratz.

16   TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re

17   payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel

18   MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement);

19   TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

20   (Vollero Testimony).  Mattel's internal correspondence reflects the fact that the

21   intent of the agreement was to exclude MGA's Bratz produce from the toy

22   department for 2005 and 2006.  TX 26612 (Zablow email re "Great News

23   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

24   TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

25   24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

26   agreement).  Further, Mattel admitted that, as a result of its agreement with Kohl's,

27   Kohl's did not carry any 2005 or 2006 Bratz products.  3/29/2011 (Vol. 1) Tr.

28   121:22-122:1 (Vollero Testimony).  As a result of this agreement with Mattel,

1   Kohl's purchased no new Bratz products from MGA in either 2005 or 2006.

2   3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian Testimony); 3/29/2011 (Vol. 1) Tr.

3   121:22-122:1 (Vollero Testimony).  MGA introduced additional evidence that

4   Mattel systematically attempted to thwart MGA's Bratz line by interfering with

5   MGA's relationships, from manufacturing to retail and there is no evidence of such

6   systematic conduct by MGA.  *See* TX 26612 (Zablow email re "Great News

7   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

8   TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

9   24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

10  agreement); TX 8972 (Eckert email to "kill the deal or let it slide"); TX 34833

11  (Mattel email re stopping Bandai's distribution of Bratz); TX 8120 (email re

12  moving product at WalMart); TX 8572 (demanding "larger playing field" and an

13  "unfair benefit" over MGA at Target); *see also* Mattel's Proposed Statement of Fact

14  Nos. 109, 110, 120, 128, 133, 134.

15

16      189.   MGA did not prove that the 2005 and 2006 agreements or any other

17  agreement with Kohl's harmed consumers.  Kohl's continued to carry MGA

18  products at its stores in 2005 and 2006. Findings of Fact ¶¶ 71-75.

19      **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

20  unsupported by California law, misleading and irrelevant.  Mattel's conclusion

21  implies that the competition privilege applies to claims other than intentional

22  interference with prospective economic advantage.  It does not.  *See, e.g.*, *San*

23  *Francisco Design Ctr. Assocs.*, 41 Cal. App. 4th at 33 ("The competition privilege

24  is an affirmative defense to the tort of interference with prospective economic

25  advantage"); *Navellier*, 262 F.3d at 937-38 (9th Cir. 2001) ("California recognizes

26  a 'competition privilege' which protects one from liability for inducing a third

27  person not to enter into a prospective contractual relation with a business

28  competitor."); Rest. (Second) Torts § 768.

1    The evidence at trial established that Kohl's had eight feet of space in its toy

2    department set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5

3    (Scholvin Testimony).  Barbie had four feet of this shelf space and Bratz also had

4    four feet.  *Id.* at 73:9-10, 77:6-9.  Mattel paid Kohl's $1.25 million to occupy all

5    eight feet of this space, including the four feet that had been designated for Bratz.

6    TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re

7    payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel

8    MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement);

9    TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

10   (Vollero Testimony).  Mattel's internal correspondence reflects the fact that the

11   intent of the agreement was to exclude MGA's Bratz produce from the toy

12   department for 2005 and 2006.  TX 26612 (Zablow email re "Great News

13   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

14   TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

15   24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

16   agreement).  Further, Mattel admitted that, as a result of its agreement with Kohl's,

17   Kohl's did not carry any 2005 or 2006 Bratz products.  3/29/2011 (Vol. 1) Tr.

18   121:22-122:1 (Vollero Testimony).  As a result of this agreement with Mattel,

19   Kohl's purchased no new Bratz products from MGA in either 2005 or 2006.

20   3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian Testimony); 3/29/2011 (Vol. 1) Tr.

21   121:22-122:1 (Vollero Testimony).  MGA introduced additional evidence that

22   Mattel systematically attempted to thwart MGA's Bratz line by interfering with

23   MGA's relationships, from manufacturing to retail and there is no evidence of such

24   systematic conduct by MGA.  *See* TX 26612 (Zablow email re "Great News

25   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

26   TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

27   24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

28   agreement); TX 8972 (Eckert email to "kill the deal or let it slide"); TX 34833

1   (Mattel email re stopping Bandai's distribution of Bratz); TX 8120 (email re

2   moving product at WalMart); TX 8572 (demanding "larger playing field" and an

3   "unfair benefit" over MGA at Target); *see also* Mattel's Proposed Statement of Fact

4   Nos. 109, 110, 120, 128, 133, 134.

5

6       190.   Finally, there is ample evidence that Mattel's purpose in entering into

7   the 2005 and 2006 contracts with Kohl's was at least in part to advance its interest

8   in competition with MGA. Mattel sought to increase representation of BARBIE at

9   Kohl's and engaged in lawful negotiations with Kohl's to do so.  Findings of Fact

10   ¶¶ 78-95.

11       **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

12   unsupported by California law, misleading and irrelevant.  Mattel's conclusion

13   implies that the competition privilege applies to claims other than intentional

14   interference with prospective economic advantage.  It does not. *See, e.g.*, *San*

15   *Francisco Design Ctr. Assocs.*, 41 Cal. App. 4th at 33 ("The competition privilege

16   is an affirmative defense to the tort of interference with prospective economic

17   advantage"); *Navellier*, 262 F.3d at 937-38 (9th Cir. 2001) ("California recognizes

18   a 'competition privilege' which protects one from liability for inducing a third

19   person not to enter into a prospective contractual relation with a business

20   competitor."); Rest. (Second) Torts § 768.

21       The evidence at trial established that Kohl's had eight feet of space in its toy

22   department set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5

23   (Scholvin Testimony).  Barbie had four feet of this shelf space and Bratz also had

24   four feet.  *Id.* at 73:9-10, 77:6-9.  Mattel paid Kohl's $1.25 million to occupy all

25   eight feet of this space, including the four feet that had been designated for Bratz.

26   TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re

27   payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel

28   MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement);

1  TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

2  (Vollero Testimony).  Mattel's internal correspondence reflects the fact that the

3  intent of the agreement was to exclude MGA's Bratz produce from the toy

4  department for 2005 and 2006.  TX 26612 (Zablow email re "Great News

5  BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

6  TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

7  24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

8  agreement).  Further, Mattel admitted that, as a result of its agreement with Kohl's,

9  Kohl's did not carry any 2005 or 2006 Bratz products.  3/29/2011 (Vol. 1) Tr.

10  121:22-122:1 (Vollero Testimony).  As a result of this agreement with Mattel,

11  Kohl's purchased no new Bratz products from MGA in either 2005 or 2006.

12  3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian Testimony); 3/29/2011 (Vol. 1) Tr.

13  121:22-122:1 (Vollero Testimony).  MGA introduced additional evidence that

14  Mattel systematically attempted to thwart MGA's Bratz line by interfering with

15  MGA's relationships, from manufacturing to retail and there is no evidence of such

16  systematic conduct by MGA.  *See* TX 26612 (Zablow email re "Great News

17  BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

18  TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

19  24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

20  agreement); TX 8972 (Eckert email to "kill the deal or let it slide"); TX 34833

21  (Mattel email re stopping Bandai's distribution of Bratz); TX 8120 (email re

22  moving product at WalMart); TX 8572 (demanding "larger playing field" and an

23  "unfair benefit" over MGA at Target); *see also* Mattel's Proposed Statement of Fact

24  Nos. 109, 110, 120, 128, 133, 134.

25

26      191.  With respect to MGA's claim that Mattel interfered with its

27  relationships with licensees, manufacturers and distributors, MGA presented no

28  evidence of interference.  Findings of Fact ¶¶ 105-31.

1    **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

2    unsupported by California law, misleading and irrelevant.  Mattel's conclusion

3    implies that the competition privilege applies to claims other than intentional

4    interference with prospective economic advantage.  It does not.  *See, e.g.*, *San*

5    *Francisco Design Ctr. Assocs.*, 41 Cal. App. 4th at 33 ("The competition privilege

6    is an affirmative defense to the tort of interference with prospective economic

7    advantage"); *Navellier*, 262 F.3d at 937-38 (9th Cir. 2001) ("California recognizes

8    a 'competition privilege' which protects one from liability for inducing a third

9    person not to enter into a prospective contractual relation with a business

10   competitor."); Rest. (Second) Torts § 768.

11          The evidence at trial established that Kohl's had eight feet of space in its toy

12   department set aside for fashion dolls.  4/6/2011 (Vol. 3) Tr. 73:4-8, 77:3-5

13   (Scholvin Testimony).  Barbie had four feet of this shelf space and Bratz also had

14   four feet.  *Id.* at 73:9-10, 77:6-9.  Mattel paid Kohl's $1.25 million to occupy all

15   eight feet of this space, including the four feet that had been designated for Bratz.

16   TX 26612 (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re

17   payment to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel

18   MGA's planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement);

19   TX 24005 (2006 Mattel-Kohl's agreement); 3/29/2011 (Vol. 1) Tr. 121:22-122:1

20   (Vollero Testimony).  Mattel's internal correspondence reflects the fact that the

21   intent of the agreement was to exclude MGA's Bratz produce from the toy

22   department for 2005 and 2006.  TX 26612 (Zablow email re "Great News

23   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

24   TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

25   24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

26   agreement).  Further, Mattel admitted that, as a result of its agreement with Kohl's,

27   Kohl's did not carry any 2005 or 2006 Bratz products.  3/29/2011 (Vol. 1) Tr.

28   121:22-122:1 (Vollero Testimony).  As a result of this agreement with Mattel,

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   Kohl's purchased no new Bratz products from MGA in either 2005 or 2006.

2   3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian Testimony); 3/29/2011 (Vol. 1) Tr.

3   121:22-122:1 (Vollero Testimony).  MGA introduced additional evidence that

4   Mattel systematically attempted to thwart MGA's Bratz line by interfering with

5   MGA's relationships, from manufacturing to retail and there is no evidence of such

6   systematic conduct by MGA.  *See* TX 26612 (Zablow email re "Great News

7   BARBIE"); TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space);

8   TX 37113 (Kohl's email offering Mattel MGA's planogram space for money); TX

9   24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's

10  agreement); TX 8972 (Eckert email to "kill the deal or let it slide"); TX 34833

11  (Mattel email re stopping Bandai's distribution of Bratz); TX 8120 (email re

12  moving product at WalMart); TX 8572 (demanding "larger playing field" and an

13  "unfair benefit" over MGA at Target); *see also* Mattel's Proposed Statement of Fact

14  Nos. 109, 110, 120, 128, 133, 134.

15

16      192.   MGA's UCL claim fails on the merits for the reasons discussed above.

17  Even if MGA had proven all of the elements of its UCL claim, the Court would

18  nonetheless dismiss it because Mattel has prevailed on its affirmative defense of

19  competition privilege.

20      **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

21  unsupported by California law, misleading and irrelevant.  Mattel's conclusion

22  asserts that the competition privilege could defeat an unfair competition claim.

23  This is false.  The competition privilege is not a defense to an unfair competition

24  claim, but rather it is only a defense to a claim of intentional interference with

25  prospective economic advantage.  *See, e.g.*, *San Francisco Design Ctr. Assocs.*, 41

26  Cal. App. 4th at 33 ("The competition privilege is an affirmative defense to the tort

27  of interference with prospective economic advantage"); *Navellier*, 262 F.3d at 937-

28  38 (9th Cir. 2001) ("California recognizes a 'competition privilege' which protects

1  one from liability for inducing a third person not to enter into a prospective

2  contractual relation with a business competitor."); Rest. (Second) Torts § 768.

3  Further, by definition, a showing by MGA that Mattel engaged in unfair

4  competition would preclude the application of the competition privilege because

5  Mattel could not show that it did not employ improper means. *San Francisco*

6  *Design Ctr. Assocs.*, 41 Cal. App. 4th at 43 (explaining that one way to defeat the

7  competition privilege is to demonstrate that "the competitor's conduct violated a

8  statute or constituted a fraud such as unfair competition.").

9

10           **5.   MGA's Unclean Hands Precludes Any Equitable Remedy**

11           193.   Mattel asserts that MGA should not be able to recover restitution or

12  injunctive relief against Mattel because MGA has unclean hands and is not entitled

13  to any equitable remedy.  See Mattel's Fourth Am. Answer And Counterclaims,

14  Dkt. 7714, at 24 (Fourth Affirmative Defense); Mattel's Fourth Am. Proposed Jury

15  Instructions, Dkt. 9683, at 226-27.

16           **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

17  unsupported by California law.  Unclean hands, an equitable defense, may not be

18  asserted to wholly defeat a UCL claim since such claims arise out of unlawful

19  conduct.  *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 179-80

20  (2000).  Mattel's proposed conclusion precludes all relief and accordingly wholly

21  defeats MGA's unfair competition claim.  Moreover, unclean hands requires that

22  the alleged misconduct "relate directly to the transaction concerning which the

23  complaint is made.  It must infect the cause of action involved and affect the

24  equitable relations between the litigants."  *Kendall-Jackson Winery, Ltd. v.*

25  *Superior Court*, 76 Cal. App. 4th 970, 984 (1999).  There must be a "direct

26  relationship between the misconduct and the claimed injuries" as unclean hands

27  "'cannot be distorted into a proceeding to try the general morals of the parties.'"

28  *Mattco Forge, Inc. v. Arthur Young & Co.*, 52 Cal. App. 4th 820, 846 (1997)

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   (*quoting Fireboard Paper Prods. Corp. v. East Bay Union of Machinists*, 227 Cal.

2   App. 2d 675, 729 (1964)); *see also Magic Kitchen LLC v. Good Things Int'l, Ltd.*,

3   153 Cal. App. 4th 1144, 1167 (2007) (holding unclean hands inapplicable where

4   claimant could not show how right asserted was connected to the alleged

5   inequitable conduct).

6

7        194.   While "equitable defenses may not be asserted to wholly defeat a UCL

8   claim since such claims arise out of unlawful conduct," the California Supreme

9   Court held in <u>Cortez v. Purolator Air Filtration Prods. Co.</u>, 23 Cal. 4th 163, 179-80

10  (2000), that equitable considerations may "guide the court's discretion in fashioning

11  the equitable remedies authorized by section 17203." <u>Cortez</u>, 23 Cal. 4th at 179.

12  "What would otherwise be equitable defenses may be considered by the court when

13  the court exercises its discretion over which, if any, remedies authorized by section

14  17203 should be awarded." <u>Id</u>. at 179-80.

15       **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

16  unsupported by California law.  Unclean hands, an equitable defense, may not be

17  asserted to wholly defeat a UCL claim since such claims arise out of unlawful

18  conduct.  *Cortez*, 23 Cal. 4th 179-80.  Mattel's proposed conclusion precludes all

19  relief and accordingly wholly defeats MGA's unfair competition claim.  Moreover,

20  unclean hands requires that the alleged misconduct "relate directly to the

21  transaction concerning which the complaint is made.  It must infect the cause of

22  action involved and affect the equitable relations between the litigants." *Kendall-*

23  *Jackson Winery*, 76 Cal. App. 4th at 984.  There must be a "direct relationship

24  between the misconduct and the claimed injuries" as unclean hands "'cannot be

25  distorted into a proceeding to try the general morals of the parties.'" *Mattco Forge,*

26  *Inc.*, 52 Cal. App. 4th at 846 (*quoting Fireboard Paper Prods. Corp.*, 227 Cal. App.

27  2d at 729); *see also Magic Kitchen LLC*, 153 Cal. App. 4th at 1167 (holding

28  unclean hands inapplicable where claimant could not show how right asserted was

1    connected to the alleged inequitable conduct).

2

3        195.   Under Cortez, "the trial court has the discretion to consider equitable

4    defenses such as unclean hands in creating the remedies authorized by Business and

5    Professions Code section 17203." See, e.g., Ticconi v. Blue Shield of California

6    Life & Health Ins. Co., 160 Cal.App.4th 528, 544-45 (2008) (citing Cortez, 23 Cal.

7    4th at 179, 182).

8        **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

9    unsupported by California law.  Unclean hands, an equitable defense, may not be

10   asserted to wholly defeat a UCL claim since such claims arise out of unlawful

11   conduct.  *Cortez*, 23 Cal. 4th 179-80.  Mattel's proposed conclusion precludes all

12   relief and accordingly wholly defeats MGA's unfair competition claim.  Moreover,

13   unclean hands requires that the alleged misconduct "relate directly to the

14   transaction concerning which the complaint is made.  It must infect the cause of

15   action involved and affect the equitable relations between the litigants." *Kendall-*

16   *Jackson Winery*, 76 Cal. App. 4th at 984.  There must be a "direct relationship

17   between the misconduct and the claimed injuries" as unclean hands "'cannot be

18   distorted into a proceeding to try the general morals of the parties.'" *Mattco Forge,*

19   *Inc.*, 52 Cal. App. 4th at 846 (*quoting Fireboard Paper Prods. Corp.*, 227 Cal. App.

20   2d at 729); *see also Magic Kitchen LLC*, 153 Cal. App. 4th at 1167 (holding

21   unclean hands inapplicable where claimant could not show how right asserted was

22   connected to the alleged inequitable conduct).

23

24       196.   The doctrine of unclean hands requires that a plaintiff act fairly in the

25   matter for which he seeks a remedy.  See Kendall-Jackson Winery Ltd. v. Sup. Ct.,

26   76 Cal. App. 4th 970, 978 (1999) ("The defense of unclean hands arises from the

27   maxim, 'He who comes into Equity must come with clean hands.'  The doctrine

28   demands that a plaintiff act fairly in the matter for which he seeks a remedy.  He

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1   must come into court with clean hands, and keep them clean, or he will be denied

2   relief, regardless of the merits of his claim.") (internal citations and quotations

3   omitted).

4      **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

5   irrelevant and misleading.  Unclean hands, an equitable defense, may not be

6   asserted to wholly defeat a UCL claim since such claims arise out of unlawful

7   conduct.  *Cortez*, 23 Cal. 4th 179-80.  Mattel's proposed conclusion precludes all

8   relief and accordingly wholly defeats MGA's unfair competition claim.  Further,

9   "courts are reluctant to apply the unclean hands doctrine in all but the most

10  egregious situations. It will be applied 'only where some unconscionable act of one

11  coming for relief has immediate and necessary relation to the equity that he seeks in

12  respect of the matter in litigation.'" *U-Haul Int'l, Inc. v. Jartran, Inc.*, 522 F. Supp.

13  1234, 1255U-haul, 522 F. Supp. at 1255 (quoting Markel v. Scovill Mfg. Co., 471

14  F. Supp. 1244, 1255 (W.D.N.Y. 1979) (internal quotation omitted)).   Moreover,

15  unclean hands requires that the alleged misconduct "relate directly to the

16  transaction concerning which the complaint is made.  It must infect the cause of

17  action involved and affect the equitable relations between the litigants."  *Kendall-*

18  *Jackson Winery*, 76 Cal. App. 4th at 984.  There must be a "direct relationship

19  between the misconduct and the claimed injuries" as unclean hands "'cannot be

20  distorted into a proceeding to try the general morals of the parties.'"  *Mattco Forge,*

21  *Inc.*, 52 Cal. App. 4th at 846 (*quoting Fireboard Paper Prods. Corp.*, 227 Cal. App.

22  2d at 729); *see also Magic Kitchen LLC*, 153 Cal. App. 4th at 1167 (holding

23  unclean hands inapplicable where claimant could not show how right asserted was

24  connected to the alleged inequitable conduct).

25

26      197.   The doctrine "closes the doors of a court of equity to one tainted with

27  inequitableness or bad faith relative to the matter in which he seeks relief, however

28  improper may have been the behavior of the defendant." Adler v. Federal Republic

1    of Nigeria, 219 F.3d 869, 877 (9th Cir. 2000) (quoting Precision Instr. Mfg. Co. v.

2    Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945)).

3         **MGA OBJECTIONS:** MGA objects to the proposed conclusion as

4    irrelevant and misleading.  Unclean hands, an equitable defense, may not be

5    asserted to wholly defeat a UCL claim since such claims arise out of unlawful

6    conduct.  *Cortez*, 23 Cal. 4th 179-80.  Mattel's proposed conclusion precludes all

7    relief and accordingly wholly defeats MGA's unfair competition claim.  Further,

8    "courts are reluctant to apply the unclean hands doctrine in all but the most

9    egregious situations. It will be applied 'only where some unconscionable act of one

10   coming for relief has immediate and necessary relation to the equity that he seeks in

11   respect of the matter in litigation.'" *U-Haul Int'l, Inc. v. Jartran, Inc.*, 522 F. Supp.

12   1234, 1255U-haul, 522 F. Supp. at 1255 (quoting Markel v. Scovill Mfg. Co., 471

13   F. Supp. 1244, 1255 (W.D.N.Y. 1979) (internal quotation omitted)).  Moreover,

14   unclean hands requires that the alleged misconduct "relate directly to the

15   transaction concerning which the complaint is made.  It must infect the cause of

16   action involved and affect the equitable relations between the litigants." *Kendall-

17   Jackson Winery*, 76 Cal. App. 4th at 984.  There must be a "direct relationship

18   between the misconduct and the claimed injuries" as unclean hands "'cannot be

19   distorted into a proceeding to try the general morals of the parties.'" *Mattco Forge,

20   Inc.*, 52 Cal. App. 4th at 846 (*quoting Fireboard Paper Prods. Corp.*, 227 Cal. App.

21   2d at 729); *see also Magic Kitchen LLC*, 153 Cal. App. 4th at 1167 (holding

22   unclean hands inapplicable where claimant could not show how right asserted was

23   connected to the alleged inequitable conduct).

24

25        198.   MGA alleges Mattel is liable for unfair competition based upon its

26   conduct with the retailer Kohl's, but there is ample evidence MGA was offering

27   money to Kohl's for the same shelf space.  Findings of Fact ¶¶ 62, 68-70.  MGA

28   did so at a time when Kohl's was facing severe margin losses due to poorly

1  performing Bratz products, yet MGA conditioned its offers of money to Kohl's in

2  2004 and 2005 on minimum purchase requirements for more non-performing MGA

3  products.  Findings of Fact ¶¶ 55-70.  This conduct relates directly to MGA's unfair

4  competition allegations against Mattel.  If Mattel's conduct is a "bribe" or "slotting

5  fee" then MGA equally should be precluded from any equitable relief under the

6  unclean hands doctrine.  Adler, 219 F.3d at 877; Kendall-Jackson Winery Ltd., 76

7  Cal. App. 4th at 978.

8      **MGA OBJECTIONS:**  MGA objects to the proposed conclusion as

9  irrelevant and unsupported.  Unclean hands, an equitable defense, may not be

10  asserted to wholly defeat a UCL claim since such claims arise out of unlawful

11  conduct.  *Cortez*, 23 Cal. 4th 179-80.  Further, "courts are reluctant to apply the

12  unclean hands doctrine in all but the most egregious situations. It will be applied

13  'only where some unconscionable act of one coming for relief has immediate and

14  necessary relation to the equity that he seeks in respect of the matter in litigation.'"

15  *U-Haul Int'l, Inc. v. Jartran, Inc.*, 522 F. Supp. 1234, 1255U-haul, 522 F. Supp. at

16  1255 (quoting Markel v. Scovill Mfg. Co., 471 F. Supp. 1244, 1255 (W.D.N.Y.

17  1979) (internal quotation omitted)).  Moreover, unclean hands requires that the

18  alleged misconduct "relate directly to the transaction concerning which the

19  complaint is made.  It must infect the cause of action involved and affect the

20  equitable relations between the litigants." *Kendall-Jackson Winery*, 76 Cal. App.

21  4th at 984.  There must be a "direct relationship between the misconduct and the

22  claimed injuries" as unclean hands "'cannot be distorted into a proceeding to try the

23  general morals of the parties.'" *Mattco Forge, Inc.*, 52 Cal. App. 4th at 846

24  (*quoting Fireboard Paper Prods. Corp.*, 227 Cal. App. 2d at 729); *see also Magic*

25  *Kitchen LLC*, 153 Cal. App. 4th at 1167 (holding unclean hands inapplicable where

26  claimant could not show how right asserted was connected to the alleged

27  inequitable conduct).  Further, MGA's conduct cannot be equated with Mattel's, is

28  not egregious, and is not connected to the right asserted by MGA.  Mattel

1   knowingly provided a national retailer with $1.25 million *in exchange for* the

2   exclusion of all competitors.  TX 26612 (Zablow email re "Great News BARBIE");

3   TX 37112 (Spalding email re payment to Kohl's for Bratz shelf space); TX 37113

4   (Kohl's email offering Mattel MGA's planogram space for money); TX 24004

5   (2005 Mattel-Kohl's agreement); TX 24005 (2006 Mattel-Kohl's agreement);

6   3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  Mattel's internal

7   correspondence reflects the fact that the intent of the agreement was to exclude

8   MGA's Bratz produce from the toy department for 2005 and 2006.  TX 26612

9   (Zablow email re "Great News BARBIE"); TX 37112 (Spalding email re payment

10  to Kohl's for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's

11  planogram space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX

12  24005 (2006 Mattel-Kohl's agreement).  Further, Mattel admitted that, as a result of

13  its agreement with Kohl's, Kohl's did not carry any 2005 or 2006 Bratz products.

14  3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  As a result of this

15  agreement with Mattel, Kohl's purchased no new Bratz products from MGA in

16  either 2005 or 2006.  3/24/2011 (Vol. 2) Tr. 162:14-163:5 (Larian Testimony);

17  3/29/2011 (Vol. 1) Tr. 121:22-122:1 (Vollero Testimony).  MGA introduced

18  additional evidence that Mattel systematically attempted to thwart MGA's Bratz

19  line by interfering with MGA's relationships, from manufacturing to retail and

20  there is no evidence of such systematic conduct by MGA.  *See* TX 26612 (Zablow

21  email re "Great News BARBIE"); TX 37112 (Spalding email re payment to Kohl's

22  for Bratz shelf space); TX 37113 (Kohl's email offering Mattel MGA's planogram

23  space for money); TX 24004 (2005 Mattel-Kohl's agreement); TX 24005 (2006

24  Mattel-Kohl's agreement); TX 8972 (Eckert email to "kill the deal or let it slide");

25  TX 34833 (Mattel email re stopping Bandai's distribution of Bratz); TX 8120

26  (email re moving product at WalMart); TX 8572 (demanding "larger playing field"

27  and an "unfair benefit" over MGA at Target); *see also* Mattel's Proposed Statement

28  of Fact Nos. 109, 110, 120, 128, 133, 134.  By contrast, Mattel has no evidence that

1  MGA engaged any wrongful conduct in its negotiations with Kohl's.  Rather

2  MGA's negotiations related to the shelf space provided for MGA's product and was

3  not premised on the exclusion of Mattel (or any other manufacturer's) products.

4

5          **6.   MGA's UCL Claim Is Superseded By CUTSA**

6          199.   California's Uniform Trade Secrets Act ("CUTSA") "occupies the

7  field" of common law claims based on the misappropriation of a trade secret.  K.C.

8  Multimedia, Inc. v. Bank of America Tech. & Operations, Inc., 171 Cal. App. 4th

9  939, 954 (2009).

10         **MGA OBJECTIONS:**  MGA objects to this proposed conclusion on the

11 grounds of relevant.  MGA's unfair competition claim is not based upon Mattel's

12 misappropriation of MGA's trade secrets.  *See* Dkt. No. 10525 (MGA's Proposed

13 Findings of Fact and Conclusions of Law regarding MGA's 17200 claim).

14

15         200.   The Act's language "implicitly preempts alternative civil remedies

16 based on trade secret misappropriation."  K.C. Multimedia, 171 Cal. App. 4th at

17 954 (citation omitted).

18         **MGA OBJECTIONS:**  MGA objects to this proposed conclusion on the

19 grounds of relevant.  MGA's unfair competition claim is not based upon Mattel's

20 misappropriation of MGA's trade secrets.  *See* Dkt. No. 10525 (MGA's Proposed

21 Findings of Fact and Conclusions of Law regarding MGA's 17200 claim).

22

23         201.   A claim cannot simply depend on a "different theory of liability" to

24 survive CUTSA's supersessive effect.  See id. at 957-959 & n. 7 (distinguishing

25 rule set forth in Powell Prods., Inc. v. Marks, 948 F. Supp. 1469, 1474 (D. Colo.

26 1996) (allowing a claim based on trade secret misappropriation to survive if the

27 claim "requires an [element] [] which is not an element of a misappropriation

28 claim")).

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    **MGA OBJECTIONS:**  MGA objects to this proposed conclusion on the

2    grounds of relevant.  MGA's unfair competition claim is not based upon Mattel's

3    misappropriation of MGA's trade secrets.  *See* Dkt. No. 10525 (MGA's Proposed

4    Findings of Fact and Conclusions of Law regarding MGA's 17200 claim).

5

6        202.   The claim must be based on more than "the same nucleus of facts as

7    the misappropriation of trade secrets claim for relief."  K.C. Multimedia, 171 Cal.

8    App. 4th at 958 (quoting Digital Envoy, Inc. v. Google, Inc., 370 F. Supp. 2d 1025,

9    1035 (N.D. Cal. 2005)).

10   **MGA OBJECTIONS:**  MGA objects to this proposed conclusion on the

11   grounds of relevant.  MGA's unfair competition claim is not based upon Mattel's

12   misappropriation of MGA's trade secrets.  *See* Dkt. No. 10525 (MGA's Proposed

13   Findings of Fact and Conclusions of Law regarding MGA's 17200 claim).

14

15       203.   The Court has previously concluded that CUTSA supersedes claims,

16   including the statutory unfair competition claims in this case, based upon the

17   misappropriation of trade secret information.  See Am. MSJ Order, Dkt. 9600, at

18   91; Order on Mtns. In Limine, Dkt. 9669, at 22; Order Regarding Advisory Opinion

19   on Claims for Violations of Cal. Bus. & Prof. Code § 17200, Dkt. 10319, at 1-2.

20   See also  K.C. Multimedia, 171 Cal. App. 4th at 961 (holding that "appellant's

21   statutory unfair competition claim" was preempted by CUTSA where "[a]s a factual

22   basis for its claim, appellant alleges the same conduct that gives rise to trade secrets

23   claim").

24   **MGA OBJECTIONS:**  MGA objects to this proposed conclusion on the

25   grounds of relevant.  MGA's unfair competition claim is not based upon Mattel's

26   misappropriation of MGA's trade secrets.  *See* Dkt. No. 10525 (MGA's Proposed

27   Findings of Fact and Conclusions of Law regarding MGA's 17200 claim).

28

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)

1    204.   None of the evidence presented at trial regarding alleged

2  misappropriation of MGA information, including without limitation from toy fairs,

3  can properly be part of MGA's UCL claim.  See Am. MSJ Order, Dkt. 9600, at 91;

4  Order on Mtns. In Limine, Dkt. 9669, at 22; Order Regarding Advisory Opinion on

5  Claims for Violations of Cal. Bus. & Prof. Code § 17200, Dkt. 10319, at 1-2. See

6  also K.C. Multimedia, 171 Cal. App. 4th at 961.

7    **MGA OBJECTIONS:**  MGA objects to this proposed conclusion on the

8  grounds of relevant.  MGA's unfair competition claim is not based upon Mattel's

9  misappropriation of MGA's trade secrets.  See Dkt. No. 10525 (MGA's Proposed

10  Findings of Fact and Conclusions of Law regarding MGA's 17200 claim).

11

12  Dated: May 12, 2011                Respectfully submitted,

13                                              ORRICK, HERRINGTON & SUTCLIFFE LLP

14

15                                              By:_____*/s/ - Warrington S. Parker III*_____
                                                        Warrington S. Parker III
16                                              Attorneys for MGA ENTERTAINMENT, INC.,
                                                MGA ENTERTAINMENT HK, LTD., MGA de
17                                              MEXICO, S.R.L. de C.V., and ISAAC LARIAN

18

19

20

21

22

23

24

25

26

27

28

MGA PARTIES' OBJECTIONS TO MATTEL'S
PROPOSED FINDINGS OF FACT AND LAW
CV-04-9049 DOC (RNBx)