1  ANNETTE L. HURST (State Bar No. 148738)
   ahurst@orrick.com
2  WARRINGTON S. PARKER III (State Bar No. 148003)
3  wparker@orrick.com
   ORRICK, HERRINGTON & SUTCLIFFE LLP
4  The Orrick Building
   405 Howard Street
5  San Francisco, California  94105-2669
   Telephone:  +1-415-773-5700
6  Facsimile:    +1-415-773-5759

7  WILLIAM A. MOLINSKI (STATE BAR NO. 145186)
   wmolinski@orrick.com
8  ORRICK, HERRINGTON & SUTCLIFFE LLP
   777 South Figueroa Street
9  Suite 3200
   Los Angeles, California  90017
10 Telephone:  +1-213-629-2020
   Facsimile:    +1-213-612-2499

11

12 THOMAS S. MCCONVILLE (STATE BAR NO. 155905)
13 tmcconville@orrick.com
   ORRICK, HERRINGTON & SUTCLIFFE LLP
14 4 Park Plaza
   Suite 1600
15 Irvine, California  92614-2558
   Telephone:  +1-949-567-6700
16 Facsimile:

17 Attorneys for MGA Parties

18              UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
19                SOUTHERN DISTRICT

20 CARTER BRYANT, an individual,          Case No. CV 04-9049-DOC (RNBx)
                                          Consolidated with Nos. CV 04-9059
21              Plaintiff,                and
                                          CV 05-2727
22       v.
                                          Hon. David O. Carter
23 MATTEL, INC., a Delaware
   corporation,                           **MGA PARTIES' OPPOSITION
24                                         TO MATTEL'S MOTION FOR
              Defendant.                   JUDGMENT AS A MATTER OF
25                                         LAW AND ALTERNATIVE
                                           MOTION FOR REMITTITUR
26 AND CONSOLIDATED ACTIONS                AND/OR NEW TRIAL**

27                                         Date:    May 24, 2010
                                           Time:    8:30 a.m.
28                                         Dept:    Courtroom 9D

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ......................................................................................... 4

    A.    The Contents Of MGA's Toy Fair Showroom Were  Secret And MGA Took Reasonable Efforts To Protect Them ......................................... 4

    B.    Mattel Efforts To Obtain The Trade Secrets And Its Own Admission That It Would Not Have Had Access To The Trade Secrets Establishes That The Information Was A Secret And That MGA Took Reasonable Efforts To Protect The Information ................................. 6

    C.    The Information Obtained Was Valuable To Mattel And Used By It .......... 8

        1.    The Evidence—Particularly the Testimony of Mattel Employees --  Establishes The Value To MGA And Mattel ............ 8

        2.    Mattel's Witnesses Confirmed That The Information It Took From MGA's Private Showroom Was Valuable And Used ........... 14

    D.    The Damages Presented To The Jury Measure The Benefit To Mattel, Even Where There Was No Mattel Product That Corresponds To The Trade Secret And Does Not Include Mattel's Sweat Equity ...................... 14

        1.    Mr. Malackowski's Top Down Approach Measures The Total Economic Benefit Of Mattel's Theft Of MGA's Trade Secrets ...... 16

        2.    Mr. Malackowski's Bottom Up Approach Measures The Head Start Benefit Received By Mattel From Its Theft Of MGA's Trade Secrets ................................................................................. 19

    E.    The Jury Found That Mattel Wilfully and Maliciously Misappropriated Twenty-Six of MGA's Trade Secrets ............................. 21

ARGUMENT .............................................................................................................. 21

I.    MATTEL CANNOT MEET THE HIGH STANDARD REQUIRED FOR JUDGMENT AS A MATTER OF LAW ................................................................ 21

II.    THE EVIDENCE MORE THAN ESTABLISHES LIABILITY FOR TRADE SECRET MISAPPROPRIATION ........................................................ 22

    A.    Unreleased Product Information At Toy Fairs Is Trade Secret And MGA Exercised Reasonable Efforts To Protect Its Secrecy ...................... 23

        1.    MGA Protected Its Trade Secrets .................................................... 23

        2.    The Information Was Not Otherwise Public ................................... 27

    B.    MGA's Trade Secrets Were Identified With Reasonable Particularity And Had Independent Economic Value ................................................... 30

        1.    The Evidence Establishes That All Products Identified By The Jury Were Misappropriated ................................................... 30

        2.    The Trade Secrets Had Value And Are Identified With Particularity ..................................................................................... 31

    C.    There Is Ample Evidence In The Record Of Mattel's Wrongful Acquisition And Use Of MGA's Trade Secrets ......................................... 32

FIRM NAME
ATTORNEYS AT LAW
OFFICE ADDRESS

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

    1.   The Jury's Verdict As To The Products Identified In The 2006

4
         Toy Fair Cannot Be Overturned ...................................... 33

5
    2.   The Evidence Establishes Misappropriation Even Without
         "Matching" Products ..................................................... 34

6
    3.   Misappropriation of Plans to Advertise .......................... 37

7
III.    THE JURY'S UNJUST ENRICHMENT DETERMINATION IS
      SUPPORTED BY THE RECORD .......................................................... 38

8
    A.   It Is The Province Of The Jury To Assess And Award Unjust
        Enrichment, Even If Higher Or Lower Than The Unjust Enrichment

9
        Offered By An Expert ................................................... 38

10
    B.   The Jury's Verdict Awards Unjust Enrichment To MGA That Is
        Supported By The Evidence .......................................... 40

11
    1.   The Jury Could Reasonably Rely On Mr. Malackowski's
         Bottom Up Approach For The Fifteen "Matched" Trade

12
         Secrets ......................................................................... 41

13
    2.   Mr. Malackowski Properly Accounted For Wrongful Conduct
         and Causation And Gave Mattel Credit For Its Sweat Equity ......... 47

14
    3.   The Evidence Supports The Unjust Enrichment Award For
         Non-Matching Products ................................................ 50

15
    4.   Mattel's Other Arguments Concerning The "Non-Matched"

16
         Products Also Fail ....................................................... 52

17
IV.    MATTEL CANNOT MEET THE HIGH STANDARD REQUIRED FOR
      ORDERING REMITTITUR IN THE FACE OF THE JURY'S VERDICT ......... 54

18
    A.   Mattel's Rank Speculation About the Jury's Means of Determination
        is Impermissible ......................................................... 55

19
    B.   The Jury's Verdict is Supported by the Evidence and Within the

20
        Range ......................................................................... 57

21
    C.   The Verdict Cannot Be Reduced Based On A Claim Of Duplicative
        Damages ..................................................................... 59

22
V.    MATTEL HAS FAILED TO SHOW A NEW TRIAL IS WARRANTED ......... 61

CONCLUSION ................................................................................. 63

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

Page(s)

3

CASES

4

*Abba Rubber Co. v. Seaquist*,
  235 Cal. App. 3d 1 (1991)...................................................................... 26

5

6

*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*,
  47 Cal. App. 4th 464 (1996)................................................................... 39

7

8

*Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*,
  369 U.S. 355 (1962) ............................................................................... 62

9

10

*Ayuyu v. Tagabuel*,
  284 F.3d 1023 (9th Cir. 2002)........................................................... 59, 60

11

12

*Bains LLC v. Arco Prods. Co.*,
  405 F.3d 764 (9th Cir. 2005)............................................................... 4, 63

13

14

*Carter v. District of Columbia*,
  795 F.2d 116 (D.C. Cir. 1986)........................................................... 55, 56

15

16

*Clark v. Banker*,
  453 F.2d 1006 (9th Cir. 1972)................................................................ 25

17

*Eastman Kodak Co. of New York v. Southern Photo Materials Co.*,
  273 U.S. 359 (1927) ............................................................................... 39

18

19

*First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust*,
  631 F.3d 1058 (9th Cir. 2011)................................................................ 21

20

21

*GHK Assocs. v. Mayer Group, Inc.*,
  224 Cal. App. 3d 856 (1990).................................................................. 38

22

23

*Heiner v. Kmart Corp.*,
  84 Cal. App. 4th 335 (2000)................................................................... 40

24

25

*Hemmings v. Tidyman's Inc.*,
  285 F.3d 1174 (9th Cir. 2002)................................................... 2, 39, 45, 46

26

*Humetrix, Inc. v. Gemplus S.C.A.*,
  268 F.3d 910 (9th Cir. 2001)............................................................. 39, 44

27

28

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997)........................................................................ 36

*In re First Alliance Mortg. Co.*,
  471 F.3d 977 (9th Cir. 2006)......................................................................... 55

*Indu Craft, Inc. v. Bank of Baroda*,
  47 F.3d 490 (2d Cir. 1995) ............................................................... 57, 58, 59

*Johnson v. Consolidated Rail Corp.*,
  797 F.2d 1440 (7th Cir. 1986)....................................................................... 57

*Josephs v. Pac. Bell*,
  443 F.3d 1050 (9th Cir. 2006)........................................................ 21, 22, 24, 47

*Kewenee Oil Co. v. Bicron Corp.*,
  416 U.S. 470 (1974) ..................................................................................... 26

*Landes Construction Co. v. Royal Bank of Canada*,
  833 F.2d 1365 (9th Cir. 1987)........................................................... 24, 25, 61

*Lara v. Nevitt*,
  123 Cal. App. 4th 454 (2004).......................................................... 3, 40, 45, 52

*Larez v. City of Los Angeles*,
  946 F.2d 630 (9th Cir. 1991).......................................................................... 60

*Learning Curve Toys, Inc. v. Play Wood Toys, Inc.*,
  342 F.3d 714 (7th Cir. 2003)................................................................... 24, 26

*Lieberman v. Dudley*,
  1998 WL 740827 (D. Conn. 1998).................................................................. 59

*Los Angeles Memorial Coliseum Com'n v. National Football League*,
  791 F.2d 1356 (9th Cir. 1986)................................................................. 55, 58

*Masoner v. Thurman*,
  996 F.2d 1003 (9th Cir. 1993)....................................................................... 36

*McGonigle v. Combs*,
  968 F.2d 810 (9th Cir. 1992).......................................................................... 60

*Morrison Knudsen Corp. v. Ground Improvement Techniques, Inc.*,
  532 F.3d 1063 (10th Cir. 2008) ..................................................................... 59

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

*O2 Micro Int'l Ltd. v. Monlithic Power Sys., Inc.*,
  399 F. Supp. 2d 1064 (N.D. Cal. 2005) ................................................................. 41, 53

*Pavao v. Pagay*,
  307 F.3d 915 (9th Cir. 2002) ................................................................. 21, 22, 24

*Phoenix Eng'g and Supply Inc. v. Universal Elec. Co.*,
  104 F.3d 1137 (9th Cir. 1997) ................................................................. 63

*Raynor Bros., v. Am. Cyanimid Co.*,
  695 F.2d 382 (9th Cir. 1982) ................................................................. passim

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2001) ................................................................. 21, 22

*Roy v. Volkswagen of Am., Inc.*,
  896 F.2d 1174 (9th Cir. 1990) ................................................................. 61

*Sargent Fletcher, Inc. v. Able Corp.*,
  110 Cal. App. 4th 1658 (2003) ................................................................. 32

*Schroeder v. Auto Driveway Co.*,
  11 Cal. 3d 908 (1974) ................................................................. 38

*Schutzky Dist., Inc. v. Kelly*,
  643 F. Supp. 57 (N.D. Cal. 1986) ................................................................. 62, 63

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
  251 F.3d 814 (9th Cir. 2001) ................................................................. 61

*Spurlin v. Gen. Motors Corp.*,
  528 F.2d 612 (5th Cir. 1976) ................................................................. 62

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
  282 U.S. 555 (1931) ................................................................. 3, 39

*Stott v. Johnston*,
  36 Cal. 2d 864 (1951) ................................................................. 38

*Tennant v. Peoria & Pekin Union Ry.*,
  321 U.S. 29 (1944) ................................................................. 61

*Tortu v. Las Vegas Metropolitan Police Dept.*,
  556 F.3d 1075 (9th Cir. 2009) ................................................................. 62

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

*Union Oil Co. of Cal. v. Terrible Herbst, Inc.*,
  331 F.3d 735 (9th Cir. 2003).................................................................. 47, 61

*Unisplay, S.A. v. Am. Elec. Sign Co.*,
  69 F.3d 512 (Fed. Cir. 1995)..................................................................... 3, 40

*United Phosphorus, Ltd. v. Midland Fumigant, Inc.*,
  205 F.3d 1219 (10th Cir. 2000) ........................................................ 56, 57, 58

*United States v. 4.0 Acres of Land*,
  175 F.3d 1133 (9th Cir. 1999)................................................................ passim

*United States v. Alston*,
  974 F.2d 1206 (9th Cir. 1992).......................................................................... 36

*Vacco Indus., Inc. v. Van Den Berg*,
  5 Cal. App. 4th 34 (1992)................................................................................ 22

*Wall Data Inc. v. Los Angeles County Sheriff's Dept.*,
  447 F.3d 769 (9th Cir. 2006).......................................................................... 58

*Wallis v. PHL Assoc's, Inc.*,
  168 Cal. App. 4th 882 (2008).......................................................................... 26

*Winarto v. Toshiba America Electronics Components, Inc.*,
  274 F.3d 1276 (9th Cir. 2001).............................................................. 1, 21, 22

*Wyler Summit P'ship v. Turner Broad. Sys., Inc.*,
  235 F.3d 1184 (9th Cir. 2000).......................................................................... 40

STATUTES

Cal. Civ. Code § 3426.1 ............................................................................ 22, 34

OTHER AUTHORITIES

Fed. R. Civ. P. 51 ..................................................................................... 59, 60

Fed. R. Civ. P.  59 ............................................................................................ 61

Fed. R. Civ. P.  61 ............................................................................................ 59

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

## **INTRODUCTION**

In its Motion for Renewed Judgment As A Matter of Law Mattel seeks judgment as a matter of law on the damages awarded by the jury for the 26 trade secrets the jury found Mattel stole because, Mattel claims, the jury disregarded the evidence and expert testimony offered by Mattel to counter MGA's evidence and expert testimony.  Mattel's burden is substantial – a jury verdict can be overturned and a post-trial JMOL motion granted "only if, under the governing law, there can be but one reasonable conclusion as to the verdict. In other words, the motion should be granted only if 'there is no legally sufficient basis for a reasonable jury to find for that party on that issue.'"  *Winarto v. Toshiba Am. Electronics Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001).  "In ruling on a motion for JMOL, the court is not to make credibility determinations or weigh the evidence and should view all inferences in the light most favorable to the nonmoving party," and that the district court must "'accept the jury's credibility findings consistent with the verdict'" and "'disregard all evidence favorable to the moving party that the jury is not required to believe,", *id*., because "[w]hen two sets of inferences find support in the record, the inferences that support the jury's verdict of course win the day." *Id.* at 1286-87.

Here, Mattel asks this Court to do precisely what the law forbids, namely ignore the MGA Parties' contrary evidence and drawing all inferences in Mattel's favor.  That is not the law.  Nor does Mattel have the facts on its side.  Instead, Mattel distorts the record, urging this Court to ignore the testimony and evidence introduced by MGA as "insufficient" to support the verdict – often, in the process, by refusing to acknowledge even the testimony of Mattel employees that supports the jury's findings.

The law does not allow this Court to grant Mattel's motion based on an argument that MGA did not maintain the secrecy of its trade secrets.  The

1   jury heard testimony about MGA's vigilance at its showrooms, the efforts to

2   which Mattel went to obtain the information that it did, all of which

3   demonstrate MGA's reasonable efforts to protect its confidential information.

4   *See* Part II, A.

5       As for the value of the information taken, which Mattel also

6   challenges, one need only consider the testimony of Mattel witnesses and

7   documents that reflect the value of the information.   *See* Part II, B, *infra*.

8       Mattel claims that it cannot be held liable for misappropriation is

9   equally flawed.  The record is rife with evidence establishing that Mattel

10  acquired the information it did by improper means, by misrepresentation and

11  theft.  It heard testimony concerning Mattel's disclosure of that information

12  in toy fair reports and videos.  Finally, it heard evidence of Mattel's use of

13  the information from Mattel's own witnesses.  In addition, Mr. Larian

14  identified numerous examples of MGA products that were referenced in

15  Mattel's toy fair reports for which a competing Mattel product was released

16  by Mattel in the same season.   *See* Part II, C, *infra*.

17      As to damages, Mattel's various arguments simply fail.  First, contrary

18  to Mattel's argument, Mr. Malackowski's calculation did take into account

19  things such as Mattel's sweat equity and the extent to which Mattel's

20  wrongful conduct contributed to the damages award.  Second, a jury's

21  damage award cannot be set aside simply because the amount awarded does

22  not correspond precisely to the calculations offered by an expert.  A jury is

23  entitled to award damages that are higher or lower than the damages expert's

24  calculations.  *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1142 (9th

25  Cir. 1999); *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002);

26  *Raynor Bros.*, *v. Am. Cyanimid Co.*, 695 F.2d 382, 385 (9th Cir. 1982); *see*

27  *also Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995).

28  A jury is entitled to average out the damages awarded.  *Lara v. Nevitt*, 123

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

Cal. App. 4th 454, 462-63 (2004).  A court cannot set aside a verdict for that reason.  Were it otherwise, courts "would discredit the role of the jury and give unbounded discretion to the district judge to override the jury's verdict." *4.0 Acres of Land*, 175 F.3d at 1142.  Nor is there merit to Mattel's implied argument that damages awarded must be set aside because they are somehow imprecise.  The Supreme Court long ago rejected any such argument.  To overturn a verdict on that ground "would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts."  *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931). *See* Part III, *infra*.

Alternatively, Mattel seeks remittitur or a new trial. Mattel cannot meet the substantial burdens required for either, and in making these arguments, takes positions wholly contradictory to those Mattel has already advanced in this case.  Indeed, as Mattel has previously argued to this Court, "[s]peculation about what the jury did cannot support a remittitur" and, quoting the Ninth Circuit, "[e]ven a total inadequacy of proof on isolated elements of damages claims submitted to a jury will not undermine a resulting aggregated verdict which is nevertheless reasonable in light of the totality of the evidence. . . . [W]here, as here, the jury's verdicts find substantial support in the record and lie within the range sustainable by the proof, we will not 'play Monday morning quarterback' and supplant the jury's evaluation of the complex and conflicting evidence with our own." Dkt. No. 4684 (Mattel Opp. to MGA Remittitur Mot.) at 12-13 (citation omitted).  And as Mattel counsel John Quinn told Judge Larson in February 2009, "We simply can't know how the jurors came up with those numbers or what they represent. … *We can make assumptions, but that would be improper*, Your Honor.  That renders the verdict an advisory verdict.  The

standard here – and it wasn't disputed in the papers – *is that it's impossible to come up with any other explanation.*" 2/11/2009 Tr. 59:24- 60:10 (emphasis added).

And Mattel has *twice* argued against granting a new trial in this case, repeatedly noting that "[o]nce judges are given the discretion to disregard jury verdicts as they see fit, the viability of the jury as an institution capable of rendering truly binding decisions is seriously imperiled." Dkt. No. 8679 (Mattel Opp. to MGA's Mot. for New Trial) at 4; Dkt. No. 4684 (Mattel Opp. to MGA Remittitur Mot.) at 5, citing *Schutzky Dist., Inc. v. Kelly*, 643 F. Supp. 57, 59 (N.D. Cal. 1986).  According to Mattel, "[a] district court faced with a new trial motion is 'obligated to ask "not whether the verdict necessarily makes sense under any reading, but whether it can be read in light of the evidence to make sense."'" Dkt. No. 4684 (Mattel Opp. to MGA Remittitur Mot.) at 5 (citing *Bains LLC v. Arco Prods. Co.*, 405 F.3d 764, 771 (9th Cir. 2005)).  Mattel did not – because it cannot – establish that remittitur or a new trial is warranted here.  Far from being inconsistent or excessive, the jury's damages award is amply supported by the evidence and is due a high degree of deference.  Mattel's unsupported arguments do not show otherwise.  *See* Part IV, infra.

Mattel's motion should be denied in its entirety.

## STATEMENT OF FACTS

### A.    The Contents Of MGA's Toy Fair Showroom Were Secret And MGA Took Reasonable Efforts To Protect Them.

The record leaves no doubt that MGA considered the products and information on display in its private toy fair showrooms to be confidential and took appropriate measures to protect their secrecy.  Entry to the showroom was by appointment only.  Visitors were met in a separate waiting area by a greeter who required them to confirm their identity with a picture

ID and any supporting information.  3/24/2011 (Vol. 2) Tr. 55:2-56:17; 3/30/2011 (Vol. 2) Tr. 97:22-98:13 (Brawer).  They were required to sign a nondisclosure agreement that advised "[y]our permission to visit MGA Entertainment's offices and facilities is granted subject to your agreement to keep confidential any information that may be disclosed to you…"  TX 36635.  Visitors were advised that they were not permitted to film or record anything they saw in the showroom.  3/24/2011 (Vol. 2) Tr. 55:2-56:17.  When they received wholesale price lists or other documents, they were reminded that the information was for their use only, and the documents were additionally stamped "confidential."  *Id.* at 44:6-15.

Nor are retailers expected or encouraged to pass on information. 3/24/2011 (Vol. 2) Tr. 70:6-12 (Larian: "Q.  Now, despite the fact that the retailers do manipulate the situation to their advantage when possible, do you expect them to keep the detailed information and pictures, the sell sheets, the price lists, all that stuff that you give them in the closed showrooms, do you expect them to keep that confidential? A.  Yes, we do."); 3/22/2011 (Vol. 1) Tr. 11:7-16 (Debrowski: "Q.  Do you consider the attributes of a product, a Mattel product, that has not yet been released to the public; that is, not yet released to retail shelves -- do you consider that to be confidential information to Mattel? A.  Is that a question? Q.  Yes. A.  Yes. Q.  And you also agree thats true for other toy companies as well, right? A.  I believe so."); 3/22/2011 (Vol. 1) Tr. 162:3-163:5 (Turetzky: improper for retailers to pass along such information, "[b]ecause it reflects our future plans and, you know, I think the expectation is that they wouldn't share it.")

MGA occasionally invited the press into a conference room or special gallery inside its booth, but only to view specifically-selected products and only under strictly choreographed conditions.  3/24/2011 (Vol. 2) Tr. 50:17-53:4 (Larian); 3/30/2011 (Vol. 2) Tr. 100:4-19 (Brawer).  For example,

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1    members of the press were never allowed to photograph the showroom and

2    otherwise distribution by the press was controlled.  3/24/2011 (Vol. 2) Tr.

3    50:7-53:4; 4/6/2011 (Vol. 2) Tr. 26:12-27:8.  And members of the press were

4    never given MGA catalogs, sell sheets, or price lists.  3/24/2011 (Vol. 2) Tr.

5    54:5-7 (Larian).

6         Mattel can hardly dispute that MGA intended to keep the contents of

7    its toy fair showroom confidential.  Security at Mattel's toy fair booth was no

8    different.  Persons requesting an invitation to Mattel's toy fair booths were

9    required to sign nondisclosure agreements stating that they could share what

10   they saw only "to those within your company, on a strict need-to-know

11   basis."  TX 7978 at 291-293.  When they arrived at the welcome area of

12   Mattel's booth, they were greeted by signs reminding them of their obligation

13   and warning that "[i]nformation, communications, and conversations in this

14   area are intended to be confidential" and that "[i]t may be a violation of the

15   law to record such confidential information, communications, and

16   conversations without the express consent of Mattel."  TX 7978 at 291-296.

17   **B.    Mattel Efforts To Obtain The Trade Secrets And Its Own
            Admission That It Would Not Have Had Access To The**
18   **Trade Secrets Establishes That The Information Was A
            Secret And That MGA Took Reasonable Efforts To Protect**
19   **The Information.**

20        Perhaps the most compelling evidence that MGA guarded its secret

21   information closely is also the most damning evidence against Mattel—the

22   fact that Mattel employees engaged in a multi-decade campaign of fraud,

23   false identities and misrepresentation to get access to MGA and other

24   competitors' information, as discussed at length in MGA's Motion for

25   Exemplary Damages (Dkt. No. 10539) at 5-23.  The jury heard how Mattel

26   fielded at least seven spies over the years and saw Mattel's "how to steal"

27   manual providing step-by-step instructions in creating a false identity and

28   using that identity to gain access to competitors' showrooms.  *Id.*

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1      Mattel employees admitted that absent their fraudulent conduct, they

2  never would have been allowed in to get access to that confidential MGA

3  information. 3/22/2011 (Vol. 2) Tr. 51:11-17 (Villasenor); 3/22/2011 (Vol. 1)

4  Tr. 33:25-34:8 (Turetzky).  And no Mattel witness even tried to portray

5  Mattel's espionage as anything other than unethical, wrong, and improper —

6  even criminal.  TX 9484AR; 3/22/2011 (Vol. 1) Tr. 34:16-23; 3/15/2011

7  (Vol. 1) Tr. 41:10-44:1, 52:17-25; accord 3/11/2011 (Vol. 3) Tr. 65:22-66:22

8  (Friedman); 4/1/2011 (Vol. 1) Tr. 18:5-19:8; 3/18/2011 (Vol. 1) Tr. 104:18-

9  105:1 (Kilpin); 3/22/2011 (Vol. 1) Tr. 12:1-8 (Debrowski); 3/22/2011 (Vol.

10  1) Tr. 41:5-42:3 (Turetzky); 3/30/2011 (Vol. 1) Tr. 43:24-44:8  (Thomas);

11  3/17/2011 (Vol. 1) Tr. 143:4-144:8 (Fontanella).   Mattel's attempted cover-

12  up of this behavior by hiding documents and paying off witnesses is further

13  evidence of Mattel's knowledge of its wrongdoing.

14      At trial, Mattel told the jury that its employees' accessing competitor's

15  showrooms under false pretenses was ultimately harmless because the

16  information it was publicly available – a claim it reiterates here.  *See, e.g.*,

17  Mot. at 18; 3/22/2011 (Vol. 1) Tr. 133:9-12; 4/1/2011 (Vol. 1) Tr. 124:6-13.

18  This explanation is undermined by Mattel's inability to justify the lengths

19  their employees went to steal the information.  3/22/2011 (Vol. 1) Tr. 161:4-

20  6; *see also* 4/5/2011 (Vol. 4) Tr. 37:18-38:3 (Wagner).

21      And in any case, the evidence establishes that Mattel continued to

22  obtain competitive information even after Villasenor left in 2006 and even as

23  late as 2009.  TX 9566; TX 9869; 4/1/2011 (Vol. 1) Tr. 115:4-116:1;

24  3/30/2011 (Vol. 1) Tr. 17:9-20:8.

25

26

27

28

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

C.    **The Information Obtained Was Valuable To Mattel And Used By It.**

1.    **The Evidence—Particularly the Testimony of Mattel Employees—Establishes The Value To MGA And Mattel.**

a.    **Pricing Information.**

Isaac Larian testified that he considered MGA's catalogues, sell sheets and price lists in its showrooms to be confidential and "100 percent" valuable information that he would never have knowingly given to competitors. 3/24/2011 (Vol. 2) Tr. 101:18-102:5; *see also id.* at 109:8-9.

This is consistent with the testimony of Mattel witnesses.  A number of Mattel executives acknowledged the confidential nature of FOB pricing. Indeed, Sal Villasenor, Matthew Turetzky and Tim Kilpin all admitted Mattel shouldn't have had access to MGA's FOB information.  *See* 3/22/2011 (Vol. 1) Tr. 40:13-25 (Turetzky: "Q.  So in this case, it would be -- let's use an example of Toys R Us would -- would pay MGA $10.25 to get the products in Hong Kong?  A.  Right.  Q.  And you understood that this FOB HK pricing was very sensitive information, correct?  A.  Uh, I -- I don't know if I would agree it was very sensitive.  Q.  Well, it's not information that Mattel should have, right?  A.  Um, it wouldn't normally be available.  Q.  It's not information that Mattel should have, right?  A.  I guess not."); 3/18/2011 (Vol. 1) Tr. 105:6-14 (Kilpin: "Q.  Mattel considers FOB Hong Kong pricing information to be confidential, correct?  A.  Yeah, we share that with the buyers.  Q.  And you would not expect a competitor to have access to Mattel's confidential pricing information on FOB Hong Kong items, correct?  A.  Uh, yes, we would expect that.  Q.  You would not?  A.  I'm sorry.  We would not expect that."); 3/22/2011 (Vol. 2) Tr. 83:9-17 (Villasenor: "Q.  Now, FOB, L.A. is the kind of information you would only find on a confidential price list of MGA, true?  A.  That's correct.  Q.  The kind of information MGA

- 8 -

1   wouldn't want its competitors getting ahold of, right?  A.  I -- I don't know

2   that for sure.  Q.  Kind of information a toy company wouldn't want his

3   competitors' getting ahold of, right?  A.  Probably not.")

4   　　　　Moreover, Mattel employees acknowledged the value of FOB pricing

5   to competitors.  3/22/2011 (Vol. 2) Tr. 90:14-91:4 ("Q.  And you are telling

6   them what the FOB, L.A. price is going to be, right?  A.  That's correct.  Q.

7   And when a toy company knows what somebody else's prices are, they can

8   undercut those prices, right?  A.  I don't know that.  Q.  Well, you know that's

9   very valuable information for a toy company to have, what the competitor's

10  pricing is going to be before it happens, right?  A.  They can use it as an

11  advantage, correct.  Q.  Well, it can save a toy company a lot of money, can't

12  it, to know what the competitor is doing and how the competitor is going to

13  price its product? … A.  Probably can.").  Villasenor agreed that one of the

14  reasons that he went to the New York Toy Fair was to obtain confidential

15  price lists and that they were important to Mattel in gaining a competitive

16  advantage.  3/23/2011 (Vol. 2) Tr. 106:25-107:7.  Villasenor also agreed that

17  a toy company "[p]robably can" save a lot of money knowing what a

18  competitor is doing and how the competitor is going to price its product.

19  3/22/2011 (Vol. 2) 90:20-91:4.  In fact, the jury saw TX 27464-158 which

20  specifically refers to the substantial savings that Mattel achieved by knowing

21  MGA's 2004 pricing.  TX 27464-158 is a November 12, 2004 email from

22  Turetzky to Villasenor thanking Villasenor for sending MGA's price list.

23  Turetzky states, "This is great.  You saved Mattel close to 1 million."  TX

24  27464-158.

25  　　　　　　　　**b.**　　**Advertising.**

26  　　　　In Mr. Larian's words, advertising makes a "huge" difference in

27  MGA's projections for how many units of a product it will sell.  3/24/2011

28  (Vol. 2) Tr. 111:21-24.  As he explained, knowing the marketing or

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

advertising plans of a competitor is valuable because it allows a competitor to decide whether or not to advertise, increase advertising or move its advertising.   3/24/2011 (Vol. 2) Tr. 111:16-20.  This is particularly true given that MGA advertises only a select few of its products.  *Id.* at 112:7-17. Knowing which products MGA planned to advertise would allow Mattel to adjust its marketing plan strategy against MGA to do a direct head-to-head advertising campaign, an earlier advertising campaign of a competing product or wait to increase advertising of the competing product later.  *Id.* at 112:15-23.  And, of course, Mattel could decide not to advertise and instead "ride off of [MGA's] coat tails, thereby saving Mattel money.  *Id.* at 112:24-113:3.  But it wasn't just Mr. Larian saying this.  Mattel's witness Jill Nordquist explained why advance knowledge of whether a product would be television advertised was valuable to a competitor because "its highly proprietary information, and it would be basically telling anybody outside of the company what we were planning on doing and what—which items we consider to be our most valuable, per se, items because we would choose to put TV against them and generate the most volume against those items." 3/9/2011 (Vol. 2) Tr. 88:17-89:11.

### c.    Unreleased Products.

Mr. Larian also explained in detail the value of seeing MGA's unreleased products:

> Q. Why would it be valuable to a competitor to be able to go into your showrooms and look at those products? [objections overruled]
> THE WITNESS: Because when they come to your showroom, they can feel, touch, play like a retailer does with your product. They can get to know how the product works. How does it play. You cannot just do that by catalog sheet, and that's why retailers from all over the world spend millions of dollars as a whole. 10,000 people come to toy shows. That's why it's valuable. They come and feel and touch and play with the toy before they make a buying decision.
> BY MS. HURST:

> Q So meeting the toy in person is the most valuable way of acquiring the information --
> A It is.
> Q -- correct?
> A Otherwise, we would not spend hundreds of thousands of dollars going to toy shows.

3/24/2011 (Vol. 2) Tr. 104:7-105:2; *see also*, 3/24/2011 (Vol. 2) Tr. 105:3-6 (it is valuable to get pictures in advance of competitors' products).

Mr. Larian went on to testify that seeing MGA's unreleased products was valuable to Mattel "[b]ecause they could change their designs. They could come up with product, they could compete with that. They could change their pricing, their marketing plans, sales plans, everything." 3/24/2011 (Vol. 2) Tr. 114:10-13.

Mattel's witnesses confirmed the value of MGA's trade secrets that it passed around. Turetzky testified that knowing information about a competitor's unreleased products "would help us compete in the marketplace to know that information." 3/22/2011 (Vol. 1) Tr. 44:5-6. Turetzky understood that having access to unreleased products would "certainly help our marketing plans" (3/22/2011 (Vol. 1) Tr. 43:10, help Mattel in planning its toy lines (*id.* at 44:11-13), potentially help Mattel in its advertising plans (*id.* at 44:17-19) and could help Mattel develop competing products (*id.* at 44:20-22).

Kilpin also agreed that "It's always good for us to understand what's coming from . . . a competitor." 3/18/2011 (Vol. 1) Tr. 114:21-22. The very reason Kilpin passed on information relating to MGA was due to its value. 3/18/2011 (Vol. 1) Tr. 115: 5-11 (Kilpin) ("Q. You're sending this to the president of Mattel brands. It was valuable information, wasn't it? A. It's always good to know what competitors are doing. Q. Is there a problem with the term "valuable"? A. No. Q. It was valuable information, wasn't it? A. Uh, yes, in terms of competitors, yes."); *see also id.* at 115:10-11

(testimony of Kilpin in reference to TX 7790 referring to Bratz Sun-Kissed Summer and Girls Nite Out!);  3/18/2011 (Vol. 1) Tr. 116:1-10 (testimony of Kilpin related to the Bratz Fall 2004 themes which was valuable information to Mattel).  The year that Bratz was introduced, Villasenor's "expedited analysis and review of the key competitive manufacturers and their key brands and products *was invaluable* for the Boy's Division going into the Mattel Toy Show."  TX 9497-3 (emphasis added).

Like MGA, Mattel also considered the "designs, themes, play patterns, [] features of product lines, samples, [and] information relating to the introduction of new or modified products and product lines" and other information it presented in its private showrooms to be confidential.  TX 7978-293; *see also* 3/31/2011 (Vol. 2) Tr. 62:19-65:22, 97:8-99:3 (DeAnda); 3/22/2011 (Vol. 1) Tr. 11:7-16 (Debrowski).

Even Michael Wagner, Mattel's damages expert, acknowledged the economic advantage that could be gained by obtaining trade secret information related to packaging of a product:

> Q.  And you would agree with me, wouldn't you, that if Mattel were able to alter its packaging to emphasize the sporting nature of the Miami Getaway product, that that would be an advantage it could gain using trade secret information?
> [objection overruled]
> THE WITNESS:  I do think if you established everything else you need to establish, that could be an advantage, yes.
> Q.  And that wouldn't take you the whole lead time for the whole doll to do something like that; right?
> A.  No.

4/5/2011 (Vol. 4) Tr. 34:11-23.  And, of course, Wagner agreed that it would not be economically rational for Mattel's employees to falsify credentials risking legal reprisals for information of no value.  4/5/2011 (Vol. 4) Tr. 37:18-38:3.

1   Mr. Larian also explained to the jury that reading about MGA's

2   unreleased products is a wholly different experience than seeing them in

3   person.

> Q.  Is there a difference between reading it,
> reading about it, you know, and these press things and
> seeing them yourself in person?
> A.  Absolutely.  You could see – if the retailers
> could see what's in the press release or in a catalog, why
> would they travel to come to your showroom and spend
> time to look at your product and touch it and feel it, look
> at the packaging, which is important, and get to know
> about your advertising?  If all of that was in a press
> release, why there would not be any toy fairs.

10  3/24/2011 (Vol. 2) Tr. 115:21-116:5.  Mr. Larian's point was supported when

11  Mattel's own damages expert attempted to argue that Girls Nite Out was

12  publicly disclosed in a press release (TX 20621) and should not be included

13  as part of the damages figures.  When pressed, Wagner could not explain

14  what a doll described as "funkalish" looked like, what the "unique party-

15  night accessory" or the other 29 or 30 accessories offered with the package

16  were, which dolls were offered in the package or what the clothes that the

17  dolls were wearing looked like.  4/5/2011 (Vol. 4) Tr. 31:19-33:12.

18  In the same vein, the evidence established that nothing could substitute

19  for the actual appearance, feel, touch and play of MGA products.  3/24/2011

20  (Vol. 2) Tr. 104:8-21.  The reason, in fact, retailers traveled the globe to

21  attend these toy fairs in person, rather than to simply look at sell sheets or

22  catalogs, was to see the actual products.  *Id*. at 104:23-105:7, 108:7-24.  The

23  very reporters who reported on these toy fairs acknowledged that there was a

24  difference between seeing a product and reading about it.  TX 37197.

### 2. Mattel's Witnesses Confirmed That The Information It Took From MGA's Private Showroom Was Valuable And Used.

27  As noted at length in MGA's Motion for Exemplary Damages, no

28  fewer than five different Mattel groups utilized the competitive information

- 13 -

1    gathered by Mattel employees from across the industry.  TX 9497.   The

2    information gathered was distributed via informal emails, formal "Toy Fair

3    Reports" and live presentations to over a hundred Mattel employees,

4    including senior management like Matt Bousquette, to inform them what the

5    industry, including MGA, was bringing to market, and at what price; this

6    information was all archived in a library at Mattel.  Dkt. No. 10539 (Mot. for

7    Exemplary Damages) at 11-12.

8        **D.    The Damages Presented To The Jury Measure The Benefit
         To Mattel, Even Where There Was No Mattel Product That**
9        **Corresponds To The Trade Secret, And Do Not Include
         Mattel's Sweat Equity.**
10

11       After hearing weeks of fact witness testimony, the jury heard

12   testimony from MGA's damages expert James Malackowski concerning both

13   the benefits Mattel received from obtaining MGA's trade secrets and the

14   head start it obtained.  4/4/2011 (Vol. 3) Tr. 47:1-8, 49:16-22; 4/5/2011 (Vol.

15   3) Tr. 60:13-61:6.

16       Mr. Malackowski used two approaches to calculate the unjust

17   enrichment award owed to MGA for Mattel's theft of MGA's trade secrets—

18   the Top Down approach and the Bottom Up approach.  The Top Down

19   approach looks at the total economic benefit that Mattel received, while the

20   Bottom Up calculation focuses specifically on the head start benefit that

21   Mattel received by stealing MGA's trade secrets.  4/5/2011 (Vol. 2) Tr.

22   34:20-25.  The Bottom Up calculation is a subset of the Top Down

23   calculation.  4/4/2011 (Vol. 3) Tr. 51:10-24, 58:7-13.  In other words, the

24   Top Down approach measures both the head start benefit and the other

25   economic benefits that Mattel received from stealing Mattel's trade secrets.

26       Importantly, Mr. Malackowski's calculations of Mattel's enhanced

27   profits on My Scene are not a disgorgement of all of Mattel's profits on My

28   Scene products.  4/4/2011 (Vol. 3) Tr. 49:23-50:7.  Mr. Malackowski did not

- 14 -

1   include profits that Mattel would have earned without the benefit of MGA's
2   trade secrets.  4/4/2011 (Vol. 3) Tr. 50:8-11; 4/5/2011 (Vol. 1) Tr. 28:4-10.
3   Rather, Mr. Malackowski allowed Mattel to retain profits from My Scene
4   that were consistent with Mattel's historical performance, *i.e.*, Mattel's
5   "sweat equity."  4/4/2011 (Vol. 3) Tr. 53:21-25, 55:23-56:3, 57:19-22, 64:14-
6   23; 4/5/2011 (Vol. 1) Tr. 27:16-19.

7          To arrive at the figures he did, Mr. Malackowski and his staff
8   reviewed "[t]ens of thousands" of pages of documents, 4/5/2011 (Vol. 3) Tr.
9   56:6-8, including Mattel's toy fair reports, Mattel and MGA documents
10  showing when products were introduced, 4/5/2011 (Vol. 2) Tr. 27:15-17,
11  Mattel sales and marketing documents showing that Mattel closely monitored
12  market share between Bratz and My Scene and analyzed individual My
13  Scene themes in competition with Bratz themes, 4/4/2011 (Vol. 3) Tr. 48:8-
14  13, 66:19-24, 67:15-18; 4/5/2011 (Vol. 2) Tr. 28:6-12, and Mattel financial
15  records related to My Scene, Generation Girl, Diva Starz and Flavas.  Mr.
16  Malackowski and his staff also independently researched Bratz products and
17  My Scene products having similar themes to determine what Bratz products
18  were shown at toy fairs and when they were released, 4/4/2011 (Vol. 3) Tr.
19  66:19-67:3, 67:8-14.  Mr. Malackowski also interviewed MGA personnel to
20  confirm the identification of matching My Scene and Bratz products, as well
21  as when the Bratz products were shown at toy fairs and released in the
22  market, 4/4/2011 (Vol. 3) Tr. 67:4-7.

23         Based on this extensive analysis, Mr. Malackowski identified
24  information related to 114 unreleased MGA products described in Mattel
25  business records (toy fair reports) that Mattel obtained by sneaking into
26  MGA's showrooms, and information about which Mattel disseminated
27  throughout the company to obtain a business and economic advantage.

28

4/4/2011 (Vol. 3) Tr. 45:5-21, 46:2-21, 48:23-49:3; 4/5/2011 (Vol. 2) Tr. 22:7-19.

### 1.   Mr. Malackowski's Top Down Approach Measures The Total Economic Benefit Of Mattel's Theft Of MGA's Trade Secrets.

The Top Down approach measures both the head start benefit as well as the other additional economic benefits that Mattel received from having MGA's trade secrets.  4/4/2011 (Vol. 3) Tr. 64:24-65:7; 4/5/2011 (Vol. 2) Tr. 34:20-25.  To calculate this, Mr. Malackowski calculated the difference between My Scene without the benefit of MGA's trade secrets and My Scene with the benefit of the trade secrets.  4/4/2011 (Vol. 3) Tr. 49:23-50:7, 51:25-52:8.

Mr. Malackowski performed two calculations using the Top Down approach.  One approach (Top Down 1) resulted in $202 million in enhanced My Scene profits and the other (Top Down 2) resulted in $149 million in enhanced My Scene profits.  4/4/2011 (Vol. 3) Tr. 49:8-15.

To reach the $202 million award under the Top Down 1 approach, Mr. Malackowski compared the overall performance of the entire My Scene product line to the performance of other Mattel fashion dolls targeted toward older girls, namely Generation Girl, Diva Starz and Flavas.  4/4/2011 (Vol. 3) Tr. 52:11-53:20.  The difference in the performances of My Scene and the older girl dolls results in Mattel's enhanced profits of $202 million and reflects the benefit that Mattel obtained by using MGA's trade secrets.  4/4/2011 (Vol. 3) Tr. 52:11-53:20.[1]

---

[1]   Mr. Malackowski testified that he did not include Barbie in his analysis because Barbie targeted three to five year old girls while My Scene and Bratz (as well as Generation Girl, Diva Starz and Flavas) targeted older girls.  4/4/2011 (Vol. 3) Tr. 47:9-48:1, 54:6-19.

1     Under the Top Down 2 approach, Mr. Malackowski looked at Mattel's
2  2003 sales projections for My Scene sales and compared that with Mattel's
3  actual sales on My Scene.  4/4/2011 (Vol. 3) Tr. 56:19-57:18.  The difference
4  between these amounts is $149 million and, again, represents the enhanced
5  profits earned by Mattel by taking MGA's trade secrets.  4/4/2011 (Vol. 3)
6  Tr. 56:19-57:18.
7     Mr. Malackowski's Top Down analysis does not depend on Mattel
8  launching a new My Scene product after seeing the MGA trade secrets.
9  4/5/2011 (Vol. 2) Tr. 31:7-12 ("Well, that's an interesting point, because you
10  can have trade secret benefits just from the taking, even if you don't launch a
11  competitive product, because you know the playbook.  You may say, well,
12  this is what company A is doing.  I'm not going to launch the exact same.
13  I'll look for something that I think is better.").  Rather, Mr. Malackowski's
14  analysis measures the overall competitive benefit that Mattel received when
15  it saw MGA's trade secrets.  4/5/2011 (Vol. 2) Tr. 25:10-16, 30:2-11.
16     For example, the My Scene Bling Bling doll existed prior to Mattel
17  seeing MGA's trade secret information that Bratz was going to introduce a
18  ring with a real diamond chip.  4/5/2011 (Vol. 2) Tr. 25:10-16.  But Mattel's
19  competitive response of launching a similar Bling Bling doll *also with a real*
20  *diamond chip* is an economic benefit received by Mattel as a result of seeing
21  MGA's trade secret.  *Id.*
22     Similarly, Mr. Malackowski explained that his analysis did not solely
23  depend on a simple visual comparison of a Bratz product and a competitive
24  My Scene product launched in response.  4/5/2011 (Vol. 2) Tr. 24:8-16, 28:6-
25  12, 28:15-29:3, 30:2-11; 4/5/2011 (Vol. 3) Tr. 55:23-56:17.  Mr.
26  Malackowski explained that "you don't even have to look in some cases at
27  the products at all.  You can look at what was known for advertising and
28  pricing and other information about MGA products alone."  4/5/2011 (Vol.

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1   2) Tr. 24:8-16.  On cross-examination, Mr. Malackowski gave Bratz Rock

2   Angelz as an example.  While Bratz Rock Angelz did not look similar to My

3   Scene Hollywood, MGA and Mattel business records and interviews with

4   MGA personnel reflected the parties' beliefs that Bratz Rock Angel and My

5   Scene Hollywood were competitive products.  4/5/2011 (Vol. 2) Tr. 25:17-

6   26:7, 26:17-22, 27:13-17.

7        Mr. Malackowski's analysis also took into account that some of the

8   Mattel My Scene products were in development before Mattel saw MGA's

9   trade secrets at the toy fairs.  4/5/2011 (Vol. 1) Tr. 30:4-31:5.  Mr.

10  Malackowski explained that Mattel still received economic benefit from

11  seeing MGA's trade secrets even when it had a product in development at the

12  time:

13          Q.  And would you explain that?
            A.  Well, the reason – I think the testimony you've
14      already heard that they go to the toy fair – um, that buyers
        go to the toy fairs to meet the product and to understand the
15      pricing, the advertising schedule, to look at what are called
        "sizzles," which are videos showing the product and how
16      it's used.
            And so there is information disclosed in the confidential
17      rooms of the toy fair that goes beyond what you see in press
        releases or even what you may see on the shelf, and it refers
18      to future plans.
            And so I've considered all of that.
19

20  4/5/2011 (Vol. 1) Tr. 30:19-31:4.

21        Mr. Malackowski also testified as to the economic benefit received by

22  Mattel even if Mattel may have sold products before it saw MGA's trade

23  secrets:

24          Q.  And for some of these Mattel products, is it possible
        that Mattel sold the products before Mattel saw MGA's
25      trade secrets at the toy fair?
            A.  Yes.  Bling is an example.  The Stylin It collection is
26      an example, where even though they had a product on the
        shelf, there was new information, future business strategies,
27      future advertising plans disclosed at the toy fair.  It's like
        getting the playbook of the opposing team.  Even though
28

- 18 -

1    you know who the players are, it's still very valuable
     competitive information.

2

3    4/5/2011 (Vol. 1) Tr. 31:6-15.

4         Mr. Malackowski also testified, consistent with the testimony of Mr.

5    Larian and Mr. Villasenor as to the economic benefit received by Mattel

6    seeing MGA's pricing at toy fairs:

7             Q. And did you do a comparison of whether MGA said
          there was a retail price suggested, or an FOB price compared
8         with Mattel's prices and do an analysis like you did with
          head-start on whether there was any quantifiable competitive
9         advantage there?
             A. No, I don't believe that's necessary. Knowing your
10        competitor's price is a benefit even if you match it or
          underprice it or overprice it.
11           So it wouldn't tell me – if I know that you are going to
          chart $10, if I chart $9 or $10 isn't the point. The point is
12        you now know what I am going to charge customers before
          the marketplace does.
13
     4/5/2011 (Vol. 2) 36:15-25; *see also* 4/5/2011 (Vol. 2) 37:7-13.
14

15            **2.    Mr. Malackowski's Bottom Up Approach Measures
                     The Head Start Benefit Received By Mattel From Its
16                   Theft Of MGA's Trade Secrets.**

17        Under the Bottom Up approach, Mr. Malackowski calculated an $88

18   million head start benefit to Mattel for stealing specific MGA trade secrets

19   related to Bratz. 4/4/2011 (Vol. 3) Tr. 49:13-15, 51:10-16. Mr.

20   Malackowski explained that he looked "at the advantage Mattel got in the

21   market by having access to the playbook or the trade secrets so they could

22   react quicker, bring products to the market quicker." 4/4/2011 (Vol. 3) Tr.

23   58:19-22. The $88 million calculation represents "the profits that the alleged

24   infringer made during that head-start period." 4/4/2011 (Vol. 3) Tr. 59:23-

25   24. On average, the head start benefit received by Mattel was four months.

26   4/5/2011 (Vol. 3) Tr. 61:3-6.

27        To reach his Bottom Up unjust enrichment figure, Mr. Malackowski

28   first determined that 73 of the 114 MGA trade secrets related to Bratz

- 19 -

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

products.  4/4/2011 (Vol. 3) Tr. 46:2-13.  Of the 73 Bratz-related trade
secrets, Mr. Malackowski determined there were 32 corresponding My Scene
products.  4/4/2011 (Vol. 3) Tr. 46:10-13.

Mr. Malackowski then narrowed this field to 26 My Scene products
for which Mattel obtained a head start benefit.  Mr. Malackowski calculated
the head start benefit that Mattel received from learning about MGA's trade
secrets at toy fairs using the conservative cutoff date as the date of invoice,
rather than the date that the product actually appeared on shelves of retailers.
4/4/2011 (Vol. 3) Tr. 60:3-7; 4/5/2011 (Vol. 2) 51:12-15.  Thus, Mr.
Malackowski's approach credits to Mattel the time that it should have taken
Mattel to develop each product without the use of MGA's trade secrets.

Based on Mattel's actual sales information, much of it produced during
trial by Court order, Mr. Malackowski calculated the profits earned by Mattel
during the head start period for 22 of the 26 matched My Scene products to
be $74.9 million.  4/4/2011 (Vol. 3) Tr. 60:18-61:6.

Because Mattel did not produce sufficient financial data on the
remaining four My Scene products, Mr. Malackowski calculated a $3.4
million average head start benefit based on the average of the head start
benefit for the 22 My Scene products for which he had data.  4/4/2011 (Vol.
3) Tr. 61:7-13.  Adding this additional $13.6 million to the $74.9 million
results in a total head start calculation of $88.5 million.  4/4/2011 (Vol. 3) Tr.
61:11-13.

**E.     The Jury Found That Mattel Wilfully and Maliciously
Misappropriated Twenty-Six of MGA's Trade Secrets.**

Presented with the evidence outlined above, the jury concluded that
Mattel stole MGA trade secrets and that MGA proved that this theft was
willful and malicious by clear and convincing evidence.  *See* Dkt. No. 10518
(Verdict Form) at 26.

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1

# ARGUMENT

2

## I.   MATTEL CANNOT MEET THE HIGH STANDARD REQUIRED FOR JUDGMENT AS A MATTER OF LAW.

3

4       A jury verdict can be overturned and a post-trial JMOL motion granted

5   "only if, under the governing law, there can be but one reasonable conclusion

6   as to the verdict. In other words, the motion should be granted only if 'there

7   is no legally sufficient basis for a reasonable jury to find for that party on that

8   issue.'"  *Winarto v. Toshiba America Electronics Components, Inc.*, 274 F.3d

9   1276, 1283 (9th Cir. 2001).  Thus, in assessing Mattel's request for judgment

10  as a matter of law, this Court must view the evidence in the light most

11  favorable to MGA and draw all reasonable inferences in MGA's favor.

12  *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006).  Under this test, it

13  does not matter that there is evidence in the record that might support a

14  conclusion that is contrary to the jury's verdict.  *Pavao v. Pagay*, 307 F.3d

15  915, 918 (9th Cir. 2002); *First Nat'l Mortg. Co. v. Fed. Realty Investment

16  Trust*, 631 F.3d 1058, 1067-68 (9th Cir. 2011) (verdict must be upheld even

17  if it is possible to draw a contrary conclusion).  The Court must disregard

18  evidence favorable to Mattel that the jury is not required to believe.  *Reeves

19  v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2001) (reversing

20  grant of JMOL motion and noting "the court must draw all reasonable

21  inferences in favor of the nonmoving party, and it may not make credibility

22  determinations or weigh the evidence…. 'Credibility determinations, the

23  weighing of the evidence, and the drawing of legitimate inferences from the

24  facts are jury functions, not those of a judge.'"); *Pavao*, 307 F.3d at 918;

25  *Winarto*, 274 F.3d at 1283, 1286-87 (district court must "'accept the jury's

26  credibility findings consistent with the verdict'" and "'disregard all evidence

27  favorable to the moving party that the jury is not required to believe",

28  because "[w]hen two sets of inferences find support in the record, the

- 21 -

1   inferences that support the jury's verdict of course win the day").  Moreover,

2   the Court may not make credibility determinations or weigh the evidence.

3   *Reeves*, 530 U.S. at 150; *accord Winarto*, 274 F.3d at 1286 n.9 ("It is the

4   non-movant's evidence that we assume to be true. To resolve direct conflicts

5   in testimony, the credibility of each side has to be weighed, and this is a task

6   for the jury, not the trial judge, and not the appeals court.").  Thus, Mattel

7   may only obtain a judgment as a matter of law when, after applying this test,

8   "the evidence permits only one reasonable conclusion, and that conclusion is

9   contrary to the jury's verdict."  *Josephs*, 443 F.3d at 1062.

## II.   THE EVIDENCE MORE THAN ESTABLISHES LIABILITY FOR TRADE SECRET MISAPPROPRIATION.

12       California's Uniform Trade Secrets Act protects information that is the

13   subject of reasonable efforts to maintain as secret and that has independent

14   economic value due to its secrecy.  A person is liable under the act when that

15   person has misappropriated a trade secret through wrongful acquisition,

16   disclosure or use.  Cal. Civ. Code § 3426.1; *Vacco Indus., Inc. v. Van Den*

17   *Berg*, 5 Cal. App. 4th 34, 49-51 (1992).

18       Mattel challenges the sufficiency of evidence introduced at trial in

19   support of these elements.  First, Mattel argues MGA's unreleased product

20   information at toy fairs was not trade secret and was not the subject of

21   reasonable efforts to maintain its secrecy.  Mot. at 7-12.  Second, Mattel

22   argues that MGA's trade secrets were not identified with sufficient

23   particularity and did not have independent economic value.  Mot. at 12-23.

24   Third, Mattel claims that there is insufficient evidence of misappropriation.

25   Mot. at 23-30.

26       These arguments fail for a variety of reasons—not the least of which is

27   the fact that Mattel ignore huge swaths of evidence that the jury considered

28   and accepted in reaching its verdict.  Mattel essentially argues the same

1    hackneyed positions that the jury rejected.  The evidence more than

2    establishes Mattel's liability for trade secret misappropriation—both directly

3    and circumstantially.

4

5    **A.    Unreleased Product Information At Toy Fairs Is Trade Secret And MGA Exercised Reasonable Efforts To Protect Its Secrecy.**

6

7    **1.    MGA Protected Its Trade Secrets.**

8    As noted above, Isaac Larian, the owner and President of MGA,

9    confirmed at trial that MGA products were shown in private and confidential

10   showrooms at toy fairs.  He described in detail MGA's efforts to maintain the

11   secrecy of information at toy fairs both internationally and domestically.

12   Specifically, Mr. Larian testified that admission to MGA showrooms was by

13   invitation only; that a guard was posted in the showrooms; that a receptionist

14   had to check people in; that there were sign in sheets for visitors; that the

15   sign in sheet expressly forbid the unauthorized disclosure of MGA's

16   confidential information; that visitors to MGA showrooms were only shown

17   the portions of MGA's gallery to which their business pertained; that visitors

18   to MGA's showrooms were escorted; that visitors were instructed not to

19   disclose confidential MGA information; that visitors to MGA showrooms

20   signed non-disclosure agreements; that MGA had a no unauthorized

21   photography policy in its showrooms.  3/24/2011 (Vol. 2) Tr. 26:7-28:1,

22   52:12-53:6, 54:10-16, 55:11-56:4, 56:22-58:1, 58:3-59:20, 66: 4-25; 113:5-

23   24; TX 36635; TX 12844.

24   Witnesses testified that MGA has dutifully guarded admission to its

25   showrooms.  3/24/2011 (Vol. 2) Tr. 55:2-56:17; 3/30/2011 (Vol. 2) Tr.

26   97:22-98:13.[2]  MGA introduced an example of a sign-in sheet that visitors to

27   _____

28   [2]    Mattel argues that Mr. Larian was the "sole" person to testify on efforts to maintain the secrecy of its unreleased product information at toy fairs.  Mot. at 13.

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1   the showroom retailers were required to sign acknowledging the

2   confidentiality of MGA's unreleased product information and agreeing to

3   maintain the secrecy of that information.  TX 36635.  It stated in large letters

4   at the very top of the sign-in that:

6   > Your permission to visit MGA Entertainment's
    > offices and facilities is granted subject to your
7   > agreement to keep confidential any information that
    > may be disclosed to you concerning MGA's
    > business affairs, including but not limited to,
8   > MGA's product lines, product names, designs,
    > artwork, trade dress, advertising and/or marketing
9   > plans.  By signing your name below, you agree that
    > you will not disclose any information, which MGA
10  > considers confidential, to any third party, including,
    > but not limited to, any parties who are in the
11  > business of manufacturing or licensing products or
    > providing services in competition with MGA's
12  > products or services.

13  TX 36635; 3/24/2011 (Vol. 2) Tr. 58:3-59:20.

14       Mr. Larian testified that MGA used sign in sheets and instructed

15  visitors not to disclose confidential MGA information consistently at toy

16  fairs.  3/24/2011 (Vol. 2) Tr. 62:6-18, 63:7-9.  Moreover, the fact that not

17  every single sign-in sheet was introduced at trial is not material.  *See* Mot. at

18  11; *Learning Curve Toys, Inc. v. Play Wood Toys, Inc.*, 342 F.3d 714, 715

19  (7th Cir. 2003) (reversing judgment as a matter of law where ample evidence

20  presented of confidential relationship even though no written agreement.);

21  *see also Landes Construction Co.*, 833 F.2d at 1371 (even in a "swearing"

22  contest between witnesses, a jury's verdict must be upheld).

23       In addition, while Mattel admits numerous MGA executives testified

24  about MGA's showroom secrecy policy (Mot. at 12), Mattel neglects to

25  mention that the jury also heard Mattel sales executive Mateo Romano testify

---

This is false as demonstrated.  *See*  3/30/2011 Tr. Vol. 2 at 97:22-98:13 (Brawer).
Even if so, such evidence cannot be disregarded for that reason.  *See Josephs*, 443
F.3d at 1062; *Pavao*, 307 F.3d at 918; *Landes Construction Co. v. Royal Bank of
Canada*, 833 F.2d 1365, 1372 (9th Cir. 1987).

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1   that he was required to sign a confidentiality agreement before he could enter

2   MGA showrooms, and that Romano characterized MGA's focus on

3   protecting confidential information as "a little bit excessive" and "obsessive."

4   TX 25857; TX 36079; 3/22/2011 (Vol. 2) Tr. 10-13, 15, 36, 38. (Romano).

5           And the jury heard about Mattel's Herculean efforts to get MGA's

6   confidential information and Mattel's own admissions that it could not have

7   obtained the information that it did absent its use of false identities and hiring

8   others to obtain the information.  *See* Statement of Facts, Part C, *supra*;

9   3/23/2011 (Vol. 2) Tr. 106:5-10; 3/22/2011 (Vol. 2) Tr. 51:11-17 (Turetzky).

10          At a minimum, MGA established that the information obtained by

11  Mattel was difficult to obtain without the use of the improper means

12  employed.  This establishes reasonable efforts.  *See Clark v. Banker*, 453

13  F.2d 1006, 1009-10 (9th Cir. 1972) (efforts to keep secret must be such that

14  the information is difficult to obtain).

15          Nor can Mattel justify its motion by referencing the fact that retailers

16  learned the information or that the press had some access to certain

17  information.  Mot. at 10-11.  MGA witnesses confirmed that MGA would

18  closely monitor the press and the information that the press obtained so that

19  trade secret information would not be disclosed.  3/24/2011 (Vol. 2) Tr.

20  50:17-53:4, 54:5-7; 3/30/2011 (Vol. 2) Tr. 100:4-19 (Brawer); 4/6/2011 (Vol.

21  2) Tr. 26:12-27:8.

22          FOB pricing, which, as discussed above, Mattel employees

23  acknowledged was confidential and was improperly in Mattel's possession, is

24  no different.  While there may be "leakage" of such information and while

25  retailers may share that information, that fact is that they agreed not to do so.

26  3/24/2011 (Vol. 2) Tr. 57:11-59:20, 65:12-20, 70:6-15 (Larian); 3/24/2011

27  (Vol. 2) Tr. 41:6-13, 44:6-15 (Larian); 3/22/2011 (Vol. 2) Tr. 83:9-17

28  (Villasenor); 3/23/2011 (Vol. 2) Tr. 106:25-107:7 (Villasenor); 3/22/2011

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1  (Vol. 1) Tr. 40:13-25 (Turetzky); 3/18/2011 (Vol. 1) Tr. 105:6-14 (Kilpin).

2  The unauthorized release of information does not mean that it is not a trade

3  secret in the first instance.  *See, e.g.*, *Wallis v. PHL Assoc's, Inc.*, 168 Cal.

4  App. 4th 882, 898-99 (2008)

5  Mattel relies heavily on Eckert's self-serving testimony that FOB

6  pricing is readily ascertainable. Mot. at 22.  Setting aside the testimony of

7  Mattel employees that it is nonetheless confidential, Mattel bore the burden

8  of establishing that Mattel obtained the information via the means described

9  by Eckert.  Mattel introduced no such evidence, and indeed, the ample

10  evidence of Mattel's theft of that information at toy fairs belies that assertion.

11  Mattel cannot assert the affirmative defense that information was readily

12  ascertainable when, as here, the evidence establishes that it obtained its

13  information wrongfully and by misappropriation.  *Abba Rubber Co. v.*

14  *Seaquist*, 235 Cal. App. 3d 1, 21 & n. 9 (1991).

15  Finally, even if Mr. Larian and MGA had not expressly instructed

16  people not to disclose confidential MGA information, an express agreement

17  is not required.  *See*, *e.g*., *Kewenee Oil Co. v. Bicron Corp.*, 416 U.S. 470,

18  474 (1974) ("the subject of a trade secret must be sacred, and . . . this

19  necessary element of secrecy is not lost, however, if the holder of the secret

20  reveals the trade secret to another in confidence and under an implied

21  obligation not to use or disclose it."); *Learning Curve Toys, Inc.*, 342 F.3d at

22  715.

23  All this evidence clearly establishes reasonable efforts to maintain

24  secrecy.

**2.      The Information Was Not Otherwise Public.**

25

26  ***Press Releases***.  Mattel  argues that 14 of the 26 products were the

27  subject of press articles and releases before they were "allegedly"

28  misappropriated.  Mot. at 18-19.  Mattel is conveniently overlooking the

1    evidence that establishes, without question, that elements of Mattel's reports

2    were not available in press releases and media reports.

3          For example, Mattel claims that the information regarding Bratz

4    Mobile in TX 9507-143 was "public information," citing various press

5    reports (Mot. at 54), but none of the purportedly "public" sources cited by

6    Mattel included the FOB pricing evident in TX 9507-143.  *Compare* TX

7    9507-143 with TX 20951, TX 23890.  Indeed, despite the fact that the exhibit

8    clearly states "FOB LA Price: $29.99" in huge text at the bottom of the

9    exhibit relied on by Mattel, Mattel bafflingly maintains "MGA presented no

10   evidence that Mattel acquired… 'FOB pricing' of Bratz Mobile."  (Mot. at

11   55.)

12         In fact, Sal Villasenor admitted FOB pricing was never available in

13   mass market publications, like those Mattel cites here.  *See* 3/23/2011 (Vol.

14   3) Tr. 23:1-3 ("Q    But none of the press releases and none of the magazine

15   articles contained FOB prices, right? A    That's correct."); *id.* at 26:5-10 ("Q

16   Well, no mass market publication ever listed MGA's FOB prices, right? A

17   That I don't know. Q    Have you ever seen one in a magazine for general

18   circulation? A    No, I have not."); *id.* at 27:3-6 ("Q    Did your comparisons

19   that you talked about earlier repeatedly contain FOB prices in your toy fair

20   report but did not appear in press releases or magazine articles? A    That's

21   correct."); *accord* 3/18/2011 (Vol. 2) Tr. 69-72 (Kilpin: "Q.    That

22   information about eight-inch dolls isn't there, is it? A.   No, it's not. Q.   That

23   information about FOB Hong Kong costs is not in there; right? A.   The retail

24   price is. Q.   Well, is FOB Hong Kong costs 14.99 in there? A.   No, it's not.

25   Q.   And that would be the cost of somebody -- of a store, a retailer

26   purchasing it from MGA; right? A.   That's correct. Q.   And that's not in the

27   article anywhere.  Nothing about the costs of the retailer of any kind; right?

28   A.   That's right. Q.   And nothing is in this article about FOB LA costs,

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1    whatsoever; right? A.   That's correct.")

2           Indeed, the jury heard how Mattel created reports that had

3    descriptions, pictures, FOB pricing and television advertising of MGA

4    products shown in MGA's private showroom at toy fairs.  Many of the

5    reports on their face described their contents as having been "gathered from

6    competitors' catalogues and price lists acquired at the New York toy fair."

7    *See*, *e.g*., TX 9498; TX 9504; TX 32836.  And the jury saw that Mattel stole

8    FOB pricing and television advertisement information regarding Bratz Styl'

9    It Collection, Bratz Winter Wonderland Collection, Bratz Formal Funk

10   Collection, Bratz Formal Funk Collection, Bratz FM Limo, Bratz

11   Motorcycle, Bratz Petz Assortment, Lil' Bratz Vehicle Assortment, and Lil'

12   Bratz Deluxe Mall Playset, just to name a few, as evidenced by the face of

13   the report cited by Mattel (*see* TX 9275-19, TX 9275-20, TX 9275-0029; *see*

14   *also* 3/22/2011 (Vol. 2) Tr. 95:25-100:9 (Villasenor testimony re

15   procurement and distribution of confidential MGA information such as FOB

16   pricing and advertisement in TX 9275).   As discussed at length above, FOB

17   pricing and television advertising plans are valuable to competitors and not in

18   the public eye.  *See* Statement of Facts, Part C*, supra*.  Mattel simply cannot

19   establish that the trade secrets at issue here were easily accessible to the

20   public in media reports.

21          Furthermore, the jury heard and saw evidence showing that what

22   Mattel employees saw in these showrooms was materially different than what

23   they could see in press reports or hear from retailers.  *See, e.g.,* 4/6/2011

24   (Vol. 2) Tr. 28:14-31:6.   The jury just had to consider the testimony of

25   Mattel's expert, Wagner, who could not explain what a doll described as

26   "funkalish" looked like, what the "unique party-night accessory" or the other

27   29 or 30 accessories offered with the package were, which dolls were offered

28   in the package or what the clothes that the dolls were wearing looked like.

1    4/5/2011 (Vol. 4) Tr. 31:19-33:12.  That testimony succinctly puts Mattel's

2    argument to the lie.

3              Moreover, in an MGA showroom, the Mattel spies could see, feel,

4    touch and play with prototypes of MGA products.  3/24/2011 (Vol. 2) Tr.

5    104:8-21.  That is why retailers attended toy fairs in person, rather than

6    simply look at sell sheets or catalogs and why Mattel paid thousands of

7    dollars each year to fly its spies to toy fairs – to see the actual products.  *Id*. at

8    104:23-105:7, 108:7-24, 115:18-116:6; 3/22/2011 (Vol. 2) Tr. 59:22-61:18,

9    70:1-9; TX 9506; 9509; 9516; 9521.   Even the reporters covering these toy

10   fairs acknowledged that there was a difference between seeing a product and

11   reading about it.  TX 37197.

12        Mattel's touting of its intelligence department communiqués which

13   simply cut-and-paste MGA press releases (*see, e.g.,* Mot. at 18-19) is wholly

14   undermined by the videos of toy fair presentations where Mattel employees

15   described the intricate details of products not highlighted in the toy fair

16   report.  Indeed, in one video presented to the jury, a Mattel Market

17   Intelligence member acts out a demonstration of a competing product she

18   saw at a toy fair showroom.  TX 9488.   This amply demonstrates that

19   information in a press release was not all Mattel had, or used.

20        ***Shipped In Commerce Does Not Mean Publicly Available.***  Mattel

21   also argues that 3 of the 26 products "were shipped to retailers" before they

22   were "allegedly" misappropriated.  Mot. at 20.  Mattel's commercial stream

23   argument fails because product crossing the ocean or sitting in containers is

24   not publicly available.  4/6/2011 (Vol. 2) Tr. 17:12-21:4.[3]

25   _____

[3]   Mattel also claims that at least one product was sold before appearing in a Toy

26        Fair showroom.  Mot. at 71.  Mr. Larian testified that the information was not
     accurate.  3/25/11 Trial Transcript, Vol. 1 at 63:15-64:13, 76:17-19.  The jury

27   was certainly entitled to believe Mr. Larian over a document Mattel only
     "authenticated" by claiming MGA produced it.   3/25/11 (Vol. 1) Tr. at 82:22-

28   83:6.

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1     Based on the foregoing, the evidence more than establishes reasonable
2   efforts to maintain secrecy.

3
    **B.    MGA's Trade Secrets Were Identified With Reasonable**
4   **Particularity And Had Independent Economic Value.**

5     Mattel claims that MGA failed to identify its trade secrets with
6   sufficient particularity and that MGA's trade secrets have no economic value.
7   Mot. at 12-17.  As part of this argument, Mattel  also claims that certain
8   products were not testified about and therefore they cannot be the subject of a
9   jury's award.  Mot. at 12-14, 17.  Second, Mattel claims that certain things,
10   such as themes, simply are not trade secrets or there was no corresponding
11   product on the market.  Mot. at 15.   Neither argument has merit.

12
    **1.    The Evidence Establishes That All Products Identified**
13   **By The Jury Were Misappropriated.**

14     All 114 products for which MGA sought damages, including the 26
15   products for which the jury found misappropriation, were referenced within
16   Mattel's toy fair reports and toy fair videos.  *See* TX 9275; 9406; 9488; 9504;
17   9566; 9656; 26546; 26755; 26758; 31530; 32836.  As to the three products
18   specifically identified by Mattel as not being the subject of testimony, all
19   three products were identified in Mattel toy fair reports admitted into
20   evidence.  TX 9275-0029 and TX 31530-00023.  The fact that these products
21   are identified in Mattel reports is in and of itself evidence of
22   misappropriation.  The testimony amply established that reports such as TX
23   9275 and TX 31530 were prepared after Mattel went to toy fairs and obtained
24   the information using false identifications and identities.  *See* Statement of
25   Facts, Part B, *supra.*   Moreover, as noted above, the Mattel report included
26   FOB pricing, which alone provides a basis for the jury's finding of
27   misappropriation since that pricing information is itself a trade secret.  *See*
28   TX 9275-0029 (Lil Bratz Vehicle Assortment FOB HK $9.99 and Lil Bratz

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

Deluxe Mall Playset and Mall Stores, FOB HK $39.99 and $14.99; Statement of Facts, Part C, *supra*.

### 2. The Trade Secrets Have Value And Are Identified With Particularity.

There can be no dispute that the look, appearance, play pattern, advertising plans and FOB pricing are trade secrets. And there can be no dispute that they are identified with reasonable particularity.

First of all, Mattel's argument concerning reasonable particularity was previously rejected by the Court during summary judgment and has now properly been rejected by the jury. Docket Nos. 9600 (summary judgment orders); Dkt. No. 10518 (verdict form). Moreover, as noted above, Mattel has itself admitted that Mattel also considers FOB pricing and the "designs, themes, play patterns, [] features of product lines, samples, [and] information relating to the introduction of new or modified products and product lines" and other information it presented in its private showrooms to be confidential. TX 7978 at 293; *see also* 3/31/2011 (Vol. 2) Tr. 62:19-65:22, 97:8-99:3 (DeAnda); 3/22/2011 (Vol. 1) Tr. 11:7-16 (Debrowski); 3/18/2011 (Vol. 1) Tr. 105:6-14 (Kilpin). Indeed, as noted above, information on a product's play pattern and appearance is specifically what retailers and Mattel's Iintelligence Department went to toy fairs for, Mattel employees demonstrated in their presentations, and Mattel employees valued. *See* Statement of Facts*, Part C, supra.* In fact, the jury saw TX 27464-158, which specifically refers to the substantial savings that Mattel achieved by knowing MGA's 2004 pricing. TX 27464-158 .

Mattel tries to overcome this evidence by mischaracterizing MGA's claimed secret as merely a "theme" –Mot. at 15 – but MGA has never presented its claim so narrowly. Instead, the jury heard that Mattel knew that MGA was releasing a new doll with that theme in a given year *along with the particular execution of that theme by MGA*. The "when" and "how" of a

1   product launch are crucial, and Mattel indisputably had the advantage of

2   seeing the particular product being launched in the coming season – – how it

3   looked, what features it had, how it played, what accessories came with it and

4   how it would be positioned in the market.  3/24/2011 (Vol. 2) Tr. 104:8-21,

5   104:23-105:7, 108:7-24, 115:18-116:6; 4/6/2011 (Vol. 2) Tr. 28:14-31:6.

6   Mattel further misconstrues MGA's claims because Mattel did not utilize this

7   information to bring out with a competing product, such as Acceleracers, that

8   looked like a MGA product.  Mot. at 16-17.  But as Mattel's own witnesses

9   demonstrated, even where Mattel does not duplicate particular features in its

10  own produces, its knowledge of MGA's plans gives Mattel valuable

11  information that it can exploit with customers to position Mattel's product

12  ahead of MGA in the market place.  3/24/2011 (Vol. 2) Tr. 45:15-46:24,

13  111:13-113:4, 113:25-114:14.

14       Last, as to value, Mattel and MGA witnesses both testified to the value

15  of the unreleased product information and FOB pricing information.  The

16  testimony was clear in this regard.  *See* Statement of Facts, Part C, *supra*.

17
18       **C.    There Is Ample Evidence In The Record Of Mattel's
              Wrongful Acquisition And Use Of MGA's Trade Secrets.**

19       In its motion, Mattel conflates the element of misappropriation of trade

20  secrets with the element of damages.  Mot. at 23.  But Mattel misconstrues its

21  own authority.  These are these distinct concepts.  *Sargent Fletcher, Inc. v.*

22  *Able Corp.*, 110 Cal. App. 4th 1658, 1665-66 (2003).   They are therefore

23  discussed separately.  *See*  Part III,  *infra* (damages)

24       Mattel's challenge to a finding of misappropriation is truly astounding

25  in light of the evidence presented at trial concerning the conduct of the

26  Market Intelligence Department.  Indeed, the jury was so outraged by

27  Mattel's misappropriation, it found such conduct to be willful and malicious.

28  Dkt. No. 10518 (verdict form).   Nonetheless, Mattel charges ahead with two

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1   arguments.  First, Mattel claims that three products appear in a 2006 Toy Fair

2   report and that there is no evidence that anyone went into the 2006 Toy Fair.

3   Mot. at 24-25.  Second, Mattel claims that there is no evidence of "matching"

4   Mattel products as to 17 of the 26 products at issue.  Mot. at 25-30.

### 1.   The Jury's Verdict As To The Products Identified In The 2006 Toy Fair Cannot Be Overturned.

7        Mattel claims that there's no evidence Mattel snuck into MGA

8   showrooms after 2005, relying on Villasenor's testimony claiming he did not

9   attend that toy fair and current Mattel employee Carey Plunkett, the "only

10  Mattel employee who testified she entered an MGA showroom without

11  revealing that she was a Mattel employee" because she said she only did it in

12  2002.  (Mot. at 24-25.)

13        Of course, the jury had its fill of incredible testimony from Mattel

14  about when its spying stopped.  Turetzky told them that the spying stopped in

15  2002, despite all the evidence to the contrary, and Eckert said the Market

16  Intelligence Department was no longer despite his receipt of emails in 2008

17  from that group.  Dkt. No. 10539 at 20. TX 36749-50, TX 35646; 4/1/2011

18  (Vol. 1) 29:6-32:3.  But the jury also heard from Mattel employees about the

19  increased use of outside contractors after 2003, such as Sharon Rahimi and

20  Kelly Osier, both of whom infiltrated toy fairs and obtained competitor

21  information under false pretenses, and both of whom, according to Jill

22  Thomas, are even now eligible to work as contractors for Mattel.  3/30/2011

23  (Vol. 1) Tr. 44:9-47:11 (Thomas); 3/22/2011 (Vol. 2) Tr. 118:11-120:2

24  (Villasenor); 3/23/2011 (Vol. 2) Tr. 59:7-20, 68:9-16 (Villasenor).

25  Moreover, it was the jury's prerogative to disbelieve Carey Plunkett when

26  she said she only did it once, back in 2002.  Since Plunkett indisputably

27  admitted she lied *as part of her job* at Mattel, and has enjoyed success at

28  Mattel as a result, it is not a stretch for the jury to refuse to accept her story –

- 33 -

1   or Mattel's claim that this information must have been obtained through

2   proper channels – at face value.

3         Moreover, the fact that Mattel put some words on a document

4   disclaiming that the information was obtained illicitly is not any basis for

5   rejecting the jury's finding.  First, the jury was entitled to assess Mattel's

6   credibility.  That was its province.  *See* Part I, *supra*.  Second, it must be

7   recalled that by 2006, there can be no question that Mattel's legal department

8   was involved and that Mattel was trying to cover its tracks.  The jury heard

9   that testimony as well.  *See* Mot. for Exemplary Damages at 6.  Certainly, a

10  jury could see through Mattel's self-serving attempt to hide its conduct.

11        In short, the jury's verdict is amply supported.

### 2.  The Evidence Establishes Misappropriation Even Without "Matching" Products.

14        Misappropriation requires proof that the defendant improperly

15  acquired *or* disclosed *or* used the plaintiff's trade secrets.  Cal. Civ. Code

16  § 3426.1(b).  Here we have all three:  improper acquisition, disclosure and

17  use of MGA's trade secrets.  First, Mattel *acquired* MGA's trade secrets

18  through improper means.  It acquired the information by misrepresentation

19  and theft.  Cal. Civ. Code § 3426.1(a).   In its motion, except to talk about the

20  2006 Toy Fair report, Mattel ignores this basis for liability.

21        Second, the jury saw and heard evidence of the widespread *disclosure*

22  of the information to key departments at Mattel in the form of written reports

23  and theatre-like presentations.  TX 9275; 9406; 9488; 9489; 9504; 9566;

24  9656; 26546; 26755; 26758; 31530; 32836.  The presentations and

25  distributions were made to large audiences, including to the highest levels of

26  Mattel.  3/22/2011 (Vol. 2) Tr. 73:4-74:9 (Villasenor).  The groups and

27  individuals receiving this information could then learn and benefit from this

28  improperly gained knowledge of competitors' trade secrets.  TX 9488; 9489;

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1    3/24/2011 (Vol. 2) Tr. 114:15-115:13 (Larian).

2         Third, the jury heard of Mattel's extensive use of this information.

3    Not only did Mattel use this information in the most obvious way – creating

4    or adapting existing products to compete with MGA's planned product

5    launches – but it also used the information to market and position its products

6    more affectively.  Mr. Larian identified numerous examples of MGA

7    products that were referenced in Mattel's toy fair reports for which a

8    competing Mattel product was released by Mattel in the same season.

9    3/24/2011 Trial Testimony, Vol. 2 at 117:7-118:15 (Bratz Winter

10   Wonderland and MyScene Chillin' Out), 118:16-120:12 (Bratz Formal Funk

11   Super Stylin Runway Disco and MyScene Sound Lounge), 120:18-122:5

12   (Bratz Motorcycle Meygan and MyScene Vespa), 122:18-124:6 (Bratz Petz

13   and MyScene Pets), 124:14-125:17 (MGA Alien Racers and Mattel

14   Acceleracers), 125:22-126:127:2 (Bratz Girls Night Out Yasmin and MySche

15   Day and Nite Chelsea and Madison), 127:9-128:20 (Bratz Forever Diamond

16   and MyScene Bling Bling), 129:13-130:10 (Flashback Fever and MyScene

17   Roller Girls), 130:16-131:10 (MGA 4-Ever Best Friends and Mattel Wee 3

18   Friends).

19        Mattel claims that the jury did not see evidence of specific matching

20   products for each of the 26 products found to have misappropriated.  But the

21   jury did not *have* to see such evidence to find misappropriation, since Mattel

22   admitting to using the information.  It gave Mattel a "superior competitive

23   advantage," in being able to position and more effectively market existing

24   products.  3/23/2011 Trial Transcript, Vol. 1 at 18:1-15 (Villasenor).  As the

25   jury heard, the Market Intelligence reports were distributed not only to the

26   Mattel design group, but to marketing and sales as well.  3/22/2011 (Vol. 2)

27   Tr. 65:2-66:11, 74:10-75:11, 81:13-82:23 (Villasenor).

28        As noted above, the jury also heard about and saw reports containing

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1  confidential FOB pricing for many of those products and saw Mattel-
2  produced catalogues, sell sheets, and price lists illegally obtained from MGA
3  showrooms.  TX 9475; 36640;  9301; 9503; 9508; 9512; 9591; 9594;
4  3/24/2011 (Vol. 2) Tr. 31:20-32:23, 35:3-36:2, 43:11-15, 43:18-44:3, 46:25-
5  47:5, 47:11-20, 49:4-16; 50:4-9.  The jury  saw the email exchange between
6  Matt Turetsky and Sal Villasenor lauding the value of such price lists, even
7  assigning a value of nearly $1 million from use of a single price list.  TX
8  27464-158.  The jury could reasonably infer from this email (as well as the
9  catalogues, sell sheets, and price lists referenced above) that Mattel's
10  possession and widespread distribution of MGA's pricing information was
11  proof Mattel used that information to its benefit.

12       Finally, Mattel attacks the jury's verdict with respect to the timing of
13  Mattel's use, arguing that there was insufficient evidence of whether Mattel
14  used MGA's trade secrets while the information was still secret.  Mot. at 27-
15  28.  But the jury was carefully instructed on the need to establish
16  misappropriation while information was secret and rendered its verdict as it
17  did.  A jury is presumed to follow the instructions given by the court.  *See*
18  *United States v. Alston*, 974 F.2d 1206, 1210 (9th Cir. 1992) ("A jury is
19  presumed to follow the instructions given by the court"); *accord Image Tech.*
20  *Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1213 (9th Cir. 1997)
21  ("Under these instructions the jury could not consider 'less restrictive
22  alternatives' without … violating the jury instructions. We presume that the
23  jury followed the court's instructions."); *Masoner v. Thurman*, 996 F.2d
24  1003, 1008 (9th Cir. 1993) ("The jury was specifically instructed to find a
25  high degree of probability, and we presume the jury followed its
26  instructions.").  In addition, the evidence establishes that the information
27  obtained at toy fairs was distributed at Mattel immediately following the toy
28  fair.  *See* Mot. for Exemplary Damages at 11.  And, as documents such as TX

1    27464-158 show, they were put to use to save Mattel money it would

2    otherwise have lost.  This is no basis for overturning the jury's verdict.

3                **3.        Misappropriation of Plans to Advertise.**

4            Finally, Mattel claims that there is no evidence that it stole MGA's

5    plans to advertise as to 10 products.  Mot. at 22-23.  Among the products

6    Mattel references is Bratz Mobile.  Mot. at 23.  Yet, while pointing to a toy

7    fair report that Mattel claims does not reflect any advertising information

8    regarding Bratz Mobile, Mot. at 22 n. 71 (citing TX 9507-143), what Mattel

9    fails to note is TX 9508-3.  That exhibit clearly reflects that Mattel knew

10   MGA intended to advertise Bratz Mobile.

11           Moreover, Mattel's knowledge of what MGA did *not* plan to advertise

12   was just as useful to Mattel.  Mattel cites TX 9275-20, which mentions Bratz

13   Pet Assortment, to show that there's no evidence that Mattel stole MGA

14   advertising plans.  Mot. at 22 n. 71.  Bratz Pet Assortment appears on the

15   same page as two other MGA products—Bratz Runway/Formal Funk Playset

16   and Bratz FM Limo.  TX 9275-20.  For these two products, there is a

17   notation "TV Advertised."  For Bratz Pet Assortment, there is no such

18   notation.  *Id.*

19           But as Mattel well knows, MGA did not advertise all of its products.

20   3/24/2011 (Vol. 2) Tr. 111:16-20, 112:7-17.  Knowing which products MGA

21   planned to advertise would allow Mattel to adjust its marketing plan strategy

22   against MGA to do a direct head-to-head advertising campaign, an earlier

23   advertising campaign of a competing product or wait to increase advertising

24   of the competing product later.  *Id.* at 112:15-23.  And, of course, Mattel

25   could decide not to advertise and instead "ride off of [MGA's] coat tails,

26   thereby saving Mattel money.  *Id.* at 112:24-113:3.  Therefore, the absence of

27   a "TV Advertised" notation next to the Pet Assortment is hardly proof that

28   information about advertising was not stolen.  Indeed, the absence of

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1   information about advertising in comparison products makes MGA's plans

2   abundantly clear – to Mattel's benefit.

3          For all these reasons, the evidence supports finding misappropriation.

4

5   **III.    THE JURY'S UNJUST ENRICHMENT DETERMINATION IS SUPPORTED BY THE RECORD**

6

7          **A.    It Is The Province Of The Jury To Assess And Award Unjust Enrichment, Even If Higher Or Lower Than The Unjust Enrichment Offered By An Expert.**

8

9          Mattel's Motion ignores the purpose and process of expert testimony

10  and the review, consideration, and evaluation of that testimony by the jury.

11  First, while a claimant must prove the amount of damages suffered, a

12  claimant need not establish the amount of the damages with mathematical

13  precision.  "Where the *fact* of damages is certain, the amount of damages

14  need not be calculated with absolute certainty.  The law requires only that

15  some reasonable basis of computation of damages be used, and the damages

16  may be computed even if the result reached is an approximation."  *GHK*

17  *Assocs. v. Mayer Group, Inc.*, 224 Cal. App. 3d 856, 873 (1990) (emphasis in

18  original); *see also Schroeder v. Auto Driveway Co.*, 11 Cal. 3d 908, 921

19  (1974); *Stott v. Johnston*, 36 Cal. 2d 864, 875 (1951).  In the words of the

20  Supreme Court, "[w]here the tort itself is of such a nature as to preclude the

21  ascertainment of the amount of damages with certainty, it would be a

22  perversion of fundamental principles of justice to deny all relief to the injured

23  person, and thereby relieve the wrongdoer from making any amend for his

24  acts. In such case, while the damages may not be determined by mere

25  speculation or guess, it will be enough if the evidence shows the extent of the

26  damages as a matter of just and reasonable inference, although the result be

27  only approximate."  *Story Parchment Co.*, 282 U.S. at 563; *Eastman Kodak*

28  *Co. of New York v. Southern Photo Materials Co.*, 273 U.S. 359, 379 (1927)

1   (agreeing with district court's statement that "[d]amages are not rendered

2   uncertain because they cannot be calculated with absolute exactness.  It is

3   sufficient if a reasonable basis of computation is afforded, although the result

4   be only approximate.").

5       Second, in arriving at a damages figure, a damages expert is entitled to

6   rely on reasonable assumptions based on the facts in the record and his or her

7   expertise.  Thus, where as here, there were documents relating to products

8   that Mattel failed to produce, Mr. Malackowski was well within his rights to

9   make reasonable assumptions and calculations based on the facts that were

10   known to him and that were in the record.  *Humetrix, Inc. v. Gemplus S.C.A.*,

11   268 F.3d 910, 919-20 (9th Cir. 2001) (citing *Arntz Contracting Co. v. St.*

12   *Paul Fire & Marine Ins. Co.*, 47 Cal. App. 4th 464, 489-90 (1996)).

13       Third, a jury's verdict is not suspect if the jury decides to reject in

14   whole or in part a damages expert's calculations.  A jury may award an

15   amount that is higher than an expert testifies is appropriate.   *4.0 Acres of*

16   *Land*, 175 F.3d  at 1142 (9th Cir. 1999).  A jury may award an amount that is

17   lower.  *Hemmings*, 285 F.3d 1174.   Indeed, a jury may even decide in

18   deliberations to discuss a high damages figure and a low damages figure and

19   then just decide that the average is the appropriate amount.  "There is no

20   impropriety in the jurors making an average of their individual estimates as

21   to the amount of damages for the purpose of arriving at a basis for discussion

22   and consideration, nor in adopting such average if it subsequently agreed to

23   by the jurors. . . ."  *Lara*, 123 Cal. App. 4th  at 462-63.

24       Thus, a jury's damage award cannot be set aside simply because the

25   amount awarded does not correspond to any particular calculation presented

26   to the jury.  *Raynor Bros.*, 695 F.2d at 385; *see also Unisplay, S.A.*, 69 F.3d

27   at 519.  Were it otherwise, courts "would discredit the role of the jury and

28

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1  give unbounded discretion to the district judge to override the jury's verdict."

2  *4.0 Acres of Land*, 175 F.3d at 1142.

3      In this regard, courts recognize that in virtually every case there is

4  competing evidence for juries to sort out.  This is true generally as to experts.

5  *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 235 F.3d 1184, 1192 (9th

6  Cir. 2000) ("Weighing the credibility of conflicting expert witness testimony

7  is the province of the jury.").   It is also true of damages experts.  "At bottom,

8  the determination of damages is essentially a factual matter on which

9  inevitable differences of opinion do not warrant intervention by the appellate

10  courts."  *Heiner v. Kmart Corp.*, 84 Cal. App. 4th 335, 347 (2000).

11  Arguments about the "meaning and effect of expert testimony on the issues

12  of damages are best directed to the jury."  *Id.*; *see also 4.0 Acres of Land*, 175

13  F.3d at 1142 (jury is charged with weighing damages expert testimony).

14      In light of these legal standards, Mattel's motion must be denied.

15

16  **B.    The Jury's Verdict Awards Unjust Enrichment To MGA
        That Is Supported By The Evidence.**

17      Mattel makes a series of arguments concerning the award of unjust

18  enrichment to MGA.  Mattel claims that (1) Mr. Malackowski only discussed

19  two products and therefore an award of damages as to any other products is

20  improper (Mot. at 31-33); (2) Mr. Malackowski's head start assumptions are

21  contrary to the evidence (*id.* at 42-44); (3) unjust enrichment was awarded

22  for five trade secrets although Mr. Malackowski disavowed head start

23  damages (*id.* at 40); (4) Mr. Malackowski's Top Down approach runs afoul

24  of *O2 Micro Int'l Ltd. v. Monlithic Power Sys., Inc.*, 399 F. Supp. 2d 1064

25  (N.D. Cal. 2005), because he valued the trade secrets as a whole and not on

26  an individualized basis (*id.* at 33-38, 47-49) and (5) Mr. Malackowski failed

27  to calculate damages based solely on Mattel's wrongful conduct and as to

28

only those trade secrets actually used and that Mr. Malackowski failed to consider Mattel's "sweat equity."  *Id.* at 40-42, 49-52.

In all respects, these arguments lack merit.

### 1.     The Jury Could Reasonably Rely On Mr. Malackowski's Bottom Up Approach For The Fifteen "Matched" Trade Secrets.

The jury's verdict can be divided into two groups of trade secrets for which they awarded unjust enrichment to MGA, both of which are fully supported by the evidence.  The first group consists of 15 trade secrets for which Mr. Malackowski found a matching My Scene product.  These trade secrets clearly fall within Mr. Malackowski's Bottom Up approach.  In other words, Mr. Malackowski calculated head start damages for each of these 15 trade secrets.  The 15 trade secrets falling within this category are:

| Bratz Product | Amount Calculated by Malackowski[4] | Amount Awarded by Jury |
|---|---|---|
| 1.  Bratz Winter Wonderland Collection | $5.773 | $3.4 |
| 2.  Bratz Formal Funk Collection | $6.323 | $3.4 |
| 3.  Bratz Motorcycle | $4.664 | $3.4 |
| 4.  Sun Kissed Summer | $9.164 | $3.4 |
| 5.  Bratz Diamondz | $16.391 | $3.4 |
| 6.  Bratz Rock Angelz | $10.339 | $3.4 |
| 7.  Bratz Campfire | $3.4 | $3.4 |
| 8.  Bratz Mobile | $3.4 | $3.4 |
| 9.  Bratz FM Limo | $1.449 | $3.4 |
| 10. Lil' Bratz Vehicle Assortment | $2.386 | $3.4 |

---

[4] In millions unless otherwise noted.

| 11.Lil' Bratz Deluxe Mall Playset | $796,000 | $3.4 |
|---|---|---|
| 12.Bratz Petz | $245,000 | $3.4 |
| 13.Dazzlin' Disco Café | $20,000 | $3.4 |
| 14.Girls Nite Out | $2.355 | $3.4 |
| 15.Wild Wild West | $1.594 | $3.4 |

Mr. Malackowski's calculated amounts for each of these 15 trade secrets were shown to the jury in a graphic during Mr. Malackowski's testimony on April 4, 2011 and then again on April 5, 2011.  4/4/2011 (Vol. 3) Tr. 64:3-13; 4/5/2011 (Vol. 1) Tr. 29:25-31:20.  For this group of trade secrets, the jury in some cases awarded lower damages than Mr. Malackowski calculated, for others, they awarded higher damages, and, for two products, awarded exactly what Mr. Malackowski calculated.  Indeed, as to these products, the jury awarded less than Mr. Malackowski's calculated as damages.  Mr. Malackowski calculations add up to $68.299 million.  The jury awarded MGA $51.0 million

The fact that the jury did not award the precise amount of unjust enrichment calculated by Mr. Malackowski for the 15 products is not fatal to the verdict.  The jury was well within its province to award higher, lower or the same amounts calculated by Mr. Malackowski so long as there was a reasonable basis for their award, which there was, as noted immediately below.  *Raynor Bros*, 695 F.2d at 385 (a jury's damage award will not be set aside simply because the amount awarded does not correspond to any particular calculation presented to the jury).

Moreover, the jury heard detailed testimony by Mr. Malackowski regarding his Bottom Up approach which calculated the head start benefit received by Mattel for 26 My Scene products.  4/4/2011 (Vol. 3) Tr. 49:13-

1    15, 51:10-16, 58:7-67:18.  The jury heard Mr. Malackowski explain that that

2    he had data on 22 of the 26 products, but, for the remaining four, did not

3    have sufficient data from Mattel.  4/4/2011 (Vol. 3) Tr. 60:18-61:6, 61:7-13.

4    While he did not testify as to his calculations for all 22 products for which he

5    had data, Mr. Malackowski walked the jury through two products to illustrate

6    the soundness of his methodology.  These two examples – My Scene Chillin'

7    Out and My Scene Bling Bling – provided the jury with a sufficient basis to

8    understand and accept Mr. Malackowski's head start calculation.

9           Mr. Malackowski testified that Mattel's misappropriation and

10    development of the My Scene Chillin' Out was "the most straightforward

11    case of a head-start period."  4/5/2011 (Vol. 1) Tr. 29:3-23.  Mr.

12    Malackowski testified that it was a classic example because MGA showed its

13    products at Toy Fair and Mattel, months later, introduced a directly

14    competitive product.  Id.  Mattel therefore received a "head start advantage"

15    because it released MyScene Chillin' Out in July of 2003, when it should

16    have been released "three months later in October, which would have been

17    the end of a natural design cycle."  Id.

18           Mr. Malackowski also testified that, while the Bling Bling product was

19    already in the market before the Bratz Diamondz product was in the market,

20    Mattel was still given confidential information at the toy fair that was

21    valuable to Mattel.  4/5/2011 (Vol. 1) Tr. 29:3-31:15.  Mr. Malackowski

22    determined that, even though Mattel already had a competing product on the

23    market, it was able to see the product at Toy Fair, see the advertising, interact

24    and play with the toy, and watch the "sizzles," which are the videos showing

25    the product and how kids can play with it.  Id.  Such information is

26    confidential because it goes beyond what is shown in just a press release or

27    even what is seen on the shelf and also extremely valuable.  Id.

28

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1    This testimony puts Mattel's claim that the head start assumptions

2    were contrary to the evidence to the lie.  Mot. at 42-44.  First, the jury heard

3    the evidence on which he relied.  Second, the record amply supported his

4    assessment that Mattel had a head start, i.e., that it used the trade secrets at

5    issue.  *See* Part II, C, *supra.*  Indeed, Mattel's argument actually depends on

6    accepting its claim that it did not misappropriate trade secrets, Mot. at 43 &

7    n. 141 (referencing argument that things stolen were not trade secret), which

8    as discussed above, is without merit.  *See* Part II, *supra.*

9    The jury also heard Mr. Malackowski's explanation of how he

10   calculated Mattel's head start benefit for four products for which he had no

11   data.  4/4/2011 (Vol. 3) Tr. 61:7-13.  For those four products, Mr.

12   Malackowski calculated the average head start benefit of the other 22

13   products within the Bottom Up approach and used that average of $3.4

14   million to represent the unjust enrichment for the four products.  4/4/2011

15   (Vol. 3) Tr. 61:7-13.  Having heard Mr. Malackowski's explanation

16   justifying the head start calculation for the 22 products, it was reasonable for

17   the jury also to adopt Mr. Malackowski's calculated average for the products

18   for which he had no data.  *Humetrix, Inc.*, 268 F.3d at 919-20.

19   A jury is entitled not only to accept the damages figure calculated by

20   the plaintiff's expert, but also to determine that the amounts should be

21   increased or decreased based on the entire record.  *See*  Part III, A, *supra.*

22   For the 15 trade secrets with matching My Scene products, Mr. Malackowski

23   calculated a total unjust enrichment of $68.299 million.  The jury awarded

24   MGA only $51.0 million.  Thus, even though the jury awarded more

25   damages than Mr. Malackowski calculated for seven products, the net overall

26   effect of the jury using the $3.4 million average was to lower the amount

27   calculated by Mr. Malackowski.

28

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1    Nothing is wrong with that.  Juries are entitled to adopt average

2    amounts.  *See Lara*, 123 Cal. App. 4th at 462-63.  They are allowed to adopt

3    amounts that are different than calculated by an expert.  For example, in

4    *Hemmings*, 285 F.3d 1174, the jury awarded damages to two plaintiffs in an

5    employment discrimination case.  For one plaintiff, the jury awarded an

6    amount slightly higher than the amount calculated by the expert and, for the

7    other, an amount significantly lower than what the expert calculated, such

8    that the overall amount was lower than that calculated by the expert.  *Id.* at

9    1191.  The defendant moved for a new trial claiming that the amount of

10   damages meant that the jury "must have been motivated by sympathy or

11   sheer guesswork."  *Id.*

12   The Ninth Circuit rejected the defendant's argument.  The Court first

13   pointed out that the defendant's principle argument was based on "quibbles

14   with [the expert's] calculations."  *Id.*  The Court pointed out that the

15   defendant cross-examined the plaintiff's expert about the assumptions in his

16   calculations.  *Id.* at 1191-92.  The Court rejected the defendant's argument

17   that there was no evidence in the record to support the damage award.  The

18   Court wrote:

19          This argument clearly fails. As described above, the
           record supported conclusions of liability. Avery's lengthy
20         and detailed testimony provided a basis for the jury to
           translate the liability into dollar amounts. Moreover, the
21         jury's award was *below* the amount calculated by Avery.
           The fact that the jury may have agreed with Avery and
22         rejected the defendant's contentions, for example, that
           compensation such as vacation time and annuities should
23         not be included, does not render the verdict "grossly
           excessive or monstrous."
24
25   *Id.* at 1192; *see also Raynor Bros.*, 695 F.2d at 385 (jury's adoption of half of

26   the amount recommended by the plaintiff was supported by the evidence).

27   Furthermore, the fact that the jury awarded some damages in excess of

28   Mr. Malackowski's calculation is not grounds sufficient to overturn the

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1  jury's verdict.  In *4.0 Acres of Land*, the jury returned a verdict that valued

2  land in a condemnation case in an amount that was higher than either the

3  plaintiff or the government's appraised value.  The district court granted a

4  new trial.  The Ninth Circuit reversed the district court's grant of a new trial

5  precisely because a jury was empowered to make the determination that a

6  higher amount was appropriate.  175 F.3d at 1142.

7       As discussed above, the jury had the material and tools it needed to

8  construct an appropriate damages award.  Not only did the jury have Mr.

9  Malackowski's testimony related to his Bottom Up approach, but it also had

10  testimony of fact witnesses that supports the jury's conclusion that the 15

11  trade secrets had value.

12       For example, Mr. Larian confirmed that "meeting the toy in person is

13  the most valuable way of acquiring the information" about a toy.  3/24/2011

14  (Vol. 2) Tr. 104:7-105:2.  Mr. Turetzky conceded that access to a

15  competitor's unreleased products "would help us compete in the marketplace

16  to know that information."  3/22/2011 (Vol. 1) Tr. 44:5-6.  Mr. Turetzky

17  even boasted to Mr. Villasenor that stealing MGA's 2004 price list resulted

18  in a close to $1 million cost savings to Mattel.  TX 27464-158.  The jury was

19  entitled to weigh the damages figure, assess the credibility of the damages

20  expert, and analyze if any other factors would serve to increase or decrease

21  the figure.

22       The evidence in the record does not indicate that only one verdict was

23  permissible, nor that the verdict was "against the clear weight of the

24  evidence."  *Josephs*, 443 F.3d at 1062; *Union Oil Co.*, 331 F.3d at 742.

25  Mattel may not like the verdict as given, but there can be no dispute that the

26  jury had substantial evidence upon with to reach its conclusions and that

27  those conclusions are reasonable in light of the evidence.  *Raynor Bros.*, 695

28

1   F.2d at 385 ("The jury's verdict should be accepted if it could reasonably

2   have been reached.").

### 2.   Mr. Malackowski Properly Accounted For Wrongful Conduct and Causation And Gave Mattel Credit For Its Sweat Equity.

6        Mattel's argument that Mr. Malackowski failed to give credit to Mattel

7   for its sweat equity, failed to account solely for its wrongful conduct and

8   causation is simply not true and failed to account for profits earned without

9   the benefit of MGA's trade secrets is without merit.

10       As explained by Mr. Malackowski, his Top Down approach separates

11  the profits earned by Mattel on My Scene with the benefit of MGA's trade

12  secrets from the My Scene profits earned by Mattel without the use of

13  MGA's trade secrets.  4/4/2011 (Vol. 3) Tr. 50:8-11, 53:21-25, 55:23-56:3,

14  57:19-22, 64:14-23; 4/5/2011 (Vol. 1) Tr. 27:16-19, 28:4-10.  This approach

15  expressly analyzed Mattel's sweat equity.  4/4/2011 (Vol. 3) Tr. 55:12-57:22

16  ("Q.  So your approach leaves Mattel, then, with what is known as its "sweat

17  equity" in MyScene; right? A.  Yes.  In fact, if you think about it that way,

18  of the 348 million shown on this chart, I have measured 202 million to be

19  associated with the trade secrets and 146 million to be associated with the

20  sweat equity…. There is a lot of  business effort that goes into finishing the

21  product,  designing the advertising, executing, hiring distributors and so

22  there's a lot of sweat equity or there's a lot of contribution made by the party

23  even if they took the trade secrets, and so I've tried to apportion out between

24  the two… . And so now what I've done [in the second, top down approach] is

25  I've simply said, let Mattel retain a measure of success based upon

26  MyScene's historical performance, but let's start with the projections they had

27  for 2003 and assume they basically would follow the pattern of success of

28  MyScene, so you can see the top blue line kind of matches the light-blue line

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1   beneath it. And because I'm allowing Mattel to have greater success, they

2   retain a larger piece of the pie, so they now retain 199 million and therefore

3   the profit to be disgorged or to award as damages decreases and so it reduces

4   to 149 million instead of the 202 we just looked at. Q.   Does this top-down

5   approach still leave profits with Mattel for all their sweat equity that they

6   invested in MyScene? A.   Yes.  Even more so than what we looked at a

7   moment ago.") .  His approach also takes into account causation, i.e., it

8   expressly does not assign damages for conduct that is lawful.  4/5/2011 (Vol.

9   1) Tr. 27:23-25 ("The portion of the damages represents the value of the

10  intellectual property as separate from the sweat equity.  We split them

11  apart."); s*ee also*, 4/4/2011 (Vol. 3) Tr. 52:19-54:5, 55:23-56:3, 57:19-22.

12  Therefore, Mattel's claim that it did not is without merit.  *See* Mot. at 49-52.

13      Similarly, Mr. Malackowski's Bottom Up approach only measures the

14  profits earned during head start period, i.e., the period of time in which

15  Mattel used the trade secrets for its benefit.  4/4/2011 (Vol. 3) Tr. 64:14-20.

16  The remainder of the profits earned by Mattel on the product encompasses

17  Mattel's sweat equity.  4/4/2011 (Vol. 3) Tr. 64:21-23.

18      Notably, Mattel's argument here was already addressed at length

19  during the *Daubert* hearings.  During the *Daubert* hearing, Mattel's attorneys

20  and the Court extensively questioned Mr. Malackowski about whether his

21  methodologies gave Mattel credit for its sweat equity.  3/19/2011 (Status

22  Conference) Tr. 89:19-93:9; 3/30/2011 (Vol. 3) Tr. 94:2-98:10.  The Court

23  found that Mr. Malackowski's methodology was sound.  4/3/2011 (Vol. 1)

24  Tr. 11:21-22.

25      Nonetheless, Mattel argues that the jury's awards here "were the

26  product of inadequate proof by MGA, not inattention" and that the jury "used

27  the only numbers they heard."  (Mot. at 2.)  But Mattel fails to explain how

28  the jury's reliance on the calculations provided by MGA's damages expert is

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1   MGA's fault – particularly since Mattel's damages expert, Michael Wagner,

2   was provided to rebut those figures and obviously failed to do so.  Indeed,

3   Wagner raised for the jury the precise issues with Malackowski's analysis

4   and calculations of sweat equity that Mattel argues now.  4/5/2011 (Vol. 3)

5   Tr. 79:16-80:13 ("Q   Now, Mr. Malackowski testified that he took into

6   account Mattel's sweat equity, that is the amount of work that went into

7   making the dolls he says were done because of the trade secrets.  Do you

8   believe that Mr. Malackowski took into account sweat equity? A   He clearly

9   did not, based on this analysis. Q   And why do you say that? A   Well, just

10  look at the last three years of this damage analysis.  And he had stated that

11  one of the reasons why his rate for trade secrets of 12 percent allocation is

12  smaller than 20 percent is because trade secrets span a longer period of time

13  and give MGA more chances to develop their themes, their sweat equity, so

14  over time is clearly lower. But look at this analysis.  The last three years of

15  this damage claim, he gives zero sweat equity to Mattel.  That makes no

16  sense if you believe his approach is valid when he does it for his client. So

17  clearly this can't reflect any sweat equity in the years where he calculates

18  significant damages, and that's the out years, after Mattel in a lot of their

19  SKUs are not accused -- are developing themes and ideas and refreshing their

20  product line.  He gives them zero credit for that, and that is not reflected in

21  the sweat equity.").

22      Finally, as Mattel acknowledges, the jury was specifically instructed to

23  subtract "the fruits of 'Mattel's sweat equity'" by the Court.[5]  Mot. at 46.

24  _____

25  [5]     To determine the amount of damages from lost profits due to
    misappropriation of trade secrets, the jury was instructed to "determine the gross

26  amount the claimant would have received but for the misappropriator's conduct and
    then subtract from that amount the expenses, including the value of the labor,

27  materials, rents and other expenses the claimant would have had if the
    misappropriator's conduct had not occurred. The amount of the lost profits need not

28  be calculated with mathematical precision, but there must be a reasonable basis for

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1  Mattel's argument that those calculations were not performed presumes that

2  the jurors disregarded the Court's instructions on determining damages for

3  misappropriation for trade secrets, an assumption contrary to established law.

4  *See* Section II, C, 2, *supra* (collecting cases). Again, Mattel has not – and

5  cannot – rebut this presumption.

6

7  ### 3.   The Evidence Supports The Unjust Enrichment Award For Non-Matching Products.

8   The second group of trade secrets in the jury's verdict are eleven trade

9  secrets for which there is no corresponding My Scene product. The jury

10  awarded MGA $3.4 million for each of these trade secrets.

11   The eleven trade secrets fall within Mr. Malackowski's Top Down

12  approach. Again, Mr. Malackowski testified extensively about his Top

13  Down approach. 4/4/2011 (Vol. 3) Tr. 49:5-58:6; 4/5/2011 (Vol. 1) Tr. 27:4-

14  25; 4/5/2011 (Vol. 2) Tr. 34:18-35:9, 37:14-48:2; 4/5/2011 (Vol. 3) Tr. 60:2-

15  22. Mr. Malackowski first explained to the jury that his Top Down approach

16  included those trade secrets for which he calculated a head start benefit using

17  the Bottom Up approach. In other words, of the $202 million or $149 million

18  calculated under the Top Down approach, $88.5 million comprised a head

19  start benefit. The remainder of the value related to the other economic

20  benefits that Mattel received as a result of its trade secret theft and which

21  resulted in enhanced profits for My Scene.

22  _____

23  computing the loss." 4/7/2011 (Vol. 2) Tr. 70:16-24. To determine the amount of
    unjust enrichment damages due to misappropriation of trade secrets, the jury was

24  instructed to "first determine the value of … Mattel's benefit that would not have
    been achieved except for its misappropriation. Then subtract from that amount …

25  Mattel's sweat equity, including their hard work, creativity, and legitimate efforts,
    as well as their reasonable expenses, including the value of the labor, materials,

26  rents, costs of transportation, and interest on invested capital. In calculating the
    amount of any unjust enrichment, do not take into account any amount that you

27  included in determining any amount of damages for the claimant's actual loss."
    4/7/2011 (Vol. 2) Tr. 71:4-13.

28

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1      While there are no corresponding My Scene products for these eleven

2    trade secrets, this is irrelevant to determining the propriety of the jury's

3    verdict.  First, Mr. Malackowski  testified that his analysis did not depend on

4    the presence of a corresponding My Scene product.  4/5/2011 (Vol. 2) Tr.

5    31:7-12 ("Well, that's an interesting point, because you can have trade secret

6    benefits just from the taking, even if you don't launch a competitive product,

7    because you know the playbook.  You may say, well, this is what company A

8    is doing.  I'm not going to launch the exact same.  I'll look for something that

9    I think is better.").

10      Second, the jury had before it the benefits that Mattel received from

11    the acquisition and use of trade secrets, even absent a corresponding product.

12    3/22/2011 (Vol. 1) Tr. 44:5-6 (testimony of Mr. Turetzky that knowing about

13    a competitor's unreleased product "would help us compete in the

14    marketplace"); 3/23/11 (Vol. 1) Tr. 18:1-15 (testimony of Mr. Villasenor that

15    the trade secret information gave Mattel a "superior competitive advantage);

16    4/5/2011 (Vol. 4) Tr. 34:11-23 (testimony of Mr. Wagner about the value of

17    trade secret information related to packaging); TX 27464-158 (11/12/2004

18    Turetzky email to Villasenor regarding close to $1 million savings from

19    acquisition of MGA's 2004 price list).

20      And finally, the jury heard Mr. Malackowski's testimony that it was

21    appropriate to use an average for products for which he did not have

22    sufficient data in calculating his Bottom Up unjust enrichment amounts.

23    4/4/2011 (Vol. 3) Tr. 61:7-13.  The jury also heard Mr. Malackowski explain

24    that the Bottom Up was a subset of the Top Down approach.  4/4/2011 (Vol.

25    3) Tr. 51:10-24, 58:7-13.  Based on this testimony, it was reasonable for the

26    jury to apply the same methodology of using an average to those products

27    within the Top Down approach for which there was no matching My Scene

28    product.  *Lara*, 123 Cal. App. 4th at 462-63.

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1    In the end, the jury was well within its authority to determine that Mr.

2    Malackowski's methodology of assigning value to the other benefits received

3    by Mattel was reasonable.  This is particularly true given that Mattel

4    attempted to discredit Mr. Malackowski's approach through its cross-

5    examination of Mr. Malackowski and on rebuttal through Mr. Wagner.  Once

6    MGA established the fact that it had been damaged because of Mattel's

7    wrongful conduct, it should not be denied recovery of damages merely

8    because the jury determined that $3.4 million was an appropriate measure of

9    the damages.  *See* Part III, A, *supra*.

10

11              **4.    Mattel's Other Arguments Concerning The "Non-Matched" Products Also Fail.**

12    Mattel's argument that Mr. Malackowski's Top Down approach is

13    flawed because it failed to provide guidance to the jury on an individual trade

14    secret basis is, at best, a red herring.  Motion at 47-50.  First, over the course

15    of three nights of *Daubert* hearings, the Court heard extensive testimony and

16    cross-examination on Mr. Malackowski's Top Down and Bottom Up

17    approach.  3/19/2011 (Status Conference); 3/30/2011 (Vol. 3) Tr. 54-117;

18    4/3/2011 (Vol. 1) Tr. 8-29.  Mr. Malackowski went through his methodology

19    step-by-step and slide-by-slide at all of those hearings, explaining the

20    assumptions that he used and the basis for his opinions.  3/19/2011 (Status

21    Conference) Tr. 17:13-33:4; 3/30/2011 (Vol. 3) Tr. 54:3-66:12, 88:6-105:18,

22    109:17-110:4; 4/3/2011 (Vol. 1) Tr. 8:7-11:20.  The Court questioned Mr.

23    Malackowski on several issues related both to the Top Down and Bottom Up

24    approaches.  *Id*.  The Court also gave Mattel the opportunity to cross-

25    examine Mr. Malackowski on his opinions, assumptions and methodology.

26    3/19/2011 (Status Conference) Tr. 76:18-97:9, 100:6-113:3; 3/30/2011 (Vol.

27    3) 88:5-105:21; 4/3/2011 (Vol. 1) Tr. 12:1-13:21.  At the conclusion of those

28    hearings, the Court did not find "any fault" with Mr. Malackowski's

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1   methodology.  4/3/2011 (Vol. 1) Tr. 11:21-22.  The Court obviously was

2   aware of his prior summary judgment order and yet, was satisfied at the

3   conclusion of the *Daubert* hearings, that Mr. Malackowski's methodology

4   was sound.  The jury also heard and weighed the challenges raised by

5   Mattel's expert Mr. Wagner on rebuttal.  4/5/2011 Tr. (Vol. 3) at 71:18-

6   100:23; 4/5/2011 Tr. (Vol. 4) at 4:5-40:10.

7        Second, the jury in *O2 Micro Int'l Ltd.*, 399 F. Supp. 2d 1064, took an

8   aggregate damage award and divided it by the number of trade secrets for

9   which it found liability.  Mattel cannot credibly posit that the jury here did

10  the same.  Had the jury followed the *O2 Micro* jury, it would have divided

11  either $202 million or $149 million by eleven (the number of non-matched

12  products).  It did not do this.  The jury did not in fact rely on the Top Down

13  approach for these non-matched products.  Instead, the jury used the average

14  head start benefit calculated in the Bottom Up approach for the products for

15  which Mr. Malackowski had no data.  For the reasons discussed *supra*, this

16  was entirely reasonable based on the evidence.  In other words, the jury

17  appears to have rejected Mr. Malackowski's Top Down approach in favor of

18  a different methodology explained in detail by Mr. Malackowski.  When the

19  evidence includes different types of damages, or different methods of

20  calculating damages, the jury's damage award may be upheld if there is

21  substantial evidence in the record to support any one of those damage

22  theories.  *See,* Part III A, *supra*.  As discussed, this standard has been met.

23       Second, the record is quite complete with evidence demonstrating that

24  there is in fact a direct correlation between the fact of damages and the

25  economic benefit received by Mattel.  Mattel's own witnesses admitted that

26  they received an economic benefit from MGA's trade secrets.  3/18/2011

27  (Vol. 1) Tr. 114:19-116:10 (testimony of Mr. Kilpin); 3/22/2011 (Vol. 1) Tr.

28  43:7-44:22 (testimony of Mr. Turetzky); 3/22/2011 (Vol. 2) 90:20-91:4

MGA PARTIES' OPPOSITION TO MATTEL'S
                                                      MOTION FOR JMOL
                                                      CV 04-9049-DOC (RNBx)

(testimony of Mr. Villasenor); 3/23/2011 (Vol. 2) Tr. 106:25-107:7 (testimony of Mr. Villasenor); 4/5/2011 (Vol. 4) Tr. 34:11-23 (testimony of Mr. Wagner).  And of course, one cannot ignore that Mattel's own expert agreed that there is no economically rational reason for Mattel's employees to risk legal reprisals for information of no value.  4/5/2011 (Vol. 4) Tr. 37:18-38:3 (testimony of Mr. Wagner).

## IV.    MATTEL CANNOT MEET THE HIGH STANDARD REQUIRED FOR ORDERING REMITTITUR IN THE FACE OF THE JURY'S VERDICT.

Mattel's request for remittitur is not only baseless, it wholly contradicts Mattel's position when MGA sought the same relief after the first trial.  Mattel argues that "MGA pursued no actual damages claim at trial, but solely an unjust enrichment remedy" and posits that the jury merely divided the $88.5 million proposed by MGA's expert by the 26 trade secrets it found Mattel had misappropriated to arrive at its damages number.  (Mot. at 30-31.)  But, as Mattel argued back in 2009, "[i]t is not the remedy [MGA] sought, *but the damages the jury awarded*, that determines whether the verdict must be upheld.  [MGA] did indeed seek hundreds of millions of dollars on [its] claims. But the jury, on each claim, chose to award less than what [MGA] sought. *Why it did so is a question that can only be answered speculatively*", and *"[s]peculation about what the jury did cannot support a remittitur*." Mattel Opp. to MGA Remittitur Mot. (Dkt. No. 4684) at 10-11 (emphasis added).  Indeed, Mattel counsel John Quinn told Judge Larson in February 2009, "We simply can't know how the jurors came up with those numbers or what they represent. … *We can make assumptions, but that would be improper*, Your Honor.  That renders the verdict an advisory verdict.  The standard here -- and it wasn't disputed in the papers -- *is that it's impossible*

*to come up with any other  explanation.*" 2/11/09 Tr. 59:24- 60:10 (emphasis added).

### A.      Mattel's Rank Speculation About the Jury's Means of Determination is Impermissible.

Courts in the Ninth Circuit "undertake only limited review of jury damages awards, in order to avoid encroaching upon the jury's proper function under the Constitution." *Los Angeles Memorial Coliseum Com'n v. National Football League*, 791 F.2d 1356, 1365 (9th Cir. 1986).  "A jury's award of damages is entitled to great deference, and should be upheld unless it is clearly not supported by the evidence or only based on speculation of guesswork."  *In re First Alliance Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006).

Previously, Mattel relied heavily on *Carter v. District of Columbia*, 795 F.2d 116 (D.C. Cir. 1986), to "emphasize[] *just how little discretion a district judge has to use remittitur to correct a jury's 'mistakes*.'" (*Id.* (emphasis added).)  In *Carter*, the trial judge had attempted to correct a jury instruction error by granting a remittur motion in that case and striking the damages awarded on one of the claims as duplicative of the amount the jury had awarded on another claim. The district court reversed, noting that "one could not say with certainty that the $40,000 figures recorded as damages under the heading 'fourth amendment,' reflected simply and only price tags the jury placed on 'the loss of constitutional rights as such.' The charge informed the jury that plaintiffs could recover for bodily injury, mental suffering, and wage losses under the fourth amendment heading. Conceivably, the jurors here totaled the amounts they found for these items of actual damage, and then allocated the total between the false arrest and fourth amendment counts. Perhaps they had in mind, in settling on the

respective verdicts, limiting the sums for which the District [of Columbia] would be answerable directly, based on a notion that the city itself was not blameworthy. Such a judgment, although not consonant with respondeat superior doctrine, is the kind of response jurors not altogether uncommonly make. … How much, if anything, the jurors awarded 'for the per se violation of Constitutional rights,' is speculative, destined to remain unknown and unknowable[.]" *Carter*, 795 F.2d at 134-35 (citations omitted); *see also United Phosphorus, Ltd. v. Midland Fumigant, Inc*., 205 F.3d 1219, 1228 (10th Cir. 2000) (rejecting defendant's argument that total damage award meant impermissible double recovery because "*this conclusion requires us to speculate as to the jury's deliberations and calculations*. While [defendant]'s explanation for the result of the verdict is persuasive, *it is not the only explanation*. However slight the chance, the jury could have arrived at the figure coincidentally, or more likely, picked the number from plaintiff's exhibits 'because it was within the range of the evidence and the jury was somehow attracted to it . . . . [G]iven the evidence presented of damages exceeding $4 million, the jury's award was well within the range of proof [.]" *Id.* (citations omitted); *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1995) ("A court's role is to reconcile and preserve whenever possible a seemingly inconsistent jury verdict.").   (cited by Mattel Opp. to MGA Remittitur Mot. (Dkt. No. 4684) at 6, 12.)

Despite its previous railing against impermissibly speculating what the jury may have done to arrive at damages awards, it is with no apparent sense of irony that Mattel now argues that "[p]lainly, the jury simply took Mr. Malackowski's overall $88.5 million damages opinion, divided it by 26, and awarded that number ($3.4 million) for each of the 26 products as to which it found liability," and repeatedly characterizes the jury's verdict as apparently "arbitrary." Mot. at 30, 38, 39, 40.  Unfortunately for Mattel, even if this

1    Court could join it in speculating what the jury may have been thinking to

2    arrive at this number – which it can't – there is no reason for the Court to do

3    so, since the award is well within the acceptable range of damages proposed

4    by MGA.

### B.    The Jury's Verdict is Supported by the Evidence and Within the Range

7        As Mattel has previously argued to this Court, a jury's damages

8    verdict "need not be broken down and attributed piece by piece to particular

9    injuries," but "'will be upheld if it is within the scope of the evidence

10   presented.'" Mattel Opp. to MGA Remittitur Mot. (Dkt. No. 4684) at 12,

11   citing *Johnson v. Consolidated Rail Corp.*, 797 F.2d 1440, 1446 (7th Cir.

12   1986).  The law in the Ninth Circuit is in accord.  *"Even a total inadequacy*

13   *of proof on isolated elements of damages claims submitted to a jury will not*

14   *undermine a resulting aggregated verdict which is nevertheless reasonable*

15   *in light of the totality of the evidence. . . .* [W]here, as here, the jury's verdicts

16   find substantial support in the record and lie within the range sustainable by

17   the proof, we will not 'play Monday morning quarterback' and supplant the

18   jury's evaluation of the complex and conflicting evidence with our own." *Los*

19   *Angeles Memorial Coliseum Com'n*, 791 F.2d at 1366 ((citations omitted);

20   *see also Wall Data Inc. v. Los Angeles County Sheriff's Dept.,*  447 F.3d 769,

21   786-87 (9th Cir. 2006) (upholding jury's damages award as "appropriate and

22   not speculative" where award fell "within an acceptable range of prices"

23   testified to by plaintiff's witness); *Indu Craft, Inc.*, 47 F.3d at 496 ("The

24   jury's special verdict sheet made no distinction between the two methods of

25   proving damages, and the figures were well within the range testified to by

26   plaintiff's expert who set a low value of $3.3 million and a mid-range of $4.3

27   million. The jury found that Indu Craft was damaged in a total amount of

28   $4.25 million, less $1 million for a failure to mitigate, for net total damages

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1  of $3.25 million. Had lost profits evidence not been presented, evidence of

2  the lost value of Indu Craft as a going enterprise, standing alone, would have

3  been sufficient to support the jury's award of damages."); *United*

4  *Phosphorus*, 205 F.3d at 1228 (cited by Mattel cited in Mattel Opp. to MGA

5  Remittitur Mot. (Dkt. No. 4684) at 12).

6      Here, as discussed above, ample evidence supports the jury's findings

7  regarding Mattel's misappropriation of MGA's trade secrets.  Moreover, as

8  noted above, Mr. Malackowski offered a number of damages awards

9  numbers, ranging from $202 million to $149 million to $88.5 million.

10  4/4/2011 (Vol. 3) Tr. 49:8-15, 61:11-13.  The law is clear that the reasons the

11  jury chose the $88.5 million are certainly unknowable, and may have even

12  been coincidental, but there is no question that the $88.5 million awarded by

13  the jury fell well within the range of damages testimony the jury heard.

14  Remittitur cannot be granted here.

15

16  **C.    The Verdict Cannot Be Reduced Based On A Claim Of Duplicative Damages.**

17      Mattel also fails to meet the high threshold for deducting $3.4 million

18  from the jury's verdict because it asserts that the award of $3.4 million for

19  both Girls Nite Out and Bratz Girlz Nite Out is duplicative.  Mot. at 52-53.

20  As Mattel argued when the shoe was on the other foot, Mattel must

21  affirmatively demonstrate:

22      "it is, quite literally, "impossible" that the jury verdicts
23      reflect separate, unduplicated damages. *Lieberman v.
        Dudley*, 1998 WL 740827, at *3 (D. Conn. 1998) (court
24      may overturn the verdicts only if it would have been
        "impossible for the jury to have awarded separate and
        distinct damages," and should not do so where it is "not
25      impossible" that the jury found unduplicated damages)
        (emphasis added); *see Morrison Knudsen Corp. v.*
26      *Ground Improvement Techniques, Inc.*, 532 F.3d 1063,
        1079 (10th Cir. 2008) ("[E]ven where the chance is slight
27      that the jury arrived at the award without erroneously
        duplicating, if the verdict is 'within range of the
28      evidence,' it will be upheld.") (citing *United Phosphorus*

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

*Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1228 (10th Cir. 2000)); *Indus. Craft*, 47 F.3d at 497 (addressing duplicative damages claim: "A court's role is to reconcile and preserve whenever possible a seemingly inconsistent jury verdict.")."

Dkt. No. 4684 at 5-6. Mattel has not met this standard. The evidence shows that this product was subject of two different reports within Mattel at separate times and in separate media. TX 9604-15 (2004 Toy Fair Report); TX 9488 (2004 video presentation). Mattel cannot demonstrate that it is quite literally impossible for the jury to find that these separate events are duplicative.

Further, under Fed. R. Civ. P. 51, parties are required to raise any objections to verdict forms "on the record, stating distinctly the matter objected to and the grounds of the objection." Fed. R. Civ. P. 51(c); *Ayuyu v. Tagabuel*, 284 F.3d 1023, 1026 (9th Cir. 2002) (Rule 61 applies to "objections to the form of the verdict as well as to any instructions about the use by the jury of the form"). When the Court advises counsel of its proposed instructions and verdict form before instructing the jury and before closing arguments (as the Court did here), counsel must raise any objections before the instructions and arguments are delivered, and before the verdict form is submitted to the jury. Fed. R. Civ. P. 51(b)(1) and (2) (Court must advise counsel of its proposed instructions and provide an opportunity for objections before instructing the jury and before closing arguments). Where a Court follows this procedure, an objection is "timely" only if it is raised before the instructions and closing arguments are delivered. Fed. R. Civ. P. 51(c)(2)(A); *Ayuyu*, 284 F.3d at 1027 ("counsel waived the opportunity to clarify the verdict form by failing to present any question about the form before the jury retired").

The Ninth Circuit interprets Rule 51 "strictly" and will not review a decision to admit or deny a jury instruction or a verdict form in the absence

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1    of a proper objection.  *McGonigle v. Combs*, 968 F.2d 810, 823 (9th Cir.

2    1992).  A proper objection must "state distinctly the matter objected to and

3    the grounds of the objection."  *Larez v. City of Los Angeles*, 946 F.2d 630,

4    638 (9th Cir. 1991).

5        In this case, the counsel for both parties submitted proposed verdict

6    forms that were revised several times.  The Court spent days reviewing the

7    verdict form that it proposed with counsel.  Several of these days were spent

8    arguing over the content and form of the verdict form.  At any point, Mattel

9    could, and should, have raised the objection related to the supposed

10   duplicative nature of Girls Nite Out and Bratz Girls Nite Out.  Having failed

11   to do so, Mattel cannot now argue that the jury's determination that damages

12   for both is inappropriate.

13
     ## V.    MATTEL HAS FAILED TO SHOW A NEW TRIAL IS
14       WARRANTED.

15       Under Rule 59, a trial court "may grant a new trial only if the jury's

16   verdict was against the clear weight of the evidence."  *Union Oil Co. of Cal.*

17   *v. Terrible Herbst, Inc.*, 331 F.3d 735, 742 (9th Cir. 2003).  The test is not

18   whether the trial court would have reached a different decision.  A trial court

19   may not substitute its "evaluations for those of the jurors."  *Id.* at 743.

20   Indeed, even in instances where the evidence could have supported a

21   different result, a new trial cannot be granted.  The jury, and not the court, is

22   given the task of weighing conflicting evidence and making credibility

23   determinations.  *See Roy v. Volkswagen of Am., Inc.*, 896 F.2d 1174, 1179

24   (9th Cir. 1990); *see also Landes Construction Co. v. Royal Bank of Canada*,

25   833 F.2d 1365, 1372 (9th Cir. 1987) (jury entitled to believe one set of

26   witnesses over others and "[d]oubts as to correctness of the verdict are not

27   sufficient grounds for a new trial").  In light of this, the Ninth Circuit has

28   reversed the grant of a new trial even when "[t]he evidence in [a] case was

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1  substantially balanced" between the prevailing party and the party against
2  whom the jury found.  *Roy*, 896 F.2d at 1179.  In the Ninth Circuit words, the
3  "evidence did not so preponderate that it fell within the discretion of the trial
4  judge to rule that the jury's verdict was against the great weight of the
5  evidence.  *Id.*; *see also Terrible Herbst, Inc.*, 331 F.3d at 743 (reversing grant
6  of new trial even though finding that there was "substantial evidence that
7  goes both ways").  To state it more succinctly, then, "a district court may not
8  grant a new trial simply because it would have arrived at a different verdict."
9  *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819
10 (9th Cir. 2001); *see also Tennant v. Peoria & Pekin Union Ry.*, 321 U.S. 29,
11 35 (1944) ("Courts are not free to reweigh and set aside the jury verdict
12 merely because the jury could have drawn different inferences or conclusions
13 or because judges feel that other results are more reasonable.").  And that a
14 jury concludes that a claimant has proven certain aspects of its case and not
15 others is not a basis for concluding that the result warrants a new trial.  Such
16 a result demonstrates nothing more than the jury's conclusion that a claimant
17 has in fact proven certain aspects of its case and not others.  *See Tortu v. Las
18 Vegas Metropolitan Police Dept.*, 556 F.3d 1075, 1084 (9th Cir. 2009) (new
19 trial not appropriate based on jury's finding that plaintiff established use of
20 excessive force as to some, but not all, officers).

21      Mattel has *twice* argued against granting a new trial in this case,
22 insisting most recently that "in assessing whether an error led to an erroneous
23 verdict, deference to the jury's verdict is required" because "[t]he
24 Reexamination Clause 'expresses in clear terms the principle that facts once
25 found by a jury in the context of a civil trial are not to be reweighed and a
26 new trial granted lightly.'" (Mattel Opp. to MGA's Mot. for New Trial (Dkt.
27 No. 8679) at 3-4 (citing *Spurlin v. Gen. Motors Corp.*, 528 F.2d 612, 620
28 (5th Cir. 1976) and *Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1  U.S. 355, 358-59 (1962) ("neither [the Supreme Court] nor the Court of

2  Appeals can redetermine facts found by the jury any more than the District

3  Court can predetermine them.").)

4      In the past Mattel has repeatedly noted that "[o]nce judges are given

5  the discretion to disregard jury verdicts as they see fit, the viability of the

6  jury as an institution capable of rendering truly binding decisions is seriously

7  imperiled." (Mattel Opp. to MGA's Mot. for New Trial (Dkt. No. 8679) at 4,

8  Mattel Opp. to MGA Remittitur Mot. (Dkt. No. 4684) at 5, citing *Schutzky*

9  *Dist., Inc.*, 643 F. Supp. at 59.) "Courts are not free to reweigh the evidence

10  and set aside the jury verdict merely because the jury could have drawn

11  different inferences or conclusions or because judges feel that other results

12  are more reasonable." (Mattel Opp. to MGA's Mot. for New Trial (Dkt. No.

13  8679) at 6, citing *Tennant v. Peoria & Pekin Union Ry. Co.*, 321 U.S. 29, 35

14  (1944).) "The Seventh Amendment forbids courts from converting jury

15  verdicts into merely advisory opinions. It is this danger of usurping jury

16  prerogatives that has led courts consistently to hold that every attempt to

17  harmonize or clarify a jury's verdicts must be made before a new trial can be

18  granted." *Schutzky*, 643 F. Supp. at 59 (N.D. Cal. 1986).  According to

19  Mattel, "[a] district court faced with a new trial motion is 'obligated to ask

20  "not whether the verdict necessarily makes sense under any reading, but

21  whether it can be read in light of the evidence to make sense.""" (Mattel Opp.

22  to MGA Remittitur Mot. (Dkt. No. 4684) at 5, citing *Bains LLC*, 405 F.3d at

23  771.)  Mattel bears the burden of showing that the jury's verdict should be

24  overturned.  *Phoenix Eng'g and Supply Inc. v. Universal Elec. Co.*, 104 F.3d

25  1137, 1142 (9th Cir. 1997) ("The burden of showing that prejudice has

26  resulted [from the error] is on the party claiming injury from the erroneous

27  rulings.") (internal quotation omitted) (cited by Mattel).

28

MGA PARTIES' OPPOSITION TO MATTEL'S
MOTION FOR JMOL
CV 04-9049-DOC (RNBx)

1      Yet here Mattel asks this Court to reexamine the jury verdict.  As

2   shown below, the verdict is supported by ample evidence and testimony from

3   which the jury could draw its conclusions.  Mattel has not established that a

4   new trial is warranted.

5                                **CONCLUSION**

6      For the foregoing reasons, Mattel's motion should be denied.

7                                          Orrick, Herrington & Sutcliffe LLP

8   Dated:       May 12, 2011

9                                    By:____*/s/ Warrington S. Parker*____
                                        WARRINGTON S. PARKER III
10                                      Attorneys for MGA
                                        ENTERTAINMENT, INC.,
11                                      MGA ENTERTAINMENT HK,
                                        LTD., MGA de MEXICO, S.R.L.
12                                      de C.V., and ISAAC LARIAN

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    MGA PARTIES' OPPOSITION TO MATTEL'S
                                    MOTION FOR JMOL
                                    CV 04-9049-DOC (RNBx)