1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
2   John B. Quinn (Bar No. 090378)
     (johnquinn@quinnemanuel.com)
3   William C. Price (Bar No. 108542)
     (williamprice@quinnemanuel.com)
4   Michael T. Zeller (Bar No. 196417)
     (michaelzeller@quinnemanuel.com)
5  865 South Figueroa Street, 10th Floor
   Los Angeles, California 90017-2543
6  Telephone: (213) 443-3000
7  Facsimile: (213) 443-3100

8  Attorneys for Mattel, Inc. and Mattel de Mexico, S.A. de C.V.

9                 UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11                     SOUTHERN DIVISION

12  | MATTEL, INC., a Delaware corporation, et al., | CASE NO. CV 04-9049 DOC (RNBx) |
| --- | --- |
| | Consolidated with |
|                    Plaintiff, | Case No. CV 04-09059 |
| | Case No. CV 05-02727 |
|                    vs. | Hon. David O. Carter |
| MGA ENTERTAINMENT, INC., a California corporation, et al., | MATTEL, INC.'S OPPOSITION TO MGA'S MOTION FOR EXEMPLARY DAMAGES AND FEES PURSUANT CALIFORNIA'S UNIFORM TRADE SECRET ACT, CAL. CIV. CODE §§ 3426.3, 3426.4 |
|                    Defendant. | |
| AND CONSOLIDATED ACTIONS | Hearing Date:    May 24, 2011 |
| | Time:    8:00 a.m. |
| | Place:    Courtroom 9D |
| __PUBLIC REDACTED VERSION__ | Trial Date:    January 11, 2011 |

00505.07975/4134263.5

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT..................................................................1

ARGUMENT .........................................................................................3

I.   MGA HAS FAILED TO PROVE, NOR COULD IT, THAT MISAPPROPRIATING INFORMATION RELATING TO 26 TOYS ON DISPLAY IS "REPREHENSIBLE"...................................................4

    A.   MGA Concedes That Three of the Five Factors Favor Mattel ..............4

    B.   Improperly Viewing 26 Toys at Toy Fairs That Ended Five Years Ago Is Not the Sort of Repetitive Unlawful Conduct that Justifies Punitive Damages .................................................................5

        1.   The Conduct Stopped by 2006....................................6

        2.   MGA's Tired "Cover Up" Claims Are Meritless .........................9

        3.   Punitive Damages Cannot Punish Conduct Involving Third Parties .................................................................. 10

        4.   Novel Claims Weigh Against Reprehensibility ........................ 11

    C.   Entering Toy Fair Showrooms Using a Phony Business Card Does Not Score at the Extreme End for Deceit or Trickery................................. 13

II.   THE HIGH COMPENSATORY DAMAGE AWARD IN THIS CASE SUPPORTS LITTLE OR NO PUNITIVE DAMAGES ............................... 15

III.   ████████████████████████████ TOO HIGH GIVEN THE UNDERLYING CONDUCT ...................................................... 18

IV.   MGA IS NOT ENTITLED TO AN AWARD OF ATTORNEY'S FEES AND COSTS UNDER CUTSA ................................................... 20

    A.   The Court Should Exercise Its Discretion To Reject An Award Of Fees And Costs Under CUTSA .............................................. 20

    B.   MGA's Failure To Apportion Between Its Winning And Losing Claims And To Submit Its Billing Records Justifies The Rejection Of Its Request ...................................................................... 21

CONCLUSION ................................................................................... 26

00505.07975/4134263.5

-i-

# TABLE OF AUTHORITIES

## Cases

02 Micro v. Monolithic Power,
    399 F. Supp. 2d 1064 (N.D. Cal. 2005) .................................................. 19, 20, 21

Acuson Corp. v. Aloka Co., Ltd.,
    257 Cal. Rptr. 368 (1989) ............................................................................ 2, 13

Adams v. Muakami,
    54 Cal. 3d 105 (1991) .................................................................................. 19, 20

Akins v. Enterprise Rent-a-Car,
    79 Cal. App. 4th 1127 (2000) .............................................................................. 23

Aucoin v. Exxon Mobil Corp.,
    2010 WL 3923160 (E.D. La. 2010) ...................................................................... 2

BMW of N. Am. v. Gore,
    517 U.S. 559 (1996) ............................................................................... 6, 7, 16

Bains LLC v. Arco Products Co.,
    405 F.3d 764 (9th Cir. 2005) ............................................................................... 6

Beliz v. M.H. McLeod & Sons Packing Co.,
    765 F.2d 1317 (5th Cir. 1987) ........................................................................... 18

Bell v. Vista Unified School Dist.,
    82 Cal. App. 4th 672 (2000) ........................................................................ 24, 25

Boeken v. Philip Morris Inc.,
    127 Cal. App. 4th 1640 (2005) ...................................................................... 2, 20

Boerner v. Brown & Williamson Tobacco Co.,
    294 F.3d 594 (8th Cir. 2005) ............................................................................. 16

Chalmers v. City of Los Angeles,
    796 F.2d 1205 (9th Cir. 1986) ........................................................................... 23

Chavez v. City of Los Angeles,
    47 Cal. 4th 970 (2010) ...................................................................................... 24

Clark v. Chrysler Corp.,
    436 F.3d 594 (6th Cir. 2006) ............................................................................... 6

Copeland v. Marshall,
    641 F.2d 880 (D.C. Cir. 1980) ........................................................................... 26

Del Cerro Mobile Estates v. Proffer,
    87 Cal. App. 4th 943 (2001) ............................................................................... 25

EOS GMBH Electro Optical Sys. v. DTM Corp.,
    2002 WL 34536678 (C.D. Cal. Mar. 18, 2002)......................................23

Eldorado Stone LLC v. Renaissance Stone,
    2007 WL 3308099 (S.D. Cal. Oct. 24, 2007) ........................................25

Employers Ins. of Wausau v. Granite State Ins. Co.,
    330 F.3d 1214 (9th Cir. 2003) ...............................................................13

Entm't Research Group, Inc. v. Genesis Creative Group, Inc.,
    122 F.3d 1211 (9th Cir. 1997) ...............................................................25

In re First Alliance Mortg. Co.,
    2003 WL 21530096 (C.D. Cal. June 16, 2003) .....................................13

Fischer v. SJB-P.D. Inc.,
    214 F.3d 1115 (9th Cir. 2000) ...............................................................25

Ford v. GACS, Inc.,
    265 F.3d 670 (8th Cir. 2001) .................................................................15

Gorman v. Tassajara Dev. Corp.,
    178 Cal. App. 4th 44 (2009) ..................................................................27

Grimshaw v. Ford Motor Co.,
    119 Cal. App. 3d 757 (1981) ..........................................................19, 20

Harman v. City and County of San Francisco,
    136 Cal. App. 4th 1279 (2006) ..............................................................23

Hilao v. Estate of Marcos,
    103 F.3d 767 (9th Cir. 1996) ...................................................................2

Hobbs v. Bateman Eichler Hill Richards, Inc.,
    164 Cal. App. 3d 174 (1985) ..........................................................19, 20

Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.,
    181 F.3d 446 (3d Cir. 1999)...................................................................15

JetSource Charter, Inc. v. Doherty,
    148 Cal. App. 4th 1 (2007) .....................................................................4

Johnson v. Ford Motor Co.,
    35 Cal. 4th 1191 (2005) ...................................................................11, 17

Kolstad v. Am. Dental Ass'n,
    527 U.S. 526 (1999)...............................................................................13

Lane v. Hughes Aircraft Co.,
    22 Cal. 4th 405 (2000) ...........................................................................17

-iii-

MATTEL'S OPPOSITION TO MGA'S MOTION FOR EXEMPLARY DAMAGES

Leavey v. Unum Provident Corp.,
    295 Fed. App'x 255 (9th Cir. 2008) ......................................................... 4

Maiorino v. Schering-Plough Corp.,
    302 N.J. Super. 323 (1997) ..................................................................... 18

Mercexchange, L.L.C. v. eBay, Inc.,
    275 F. Supp. 2d 695 (E.D. Va. 2003) ..................................................... 18

Merrick v. Paul Revere Life Ins. Co.,
    500 F.3d 1007 (9th Cir. 2007) ................................................................ 11

Mirkin v. Wasserman,
    5 Cal. 4th 1082 (1993) ....................................................................... 17, 18

Mobile Mini, Inc. v. Khordt,
    2007 WL 2109224 (E.D. Cal. July 23, 2007) (Mot. at 24-25) ................. 5

Modine Mfg. Co. v. Allen Group, Inc.,
    917 F.2d 538 (Fed. Cir. 1990) ................................................................ 18

Neal v. Farmers Ins. Exchange,
    21 Cal. 3d 910 (1978) ............................................................................. 19

Noyes v. Kelly Servs., Inc.,
    349 Fed. App'x 185 (9th Cir. 2009) ......................................................... 5

Nunez by Nunez v. City of San Diego,
    114 F.3d 935 (9th Cir. 1997) .................................................................. 13

Philip Morris USA v. Williams,
    549 U.S. 346 (2007).................................................................................11

Pistorious v. Prudential Ins. Co. of Am.,
    123 Cal. App. 3d 541 (1981) .................................................................. 19

Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coalition of Life Activists,
    422 F.3d 949 (9th Cir. 2005) .................................................................... 6

Robert L. Cloud & Assocs., Inc. v. Mikesell,
    69 Cal. App. 4th 1141 (1999) ................................................................... 1

Roby v. McKesson Corp.,
    47 Cal. 4th 686 (2010) ........................................................................... 20

Roemer v. Retail Credit Co.,
    44 Cal. App. 3d 926 (1975) .................................................................... 19

Satcher v. Honda Motor Co.,
    52 F.3d 1311 (5th Cir. 1995) .................................................................. 15

Sierra Club Foundation v. Graham,
  72 Cal. App. 4th 1135 (1999) ........................................................................19

Slip-N-Slide Records, Inc. v. TVT Records, LLC,
  2007 WL 3232274 (S.D. Fla. Oct. 31, 2007) ................................................17

State Farm Mt. Auto Ins. Co. v. Campbell,
  538 U.S. 408 (2003) .............................................................. 3, 4, 16, 18

Stevens v. Owens-Corning Fiberglas Corp.,
  49 Cal. App. 4th 1645 (1996) .......................................................................20

Storage Services v. Oosterbaan,
  214 Cal. App. 3d 498 (1989) .........................................................................19

Sun Pac. Farming Co-Op, Inc. v. Sun World Int'l, Inc.,
  2009 WL 900751 (E.D. Cal. Mar. 31, 2009) ..................................................5

TVT Records v. Island Def Jam Music Group,
  288 F. Supp. 2d 506 (S.D.N.Y. 2003) ..........................................................18

Thelen Oil v. Fina Oil,
  962 F.2d 821 (8th Cir. 1992) .........................................................................23

Thomas v. iStar Financial, Inc.,
  508 F. Supp. 2d 252 (S.D.N.Y. 2007) ..........................................................17

United States v. $1,379,879.09 Seized From Bank of America,
  374 F. App'x 709 (9th Cir. 2010) ..................................................................26

Waits v. Frito-Lay,
  978 F.2d 1093 (9th Cir. 1992) .......................................................................13

Walker v. Farmers Ins. Exchange,
  153 Cal. App. 4th 965 (2007) ..................................................................17, 19

Weber v. Langholz,
  39 Cal. App. 4th 1578 (1995) .......................................................................25

Williams v. Conagra Poultry Co.,
  378 F.3d 790 (8th Cir. 2004) .........................................................................17

Witcher v. Bank of Am.,
  2010 WL 3395689 (W.D. Va. August 27, 2010) ............................................7

## **Statutes**

Cal. Civ. Code § 3426.3(c) ...............................................................................1

Cal. Civ. Code § 3426.4 ..................................................................................21

**<u>Preliminary Statement</u>**

At issue in this case is, at most, a sneak peek at 26 toys displayed at six toy fairs over a six year period.  No one died.  No towns were lost.  MGA suffered no actual injury and did not even claim at trial that it did.  Contrary to MGA's unsupported assertions, the conduct stopped five years ago.  Whatever steps MGA took to protect products in its showroom, it was not enough to stop a Mattel employee with only a cheap phony business card from looking at the toys MGA was selling to retailers that season.  And the jury found that the overwhelming majority of the claimed trade secrets were not trade secrets at all.  For this, MGA seeks a punitive damages windfall of ███████ ████████████████████████; when added to the compensatory damages and other fees it seeks, MGA frivolously seeks some ███████████████.

Contrary to the theme of MGA's motion, the question here is not merely "*how much.*"  The Court must first ask, "is anything more necessary to punish or deter?"  An award of punitive damages is not automatic following a jury's determination of willful and malicious misappropriation.  <u>Cal. Civ. Code</u> § 3426.3(c) ("If willful and malicious misappropriation exists, the court *may* award exemplary damages . . . ." (emphasis added)); <u>Robert L. Cloud & Assocs., Inc. v. Mikesell</u>, 69 Cal. App. 4th 1141, 1151 n.8 (1999) (courts may award "zero" in punitive damages).

The jury awarded MGA $3.4 milliion in damages for each sneak peek, a number MGA now seeks to increase to over $10 million each, making these the most expensive sneak peeks in history.  Mattel has located no decision in which punitive damages of even $25 million for a trade secret misappporpriation claim have been affirmed; MGA's requested $177 million award would outrank (by a multiple of at least seven) even the most egregious trade secrets precedents, falling instead among awards for massive environmental disasters caused by wanton misconduct,[1] tobacco products that caused

---

[1]   <u>Aucoin v. Exxon Mobil Corp.</u>, 2010 WL 3923160 (E.D. La. 2010).

cancer in millions of people,[2] and systematic, violent human rights abuses against thousands of people.[3] In the words of this Court: "Remember this is just a doll. . . . hasn't been to Vietnam, hasn't cured the Afghanistan problem, it hasn't cured AIDS, it's done nothing for the swine flu . . . *So not to be concerned about protecting this great secret.*"[4]

No case that Mattel has located has held that something shown to buyers at a toy fair or trade show was a trade secret. The authority Mattel has located holds that when a manufacturer shows its products to its buyers, secrecy is lost.[5] Novel cases rarely justify punitive awards, nor do close ones. The jury itself rejected MGA's trade secret claims as to most of the products at issue, including products at these very same toy fairs. There is no dispute that the employee at the center of this left Mattel in 2006, and despite MGA's unsupported claims to the contrary, the evidence and the jury's verdict establish that the conduct ended then. MGA executives not only knew of the practices but tried to hire Mr. Villasenor. MGA has been more than adequately compensated for its losses; in fact, it has not proven that it suffered any at all. The compensatory award here, based solely on Mattel's unjust enrichment, is more than enough to deter wrongdoing, and already more than fully compensates MGA.

Mattel is not rearguing its JMOL.[6] These are the factors that guide courts in determining whether punitive damages are appropriate. Here, literally all of the relevant factors—under both CUTSA and the due process standards—point against such damages.

---

[2] Boeken v. Philip Morris Inc., 127 Cal. App. 4th 1640 (2005).
[3] Hilao v. Estate of Marcos, 103 F.3d 767, 781 (9th Cir. 1996).
[4] Hearing Tr., dated Dec. 17, 2009, at 21:15-22:2.
[5] See *infra* Section I(B)(4), discussing Acuson Corp. v. Aloka Co., Ltd., 257 Cal. Rptr. 368 (1989).
[6] In MGA's brief, and this opposition, the parties address the verdict as reached by the jury. Mattel believes that verdict should be reduced or set aside as a matter of law. To the extent it is reduced, that would render MGA's claim that Mattel's conduct was reprehensible that much more attenuated.

1

<u>**Argument**</u>

2     While CUTSA delegates broad discretion to courts to set punitive damages, the
3 courts have developed multi-factor tests to guide that discretion and ensure that cases are
4 treated fairly.  Both CUTSA and the due process clause, as interpreted by state and
5 federal courts, impose similar guidelines.  After all the rhetoric, the real dispute between
6 the parties is about the application of those factors.

7     "The Due Process Clause of the Fourteenth Amendment prohibits the imposition
8 of grossly excessive or arbitrary punishments on a tortfeasor."  <u>State Farm Mt. Auto Ins.</u>
9 <u>Co. v. Campbell</u>, 538 U.S. 408, 416 (2003).  The Court has set forth three guideposts to
10 inform whether a punitive damages award is consistent with substantive due process:
11 "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity
12 between the actual or potential harm suffered by the plaintiff and the punitive damages
13 award; and (3) the difference between the punitive damages awarded by the jury and the
14 civil penalties authorized or imposed in comparable cases."  <u>Id.</u> at 418.[7]  The most
15 important of these factors is reprehensibility.  <u>Id.</u> at 419.

16     Federal and state courts applying CUTSA have adopted similar rules, also asking
17 if the defendants' conduct, admittedly willful and malicious, is "reprehensible";
18 examining the punitive award sought as compared to the injury suffered, the
19 compensation already awarded, and the required deterrence; and taking account of the
20 losing party's net worth and ability to pay.  On all of these factors, MGA bears the
21 burden of proof; on all of them, Mattel has the better of the argument.  Punitive damages
22 here are simply not just; to grant them would violate the fundamental principle that like
23 cases be treated alike, and would unduly punish Mattel when no more punishment is
24 needed.

25

26

27   [7]  Although it bears the burden here, MGA has not attempted to make any showing
as to the third factor in support of its motion, so Mattel does not address it here.

28

MATTEL'S OPPOSITION TO MGA'S MOTION FOR EXEMPLARY DAMAGES

I.    **MGA FAILED TO PROVE, NOR COULD IT, THAT MISAPPROPRIATING INFORMATION RELATING TO 26 TOYS ON DISPLAY IS "REPREHENSIBLE"**

"Punitive damages should *only* be awarded if the defendant's culpability, *after having paid compensatory damages*, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." State Farm, 538 U.S. at 419 (emphasis added). In order to determine the existence and degree of represhensibility, the Court in the due process context has instructed courts to consider whether:  1) the harm caused was physical as opposed to economic; 2) the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others; 3) the target of the conduct had financial vulnerability; 4) the conduct involved repeated actions or was an isolated incident; and 5) the harm was the result of intentional malice, trickery, deceit, or mere accident. Id.

A.    **MGA Concedes That Three of the Five Factors Favor Mattel**

MGA admits it can make no showing as to the first three represhensibility factors.

1.  The harm here was purely economic, not physical.

2.  The conduct did not constitute a "health or safety" issue.

3.  MGA is not a "financially vulnerable" party.

MGA then ignores these factors, as if they should not be counted at all in the balance. Mot. at 24.  But courts hold that in their absence, any punitive damages should be strictly limited. See Leavey v. Unum Provident Corp., 295 Fed. App'x 255, 259 (9th Cir. 2008) (where three factors were lacking, ratio of 1.5-to-1 was "the constutional maximum"); JetSource Charter, Inc. v. Doherty, 148 Cal. App. 4th 1, 11 (2007) ("Although, in the words of the Campbell court, the defendants' fraudulent scheme, repeated over a number of transactions, 'merits no praise;' nonetheless, the harm the defendants caused was solely economic and did not involve, in any sense, a vulnerable victim. . . . Moreover, the total of $6.5 million in compensatory damages and prejudgment interest was, to say the least, substantial. . . In light of all the circumstances, we do not believe a total

1   punitive damage award in excess of the $6.5 million compensatory award is
2   appropriate.").

3       MGA claims it is entitled to maximum punitive damages despite the absence of
4   these three factors, but the authorities it cites hold no such thing. Noyes v. Kelly Servs.,
5   Inc., 349 Fed. App'x 185, 187 (9th Cir. 2009), held that even though three factors were
6   present (more than MGA even contends are present here), a 1-to-1 ratio was appropriate.
7   Mobile Mini, Inc. v. Khordt, 2007 WL 2109224 (E.D. Cal. July 23, 2007) (Mot. at 24-
8   25), involved a default judgment based on unchallenged allegations in a complaint, and
9   concluded that compensatory damages of $212,542 were "not so substantial as to
10  suggest that a ratio of 1 to 1 would be the outermost limit of punitive damages consistent
11  with due process." Id. at *5. The fact that a compensatory award of $212,542 in a
12  default judgment is not enough to trigger a 1-to-1 ratio limit hardly means that $88.5
13  million, or whatever it turns out to be, will not be enough.[8] Here, the three factors that
14  MGA concedes favor Mattel, coupled with the two it contests, undercut its argument for
15  an additional double damages for "reprehensible" conduct.

16      **B.**     **Improperly Viewing 26 Toys at Toy Fairs Five Years Ago Is Not the**
17              **Sort of Repetitive Unlawful Conduct that Justifies Punitive Damages**

18      The fourth factor—repetitive conduct—is satisfied only when "a defendant has
19  repeatedly engaged in prohibited conduct *while knowing or suspecting that it was*
20  *unlawful*". BMW of N. Am. v. Gore, 517 U.S. 559, 576-77 (1996) (emphasis added).
21  MGA relies heavily on Gore, but the Supreme Court there *rejected* plaintiff's arguments
22  that BMW's nationwide policy, which had been in effect for over a decade, constituted
23  "repeated misconduct [that was] more reprehensible than an individual instance of
24  malfeasance." Id. at 576-80. The Court so held because although the policy was applied

---

25      [8]   MGA also touts the award of punitive damages based on willfulness in Sun Pac.
26  Farming Co-Op, Inc. v. Sun World Int'l, Inc., 2009 WL 900751, at *7 (E.D. Cal. Mar.
    31, 2009), a case that involved a punitive award of only $40,000 against a large
27  international agricultural company.

28

nationwide for many years, BMW could not have been expected to know that the policy was unlawful. Because "a corporate executive could reasonably interpret" the law to permit the non-disclosure policy on which the jury ultimately found liability, and BMW could not "have anticipated that its actions would be considered fraudulent," this factor weighed against punitive damages. Id. at 577-78. Where "there is no evidence that [defendant] knew" its repeated actions were risking injury," the repetition "does not show any disrespect for the law." Clark v. Chrysler Corp., 436 F.3d 594, 604 (6th Cir. 2006) (finding an "absence of evidence of repeated misconduct" where Chrysler did not have notice that a part used in its Dodge trucks could cause severe injury).

MGA's cases are not to the contrary (and in any event could not overrule Gore). In Bains LLC v. Arco Products Co., 405 F.3d 764, 775 (9th Cir. 2005), the court found repeated conduct was reprehensible where it involved blatant "ethnic harassment" (id.) that had repeatedly been brought to the attention of multiple management-level employees but did not cease. Id. at 767-68. In Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coalition of Life Activists, 422 F.3d 949 (9th Cir. 2005), the court found the defendants' conduct was repeated and reprehensible in the context of threats of violence against physicians, where past threats had resulted in injury and murder. Id. at 951-52. The situation here is in no way comparable.

### 1. **The Conduct Stopped by 2006**

The practice complained of stopped years ago. In analyzing this sub-factor in Gore, the Supreme Court found it "significant that there is no evidence that BMW persisted in a course of conduct after it had been adjudged unlawful on even one occasion." 517 U.S. at 579; see Witcher v. Bank of Am., 2010 WL 3395689, at *1 (W.D. Va. August 27, 2010) (rejecting claim for punitive damages where "the offending conduct ceased" after counsel was contacted).

MGA's misstatements of the record not withstanding, the conduct stopped by 2006, long before it was ever adjudged to be unlawful. Villasenor testified he knew he would be fired if he continued the practice,[9] he was not involved in any competitive intelligence gathering after December 2005, and he did not attend any toy fairs in 2006.[10] Mattel's 2006 Competitive Product Overview states plainly that it was "created by collecting content from a variety of press releases, news articles and widely accessible websites. All included content is publicly available and can be directly sourced by request. None of this information was directly or indirectly, obtained or sought out of any third party."[11] MGA presented no evidence to contradict this.[12] Furthermore, MGA did not allege trade secret misappropriation with respect to any MGA product after 2006.

Although included nowhere in its trade secret chart or among any of its disclosures in discovery as purported trade secrets, MGA now claims that a 2009 e-mail from Sarah Allen, a contractor for Mattel UK, proves Mattel's continued misconduct.[13] Not so. The e-mail refers to "bits and pieces from the MGA stand at Nuremberg," yet it is undisputed Ms. Allen did not attend the 2009 Nuremburg Toy Fair.[14] Rather, Ms. Allen spoke to a member of the press, a publisher of a toy-related magazine in the UK, who had attended the toy fair and saw the information in MGA's display.[15] He passed it on to Allen in a telephone conversation after toy fair ended.[16] While MGA's brief ignores all this evidence and fails to even cite Ms. Allen's testimony, MGA never before

---

[9]  3/23/11 Trial Tr. Vol. 1 (Villasenor) at 128:25-129:17 ("Q: Your understanding was that you would lose your job unless you stopped misrepresenting yourself, correct? A: That's the way I felt, correct.").
[10]  3/23/11 Trial Tr., Vol. 2, at 48:19-49:4; 3/23/11 Trial Tr. Vol. 1 at 76:20-77:7.
[11]  TX 9566-3.
[12]  The jury found that Mattel misappropriated trade secrets relating to three 2006 products—of the two dozen 2006 products for which MGA asserted trade secret misappropriation. These products are the subject of Mattel's Renewed Judgment as a Matter of Law, dated May 5, 2006.
[13]  TX 9869-001; 4/5/11 Trial Tr. Vol 5 (Allen) at 9:5-16 .
[14]  4/5/11 Trial Tr. Vol 5 (Allen) at 10:9-11:10.
[15]  4/5/11 Trial Tr. Vol 5 (Allen) at 19:11-16.
[16]  4/5/11 Trial Tr. Vol 5 (Allen) at 11:11-12:10; 13:4-14:5; 18:17-20.

MATTEL'S OPPOSITION TO MGA'S MOTION FOR EXEMPLARY DAMAGES

1   even claimed any information in the e-mail was trade secret, confidential or

2   misappropriated.[17]

3          Mr. Eckert first learned of Villasenor's conduct in 2009, when he first heard his

4   name.[18] MGA's brief falsely suggests Matt Bousquette, former President of Mattel

5   Brands, knew of Villasenor's activity, but Villasenor himself testified to the contrary:

6   "During the time period of 1999 through 2006, you had no conversations with Mr.

7   Bousquette about your practice of going into showrooms using false information,

8   correct?  A. That's correct."[19]  MGA claims the so-called "how to steal" manual

9   evidences widespread knowledge of Villasenor's actions, but there is no evidence that

10  anyone at Mattel, other than Villasenor, had ever seen the document.  That "manual"

11  references New York Toy Fair, Hong Kong Toy Fair, Nuremberg Toy Fair, Pomona Toy

12  Fair, and the E3 Expo as trade shows the author "attended in the past"[20]—and only

13  Villasenor attended those trade shows.[21]

14         MGA's hyperbole aside, the fact is that Mattel's attorneys did not know of any

15  wrongdoing while it occurred and only learned of it after it stopped in 2005.  Mr.

16  Normile, Mattel's General Counsel, learned of Villasenor's activities shortly before Sal

17  Villasenor's "set-up" e-mail in late December 2005 and instructed Mattel attorneys to

18  investigate the issue and ensure the conduct had ceased.[22]  Michael Moore first learned

19  about the past practice of using fake business cards to get competitive information from

20  toy fairs in mid-2005.[23]  MGA asserts that even if Mattel's legal department didn't learn

21

22  [17]   Verdict Form, Dkt. No. 10518.
    [18]   4/1/11 Trial Tr. Vol. 1 (Eckert) at 21:11-19.
23  [19]   3/23/201 Trial Tr. Vol. 2 (Villasenor) at 75:8-14.
    [20]   See TX 36028-03.
24  [21]   See 3/22/11 Trial Tr. Vol. 2 (Villasenor) at 59:22-24 (New York, Hong Kong, and
    Nuremberg Toy Fairs); id. at 59:4-14 (Pomona Toy Fair); id. at 132:21-23 (E3 Expo).
    [22]   TX 9484-R; 3/29/11 Trial Tr. Vol. 2 (Normile) at 43:23-44:10 (testifying that he
25  was aware of Michael Moore's discussions with Mr. Villasenor in mid-2005 and that the
    conduct had ceased and would not continue).
26  [23]   03/29/11 Trial Tr. Vol. 2 (Moore) at 123:3-18.  MGA falsely argues that Moore
    knew of the conduct earlier, but the undisputed evidence is that Moore was only asked
27  about general guidelines for collecting competitive information, and was never told
    (footnote continued)
28

00505.07975/4134263.5

-8-

MATTEL'S OPPOSITION TO MGA'S MOTION FOR EXEMPLARY DAMAGES

1  about the activity until 2005, Moore then had "10 to 20" meetings with Villasenor to

2  discuss the lawsuit.  Dkt. 10539 at 6.  That is false—during this period Moore spoke

3  with Villasenor 10 to 20 times *in total*, including "incidentally bumping into him in the

4  cafeteria and the elevator and other things"[24]—but in any case this is entirely irrelevant;

5  given the total lack of evidence that the conduct continued after this point, the 2005

6  conversations with Moore in no way indicate that Mattel's legal department tolerated, let

7  alone supervised, Villasenor's activities.[25]

8              **2.    MGA's Tired "Cover Up" Claims Are Meritless**

9        Nor do MGA's claims of a supposed "cover up" find any support in the record.

10  At summary judgment, the Court rejected MGA's claims that Mattel "fail[ed] to produce

11  evidence relevant to MGA's statute of limitations defense prior to the Phase 1

12  proceedings"—an allegation MGA expressly renews here[26]—and that Mattel improperly

13  "fail[ed] to produce evidence concerning the market intelligence group prior to the phase

14  1 proceedings," stating that these allegations "have no support in the factual record."

15  Dkt. No. 9600 at 146.  Indeed, the Court expressly found that "all of the evidence

16  allegedly concealed by Mattel wasn't relevant to the phase 1 proceedings *and was*

17  *subsequently produced*."  Id. at 156 (emphasis in original).  The only part of MGA's

18  "cover up" argument here that does not consist entirely of previously-rejected assertions

19  ─────────────────────

20  about the activities of Mr. Villasenor until 2005. 3/22/2011 Trial Tr. Vol. 1 (Turetzky) at 62:2-6; Id. at 62:17-63:2.
      [24] 03/29/11 Trial Tr. Vol. 2 (Moore) at 112:5-9; 03/29/11 Trial Tr. Vol. 2 (Moore) at

21  114:1-19.
      [25]   MGA's criticism that Mattel failed to sufficiently reprimand those who

22  participated in this misconduct is particularly unfounded in light of how MGA treated the felonious trade secret misappropriation of a former Mattel employee. Even when an

23  MGA employee admitted to downloading confidential Mattel information on a PDA, allegedly in contravention of MGA's policy not to take any information from a former

24  employer, and ignoring Larian's personal instruction to follow that policy, Larian did not reprimand, discipline or fire the employee or even do anything to investigate what the

25  employee took. See 2/10/11 Trial Tr. Vol. 1 (Larian) at 122:15-123:1, 124:8-12. Larian did nothing even after the employee pled guilty in a criminal prosecution to taking

26  Mattel trade secrets from Mattel.  See 4/4/11 Trial Tr. Vol. 2 (Moore) at 121:22-122:1; see also 2/10/11 Trial Tr. Vol. 1 (Larian) at 122:15-123:1, 124:8-12.

27      [26]   Mot. at 16:14-21; 17:6-9.

28

is its claim that Mattel wrongfully withheld "*35 boxes of competitors' stolen trade secrets*...carted out of the library shortly before Mr. Eckert's visit and secreted away in the offices of counsel unconnected to this case." Mot. at 3. There was no evidence at all to support this statement. In fact, the boxes were from Villasenor's cubicle area and in 2006 were collected and preserved.[27] During discovery, Mattel's counsel in this case reviewed all 35 boxes and, pursuant to the Discovery Master and Court Orders in Phase 2, produced all documents from the boxes referring to "Bratz" or "MGA."[28] Tellingly, MGA fails to point to a single document from the boxes that it claims should have been produced earlier and was not. During trial, the Court and the Discovery Master reviewed the boxes, ordered only five additional documents produced (none of which MGA attempted to introduce at trial or has even claimed were relevant), and otherwise rejected MGA's efforts to obtain documents from the boxes beyond those it had already received during discovery.[29] MGA's cover-up accusations are meritless.

### 3.   Punitive Damages Cannot Punish Conduct Involving Third Parties

In a transparent effort to increase the amount of purported wrongdoing here enough to justify the award, MGA focuses much of its brief *not* on wrongs Mattel committed against MGA—the subject of the jury's verdict—but on wrongs supposedly committed against others. A punitive damages award that punishes a defendant for harm purportedly done to third parties violates due process. Philip Morris USA v. Williams, 549 U.S. 346, 349 (2007); Merrick v. Paul Revere Life Ins. Co., 500 F.3d 1007, 1017-18 (9th Cir. 2007) (trial court "erred in failing to instruct the jury that it could not punish the defendants for conduct that harmed only nonparties"). "[T]he Constitution's Due

---

[27]   Dkt. No. 10302 at 1; Dkt. No. 10309 at 1.  Mr. Eckert went not to Villasenor's cubicle, but to a separate "research library," and did so in *2011*, years after the boxes were collected, so MGA's accusations are incorrect in this regard as well. See 4/4/2011 Trial Tr., Vol. 1, at 6:16-7:6; 4/1/2011 Trial Tr., Vol. 1, at 132:19-133:15.

[28]   Dkt. No. 10309 at 2; 3/28/2011 Trial Tr., Vol. 2 at 43:5-44:11; 46:16-47:5, 65:1-12.

[29]   3/29/2011 Trial Tr., Vol. 3 at 76:23-77:5.

MATTEL'S OPPOSITION TO MGA'S MOTION FOR EXEMPLARY DAMAGES

Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, i.e., injury that it inflicts upon those who are essentially strangers to the litigation." Williams, 549 U.S. at 353 (quotations omitted).

MGA cites dicta from Johnson v. Ford Motor Co., 35 Cal. 4th 1191 (2005), to argue that a defendant's "recidivism" may be considered in determining the amount of punitive damages.  Mot. at 26.  Certainly, in measuring what it takes to deter a committed wrongdoer, past wrongdoing can be considered.  But that is a far cry from saying that a punitives award may take account of uncharged and unproven conduct against third parties.  Johnson does not take issue with the rule that a punitive damages award cannot be used to punish the defendant for actions against non-parties; indeed, Johnson recognized that to do otherwise "creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other plaintiff obtains." 35 Cal. 4th at 1209 (citation omitted); id. at 1208-09 (such unfairness "may be of constitutional dimension").

### 4. <u>Novel Claims Weigh Against Reprehensibility</u>

The jury found that 76 of the 114 products alleged to be trade secrets—products shown in the same showrooms at the same toy fairs—were not trade secrets at all.  MGA admitted that it got information about competitors' products at toy fairs from retailers and others; so did the rest of the industry.  Yes, Mattel employees should have known that using fake business cards was *unethical*, but according to the jury, it was *unlawful* only as to these 26 products in these six particular toy fairs.  The jury's rejection of most of MGA's trade secret claims was certainly warranted; indeed, witness after witness, from both Mattel and MGA, testified that information shared with retailers in the toy industry is not trade secret because the expectation is that retailers will share such

1   information with competitors, including to play one manufacturer off another to obtain
2   better prices—an obvious benefit to consumers.[30]

3         Nor is it the case that there was, or is now, some clear body of law showing that
4   products shown at toy fairs and sales events are trade secrets. To the contrary, courts
5   have ruled, including in California, that a manufacturer's asserted trade secrets become
6   public after disclosure to buyers because buyers are the ones "who have an economic
7   interest in the product and whose demand for the product encourages manufacturers to
8   supply it. Disclosure to them is, for all relevant purposes, disclosure to the world."
9   Acuson Corp. v. Aloka Co., Ltd., 257 Cal. Rptr. 368, 375-76 (1989) (citing The
10  Commissioners' Comment to the Uniform Trade Secrets Act ("If the principal person
11  who can obtain economic benefit from information is aware of it, there is no trade
12  secret.")) (review denied and ordered not published, June 22, 1989).[31] "Acuson has not
13  cited any case – and we have found none – holding that a competitor's concealment of

14

15  [30]  3/25/11 Trial Tr. Vol. 2 (Larian) at 37:18-38:4 (Larian "expects retailers to talk");
    3/25/11 Trial Tr. Vol. 1 (Larian) at 88:20-89:17 (In Larian's experience, retailers "go
16  ahead and share information from MGA with other people in the industry;"
    "[P]ractically speaking" Larian knew retailers would share the information he gave them
17  with others in the industry.); 4/6/11 Trial Tr. Vol. 2 (Saunders) at 66:24-67:14 (MGA's
    Lisa Saunders testified that once a retailer knows a toy manufacturer's information, there
18  is a risk that other people are going to learn about it, and indeed she testified that she
    obtained information about unreleased Mattel products from retailers.); 3/31/11 Trial Tr.,
19  Vol. 2, (Brawer) at 39:7-16, 41:10-42:9 (MGA's Ron Brawer testified that "when I tell
    [a retail] customer anything, I am taking a huge risk that that information will then
20  become public" and that "there's certainly a significant amount of leakage from the
    moment that you start telling retailers what the FOB cost is of a product."); 4/6/11 Trial
21  Tr. Vol. 1 (Jolicoeur) at 13:16-18 (MGA's Chief Financial Officer, MGA's corporate
    spokesperson on toy fair practices, agreed that "if information is released to the retailer,
22  it was released to the public."); 2/24/11 Trial Tr., Vol. 1, (Kuemmerle) at 35:12-36:16
    (MGA's Susana Kuemmerle testified that price lists are not trade secrets and that
23  retailers share them with competitors "all the time."); See 3/17/11 Trial Tr. Vol. 2
    (Fontanella) at 39:10-23 (former president of Mattel's Girls Division, Adrienne
24  Fontanella testified that it was her expectation that once an upcoming product or other
    information was shared with a retailer, it became public); 3/22/11 Trial Tr. Vol. 1
25  (Turetzky) at 126:8-11 (A former Mattel vice president, Matthew Turetzky, agreed that
    information that's shared with retailers is widely understood in the toy industry to be
26  public).
    [31]  Federal courts may consider depublished state court decisions. See Employers Ins.
27  of Wausau v. Granite State Ins. Co., 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003); Nunez by
    Nunez v. City of San Diego, 114 F.3d 935, 943 n. 4 (9th Cir. 1997).

28

-12-

MATTEL'S OPPOSITION TO MGA'S MOTION FOR EXEMPLARY DAMAGES

1   its identity to obtain a publicly available product will create liability under trade secret

2   law." Id. at 381.  And as this Court has ruled, a party "ha[s] no property interest in its

3   non-trade secret materials and information" as a matter of California law. Dkt. No. 9714

4   at 3.

5        As Acuson confirms, the basis for liability in this case (if it is upheld) was

6   certainly not well-established.   "It is generally recognized in California and the Ninth

7   Circuit that punitive damages are not proper in cases of first impression."  In re First

8   Alliance Mortg. Co., 2003 WL 21530096, at *10-11 (C.D. Cal. June 16, 2003) (citing

9   Waits v. Frito-Lay, 978 F.2d 1093, 1104 (9th Cir. 1992)); see also Kolstad v. Am. Dental

10  Ass'n, 527 U.S. 526, 537 (1999) (punitive damages may not be appropriate where the

11  "underlying theory of discrimination [is] novel or otherwise poorly recognized"). The

12  "unique nature" of a case "add[s]  to the general caution with which the Court must

13  consider the appropriateness of punitive damages."  In re First Alliance Mortg. Co., 2003

14  WL 21530096 at *11.

15       If this verdict is upheld, then Mattel will be required to pay a damage award.  But

16  it is unjust to damn as reprehensible—not just unlawful but reprehensible—conduct that

17  had never before been found unlawful and that even the jury here found, as to most of

18  the information at issue, was not unlawful.

19  **C.    Entering Toy Fair Showrooms Using a Phony Business Card Does Not**

20      **Score at the Extreme End for Deceit or Trickery**

21       The jury found that Mattel's wrongdoing was intentional and willfull.  But that

22  does not mean, even as to the fifth factor, that it was reprehensible.  This was not a case

23  of competitors faking workplace IDs to infiltrate and examine prototypes that were a

24  year or more away from the sales shelves.  Security at toy fair was such that MGA hired

25  young women to stand outside dressed as Bratz dolls inviting the public to enter; all it

26  took to get into the most "secure" showroom was a card with the name of a fictitious

27

28

store somewhere.[32]  Indeed, self-authenticating news footage available on the Internet demonstrates the bustling, crowded nature befitting the name, toy *fair*.[33]  The products at toy fair were on their way to retailers shelves; some were literally already on their way.

MGA itself collected the same information about Mattel.  It routinely received information from retailers about unreleased products being shown in Mattel toy fair showrooms.[34]   Larian admitted he "personally" got similar information about competitors' products, including Mattel,[35] and that he did not believe he was using a retailer to steal "trade secrets" when he did so.[36]  Nor did Larian discipline MGA employees or investigate the circumstances at all when he learned they had gained access to a Mattel showroom at toy fair and prepared and disseminated a detailed report of what they saw.[37]  Instead, such behavior at MGA earned accolades.[38]

Where the party seeking punitive damages has engaged in similar behavior, or where it is widespread in an industry, such behavior is not "reprehensible" within the meaning of the law.  See Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc., 181 F.3d 446, 467 (3d Cir. 1999) (analyzing reprehensibility factors and concluding that it weighs

---

[32]  2/16/11 Trial Tr., Vol. 2 (Larian), at 27:21-28:8.
[33]     See  http://video.google.com/videoplay?docid=-8994643910142214111#; http://xfinity.comcast.net/video/new-york-toy-fair/66141783/; http://cnettv.cnet.com/preview-2006-hottest-toys/9742-1_53-50012308.html; http://video.google.com/videoplay?docid=4326385115367637655#; http://www.youtube.com/watch?v=5-V0tPlsQLU; http://www.youtube.com/watch?v=q2Eun50P9CY&feature=related; http://www.youtube.com/watch?v=xVkOFKI4OeI&feature=related.  These videos are being lodged concurrently with the Court on a compact disc.
[34]  See, e.g., TX 9533; 3/24/11 Trial Tr. Vol. 2 (Larian) at 67:22-25; 3/25/11 Trial Tr., Vol. 1 (Larian) at 112:9-16.
[35]  See 3/24/11 Trial Tr. Vol. 2 (Larian) at 67:9-16.
[36]  3/25/11 Trial Tr. Vol. 1 (Larian), at 105:21-24.
[37]  See 3/25/11 Trial Tr., Vol. 1 (Larian) at 108:8-113:25; see also TX 9533 (an email from Angelika Stemberg to Isaac Larian, copy to Ron Brawer, Paula Garcia and Thomas Pfau, dated February 3, 2007 regarding a Mattel product being shown "as a TOP SECRET theme in a closed room at Toy Fair."), TX 24748; 3/35/11 Trial Tr. Vol. 1 (Larian) at 115:19-118:4; TX 9854 (an email from Angelika Stemberg, copy to Isaac Larian, among others, dated February 13, 2008, in which Ms. Stemberg writes,"Two of our colleagues have been able to enter the booth of our competitor and wrote the attached report.").
[38]  See TX 9539.

1  against reprehensibility that "[plaintiff] itself breached the [parties'] agreement . . . and

2  engaged in tortious acts"); <u>Ford v. GACS, Inc.</u>, 265 F.3d 670, 678 (8th Cir. 2001)

3  (defendant entitled to judgment as a matter of law on punitive damages claim where

4  design at issue was industry standard at time of manufacture); <u>Satcher v. Honda Motor</u>

5  <u>Co.</u>, 52 F.3d 1311, 1316–17 (5th Cir. 1995) (vacating punitive damages in part because

6  defendant's conduct was consistent with industry and governmental safety standards).[39]

7      Without excusing the wrongdoing of Mr. Villasenor and others, the fact remains

8  that they did not endanger the security of MGA or the safety of its products, did not

9  create a sophisticated ID or phony password to penetrate to the deepest levels of MGA

10  and did not steal its secret sauce. They made cheap phony business cards to see products

11  MGA was showing every retailer that asked, and the press. Mr. Brawer, long one of

12  MGA's highest-level executives, obviously did not consider Villasenor's wrongdoing

13  shocking—indeed, he considered hiring him.[40] On the scale of fraud and deceit and

14  trickery that this Court sees on a daily basis, Mr. Villasenor cannot possibly be in the

15  commanding position to which the windfall MGA seeks would elevate him.

16  **II.  THE HIGH COMPENSATORY DAMAGE AWARD IN THIS CASE**

17         **SUPPORTS LITTLE OR NO PUNITIVE DAMAGES**

18      The second factor to be considered, under CUTSA and due process, is the ratio

19  between "the actual or potential harm suffered by the plaintiff and the punitive damages

20  award". <u>State Farm</u>, 538 U.S. at 419; <u>Gore</u>, 517 U.S. at 580 ("The second and perhaps

21  most commonly cited indicium of an unreasonable or excessive punitive damages award

22  is its ratio to the actual harm inflicted on the plaintiff."). After finding a $1 million

23  compensatory award "substantial," the <u>State Farm</u> Court held that "when compensatory

24     [39]  As discussed more fully in Mattel's concurrently-filed motion requesting

25  adjudication of affirmative defenses in its favor, which Mattel incorporates herein by reference, Mattel's unclean hands and laches affirmative defense bar MGA's trade secret

26  claims entirely. Regardless of the resolution of that motion, these equitable factors weigh against an award of punitive damages and attorney's fees.

27     [40]  See TX 9293; 3/23/2011 Trial Tr., Vol.1, at 69:25-72:23; <u>see also</u> 3/31/2011 Trial Tr., Vol. 1, at 85:4-11; TX 22395.

28

MATTEL'S OPPOSITION TO MGA'S MOTION FOR EXEMPLARY DAMAGES

1 | damages are substantial, then a lesser ratio, perhaps only equal to compensatory
2 | damages, can reach the outermost limit of the due process guarantee." 538 U.S. at 425.
3 |     Doubling a high compensatory award, or coming anywhere close to that, would
4 | produce a punitives award utterly out of proportion to the harm to the plaintiff –
5 | especially in this case. There is simply no math set in which an advance peek at 26 dolls
6 | that are about to come to market and have already been disclosed to those who will
7 | purchase them is somehow "worth" nearly a quarter of a billion dollars or anything close
8 | to it. Even where courts have found a defendant's conduct to be reprehensible, they
9 | reduce punitive damages where the ratio was too high, or the compensatory award too
10 | high, to justify the ultimate recovery. See Boerner v. Brown & Williamson Tobacco
11 | Co., 294 F. 3d 594, 603 (8th Cir. 2005) (remitting punitive damages award to
12 | "approximately 1:1" of $4,025,000 general award despite reprehensible conduct);
13 | Williams v. Conagra Poultry Co., 378 F.3d 790, 799 (8th Cir. 2004) (remitting
14 | $6,062,750 punitive damages award to $600,000 award reflecting 1:1 ratio); Walker v.
15 | Farmers Ins. Exchange, 153 Cal.App.4th 965, 974 (2007) ("Thus, this case appears to
16 | come within the description of a case by the Simon decision where the compensatory
17 | damages are so substantial as to support only a 1 to 1 ratio.") Slip-N-Slide Records, Inc.
18 | v. TVT Records, LLC, 2007 WL 3232274, at *30 (S.D. Fla. Oct. 31, 2007) (reducing
19 | punitive damages award to 1:1 ratio due to "substantial" $2,279,200 compensatory
20 | award); Thomas v. iStar Financial, Inc., 508 F. Supp.2d 252, 262-64 (S.D.N.Y. 2007)
21 | (reducing punitive damages award to less than half of compensatory award in part
22 | because compensatory award was substantial).
23 |     Moreover, a high compensatory award itself often effects sufficient deterrence
24 | such that no more punishment is needed, and that certainly is the case here. Indeed, the
25 | compensatory award here—a purported quantification of Mattel's unjust enrichment and
26 | not MGA's actual losses—is *already* justified on deterrence grounds; requiring the
27 | wrongdoer to disgorge his ill-gotten gains, even where it is a windfall to a plaintiff who
28 | suffered no demonstrable injury, is deemed justified to deter wrongdoing. No more

1   deterrence is needed.  It is hard to imagine a universe in which $3.4 million for each
2   advance look at a product headed for retailer shelves is not enough to deter the lookers.
3   See Lane v. Hughes Aircraft Co., 22 Cal.4th 405, 424 (2000) (Brown, J, concurring)
4   ("[L]arge compensatory damage awards ... have a strong deterrent and punitive effect in
5   themselves"); Mirkin v. Wasserman, 5 Cal.4th 1082, 1106 (1993) (size of compensatory
6   damages awards alone may create "significant deterrent" effect in securities fraud cases);
7   Johnson v. Ford Motor Co., 35 Cal.4th 1191, 1208 (2005) ("A gain-based measure of
8   this sort sends a clear signal to defendants that such misconduct does not pay and, thus,
9   serves the deterrent function of punitive damages.") (quoting Cummings Medical Corp.
10  v. Occupational Medical Corp., 10 Cal. App. 4th 1291, 1299-1300 (1992) (removing
11  "defendant's profits . . . serves the deterrent function of punitive damages")); see also
12  State Farm, 538 U.S. at 426 (noting that in some cases, compensatory awards "already
13  contain [a] punitive element").

14       The jury's $88 million compensatory award was never a measure of actual, or
15  potential, harm to MGA.  It was a measure of Mattel's alleged ill-gotten gains, to be
16  disgorged to MGA to prevent unjust enrichment and deter wrongdoing.  This high unjust
17  enrichment award does not support the substantial additional punitive damages that
18  MGA seeks (or, indeed, any punitive damages). See Modine Mfg. Co. v. Allen Group,
19  Inc., 917 F.2d 538, 543 (Fed. Cir. 1990) (affirming district court's denial of punitive
20  damages after a large $50 million compensatory verdict in light of "the deterrent
21  function of enhanced  damages"and noting willfulness issue was "sufficiently close on
22  the evidence"); Mercexchange, L.L.C. v. eBay, Inc., 275 F. Supp. 2d 695, 720 (E.D. Va.
23  2003) (denying request for enhanced damages, despite jury's finding of willfulness),
24  aff'd in relevant part, 401 F.3d 1323, 1326 (Fed. Cir. 2005); see also Mirkin v.
25  Wasserman, 5 Cal.4th 1082, 1106 (1993) (punitive damages may not be necessary where
26  "the overall size of compensatory damages alone may constitute a significant deterrent.")
27  (internal quotation omitted); Beliz v. M.H. McLeod & Sons Packing Co., 765 F.2d 1317,
28  1332 (5th Cir. 1987) ("Deterrent effect may be achieved without awarding exemplary

1  damages."); <u>TVT Records v. Island Def Jam Music Group</u>, 288 F. Supp. 2d 506, 511

2  (S.D.N.Y. 2003) ("[T]he jury assessed a substantial compensatory award" and a

3  "damages award that essentially makes the victim whole serve a punitive function as

4  well.").

5  **III.** ███████████████████████████████ **IS TOO HIGH GIVEN THE**

6  **UNDERLYING CONDUCT**

7      The punitive award sought by MGA would amount to ███████████

8  ██████, according to the figures MGA relies upon.  While federal law considers a

9  defendant's wealth irrelevant, California law seeks to protect defendants from gratuitous

10  ruin. "Because the quintessence of punitive damages is to deter future misconduct by a

11  defendant, the key question before the reviewing court is whether the amount of

12  damages exceeds the level necessary to properly punish and deter." <u>Adams v. Muakami</u>,

13  54 Cal. 3d 105, 110 (1991) (quoting <u>Neal v. Farmers Ins. Exchange</u>, 21 Cal. 3d 910, 928

14  (1978). The standard is not whether the award would completely "cripple" the company,

15  but whether "in light of the defendant's wealth and the gravity of the particular act, [it]

16  exceeds the level necessary to properly punish and deter." <u>Id</u>.

17      MGA justifies its request for ████████████████████████

18  ████████████████████████ Mot. at 29.  That is not a rule

19  of thumb, but the *maximum* allowed for the most reprehensible conduct. "[P]unitive

20  damage awards are generally not allowed to exceed 10 percent of the defendant's net

21  worth, and [] *significantly lower percentages are indeed the norm*." <u>Storage Services v.</u>

22  <u>Oosterbaan</u>, 214 Cal. App. 3d 498, 515 (1989) (emphasis added).  MGA cited <u>Storage</u>

23  <u>Services</u> but notably omitted this final clause. Mot. at 29. Other authorities are similar.

24  <u>See</u> <u>Walker v. Farmers Ins.</u>, 153 Cal. App. 4th 965, 972-75 (2007) (affirming reduction

25  of punitive award to 0.162% of net worth); <u>Sierra Club Foundation v. Graham</u>, 72 Cal.

26  App. 4th 1135, 1162-63 (1999) (affirming award of 2.2% of net worth); <u>Hobbs v.</u>

27  <u>Bateman Eichler Hill Richards, Inc.</u>, 164 Cal. App. 3d 174, 195 (1985) (affirming award

28  of 1% of net worth); <u>Pistorious v. Prudential Ins. Co. of Am.</u>, 123 Cal. App. 3d 541, 554-

1   55 (1981) (affirming award less than 1% of net worth); Grimshaw v. Ford Motor Co.,

2   119 Cal. App. 3d 757, 820 (1981) (affirming award of 0.005% of net worth), Roemer v.

3   Retail Credit Co., 44 Cal. App. 3d 926, 937 (1975) (affirming award of 0.63% of net

4   worth).

5        MGA argues that the court in 02 Micro v. Monolithic Power, 399 F. Supp. 2d

6   1064 (N.D. Cal. 2005) used the same methodology for calculating net worth as MGA

7   uses here to "confirm defendant's ability to pay an award of double damages." Mot. at

8   30. This is misleading. The issue here is not Mattel's ability to pay a given award, but

9   rather what percentage of net worth will sufficiently punish and deter. Although the

10  award in 02 Micro was for double damages, the court there specifically determined that

11  the punitive award was only 2.8% of net worth. Id. at 1078-80. MGA's argument that

12  so long as Mattel has the "ability to pay" double damages it should be required to do so

13  is contrary to law. "[T]he punitive damages award must not punish the defendant simply

14  for being wealthy." Roby v. McKesson Corp., 47 Cal.4th 686, 719 (2010). The award

15  cannot exceed the level necessary to "punish and deter." Adams, 54 Cal.3d at 110.

16  MGA fails to explain why an award of ████████████████████ is "needed to

17  punish and deter," nor could it, given that awards of 1% (Loan and Hobbs) or .05%

18  (Grimshaw) have been found sufficient to punish and deter more serious misconduct.

19       Moreover, having gone to great lengths to emphasize (where it was utterly

20  irrelevant) that Mattel's supposed misconduct extended to others, MGA is curiously

21  silent on the topic here, where the potential for further recoveries by third parties for

22  long since ended conduct would militate, strongly, against finding that a significant

23  award is necessary either to punish or deter. See Boeken v. Philip Morris Inc., 127 Cal.

24  App. 4th 1640, 1701-02 (2005) (finding that "possible future awards[] are relevant in

25  determining the amount of punitive damages required to sufficiently punish and deter, so

26  long as they are shown to have identical issues"); Stevens v. Owens-Corning Fiberglas

27  Corp., 49 Cal. App. 4th 1645, 1661 (1996) ("The likelihood of future punitive damage

28  awards may also be considered, although it is entitled to considerably less weight.");

1   Restatement Torts Second, § 908(e) ("Another factor that may affect the amount of

2   punitive damages is the existence of multiple claims by numerous persons affected by

3   the wrongdoer's conduct. It seems appropriate to take into consideration both the

4   punitive damages that have been awarded in prior suits and those that may be granted in

5   the future, with greater weight being given to the prior awards.").

6       Combining MGA's demands for punitive damages and fees and costs to the

7   compensatory award, MGA seeks by its estimate ███████████████. That

8   is not defensible.

9   **IV.   MGA IS NOT ENTITLED TO AN AWARD OF ATTORNEY'S FEES**

10  **AND COSTS UNDER CUTSA**

11      Combined with its copyright fees motion, MGA is seeking to recover every cent

12  its primary law firms ever billed on this case. See Declaration of Stephen Schultz, ¶¶ 5,

13  6, 16. Under the guise of recovering fees for a claim raised for the first time in August

14  2010, MGA seeks every penny its law firms ever billed to affirmative claims matter

15  numbers—every cent billed by Orrick on any of MGA's affirmative claims going back

16  at least three years and every cent billed by O'Melveny on any of MGA's affirmative

17  claims going back at least six years. This gross overreaching should be rejected.

18      **A.   The Court Should Exercise Its Discretion To Reject An Award Of Fees**

19      **And Costs Under CUTSA**

20      MGA argues it is entitled to ████████████████ because the

21  jury found willful and malicious misappropriation. Mot. at 33. However, even where

22  willfulness is shown, an award of attorney's fees under CUTSA (like an award of

23  punitive damages) is discretionary. Cal. Civ. Code § 3426.4 ("If . . . willful and

24  malicious misappropriation exists, the court *may award* reasonable attorney's fees and

25  costs to the prevailing party.") (emphasis added). See 02 Micro, 399 F. Supp. 2d at

26  1078-81 (declining to award attorney's fees under § 3426.4 "because of the purpose of

27  the statute, the behavior of the parties during this litigation and the exemplary damages

28  awarded").

1   For all the reasons discussed above, a fee award is unjustified and unnecessary.

2   The jury's substantial compensatory damages award more than adequately deters, and

3   more than adequately compensates MGA by giving it the putative benefits that inured to

4   Mattel without any showing of actual losses at MGA.   Even a fraction of the jury's

5   award would more than adequately compensate MGA and promote deterrence; there is

6   no need for fee shifting to accomplish those, or any other, goals.

7   MGA argues that fee shifting is justified because, but for its "diligent pursuit of its

8   claims, Mattel would never have answered for its conduct aimed at MGA" and "but for

9   MGA's pursuit of its claims, Mattel would have continued stealing[.]"   Mot. at 4.

10   Parties should not be permitted to make blatantly false claims for which there is no

11   evidentiary support.   There was absolutely no evidence at trial that anyone from Mattel

12   entered any toy fair showroom wrongfully after 2006.   The jury verdict found no

13   misconduct after 2006.   The accusation that the misconduct stopped only because MGA

14   sued *in August 2010* could be made only by someone entirely unfamiliar with the record

15   in this case, particularly since it was MGA's counsel, during the examination of Mr.

16   Eckert, who conceded the activity did not continue past 2005.[41]   As for MGA's reliance

17   on Ms. Allen's 2009 e-mail, the evidence again is undisputed that Ms. Allen, who was

18   not a Mattel employee and didn't even attend toy fair, received the information she was

19   passing along to Mattel from a reporter.[42]   MGA's obviously false "facts" do not support

20   its fee request.

21   **B.**   **MGA's Failure To Apportion Between Winning And Losing Claims**

22   **And To Submit Its Billing Records Justifies Rejection Of Its Request**

23   In any case, even if fees properly could be shifted, MGA's utter failure to seek to

24   apportion its fees, and its shielding of the records of its lawyers' work, justify either

25   rejecting its application outright or substantially reducing its request.

26   [41]   4/1/2011 Trial Tr., Vol. 1 (Eckert) at 19:16-19.

27   [42]   3/30/11 Trial Tr., Vol. 1 (Stockton) at 21:13-16, 24:2-10; 4/5/11 Trial Tr., Vol. 5 (Allen) at 18:18-20, 19:7-19.

28

MATTEL'S OPPOSITION TO MGA'S MOTION FOR EXEMPLARY DAMAGES

"[C]ounsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended." <u>Chalmers v. City of Los Angeles</u>, 796 F.2d 1205, 1210 (9th Cir. 1986). As discussed in Mattel's opposition to MGA's copyright fee request, MGA "has not met even its most minimal burden of showing entitlement to any fees or costs" because it has redacted the work descriptions in its invoices and failed to apportion between its successful trade secret claims and lost or abandoned claims. <u>See, e.g.</u>, <u>EOS GMBH Electro Optical Sys. v. DTM Corp.</u>, 2002 WL 34536678, at *4-5 (C.D. Cal. Mar. 18, 2002) (Carter, J.); <u>Thelen Oil v. Fina Oil</u>, 962 F.2d 821, 824 (8th Cir. 1992) ("[I]t is not inappropriate to deny fees completely when the fee request is outrageously excessive and unsupported by adequate documentation."); <u>Jadwin v. County of Kern</u>, 2011 WL 240695, at *21 (E.D. Cal. Jan. 24, 2011) (disapproving of counsel's "refusal to provide a properly documented fee motion containing adequate descriptions of hours expended for specific services provided on identifiable subject matter. This includes failing to provide a functional delineation of the number of hours spent litigating this case with a description of the services performed.").

Despite its failure to support its motion with billing records, MGA's overreaching is clear. "When a cause of action for which attorney fees are provided by statute is joined with other causes of action for which attorney fees are not permitted, the prevailing party may recover only on the statutory cause of action." <u>Akins v. Enter. Rent-a-Car</u>, 79 Cal. App. 4th 1127, 1133 (2000). Claims are unrelated and require apportionment if they "are based on different facts and legal theories." <u>Harman v. City and County of San Francisco</u>, 136 Cal. App. 4th 1279, 1311 (2006). MGA's trade secret claim as to the 26 products on which MGA prevailed at trial were not factually intertwined with the many claims it either lost or abandoned. And even as to the trade secret claim MGA had only partial success; the jury rejected its claim as to the majority of the products. <u>Chavez v. City of Los Angeles</u>, 47 Cal.4th 970, 989 (2010) ("[U]nder state law as well as federal law, a reduced fee award is appropriate when a claimant achieves only limited success.").

Thus, MGA may potentially recover attorney's fees incurred in successfully asserting the 26 trade secret claims it won, but may not recover fees incurred in asserting the claims it lost: (1) trade secret claim based on 88 distinct products, (2) RICO claim, (3) wrongful injunction claim, (4) trade dress infringement claim based on trapezoidal packaging and 4-Ever Best Friends, (5) trade dress dilution claim based on trapezoidal packaging and 4-Ever Best Friends, (6) unjust enrichment claim, and (7) common law unfair competition claim. Dkt. 9600 at 162-63. Nor may MGA recover fees incurred in asserting claims it expressly abandoned or as to which it presented no evidence at trial: (1) trade dress infringement claims based on Bratz, Acceleracers, and Little Mommy and (2) statutory unfair competition claim based on 21 distinct factual bases. Dkt. 10526 at 19-21.

In these situations, California law requires (1) apportionment of attorney's fees and costs between MGA's trade secrets claim as to the 26 products and its many other lost or abandoned claims, (2) submission of detailed billing records to effectuate that apportionment, and (3) outright rejection of the fee request or a "reasonable percentage" reduction if apportionment is impossible based on deficiencies in the billing records submitted. Bell v. Vista Unified School Dist., 82 Cal. App. 4th 672, 689 (2000). Tellingly, Larian stated that MGA was seeking $1 billion in damages related to its March 2005 Complaint[43] and another $1 billion related to the August 2010 wrongful injunction claim it lost (Dkt. 8583 at 4), meaning that MGA recovered only a tiny fraction—4%—of the $2 billion it claimed to be seeking.[44]

---

[43]    TX 20321: 12/23/2006 ABC Nightline Transcript where Larian states "When we're done with Mattel, we will get them for billions of dollars, not only for this, but for defamation."

[44]    MGA argues that "hours expended on a particular claim may be proved by invoices showing the amount billed supported by a declaration" (Mot. at 32), but this is the exception, not the rule—the issue is whether the evidence presented provides substantial evidence to support the particular award. See Weber v. Langholz, 39 Cal. App. 4th 1578, 1587 (1995) ("*Although a fee request ordinarily should be documented in great detail*, it cannot be said *in this particular case* that the absence of time records and billing statements deprived the trial court of *substantial evidence to support an*
(footnote continued)

1   Despite these requirements, MGA's fees claim boils down to the proposition that
2   it should be reimbursed for every dime the Orrick and O'Melveny firms billed to the
3   separate "MGA affirmative case" matters those firms set up. See Declaration of Stephen
4   Schultz, ¶¶ 5, 6, 16. (MGA is not seeking, with this motion, reimbursement for the fees
5   the Skadden and Keller firms spent on its affirmative claims only because it is seeking
6   those fees as part of its copyright defense, even though they were incurred on MGA's
7   affirmative claims.) MGA demands fees incurred in 2005 as part of claims first asserted
8   in 2010. To describe MGA's fee claim is to rebut it.

9   Apportionment is not required when "two causes of action arose from a common
10  core of operative facts," Del Cerro Mobile Estates v. Proffer, 87 Cal. App. 4th 943, 951
11  (2001), but MGA does not even argue that its 2005 Lanham Act and unfair competition
12  claims, or its other lost and abandoned claims, arise from the same facts as its 2010 trade
13  secret claim. MGA argues no apportionment is required because it allegedly was by
14  "pursuing its affirmative claims in CV-05-2727" that "MGA discover[ed] that Mattel
15  had misappropriated trade secrets." Mot. at 32. But MGA cites no authority for the
16  proposition that some sort of reverse fruit of the poisonous tree rule applies to fee
17  apportionment. It is the commonality—or here, lack thereof—of the underlying facts
18  that controls. Because MGA's 2005 claims implicate different facts than its 2010 trade

19  award") (emphasis added). In the apportionment context, detailed billing records are
    necessary to support the award. Bell, 82 Cal. App. at 689. One case cited by MGA
20  notes that the fee motion was supported by both billing records and a declaration, not a
    declaration in lieu of billing records. See Eldorado Stone LLC v. Renaissance Stone,
21  2007 WL 3308099, at *5 (S.D. Cal. Oct. 24, 2007) ("Plaintiffs have the burden of
    submitting evidence supporting the hours worked and the rates claimed. Plaintiffs have
22  met that burden by submitting contemporaneous billing records and summarizing how
    the hours billed applied to each claim through the declaration of counsel with personal
23  knowledge of the case."). The other case cited by MGA holds that while not "absolutely
    necessary" in every case, the Ninth Circuit has a "preference" for contemporaneous
24  billing records. Fischer v. SJB-P.D. Inc., 214 F.3d 1115, 1121 (9th Cir. 2000). See
    Entm't Research Group, Inc. v. Genesis Creative Group, Inc., 122 F.3d 1211, 1231 (9th
25  Cir. 1997) (district court abused discretion by concluding that summaries submitted
    with attorney declaration were sufficient; "we believe that the district court erred in not
26  requiring Genesis to submit its original time records and billing statements so that
    ERG—and the district court—could determine whether the fees being claimed were truly
27  for time spent in defending against the [copyright] claims.") (emphasis added).

28

1   secret claims, the Court should not award O'Melveny's fees—which MGA itself has
2   described as excessive and false[45]—at all. Schultz Dec., ¶ 5, 6, 16. And MGA's utter
3   failure to attempt to apportion its fees and support its claim mandates that the rest of its
4   fee claim be substantially reduced.

5       The Court has ordered MGA to submit unredacted billing records to the Discovery
6   Master. As discussed in Mattel's copyright fees response, Mattel should be given an
7   opportunity to challenge both the apportionment and the reasonableness of the requested
8   fees by reviewing MGA's detailed work descriptions. See, e.g., United States v.
9   $1,379,879.09 Seized From Bank of America, 374 Fed. App'x 709, 711 (9th Cir. 2010)
10  ("[W]e vacate the fee award and remand for further proceedings. On remand, the
11  government must have access to the billing records underlying the fee request, including
12  the specific descriptions of services rendered; the records should be redacted only to the
13  extent absolutely necessary to protect information covered by the attorney-client
14  privilege or the work-product doctrine. The government then must have an opportunity
15  to object to the fee request."); Gorman v. Tassajara Dev. Corp., 178 Cal. App. 4th 44,
16  101 (2009) (reduced attorneys fees award justified, inter alia, where "opposing party has
17  stated valid objections"). If the Court determines that any fee award is justified, Mattel
18  should be entitled to review the records submitted to the Discovery Master, subject only
19  to strict privilege redaction, and given the opportunity to brief before the Discovery
20  Master or this Court the specifics of its challenges, which MGA's approach has
21  prevented it from doing here.

22

23

---

24  [45]    As discussed in the response to MGA's copyright fees motion, MGA is demanding, in its fee application, that Mattel pay fees billed by O'Melveny that MGA
25  itself alleges were the product of "improper[] staffing," "egregious overbilling," "inefficiencies by virtue of a lack of direction, oversight, coordination and review,"
26  "fraudulent[] overbilling," and so on – MGA demands, in short, that Mattel pay fees MGA itself need not pay. The law does not require this. Copeland v. Marshall, 641
27  F.2d 880, 891 (D.C. Cir. 1980) ("Hours that are not properly billed to one's client are not properly billed to one's adversary.").

28

MATTEL'S OPPOSITION TO MGA'S MOTION FOR EXEMPLARY DAMAGES

1

**Conclusion**

2        For all these reasons, Mattel requests that the Court deny MGA's motion for

3  exemplary damages and fees.

4

5  DATED:  May 12, 2011           QUINN EMANUEL URQUHART &

6                           SULLIVAN, LLP

7

8                  By _____

9                    John B. Quinn

                  Attorneys for Mattel, Inc., and Mattel de

10                    Mexico, S.A. de C.V.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28