**SCHEPER KIM & HARRIS LLP**
DAVID C. SCHEPER (State Bar No. 120174)
dscheper@scheperkim.com
ALEXANDER H. COTE (State Bar No. 211558)
acote@scheperkim.com
601 W. Fifth Street, 12th Floor
Los Angeles, CA 90071
Telephone:   (213) 613-4655
Facsimile:    (213) 613-4656

**LAW OFFICES OF MARK E. OVERLAND**
MARK E. OVERLAND (State Bar No. 38375)
mark@overlaw.net
100 Wilshire Blvd., Suite 950
Santa Monica, CA 90401
Telephone: (310) 459-2830
Facsimile: (310) 459-4621

Attorneys for Carlos Gustavo Machado Gomez

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| CARTER BRYANT, | **CASE NO. CV 04-9049 DOC (RNBx)** |
| Plaintiff, | **Consolidated with CV 04-9059 and CV 05-2727** |
| v. | **GUSTAVO MACHADO'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS MOTION FOR ATTORNEYS' FEES PURSUANT TO CAL. CIV. CODE § 3426.4** |
| MATTEL, INC, | |
| Defendant. | |
| AND CONSOLIDATED CASES | **Date**:   May 24, 2011<br>**Time**:   9:00 AM<br>**Crtrm**: Honorable David O. Carter |
| | **Trial:**   January 18, 2011 |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................... 1

II.  LEGAL ANALYSIS .................................................................................. 1

    A.  Plaintiffs' Untimely Claim Was Brought in Bad Faith Even Though It Survived Summary Judgment ................................................ 1

    B.  Plaintiffs' Other Arguments Regarding Timeliness Are Meritless ........ 3

        1.  Purported Waiver of Borrowing Statute ................................... 3

        2.  Purported Inducement by Larian .............................................. 4

        3.  Purported Ownership By A California Company ....................... 4

        4.  Purported Obligations Owed to A California Company ............. 5

        5.  Purported Stay Never Occurred ................................................ 5

    C.  Plaintiffs Had No Basis For Seeking Monetary Relief ......................... 6

        1.  Plaintiffs' Damages Expert Testified Plaintiffs Were Not Entitled To Any Monetary Relief From Mr. Machado ............... 6

        2.  Plaintiffs Never Presented Any Evidence of Trade Secrets Use, a Prerequisite for Recovery of Monetary Relief ................. 8

        3.  Plaintiffs' Pursuit of a Multimillion Dollar Damages Award Was Motivated by Subjective Bad Faith ....................... 10

    D.  The POS Data Was Not A Trade Secret ............................................. 10

    E.  W Hotel Presentation Was Not A Trade Secret .................................. 11

    F.  MVR Was Never Misappropriated ..................................................... 12

    G.  Plaintiffs Manipulated Evidence to Avoid Summary Judgment ......... 13

III.  THE CLAIMED FEES ARE REASONABLE IN LIGHT OF THE SERIOUSNESS AND SCOPE OF THE CLAIM ......................................... 15

    A.  No Apportionment Is Required Because The Claims Shared Common Issues .................................................................................. 16

    B.  Counsel's Attendance At Trial Was Reasonable ................................ 17

    C.  Counsel's Monitoring of the Case Was Reasonable ........................... 19

IV.  CONCLUSION ....................................................................................... 19

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Bose Corp. v. Consumers Union of United States, Inc.*,
   466 U.S. 485 (1984) ........................................................................9

*Bourns, Inc. v. Raychem Corp.*,
   331 F.3d 704 (9th Cir. 2003) .........................................................8

*CRST Van Expedited, Inc. v. Werner Enters.*,
   479 F.3d 1099 (9th Cir. 2007) .....................................................14

*Hatfield v. Halifax PLC*,
   564 F.3d 1177 (9th Cir. 2009) .......................................................6

*Parisco v. Towse*,
   45 F.2d 962 (2d Cir. 1930) .............................................................9

*Pixion, Inc. v. Placeware, Inc.*,
   2005 WL 3955890 (N.D. Cal. Apr. 22, 2005) ...............................2

*Showell v. C.I.R.*,
   254 F.2d 461 (9th Cir. 1958) .........................................................9

*U.S. v. Grubbs*,
   506 F.3d 434 (6th Cir. 2007) .........................................................9

## STATE CASES

*Akins v. Enterprise Rent-A-Car Co.*,
   79 Cal. App. 4th 1127 (2000) .......................................................16

*Flir Systems, Inc. v. Parrish*,
   174 Cal. App. 4th 1270 (2009) ................................................2, 14

*Bell v. Vista Unified School Dist*,
   82 Cal. App. 4th 672 (2000) ........................................................16

*Yield Dynamics, Inc. v. TEA Systems Corp.*,
   154 Cal. App. 4th 547 (2007) .......................................................16

## STATE STATUTES

Cal. Civ. 3426.1 ..............................................................................10

Cal. Civ. 3426.4 ..............................................................................19

MACHADO'S REPLY IN SUPPORT OF MOTION FOR ATTORNEYS' FEES

**STATE RULES**

CACI 4400.................................................................................................8

1

## I.     INTRODUCTION

2  As Mr. Machado's fee motion argued, Plaintiffs pursued the trade secrets

3  claim against him in bad faith. Plaintiffs knew (or should have known) that (1) the

4  claim was untimely, (2) that they had no basis for damages and (3) that the claimed

5  trade secrets were not actually secret, not actually misappropriated and/or not

6  actually used. Plaintiffs cannot dispute these points, so they offer *new* legal theories

7  that supposedly shore up their claim– but the new theories fail for lack of evidence.

8  Plaintiffs also identify new witnesses that purportedly would have testified in their

9  favor, but Plaintiffs can only speculate about the trial testimony of witnesses they

10 never called. These new theories and witnesses do not remedy the fatal flaws in

11 Plaintiffs' specious claim, but the fact that Plaintiffs are *still* presenting moving

12 targets at this late date speaks volumes.

13  With or without the new theories and new witnesses, the evidence adduced at

14 trial leads inescapably to the conclusion that Plaintiffs pursued the claim with

15 subjective bad faith. They had little interest in actually proving that Mr. Machado

16 misappropriated trade secrets. Plaintiffs only had eyes for Isaac Larian and MGA,

17 and their strategy was always to pressure Mr. Machado into testifying against those

18 other defendants, or failing that, to use the specious claim against Mr. Machado to

19 attack MGA and Larian in the "main case." From the first filing against Mr.

20 Machado to the end of trial (and beyond), Plaintiffs pursued the claim for the

21 purpose of attacking the *other* defendants – not to vindicate any purported injury

22 caused by Mr. Machado. Accordingly, Mr. Machado respectfully requests an award

23 of all fees incurred in defending against Plaintiffs' bad faith claim.

24 ## II.     LEGAL ANALYSIS

25     ### A.     <u>Plaintiffs' Untimely Claim Was Brought in Bad Faith Even</u>

26          <u>Though It Survived Summary Judgment</u>

27  Plaintiffs contend that their pursuit of a time-barred claim could not be in bad

28 faith because the claim survived summary judgment. Plaintiffs misstate the law. In

1  *Flir Systems, Inc. v. Parrish*, 174 Cal. App. 4th 1270 (2009), the court of appeal

2  affirmed a finding of bad faith where the trial "court denied a motion for summary

3  judgment, a motion *in limine*, and two nonsuit motions." *Id.* at 1282. Notably, the

4  Court reasoned: "[i]f the rule were otherwise, a trade secrets plaintiff could file

5  sham declarations to successfully oppose a summary judgment motion and

6  immunize itself from sanctions." *Id.*[1]

7      *Flir Systems'* concern with "shams" applies here. Plaintiffs evaded summary

8  judgment in part by convincing this Court that California had a strong interest in this

9  case because Mr. Machado copied files from Mattel's servers in California. (Docket

10  No. 9600 (MSJ Order) at 56:21-57:3 ("there is a genuine issue of material fact as to

11  whether the documents resided on Mattel's California servers…California may have

12  some interest in the application of its laws to this dispute if that were the case").)

13  But Plaintiffs never had such evidence.[2]

14      Although Plaintiffs presented two witnesses, Jill Nordquist and Allison

15  Willensky, to testify that three documents were kept on U.S. servers – the

16  Preliminary Line List ("PLL"), Mexico Viability Report ("MVR") and Customized

17  Guidelines – on cross-examination the witnesses agreed that all three documents

18  were routinely sent to foreign subsidiaries, including Mexico. (*See* D31 V1 P23:12-

19  26:24 (Trueba used documents "like" the PLL in Mexico); TX 6739 and D31 V1

20  P82:13-22 (MVR was sent to employees in Mexico), D31 V1 P28:7-30:20 *and* TX

---

22  [1] Plaintiffs also misstate their cited authority, *citing Pixion, Inc. v. Placeware, Inc.*,

23  2005 WL 3955890 (N.D. Cal. Apr. 22, 2005). (Opp. at 6:25-7:18, *see also* 12:7-28.)
   There, Judge Illston held that "the Court **does not agree** with Pixion that any trade

24  secret claim which survives summary judgment is, as a matter of law, brought in

25  good faith…" *Id.* (emphasis added).

26  [2] Plaintiffs claim Mr. Machado "admitted" taking documents located in California.
   (Opp. at 8:5-9.) But the cited testimony reveals that Mr. Machado knew some of the

27  files *originally* came from California, not that he copied them from there.

28

1  8864 (customized guidelines sent to Mariana Trueba in Mexico).) Nordquist and

2  another employee, Richard de Anda, also admitted that foreign employees like

3  Machado could not access Plaintiffs' computer systems in California. (*See, e.g.,* D31

4  V1 P27:8:16 (foreign employees "could not have logged into the U.S. to get them");

5  D31 V1 P31:20-24 (same); Docket No. 9600 (MSJ Order) at 56:22-27, *see also* D30

6  V2 P51:14-53:24 ("Mr. Machado . . .would only be able to have access to

7  information in Mexico that he needed to do his job").) Finally, Plaintiffs reveal in

8  their opposition that they *knew all along* that at least the MVR *was* kept in Mexico,

9  because Ricardo Ibarra – a witness Plaintiffs never called at trial – testified in

10  deposition that the MVR was kept in a binder in his office in Mexico. (Opp. at 19:2-

11  4.)

12      Plaintiffs concocted a sham argument to evade summary judgment, called

13  witnesses at trial to support that sham with testimony that fell apart on cross-

14  examination, and then refused to call other witnesses whose testimony would reveal

15  the sham. This conduct is ample evidence of bad faith.

16      **B.   Plaintiffs' Other Arguments Regarding Timeliness Are Meritless**

17           *1.   Purported Waiver of Borrowing Statute*

18      In a further effort to justify their untimely claim, Plaintiffs argue that Mr.

19  Machado waived the borrowing statute because it was not cited in the answer or pre-

20  trial conference order. (Opp. at 8:22-9:6.) Mr. Machado pled the statute of

21  limitations defense in the answer and pre-trial conference order, so Plaintiffs'

22  objection must be that he failed to cite the actual borrowing statute itself, Cal. Civ.

23  Pro. Code § 361. But this argument betrays a double standard that could not be

24  urged in good faith: Plaintiffs asserted a statute of limitations defense in at least

25  three pleadings, yet *never* cited an actual statute. (*See, e.g.,* Docket 10452 at 14:5-6

26  (Pre-Trial Conference Order states that "MGA's claims are barred in whole or in

27  part by the *applicable* statutes of limitations" without citing a single statute); Docket

28

1 No. 8928 at 13:6-7 (same in answer to counterclaims-in-reply); Docket No. 7714 at

2 25:5-6 (same in answer and counterclaims).)

### 2. *Purported Inducement by Larian*

4 In his fee motion, Mr. Machado noted that there was no evidence of

5 inducement by Larian at all, and certainly none while Larian was in California –

6 undercutting Plaintiffs' contention that the case should be governed by California

7 law. In response, Plaintiffs claim that

> Mattel presented circumstantial evidence that Larian
> induced the theft. Machado admitted that, immediately
> following his meeting with Larian, he instituted his plan to
> take Mattel documents to MGA.

11 (Opp at 9:14-17.) But this so-called "circumstantial evidence" just proves the point:

12 the only "meetings" with Larian took place in New York and Mexico, *not*

13 *California*. (*See, e.g.,* D22 V2 P66 (meeting in New York), D28 V3 P11-16

14 (meetings in New York and in Mexico City).) Plaintiffs never had any basis for

15 contending that Larian induced Machado from California, thus giving California an

16 interest in this action, because the evidence was to the contrary.

### 3. *Purported Ownership By A California Company*

18 Plaintiffs claim that they put on evidence contradicting Mr. Machado's

19 employment contract, which unambiguously stated that Mattel Servicios – a

20 Mexican corporation – owned the documents he copied. (Opp. at 10:24-11:15.) But

21 none of Plaintiffs' proffered evidence concerns *ownership*: evidence that U.S.

22 employees created the PLL or MVR does not establish that Mattel, Inc. owned those

23 documents *after* they were sent to the Mexican subsidiaries. Plaintiffs also contend

24 that "the entire purpose of Mattel Servicios was to provide services to Mattel [de]

1   Mexico." (Opp. at 11:4-5.)[3] Yet Plaintiffs presented no evidence that Mattel

2   Servicios *assigned* its ownership of the files to Mattel de Mexico as part of this

3   arrangement. And, even if one were to imagine such an assignment, it would not

4   help Plaintiffs' choice of law argument because Mattel de Mexico is *also* a Mexican

5   corporation. Plaintiffs' claim that Mattel, Inc. "owned" the files, giving California

6   an interest in this case, was specious and completely unsupported by any evidence.

### 4.   *Purported Obligations Owed to A California Company*

8   Unable to claim that Mr. Machado owed Plaintiffs any *contractual* duty (*see*

9   Docket No. 9600 (MSJ Order) at 80:14-15 ("Machado breached no contractual

10   obligations to either Mattel or Mattel Mexico because he did not enter into a valid

11   contract with either entity"), Docket No. 10417 (JMOL Order) at 13:7-12 (same)),

12   Plaintiffs argue that Mr. Machado "admitted" he owed a "legal obligation" to

13   Mattel, Inc. "not to steal" under California's trade secrets laws, which therefore

14   gave California an interest in this matter. (Opp. at 11:16-12:6.) This argument is

15   pure tautology: California law cannot be the basis for a "legal obligation" without

16   first determining that California law applies in the first place.

### 5.   *Purported Stay Never Occurred*

18   Finally, Plaintiffs repeat their contention that the claim was timely because

19   there was a "stay" that barred filing of new claims during the limitations period.

_____

21   [3] The Court knows this was *not* the "entire purpose of Mattel Servicios." Rather,
22   Mattel Servicios was created in order to evade a Mexican law requiring employers
    to share a portion of their profits with their employees. In order to avoid this law,
23   Mattel formed two subsidiaries in Mexico: Mattel de Mexico to earn the profits
24   (without any employees) and a wholly owned subsidiary, Servicios, to pay the
    employees (without any profits), thereby depriving Mr. Machado and his coworkers
25   of their rightful compensation. (*See generally* Docket No. 9431 (Machado's
26   Opposition To Mattel's Motion In Limine No. 17).) The Court excluded this
    evidence from trial, but that does not give Plaintiffs license to continually
27   misrepresent the "entire purpose of Mattel Servicios."

1   (Opp. at 13:1-16.) This remains an outright misrepresentation of the record: Judge

2   Manella stayed discovery, nothing else. Plaintiffs could not assert the contrary in

3   good faith – especially when they actually filed pleadings *during* the purported stay.

4   Nor does Plaintiffs' last-minute invocation of two New York district court decisions

5   render their argument any less specious. Mexico law governs the tolling of

6   Plaintiffs' claim – not New York law or federal law – as the Ninth Circuit made

7   abundantly clear. *See, e.g., Hatfield v. Halifax PLC*, 564 F.3d 1177, 1184 (9th Cir.

8   2009)("when a foreign jurisdiction's limitations period is found to apply, that

9   jurisdiction's tolling laws will also apply"). Plaintiffs' tolling argument was both

10  factually and legally bankrupt.

### C.   Plaintiffs Had No Basis For Seeking Monetary Relief

12          Plaintiffs ultimately sought $5.6 million in damages from Mr. Machado,

13  based on his supposed unjust enrichment from the alleged trade secrets. Plaintiffs

14  never had any basis for making this demand for at least two reasons: *first*, Plaintiffs'

15  own damages expert admitted that his theory applied only to MGA, not Mr.

16  Machado and *second*, Plaintiffs failed to offer any evidence that Mr. Machado used

17  any trade secret, a critical prerequisite to an award of monetary relief.

#### 1.   *Plaintiffs' Damages Expert Testified Plaintiffs Were Not Entitled To Any Monetary Relief From Mr. Machado*

20          Michael Wagner, Plaintiffs' damages expert, admitted that his theory of

21  damages had no application to Mr. Machado. Plaintiffs offer no rebuttal on this

22  point. Instead, recognizing that the old theory is indefensible, they invented some

23  new theories:

24  • *New Theory No. 1:* Plaintiffs claim that "Mattel presented evidence of lost

25      market share in Mexico," entitling them to damages. (Opp. at 13:24.) But

26      Wagner testified that the trade secrets had no impact on sales for either Mattel de

27      Mexico or MGA de Mexico, so lost market share cannot be a basis for trade

28      secrets damages. (D30 V1 P25:1-25.)

1  • *New Theory No. 2:* Plaintiffs claim that Mr. Machado used trade secrets to get

2  his job at MGA de Mexico, where he received a pay raise and bonuses. This is a

3  reference to the W Hotel presentation, which contained no trade secrets, as

4  Plaintiffs now admit. (*See* Part II.E below.) Moreover, Plaintiffs offered no

5  evidence that trade secret misappropriation was the *cause* of any of these

6  benefits. On the contrary, the evidence showed that Mr. Machado's base salary

7  was consistent with his increased responsibilities and title, and in fact, was only

8  half that of his contemporary at Mattel Servicios. (*See generally* TX 35378.)

9  Likewise, Mr. Machado's bonus was based solely on achieving a sales goal, and

10  Wagner admitted that the trade secrets did not increase sales. (D30 V1 P25:5-25.)

11  • *New Theory No. 3:* Plaintiffs claim that Mr. Machado received a "benefit" from

12  the trade secrets because MGA paid his legal fees. This theory is completely

13  circular: (1) Mr. Machado copied files from which he derived no unjust

14  enrichment, (2) Plaintiffs brought a suit seeking unjust enrichment even though

15  there is none, (3) MGA paid the legal fees to defend against the meritless suit, (4)

16  Plaintiffs claim that the fees in step 3 are the unjust enrichment sought in step 2.

17  Plaintiffs' new damages theories are no better than the old one. And the fact

18  that the basis for Plaintiffs' damages claim remains a moving target – even a full

19  month after verdict – perfectly illustrates their bad faith.[4]

20

21  _____

22  [4] Plaintiffs also claim that they could recover unjust enrichment from Mr. Machado

23  under a joint tortfeasor theory. (Opp. at 15:3-10.)  But Plaintiffs presented no
   evidence that MGA or MGA de Mexico actually misappropriated any documents, or

24  induced, suggested or hinted that Mr. Machado copy Mattel files. Rather, all
   evidence was to the contrary, as the jury properly found. (D28 V3 P39:2-23; Docket

25  No. 10518 (Verdict Form) at 8, *see also* Docket No. 10417 (JMOL Order) at 15:5-9

26  (the notion that "MGA Mexico used Mattel documents that concerned the American
   Market [is] a proposition for which there is no evidence in the record").)

27  Accordingly, there could be no joint tortfeasor liability.

28

### 2.     *Plaintiffs Never Presented Any Evidence of Trade Secrets Use, a Prerequisite for Recovery of Monetary Relief*

Plaintiffs offered no evidence that any MGA employee accessed any Mattel document copied by Mr. Machado, apart from a single document containing POS Data. But the POS Data are not trade secrets. (*See* Part II.D below.) The uncontroverted testimony from both Mr. Machado and Ms. Kuemmerle was that none of the other documents were even looked at, let alone used. Accordingly, Plaintiffs had no basis for seeking *damages* from Mr. Machado, because mere misappropriation without use or disclosure does not give rise to damages.

Plaintiffs respond that this is "wrong as a matter of law," because misappropriation includes mere acquisition. (Opp. at 19:16-19.) Plaintiffs attack a strawman: the point is that use or disclosure is required to recover *monetary relief* for misappropriation, as the form jury instructions make clear. *See, e.g.,* CACI 4400 ("mere acquisition of a trade secret, as distinguished from a related disclosure or use, will not result in damages and will only be relevant to injunctive relief"), *see also Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, (9th Cir. 2003)("proof that trade secrets were actually disclosed or used by the employee was **necessary** for a verdict in Raychem's favor")(emphasis added).

Consistent with this legal principle, Mattel's own witnesses agreed that the alleged trade secrets were valuable to MGA *only if* MGA *used* them:

- **Wagner** testified that "there is no value in Carter Bryant's drawings if he just sticks them in a drawer" and that they "are only valuable if they are commercially *exploited*" (D29 V2 P49:18-23)
- **Nordquist** testified that (1) price information was valuable because "a competitor … *could price your own items accordingly*" (D30 V2 P90:25-91:2), (2) margin information was valuable because "you can *use* that to determine how you can provide perhaps a more appealing retailer margin," (D30 V2 P92:21-93:3) (3) information on customized products was valuable because "it could

1   help give [a competitor] insight and possibly *give them a leg up to create*

2   *something* maybe more desirable" (D30 V2 P103)

3   • **Cavassuto** testified that POS Data was valuable (1) because "if you are a

4   competitor, *you can adjust your own strategies* . . .there *are things you can do or*

5   *increase your presence in that store*." (D29 V1 P38), (2) "[b]ecause our

6   competitor can *adjust its strategies* understanding how Mattel is doing in the

7   marketplace" (D29 V1 P49) and (3) because "competitor can *use* [it] to fashion

8   its own strategy or sales" (D29 V1 P53; *see also* D29 V1 P62 ("the value of the

9   document or the value of the information comes from how it's *used*").)

10  • **Willensky** testified that the MVR was a trade secret because it "could be *used* by

11  competitors to gain an advantage over us," *i.e.* a competitor could "*use* that

12  perhaps to plan development of future products [or] use that in developing their

13  own advertising plans." (D31 V1 P77-78) (all emphasis above added)

14  As Plaintiffs' witnesses admitted, the purported trade secrets had no value to anyone

15  unless they were used. Accordingly, absent evidence of use, Plaintiffs had no basis

16  for asking Mr. Machado to pay even a penny in monetary damages.

17      Next, Plaintiffs contend that "the jury was free to discount [Mr. Machado's]

18  denial of use." (Opp. at 20:15.) Even if the jury discounted this testimony, however,

19  Plaintiffs could not have prevailed, because they presented no affirmative evidence

20  at all. Mere disbelief of a witness is not a substitute for affirmative proof of the

21  elements of the claim. *See e.g., Bose Corp. v. Consumers Union of United States,*

22  *Inc.*, 466 U.S. 485, 512, (1984); *Showell v. C.I.R.*, 254 F.2d 461, 464 (9th Cir.

23  1958); *U.S. v. Grubbs*, 506 F.3d 434, 440 (6th Cir. 2007); *Parisco v. Towse*, 45 F.2d

24  962, 964 (2d Cir. 1930). Plaintiffs' failure to prove use meant they could not

25  establish even a *prima facie* case for damages.

26      Finally, Plaintiffs point to Pablo Vargas's deposition and claim that he would

27  have testified consistently with it at trial. (Opp. at 20:19-21:10.) But this is a red

28  herring, because Vargas *never* testified in deposition that Machado used the PLL or

the MVR, which are the only trade secrets Plaintiffs sought damages for at trial.[5]

Thus, even if Vargas had testified at trial in accordance with his deposition, Plaintiffs *still* would have no evidence of use. The claim for damages was specious.

### 3. *Plaintiffs' Pursuit of a Multimillion Dollar Damages Award Was Motivated by Subjective Bad Faith*

Plaintiffs offer no justification for seeking millions of dollars of damages from Mr. Machado in light of the foregoing fatal shortcomings in their claim. Nor can they, because Plaintiffs never cared about recovering any damages from Mr. Machado or vindicating any supposed misconduct by him. The $5.6 million sought from Mr. Machado was not significant to Mattel, Inc. and Mattel de Mexico in light of their demand for a *billion* dollars from MGA and Larian.

But $5.6 million was significant to Mr. Machado, an individual working as a part time consultant in Mexico, as Plaintiffs knew. So Plaintiffs brought enormous pressure to bear against Mr. Machado, hoping to eventually force him to testify against MGA, as they did successfully with Pablo Vargas. Or if that failed, they could use their specious claim to drag Mr. Machado in front of the jury in order to bolster the false trial narrative that MGA and Larian steal their competitors' trade secrets. Either way, Plaintiffs pursued the claim with an improper ulterior motive, and this subjective bad faith entitles Mr. Machado to a fee award.

### D. The POS Data Was Not A Trade Secret

Omar Cavassuto, Plaintiffs' sole witness on the POS Data, admitted that the retail sales information was not a trade secret because other companies – notably the retailers themselves – could obtain an economic advantage from the POS Data. *See, e.g.* Cal. Civ. 3426.1(d)(1) and D29 V1 P59:12-60:21. Because this fact was always

---

[5] Vargas claimed use of POS Data contained in a file called "FRP Walmex" (Opp. at 20:22-21:11), but POS Data is not a trade secret.

1   known to Plaintiffs, their pursuit of $5.1 million in damages from Mr. Machado

2   (ninety percent of their total damages claim) for the cost of the POS Data was

3   objectively specious.

4        When the old theory fails, invent a new theory: Plaintiffs now claim that the

5   *real* trade secrets were the "analyses" and "compilations" of the POS Data, not the

6   raw data itself. (Opp. at 16:3-22.) Predictably, the new theory is unsupported by the

7   evidence. Plaintiffs demanded $5.1 million in damages because that was the cost of

8   the raw data, not the cost of the "analyses" and "compilations." Plaintiffs presented

9   *no* evidence that the "analyses" or "compilations" cost anything to create or were

10  worth anything to anyone at all, let alone millions of dollars. The new theory is no

11  less specious than the old one, and this moving target is just a further illustration of

12  Plaintiffs' bad faith.

13       Finally, Plaintiffs offer absolutely no response to their well documented bad

14  faith tactics concerning the POS Data. Nor can they. Plaintiffs refused to produce

15  the retailer contracts governing Plaintiffs' purchase of the POS Data until ordered to

16  do so by the Court, twenty-eight days into trial. Then Plaintiffs refused to call a

17  witness to authenticate the contracts until ordered by the Court to do so. Once that

18  witness was on the stand, he admitted that the POS Data was never a trade secret in

19  the first place. Plaintiffs' desperation to conceal the retailer contracts from opposing

20  counsel, the Court and the jury was all an effort to conceal that the claim was

21  substantively meritless. This epitomizes subjective bad faith.

22       **E.    W Hotel Presentation Was Not A Trade Secret**

23       In his fees motion, Mr. Machado argued that notwithstanding their opening

24  statement, Plaintiffs never seriously pursued the claim that the W Hotel presentation

25  was a trade secret. The presentation contains information obviously acquired from

26  public sources and Plaintiffs failed to present *any* evidence of damages resulting

27  from its misappropriation.

28

1    In their opposition, Plaintiffs offer no support for their contention that the

2  presentation was a trade secret. Instead, they offer another new theory: that the

3  "primary purpose of this document – and this is undisputed – was to show that while

4  Machado and Vargas were Mattel [Servicios] employees, they blatantly copied and

5  misused Mattel information to benefit Larian and MGA." (Opp. at 17:15-18.) In

6  other words, Plaintiffs did not care whether the presentation was a trade secret or

7  not, so long as they could use it against "Larian and MGA."[6]

8    Plaintiffs harped on the W Hotel Presentation because it was the only alleged

9  Mexican "trade secret" Mr. Machado ever showed to Isaac Larian. Thus, Plaintiffs

10 could use it to insinuate that Larian steals his competitors' trade secrets. The fact

11 that the W Hotel Presentation actually contained no trade secrets, as Plaintiffs now

12 admit, did not matter, so long as the false impression fit their narrative. In light of

13 this evidence of bad faith, a fee award is appropriate.

14    **F.    MVR Was Never Misappropriated**

15    Plaintiffs admit that they presented no direct evidence at trial that the MVR

16 was misappropriated by anyone, but now claim that they offered "circumstantial

17 evidence" of misappropriation. (Opp. at 18:17.) What Plaintiffs actually offered was

18 idle speculation: the fact that "few documents would have been more valuable than"

19 the MVR does not mean that anyone misappropriated it. (Opp. at 18:20-21.)

20    Nor does TX 8147, Ms. Trueba's email requesting a copy of a viability report,

21 support the claim that Ms. Trueba asked for the MVR in order to copy it. Instead,

22 Plaintiffs' witness admitted that "people who were responsible for marketing in

23 Mexico," like Ms. Trueba, "would need this document" to do their jobs. (D31 V1

24 P82:20-22.) Moreover, Jill Nordquist, the recipient of TX 8147, actually *denied* that

25

26 [6] As they did with the POS Data, Plaintiffs attempt to redefine the trade secrets in
   the W Hotel Presentation as "analyses" of the public data. (Opp. at 18:4-6.) This

27 argument fails here for the same reasons.

28

1   Ms. Trueba's email concerned the *Mexico* report at all. She instead testified that Ms.

2   Trueba's email asked for some *other* viability report. (D31 V1 P39:17-22 ("Q.

3   Right. And there's a Mexican 2004 viability report, right? A. I presume there would

4   have been. Q. And that's what you understood Ms. Trueba to be asking for, right? A.

5   *No, that's not correct.*")(emphasis added).) Plaintiffs' proffered "circumstantial

6   evidence" was refuted by their own witnesses.

7        Plaintiffs also identify a witness they did not call, Ricardo Ibarra, and claim

8   that he would have testified that he lost *his* copy of the MVR around the time Mr.

9   Machado resigned. We can only speculate what Ibarra would have actually said at

10  trial, but even if he testified consistently with his deposition, Plaintiffs still would

11  not have any evidence that Mr. Machado or anyone else took the MVR, because

12  Ibarra did not even know *when* he lost it. (Opp. at 19:1-4; Ibarra Depo. Vol. 2 at

13  469:8-10 ("Q. When did you look for the report? A. I don't know. After sometime

14  that they left").)

15       More importantly, Plaintiffs' refusal to call Ibarra illustrates their subjective

16  bad faith. Plaintiffs claim that they did not call Ibarra because of "time constraints."

17  (Opp. at 19:1.) But these time constraints were well known to Plaintiffs before trial

18  and, if they had considered Ibarra an important witness, they could have adjusted

19  their presentation accordingly. In fact, Plaintiffs elected not to call Ibarra because

20  his testimony would reveal that Plaintiffs' choice-of-law argument was premised on

21  false information, *i.e.*, Ibarra's testimony would have shown that Mr. Machado did

22  not need to access computers in California to get the MVR, because at least one

23  copy of it was in Mexico. "Time constraints" had nothing to do with it.

24       **G.    Plaintiffs Manipulated Evidence to Avoid Summary Judgment**

25       In his fee motion, Mr. Machado showed that Plaintiffs offered Pablo Vargas a

26  complete pardon of the Mexico criminal charges – so long as he testified against

27  MGA. So Plaintiffs' lawyers drafted a declaration for Vargas' signature, which

28  claimed that he used Mattel's trade secrets while at MGA – notwithstanding that

1    Vargas had previously made at least five statements denying such use. Vargas
2    executed the declaration, and then testified consistently with the declaration at his
3    deposition – as Plaintiffs required him to do before they gave him the pardon. After
4    the deposition, Plaintiffs gave Vargas his pardon, and then they relied on the
5    deposition and declaration to fabricate a triable issue of fact and avoid summary
6    judgment. However, Plaintiffs never called Vargas as a witness at trial, knowing that
7    his bought-and-paid for testimony lacked credibility. Plaintiffs' manipulation of the
8    evidence shows subjective bad faith.

9         Plaintiffs first respond to this argument by claiming that their "negotiation
10   and agreement with Vargas are irrelevant," but this misstates the law. (Opp. at
11   21:14-18.) A plaintiff's unsavory tactics can be evidence of bad faith. *Flir Systems*,
12   174 Cal. App. 4th at 1281 (settlement tactics show bad faith), *CRST Van Expedited,*
13   *Inc. v. Werner Enters.*, 479 F.3d 1099, 111s (9th Cir. 2007)(haggling for a release
14   from defendant shows bad faith). In addition, the use of "sham" testimony on
15   summary judgment is itself evidence of bad faith. *Flir Systems,* 174 Cal. App. 4th at
16   1283. Plaintiffs offer no reason why this common-sense conclusion does not apply
17   to Vargas' coerced declaration and deposition here.

18        Next, Plaintiffs ask the Court to determine that Vargas' declaration and
19   deposition testimony (which were dictated by Plaintiffs) are the "truth," and that his
20   five prior statements (supposedly induced by MGA) were false. (Opp. at 21:19-24.)
21   But, as the Court recognized, in denying Mr. Machado's motion to exclude the
22   Vargas deposition scripted by Plaintiffs, "[t]he fact-finder, and not this Court, must
23   determine Vargas' credibility." (Docket No. 9669 at 27.) Because Plaintiffs never
24   called Vargas as a witness, they denied the fact-finder the opportunity judge his
25   credibility. More importantly, it is disingenuous for Plaintiffs to support their
26   argument that they did not doctor Vargas' deposition, with evidence from that
27   doctored deposition. The argument is a complete bootstrap: Plaintiffs rely on their
28   own fabricated version of the facts to show that those facts are not fabricated.

1    Neither "time limitations" nor the timing of Mr. Machado's testimony had

2    anything to do with Plaintiffs' failure to call Vargas as a witness. (Opp. at 22:20-

3    21.) If Plaintiffs considered Vargas an important (or credible) witness, they had

4    ample time to call him *after* they examined Mr. Machado. Instead, Plaintiffs had a

5    tactical reason for not calling Vargas: they could no longer control his testimony,

6    now that Vargas had his pardon. That is the problem with a mercenary witness: once

7    the payment is received, you can never be sure what the witness will say. But in any

8    event, speculation about Vargas' possible trial testimony cannot help Plaintiffs

9    avoid a fee award when they refused to call him in the first place.

10    Finally, Plaintiffs claim that Mr. "Machado does not now and has never

11    offered any evidence that Vargas' declaration and testimony … was false in any

12    way." (Opp. at 22:15-19.) But the record is replete with such evidence. Mr.

13    Machado and Ms. Kuemmerle unequivocally denied using any Mattel documents,

14    except for Mr. Machado's one-time look at non-trade secret POS Data. Plaintiffs

15    were aware of this testimony prior to trial, which is why they approached Vargas

16    with the pardon deal in the first place: so they could fabricate a triable issue of fact

17    and evade summary judgment. When it came time to prove their case at trial,

18    however, the jig was up: Plaintiffs refused to call Vargas, thereby abandoning their

19    *only* "evidence" of trade secrets use. This was no "sideshow," as Plaintiffs claim.

20    (Opp. at 23:2-3.) This was a tacit admission that Plaintiffs never had any basis for

21    their claim, let alone any basis for evading summary judgment.

22   **III.   THE CLAIMED FEES ARE REASONABLE IN LIGHT OF THE**

23    **SERIOUSNESS AND SCOPE OF THE CLAIM**

24    Plaintiffs make three arguments in an effort to reduce Mr. Machado's fee

25    award. First, they claim that the award should be reduced by $556,353, because Mr.

26    Machado must apportion fees between the trade secrets claim entitling him to fees

27    and the other claims which do not. (Opp. at 23:9-24:7.) Second, Plaintiffs claim that

28    Mr. Machado's fees should be reduced by another $212,300, because there was "no

1  reason" for Mr. Machado's counsel to attend every day of trial. (Opp. at 24:16-28.)

2  Third, Plaintiffs claim that Mr. Machado's fees should be reduced by $34,738

3  because counsel's review of the numerous pleadings filed in the case was

4  "unreasonable." (Opp. at 25:1-7.) None of these points has any merit, as discussed

5  below. But more importantly, Plaintiffs apparently have no dispute with the

6  remaining $455,455 in fees incurred by Mr. Machado, and therefore this amount

7  should be the minimum amount awarded by the Court.

8      A.    **No Apportionment Is Required Because The Claims Shared**

9            **Common Issues**

10         Plaintiffs complain that Mr. Machado did not apportion fees between the

11  trade secret claim and Plaintiffs' other ultimately meritless claims. However, the

12  authority cited by Plaintiffs, *Bell v. Vista Unified School Dist*, 82 Cal. App. 4th 672,

13  688-89 (2000) unambiguously holds:

14         Such fees need not be apportioned when incurred for
           representation on an issue common to both causes of
15         action in which fees are proper and those in which they are
           not. Apportionment is not required when the claims for
16         relief are so intertwined that it would be impracticable, if
           not impossible, to separate the attorney's time into
17         compensable and noncompensable units.

18  *Id.* (cites omitted). *See also Yield Dynamics, Inc. v. TEA Systems Corp.*, 154 Cal.

19  App. 4th 547, 577 (2007) ("The prevailing party is entitled to recover all expenses

20  incurred in litigating common issues between covered and uncovered claims or

21  defenses."); *Akins v. Enterprise Rent-A-Car Co.*, 79 Cal. App. 4th 1127, 1133

22  (2000)(same analysis applies where fee award is statutory).

23         Here, each of Plaintiffs' claims was based on the allegation that Mr. Machado

24  misappropriated Mattel's confidential files: (1) misappropriation was the primary

25  predicate act claimed under RICO (s*ee, e.g*., Docket No. 9600 (MSJ Order) at

26  150:10-13); (2) misappropriation was the only breach of contract alleged (*id.* at

27  80:3-9); (3) misappropriation was the only breach of fiduciary duty and breach of

28  loyalty alleged (*id.* at 76:21-22) and (4) confidential information was the only

1  property allegedly converted (*id.* at 86:13-16). Indeed, the state law tort claims were

2  so closely identified with the trade secrets claim that the Court found CUTSA

3  preempted them in their entirely. (*See generally id*.) Plaintiffs' demand for

4  apportionment of fees has no basis in fact or law and must be rejected.

5  ## B.   Counsel's Attendance At Trial Was Reasonable

6      Plaintiffs next claim that Mr. Machado's counsel acted unreasonably by

7  actually attending trial. It is unclear whether the complaint is that Mr. Machado had

8  *two* counsel in attendance or the complaint is that Mr. Machado had *any* counsel in

9  attendance, but either way, the complaint has no basis.

10      Obviously, Mr. Machado was a named defendant in the single-phase trial, and

11  it was not only reasonable for counsel to attend trial, but it would have been

12  negligence, as well as a tactical error for counsel to permit trial to proceed without

13  being present. Clearly, in not bifurcating the trial, the Court expected Mr.

14  Machado's counsel to appear for the entire trial. Moreover, contrary to Plaintiffs'

15  suggestion, Mr. Machado's counsel had no way of knowing when an issue relating

16  to Mr. Machado would be raised at trial. In fact, during many days of trial the Court

17  or the parties *did* raise issues concerning Mr. Machado even when the testimony

18  primarily concerned other matters. Plaintiffs' constant gamesmanship with their

19  anticipated witness list and binders of exhibits, which changed daily if not several

20  times a day, did nothing to alleviate this uncertainty.

21      It was also critical for Mr. Machado to be represented for an important

22  tactical reason: to convey to the jury that Mr. Machado was taking Plaintiffs' claim

23  seriously. Even Plaintiffs recognize the importance of this impression, as Mr. Quinn

24  began his substantive questioning of Mr. Eckert by asking whether there was a

25  reason why Mr. Eckert had not been attending trial. (D25 V1 P116:24-117:8.) Mr.

26  Quinn asked this question because he "wanted to dissipate, do battle with any

27  impression that [Eckert] doesn't regard this as an important matter because he hasn't

28  been here." (D25 V2 P95:2-6.) Ultimately, the Court regarded this potential

1   appearance of disinterest to be so important that it ordered both Mr. Eckert and Mr.

2   Larian to appear at all future days of trial. (D25 V3 P5:4-6:7.) Plaintiffs must

3   concede that it was just as important to "do battle with any impression that [Mr.

4   Machado] doesn't regard this as an important matter" by having *counsel* attend trial.

5       Finally, Plaintiffs conveniently ignore that Mr. Machado's counsel were

6   diligently working on other aspects of the case while attending trial, including

7   preparation for witness examinations and preparation of motions (including the

8   successful JMOL motion). Mr. Machado's counsel were not merely "sitting and

9   billing silently" as Plaintiffs disingenuously claim.[7]

10      Plaintiffs' suggestion that Mr. Machado over-staffed the case is laughable.

11  Plaintiffs initially sought $6.5 million in damages from Mr. Machado, arising out of

12  almost 70 documents purportedly containing trade secrets. (Docket 9801-3.)

13  Plaintiffs filed a 325 page exhibit list containing hundreds of potential exhibits

14  related to the claim against Mr. Machado and a forty page witness list containing

15  dozens of witnesses who might testify about Mr. Machado. (Docket Nos. 9388 and

16  9389). The massive amount of information necessary to adequately represent Mr.

17  Machado could not have been effectively marshaled by a single lawyer. The fact

18  that Plaintiffs ultimately sought damages for only a handful of alleged trade secrets,

19  introduced just a bare fraction of their potential exhibits into evidence and called

20  only a handful of witnesses that had anything to do with Mr. Machado speaks more

21  to their sandbagging tactics than to the staffing of Mr. Machado's defense. As this

22  Court has recognized, defense counsel has had to deal with Plaintiff's moving

23  targets throughout these proceedings, which consumed even more resources.

24  _____

25  [7] Plaintiffs are also incorrect in arguing that MGA's trade secret claims "had nothing
    to do with Machado" (Opp. at 24:22-24), as the evidence adduced during MGA's
26  case in chief would have been a primary component of Mr. Machado's argument on
27  his unclean hands defense.

28

C.  **Counsel's Monitoring of the Case Was Reasonable**

Finally, Plaintiffs take issue with counsel's monitoring of the numerous filings made in the case, claiming that the filings might not have related to the trade secrets case. As illustrated above, however, all filings discussing Mr. Machado had to do with the trade secrets claim, because every cause of action against Mr. Machado ultimately arose out the allegation that he misappropriated confidential information. And the only way to determine whether a filing concerned Mr. Machado, in many cases, was to actually read the filing.

Moreover, the numbers prove Plaintiffs' argument off the mark. Plaintiffs complain that Mr. Machado's spent 82.2 hours reviewing filings between September 2007 and March 2011, but during this time period Pacer reflects 9464 filings in this case. On average, then, Mr. Machado's counsel spent 0.008 hours (that is, about thirty seconds) per document reviewing these filings, many of which were hundreds of pages long. This investment of time was not "unreasonable."

IV. **CONCLUSION**

For the foregoing reasons, Mr. Machado respectfully requests that the Court award him $1,262,356 in attorney's fees pursuant to Cal. Civ. Code § 3426.4.

DATED: May 19, 2011          Respectfully submitted,

SCHEPER KIM & HARRIS LLP
ALEXANDER H. COTE

LAW OFFICES OF MARK E. OVERLAND
MARK E. OVERLAND
By:  /s/ *Alexander H. Cote*
     ALEXANDER H. COTE

*/s/ Mark E. Overland*
MARK E. OVERLAND

Attorneys for Carlos Gustavo Machado Gomez