ANNETTE L. HURST (State Bar No. 148738)
ahurst@orrick.com
WARRINGTON S. PARKER III (State Bar No. 148003)
wparker@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Telephone:  415-773-5700
Facsimile:   415-773-5759

WILLIAM A. MOLINSKI (State Bar No. 145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA  90017
Telephone:  213-629-2020
Facsimile:   213-612-2499

THOMAS S. MCCONVILLE (State Bar No. 155905)
tmcconville@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
4 Park Plaza, Suite 1600
Irvine, CA 92614-2258
Tel: (949) 567-6700/Fax: (949) 567-6710

Attorneys for MGA Parties

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS. | Case No. CV 04-9049 DOC (RNBx)<br><br>Consolidated with Case No. CV 04-9059 and Case No. CV 05-2727<br><br>**REPLY IN SUPPORT OF MGA PARTIES' MOTION FOR EXEMPLARY DAMAGES AND FEES PURSUANT TO CALIFORNIA'S UNIFORM TRADE SECRET ACT, CAL. CIV. CODE §§ 3426.3, 3426.4**<br><br>Hearing Date: May 24, 2011<br>Time: 8:00 a.m.<br>Place: Courtroom 9D<br>Trial Date: January 18, 2011<br>Judge:  Hon. David O. Carter |

1

2

## **TABLE OF CONTENTS**

3

**PAGE**:

4    INTRODUCTION ................................................................................1

5    ARGUMENT ....................................................................................4

6    I.    MATTEL'S OPPOSITION CONFIRMS THAT  MGA IS ENTITLED
      TO AN AWARD OF EXEMPLARY  DAMAGES EQUAL TO
7    TWICE ACTUAL DAMAGES. ...............................................................4

8         A.    Mattel's Conduct Is Reprehensible. ....................................5

9               1.    Mattel's Attempt To Rewrite The Record Fails........................5

10              2.    Unable To Defend Its Misconduct, Mattel Blames MGA..........7

11              3.    Mattel's Contention That Its Theft Stopped Long  Ago Is
                     Factually Dubious And Legally Irrelevant. ...............................8

12
                16              4.    The Impact Of Mattel's Theft On Third Parties Is
13                   Properly Considered In Assessing The Reprehensibility
                     Of The Acts. ...................................................................9

14
15              5.    There Is Nothing Novel About Mattel's Naked Theft Of
                     Trade Secrets Other Than The Sheer Size Of The Theft. ........10

16        B.    Mattel's Contention That An Exemplary Damages  Award Of
                Twice Actual Damages Is Excessive Is Baseless..............................12

17
18        C.    Mattel's Contention That An Exemplary Damages Award Equal
                To 7.02% Of Its Net Worth Is Unreasonable Is Just Wrong. .............17

19    II.   MATTEL'S OPPOSITION ONLY CONFIRMS THAT MGA IS
          ENTITLED TO RECOVER ITS ATTORNEYS' FEES AND  COSTS......19

20
21        A.    MGA's Efforts In Uncovering And Stopping  Mattel's Theft
                Warrant An Award Of Attorneys' Fees.............................................19

22        B.    Mattel Is Not Entitled To MGA's Unredacted Fee Invoices..............21

23        C.    MGA Need Not Apportion Its Fees Because They Were
                Incurred On Related Claims Arising From Common Facts. ..............22

24
          CONCLUSION ..............................................................................24

25

26

27

28

1

2

## TABLE OF AUTHORITIES

3

**Page(s)**

4

## CASES

5

6

*Acuson Corp. v. Aloka Co., Ltd.*,
   257 Cal. Rptr. 368 (Cal. Ct. App. 1989), *rev. denied and ordered not to be
   officially published*, 209 Cal. App. 3d 1098E (1989)........................................11

7

8

*Adams v. Murakami*,
   54 Cal. 3d 105 (1991) ...................................................................................9

9

10

*Akins v. Enterprise Rent-A-Car Co. of S. F.*,
   79 Cal. App. 4th 1127 (2000)........................................................................22

11

12

*Beliz v. W.H. McLeod & Sons Packing Co.*,
   765 F.2d 1317 (5th Cir. 1985).......................................................................13

13

14

*Bell v. Vista Unified Sch. Dist.*,
   82 Cal. App. 4th 672 (2000)..........................................................................22

15

16

*BMW of N. Am. v. Gore*,
   517 U.S. 559 (1996)...............................................................................5, 13

17

18

*Bourns Inc. v. Raychem Corp.*,
   331 F.3d 704 (9th Cir. 2008)...................................................................14, 15

19

*Bullock v. Philip Morris USA, Inc.*,
   159 Cal. App. 4th 655 (2008)........................................................................10

20

21

*Chalmers v. City of L.A.*,
   796 F.2d 1205 (9th Cir. 1986).......................................................................21

22

23

*Clark v. Chrysler Corp.*,
   436 F.3d 594 (6th Cir. 2006).......................................................................5, 6

24

25

*Copeland v. Marshall*,
   641 F.2d 880 (D.C. Cir. 1980) .....................................................................23

26

27

*Del Cerro Mobile Estates v. Proffer*,
   87 Cal. App. 4th 943 (2001)..........................................................................22

28

*Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.*,
   155 Cal. App. 3d 381 (1984).........................................................................18

1

2  *Emp. Ins. of Wausau v. Granite State Ins. Co.*,
3      330 F.3d 1214 (9th Cir. 2003) ..................................................................11

4  *Exxon Shipping Co. v. Baker*,
5      554 U.S. 471 (2008) ...................................................................................9

6  *Gorman v. Tassajara Dev. Corp.*,
7      178 Cal. App. 4th 44 (2009) ...................................................................22

8  *Grimshaw v. Ford Motor Co.*,
      119 Cal. App. 3d 757 (1981) ............................................................18, 19

9  *Hobbs v. Bateman Eichler Hill Richards, Inc.*,
10     164 Cal. App. 3d 174 (1985) ...................................................................18

11 *In re First Alliance Mortg. Co.*,
12     2003 WL 21530096 (C.D. Cal. June 16, 2003) .................................11

13 *Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.*,
14     181 F.3d 446 (3d Cir. 1999) .....................................................................8

15 *Jet Source Charter, Inc. v. Doherty*,
16     148 Cal. App. 4th 1 (2007) .....................................................................16

17 *Johnson v. Ford Motor Co.*,
      35 Cal. 4th 1191 (2005) ...........................................................................13

18
19 *Lane v. Hughes Aircraft Co.*,
      22 Cal. 4th 405 (2000) .............................................................................13

20 *Mercexchange, L.L.C. v. eBay, Inc.*,
21     275 F. Supp. 2d 695 (E. D. Va. 2003), *vacated, eBay Inc. v.*
22     *MercExchange, L.L.C.*, 547 U.S. 388 (2006) .....................................13

23 *Merrick v. Paul Revere Life Ins. Co.*,
24     500 F.3d 1007 (9th Cir. 2007) .................................................................9

25 *Mirkin v. Wasserman*,
26     5 Cal.4th 1082 (1993) ..............................................................................13

27 *Modine Co. v. Allen Group, Inc.*
      917 F.2d 538 (Fed. Cir. 1990) ................................................................13

28

1

*O2 Micro Int'l Ltd.*,
   399 F. Supp. 2d 1064, 1078 (N.D. Cal. 2005) ............................................ 12, 14

*Neal v. Farmers Ins. Exch.*,
   21 Cal. 3d 910 (1978) ........................................................................................ 9

*Nunez v. City of San Diego*,
   114 F.3d 935 (9th Cir. 1997) ........................................................................... 11

*Philip Morris USA v. Williams*,
   549 U.S. 346 (2007) ........................................................................................... 9

*Pistorius v. Prudential Ins. Co.*,
   123 Cal. App. 3d 541 (1981) ........................................................................... 18

*Roemer v. Retail Credit Co.*,
   44 Cal. App. 3d 926 (1975) ............................................................................. 18

*Rufo v. Simpson*,
   86 Cal. App. 4th 573 (2001) ............................................................................ 17

*Sornia v. El Centro Elementary Sch. Dist.*,
   285 F. App'x 337 (9th Cir. 2008) .................................................................... 18

*Stevens v. Owens-Corning Fiberglas Corp.*,
   49 Cal. App. 4th 1645 (1996) .......................................................................... 19

*Thelen Oil Co. v. Fina Oil & Chem. Co.*,
   962 F.2d 821 (8th Cir. 1992) ........................................................................... 21

*TVT Records v. Island Def Jam Music Group*,
   288 F. Supp. 2d 506 (S.D.N.Y. 2003), *rev'd*, 412 F.3d 82 (2d Cir. 2005) ........ 13

*U.S. v. $1,379,879.09 Seized From Bank of Am.*,
   374 F. App'x 709 (9th Cir. 2010) .................................................................... 22

*Vacco Indus., Inc. v. Van Den Berg*,
   5 Cal. App. 4th 34 (1992) ................................................................................ 15

*Vallbona v. Springer*,
   43 Cal. App. 4th 1525 (1996) .......................................................................... 17

*Walker v. Farmers Insurance Exchange*,
   153 Cal. App. 4th 965 (2007) ..................................................................... 15, 16

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Wysinger v. Auto. Club of S. Cal.*,
    157 Cal. App. 4th 413 (2007)...........................................................................23

**STATUTES**

Cal. Civ. Code § 3294............................................................................................9

Cal. Civ. Code § 3426.....................................................................................passim

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

Mattel's Opposition highlights that Mattel does not feel an ounce of remorse for the wrongs it committed.  In keeping with its stubborn refusal to take any responsibility for its wrongs, Mattel opens its Opposition by arguing that exemplary damages are not warranted because Mattel obtained only "sneak peek[s]," using "cheap phony business card[s]," and "[n]o one died," and "[n]o towns were lost." Opp. at 1.  This lack of remorse and this demonstrated inability to acknowledge the scope and gravity of its stealing for almost two decades confirms that an award of exemplary damages is not only appropriate, but necessary to punish Mattel for its past wrongdoing and to deter it from engaging in such blatantly illegal and wrongful conduct in the future.  Mattel holds itself out as the leading toy company in the world.  If so, it should be punished accordingly for abusing its power, thereby sending a message to the entire industry that this sort of sordid conduct simply will not be tolerated.  The Toy Monster must be tamed.

Aside from downplaying and ignoring what the evidence established, Mattel's opposition makes a number of important concessions.  First, Mattel concedes that MGA articulated the correct legal standards for assessing exemplary damages—even if Mattel draws a different (and erroneous) conclusion from their application.  Second, Mattel does not—and cannot—dispute the core facts underlying its theft of no fewer than 26 of MGA's most valued trade secrets.  Third, Mattel does not actually fully dispute that its conduct was reprehensible.  Its real argument is that it just was not "that bad" and that MGA is at fault too.

Given these concessions, Mattel is left with no choice but to attack the legality of punitive damages in the abstract, to fight arguments MGA did not make, and to downplay the reprehensibility of its wrongdoing.  Mattel tries to run from its carefully orchestrated decade-long campaign of theft and distribution of the highly confidential (and valuable) MGA product, pricing and advertising information by

calling its corporate spies' infiltration into MGA's secure showrooms merely "sneak peeks."  Mattel made these very same arguments to the jury, which rejected them expressly.  *See* Dkt. No. 10518 (Verdict Form) at 26 (Mattel guilty of willful and malicious theft of trade secrets).

Mattel flippantly argues that exemplary damages are not warranted because the MGA trade secrets it systematically stole are "just about a doll."  This glib assertion is put to the lie by Mattel's prior actions.  As this Court knows, Mattel relentlessly pursued its baseless claims for MGA's "theft" of the Bratz idea for nearly a decade, seeking a finding that the misappropriation was willful and malicious.  *See* Dkt. No. 10518 (Verdict Form) at 14.  Mattel is reported to have spent nearly $400 million of its shareholders' money on legal fees on something that is "just about a doll."  Only a month ago, Mattel's CEO explained: "it's most important for everybody to remember that we brought this litigation because of the *critical principle at stake. This is about protection of our intellectual property, which is at the very heart of the company's creative work*."  Annette Hurst Decl. ("Hurst Decl.") Ex. 3; *id.* Ex. 4 ("this has always been this *is about doing the right thing, about protecting our intellectual property*, about making sure that employees of this company know that when they create something, we will protect it and we will help them work on a collaborative environment and *keep the intellectual property here at Mattel*.")[1]

Mattel's Opposition ultimately blames MGA for being defrauded.  Mattel glibly downplays its orchestrated, corporate-endorsed systematic campaign of theft by employees because those employees "made cheap phony business cards to see products MGA was showing every retailer that asked."  Opp. at 15, *accord id.* at 1.  This argument exemplifies Mattel's lack of remorse.  First, blaming the victim in light of Mattel's systematic and carefully orchestrated plan to steal merely underscores that Mattel does not want to accept what it has done.  It wants to cast

---

[1] All emphasis is added and citations and quotations are omitted unless otherwise noted.

1

2   the blame elsewhere, as though MGA were somehow responsible for the decades of

3   stealing.  Second, whether the business cards were "cheap," they were, in Mattel's

4   words, "phony," and they were used to steal.  In short, Mattel's conduct is utterly

5   reprehensible.  *See* Section I.A, *infra*.

6       Mattel next argues that an exemplary damages award of twice actual

7   damages is excessive because the jury awarded substantial compensatory damages.

8   In other words, because Mattel is guilty of an enormous theft of trade secrets, the

9   exemplary damages award against it should be small.  Not only is this argument

10  completely illogical, it finds no support in the law.  Mattel fails to cite a single case

11  supporting its argument.  Indeed, *none* of Mattel's authorities even addresses the

12  relevant statute—Cal. Civ. Code § 3426.3—which allows for an exemplary

13  damages award of twice the actual damages where, as here, the jury has found the

14  defendant's conduct willful and malicious.  Not surprisingly, the cases applying

15  Cal. Civ. Code § 3426.3 make clear that an exemplary damages award of twice

16  actual damages is entirely appropriate and that the size of the exemplary damages

17  should not decrease as the magnitude of the wrong increases.  Any other result

18  would lead to the perverse rule that a thief is rewarded for stealing more, knowing

19  that the more he steals, the less he will be punished.  That is not and cannot be the

20  law.  *See* Section I.B, *infra*.

21      Mattel also contends that an exemplary damages award of twice actual

22  damages would exceed the maximum percentage of Mattel's net worth permitted by

23  California courts and would be "unprecedented."  Simply stated, Mattel is wrong.

24  The award sought by MGA would constitute approximately 7.02% of Mattel's net

25  worth, a figure well within the range endorsed by California courts and certainly

26  not "unprecedented."  Mattel's real issue is with the "unprecedented" dollar amount

27  of the award.  What Mattel ignores, of course, is that the only thing lacking

28  precedent here is the sheer magnitude and audacity of Mattel's corporate espionage.

MGA could not find a larger or more egregious case since California's Uniform

Trade Secret Act was enacted.  Thus, it should come as no surprise that Mattel should be hit with a large award.  Unable to dispute MGA's methodology, the determination of Mattel's net worth, or the reasonableness of the proposed damages, Mattel essentially asks, without any support, that the Court use a smaller percentage.  *See* Section I.C, *infra*.

Finally, Mattel makes three arguments against awarding MGA its attorneys' fees and costs under Cal. Civ. Code § 3426.4.  None has merit.

Mattel first argues that this Court should deny fees because MGA already received enough compensation under the damages award.  Nonsense.  The damages award MGA received only compensates MGA for the damages it suffered in having its trade secrets stolen.  The millions of dollars in fees it expended pursuing recovery of those damages are *additional* costs to MGA that would *not* otherwise be recovered if a fee award were denied.  *See* Section II.A, *infra*.

Mattel next argues that fees should be denied because MGA did not provide Mattel with unredacted copies of its invoices from attorneys.  This argument ignores that MGA submitted its unredacted invoices to the Court for *in camera* review and the authority holding that the district court is the entity best suited to make assessments about the reasonableness of fees.  *See* Section II.B, *infra*.

Mattel finally argues that fees should be denied because MGA did not apportion its claims between "winning and losing claims."  Mattel simply ignores that these claims are intertwined and it is neither practical nor required to apportion the fees on these related claims.  *See* Section II.C, *infra*.

### ARGUMENT

**I.    MATTEL'S OPPOSITION CONFIRMS THAT MGA IS ENTITLED TO AN AWARD OF EXEMPLARY DAMAGES EQUAL TO TWICE ACTUAL DAMAGES.**

Mattel agrees as to the five factors to be considered in determining the degree of reprehensibility of a defendant's conduct.  Mot. at 24-25; Opp. at 3.  However, Mattel makes much of the fact that MGA did not argue three of the five

1

2   reprehensibility factors.  Opp. at 4-5.  What this argument ignores is that these

3   factors are used generally to consider punitive damages and are not tailored to theft

4   of trade secrets.  Not surprisingly, a theft of trade secrets typically involves "purely

5   economic, not physical harm," there is unlikely to be a "health or safety issue," and

6   the victim may not be "financially vulnerable."  Yet, California nonetheless

7   *expressly* adopted Civil Code § 3426.3 to authorize exemplary damages in theft of

8   trade secret cases.  If Mattel's argument were endorsed, exemplary damages would

9   almost never be awarded in such cases as three of the five reprehensibility factors

10  would rarely be present.  That Mattel's argument is without merit is shown by the

11  cases where substantial exemplary damages were awarded in trade secret cases and

12  in those cases the courts focus on the reprehensibility of the theft of trade secrets.

13  Mot. at 26-28 (citing cases).

14          As reflected in its moving papers and as reflected below, MGA has

15  established the reprehensibility of Mattel's conduct.  *See* Mot. at 5-23.

16          **A.**     **Mattel's Conduct Is Reprehensible.**

17                  **1.**     **Mattel's Attempt To Rewrite The Record Fails.**

18          There is no viable way for Mattel to claim that exemplary damages are

19  inappropriate because its executives were unaware or that this Court should not

20  consider the fact that "repeated misconduct is more reprehensible than an individual

21  instance of malfeasance."  Mot. at 26-27 (collecting cases); Opp. at 5-6.  Mattel

22  executives knew what its Market Intelligence Department was doing.  And they

23  knew it was wrong.  *See, e.g.,* Mot. at 5-6, 11-12.  Mattel's self-serving denials of

24  executive knowledge of the spying, Opp. at 8-9, are additionally contradicted by the

25  ample evidence that the fruits of the espionage were widely distributed to those

26  same executives.  Mot. at 10-11, 14-15.  Therefore, analogizing Mattel's behavior

27  to car company executives who attempted to comport with the law or industry

28  practices fails.  Opp. at 5-6.[2]

---

[2]     Mattel relies on *BMW of N. Am. v. Gore*, 517 U.S. 559 (1996), to defend its policy

1

2      Nor should any credence be given to Mattel's claim that the behavior stopped

3   long before "it was ever adjudged unlawful." *Id.* at 7.  First, as noted below, that

4   the behavior stopped before being adjudge unlawful is irrelevant, and in any case, it

5   did not stop when Mattel claims it did.  *See* Part I, A, 3, *infra.*  Second, even if

6   Mattel is believed, the conduct occurred from 1992 to at least 2005 (13 years).

7   Third, the jury concluded based on all the testimony that the conduct continued at

8   least until 2006, despite Mattel's protestations otherwise.  Fourth, and perhaps most

9   telling, Mattel's argument implicitly depends on the view that its behavior was not

10  wrongful until such time as it was "adjudge unlawful."  And yet, witness after

11  Mattel witness admitted that the conduct was wrong; they needed no verdict to

12  make that assessment.  *See* Mot. at 12-14.  Despite knowing that its conduct was

13  wrongful, the conduct continued.

14      Further support for the reprehensibility of Mattel's conduct is evident from

15  Mattel's derision of MGA's claims in its Opposition.  Mattel stresses that "[n]o one

16  died" and that, after all, this is "just a doll."  Opp. at 1-2.  This belies Mattel's own

17  stated reasons for pursuing its claims.  Hurst Decl. Exs. 1-2, *accord* Ex. 3.[3]

18      And this downplaying of its behavior in its Opposition, just as at trial, speaks

19  of theft, but the *BMW* court expressly found that BMW *actively* sought to comply with
    state disclosure statutes regulating its conduct.  *Id.* at 579-80.  In *Clark v. Chrysler Corp.*,
20  436 F.3d 594 (6th Cir. 2006), the court found Chrysler had no reason to suspect a design
    flaw where "there is no evidence of earlier, similar accidents that might have alerted
21  Chrysler to the problem" and since industry practices imposed no duty "to conduct B-
    pillar testing, its failure to do so does not show any disrespect for the law."  *Id.* at 604-05.
22  Mattel made no such attempts to comport with the law and indeed, knew that what the
    Market Intelligence Department was doing was unethical—even illegal—and violated its
23  own Code of Conduct.  *See* Mot. at 12-13.
    [3] As noted above, this position wholly undermines Mattel's stated *raison d'être* for the
24  years of Bratz litigation.  Certainly, Mattel's shareholders would be curious to know  why
    Mattel reportedly spent $400 million of their money in legal fees in the last seven years to
25  ensure "protection of our intellectual property, which is at the very heart of the company's
    creative work" if its trade secrets are truly as inconsequential as Mattel's opposition
26  claims.  *See* Hurst Decl. Exs. 3-4, *accord* Ex. 5 ("Mattel has pursued this case as a matter
    of principle and we are very satisfied that the justice system has helped uncover the
27  wrongdoing that occurred.  While the case has been very complicated, the underlying
    principal *(sic)* has been a simple one; you shouldn't take what isn't yours."); Ex. 6 ("And I
28  have great confidence in the judicial system and the ability of the Jury to right the wrongs
    that Mattel is suffering"); Ex. 7 ("[T]his is a matter of principle, it's about writing *(sic)* a
    wrong, and I have confidence in this system and that will prevail").

1
2   volumes about Mattel's indifference to its own wrongdoing.  That Mattel "did not
3   endanger the security of MGA or the safety of its products, did not create a
4   sophisticated ID or phony password to penetrate to the deepest levels of MGA and
5   did not steal its secret sauce" trivializes Mattel's conduct and is simply not well
6   placed in any case.  Opp. at 15.  Mattel did not just obtain "sneak peeks" at MGA's
7   products.  Opp. at 1-2, 16.  And Mattel did in fact willfully and maliciously purloin
8   MGA's "secret sauce" because the information Mattel got was the formula to
9   MGA's success.  Mattel took information about the appearance, operation, intended
10  play pattern, plans to advertise on television, and FOB pricing of MGA's
11  unreleased products—invaluable information that Mattel witnesses told the jury
12  was confidential, that should not have been in Mattel hands, and that Mattel
13  distributed widely.  Mot. at 27-28; Dkt. No. 10563 (MGA Opp. to JMOL) at 8-13;
14  Dkt. No. 10518 (Verdict Form) at 26.

15          **2.      Unable To Defend Its Misconduct, Mattel Blames MGA.**

16          That Mattel continues to refuse to accept responsibility for what it has done
17  is further shown by Mattel's tack of blaming MGA.  Mattel grudgingly admits that
18  "[y]es, Mattel employees should have known that using fake business cards was
19  *unethical*," Opp. at 11 (emphasis in original), but suggests—wrongly—that "all it
20  took to get into the most 'secure' MGA showroom was a card with the name of a
21  fictitious store somewhere."  Opp. at 13-14.  Indeed, Mattel even notes that it used
22  "cheap phony business cards" to dupe MGA.  Opp. at 1, 15.  But the record showed
23  that without engaging in duplicity and lying, however rudimentary Mattel wishes to
24  portray that duplicity, Mattel employees would not have been allowed in MGA
25  showrooms.  3/22/11 Vol. 2 Tr. 51:11-17; 3/22/11 Vol. 1 Tr. 33:25-34:8.
26  Moreover, the record shows that a business card alone—regardless of the card stock
27  it was printed on—was not enough to gain admittance.  *See* TX 36028; 3/23/11 Vol.
28  3 Tr. 5:6-6:1, 6:16-21 (Villasenor).

          Mattel also attempts to dodge blame by insisting that "MGA itself collected

1   the same information about Mattel," but relies primarily on testimony about

2   information MGA obtained from retailers eager to deal.[4]  There is no evidence of

3   MGA misconduct remotely comparable to the misdeeds of the numerous Mattel

4   employees.  Mot. at 6-9, 11-12.[5]  Indeed, if it were comparable, there is no doubt

5   that this evidence would have been featured in Mattel's trade secret claim.

### 3.   Mattel's Contention That Its Theft Stopped Long Ago Is Factually Dubious And Legally Irrelevant.

Mattel insists that "the practices complained of stopped years ago."  Opp. at 6-7.  Yet, the jury saw through Mattel's repeated claims that the practice came to an end prior to some earlier date.  They heard Turetzky claim that the practice should have stopped in 2002.  3/22/11 Vol. 1 Tr. 54:2-18.  They heard Mattel claim that this was just the efforts of a rogue employee, Villasenor.  *See* Mot. at 19-20.  They heard that there was not even a real group called the Market Intelligence Department.  *Id.*  The jury rejected all of these claims because they are untrue.  *Id.*  Similarly, the testimony of Sarah Allen regarding the 2009 email, TX 9869, was inherently incredible.  The best that she could muster when put to the test of cross-examination was that she "simply passed the information on."  4/5/11 Vol. 5 Tr. 22:8-10; *see also id.* 17:17-24:22.

---

[4]   *Compare* Opp. at 14 *with* 3/24/11 Vol. 2 Tr. 68:16-23 (Larian: "Q. Do retailers sometimes choose to disclose information for their own business purposes? A. Selectively when it fits them well, yes. ...Q. So if they want to try to bargain for a lower price, they'd do that sometimes, right? A. I think that's the only time I know that they do."

[5]  The obvious disparity between Mattel's concerted espionage efforts and MGA's sporadic tips from retailers and distributors distinguish Mattel's out-of-circuit case as to punitives being reduced for "similar" behavior.  *See Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.*, 181 F.3d 446, 451-53 (3d Cir. 1999) (mutual breach of distributor agreement between the parties) (cited at Opp. at 14-15).  Nor has Mattel established that a department devoted to sneaking into competitors' showrooms was *de rigueur* in the toy industry—because it was not—and the products liability cases it cites are wholly inapposite.  Opp. at 15 (citing *Ford v. GACS*, 265 F.3d 670, 678 (8th Cir. 2001) (evidence that defendant ratchet system manufacturer employed "chain and ratchet system, which was standard in the industry" did not meet requirements of "evil motive or reckless disregard" for punitive damages finding under Missouri law); *Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1317 (5th Cir. 1995) (no industry or government requirement for use of leg guards for motorcycle riders meant insufficient evidence required for punitive damages under Mississippi law)).  Mattel's corporate theft was unique.

1

2     Setting aside issues of credibility and the evidence, even *if* the practice had

3     stopped, exemplary damages would still be appropriate.  One of the key purposes of

4     punitive damages is to punish Mattel for its *past* wrongdoing, as Mattel admits.

5     Opp. at 11 ("in measuring what it takes to deter a committed wrongdoer, past

6     wrongdoing can be considered"); *see also Adams v. Murakami*, 54 Cal. 3d 105, 110

7     (1991); *Neal v. Farmers Ins. Exch.*, 21 Cal. 3d 910, 928 n. 13 (1978); *Exxon*

8     *Shipping Co. v. Baker*, 554 U.S. 471, 492 (2008) ("[T]he consensus today is that

9     punitives are aimed not at compensation but principally at retribution and deterring

10    harmful conduct"); Cal. Civ. Code § 3294 (punitive damages intended "for the sake

11    of example and by way of punishing the defendant").

12    Given this, exemplary damages are in order.  Since every fact must be

13    construed in the light most favorable to MGA as the prevailing party, Mattel's self-

14    serving contention that it ceased its bad acts need not be credited because there is

15    ample evidence from which the Court (and a jury) could conclude that the bad acts

16    continued long after Mattel admits.  In addition, the Court need not resolve the

17    question because it is sufficient that Mattel engaged in the wrongful acts in the past

18    and punishment is proper to deter future bad acts.

19              **4.    The Impact Of Mattel's Theft On Third Parties Is Properly**
                       **Considered In Assessing The Reprehensibility Of The Acts.**
20

21    MGA established that the conduct Mattel directed at other competitors is

22    "critically relevant" to this Court's reprehensibility analysis.  Mot. at 27 (collecting

23    cases).  Mattel responds that "[a] punitive damages award that punishes a defendant

24    for harm purportedly done to third parties violates due process."  Opp. at 10-11.

25    Mattel misses the point made by the cases it cites.  A Court cannot "inflict[]

26    punishment for harm caused strangers to the litigation.  At the same time we

27    recognize that conduct that risks harm to many is likely more reprehensible than

28    conduct that risks harm to only a few. And a [factfinder] consequently may take this

      fact into account in determining reprehensibility."  *Philip Morris USA v. Williams*,

MGA'S REPLY BRIEF ISO MOTION FOR EXEMPLARY
                                              DAMAGES AND FEES PURSUANT TO CUTSA
                                              CV-04-9049 DOC (RNBX))

549 U.S. 346, 357 (2007); *accord Merrick v. Paul Revere Life Ins. Co.*, 500 F.3d 1007, 1017 (9th Cir. 2007) (jury was permitted to consider evidence of decades-long fraud against third parties "when determining the reprehensibility of the insurers' actions toward Merrick, but it could not directly punish the defendants for harm to victims other than Merrick") (cited by Mattel at Opp. at 10-11); *Bullock v. Philip Morris USA, Inc.*, 159 Cal. App. 4th 655, 692 (2008) (evidence of harm to others may be considered for the purpose of determining whether punishment warranted).

Thus, in making its reprehensibility determination, this Court may consider Mattel's schemes to fraudulently obtain not just MGA's trade secret information, but the trade secrets of Mattel's other competitors, as evidenced by admitted trial exhibits such as the "how to steal" manual, which offers Mattel employees advice on obtaining information from "manufacturers" in general, and Villasenor's resignation letter, which bluntly stated "I am writing to complain about Mattel's directives and instruction *to gather market intelligence from competitors through unlawful means*." TX 36028, TX 9484AR; *see also* TX 9593, TX 9656, TX 26546, TX 26758 (toy fair reports containing competitor information).

### 5. There Is Nothing Novel About Mattel's Naked Theft Of Trade Secrets Other Than The Sheer Size Of The Theft.

Finally, Mattel argues that punitive damages are not appropriate in cases of first impression. Mattel claims that "[t]he authority Mattel has located holds that when a manufacturer shows its products to buyers, secrecy is lost" and thus whether or not a product shown to retailers at a toy fair is secret is a novel issue. Mot. at 2, 12-13.

Yet, this argument cannot be squared with the chorus of Mattel witnesses who admitted that the conduct for which Mattel was charged and found liable was wrong. There was no mystery. The excuse that no one knew it was wrong falls flat. Everyone knew.

1

2      In addition, Mattel's basis for this extraordinary statement is a single

3  depublished California state appellate court decision more than two decades old—

4  *Acuson Corp. v. Aloka Co., Ltd.*, 257 Cal. Rptr. 368 (Cal. Ct. App. 1989), *rev.*

5  *denied and ordered not to be officially published*, 209 Cal. App. 3d 1098E (1989).

6  As Mattel's own cases make clear, although this Court "may consider unpublished

7  state decisions ... such opinions *have no precedential value*." *Emp. Ins. of Wausau*

8  *v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003) (emphasis

9  added); *accord Nunez v. City of San Diego*, 114 F.3d 935, 943 n. 4 (9th Cir. 1997).

10  A decision that cannot even be relied upon in California state court is hardly the

11  basis on which to find a novel issue of law.

12      The infirmities of its sole authority aside, Mattel wholly misstates its lone

13  case.  In *Acuson*, a manufacturer sued a competitor for misappropriation of trade

14  secrets where the defendant competitor had purchased the product containing the

15  "secrets" *on the open market*.  The court noted that "[a]t least hundreds of the

16  product have been sold since it was introduced in 1983" and, unsurprisingly, given

17  that the product was already available for purchase by any interested member of the

18  medical community and had been for years, held that plaintiff had no claim for

19  trade secret misappropriation because the product was "disclos[ed] to the world"

20  when Acuson *sold* it to the medical community, putting it into the public domain.

21  *Id.* at 374-75.  In contrast, the jury here heard testimony and saw evidence that the

22  trade secrets Mattel misappropriated concerned unreleased products not yet on the

23  market; indeed, MGA and Mattel witnesses alike told the jury that both Mattel and

24  MGA considered the unreleased products and information about those products on

25  display in its private toy fair showrooms to be confidential and took measures to

26  protect their secrecy.  Dkt. No. 10563 ( MGA Opp. to Mattel JMOL) at 4-6, 23-25.

27      Mattel can point to no authority whatsoever to support its contention that the

28  trade secret status of products shown at toy fairs is a novel issue meriting the

rejection of punitive damages.  As this Court noted in *In re First Alliance Mortg.*

MGA'S REPLY BRIEF ISO MOTION FOR EXEMPLARY
DAMAGES AND FEES PURSUANT TO CUTSA
CV-04-9049 DOC (RNBX))

*Co.*, 2003 WL 21530096, at \*10 (C. D. Cal. June 16, 2003), "[t]he rationale behind not allowing punitive damages in cases of first impression [is] that the requisite intent or willfulness required to consciously disregard another's rights cannot be present if no right or duty has been recognized."  That  rationale cannot possibly apply where 1) both parties acknowledge that the information on unreleased products at toy fairs is confidential and protected; and 2) the determination of whether information is a trade secret is governed by statute (Cal. Civ. Code § 3426 *et seq.*) and reams of case law; and 3) every Mattel witness who was asked (along with Mattel's own counsel) admitted that falsifying identification and sneaking into competitor showrooms is legally and morally wrong—even criminal.  TX 9484AR.[6]  Mattel's argument thus falls flat.

### B.   Mattel's Contention That An Exemplary Damages Award Of Twice Actual Damages Is Excessive Is Baseless.

Bereft of any real defense to the reprehensible nature of its wrongdoing, Mattel argues that MGA's requested relief would be beyond the "constitutional maximum" and that doubling the award "would produce a punitives award utterly out of proportion to the harm to the plaintiff – especially in this case."  Opp. at 4, 15.  Mattel's argument is frivolous.

Section 3426.3 expressly permits a court to award exemplary damages equal to twice actual damages.  Cal. Civ. Code § 3426.3; *see also O2 Micro Int'l Ltd. v. Monolithic Power*, 399 F. Supp. 2d 1064, 1078 (N.D. Cal. 2005) ("if willful and malicious misappropriation exists, the court has the discretion to award exemplary damages in an amount not to exceed twice any award").  No court has ever held that Section 3426.3 is unconstitutional or that an exemplary damage award of twice actual damages would be beyond the "constitutional maximum."  In addressing

---

[6]      In contrast, this Court refused to allow a claim for punitive damages to proceed in *In re First Alliance Mortgage* because "[t]he Court knows of no prior case where a secondary lender has been sued for aiding and abetting fraud" and thus "Lehman did not have any indication prior to this case that it, as a secondary lender, could violate Plaintiffs' rights."  2003 WL 21530096 at \*10.

1

2    sizeable punitive damages awards, the Supreme Court has held that "a recidivist

3    may be punished more severely than a first offender," and a "higher ratio [of

4    punitive to compensatory damages] may also be justified in cases in which the

5    injury is hard to detect[.]" *BMW*, 517 U.S. at 577, 582.  As shown below, there are

6    several instances—all involving facts far less reprehensible than those present

7    here—where courts have awarded punitive damages equal to twice actual damages.

8        Thus, despite Mattel's claimed concern about limitless punitive damages

9    awards, there *is* a benchmark that controls how much can be awarded in exemplary

10   damages for Mattel's trade secret theft: Civil Code § 3426.3.  It allows for the

11   recovery of up to twice the compensatory damages where, as here, the jury has

12   found the defendant's conduct willful and malicious.  While the statute permits this

13   Court to award zero dollars in punitive damages if so inclined, Opp. at 1, Mattel

14   does not cite a single trade secret case where a court has actually done so.[7]  Instead,

---

15   [7]    Mattel's cases standing for the proposition that an award of no punitive damages is
16   appropriate do not support Mattel's contentions here.  Opp. at 17-18.  Three decisions
     relied on by Mattel *actually call for an award of punitive damages*: *Beliz v. W.H. McLeod*
17   *& Sons Packing Co.*, 765 F.2d 1317, 1331-33 (5th Cir. 1985) (in remanding for a damages
     determination by the lower court in Farm Labor Contractor Registration Act case, court
18   noted that given the intended deterrent effect of the enhanced damages permissible under
     the Act, a purely compensatory award of $200 per plaintiff would be "manifestly
19   inadequate"); *TVT Records v. Island Def Jam Music Group*, 288 F. Supp. 2d 506, 510-11
     (S.D.N.Y. 2003)  (in a reversed willful copyright infringement, fraud by fraudulent
20   concealment and tortious interference with contractual relations case, punitive damages of
     $108 million were reduced to $29 million), *rev'd*, 412 F.3d 82 (2d Cir. 2005); *Johnson v.*
21   *Ford Motor Co.*, 35 Cal. 4th 1191, 1213 (2005) (remanding fraud by misrepresentation
     case for consideration of whether punitive damages award should be *higher* than three
22   times compensatory damages award because of fraudulent "policies and practices, and
     their scale and profitability").  Two are patent infringement, not trade secret, cases.  *See*
23   *Modine Co. v. Allen Group, Inc.*  917 F.2d 538 (Fed. Cir. 1990); *Mercexchange, L.L.C. v.*
     *eBay, Inc.*, 275 F. Supp. 2d 695 (E. D. Va. 2003), *vacated*, *eBay Inc. v. MercExchange,*
24   *L.L.C.*, 547 U.S. 388 (2006).  And Mattel distorts through selective quotation the holdings
     in its cases.  For example, in *Mirkin v. Wasserman*, 5 Cal. 4th 1082 (1993), a securities
25   fraud class action, the court explained the policy behind the federal statutory prohibition
     on punitive damages in securities cases: "actual damages, alone, represent a potentially
26   crushing liability in securities fraud cases" and "*the class action mechanism, which makes*
     *litigation affordable for individuals, tends to ensure that the securities laws will be*
27   *enforced. Because this procedural device 'allow[s] many small claims to be litigated in*
     *the same action*, the overall size of compensatory damages alone may constitute a
28   significant deterrent.'" *Id.* at 1106. (emphasis on language omitted by Mattel).  Mattel
     misleadingly omits the language explaining that the rule it relies on exists by virtue of the
     class action mechanism—wholly inapplicable here.  Similarly, Mattel omits crucial
     language in quoting Judge Brown's concurring opinion in *Lane v. Hughes Aircraft Co.*, 22

1

2  Mattel claims that there are no decisions "in which punitive damages of even $25

3  million for a trade secret misappropriation claims have been affirmed" and that the

4  award MGA seeks here, well within the confines of Section 3426.3, would "outrank

5  … even the most egregious trade secret precedents[.]"  Opp. at 1.

6        What Mattel fails to recognize is that its misconduct here has set a new bar in

7  egregious trade secret theft precedents.  The jury found that Mattel made off with

8  no fewer than **26** MGA trade secrets.  Mattel has not—because it cannot—point to a

9  trade secret suit where a jury found that literally more than a score of trade secrets

10 were stolen, and exemplary damages were *not* imposed.  Indeed, the opposite is

11 true. Double damages have been imposed under Section 3426.3 where far fewer

12 secrets were at issue.  The court in *O2 Micro International Ltd.*, 399 F. Supp. 2d

13 1064, for example, imposed punitive damages of *double* the reasonable royalty

14 awarded in keeping with the limits of Section 3426.3—and in that case, the jury

15 found only *five* of a potential 11 trade secrets were stolen, and no compensatory

16 damages were warranted.  *Id.* at 1069, 1078-80 ("O2 Micro should not be denied

17 exemplary damages because it fails to show compensatory damages, especially

18 since the UTSA explicitly authorizes exemplary damages awards of not more than

19 twice the award of a reasonable royalty or unjust enrichment damages.  Therefore,

20 the Court determines that, based on MPS' financial condition and the jury's finding

21 of willfulness and maliciousness, exemplary damages are appropriate.  The Court

22 awards $1,800,000, twice the amount of the reasonable royalty.")

23        Similarly, in *Bourns Inc. v. Raychem Corp.*, 331 F.3d 704 (9th Cir. 2008), a

24 former Raychem employee took a strategic plan and some other proprietary

25 information to a competitor, and then he and the competitor developed a competing

26

27 Cal. 4th 405, 424 (2000): "[L]arge compensatory damage *awards not based on a defendant's ill-gotten gains* have a strong deterrent and punitive effect in themselves."

28 (emphasis on language omitted by Mattel). Here, as Mattel admits (ironically immediately after selectively quoting *Lane*), the jury's compensatory award "was a measure of Mattel's alleged ill-gotten gains"—and thus the language relied on by Mattel is expressly not applicable due to the language Mattel omits.  Opp. at 17.

product with the help of other former Raychem employees with knowledge of the Raychem product. *Id.* at 706-07. The jury awarded $9 million in compensatory damages and the judge awarded another $9 million in punitives due to the "egregiousness of Bourn's malfeasance"—both awards were affirmed by the Ninth Circuit. *Id.* at 709-10; *see also Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34, 41-42, 44-45 (1992) (compensatory damages of $15,000 and punitive damages of $17,500 awarded for unfair competition, misappropriation, and breach of fiduciary duty claims where former employee took confidential information on three products to make competing products).

None of the trade secret cases cited above featured an insidious corporate campaign to steal the trade secrets of competitors, involving numerous employees and directed by executives. They arose instead, for the most part, from a lone greedy employee taking proprietary information with him to a competitor. Despite Mattel's urging to the contrary, the law is clear that even where a significantly smaller universe of culprits and trade secrets are at issue, double exemplary damages are warranted. The scope and magnitude of Mattel's wrongdoing places it well outside the norm of the cases it cites—and Mattel should be punished accordingly.

Mattel also complains that the $88.5 million in compensatory damages is deterrence and punishment enough for its conduct. Opp. at 16-18. But the cases Mattel relies on do not involve trade secret theft, and are factually wholly distinguishable from the facts and findings here. For example, Mattel cites *Walker v. Farmers Insurance Exchange*, 153 Cal. App. 4th 965 (2007), a bad faith insurance action where the court found a "relatively low level of reprehensibility"— indeed, only one of the *State Farm* factors favored plaintiffs, since the "conduct toward respondents was an isolated incident; and the harm to plaintiffs was the result of oversight and a mistake." Still, the court, noting that plaintiffs "recovered all of their economic damages, as well as attorney fees,"

nonetheless affirmed a punitive damages award of $1.5 million, equivalent to the compensatory damages award.  *Id.* at 973-74.  Mattel also cites *Jet Source Charter, Inc. v. Doherty*, 148 Cal. App. 4th 1 (2007), where an aircraft broker misrepresented the prices it paid for aircraft to its buyer in six transactions.  *Id.* at 4-7.  The court, while noting that "there are no rigid benchmarks that a punitive damages award may not surpass" in that case, and "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff," determined that a punitive damages award of *four* times the compensatory damages was excessive and remanded the case for further determination of punitive damages.  *Id.* at 9, 11-12.[8]

The fact is that Mattel engaged in a decade long campaign to steal its competitors' most valuable trade secrets and gained enormous financial advantage in doing so.  Although the $88.5 million compensatory damages award is large, it pales in comparison to the benefits that Mattel enjoyed from its wrongful conduct.

---

[8]     Mattel's cited authority in support of its "ratio" arguments are factually inapposite and do not involve trade secrets or the statutorily-permitted double damages described by Section 3426.3(c); indeed, most of Mattel's cases are not even from this Circuit.  Opp. at 4, 16 (citing *Leavey v. Unum Provident Corp.*, 295 F. App'x 255, 258-59  (9th Cir. 2008) (in bad faith insurance case, where insured demonstrated "scant evidence of repeated misconduct of the sort that injured [him]", court found "reduced punitive damages award-with a ratio of 1.5:1-was not constitutionally excessive" but noted that "[t]he Supreme Court has 'decline[d] ... to impose a bright-line ratio which a punitive damages award cannot exceed'"); *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 798 (8th Cir. 2004) (punitives in hostile work environment claim reduced where award was more than 20 times the Title VII cap for punitive damages, and more than 10 times the compensatory damages award); *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 603 (8th Cir. 2005) (punitive damages reduced from $15 million to $5 million in products liability case where $4 million was awarded in compensatory damages, noting "there is no evidence that anyone at American Tobacco intended to victimize its customers"); *Slip-N-Slide Records, Inc. v. TVT Records, LLC*, 2007 WL 3232274, at *29-30  (S. D. Fla. Oct. 31, 2007) (in tortious interference case, court noted "there is no precise mathematical formula" and affirmed reduced punitive damages award from three times the damages to a 1:1 ratio because, *inter alia*, "the conduct here was not a repeated series of actions or a pattern of conduct designed to eliminate the competition. It was, as stated earlier, largely a one-time event."); *Thomas v. iStar Fin., Inc.*, 508 F.Supp.2d 252, 262-63 (S.D.N.Y. 2007) (reduction of punitive damages from 3-4:1 ratio in Title VII race discrimination and retaliation case, noting that "there was no finding by the jury that Defendants had intentionally discriminated against Thomas or that iStar's top management, such as O'Connor, or Tretola, the ultimate decision maker with respect to the termination, were directly motivated by retaliation" and "the jury's award of punitive damages is not in line with the federal statutory caps on punitive damages")).

Indeed, MGA's expert opined that the benefits to Mattel were likely more than double what the jury awarded. *See* 4/4/2011 Vol. 3 Tr. 49:8-15 (calculating top down damages of $146 or $202 million). Moreover, Mattel has shown no remorse for what it has done, for its active concealment of the wrongdoing, or for the harm it wrought on MGA and other competitors. Under the circumstances, an award of exemplary damages equal to twice actual damages is not excessive, it's necessary.

### C.   Mattel's Contention That An Exemplary Damages Award Equal To 7.02% Of Its Net Worth Is Unreasonable Is Just Wrong.

MGA established in its Motion that under California law, an award of punitive damages should be large enough to "punish the wrongdoing" and "protect [the public] from future misconduct," but it cannot be too small such that the defendant can pay the award with "little or no discomfort" and thus an award that represents less than 10% of a company's net worth is reasonable. Mot. at 28-30 (collecting cases). It then showed that the award MGA seeks here is equal to approximately 7.02% of Mattel's net worth and therefore well within reason. *Id.*

In response, Mattel chooses to fight a straw man, arguing that the 10% of net worth rule cited by MGA is "the *maximum* allowed for the most reprehensible conduct." Opp. at 18 (emphasis in original). Since MGA is not seeking an award in excess of 10%, this entire discussion is a red herring. To the extent it matters, however, Mattel is wrong and completely misstates the law.

Although, as MGA demonstrated in its Motion, punitive damage awards generally do not exceed 10 percent of the defendant's net worth, "case law has not established any specific numerical percentage of net worth as constituting the upper permissible limit for the amount of a punitive damages award." *Vallbona v. Springer*, 43 Cal. App. 4th 1525, 1539 (1996) (punitive damages award representing nearly 24 percent of defendants' net worth was not excessive); *accord Rufo v. Simpson*, 86 Cal. App. 4th 573, 625 (2001) (affirming punitive damages exceeding defendant's net worth because "[t]here is no formula based on net worth

for determining what amount is too much" and "[t]he fundamental underlying principle is that punitive damages must not be so large they destroy the defendant"); *Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc*., 155 Cal. App. 3d 381, 390-91 (1984) (finding punitive damages award representing 17.5 percent of defendant's annualized net worth was "somewhat greater than comparable ratios contained in the reported cases" but that "we cannot say these numerical differences mandate a finding of excessiveness"); *Sornia v. El Centro Elementary Sch. Dist*., 285 F. App'x 337, 339 (9th Cir. 2008) (upholding award constituting 24% of net worth).

Turning to the <u>relevant</u> issues, Mattel offers no challenge to MGA's showing that: 1) Mattel's net worth is $2.5 billion; 2) the exemplary damages MGA seeks here constitute 7.02% of Mattel's net worth; 3) Mattel will not be destroyed or crippled by the award requested; and 4) the net worth methodology used is appropriate here.  Mot. at 29-30.  That ends the analysis.

Unable to dispute the salient points, Mattel instead gamely cites decades-old cases to claim an award reflecting a significantly smaller percentage of net worth— such as .0005% to 1%–would be "sufficient to punish and deter" but Mattel fails to demonstrate how such a miniscule reduction in net worth would cause Mattel any "discomfort" at all.[9]  Mattel also urges the Court to consider the "potential for further recoveries by third parties" as "militat[ing] strongly" against a substantial award.  Opp. at 19.  However, this exact argument was *rejected* by another decision cited by Mattel, *Grimshaw v. Ford Motor Co.*:

> We recognize the fact that multiplicity of awards may present a problem, but the mere possibility of a future award in a different case is not a ground for setting aside the award in this case. . . . If Ford should be confronted with the possibility of an award in another case for the same conduct, <u>it may raise the issue in that case</u>.  We add,

---

[9]    Yet again, Mattel fails to cite any trade secret cases to support these net worth percentage calculations—and most of its cases were decided decades ago.  Opp. at 18-19, citing, *e.g.*, *Hobbs v. Bateman Eichler Hill Richards, Inc.*, 164 Cal. App. 3d 174 (1985) (breach of fiduciary duties);  *Pistorius v. Prudential Ins. Co.*, 123 Cal. App. 3d 541 (1981) (bad faith insurance); *Grimshaw v. Ford Motor Co.*, 119 Cal. App. 3d 757 (1981) (products liability); *Roemer v. Retail Credit Co.*, 44 Cal. App. 3d 926 (1975) (libel).

1

2

3

4

5

6

> moreover, that there is no necessary unfairness should the plaintiff in this case be rewarded to a greater extent than later plaintiffs. As Professor Owen has said in response to such a charge of unfairness: "This conception ignores the enormous diligence, imagination, and financial outlay required of initial plaintiffs to uncover and to prove the flagrant misconduct of a product manufacturer. In fact, subsequent plaintiffs will often ride to favorable verdicts and settlements on the coattails of the firstcomers." That observation fits the instant case.

7

8

9

10

119 Cal. App. 3d at 812; *see also Stevens v. Owens-Corning Fiberglas Corp.*, 49 Cal. App. 4th 1645, 1661 (1996) (cited by Mattel, Opp. at 19). As Mattel offers no more than a "mere possibility" that it will be sued by another victim of the Market Intelligence Department for theft of trade secrets, this argument falls flat.

11

12

13

14

15

16

17

18

Finally, Mattel notes that "[c]ombining MGA's demands for punitive damages and fees and costs to *(sic)* the compensatory award" results in a total award of "over 17% of Mattel's net worth." Opp. at 20. But, unsurprisingly, Mattel cites no authority remotely endorsing such a "combination" as part of the net worth test for excessiveness of punitive damages. This argument is irrelevant in any event because even if one added the compensatory damages to the requested exemplary damages, the award would be only roughly 10% of Mattel's net worth, not the 17% Mattel claims.

19

20

## II.   MATTEL'S OPPOSITION ONLY CONFIRMS THAT MGA IS ENTITLED TO RECOVER ITS ATTORNEYS' FEES AND  COSTS.

21

22

23

24

In its Motion, MGA demonstrated that the jury's finding that Mattel misappropriated MGA trade secrets willfully and maliciously means MGA is entitled to attorneys' fees and court costs as authorized by Civil Code § 3426.4. In opposition, Mattel offers three responses. None has any merit.

25

26

### A.   MGA's Efforts In Uncovering And Stopping Mattel's Theft Warrant An Award Of Attorneys' Fees.

27

28

MGA established in its opening brief that but for MGA's lawsuit, Mattel's spying activities would not have ceased. Mot. at 30-32. MGA's effort in uncovering Mattel's misconduct supports the award of fees. *Id.* Mattel counters

this showing with a non-sequitur—that there is no evidence "that the misconduct stopped only because MGA sued *in August 2010*." Opp. at 21. That is not what MGA argued. To borrow a phrase from Mattel, this argument "could only be made by someone entirely unfamiliar with the record in this case." MGA's point is that the litigation with MGA, in which MGA was actively seeking discovery of Mattel's Market Intelligence Department, is what caused Mattel to cease its spying.

As Michael Moore admitted, Mattel first focused its attention on Villasenor's conduct after MGA filed "fairly broad" unfair competition claims against Mattel *in April 2005*. 3/29/11 Vol. 2 Tr. 109:16-21, 110:14-111:7. Although Moore later backpedaled from his deposition testimony that he met with Villasenor 10 times in the latter part of 2005 to talk about MGA claims, *id.* at 113:22-114:16, he still admitted that he had at least "four, maybe five substantive conversations with him" specifically about the MGA lawsuit, "potentially even talking about gathering other types of information in terms of NPD publicly-available information." *Id.* at 111:22-112:20, 115:6-8. Villasenor confirmed that he was summoned to meet with Moore about the MGA lawsuit. 3/23/11 Vol. 1 Tr. 34:5-11. Moore testified that he learned about the use of false identification and misrepresentations by Villasenor and other employees between June and December 2005 while talking to Villasenor *in connection with the MGA claims*. 3/29/11 Vol. 2 Tr. 123:3-125:18.[10] Then suddenly, in late 2005, supervisor John Louie told Villasenor he could not misrepresent himself anymore. 3/23/11 Vol. 1 Tr. 24:22-24, 27:18-25.

The timing of these events cannot be coincidental. For example, in 2002, Turetzky approached Michael Moore about the propriety of using certain methods of collecting competitive information. *See* Mot. at 5-6. But the conduct still continued, including with Turetzky's assistance. TX 9449 (Turetzky authorizes

---

[10] Moore even confirmed that he had Villasenor's counsel talk to Mattel's outside counsel because Moore thought what Villasenor had to say could impact the litigation with MGA. TX 27464; 3/29/11 Vol. 2 Tr. 121:25-123:2.

1

2   2004 reimbursement for false business cards).

3       In contrast, in the fall of 2005, Mattel admits it was investigating and

4   preparing to respond to MGA's unfair competition claims.  And, if Mattel is

5   believed, the conduct stopped in 2005.  Therefore, if Mattel is believed and the

6   conduct stopped, it stopped because of this lawsuit, not because Mattel suddenly

7   decided on its own to bring the spying to a close.

8           **B.**     **Mattel Is Not Entitled To MGA's Unredacted Fee Invoices.**

9       Mattel claims that MGA's requests for fees must be rejected because MGA

10  has not submitted "detailed time records," but Mattel also acknowledges, as it must,

11  that "[t]he Court has ordered MGA to submit unredacted billing records to the

12  Discovery Master."  Opp. at 22, 25.  Indeed, this Court's order dictates that

13  "[b]ecause the calculation of reasonable attorneys' fees—to the extent such fees are

14  deemed recoverable—will likely require the review of voluminous attorney billing

15  records, the Court directs the Special Master for Discovery, Robert C. O'Brien,

16  Esq., to conduct an initial review of the attorney billing records submitted by the

17  moving parties and prepare a Report and Recommendation to the Court in

18  connection with that review."  Dkt, No. 10547 (5/9/11 Minute Order) at 1.  This

19  procedure is in keeping with Mattel's own authority, which establishes that "[t]he

20  district court is in the best position to determine in the first instance the number of

21  hours reasonably expended in furtherance of the successful aspects of a litigation

22  and the amount which would reasonably compensate the attorney."  *Chalmers v.*

23  *City of L.A.*, 796 F.2d 1205, 1211 (9th Cir. 1986); *see also Thelen Oil Co. v. Fina*

24  *Oil & Chem. Co.*, 962 F.2d 821, 824 (8th Cir. 1992) (where party requesting fees

25  failed to separate fees by matter but submitted "a lump-sum request for over

26  $650,000 in attorney fees and costs," the court left "to the district court on remand

27  the task of sorting out what fees, if any, Fina is entitled to receive").

28      Nonetheless, Mattel insists that it has the right to "review[] MGA's detailed

    work descriptions" in order to challenge the Court's conclusions.  Opp. at 25.

MGA'S REPLY BRIEF ISO MOTION FOR EXEMPLARY
DAMAGES AND FEES PURSUANT TO CUTSA
CV-04-9049 DOC (RNBX))

1

2   Mattel points to no case suggesting that MGA is required to produce its detailed

3   billing records to Mattel.[11]  Mattel's request for further review should be denied.

4       **C.**     **MGA Need Not Apportion Its Fees Because They Were**

5            **Incurred On Related Claims Arising From Common Facts.**

6        MGA established in its Motion that it is entitled to fees for the hours required

7   to bring its affirmative claims, that those claims arose from the common assertion

8   that Mattel had stolen MGA's confidential trade secret information and included the

9   claims alleged in CV-05-2727 and thus an award for pursuit of such claims is

10  warranted without further apportionment.  Mot. at 32-33 (collecting cases).[12]

11  Mattel responds that MGA is not entitled to O'Melveny's fees "because MGA's

12  2005 claims implicate different facts than its 2010 trade secret claims."  Opp. at 24-

13  _____

14  [11]      The only case Mattel cites that is even close is *U.S. v. $1,379,879.09 Seized From Bank of Am.*, 374 F. App'x 709 (9th Cir. 2010), a one page, unpublished memorandum

15  disposition, with no analysis whatsoever, that suggests that the party opposing the fees was entitled to see "specific descriptions" only after it was improperly denied redacted

16  versions of the billing records; moreover, the court ordered production of detailed descriptions subject to privilege after its own in camera review.  *Id.* at 711.  Putting aside

17  the questionable precedential value of this unpublished order, given the lack of analysis, it is impossible to assess what arguments were being made.  Regardless, the case is plainly

18  distinguishable since it rejected an *in camera* review (which is occurring here) and since the party opposing fees did not even receive redacted invoices (which Mattel did).

19  Moreover, the policy concerns that drive withholding of attorney-client privileged communications between adversaries would be less compelling in an action against the

20  United States than it would be here, where Mattel is a business competitor who has shown every inclination to use (and misuse) information it receives.  Mattel's other case, *Gorman*

21  *v. Tassajara Dev. Corp.*, 178 Cal. App. 4th 44, 101 (2009), stands for the unremarkable proposition that "[t]he party opposing the fee award can be expected to identify the

22  particular charges it considers objectionable."  Mattel has been provided with MGA's redacted billing records, and has not shown it's entitled to something more.

23  [12]      Mattel's authority is not to the contrary. *See, e.g., Del Cerro Mobile Estates v. Proffer*, 87 Cal. App. 4th 943, 951 (2001) ("since Del Cerro's two causes of action arose

24  from a common core of operative facts, the court was not required to apportion the attorney fees incurred by Proffer between those causes of action"); *Akins v. Enterprise*

25  *Rent-A-Car Co. of S. F.*, 79 Cal. App. 4th 1127, 1133 (2000) ("[T]he joinder of causes of action should not dilute the right to attorney fees. Such fees need not be apportioned when

26  incurred for representation of an issue common to both a cause of action for which fees are permitted and one for which they are not. All expenses incurred on the common issues

27  qualify for an award. When the liability issues are so interrelated that it would have been impossible to separate them into claims for which attorney fees are properly awarded and

28  claims for which they are not, then allocation is not required."); *Bell v. Vista Unified Sch. Dist.*, 82 Cal. App. 4th 672, 687 (2000) ("Apportionment is not required when the claims for relief are so intertwined that it would be impracticable, if not impossible, to separate the attorney's time into compensable and noncompensable units") (citing *Akins*).

25.  Not so.  There is no question that O'Melveny was developing claims factually intertwined with the 2010 claims, as its discovery requests show.[13]  *See* Hurst Decl. Ex. 8 (MGA First Request for Production of Documents Request No. 31: "All DOCUMENTS REFERRING OR RELATING TO whether MATTEL had access to any exhibits, displays or show rooms containing any of MGA' s "BRATZ" lines prior to its release to the public") and Ex. 9 (MGA Fifth Request for Production of Documents Request 476: "All DOCUMENTS RELATING TO YOUR efforts, or knowledge of any efforts by any PERSONS, worldwide to monitor, "spy on" or gain knowledge of MGA's trade secrets, non-public information, non-public activities, unreleased products, and product development[.]").  Mattel dismisses MGA's argument as a "reverse fruit of the poisonous tree rule" but does not point to any cases or facts that show that MGA is not entitled to ask for fees accrued in the course of pursuing claims arising from Mattel's unlawful access to MGA trade secrets.  Opp. at 24.

The links between MGA's 2005 and 2010 claims also negate Mattel's argument that MGA is not entitled to collect fees for work on claims MGA "lost or abandoned."  Opp. at 22-23.  California law is clear that "[w]here a lawsuit consists of related claims, and the plaintiff has won substantial relief, a trial court has discretion to award all or substantially all of the plaintiff's fees even if the court did not adopt each contention raised.  To reduce the attorneys' fees of a successful party because he did not prevail on all his arguments makes it the attorney, and not the defendant, who pays the costs of enforcing the plaintiff's rights." *Wysinger v. Auto. Club of S. Cal.*, 157 Cal. App. 4th 413, 430-31 (2007) (apportionment not

---

[13]    Mattel's argument that it is not required to pay O'Melveny fees because MGA has disputed those bills, Opp. at 25 & n.45, is, at the very least, premature, given that litigation between O'Melveny and MGA on these issues is pending.  Moreover, Mattel has no authority for this argument: the *Copeland v. Marshall*, 641 F.2d 880 (D.C. Cir. 1980), decision cited by Mattel merely stands for the unremarkable proposition  that "no compensation is due for nonproductive time", such as three attorneys attending a hearing "when one would suffice," – neither the client nor the party required to pay the fee should have to pay "for the excess time."  *Id.* at 891.

1

2   required and attorney entitled to fee where attorney "obtained excellent results" and

3   the "issues in the case were common to one another and ... intertwined...." even

4   though client prevailed on some but not all causes of action).

5
### CONCLUSION

6
    For the foregoing reasons, MGA is entitled to exemplary damages equal to

7   twice the amount of damages awarded and to its fees and costs.

8
Dated: May 19, 2011                    ORRICK, HERRINGTON & SUTCLIFFE LLP

9

10                                     By: _____ */s/ William Molinski* _____
                                                William Molinski
11                                          Attorneys for MGA Parties

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MGA's Reply Brief ISO Motion For Exemplary
Damages and Fees Pursuant to CUTSA
CV-04-9049 DOC (RNBX))