QUINN EMANUEL URQUHART & SULLIVAN, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  William C. Price (Bar No. 108542)
  (williamprice@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Mattel, Inc. and Mattel de Mexico, S.A. de C.V.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MATTEL, INC., a Delaware corporation, et al., <br><br> Plaintiff, <br><br> vs. <br><br> MGA ENTERTAINMENT, INC., a California corporation, et al., <br><br> Defendant. <br><br>———————————————— <br><br> AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 DOC (RNBx) <br><br> Consolidated with <br> Case No. CV 04-09059 <br> Case No. CV 05-02727 <br><br> Hon. David O. Carter <br><br> **MATTEL'S REPLY IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW RE MGA'S CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50(B) AND ALTERNATIVE MOTION FOR REMITTITUR AND/OR NEW TRIAL** <br><br> Trial Date: January 18, 2011 |

1

# **<u>TABLE OF CONTENTS</u>**

2

<u>Page</u>

3

4 PRELIMINARY STATEMENT ........................................................................ 1

5 ARGUMENT ..................................................................................................... 2

6 I.   MATTEL MEETS THE RULE 50 STANDARD FOR JUDGMENT
     AS A MATTER OF LAW ......................................................................... 2
7
8 II.   THE COURT, AT MGA'S INSTANCE, REQUIRED PROOF OF
      LIABILITY AND DAMAGES ON A TRADE SECRET BY TRADE
      SECRET BASIS ........................................................................................ 4
9
10 III.   THE JURY'S LIABILITY FINDING HAS NO EVIDENTIARY
       BASIS ........................................................................................................ 5

11     A.   MGA Fatally Ignores the Product-By-Product Deficiencies that
           Mattel Identified .............................................................................. 5
12
13     B.   MGA Identified No Evidence Showing That Each of the 25
           Trade Secrets Was, In Fact, Secret ................................................. 6

14          1.   MGA Identified No Evidence That The 25 Products Were
               Not Disclosed to Press, Retailers and Strangers at Toy
15               Fairs ...................................................................................... 6

16          2.   Fourteen of the 25 Products Were Disclosed in MGA
               Press Releases or Articles At or Before Toy Fair ..................... 12
17
     C.   The Claim of Misappropriation of FOB Pricing Information Fails ..... 13
18
19     D.   Examined Individually, Each Of MGA's Trade Secret Claims
           Fails .................................................................................................. 15
20
     E.   The Jury's Finding Of Misappropriation Is Not Supported By
21          Evidence ........................................................................................... 23

22          1.   MGA Fails To Point To Evidence Of Mattel's
               Misappropriation By Use ..................................................... 24

23          2.   MGA Failed To Prove Misappropriation By Acquisition
               Or Disclosure ...................................................................... 27
24
25          3.   No Reasonable Juror Could Find That Mattel
               Misappropriated The "Plans To Advertise On Television"
               of at Least 12 Products For Which The Jury Found
26               Liability ................................................................................. 28

27 IV.   THE JURY'S DAMAGES AWARDS ARE NOT SUPPORTED BY
       EVIDENCE .............................................................................................. 29
28

    A.    The Jury Had No Basis To Perform Its Own Damages
          Calculations.................................................................. 30

    B.    The Jury Had No Basis To Apply "Average" Damages Amounts
          To Any of the 26 Claimed Trade Secrets ................................ 34

    C.    As MGA Admits, Mr. Malackowski's "Top Down" Approach
          Provides No Basis For the Jury's Damages Awards ...................... 37

    D.    Both the "Top Down" and "Bottom Up" Approaches Are
          Unreliable As a Matter of Law ............................................ 39

V.    MGA DOES NOT AND CANNOT ANSWER THE RELEVANT
      REMITTITUR QUESTION:  IS EACH DAMAGES AWARD
      SUPPORTED BY EVIDENCE?................................................. 41

VI.   THE MATHEMATICAL ERROR AND DUPLICATIVE AWARD
      MUST BE REMITTED ........................................................ 45

VII.  ALTERNATIVELY, THE COURT SHOULD VACATE THE
      VERDICT AND ORDER A NEW TRIAL ON THE 26 "TRADE
      SECRETS" ........................................................................ 46

CONCLUSION ................................................................... 49

1

## TABLE OF AUTHORITIES

2

**Page**

3

## Cases

4
5
Abba Rubber Co. v. Seaquist,
  235 Cal. App. 3d 1 (Cal. Ct. App. 1991)........................................................ 14

6
Alamar Biosciences, Inc. v. Difco Labs., Inc.,
  40 U.S.P.Q. 2d 1437 (E.D. Cal. 1996) .................................................. 10, 13

7
8
Am. Paper & Packaging Prods., Inc. v. Kirgan,
  183 Cal. App. 3d 1318 (1986)........................................................ 14

9
Atlantic Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,
  369 U.S. 355 (1962) ........................................................ 48

10
11
Autohaus Brugger, Inc. v. Saab Motors, Inc.,
  567 F.2d 901 (9th Cir. 1978)........................................................ 3

12
Bains LLC v. Arco Prods. Co.,
  405 F.3d 764 (9th Cir. 2005)........................................................ 48

13
14
Blanton v. Anzalone,
  813 F.2d 1574 (9th Cir. 1987)........................................................ 44

15
16
Bracco Diagnostics, Inc. v. Amersham Health, Inc.,
  627 F. Supp. 2d 384 (D. N.J. 2009) ........................................................ 39

17
Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,
  429 U.S. 477 ........................................................ 45

18
19
Carter v. D.C.,
  795 F.2d 116 (D.C. Cir. 1986) ........................................................ 41

20
Chisholm Bros. Farm Equip. Co. v. Int'l Harvester Co.,
  498 F.2d 1137 (9th Cir. 1974)........................................................ 3

21
22
Clark v. Banker,
  453 F.2d 1006 (9th Cir. 1972)........................................................ 10

23
24
Cretella v. Kuzminski,
  640 F. Supp. 2d 741 (E.D. Va. 2009)........................................................ 41, 43

25
Cytodyn, Inc. v. Amerimmune Pharmaceuticals, Inc.,
  160 Cal. App. 4th 288 (2008)........................................................ 27

26
27
Fenner v. Dependable Trucking Co.,
  716 F.2d 598 (9th Cir. 1983)........................................................ 46

28

In re First Alliance Mortg. Co.,
   471 F.3d 977 (9th Cir. 2006)..................................................................... 33

First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust,
   631 F.3d 1058 (9th Cir. 2011).................................................................... 3

Hawkins v. Sims,
   137 F.2d 66 (4th Cir. 1943)........................................................................ 3

Hemmings v. Tidyman's Inc.,
   285 F.3d 1174 (9th Cir. 2002)................................................................... 32

Hicks v. Capitol Am. Life Ins. Co.,
   943 F.2d 891 (8th Cir. 1991)..................................................................... 43

Humetrix, Inc. v. Gemplus S.C.A.,
   268 F.3d 910 (9th Cir. 2001)............................................................... 33, 34

Indu Craft, Inc. v. Bank of Baroda,
   47 F.3d 490 (2d Cir. 1995)........................................................................ 41

Johnson v. Consol. Rail Corp.,
   797 F.2d 1440 (7th Cir. 1986)................................................................... 43

Kewanee Oil Co. v. Bicron Corp.,
   416 U.S. 470 (1974).................................................................................... 7

L.A. Mem'l Coliseum Comm'n v. NFL,
   791 F.2d 1356 (9th Cir. 1986)................................................................... 41

L.A. Police Protective League v. Gates,
   907 F.2d 879 (9th Cir. 1990)..................................................................... 43

Lakeside-Scott v. Multnomah County,
   556 F.3d 797 (9th Cir. 2009)........................................................... 2, 10, 26

Landes Construction Co. v. Royal Bank of Canada,
   833 F.2d 1365 (9th Cir. 1987)................................................................ 9, 46

Language Line Services, Inc. v. Language Services Associates, LLC,
   2010 WL 2764714 (N.D. Cal. July 13, 2010)........................................... 27

Lara v. Nevitt,
   123 Cal. App. 4th 454 (2004)..................................................................... 34

Learning Curve Toys, Inc. v. Play Wood Toys, Inc.,
   342 F.3d 714 (7th Cir. 2003).................................................................... 8, 9

Masimo Corp. v. Tyco Health Care Group, L.P.,
   2006 WL 1236666 (C.D. Cal. Mar. 22, 2006)........................................... 41

00505.07975/4149500.1

-iv-

Moist Cold Refrigerator Co. v. Lou Johnson Co.,
   249 F.2d 246 (9th Cir. 1957) ................................................................ 45

Molski v. M.J. Cable, Inc.,
   481 F.3d 724 (9th Cir. 2007) ................................................................ 45

O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.,
   399 F. Supp. 2d 1064 (N.D. Cal. 2005) ................................. 33, 36, 40

PAI Corp. v. Integrated Sci. Solutions, Inc.,
   2009 WL 1106809 (N.D. Cal. Apr. 23, 2009) ....................................... 2

PMC, Inc. v. Kadisha,
   78 Cal. App. 4th 1368 (2000) ................................................................ 24

Quintana-Ruiz v. Hyundai Motor Corp.,
   303 F.3d 62 (1st Cir. 2002) ..................................................................... 4

Raynor Bros. v. Am. Cyanimid Co.,
   695 F.2d 382 (9th Cir. 1982) ................................................................ 32

Reeves v. Sanderson Plumbing Prods., Inc.,
   530 U.S. 133 (2001) ................................................................................ 3

Roy v. Volkswagen of America, Inc.,
   896 F.2d 1174 (9th Cir. 1990) ........................................................ 46, 47

Ruckelshaus v. Monsanto Co.,
   467 U.S. 986 (1984) ............................................................................... 11

Sargent Fletcher, Inc. v. Able Corp.,
   110 Cal. App. 4th 1658 (2003) .............................................................. 27

Schutzky Dist., Inc. v. Kelly,
   643 F. Supp. 57 (N.D. Cal. 1986) ........................................................ 48

Silvaco,
   184 Cal. App. 4th at 220 .................................................................. 24, 26

Spurlin v. Gen. Motors Corp.,
   528 F.2d 612 (5th Cir. 1976) ................................................................ 48

Tennant v. Peoria & Pekin Union Ry. Co.,
   321 U.S. 29 (1944) ................................................................................. 48

Tortu v. Las Vegas Metro. Police Dept.,
   556 F.3d 1075 (9th Cir. 2009) .............................................................. 47

Trademark Research Corp. v. Maxwell Online, Inc.,
   995 F.2d 326 (2d Cir. 1993) ................................................................. 43

Union Oil. Co. of Cal. v. Terrible Herbst, Inc.,
      331 F.3d 735 (9th Cir. 2003)....................................................45

Unisplay, S.A. v. Am. Elec. Sign Co., Inc.,
      69 F.3d 512 (Fed. Cir. 1995)....................................................32

United Phosophorus, Ltd. v. Midland Fumigant, Inc.,
      205 F.3d 1219 (10th Cir. 2000)................................................41

United States v. 4.0 Acres of Land,
      175 F.3d 1133 (9th Cir. 1999)..................................................32

United States v. Wood,
      943 F.2d 1048 (9th Cir. 1991)..................................................30

Wall Data Inc. v. L.A. County Sheriff's Dep't.,
      447 F.3d 769 (9th Cir. 2006)....................................................41

Willis v. Marion County Auditor's Office,
      118 F.3d 542 (7th Cir. 1997)......................................................2

Winarto v. Toshiba America Elec. Components, Inc.,
      274 F.3d 1276 (9th Cir. 2001)....................................................3

In re Wolverton Assocs.,
      909 F.2d 1286 (9th Cir. 1990)..................................................43

Woodworkers Tool Works v. Byrne,
      191 F.2d 667 (9th Cir. 1951)....................................................45

Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,
      259 F.3d 1101 (9th Cir. 2001)..................................................44

**Statutes/Rules**

Cal. .Civ. Code, § 3426.1 ...........................................................14

Cal. Civ. Code § 3426.1(d)(2) ...............................................10, 12

Fed. R. Civ. P. 50(a) & (b) ...........................................................2

**Miscellaneous**

5A Moore's Federal Practice ¶ 50.02(1) (2d Ed. 1968)............................3

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

During trial, MGA literally failed even to mention 3 of the 25 trade secrets for which it received $3.4 million in damages.  Now, in this opposition, it fails to include a word in its brief about 6 of the 25 supposed secrets:  *Wild Life Safari Collection, Bratz Virtual Buddiez Petz, Monkey See Monkey Do, Lil' Bratz Boys, Bratz Kidz, Passion for Fashion.*  There can be no dispute that Mattel is entitled to JMOL as to these six.

And MGA fares no better for the 19 secrets that it does attempt to discuss.  For each, Mattel offered a detailed list of missing elements required to prove misappropriation and justify the damages awarded by the jury.  Yet for each, MGA either ignores the deficiencies raised by Mattel or offers no plausible argument in response.  Rather, despite having long vociferously insisted that trade secret issues be addressed on a trade secret by trade secret basis, MGA does just the opposite now.  It offers speculation, untethered to the trade secrets actually at issue and unsupported by the actual evidence, about how products shown at toy fairs could be confidential and could be fruitfully misappropriated.  But speculation cannot sustain a verdict, and the jury was explicitly instructed to consider each alleged trade secret individually.  The jury also was instructed that in doing so, it could only consider the evidence introduced at trial.  As MGA's silence demonstrates, the evidence at trial does not support the findings of liability and damages entered by the jury.  MGA's post hoc efforts to change the rules at this point cannot be credited; it would constitute reversible error to let stand a judgment that can only be supported by abandoning the rules of proof that MGA insisted upon, that the jury was instructed must be met and that the verdict form given to the jury makes clear must be applied.

MGA's defense of the damages awards illustrates its flawed approach.  Mattel showed, in its motion, that there was no evidence of damages calculations as to any but two of the claimed trade secrets.  Mattel showed that the $3.4 million figure set

out in the verdict form was based – if it was based on anything – on an average of 22 specific damages calculations that are not in evidence at all and (even if they were) are damages calculations for products as to which the jury found no liability.  Mattel showed that the only "evidence" of damages going beyond the two products Mr. Malackowski testified to was a chart that was not admitted into evidence, and Mattel showed that Mr. Malackowski affirmatively disclaimed damages as to five products for which the jury awarded them.  MGA rebuts none of this and ignores most of it. Its answer—that the jury could have performed its own damages calculations based on Mr. Larian's or Mr. Turetsky's testimony, or could have accepted a damages average that assumed liability as to products where there was none—is no answer at all.  MGA's trade secret claims were defective; no evidence supports the verdicts. Mattel is entitled to judgment as a matter of law.

### Argument

## I.   MATTEL MEETS THE RULE 50 STANDARD FOR JUDGMENT AS A MATTER OF LAW

A court may grant a motion for judgment as a matter of law "against a party on a claim or issue where the party has been 'fully heard on [that] issue during a jury trial' and the court finds that a 'reasonable jury would not have a legally sufficient evidentiary basis' to find for that party."  PAI Corp. v. Integrated Sci. Solutions, Inc., 2009 WL 1106809, at * 4 (N.D. Cal. Apr. 23, 2009) (quoting Fed. R. Civ. P. 50(a) & (b)).  MGA argues that "[i]n assessing Mattel's request for judgment as a matter of law, this Court must view the evidence in the light most favorable to MGA and draw all reasonable inferences in MGA's favor."  Opp. at 21.  MGA is wrong.  Under the law of this circuit, the evidence determines the application of this rule.  A "reasonable inference" in favor of a verdict "cannot be supported by only threadbare conclusory statements instead of significant probative evidence." Lakeside-Scott v. Multnomah County, 556 F.3d 797, 802 (9th Cir. 2009); Willis v.

1  Marion County Auditor's Office, 118 F.3d 542, 545 (7th Cir. 1997) ("[a] mere
2  scintilla is not enough" to sustain a verdict for the prevailing party).

3      "When considering the propriety of the grant or denial of a motion for
4  judgment n.o.v. or a directed verdict, the correct standard is [] whether or not,
5  viewing the evidence as a whole, there is *substantial* evidence present that could
6  support a finding, by reasonable jurors, for the nonmoving party." Autohaus
7  Brugger, Inc. v. Saab Motors, Inc.,  567 F.2d 901, 909 (9th Cir. 1978) (reversing
8  district court's denial of defendant's post-trial motion for j.n.o.v.) (quotations
9  omitted, emphasis added). "Substantial evidence is more than a mere scintilla." Id.
10 (quotations omitted).   "A motion for directed verdict should be granted 'where there
11 is no substantial (or 'believable') evidence to support' any other verdict." Id. at 910
12 citing Hawkins v. Sims, 137 F.2d 66, 67 (4th Cir. 1943); 5A Moore's Federal
13 Practice ¶ 50.02(1) (2d Ed. 1968)); see also Chisholm Bros. Farm Equip. Co. v. Int'l
14 Harvester Co., 498 F.2d 1137, 1139-40 (9th Cir. 1974) (affirming district court's
15 grant of defendant's motion for a directed verdict and holding that "if [plaintiff] . . .
16 does not present enough evidence within his case-in-chief to support a reasonable
17 finding in his favor, a district court has a duty to direct a verdict in favor of the
18 opposing party.").

19     MGA cites First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust, 631 F.3d 1058,
20 1067-68 (9th Cir. 2011) to argue that the "verdict must be upheld even if it is
21 possible to draw a contrary conclusion."  Opp. at 21.  MGA fails to mention,
22 however, that the First National court directed that the jury's verdict must be
23 "supported by *substantial* evidence" in order to be upheld.  Id. at 1067 (emphasis
24 added).  MGA also argues that the Court must disregard evidence favorable to
25 Mattel that the jury is not required to believe and may not make credibility
26 determinations or weigh the evidence.  Opp. at 21 (citing Reeves v. Sanderson
27 Plumbing Prods., Inc., 530 U.S. 133, 150 (2001), and Winarto v. Toshiba America
28 Elec. Components, Inc.,  274 F.3d 1276, 1294 (9th Cir. 2001)).  But the Supreme

1  Court cautioned in <u>Reeves</u> against overstating the JMOL threshold, explaining that

2  "the court should give credence to the evidence favoring the non movant as well as

3  that evidence supporting the moving party that is uncontradicted and unimpeached,

4  at least to the extent that that evidence comes from disinterested witnesses." <u>Id.</u> at

5  151 (quotations omitted).  "A jury is not 'at liberty, under the guise of passing upon

6  the credibility of a witness, to disregard his testimony, when from no reasonable

7  point of view is it open to doubt.'  <u>Quintana-Ruiz v. Hyundai Motor Corp.</u>, 303 F.3d

8  62, 75 (1st Cir. 2002) (reversing verdict for the plaintiff in an automobile collision,

9  and finding that the jury had no rational basis to doubt the credibility of the

10  defendant's expert witness) (quoting <u>Chesapeake & O. Ry. Co. v. Martin</u>, 283 U.S.

11  209, 216 (1931)).

12  **II.    THE COURT, AT MGA'S INSTANCE, REQUIRED PROOF OF**

13       **LIABILITY AND DAMAGES ON A TRADE SECRET BY TRADE**

14       **SECRET BASIS**

15       MGA was required to prove every element of its trade secret misappropriation

16  claim with respect to each alleged trade secret.  The instructions and the verdict

17  form required the jury to identify for each alleged MGA trade secret whether MGA

18  had proven (1) it was a trade secret, (2) Mattel misappropriated it; (3) Mattel used

19  improper means to acquire the claimed trade secret; and (4) the amount of damages,

20  if any, MGA is owed from Mattel for the misappropriation.[1]  MGA argued for this

21  level of specificity with respect to the parties' trade secret claims,[2]  because it would

22  be  "silly" *not* to require each trade secret to be identified with particularity:

23       "one, how could you figure out whether [the trade secret] was secret?  Two,

24       how could you figure out whether it had economic value?  Three, how could

25

26

27  [1]   Dkt. No. 10493 (Jury Instructions, dated April 21, 2011) at Instruction Nos. 1, 79; Dkt. No. 10518 (Verdict Form, dated April 20, 2011) at 16.
    [2]   2/19/11 Trial Hearing Vol. 2 (Jury Instructions) at 4:17-7:8.

28

1   you figure out whether it was taken or not?  Four, how could you figure out

2      whether there was any causational harm or unjust enrichment?"[3]

3   The Court agreed,[4] recognizing that any other rule would make it impossible to

4   correct errors with respect to a claim without "attacking the heart of the case."[5]

5   **III.   THE JURY'S LIABILITY FINDING HAS NO EVIDENTIARY BASIS**

6         **A.   MGA Fatally Ignores the Product-By-Product Deficiencies that**

7              **Mattel Identified**

8        For each of the 25 alleged trade secrets, Mattel identified required elements of

9   proof that were either supported by no evidence or where the only evidence favored

10  Mattel.   Motion at 54-93.   MGA ignores Mattel's showing.   MGA's 63-page

11  opposition does not mention six of the 25 products *at all*: Wild Life Safari

12  Collection, Bratz Virtual Buddiez Petz, Monkey See Monkey Do, Lil' Bratz Boys,

13  Bratz Kidz, Passion for Fashion.   As to those, judgment should be entered for

14  Mattel.  See Motion at 73-74, 76-77, 84-86, 89-93 (discussing specific deficiencies

15  as to each of the listed products).  Nor does MGA join issue with respect to the other

16  19 products.   It makes no effort to meaningfully address the numerous, specific

17  evidentiary holes that Mattel identified, at most mentioning them in passing.   Its

18  failure to address the individual elements of these claims dooms them.

19        MGA almost certainly knows that, but it has no choice but to paint with the

20  broadest brush.   MGA never introduced evidence sufficient to support liability for

21  each of the individual secrets.   If the jury accepted Isaac Larian's claim that

22  "everything" was confidential, they would have found that all 114 MGA products

23  were trade secrets.   Instead, they necessarily rejected Larian's sweeping assertion

24  and, following this Court's instruction, considered the claims trade secret by trade

25  secret, finding that only 26 of MGA's claims (two of which were in fact based on the

---

[3]  Id.
[4]  Id.
[5]  02/19/2011 Trial Tr. Vol. 1 (Jury Instructions) at 15:5-16:3.

same product) were misappropriated trade secrets.[6]  Just as the jury did, the Court must examine each trade secret individually to determine if the verdict as to the 25 has a legally sufficient evidentiary basis.

### B.   MGA Identified No Evidence Showing That Each of the 25 Trade Secrets Was, In Fact, Secret[7]

#### 1.   MGA Identified No Evidence That The 25 Products Were Not Disclosed to Press, Retailers and Strangers at Toy Fairs

While rejecting the bulk of MGA's claims, the jury found that products were misappropriated from the New York Toy Fair in 2001-2004 and 2006 and the Nuremburg Toy Fair in 2005.[8]  As to those toy fairs, MGA offered no evidence of steps to keep the 25 products secret, and its assertions to the contrary evidence this default.

First, MGA claims that it limited access to portions of its showrooms (Opp. at 23), but identifies no evidence that it placed any of the 25 products in limited access areas during those toy fairs.

Second, MGA emphasized that it had guards, receptionists and escorts at toy fairs (though MGA pointed to no evidence that it had them at any of the actually relevant fairs).  Opp. at 23.  What evidence there is establishes that the guards and receptionists admitted press and people they didn't know at all into MGA showrooms, where they were escorted and guided through MGA products by MGA personnel.[9]

Third, MGA claims it monitored what information the press accessed.  Opp. at 25.  Either a product is secret or it isn't.  Disclosure *just* to the press—which

---

[6]  Dkt. No. 10518 at 16-25.
[7]  And, as detailed in Mattel's Motion, the jury heard ample evidence, including from MGA's own personnel and wetnesses, directly contradicting MGA's broad assertions that everything in MGA's showroom was secret.  Motion at 8:18-12:19.
[8]  Dkt. No. 10518 at 16-25; Motion at 54-93.
[9]  4/6/11 Trial Tr. Vol. 2 (Saunders) at 52:15-53:4.

1   MGA unquestionably did with most of these 25 products—is still *disclosure* that

2   defeats any claim of secrecy.  Mot. at 10.

3          Fourth, MGA claims that sign-in sheets and non-disclosure agreements were

4   required.  Opp. at 23.  But MGA introduced no sign-in sheet or non-disclosure

5   agreement for any New York or Nuremburg Toy Fair, even though Larian directed

6   people to search "everywhere" for such sign-in sheets.[10]  The best MGA could

7   muster was a single sign-in sheet with boilerplate confidentiality language from the

8   2005 Hong Kong Toy Fair.[11]  Not one of the 25 products at issue was alleged to

9   have been misappropriated at the 2005 Hong Kong Toy Fair.  Indeed, no evidence

10  shows that MGA displayed any of the 25 products at the 2005 Hong Kong Toy Fair.

11  Most were on shelves before 2005.  Larian also admitted that he did not recall any

12  sign-in sheets that included boilerplate confidentiality language before the 2005

13  Hong Kong Toy Fair.[12]  Similarly, not a single person who actually entered an MGA

14  showroom testified to signing, much less being asked to sign, a non-disclosure

15  agreement.[13]  Nor did MGA identify a single agreement with any retailer with a

16  confidentiality clause governing toy fair.  MGA argues that an express agreement

17  with retail buyers and the press was not required, citing <u>Kewanee Oil Co. v. Bicron

18  Corp.</u>, 416 U.S. 470, 474 (1974).  Opp. at 26:15-22.  But no evidence suggests that

19  any implied obligation arose when both MGA and Mattel witnesses testified that

20  they knew retailers shared such information with other competitors "all the time"[14]

---

[10]   Trial Tr., 3/24/11, Vol. 2 at (Larian) 62:2-65:5.

[11]   3/24/11 Trial Tr., Vol. 2 (Larian) at 58:3-22.

[12]   Id.

[13]   See 3/29/11 Trial Tr. Vol. 1 (Plunkett) at 41:23-42:4, 43:7-12 (Plunkett was not asked to sign an NDA or told orally to keep the information she learned confidential); <u>see also</u> 3/22/11 Trial Tr. Vol. 2 (Romano) at 29:25-29:5 (Romano did not see anyone sign an NDA at either MGA's Hong Kong or New York toy fair showrooms); 3/18/11 Trial Tr. Vol. 2 (Kilpin) at 45:7-49:7 (Kilpin was not asked to sign an NDA when he visited an MGA showroom nor did he see anyone else being asked to sign an NDA).

[14]   See, e.g., 3/25/11 Trial Tr. Vol. 2 (Larian) at 37:18-38:4 (Larian "expects retailers to talk"); 3/25/11 Trial Tr. Vol. 1 (Larian) at 88:20-89:17 (In Larian's experience, retailers "go ahead and share information from MGA with other people in the industry;" "[P]ractically speaking" Larian knew retailers would share the (footnote continued)

00505.07975/4149500.1

1   and where MGA witnesses, including Mr. Larian, admitted they got the same type

2   of information about Mattel from retailers all the time.[15]  The undisputed fact that

3   MGA invited press to its showrooms, particularly in New York, with no

4   confidentiality requirement (and indeed, with the knowledge that such visits produce

5   press accounts), precludes finding an implied confidentiality agreement.

6        Learning Curve Toys, Inc. v. Play Wood Toys, Inc., 342 F.3d 714, 715 (7th

7   Cir. 2003) does not save MGA.  There, the court held there was sufficient evidence

8   for the jury to determine that plaintiff had taken reasonable steps to guard the

9   secrecy of its invention because there was evidence that plaintiffs "entered into an

10  oral confidentiality agreement with [defendants]" before disclosure to only three

11  individuals, as had been done in the past among these parties.  Id. at 725.  Here,

12  MGA identifies no evidence that any of the 25 products was covered by a pre-

13  disclosure oral agreement, and in fact, the evidence that MGA disclosed its products

14

15  _____

16  information he gave them with others in the industry.); 4/6/11 Trial Tr. Vol. 2
    (Saunders) at 66:24-67:14 (testifying that once a retailer knows a toy manufacturer's

17  information, there is a risk that other people are going to learn about it and that she
    obtained information about unreleased Mattel products from retailers.); 3/31/11 Trial

18  Tr., Vol. 2, (Brawer) at 39:7-16, 41:10-42:9 (testifying that "when I tell [a retail]
    customer anything, I am taking a huge risk that that information will then become

19  public" and that "there's certainly a significant amount of leakage from the moment
    that you start telling retailers what the FOB cost is of a product."); 4/6/11 Trial Tr.

20  Vol. 1 (Jolicoeur) at 13:16-18 ("if information is released to the retailer, it was
    released to the public."); 2/24/11 Trial Tr., Vol. 1, (Kuemmerle) at 35:12-36:16
    (testifying that price lists are not kept secret and that retailers share them with

21  competitors "all the time."); 3/17/11 Trial Tr. Vol. 2 (Fontanella) at 39:10-23
    (testifying that it was her expectation that once an upcoming product or other

22  information was shared with a retailer, it became public.); 3/22/11 Trial Tr. Vol. 1
    (Turetzky) at 126:8-11 (testifying that information that's shared with retailers is

23  widely understood in the toy industry to be public.); 3/18/11 Trial Tr. Vol. 2 (Kilpin)
    at 38:16-40:24 (testifying that although Mattel would prefer that retail buyers not

24  share pricing information, Mattel knows that in fact retailers do share such
    information and information shared with retail buyers is "likely to be shared with
    other parties and competitors."), 82:21-83:2 (it's not a surprise to Kilpin and

25  consistent with his experience that buyers seeking to stimulate competition among
    toy companies share FOB pricing information of competitors).
    [15] See, e.g., TX 9533; 3/24/11 Trial Tr. Vol. 2 (Larian) at 67:22-25; 3/25/11 Trial

26  Tr., Vol. 1 (Larian) at 112:9-16; 4/6/11 Trial Tr. Vol. 2 (Saunders) at 66:24-67:14
    (MGA's Lisa Saunders testified that once a retailer knows a toy manufacturer's

27  information, there is a risk that other people are going to learn about it, and indeed
    she testified that she obtained information about unreleased Mattel products from

28  retailers.).

MATTEL'S REPLY ISO RENEWED JMOL RE MGA'S TRADE SECRET CLAIM

00505.07975/4149500.1

1  to thousands of people, not three, including press and any stranger with a business

2  card, belies the existence of any such oral agreement.

3      <u>Landes Construction Co. v. Royal Bank of Canada</u>, 833 F.2d 1365, 1372 (9th

4  Cir. 1987) is similarly off-point.  Like the parties in <u>Learning Curve</u>, the parties in

5  <u>Landes</u> entered into an oral contract.  Because the court found conflicting evidence

6  on the scope of the agreement, it did not disturb the jury's verdict.  MGA did not

7  claim that it entered into specific oral contracts with each party who entered its

8  showrooms.

9      The dispute here is not the scope of an oral agreement, nor is it the parties'

10  actions or expectations with respect to secrecy.  To the contrary, multiple MGA

11  witnesses testified that retailers do not keep information shared with them

12  confidential.[16]  MGA's Chief Financial Officer, MGA's corporate spokesperson on

13  toy fair practices, agreed that "if information is released to the retailer, it was

14  released to the public."[17]  With respect to the press, at least 14 of the products on

15  which the jury found liability were the subject of press releases or articles

16  contemporaneous with the toy fair at which MGA alleged misappropriation.

17  MGA's Chief Financial Officer admitted that upcoming product lines are "public

18

19  _____

20  [16]    See, e.g., 3/25/11 Trial Tr. Vol. 2 (Larian) at 37:18-38:4 (Larian "expects
retailers to talk"); 3/25/11 Trial Tr. Vol. 1 (Larian) at 88:20-89:17 (In Larian's
21  experience, retailers "go ahead and share information from MGA with other people in
the industry;" "[P]ractically speaking" Larian knew retailers would share the
information he gave them with others in the industry.); 4/6/11 Trial Tr. Vol. 2
22  (Saunders) at 66:24-67:14 (MGA's Lisa Saunders testified that once a retailer knows
a toy manufacturer's information, there is a risk that other people are going to learn
23  about it, and indeed she testified that she obtained information about unreleased
Mattel products from retailers.); 3/31/11 Trial Tr., Vol. 2, (Brawer) at 39:7-16, 41:10-
24  42:9 (MGA's Ron Brawer testified that "when I tell [a retail] customer anything, I am
taking a huge risk that that information will then become public" and that "there's
25  certainly a significant amount of leakage from the moment that you start telling
retailers what the FOB cost is of a product."); 4/6/11 Trial Tr. Vol. 1 (Jolicoeur) at
26  13:16-18See, e.g (MGA's Chief Financial Officer, MGA's corporate spokesperson on
toy fair practices, agreed that "if information is released to the retailer, it was released
27  to the public."); 2/24/11 Trial Tr., Vol. 1, (Kuemmerle) at 35:12-36:16 (MGA's
Susana Kuemmerle testified that price lists are not kept secret and that retailers share
28  them with competitors "all the time.").
[17]    4/6/11 Trial Tr. Vol. 1 (Jolicoeur) at 13:16-18.

1  knowledge" by the time of toy fairs.[18]  MGA's trade secrets were published in press
2  releases, disclosed to retailers, and revealed to the press prior to and
3  contemporaneous with toy fair as a matter of course.  See, e.g., Mattel Mot. at 3-4
4  (chart detailing extent of public disclosure).  MGA cannot claim that it took
5  reasonable efforts to protect "trade secrets" that it knowingly shared with third
6  parties who MGA knew were sharing the information with others.  Alamar
7  Biosciences, Inc. v. Difco Labs., Inc., 40 U.S.P.Q 2d 1437 (E.D. Cal. 1996) (where
8  there is material apprehension that individuals possess a trade secret and are using or
9  likely to use it to plaintiff's detriment, failure to take prompt and vigorous action
10 may go to the merits of whether or not the plaintiff has exercised reasonable
11 precautions to maintain secrecy).  The only witness to claim anything different—
12 that MGA had agreements assuring confidentiality—did so in a purely conclusory
13 fashion, offering no evidence to support his view.[19]  A "reasonable inference" in
14 favor of a verdict "cannot be supported by only threadbare conclusory statements
15 instead of significant probative evidence."  Lakeside-Scott, 556 F.3d at 802.[20]

16         Finally, MGA argues that, apart from its other clear failures of proof as to
17 express or implied agreements with Fair attendees, "[a]t a minimum [MGA]
18 established that the information obtained by Mattel was difficult to obtain without
19 the use of the improper means employed."  Opp. at 25:10-14.  Ease or difficulty of
20 access is not the measure of secrecy; the focus is on the efforts to preserve secrecy.
21 Cal. Civ. Code § 3426.1(d)(2).  The decision in Clark v. Banker, 453 F.2d 1006,
22 1009-10 (9th Cir. 1972), which MGA cites, is inapposite.  It was a compilation case,
23 which turned on whether a compilation of public information was sufficiently novel
24 or difficult to create that trade secret protection was appropriate.  This is not a
25 compilation case.  MGA did not create a unique "compilation" of public materials as
26
27 _____
   [18]  4/6/11 Trial Tr. Vol. 1 (Jolicoeur) at 15:13-17.
28 [19]  3/24/11 Trial Tr. Vol. 2 (Larian) at 57:6-59:20.

1  did the defendants in <u>Clark,</u> where the sum is greater and different than its

2  constituent parts.  MGA showed individual products to the press and public.  Indeed,

3  because it did so broadly and intentionally for the purpose of publicizing and selling

4  those products, MGA did not, nor could it, even show that the information was

5  difficult to obtain.  During the relevant years, MGA created compact discs—called

6  "press kits" or "media kits"—filled with photos of unreleased products and handed

7  them out to the press at MGA's showroom at New York Toy Fair.[21]  It is undisputed

8  that at least 14 of the 25 products at issue were the subject of contemporaneous

9  press releases.

10        There was certainly no evidence introduced at trial which would show

11  MGA's characterization of "Mattel's Herculean efforts to get MGA's confidential

12  information" to be anything more than hyperbole.  Mr. Villasenor's testimony

13  hardly described a "herculean effort."  Quite the contrary.  He testified that all he

14  had to do to enter a competitor's showroom was give a fictitious business card for a

15  fictitious company that no one had ever heard of.[22]  He never had to provide an

16  invoice, photo identification or any other documentation. [23]   Catalogs were

17  "everywhere" at toy fair—both in public and private spaces—and individuals would

18  trade catalogs with one another. [24]   And finally, as everyone in this case

19  acknowledged, such information was available to third parties—including retailers

20  and the press—who had no obligation to keep it confidential and did not keep it

21  confidential.

22

23

24

25  _____
    [20]   To the extent any such non-disclosure agreements existed, MGA was required
26  to produce them.  Dkt. No. 8921.
    [21]   See 4/6/11 Trial Tr. Vol. 2 (Jolicoeur) at 8:10-16; <u>see also</u> TX 23718.
27  [22]   3/23/11 Trial Tr. Vol. 1 (Villasenor) at 85:4-8.
    [23]   3/23/11 Trial Tr. Vol. 1 (Villasenor) at 80:2-12.
28  [24]   3/23/11 Trial Tr. Vol. 1 (Villasenor) at 63:7-25, 99:17-100:21

**2.** **Fourteen of the 25 Products Were Disclosed in MGA Press Releases or Articles At or Before Toy Fair**

MGA does not dispute that aspects of 14 of the products were the subject of MGA press releases and articles *before* they were allegedly misappropriated.  Opp. at 26:26-27:2.  Those products are: Bratz Mobile, Bratz Petz, Sun Kissed Summer, Girls Nite Out, Wild Life Safari Collection, Bratz Diamondz, Bratz Virtual Buddiez Petz, Bratz Campfire, Wild Wild West, Bratz Rock Angelz, Monkey See Monkey Do, Alien Racers, Bratz Kidz, and Passion for Fashion.  By definition, publicly disclosed information is not trade secret.  <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information . . . his property right is extinguished."); <u>see</u> <u>Cal. Civ. Code</u> § 3426.1(d)(2).

MGA does not even argue that the "appearance, operation, intended play pattern" of any of the 14 products were secret at the time of the alleged misappropriation.  Rather, its only counter-argument is that FOB pricing and plans to advertise were not disclosed in press releases or in articles at or before the toy fairs in question.  As discussed below, however, MGA's misappropriation claim for FOB pricing and plans to advertise fail for independent reasons.  <u>See</u> Parts C & D.

Otherwise, MGA's only response to the fact that these 14 products were indisputably not secret, nor were any efforts at all taken to maintain their secrecy (quite the opposite), is to argue that the experience of Mattel employees at toy fairs is "materially different" than what appears in press releases or articles because Mattel's *damages* expert could not describe what a "funkalish" doll was, or what a "unique party-night accessory" could be.  Opp. at 27:3-29:2.  Not only is the argument about what the damages expert knew irrelevant to secrecy, but MGA never claimed as misappropriated trade secrets whatever unique, experiential "touching and feeling" MGA alleges Mattel employees did in its showroom.  Dkt. No. 9948 (MGA's Trade Secret Chart Filed Pursuant to the Court's February 1, 2011

1    Order).  And even if they had, they utterly failed to prove it.  Mattel employees did

2    not get to touch or play with toys exhibited in MGA showrooms.[25]  The Mattel

3    video presentation which MGA claims shows the value of "touching and feeling" a

4    toy, Opp. at 29, does no such thing: TX 9488 does not show anything other than still

5    images of product, and, contrary to MGA's claim, does not show a Mattel employee

6    "act[ing] out a demonstration of a competing product she saw at a toy fair

7    showroom."

8         MGA also argues that product shipped to retailers is still trade secret.

9    Nothing in the evidence supports that statement.  The law does not say this; MGA

10   had no agreements that provided this.  Product shipped to retailers is by definition

11   no longer within MGA's control and cannot reasonably be expected to be

12   confidential.[26]  To the extent MGA now attempts to contest the accuracy of its own

13   document showing Girls Nite Out was released prior to Toy Fair, this is consistent

14   with its own damages expert's information.[27]

15        **C.    The Claim of Misappropriation of FOB Pricing Information Fails**

16        MGA argues that FOB pricing is trade secret even though its own officers

17   testified that they were fully aware that retailers shared such pricing information

18   with other competitors "all the time."[28]    See Alamar Biosciences, 40 U.S.P.Q 2d

19   1437 (E.D. Cal. 1996) (where there is material apprehension that individuals possess

20   a trade secret and are using or likely to use it to plaintiff's detriment, failure to take

21   prompt and vigorous action undermines the claim that plaintiff exercised reasonable

22   precautions to maintain secrecy).    MGA claims that Mr. Eckert's undisputed

23   _____

24        [25] 3/29/11 Trial tr. Vol. 1 (Plunkett) at 43:13-17.
          [26] 4/6/11 Trial Tr. Vol. 1 (Jolicoeur) at 13:16-18.
          [27] Compare TX 24671-2 with TX 37189-33.

25        [28] 3/31/11 Trial Tr., Vol. 2, (Brawer) at 39:7-16, 41:10-42:9 (MGA's Ron Brawer

26   testified that "when I tell [a retail] customer anything, I am taking a huge risk that
     that information will then become public" and that "there's certainly a significant

27   amount of leakage from the moment that you start telling retailers what the FOB cost
     is of a product."); 2/24/11 Trial Tr., Vol. 1, (Kuemmerle) at 35:12-36:16 (MGA's

28   Susana Kuemmerle testified that price lists are not trade secrets and that retailers
     share them with competitors "all the time.").

1  testimony on how manufacturers can simply derive FOB prices from retail price and

2  retailer margin is irrelevant.[29] As MGA itself has previously argued,[30] regardless of

3  how information may have been acquired, the trade secret misappropriation claim

4  fails if it is reasonably ascertainable.  Am. Paper & Packaging Prods., Inc. v. Kirgan,

5  183 Cal. App. 3d 1318, 1326 (1986) (holding that although customer lists could be

6  trade secret, plaintiff's customer lists in particular were not because the information

7  contained in the compilations "would be known or readily ascertainable to other

8  persons in the shipping business.  The compilation process in this case is neither

9  sophisticated nor difficult nor particularly time consuming.").  MGA cites Abba

10 Rubber Co. v. Seaquist, 235 Cal. App. 3d 1, 21 & n. 9 (Cal. Ct. App. 1991), but that

11 case supports Mattel, not MGA.  It specifically recognizes that if information is

12 reasonably ascertainable, the trade secret theft claim fails.  Id. at 21 n.9 (holding that

13 "the assertion that a matter is readily ascertainable by proper means remains

14 available as a defense to a claim of misappropriation"[31] (quoting Legis. committee

15 com., Cal. Civ. Code, § 3426.1 (1991 pocket supp.) ).

16

17 [29]  4/1/11 Trial Tr. Vol. 2 (Eckert) at 12:24-13:23.
   [30]  See, e.g., Dkt No. 9250 (MGA Parties' Reply In Support of Motion for
18 Summary Judgment in 05-2727 Action, dated November 8, 2010) at 27:26-28:1; Dkt.
   Nos.  7899,  7900  (MGA's  Separate  Statement  of  Uncontroverted  Facts  and
19 Conclusions  of  Law  in  Support  of  the  MGA  Parties  and  IGWT's  Motions  for
   Summary Adjudication of the First, Second and Third Claims for Relief of the
20 FAAC, dated May 10, 2010) at 74, 75-81, 85, 88, 90, 93, 95, 96, 98, 100-101, 103-
   104, 106, 108, 109, 111, 113-114, 116, 118-119, 121-122, 124, 128, 132, 136, 140,
21 145, 149, 153, 157, 162, 166, 170, 174, 179, 183, 187, 192, 196, 200, 204, 209, 213,
   217, 222, 226, 230, 235, 239, 243, 247, 252, 256, 260, 265, 269, 273, 277, 282, 286,
22 290, 295, 299, 303, 308, 312, 316, 320, 325, 329, 333, 338, 342, 346, 350, 355, 359,
   363, 368, 372, 376, 380, 385, 389, 393, 398, 402, 403, 411, 415, 419, 423-424, 428,
23 432, 436, 441, 445, 449, 454, 458, 462, 467, 471, 475, 479, 484, 488, 492, 497, 501,
   505, 509-510, 514, 518, 522, 527, 533, 536, 538, 540, 542, 544, 546-547, 549, 551,
24 553, 555, 557, 559, 561, 563, 565-566, 568, 570, 572, 574, 576, 590, 593, 596, 599,
   602, 605, 608, 611, 614, 617, 620, 623, 626, 629, 632, 635, 638, 641, 644, 647, 650,
25 653, 656, 659, 662, 665, 668, 671, 674, 677, 680, 683, 686, 689, 692, 695, 698, 701,
   704, 707, 710, 713, 716, 719, 722, 725, 728, 731, 734, 737, 740, 743, 746, 749, 752,
26 755, 758, 761, 764, 767, 770, 773, 776, 779, 782, 785, 788, 791, 794, 797, 802, 805,
   808, 811, 814, 817, 820, 824, 827, 830, 833, 836, 839, 842, 845, 848, 851, 854, 857,
27 860, 863, 866, 869, 873, 876, 879, 882, 885, 888, 892, 896, 900, 903, 907, 911, 915,
   919, 922, 926, 929, 932, 935, 938, 941, 944, 947, 950, 953, 956, 959, 962, 965, 968,
   971, 974, 977, 980, 983, 986, 989, 992, 995, 998, 999, 1001, and 1004.
   [31]  Mattel pled the affirmative defense that MGA's "information was public and/or
28 otherwise fails to meet the requirements for trade secret protection."  Dkt. No. 8928
   (footnote continued)

### D.   Examined Individually, Each Of MGA's Trade Secret Claims Fails

MGA avoids discussing its trade secrets individually.  That is because, when that examination is done, its claims clearly fail as to each.

1.   <u>The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Mobile.</u>  MGA concedes that the appearance, operation and intended play pattern of Bratz Mobile was public at the date of the alleged misappropriation.  Opp. at 27:3-11.  MGA identified no evidence that Mattel used any of the allegedly trade secret elements of Bratz Mobile.  MGA identified no evidence to support any damages award.  <u>See</u> Mot. at 54-56.

2.   <u>The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Styl' It Collection.</u>  MGA mentions Bratz Styl' It Collection only once buried in a list of products, Opp. at 28, and does not address any of the failures of proof detailed in Mattel's motion, including the failure to identify the trade secrets with reasonable particularity, to show that the "trade secrets" were kept secret, or to present evidence of injury, use, or damages.  <u>See</u> Mot. at 56-57.

4.   <u>The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Winterwonderland Collection.</u>  MGA claims that its particular execution of a theme is part of MGA's trade secret claim, but MGA identified no evidence showing what, of its claimed "particular execution" of a winter theme rises to trade secret status.  Opp. at 31:26-28.

5.   <u>The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Formal Funk Collection.</u>  MGA's Opposition mentions Bratz Formal Funk Collection once among a list of products and once in a chart.  Opp. at 28, 41.  Again, MGA  does not even attempt to address the failures of proof detailed in Mattel's motion, including the failure to identify the trade secrets

---

(Mattel's Answer to MGA's Counterclaims-In-Reply, dated October 12, 2010) at
(footnote continued)

00505.07975/4149500.1

MATTEL'S REPLY ISO RENEWED JMOL RE MGA'S TRADE SECRET CLAIM

1   with reasonable particularity, to present evidence of MGA's allegedly "unique

2   execution" of a generic prom theme, to show that the "trade secrets" were kept

3   secret, or to present evidence of injury, use, or damages.  <u>See</u> Mot. at 58-59.

4       6.   <u>The appearance, operation, intended play pattern, plans to advertise on

5   television and FOB pricing for Bratz Runway Formal Funk Collection.</u>  MGA's

6   Opposition emphasizes that Bratz Runway Formal Funk Playset was one of the only

7   products which Larian matched to a Mattel product.  Opp. at 35.  But tellingly,

8   MGA fails to acknowledge that Larian identified the common element of the two

9   products to be trapezoidal-shaped packaging, which cannot be a trade secret as

10  MGA had sold millions of products in trapezoidal packaging prior to the alleged

11  date of misappropriation.  MGA identified no evidence that Mattel misappropriated

12  the appearance of the Bratz product, as opposed to the packaging (Mot. at 60) nor

13  did it address any of the other failures of proof identified in Mattel's motion,

14  including MGA's failure to present evidence the "trade secrets" were kept secret or

15  of injury, use, or damages.  <u>See</u> Mot. at 59-60.

16      7.   <u>The appearance, operation, intended play pattern, plans to advertise on

17  television and FOB pricing for Bratz FM Limo.</u>  MGA's Opposition mentions Bratz

18  FM Limo three times—once in a list, once noting that the Mattel toy fair report at

19  issue listed the FOB price of this product, and once in a chart showing that MGA's

20  damages expert's unadmitted chart estimated damages for this product at $1.449

21  million—some $2 million *less* than the jury's $3.4 million award.  Opp. at 28, 37,

22  41.  MGA fails even to address any of the other failings identified in Mattel's

23  motion, including MGA's failure to present evidence the "trade secrets" were kept

24  secret or of injury, use, or damages.  <u>See</u> Mot. at 61-62.

25      8.   <u>The appearance, operation, intended play pattern, plans to advertise on

26  television and FOB pricing for Bratz Motorcycle.</u>  MGA's Opposition touts that

27  ────────────────

28  14:17-20.

Bratz Motorcycle was, like Bratz Runway Formal Funk, one of the few products for which Larian identified a matching Mattel product.  Opp. at 35.  What MGA omits is that Larian identified the products' common element as the utterly generic fact that they were both toy motorcycles. And the products themselves show that even Larian's threadbare claim of similarity was indisputably false since the Mattel product was not a motorcycle.  Mot. at 62.  MGA fails to address any of the other failures of proof identified in Mattel's motion, including MGA's failure to present evidence the "trade secrets" were kept secret or of injury, use, or damages. <u>See</u> Mot. at 62-63.

9.    <u>The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Bratz Pet Assortment</u>.  MGA's Opposition is silent as to all the supposedly misappropriated elements of the Bratz Pet Assortment other than "plans to advertise on television."  With respect to this element, MGA argues that MGA's plan *not* to advertise this product on television was misappropriated by and of value to Mattel.  Opp. at 37-38.  Apart from being an absurd contention, MGA never claimed plans to *not* advertise as a trade secret. <u>See</u> Dkt. No. 9948. And, now MGA asks the Court to make the unprecedented ruling that the complete lack of evidence of misappropriation, is, in fact, evidence of misappropriation. Without more, the absence of advertising information in a report, is not evidence that (a) Mattel knew that an MGA product was not being television advertised, (b) that MGA's decision not to advertise Bratz Pet Assortment had any commercial value, or (c) that Mattel used that non-information to its benefit or MGA's detriment. MGA does not otherwise address the failures of proof Mattel identified with respect to this claim, including the absence of any evidence in the record regarding this product other than a couple lines in a toy fair report and testimony confirming that the product was, among other products, listed in the report. <u>See</u> Mot. at 63-64.

14.    <u>The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Lil' Bratz Vehicle Assortment</u>.  MGA does not

dispute that it presented no testimony about this product.  It claims that the bare mention of this product in a single Mattel toy fair report can support the jury's finding of trade secret misappropriation and an award of $3.4 million.  Opp. at 30-31.  That's a recovery of nearly $245,000 per word[32] and more than $1 million greater than the "head start damages" listed in MGA's damages expert's unadmitted chart.  This result is not only untenable, but MGA over-reaches even further by seeking to multiply the amount in exemplary damages.  MGA does not address its complete lack of evidence regarding when the product was disclosed, whether Mattel allegedly used it before disclosure, or supporting the headstart damages awarded.[33]  See Mot. at 64-65.

15.    The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Lil' Bratz Deluxe Mall Playset.  MGA likewise argues that the bare fact that this product was mentioned in a Mattel toy fair report is alone sufficient to justify the jury's award of $3.4 million – or $105,000 per word.  Opp. at 30-31.[34]  MGA ignores, and thus concedes, that the record is wholly devoid of proof regarding when the product was disclosed, showing that Mattel used it before disclosure, or supporting any headstart damages awarded.[35]  See Mot. at 64-65.

16.    The appearance, operation, intended play pattern and plans to advertise on television for Bratz Petz.  MGA's Opposition relies on the fact that this is one of a handful of products for which Larian identified a Mattel matching product.  Opp. at 35.  But it fails to address all of the other shortcomings, even in Larian's testimony identifying the product simply as a line of animal toys, much less to point

---

[32]   See TX 9275-0029.
[33]   A damages award that is more than $1 million greater than the $2.386 million "head start damages" listed in MGA's damages expert's unadmitted chart.  See TX 37189 (not admitted); see also Mot. at 66.
[34]   See TX 9275-0029.
[35]   And for good measure, this was a damages award that is exponentially greater than the $796,000 "head start damages" listed in MGA's damages expert's unadmitted chart.  See TX 37189 (not admitted); see also Mot. at 66.

to any evidence of the other elements it was required to prove as to secrecy, reasonable steps, use and damages.  MGA cannot show secrecy as it is uncontested that this product was on retail shelves by December 2003 and the subject of an MGA press release before the toy fair at which MGA alleges misappropriation.  <u>See</u> Mot. at 66-68.

18.    The appearance, operation, intended play pattern and plans to advertise on television for Dazzlin' Disco Cafe.  Like product 16 above, the only evidence in the record supporting MGA's claim is the fact that the product was mentioned in a Mattel report.  Opp. at 30-31. There was literally no other testimony about this product.  MGA does not address its complete lack of proof regarding when the product was disclosed, showing that Mattel used it before disclosure, or supporting headstart damages.[36]  <u>See</u> Mot. at 68-69.

19.    The appearance, operation, intended play pattern and plans to advertise on television for Sun Kissed Summer.  MGA does not deny that the "trade secret" elements of this product were public as of the date of the alleged misappropriation. This product was both on store shelves and the subject of an MGA press release prior to the date of the alleged misappropriation.  MGA identified no evidence that Mattel used any of the allegedly trade secret elements of Sun-Kissed Summer. MGA identified no evidence to support any damages award.  <u>See</u> Mot. at 69-71.

20.    The appearance, operation, intended play pattern and plans to advertise on television for Girls Nite Out.  MGA does not deny that the purportedly "trade secret" elements of this product were public as of the date of the alleged misappropriation.   MGA contests the veracity of its own document—which is consistent with the work product of its own expert—showing that the product was on store shelves by November 2003, months before it was allegedly misappropriated

---

[36]    This, too, was also a damages award that is exponentially greater than the $20,000 "head start damages" listed in MGA's damages expert's unadmitted chart. <u>See</u> TX 37189 (not admitted); <u>see also</u> Mot. at 66.

00505.07975/4149500.1

at the 2004 New York Toy Fair.  Opp. at 29, n. 3.  MGA also argues that the fact that the product was referenced in two Mattel reports proves that there were two different Bratz products of the same name in the same year.  Opp. at 58-60.  Plainly it does not, and if that is MGA's best and only argument, then the verdict cannot stand.  MGA identifies no evidence of record to support any damages award for Mattel's claimed misappropriation, much less a double recovery.  See Mot. at 71-72.

21.   The appearance, operation, intended play pattern and plans to advertise on television for Wild Life Safari Collection.  MGA does not mention Wild Life Safari Collection at all in its brief, much less refute the evidentiary deficiencies that Mattel identified, including that the product was the subject of a press release prior to the date of the alleged misappropriation, the "matched" Mattel product came out years later, and that MGA presented no evidence to support a damages award.  See Mot. at 73-74.

22.   The appearance, operation, intended play pattern and plans to advertise on television for Bratz Diamondz.  Conceding that it had disclosed the only claimed Bratz Diamondz trade secret before it was misappropriated, MGA fails to identify any evidence that could support the jury's finding that elements of this product were "trade secrets" on the date of the alleged misappropriation, much less justify a $3.4 million damages award.  See Mot. at 74-76.

24.   The appearance, operation, intended play pattern and plans to advertise on television for Bratz Virtual Buddiez Petz.  MGA does not mention Bratz Virtual Buddiez Petz at all in its brief, much less contest the evidentiary deficiencies that Mattel identified, including that the supposed trade secret information about the product came entirely from a prior MGA press release, that MGA's damages expert was unable to calculate damages for this product and thus dropped it from his calculations, and that MGA presented no evidence of injury, use or damages.  See Mot. at 76-77.

27.   The appearance, operation, intended play pattern and plans to advertise on television for Bratz Campfire.  MGA's only mention of Bratz Campfire is in a chart showing MGA's damages expert's unadmitted damages figure for this product.  MGA fails to address the failures of proof identified in Mattel's motion, including that the purported trade secret information about the product was indisputably from a prior MGA press release, that Mattel released a camping theme product years before this product, and that MGA presented no evidence of injury, use or damages.  See Mot. at 77-79.

28.   The appearance, operation, intended play pattern and plans to advertise on television for Wild Wild West.  MGA's only mention of Wild Wild West is in a chart showing MGA's damages expert's unadmitted damages figure for this product.  MGA fails to address the evidentiary failures identified in Mattel's motion, including that the alleged information about the product came from a prior MGA press release, that MGA modeled its Western theme after Mattel, not vice versa, and that MGA presented no evidence of injury, use or damages.  See Mot. at 79-81.

29.   The appearance, operation, intended play pattern and plans to advertise on television for Bratz Rock Angels.  At page 18 of its opposition, MGA concedes that "Bratz Rock Angelz did not look like My Scene Goes Hollywood"—the product to which MGA's damages expert "matched" Rock Angels.  Opp. at 18.  The only other mention of this product is in a chart showing MGA's damages expert's unadmitted damages calculation for this product.  Opp. at 41.  MGA fails to address the failures of proof identified in Mattel's motion, including that the alleged information about the product came from a prior MGA press release and that MGA presented no evidence of injury, use or damages.  See Mot. at 81-83.

41.   The appearance, operation, intended play pattern, plans to advertise on television and FOB pricing for Monkey See Monkey Do.  MGA does not mention Monkey See Monkey Do in its brief, much less contest the evidentiary deficiencies that Mattel identified, including that the information in Mattel's toy fair report is a

1    verbatim copy of an earlier-dated MGA press release, that this product was an utter

2    failure, selling only five units total, and that MGA presented no evidence of injury,

3    use or damages.  See Mot. at 84-85.

4           49.    The appearance, operation, intended play pattern, plans to advertise on

5    television and FOB pricing for Lil' Bratz Boyz.  MGA does not mention Lil' Bratz

6    Boyz at all in its brief, much less address the multiple evidentiary deficiencies that

7    Mattel identified, including that the product was never introduced into evidence,

8    MGA never identified any "matching" Mattel product or presented any evidence

9    from which the jury could determine whether the claimed elements were secret or

10   used and that MGA presented no evidence of injury, use or damages, much less

11   evidence that could sustain an award of $3.4 million.  See Mot. at 85-86.

12          58.    The appearance, operation, intended play pattern and plans to advertise

13   on television for Alien Racers.  Again, MGA emphasizes that Alien Racers was one

14   of the few products for which Larian identified a matching Mattel product.  Opp. at

15   35.  MGA omits, however, that what Larian identified as the products' ostensibly

16   common element was only their names, acknowledging that the products had no

17   other commonalities.  Mot. at 86-88.  But the undisputed evidence shows that MGA

18   made the product name public prior to the alleged date of misappropriation and that

19   the name is *not* among the alleged trade secrets that the jury found were

20   misappropriated.  Dkt No. 10518 at 21.  Again, MGA fails to address the other

21   failures of proof identified in Mattel's motion, including that MGA failed to present

22   evidence that the elements were secret or used or that MGA suffered injury or

23   damages at all.  See Mot. at 86-88.

24

25

26

27

28

65.   The appearance, operation, intended play pattern and plans to advertise on television for Girls Nite Out.[37]  This claimed "trade secret" is a duplicate.  See ¶ 20 above.

66.   The appearance, operation, intended play pattern and plans to advertise on television for Bratz Kidz.  MGA does not mention Bratz Kidz at all in its brief, much less address the evidentiary deficiencies that Mattel identified, including that there is no evidence of misappropriation, that the "trade secrets" were shared with a blogger who posted during toy fair a description on the Internet more detailed than that in Mattel's report, and that MGA presented no evidence of injury, use or damages.  See Mot. at 89-92.

69.   The appearance, operation, intended play pattern and plans to advertise on television for Passion for Fashion.  MGA does not mention Passion for Fashion at all in its brief, much less address the evidentiary deficiencies that Mattel identified, including that there is no evidence of misappropriation, that the "trade secrets" were shared with a blogger who posted during toy fair a description on the Internet more detailed than that in Mattel's report, and that MGA presented no evidence of injury, use or damages.  See Mot. at 89-92.

While failing to address the specific deficiencies in the 25 trade secrets for which the jury found liability, much less to even mention 6 of them in the brief (or 3 at any time during trial), MGA makes much of the fact that it did identify its trade secrets with particularity.  But to survive a post-trial JMOL, MGA must do more than point to its boilerplate descriptions of its claimed secrets.  It must point to *evidence* admitted at trial that could provide a basis for the jury's verdict.   It has failed—either at trial or in its opposition—to do so.

### E.   The Jury's Finding Of Misappropriation Is Not Supported By Evidence

---

[37]   Bratz Girls Nite Out is the same product as Girls Nite Out.  Thus, the jury (footnote continued)

Mattel demonstrated in its motion that the evidence is insufficient as a matter of law to support a finding that Mattel misappropriated any of MGA's claimed trade secrets by using them in the development of Mattel's own products, which is a predicate for headstart damages.  See Mot. at 23-30.  MGA does not dispute that it sought to prove Mattel's use of MGA's trade secrets by identifying "product matches" between alleged MGA trade secrets and Mattel products that allegedly incorporated aspects of the trade secrets.  In arguing that the "jury heard of Mattel's extensive use of" MGA's trade secrets (Opp. at 35), MGA cites only Mr. Larian's testimony about nine "product matches" between MGA claimed trade secrets and Mattel products.  Id.  Of those "matches," the jury found liability as to seven (Bratz Winter Wonderland Collection, Bratz Runway Formal Funk Collection, Bratz Motorcycle, Bratz Petz, Bratz Girls Nite Out, Bratz Diamondz, and Alien Racers).  Thus, of the 25 products as to which the jury found liability, there is no evidence of Mattel's use of 18 of them.  As discussed below, as to the other seven, the evidence does not support a finding that Mattel used the claimed trade secrets, and MGA's post hoc attempts to fill these gaping evidentiary holes are unavailing.

### 1.    MGA Fails To Point To Evidence Of Mattel's Misappropriation By Use

MGA argues that even though the jury did not "see evidence of specific matching products for each of the 26 products found to have [been] misappropriated," it did not "*have* to see such evidence to find misappropriation, since Mattel admitting [sic] to using the information."  Opp. at 35 (emphasis in original).  To support its bold statement, MGA cites Villasenor's testimony that the information Mattel obtained gave Mattel a "superior competitive advantage."  Opp. at 35.  Even assuming Mr. Villasenor's testimony was credible and reliable, no reasonable juror could conclude based on that testimony that Mattel used each (or even any) of the 26 claimed trade

_____

found liability as to trade secrets of only 25, not 26 products.  See Section VI infra.

secrets at issue "to the detriment of [MGA] in the market," as MGA itself has argued is required to prove misappropriation by use.  See Dkt. No. 9084 at 67; see also PMC, Inc. v. Kadisha, 78 Cal. App. 4th 1368, 1383 (2000) (defining use as "[e]mploying the confidential information in manufacturing, production, research or development, marketing goods that embody the trade secret, or soliciting customers through the use of trade secret information") (citing Rest.3d Unfair Competition (1995) § 40, com. c.)).  Villasenor's conclusory statement is simply not enough to prove use As to the specific information at issue.  A "competitive advantage" is not, by itself, use, and MGA has failed to meet its evidentiary burden of proving use as to at least 19 of the 26 claimed trade secrets for which there is concededly no evidence of a matching Mattel product.

Moreover, even as to the seven MGA trade secrets as to which Mr. Larian identified an allegedly matching Mattel product, MGA does not dispute that the evidence is wholly insufficient to support a finding that Mattel used the claimed trade secrets *while they were trade secrets* (as opposed to after MGA's disclosure of them).  Mattel demonstrated in its motion that the "record does not contain critical information needed to make such a showing, including such basic factors as when the Mattel product was developed and released, whether that release was before or after the toy fair where MGA's information was allegedly acquired, and, if after, how long after."  Mot. at 27.  MGA's only response to this argument proves Mattel's point.  MGA asserts, in circular fashion, that any evidentiary insufficiency regarding whether "Mattel used MGA's trade secrets while the information was still secret" is irrelevant because "the jury was carefully instructed on the need to establish misappropriation while information was secret and rendered its verdict as it did."  Opp. at 36.  How the jury was instructed does not save a verdict where MGA failed to offer evidence to support it.

Indeed, far from proving use, the only record evidence flatly contradicts MGA's claim that Mattel "used" certain of MGA's claimed trade secrets.  See Mot. at

28-30.  Specifically:

- One allegedly matching Mattel product – My Scene Jammin' In Jamaica Guava Gulch – was released *before* Mattel's acquisition of the claimed trade secret (Bratz Sun-Kissed Summer);

- For five claimed trade secrets, the allegedly matched products – My Scene Club Birthday Car with Radio (matched with Bratz Mobile), My Scene Night on the Town (matched with Bratz Formal Funk Collection), My Scene Goes Hollywood Party Limo and Bling Bling Limo (matched with Bratz FM Limo), My Scene Convertible/My Scene Delancey & Hudson Convertible (matched with Lil' Bratz Vehicle Assortment), and My Scene Mall Maniacs Playset (matched with Lil' Bratz Deluxe Mall Playset) – were released *long after* Mattel's alleged acquisition;

- There is no evidence of when Mattel released two other allegedly matching products (My Scene Pets/Soft Pets and My Scene Outdoors Camping/Barbie Camping Family);

- Two allegedly matching Mattel products (My Scene Chillin' Out and My Scene Delancey with Vespa) did not "use" the only aspects of MGA's products that MGA claims were trade secrets;

- A simple comparison of another allegedly matched Mattel product (My Scene Goes Hollywood) to the purported MGA trade secret (Bratz Rock Angels) reveals that they are  not "matching" in any way.

These arguments are dispositive of MGA's claim as to nine claimed trade secrets – Bratz Sun-Kissed Summer, Bratz Mobile, Bratz Formal Funk Collection, Bratz FM Limo, Lil' Bratz Vehicle Assortment, Lil' Bratz Deluxe Mall Playset, Bratz Winter Wonderland, Bratz Motorcycle, and Bratz Rock Angels – yet MGA offers no response to them.  See id.

There was also no evidence offered by MGA to counter Mattel's showing that no Mattel employee or agent visited MGA's New York Toy Fair showroom in 2006 and that all information in Mattel's 2006 toy fair report came from public sources. See Mot. at 25.  Yet, the jury found misappropriation as to three products that were shown in New York in 2006: MGA's Bratz Diamondz, Bratz Kidz and Passion for

1   Fashion.  Mattel also proved that MGA publicly disclosed its Bratz Diamondz, Bratz

2   Kidz and Passion for Fashion products before the 2006 toy fair.  See Mot. at 3-4.

3   MGA argues the jury could have disbelieved Carey Plunkett's testimony that she did

4   not visit MGA's booth in 2006 or concluded that Mattel used some other unidentified

5   contractor that year.  See Opp. at 33-34.  To oppose the Motion as to these products,

6   MGA must identify evidence supporting the jury's verdict.  After-the-fact, speculative

7   assertions about Plunkett's credibility are no substitute for MGA's obligation to

8   produce evidence that *supports* the jury's verdict.  See Lakeside-Scott v. Multnomah

9   County, 556 F.3d 797, 802 (9th Cir. 2009) ("reasonable inference" in favor of a

10  verdict "cannot be supported by only threadbare conclusory statements instead of

11  significant probative evidence"). The Motion should be granted as to these products.[38]

12          **2.      MGA Failed To Prove Misappropriation By Acquisition Or**

13                   **Disclosure**

14          MGA makes an abbreviated argument that the jury *could have found*

15  misappropriation through acquisition or disclosure.  Opp. at 34.  But even if the

16  Mattel internal reports were considered sufficient evidence of acquisition or

17  disclosure, they provide no basis for awarding any damages – much less $3.4 million

18  per acquisition.  MGA introduced no evidence that it actually suffered any injury or

19  harm *at all* as a result of Mattel's acquisition or disclosure of such information, as

20  opposed to use.   This goes not merely to the amount of damages, but to whether

21  MGA  has established the required injury.  Silvaco, 184 Cal. App. 4th at 220 ("A

22  cause of action for monetary relief under CUTSA may be said to consist of the

23  following elements: (1) possession by the plaintiff of a trade secret; (2) the

24  defendant's misappropriation of the trade secret, meaning its wrongful acquisition,

25  disclosure, or use; and (3) *resulting or threatened injury to the plaintiff*.") (emphasis

26  added); Sargent Fletcher, Inc. v. Able Corp., 110 Cal. App. 4th at 1658, 1665-66

27

28  [38]  See TX 8522-06.

(2003) ("Under the UTSA, a prima facie claim for misappropriation of trade secrets requires the plaintiff to demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) *the defendant's actions damaged the plaintiff*.") (emphasis added); Cytodyn, Inc. v. Amerimmune Pharmaceuticals, Inc., 160 Cal. App. 4th 288, 297 (2008) (same); Language Line Services, Inc. v. Language Services Associates, LLC, 2010 WL 2764714, at *3 (N.D. Cal. July 13, 2010) (same); see also CACI 4401 (harm to plaintiff or unjust enrichment to defendant must be proved); Jury Instruction No. 57 (instructing jury that to succeed on its claim for trade secret misappropriation, MGA must "prove that it was harmed or [Mattel] was unjustly enriched" as a result of the misappropriation).

MGA does not contest this law.  At most, it argues that Mattel "conflates the element of misappropriation of trade secrets with the element of damages." Opp. at 32 (citing Sargent Fletcher, 110 Cal. App. 4th at 1665-66)).  Not so. Mattel recognizes, as does Sargent Fletcher and Mattel's other authorities, that misappropriation through use, acquisition or disclosure, on the one hand, and damages to the plaintiff, on the other hand, are distinct elements of a "prima facie claim for misappropriation." Id. at 1665.  MGA must prove *both elements*.  MGA has identified no evidence that Mattel's acquisition or disclosure of any of the 25 claimed trade secrets resulted in "injury to the plaintiff."  MGA has therefore failed to present sufficient evidence to prove its trade secret misappropriation claim.

### 3. **No Reasonable Juror Could Find That Mattel Misappropriated The "Plans To Advertise On Television" of at Least 12 Products For Which The Jury Found Liability**

For 10 products for which the jury found liability, the Mattel toy fair report that MGA identifies as proof of misappropriation contains no reference to television advertising.  The reports are silent as to MGA's advertising plans for Bratz Mobile, Bratz Pet Assortment, Dazzlin Disco Café, Girls Nite Out, Wild Life Safari, Bratz

1  Virtual Buddiez Petz, Bratz Campfire, Wild Wild West, Bratz Rock Angels and
2  Alien Racers.[39]  In a futile and absurd attempt to salvage its advertising claim, MGA
3  posits, without evidence, that absence of advertising information proves that Mattel
4  acquired MGA's plan *not to advertise* on television.  Opp. at 37:11-38:3.

5      First, MGA never claimed its plan "not to advertise" was a trade secret.  See
6  Dkt. No. 9948 (MGA's Trade Secret Chart Filed Pursuant to the Court's February 1,
7  2011 Order).  Second, the only evidence in the record disproves MGA's attempt to
8  equate the absence of advertising information from a Mattel report.  The Mattel
9  report on Bratz Mobile, for example, says nothing about advertising, but MGA did
10 plan to advertise and advertized Bratz Mobile on TV.  Compare TX 9507-143 with
11 TX 9508-3.  Third, MGA does not even contest that for at least two other products,
12 any "plans to advertise on television" were no longer trade secret by the date of toy
13 fair because the products – Bratz Petz and Sun-Kissed Summer – had already been
14 released to market.[40]  In sum the evidence was insufficient to hold Mattel liable for
15 misappropriating "plans to advertise on television" for any of the following
16 products: Bratz Mobile, Bratz Pet Assortment, Dazzlin Disco Café, Girls Nite Out,
17 Wild Life Safari, Bratz Virtual Buddiez Petz, Bratz Campfire, Wild Wild West,
18 Bratz Rock Angels, Alien Racers, Bratz Petz and Sun-Kissed Summer.

19 **IV.    THE JURY'S DAMAGES AWARDS ARE NOT SUPPORTED BY**
20 **EVIDENCE**

21     MGA's response on the damages issues ignores Mattel's main arguments.
22 MGA does not dispute that its own damages expert calculated ostensible damages for
23 only 15 of the 26 claimed trade secrets as to which the jury found liability.  As to the
24 other 11, Mr. Malackowski could not, and did not, calculate any damages.  MGA
25 recognizes Mattel's argument that Mr. Malackowski actually disclaimed damages as

26

27 [39]  See TX 9507-143, TX 9275-020, TX 31530, TX 9284-01, TX 9284-02 , TX
   26755-012, TX 26755-00010, TX 26755-00010, TX 26755-00010 and TX 23894-
28 00002.

to 5 of them (Opp. at 40), but provides no response.  Even as to the 15 trade secrets for which Mr. Malackowski did calculate damages, MGA ignores that the only "evidence" supporting his damages opinions as to all but two of them (TX 37189-33), was not admitted into evidence.  MGA urges that the jury can "average" its awards, but ignores that the "average" figures offered by Mr. Malackowski were based on alleged damages from products as to which the jury found no misappropriation. MGA argues that Mr. Malackowski's "top-down" opinions support the verdict while simultaneously conceding they do not; and MGA certainly does not rebut Mattel's showing that (1) those opinions assumed liability as to all 114 trade secrets, and (2) the jury did not find liability as to all 114 trade secrets.  MGA ignores altogether Mattel's argument that the "bottom up" approach cannot support the verdicts because it did not allow the jury to disaggregate among the various component aspects of each claimed trade secret, even though there clearly is no evidence of liability as to each component of each claimed trade secret.  See Mot. at 41-42.

In short, the fundamental, dispositive errors identified by Mattel are unrebutted.  The damages awards are arbitrary and lack the "reasonable basis" in evidence that MGA concedes must exist.  Opp. at 42.  They fail as a matter of law.

## A.    The Jury Had No Basis To Perform Its Own Damages Calculations

Mattel showed that of the 26 trade secrets as to which the jury found liability, there was evidence in the record of damages calculations as to only 2 (Bratz Diamondz and Bratz Winter Wonderland).  See Mot. at 32-33.  While MGA references a "graphic" that was shown to the jury during Mr. Malackowski's testimony that purportedly contains Mr. Malackowski's damages calculations for 13 additional claimed trade secrets (Opp. at 42), MGA does not dispute that Mr. Malackowski never testified to the calculations contained on that "graphic" and that the graphic itself is not evidence.  See Mot. at 26 (citing United States v. Wood,  943

---

[40]  See TX 24603-2, TX 24671-00006.

F.2d 1048, 1053-1054 (9th Cir. 1991) (demonstrative charts should "not be admitted into evidence or otherwise be used by the jury during deliberations")).  MGA does not even reference the graphic by its trial exhibit number – because it is not in evidence.  Moreover, the jury's damages awards are dramatically different than Mr. Malackowski's calculations even as to the 15 trade secrets addressed on the graphic (with one exception), as MGA recognizes.  See Opp. at 41-42.  The "graphic" thus does not support the jury's damages awards as a matter of fact or law.

Lacking supporting evidence from Mr. Malackowski, MGA argues the *jury itself* had the "material and tools it needed to construct an appropriate damages award."  Opp. at 46.  But the only "material and tools" MGA identifies is Mr. Malackowski's testimony concerning Bratz Diamondz and Bratz Winter Wonderland, which MGA claims Mr. Malackowski "walked the jury through . . . to illustrate the soundness of his methodology."  Opp. at 43. While that testimony may have given the jury an overview of Mr. Malackowski's *method* for calculating "head start" damages as to those two products, it did not provide a basis for any actual *calculations* other than, at most, the two specific examples.  MGA never directed the jury to any evidence that would allow it to "construct an appropriate damages award" on its own, and MGA points to no such evidence now.

At a minimum, and as to each claimed trade secret, the jury would have needed evidence of each of the following to "construct" its own head start damages award: the date of the toy fair, the date the MGA claimed trade secret was made public (for the end of his head start period), the date the allegedly matching product was brought to market, the aspects of MGA's claimed trade secret that were "used" in the Mattel product, and the profits Mattel earned from its product during the "head start period." See Opp. at 15 (identifying materials Mr. Malackowski purported to consider in calculating damages).  As Mattel showed, *this evidence is not in the record* as to any – let alone all – MGA claimed trade secrets and supposedly matched Mattel products. See Mot. at 24-29, 40 n. 25.  MGA argues that the jury "*heard* the evidence on which

[Mr. Malackowski] relied," Opp. at 44 (emphasis added), but even if the jury *heard* Mr. Malackowski testify that he and his staff reviewed "tens of thousands" of pages of documents (Opp. at 15), that did not and could not provide the jury with the "material and tools it needed to construct an appropriate damages award" given that, as is undisputed, the underlying materials that Mr. Malackowski claims to have used to calculate damages are not in evidence.

MGA asserts that the "testimony of fact witnesses . . . supports the jury's conclusion that the 15 trade secrets had value." Opp. at 46. But general testimony about "value" does not support the $3.4 million awarded on each claimed trade secret. Nothing about Mr. Larian's testimony that "meeting the toy in person is the most valuable way of acquiring" information about a toy, or Mr. Turetzky's testimony that access to competitor information helped Mattel "compete in the marketplace" (id.) gave the jury the "material and tools" it needed to calculate an amount of damages for each of the 25 trade secrets based on Mattel's use of MGA's trade secrets. Nor does Mr. Turetzky's statement that another company's pricing data – which MGA falsely, and without support, describes as "MGA's 2004 price list" (Opp. at 46) – saved "Mattel close to $1mm" provide any basis for the jury to calculate "head start" damages to Mattel based on its alleged "use" of MGA's product information in specific Mattel products during a limited period of time.

As Mr. Malackowski testified, the calculation of "head start" damages for each trade secret is by necessity a "very fact-specific approach."[41] MGA does not point to any evidence that the jury actually could have used to conduct that fact-specific analysis. That is because there was no such evidence. The jury had no "reasonable basis" to "construct[] an appropriate damages award," whether it considered Mr. Malackowski's opinions as a starting point or not. This situation is therefore unlike the cases MGA cites in which a jury made a reasoned decision based on the evidence

---

[41]   4/4/11 Trial Tr., Vol. 3 (Malackowski), at 59:25-60:3.

1   before it to depart from an expert's damages calculation or to calculate damages on

2   its own based on an expert's methodology.  See United States v. 4.0 Acres of Land,

3   175 F.3d 1133, 1141-42 (9th Cir. 1999) (under "scope of the evidence rule"

4   applicable in condemnation cases, jury's departure from appraisers' valuation of land

5   "after taking," which resulted in a lower "just compensation" award to the plaintiff,

6   was based on "testimony from which it could have reasonably concluded that [the

7   plaintiff's] remaining seven acres would not diminish in value after the taking");

8   Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1191-92 (9th Cir. 2002) (expert's

9   "lengthy and detailed testimony" concerning calculation of lost wages "provided a

10  basis for the jury to translate the liability into dollar amounts," and jury's downward

11  departure from expert's calculation were supported by cross-examination of expert

12  regarding whether paid vacations and annuities should be included in damages

13  award).

14        MGA urges that "a jury's damages award cannot be set aside simply because

15  the amount awarded does not correspond to any particular calculation presented to the

16  jury."  Opp. at 39.  But Mattel does not contend that the damages are flawed because

17  the jury did not adopt Mr. Malackowski's "particular calculations," but rather

18  because the jury's awards are not supported by evidence (Mr. Malackowski's

19  calculations or otherwise).  MGA's authorities do not hold that a damages award need

20  not correspond to the relevant evidence, and in fact, like MGA itself, they recognize

21  otherwise.[42]

22

23  _____
    [42]   For example, although the court in Unisplay, S.A. v. Am. Elec. Sign Co., Inc.,

24  69 F.3d 512 (Fed. Cir. 1995), stated that it was not holding that "a jury may only
    arrive at a royalty specifically articulated by the parties during trial," it did not hold
    that a jury's damages award need not even "correspond to any particular calculation,"

25  and in fact the court set aside the jury's damages verdict because it "was not
    supported by relevant evidence."   Id. at 519-20; see also Raynor Bros. v. Am.

26  Cyanimid Co., 695 F.2d 382, 385 (9th Cir. 1982) (even though jury awarded
    approximately half of the plaintiff's expert's calculation, the award was supported by

27  "substantial evidence" that supported that reduction); Humetrix, Inc. v. Gemplus
    S.C.A., 268 F.3d 910, 919 (9th Cir. 2001) ("lost profits" damages awards must be

28  "supported by substantial evidence").

**B.**     **The Jury Had No Basis To Apply "Average" Damages Amounts To Any of the 26 Claimed Trade Secrets**

MGA argues that the jury's damages awards are supported by Mr. Malackowski's "average" damages calculations of $3.4 million for the 4 products for which MGA claims Mr. Malackowski lacked "sufficient data" to calculate "Bottom Up unjust enrichment amounts."  Opp. at 51; see also Opp. at 44 ("it was reasonable for the jury also to adopt Mr. Malackowski's calculated average for the products for which he had no data").

It is misleading and erroneous for MGA to refer to the $3.4 million figure as an "average" damages calculation that could actually apply in light of the verdicts.  First, that "average" figure was based on Mr. Malackowski's calculation of head start damages of $74.9 million *for 22 specific claimed trade secrets for which he assumed liability.*[43]  The jury found *no* liability as to eight of those 22 claimed trade secrets, rendering the $74.9 million number – and the $3.4 million "average" – wholly without support and of no use to the jury.  See O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc., 399 F. Supp. 2d 1064, 1077 (N.D. Cal. 2005) ("After the jury concluded that MPS did not misappropriate all of O2 Micro's trade secrets, Mr. Meyer's expert testimony regarding damages for misappropriation of all trade secrets was useless to the jury" and "the jury was then left without sufficient evidence, or a reasonable basis, to determine the unjust enrichment damages").  Even if averaging were permissible in appropriate circumstances, an "average" damages award that is not supported by the evidence clearly is not an appropriate basis for damages as Mattel showed in its motion.  See Mot. at 39 (citing In re First Alliance Mortg. Co., 471 F.3d 977, 1002-03 (9th Cir. 2006) (damages calculated by averaging the estimates of each party's damages experts "cannot be said to be properly rooted in the evidence at trial" where one of the expert's estimates from which average was

1    calculated was legally erroneous)).

2         Second, and independently, there was no evidentiary basis for applying Mr.

3    Malackowski's "average" calculation for four of the 114 trade secrets as a "catch-all"

4    that could apply to *all* trade secrets.  Not even Mr. Malackowski claimed that it

5    would be reasonable to apply this "average" to any or all of the remaining claimed

6    trade secrets.  If MGA's argument that it was appropriate for the jury to apply the

7    $3.4 million "average" to any and all trade secrets were accepted, the jury, had it

8    found liability for all 114 trade secrets, could have awarded unjust enrichment

9    damages up to $387.6 million ($3.4 million for each of 114 trade secrets) – which is

10   $185 million more than Mr. Malackowski's absolute highest total damages

11   calculation (of $202 million) and $40 million more than *total MY SCENE profits for*

12   *all products over the entire life of the line.*[44]  This exposes the absurdity of MGA's

13   argument; the jury's damages awards cannot be supported by Mr. Malackowski's

14   "average" calculations.  None of MGA's authorities remotely supports accepting the

15   "average" damages verdicts purportedly at issue here.[45]

16        As to the 14 products for which Mr. Malackowski calculated a specific amount

17   of head start damages, there was no reasonable basis for the jury to have reverted to

18   an "average" calculation that resulted in damages awards as much as 170 times

19   greater than the damages Mr. Malackowski calculated.  To the extent the jury applied

20   "average" awards to these trade secrets simply because it found no evidence in the

21   record to award any particular amount of damages, MGA's failure to put evidence in

22

23        [43]   4/4/11 Trial Tr., Vol. 3 (Malackowski) at 44:13-20, 61:1-13; see also TX 37189 -00033 (Malackowski trial aid).

24        [44]   TX 37189-00004; 4/4/11 Trial Tr., Vol. 3 (Malackowski) at 52:9-53:20).
          [45]   See Opp. at 44-45.  Lara v. Nevitt, 123 Cal. App. 4th 454 (2004), held that a
25   jury's damages award in a personal injury case calculated by averaging each juror's
     estimate of damages was not an improper "chance or quotient verdict" because there
26   was no evidence that the damages amount "was adopted without further consideration
     or that the jury agreed at any time to adopt an average and abide by the agreement
27   without further discussion or deliberation."  Id. at 463.  Lara did not address the issue
     here, which is whether Mr. Malackowski's average damages award was supported by
     evidence or provided a reasonable basis for the jury's damages awards.  Humetrix,
28   268 F.3d 910, did not address "average" damages awards at all.

the record does not provide a reasonable basis for an award of $3.4 million per product.

As to the 11 remaining trade secrets for which Mr. Malackowski did not calculate any head start damages because he could not find a "matching" Mattel product, it was even less reasonable for the jury to use "the average head start benefit calculated in the Bottom Up approach for the products for which Mr. Malackowski had no data."  Opp. at 53.  Even Mr. Malackowski recognized that for any "head start" damages to be justified (whether an average or specific calculation), there must at least be evidence that Mattel gained a "head start" competitive advantage by using an MGA trade secret in a "matching" Mattel product.[46]  This is precisely why Mr. Malackowski asserted damages for only 26 of the 114 MGA claimed trade secrets.[47]  This is also why it was baseless for MGA's counsel to have argued, in closing, that Mr. Malackowski's "average" calculations apply even to those trade secrets as to which Mr. Malckoswki did *not* calculate damages based on a "theme-by-theme comparison with Bratz and MyScene."[48]  Where MGA's own damages expert could not find a basis (in evidence or not) to calculate "Bottom Up unjust enrichment amounts," it was improper for the jury to do so – and in any case, no evidence supports the calculations.  MGA's attempt to support the jury's damages awards with Mr. Malackowski's $3.4 million "average" head start damages is meritless.

Finally, MGA does not even attempt to defend (nor could it) the jury's award of $3.4 million "average" damages to each of the five claimed trade secrets – Bratz Styl' It Collection, Bratz Runway Formal Funk Collection, Bratz Pet Assortment, Wild Life Safari Collection, and Bratz Virtual Buddiez Petz – for which Mr. Malackowski disclaimed any head start damages because, as he admitted, there was

---

[46] 4/4/11 Trial Tr., Vol. 3 (Malackowski) at 59:25-60:25.
[47] Id.; 4/5/11 Trial Tr., Vol. 3 (Malackowski) at 63:23-64:19.
[48] 4/8/11 Trial Tr., Vol. 3 (MGA closing argument), at 9:3-7; id. at 10:5-8 ("you heard Mr. Malackowski testify that the average amount of enhanced profits Mattel earned by stealing MGA's trade secrets was 3.4 million each as to the other products.").

either no head start benefit to Mattel or there was overlap with another trade secret for which he had already calculated damages.  See Mot. at 40-41.  The damages awards as to these claimed secrets are indefensible.

**C.   As MGA Admits, Mr. Malackowski's "Top Down" Approach Provides No Basis For the Jury's Damages Awards**

Recognizing that the "bottom up" approach has no application to the 11 trade secrets as to which Mr. Malackowski did not calculate "head start" damages, MGA argues those "eleven trade secrets fall within Mr. Malackowski's Top Down approach." Opp. at 52.  Even though MGA devotes several pages to this argument, it ultimately concedes that the "*jury did not in fact rely on the Top Down approach for these [eleven] non-matched products*."  Opp. at 53 (emphasis added).  MGA thus effectively admits that its attempt to save the jury's damages awards by relying on the top down approach is wasted space.

In any case, the "top down" approach does not support the verdicts. While discussing the top-down opinions at length, MGA ignores Mr. Malackowski's own testimony that the top down approach did not permit the jury to "pick and choose" among the trade secrets or allocate damages between the trade secrets on "a specific product basis."[49]  Instead, the top down approach attempted to measure the "enhanced profitability" to the MY SCENE product line "*in total*" from the alleged taking of *all* 114 claimed trade secrets as a group.[50]  As Mattel showed in its motion, the top down approach is insufficient as a matter of law to support the jury's damages awards as to only a subset of the trade secrets that were included in the top down calculation.  See Mot. at 37-38 (citing, *e.g.*, O2 Micro, 399 F. Supp. 2d at 1077).

MGA largely ignores Mattel's authorities holding that aggregate damages

---

[49]   See 3/19/11 Hearing Tr. (Malackowski Daubert hearing), at 88:21-89:16 (emphasis added); see also 3/19/11 Daubert Hearing at 89:12-16 (Malackowski testifying that "if the jury is going to start to knock out individual themes, I think they're focused on the bottom up approach").
[50]   4/4/11 Trial Tr., Vol. 3 (Malackowski), at 49:16-22, 51:17-14, 64:24-65:7 (italics added).

opinions cannot support a verdict where only a subset of the conduct at issue is found to be actionable.  While it at least addresses it, MGA mischaracterizes <u>O2 Micro</u>.  According to MGA, <u>O2 Micro</u> does not apply because there the jury "took an aggregate damages award and divided it by the number of trade secrets for which it found liability," while here "Mattel cannot credibly posit that the jury here did the same."  Opp. at 53.  In fact, in <u>O2 Micro</u>, the plaintiff's damages expert had calculated approximately $16 million in unjust enrichment damages based on the assumption that all of the alleged trade secrets were misappropriated and failed to provide individual damages calculations for any of them.  399 F. Supp. 2d at 1077.  The jury awarded $12 million in unjust enrichment damages after finding that 5 of the 11 claimed trade secrets were misappropriated and that the misappropriation of only one of them resulted in the defendant being unjustly enriched.  <u>Id.</u>  The court granted JMOL because the expert's testimony regarding damages for all trade secrets left the jury "without sufficient evidence, or a reasonable basis, to determine unjust enrichment damages."  <u>Id.</u>  That is precisely the situation here under Mr. Malackowski's "top down" approach.

MGA urges that Mattel's argument that the top down approach "failed to provide guidance to the jury on an individual trade secret basis is, at best, a red herring" because at the <u>Daubert</u> hearings "the Court heard extensive testimony and cross-examination on Mr. Malackowski's Top Down and Bottom Up approach" and did not find "any fault" with his methodology.  Opp. at 52-53. But those hearings took place *before* the jury rejected MGA's trade secret claims as to 88 of the 114 products at issue.  Nothing in the record suggests that the Court approved or endorsed the top down approach as a method of determining damages on an *individual* trade secret basis.  To the contrary, as Mattel showed and as MGA ignores, the Court anticipated the problem with Mr. Malackowski's "global calculation of the harm caused by all acts of misappropriation" in ruling on the parties' motions for summary judgment and concluded the "the proper course of action is to wait and see whether

1  'the jury conclude[s] that [Mattel] did not misappropriate all [MGA's] trade

2  secrets".[51]

3      Now that the jury has found that Mattel did not misappropriate 88 of the 114

4  claimed trade secrets, even MGA acknowledges that, in reality, Mr. Malackowski's

5  top down approach provided no basis for the jury's damages award.    It thus

6  acknowledges that the "jury *did not in fact rely on the Top Down approach for these*

7  *non-matched products.*    Instead, the jury used the average head start benefit

8  calculated in the Bottom Up approach for the products for which Mr. Malackowski

9  had no data . . . .    In other words, *the jury appears to have rejected Mr.*

10 *Malackowski's Top Down approach* in favor of a different methodology explained in

11 detail by Mr. Malackowski."  Opp. at 53 (emphasis added).   MGA's self-defeating

12 attempt to rely on the "top down" approach only underscores that it can offer no

13 credible support for the jury's damages awards.

14     **D.    Both the "Top Down" and "Bottom Up" Approaches Are**

15           **Unreliable As a Matter of Law**

16     Even assuming the jury's damages awards could be supported by either the

17 "top down" or "bottom up" approach, those awards still would fail as a matter of law.

18     Mattel demonstrated in its motion that the top down approach failed to account

19 for "excess" profits Mattel earned in its MY SCENE line that are attributable to

20 factors other than Mattel's alleged misappropriation.  See Mot. at 50-52.  In response,

21 MGA cites to Mr. Malackowski's testimony that the top down approach purportedly

22 accounts for Mattel's sweat equity.  Opp. at 48.  This argument is non-responsive.

23 Even if Mr. Malackokwski's top down approach allowed Mattel to retain the profits

24 attributable to its sweat equity (it didn't), it still failed to account for other factors

25 unrelated to misappropriation that could have contributed to the profits he deems

26 "excess."  Indeed, Mr. Malackowski's methodology – doubling actual MY SCENE

27

28  ───────────────
    [51]  Dkt. No. 9600 at 161-162.

1  sales in 2002 and assuming every sale in 2003 in excess of that baseline amount was
2  due entirely to the alleged misappropriation – shows that he simply assumed what his
3  analysis purportedly proved.  He ignores other potential causes, such as his own
4  claim that Bratz expanded the market for MY SCENE,[52] or the simple fact that the
5  MY SCENE line included more products in 2003 than in 2002.[53]  Nor does MGA
6  address any of Mattel's authorities demonstrating that Mr. Malackowski's failure to
7  account for other potential causes for the so-called "excess" profits is fatal to his top
8  down approach, including the case in which Mr. Malackowski's damages opinions
9  were excluded because, like here, he failed to exclude non-actionable conduct.  See
10 Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384, 442-44 (D.
11 N.J. 2009) (excluding Mr. Malackowski's damages opinions because his "failure to
12 account for the effects of non-tortious activity is fatal to the validity of his
13 calculations.").

14      Mr. Malackowski's "bottom up" approach is similarly flawed because, as
15 MGA concedes, it awards MGA every penny of profit earned by Mattel during the
16 head start period.  See Mot. at 45-47.  MGA makes no effort to defend Mr.
17 Malackowski's mistaken view that allowing Mattel to retain the profits earned *after*
18 the head start period ends somehow accounts for the contributions of Mattel's hard
19 work, creativity and legitimate efforts to the profits earned *during* the head start
20 period.  See Opp. at 48.  It also fails to rebut Mattel's arguments and authorities
21 which show that the notion that limiting MGA's recovery *after* the damages period
22 has ended represents a proper apportionment of Mattel's profits *during* the damages
23 period is illogical and unsupported.[54]  The only response MGA musters is that the
24 jury was specifically instructed to subtract "the fruits of 'Mattel's sweat equity'" and
25 that Mattel improperly "presumes that the jurors disregarded the Court's

---

[52]  4/5/11 Trial Tr., Vol. 2 (Malackowski), at 14:6-11.
[53]  3/19/11 Hearing Tr. (Malackowski Daubert Hearing), at 85:11-87:18.
[54]  See Motion at 45-47.

1  instructions." Opp. at 49-50.  That argument misses the mark:  Mr. Malackowski
2  provided the jury with no way to measure or subtract the fruits of Mattel's sweat
3  equity and instead offered only unjust enrichment numbers that were inconsistent
4  with the law.

5       Last, MGA does not respond to Mattel's argument that the "bottom up"
6  approach fails to support the jury's verdict because it does not allow the jury to
7  disaggregate Mr. Malackowski's damages calculations – even as to the few
8  calculations in evidence – among the various component trade secrets that MGA
9  claims are contained in each product.  See Mot. at 41-42.  Mr. Malackowski's "head
10  start" calculations assumed that all claimed trade secrets relating to each product –
11  "appearance, operation, intended play pattern," "plans to advertise on television," and
12  "FOB pricing" – were misappropriated by Mattel and resulted in head start damages.
13  However, as Mattel showed, the evidence does not support a finding that all (if even
14  any) components relating to each product actually were trade secrets and were
15  misappropriated by Mattel.   Id.   This renders Mr. Malackowski's bottom up
16  calculations unusable as a matter of law.  See O2 Micro, 399 F. Supp. 2d at 1077.

17  **V.**   **MGA DOES NOT AND CANNOT ANSWER THE RELEVANT**
18       **REMITTITUR QUESTION:  IS EACH DAMAGES AWARD**
19       **SUPPORTED BY EVIDENCE?**

20       Avoiding the actual remittitur issue, MGA spends much of its opposition
21  arguing that Mattel's request for remittitur here is inconsistent with Mattel's
22  opposition to MGA's 2008 remittitur motion.  Opp. at 54-55.  It isn't; the issues are
23  entirely different.  In 2008, MGA moved for remittitur based on the argument that
24  the jury had awarded duplicative damages.  See Dkt. No. 4523.  In 2008, there was
25  no dispute that the amounts of the damage awards, whether duplicative or not, were
26  fully supported by the evidence.  See, e.g., Mattel's Opposition to MGA's Motion
27  for Remittitur, Dkt. No. 4684 at 1 ("MGA does not even argue that the jury's
28  awards, either individually or in total, are not supported by sufficient evidence.").

With the sole exception of Bratz Girls' Nite Out, Mattel does not argue here that the verdicts give MGA a "double recovery" but instead that there is no evidence to support the jury's damage awards, which is a different issue. MGA's failure to grapple with this question is telling, and the difference critical. The remittitur question here does not require any investigation of what the jury intended or thought in awarding damages. Most of MGA's cases, cribbed from Mattel's 2008 remittitur opposition, are wholly inapposite for this reason.[55] Indeed, MGA's 2008 motion for remittitur itself recognized the undisputed principle of law at issue now – a principle which Mattel has never disputed: "*The jury's damages award is necessarily constrained by the damages evidence introduced at trial.*" MGA's Motion for Remittitur, Dkt. No. 4523 at 16, n.5 (citing L.A. Mem'l Coliseum Comm'n v. NFL, 791 F.2d 1356 (9th Cir. 1986); Masimo Corp. v. Tyco Health Care Group, L.P., 2006 WL 1236666, at *15 (C.D. Cal. Mar. 22, 2006)); see also Cretella v. Kuzminski, 640 F. Supp. 2d 741, 757 (E.D. Va. 2009) (holding that "the court must examine the evidence presented and its relationship to the amount of damages awarded by the jury" and engaging in separate remittitur analysis as to each count of defamatory conduct). Notably, the Masimo court found a jury's award unsupported by evidence where it was in excess of an expert's damages calculation and the liability verdict could not include all of the acts the expert's opinion had included (2006 WL 123666 at *13-15), making this MGA authority far more applicable than the ones Mattel cited on other issues in 2008.

By the Court's express design in the verdict form, each of the jury's 26 awards was dependent on proof of wholly distinct harm arising from wholly distinct

---

[55] See United Phosphorus, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219, 1227-29 (10th Cir. 2000) (rejecting argument that verdict was a "double recovery"); Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 497 (2d Cir. 1995) (same); Carter v. D.C., 795 F.2d 116, 134-35 (D.C. Cir. 1986) (same); see Wall Data Inc. v. L.A. County Sheriff's Dep't., 447 F.3d 769, 786-87 (9th Cir. 2006) (jury's "general verdict awarding Wall Data damages of $210,000" upheld where award had "substantial support in the record" and was "within a range sustainable by proof").

00505.07975/4149500.1

MATTEL'S REPLY ISO RENEWED JMOL RE MGA'S TRADE SECRET CLAIM

liability.   The question is simply whether there is sufficient evidence to support those awards.  If, as MGA stated in 2008, *"the jury's damages award is necessarily constrained by the damages evidence introduced at trial,"* then the jury's damages award is constrained to the following damages evidence MGA introduced at trial:

| | | |
|---|---|---|
| 1. | Bratz Mobile – | no damages evidence |
| 2. | Bratz Styl' It Collection – | no damages evidence |
| 4. | Bratz WinterWonderland – | asserted damages of $5,773,000 |
| 5. | Bratz Formal Funk Collection – | no damages evidence |
| 6. | Bratz Runway Formal Funk Collection – | no damages evidence |
| 7. | Bratz FM Limo – | no damages evidence |
| 8. | Bratz Motorcycle – | no damages evidence |
| 9. | Bratz Pet Assortment – | no damages evidence |
| 14. | Lil' Bratz Vehicle Assortment – | no damages evidence |
| 15. | Lil' Bratz Deluxe Mall Playset – | no damages evidence |
| 16. | Bratz Petz – | no damages evidence |
| 18. | Dazzlin' Disco Café – | no damages evidence |
| 19. | Sun Kissed Summer – | no damages evidence |
| 20. | Girls Nite Out – | no damages evidence |
| 21. | Wild Life Safari Collection – | no damages evidence |
| 22. | Bratz Diamondz – | asserted damages of $16,391,000 |
| 24. | Bratz Virtual Buddiez Petz – | no damages evidence |
| 27. | Bratz Campfire – | no damages evidence |
| 28. | Wild Wild West – | no damages evidence |
| 29. | Bratz Rock Angels – | no damages evidence |
| 41. | Monkey See Monkey Do – | no damages evidence |
| 49. | Lil' Bratz Boyz – | no damages evidence |
| 58. | Alien Racers – | no damages evidence |
| 65. | Bratz Girls Nite Out – | no damages evidence |
| 66. | Bratz Kidz – | no damages evidence |
| 69. | Passion for Fashion – | no damages evidence |

Mattel does not ask the Court to inquire into the jury's intent or method of calculation in awarding $3.4 million for each of 26 trade secrets.  The problem is that there was no evidence supporting the damages awards at all; such calculations "must find support in the record" or they cannot be sustained.  In re Wolverton Assocs., 909 F.2d 1286, 1296 (9th Cir. 1990).

1    Nor does assessing the evidence here on an individual trade secret basis
2  involve improperly breaking a verdict down "piece by piece to particular injuries,"
3  as MGA argues.  Opp. at 57 (quoting <u>Johnson v. Consol. Rail Corp.</u>, 797 F.2d 1440,
4  1446 (7th Cir. 1986)).  In <u>Johnson</u>, there was a *single*, general damages verdict for
5  injuries caused by negligence, and the court rejected defendants' attack on a sub-set
6  of plaintiff's claimed injuries.  <u>Id.</u> at 1441-42.  But here, there are 26 separate
7  findings of liability with 26 separate damages awards for each.  Where a special
8  verdict form sets forth specific awards, each must be evaluated individually to
9  determine if the evidence is sufficient to support the award.  <u>See, e.g.</u>, <u>L.A. Police</u>
10 <u>Protective League v. Gates</u>, 907 F.2d 879, 882 (9th Cir. 1990) (remanding for
11 district court to revisit its remittitur to a flat amount of jury verdict containing
12 specific damages awards for specific violations because remittitur "did not direct
13 itself to specific portions of the verdict" and requiring district court to instead
14 consider "the damages for each claimed violation"); <u>Cretella</u>, 640 F. Supp. 2d at
15 754.  Indeed, that is the entire purpose of a special verdict form; without it, errors or
16 failures of evidence affecting a portion of the verdict require a new trial, but with it
17 they can be remitted.  <u>See also</u> <u>Hicks v. Capitol Am. Life Ins. Co.</u>, 943 F.2d 891,
18 894-95 (8th Cir. 1991) ("Had the jury verdict been specific, we might otherwise
19 reduce the damage award," but because "[w]e cannot assume any particular
20 scenario" and there was "no way of determining what was included" in the verdict, a
21 "new trial on the issue of damages" was required); <u>Trademark Research Corp. v.</u>
22 <u>Maxwell Online, Inc.</u>, 995 F.2d 326, 337-338 (2d Cir. 1993) ("a special verdict form
23 is to be recommended where the nature of the evidence on damages presents the
24 possibility of piecemeal disallowance on a motion for judgment n.o.v. or on appeal.
25 Where categories of damages are easily segregable and are contested on
26 independent legal grounds, the use of a neutrally worded special verdict form
27 increases the likelihood that the ultimate judgment reflects the findings of the
28

1  jury."). Regardless of how or why the jury awarded what it did, its damages awards

2  cannot stand.

## VI. THE MATHEMATICAL ERROR AND DUPLICATIVE AWARD MUST BE REMITTED

5  MGA does not dispute that the jury's verdict form contains a mathematical

6  error and must be reduced from $88.5 million to $88.4 million. Mot. at 53.

7  As to duplication, MGA concedes that "Girls Nite Out" is a single product

8  that appeared twice on the verdict form. Opp. at 59 (arguing that "this product"

9  appeared in more than one Mattel report). And MGA does not address the Court's

10  prior tentative ruling that "I'm probably going to strike that amount. It appears to be

11  duplicative and a dual verdict. . . . MGA, of course, would be opposed to that, but it

12  does appear to be a duplicative verdict." 4/21/11 Hearing Tr., Vol. 1 at 145:23-15.

13  MGA's claim that Mattel waived objection is incorrect. Mattel appropriately

14  objected as soon as the duplication became apparent, and before the jury was

15  discharged. 4/21/11 Hearing Tr., Vol. 1 at 145:23-15; see Yeti by Molly, Ltd. v.

16  Deckers Outdoor Corp., 259 F.3d 1101, 1110 (9th Cir. 2001) (to preserve objection,

17  "Deckers could have objected after the verdict had been announced but before the

18  jury was released"). The duplication error was so obvious to the Court that, when

19  Mattel objected before the jury was discharged and requested the jury be polled to

20  confirm the award was in fact duplicative, the Court denied the request. Id. The

21  Court wished MGA "good luck" in arguing otherwise. Id. Where, as here, it is

22  clear beyond dispute that the verdict reflects duplicative damages, remittitur should

23  be ordered. The Court's authority to correct this type of error, including in a verdict

24  form, is well-established. See, e.g., Blanton v. Anzalone, 813 F.2d 1574, 1577 (9th

25  Cir. 1987) (affirming deletion of pre-judgment interest where Court had not

26  intended to grant such interest); Woodworkers Tool Works v. Byrne, 191 F.2d 667,

27  676 (9th Cir. 1951) (correcting jury verdict after jury was discharged where it was

28  apparent two numbers had been "transposed" because "[t]he error made was

1  obviously clerical and the mistake was easily remedied by setting the amounts in

2  their proper places").

3  **VII.   ALTERNATIVELY, THE COURT SHOULD VACATE THE VERDICT**

4  **AND ORDER A NEW TRIAL ON THE 26 "TRADE SECRETS"**

5      The lack of evidence of liability or damages compels entry of judgment for

6  Mattel.  As set forth in Mattel's Motion, JMOL may be granted specifically with

7  respect to the issue of damages.  Mot. at 6 (citing <u>Brunswick Corp. v. Pueblo Bowl-</u>

8  <u>O-Mat, Inc.</u>, 429 U.S. 477, 489-490 ("Our review of the record, however, persuades

9  us that a new trial on the damages claim is unwarranted. . . .  Since respondents did

10  not prove any cognizable damages . . . petitioner is entitled, in accord with its motion

11  made pursuant to Rule 50(b), to judgment on the damages claim notwithstanding the

12  verdict.")).  MGA's Opposition fails to even address this case law.  If the Court does

13  not enter judgment for Mattel, and does not order a remittitur, then it should vacate

14  the verdict and order a new trial as to the 26 "trade secrets" identified by the jury.

15      MGA concedes that a new trial is warranted when a verdict is against the clear

16  weight of the evidence.  Opp. at 60 (citing <u>Union Oil. Co. of Cal. v. Terrible Herbst,</u>

17  <u>Inc.</u>, 331 F.3d 735, 742 (9th Cir. 2003).  The Court has an affirmative obligation to

18  "weigh the evidence as he saw it, and to set aside the verdict of the jury, even though

19  supported by substantial evidence, where, in his conscientious opinion, the verdict is

20  contrary to the clear weight of the evidence."  <u>Moist Cold Refrigerator Co. v. Lou</u>

21  <u>Johnson Co.</u>, 249 F.2d 246, 256 (9th Cir. 1957); <u>see</u> <u>Molski v. M.J. Cable, Inc.</u>, 481

22  F.3d 724, 729 (9th Cir. 2007) (historically recognized grounds for granting a new trial

23  "include, but are not limited to, claims that the verdict is against the weight of the

24  evidence, that damages are excessive, or that, for other reasons, the trial was not fair

25  to the party moving") (quoting <u>Montgomery Ward & Co. v. Duncan</u>, 311 U.S. 243,

26  251 (1940)).  Failure to weigh the evidence to determine whether the clear weight

27  supports the verdict is an abuse of discretion.  <u>See</u> <u>Fenner v. Dependable Trucking</u>

28  <u>Co.</u>, 716 F.2d  598, 602-03 (9th Cir. 1983)  (reversing trial court denial of a motion

1  for new trial and holding that failure to set aside a verdict of damages in excess of the

2  clear weight of evidence is an abuse of discretion).

3      MGA's only response to Mattel's request for a new trial is that "Mattel asks

4  this Court to reexamine the jury verdict."  Opp. at 63.  Though MGA claims this is

5  because "the verdict is supported by ample evidence and testimony" (which it is not),

6  MGA also suggests that Mattel's request for a new trial is improper because the Court

7  should refrain from any evaluation or weighing of the evidence.  According to MGA,

8  "facts once found by a jury in the context of a civil trial are not to be reweighed and a

9  new trial granted lightly."  Opp. at 61.  MGA further argues that "[t]he jury, and not

10 the court, is given the task of weighing conflicting evidence and making credibility

11 determinations."  Id. at 60 (citing Roy v. Volkswagen of America, Inc., 896 F.2d

12 1174 (9th Cir. 1990) and Landes Construction Co. v. Royal Bank of Canada, 833

13 F.2d 1365 (9th Cir. 1987)).

14     The Ninth Circuit has explicitly and frequently rejected that argument,

15 including in the cases that MGA cites, in the context of new trial motions based on

16 the weight of the evidence.  Nor do Landes or Roy support MGA's position.  In

17 Landes, the Ninth Circuit stated that denial of a motion for a new trial will be

18 reversed where the trial court failed to weigh the evidence: "[w]e will reverse denials

19 of such motions for new trials" when, among other things, "[the trial court] concludes

20 that it may not weigh the evidence."  Landes, 833 F.2d at 1372 (citing Moist Cold

21 Refrigerator Co., 249 F.2d at 256).  Landes further stated that the trial court must

22 independently "weigh the evidence and assess the credibility of witnesses, and need

23 not view the evidence from the perspective most favorable to the prevailing party."

24 Landes, 833 F.2d at 1371.  In Roy, the court stated that a "trial court may grant a new

25 trial, even though the verdict is supported by substantial evidence, if the verdict is

26 against the clear weight of the evidence," and that in making this determination, a

27 trial court "may weigh the evidence and credibility of the witnesses...."  Roy, 896

28 F.2d at 1176.

1   MGA cites <u>Tortu v. Las Vegas Metro. Police Dept.</u>, 556 F.3d 1075, 1084 (9th
2   Cir. 2009) for the proposition that if "a jury concludes that a claimant has proven
3   certain aspects of its case and not others is not a basis for concluding that the result
4   warrants a new trial." Opp. at 61. <u>Tortu</u> says no such thing. <u>Tortu</u> did not involve "a
5   claimant [who] has proven certain aspects of its case and not others," but a verdict
6   finding only one of three defendants liable for use of excessive force. The appellate
7   court ruled that the verdict was not against the weight of the evidence merely because
8   one defendant was found liable and two others were not. <u>Tortu</u>, 556 F.3d at 1083-
9   1084 ("The district court based its decision that the jury's verdict was against the
10  clear weight of the evidence largely on the ground that its verdict for Officers
11  Cashton and Crowley was inconsistent with a verdict against Officer
12  Engle…Contrary to the district court's view, the jury verdict only demonstrates that
13  Tortu did not bear his burden of proof…that all of the officers used excessive force in
14  effecting the arrest.").

15      In any event, Mattel is not requesting a new trial because the jury found
16  liability for some products but not others, but rather because the jury's verdict with
17  respect to the 26 products for which the jury did find liability and awarded damages
18  is against the clear weight of the evidence. For some products, the trial record
19  contains no evidence. For others, the evidence shows no secrecy or no value. For all
20  of them, MGA presented no evidence that Mattel used MGA's information, while it
21  remained undisclosed, on any product to obtain a head start, leaving no evidence
22  supporting any monetary award. <u>See</u> Motion at 27-30. If the Court declines to grant
23  judgment as a matter of law in favor of Mattel or to remit the jury's damages award,
24  then the Court should vacate the verdict as to the 26 products and order a new trial on
25  these claims.[56]

26  _____

27  [56]   MGA also cites Mattel briefs opposing MGA's new trial motions after the
    2008 trial. These briefs are irrelevant. Unlike Mattel, MGA never sought a new trial
28  because the 2008 verdict was against the weight of the evidence. Neither Mattel's nor
    (footnote continued)

1        <u>**Conclusion**</u>

2        For the foregoing reasons, Mattel respectfully requests that the Court grant

3   Mattel's motion.

4   DATED: May 19, 2011                QUINN EMANUEL URQUHART &
                                       SULLIVAN. LLP
5

6
                                  By /s/ John B. Quinn
7                                    John B. Quinn
                                     Attorneys for Mattel, Inc., and Mattel de
8                                    Mexico. S.A. de C.V.

9

10

11

12

13

14

15

16

17

18

19

20

21

22   _____
     MGA's briefs addresses that issue.  MGA moved, and Mattel opposed motions based
23   on inconsistent verdicts, duplicative damages and instructional error.  See generally
     Mattel's Opposition to MGA's Motion for a New Trial (Dkt. No. 8679);  Mattel's
24   Opposition to MGA's Motion for Remittitur (Dkt. No. 4684).  MGA cites cases from
     Mattel briefs, but they do not discuss or were cited for weight of the evidence as a
25   basis for a new trial.  See Atlantic Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369
     U.S. 355, 360-364 (1962) (instructional error); Bains LLC v. Arco Prods. Co., 405
26   F.3d 764, 771 (9th Cir. 2005) (inconsistent verdict); Schutzky Dist., Inc. v. Kelly, 643
     F. Supp. 57, 59-60 (N.D. Cal. 1986) (inconsistent verdict).  Tennant v. Peoria &
27   Pekin Union Ry. Co., 321 U.S. 29, 35 (1944) and Spurlin v. Gen. Motors Corp., 528
     F.2d 612, 620 (5th Cir. 1976) add nothing to the discussion.  In both, the reviewing
     court's reversed a lower court that did not consider evidence supporting liability.
28   Here, no evidence supports the jury's liability or damages verdict.