1              **UNITED STATES DISTRICT COURT**

2             **CENTRAL DISTRICT OF CALIFORNIA**

3          **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    – – – – – – –

5

6    MATTEL, INC., ET AL.,            )
                                      )
7              Plaintiffs,            )
                                      )
8         vs.                         ) No. CV 04-9049-DOC
                                      )
9    MGA ENTERTAINMENT, INC., ET AL., )    Volume 1 of 4
                                      )
10            Defendants.             )
     _____)

11

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                      Motions

17               Santa Ana, California

18             Wednesday, May 25, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     ll-05-25 MattelV1

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR PLAINTIFFS MATTEL, INC., ET AL.:

 4            QUINN, EMANUEL, URQUHART & SULLIVAN
              By:  JOHN B. QUINN
 5                 MICHAEL T. ZELLER
                   SUSAN ESTRICH
 6                 Attorneys at Law
              865 South Figueroa Street
 7            10th Floor
              Los Angeles, California 90017-2543
 8            (213) 443-3000

 9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11            ORRICK, HERRINGTON & SUTCLIFFE, LLP
              BY:  THOMAS S. MC CONVILLE
12                 Attorney at Law
              4 Park Plaza
13            Suite 1600
              Irvine, California 92614
14            (949) 567-6700

15            - AND -

16            ORRICK, HERRINGTON & SUTCLIFFE, LLP
              BY:  ANNETTE L. HURST
17                 Attorney at Law
              405 Howard Street
18            San Francisco, California 94105
              (415) 773-5700
19
              - AND -
20
              KELLER RACKAUCKAS, LLP
21            BY:  JENNIFER L. KELLER
                   Attorney at Law
22            18500 Von Karman Avenue
              Suite 560
23            Irvine, California 92612
              (949) 476-8700

24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10606   Filed 05/26/11   Page 3 of 85   Page ID
#:320995
CV 04-9049-DOC - 05/25/2011 - Vol. 1 of 4

3

```
1    APPEARANCES OF COUNSEL (Continued):

2


3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4            SCHEPER, KIM & OVERLAND, LLP
             BY:  ALEXANDER H. COTE
5                 Attorney at Law
             601 West Fifth Street
6            12th Floor
             Los Angeles, California 90071
7            (213) 613-4660

8            - AND -

9            LAW OFFICES OF MARK E. OVERLAND
             BY:  MARK E. OVERLAND
10                Attorney at Law
             100 Wilshire Boulevard
11           Suite 950
             Santa Monica, California 90401
12           (310) 459-2830

13

14   Also Present:

15           ISAAC LARIAN, MGA CEO
             ROBERT ECKERT, Mattel CEO
16           RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan
             KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe
17           WARRINGTON PARKER, Orrick Herrington & Sutcliffe
             MELANIE PHILLIPS, Orrick Herrington & Sutcliffe
18           FRANK RORIE, Orrick Herrington & Sutcliffe
             DIANA RUTOWSKI, Orrick Herrington & Sutcliffe
19           DENISE MINGRONE, Orrick Herrington & Sutcliffe
             JEANINE PISONI, MGA Attorney at Law
20

21

22

23

24

25
```

1                          I N D E X

2

3

4    MGA PARTIES' MOTION FOR JUDGMENT OF MATTEL'S INTENTIONAL
     INTERFERENCE WITH CONTRACT AND UNFAIR COMPETITION CLAIMS
5
     MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW RE MGA'S
6    CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO
     FEDERAL RULE OF CIVIL PROCEDURE 50(B); AND ALTERNATIVE
7    MOTION FOR REMITTITUR AND/OR NEW TRIAL

8    MGA PARTIES' MOTION FOR EXEMPLARY DAMAGES AND FEES PURSUANT
     TO CALIFORNIA'S UNIFORM TRADE SECRET ACT, CAL. CIV. CODE
9    3426.3, 3426.4

10   MATTEL'S MOTION AND MOTION TO STRIKE AND CONFIRM WAIVED THE
     MGA PARTIES' UNTIMELY OBJECTIONS TO MATTEL'S PROPOSED
11   FINDINGS OF FACT AND CONCLUSIONS OF LAW RE MGA'S UNFAIR
     COMPETITION CLAIM

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          SANTA ANA, CALIFORNIA, WEDNESDAY, MAY 25, 2011

2                         VOLUME 1 OF 4

3                          (9:34 a.m.)

4          THE COURT:  First of all, I received a request

5     from Mr. Quinn concerning Ms. Estrich being present.  Is she

6     here?

7          MR. QUINN:  She's coming from the conference room

8     as we speak, your Honor.

9          THE COURT:  All right.

10         And Mr. Eckert is here.

11         Good morning Mr. Eckert.

12         MR. ECKERT:  Good morning, sir.

13         THE COURT:  Mr. Larian?

14         MS. KELLER:  Mr. Larian is --

15         MR. MC CONVILLE:  He's running a little late, your

16    Honor.  He's going to be here.  He's coming on a flight.

17         THE COURT:  Do you want me to wait, as a courtesy?

18         MS. PISONI:  He should be here within the next 30

19    minutes, your Honor.

20         THE COURT:  Well, it's too important for both of

21    the principals and the parties, and I certainly would extend

22    that invitation to either party.

23         Mr. Zeller, how are you today?

24         MR. ZELLER:  Good.  How are you, Judge?

25         THE COURT:  Good to see you.

CV 04-9049-DOC - 05/25/2011 - Vol. 1 of 4

6

1            And Susan Estrich, is she --

2            MR. ZELLER:  She is.  She -- we were in my office,

3    your Honor.

4            THE COURT:  Okay.  That's no problem.

5            What I can do is propose to you some of the

6    questions that I have, then turn you loose at the lectern

7    and let you make any presentation in any order you'd like

8    to, but maybe you should hear some of the concerns and

9    questions I have first so you can shape your arguments and

10   make sure that you respond to them.

11           Ms. Estrich, how are you today?

12           MS. ESTRICH:  I apologize, your Honor.

13           THE COURT:  No, you shouldn't apologize.  I was

14   late.  I just got here.

15           I'm just kidding you, Ms. Estrich, but have a

16   seat.  You're more than welcome.  It's good to see you.

17           MS. ESTRICH:  Thank you, your Honor.

18           THE COURT:  Nice to see you.

19           Now, I received a request from Mr. Zeller

20   yesterday that Ms. Estrich appear and argue.  That's fine

21   with me, but I think it should be properly noticed, and I

22   don't want MGA disadvantaged, if you'd like another person

23   to argue also.  But after all, a lot of this is going up on

24   appeal, and so if you feel disadvantaged, I'll wait until

25   you get whoever you'd like here.

Case 2:04-cv-09049-DOC-RNB   Document 10606   Filed 05/26/11   Page 7 of 85   Page ID #:320999
CV 04-9049-DOC - 05/25/2011 - Vol. 1 of 4

7

1          MS. HURST:  We're fine, your Honor.

2          THE COURT:  You're sure?

3          MS. HURST:  Yep.

4          THE COURT:  Well, Ms. Estrich, you're welcome, and

5    you can be arguing today.

6          MS. ESTRICH:  Thank you, your Honor.

7          THE COURT:  All right.  Let me start with some of

8    the questions that I've got.  Let's go over the motions that

9    the Court still has pending so that there are no loose ends.

10         First, Mattel's application to compel MGA to

11   produce billing records that have already been submitted for

12   the discovery master's in-camera review.

13         Second, MGA's application to compel Mattel to

14   produce its billing records.

15         Third, Mattel's application to strike MGA's

16   objections to Mattel's proposed findings of fact and

17   conclusions of law.

18         Let me stop there so you can catch up for a

19   minute.

20         The fourth motion pending is MGA's motion to

21   confirm the dismissal of the action numbered CV 04-9059 that

22   is entitled "Bryant v. Mattel, Inc."

23         The fifth are the equitable claims and defenses

24   that were tried to the Court.

25         The sixth would be Mattel's motion for judgment as

1     a matter of law on MGA's claim for trade secret

2     misappropriation.

3            The seventh would be MGA's motion for judgment as

4     a matter of law on Mattel's claim for intentional

5     interference with contractual relations.

6            The eighth would be MGA's application for

7     attorneys' fees under the Copyright Act.

8            And the last motion I have, at least my records

9     would reflect the last motion I have, is MGA's application

10    for attorneys' fees and exemplary damages under the Trade

11    Secret Act.

12           Now, if you'd like, I could go over those again.

13    I want to make sure you check your records.

14           So Mr. Zeller and Ms. Hurst, let me do that one

15    more time, quickly.

16           First, Mattel's application to compel MGA to

17    produce billing records that have already been submitted for

18    the discovery master's in-camera review.

19           Second, MGA's application to compel Mattel to

20    produce its billing records.

21           Third, Mattel's application to strike MGA's

22    objections to Mattel's proposed findings of fact and

23    conclusions of law.

24           The fourth pending motion I have is MGA's motion

25    to confirm the dismissal of the action numbered CV 04-9059

1    that is entitled "Bryant v. Mattel, Inc."

2            The fifth are the equitable claims and defenses

3    that were tried to the Court.

4            The sixth would be Mattel's motion for judgment as

5    a matter of law on MGA's claim for trade secret

6    misappropriation.

7            The seventh would be MGA's motion for judgment as

8    a matter of law on Mattel's claim for intentional

9    interference with contractual relations.

10           The eighth would be MGA's application for

11   attorneys' fees under the Copyright Act.

12           And the last motion I have is MGA's application

13   for attorneys' fees and exemplary damages under the Trade

14   Secret Act.

15           Okay.  Let me turn to MGA and --

16           MR. OVERLAND:  You forgot us again.

17           THE COURT:  What?

18           MR. OVERLAND:  You forgot us again.

19           THE COURT:  Okay.

20           MR. OVERLAND:  Mr. Machado's motion for attorneys'

21   fees.

22           THE COURT:  Okay, my apologies.  Thank you.

23           Okay.  Anything else concerning Machado?

24           MR. OVERLAND:  No.  That's all.

25           THE COURT:  Now, let me turn to MGA.

CV 04-9049-DOC - 05/25/2011 - Vol. 1 of 4

10

```
 1            What motions do you still believe are pending that
 2   the Court would be resolving today?
 3            MS. HURST:  I think that covers everything, your
 4   Honor.  Our JMOL also covers Mattel's 17200 claim.  I think
 5   that's in the substance of when the Court references Number
 6   7.
 7            THE COURT:  Okay.  Let me turn to Mattel.
 8            Mr. Quinn, Mr. Zeller, Ms. Estrich, what
 9   motions --
10            MR. QUINN:  I think that covers everything, your
11   Honor.
12            THE COURT:  Okay.
13            Now, the procedural matters.  These aren't final
14   rulings.  Let me tell you initial thoughts.  I'm subject to
15   argument.
16            I'm tentatively inclined to deny as moot, in light
17   of the jury verdict, MGA's motion to confirm the dismissal
18   of CV 04-9059.
19            I'm also tentatively inclined to deny Mattel's
20   application to strike MGA's objections to Mattel's proposed
21   findings of fact and conclusions of law.  Although Mattel
22   argues that MGA did not timely file its objections under the
23   local rules, my briefing schedule indicated that opposition
24   briefs were not due until a designated date.  And in
25   addition, Mattel filed amended findings of fact and
```

```
1    conclusions of law that seemed to open the door for MGA's
2    allegedly belated objections.  So I'm going to hear argument
3    in a few moments on that.
4            Next, turning to the production of billing
5    records, I'm tentatively inclined to deny MGA's request that
6    I compel Mattel to produce its billing records since
7    Mattel's billing statements are not relevant to the
8    reasonableness of MGA's fees, especially because MGA was not
9    similarly situated in this case.
10           I'm also tentatively inclined to hold in abeyance
11   Mattel's request that MGA produce all of the billing records
12   that's submitted for the discovery master's in-camera review
13   since there is no need to deal with that issue until I make
14   a final determination on the subject matter.  And I'm going
15   to hear your thoughts concerning that in just a few moments.
16   These are just tentative thoughts on my part.
17           Concerning the equitable claims and defenses, I'm
18   tentatively inclined to enter judgment against Mattel on its
19   unfair competition and intentional interference claims on
20   the grounds that Mattel does not oppose the entry of
21   judgment on these claims, which were untimely according to
22   the jury's findings.
23           That leaves the Kohl's issue, and the issue I'd
24   like you to address, the restitution of any business or
25   property under the California Supreme Court's recent
```

1    discussion in Kwikset Corporation v. Superior Court.  You'll

2    find it at 51 Cal.4th 310.  It's a January 27th, 2011

3    opinion.  So Kwikset Corp. v. Superior Court, 51 Cal.4th

4    310, January 27th, 2011, and the following language in that

5    opinion regarding Proposition 64, quote:  "The intent of

6    this change was to confine standing to those actually

7    injured by defendant's practice," end of quote, and to

8    disallow individuals to file lawsuits if they had no

9    business dealings with the defendant.

10           So my question is, doesn't the Court's discussion

11   of causation in that case mean that Kohl's conduct is an

12   intervening force that is sufficiently strong so as to sever

13   Mattel's conduct from MGA's damages as a matter of law?  And

14   I'm raising that as a question.

15           Concerning attorneys' fees, on behalf of MGA, are

16   you seeking defensive fees under only the Copyright Act or,

17   like Mr. Machado, under Section 3624.4 of the Trade Secrets

18   Act as well?  Let me repeat that.  Are you seeking defensive

19   fees under only the Copyright Act or, like Mr. Machado, are

20   you seeking those fees under Section 2 -- or 3624.4 of the

21   Trade Secret Act as well?

22           The second question:  Under the Copyright Act, is

23   there a consensus that the Court should under Fantasy v.

24   Fogerty at 94 F.3d 553, Ninth Circuit 1996, consider whether

25   the successful defense furthers the purposes of the

1  Copyright Act?  The relevant factors are, first, the degree

2  of success; second, the extent to which the claim is

3  frivolous; third, the objective reasonableness of the

4  factual and legal arguments; fourth, the motivation in

5  bringing the lawsuit; and fifth, the need for compensation

6  and deterrence.

7       The legal question is whether there are any

8  additional factors that must be considered in determining

9  whether the successful defense furthered the purposes of the

10  Copyright Act, and I'm asking that of the parties to address

11  the Court on that.

12       Third, on the apportionment issue, what's the best

13  authority on the recovery of fees in a case involving

14  non-copyright claims where those claims in substantial part

15  are based upon the same nucleus of facts that give rise to

16  the copyright claim.  Wouldn't all of the work done by an

17  attorney, like depositions, simultaneously apply to the

18  copyright claim and the non-copyright claim?  And I'm asking

19  that question.

20       Concerning exemplary damages, since O2Micro

21  International Limited v. Monolithic Power Systems, Inc., 399

22  F.Supp.2d 1064, California courts have concluded an

23  exemplary damages determination under Section 3426.3(c) of

24  the Trade Secrets Act, and that that act should apply -- oh,

25  I'm sorry.  That section should apply the same factors that

1    apply to the calculation of punitive damages on any other

2    claim.  Those factors, according to the California Supreme

3    Court's decisions in Neal v. Farmers Insurance Exchange and,

4    more recently, in Adams v. Murakami are, first, the nature

5    of the misconduct; second, the amount of compensatory

6    damages, and third, the defendant's financial condition.  Is

7    there any objection on this threshold legal issue?  I'm

8    asking that of the parties.

9            Second, concerning exemplary damages, the big

10   legal dispute centers around the second Neal factor, quote,

11   "The amount of compensatory damages," end of quote.  How

12   does the following language from page 990 of the Neal

13   opinion factor into the arguments in your briefing, quote,

14   "Another relevant yardstick is the amount of compensatory

15   damages awarded; in general, even an act of considerable

16   reprehensibility will not be seen to justify a

17   proportionally high amount of punitive damages if the actual

18   harm suffered thereby is small," end of quote.

19           Now, I'm going to take a recess for a moment.  I

20   want Mr. Larian here, and I don't understand why he's not

21   here.  This is -- why isn't he here?

22           MR. MC CONVILLE:  Your Honor, he had a business

23   trip that took him out of town.

24           THE COURT:  So what?

25           MR. MC CONVILLE:  He'll be here within the hour.

```
 1              THE COURT:  When?  I suggest you get him here.
 2              MR. MC CONVILLE:  He's on his way.
 3              THE COURT:  I think this is sufficiently important
 4    that he can cancel his business trip.
 5              MR. MC CONVILLE:  Yes, sir.
 6              THE COURT:  All right.
 7              Now, I want you to take your time with this, and
 8    then you can go to the lectern and make your presentation in
 9    any way you want to.  But at some point during that
10    presentation and whatever issue you're addressing, I'd like
11    to get those questions responded to.
12              So gather as a group.  I'll give Mr. Larian 20
13    minutes, and then we'll start; 10 after.
14              (Recess.)
15              THE COURT:  All right.  We are back on the record.
16    Counsel are present.
17              MR. MC CONVILLE:  Your Honor, I wanted to correct
18    something.  I said before that Mr. Larian was out of town on
19    a business trip.  I was wrong.  He's coming back from
20    New York having attended his daughter's graduation, so I was
21    wrong, and he'll be here shortly.
22              THE COURT:  Well, we are going to get started.
23              MR. MC CONVILLE:  Okay.
24              (Mr. Larian entered the proceedings.)
25              THE COURT:  All right.  All counsel are present.
```

 1   Mr. Larian and Mr. Eckert are also present.

 2          Since the motions are mixed by each side, I really

 3   don't care which side starts, and if there is a

 4   preference --

 5          MR. QUINN:  Your Honor, just as a suggestion of a

 6   way to proceed --

 7          THE COURT:  Why don't you have a seat, and just

 8   pull the microphone closer.

 9          MR. QUINN:  Your Honor, of course we want to make

10   sure that we address the Court's questions, and if it's

11   acceptable to the Court, one way we'd propose to do this is

12   to begin by addressing those specific questions.

13          THE COURT:  Sure.

14          MR. QUINN:  And then we would suggest, if it's

15   acceptable, turning to Mattel's JMOL motion with respect to

16   the trade secrets because some of the other issues before

17   the Court are really dependent on the resolution of that

18   motion.

19          THE COURT:  That's fine.

20          MR. QUINN:  All right.  So if I may, your Honor?

21          THE COURT:  Please.

22          This is Mr. Quinn on behalf of Mattel.

23          MR. QUINN:  Your Honor, with respect to the

24   objections to the timeliness of the -- the objections to our

25   proposed statements, findings of fact and conclusions of law

CV 04-9049-DOC - 05/25/2011 - Vol. 1 of 4

17

1    on the 17200 claim, we'll submit on that, your Honor.  We're

2    not going to argue that.

3            I would like to address, your Honor, two of the

4    questions, and then Mr. Zeller and Ms. Estrich will address

5    some of the other questions that the Court raised.  I would

6    propose to address the issues regarding the 17200 claim,

7    which the Court raised in the context of the Kwikset

8    decision.  And then also the exemplary damages issue

9    relating to the Neal decision and the actual harm suffered.

10           THE COURT:  Okay.

11           MR. QUINN:  So to begin with the Kwikset decision

12   and the UCL claim, the Court raised the question about

13   whether -- as we understood the issue raised by the Court as

14   whether the actions of the decisions by Kohl's were

15   potentially an intervening cause.  And as indicated in our

16   Proposed Findings of Fact Number 77 to 81, we do believe

17   that there was an intervening cause, here.

18           The -- the evidence was undisputed that if the

19   relationship between MGA and Kohl's was not complete --

20   hadn't completely breached, it was at least a very troubled

21   relationship.  The evidence was undisputed that Kohl's was

22   losing money on Bratz, that Kohl's stores tend to be in the

23   midwest, Kohl's customers just simply weren't buying the

24   Bratz dolls.  And the evidence was that they had -- Kohl's

25   had made a decision and made its own decision that it was

CV 04-9049-DOC - 05/25/2011 - Vol. 1 of 4

18

1   not going to continue to buy Bratz products.  Barbie

2   products were selling; Bratz products were not selling.

3   That's a decision that Kohl's, as a retailer, is entitled to

4   make on its own.  I don't think even MGA would suggest that

5   there is any basis or any way that MGA could force Kohl's to

6   continue to purchase Bratz products.  The simple fact was

7   they weren't selling, and Kohl's, after its efforts to get

8   some assistance on markdown money, were not successful with

9   MGA, had made a decision even before they approached Mattel

10  with the proposal that they weren't going to continue to

11  lose money on Bratz -- Bratz products.  So we think that's a

12  decision that really none of us and the Court isn't in the

13  position and wouldn't want to second guess.

14          But then more generally, taking a step back from

15  this, your Honor, the only claim here, of course, that can

16  be made under 17200 is a claim for restitution.  And as the

17  Court knows from the Korea Supply and the Bank of the West

18  case, you really have to have a vested interest in property.

19  If somebody else has property, which is yours, and you can

20  bring a claim under 17200 to get that property back, it's

21  almost in the nature of a tracing.  And the cases are -- we

22  cited the cases.  There are numerous cases holding that a

23  lost profits claim, which is what was presented through

24  Mr. Malackowski, is really not actionable, cannot -- lost

25  profits cannot be recovered under 17200.

1           This claim made it by a summary judgment.  Your
2   Honor, the Court may recall the Court wrote an opinion
3   addressing this issue, and I believe that the Court in its
4   opinion held open the possibility in denying summary
5   judgment, that MGA might be able to prove something in the
6   nature of a protectable property interest; i.e. more
7   specifically, a contract interest, which it was deprived of.
8           Certainly I -- you know, I always hesitate to tell
9   a court what the Court intended, but what we understood by
10  the denial of the summary judgment was that what was
11  contemplated here is that there might be proof, the door the
12  left open for MGA to prove some entitlement of some kind,
13  contractually based or otherwise, to continue to sell Bratz
14  products at Kohl's, and there was no -- there was no such
15  proof, of course.
16          We heard about, you know, MGA's 4 feet of space at
17  Kohl's, but MGA doesn't own, obviously, 4 feet of space at
18  Kohl's.  It was never entitled to 4 feet of space at Kohl's.
19  It didn't have any contract or any other right that entitled
20  MGA to continue to sell to Kohl's, so we don't think that
21  there is standing here.  We don't think there was any
22  evidence presented of a restitutionary type of property
23  interest that could be returned, and we do believe that
24  Kohl's decision not to continue to lose money on Bratz
25  products is a separate and independent intervening cause,

1    which Kohl's was entitled to make.

2           If I could turn, now, your Honor, to the question

3    the Court raised concerning exemplary damages and the Neal

4    decision.  I mean, we agree with the Court's identification

5    of the factors which govern the appropriateness and amount

6    of exemplary damages, and we also agree that as the Court

7    indicated in the Neal decision that the actual harm suffered

8    is and must be a significant factor in addressing the issue

9    of exemplary damages.  And in this case, MGA did not make

10   any proof of -- didn't attempt to prove any loss at all, any

11   lost sales.  There was no case made for lost sales or for

12   compensatory damages as such.  So to the extent that the

13   Neal decision does, and we think that's a correct reading of

14   it, indicated that the actual harm suffered by the plaintiff

15   is an appropriate element, that -- that fails by default,

16   here, because there was no, underlying no, evidence of

17   actual harm suffered.  The only -- the only theory of

18   recovery here was an unjust enrichment based on a head-start

19   theory, which I know Mr. Zeller will be discussing in

20   greater detail.

21           Obviously, the amount of compensatory damages

22   awarded, in this case unjust enrichment, is irrelevant and

23   improper consideration in the amount of exemplary damages.

24   And one consideration is, is that sufficient to defer or to

25   deter such conduct in the future?  Here we have an

 1    $88 million unjust enrichment award, a very substantial

 2    award that would, in itself, would be sufficient to -- if we

 3    are going to look past the issue of their failure to

 4    introduce any proof of actual harm suffered, that amount is

 5    substantial enough, certainly, to deter anyone from engaging

 6    in this type of conduct again.  You'd have to be -- any

 7    rational economically motivated business person certainly

 8    would be deterred by the size of such a compensatory damages

 9    award.

10           So having addressed those two questions, your

11    Honor, I will turn the podium, with the Court's permission,

12    to Ms. Estrich to address the questions the Court raised

13    concerning attorneys' fees.

14           THE COURT:  Ms. Estrich?

15           MS. ESTRICH:  Thank you very much, your Honor.

16           The first question you raised was the question to

17    MGA as to whether they were seeking fees for their

18    successful defense of CUTSA claims raised by us.  Obviously

19    Ms. Hurst has to answer that question, but I would simply

20    point out that this would be the first time they ever said

21    they were seeking such fees.  And I imagine that the reason

22    they have made that decision is because the standard for

23    receiving fees as a successful defendant in CUTSA cases

24    requires the proof of bad faith.  Indeed, bad faith is

25    defined in such a way that the claim must be specious, et

CV 04-9049-DOC - 05/25/2011 - Vol. 1 of 4

22

1    cetera, et cetera.  So that issue is relevant, obviously,

2    but it is a question for them.

3           The second question you asked was should the Court

4    consider whether the defense furthers the purpose of the

5    Copyright Act as specifically reflected in the following

6    factors:  Degree of success, frivolousness, motivation,

7    whether the other side's position was objectively

8    unreasonable, which I will argue later has been considered

9    by most courts to be the key factor and, in a way, takes

10   into account the others.  And finally, whether an award here

11   would serve the compensatory and deterrent purposes of the

12   act.

13          I'm obviously, knowing me, prepared to address

14   each of these factors in detail, but for present purposes,

15   your question was:  Are there any additional issues or

16   factors that must be considered or should be taken in

17   account by the Court?

18          The Ninth Circuit in its Fogerty opinion, a lot of

19   Fogerty opinions, suggested that the overall, or held that

20   the overall purpose of this position -- provision in the

21   Copyright Act was to provide evenhanded treatment, both

22   plaintiffs and defendants, or rather, both successful

23   plaintiffs and successful defendants.  The Court rejected

24   the test that had been applied in the past, what it called

25   the "duel standard" of requiring less of plaintiffs than it

Case 2:04-cv-09049-DOC-RNB   Document 10606   Filed 05/26/11   Page 23 of 85   Page ID #:321015
CV 04-9049-DOC - 05/25/2011 - Vol. 1 of 4

23

1    did of defendants.  It said to the lower courts, the real

2    question here is whether an award in the defense furthers

3    the purpose of the Copyright Act, but we don't want federal

4    judges, as you can well understand, going out, each on their

5    own, even within the same courtroom and certainly courtroom

6    by courtroom and saying, "Well, I think this furthers the

7    purpose of the Copyright Act, but Judge down the hall says,

8    'I don't think so.'"  That would be standardless decision

9    making of the sort that undermines the confidence under the

10   rule of law and makes evenhandedness, by definition,

11   impossible.

12          So what the Supreme Court did is it invited the

13   Circuits to adopt guidelines for judges to exercise their

14   discretion.  In its own opinion, it mentioned the Leib

15   factors, L-e-i-b, which has been established by one of the

16   other circuits that disagreed with the Ninth Circuit, and

17   listed exactly the factors you noted and encouraged the

18   Circuits to review these factors and provide guidelines for

19   their judges.

20          Now, in the remand on Fogerty to the Ninth

21   Circuit, the Ninth Circuit used very broad language saying,

22   "The purpose here, the purpose of the Copyright Act is the

23   overwhelming factor."  But the Court then went on and,

24   indeed, it said, you know, "These are not exclusive factors.

25   This is up to the discretion of the district judge."

1            But the Court then went on in Fogerty to look at

2    all of these same factors, to look at whether the district

3    court had applied these same factors.  In fact, they had

4    concluded that this would greatly serve the purposes.  It

5    would greatly serve compensation and deterrence.  And

6    interestingly enough, in that opinion, the Ninth Circuit

7    said in great detail, you know, "This is the case of one of

8    the greatest rock bands of all time of an artist being sued

9    for plagiarizing his own work in a way that will limit not

10   only his creativity but the creativity of others in the

11   Swampland Rock genre."

12           The Court pointed out that he had indemnified

13   Warner music, so he was bearing all these costs himself.

14   And in that context -- and pointed out that he had

15   reached -- they had reached a decision on the merits.  And

16   in that context of specifically reviewing factors, the Ninth

17   Circuit upheld or held that a decision in favor of fees was

18   required.

19           I have yet, your Honor, to find a single case,

20   other than perhaps Fogerty, and not even what they actually

21   did in Fogerty, in which any district court or the court of

22   appeals makes a decision without reference to these very

23   factors that we have discussed.  I have found a number of

24   cases in which district courts who failed to consider the

25   factors or simply considered them in boilerplate language,

1    and that was the case in Ms. Hurst's favorite case, Walking

2    Mountain, where the Judge misstated one of the factors and

3    failed to consider the objectively reasonable factor.  And

4    the Court said, "Wait a minute.  This is going back down.

5    We're not sure you probably understood the first factor.

6    You didn't reach objectively reasonable.  We think Mattel's

7    claims are objectively unreasonable.  We're sending it

8    back."  And they did the factors.

9            The only additional factors I have ever seen, your

10   Honor, listed as factors was in the Ets-Hokin.  I'm sure I'm

11   pronouncing it wrong, but the Ets-Hokin case -- I think of

12   it as the Skyy Vodka case -- in which fees were not granted

13   to a successful plaintiff, but the Court did say instead of

14   listing, as I did, furtherance of the purpose of the

15   Copyright Act as the overall goal, the Court in Ets-Hokin

16   listed it as one of the factors.  It also listed a factor

17   of, you know, "In impecunious, we don't want to have a

18   chilling effect on an impecunious plaintiff as another

19   factor."

20           But to conclude, to not consider the factors, to

21   not make a judgment based on consideration of the factors,

22   to hold that it is enough simply to prevail to hold that the

23   winning party has any entitlement or presumption to

24   attorneys' fees would be, under Ninth Circuit law, clearly

25   reversible error, because as to each of those points I have

1    made, we cite in our briefs cases where the Ninth Circuit,

2    indeed, did reverse.

3              The final question the Court asked --

4              THE COURT:  Just one moment.

5              MS. ESTRICH:  Oh, sure.

6              THE COURT:  Thank you.  Please continue.

7              MS. ESTRICH:  Thank you, your Honor.

8              The final question I believe that relates to my

9    area is what is the Court suppose to do about all of these

10   interrelated, or allegedly interrelated claims?

11             MGA has argued that it needn't apportion, other

12   than to remove its affirmative CUTSA case, because all of

13   the claims and everything it did, other than that small

14   amount, or relatively small -- it looks big to me -- they

15   argue was related to the copyright defense.

16             Now, that just can't be.  I mean, I don't know how

17   you get our Mexican trade secret case, which turned on

18   inventory in Mexican law, and whether they were trying to

19   get a head start and say any of the factual issues involved

20   are related to our copyright case, our Bratz case.  And

21   there is a long list, your Honor, of claims they lost,

22   claims that were abandoned, Brisbois, the seamstresses, the

23   Mexican transactions, et cetera, for which there is no

24   question, I would argue, that they are not interrelated.

25             As for the state law claims, I would argue that

1    this Court specifically held, and it held at MGA's

2    insistence, that those claims could not and did not include

3    the activity of copying and infringing on copyrightable

4    material that was the subject of our copyright claim,

5    because if they had been based on the same factors, and only

6    the same factors, they would have been preempted.

7            There was substantial opinion, both in the Ninth

8    Circuit and in the California courts and elsewhere, that

9    what you'd have to look at, the first thing a judge has to

10   do, in a sense, is make some judgments; what's related here,

11   what's not related.  Obviously, and I'm going to concede

12   this point, because I think I was nuts if I didn't, the

13   CUTSA trade secret case based on Bratz certainly does arise

14   out of the same set of facts as the copyright case, so

15   though as the Court knows, the CUTSA claim was brought.

16           But where work is done or where billing records

17   reflect that more than one claim or more than one party or,

18   indeed, in depositions, more than one subject was covered,

19   the task is to apportion.  And the Ninth Circuit has, in

20   fact, specifically said that even if the billing records

21   don't make that easy, and I have no idea whether they do or

22   not, since I really haven't seen any descriptions of tasks,

23   that the district court must make an effort to do it anyway.

24   And in doing it anyway, it can use a percentage reduction,

25   it can make a judgment of, you know, "You had 20 claims in

CV 04-9049-DOC - 05/25/2011 - Vol. 1 of 4

1    this case.  You deposed Mr. Larian for how many days?

2    Certainly there were days in there where copyright was not

3    discussed."

4            And so what the case law specifically says is that

5    in this case, for instance, Lahiria, L-a-h-r-i-a, the

6    Universal Music, 606 F.3d 1216, 1222, Ninth Circuit 2010, it

7    says that because defendants used single entries for tasks

8    pertaining to two different copyright defendants' claims,

9    the district court took it and said, "All right, we'll cut

10   it in half, we'll apportion half."  And the Ninth Circuit

11   says, "Fine, that was a good conservative approach."

12           California law is to the same effect.  I would

13   quote -- I came up with a few cases in response to your

14   Honor's question -- Carver v. Chevron U.S.A., 119 Cal.App.

15   4th, 498.  That's from the California Court of Appeal in

16   2004.  The Court there was dealing with Cartwright Act, and

17   not Cartwright Act, causes of action, but the question still

18   was how do I have the discretion?  What do I do to cut these

19   apart?  And again, the Court said, "By apportioning

20   65 percent of the fees."

21           So my short answer, your Honor, is all of these

22   claims are not interrelated.  All of the tasks involved in

23   making a defendant against these claims are not

24   interrelated.  It is the task of the Court and the discovery

25   master to apportion, should it decide fees are justified.

CV 04-9049-DOC - 05/25/2011 - Vol. 1 of 4

29

1    And no matter how hard that is, the appellate courts will

2    accept a reasonable guesstimate.  What they will not accept

3    is either denying fees entirely on that basis or granting

4    everything when it's clear that apportionment should have

5    been done.

6              I believe that answers your Honor's questions

7    relating to the attorneys' fees?

8              THE COURT:  It does at the present time.  Thank

9    you.

10             MS. ESTRICH:  Thank you very much, your Honor.

11             THE COURT:  And just one moment.

12             All right.  Thank you.

13             Then Mr. Zeller?

14             MR. ZELLER:  Your Honor, just briefly.

15             THE COURT:  Why don't you have a seat so I can

16   hear you.  Pull the microphone closer or go to the lectern.

17             MR. ZELLER:  Maybe it's easier if I go to the

18   lectern.

19             Just briefly, your Honor, we'll submit, subject to

20   any response, to MGA's argument as to the Court's tentative

21   to deny as moot in light of the verdict the motion to

22   confirm dismissal.  We'll submit on the application to

23   strike, and I believe the -- what we'll submit, again

24   subject to any response, so we may make to MGA's arguments

25   of the Court's tentative to hold in abeyance Mattel's motion

1    to compel -- or excuse me, the motion to compel billing

2    records.

3              Thank you.

4              THE COURT:  Okay.  Anything else from Mattel at

5    this time before I turn to MGA?

6              MR. ZELLER:  Not at this time.

7              THE COURT:  Okay.

8              Mr. Quinn, are you satisfied?

9              MR. QUINN:  Yes.

10             THE COURT:  Mr. Zeller?

11             MR. ZELLER:  Yes, sir.

12             THE COURT:  Okay.

13             Ms. Estrich?

14             MS. ESTRICH:  Yes, sir.

15             THE COURT:  Okay.  Did you talk to your client to

16   make sure?

17             Mr. Eckert?

18             MS. ESTRICH:  That's fine.

19             THE COURT:  Okay.  Let me talk to MGA and in no

20   particular order, Counsel.

21             MS. HURST:  Your Honor, may we have just a brief

22   five-minute recess to confer with Mr. Larian, who was

23   actually at his daughter's college graduation yesterday?  I

24   just wanted to make clear that --

25             THE COURT:  Ten after, then.  Thank you.

 1           MS. HURST:  Thank you very much, your Honor.

 2           *(Recess.)*

 3           THE COURT:  All right.  Counsel, on behalf of MGA.

 4           MS. HURST:  Thank you, your Honor.

 5           Your Honor, with respect to the Court's tentative

 6   to deny as moot the motion to confirm dismissal, as long as

 7   the judgment ends up reflecting a dismissal with prejudice

 8   as to MGA as the defendant in intervention in that case,

 9   that's fine, but we do need some final judgment reflecting

10   that there are no claims upon which Mattel is entitled to

11   any relief against MGA in that matter.

12           We'll submit and agree with -- obviously agree

13   with the tentative regarding the timing of the objections.

14           With respect to the billing records, your Honor,

15   the Ninth Circuit, in at least a couple of cases, has said

16   the amount the opponent spent in losing the case is

17   relevant, and a number of district courts have ordered

18   billing records on that basis.  We certainly recognize that

19   privilege covering descriptions, and that's why we had asked

20   for them only in a redacted form and then to be submitted to

21   Mr. O'Brien in unredacted form.

22           I'm not sure the basis for the Court's tentative

23   conclusion that Mattel and MGA were not in similarly

24   situated positions with respect to the relevance of those

25   billing records.  Certainly, to the extent the claims were

1    related, which I'll discuss further in a moment, the parties

2    were litigating the same case.  It's absolutely true that to

3    the extent that Mattel was a plaintiff on the claims that

4    drove the massive amount of discovery from MGA, that MGA

5    was -- would be justified in having spent more than Mattel

6    in this situation.  I think the records will show that MGA

7    spent less, and that that will be -- absolutely be a strong

8    additional ground and support of the claim relatedness and

9    ultimate decision by the Court to award a substantial amount

10   of fees in this case.  So I would urge the Court to

11   reconsider its tentative in that regard.

12           Your Honor, with respect to the 17200 claim and

13   the Kwikset decision, the force of that decision, your

14   Honor, was that even when a party may not be -- meet the

15   requirements of restitution under 17203, the parties still

16   has standing to bring the claim under 17204.  That was a

17   restrictive reading of Prop 64 and a liberalization of where

18   the appellate courts had been going in California prior to

19   that point in terms of standing to bring a Section 17200

20   claim.  I think it would not be a fair reading of that case,

21   the majority opinion in that case, that it cut back on

22   standing in a situation where there are additional actors.

23   In particular, I think the Court's suggested rational that

24   Kohl's conduct may have been an intervening force would

25   effectively eliminate the entire line of Cell Tech based

1    17200 claims where injury to competition by a dominant

2    competitor is the thrust of the claim.  I certainly think

3    that California Supreme Court never had any intention of

4    effectively silently overruling Cell Tech in its progeny and

5    the theory of threatened injury to competition as a 17200

6    claim.

7            Now, those kinds of claims always involve

8    additional actors because a competitor must carry out its

9    anti-competitive actions using the tools in the market place

10   at hand.  In this case, a retailer.  And so that can't be

11   the basis for a lack of standing to bring a Section 17200

12   claim or we wouldn't have competitor based claims anymore,

13   and the competitor based claim has always been,

14   historically, a significant element of Section 17200

15   jurisprudence.  There is no basis to think that the voters

16   in enacting Prop 64 intended to do away with that whole

17   branch of 17200.

18           So with respect, your Honor, I would suggest that

19   that not be a fair proper reading of Kwikset.

20           With respect to Mr. Quinn's arguments on the

21   merits of the 17200 claim, I think that characterization

22   that it was undisputed that this was Kohl's decision, and

23   Kohl's was losing money on Bratz, and so forth, that is a --

24   I don't want to use an inappropriate adjective.  There was a

25   lot of dispute about that.  Let's just put it that way.

1           The evidence to which Mr. Quinn refers was hearsay

2     that came in under a limiting instruction, and the direct

3     testimony of MGA's representatives was that there were

4     common issues to be dealt with in all retailers with Kohl's.

5     It was absolutely clear that Mattel entered into a

6     relationship with Kohl's, the purpose of which were to

7     exclude MGA from Kohl's, and that relationship succeeded in

8     doing so, not only for the two years that were covered by a

9     remarkable expressed contract embodying this agreement, but

10    frankly, ever since.  Till this day, MGA toys, dolls are not

11    on the shelf at Kohl's.  And that's exactly the kind of

12    continuing injury and effect that 17200 was designed to

13    remedy.

14          Mr. Quinn argued that the theory of damages

15    offered was compensatory damages rather than restitution,

16    that's incorrect.  Mr. Malackowski testified that his amount

17    that he offered was confirmed by the benefit received by

18    Mattel during the period of time for which he calculated a

19    remedy, the remedy designed to restore to MGA.  And the

20    language in Kwikset in terms of restoration, and so forth,

21    is certainly broad enough, as the Court found in its prior

22    summary judgment order, to cover the situation that we have

23    here.  The reality is that Mattel was unjustly enriched to

24    MGA's detriment by interfering with an ongoing contractual

25    relationship by paying for Kohl's to exclude MGA from its

Case 2:04-cv-09049-DOC-RNB   Document 10606   Filed 05/26/11   Page 35 of 85   Page ID #:321027
CV 04-9049-DOC - 05/25/2011 - Vol. 1 of 4

35

 1   store shelves, and that is a situation that 17200 was

 2   designed to remedy.

 3           Your Honor, moving on to the Court's questions

 4   regarding, I believe exemplary damages in the Neal and the

 5   Adams decisions was next.

 6           *(Attorney discussion held off the record.)*

 7           MS. HURST:  Mr. Quinn took it out of order, so I

 8   was following his order.  Does the Court have a preference

 9   or --

10           *(No audible response.)*

11           MS. HURST:  Okay.  Then I'll stay there for a

12   moment with the exemplary damages.

13           We agree that Neal and Adams express the proper

14   test as reflected in Judge Wilkins' well-reasoned opinion in

15   the O2Micro case concerning exemplary damages under the

16   California Trade Secrets Act.

17           It's important to note, however, that the

18   California legislature expressly contemplated the full award

19   of double damages in a case where only unjust enrichment or

20   even reasonable royalty damages were found.  So it cannot be

21   the case that a failure -- that if a plaintiff doesn't have

22   an actual damages theory, that precludes the award of double

23   damage.  It simply can't be right because the legislature

24   expressly contemplated in enacting the statute, the manner

25   and the form and the sequence in which it's enacted, as

1    Judge Wilkins noted in O2Micro, expressly contemplated a

2    full award of double damages even in a situation where

3    unjust enrichment or reasonable royalty are the only

4    theories of relief.

5            Now, having said that, compensation is a

6    significant element here, and later, when we get to arguing

7    the motions, and Ms. Keller will also address the

8    exemplarily damages motion, but I'll make a few brief

9    comments about that now.

10           First of all, as the Court will recall, we learned

11   of the conduct very late in the case, and the ability to

12   react to it and develop damages theories and get all of the

13   evidence was somewhat constrained.  We never got all of the

14   development documents, and there is substantial reason to

15   believe when you're dealing with direct competitors who were

16   introducing new products, new directly competitive products,

17   that, in fact, there is an important compensation element at

18   work here, and that's just in dealing with the particulars

19   of this claim.

20           But beyond that, if we look at the broader picture

21   of compensation in connection with this whole litigation and

22   this whole war by Mattel to use litigation to eliminate a

23   competitor, if the Court awards every penny sought by MGA

24   today in fees and double damages and restitution, if the

25   Court awards every penny, it will not have compensated MGA

```
 1    for the harm it has suffered at Mattel's hands.

 2            Hundreds of people lost jobs.  The company was

 3    nearly destroyed.  The brand was nearly destroyed.  And the

 4    full amount sought by MGA at this hearing is just one step

 5    on the path of remedying that harm.

 6            And the Court asked about compensation in the

 7    context of exemplary damages, and I know Ms. Keller will

 8    address this as well, but I do want to say something about

 9    deterrence.

10            Mattel has been singularly unrepentant in its

11    treatment of this situation.  I have to say in my career,

12    I've handled a few situations involving punitive damages.

13    For a public company not to come in here and show us what it

14    has done, what policies it's adopted to show us that this is

15    not going to happen again, to apologize to MGA and all of

16    the other competitors in this industry to show that it's

17    taking this seriously, where is the audit committee?  Where

18    are the witnesses to come here and show us that Mattel has

19    taken this seriously?  Nowhere.

20            Instead, their cavalier approach is "No one died

21    and no towns were lost."  If ever there were a situation

22    where a message needed to be sent, this is it.  And it's

23    only unfortunate that the degree of message that the Court

24    could send would amount to less than 10 percent of the

25    company's present net worth.  Will that even be enough to
```

1    get their attention, finally; one wonders.

2             So compensation is not a necessary component for a

3    full award of double damages.  We know that from the

4    statutory scheme, but there is a significant element here of

5    compensation, and certainly deterrence isn't an

6    extraordinarily strong factor here.

7             I'll move on to the Court's questions regarding

8    attorneys' fees.

9             An award of attorneys' fees under the California

10   Uniform Trade Secrets Act would be an additional ground

11   supporting the Court's award of fees.  We have certainly

12   discussed in the papers all of the reasons why Ms. Estrich

13   emphasized bad faith.  We've discussed at some length

14   Mattel's bad faith and improper motive in seeking to use the

15   weapons of litigation to eliminate a competitor in this

16   action.  Both a direct and circumstantial evidence that that

17   was its purpose, and there is no doubt that that standard is

18   met.

19            So the California Uniform Trade Secrets Act is

20   certainly an additional ground for the award of the full

21   amount of fees sought here.  And when we got to trial on

22   those employee based trade secret claims, there was no

23   evidence that Ron Brawer had ever misappropriated any trade

24   secret.  They offered no evidence on Jeanine Brisbois.

25   Their witness admitted -- they had no evidence whatsoever

Case 2:04-cv-09049-DOC-RNB   Document 10606   Filed 05/26/11   Page 39 of 85   Page ID #:321031
CV 04-9049-DOC - 05/25/2011 - Vol. 1 of 4

39

1   that Mr. Castilla had taken anything to MGA, and that her

2   belief was otherwise.

3         Mr. Cooney, they offered nothing.  They offered a

4   document with respect to Mr. Cooney that they had in the

5   summary judgment context dropped as a trade secret and

6   admitted that it wasn't a trade secret.  So yes, they got

7   over the hump at summary judgment, but when we got to trial,

8   we saw in the Flir case, as instructed here, a complete

9   failure of proof.

10        The standard for the award of fees under

11  Section 505 of the Copyright Act, the question whether the

12  successful defense in this case furthered the purposes of

13  the act is a question independent of the Leib factors.  We

14  know that because in the United States Supreme Court

15  decision, Fogerty v. Fantasy, 510 U.S. 517, the Court

16  discussed at some length the assessment of furthering the

17  purposes of the Copyright Act.  And the way the Court said

18  you determine that is you look at what are the purpose of

19  the act, and then you look at the substance of the defense,

20  and you determine whether the outcome vindicates a principle

21  to be promoted by the Copyright Act.

22        The Court says, "And courts may want to consider

23  other factors in footnote 19, citing the Leib case."  And

24  the courts have, by and large, considered the Leib factors.

25  But the question whether the successful defense furthers the

1   purpose of the act is first measured by what are the

2   purposes and what did the defense accomplish?  In that

3   sense, it is clear, then, that both in Fogerty and on remand

4   in the Ninth Circuit's decision, that all that is necessary

5   to qualify for an award under Section 505 is that the

6   defendant prevailed, and that having done so, furthered the

7   purposes of the act.  And there can be no doubt that that is

8   the case here.  Just as in Fogerty, here we have a situation

9   where the defendant itself is a copyright holder where the

10  defense, over a multi-year period of time, enabled the

11  consuming public to be exposed to a much wider variety of

12  expression.

13          There is no small public interest in giving little

14  girls a multi-ethnic alternative to Barbie to creating those

15  dolls that all girls can project themselves onto.  This is

16  the epitome of a defense furthering the purposes of the

17  Copyright Act.

18          And then when we get to the motions, I'll address

19  the other factors, all of which weight in our favor here.

20          The Court also asked about relatedness.  And the

21  Court asked, "Are there any other factors other than the

22  Leib factor?"  I would say yes, that it would be worthwhile,

23  here, for the Court to consider how the Seventh Circuit

24  treats the award of fees to successful defendants.  And the

25  Seventh Circuit has systematically said, Judge Easterbrook,

```
 1    Judge Posner, they've all said that since a successful
 2    defendant has no prospect of recovering damages in a
 3    copyright case, that there is not a lot of incentive to go
 4    on fighting.
 5            And so the Seventh Circuit has adopted a very
 6    strong presumption in favor of an award of fees to
 7    defendants, successful defendants, and that's been expressed
 8    in numerous decisions that are cited in footnote 1 of our
 9    reply brief, the FM Industries case, Mostly Memories,
10    Riviera, Woodhaven and Assessment Text.  Over a six-year
11    period of time, the Seventh Circuit has consistently
12    affirmed that when you have a successful prevailing
13    defendant you have to consider the fact that this is the
14    only way to incentivize, continuing to put your expression
15    out into the marketplace and meet those purposes of the
16    Copyright Act is the ultimate award of fees.  Perhaps that's
17    another way of saying "compensation," but it's a significant
18    one.
19            With respect to relatedness, there are multiple
20    non-copyright authorities awarding fees on nonfee-bearing
21    claims because of relatedness, or there are multiple Ninth
22    Circuit decisions discussing this and saying that the
23    standard for meeting the relatedness test is not that
24    stringent.  Some of those cases, Thomas v. City of Tacoma,
25    410 F.3d 644; Aguirre v. Los Angeles Unified School
```

1    District, 461 F.3d 1114; Sorenson v. Mink, 239 F.3d 1140;

2    Webb v. Sloan, 330 F.3d 1158; McGowan v. City of Montana,

3    565 F.3d 1097.  The Ninth Circuit has said repeatedly that

4    the standard for relatedness would be common facts or legal

5    theories, and not both.  If you meet either prong, that's

6    sufficient to demonstrate relatedness.

7          Now, Ms. Estrich argued that the state law claims

8    regarding use were preempted by the Copyright Act

9    infringement test so that we know that those can't be

10   related.

11         Now, that just ignores the other element of a

12   prima facia case of copyright infringement, which let's face

13   it, it's what this entire case was about, which was who owns

14   it.

15         As the Court well knows, every one of those state

16   law claims was a basis for the claim of ownership, the

17   ownership prong of copyright.  There is no doubt that who

18   did what and when including the seamstresses was the core of

19   the case about who owned Bratz.

20         Did the employee based trade secret claims figure

21   into this as well?  Absolutely, because if you look at the

22   first paragraph of Mattel's fourth-amended counterclaims, it

23   posits that the employee thefts of trade secrets, which they

24   ultimately failed to prove, were part of an ongoing scheme

25   to infringe their copyrights, that MGA, being the one-trick

1    pony, could not successfully exploit the intellectual

2    property it had stolen from them without also engaging in

3    these other activities.  It was in their parlance, part and

4    parcel of the same ongoing scheme to the point that when in

5    the summary judgment motions we pointed out that trade

6    secret misappropriation -- the ongoing use prong of trade

7    secret misappropriation cannot be a predicate act under

8    RICO.  They came back and argued, "Well, all of those

9    employee thefts of trade secrets are actually copyright

10   infringements as well."  They deployed a common legal theory

11   as well as a common factual theory to cover those employee

12   claims.

13           They tried this case from moment one, as it's all

14   related.  Their RICO claim required them to do that.  It was

15   the basis for their RICO pattern.  It was the basis for

16   their enterprise.  It was all related to the fundamental

17   question of the ownership of the Bratz copyrights and the

18   exploitation of them.  That was the core question that drove

19   their case, and they fit everything else into that rubric,

20   and we had a defendant on that basis.  And that's why every

21   penny spent defending a case that they constructed around

22   the proposition that MGA was not the real owner of Bratz and

23   was, in fact, infringing Mattel's copyrights is related and

24   is entitled to be awarded.

25           Let me just confer with my colleagues.

CV 04-9049-DOC - 05/25/2011 - Vol. 1 of 4

44

```
 1            (Attorney discussion held off the record.)

 2            MS. HURST:  I've conferred and that completes the

 3     Court's questions.  Thank you, your Honor.

 4            MR. QUINN:  Your Honor, Mr. Machado's counsel

 5     asked to address the Machado attorney fees issue before we

 6     do the JMOL with respect to the trade secrets.

 7            THE COURT:  Okay.

 8            MR. COTE:  Thank you, your Honor.  And I was also

 9     going to answer one of the Court's questions about

10     apportionment, if I could.

11            Mattel brought, I believe it was seven claims

12     against Mr. Machado.  All but the trade secrets claim were

13     tossed out on summary judgment.  The trade secrets claim, of

14     course, went to trial, and that's the claim for which we're

15     seeking fees.

16            Plaintiff's claim that if you fail to apportion

17     the fees between the claims that they lost on summary

18     judgment and the claims they lost on trial, that there can't

19     be any recovery at all, and they cite the Bell v. Vista

20     Unified School District case for that proposition.  And

21     that's 82 Cal.App.4th 672.  It's a 2000 case.

22            Here is what Bell actually holds:  "Such fees need

23     not be apportioned when it incurred for representation on an

24     issue common to both causes of action in which fees are

25     proper and those in which they are not."
```

 1          And as Ms. Hurst indicated, all of the claims

 2   against Mr. Machado, and all of the claims against all of

 3   the defendants, are related in some way.  But with respect

 4   to Mr. Machado, all of the issues are common issues.  They

 5   brought a RICO claim, but the primary predicate act was the

 6   taking of the trade secrets.  They brought a contract claim,

 7   but the breach of contract was the taking of the trade

 8   secrets.  They brought an interference -- I'm sorry, a

 9   fiduciary duty and a duty of loyalty claim.  The breaches of

10   those duties was the taking of the trade secrets.  And they

11   brought a conversion claim, but the only thing Mr. Machado

12   allegedly took were the trade secrets.  All of those state

13   law claims had so many issues in common with the trade

14   secrets claim, that the Court found them all preempted.

15          So California law is clear on the question of

16   apportionment that on the facts of this case where the trade

17   secret claims were identical or virtually identical to all

18   the other claims, there is no need to apportion.  With that

19   being said, we did do some apportionment.  For example, we

20   are not seeking fees for any of the times spent on the

21   12(B)6 motion because that motion attacked the RICO claim

22   and only the RICO claim.

23          And for purposes of that motion, we assumed or we

24   conceded that there was a taking of trade secrets, and our

25   argument was even if that's true, there is no RICO claim.

1   So we took that out of the fees motion, all of the time

2   spent on the 12(B)6.  We made the same argument on summary

3   judgment, so we took all that time out, too.

4           So where we could and where there were, in fact,

5   not common issues, we apportioned.  For everything else, the

6   issues were common, and that's why no further apportionment

7   is required.  That is responding to your Honor's question on

8   apportionment.

9           Now, as to the -- I want to get to the substance

10  of the argument now, if I could.

11          The Mexico claim was never about Gus Machado.  It

12  was never about vindicating Mattel's rights.  It was never

13  about collecting damages for an actual injury.  It was never

14  about preventing people from, quote-unquote, "stealing

15  Mattel's intellectual property," as Mr. Eckert claimed on

16  the stand.

17          The Mexico claim was pursued against Mr. Machado

18  because Mattel wanted him to flip.  They wanted him to

19  testify against Mr. Larian and against MGA, and they brought

20  the case against him to bring that pressure, just like they

21  did with Pablo Vargas.  They brought the criminal case

22  against Pablo Vargas, and they got him to flip because he

23  couldn't take the pressure anymore, and he testified against

24  MGA and against Mr. Larian in his deposition.  And I'll

25  circle back to that in a minute.

1           But just like Mr. Vargas, Mr. Machado is just a

2    tool to Mattel.  He was just a means to reaching an end.  He

3    was -- as Ms. Hurst said, a weapon of litigation, and that's

4    why we are entitled to fees.

5           California imposes a sanction in the form of

6    attorneys' fees wherein a trade secret claim is brought that

7    is objectively specious and is brought in subjective faith.

8    Let me briefly go over each of those elements.

9           "Specious" means apparently right or proper,

10   superficially fair or correct, but not so in reality.

11   That's what the Gemini case says, and Gemini lists that

12   definition right out of the Stillwell opinion by Judge King.

13          The first line of Mattel's opposition to the fee

14   motion is Machado stole from Mattel thousands of pages of

15   confidential documents, period.  Admittedly, this makes the

16   claim seem apparently right, or superficially correct, but

17   as Gemini says, it was not so in reality.  In reality, the

18   claim was untimely.  In reality, the confidential documents

19   were not trade secrets, or they weren't used or they weren't

20   disclosed or they weren't even misappropriated.  And in

21   reality, Mattel was never entitled to a penny of monetary

22   relief from Mr. Machado.

23          Mattel had no basis for the trade secrets claim,

24   but it pursued it anyway because winning a judgment against

25   Mr. Machado was not the goal.  The goal was to pressure him

1   into testifying against MGA, and to further the goal of

2   prevailing against MGA on the origins of the Bratz and the

3   claims associated with that, not Mr. Machado.

4           Now, I'd like to go through each of those points I

5   just made and explain why they were both specious and

6   brought in subjective bad faith.

7           The claim was untimely, as the Court held in its

8   JMOL order.  Plaintiffs evaded summary judgment on the same

9   point by claiming that the documents that Mr. Machado copied

10  were contained on a server in California.  The Court held in

11  its summary judgment order, the amended order, pages 56 to

12  57, "There is a genuine issue of material fact as to whether

13  the documents resided on Mattel's California servers.

14  California may have some interest in the application of its

15  laws to this dispute, if that were the case."  It wasn't the

16  case, and they always knew it.

17          All of the evidence was to the contrary.

18  Mr. Machado said, "I copied files from my computer and from

19  the internal Mattel Servicios server that I could access in

20  Mexico."  So plaintiffs called two witnesses to try to rebut

21  that.  They called Jill Norquist, and they called Allison

22  Willensky.  And they purported to identify documents

23  exclusively on the California servers, but the testimony

24  fell apart on cross-examination.  Ms. Norquist admitted,

25  "Okay, we send that document to every subsidiary, including

 1    Ms. Trueba in Mexico."  She had to admit people in Mexico

 2    need this document to do their job.

 3          Ms. Willensky had to admit that the Mexico

 4    viability report, which was a research study of consumer

 5    preferences, was actually delivered in paper form to

 6    Mr. Machado's boss in Mexico.  It says that right on the

 7    front of the document.  It was just not true that it was

 8    kept only in California.  In fact, in their opposition,

 9    plaintiffs now admit this.  They say, "Well, we had a

10    witness we could have called"; Mr. Ibarra, who would say, "I

11    had a copy the Mexico viability report in a binder in my

12    office," and he would go on to say plaintiffs speculate that

13    it was missing around the time that Mr. Machado resigned,

14    and that's evidence that he actually took it.

15          We'll come back to Mr. Ibarra's testimony in a

16    little bit.  But if they knew it was in a binder in Mexico,

17    why did they put Ms. Willensky on the stand to say that it

18    wasn't, to say it was only on a server in California, to say

19    that Mr. Machado had to reach across the boarder into

20    California to take the file when they knew he didn't?

21          Plaintiffs are also ignoring the other testimony

22    that was elicited in cross-examination.  Ms. Norquist

23    testified that she didn't think anyone in a foreign

24    subsidiary could even access files in California; couldn't

25    do it.

 1          Mr. De Anda, the head of security, testified, and
 2     this was actually highlighted in the summary judgment
 3     motion -- excuse me, the summary judgment order, around the
 4     same page, page 56.  It's doubtful that the three Mattel
 5     Servicios employees had wide-ranging access to Mattel, paren
 6     (the parent), closed paren, documents because all three
 7     individuals were tasked with managing the Mexican market.
 8     That's what the Court held in its summary judgment order.
 9          But despite the Court highlighting that point,
10     Mattel continued to pursue the claim.  They continued to say
11     that the documents were only kept in California.
12          The Court's concern was proven correct,
13     Mr. Machado did not reach across the boarder, did not reach
14     into California to copy any of the files, and they knew all
15     along that he didn't do it.
16          Mattel made a variety of other arguments on the
17     issue of timeliness, and I don't want to get into too much
18     nitty-gritty, unless the Court has questions about them.
19     But I do want to highlight one of the arguments that they
20     made, which was to indicate that the case was stayed during
21     the period of time that the statute ran.
22          This argument was typical of the types of
23     arguments we've heard in this case; make a claim that has no
24     basis in fact, but when you get caught, make a new one.
25     That doesn't have any basis in fact either.  There was no

1    stay of the entire case.  There was a stay of discovery and

2    discovery only.  We know this because Mattel itself filed

3    pleadings during the stay, including an answer.  Of course,

4    the claim against Mr. Machado was brought in an answer in

5    the first place.

6            The last argument that they made in their

7    opposition that I should address is the notion that if you

8    survive summary judgment on a claim, as a matter of law, it

9    can't be specious.  This is the argument they make in their

10   opposition.  This argument is rejected explicitly by the

11   Flir systems case.  It's also rejected explicitly by the

12   case they cite for the proposition, which is Pixion,

13   P-i-x-i-o-n, a Northern District case.

14           The Pixion case says the Court does not agree with

15   Pixion, that any trade secret claim, which survives summary

16   judgment, is as a matter of law brought in good faith.  It's

17   just another specious argument.

18           The reason for rejecting such a bright line rule,

19   according to the Flir systems case -- and Flir is F-l-i-r,

20   and the cite is 174 Cal.App.4th 1270 -- is because a party

21   could evade summary judgment by offering what the Flir case

22   calls a sham argument.  That's exactly what happened here.

23   The sham argument was Mr. Machado reached into California to

24   copy a file, and that's why California statute of

25   limitations should control.  It wasn't true.  It was never

1     true.  And they knew it was never true.

2          The next critical flaw in their claim, the next

3     specious part of their claim was that they couldn't prove

4     every element of the trade secret misappropriation for any

5     of the documents.  Every document had at least one problem.

6     The one we heard the most about at trial was the point of

7     sale data, or as I call it in the brief, the POS data.  The

8     POS data is information that retailers, like Walmart,

9     collect from a cash register, or all their cash registers,

10    and they collect it and they sell part of it to Mattel.  And

11    it shows the sales, and particularly, the part that Mattel

12    is interested in, sales of their products.

13         But the evidence came out at trial that Walmart

14    uses that data for itself, as do all of the other retailers.

15    Well, of course they do.  That's why they collect it.  It

16    can't be a trade secret if any other person can get economic

17    value from it.  And of course Walmart gets economic value

18    from it.  Mr. Cavassuto admitted on the stand that Walmart

19    could use the information to manage its inventory.  That's

20    economic value.  The same is true for all the retailers.

21         So when the old theory fails, invent a new theory.

22    "Here is the new theory.  The real trade secret wasn't the

23    data from the retailers.  The real trade secret was analyses

24    of the data."  That's the argument they offered in the

25    opposition.  This is just transparent revisionism.  That's

1    not what they argued at trial.

2         The only evidence they offered at trial was that

3    the raw data cost $5.1 million, and that's what they wanted

4    from Mr. Machado for the POS data, because that's how much

5    it cost them to buy it.  They didn't offer any evidence that

6    it cost them anything to make these so-called analyses.

7    They did not even identify what they were, and there is no

8    evidence that they are worth anything at all to anybody.

9         Now, the POS data is also -- was also pursued with

10   subjective bad faith.  The POS data was the backbone of the

11   entire claim.  90 percent of the damages they wanted from

12   Mr. Machado related to the POS data.  Twenty-six out of the

13   29 claimed trade secret documents that had a dollar figure

14   attached to them were POS data documents.  The only

15   documents that had thousands of pages, as Mattel trumpeted

16   in its opening statement and throughout trial, were the POS

17   data documents.  They were the backbone of the case.  But

18   they never had any basis for claiming they were trade

19   secrets.  For them to be trade secrets, Walmart -- this is

20   sort of a hypothetical you have to think about, what they

21   had to prove to show they were trade secrets -- that would

22   have to prove that Walmart collects data from every cash

23   register in Mexico throughout the entire country of every

24   sale of every product, groceries, clothes, televisions,

25   motor oil, everything they sell, and puts it all together

```
 1    just so they can get a 1 percent discount on their Barbie
 2    dolls.  Because if they used it for any other purpose, they
 3    would have gotten economic value from it, and it could not
 4    have been a trade secret.
 5            When you think about what they would have had to
 6    have proved to show it was a trade secret, the claim is
 7    laughable, it's shameful, and that's why Mattel tried to
 8    conceal the evidence on this point.
 9            The Court may recall that we had a couple days of
10    hearings with Mr. Wagner, and when I was asking Mr. Wagner
11    questions, he admitted that he had never seen the contracts
12    with the retailers.  They weren't produced until the middle
13    of trial, and then once they were produced, Mattel refused
14    to call a witness on them, because once they did call a
15    witness on them and that witness was on the stand, that
16    witness, Mr. Cavassuto, admitted not a trade secret.  That's
17    why they are trying to hide those contracts.
18            That shows their bad faith.
19            Another trade secret we heard a lot about was the
20    presentation that Mr. Machado gave at the W Hotel, and it's
21    not a trade secret for the same reason it contained data
22    purchased from other parties who are free use it for their
23    own benefit.  In fact, some of the data comes from companies
24    like Nielsen and other research companies who gain benefit
25    from selling it, so it can't be a trade secret.
```

 1          In opposition, we get another new theory.  It was

 2    never meant to be a trade secret.  It was, quote, "to show

 3    that while Machado and Vargas were Mattel employees, they

 4    blatantly copied and misused Mattel information to benefit

 5    Larian and MGA; that is, Mattel didn't care if it was a

 6    trade secret, even though they talked about it incessantly

 7    in their trade secret case.  They just wanted to use it to

 8    attack Mr. Larian.

 9          And this shows another example of their bad faith

10    because that presentation is the only document having

11    anything to do with Mexico that Mr. Larian ever saw.  He

12    didn't see any of the others.  There is no testimony to the

13    contrary on that point.  The fact that the W Hotel

14    presentation didn't have a single trade secret in it didn't

15    matter.  What matters was showing that Mr. Larian had seen

16    it to give rise to an inference falsely, and Mr. Larian and

17    MGA are companies that steal competitors' trade secrets.

18          Another claim trade secret was the viability

19    report that I spoke about briefly.  The problem with this

20    one is there is no evidence that anyone ever took it.  It

21    was not found during the search, either on the CD or in

22    paper format.  There is no server record showing it was

23    copied.  There are no e-mails showing it was sent to

24    anybody.  There is just no evidence at all.  Mattel claims

25    it has circumstantial evidence that it was taken that point

1  to an e-mail from Ms. Trueba to Ms. Norquist asking for a

2  viability report.  I ask Ms. Norquist, "Is this the Mexico

3  viability report?  Is that what she's asking for?"  "No,

4  it's not," she said.  She's asking for a different report.

5  If they knew that, why did they claim it was taken?

6         So when that evidence fails, what do we do?  We

7  offer new evidence.  Trial is over a month, but we've got

8  another witness, Mr. Ibarra.  Mr. Ibarra would come in and

9  say, "I had a copy on my desk in a binder, and later, after

10 Mr. Machado left, I couldn't find it.  I'm not sure when I

11 lost it because I don't remember when I looked for it, but

12 it was missing later at some point."

13        That may be what he said in his deposition, but

14 they didn't call him to the stand, so we don't know what he

15 would have said there.  But more importantly, the reason

16 they didn't call him is because his story would torpedo the

17 choice of law argument.  The choice of law argument depended

18 on Mr. Machado reaching across the border into California to

19 take a document, but he didn't have to do that if it was on

20 Mr. Ibarra's desk.  And that's why they didn't call him,

21 because it would shoot a hole in their choice of law theory.

22        After all, both statements could not be true.  It

23 could not be simultaneously in Mr. Ibarra's binder in Mexico

24 so that Mr. Machado could take it from that and

25 simultaneously be only in a server in California, so he had

1    to reach into California to get it.  It can't both be true,

2    and that's why they didn't call Mr. Ibarra, not because of

3    time constraints, as they claim in their papers.

4           The last major flaw in the case, in the claim, was

5    that they had no basis for seeking monetary relief from

6    Mr. Machado; no basis at all.  Mr. Wagner, on the stand

7    during cross-examination, admitted that his theory was a

8    theory of unjust enrichment or of discouragement, and that

9    the only party who could have theoretically been unjustly

10   enriched from the documents at issue was MGA, not

11   Mr. Machado.  There is no response to this claim in the

12   opposition because there really isn't one to make.

13          So when the old theory fails, invent some new

14   theories.  In the opposition they claim, "Well, but Mattel

15   lost market share."  Maybe, but Mr. Wagner testified that he

16   couldn't find any evidence at all that Mattel lost a sale or

17   MGA gained a single sale from the trade secrets, and that's

18   the only kind of increase or loss of sales that matters, for

19   purposes of a trade secret claim.

20          The new theory is just as bad as the old one, but

21   the fact that they are still coming up with new theories

22   today, a month after trial is over, and those theories are

23   still unsupported by the evidence, perfectly illustrates the

24   subjective bad faith at issue here.

25          Now, the other reason why Mattel was not entitled

1    to damages is because they didn't show use of any of the

2    trade secrets.  Mr. Machado testified that he took a peek at

3    the POS data.  That's not a trade secret, as we talked about

4    earlier.  And the citations for the idea that you need to

5    have use to get damages are abundant.  There is the jury

6    instructions, CACI 4400.  There's the Bourns case, which is

7    cited by Mattel in its papers, B-o-u-r-n-s, 331 F.3d 704,

8    which held proof that trade secrets were actually disclosed

9    or used by the employee was necessary for a verdict in

10   Raychem's favor.

11          Another Ninth Circuit case was Crst Van Expedited,

12   479 F.3d 1099.  This affirms a district court's award of bad

13   faith attorneys' fees because, in part, the plaintiff,

14   quote, "Failed to demonstrate the required use or disclosure

15   of trade secrets by the defendant."  And Mattel's witnesses

16   agreed that the documents have value only if they are used.

17   You can start with the main case, the Bratz part of the

18   case.  Mr. Wagner said, "There is no value to Carter

19   Bryant's drawings if he just sticks them in a drawer.  They

20   have to be commercially exploited."

21          Ms. Norquist testified that one of the documents

22   was valuable because the competitor could use the

23   information in it to change its prices, change its margins,

24   or change other practices like advertising.  You have to use

25   the document to make those changes.

1        Ms. Willensky testified that the viability report
2   was valuable because the competitor could use it to develop
3   new products.  If the documents were never used, there could
4   never be damages.

5        And Mattel had no use, no evidence of use, of any
6   of the trade secrets.  Mr. Machado and Ms. Kuemmerle were
7   the only witnesses who were asked questions about this, and
8   they both denied doing it.

9        Now, Mattel says the jury can disbelieve that
10  evidence.  Maybe, but that doesn't work as a substitute for
11  affirmative evidence.  Merely disbelieving evidence offered
12  by the defendant does not prove the plaintiff's claim.  So
13  even if that evidence was not credible, and they offer no
14  reason to show why it should not be credible, it doesn't
15  give them their case.

16       Now, the issue of the monetary damages sought also
17  illustrates Mattel's subjective bad faith.  Mattel never
18  cared about collecting these damages from Mr. Machado.  They
19  didn't have a basis for them.  Their own expert said that
20  they couldn't collect them or they weren't entitled to them.
21  And Mr. Machado is a single individual living in another
22  country, working as a part-time consultant after he was laid
23  off from his job, where he earned about $130,000 a year two
24  years ago.  The idea that Mattel was going to collect
25  $5 million from him for -- pursuant to a judgment by this

1    Court is just not credible.  It was not their practical

2    concern, especially when you compare the $5.6 million they

3    wanted from Mr. Machado to the billion dollars they wanted

4    from MGA; half of a percent.  The $5.6 million was not

5    really important to Mattel.  It was not significant to

6    Mattel, but it was significant to Mr. Machado, and that's

7    why they brought the claim, to pressure him into testifying

8    against MGA.

9            And this brings me back to Mr. Vargas.  Subjective

10   bad faith is going to obviously require inferring Mattel's

11   conduct from the evidence.  It can be inferred from all of

12   the things I've already spoken about:  Untrue arguments

13   about where the documents are kept, untrue arguments about

14   the case being stayed, failure to hit every element for any

15   trade secret, or alleged trade secret.  You know, the

16   documents that were -- that were maybe trade secrets, that

17   the jury found to be trade secrets, weren't used by anybody.

18   The documents that Mr. Machado looked at weren't trade

19   secrets.  They didn't mesh.  They didn't hit every element

20   for any document.

21           Concealing evidence to bolster your claim, the

22   retailer contracts.  Putting an expert on the stand that

23   testified to damages that has no basis, pursuing damages

24   against a defendant who's all but judgment-proof in another

25   country, changing your theories -- the real trade secrets

 1    are still negotiable, apparently, a month after trial -- and

 2    identifying new witnesses.  All of these things together

 3    give rise to an inference of subjective bad faith.

 4              But perhaps the best example is what they did with

 5    Pablo Vargas.  It's undisputed that Mattel offered

 6    Mr. Vargas a pardon of the criminal charges against him in

 7    Mexico.  Mattel could offer a pardon because Mattel was

 8    essentially the prosector.  It was entirely within Mattel's

 9    discretion whether Pablo Vargas continued to be prosecuted

10    in Mexico or not.  And they offered him the pardon so long

11    as he told the truth, but not the truth that he told them

12    the first few times, only the truth where he said he used

13    the documents.  As Mattel's lawyers told Pablo Vargas and

14    Pablo Vargas' lawyers, any other statement would be a lie to

15    Mattel, even though Vargas denied using the trade secrets

16    many, many times before.

17              So Mr. Vargas didn't want to go to jail.  He

18    signed a declaration that Mattel's lawyers wrote that had

19    their version of the truth in it.  But before he could get

20    that pardon, he also had to testify in a deposition, and the

21    deposition had to be consistent with the version of the

22    truth that was in the declaration.  If his deposition was

23    different than the declaration, no pardon.  That was the

24    terms of the agreement.

25              So Vargas was deposed, and as you would expect, he

1    testified consistently with the declaration.  He testified
2    that he used the documents.  When the deposition was over,
3    Pablo Vargas got his pardon, and Mattel had evidence to
4    raise a triable issue of fact on the question of use.  But
5    the testimony at trial denied use.  Ms. Kuemmerle denied
6    using any of the documents.  Mr. Machado denied using any of
7    the trade secret documents.  And Mattel knew that this
8    testimony was coming because they said the same thing in
9    their deposition, which is why they went to Pablo Vargas in
10   the first place, because they had to generate a different
11   version of events to get over the hump of summary judgment.
12           But they never called him to the stand.  Pablo
13   Vargas never came and testified to that version of the
14   truth.  He was their only witness that these documents were
15   used, a key witness on a key element of the claim, and they
16   didn't even call him, and they didn't explain why, even
17   though we asked.
18           They didn't call him because he was incredible.
19   He was incredible because if he testified to this new
20   version of the truth, he would be impeached by all of his
21   prior statements where he said something totally different.
22           But there was a bigger problem with Pablo Vargas
23   at that point, which was Mattel had lost its leverage over
24   him.  They didn't know what he was going to say because he
25   had his pardon.  This is the problem with a mercenary.

CV 04-9049-DOC - 05/25/2011 - Vol. 1 of 4

63

1    After you pay them, you don't know which side they are going

2    to be on.  So they didn't call him.  They manipulated him

3    into testifying against MGA to get over the hump of summary

4    judgment and then didn't even put him on the stand at trial

5    and, in fact, abandoned any pretense of offering evidence of

6    use of any trade secret at trial.

7         They criminally prosecuted him for five years, but

8    it all went away as long as he testified that MGA steals

9    competitors' information.

10        This course of conduct did not vindicate any

11   rights of Mattel.  It didn't protect its intellectual

12   property.  A complete pardon and to walk away vindicates

13   nothing.  It protects nothing.  It was not, as Mr. Eckert

14   testified, quote, "Very important for Mattel to do

15   everything we can to prevent people from stealing our

16   property."

17        Something else was very important, and that was

18   attacking MGA and attacking Mr. Larian with all means

19   available, even including a specious claim against

20   Mr. Machado.  Under California law, that specious claim

21   brought for that improper purpose requires a fee award in

22   favor of Mr. Machado.

23        Thank you.

24        THE COURT:  Thank you.

25        Counsel, response?  And then after these

```
 1    responses, do you want to move to the JMOLs?
 2              MR. QUINN:  Yes.
 3              THE COURT:  Okay.  Do you want to take a break for
 4    lunch at that time or just go straight through; what's your
 5    preference?
 6              MS. KELLER:  Break for lunch.
 7              MS. HURST:  Break for lunch, please.
 8              THE COURT:  Okay, good.  We'll go straight
 9    through.  I'm just kidding you.
10              (Laughter.)
11              THE COURT:  Let's finish off this round, then, and
12    then come back to the JMOLs right after lunch, if that's
13    acceptable.
14              MR. ZELLER:  Okay.  And what I'll do at this
15    point, your Honor, with your permission, is respond to
16    Mr. Machado's arguments.  The factual components of it,
17    Ms. Estrich, being better versed on the law in this area,
18    may have something to add after that, and then we would go
19    to the JMOL.
20              Let me start with -- the notion here is that you
21    heard this referring about there was no basis, and that's
22    obviously the reason why it stayed that way is because
23    that's what the standard essentially requires.  But it's
24    simply false.
25              Mr. Machado's counsel is equating contested issues
```

1  with being no basis.  The fact that they disputed them does

2  not mean that they were baseless, and, in fact, I will talk

3  about the evidence.  The Court has heard it.  The Court

4  knows full well what happened at this trial, saw the

5  witnesses, heard the testimony, and, in fact, over

6  Mr. Machado's counsel's constant objections, we had to bring

7  in witness after witness in order to establish those facts,

8  in order to get the CD into evidence that Mr. Machado had in

9  his possession, and, moreover, to establish these damages.

10  So a number of these statements, the Court knows full well,

11  from Mr. Machado's counsel are simply false, false

12  statements about what the evidence showed at trial.

13         First point is that Mr. Machado never denied that

14  he knew full well that the documents came from California.

15  And what he said here is, question, "You took documents that

16  you knew came from Mattel here in California, correct?"

17  Answer, "Yes."  That is the March 4th, 2011, trial

18  transcript, Volume I, at page 53, lines 10 through 12.  He

19  admitted this elsewhere, that he knew full well that what he

20  was accessing were servers not in Mexico but from the

21  parent, Mattel in California and Arizona.

22         Then also, of course, there was evidence that

23  while acting in concert with Ms. Trueba, that Ms. Trueba

24  solicited documents for both of them to take from

25  California, including by sending e-mails and contacting

```
 1   people here in California to obtain those documents.  One
 2   example of that is TX-8147.
 3           Then there were also two of the other trade secret
 4   documents taken by Mr. Machado, the viability testing report
 5   and the Barbie all world's line list were, in fact, stored
 6   in Mattel's servers in the United States.  And there was
 7   testimony by Ms. Willensky and by Ms. Norquist on that
 8   specific point.
 9           Now, also -- I'll come back to that in a second
10   here, but the Court, in fact, at the hearing on
11   Mr. Machado's JMOL even agreed that Mattel had a, quote,
12   "strong argument," end quote, and that there is a, quote,
13   "huge nexus, if you will, to this country," end quote,
14   regarding the facts surrounding Mr. Machado's actions.  So
15   the idea that somehow that there was no evidence, there was
16   no basis, that there was somehow a fabrication of these
17   facts is -- is simply false, and it's absolutely
18   contradicted by the indisputable record, including
19   Mr. Machado's own testimony.
20           Now, we also heard in the midst of this argument
21   that there was no evidence that, in fact, the documents that
22   Mr. Machado --
23           (Interruption in the proceedings.)
24           MR. ZELLER:  I'm sorry.
25           We also heard in this argument that the documents
```

1    that Mr. Machado took were not even trade secret.  In fact,

2    the jury found, and this is Item Number 7 and Item Number 8,

3    that the Barbie 2005 preliminary line list and the viability

4    testing report, two of the documents that Mr. Machado took

5    and that there was ample evidence that he took, were, in

6    fact, Mattel trade secrets.  Column one, the jury answered

7    "yes" to both of those questions.  They ultimately found

8    that there was not evidence of misappropriation by MGA or

9    Mr. Larian, but it is simply false to make any argument that

10   it was -- that there was no basis for finding that those

11   were, in fact, Mattel trade secrets.

12           Another factual assertion that was made here could

13   pertain to the point of sale information and that this was

14   the, quote, "Backbone of the trade secret claim and that

15   there was no basis" -- and that was the phrase -- "no basis

16   for claiming it was trade secret."  Again, the Court will

17   recall that we called in witnesses, including one from

18   Mexico, to come here specifically to testify as to the fact

19   that these were Mattel compilations of data, and that's why

20   they were, in fact, trade secret.

21           I mean, the Court will, of course, recall vividly

22   that the Court -- and this was after also extensive

23   discussion and argument by the parties -- required the

24   parties to come in and put in specific evidence to establish

25   the trade secret nature of these documents.  We would have

Case 2:04-cv-09049-DOC-RNB   Document 10606   Filed 05/26/11   Page 68 of 85   Page ID #:321060
CV 04-9049-DOC - 05/25/2011 - Vol. 1 of 4

68

1   never been even allowed to talk about those documents had we

2   not met the Court's standard, and we brought in witnesses to

3   do exactly that as to the point of sale documents and the

4   others.

5           There was another point that was made about how

6   supposedly there was a bait and switch on some of these

7   documents, and that Jill Norquist, for example, stated that

8   the preliminary line list was distributed to the foreign

9   subsidiaries.  The Court will also recall that, in fact,

10  Ms. Norquist testified that what was taken and what was

11  showing up on Mr. Machado's CD was the early preliminary

12  version of that line list.  If you recall, this is the

13  February to April of 2004 time period.  It's only months

14  later that it was distributed to the foreign subsidiaries,

15  not when it was taken, and that -- Ms. Norquist was

16  absolutely crystal clear on that.

17          In terms of the argument about a different

18  viability report, that, too, was wrong.  Ms. Willensky

19  testified, and, in fact, the Court will recall, the

20  viability report included data from both the United States

21  and Mexico.  They are not different reports.  They were the

22  same report.

23          The other argument that was made, then, was that

24  there was no basis for monetary relief, and the only thing

25  that was really talked about here in terms of the evidence

Case 2:04-cv-09049-DOC-RNB   Document 10606   Filed 05/26/11   Page 69 of 85   Page ID #:321061
CV 04-9049-DOC - 05/25/2011 - Vol. 1 of 4

69

 1   was Mr. Wagner.  But the Court will recall quite well that

 2   Mr. Wagner never even testified on that subject.  Mattel,

 3   MGA, or particularly, Mr. Machado's basic insistence had to

 4   bring in individual witnesses to talk about the cost of

 5   development for each of those trade secrets, and we brought

 6   those witnesses in.  There was ample basis for showing that

 7   there was, in fact, cost of development.

 8           The next argument that basically Mr. Machado

 9   makes, then, confuses a couple of different legal

10   principles.  Yes, there has to be evidence of use in order

11   to obtain unjust enrichment recovery, but not for damages.

12   The cost of development is a recognized basis for damages in

13   a trade secret case.  That was the theory that we went on.

14   It wasn't on use and it was not on unjust enrichment; it was

15   that the cost of development was an appropriate measure of

16   damages because that showed what Mattel had lost.

17           And so, yet again, also when talking about the

18   testimony on this, Mr. Machado's counsel conflated the

19   testimony about the value of the -- namely, that this

20   information was valuable, that it was trade secret, would

21   have been another theory about damages.  But there was no

22   shifting of theory in this, your Honor.  From the beginning

23   of the trial, our theory of damages, recovery, against

24   Mr. Machado was cost of development, and I'm sure that the

25   Court will recall that quite vividly.  We went through this

1    with multiple witnesses over an extended period of time.

2            The next point that was basically raised here, and

3    this is kind of getting to the end of Mr. Machado's factual

4    arguments, had to do with the idea that he was

5    judgment-proof, that this was to pressure Mr. Machado.  I

6    mean, that's all rhetoric.  The fact is that when Mattel

7    brought this claim, Mr. Machado was here in the United

8    States.  The other two weren't, but Mr. Machado was promoted

9    by MGA to come here and work in the United States.  He was

10   in this district.  He was an appropriate subject as a

11   defendant, based on those claims.  The other two weren't.

12   So the idea that somehow there is disparate treatment shows

13   bad faith doesn't hold water.

14           Also, at the time Mr. Machado was an executive of

15   MGA, that MGA cast him aside or did whatever it is that they

16   did to Mr. Machado later on, hardly speaks of Mattel's bad

17   faith in bringing the claim.

18           Then -- also, basically the points about

19   Mr. Vargas, which are -- I would respectfully submit are

20   really a red herring, but Mr. Machado was free to call

21   Mr. Vargas if he thought that that testimony was so helpful

22   for him.  He didn't do it.  He didn't do it.

23           And Mr. Vargas, the Court will recall, testified

24   in his deposition that he lied because MGA-paid lawyers told

25   him to lie, and that he did lie.  That is the record, so to

1    the extent that Mr. Machado is touting this testimony by

2    Mr. Vargas and him supposedly being pressured, the fact is

3    is that Mr. Vargas' undisputed testimony is that he was

4    pressured to lie by MGA, not by Mattel.

5              THE COURT:  Ms. Estrich?

6              MS. ESTRICH:  Thank you, your Honor.  I'll be

7    brief.

8              THE COURT:  You don't have to.

9              Just a moment.  Check with Mr. Quinn, your client,

10   and make sure you are satisfied.

11             Okay.  Ms. Estrich?

12             MS. ESTRICH:  I'm going to be brief on this

13   Machado motion.

14             The first point is that bad faith is required, and

15   as the Court well knows, the definition of bad faith, for

16   purposes of fees here, is a very strict one.  It requires

17   both objective speciousness and subjective bad faith.  And

18   as for objective speciousness, I think the fact that the

19   claims survived summary judgment, that the Court recognized

20   its substance on JMOL, that as Mr. Zeller has summarized, it

21   was ample evidence that Mr. Machado did admit to wrongdoing,

22   did admit that he stole information that was not his; the

23   jury, indeed, found some of it trade secret.

24             We lost not because our CUTSA claim was specious,

25   but on the question of whether a three-year statute of

1    limitation should apply or a two-year period of statute of

2    limitations, based on the choice of law issue.  I think

3    there is simply no case and no basis for saying that as a

4    matter of law, this was objectively specious.

5            As for subjective bad faith, Mr. Machado's

6    attorneys basically offered two claims for subjective bad

7    faith.  One was the no-evidence claim, which Mr. Zeller has

8    amply responded to, claims that, "Well, there was no

9    evidence as to this," or "This one wasn't called," et

10   cetera.  Mr. Zeller has answered those claims more

11   basically.  I don't think any of those claims can trump this

12   Court's decisions at SJ and JMOL to recognize that this was,

13   indeed, a significant case.  And the reason SJ matters is

14   because it's a pretty good judge or tool for measuring

15   objective reasonableness, and you'll see it's in the

16   copyright field as well.  But Mr. Machado's counsel says,

17   "Nonetheless, you could be subjectively in bad faith even if

18   your claim was reasonable."

19           And putting aside the factual issues, which I

20   don't think work at all -- the Court can obviously decide --

21   the only other argument they have for subjective bad faith

22   goes to this larger issue of Mattel's a terrible litigator,

23   and they are just litigating people to death and putting

24   pressure on us, et cetera, et cetera.

25           I submit first that that is simply not true, and

```
 1    we'll discuss the lack of evidence.  I think it's based
 2    simply on Mr. Brawer's testimony and contradicted by
 3    everything else.  But, your Honor, there is a concern here,
 4    which I would like to raise, and the concern applies not
 5    only to the argument on behalf of Mr. Machado, but also to
 6    exemplary damages and certainly to attorneys' fees, which is
 7    that unless you were to rule based on the speciousness, no
 8    evidence of bad faith, factual misstatements, that's all
 9    fine, but if you were to take Mr. Cote's indication to
10    somehow make a finding that notwithstanding all of this,
11    Mattel was engaged in a bad faith litigation strategy, then
12    I would submit to you that the longer this antitrust claim
13    is pending, you would have a serious Seventh Amendment issue
14    by making equitable findings in advance of a claim that
15    raises these same factual issues about Mattel's litigation
16    strategy and as to which Mattel has a right to a jury trial.
17            The United States Supreme Court has recognized
18    time after time that equitable decisions, if you are in the
19    same case or you are considering bifurcating a case, before
20    you can split the claims up, as, frankly, Judge Larson did
21    earlier here, you must make sure that splitting the claims
22    will not put the Judge in the position where he's going to
23    be making equitable findings that will then deprive a party
24    of its constitutional right to have the jury make those
25    findings.
```

```
 1              Now, they have filed an antitrust claim, which we
 2    submit is claims splitting.  It says here, "They are taking
 3    their claims that arise out of a common nuclear fact" --
 4    it's not as if it is -- "and splitting the claims."  Now, if
 5    a judge can't split claims and, in doing so, deprive a
 6    litigant of a Seventh Amendment right, certainly a party
 7    can't do it.  And our concern, your Honor, is that any
 8    findings you might make about Mattel's litigation strategy
 9    or Mattel's market intelligence program go directly to
10    issues in their complaint.  Whether Mattel pursued baseless
11    and bad faith litigation, it's paragraph 13, by seeking
12    equitable remedies; paragraphs 18, making misrepresentations
13    as to damages, withholding evidence, et cetera.  These are
14    all claims in the antitrust case.
15              And I know that the Court has said in the past
16    that it didn't intend any decision it made in equitable
17    determinations to bind any future jury.  But the problem
18    with that is that if it is claims splitting, then we are
19    fine; then you dismiss that case, you can make whatever
20    judgments you want at that point in time on these equitable
21    issues, and we are very fine with the Seventh Amendment.
22              But if the Court should decide that it's not
23    claims splitting, that it really is a separate case, which I
24    think would be an error, but if the Court should decide
25    that, then we've got a big problem with Parklane Hosiery,
```

 1    because notwithstanding the Court's good intentions of

 2    preserving jury trial rights, Parklane Hosiery specifically

 3    says that "Where a judge properly makes equitable findings

 4    in Case Number 1, it can, indeed, bind the jury in a

 5    separate Case Number 2."

 6            So we would submit, your Honor, that in

 7    Mr. Machado's case, the evidence is pretty clear, that it's

 8    not specious and it's not in subjective bad faith.  But the

 9    invitation to this Court to make findings that go beyond

10    that into our litigation strategy raises Seventh Amendment

11    questions which I think are very serious, and I can cite to

12    the Court numerous cases establishing the principles I've

13    articulated.

14            But the final point I would like to make, and then

15    we can move to JMOL, is that notwithstanding my many

16    disagreements with Mr. Machado's position, he apportioned --

17    he apportioned 25 percent of his costs.  Now, I'll submit on

18    our briefs, we have some issues with some of the

19    descriptions of the tasks done, et cetera, but we believe

20    bad faith makes it unnecessary to reach it.

21            But I would just point out, as we break for the

22    day, that to his credit, Mr. Machado, frankly unlike MGA,

23    and perhaps on stronger facts of inter-relationship,

24    recognized the responsibility to apportion.

25            Thank you very much, your Honor.

CV 04-9049-DOC - 05/25/2011 - Vol. 1 of 4

76

```
 1              THE COURT:  Ms. Estrich, check with your
 2     co-counsel and make sure that you are satisfied and that
 3     they are satisfied.
 4              MS. ESTRICH:  They are satisfied.  Mr. Eckert?
 5              THE COURT:  Good.  Thank you very much.
 6              MS. ESTRICH:  Thank you very much.
 7              THE COURT:  Counsel, your response by --
 8              MR. COTE:  Can I have one more round, your Honor?
 9              THE COURT:  -- Mr. Cote.
10              MR. COTE:  Thank you.
11              Your Honor, I'm not sure how to respond -- or
12     organize my response, rather, except to go to respond to the
13     laundry list, so I think I'll just take that approach.
14              Mr. Zeller claimed that Mr. Machado never denied
15     knowing that the documents, quote, "came from California."
16     Sure, some of them were made in California.  That's not the
17     point.  The point that they made on summary judgment, the
18     argument that they made on summary judgment, is that
19     Mr. Machado had to reach across the border into California
20     to get them.  That's not true.  That has no basis.  The fact
21     that they were made in California, as Ms. Willensky and
22     Ms. Norquist testified, and the fact that they were then
23     sent to Mexico, as those witnesses testified, doesn't
24     matter; that wasn't the argument that was raised at summary
25     judgment.  The argument was, "The documents are exclusively
```

1    in California, and Mr. Machado had to go there to get them."

2    That's what they said, and that's false.  So, again, the

3    theories are shifting.  It's a month after trial; we've got

4    a new argument.

5           Mr. Zeller also quoted testimony that the

6    documents were stored on the server in the United States,

7    and maybe they were, but copies were sent around the world,

8    including Mexico.

9           As Mr. Ibarra testified in deposition and as

10   Mattel cited in their opposition to this very motion, he had

11   a copy of one of the documents in his binder.  You can't

12   have it both ways, your Honor; it can't be both in a binder

13   in Mexico and only on a computer in California.

14          Mr. Zeller claimed that two documents, the

15   preliminary line list and the Mexico viability report, were

16   trade secrets, and the jury so found.  I thought I'd said

17   that when I stood up here.  If I didn't, I meant to.  They

18   weren't used.  That's where the claim fails.  The jury found

19   that MGA didn't use them, and Mattel offered no evidence

20   whatsoever that Mr. Machado ever used them.  In fact, when

21   he was asked, he said the opposite; so did Ms. Kuemmerle.

22   That's all of the evidence on use that was presented to the

23   jury, your Honor.  That's all they had.

24          On the point of sale data, nobody came from

25   Mexico; that's not true.  Omar Cavassuto came from El

 1    Segundo, California, because that's where he works and
 2    lives.  Mattel claimed that they'd have to bring someone out
 3    from Mexico.  In fact, at one point they claimed they'd have
 4    to bring up six people from Mexico, and that was why they
 5    didn't want to have to present a sponsoring witness.  The
 6    Court ordered them to do it anyways, and they found one guy
 7    in California to authenticate the contracts, but the problem
 8    was that witness admitted they weren't trade secrets in the
 9    first place.  That's why they didn't want to call someone.
10    It had nothing to do with bringing people up from Mexico or
11    six people up from Mexico.
12            On the Mexico viability report, Mr. Zeller
13    repeated the argument that she asked someone in California
14    to send her a copy of the Mexico viability report.  The
15    trial exhibit at issue that he cited was TX-8147.
16            The recipient of that e-mail was Ms. Norquist, and
17    I asked Ms. Norquist, "Right?  And there is a Mexican 2004
18    viability report, right?"
19            "I presume there would have been."
20            Question:  "And that's what you understood
21    Ms. Trueba to be asking for, right?"
22            Answer:  "No, that's not correct."
23            So the only evidence they have that Ms. Trueba was
24    collecting documents shows that she wasn't even asking for
25    the document that they claimed is a trade secret.  It was

 1    some other document.  That's why the claim is specious.

 2              As for damages, I had a head scratcher.

 3    Mr. Zeller claimed that Mr. Wagner never testified on

 4    damages for Mexico.  That's just not true.  It's at the very

 5    end of his exam.  He said, "Mattel spent $5.1 million on the

 6    POS data, the raw data."  The only reason he offered that

 7    testimony is because it was part of their damages theory.

 8              And Mr. Zeller stood up here and he admitted that

 9    you have to show use for unjust enrichment, but he claimed

10    that Mr. Wagner didn't have an unjust enrichment theory.

11    Nonsense.  Look at his report.  Look at his Daubert

12    testimony.  Look at his cross-examination testimony.  The

13    theory was MGA saved money by not having to make these

14    documents for itself.  That's unjust enrichment.  That's

15    what he called it.  He called it "unjust enrichment."  And

16    this reference to cost of development, I am not sure how

17    that's supposed to be different than unjust enrichment

18    because obviously if you are saving development costs, you

19    are unjustly enriched, if the information is actually a

20    trade secret and if you're actually using it.

21              The case cited by Mattel for the proposition of

22    avoiding or minimizing start-up costs is the Bourns case

23    that I cited earlier.  And the Bourns case says that the

24    jury was properly instructed that you have to find use

25    before you can recover on that theory.  The Bourns case

 1    involves trade secrets that let the defendant save three
 2    years of development costs.  How did they save three years
 3    of development costs?  By using the trade secrets.  Use is
 4    an element for any kind of monetary relief, absent some
 5    exceptional circumstances that don't fit this case here.
 6            The next point raised was Mr. Vargas, and I'll
 7    make three quick points on this.
 8            First of all, it was Mattel's burden to prove use
 9    of trade secrets; it was Mattel's burden to prove every
10    element of its claim.  It was not Mr. Machado's burden to
11    prove any of it, so when they abandoned their only witness
12    who ever gave even a hint of testimony that the trade
13    secrets were used, they abandoned their claim, their claim.
14    Mr. Machado didn't have a claim to prove.
15            The other point was Mr. Zeller suggested that
16    maybe we should have called Mr. Vargas, but why would we
17    call someone who is an admitted liar?  He told two different
18    stories; only one of them is true.  Why would we call him
19    just to impeach him?  That's not what we do.  We don't call
20    liars.
21            The other point is Mr. Zeller would like the Court
22    to now decide, a Judge, that the second story, the one that
23    he told in his deposition, was the truth.  But the evidence
24    they offer to show that the second story is the truth is the
25    deposition testimony.

 1          When I was in law school, I didn't fully
 2   understand the notion of what a bootstrap was.  Now I think
 3   I get it.  You can't use the doctored testimony to show that
 4   the testimony is not doctored.  That's a bootstrap.
 5          As for overcoming summary judgment, with respect,
 6   Ms. Estrich is just wrong on that point.  Surviving summary
 7   judgment doesn't show that your claim is subjectively
 8   reasonable.  It shows that you've raised a triable issue of
 9   fact.  But when you do it with false facts, a sanction is
10   appropriate, and that's exactly what the Flir case says,
11   F-L-I-R.
12          That's exactly what the cases that are cited by
13   Mattel say, the Pixion case in the Northern District.
14   That's why that rule exists, because summary judgment, in
15   fact, is not so hard to get over if you are willing to make
16   any argument you need to to do it.  And that's what happened
17   here.  They argued, for example, the documents were kept
18   only on a server in California.  It was never true.  They
19   new it was never true, but it was enough to get over summary
20   judgment, and that's why a sanction is appropriate.
21          The final point I would respond to is the point
22   about the antitrust case, and respectfully I'm going to
23   decline Ms. Estrich's invitation to become a plaintiff in
24   that case.  I don't think Mr. Machado has a claim in the
25   antitrust; he's not asserting a claim in the antitrust.  The

```
 1   antitrust claims have nothing do with what Mr. Machado is

 2   arguing.  The litigation strategy that Mattel had against

 3   Mr. Machado is wholly separate from the litigation strategy

 4   that they had against MGA, and it's just a complete red

 5   herring designed to throw a stop in the works.  The Court

 6   has the motion fully briefed in front of it, and because

 7   this was a specious claim and because it was brought in bad

 8   faith, the fee award is appropriate.

 9              Thank you, your Honor.

10              THE COURT:  Okay.  Now, what would you like to do

11   next?

12              MR. ZELLER:  JMOL.

13              THE COURT:  JMOLs?  JMOLs?

14              Okay.  Now, do you want some lunch or do you want

15   to just go straight through?  Either way is fine with me.

16              MS. KELLER:  We would like lunch.

17              THE COURT:  Lunch?  Then let's get unanimity.  Do

18   you want to go to lunch or do you want to go straight

19   through?

20              MR. ZELLER:  I think our vote is to go straight

21   through, but --

22              THE COURT:  Well, that's perfect.

23              MR. ZELLER:  I know, exactly.  As you can tell, we

24   never agree on anything.

25              THE COURT:  Let's compromise.  How long for lunch;
```

1    an hour?

2              MS. KELLER:  That would be great.

3              MS. HURST:  An hour.

4              THE COURT:  Just like a jury, one hour, okay?  Why

5    don't we just come back at 2:00.

6              Now, how long do you estimate for your JMOLs?  It

7    doesn't matter to me, but just give me some idea for the

8    Court staff so I have all of the resources that you need.

9              MR. ZELLER:  Well, an hour, hour and 15 minutes.

10             THE COURT:  Hour and a half, two hours.

11             *(Laughter.)*

12             THE COURT:  As long as you'd like.  But just

13   roughly speaking, just so I have an idea, how long do you

14   think for JMOLs?

15             In other words, all I want to know is do I need a

16   nighttime staff?  Do I need air, lights?  If so, how late

17   tonight?

18             MS. KELLER:  I would imagine our portion of that

19   would be maybe 45 minutes.

20             THE COURT:  So an hour and a half, okay.

21             So it sounds to me like 5:00, 5:30, at the latest,

22   6:00.

23             So for the Court reporters, I don't think I need

24   nighttime court reporters.

25             Now, you are not bound to that.  I may have

```
 1    questions.  We may go on, but if I don't, I've got a pretty
 2    good idea.
 3            Have a nice lunch.  See you at 2:00.
 4            MR. OVERLAND:  May we be excused?
 5            (Discussion held off the record.)
 6            THE COURT:  We are back on the record.
 7            Mr. Overland is requesting to be excused, and
 8    Mr. Cote.
 9            MR. COTE:  Thank you, your Honor.
10            THE COURT:  All right.  Now, I don't think I've
11    got questions, but I am taking the lunch hour to go over
12    some of the arguments.
13            MR. OVERLAND:  We'll come back after lunch.
14            THE COURT:  That doesn't mean that at 5:00 I won't
15    have questions, but if I do --
16            MR. OVERLAND:  We'll stay.
17            THE COURT:  -- you'll stay.  I don't think I do
18    right now, though, in good faith.  So why don't I do this:
19    Go, and if I've got questions, it may require a cell phone
20    and turn around the car, okay?  Right now I don't think I
21    have questions of either side, at least on the first round,
22    okay?
23            MR. OVERLAND:  All right.
24            MR. COTE:  Thank you, your Honor.
25            (Recess.)
```

1                              -oOo-

2                          **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  May 26, 2011

12

13

14   _____

     JANE C.S. RULE, U.S. COURT REPORTER
15   CSR NO. 9316

16

17

18

19

20

21

22

23

24

25