**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL, INC., ET AL., )
PLAINTIFFS, )
vs. ) CV NO. 04-9049-DOC
) VOLUME 2 of 4
MGA ENTERTAINMENT, INC., ET AL., )
DEFENDANTS. )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

WEDNESDAY, MAY 25, 2011

2:11 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(714) 542-8409**
**D.PARKER@IX.NETCOM.COM**

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF, MATTEL, INC.:

JOHN QUINN
WILLIAM PRICE
SUSAN ESTRICH
MICHAEL T. ZELLER
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 S. FIGUEROA STREET
10TH FLOOR
LOS ANGELES, CALIFORNIA 90017
(213) 443-3000

FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:

THOMAS S. MC CONVILLE
ORRICK HERRINGTON & SUTCLIFFE, LLP
4 PARK PLAZA
SUITE 1600
IRVINE, CALIFORNIA 92614
(949) 567-6700

ANNETTE L. HURST
ORRICK HERRINGTON & SUTCLIFFE, LLP
THE ORRICK BUILDING
405 HOWARD STREET
SAN FRANCISCO, CALIFORNIA 94105
(415) 773-5700

JENNIFER L. KELLER
KELLER RACKAUCKAS, LLP
18500 VON KARMAN AVENUE
SUITE 560
IRVINE, CALIFORNIA 92612
(949) 476-8700

ALSO PRESENT:

JEANINE PISONI
MGA ENTERTAINMENT, INC.
16360 ROSCOE BOULEVARD
SUITE 105
VAN NUYS, CALIFORNIA 91406

ROBERT ECKERT, MATTEL CEO
ISAAC LARIAN, MGA CEO

SANTA ANA, CALIFORNIA; WEDNESDAY, MAY 25, 2011; 2:11 P.M.

THE COURT: We're back on the record.

And, Counsel, please sit down. Thank you.

Do you want to start with Mattel first?

MR. ZELLER: I think so.

THE COURT: Okay. These are on the JMOLs.

Mr. Zeller.

MR. ZELLER: On Mattel's JMOL.

I think one way of approaching this -- and I do intend to go through these trade secret by trade secret. But I think setting out some categories, too, will be helpful in identifying what products are really at issue here in a sense for each category.

For 23 of the 25 trade secrets that the jury found misappropriated -- and I'll use 25 advisedly and explain that in a moment -- there was literally no unjust enrichment testimony at all. The only products that Mr. Malackowski testified to and provided damages numbers for in terms of testimony was for Bratz Diamondz and Bratz Winter Wonderland. The other numbers that he provided were only on a demonstrative that he never testified to, and that demonstrative is TX37189. That demonstrative was not admitted into evidence. The court is well aware of the long history that went into the admissibility of these demonstratives. MGA was the proponent of the position that

the demonstratives from the experts were not evidence and would not be admitted in evidence. The jury was told that the demonstratives were not evidence. So there is literally no admissible evidence on unjust enrichment, any number, for 23 of the 25 that the jury found were misappropriated of these trade secretes. And I use 25 because it's quite clear that at least one of them is duplicative, *Girls Nite Out*.

THE COURT: Well, MGA is going to disagree with you in just a moment, so make your record and --

MR. ZELLER: Understood.

And I only do that to -- so there's no confusion in the record as to why I'm referring to 25 versus 26 that the jury physically checked off on the verdict form. And I'll talk about this a little bit more.

But the only number for 3.4 million was not testified to at all by MGA's expert. It was a misstatement by Ms. Keller in closing where she claimed and she used the word "testified," she represented to the jury falsely that Mr. Malackowski, quote, testified, end quote, to an average head start damages number of $3.4 million. Not only was that wrong in terms of it being testimony, I'll explain later on why it's not even sustainable, even under the best fact pattern for MGA.

Then another category is, is that the jury found unjust enrichment damages for 11 trade secrets for which

Mr. Malackowski provided no number, even in his demonstrative. Those were: Bratz Mobile, Bratz Style It Collection, Bratz Runway Formal Funk Collection, Bratz Petz Assortment.

THE COURT: Just a moment.

MR. ZELLER: Sure. Bratz Petz Assortment.

THE COURT: I'm following your brief. Just a moment.

*(Pause.)*

THE COURT: Bratz Petz is No. 4?

MR. ZELLER: Wildlife Safari Collection; Bratz Virtual Buddiez -- with a "Z" -- Petz, P-E-T-Z; Monkey-See Monkey-Do, Lil' Bratz Boyz.

THE COURT: Just a moment.

*(Pause.)*

THE COURT: We should be up to No. 8.

MR. ZELLER: Lil' Bratz Boyz, Alien Racers, Bratz Kidz with a "Z" and Passion for Fashion.

So even under the best-case scenario, even assuming, contrary to the law and the facts, that TX37189 were deemed to be evidence of some kind, there is nothing on that chart that would sustain damages as to those 11, or unjust enrichment, more specifically.

And, in fact, as to five of those, Mr. Malackowski affirmatively stated that there were no head start damages.

And those five were --

THE COURT: Just a minute.

MR. ZELLER: Sure.

*(Pause.)*

THE COURT: All right. Those five are?

MR. ZELLER: Bratz Stylin' It Collection.

THE COURT: Just a moment.

*(Pause.)*

THE COURT: So Bratz Style Collection.

MR. ZELLER: Bratz Runway Formal Funk Collection.

THE COURT: Just a moment.

*(Pause.)*

THE COURT: Is that the same one as Runway Formal Funk?

MR. ZELLER: Yes. Yes. Those are one in the same.

*(Pause.)*

THE COURT: Okay.

MR. ZELLER: Bratz Petz Assortment.

THE COURT: All right.

MR. ZELLER: Wild-Life Safari collection.

THE COURT: All right.

MR. ZELLER: And Bratz Virtual Buddiez Petz.

THE COURT: Thank you.

MR. ZELLER: So as to that 11, which there was no

calculation, again, presented even by the inadmissible chart, Mr. Malackowski actually went so far as to say, *As to five of them, I'm offering no head start unjust enrichment number.* And those were the five I just read.

Seven of the jury's $3.4 million awards exceeded the calculations that Mr. Malackowski's inadmissible chart provided as well.

THE COURT: And those are?

MR. ZELLER: These were Bratz FM Limo.

THE COURT: All right.

MR. ZELLER: Lil' Bratz Vehicle Assortment.

THE COURT: All right.

MR. ZELLER: Lil' Bratz Delux Mall Playset.

THE COURT: All right.

MR. ZELLER: Bratz Petz with a "Z."

THE COURT: Okay.

MR. ZELLER: Dazzling Disco Cafe.

THE COURT: All right.

MR. ZELLER: Girls Nite Out.

THE COURT: Next.

MR. ZELLER: And Wild Wild West.

THE COURT: Thank you.

MR. ZELLER: And as to some of those numbers, like with Dazzling Disco Cafe, Mr. Malackowski's inadmissible chart pegged head start damages at $20,000. The jury's

award of 3.4 million for that was obviously orders of magnitude beyond anything that even the inadmissible chart would support.

THE COURT: Okay. Thank you.

MR. ZELLER: The next category is that there are five alleged trade secrets, or jury -- trade secrets that the jury found that was misappropriated where matching Mattel product that supposedly -- the supposed misappropriation -- was released long after the alleged acquisition of the trade secret and in some cases as much as three years after as shown by the undisputed evidence such as invoices. And those five were: Bratz Mobile, Bratz Formal Funk Collection, Bratz FM Limo, Lil' Bratz Vehicle Assortment and Lil' Bratz Delux Mall Playset.

THE COURT: Just a moment. Lil' Bratz Mall Playset?

MR. ZELLER: Correct. Lil'-Bratz Deluxe Mall Playset.

And so, as the undisputed evidence showed there, all of these so-called trade secrets were on the shelves of stores long before Mattel supposedly misappropriated them. So there is no basis for head start as to those five.

And another category, the allegedly matching Mattel product came out before the toy fair and that's Mattel's MyScene Jammin' in Jamaica Guava Gulch. And that's

the product that MGA claimed was misappropriation of Bratz Sun-Kissed Summer.

The next category is, is that three of the products that MGA claimed as trade secrets were shipped before the toy fair at which Mattel allegedly acquired the trade secret. Those are: Bratz Petz --

THE COURT: Just a minute.

MR. ZELLER: Sure.

THE COURT: I have all this. I just want to slow you down for a moment. I'd prefer to carry my own notes around sometimes during the evening when I think about it, rather than telephone books each of you are giving me.

MR. ZELLER: Understood.

THE COURT: You've got plenty of time, okay?

So Bratz Petz.

MR. ZELLER: Bratz Sun-Kissed Summer.

THE COURT: And?

MR. ZELLER: Girls Nite Out.

THE COURT: Okay.

MR. ZELLER: Then, there are six trade secrets that MGA doesn't even attempt to defend in its opposition brief. Doesn't say anything about them. Those are: Wild Life Safari collection, Bratz Virtual Buddiez Petz, Monkey-See Monkey-Do, Lil' Bratz Boyz, Bratz Kidz.

THE COURT: Boys has a "Z" on the end of it,

doesn't it?

MR. ZELLER: If I can just double-check.

*(Pause.)*

MR. ZELLER: It should have an "Z" on it.

THE COURT: And Bratz Kidz?

MR. ZELLER: Bratz Kidz.

THE COURT: Okay.

MR. ZELLER: And Passion 4 Fashion.

THE COURT: All right. Thank you.

MR. ZELLER: Next category is that there are three trade secrets, claim trade secrets that the jury found were misappropriated that were displayed at the 2006 New York Toy Fair for which there was no evidence of any infiltration by Mattel. Those are Bratz Diamondz, Bratz Kidz and Passion 4 Fashion.

And the court will recall that by that time, Mr. Villasenor was not even working for Mattel. He had gone out on so-called stress leave, as of December of 2005.

THE COURT: All right. Now, just one moment, please.

*(Pause.)*

THE COURT: All right. TX1789, 11 items. We'll begin with Mobile. Go -- one, two, three, four, five, six -- 10 down. That should be Bratz Kidz. You have 11 items. The tenth should be Bratz Kidz.

MR. ZELLER: Right. Yes.

THE COURT: No. 10, right.

MR. ZELLER: Yes. Correct.

THE COURT: Now, go over to the three -- I'm sorry. There's six trade secrets MGA does not defend. And go five down.

MR. ZELLER: The ones that they do not mention in their opposition: Bratz Kidz --

THE COURT: Bratz Kidz. Same Bratz Kidz in the 11 under TX1789? I'm assuming it is.

MR. ZELLER: I think it has to be.

THE COURT: I do, too. So let's slow down.

Now, go down to your three trade secrets where the jury finds misappropriation because these were displayed at the 2006 toy fair.

Second down.

MR. ZELLER: Right. Bratz Kidz.

THE COURT: Same?

MR. ZELLER: Correct. And I'm categorizing them by flaw, not by trade secret.

THE COURT: Make sure I'm not double-counting.

MR. ZELLER: Exactly. I'm going to go through them one by one. But, now, I'm talking about categories of deficiencies, essentially.

THE COURT: Okay. All right.

MR. ZELLER: The final category before I start going one by one through the trade secrets is that there are four of them were from another toy fair, the 2005 Nuremberg toy fair, for which there was no evidence of infiltration at all.

THE COURT: And those four?

MR. ZELLER: Those four are Bratz Virtual Buddiez Petz, Bratz Campfire, Bratz Wild Wild West and Bratz Rock Angelz.

THE COURT: Okay.

MR. ZELLER: So then, focusing on the first trade secret that was found by the jury to have been misappropriated, was Bratz Mobile and that's verdict form No. 1. And there, it's undisputed that the evidence was that the appearance, operation and intended play pattern of this product was public by the date of the alleged misappropriation and MGA concedes this. Opposition at page 27, lines 3 through 11.

This is a product that Mr. Malackowski did not mention during his testimony. There was a MGA product called FM Cruiser that appeared on his unadmitted and inadmissible demonstrative. But there is no evidence to determine whether that product was even the Bratz Mobile.

Moreover, this is another instance in which the unadmitted chart had a damages number significantly lower

than the amount that the jury awarded. Now, this is, of course, one of those products, too, where FOB pricing was included among the description of the claim trade secret. But, number one, there is no evidence at all even inferentially that Mattel changed any price or otherwise used in any way FOB pricing information for any product. And that was not a theory that, in fact, Mr. Malackowski even went to the jury on. Rather, he went trade secret by trade secret, based upon a head start theory, not on a changed pricing theory, or any other theory. So there is, literally, no evidence as to those that include FOB pricing of any use which of course therefore, could not substantiate any head start damages theory. And, of course, it wouldn't make any sense to say that a change in pricing would be the same. It's a completely different theory, and it's not even one that MGA went to the jury on.

I would also say, your Honor, that the testimony was unequivocal on this point, which is that FOB pricing is simply not protectable as a trade secret. Everyone knows that it is shared with retailers. By definition FOB pricing is the pricing that is provided to retailers, the price at which retailers purchase product. It's not internal pricing. It is information by definition shared with retailers. Mr. Brawer and others acknowledged that they knew full well that retailers share that information.

And I would also submit, your Honor, that to allow MGA to protect FOB pricing as trade secret would be anticompetitive. The court heard unrefuted, unequivocal testimony that retailers take that information and they use it to play manufacturers off of one another for pricing purposes. To allow MGA to say certainly under these circumstances where there is no NDA that they have come forth to say that FOB pricing was provided to retailers confidentially means that the court would be setting a precedent that would allow MGA to say to retailers they cannot share that information with competitors. That would hinder the -- that would hinder the ability of retailers to go and compete on pricing with other manufacturers. And that is, obviously, not a purpose that should be permitted.

The next category is the Bratz Stylin' It! Collection. And that is Verdict Form Number 2. Now, there was no evidence at all about this Bratz Styling It! Collection. Mr. Larian said it was basically the same thing as another MGA product, Bratz Strut It!, which MGA did not even claim as a claim secret. And this product was not shown to the jury. And, in fact, there is no evidence at all that this was held in any kind of secret or closed room at toy fair. Moreover, there is no evidence of any supposedly matching Mattel product that was supplied to anyone.

There was no evidence of that introduced, any matching product and no one at MGA, or Mr. Malackowski, asserted that there was any product that Mattel released that somehow had a benefit from head start. And, in fact, this is one of the ones that Mr. Malackowski affirmatively dropped from his list.

The next one is Verdict Form No. 4, Bratz Winter Wonderland Collection. The only testimony as to what was trade secret about that product was Mr. Larian's testimony that the fur handle on the product's packaging was secret. There was no evidence, whatsoever, that that feature, the only one identified as the supposed trade secret, was used by Mattel. The product that they put into evidence for this, or that they accused I should say, MyScene Chillin' Out doll does not have a fur handle on it. There is no evidence either that MGA provided that there was any use of the Bratz Winter Wonderland plans to advertise on television, or FOB pricing, or any of the other aspects that they actually claimed in their trade secret chart.

But regardless of the chart, the only evidence was Mr. Larian's testimony as to what was supposedly protectable about that product. And there's -- it's undisputed that that was not used.

The next one I have is Bratz Formal Funk Collection. That's Verdict Form No. 5.

THE COURT: Just a moment.

*(Pause.)*

THE COURT: Thank you.

MR. ZELLER: Here, there is also a failure of evidence as to any matching Mattel product that would be the basis for a head start damages verdict. The supposed matching product was Mattel's Night on the Town which was never introduced. This is also another product that Mr. Malackowski said nothing in his testimony about.

Verdict Form No. 6, the Bratz Runway Formal Funk Collection. And Mr. Larian identified as the only supposedly protectable element of this playset that Mattel copied was the trapezoidal-shaped packaging. For the record that is, March 24, 2011 trial transcript, Volume 2 at pages 118 through 119. But the Mattel report that MGA bases its claim upon has no photograph of the product, much less show its packaging. And, in fact, this was another product that Mr. Malackowski affirmatively dropped from his head start damages calculation.

THE COURT: No. 7.

MR. ZELLER: No. 7, Bratz FM Limo.

In its February 4th trade secret chart, MGA claimed that Mattel's MyScene limo somehow used these MGA -- claimed MGA trade secrets but MGA never introduced the Mattel product at trial. And, in fact, the only admitted

evidence shows that the accused MyScene product was released on the market more than two years after the toy fair at issue. And that is TX24838-1. So this is long after any plausible claim of secrecy could be maintained.

And, finally, this was another one that even if -- even if, contrary to fact and law, Mr. Malackowski's inadmissible chart were considered, his damages number, his unjust enrichment number was lower. In fact, about half of what it is that the jury awarded.

Verdict Form No. 8 is the Bratz Motorcycle.

THE COURT: This would be on page 17 of the verdict form.

MR. ZELLER: That's right. We're on page 17 of the Verdict Form.

This somewhat fails on its face as an initial matter. The claim was that the Bratz Motorcycle, itself, was a trade secret and that there is supposedly a matching Mattel product that they claimed was the misappropriation of that trade secret. But they are completely different. One is a Harley motorcycle that was MGA's. And the other one is a small Vespa scooter.

No. 9 -- Verdict Form No. 9 is the Bratz Petz Assortment. As an initial matter, this is one that Mr. Malackowski affirmatively dropped, so there was no testimony. No evidence. Even the best-case scenario,

considering the inadmissible chart for which damages could have been calculated. Also, MGA's opposition gives no indication -- it's completely silent -- on what the supposedly misappropriated elements were. At one point, it seems to suggest or does argue that the plans to advertise on television of Bratz Petz Assortment was the misappropriated element.

By the way, I mean, MGA's inability to defend all the aspects that they were claiming as trade secret for any and all of these trade secrets alone dooms any particular claim. And that's because, as MGA itself has argued many times and the *O2 Micro* case makes clear, you have to be able to substantiate the entirety of your claimed trade secret. And if you do not disaggregate the damages for each element, then the entire number falls. And MGA makes only an effort to say, *Well, plans to advertise on television for this product were somehow the trade secret.*

But the problem for MGA is, is that there's nothing in Mattel's documents. There's nothing of record at all that Mattel used such information or that there even were plans to advertise on television.

So MGA's next argument is, is that, Well, plans not to advertise on television is a misappropriation trade secret, which is, of course, absurd. But it's also unprecedented in asking for the court to rule that the

complete lack of evidence of misappropriation is, in fact, evidence of misappropriation. But there is nothing even inferentially in the record -- just like FOB pricing -- nothing inferentially, let alone directly in the record, that would allow a jury to determine that there was any misappropriation -- rather use, I should say, by Mattel of any plans to advertise on television or lack thereof. Zero evidence in the record. MGA has never pointed to any of it, because it did not even attempt to go to that theory to the jury.

Verdict Form No. 14. That's the Lil' Bratz Vehicle Assortment. This is a situation where the jury awarded more than a million dollars greater than even Mr. Malackowski's inadmissible chart suggested. And, of course, Mr. Malackowski actually provided no admissible testimony at all on this product that would allow for head start damages to be calculated. Moreover, MGA did not identify or introduce any Mattel product that it claimed used this information for a head start on. It had --

Basically, in the unadmitted demonstrative and the inadmissible demonstrative, it identified the MyScene Convertible or the MyScene Delancey and Hudson Convertible. But there is no testimony or evidence that would allow a comparison of those products, and moreover, there was absolutely no evidence about the timing of the release of

these products. So there is complete failure of evidence here that would allow a jury to determine there was, in fact, head start damages in the form of unjust enrichment. And as I've noted, even their best scenario for MGA, the admissible chart by Mr. Malackowski had a number that was lower, over a million dollars lower than the award.

Verdict Form No. 15, this is Lil' Bratz Deluxe Mall Playset. There was no testimony at all about this product. Three months of trial, across 64 different witnesses, MGA did not introduce or identify any Mattel product that it claimed used the alleged trade secret. Mr. Malackowski's inadmissible chart referred to MyScene Mall Maniacs Playset, but there is no -- that was never introduced into evidence, the product itself, let alone there was no testimony about it either. So there is no evidence of record that would allow for basis of so-called matching which was -- again, MGA's theory that it went to the jury on was that there was a matching Mattel product that supposedly used the claim trade secrets.

And, finally, the only record evidence as to this so-called match fails on timing. The Mattel product that MGA identified was not released until three years after the toy fair at which MGA claimed there was misappropriation. For the record, that is TX24841-1.

Next one is Verdict Form No. 16, Bratz Petz. This

was a product that was disclosed publicly before the toy fair. MGA shipped Bratz Petz to retailers to put on store shelves two months before the 2004 New York Toy Fair, so this is in December of 2003. For the record, that is reflected in TX24603-2. And, separately, MGA not only shipped this product prior to the toy fair, but it also issued a press release that was identical to the document that MGA claimed proved misappropriation by Mattel. In other words, this is one of those situations where the Mattel document supposedly showing the misappropriation, in fact, is a verbatim copy of a prior MGA press release. Mr. Malackowski never mentioned this product. And, moreover, even if the chart is considered, it identified the claimed head start damages for Bratz Petz as $245,000, which is of course a fraction of the award of 3.4 million for that product.

Next one is Verdict Form No. 18, which is Dazzling Disco Cafe. It was a complete failure of proof on this supposed trade secret. MGA did not introduce the product, an image of the product or any meaningful description of it. There was no testimony about it. Moreover, MGA shipped this product, Dazzling Disco Cafe, to retailers before the toy fair where MGA alleges that it was misappropriated. And this was -- even on Mr. Malackowski's inadmissible demonstrative, he calculated those damages, head start

damages at $20,000, which, of course, is a fraction of the 3.4 million awarded by the jury.

The next one is Verdict Form No. 19, Sun-Kissed Summer. The evidence shows that that product was shipped and on retail shelves as of December of 2003, which of course is months before the 2004 New York Toy Fair where it was supposedly taken. For the record, that is shown by TX24671-6. The supposed matching product which was never testified to but is reflected on Mr. Malackowski's inadmissible demonstrative matched a product called Jammin' in Jamaica Guava Gulch, but MGA never introduced this product into evidence, let alone any evidence that the product used in any way MGA trade secrets. And, in fact, the only record evidence shows that the timing fails. The Mattel product that MGA identified was on the market two months before the toy fair at which MGA alleges misappropriation of Sun-Kissed Summer. And that is shown by TX24671-11.

The next is Verdict Form No. 20, and it's Girls Nite Out. This is a duplicate -- and I recognize MGA will dispute this -- of No. 65. The date of the alleged misappropriation of this claim trade secret was the 2004 New York Toy Fair. In fact, MGA shipped this product to retailers for sale to the public in November 2003 months before and, in fact, consumer sales data shows that it was

actually being sold to the public as of that same month, November 2003. For the record, those are TX24603-3, 24671-2, line 100. Further confirming the point, the Mattel document supposedly evidencing the misappropriation is also a verbatim copy of a MGA press release for the product that MGA issued on February 11th, 2004 before the New York Toy Fair.

There's also no evidence that the supposed trade secret was used for any Mattel product on which head start damages could be based. MGA suggested that MyScene Day and Nite copied Girls Nite Out, but that product the Mattel product came out a year after MGA's product. And that is shown by TX24671-2.

THE COURT: Line 100? Line 100?

MR. ZELLER: I'm sorry?

THE COURT: Line 100?

MR. ZELLER: The final thing I would say about -- That's the earlier one. Let me just see. That is -- that's the NPD consumer sales data, so that's 24671, yeah, line 100 -- yeah, same place.

THE COURT: Okay.

MR. ZELLER: Right. The same line, because it shows both corresponding products.

The final point on this is, is that even with respect to Mr. Malackowski's inadmissible demonstrative, the

number -- the award that the jury gave was over a million dollars higher than what it is that Mr. Malackowski even had on his chart.

The next one is Verdict Form No. 21, Wild Life Safari Collection. This is one of the ones that MGA doesn't even attempt to defend in its opposition. And, first, the evidence shows without dispute or indisputable evidence that the Mattel e-mail about Wild Life Safari that MGA claims proves misappropriation is a verbatim copy of a MGA press release for that product that was issued on February 11th, 2004 before the New York Toy Fair. There is also no evidence of use that was put into the record. There was at one point a suggestion that the trade secret was embodied in MyScene Jungilicious, J-U-N-G-I-L-I-C-I-O-U-S, but that product was not introduced until 2007, which was three years after MGA had already disclosed Wild Life Safari, and that can be shown by TX24847-1. And, finally, this was one of those products that Mr. Malackowski affirmatively dropped which he made no head start damages calculation at all.

The next one is Verdict Form No. 22, Bratz Diamondz. And this was allegedly misappropriated from the 2006 New York Toy Fair. As I mentioned, there is no evidence, even inferential evidence, that any Mattel employee obtained access improperly to MGA showroom at that toy fair. The claimed trade secret for Bratz Diamondz that

MGA claimed was the use of a real gem. But that fact that the Bratz Diamondz would use a real gem was disclosed, made public by MGA itself, on February 9th, 2006 before the 2006 New York Toy Fair where it was supposedly taken. It goes without saying that publicly disclosed information by MGA cannot be a trade secret.

Verdict Form No. 24, Bratz Virtual Buddiez Petz. This is another one that is not mentioned in MGA's opposition. This is also one that was supposedly misappropriated from the 2005 Nuremberg Toy Fair from which there is no evidence that anyone from Mattel gained access at, in MGA's showroom. The supposed Mattel product that used the trade secret that MGA alleges was misappropriated was the Miami Getaway Pets, but that product was not introduced. There was no testimony on it, leaving no basis on which there could be any comparison or determination that somehow that product used as a head start any claimed trade secret. And then, finally, this was another product that Mr. Malackowski affirmatively dropped from his head start damages calculations.

Verdict Form No. 27, Bratz Campfire. This, too, was allegedly taken from the 2005 Nuremberg Toy Fair for which there is no evidence that anyone from Mattel gained improper access to, MGA showroom. There was evidence -- and, in fact, the documents show -- that the supposed trade

secret information Mattel had in its documents was copied from the February 19th, 2005 Asmzine article which was published during the 2005 Nuremberg Toy Fair. And there was also absolutely no evidence of use. And even under Mr. Malackowski's inadmissible chart, he identified two Mattel products with camping themes: One was MyScene Outdoors Camping and the other was Barbie Camping Family. But these products were never introduced into evidence, so there was no comparison by which the jury could make.

The only camping-related product that MGA introduced into evidence was another product, and that was the Barbie Stacie Kelly Camp Gift Set, and that is TX24029. But that product came out in 2001, years before the supposed misappropriation.

THE COURT: What was the number? TX27489?

MR. ZELLER: 24029. That's the tangible.

THE COURT: 24029. Thank you.

MR. ZELLER: Mr. Malackowski identified no head start damages for the Bratz Camp Fire claim trade secrets. This was one in which he based an average, even on his inadmissible chart, which I'll talk about more generally a bit later as to why that was not a proper calculation in any event. But there's nothing on Mr. Malackowski's inadmissible chart that provides a number for that supposed misappropriation or head start.

Verdict Form No. 28. This is Wild Wild West. Another product that was ostensibly taken from the 2005 Nuremberg Toy Fair for which there is zero evidence that a Mattel employee gained improper access to MGA's showroom at. This was another product where the information showing up in Mattel's documents that supposedly constituted the misappropriation was from the Asmzine article published during the 2005 Nuremberg Toy Fair. There's also -- there's no evidence at all that anything about this product Wild Wild West was in itself a trade secret in any event. Mr. Larian's testimony was something along the lines, *This is like a cowboy theme. It came with accessories. We had horses. We had horse carriages. It was a whole brand.*

That is at the February 17, 2011 trial transcript, Volume 1, pages 110 to 111. Even assuming that that could possibly be a trade secret, for which there was no evidence, there's also no evidence that it was used by Mattel in any way. There was no testimony by anyone. But it was on Mr. Malackowski's inadmissible demonstrative where MGA -- Mr. Malackowski listed Mattel's Barbie Cali Girl Horseback Riding Doll, but that product was never admitted in evidence. There was no other evidence that was put into the record about that supposedly matching product and on which, accordingly, there can be no basis for no jury verdict in terms of a claimed head start, let alone damages.

And then, finally, even if that chart were in evidence -- and it is not -- it had a number that was about $2 million less than what the jury awarded.

Verdict Form No. 29, which is Bratz Rock Angelz. This was a product that was invoiced and shipped to retailers for placement on shelves in November of 2004, months before the 2005 toy fair, Nuremberg Toy Fair, which it was supposedly taken -- again, which there's no evidence that any Mattel employee infiltrated. The cite for the date of invoicing and shipment for this product is TX37189-33.

There's another product where the information that Mattel supposedly obtained, in fact, is taken directly from the public Asmzine article. And also, Mr. Malackowski admitted as to this product, which he claimed at one point was matched to MyScene Goes Hollywood. He, in fact, admitted he made no comparison of those two products; and, in fact, a comparison of them shows that it's completely untenable to conclude that MyScene Goes Hollywood constituted a head start use from Bratz Rock Angelz. There's nothing similar about them at all. And, in fact, at page 18 of its opposition, MGA concedes that Bratz Rock Anglez does not look like MyScene Hollywood.

And even if one were to consider Mr. Malackowski's inadmissible chart as to this pair of products, the chart shows that MGA released Bratz Rock Anglez in November 20033,

months before the toy fair. So that, obviously, fails as a claimed trade secret for that reason alone.

Verdict Form No. 41 is next, Monkey-See Monkey-Do. MGA doesn't --

THE COURT: Just one moment.

*(Pause.)*

THE COURT: All right. Thank you.

MR. ZELLER: Verdict Form No. 41, Monkey-See Monkey-Do. This is one that MGA's opposition doesn't attempt to defend. MGA never introduced this product into evidence, much less proved that it reflected any actual trade secrets. There was no evidence of use that was provided. It wasn't argued that there was a Mattel product that adopted or incorporated anything for Monkey-See Monkey-Do; therefore, there can be no head start damages at all. And then, finally, this is something Mr. Malackowski didn't even list in his chart, didn't provide calculations for and there's simply no basis for the award as to this product -- for alleged trade secret.

Verdict Form No. 49. This is Lil' Bratz Boyz. This, too, is not mentioned in MGA's opposition. There is no attempted defense of it. MGA never introduced this product into evidence. No witness testified as to the supposed trade secret for Lil' Bratz Boyz. There was no claim even that Mattel had any product that incorporated, or

adopted, or used anything from Lil' Bratz Boyz. And there was again no calculation, whatsoever, provided for by Mr. Malackowski.

Verdict Form No. 58, Alien Racers. There was failure of proof that any of this was trade secret. The only thing that was identified during trial was the name Alien Racers which Mr. Malackowski claimed Mattel's AcceleRacers was based on. I'll talk about that in a moment. But there was no evidence about the appearance, operation, intended play pattern and plans to advertise on television for Alien Racers which was the claimed trade secret and the claim trade secret on the verdict form. No one testified as to that.

As I was mentioning, Mr. Larian testified that the name was supposedly confidential and that Mattel used it for the name of Mattel's AcceleRacers. But the name Alien Racers was publicly disclosed by MGA before the toy fair, and that is shown by TX20621. And the court will recall, too, that Mr. Jolicoeur, MGA's 30(b)(6) designee on trade secrets, admitted that Alien Racers was not a trade secret. I've been handed a note that I --

Just to correct something, in terms of the lines, your Honor, when we were talking earlier by TX24671-2, line 100 shows the Bratz Girls Nite Out release date.

THE COURT: Just a moment.

*(Pause.)*

THE COURT: All right.

MR. ZELLER: So we were -- we were both correct about that.

THE COURT: Just a moment.

For the record, this would be Exhibit No. 20, if the circuit is following this, and it would be on page 18 of the verdict form. We're going back to a discussion about line 100.

MR. ZELLER: That's right. And for Verdict Form No. 20 -- and if we're right, the duplicate line -- at Verdict Form No. 65, which is Girls Nite Out.

And we were both correct in identifying line 100 as being the release -- where the release date for Bratz Girls Nite Out is. But the MyScene product that I talked about earlier, that's actually found at line 75 of the same document. They're not on the same line, apparently. Line 100 for the MGA product. Line 75 for the Mattel product.

THE COURT: Okay.

MR. ZELLER: Then, finally, with respect to Alien Racers --

THE COURT: Just a moment. Just a moment. Counsel is back to Verdict Form 58. It's Alien Racers, and that verdict is found on page 21 of the verdict form.

All right, Counsel. Continue.

MR. ZELLER: So the final point on Alien Racers is that Mr. Malackowski did not provide -- he didn't even list this on his inadmissible chart, let alone testified about it, so there is no evidence from which the claimed head start number could be based.

THE COURT: Okay.

MR. ZELLER: No. 65.

THE COURT: Just one moment.

*(Pause.)*

THE COURT: All right. No. 65.

MR. ZELLER: That, in our view, is a duplicate of Verdict Form No. 20, Bratz Girls Nite Out. And I think just in terms of that argument, MGA's main argument appears to be that Mattel somehow waived by not objecting to the duplication in the jury verdict form before it went to the jury, but MGA constructed that. MGA was provided the supposed trade secrets that it was claiming.

As the court will recall, Mr. Quinn did object prior to the time that the jury was discharged, asked that any ambiguity be cleared up. And so, we did object, and we did make timely note of the apparent duplication. And the case law is clear, we cited in our brief, that that's all that's required. There's zero authority for the notion that somehow we have waived by MGA providing on the morning of

the -- of when the issues were submitted to the jury, this lengthy list and not catching for MGA its own duplication.

Next one is Verdict Form No. 66. This is Bratz Kidz. There was -- this is one that MGA doesn't attempt to defend in its opposition.

THE COURT: Okay.

MR. ZELLER: This is a product or trade secret rather that was supposedly misappropriated from the 2006 New York Toy fair. There's no evidence that any Mattel employee infiltrated MGA's showroom after the 2006 New York Toy Fair. MGA presented no evidence that any Mattel product used anything from Bratz Kidz. So there was nothing for the jury to conclude that Mattel obtained some head start on. And this was also a product or trade secret that Mr. Malackowski did not testify about, didn't provide the jury with any damages calculation for, or even include it in his inadmissible head start demonstrative.

THE COURT: 69.

MR. ZELLER: 69, Passion 4 Fashion.

The same point that this was allegedly misappropriated from the 2006 New York Toy Fair, which there is no evidence that any Mattel employee infiltrated. There was no evidence that there was any Mattel product that used any of the claimed trade secrets from Passion 4 Fashion, so there is nothing to base a head start on. This also was a

product or trade secret that Mr. Malackowski didn't testify about, didn't provide the jury with any damages calculation for, or even include it in his inadmissible head start demonstrative.

Undoubtedly, MGA is going to argue, as it has, that 3.4 million was a proper number for the jury to apply to any trade secret that it found was misappropriated, and that fails for a host of reasons. This was the head start damages theory that Mr. Malackowski called the bottom-up approach. As an initial matter, you can't simply aggregate these numbers. Because Mr. Malackowski, himself -- and the law is also pretty clear about this. But just starting with what Mr. Malackowski said, he said that this bottom-up approach, head start approach is a, quote, very fact-specific approach, end quote, that measures, quote, specific benefits, end quote, and requires a, quote, product specific calculation, end quote. So it wasn't enough for the jury to simply take that number that he provided as a gross number, whether it was 88 million, or the complete number he gave for all 114 and then do some sort of divisional arithmetic to come up with the numbers. That was not even consistent with what Mr. Malackowski said his own methodology was doing. And, moreover, to construct its own damages award, the jury would have needed evidence at a minimum of the release dates and also when the dates of the

trade secrets became public to start coming up with some number, if it were going to apply its own methodology. It's quite obvious from the record that, in fact, what the jury did was, is not having evidence for anything other than two products by MGA's own position in this case because of the demonstrative not being admitted into evidence, took Ms. Keller's misstatement in closing and then just simply applied it.

THE COURT: How can each party not find fault with itself?

What each of you did, frankly, was played the game. I asked both experts, if you recall, to come up with a specific number; and, in fact, your expert told me, basically, it would take too much work and too much time, if you recall.

The court was very explicit about 11 o'clock at night asking your expert that. So what each side did, frankly, for this record is: Neither side, frankly, decided to supply the jury with any specific calculation concerning damages. And you both did that.

MR. ZELLER: Well, I would say this, your Honor, is that --

THE COURT: And, now, everybody is going to cry foul, whoever loses. So -- I mean, you both placed yourself in that position and you each were repeatedly asked. If the

verdict would have come out the same way, I assume MGA would be arguing the same thing. But each side was repeatedly told and repeatedly your experts were asked, you know, *Break this down. Give us some specific damages.*

And each of you, tactically, apparently, decided not to.

Now, why? Why would you place the jury in this position and then cry foul?

MR. ZELLER: We didn't place the jury in this position as to --

THE COURT: Yes, you did. You did the same thing on the other side. You didn't attach any specific calculation to any of your trade secret claims, either. You both did this. So what you really did was place the jury in a position of having to come up with a lump sum number, which in all possibility and probability they did. And the 3.4 and the 3.4 and the 3.4. But, now, the losing party -- and it could have been reversed. I'm not finding fault with Mattel, but you both did this. And you were specifically asked.

And if you disagree with me, I'll go back and get the record. And your expert was asked by this court. I was sitting right in that chair. Your expert basically said, *Too much work.*

MR. ZELLER: I understand, respect what the court

is saying.

THE COURT: No, no, that's okay. Take away the word "respect."

*Your Honor, with all due respect* -- nonsense.

Now, we're having a discussion about this. How can you place an American jury in that situation, not giving damage for either side and, quite frankly, MGA is equally guilty of this?

And the court repeatedly asks, you know, *Break down these damages through your experts. Make them specific.*

And both sides decide they're not going to do that.

Now, the losing party is going to come to the court and, you know, say, *Gee, there's no foundation for this.* You were warned along the way and so was MGA if this was reversed.

MR. ZELLER: My response, your Honor, is for purposes of this motion that MGA was warned is what matters here. They're the ones who have to defend this damages award. They're the ones who went to the jury --

THE COURT: We'll rest on that record, if that's your response.

MR. ZELLER: I don't agree that that's what we did, your Honor. But my perspective --

THE COURT: Do you want me to pull the transcripts?

MR. ZELLER: We did have different numbers. We went through, obviously, many different iterations.

THE COURT: I'm not going to quibble about that, but no, you didn't. You didn't break this down specifically by trade secret when you were making your claim for trade secrets. In other words, both sides did this. Why?

MR. ZELLER: I can't answer for MGA. That's -- MGA took the position that that was required.

THE COURT: Why didn't Mattel?

MR. ZELLER: We, in fact -- our expert was of the view that whether it was the broader trade secret or the subset --

THE COURT: Let's go to page 8, No. 14. 7172. You tell me what your expert broke down, the valuation for that trade secret. What was the number?

MR. ZELLER: I would have to get -- I don't know, your Honor.

THE COURT: 71778. What was the number?

MR. ZELLER: I don't know -- I don't have that with me here.

THE COURT: 7180. What was the number? In other words, you didn't do it. Why?

I'm going to ask MGA the same question in just a

moment. You were given plenty of notice on both sides and now the losing party, I've anticipated, would come to this court in this position.

MR. ZELLER: If it's --

THE COURT: And remember, I offered you a lump sum at one time. The court said, *If you want to do a lump sum, that's fine.* Gave you and MGA all the options because this could be reversed and, frankly, the parties just ignored it.

MR. ZELLER: On our side of the equation, Mr. Wagner said specifically that his damages number were the same, whether it was one Bratz trade secret, or it was all of them.

THE COURT: You're not answering my question. I'm going to come right back to it: Where is the valuation, the specific valuation on your trade secret?

Take No. 14. 7171.

MR. ZELLER: I would have to get those numbers. I don't have that up here with me. I don't think conceptually that these are one and the same. Your Honor, I just don't think that this is the -- this is the issue here.

THE COURT: Yes, it is. You're asking me to overturn the verdict. It's certainly the issue.

In other words, you put the American jury system in that position. Nobody is going to take these claims specifically and give a valuation for either side. The jury

comes up with a lump sum. This case ought to support this, by the way, from MGA's perspective, so I'm giving you every opportunity now. You both did this. Both your experts were warned. I spoke to each of the experts in your presence on the record.

MR. ZELLER: Whatever defect the court thinks, perceives, or concludes that Mr. Wagner had has nothing to do with whether or not Mr. Malackowski's numbers are sustainable. But MGA took the position that this had to be done trade secret by trade secret. Mr. Malackowski, himself, testified that this approach was a product specific approach. He gave different numbers for the numbers he did give, so it's not -- it was not a lump sum number. There was a total. But he never said that it was a lump sum damages calculation that he was providing, and that's a very different matter.

And more specifically, what Mr. Malackowski, in fact, did -- and this is only shown on his chart, the inadmissible chart -- the $3.4 million number comes only from averaging for -- or four of the four claim trade secrets for which Mr. Malackowski claimed he did not have sufficient sales information. So what he did is he took the other 222 claim trade secrets, totaled those numbers up and averaged it to come up with the $3.4 million number on the chart. He never testified to it.

But there was absolutely no basis then for either Ms. Keller stating in closing or the jury relying upon it to take that average number and apply it then to all 25 trade secrets and particularly in light of the fact that Mr. Malackowski testified -- or not testified, but his chart had different numbers, some that were lower than the $3.4 million average.

And, by the way, the fact is, is that -- I understand the court is faulting our approach on trade secret.

THE COURT: No, I'm faulting both of you. Both MGA and Mattel. You didn't give the jury adequate information concerning these specific trade secrets and tactically, you apparently chose -- both parties.

MR. ZELLER: We objected to their damages.

THE COURT: And you were asked on the record to do so, and your experts were asked by this court to do so.

MR. ZELLER: That fundamentally, your Honor, is not --

THE COURT: And you chose not to. Why?

MR. ZELLER: We thought that we had provided different numbers.

THE COURT: So 7176, page 8, No. 18. What was the valuation?

MR. ZELLER: Again, your Honor -- I can go and get

the numbers.

THE COURT: Well, this is what you gave to the jury, No. 26, page 9, 7184. What is your number you gave to the jury?

MR. ZELLER: I just don't have the numbers memorized, your Honor. I don't have the answer to the question. I can take a break and get the numbers. But in terms of --

We did not go on just this lump sum notion. The expert testified that most of the buckets, with the exception of the name, had the same value. It wouldn't matter. His viewpoint was whether we were locked out with 10 locks versus 8 didn't make any difference, in terms of the valuation. But, fundamentally, your Honor, regardless of what we did on our trade secret, what our expert did -- number one, we lost; number two, we did object to MGA's approach and that's the salient point here. MGA has to sustain the verdict number. Both parties were at fault for how this was approached. That doesn't allow for the substantiation of MGA's damages.

THE COURT: MGA is going to come back with a pretty strong case in just a moment and say that you're wrong; that I can take the lump sum approach. I would like not to. I wish there was better evidence concerning each of these trade secrets, frankly. The parties were asked.

By the way, it's not finding fault with Mattel. MGA did the same thing. It could be absolutely reversed and the same question could be asked by this court of MGA, if they were the losing party on this.

MR. ZELLER: There are two numbers that are at issue as a general proposition. Number one, is the average number that the jury picked which Mr. Malackowski never testified to and certainly never said that that number could be applied to any and all of the 114, or any other subset of the trade secrets, except for four of them. They were reflected on the chart, and those are not the ones that the jury picked for 3.4.

In addition, the average number cannot be sustained because these are completely different sets of trade secrets. What Mr. Malackowski did is he picked 26 trade secrets and provided these calculations and the inadmissible demonstrative. Those are not the same 26 that the jury selected. And, in fact, 11 of the trade secrets for which the jury found liability were not included in Mr. Malackowski's head start analysis at all. And he did not otherwise provide any damages calculations for those trade secrets. And so, if the -- so that average simply cannot be applied. And moreover, again, Mr. Malackowski said, *Head start is a product specific calculation.* And if one looks at it as inadmissible, an unadmitted

demonstrative, it shows that, in fact, it has to be calculated on a product-by-product basis.

That is what head start is. Head start is a defined time period for a particular product. And moreover, we're not talking about damages to MGA, or lost to MGA. We're talking about unjust enrichment, which is also a different factual situation. There's specifics as to what, if anything, Mattel made. And I would also overlay that with a point that MGA made to the Ninth Circuit and prevailed on which had to do with sweat equity. The point is that MGA cannot claim all profits for all these products. And, in fact, if you took the 3.4 million average, and you extrapolated that to the 114, that is a number that is significantly higher than what Mr. Malackowski claimed could ever be awarded and, moreover, far more than what Mattel ever made for MyScene products in terms of profit. So that shows that that number cannot be extrapolated. There is no evidence of record that would allow that number to be extrapolated.

There is also no evidence and no testimony by Mr. Malackowski in terms of his methodology that either of the numbers, whether it was top down, or bottom up, that the total number could be averaged across anything, or even segmented, or divided among anything. Again, to the contrary, if you look at his chart, what it shows are

different numbers for each of the potentially competing MyScene products and it also shows that that calculation was based on particular number of months of head start. So, again, there is no average that can simply be applied to that. And he did not say that his total number, which was a total just of adding up aggregate numbers was, in fact, a lump sum that could be awarded by the jury. I'll find, in fact, the quote where Mr. Malackowski specifically said that. This was the --

You'll recall, it was specifically during his *Daubert* hearing where he acknowledged that if the jury didn't find that the -- all of the 114 claim trade secrets were in, in fact, trade secret that the approach that they would be using and have to use would be the head start analysis. So even the overall number of what is so-called the top-down approach cannot be applied.

And there is authority for the proposition that it is not possible -- not permissible simply to base an average on invalid data points which here -- there were at least eight of the 22 data points on which Mr. Malackowski relied were not found by the jury to have been misappropriated. There is the --

THE COURT: Which ones are those?

MR. ZELLER: Those were the *In re First Alliance Mortgage Company* case, 471 F.3d 977, 1001 through -3. The

relevant portion of is where the Ninth Circuit talks about how one of the figures used in the averaging was based on an incorrect damages calculation and, therefore, cannot be relied upon.

The same point applies here, your Honor. The average that Mr. Malackowski came up with included a number of claim trade secrets that the jury found were not misappropriated. So it means, number one, the average that the jury was applying could not be applied to the products that the jury, in fact, found were misappropriated; and number two, it's an *02 Micro* problem as well where he included as part of his number -- call it an average, call it an aggregate -- conduct that was legal. That is under the law two reasons why it is not proper, whether it's taken as a lump sum or taken as an average for those numbers to be used by the jury in this case.

MGA relies on the *Lara versus Nevitt* case, which is California Court of Appeals, where it talks about juries being entitled to adopt average amounts. But what was going on there in that case were jurors with their own individual estimates, having numbers that were grounded in the record and then averaging those numbers. So unlike *Lara*, the jury here didn't merely average their own percipient estimate of damages. Instead, what the jury did was adopted an average head start benefit that was presented to them in closing,

which was based on an analysis of 22 specific products and based on facts not in evidence as to which the jury found was not entirely illegal behavior. And moreover, the jury applied this average to supposed trade secrets for which there was no head start evidence. That's why I did go through them one by one. There are a number of these which there was zero evidence of head start damages, which means it cannot be applied -- no average, no lump sum can be applied to that conduct. And, fundamentally, what we have is, number one, a flawed methodology -- not necessarily, we'll say, a flawed methodology. It was a methodology that was shoehorned into a different fact pattern from what the jury ultimately found. And number two, it fails to disaggregate legal conduct from conduct that the jury found was illegal. And Mr. Malackowski's numbers were based upon the assumption that all of that conduct was illegal and that is not consistent with what the jury ultimately found.

And, by the way, the number -- if you were to take a 3.4 million average and apply it to all 114 claimed trade secrets, then that would come up with an unjust enrichment damages award $387.6 million, which is $185 million more than Mr. Malackowski's highest calculation. And that was even for the so-called top-down approach where he had said that the maximum number was 202 million and it was, in fact, some $40 million more than total MyScene profits over the

entire life of the product which obviously shows, again, that those numbers cannot be extrapolated in the way that MGA is arguing.

And further, to the point about sweat equity, the way that the Ninth Circuit was talking about it -- and this is also identified in CACI 4401 -- is that a plaintiff must prove unjust enrichment and unjust enrichment does not include amounts unrelated to the trade secret misappropriation. And in its opposition, MGA does not dispute that it bears the burden and bore the burden to apportion. Taking a $3.4 million number and applying it in that fashion violates that principle of law. And, in fact, MGA even concedes in its opposition that even taking the more conservative approach, let's say, the bottom-up head start calculation, it gives MGA every penny of profit that Mattel earned during the head start period.

I would also note that as to a number of these products, as I've talked about, there was no evidence, whatsoever, that Mattel used the trade secret. There was no claim matching Mattel product or the evidence showed that the supposed match simply could not be the case, whether it was because it was before or some case years after, the MGA product. That is another reason why the aggregate number or the average number cannot just simply be applied across the board as the jury did.

But I'll go back to, also, the fundamental point, your Honor, and I would challenge MGA to show the court where in the record Mr. Malackowski, or any other witness during the trial testified that $3.4 million was, number one, an average; or number two, appropriate to apply to any and all trade secrets that were taken. That was something that Ms. Keller made up in closing. That is its only source. And, in fact, the court will jury asked for Mr. Malackowski's testimony be read back. Undoubtedly, because it was looking for evidence to provide some calculation. It was not there. So it went to MGA's counsel's misstatement in closing and relied upon it.

This is not a situation where we can come up with scenarios that would save the numbers that were being provided, because somehow the jury picked between different estimates or between different experts. This is a complete failure of proof and there is absolutely no mathematical or evidentiary basis for applying either the lump sum to the 26; or, as we view it, 25 trade secrets that were misappropriated.

Here's where Mr. Malackowski also admitted that the so-called top-down approach, if that's the lump sum that they're going to try and take trying and say, *Well, anything less than $202 million would be appropriate because Mr. Malackowski testified as to that,* well, number one, the

jury rejected 88 of the 114 claim trade secrets. So that methodology failed for that reason alone. And, in fact, the court -- which I'll get to in a moment -- recognized this possibility on summary judgment. But what Mr. Malackowski said, what he testified to was that you couldn't take the top-down approach and allocate damages between the trade secrets. He said, quote: On a specific product basis, they could not, end quote. And he went on to say, quote: If the jury is going to start to knock out individual themes, I think they're focused on the bottom-up approach, end quote.

Now, the court anticipated this problem with the global calculations by Mr. Malackowski on summary judgment. And the court wrote: Mattel argues that MGA's expert has failed to substantiate any specific loss caused by the alleged misappropriation of information about 111 of the 114 products about which Mattel employees allegedly fraudulently procured information. MGA's expert witness instead provides a global calculation of the harm caused by all acts of misappropriation and then purports to provide exemplar calculations of the loss suffered as a result of the misappropriation of information about three of the 114 products. In such circumstances, the proper course of action is to wait and see whether the jury concludes that Mattel did not misappropriate all of MGA's trade secrets. And if it does, the court may examine whether MGA's expert

testimony regarding damages for misappropriation of all trade secrets was useless to the jury. And then --

In here, the court is quoting *Monolithic Power Systems.* So then the court ultimately says, *So this is an issue that's not fit for resolution at this stage.* Premature. It's something to consider if it comes to pass that the jury rejects the totality of MGA's trade secret claims or at least some of them. And, of course, that is where we are.

And, finally, I would -- on this subject, I would note that opposition -- MGA's opposition at page 53 concedes that the jury did not, in fact, rely on Mr. Malackowski's top-down approach for these 11 non-match products and appears to be applying the head start benefit calculated by the so-called bottom's up approach -- the bottom-up approach.

And we actually cited a large number of cases in our brief, your Honor, where the law, we think, is actually very clear that where an expert analysis fails to segregate out potential nonactionable conduct intertwined with the damages calculation is flawed as a matter of law. And for that, *Farley Transportation*, which is 1985, Ninth Circuit decision, 786 F.2d 1342, where the court wrote: *Plaintiff's utter failure to make any segregation between damages attributable to lawful competition and that attributable to*

*the lawful scheme requires reversal of the verdict and remand for a new trial on the amount of damages.*

And given that the -- some number of the head start damages numbers that Mr. Malackowski included in his calculation, whether it's deemed as a -- seen as an average or seen as the aggregate amount included conduct that the jury also found was not trade secret misappropriation and was not illegal. So that is exactly why that number simply cannot be applied, cannot be turned into a general damages number and it cannot be averaged across the 25 trade secrets that the jury did find was misappropriated.

Another case that I would direct the court's attention to, it's a District Court of New Jersey case which is *Bracco Diagnostics*. And there, it was the same situation where an expert came up with a damages number. Some of the conduct the court found was not -- not illegal. It wasn't false advertising. And the court found that that -- that his failure to account for the effects of non-tortious activity was fatal to the validity of his calculations.

I would also note to the extent that any of the individual trade secrets of the 25 that the jury did find not only is there already the discrepancy that I noted between the products that Mr. Malackowski based his aggregate numbers on and his specific numbers on versus what the jury actually found, but if any of the other ones fall,

the disparity becomes even larger. There are a number of these of the 25 --

THE COURT: The jury found 26.

MR. ZELLER: I understand. But that's why I was mentioning earlier that I'll refer to them as 25. MGA will call them 26. But as to those, if any of the initial ones fall, then there's even greater disparity between what it was that Mr. Malackowski based his calculations upon versus the numbers that the jury, in fact, was applying. This methodology simply cannot be extrapolated to it, because the assumptions and the calculations are simply different.

I don't have anything further, your Honor.

THE COURT: Check with your colleagues.

MR. ZELLER: Sure.

*(Pause.)*

THE COURT: Mr. Quinn, you're more than welcome to add. Ms. Estrich?

So if somebody wants to add something, you're more than welcome to.

*(Pause.)*

MR. ZELLER: There's another disparity here as well, your Honor, which was pointed out to me by Mr. Quinn, as you know. MGA, of course, at various times during trial talked about the true value of these trade secrets, meaning that people could touch and feel these products; that that

was supposedly the -- why it was so important for Mattel to have people infiltrate the showrooms to get that kind of information. It's --

THE COURT: Mr. Larian testified to that.

MR. ZELLER: Yes. And there's also -- there was no evidence that Mr. Malackowski -- and certainly no calculation, or opinion that he provided that allowed for the calculation of damages based on that either. So there is here another disparity between what it is that the evidence showed and what it is that Mr. Malackowski was calculating.

THE COURT: Check again.

MR. ZELLER: It looks like I'm released.

THE COURT: The record should note three heads nodding in affirmance.

Why don't we take a recess. How long would you like, Counsel?

MS. KELLER: Ten minutes is fine with us, your Honor.

THE COURT: Why don't we make it 10 after the hour. That makes it simple.

Okay. We'll recess to 10 after.

*(At 3:55 p.m., proceedings were adjourned.)*

-oOo-

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: May 25, 2011

_______________________________________

Deborah D. Parker, Official Reporter