Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL INC., et al.,              )
                                  )
                Plaintiff,        )
                                  )        MOTIONS
          vs.                     ) No. CV 04-9049-DOC
                                  )     VOLUME 3 OF 4
MGA ENTERTAINMENT, INC.,          )
                                  )
                Defendant.        )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

WEDNESDAY, MAY 25, 2011

Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

1    **APPEARANCES OF COUNSEL:**

2    **FOR THE PLAINTIFF:**  QUINN EMANUEL URQUHART OLIVER & SULLIVAN
                            BY:  MICHAEL ZELLER, ESQ.
3                           and  JOHN QUINN, ESQ.
                            865 S. FIGUEROA
4                           10TH FLOOR
                            LOS ANGELES, CALIFORNIA 90017
5                           (213)443-3000

6
     FOR THE DEFENDANTS:  ORRICK, HERRINGTON & SUTCLIFFE
7                           BY:  ANNETTE HURST, ESQ.
                            405 HOWARD STREET
8                           SAN FRANCISCO, CALIFORNIA 94105
                            (415)773-5700
9

10
     FOR THE DEFENDANTS:  ORRICK HERRINGTON & SUTCLIFFE
11                          BY:  THOMAS MCCONVILLE, ESQ.
                            4 PARK PLAZA
12                          SUITE 1600
                            IRVINE, CALIFORNIA 92614
13                           (949)567-6700

14
                            KELLER RACKAUCKAS
15                          BY:  JENNIFER KELLER, ESQ.
                            18500 VON KARMAN AVENUE
16                          SUITE 560
                            IRVINE, CALIFORNIA 92612
17

18

19

20

21

22

23

24

25

Page 3

1          SANTA ANA, CALIFORNIA; WEDNESDAY, MAY 25, 2011

2                              -oOo-

3          THE COURT:  We are present, all counsel are present.

4   This is MGA's argument with Ms. Keller.

5          MS. KELLER:  Your Honor, before we begin, may we inquire

6   about the Court's schedule tonight?  Because I know Mr. Quinn has

7   to leave at 4:45.

8          THE COURT:  He is welcome to go.

9          MS. KELLER:  Will we be finishing tonight or will we be

10  finishing tomorrow?

11         THE COURT:  It's up to you.

12         MS. KELLER:  I didn't make the request.

13         MS. HURST:  We would like to finish tonight.

14         THE COURT:  Who made the request?

15         MS. KELLER:  I heard Mr. Quinn say I think his

16  daughter's graduation is.

17         THE COURT:  He's welcome to go.

18         MS. KELLER:  So we'll finish up tonight?  Okay.

19         MR. QUINN:  We need to come back tomorrow, Your Honor.

20         THE COURT:  We need to come back tomorrow?  Why?

21         MR. QUINN:  Because I'm responsible for arguing some

22  portions of the things that are on the agenda.

23         THE COURT:  What is left to argue besides the JMOL, from

24  your perspective?

25         MR. QUINN:  We addressed the Court's questions as to

Page 4

1   some of the other things like exemplary damages, but we didn't

2   really go through that completely.  We kind of reserved --

3          **MS. HURST:**  We still have our motions for exemplary

4   damages and attorney's fees that we want to argue.

5          **THE COURT:**  Why don't you -- what time is graduation?

6          **MR. QUINN:**  Well, it's not a graduation.  Specifically,

7   she is getting an award.

8          **THE COURT:**  Go and come on back.

9          **MR. QUINN:**  It's at 7:00 o'clock in Westwood.

10         **THE COURT:**  So by the time you come back it's a

11  ridiculous hour, isn't it?

12         **MS. HURST:**  My problem tomorrow is just the --

13         **THE COURT:**  Just a moment.  Time out now.  We have all

14  got problems.  You want to hear mine?  I'm just kidding you.

15         Look, I've got a full day tomorrow with counsel starting

16  a trial.  So I don't know that I'm going to finish this evening,

17  and I'm not going to preclude you from the argument.  So how are

18  we going to solve that?  You are going to keep your daughter's

19  date that's important.  That's memorable.  So let's get that out

20  of the way.

21         And you are going to go home if you want to.  Do I need

22  you tomorrow?

23         **MS. HURST:**  If we're continuing tomorrow, yes.

24         **THE COURT:**  Once again, I know the parties aren't going

25  to reach any sort of agreement, and I'm not going to sort that out

Page 5

1   between you.

2          **MS. HURST:**  So the Court has trial starting tomorrow?

3          **THE COURT:**  I have a huge class action that your case

4   pales in comparison, quite frankly.  I know you think you two are

5   number one, but believe me, it's not even in the same ballpark.

6          So you work it out.  I'm going to sit here.

7          Mr. Quinn, approach Ms. Keller, work it out.  I'm not

8   going to get involved with the quibbling anymore.

9              (Brief pause in proceedings.)

10          **THE COURT:**  I'm writing this for tomorrow night.  I'm

11  telling you straight out.  This case is done in terms of the

12  argument.  This isn't going over to next week, etcetera, at all.

13  This Court is writing now.  One of the reasons is because it's

14  fresh in mind and I'm not going to have 20 cases between you.

15          You and Mr. Quinn are going to work this out.  It's

16  going to be the first thing you work out in the history of

17  humankind.  You just talk to each other.  I have counsel coming

18  from all over the country tomorrow.  And Friday we're tied up

19  also.  If you came in like 7:30 and you had like an hour left, I

20  could do that, and hopefully you could catch a plane that wouldn't

21  be too onerous for you.  In fact, 7:00 o'clock.

22          Maria, can you do 7:00?  I'll come in at 6:00 if you

23  want.  I just can't get the doors open.

24          **MS. KELLER:**  Well, argue the exemplary damages at 7:00.

25          **THE COURT:**  You have got to pledge that by 8:30 I'm

1   ready to roll with the counsel coming from all over the country.

2          MS. KELLER:  I understand.

3          THE COURT:  That work for both of you?  Can you get to

4   your daughter's award?

5          And can you get a plane, Ms. Hurst, tomorrow?

6          MS. KELLER:  Ms. Hurst is going to reschedule.

7          THE COURT:  Will that work out for both of you?  That be

8   okay?

9          MR. QUINN:  Yes, Your Honor.  Thank you.

10         THE COURT:  Okay.  Let's go.  Ms. Keller.

11         MS. KELLER:  Your Honor, I'm not going to address every

12  single issue that I know to the Court's dismay probably --

13         THE COURT:  No, no.  Not so fast.  If you are not going

14  to, I'm going to start with --

15         MS. KELLER:  Well, I'd like to, if I could, start with a

16  general statement.  And I think to some degree we lose track of

17  this in getting ultra granular when we're examining the jury's

18  verdict.

19         The standard is the jury awards are to be enforced

20  unless a defendant can prove that the jury could not possibly have

21  reached it's damage award in using a rational basis.  That's the

22  key.  Could the jury have reached the award it did rationally?

23  The jury is not bound to follow any expert.  It is not bound to

24  follow any expert's analysis.  It is not bound to follow any

25  expert's range.  It can do whatever it wishes in terms of

1    apportioning, in terms of averaging.  The jury is free to do

2    whatever it wants as long as it is rational.

3           And when we look here at what happened, it's as if,

4    according to Mr. Zeller, there never was any top-down analysis.

5    The jury was given two alternate methods.  And I have heard

6    repeatedly, "and it's obvious that the jury did this, and it's

7    obvious that the jury did that."  Well, it's not obvious.  In

8    fact, we're not allowed to guess or speculate what the jury did.

9    And this is one of the things that, at the conclusion of the first

10   trial, Mr. Quinn himself argued to the Court, because the shoe was

11   on the other foot.  MGA was contesting a $100 million damage

12   award.

13           **THE COURT:**  First of all, it was never $100 million.

14   The jury may have awarded that.  That was an impossible verdict,

15   and the circuit wouldn't sustain it.  Those were overlapping state

16   law claims.  That verdict was $40 million.  And no circuit would

17   have sustained there was $100 million.  There was no trade secret

18   misappropriation noted.  Those were overlapping claims.  It would

19   have been $10 million and $30 million, and the circuit would have

20   had to reach a $40 million verdict.

21           **MS. KELLER:**  And that's what MGA was arguing.  MGA was

22   arguing that there wasn't a rational way to look at this verdict;

23   this apportionment of damages.  And Mattel argued in return that

24   it didn't matter what we thought, it only mattered what the jury

25   had done, and that MGA had to affirmatively establish -- and this

1    is I'm quoting -- "that it is quite literally impossible that the

2    jury verdicts reflect separate unduplicated damages."

3              And Mattel went on to argue in its brief even when the

4    chance is slight that the jury arrived at the award without

5    erroneously duplicating, if the verdict is within the range of the

6    evidence, it will be withheld.  And that was citing to United

7    Phosphorous and Indu Craft that Mr. Zeller has mentioned recently.

8              And that is the rule that has been repeatedly stated,

9    that unless the jury's verdict was arrived at in an impossible

10   fashion, an irrational fashion, that it should be withheld and we

11   should not be looking behind the verdict.

12             So start with that principle.  Here, the jury's verdict

13   was very conservative.  The range that was given by

14   Mr. Malackowski had the 88.4 million on the low end, and the high

15   end was over 200 million.  And we don't know how the jury decided

16   to arrive at the figure it did.  It may well be that the jurors

17   did not go on an item by item.  It may be that they decided well,

18   we have got a high range and a low range, we're going to pick the

19   low range and we're going to divide.

20             Maybe they did that.  Maybe they didn't.  We really

21   don't know.  And the fact that we don't know is important.  We

22   don't have a recording device in there.  We can watch them and

23   second-guess them and we're not supposed to.

24             So there are a number of statements that were made by

25   Mr. Zeller, including that I had misstated things to the jury and

1    had, once again, made misleading statements in that

2    Mr. Malackowski never came up with the $3.4 million figure.  But

3    he actually did.

4            What he did was when he was analyzing the 26 trade

5    secrets in issue, he had hard data for 22 of them, if the Court

6    remembers.  Before, Mattel simply hadn't supplied him with that

7    data.  So what he did is he took the $74.9 million that he had

8    come up with for the 22, and he divided it by 22.  That gave him

9    $3.4 million.  And that's what he used for the four trade secrets

10   on his bottom-up analysis that he didn't have enough data for from

11   Mattel.

12           And so, that's precisely what it comes out to if you

13   divide 74.9 by 22.  You come up with 3.4 million.  And he said

14   that he thought that was an appropriate number.  He thought it was

15   appropriate to apply that number to the four that he didn't have

16   sufficient data for, and he explained why.

17           So while he may not have said you can use an average of

18   3.4 million, that's precisely what he did and what he described

19   and how he went about it.  So my misstatement was really no

20   misstatement at all.

21           And there was also a statement by Mr. Zeller that

22   Malackowski never testified about the value of FOB pricing; that

23   that simply was never discussed.  But it was discussed on April 4

24   and April 5, in volumes two and three of the trial testimony.  He

25   did go into the importance of FOB pricing remaining confidential.

1   And that was actually part of his head-start analysis.

2         Much has been made of the fact that the identical 26

3   were not the same 26 that the jury found.  But they weren't

4   required to do that either.  The jurors could -- the jurors in

5   this case were incredibly conscientious.  They went through and

6   obviously went through the exhibits very carefully so that they

7   could see the exhibits existed for those 26 that circumstantially

8   established the theft of our trade secrets.

9         And we know that they were conscientious because they

10  rejected so many of our -- we had 114 and they rejected all but

11  26.

12        **THE COURT:**  Well, regardless of the damages calculation

13  and however the Court makes its findings eventually, I would

14  subscribe to both parties that this was an incredible jury.  You

15  had people with doctorate degrees, master's degrees.  But more

16  importantly, they caught numerous issues that counsel hadn't and

17  the Court hadn't caught.  They actually caught exhibits that had

18  been referred to by each of you that you had signed were, in fact,

19  in evidence.  And the record will reflect that.  This was an

20  extraordinary jury.

21        **MS. KELLER:**  This was a conscientious and highly

22  intelligent jury.  And to say that they behaved in an irrational

23  fashion in arriving at their damage award would be simply wrong.

24  They were careful.  They didn't throw the book at Mattel.  They

25  didn't gratuitously decide that everything was a trade secret.

Page 11

1    They were very, very careful.

2          And so because it is so hard in this type of trade

3    secret theft to come up with a very precise figure, it's the

4    opposite of irrational for them to come up with an average.  How

5    do you decide, for example, what the value is of somebody finding

6    out your advertising plans and either not advertising something

7    that they would have otherwise, or advertising something that they

8    wouldn't have?  How do you even know that that occurred?  You

9    don't.

10          But what you have is circumstantial evidence that

11   companies, and Mattel in particular, thought that kind of

12   information was really valuable.  Valuable enough to set up this

13   whole market intelligence unit to get that information because

14   they had the other side's playbook.

15          So I suppose it would be a little like in a football

16   game, if you steal the other side's playbook, everybody knows that

17   that really valuable information.  But on a given touchdown, is it

18   because you had a brilliant wide receiver who made a great cut, or

19   is it because he knew what the defensive setup was going to be?

20   How do you prove that?

21          So it's not irrational.  In fact, it's highly rational

22   to draw inferences from the evidence that you have and start

23   looking at ranges and do exactly what Mr. Malackowski did, which

24   is go through all of them one by one and then started looking at

25   them and in different ways.  Look at them top-down, look at the

Page 12

1   overall picture, and then look at the bottom-up one by one.  And

2   then if the jury wants to average from that, that's completely

3   rational.  There is nothing whatsoever wrong with it.

4           And when the Court talks about the verdict form, one of

5   the things that we have been told is that there is a duplicate of

6   Girls Nite Out.

7           **THE COURT:**  Number 20 and number 65.

8           **MS. KELLER:**  And Bratz Girls Nite Out, yes.  And the

9   problem is that we have here two different reports at two

10  different times using two different media, toy fair reports that

11  the jurors had and could have easily concluded that these were two

12  separate thefts of trade secrets.

13          Now, as far as the waiver issue goes, this verdict form

14  was tinkered with repeatedly, even after it went to the jury.

15  There were opportunities to make many corrections on this because

16  as the Court pointed out, the lawyers missed some things.  And our

17  list of trade secrets, there were things that changed but that

18  remained static.  That was in the hands of Mattel for a long, long

19  time and not once did we hear, "Oh, this is a duplication.  You

20  need to get rid of this."

21          Even after the jury was deliberating and had it back in

22  the jury room, we didn't hear that.  The first time we heard that

23  was after they returned their verdict.  So we do think that there

24  has been a waiver without objection.

25          But even if the waiver had not occurred, we think the

1   jury found two different thefts of trade secrets based on two

2   different toy fair reports at two different times with two

3   different forms of media.

4           Now, as far as the FOB pricing issue, I think Mr. Zeller

5   misstated the state of the record.  The state of the record is

6   that there was testimony from a number of people, including Mattel

7   executives, that FOB pricing is information that you would like to

8   have and would like to keep confidential.  I believe Mr. Eckert

9   said you could figure it out by knowing a given retailer's margin

10  and by knowing the retail price.  But Mr. Larian disagrees with

11  that and believes that you can't -- that that's something that the

12  retailer likes to keep to himself.

13          And at any rate, there is a conflict in the evidence

14  there, and the conflict in the evidence has to be resolved in

15  favor of the jury's verdict.  And the jury's verdict is it's very

16  clear that FOB pricing was something that was found to be a trade

17  secret.

18          Now, that also was something -- a finding the Court

19  made.  So we're getting that relitigated as well.  And in fact,

20  much of what I have heard today is an attempt to relitigate those

21  rulings.  Essentially, what I'm hearing from Mattel is that Court

22  should have never held that FOB pricing could be a trade secret.

23  But the Court did so hold based on the solid record and the jurors

24  used that as one item in determining whether there was theft of a

25  trade secret.

1          By the same token, I'm hearing a lot of criticism now of

2    Mr. Malackowski's methodology.  It's all an attempt to relitigate

3    the Daubert hearing.  But the Court made its findings that the

4    basis for Mr. Malackowski's calculation was sound at the time, and

5    this is not the time to relitigate that either.

6          So by the same token, it's not the time to attempt to

7    force the jurors to adopt any or all of Mr. Malackowski's opinion

8    so that their verdict can then be attacked.  It doesn't matter.

9    By the same token, there is no requirement of matching products.

10   Counsel was arguing about that as if there is no matching product,

11   or matching product came out later, that somehow that means there

12   was no theft of trade secret, no misappropriation of the trade

13   secret, no use of the misappropriated secret.  And that's not true

14   either.

15         There was a tremendous amount of evidence from which

16   this jury could find that each one of these trade secret thefts.

17   And for each one of these there was documentary evidence in the

18   jury's hands to look at to see that confidential toy fair

19   information had been obtained.

20         We have heard in the briefing as well as in arguments

21   that it wasn't really confidential.  This has been a refrain

22   throughout the trial, that this information really wasn't

23   confidential.  The FOB pricing, for example, wasn't really

24   confidential.  That was rejected by the jury.  The jury rejected

25   those arguments and found clearly that these were trade secrets.

1           So that horse left the barn a long time ago.  The

2    argument that something has been shipped in commerce to a retailer

3    and therefore that has made it instantly publicly available is

4    wrong.  Something can be on a container ship on the proverbial

5    slow boat from China in a sealed container on its way to a

6    retailer with the understanding that it's not going to be released

7    by that retailer until a date certain, and that doesn't mean it

8    has become available to the general public anymore than it does if

9    a retailer comes into a private showroom and sees that product

10   pre-released, it doesn't mean it's become publicly available.

11           Now, the circumstantial evidence in this case was that

12   Mattel routinely infiltrated toy fairs.  Routinely infiltrated as

13   many toy fairs as it could, and obtained toy fair reports and the

14   confidential information found in them.  And were those found in

15   the files of Mattel.

16           Now, we would have loved to have had a more thorough

17   record of all of that.  But as the Court knows, that information

18   was withheld from us until 2010.  Mattel has taken the position

19   that no matter what legitimate discovery requests are made, unless

20   we file a motion to compel with specificity on each thing that, of

21   course, we don't even know exists yet, that they don't have to

22   turn it over.

23           And the only way we found out about this whole market

24   intelligence unit to begin with was because Mr. Malinski had seen

25   the name Sal Villaseñor a few times and decided to go ahead and

 1   take his deposition.  Had that not occurred, we would have never,

 2   ever, ever known about the market intelligence.  It could have

 3   been concealed from us until this day.

 4           And getting any documents out of Mattel, as the Court

 5   knows, was like pulling teeth.  It was very, very difficult.

 6   There were a number of documents that we still would like to have

 7   and don't, but we did the best we could.  And I don't think it's

 8   entirely fair to compare the two sides, because we produced as the

 9   Court knows, something like a million 200,000-plus documents.

10   Mattel produced over a couple hundred thousand in return.

11           And one of the categories of things that we asked for

12   were the theft of trade secret materials, the market intelligence

13   materials involving our competitors.  Because that would have

14   established a better pattern.  We would have had a better time

15   line.  We would have had more information to bolster our own

16   claims.  And the Court recalls ruling that that was not something

17   that was relevant to us, and we were denied that information.

18           Had we had more time and had we not had discovery

19   cut-offs, and had we been able to get that information, we would

20   have been able to provide more specificity.  But given the

21   intransigence of Mattel and the constant road blocks and

22   stonewalling, we did the best we could.  And I think we produced

23   sufficient evidence for this jury to find that when they see, for

24   example, a toy fair report that has FOB pricing in it and

25   confidential price lists of ours sitting in Mattel files given the

Page 17

1    testimony of Mr. Villaseñor and others, I think that the

2    circumstantial interference is pretty strong as to where that came

3    from.  Even if you don't have somebody saying, "I was standing

4    there at the entrance to the Nuremberg toy fair and I saw this

5    particular Mattel person incognito going in."

6         I don't think that's necessary.  Circumstantial evidence

7    is every bit as good and powerful as direct evidence.  And the

8    circumstantial evidence here was pretty overwhelming.

9         As far as Mr. Villaseñor leaving in '05, that didn't

10   mean the practice stopped.  In fact, it didn't.  We know that

11   Sharon Rahimi was brought on as a contract person to continue

12   spying.  We know Ms. Plunkett was to continue spying.  We know

13   that even though Mattel's legal department became aware of what

14   had been happening, it didn't stop.  It kept going.

15        And I think it's pretty clear that had it not been on

16   for our eventually finding out through Mr. Villaseñor producing

17   those documents to us about what was going on, it would probably

18   still be happening right now in 2011.  This was only last year

19   that we found out.

20        So it's -- I think, Your Honor, that maybe MGA deserves

21   just a little more credit for having put this together as best we

22   could, given the limited amount of documents that we were getting

23   from Mattel.

24        But I don't think it's true that the jury simply got it

25   wrong on everything, nor do I think it's true that we need to

1    defend, as Mr. Zeller put it, against every contention raised by

2    Mattel.  No, we don't.  We have a verdict.  We have a damages

3    award.  And it is up to Mattel to show that the jury arrived at

4    in an irrational fashion, so irrational that it was simply

5    impossible for them to have made the decision they made.  And that

6    is -- to say that Mattel has fallen far short of that I think is

7    an understatement.

8           One of the arguments that Mr. Zeller made was that the

9    Bratz Girls Nite Out release date was before the -- with the

10   competing My Scene product, and one was found at line 100 and one

11   found at line 25 of the exhibit that he referenced.  That was a

12   hearsay document.  That was an MPD document.  We had strongly

13   objected that it was hearsay.  The MPD data was unreliable.  It's

14   not true that we agree with it.  We don't agree with it.  It's not

15   true that we're conceding it.  We don't concede it.  We think that

16   it's completely unreliable.

17          Likewise, Mr. Zeller said that we had conceded that the

18   information regarding Bratz Mobile was actually public information

19   before the alleged theft of trade secrets.  If the Court looks at

20   our brief at page 27, he was saying we conceded this in our brief.

21   Not only do we not concede that, we argued the opposite.  We said

22   that Mattel claimed that the information was public information

23   citing various press reports but none of the reportedly, quote,

24   public sources cited by Mattel including the FOB pricing.  And

25   then we provided the exhibit.

1           So we said despite the fact that the exhibit clearly

2    states FOB L.A. price $29.99 in huge text at the bottom of the

3    exhibit relied on by Mattel, Mattel bafflingly maintains "MGA

4    presented no evidence that Mattel acquired FOB pricing of Bratz

5    Mobil."

6           That is -- what I just read the Court, that is verbatim

7    from our brief and that's what Mr. Zeller claims is our conceding,

8    that this was publicly available information?

9           That is not true.  On verdict form number 58, Alien

10   Racers, Mr. Zeller said that Mr. Malackowski didn't even list it

11   and there was -- so there couldn't be any head-start.  He didn't

12   list it as any of his 26.  He didn't have to for this jury to make

13   the finding that it did.  It didn't have to be something that they

14   thought was susceptible to head-start damages.  They could just as

15   easily decide they were going to look at the range of top-down and

16   bottom-up, or simply use an average for Alien Racer, and there is

17   nothing wrong with that.

18          The Bratz Kidz.  We heard there was no Mattel matching

19   product so there couldn't be any head-start damages.  The jury

20   wasn't limited to head-start damages.  The jury didn't have to

21   find there was a matching product, and the Court so instructed the

22   jury.  There was no requirement of that.  All they had to do was

23   find a misappropriation of our trade secret and damages.  That's

24   it.  They weren't tied to any one thing.

25          Same thing with number 69, Passion for Fashion.  This

1   was one where Mr. Zeller argued that there was no misappropriation

2   because there was no evidence of our infiltrating the New York Toy

3   Fair in 2006, but there was circumstantial evidence of it,

4   including having found our confidential documents, as usual, in

5   their files.  And then again, the argument that there was no match

6   up.  Well, so the jury could use a top-down analysis.

7           The jury was free to find any trade secret

8   misappropriation that it had evidence for without respect to

9   whether there was a matching product.  That is really a red

10  herring.  The attempt to tie them, that if they didn't find

11  everything Malackowski documented in exactly the way he did, with

12  exactly the numbers he came up with in his, quote, inadmissible

13  chart, that this verdict has to be set aside is simply wrong and

14  there is no precedent for that.

15          The reason that we did the analysis two ways -- both

16  top-down and bottom-up -- is because we understood that.  We

17  understood that we didn't have to present a matching product for

18  each stolen trade secret.  And we wanted to give the jury some

19  flexibility in determining an award, and flexibility in how they

20  looked at a range, a reasonable range.  And as it turns out, they

21  chose a very conservative way to go about their business, and

22  that's fine.

23          I would I think that the Court definitely has taken both

24  parties to task on the fact that we didn't give them the option of

25  coming up with a lump sum.

 1          **THE COURT:**  Let's see if your memory is the same, and I

 2   invite you to go back.

 3          Mr. Wagner was on the stand between -- I forget.  I

 4   think he was on the stand until 12:00 o'clock midnight one night,

 5   but between 7:00 and 11:00.  I specifically asked Mr. Wagner why

 6   we weren't breaking down these damages.  And his response to me at

 7   that time was, "I don't have that data," or, "It would take so

 8   long."  I forget the exact words.

 9          I invite Mr. Zeller to look that up.  I was stunned by

10   that answer.  Both of you had that opportunity.  And this could be

11   absolutely reversed.  You could be sitting making the exact

12   argument that Mattel is making at the present time, and I would

13   expect you to.  But frankly, that's what each of you chose to give

14   to the jury.

15          Now, the problem is, I'd like more definiteness also,

16   but I do understand that the experts came out, and I do understand

17   that the average is permissible.

18          So, the question I have got is 20 and 65.  And I have

19   got a couple more questions.  I'm going to let you finish.  I want

20   to let you go through your presentation.  I didn't interrupt Mr.

21   Zeller until about an hour and 45 minutes in, so about an hour and

22   45 minutes from now I'm going to interrupt you, but you are

23   eventually going to explain 20 and 65.

24          **MS. KELLER:**  Well, I don't intend to take three hours.

25          **THE COURT:**  You can.

1      MS. KELLER:  I shall not.  20 and 65 being Girls Nite

2  Out and Bratz Girls Nite Out?

3      THE COURT:  Absolutely.

4      MS. KELLER:  Well, as I said --

5      THE COURT:  First of all, the good part about it is it's

6  consistent.  You can imagine if they were examining the same

7  duplicative problem.  And if it was duplicative -- assuming --

8  it's consistent.

9      Now the question is, let's assume it's not for a moment.

10  How does that play out in this record?  I mean, it appears to be

11  the same thing, and I gave both counsel latitude to shape your own

12  trade secret misappropriations.  So where are you coming up with

13  these being two separate --

14      MS. KELLER:  We can go back and dig the exhibit numbers

15  out, Your Honor, but there were two separate -- as I recall, there

16  were two different toy fair reports at two different times and

17  with different media.  And I think we can --

18      THE COURT:  How would the jury ferret that out and where

19  did that testimony come in?  You can have a consultation with

20  counsel.

21      MS. KELLER:  They appeared to be the same product, Your

22  Honor, but there are different documents at different times.

23      THE COURT:  Different documents, but the same product.

24  Why am I awarding $3.4 million twice?

25      MS. KELLER:  Because it's the theft of the trade secret

1   that's in issue, not the product itself.  In other words, if there

2   is a theft of a trade secret -- this is just hypothetically --

3   about a product now, and say six months from now -- say I steal

4   the trade secret now about the pricing, and six months from now I

5   steal information about advertising plans, those are two different

6   theft of trade secrets.  And that's --

7        **THE COURT:**  Where does the record justify that?

8        **MS. KELLER:**  We'll have to go through and pull the toy

9   fair reports.  But we do have two sets, and Mr. Malinski will be

10  doing that.  We'll see if we can get that for the Court as soon as

11  possible.

12       **THE COURT:**  The second claim is that a number of

13  products were, in fact, released but the argument is twofold.

14  Some of those, it's argued, are in shipment.  And your response

15  is, it doesn't matter.  They can be in shipment and still be a

16  trade secret if the retailer decides not to release them.

17       What about the products that were argued that were

18  specifically released to the market?

19       **MS. KELLER:**  It's, Your Honor, it's more than just the

20  retailer decides not to.  There are actually dates before which

21  they can't release them by contract.

22       **THE COURT:**  Set that aside for a moment.  What about the

23  argument that certain products were, in fact, released to the

24  market, actually released?

25       **MS. KELLER:**  Your Honor, we just think that Mr. Zeller

Page 24

1   is simply wrong on the evidence.  We don't think the evidence

2   reflects that.

3         And, Your Honor, I do have exhibit numbers for the Court

4   with respect to the two different reports that were found within

5   Mattel at separate times and at separate media on the Girls Nite

6   Out.

7         **THE COURT:**  Which is 20 and 65.

8         **MS. KELLER:**  Right.  And the exhibit numbers are

9   9604-15, which is a 2004 toy fair report.  And then trial

10  Exhibit 9488, which was a 2004 video presentation.

11        And the problem for Mattel is it would have to be able

12  to demonstrate that it is literally impossible for the jury to

13  find that these separate events are duplicative and Mattel cannot

14  find that and they can't prove that.  So since that is Mattel's

15  burden to prove and they can't look behind the verdict to prove

16  it, we think those two should stand.

17        And I'm reminded as products are released, Your Honor,

18  they change.  That different waves of the product have different

19  features, different pricing, different add campaigns.  So just

20  because a product has been released doesn't mean that you can't

21  have theft a trade secret.  You might have a product that's a hot

22  product and you decide to price it higher.  You might have a

23  product that's doing poorly and you might decide to price it

24  lower.  You might have a product that with one little outfit is

25  going gangbusters and with another outfit is failing, and you

1   might switch the fashions on the doll.

2          So just the fact that a doll by a given name has been

3   released doesn't mean you can't have a theft of a trade secret

4   about that doll.

5          And in fact, the whole toy industry is one that is

6   always evolving, changing, and moving constantly in response to

7   the market.  So I think that just saying well, this was released

8   and therefore there can't be a theft of a trade secret that

9   affects that product is wrong.  And we don't know what the jury's

10  rationale was for those.  We can't look behind that verdict and

11  say well, this jury obviously was only looking at pricing, or this

12  jury could have only been looking at play patterns.  We don't know

13  and we're not supposed to know because we're not supposed to look

14  behind the verdict.

15         As far as basing an average on so-called invalid data

16  points, the data points were not invalid.  Just because a jury may

17  have found that a given item wasn't a trade secret doesn't mean

18  that it can't be valued, and that the market value of it can't be

19  looked at; that it can't be given a valuation.  Otherwise, any

20  time you had an expert look at, say, 200 items and come up with an

21  average, for example, that average would be considered invalidated

22  later if the jury found that 10 of those items weren't trade

23  secrets.

24         And you just don't have that much precision in trade

25  secret misappropriation like this.  Maybe if you were dealing with

Page 26

1   one patent or one computer chip where you could quickly compare it

2   to other chips, quickly figure out how well machines sold that had

3   that chip in it, you could have that kind of precision.  But here,

4   we don't.  Here, we're looking at what is a reasonable damage

5   figure.  What is rational and reasonable.  What range can we come

6   up with that makes sense.

7           And that's what the jury did.  And requiring them to do

8   more than that is not something that comports with the case law

9   that I have seen.

10          In terms of what a jury can do in terms of awarding

11  damages, the case law is actually fairly broad that a jury can

12  even decide in deliberations to discuss a high damages figure,

13  discuss a low damages figure, and decide to average them to come

14  up with an appropriate amount; to pick the lower version; to pick

15  the higher version.  That is all within the jury's province, and

16  there is no impropriety in that.

17          Whether they average their individual estimates, there

18  has been case law saying they can average their individual

19  estimates.  That's even less precise that averaging a damage

20  expert's estimates.  But they're allowed to do it.  They can do it

21  as a basis for discussion.  They can to it as a basis for a

22  decision.  And the damage award cannot be set aside simply because

23  the amount awarded doesn't correspond to any particular

24  calculation presented to the jury.  And there is case law on that,

25  too.  That's the Rayner Brothers case.

1          So the jury has a lot of discretion in determining what

2    is an appropriate award.  And I think that we're wrong to say that

3    unless they are pinned to a precise amount that an expert gives

4    them, that they can't make a reasonable award.  And they can do

5    math, too.  They can add, they can divide, and they can subtract.

6    We had a tax accountant on the jury.  They were -- they did not

7    come up with an irrational verdict.  I don't think anyone looking

8    at this, looking at this overall could say that this jury came up

9    with irrational damage figures.  They did not.

10          And it's also within their province to weigh the

11   credibility of the experts and decide what to accept and what to

12   reject, and we don't get to look behind that process either.

13          So we don't know.  Obviously they rejected some of

14   Mr. Malackowski's conclusions because they didn't adopt all of the

15   trade secret misappropriations that he adopted and used as a basis

16   for his opinion.

17          So, Your Honor, unless you have any questions about

18   specific items or anymore specific questions of me about any of

19   the particular items that were discussed by Mr. Zeller, I think I

20   would -- there is one last thing I wanted to mention, and that's

21   that Mr. Zeller talked about how there is no evidence of

22   misappropriation of any data on Stylin' It, the Bratz Stylin' It.

23   We had a series of e-mails between Bousquette and Mr. Villaseñor.

24          **THE COURT:**  Just a moment.  Number two on the verdict

25   form.  All right.

1          **MS. KELLER:**  We had a series of e-mails between Matt

2     Bousquette and Mr. Villaseñor about trying to get data on Stylin'

3     It.  So if the data was readily available, as Mr. Zeller said it

4     was, and there was no indication of trying to obtain trade

5     secrets, I don't think we would have this series of e-mails where

6     Bousquette is trying to get Villaseñor to find out -- get some

7     info on it.

8          Also, with respect to the argument that we can't

9     consider FOB pricing to be a trade secret or it would be

10    noncompetitive, Your Honor, this was never argued during the trial

11    once.  When the Court was making its decision about whether FOB

12    pricing would be a trade secret, that was never mentioned by

13    Mattel.

14         **THE COURT:**  They objected to that.

15         **MS. KELLER:**  Not on that ground.  Not on the ground that

16    it was anticompetitive.  That was not raised.  The ground of the

17    objection was simply it's not really a trade secret; it's

18    something that could be figured out.  Not, this would be an

19    anticompetitive practice and against public policy.

20         So that was absolutely waived.  And that's another

21    example, I think, of rearguing evidentiary rulings at this point.

22         With respect to the '02 Micro case and that you have to

23    disaggregate damages or the entire number falls, I think Mr.

24    Zeller said, we disagree with that as well.  In '02 Micro there

25    were some alleged trade secrets for which there was literally zero

Page 29

 1   evidence of any kind presented.  Nothing.  And the expert gave an

 2   overall figure for the -- I think it was 10.  Gave an overall

 3   figure, and that was it.  And no averaging.  Nothing.  Just a lump

 4   sum for all of them.

 5          And as to the ones for which there was zero evidence,

 6   those claims didn't survive.  And then the Court was left with a

 7   number that had not been in any way broken down, including by

 8   average or anything else.

 9          So it's a very, very different situation than we have

10   here where the jury had circumstantial evidence of all these

11   different things that were going on:  The infiltration of the toy

12   fairs, the obtaining of the toy reports, the FOB prices, some of

13   the competitive matching products being released.  The jury had a

14   huge amount of circumstantial evidence here to establish the theft

15   of the trade secrets.  So it wasn't a situation where they had

16   zero information about it.

17          And there were two types of damage analyses done:

18   Top-down and bottom-up.  So the jury had two separate models to

19   use for calculating damages if it chose to.  It could calculate

20   them overall or it could calculate them bottom-up.

21          The other thing Mr. Zeller said was that finding out

22   about our plans to advertise or not advertise, the not advertising

23   part, he said was -- that that could be a trade secret was absurd.

24   We disagree with that, too, because knowing what not to spend your

25   money on could be every bit as important as knowing what to spend

Page 30

1   your money on.

2          And if you find out that your competitor, for example,

3   who you think might be coming out with this hot new product

4   actually isn't coming out with it, that's going to effect your

5   advertising plans.  So that made no sense to me intuitively or

6   logically, but apparently we're in disagreement on that.

7          So Your Honor, are there any specific questions other

8   than the ones that the Court has already had for me?

9          **THE COURT:**  Yes.  Check with your colleagues, though,

10  make sure thus far you are satisfied with your argument and if

11  they have any additions, and check with your client for just a

12  moment.  And I have got some questions for you.

13          (Brief pause in proceedings.)

14          **MS. KELLER:**  It's pointed out to me there is more

15  evidence in the record that the jurors could have relied on as

16  well including we have the e-mail from Mr. Bousquette to

17  Mr. Villaseñor -- I'm sorry, Mr. Turetzky where he is

18  congratulating Mr. Villaseñor on obtaining our confidential price

19  list, and just one price list, he said, you saved us a million

20  dollars.  And that was just one isolated price list.

21          So that's a data point from which the jurors could

22  definitely understand that these price lists that were found in

23  Mattel's possession were something of great value.

24          The product sales reports by SKU that Mattel obtained,

25  very important as well.  And the jury asked for that, by the way,

1   that e-mail from Turetzky to Villaseñor and back during

2   deliberations.  They specifically asked for that one.

3            So that's economic data in the record about the product

4   performance from Mattel itself that the jurors could have relied

5   on.

6            Also, the product sales reports by SKU.  Those were

7   invaluable to Mattel.  The brand profitability reports with SKU.

8   Those were in the record as well.  Those could have been relied on

9   by the jurors.

10           There are innumerable data points and bits of

11  circumstantial evidence here, Your Honor, from which the jury

12  could have come up with a rational basis for deciding damages the

13  way it did.  And one of the things that's notable that wasn't

14  mentioned by Mattel is that a number of the jury awards were

15  actually lower than Mr. Malackowski had calculated.  So all of the

16  benefit of the 3.4 million average figure did not inure to MGA.

17           For example, the Bratz Winter Wonderland collection

18  Mr. Malackowski calculated to be worth 5.773 million on his

19  bottom-up analysis, the head-start damages, but the jury awarded

20  2.3 million less.

21           The Bratz Formal Funk collection, Mr. Malackowski

22  calculated the head-start damages to be 6.323 million.  The jurors

23  awarded 3.4.

24           Bratz Motorcycle, Malackowski calculated to be worth

25  4.664 million.  The jury awarded 3.4.

1          Sun Kissed Summer, Mr. Malackowski calculated to be

2     worth 9.164 million.  The jury came up with 3.4.

3          Bratz Diamonds he calculated to be --

4          **THE COURT:**  Just a moment.

5          **MS. KELLER:**  And we have this chart in our brief, Your

6     Honor, at page 41.

7          **THE COURT:**  I know you do but I'm going to carry some

8     notes around with me also.  I have you left off with number 19,

9     Sun Kissed Summer.

10         **MS. KELLER:**  Sun Kissed Summer, Mr. Malackowski

11    calculated 9,164,000 as the damages, and the jury found 3.4.  The

12    biggest differential was probably Bratz Diamonds where he

13    calculated 16,391,000, the jury found 3.4.  And then Bratz Rock

14    Angelz which he calculated at 10,339,000, and the jury came up

15    with 3.4.

16         And it's not really that surprising because they heard

17    Mr. Malackowski testify that it was appropriate to use an average

18    for products for which he didn't have sufficient data to calculate

19    his bottom-up unjust enrichment amounts.  And they also heard him

20    explain that the bottom-up approach was a subset of the top-down

21    approach.

22         So based on that testimony, it's reasonable for the jury

23    to have used the same methodology of coming up with its own

24    average for those products within the top-down approach when there

25    wasn't a matching My Scene product, or they didn't feel that they

Page 33

1   had sufficient data so they could extrapolate.

2           So, ultimately the jury was well within its authority to

3   do precisely what it did in calculating those damages, and did it

4   in a very conservative way.

5           If I could have one more moment.

6           **THE COURT:**  Check with your co-counsel, check with your

7   client.

8               (Counsel confer)

9           **MS. KELLER:**  Then, Your Honor based on their moving

10  papers, we would submit it.

11          **THE COURT:**  Where are the two reports that you have

12  found for me showing the differentiation between 20 and 65?

13          **MS. KELLER:**  The video and the toy fair report.

14          **THE COURT:**  The video and the toy fair report.  I'm

15  going to repeat back what I've got.  9604-15 and 9488.

16          **MS. KELLER:**  That's correct, Your Honor.

17          **THE COURT:**  Second question is, I want you to look at

18  number -- you can work off the verdict form if you want to, but

19  I'll give you a number and a name and I'll give you an example.  I

20  want to take number 16 which is Bratz Petz, found on Page 17 on

21  the verdict form.  And there it's been argued by way of example

22  that the damages that were identified were $245,000.

23          I'll take another example of Mr. Zeller's argument.  18,

24  Dazzling Disco Cafe -- write these down and take your time with

25  the answers -- where Mr. Zeller argued that the damages were

Page 34

1    identified as only $20,000.  Number 20, Girls Nite Out, where the

2    award was over $1 million higher than Mr. Malackowski's

3    calculation.

4          I won't go through all of them, but there is a repeated

5    argument that the calculations of 3.4 were in excess of the

6    specific evidence that pointed to a lower claim.  You pointed me

7    to some higher claims.  That's the first question for you.  Don't

8    answer for a moment.  Just sit down and think for a minute.

9          The second argument was that Malackowski had discounted

10   or dropped a number of these different trade secrets from his

11   head-start calculation.  I'm going to give you some examples of

12   some numbers for just a moment.

13         24, which is Bratz Virtual Buddies Petz.  Number nine,

14   Bratz Petz Assortment.  Just use some examples for the record.

15   These are where specifically it's been argued they were dropped.

16   Number two, Bratz Style Collection, which is number two in the

17   verdict form.

18         Now, that's a repeated argument, and I have just given

19   you three examples.  So how do you respond to those two questions?

20   One is the under calculation -- not the over calculation -- where

21   you claim that the jury used their rational process in arriving at

22   a verdict, and you have got 15 million or 10 million and they were

23   awarded 3.4.  What do you do with the argument that there is a

24   calculation of 20,000, or 245,000, or 2.4 million and the jury

25   reaches a calculation of 3.4 million?

1          MS. KELLER:  I think it's the same answer, Your Honor.

2    The jury is free to reject a higher number.  They're free to

3    reject a lower number.  They're free to use the averaging process.

4    They're free to adopt any rational approach.

5          THE COURT:  Are they free to use the averaging process

6    as to a specific item where that specific item has no basis in

7    evidence for the higher award?

8          In other words, I understand the argument that you can

9    calculate -- or average.  I have no disagreement with that.  It's

10   not my question.  And that is, where the Court is faced with a

11   specific trade secret and there is evidence in the record that the

12   amount is lower, then the Court is confronted with the case law

13   saying that you can average, but a specific example as to one or

14   more trade secrets where the expert has a significantly lower

15   calculation and the jury is using an average, how is that

16   justifiable?

17         MS. KELLER:  We are all assuming that the jury used the

18   bottom-up approach, but we don't know and we're not entitled to

19   know.  It could be that the jury decided to apportion by using

20   some of the top-down figures.  The jury could have done that.  And

21   we just don't know.  But it would be rational to do that just like

22   it would be rational to use a bottom-up.  The jury could have

23   decided to use a combination of a top-down and bottom-up approach.

24   The jury could have decided to apportion --

25         THE COURT:  How do you do that with the same trade

Page 36

1   secret?

2          **MS. KELLER:**  I'm not saying with the same trade secret.

3   There may have been a trade secret that they looked at and said we

4   disagree with the expert.  We think this is worth more.  They

5   don't have to adopt the expert's calculations.  They are free to

6   completely reject them.

7          **THE COURT:**  Okay.  Second, concerning the argument that

8   there is no specific evidence concerning specific access to an MGA

9   showroom in close proximity to the trade secret misappropriation,

10  the argument that I heard, I'm going to repeat back to you, that

11  I'm hearing is, judge, it doesn't matter because it was so

12  widespread in terms of Mattel's going into showrooms that the jury

13  could have, through circumstantial evidence or because of the

14  activity and the continuing activity, reached a rational decision

15  that this was a trade secret misappropriation even without

16  specific evidence.

17         Is that the argument I'll hearing from you?

18         **MS. KELLER:**  Well, if I'm burglarizing houses over a

19  ten-year period, and you come into my house and find a bunch of

20  property that was stolen from your house yesterday at a burglary,

21  I think it's pretty good circumstantial evidence that I probably

22  burglarized your house or at least I very well may have.

23         If you know I did the other burglaries, you can

24  certainly draw the inference that I did this one.  And there is a

25  wide range of circumstantial evidence, but the most damning is

Page 37

1    just finding the evidence in Mattel's files.

2            THE COURT:  So that's the argument I heard.

3            MS. KELLER:  Yes.  I think my colleague would like to

4    add something.

5            MS. HURST:  Your Honor, and there was also one specific

6    example in the record of the circulation of the information either

7    during or right after the toy fair, that was the walk-the-showroom

8    e-mail, and four days later Ms. Fontanella's adoption of corporate

9    goals, including business objectives to titivate particular new

10   product lines targeted to Bratz.

11           There was a four-day gap and Ms. Fontanella admitted

12   under cross-examination that there were numerous direct reports on

13   that memo who would have received the information and undoubtedly

14   would have reported it to her.

15           So in terms of timing between business decisions and

16   receipt of the information, there was one very specific example in

17   the record showing close in time proximate reporting of the

18   information and then specifically related business decisions.

19           THE COURT:  Would you remain there?  I want to get a

20   note from the back in chambers.  Just a moment.  Be right back.

21                 (Brief pause in proceedings.)

22           THE COURT:  All right.  I want to ask you, I have been

23   hearing about this hundred million dollars and the first jury

24   verdict forever, and Judge Wardlaw hit it right on the button.

25   And I don't understand something.  This has become mantra, which

Page 38

 1   apparently it has become gospel.  I'm just curious about this.

 2   The copyright verdict in Judge Larson's court was $10 million.

 3   There was $30 million on the intentional interference with

 4   contractual relations.  There was $30 million on the aiding and

 5   abetting breach of duty of loyalty, which this Court found is not

 6   existent.  And aiding and abetting fiduciary for $30 million.

 7          So the mantra is going up this was $100 million.  Judge

 8   Wardlaw alluded to it a number of times.  Basically what she was

 9   saying, from my interpretation, is where is the trade secret

10   misappropriation.

11          Counsel at that time really didn't have a good answer up

12   in the Ninth Circuit.  Well, that's my opinion.  I'll leave that

13   to the circuit.  How did this come to be $100 million?  Because if

14   the trade secret misappropriation was there, what you would have

15   would be supersession here.  What you would end up with is a

16   $40 million verdict.

17          In other words, if a trade secret misappropriation would

18   have been in the original claim, these three -- well, at least two

19   of them would have been superseded.

20          **MS. HURST:**  Probably all three.

21          **THE COURT:**  Probably all three.  What happened here?  I

22   don't understand how this mantra has grown up.

23          **MS. HURST:**  I think, Your Honor, if I may, the real

24   import of that verdict for where we are today on Mattel's JMOL

25   motion is that MGA consistently argued that the 10 million piece

1   on the copyright claim showed that the jury only found the first

2   generation of dolls infringing.  And the significance of that

3   argument for where we are today was that it was a very strong

4   argument made in connection with the injunctive relief

5   proceedings.

6          And MGA consistently argued that no injunction broader

7   than a first generation -- no injunction should be entered at all,

8   but certainly nothing broader than a first generation doll should

9   be entered because the jury's damages verdict on the copyright

10   claim reflected a judgment on the first jury's part that only the

11   first generation infringed.

12          In response to that position, Mattel consistently said

13   you cannot look behind that 10 million to try to understand what

14   it means.  You can't do it.  And not only did they take that

15   position --

16          **THE COURT:**  That's why I'm raising it.  That's what I

17   read in terms of an argument and now I'm being asked by either

18   party.  By the way, it doesn't matter, by either party.  Whoever

19   the prevailing party is.  And if this was reversed, Mattel would

20   be making the same argument, don't look behind the verdict.

21   Whoever the prevailing party is, is going to take that position.

22   If this was reversed, you would be going through picking through

23   this verdict and saying there is no substantiation.

24          If Mattel would have come back, for instance, on -- just

25   pick a number, number 17, the forecasting inventory which is 7175,

1   your argument would be the same as Mattel's today; and that is, no

2   substantiation.

3          One more question for you.  Can you have a press release

4   and still have a trade secret?  One of the assumptions has been

5   this broad sweeping generalization by both parties during

6   litigation, that, judge, this has been released by the press.

7   Well, no, it hasn't.  The record doesn't substantiate that.

8   Different products have different references, but oftentimes you

9   would have a product that didn't have a picture, didn't have

10  specific information and, therefore, there wasn't this wholesale,

11  sweeping conclusion that, in fact, the product was a release.

12         Now, Mr. Zeller, you have taken the position -- and I

13  want you to respond to it in just a moment -- judge, this was

14  released by the press.  I hear that and I agree with you.  If it's

15  released by the press, it's not a trade secret.  By the same

16  token, it has to be specific.  It can't be we're coming out with

17  something called Bratz Diamonds.  Okay.  Still a trade secret,

18  because the Bratz Diamond doll might have a diamond in the belly,

19  or in the ear, or in the forehead.  I won't go any further.

20  Wherever.  And that's still a trade secret.  The type of stone

21  used, might be diamond, might be whatever.

22         So I'm not certain that the issuance of a press

23  release -- and I'm going to just pick a number.  I'm going to pick

24  number 16 Bratz Petz for a moment.  I may be wrong about that

25  example, but you have used the example a number of times, and you

1   referred me to TX24603-2.  And I want you to respond in just a

2   moment about a press release.  This is the one with the valuation,

3   from your standpoint, of 245,000, so how can we get 3.4 million.

4   Even if we're using an average, judge, at least you should take

5   those and cut those down where there is specific information in

6   the record that doesn't allow an average.

7          So anything else that you want to say on behalf of MGA,

8   then I'll turn to Mattel then turn back to MGA?

9          MS. KELLER:  We also have testimony that never in any

10  press release was FOB pricing included.  Ever.

11         THE COURT:  I understand that.

12         MS. KELLER:  So the press release was controlled by MGA,

13  very limited information, designed to further MGA's aims, but --

14         THE COURT:  I have never seen a press release with FOB

15  anyway.  It's counterintuitive.

16         MR. MCCONVILLE:  Your Honor, if I could just add on the

17  issue of press releases.  Mr. Larian testified that the ultimate

18  value of going to these toy fairs is to see, touch, feel, taste

19  these products.  And if that weren't so valuable, why would they

20  have a convention every year where thousands of people come to New

21  York to view these products if all you simply needed to get what

22  the value of the product was, was a press release?

23         THE COURT:  If I was on Mattel's side of the ledger

24  right now I would argue that regardless of touch, feel, etcetera

25  it's also the opportunity for salesmanship; personal contact with

Page 42

1    the customer.  And there is nothing more beneficial.  You don't do

2    that by video conferencing.

3            **MR. MCCONVILLE:**  The other thing that demonstrates the

4    value in addition to Mr. Larian's testimony is the fact that

5    Mattel sent people year after year after year to enter MGA's

6    showrooms to see, touch, feel, taste the product because the value

7    of the product is knowing how it works and operates.

8            **THE COURT:**  See if you have anymore responses to any of

9    the questions I have asked.  Let me check my notes to make certain

10   at least at this point I don't have anymore questions of you.

11           FOB.  One of the interesting things about this lawsuit

12   is the valuation of the trade secret.  And what is occurring to

13   this Court is different trade secrets have different, let's say,

14   life expectancies or limitations.  FOB pricing might be valuable

15   and might always be valuable as a trade secret.  But the diamond

16   in the belly of the Bratz diamond doll has a very limited trade

17   secret valuation because it's what I call a start-up time.  It's,

18   I produce it, I show it to selected retailers, and then I put it

19   on the market.  So I might two months, four months, six months,

20   eight months, whatever.

21           And I'm not certain how any jury or, quite frankly, any

22   expert can give a finite valuation.  That's why I think the

23   circuit is coming up and has to with the fact that averages are

24   acceptable.  I wouldn't be surprised to see the circuit say lump

25   sums are acceptable.  That this is the rare case where it's been

Page 43

1    sent back by the Ninth Circuit with some demand of more

2    specificity and, you know, 200 trade secrets on one side or

3    whatever number, and 114 trade secrets on the other side.  But I

4    wouldn't be surprised if the circuit took the position that even a

5    lump sum is acceptable.  I don't know that these valuations have

6    to have an average.

7             MS. KELLER:  Well, the one thing we do know is that it's

8    for the trier of fact to determine.  And if we had information on

9    the short shelf life of some of these trade secrets, then that

10   should have been presented to the trier of fact and argued and the

11   trier of fact can make the decision.  But to go back now and

12   second-guess them is not something that we should be doing.

13            THE COURT:  Which is why the circuit is coming up an

14   average.  It's the very best that they could do in this very

15   nebulous field.

16            One more question.

17            Mr. Zeller, have a seat.  We're not done yet with MGA.

18            I want to go back to this question.  Malackowski

19   dropping this from its list and taking, for instance, number two

20   Bratz Style It Collection.  Your point is it doesn't matter.

21   Dropping it from his list means what?  From the head-start?  Does

22   it matter?

23            MS. KELLER:  That wasn't my phrase that he dropped it.

24            THE COURT:  No, no.  It's Mr. Zeller.  I'm asking you to

25   respond to this argument.  Judge, Malackowski dropped number two

Page 44

1   from his list, Bratz Style It Collection, Bratz Petz Assortment

2   number nine, etcetera.  What does that mean?  Does that have any

3   effect other than the head-start, and does that affect top-down?

4          MS. KELLER:  It doesn't have any effect on the ultimate

5   decision the jury makes because they can simply elect on that one

6   to use the top-down analysis.

7          THE COURT:  Tentatively, Mr. Zeller, when you argue, I

8   think that the rational pointed out by Ms. Keller makes a lot of

9   sense concerning what the 3.4 million represents.  I'm going to

10  read it back to you because I want a response.

11         This is Ms. Keller, "What he did when he was analyzing

12  the 26 trade secrets in issue, he had hard data for 22 of them, if

13  the Court remembers.  Before, Mattel simply hadn't supplied him

14  with that data.  So what he did is he took the 74.9 million that

15  he had come up with for the 22, and he divided it by 22.  That

16  gave him 3.4 million. That's what he used for four trade secrets

17  on his bottom-up analysis that he," and I didn't get the realtime,

18  and I apologize.  I think it's that he didn't have enough data

19  from Mattel.  "And so, that's precisely what it comes out to if

20  you divide 74.9 by 22.  You come up with 3.4 million."

21         At the time of the verdict there was a miniscule

22  deviation by the jury.  It was $100,000, if I recall.  And I'm

23  doing that from memory.  I should have gone back and looked at

24  that portion of the record.  But it was $100,000.  It didn't

25  compute, when you both gave me permission to look at it in

1    chambers, when I just went through the math.  Does that make a

2    difference?  And if it does, I want to hear what difference that

3    makes from Mattel's perspective or MGA's perspective.

4         I think I'm done with my questions right now unless MGA

5    has any other responses, and then I'll come back to you after Mr.

6    Zeller.  Anything else?

7         Okay, Mr. Zeller.

8         MR. ZELLER:  In exactly the calculation that the Court

9    has described and that MGA has advocated here, which was analyzing

10   the 26 trade secrets, had hard data for 22 of them, and then took

11   that total and divided it in order to apply that average to the

12   four for which Mr. Malackowski did not have data --

13        THE COURT:  Are we doing the hard math?  Is there

14   100,000 kicking around?  That's what I think it is.

15        MR. ZELLER:  Right.

16        THE COURT:  So they just tacked on the hundred.

17        MR. ZELLER:  Right.  And I think it comes about from the

18   fact that the jury was not -- let me actually back up for a

19   moment, because I think this whole rhetorical point that MGA is

20   trying to make that somehow we're attacking the jury is really

21   inappropriate.

22        THE COURT:  Appropriate?

23        MR. ZELLER:  It's MGA's failing here.  MGA was the one

24   that failed to put the proper evidence in front of the jury.  So

25   the idea that somehow, as Ms. Keller kind of rhetorically

Page 46

 1    constantly talked about, somehow this was anything other than

 2    MGA's failing -- and that's what a JMOL goes to, by the way -- Ms.

 3    Keller is absolutely dead wrong when she says over and over that

 4    the verdict has to be sustained as long as it has some -- as long

 5    as it's not irrational and the other standard she was using, she

 6    is confusing different legal standards.

 7            We're here on a JMOL.  That means that MGA had to have

 8    presented evidence to substantiate its claim as to every element.

 9    There has to be sufficient evidence to prove it as to every

10    element.  We didn't hear about that.  We hear about that's the

11    appropriate standard.  The standard in terms of rationality and

12    the like is on remittitur, not on JMOL.  And we're talking about

13    the sufficiency of the evidence that MGA put in front of this

14    jury.

15            And the reason why those numbers are not sufficient, the

16    damages cannot be sustained as a matter of law, is because MGA and

17    its expert did not provide information to the jury that would

18    allow them even to make the average that they did.

19            THE COURT:  Now, this is going to be an interchange

20    between each of you on the second round, both Mattel and MGA.  I

21    have heard your argument to begin with.  I don't need to repeat

22    it, so here is the interchange.  Well, from MGA's perspective, you

23    resisted discovery and the Court had to order that literally on a

24    Thursday night or Friday night because it hadn't been forthcoming.

25    So Malackowski couldn't make the calculations.  And, in fact, he

1   was ordered to deliver them by Sunday at 6:00 o'clock in the

2   evening for a 9:00 o'clock or 7:00 o'clock hearing.

3           That's going to be their argument to the circuit.

4           **MR. ZELLER:**  And insufficiency is insufficiency is

5   insufficiency.  It does not matter why.  MGA can make those

6   arguments about discovery.  They're false.  I'm happy to refute

7   them.  But ultimately if MGA believes that the real reason why it

8   is that they could not present sufficient evidence to the jury to

9   sustain the verdict as was their burden of proof and as their

10  burden on the JMOL, then they should have made a motion.

11          **THE COURT:**  Okay.  Next question.  What is wrong with

12  averaging?  Case law seems to support it.  In other words, your

13  strongest position -- your fall-back position may be -- well, your

14  strongest position is, judge, you can't average because there is

15  just not sufficient foundation to do it.  It's faulty criteria.

16  Assume hypothetically that you lost that.  Hold on.  You don't

17  know the question yet.  I'm just joking with you.  Now, your

18  strongest position has to be, judge, at least in certain claims

19  you have got specific evidence in front of you that just doesn't

20  justify a 3.4 million.  So regardless of their averaging, you can

21  take four, six, eight claims, where regardless of how you come out

22  on the other arguments, and assuming that you lost of all those

23  other arguments, how can you sustain 3.4 million when there's

24  245,000 direct evidence?

25          That's the fall, fall-back position because you're still

Page 48

1    dealing with millions and millions of dollars.  But that's the
2    argument I'm hearing.

3           MR. ZELLER:  And that is certainly one of them, is you
4    have not heard any basis for MGA to reconcile the application of a
5    so-called 3.4 million average to something such as the Dazzling
6    Disco product where the inadmissible demonstrative itself said the
7    damages -- unjust enrichment was $20,000.

8           THE COURT:  Finally, it's going to sound like I'm
9    chiding you.  And if it does, so be it.  But I'm not.  As soon as
10   I say that, you know I am, like "all due respect."  I'm just
11   kidding you.

12          So let's do this.  The 100 million or 40 million to me
13   is not important concerning Judge Larson's trial.  What is
14   important is how those arguments are swinging, because the
15   argument by Mattel to Judge Larson was the same argument I'm
16   hearing from MGA today.  It's absolutely reversed.  And that is,
17   Judge Larson, you can't look behind these verdicts.  It's
18   $100 million.

19          Now, I'm not the circuit.  Nobody is calling me from the
20   circuit, believe me, and I'm never going to be invited to go to
21   the circuit.  But I just tell you that it's hard to believe that a
22   $100 million verdict would have been sustained by the circuit with
23   no criticism to my very able, young colleague, much just now
24   standing jurist.  But there you have got 10 million on the
25   copyright even if you disagree with my finding on duty of loyalty.

Page 49

1    30 million, fiduciary; aiding and abetting, 30 million, and

2    intentional interference, 30 million.

3          If you had a trade secret misappropriation, Judge

4    Wardlaw was right on the button.  She is focused on it.  And that,

5    we can call it, superseded.  That was a $40 million verdict.  But

6    the mantra has grown up that this is 100 million.  Now, the

7    circuit never examined that.  They never had an opportunity to

8    look at it.  But I'm pretty certain that that was a $40 million

9    verdict and the circuit would have so found eventually if it would

10   have gone on.

11         Regardless of that, even if I'm wrong, Mattel's argument

12   then was the same argument I'm hearing now from MGA.  Judge, there

13   is a rational basis to it.  Now, there, the rational basis

14   apparently was one of the jurors sent a note to the clerk and the

15   note basically said we intended $100 million, and $100 million.

16         So I mean, I love your arguments, believe me.  I'm going

17   to miss all of you.  But tell me now how this has switched around,

18   because you were on the other side of the table in front of Judge

19   Larson making the same argument that MGA is making to me.

20         **MR. ZELLER:**  The issue there on the first verdict was

21   the fact that there were damages on multiple state claims that MGA

22   argued were duplicative.  So this was a remittitur-type situation.

23   It was not JMOL.  It was not judgment as a matter of law.  MGA was

24   arguing that no rational jury could have awarded $100 million, and

25   there was no rational basis to have separate awards of 30 million

Page 50

1    for each of those three state law claims.

2              And what we argued, and Judge Larson agreed was, in

3    fact, there was independent conduct that potentially supported

4    each of those different claims.

5              Now, with respect to the Court's supersession question,

6    MGA -- because, of course, the Court will recall that we had

7    raised Bratz trade secret as a claim potentially before the Phase

8    One trial.  There was back and forth.  We ended up not asserting

9    it because it was supposed to be part of Phase Two.  I'm not going

10   to recite all the history.  But this Court recognized in one of

11   its decisions that one reason to allow us to assert the Bratz

12   trade secret claim is because of the potential for supersession.

13             It would be unfair to say, Mattel, you didn't assert it

14   in the first trial, it's going to supersede your other claims, but

15   now you can't assert it in this case.  As a matter of fact, they

16   raised, MGA raised supersession post-trial, the first trial.  And

17   Judge Larson ended up not ruling on it because it was waived.

18   It's a waivable defense.  It was not raised prior to trial with

19   respect to those state law claims.

20             Now, of course, all that is water under the bridge at

21   this point because of where we are now.  But that explains how,

22   procedurally anyway and historically, we ended up at that point.

23   Fundamentally these are just different motions.  The only

24   similarity would be -- and the only place where that standard

25   would apply from that first post-trial motion is on Girls Nite

Page 51

1   Out, is this duplicative?  That's the only place that standard

2   applies.

3           That's where a rationality or rationality applies.

4   We're talking about JMOL.  And where there is insufficient

5   evidence to sustain each and every element of the claim as a

6   matter of law, it's not remittitur and it's not a rational basis

7   standard.  It's just like summary judgment.  They're the proponent

8   of a claim.  They bear the burden of proof.  They have to put the

9   evidence in to substantiate each and every element.  And they

10  haven't done that, including as to the damages numbers that the

11  jury found.

12          THE COURT:  Why isn't FOB literally almost a carte

13  blanche trade secret?  Explain to me for just a moment -- strike

14  that.

15          I understand that a retailer may get that information

16  and may decide to disburse that in a social situation, in a bar or

17  just to another person, maybe even getting leverage.  I understand

18  that.  But typically FOB seems to be the very kind of information

19  a fortiori it would be a trade secret.  Why isn't it?

20          MR. ZELLER:  Because if it's up to the retailer whether

21  they're shared or not, it can't be a trade secret.

22          THE COURT:  Because they're using it for leverage.

23          MR. ZELLER:  And MGA, by the way, fully understands and

24  expects that retailers may very well disclose that information.

25  It goes to the secrecy requirement and the reasonable steps to

Page 52

1    protect secrecy.

2              If you know that someone is likely to share it, and you

3    have no really legally enforceable way of stopping them from

4    sharing it, it can't be a trade secret in the first instance.  It

5    fails at the threshold.

6              **THE COURT:**  Second question.  I'm now shipping in

7    November, let's say, with an expectation that the toy fair is in

8    New York in February, or Hong Kong -- January.  Hong Kong,

9    January, and then New York, I think, February.

10             And it would seem to me that I have got a very limited

11   time frame.  The first question is, if it's even a trade secret

12   once I start to ship.  I'm going to assume it's in containers.

13   The public can't see it.  Aren't I just talking about what I call

14   start-up time?  Let me see if I can conceptually define it just

15   for me.

16             Aren't I talking about a very brief limited period of

17   time in which I have got the expectation from Mattel's

18   perspective, or MGA's perspective, months at the most concerning

19   the secrecy and then I off-load it at Walmart.  I ship it in

20   November and the packaging gets there in December 2.  Okay.  Now

21   it gets off-loaded.  All the workers see it at Walmart.  Okay.  I

22   still probably have the expectation, though, it is a trade secret.

23   And by the way, I'd like to move it a little earlier because I'd

24   like to get the Christmas season in.

25             I guess if I was shipping 20 million dolls, that that

Page 53

1    secret is valuable even in a limited period of time and might have

2    some substantial damages if my competitor got it because then they

3    could price accordingly for the Christmas season.

4              But what happens if my competitor didn't get it until

5    December 21?  The season is over.  And that's what I can't figure

6    out, frankly.  And I don't know that the circuit or any expert can

7    figure that out also as to what is the true value of this.  If

8    that's the case, then the rationale of the circuit makes a lot of

9    sense in allowing averaging.

10             **MR. ZELLER:**  If I can maybe break that down.

11             **THE COURT:**  Repeat it back to me.

12             **MR. ZELLER:**  In terms of the question of true value, and

13   this is certainly an argument that MGA has been making here, is

14   that in some ways it's impossible.  But that is a different issue

15   as to the quantification of damages.  He has to be sure there are

16   rules that say obviously you don't have to have all damages

17   computed with mathematical precision.  But that's a different

18   issue of whether or not there is value to the information.

19             What Ms. Keller is talking about, and also in this

20   example is looking at the true value of the information does not

21   lead and it's not probative of what the unjust enrichment

22   calculation should be.

23             That's why there is sort of a disconnect here and a mix

24   and match here by MGA that doesn't work.  They're talking about

25   one of the predicates for something to be a trade secret in the

Page 54

1    first place.  It has value.  You don't have to quantify it in

2    order to meet that threshold burden.  You just show it to be

3    valuable to me, and it would be valuable if my competitors had it,

4    and I took reasonable steps to keep it secret.  But then you still

5    have a burden, as a plaintiff in a trade secret, to quantify what

6    those damages are.

7            And I think one thing, Your Honor, is that the issue

8    here is not whether averaging, or lump sum, or reasonable range-

9    type damages could ever be accepted.  We have here a very specific

10   context.  What MGA sought was head-start damages.  That is a

11   specific thing with a specific methodology.  And that methodology,

12   this average total that Mr. Malackowski reached -- by the way, it

13   wasn't in evidence, but let's assume for the moment that it was in

14   evidence in some way that the jury could surmise it -- that

15   average was based on 11 claim trade secrets that the jury found

16   were not trade secrets or were not misappropriated.

17           So that average -- his assumption was rejected by the

18   jury.  That's why that average cannot be applied then to any other

19   trade secrets at all.

20           **THE COURT:**  I'm going to repeat back to you what I just

21   heard so you know I'm tracking and then I want you to correct me.

22           Judge, look, 11 of these that go into the average are

23   just defunct, so how can you have an average that's valid.

24           **MR. ZELLER:**  Correct.  The data points that

25   Mr. Malackowski assumed, namely, these 24 -- I'm sorry, 22 data

Page 55

1  points, 11 of them were rejected.  That means that that average

2  has no basis in evidence.

3        **THE COURT:**  The last question I have then from my

4  perspective, and then I'll turn you loose to argue.  The argument

5  is made, judge, look how fair this is.  It's what I call an

6  equitable argument.  Look how fair this jury was.  They gave 3.4,

7  3.4, 3.4, and we over here on the MGA side of the table hear the

8  245,000.  But don't worry about that, judge, because actually the

9  jury is so fair that there was 15 million and they only give 3.4,

10 and 10 million and they only gave 3.4.

11       And they use the example of Bratz Winter Wonderland

12 5.773 million, Formal Funk, 6.323 million, Bratz Motorcycle 4.664

13 million, Sun Kissed Summer 9.164 million, Bratz something

14 15.39 million, and Rock Angelz 10.399 million.

15       My response if I was on Mattel's side of the ledger now

16 would be, so what?  The end result is, judge, you still have

17 specific evidence on the downward side of 245,000 or $20,000.  And

18 regardless of the average, you have got to take that into account.

19 And even if you average, you ought to take into account at least

20 those four, five or six that we've pointed out that have an

21 undervaluation.

22       Now, that could be significant.  That could be 10-, 12-,

23 $15 million right there.  I don't know.  So is that your fall-back

24 position?  Your real position is, judge, grant the JMOL.

25       **MR. ZELLER:**  And I do agree.  I think what the Court is

Page 56

1    saying that, yes, that is a fall-back position.

2         The other thing I would say about this -- and let's take

3    Bratz Diamonds as an example because that's also one that the

4    Court has raised about --

5         **THE COURT:**  That is Bratz Diamonds.

6         **MR. ZELLER:**  -- about specifically the trade secret,

7    right?  I mean, let's just maybe step back for a moment because

8    the reason why I think there is some, again, mix and matching

9    going on by MGA that's not proper here, is they presented a trade

10   secret chart.  And that trade secret chart claimed that the

11   appearance, operation, play pattern and other aspects of Bratz

12   Diamonds was their trade secret.

13        That chart was never admitted into evidence.  The only

14   testimony and the only evidence that was presented to the jury as

15   to what about Bratz Diamonds was a trade secret at all was Mr.

16   Larian's testimony that it had a real diamond.  That's it.  It

17   wasn't it's on the forehead, it's in the bellybutton.  It wasn't

18   about any other aspect of it.  It was about the fact it had simply

19   a gem.

20        Mattel came out with a competing product.  That's

21   basically their equation.

22        **THE COURT:**  Location is insignificant.

23        **MR. ZELLER:**  Correct.  And they never argued that the

24   location of it either was a trade secret or that that was really

25   the misappropriation by Mattel.  The supposed trade secret was the

Page 57

1   fact of the diamond and then Mattel took an existing product, My

2   Scene Bling Bling and added real gems to it.

3           The problem for MGA is that the only thing, the one

4   feature that they identified as a trade secret was already

5   identified specifically in a press release.  The only information

6   that they claim is trade secret was in the press release before

7   toy fair.  And that's why they're kind of hand waving about the

8   taste of a product, which I don't even want to -- I shudder to

9   think.  But the idea that this touchy-feely stuff is also somehow

10  their trade secret, not even in their chart let alone anything

11  that was ever quantified.

12          Again, there is another disconnect.  They're mixing and

13  matching different pieces of information, but none of them come up

14  with a coherent, cohesive hold to sustain what MGA presented to

15  the jury as being $3.5 million in damages, or even that they're

16  trade secrets.

17          And so the idea that somehow Mattel was benefited and

18  MGA had some detriment, I think was the term that was used, by the

19  jury not awarding 16 million or whatever the number was for Bratz

20  Diamonds as opposed to 3.4 really just falls apart on that alone.

21  The only thing that was identified was a trade secret was not.

22          **THE COURT:**  I'm done with my questions.  I'll turn you

23  loose.

24          **MR. ZELLER:**  What I'd like to do is finish up on a

25  couple of issues I think that are of most interest to the Court.

1         And what I was saying about averaging or a range, the

2    first point I was making is that Mr. Malackowski's average was

3    based on 11 claimed trade secrets that the jury found were not

4    trade secrets or were not misappropriated at all.  So that average

5    does not and cannot apply.  Those data points, those assumptions

6    that Mr. Malackowski made were affirmatively rejected by the jury.

7         **THE COURT:**  What happens if MGA comes back and argues

8    fine, toss out the 11, just take the other 11.  That doubles the

9    average.

10        **MR. ZELLER:**  But that wouldn't be sustained by the

11   record, is the problem for them.  This is the theory they went to

12   the jury on was head-start damages.  That was it.  Head-start

13   damages.

14        And I'll talk about top-down in a moment.

15        **THE COURT:**  I got a C in math, by the way.  So I'm not

16   sure of my calculation.

17        **MR. ZELLER:**  I understand.  But just conceptually.  And

18   as I say, Your Honor, that was what they are presenting to the

19   jury, $3.4 million.  It was a number.  That was the number that

20   they at least said in closing.  Mr. Malackowski didn't actually

21   say it.

22        But the other point I would make about this is there was

23   no testimony by Mr. Malackowski or anyone else that this was a

24   range or average that could be applied to the 25, or in MGA's

25   theory, 26 trade secrets that were found misappropriated.  Even

1   Mr. Malackowski's inadmissible chart only tried to apply it to

2   four other products.  Didn't say anything about being appropriate

3   to apply to other trade secrets other than those four.  There is

4   no record evidence that that can be extrapolated to those other

5   ones.

6         And fundamentally, I think we have to sort of look at

7   the context of what are head-start damages.  Head-start damages

8   are not some amorphous touchy-feely range of numbers.  It is trade

9   secret misappropriated.  Competitor used it to develop a specific

10  product.  That competitor had X number of months advantage than

11  they otherwise would have had for releasing the product.  They

12  made X amount of money for profit during that time period.  This

13  is not some notion how could we possibly calculate these damages,

14  as MGA seems to suggest excuses their failures and deficiencies.

15        **THE COURT:**  What do you do with the argument by MGA --

16  it's a philosophical concern for every Court -- and that is your

17  argument for specificity and their argument based upon

18  reasonableness and jury discretion within that reasonableness

19  standard.  And we're reputed to deal with standards.  The famous

20  standard, I can't define it but I know it when I see it.  You can

21  figure out what one that one is.

22        Another one over in the criminal law side concerning

23  loss is simply the reasonableness of the Court's calculation.

24  It's not the finiteness of figuring out whether you have a $100

25  million loss, or $98 million, or $50 million.  It's the

Page 60

1    reasonableness.  Just ask us to use that kind of standard.

2           It tends to swing that way -- the presumption tends to

3    go with the jury also, and that's what you heard Ms. Keller argue.

4    She got up and said basically, look, as long as it has got some

5    rationality to it, you don't have to figure out exactly what those

6    folks did.  You don't have to be specific because we have to trust

7    the jury.  We have to trust their discretion.  That's our system.

8    And as long as they're not taking just a throw-it-in approach.

9           And she points out that there is a rational about the

10   $3.4 million.  Now, from the circuit's perspective, that's going

11   to be awfully attractive.

12          **MR. ZELLER:**  I would say, Your Honor, I don't disagree

13   with the proposition that obviously that once certain evidence is

14   actually been submitted to a jury that would allow it to exercise

15   its discretion, to exercise its rationality, then, yes, it gets to

16   choose what that number is.  It gets to pick what that is, and we

17   don't look into it.

18          But that's not where we are on this award.  What we're

19   here on this award is because, number one, MGA posited a specific

20   theory.  And even looking at their inadmissible chart, 37189-33,

21   the Court will see there is a head-start column which identifies

22   the time that supposedly for each Mattel matching product was the

23   head-start.

24          These are not random calculations or approximations.

25   This is a specific product.  It is no different than saying, well,

1    one Bratz product made X million dollars, one Bratz SKU.

2    Therefore, I'm going to average that number to all Bratz SKUs and

3    say that they made $10 billion.  That is literally the kind of

4    approach that they're asking the Court to take here and to bless

5    anyway because, again, that average number, as I was saying

6    before, if you were to extrapolate to all 114 products, it comes

7    out substantially larger than what even Mr. Malackowski's largest

8    range was.

9            **THE COURT:**  Let me repeat that to you.  Judge, if you

10   took the 3.4 million and multiplied it 114 million, you'd come out

11   with a number that's significantly larger than Malackowski's.

12           **MR. ZELLER:**  Right.  Even his top-down approach, it

13   exceeds it by something like an order of magnitude of

14   $185 million.  So we know that these numbers do not work.  And

15   that's the big difference here, is that where the numbers simply

16   do not work, it's not question of the juries' rationality.  It's

17   that MGA did not provide the evidence, they just failed to provide

18   that evidence to sustain the damages award that they advocated to

19   the jury.

20           **THE COURT:**  Okay.

21           **MR. ZELLER:**  But fundamentally it's that there is no

22   foundation for the number that they presented to the jury.  And

23   again, I would sort of -- the highlight to this point about

24   Dazzling Disco.  $20,000.  That was even the number advocated by

25   Mr. Malackowski.  There is no way, and MGA has not even offered to

Page 62

1    reconcile how you take a specific calculation for a product which

2    is based on, ostensibly, specific matching product and specific

3    head-start, and then you are quantifying Mattel's profits during

4    that time period.  It cannot be extrapolated to other products.

5            And it makes no sense to say that somehow the jury could

6    disregard that calculation, the only one that was even arguably

7    submitted in this inadmissible demonstrative, and say that the

8    jury was free to pick out a number that was orders of magnitude,

9    multiples of that $20,000 number.  There is no evidentiary basis

10   for it.

11           Just to reiterate, one thing is, of course, our view is

12   that the other reason that the average cannot stand is because it

13   wasn't admitted into evidence.  MGA only presented it through the

14   course of this chart.  There is nothing that Mr. Malackowski

15   testified to about the $3.4 million.  And while I was told that I

16   was -- or Ms. Keller said that I had misstated her closing

17   argument, here is what she said during closing:  "Mr. Malackowski

18   testified that the average amount of enhanced profits Mattel

19   earned by stealing MGA's trade secrets was 3.4 million each as to

20   the other products."

21           He did not so testify.  That is not what he said.  He

22   did not testify to 3.4.  She took it from this chart, a

23   demonstrative that was not admitted into evidence, that the jury

24   was told could not be considered as evidence.

25           And the Court knows the history of why the

Page 63

1    demonstratives were not admitted into evidence.  Ironically

2    enough, Mattel wanted these demonstratives from the experts, MGA

3    took the position they were inadmissible and that's why they were

4    never presented to the jury.

5             THE COURT:  That's not a good record.  No.  That's not

6    true.  You wanted some demonstratives and they didn't.  And they

7    wanted some demonstratives and you didn't.  So now you are

8    referring to the damages, but let's go back to Dr. Aginsky.

9             That swung both ways.  I respect the argument concerning

10   the damages expert, but I don't want the circuit to get the

11   impression that both sides didn't play that game back and forth.

12            MR. ZELLER:  I'm not suggesting it was a game.  We did

13   advocate the admission of demonstratives.  We did advocate that,

14   and MGA said no.

15            THE COURT:  No, you objected to theirs.

16            MR. ZELLER:  We did object to theirs.

17            THE COURT:  You wanted all your demonstratives in but

18   none of theirs.

19            MR. ZELLER:  That's always the ideal, of course.  But in

20   fairness, Your Honor, we did say that -- we did try and move our

21   demonstratives into evidence.  MGA said demonstratives don't come

22   into evidence.  Then they tried to get theirs in and we said what

23   is good for the goose is good for the gander.

24            THE COURT:  I'll never let you create that record.  You

25   know very well that I offered to both of you to get rid of the

Page 64

1   insanity and let both your demonstratives in.  And each of you

2   played the game, frankly, and I'll put that right on the record.

3   And you wanted yours in and objected to theirs, and they wanted

4   theirs in and objected to yours.

5           I'll leave the record with that.  The circuit will

6   figure that out quickly.

7           MR. ZELLER:  You absolutely did offer for both parties

8   just to agree that they come in.

9           THE COURT:  I encouraged you to both to get all these

10  demonstratives in, but also I let you refer to all of them.  And

11  the mistake I made, quite frankly, was allowing your

12  demonstratives in too early.  You know that I regretted that with

13  Dr. -- allowed it in and that was a mistake.

14          MR. ZELLER:  I appreciate the Court's point here.  What

15  I would simply say is that at the end of the day the

16  demonstratives were not evidence.  MGA --

17          THE COURT:  You can refer to them.  I let you both refer

18  to them.  In other words, when you put your expert on the stand,

19  your expert was able to show demonstratives.  They just didn't

20  come into evidence.

21          When they had their expert on the stand, they could put

22  their demonstratives up, but they didn't come into evidence.  So

23  you could argue them.

24          MR. ZELLER:  Mr. Malackowski did not testify in the way

25  that MGA claimed during closing.  It's that simple.

1          THE COURT:  Let's move on to your next point.

2          MR. ZELLER:  There was a broad assertion that there were

3     lots of economic data points about the value of trade secrets.

4     And the fact is that there weren't data points other than what

5     Mr. Malackowski testified to, or what was in his inadmissible

6     demonstrative in a way to quantify those numbers.

7          And that was fundamentally the point I was making

8     earlier about there is a difference between saying trade secrets

9     are valuable versus quantifying what those numbers are.  And

10    certainly a main point of what we're talking here is that there

11    was no evidence to substantiate the quantification of damages that

12    MGA advocated and that the jury adopted.

13         THE COURT:  I understand that.  Let's move on now.

14         MR. ZELLER:  Specifically then they went on to say, or

15    Ms. Keller went to say that the price list document between

16    Mr. Turetzky and Mr. Villaseñor was also something that would

17    substantiate the number that MGA sought.  But, in fact, it is

18    simply not correct, as MGA has claimed, that that price list

19    related to MGA.  There is no evidence of that.  Quite to the

20    contrary, it's clear from the time period it has nothing to do

21    with toy fair.

22         But even more importantly, I would say, is that there is

23    no attempt by MGA to provide a basis as to why a $1 million

24    quantification for a price list in terms of saving Mattel money

25    could possibly translate to $3.4 million, or even an average or a

Page 66

1    lump sum for the trade secrets that MGA sought.  And part of the

2    reason has to do with the fact that, first of all, there is no

3    ratio between those numbers, 1 million versus the other numbers.

4    But also, price lists, by definition, have multiple products in

5    them.  So if anything, that number on a per product basis should

6    be even lower.

7           But there is nothing in the record to substantiate any

8    connection between that e-mail and what MGA claims were the

9    damages that could be properly awarded here.

10          The argument is being made, too, as to circumstantial

11   evidence about Mattel employees getting into MGA's showroom in

12   2005 for the Nuremberg Toy Fair and 2006 for New York Toy Fair.

13   But the fact is she mentioned Plunkett and Rahimi.  But the

14   uncontradicted evidence is that Ms. Plunkett was there only in the

15   2002 toy fair.  There is absolutely nothing to extrapolate her

16   being in 2005 or 2006 let alone half a world away in Nuremberg.

17   There is zero evidence of that.

18          And moreover, there is the notion of somehow that Ms.

19   Rahimi was hired to continue to do this as an independent

20   contractor.  That's not the evidence either.  There is no evidence

21   of that from that time period.  There is a difference between

22   circumstantial evidence and then zero evidence.  The idea that MGA

23   could just simply argue that the conduct is continued and

24   apparently is going to even argue it continues to this day is

25   without any evidentiary basis.

Page 67

```
 1              The law is very clear, that mere conclusory statements
 2     and the like are not sufficient.  The evidence simply does not
 3     support the kind of inference that they're trying to argue, and
 4     particularly given the evidence that shows that from those toy
 5     fairs what was supposedly misappropriated was public information.
 6     Bratz Diamonds was exactly the situation.  The one thing they
 7     could identify was from a press release.
 8              So, there is simply no evidence to substantiate this
 9     kind of adverse inference that they are asking for with respect to
10     the other toy fairs.
11              Another, I think, critical issue here has to do with the
12     difference between misappropriation and the evidence of use.  And
13     this also goes back to the head-start point.  Head-start requires
14     evidence of use of some kind.  There has to be some product that
15     benefited from the head-start.  It is unjust enrichment that
16     somehow Mattel made money by selling a product using the trade
17     secret.
18              The Court will, of course, recall that there was a
19     debate between the parties for jury instructions as to whether or
20     not bare misappropriation without evidence of use or disclosure
21     could be considered trade secret misappropriation.  And
22     ultimately, there is no -- I seem to recall that we generally --
23     we prevailed it could be misappropriation whether or not there was
24     also evidence of use and evidence of -- or evidence of disclosure.
25              But in order to have head-start damages as opposed to
```

Page 68

1    just liability it requires evidence of use.  That's why there had

2    to be a matching product.  There is no question that the Court

3    when it said to the jury, I didn't instruct you to go find

4    matching products.  That was for liability.  That wasn't for

5    damages.  There has to be a matching product.  There has to be

6    something Mattel did to show use in order to get head-start

7    damages.

8            And MGA literally does not address that point at all.

9    Instead, they shifted this argument but how there was no need for

10   matching because it doesn't mean that there wasn't trade secret

11   theft.  Sure.  There could be trade secret misappropriation, trade

12   secret theft, but that does not support the damages numbers for

13   those supposed trade secrets that were taken for which MGA had no

14   matching product, or in which the undisputed evidence shows that

15   it could not have been a matching product in the way that MGA said

16   because either it came out years later, or it came out before.

17           The point about Girls Nite Out and that these were two

18   different reports and different thefts falls for that same reason.

19   This is, again, not an issue of were these duplicative thefts.

20   The issue is are they duplicative damages.  MGA does not point to

21   anything being different products.  That is -- or different

22   matching product, or that Mattel made different products from

23   these two supposed thefts.

24           So again, the issue conflates liability versus the kind

25   of use that is necessary to sustain head-start damages that MGA

Page 69

1    sought.

2           And also, I will note that MGA has, I think, really

3    disavowed its earlier position on the top-down approach.  The fact

4    is, is that now MGA is trying to say that somehow between the

5    bottom -- the top-down and the bottom-up approach, that somehow

6    the jury could divine a number based on what it is that MGA gave.

7    But here is what they said in their brief.  This is their

8    opposition to Mattel's motion.  It is docket number 10563, page

9    53, starting line 12.

10          "The jury did not, in fact, rely on the top-down

11   approach for these non-matched products.  Instead, the jury used

12   the average head-start benefit calculated in the bottom of

13   approach for the products for which Mr. Malackowski had no data."

14          And the reason why MGA had to concede that was, is

15   because Mr. Malackowski's top-down approach assumed theft of 114

16   trade secrets.  The jury rejected 88 of those.

17          So again, we're in a situation where this isn't just

18   simply looking at it and saying well, the jury could have accepted

19   a particular calculation from Mr. Malackowski and backed out of

20   it.  Mr. Malackowski chose to give a calculation which was the

21   so-called top-down approach, assuming all 114 of the trade secrets

22   were misappropriated.  That assumption turned out to be wrong.

23          That is an '02 Micro problem.  In fact, the reason why

24   MGA made this concession in its brief is because if it didn't, it

25   ran right into the '02 Micro problem.  And the problem, as a

Page 70

1    matter of black letter law where a damages expert does not

2    disaggregate lawful conduct from unlawful conduct and there is a

3    simple overall lump sum number cannot stand.  And that's the

4    situation we have here.

5

6    (Whereupon there was a change in reporters and DEBORAH PARKER

7    reported the 6:19 P.M session.)

8

9                              -oOo-

10

11                          CERTIFICATE

12

13          I hereby certify that pursuant to Section 753, Title 28,

14    United States Code, the foregoing is a true and correct transcript

15    of the stenographically reported proceedings held in the

16    above-entitled matter.

17

18    Date:  MAY 26, 2011

19

20    _____

21    MARIA DELLANEVE, U.S. COURT REPORTER
      CSR NO. 9132

22

23

24

25