UNITED STATES DISTRICT COURT

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL, INC., ET AL.,                    )
                                         )
             PLAINTIFFS,                 )
                                         )
        vs.                              ) CV NO. 04-9049-DOC
                                         ) VOLUME 4 of 4
MGA ENTERTAINMENT, INC., ET AL.,         )
                                         )
             DEFENDANTS.                 )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

WEDNESDAY, MAY 25, 2011

6:19 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(714) 542-8409**
**D.PARKER@IX.NETCOM.COM**

```
 1   APPEARANCES OF COUNSEL:

 2       FOR THE PLAINTIFF, MATTEL, INC.:

 3                           JOHN QUINN
                             WILLIAM PRICE
 4                           SUSAN ESTRICH
                             MICHAEL T. ZELLER
 5                           QUINN EMANUEL URQUHART
                             & SULLIVAN, LLP
 6                           865 S. FIGUEROA STREET
                             10TH FLOOR
 7                           LOS ANGELES, CALIFORNIA 90017
                             (213) 443-3000
 8

 9       FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:

10                           THOMAS S. MC CONVILLE
                             ORRICK HERRINGTON & SUTCLIFFE, LLP
11                           4 PARK PLAZA
                             SUITE 1600
12                           IRVINE, CALIFORNIA 92614
                             (949) 567-6700
13

14                           ANNETTE L. HURST
                             ORRICK HERRINGTON & SUTCLIFFE, LLP
15                           THE ORRICK BUILDING
                             405 HOWARD STREET
16                           SAN FRANCISCO, CALIFORNIA 94105
                             (415) 773-5700
17

18                           JENNIFER L. KELLER
                             KELLER RACKAUCKAS, LLP
19                           18500 VON KARMAN AVENUE
                             SUITE 560
20                           IRVINE, CALIFORNIA 92612
                             (949) 476-8700
21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1    ALSO PRESENT:

 2                        JEANINE PISONI
                         MGA ENTERTAINMENT, INC.
 3                       16360 ROSCOE BOULEVARD
                         SUITE 105
 4                       VAN NUYS, CALIFORNIA 91406

 5
                         ROBERT ECKERT, MATTEL CEO
 6                       ISAAC LARIAN, MGA CEO

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1        SANTA ANA, CALIFORNIA; WEDNESDAY, MAY 25, 2011; 6:19 P.M

 2             MR. ZELLER:  As we talked about a little bit

 3   previously, MGA posits as an excuse the discovery issues.

 4             First of all, it is simply incorrect that Mattel

 5   has produced a thousand documents.  Mattel has produced

 6   millions of pages of documents in this case.  We also can go

 7   through chapter and verse about some of these discovery

 8   disputes.  It's never been Mattel's position that it won't

 9   produce discovery unless specifically compelled.  The

10   request that MGA made about these toy fairs sought

11   everything on earth.  These were large, compound, unduly

12   burdensome requests that we objected to.  And, in fact, when

13   the court eventually by virtue of MGA finally raising it in

14   2010 looked at them agreed that they were overbroad.  We

15   ended up producing the evidence that the court believed was

16   reasonable.  And -- but MGA's request were not.  And it was

17   simply not Mattel's position as described.

18             The other thing I would say, your Honor, is that

19   the court has, in fact, been through the documents,

20   including these 35 boxes, along with the Discovery Master

21   and has seen that these documents --

22             THE COURT:  I went through nine of them.

23             MR. ZELLER:  I understand.

24             THE COURT:  And then, Mr. Quinn asked me to stop.

25             MR. ZELLER:  Well --
```

```
 1            THE COURT:  About midnight.  He was getting tired.
 2   Just joking with you.  He asked me to stop.
 3            MR. ZELLER:  And we'll all agree that the court,
 4   of course, has worked extraordinarily hard.  That's why I
 5   say along with the Discovery Master.
 6            THE COURT:  No, I haven't.  I haven't worked hard
 7   enough.  I wish I would have had this case from the very
 8   beginning, day one.
 9            MR. ZELLER:  And Mr. O'Brien -- that's why I say,
10   the court, along with Mr. O'Brien, went through those.
11   There were a few additional documents that were ordered
12   produced as a result of that review which, by the way, MGA
13   did not use at trial, showing that, in fact, this idea that
14   somehow they were denied anything or it was delayed is
15   simply incorrect.  And I also point, your Honor, that MGA
16   itself did not produce until August and September of 2010
17   the documents showing they were getting into Mattel
18   showrooms as well.  As well as, of course, the older
19   evidence that Mr. Larian was asking retailers to obtain
20   priceless catalogs and the like from competitor toy fair
21   showrooms.  So those documents by MGA's own likes weren't
22   produced.
23            The other thing that was clearly just incorrect
24   was the idea that somehow all this only became known to MGA
25   because Mr. Molinski -- and not to deprive him of credit --
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    somehow stumbled upon this.  In fact, MGA was asking

2    questions about Mr. Villasenor going back to 2008.  There

3    were multiple stays of discovery which is another reason,

4    too, why there were delays in terms of productions and the

5    like, stays that MGA sought on phase two discovery, over and

6    over and over.  But MGA has never explained, in fact -- and

7    this has been a sore point, I think, that we have raised

8    with the court several times.  MGA has never explained how,

9    in fact, they knew to even ask about Mr. Villasenor and

10   about market intelligence and the like back in 2007, 2008,

11   when these discovery requests were being made.  It had

12   nothing to do with Mr. Molinski.  He was not even on the

13   case at that point.  But MGA clearly knew.  We certainly

14   know that Mr. Brawer knew, going back to 2004, when he went

15   over to MGA.  So this kind of -- this chronology that's

16   being given about those issues really just doesn't -- isn't

17   correct.

18          But I will also point out that, of course, MGA has

19   made no motion on this.  MGA has not and cannot cite any

20   authority that says whatever discovery issues they think

21   there were excuses them from meeting their burden on a JMOL.

22   And that is the standard of what we're looking at now.

23   They've never made a motion on that subject.

24          I was chastised for supposedly misrepresenting

25   what MGA's concession was about Bratz Mobile.  In fact, what

1    I said and what was correct is, is that MGA conceded that

2    there was no evidence that Bratz Mobile operation,

3    appearance or play pattern were trade secret.  She points to

4    language about FOB, which I did respond to separately, but I

5    did state exactly what their brief stated.

6            With respect to the point about protecting FOB

7    information as being trade secret, as having implications

8    that would -- or in effect that would hinder competition,

9    that was based upon the testimony at trial.  This is a --

10   this is based on the evidence that was submitted at trial.

11   There is nothing to be waived in that respect, and there is

12   no authority that's been cited for the idea that somehow the

13   implications of the testimony at trial cannot be considered.

14   The undisputed testimony was that the retailers use this

15   information to compete.  And to hinder, chill, threaten the

16   ability of retailers to use that information to compete in

17   the marketplace and play manufacturers off one another,

18   which was the purpose as to why everyone agreed it was

19   disclosed, would in fact have that.  There was no

20   substantive response to that point.  So I do think, your

21   Honor, that the idea that somehow just because factually the

22   parties hope or want information to be kept secret, that's

23   not enough to keep something as a trade secret.  There has

24   to be an actual expectation, an obligation, an ability to

25   enforce it that the information be kept secret.  And this is

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1    also the same reason why it doesn't matter even if factually
 2    products are boxed up and put into a container and shipped
 3    out, that merely because it is factually not known to others
 4    that it's still a trade secret.  The point about trade
 5    secret is there has be -- it's based on your expectation,
 6    what do you know.  Once you put it out of your possession --
 7              THE COURT:  I'll tell that to Boeing next time.
 8              MR. ZELLER:  Well, if they put a product out of
 9    their possession into -- well, Boeing is a different
10    situation.  That's obviously a broader notion.  That's not
11    trade secret.  That's national security.  This is trade
12    secret.
13              Once you take a product and you put it into the
14    stream of commerce -- in other words, you no longer control
15    it -- and bear in mind, what the evidence is, is that with
16    FOB once the product is actually given or shipped, it
17    belongs to the retailer.  It's the retailer's product.  MGA
18    knows full well, as any retailer must, that the retailer can
19    did anything it wants with the product at that point.  Now,
20    there may be an exception if there were evidence that
21    retailers were obliged to keep the information confidential
22    once it was put into their possession.  There was no
23    evidence of that.
24              So what MGA is hypothesizing is a hypothetical for
25    which there was no evidence.  Your Honor, the idea that
```

```
 1   somehow you can continue to -- once you interject something,
 2   you give it to somebody else with no expectation, or I
 3   should say legal obligation for that party to keep it
 4   confidential, it remains a trade secret just because the
 5   other party chooses not to disclose it, that's not the law.
 6   The law is, is that it has to be something that is the
 7   subject of reasonable steps to keep it secret.  And that
 8   means that there has to be some obligation on the part of
 9   parties to whom you disclose it.  In fact, I can find the
10   case, but there was a situation which is, in fact, quite
11   comparable here.  Mr. Brawer testified that once you
12   disclose information, whether it's the FOB price, or
13   anything else, to retailers, you're giving it to hundreds of
14   people.  These are very large companies.  There is
15   absolutely no evidence that those hundreds of people who
16   receive that information have any obligation whatsoever to
17   MGA to keep it confidential.  That is what's required.  And
18   there was -- there's a case that I can find the name of it
19   in a moment, but there was a situation where the information
20   was disclosed to hundreds of potential customers, about 190
21   of them signed agreements that they would keep it
22   confidential.  The court said not a trade secret.  At that
23   point there can be no reasonable exception that it will be
24   kept secret, because it's now in the control of somebody
25   else to do with it what they will.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    The other point that was made -- and this is the
2  burglary analogy about MGA about how that's somehow a
3  sufficient basis for finding misappropriation -- that might
4  very well work if we know that that is by definition
5  something that is trade secret, but that's not the record
6  here.  The record here is, is that there's a lot of this
7  information -- the court has said it itself -- it's public.
8  And so they can't just simply say, *Well, there's information*
9  *about MGA that's found in Mattel's file; therefore, it must*
10 *be a trade secret.  Therefore, it's rational and reasonable*
11 *to infer that it must have been stolen by improper means.*
12    That is not substantiated by the record in this
13 particular circumstances where the evidence shows that
14 there's all kinds of press releases, promotion, disclosure
15 by retailers, a number of other sources for which there can
16 be no argument that it is trade secret misappropriation.
17    I'll check with Ms. Estrich as to whether I have
18 anything else and, of course, if the court has any further
19 questions.
20    THE COURT:  Check with Ms. Estrich and your
21 client.
22    MR. ZELLER:  I think that concludes it then, your
23 Honor.
24    THE COURT:  Ms. Estrich?
25    MS. ESTRICH:  He's done a great job.

1          THE COURT:  And MGA.

2          MS. KELLER:  We don't have much more to add, other

3     than it has occurred to me that -- actually, it occurred to

4     one of my colleagues -- if Mr. Malackowski's information on

5     his inadmissible chart that never came in is indeed

6     inadmissible and was never before the jury and was never

7     broken down, then neither were these $20,000 figures or

8     $250,000 figures.  None of that was ever before the jury.

9     And so what the jury had to go on, the most logical way for

10    the jury to behave, the most reasonable and rational way was

11    to average, and that's what they did.

12         THE COURT:  Now, let me raise one other issue with

13    all of you.  First of all, check and make sure that you're

14    satisfied with your arguments.  There's no time limitation,

15    because this is probably the last time I'll engage you.

16         So why don't each of you huddle and see if there

17    is some bright-line dispositive --

18    *(Pause.)*

19         THE COURT:  -- so it will absolutely turn the case

20    respectively in neither of your favor that you've forgotten.

21         MS. KELLER:  Your Honor, I think we're satisfied

22    that we've covered everything we need to cover.

23         THE COURT:  Are you satisfied?

24         MR. ZELLER:  We are.  Now, one more thing.

25    Because of the personal tragedy to one of the counsel and

```
 1   the family and because of the illness to other side at one
 2   time, you started communicating with me on my personal court
 3   e-mail.  I really don't care.  In fact, I let that go on in
 4   this last go-round.  But what I don't want is the accusation
 5   that it's ex parte communication.  So I let that go in this
 6   round, and I was picking up your communications.  In fact,
 7   quite frankly, thought it very helpful.  Thank you.
 8              But I'm a little worried from now on if you use my
 9   personal court e-mail, which is David underscore -- I'm just
10   kidding you.
11        (Laughter.)
12              THE COURT:  I just encourage you to go through the
13   clerk from now on.  I did that because there was a death in
14   the family, and you started communicating.  But, now, your
15   associates for the respective parties are communicating with
16   me and that gets really difficult.
17              So Mr. Zeller, Ms. Estrich, you're always welcome.
18   I'm just kidding you.
19              And lead counsel, Ms. Keller and Ms. Hurst, you're
20   more than welcome to do that.  But let's stop that, because
21   now the associates are coming in, who are writing the briefs
22   and then informing me.  Go to the clerk from this point.
23   That was just a courtesy to make sure, especially on the
24   weekends we kept.
25              Don't mind if I take a little time with you -- oh,
```

1    I'm sorry.  Did you have something?

2            Okay.  Don't mind if I take a little time with the

3    issues.  I don't have a time frame, but I promise you I'll

4    get to it almost immediately.  I just have a full day

5    tomorrow and Friday.

6            MS. HURST:  Can we argue the fee motions tonight

7    as well and then just save exemplaries for the morning?

8            Would that be all right with you?

9            THE COURT:  You can do anything you like tonight.

10   Sure.

11           MS. HURST:  We would like to argue that.

12           THE COURT:  Fine.  Counsel.

13           MS. HURST:  Thank you, your Honor.

14           Just a moment.  Mr. Zeller, is that acceptable?

15           MR. ZELLER:  It is, sir.

16           MS. HURST:  I'm not going to repeat what's in the

17   briefs or what I've already said.  Just going to briefly

18   emphasize a few points on the motions for attorney's fees.

19   Going back to the factors for an award for a successful

20   defendant, I think I've already fairly discussed the reasons

21   why the successful defense of MGA furthered the purposes of

22   the Copyright Act.  And I would just underscore that the

23   Ninth Circuit opinion strongly supports -- the existing

24   Ninth Circuit opinion strongly supports that analysis.

25           The Ninth Circuit previously was concerned with

1   having additional expression, additional options in the

2   marketplace, noted how Barbie, the All-American girl, could

3   be expected to thrive on competition.  And that is really

4   what furthering purposes of the Copyright Act is all about

5   when you're enforcing limitations.

6           To look at the other lead factors as Ms. Estrich

7   has so strongly urged the court, obviously, the degree of

8   success here is very high.  With respect to frivolousness

9   and objective reasonableness, I'm going to treat those as

10  part and parcel.

11          There were many positions taken by Mattel in this

12  case that were objectively unreasonable and either bordered

13  on or were frivolous.  The notion that every product MGA

14  ever marketed, infringed copyrights in Carter Bryant's

15  original drawings, that was unreasonable from the start.

16  Seeking receiverships and court supervisions pursuant to the

17  terms of the copyright injunction on the basis that the

18  copyright verdict was being undermined by a transaction that

19  placed funds into the company with false court filings,

20  declaring that that transaction had been secret and hidden

21  from Mattel, that was objectively unreasonable.  There was

22  never any evidence that Mattel put forward objective

23  evidence of any kind that Carter Bryant made Bratz in a time

24  period other than he testified.  None whatsoever.

25          And the unreasonableness of the injunction

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1   obtained by Mattel has already been confirmed by the Ninth

2   Circuit, the copyright injunction.

3           So there were many aspects of the claims and

4   assertions and positions taken by Mattel in support of its

5   copyright claims in this case that were unreasonable, false,

6   indeed frivolous.  But as carefully explained, no finding in

7   Mattel's favor -- pardon me, in MGA's favor on that point is

8   even necessary for an award of fees.  It favors MGA, but

9   it's not necessary.  And *Fantasy* is a case where there were

10  no culpability factors at all and fees were awarded to the

11  successful defendant.

12          Improper motive, we've discussed at length in our

13  papers.  All of the evidence at this trial and the evidence

14  the jury didn't get to consider from Mr. Brawer's deposition

15  testimony was that this litigation was war waged by Mattel

16  to eliminate a competitor.  And numerous cases -- *Yankee*

17  *Candle* and others cited in our brief -- strongly support the

18  notion that that's a good reason for an award of fees to a

19  successful defendant.

20          With respect to compensation and deterrence, both

21  of those factors strongly favor an award here to MGA.

22  In fact, the fact of the matter is, Mattel has conceded in

23  its briefing all of the factors other than frivolousness and

24  objective reasonableness.  I mean, they haven't really

25  argued anything else.  And they want the court to accept the

 1   notion that just that one factor, even if you assume it

 2   weighs in their favor, which there's good reason to conclude

 3   it doesn't, is a sufficient basis for complete denial of

 4   fees here, given the strength of a showing made by MGA on

 5   all the other factors.

 6            I would just submit, respectfully, your Honor,

 7   that is not consistent with the outcome in *Fogerty*.  It's

 8   not.  There were no capability factors in *Fogerty*, and the

 9   court said that's the point of the evenhanded approach.

10   What they're doing is taking a backdoor to arguing, well,

11   bad faith is still required.  Bad faith and frivolousness

12   are still required for an award of fees to a successful

13   defendant.  That's what they're saying.  They won't say it

14   in exactly that way, because then it would be obvious that

15   what they're doing is flying in the face of controlling

16   Supreme Court precedent.  So they just do it a different

17   way.  They just say, *Well, we weren't objectively*

18   *unreasonable, and that's the only factor we have in our*

19   *favor*.  *But, you know, don't award fees.*

20            And that really does fly in the face of the

21   outcome of *Fogerty* and the whole point of the

22   Supreme Court's opinion in adopting the evenhanded approach

23   and saying, *No, the Ninth Circuit is wrong in requiring*

24   *frivolousness.*

25            Every other factor clearly favors MGA and

 1   respectfully, your Honor, those factors do as well,

 2   especially with respect to motivation.

 3           So I think that then brings us to the issues of

 4   relatedness and apportionment and the reasonableness of the

 5   fees.

 6           MGA -- by the numbers, MGA produced 1,187,715

 7   documents in this case.  There were 426 volumes of

 8   deposition transcripts.  There were 10,000 deposition

 9   exhibits.  10,600 docket entries.  25,000 trial exhibits

10   were identified in advance of trial.  This is just the

11   second time.  49 days of trial.  In the *Oracle versus SAP*

12   case, which went on for half the time and had one trial,

13   there was $120 million fee award.  Where the stakes were

14   comparable to what was at issue here, the damages request

15   was comparable to what was at issue here, you had competitor

16   litigants.  There, you didn't even have David versus Goliath

17   the way you had here.  You had two comparable litigants of

18   approximately the same size.  And there was $120 million fee

19   award in that case.  That's only slightly less than what

20   we're requesting here.  That is a benchmark of

21   reasonableness for the request in this case.

22           Now, Mattel's copyright claim went into the whole

23   history of what happened and when, and it went into MGA's

24   entire business history during its exploitation of Bratz and

25   claimed that all of those facts were relevant to the

copyright claim.  Let's remember the whole story about the whole Bratz origin story was related to the ownership prong. Every product MGA marketed was claimed as a basis for damages either directly because they were infringing or because of indirect profits.  The damages case on the copyright claim made everything MGA ever did a relevant subject of inquiry.  And, boy, Mattel took advantage of that in the massive litigation that they conducted.  And you can't just separate all that out and say, *Well, only, you know, 32 lines of this depo transcript were completely unrelated* when what you're doing is examining a 10-year business history.  It just doesn't work that way.  That's not reasonable, and that is definitely not consistent with the Ninth Circuit authorities that I mentioned earlier, which said the standard for relatedness, especially when you have a high degree of success, as we do here, it's loose. It's not stringent.  It is not reasonable to think that people are going to go through everything they ever did and say, *Well, 20 percent of this deposition was for this, and, you know, these interrogatory responses were for that.* That's not the way it works.

        Mattel has been a prolific Copyright Act litigant. It has cultivated a reputation as such.  It has used its intellectual property to its maximum effect in the courts to support what its expert called here in this trial a legal

monopoly in the fashion doll market.  And if there were ever

a circumstance where the evenhanded standard could be met by

a successful defendant, the evenhanded standard adopted by

the Supreme Court expressly in rejection of a frivolousness

requirement, this is it.  This is the case.

So respectfully, your Honor, I would submit it

would be inconsistent with *Fogerty* not to award fees here.

Certainly, the court has the discretion to award fees and

should do so.  And it will, in doing so, only go a very

small way to compensate MGA for the harms that it has

suffered as a result of this litigation which at bottom was,

is and always has been copyright litigation.

Thank you.

THE COURT:  All right.  Ms. Estrich.

MS. ESTRICH:  I have a lot of papers.

I want to begin, your Honor, by addressing some of

Ms. Hurst's points, some that she made earlier in answer to

the questions and some right now.

Ms. Hurst initially suggested that winning was

enough, provided you could say that your winning served the

purposes of the copyright law and that you didn't have to go

through my factors.  And she cited for this proposition a

Seventh Circuit case, the case of *Assessment Technologies of*

*Somewhere, LLC, versus WIREdata.*  This is a Seventh Circuit

case that's never been followed in the Ninth Circuit.

In fact, there are district courts –– I have one here, the
District of Washington saying –– specifically rejecting this
case, saying it's never been followed in the Ninth Circuit.
This is *Modular* –– M-O-D-U-L-A-R –– *Arts versus Hinterland
Corporation*, a Western District of California.  They said,
*Look, this case hasn't been followed in the Ninth Circuit.*
And it had specific facts that may have made the award
appropriate in that case, but it's completely inconsistent
with *Fogerty*, and we're not going to follow it.

So I think it can fairly be said –– and I can cite
dozens of cases in addition to *Fogerty*, which I'll get to in
a moment, that winning is not enough; that what the Supreme
Court did hold in *Fogerty* was that we need to have an
evenhanded approach.  And it rejected simultaneously both
the approach that said you only get fees if the other side
is acting in bad faith, which had been the approach up to
then in the Ninth Circuit for defendants.  And as for
plaintiffs, you always get fees, basically.  And the court
said you had to be evenhanded.

Now, Ms. Hurst says she cites in reliance on,
basically, one case *Fogerty*, so I'm going to spend a minute
on it.  She says even –– you don't have to consider the
factors, if you've got a case like *Fogerty* where you're
serving the purposes of the copyright laws.  And she says,
*If ever there was a case like Fogerty, it's this one.*

```
 1              I want to quote from Judge Rymer's opinion in
 2     Fogerty, in which she held that attorneys' fees on remand
 3     were warranted.  And she said, in upholding the district
 4     court:  The reasoning upon which it relied -- the district
 5     court -- does lead to compulsory fee awards to prevailing
 6     copyright defendants.  Copyright claims do not always
 7     involve defendant authors, let alone defendant authors
 8     accused of plagiarizing themselves and do not always
 9     implicate the ultimate interests of copyright.  Copyright
10     defendants do not always reach the merits, prevailing
11     instead of technical defenses.  Defenses may be slight or
12     insubstantial.  The chilling effect of attorney's fees may
13     be too great or impose an inequitable burden.  In sum,
14     evenhandedness means we should start with an evenly balanced
15     scale.  And, indeed, the district court and the Court of
16     Appeals in Fogerty both emphasized not only the factors
17     involved but that we were here dealing, as both Judge Rymer
18     and Chief Justice Rehnquist described it, with one of the
19     greatest American rock and roll bands ever.  And that the
20     issue in Fogerty was whether John Fogerty, the lead singer
21     of Creedence Clearwater Revival could use his own musical
22     compositions to further develop his music.  And he got sued
23     by the holder -- in turn, the copyright holder of one of his
24     old songs, who said, Listen, Fogerty, you're using the same
25     music.  You're just changing the words, making up a new
```

```
 1   song.  You know, we really own this underlining song.
 2   Fogerty interestingly enough was indemnifying Warner music
 3   in defending this case.  It went to the merits.  And the
 4   court held that Mr. Fogerty had a right to play his own
 5   music with new lyrics and to allow other musicians to follow
 6   suit.  And if you read, as I'm sure you have, all the
 7   Fogerty opinions, they go on and on about this great
 8   contribution.  I wish I was a Creedence fan.  But this great
 9   contribution, and this terrible loss if swampland rock
10   couldn't be preserved.
11           Let's compare our case, your Honor.  I don't mean
12   to underplay the significance of the interests of the
13   litigants here.  But our case was not decided on the merits
14   of the copyright claim.  Our case, at least, in this court
15   was like Judge Rymer referred to, like the court referred to
16   in the Halicki case, not decided on the copyright issue.  It
17   was decided on the contract issue.  And the decision on the
18   contract issue said, If you want to cover nights and
19   weekends, you better put it in your contract during the
20   period of.  Because at least this jury was not going to
21   infer that the contract covered all such costs.
22           So that if you're looking solely at what happened
23   in this court, it's kind of hard to say it looks like
24   Fogerty.  You know, we're not saving music.  We're deciding
25   who among these folks is going to make the Bratz doll.  And
```

 1    we're deciding on the contract ground.  But I expect

 2    Ms. Hurst would then come back at me and say, *Well, I'm not*

 3    *talking about serving the purposes of the copyright law*

 4    *necessarily just in this court.  I'm talking about our big*

 5    *victory in the Ninth Circuit, right?  Where we won.  We were*

 6    *the prevailing party.*

 7            Now, when I first reread the Ninth Circuit

 8    opinion, not exactly a pleasant experience for me, but when

 9    I reread it the other day, it did strike me that they won on

10    some things in the Ninth Circuit certainly.  They got the

11    thin protection on the sculpt.  We got the broad protection

12    on the drawings.  They got a suggestion that the protection

13    might be limited generationally.  We ended up with the claim

14    that the sculpt might be virtually identical to all the

15    dolls.

16            The court remanded for trial.  In remanding the

17    Court of Appeals said that it was reasonable that we could

18    win on the contract claim; that a properly instructed jury

19    might well conclude in our favor on the contract claim.  And

20    then because it thought we might win on the contract claim

21    and further direction would be required, it went on to

22    address the copyright issues and concluded that we might

23    well win on the copyright claim, too.  We might win for all

24    future generations, but it certainly would be reasonable.

25    And I use the court's exact word "reasonable."

1           And then what did the Ninth Circuit do?  And this
2    may be the most important point I make all day.  As you
3    know, your Honor, when you take an appeal, if one party
4    prevails, the other party has to pay costs.  That's the
5    rules in the Ninth Circuit.  It's the rules of appellate
6    procedure:  Prevailing party pays costs.
7           So you might ask yourself, as I look for the exact
8    words of the rule:  Who is the prevailing party here?  And
9    if you look at the very -- and it's not discretionary.  This
10   is what you do:  Prevailing, you pay.  But the rule says, if
11   it's a mixed result, if both sides win something, then each
12   side pays its cost.  Actually, it's up to the court what to
13   do with costs, if both sides win.
14          And if you look at the very last line of the Ninth
15   Circuit's opinion, what do they say?  Each party to bear its
16   own costs.
17          I don't know how you can -- and I now have the
18   rule in front of me:  *Unless otherwise providing by law, the*
19   *party prevailing on appeal is entitled to appellate costs.*
20   *Specifically, appellant is entitled to costs where the*
21   *judgment is reversed --*
22          THE COURT:  Did you get all that, Deborah?
23          MS. ESTRICH:  Specifically, the rules provide that
24   the prevailing party is entitled to appellate costs.  Citing
25   to a Ninth Circuit case -- and this one we're both going to

have fun with -- *Ninilchik*, N-I-N-I-L-C-H-I-K, *Traditional*
*Council versus United States*, a Ninth Circuit opinion from
2000.  And this is just from the rules.  But 10 colon 303 --
I never know how to say these -- provides mixed
dispositions:  *The judgment is affirmed in part, reversed in*
*part, vacated or modified.  Costs are taxed only as the*
*court orders.  Panels issuing such dispositions should*
*specify whether hand to whom costs are awarded.*

         So if you're looking more broadly at the defense
of the Copyright Act in serving the purposes of the
Copyright Act, then I think you got very big problems here
with the fact that the Ninth Circuit in its judgment as to
the contract and copyright claims that it ruled on, did not
find that either party had clearly prevailed, did not find
that we should bear costs because our position was so
clearly frivolous.  Instead, they plainly considered this a
mixed disposition and specifically ruled that costs should
be divided.

         THE COURT:  Does it make a difference in your
opinion that the Ninth Circuit at that time had you, as the
prevailing party before it, and here you're in a different
position?  You're not the party that's prevailed?

         MS. ESTRICH:  No, because I think the rules quite
clearly say that if the -- that the appellant is entitled to
costs -- that would be MGA -- when the judgment on appeal is

1    reversed.  The appellee -- that would have been us -- is

2    entitled to costs when the appeal is dismissed, or the

3    judgment is affirmed.  So the Ninth Circuit has made clear

4    consistent, frankly, with *Fogerty* that essentially these

5    same rules apply.  My young and able colleague reminds me to

6    cite you to Federal Rules of Appellate Procedure, 39(a).

7            So I think what we get from the Ninth Circuit very

8    clearly is that in terms of the copyright laws, as well as

9    contract law to the extent that it relates, they clearly saw

10   this as a mixed result in which neither party had obviously

11   behaved abusively and in which each should bear their costs.

12   That goes, your Honor, to the reasonableness of our position

13   or unreasonableness.

14           Ms. Hurst suggested that we've conceded on every

15   point but objectively unreasonable.  I don't concede on

16   anything.  I think once you go to the factors -- and I would

17   suggest that MGA didn't want to go to the factors,

18   initially, because they're a little tough on them, but I'm

19   not conceding anything.  I think once you go through those

20   factors -- and as I said earlier, they all do relate in a

21   way to reasonableness, because we're asking ourselves, you

22   know, what do we want to incentivize here with fees?  What

23   do we want to dis-incentivize with fees?  Because there's no

24   automatic right.  It's discretionary.

25           Let me go through each of those factors, since I

1 didn't concede on any of them:  The first one is, is our

2 claim frivolous?

3          Your Honor, their claim -- their argument that our

4 claim is frivolous is based in large part, they say there

5 was no proof of 1998 story.  How could anybody -- we had no

6 basis.

7          Your Honor, the first jury concluded that these

8 drawings were not done in 1998.  You may agree or disagree.

9 But there was certainly a good deal of evidence on this.

10 Frivolous.

11          The Ninth Circuit found our positions both on

12 contract and on copyright sufficiently reasonable that they

13 felt we had a good chance or at least a decent chance to

14 actually win on remand.

15          Frivolous.  We not only won everything before

16 Judge Larson who obviously made some mistakes but whose

17 decisions on both contract and copyright were reviewed

18 *de novo*, so there's no basis to say he was unreasonable, or

19 that he was clearly frivolous in his views.  The circuit

20 obviously disagreed.

21          Your Honor, we survived motions to dismiss and

22 summary judgment with you, which I would submit without any

23 intention of flattery, is not a low threshold.  So I don't

24 know how you argue that claims that were viewed as

25 reasonable by the Ninth Circuit, accepted by one federal

 1    judge, passed summary judgment and motions to dismiss in

 2    front of you are somehow frivolous.

 3            Second point motivation.  We have two successful

 4    companies, well-funded litigation on both sides, including

 5    insurance funds.  I must say I find it a little surprising

 6    to think that we, who were not insured, would think it was

 7    to our great advantage to spend our own money suing somebody

 8    who was insured, if our only goal was some kind of

 9    litigation strategy.  So I would simply say you had able

10    counsel fighting over important stakes for the two

11    companies.  We fought hard.  It was well-funded litigation.

12    But to say that it was brought in bad faith when the claims

13    were objectively reasonable; when you've got two well-funded

14    opponents, when you've got courts, respected federal judges

15    disagreeing on aspects of the claim, simply doesn't pass

16    muster.  But I must make the point again that I made earlier

17    today:  To go beyond on the motivation point anything, or

18    the tenor of what I've just said, that is, to go beyond the

19    facts relied on by other courts that we have successful

20    companies and well-funded litigation, et cetera, and to go

21    down the path Ms. Hurst was suggesting -- we litigate people

22    to death.  We are trying to achieve competitive advantage in

23    doing so -- your Honor, that's right down the road to the

24    antitrust fund.  And I would simply say to your Honor that

25    if we can resolve the fees issue without making --

1    without -- you resolve it without making factual findings

2    which could potentially be preclusive in the antitrust case,

3    then fine.  But if we can't, if resolving the issue of

4    motivation in your Honor's mind requires doing more than

5    what I've just suggested and really delving in to why Mattel

6    sued, et cetera, then we got problems with the antitrust

7    case.  And I would submit that the only way to avoid those

8    Seventh Amendment problems would be to hold in abeyance

9    until your Honor decides how to proceed in that antitrust

10   case.

11              I would simply recommend to the court -- or I

12   enjoyed it anyway -- the decision of the First Circuit in

13   the *Lotus* case, *Lotus versus Borland.*  I asked some of our

14   very able associates to find me the case that looked most

15   like this case.  And the case they came up with was from the

16   First Circuit and it was about this fight between Lotus and

17   Borland about the Lotus 1-2-3 software and who might be

18   infringing whom on that basis.  And the First Circuit in

19   its, I believe, second time with this case, it made me smile

20   because there were four district court opinions.  It went up

21   to the circuit twice.  The Supreme Court affirmed by a

22   equally divided court which had the district judge trying to

23   figure out, you know, what does that mean in terms of fees?

24   And then it went back up to the First Circuit.  And in

25   refusing to grant fees, what the First Circuit said was,

*Look, this has been hard fought litigation for years.  It's*
*gone back and forth.  We have two successful companies*
*engaging in well-funded litigation on both sides.  And we're*
*simply in that circumstance not going to decide.  They're*
*making counterclaims.  One says, you only partially won; the*
*other side says, you only partially won.*

Each of these parties are in a position to bear
their own costs and fees.  The Copyright Act in these
circumstances doesn't require us to provide fees.  These
plaintiffs and these defendants -- successful companies,
insured, well-funded -- had every incentive to make their
cases and defend their cases.  Ms. Hurst said earlier that
if fees were awarded here -- if fees, excuse me, were not
awarded here, then defendants would lose their incentive to
defend their stakes.  It's just not so.  If you are a large
company like Lotus or MGA and you've got, you know, powerful
financial interests, your decision to defend your claims
does not depend on whether three years from now you'll be
awarded attorney's fees.  The real issue in showing
effect -- and I'll get to that in a minute -- that the
courts have recognized over and over again -- is the concern
with impecunious plaintiffs.  They've also expressed some
concern with defendants who were solo, not well-funded.  But
the idea that it required you to give fees now for
Mr. Larian to stand up for himself just doesn't make sense.

1    And, indeed, if we're going to get into motivation and bad

2    faith, which I don't think you can get really get to far

3    into, given the Seventh Amendment, you know, let's be honest

4    here.  Is MGA not litigious?  Is MGA not aggressive in its

5    litigation strategy?

6            I don't want to get into a tit-for-tat here.

7    That's not my goal.  But there is no basis for saying that

8    Mattel's motivation here, unlike MGA's, was in any way so

9    corrupt, or so bad, or so anything.  I should also add,

10   because your Honor may be interested, the *Lotus* case went so

11   far as to say, the First Circuit, *Look, if you've got a*

12   *meritorious claim or a potentially meritorious claim, the*

13   *fact that you're asserting it against a competitor and*

14   *hoping that it will help you in the market is hardly bad*

15   *faith.*

16           Indeed, one can argue that's what public companies

17   are required to do when they make a decision to litigate, to

18   consider not only whether they have a valid claim but

19   whether it makes good business sense to expend their funds

20   in support of it.

21           The third factor is objectively reasonable or

22   unreasonable.  Was our position objectively unreasonable?

23   MGA bears the burden.  I get case after case saying this is

24   the most important factor.  And I think the reason it's the

25   most important factor, is because it does encompass the

1    others.

2           I don't know what more I can point out to you,

3    your Honor, but a Ninth Circuit opinion which specifically

4    says twice that as to the two key issues in this case our

5    position is reasonable.  I don't know what more I can offer

6    you than the results of a first trial where mistakes were

7    made but, certainly, I'm not going to impugn the jury there

8    or here.  The jury took its concerns seriously, found in our

9    favor.  Judge Larson took his job seriously, found in our

10   favor.  The circuit reached a mixed result but was clear to

11   say that our positions both on contract and on copyright was

12   sufficiently reasonable that we might well win and, indeed,

13   even on equitable relief.  It wasn't saying there could be

14   no equitable relief, but only that had it to be more

15   narrowly tailored.

16          The last factor is the compensatory and deterrent

17   purposes -- whether a fee award is necessary for

18   compensatory or deterrent purposes.  Your Honor, I don't

19   know what you want to deter here.  We brought a legitimate

20   claim.  They fought us.  We won.  They won.  This is not the

21   kind of frivolous suit by a, you know, strike suit by a

22   plaintiff with no basis who hopes to exact a settlement by,

23   you know, forcing the defendant to confront the choice of

24   paying a lot in attorney's fees or paying maybe less in a

25   judgment.  It's simply not the case, kind of case where you

1    have to worry about deterrence.

2            Ms. Hurst argues, *Yeah, but what about consumer*

3    *choice?*

4            Your Honor, first of all, consumer choice is not

5    one of the stated goals of the Copyright Act.  It's to

6    protect and preserve and promote the arts.  But this wasn't

7    a question of there will never be another doll on the

8    market.  As the court well knows, the issue here was who's

9    going to make Bratz?  Who owns Bratz?  And who's going to

10   make Bratz?

11           As for apportionment, your Honor, I don't know how

12   you can argue in this case with all 18 claims, with MGA

13   telling us that O'Melveney engaged in fraudulent

14   overbilling; that Skadden was forced to go through all these

15   start-up costs when it became one of 13 firms in this case.

16   We had disqualification motions.  We had stuff related to

17   Mexico and Canada.  We had -- however, the court comes

18   down -- and I would urge that the state law claims did have

19   independent elements -- but however, the court comes down --

20           THE COURT:  Really?

21           MS. ESTRICH:  I would urge it, but --

22           THE COURT:  Loyalty?  See, if there's a trade

23   secret -- I mean, we'll go off the subject.

24           If there was a trade secret misappropriation

25   claim, no, they didn't.  This was a $40 million verdict.

1          MS. ESTRICH:  Oh, I'm not disputing.  I don't

2    think it matters, your Honor.

3          I should add that on the remittitur point, just to

4    be completely honest, the standard on remittitur is whether

5    there is any conceivable basis for upholding the verdict and

6    if there isn't, you take it down.  I must admit, in writing

7    that brief, I thought how am I going to add 30, 30, 30 and

8    10 without somebody saying 30, 30 and 30, maybe the same 30.

9          There is a Ninth Circuit case that was directly on

10   point that supported us very strongly where they had given

11   an absolutely identical instruction about, you know, don't

12   give the same damages twice and blah, blah, blah, or

13   consider each separately.

14         Now, you may laugh.  I'll just do one minute of

15   relief.  In my experience when you need a case like that,

16   you go look at the Ninth Circuit's civil rights decisions.

17   So we found -- I found a great Ninth Circuit civil rights

18   decision in which in an effort to justify punitive damages,

19   they basically said, *You can add anything you want, you*

20   *know.  Maybe the jury sort of meant this, but it wrote down*

21   *this.  Or maybe they were under the impression, even though*

22   *the instruction said exactly the opposite, that they could*

23   *add things up.*

24         One might question whether that particular case

25   was affected by the civil rights context.  But it was good

1    authority which Judge Larson felt that given the identity of

2    issues and the exact same instructions what was he to do.

3    But *Entertainment Research* is a case I would commend on this

4    point.  *Entertainment Research*, Ninth Circuit, we're citing

5    it a lot.  You had two copyright claims -- actually, there

6    were three claims, copyright claims.  The other side won on

7    two.  You had all these contract claims, state law claims.

8    Believe it or not, the court said, You must apportion.  And

9    at least, on our view, all you get for attorney's fees is

10   fees from these particular two copyright claims as to which

11   they introduced no evidence at all.  And the court was very

12   clear, *You must apportion.*

13           *U.S. versus A Lot of Money Seized from the Bank of*

14   *America* is another such case.  You must apportion.  And as I

15   said earlier today, your Honor, even if you can't do it

16   perfectly right, even if the state of the evidence as

17   Ms. Hurst says, you know, how much time of that deposition

18   was copyright, how much time was custody, how much time --

19   the court has got to make an estimate.  Discovery Master has

20   got to make a estimate.

21           Now, we would submit that you don't even get this

22   far.  Because Ms. Hurst says if ever there was a case for

23   attorney's fees, this is it.  I would say, you lose on all

24   four factors.  You didn't get to the merits.  You've got two

25   well-funded defendants.  You've got objectively reasonable

positions.  You've got the Ninth Circuit saying you might be

right.  You've got the Ninth Circuit saying no one prevailed

and costs should be split.  I think this is a case for no

fees.  But should the court disagree, then two things are

perfectly clear:  One is that we have a right to view and

challenge the timesheets.  I don't know if your Honor looked

at the timesheets we were given.  But every single

description -- I didn't even bring them with me today

because they were too heavy and added no value.  Every

single description is blocked out.  Courts have repeatedly

held in the Ninth Circuit that not only the court but also

the other side has a right to review timesheets to make sure

that time is properly allocated to the claims for which

attorney's fees are appropriate.  Indeed, I was very

surprised to find that there is substantial authority that

says when you put your billing records and you seek fees and

put your billing records at issue, it's considered an

implied waiver of any privilege.

Now, I will say that was not intuitively obvious

to me.  But, in fact, there is substantial authority which

we've quoted in our brief -- and I happen to read a case

last night from the Ninth Circuit, *MGIC v. Weisman.*  That's

W-E-I-S-M-A-N, 1986, that said very clearly -- in that case

the judge had engaged in in-camera review of the billing

records and reached his decision based on that.  And the

losing party, as it were, the non-prevailing party appealed to the Ninth Circuit and said, *We never get to see the bills, you know.  This is just in camera.  We need to see the detailed records.*

And literally, this is the quote:  *We see no reason now that the case is over why timesheets should not be turned over, period.*

You could read that case to say you don't even get privilege.  If you don't want to go that way, then it's absolutely clear that any redactions have to be strictly limited.  That's our fallback position.  Our main position would be:  You put your billing records at issue.  The case is over, you know.  You want fees.  Show us the billing records.  And, indeed, it seems the Ninth Circuit at least has seemed to say that as have other courts.  But at the very least, your Honor, we need to see enough so that we know we're not being charged for O'Melveney's fraudulent overbilling, or Skadden's duplicative work, or any of the 13 other firms who were involved with the seamstresses, or Omni disqualification motions.

Entertainment Research, by the way, had an intentional interference with contract claim and a breach claim that were not related to the underlying copyright claims, even though someone might consider them to have a related nucleus of facts.

1          Your Honor, when it came to billing us, all we

2    could tell from the records -- we couldn't tell what anybody

3    did.  But what we could tell and what we got from

4    Mr. Schultz' declaration was that Skadden had no separate

5    matter numbers, so they throw it all in to the copyright,

6    the application.

7          O'Melveney and Orrick, it turns out, had basically

8    two matter numbers:  One for their offensive or affirmative

9    claims, which they've hit us up all of which for CUTSA and

10   the other the defensive claims.  And for O'Melveney and

11   Orrick, they took every penny for the defensive claims, even

12   though they all weren't copyright.

13         You know, we had Ms. Brisbois.  They hit us with

14   all the defensive claims money.

15         And for Ms. Keller, she only had one matter

16   number, so we got hit with all of that.  You just can't take

17   all your defensive claims, including unspecified claims, and

18   say, *Those are all copyright.  And all the affirmative*

19   *claims, That's this CUTSA case we brought on August the*

20   *10th.*

21         The effort to force Mattel to what would be a

22   virtually unprecedented attorney's fees award, based on a

23   contract victory here, a Ninth Circuit opinion saying this

24   is all reasonable, no frivolousness, no bad faith, two

25   well-funded defendants -- two well-funded parties cannot be

1    justified.

2          Ms. Hurst points to one award that's even ballpark

3    comparable.  And when I say "even ballpark," I found one

4    study after *Fogerty* in the UCLA Law Review, that finds after

5    *Fogerty*, prevailing defendant's average award of costs and

6    attorney fees, $107,000; the median, $30,000.

7          They're seeking about 1,500 times larger.  And the

8    one case they cite to you is that *Oracle* case.  They say,

9    *Look, here the fee award was $120 million.*

10         What they haven't told you and, perhaps, weren't

11   aware of, is that that was an agreement between the parties.

12   In other words, the two parties got together.  SAP didn't

13   want to see a punitive damages award, because they were

14   afraid of punitives.  So it was announced as an agreement

15   between the parties, November 8th, 2010, that they would

16   agree to pay the attorney's fees of $120 million in exchange

17   for the other side not seeking punitives.  I do not think --

18   there was no federal district court that went factor by

19   factor and reviewed bill by bill and said, *We're applying*

20   *the Ninth Circuit standards and here are the factors.  And*

21   *I've reviewed these bills.*

22         It was an agreement by the parties, and I don't

23   think it provides a basis here for awarding attorney's fees

24   at all but certainly not a basis for the kind of numbers

25   that were put on the table.

1          As I said earlier, we got to see this stuff.

2    We're operating in the dark.

3          Now, I would like to just briefly address two

4    other issues so that Ms. Hurst and I can be done with fees.

5    The first issue relates to billing records.  Your tentative

6    decision was that they don't have a right to our billing

7    records.  I think that's clearly right, you'll be surprised

8    to hear.  Our billing records aren't comparable, as the

9    court pointed out.

10         And not only are they not --

11         THE COURT:  Just a moment.  Let me ask you a

12   question.

13         MS. ESTRICH:  Sure.

14         THE COURT:  Let's assume that I hold to that

15   tentative concerning your billing records, that they're not

16   comparable.  Are the general rates comparable?  In other

17   words, the circuit directs me also to a second factor I've

18   been waiting to address when we got to this point with you

19   and that is, while there is a strong argument concerning

20   your billing records not being comparable, there is

21   direction from the circuit concerning the legal community in

22   which we operate in.  Los Angeles is far different than

23   Boise, Idaho.

24         Are your rates in a redacted form of relevance to

25   the court?

```
 1              MS. ESTRICH:  It would be -- I'm sorry, your

 2    Honor.

 3              THE COURT:  I'm sorry.

 4              MS. ESTRICH:  It would be of relevance if we were

 5    challenging their rates, but we're not.  I'm not going to

 6    concede.  But if I were saying that Annette's rates were too

 7    high, it would certainly be fair to say, you know, whose

 8    standard?  What are your rates?

 9              If I were saying --

10              THE COURT:  We're past that issue then.

11              MS. ESTRICH:  Right.  And let me just take it one

12    more step.  I'm also not claiming that they spent too much

13    time on legitimate tasks.  In other words, if the essence of

14    my objections were that her rates are too high and Molinski,

15    here, spent too much time on that SJ motion, then you might

16    well ask me, Well, what are your rates and how much time did

17    you spend?

18              But our challenge involves neither of those

19    factors.  And given that what we're challenging here is not

20    the hourly rates and not the fact that they spent too much

21    time on particular tasks and some tit-for-tat of who was the

22    fastest writer.  But rather we're claiming that much of

23    these, a good part of these fees do not relate to work for

24    which attorney's fees can be imposed under the Copyright

25    Act.  And I should say some courts have said, Well, even
```

1  *apart from the rates --* or how much time I spent versus how

2  much time Mr. Molinski spent --  *why isn't it a good measure*

3  *of what somebody thinks a case is worth to just compare*

4  *overall how much did you spend versus how much did they*

5  *spend?*

6         And interestingly enough, the Ninth Circuit in the

7  *Ferland* case, F-E-R-L-A-N-D, said, *You know, that's a nice*

8  *temptation.  But even in simple cases, even in noncomplex*

9  *cases, maybe one or two claim cases, there is no necessary*

10  *basis for assuming that the parties are in comparable*

11  *positions or that the spending of one should determine the*

12  *appropriate fees as to the other.*

13         So as for our bills, at this point, given that

14  we're not challenging ours, given that we're not challenging

15  rates, given that our bills really aren't comparable -- I

16  was talking to Mr. Zeller about how we bill and block

17  billing.  And to be perfectly honest, we bill lots and lots

18  and lots of aspects of our representation of Mattel under a

19  single number.

20         Now, if we were seeking our fees, we would have to

21  divvy it up somehow and if we couldn't divvy it up, the

22  court would have to.  But at this point in time, knowing

23  what our block billing rates are, or our block billing

24  totals offers you no information really that's of much value

25  here.

```
 1              The final issue I would like to address and only
 2    very briefly is the fee application under CUTSA, because MGA
 3    has not only sought fees for its defense of its copyright
 4    claim.  It has also sought fees for its toy fair success.
 5    And I would just like to make three quick points here.  As
 6    Ms. Hurst and Ms. Keller have both acknowledged, they won 22
 7    and lost 88.  So if we're going to do fees on CUTSA at
 8    all --
 9              THE COURT:  26 and 88.
10              MS. ESTRICH:  26 and 88.
11              THE COURT:  Mr. Zeller, 25.  So 26 and 88.
12              MS. ESTRICH:  I decided to defer to the court on
13    this point.  I'll give them 26 for the sake of argument and
14    take 88.  The claim was brought, your Honor, as you
15    remember, in August 2010.  When they brought it, they said
16    we need a lot of discovery because we've not done anything
17    on this claim.  And we said, *Oh, no*, *you've raised* --
18              Oh, no, it's our new claim.  We've only been able
19    to recently find out about this.
20              They're charging us three years of fees, Orrick
21    is, for a claim that's less than a year old, which is
22    probably not as bad as O'Melveney for which they want six
23    years of fees.  And they weren't even around when this claim
24    was brought.  Now, I would argue, once again, that they
25    aren't entitled to fees at all.
```

1           Look, they won 22 or 26.  We won on 88.

2           I would refer the court to our new favorite case,

3     *02Micro.*  In that case, both sides wanted fees.  Well, the

4     first side came in for fees and then the other side said,

5     *Well, we want some, too.  So if you're going to give them*

6     *fees, you've got to offset it by our fees.*

7           Claims had been changed.  They had won four.  Lost

8     seven.  Partial success.  There was a willfulness finding.

9     Punitive damages were even awarded.  But the court said,

10    *Come on.  No fees to anybody.*

11          *We've got a mixed situation where we've got some*

12    *winning and losing claims in a hard fought case.  We're just*

13    *not going to grant fees at all.*

14          But again should you decide to grant fees on

15    CUTSA, you can't grant fees for work done in 2005 for a

16    complaint that they made in August 20010 and literally said,

17    *You got to give us a lot of discovery, Judge.  We haven't*

18    *been looking at this.  We didn't even know about it.*

19          Now, their one answer in their briefs is that

20    their UCL claim in 2005 caused Mattel to stop these

21    nefarious doings.  Well, first of all, no evidence in the

22    record to support that.  Second of all, MGA's own counsel

23    took the position that that claim did not include the toy

24    fair allegations.  So what MGA is left with and really their

25    only argument is that, okay, the claim wasn't brought until

```
 1   August 2010 and these other claims are actually different.
 2   But we've got to reverse fruit of the poisonous tree.  As
 3   your Honor knows, this is the only way I can think of to
 4   describe it.  In criminal law, we have a poisonous tree and
 5   it's fruit.  Here they say, *Well, the only way we got the*
 6   *fruit in effect was by tracing it back to the tree.  So that*
 7   *everything we did leading up to making this claim is*
 8   *compensable.*
 9           Your Honor, we couldn't find a single case and
10   Mattel -- excuse me, MGA cites none for the proposition that
11   all the work you do on other claims for which you discover
12   new facts, you're entitled to receive attorney's fees from
13   the other side.
14           I would simply conclude by saying that what MGA is
15   seeking here is a truly extraordinary award, much of which
16   would probably go to insurance companies, raising issues as
17   to the compensatory purpose.  But in any event a truly
18   extraordinary award of attorney's fees as between two
19   parties, neither of whom were chilled, neither of whom were
20   going to be chilled as your Honor can well imagine, if you
21   send us back to look at these records, we will be at it on
22   both sides.  We are vigorous.  These parties are well
23   represented.  This is not a case where you need to worry
24   that the defense won't defend itself, or a plaintiff won't
25   be able to support itself with an award of fees.
```

1           Fees were not intended to be the rule.  Fee

2    shifting was intended to serve the purposes of the

3    Copyright Act.  And the only case that MGA really relies on,

4    the *Fogerty* case, is so factually distinct from this one

5    that I would argue that for every factor in *Fogerty* we got

6    the opposite fact and given that the only fair conclusion

7    here is that each side should pay its own fees.

8           Thank you very much, your Honor.

9           THE COURT:  Now, just a moment.  We'll go off the

10   record for just a second.

11       *(At 7:35 p.m., proceedings were adjourned.)*

12

13                        -oOo-

14

15

16

17

18

19

20

21

22

23

24

25

47

```
 1                          CERTIFICATE

 2            I hereby certify that pursuant to Section 753,

 3    Title 28, United States Code, the foregoing is a true and

 4    correct transcript of the stenographically reported

 5    proceedings held in the above-entitled matter and that the

 6    transcript page format is in conformance with the

 7    regulations of the Judicial Conference of the United States.

 8

 9    Date:   May 26, 2011

10

11

12                          _____

13                          Deborah D. Parker, Official Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*