**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

- - - - - - -

MATTEL, INC., ET AL.,                )
                                     )
          Plaintiffs,                )
                                     )
     vs.                             ) No. CV 04-9049-DOC
                                     )
MGA ENTERTAINMENT, INC., ET AL.,     )      Volume 1 of 2
                                     )
          Defendants.                )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Motions

Santa Ana, California

Thursday, May 26, 2011

Jane C.S. Rule, CSR 9316
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-7755

11-05-26 MattelV1

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART & SULLIVAN
               By:   JOHN B. QUINN
5                    MICHAEL T. ZELLER
                     SUSAN ESTRICH
6                    Attorneys at Law
               865 South Figueroa Street
7              10th Floor
               Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   THOMAS S. MC CONVILLE
12                   Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             - AND -

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   ANNETTE L. HURST
17                   Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700
19
               - AND -
20
               KELLER RACKAUCKAS, LLP
21             BY:   JENNIFER L. KELLER
                     Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10610   Filed 05/27/11   Page 3 of 94   Page ID #:321253
CV 04-9049-DOC - 05/26/2011 - Vol. 1 of 2

3

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3    Also Present:

 4            ISAAC LARIAN, MGA CEO
              ROBERT ECKERT, Mattel CEO
 5            RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan
              KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe
 6            WARRINGTON PARKER, Orrick Herrington & Sutcliffe
              MELANIE PHILLIPS, Orrick Herrington & Sutcliffe
 7            FRANK RORIE, Orrick Herrington & Sutcliffe
              DIANA RUTOWSKI, Orrick Herrington & Sutcliffe
 8            DENISE MINGRONE, Orrick Herrington & Sutcliffe
              JEANINE PISONI, MGA Attorney at Law
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 10610   Filed 05/27/11   Page 4 of 94   Page ID #:321254
CV 04-9049-DOC - 05/26/2011 - Vol. 1 of 2

4

1                        **I N D E X**

2

3

4    MGA PARTIES' MOTION FOR JUDGMENT OF MATTEL'S INTENTIONAL
     INTERFERENCE WITH CONTRACT AND UNFAIR COMPETITION CLAIMS
5
     MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW RE MGA'S
6    CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO
     FEDERAL RULE OF CIVIL PROCEDURE 50(B); AND ALTERNATIVE
7    MOTION FOR REMITTITUR AND/OR NEW TRIAL

8    MGA PARTIES' MOTION FOR EXEMPLARY DAMAGES AND FEES PURSUANT
     TO CALIFORNIA'S UNIFORM TRADE SECRET ACT, CAL. CIV. CODE
9    3426.3, 3426.4

10   MATTEL'S MOTION AND MOTION TO STRIKE AND CONFIRM WAIVED THE
     MGA PARTIES' UNTIMELY OBJECTIONS TO MATTEL'S PROPOSED
11   FINDINGS OF FACT AND CONCLUSIONS OF LAW RE MGA'S UNFAIR
     COMPETITION CLAIM
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:04-cv-09049-DOC-RNB   Document 10610   Filed 05/27/11   Page 5 of 94   Page ID #:321255
CV 04-9049-DOC - 05/26/2011 - Vol. 1 of 2

5

```
 1              SANTA ANA, CALIFORNIA, THURSDAY, MAY 26, 2011

 2                          VOLUME 1 OF 2

 3                          (7:10 a.m.)

 4              THE COURT:  Okay.  We are back on the record.  All

 5    counsel are present.  The parties are present with the

 6    exception of Mr. Larian, who should be here.  The Court is

 7    going to start regardless.

 8              All right.  Now, counsel, let me propose three

 9    other questions that I thought of last evening, since I had

10    a little bit of time after you left, and I want to thank all

11    parties for their courtesy.

12              First, the -- on the -- concerning the argument on

13    motions for judgment as a matter of law on the JMOLs, I want

14    you to finish your argument concerning attorneys' fees, but

15    I want you to come back and discuss three questions.  First,

16    is there a consensus that I should enter judgment against

17    Mattel on its intentional interference with contractual

18    relations claims because it is time barred?

19              (Mr. Larian entered the proceedings.)

20              THE COURT:  And Mr. Larian is here.

21              Second --

22              And good morning, Mr. Larian.

23              -- if certain trade secrets are similarly

24    situated, for example, shown in the same showroom or to the

25    same retailers, can a fact finder consider general proof
```

1    that such similarly situated trade secrets were valuable and

2    subject to reasonable efforts to maintain secrecy?

3             And third, and I think that the standard of review

4    needs more discussion, I want you to discuss with me the

5    following:  How should the Ninth Circuit's substantial

6    evidence standard be balanced against the Ninth Circuit's

7    rule that judgment should be entered against the party that

8    prevailed if, quote, "The evidence permits only one

9    reasonable conclusion, and that conclusion is contrary to

10   the jury's verdict"?  And I cite Josephs v. Pacific Bell at

11   443 F.3d 1050, Ninth Circuit 2006.

12            And I'd like you to discuss with me -- identify

13   the key authorities and language from those cases that

14   should guide my review of the jury's verdict.  Now, the

15   reason for that is you've each proposed various theories,

16   various ideas, but, of course, I needed to make certain that

17   it comports with the law in terms of whatever my reasoning

18   process is.

19            So, once again, Mr. Zeller, let me remind you that

20   there's no time limits today.  If there is something you

21   thought of last evening, you are not being pushed into a box

22   in terms of time.

23            MR. ZELLER:  Could you just, to make sure I fully

24   have it, repeat the third question?

25            THE COURT:  Oh, absolutely.  In fact, let me

1    repeat all three.

2            First, should I enter judgment against Mattel on

3    its intentional interference with the contractual relations

4    claim because it's time barred?  Is there a consensus on

5    that between the parties?

6            Second, if certain trade secrets are similarly

7    situated, for example, shown in the same showroom or to the

8    same retailers, can the fact finder consider general proof

9    that such similarly situated trade secrets were valuable and

10   subject to reasonable efforts to maintain secrecy?  Third, I

11   want to talk to you or have you discuss with me a little bit

12   concerning the standard of review.

13           How should the Ninth Circuit's substantial

14   evidence standard be balanced against the Ninth Circuit's

15   rule that judgment should be entered against the party that

16   prevail if, quote, "The evidence permits only one reasonable

17   conclusion, and that conclusion is contrary to the jury's

18   verdict?"  And I cite Josephs v. Pacific Bell, 443 F.3d

19   1050, Ninth Circuit 2006.  I want you to identify the key

20   authorities for me and language from those cases and help me

21   in my review of this jury's verdict.

22           Now, finally, there is no time limits.  I'll worry

23   about my own schedule later on.  I've got a couple of

24   criminal pleas I need to take at 7:30.

25           And, Mr. Levine, we'll take your matter.

Case 2:04-cv-09049-DOC-RNB   Document 10610   Filed 05/27/11   Page 8 of 94   Page ID #:321258
CV 04-9049-DOC - 05/26/2011 - Vol. 1 of 2

8

1       And Julie, just bring the prisoners up when the

2   marshals have them, okay?

3       And, second, I asked the discovery master to come

4   back because he's making an initial recommendation to me,

5   and I -- I thought that the discussion last evening was

6   extraordinarily helpful and very good, and I'm sorry I

7   didn't invite him back last evening.  I think that we all

8   thought we were done with that after the initial go-around

9   and we weren't.

10       So, Jane, I'm going to need a transcript from

11   yesterday's.  I know this is a daily, but I need a copy to

12   go to the special master, Mr. O'Brien, from yesterday's

13   discussion.

14       You can repeat any points because I don't want the

15   Court to have some divergent thoughts initially and go down

16   one road.  By the same token, I'm not, as you know,

17   willy-nilly at adopting the special master's findings, so I

18   think it's helpful that he hears the same arguments that

19   have occurred.  That way I've got two independent analyses,

20   his and, of course, mine.

21       But we're hearing the same arguments, and I don't

22   think he was able to be here last evening with us.  He was,

23   but he didn't know that we were going back to the arguments

24   concerning attorneys' fees.

25       So let me go back to Mr. Zeller for a moment

CV 04-9049-DOC - 05/26/2011 - Vol. 1 of 2

9

1   before I turn -- any other thoughts that you had concerning

2   your arguments last evening?

3          MR. ZELLER:  No, not concerning those, your Honor.

4   I think the first two questions I can address, and then if I

5   could defer the third to a little later --

6          THE COURT:  Sure.

7          MR. ZELLER:  -- to give us an opportunity to pull

8   the cases and identify some of the appropriate language.

9          THE COURT:  Sure.

10         MR. ZELLER:  As to the first question, certainly

11  on Mattel's part, we -- we do agree that based upon the

12  jury's verdict that the JMOL on Mattel's tortious

13  interference claim by MGA should be granted on the time bar

14  grounds.  Obviously we don't waive our objections to the

15  verdict in that score, but in light of the findings made by

16  the jury, we -- we submit on that.

17         THE COURT:  Reserving all issues for appeal, et

18  cetera.

19         MR. ZELLER:  Correct.

20         THE COURT:  Okay.

21         Counsel, your thoughts.

22         MS. KELLER:  We agree.

23         MS. HURST:  Yes, that judgment should be entered

24  and on the 17200 claim as well, dismissing that claim of

25  prejudice.

```
 1            THE COURT:  Concerning similarly situated trade
 2    secrets, do you have any thoughts or would you like to
 3    reserve the argument until later?
 4            MR. ZELLER:  Well, on that the -- certainly
 5    hypothetically a fact finder could in appropriate
 6    circumstances where trade secrets were, in fact, similarly
 7    situated rely on such evidence, but here, in fact, we know
 8    that the jury did not and could not have relied upon them.
 9    Number one is --
10            THE COURT:  Mr. Larian and Mr. Eckert, I'm not
11    offended by a Blackberry, so if you have business to
12    conduct, don't be concerned.  I know they are trying to get
13    ahold of you.  You both have major corporations to run, for
14    goodness sakes, so don't tune in; it's not going to bother
15    me a bit.
16            I'm sorry, Mr. Zeller.
17            MR. ZELLER:  There were two -- the evidence showed
18    without dispute that there were two key distinctions, and
19    probably more, but two that I'll focus on at the moment as
20    between different alleged trade secrets, namely these
21    products that were being shown, and also even within
22    particular trade secrets that were alleged, the Court is
23    aware that there was evidence that even those features were
24    similarly situated.  Some aspects were clearly public.  Some
25    of it may be because it was published in a photo or, in
```

1    fact, the evidence showed that some of them were published

2    by photographs; some of them were described publicly in

3    public press releases.

4           There's also evidence that there were public

5    versus private type events, separate showrooms within

6    showrooms where people actually did take steps, at least

7    arguably there, to protect the trade secrets.  So there

8    are -- there are distinctions that the evidence showed that

9    these products were not similarly situated.  We also know

10   that factually the jury did not rely and could not have

11   relied upon those -- upon any kind of general hypothesis or

12   kind of this general claim or any general claim that

13   anything and everything in a showroom was trade secret.  We

14   know that that's just simply false, and we know that no

15   reasonable jury could have determined that; we know that

16   this jury did not.

17          For example, focusing on the products just from

18   the 2006 New York Toy Fair, there were 22 of those on the

19   verdict form, and the jury found liability as to three.  So

20   this was not an instance where the jury said everything in

21   the showroom was by definition a trade secret because

22   methods were taken to restrict access to the showroom went

23   large.  So this is not a situation where the evidence would

24   allow the verdict to be sustained on general claims of

25   secrecy because, again, we know that that's just simply not

1    correct, and no reasonable fact finder could so find.

2             I would also point out that the law under JMOL is

3    very clear, and this is Ninth Circuit law, that threadbare

4    conclusory claims without evidentiary support in testimony

5    is not sufficient to sustain a verdict.  So Mr. Larian

6    simply making broad assertions that were refuted by all

7    manner of actual evidence that everything in the showrooms

8    was trade secret cannot sustain the verdict -- could not

9    sustain MGA's burden of proof.

10            THE COURT:  Okay.  Counsel?

11            MS. KELLER:  Your Honor, we disagree, needless to

12   say.  The trier of fact is well within -- well within bounds

13   to consider general principals that apply to these

14   showrooms, and if there were distinctions among them, then

15   the trier of fact considered those too.  And we know the

16   trier of fact rejected the majority of our trade secret

17   claims, so they went through them carefully.

18            We know the trier of fact sorted through all of

19   those things.  And with respect to Mr. Zeller's point that

20   Mr. Larian's broad assertions were refuted by others, the

21   trier of fact is also entitled to decide who to believe, and

22   frankly Mattel's many witnesses were so contradictory and

23   self-serving and so lacking in credibility on many, many

24   points that it's not a stretch to think that the trier of

25   fact rejected some of what they said in favor of what

1    Mr. Larian said, especially since Mr. Larian is the head of

2    his company and actually knew what his policies were and had

3    put them into effect.

4            So as far as relying on general proof, that's

5    exactly what Mattel did in terms of their employee trade

6    secret claims.  They relied on general proof as well.  But

7    here it's not even just general proof.  It's really --

8    again, we are talking about circumstantial evidence.  MGA

9    kept its showrooms private.  They were invitation only.  MGA

10   had certain areas within its showrooms that were even more

11   restrictive.  MGA would not allow Mattel employees to come

12   in.  Even the Mattel employees conceded that; that's why

13   they had to fake it.  They knew they weren't permitted to

14   come into any MGA private showrooms at any toy fairs.

15           So that evidence was across-the-board evidence.

16   There weren't any exceptions shown that MGA threw open the

17   flood gates and allowed the general public, including Mattel

18   employees, to come in.  So the finder of fact was well

19   within its province to not have to have that reiterated 112

20   times, or however many, 114 times.  At some point that's

21   absurd.  You know, if the showrooms are private, they are

22   private.  If they are invitation only, they are invitation

23   only.  If they are opened only to retailers, they are only

24   opened to retailers.  There was no evidence to the contrary.

25           So these aren't threadbare conclusory claims; this

```
1   was clear and compelling and unequivocal evidence that

2   applied to all of MGA's toy fair showrooms.  And it is --

3   the fact that the Mattel employees knew that is proven by

4   the fact that they had to create fake identities in order to

5   get in.

6            So I don't think this is any different than any

7   other form of -- of proof, frankly.  You know, it's -- it

8   would be like saying, you know, there were 10 vehicle thefts

9   from an auto yard, and the auto yard puts on evidence once

10  that it locks the front gate every night.  The auto yard

11  would not have to put on evidence that every single day that

12  there was a theft, they had locked the gate that night.

13  They put on evidence that it's a routine practice, it's a

14  custom and habit.

15           So with respect to whether the trade secrets were

16  valuable, that testimony was also unrefuted, and, in fact,

17  even the Mattel executives testified that information about,

18  for example, pricing that they got in advance, description

19  of toys, FOB prices, play patterns, they testified that that

20  was valuable information.  That's why they had the market

21  intelligence unit to acquire that valuable information.

22           So, again, I don't think that it was necessary for

23  the trier of fact to have that repeated a hundred and some

24  times as to each individual item, so that we think that the

25  proof is more than sufficient, your Honor.
```

 1            THE COURT:  All right.  Do you want to turn, then,

 2    back to the attorneys' fee award?

 3            MS. HURST:  Yes.

 4            THE COURT:  And you are not limited to 20 minutes,

 5    okay?  Take your time.

 6            MS. HURST:  Did the Court say it had another

 7    obligation at 7:30?

 8            THE COURT:  You just worry -- you keep going,

 9    okay.  You'll do fine.

10            MS. HURST:  Okay.  Okay.  I'll keep going, your

11    Honor.

12            THE COURT:  We'll worry about the Court later.

13    Take your time.  I want a full response.

14            And, then, Ms. Estrich, you can repeat any portion

15    or -- because I called Mr. O'Brien back so he -- so he could

16    hear that.  I thought it was an extraordinarily good

17    discussion yesterday between both sides, so --

18            MR. O'BRIEN:  I apologize.

19            MS. HURST:  -- let me get my notes so I can repeat

20    everything that I said.

21            If we boil it down, there are three questions to

22    be answered with respect to fees.  Can the Court award fees?

23    Should the Court award fees?  And how much?

24            Mattel does not contest that the Court can award

25    fees --

 1          THE COURT:  Bring him out.  Bring him out.

 2          I'm sorry.  You keep going, counsel.

 3          MS. HURST:  They had not made any argument that it

 4    would be an abuse of discretion for the Court to award fees

 5    here, and truly the only question is whether it would be an

 6    abuse of discretion not to do so.

 7          And what they do instead is just make a series of

 8    mischaracterizations of MGA's arguments, which is

 9    disconcerting and frustrating, frankly.  But, for example,

10    MGA never said that winning alone is enough, and that's just

11    a red herring.  What we have said is, "If you prevail and

12    further the purposes of the Copyright Act, then that meets

13    the basic test announced by the Supreme Court in Fogerty,"

14    and that is correct, and it's important to note that the

15    Supreme Court did not adopt the Leib factor.  The Court said

16    in a footnote, "Courts may wish to consider them when

17    appropriate."

18          And there are many respects in which the Leib

19    factors are not appropriate when you are considering a claim

20    of a successful defendant for fees.  Nonetheless, MGA

21    discussed all of the Leib factors in its briefing and

22    demonstrated that they all tilt in favor of an award of fees

23    to MGA.

24          It is not the case that MGA relies only on

25    Fogerty.  However, when there is controlling Supreme Court

1    precedent, ordinarily one would think it would be a

2    significant part of the discussion.  That's not the case for

3    Mattel because it's a bad case for them.  And just

4    Ms. Estrich's recitation and reading from the case yesterday

5    demonstrates why it is such a bad case for them.

6           In discussing the language from the Ninth Circuit

7    opinion on remand, Ms. Estrich talked about, "Well, is the

8    defendant a copyright holder?"  The answer here is, "Yes,"

9    just as it was in that case.  There, the copyright holder

10   did not prevail on a technical defense.  Here, the defendant

11   copyright holder did not prevail on a technical defense.  It

12   prevailed on the substance of the copyright claim, on the

13   ownership prong.  Would the chilling effect be too great on

14   an impecunious plaintiff?  This is not an impecunious

15   plaintiff.

16          Now, when applying the Leib factors, it's

17   important to look at the outcome and whether the outcomes

18   are consistently resulting in the evenhanded approach that

19   the Supreme Court required.  And Ms. Estrich says, she sent

20   out the masses of young associates to find the most

21   comparable case and came back with Lotus v. Borland.  Well,

22   what I did was look at the Ninth Circuit for a case where we

23   had a plaintiff that was similarly situated to MGA because I

24   thought if we're going to look at Fogerty and see whether

25   the courts are really being evenhanded on the application of

 1    the Leib factors, then what we need to do is find a case in

 2    our circuit that looks similar to this one but is for the

 3    plaintiff rather than the defendant.

 4            And what I found when I undertook that analysis is

 5    Twentieth Century Fox v. Entertainment Distributing,

 6    429 F.3d 869.  It's also known as the Daystar case.  And in

 7    that case, the issue was whether General Eisenhower's memoir

 8    was a work made for hire or not.  In other words, it was an

 9    ownership case.  It was a closely-contested ownership case.

10    There was no assertion whatsoever that the defense was

11    frivolous.  Indeed, the dissent in the Ninth Circuit opinion

12    was that it was not a work made for hire, and the dissenter

13    disagreed, but the majority affirm it, of the conclusion

14    that General Eisenhower's memoir was a work made for hire.

15            They went up to the Supreme Court once, and

16    Daystar prevailed on its preemption defense, that the

17    reverse passing off claim under the Lanham Act couldn't be

18    stated consistent with the Copyright Act.  It's a lot like

19    this case if you are just looking at the Leib factor, and

20    the Court awarded fees to the prevailing plaintiff in that

21    case.

22            So we can't just do this rote application of the

23    Leib factors without regard to whether the results are

24    evenhanded, as commanded by the Supreme Court.  And when

25    Mattel marches through the Leib factors, what we heard over

1    and over and over again last night was no matter what the

2    factor, it all came back to frivolousness.  Every factor,

3    what was the -- you know, frivolousness, it wasn't

4    frivolous; objective reasonableness, it wasn't frivolous;

5    compensation, it wasn't frivolous; deterrence, well, what's

6    to deter?  It wasn't frivolous.  Every single argument they

7    had on the Leib factors boils back down to the contention

8    that their case wasn't frivolous.

9         That violates Fogerty.  That is the proposition

10   that was rejected by the Supreme Court in Fogerty.  That is

11   not the evenhanded standard.  And there is no doubt here at

12   all that the Court can award fees, and in our view, given

13   the evenhanded requirement, the outcome for plaintiffs in

14   cases like this one in Ninth Circuit -- important Ninth

15   Circuit cases, it well could be an abuse of discretion not

16   to award them, but the Court certainly can do so, and it

17   should because the purposes of the act were furthered by

18   this defense because the degree of success was high.

19        Now, here I have to confess that I think we were

20   all flabbergasted by the news that we didn't win the Ninth

21   Circuit appeal; that was something.  I think Ms. Estrich's

22   comment that it was painful for her to go back and read the

23   opinion is evidence enough as to who prevailed.  The

24   injunctive relief was vacated, and a company that was

25   moments away from destruction because of an overreaching due

 1   process violating worldwide recall order was saved by the

 2   result on that appeal.  No higher degree of success could be

 3   attained.  It was widely reported in the press as an

 4   enormous victory for MGA.

 5        THE COURT:  So I should cite the press?  Just

 6   joking, counsel.

 7        Isn't the point the issues before the Circuit?

 8   What was the circuit really examining?  The point is there

 9   were limitations on what the Circuit was going to review, so

10   both of you have decent arguments in that regard.

11   Tentatively, Ms. Estrich, I think that when you readdress

12   the Court, you might consider in answering the following

13   question, and that is while you view, in a sense, the

14   non-disturbance of certain rulings, the question really is

15   were those being reviewed by the Court or not.  I think the

16   Court acted in a very limited fashion, and they focused on

17   the worldwide injunction, quite frankly, and chose not to go

18   any further, remanding it back.

19        But counsel?

20        MS. HURST:  That's right, and there's a footnote,

21   your Honor, where the Court discusses all of the issues that

22   it chooses not to reach, and only in that sense could it be

23   viewed as a mixed result.  The lengthy footnote discussing

24   not reaching the issue of the juror misconduct, other issues

25   raised by MGA, but the core of the case was addressed and

1    provided the basis for the second trial.

2              THE COURT:  Well, the Court never examined the

3    $100 million either.

4              MS. HURST:  Right.

5              THE COURT:  And that's the issue.  Judge Wardlaw

6    really ferreted that out, though.  She was looking very

7    closely and continually asked, "Where is the trade secret

8    misappropriation?"  And in doing so, it's very possible that

9    that would have been superceded, if it would have been in

10   place, and you would have had a $40 million verdict, not a

11   $100 million verdict, but the Court never reached that.

12             MS. HURST:  Well, and no constructive trust

13   because that was a remedy unavailable, and, as we know,

14   that's why they didn't want to plead a trade secret claim.

15             THE COURT:  Well, that's got an interesting

16   history.  We'll leave that for the Circuit about what they

17   wanted to do or not.

18             MS. HURST:  All right.  So Ms. Estrich argues that

19   the reason -- although the Court could award fees, a reason

20   not to is that the money will just go to insurance

21   companies.  Well, these were just well-healed equal parties,

22   and the money will go to insurance companies, so don't

23   bother awarding fees.  I think that is just a remarkable

24   revision of history of what's happened in this case.

25             I mean, and Mattel sought the appointment of a

```
 1    receiver on the grounds that the company was in financial
 2    distress and in threatening to dissipate assets to which
 3    they believed they were entitled.  The company was near
 4    oblivion because of the effects of the recall.  I mean, that
 5    was a remarkable argument violating the collateral source
 6    rule, to argue that there were insurance proceeds and,
 7    therefore, MGA requires no compensation.
 8         But if Ms. Estrich is going to violate the
 9    collateral source rule, I'll take the invitation to make
10    sure the Court knows that MGA has not been reimbursed by
11    insurance companies and is out of pocket to the tune of
12    $70 million in attorneys' fees, still even with some
13    coverage.  I think the Court knows this as well because it's
14    handling the other cases.
15         You know, $70 million, you've got multiple lawyers
16    who have not been paid here.  Skadden is owed significant
17    sums, not -- Ms. Keller's invoices haven't all been paid;
18    ours haven't been paid.  This is not in any way, shape, or
19    form a situation where you have a well-healed defendant with
20    deep pocket insurance companies who have covered everything.
21    That's just a fantasy.  It is absolutely MGA's position that
22    the insurance companies will not be entitled to funds
23    awarded on a fee motion.
24         The motivation factor, Mattel argues, can't really
25    be considered because of some amendment concerns.
```

 1          THE COURT:  Take your time in addressing that.  I

 2   thought that was a very interesting argument.

 3          MS. HURST:  I think the Seventh -- every time they

 4   don't want something bad to happen to them, we hear the

 5   Seventh Amendment.

 6          THE COURT:  It's an interesting argument.  You can

 7   address it.

 8          MS. HURST:  I am.  In Parklane Hosiery, the case

 9   referenced by Ms. Estrich, the Supreme Court held that the

10   application of non-mutual offensive collateral estoppel does

11   not violate the Seventh Amendment.  So the predicate

12   assertion that we have some kind of a big Seventh Amendment

13   problem here, even if you assume that this Court makes the

14   finding and that it was binding in the antitrust case, it's

15   simply wrong.  Here we have mutuality.  In that case, it was

16   the absolute extreme, non-mutual offensive collateral

17   estoppel.  Here we have mutuality.  And the Court held in

18   that case it did not violate the Seventh Amendment, that

19   application of non-mutual offense collateral estoppel

20   between an equitable and a legal proceeding was okay under

21   the common law and did not violate the Seventh Amendment.

22          But, importantly, the Court also held that it is

23   the job of the trial court in the second proceeding to

24   determine whether application of preclusionary principles is

25   fair, and the Court held in Parklane Hosiery that the trial

Case 2:04-cv-09049-DOC-RNB   Document 10610   Filed 05/27/11   Page 24 of 94   Page ID #:321274
CV 04-9049-DOC - 05/26/2011 - Vol. 1 of 2

24

1    court has wide discretion in determining that fairness in

2    the second case.

3           It is not a reason to deny recovery in this case,

4    and if Mattel musters an argument in the antitrust case that

5    it's somehow unfair, despite the fact that there is

6    mutuality, that they've had every opportunity to litigate,

7    and that the stakes here are just as significant as they

8    would be there, if they somehow muster an argument that it's

9    unfair, then the Court will be entitled to consider that

10   under Parklane Hosiery.  But under no circumstances could

11   that be a violation of the Seventh Amendment under the

12   opinion in Parklane Hosiery, and in no sense is it a basis

13   for denying recovery here in case one.

14          THE COURT:  I'm going to ask Ms. Estrich to

15   address the following:  You've warned -- one of the

16   arguments has been the subtlety of the argument on your part

17   that there is claim splitting going on.  Claim splitting

18   oftentimes has a nefarious connotation, and the intentional

19   act by a party.  The courts frown upon that.  Here, how can

20   there be that kind of scienter when the information

21   concerning the showroom activity by Mattel was so lately

22   discovered in the process?

23          If this information had been discovered, as you

24   believe, by the way, for appellate purposes, as early as

25   2005, 2006, which you'll argue on appeal, then you may have

1    a strong argument.  But if, in fact, the verdict's upheld

2    and the findings of this jury are synonymous with the theory

3    that this was discovered late in the litigation, then at

4    least the scienter element is weakened in your argument

5    because this isn't intentional claim splitting by MGA.  So

6    address that in a moment.

7            The second is there is a warning by you that if

8    the Court makes rulings concerning attorneys' fees which

9    lead to -- let's just take a holistic word, "bad faith," and

10   findings that would substantiate attorneys' fees in this

11   matter, your concern and argument is that that's going to

12   have Seventh Amendment preclusive effects on the antitrust

13   case.

14           As a policy -- because I know you love the law,

15   and I've been anxious to hear your thoughts for a long time.

16   As a policy, your encouragement for the Court in delaying

17   that issue causes tremendous harm to what I call a litigant

18   that doesn't have the financial ability to carry forth this

19   kind of litigation.

20           Now, your response will be and should be, "Judge,

21   these are both well-healed defendants; whether covered by

22   insurance or not, both parties can undertake this kind of

23   litigation."  MGA's position is different.  MGA's position

24   is that this is basically a dead brand.

25           Number two, that whatever financial resources they

 1    have are still subject to the whims of the insurance

 2    carriers or their well-reasoned positions.  So a policy

 3    address, you know, the small litigant in terms of financial

 4    resources versus a large litigant, and that isn't meant to

 5    have the connotation that Mattel is the Goliath in terms of

 6    funding.  That's not -- that's not true, but just the

 7    imbalance, and that is a policy reason, because the Court's

 8    going to decide a specific issue, but it has great weight in

 9    terms of precedence, and this sweeps across the board.

10         So I don't know if this record substantiates that

11    these are, you know, equally well-healed litigants in the

12    policy concerning smaller litigants without funding, which

13    MGA may have had a strong argument on when they came into

14    this Court.

15         Third, if I delay that, what is the Court's

16    position concerning the antitrust, not knowing and not even

17    dealing with the antitrust -- if you'll notice, Ms. Estrich,

18    I've been very careful concerning discovery.  Apparently

19    Mr. Bleecher is charging down the road wanting discovery.

20    I'm not allowing discovery by Mr. Bleecher at the present

21    time.  Its premature.

22         Number two, I haven't even considered the 12(B)6

23    aspects.  In other words, I don't want to have a cloud

24    hanging over my head with preconception.  Your response is,

25    "Judge, that's the very thing that's going to happen.  If

1   you find bad faith here, why would you then move to the next

2   step?  And certainly your 12(B)6 is going to survive and

3   down the road you go into summary judgment, and what you've

4   really done is you've decided those initial issues or at

5   least formed that process."

6           How do I balance that, once again, with the harm

7   to a litigant who isn't as well-funded, you know, who's

8   suffering in terms of assets?  Now, your response back to me

9   last night, as I was kind of talking to myself, was, "Well,

10  Judge, they chose to bring a lawsuit concerning antitrust."

11  Now, I didn't hear that from you, but I anticipate that, so

12  let's go back and forth with that.  You sort that out with

13  me.

14          All right, counsel, please continue.

15          MS. HURST:  Your Honor, the Court is correct that

16  it is -- it would be a terrible detriment and burden to MGA

17  for it to hold entry of judgment in this case in abeyance

18  until it ultimately acts on the antitrust claim.  I mean,

19  that could be years.

20          THE COURT:  Well, it won't be years, counsel.  You

21  must be in some other Court.  Trust me.

22          (Laughter.)

23          MS. HURST:  And -- anyway, well --

24          THE COURT:  Put your roller skates on.

25          MS. HURST:  Yeah, I'm not there.

Case 2:04-cv-09049-DOC-RNB   Document 10610   Filed 05/27/11   Page 28 of 94   Page ID
#:321278
CV 04-9049-DOC - 05/26/2011 - Vol. 1 of 2

28

```
 1              THE COURT:  One way or the other.
 2              MS. HURST:  All right.  I note for the record that
 3    MGA's counsel in the antitrust case is not present.
 4              THE COURT:  Oh, he will be.
 5              MS. HURST:  Having said that, your Honor, you
 6    know, we all know that Mattel is going to appeal a judgment.
 7    If we don't get that process rolling, I mean, it is going to
 8    be a long time before MGA --
 9              THE COURT:  Right.
10              MS. HURST:  -- and we need to -- you know, this is
11    a company entitled to a speedy determination at this point.
12              THE COURT:  I've taken that into account in the
13    conversation with myself last evening also, and that is I
14    can't control the appellate process.  That's where you could
15    be really harmed in terms of length of the time that the
16    appellate court needs to sort out this record, and it's
17    going to be extraordinarily complicated for the Circuit
18    because they had a limited issue the first time.  Now,
19    they've got Pandora's box.  They've got even arguments
20    concerning Mattel potentially that the first verdict should
21    be upheld.
22              MS. HURST:  MGA wants its judgment entered and
23    additional motions addressed.
24              THE COURT:  Now, the reason I'm talking to both of
25    you about that is because I need to write about that.  In
```

```
 1    other words, you need to know what this Court is thinking
 2    and the Circuit needs to know.  So that's why we're taking
 3    the time, there's no time limits today.  I'll worry about
 4    the credit card industry later on.
 5         MS. HURST:  You know, as you mentioned, your
 6    Honor, you know, MGA's view is that it would be fully
 7    consistent with the Seventh Amendment in Parklane Hosiery to
 8    apply this Court's findings in the second case.
 9         THE COURT:  Right.
10         MS. HURST:  Having said that, this Court -- this
11    is exactly the same point this Court has wrestled with
12    repeatedly already in this case.  When the Court's called
13    upon to make a finding in connection with a discovery
14    matter, and the Court has at one time or another looked at
15    one party or another and said, "Now, understand there is not
16    going to be a word of that in front of the jury, right;
17    that's for discovery purposes."
18         So the Court has a full panoply of options
19    available to it to deal with this.  And, you know, obviously
20    it's MGA's view that it should be binding, but the Court has
21    a discretion to address that, broad discretion to address
22    that, under Parklane Hosiery in whatever manner it deemed is
23    fair.
24         And it is the second case in which that should be
25    addressed because it's a defense.  It's a defense in the
```

1    second case.  It's not a ground for denial of relief to

2    which MGA is entitled in the first case.  It's a defense in

3    the second case, and it's an affirmative defense in the

4    second case.  The burden is on Mattel.

5            And so what we have here is them saying that, you

6    know, an affirmative defense in the second case on which

7    they bear the burden, the whole premise of which is that

8    we've won, and the first proceeding should somehow stop us

9    from winning in the first proceeding; that's crazy.

10           THE COURT:  So you would like to encourage the

11   Court under the fourth Fogerty factor to have a full

12   discussion concerning the motivation for bringing the

13   lawsuit.

14           MS. HURST:  I think the Court should.

15           THE COURT:  All right.

16           MS. HURST:  I think it's not just the

17   motivation --

18           THE COURT:  Why don't you address that also.

19           MS. HURST:  It's not just the motivation for

20   bringing the lawsuit; it's also the motivation as reflected

21   in the manner in which the lawsuit was conducted.

22           THE COURT:  How do I make that ruling -- strike

23   that.

24           How do I make those factual findings without

25   further discovery or is further discovery necessary?  In

1    other words, Mr. Bleecher's position is going to be in the

2    antitrust matter that these are the very issues, you know,

3    that drive the antitrust case, and I think Judge Kleinfeld

4    has written a very interesting article about this issue.

5    You've read that?

6          MR. ZELLER:  Yeah.

7          THE COURT:  You're familiar with it, both of you.

8          It's -- it's not troublesome tentatively that you

9    brought the antitrust suit at this stage.  That's why I'm

10   asking Ms. Estrich to address the issue, because this

11   doesn't seem to have the scienter of claims splitting.  The

12   issue is going to be I don't want to place myself in a

13   position of making adamant findings here that are going to

14   be brought back in a confrontational legal way, "Judge, you

15   said the following, and, therefore, why are you doing X, Y,

16   and Z?"

17         That's been one of the problems with this lawsuit,

18   and that is occasionally counsel have taken the 12(B)6

19   ruling, which has no effect concerning the trial, and even

20   the summary judgment, which both counsel know is not the

21   standard for trial, but use that in a sense and it might be

22   used for appellate purposes.  Now, I'd do the same thing, so

23   I'm not chiding counsel about that.

24         So the stronger factors could, in fact, have that

25   preclusive effect or have the effect of creating the

CV 04-9049-DOC - 05/26/2011 - Vol. 1 of 2

32

 1    perception that the Court's already in a sense deciding the

 2    antitrust case for 12(B)6 purposes, let alone summary

 3    judgment purposes.  That's what I'm hearing Ms. Estrich say,

 4    and that's what's fascinating to me.

 5              MS. HURST:  Well, I would say this.  I think the

 6    legal standards are not the same because we are dealing with

 7    in one instance here the test for fees under the Copyright

 8    Act --

 9              THE COURT:  Right.

10              MS. HURST:  -- which is not the same thing as a

11    Noerr-Pennington and the other factors to be considered in

12    connection with the antitrust claim.  The Court is

13    absolutely right on its point about lack of scienter with

14    respect to the claims splitting.  I mean, the evidence comes

15    in late in the day.  The Kohl's evidence came in late in the

16    day.  The Court knows, you know, what we had to go

17    through --

18              THE COURT:  Now the opposite problem.  I take

19    Fogerty, I find the fourth factor hypothetically on behalf

20    of Mattel, but I don't write a strong enough opinion.  In

21    other words, there's other factors out there that actually

22    bolster your case.  I think your response to me in our

23    conversation -- I'm just joking about that, for the record.

24    This is a conversation with just me anticipating what

25    counsel would say today, and that's, "Judge, it doesn't

1   matter."  In other words, the end result is you've got five

2   other -- you've got five factors.  Okay?

3             MS. HURST:  That's certainly the case.

4             THE DEFENDANT:  And the third factor is the most

5   important.

6             MS. HURST:  I don't know.  I'm not sure what the

7   numbering is.

8             (Laughter.)

9             THE COURT:  Well --

10            MS. HURST:  I think that's Ms. Estrich's view, but

11  what that boils down is the concern that I've expressed,

12  which is if you put all the weight on that factor, what you

13  end up with is not the evenhanded approach.

14            THE COURT:  The difficulty is the fourth factor

15  under Fogerty is what I call a driving factor.  It is a

16  factor where the Circuit -- well, nobody has called in from

17  the Circuit yet, so I'm going to joke with you, but where

18  the Circuit might attach a greater significance, because the

19  degree of success, the extent to which the claim is

20  frivolous, well, that's -- that's an interesting factor, the

21  objective reasonableness of the factual legal argument, but

22  the fourth factor, the motivation in bringing the lawsuit,

23  that's the 800-pound gorilla.

24            And the fifth factor, so I have a complete record,

25  the need for compensation and deterrence, which is why I've

 1   asked Ms. Estrich to address, you know, what I've called the

 2   more well-healed litigant versus the litigant who doesn't

 3   have funds or substantial funds.

 4            MS. HURST:  Our view is that we do not need

 5   additional discovery, to answer the Court's prior question

 6   with respect to motivation, and, frankly, the only -- I

 7   think at this point the only additional discovery that could

 8   be had would be of privileged communications.  As the Court

 9   knows, we've sought those repeatedly in the past and the

10   Court has denied that discovery.  And, you know, in terms of

11   the motivation in bringing the suit and in the manner in

12   which it's been prosecuted, the evidence in the record is

13   Mr. Brawer's testimony that senior executives, and

14   Mr. Bousquette in particular, discussed using litigation as

15   a business weapon.  That direct evidence is supported by the

16   2004 tracks goals which refer, moments before the filing of

17   this lawsuit, to aggressive IP enforcement as a business

18   goal of Mattel.

19            And then we have the manner in which the

20   litigation was conducted.

21            THE COURT:  Oh, no, let's separate the two.  There

22   is a difference between filing a suit on Mattel's part and

23   what Mattel, or the management structure of Mattel,

24   believes, Mr. Eckert, et al., in-house counsel, and the

25   litigation of the suit.

1    So let's separate those two for a moment because
2    there hasn't been a discussion of the lawyers and the
3    initial decision.  So let's take the initial position -- or
4    decision for a moment.  Let's take the fourth factor and
5    assume that the Court writes a strong opinion favorable to
6    MGA, and that would be that the motivation, quote-unquote,
7    "in bringing a lawsuit."

8    Well, the second factor is the frivolousness of
9    the lawsuit.  Explain to me the difference between the two
10   factors.

11   MS. HURST:  Well, the motivation is a subjective
12   factor.

13   THE COURT:  Okay.  Now, let's stop right there.  I
14   agree.  And frivolousness could be those additional thoughts
15   that occur along the way, so let's just take the fourth
16   factor.

17   Sit in Mattel's position for a moment.  You've
18   got -- you are the 90 percent player in the market, let's
19   say.  You've got somebody named Machado, who at least in the
20   2004, 2005 era, is conducting some activity in Mexico.  You
21   haven't fully developed your discovery concerning Carter
22   Bryant, okay?  But you know that there's a product out there
23   that's going to market awfully quickly, and for your
24   subjective good faith, you have a large bureaucratic,
25   creative industry, but it takes time to turn your product in

1    the El Segundo play.  You've got a lot of creative people, a

2    lot of steps you go through.  Let's just say it takes eight

3    months to turn around.  Now you've got a very efficient

4    smaller company that's able to react more quickly, yet from

5    Mattel's perspective subjectively, they just don't

6    understand how this smaller company can get off the ground.

7         And let's assume in good faith that it is getting

8    off the ground quickly.  They've got somebody named Carter

9    Bryant who goes over, acts suspiciously, won't tell people

10   where he's going.  You know, the subjective belief initially

11   on behalf of Mattel may have a reasonableness to it in terms

12   of we're getting stolen blind, and then they look at their

13   records and they see a number of key employees going over.

14   Now, discovery is not fully developed.

15        The second factor is the extent to which the claim

16   is frivolous.  Now a law firm enters or entered at the

17   inception with house counsel.  Your objection may be

18   stronger concerning the way the lawsuit is conducted versus

19   the original thought process of the management structure at

20   Mattel, and the more interesting question always becomes

21   when you have house counsel and how involved they are or

22   outside counsel who continually represent a major client in

23   that decision-making process.

24        Now, in England, as you know, they've advocated

25   this in-house counsel privilege.  They found it utterly

1    ridiculous because counsel who were in-house counsel have

2    crossed the line, not intentionally, but by virtue of their

3    profession.  England may have the better rule, by the way,

4    in the long term because house counsel is brought into every

5    meeting, and I think Judge Alsop, this Court and others are

6    looking very, very closely at that.  We're not going to

7    abrogate the federal rule but getting very, very concerned,

8    generally speaking, about where those limitations are when

9    you have in-house counsel.

10           So that's the only distinction I can make between

11   two and four under the Fogerty test, and your strongest

12   argument doesn't seem to me the initial decision by

13   Mr. Eckert to think about or to bring a lawsuit.  Your

14   strongest argument is along the way, a whole bunch of things

15   happened that should have raised flags, and one of those

16   that you point out is this, from your perspective,

17   nefariousness of these 35 boxes.  I mean, hidden behind that

18   is this late discovery of information that you believe has

19   passed through a number of counsel, from in-house counsel to

20   outside counsel, and you've been shielded from.  Now, I

21   don't want to focus on those 35 boxes, but that raised, you

22   know, quite a red flag at the last part of the case for you.

23           So I'm trying to sort out the second factor and

24   the fourth factor and how I write this opinion either

25   favorably or unfavorably and what I state that either has an

CV 04-9049-DOC - 05/26/2011 - Vol. 1 of 2

38

```
 1    effect on the antitrust case, so that's why I invited

 2    Mr. O'Brien back today, because I thought that was an

 3    absolutely fascinating discussion last night between the two

 4    of you.  Sort that out for me because you tend to take

 5    factors two and four, lump them together, take Mr. -- the

 6    management structure's initial decision by Mattel, transfer

 7    that over to the over-aggressiveness of a law firm from your

 8    perspective, you know, who should have backed away from your

 9    perspective -- that's what I'm hearing at different times --

10    or conveyed to their client the following, I'm not too

11    certain.

12              MS. HURST:  So focusing on the motivation in

13    bringing the suit first --

14              THE COURT:  I mean, you've got a brand out there,

15    you've got a former employee that's acting suspicious.  He

16    goes over to another company.  There is a turnaround time

17    that's almost instantaneous.  You find out he's ordering

18    things within a brief period of time.  He's jumped the gun.

19    Why wouldn't Mattel be suspicious?  Now, that doesn't have

20    anything to do with the merits, you know, the jury found,

21    you know, "X."

22              MS. HURST:  Right.

23              THE COURT:  But in awarding attorneys' fees, I

24    want to address each of the five Fogerty factors.  I am not

25    sending this back to Judge Wardlaw, Judge Kozinski, and
```

1   Judge Trotter on a wing and a prayer.  They are going to

2   know exactly what the Court is thinking.  If they disagree

3   with it, then they'll know my thoughts at least.

4          MS. HURST:  What the Court has described were all

5   things that Mattel knew in 2002.

6          THE COURT:  Okay.  And that's substantiated

7   because of the jury verdict in terms of the --

8          MS. HURST:  In terms of the intentional

9   interference.

10          THE COURT:  So you have specific factual findings

11   to back you up.

12          MS. HURST:  And there were witnesses who came and

13   testified to that.  Ms. Nordquist talked about what she knew

14   in 2002.

15          THE COURT:  So the argument, then, would be at

16   least at that time, even after the initial decision, by 2002

17   they should have backed up.

18          MS. HURST:  Right.  Well, what they knew in

19   2002 -- so they know everything the Court's described that

20   might be a possible basis for saying, "We didn't have bad

21   faith," they knew all of that in 2002.  Did they sue in

22   2002?  No.  Did they sue in 2003?  No.  Because through all

23   that period of time, they were looking and waiting and

24   seeing whether MGA was a big problem for them in the

25   marketplace, whether they could deal with this in the

```
 1   marketplace.
 2            THE COURT:  Now, this is our time to interchange,
 3   okay?  I'm interchanging with you.
 4            Nonsense.  I'm hearing Mr. Price's voice, and
 5   here's Mr. Price's argument:  "Judge, we'd have to be
 6   certifiably insane to let a competitor rack up millions
 7   and -- hundreds of millions of dollars of profit and not
 8   take action as quickly as possible.  In other words, why
 9   would we wait to see if they're successful when they go from
10   $100 million or $160 million up to $700 million?"
11            MS. HURST:  That argument supports our position.
12            THE COURT:  Tell me how.
13            MS. HURST:  Because what it shows is that what
14   they had when they did sue was no different than what they
15   had when they didn't sue.  And because their state of
16   knowledge was no different, that cannot explain and offer
17   them a basis for not acting in bad faith.  They tried
18   everything.  In the beginning they thought this was a flash
19   in the pan.  They thought it was a flash in the pan and it
20   was going to go away.
21            THE COURT:  Hold on.  $160 million-plus in 2002 is
22   a flash in the pan?  I'll take that any day.
23            MS. HURST:  That is what Diva Starz, Generation
24   Girl, all of their other older-girl-targeted products did.
25   They'd come out in year one, they'd do between
```

```
 1    $102 million -- $200 million worth of business -- all of
 2    this evidence is in the record -- and then they'd tail off.
 3    It's right there in the Bratz brief.  And that -- Adrienne
 4    Fontanella had, you know, Matt Turetzky writing sales
 5    promotional pieces saying this is a flash in the pan and
 6    it's going to go away.  And that had been their experience.
 7              THE COURT:  Are you asking -- this is a late-night
 8    conversation with myself.  Are you asking me to eventually
 9    write and find or proposing that somehow the worldwide
10    injunction and the harm that MGA suffered should be part of
11    my findings?  And if you are, why would the Court do that?
12    In other words, if that error was created, you know, what's
13    the nexus in terms of this Court's findings -- in other
14    words, I worry about, quote-unquote, "the idea of equitably
15    making someone whole when there's not a direct nexus to the
16    activity in this lawsuit," and that seems to me to be what
17    the antitrust suit is potentially addressing if it goes
18    forward.
19              So I don't want to get those two conflated, and if
20    you are thinking that that should be a part of the Court's
21    findings, which I heard subtly in your presentation, I'd
22    like to know that and have you front that argument now.
23              MS. HURST:  It is a reason for both compensation
24    and relevant to the deterrence factor.
25              THE COURT:  All right.  Now, isn't that the very
```

CV 04-9049-DOC – 05/26/2011 – Vol. 1 of 2

42

```
 1   preclusive effect that Ms. Estrich was so concerned about
 2   last evening and the warning to the Court not to get myself
 3   in the Seventh Amendment box?  By the way, I know you've got
 4   a very well-presented presentation, but this is our time to
 5   have the discussion.
 6              MS. HURST:  Understood.  It was a copyright
 7   injunction, and it nearly put the company out of business --
 8              THE COURT:  No, I know that.
 9              MS. HURST:  -- and destroyed the brand.  And the
10   few who are here will not compensate MGA fully for that
11   harm.  There is no possibility it will compensate MGA fully
12   for that harm.
13              THE COURT:  Your argument back is there are simply
14   fees that in a sense, if not making Mr. Larian whole and MGA
15   whole, are directed towards the activity up to this point.
16              MS. HURST:  Right, and the relevant activity for
17   Copyright Act purposes.
18              THE COURT:  Okay.
19              MS. HURST:  Since it was a copyright injunction.
20              THE COURT:  Okay.
21              MS. HURST:  And since it was -- I mean, even when
22   we came here before the Court one of the very first times
23   and their position was that copyright injunction required
24   MGA to sweep the shelves of product on a worldwide basis.
25   Over-enforcement of it contributed to the problem.  And
```

1    look, they will argue -- they can argue in the subsequent

2    case if they want to --

3          THE COURT:  You know, I'm sorry.  You know that

4    Starbucks, you don't want that in my Court.  Thank you very

5    much.  I appreciate it.  Why don't you bring that up so I

6    can drink it.

7          (Laughter.)

8          THE COURT:  Thank you.  Anyway, what you want

9    is -- you want a Senior cup of coffee anyway; you don't want

10   a Starbucks.  I'm just kidding you, but I just don't want

11   that out in the audience.

12         Okay, counsel.

13         MS. HURST:  Again, this is a defense in the second

14   case.  They can argue whatever they want to.  I mean, we

15   don't think it will be well taken.  There is no way that's

16   going to, you know, compensate for all the harm that

17   occurred.  If you award here, it will just be a drop in --

18   it won't go to the brand at all.

19         THE COURT:  Okay.  You understand I need to be

20   very careful.  In other words, if I eventually find for MGA,

21   the Circuit needs to know, you know, what my process is, and

22   I need to take into account the Seventh Amendment issue.  I

23   think it's fascinating, and I don't want to get ahead of

24   myself either in terms of opinion or prejudging.  That's a

25   whole different case with a whole set of factors, we start

1    all over again, so -- all right.  I think you've answered it

2    as best you can.

3              Any other thoughts?

4              MS. HURST:  I wanted also to talk -- speak to some

5    of the other comments the Court made about how they might

6    have been justified in thinking that it was a short time to

7    market.  That -- that in particular, because they knew MGA

8    had a shorter time to market before they ever sued MGA, and

9    that is the Bain report in September of 2004.  And the Court

10   will recall that it was those specific portions of the draft

11   Bain report that Mr. Moore instructed be deleted, the parts

12   about MGA's short time to market were the parts that he,

13   Mr. Moore, instructed the people at Bain and the Mattel

14   executives to delete, to spoliate, because that would hurt

15   their position in this lawsuit.

16             THE COURT:  There is only one other conversation

17   you and I hypothetically had last night.  The conversation

18   is this:  "Judge, from the beginning of at least MGA and

19   Mattel coming to this Court, you propounded a consistent

20   theme that this was litigation to death; it was a killing of

21   a brand.  Mr. Larian was on the ropes.  Insurance carriers

22   weren't paying," or, if so, what I call the trickle-down

23   theory, "and if you take attorneys' fees and you're overly

24   cautious, when we, MGA, deserve compensation, the message

25   that you are sending is that Mattel was able to kill the

1    brand, quote-unquote, 'lose the lawsuit,' but the policy

2    message that you send is basically, 'no harm, no foul.'"

3            So, in a sense, even if the Court upholds the

4    verdict in our hypothetical conversation of whatever million

5    and whatever occurs with exemplary damages, in effect they

6    killed a billion-dollar brand for $200 million in

7    compensation and recaptured market.

8            MS. HURST:  Right.

9            THE COURT:  Now, I want the record clear.  I

10   haven't had any conversations with Ms. Estrich or Ms. Hurst

11   or any counsel.  That's what I do at night, okay?  So I need

12   to get a life.

13           *(Laughter.)*

14           THE COURT:  But that's one of the conversations I

15   had with you last evening, and that's what I'm clearly

16   hearing, you know, is that the cautiousness needs to at some

17   point also reflect what's truly compensable in the

18   attorneys' fees award because otherwise -- and I'm going to

19   hear this in exemplary damages in a moment -- otherwise, the

20   end result is it was a good investment for Mattel even if

21   they, quote-unquote, "lost the lawsuit."

22           MS. HURST:  That's right, and that's another

23   reason why we should be getting their fee information

24   because it is also relevant to motivation and objective

25   reasonableness because it shows how much they were willing

1    to spend, and to measure the objective reasonableness of how

2    they litigated this case, when they've spent $400 million

3    means --

4                    THE COURT:  Now, just a moment.  I have heard all

5    sorts of figures tossed around.  I don't know that.

6                    MS. HURST:  No, none of us do, but the Court has

7    the power to order that and it should, because when you find

8    out that they spent $400 million on this case --

9                    THE COURT:  Let's say $300 million.

10                    MS. HURST:  $300 million.

11                    THE COURT:  Let's say $280 million.

12                    MS. HURST:  $280 million.

13                    THE COURT:  Let's say $260 million.

14                    MS. HURST:  No way.  You heard Ms. Estrich up here

15    yesterday.  Block billing.

16                    THE COURT:  Okay.  Now, I want you to look at my

17    discovery master.

18                    MS. HURST:  You can look at their --

19                    THE COURT:  Are you looking at my discovery

20    master?  Everybody look at my discovery master.  He is a

21    wise counsel, and I've given him the following instruction:

22    Sort out the duplication.  Sort out any possibility that a

23    law firm -- and, by the way, each of you have exemplary

24    ethics, but sort out duplication and sort out if a law firm

25    has an associate sitting around with nothing to do on a

1    particular day and all of a sudden go work on this case.

2    How -- how do I sort that out?  And I'll have Ms. Estrich

3    address that in just a moment.

4            MS. HURST:  Ms. Estrich --

5            THE COURT:  No, no, no, I'm not done yet.  We had

6    a conversation last night, okay?

7            MS. HURST:  Sorry.

8            THE COURT:  How do I decide when I really need

9    three senior partners or two senior partners working on the

10   same issue if that's, quote-unquote, "reasonable or not."

11   And, by the way, this could be reversed.  If you were the

12   losing party, I would be asking the same thing.

13           You both conceded that the rate is acceptable.

14   You are not arguing about the rate in the Los Angeles

15   community, and I want to thank you both for that.  One of

16   the problems that you have is what I'm observing, and how do

17   you address any duplication effort when I see just as many

18   associates sitting with MGA in the courtroom as I'm seeing

19   with Mattel?

20           Now, I'm not counting on each day, but, you know,

21   you both lawyered up for good reasons.  You needed those

22   resources.  So this is some fault finding by the Court.  You

23   needed these young associates out there.  I mean, I saw them

24   carrying boxes.  They did an exemplary job.

25           But do I get into an argument by Mattel,

1   Ms. Estrich, that MGA is duplicative in terms of the use of

2   their associates or counsel?  Because their response is

3   going to be, "I don't know about the past, but, boy, when we

4   came into this case, as Ms. Keller did on a wing and a

5   prayer a couple of weeks before, that's kind of bare bones

6   litigation."

7           Now, Ms. Hurst and her firm were already in place,

8   so that's my fear that you are going to take a look at that

9   firm and make the accusation that they were duplicative

10  because we've set the rate aside.  So I want to hear from

11  you what your position is going to be in your rebuttal

12  argument in just a moment, okay?

13          Okay.  Ms. Hurst.

14          MS. HURST:  Your Honor, on that point I wrote this

15  down in red pen last night when Ms. Estrich said it, and the

16  transcript will bear this out.  Ms. Estrich said, and I

17  quote, "We can see that excessive time was not spent."

18          THE COURT:  Excellent.

19          Are you conceding that?

20          MS. ESTRICH:  I --

21          THE COURT:  That's a "yes" or "no."

22          MS. ESTRICH:  Excessive time was not spent on

23  legitimate tasks.

24          THE COURT:  Talk to Mr. Quinn for just -- see, I

25  know that.  Now --

1              (Interruption in the proceedings.)

2              THE COURT:  "Excessive time was not spent on

3    legitimate tasks."

4              Can I talk to Ms. Estrich for just a moment?

5              MS. HURST:  Could I finish first and then --

6              THE COURT:  No, no, no.

7              MS. HURST:  One more point.

8              THE COURT:  No, no.  Just a moment.  I'll get

9    right back to you.  Hold your point.

10             MS. HURST:  All right.

11             THE COURT:  With all due respect, that means

12   nothing to me.  Let me tell you why.  What that means subtly

13   is the definition of what is an appropriate task.  Is the

14   argument that if it's an appropriate task, is the number of

15   counsel or associates that MGA devoted to that off the

16   table?

17             MS. ESTRICH:  Yes.

18             THE COURT:  Okay.  Second, how do I define what a

19   an appropriate task is?  How does my special master make

20   that representation back to me?

21             MS. ESTRICH:  Has to relate directly, be

22   inextricably intertwined with the defense of the copyright

23   claim, and so presumably -- I haven't seen their billing

24   descriptions, but I know the kind of ones I use.  Presumably

25   if it said, you know, "We are going to meet with Mr. Vargas

1    in Mexico," I'm going to challenge that because I'm going to

2    say, "That was about your defense of your trade secret

3    claim."

4              THE COURT:  Okay.  Just a moment.  But how is that

5    not an essential task if Mattel initially brings the RICO?

6    In other words, you are the driving force -- not you

7    personally, but Mattel generically is the driving force on a

8    RICO claim that eventually, you know, the Court --

9              MS. ESTRICH:  I know.

10             THE COURT:  -- resolves unfavorably to Mattel, but

11   up to that time -- now, second, there was a tremendous

12   benefit to Mattel.  You basically got the RICO in.  Not in

13   the full form that Mr. Quinn argued on the Brisbois, but

14   Brisbois came in, Machado certainly came in full force.  In

15   other words, when you really look at the RICO claim, the

16   RICO claim in some form went forward in this Court, not

17   under the name RICO and not leaving with the treble damages

18   that RICO can provide.  But if you really look at the

19   evidence on the record, we really had a RICO trial.

20             MS. ESTRICH:  Your Honor, two answers.  Quick one,

21   there is no attorneys' fees for RICO.  Second answer, a

22   little longer.  As you and I discussed at great length, RICO

23   was the statute that was intended and has perhaps wrongly in

24   the civil context served as a mechanism to take people who

25   would otherwise be viewed as unrelated for purposes of law,

1    and indeed --

2              THE COURT:  Ms. Hurst, it would be interrupting

3    Ms. Eckert during her argument, and you'll be responding

4    also.  It would be coequal.

5              MS. ESTRICH:  And indeed in conspiracy, you

6    couldn't charge them as co-conspirators.  So what we do in

7    RICO is, frankly, we take a whole series of separate acts

8    committed by people for whom we can shape an enterprise, and

9    if the Supreme Court in a criminal case, it's a really broad

10   shape, and you can put together what would otherwise be,

11   were it not for RICO, completely separate acts by separate

12   people.  Our RICO claim did not charge the Mexican former

13   employees with stealing Bratz.  Ms. Hurst said yesterday the

14   key to this case was ownership of Bratz.  They had

15   absolutely nothing to do with that key copyright claim on

16   which they are seeking damages.

17             THE COURT:  Okay.  All right.

18             Ms. Hurst?

19             Why don't you take a break for just a moment.  Let

20   me take the criminal matters, okay?  I'm going to spend

21   time, okay?  Trust me.

22             (Recess.)

23             THE COURT:  All right.  All parties and counsel

24   are present.

25             And Ms. Hurst, if you'd like to continue.

1      MS. HURST:  Thank you, your Honor.

2      Going back to this issue of Mattel's billing

3  records and expenditures, you can look at their securities

4  filings and have some understanding of the amount that has

5  been spent on legal expenses during a relevant period of

6  time, and that is undoubtedly the basis for some analyst

7  estimates of a $400 million expenditure on this case.  And

8  an expenditure of the magnitude we're looking at here is

9  relevant also to motivation and reasonableness because it

10  shows that the objective of the litigation was to destroy a

11  competitor.  You can't justify that kind of an investment

12  unless the objective is the disruption and elimination of a

13  competitor.

14      THE COURT:  How can that be?  In the first trial,

15  the request was for a billion dollars.  Just because the

16  verdict came in at a hundred million dollars doesn't mean

17  that with the Court granting an entirely new trial, that

18  subjectively Mattel didn't believe that they had no

19  limitation in terms of requesting again $750 million to a

20  billion dollars.

21      MS. HURST:  But the ridiculousness of that request

22  was underscored by the result in that.  I mean, in a case

23  where they won, you know, a hundred straight motions, had a

24  completely one-sided set of jury instructions, they still

25  got, as the Court has repeatedly noted, $40 million.  They

```
 1    got 10 on the copyright claim.  10 on the copyright claim,

 2    and then came back here with 750 again.

 3            THE COURT:  Is that 10 on the copyright claim?

 4            (Laughter.)

 5            MS. HURST:  Ten, and that's with all of the

 6    defendants combined; six, three and one; maybe duplication

 7    there, too.

 8            THE COURT:  No supreme court is not going to

 9    preempt in that area.

10            (Laughter.)

11            MS. HURST:  So where we are now is they've

12    conceded rate reasonableness and they've conceded hours

13    reasonableness.  They have conceded that no excessive time

14    was spent, so all of that stuff about Skadden spent too much

15    time getting up to speed after O'Melveny, that's all out the

16    window, now.  They can't make that argument and not turn

17    over their own billing records.

18            What we're down to now is relatedness, and that's

19    it.  And that's what Ms. Estrich said last night.  We're

20    only challenging allocation to unrelated claims, and she's

21    repeated it here again this morning.

22            THE COURT:  On the White/Experian matter, if you'd

23    gather all counsel and just remain in the court, okay, and

24    we'll get to you as quickly as we can.

25            Counsel?
```

```
 1              MS. HURST:  Now, the test for relatedness comes
 2    out of the Supreme Court decision in Hensley v. Eckerhart,
 3    and it has been elaborated in numerous cases in the Ninth
 4    Circuit, non-copyright cases.  And the Supreme Court has
 5    made clear that it wants a uniform jurisprudence on this
 6    issue of prevailing parties under federal statutes in the
 7    Buckanon (phonetic) case; we are going to use the same
 8    standards across the boards.
 9              So when you look at all the cases that I
10    referenced yesterday, Thomas, Aguirre, Sorenson, Webb v.
11    Sloan, McGowan v. City of Fontana, the standard is common
12    facts or legal theories; not both, either.  And we measure
13    that with respect to the prima facia elements of the
14    copyright claim, and here, the copyright claim is litigated
15    by Mattel, included an element of ownership, the element of
16    infringement and the element of damages.
17              All of the state law claims related to the
18    ownership prong.  They've conceded the trade secret claim as
19    related.  Damages, the way they litigated it, was MGA's
20    entire business history, the sales of every one of its
21    products, the reasons for the sales of those products, the
22    interrelationship between the sales of its products.
23    Everything about MGA that it litigated in the copyright
24    claim was the crux of this litigation.
25              I say it's remarkable that Ms. Estrich has said
```

 1    here this morning, "Well, all those other employee trade

 2    secret claims weren't really related, your Honor.  We just

 3    strung it together because that's what we would get away

 4    with under RICO."  That was unbelievable.  Now, there's some

 5    objective unreasonableness for ya.

 6              Criminal copyright infringement was the principal

 7    predicate act that they pushed, and they pushed it after the

 8    successful verdict in phase one.  Ongoing copyright

 9    infringement, that was the basis for the injunction and the

10    receivership and the monitor supervision.  The monitor

11    meeting with MGA at MGA pouring through MGA's records on a

12    daily basis, supervising whether the worldwide injunction

13    and recall was being adequately implemented.  That copyright

14    claim continued throughout the case as the basis for all of

15    the significant litigation by Mattel against MGA.

16              So Ms. Estrich says, "Well, Mexico, that wasn't

17    related."  But that's not the way they tried their case.

18    They tried it all as related.  Their theory was that this

19    was a necessary and significant market for the exploitation

20    of Bratz, that that was the copyright infringement, and that

21    he we needed to steal these other things from them in order

22    to continue that exploitation.  That was the purpose, they

23    said, of the exploitation -- of the alleged trade secret

24    thefts.

25              The purpose of the employee trade secret thefts as

1    they pled, discovered and tried their case was the continued

2    exploitation of Bratz; the one-trick pony, that was their

3    case.  They made it all related.  And now, it does not lie

4    in their mouth to stand here and say, pick an arbitrary

5    percentage reduction for this unrelated stuff.

6          The Ninth Circuit in all those cases I mentioned

7    has repeatedly said when you have a high degree of success,

8    we are not going to second guess a district court on a

9    relatedness determination.  We have here common facts and

10   common legal theories, which is more than is even required

11   under the case law.  And we excluded things that were

12   clearly attributable to non-copyright claims; we excluded

13   substantial fees in our application.

14         Now, with respect to the fee application under the

15   California Trade Secrets Act, I think we sought about

16   $6.8 million or so on that one.  There was separate billing

17   on the affirmative claims for two of the law firms, and

18   that's the basis for that request.

19         Ms. Estrich characterized it as reverse fruit of

20   the poisonous tree.  I don't know what that means.

21   Here's -- here's the facts.  The facts are that the original

22   complaint by MGA was pled as a serial copying claim.  MGA

23   knew something was going on that was bad and pled it as a

24   serial copying claim because we didn't know how they were

25   effectuating that serial copying at the time.

 1          Then finally, on the eve of trial, we found out
 2    how they had been effectuating that serial copying, by
 3    systematically misrepresenting themselves to steal our
 4    business information, trade secret information.  So the
 5    remedy that MGA got on its trade secret misappropriation
 6    claim, the remedy, there, was the gravamen of the harm that
 7    MGA had been complaining about all along.
 8          And it's true that MGA did not plead that claim
 9    sooner because it didn't have evidence of that claim sooner.
10    And I've said that consistently, but that doesn't mean that
11    what it did before didn't contribute to the prosecution of
12    that claim, it wasn't an element that when we finally got
13    the last piece that fell into place supported the
14    prosecution of that trade secret misappropriation claim.
15          The discovery we had on the development documents
16    up to that point in connection with the trade dress, the
17    serial copying claim, that was the basis, in part, for
18    Mr. Malackowski's opinions.  What we had up to that point on
19    the affirmative claims was used by Mr. Malackowski, so
20    that's not reverse fruit of the poisonous tree.  It's
21    another relatedness standard under state law, which is
22    comparable to the one under the federal standards.  Was the
23    work that had been previously done on the affirmative claims
24    related to the claim upon which MGA ultimately prevailed,
25    are there common facts?  That's the test.  There were common

CV 04-9049-DOC - 05/26/2011 - Vol. 1 of 2

58

 1    facts because the serial copying issue were part of all of

 2    those claims.

 3           Ms. Estrich argued that there was no evidence that

 4    our UCL claim stopped their conduct.  I guess that argument

 5    is premised on the -- I -- I -- you know, you heard

 6    Mr. Zeller argue at length that they had stopped the conduct

 7    in 2005, and there was no evidence that it continued.  We

 8    disagree with that.  We think there was evidence that

 9    continued because they outsourced it to independent

10    contractors.  But there is no doubt when you listen to

11    Michael Moore's testimony that his 10 meetings with

12    Mr. Villasenor in the latter half of 2005, there is no

13    question that that was motivated by MGA's filing of a

14    complaint against Mattel.  It's admitted that it was

15    motivated by the filing of that claim.  Mr. Corey was there

16    investigating and collecting documents related to that

17    complaint.  That's what kicked off the series of 10 meetings

18    and phone calls between Mr. Moore and Sal Villasenor.

19           MGA's complaint to the extent they stopped or went

20    underground, more underground than they had been, it was

21    MGA's legal proceeding that motivated the change in their

22    behavior, and that justifies an award of fees under 1021.5

23    as well.  The entire industry benefited from that.  We

24    didn't know, but that doesn't mean it didn't cause the

25    reaction on their side.

1          So people heard rumors about Sal Villasenor, and
2     they asked questions about it in depositions earlier in the
3     case, and they were told there was nothing there, and we
4     never got any evidence because apparently we didn't ask just
5     exactly the right question.  Mr. Normile's testimony being a
6     fine example of that.  I asked him, "Have you ever heard of
7     market intelligence?"  "Well, no."  And then we come to find
8     out after their parade of witnesses that it's because you
9     use the word "department," and there's never been a
10    two-person department at Mattel, but "Oh, yeah, we know all
11    about market intelligence."  They buried that evidence, for
12    years.
13          Now, Ms. Estrich also seem to contend that we were
14    not the prevailing party on the Uniform Trade Secrets Act
15    claim, citing her new favorite case of O2Micro.  You've got
16    to be kidding me, with a month of discovery on that claim
17    brought as a last-ditch procedural maneuver?  Thank God the
18    Court recognized the propriety of it as a counterclaim and
19    reply.  And an $88.5 million damages award and a jury with a
20    willful and malicious finding, we're not the prevailing
21    party?  You've got to be kidding me.
22          By definition under the statute, the wilful and
23    malicious finding makes us a prevailing party.  Is that
24    substantial success on the claim?  Of course it is.  It's an
25    insult to the jury to say that we're not the prevailing

1    party on that claim.  All the hard work they did, it's an

2    insult.

3            Now, I referenced the award of $120 million in

4    fees in the Oracle v. SAP matter, and that's in the judgment

5    in that case as a reasonable fee.  And the Court in that

6    case had an obligation to reject that number if it was not

7    reasonable, and there are federal circuit cases where the

8    parties agree and the Court says, you know, "Too bad, I

9    still find it's not reasonable."  That's the Court's

10   obligation.

11           So the fact that there was agreement in Oracle v.

12   SAP is neither here nor there as to whether it was a

13   reasonable fee or not.  And this, again, underscores if we

14   had their billing records, we wouldn't even be having that

15   discussion, because their billing records would show they

16   spent far more than we did.

17           That case is a good benchmark for the request made

18   here.  And the assertion that the agreement was made to

19   avoid punitive damages, I don't even understand.  You can't

20   get punitive damages under the Copyright Act.  They are not

21   available.  There are numerous cases saying there's no

22   punitive damages under the Copyright Act.  It doesn't even

23   make sense.

24           So can the Court award fees?  Of course it can.

25   There is no credible argument here that it would be any kind

```
 1    of legal error or abuse of discretion to award fees here.

 2    Should the Court award fees?  It should, it absolutely

 3    should.  The purposes of the act go further.  Compensation

 4    is important.  Deterrence is important to keep them from

 5    spending what they could against the smaller competitor

 6    destroying the brand and getting away with it.

 7             They had the purpose of eliminating a competitor.

 8    They had plenty of evidence inconsistent with their

 9    theories.  I mean, let's just talk about Toon Teenz for a

10    moment.  Their whole theory of timing was Toon Teenz?  Oh,

11    there was some striking similarity between the pose in the

12    drawing of Toon Teenz in Carter Bryant's drawings?

13             A position rejected as a matter of law by the

14    Ninth Circuit in this Court in holding that those kinds of

15    postures aren't even protectable.  They are so common, it

16    was a factual fallacy from the outset.  To use Mr. Cote's

17    definition of speciousness, a fallacious superficially

18    appealing, but ultimately fallacious contention that somehow

19    Lilly Martinez's drawing of Toon Teenz could place the

20    timing of Mr. Bryant's work.  Not only that, Ms. Martinez

21    admitted that she had no -- no evidence that Mr. Bryant had

22    ever seen the drawings of Toon Teenz as opposed to the

23    dolls.  And when we got the dolls in here, finally, in this

24    trial, not just the drawings, we saw they didn't look

25    anything like Bratz.  It was a specious argument that Toon
```

1    Teenz was a basis for placing Carter Bryant's work in 1999.

2    That it was specious was conceded by their own admissions,

3    repeated admissions that they weren't contending

4    infringement on the basis of Toon Teenz.

5              So were there frivolous aspects to the claim or

6    objectively unreasonable aspects to the copyright claim?

7    You bet.  They brought it with a purpose to eliminate a

8    competitor, and by the grace of God, they didn't, but it was

9    just that close.  And it was the effort of a lot of

10   dedicated attorneys who kept working despite not being paid

11   that helped that happen.

12             This is exactly the kind of case where on the

13   copyright claim for the defendant no damages are available

14   and protecting a competitor's participation in the market,

15   the only incentive for lawyers to do that when you have a

16   much smaller defendant against Goliath in a near-bankruptcy

17   situation, the only incentive at the end of the day is the

18   prospect of that award of fees, and they should be awarded,

19   and they should be awarded in the full amount requested.

20             Thank you.

21             THE COURT:  Counsel, thank you very much.

22             Ms. Estrich, your final comments, please.

23             MS. ESTRICH:  Your Honor, I'm happy to restate my

24   case for Mr. O'Brien, but I thought I'd begin --

25             THE COURT:  No.  He'll have a record.

```
 1          MS. ESTRICH:  That's what I thought.  I thought I
 2   would spend this time focusing both on your Honor's
 3   questions and on what I thought were Ms. Hurst's mistakes,
 4   but that's just our agreement.
 5          Your first question was about abuse of discretion
 6   and can a judge be reversed on appeal for abusing
 7   discretion.  I take it it's a questions for either granting
 8   fees or denying fees.  And the answer is yes, and you will
 9   find cases on both.
10          Now, does that mean that I'm arguing, as Ms. Hurst
11   may be suggesting that you have no right to grant damages --
12   to grant fees?  Of course I'm not arguing that.  The
13   Copyright Act says that the Judge may grant fees.  The
14   Supreme Court has said to do it in an even-handed way.
15   Serve the purposes of the Copyright Act.  Find factors, you
16   know, do it in an objective and reasonable way.
17          And most of the time when courts go through each
18   of the factors and when it's clear they've carefully
19   analyzed them, they are upheld.  But I have seen numerous
20   cases in which courts are reversed for failing to give
21   adequate consideration to the factors.  Indeed in Walking
22   Mountain, the Ninth Circuit reversed saying, "All you did
23   was give us a boilerplate on the factors, and the first one
24   you didn't spell out exactly correctly.  And as for
25   objective reasonableness, the claims in this case look
```

1    pretty unreasonable to us, and you didn't address that

2    factor," and, of course, the Court focused on the five

3    factors and went through the list.

4            Second question I think is "What about impecunious

5    parties?  What about poor parties, whether plaintiffs or

6    defendants, who need fees to carry on?" or as Ms. Hurst

7    said, "Don't delay.  We need fees, and we're in trouble.

8    We've been close to bankruptcy.  We almost were driven out

9    of business."  Let me give a couple of answers, and

10   Mr. Zeller, who knows the evidence introduced at trial

11   better than I do, may have some further ones.

12           MGA claimed a number of times to be on the verge

13   of bankruptcy.  Indeed, I remember one particular one when

14   they sought a stay, they went straight to the Ninth Circuit

15   without waiting for Judge Larson even to rule on the

16   application.  They said, "You must decide this case by

17   December 31st or we will literally be out of business.  They

18   ruined my entire Christmas holiday, which was spent

19   responding to that."  And, of course, the Circuit denied the

20   stay or remanded it back.  They didn't -- they weren't

21   destroyed, and they have continued to be in business.

22           As for the appointment of the temporary receiver,

23   what happened there was we had been told all along that they

24   couldn't get any credit, they told the appellate court, you

25   know, "We are in dire straits, and nobody will give us any

Case 2:04-cv-09049-DOC-RNB   Document 10610   Filed 05/27/11   Page 65 of 94   Page ID
#:321315
CV 04-9049-DOC - 05/26/2011 - Vol. 1 of 2

65

1    funds."  And then we find out that there's this company Omni

2    808 that has now infused some $300 million, in effect, in

3    the company.  And Judge Larson said, "I don't understand

4    what's going on here.  First you say you are going to be out

5    of business, you tell the Circuit in a declaration that

6    you've got no access to any credit, and now we find out that

7    you are getting a $300 million infusion that we don't know

8    about."  And he literally said, "I find MGA's finances a

9    mystery, and because of that, I'm going to start with a

10   forensic accountant.  I don't know even how to get a handle

11   on this."  And that was what lead to the forensic

12   accountant.

13           As for MGA's immediate need for the fees to carry

14   on, your Honor, I would suggest they are carrying on.  You

15   and I must have been in conversation last night, because my

16   answer to this one was you filed an antitrust case, so if

17   you need fees to carry on -- any delay here is of MGA's own

18   making.  I'll address the Seventh Amendment issue in a

19   moment.  But I was not arguing that on that basis you should

20   never award fees.  I don't think you should award fees, but

21   that's a different question.

22           The Seventh Amendment problem was the problem of,

23   I would argue, they're claims splitting, which puts us, in

24   effect, dividing claims and deciding equitable issues that

25   are fundamental to those claims in advance of the

1    opportunity for a jury trial where we know full well that
2    these claims are pending.  The Court asked -- and I'll go
3    back to this in a minute, but I can read you the list, your
4    Honor -- exactly the same allegations in the latest
5    complaint, exactly the same were included in the RICO
6    complaint filed last August.  Most of them were in the
7    unfair competition claim that they filed in 2005, and
8    whatever we didn't find there on a list of these issues
9    about litigating and conduct of litigation and market
10   intelligence was in the unclean hands affirmative defense,
11   which they filed in 2007, and literally mentioned the
12   business parts.
13          So if MGA had enough information in August 2010 to
14   file this as a trade secret claim, and it had enough
15   invitation -- information to file it as a RICO claim, which
16   requires a little bit more work in terms, the causation
17   requirements and the like, how can it be that they didn't
18   have enough information to file their antitrust claim at the
19   same time and to illuminate it through discovery?  So this
20   is not a case where we have an impecunious plaintiff who
21   needs his attorneys' fees right now or he won't be able to
22   stay in the game.
23          Mr. Larian, I should add, took half a billion
24   dollars of distributions from his company while Bratz was
25   flying high.  I have heard his well-estimated at numerous

 1    numbers.  None of them, at least from their side, were zero.

 2    So that we have, really, a successful businessman, well

 3    insured, Ms. Hurst chastised me for mentioning insurance and

 4    tells me that not a penny of this is going to go to

 5    insurance.  Well, that sounds like a windfall to me.  You've

 6    got an insurance company paying your fees.  At least you've

 7    got a chunk of them, or maybe half, at least.  And then

 8    you're telling me "We need this to carry on, and we're not

 9    going to give any of it."  I'll leave that to you.

10          A second question this Court asked was exactly

11    what is the scienter requirement for claims splitting.  I

12    would suggest to the Court that it certainly can't be

13    purpose or intent, it cannot within the strict meaning of

14    scienter of a purposeful intent be required.  And the reason

15    it can't be required is because to do so would get rid of

16    res judicata.  In other words, anytime MGA came back and

17    said, "Now we're suing you on a claim arising from the same

18    facts and transactions, and why didn't we bring this before?

19    Judge, it's not our fault," all right?  "We didn't have

20    scienter."  Well, what are you going to do then?

21          Res judicata, the very idea of res judicata is

22    based on the proposition that when two parties get into

23    litigation about a certain subject matter or occurrence,

24    they get one bite out of the apple.  That's their

25    opportunity to raise their claims arising out of that

 1   transaction to raise their defenses.  And just to go down

 2   the list in the antitrust complaint, here are some of the

 3   allegations:  Seeking to litigate Bratz out of business by

 4   pursuing baseless litigation remedies; looks a lot like the

 5   RICO claim; looks a lot like the unfair competition claim,

 6   and looks exactly like the findings they are asking you to

 7   make right now on motivation as well as frivolousness.  I

 8   mean, how do you make a finding that we sought to litigate

 9   Bratz out of business by pursuing baseless litigation

10   remedies without it being influenced by an earlier finding

11   by that very judge for whom you have great respect that

12   says -- that makes a finding precisely on this point, that

13   says, "You know, Mattel did act in bad faith," as Ms. Hurst

14   says, "You've got to go down this road."  We did act in bad

15   faith.  You've got to evaluate our litigation.  Go into our

16   intent.  And then you make that finding, and she says that's

17   binding in the next case.  I find that very troublesome.

18          Now, Ms. Hurst says to me, "But that has nothing

19   to do with the Seventh Amendment because the Court held that

20   the Seventh Amendment was not violated when, in a subsequent

21   case, collateral estoppel was applied and equitable rulings

22   by the Judge were found to be binding."  Your Honor, the

23   reason that case made it to the Supreme Court was because

24   the Circuits were in disagreement as to whether a judge's

25   earlier equitable findings even in a different case would

1    deny the constitutional rights of the party seeking a jury

2    trial in that second case.

3            Subsequently, given that rule that findings could

4    be binding, the United States Supreme Court and every

5    circuit that I know of in the country adopted prudential

6    rules intended to avoid the constitutional issue and to

7    insure that Seventh Amendment rights were fully protected.

8    And the Dairy Queen case, which Ms. Hurst cited in support

9    of her argument that this has nothing to do with the Seventh

10   Amendment, this business of, you know, trying the equitable

11   ones first, the Dairy Queen case says specifically that

12   we've got to preserve to the maximum extent possible the

13   inviolate rights of the Seventh Amendment.  And that's why

14   we're telling federal judges not to decide equitable claims

15   in such a way as to preclude a jury trial in that case.

16           And I can keep going down the list.  The list even

17   includes getting market intelligence so that it affects not

18   only -- this is the antitrust case -- so it affects not only

19   the fees findings but also, what will I'm sure be, the case

20   for exemplary damages.

21           Ms. Hurst suggested that everything in our case

22   comes down to frivolousness.  It doesn't.  I'm the one who

23   argued yesterday, your Honor, that you couldn't just look at

24   one factor, that you had to look at all of the factors.  And

25   if you didn't look at all of the factors, you better have

CV 04-9049-DOC - 05/26/2011 - Vol. 1 of 2

 1    Credence Clearwater Revival, who is very survival of

 2    swampland rock and John Fogerty's willingness and ability to

 3    write lyrics is on the line, because that is the only case

 4    anybody can cite in which the Court focused almost

 5    exclusively on the pursuit of the goals of the Copyright

 6    Act.  And even Judge Rymer went through the factors, was

 7    careful to analyze that, you know, not everybody is John

 8    Fogerty, not everything is credence, you know, et cetera.

 9         So I don't want to say it all comes down to

10    frivolousness.  Indeed, I would say --

11         (Interruption in the proceedings.)

12         MS. ESTRICH:  I'm sorry.

13         THE COURT:  "This does not all come down to

14    frivolousness.  Indeed, I want to say that frivolousness is

15    not even the most important factor."

16         MS. ESTRICH:  May not even be the most important

17    factor.

18         Most courts think objective unreasonableness is

19    the most important factor, and indeed, that's been the

20    ground for reversal when they don't consider it.  And there

21    are numerous Ninth Circuit opinions saying that objective

22    reasonableness or unreasonableness is the critical factor.

23    And I think one of the reasons for that, but we'll go into

24    this a little bit more, is that it is objective, and that

25    courts can look at these claims and make some judgments as

 1   to whether they appear to be at least reasonable.  It's an

 2   interesting shift in burdens, here.

 3          Obviously, during the trial we bore the burden of

 4   proof to prove our claims on the merits through evidence.

 5   This is a shift.  They bear the burden to prove not -- not

 6   that we were wrong.  We know we were wrong.  We had the

 7   world's greatest jury.  They said we were wrong.  They bare

 8   the burden to prove that our claim was subjectively

 9   unreasonable, which is very different from the burden we had

10   at trial.  The fact that we lost at trial, everybody who

11   contest prevailing parties for fees lost at trial.  But not

12   everybody can point to a Ninth Circuit opinion, not even

13   considering Judge Larson and the first trial which said two

14   things.  It said, "A properly instructed jury may, indeed,

15   find for you on the contract claim," in answer to

16   Ms. Hurst's question of whether it was so obviously wrong,

17   "and a well-instructed jury could possibly find for you on

18   the copyright claim," although we think, at least on this

19   record, that it should be more limited.

20          You asked me if it was fair to say that the

21   Circuit really considered the issues involved in the

22   copyright claim on account of the fact that it was just

23   injunctive relief at stake.  As you recall, I'm sure, the

24   Circuit said after it addressed the ownership claim that we

25   could stop here as a matter of holding because once we've

Case 2:04-cv-09049-DOC-RNB   Document 10610   Filed 05/27/11   Page 72 of 94   Page ID #:321322
CV 04-9049-DOC - 05/26/2011 - Vol. 1 of 2

72

1    decided that the ownership claim has to be retried, as we

2    now know when you lose ownership, everything else follows.

3    But the Court then said, "Since we think Mattel could win on

4    ownership, let's help Judge Carter a little bit, give him

5    some guidance about that copyright claim."  The reason the

6    Circuit did that, the reason the Circuit could do that is

7    not only because our position was reasonable on the contract

8    and, indeed, reasonable on the copyright claims,

9    sufficiently reasonable that they thought you might need

10   some clarity on how to do it, but they also did it because

11   MGA argued all those sir issues.

12           I have MGA's briefs here.  They took the

13   injunction because it was based on the copyright findings

14   and the findings of substantial similarity and, you know,

15   the jury verdict of 10 million being, you know, a small

16   percentage of what we were asking for.  They briefed every

17   one of those issues in arguing that the copyright claim

18   didn't hold water and that the injunction was way overbroad.

19   So if you're asking me were the basic issues at stake here,

20   both in terms of contract law and copyright law addressed by

21   the Ninth Circuit, they were fully argued, fully briefed and

22   address specifically by the Ninth Circuit, and unless there

23   be any question -- I noticed that Ms. Hurst has no answer,

24   and I don't blame her because in my conversation with you

25   last night, I couldn't come up with an answer.

1          THE COURT:  Let the record clearly reflect that

2    the Court was talking to itself.

3          MS. ESTRICH:  I was also talking to myself, which

4    is probably a sign that I don't have life either.

5          I heard no answer, your Honor.  I came up with no

6    answer to my -- to what I thought was my fairly clever point

7    yesterday, that the Ninth Circuit decided who the prevailing

8    party was in the Ninth Circuit.  I'm not saying we won.  I'm

9    not saying we won on the CUTSA claim.  If we won, I'd be

10   filing an opinion with you for some fees and exemplary

11   damages.  On the CUTSA claim, and then I'll come back to

12   this, all I said was when you win 26 and you lose 88, it's

13   entirely appropriate, and, indeed, I got cases saying it's

14   required for the Court to, at the very least, take that into

15   account in measuring, you know, the scope of your victory.

16          And the point in O2Micro was, or the way I read it

17   was, trying to decide attorneys' fees as between two parties

18   who in that case had litigated for, I think, seven years in

19   two separate courts, plus the appellate court had changed

20   their claims at least two or three times, trying to do that,

21   and we're both financially solvent.  I'm not sure Borland is

22   any lotus, but they were certainly financially solvent and

23   aggressively represented and needed no incentive.

24   Mr. Larian doesn't need an incentive to defend himself or to

25   sue.  Maybe we can take away some incentives.  In that

1  circumstance, the Court said, "Look, we are going to

2  exercise our discretion.  Given this record, we don't think

3  it's either necessary or maybe easily done or even remotely

4  easily done to segregate these claims."

5          Now, the difficulty of segregation is not itself

6  grounds for the Court to refuse to apportion.  It's quite

7  the contrary.  There's authority that says, "Mr. O'Brien, we

8  hope we don't get that far, but no matter how hard it is to

9  look at these records, you've got to do it and come up with

10  a best guess."

11          But the very idea, here, that MGA desperately

12  needs these funds, that they are not going to go to

13  insurance, that they should go to the lawyers, strikes me,

14  at least, as a windfall.

15          I think the next question Ms. Hurst mentioned was

16  why did I cry, get so upset when I read the Ninth Circuit

17  opinion, and didn't that mean we lost?

18          I get so upset when I read the Ninth Circuit

19  opinion because I think of all of the arguments I would have

20  made had I been the one answering the questions.

21          So just to correct this, Ms. Hurst, my upset is a

22  little bit self-involved.  It is not -- I'm not upset at

23  Judge Kozinski.  I'm upset that I think there were serious

24  and substantial arguments, particularly based on the fact

25  that Mr. Quinn or Mr. Zeller or even myself might have made

1    to the Ninth Circuit.  That's all for me being upset.

2              On the Seventh Amendment, your Honor, just one

3    final point.  Somebody's got a constitutional right to a

4    jury trial.  It doesn't matter if it's a little inconvenient

5    for the lawyers who are looking to get paid now as opposed

6    to a few months from now.  You know, we balance

7    constitutional rights against compelling state interests.

8    We don't balance them against the lawyers.  I'm not doubting

9    their legitimate desire to get paid.  It's something I enjoy

10   as well.  But if there is a Seventh Amendment problem here,

11   particularly a Seventh Amendment problem that has been

12   caused, I would argue by filing a totally duplicative suit

13   where I can find virtually every allegation somewhere else,

14   and where the claim is in key parts virtually identical to

15   the August 2010 complaint, which they could have added an

16   antitrust claim, I would argue that the inconvenience is

17   just not a factor to outweigh a serious Seventh Amendment

18   concern.

19             And I add, your Honor, I don't know if it would be

20   a violation of the Seventh Amendment fee to make these

21   findings right now or not, because we are in a somewhat

22   unique position where we've got a, quote, "separate filing,"

23   which may be a separate case and, indeed, may not be.  And

24   our arguments to you on the motion to dismiss will focus

25   very heavily on this very issue, and, quite frankly, should

```
 1   we lose, very unlikely, of course, we will be re-litigating
 2   the toy fair claims and, you know, the Bratz brief, and is
 3   Ron Brawer enough or was he a disgruntled employee?
 4           Your Honor, maybe you would like three moments
 5   more of that, but our position is those were the issues in
 6   this case, and findings as to the parties motivation to the
 7   extent they require that kind of an investigation is
 8   retrying this case with another name to it.
 9           THE COURT:  You referred to it as Groundhog Day,
10   Counsel.  There was a famous movie --
11           MS. ESTRICH:  I saw it.  I haven't seen any movie
12   in 20 years, but so that was in 20 years.
13           Your Honor, you asked the question your Honor --
14   one of my kind of questions -- what is the difference
15   between frivolous and motivation?  Favorite of mine.
16           Frivolous is obviously an objective standard.  You
17   decide what's frivolous.  The Ninth Circuit decides what's
18   frivolous.  I would argue that the Ninth Circuit, here, has
19   already decided in its opinion in recognizing the
20   reasonableness of our positions, or potential
21   reasonableness, twice.  This is not a frivolous matter.
22           I would say, Ms. Hurst, that you would not have
23   spent the last two years of your life, Judge Carter,
24   Mr. O'Brien, our team, Mr. Larian and Mr. Eckert, nobody
25   would have made the investments we have made if any of us
```

 1    thought this was simply a frivolous lawsuit that could be

 2    resolved on a simple motion.

 3            The motivation question is difficult because

 4    motivation would generally refer to the subjective state of

 5    mind of those who initiated the lawsuit.  And what MGA seems

 6    to be arguing is that even if it you've got a legitimate

 7    lawsuit, and you've got a competitor who is hurting you in

 8    the marketplace, and you think with very good reason that

 9    the Court has detailed, and Mr. Zeller can detail more if

10    you want, with very good reason you suspect that, you know,

11    the new dolls come out, the guy used to work for you, all

12    these employees have gone, there is some suspicious

13    circumstances.  First you get an anonymous letter, you start

14    to investigate.  You ultimately see the contract, and the

15    contract makes clear that the guy was working for MGA when

16    he was working for you.  I mean, I would argue they had sued

17    much earlier than that and come in and saying you have no

18    facts, all you have is a case against Carter Bryant, which

19    is actually where we started.

20            But the larger question is can a legitimate

21    lawsuit be brought against a competitor in the marketplace?

22    Does that prima facia -- that -- that may have a negative

23    impact on the competitor because after all, your

24    competitor's biggest product is something you claim in good

25    faith is yours.

1           Now, could reasonable people foresee that this

2    might have a negative impact?  Sure.  Does that make it bad

3    faith?  Absolutely not, your Honor.  If Mr. Eckert and

4    Mr. Normile were to file lawsuits with legitimate claims

5    against people who didn't have a dime with no prospect of

6    recovery, they would be sued by their shareholders for not

7    serving the interest of the shareholders.  There is no rule

8    in the law that I'm aware that says that filing a legitimate

9    lawsuit if and only if you have some prospect of furthering

10   your position or improving your financial position

11   constitutes bad faith.

12           THE COURT:  Are you asking me to set up two

13   standards; that is, that there are some motivation for a

14   publicly held company to file a specious lawsuit --

15           MS. ESTRICH:  No.

16           THE COURT:  -- than a privately held company?

17           MS. ESTRICH:  No, there is no motivation to file a

18   specious lawsuit, and this wasn't a specious lawsuit.

19           THE COURT:  Why, if you drive your competitor out

20   of business --

21           MS. ESTRICH:  It would be --

22           (Interruption in the proceedings.)

23           THE COURT:  If you drive your competitor out of

24   business or reduce the brand, that's a business motivation

25   whether you're public or private.

1          MS. ESTRICH:  There is nothing illegal about

2    having a business motivation to file a legitimate lawsuit, a

3    reasonable lawsuit.

4          THE COURT:  What about if you file a legitimate

5    lawsuit or believed that you are, and it becomes apparent

6    along the way that, at least, let's say an extremely weak

7    lawsuit?

8          MS. ESTRICH:  Well, there's a difference, your

9    Honor, between extremely weak and specious, and that

10   difference, I would submit, is the difference that is set

11   up.  I mean, we're lawyers.  We're not allowed to bring

12   specious lawsuits.  If we do, we get sanctioned for it.

13         THE COURT:  Then you've got a duty, and you've got

14   lawyers.  You've got a duty to your client.  Now, you've got

15   house counsel, you've got outside counsel, you've got

16   counsel, counsel, counsel.  Those are our clients.  There's

17   a duty to inform them about how this lawsuit is going and

18   how the evidence is developing even before litigation.

19         MS. ESTRICH:  I agree, your Honor.  It was going

20   really well for a while.  I mean, it really was.  I mean, if

21   you look at Mattel and say, "God, they should have known

22   this was a specious lawsuit."  After all, they developed all

23   this great evidence on discovery.

24         THE COURT:  You came in with a $100 million

25   verdict.

```
 1              MS. ESTRICH:  I didn't say that, your Honor.

 2              THE COURT:  Forty, but --

 3              MS. ESTRICH:  And a significant injunction that

 4    was based on the Judge's belief.

 5              THE COURT:  Right.

 6              MS. ESTRICH:  And a victory on the contract, which

 7    is important to Mattel as a matter of business.

 8              THE COURT:  Right.

 9              MS. ESTRICH:  I don't think we can measure this

10    solely in terms of, "Well, what percent return did you get?"

11              THE COURT:  Fair enough.

12              MS. ESTRICH:  You know, Mr. Eckert has repeatedly

13    said that for him protecting intellectual property of the

14    company and making clear to everyone that Mattel will not

15    sit on its hands is a critically important part of

16    protecting the licensing scheme, protecting the intellectual

17    property.  Indeed, one of the Mattel folks said to me this

18    moaning --

19              THE COURT:  You know, I'm going to interrupt you.

20    There's been the subtlety that Mattel is litigious.  Your

21    response in our conversation would be, "So what?  We have

22    the right to be litigious.  We have the right to protect our

23    intellectual property, and anytime somebody steals from us,

24    we have the right to go to court."

25              MS. ESTRICH:  As long as we have a legitimate
```

```
 1    claim.
 2              THE COURT:  Absolutely.
 3              MS. ESTRICH:  You know, there is no rule -- there
 4    is a very clear rule that says if it you keep running to the
 5    courts with illegitimate claims, you'll end up like that guy
 6    who attacked Judge Kozinski, thrown out of every court.
 7    They won't let you file in California, and he's not allowed
 8    to file in Washington.  But bad faith is not bringing
 9    legitimate lawsuits.  Bad faith -- and you asked the
10    connection earlier, and maybe we'll get back to it.  The
11    connection between motivation and frivolousness is if the
12    lawsuit is not frivolous, if the lawsuit is legitimate,
13    proving bad motivation, quite frankly, is extremely
14    difficult because you have to prove not that a legitimate
15    business judgment, you know, affected and influenced the
16    decision to bring a legitimate suit, you've got to prove
17    some kind of personal animus or racial animus, et cetera.
18              And just as I would say to you that being
19    litigious -- I mean, my goodness, you have two litigious
20    parties here -- that being litigious is not the standard,
21    it's being in some way abusive and in bad faith.  So I can
22    sort of contemplate in the back of my head, you know,
23    somebody saying, "Well, I've got a legitimate claim against
24    Carter, but normally I wouldn't bring it, but I don't like
25    him because he ruled against me, so I'm going to bring that
```

1    claim."

2           The claim might not be frivolous, but if you could

3    prove all that, you might have a case of bad motivation.

4           THE COURT:  I've got judicial immunity, Counsel.

5           MS. ESTRICH:  I know you do, and that's why that

6    wasn't a real threat.

7           THE COURT:  I'm just joking.

8           (Laughter.)

9           MS. ESTRICH:  In closing, your Honor, and I'll

10   leave it to Mr. Zeller to --

11          THE COURT:  No, no, no, no.  This isn't run-in.

12   You've been granted the leave to amend.  This is your

13   argument.  You and Ms. Hurst are doing very well.  No other

14   counsel is running into this argument on attorneys' fees.

15   You're it and so is Ms. Hurst.

16          MS. ESTRICH:  Okay.

17          THE COURT:  So I've granted leave for you to come

18   in, but this isn't going to be splitting; no.

19          MS. ESTRICH:  Okay, fine.

20          THE COURT:  If I need more, I'll ask for it.

21          MS. ESTRICH:  I would like to add one or two

22   points about the claim that this case has been abusively

23   litigated, because the Court asked this morning, "Well,

24   maybe Mr. Eckert was a good guy, but maybe we came in later

25   and somehow poisoned that litigation."

```
 1              THE COURT:  I thought it was broader than that,
 2    house counsel, and I don't think I inferred "poisoned."
 3              MS. ESTRICH:  Well --
 4              THE COURT:  The question is advising, you know,
 5    how is this case developing along the way, and you have a
 6    very good point.  You won.
 7              MS. ESTRICH:  It was developing very well --
 8              THE COURT:  A hundred million dollars.
 9              MS. ESTRICH:  I think whatever we won, we won a
10    victory of principle, we won an injunction, we sent a
11    powerful message.  I would argue, frankly, that what's
12    happened to the Bratz brand is -- well, let me get to this,
13    but that was the wrongful injunction action.  They raised
14    these same concerns, and that was not legitimate.  That's
15    the whole purpose of their antitrust case is to try to
16    recover exactly the damages they are seeking here.
17              But to return just very briefly, we didn't rely
18    solely -- well, let me just add one more point.  In terms of
19    the way this was litigating, I was collecting some numbers,
20    actually, from Mr. Zeller.  We won more motions to compel --
21    I mean, if we want a tip for tat this, which I don't think
22    is what the Circuit or the Court or anybody else --
23              THE COURT:  Let's stop right there.  No, you
24    didn't.  Here is what really occurred, so we have a very
25    clear record of this.  When you and -- not you, but MGA and
```

```
1   Mattel came in here, we had what I call an "ah-ha" moment.
2   The "ah-ha" was you better start over.  There had been
3   numerous abuses by both sides concerning privilege logs, and
4   I made the statement a number of times.  From the beginning
5   there was a chance that this Court could have granted
6   terminal sanctions to one or both parties, and I kept that
7   as a neutral statement.  Frankly, to say "appalled" is a
8   kind word.  And what we really occurred is the following, so
9   we have a very clear understanding between you and me.
10          One, we're focused on interrogatories.  Then it
11  went to the special master who, of course, needed time
12  because of the volume of material.  After his report to
13  Judge Larson, substantial time had passed because he needed
14  that time with the flood of litigation by both parties.
15          Then what occurred, so we have an absolutely
16  accurate rendition of this, is that Judge Larson then made a
17  ruling.  Then each party, depending upon who was on the
18  unfavorable side, asked for a motion for consideration.  By
19  the time the ruling had been handed down concerning the
20  interrogatories, literally three to four months had passed,
21  then each party took the position, "Well, you didn't comply
22  with Discovery Motion Number 181, so we don't have to comply
23  with Discovery Motion Number 202."  In other words, what you
24  did, and I don't mean you personally, but what each party
25  did was absolutely abused the process.  Now, if you turn me
```

CV 04-9049-DOC - 05/26/2011 - Vol. 1 of 2

85

```
 1    loose, I can write quite an opinion about that because --
 2            Now, you listen to me for a moment.  Now we're
 3    having a heart-to-heart conversation.
 4            MS. ESTRICH:  I'm listening.
 5            THE COURT:  Yeah, you listen intently.
 6            So what occurred when it came to my court was the
 7    abuse was so strong on both sides, the trade-offs, that it
 8    felt ridiculous to start with a sanction of X with one party
 9    and Y with another party because I didn't want to get into
10    the sanctions game.  Trust me, this case, mine from the
11    beginning, I doubt that it would have gone to trial.
12            Number two, I'm inviting the Circuit to look at
13    the privileged logs and the way they were used.  Now, when
14    it came to this Court, we started all over again.  I don't
15    think Mr. Quinn was here but Mr. Zeller was here on all
16    occasions.  Ms. Hurst was here and Mr. Larian was here and
17    Mr. McConville was here.
18            No.  Mr. Quinn was here.  Mr. Price was not here.
19    My apologies.
20            I said you're starting over, everybody better
21    start over.  You've got a clean bill of health, but don't
22    abuse this process.  And then we switched from depositions
23    because interrogatories were going nowhere, and then I
24    demanded that my special master get actively involved and
25    have been actively buried with paperwork.  And I used the
```

1    famous example of the 859-page briefing that I got at

2    4:00 in the afternoon, and I think it was at about 11:00 or

3    11:30 when I wheeled that in with two law clerks and dumped

4    it onto the courtroom floor.

5              Now, by 1:00, everybody had worked out that

6    ridiculousness, so we always have a clear understanding

7    between the two of us, and it was 20 pages and 20 pages and

8    10 in response and 50 exhibits, which could have been a long

9    time ago.  Now, that's the ridiculousness of both parties,

10   frankly.  So when we get this clear understanding, I think

11   both parties are lucky that they even got to trial, frankly.

12   When I got it, I didn't know where to start.  And I'll go

13   back to a number of law firms on the other side, so it's

14   really coequal in this regard, and I viewed it as coequal.

15             So you didn't win or prevail on the majority of

16   the discovery motions once you got to my court.  It was

17   pretty coequal in terms of the numbers if you look at the

18   record.  I think we turned out 157 discovery motions, and we

19   short-circuited those.  We didn't allow the parties to take

20   the position that you had unending time.  I think you had 48

21   hours to turn that recommendation by the discovery master

22   around.

23             Listen to me.  Mr. Zeller, you've got plenty of

24   time.  I want you focused here.  Quit passing notes for a

25   moment.

1          You had 48 hours to turn that around if you

2     disagreed with the motion, but it came back right away.  I

3     think things then settled down.  We got a series of back and

4     forth, and we tried to get the discovery to you, and we got

5     it on a track that I think it should have been on from the

6     very beginning.  You did not prevail on the number of

7     discovery motions you think you did.  It's pretty coequal

8     between the parties once you got here.  You did prevail if

9     you take the total number going back historically from the

10    beginning of the case on the majority of motions.  And quite

11    frankly, I think the frustration on your side was, "We're

12    not getting compliance from Mr. Larian and MGA."  That was

13    frustration was voiced numerous times.  I heard that, okay?

14    I think that straightened itself out very quickly.

15          Now, each of you will have some comment and some

16    concern about what the party finally didn't give up, but --

17          MS. ESTRICH:  I understand.

18          THE COURT:  Okay.  So let's correct that record.

19          Now, I want you to finish.

20          MS. ESTRICH:  Your Honor, "coequal," as you seem

21    to be suggesting, means that both sides had a motivation to

22    litigate aggressively.  We're not asking them to pay us for

23    litigating aggressively.

24          THE COURT:  You don't have an option.

25          MS. ESTRICH:  I'm not contesting their fees for

```
 1    being overly aggressive in discovery.  I'm not engaged.

 2    That's what I meant by saying I'm not engaged in that

 3    particular tit for tat.

 4              THE COURT:  By the way, I hear your argument.  The

 5    over aggressiveness isn't over aggressiveness when you are

 6    not getting compliance.

 7              MS. ESTRICH:  That is my argument, and my argument

 8    would be that it doesn't turn on, you know, "Did we win five

 9    more than them, did they win five more than us?"  Have they

10    proven by that, by the fact that we engaged in conduct

11    allegedly, not that it conceded, but that we engaged in

12    conduct very much like what they engaged in, that can't

13    prove bad faith, your Honor.  If that's their best argument

14    for our elicit motivation -- as I heard it, they had two.

15    They had, "You guys are bad litigators.  You're overly

16    aggressive.  You act in bad faith."  Blah-blah-blah.  "You

17    should have known your claim was going down the hill."  I'll

18    be honest with you, your Honor, I didn't know that until the

19    Ninth Circuit argument.  I think there was a substantial

20    sense that with a respect to Judge -- like Judge Larson who

21    had carefully considered the case, that the Court might well

22    choose to show deference to his careful consideration to

23    resolve issues where it realized there was a reasonable

24    disagreement in his favor.

25              THE COURT:  Sure.
```

```
 1          MS. ESTRICH:  And if you say to us, "Well, after
 2   you lost in the Court of Appeals and got remanded for a new
 3   trial basically with Judge Carter, why didn't you tell your
 4   clients to drop it right there?  Was it bad faith to think
 5   you should go forward?"  I would simply say that the Circuit
 6   itself left open as the Court ultimately held very serious
 7   and substantial claims.  And the Circuit itself suggested
 8   that -- I know I've said this a few times, but it's
 9   critically important -- that it might indeed work out that
10   we would win on the contract, win on copyright, and then,
11   indeed, said to you that now we don't mean to say no
12   equitable relief is appropriate here.  We just want you,
13   with all due respect to Judge Larson, to be a little more
14   careful and constrained and using proper instructions, but
15   it even said equitable --
16          THE COURT:  Let's -- let's leave the record with
17   also that he's an extraordinary colleague and an
18   extraordinary judge.  I hear too much, unintentionally, even
19   in my colloquy that there is some criticism.  There's none.
20          MS. ESTRICH:  And your Honor, I happen to have
21   great respect for Judge Larson.
22          THE COURT:  So let's go on.
23          MS. ESTRICH:  And so the fact that he, on de novo
24   review, was found to have erred in his instructions and
25   holdings on a contract claim and a -- I would submit a
```

 1    fairly complicated and sophisticated issue.

 2              THE COURT:  Right.

 3         MS. ESTRICH:  Ms. Keller referred in her closing,

 4    these are really hard issues, and the Circuit corrected

 5    them, and his correction helped them in some respects, at

 6    least left doors opened, in some respects.

 7              So I would argue, at least, that until the verdict

 8    came down, there would be no reason to advise our clients

 9    that what had been a legitimate claim some years ago, what

10    Judge Larson viewed as a legitimate claim, what the first

11    jury viewed as a legitimate claim, what the Circuit said was

12    the kind of claim that we might ultimately triumph, I don't

13    know the moment in there where we're supposed to say,

14    "Client, drop it, this is in bad faith."  And as for

15    aggressive litigation tactics, I don't think you can't be a

16    source finding bad faith as you, yourself, have suggested,

17    and I want to do it in the kindest possible terms.

18              The procedures we followed and the timing involved

19    prior to coming to this Court, with no criticism for

20    anybody, made any production a federal case, and both sides

21    took aggressive positions.  Whether those positions were

22    justified is not the issue here.  It's whether we had a bad

23    motive.

24              THE COURT:  Hindsight is always great.

25              MS. ESTRICH:  Very excellent, hindsight.

1          THE COURT:  Sure.

2          MS. ESTRICH:  Finally, I'd like to address, unless

3     the Court has more questions for me, I'd like to address

4     this issue about compensation.

5          Ms. Hurst says, and she's been generally

6     passionate about this, and I'm in no way criticizing that,

7     that MGA deserves to be compensated, and that whatever you

8     order in fees won't be nearly enough to compensate them.

9          The big issue I had with myself last night was

10    compensated for what, right?  Compensated for the wrongful

11    injunction that they had no basis to challenge?  We've been

12    down that road before.  We are not entitled to compensation

13    for the wrongful injunction that, by the way, never went

14    into effect.

15         Compensation for the effects of litigation, which

16    both in the criminal and civil side, you know, litigation

17    has affects on people.  That's why we have Noerr-Pennington

18    and other doctrines that insure that you have access to the

19    Court's understanding that obviously bringing suit may hurt

20    somebody, competitively, personally, et cetera.  But the

21    other point on that is that that is their whole antitrust

22    case.  I mean, if they are asking you for compensation

23    through attorneys' fees for the effects of litigation, what

24    are they doing in the antitrust case?  I never heard a case

25    where attorneys' fees in a copyright case were intended to

 1    compensation for what they are now claiming was an antitrust

 2    violation.

 3            And while I have no doubt that this litigation has

 4    been painful for MGA, the issue in front of us right now is

 5    attorneys' fees for the copyright claim.  It's not for the

 6    general damages in the marketplace.  It's not for the

 7    wrongful injunction.  As for killing the brand, the decline

 8    of the brand started long before we jumped in, but those are

 9    factual questions.

10            THE COURT:  That may be true, but it certainly

11    shortened the life expectancy from shelf space to retailers

12    who literally cancelled contracts, but that's not part and

13    parcel --

14            MS. ESTRICH:  Of the copyright claim.

15            THE COURT:  -- of the copyright claim.

16            MS. ESTRICH:  Fine.

17            And one could argue that, you know, that the thing

18    for MGA to do is, you know, either recommit itself to Bratz

19    and make it so fabulous that it would be on everybody's

20    shelves or come up with the next Bratz.  The fact that MGA

21    is in trouble as a company, and if you want to try this

22    antitrust case -- you'll hear more than you probably would

23    like about this -- has a great deal to do with the business

24    and economic choices they made with their inability to

25    develop new dolls.  I mean, I don't really think this is the

1    stuff of the Court, but the bottom line is that Mr. Larian

2    had a big company, maybe not as big as ours, but certainly

3    he's not an impecunious defendant saying, "I would never get

4    a lawyer unless that lawyer expects fees."

5              He had a wide range of financial and personal

6    backers.  He had an insurance policy because these things

7    happen in business.  And he made a choice to litigate

8    aggressively.  I'm not accusing him, at least I'm not --

9    that's a bad faith choice.  We made the same choice; the

10   stakes were high.  But as many times as it has been repeated

11   in this case, the 9,000 plus pages of billing records we

12   received, even with all the descriptions blocked out, should

13   put to rest once and for all the David and Goliath

14   comparison that MGA likes so well.  David had a slingshot.

15   Isaac Larian had 13 law firms.

16             Thank you very much.

17             THE COURT:  All right.  Now, if I need more

18   argument concerning this, I'll request this.  That's

19   concluded.

20             MS. ESTRICH:  Thank you, your Honor, and thank you

21   for your time.

22             THE COURT:  Thank you.  It's a pleasure.

23             Now, we have exemplary, don't we, to go?  And then

24   the comments concerning my third question.

25             But let me talk to White/Experian because you're

CV 04-9049-DOC - 05/26/2011 - Vol. 1 of 2

94

1    coming from all over the country.

2              *(Another matter held.)*

3              *(Recess.)*

4                        -oOo-

5                   **CERTIFICATE**

6

7         I hereby certify that pursuant to Section 753,

8    Title 28, United States Code, the foregoing is a true and

9    correct transcript of the stenographically reported

10   proceedings held in the above-entitled matter and that the

11   transcript page format is in conformance with the

12   regulations of the Judicial Conference of the United States.

13

14   Date:  May 27, 2011

15

16

17   _____

                  JANE C.S. RULE, U.S. COURT REPORTER
18                CSR NO. 9316

19

20

21

22

23

24

25