1            UNITED STATES DISTRICT COURT

2          **CENTRAL DISTRICT OF CALIFORNIA**

3        **SOUTHERN DIVISION AT SANTA ANA**

4     HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6

MATTEL, INC., ET AL.,        )

7                     )

         PLAINTIFFS,    )

8                     )

       vs.          ) CV NO. 04-9049-DOC

9                     ) VOLUME 2 of 2

MGA ENTERTAINMENT, INC., ET AL.,  )

10                   )

       DEFENDANTS.    )

11 _____)

12

13

14      REPORTER'S TRANSCRIPT OF PROCEEDINGS

15         SANTA ANA, CALIFORNIA

16        THURSDAY, MAY 26, 2011

17           10:54 A.M.

18

19

20        **DEBORAH D. PARKER, CSR 10342**
           **OFFICIAL COURT REPORTER**
       **UNITED STATES DISTRICT COURT**

21        **411 WEST FOURTH STREET**
            **SUITE 1-053**

22     **SANTA ANA, CALIFORNIA 92701**
         **(714) 542-8409**

23      **D.PARKER@IX.NETCOM.COM**

24

25

```
1    APPEARANCES OF COUNSEL:

2         FOR THE PLAINTIFF, MATTEL, INC.:

3                             JOHN QUINN
                              WILLIAM PRICE
4                             SUSAN ESTRICH
                              MICHAEL T. ZELLER
5                             QUINN EMANUEL URQUHART
                              & SULLIVAN, LLP
6                             865 S. FIGUEROA STREET
                              10TH FLOOR
7                             LOS ANGELES, CALIFORNIA 90017
                              (213) 443-3000
8

9         FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:

10                            THOMAS S. MC CONVILLE
                              ORRICK HERRINGTON & SUTCLIFFE, LLP
11                            4 PARK PLAZA
                              SUITE 1600
12                            IRVINE, CALIFORNIA 92614
                              (949) 567-6700
13

14                            ANNETTE L. HURST
                              ORRICK HERRINGTON & SUTCLIFFE, LLP
15                            THE ORRICK BUILDING
                              405 HOWARD STREET
16                            SAN FRANCISCO, CALIFORNIA 94105
                              (415) 773-5700
17

18                            JENNIFER L. KELLER
                              KELLER RACKAUCKAS, LLP
19                            18500 VON KARMAN AVENUE
                              SUITE 560
20                            IRVINE, CALIFORNIA 92612
                              (949) 476-8700
21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

3

1    ALSO PRESENT:

2                          JEANINE PISONI
                         MGA ENTERTAINMENT, INC.
3                        16360 ROSCOE BOULEVARD
                         SUITE 105
4                        VAN NUYS, CALIFORNIA 91406

5
                         ROBERT ECKERT, MATTEL CEO
6                        ISAAC LARIAN, MGA CEO

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1     SANTA ANA, CALIFORNIA; THURSDAY, MAY 26, 2011; 10:54 A.M.

 2           THE COURT:  All parties are present.

 3           Counsel are present.

 4           My apologies, Ms. Keller.  If you would like to

 5   begin with your arguments today.

 6           MS. KELLER:  Thank you, your Honor.

 7           Your Honor, I think we start with the fundamental

 8   premise that the goal of punitive damages is to punish and

 9   to deter future misconduct, but also to make an example of

10   the wrongdoer.  Here, the goal should be to punish Mattel's

11   long-term wrongdoing and protect the public as well as its

12   competitors from future misconduct either by Mattel, or by

13   other potential wrongdoers.

14           We have widespread media coverage on this case.

15   Corporations all over the world are watching to see what

16   this court does about Mattel's multi-year systematic

17   corporate espionage against -- not just MGA but against all

18   of its competitors which, as the court knows, the case law

19   allows the court to look at in determining the degree of

20   reprehensibility.

21           If no punitive damages or only a slight amount

22   that doesn't cause Mattel any discomfort are levied, then

23   the message will be that Mattel has gotten away with it, and

24   Mattel has made a business decision to operate in this

25   unethical way and has not paid any price for it.
```

| 1 | We had Google alerts set when the verdict came out |
|---|---|

1            We had Google alerts set when the verdict came out

2     to see what kind of media coverage was ensuing.  And within

3     the first hour, there were over 1,100 reports worldwide in

4     various publications that were flooding in.  It was -- it is

5     one of the most --

6            THE COURT:  I'll joke with you.  Half of those

7     were the associates for both sides.

8            MS. KELLER:  These were media reports.

9            THE COURT:  Oh, okay.  Thank you.  I'm sorry.

10           MS. KELLER:  I'm not talking about e-mails.  I'm

11    talking about media reports around the world within an hour

12    of this verdict.  So to say that other companies are

13    watching to see what happens here is no overstatement.

14    Companies are watching around the world.  And that's

15    especially true because Mattel has held itself out publicly

16    as an industry leader as one of the world's most ethical

17    companies and, yet, it was engaging in a systematic pattern

18    of utterly unethical conduct, utterly reprehensible conduct.

19    It hasn't shown any remorse whatsoever.  None.  Zero.  And

20    instead it has tried to blame MGA.

21           You would expect that in a situation where this

22    company has been exposed as it has for its wrongdoing,

23    through its market intelligence department, that faced with

24    the prospect of punitive damages, that Mattel's core people

25    would be here apologizing to this court, apologizing to the

1    public, apologizing to MGA.

2              THE COURT:  Why?  They've got appellate rights.

3              MS. KELLER:  They may have appellate rights, but

4    there is no question as to what actually happened in terms

5    of the market intelligence unit.  They can raise all the

6    technical arguments they wish, but the facts came out, the

7    facts of what was occurring are clear.  You would expect

8    that Mattel would be taking steps to make sure nothing like

9    that ever happened again.  You would expect that they would

10   be in here showing you a new compliance program, showing

11   HR pamphlets on this, showing you training videos to keep

12   anything like this from happening again.  You would expect

13   that you would hear from some special committees of the

14   board on corporate governance.  You would expect to hear

15   from an audit committee.  You would expect to see an apology

16   of some kind for the conduct in a reassurance, *Don't worry,*

17   *your Honor, we don't need to be deterred.  We have learned*

18   *our lesson.  We're going to make sure nobody in the company*

19   *ever does these sorts of things again.*

20             And, instead, what you heard is the CEO,

21   Mr. Eckert, up on the stand saying, literally, anything that

22   his attorneys suggested he say.  You heard him testifying

23   that there was no market intelligence library.  There was

24   just a storage closet on the ninth floor with a couple of

25   boxes in it, knowing full well because he was heard when all

```
1    of us heard it from Mr. Moore, himself, that 35 boxes of

2    documents from the market intelligence library on a

3    different floor had been carted away and stored at the

4    offices of outside counsel.

5           Mr. Eckert started out denying there even was such

6    a thing.  That was Mattel's position:  Deny there even was a

7    market intelligence department.  Then, when confronted with

8    e-mails from the department, claim it was just

9    Mr. Villasenor.  Then, when confronted with the fact that it

10   was more than Mr. Villasenor, claim it was only two and

11   that's not a department.  Then, when confronted with the

12   fact that it's actually multiple people, well organized,

13   complete with how to steal manuals, complete with detailed

14   instructions on creating false identities, complete with the

15   involvement of Mattel's accounting department to create

16   phony invoices for their phony companies, you would think

17   that they would have at least admitted, yes, this happened.

18   But they didn't.  They kept denying it and denying it.

19          And, finally, when the proof was simply

20   overwhelming they said, *Oh, well, big deal.*  And they're

21   still saying "big deal" in their briefs.  They're still

22   taking the position that it wasn't anything important.

23   In fact, Mattel stresses in its briefs that, quote, no one

24   died, unquote.  And that after all, this is, quote, just a

25   doll, unquote.  And, you know, to say that belies Mattel's
```

1    own stated reasons for pursuing its claims against MGA for

2    nearly a decade so, vigorously, as you just heard a little

3    while ago from Ms. Estrich.

4          Mr. Eckert has made it a huge priority to try to

5    protect Mattel's intellectual property.  Yet, now, when the

6    jury has spoken and found that Mattel's conduct was willful

7    and malicious, all of a sudden, it's just a doll and no big

8    deal.  Mattel even blames MGA for being duped by cheap,

9    phony business cards and tries to equate its own systematic

10    and fraudulent actions with MGA's trying to get occasional

11    information from retailers, which is further evidence that

12    Mattel has zero remorse.  And if the court doesn't do

13    something to create a deterrent effect, it will not be

14    deterred.

15          They are completely, completely unapologetic about

16    this.  They have shown no indication, whatsoever, that they

17    appreciate the seriousness of the conduct.  They have

18    described it as merely taking a sneak peek.  They have

19    denigrated Mr. Villasenor as somebody who was just trying to

20    hit them for some quick cash.  When Mr. Villasenor, quite

21    properly, had complained that he felt his actions were

22    subjecting him to potential criminal liability, which they

23    certainly could have and the court has certainly seen

24    Assistant U.S. Attorneys, coming and going from this court,

25    observing the proceedings with great interest.

```
 1              In closing argument, Mattel said that Carter
 2    Bryant --
 3              THE COURT:  Well, just a moment.  That's a subtle
 4    inference.  They were probably up watching outstanding
 5    counsel for both sides.  I'm not going to draw an inference
 6    from that.
 7              MS. KELLER:  Nevertheless, the conduct is not
 8    mischaracterized as subjecting Mr. Villasenor to potential
 9    criminal liability.  It certainly could have, as well as
10    Mattel itself.
11              We heard in closing argument that this was, quote,
12    the greatest intellectual property heist of all time.  We
13    heard in opening statement that a billion dollars was due to
14    Mattel.  And we heard that in voir dire that we were going
15    to be hearing figures like a billion dollars.  And yet, now,
16    suddenly, everything here is minimized.  Suddenly, stealing
17    another's trade secrets is just part of the game.  But this
18    pattern that Mattel showed really does constitute among the
19    worst trade secret thefts that we've seen in California case
20    law.  Given that, doubling the compensatory award is not
21    only in keeping with CUTSA, but it serves the interest of
22    CUTSA.  It serves the interest that CUTSA lays out.
23              And as we go through some discussions of the cases
24    dealing with punitive damages, I think it's really worth
25    remembering that Section 3426.3 governs here.  This isn't a
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

 1   generalized punitive damages discussion.  The legislature

 2   has made very specific provisions for what can happen in a

 3   case like this one where there is a finding of willful and

 4   malicious conduct.  And courts applying Section 3426.3 have

 5   doubled damages with far fewer trade secrets in play and far

 6   less willful and intentional egregious conduct than we have

 7   here.

 8           Mattel's argument is that twice actual damages is

 9   excessive, because the jury already awarded substantial

10   compensatory damages.  The logic in that is that it would

11   mean that because Mattel is guilty of an enormous theft of

12   trade secrets, because it really -- because its conduct was

13   so bad over such a long period of time that the exemplary

14   damages award should be small.  And that makes no sense at

15   all.  The duration and the egregiousness of it, under the

16   case law, militates in favor of a larger, not a smaller

17   punitive damages award.  And the size of the award we're

18   requesting would only amount to 7.02 percent of Mattel's net

19   worth, so it's entirely, entirely reasonable.

20           THE COURT:  Is net worth a proper argument?  I

21   would think that that wouldn't be the standard.

22           MS. KELLER:  It's not the standard.  But the cases

23   suggest, as I'll be discussing later --

24           THE COURT:  Wouldn't income be more appropriate?

25           MS. KELLER:  Well, the cases suggest that a

1    reasonable limit may be, not is, but may be 10 percent of

2    net worth.  The cases analyzed it in terms of the net worth

3    of the company, not the income.  And we'll be going into

4    that.

5            So this would amount to 7.02 percent of Mattel's

6    net worth, well within and lower than the 10 percent number

7    that some courts have said is a reasonable figure to set as

8    a potential maximum, although there is no hard and fast

9    rule.

10           And I'm also going to be talking, your Honor,

11    about -- later on about attorney's fees and costs under the

12    Trade Secrets Act for the specific trade secrets in issue

13    here.  And we'll be discussing that apportionment is not

14    required, whereas here MGA's claims are interlinked.  MGA

15    established that its 2005 lawsuit shut down Mattel's

16    conduct, ultimately, eventually and that if it weren't for

17    MGA's lawsuit, that conduct would still be going on, harming

18    not just MGA, but its competitors because this conduct was

19    not limited to MGA.  Mattel's conduct was designed to give

20    it a competitive advantage against the whole universe of

21    competitors so that it could sit and put together pieces of

22    the puzzle and decide how to market, what products to

23    introduce, what products to withhold, what products to copy.

24           Now, as I discussed, the California Uniform Trade

25    Secrets Act is a statutory scheme, so some of the cases that

```
 1    Mattel has cited, which do not involve a statutory scheme --
 2    it involved very different kinds of cases, everything from
 3    product liability to insurance bad faith are not entirely on
 4    point, although we'll be discussing them.
 5              But it's clear that the legislature thought that
 6    double the compensatory damages was an appropriate amount in
 7    the right case.
 8              THE COURT:  Just a moment.
 9         (Pause.)
10              THE COURT:  Counsel.
11              MS. KELLER:  California -- the code itself, 3294,
12    actually talks about that punitive damages are also for the
13    sake of example, not just to punish and not just to deter
14    but to make an example of the wrongdoer to deter others.
15    There are three factors used to determine the
16    appropriateness of a punitive damages award:  One is
17    reprehensibility; two is harm and then the third is net
18    worth, whether the company's net worth establishes its
19    ability to pay the amount that is being discussed.
20              And Adams versus Murakamai established the factors
21    to be considered when assessing punitive damages awards; and
22    then later, the Adams factors were applied in trade secret
23    cases, including the Cloud & Associates case, the Vacco,
24    V-A-C-C-O, case and the 02Micro case, which are all in our
25    brief.
```

1           And the U.S. Supreme Court in *BMW of North America*

2    *versus Gore* established that the most important -- the most

3    important factor in determining the reasonableness of a

4    punitive damages award is a degree of reprehensibility of

5    the defendant's conduct.  So the more reprehensible the act,

6    the greater the appropriate punishment, assuming all other

7    factors are equal.  And that is a quote from Neal *versus*

8    *Farmers Insurance Exchange*, and we've had some discussions

9    of the *Neal* case and other context as well.

10          If we have look at the U.S. Supreme Court's

11   analysis of the determination of reprehensibility, how do we

12   determine what's really reprehensible conduct?

13          The Supreme Court has talked about, one, whether

14   the harm was physical and not merely economic; two, whether

15   the conduct demonstrated an indifference or reckless

16   disregard for the health or safety of others.  But the

17   factors that apply here -- the third is whether the target

18   of the conduct was financially vulnerable, and I think

19   that's a relative analysis.  I think when you have a company

20   that is a much larger publicly traded company with virtually

21   infinite resources against a smaller privately held company,

22   I think arguably you do have a financially vulnerable

23   target.

24          But the two other factors that are in issue here

25   really are whether the conduct was repeated versus being an

```
 1     isolated incident.  And that is critical factor and whether
 2     the conduct was a result of intentional acts or mere
 3     accident, another critical factor.  And if we look at the
 4     case of Mobile Mini versus Khordt, K-H-O-R-D-T, an Eastern
 5     District case from 2007, we see the court holding that even
 6     though there was no evidence of the first three subfactors,
 7     the remaining subfactors favored a high-end punitive damages
 8     award, because in that case, the defendant's conduct
 9     involved repeated actions, and it was a result of
10     intentional trickery and deceit.
11            And then, if we look at the Sun Pacific Farming
12     Co-op case, again, in that case, four of the factors were
13     absent.  But the fifth factor alone -- evidence of
14     intentional and malicious conduct -- was present.  That was
15     enough in that case to award punitive damages.  Mattel
16     really doesn't dispute in its briefing the test.  It does,
17     however, make much of the fact that we didn't argue three of
18     the five factors.  But Mattel ignores the fact that these
19     factors are used, generally, to consider punitive damages
20     and are not specifically tailored to trade secret cases.  A
21     theft of trade secret usually involves purely economic harm,
22     not physical harm.  And there is unlikely to be a health and
23     safety issue.  The victim may not be financially vulnerable.
24     So if all of those factors had to be met, generally
25     speaking, you never have the punitive damage award in a
```

1     trade secret case.  And so, they're not required.  And

2     California's legislature recognized that in adopting Civil

3     Code Section 3426.3 which authorizes exemplary damages in

4     theft of trade secret cases.

5             So there are a number of trade secret cases

6     awarding substantial exemplary damages and that disproves

7     Mattel's approach.

8             The evidence here and the jury's finding here of

9     willful and malicious trade secret misappropriation really

10    does speak to a new bar for reprehensibility.  It was merely

11    20 years that Mattel engaged in misconduct.  Nearly 20

12    years.  Their market intelligence department used fake

13    identification to sneak into various competitors' showrooms,

14    including MGA, and that was outlined and endorsed in a

15    written handout that employees were given about exactly what

16    to do to fake their identities as retailers.  Mattel took

17    information about the appearance, operation, intended play

18    pattern, plans to advertise on TV and FOB pricing of MGA's

19    unreleased products, which is valuable information that

20    Mattel witnesses have told the jury was confidential and

21    which shouldn't have been in Mattel's hands.

22            But it was not only in Mattel's hands, the stolen

23    materials were distributed throughout Mattel and were even

24    presented in the Mattel theater to hundreds of employees

25    accompanied by slick videos, one of which the court has

1    seen.  Mattel executives received the information and knew

2    what the market intelligence department was up to.  Mattel

3    executives now, finally, when forced, acknowledged that this

4    conduct was improper and unethical.  But what did they do

5    with the people committing it?

6            The Mattel spies were praised, promoted, given pay

7    increases.  Never disciplined.  When MGA litigation

8    threatened to expose this conduct, what did Mattel do?

9            It buried the evidence.  And, your Honor, the only

10   way we ever found out was by chance.  Despite many, many

11   document requests that were appropriate to cover the subject

12   matter, we didn't receive anything from Mattel.  It was only

13   by deposing Mr. Villasenor who brought with him the

14   documents, who brought with him the how-to-steal manual.

15   Who brought with him the letters -- the letter to Mattel

16   about his fears of criminal liability, who brought with us

17   the settlement agreement that contained a hush provision

18   preventing him from disclosing the information to anybody

19   who had pending action against Mattel or a future action

20   against Mattel.

21           Had it not been for the chance deposing of

22   Mr. Villasenor, we wouldn't know about it today.  It would

23   still be buried along with the 35 boxes that were shipped

24   out to outside counsel somewhere.  It would still be buried.

25           So we -- as I'll be discussing in a little bit,

1   Mattel's lawyers knew all about this and regularly used the

2   information.  Box 10 of the 35 that the court looked at

3   briefly and that we were allowed to look at briefly were --

4   contained requests of lawyers for the information going back

5   years.  So there wasn't even any compliance function

6   possible because the compliance function itself was

7   infected.

8            This was really widespread systemic conduct that

9   was, if not actively countenanced and endorsed, at best

10  ignored and tolerated by Mattel's own lawyers.  And we heard

11  they had a staff of over 30 in-house.  And, of course,

12  they've had numerous law firms, including the current trial

13  counsel advising them along the way.  No one said, *Stop it.*

14  What they said was *Bury it.*  And that's what was heard for

15  years and years.

16           So Mattel's competitors would still be dealing

17  with a situation where Mattel was spying on them and finding

18  out their game plans and presenting information about them

19  to their hundreds of people had it not been really for

20  chance.

21           Conduct that demonstrates a business practice or

22  policy has been said by the U.S. Supreme Court in *BMW of*

23  *North America* to be more blameworthy and warranting a

24  stronger penalty to deter continued or repeated conduct of

25  the same nature.  And the court has said repeated misconduct

```
 1    is more reprehensible than an individual instance of
 2    malfeasance.  The scale and profitability of a course of
 3    wrongful conduct also justifying an award of punitive
 4    damages.
 5               THE COURT:  How do I know the reprehensibility of
 6    this, when the court used the term with you and Mattel's
 7    counsel, that it was willing to open up Pandora's box.  By
 8    that conversation, if you recall, when these 35 boxes were
 9    being looked at in Los Angeles and we were discussing this
10    subsequently, there was a conversation about Mattel's
11    initial request that discovery go no further, which this
12    court and Judge Larson had acquiesced to.  Then, when these
13    boxes were discovered -- I've certainly never looked through
14    all 35 boxes.  But Mattel has taken the position, just as
15    you have on behalf of MGA and Mr. Larian, that the court
16    order was by both parties not to be extended.
17               Perhaps you can argue that Mattel, obviously,
18    feared competitor suits if this conduct was going further
19    than Mr. Larian -- I'm sorry, MGA.  But MGA took the same
20    position and Mr. Larian did also concerning Mattel's concern
21    and complaint that MGA was entering into similar activity.
22    I think I termed it, a deal being struck with the devil.
23               Now, that was -- hold on.  My turn.
24               That was -- well, my apologies.  I saw the body
25    language flinch, so I assumed something.  So my fault.  You
```

1    were just itching.

2           What that means is, I'm never going to be certain

3    of the full reprehensibility or innocence of this at this

4    stage when you're arguing this to the court.  I would feel

5    extraordinary foolish taking a position with incomplete

6    discovery in this regard.  That would be unduly exemplary.

7    By the same token, there may be enough there for exemplary

8    damages.  And the difficulty for me may eventually be no

9    exemplary damages on an incomplete record or exemplary

10   damages and not knowing how to quantify that.  And that's

11   the position, once again, that the court's been put in,

12   through no fault of counsel.  You both made that request.

13   But it's awfully uncomfortable for a court to be in the

14   position of not having all the facts it can get.

15          So, your turn.

16          MS. KELLER:  You don't need to go beyond the

17   record of this trial and the evidence that was presented in

18   this case to make those findings.  There is ample, ample

19   evidence.

20          THE COURT:  What happens if it turns out that this

21   is -- not simply and I don't mean to demean this.  But

22   simply a series of catalogs that became available in a short

23   period of time after the toy fair, as opposed to a series of

24   catalogs, et cetera and, you know, for a time being some

25   very, very significant misappropriation and a multitude by

```
 1   Mattel.  You know, all the competitors.
 2          Now, that is extraordinarily significant.  By the
 3   same token, Mattel has made that accusation, you know, after
 4   initially requesting and resisting your discovery request,
 5   which the court signed off on, on behalf of Mattel
 6   initially, that Mr. Larian is doing the same thing.  And the
 7   point is, does that matter?
 8          MS. KELLER:  It would matter if there were any
 9   evidence of it.  There is zero evidence.  Zero that MGA ever
10   engaged in any kind of systematic campaign.  None.
11          At most, we have some -- in fact, we know that MGA
12   didn't, because we have these occasional e-mails from
13   Mr. Larian saying, in effect, Gosh, I sure wish I knew what
14   our competitors were up to.  Can you ask a retailer?  Maybe
15   they'll tell us.
16          If, in fact, we had had a systematic campaign, we
17   wouldn't have needed to do that.  Mattel didn't need to do
18   that.  Mattel knew.
19          THE COURT:  Would it make a difference?
20          MS. KELLER:  It would make a big difference.
21          THE COURT:  Would it make a difference in this
22   regard:  Would it make a difference if Mattel was carrying
23   on, much wider effort to obtain competitor trade secrets
24   that extend beyond Mr. Larian, and Mr. Larian was engaged,
25   let's say, in some smaller amount, however, you quantify
```

1    that of that kind of activity.

2              Does that make a difference?

3              MS. KELLER:  Well, Mattel argues that it should.

4    Mattel is arguing in sort of quasi-unclean hands, based on

5    nothing but speculation.  But we have a trial record here to

6    go by.  That's what we've got.  We have evidence.  We have

7    Mr. Villasenor telling us that it wasn't just MGA.  It was

8    various competitors.  And if you look at the how-to-steal

9    manual, itself, it talks about going into competitors'

10   showrooms.  It doesn't talk about MGA.

11             THE COURT:  Let's break that down.  We saw a video

12   of the infamous conference room meeting where Mr. Villasenor

13   is answering questions and giving a presentation.

14             MS. KELLER:  That was actually at the Mattel

15   theater.

16             THE COURT:  Right.

17             MS. KELLER:  And hundreds of people attended that.

18             THE COURT:  Exactly.

19             MS. KELLER:  Yes.

20             THE COURT:  Now, that comes in 1999-2000, doesn't

21   it?

22             MS. KELLER:  And he testified that when he had

23   gotten there, I believe he said in 1992, it was already

24   ongoing.  I mean, the program was in place.  He didn't

25   originate it.  In fact, he didn't even know who prepared

1  that handout, because it was there.

2      THE COURT:  Now, Mr. Eckert is not president and

3  doesn't have the reign or the present, let's say, management

4  team that forms around him until 2000?

5      2000.  November, I think, 2000.  Is my focus

6  holistic and exemplary damages for Mattel's entire conduct

7  that extends earlier than Mr. Eckert coming to Mattel?  Or

8  should I be focusing from your strongest argument on

9  Mr. Eckert and what he should or shouldn't have known as,

10  let's say, of 2004, or 2005?

11      The second question is going to be:  How much

12  weight do I give to Mr. Villasenor concerning the initial

13  request of $3 million that's been alluded to?

14      From your perspective, I think the response would

15  be:  *Judge, it doesn't matter, because the end result is,*

16  *here's the evidence.*

17      It doesn't matter what he asks for.  Whatever his

18  motivation was, if it was too high, if it was shaking down

19  Mattel, so what?

20      I mean, the best argument Mattel could propose.

21      MS. KELLER:  Well, I think the only reason that it

22  would be relevant to look at the amount of money he asks for

23  would be in terms of his credibility.  The problem is, it's

24  all corroborated.  When he says, *This is what was going on*

25  and then we have e-mails and video presentations and we find

```
 1   all the catalogs, and we find the price lists and then we
 2   have his letter to them and we've got the how-to-steal
 3   manual which is the smoking gun -- it really is -- then his
 4   credibility is no longer an issue.  I mean, we know that
 5   what he said about what was going on was the truth.
 6                THE COURT:  Where is the line of demarcation?  If
 7   that occurred before and the present management team comes
 8   to Mattel sometime in 2000 and afterwards, you're going to
 9   have to focus on what this management team did or didn't do.
10                MS. KELLER:  We can do both.  First of all, I
11   think the long-term pattern is a factor in reprehensibility.
12   It absolutely is, according to the U.S. Supreme Court.
13   Looking at the duration and repetition of intentional
14   misconduct is important.  However, you wouldn't have to.
15   You could start in 2000, if you wanted to and only look at
16   what happened from then on.
17                THE COURT:  I think the circuit is going to be
18   most interested in that.
19                MS. KELLER:  But it's important to note that
20   Mattel is the party here, not Bob Eckert.  Bob Eckert is
21   merely the CEO.  Mattel, the company, lives on before him
22   and after him.  And we know that Mattel management was
23   involved, because we know Matt Turetsky, who was a vice
24   president, was directly involved.  He was somebody who was
25   having his own home address used as the business address for
```

1    these people.  And we know Matt Bousquette, who was

2    president of Mattel brands, was directly involved.  So

3    either way the court looks at it, if the court looked at it

4    over the long period of time that this conduct was

5    happening, or if you wanted to just establish an arbitrary

6    cutoff date of 2000, when Mr. Eckert came on board, the

7    conduct was still going on.  It was December of 2005 that

8    Mr. Villasenor wrote his letter.  And it was going on right

9    up until then, and it continued after that.  We know it did,

10   because we heard from other witnesses about that.

11          THE COURT:  Is the publicly held company to be

12   shielded by a court any more than a privately held company?

13          Let me spin this out for a moment.  There, the

14   true persons or parties hurt are the shareholders.  Stocks

15   increase.  There's a strong argument that there shouldn't be

16   any difference.  But there's also an argument that the

17   people most harmed aren't the privately held owners of a

18   company.  It's the investing public.

19          Frankly, I can't find anything that sets up any

20   kind of differentiation than the standard between the

21   entities, and I don't think that there is.  But should I

22   write about that, if I find for MGA?

23          MS. KELLER:  I don't think the court needs to,

24   because the cases are replete with examples of publicly held

25   companies that have been subjected to punitive damage

```
 1    awards.  And the ones that spring to mind immediately, of

 2    course, are the tobacco companies.  The shareholders have a

 3    remedy.  They have a shareholders derivative suit.  They can

 4    bring suit against the corporation to recover anything that

 5    they feel they've lost.  But so far, Mattel's misconduct

 6    hasn't cost a penny and hasn't cost shareholders.  In fact,

 7    its shareholders have been reaping the benefit all these

 8    years of Mattel's growth and profitability and increase in

 9    share prices which has happened steadily.  The shareholders

10    may not have known about it, but they benefited from the

11    price misconduct.

12              THE COURT:  Your argument would be also in having

13    this private conversation with myself, that if it didn't

14    kill the brand, it certainly curtailed the life expectancy

15    of the brand.

16              MS. KELLER:  Yes.

17              THE COURT:  The end result is, that there's an

18    artificial, if you will, enhancement for Mattel in terms of

19    the shareholders.  So, Judge, as you're asking these

20    questions of you as counsel, don't forget that there's a

21    benefit also in terms of recapturing market share.

22              MS. KELLER:  That's right.  And their own damages

23    expert agreed that this -- that this activity was

24    economically beneficial to Mattel.

25              THE COURT:  All right.  Let's do this.
```

```
 1              I'm going to excuse you.  I don't want you waiting
 2     around.  If I do finish with White and Experian beforehand,
 3     it's not worth the 20 or 30 minutes.  It's a waste of all
 4     your time.
 5              You don't have to come back tomorrow, Ms. Hurst.
 6     I know you're going home.
 7              MR. QUINN:  Could we -- any chance of starting
 8     early again tomorrow morning, your Honor?
 9              THE COURT:  No, there's none.  In fact, it will be
10     9:00 o'clock.  It will be 9:00 o'clock.  I've got morning
11     matters, and I'm not -- I'm done moving them now.  It's
12     causing too much stress and pain for the court.
13              I've moved everything around, and that's the best
14     we can do.  So, it will be 9:00 to 12:00.  That's it.
15              So we'll see you at 9:00 o'clock.
16              Now, White and Experian, why don't you come up
17     here and we'll go right through lunch.
18          (At 11:33 a.m., proceedings were adjourned.)
19
20                              -oOo-
21
22
23
24
25
```

27

```
 1                        CERTIFICATE

 2            I hereby certify that pursuant to Section 753,

 3    Title 28, United States Code, the foregoing is a true and

 4    correct transcript of the stenographically reported

 5    proceedings held in the above-entitled matter and that the

 6    transcript page format is in conformance with the

 7    regulations of the Judicial Conference of the United States.

 8

 9    Date:  May 26, 2011

10

11

12                       _____

13                       Deborah D. Parker, Official Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```