1

```
 1              UNITED STATES DISTRICT COURT

 2           CENTRAL DISTRICT OF CALIFORNIA

 3           SOUTHERN DIVISION AT SANTA ANA

 4       HONORABLE DAVID O. CARTER, JUDGE PRESIDING

 5

 6
   MATTEL, INC., ET AL.,              )
 7                                    )
                PLAINTIFFS,           )
 8                                    )
            vs.                       ) CV NO. 04-9049-DOC
 9                                    ) VOLUME 1 of 2
   MGA ENTERTAINMENT, INC., ET AL.,   )
10                                    )
                DEFENDANTS.           )
11   _____)

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15             SANTA ANA, CALIFORNIA

16             FRIDAY, MAY 27, 2011

17                  9:39 A.M.

18

19
              DEBORAH D. PARKER, CSR 10342
20               OFFICIAL COURT REPORTER
              UNITED STATES DISTRICT COURT
21              411 WEST FOURTH STREET
                    SUITE 1-053
22           SANTA ANA, CALIFORNIA 92701
                   (714) 542-8409
23              D.PARKER@IX.NETCOM.COM

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1    APPEARANCES OF COUNSEL:

 2        FOR THE PLAINTIFF, MATTEL, INC.:

 3                            JOHN QUINN
                              WILLIAM PRICE
 4                            SUSAN ESTRICH
                              MICHAEL T. ZELLER
 5                            QUINN EMANUEL URQUHART
                              & SULLIVAN, LLP
 6                            865 S. FIGUEROA STREET
                              10TH FLOOR
 7                            LOS ANGELES, CALIFORNIA 90017
                              (213) 443-3000
 8

 9        FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:

10                            THOMAS S. MC CONVILLE
                              ORRICK HERRINGTON & SUTCLIFFE, LLP
11                            4 PARK PLAZA
                              SUITE 1600
12                            IRVINE, CALIFORNIA 92614
                              (949) 567-6700
13

14                            ANNETTE L. HURST
                              ORRICK HERRINGTON & SUTCLIFFE, LLP
15                            THE ORRICK BUILDING
                              405 HOWARD STREET
16                            SAN FRANCISCO, CALIFORNIA 94105
                              (415) 773-5700
17

18                            JENNIFER L. KELLER
                              KELLER RACKAUCKAS, LLP
19                            18500 VON KARMAN AVENUE
                              SUITE 560
20                            IRVINE, CALIFORNIA 92612
                              (949) 476-8700
21

22

23

24

25
```

```
 1   ALSO PRESENT:

 2                        JEANINE PISONI
                         MGA ENTERTAINMENT, INC.
 3                        16360 ROSCOE BOULEVARD
                         SUITE 105
 4                        VAN NUYS, CALIFORNIA 91406

 5
                         ROBERT ECKERT, MATTEL CEO
 6                        ISAAC LARIAN, MGA CEO

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          SANTA ANA, CALIFORNIA; FRIDAY, MAY 27, 2011; 9:39 A.M

 2              THE COURT:  First of all, I want to apologize to

 3     each of you.  I said 9:00.  I truly thought I'd be here.

 4     They had the government leaders' prayer breakfast this

 5     morning.  When they put you on that dais, that high place,

 6     and you can't escape because there's a thousand people

 7     looking at you on the screen -- my fault.  I wouldn't have

 8     wasted your time.  I would have asked you to come in a

 9     little later.

10              Listen, today, I've got until 12:00 o'clock.  I

11     don't care if you finish.  If you don't, you're not pushed

12     again.  You can come back Wednesday, Thursday, Friday.  But

13     just so you know.

14              Okay.  Ms. Keller.

15              MS. KELLER:  Thank you, your Honor.

16              Your Honor, when we broke yesterday, I was

17     beginning to discuss the fact that the case law holds that

18     when conduct demonstrates a business practice or policy of

19     trade secret thefts that that is more blameworthy and

20     warrants a stronger penalty to deter continued or repeated

21     conduct of the same nature.  And the cases also hold that

22     repeated misconduct is more reprehensible than an individual

23     instance of malfeasance.  The scale and profitability of a

24     course of conduct also justify the award.  And the leading

25     case on that is BMW of North America, Inc. versus Gore,
```

1    which is a United States Supreme Court case.

2            The *Exxon Valdez* case from this circuit held the

3    same thing.  Evidence that the defendant repeatedly

4    permitted conduct to occur over three years was sufficient

5    to demonstrate reprehensibility when the court awarded

6    $2.5 billion in punitive damages.

7            *Bains, LLC versus* --

8            THE COURT:  Just a minute.  Wasn't *Exxon Valdez*,

9    though, a proportional case with 11.5 million, I think, in

10   punitives?  I'm doing that from memory.

11           MS. KELLER:  Yes.  But the point is that the court

12   allowed the additional 3.5 billion -- I mean, the additional

13   2.5 billion because of the reprehensibility of the repeated

14   conduct.

15           The amounts here vary, but in each --

16           THE COURT:  I'm just looking at the

17   proportionality argument.  You've got 11, 2.5.

18           Here you've got, you know, 88, depending upon the

19   court's findings, if the JMOL is granted.  Then, you've

20   got -- you're asking for one, two, three times.

21           I'm waiting to hear.

22           MS. KELLER:  And I'll be going through that.

23           The main thing with these cases, including *Exxon*

24   *Valdez*, is that they're not cases brought under CUTSA where

25   there's a statutory scheme that establishes that twice the

1   amount of the compensatories is a legitimate figure for the

2   court to use.

3          It's not a figure the court has to use, but it

4   certainly establishes that as the benchmark.

5          THE COURT:  Well, I thought the principle of *Exxon*

6   *Valdez* was the excess that the court -- there was no

7   proportionality to it in a sense.  And when you look at the

8   proportion to ratio, you're talking about less than, you

9   know, one times on the *Exxon Valdez* case.

10         So in terms of principle, you're right.  In terms

11  of the case law, 2.5 billion, but you've got to look at the

12  compensatory to begin with.  And here, you're going to, I

13  assume, be asking for five billion dollars.  I'm just

14  kidding you.  But, you know, you're going to ask for one,

15  two, or three times.  My guess is you'll ask for two or

16  three times in just a moment, the actual compensatory.

17  You're probably restraining yourself to three, but my guess

18  is you'll ask for the maximum.

19         So, you know, when you look at that

20  proportionately, it doesn't fit *Exxon Valdez*.

21         MS. KELLER:  Well, there are cases --

22         THE COURT:  The principle does.

23         MS. KELLER:  Well, there are a number of cases I'm

24  going to be discussing where the punitive damage award is

25  significantly higher than the compensatory award.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          THE COURT:  Right.  Let's get to those, because

2    *Exxon Valdez* isn't a great example.

3          MS. KELLER:  All right.  Well, we have the *Johnson*

4    *versus Ford Motor Company* case.  There's another one where

5    the Ninth Circuit -- rather, in that case, the California

6    Supreme Court held that the frequency and profitability of

7    the defendant's prior or contemporaneous similar conduct

8    influenced the determination of reprehensibility because the

9    defendant's conduct was placed into the context of a

10   business practice.

11         THE COURT:  Now, do you want me to interrupt you,

12   or do you just want to complete your argument; and then,

13   I'll come back with questions?

14         What's more comfortable for you?

15         MS. KELLER:  I'd probably prefer to just complete

16   it, because some of the things I'm going to address will

17   probably answer some of the court's questions.

18         THE COURT:  Well, just think about *Johnson* then,

19   so I can violate what I just said to you; and that is, the

20   repeated reprehensible conduct.  How would I find that?

21         I'll only focus on this lawsuit, because otherwise

22   I would be taking extraneous representations -- and you've

23   made those, and they're made, probably, in good faith.  I

24   keep hearing Mattel is litigious.  Now, how does the court

25   make that finding?

8

1        How do I find that that's virtuous or not, or it

2   has a chilling effect?

3        So I'm assume you're asking me to focus on the

4   facts of this case and the way this case was conducted and

5   not the other argument that you made yesterday; and that

6   was, the prior filings of Mattel -- that one of counsel

7   argued -- Ms. Hurst did -- you know, shows the litigiousness

8   of Mattel.

9        MS. KELLER:  I'm not even talking about

10   litigiousness at all.  What I'm talking about here is the

11   trade secret misappropriation that the jury found are 26

12   misappropriated trade secrets.  We have established through

13   the testimony of Mr. Villasenor and others that the conduct

14   occurred from at least 1992 to at least 2005.  That's 13

15   years of repeated wrongdoing, institutionalized wrongdoing

16   that rose to the level of a business practice.  And that is

17   precisely one of the factors that the U.S. Supreme Court

18   said is to be looked at in determining reprehensibility.

19        Now, Mattel tries to distinguish its repetitive

20   conduct at toy fair after toy fair after toy fair for 13

21   years or more by saying its executives didn't know or have

22   reason to know that the conduct was unlawful.  And in its

23   brief it relies on cases involving car company executives

24   who the court found expressly attempted to comport with the

25   law and industry practices.  And that -- BMW is one of those

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    cases.

2            But Mattel here absolutely made no such attempt to

3    comport with the law, knew what the market intelligence

4    department was doing was unethical, violated Mattel's own

5    code of conduct and even illegal.  So the self-serving

6    denials of some executives of the spying are contradicted by

7    the evidence of corporate espionage that was widely

8    distributed to those same executives.

9            And the jury drew the inferences against Mattel on

10   that point and found that the conduct was willful and

11   malicious.  And if this had been an isolated employee acting

12   on his own or even a couple, the jury would have not drawn

13   that inference and the inferences have to be drawn in favor

14   of the jury's verdict where there are a number of

15   interpretations.  And here, I would submit that there aren't

16   even a number of interpretations.

17           At best, the evidence shows that Mattel executives

18   either hid their heads in the sand so they would have

19   plausible deniability -- and that would be Mr. Eckert,

20   Mr. Normile and Mr. Moore -- or they actively encouraged

21   behavior they knew was wrong -- and that would be Mr.

22   Turetzky, who was a vice president and Mr. Bousquette, who

23   was president of Mattel brands.

24           Mattel claims -- first of all, as I discussed

25   yesterday, Mattel claimed there was no market intelligence

1    department.  Then, well, there was, but it was only two

2    people.  Then, well, there was, and it was more than two

3    people, but they didn't really do anything.  They didn't

4    really collect anything that wasn't publicly available, and

5    it really wasn't a big deal.  And the jury found against

6    Mattel on those arguments, and rightly so.

7             The evidence shows that the conduct did not

8    stop -- did not stop when Mattel says it did.  The evidence

9    showed the conduct continued until at least 2009.  Now,

10   Mattel insists that the Sarah Allen testimony about the 2009

11   e-mail showed that Mattel was just getting information about

12   retailers.

13            Sarah Allen, in a sea of witnesses lacking

14   credibility, was the least credible.  She was the one who

15   repeated as a mantra, no matter what questions she was

16   asked, that she was simply passing along information, so she

17   was an inherently unbelievable corporate stooge, frankly,

18   who was just parroting the corporate line.  And, clearly,

19   the jury rejected her testimony as well.

20            But even if the practices had stopped, as Mattel

21   claimed, exemplary damages are still warranted here,

22   because, as Mattel admits in its brief, one of the key

23   purposes of punitive damages is to punish past wrongdoing.

24   This is 13 years of wrongdoing.  And we know by the jury's

25   verdict that the jury concluded, based on all the testimony,

1    that the conduct continued until at least -- at least, 2006.

2              So what does Mattel do in response?

3              Mattel shows no remorse for its actions and

4    actually continues to mock MGA's claims.  In Mattel's

5    opposition papers, it stresses that no one died and this is

6    just a doll.  It's not a big deal, which completely

7    contradicts Mattel's pursuit of MGA's theft of the Bratz

8    idea for nearly a decade, expending what have been reported

9    in the press to be over $400 million in legal fees, claiming

10   it was a matter of principle, protection of our intellectual

11   property which is at the very heart of the company's

12   creative work.

13             And as I discussed yesterday, Mattel's closing

14   argument, they maintained that this case involved the

15   biggest intellectual property heist of all time.  Now that

16   the jury found against them, they claim it's nothing.  It's

17   no big deal.  It's just a doll.  No one died.

18             And, your Honor, I'll tell you, if this were a

19   criminal case and you had a defendant convicted of

20   $88 million worth of fraud and the defendant came before the

21   court at sentencing and said, *Hey, it's no big deal.  I have

22   my appellate rights, so I'm not going to take responsibility

23   for anything.  And, you know, I don't think it was a big

24   deal, and it was really the victim's fault anyway, because

25   the victim allowed me to do it too easily.  The victim*

1    *should have been more vigilant.*

2         The court would whack that defendant.  The

3    prosecution would be seeking an upward departure for

4    nonacceptance of responsibility.  And any court would punish

5    that defendant for taking that cavalier position.  And

6    that's what Mattel is doing.  Mattel says, *Well, you know,*

7    *at worst our spying was just getting sneak peeks into MGA's*

8    *secure showrooms and distribution of highly confidential*

9    *information on MGA product, pricing and advertising.*

10        Mattel says, *It's not like we stole MGA's secret*

11   *sauce.*

12        Now, these arguments were also made in various

13   forms to the jury which rejected them, finding willful and

14   malicious theft of trade secrets.  Mattel got the formula to

15   MGA's success during the period of time MGA had its biggest

16   hit ever, Bratz, and Mattel got information about the

17   appearance, operation, intended play pattern, plans to

18   advertise on TV and FOB pricing of MGA's unreleased

19   products.  And even Mattel witnesses told the jury that

20   shouldn't have been in Mattel's hands.

21        We really don't have any way of knowing how much

22   worse the economic damage was to MGA that has been

23   established.  But we know it was far more than the 26 trade

24   secrets here.  And the court may recall Mr. Malackowski

25   saying that he thought that the economic damage to MGA was

1    probably twice that -- twice the low-end figure that he

2    gave.

3            The lack of responsibility and the lack of respect

4    for the seriousness of the conduct continued when even as

5    the verdicts were being read, Mr. Quinn was tweeting that

6    the jury got it wrong, but it was nothing that couldn't be

7    fixed later.

8            Now, MGA also argues in its briefs that all it

9    took to get into the most secure MGA showroom was a card

10   with the name of a fictitious store somewhere and MGA

11   shouldn't have been taken in by these cheap, phony business

12   cards that Mattel employees used to dupe MGA.

13           But the jury heard Mattel employees say that they

14   would not have been allowed in MGA showrooms and a business

15   card alone, regardless of the card stock it was printed on,

16   wasn't enough to gain admittance.  First, the Mattel

17   employees had to get credentials from the toy fairs

18   themselves, even to be allowed to attend and those required

19   elaborate false identities.  Employees were cautioned not to

20   use their own names on the business cards for their

21   nonexistent retail businesses because they might be required

22   to send government-issued photo ID to access the private

23   showrooms.  And Mattel's spies came in armed with back

24   stories about the size and location of their stores.  And

25   worse, they had fake invoices mocked up by Mattel's accounts

1    payable department to show proof of business if asked by the

2    manufacturers, and they also used those to obtain toy fair

3    access badges.

4           So to me, the comparison is that Mattel is like a

5    burglar who gets caught sneaking into somebody's home and

6    then tries to blame the homeowner for having nice things to

7    steal and an insufficient security system, because the house

8    had a door.  That really is what they're arguing here:  MGA

9    is at fault, because MGA shouldn't have been taken in by the

10   fake identities created by their market intelligence

11   department.

12          They also kind of invoke, as I described it

13   yesterday, a quasi unclean hands theory, saying that

14   Mattel -- saying that MGA, itself, collected information

15   about Mattel.  But Mattel cites information MGA obtained

16   from retailers or distributors at toy fairs.  There is zero

17   evidence that MGA ever staffed a department of employees

18   tasked with using fake IDs to sneak into Mattel showrooms

19   and steal its secrets.  Nothing remotely similar.  Nothing.

20   And Mattel hasn't established that a department devoted to

21   sneaking into competitors' showrooms was routine in the toy

22   industry, so the products liability cases that it cites are

23   completely inapposite.

24          They cited, for example, *the Ford versus GACS*

25   case.  In that case, there was evidence that the defendant

1    rachet system manufacturer employed a chain and rachet

2    system standard in the industry; and, therefore, didn't meet

3    the requirements of having an evil motive or reckless

4    disregard, so punitive damages shouldn't be allowed.  That

5    has nothing, nothing to do with this case.  Nothing,

6    whatsoever.

7          Mattel also argues that MGA is seeking to recover

8    damages for unproven claims to other competitors targeted by

9    Mattel which is not permitted by law, because it would

10   violate due process.  And, for example, it cites the *Philip*

11   *Morris* case.  But Mattel ignores its own cases in its own

12   brief, showing that harm to third parties is relevant in

13   determining reprehensibility.  In the *Philip Morris* case,

14   itself, the U.S. Supreme Court said:  *The state cannot*

15   *inflict punishment for harm caused to strangers to the*

16   *litigation.  At the same time, we recognize that conduct*

17   *that risks harm to many is likely more reprehensible than*

18   *conduct that risks harm only to a few.  And a fact-finder,*

19   *consequently, may take this fact into account in determining*

20   *reprehensibility.*

21         Mattel also cites *Merrick versus Paul Revere*.

22   That's a Ninth Circuit case, 2007.  In that case, a jury was

23   permitted to consider evidence of decades-long fraud against

24   third parties when determining the reprehensibility of an

25   insurance company's actions toward Merrick, although it

1    couldn't directly punish defendants for harm to victims

2    other than Merrick.

3              So this is really almost black letter law that

4    harm to third parties can be looked at in determining

5    reprehensibility.  And we know from the toy fair reports

6    that every company that was a competitor of Mattel's was

7    being spied on.  Mr. Villasenor, himself, spied for the

8    boys' toys department, so he wasn't directly spying on MGA.

9    The women at Mattel who were in his unit were doing that.

10              And we saw spying on Hasbro, Jakks Pacific, many,

11   many other toy companies.  I think it's a very reasonable

12   inference that this business practice of Mattel's

13   contributed to its retaining its dominant position in the

14   industry.

15              So the court may consider Mattel's schemes to

16   fraudulently obtain not just MGA's trade secret information

17   but other of Mattel's competitors which were shown by

18   admitted trial exhibits, such as the how-to-steal manual

19   which addressed not just how to steal from MGA but

20   manufacturers in general.  Mr. Villasenor's resignation

21   letter, where he said *I'm writing to complain about Mattel's*

22   *directives and instruction to gather market intelligence*

23   *from competitors through unlawful means.*  And we have a

24   number of toy fair reports -- 36028, 9484AR, 9593, 9656,

25   26546 and 26578 -- all toy fair reports containing

1    information of competitors other than just MGA.

2           Mattel's next argument is that punitive damages

3    are not appropriate in cases of first impression.  Mattel

4    says the authority that Mattel has located holds that when a

5    manufacturer shows its products to buyers, secrecy is lost;

6    and thus, whether or not a product shown to retailers at a

7    toy fair is secret is a novel issue.

8           For this proposition, Mattel relies on a single

9    de-published California state appellate Court decision more

10   than two decades old, and that's the *Accuson Corporation*

11   case.  The court -- this court is not only not bound by such

12   a precedent but, in fact, in California state courts, it is

13   considered professional misconduct to cite an unpublished,

14   or de-published opinion.  A decision that cannot even be

15   relied upon in the California state courts is hardly a basis

16   on which to find a novel issue of law.  And even if it were

17   a proper case to cite -- which it is not -- Mattel misstates

18   its holding.  In *Accuson*, a manufacturer sued a competitor

19   for misappropriation of trade secrets where the defendant

20   competitor had purchased the product containing the

21   so-called secrets on the open market.  The product had been

22   disclosed to the world and in the public domain because

23   Accuson had sold hundreds of the products for years to the

24   medical community, putting it in the public domain.

25          And in contrast, the jury here heard testimony and

1    saw evidence that the trade secrets Mattel misappropriated

2    concerned unreleased products not yet on the market.  It

3    just has nothing to do with our case, even if it were a

4    proper authority to cite.

5              The court noted in the *First Alliance Mortgage*

6    case, which dealt with the never-before-seen action of a

7    secondary lender being sued for aiding and abetting fraud

8    that the rationale behind not allowing punitive damages in

9    cases of first impression is that the requisite intent or

10   willfulness required to consciously disregard another's

11   rights cannot be present if no right or duty has been

12   established.

13             But, here, the determination of whether

14   information is a trade secret is governed by statute,

15   California Civil Code 3426, et seq., and reams and reams of

16   case law.  There is nothing novel that would have prevented

17   Mattel's agents from knowing they were committing wrongs

18   when they committed them.  Even a child knows that stealing

19   is wrong.  Furthermore, Mattel employees and executives at

20   this trial admitted that they knew it was wrong to take

21   MGA's information, and they knew that such information is

22   confidential and protected.

23             Mr. Turetzky, who aided and abetted the trade

24   secret misappropriation, who was a vice president, whose

25   home address was used for the spies to put on their business

| | |
|---|---|
| 1 | cards, he admitted he knew it was wrong.  He knew it was |
| 2 | wrong at the time. |
| 3 | Mr. Villasenor, of course, admitted it. |
| 4 | Mr. Friedman, president of Mattel brands -- after |
| 5 | Mr. Bousquette -- he admitted it. |
| 6 | Mr. Debrowski, the executive vice president of |
| 7 | worldwide operations that admitted it was wrong, and he knew |
| 8 | it was wrong. |
| 9 | Adrienne Fontanella admitted that the conduct was |
| 10 | wrong.  She had been president of girls brands. |
| 11 | Tim Kilpin, who had been president from boys |
| 12 | brands admitted it was wrong. |
| 13 | And even Mr. Eckert, who claimed still, after all |
| 14 | these years, not to know about it, only heard about it in |
| 15 | passing during his deposition and never having followed up |
| 16 | on any of this, with any of his in-house counsel or any of |
| 17 | his outside counsel -- which I submit to the court was |
| 18 | simply inherently unbelievable -- even Mr. Eckert admitted |
| 19 | that the conduct was wrong and said that eventually he would |
| 20 | look into it and, eventually, heads would roll. |
| 21 | You know, here we are with conduct that Mattel |
| 22 | claims stopped it 2005.  It's now 2011.  We're still waiting |
| 23 | for them to figure out what to do about it. |
| 24 | So they knew it was wrong.  Everybody knew it was |
| 25 | wrong.  They didn't need any case establishing that you |

1    can't use fake identities and fake cards and fake

2    credentials to sneak into competitors' showrooms to know

3    that was wrong.

4           Now, a punitive damages award of double damages is

5    permitted by CUTSA and is not excessive.  So the second

6    factor to be considered under CUTSA and due process -- and

7    the one the court has mentioned a few moments ago -- is the

8    ratio between the actual or potential harm suffered by the

9    plaintiff in the punitive damages award.

10          And in addressing sizable punitive damages awards,

11   the Supreme Court has held that a recidivist may be punished

12   more severely than a first offender and a higher ratio of

13   punitive-to-compensatory damages may also be justified in

14   cases in which the injury is hard to detect.  And that was

15   in the *BMW* case, 517 U.S. at 577 and 582.

16          This was unbelievably hard to detect.  We weren't

17   even able to find out about it until 2010, and it was really

18   almost by chance.  It was close to being by chance when

19   Mr. Molinski saw Mr. Villasenor's name a couple of times and

20   decided to depose him.  It was then and only then that the

21   documents were produced showing the existence of the market

22   intelligence department and its activities were very hard to

23   detect.  But once we detected it, what we found was that

24   Mattel was a recidivist offender and, therefore, that higher

25   ratio of punitive-to-compensatory damages is justified.

1          Mattel argues that doubling the damages would

2    exceed the Constitutional maximum permitted, and it relies

3    on *Jet Source Charter, Inc. versus Daugherty*, where an

4    aircraft broker misrepresented the prices it paid for

5    aircrafts to its buyer in six transactions.  The court in

6    that case, while noting that there are no rigid benchmarks

7    that a punitive damages award may not surpass also said that

8    the precise award in any case must be based on the facts and

9    circumstances of the defendant's conduct and the harm to

10   plaintiff.  And that a punitive damages award of four times

11   the compensatory damages in that case was excessive.

12          That was not a trade secret case under CUTSA, so

13   the CUTSA statute did not control.  Here, there is a

14   benchmark that controls how much can be awarded in exemplary

15   damages for Mattel's trade secret theft and that amount is

16   twice the award if willful and malicious misappropriation

17   exists.  And that's found in 3426.3, and it's discussed in

18   the *02Micro* case.

19          No court has ever held that Section 3426.3 is

20   unConstitutional or that an exemplary damage award of twice

21   actual damages in a trade secret case would be beyond the

22   Constitutional maximum.  That has never been held.

23          Mattel says there are no decisions in which

24   punitive damages of even 25 million for a trade secret

25   misappropriation claim have been affirmed and that the award

1    MGA seeks here would outrank even the most egregious

2    precedence.  But Mattel's misconduct here has set a new bar

3    for egregious trade secret theft.  It stole no less than 26

4    MGA trade secrets.  Double damages, 3426.3, when far fewer

5    secrets were in issue.

6           As the court knows, in the *02Micro* case, a jury

7    found only five of a potential 11 trade secrets were stolen

8    and no compensatory damages were warranted, but the court

9    awarded punitives of double a reasonable royalty per

10   Section 3426.3.  In that case that amounted to 1,800,000,

11   which the court found to be double the amount.

12          In the *Bourns, Inc. versus Raychem Corporation*

13   case, also a Ninth Circuit case, where a former Raychem

14   employee took a strategic plan and other proprietary

15   information to a competitor and the competitor developed a

16   competing product with the help of other former Raychem

17   employees who had knowledge of the product, the jury awarded

18   9 million in compensatories and the judge awarded another

19   9 million in punitives because of the egregiousness of the

20   malfeasance.

21          And in the *Vacco Industries* case, the court

22   awarded more than the amount of compensatory damages as

23   well.

24          Now, none of these cases featured an insidious

25   corporate campaign using an actual department set up for the

1    purpose of stealing trade secrets of competitors involving

2    numerous employees and directed by executives.  So the scope

3    and magnitude of Mattel's misconduct places it well outside

4    the norm of the cases it cites.  And it should be punished

5    accordingly.

6         Mattel argues that doubling a high compensatory

7    award would produce a punitives award utterly out of

8    proportion to the harm to the plaintiff here.  But Mattel's

9    cases are factually inapposite, and they don't involve trade

10   secrets or the statutorily double damages prescribed by

11   statute here.  One of them, the *Levy* case, is a bad faith

12   insurance case -- it's a Ninth Circuit case -- where the

13   insured -- the court found that the insured demonstrated,

14   quote:  *Scant evidence of repeated misconduct of the sort*

15   *that injured him.*

16        Totally unlike here where there was repeated

17   misconduct over 13 years.  The court found in that case that

18   reduced punitive -- the court found, quote:  *Reduced*

19   *punitive damages with a ratio of one and a half to one was*

20   *not Constitutionally excessive.*

21        And it went on to say that *the Supreme Court has*

22   *declined to impose a bright line ratio that a punitive*

23   *damages award can't exceed.*

24        In the *Boerner versus Brown & Williamson Tobacco*

25   case, which Mattel cites -- again, not a trade secret case.

1    In that case, the court reduced punitive damages from

2    15 million to 5 million in a product liability case where

3    there were 4 million in compensatories.  And the reason the

4    court did is it noted, quote:  *There is no evidence that*

5    *anyone at American Tobacco intended to victimize its*

6    *customers.*

7            So, again, completely inapposite.  There was ample

8    evidence that Mattel intended to steal trade secrets.

9            The *Slip and Slide Records* case cited by Mattel --

10   also not a trade secret case and not governed by statute --

11   was a tortious interference case.  In that case, the court

12   said *There is no precise mathematical formula,* and it

13   reduced punitive damages from three times the damage to a

14   one-to-one ratio and said the reason was, quote:  *The*

15   *conduct here was not a repeated series of actions or a*

16   *pattern of conduct designed to eliminate the competition.*

17   It was, as stated earlier, largely a one-time event.

18           So in the *Slip and Slide* case, a punitive damages

19   award of one to one was warranted even for a one-time event

20   but reduced from a higher award because of a lack of pattern

21   or repeated series of actions.

22           Mattel also cited *Thomas v. Eyestar*.  That was

23   also a reduction of punitive damages case from three to four

24   to one.  That was a Title VII race discrimination and

25   retaliation case.  And when the court reduced the punitive

1    damages there, the court said there was no finding by the

2    jury that defendants had intentionally discriminated against

3    Thomas or that Eyestar's top management, the ultimate

4    decisionmaker with respect to termination, were directly

5    motivated by retaliation.  And the other reason for reducing

6    the amount was that, quote:  The jury's award of punitive

7    damages is not in line with federal statutory caps on

8    punitive damages in Title VII cases.

9            So in that case the court was guided by the

10   statute.  And we are argue, of course, that here the court

11   should be guided by the statute that the legislature

12   enacted.

13           Mattel also argues that the 88.5 million in

14   compensatory damages is deterrence and punishment enough for

15   its conduct because, quote:  *A high compensatory award*

16   *itself often effects sufficient deterrence such that no more*

17   *punishment is needed and thus punitive damages need not be*

18   *awarded at all or only a small amount.*

19           This is illogical on its face.  It punishes a

20   thief less for taking more.  And the jury in this case found

21   that the conduct was willful and malicious, which on its

22   face justifies a higher award than merely compensatory

23   damages.

24           A number of the cases Mattel relies on for that

25   proposition actually hold that punitive damages are

warranted.  In the *Walker versus Farmers Insurance Exchange*
case, that was a bad faith insurance action where the court
found there was a relatively low level of reprehensibility
since the, quote*, conduct toward respondent was an isolated
incident and the harm to plaintiffs was the result of
oversight and a mistake*, close quotes.  And even though
plaintiffs, quote, recovered all of their economic damages
as well as attorney fees, close quote, the court still
affirmed a punitive damages award of one-and-a-half million
which was equivalent to the compensatory damages award.

So there the court is doing a one-to-one ratio
where it was a one-time isolated incident that was the
result of oversight and mistake and the plaintiffs had
recovered all of their economic damages and all of the
attorney's fees.  And still, even then, one to one was
justified.

In the *Johnson versus Ford Motor* case, at 35
Cal.4th 1191, that was a fraud by misrepresentation case,
and it was actually remanded for consideration of whether
punitive damages should be higher than three times
compensatories.  And the reason the court remanded it for
consideration was because the fraudulent policies and
practices were institutionalized, business practices, and
their scale and profitability to the company was such that
the court thought that, perhaps, three times compensatories

1    might not be enough to deter future misconduct.

2            The out-of-circuit cases Mattel points to where no

3    damages are awarded are either patent infringement cases --

4    well, they are patent infringement cases.  They're not trade

5    secret cases.  They have nothing to do with Section 3426.3.

6    That would include the *Modeen* case and the *Mersick Exchange*

7    case.

8            Mattel also distorts through selective quotation

9    the holding in some of its cases.  *Mirkin versus Wasserman,*

10   a California Supreme Court case, was a securities fraud

11   class action.  And the court explained that the policy

12   behind the federal statutory prohibition on punitive damages

13   and securities cases was, quote:  *Actual damages alone*

14   *represent a potentially crushing liability in securities*

15   *fraud cases,* and quote:  *The class action mechanism which*

16   *makes litigation affordable for individuals tends to ensure*

17   *that the securities laws will be enforced.  Because this*

18   *procedural device allows many small claims to be litigated*

19   *in the same action, the overall size of the compensatory*

20   *damages alone may constitute a significant deterrent.*

21           And as we know, damages in class action cases can

22   be absolutely crushing.  So citing a case where there is a

23   federal statutory prohibition on punitive damages because of

24   the potentially crushing damages that can result from class

25   actions is very misleading to the court and really borders

1    on being disingenuous.

2           Now, Mattel omitted that language.  It omitted the

3    language explaining that the rule it was relying on exists

4    by virtue of the class action mechanism.  That is found

5    nowhere in the brief.  Likewise, Mattel cites *Lane versus*

6    *Hughes Aircraft* and omits crucial language there.  In that

7    case, Judge Brown's concurring opinion -- this is also a

8    California Supreme Court case -- said *large compensatory*

9    *damage awards not based on a defendant's ill-gotten gains*

10   *have a strong deterrent and punitive effect in themselves.*

11          So Judge Brown was focusing on large compensatory

12   awards where the defendant had not reaped ill-gotten gains.

13   That language was omitted.  The award is not based on a

14   defendant's ill-gotten gains.  That language was omitted by

15   Mattel.  And here, as Mattel admits, somewhat ironically

16   because it was immediately after the selected quotation of

17   blame, here the jury's compensatory award was a measure of

18   Mattel's ill-gotten gain.  So the case and the language

19   relied on by Mattel is expressly not applicable because of

20   the language Mattel omitted.

21          Now, although the 88-and-a-half-million-dollar

22   compensatory damages award seems large, it pales in

23   comparison to the benefits that Mattel enjoyed from its

24   wrongful conduct.  And as I pointed out, our expert opined

25   that the benefits to Mattel were likely more than double

1    what the jury awarded.  And Mattel has shown no remorse

2    either for what it has done, for its active concealment of

3    the wrongdoing, or for the harm brought.

4              Now, what are the general guidelines for what

5    would be considered an excessive award of punitive damages?

6              Here, what we're asking for, your Honor, would

7    amount to 7.2 percent of Mattel's net worth and that has

8    repeatedly been found in case law to be reasonable, given

9    the financial condition of this defendant.  The *Adams* case

10   talks about how an award of punitive damages should be large

11   enough to punish the wrongdoing and protect the public from

12   future misconduct but not so large as to financially cripple

13   a company, yet not so small that the defendant can pay them

14   and feel, quote, *little or no discomfort.*

15             A company's ability to pay has been repeatedly

16   seen to be -- well, an award of punitive damages that is no

17   greater than 10 percent of company's net worth has

18   repeatedly been held to be permissible.  *Michaelson versus*

19   *Hermada* case, 29 Cal.App.4th, noted that under California

20   law punitive damages generally should not exceed 10 percent

21   of the defendant's net worth.

22             The *Storage Services versus Oosterbaan* case, cited

23   in our brief, also talks about how punitive damages award

24   should generally not exceed 10 percent of the defendant's

25   net worth.  And *Devlin versus Kearny Mesa*, which we also

1    cited, talks about the fact that net worth is generally

2    considered the best measure of defendant's wealth for

3    purposes of assessing punitive damages.

4            MGA established that Mattel is the largest,

5    richest toy company in the world and its net worth is 2.5

6    billion, as of March 31st, 2011.  It's market cap is much,

7    much higher than that.  But net worth is the difference

8    between assets and liabilities.

9            So, for example, in the *02Micro* case, the net

10   worth of the company was calculated in determining an

11   appropriate punitive damages award.  Mattel doesn't

12   challenge either the net worth amount or the methodology

13   cited by MGA.  And MGA has established that doubling the

14   compensatory award here would equal 7.02 percent of Mattel's

15   net worth well within the 10 percent figure.  Mattel doesn't

16   challenge that calculation.  It doesn't argue it would be

17   crippled by the award sought.  But it does argue that

18   10 percent of net worth is the maximum allowed for the most

19   reprehensible conduct.

20           That's not true.  However, we're not seeking an

21   award of more than 10 percent, so the entire discussion is

22   really a red herring.  But Mattel does misstate the law.

23   Although punitive damage awards generally don't exceed

24   10 percent of a defendant's net worth, case law has not

25   established any specific numerical percentage of net worth

as constituting an upper permissible limit for the amount of a punitive damages award and courts have routinely ordered more than 10 percent where it was warranted.

In *Valbona versus Springer*, at 43 Cal.App.4th, 24 percent of net worth was not excessive.

In *Devlin versus Kearny Mesa*, 17.5 percent of a defendant's annualized net worth was described somewhat greater than comparable ratios contained in reported cases, but the court said we cannot say these numerical differences mandate a finding of excessive.

In *Rufo versus Simpson*, the court said there is no formula based on net worth for determining what amount is too much and the fundamental underlying principle is that punitive damages must not be so large that they destroy the defendant.

In the *Sornea versus El Sentro Elementary School District* case, a Ninth Circuit case, in 2008, a court -- the court upheld an award of 24 percent of net worth. So while 10 percent has been a benchmark that has been repeatedly discussed as being anything that low or below being appropriate -- and all but unchallengable really -- there's certainly no magic formula or bright line beyond which a court can't go. But, again, we haven't asked the court to do that. So that whole discussion really is a red herring. We get to 7.02 percent.

1          Now, Mattel claims that an award reflecting a

2    significantly smaller percentage of net worth, such as half

3    of one percent to one percent, would be sufficient to punish

4    and deter Mattel because awards such as these have been

5    found sufficient to punish and deter serious misconduct.

6    Mattel has not demonstrated how such a minuscule reduction

7    in net worth would cause it any discomfort at all.  It fails

8    to cite any trade secret cases to support such a

9    calculation.  And the cases it does cite are not 3426.3

10   cases and were decided decades ago, and that's this *Grimshaw*

11   *versus Ford Motor*, which is a product liability case, and

12   *Hobbs versus Bateman Eichler*, which is a breach of fiduciary

13   duty case.  So those cases have nothing do with our

14   situation.

15         Mattel's next argument is that the potential for

16   further recoveries by third parties militates strongly

17   against a substantial award.  That exact argument was

18   rejected in another decision cited by Mattel, *Grimshaw*

19   *versus Ford Motor Company*, where the court held, quote:  *We*

20   *recognize the fact that multiplicity of awards may present a*

21   *problem, but the mere probability of a future award in a*

22   *different case is not a ground for setting aside the award*

23   *in this case.*

24         So Mattel says, Well, there's a possibility that

25   somebody else might sue it, based on the activities of its

1    market intelligence department, thefts of trade secrets.

2    And, therefore, your Honor, don't award any punitive damages

3    to MGA, because at some point, some time in some as yet

4    unknown action that hasn't yet been brought by anyone, we

5    might end up being punished.

6            As I said, that's been rejected in the *Grimshaw*

7    case, but it should also be rejected as a basis of logic.

8    It's really like saying, *Don't punish me for this burglary*

9    *because other victims may come forward because they want*

10   *to --*

11           They argue that combining MGA's demands for

12   punitive damages and fees and costs to the compensatory

13   award would result in a total award of over 17 percent of

14   Mattel's net worth.  Mattel cites no authority remotely

15   endorsing such a combination as part of the net worth test

16   for determining the excessiveness of punitive damages.  And

17   that argument is irrelevant in any event because even if you

18   added the compensatory damages here to the requested

19   exemplaries, the award would still be roughly 10 percent of

20   Mattel's net worth.  If you added them both together,

21   everything we've asked for plus compensatories would still

22   be 10 percent of net worth.

23           So those are the arguments that Mattel has

24   advanced on punitive damages.  And I would now like to turn

25   to the issue of fees and costs under CUTSA.

```
 1              Since 1992, Mattel has maintained its dominant
 2    position in the industry --
 3              MR. QUINN:  Your Honor, I thought the court had
 4    said that it had more questions on this issue.
 5              THE COURT:  I think we're on costs, though.  We
 6    argued attorney's fees.  But there has never been an
 7    argument on costs.
 8              MS. KELLER:  This is under the trade secrets, not
 9    the Copyright Act.
10              MS. ESTRICH:  Annette and I did fees under the
11    CUTSA.
12              MS. KELLER:  She mentioned it kind of in passing.
13    She didn't really mention it thoroughly.  She was really
14    focused on the Copyright Act.
15              THE COURT:  I wanted to give you both full and
16    complete arguments.  I thought we were done with attorney's
17    fees also, but I'm not going to preclude you.  There's no
18    time limit.  It's just the way we're going, we're all coming
19    back.  It's my fault for wasting 40 minutes this morning.
20              I apologized also to you and the other party.  I
21    got stuck on a podium in front of a thousand people, and you
22    can't walk off when you're up there.  I got trapped.  I
23    thought I could sneak out the door at 7:30.  I wasted 40
24    minutes of your time, and I want that on the record, and you
25    both have my apologies.
```

```
 1            Take your time.  If you want to go back into
 2   attorney's fees?  That's fine.  Costs?
 3            MS. KELLER:  Well, your Honor --
 4            THE COURT:  I'm just kidding you.  Just go.
 5            Let me apologize to you.  Here's what happened.  I
 6   got engaged with you right from the beginning yesterday
 7   because I didn't transition in my mind from the prior
 8   discussion.  I've given both of you an opening first round,
 9   and then I engaged each of you in conversation the second
10   time around.  I apologize, Ms. Keller, to you because I
11   engaged you right in the presentation the first round.  You
12   should have a clear run of this and if you want to start
13   over, if there is something that was discordant.
14            MS. KELLER:  I actually thought the court had good
15   questions and I was happy to answer them, so I have no
16   complaints about that.
17            THE COURT:  I got a whole bunch of questions and
18   then what you want me to ask my questions to any about them.
19   Otherwise, it's going to be a wing and prayer.  I've got a
20   whole lot of questions.
21            MS. KELLER:  I would say before we move on to fees
22   and costs, I would ask the court to address any questions
23   about the motion that I've just been discussing.
24            THE COURT:  Okay.  That's logical for a moment;
25   and then, you can think about it for the next time around,
```

1    or you can try to answer it now, because I want thoughtful

2    answers and they have been thoughtful.

3           But my concern is, when I engage you the second

4    time around, you're just at the lectern.  You don't have the

5    time and you're going to be like a deer in headlights.

6           MS. KELLER:  Maybe the court can tell me the

7    questions the court has on its --

8           THE COURT:  Sure.  Some comments and some

9    questions for you to think about -- you don't have to

10   respond.  One of your able assistants just gave you,

11   apparently, the deciding note that will help you.

12          MS. KELLER:  No, no.  Actually, Mr. Russell was

13   reminding that the fees that I was about to discuss are on

14   MGA's offensive affirmative claims and that Ms. Hurst, her

15   argument focused on defensive claim fees on both the trade

16   secrets that Mattel claimed, as well as the Copyright Act.

17          THE COURT:  You tell me what you're comfortable

18   with in terms of your presentation.  And that's what we're

19   going to do.  And if you want me to engage in the second

20   round, I will have that conversation I had with me last

21   night with you.

22          MS. KELLER:  I think the best way, your Honor, for

23   me to be able to give the court thorough answers would be if

24   the court now while it's fresh in your mind tells me --

25          THE COURT:  Is that acceptable?

```
 1            MS. KELLER:  Just tell me the questions you have
 2    and then I'll reserve answering them until I've had --
 3            THE COURT:  I'm going to talk out loud.  What I'm
 4    saying isn't meant to chill you, or threaten you, or the
 5    other party.  I want to have a conversation, and some of it
 6    will be of great concern to both of you.  These are not
 7    findings.  This is a search on my part.
 8            I have an impression that United States Supreme
 9    Court is consistently pulling back in punitive damages.
10    Now, I can take 10 exceptions to what I just said.  But,
11    generally, we have a history of limitation.
12            Second, the California Supreme Court has also
13    seemed to start pulling back.  And we'll take the very case
14    you cited, I think, Grimshaw.  My memory was, it was
15    Judge Goldstein.  Mark Robinson, I think, was plaintiff's
16    counsel.  It was the Ford case.  Explosion of the fuel cap.
17    I forget.  '75.  '76.
18            Actually, lead counsel was Munoz, right across the
19    street, and Mark Robinson was associate counsel.  There I
20    think the punitives were 160 -- I'm doing this from
21    memory -- $157 million.  I think the actual compensatory for
22    the little girl who was severely burned was, although I
23    think Judge Goldstein reduced it to 6 or 9 million.  I'm
24    doing all that from memory.
25            The tobacco case you cite.  Another example.  How
```

1    can those be analogous?

2              In the *Grimshaw* case, you're looking at the care,

3    if you will, of this little girl.  You're too young.  You

4    didn't see her.  She was in the courthouse across the way.

5    And there you had one -- strike that.

6              You had -- the reprehensibility was the documents

7    actually found in Ford's files that explicitly shows that

8    Ford made a conscious decision that the cost of recall was

9    high and that they would prefer to live with the

10   individualized lawsuits knowing that the gas cap would

11   potentially explode.

12             Now, you can look at that as a continuing act, but

13   however you view that -- or one lawsuit.  But however you

14   view that, reprehensibility has strong grounds.  Here I have

15   two parties in, apparently, a death grip with one another.

16   I don't see a factual record right now that sustains

17   litigiousness on Mattel's part other than the comment that

18   Mattel is litigious.  What the argument does is it, it

19   sweeps both concepts.  It runs together the litigious in

20   your case, but are they also litigious in other cases; and

21   if they are, where would those facts be?

22             Hold on.  I got -- I'm talking to myself now, so

23   it won't make sense.  So I don't know what "continuous"

24   means.  I don't know what "reprehensibility" means.  And I'm

25   confused by the arguments by Ms. Hurst a little bit

1   yesterday, and I want to make certain that you segment that

2   out and which is why I broke in and asked, *Are you arguing*

3   *this case?*

4           *Yes, I'm arguing this case and the conduct in this*

5   *case.*

6           MS. KELLER:  And we're not arguing litigious, at

7   all, in the context of exemplary damages.  Not at all.

8           THE COURT:  I understand.  I understand.

9           For Mattel, let's take the initial request of $750

10  million, or one billion dollars.  I think in either formal

11  or informal conversations, Mr. Quinn, when I first met you,

12  I think I made the comment that if you were re-entering this

13  lawsuit that, quite frankly, your first verdict may pale in

14  comparison to the ability to get a higher verdict in this

15  case.  I just didn't know, you know, if you prevailed on

16  $750 million or a billion dollars.

17          And I think I expressed a concern at that time.

18  You know, the circuit is going to be concerned about how

19  that's broken down in buckets.  And now the concept I

20  unusually floated by you and then I went back and offered

21  you just a generalized verdict, and it could have been

22  either.

23          Here is my bewilderment:  Why shouldn't I look at

24  the expenditures in terms of the compensation for your firm

25  and the expected return?  This whole effort has to be one of

1    balance.  And if the initial verdict was as you believe,

2    $100 million, but as I believe it couldn't be sustained if

3    it got to appellate review for anything more than

4    $40 million, what was the reward versus the risk?

5            Now, because I granted in a sense a *de novo* trial,

6    you were starting over again.  So 750 from your standpoint

7    may have been very possible.  But does this bear on

8    maliciousness, as MGA's arguing, even in light of all of the

9    Seventh Amendment problems that Ms. Estrich has raised and

10   give credence to what MGA's really asking for; and that is,

11   the killing of the brand or at least a shortening of the

12   life expectancy as a conscious and willful litigation

13   tactic?

14           Now, they haven't worded it that way.  Then, I

15   want to flip, because I haven't had time to sort out my

16   thoughts.  But *First Alliance*, really, is an interesting

17   case because *First Alliance*, we had Lehman Brothers in here.

18   It's titled "First Alliance," but every person you saw on

19   60 Minutes, other than the president, testified in Lehman

20   Brothers in this court.  And what I found in terms of that

21   revolving line of credit and the subprime industry was that

22   I didn't have prior history or record in the subprime

23   industry because nobody had taken it on before.  By the way,

24   the best writing comes from an eminent professor from

25   Columbia who foresaw much of this in some treatises.

1          Before First Alliance came into the court and

2     Lehman, I didn't have this kind of history, and that's why

3     you saw the cautiousness in terms of Lehman.

4          Where is the history in terms of Mattel?

5          MS. KELLER:  Your Honor, I think --

6          THE COURT:  Hold on.  I got a whole bunch of

7     thoughts.  I'm still talking to myself.

8          If the history is blurred to, *Judge, they're*

9     *litigious and we're just going to run that together in terms*

10    *of this lawsuit also,* then you want that sorted out.  I want

11    you to categorically state:  They're litigious.  They do

12    this all the time.  They are lying to kill the competition.

13         Just state it so I know.  If you're maintaining

14    your position which, I think you are, that here it's, you

15    know, malicious, confined to this lawsuit with what they

16    did, I need to clearly separate that out.

17         Third or fourth:  Why do two wrongs make a right?

18    When a worldwide injunction is put into effect minimally

19    this court, if not cautious, ought to be absolutely

20    transparent in my writing.  Because with the 7.2 percent and

21    the standard of 10 percent, that's good at the beginning,

22    but that doesn't take into account economic factors.  And

23    what I don't know is this:  I can have a company like GM

24    worth billions but absolutely going down the drain, or poor

25    in terms of potential bankruptcy.  For that exact moment or

```
 1   time a high award by a court could take a standard of
 2   10 percent of net worth and be absolutely meaningless in
 3   terms of quarterly or yearly earnings.
 4           Now, on the other side, Mattel may have high
 5   quarterly or yearly earnings.  That evidence isn't before
 6   the court.  Hold on.  Stay with me.  I got 20 questions
 7   here, okay?
 8           But if it is, should I take that into account
 9   along with the 10 percent standard?  Because there I could
10   have a company at 10 percent and part of the strength of
11   your argument could be, Judge, this is 7 percent or
12   10 percent.  But you shouldn't be cautious at all, because
13   whatever the net worth is of 2.0 or 2.5 billion dollars,
14   their quarterly or yearly earnings are so sky high that this
15   company is still making money.
16           Now, hold on.
17           MS. KELLER:  I was just going to say I think you
18   do have some evidence before the court from Mr. Eckert on
19   why his bonuses were so justified because each year Mattel's
20   earnings had increased, and he went into that -- gave some
21   figures.
22           THE COURT:  I'll let you go back and look.
23           Why do I expect an apology?  Why is this an
24   argument that I should take into account that suddenly
25   Mattel should come in, in light of a verdict that they
```

1   disagree with and suddenly say, *Judge, we apologize.  Reduce*

2   *our punitive damages.*

3           First of all, it would be somewhat facetious, as

4   far as I'm concerned.  Disingenuous.  I would expect

5   litigants on either side to preserve their appellate rights.

6   And, frankly, I don't expect an apology.  I think it has a

7   chilling effect.  I think it's contra to the position that

8   would be taken on appeal.  It just doesn't make sense that

9   Mattel, or Mr. Eckert, or Mr. Quinn is suddenly going to

10  say, *Oops, because of this verdict that we don't agree with,*

11  *Judge, we apologize.*

12          Are you apologizing, Mr. Quinn?

13          No, he's not apologizing.  I'm just joking.

14          MR. QUINN:  And I didn't tweet that either.  What

15  she said I did not say.

16          THE COURT:  Next, I don't mean to make light of

17  it, but I joke around a lot.  But it's definitely serious.

18  This trade secret misappropriation case that you've cited,

19  frankly, I haven't read that case, and I'm going to go back

20  and look at the $25 million.  But what I'm going to be

21  asking before I even read it is, hey, what was the

22  compensatory here?  Are we dealing with a royalty to begin

23  with?  Was strictly a damage award.

24          Because if it's a royalty, that could be a pretty

25  high punitive award.  If it's compensatory, I need to take a

1    look.

2            MR. QUINN:  Your Honor, which of the trade secret

3    cases --

4            THE COURT:  She cited a trade secret case, and I

5    don't -- I'll go back and look at your briefing.  I'm

6    listening today, and I've got a lot of work to do when you

7    leave.  And she cited --

8            Ms. Keller, you cited a case that had punitives of

9    25 million.  She didn't cite the name of the case, but it

10   must be in the briefing.

11           MS. ESTRICH:  We'll look for it.

12           THE COURT:  Shouldn't I also in writing an

13   opinion, if I hold for your position and the amount in

14   question, be very careful about the chilling effect?

15           Whether Mattel can sustain or not your argument

16   about X amount, if Mattel at the inception generally

17   believes that they're protecting intellectual property, why

18   is the message of the court in a large punitives amount not

19   balanced with a thorough discussion in my writing about the

20   effect that this has, potentially, in terms of chilling a

21   company who honestly and earnestly believes at least at the

22   beginning -- I know you disagree -- at the beginning that

23   this is intellectual property being stolen from them?

24           But the fallback argument that I've considered

25   that might be made is this:  Well, Mattel might have

```
 1   intellectually believed that to be correct.  In the initial
 2   decision-making process, it became dogmatic.  In other
 3   words, nothing is constant in the world, so I can believe X
 4   on day one and then hold for that position in light of
 5   weakening case, information about the sneaking into the
 6   showrooms coming into my purview.  I just carry on.  I just
 7   keep going.  I never back away.
 8          MS. KELLER:  If I could just say one thing.
 9          THE COURT:  Oh, hang with me because --
10          MS. KELLER:  We're not arguing it, though, your
11   Honor.  The problem is the court is going into an analysis
12   of something I'm not arguing.  When it comes to exemplary
13   damages, I am not arguing that Mattel's suing MGA and
14   claiming that the Bratz line belonged to Mattel has anything
15   to do with anything.  I'm talking about trade secret
16   misappropriation by the market intelligence department which
17   is what the jury found to occurred 26 times.
18          THE COURT:  You are citing *Grimshaw* which is not a
19   trade secret.  You're citing *American Tobacco.*  In other
20   words, you're bolstering your argument and I'm not critical.
21   But you're bolstering your argument in terms of punitives in
22   areas that are not related to trade secret.
23          MS. KELLER:  And I agree with that.
24          What I'm saying is, but I wasn't citing those for
25   this purpose.  I was citing some of the cases for the
```

1   purpose that, basically, anything 10 percent or less is not

2   going to be deemed excessive.  I was citing them for the

3   purpose that punitive awards should be higher, if the

4   conduct has been repeated and is not an isolated incident.

5   I was citing the cases for the proposition that the

6   punitives should be higher, if the court finds it was

7   actually institutionalized as a business practice.

8          The litigiousness or nonlitigiousness of Mattel

9   really has nothing to do with this analysis.  So as far as

10  the chilling effect of Mattel protecting its IP --

11         THE COURT:  Just a moment.  You used the word

12  "continuous" in your argument.  And I don't know the

13  difference between "continuous" and "continuing" and

14  "litigiousness."

15         MS. KELLER:  I'm not talking about litigation.

16  I'm talking about the activities of the market intelligence

17  unit.  Because I think if the court assesses exemplary

18  damages, the court has to do it based on the jury's finding

19  that those 26 trade secrets were willfully and maliciously

20  misappropriated.

21         Those 26 trade secrets, the jury didn't make any

22  finding about litigiousness, nor was it asked to.  The jury

23  didn't make any other findings.

24         I think the best thing to do is to stick to CUTSA

25  and the verdict and the findings and then look at that.

1           Now, when I say --

2           THE COURT:  Well, I agree.

3           MS. KELLER:  But when I say "continuous," I'm

4    limiting that to the trade secret misappropriation which

5    went on for 13 years in an institutionalized manner that was

6    a business practice that permitted Mattel to maintain a

7    dominant position in the marketplace.

8           When I talk about "reprehensibility," a lot of the

9    cases that I cited to the court dealt with reprehensibility.

10   I wasn't citing them for any proposition about

11   litigiousness, only for the proposition that if the conduct

12   involves third parties as well -- not just one victim, but

13   many -- the court can look to that in determining how

14   reprehensible the conduct is.

15          Mattel has every right to try and protect its

16   intellectual property.  We don't argue that it doesn't.

17          What we are arguing here when we look only at

18   exemplary -- and, frankly, I think it would be error if the

19   court were to find punitive damages, based on how Mattel has

20   conducted the litigation, because that's outside the purview

21   of CUTSA.

22          *(At 10:50 a.m., live switch with Jane Sutton Rule,*

23          *Volume 2.)*

24

25                              -oOo-

```
 1
 2                         CERTIFICATE
 3          I hereby certify that pursuant to Section 753,
 4   Title 28, United States Code, the foregoing is a true and
 5   correct transcript of the stenographically reported
 6   proceedings held in the above-entitled matter and that the
 7   transcript page format is in conformance with the
 8   regulations of the Judicial Conference of the United States.
 9
10   Date:  May 28, 2011
11
12
13          _____
14                      Deborah D. Parker, Official Reporter
15
16
17
18
19
20
21
22
23
24
25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*