1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    – – – – – – –

5

6    MATTEL, INC., ET AL.,                )
                                          )
7              Plaintiffs,                )
                                          )
8         vs.                             ) No. CV 04-9049-DOC
                                          )
9    MGA ENTERTAINMENT, INC., ET AL.,     )     Volume 2 of 2
                                          )
10            Defendants.                 )
     _____ )

11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                       Motions

17                 Santa Ana, California

18                Friday, May 27, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     ll-05-27 MattelV2

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

 4              QUINN, EMANUEL, URQUHART & SULLIVAN
                By:  JOHN B. QUINN
 5                   MICHAEL T. ZELLER
                     SUSAN ESTRICH
 6                   Attorneys at Law
                865 South Figueroa Street
 7              10th Floor
                Los Angeles, California 90017-2543
 8              (213) 443-3000

 9

10    FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                BY:  THOMAS S. MC CONVILLE
12                   Attorney at Law
                4 Park Plaza
13              Suite 1600
                Irvine, California 92614
14              (949) 567-6700

15              - AND -

16              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                BY:  ANNETTE L. HURST
17                   Attorney at Law
                405 Howard Street
18              San Francisco, California 94105
                (415) 773-5700
19
                - AND -
20
                KELLER RACKAUCKAS, LLP
21              BY:  JENNIFER L. KELLER
                     Attorney at Law
22              18500 Von Karman Avenue
                Suite 560
23              Irvine, California 92612
                (949) 476-8700
24

25
```

1    APPEARANCES OF COUNSEL (Continued):

2

3    Also Present:

4              ISAAC LARIAN, MGA CEO
               ROBERT ECKERT, Mattel CEO
5              RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan
               KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe
6              MELANIE PHILLIPS, Orrick Herrington & Sutcliffe
               FRANK RORIE, Orrick Herrington & Sutcliffe
7              DIANA RUTOWSKI, Orrick Herrington & Sutcliffe
               DENISE MINGRONE, Orrick Herrington & Sutcliffe
8              JEANINE PISONI, MGA Attorney at Law

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                             **I N D E X**

2

3

4    MGA PARTIES' MOTION FOR JUDGMENT OF MATTEL'S INTENTIONAL
     INTERFERENCE WITH CONTRACT AND UNFAIR COMPETITION CLAIMS

5
     MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW RE MGA'S
6    CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO
     FEDERAL RULE OF CIVIL PROCEDURE 50(B); AND ALTERNATIVE
7    MOTION FOR REMITTITUR AND/OR NEW TRIAL

8    MGA PARTIES' MOTION FOR EXEMPLARY DAMAGES AND FEES PURSUANT
     TO CALIFORNIA'S UNIFORM TRADE SECRET ACT, CAL. CIV. CODE
9    3426.3, 3426.4

10   MATTEL'S MOTION AND MOTION TO STRIKE AND CONFIRM WAIVED THE
     MGA PARTIES' UNTIMELY OBJECTIONS TO MATTEL'S PROPOSED
11   FINDINGS OF FACT AND CONCLUSIONS OF LAW RE MGA'S UNFAIR
     COMPETITION CLAIM

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          SANTA ANA, CALIFORNIA, FRIDAY, MAY 27, 2011

2                        VOLUME 2 OF 2

3                         (10:50 a.m.)

4          *(Live reporter switch with Deborah Parker.)*

5          MS. KELLER:  CUTSA is strictly limited to those

6    trade secrets that were misappropriated, and that finding by

7    the jury of willfulness and maliciousness, and then the

8    Court can look at all the different factors that determine

9    reprehensibility, what's an appropriate size of the award.

10   All I know is this from reading all of the cases, and I

11   really agree with the Court that the U.S. Supreme Court has

12   pulled back on punitive damages; so has the California

13   Supreme Court.  If somebody is going to give compensatory

14   damages of 150 times compensatories, you can expect the

15   California Supreme Court to do something about that.  And

16   same with the U.S. Supreme Court.  But here we have a

17   statutory scheme that the legislature enacted that

18   specifically gives you the benchmark, and it's twice the

19   amount of compensatories.

20          Then, in determining whether the -- where the

21   Court wants to go within that amount of twice the

22   compensatories, the Court looks at all of these different

23   factors, and I think one thing that's very appropriate to

24   look at is the cases holding basically anything that

25   10 percent of net worth or less is not going to be disturbed

1   on appeal.  I mean, it's an absolutely -- given the case

2   law, it's an absolutely safe amount.  That has been

3   determined over and over again to not be excessive and to be

4   well within the Court's purview, and we're asking for

5   7.02 percent.  That was the reason for those cases being

6   cited, your Honor.

7           THE COURT:  Okay.  Let me take on Exxon Valdez

8   because, remember, you cited Exxon Valdez.

9           MS. KELLER:  And I cited it only for one purpose.

10          THE COURT:  Well, you may have but -- but --

11          MS. KELLER:  It was business practice or policy.

12  It was the Court saying, "If something's a business practice

13  or policy, it's more blameworthy."

14          THE COURT:  Here is what I heard.  I know what you

15  did.  Thank you.  I accept that.  Here is what I heard.  I

16  heard $2.5 billion.  In other words, the impression that I

17  got, which you did not intend to argue, was, "Judge, these

18  large punitive damages awards are often forthcoming," and I

19  interrupted you, with my apologies to you, and said, "Well,

20  the original, I think, was $11 billion" -- I forget what it

21  was -- "in Exxon Valdez."

22          But I also thought a portion of Exxon Valdez spoke

23  to this principle as well.  In these bright line tests being

24  set up by the courts that the higher the compensatory also

25  means that the Court has to take into account what the

 1    compensatories are and at least be very careful about the
 2    punitives.  In other words, you just don't double
 3    compensatories or one-times it.  I can have an award, of,
 4    you know, $500 million, and that doesn't mean that the Court
 5    should impose another billion dollars or another
 6    $500 million because the larger -- remember Exxon Valdez is
 7    principle, and a lot of cases now we're speaking, that's one
 8    test, but the other test is large compensatories also mean
 9    that the Court should be cautious and give its reasons and
10    ruling in a transparent form in large compensatory verdicts,
11    and there is a strong argument that that should, in fact, be
12    taken into account in a -- not lower, but lower ratio
13    punitive.  So an $11 billion case, that's why you have the
14    2.5 billion in punitives and not 22 billion.
15            MS. KELLER:  Well, each case turns on its own
16    facts.
17            THE COURT:  Sure.
18            MS. KELLER:  There's no question.  And in Exxon
19    Valdez, for example, Exxon had already expended gigantic
20    sums in cleanup efforts, you know, in mitigation efforts.
21    So, you know, you have a whole host of -- you have a whole
22    host of other factors.  I only cited it, though, for that
23    one proposition.
24            THE COURT:  Okay.  I'll accept that, but remember,
25    I heard $2.5 billion; in other words, lots of money.

1          Class action cases -- look, the whole fight over

2   class action, I know the principle you cited it for, but let

3   me just clear that off the table.  The whole fight in class

4   actions are the initial certification.  Anytime a court

5   certifies a class action, game's over, and the reason for

6   that is the parties have to settle, usually.

7          MS. KELLER:  I actually didn't cite it for any

8   proposition, your Honor.  Mattel cited it, and I was

9   pointing out that it has nothing to do with our case --

10          THE COURT:  Okay.

11          MS. KELLER:  -- because it's a class action case,

12   and that -- you know, there is a bar on collection of

13   punitive damages in a federal class action case, so it

14   can't -- it has nothing to do with our case, and I was

15   pointing out there was some language admitted.  I'm the

16   first to agree that it has zero relevance here.

17          THE COURT:  All right.  Now, let me take the

18   two-judge case, Judge Kozinski and Judge Kleinfeld, for a

19   moment.

20          MS. KELLER:  In which case, your Honor?

21          THE COURT:  No case.  They are just two separate

22   judges.  I am just joking with you, counsel.

23          Reprehensibility, the Courts often speak about a

24   pattern, and for the purposes of my writing, then, if there

25   is a pattern, I want to be very clear that there is no

1    miscommunication on my part back to you.  I would be

2    writing, then, about a pattern or a continuing conduct in

3    relation to the facts before this case, not the comment made

4    yesterday about Mattel's litigiousness in terms of other

5    cases because that's absolutely on the record, absolutely

6    restated.  And the invitation is, you know, to take into

7    account Mattel litigating other cases when I don't know the

8    result of those cases; I don't know if they are properly

9    brought; I don't know if this is an over-litigious

10   defendant.

11         So are we clear that you are talking about

12   continuous pattern, this case reprehensibility, this case

13   and no other case outside of the parameters of this case?

14         MS. KELLER:  I want to be absolutely clear that

15   our request for exemplary damages is based on the continuing

16   pattern in this case -- that was demonstrated in this case

17   over a period of 13 years of the market intelligence

18   department systematically spying on MGA and competitors,

19   other competitors, for purposes of showing reprehensibility.

20   It is based on their theft of trade secrets by the market

21   intelligence department and having it be institutionalized

22   in a business practice or policy.

23         THE COURT:  I know the answer.  I think it's

24   self-evident when I ask you this question, but which way

25   should the presumptions fall if the Court took the position

1    that some amount of punitives were appropriate when the

2    Court has a complete record and doesn't thoroughly know

3    what's in the 35 boxes, which, from your position, is simply

4    evidence that corroborates the fact that this is ongoing,

5    long-standing, and, in fact, from your position, extends

6    beyond MGA?

7            How do I know how continuous and excessive this is

8    from your standpoint and know in relation to your client,

9    discounting anybody else that this may have occurred to,

10   Jax, et cetera?  And from your position, it doesn't matter.

11   In other words, since you prevailed on willful and

12   maliciousness, should the presumption fall in your favor

13   that, "Judge, you may not have all the facts because you

14   haven't gone through the 35 boxes, and you haven't been

15   allowed to, and the other side hasn't" -- well, the other

16   side has.

17           MS. KELLER:  I think the safest thing, your Honor,

18   frankly, for purposes of the record, is not to consider the

19   35 boxes.

20           THE COURT:  Okay.

21           MS. KELLER:  You know they exist, but we haven't

22   been given the discovery that would have enabled us to use

23   in argument.  So I think the safest thing to do is look at

24   the testimony of Mr. Villasenor and others.  The jury

25   believed that testimony, so I think the inferences should be

1    drawn in favor of the jury's verdict.

2            THE COURT:  Now, Mr. Quinn, when you get up and

3    address the Court the first time and the second time --

4    right now I'm still tentatively inclined not to divulge the

5    billing records, okay?  But here is the problem with that.

6            Let's just assume that the first verdict was 100

7    million or 40 million; it doesn't matter for the moment.  If

8    as counsel insinuates and actually argues that there are

9    $400 million in attorneys' fees, and you are arguing for

10   $750 million, what are the risks and rewards, what is the

11   balance, because what that could do in the Circuit's mind,

12   especially with Judge Kleinfeld, if this went en banc, if

13   you read his treatises, he's very concerned about the

14   courts being used in terms of litigation, and in this case,

15   Ms. Keller's argument would be killing a brand, in other

16   words, not competing in the marketplace but competing in the

17   courtroom.

18           And so when you are concerned about giving the

19   Court that information, then at some point I'm writing with

20   a pen assuming that there's 300 million or 400 million, some

21   huge amount of attorneys' fees that just, from the Circuit's

22   perspective, may not seem to balance with the eventual

23   return.

24           Now, back to MGA, I'm not certain I accept the

25   argument that Mattel didn't apologize.  I heard in

1     Mr. Quinn's opening statement a very difficult thing he had

2     to deal with right from the beginning, and that was the

3     explanation about the concealment of Mattel's activities.

4              Now, your response will be, "Yeah, Judge, he had

5     to do it anyway; in other words, he had to front it.

6     Somebody who is not similar to having a prior, but when

7     you've got him on the stand, you might be the first party

8     that brings out the prior."  But in a sense, Mr. Quinn was

9     not apologizing, but telling the jury right to begin with,

10    "Yeah, there is a problem here from my client's standpoint."

11    Now, that's just good lawyering and good tactics; I know

12    that.

13             So I want to call that to both of your attention

14    because this isn't something that just got popped in the

15    middle of trial like an "aha" moment.  That had to be dealt

16    with right to begin with, and Mr. Quinn tried to effectively

17    deal with it.  I know your response is --

18             MS. KELLER:  Well, no.  I mean, my response is

19    that yes, he tried to -- like any good lawyer would try to

20    take the sting out of bad evidence that he knew was coming,

21    but what happened throughout the trial over and over again

22    was an attempt to minimize it and an attempt to say that it

23    didn't even matter, that it was no big deal, almost like MGA

24    was hypersensitive about this, and who cares and it happens

25    all the time and it's public information anyway, it's

1    available anyway; it's no big secret.

2           So that wasn't an apology.  That was a little bit

3    of an attempt to take some of the sting out of upcoming

4    attractions, but it was -- the entire attitude of Mattel to

5    this market intelligence unit's misconduct, including now in

6    the briefs, has almost been mocking, your Honor.  It's

7    almost been a mocking tone, like, "Big deal, you know, grow

8    up.  It's only a doll.  Nobody died.  Big deal.  You guys

9    should have known better than to take cheap, phony business

10   cards and actually believe that they were real.  You should

11   have known better.  You didn't do a good enough job of

12   protecting your property."

13          It's -- it is not hyperbole to say that Mattel's

14   attitude has been, "So what?  Too bad, so sad."  Well, the

15   jury didn't feel that way.  The jury did not feel that way

16   when it made its finding of willful and malicious trade

17   secret misappropriation.  And I think that calling this a

18   campaign of corporate espionage, likewise, is not hyperbole.

19   I'm sure that a number of Mattel's other competitors when

20   they learned of what has been happening found that it was a

21   big deal, but not to Mattel.

22          It's just -- you know, first of all, it was

23   concealed for years and years and years.  It was concealed.

24   It was lied about, and when it finally came to light, we

25   were told it was no big deal.  It's the overall attitude,

1    your Honor.  It's not just -- yes, there was a line in

2    opening statement about it, and I think that probably

3    shouldn't have happened.

4              THE COURT:  And how do I write about that?

5              MS. KELLER:  Well, I think it goes to the issue of

6    deterrence.  You know, if a company really doesn't think

7    that this was that bad, it really doesn't think it was

8    something that they shouldn't have been doing, it really

9    truly thinks it's no big deal, they are not deterred from

10   doing something like it again.

11             I mean, the point is to punish them and deter

12   future wrongdoing, and not just theirs --

13             THE COURT:  All right.

14             MS. KELLER:  -- but other companies, and the case

15   law is clear on that.  I really truly think this Court will

16   be sending a message that is going to be heard loud and

17   clear all over the world about whether people who can do the

18   sorts of things Mattel did and get away with it unscathed,

19   unpunished, and be told, "Oh, well, it would be too big of

20   an amount of money, so we're not going to levy any

21   additional exemplary damages."

22             THE COURT:  Let me share a thought with you for a

23   moment.

24             In my lifetime, whatever judgment I've had has

25   been gained from experience, and a lot of my experience has

1    been gained from bad judgment.  And the position I've always

2    taken with myself is am I going to repeat that stupidity.

3    Insanity is doing the same thing over and over and over

4    again when it doesn't work.  So the end result is when we

5    talk about words like "reprehensibility," and we dress those

6    up in legal terms, most of the case law that I recall and

7    have read talks about reprehensibility in terms of a

8    continuing conduct and pattern, and what it usually does is

9    it falls into a situation where we do X, and then we move on

10   to another party and we do X, and we move on to another

11   party and we do X.  That's why I come back repeatedly just

12   to get a definition of where reprehensibility lies in this

13   case, and you've been very clear.  Yesterday, it slid into

14   an argument about they're litigious, et cetera, the

15   inference being left that they are suing everybody and they

16   are trying to chill the area.  You've been very clear, and I

17   appreciate that.

18           I also hear this argument, reversing now to your

19   thought, "Judge, how can they literally curtail, at least,

20   or kill a brand?  We don't expect to be made whole.  We'll

21   never be made whole."  It takes, you know, seven, eight

22   years of entrepreneurship out of Mr. Larian, come in and

23   have a de minimis message sent, from your perspective, of

24   compensatories and no punitives, or minimal punitives.  I

25   mean, the end result is where is the deterrence effect, so

1    now we're moving from reprehensibility, and this is what I'm

2    hearing:  "The deterrence, why isn't this just a good

3    business decision, the very thing that Judge Kleinfeld is

4    worried about in his discussion?  Why isn't this, you know,

5    88 million, leave it at that, some amount for attorneys'

6    fees, some amount for costs, we walk out with a, you know, a

7    sum of" -- and I'll toss out numbers -- "$100-$125 million?"

8    Good business practice.  Because what -- from your argument

9    is it doesn't act as a deterrence.  And I'm not talking

10   about a wholeness argument.  It just doesn't send a message

11   that they shouldn't do this again to Jax or to Mr. Larian

12   emerging in the market, or any competitive brand.

13          MS. KELLER:  The cases on exemplary damages don't

14   talk about making people whole.  They talk about the purpose

15   being to punish and to deter not just that defendant or not

16   just that party, but other parties.  And I think one lesson

17   would be if they are not punished with punitives, "Hey,

18   everybody else is free to engage in all of the corporate

19   espionage you want, and you are not going to be punished for

20   it because it's going to be seen as, oh, well, you know, if

21   there is a big enough award, the compensatories are enough

22   to justify it, and so you don't get" -- "you don't get any

23   additional punishment for it."

24          THE COURT:  The courts need to be extraordinarily

25   cautious when they enter into this area and absolutely

1    transparent for this reason.  In the Circuit, if I were

2    sitting in the Circuit, the one thing I might do is uphold a

3    verdict but be very, very cautious to reign in a court in

4    terms of their excessiveness.  And two wrongs don't make a

5    right.  This worldwide injunction doesn't get balanced by a

6    court suddenly coming back with punitives, you know, trying

7    to right the wrong.  So I'm glad we are speaking the same

8    language.  We are not talking about making your client

9    whole.

10              MS. KELLER:  No, we are not.

11              THE COURT:  Good --

12              MS. KELLER:  And the case law doesn't permit that.

13              THE COURT:  -- because I heard that argument

14    yesterday also.

15              MS. KELLER:  I think that was more in the context

16    of fees, your Honor, because Mr. Larian is out -- and MGA

17    are out so much in fees that there, it's appropriate to look

18    at making us whole on fees, because that's the whole idea,

19    after all, to --

20              THE COURT:  Well, do you realize that if I hold

21    for your position of whether it's a little or not, I've got

22    to do an extraordinary amount of writing.  In other words,

23    the Circuit has to know exactly what my thoughts are, and I

24    have to be completely transparent about that, which is why

25    I'm asking you these questions, in case I do hold for your

 1    position, because Mattel has the right to go up, whether

 2    it's a little or a lot, and say, "He's wrong, and he's wrong

 3    for these reasons intellectually," so --

 4            MS. KELLER:  That's why I'm keeping it narrow,

 5    your Honor, because I think -- I think that the best

 6    practice here is to keep it narrow.  You have the statute

 7    the legislature enacted.  You rule within that statute.  You

 8    find for -- you use the various guidelines that have been

 9    laid out by the courts as far as punishment and deterrence.

10    You look at the factors like reprehensibility and continuous

11    conduct.  And then you come up with an award that does not

12    even reach 10 percent of net worth, and I have not seen any

13    cases yet that have held that an award of less than 10 -- of

14    less than 10 percent of net worth is excessive on its face.

15            THE COURT:  And finally, should I write, if I take

16    your position, about not only net worth, which is one

17    standard, and under 10 percent, which is, you know, the

18    balance against net worth, but also the earnings income at

19    the present time or historically in the recent past?

20    Because the argument, once again, can be, whether it's

21    United Airlines which went into bankruptcy, which went to

22    the government, et cetera, that we may be worth X-amount in

23    terms of plant facilities, infrastructure, et cetera, but

24    our income is low.

25            Now, if their income is high, so be it, and where

1    do I find those figures, in the 10K?

2           MS. KELLER:  I think the safest -- yes, of course,

3    the 10K the Court can take additional notice of, and Mattel

4    has done extraordinarily well.  Their stock has done well;

5    their earnings have boomed.  They've done well.

6           THE COURT:  Just a minute.  My findings -- my

7    findings are as follows -- now I'm writing to the Circuit --

8           MS. KELLER:  Your Honor, if I could just --

9           THE COURT:  -- "Mattel has done extraordinary

10   well."  That's not good.

11          MS. KELLER:  I -- I understand.

12          Your Honor, I think the safest thing to look at,

13   and the courts have said this, the best thing to look at is

14   net worth because it's assets versus liabilities.  In the

15   case you're talking about, about United Airlines, earnings

16   might give a distorted picture, but if you look at assets

17   versus liabilities, they are in bankruptcy because their

18   liabilities exceed their assets.  So to be conservative,

19   which is, I think, what the courts have suggested should be

20   done in punitive damage awards, you look at net worth.  You

21   don't need to go beyond that.

22          Now, it happens to be the case --

23          THE COURT:  And why wouldn't I make certain in

24   writing that I also take into account and discuss whether

25   this has a chilling effect or not?  In other words, you

```
 1    don't want a company as a court, because what appears to be
 2    an excessive award -- and I am not talking about their
 3    belief of what an excessive award is.  I'm talking about the
 4    message that the Court is sending to all these different
 5    entities all around the world that you mentioned.
 6              MS. KELLER:  Well, then --
 7              THE COURT:  You don't want a company to be
 8    defenseless if they are genuinely trying to protect their
 9    intellectual property right because of one case that is such
10    a severe punishment.
11              MS. KELLER:  But, your Honor, remember how the
12    Court had repeatedly emphasized to us throughout trial that
13    there are actually two plaintiffs here.  There are actually
14    two cases here.
15              THE COURT:  Right.
16              MS. KELLER:  And that's why the Court even had us
17    switch-counsel tables so that we -- when it came time to
18    bring our trade secret misappropriation case, we're sitting
19    in the role of the plaintiff.
20              Nothing is being said about Mattel's right to
21    bring the lawsuit involving Carter Bryant in the Bratz line;
22    nothing.  There is no chilling effect, because that's not
23    what the exemplary damages go to.  They go to the case in
24    which we are the plaintiff.  The trade secret
25    misappropriation theft by the market intelligence unit has
```

1   nothing to do with Bratz.  It had to do with their setting

2   up this unit to spy on their competitors, including MGA, and

3   steal our trade secrets, so there is no chilling effect.  We

4   didn't even know about it until -- we didn't know about it

5   until 2010.

6            THE COURT:  I know.  I understand.  I've got it.

7            Now, the degree is what's troublesome to me.  In

8   other words, when I write -- if I take your position, I need

9   to be very clear about how extensive that is, and this is

10  what I'm hearing, and this is a golden opportunity for you

11  and Mattel.  I mean, I can just go back and write and not

12  ask any questions at all; it's very easy to do.

13           I'm hearing, "Judge, first of all, it's

14  continuous, it's continuous since the early 1990s.  That's

15  one factor you should take into consideration."  Number two,

16  "Judge, there's a lot of inferences that it's broad, but we,

17  MGA, aren't even going to go into that.  You just have to

18  look at the conduct."

19           There's a note that will turn the case for you,

20  counsel, from Mr. McConville to you.

21           "Are you just going to" -- "you just have to go

22  into these facts; you don't have to extend beyond the facts

23  of this case."

24           Number three, "That would be consistent with your

25  ruling concerning trade secret misappropriation if you

 1    didn't reduce or go into the trade secret misappropriation

 2    area because it has a certain nexus to it."

 3            MS. KELLER:  It has a nexus in this way:  Their

 4    theft of our trade secrets helped them compete unfairly

 5    against us.  However, it's a totally different issue than

 6    who owned the rights to Bratz.  Who owned Bratz?  That was a

 7    separate issue, and that was an issue that -- that Mattel --

 8    I can understand why the Court is saying, "Well, Mattel had

 9    a right to bring that lawsuit to try to protect what it

10    thought was its intellectual property" -- at least at the

11    start it thought that -- "and so they had a right to do

12    that."  So we are not disputing that.  We're saying this

13    trade secret misappropriation that occurred was totally

14    separate from the issue of who owned Bratz.

15            THE COURT:  Now, just a moment.  I didn't make

16    that finding that Mattel had a right to bring this lawsuit.

17            MS. KELLER:  I understand.

18            THE COURT:  I just asked you to assume that.  It

19    may be that by the time Mattel brought this lawsuit, you

20    know, it's everything that you assumed to begin with, and

21    that is maliciousness in terms of, you know, the profit and

22    the competition, et cetera.  I'm just tossing out thoughts

23    right now.

24            MS. KELLER:  I misspoke, your Honor.  What I meant

25    was I understood what the Court was saying about, you know,

 1    "I'm concerned about a chilling effect.  What if Mattel

 2    really believes it's protecting its intellectual property?

 3    Why is the message of the Court not to try to balance its

 4    right to do that with" --

 5              THE COURT:  Because Exxon Valdez is not a good

 6    analogy.  I know why you cited it, but it's not a good

 7    analogy.  Otherwise, the Court would have found $22 billion

 8    in punitives, and the higher the award, depending upon

 9    whether the Court used $88 million or some reduction if the

10    JMOL isn't granted, is a high award.  And the way I view

11    that has to be, one, on net worth, as you said, but also I'm

12    a little concerned that I'm not taking into account, at

13    least up to this time, the earnings in a quarterly or yearly

14    basis, and I'm going to go back and think about whether

15    that's an appropriate thing to comment upon also if I write

16    a punitive damages award.

17              MS. KELLER:  And the magic note that I was handed

18    that the case might turn on, your Honor, was actually what

19    Mattel's net income was for 2009.  It was $528.7 million,

20    which was --

21              THE COURT:  Where do I find that net?

22              MS. KELLER:  In the 10K, your Honor.

23              THE COURT:  $528 --

24              MS. KELLER:  -- .7 million.

25              THE COURT:  $527 million?

1          MS. KELLER:  $528.7 million.

2          THE COURT:  Is the net --

3          MS. KELLER:  That was its net income, "net," and

4   that was an increase of 39.27 percent from 2008.  And then

5   Mattel -- and we'll be happy to supply the Court with the

6   10Ks -- Mattel's net income in 2010 went up to

7   $684.9 million, an increase of 29.5 percent from 2009.

8          So this isn't a company that has, you know -- on

9   paper, has what looks like good asset -- a good

10  asset-to-liability ratio but, in fact, is hurting in terms

11  of net earnings.  Mattel is making plenty of money.  Mattel

12  is pumping out earnings.

13         THE COURT:  Okay.  Now, I'm going to cease my

14  questions, okay?  I want you to finish off, and, once again,

15  let me apologize.  I engaged you too early, and I should

16  have waited until the second round.

17         MS. KELLER:  No.  I -- I'm happy to answer the

18  Court's questions, your Honor, and I just think that when it

19  comes to exemplary damages, the things that I think are,

20  from MGA's perspective, the most important are, number one,

21  unlike all of these other cases that have been cited by

22  Mattel, here we have a statutory scheme.  The California

23  legislature has made its determination of what is not an

24  excessive punitive damages award in a trade secrets case,

25  and the determination that the legislature has made is twice

1    the amount of the compensatories.  That is -- that is the

2    limit, but anything within that obviously the legislature

3    has determined is appropriate.  So we've got that, number

4    one; and then, number two, we have all of the other factors

5    that we cited; and, number three, finally, we have --

6            THE COURT:  Well, just a moment before we get to

7    three.

8            Why isn't Ms. Estrich's argument of great concern

9    to the Court when you had time to file a RICO at the last

10   moment, which I allowed; why couldn't the antitrust be

11   filed?  Because I understand the difference intellectually

12   and legally, and I can write in a way that separates that

13   out, quite frankly, for the Circuit, but looking at that, in

14   a sense, there's a strong argument by Ms. Estrich that, you

15   know, you've got punitives in terms of willfulness and

16   maliciousness, but they involve many of the same factors

17   that could be floating out there for the antitrust case.

18           MS. KELLER:  But this is in the realm of what if,

19   what if, and what will happen, what might happen and what

20   could happen, and I would suggest that if the Court ever

21   thought it was getting into the area of double recovery,

22   then down the line in that other case, the Court could make

23   an offset.  But to say now, because of something that may or

24   may not happen in the future, the Court should not deal with

25   what the jury found in this case makes no sense to me.

1           THE COURT:  And let me put it another way.

2           "Judge, why would you be cautious if genuinely

3    your findings would be for X amount on behalf of MGA?  Why

4    would you be concerned with the speculation of the case in

5    the future when you can deal with it?  Because a lot of

6    things can happen on that case, and Mr. Larian and MGA would

7    be punished by, you know, diminishing through that secret

8    concern you have and" --

9           MS. KELLER:  And we don't know what will happen

10   with that case.

11          THE COURT:  Okay.

12          MS. KELLER:  You could have any -- you could have

13   a whole host of things happen, and we might end up with

14   nothing.

15          THE COURT:  Deal with the case on the merits, in

16   other words.

17          MS. KELLER:  I think that's the only thing that

18   you can do.

19          THE COURT:  Mr. McConville has another note for

20   you.

21          MS. KELLER:  I think the other thing, your Honor,

22   in terms of Mattel's arguments, is Mattel had never argued

23   in its briefs that the punitive numbers that Mattel -- that

24   MGA has proposed would crush or debilitate it.  It's very

25   clear that our numbers would not do that to Mattel, and it's

1    very clear this is a healthy company with a healthy balance

2    sheet --

3            THE COURT:  Now, let's add that up for a moment.

4    "Whoa, you used 7.2 percent but" -- do you have a pen,

5    pencil?

6            MS. KELLER:  7.02 percent.

7            THE COURT:  Mr. McConville?

8            There we go.  Let's just take your best argument,

9    "$88 million, Judge, don't reduce it."  In fact, $88.5

10   million.  Now, are you asking me to double it or triple it?

11           MS. KELLER:  We are asking you to double it, which

12   is what CUTSA --

13           THE COURT:  Okay.  That's 100 and what?

14           MS. KELLER:  That the exemplary damages, which

15   would be double the amount --

16           THE COURT:  We are adding now.  We are adding now.

17   88.5 and 88.5, three times 88.5, what is it?

18           Mr. McConville, three times 88.5.

19           MR. MC CONVILLE:  258.50 -- $268.50.

20           THE COURT:  Okay.  Now --

21           Pardon me?  It's -3, isn't it?

22           MR. MC CONVILLE:  268.

23           THE COURT:  268, okay.  You've got 268.

24           Now, what are you asking for in attorneys' fees

25   again?

1           MS. KELLER:  Well --

2           THE COURT:  No.  Give me a number.

3           MS. KELLER:  I think around $140 million.

4           THE COURT:  Okay.  Add 140 million to that.

5      Mr. McConville?

6           MR. MC CONVILLE:  408.

7           THE COURT:  408.  Okay, now add your costs.

8           MR. MC CONVILLE:  Roughly -- I would say roughly

9      40.

10          THE COURT:  Okay.  40 and 408 is what?

11          MR. MC CONVILLE:  448.

12          THE COURT:  Now take your estimated valuation of

13     2 billion to 2.5 billion for -- in other words, it depends

14     upon the way you start shaping it, so take 2.5 billion or

15     2 billion, you're dealing with about 25 percent.

16          Now, I know that attorneys' fees and costs could

17     be separated out in legal jargon, et cetera, but the end

18     result is you are dealing with about 25 percent.

19          MS. KELLER:  Well, but there is absolutely not a

20     single case that has said that you aggregate compensatories

21     and attorneys' fees and costs and that you decide an

22     exemplary damage award based on that.  There is not one

23     case, and I don't think you are going to find one.

24          THE COURT:  I know that.  I know that.  But the

25     end result is it's still about 25 percent, so we can dress

```
 1    that up legally, and that's what Mattel is going to come
 2    back and say.  They are going to say, "Look, Judge, our
 3    figures weren't fictional.  When you add all this up, you go
 4    back through the case law, Judge, and sort it out, but it's
 5    about 20, 25 percent."
 6              MS. KELLER:  But, your Honor, Mattel was driving
 7    this train.  Mattel chose to bring this litigation; we did
 8    not.  We were -- we were the target of the litigation.  We
 9    didn't want to spend this kind of money; we didn't have it.
10    The Court knows it just about destroyed MGA, just about put
11    it out of business, and it did destroy the brand.  And the
12    Court knows the battles to get the insurance carriers to pay
13    fees, and those battles are going on still.
14              I mean, to say, "Oh, poor Mattel might suffer all
15    this expense" when it was Mattel that chose to bring the
16    litigation.  It was Mattel that chose to conduct it the way
17    it did.  And if the published reports are right and Mattel
18    has chosen to spend well over 400 million just in attorneys'
19    fees to the Quinn, Emanuel firm alone, then that 448 million
20    figure that the Court is talking about, aggregate of all of
21    our fees and costs and exemplaries and compensatories,
22    doesn't look so huge.  If they made that decision -- and who
23    knows how much over 400 million it even is because we
24    haven't been permitted to see the records.
25              All of a sudden things come into a very different
```

Case 2:04-cv-09049-DOC-RNB   Document 10613   Filed 05/31/11   Page 30 of 44   Page ID #:321449
CV 04-9049-DOC - 05/27/2011 - Vol. 2 of 2

30

1    focus, very different focus.

2         THE COURT:  And now you see why I'm asking

3    Mr. Quinn and you to answer that question, and you can't

4    answer that.  Only Mr. Quinn can, and if those figures don't

5    want to be shared, so be it.  But the mantra is running

6    around that this is about a 400 million case.

7         MS. KELLER:  Those seem to be the figures that

8    have been in the media.

9         THE COURT:  And your point is, "If you are going

10   to spend that kind of money, Judge, why are you being so

11   cautious with, you know, punitives, if they're justified, et

12   cetera?"

13        Okay.  Now, Ms. Keller, you take your time, and

14   I'm sorry for all of the interruptions and all of the

15   questions, but this is a lot of money, so if we need another

16   day, that's the way it is.

17        MS. KELLER:  Your Honor, if it's all right with

18   the Court, if we could just take a brief break and then move

19   on to the fees and costs, just a long enough break to --

20        THE COURT:  Sure.  But remember, we're at about 10

21   to 12:00 unfortunately now and --

22        MS. KELLER:  Then I'll keep going.  I'll keep

23   going.

24        THE COURT:  Yeah, that's going to be it for me

25   today, and I want to apologize to both parties.  But now

Case 2:04-cv-09049-DOC-RNB   Document 10613   Filed 05/31/11   Page 31 of 44   Page ID #:321450
CV 04-9049-DOC - 05/27/2011 - Vol. 2 of 2

31

```
1    you've got to fit into my schedule.  I fit into your
2    schedule for three months.  I've rescheduled so many things
3    that I'm not breaking those schedules now.
4             MS. KELLER:  Then I think we should go on to fees
5    and costs, your Honor, and I'll try to deal with it as
6    quickly as I can.
7             THE COURT:  No, don't --
8             MS. KELLER:  Well, this is -- this is a much
9    smaller amount of money than we were talking about on the
10   defensive case.  Our defense of our case against Mattel's
11   claims was really the -- that was the issue that Ms. Hurst
12   was addressing, and that was really a very large sum of
13   money.  Here we're talking about fees and costs incurred for
14   our trade secret misappropriation case, which hasn't been
15   going on since 2005.  It's only been going on since 2010.
16            So there is -- under CUTSA, the jury is finding
17   that Mattel's misappropriation was willful and malicious
18   means that Mattel should reimburse MGA for attorneys' fees,
19   expert fees, and costs it bore, proving its affirmative
20   claims in addition to exemplary damages.
21            Mattel says there is no evidence that the
22   misconduct by Mattel stopped only because MGA sued in August
23   of 2010, but MGA never said that.  Our point was that the
24   litigation with MGA in which MGA was constantly actively
25   seeking discovery about things like Mattel's market
```

1    intelligence department is what caused Mattel to cease its

2    spying, and we know that that happened because the evidence

3    in this Court showed that Mattel first focused -- it focused

4    on Villasenor's conduct after MGA filed this fairly broad

5    unfair competition claim against Mattel in April of 2005.

6             Mattel's in-house attorney, Michael Moore,

7    admitted that he had at least four, maybe five, substantive

8    conversations with Villasenor specifically about the MGA

9    lawsuit, potentially even talking about gathering other

10   types of information in terms of NPD-publicly available

11   information.  And Villasenor confirmed that he was summoned

12   to meet with Mr. Moore about the lawsuit, the MGA lawsuit,

13   and Mr. Moore testified that he learned about the use of

14   false ID and misrepresentations by Villasenor and other

15   employees between June and December of 2005, when he was

16   talking with Villasenor specifically in connection with the

17   MGA claims.

18             Then suddenly in late 2005, Mr. Villasenor's

19   supervisor, John Louie, tells Mr. Villasenor he can't

20   misrepresent himself anymore.  So the timing of these events

21   cannot be coincidental.

22             In 2002, Matt Turetzky approached Michael Moore

23   about the propriety of using certain methods of collecting

24   competitive information.  And that was clearly, your Honor,

25   clearly the market intelligence type of activities, but the

1    conduct still went on, and it went on with Mr. Turetzky, a

2    high-placed Mattel executive's assistant.  And, for example,

3    we put in Trial Exhibit 9449, authorizing in 2004

4    reimbursement for fake business cards.

5            In contrast, in the fall of 2005, Mattel admits it

6    was investigating and preparing to respond to MGA's unfair

7    competition claims, and if Mattel was believed, which by

8    inference the jury did not believe, the conduct stopped in

9    2005.  Therefore, if Mattel is believed and the conduct

10   stopped, it stopped because of this lawsuit and not because

11   Mattel suddenly decided on its own to bring spying to a

12   close.

13           So MGA outlined the process for calculation of

14   reasonable attorneys' fees on our affirmative claims.  The

15   Court must calculate the lodestar figure by taking into

16   account the number of hours MGA reasonably expended, proving

17   its affirmative claims, and multiplying it by a reasonable

18   hourly rate.  Fortunately, there is no dispute that our

19   rates are reasonable by Mattel.

20           And the Court looks at enhancing or reducing the

21   figure based on the novelty and complexity of the issue.  I

22   think the Court is very -- in an ideal position to determine

23   that, the special skill and experience of counsel, the

24   quality of the representation, the results obtained, and the

25   contingent nature of any fee arrangement.

 1            And the fees recoverable include paralegal fees

 2    and cost of experts.  So not only does Mattel not -- Mattel

 3    isn't challenging the quality of counsel, the recoverability

 4    of fees for paralegals, the reasonableness of the rates, or

 5    the results obtained because they speak for themselves.

 6            So MGA has argued that we should be compensated

 7    for fees incurred in connection with claims that Mattel

 8    serially copied MGA products, as alleged in CV 05-2727, and

 9    MGA's counterclaims and reply against Mattel because only by

10    pursuing the affirmative claims in CV 05-2727 did we

11    discover that Mattel had misappropriated MGA's trade

12    secrets, and MGA's trade secret misappropriation claim and

13    civil RICO in the counterclaims and reply both arose from

14    Mattel stealing MGA's confidential trade secret information.

15            The reason this is important is because when

16    you've got a common core of facts and related legal

17    theories, as has been discussed before, no further

18    apportionment is necessary.  And Mattel's authority -- and

19    we've cited authorities for this, your Honor, and Mattel's

20    authority is not to the contrary.

21            And I'm not going to rediscuss the issue of the

22    O'Melveny fees and any apportionment because Ms. Hurst

23    already went into that, and she already discussed also that

24    the -- the related claims in the trial court's discretion to

25    award all or substantially all of plaintiff's fees,

1    even if there's --

2              THE COURT:  Do you want to hear something

3    humorous?  It's totally unrelated to this case.  Apparently

4    a lawyer in Ms. Hurst's firm, after you prevailed on a duty

5    of loyalty, just filed another lawsuit that sets out duty of

6    loyalty.  Unrelated to you, but apparently one side of the

7    law firm doesn't know what the other side is doing.

8              I'm just joking with you, counsel, but they --

9    it's in the Ninth Circuit notes, or whatever.

10             (Laughter.)

11             MS. KELLER:  It's a pretty -- it's a pretty big

12   law firm.

13             THE COURT:  Must be.

14             MS. KELLER:  It's got 1,200 lawyers.

15             Your Honor, the bottom line is that we have

16   calculated -- we've been really conservative about this, as

17   the Court could --

18             MR. QUINN:  We will probably be on the other side

19   of that.

20             THE COURT:  Yeah, probably.

21             (Laughter.)

22             THE COURT:  I'm sorry.  I'm just joking with both

23   of you.  It's got nothing to do with this case, but I

24   thought it was extraordinarily humorous this morning at

25   about 6:00 when I was flipping through the Blackberry.  But

1    I'm sorry, Ms. Keller.

2         MS. KELLER:  Well, I was just going to say, your

3    Honor, that we have calculated our fees in connection with

4    the affirmative claims that resulted in the jury's finding

5    of trade secret misappropriation and willful and malicious

6    misappropriation.

7         We calculated them very conservatively, and they

8    have come to $6,846,272 and an additional $80,201 in costs.

9    We have been scrupulous about trying to eliminate any kind

10   of duplication or anything that was even arguably not

11   warranted.

12        So unless the Court has any questions about that

13   fees and costs portion, I'm prepared to turn it over to

14   Mr. Quinn.

15        THE COURT:  Yeah, check your notes.  I want to

16   apologize again.  I didn't -- intellectually didn't make the

17   transition yesterday from the interchange in the second

18   round to your presentation.  That's rude on my part or, at

19   least if not rude, inattentive.

20        If there is anything in your notes or if you want

21   to start over again with the first portion, because you only

22   argued for 45 minutes yesterday, you are more than welcome

23   to.  I want to make sure you are satisfied.

24        MS. KELLER:  Well, your Honor, you could have

25   fooled me that you weren't being attentive because I thought

 1    you were being very attentive, and you asked some great

 2    questions, so I don't -- I'm not feeling put upon at all.

 3    I'm perfectly content.

 4            THE COURT:  Well, it was inartful.  I was

 5    attentive yesterday.  I just worry about knocking the

 6    glasses off my face.

 7            MS. KELLER:  There was one issue that the Court

 8    had raised that doesn't have anything to do with what we

 9    just talked about.  It really had to do with the standard

10    for a JMOL.

11            THE COURT:  Right.

12            MS. KELLER:  If the Court wants that addressed,

13    we've pulled some cases, and Mr. McConville would --

14            THE COURT:  The next time.  It's obvious to me we

15    are coming back, and I'm looking at 11:30 right now.

16            And for the 10 minutes you'd start, Mr. Quinn, it

17    just seems ridiculous because I'd just invite you to start

18    over again.

19            MR. QUINN:  Okay.

20            THE COURT:  You know my -- you know a couple of my

21    primary concerns right off the bat, and then I will talk to

22    myself over the weekend and have some questions for you.

23    And I apologize because I'm so inarticulate.  These are just

24    thoughts that I'm having.

25            Remember, I'm not trying to make you feel

 1  uncomfortable.  I'm just having a lot of conversations

 2  intellectually outside your presence, just with me.

 3           MS. KELLER:  Your Honor, may I just take a minute

 4  just to ask Mr. Larian if there is anything else he would

 5  like me to raise?

 6           THE COURT:  Absolutely, take your time.  And

 7  consult with your client and see if there is something else

 8  you want to cover today.  And then let's come back, and let

 9  me go down and get my calendar so you're not sitting around.

10           Mr. Larian and Mr. Eckert, I really apologize to

11  you.  Forty minutes is a lot of time in my life; it's an

12  extraordinary amount of time in your lives, so that won't

13  happen again.

14           *(Attorney-client discussion held off the*

15       *record.)*

16           THE COURT:  Remember there is going to be a second

17  round, Ms. Keller, so if you forgot something, you're coming

18  back again.

19           MS. KELLER:  Your Honor, I think -- for right now,

20  I think we've covered what we need to.

21           THE COURT:  Will all of you just visit for a

22  moment?  Let me go down and get my calendar for Wednesday.

23  Tuesday is not available to you, and I'd like to finish this

24  off in one block of time, so I'll be right back.

25           Would you be -- Mr. Larian, would you be available

 1    Wednesday at some point?

 2            MR. LARIAN:  Yes.

 3            THE COURT:  Would you, Mr. Eckert?

 4            MR. ECKERT:  Yes.

 5            THE COURT:  And if you have engagements during the

 6    day, I've got a calendar also.  I just don't want you

 7    sitting, and I can never predict with counsel because

 8    counsel always give me time estimates, but what I found is

 9    that most counsel would just like to actually be heard in

10    court and not have time constraints pressed on them.  That's

11    the most valuable thing a court can give.

12            Now, let me go down and get a calendar and

13    coordinate with all of you for just a moment.

14            *(Recess.)*

15            THE COURT:  Okay.  We are back on the record.

16            I'm going to ask Mr. Quinn to consider that strong

17    subtle argument that's going on.  All the legalese says this

18    argument:  "Judge, apply the law, apply the standards,

19    balance, but don't hold back because if you think it's

20    appropriate and you are concerned in your mind about

21    diminishing this some way, that while MGA is now arguing to

22    be made whole, the message can't be that the brand can

23    curtailed or be killed because the end result is it almost

24    ends up being a good business investment."

25            Now, I can dress that up in all sorts of legal

CV 04-9049-DOC - 05/27/2011 - Vol. 2 of 2

40

 1    terms, but that's really the argument that -- that's coming

 2    forth in some ways.

 3              MR. QUINN:  We -- we -- we can address that, your

 4    Honor.

 5              THE COURT:  Yeah.

 6              MR. QUINN:  We can address that.  We are prepared

 7    on that.

 8              THE COURT:  And the second thing I understand is

 9    that --

10              (Interruption in the proceedings.)

11              THE COURT:  -- is that I understand the

12    10 percent, 10 percent revenue.  And that's just a guide.

13    That's all that is.  It's meant to stop the courts from

14    excessiveness.  One, is this a high verdict by Exxon Valdez

15    where it's not automatically one time or two times, but if

16    there were punitives, is it substantially less on a ratio

17    basis?  And kind of like the Exxon Valdez ruling, nobody is

18    going to hand down $22 million, okay?  And the first

19    position is, "Judge, no punitives."

20              MR. QUINN:  That is our position; no punitives.

21              THE COURT:  But address that also.

22              MR. QUINN:  We will.

23              THE COURT:  Because eventually I'm going to ask

24    that.

25              MR. QUINN:  Absolutely.

1         THE COURT:  And I'm going to ask you to assume

2    that I was -- not to frighten you, but just so you address

3    all of the fallback positions.

4         MR. QUINN:  We'll be prepared on that.

5         THE COURT:  Second, how do I deal with, once

6    again, this statute, but why is the court writing so

7    incompletely?  Why aren't I also taking the revenue, and

8    should I -- should I take in account net on a quarterly or

9    yearly basis?  What's fair about that is it gives a nice

10   balance to it, and what's unfair about that is the quarterly

11   net this quarter may not have anything to do with the next

12   quarter because it's seasonal.

13        So all of a sudden you get a good quarter of what

14   MGA sites of $650 million -- well, a good year, that doesn't

15   mean the next year is a good year.  It doesn't mean

16   historically that's been your average over a period of time.

17   And if quarterly from, let's say, October to December is

18   really a miscalculation compared to January or February, or

19   should the Court even take that into account?

20        Third, this mantra is flying around about the cost

21   of the lawsuit in both expenditures and attorneys' fees by

22   Mattel and by MGA.  The argument overtly and subtly, because

23   it did transition from Ms. Hurst to Ms. Keller, is that

24   because the fees are what appears to be large, that the

25   willingness of Mattel to expend those fees should be taken

 1   into account by the Court in some form in terms of not only

 2   the aggressiveness of the litigation, but the reasonableness

 3   of it in terms of return.  In other words, at some point if

 4   I can get $10 back and I spent a million dollars, it doesn't

 5   make sense, and that's an outside example.

 6          And then in the second round, you direct me

 7   because I'm a little chagrined from myself cutting you off

 8   so many times.  I didn't intend to.  You tell me if you want

 9   to make a complete presentation and then have me ask

10   questions so you can roll right through.

11          And you guide me also.  I mean, on your first

12   presentation, you tell me on next Wednesday if you want to

13   make a complete presentation without any interruption, roll

14   right through, okay?

15          MR. QUINN:  Okay.

16          THE COURT:  Now, you go and have a good weekend,

17   and any comments today, trust me, I'm not -- I'm exploring

18   every possible nuance that I can think of and trying to

19   decide not to necessarily issue a structure right now.  How

20   does the Court write to the Circuit so the Circuit knows

21   whether they agree or disagree on the Court's eventual

22   resolution, and how does the Circuit knows that the Court's

23   considered or at least know it's thinking about that without

24   walking into a proceeding and saying it's this or it's that,

25   okay?

CV 04-9049-DOC - 05/27/2011 - Vol. 2 of 2

43

1              You go and have a good weekend.  Don't be troubled

2    by my comments today.  There is no winning or losing.

3              MS. ESTRICH:  Thank you, your Honor.

4              MS. KELLER:  Thank you.

5              MR. QUINN:  Thank you, your Honor.

6              *(Court adjourned.)*

7                              -oOo-

1                           -oOo-

2                      **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  May 28, 2011

12

13

14   _____

15   JANE C.S. RULE, U.S. COURT REPORTER
     CSR NO. 9316

16

17

18

19

20

21

22

23

24

25