1  ANNETTE L. HURST (State Bar No. 148738)
   ahurst@orrick.com
2  WARRINGTON S. PARKER III (State Bar No. 148003)
   wparker@orrick.com
3  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
4  405 Howard Street
   San Francisco, CA 94105
5  Telephone:  415-773-5700
   Facsimile:  415-773-5759
6
   WILLIAM A. MOLINSKI (State Bar No. 145186)
7  wmolinski@orrick.com
   ORRICK, HERRINGTON & SUTCLIFFE LLP
8  777 South Figueroa Street, Suite 3200
   Los Angeles, CA  90017
9  Telephone:  213-629-2020
   Facsimile:  213-612-2499
10
   THOMAS S. MCCONVILLE (State Bar No. 155905)
11 tmcconville@orrick.com
   ORRICK, HERRINGTON & SUTCLIFFE LLP
12 4 Park Plaza, Suite 1600
   Irvine, CA 92614-2258
13 Tel: (949) 567-6700/Fax: (949) 567-6710

14 Attorneys for MGA Parties

                    UNITED STATES DISTRICT COURT

15                  CENTRAL DISTRICT OF CALIFORNIA

16                       SOUTHERN DIVISION

17

18 | CARTER BRYANT, an individual | Case No. CV 04-9049 DOC (RNBx) |

19 | Plaintiff, | Consolidated with Case No. CV 04-9059 and Case No. CV 05-2727 |

20 | v. | |

21 | MATTEL, INC., a Delaware corporation, | **MGA PARTIES' NOTICE OF MOTION AND MOTION FOR EXEMPLARY DAMAGES AND FEES PURSUANT CALIFORNIA'S UNIFORM TRADE SECRET ACT, CAL. CIV. CODE §§ 3426.3, 3426.4** |

22 | Defendant. | |

23

24 | AND CONSOLIDATED ACTIONS. | |

25 | | Trial Date: January 18, 2011 |

26 | | Judge:  Hon. David O. Carter |

27 **CONFIDENTIAL – ATTORNEYS' EYES ONLY**

28

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

MAY 1 7 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                      DEPUTY

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................. 1

STATEMENT OF FACTS ..................................................... 5

A. Mattel Executives Knew About The Market Intelligence Activities For Years ................................................. 5

B. Mattel's Theft Was Well Organized, Supervisor-Directed and Smoothly Executed ................................................. 6

C. Mattel Bolstered Its Market Intelligence Group With Hired Agents ................................................................... 9

D. The Trade Secrets Mattel Stole Were Not Publically Available And Were Extremely Valuable ................................... 9

E. Mattel Used The Information It Stole To Maintain Its Competitive Advantage ........................................... 11

F. From Top To Bottom, Every Mattel Employee Confronted With The Fact Of Mattel's Espionage Admitted It Was Wrongful ............ 12

G. Mattel Ignores The Conduct, Then Hides It, So That The Conduct Could Continue Without Consequence ................ 14

  1. Mattel Does Nothing To Stop The Stealing And It Continues To 2009, At Least ...................................... 14

  2. Mattel Hides The Evidence ..................................... 15

  3. Senior Mattel Executives' Denials ........................... 17

  4. Mattel Pays Villasenor Hush Money ......................... 18

H. At Trial, Mattel Only Paid Lip Service To Its Wrongful Conduct Attempting To Minimize It And Dissemble ...................... 19

I. The Jury Finds The Conduct Was Willful And Malicious ............... 23

ARGUMENT ........................................................................ 23

I. THIS COURT SHOULD AWARD EXEMPLARY DAMAGES .............. 23

A. Mattel's Conduct Is Reprehensible ............................. 24

B. MGA Suffered Grievous Injury .................................. 27

C. Due To Mattel's Substantial Wealth, Higher Punitive Damages Are Required To Effectively Punish And Deter Mattel .............. 28

II. FEES AND COSTS ARE WARRANTED ................................... 30

CONCLUSION ..................................................................... 34

# **TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Bains LLC v. Arco Products Co.,*
    405 F.3d 764 (9th Cir. 2005)................................................................26

*Bolt v. Merrimack Pharmaceuticals, Inc.,*
    503 F.3d 913 (9th Cir. 2007)...............................................................30

*BMW v. Gore,*
    517 U.S. 559 (1996)...........................................................................26

*Drew v. Equifax Information Services, LLC,*
    2010 WL 5022466 (N.D. Cal. Dec. 3, 2010).....................................26

*Eldorado Stone LLC v. Renaissance Stone,*
    2007 WL 3308099 (S.D. Cal, Oct. 24, 2007)..............................31, 32

*Exxon Valdez v. Exxon Mobile Corp.,*
    490 F.3d 1066 (9th Cir. 2007).............................................................26

*Fischer v. SJB-P.D., Inc.,*
    214 F.3d 1115 (9th Cir. 2000).............................................................32

*Gates v. Dukemejian,*
    987 F.2d 1392 (9th Cir. 1992).............................................................33

*Gryger v. Burke,*
    334 U.S. 728 (1948)...........................................................................26

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983)......................................................................31, 33

*Lytle v. Carl,*
    382 F.3d 978 (9th Cir. 2004)...............................................................31

*McCollough v. Johnson, Rodenburg & Lauinger, LLC,*
    2011 WL 746892 (9th Cir. March 4, 2011) .......................................26

*Mobile Mini, Inc. v. Khordt,*
    2007 WL 2109224 (July 23, 2007 E.D. Cal. 2007) ..........................24

*Morales v. City of San Rafael,*
  96 F.3d 359 (9th Cir. 1996)................................................................ 32, 33

*Noyes v. Kelly Services, Inc.,*
  349 Fed. Appx. 185 (9th Cir. 2009) ........................................................ 25

*O2 Micro v. Monolithic Power,*
  399 F. Supp. 2d 1064 (N.D. Cal. 2005) ............................................. passim

*Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of
  Life Activists,*
  422 F.3d 949 (9th Cir. 2005).................................................................. 26

*Sorenson v. Mink,*
  239 F.3d 1140 (9th Cir. 2001)................................................................ 33

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
  538 U.S. 408 (2003) ....................................................................... 24, 27

*Sun Pacific Farming Co-op., Inc. v. Sun World Intern., Inc.,*
  2009 WL 900751 (E.D. Cal. March 31, 2009)........................................ 25

*Velarde v. PACE Membership Warehouse, Inc.,*
  105 F.3d 1313 (9th Cir. 2005)................................................................ 31

*Winterrowd v. Am. Gen. Annuity Ins. Co.,*
  556 F.3d 815 (9th Cir. 2009)................................................................. 32

**CALIFORNIA CASES**

*Adams v. Murakami,*
  54 Cal. 3d 105 (1991).................................................................... passim

*Boeken v. Phillip Morris, Inc.,*
  127 Cal. App. 4th 1640 (2005)............................................................... 27

*Bullock v. Phillip Morris USA, Inc.,*
  159 Cal. App. 4th 665 (2008)................................................................ 23

*Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.,*
  155 Cal. App. 3d 381 (1984).................................................................. 29

*Downey Savings & Loan Assn. v. Ohio Casualty Ins. Co.,*
  189 Cal. App. 3d 1072 (1987)................................................................ 29

*Fed-Mart Corp. v. Price,*
    111 Cal. App. 3d 215 (1980)............................................................31, 32, 33

*Grimshaw v. Ford Motor Co.*
    119 Cal. App. 3d 757 (1981)....................................................................27, 29

*Johnson v. Ford Motor Co.,*
    35 Cal. 4th 1191 (2005)............................................................................26, 27

*Kelly v. Haag,*
    145 Cal. App. 4th 910 (2006)..........................................................................29

*Ketchum v. Moses,*
    24 Cal. 4th 1122 (2001)............................................................................32, 33

*Michelson v. Hamada,*
    29 Cal. App. 4th 1566 (1994)........................................................................29

*Neal v. Farmers Ins. Exchange,*
    21 Cal.3d 910 (1978)..............................................................................passim

*PLCM Group v. Drexler,*
    22 Cal. 4th 1084 (2000)............................................................................32, 33

*Reynolds Metal Co. v. Alpeson,*
    25 Cal. 3d 124 (1979)......................................................................................33

*Robert L. Cloud & Assocs. v. Mikesell,*
    69 Cal. App. 4th 1141 (1999)........................................................................23

*Romo v. Ford Motor Co.,*
    113 Cal. App. 4th 738 (2003)........................................................................27

*Sierra Club Foundation v. Graham,*
    72 Cal.App.4th 1135 (1999)..........................................................................29

*Storage Services v. Oosterbaan,*
    214 Cal. App .3d 498......................................................................................29

*Vacco Indus., Inc. v. Van Den Berg,*
    5 Cal. App. 4th 34 (1992)......................................................................passim

*Washington v. Farlice,*
    1 Cal. App. 4th 766 (1991)............................................................................29

- 3 -

*Weeks v. Baker & McKenzie,*
    63 Cal. App. 4th 1128 (1998)............................................................29

*Zhadan v. Downtown Los Angeles Motor Distributors, Inc.,*
    100 Cal. App. 3d 821 (1979)..........................................................29

**OTHER STATUTES**

Cal. Civ. Code § 3246.3(c) ...................................................1, 4, 23

California's Uniform Trade Secret Act. Cal. Civ. Code § 3426.4 ................4, 31, 32

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on a date to be determined by the Court or as soon thereafter as the matter may be heard before the Honorable David O. Carter, located at 411 West Fourth Street, Santa Ana, California, MGA Entertainment, Inc. will, and hereby does, move this Court to enter exemplary damages against Mattel for its willful and malicious theft of MGA's trade secret information and to award MGA attorneys' fees and costs pursuant to California's Uniform Trade Secret Act, Cal. Civ. Code §§ 3426.3 and 3426.4.

This motion is made on the grounds that exemplary damages and attorneys' fees and costs are authorized by statute and justified under the facts of this case.

This motion is based upon this Notice, the attached Memorandum of Points and Authorities, the pleadings and records of this Court, the Declarations of James E. Malackowski, Annette L. Hurst, Peter Zeughauser, and Steve Schultz, all matters of which this Court may take judicial notice, and on such other and further arguments as may be presented by the parties at the hearing on this motion.

Dated: May 5, 2011

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _____
Warrington S. Parker III
Attorneys for MGA ENTERTAINMENT, INC.,
MGA ENTERTAINMENT HK, LTD., MGA de
MEXICO, S.R.L. de C.V., and ISAAC LARIAN

MGA'S MOTION FOR EXEMPLARY DAMAGES AND FEES
PURSUANT TO CUTSA
CV-04-9049 DOC (RNBX))

# INTRODUCTION

The California Uniform Trade Secrets Act ("CUTSA") dictates that where trade secret theft is willful and malicious, "the court may award exemplary damages in an amount not exceeding twice any award made." Cal. Civ. Code § 3426.3; *see also O2 Micro v. Monolithic Power*, 399 F. Supp. 2d 1064, 1078 (N.D. Cal. 2005) ("if willful and malicious misappropriation exists, the court has the discretion to award exemplary damages in an amount not to exceed twice any award"). Courts consider three factors in determining appropriate damage amounts: 1) the nature of the misconduct, 2) the amount of compensatory damages, and 3) the defendant's financial condition. *O2 Micro*, 399 F. Supp. 2d at 1079. "[T]he more reprehensible the act, the greater the appropriate punishment, assuming all other factors are equal." *Neal v. Farmers Ins. Exchange*, 21 Cal.3d 910, 928 (1978).

If ever there was a case under CUTSA that cried out for the imposition of exemplary damages, this is it. For over 17 years, Mattel engaged in a calculated campaign of fraud and deceit to steal valuable secret information from dozens of its competitors, including MGA. This was not an isolated incident, performed by some "rogue" employee, unbeknownst to Mattel's executives. Quite the contrary, this was a carefully constructed scheme, orchestrated and supervised by Mattel's most senior executives, to steal its competitors' trade secrets for its own competitive advantage. Mattel went so far as to provide detailed training to its operatives, including drafting a "how to steal" manual that detailed the means by which its corporate spies could falsify business cards and invoices – with help from Mattel's accounting department – to obtain access to secure showrooms of their competitors.

Mattel's spies worked in the "Market Intelligence Group." Their illicit activities were so valued that when these spies obtained a competitor's trade secret information, Mattel would hold assemblies, attended by hundreds of their

MGA'S MOTION FOR EXEMPLARY DAMAGES AND FEES
PURSUANT TO CUTSA
CV-04-9049 DOC (RNBX)

1    employees, in which the Intelligence Group would explain in painstaking detail the

2    most intimate and valuable secrets of their competitors to allow Mattel to maximize

3    the unfair advantage it gained.  Mattel housed the stolen trade secrets in a library.

4         There is no dispute that Mattel's conduct was wrong, or that it was unethical,

5    or that Mattel harbored any illusions that this conduct was improper and

6    unacceptable.  The jury heard a parade of Mattel senior executives begrudgingly

7    admit that the actions of the Mattel Intelligence Department were improper,

8    unacceptable, unethical, violative of the Mattel Code of Conduct, and wrong.

9    3/11/2011 (Vol. 3) Tr. 65:22-66:22 (Friedman); 3/15/2011 (Vol 1) Tr. 41:10-44:1

10   (Friedman); 3/18/2011 (Vol. 1) Tr. 104:18-105:1 (Kilpin); 3/22/2011 (Vol. 1) Tr.

11   12:1-8 (Debrowski); 3/22/2011 (Vol. 1) Tr. 41:5-42:3 (Turetzky); 3/30/2011 (Vol.

12   1) Tr. 43:24-44:8  (Thomas); 3/17/2011 (Vol. 1) Tr. 143:4-144:8 (Fontanella).  John

13   Quinn told the jury that the activities of the Market Intelligence department were

14   "unsavory" and that "it was wrong.  It was wrong for people to misrepresent

15   themselves.  It was wrong, and it was stupid[.]"  4/8/2011 (Vol. 1) Tr. 109:8;

16   4/8/2011 (Vol. 3) Tr. 20:2-4.

17        These facts were known to Mattel at the highest levels of its organization—

18   from the president to his senior vice-presidents to the general counsel and his staff.

19   Yet the illegal conduct continued unabated.  Despite Mattel's in-house counsel

20   learning of this campaign of theft years ago, well after Mattel and MGA had locked

21   horns in this suit, Mattel's reprehensible conduct continued at least until 2009.

22        Based on the testimony it heard, the jury – to no one's surprise – found

23   Mattel liable for its misappropriation of MGA trade secrets, and that Mattel's theft

24   was willful and malicious.  The conduct of Mattel's Market Intelligence

25   Department, by itself, would be more than sufficient to justify an exemplary

26   damages award of twice the damages awarded by the jury.  Unfortunately, the

27   grounds for awarding exemplary damages do not stop at the 17 years of Mattel-

28   orchestrated willful and malicious thefts of competitor's trade secrets.  Predictably,

1   Mattel did not want MGA, or anyone else, to learn of this sordid and illegal

2   behavior so when MGA sought to discover this highly relevant information in the

3   course of this litigation, Mattel buried it.  Mattel refused to produce documents.

4   Witnesses at deposition denied any knowledge.  Mattel paid off two of the people

5   involved, expressly obtaining a guarantee from Mattel's greatest threat, former

6   Market Intelligence Department spy Sal Villasenor, that he would not talk about his

7   participation in the systematic theft of competitors' trade secrets.  Mattel's general

8   counsel Bob Normile and others testified that no such department existed.  *See* 3/29

9   Vol. 2 Tr. 28:9-19 (Normile); 3/29/2011 Vol. 1 Tr. 79:21-89:15 (Vollero).   MGA

10   literally had to fight tooth and nail to obtain discovery, even though there was no

11   credible argument that this information was not directly relevant to MGA's

12   affirmative claims, as well as its defenses to many of Mattel's claims.  The Court

13   had to drag in Mattel's in-house legal group and interrogate them to obtain even

14   basic information about Mattel's wrongful activities and, even then, Mattel

15   dissembled to the Court and provided misinformation.

16         At trial, Mattel continued its efforts to deny and, when confronted with

17   overwhelming evidence, to lie.  Thus, for example, Michael Moore, Mattel's in-

18   house counsel, despite all the testimony and evidence to the contrary, denied he

19   knew much of anything, even denying (falsely) the existence of his notes.  For as

20   long as it could, Mattel engaged in a pervasive cover up of its continuing theft.

21   Mattel's CEO testified under oath that he had gone to the market intelligence

22   library created by Mattel to house the stolen trade secrets and found it was nothing

23   more than "a storage closet."  4/1/2011 Tr. (Vol. 1) at 132:19-133:10.  Of course,

24   the jury later learned that the so-called storage closet actually housed *35 boxes of*

25   *competitors' stolen trade secrets* that had been carted out of the library shortly

26   before Mr. Eckert's visit and secreted away in the offices of counsel unconnected to

27   this case.  4/4/2011 Tr. (Vol. 2) at 26:19-28:14.  MGA did not learn of those 35

28   boxes of stolen trade secrets until trial was nearly over.

- 3 -

MGA'S MOTION FOR EXEMPLARY DAMAGES AND FEES
PURSUANT TO CUTSA
CV-04-9049 DOC (RNBX))

1    Faced with the impossible task of explaining this misconduct to the jury,
2    Mattel offered several lame (and demonstrably false) excuses. For example, Mattel
3    claimed that Villasenor and other Mattel gatherers/disseminators of competitors'
4    confidential information were self-aggrandizing rogue employees, that the Market
5    Intelligence Department was kept secret from Mattel executives, that the conduct
6    stopped and the employees were all reprimanded as soon as Mattel found out about
7    it, and the information was, in any case, widely available. The evidence and
8    testimony did not support any of these explanations, and the jury rejected them out
9    of hand and found Mattel guilty of willful and malicious theft of trade secret.
10    Based on these facts and those set forth below, MGA is entitled to both
11    exemplary damages of two times the amount of the awarded damages and fees
12    pursuant to California Civil Code §§ 3426.3(c) and 3426.4. Exemplary damages
13    are necessary because Mattel's actions were reprehensible and breathtaking in
14    scope and duration. MGA was indisputably injured, and Mattel's net worth
15    justifies such an award. Nothing in the evidence or testimony of Mattel executives
16    indicates any remorse for what Mattel did, reflecting only a concerted attempt to
17    avoid being caught. Given Mattel's obvious lack of remorse, an award of
18    exemplary damages is a powerful means of dissuading Mattel from engaging in
19    such company-endorsed fraudulent and anticompetitive conduct in the future.
20    As for fees, this is not merely a case where MGA had to bring its claim to
21    right a wrong, although that is indeed true. But for MGA's diligent pursuit of its
22    claims, Mattel would never have answered for its conduct aimed at MGA. The
23    facts also establish that but for MGA's pursuit of its claims, Mattel would have
24    continued stealing, since its Code of Conduct, its executives, and even in-house and
25    outside counsel were ineffective (and/or uninterested) in preventing this
26    egregiously improper behavior. Fees are therefore warranted because not only did
27    MGA vindicate its own rights, but in so doing, MGA also halted Mattel's actions
28    harming MGA and other toy companies, retailers and, ultimately, the consumer.

MGA'S MOTION FOR EXEMPLARY DAMAGES AND FEES
PURSUANT TO CUTSA
CV-04-9049 DOC (RNBX))

**STATEMENT OF FACTS**

A. **Mattel Executives Knew About The Market Intelligence Activities For Years**

From at least 1992 through at least 2009, Mattel directed, trained, and provided the means for its employees to steal information from the private showrooms of its competitors. 3/22/2011 Tr. (Vol. 2) 50:24-51:7 (activity has occurred since at least 1992); 3/22/2011 Tr. (Vol. 1) at 33:15-20 (activity has occurred for " a long period of time"); TX 9869 (2009); 4/1/2011 Tr. (Vol. 1) at 115:4-116:1 (2006); 3/30/2011 Tr. (Vol. 1) at 17:9-20:8 (2009). It was not the work of a lone employee. There was an entire group at Mattel—the Market Intelligence Group—devoted to these activities. It included, but was not limited to, Michael Shore, Kelly Osier, Carey Plunkett, Sharon Rahimi, Matthew Turetzky, Sal Villasenor, and Tyler Bradley. Tr. 3/22/2011 Tr. (Vol. 1) at 31:12-32:20 (Michael Shore and Carey Plunkett); Tr. 3/22/2011 Tr. (Vol. 1) at 36:11-15 (Tyler Bradley).

This activity was both known and actively encouraged by those at the highest level of Mattel. Matthew Turetzky, Mattel's Vice President of Strategic Planning and Consumer Research for the Girls' Division, supervised the spies. 3/22/2011 Tr. (Vol. 1) at 29:24-30:16. He not only admitted that he knew about the spying, he testified that he actually assisted. 3/22/2011 Tr. (Vol. 1) at 35:3-7. As Barbie sales continued to flounder, Matthew Bousquette, President of Mattel, made increasingly insistent requests to Villasenor to gather precisely the sorts of competitive information about Bratz not generally available to the public. 3/22/2011 Tr. (Vol. 1) at 58:19-59:23. Even Mattel's legal department—including General Counsel Robert Normile and Michael Moore, the attorney responsible for managing Mattel's litigation against MGA—knew that Mattel was systematically spying on its competitors. 3/22/2011 Tr. (Vol. 1) at 60:4-62:6 (Turetzky met with Moore as early as 2002 to discuss intelligence collection methods). In 2002 and 2003,

- 5 -

1    Turetzky approached Moore, on two occasions to discuss the activities of the

2    Market Intelligence Group.  Turetzky denies that he informed Moore of the full

3    extent of Villasenor's activities.  But Turetzky made clear that the discussion

4    involved appropriate methods for gathering competitive information – and

5    presumably Villasenor's methods were not included. 3/22/2011 Tr. (Vol. 1) at 60:4-

6    68:8.

7         Even accepting at face value Turetzky's Mattel-serving testimony that he

8    failed to inform Moore of the precise activities of the Market Intelligence Group,

9    Mattel cannot deny that in June 2005, shortly after MGA sued Mattel claiming that

10   Mattel was serially copying MGA products and themes, Moore began a series of

11   "10 to 20" meetings with Villasenor to discuss the lawsuit. 3/29/2011 Tr. (Vol. 2)

12   at 110:14-112:13.  During the course of these meetings, some of which included

13   external litigation counsel, Moore learned that Villasenor and other Mattel

14   employees had for years used fake business cards and false pretenses to gather

15   competitive information. 3/29/2011 Tr. (Vol. 2) at 123:3-18.

16        Yet, despite this, the conduct continued even after 2005.  *See* Statement of

17   Facts, Part D, *infra*.

18   **B.    Mattel's Theft Was Well Organized, Supervisor-Directed and
         Smoothly Executed**

19

20        Mattel did not merely ask its employees to try to gather the odd bit of

     second-hand competitive information divulged by a retailer eager to bargain or to

21   keep an eye out for new products in planogram rooms.  Instead, Mattel trained its

22   employees to create and use false identities to sneak into the showrooms of its

23   industry competitors, including MGA.  Mattel created a "how to steal" manual

24   providing step-by-step instructions in creating a false identity and using that

25   identity to gain access to competitors' showrooms. TX 36028; *see also* 3/22/2011

26   Tr. (Vol. 1) at 32:11-35:7 (in 2001 or 2002, Michael Shore and Carey Plunkett

27   instructed Matthew Turetzky on the necessity of creating false credentials in order

28

MGA'S MOTION FOR EXEMPLARY DAMAGES AND FEES
                    PURSUANT TO CUTSA
                    CV-04-9049 DOC (RNBX))

1   to gain access into competitors' private toy fair showrooms).  Employees were told

2   to obtain business cards identifying themselves as representatives of fictitious toy

3   retailers.  Neophyte spies were directed to go to the Kinko's "around the corner

4   from Mattel" and to give them "at least one week to design and print your cards."

5   The cost of the cards, "[a] pack of 250 black and white business cards, which is the

6   minimum you can buy, will cost $21.99," was reimbursed by Mattel.  TX 36028-

7   17; TX 9449 (Turetzky authorized 2004 reimbursement request for fake business

8   cards); 3/22/2011 Tr. (Vol. 3) at 5:5-6:19 (Villasenor relied on false business cards

9   to sneak into showrooms).  Next, in order to demonstrate that the fictitious business

10  actually existed, Mattel informed its employees that "3 recent industry

11  manufacturer's invoices" is "probably the easiest proof of business.  You can

12  contact someone in the Accounts Payable … to have them proctor an invoice with

13  your company name on it.  Each invoice should be for at least $500 and date within

14  the last year." TX 36028-15.  Just in case, Mattel employees sometimes padded

15  these *bona fides* with false advertisements and phony email addresses for their

16  fictitious businesses.  TX 8412; TX 35986; TX 36023.

17       Mattel dispatched its well-trained and supplied spies to the toy industry's

18  major preview events, further armed with advice specific to each.  For instance,

19  Mattel employees sent to Nuremberg were advised that "[i]t's best to go as a U.S.

20  retailer since you will not be asked as many questions (i.e., where is your store

21  etc.)."  Before attending the New York Toy Fair, employees were advised to "think

22  about the size of your store.  Try to keep it reasonably small.  What type of toys you

23  sell.  How many employees.  Where exactly your store is located.  How many

24  stores you have."  TX 36028.  In other words: think of a good cover story.  And to

25  prevent your lie from coming unraveled, don't give your marks the opportunity to

26  research it: "Manufacturers [] accept appointment reservations prior to the toy fair;

27  however, it's best that you make them while you are there, in case they want to run

28  a background check on your store; i.e., if you've bought from them before." *Id.*

1        Mattel expected its employees to gather large amounts of information.  It

2   recommended "[c]omfortable shoes" and "[c]oordinat[ing] with your partner ... as

3   to what floors of the Toy Building each person will go to, so you don't duplicate

4   efforts."  TX 36028 at 14-16.  "You should bring either a shoulder bag or a

5   briefcase with wheels," employees were told, "[t]o carry all the catalogs and price

6   lists." *Id.*

7        Once in the field, Mattel's spies could count on the resources and support of

8   their employer.  For example, Sal Villasenor submitted expense reports for his

9   various trips to toy fairs, covering everything from the mundane—trips to Kinko's

10  to have fake business cards made and dinners where Mattel employees would

11  discuss the day's espionage—to requisitions out of a James Bond movie, such as

12  high-tech camera equipment and stays at the Waldorf-Astoria.  TX 9506; TX 9509;

13  TX 9516; TX 9517.

14       Mattel knew the risk of being caught, and was careful to conceal its tracks

15  accordingly.  Although employees were told to use their real names, "since you

16  usually need to present your business cards with a picture ID," they were

17  specifically cautioned to "always use your home address in case the manufacturer

18  wants to send you materials" and, especially, "*Just don't put down your Mattel*

19  *number.*"  TX 36028-7 (emphasis added); *see also* 3/22/2011 Tr. (Vol. 1) at 33:21-

20  34:8 (false addresses were used so that competitors would not know that

21  information was going to Mattel).

22       Internally, Mattel lauded employees who returned from toy fairs with their

23  shoulder bags and briefcases stuffed with confidential information.  Villasenor was

24  praised for his ability to obtain competitive information and price lists from toy

25  fairs. *See, e.g.,* TX 9486; TX 9496; TX 9497; TX 9518; TX 9519; 3/22/2011 Tr.

26  (Vol. 2) at 120:22-126:9.  In fact, every employee that engaged in the practice was

27  richly rewarded.  For example, Plunkett and Shore, who explained Mattel's policy

28  of corporate espionage to Turetzky, were both praised for their spying, are still with

MGA's MOTION FOR EXEMPLARY DAMAGES AND FEES
PURSUANT TO CUTSA
CV-04-9049 DOC (RNBX)

1   Mattel, and have been steadily promoted. *See, e.g.*, TX 38064-131; 3/15/2011 Tr.

2   (Vol. 1) at 86:24-87:6, 99; 3/15/2011 Tr. (Vol. 1) at 88:21-89:10;  TX 36083 at 114,

3   117; 3/15/2011 Tr. (Vol. 1) at 100:21-101:17.

### C.   Mattel Bolstered Its Market Intelligence Group With Hired Agents.

6   When Mattel felt that its considerable in-house capabilities were insufficient

7   to steal all the information it needed, it was not shy about bringing in hired guns.

8   Thus, in 2003, when Villasenor told his boss that he was worried that he might be

9   recognized while sneaking into showrooms, Mattel hired Sharon Rahimi, a former

10  Mattel employee who had been out of the toy industry for a few years, to infiltrate

11  showrooms—including MGA's. 3/16/2011 Tr. (Vol. 3) 36:5-37:1; 3/22/2011 Tr.

12  (Vol. 2) 70:10-71:5, 72:8-73:3.  In 2004, Mattel hired Bain & Company to conduct

13  an exhaustive investigation of the competitive threat presented by MGA and Bratz.

14  Mattel tasked Bain with obtaining confidential information from MGA's business

15  partners.  Bain contacted dozens of MGA's licensees, distributors, and production

16  companies and obtained valuable confidential information that it passed on to

17  Mattel. TX 8987 at 10, 20-23, 33-34.  Mattel ultimately paid Bain more than

18  $422,000 dollars for its work.  TX 35820; 3/2/2011 Tr. (Vol. 2) 87:20-88:21.

### D.   The Trade Secrets Mattel Stole Were Not Publically Available And Were Extremely Valuable.

21  Had Mattel not believed that the information gathered by its spies was worth

22  all of this effort and expense—and the risk of being caught—there would have been

23  no reason for Mattel to continue its systematic espionage year in and year out.

24  Mattel persisted in this conduct even after filing suit against Carter Bryant, after

25  MGA filed a lawsuit alleging unfair business practices, through all of Phase 1, and

26  at least until 2009. *See* TX 9869.  It did not do so because the information was

27  publicly available or worthless, as Michael Wagner, Mattel's damages expert,

28  reluctantly admitted.  4/5/2011 Tr. (Vol. 4) at 37:18-38:3 (no rational reason for

1   Mattel employees to falsify credentials and risk legal reprisal for worthless

2   information.).

3        Mattel bore the cost and the risk of spying on its competitors because it knew

4   that the information it wanted was not publicly available outside of its competitors'

5   private showrooms, and that if it did not lie and cheat its way into those

6   showrooms, Mattel never would have been allowed in. 3/23/2011 Tr. (Vol. 2)

7   106:5-10; *see also* 3/22/2011 Tr. (Vol. 2) 51:11-17 (Turetzky) (Mattel employees

8   would not have been allowed into competitors' showrooms if they provided

9   genuine identification). Without access to competitors' showrooms, Mattel would

10   be denied information vital to maintaining its competitive advantage: the

11   appearance, operation, and play patterns of toys and products that were not yet on

12   the market, competitor price lists with wholesale pricing of unreleased products,

13   and documents showing advertising plans and market strategies. 3/23/2011 Tr.

14   (Vol. 2) 106:25-107:7 3/22/2011 Tr. (Vol. 1) at 40:5-25.

15        Indeed, Mattel executives acknowledged that unreleased product information

16   was invaluable.  Turetzky, Villasenor's boss, testified that access to the unreleased

17   products of Mattel's competitors gave Mattel an advantage at least by helping

18   Mattel plan its product lines, make marketing decisions, create advertising plans,

19   and develop competing products.  3/22/2011 Tr. (Vol. 1) at 42:21-45:5; *see also*

20   3/18/2011 (Vol. 1) Tr. 115: 5-11 (Kilpin) ("Q. You're sending this to the president

21   of Mattel brands. It was valuable information, wasn't it? A. It's always good to

22   know what competitors are doing. Q. Is there a problem with the term "valuable"?

23   A.  No.  Q. It was valuable information, wasn't it? A.  Uh, yes, in terms of

24   competitors, yes."). In fact, information about the prices competitors charged for

25   their products was worth—literally—millions to Mattel. *See, e.g.,* TX 27464-158

26   (September 2004 email praising Villasenor for obtaining a competitors' price list:

27   "This is great.  You just saved Mattel close to 1 million."); 3/22/2011 Tr. (Vol. 3) at

28   12:5-13:12.  The year that Bratz was introduced, Villasenor's "expedited analysis

MGA'S MOTION FOR EXEMPLARY DAMAGES AND FEES
PURSUANT TO CUTSA
CV-04-9049 DOC (RNBX))

1   and review of the key competitive manufacturers and their key brands and products

2   *was invaluable* for the Boy's Division going into the Mattel Toy Show." TX 9497-

3   3 (emphasis added).

4       **E.      Mattel Used The Information It Stole To Maintain Its Competitive
                  Advantage.**

5

6           Having stolen its competitors' trade secrets, Mattel put them to use.  No

7   fewer than five different groups utilized the competitive information gathered by

8   Mattel employees from across the industry.  TX 9497.

9           Immediately after the toy fairs, maximizing the time to act on Mattel's newly

10  acquired "intelligence," emails were sent to Mattel managers and employees

11  describing what Mattel's spies had seen and collected in competitor's showrooms.

12  *E.g.,* TX 9643; TX 9291.  Then Mattel employees prepared more formal "Toy Fair

13  Reports" that were distributed to over a hundred Mattel employees, including senior

14  management like Matt Bousquette, to inform them what the industry, including

15  MGA, was bringing to market, and at what price.  *E.g.,* TX 9498; TX 9499; TX

16  9502; TX 9504; TX 26758; 3/22/2011 Tr. (Vol. 2) at 76:18-86:12 (Villasenor

17  confirmed that he and other Mattel employees distributed reports detailing

18  unreleased products viewed in industry showrooms); *accord* 3/30/2011 (Vol. 2) Tr.

19  89:18-91:20 (Brawer); 3/22/2011 (Vol. 2) Tr. 57:6-10, 61:19-66:11, 122:19-123:8

20  (Villasenor testimony regarding Mattel management's knowledge of his activities);

21  *id.* at 105:6-21 (Villasenor: "Q. So there is no question that Matt Bousquette

22  president of Mattel Brands, knew you were getting confidential price lists and

23  catalogs at the 2003 Hong Kong toy fair, right? …THE WITNESS:  That's correct.

24  BY MS. KELLER: Q. You weren't just out doing this on your own, right? A.

25  Correct. Q. No matter what anybody may say, you had the full knowledge and

26  authority of the president of the company, right? … THE WITNESS: That is

27  correct.").

28          In addition to the emails and formal reports, Mattel gave live presentations in

- 11 -

MGA'S MOTION FOR EXEMPLARY DAMAGES AND FEES
PURSUANT TO CUTSA
CV-04-9049 DOC (RNBX))

1   the company theater. 3/22/2011 Tr. (Vol. 1) at 30:13-31:11; 3/22/2011 (Vol. 2) at

2   73:4-74:6 (Villasenor, Plunkett, and Rahimi would present competitors products to

3   hundreds of Mattel employees and executives).  The presentations were videotaped

4   and distributed to Mattel employees who were not able to attend the live

5   presentation.  *See, e.g.,* TX 9488.

6       And lest any of this information be lost, Mattel archived copies of its

7   competitors' price sheets and product information—including examples from

8   MGA—in its Competitive Intelligence Library.  *See* TX 9498 (noting that the 2000

9   catalogs and price lists collected from the NYTF and videotapes of the presentation

10  are available in the 9th floor library); 3/22/2011 Tr. (Vol. 2) at 77:7-16.

11      **F.    From Top To Bottom, Every Mattel Employee Confronted With
            The Fact Of Mattel's Espionage Admitted It Was Wrongful.**

12

13      Mattel knew that spying on its competitors was wrong.  Villasenor, the

14  Manager of the Market Intelligence Group, harbored no illusions about his

15  conduct—not only was it wrong; it was illegal.  He said this in a December 2005

16  email to Mattel's General Counsel (Robert Normile, who would later deny that the

17  Market Intelligence Group existed):

18          I have worked for Mattel, Inc. for almost fourteen years. I am currently
            the Manager of Market Intelligence.
19
            I believe my work conditions have become intolerable, and I am
20          writing to complain about Mattel's directives and instruction to gather
            market intelligence from competitors through unlawful means.  I no
21          longer wish to engage in misrepresentations and undercover
            assignments in which I am paid by Mattel to attend trade shows and
22          events.  I fear that my actions may expose me to personal criminal
            liability and I am stressed about the fallout, which may occur.  My
23          conscience does not allow me to continue in this role and I do not feel
            I can take the pressure to engage in misrepresentations any longer.
24
            I know that Mattel has gained a superior competitive advantage
25          through my hard work and I appreciate your consideration of my
            complaint.
26

27  TX 9484AR.

28      Villasenor's boss, Vice President Matthew Turetzky, also did not think it was

- 12 -

right for Mattel to be stealing its competitors' confidential information. 3/22/2011 Tr. (Vol. 1) at 41:5-42:17.  In 2001 or 2002, Carey Plunkett and Michael Shore (both of whom are still with Mattel) told Turetzky that they needed to create false identities for spies to gather information at the New York Toy Fair. 3/22/2011 Tr. (Vol. 1) at 32:11-34:8.  Turetzky testified that he "wasn't comfortable" with spying on other companies at toy fairs, "but because it had been an established practice, I didn't object to it."  *Id.* at 34:16-23.  In fact, far from simply "failing to object" to the practice, Turetzky allowed Mattel's spies to use his home address on their business cards. 3/22/2011 Tr. (Vol. 1) at 35:3-7.

Neil Friedman, Mattel's President of Mattel Brands, also harbored no doubts. "There's—there's no question that was wrong." 3/15/2011 Tr. (Vol. 1) at 41:10-44:1, 52:17-25; accord 3/11/2011 (Vol. 3) Tr. 65:22-66:22 (Friedman).   And other former and current Mattel executives were equally unhesitant to condemn that behavior as unethical or improper.  *See* 3/18/2011 (Vol. 1) Tr. 104:18-105:1 (Kilpin); 3/22/2011 (Vol. 1) Tr. 12:1-8 (Debrowski); 3/22/2011 (Vol. 1) Tr. 41:5-42:3 (Turetzky); 3/30/2011 (Vol. 1) Tr. 43:24-44:8  (Thomas); 3/17/2011 (Vol. 1) Tr. 143:4-144:8 (Fontanella).

And Robert Eckert, Mattel's CEO, too was unequivocal in his condemnation of this behavior as wrong or unethical. *See e.g.* 4/1/2011 (Vol. 1) Tr 18:5-19:8.  He sermonized at length about Mattel's commitment to values and how the activity violated those values. *Id., see also id.* at 72:15-73:1.  But he ultimately laid blame for Mattel's lapse on Turetzky—who departed with a lucrative consulting contract in 2006—while refusing to condemn either Plunkett or Shore, both of whom remain with Mattel. *Id.* at 46:18-21 (Turetzky "is the worst offender here or among the worst offenders"), 53:3-14 ("Think about Carey Plunkett, who was up here. I heard that she went – and she may have been the only one I think who was up here – in 2002, went into MGA's showroom. That was wrong. She wasn't comfortable at the time. She's been an employee for ten years since. She's apparently done well.

MGA's MOTION FOR EXEMPLARY DAMAGES AND FEES
PURSUANT TO CUTSA
CV-04-9049 DOC (RNBX))

1  For all I know, she did this because Sal Villasenor talked her into doing it. I'm not

2  sure I'm gonna treat Carey Plunkett or anybody should think of Carey Plunkett the

3  way we might think of a Matt Turetzky, who is a supervisor, who knows the code

4  of conduct, who's a Harvard MBA, who knows right from wrong and said it was a

5  gray area. Those to me are different situations.").

6        **G.**    **Mattel Ignores The Conduct, Then Hides It, So That The Conduct Could Continue Without Consequence.**

7

8        Mattel not only knew that it should not be spying on the rest of the industry,

9  it knew what it meant if Mattel was caught – that it would be forced finally to quit

10  its spying and stealing. The fear of being caught was hardly abstract: in November

11  2006, MGA served the first discovery requests that should have elicited documents

12  describing the activities of the Market Intelligence Group. Yet Mattel wanted the

13  conduct to continue, as evidenced by a 2009 email reflecting information obtained

14  from the Nuremberg Toy Fair. TX 9869.

15        **1.**    **Mattel Does Nothing To Stop The Stealing And It Continues To 2009, At Least.**

16

17        Although Turetzky claimed that he knew the conduct was wrong and that he

18  spoke to Moore in 2002 and 2003 about the proper way to collect competitive

19  information, the activities continued. *See, e.g.,* TX 9566; TX 9869; 4/1/2011 Tr.

20  (Vol. 1) at 115:4-116:1; 3/30/2011 Tr. (Vol. 1) at 17:9-20:8. In fact, Turetzky

21  continued to approve the invoices necessary for the activity to occur. 3/22/2011 Tr.

22  (Vol. 1) 72:6-75:4; TX 9449. And as noted above, Mattel executives, including

23  Matt Bousquette, were well-aware of these activities, since they were copied on

24  communications and attended presentations where the obviously stolen information

25  was disseminated. 3/30/2011 (Vol. 2) Tr. 89:18-91:20 (Brawer); 3/22/2011 (Vol.

26  1) Tr. 58:5-14; 3/22/2011 (Vol. 2) Tr. 57:6-10, 61:19-66:11, 73:4-74:9, 122:19-

27  123:8 (Villasenor testimony regarding Mattel management's knowledge of his

28  activities); *id.* at 105:6-21 (Villasenor testimony: "Q. So there is no question that

MGA'S MOTION FOR EXEMPLARY DAMAGES AND FEES
PURSUANT TO CUTSA
CV-04-9049 DOC (RNBX))

1   Matt Bousquette  president of Mattel Brands, knew you were getting confidential

2   price lists and catalogs at the 2003 Hong Kong toy fair, right? ...THE WITNESS:

3   That's correct. BY MS. KELLER: Q. You weren't just out doing this on your own,

4   right? A   Correct. Q.  No matter what anybody may say, you had the full

5   knowledge and authority of the president of the company, right? ... THE

6   WITNESS:  That is correct.").

7          Setting aside the complicity of Mattel executives, Mattel's legal staff did

8   nothing.  Despite Moore's series of meetings with Villasenor beginning in 2005,

9   Moore denied knowing that Mattel had used improper and illegal means to gain

10  entry into showrooms.  *Id.* at 123:19-125:18. Indeed, Moore went so far as to deny

11  (falsely) that he took notes during these meetings.[1] *Id.* at 125:15-25.

12         And in any case, the evidence establishes that Mattel continued to obtain

13  competitive information even after these meetings with Villasenor took place, in at

14  least 2006 and 2009.  TX 9566; TX 9869; 4/1/2011 Tr. (Vol. 1) at 115:4-116:1;

15  3/30/2011 Tr. (Vol. 1) at 17:9-20:8.

16                    **2.    Mattel Hides The Evidence.**

17         Not only did Mattel do nothing to stop these acts, Mattel hid its activities.

18  Mattel neither identified Sal Villasenor on any Rule 26 statement nor produced

19  documents showing that he or other Mattel employees had systematically spied on

20  Mattel's competitors, including MGA.  Instead, 35 boxes of documents were

21  carted out of Villasenor's office and taken to counsel unconnected to this case.

22  4/4/2011 Tr. (Vol. 2) at 26:19-28:14.  Thus, Mattel's CEO was able to testify that

23  he had examined the Competitive Intelligence library and describe it as "a storage

24  closet." 4/1/2011 Tr. (Vol. 1) at 132:19-133:10.  Mattel produced nothing at all

25  from Villasenor until three days before his deposition, when it was apparent that

26  Mattel no longer had any choice.  And the 35 boxes didn't even get a mention (or

27  _____

28  [1]    As this Court knows, having ordered those notes produced for *in camera*
review, this statement was patently false.

- 15 -

MGA's MOTION FOR EXEMPLARY DAMAGES AND FEES
PURSUANT TO CUTSA
CV-04-9049 DOC (RNBX))

1  see the light of day) until the trial was nearly over. *See, e.g.*. 4/1/2011 (Vol. 1) Tr.

2  75:18-25 (THE COURT: "And I'm also having and will put on the record that we

3  had a midnight session up in Los Angeles, where these 35 boxes came to the

4  Court's attention on Tuesday evening. I'm not making any record concerning that,

5  but this is obviously the -- some of the market intelligence information that came

6  out of Sal Villasenor's offices and were over in the Paul Hastings offices."); *id.* at

7  139:5-15 (THE COURT: "The testimony for Mr. Eckert is that he recently went to

8  investigate the whereabouts of Market Intelligence or the library. Mr. Eckert, I

9  don't know if you're even aware – and I say this with all due respect – but that

10  apparently is over at Paul Hastings. And this Court reconvened counsel at 9:00

11  o'clock on Tuesday night, for the previously undiscovered – or at least unsubmitted

12  boxes, which were 35 in number, which appear to be a large part of either Sal

13  Villasenor's cubicle or the Market Intelligence information.").

14      Mattel's 2001 New York Toy Fair report is but one example of a document

15  Mattel withheld. That report shows that Mattel was aware of Bratz months before

16  the dolls went on sale: "Their biggest title this year is Bratz," which the report

17  described as "'Diva Starz' with a smarty attitude ... FOB LA price is $11.99." TX

18  9502.[2] This document was responsive at least to MGA's First Set of Phase 1

19  Request No. 16, "All Documents referring to relating to the Bratz themes before

20  they were advertised or otherwise made publicly available" and was relevant to

21  MGA's Phase 1 statute of limitations and laches defenses. Mattel had assured

22  MGA that those documents were or would be produced in June of 2007. Hurst

23  Decl., Ex. J ("During our conference, I stated that Mattel had produced and/or

24  would produce non-privileged documents, to the extent responsive documents exist

25  at all, pursuant to a reasonable, good faith search relating to MGA's claims, in

26  response to the following Document Request numbers, as stated in Mattel's

27

28  [2]    TX 9502, the version of this document that includes the cover email, was not produced until August 7, 2010.

- 16 -

1   Responses dated January 15, 2007: 1, 2, 4, 5, 6, 7, 10, 11, 12, 13, 14, 15, 16, 17, 18,

2   20, 21, 22, 23, 24, 25, 26, 27, 30, 31, 34, 35, 36, 44, 68, 69. 70, 71, 72, 73, 74,75,

3   79, 80, 81, 82, 83, 84, 85, 86, 87, 90, 91, 93, 94, 106, 107, 108, 109, 110, 111, 112

4   and 113.").

5          In fact this and similar documents were among those *ordered produced by*

6   *the Court multiple times.* First, there is a September 7, 2007 Order compelling

7   production of documents concerning similarities between Bratz and Mattel

8   products, documents relating to Mattel's damages claim, and documents relevant to

9   MGA's statute of limitations defense. Dkt. No. 989. Second, there is a January 13,

10  2010 Order compelling Mattel to produce documents in response to requests

11  relating to any exhibition of Bratz prior to its public release, relating to whether

12  Mattel had access to exhibits or showrooms containing Bratz, and relating to efforts

13  to monitor or spy on MGA's trade secrets and non-public information. Dkt. No.

14  7396. Mattel had in fact assured the Court (and, as noted above, MGA) that it was

15  producing relevant documents. *See* Dkt. No. 7523 at 1; (3/9/2010 Hearing Tr. at 7

16  assuring the Court that Mattel was producing documents responsive to requests not

17  appealed).

18         Even then, Villasenor's deposition made it clear that that Mattel's belated

19  production was only the tip of the iceberg. MGA received the full production only

20  after additional motion practice and in some cases, including particularly the "how

21  to steal" memo, only after Villasenor produced the documents pursuant to

22  subpoena.

23         **3.    Senior Mattel Executives' Denials.**

24         At deposition, Mattel's witnesses—many of whom were the recipients of

25  Mattel's stolen information—were no more forthcoming. Despite the widespread

26  dissemination of Villasenor's reports to senior management, including Adrienne

27  Fontanella, the President of Mattel's Girls' Division, Fontanella denied ever

28  hearing of Villasenor. 1/16/2008 Depo. Tr. 203:12-16. Russell Aarons, head of

                                        - 17 -          MGA'S MOTION FOR EXEMPLARY DAMAGES AND FEES
                                                                    PURSUANT TO CUTSA
                                                                 CV-04-9049 DOC (RNBX))

1    Barbie Marketing from 2003 to 2005, claimed "I don't recall what his specific role

2    was" and disclaimed any knowledge of the source of his information. 4/21/2010

3    Depo. Tr. 328:2-329:16.  Matthew Bousquette, President of Mattel, who Sal

4    Villasenor considered "a personal friend" and who received copies of Mattel's toy

5    fair reports, disavowed any knowledge of Villasenor, or his role at Mattel.

6    3/22/2011 Tr. (Vol. 2) at 65:2-13; 3/12/2010; Bousquette Depo Tr. at 640:20-641:2,

7    645:18-25.  This despite the testimony of Turetzky, Villasenor's boss, who

8    confirmed that Bousquette in fact made increasingly demanding requests to

9    Villasenor to gather precisely the sorts of competitive information about Bratz that

10   were not generally available to the public. 3/22/2011 Tr. (Vol. 1) at 58:19-59:23.

11   Most incredibly, Robert Normile, Mattel's General Counsel, denied all knowledge

12   of the existence of Mattel's Market Intelligence Group despite Villasenor's

13   December 2005 letter.  3/29/2011 Tr. (Vol. 2) 77:6-12.

14                    **4.    Mattel Pays Villasenor Hush Money.**

15          As for Villasenor himself, Mattel attempted to make him disappear.  On July

16   17, 2006, Villasenor left Mattel after signing an agreement that paid him 18

17   months' salary and additional lump sum payments of $20,000 for himself and

18   $20,000 for his attorney.  TX 9266.  In return, Villasenor was not to disclose the

19   conditions of his severance: "I agree not to disclose the terms or amount of this

20   agreement to anyone other than a member of my immediate family, my attorney,

21   Patricio Barrera, or any other professional adviser … and even as to such a person,

22   only if the person agrees to honor this confidentiality agreement."  TX 9266.  He

23   could never reveal the activities of the Market Intelligence Group, especially to

24   MGA: "Neither I  nor anyone to whom it may be disclosed pursuant to this

25   subsection shall disclose any confidential information to … *any counsel for any*

26   *party threatening or asserting claims against any of the released parties*" unless

27   compelled by a Court.  *Id.*; see also 3/29/2011 Tr. (Vol. 2) at 144:8-16 (Michael

28   Moore, in-house counsel for Mattel admitted "well, it would be anyone, including

                                    - 18 -

MGA."). And, if anyone asked him why he left Mattel, he was instructed to lie: "I agree that if any inquiry is made as to the termination of my employment, I will respond without elaboration that 'I left to pursue other opportunities.'" TX 9266. Indeed, Neil Friedman, Mattel's President of Mattel Brands, could not deny that Villasenor was required to lie under this agreement and that Mattel "didn't want them going to the press and speaking to anybody outside the company on any wrongdoings because the company would be embarrassed by that" – but he claimed that such a provision was "typical." 3/15/2011 Tr. (Vol. 1) at 52:9-53:4.

**H.    At Trial, Mattel Only Paid Lip Service To Its Wrongful Conduct Attempting To Minimize It And Dissemble.**

At trial, Mattel paid lip service to the now-undeniable fact of its espionage, but refused to own up to its actions. Instead, Mattel's witnesses alternately claimed that any espionage was the conduct of a rogue employee acting against company policy or that if others had assisted, the activity was halted and the employees were disciplined. Anyway, according to Mattel, all of the information Mattel obtained was public in any event, so Mattel did not really do anything wrong.

The facts belie all of these assertions.

***Even if someone spied, it was the action of a "rogue employee" that stopped.*** Mattel attempted to deny that its espionage was a deliberate corporate undertaking, instead attributing it to the actions of a lone employee acting beyond his authority. Thus, Robert Normile testified that he was unaware that Mattel had a Market Intelligence Department and further asserted at trial that "I am of the view that it was probably not a department." 3/29/2011 Tr. (Vol. 2) at 28:9-19. Turetzky testified that "Market Intelligence" was just a term made up by Villasenor to describe his work and that of one other employee, Stephanie Page. 3/22/2011 Tr. (Vol. 1) at 129:13-24.

Moreover, Mattel witnesses testified that even if Mattel had spied in the past, they stopped. For example, Turetzky testified that although Mattel employees had

1   used false credentials to gather competitive intelligence for years before he joined

2   Mattel and that he had continued the practice, it should have stopped in 2002 when

3   Mattel revised its code of conduct. 3/22/2011 Tr. (Vol. 1) at 54:2-18.

4          Despite claims that the program ceased as early as 2002, the facts show it

5   continued to thrive. In 2003, Villasenor, Osier, and Plunkett continued their annual

6   practice of gathering confidential information, including FOB pricing, from

7   Mattel's competitors. *Id.* at 54:23-57:2; TX 9275 at 1, 19. In 2004, Turetzky

8   approved an expense report from Villasenor compensating his expenses at "Kinko's

9   for tradeshow business cards," which he acknowledged could only have been used

10  to sneak into showrooms. 3/22/2011 Tr. (Vol. 1) at 72:17-75:4; TX 9449.

11  Turetzky continued to use Sharon Rahimi to impersonate a journalist. 3/22/2011

12  Tr. (Vol. 1) at 63:13-22. And the evidence establishes that Mattel—unrepentant—

13  was still gathering "intelligence" in 2006 and even as late as 2009, although

14  Michael Moore had, by then, fully debriefed Villasenor. *See* Statement of Facts,

15  Part A, *supra*.

16         Nor was the department's name, "Market Intelligence" merely Villasenor's

17  creation. Rather, it was created by Mattel. *See, e.g.,* TX 36092-65; 4/1/2011 Tr.

18  (Vol. 1) at 24:23-27:24. Indeed, "Market Intelligence" continued to exist long after

19  Villasenor's departure. Eckert admitted he and other executives were still being

20  copied on reports from the Market Intelligence Department in 2008. TX 36749-50,

21  TX 35646; 4/1/2011 (Vol. 1) 29:6-32:3.

22         ***Even if we spied, we disciplined all the involved employees.*** It is no

23  surprise that Mattel and its employees continued to spy on competitors: neither

24  Mattel nor any of the employees that spied on its behalf have ever suffered any

25  negative consequences for their actions. In fact, Mattel's employees were

26  consistently rewarded for their contribution to Mattel's espionage program. *See*

27  Statement of Facts, Part C, *supra*. For all the talk of Mattel's ethics, it has never

28  done anything but encourage its employees to spy for it. *See, e.g.,* 3/29/2011 Tr.

MGA's Motion For Exemplary Damages And Fees
Pursuant to CUTSA
CV-04-9049 DOC (RNBX))

1   (Vol. 2) at 69:16-70:4; 4/1/2011 Tr. (Vol. 1) at 46:12-14; 3/15/2011 Tr. (Vol. 1.) at

2   68:22-69:22.

3       As Mattel's CEO admitted on the stand and as human resource records

4   plainly show, Mattel employees who conducted and who knew of the corporate

5   espionage were not demoted.  They were not fired.  Rather, the employees—

6   including Shore, Plunkett, and not least of all Villasenor – were praised, promoted,

7   and paid.  4/1/2011 Tr. (Vol. 1) at 44:2-45:1; 3/22/2011 Tr. (Vol. 1) at 32:6-15,

8   47:16-48:16; TX 9450; TX 9368.; TX 9369.  3/15/2011 Vol. 1 Tr. 83:13-84:4,

9   98:20-99:1, 101:3-20, 102:18-23 (Friedman); 3/16/2011 Vol. 3 Tr. 58:21-59:22

10  (Kaye). To this day, many of the employees and independent agents who were most

11  intimately involved with Mattel's espionage, including Michael Shore, Carey

12  Plunkett, Sharon Rahimi and Kelly Osier, continue to work for Mattel. 4/1/2011

13  Tr. (Vol. 1) at 45:12-46:11.

14      Even those who departed were not penalized.  Turetzky and Villasenor left of

15  their own accord and with hundreds of thousands of dollars in severance; in fact,

16  Mattel executives testified that Villasenor received no reprimand precisely because

17  he was already out on leave he chose to take, and he was invited to return to Mattel

18  when his leave was up.  TX 36813; 3/15/2011 (Vol. 1) Tr. 70:22-71:5 (Friedman);

19  3/16/2011 (Vol. 3) Tr. 62:25-63:2 (Kaye); 3/23/2011 (Vol. 3) Tr. 28:10-15

20  (Villasenor); TX 9443; 3/22/2011(Vol. 1) 23:21-24:3, 25:4-24 (Turetzky received

21  $225,000 in severance when he voluntarily left Mattel).

22      The "reprimands"  meted out were nothing more than vague letters

23  expressing "disappointment" with "allegations" regarding the employee's

24  (unenumerated) conduct. *See, e.g.,* TX 25103; TX 25107.  The letters were so

25  toothless that even Mattel's General Counsel would go only so far as to say that

26  "[i]t *implies* that we think he did it." 3/29/2011 Tr. (Vol. 2) at 74:14-25 (emphasis

27  added).  And obviously, since the recipients are still employees and have in some

28  cases been promoted, the reprimand had no ill effect on their Mattel careers.

- 21 -

MGA'S MOTION FOR EXEMPLARY DAMAGES AND FEES
PURSUANT TO CUTSA
CV-04-9049 DOC (RNBX))

1        ***Even if we spied, everything was public knowledge.***   Mattel's last refuge

2 was the assertion that even if it had used false pretenses to sneak into competitor's

3 showrooms, such behavior was simply lazy on the part of the involved employees,

4 and was harmless because the information it gleaned from its espionage was

5 publicly available. *See, e.g.,* 3/22/2011 Tr. (Vol. 1) at 133:9-12 (Turetzky testified

6 that "most" of the information gathered by the Market Intelligence Group was

7 publicly available); 4/1/2011 (Vol. 1) Tr. 124:6-13 (Eckert testimony that "I think

8 this is a situation where the harder way is the better way. Carey Plunkett's term, I

9 believe, when she sat up here, was it was 'convenient' to go to the showrooms and

10 gather the information. In my view, it was the easy way or the lazy way. The

11 information was gathered -- was gathered after that, and you don't need to go to

12 somebody's showrooms to get that information."). But Mattel was never able to

13 provide anything like a satisfactory answer to the common-sense question: if this is

14 so, why did Mattel go through all of the trouble to steal it? Why provide employees

15 with a manual describing how to falsify their identities to sneak into private

16 showrooms? Why spend tens of thousands of dollars to send employees to toy fairs

17 to gather this material? And why did Mattel risk being caught sneaking into

18 showrooms under false pretenses if there was no reason to do so in the first place?

19 Turetzky had no idea:

20        Q: Well, if it's publicly available, why do you have to sneak around?

21        A: I don't know.

22 3/22/2011 Tr. (Vol. 1) at 161:4-6; *see also* 4/5/2011 Tr. (Vol. 4) at 37:18-38:3

23 (Wagner).

24        In fact, the same Mattel witness who claimed that all of the information in

25 MGA's showroom was public because it was shared with retailers admitted that

26 that it would have been improper for retailers to pass along such information,

27 "[b]ecause it reflects our future plans and, you know, I think the expectation is that

28 they wouldn't share it." 3/22/2011 Tr. (Vol. 1) at 162:3-163:5 (Turetzky

- 22 -

1  impeached with deposition transcript).

2  **I.    The Jury Finds The Conduct Was Willful And Malicious.**

3       Based on the foregoing, the jury concluded that MGA proved that the

4  conduct of Mattel was willful and malicious by clear and convincing evidence. *See*

5  Dkt. No. 10518 (Verdict Form) at 26.

6                              **ARGUMENT**

7  **I.    THIS COURT SHOULD AWARD EXEMPLARY DAMAGES.**

8       Given Mattel's conduct and given the jury's finding that Mattel engaged in

9  willful and malicious trade secret misappropriation, an award of exemplary

10 damages of two times the amount of the damages awarded is appropriate. Cal. Civ.

11 Code § 3246.3(c). The three factors used to determine the appropriateness of such

12 an award are met: (1) Mattel's conduct was reprehensible; (2) there is harm; and,

13 (3) Mattel's net worth establishes its ability to pay that amount. *Adams v.*

14 *Murakami*, 54 Cal. 3d 105, 110 (1991) (establishing the factors to be considered

15 when assessing punitive damages awards); *Bullock v. Phillip Morris USA, Inc.*, 159

16 Cal. App. 4th 665, 690 n. 18 (2008) (same); *Robert L. Cloud & Assocs. v. Mikesell*,

17 69 Cal. App. 4th 1141, 1151 (1999) (applying the *Adams* factors to a determination

18 of exemplary damages in a trade secret misappropriation case); *Vacco Indus., Inc.*

19 *v. Van Den Berg*, 5 Cal. App. 4th 34, 46 n. 11 (1992) (holding that the *Adams*

20 factors apply to determinations of exemplary damages in trade secrets cases); *O2*

21 *Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1078-79

22 (N.D. Cal. 2005) (applying the *Adams* factors to determine an award of exemplary

23 damages in a trade secret misappropriation case).

24       An award of double damages serves the public objectives to "punish the

25 wrongdoing" and "protect [the public] from future misconduct, either by the same

26 defendant or other potential wrongdoers." *Adams*, 54 Cal.3d at 110; *see also Neal*

27 *v. Farmers Ins. Exch.*, 21 Cal. 3d 910, 928 n. 13 (1978). For those objectives to be

28 accomplished, the award cannot be too small such that "the wealth of the defendant

- 23 -

1    allows him to absorb the award with little or no discomfort." *Adams*, 54 Cal. 3d at
2    110; *Neal*, 21 Cal. 3d at 928 n. 13. For a wealthy defendant, such as Mattel, "the
3    larger the award of exemplary damages need[s] [to] be in order to accomplish the
4    statutory objective." *Adams*, 54 Cal. 3d at 110.
5        MGA respectfully requests an award of double damages as such award is
6    both appropriate under California law and will satisfy the statutory objectives of
7    punishment and deterrence.
8    ### A.    Mattel's Conduct Is Reprehensible.
9        As evidenced by the Statement of Facts, the extent of Mattel's conduct is
10   extraordinary. Mattel's scheme was calculated, elaborate, and occurred repeatedly
11   over a span of almost two decades. There can be no doubt that such conduct was
12   reprehensible: the only question that remains is *how* reprehensible.
13       The United States Supreme Court has articulated five factors to aid courts in
14   determining the degree of reprehensibility of a defendant's conduct: (1) whether the
15   harm was physical and not merely economic; (2) whether the conduct demonstrated
16   an indifference or reckless disregard for the health or safety of others; (3) whether
17   the target of the conduct was financially vulnerable; (4) whether the conduct was
18   repeated or an isolated incident; and (5) whether the conduct was the result of
19   intentional acts or mere accident. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538
20   U.S. 408, 419 (2003).
21       Evidence of all factors is not required. While, "[t]he existence of any one of
22   these factors weighing in favor of a plaintiff may not be sufficient to sustain a
23   punitive damages award; and the absence of all of them renders any award
24   suspect," *State Farm*, 538 U.S. at 419, MGA has clearly proven that the remaining
25   two sub factors "favor a high-end punitive damages award," particularly because
26   Mattel's "conduct involved repeated actions and was the result of intentional
27   trickery and deceit." *See, e.g., Mobile Mini, Inc. v. Khordt*, 2007 WL 2109224, at
28   *5 (July 23, 2007 E.D. Cal. 2007) (Even though there was no evidence of the first

- 24 -

1    three sub factors, the "remaining sub factors favor a high-end punitive damages

2    award because defendant's conduct involved repeated actions and was the result of

3    intentional trickery and deceit."); *see also Noyes v. Kelly Services, Inc.*, 349 Fed.

4    Appx. 185, 187-88 (9th Cir. 2009) (awarding punitive damages based on findings

5    that the last three factors were present); *Sun Pacific Farming Co-op., Inc. v. Sun*

6    *World Intern., Inc.*, 2009 WL 900751, at *7 (E.D. Cal. March 31, 2009) (awarding

7    punitive damages on the basis that the fifth factor alone—evidence of intentional

8    and malicious conduct—was present).

9         Mattel's theft of trade secrets was not a one-time affair. Mattel targeted a

10   smaller competitor and for years stole from it and others to obtain and maintain its

11   competitive advantage. Mattel had a department that, for almost two decades, was

12   devoted to stealing admittedly valuable confidential information from MGA and

13   other companies. Mattel created and funded the department, the Market

14   Intelligence Group, whose purpose was to steal competitive information about

15   competitors. It trained them on how to do this as reflected in the "How to Steal"

16   memo. TX 36028. It provided the financial support for this activity. Indeed,

17   Mattel created the documents—such as invoices—so that Mattel employees could

18   more effectively gain access to Toy Fairs without being discovered and thereby

19   thwarted. TX 36028-15.

20        In the event its employees were stymied, Mattel hired "consultants" who

21   could disclaim affiliation with Mattel so that Mattel could continue to obtain trade

22   secret information. TX 8987 (Bain & Co.'s analysis of MGA); 3/16/2011 Tr. (Vol.

23   3) 36:5-37:1; 3/22/2011 Tr. (Vol. 2) 70:10-71:5, 72:8-73:3 (Mattel hired Sharon

24   Rahimi to carry on the activities in Villasenor's stead).

25        Mattel knew that its acts were wrong and has admitted as much. But that did

26   not stop Mattel from continuing its campaign of theft for as long as it could. And

27   this conduct occurred with the full knowledge of Mattel executives and its legal

28   department.

MGA'S MOTION FOR EXEMPLARY DAMAGES AND FEES
PURSUANT TO CUTSA
CV-04-9049 DOC (RNBX))

1    Under such circumstances an award of exemplary (punitive) damages is

2   warranted.  Conduct demonstrating a "business practice or policy is "more

3   blameworthy and warrants a stronger penalty to deter continued or repeated conduct

4   of the same nature." *Johnson v. Ford Motor Co.*, 35 Cal. 4th 1191, 1206 n. 6

5   (2005) (by "placing the defendant's conduct on one occasion into the context of a

6   business practice or policy, an individual plaintiff can demonstrate that the conduct

7   toward him or her was more blameworthy and warrants a stronger penalty to deter

8   continued or repeated conduct of the same nature"); *Drew v. Equifax Information*

9   *Services, LLC*, 2010 WL 5022466, at *7 (N.D. Cal. Dec. 3, 2010) (evidence of

10   repeated conduct admissible to establish that defendant's violation of the FCRA

11   was the result of a business policy chosen by defendant and properly considered by

12   a jury when calculating punitive damages).

13    Moreover, "repeated misconduct is more reprehensible than an individual

14   instance of malfeasance." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 577

15   (1996); *see also Gryger v. Burke*, 334 U.S. 728, 732, (1948); *McCollough v.*

16   *Johnson, Rodenburg & Lauinger, LLC*, 2011 WL 746892, at *10 (9th Cir. March 4,

17   2011) (district court did not abuse its discretion by admitting evidence of repeated

18   conduct in similar cases to prove reprehensibility); *Exxon Valdez v. Exxon Mobile*

19   *Corp.*, 490 F.3d 1066, 1087-88 (9th Cir. 2007) (evidence that defendant repeatedly

20   permitted conduct to occur over three years permitted to demonstrate

21   reprehensibility when awarding $2.5 billion in punitive damages); *Bains LLC v.*

22   *Arco Products Co.*, 405 F.3d 764, 775 (9th Cir. 2005) ("intentional, repeated ethnic

23   harassment" increased the level of reprehensibility under a finding of punitive

24   damages); *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition*

25   *of Life Activists*, 422 F.3d 949, 959 (9th Cir. 2005) (evidence demonstrating a

26   pattern of conduct may be factored in to the reprehensibility analysis in an award

27   for punitive damages).

28    Further, the "scale and profitability" of a "course of wrongful conduct"

- 26 -

justifies the award. *Johnson*, 35 Cal. 4th. at 1207 (frequency and profitability of the defendant's prior or contemporaneous similar conduct influences a determination of the reprehensibility of that conduct); *Grimshaw v. Ford Motor Co.* 119 Cal. App. 3d 757, 819–820 (1981) (award not excessive in light of, among other considerations, "the profitability of the conduct"); *Romo v. Ford Motor Co.*, 113 Cal. App. 4th 738, 750 n. 3 (2003) (evidence of an entire course of conduct is relevant and admissible to a reprehensibility analysis because "a state is permitted to punish recidivist conduct more severely than an individual instance of malfeasance.").

Finally, the fact is that this conduct was not aimed merely at MGA. Mattel engaged in this conduct as to all of its competitors. Such a fact is critically relevant to a determination whether punitive damages should be awarded. *Boeken v. Phillip Morris, Inc.*, 127 Cal. App. 4th 1640, 1693 (2005) (fact that losing party harmed others is relevant to determination of reprehensibility); *see also State Farm*, 538 U.S. at 422.

In the end, there is not a single mitigating fact militating against a finding of reprehensibility. Mattel's admission at trial that this conduct was wrongful just underscores the reprehensibility of its conduct.

**B.    MGA Suffered Grievous Injury.**

MGA has also proven the second factor: that it was injured as a result of Mattel's willful and malicious trade secret misappropriation, as evidenced by the substantial jury award of damages. This is true despite the fact that there is no rule "mandating that a party show that all three factors point strongly in favor of an exemplary damages award." *O2 Micro Int'l Ltd*, 399 F. Supp. 2d at 1080.

In this case, MGA proved and the jury found that MGA was injured. Mr. Malackowski testified that Mattel stole significant confidential information such as the appearance, operation, intended play pattern, plans to advertise on television, and FOB pricing of MGA's new products. 4/5/2011 Tr. (Vol 1) 26:20-31:15.

MGA's Motion For Exemplary Damages And Fees
Pursuant to CUTSA
CV-04-9049 DOC (RNBX))

1   Mattel benefited because, by knowing this information, it was afforded a "head start

2   advantage" so that it could either introduce a product sooner than it would have

3   been able to had it learned about the competition in the marketplace or it could fine-

4   tune or modify products already in the marketplace so that they would more

5   effectively compete with MGA's to-be-launched products. *Id.* According to Mr.

6   Malackowski, obtaining this "new information, future business strategies, [and]

7   future advertising plans disclosed at the toy fair" was like "getting the playbook of

8   the opposing team." *Id.*

9        Mattel itself acknowledged that the information it obtained from toy fairs

10  was enormously valuable, providing it a competitive advantage. Matt Turetzky,

11  Villasenor's boss, testified that access to unreleased products gave Mattel a

12  competitive advantage because Mattel was better able to plan product lines, make

13  marketing decisions, create advertising plans, and develop competing products.

14  3/22/2011 Tr. (Vol. 1) at 42:21-45:5. Mattel considered its improper access to FOB

15  pricing worth millions. *See, e.g.,* TX 27464-158 (September 2004 email praising

16  Villasenor for obtaining a competitors' price list: "This is great. You just saved

17  Mattel close to 1 million."); 3/22/2011 Tr. (Vol. 3) at 12:5-13:12. As Mr.

18  Villasenor confirmed, Mattel's acquisition of such information before the product

19  was released to market ensured its "superior competitive advantage." TX 9484R.

20       There can be no dispute that the information Mattel stole was enormously

21  valuable, that Mattel's theft injured MGA, and that such injury was substantial.

22  **C.   Due To Mattel's Substantial Wealth, Higher Punitive Damages
         Are Required To Effectively Punish And Deter Mattel.**

23

24       California courts have held that an award of punitive damages should be

25  large enough to "punish the wrongdoing" and "protect [the public] from future

26  misconduct," but it cannot be too small such that the defendant can pay the award

27  with "little or no discomfort." *Adams,* 54 Cal. 3d at 110; *Neal,* 21 Cal. 3d at 928 n.

28  13. At the same time, California courts have cautioned that any award cannot be so

- 28 -

1   large as to financially cripple a company.  *Id.*

2         Therefore, California courts have adopted the rule of thumb that an award

3   that represents less than 10% of a company's net worth is well within reason and

4   may be awarded.  In terms the courts use, a company has an "ability to pay" an

5   amount that represents less than 10% of the company's net worth.  *Michelson v.*

6   *Hamada*, 29 Cal. App. 4th 1566, 1596 (1994) (noting that under California law,

7   punitive damages generally should not exceed 10 percent of the defendant's net

8   worth); *Storage Services v. Oosterbaan*, 214 Cal. App .3d 498, 515 (1989)

9   (collecting cases and based thereon stating that "punitive damage awards are

10  generally not allowed to exceed 10 percent of the defendant's net worth"); *Devlin v.*

11  *Kearny Mesa AMC/Jeep/Renault, Inc.*, 155 Cal. App. 3d 381, 391 (1984) (finding

12  that "[n]et worth generally is considered the best measure of a defendant's 'wealth'

13  for purposes of assessing punitive damages"); *see also Sierra Club Foundation v.*

14  *Graham*, 72 Cal.App.4th 1135, 1163 (1999) (upholding punitive damages award

15  that was less than 10 percent of net worth); *Weeks v. Baker & McKenzie*, 63 Cal.

16  App. 4th 1128, 1166 (1998) (same); *Downey Savings & Loan Assn. v. Ohio*

17  *Casualty Ins. Co.*, 189 Cal. App. 3d 1072, 1100 (1987) (same); *Grimshaw* , 119

18  Cal. App. 3d at 820 (same).

19        Mattel is the largest, richest toy company in the world.  3/29/2011 (Vol. 2) at

20  104:10-14.  Mattel's 2010 Annual Report, Mattel's SEC Form 10-K for the year

21  ending December 31, 2010, and Mattel's SEC Form 10-Q for the quarter ended

22  March 31, 2011, establish that Mattel has a net worth (shown as Total stockholders'

23  equity on Mattel's balance sheet) of $2.5 billion as of March 31, 2011.[3]

24  Declaration of James E. Malackowski ("Malackowski Decl.") ¶ 4; *see also Bolt v.*

25  *Merrimack Pharmaceuticals, Inc.*, 503 F.3d 913 (9th Cir. 2007) (applying the

---

26  [3]   For the purposes of a punitive damages assessment, the Court must evaluate
     Mattel's financial condition at the time of trial.  *Kelly v. Haag*, 145 Cal. App. 4th
27  910, 915 (2006); *see also Zhadan v. Downtown Los Angeles Motor Distributors,*
     *Inc.*, 100 Cal. App. 3d 821, 839, (1979); *Washington v. Farlice*, 1 Cal. App. 4th
28  766, 777 (1991).  Accordingly, the March 31, 2011 figure is the most accurate.

1   "common and well-established meaning of the term 'net worth' as the difference

2   between total assets and total liabilities").  The court in *O2 Micro Int'l Ltd.* used

3   precisely this same methodology to arrive at the defendant's net worth, which was

4   then used to confirm defendant's ability to pay an award of double damages.  *O2*

5   *Micro Int'l Ltd.*, 399 F. Supp. 2d at 1079 n. 5 (after subtracting current assets from

6   current liabilities the court found that "MPS has a net worth of approximately $63.9

7   million, or, as stated in SEC terminology, a 'total stockholders' equity' of

8   approximately $63.9 million").

9           An award of double damages in this instance comprises 7.02 percent of

10  Mattel's net worth, and is well within reason under California law.  Such award is

11  large enough to punish Mattel and deter it and others from such conduct while

12  being small enough that it does not financially cripple or destroy Mattel.

13  **II.    FEES AND  COSTS ARE WARRANTED.**

14          Since at least 1992, Mattel has maintained its dominant position in the

15  industry in part by spying on its competitors.  Mattel's actions have harmed not

16  only MGA, as the jury found, but have extended across the entire industry.  *See,*

17  *e.g.* TX 9593; TX 9656; TX 26546; TX 26758  (Mattel spied not only on MGA, but

18  on *all* of their competition).

19          There is every reason to believe that if MGA had not brought suit and

20  thereby uncovered Mattel's systematic program of corporate espionage, Mattel

21  would still be spying.  Mattel spied on its competitors for one reason: it made

22  economic sense for them to do so.  Mattel spent hundreds of thousands of dollars to

23  hire and deploy spies, and when necessary hundreds of thousands more to buy their

24  silence.  But until this jury's verdict, Mattel had done nothing but profit by stealing

25  "intelligence" detailing its competitors' unreleased products, its competitors'

26  marketing plans, and its competitors' confidential pricing information.  The facts

27  show that Mattel tried to conceal evidence of its wrongdoing not only to avoid

28  liability, *but also so that it could continue to spy*.  Despite a parade of witnesses

MGA's Motion For Exemplary Damages And Fees
Pursuant to CUTSA
CV-04-9049 DOC (RNBX))

1  from the CEO on down who claimed that *if* Mattel had ever spied on a competitor it

2  no longer did so, the evidence shows that Mattel continued to spy on its competitors

3  as recently as 2009.  The *only* thing that stopped it was MGA's lawsuit.

4      Accordingly, Mattel should reimburse MGA for the attorneys' fees, expert

5  fees, and costs it bore proving its affirmative claims, as expressly provided by

6  California's Uniform Trade Secret Act.  Cal. Civ. Code § 3426.4; *Vacco Indus.,*

7  *Inc.,* 5 Cal. App. 4th at 54.  An award of costs and fees is reviewed under the

8  "abuse of discretion" standard.  *Velarde v. PACE Membership Warehouse, Inc.,*

9  105 F.3d 1313, 1318 (9th Cir. 2005); *Fed-Mart Corp. v. Price,* 111 Cal. App. 3d

10  215, 227 (1980).  An award to MGA as the prevailing party pursuant to CUTSA

11  requires only a finding that Mattel's misappropriation of trade secrets was willful

12  and malicious, which the jury found by clear and convincing evidence.  Cal. Civ.

13  Code § 3426.4; *Vacco Indus., Inc.,* 5 Cal. App. 4th at 54.  It is appropriate *in*

14  *addition to* exemplary damages.  *Vacco Indus., Inc.,* 5 Cal. App. 4th at 55

15  (affirming award of attorney fees under Cal. Civ. Code § 3426.4 in addition to

16  punitive damages); *Eldorado Stone LLC v. Renaissance Stone,* 2007 WL 3308099

17  at *1-2 (S.D. Cal, Oct. 24, 2007) (awarding attorney fees and expert witness costs

18  under Cal. Civ. Code § 3426.4 in addition to exemplary damages, fees under the

19  Copyright Act, and fees under the Lanham Act).

20      Calculation of a reasonable fee is a two-step process.  First, the Court must

21  calculate the "lodestar figure" by taking the number of hours MGA reasonably

22  expended proving its affirmative claims and multiplying it by a reasonable hourly

23  rate.  *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983); *Lytle v. Carl,* 382 F.3d 978,

24  988 (9th Cir. 2004).  Second, the Court may decide to enhance or reduce the

25  lodestar figure by based upon "(1) the novelty and complexity of the issue; (2) the

26  special skill and experience of counsel; (3) the quality of representation; (4) the

27  results obtained; and (5) the contingent nature of the fee arrangement." *Morales v.*

28  *City of San Rafael,* 96 F.3d 359, 364 (9th Cir. 1996); *Ketchum v. Moses,* 24 Cal. 4th

- 31 -

1122, 1132-33 (2001); *PLCM Group v. Drexler*, 22 Cal. 4th 1084, 1096 (2000).

The hours expended on a particular claim may be proved by invoices showing the amount billed supported by a declaration. *See Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2000); *Eldorado Stone*, 2007 WL 3308099 at *4; *see also Fed-Mart Corp.*, 111 Cal. App. 3d at 226-27 (in California, "[a]n award for attorney fees may be made in some instances solely on the basis of experience and knowledge of the trial judge without the need to consider any evidence."). Fees recoverable include paralegal fees and costs of expert witnesses. Cal. Civ. Code § 3426.4; *Winterrowd v. Am. Gen. Annuity Ins. Co.*, 556 F.3d 815, 823 (9th Cir. 2009) ("This court has permitted fee recovery for the work of paralegals, database managers, legal support, summer associates, and even attorneys who have yet to pass the bar.").

MGA is properly due compensation for the hours required to bring its affirmative claims as reflected in the Steve Schultz Declaration, Exhibit 1 (matter number 2004), Exhibit 2 (matter number 8). These include MGA's claims that Mattel serially copied MGA products as alleged in CV-05-2727 and MGA's Counterclaims in Reply against Mattel. The fees sought by this motion are only those incurred in connection with MGA's affirmative claims. Only by pursuing its affirmative claims in CV-05-2727 did MGA discover that Mattel had misappropriated trade secrets.[4] And as for the Counterclaims in Reply, the claims set forth therein comprising MGA's trade secret misappropriation claim and civil RICO claim (which alleged that Mattel conspired to steal MGA's trade secret information), were both based on the common assertion that Mattel had stolen MGA's confidential trade secret information.[5] Under such circumstances, an award for pursuit of such claims is warranted without further apportionment. *See Hensley*,

---

[4] Moreover, as set forth in the concurrently-filed Motion For Fees Under The Copyright Act, this case was at all times hotly litigated, requiring extensive motion practice simply to obtain the most relevant of requested documents.
[5] A third claim, for wrongful injunction, was not long entertained and the attorney effort spent on it was *de minimis*.

MGA's MOTION FOR EXEMPLARY DAMAGES AND FEES
PURSUANT TO CUTSA
CV-04-9049 DOC (RNBX))

1   461 U.S. at 435 (common core of facts or related legal theories); *Reynolds Metal*

2   *Co. v. Alpeson*, 25 Cal. 3d 124, 129-30 (1979)  (no apportionment on "an issue

3   common to both a cause of action in which the fees are proper and one in which

4   they are not allowed."); *Fed-Mart Corp.*, 111 Cal. App. 3d at 227 (affirming

5   statutory award of fees absent a court determination of the precise number of hours

6   expended where the prevailing party relied on three factually intertwined but

7   distinct theories of recovery and "it would be impracticable, if not impossible, to

8   separate the multitude of conjoined activities into compensable or noncompensable

9   time units.").

10      A reasonable hourly rate is calculated according to the prevailing market

11   rates in the community in which the court sits or counsel is located. *Sorenson v.*

12   *Mink*, 239 F.3d 1140, 1145 (9th Cir. 2001); *Gates v. Dukemejian*, 987 F.2d 1392,

13   1397 (9th Cir. 1992); *PLCM Group*, 22 Cal. 4th at 1096.  Counsel charged a

14   reasonable hourly rate of between $280 and $890.   Declaration of Steve Schultz,

15   Exhibit 1 (matter number 2004), Exhibit 2 (matter number 8); Declaration of Peter

16   Zeughauser.

17      In total, MGA's compensable attorneys' fees total $6,846,272.  Declaration

18   of Steve Schultz, ¶ 16.

19      In addition, MGA incurred $80,201 in costs.  Declaration of Steve Schultz, ¶

20   16.  As noted, costs may awarded.

21      Accordingly, MGA is due a total of $6,926,473 in attorneys' fees and costs.

22      If anything, the facts counsel an increase in fees considering the (1) skill and

23   experience of counsel and the quality of their representation, and (2) the results

24   obtained. *See Morales* 96 F.3d at 364 ; *Hensley*, 461 U.S. at 434; *Ketchum*, 24 Cal.

25   4th at 1134-35 & n. 1 (court authorized to apply multiplier unless statute allowing

26   for fees specifically states otherwise).

27      Mattel can hardly question the quality of MGA's representation or the skill

28   and experience of counsel.  In January 2011, Mattel's Opposition to MGA's

MGA'S MOTION FOR EXEMPLARY DAMAGES AND FEES
PURSUANT TO CUTSA
CV-04-9049 DOC (RNBX))

1   Emergency Motion To Stay Trial apprised the Ninth Circuit that MGA was

2   represented by a "preeminent" firm with accomplished lead counsel:

3           Each of MGA's two lead counsel at Orrick, Annette Hurst and Thomas
            McConville, has twenty years of experience; Ms. Hurst was recently
4           named one of the "Top 75 IP Litigators in California" and Mr.
            McConville spent ten years as a federal prosecutor, earning the
5           "Director's Award" from the U.S. Attorney's Office for his trial work
            … Orrick touts its trial ability to its clients: "What sets Orrick apart
6           from other firms that handle large, complex litigation is our trial track
            record. We take complicated, high-stakes cases. *We try and win them.*
7

8   Ninth Circuit, Case No. 10-802354 Dkt. No. 9-1 at 4 (emphasis in original)

9   (internal citations omitted).

10          The results speak for themselves.  MGA uncovered a program of systematic

11  espionage that had persisted at Mattel for the better part of two decades.  Moreover,

12  MGA exposed a cancer that afflicted every major participant in the toy industry,

13  thereby—hopefully—putting an end to a practice that Mattel, by all indications,

14  was intent on continuing.

15                              **CONCLUSION**

16          For the foregoing reasons, MGA is entitled to exemplary damages in the

17  amount of two times the amount awarded and its fees and costs.

18  Dated: May 5, 2011              Respectfully submitted,

19                                  ORRICK, HERRINGTON & SUTCLIFFE LLP

20

21                                  By:

22                                      Warrington S. Parker III
                                    Attorneys for MGA ENTERTAINMENT, INC.,
23                                  MGA ENTERTAINMENT HK, LTD., MGA de
                                    MEXICO, S.R.L. de C.V., and ISAAC LARIAN

24

25

26

27

28

MGA's Motion For Exemplary Damages and Fees
Pursuant to CUTSA
CV-04-9049 DOC (RNBX))