

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

MAY 1 7 2011

CENTRAL DISTRICT OF CALIFORNIA
BY (AW)          DEPUTY

1   ANNETTE L. HURST (State Bar No. 148738)
    ahurst@orrick.com
2   WARRINGTON S. PARKER III (State Bar No. 148003)
    wparker@orrick.com
3   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
4   405 Howard Street
    San Francisco, CA 94105
5   Telephone:  415-773-5700
    Facsimile:  415-773-5759
6
    WILLIAM A. MOLINSKI (State Bar No. 145186)
7   wmolinski@orrick.com
    ORRICK, HERRINGTON & SUTCLIFFE LLP
8   777 South Figueroa Street, Suite 3200
    Los Angeles, CA  90017
9   Telephone:  213-629-2020
    Facsimile:  213-612-2499
10
    THOMAS S. MCCONVILLE (State Bar No. 155905)
11  tmcconville@orrick.com
    ORRICK, HERRINGTON & SUTCLIFFE LLP
12  4 Park Plaza, Suite 1600
    Irvine, CA 92614-2258
13  Tel: (949) 567-6700/Fax: (949) 567-6710

14  Attorneys for MGA Parties

15              UNITED STATES DISTRICT COURT

16             CENTRAL DISTRICT OF CALIFORNIA

17                  SOUTHERN DIVISION

18

19  CARTER BRYANT, an individual        Case No. CV 04-9049 DOC (RNBx)
                                        Consolidated with: Case No. CV 04-9059
20              Plaintiff,              Case No. CV 05-2727

21       v.                            **DECLARATION OF ANNETTE L.
                                        HURST IN SUPPORT OF MGA's
22  MATTEL, INC., a Delaware            MOTIONS FOR FEES AND COSTS**
    corporation,
23
                Defendant.
24

25  AND CONSOLIDATED ACTIONS

26  **[EXHIBITS F, G, H, I FILED UNDER SEAL]**

27

28

                                        DECLARATION OF ANNETTE L. HURST
                                        CV-04-9049 DOC (RNBX)

I, Annette L. Hurst, declare:

1.     I am a member of the bar of the State of California, admitted to practice before this Court, a partner with the law firm of Orrick, Herrington & Sutcliffe LLP, and counsel for the MGA Parties. I make this declaration based on personal knowledge unless otherwise expressly stated, in which case, it is based on information and belief. If called and sworn as a witness, I could and would testify competently as follows.

2.     I was lead counsel of record for defendant Thomas Forsyth in the *Mattel v. Walking Mountain* case. After the Ninth Circuit's reversal of the denial of attorneys' fees on the cross-appeal, the United States District Court for the Central District of California, Judge Lew presiding, granted defendant's request for an award of attorneys' fees and awarded nearly $2M in fees and costs.

3.     Attached hereto as Exhibit A is a true and correct copy of the book entitled "Toy Monster: The Big, Bad World of Mattel," written by Jerry Oppenheimer and published by John Wiley & Sons, Inc. on February 24, 2009.

4.     Attached hereto as Exhibit B is a true and correct copy of the article titled "Barbie's Bodyguards," written by Tracie L. Thompson and published in the *California Lawyer* magazine in May of 2006.

5.     Attached hereto as Exhibit C is a true and correct copy of the article titled "Mattel's Latest: Cease-and-Desist Barbie," written by Steve Silberman and published by Wired.com on October 28, 1997.

6.     Attached hereto as Exhibit D is a true and correct copy of the article titled "Sue-happy Barbie" published by the Times-Picayune Publishing Company on January 28, 2003.

7.     Attached hereto as Exhibit E is a true and correct copy of the article titled "Jury rejects Mattel's Bratz doll copyright claim," written Amy Taxin and Mae Anderson and published by The Associated Press on April 22, 2011.

8.     Attached hereto as Exhibit F is a true and correct copy of a transcript

DECLARATION OF ANNETTE L. HURST
CV-04-9049 DOC (RNBX)

1  of the testimony of Tom Nolan given on November 9, 2010 in the *MGA v.*

2  *Lexington, et al.* arbitration.  [FILED UNDER SEAL]

3      9.      Attached hereto as Exhibit G is a true and correct copy of the transcript

4  of testimony of Annette Louise Hurst given on November 10, 2010 in the *MGA v.*

5  *Lexington, et al.* arbitration.  [FILED UNDER SEAL]

6      10.      Attached hereto as Exhibit H is a true and correct copy of the transcript

7  of testimony of Jeanine Pisoni given on November 11, 2010 in the *MGA v.*

8  *Lexington, et al.* arbitration.  [FILED UNDER SEAL]

9      11.      Attached hereto as Exhibit I is a true and correct copy of a letter from

10  Timothy L. Alger at Quinn Emanuel to Michael Keats and Johanna Schmitt at

11  O'Melveny & Myers LLP dated June 7, 2007.  [FILED UNDER SEAL]

12      I declare under penalty of perjury under the laws of the United States that the

13  foregoing is true and correct.  Executed on May 5, 2011, in San Francisco,

14  California.

15

16

17

18                                                    */s/ Annette L. Hurst*

19                                                    Annette L. Hurst

20

21

22

23

24

25

26

27

28

DECLARATION OF ANNETTE L. HURST
CV-04-9049 DOC (RNBX)

# EXHIBIT F

## (FILED UNDER SEAL – PURSUANT TO PROTECTIVE ORDER)

Page 273

IN RE JAMS ARBITRATION

| | |
|---|---|
| MGA ENTERTAINMENT, INC., a California corporation; and ISAAC LARIAN, an individual,<br><br>                    Claimants,<br><br>        vs.<br><br>LEXINGTON INSURANCE COMPANY, CHARTIS SPECIALTY INSURANCE COMPANY, and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,<br><br>                    Respondents.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Reference<br>) No. 110059976<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) PAGES 273 - 562 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

VOLUME II

9:07 A.M. TO 4:59 P.M.

TUESDAY, NOVEMBER 9, 2010

ORANGE, CALIFORNIA

FILE NO:  101109RE

REPORTED BY:

REAGAN EVANS, RMR, CRR, CLR

CA CSR NO. 8176

CONFIDENTIAL - ATTORNEYS' EYES ONLY             Exhibit F - Page 239

Page 274

1    VOLUME II OF THE REPORTER'S TRANSCRIPT OF

2    PROCEEDINGS, taken at 500 North State College

3    Boulevard, 14th Floor, Orange, California,

4    commencing at 9:07 a.m. on Tuesday, November 9,

5    2010, before Reagan Evans, RMR, CRR, CLR, CA CSR

6    No. 8176.

7

8

9

10

11

12                    A P P E A R A N C E S

13

14   JAMS PANEL:

15

16        HON. EDWARD J. WALLIN

17        HON. RONALD M. SABRAW

18        HON. STEVEN J. STONE

19        HON. GREER H. STROUD

20

21

22

23

24

25

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 240

Vol. II (273-562)      MGA v. Lexington, et al.           11/9/2010

```
                                                        Page 275

 1   APPEARANCES CONTINUED:

 2

 3   FOR THE CLAIMANTS:

 4

 5       SHERNOFF BIDART ECHEVERRIA LLP

 6       BY:  MICHAEL J. BIDART, ESQ.

 7            RICARDO ECHEVERRIA, ESQ.

 8            STEVEN M. SCHUETZE, ESQ.

 9       600 South Indian Hill Boulevard

10       Claremont, California 91711

11       (909) 621-4935

12

13   FOR RESPONDENTS LEXINGTON INSURANCE COMPANY, CHARTIS

14   SPECIALTY INSURANCE COMPANY, AND NATIONAL UNION FIRE

15   INSURANCE COMPANY OF PITTSBURGH, PA:

16

17       DRINKER BIDDLE & REATH LLP

18       BY:  MARK D. SHERIDAN, ESQ.

19            MARK C. ERRICO, ESQ.

20       500 Campus Drive

21       Florham Park, New Jersey 07932-1047

22       (973) 549-7000

23

24

25
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY      Exhibit F - Page 241

Vol. II (273-562)          MGA v. Lexington, et al.              11/9/2010

```
                                                      Page 276

 1   APPEARANCES CONTINUED:

 2

 3   FOR RESPONDENT CRUM & FORSTER SPECIALTY INSURANCE

 4   COMPANY:

 5

 6      MUSICK, PEELER & GARRETT LLP

 7      BY:  LARRY C. HART, ESQ.

 8           SUSAN J. FIELD, ESQ.

 9      One Wilshire Boulevard

10      Suite 2000

11      Los Angeles, California 90017-3383

12      (213) 629-7618

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 242

Page 277

1                        I N D E X

2                       VOLUME II

3

4                                                PAGE

5    TUESDAY, NOVEMBER 9, 2010

6        A.M. SESSION                             281

7        P.M. SESSION                             415

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 243

Page 278

```
 1              CHRONOLOGICAL INDEX OF WITNESSES

 2

 3   CLAIMANTS' WITNESSES                              PAGE

 4

 5   MICHAEL SCHMIDT

 6        DIRECT EXAMINATION BY MR. SCHUETZE           281

 7        CROSS-EXAMINATION BY MR. ERRICO              314

 8        REDIRECT EXAMINATION BY MR. SCHUETZE         327

 9        RECROSS-EXAMINATION BY MR. ERRICO            336

10

11   RUBY ANN HELSLEY

12        DIRECT EXAMINATION BY MR. SCHUETZE           337

13        CROSS-EXAMINATION BY MR. ERRICO              371

14        REDIRECT EXAMINATION BY MR. SCHUETZE         413

15

16   TOM NOLAN

17        DIRECT EXAMINATION BY MR. BIDART             415

18        CROSS-EXAMINATION BY MS. FIELD               473

19        CROSS-EXAMINATION BY MR. SHERIDAN            553

20

21

22

23

24

25
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 244

Page 415

1          TUESDAY, NOVEMBER 9, 2010; ORANGE, CALIFORNIA

2                              1:37 P.M.

3

4          JUSTICE WALLIN:  I think we're ready to

5     resume.

6          And I see Mr. Nolan is here.  I've met

7     Mr. Nolan years ago, five or six, anyway, probably.

8          THE WITNESS:  At least.

9          JUSTICE WALLIN:  So let the reporter swear

10    him and let's begin.

11

12                         TOM NOLAN,

13    called as a witness by the Claimants, was

14    administered the oath and testified as follows:

15

16                    DIRECT EXAMINATION

17    BY MR. BIDART:

18    Q.   Mr. Nolan, what is your business or

19    profession?

20    A.   I'm an attorney.

21    Q.   And how long have you been licensed to

22    practice as an attorney?

23    A.   Thirty-five years.

24    Q.   Okay.  And we'd like to spend just a few

25    moments on your formal educational background,

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit F - Page 245

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 416

1    beginning with your undergraduate schooling.

2              Where did you go to school?

3        A.    I graduated from Loyola Marymount

4    University in 1974.  Then I attended Loyola Law

5    School -- no, I'm sorry.  I graduated undergraduate

6    in 1971, and I graduated from Loyola Law School in

7    1975.

8        Q.    And when were you first admitted to

9    practice law?

10       A.    Shortly after taking the Bar exam.  And I

11   think that it was December of 1975.

12       Q.    And after completing your law school

13   education and passing the Bar, where did you first

14   go to work?

15       A.    I was fortunate.  I went -- I was hired

16   directly into the United States Attorneys' Office in

17   Los Angeles, California, where I served as an

18   assistant United States Attorney.

19       Q.    And how long did you stay in that position?

20       A.    I stayed as the assistant United States

21   Attorney for approximately 3 1/2 years, the last

22   year of which I served as head of the fraud and

23   special prosecutions unit at the United States

24   Attorneys' Office.

25       Q.    In Los Angeles?

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Exhibit F - Page 246

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 417

```
 1        A.    In Los Angeles, yes.

 2        Q.    And did you have occasion to actually try

 3   cases to a jury while you were an AUSA?

 4        A.    Yes.

 5        Q.    Okay.

 6        A.    On numerous occasions.

 7             JUSTICE WALLIN:  I have to say, I was

 8   offered that same job after I had finished at the

 9   AUSA's job by a guy named Robert Meyer, who was a

10   U.S. Attorney years ago.

11             THE WITNESS:  Oh, sure.

12             JUSTICE WALLIN:  And I turned it down

13   because I didn't want to leave my law practice.  I

14   know exactly what that job is because I worked -- I

15   did the same thing for three years.

16   BY MR. BIDART:

17        Q.    And after you left that job, where did you

18   next go to work?

19        A.    I went to -- I went into private practice.

20   Joined a lawyer by the name of Stephen D. Miller.

21   Stephen had previously worked in a law firm in

22   Beverly Hills specializing in white collar criminal

23   work.

24             JUSTICE WALLIN:  Miller, Glassman &

25   Browning.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit F - Page 247

Page 418

 1          THE WITNESS:  Miller, Glassman & Browning,

 2    thank you.

 3          And Stephen left that firm to start his own

 4    firm and I joined Stephen and we formed Miller &

 5    Nolan.

 6    BY MR. BIDART:

 7      Q.   And what year did you form Miller & Nolan?

 8      A.   19- -- October 15th, 1979.

 9      Q.   And how would you best describe that law

10    practice?  What type of practice was it?

11      A.   We specialized in white collar criminal

12    defense and civil litigation.

13          And based on Stephen's trial experience

14    while he was in the U.S. Attorneys' Office, as well

15    as my experience in the U.S. Attorneys' Office, we

16    projected ourselves to the public as trial lawyers

17    that could try complex criminal as well as civil

18    cases.

19      Q.   And how long did you remain in that firm?

20      A.   Well, I had two stints in that firm.  I

21    left that firm in 1985 and spent a year or two in a

22    firm called Finley Kumble.

23          Then I went to Jones Day for two years

24    because I was dealing with a receivership that

25    required a very substantial law firm backing.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 248

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 419

1    And -- but after two years at Jones Day, I went back

2    to Stephen, and we reformed, if you would, Miller &

3    Nolan.  And that was in 1989.  And then we were

4    acquired or we merged with the law firm of what was

5    then known as Howrey & Simon.

6        Q.   Okay.

7        A.   And we opened up their L.A. office.

8        Q.   Backing up just a bit.

9             For the stints you had with Finley Kumble

10   and Jones Day, what type of functions were you

11   performing in those firms?

12       A.   Well, my entire practice has always been

13   trial practice.  So I would handle trials, but I was

14   also -- but not every case gets tried.  But I was

15   handling, you know, the type of cases I was handling

16   in the U.S. Attorneys' Office, but I was doing it

17   from a defense side or from a civil side.

18            They were generally complex litigation

19   involving multi, you know, state witnesses or

20   various types of issues.  And that's -- you know,

21   that was my practice all the way through, you know,

22   Jones Day and when I went back to Miller Nolan and

23   when I went to Howrey.

24       Q.   And since we've known each other for years,

25   I know that you have extensive trial experience both

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**          Exhibit F - Page 249

Page 420

1    in state and federal court; is that correct?

2         A.    That's correct.

3         Q.    Okay.  Do you have an estimate of the

4    number of cases you've tried to a jury?

5         A.    Probably somewhere like 40 to 50.

6         Q.    And without getting into a large number of

7    cases, can you just give the Panel a feel for maybe

8    two or three, describe two or three of the most

9    complex or major cases that you've been engaged for

10   the purposes of being trial counsel.

11        A.    Okay.  In the early 19- -- I'm sorry.

12             In 1987, while at Jones Day, I was asked to

13   serve as the trial counsel in a case which was then

14   described as the largest civil case in Los Angeles

15   Superior Court history.  It was a battle between

16   Jordache jeans and Guess jeans, the Marcianos and

17   the Nakashes.  It was tried in front of Judge Norm

18   Epstein.  And I represented the Jordache parties in

19   that case.

20             Very substantial case involving many myriad

21   of issues, including having the privilege of going

22   over to Tel Aviv to take a deposition.  So that was

23   a fascinating case.

24             JUSTICE STONE:  Did you work with Elwood

25   Lui on that case?

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 250

Vol. II (273-562)       MGA v. Lexington, et al.              11/9/2010

Page 421

```
 1              THE WITNESS:  Yes.  Yes.  Elwood Lui was on
 2    that case.
 3              And so that would be an example of it.
 4              And then I think the Howrey & Simon
 5    experience, I would take two cases there.  One was
 6    my first antitrust trial where I was asked to be the
 7    lead counsel for Litton Industries in a decade-long
 8    antitrust monopoly case where Litton was suing
 9    Honeywell for monopolizing a piece of aviation
10    equipment that was installed on every commercial
11    airplane that flew in the country, around the world.
12              We prevailed, and ultimately the verdict in
13    that case was $800 million, including attorney fees.
14    It was troubled.  It was tried to two juries because
15    the damages were believed to be excessive the first
16    time.  We tried it the second time in front of Judge
17    Pfaelzer and did better the second time around, so
18    the case ultimately settled on appeal.
19              Another substantial case that I handled was
20    a matter where I represented International Paper
21    Company involving an insurance dispute, a bad faith
22    claim that they were bringing against 23 of their
23    carriers for refusal to defend a products liability
24    case in Mobile, Alabama, where International Paper
25    got hit pretty hard.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit F - Page 251

Page 422

```
 1           I came in and tried two cases spanning over
 2   six months up in San Francisco where we got a bad
 3   faith verdict, which was the largest in the state.
 4   I think you later got a larger one; I don't know.
 5      Q.   I didn't know you didn't refer that one to
 6   me.
 7      A.   No.
 8           And in that case ultimately the verdict
 9   ended up in the collection of -- in the settlement
10   of $650 million.
11           And I guess the last case I would point
12   out, although this sounds like I'm -- but you asked
13   the question.
14      Q.   Yes, I did.
15      A.   I have a video that I could share with
16   everybody.
17           MS. FIELD:  We'll take it home and get some
18   popcorn.
19   BY MR. BIDART:
20      Q.   Honestly, we know it's not the kind of
21   stuff that you normally do.
22      A.   I'm sorry.  My mother's no longer alive,
23   but I always try to think she'd be proud of hearing
24   these stories.
25           And I guess the last one other than --
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit F - Page 252

Vol. II (273-562)        MGA v. Lexington, et al.              11/9/2010

                                                             Page 423

 1   before the Bratz case was I was the lead trial

 2   counsel for the underwriter banks in the WorldCom

 3   litigation in New York, which was and is the largest

 4   securities class-action lawsuit that was to be

 5   tried.  And we settled that case on the eve of

 6   trial.  And the main client in that consortium was

 7   JPMorgan Chase.

 8       Q.    Okay.  Mr. Nolan, you know that the case

 9   we're here in arbitration has to do with your

10   clients, MGA Entertainment and Isaac Larian, against

11   vari- -- two insurance companies?

12       A.    Yes.

13       Q.    And I would like to have you tell us when

14   you first became aware of or became involved in any

15   capacity as a lawyer for MGA Entertainment and

16   Mr. Larian in connection with those proceedings.

17       A.    My best recollection is that early October

18   of 2007 I received a phone call from a gentleman

19   that I did not know, Craig Holden, who was in-house

20   counsel for MGA, asked me if I had heard of the

21   case -- I had not -- that it involved Bratz.

22             No offense, Isaac, I had not heard of

23   Bratz.

24             But would I be interested in coming out and

25   interviewing.  And I, the next day, went out and

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 253

Vol. II (273-562)        MGA v. Lexington, et al.                11/9/2010

Page 424

```
 1    interviewed with Craig Holden and Isaac Larian.  And
 2    between the call and the time of the meeting, I
 3    asked my daughters about Bratz, so I was more
 4    familiar at the time of the interview.
 5        Q.   Do I infer from that that you had had no
 6    prior business relationship or personal relationship
 7    with Mr. Larian or MGA?
 8        A.   No.  No.
 9        Q.   Okay.  And following that, when -- strike
10    that.
11             When -- what law firm was then or what
12    firms that you can recall were representing MGA and
13    Isaac at that time?
14        A.   My best recollection was that O'Melveny &
15    Myers and the Christensen Glaser law firm were
16    representing Isaac Larian and MGA.  And I don't know
17    whether or not there were any other law firms that
18    may have been representing any of the individuals
19    that required representation in that case.
20        Q.   And as a result of your having then met
21    with Mr. Larian and the people at MGA, when in time
22    did you first come into being attorney of record or
23    one of the attorneys of record?
24        A.    I think it was approximately maybe ten
25    days, two weeks after my first meeting with
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 254

Page 425

1    Mr. Larian and Mr. Holden.  We -- I participated in

2    a telephonic conference with Judge Larson, where we

3    announced that Skadden was going to be coming in and

4    replacing the O'Melveny law firm and the Christensen

5    Glaser law firm.

6         Q.   And when you first came into the case and

7    made that announcement, was the case already set for

8    trial?

9         A.   Yes, it was.

10        Q.   And that trial was set in front of Judge

11   Larson in Riverside, correct?

12        A.   Correct.

13        Q.   Do you recall from memory approximately

14   when it was set for trial?  What I mean by that,

15   what dates had been established by then?

16        A.   So we came in at the end of October, very

17   early part of November.  And the trial was that --

18   at that point in time I believe set for April 15th.

19   It subsequently slid one month to allow us a little

20   bit of time to gear up.

21        Q.   Okay.  Tell us in your own words at the

22   time you came into the case what your arrangement

23   was at Skadden in terms of the way you organized and

24   set up to handle such a major piece of litigation.

25   And take your time to answer exactly how it was set

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit F - Page 255

Vol. II (273-562)      MGA v. Lexington, et al.                    11/9/2010

Page 426

 1   up and what your role was in that connection.

 2        A.    Well, Skadden Arps, which is probably known

 3   more for its corporate practice, it does have a very

 4   substantial litigation practice.  It's a national

 5   litigation practice that operates on a national

 6   platform in the sense that although you are located

 7   in the Los Angeles office, you don't handle just

 8   Los Angeles cases.  And vice versa, if you're in

 9   New York, you don't just handle a New York case.

10             Hence the reason why, even though I was in

11   Los Angeles, I was going to be the lead trial lawyer

12   in the Southern District of New York for the

13   underwriters in the WorldCom case.

14             And so what I did was I made an initial

15   effort to size up the case, understand the issues,

16   and then went around to the various offices and

17   the -- my colleagues to identify those in the firm

18   that had the most particular expertise to deal with

19   the issues that were facing MGA and Isaac Larian in

20   that case as opposed to just looking to Los Angeles

21   for staffing purposes.

22        Q.   At the time you came into the case, give us

23   a general overview of the nature of the claims that

24   were being asserted by Mattel against MGA and Isaac

25   and any and all claims that he was asserting against

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit F - Page 256

Vol. II (273-562)        MGA v. Lexington, et al.              11/9/2010

Page 427

 1    them.  Like an overview of the litigation, the

 2    nature of it.

 3        A.   Well, you know, it was the kitchen sink of

 4    claims that Mattel was bringing against MGA and

 5    Isaac Larian, and a similar kitchen sink of claims

 6    back against Mattel; many of them in a defensive

 7    mode, but some of them in an affirmative fashion.

 8            When we came into the case in October and

 9    early part of November, the case had already been

10    bifurcated into at least two phases:  Phase I,

11    Phase II.  Phase I had been determined that it would

12    deal with the copyright ownership issues and the

13    tortious interference with Carter Bryant -- with

14    Mattel rights with respect to Carter Bryant.  But,

15    although that was the first phase, there was no stay

16    of discovery on Phase II.

17            And so when we came into the case, Phase I

18    discovery and Phase II discovery were going

19    full-bore.  And it was not until later in '08, I

20    think it was January or February, that Judge Larson

21    finally imposed a stay of sorts on the Phase II

22    discovery.

23            So when we came into the case, we were

24    dealing with copyright issues.  We were dealing with

25    breach of contract issues.  We were dealing with the

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 257

Vol. II (273-562)        MGA v. Lexington, et al.                11/9/2010

                                                        Page 428

1    state tort claims, breach of duty, breach of

2    loyalty.  Those were being asserted against Isaac.

3            The copyright claim had the additional

4    willful component of a willful violation of the

5    copyright infringement claims.

6            And we were also representing MGA and Isaac

7    against claims of trade secret theft from the

8    alleged hiring of MGA employees -- I'm sorry --

9    Mattel employees out of Mexico and a claim that MGA

10   and Isaac had hired a Canadian representative,

11   former employee of Mattel, to open up MGA's

12   marketing offices in Canada.

13           We were dealing -- so we were dealing with

14   the trade secret issues as well.

15           We were also dealing with and analyzing and

16   asserting a trade dress claim that MGA and Isaac

17   Larian were asserting back against Mattel in two

18   respects:  One is that there was a doll, a

19   competitor to Bratz, that Mattel introduced in the

20   market called My Scene.  And one of the allegations

21   was that we had copyright claims against Mattel for

22   ripping off, if you would, the Bratz doll that MGA

23   was so successful in.

24           We also were asserting trade dress claims

25   against Mattel arising out of the dress of My Scene;

CONFIDENTIAL - ATTORNEYS' EYES ONLY                        Exhibit F - Page 258

Vol. II (273-562)        MGA v. Lexington, et al.                11/9/2010

Page 429

1   also, the packaging of My Scene.  Because in the

2   toy -- in the toy business, as I soon learned, the

3   accessories and the packaging that accompany a

4   particular model of a doll are all part of the

5   product.  And so that there would be claims of

6   infringement with respect to copying, you know, the

7   trade dress claims.

8           And there was also a claim that we were

9   bringing, if I recall correctly, about Mattel's use

10  of a trapezoid design for a toy that they introduced

11  in the market that we were claiming we had a patent

12  on or we had a claim to.  And they were using it in

13  their "Toy Story 3."

14          So there was multiple of claim kind of

15  allegations going back and forth.

16          JUDGE SABRAW:  Mr. Nolan, if I could

17  interject, when you use the phrase "when we entered

18  the case," who are you referring to when you say

19  "we"?

20          THE WITNESS:  My apologies.  Skadden Arps.

21  Skadden Arps.

22          JUDGE SABRAW:  And were you associated with

23  Skadden Arps at that point --

24          THE WITNESS:  Yes, I'm sorry.

25          MR. BIDART:  You know, I just realized that

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Exhibit F - Page 259

Vol. II (273-562)        MGA v. Lexington, et al.                11/9/2010

                                                          Page 430

 1    I didn't get that in the chronology.  Your Honor,

 2    thank you.  I'm going to get that right now if you

 3    don't mind.

 4            JUDGE SABRAW:  Sure.  Thank you.

 5    BY MR. BIDART:

 6       Q.   Okay.  And I didn't have the presence of

 7    mind to continue on with your chronology of your

 8    employment history.  So tell us when you had first

 9    become involved with Skadden Arps.

10       A.   Okay.  I worked at Howrey & Simon for 12

11    years.  And I then joined Skadden Arps on

12    January 1st of the year 2004.

13       Q.   Okay.  And have you remained uninterrupted

14    at Skadden Arps since then?

15       A.   Yes.

16       Q.   Okay.  And you are a partner at Skadden

17    Arps?

18       A.   That's right.  And I -- and I am co-chair

19    of the West Coast litigation department of Skadden.

20    And I serve as one of the co-chairs of the National

21    Litigation Business Development Practice Group.

22       Q.   And worldwide, how many lawyers does

23    Skadden have?

24       A.   I think about -- I think 1900 lawyers, 24

25    offices.

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit F - Page 260

Vol. II (273-562)        MGA v. Lexington, et al.                11/9/2010

                                                             Page 431

 1      Q.    Okay.  And at the time that you came into

 2   this case, who was responsible at Skadden for

 3   assembling the lawyers, associates, partners,

 4   personnel for manning this case?

 5      A.    I was.

 6      Q.    Okay.  And to carry out that obligation --

 7   or that charge, what did you do?  How did you go

 8   about that?

 9      A.    Well, first of all, there was triage

10   involved in terms of trying to deal with the current

11   status of the litigation.  We needed to understand

12   what needed to be addressed immediately.

13          And, yes, we knew we had a trial, but we

14   also had ongoing discovery requirements and issues

15   and obligations.  And so we assessed where we stood.

16          I remember the first phone call that I had

17   the weekend after we entered the case with Mattel to

18   talk about open discovery issues, I was told that

19   there were 90 -- currently at that point in time

20   there were 91 open discovery matters that Mattel

21   were asserting against MGA in some form or fashion.

22   Many of them were in the stage of a motion to compel

23   pending in front of the discovery referee, Judge

24   Infante.

25          And so what I did was I decided to break

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit F - Page 261

Vol. II (273-562)         MGA v. Lexington, et al.                    11/9/2010

Page 432

```
 1    the team up into offense and defense units,

 2    offensive discovery and defensive discovery teams.

 3             I then, realizing that at the same time I

 4    needed to be getting the case ready for trial, I

 5    formed a team that would focus on the development of

 6    the experts, what experts we would need, what

 7    experts we would anticipate.

 8             And so I had a separate team that were

 9    looking at those issues.  And of course at night

10    they would all come back, and then we would all

11    huddle and compare notes.

12             I also had a writing team that was

13    established, a briefing team, so that we were not

14    being distracted from the onslaught of discovery

15    that was coming in from Mattel because they were

16    very effective in this regard.  And I had a separate

17    group that would be responding to the written motion

18    practice.

19             And I asked my partner Raoul Kennedy in

20    San Francisco to head up any arguments or hearings

21    that were had in front of Judge Infante, who was for

22    our purposes the court-appointed discovery referee.

23             And to the best of my knowledge, I think

24    during the period of time leading up to the time of

25    the trial, Mr. Kennedy handled some 83 separate
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit F - Page 262

Vol. II (273-562)        MGA v. Lexington, et al.               11/9/2010

Page 433

1   hearings in front of Judge Infante on discovery

2   disputes.

3           So I broke it all up into teams so that

4   everybody could keep the ball moving forward.  And

5   then I had ultimate responsibility, authority to

6   deal with the client, deal with the administrative

7   issues, but also get the teams communicating and

8   getting the case ready for trial.

9      Q.   And in connection with your dealings with

10  the client, who were the contact -- who was the

11  contact person or persons you were dealing with at

12  MGA in connection with your duties and

13  responsibilities?

14     A.   You know, from the very beginning I was

15  fortunate.  I always had access to Isaac Larian and

16  probably talked to Isaac Larian on a daily basis.

17  But also Craig Holden, who is general counsel -- I'm

18  sorry.  He was a -- he was an in-house lawyer.  I

19  think his title may have been, you know, vice

20  president of general counsel or whatever, whatever

21  that would be.

22          And then Jeanine Pisoni at some point in

23  time came in, was hired as the general counsel, and

24  I began dealing with Jeanine as well.

25          So it would be Craig on certain issues,

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 263

Page 434

1    generally getting bodies ready for presenting for

2    deposition and Jeanine for overall ideas of concepts

3    and things like that and Isaac dealing on a factual

4    basis.

5         Q.   And the time that this -- these discussions

6    were taking place at the beginning was roughly

7    October of 2007?  Did I understand correctly?

8         A.   Yes.

9         Q.   And at that time, is it the case that all

10   of your discussions concerning the financial

11   arrangement between Skadden and MGA and Isaac Larian

12   were without regard to any insurance coverage issues

13   for MGA for the matter?

14        A.   Yes.  That -- all of our arrangements were

15   with MGA and Isaac Larian without regards to any

16   insurance coverage.

17        Q.   Okay.  And at some point in time later on

18   during your involvement or handling of the matter,

19   the underlying matter on behalf of MGA and Larian,

20   did you become generally familiar with the fact that

21   there were some insurance issues floating out there?

22        A.   The -- yes, but I, in my first meeting --

23   not with you -- the first meeting wouldn't have been

24   with you.

25             At some point in time I realized that there

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 264

Vol. II (273-562)        MGA v. Lexington, et al.                11/9/2010

Page 435

1    was an ongoing insurance dispute.

2         Q.    Okay.

3         A.    And I can't recall specifically when I

4    first learned that.

5         Q.    Very well.

6              At any point in time when you first came

7    into this case, did MGA or anybody affiliated with

8    MGA advise you that you were going to be required to

9    comport with billing guidelines from any insurance

10   company?

11        A.    No, absolutely none.

12        Q.    Okay.  Was there ever --

13        A.    They mentioned their own guidelines.

14        Q.    Okay.  Let's talk about that next.

15             At any point in time did you have a

16   discussion with MGA regarding its own billing

17   guidelines?

18        A.    Yes.

19        Q.    And tell us what those discussions were.

20        A.    Well, they were ongoing.  The first

21   discussion occurred during the interview that I had

22   with Craig Holden and Isaac Larian about the matter.

23   And after the matter had been described to me, they

24   mentioned that there were some billing guidelines;

25   that they were not certain as to whether or not the

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 265

Vol. II (273-562)        MGA v. Lexington, et al.              11/9/2010

                                                         Page 436

 1   guidelines would apply in a complex case like this;

 2   and that one of the issues that, for instance, as an

 3   example, was block billing.

 4          And I remember it because I -- I turned to

 5   Craig Holden and Isaac Larian, and I said that I

 6   would not -- that I would not take the case on if I

 7   had to do block billing.

 8          And I think they were surprised by that.

 9   Q.   Do you mean by that, not being able to

10   block bill?

11   A.   Yes.

12   Q.   Okay.

13   A.   Oh, yeah, I'm sorry.  The reverse, yeah.

14          And that led to a discussion of the

15   guidelines.  Because I said that from where I was

16   looking at this case and I had been familiar with

17   guidelines in the past, that I would want to

18   understand more about these guidelines and see how

19   they fit the case going forward.

20          And Craig Holden and Isaac Larian assured

21   me that that would be the case.  Our retention

22   agreement makes reference to the MGA guidelines.

23   And -- but for the exception that was used for me in

24   the very beginning about not having to block bill,

25   in the beginning we used to have discussions on a

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**          Exhibit F - Page 266

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 437

1   monthly basis.

2           But when it came to around December or

3   January, we were facing a discovery cutoff date.

4       Q.   We're talking about December 2007 and

5   January 2008?

6       A.   Right.

7           We were facing a discovery cutoff date.

8   And Craig -- not Craig.

9           Surprisingly, Mattel made a motion seeking

10  to take 50 depositions over a three-week period of

11  time leading up to the discovery cutoff period of

12  time, which required us, I believe, to go to at some

13  point -- I may be wrong, and this may be an

14  exaggeration.  I apologize if it is.  But it seemed

15  like we were running six to seven tracks of the

16  deposition, and so I had to expand the team to take

17  care of that.

18          We objected to the depositions.  We told

19  Judge Larson that it was just, you know, litigation

20  by fire and a scorched earth and we've got to put a

21  stop to it.

22          Unfortunately, Judge Larson didn't see it

23  that way.  And so at that point in time that's when

24  the discussions with MGA became far more earnest

25  about the guidelines not being applicable and

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 267

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 438

1   thereafter really never had them, you know, restrict

2   us in that regard.  Because they're just -- they

3   were simply that.

4            And that's how I understood it, that's how

5   my team understood it, and that was that they were

6   to be guidelines.  I told the team to obviously keep

7   track of their hours to make it as clear as

8   possible.  To the extent you could honor the block

9   billing, try to.  But the biggest thing is we've got

10  a trial coming up, we've got a discovery cutoff, and

11  I don't want people bogged down on trying to record

12  the time by a particular unit.

13     Q.   Now, you indicated in your testimony that

14  at some point in time you established an original

15  team of people at the outset, but then it needed to

16  be expanded.

17            So tell us in your own words how many

18  people, roughly, were involved in the initial team

19  and then to what it expanded.

20     A.   You know, based on my experience on

21  handling big cases, I'm not a big proponent of

22  having as many lawyers working on a case because it

23  just exponentially adds to the management

24  requirements.

25            And so -- but in this case we became an

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 268

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 439

1    accordion in the sense that we would expand when we

2    had to take on the bandwidth of the case.  For

3    instance, we added more people in January where I

4    believe the bill was a very substantial bill.  And I

5    had communications with Isaac with respect to that.

6              I think that at some point in time we had

7    57, 60 lawyers around -- around the country

8    literally working on either getting prepared for a

9    deposition, defending a deposition, taking a

10   deposition, responding to interrogatories or

11   requests for admissions, to give you a sense of the

12   pressures that we were facing.

13             Mattel propounded --

14             JUSTICE WALLIN:  How many of those 50

15   depositions were taken?

16             THE WITNESS:  53.

17             JUSTICE WALLIN:  How many had any

18   significance in the actual trial?  I think you were

19   suggesting it was makework by the plaintiff's side.

20             THE WITNESS:  Many of it was -- was

21   unnecessary.  Unnecessary, maybe not in the fact

22   that they were taken initially, but they could have

23   probably been taken in two hours, but they would go

24   much longer than that.

25             And so it was clear to us that the other

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 269

Page 440

 1    side was not interested in the efficiency of moving

 2    the litigation as much as I thought they were trying

 3    to do is raise up the cost of Isaac's defense of the

 4    case.

 5            I'll give you --

 6            JUSTICE WALLIN:  I'm just sitting here --

 7    maybe all three of us are.  We've all been trial

 8    judges.  We've all been discovery referees.  And

 9    some of the testimony from earlier today, if I'm

10    reading it correctly, millions spent on

11    interrogatories.

12            When I get to be Emperor, they'll be

13    banned.  But I'm just -- I'm still in shock at how

14    little control it seems the Court exercised over

15    this whole process.

16            THE WITNESS:  I'm not in the business of

17    criticizing judicial officers, but the manner in

18    which this case was managed by the district court

19    was appalling.

20            JUSTICE WALLIN:  It seems like it's been

21    unfair to the insurers, to MGA, and everyone else,

22    and it's probably made this case what it has become,

23    incredibly expensive.

24            THE WITNESS:  Well, I'll give you -- I'll

25    give you one statistic, that to this day, I -- I'm

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit F - Page 270

Page 441

1   still blown away with.  We responded to 6,500 and --

2   -500 odd numbers of requests for admissions.

3          And then on the eve of trial, we were faced

4   with a motion by Mattel, which Judge Larson granted,

5   which required us to go back to all of the responses

6   in our interrogatories -- and the interrogatories, I

7   want to say, were multiple thousands -- and to list

8   by Bates number every exhibit, every document that

9   we were relying on in defense of the assertion that

10  we were making in answer to the interrogatory.  And

11  in any request for admission that we denied, we

12  would have to list the documents.

13         I had never seen that in any case.  And

14  I -- I assure you, we objected to it.  And I think

15  it led to, you know, a difficult relationship that I

16  had with the trial court.

17         JUSTICE STONE:  I might add at this time,

18  since Justice Wallin and I were on the appellate

19  court, we were in the business of criticizing

20  judicial officers.

21         JUSTICE WALLIN:  Yes.  We graded their

22  papers every day.

23         JUDGE SABRAW:  And I was only a recipient

24  of the criticism.

25         THE WITNESS:  All kidding aside, this was

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 271

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 38 of 486   Page ID
#:321666
Vol. II (273-562)        MGA v. Lexington, et al.                11/9/2010

Page 442

 1   an octopus of a case where we had no -- we had no

 2   referee that was helping contain -- contain the size

 3   of this case and had to expand in order to meet it

 4   because, if you are familiar with the Ninth Circuit

 5   argument -- or, I'm sorry -- the appellate decision,

 6   or, frankly, the decision by Judge Larson with

 7   respect to the injunction, many of the arguments

 8   that we made, which ultimately were the ones that

 9   the Ninth Circuit relied on, Mattel would take the

10   position that we had waived an objection.

11          And Judge Larson went along with that quite

12   a bit, which was shocking to us.  It was almost like

13   a default position.  And we saw that early on in his

14   rulings, and that's why we had to be even more

15   vigilant about not letting anything pass.  Because

16   he would -- he would nail us on a waiver argument.

17   So...

18          And, by the way, the 53 depositions, those

19   were the ones that were ordered in January.

20   BY MR. BIDART:

21      Q.   Just the tail end.

22      A.   That didn't include all the other

23   depositions that had been previously taken before

24   that.  That was just the last --

25          JUSTICE WALLIN:  How many depositions

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 272

Page 443

1  overall were taken in the case?

2          THE WITNESS:  You know, in Phase I -- I'm

3  sorry -- I'm not -- I'm not certain of that number.

4  Maybe someone else could -- I would -- my best

5  estimate would be somewhere between 80 -- while we

6  were on deck, probably 80 depositions.  I may be

7  wrong on that number.  I could obviously supplement

8  the record on that point.

9          JUSTICE WALLIN:  The judge you have now --

10  are you trying the case that's coming up now?

11          THE WITNESS:  I'm not.

12          MR. BIDART:  We're going to be getting to

13  that, your Honor, as part of the progression of the

14  litigation.

15          JUSTICE WALLIN:  It will be different --

16          THE WITNESS:  I know.

17          JUSTICE WALLIN:  -- with Judge Carter, a

18  lot different.

19          MR. BIDART:  May I proceed?

20          JUSTICE WALLIN:  Yes.

21          MR. BIDART:  Okay.  Thank you.

22          JUSTICE WALLIN:  I used to grade his

23  papers.

24  BY MR. BIDART:

25     Q.   You've mentioned Quinn Emanuel.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 273

Page 444

1           If you would, tell us -- had you had prior

2    dealings with the Quinn Emanuel firm when you

3    entered into this case?

4       A.   I did.

5       Q.   Okay.  And what dealings had you had?

6       A.   You know, I knew a few of the partners

7    there.  I knew John in a social context, but not

8    close at all.

9       Q.   John Quinn?

10      A.   John Quinn.

11      Q.   Yeah.

12      A.   I had litigated against John in a case

13   where I represented Rockwell International and he

14   was representing Hughes in a contract dispute.  And

15   so I was familiar with Quinn Emanuel.

16      Q.   And did you have a high regard for their

17   skills as trial lawyers and their level of

18   preparation of their cases?

19      A.   Absolutely, without a doubt.  Anything that

20   I've said that would suggest that I, you know, I was

21   being critical of their style or anything else like

22   that -- I may have a view about the way they do

23   litigation, but the quality of the lawyering is

24   first rate.  And my view is that it is the best

25   litigation firm in the country.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                     Exhibit F - Page 274

Vol. II (273-562)      MGA v. Lexington, et al.                    11/9/2010

                                                        Page 445

 1      Q.    And in connection with this case --

 2      A.    Second to Skadden.

 3      Q.    There we go.

 4            JUSTICE WALLIN:  That doesn't say much for

 5      your firm, Michael.

 6            MR. BIDART:  You're right.  Well, I don't

 7      profess to be in the same league, but --

 8      Q.    The number of lawyers -- did you have a

 9      rough estimate of the number of lawyers who were

10      involved in the team at Skadden -- at Quinn Emanuel

11      against you?

12      A.    Right.  You know, I said that we had

13      expanded to handle the extra depositions, but then

14      we came back and we cut back.  And I want to say

15      that our trial team ended up -- I may be wrong by a

16      couple of head counts, but I think it was like a

17      dozen to 15 lawyers, you know, coming in and out.

18            We got to know the Quinn team very well.

19      And I had been told that at one point in time

20      leading up to the trial that the Quinn firm had 60

21      partners assigned to the case.  And they had -- they

22      used contract lawyers quite a bit.  And they had a

23      vast army of lawyers on the other side, which was

24      evident by the number of lawyers that were in court

25      every day.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 275

Page 446

1      Q.   Now, how many partners were a part of your

2   team at the maximum?

3      A.    Three.

4      Q.   And those partners --

5      A.   Well, three in the courtroom:  Myself,

6   Lauren Aguiar, a lawyer from New York, and then

7   Raoul Kennedy.  Raoul came in for the damages.

8           I had -- I did have Jason Russell that

9   would write briefs, and Jason is a partner.  And

10  then I had David Hansen, who is a partner, who would

11  advise on copyright issues but was not an everyday

12  member of the team.

13     Q.   Okay.  So as far as everyday members of

14  your team, both before trial and during trial, fully

15  committed to this case were four people?

16     A.   Oh, no.  I'm sorry.  I would have to go

17  back.

18          If you included, Mr. Bidart, all the way

19  back into the pretrial phase, I had a number of

20  other partners dealing with it.

21     Q.   I see.

22     A.   But never up to the amount of 60.

23     Q.   Okay.  And at the time of trial, there's

24  been some discussion here in these proceedings to

25  date that there were 25 or so lawyers at trial from

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 276

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 43 of 486   Page ID
#:321671
Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 447

1    Skadden dealing with this case.

2              First of all, tell us what the compliment

3    of lawyers were that were involved in the trial on

4    behalf of MGA and Isaac from Skadden.

5         A.   To the best of my recollection, myself,

6    Lauren Aguiar were in court every day.  And then we

7    would have various other lawyers that would come in

8    for special assignments as the case progressed.

9              When we got to the damage phase, obviously

10   Raoul Kennedy and Carl Roth came in and dealt with a

11   number of the damage issues.  When there was a legal

12   argument that would be briefed and have to deal

13   with, it would be Jason Russell.

14             We did have a dispute that arose,

15   incredulously, that Mattel was trying to bring in

16   evidence of a dispute that Isaac had had with his

17   brother in a prior arbitration.  And I asked my

18   partner Jose Allen in San Francisco to deal with

19   that limited issue.

20             And then David Hansen, as I indicated,

21   would help on the jury instructions and on some of

22   the copyright issues.

23             Then we had a group of senior lawyers who

24   would be back at the hotel meeting with witnesses,

25   preparing outlines, and getting them ready for

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 277

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 448

```
 1   meeting with me either on the weekend before I was

 2   putting them on or the night before, depending on

 3   what that issue is.

 4           So it would be hard to say, Mr. Bidart,

 5   without reviewing the bills, to give you a

 6   compromise.  But everybody had a distinct role.  And

 7   if there were 25 people in a courtroom on any given

 8   day, I would be surprised.  But if they were, it may

 9   have been in the context of an opening statement or

10   a closing argument.

11           Typically we would ask the associate who

12   was most familiar with the record for a particular

13   witness if I was cross-examining someone or if we

14   had our witness on, I would want the associate who

15   was most familiar with the depositions and the

16   exhibits and the potential cross-examination points

17   to be available in the courtroom.  And sometimes

18   that was more than one associate, given the volume

19   of the issues that a particular witness may have to

20   carry.

21       Q.   When in time was the trial of Phase I?

22       A.   I believe that we started picking the jury

23   in early June of '08.

24       Q.   Okay.  Today do you recall having had a

25   discussion with me about what your life was like
```

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit F - Page 278

Vol. II (273-562)       MGA v. Lexington, et al.                11/9/2010

Page 449

 1   during that trial and an issue concerning your

 2   limitation of your time for your own billings?

 3        A.   Yes.

 4        Q.   Okay.

 5             I would like to make a disclosure for the

 6   record, and it's up to the Panel and subject to

 7   objection of counsel.

 8             For the first time today Mr. Nolan advised

 9   me that he brought along something that he had

10   created at the time and never had been asked to or

11   given to us before.  And I've created copies for

12   counsel.

13             And what it represents, the offer is, is

14   that it's contemporaneous entries made by Mr. Nolan

15   on a calendar -- these are copies -- of what he

16   would foundationalize of time he billed -- his own

17   personal time to explain his own involvement of the

18   case during the trial.  But it is a written record

19   of his time.

20             If you would like to see it, I would be

21   happy to show it to you.

22             MR. SHERIDAN:  Is it just the Mattel

23   litigation?

24             THE WITNESS:  It's just Mattel litigation.

25             MS. FIELD:  I would object.  I don't think

CONFIDENTIAL - ATTORNEYS' EYES ONLY                         Exhibit F - Page 279

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 450

1    it's relevant to the time period, nor do we doubt

2    that Mr. Nolan was heavily involved in the trial.

3              MR. BIDART:  Okay.  Very well.

4              JUSTICE WALLIN:  Is that outside the time

5    period?

6              MR. BIDART:  Actually, it is because the

7    time period of the billing for this case and the

8    offer is just the mentality of this person, this

9    lawyer, the way he was dealing with this case.

10   Because some of his billings are within the time

11   period.

12             MS. FIELD:  Later.

13             JUSTICE WALLIN:  Because we are all -- we

14   all tried lawsuits as lawyers, and I would think

15   we'd probably all stipulate that Mr. Nolan was very

16   tired after the trial.

17             MR. BIDART:  Very well.  I'll move on.

18             JUSTICE WALLIN:  Okay.

19   BY MR. BIDART:

20      Q.   Mr. Nolan, I would like to take a moment

21   just to establish something for the record having to

22   do with the billing practices that were employed at

23   Skadden for this particular piece of litigation.

24             First of all, who was responsible for the

25   bills that were sent from Skadden to MGA and Isaac

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 280

Page 451

1    Larian?

2         A.    I was.

3         Q.    And explain to us in your own words how you

4    carried out your responsibility for ensuring that

5    the billings were thorough, they were complete, and

6    they were fair.

7         A.    What would happen is at the end of the

8    month, a pre-bill would be prepared.  It would be

9    given to my assistant, and my assistant would send

10   it to various people, depending on, you know, their

11   expertise in the case.

12            For instance, Lauren Aguiar, who was my

13   chief of staff during the course of the trial, would

14   take a first stab and take a look at all of the

15   entries to determine whether or not the entries were

16   reasonable.

17            And then at the end of her review -- and

18   part of her review would be to reach out to the

19   various team members and ask them any questions that

20   she might have with respect to the billing entries.

21            And each month after she did that, Lauren

22   would meet with me during the trial.  It was at the

23   hotel.  And we would review the suggested write-offs

24   that she was suggesting.  And I would look at them,

25   I would approve them, and then the bill would be

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 281

Page 452

 1    prepared, a final bill would be prepared.  And then

 2    I would be presented the final bill.

 3          And then I would review it once again, and

 4    then I would sign it and send it out to MGA.

 5      Q.   Was that practice in keeping with your

 6    normal practice and procedure at your law firm for a

 7    case such as this?

 8      A.   Yes.  Most definitely.

 9      Q.   And the trial concluded approximately when?

10    When I say it concluded, Phase I of the trial was

11    approximately when?

12      A.   I'm going to go back if I can.  I just

13    remembered something.

14      Q.   Sure.

15      A.   The other review process that the bills

16    would go through would be our accounting department,

17    because Skadden has certain guidelines with respect

18    to expenses.

19          And if certain expenses by lawyers would

20    exceed some of the guidelines from Skadden, its

21    internal point of view, they would be written off

22    before the bills were ever sent out to MGA.

23          So I'm sorry.  What was the question?

24      Q.   That's good.  That leads me to my next

25    question.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 282

Page 453

         1              In the process, do I understand correctly

         2      from your testimony that it was routine for you

         3      to -- after conducting that review process you've

         4      just described, sometimes you would write off

         5      certain amounts before they would be sent to the

         6      client?

         7         A.   Oh, absolutely.

         8         Q.   Was that a common occurrence?

         9         A.   In this case?

        10         Q.   Yes.

        11         A.   Yes.

        12         Q.   Okay.  And -- go ahead.

        13         A.   Yeah, there were two accommodations.  There

        14      would be write-offs, and there would be a

        15      self-imposed cap that I imposed on my own time.

        16         Q.   Okay.  And the first phase concluded

        17      approximately when?

        18         A.   The first phase verdict was August 24th.

        19      My birthday was 27th.  I think it was the 24th or

        20      the 25th of August of '08.

        21         Q.   And just generally, in a nutshell, describe

        22      what the result was in the first phase.

        23         A.   You know, I'm sorry, Mike -- Mr. Bidart.

        24              The first phase has Phase I-A and I-B.  I'm

        25      sorry.

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit F - Page 283

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 454

1        Q.    Okay.  Describe those for us.

2        A.    So Phase I-A was to be the timing issue of

3    the creation of the Bratz doll and the drawings and

4    that type of thing.

5              And then Phase B or I-B would be the

6    damages, if any, that would flow from any liability

7    finding.

8              And so Phase I-A started in June, and I

9    believe that it lasted through somewhere near the

10   end of July of '08.

11       Q.    Thank you.

12             And there was also a component in the first

13   phase of an injunction, correct?

14       A.    Yeah.  There -- so let me make certain I'm

15   clear because I haven't been.  I apologize.

16             So when we talk about Phase I, there are

17   three phases in Phase I which is referred to as A,

18   B, and C.  Nothing unique about that.

19             Phase A, for lack of a better term, would

20   be the liability phase; the second, B, would be any

21   damages that would have flowed; and then C would be

22   the equitable phase of Phase I, which included the

23   injunction proceeding, the motion for appointment of

24   receiver, and that type of thing.

25       Q.    And just to speed through this, is it fair

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 284

Page 455

1    to say that the equitable proceedings were under

2    consideration and then ultimately imposed by the

3    Court in order to protect the judgment from the

4    other phase?

5        A.   Correct.  Yes, absolutely.

6        Q.   And as briefly as you can, explain what the

7    nature of the requested injunction and the granted

8    injunction was.

9        A.   The requested injunction, we lost Phase I

10   on the liability phase.  And on Phase II, jury came

11   back and awarded damages on various of the causes of

12   action.  The aggregate, if you added them up, which

13   Judge Larson did, turned out to be a hundred million

14   dollars.  Judge Carter subsequently kicked those

15   out.

16        And then the injunction phase, Mattel asked

17   for a constructive trust to be imposed on MGA and

18   Mr. Larian on all proceeds from the sale of Bratz

19   and on the Bratz model, the molds, the manufacturing

20   process, everything related to Bratz, including the

21   packaging and everything else like that.

22        And an injunction prohibiting MGA and Isaac

23   Larian from manufacturing and selling any Bratz

24   dolls, which we opposed vigorously and lost.  And

25   the Court imposed the constructive trust, issued a

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit F - Page 285

Page 456

```
 1   worldwide injunction.  We moved to stay the

 2   injunction.

 3           And he gave us a slight amount of relief to

 4   allow the retailers to sell out their inventory, but

 5   then imposed the injunction, the worldwide

 6   injunction, which was ultimately stayed and -- four

 7   hours after the Ninth Circuit argument.

 8           JUSTICE WALLIN:  So how long was that

 9   injunction in effect?  Because argument didn't take

10   place the following week, obviously.

11           THE WITNESS:  Yeah, no.  No.  And we moved

12   for an emergency stay.  And they denied the

13   emergency stay.

14           Interestingly, Judge Kozinski was on the

15   panel that denied the motion for the emergency stay.

16   And the opinion came down in July, July 22nd of the

17   year 2010.  And the injunction was issued

18   December 3rd of 2008.  So the injunction was in

19   place for a substantial period of time.

20           JUSTICE WALLIN:  Over a year and a half.

21   BY MR. BIDART:

22       Q.   Roughly a year and a half.

23       A.   Yeah, roughly a year and a half.

24       Q.   And during that period of time, Judge

25   Larson had appointed a receiver by the name of?
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 286

Vol. II (273-562)        MGA v. Lexington, et al.                11/9/2010

Page 457

 1      A.   He appointed a forensic examiner by the
 2   name of Ron Durkin.  And then he appointed -- in
 3   response to a motion for receiver, he appointed a
 4   monitor.  And his name was --
 5      Q.   Was it Patrick Fraioli?
 6      A.   Thank you.  Yes, Patrick Frioli.
 7      Q.   And did he order the parties to share in
 8   the costs of that?
 9      A.   Yes.  Yes, I believe he did.
10      Q.   In other words, the parties were ordered to
11   share the costs equally or was it imposed just on
12   MGA or do you recall?
13      A.   You know, as I'm sitting here -- I'm
14   sitting here --
15      Q.   It was only MGA?
16      A.   I'm not certain of that.  Although I -- I
17   have a visceral reaction that whatever the order
18   was, that we all thought that it was so -- it was
19   incredibly unfair, and Frioli would go in and then
20   sweep the profits of any sales that Mr. Larian had
21   from the Bratz dolls that were allowed under the
22   injunction.
23      Q.   Okay.  And so did there come a time after
24   the trial where you and your firm's role as the lead
25   counsel for MGA and Larian changed?

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 287

Page 458

```
 1       A.   Yes.

 2       Q.   When was that, approximately?

 3       A.   Shortly after the trial in September of

 4   2008, Mr. Larian and I came together, and the

 5   financial situation was just too enormous for,

 6   frankly, both of us.

 7            Skadden had been incurring a substantial

 8   account receivable.  I was personally getting a lot

 9   of pressure from the firm regarding the collection.

10   Mr. Larian was, you know, still battling with the

11   insurance companies.

12            And so there was a discussion about what we

13   could do, but that I had been told by my management

14   that we just couldn't continue to be a bank.

15            And so I talked to Mr. Larian, and it was

16   decided that Mr. Larian would attempt to get

17   additional counsel to step in and take the primary

18   role and responsibility for the litigation and to

19   take kind of me out of the hot seat and Skadden out

20   of the position of just a rolling account

21   receivable.

22            And that decision, I think, was made close

23   to the end of September, and -- but we agreed to

24   stay in for certain assignments where we remained in

25   the lead, including all of the oppositions to the
```

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit F - Page 288

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 55 of 486   Page ID
#:321683
Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 459

 1   motions for new trial and that -- all of the

 2   equitable relief in Phase I-C.

 3          And that we would continue to be -- I

 4   wouldn't say primary counsel, but it would almost be

 5   essential counsel on the appeal because all of the

 6   arguments that had been made before Judge Larson

 7   that had been briefed, had been briefed by Skadden

 8   Arps.  And I promised Isaac, as did my management,

 9   that notwithstanding the substantial account

10   receivable, that we would not abandon him.

11          JUSTICE WALLIN:  How high was your account

12   receivable at the highest point?

13          MR. BIDART:  That's what I'm about to get

14   to, right.

15      Q.   Why don't you share with the Panel your

16   accounts receivable at its highest point and what it

17   is today.

18      A.   I think our account receivable -- our

19   account receivable today is approximately

20   $24 million.  And it's probably -- that's probably

21   the highest -- it got to about the same amount right

22   after the trial.  I think that's where I -- I was at

23   about that number at the conclusion of the first

24   trial.  I may be a little bit off on that, but it

25   was a substantial amount of money.

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit F - Page 289

Vol. II (273-562)        MGA v. Lexington, et al.              11/9/2010

Page 460

1              And my best recollection is that as I was
2    coming back out of September, I was staring at an
3    account receivable of somewhere in the neighborhood
4    of $23 million.
5         Q.   At some point in time, then, did you have
6    discussions with Ms. Pisoni and Mr. Larian where you
7    took a lien interest, for lack of a better term, or
8    a security interest in the proceeds of any insurance
9    litigation to apply against your account receivable?
10        A.   Yes.
11        Q.   In fact, as we sit here today, does your
12   firm have dibs on the net proceeds of these
13   proceedings?
14        A.   Yes.
15        Q.   And notwithstanding the fact that MGA and
16   Isaac Larian owe you so much money, you've continued
17   to remain cooperative with them throughout in terms
18   of their defense of the case?
19        A.   Yes.
20        Q.   And when you had the discussions with MGA
21   and Isaac Larian, did you come into possession of
22   information that the rates charged by Orrick for the
23   lawyers handling the case were at levels somewhat
24   less than what Skadden was charging?
25        A.   My understanding, although I don't have

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 290

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 461

1   specific knowledge of their individual rates, that

2   my understanding was that it was substantially less

3   than what Skadden had been charging on our rates.

4        Q.   Okay.  And I know, because I sat next to

5   you at the oral argument in the Ninth Circuit, that

6   you were still involved.  But can you describe for

7   the Panel what role you had in connection with

8   assisting Josh Rosenkranz, who argued the case, and

9   the other appellate lawyers at Orrick.

10       A.   We -- because of our familiarity with the

11  record and the legal issues, I think it's absolutely

12  fair to say that although Josh Rosenkranz and his

13  team added value -- there's no doubt about that and

14  I'm not taking anything away from him, but equally

15  we were equally involved.

16            Jason Russell, who authored most of our

17  briefs and is a brilliant young lawyer, his

18  arguments were the cornerstone of every argument

19  that was made in the Ninth Circuit appellate brief.

20            Both -- and Jason worked with Josh

21  Rosenkranz on rewrites, edits.  I know for a fact

22  that no brief was ever filed without our editing,

23  sometimes substantial editing.

24            And that leading up to the argument, both

25  Jason and I participated in the mock appellate

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit F - Page 291

Vol. II (273-562)       MGA v. Lexington, et al.                    11/9/2010

Page 462

1   argument that was conducted and then met with

2   Mr. Rosenkranz immediately after those mock

3   arguments to give him more familiarity with the

4   record.

5           And if I might add, the reason why that was

6   the case is -- I go back to my example that this was

7   an octopus.  It would have been impossible for

8   someone making an argument who had not lived through

9   this to be able to instinctively remember issues.

10          And our whole goal here was to make

11  absolutely certain -- and this was at Isaac's

12  request and direction -- that the appellate lawyer

13  representing MGA be as prepared to address every

14  single issue that could come from that Panel because

15  of the injustice that we felt occurred at the trial

16  level.

17          And I think the best example would be that

18  most -- I'm sorry.  I get emotional when this comes

19  up.

20          When you compare the performance of

21  Mattel's appellate counsel, Dan Collins, who is a

22  terrific lawyer, just absolutely spectacular, and

23  Munger Tolles, spectacular law firm, they did not

24  have the command of the facts.  And so that when

25  Judge Wardlaw or Judge Kozinski asked a pointed

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 292

Page 463

1    question, Mr. Rosenkranz was able to answer that

2    question.

3              And we had a party at my house afterwards

4    and, you know, we weren't getting paid for this.

5    And he turned and he said, you know, that he had

6    never seen a relationship like this before, where we

7    were willing to hang in there and not let this case

8    go down.

9         Q.   In fact, in that connection, the trial

10   transcript which formed the basis of that appeal and

11   the appellate argument was how many thousand pages

12   long?

13        A.   Oh, my -- I mean, crazy.  I apologize.  I

14   should know that.  And the appendix was unbelievable

15   in terms of the amount of pleadings that had gone --

16   that made up this record.

17        Q.   At the end of the day when --

18        A.   I'm sorry.  And, of course, you know, I

19   pointed out earlier, the other problem was that we

20   made a motion to -- for an expedited -- I'm sorry --

21   for a stay of the injunction.

22             I said that it was denied.  I forgot to

23   mention that Judge Kozinski, because I did point out

24   that he was on the panel, Judge Kozinski expedited

25   the appeal and ordered a certain briefing schedule

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 293

Page 464

1    with the order that no extensions would be granted.

2           So it would have been virtually impossible

3    for the Orrick firm to do that without a complete

4    team effort by Skadden and Orrick.

5       Q.   And when you read the Ninth Circuit opinion

6    and the amended opinion that came out October 21,

7    2010, did you feel that the arguments that you and

8    your partners and others had made at the trial court

9    had been vindicated?

10       A.   Absolutely.

11       Q.   Okay.

12       A.   Especially Footnote 3.

13       Q.   And could you tell us about that.

14       A.   Footnote 3 is a footnote where on one of

15    the most important arguments in the case, Mattel was

16    intending that Skadden Arps had waived the argument.

17    And Larson had said that we had to waive the

18    argument I thought intellectually to avoid a very

19    tough issue, which Judge Kozinski did not have

20    trouble with at all.

21           And Footnote 3 says that we did not waive

22    that argument and it was well preserved.  And so

23    well preserved that my argument at the underlying

24    hearing was the final quote to the Ninth Circuit in

25    the closing -- in the argument.

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit F - Page 294

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 465

1            And Rosenkranz knew the record that cold in

2     order to be able to answer Kozinski's question on

3     that point.

4        Q.    And in connection with the work during the

5     period of time that you just described of bringing

6     the Orrick people up to speed, is that in the nature

7     of what are oftentimes referred to as transition

8     fees?

9        A.    Yes.

10       Q.    Okay.  And did you believe that that work

11    was essential to the successful outcome, that is,

12    the work of assistance that you gave to Orrick?

13       A.    Absolutely.  And by saying that I'm not in

14    any way taking away anything from them, but I don't

15    think anybody could have done it without a complete

16    full court press.  And the best evidence of that is

17    that Quinn Emanuel walks around blaming Munger

18    Tolles for losing the appeal.

19       Q.    And since the decision from the Ninth

20    Circuit came out, describe to us in your own words

21    what role you and your firm have continued to play

22    in connection with this litigation on behalf of MGA

23    and Isaac.

24       A.    We, you know, we continue to assist

25    whenever asked.  I'm proud that I work for a law

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 295

Vol. II (273-562)      MGA v. Lexington, et al.                    11/9/2010

 1   firm that, notwithstanding the fact that we're owed

 2   $23 million, would not tolerate us not responding to

 3   inquiries, one as recently as three weeks ago when

 4   they couldn't find exhibits to an expert report.

 5            And I called our technology person and woke

 6   them up and they came into the office and printed

 7   out the exhibits for Orrick so they could meet the

 8   expert date.

 9            No one has ever said, why are we still

10   doing this when we're not getting paid?  I mean,

11   they do -- my management asks me that question all

12   the time, but I wanted to assure you that --

13       Q.   And you're referring to then contact that

14   you were -- things you were doing for Orrick to

15   allow them to comport with Judge Carter's order?

16       A.    Correct.

17       Q.   And you've also spent time with me

18   telephonically and in meetings to prepare yourself

19   for today's proceedings, correct?

20       A.    That's correct.  But my most vivid memory

21   of a phone call with you was during the course of

22   trial when I was begging you to -- to call the

23   insurance carriers and ask them for $10,000 because

24   our expert from Navigant was telling me they

25   couldn't work anymore because their account

CONFIDENTIAL - ATTORNEYS' EYES ONLY                     Exhibit F - Page 296

Page 467

1    receivable was just too -- was growing.

2            And so that's -- I think that was one of

3    the first times I had a substantive conversation

4    with you.

5            And, yes, I've worked with you and answered

6    questions in preparation for these proceedings.

7        Q.   And you've never billed me or MGA for the

8    time you spent with me, correct?

9        A.   No.  No.

10       Q.   And I have my co-counsel here, who is

11   giving me some questions.  Excuse me.

12       A.   It was a luxury I enjoyed for many months.

13       Q.   He doesn't charge me either.

14           Thank you.

15           Mr. Nolan, you also have an appellate

16   department at Skadden Arps, do you not?

17       A.   Yes.

18       Q.   Okay.  And it's an excellent appellate

19   department, correct?

20       A.   Absolutely.

21       Q.   So why is it that your appellate department

22   didn't handle the appeal before the Ninth Circuit

23   without having to work with Orrick to do so?

24       A.   We believed after some serious

25   consideration that the -- this doesn't apply in

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 297

Vol. II (273-562)        MGA v. Lexington, et al.                11/9/2010

                                                              Page 468

 1    every case.  But there is a school of thought that

 2    the appellate counsel should not be trial counsel.

 3    And that -- and the same is true for the same law

 4    firm handling the appellate argument that handled

 5    the trial.

 6              There is some benefit to it, obviously.

 7    But in a case of such enormous importance, where the

 8    lifeblood of MGA was at stake, we did not believe

 9    that it would be fair for us to urge Isaac and MGA

10    to just stay within Skadden.  And that we supported

11    a search for somebody out there that we thought

12    would be able to resonate with the Ninth Circuit.

13              We did that similarly during the course of

14    the trial on a petition that we brought on a motion

15    for mistrial where we asked Jerry Falk to serve in

16    that role and to hopefully impress upon the panel

17    that special attention needed to be spent on this

18    case.  This was special.  And that -- and so we set

19    aside law firm branding, ego, and that's why we did

20    it.

21        Q.   And, in fact, Quinn Emanuel and Mattel did

22    the same by going to Munger Tolles for the appeal?

23        A.   Absolutely.  Much to the chagrin, I

24    believe, of John Quinn.

25              JUSTICE WALLIN:  I have to say as someone

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit F - Page 298

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 469

```
 1    who spent a little bit of time in an appellate court
 2    that I think it's wise to have a different law firm
 3    and different lawyers do an appeal.  And my good
 4    friend and former teaching partner at SC, Ellis
 5    Horvitz, made a great living at this for many, many
 6    years.
 7              THE WITNESS:  Amen.  He did.
 8              JUSTICE WALLIN:  Ellis is a very close
 9    friend, actually.  And he did that because he gave a
10    fresh look.
11              And I don't know about your office, Mike,
12    if you handle --
13              MR. BIDART:  No.  Well, Ellis has beaten me
14    plenty of times.
15              JUSTICE WALLIN:  Okay.  That's right.
16              But I think many firms after a complex
17    trial select someone else to handle the appeal.  And
18    I think that is a wise thing, to have someone take a
19    fresh look, because you get so wedded to what you
20    did as a trial lawyer and someone -- sometimes are
21    blinded to another issue or blinded to something you
22    missed.
23              THE WITNESS:  Correct.  Correct.
24              JUSTICE STONE:  It's a widely held school
25    of thought.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 299

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 470

 1            JUSTICE WALLIN:  Yeah.

 2            Among appellate justices I think that would

 3   be considered a wise decision, yeah.

 4            THE WITNESS:  But the trial counsel always

 5   reserves the right to take credit for the victory.

 6            JUSTICE WALLIN:  Absolutely.

 7            THE WITNESS:  I'm sorry.

 8            MS. FIELD:  And blame somebody else for

 9   their loss.

10            THE WITNESS:  Absolutely.

11            JUSTICE STONE:  Ellis Horvitz has made a

12   good living off of you, Mr. Bidart.

13            MR. BIDART:  His wine cellar is a lot

14   better than mine, I know that.

15            JUSTICE WALLIN:  It certainly is, I'm sure.

16   BY MR. BIDART:

17      Q.   And so, Mr. Nolan, you -- was there ever a

18   hope on your part that you were going to be able to

19   be the trial lawyer once again for the retrial?

20      A.    I never doubted for a moment that I

21   wouldn't be the trial counsel in Phase II if the --

22   if the financial arrangement could be made to allow

23   us to re-enter the case, because the issues are so

24   similar to what we tried, especially now after the

25   case has been reset by the Ninth Circuit, if you

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit F - Page 300

Page 471

1   would.

2       Q.    But as we sit here today, that's not the

3   plan, correct?

4       A.    That's correct.

5       Q.    And as a result of your handling of this

6   case, notwithstanding everything you've talked about

7   and the financial issues and everything else, do you

8   consider yourself to have Mr. Larian as your friend?

9       A.    Yes.

10      Q.    And --

11      A.    I -- on a personal approach, I had my

12  daughter's 21st birthday in Washington, D.C., and I

13  never knew that college students could have so many

14  friends that would want a free dinner.  And I was

15  standing outside the dinner at the announced time

16  and my daughter came in and it was obviously an

17  important evening for her.  And I was on the phone.

18  Isaac was in Hong Kong.

19          And she came walking in and she said, "Dad,

20  you're on the phone."

21          And I said, "It's Isaac."

22          And she goes, "Oh, say hi to Isaac," and

23  walked in.

24          I consider myself a friend of Isaac and so

25  does my family.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 301

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 472

1        Q.   And in connection with all of the services

2    rendered by your firm on behalf of MGA and Isaac

3    Larian, and as a person responsible for all of the

4    charges and the billings and the things you've

5    described here and your role over all those months

6    and years in this case, what is your feeling as to

7    whether or not the charges that were charged to MGA

8    and Isaac Larian from Skadden -- is it your opinion

9    that those charges were reasonable and necessary for

10   the defense of the case?

11            MS. FIELD:  Objection.  This witness wasn't

12   called as an expert.  He wasn't -- we didn't have a

13   report.  We didn't depose him.  I would object to

14   this.

15            JUSTICE WALLIN:  Okay.  Sustained.

16            I think I know what he would say anyway.  I

17   don't think he's going to say, no, we overbilled

18   them.

19            MR. BIDART:  That's right.  Thank you.

20            You're going to be, I'm sure, asked

21   numerous questions about various issues, clerical,

22   Canada litigation and other things on

23   cross-examination.  So I'm going to turn you over to

24   counsel for cross-examination.

25            Thank you very much, Mr. Nolan.

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Exhibit F - Page 302

Page 473

1           JUSTICE WALLIN:  All right.  Mr. Nolan --

2           Why don't we take a break until about

3     three o'clock.

4           (Off the record from 2:51 p.m. to

5           3:12 p.m.)

6           JUSTICE WALLIN:  All right.  Back on the

7     record to cross-examine Mr. Nolan.

8           Go ahead, Ms. Field.

9           MS. FIELD:  Thank you.

10

11                    CROSS-EXAMINATION

12    BY MS. FIELD:

13    Q.   Good afternoon.

14    A.   Good afternoon.  How are you?

15    Q.   I'm good, thank you.  How are you?

16    A.   Good.

17    Q.   Let me start out by basically saying that

18    we've all appreciated the information you gave us

19    about the case.  Some of us have been involved

20    longer than others.

21          It's a huge case.  It's a very difficult

22    case.  No question about it.  It's much bigger than

23    any case that I've ever been involved in.  And

24    you've covered a lot of ground, and I'm going to try

25    my best -- I'm a little intimidated by asking you

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit F - Page 303

Page 474

```
 1   questions, but I'm going to try my best.

 2       A.    Seriously?

 3       Q.    Come on, you're you.

 4       A.    I'm intimidated.  I'm not usually

 5   cross-examined.

 6       Q.    Wait a minute.  You have daughters.

 7       A.    Please.  That's true.  That's true.

 8             MR. BIDART:  Other than his wife.

 9             JUSTICE STONE:  I thought you were bringing

10   John Quinn in to do this.

11             MR. BIDART:  That would be great.

12             THE WITNESS:  That would be fine.

13   BY MS. FIELD:

14       Q.    I have daughters.  I know you have been

15   cross-examined.

16       A.    This is the one that I'm worried about.

17       Q.    So anyway, bear with me.  I'm going to try

18   my best.

19             First of all, let me make sure a couple of

20   things.

21             You understand, don't you, that the bills

22   at issue in this case range from about September 30,

23   '08, through April sometime of 2010?

24       A.    Right.

25       Q.    Okay.  So a lot of the things that we were
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 304

Vol. II (273-562)        MGA v. Lexington, et al.               11/9/2010

Page 475

1    talking about earlier that you were discussing with

2    counsel, those are bills that predate

3    September 30th, '08, right?

4        A.   Actually, I think the way I described it is

5    I know the limited period that we're dealing with

6    here.  Unfortunately, I can't limit my emotional

7    responses to a particular quarter of the year.

8        Q.   No.  And I understand that.  And I also

9    understand that having the background to this case

10   is very important to the Panel.

11       A.   But I understand your focus.

12       Q.   But when we get down to talking about the

13   invoices, I need to make sure that we're all clear

14   that the period of time is a limited one.

15            And I think that one of the things that you

16   commented about at the -- sort of toward the end of

17   the direct examination had to do with the --

18   Skadden's outstanding receivable.  And I think you

19   told us that it was $24 million, give or take,

20   around September of '08; is that correct?

21       A.   You know, that's what it is today.  And I

22   have this vague recollection, Ms. Field, that it was

23   around $23 million as of September.  But if you had

24   a document that would refresh my recollection on

25   that -- I know it was really large.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 305

Vol. II (273-562)       MGA v. Lexington, et al.                    11/9/2010

Page 476

1       Q.   Right.  So it was somewhere around 23,

2    24 million in September '08, and it's around 23,

3    $24 million today?

4       A.   That's my best recollection.

5       Q.   And I think you told us that Skadden -- I

6    think several times you said that Skadden is not

7    being paid.

8            But it's true, isn't it, that Skadden has

9    been submitting bills to MGA for its work since

10   September of '08 up through now, right?

11      A.   Oh, yes.

12      Q.   Okay.

13      A.   We just haven't been -- we haven't received

14   payments on all of those bills.

15      Q.   On all of them.

16           But Skadden has been paid for some of them,

17   correct?

18      A.   Some, but not many.

19      Q.   Are you aware as to the fact that the

20   amount of Skadden bills at issue in this arbitration

21   is about a million and a half dollars?

22      A.   That's the approximate amount that I was

23   told.

24      Q.   Okay.  So that --

25      A.   It's in that range.

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 306

Page 477

1      Q.   So the 23 or $24 million is not related to

2   anything that's involved in this arbitration?

3      A.   I can't answer that question because I

4   think some of the 1.3, 1.4 obviously would be

5   included in the amount that I was referring to as

6   being still outstanding.

7      Q.   Now, I think you said you were the billing

8   attorney in connection with this matter?

9      A.   Yes.

10     Q.   Is that what they call it at Skadden also,

11  call it the billing attorney?

12     A.   They call it the engagement partner, and

13  the engagement partner generates the billing

14  partner.

15     Q.   And is the engagement partner usually the

16  one who perhaps has signed the retainer agreement?

17  Or was it -- could be anybody?

18     A.    In this case it was me, and I signed it in

19  the capacity of -- as the engagement partner.

20     Q.   Now, I think we -- I think you talked about

21  the retainer or the engagement letter, but I'm not

22  sure that we ever actually took a look at it.

23            So if we could bring up Exhibit 95.

24            (Exhibit 95 first referenced in

25            Volume II of the proceedings.)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 478

1              MS. FIELD:  You know, I could see it a lot

2       better when I was in the other seat.

3          Q.    You recognize this document?

4          A.    Yes, I do.

5          Q.    Okay.  If you turn to the last page,

6       signature page.  One more back, I think.

7          A.    Yeah, that's my signature.

8          Q.    Is that your signature?

9          A.    That's my signature.

10          Q.    And I think that earlier you indicated that

11       you had spoken with both Mr. Larian and Mr. Holden

12       in connection with your initial retention?

13          A.    Correct.  I did.

14          Q.    And this document that we're looking at,

15       Exhibit 95, that was a document initially drafted by

16       you or by someone in your firm?

17          A.    By -- it's actually almost a template, if

18       you would, of retainers that get adjusted, depending

19       on a particular matter.

20          Q.    So --

21          A.    But I was responsible for the drafting or

22       making any modifications to the template.

23          Q.    So Skadden has a, essentially a set of sort

24       of approved engagement letters which then get

25       adopted or adapted, depending upon the nature of the

Page 479

1    case?

2        A.    Correct.  Yes.

3        Q.    And you were the one who essentially edited

4    and adapted that letter to this case?

5        A.    Yes.

6        Q.    Other than yourself at Skadden, does -- is

7    there a committee or anybody else who has to approve

8    retainer letters?

9        A.    Yes.

10        Q.    And who is -- well, at the time, how large

11    a committee is that?  I guess that's October of '07.

12        A.    You know, I can't -- I don't know how large

13    the committee was at that time, but it was -- this

14    retainer provided for -- I think the only adjustment

15    this retainer -- I'm sorry -- this engagement letter

16    provided was a 10 percent discount.

17            And if my recollection is correct, I could

18    get that approval for a 10 percent discount from the

19    client committee representative, who at the time I

20    believe was Nick Saggese in the Los Angeles office.

21        Q.    This retainer at page 2 has a section

22    called "Retainer and Billing."

23            Do you see that?

24        A.    I do.

25        Q.    So then this retainer refers to a $500,000

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 309

Vol. II (273-562)       MGA v. Lexington, et al.                    11/9/2010

Page 480

1    retainer.

2            Was that standard at Skadden, or was that

3    something specially negotiated?

4       A.   It certainly was not standard.  And it was

5    an amount that I quoted.  I don't recall it being

6    negotiated.

7       Q.   And then the last line of that paragraph

8    states that the terms of the MGA billing policy is

9    incorporated by reference into this agreement.

10           Do you see that?

11      A.   That's correct.

12      Q.   And you discussed with Mr. Bidart a little

13   earlier today about a discussion you had about the

14   billing policy with I believe Mr. Larian and

15   Mr. Holden.

16           Am I correct on that?

17      A.   That's correct.

18      Q.   And the billing policy that's referenced

19   here is incorporated, but it's not attached.

20      A.   That's correct.

21           MS. FIELD:  Could -- could you bring up for

22   me Exhibit 300.

23           (Exhibit 300 first referenced in

24           Volume II of the proceedings.)

25           ///

CONFIDENTIAL - ATTORNEYS' EYES ONLY                          Exhibit F - Page 310

Vol. II (273-562)        MGA v. Lexington, et al.              11/9/2010

Page 481

 1    BY MS. FIELD:

 2        Q.    This is a document that bears the title

 3    "MGA Entertainment Billing Policy -- All

 4    Mattel-Related Litigation."

 5        A.    Yes.

 6        Q.    Have you seen this before?

 7        A.    I have.

 8        Q.    Okay.  Do you think that this is the

 9    document?  Although I will point out that it does

10    say Pisoni.  And I will point out that this may not

11    be the exact document.

12            But was the billing policy that you saw

13    something called "MGA Entertainment Billing

14    Policy -- All Mattel-Related Litigation"?

15        A.    Not that I recall.

16        Q.    Okay.

17            Could you bring up Exhibit 241.

18            (Exhibit 241 first referenced in

19            Volume II of the proceedings.)

20    BY MS. FIELD:

21        Q.    This one is just "MGA Entertainment Billing

22    Policy."

23            Is that the one you recall seeing?

24        A.    You know, to the best of my recollection,

25    this is the one that I remember talking generally

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Exhibit F - Page 311

Vol. II (273-562)        MGA v. Lexington, et al.              11/9/2010

Page 482

1    about with Mr. Holden.

2        Q.    And the -- I keep calling it a retainer

3    letter.  You've called it an engagement letter.  But

4    Exhibit 95.

5             Could we have that back.

6        A.    I -- may I add, Ms. Field?

7        Q.    Sure.

8        A.    I'm not certain that on the date that I

9    signed the engagement letter and -- that we actually

10   physically had a copy of the MGA billing guidelines.

11           I had discussed the guidelines generally

12   with Mr. Holden and that there had been an agreement

13   to, you know, make reference to these guidelines and

14   that we would work through them as we better

15   understood what the outstanding areas of

16   responsibility would be in the case.

17       Q.    I was going to ask you that.  So I'll --

18   maybe I'll get back to that later or maybe I'll skip

19   it.

20           But in terms of the incorporation, are you

21   telling me that at this time you don't think you

22   actually had seen and reviewed any of the billing

23   policies; you just knew that they existed?

24       A.    I had reviewed them orally with Mr. Holden

25   in a general sense, but did not -- I don't have a

CONFIDENTIAL - ATTORNEYS' EYES ONLY               Exhibit F - Page 312

Page 483

```
 1   present recollection of having gone through them
 2   line by line.  Because if I had, I would have had
 3   an -- I would have edited like I typically do.
 4           But my -- my discussions with Mr. Holden
 5   had indicated to me that the guidelines, you know --
 6   we would get familiar with the guidelines as we went
 7   along.
 8           And then ultimately the guidelines really
 9   never played much of a role in how we managed the
10   case, frankly, because they didn't have an
11   application to what we were doing.
12      Q.   Now, when -- just generally, though, when
13   you're doing a retainer letter or engagement letter,
14   the purpose of it is to document the agreement
15   between the client and the lawyer, right?
16      A.   That's correct.
17      Q.   And it's important, you'd agree, that the
18   retainer letter accurately set forth what the
19   agreements are, correct?
20      A.   Oh, absolutely.
21      Q.   So -- and it's a contract, obviously,
22   between the lawyer and the client, correct?
23      A.   Absolutely, but the guidelines were --
24      Q.   Just generally, I mean.
25      A.   Yeah.  Of course.  Of course it's a
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 313

Vol. II (273-562)      MGA v. Lexington, et al.              11/9/2010

Page 484

 1   contract.

 2        Q.    Sure.

 3              So at any point in time when you were

 4   drafting this contract, did you consider the fact

 5   that -- for example, I think you indicated that you

 6   were going to get a dispensation not to block bill,

 7   that that should be in this retainer agreement?

 8        A.    No.

 9        Q.    That was never discussed?

10        A.    That it would be included in the retainer

11   agreement, no, because we had already discussed that

12   there were guidelines that were in place, that we

13   would agree to incorporate them by reference in the

14   agreement, but that the understanding would be that

15   those guidelines were simply that; they were

16   guidelines.

17              And all we did, as I understood the

18   agreement that I had with MGA, is that we would work

19   in good faith to have those guidelines applied in a

20   way that was satisfactory and met the goals that MGA

21   had in terms of, you know, controlling their costs.

22              And I would have conversations on a monthly

23   basis with both Jeanine Pisoni and/or Craig Holden

24   on those issues.

25        Q.    So the idea was essentially they described

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**               **Exhibit F - Page 314**

1  to you generally what the billing guidelines were,

2  correct?

3      A.   Correct.

4      Q.   And I guess they mentioned the

5  block-billing issue to you, correct?

6      A.   Yeah, they did.

7      Q.   And did they -- did you have any discussion

8  about the fact that the bills should be clear and

9  not vague?

10     A.   I don't remember that because I would love

11 to be able to meet with a client who wouldn't

12 require that from me otherwise.

13     Q.   Right.  Because regardless of whether they

14 said so, you would understand that the bills that

15 you should submit to a client should be clear and

16 accurate and set forth what somebody did in a way

17 that somebody would understand that it was worth

18 paying your firm the billable hour rate that they're

19 paying you, right?

20     A.   Absolutely.  But the other thing was that

21 in this case we were working closely with, you know,

22 Mr. Holden.  This was an ongoing matter.

23          I have clients that don't pay much

24 attention to what's going on during a particular

25 month, and the first time they learn of anything is

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 315

Page 486

1    in the context of receiving a bill.

2            But in this case, this was more -- this was

3    more live time, real time -- that's what I want to

4    say -- in terms of -- I think Mr. Holden and

5    Ms. Pisoni certainly understood the nature of what

6    people were doing.  And they would call occasionally

7    and ask me if they had a question, and I would

8    answer them.

9            But I'm not disagreeing with you at all.  I

10   knew it was our obligation to have billing entries

11   that would be -- would be clear, and I think we

12   issued those.

13       Q.   When you had this initial conversation with

14   Mr. Holden and I guess Mr. Larian about the billing

15   guidelines and your concern about the block-billing

16   entries, did you raise any other concerns about any

17   particular portions of the billing guidelines?

18       A.   The -- I remember generally talking about

19   that it was difficult for us to estimate what the

20   size of the problem was.

21           I recall that Isaac told me that he had

22   interviewed a few other law firms and that they --

23   all the law firms said they would come in if they

24   could get a stay from Judge Larson and -- before

25   they would accept the responsibility.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit F - Page 316

Page 487

```
 1            And I remember saying to Isaac that I did
 2    not think that that was in -- even in the cards with
 3    Judge Larson and that we had to commit to jump into
 4    the fire pit with him.  And that we would grow into
 5    the case from a staffing point of view.
 6            And that's why the guidelines were,
 7    although important, were fluid in the sense of we
 8    both needed to understand what was going to be
 9    necessary because it was also discussed at that
10    point in time that it was not clear to them all of
11    the open items in discovery and that I needed to do
12    that as Task No. 1.
13       Q.   And that was all the conversations
14    generally leading up to the fact that you were
15    coming in in October of '07, that the trial was set,
16    that things were going kind of crazy, and you guys
17    needed to come in and get up to speed, correct?
18       A.   Correct.  And although there was a trial
19    date that -- you know, not surprisingly, there was a
20    motion date for summary judgments to be filed.
21    Close of discovery deadlines were set.  And so we
22    had a limited period of time, especially with the
23    close of discovery.
24            I remember that the discovery cutoff was
25    the most -- the most dangerous for us, the most
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 317

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 488

1   intimidating because we did not know what the state

2   of the discovery records looked like.

3        Q.   And I think you told Mr. Bidart that when

4   you came in, the case was in, I think what you said,

5   full-bore and that you had to kind of jump in.

6             As of that date, the case had been going on

7   for a long period of time, and the issues had been

8   handled either by O'Melveny or the Christensen firm

9   or both, correct?

10       A.   That's correct.

11       Q.   So that when you came in, you had to

12   basically pick up the case and relearn whatever they

13   had done in order to move forward, correct?

14       A.   Yes.

15       Q.   And at some point other firms took over the

16   position that you were in, and they had to relearn

17   what you knew, correct?  Orrick has come in.

18       A.   Yeah, but they had a different -- they had

19   an advantage.

20       Q.   And their advantage was they had you?

21       A.   They had Skadden.

22       Q.   Right.

23       A.   Answering their phones.

24       Q.   And Orrick has been working on this case

25   pretty nonstop as well since they got involved.  Are

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**        Exhibit F - Page 318

Page 489

1    you aware of that?

2         A.   Correct.   That's -- I'm aware of that.

3         Q.   And so they've done huge amounts of

4    discovery.   They've handled large numbers of motions

5    as well.

6         A.   Correct.

7         Q.   And so if -- if they then turn it back over

8    to your firm, you'll have to come in and relearn

9    some of the stuff they've done, right?

10        A.   Well, as -- as we discussed -- I don't know

11   if you were on the phone, Ms. Field, when we made a

12   proposal as to how we thought it was more efficient

13   for Skadden to come into the case, as we pointed out

14   that as a result of having to transition to Orrick

15   and being an equal partner on the appeal and,

16   frankly, the authors of many of the key arguments in

17   the case and handling the key witnesses in the case,

18   that our familiarity with the record already was

19   substantial.   And that the additional learning

20   costs, frankly, might benefit the insurance by

21   allowing Skadden to come back in.

22        Q.   So during the entire time that Orrick has

23   been involved, then, your firm has also been

24   involved learning the issues in the Phase II

25   discovery and being involved in motions and things

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 319

Vol. II (273-562)        MGA v. Lexington, et al.                 11/9/2010

Page 490

1   like that?

2       A.   No.  I don't -- if that's -- if that's how

3   you interpreted what I said, then I was not as clear

4   as I meant to be.

5           We're not -- I wouldn't describe this as --

6   we're not in a training wheel relationship with

7   Orrick in the sense of just kind of shadowing them.

8           What we do for Orrick, and any other firm

9   that was looking at these issues, is when they were

10  dealing with an issue, rather than simply pointing

11  them to the record in the first phase and say, go

12  find it -- and oftentimes it would be literally a

13  needle in the haystack -- we would be an adjunct to

14  them in terms of trying to add to the efficiency of

15  the work to make certain that they knew what we knew

16  about the record.

17          And oftentimes we have a better and more

18  robust database than any of those law firms had.

19          And so we were being asked a lot of times

20  to run particular searches on a particular fact.

21  And what was developed in the first phase, how does

22  it impact the second phase?  And the only way I

23  think Orrick would have been able to do that

24  probably would have been, you know, to double the

25  staff that they have assigned to this case.

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 320

Page 491

1     Q.    Now, I'm somewhat confused about the timing

2   you're talking about.

3           Is that information you've been providing

4   to Orrick on the Phase I case through today?

5     A.    Yes.

6     Q.    And your firm has also been involved, if I

7   understand correctly, in the Phase II activities;

8   isn't that true?

9     A.    To the extent that we are asked to review

10  and edit arguments or motions that are being filed,

11  oppositions, for instance.  I'll give you -- if I

12  can give you one example that might explain.

13          With respect to the summary judgment

14  motions that were being filed for Phase II, to the

15  extent that they adopted arguments or referred to

16  arguments that had been already dealt with in

17  Phase I or raised by us in Phase I, then generally

18  Jason Russell or Hillary Hamilton or Jennifer del

19  Castillo or myself would be asked to review the

20  opposition to make certain that it did not in any

21  way interfere with or be contrary to positions that

22  were asserted in the first phase.

23          Because up until very, very recently the

24  Ninth Circuit had in front of it a very robust

25  petition for rehearing and hearing -- and hearing en

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 321

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 492

1    banc suggestion.  And it was very, very important

2    for all of us to make certain that an argument

3    wasn't being made without the benefit of everybody

4    who had lived through and contributed to the

5    arguments.  Okay.  That's just one example.

6        Q.   I appreciate that, and I may not have asked

7    my question artfully.

8             I guess my question is, then, your firm has

9    not been involved in the Phase II discovery specific

10   to the Phase II issues; is that correct?

11       A.   We've not initiated discovery, nor have we

12   responded to any discovery related to Phase II.

13            To the extent that any of the Phase II

14   would have overlapped with discovery in Phase I, we

15   would have been asked to deal with it.  And by way

16   of example on that, I think there were motions

17   regarding motion to compel further discovery of

18   Mr. Larian's hard drive.

19            And so there was an issue as to whether or

20   not we had imaged the hard drive in Phase I.  And if

21   we had, could we give the tracking numbers as to

22   what was imaged out of Phase I to counsel for Orrick

23   so that they were not dependent on being across the

24   table from Quinn Emanuel saying, oh, that was dealt

25   with this way in Phase I.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 322

Page 493

1            Does that help at all?

2       Q.   Yes.  Okay.  Let me go back --

3       A.   But we've never taken a deposition in

4   Phase II.

5       Q.   Okay.  And/or argued motions in connection

6   with Phase II?

7       A.   Correct.

8       Q.   That's all -- the Phase II stuff primarily

9   has been Orrick since Orrick became involved?

10      A.   Absolutely.

11      Q.   Before it became involved, it was for a

12  period of time Mitchell Silberberg; and Glaser?

13      A.   Right.  But I don't think a lot of work had

14  been done in Phase II by those firms.  There was a

15  transition period at that point in time.

16           But the real -- and I -- because I thought

17  there was a stay of discovery for Phase II finally

18  entered.  And that Orrick basically has primarily

19  been the one that's been pushing Phase II.

20      Q.   You walked us through, I think, the process

21  at Skadden or the process you used for the issuance

22  and review of monthly invoices or of bills.

23      A.   Yes.

24      Q.   And I think that -- and I may have

25  misunderstood because I think that I thought you

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 494

 1    were talking about during the trial period.

 2            But it appears to me that the general

 3    practice is a pre-bill gets issued.  It goes to

 4    you -- correct? -- as the billing lawyer or the --

 5        A.   That's correct.

 6        Q.   Okay.  And then --

 7        A.   I wasn't limiting my answer, and if I did,

 8    I apologize.

 9            I have continued the policy that I've

10    described earlier throughout the -- my handling of

11    the engagement for Skadden of MGA and Isaac Larian.

12        Q.   So if a bill comes in, the pre-bill comes

13    out -- I don't know what the day is, but it came out

14    earlier, probably in the last couple of weeks --

15        A.   It hits my desk.

16        Q.   -- for the month before.  It hits your

17    desk.  You take it.  And I think you said you give

18    it over to someone else to sort of parcel out

19    portions to take a look at; is that correct?

20        A.   Yeah, at various times during the case.

21    For instance, during the trial, I would have Lauren

22    Aguiar review and make suggested changes.

23            Now Lauren has not been involved and that

24    it's more Jason Russell.  And I will ask Jason

25    Russell to take a look at it in order to give me his

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 324

Page 495

1   views as to whether or not the time devoted by

2   associates that may have been under his direct

3   supervision was reasonable.  Jason would make edits

4   or comments, and then he would give them back,

5   review them with me.

6           So it would be a series of people,

7   depending on what roles they were playing at various

8   stages.  But I ultimately bear the responsibility of

9   approving the bill and sending it out.

10     Q.   And so I -- if you give it to Jason, I

11  presume he also looks at his own time to make sure

12  that it reflects what it is he had written down on

13  his time sheets or however Skadden does it?

14     A.   Correct.  And there are times that I would

15  give it back to Jason and ask him to try to unblock,

16  you know, the time.  Especially as we got out of the

17  trial.

18     Q.   And I was going to ask that question.

19          Did the practice change at any time

20  specifically after the trial, when things began to

21  settle down, as to how the bills were handled?

22     A.   It was more -- the answer is no.  It was

23  more in response to inquiries that we were receiving

24  from MGA.  And as I've understood it now, from -- I

25  guess that started off with the -- started from the

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**              Exhibit F - Page 325

Page 496

1    insurance companies asking us.

2        Q.    Do you keep the draft bills, the ones with

3    the edits on them or the notes on them?

4        A.    No, not the -- no.

5        Q.    Do you know what happens to those?

6        A.    I suspect they get thrown away.

7        Q.    I suspect so too.

8              Now, you also -- I think you told us --

9        A.    And I -- I apologize.

10             Because any final edits would be included

11   in the final billing statement that would go out.

12   Although the client would not know what we had

13   already written off.

14       Q.    And your internal records, I guess, would

15   reflect how much time you wrote off, as we call it,

16   before the pre-bill goes out?

17       A.    Correct.

18       Q.    And do you have any idea as you sit here

19   today how much time has been written off by Skadden

20   for the invoices that were ultimately -- or the time

21   that went into the computer that didn't go out?

22       A.    Over the course of the engagement?

23       Q.    Sure.

24       A.    I believe it is in excess of $3 million.

25       Q.    Okay.  And that's at the rates, obviously,

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit F - Page 326

Page 497

1    that Skadden Arps --

2        A.    At my rates.

3              I'm sorry.  When I say "at my rates," the

4    standard rates at Skadden.

5        Q.    Understood.  And I think you said something

6    about a self-imposed cap on your time?

7        A.    Yes.

8        Q.    What did you mean by that?

9        A.    You know, during the trial -- and to

10   correct Mr. Bidart, what I was attempting to

11   introduce was not contemporaneous at the time.

12             In coming -- preparing myself for today and

13   knowing that I would be asked about the management

14   of, you know, or what efforts did I make to try to

15   contain the costs, I knew that Isaac was under

16   enormous pressure.

17             And so I had the highest billing rate on

18   the case.  And so I would cap myself in terms of the

19   hours that I would bill a day.  And so generally I

20   would cap the time.

21             During the trial my days would start at

22   roughly 6:00 in the morning and then go until

23   midnight.  That was usually the schedule that we

24   kept.

25             But during trial -- and so that would be an

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit F - Page 327

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 498

1    18-hour day.  But during the trial, most days I

2    capped myself at 15 hours, 12 to 15 hours with the

3    exception of I think two days where -- two or three

4    days on the eve of closing argument where, you know,

5    frankly, I stayed up all night.  And I thought,

6    okay, well, I'll go a little bit higher.

7            And then I capped the -- my own hours.  I

8    didn't impose this on other lawyers, but I capped my

9    time on weekends to, I think it was no more than six

10   to eight hours on a weekend.  And that didn't show

11   up anywhere.  It doesn't show up in a write-off.

12   That's the time I would book.

13           MS. FIELD:  If we can go back to

14   Exhibit 95.  It's 95-6.

15      Q.   This is an attachment to the engagement

16   letter.

17           Is this familiar to you?

18      A.   It is.

19      Q.   And this is a standard document that

20   Skadden Arps attaches to its retainer letters?

21      A.   Yes.

22      Q.   And this is part of, then, the contract for

23   the client?

24      A.   Correct.

25      Q.   Okay.  Was there any discussion with

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                          Exhibit F - Page 328

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 499

1   Mr. Larian or Mr. Holden about the items that are

2   reflected in this standard policy regarding charges

3   and disbursements?

4        A.   I'm sure we did.  I, you know, if you

5   directed me to a particular subject, it might be

6   easier for me to refresh my recollection on a

7   particular subject.  But I had general discussions

8   with him from time to time regarding guidelines.

9        Q.   Now, as I understand it, as reflected in

10  this document, which is Exhibit 95, at least at the

11  time that you first became involved, your billing

12  rate was -- you call it hourly internal time charge,

13  but I think most of us refer to it as billing rate.

14       A.   I think it's the billing rate.

15       Q.   Your billing rate was $950 an hour,

16  correct?  95-2.  It's not a memory test.

17       A.   I'm sure -- that sounds right.

18       Q.   And there were other persons that were

19  involved.  I think the letter says other partner

20  rates range from 665 to 950 and associates from 325

21  to 750.

22            Do you recall that?

23       A.   That sounds right.

24       Q.   And at some time over the course of this

25  case, the billing rates that your firm has charged

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 329

Page 500

1   have increased to some degree, correct?

2       A.   That's correct.  There's generally an

3   annual adjustment.  And then there's a class

4   adjustment.  You know, as associates elevate up to

5   the next class, that might trigger a different

6   billing rate than the previous class year.

7       Q.   So you'd agree with me that at least some

8   overhead charge, some accounting for overhead of the

9   firm is built into those hourly rates, right?

10      A.   Oh, I -- I'm not equipped to answer that

11  question.  I don't mean to dodge it, but I -- we

12  don't charge a separate overhead number.  So I

13  assume that built into billing rates would include

14  some coverage of your, you know, general overhead

15  for the firm.

16      Q.   You certainly don't get paid 950 an hour

17  yourself to take home and buy things for your

18  daughter, correct?

19          MR. BIDART:  Oh, are you limiting it to his

20  daughter?

21          THE WITNESS:  No.  No.

22  BY MS. FIELD:

23      Q.   So let me ask you this.

24      A.   I assume that I'm covering the costs

25  somewhere.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 330

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 501

1        Q.   Somewhere in there there's some overhead

2    built in to handle things like secretarial time or

3    some other kind of overhead charges, maybe the

4    librarian or other things that Skadden must have,

5    right?

6        A.   I'm sure that's the case.

7        Q.   Kitchen services or whatever they call them

8    in firms?

9        A.   Yes.

10       Q.   But this billing policy does provide for

11   certain charges that can be assessed for such

12   things, correct?

13       A.   Correct.  That is correct.

14       Q.   And if I understand correctly, if I look at

15   95-6, that section that says "Word Processing,

16   Secretarial, and Other Special Task-Related

17   Services" --

18       A.   Yes.

19       Q.   So as I understand it, according to this,

20   Skadden agreed that it would -- or that -- excuse

21   me -- that MGA agreed that Skadden could charge at

22   $50 an hour for certain secretarial time that

23   involved typing, copying, collating, and

24   distributing legal documents; is that correct?

25       A.   That's -- that's in the guidelines, yes.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 331

Vol. II (273-562)        MGA v. Lexington, et al.              11/9/2010

Page 502

1       Q.   And then it goes on to indicate that other
2    tasks, such as qualified secretaries and word
3    processors or other things, may be recorded in the
4    appropriate billing category.
5            Do you see that?
6       A.   That's correct.
7       Q.   Now, we talked, I think --
8       A.   Can I ask you a question.
9       Q.   -- for a moment -- we talked a moment or
10   two ago about the MGA guidelines and the fact that
11   you don't think you saw them in advance.  But let's
12   go back to I think the one that you believe it is,
13   which is Exhibit 241.
14           And I think you said that at some point --
15   that in the discussions, that you would try your
16   best to adhere to sort of the general outlines of
17   the billing policy, correct?
18      A.   To the extent they were applicable --
19      Q.   Okay.
20      A.   -- to the -- what I would describe the pace
21   of the litigation and what we were dealing with.
22      Q.   And then later when the pace slowed down, I
23   think you indicated that you told people to try to
24   comply perhaps even more because they had more time
25   to do so.  Is that what you're telling me?

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Exhibit F - Page 332

                                                              Page 503

1       A.    No.   I think you asked me that before.   And

2    I think what I explained was that there came a time

3    when we started getting more inquiries from the

4    client that I thought were emanating from the

5    insurance companies.

6       Q.    At any point in time after you signed the

7    engagement letter, did you get a copy of this

8    policy?

9       A.    I'm sure I did.   I just don't remember --

10   oh, I'm positive, you know, that we had the

11   guidelines.   I just can't tell you what -- the date

12   I have it.

13          And I want to make clear.   I think it's

14   this one, but it may have had the title related to

15   Mattel litigation.   I may be wrong on that.   I

16   apologize.

17      Q.    Assuming it's this one or the other one,

18   whichever one it is, at any point in time did you

19   circulate the MGA billing policies to the people who

20   were working on the Mattel case?

21      A.    I know in the beginning that we had a

22   discussion with the team regarding -- regarding some

23   of the guidelines and telling them that I would get

24   back to them as we had more specific definition from

25   the client on some of them.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 333

Vol. II (273-562)       MGA v. Lexington, et al.                    11/9/2010

Page 504

1          And -- but I don't -- as I'm sitting here

2     today, I don't have a specific recollection of

3     sending them to anybody but maybe the accounting

4     department.

5          Q.   Do you recall ever writing a memo sort of

6     summarizing any of the guideline issues that you

7     wanted people to kind of keep in mind as they were

8     preparing their bills?

9          A.   No.  That was generally -- to the extent it

10    was handled, it was addressed in team meetings.

11         Q.   And in those team meetings, did you tell

12    the people who were working on the file that, you

13    know, they should try their best to not block bill,

14    to put entries that were clear, not to charge for

15    things that are clerical?

16         A.   Yeah.  I recall specifically telling

17    everybody that their billing entries, you know,

18    could not be a single word, a line item, you know.

19    Just reminding them of that.  And told them that --

20    I remember admitting to everybody that I did not

21    have to block bill and everybody getting mad at me.

22          But then I also said at the same time,

23    though, that we're trying a case.  We're getting a

24    case ready for trial.  And if you have real issues,

25    come to us.  The client is very familiar with the

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 505

1    problem, and we are, you know, trying to give it to

2    them.  And we'll respond to any questions.

3          And oftentimes I would go back and ask an

4    associate what -- what they had done on a particular

5    matter -- and I know that Ms. Aguiar did the same

6    thing -- to ensure that we understood that the

7    amount of time that was being billed was reasonable.

8    Q.   After the trial was over, because you keep

9    referring to the trial in terms of this block

10   billing or other issues --

11   A.   Uh-huh.

12   Q.   -- and this period that we're talking about

13   here, it doesn't involve those bills.  So --

14   A.   No, but I keep -- I'm sorry.  I may be -- I

15   apologize.  You have been at this more than -- more

16   than I have in this session.

17          I keep wanting to remind you or make myself

18   more clear that any change in our time recordation

19   was not as a result of having more time.  It was

20   more that we were now being asked to correct

21   something because an insurance company had asked a

22   question of us.

23          We didn't -- in other words, we didn't

24   internally -- I want to make it clear, we didn't

25   internally say, okay.  You know what, the trial's

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 335

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 506

1   over with.  Now everybody's got to go back and

2   change all of your ways.  We didn't approach it that

3   way.

4       Q.   Okay.  At what point in time do you recall

5   learning that someone was asking questions, for

6   example, about block billing and going back to your

7   team and telling them to be more precise about the

8   time put in on these billing items?

9       A.   I want to say that it was in 2009 and not

10  2008.

11      Q.   Early part of 200- --

12      A.   I know I want to say that.  That's what I'm

13  saying.

14      Q.   No.  No.  I understood that too.  I think

15  we all understood that.

16      A.   I'm sorry.

17      Q.   Otherwise, you'd say it again.

18      A.   Right.

19      Q.   I understand 2009.  Early 2009?  Late 2009?

20  Any point in time at all?

21      A.   I think it was -- I am sorry.  I couldn't

22  tell you exactly.  But it would have been -- I don't

23  know.  I want to say that it was kind of like in the

24  middle of 2009 that we seem to get some invoices

25  coming back and asking us for clarification.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 336

Page 507

1      Q.    Let me ask you that.

2            Did you ever get copies of letters written

3   by McCormick Barstow raising questions about your

4   firm's invoices?

5      A.    No.  In fact, until right now, I had never

6   heard of that -- heard of the law firm.  No

7   disrespect.  I mean, I never saw any correspondence,

8   or nobody from them ever called me.

9      Q.    So whatever information you got about

10  questions being raised, those were coming to you

11  from MGA?

12     A.    That's correct.

13     Q.    And who was at MGA that was giving you the

14  information about questions being raised about your

15  invoices?

16     A.    Either Jeanine Pisoni or they would come

17  from Rosa Colorado.

18     Q.    Colorado.

19           And would they come to you directly or to

20  someone else?

21     A.    It depends.  If I was in trial, you know,

22  my assistant would send them down to the accounting

23  department to see whether or not they could get

24  addressed that way.

25           Eventually they would be brought to my

CONFIDENTIAL - ATTORNEYS' EYES ONLY                     Exhibit F - Page 337

Page 508

1   attention.

2       Q.   And did you have conversations with either

3   Ms. Pisoni or Ms. Colorado directly yourself about

4   the questions that were being raised?

5       A.   On occasion they would ask me, you know,

6   "Can you address this?"

7           And I would say, "Yes.  Let me take a look

8   at them."

9           And then on a couple of occasions more

10  generally with Jeanine I would -- Jeanine Pisoni, I

11  would call her and express -- express my -- or give

12  her my observations regarding the questions that

13  were being asked.

14      Q.   I understand.  You weren't really happy

15  about it; fair statement?

16      A.   Well --

17      Q.   That's -- you know --

18      A.   Especially with respect to the question of

19  unclear entries.

20      Q.   Okay.  Let me ask you.  You just said

21  that -- and I probably can't quote it, but that you

22  weren't aware of the McCormick firm.  Is that true?

23      A.   I mean, I know that we sat in a mediation

24  one time.  And I know that somebody, you know,

25  introduced themselves.  And I apologize if you were

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit F - Page 338

Page 509

```
 1    from that law firm.

 2             I don't remember seeing any correspondence.

 3    And I don't recall ever being contacted by anybody

 4    directly from that firm and ever asked the question.

 5       Q.   In your conversations with MGA, did you

 6    ever suggest to MGA that maybe you should go talk to

 7    the carriers who were raising these questions

 8    directly and see if you could work this out?

 9       A.   I don't know if I expressed it that way.  I

10    just thought the whole thing -- I'm sorry.  I don't

11    want -- I'm going to be -- if you're asking me my

12    conversations with Jeanine Pisoni, my conversations

13    with Jeanine Pisoni would include the following

14    comments:

15             This is ridiculous.  This is a game plan.

16             They just don't want to pay your bills.

17             Jeanie, why can't we get paid?  Because

18    they're playing -- it's a delay game.  I'll give you

19    an example, Jeanine.  Do you have my bill in front

20    of you?

21             Yes.

22             The invoice that you just sent to me

23    asks -- say that this entry is unclear.  And I would

24    read the entry.  And I go, how much more clear do I

25    need to make it?  Other than to say we conducted
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit F - Page 339

Page 510

```
 1   legal research concerning, you know, constructive

 2   trust?  Do they want to know what cases we looked

 3   at?  In that case, maybe we should go directly to

 4   them and talk to them.  Something like that.

 5          And, you know, I -- I never expressed an

 6   objection to ever taking a phone call from the

 7   insurance carriers.  And, in fact, I recall actually

 8   having a conversation, a videoconference with the

 9   insurance carriers sometime in -- after the trial to

10   explain to them the nature of the case.  It was on

11   videoconference.

12          I don't know who was representing the

13   insurance carriers, but I sat there and I pledged to

14   them that if they ever had a question, they could

15   call me directly.  And that was on a

16   videoconference.

17      Q.   And were they on the telephone?

18      A.   No.

19      Q.   Were they on the video?

20      A.   They were on a screen.  They were on the

21   other side of the screen.

22      Q.   And were there lawyers involved on the

23   other side of the screen for the carriers?

24      A.   Yeah, there were lawyers on the phone --

25   I'm sorry.  No.  I'm sorry.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 340

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 511

```
 1              There was a videoconference.  I was an
 2    attorney on this side.  I was representing MGA.  My
 3    understanding was that the individuals that appeared
 4    on the screen were lawyers or representatives of the
 5    insurance company asking me for additional
 6    information about our representation of MGA, Isaac
 7    Larian, about the case, the complexity of the case.
 8              That was -- I think Mr. Bidart had arranged
 9    the conference.  And that's what I recall.
10              So, yeah, they were lawyers from the
11    insurance company.
12       Q.   And so -- I go back to -- I would move to
13    strike it, but I can't remember my own question.
14              My question was:  Did you ever --
15              MR. BIDART:  You meant to strike your
16    question or --
17    BY MS. FIELD:
18       Q.   Did you ever call any -- suggest that you
19    talk to -- directly to any of the carriers or the
20    lawyers who were on the other side of that
21    videoconference about the problems you were having
22    getting your bills paid or the issues they were
23    raising about the bills?
24       A.   I don't have a specific recollection of
25    that.  And the reason is that I -- I personally told
```

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**              Exhibit F - Page 341

Page 512

1    the insurance company representatives on that

2    videoconference, whatever the date was -- and we can

3    find out when that was -- that if they had a

4    question, they could call me.

5              I even looked at Mr. Bidart and asked him

6    if that would be okay.  "If you have a question,

7    call me on this."

8              Nobody ever called.  And that's why when I

9    was talking to Ms. Pisoni about some of the comments

10   and objections that were being made, I would say

11   that it was a game that was being played.

12        Q.   And in that videoconference, was there any

13   discussion about your firm's invoices at all?

14        A.   Yes.

15        Q.   Yes?  And what was the discussion, then?

16        A.   Almost the same line of questions you're

17   asking me, about, you know, guidelines, how were

18   they to be applied.  I talked to them and I

19   explained to them about our meetings early on, that

20   the guidelines from MGA -- never mentioned about the

21   insurance guidelines.  I've never seen those.  To

22   this day I've not seen those.  Nobody's ever sent

23   them to me.

24              But on the -- on the videoconference, I

25   made it absolutely clear.

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit F - Page 342

Vol. II (273-562)        MGA v. Lexington, et al.                11/9/2010

Page 513

```
 1            And the reason why I'm so certain of it is
 2    because I've handled and prosecuted claims against
 3    insurance companies and I wanted to be absolutely
 4    clear that we were making ourselves available if
 5    they had any concerns or questions.
 6       Q.   That conference, was it -- let me show you
 7    the next exhibit, which I think is 97.
 8            Can we pull up 97.
 9            (Exhibit 97 first referenced in
10            Volume II of the proceedings.)
11    BY MS. FIELD:
12       Q.   I think earlier in response to Mr. Bidart's
13    question, I think -- I forgot how he put it, but he
14    said something about having a stake -- did somebody
15    eat that?
16            MR. BIDART:  Stake.
17            MS. FIELD:  A stake in this litigation, but
18    I'm looking at this letter and it looks like
19    somebody just nibbled around the edges of it.
20            MR. BIDART:  Boy.
21            THE WITNESS:  We don't usually edge our
22    correspondence that way.
23            MS. FIELD:  That was very fancy.
24            JUSTICE WALLIN:  The dog ate my homework,
25    huh?
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit F - Page 343

Page 514

```
 1            MR. ECHEVERRIA:  They weren't being
 2   reimbursed for stationery, so they had to --
 3   BY MS. FIELD:
 4        Q.   Let me start again.
 5            I had them pull up Exhibit 97.  And earlier
 6   Mr. Bidart asked you some questions about whether
 7   Skadden Arps had some kind of a stake in the outcome
 8   of this proceeding.
 9            Is there a written agreement between
10   Skadden Arps and MGA that details Skadden's
11   interests in recovery in this arbitration?
12        A.   My recollection is that there is an
13   assignment, an insurance assignment with respect to
14   proceeds -- proceeds paid by the insurance carriers.
15        Q.   Let me see if I can find Exhibit 97.
16            And forgive me for shooting this across the
17   table.
18        A.   What number do you want me to look at?
19        Q.   97.  My question about 97 is simply, is
20   that an assignment that you were just referring to?
21        A.   This is -- I'm sorry.  You know, I
22   apologize.  I -- this one's not signed by Skadden
23   Arps.  I don't know if this is the final agreement.
24        Q.   I will represent to you this is the only
25   one I -- the only document I've seen.  So if another
```

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit F - Page 344

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 515

1    one exists, I can't -- I can't show it to you

2    because --

3        A.    You don't have it.

4        Q.    -- I don't think it has been produced.  So

5    this is all I have.

6            And my question, I guess, would be:  Do you

7    recognize this and is there something, you know,

8    that you could tell us about the assignment if, you

9    know, if this helps or -- if this is not it, then

10   let's find out.

11       A.    Right.  No.  No.

12           The difficult- -- I could let you know.

13   But the difficulty that I have is that I did not --

14   unlike the engagement letter, I did not draft the

15   insurance assignment agreement.

16           At this point in time, in November of 2008,

17   I had rolled out of the Bratz case, and I was

18   involved in the class-action wage and hour case

19   brought against "The Orange County Register."  And

20   so I was in trial during this period of time.

21           And although I was aware of it, it was

22   being handled and negotiated by other lawyers within

23   Skadden.  That's why I just can't tell you right now

24   whether or not this is word for word the exact one

25   that we have.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 345

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 516

1           But the fact that Isaac's signature appears
2    on this suggests to me that this may be the final
3    one, but I apologize.
4       Q.   And the other lawyers that were negotiating
5    this assignment included Jason Russell; is that
6    correct?
7       A.   I think that Jason -- no.  It would have
8    been Lauren Aguiar, and then our director of the
9    firm, Earle Yaffa.  And then we may have had some
10   additional people adding, you know, particular
11   language, fly-specking it or something like that.
12      Q.   And would the services for the negotiation
13   of this assignment, would those have been put on a
14   different billing invoice than the Mattel-MGA
15   invoice?
16      A.   No.  I mean, assuming -- I mean, are you --
17   are you assuming that this time was billed?
18      Q.   Well, that would be my first question, I
19   guess.
20           Was the time that was spent by Lauren or
21   the other -- Lauren Aguiar or the other lawyers
22   billed to MGA?
23      A.   No.  No.  Typically it would not be, you
24   know, our policy, you know, to bill for that.
25      Q.   Does -- I think you just told me that by

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 346

Vol. II (273-562)      MGA v. Lexington, et al.                    11/9/2010

Page 517

```
 1    November of 2008 you were involved in another big

 2    trial.  Is that correct?

 3        A.    Yes.

 4        Q.    And that trial started sometime shortly

 5    after the Bratz case trial, right?

 6        A.    Yeah, too soon after the Bratz trial.

 7        Q.    And I think that at the time following the

 8    Phase I trial, when was the Phase II trial projected

 9    to start?

10        A.    I don't believe a trial date had been

11    established yet.  That was set in -- that was going

12    to be set at a status conference by Judge Larson

13    after he had dealt with the equitable defenses.

14              And so there was a period of time in which

15    there was a stay of discovery for Phase II.  And it

16    was during that period of time that I -- that we

17    were asked to parachute into a trial in Orange

18    County two weeks before it started.  We got involved

19    in that case and then came back out and was ready to

20    go on with Phase II.

21        Q.    And --

22              JUSTICE WALLIN:  Was that the case against

23    Dan Callahan over the newsboys?

24              THE WITNESS:  Yes.  Yes.

25              ///
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 347

Page 518

 1   BY MS. FIELD:

 2       Q.   And just so I'm clear, at this point in

 3   time when you were starting to move out of that case

 4   in November of 2008, were you aware of the

 5   negotiations that were going on with the insurance

 6   carriers, between MGA and its insurance carriers?

 7       A.   I just knew that there were discussions

 8   with the insurance companies.  We were not apprised

 9   of the status of the negotiations or that there was

10   any actual negotiations going on, frankly.

11       Q.   Maybe I'm -- and I misheard; maybe I don't

12   remember.  But did you say that even as of today,

13   you've never seen one of the letters that have been

14   received, that's been sent by McCormick?

15       A.   You know, to the best of my recollection, I

16   haven't.

17            Usually when we got responses from the --

18   from MGA or inquiries from MGA, I don't believe they

19   were -- I would get it in kind of an Excel

20   spreadsheet.  I don't know who prepared the Excel

21   spreadsheet.

22            If on the left-hand side someone showed me

23   that it came from that law firm, then I would stand

24   corrected.  I just don't remember it actually being

25   directed in a letter of some communication.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 348

Vol. II (273-562)      MGA v. Lexington, et al.                    11/9/2010

Page 519

1        Q.    Now, you understood that the carriers paid

2    a portion of every hour that your firm has billed

3    when they were paying it and then MGA would pay a

4    portion above that?

5        A.    You know, I now know as part of the

6    arbitration preparation and stuff like that.  But

7    I've never seen the settlement agreement that was

8    entered into with the insurance carriers.

9        Q.    So up until the recent period of time, you

10   were not aware that the carriers were paying, for

11   example, 420 an hour of your billing rate, and then

12   MGA was going to pay the balance, whatever it is, up

13   to whatever the billable rate was?

14       A.    Oh, I'm sorry.  At some point in time I

15   learned that.

16       Q.    Okay.  Do you remember when you learned

17   that?

18       A.    No, I -- I apologize.  I don't.

19            I do recall having discussions about what

20   the insurance companies -- you know, what a

21   reasonable fee would be for a case this complex.

22   And --

23       Q.    But my question was whether you were aware

24   of the carriers paying a portion and MGA paying a

25   portion, whatever the rates were.

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                     Exhibit F - Page 349

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 520

1        A.    I do recall there was a period of time when

2    I was told -- it was after the fact -- what rates

3    the insurance companies had agreed to pay.

4        Q.    And when you indicated you would get the

5    spreadsheets that would show the amounts that were

6    questioned, deferred, written off, whatever it is,

7    did you understand that the entire hour was being

8    written off?  That is, MGA's portion and the

9    carrier's portion.

10       A.    I -- I mean, I didn't focus on it at that

11   level.  I didn't even -- that wasn't part of my

12   issue.

13       Q.    Okay.  Did you ever inquire of MGA during

14   that time period whether they were paying their

15   portion of whatever the challenged hour was?

16       A.    I mean, I -- I was always asking MGA to pay

17   the bill.

18       Q.    And when you had the conversation earlier

19   you talked about with Jeanine Pisoni --

20       A.    I don't care where they got the money.  I

21   needed -- the management committee was -- every

22   time -- I couldn't go to New York without someone

23   asking me, "When are we getting paid?"

24             So I would generally take every opportunity

25   I had with Jeanine Pisoni to ask her the same

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 350

Page 521

1   question.

2            ISAAC LARIAN:   And argumentative.

3   BY MS. FIELD:

4       Q.   And so at the point at which you were

5   having conversations about the things that were

6   being written off or withheld, did you tell her,

7   well, Jeanine, you should pay your part of this

8   bill?

9       A.    No.   I don't have a recollection of ever

10  saying that.   Nor would I have assumed that that

11  was, you know, even possible.   I wasn't engaged in

12  any of the negotiations, so I don't know what the

13  status of that was.

14           But to be specific, I don't recall her

15  asking that question.

16      Q.    Now, Mr. Bidart told you that I would go

17  through entries.   So I think the time has come that

18  we should look at some of these.

19      A.    Good.   Fine.

20      Q.    Because after all, he made a promise and I

21  have to keep it.

22      A.    I understand that.   I would be disappointed

23  if I was not shown some of the creative entries that

24  may appear on some page of a lengthy billing

25  statement.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 351

Page 522

```
 1      Q.   Well, let's start with page 108.  And let
 2   me --
 3           JUDGE SABRAW:  Which exhibit are we --
 4           MS. FIELD:  This is Exhibit 250.
 5           (Exhibit 250 first referenced in
 6           Volume II of the proceedings.)
 7   BY MS. FIELD:
 8      Q.   And, you know, one of the things that you
 9   indicated was that block billing was one of those
10   issues that there were variances from and that
11   they -- for you, and that sometimes other people
12   wouldn't be able to...
13      A.   Oh, right.  I mean, at some point in time
14   shortly after January when we were hit with the 50,
15   you know, motions, the order to start listing all of
16   the exhibits that supported interrogatories and all
17   that stuff like that, it was -- there was no way
18   that I could impose block billing across the way.
19           And, you know, we -- nobody -- nobody -- I
20   mean, some people may have continued to do it, but
21   it was almost virtually impossible to do so.
22      Q.   Well, let me start with page 107.  The
23   entry is 1013.
24           Let's bring that up.
25           Can you make it even bigger than that?
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 352

Page 523

```
 1          Well, you know what, we can -- that may be

 2    easier but we can probably make it even bigger than

 3    that, I suspect.

 4       A.   Okay.  Thank you.

 5            So, I'm sorry.

 6       Q.   It's page 107, 1013.  And I think it's

 7    actually -- take a look, Tom, and see if that --

 8    take a look at the screen.  See if that's easier.

 9       A.   Do you mind if I look up here?

10       Q.   I think that might be easier.  We can even

11    make it larger, take out the Skadden Arps part.

12            That's an entry dated 10-31-2008.  That's

13    after the trial.

14       A.   Correct.

15       Q.   By Ms. Aguiar.

16       A.   Correct.

17       Q.   And the entry is (as read):

18              Edit and revise, reply to

19            motion to strike; TCs -- which I

20            assume means telephone calls --

21            with team.  Work on materials for

22            injunction argument.

23            Do you see that?

24       A.   Yes, I do.

25       Q.   And it's nine hours.
```

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit F - Page 353

Page 524

1      A.   Correct.

2      Q.   And you would agree with me, at least, that

3   that's a block-billed entry, correct?

4      A.   That is a block-billed entry.

5      Q.   And is there a reason why you -- sitting

6   here, Ms. Aguiar couldn't have broken out that entry

7   to explain how much time was spent on each of those

8   tasks?

9      A.   Well, I can tell you that in October of

10  2008 we were fighting for our lives on the

11  injunction and the pressures were enormous.  And,

12  you know, physically could she have entered the time

13  for the entries, for the time entry?  I imagine so,

14  but I would suspect that given the time pressures,

15  it wasn't practical.

16     Q.   So the time pressures were too much to have

17  broken out those three entries into their segments;

18  is that what you're telling me?

19          MR. BIDART:  Asked and answered.

20          THE WITNESS:  Well, no.  Let me repeat my

21  answer so that I'm clear about it.

22          JUSTICE WALLIN:  All right.  Go ahead.

23          THE WITNESS:  I apologize, Justice Wallin.

24          I imagine that you could read this and

25  believe that she could say, edit and revise, reply

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 354

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 525

1    to motion to strike.  Full stop.  Put an hour in

2    there.  Telephone conversations with team.  Full

3    stop.  Put a time there.  And work on materials for

4    injunction argument.  Full stop.  Put a time there.

5    But that would be a complete misunderstanding of

6    what that entry is conveying.

7              I imagine what is happening is that

8    Ms. Aguiar has in front of her a motion to strike

9    that is dealing with a component of the

10   injunction --

11   BY MS. FIELD:

12     Q.   I don't want to interrupt, but I don't want

13   you to imagine.  I mean --

14     A.   I'm just asking -- I'm telling you why I

15   don't think it was reasonable.  You're asking me --

16   I'm sorry.  You're asking me why she couldn't have

17   done it.  I'm giving you the reason why she couldn't

18   have.

19     Q.   I guess the answer is you weren't there.

20   You don't know.  But if you're going to imagine for

21   me -- I don't --

22             JUSTICE WALLIN:  You asked him to sort of

23   guess, and so he's doing the best he can knowing the

24   timekeeper there.  I don't know if you really want

25   to ask that.

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                  Exhibit F - Page 355

Page 526

1            THE WITNESS:  I'm sorry.

2            I would expect that all of this related to

3   the same issue.  And it was a series of working on a

4   motion to strike relating to the injunction

5   argument, looking at the documents, and calling

6   various people to get information regarding a

7   particular portion of the argument.  That's what I

8   would expect from this kind of an entry.

9            JUSTICE STONE:  So you're saying that those

10  three discrete tasks were for the same mini mission?

11           THE WITNESS:  It probably was.

12           JUSTICE STONE:  All right.

13           THE WITNESS:  And more than likely, given

14  that date and the time period that we were dealing

15  with, absolutely, Justice.

16  BY MS. FIELD:

17    Q.   Was there a motion to strike --

18           JUSTICE WALLIN:  I notice, Mr. Nolan,

19  Ms. Aguiar -- this was on Halloween.  Does she have

20  children under 15?

21           THE WITNESS:  She does today.

22           JUSTICE WALLIN:  But not then?

23           THE WITNESS:  No.  She recently had a baby.

24  But at that period of time she had a husband that

25  was angry that she was working, probably.  But, no,

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 356

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 527

1    she didn't have children at the time.

2              JUSTICE WALLIN:  Okay.  Because if a mom

3    with small children was working on Halloween, that

4    indicates incredible time pressure to me.  That's

5    why I asked.

6              JUSTICE STONE:  Even a dad with small

7    children.

8              JUSTICE WALLIN:  Even a dad.

9    BY MS. FIELD:

10       Q.   The motion to strike related to the

11   injunction?

12             MR. BIDART:  Are you moving to strike what

13   the Court just said?

14             MS. FIELD:  No.  I'm just asking --

15             JUSTICE WALLIN:  She's reading --

16             MR. BIDART:  Okay.

17   BY MS. FIELD:

18       Q.   I was just asking if the motion to strike

19   related to the injunction.  The first one says

20   motion to strike and the second is injunction and

21   I'm not as familiar with the case as you are.

22       A.   So let me answer it this way:  A, I don't

23   know for certain the motion to strike, what's being

24   referenced here.

25             What I'm driving from is the date of

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**        Exhibit F - Page 357

Vol. II (273-562)      MGA v. Lexington, et al.                    11/9/2010

Page 528

1    October 31st.  And that October 31st we were in

2    Phase C, which was the equitable relief.  And so

3    there was a constructive trust motion, there was a

4    motion for receivership, and there was a motion for

5    injunction.

6           It very well may be that the motion to

7    strike had something to do with one of the related

8    motions that all rolled up to the materials

9    regarding the injunction argument.

10          So I'm just saying that at that period of

11   time, everything was blended into one issue that we

12   were dealing with.

13      Q.   Let's go to page 108, line 1019.

14      A.   Yes.

15      Q.   Do you know what it means to have an entry

16   that says "unassigned"?

17      A.   I think I do.

18      Q.   Okay.  What does that mean?

19      A.   I think that when you don't put in a time

20   entry, but that you are asked to put in your time,

21   okay, to keep, like, account of where we were at at

22   a particular time in the month -- and we encourage

23   people, obviously, to put in their time on a daily

24   basis -- that Mr. Hammon would put in the time that

25   he put on that date.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 358

Vol. II (273-562)       MGA v. Lexington, et al.                    11/9/2010

Page 529

1            And that since there was not an entry for

2       the work, that the computer system would put in

3       "unassigned."  That's my -- that's my belief.

4            And this is, again, on October 31st.  So

5       this is a period of time where Mr. Hammon was

6       helping -- this is Patrick Hammon.  He's a talented

7       associate up in San Francisco, and he was working on

8       the posttrial briefing.

9       Q.   So what you're telling me is he just left

10      the entry out --

11      A.   Yes.

12      Q.   -- so that we don't know what it is, but

13      the computer just put something in there because

14      there was a blank?

15      A.   That -- that's what I believe.

16      Q.   Is that what you're saying?

17      A.   That's what I believe.

18      Q.   But he may have written down "unassigned";

19      we just don't know.  Right?

20      A.   You know, I think that that's entirely

21      possible, but...

22      Q.   Okay.  Let me turn --

23      A.   Let me put it this way:  If you ultimately

24      are being asked to pay for someone not assigned to a

25      target, hold that against us because we're not

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Exhibit F - Page 359

Page 530

1    trying to bill you for that.

2       Q.   Let's turn to 109.

3       A.   And I apologize.  I should have caught that

4    in the review.

5            MS. FIELD:  If you could bring up lines

6    1025 through -- and I'm not sure you'll be able to

7    do this, but 1033.  Let's start with 1025.  Just

8    1025.  All the way across if you could.

9       Q.   That's an entry from Jason Russell on

10   11-11-08?

11      A.   Yes.

12      Q.   It says (as read):

13               Research draft and review

14           remitted motions; research on

15           appellate issues; research new

16           trial issues, eight hours.

17           Do you see that?

18      A.   Yes.  Yes.

19      Q.   And those may be related entries, but they

20   may relate to different motions, right?

21      A.   I'm just -- let me just try to put this

22   into context for me.  I'm sorry.

23           So it's November 11th?

24      Q.   November 11th, '08.

25      A.   Okay.  Can I stand up and get closer to the

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 360

Vol. II (273-562)        MGA v. Lexington, et al.                11/9/2010

Page 531

 1   screen?

 2            JUSTICE WALLIN:  Sure.

 3            THE WITNESS:  Okay.  Again, this -- the

 4   scope of work here is in Phase I-C, the equitable

 5   phase of the case.  And they had -- they had filed a

 6   series of motions with respect to the verdict

 7   itself.

 8            And what we were looking at was whether or

 9   not we could make an argument that the jury -- if

10   you've seen the verdict form, okay, there are

11   separate verdicts.

12            What I'm saying -- I'm sorry.  You can't

13   have a trial lawyer stand up at a graph like this on

14   his feet and not be able to go on and on.

15            All I'm saying is that I honestly believe

16   that they all relate to the same issue, similar to

17   Ms. Aguiar's entry, and that is, that these are not

18   separate and distinct, that they relate to the same

19   legal issues that were being addressed.

20            And we were concerned with the appeal,

21   which is what we were always considering and how we

22   would set up the argument in terms of posttrial

23   motions.

24   BY MS. FIELD:

25       Q.   It's fair to say, at least sitting here, we

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 361

Page 532

1    don't know what the appellate issues are that he was

2    researching, correct?

3         A.   Oh, no.  I could tell you right now.

4         Q.   From this, could I tell?  You could tell.

5    Can I tell looking at this?

6         A.   No.  But if you would have called me, I

7    would have told you.

8         Q.   So let's look at, now, 1026, line 1026.

9         A.   Got it.  What is it?

10        Q.   So this is another entry the next day from

11   Mr. Russell.  It's the exact same wording of the

12   exact same entry, and it's the exact same amount of

13   8.0 time.

14        A.   That's correct.  And it looks like the same

15   series of entries for --

16        Q.   1027?

17        A.   Correct.

18        Q.   1028, 1029?

19        A.   Right.

20        Q.   Exactly the same entry, exactly the same

21   amount of time.

22        A.   Exactly.

23        Q.   All the way down to 1033?

24        A.   Yes.

25        Q.   But it's your position that this is neither

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Vol. II (273-562)        MGA v. Lexington, et al.                11/9/2010

Page 533

1    vague nor block billed?

2        A.   No, that's not -- I didn't say that.

3        Q.   Okay.

4        A.   My -- to be clear --

5        Q.   Go ahead.

6        A.   To be absolutely clear, it is absolutely

7    not vague.  We tell you what we're working on.  And,

8    B, it is all related to the same topic or issue that

9    Mr. Russell was working on over a sustained period

10   of time.

11       Q.   Okay.  Let's look at 1034.  That's a

12   timekeeper named Weinstein.  That's not -- I don't

13   think that's a name I've heard.  But who is

14   Weinstein?

15       A.   It's Ryan Weinstein.  He's an associate at

16   Skadden.

17       Q.   And that entry says (as read):

18                   Interview expert candidates,

19            meet with Navigant.

20            I don't know if that's Navigant re or

21   Navigant Ray Myer declaration.

22       A.   Right.  I'm sorry.  I'm interrupting you.

23            Do you want me -- Navigant is the outside

24   vendor -- I'm sorry -- the experts that we were

25   using.  I had mentioned a phone call to Mr. Bidart

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit F - Page 363

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 534

 1    during the trial to try to get $10,000.  It was

 2    Navigant that -- my understanding was that they were

 3    complaining.

 4            Navigant re Myer declaration.

 5            Ryan Weinstein --

 6    Q.   I didn't -- and I was just commenting.  I

 7    didn't know if it was Navigant re the Myer

 8    declaration or whether it was a company called

 9    Navigant Re.

10            The next says (as read):

11                Facilitate agreement on expert

12                retention; arrange interview with

13                MGA licensing personnel and

14                research issues for injunction

15                opposition.

16            Do you see that?

17    A.   Yes.

18    Q.   Okay.  Simple question.  Are those all

19    related to exactly the same service, or are they

20    related to different activities?

21    A.   And the date is October of '08?

22    Q.   Yep.  And all I'm asking about is

23    Mr. Weinstein's activities right there.

24    A.   They're all related to the same issue

25    because Mr. Myer -- Mr. Weinstein was working with

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 364

Vol. II (273-562)        MGA v. Lexington, et al.                11/9/2010

Page 535

 1    Mr. Myer to gather information on the relationship

 2    with licensees that MGA was engaged in so that we

 3    could argue the issue for opposing the injunction,

 4    because Mattel was asking to have all of the

 5    licensees also subject to the injunction.

 6        Q.   Let's turn to 9- -- page 970, line 14383.

 7        A.   I'm sorry.  What's the page?

 8             COMMISSIONER STROUD:  970.

 9    BY MS. FIELD:

10        Q.   14383.

11        A.   I'm on page 970.  What is it?

12        Q.   Line 14383.  The timekeeper is A. Shorr?

13        A.   Yes.

14        Q.   Do you know -- can you tell us who A. Shorr

15    is?

16        A.   Absolutely.  Aaron Shorr.

17        Q.   Is that a -- I just don't -- paralegal?  An

18    attorney?

19        A.   Yeah, sure.  Aaron is neither fish nor

20    fowl.  He is a legal technician that -- in-house at

21    Skadden we do our own graphics.  We do our own

22    technology presentation.  So we don't go out and,

23    like, use Executive Presentations.

24             And Aaron is the one that deals with all of

25    that task.  And he would, you know, be pulling

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit F - Page 365

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 536

1    together here.  This was -- the date of this -- I'm

2    sorry -- was December 1 of 2008.  And he would have

3    been going through and pulling off of the database

4    those selected graphics I assume that somebody was

5    asking for in connection with the arguments that

6    were coming up in the injunction.  Or, if not that,

7    would have been as part of the transition and

8    sending it off to somebody else.

9        Q.   And someone reading this, other than you

10   who knows this, would they know what "provide

11   closing graphics" means?

12       A.   Yes.  With all due respect, yes.

13       Q.   So looking at it, I should know what

14   "provide closing graphics" means?

15       A.   Correct.  Because this wasn't, we

16   weren't -- and I'm sorry.  I don't mean to be

17   sarcastic.

18            We were not closing a business transaction.

19   So there was no closing where everybody signs off on

20   a business deal.  The closing graphics would have

21   been the graphics that were used during the closing

22   argument.  Okay.  And that's what the closing would

23   refer to.

24            And I think anybody who was following the

25   trial would know that during this period of time, we

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Exhibit F - Page 366

Page 537

1    were -- and if you could look right below that is

2    the entry regarding preparation for hearing by

3    Hillary Hamilton.

4            And what Aaron Shorr was doing was

5    providing the closing graphics that were used during

6    the closing argument to prove to Judge Larson that

7    Mattel itself had not asked for the breadth of the

8    injunction or Skadden had made certain arguments at

9    the closing that we were using as part of the

10   injunction.

11      Q.   Let me just ask you a question.  I think

12   you told me that if I didn't understand this, I

13   should ask.  Is that what you said?

14      A.   Yes.

15      Q.   So if the carriers had asked about this, do

16   you think they would have gotten the information

17   that they needed to pay this bill?

18      A.   If they had asked?

19      Q.   Right.  And if they had asked MGA about it,

20   do you think they would have been provided the

21   information to pay this bill?

22           MR. BIDART:  Calls for speculation and

23   argumentative.

24           JUSTICE WALLIN:  Sustained.

25           ///

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit F - Page 367

Page 538

1    BY MS. FIELD:

2        Q.    I only have a couple more.

3              Let me look at 972, line 14430.

4        A.    Okay.  I'm there.  Roth.

5        Q.    Roth, right.  Let me ask you this:

6              Mr. Baker testified yesterday that entries

7    such as "review documents" or "document review" is

8    vague.

9              Would you agree with that?

10       A.    I apologize.  I was looking at the entry.

11       Q.    Sorry.

12       A.    That's okay.

13       Q.    Yesterday Mr. Baker testified that entries

14   such as "review documents" or "document review" is

15   vague.

16             Would you agree that that's vague?

17       A.    Are you asking me whether or not Mr. Roth's

18   description is vague?

19       Q.    I'm asking you whether you agree with

20   Mr. Baker, who testified yesterday.

21             JUSTICE WALLIN:  He doesn't have to attempt

22   to recall prior testimony.

23             MS. FIELD:  No.

24             JUSTICE WALLIN:  But you can ask him what

25   he thinks.  Ask him a direct question.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 368

Page 539

1          MS. FIELD:  I think I will.

2          JUSTICE WALLIN:  I don't care what

3    Mr. Baker said, nor does he.

4    BY MS. FIELD:

5      Q.   My question was:  Do you think -- I might

6    point out Mr. Baker testified to that yesterday.  Do

7    you think that an entry that simply says review --

8          JUSTICE WALLIN:  That makes a question

9    argumentative because he doesn't have to go back and

10   know.  The record will show what Mr. Baker testified

11   to.  So just ask him a direct question.

12   BY MS. FIELD:

13     Q.   Do you think -- not this entry, but do you

14   think that an entry that says "review records" is

15   vague?

16         JUSTICE WALLIN:  Excellent question.

17         MS. FIELD:  Thank you.

18         JUSTICE WALLIN:  Thank you.

19         THE WITNESS:  In the abstract, it could be

20   but in the context used here, I think it's

21   absolutely clear that what Mr. Roth is doing --

22   because he has two time entries on that date.  So he

23   was not block billing.

24         And he put down here that he was working

25   with experts and that as part of working with the

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 369

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 540

1    experts, he was reviewing documents relating to

2    that.

3              And this -- I'm sorry.  This is a perfect

4    example of where block billing sometimes creates the

5    ambiguity, because otherwise, we would have to set

6    forth every document or the, you know, the documents

7    that he was looking at.

8              It's clear to me from this, Mr. Roth's

9    entry, that he was working with experts, including

10   on telephone calls and meetings and during that

11   reviewed documents relating to the experts.

12   BY MS. FIELD:

13       Q.    And if it wasn't clear to someone else,

14   they should have asked for further clarification,

15   right?

16             MR. BIDART:  Calls for speculation.

17             THE WITNESS:  No.  To be honest with you, I

18   think that --

19             JUSTICE WALLIN:  Overruled.

20             THE WITNESS:  -- anybody, any reviewer, if

21   they were looking at it in the context of an entry

22   by one attorney on one day would see the description

23   and realize that it all related to the same thing.

24   BY MS. FIELD:

25       Q.    Earlier today when you were talking about

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 370

Page 541

1    the appeal, I think you said that you attended and

2    Mr. Russell attended.

3              Was there anybody else from Skadden that

4    attended?

5         A.   I suspect that there were other associates

6    that attended.  Some who were just, you know,

7    observing, but others from the appellate team may

8    have been present, including Jennifer del Castillo,

9    and some others.

10             But, I mean, if you have names there, I'll

11   tell you whether or not I remember seeing them

12   there.

13        Q.   And I think -- I may have misunderstood,

14   but I think you -- maybe I didn't.

15             Did you bill MGA for the attendance of all

16   of the attorneys who attended the hearing?

17        A.   As I sit here today, I don't know.

18        Q.   Well --

19        A.   I mean, if you have a bill, I'm happy to

20   take a look at it.

21        Q.   789.

22        A.   Page 789?

23        Q.   Page 789.  Let's look at lines 11688 to

24   116- --

25        A.   Hold on a minute.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 371

Vol. II (273-562)      MGA v. Lexington, et al.                    11/9/2010

Page 542

1      Q.   He's going to pull it up.   So...

2      A.   It's easy for me here.

3           Okay.   So what page?

4      Q.   789, lines 11688 to -690.

5      A.   Okay.   All right.   So this shows that I

6   attended and I billed.

7      Q.   Actually, this is a chart of write-offs,

8   you know, write-offs or write-downs or deferrals or

9   whatever it is.

10          So I just want to make sure that -- I just

11  want to see -- you asked me if I could show you

12  something that would refresh your recollection.

13     A.   Oh, yeah.   Okay.   I'm sorry.

14     Q.   Do you recall that -- is it Jennifer del

15  Castillo?

16     A.   It's Jennifer del Castillo, Jason Russell,

17  and Tom Nolan.   And all three of us attended the

18  Ninth Circuit hearing.   All three of us were

19  involved in the brief writing and editing and the

20  formation of the arguments.

21          In fact, I argued a lot of them below in

22  the district court.   Jason would have argued some.

23  Jennifer del Castillo argued -- I'm sorry -- didn't

24  argue any of them, but she wrote most of those

25  briefs and also helped on the briefs.

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 372

Vol. II (273-562)      MGA v. Lexington, et al.                    11/9/2010

                                                              Page 543

   1          And so the three of us went there.  We had

   2    an early morning meeting at the Ninth Circuit where

   3    we met with Josh Rosenkranz to go over any

   4    additional arguments.

   5      Q.    And do you recall that your -- that you

   6    billed both for the meetings and for the attendance

   7    at the hearing?

   8      A.    Yeah, definitely, because Jason -- so just

   9    so you know, with the argument, Jason was at counsel

  10    table with Josh --

  11      Q.    Okay.

  12      A.    -- ready for -- I mean, we were prepared, I

  13    promise you.  Josh was at the podium or at his seat.

  14    Jason was sitting next to him.  Jennifer was in the

  15    first row and would have the binders and the record.

  16    And Jennifer would be the one -- not anybody else at

  17    Orrick.  Jennifer would be the one that if there was

  18    a question that Josh needed from the appellate

  19    record, Jennifer would pull it.

  20          I was sitting next to -- no, I'm sorry.  I

  21    wasn't.  I was sitting towards the back.  So maybe I

  22    shouldn't have billed my time.

  23      Q.    Well, the question I had was -- I think you

  24    indicated that you weren't being paid for your time.

  25          Do you know whether the carriers paid for

CONFIDENTIAL - ATTORNEYS' EYES ONLY               Exhibit F - Page 373

Page 544

1    any of your attendance?  That is, yours, Jason

2    Russell's, or Ms. Del Castillo's.

3         A.   I'm sorry.  When you said that I testified

4    that I wasn't paid for our time, is that what you

5    said, we weren't being paid?

6         Q.   I think you -- saying you weren't being

7    paid, yeah.

8              JUSTICE WALLIN:  You asked if he knew

9    whether the carriers paid for any of -- I guess any

10   of those timekeepers' time on that day.

11   BY MS. FIELD:

12        Q.   Any of those time.  Yeah.

13        A.   I'm sorry.  I don't know.  I have no idea.

14             JUSTICE WALLIN:  Okay.  You don't know.

15             Okay.  Ask another question.

16   BY MS. FIELD:

17        Q.   Can we -- was there a state court case that

18   was involved with the MGA case that you were

19   involved in?

20        A.   Yes.

21        Q.   Okay.  What was that state court case?

22        A.   I recall that -- my best recollection --

23   can you give me the time and the year?

24        Q.   Well, I could show you an entry.

25        A.   Do you mind just showing me?

CONFIDENTIAL - ATTORNEYS' EYES ONLY             Exhibit F - Page 374

Page 545

1     Q.   Let's look at page 826.

2     A.   826.  And the line entry?

3     Q.   Lines 12145 and 12146.

4     A.   No, these are mistakes.  These are mistakes

5  that I didn't catch.

6     Q.   And the 12148, the line for Mr. Russell

7  about the patent litigation, does that relate to

8  this case?

9     A.   I'm sorry.  I'm just trying -- my entries

10  are clearly wrong.  And it should not have billed

11  because that was for a different matter.

12         In the patent litigation, I'm just -- I'm

13  sorry.  Just trying to think of whether or not there

14  was any patent litigation or thoughts of how that

15  would be filed.

16         I can't answer that question right now as

17  I'm sitting here.

18     Q.   Do you know what the Faith and Herman

19  matters are that is in the next line?

20     A.   No.  I'm sorry.  I don't.

21         You know, I don't, other than whether or

22  not the actions that were taken against Bratz in

23  New York by the Madden ad people.  Whether or not

24  that relates to that, I don't --

25     Q.   That's called Bel Air.  Does that help?

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit F - Page 375

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

                                                                Page 546

     1      A.    No.  Because I don't know the names of the

     2   individuals.  I mean, I know the -- I know it's the

     3   Bel Air case, but I don't know any of the names of

     4   any of the parties.  Maybe someone was using -- but

     5   I'm not saying that relates to it.  I just would

     6   need to know more.

     7      Q.    So as you sit here today, you're not sure

     8   whether this relates and how it would relate to the

     9   MGA case?

    10      A.    No, but I'm happy to drill down on that for

    11   you and find out.

    12            JUSTICE WALLIN:  Let me -- did I hear you

    13   say that this entry, actually, it's your time of ten

    14   hours --

    15            THE WITNESS:  Yes.

    16            JUSTICE WALLIN:  -- before Judge Hogue does

    17   not relate to this case?

    18            THE WITNESS:  That's correct.  I apologize.

    19   It was included in the bill by accident, and we

    20   didn't catch it.

    21            JUSTICE WALLIN:  Okay.

    22            THE WITNESS:  And the same would be true

    23   for the -- it would be true for -- I'm sorry -- the

    24   three entries, now that I see this.  12/6 review and

    25   edits to opening statement, preparation for

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 376

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 143 of 486   Page ID
#:321771
Vol. II (273-562)      MGA v. Lexington, et al.                    11/9/2010

Page 547

1    attendance at first day of trial and meeting with

2    trial team after court -- those three entries are

3    mistakes.  And my assistant did not bill those to

4    the right client.

5              I'm sorry.  That's the first time this was

6    brought to my attention.

7              JUSTICE WALLIN:  Wait a minute.  So the one

8    above there, review and edits to the opening

9    statement, and what was the third one?

10             THE WITNESS:  I'm sorry.  Right.  It would

11   be line 12145, one hour.  And 12146, ten hours by

12   me.  And then 12147, one hour, meeting with trial

13   team after court.

14             JUSTICE WALLIN:  Okay.

15   BY MS. FIELD:

16      Q.   And I think you told us that the

17   conversations that you had with Mr. Bidart about

18   coverage were unrelated to at least the Mattel

19   litigation entries and that those were not billed to

20   the carriers and to MGA; is that correct?

21      A.   I thought I had testified that the

22   conversations I had with Mr. Bidart relating to the

23   insurance claims, okay, were not being billed.

24             But I do -- I did discuss with Mr. Bidart

25   during Phase I-C the fact that they were seeking a

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 377

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

                                                              Page 548

  1   constructive trust, the appointment of a receiver,

  2   forensic auditors, and stuff like that.

  3           To that extent -- so during that phase, I

  4   would have had a couple of conversations at least

  5   with Mr. Bidart with respect to whether or not those

  6   matters were included and how we would have to

  7   fashion an argument that would -- not describe it

  8   right, but I wanted to know whether or not those

  9   would be, quote, additional costs ordered by a judge

 10   that would otherwise be reimbursable.

 11           In a case that I had that Mr. Brown was an

 12   expert witness in, in San Francisco for the

 13   insurance company case, there was an issue as to

 14   whether or not additional court costs imposed upon

 15   us through a referee or what- -- I think it was a

 16   claims administrator would be covered.  And I would

 17   ask Mr. Bidart those kind of questions.

 18       Q.   So you discussed with Mr. Bidart the impact

 19   of the rulings as they related to insurance

 20   coverage?  I'm sorry.  I just -- it was a long

 21   answer and I guess I didn't follow it.

 22       A.   No.  The -- I had conversations with

 23   Mr. Bidart relating to issues briefed by Mattel.

 24   Okay.  And those questions that I asked Mr. Bidart

 25   would be that if asked, would it matter if Judge

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit F - Page 378

Vol. II (273-562)      MGA v. Lexington, et al.                    11/9/2010

Page 549

1    Larson assessed against Mattel or us the cost of,

2    let's say, the forensic auditor for the receiver or

3    the court-ordered monitor and whether or not I

4    should make that -- whether or not -- that was a big

5    argument that we had to make with Judge Larson.

6         Q.    Okay.  Could we turn to page 363.

7              JUSTICE WALLIN:  While we're doing that,

8    I'm going to suggest that the claimant keep track of

9    the areas or the items that are actually conceded --

10             MR. BIDART:  Right.

11             JUSTICE WALLIN:  -- and prepare some kind

12   of a chart or some explanation of that.  I don't

13   know who's doing that, but --

14             MR. BIDART:  Yeah.  So noted, your Honor,

15   and we're doing that.  And also that relates to the

16   October 15 payment that was referenced earlier on

17   the 253,000.

18             JUSTICE WALLIN:  Yes.  Yes.  Anything like

19   that where you basically are conceding --

20             MR. BIDART:  Right.

21             JUSTICE WALLIN:  -- that you don't have an

22   argument.

23   BY MS. FIELD:

24        Q.    I just wanted to clarify.  Page 363, 4889

25   is a reference to a telephone call with

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 379

Page 550

```
 1    Mr. Bidart --
 2        A.    Yes, I see that.
 3        Q.    Okay.  And then at 4891 there's a
 4   reference, Jason Russell, telephone conference with
 5   M. Bidart re insurance.
 6        A.    Correct.
 7        Q.    Is it your belief that those were about
 8   insurance coverage?
 9             JUSTICE WALLIN:  It looks like it's
10   one-tenth of an hour.  So I want you to decide how
11   long you want to spend on that.
12             MS. FIELD:  Not very long.  Just want to
13   know the answer.
14             MR. BIDART:  Contingency fee lawyers are
15   efficient.
16             THE WITNESS:  To address your question,
17   from the time entries, from the date of the entries,
18   which was during the I-C period of time where we
19   were briefing issues and being confronted with
20   requests for the appointment of a receiver and stuff
21   like that, these conversations, although I wasn't a
22   party to them, I would suspect they would be dealing
23   with that because -- the other reason why is that
24   Mr. Bidart would have no reason to be talking
25   directly to those lawyers about the claims in this
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 380

Vol. II (273-562)        MGA v. Lexington, et al.                11/9/2010

Page 551

1    case.

2    BY MS. FIELD:

3        Q.    My last question is, do you know a lawyer

4    named J. Kaye, K-a-y-e?

5        A.    J. Kaye.

6            JUSTICE WALLIN:   Can you help us by

7    identifying an entry?

8            MS. FIELD:   I can.

9        Q.    Page 975, line 14505.

10       A.    975.  And the line again?

11       Q.    14505.  The entry just says "general

12   counsel."  I was just trying to identify that

13   person.

14       A.    Hold on just a minute.  Oh.  Oh.  Oh.  Yes.

15   This was Judith Kaye, who is my partner in New York.

16   She's the former Supreme Court --

17           JUSTICE WALLIN:   Former Chief Justice of

18   the Court of Appeal in New York, right?

19           THE WITNESS:   In New York, yes.  Thank you.

20           And that Jeanine Pisoni reached out to

21   Judith Kaye to ask Judge Kaye's views as to how --

22   how a certain argument might play in front of the

23   court and whether or not there was a different

24   approach.

25           And so -- and that's how Judge Kaye often

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 381

Page 552

1    is used within our firm.  It's almost like a mock

2    exercise.

3    BY MS. FIELD:

4        Q.   So her entry of "general counsel" was just

5    to reflect the fact that she spent some time on the

6    file?

7        A.   No.  It reflected the fact that she had

8    spoken to maybe the general -- well, let me -- no.

9    Let's look at -- because, see, you are asking me

10   regarding a time entry, and I always want to put it

11   in the time period that we were dealing with.

12            And so it's telephone conference with

13   Jeanine Pisoni regarding general counsel, regarding

14   general -- yeah.  It would have been general advice

15   that she was giving to Jeanine Pisoni in September

16   of 2009 having to do with respect to the issues

17   around this period of time, which was we were

18   dealing with Omni and whether or not --

19       Q.   With all due respect, were you on the phone

20   call?

21       A.   No, but I know why she was brought in.  I

22   suspect that this may be the only entry.

23       Q.   Okay.

24       A.   And whether or not -- what Judge Kaye's

25   reaction was to the explanation with respect to the

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 382

Page 553

1   Omni transaction and Isaac Larian's involvement with

2   the head of -- Neil Kadisha.

3       Q.   And if somebody didn't understand that,

4   they could write a question, say, I don't understand

5   it, and ask for more information, correct?

6       A.   You know, again, I'm saying that anybody's

7   reviewing our bills during a period of time would

8   look at what the issues were being discussed at that

9   period of time and understand that the advice

10  related to that particular matter.  Or they could

11  easily go on the Web site of Skadden Arps and see

12  who Judge Kaye was.  Or they could have called me.

13      Q.   Or they could just ask.

14           MS. FIELD:  Thank you.  I have no further

15  questions.

16           MR. BIDART:  One question.  Mr. Nolan --

17           MR. SHERIDAN:  I have quite a few.

18           MR. BIDART:  Okay.

19           MR. SHERIDAN:  I want to make certain I

20  understand here.

21

22                    CROSS-EXAMINATION

23  BY MR. SHERIDAN:

24      Q.   You have an assignment of rights with

25  respect to insurance proceeds from this proceeding?

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 383

Vol. II (273-562)      MGA v. Lexington, et al.                    11/9/2010

```
                                                        Page 554

     1       A.    Yes.

     2       Q.    And how long have you had that?

     3       A.    From the date -- whenever it was executed.

     4   I think it was executed in -- I think -- I don't

     5   know the exact date.  It would have been sometime

     6   between September of -- the end of September of '08

     7   through the end of the year.

     8             MR. SHERIDAN:  Could you pull up

     9   Exhibit 114, page 11.  Can you pull out paragraph

    10   22.

    11             This is the settlement agreement between

    12   Chartis and MGA.  It says (as read):

    13                 MGA and Larian hereby

    14             represent and warrant that they

    15             have not assigned or otherwise

    16             transferred or subrogated and will

    17             not assign or otherwise transfer or

    18             assign, in whole or in part, any

    19             claims or rights which they have --

    20             which they may have against the

    21             member companies based upon,

    22             arising out of, or relating in any

    23             way to the declaratory judgment

    24             and/or the underlying action.

    25             Do you have such an assignment?
```

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit F - Page 384

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

                                                          Page 555

 1      A.   No.

 2      Q.   So you don't have any rights against the

 3  member companies?

 4      A.   That's not --

 5           MR. BIDART:  He testified he had proceeds,

 6  a right to the proceeds out of this litigation.

 7  There's a difference between the claim and the

 8  proceeds.

 9           JUSTICE WALLIN:  Don't argue with him,

10  Mr. Bidart.

11           MR. BIDART:  Excuse me.  I apologize.

12           MR. SHERIDAN:  I asked him if he had an

13  assignment.

14      Q.   Do you have an assignment of the proceeds

15  with respect to this?

16      A.   Only proceeds.  No claims.

17      Q.   How much of the proceeds is the assignment

18  for?

19      A.   Up to the amount of money that's owed to

20  Skadden Arps.

21      Q.   Skadden Arps' bills at issue in this

22  arbitration are 1.4 million.

23           Is it 1.4 million or is it -- is it the

24  full $7 million Mr. Bidart's asking for?

25      A.   If I -- if we could get more out of this,

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit F - Page 385

Page 556

1   it would apply to that.

2          I'm sorry.  It's late.  I apologize.  That

3   was rude.

4          JUSTICE WALLIN:  It's everything you can

5   get; is that right?

6          THE WITNESS:  Yes.

7   BY MR. SHERIDAN:

8      Q.   Okay.  You were brought into this case in

9   October of 2007, correct?

10     A.   That's correct.

11     Q.   So you were working on it on November 1

12  when the case was tendered to Lexington Insurance

13  Company, correct?

14     A.   I was working on the case certainly in

15  November.  I was not involved in the tender and was

16  not -- I don't believe I was aware of any of that.

17     Q.   Was anybody else working for MGA at that

18  time?

19     A.   I'm sorry.  I don't understand.

20     Q.   Was there anybody else representing MGA in

21  the Mattel litigation at that time?

22     A.   Yes.

23     Q.   Who else?

24     A.   I believe so because there were a number of

25  people who had individual -- individual --

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 386

Vol. II (273-562)        MGA v. Lexington, et al.                11/9/2010

Page 557

1    individuals that were involved in the litigation,

2    like the former Mattel employees.  I think they had

3    separate counsel by then already.

4           I know that the McFarland law firm was

5    providing advice and serving as outside trademark

6    and copyright counsel because I met Larry McFarland

7    involved in that.  So I assume that he was working

8    for them at the time.

9           And there may have been others.  I just

10   don't -- I don't have a listing right now, but I

11   would be happy to, you know, identify any of them if

12   you refresh my recollection.

13   Q.   Are you aware that the member companies

14   agreed to provide MGA with a defense from

15   November 1, 2007, on?

16   A.   I apologize.  I have not followed, you

17   know, the settlement agreement or, you know, any of

18   the litigation arising out of it.  I'm not clear as

19   to dates as to when they accepted the duty to

20   defend.

21          Again, it's late in the hour, but if that

22   was the case, I would sure like to know where

23   everybody was during the trial.

24   Q.   Let me help you out.

25          Exhibit 114.  Can you pull up pages 6 and

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 387

Page 558

1  7.

2      A.   Did you say November 2007?

3      Q.   Yes.

4      A.   Okay.

5          MR. SHERIDAN:  If you could pull up the

6  bottom, paragraph 7, all of paragraph 7.

7          THE WITNESS:  I'm sorry.  I thought your

8  question was did I know that on November 1st you all

9  stood up and offered the defense.

10  BY MR. SHERIDAN:

11     Q.   We were tendered the claim on November 1,

12  2007.  Did you know that?

13     A.   I accept that.  I didn't know that.

14     Q.   Okay.  Did you know that --

15     A.   Did you -- I mean, did you offer the

16  defense upon receipt of the tender?  Because I

17  didn't know if you did.

18     Q.   I wasn't aware I was being deposed.

19          My question is, member companies agreed to

20  pay for all of those foregoing hours from

21  November 1, 2007, to November 30th, 2008.  That

22  amounted to, at the negotiated rate, $25 million

23  that we paid to MGA.

24          Did that money find its way to Skadden

25  Arps?

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit F - Page 388

Page 559

1     A.   We've been paid money from MGA.  I don't
2  know how much of that money that was paid was paid
3  to Skadden Arps.
4     Q.   You have a $24 million receivable, right?
5     A.   Yeah, that's what I testified to.
6     Q.   There's only $1.4 million of your fees at
7  issue in this arbitration, right?
8     A.   That's about the third time I was asked,
9  and it hasn't changed.
10    Q.   Who owes the other 22 1/2?
11    A.   I'm sorry.  What?
12    Q.   Who owes the other 22 1/2?
13    A.   My account receivable is from MGA and Isaac
14  Larian to Skadden Arps.
15    Q.   It was your law firm from November 1, 2007,
16  through September 30th, 2008.  We paid those hours.
17  And there's 1.4 million outstanding.
18    A.   Counsel, I'm sorry.  The document speaks
19  for itself.  I -- this is the first time I've seen
20  this document.  But my -- but I don't see that --
21  I'm sorry.
22         In paragraph 7, where does it say that the
23  money was paid only for Skadden Arps?  I mean, he --
24  there were a lot -- am I wrong on that?
25    Q.   Those are all the hours billed, all of the

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit F - Page 389

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 560

1    hours billed between November 1, 2007, and

2    September 30th, 2008.

3         A.   Okay.  I'm sorry.  As I'm saying, this is

4    the first time I'm seeing this document.

5         Q.   But, again, $1 1/2 million is at issue

6    here, $24 million receivable, right?

7              MR. BIDART:  Excuse me.  I don't understand

8    the question.

9              JUSTICE WALLIN:  He's already said that a

10   couple times.

11             If you have a question, though, go ahead.

12             MR. SHERIDAN:  I have nothing further.

13             JUSTICE WALLIN:  Oh, okay.

14             MR. BIDART:  Nothing further.

15             Thank you.

16             JUSTICE WALLIN:  So we're done with

17   Mr. Nolan?

18             MR. BIDART:  We are.

19             Thank you very much.

20             JUSTICE WALLIN:  All right.  Thank you for

21   coming.

22             THE WITNESS:  Thank you very much.  Thanks

23   for your patience.  And I'm sorry about these

24   mistakes.  I'll work with them on those three.

25             JUSTICE WALLIN:  See you all tomorrow at

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit F - Page 390

Vol. II (273-562)        MGA v. Lexington, et al.                11/9/2010

                                                                Page 561

    1   9:00.

    2            (Proceedings adjourned at

    3            4:59 p.m.)

    4

    5

    6

    7

    8

    9

   10

   11

   12

   13

   14

   15

   16

   17

   18

   19

   20

   21

   22

   23

   24

   25

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                **Exhibit F - Page 391**

Vol. II (273-562)        MGA v. Lexington, et al.                    11/9/2010

Page 562

1        I, REAGAN EVANS, RMR, CRR, CLR, CSR NO. 8176, in

2    and for the State of California, do hereby certify:

3        That said proceedings were taken down by me in

4    shorthand at the time and place therein named, and

5    thereafter reduced to typewriting under my

6    direction, and the same is a true, correct, and

7    complete transcript of said proceedings;

8        I further certify that I am not interested in

9    the event of the action.

10       Witness my hand this 20th day of November, 2010.

11

12                    _____

13                    REAGAN EVANS, RMR, CRR, CLR
                      CSR NO. 8176
                      Certified Shorthand
14                    Reporter for the
                      State of California

15

16

17

18

19

20

21

22

23

24

25

866-244-3181        www.OlympicReporting.com        909-460-5559

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**              Exhibit F - Page 392

# EXHIBIT G

## (FILED UNDER SEAL – PURSUANT TO PROTECTIVE ORDER)

Page 563

IN RE JAMS ARBITRATION

| | |
|---|---|
| MGA ENTERTAINMENT, INC., a California corporation; and ISAAC LARIAN, an individual,<br><br>Claimants,<br><br>vs.<br><br>LEXINGTON INSURANCE COMPANY, CHARTIS SPECIALTY INSURANCE COMPANY, and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,<br><br>Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>) Reference<br>) No. 110059976<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) PAGES 563 - 886 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

VOLUME III

9:09 A.M. TO 5:30 P.M.

WEDNESDAY, NOVEMBER 10, 2010

ORANGE, CALIFORNIA

FILE NO:  101110RE

REPORTED BY:

REAGAN EVANS, RMR, CRR, CLR

CA CSR NO. 8176

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 393

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 161 of 486   Page ID
#:321789
Vol. III (563-886)     MGA v. Lexington, et al.              11/10/2010

Page 564

1    VOLUME III OF THE REPORTER'S TRANSCRIPT OF

2    PROCEEDINGS, taken at 500 North State College

3    Boulevard, 14th Floor, Orange, California,

4    commencing at 9:09 a.m. on Wednesday, November 10,

5    2010, before Reagan Evans, RMR, CRR, CLR, CA CSR

6    No. 8176.

7

8

9

10

11

12                    A P P E A R A N C E S

13

14   JAMS PANEL:

15

16        HON. EDWARD J. WALLIN

17        HON. RONALD M. SABRAW

18        HON. STEVEN J. STONE

19        HON. GREER H. STROUD

20

21

22

23

24

25

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit G - Page 394

Page 565

1    APPEARANCES CONTINUED:

2

3    FOR THE CLAIMANTS:

4

5         SHERNOFF BIDART ECHEVERRIA LLP

6         BY:  MICHAEL J. BIDART, ESQ.

7              RICARDO ECHEVERRIA, ESQ.

8              STEVEN M. SCHUETZE, ESQ.

9         600 South Indian Hill Boulevard

10        Claremont, California 91711

11        (909) 621-4935

12

13   FOR RESPONDENTS LEXINGTON INSURANCE COMPANY, CHARTIS

14   SPECIALTY INSURANCE COMPANY, AND NATIONAL UNION FIRE

15   INSURANCE COMPANY OF PITTSBURGH, PA:

16

17        DRINKER BIDDLE & REATH LLP

18        BY:  MARK D. SHERIDAN, ESQ.

19             MARK C. ERRICO, ESQ.

20        500 Campus Drive

21        Florham Park, New Jersey 07932-1047

22        (973) 549-7000

23

24

25

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 395

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 163 of 486   Page ID
#:321791
Vol. III (563-886)      MGA v. Lexington, et al.              11/10/2010

Page 566

 1   APPEARANCES CONTINUED:

 2

 3   FOR RESPONDENT CRUM & FORSTER SPECIALTY INSURANCE

 4   COMPANY:

 5

 6       MUSICK, PEELER & GARRETT LLP

 7       BY:  LARRY C. HART, ESQ.

 8            SUSAN J. FIELD, ESQ.

 9       One Wilshire Boulevard

10       Suite 2000

11       Los Angeles, California 90017-3383

12       (213) 629-7618

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - ATTORNEYS' EYES ONLY                 Exhibit G - Page 396

Page 567

1                       I N D E X

2                      VOLUME III

3

4                                              PAGE

5     WEDNESDAY, NOVEMBER 10, 2010

6        A.M. SESSION                            570

7        P.M. SESSION                            696

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit G - Page 397

Page 568

```
 1              CHRONOLOGICAL INDEX OF WITNESSES

 2

 3   CLAIMANTS' WITNESSES                          PAGE

 4

 5   CHARLES CREAMER

 6        DIRECT EXAMINATION BY MR. ECHEVERRIA      570

 7        CROSS-EXAMINATION BY MR. SHERIDAN         631

 8        REDIRECT EXAMINATION BY MR. ECHEVERRIA    650

 9

10   JAMES WAGONER

11        DIRECT EXAMINATION BY MR. BIDART          654

12        DIRECT EXAMINATION (RESUMED) BY MR. BIDART 772

13        CROSS-EXAMINATION BY MR. SHERIDAN         795

14        REDIRECT EXAMINATION BY MR. BIDART        850

15

16   ANNETTE LOUISE HURST

17        DIRECT EXAMINATION BY MR. BIDART          696

18        CROSS-EXAMINATION BY MS. FIELD            741

19        CROSS-EXAMINATION BY MR. SHERIDAN         761

20        CROSS-EXAMINATION (REOPENED) BY MS. FIELD 768

21

22

23

24

25
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 398

Vol. III (563-886)      MGA v. Lexington, et al.              11/10/2010

Page 696

1    WEDNESDAY, NOVEMBER 10, 2010; ORANGE, CALIFORNIA

2                        1:25 P.M.

3

4          JUSTICE WALLIN:  Go ahead, Mr. Bidart.

5          Ms. Hurst -- Reporter, please swear the

6    witness.

7

8                   ANNETTE LOUISE HURST,

9    called as a witness by the Claimants, was

10   administered the oath and testified as follows:

11

12         JUSTICE WALLIN:  State your full name.

13         THE WITNESS:  Annette Louise Hurst.

14         JUSTICE WALLIN:  All right.

15         Mr. Bidart.

16         MR. BIDART:  Thank you, your Honor.

17

18                 DIRECT EXAMINATION

19   BY MR. BIDART:

20     Q.   Ms. Hurst, would you please tell us about

21   your formal educational background, beginning with

22   graduation from college.

23     A.   Yes.  In 1987 I graduated from Miami

24   University of Ohio, where I obtained a B.S. in

25   business administration and a B.A. in philosophy,

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 399

 1   both magna cum laude.

 2       Q.   And following that, you went to law school

 3   where?

 4       A.   Yes.  I went directly to law school at

 5   New York University School of Law.

 6       Q.   Graduating in what year?

 7       A.   1990.

 8       Q.   And following graduation from law school,

 9   where did you take the Bar exam?

10       A.   In California.  I came directly here.

11       Q.   And you were admitted when?

12       A.   1990.

13       Q.   And you've practiced law continually since

14   that date in California?

15       A.   Yes, I have.

16       Q.   And you're currently licensed to practice

17   law in California, both state and federal courts?

18       A.   Yes.

19       Q.   And what we'd like to do now is have you

20   tell us in your own words about your employment

21   background following becoming licensed to practice

22   law, starting with your first job that you took, and

23   then we'll go sequentially through your career.

24       A.   Sure.

25            I started right out of NYU with Howard Rice

Vol. III (563-886)        MGA v. Lexington, et al.              11/10/2010

Page 698

 1   Nemerovski Canady Falk & Rabkin in San Francisco.

 2          I was with Howard Rice for 15 years.  I

 3   became what was called a director there, equivalent

 4   of a partner in other firms, after 6 1/2 years, and

 5   I stayed there through 2005.

 6          In 2005 I joined the Heller Ehrman law firm

 7   as a partner.  And I was there until its unfortunate

 8   demise in 2008, when I became a partner at Orrick,

 9   Herrington & Sutcliffe.

10      Q.   I would like you to take a moment and

11   describe for us the nature of the functions you

12   performed in your first employment at Howard Rice,

13   what kind of cases did you work on, et cetera.

14      A.   Sure.

15          Howard Rice had a general litigation

16   department.  It was not divided by specialties at

17   that time.  But from the first day I joined the

18   firm, I worked on intellectual property cases.  My

19   very first assignment at the firm was a very large

20   copyright case, the Galoob versus Nintendo case.

21          And during my first two years at Howard

22   Rice, we went to trial in that case twice.  There

23   were two appeals to the Ninth Circuit.  And it was a

24   really cutting-edge copyright case that I really cut

25   my teeth on in the intellectual property arena.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 401

Vol. III (563-886)        MGA v. Lexington, et al.                11/10/2010

Page 699

1      Q.    Did you have occasion -- and since we've

2    not discussed this case before now, I don't know the

3    answer to this question, which is a cardinal rule

4    I'm not supposed to do.

5      A.    Don't do that, Mike.

6      Q.    But did you actually attend the court

7    proceedings in that case in the trial?

8      A.    I did.  Judge Fern Smith was the presiding

9    judge in that matter.

10          And during the second trial Judge Smith

11   really got me my start as a cross-examiner when she

12   looked down from the bench and said, "Mr. Falk and

13   Mr. Glick, when is Ms. Hurst going to get to do

14   something?"

15          And so he unwittingly stepped into a good

16   story there, didn't he?

17     Q.    We'll pretend that I didn't know the

18   answer.

19     A.    So I got my first witness on cross during

20   the second Galoob trial, which was actually a

21   wrongful injunction bond proceeding in which we

22   recovered $15 million on the security after having

23   won the trial on the merits.

24          And both of the trial results were affirmed

25   on appeal in the Ninth Circuit.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit G - Page 402

Vol. III (563-886)     MGA v. Lexington, et al.          11/10/2010

Page 700

1        Q.    And throughout your stay at the Howard Rice

2    firm, you remained in the litigation section?

3        A.    Yes.

4        Q.    Okay.  And when you went to Heller, tell us

5    about what you were doing there.

6        A.    Sure.

7             So over time I've handled all different

8    types of intellectual property matters.

9             I have tried copyright cases, trademark

10   cases, and patent cases.  And at Heller I did a lot

11   more patent work than I had in the past, including

12   second chairing a two-week jury trial before Judge

13   Young in Massachusetts, which was a patent

14   infringement case.

15       Q.    And in your experience doing intellectual

16   property cases, have you represented both plaintiffs

17   and defendants?

18       A.    Yes.  Unlike many disciplines, in the

19   intellectual property arena, you work for both

20   plaintiff and defendant.  It's not a divided bar the

21   way it is in some other subject matter areas.

22       Q.    And did that type of experience continue in

23   the Heller Ehrman firm?  Were you essentially doing

24   the same kind of cases?

25       A.    Yes.  Over time, of course, as I gained

CONFIDENTIAL - ATTORNEYS' EYES ONLY           Exhibit G - Page 403

Vol. III (563-886)      MGA v. Lexington, et al.                11/10/2010

Page 701

 1    more experience, my role in the case changed as I

 2    gained more experience and seniority as a lawyer.

 3              When I was at Howard Rice, when I first

 4    became a partner -- and I'll just use that term

 5    loosely, even though we weren't technically called

 6    partners -- my real forte there was managing really

 7    large cases.

 8              And so, for example, one of the really

 9    large cases that I managed there right after

10    becoming a partner was the Raiders versus NFL

11    litigation.  And that had intellectual property

12    aspects to it.  It had corporate governance aspects

13    to it.  There were times when I was, you know,

14    managing seven partners flying around the country,

15    taking depositions.

16              And so that was -- both the intellectual

17    property and the management of large cases was

18    really what I did starting from the time I was a

19    senior associate and first a partner.

20       Q.   And what year did you say you -- 2005 that

21    you went to Orrick?

22       A.   Yes.

23       Q.   And that was only upon the dissolution of

24    Heller Ehrman?

25       A.   I'm sorry.  2008 I went to Orrick.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                     Exhibit G - Page 404

Vol. III (563-886)        MGA v. Lexington, et al.              11/10/2010

                                                              Page 702

    1        Q.    Pardon me.

    2        A.    Yes.  My --

    3        Q.    Okay.

    4        A.    And, yes, that was only upon the

    5   dissolution of Heller.

    6        Q.    And while with Orrick -- what month in 2008

    7   did you start with Orrick?

    8        A.    October.

    9        Q.    Okay.  And, once again, the cases you have

   10   been doing at Orrick also are the same ilk?

   11        A.    Yes.

   12        Q.    And do you supervise other lawyers at

   13   Orrick?

   14        A.    Yes.

   15        Q.    Tell us about that in terms of how you're

   16   set up and who you supervise.

   17        A.    Well, I -- you know, the supervisory role

   18   depends on the case.  I have multiple roles,

   19   depending on which cases I'm running.  I also have a

   20   staffing role in the San Francisco office.  I'm the

   21   intellectual property staffing partner and

   22   utilization partner.  And usually I am the senior

   23   partner on any case and responsible for the overall

   24   supervision.  That has been true pretty much

   25   throughout the time that I've been at Orrick.

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**              **Exhibit G - Page 405**

Vol. III (563-886)        MGA v. Lexington, et al.              11/10/2010

Page 703

1      Q.    And I would like to now go to the point in

2   time when you first became in any way familiar with

3   or involved with the Mattel versus MGA litigation.

4   So I would like you to focus your attention to that.

5           When in time did you first have any contact

6   with that piece of litigation?

7      A.    Actually, the very first time I had any

8   contact with that piece of litigation was shortly

9   after Mattel sued Carter Bryant in 2004.

10     Q.    Explain that to us, what role you had then

11  or what information.

12     A.    Maybe to put it in context, I would say it

13  this way:  Three times is a charm.

14          I met with the client three different times

15  over the course of many years to discuss possibly

16  representing MGA in this matter.  Once in 2004 when

17  I was pregnant with my twins.  And so that

18  ultimately did not come to pass.

19          Again in late 2007 when Skadden was hired.

20          And then in the spring of 2009.  And that

21  was when I was ultimately hired.

22     Q.    Do I understand from your testimony that

23  you were being interviewed or your firm was being

24  considered at the same time that the Skadden firm

25  was being considered?

CONFIDENTIAL - ATTORNEYS' EYES ONLY         Exhibit G - Page 406

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 174 of 486   Page ID
#:321802
Vol. III (563-886)      MGA v. Lexington, et al.            11/10/2010

Page 704

1      A.    Yes.

2      Q.    And that was to replace the O'Melveny firm?

3      A.    Correct.

4      Q.    Okay.  And then later on when you were

5   ultimately hired the third time that you mentioned,

6   after consideration the third time, who were the

7   counsel of record at the time that you came into the

8   case?

9      A.    So we came in in both the appeal and in the

10  Phase II trial proceedings.  In the appeal, counsel

11  of record in the case was Skadden and Sidley &

12  Austin.  Mark Haddad was the lead appellate lawyer

13  at that time.

14          And then in the Phase II trial proceedings,

15  it was the Glaser Weil firm and Patty Glaser and

16  Mitchell Silberberg & Knupp and Russ Frackman who

17  were co-leads in the case at the trial level.

18      Q.   And, again, what month was it, then, when

19  you were first interviewed that third time?

20      A.   We -- I started working for MGA in related

21  matters in March and April.  It was May -- the end

22  of May and early June when Ms. Pisoni, the general

23  counsel, suggested to me that perhaps we would like

24  to pitch to take over the entire matter.

25          Then in June I and a number of my partners

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 407

Vol. III (563-886)        MGA v. Lexington, et al.              11/10/2010

                                                              Page 705

 1    from Orrick met repeatedly with the client, and we

 2    spent a lot of time negotiating and ultimately

 3    signed an agreement on July 3rd and appeared in the

 4    case for the first time on July 6th.

 5         Q.   And just so we have clarity in the record,

 6    what year were all those dates?

 7         A.   Oh, I'm sorry.

 8         Q.   That's okay.

 9         A.   2009.

10         Q.   All right.

11              And so the meeting where you said you met

12    with certain representatives from MGA and ultimately

13    signed the agreement, could you identify who you met

14    with?

15         A.   Yes.  We met with Mr. Larian, Ms. Pisoni,

16    and Craig Holden.

17         Q.   Okay.  And as a result of you being

18    retained, who were the Orrick partners in the

19    various roles they were to be playing in connection

20    with that retention?  It's a poorly framed question.

21              JUSTICE WALLIN:  Good.  Then ask another

22    one.

23              MR. BIDART:  That's right.  I will.

24         Q.   The next question is:  Who was coming in

25    for the appeal at that time?

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit G - Page 408

Vol. III (563-886)      MGA v. Lexington, et al.            11/10/2010

Page 706

1     A.    Okay.  So on the appeal, the lead partner

2   at Orrick was my partner Josh Rosenkranz in

3   New York.  And I had worked with Josh Rosenkranz at

4   Heller, so I knew him very well.  We had worked on

5   an appeal together for SAP while I was at Heller.  I

6   had very high opinion of Josh.  He had clerked for

7   Justices Brennan and Scalia, both, a rare

8   combination.  An incredibly great writer and smart

9   guy.

10          And so when I first started discussing with

11  the client the possibility of coming in, we were

12  only discussing taking over the Phase II trial

13  proceedings, but I was very adamant that I wanted to

14  get the appeal as well.

15          I was concerned about the arguments being

16  presented on appeal, and I felt like if we were

17  going to try to live with this result and the trial

18  proceeding going forward, I wanted us to get some

19  influence over the arguments that were being

20  presented on appeal.

21          And so it was Josh Rosenkranz who I

22  presented to them as the lead partner for the

23  appeal.

24     Q.    And so Josh for Orrick replaced which firm

25  on the appeal?

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit G - Page 409

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 177 of 486   Page ID
#:321805
Vol. III (563-886)        MGA v. Lexington, et al.                11/10/2010

Page 707

1        A.    Mark Haddad at Sidley & Austin.

2        Q.    Very well.

3              And you and your partners at Orrick on the

4    litigation side were replacing Glaser Weil?

5        A.    Yeah, Glaser and Mitchell Silberberg.

6        Q.    Okay.   And by the time that you came in,

7    had Skadden substituted out of the case altogether?

8        A.    So this is a little complicated, but here's

9    what I understand had happened.

10             In January of 2009, the Glaser Weil and

11   Mitchell Silberberg firm had been -- come in as the

12   Phase II, what was called the Phase II counsel.

13             Skadden remained involved in the case for

14   the continuation of what was called Phase I

15   proceedings.   And probably Mr. Nolan has described

16   this, but, as I understood it, what that meant was

17   Skadden was continuing to handle all of the

18   posttrial proceedings related to the equitable

19   relief that had been granted in Phase I in the trial

20   court.

21             And so, for example, there had been a

22   receiver that had been appointed.   The receiver was

23   later backed down to what was called a monitor.

24   There were many hearings before the monitor, and all

25   of that sort of thing continued to be handled by the

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**          Exhibit G - Page 410

Page 708

1    Skadden firm.

2        Q.    Okay.  And you, by contrast, were

3    concentrating on what had been announced as the

4    upcoming Phase II proceedings?

5        A.    Right.  The appeal and Phase II.

6        Q.    Very well.

7        A.    Yes.

8        Q.    And did you have interface with the

9    appellate lawyers, Mr. Rosenkranz and his team, in

10   connection with the Ninth Circuit appeal?

11       A.    Yeah.  And it really wasn't a different

12   team.  It was really the same team.  And this was of

13   great benefit, in my view, to the client and,

14   frankly, the insurance companies economically

15   because there was a very hard cap on the appeal,

16   very low cap on the appeal.

17            And we did it because I just absolutely

18   insisted we had to have the appeal, too, if we were

19   going to keep going in the trial court proceeding.

20            And the way it was supposed to work was we

21   were supposed to get a complete, completed draft of

22   the opening brief on appeal from the Sidley firm,

23   but we never got it.  And so we had to do the appeal

24   from scratch in about a four-week, four- to

25   five-week period of time.

CONFIDENTIAL - ATTORNEYS' EYES ONLY      Exhibit G - Page 411

Vol. III (563-886)        MGA v. Lexington, et al.              11/10/2010

Page 709

```
 1            And so it was actually the same team.  It
 2    was me and Mr. Rosenkranz and Lisa Simpson in
 3    New York, and Mr. Parker, who's also here today,
 4    were the core team.  And then the other people who
 5    worked on appeal became part of the core team in the
 6    Phase II proceedings going forward, which meant all
 7    the getting up to speed that we did in connection
 8    with the appeal, understanding the Phase I trial
 9    record, understanding the legal issues, was then,
10    you know, a very effective, cost-effective
11    transition for then being counsel in the Phase II
12    trial proceedings.
13            JUDGE SABRAW:  You're talking about a hard
14    cap on fees.
15            THE WITNESS:  Correct.
16            MR. BIDART:  That's what I was just going
17    to ask her to explain.
18        Q.   And could you -- because that was my next
19    question.  Could you elaborate on what you termed as
20    the first time we've heard about this --
21        A.   Yeah.
22        Q.   -- the hard cap on fees for that.  Just
23    explain to us in your own words how that cap arose
24    and the discussions and the negotiations and how it
25    ended up, what form it took.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit G - Page 412

Vol. III (563-886)      MGA v. Lexington, et al.              11/10/2010

                                                        Page 710

     1     A.    Okay.  So we had -- and I'm going -- if
     2   it's okay, I'll put this in my own context, and tell
     3   me if I'm off base, but...
     4          We had seen the stay briefing.  There had
     5   been a stay motion briefed to the Ninth Circuit.
     6   And the principal focus of the stay briefing had
     7   been a Seventh Amendment argument that we felt was
     8   not very likely to succeed.
     9          And so we -- I particularly, the very first
    10   day I got involved in the case, felt that we should
    11   be making the copyright virtual identity argument.
    12   I felt that that was an important legal argument
    13   that needed to be made.
    14          And so going forward I felt that because
    15   the Phase II claims and the RICO claim in particular
    16   were predicated on the same legal issues and factual
    17   issues as the Phase I claim, that these things were
    18   tightly bound together and we had to do both.
    19          And so when I became involved, initially
    20   the client was not asking us to pitch the appeal.
    21   They were happy with who they had as appellate
    22   counsel, and they had a hard cap with Sidley and
    23   Skadden on that -- on that appeal.
    24          And so in order for us to get the appeal
    25   and succeed in doing that, we also had to agree to

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**          **Exhibit G - Page 413**

Page 711

1  that hard cap, but we felt that it was important to

2  do so in terms of the likely success, being able to

3  just get the likely success in the case.

4      Q.   While it may seem obvious, but what does

5  the term "hard cap" mean?  Is it a financial issue?

6  Please put a little meat on those bones.

7      A.   Yeah.  You don't get paid any more than

8  that number.  That is it.

9      Q.   Okay.  So you're agreeing in advance to a

10  lid on the amount of money that the function will

11  cost?

12      A.   That's correct.  And it was based on an

13  assumption, as I indicated, that was not ultimately

14  met, but, nonetheless, we have abided by that.

15          We also had a success fee associated with

16  the appeal, which obviously we earned, given the

17  excellent result in the Ninth Circuit.

18      Q.   And I would like to now move forward to

19  following the Ninth Circuit opinion, which the Panel

20  has seen, what exactly now is the status of what's

21  going on before Judge Carter on this case?  Please

22  tell us the current status, what's upcoming, and

23  then trial, et cetera.

24      A.   Sure.

25          We just completed the briefing on the

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit G - Page 414

Vol. III (563-886)       MGA v. Lexington, et al.              11/10/2010

Page 712

1    summary judgment motions pertaining to the original

2    Phase II defined proceedings as well as all Phase I

3    issues.  And the reason for that is that there is no

4    longer the Phase I, Phase II distinction.  Once the

5    Ninth Circuit reversed, Judge Carter immediately

6    issued an order vacating all the Court's prior

7    orders regarding trial -- what he called trial

8    structure.  He undid the bifurcation, in essence,

9    over the summer of this year, 2010.

10           And from that point forward -- for a while

11   we had really been responsible for the Phase I

12   issues in the trial court.  But from that point

13   forward, it was official:  All issues were to be

14   treated as on the table and part of the case.

15           And so we've just completed the summary

16   judgment briefing on that.  And the trial is

17   scheduled to begin on January 12th, picking --

18   starting picking the jury on January 5th and trial

19   opening statements on the 12th.

20       Q.   Now, have you been involved in the

21   discovery associated with Phase II?

22       A.   Oh, yes.

23       Q.   Please tell us in your own words about

24   what's been going on in connection with the

25   discovery for Phase II since the time of your

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 415

Vol. III (563-886)      MGA v. Lexington, et al.                    11/10/2010

                                                              Page 713

 1    involvement.

 2        A.    Sure.

 3              So as I indicated, we first appeared in

 4    July of 2009.  At that time there was a discovery

 5    master who had already been stipulated to by the

 6    parties.  His name is Robert O'Brien.  He's a

 7    partner at the Arent Fox law firm.

 8              One of the concerns that the client had

 9    when we became involved was the expense associated

10    with having a private discovery master.  I think

11    everybody was -- you know, could be concerned about

12    that.

13              And we did go to Judge Carter and ask if we

14    could have a magistrate to handle the discovery

15    matters in the case so that it would be of less

16    expense, not having to --

17              JUSTICE STONE:  This Panel is not averse to

18    private --

19              THE WITNESS:  I understand.

20              JUSTICE STONE:  -- private judicial

21    officers.

22              THE WITNESS:  Well, Judge Carter was not

23    either.

24              JUSTICE WALLIN:  We don't have all the

25    associates that the Arent Fox firm could put on.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit G - Page 416

Page 714

```
 1          MR. BIDART:  Right.  Right.
 2          JUSTICE WALLIN:  We wouldn't be able to
 3     charge as much, unfortunately.
 4          THE WITNESS:  Yeah.  Well, bottom line, we
 5     tried to make it cheaper, and we failed.  So...
 6     BY MR. BIDART:
 7       Q.   And so those proceedings were before Judge
 8     Carter, right?
 9       A.   Yes.
10       Q.   By then Judge Larson was off the case?
11       A.   Right.  And -- that's exactly right.  Yes.
12     Yeah.
13       Q.   And so -- and the reason for going to --
14     what happened as a result of your efforts about the
15     magistrate, et cetera, as you described?
16       A.   Right.  So Judge Carter said, "This case is
17     so big and there's so much going on, my magistrates
18     will not touch this thing with a 10-foot pole.
19     Forget it.  Right.  You guys are warring with each
20     other, and it's a motion a day.  And, you know, God
21     love Mr. O'Brien, we're going to leave this right
22     where it is."
23          And Mr. O'Brien has issued 105 Phase II
24     discovery orders, 105.  And that is not, by far, all
25     the contested discovery motions that have happened
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 417

Vol. III (563-886)      MGA v. Lexington, et al.          11/10/2010

Page 715

1    in Phase II because once Judge Carter came into the

2    case, there were many discovery motions that were

3    filed with him directly.

4          And he also appointed Judge James Smith,

5    whom some of you may know, as our electronic

6    discovery special master.  And Judge Smith has also

7    heard a number of discovery issues related to the

8    dispute.

9          There's been a lot of discovery motion

10   practice.

11     Q.   And has part of your responsibilities been

12   to monitor and direct your firm's handling of those

13   matters?

14     A.   Absolutely.

15     Q.   That's part of your -- that's what -- the

16   ambit of your responsibilities in the case?

17     A.   Yes, it is.

18     Q.   Okay.  And the law and motion.  Could you

19   tell us what law and motion has taken place before

20   Judge Carter in connection with Phase II.  What

21   rulings to date and what's pending, if anything.

22     A.   Sure.

23          And I'll assume by that that you mean

24   nondiscovery motions.

25     Q.   Yes.

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**               Exhibit G - Page 418

Page 716

1    A.    Okay.  So one of the very, very first
2  nondiscovery motions that we made that was of great
3  significance was a motion to vacate the recall,
4  which was part of the Phase I orders, and to modify
5  the injunction and the recall order that was then in
6  effect.
7         It was one of the first motions that we
8  presented to Judge Carter after he came into the
9  case.
10         At that time the motion that we presented
11  to the Court indicated that the recall could well
12  put MGA out of business.
13    Q.    Before we go further.  In fact, the timing
14  of that motion was even before the Ninth Circuit had
15  ruled, of course?
16    A.    Yeah.  And that was before the argument in
17  the Ninth Circuit.  It was in the November 2009 time
18  frame, October/November 2009 time frame.
19         Frankly, it was not the first thing that,
20  you know, you would really want to present to a new
21  judge, but as described in the papers, the march
22  toward the recall which was then set to happen in
23  January of 2010, it was so expensive and it was just
24  so disruptive of the company's business
25  relationships that it was a -- it was a real threat

CONFIDENTIAL - ATTORNEYS' EYES ONLY                        Exhibit G - Page 419

Vol. III (563-886)      MGA v. Lexington, et al.              11/10/2010

Page 717

1   to the existence of MGA.

2           So --

3           JUSTICE WALLIN:  Because there was an order

4   that the company recall all the dolls in the stream

5   of commerce?

6           THE WITNESS:  That's correct.  And not

7   only -- and then the way it was being interpreted at

8   the time by the monitor, they --

9           JUSTICE WALLIN:  Instead of -- instead of

10  money?

11          THE WITNESS:  Yeah.

12          JUSTICE WALLIN:  Yeah.

13          THE WITNESS:  That's correct.

14          JUSTICE STONE:  What was the grounds for

15  that?

16          JUSTICE WALLIN:  Well, only a federal judge

17  would do that.

18          JUSTICE STONE:  I thought Hauk was dead.

19          MR. BIDART:  Judge Sabraw wants to ask a

20  serious question.

21          JUSTICE WALLIN:  That order startles me,

22  but it was the order, I guess.

23          JUDGE SABRAW:  I did want to clarify,

24  Ms. Hurst.  You referred to Phase II, but in your

25  discussion and testimony you've talked about Judge

CONFIDENTIAL - ATTORNEYS' EYES ONLY      Exhibit G - Page 420

Vol. III (563-886)        MGA v. Lexington, et al.                11/10/2010

                                                              Page 718

 1   Carter vacating the earlier orders of Judge Larson.

 2            And is there still a Phase II?  Or are we

 3   just talking about the retrial of the original

 4   matter?

 5            THE WITNESS:  At this point we're talking

 6   about it's all combined into one case for trial in

 7   January.

 8            JUDGE SABRAW:  So when you say Phase II, as

 9   we're going forward, before Judge Carter, you're

10   really talking about the retrial of the case?

11            THE WITNESS:  That's true now, yes.

12   BY MR. BIDART:

13       Q.   For clarification, when you came into the

14   case and were originally retained, it was -- you

15   were being brought in for what was then set up to be

16   Phase II, but the rules have since changed with

17   Judge Carter, correct?

18       A.   That's correct.

19       Q.   Okay.

20       A.   So in the beginning, loosely speaking, the

21   difference between Phase I and Phase II was this:

22   Phase I was the original trial about who owned the

23   Bratz drawings and what the consequences of that

24   were.

25            Phase II was MGA's claims against Mattel

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**              **Exhibit G - Page 421**

Vol. III (563-886)      MGA v. Lexington, et al.                11/10/2010

Page 719

 1   for unfair competition and some other related

 2   claims.  And then the RI -- I mean the RICO is

 3   really the core, a lot of the core of what was

 4   driving the Phase II.

 5           And then this huge trade secret

 6   misappropriation theory was the other big piece of

 7   it.

 8           Of course the RICO piece was -- had as the

 9   predicate act the copyright infringement that had

10   been litigated in the Phase I case.  So in that way

11   it subsumed in many respects the Phase I case within

12   it.  And it was -- it just was a huge thing,

13   basically.

14           Then after the Ninth Circuit reversed,

15   Judge Carter made it official and said, "This whole

16   thing is in the pot together."

17      Q.   And had Judge Carter ruled on those motions

18   that you first made to him, as you indicated, before

19   the Ninth Circuit argument?

20      A.   Yes.  Unfortunately, he denied the motion

21   to vacate the recall.  And he did modify it in some

22   limited respects.  And he made it clear, both on and

23   off the record, that he felt that as long as MGA was

24   in good faith doing what -- everything that it could

25   to comply with the order, that that would be

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit G - Page 422

Vol. III (563-886)      MGA v. Lexington, et al.                11/10/2010

Page 720

```
 1   sufficient from his perspective.  And we did feel

 2   that was important because we had no doubt that

 3   Mattel was teeing it up for contempt proceedings.

 4           Then we had the hearing before the Ninth

 5   Circuit on December 9th.  And at the hearing Josh,

 6   Mr. Rosenkranz, who I mentioned earlier, who argued

 7   the appeal --

 8           JUSTICE WALLIN:  When did Judge Carter

 9   actually begin working on the case?

10           THE WITNESS:  I believe that was

11   October 22nd that the transfer became official.

12           JUSTICE WALLIN:  And the hearing where you

13   were seeking to reverse the recall order?

14           THE WITNESS:  November.

15           JUSTICE WALLIN:  Okay.  So it was only a

16   few weeks after that that the Ninth Circuit decided

17   the case.

18           THE WITNESS:  That's correct.  Well, they

19   didn't decide it.

20           JUSTICE WALLIN:  That's not quite true.

21           THE WITNESS:  Yeah.  They granted the stay.

22           So what happened was we had the hearing on

23   December 9th.  And our -- probably shouldn't

24   characterize it quite this way, but it's the truth.

25           JUSTICE WALLIN:  The hearing before the
```

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit G - Page 423

Vol. III (563-886)      MGA v. Lexington, et al.            11/10/2010

Page 721

 1   Ninth Circuit.

 2            THE WITNESS:  Before the Ninth Circuit,

 3   right.

 4            JUSTICE WALLIN:  Oral argument.

 5            THE WITNESS:  Oral argument, correct, was

 6   on December 9th and our motion to vacate the recall

 7   was the first prong.  Our hail Mary was an oral

 8   renewal of the motion for stay upon the conclusion

 9   of the Ninth Circuit argument, depending on how it

10   went.

11            And it went, now as we know, very, very

12   well for our side.  We caucused at the table,

13   concluded that Josh should make the -- renew the

14   oral motion for stay, and within four hours of the

15   conclusion of the oral argument, the Ninth Circuit

16   panel issued a stay order.

17            I think I was on the phone with some of you

18   on that.

19   BY MR. BIDART:

20      Q.   I was just going to ask you, do you

21   recall -- we'll get to that later.

22            Do you recall a telephone conference where

23   you were providing the lawyers that are -- some of

24   which are in the room here today --

25      A.   Yes.

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit G - Page 424

Vol. III (563-886)        MGA v. Lexington, et al.              11/10/2010

                                                              Page 722

  1      Q.   -- with status of the litigation -- and I
  2   was on the line as well -- when you received notice
  3   of the Ninth Circuit ruling?
  4      A.   Yes.  I recall it very well.  First of all,
  5   I recall where I was sitting, which is in our, what
  6   we have come to affectionately call our Santa Ana
  7   satellite office.
  8           One of the things that Judge Carter did
  9   when he first came into the case was say, "I want
 10   you across the court -- straight from the courthouse
 11   for all your depositions.  You're going to rent
 12   space over here, and I'm going to have you basically
 13   within my ambit at all times.  I'm going to keep
 14   good control of these proceedings."  Right?
 15           JUSTICE WALLIN:  Good for him.  It's good
 16   for our economy.
 17           THE WITNESS:  Exactly.
 18           So I was sitting in the Santa Ana satellite
 19   office on the phone with, I'm sure, a number of the
 20   attorneys here, giving a report, about the argument
 21   and how we felt about it and the little -- I was
 22   looking at my e-mail and the little ECF notice came
 23   up and I read the order and I started -- I think I
 24   probably blew their eardrums out.
 25           I started screaming at the top of my lungs,

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**              Exhibit G - Page 425

Vol. III (563-886)     MGA v. Lexington, et al.              11/10/2010

Page 723

1    "Oh, my God, the Ninth Circuit just stayed.  I got

2    to go, guys.  Bye."

3            And, you know, so, yeah, it was -- that was

4    a major turning point in the case, frankly.

5    BY MR. BIDART:

6       Q.    Following the Ninth Circuit's ruling, could

7    you tell us what efforts have been made by MGA

8    through your offices to narrow the litigation, to

9    knock out some of the claims and the current status

10   of that.

11      A.    Right.

12           So in September of 2009, before the case

13   was transferred, Mattel had filed a motion to amend

14   its pleading again and to add more claims and change

15   the theories and so forth.  And they had filed a

16   number of amended pleadings at that point in the

17   case.

18           Judge Larson ordered that motion off

19   calendar before the transfer to Judge Carter.

20           And when Judge Carter took up the case, he

21   said, "I'm not going to let you amend right now.

22   We're just going to go do all this discovery, and

23   then at the end of a big substantial period of

24   discovery, I'm going to give you one more chance to

25   amend, Mattel, and say whatever you want to say."

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 426

Vol. III (563-886)      MGA v. Lexington, et al.                11/10/2010

Page 724

1    And then we'll see where we are in the case,

2    basically.

3            At that point -- well, this is...

4            So eventually Mattel did file a motion for

5    leave to amend, and that was granted.  And of course

6    we tried to prevent that from happening but were not

7    successful.

8            At that point I believe they had 17 claims,

9    17 claims, including the two RICO claims, the RICO

10   and the RICO conspiracy claims.  And we both -- we

11   simultaneously moved to dismiss and moved for

12   summary judgment.  We made an early motion for

13   summary judgment on the RICO claim in particular.

14       Q.   When was that first made?

15       A.   Let's see.  That was May the 10th, I

16   believe, that we filed that motion.

17       Q.   Of 2010?

18       A.   Yes.  So we tried to shut it down.  In

19   fact, we kept trying to shut it down every which way

20   we could.  We kept coming back to Judge Carter and

21   saying, "Could we please have a trial date?"  You

22   know, "Could we file summary judgment motions?" you

23   know.

24           But, understandably, I can completely

25   understand why the Court did not want successive

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Exhibit G - Page 427

Page 725

1    summary judgment motions.  And I, you know -- but --

2            JUSTICE WALLIN:  Did the court enforce a

3    strict page limit on those motions?  I bet not.

4            THE WITNESS:  No.  Actually, this round

5    that we just did, he gave us a hundred pages each in

6    the opening and opposing briefs and 50 pages on the

7    reply.  That gives you an indication of what we're

8    dealing with when the judge just comes off the bench

9    and said, "You're going to get 250 pages each for

10   the summary judgment motions."

11           JUSTICE WALLIN:  Otherwise, they would have

12   been a thousand.  And the shorter ones are ten times

13   better written.

14           THE WITNESS: Probably.  Yeah.  It was

15   tough to cram it all in, but we did it.  We did it.

16           Anything shorter and it wouldn't have been

17   any kind of a story at all.  It would have just been

18   a series of case cites and -- you know, so,

19   therefore...

20   BY MR. BIDART:

21     Q.   Okay.  And so if you could pick up from

22   there, those motions -- they had 17 claims?

23     A.   Right.

24           So we were successful -- and this gets back

25   to your question about nondiscovery motions.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 428

Vol. III (563-886)      MGA v. Lexington, et al.                11/10/2010

Page 726

1          We were successful on the motion to dismiss

2    in knocking out a bunch of the claims.  We were

3    successful in knocking out several new state law

4    claims under the fraudulent conveyance statutes,

5    theory based on violating the Phase I orders called

6    a breach of constructive trust.  I think we ended up

7    knocking out four or five claims in that motion to

8    dismiss practice.

9          On the RICO claims, the court issued an

10   order indicating that it was extremely skeptical,

11   but that it was going to wait for summary -- wait

12   finally for summary judgment.

13      Q.    And since then, have summary judgment

14   motions been filed?

15      A.    Yes.

16      Q.    When were they filed?

17      A.    So the opening briefs were filed on

18   October 12th and oppositions on the 29th and the

19   replies just on Monday, November 8th.

20      Q.    2010?

21      A.    Correct.

22      Q.    And in connection with those motions,

23   please explain to the Panel your views on at least

24   the possibility, depending on the Court's reaction

25   to the motions, of disposing of the entire case,

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit G - Page 429

Vol. III (563-886)      MGA v. Lexington, et al.                11/10/2010

Page 727

1    the -- what you explained about the statute of

2    limitations arguments.

3        A.    Sure.

4              Well, I was excited because when we made

5    the motion, it actually was a motion for summary

6    judgment.  I realized, you know, that we had one or

7    more arguments that would dispose of every single

8    one of the remaining claims.

9              And some of this was based on new evidence

10   developed during the Phase II proceedings that went

11   to defenses that had also been presented in Phase I,

12   in particular, the statute of limitations.

13             And there was a lot of new evidence

14   developed related to the statute of limitations

15   during the Phase II proceedings.  Because of

16   Mattel's ever-changing legal theories, that also put

17   things in a different posture.

18             And so, you know, look, it's a huge case.

19   It's a lot of paper.  Some judges employ the rule

20   that if it's this high, you lose automatically.  I

21   don't think Judge Carter does.  He's an incredibly

22   hard-working, thoughtful judge who is giving this

23   case an incredible amount of attention.

24             So, you know, as I said, we were excited

25   because it really was a motion for summary judgment.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit G - Page 430

Vol. III (563-886)       MGA v. Lexington, et al.              11/10/2010

Page 728

1      Q.   And the hearing on that is set for when?

2      A.   We have two days set aside, November 16th

3   and 17th.

4      Q.   And who will be arguing that for MGA?

5      A.   I will, along with my partner Bill

6   Molinski.

7      Q.   And has Quinn Emanuel been involved as

8   defense counsel throughout everything you've just

9   stated?

10      A.   Yes.

11      Q.   Okay.  And just -- I think the Panel

12   already has a feel for it, but from your

13   perspective, how would you characterize the level of

14   intensity of their approach to this litigation?

15      A.   Well, this is not my first time litigating

16   against Quinn Emanuel and Mattel.  I also did a

17   case, pro bono case, actually, that the ACLU of

18   Southern California asked us to take while I was at

19   Howard Rice when sort of a starving artist was sued

20   by Mattel for doing some Barbie photographs.

21           And based on my long experience, which

22   dates back to I think now 2001 with Mattel and Quinn

23   Emanuel --

24           JUSTICE WALLIN:  Is that the one where

25   there's a poem or something in the opinion?

CONFIDENTIAL - ATTORNEYS' EYES ONLY             Exhibit G - Page 431

Vol. III (563-886)      MGA v. Lexington, et al.                 11/10/2010

                                                          Page 729

 1              THE WITNESS:  That, no.  I think you're

 2     thinking of the song case, which is the Aqua girl --

 3              JUSTICE WALLIN:  That's right.  You're

 4     right.

 5              THE WITNESS:  "Barbie Girl," Aqua -- by

 6     song -- yeah.  Yeah.

 7              This is the one with the Barbies and

 8     vintage kitchen appliances in compromising

 9     positions.

10              JUSTICE WALLIN:  I haven't read that one.

11     It sounds more interesting.

12              THE WITNESS:  It is.  It's very

13     interesting.

14              Anyway, it's, you know, it's a real -- it's

15     a real challenge because the approach by Quinn

16     Emanuel, especially when representing Mattel, which

17     apparently has just an open checkbook for these

18     kinds of cases, is never agree to anything.  It's

19     never limit a request once made.  Never agree to any

20     limitation proposed.  Never give up anything

21     voluntarily.  Everything must be the subject of a

22     motion and order.

23              I mean, they won't even take "yes" for an

24     answer.  Sometimes we would serve document responses

25     that would say, "Yes, we will produce this," and we

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**            Exhibit G - Page 432

Vol. III (563-886)       MGA v. Lexington, et al.                11/10/2010

Page 730

 1    would still get a motion to compel on those

 2    responses.

 3              JUSTICE WALLIN:  Does anything like this

 4    ever lead to sanctions?

 5              THE WITNESS:  Judge Carter has said many

 6    times that if he had had this case from the outset,

 7    it would have been a different story in that regard.

 8              JUSTICE WALLIN:  I've mentioned to some of

 9    these lawyers that when I was a discovery referee

10    for Judge Carter a few years ago, I issued a

11    $250,000 sanction, and he upheld it.

12              THE WITNESS:  Yeah.

13              And, you know, it's hard.  I mean -- this

14    is going to sound really geeky, but it's -- it's

15    really a game theory problem, because when you're

16    faced with an adversary who never compromises, you

17    know you're in that prisoner's dilemma, right.

18              If I compromise, what will happen to me?

19    And if I don't compromise, what will happen?

20              It's not in the institutional interest of

21    the court to be in a situation like that.  And you

22    just constantly feel like they're pushing you down

23    the field to their -- you know, your goal line

24    unless you are prepared to meet force with force,

25    frankly.

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**
                               Exhibit G - Page 433

Vol. III (563-886)       MGA v. Lexington, et al.              11/10/2010

Page 731

1            And it's not in the interest of the court

2    to have the cases litigated that way.  But until you

3    go in that direction, it's -- there's really no

4    chance of success.

5            And when we came in, there had not been, I

6    think, more than one or two motions to compel ever

7    filed on behalf of MGA in the whole long history of

8    the case.  It has been a history of just Mattel and

9    Quinn Emanuel pushing MGA down to the other end of

10   the field and never moving back across the 50-yard

11   line.

12           And one of the very first things we did was

13   make a giant motion to compel against them, which

14   ultimately led to a huge cache of new evidence,

15   important evidence in the case.

16   BY MR. BIDART:

17      Q.   Some of that evidence is what you're

18   referring to as having been developed for the

19   purposes of this recent statute of limitations

20   argument?

21      A.   True.  Yes.

22      Q.   Okay.  And discovery on your part of

23   knowledge on the part of Mattel of certain events

24   which buttress your argument on the statute of

25   limitations?

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit G - Page 434

Vol. III (563-886)      MGA v. Lexington, et al.           11/10/2010

Page 732

```
 1      A.   Yes.
 2      Q.   By way of example of this tactic or this
 3   attitude for the litigation from Mattel and its
 4   counsel, first of all, inform the Panel.  What did
 5   Judge Carter say about his view of experts?
 6      A.   Right.
 7           So we've had many opportunities for
 8   off-the-record conferences with Judge Carter.  He's
 9   spent a lot of time with us in this case, a lot of
10   late-night sessions.  We've had Saturday sessions.
11   We've even had Sunday sessions.  Some of which are
12   reported and some are not.  And I view the ones that
13   are not as really good opportunities to hear how
14   he's thinking about the case.
15           One of the things that he has said
16   repeatedly is, "I don't want a lot of experts.  I
17   don't like experts.  I think they're paid whores."
18   That was his word.  "And I don't want any redundancy
19   in the experts.  Don't come in here with a lot of
20   these experts."
21      Q.   Sorry.  There's an expert at the other end.
22      A.   Oh, I'm so sorry.
23           So on, I think --
24           JUSTICE WALLIN:  But he's also a real
25   lawyer, not just an expert, so it's okay.
```

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                **Exhibit G - Page 435**

Page 733

1              THE WITNESS:  Okay.  All right.  Good.

2              JUSTICE WALLIN:  And he knows you're right.

3     In his lawyer hat he knows you're right.

4              THE WITNESS:  On November 1st Mattel

5     disclosed 20 expert reports.

6     BY MR. BIDART:

7         Q.   How many did you disclose?

8         A.   Four.

9         Q.   And this is after everybody had been

10    advised of what he thinks about experts?

11        A.   Yeah, repeatedly.  Repeatedly.

12        Q.   Okay.

13             JUSTICE WALLIN:  So has he ruled yet on how

14    many experts would be permitted?

15             THE WITNESS:  No.  And, you know, the

16    unfortunate part now is I don't really see any way

17    of getting an advance ruling on that.  And we're

18    just going to have to go and depose them all and do

19    everything we have to do.  And, you know, figure out

20    which ones are we going to have to hire additional

21    experts for because there's -- there's such a short

22    amount of time that, you know, it's just...

23    BY MR. BIDART:

24        Q.   Now, there's no secret but that these

25    proceedings relate to certain invoices that have

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit G - Page 436

Vol. III (563-886)        MGA v. Lexington, et al.              11/10/2010

Page 734

1    been received by MGA and, in turn, submitted to

2    their insurance coverages for this case.

3            So I would like to direct your attention

4    for a moment to the issues between you and MGA

5    concerning the financial arrangements and the

6    original retainer agreement, et cetera.

7        A.   Uh-huh.

8        Q.   With whom did you negotiate the financial

9    terms of your arrangement to represent MGA?

10       A.   Primarily with Jeanine Pisoni.

11       Q.   Okay.  And were you personally involved in

12   those negotiations?

13       A.   Oh, yes.

14       Q.   Okay.  How would you in your own words

15   characterize Ms. Pisoni's level of diligence

16   concerning striking as good a possible financial

17   bargain as she could for MGA?

18       A.   She was tough.  She was a very tough

19   negotiator.

20       Q.   And tell us, what are some of the things

21   that she was insisting on and what -- what you would

22   agree to and what you would not agree to.

23       A.   All right.  Well, as I indicated earlier,

24   there was the hard cap on the appeal.  She was also

25   absolutely insistent that there would be budgets and

Vol. III (563-886)      MGA v. Lexington, et al.              11/10/2010

Page 735

1    fee caps for the entirety of the representation.

2           And so that and then how much -- we were

3    concerned about the credit position of MGA at the

4    time.  It had been temporarily in receivership.  And

5    so, you know, that was part of our concern,

6    negotiating the fee provisions and the payments

7    associated with that.

8           And so what emerged from this negotiation

9    was a -- for the trial proceedings, a monthly cap.

10   And, of course, keep in mind that this was

11   negotiated at the time Judge Larson was presiding

12   over the case.  A monthly cap.

13          And then above that there was a, sort of a

14   10 percent where we would eat it.  And then above

15   that 10 percent it's what we called a collar, which

16   would be a share of the paying-type scenario, 50/50

17   between us and MGA.

18      Q.   Had you ever been involved in agreeing to

19   such a type of arrangement before in other cases?

20      A.    Personally I had not, but Orrick is kind of

21   in the vanguard of alternative fee arrangements.

22   And we have a whole group of people sort of

23   dedicated to analyzing them and thinking about them

24   and structuring them.  I think Mr. Baxter had kind

25   of been in the news about this.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 438

Page 736

1          And so I had the support of some, what we

2     call, client service professionals during the

3     negotiations over those terms.

4          Q.   Okay.  Now, you were aware -- strike that.

5          Did you become aware at some point in time

6     during your involvement on behalf of MGA that

7     insurance companies were contributing to the defense

8     costs?

9          A.   Yes, during the negotiations.

10         Q.   And what did you learn about that?

11         A.   I believe that I was aware there was a

12    settlement and that pursuant to the settlement, some

13    portion of our fees would be paid.

14         And as I indicated earlier, we were

15    concerned about MGA's credit status.  It did have

16    bankruptcy counsel who were part of the team of

17    counsel.

18         And so as part of the retainer agreement,

19    we asked for a security interest in those insurance

20    proceeds.

21         Q.   And were you given a security interest in

22    insurance proceeds?

23         A.   Yes.

24         Q.   Okay.  And was that at the time you

25    originally came on?

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 439

Vol. III (563-886)      MGA v. Lexington, et al.                11/10/2010

Page 737

1      A.   Yes.

2      Q.   Okay.  And since you've been involved in

3   representing MGA, tell us in your own words what

4   contact and the nature of the contact you've had

5   with lawyers representing the insurance companies.

6      A.   At some point fairly -- well, initially the

7   calls would be sort of ad hoc.  It would be at a

8   time there was to report something significant or --

9   usually Ms. Field would reach out on behalf of the

10   insurance companies and ask for an update.

11        And then at some point, I can't remember

12   exactly when, we just set up a regular monthly call

13   for updates, where we would have a dial-in number

14   and I would report on what had happened in the last

15   month, what the upcoming deadlines were, what the

16   status was, and so forth.

17      Q.   And who attends those meetings by phone?

18      A.   I do, recently my partner Denise Mingrone

19   has also attended.  Then there would usually be one

20   or often two representatives of each of the

21   insurance companies and usually someone from your

22   office as well.

23      Q.   And describe for us what type of

24   information is exchanged.  How does that conference

25   go?  What --

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**              Exhibit G - Page 440

Page 738

```
 1      A.    Sure.

 2            Usually we start off by me giving a summary

 3      of what's happened for the last month or period of

 4      time since we've last had the call, the key events,

 5      where we are in the status of discovery and motion

 6      practice, any key orders that have been made by the

 7      Court.

 8            And then I stop, and any questions anybody

 9      has to elaborate or anything else they want to know

10      about, I answer the questions.

11      Q.    Have you ever been advised by anybody

12      representing -- or someone you understood to be

13      representing an insurance company, whether a lawyer

14      or an employee of an insurance company involved in

15      this case, suggesting to you that your charges for

16      your services were in any way unreasonable?

17      A.    No.

18      Q.    And have you ever been asked by anybody of

19      any insurance company or their lawyers to explain

20      any particular entries as to reasonableness?

21      A.    No.

22      Q.    Have you at times been asked by MGA to

23      address certain issues that have been raised to MGA

24      by their insurance companies concerning your

25      billings?
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 441

Vol. III (563-886)      MGA v. Lexington, et al.          11/10/2010

Page 739

1        A.    Yes.

2        Q.    Explain to us what happened there.

3        A.    So usually we get a spreadsheet that is a

4    list of rejections, or whatever you want to call it,

5    based on the guidelines.  I've always understood

6    that those were coming ultimately from the insurance

7    company.  We get them from MGA.

8              And it will be a list of the entries

9    they're objecting to on the ground that they don't

10   comply with the billing guidelines.  And there's

11   usually two guidelines that are the focus of the

12   rejections, either vagueness or block billing.

13       Q.    Now, at the beginning of your involvement

14   in this case, did MGA, Ms. Pisoni, and the others

15   disclose to you that -- the existence of AIG billing

16   guidelines?

17       A.    Yes.

18       Q.    And did you have discussions with MGA

19   concerning your willingness or lack of willingness

20   to be bound by those guidelines?

21       A.    We did.

22       Q.    Tell us in your own words what was

23   discussed.

24       A.    So I got the AIG billing guidelines and

25   reviewed them extremely carefully.  And I wrote up a

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**              Exhibit G - Page 442

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 210 of 486   Page ID
#:321838
Vol. III (563-886)        MGA v. Lexington, et al.                 11/10/2010

Page 740

1    whole, several pages of why they -- requirements of

2    those guidelines made absolutely no sense in a case

3    like this one.

4            As best I could tell, it was a -- they were

5    guidelines for maybe panel counsel for a personal

6    injury case or something like that.  I actually

7    shared them with one of my partners, Barry Levin,

8    who is an insurance coverage lawyer as well.  And he

9    explained to me how they work and how they really

10   are written for cases other than one of this type.

11           And so I made up a detailed set of notes

12   about, you know, we couldn't adhere to this because,

13   and why these didn't make sense, and I provided that

14   to MGA.

15      Q.   Did you ever at any point in time, either

16   with MGA or with any insurance company

17   representative, agree to be bound by AIG's billing

18   guidelines?

19      A.   No.

20           MR. BIDART:  Thank you.  I have nothing

21   further.

22           You need to sit over here now.

23           THE WITNESS:  Okay.

24   ///

25           ///

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 211 of 486   Page ID
#:321839
Vol. III (563-886)      MGA v. Lexington, et al.                11/10/2010

Page 741

1                    CROSS-EXAMINATION

2    BY MS. FIELD:

3        Q.   Good afternoon.

4        A.   Hello.

5        Q.   How are you?

6        A.   Okay.

7        Q.   We speak again.

8        A.   Indeed.

9        Q.   Let me go back over a couple of quick

10   things.

11            You have discussed the -- I think you said

12   that the retainer agreement or the letter was signed

13   with MGA on July 3rd.

14       A.   I think that's right, yes.

15            MS. FIELD:  Could we put up Exhibit 470 for

16   a moment.

17            (Exhibit 470 first referenced in

18            Volume III of the proceedings.)

19   BY MS. FIELD:

20       Q.   I don't know if you can recognize that.

21   And if you can't see it, we can blow it up.

22            This is the first page of a July 2nd letter

23   which is addressed to Isaac from you.

24            And if we could turn to page 10 of that

25   letter.  That's probably page 11.  Go back one page.

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit G - Page 444

Page 742

1   Sorry.  You're right.  Page 9.

2             If you could take a look at the signature

3   block.  That's signed by Mr. Larian.

4             Do you recognize his signature?

5        A.   I do.

6        Q.   But at that point --

7             If you could go back down again.

8             -- it's not yet signed by you.

9             If -- do you recall that there was an

10  e-mail that you exchanged, I think, with Ms. Pisoni

11  which confirmed the final terms of the retainer

12  agreement?

13       A.   Yes.

14            MS. FIELD:  Could we put up Exhibit 120.

15            (Exhibit 120 first referenced in

16            Volume III of the proceedings.)

17  BY MS. FIELD:

18       Q.   Up at the top, the first little box there

19  says -- that's dated July 3rd, and that's from you

20  to Ms. Pisoni and says, "We are confirmed."

21       A.   Yes.

22       Q.   Is that what you meant when you said that

23  it was signed on July 3rd?

24       A.   I think that Mr. Larian's signature was

25  actually transmitted to me on July 3rd.  And that's

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 743

 1    what I was thinking of.

 2        Q.    And --

 3              That's enough.

 4              And as I understand it, the original letter

 5    was actually amended by this e-mail and some terms

 6    that MGA came back to you on?

 7        A.    Yes.  And I think there were some typos and

 8    there were some things that Ms. Pisoni came back to

 9    me on.  And then she and I had a further

10    conversation after that as well.

11        Q.    So both of those two documents taken

12    together are the agreement between the Orrick firm

13    and MGA with respect to the Orrick firm's

14    representation of MGA in this matter; correct?

15        A.    I think there may have been a further

16    e-mail from me responding to hers as well.

17        Q.    That's what I was going to ask you, because

18    these are the only two that I have seen.  And my

19    question is:

20              Are there any other amendments to the

21    agreement since that time that would change the

22    terms of the agreement significantly?

23        A.    Putting aside the exchanges in the early

24    July time frame, is that what you mean?  Or

25    including those?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 744

1      Q.    No.  We have the July 2nd letter --

2      A.    Okay.

3      Q.    -- and then we have the July 3rd e-mail.

4            Subsequent to that, is there anything else

5      that changed the terms of the retainer?

6      A.    The original terms of the retainer were a

7      product of the letter, the e-mail, and a further

8      conversation and I believe further e-mail that I had

9      with Ms. Pisoni.

10           Since that time, there have been a number

11     of discussions between us about the terms, what

12     certain terms mean or don't mean.  But there have

13     been nothing signed as a formal modification of the

14     agreement.

15     Q.    What terms in these agreements do you have

16     some kind of agreement on that is not necessarily

17     clear to us reading this agreement?

18     A.    I'm not sure I understood that.  I'm sorry.

19     Q.    I think you said there have been

20     discussions about certain terms.  And I'm just

21     making sure.

22           Does that discussion amend the terms of

23     these written agreements here?

24     A.    I think the word "amend" would imply a

25     change.  I think we've had some disagreements about

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 745

1   things that we would probably characterize as

2   ambiguous.  So that's the -- that's what I'm

3   struggling with.

4       Q.    Have those been resolved?

5       A.    No.

6       Q.    And what are those terms that you have a, I

7   think you said disagreement on?

8             MR. BIDART:  There's a potential that that

9   question could relate to attorney-client privileged

10  communications.  And if -- and I'm only saying

11  there's a potential, so I'm not taking a firm

12  position.  I want to put it out on the table and

13  seek assistance of the Panel on how we deal with it.

14            If it relates to financial matters

15  concerning which the insurance companies have a

16  right and a need to know, I, you know, I think that

17  that's fair game.

18            What I -- because I don't know the answer

19  to the question myself.  I'm concerned that the

20  information may be something that would possibly

21  undermine and prejudice MGA in the defense of the

22  underlying case.

23            And because I don't know the answer, I

24  think a proper procedure might be to have that as an

25  in camera confidential proceeding with the Panel

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 448

Page 746

 1   with very strict rules relating to the divulging of

 2   that information outside of these proceedings.

 3            I'm just erring on the side of caution

 4   because I don't know the answer to the question.

 5            JUDGE SABRAW:  I'm not sure that we can

 6   have an in camera hearing on attorney-client

 7   privileged matters.  You can do that, I think, with

 8   work product, but I'm not sure with attorney-client.

 9            MR. BIDART:  Well, because it could

10   affect -- I just have to err on the side of caution.

11            I'm going to object as saying she can't

12   answer that unless I'm given an opportunity to know

13   if it relates to matters that are relevant to these

14   proceedings.

15            It could be that it's -- for example, it

16   could be -- and I don't know this, but it could be

17   she's had a disagreement with Ms. Pisoni or

18   Mr. Larian concerning what witness to call in the

19   underlying case because of some information they

20   have about a -- about fraud at Mattel.  I don't

21   know.

22            MS. FIELD:  I -- didn't -- Ms. Hurst is

23   here, but I went back to see.  We were talking about

24   some ambiguity, I thought, in connection with the

25   terms of this agreement.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                     Exhibit G - Page 449

Page 747

1          Am I right?

2          THE WITNESS:  Yes.

3          JUSTICE WALLIN:  Unfortunately, I don't

4    have the question in front of me again.

5    BY MS. FIELD:

6      Q.   Well, Ms. Hurst, we're talking about some

7    kind of ambiguity and disagreement about the

8    interpretation of these documents.  I think it was

9    Exhibit 470 and 120, correct?

10          MR. BIDART:  What I would like an

11   opportunity to do, and to keep it pristine, I would

12   like to stay out of the conversation, but I would

13   like to give Ms. Hurst an opportunity to consult

14   with her partner outside for a moment just to

15   consider whether or not they believe there's any

16   problem in answering that question the way it's

17   framed.

18          MR. SHERIDAN:  I would like to be heard.

19          The question was (as read):

20              I think you said there have

21          been discussions about certain

22          terms -- that's terms in this

23          agreement -- and I'm just making

24          sure.

25              Does that discussion amend the

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 748

```
 1             terms of these written agreements
 2             here?
 3             There's nothing attorney-client privilege
 4    about the amendment of these retainers when they're
 5    asking us to pay these bills.
 6             JUSTICE WALLIN:  Doesn't sound like it, but
 7    there might be something in a response that, in
 8    fact, would do so.
 9             So I'm okay with a time out to do that if
10    that's what you're suggesting, Mr. Bidart.
11             MR. BIDART:  If you don't mind.
12             JUSTICE WALLIN:  Without yet ruling on the
13    question itself.
14             JUSTICE STONE:  I think the witness is
15    capable of determining whether or not there's an
16    attorney-client privilege in an answer that she
17    would give to the question.
18             THE WITNESS:  I think --
19             MR. BIDART:  I agree with that.
20             THE WITNESS:  I think I can answer the
21    question, at least initially.  And why don't I try
22    to do that, and then we'll see where we go.
23             JUSTICE WALLIN:  All right.  Let's do that.
24             THE WITNESS:  There are, I would say, two
25    principal issues.  One is the scope of work that is
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit G - Page 451

Page 749

1    covered by the definition of Phase II proceedings.

2           And the second is that we do not presently

3    have an agreed budget for the case and have not

4    since the Court vacated the order on trial structure

5    and consolidated the proceedings.

6    BY MS. FIELD:

7       Q.   Explain to me the dispute over the scope of

8    work.

9       A.   For example, the motion to vacate the

10   recall was a Phase I piece of work.  And we view

11   that as not subject to the cap.

12      Q.   Okay.  So the question is:  Which services,

13   if you will, fall within the terms of the various

14   caps that are in the agreement and which services

15   might fall outside of that cap?

16      A.   That's fair.

17      Q.   Okay.

18      A.   For the example I just gave, yes.

19           JUSTICE WALLIN:  Whether the cap is

20   abrogated by the change and posture of the case,

21   perhaps.

22           THE WITNESS:  Right.

23           So going all the way back to January, our

24   feeling was that the cap was abrogated when Judge

25   Carter completely changed the case.

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit G - Page 452

Page 750

```
 1            When we first came in and negotiated over
 2    this fee cap, it was with the understanding that the
 3    ten-deposition limit and seven-hour-per-day rule was
 4    going to apply.  And Judge Carter completely threw
 5    that out the window.
 6            And we, you know, we have lived under the
 7    cap since, but we disagree that it should apply when
 8    all of the assumptions about the circumstances
 9    change.
10            In addition to that, however, by its terms,
11    the agreement says that if there's a reversal on
12    appeal and a consolidation for retrial, a new budget
13    has to be negotiated in light of that.
14    BY MS. FIELD:
15       Q.   Okay.
16            JUSTICE WALLIN:  That reminds me of
17    something I -- I should have asked a few minutes
18    ago, but both sides to this case want what you're
19    doing to go forward as cheaply as possible,
20    consistent with obviously an adequate defense.
21            And you said that Judge Carter encouraged
22    the counsel to have as few depositions -- as few
23    experts as possible.  You came up with 4.  They came
24    up with 20.  And now you assume you're going to
25    depose all 20 and maybe get 16 more of your own.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit G - Page 453

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 221 of 486   Page ID
#:321849
Vol. III (563-886)      MGA v. Lexington, et al.                11/10/2010

Page 751

```
 1              And I'm wondering if you are able to just
 2     bring a motion in front of Judge Carter and say,
 3     hey, Judge, we honored what you had indicated by
 4     picking 4 people, and now they've picked 20, and
 5     invite the Court to limit both sides to four or five
 6     or some number like that.  That would save a ton of
 7     money right there.
 8              THE WITNESS:  It would.
 9              I have actually investigated that.  I think
10     it would probably require me to disclose my work
11     product in order to respond to that question.  But I
12     could if it would be --
13              JUSTICE WALLIN:  No.  I'm not asking you to
14     do it.
15              THE WITNESS:  Yeah.
16              JUSTICE WALLIN:  That, I mean --
17              THE WITNESS:  I investigated that and
18     concluded that it would not work for reasons that I
19     could describe that are work product.
20              JUSTICE WALLIN:  Okay.  I was sure you had,
21     but I was puzzled by that.
22              THE WITNESS:  No.  I completely -- I take
23     your suggestion.
24              We studied it carefully, actually, and
25     concluded for reasons that I won't go into that it
```

Page 752

1    was not likely to succeed.

2            And to elaborate on the -- all the

3    assumptions changing, Judge Carter changed the

4    number of depositions from 10 to 25, but he also

5    made the 30(b)(6) depositions unlimited, which meant

6    that one 30(b)(6) deposition -- all 30(b)(6) notices

7    counted as one deposition.

8            He also lifted the seven-hour limit so that

9    every single deposition was continuing from day to

10   day until completed.  And the result has been more

11   than 200 volumes of deposition taken in, I don't

12   know, a six- or seven-month period of time.

13           And, by the way, the days that we go -- I

14   mean, Judge Carter is the hardest working judge in

15   the business.

16           MS. FIELD:  The hardest working judge in

17   the business.

18           THE WITNESS:  And so we would go 8:00 to

19   midnight some days, especially for 30(b)(6)

20   witnesses.  So the total number of hours that we

21   have been either taking or defending depositions has

22   been astronomical.

23   BY MS. FIELD:

24       Q.   I want to go back, if I can, to something I

25   think you said, which says you have been -- that --

CONFIDENTIAL - ATTORNEYS' EYES ONLY                         Exhibit G - Page 455

Vol. III (563-886)        MGA v. Lexington, et al.          11/10/2010

Page 753

1    I'm trying to do real time, but I'm not doing it.

2    So either you said that you have been living under

3    or that you lived under the caps that are set forth

4    in the retainer agreement.

5            What do you mean by that?

6    A.    I mean we continued representing the client

7    even though we hadn't been paid fully for what we

8    hoped and expected we would be paid.

9    Q.    Okay.  So as I understand it, when the

10   services that the Orrick firm provides have reached

11   one of these fee caps, MGA has refused to pay any

12   more money, correct?

13   A.    Yeah.  It's a little more complicated than

14   that because there's the cap and then there's the

15   collar.  So it's an ongoing complex calculation,

16   quite frankly.

17           But MGA has certainly taken the position

18   that the cap applies to everything that we've billed

19   to the matters upon which you've been provided the

20   bills.

21   Q.    Okay.  The second issue you said was

22   something about presently not having a budget.

23   A.    Yes.

24   Q.    And the retainer agreement provides for the

25   fact that there will be some kind of a budget?

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 456

Vol. III (563-886)      MGA v. Lexington, et al.              11/10/2010

Page 754

1        A.    The retainer agreement had -- you know, I'm
2    going based on memory here, okay, so give me a
3    little leeway.
4            But the retainer agreement had two
5    potentially relevant provisions to the circumstances
6    we're presently in.  One was that it required the
7    negotiation of a new arrangement when we got close
8    to trial.
9            But the second was that if there was a
10   reversal on appeal and the case was consolidated
11   such that it had become apparent the scope of the
12   case changed, then we would also negotiate a new
13   arrangement at that time.
14       Q.    And that's what you meant by a new budget?
15       A.    Yes.
16       Q.    In the agreement with MGA and during your
17   negotiations with Ms. Pisoni, you became aware of
18   the Mattel billing policy -- the MGA billing policy
19   for the Mattel matters, correct?
20       A.    Yes.
21       Q.    Okay.  And you earlier commented that you'd
22   done an analysis in which you raised issues
23   concerning the AIG guidelines.
24            Do you recall that?
25       A.    Yes.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 457

Vol. III (563-886)      MGA v. Lexington, et al.                11/10/2010

Page 755

```
 1        Q.    In the retainer agreement, you set forth
 2    specific categories of issues that you had with the
 3    MGA billing policy, correct?
 4        A.    I believe that's correct.
 5        Q.    And that was to make sure that it was clear
 6    which parts of the MGA billing policy that you were
 7    going to comply with or agree to and which parts you
 8    were not going to comply with or agree to, correct?
 9        A.    Could I see the retainer letter before I
10    answer that?
11        Q.    Sure.
12              If we can, I can just show you the --
13              Let's pull up exhibit --
14        A.    Is there a binder with a piece of paper in
15    it I could look at?
16        Q.    Sure.
17        A.    I can't read that all the way over there.
18    I'm sorry.
19              MR. BIDART:  We'll give you a hard copy.
20              MS. FIELD:  470.
21        Q.    And I was actually referring to the bottom
22    of page 2.
23              Maybe we could just pull up the -- that
24    paragraph.
25              It starts with the second paragraph there.
```

Vol. III (563-886)        MGA v. Lexington, et al.                11/10/2010

Page 756

1    It says (as read):

2                    We will abide by MGA's billing

3              guidelines-Mattel matters as set

4              forth in Appendix A, excluding its

5              incorporation of the insurer

6              guidelines and with the following

7              exceptions:

8                    And then it goes on to list four -- excuse

9    me -- six categories of items that were being

10   excepted from the MGA guidelines.

11                   Do you recall that?

12       A.    Yeah, I'm just -- if you'll give me a

13   moment, I'm going to --

14       Q.    Please do.

15       A.    Right.

16                   So this is the paragraph where there was a

17   typo and that ten hours per month is supposed to be

18   a hundred hours per month.

19       Q.    Right.  I promised you I was going to make

20   sure that was clear.

21       A.    But other than that and the caveat in sub

22   6, that the agreement controls over the guidelines

23   where there's an express provision, yes, that's

24   fair.

25       Q.    And so other than what was excepted out in

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit G - Page 459

Page 757

1    that explanation about any potential inconsistency,

2    Orrick agreed to abide by the MGA guidelines?

3         A.    Yeah, the ones that are attached to this

4    retainer, not as may be modified from time to time

5    in our sole discretion, right?

6         Q.    Fair enough.

7              So let's turn to page 11 of this document,

8    if you flip in.  This doesn't have a page number.

9    It is what is behind Appendix A.

10             And I would just ask you to take a look at

11    that, and tell me, if you can, whether to the best

12    of your recollection this is the MGA billing policy.

13             I can represent to you that this has been

14    provided to us this way by MGA.

15        A.    I -- you know, without looking in my

16    e-mail, I couldn't be absolutely certain, but I

17    don't see anything here that strikes me as

18    inconsistent with my recollection as to this

19    document.

20        Q.    Earlier you indicated that you get some

21    kind of communication from MGA with spreadsheets

22    relative to issues raised about your firm's

23    invoices.

24        A.    Yes.

25        Q.    Do you recall that?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 758

```
 1      A.   Yes.
 2      Q.   And I think you indicated that you had
 3 understood that the spreadsheets came from the
 4 insurance carriers; is that correct?
 5      A.   Yes.
 6      Q.   Have you ever seen one of the letters that
 7 the insurance carriers send to MGA relative to
 8 questions raised about invoices?
 9      A.   Not that I recall.
10      Q.   Were you aware that there are letters that
11 are written by the carriers or on behalf of the
12 carriers to MGA that raise issues?
13      A.   I'm certainly aware that there are
14 rejections communicated.  The specific content, the
15 letters, I'm not aware of.
16      Q.   So you don't know whether there are just
17 spreadsheets with e-mails or whether there's a
18 letter, but you know there are communications,
19 correct?
20      A.   Absolutely, yes.  Correct.
21           I mean, I know -- I mean, I don't have
22 personal knowledge, but I believe that to be the
23 case.
24      Q.   Right.
25           You mentioned the December phone call.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 759

1      A.   Yes.

2      Q.   I remember it well too.

3           But is it your -- isn't it correct that

4   that was, in fact, our first phone call to try to

5   get people together to get information about what

6   was going on in the litigation?

7      A.   If you say so.  I don't -- I don't

8   remember.

9      Q.   And do you recall communications with me

10  indicating that before those could get set up, you

11  had to run it by Mr. Bidart's office in order to

12  ensure that these phone calls could go forward?

13     A.   Yeah.  I personally had no idea what

14  obligations I would have.  So I wanted to take

15  advice from Mr. Bidart on that.  And so that was

16  my -- yeah.  So I indicated that I wanted him in the

17  loop.

18     Q.   And you understood that the purpose of

19  those calls, because you were busy, was to try to

20  get information in the most efficient way other than

21  writing letters and all of this sort of ad hoc, I

22  think, way that you had indicated?

23     A.   If I recall correctly, you and I agreed

24  that we would have a monthly phone call.  And

25  Mr. Bidart suggested that I would do a written

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Vol. III (563-886)      MGA v. Lexington, et al.                    11/10/2010

                                                              Page 760

 1    report.  And I kneecapped him later, and then we

 2    agreed to the phone calls.

 3              MR. BIDART:  I'm having surgery November

 4    the 19th.

 5    BY MS. FIELD:

 6         Q.   And since that time, I think the first

 7    actual phone call -- because that December phone

 8    call got totally interrupted --

 9         A.   Right.

10         Q.   -- I think the first phone call started in

11    January.  And since then we have phone calls that

12    are set for the third Wednesday of every month at

13    10:00 a.m., right?

14         A.   That sounds right.

15         Q.   And it's my call-in number, and anybody who

16    wants to participate, participates, right?

17         A.   Correct.

18         Q.   And the purpose of those calls has been, as

19    we indicated, to get substantive information about

20    what's going on, right?

21         A.   Yes.

22         Q.   During any of those conversations have

23    there been -- have you raised any questions or

24    concerns about the payment of your bills from the

25    carriers?

CONFIDENTIAL - ATTORNEYS' EYES ONLY           Exhibit G - Page 463

Page 761

1      A.   No.

2           MS. FIELD:  I have no further questions.

3           MR. SHERIDAN:  Your Honor, I have a few,

4   but I would like to take a five-minute break.

5           JUSTICE WALLIN:  Time out.

6           (Off the record from 2:41 p.m. to

7           2:59 p.m.)

8           JUSTICE WALLIN:  All right.  Let's resume.

9           I think, Mark, you were up.

10          MR. SHERIDAN:  I have a few questions.

11

12                    CROSS-EXAMINATION

13  BY MR. SHERIDAN:

14      Q.   Ms. Hurst, good afternoon.  My name is Mark

15  Sheridan.  I'm with Drinker Biddle & Reath, and I

16  represent Lexington and the other Chartis companies

17  in connection with this arbitration.

18          You testified earlier that you had concerns

19  about the arguments that were being made on appeal.

20  Is that correct?

21      A.   Yes.

22      Q.   Can you tell me what those concerns were?

23      A.   I felt there were other arguments that were

24  more likely to succeed.

25      Q.   And who made the original arguments in the

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 464

Page 762

1    appeal, that you questioned?

2        A.    I don't know who was responsible for the

3    strategy of those, ultimately.

4        Q.    Well, it was either Sidley or Skadden,

5    correct?

6        A.    Presumably.

7        Q.    And then you created the arguments that

8    prevailed on appeal; is that correct?

9        A.    I would say that -- no.  We worked jointly

10   with Skadden, and we -- but there were new arguments

11   that we identified that were presented in the

12   opening brief that had not been part of the stay

13   briefing and which were ultimately successful, yes.

14       Q.    But you came up with those new arguments?

15       A.    They had been preserved by Skadden.  So it

16   was a matter of choosing which in our judgment were

17   most likely to succeed.

18       Q.    You said that you had a hard cap on your

19   appellate work, correct?

20       A.    Yes.

21       Q.    And I believe you said that Sidley had a

22   hard cap on its appellate work.  Correct?

23       A.    I didn't see the fee agreement, but that's

24   what I was told.

25       Q.    And I think you said that Skadden had a

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit G - Page 465

Page 763

1    hard cap on the appellate work; is that correct?

2        A.   Actually, I have no idea what Skadden's

3    arrangements were.  Nobody informed me on that

4    score.

5        Q.   You worked on the appeal?

6        A.   I did, yes.

7        Q.   So Orrick worked on the appeal?

8        A.   Yes, it did.

9        Q.   Sidley worked on the appeal?

10       A.   I couldn't say.

11       Q.   They sent you a draft briefing?

12       A.   No, they didn't.  That was my point.  They

13   were supposed to and they didn't and so we had to do

14   it from scratch.

15       Q.   Did they send you any work product?

16       A.   I don't think so.

17       Q.   Skadden worked on the appeal too?

18       A.   Yes.

19       Q.   So all three firms worked on the appeal?

20       A.   Like I said, I don't know whether Sidley

21   did or not.

22       Q.   You didn't have any interaction with the

23   Sidley lawyers?

24       A.   A few phone calls.

25       Q.   That was the extent of it?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Vol. III (563-886)        MGA v. Lexington, et al.              11/10/2010

Page 764

1      A.   And transmitting suggested edits to the

2   stay brief.

3      Q.   Do you know if Mr. Rosenkranz had any

4   communications with the Sidley lawyers?

5      A.   The same.

6      Q.   Nothing more than that, as far as you know?

7      A.   He probably would have had more phone calls

8   and e-mails with them than I did because he was our

9   lead counsel for the appeal, and it was appropriate

10  for lead counsel to deal with lead counsel.

11     Q.   And I believe you said that MGA's taken the

12  position that they don't owe you for certain work in

13  excess of the Phase II cap.  Is that correct?

14     A.   You mean the appeal cap or something else?

15     Q.   The Phase II, you have -- in excess of the

16  cap.

17     A.   No, because there's a collar.  So they're

18  not taking the position they don't owe us anything

19  in excess of the cap.  There is a collar.

20     Q.   But they withheld payment for certain work

21  from Orrick, correct?

22          MS. FIELD:  Maybe you don't understand the

23  collar.

24          THE WITNESS:  Withheld payment.  We have

25  not been paid everything that we believe we are

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit G - Page 467

Vol. III (563-886)      MGA v. Lexington, et al.              11/10/2010

Page 765

1   owed.  How about if I put it to you that way?

2   BY MR. SHERIDAN:

3      Q.   So you've billed for services which MGA

4   hasn't paid you for?

5      A.   Correct.

6           JUDGE SABRAW:  Could you explain the collar

7   again, what's meant by the collar?

8           THE WITNESS:  There was -- it's not a --

9   call it a -- I'm not sure what kind of cap you would

10  characterize it as.  But there was a monthly cap.

11  And then the next 10 percent we ate.  And then after

12  that, it was 50/50, MGA and us.

13          JUSTICE STONE:  It's like Medicare drugs.

14  They call it a donut.

15          THE WITNESS:  The donut hole was the

16  10 percent, and then the collar is the 50/50 piece.

17  Right.

18  BY MR. SHERIDAN:

19     Q.   Ms. Hurst, have you gone above the collar

20  in terms of your billing?

21     A.   What do you mean?

22          JUSTICE WALLIN:  Are you above the

23  10 percent?

24          THE WITNESS:  Oh, yes.  Yes.  We have been.

25          JUSTICE WALLIN:  So you're now in the

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 468

Vol. III (563-886)       MGA v. Lexington, et al.            11/10/2010

Page 766

1   collar territory as far as MGA's concerned?

2           THE WITNESS:  Correct.

3           JUSTICE WALLIN:  Is that what you meant?

4           MR. SHERIDAN:  Yes, it is.

5      Q.   So -- and MGA says they won't pay you for

6   anything more than that, correct?

7      A.   Anything more than what?

8      Q.   On what you just answered.  You've taken

9   the position previously that MGA has said that they

10  don't owe you for certain items, correct?

11     A.   We are negotiating what is within the scope

12  of work covered, whether certain items, like I gave

13  an example to Ms. Field, are covered by the scope of

14  work that's subject to the cap or not.  That

15  negotiation has not reached a conclusion.

16     Q.   For future work or past work?

17     A.   Past work.

18     Q.   So at present you've performed work in the

19  past that MGA has not paid for, correct?

20     A.   Correct.

21     Q.   Do you know how much work it is that you've

22  done that MGA has not paid for?

23     A.   Do you mean me to include the rejections

24  for vagueness and block billing and all that?

25     Q.   There's been rejections for vagueness and

Page 767

1    block billing?

2        A.    Yes.  I believe I testified to that

3    earlier.  And then we resubmit and resubmit and

4    resubmit.

5        Q.    And when there are --

6        A.    And then --

7        Q.    You're aware that -- I'm sorry.  Did you

8    need to finish?

9        A.    No.

10       Q.    You're aware that the carriers only pay a

11   negotiated fee -- correct? -- a negotiated rate with

12   MGA?

13       A.    Yes.

14       Q.    And above that, for every hour MGA owes the

15   difference, correct?

16       A.    Within the terms of our agreement, yes.

17       Q.    With respect to these items that have been

18   rejected for vagueness and block billing, has MGA

19   paid its portion of those hours?

20       A.    MGA has paid us its monthly initial

21   payments, some of which are attributed to that.

22   We've got a complicated calculation in terms of how

23   we assign everything.

24       Q.    Do you know how much the insurance carriers

25   have paid Sidley Austin in connection with this

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 470

Page 768

1   matter?

2       A.   I have no idea.

3       Q.   Would it surprise you to learn we paid them

4   $570,000 for their work on the appeal?

5       A.   I -- that's consistent with what I was told

6   was their cap.

7            JUSTICE WALLIN:  When you say "we," are you

8   including Crum & Forster as well?  That 570,000 is

9   everyone at this table here, you're saying?

10           MR. SHERIDAN:  Ms. Field has one more

11  question.

12           I'm done, your Honor.

13           JUSTICE WALLIN:  Sure.

14

15                CROSS-EXAMINATION (REOPENED)

16  BY MS. FIELD:

17      Q.   I know I should -- the arrangement that you

18  have with MGA is extremely complicated in terms of

19  the various caps and the fee-sharing and the collar

20  and all of that.

21      A.   Yes.

22      Q.   And as I understand it, there's some

23  monthly set sum that MGA pays, right?

24      A.   Correct.

25      Q.   And then there's complicated formulas as to

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 471

Page 769

1    how much more is to be paid and when it is to be

2    paid.  And I don't want to try to explain it, but

3    there are formulas that are built into that retainer

4    agreement, correct?

5         A.   Yes.

6         Q.   Okay.  And in addition to the MGA monthly

7    amount, as I understand it, the monies that are paid

8    for your firm's bills by the carriers is supposed to

9    be paid to you, correct?

10        A.   Yes.

11        Q.   And in connection with the appeal cap that

12   you were talking about, your firm's fees have

13   exceeded that cap?  Is that what you're telling us?

14        A.   Yes, they did exceed that cap.

15        Q.   And as I understand it, MGA has refused to

16   pay the amount in excess of that cap, correct?

17        A.   That's correct.

18             MS. FIELD:  I have no further questions.

19             MR. BIDART:  Nothing further.

20             JUSTICE WALLIN:  All right.  Thank you,

21   Ms. Hurst.  I believe you're excused.

22             THE WITNESS:  Thank you very much.

23             And talk to you next month.

24             JUSTICE WALLIN:  Okay.  Who is next,

25   Mr. Bidart?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 770

```
 1            MR. BIDART:  We're going to resume
 2   Mr. Wagoner.
 3            JUSTICE WALLIN:   Okay.
 4            Mr. Wagoner.
 5            MR. SHERIDAN:  Your Honor, we've got a
 6   little housekeeping before we put Mr. Wagoner back
 7   on, if we could.  We've got a little housekeeping,
 8   if we could.
 9            MR. HART:  If we may, if we can point it
10   out to the Court at the beginning of the
11   arbitration, we have a witness who we can't get
12   here.
13            Fortunately, we do have his depo transcript
14   taken in the U.S. District Court action, and we
15   would like to bring that witness by that deposition.
16            MR. BIDART:  We would like to be heard
17   because we have strenuous objection to that for
18   reasons I would like to be able to put on the
19   record.
20            JUSTICE WALLIN:  Can't we do that at the
21   end of the day?
22            MR. BIDART:  That's fine with me.
23            MR. HART:  Yeah.  I just want to make sure
24   we got it in front of everybody.
25            JUDGE SABRAW:  Just to understand, is this
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit G - Page 473

Page 771

```
 1   a videotaped --

 2              MR. HART:  No, it is not.

 3              JUDGE SABRAW:  So it's just a transcript

 4   of --

 5              MR. HART:  It's a transcript we'll be

 6   reading.

 7              JUSTICE WALLIN:  All right.  Let's save

 8   that for the end of the day.

 9              JAMES WAGONER:  By chance, does that mean

10   the Panel expects to stop at like 5:00 or ten to

11   5:00?  I have a five o'clock call.  We can continue,

12   but I just need to know.

13              JUSTICE WALLIN:  Okay.  That's okay with

14   me.

15              JAMES WAGONER:  You want to stop at a

16   quarter to 5:00 or ten to 5:00?

17              JUSTICE WALLIN:  Sure.  And then we can

18   have that conversation, and then that's the end of

19   the day.

20              JAMES WAGONER:  Great.

21              JUSTICE WALLIN:  Go ahead, Mr. Bidart.

22              MR. BIDART:  Thank you.

23              If possible -- I'm getting a little hard of

24   hearing here -- if you could try to keep your voice

25   up, I would appreciate it, Mr. Wagoner.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit G - Page 474

Page 772

 1            JUSTICE WALLIN:  Use a federal court voice

 2    like Ms. Hurst.

 3            JAMES WAGONER:  I had that same criticism

 4    from the end of the table.

 5

 6                    JAMES WAGONER,

 7    previously called as a witness by the Claimants, was

 8    previously administered the oath, resumed the stand,

 9    and testified further as follows:

10

11            DIRECT EXAMINATION (RESUMED)

12    BY MR. BIDART:

13       Q.   Mr. Wagoner, have you been participating

14    personally in these periodic phone calls, these

15    monthly phone calls that were referred to by

16    Ms. Field in her questioning of Ms. Hurst?

17       A.   Some of them.  Not all of them.

18       Q.   And when you're not able to attend, does

19    someone else from your office attend?

20       A.   Yes.

21       Q.   Okay.  And who are the other people that

22    you've assigned to do that when you're unavailable?

23       A.   I've asked Ruby to help.

24       Q.   And have you asked questions of Ms. Hurst

25    during those phone calls?

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit G - Page 475

Vol. III (563-886)        MGA v. Lexington, et al.                11/10/2010

Page 773

1     A.   I don't think I asked a question.  I made a
2  comment about an issue that she was discussing.  And
3  I made a comment.  I wouldn't put it as a question,
4  but I spoke.
5     Q.   How many of those phone calls have you
6  attended?
7     A.   I remember the one that Ms. Hurst described
8  where she got the Ninth Circuit decision right in
9  the middle of the call and she made a few excited
10  remarks and got off the phone.
11          I was in one that I made the comment on
12  that I just referred to.  And I may have been in
13  others.  I really -- I can't recall.
14     Q.   And you know that in an organized fashion,
15  those calls have been going on since January of
16  2010, correct?
17     A.   I know -- that -- I won't disagree with
18  that.  I don't know if they were on a monthly basis
19  scheduled since January, but I know that -- that's
20  when the first phone call was.
21     Q.   Now, going back to 2009, do you recall
22  mentioning in earlier testimony of a meeting that
23  took place in February of 2009?
24     A.   I do.
25     Q.   And that meeting was actually a meeting

CONFIDENTIAL - ATTORNEYS' EYES ONLY                      Exhibit G - Page 476

Page 774

1    that I had requested and contacted you to set up,

2    correct?

3        A.    Correct.

4        Q.    And in my contact to you, I advised you

5    that, in fact, MGA was in the process of discussing

6    changing lawyers for part of the handling of the

7    case, and we wanted to involve the carriers in that

8    process.

9             Do you recall that?

10       A.    Something to that effect.  I don't recall

11   that specifically.

12       Q.    Yes.  And you and I had a cordial

13   conversation where I requested that you, because we

14   had been talking about this case, assist in trying

15   to get people together to come to a meeting,

16   correct?

17       A.    Yes, you did.

18       Q.    And you did so?

19       A.    I did.

20       Q.    And from your side of that -- strike that.

21            And in attendance at that meeting -- do you

22   recall that the meeting took place at Drinker

23   Biddle's Downtown Los Angeles office on February 18,

24   2009?

25       A.    I believe that's correct, yes.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 775

```
 1      Q.   And present at the meeting were you?

 2      A.   Yes.

 3      Q.   Representing Lexington, correct?

 4      A.   I -- I think it's probably debatable

 5   whether I also represent the other Chartis companies

 6   as well.

 7      Q.   Okay.

 8      A.   I would say I do.

 9      Q.   But at a minimum Lexington?

10      A.   Yes.

11      Q.   Ruby Helsley was there?

12      A.   Correct.

13      Q.   Michael Schmidt was there?

14      A.   Correct.

15      Q.   Mark Sheridan was there --

16      A.   Correct.

17      Q.   -- having come out from the East Coast for

18   the meeting at my invitation, correct?

19      A.   Correct.

20      Q.   And Chris Bradley, a claims rep for AIG

21   Lexington from New York was there?

22      A.   He didn't rep- -- he's not for Lexington.

23   He was AIG New York.

24      Q.   Okay.  And I was there?

25      A.   You were.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit G - Page 478

Vol. III (563-886)       MGA v. Lexington, et al.               11/10/2010

Page 776

```
 1      Q.   Our administrator and paralegal Vikki
 2   Sanchez was there?
 3      A.   That's right, Vikki was there.
 4      Q.   Jeanine Pisoni, in-house counsel for MGA,
 5   was there?
 6      A.   Correct.
 7      Q.   Mark Haddad, appellate counsel then on the
 8   appeal for MGA in the underlying Mattel case, from
 9   Sidley & Austin was there?
10      A.   He was.
11      Q.   Joel Klevens, current defense counsel for
12   MGA in the Mattel case, from Christensen, Glaser,
13   Fink, et al., was there, right?
14      A.   There was someone there from that firm.  I
15   don't remember their name.  I have no reason to
16   dispute what you say.
17      Q.   And Mark Overland, counsel for Machado in
18   the Mexican litigation, was there?
19      A.   I do remember Mr. Machado -- Gustavo
20   Machado's attorney being there.  I don't remember
21   his name.
22      Q.   All right.  And before I get into what
23   happened during that meeting, you'll recall that I
24   had expressed to you that I wished to figure out a
25   way of facilitating a smooth, working relationship
```

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                     Exhibit G - Page 479

Page 777

1   between the lawyers and MGA and the insurance

2   companies, correct?

3       A.    I don't recall such a remark.  You may well

4   have said that.

5       Q.    Okay.  And certainly, putting aside your

6   not remembering the exact words or those weren't the

7   exact words I used, clearly you had the impression

8   that what I was trying to do was promote

9   communication between everybody to facilitate the

10   defense of the claim going forward?

11      A.    I would -- my best recollection is you were

12   trying to facilitate the furtherance of the

13   transition.  I don't recall that the topics went

14   beyond the transition; they may have.  I have no

15   memory of that.

16      Q.    And during that meeting, it was discussed

17   in open meeting in the large conference room there

18   that although Sidley Austin was replacing the Howard

19   Rice firm, there was still going to be a consulting

20   role for Howard Rice.

21           Do you recall that?

22      A.    I do not.

23      Q.    And also it was discussed that the Glaser

24   firm was replacing Skadden, but there was going to

25   be a transitional role for Skadden.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 480

Vol. III (563-886)       MGA v. Lexington, et al.                 11/10/2010

Page 778

1              Do you recall that?

2      A.    I do.

3      Q.    You do recall that?

4      A.    Yes, sir.

5      Q.    Okay.  And that at least at that time, it

6   was the intention of MGA, which they were

7   communicating at that meeting to the carriers, that

8   the Glaser firm would be handling Phase II, correct?

9      A.    Correct.  I think there was -- the Mitchell

10  firm was going to handle some other part of

11  Phase II, but Glaser would be the defense counsel --

12     Q.    And --

13     A.    -- principally.  Excuse me.

14     Q.    And this meeting of February 18, 2009, was

15  just roughly two months after the settlement

16  agreement between MGA and Lexington, which is

17  Exhibit 114, correct?

18     A.    Yes.

19     Q.    And, in fact, the reason --

20     A.    I assume that was after the execution of

21  the agreement.

22     Q.    Right.

23     A.    Okay.

24     Q.    And there was -- there were no other

25  insurance companies invited to the meeting because

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Exhibit G - Page 481

Vol. III (563-886)       MGA v. Lexington, et al.              11/10/2010

Page 779

1   none of them had agreed to defend yet, correct?

2        A.    I believe that's true.

3        Q.    And, in fact, the adjudication of the duty

4   to defend for Crum & Forster and for Evanston did

5   not take place until June 24, 2009, correct?

6        A.    I don't remember the date, but it was after

7   that meeting.

8        Q.    Yes.

9        A.    Couple months later, I agree.

10       Q.    Well, from February to June.  Would it

11  refresh your memory if I told you it was June 24,

12  2009?

13       A.    I don't know that I had a memory of that at

14  any time.

15       Q.    Okay.

16       A.    But I don't -- I'm not disputing your date.

17  That's easily verifiable.

18       Q.    All right.  And during that meeting, one of

19  the things that all of the lawyers on behalf of MGA

20  present was to provide a status of the underlying

21  Mattel case, correct?

22       A.    I don't -- I don't recall that that was the

23  purpose of the meeting.  I think we did hear some

24  part of what was going on in the underlying case,

25  but I don't recall that being a primary agenda item.

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**          Exhibit G - Page 482

Page 780

1      Q.   Is your memory refreshed when I tell you

2    that counsel for MGA reported that the injunction

3    and the constructive trust orders were not yet final

4    as of that date?

5      A.   That --

6            MR. SHERIDAN:  Objection.

7            Is your memory refreshed when I tell you

8    that counsel for MGA reported?  Who's testifying

9    here?

10           MR. BIDART:  Did -- strike that.

11           JUSTICE WALLIN:  He -- it doesn't matter

12   because he can say, no, there's no proof of that.

13           THE WITNESS:  I have faint recollections of

14   stuff in that general area.  I couldn't verify that

15   for certain, Mr. Bidart.

16   BY MR. BIDART:

17     Q.   Do you recall that you learned at that

18   meeting that Judge Larson was -- had said that he

19   was going to be revisiting the injunction and

20   constructive trust orders?

21     A.   Probably same category.  I have a faint

22   recollection of something about that topic coming

23   up, but I don't know that he was -- that what -- the

24   way you put it was what I specifically recall

25   hearing.

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit G - Page 483

Page 781

1      Q.    Do you recall being advised on February 18,

2   2009, that the stay, which was then in place, was

3   going to remain in place according to Judge Larson

4   through the end of 2009?

5      A.    You're referring to the stay on --

6      Q.    The injunction.

7      A.    I do not -- let me read that.  Let me look

8   at that question again.  Excuse me.

9            Yeah, I do remember that.  You're right.

10     Q.    Okay.  And before I go further, do you

11  recall whether or not either you or anybody at your

12  instruction at McCormick Barstow prepared a

13  memorandum of what took place at that meeting?

14     A.    I would have to see the memo.  I don't

15  recall if I gave that instruction.  I may well have.

16     Q.    Okay.  And you've not ever seen -- first --

17  strike that.

18            First of all, you have no memory of

19  creating such a memo yourself, correct?

20     A.    I took notes myself at the meeting.

21  Whether I converted them to a memo, I would have to

22  check my file.

23     Q.    Do you know where you keep those notes?

24     A.    I do.

25     Q.    Okay.  In your office?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 782

1     A.    Yes.

2     Q.    In a file?

3     A.    They should be in a file called "Attorney

4  Notes."

5     Q.    Okay.  Do you recall learning at the

6  meeting that the JNOV filed by both sides had been

7  filed as to the jury verdicts that had been rendered

8  in 2008?

9     A.    I know that I knew that.  I don't know that

10  I knew it from the meeting.

11     Q.    Okay.  Do you recall it being reported at

12  the meeting that all of those were under submission

13  before Judge Larson?

14     A.    Same answer.

15     Q.    Okay.

16     A.    Actually, that would be imprecise.  I don't

17  recall -- I know I knew about the motions.  I don't

18  recall if they came up at the meeting at all or not.

19     Q.    And do you recall that at the meeting,

20  there was a free-flow of information between you,

21  the other lawyers on behalf of the insurance

22  company, Mr. Sheridan, and all of the lawyers that

23  were there on behalf of MGA?

24          What I mean by that, that direct questions

25  were asked of the lawyers and direct answers given,

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 485

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 253 of 486   Page ID
#:321881
Vol. III (563-886)      MGA v. Lexington, et al.            11/10/2010

Page 783

1   not through me.

2      A.   I recall the way you described it in the

3   second part of your question.  I don't -- free-flow,

4   I'm not sure I recall it that specifically.

5      Q.   In other words, everybody was sitting

6   around a big table, correct?

7      A.   That's true.

8      Q.   And lawyers on behalf of MGA in the

9   underlying case were each asked to give a summary of

10  what was going on in the case, and they spoke as to

11  what their role was in the case?

12     A.   I recall some lawyers speaking.  I don't

13  know if they went around the table on a -- you know,

14  everybody got to speak.  But I recall lawyers giving

15  indications as to what was going on in certain

16  aspects of the case.  I can't recall if it was

17  represented to be a complete status report.

18     Q.   Do you recall asking questions of those

19  lawyers?

20     A.   I do.

21     Q.   Do you recall getting answers?

22     A.   I do.

23     Q.   Do you recall asking any questions to which

24  you didn't get an answer?

25     A.   I do not.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 486

Page 784

1      Q.   Do you recall ever lodging any complaint

2    with any of the lawyers or anybody else that you had

3    asked questions for which you did not get answers?

4      A.   I do not.

5      Q.   Do you recall agreeing to do anything

6    yourself as a result of that meeting and report back

7    to people?

8      A.   No.

9      Q.   The answer is no?

10     A.   The answer is no.

11     Q.   Okay.

12     A.   Oh, sorry.

13     Q.   Do you recall -- do you wish to change your

14   answer?

15     A.   No.  I want to speak up.

16     Q.   Oh, I see.  That's all right.

17          JUSTICE WALLIN:  Emulate Ms. Hurst.

18          THE WITNESS:  I will try to speak up.

19   BY MR. BIDART:

20     Q.   Do you recall at that meeting that an issue

21   came up concerning what Lexington's position would

22   be regarding the defense obligation for an

23   injunction being entered, in other words, a

24   discussion between equitable relief versus exposure

25   for damages?

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit G - Page 487

Page 785

```
 1      A.   Not the way you phrased it.  If you could
 2   be more elaborate, I --
 3      Q.   I'll try to.  I'll try to make it clearer.
 4           JUSTICE WALLIN:  On that subject, what do
 5   you recall?
 6           MR. BIDART:  That's a better question.
 7           JUSTICE WALLIN:  All lawyers always say my
 8   questions are good, but I'm not sure it's true.
 9           THE WITNESS:  Hang on.  Don't let the
10   question go away.  Wait a minute.
11           Yes, I do.
12   BY MR. BIDART:
13      Q.   And what is your recollection as to what
14   you agreed to do as a result of that discussion?
15      A.   I don't have a recollection.  If I agreed
16   to do something, please remind me.
17      Q.   Well, I just want -- I'll ask you what you
18   remember.
19           Do you recall Mr. Sheridan and you agreeing
20   that you would provide an opinion to all of us
21   regarding the requirements for the carrier if only
22   an injunction was entered, and that is, whether or
23   not there would be any position taken by the carrier
24   that there would not be a duty to defend if only an
25   injunction was being required?
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 488

Vol. III (563-886)      MGA v. Lexington, et al.            11/10/2010

Page 786

 1      A.   I don't remember agreeing to that.

 2      Q.   Okay.  Do you recall ever doing a memo

 3  regarding those issues?

 4      A.   I do not.

 5      Q.   Okay.  Do you recall Mr. Klevens reporting

 6  on issues relating to Phase II?

 7      A.   Klevens was which --

 8      Q.   Mr. Klevens -- he was the current defense

 9  counsel then in place for MGA from Christensen

10  Glaser.

11      A.   I recall some discussion about what was

12  expected -- something about Phase II.

13      Q.   Okay.

14      A.   I recall there was some discussion about

15  what -- the anticipated Phase II, correct.

16      Q.   You would agree that all of the lawyers

17  there representing MGA, first of all, they appeared

18  at the time scheduled for the meeting, correct?

19      A.   I don't recall anybody being late.

20      Q.   Okay.  They came, and they were

21  professional the way they handled themselves?

22      A.   They did.

23      Q.   They were cordial in their dealings with

24  you?

25      A.   They were.

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit G - Page 489

Vol. III (563-886)       MGA v. Lexington, et al.            11/10/2010

                                                         Page 787

    1       Q.    And they answered any and all questions

    2   that were asked of them?

    3       A.    I don't recall anyone refusing to answer a

    4   question.

    5       Q.    And do you recall being left with the

    6   impression that any of those lawyers were being

    7   anything short of complete and thorough in their

    8   answers?

    9       A.    I do not.

   10       Q.    And you never recall having issued any

   11   follow-up letters or communications to anyone

   12   complaining about the level of cooperation you got

   13   at the meeting, correct?

   14       A.    I did not.

   15       Q.    Okay.  And do you recall that Mr. Klevens

   16   reported that the claims made under Phase II are for

   17   unfair competition and trade secrets, alleging the

   18   stealing of Bratz and trade secrets and employees of

   19   Mattel?

   20       A.    I remember some discussion, a little bit

   21   about Phase II.  I don't recall the detail that your

   22   question includes.

   23       Q.    And do you recall that Mr. Klevens stated

   24   that the Glaser firm's responsibility would

   25   primarily focus on the RICO claims?

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit G - Page 490

Page 788

1    A.   I recall there was a firm that was going to

2   concentrate on the RICO claims.  In fact, my

3   recollection was not Glaser, but I may be

4   mis-recalling, but I thought it was a different

5   firm.

6    Q.   And do you recall Mr. Klevens of the

7   Christensen Glaser firm stating that it was MGA's

8   position that employees did come over from Mattel

9   and did take things despite Isaac Larian telling

10   them specifically not to bring anything with them?

11        Do you recall that?

12    A.   I do recall something to that effect,

13   that -- I don't know who said it or the context, but

14   I recall something about the way you've described

15   it.

16    Q.   And do you recall Mr. Klevens of that same

17   firm reporting that, in his opinion, Mattel's

18   counterclaim was weak on the facts showing that MGA

19   did anything to direct any of that conduct?

20    A.   That -- the way you describe it, I have a

21   faint recollection that may be true.  I don't have a

22   precise recollection.

23    Q.   Do you recall from the meeting having

24   learned information concerning the case involving

25   Omni?

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 491

Vol. III (563-886)     MGA v. Lexington, et al.               11/10/2010

Page 789

     1      A.    I remember the name.

     2      Q.    Do you recall that Omni was the entity that

     3   had done some financing and acquired a financial

     4   interest?

     5      A.    I recall something generally about who Omni

     6   was.  My -- that may have been it.  I would have to

     7   look at my notes.  Those weren't important details

     8   to me at that point.

     9      Q.    And the reason they weren't important

    10   details to you is that because this was general

    11   information only and it did not affect the review

    12   that you were doing of the billing submissions?

    13      A.    That's not the reason.

    14      Q.    What was the reason?

    15      A.    I think the reason is my memory has

    16   narrowed over the years and it only permits me to

    17   recall certain things.

    18      Q.    Right.

    19      A.    And those -- and that's why I take a lot of

    20   notes.

    21      Q.    Right.

    22      A.    And so the things that I do remember,

    23   things that, for whatever reason, stuck in your

    24   mind -- you don't know why certain things stick in

    25   your mind sometimes, but I do recall certain things

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit G - Page 492

Vol. III (563-886)      MGA v. Lexington, et al.            11/10/2010

Page 790

1    from that meeting.  I don't recall everything.

2         Q.   Well, please, then, identify for the record

3    the things that you did hear or learn during that

4    meeting that you do recall.

5         A.   I recall distinctly Ms. Pisoni making the

6    remark that MGA did not expect the insured to be

7    responsible for the fees incurred in transition from

8    one firm to another.

9         Q.   And you're talking about the firms that

10   were present at that meeting as replacing earlier

11   firms?  Is that what you understand it to mean?

12        A.   Yes.

13        Q.   Okay.  Anything else you remember from the

14   meeting?

15        A.   That was said?

16        Q.   Or I guess all your sentences.

17        A.   I remember being very impressed with Mark

18   Haddad.

19        Q.   Okay.  Were you impressed with any of the

20   rest of us?

21        A.   You, of course.  But I have been impressed

22   with you for a long time.

23        Q.   Right.  Thank you.

24             JUSTICE WALLIN:  That was a tough question

25   to ask, not knowing the answer.

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit G - Page 493

Page 791

 1          THE WITNESS:  Mike knows that I hold him in

 2     high regard.

 3     BY MR. BIDART:

 4       Q.    In seriousness, Mr. Wagoner, following this

 5     meeting, do you recall either you or anybody at your

 6     direction making contact or seeking contact or

 7     information from any of the lawyers that were

 8     present at this meeting seeking information or

 9     clarification?

10       A.    Directly from us to them?

11       Q.    Yes.

12       A.    Do I recall doing that?

13       Q.    Right.

14       A.    No.

15       Q.    Do you recall ever communicating to me or

16     anybody at my office seeking to be able to talk to

17     any of those people?

18       A.    I recall, Mike, that you told me in an

19     early conversation that you didn't want me talking

20     to those lawyers without going through you.  And I

21     don't recall ever since then saying, Mike, I want to

22     talk to lawyers, other than in the calls that Susan

23     promoted.

24       Q.    The fact is, Mr. Wagoner, that on each and

25     every occasion you've ever requested anything from

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 494

Page 792

1    me regarding any information, I've provided it to

2    you, correct?

3        A.   Are you referring to the letters that we

4    sent you?

5        Q.   In other words -- no.  I'm talk- -- I'm

6    referring to any request to talk to counsel or

7    any --

8        A.   Oh, to talk -- I don't recall having made

9    any request to talk to counsel.

10       Q.   And you've never raised any issues with me

11   or anybody in our office concerning information that

12   you needed to conduct a determination of

13   reasonableness of fees, correct?

14       A.   Not -- not reasonableness, correct.

15       Q.   Okay.

16       A.   We have asked other questions that have not

17   been responded to.

18       Q.   This you're talking about -- you're

19   referring now to information that's contained in

20   these monthly responses to the submissions?

21       A.   Not just those, but there are other letters

22   in between the monthly responses that have gone

23   unresponded to.  Some of those have gone directly to

24   Ms. Pisoni.  Usually copy -- I think they're always

25   copied to you.

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit G - Page 495

Page 793

1       Q.    And do you believe that any of that

2   information that you're referring to which you

3   purport was unresponded to or information not given

4   to you, none of that information related to

5   reasonableness of fees, correct?

6       A.    I wouldn't agree with that.

7       Q.    Okay.  You were not doing any review for

8   reasonableness of fees at any point in time,

9   correct?

10      A.    That's true.

11      Q.    Okay.  And so any information which you

12  believe you needed did not in any way impede an

13  investigation that you were doing on reasonableness

14  of fees; is that correct?

15      A.    I wasn't doing an investigation on

16  reasonableness of fees.

17      Q.    And so necessarily it couldn't have in any

18  way impeded any such investigation?

19      A.    There was no such investigation.

20      Q.    Okay.  Anything else you remember about

21  that meeting?

22      A.    I remember Ms. Pisoni.  Hadn't met her

23  before.  I recall that she seemed to get a little

24  emotional at the meeting.

25      Q.    Emotional.  There's a lot of forms of

CONFIDENTIAL - ATTORNEYS' EYES ONLY           Exhibit G - Page 496

Page 794

1    emotion.  Was it anger? crying?

2         A.    Crying or close -- crying or close to it.

3         Q.    She demonstrated some frustration, correct?

4         A.    I don't know that I would call it

5    frustration.  I don't -- I wouldn't -- let me think.

6              She was upset and -- about -- I think one

7    of the things she was talking about was how hard she

8    was having to work to manage this piece of

9    litigation.  If you would call that frustration,

10   yes, I would guess that's true.

11             MR. BIDART:  Okay.  I have nothing further.

12             Thank you, Mr. Wagoner.

13             THE WITNESS:  Thank you.

14             MR. SHERIDAN:  Your Honor, can I have 10 or

15   15 minutes with Mr. Wagoner, and then we'll wrap it

16   up?

17             JUSTICE WALLIN:  Sure.

18             MR. BIDART:  Do you want to put him here,

19   or do you want to just leave him?

20             MR. SHERIDAN:  No.  I would like to take a

21   short break with him and then come back.

22             JUSTICE WALLIN:  Off the record.

23             (Off the record from 3:34 p.m. to

24             4:00 p.m.)

25             JUSTICE WALLIN:  All right.  Let's proceed.

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit G - Page 497

Page 795

```
 1            Mr. Sheridan, go ahead.

 2

 3                      CROSS-EXAMINATION

 4   BY MR. SHERIDAN:

 5       Q.   Mr. Wagoner, we discussed your background

 6   briefly before, but could you tell me a little bit

 7   about your practice at McCormick Barstow.

 8       A.   We started doing coverage shortly after I

 9   got to the firm, and it kind of expanded to the

10   point where we actually formed a coverage department

11   about 1978.  And we've since become statewide

12   counsel for a number of carriers.  And I think I

13   probably have one case in Fresno and the rest of

14   them are L.A., San Francisco, San Diego, and hither

15   and yon.  It's the statewide practice.

16       Q.   And do you practice outside of California

17   as well?

18       A.   Yes, I do.

19       Q.   And has that been pretty consistent over

20   your career, practicing outside of Fresno and

21   outside of --

22       A.   I would say it started when Fireman's Fund

23   retained us as statewide counsel about -- sometime

24   in the 1980s.

25       Q.   If you would, could you describe for us
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY      Exhibit G - Page 498

Vol. III (563-886)        MGA v. Lexington, et al.              11/10/2010

Page 796

1    your view on the relationship between MGA and its

2    insurers in this case.

3        A.    I'll do the best I can to try to describe

4    it in a few words.

5            The relationship started out with me giving

6    Lexington what I would call -- what I would sort

7    of -- you know, once in a lifetime advice to pay

8    more than what they owed and even without knowing

9    what they did owe.

10           And I explained -- well, I don't want to go

11   into attorney-client privileged information, but the

12   effort starting with that and a lot of other things

13   has been to do really everything we can beyond what

14   I've ever recommended clients do in other cases is

15   to try to accommodate MGA.

16           And it seems to me that when MGA wants a

17   meeting or something, there's been -- there was just

18   an instance a few months ago where Mr. Bidart wanted

19   a meeting the next day in L.A. and I arranged it and

20   said, "Yes.  Okay."

21           And he called me back and said, "We're not

22   going to have the meeting."

23           That meeting's never occurred.  But every

24   time there's been a request to accommodate MGA in

25   some fashion, we've tried to do that.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 499

Vol. III (563-886)        MGA v. Lexington, et al.              11/10/2010

                                                              Page 797

 1            In response, it doesn't seem like it's been
 2   reciprocated.  In fact, I'm confident I can say it
 3   hasn't been reciprocated the way I would expect,
 4   particularly in view of how we've gone overbroad to
 5   try to accommodate MGA.
 6        Q.   Can you tell me how you've gone overbroad
 7   to accommodate MGA, in your opinion?
 8        A.   Well, besides paying the $20 million and
 9   risking my career in giving that advice --
10        Q.   Can we stop there for a second.
11        A.   Okay.
12        Q.   So you are responsible for putting
13   Mr. Creamer's career at risk?
14        A.   We're going down -- I thought -- this was
15   my idea.  I thought it made sense.  I thought it was
16   something that we could use to hopefully generate a
17   good working relationship going in with MGA.
18            I explained to Lexington that it's going to
19   probably owe that amount of money anyway within a
20   couple of months.  It just made sense because of the
21   financial condition, the portrayal of the financial
22   condition of MGA and its problems with paying its
23   lawyers.
24            And so I kind of stuck my neck out and made
25   that recommendation to Chuck.  And dust was kicked

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit G - Page 500

Page 798

1   up but eventually settled, and my recommendation was

2   agreed to, with reluctance, as I understand, on the

3   part of some of the higher-ups at Lexington, but

4   they agreed to follow my advice.

5        Q.   Have you ever given advice like that

6   before?

7        A.   No.

8        Q.   Have you ever given advice like that since?

9        A.   No.

10        Q.   You talked about how you've gone overbroad,

11   and we've talked about the prepayment.

12            Are there any other ways that you feel that

13   carriers, particularly the Chartis companies, have

14   gone overbroad in their cooperation with MGA or

15   assisting MGA?

16        A.   There's been a lot of them.  We've talked

17   about them.  It's late in the day, and I don't have

18   a memory of all of them.

19            I remember one instance about the Navigant

20   bill.  When that was brought to our attention, it

21   was a day or two before I took a backpack trip.  I

22   do a lot of backpacking.  And there was a big

23   problem.  And I usually take a satellite phone with

24   me.

25            I remember talking to Vikki Sanchez, Mike's

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 501

Vol. III (563-886)        MGA v. Lexington, et al.                    11/10/2010

Page 799

1   assistant, and -- from just under a place called

2   Franklin Pass and trying to get -- make sure

3   Navigant got paid, explaining to Vikki when the

4   check was going to get there and how it was going to

5   be plenty to accommodate the Navigant amount, which

6   was -- it wasn't $10,000.  According to the letter I

7   saw, it was like 8- or $900,000.

8              And there was that instance.  I remember

9   making that phone call.  I'm pretty sure it was

10  Vikki that I talked to.  And let her -- relayed to

11  her what was happening and that the money would be

12  arriving shortly, and she could assure Navigant that

13  it was coming.

14      Q.   In particular, any other instances relating

15  to MGA's relationship with its other carriers?

16      A.   Oh, yeah.  I had a conversation I had with

17  Mike.  It was when the Evanston and Crum & Forster

18  had filed motions to dismiss for lack of coverage

19  based on the allegations of the MGA -- of the Mattel

20  counterclaim combined with the terms of the

21  policies, which I believe were attached to the bad

22  faith complaints.

23              I was having a conversation with Mike.  I

24  had other cases with him, I think, at the time.  But

25  I was talking to Mike, and he said -- he was talking

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit G - Page 502

Page 800

1   about the advertising injuries and stuff.

2          And I kind of said, "Mike, you're missing

3   the big issue here.  You can allege -- you can talk

4   about disparagement."

5          And his response was, "Well, Jim, it only

6   talks about disparagement during a certain policy

7   period that's covered by Lexington."

8          And I cited to him a case that I was the

9   prevailing attorney on called Atlantic Mutual versus

10  J. Lamb.  It's 100 Cal.App.4th 1017.  And I -- I

11  actually have a law library at home, was talking to

12  him at home.  I pulled the book right off the shelf,

13  opened it up, read to him the passage that basically

14  said when the complaint doesn't allege a date for

15  duty to defend purposes, it has to be presumed that

16  the disparagement occurred during any possible date

17  and during all possible periods.

18          And I told him that was, I thought, his

19  better argument against Crum & Forster and Evanston.

20          And he was very grateful and thankful for

21  that advice.  He was unaware of the case and didn't

22  appreciate the argument before I relayed it to him.

23      Q.   Do you know what the result of that was?

24      A.   He defeated both of their motions and both

25  carriers were held to have a duty to defend.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Vol. III (563-886)        MGA v. Lexington, et al.              11/10/2010

```
 1              MS. FIELD:  Thanks, Jim.
 2              MR. BIDART:  I was just going to say --
 3    nothing -- didn't help Lexington at all.
 4              THE WITNESS:  It did help -- I think at the
 5    time I was -- there was a dual purpose, but I was
 6    trying to help MGA as well as Lexington.
 7              JUSTICE WALLIN:  Well, I think it probably
 8    did because it got another contributor.
 9              THE WITNESS:  Two.
10              JUSTICE WALLIN:  It helped Lexington and
11    helped MGA.  It didn't help Crum & Forster much.
12              MR. BIDART:  Does that mean the trier of
13    fact doesn't believe it was just to help me?
14              THE WITNESS:  Mike, I consider you my
15    friend.  It was to help you too.
16              MR. BIDART:  Thank you.
17              MS. FIELD:  Well, it certainly did.
18    BY MR. SHERIDAN:
19       Q.   Mr. Wagoner, can we talk a little bit about
20    the letters that are written on a monthly basis.
21       A.   Okay.  Can I complete my last answer?
22       Q.   Sure.
23       A.   The other thing I think I would say is the
24    35-day turnaround understanding that required me to
25    really lean pretty hard on Ruby and Mike to work
```

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit G - Page 504

Vol. III (563-886)      MGA v. Lexington, et al.            11/10/2010

Page 802

1    lengthy hours to be able to accommodate that 35-day

2    turnaround agreement.

3            And we've never done anything like that

4    either.  Most carriers pay bills on a quarterly,

5    semiannual, or annual basis, and many times the time

6    between submission of the invoice and payment is --

7    can be lengthy.

8            And we -- we did our best to put into place

9    an arrangement where we would be able to let the

10   carriers know by a certain date that they needed for

11   their financial arrangements within their companies

12   so that they could get clearance to cut those checks

13   with a certain amount of time.  We set up a

14   procedure to do that.  And I sort of leaned on Chuck

15   at least to agree to that.

16       Q.   You're now trying to explain your

17   ever-diminishing number of friends around this

18   table.

19       A.   Yes, I understand that.

20            Are you still my friend, Mark?

21       Q.   I am.

22       A.   Okay.

23       Q.   That way you might want to just look away

24   at this moment.

25       A.   I'm sorry.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 505

Page 803

```
 1              There's been other -- I just can't remember
 2      all the instances.  There's been areas where I
 3      thought in this case we've done things that I've
 4      never seen done in the past to -- for an insurer to
 5      accommodate an insured in a situation like this.
 6          Q.    Thirty-five days isn't the usual turnaround
 7      on bills of this size?
 8          A.    I don't think it's usual turnaround on any
 9      bill unless you're a public entity that you're
10      sending a bill to.
11          Q.    Can you describe your experience in bill
12      reviews in the past?
13          A.    I can.
14              We've done different varieties of billing
15      issues to the extent there are -- they require legal
16      analysis of different issues as part of determining
17      what we would recommend to a carrier to pay to
18      fulfill its obligation.
19              And there are legal issues that sometimes
20      come up in looking at these things, such as whether
21      something is or isn't prosecution, whether it's
22      pre-tender, whether it's actually defense work
23      versus some other kind of work that's not -- you
24      wouldn't call defense.  Those sorts of things are
25      all legal issues that sort of need some legal input
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit G - Page 506

Case 2:04-cv-09049-DOC-RNB  Document 10622  Filed 05/17/11  Page 274 of 486  Page ID
#:321902
Vol. III (563-886)        MGA v. Lexington, et al.                11/10/2010

Page 804

 1    into answering the question as to what the carrier's

 2    obligation is.

 3        Q.   And as far as getting the letters or

 4    recommendations approved, what's your role in that

 5    process?

 6        A.   As of presently, the way it works now?

 7        Q.   With respect to the MGA-Mattel matter.

 8        A.   The way it works now, it's evolved to the

 9    way it's been for probably the last year or so.  I

10    don't recall the exact date.

11            When the bills come in, Ruby instantly

12    starts looking at them.  They don't always come in

13    the same day.  We'll sometimes get three or four

14    submissions a month, sometimes more.  Ruby knows

15    that the cutoff date is the 10th of each month and

16    any bill received by the 10th of that month will be

17    reviewed and we will get -- excuse me -- not the

18    10th, it's the tenth business day of each month.

19    Excuse me.

20            We will get the bills.  Mike and Ruby will

21    go through their process.  I get -- not only will I

22    get questions when they're doing their review

23    process that we'll dialogue on and talk about on a

24    sometimes daily basis, sometimes more frequently;

25    then when I first see a draft letter, I go over the

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    **Exhibit G - Page 507**

Page 805

1   letter very carefully.

2            I will -- I'm still a lawyer that dictates

3   as opposed to types a lot of stuff.  So I'll dictate

4   notes right in the letter, make changes in the

5   letter, do different things, send them back to Mike

6   and Ruby.  And that process is typically -- I

7   probably read those letters at least three times,

8   sometimes more.

9            And we get them to the point where we need

10  to get them done.  There's a deadline we need to get

11  them to Chuck by that Ruby's very cognizant of.  And

12  the other carriers are delivered copies of the draft

13  recommendation letters too, I think 24 hours or

14  something within -- around the same time that Chuck

15  gets them.

16           After Chuck gets them, sometimes he'll call

17  me.  Sometimes he'll discuss it.  Sometimes he'll

18  make changes in the letters.  But we try to get the

19  letters out by the appointed day.

20           And when the carriers recognize what our

21  recommendation is and they've agreed to it, then

22  they schedule their payments in order to be able to

23  get that kind of money out of their piggy banks, for

24  lack of a better term.

25           And they have to schedule it, as I

CONFIDENTIAL - ATTORNEYS' EYES ONLY                     Exhibit G - Page 508

Page 806

 1   understand it.  And it's something that is beyond my

 2   understanding as to why it's that important, but

 3   apparently it is important to schedule payments of

 4   this size for carriers.

 5          And so they -- we get it to them in such a

 6   time they can schedule it and get the checks sent so

 7   that MGA receives the funds roughly by the 15th of

 8   the following month.

 9      Q.   Can you tell me, if you know, why MGA needs

10   to receive the funds by the 15th of the following

11   month?

12      A.   To make their payments and to be able to

13   take advantage, if they can, of their prompt payment

14   discounts.

15      Q.   What do you mean by "prompt payment

16   discounts"?

17      A.   In some of the retainer agreements -- I

18   don't know which ones -- they have commitments to

19   make -- that if they make payments within a certain

20   period of time, there's a discount available to

21   them.

22      Q.   And you've been involved in every letter

23   that's gone out the door, correct, with respect to

24   bill reviews?

25      A.   I have.

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit G - Page 509

Page 807

1    Q.   You haven't signed all of them, though,
2    have you?

3    A.   That's true.

4    Q.   And in the instance where you don't sign
5    them, who does?

6    A.   It's usually Ruby.

7    Q.   But you're always involved in all of the
8    letters?

9    A.   Yes.

10   Q.   Red pen's always going?

11   A.   Well, it's the red pen or the dictating
12   machine, or both, usually.

13   Q.   If I could, I would like to talk to you
14   about the categories of deductions for a moment.

15        One of the categories that we've had a lot
16   of discussion about this week is vague entries.

17   A.   All right.

18   Q.   Tell me, first of all, what is the basis
19   for taking deductions or deferring payment for vague
20   entries?

21   A.   Three sources.

22        The AIG guidelines basically say that
23   entries have to be sufficiently specific to allow
24   the person paying the bill to know what was done.

25        The MGA guidelines that incorporate the

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit G - Page 510

Page 808

 1    insurer guidelines have a very similar proclamation.

 2         And then it's my understanding of the law

 3    that -- there's a lot of case law on attorney's fees

 4    and a lot of that law essentially says that vague

 5    entries are not something that the lawyer can insist

 6    be paid because of their lack of specificity.

 7    Q.   So that's what you rely upon in making your

 8    recommendations to Mr. Creamer?

 9    A.   It is.

10    Q.   Can you tell me, why is it necessary to

11    have vague entries clarified?

12    A.   There's about three reasons that apply to a

13    lot of these other things as well.

14         One is if -- at some point in time the

15    insurers have a right to do a reasonableness audit.

16    To do the reasonableness audit, they need to have a

17    sufficiently specific billing description to be able

18    to conduct that.

19         The second reason is there's copyright

20    allegations in these cases, and the successful party

21    in a copyright case is entitled to get their

22    attorney's fees back.

23         Since the carriers have paid some of those

24    attorney's fees, they would be subrogated to MGA's

25    right to get those attorney's fees back.

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit G - Page 511

Page 809

1            In order to get those attorney's fees back,

2      they're going to have to file a motion and they're

3      going to have to present their bills.  If those

4      bills aren't sufficiently specific, they're not

5      going to recover that money.  And for that reason,

6      we want the bills sufficiently specific.

7            And then the third reason is -- it's a

8      secondary reason -- is that at some point in time

9      the carriers, having reserved their right -- at

10     least Lexington and the Chartis companies, having

11     reserved their right to seek recovery under Buss,

12     and I have been asked to make sure that those rights

13     are preserved.

14            For there to be a Buss-type allocation, you

15     need to be able to show what was specifically spent

16     on, solely on the defense of a noncovered claim.

17     And for that reason, the entry has to be

18     sufficiently specific to allow that determination

19     without having to go actually look at the work

20     product if you can accomplish that goal.

21      Q.   With respect to the category of "Block

22     Billing," can you tell me the basis for taking those

23     deductions?

24      A.   The AIG guidelines, the MGA guidelines, and

25     case law, same three.

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit G - Page 512

Page 810

1    Q.    Okay.  Can you tell me why it's necessary

2    to take -- why is it necessary to have block bills

3    unblocked?

4    A.    Yeah.  To the extent that -- well, first of

5    all, if we're going to take the potential

6    subrogation case, case law from courts being asked

7    to award attorney's fees have basically said that

8    block -- for block billing, if you block bill, there

9    can be a reduction of 10 to 30 percent.

10          And there's an argument, depending on who

11   brings the subrogation action and the extent to

12   which the made whole rule applies, the carriers

13   might be standing second in line on that.

14          And so if the 30 percent or 20 percent

15   reduction is taken, that would be a hundred

16   completely to the carriers' detriment as opposed to

17   MGA's.

18          And for that reason, the carriers want to

19   insist -- or I recommend the carriers insist that,

20   to the extent they can, that they have unblocked

21   bills so that those bills, if they're ultimately the

22   subject of an attorney's fees motion someday, will

23   not be looked upon by the Court with disfavor and

24   not fully compensated.

25          The second reason is the reasonableness

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 513

Page 811

```
 1   audit, to the extent at some point in time a

 2   reasonableness audit is done, perhaps not by us,

 3   perhaps by somebody else, billing entries have to be

 4   unblocked so that it can be determined whether

 5   certain categories or certain items, tasks were or

 6   were not reasonable, necessary, and for something

 7   that was appropriate for the litigation.

 8             And then the third reason is Buss, to the

 9   extent there's something in a block-billed entry

10   that's potentially allocable solely to a noncovered

11   claim, that needs to be set forth in the entries

12   specifically so the carrier's right to pursue a Buss

13   recovery is not impeded by the lack of separately

14   specific billing entries.

15             JUSTICE WALLIN:  You said in there that

16   there would be a 10 to 30 percent reduction if a

17   billing firm submits blocked bills according to the

18   case law.  Is that right?  Did I understand that

19   right?

20             THE WITNESS:  There's case law that says

21   that, yes, your Honor.

22             JUSTICE WALLIN:  Is there any reason why

23   you don't, then, pay 70, 80 percent, 90 percent,

24   whatever, and then invite the -- MGA or the

25   attorneys to submit some different bill for the
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 514

Page 812

1   balance?

2            THE WITNESS:  Yeah.  The reason why I guess

3   I prefer -- recommend not to see the carriers pay

4   some fraction of whatever the obligation would

5   otherwise be is that that would pretty easily be

6   deemed a breach.  Whereas I think if we simply say

7   resubmit it, and we'll consider it once it's broken

8   down.

9            JUSTICE WALLIN:  But if you paid -- I don't

10  know.  I'm just using your numbers.  This is the

11  first I heard this -- 70, 80, or 90 percent and

12  said, we'll pay that, and if you resubmit, we'll

13  consider the balance --

14           THE WITNESS:  How do I decide --

15           JUSTICE WALLIN:  -- wouldn't that be a

16  better situation in terms of that argument than

17  paying nothing?

18           THE WITNESS:  How do I decide what

19  percentage to recommend?  10, 20, or 30?

20           JUSTICE WALLIN:  Let's say you recommended

21  a 30 percent reduction and paid 70 percent.  Even on

22  your testimony, you would pay 70 percent, right?

23           THE WITNESS:  You would pay 70 percent

24  and -- but still potentially be in breach because if

25  the law requires you to provide a full defense and

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 515

Page 813

1    paying some percentage would not satisfy.

2              Now, what you're suggesting is --

3              JUSTICE WALLIN:  Is the law satisfied then

4    by paying nothing?

5              THE WITNESS:  The law, I think, is

6    satisfied by saying resubmit the bill.

7              JUSTICE WALLIN:  If you pay 70 percent and

8    say resubmit and we'll consider the other

9    30 percent, isn't that a stronger position?  I'm

10   trying to understand.

11             THE WITNESS:  If you think it is, it

12   obviously is.

13             JUSTICE STONE:  Well...

14             JUSTICE WALLIN:  I don't know.  I might not

15   have a vote here.

16             THE WITNESS:  Your Honor, I think the --

17   what we wanted was we wanted unblocked bills.  I'm

18   not certain whether that -- it would be speculation

19   on my part to say that the 10 or 20 or 30 percent

20   reduction wouldn't cause the bills to be resubmitted

21   and whether it would be successful with that.

22             Nor did I -- I really -- the idea of paying

23   something less than the full amount was something

24   that -- I didn't like considering that option

25   because it seems like it sounds a lot more like a

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 516

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 284 of 486   Page ID
#:321912
Vol. III (563-886)      MGA v. Lexington, et al.              11/10/2010

Page 814

1  breach than merely saying, please resubmit your

2  bills.

3          It's not uncommon.  I have clients many

4  times ask me to resubmit bills, and I don't consider

5  it a breach of their obligation.  And I don't -- I

6  would think that -- and this is my recommendation to

7  Chuck.  I think that's a position that I think I

8  like better than your suggestion, but I may be

9  proven wrong by this award.

10          JUSTICE STONE:  So you think that -- it's

11  your belief that by simply asking for a resubmission

12  and not paying it, you're more likely to get the

13  resubmission.  That's one reason.

14          THE WITNESS:  That's exactly correct.

15          JUSTICE STONE:  And the other being, if I

16  heard you right, that by paying part, it smells like

17  you're low-balling, which is a big no-no; is that

18  right?

19          THE WITNESS:  That's exactly correct.  It's

20  the kind of thing that --

21          JUSTICE STONE:  Yeah.  Okay.

22          THE WITNESS:  I can hear Mike Bidart making

23  a better argument on that than the argument --

24          JUSTICE STONE:  I've heard it many times.

25          THE WITNESS:  I have too.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 517

Vol. III (563-886)      MGA v. Lexington, et al.            11/10/2010

                                                      Page 815

 1              MR. SHERIDAN:  I don't to make any

 2    arguments for Mr. Bidart at this moment.

 3              JUSTICE WALLIN:  He makes a lot of

 4    ridiculous arguments.

 5              MR. BIDART:  For a country boy --

 6              MR. SHERIDAN:  Your Honor, if we --

 7              THE WITNESS:  I'm the country boy.  I'm

 8    from Fresno.  You can't take my position, now.  Come

 9    on.

10    BY MR. SHERIDAN:

11        Q.   If we could -- Mr. Wagoner, we haven't

12    said -- the insurance carriers haven't said that

13    they won't pay these amounts if they're unblocked?

14        A.   Not at all.

15        Q.   At this point in time they've simply

16    deferred payment, correct?

17        A.   Correct.

18        Q.   In fact, there have been bills that have

19    been resubmitted, correct?

20        A.   And paid, yes.

21        Q.   In fact, the first day of this arbitration

22    we learned there was $250,000 that was paid for

23    resubmitted bills, correct?

24        A.   I learned that before the first day of the

25    arbitration, but yes.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 518

Vol. III (563-886)      MGA v. Lexington, et al.              11/10/2010

Page 816

1      Q.    The rest of us didn't.

2      A.    That's true.  Well, I think Ruby knew it

3    too, as did Chuck.  And Eric, I think.

4            MR. HART:  Starting to feel lonely over

5    here.

6            THE WITNESS:  I haven't picked on you yet.

7            JUSTICE STONE:  More and more empty chairs

8    over there.

9            MR. SHERIDAN:  Diminishing number of

10   friends.

11     Q.    Clerical tasks.  Can you tell me -- you've

12   recommended that Lexington and the other carriers

13   not pay for clerical tasks, correct?

14     A.    That's correct.

15     Q.    And can you tell me why you've made that

16   recommendation?

17     A.    I don't consider it part of the defense

18   obligation.  The duty to defend is the duty to pay

19   legal fees.  Clerical tasks are not legal fees.

20           And let me rephrase that.

21           If a lawyer performs a clerical task, I

22   don't consider it to be part of the defense, the

23   case law doesn't consider it to be part of the

24   defense, and the guidelines don't consider it to be

25   part of the defense.

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**          Exhibit G - Page 519

Page 817

1          And recall that with -- well, go ahead.

2    I'm sorry.

3       Q.   Well, with respect to clerical tasks, are

4    you relying on the MGA and the AIG guidelines too?

5       A.   In part, yes.

6       Q.   You've testified with respect to the other

7    categories that you've also relied on the law.

8          Are you relying on your understanding of

9    the law with respect to clerical tasks?

10      A.   Yeah.  Case law, as I understand it, says

11   that attorney's fees do not include clerical tasks,

12   in essence.  I would have to read a case to be more

13   specific and elaborate than that, but I've seen

14   plenty of case law over the years that have said

15   that.

16      Q.   Are you familiar with the billing rates of

17   the lawyers involved in this case?

18      A.   I've seen them, yes.

19      Q.   Higher than your billing rate?

20      A.   Yes, just a bit.

21      Q.   Does your billing rate include any portion

22   of overhead?

23      A.   Our billing rate includes our overhead,

24   yes.

25      Q.   And clerical tasks you would consider to be

CONFIDENTIAL - ATTORNEYS' EYES ONLY      Exhibit G - Page 520

Page 818

1    part of the overhead?

2         A.    I do.

3         Q.    There are a couple of other categories that

4    we need to discuss.  If we can go to interoffice

5    conferences.

6         A.    Okay.

7         Q.    You've recommended to your client that they

8    apply the AIG billing guidelines limitation on

9    interoffice conferences, correct?

10        A.    Starting that after we got the MGA

11   guidelines and incorporated the insurer guidelines,

12   yes.

13        Q.    So prior to that time, you weren't applying

14   the --

15        A.    The interoffice conference, correct, we

16   were not.

17        Q.    Do you know when that began, roughly?

18        A.    We got their guidelines the day after the

19   February 18th or 19th meeting, whatever it was.  We

20   sent them a letter I believe sometime in April that

21   basically said that as of this date, billing entries

22   that occur after this date -- I would have to look

23   at the letter to be more precise.

24             But we basically said that based on the

25   billing guidelines of MGA that incorporate the

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit G - Page 521

Page 819

1    insurer guidelines, we would no longer pay for

2    interoffice conference absent some prior approval or

3    exception.

4         Q.    You received the MGA billing guidelines

5    after, the day after the February meeting?

6         A.    Yes.

7         Q.    Is that the first time you learned about

8    the billing guidelines?

9         A.    Yes.

10        Q.    They had never been disclosed to you prior

11   to that?

12        A.    That's correct.

13        Q.    And you had been representing -- you had

14   been -- Lexington had been defending MGA for how

15   long at that point?

16        A.    Since May 15th of '08.

17        Q.    Have you recommended to your clients that

18   they not pay for multiple attorney attendance?

19        A.    Yes.

20        Q.    And what have you based that on?

21        A.    The MGA guidelines which incorporate the

22   insurer guidelines.

23        Q.    And is it an absolute prohibition on --

24        A.    No.

25        Q.    What do you mean no?

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Exhibit G - Page 522

Vol. III (563-886)        MGA v. Lexington, et al.              11/10/2010

Page 820

1        A.    What it says is absent prior approval --

2    with the exception of the Orrick retainer, the MGA

3    guidelines say absent prior approval, essentially

4    one lawyer.  And those guidelines incorporate or

5    direct the lawyer to comply with insurer guidelines

6    where an insurance company's paying the bill.  And

7    the AIG guidelines basically say the same thing.

8             JUSTICE STONE:  Are you still paying only

9    one attorney per proceeding?

10            THE WITNESS:  We are paying --

11            JUSTICE STONE:  Are you still doing that?

12            THE WITNESS:  Yeah.  Unless it's prior

13   approval.  Because on -- and we've asked -- I think

14   during Ruby's testimony there was a letter that we

15   had sent to Ms. Pisoni that basically said, we've

16   looked at the guidelines.  Please tell us if

17   anyone -- if there's been any approval to deviate

18   from these guidelines in any way, and we've never

19   had a response saying, yes, there is.

20            JUSTICE STONE:  From what you know of the

21   litigation, if they requested it, you would approve

22   it, wouldn't you?

23            THE WITNESS:  Most likely, yes.

24            JUSTICE STONE:  Most likely?

25            THE WITNESS:  Well, not always.  It depends

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit G - Page 523

Page 821

1    on what it is.

2              Your Honor, I've -- I've handled -- there

3    have been sometimes such as this one and other cases

4    where I've tried cases with another lawyer from my

5    firm.  There's been -- I tried a four-month case one

6    time all by myself.

7              I was mentioning to Mark I handled the

8    Lincoln Savings and Loan matter, which involved a

9    $4 billion award.  I did all those motions and

10   depositions myself without anybody else there.

11             I agree, it's a luxury and sometimes it's

12   very helpful to have a second lawyer there.  I don't

13   know that it's necessary every time.

14             And that's why I think what I would --

15   we've had discussions, which I can't go into because

16   they're privileged --

17             JUSTICE STONE:  Sure.

18             THE WITNESS:  -- but we would love to have

19   a situation where we can have almost a hotline,

20   24-hour turnaround, something like that, that would

21   say, okay.  We want to make this request.  Okay.

22   What's the reason?

23             We'd have something set up where Chuck

24   would either preapprove me or I'd call him at home

25   or something.  We could probably get something like

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 822

1    that done.  We would like to have something like

2    that, if we could, to try to solve these issues.

3    Consistent with our efforts to try to accommodate

4    MGA in the past like we've done, we would love to

5    try to work out something with them.

6              JUSTICE STONE:  Thank you.

7    BY MR. SHERIDAN:

8        Q.   Mr. Wagoner, you mentioned the Orrick

9    agreement, I believe.

10             What is the Orrick agreement with respect

11   to multiple attorney attendance?

12       A.   I would have to look at it to be precise,

13   but I believe it says up to two attorneys at

14   appearances and depositions, something -- I would

15   have to read it to be more precise, but it goes to

16   two.

17       Q.   And so you've taken the position that it

18   should be one, and Orrick has taken the position

19   that it should be two?

20       A.   Correct.

21       Q.   You've been involved in the bill review.

22             Are there instances where it's beyond two

23   people attending a hearing or a deposition?

24       A.   There are.

25       Q.   Can you tell me roughly how many of the

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    **Exhibit G - Page 525**

Page 823

1    instances?

2        A.    I'm sorry.  I couldn't.

3        Q.    More than half?

4        A.    I honestly don't know.  I couldn't tell

5    you.

6        Q.    Can you tell me when you began applying the

7    multiple attorney attendance requirements?

8        A.    It would have -- well, the April letters,

9    when we first announced it.  But it wasn't applied

10    until we started receiving bills that included

11    entries after the date of that letter.  And that was

12    like August or something by the time that we started

13    writing letters that had referred to bills, post

14    that April date that were submitted and processed

15    and recommendations were made.

16            JUDGE SABRAW:  That's August of 2009?

17            THE WITNESS:  I believe that's true, yes.

18    BY MR. SHERIDAN:

19        Q.    So you paid for multiple attorney

20    attendance up until August of 2009?

21        A.    Yes.

22        Q.    And throughout the trial, you recommended

23    payment for all of multiple attorney attendance?

24        A.    Yes.

25        Q.    I'm sorry.  Can you just tell me again why

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 824

1    the position changed?

2        A.    Yeah.

3             We -- it's kind of -- one of the things we

4    picked up on when we looked at the MGA guidelines is

5    that MGA says they'll pay no more than 5 cents per

6    Xerox copy, whereas the AIG guidelines say 10 cents.

7             And Ruby pointed out to me, "Jim, this

8    shouldn't be a situation where just because the AIG

9    guidelines are more liberal, that MGA should be

10   making a profit."

11            And that same notion pretty much applied to

12   this.  If MGA is not liable to their lawyers to pay

13   for more than one attorney, it seemed to me that it

14   shouldn't be the insurer's responsibility to pay MGA

15   as opposed to the lawyers, which is where the

16   money's going, to the point where MGA is making a

17   profit.  That's not the purpose of the policy.

18            JUSTICE WALLIN:  Are you suggesting the

19   attorneys must have been getting permission from MGA

20   for multiple attorney attendance at depositions,

21   trials, hearings, whatever?

22            THE WITNESS:  That's what their guidelines

23   say -- or policy.  Excuse me.  They call it a policy

24   and not a guideline.

25            JUSTICE WALLIN:  Did you understand that

Page 825

1    that was ever occurring?

2            THE WITNESS:  That multiple attorneys were

3    attending?

4            JUSTICE WALLIN:  No.  That they were

5    getting permission from MGA before doing so.

6            THE WITNESS:  I don't recall.  We asked

7    that question.  I don't recall we ever got a

8    response.  That was Ruby's letter, please tell us

9    who's been -- or what deviations there have been,

10   and we've never had a response to that.

11           JUSTICE WALLIN:  Have you ever had any idea

12   how many people Quinn Emanuel sends to these kinds

13   of events?

14           THE WITNESS:  I attended one day of the

15   trial in Riverside was going on and saw just a

16   courtroom full of lawyers, and I guessed about half

17   of them were Quinn Emanuel's.  But other than that,

18   I didn't count them.  There was more than two.

19           JUSTICE WALLIN:  Okay.

20   BY MR. SHERIDAN:

21       Q.   With respect to the representation of

22   Mattel or MGA, can you tell me how many of those

23   lawyers were talking at one time in the courtroom?

24       A.   It was -- parts of it were contentious.  I

25   don't have a specific memory of that, other than it

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit G - Page 528

Vol. III (563-886)      MGA v. Lexington, et al.              11/10/2010

Page 826

1   was impressive.

2       Q.    We talked about costs a moment ago.

3             You've reviewed the settlement agreement,

4   correct?

5       A.    I have.

6       Q.    Does the settlement agreement deal with

7   differentials in costs between the costs agreed to

8   by the carriers in the AIG billing guidelines and

9   the costs that MGA actually pays?

10      A.    I would have to see the agreement to see if

11  that's true.  I'm sorry, Mr. Sheridan.

12            MR. SHERIDAN:  Can you pull up 114, page 6.

13            MR. BIDART:  It's 4:33.

14            MR. SHERIDAN:  I'll hurry, Jim.

15            Can you pull up paragraph 5.

16      Q.    Mr. Wagoner, this says (as read):

17                 The parties agree that all

18                 costs, other than attorney's fees,

19                 incurred by MGA and/or Larian in

20                 connection with the underlying

21                 action shall be reimbursed at the

22                 actual cost paid by MGA and/or

23                 Larian, subject to the provisions

24                 of paragraph 3 above, including the

25                 member companies' reservation of

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit G - Page 529

Page 827

```
 1              their rights to withhold payment

 2              for certain expenses which they

 3              determine to be unreasonable or as

 4              not in compliance with the billing

 5              guidelines.

 6              Did I read that accurately?

 7     A.    You did.

 8     Q.    You talked about costs where MGA was paying

 9  less for copying than was in the billing guidelines.

10              Does this refresh your recollection as

11  to --

12     A.    I do recall that that was there, but I --

13  when I -- when Ruby and I had that conversation, we

14  weren't talking about that.  We were just, I think,

15  talking about general principles of what the purpose

16  of the policy was.  Had I known that was there, I

17  probably would have mentioned that as well.

18     Q.    Do you know if there's a similar provision

19  with respect to the hourly rate paid by MGA?

20     A.    I would have to see it.

21              MR. SHERIDAN:  Could you go back to the

22  preceding page and pull up paragraph 4.

23              THE WITNESS:  I do recall that, correct.

24  There was instances where there's settlement

25  agreement rates, but occasionally, whether it's a,
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit G - Page 530

Page 828

```
 1   sort of an attorney staffing firm or one of these

 2   document review firms that charged less than the

 3   lowest rate for lawyers and paralegals, Ruby and

 4   Mike applied the actual rate as opposed to the

 5   settlement conference rate because, otherwise, it

 6   would be a situation where MGA would be making a

 7   profit, basically.

 8   BY MR. SHERIDAN:

 9       Q.   I'm sorry.  Could we talk about transition

10   costs.

11       A.   Okay.

12       Q.   You've recommended that your clients not

13   pay for transition costs.

14            Can you explain to me why you've made that

15   recommendation?

16       A.   When we went to the February meeting and

17   knowing the topic that Skadden was getting off the

18   case because they weren't being paid and that

19   another firm -- I don't know that I knew there were

20   going three firms or whatever number of firms

21   requested -- I don't recall either way.

22            But when we went there, and we were --

23   discussion came up about the attorneys taking over

24   for Skadden.  And Ms. Pisoni made the

25   representation, sort of volunteered, "We don't
```

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**              Exhibit G - Page 531

Page 829

1    expect the carriers to pay for transition costs."

2            And that was an issue that we were kind of

3    thinking about, knowing what the topic of the

4    meeting was, and so that's why I distinctly recall

5    her saying that.

6            And I said, "Okay.  Great."

7            And I'm confident I took a note in my notes

8    to that effect.

9            And when the bills would come in for more

10   than one independent counsel that was not approved

11   by the company, our analysis was under the

12   San Gabriel Valley case, absent prior approval,

13   basically, an insured is only held to one

14   independent counsel absent prior approval.

15           When there's -- as demonstrated by the

16   results of the February 18th meeting, when there's a

17   good reason for -- or the request, it was approved

18   in that instance, whether it would be approved

19   again, I don't know, but we'd certainly like that.

20           And it was a situation where it just seemed

21   unreasonable to -- for MGA to constantly be

22   switching lawyers and expect the carriers to pay the

23   transition costs between the old lawyer -- law firm

24   and the new law firm when it was really their

25   decision and they already had an independent counsel

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit G - Page 532

Page 830

1   that was perfectly competent.  It wasn't a situation

2   where somebody died or retired.

3           Skadden was getting off the case because

4   they weren't being paid by MGA.  And this didn't

5   seem to me that it was reasonable to insist that the

6   carriers pay for the transition costs.

7           JUSTICE WALLIN:  You have been in the

8   situation, I assume, where perhaps a carrier that

9   you represent has selected a panel counsel, and then

10  somehow you've realized either they're not doing a

11  good job or the case is beyond them.

12          And it's rather like managing a baseball

13  team.  When you have a .185 hitter coming up in a

14  tight spot in the end of the game and you have a

15  .300 hitter on the bench, you call in someone else,

16  right?

17          THE WITNESS:  I have been called in that

18  position myself, yes.

19          JUSTICE WALLIN:  I bet you have.

20          THE WITNESS:  Just recently, and I still

21  had to pay a bunch of money to Mr. Bidart.

22          JUSTICE WALLIN:  But hopefully a lot less

23  than the other lawyer would have --

24          THE WITNESS:  I'm not sure.  I think I got

25  him so --

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit G - Page 533

Page 831

1            JUSTICE WALLIN:  He says no.

2            THE WITNESS:  -- so irritated at me in that

3    case.  First time he's ever hung up on me in all my

4    conversations.

5            MR. BIDART:  I'm just now getting over it.

6            THE WITNESS:  We got testy with each other

7    in that case.

8            JUSTICE WALLIN:  That just shows you were

9    doing a good job if you were driving him up the

10   walls.

11           THE WITNESS:  Apparently I did.

12           JUSTICE STONE:  It's not easy to do.

13           THE WITNESS:  I found a soft spot.

14           JUSTICE WALLIN:  There was a case he had

15   years ago that I --

16           MR. BIDART:  You've lost control of the

17   conversation.

18           MR. SHERIDAN:  I know.  I've lost control

19   of the conversation.

20           JUSTICE WALLIN:  There was a case he had --

21           THE WITNESS:  I think he's got priority

22   over you.

23           MR. SHERIDAN:  He does.  He does.

24           MR. BIDART:  I think it doesn't matter what

25   you think.

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit G - Page 534

Page 832

1            JUSTICE WALLIN:  It was a case he had years

2      ago, the Goodrich case.  You've probably heard of

3      this case, Goodrich versus Aetna.

4            THE WITNESS:  Oh, yes.

5            JUSTICE WALLIN:  I mediated that

6      afterwards, so I know a little bit about it.

7            JUSTICE STONE:  You couldn't get it in

8      before the trial?

9            JUSTICE WALLIN:  No.  I wasn't involved

10     beforehand.

11            I will just say that if a different trial

12     attorney had been selected by the carrier in that

13     case, I think Mike would have settled it for a lot

14     less than he wound up with.

15            THE WITNESS:  The lawyers that I took over

16     for, I understood from Mike, had really irritated

17     him already.  And so I think the goal was that I

18     would irritate him less.  I'm not sure I succeeded.

19            JUSTICE WALLIN:  I think the goal was to

20     pay less.

21            THE WITNESS:  That's true.

22            JUSTICE WALLIN:  Yeah.

23            JUSTICE STONE:  Side effect.

24            JUSTICE WALLIN:  You don't care if he's

25     irritating.  You just don't want to pay too much.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 535

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 303 of 486   Page ID
#:321931
Vol. III (563-886)      MGA v. Lexington, et al.              11/10/2010

Page 833

1        THE WITNESS:  There's no question what the

2  priorities are.

3        MR. BIDART:  My hair used to look like his

4  before I met him.

5        THE WITNESS:  Was that under oath?

6        JUSTICE WALLIN:  I mean, we've all seen

7  that.  As judges, we've seen cases where Lawyer A is

8  just overmatched by Lawyer B, and that's too bad for

9  one side.

10        THE WITNESS:  And the client.

11        JUSTICE WALLIN:  Yeah.  Exactly.

12        THE WITNESS:  Right.  Lawyers can make a

13  difference in the outcome of cases.

14        JUSTICE WALLIN:  And in light of that, you

15  pointed out that you went to a part of the trial or

16  hearing or something, and you saw a roomful of

17  lawyers for Quinn Emanuel.

18        Did you get a sense that maybe multiple

19  attorneys would be needed on the other side, not

20  just one?

21        THE WITNESS:  Your Honor, that was the

22  trial.  And I think my testimony was that there was

23  a courtroom full of lawyers, and I estimated half of

24  them were Quinn Emanuel and the other half were

25  there.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 536

Page 834

```
 1          I distinctly recall mentioning to Chuck

 2   Creamer -- and this is during the trial -- that we

 3   should -- that we should not be attempting to

 4   enforce the multiple attorney guideline because

 5   they're in trial.  And that was specifically

 6   discussed, and it was not enforced during that

 7   period of time.

 8          JUSTICE WALLIN:  And so all multiple

 9   attorney presence, the presence of multiple

10   attorneys was all paid through the trial; is that

11   right?

12          THE WITNESS:  Yes.

13          JUSTICE WALLIN:  Oh, okay.

14          THE WITNESS:  Yeah.  For trial -- I mean,

15   for trial, we -- it was sort of -- sure, the

16   guidelines don't say that, but this is one instance

17   where I recommended to Chuck that the guideline not

18   be enforced.  I remember that conversation.

19          JUSTICE WALLIN:  I don't think it's a very

20   good tactic to have a huge number of lawyers in the

21   courtroom when a trial is going on.  I think you

22   want to have as few as possible and let the other

23   side have many.

24          THE WITNESS:  I have -- one of my partners

25   have that philosophy as well.  Makes one lawyer work
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 537

Vol. III (563-886)        MGA v. Lexington, et al.              11/10/2010

                                                          Page 835

 1   harder, but...

 2            JUSTICE WALLIN:  I mean, you may have all

 3   the others in a -- you know, down the block or

 4   across the hall, but the jury should only see a

 5   handful.  That's my point.

 6            THE WITNESS:  Same reason why one of my

 7   partners doesn't drive his Porsche to court when

 8   he's in a jury trial.

 9   BY MR. SHERIDAN:

10       Q.   Jim, if I could, I apologize for

11   interrupting.

12       A.   Mr. Sheridan, yes.

13            JUSTICE WALLIN:  That's why Bidart drives

14   his 1958 Edsel, probably, to --

15            JUSTICE STONE:  Worth more than his

16   Mercedes.

17   BY MR. SHERIDAN:

18       Q.   We were just talking about baseball

19   analogies and .185 hitters.

20            You were here yesterday.  You don't

21   consider Tom Nolan to be a .185 hitter, do you?

22       A.   Definitely not.

23       Q.   Patty Glaser?

24       A.   Definitely not.

25       Q.   Mark Haddad?

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 538

Page 836

```
 1      A.   Definitely not.  I was impressed with him.

 2      Q.   Mitchell Silberberg?

 3      A.   I don't -- I've not even sure Mitchell

 4 Silberberg was at that meeting.  They may have been.

 5 I just don't know.

 6           I've known lawyers from Mitchel Silberberg

 7 on other cases, and I was more impressed with them

 8 than the average lawyer, but not as impressed as I

 9 have been with other firms.  But I don't know if

10 it's the same lawyers.  I mean, all firms are made

11 up of multiple lawyers.

12      Q.   Ms. Hurst today?

13      A.   I was impressed with her on the phone call

14 before I ever met her.

15      Q.   Not a .185 hitter?

16      A.   No.  I was pretty impressed.

17      Q.   All of them were replaced, though, right?

18      A.   Ms. Hurst is still on the case, I think.

19      Q.   For now.

20      A.   For now.

21      Q.   Mr. Nolan testified yesterday, right, that

22 there was a proposal for him to come back into the

23 case, correct?

24      A.   He did.

25      Q.   Couple other items just to clear up here
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 539

Page 837

1    that we haven't talked about.

2            There's been a lot of discussion about

3    Buss -- well, first, let's start with this.

4            With respect to the review that you

5    conducted, it was not a reasonableness review,

6    correct?

7        A.   Correct.

8        Q.   All right.  Could you just tell me what you

9    mean by a reasonableness review?

10       A.   What I mean by that is a review of -- that

11   would assess whether what the attorneys charge was

12   reasonable and necessary for the work performed, or

13   excessive, and also whether the work performed was

14   legitimate for the handling of the case.

15           It's something that requires more than just

16   review of the bills.  It requires a review of the

17   work product and understanding of the case and

18   possibly discussions with the lawyers entering the

19   billing entries.

20       Q.   And when, in your opinion, should a

21   reasonableness review be conducted?

22       A.   Well, in most cases, if you're going to

23   conduct a reasonableness review, I think it makes

24   sense to combine it with a Buss review.  And since a

25   Buss review can't be done until the end of the case,

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 540

Vol. III (563-886)        MGA v. Lexington, et al.              11/10/2010

                                                              Page 838

 1    I think it makes sense to have the reasonableness

 2    review done at the same time because there's no

 3    reason to have that kind of a detailed review.

 4            A Buss review requires, many times, looking

 5    at the actual work product and talking to lawyers as

 6    well.  And it wouldn't make sense to do it twice.

 7       Q.    You've -- Lexington has committed and the

 8    other carriers have committed to review the bills

 9    and make payment within 35 days, correct?

10       A.    Correct.

11       Q.    Could you do a reasonableness review on

12    every set of bills you get within 35 days and make

13    payment?

14       A.    No, I could not.

15       Q.    But you're being criticized for not having

16    done a reasonableness review yet, correct?

17            MR. BIDART:  Who said that?  We're just

18    saying it wasn't done.  Nobody criticized anybody.

19            THE WITNESS:  Sustained.

20            MR. BIDART:  They had a right to do it and

21    they didn't do it.

22            THE WITNESS:  Sustained.

23            MR. SHERIDAN:  I'm asking him a question.

24            JUSTICE WALLIN:  Not necessary to make that

25    comment, Mr. Bidart.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 541

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 309 of 486   Page ID
#:321937
Vol. III (563-886)      MGA v. Lexington, et al.              11/10/2010

Page 839

1           THE WITNESS:  Let me have the question

2    read, please.  I'm sorry.

3           MR. BIDART:  I apologize.

4           JUSTICE WALLIN:  (As read):

5                But you're being criticized

6                for not having done a

7                reasonableness review.

8           MR. BIDART:  Assumes facts not in evidence.

9           JUSTICE WALLIN:  All right.  So Mr. Bidart

10   is representing that he's not going to criticize --

11          JUSTICE STONE:  Hasn't.

12          JUSTICE WALLIN:  And has not.  At least has

13   not or is not going to.  Otherwise, he should

14   testify to it.

15          You're not going to criticize them for not

16   doing a reasonableness review?

17          MR. BIDART:  I am criticizing them for

18   taking deductions when they had a right to do a

19   reasonableness review and didn't do it.  That's what

20   we said from the very beginning of this case, is

21   that they've taken deductions.  They have two

22   grounds upon which to do it:  reasonableness and

23   departure from AIG billing guidelines.

24          They have completely waived, in our view,

25   our contention is, any right to deduct for

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 542

Page 840

1    reasonableness because they didn't do such a review.

2            The only grounds left is the AIG billing

3    guidelines, which we, of course, are asserting are

4    inappropriate.

5            JUSTICE WALLIN:  So you're not criticizing

6    them for not doing a reasonableness review.  You're

7    just saying that they've waived it.

8            MR. BIDART:  That's correct.  By virtue of

9    not having done it.

10           JUSTICE WALLIN:  I'm still going to let him

11   answer the question.

12           THE WITNESS:  I'm sorry.  Can I have the

13   question reread, please?  Or can I see a copy of it

14   or something?

15           JUSTICE WALLIN:  Please.

16           MR. BIDART:  And I apologize for the

17   earlier form of my objection.

18           (The record was read back as

19           follows:

20               "Question:  But you're being

21           criticized for not having done a

22           reasonableness review yet,

23           correct?")

24           THE WITNESS:  I think my answer to that is

25   I'm not sure Mike is criticizing me for not doing a

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit G - Page 543

Page 841

```
 1   reasonableness review.  I think he may be critical

 2   of our clients for not taking the opportunity to do

 3   it when he thinks they should.

 4          I disagree with his interpretation of the

 5   agreement.  He's omitting the fact that all the

 6   agreement obligates the insurers to do is to

 7   basically pay defense costs.  And he seems to think

 8   the defense costs is anything on the bill, whereas

 9   the defense costs, in my judgment, don't include

10   prosecution, don't include clerical, don't include

11   transition, don't -- there's certain things that are

12   not within the duty to defend to begin with.

13          And Mike and I apparently have a

14   disagreement about that.  I don't consider that's in

15   violation of the agreement because the agreement

16   only obligates -- or the policy is what obligates

17   the insurers to do -- to defend.  The settlement

18   agreement has a provision that says this agreement

19   does not modify the policy in any way, or something

20   to that effect.

21          And under those circumstances, we don't

22   think that it's in violation of the settlement

23   agreement or anything else to say -- for the

24   carriers to say, we're not going to pay clerical,

25   we're not going to pay prosecution, and things of
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit G - Page 544

Page 842

```
 1   that nature, because they're not defense.

 2            I mean, the duty to defend is what the

 3   settlement agreement is all about.  And it's really

 4   consistent with how that duty to defend is going to

 5   be performed as opposed to expanded.

 6   BY MR. SHERIDAN:

 7       Q.   The last three categories I want to discuss

 8   are all -- are "Not Approved As Independent

 9   Counsel," "Orrick Services Provided Prior to

10   Retainer," and Orrick -- or, I'm sorry -- "Occurred

11   Post-Orrick As Independent Counsel."

12       A.   What was the middle one?

13       Q.   "Orrick Services Provided Prior to

14   Retainer."

15       A.   Okay.

16       Q.   Let's actually start with that one.

17            Can you explain to me the basis for that

18   deduction?

19       A.   Yeah.

20            As of the time Orrick came on the case, the

21   independent counsel that were already on the case

22   were the Mitchell Silberberg firm, the Sidley Austin

23   firm, the Skadden firm, and the Glaser Weil firm,

24   the combination of which was represented by MGA they

25   would be able to handle every aspect of the case.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit G - Page 545

Page 843

1        When we were told that Orrick -- I'm not
2   sure exactly when we heard it, but Orrick had been
3   officially retained and they became an attorney of
4   record some week or less or more later, Ruby and
5   Mike and I discussed, okay, at what point during
6   this process does the obligation to pay Orrick
7   commence?
8        And one way of looking at it is say, well,
9   2860 only obligates the insured to pay defense
10   counsel, and they don't pay -- they're not defense
11   counsel until they become attorney of record.
12        And the other way to look at it is say,
13   well, gee, as of the date of their agreement, they
14   agreed to become defense counsel.  Let's look at the
15   earliest of the two dates and give the insured the
16   benefit of the doubt.
17        And so we, instead of using the date they
18   became attorney of record which we could determine
19   from the docket, we went back whatever number of
20   days it was, the date the agreement was signed.
21        But before that, the reason we used -- we
22   said that we recommended that fees incurred before
23   the date of the retainer not be considered for
24   payment was that they weren't approved as
25   independent counsel as of that point, but there were

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 546

Page 844

1    four other firms that the carriers were still paying

2    as independent counsel that, in theory, were able to

3    cover everything, perhaps duplicatively.

4        Q.    So that would address both the "Orrick

5    Services Provided Prior to Retainer" and "Occurred

6    Post-Orrick As Independent Counsel"; is that

7    correct?

8        A.    Yeah.  The post-Orrick as independent

9    counsel would mean that there would be

10   recommendations not to pay the other firms who were

11   previously independent counsel, because at that

12   point Orrick was represented to be the one that was

13   going to do everything.

14       Q.    And you just used the Orrick retainer as

15   the earliest date that Orrick was officially in the

16   case as, quote, unquote, independent counsel?

17       A.    Another example of where I thought we tried

18   to accommodate the insured's interest.

19       Q.    And then there's the additional category,

20   "Not Approved As Independent Counsel."

21             What can you tell me about that category?

22       A.    Under that San Gabriel case, an insured is

23   entitled to one independent counsel.  Obviously the

24   carrier can agree to do more than what -- the

25   minimum the law requires and the carrier, Lexington

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 547

Vol. III (563-886)      MGA v. Lexington, et al.                11/10/2010

Page 845

1    at least, did in that one instance where we had the

2    meeting in February.

3           Beyond those four firms that were still

4    considered to be working when there were other firms

5    that were -- had not yet been approved as

6    independent counsel and the carriers had not been

7    requested to approve them as independent counsel and

8    there was no justification to say why this -- what

9    this firm is doing could not be done by that other

10   firm, we felt that it was under those circumstances

11   essentially not within the carriers' obligation, and

12   at a minimum it was not reasonable to expect the

13   carriers to pay for multiple attorneys performing

14   the same work absent justification.

15      Q.   If we can just touch upon Buss quickly.

16           We spent a lot of discussion about Buss and

17   its effect on certain categories, including the

18   disputed categories or what carriers have labeled as

19   the disputed categories.

20           Can you explain to me the deduction for the

21   Canada litigation.

22      A.   The Canada litigation is not the case that

23   the carriers have extended a defense on.  And so if

24   there's some work done on some other case pending

25   somewhere else, that's not within the carriers'

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 548

Vol. III (563-886)      MGA v. Lexington, et al.                    11/10/2010

Page 846

 1   defense obligation as called for by the policy.

 2        Q.   Even if defending that action would help

 3   MGA in this action?

 4        A.   That's correct.

 5        Q.   There's also the --

 6             JUSTICE WALLIN:  Isn't that because it

 7   involves an entity that's not covered under the

 8   policy?  What is the reason?

 9             THE WITNESS:  That's a different issue.

10             JUSTICE WALLIN:  Okay.

11             THE WITNESS:  There are -- there are

12   instances where certain entities that MGA has

13   submitted bills for their defense are not insureds

14   under the policy.  That's true.

15             JUSTICE WALLIN:  But -- so is the entity

16   that AIG or -- I call it AIG -- Lexington insures

17   the defendant in the Canadian action?

18             THE WITNESS:  I believe -- I believe that

19   to be true, but I know that both Lexington and the

20   Chartis companies have denied coverage for that

21   action.

22             JUSTICE WALLIN:  And denied a defense.

23             THE WITNESS:  And denied a defense,

24   correct.  And there's been no dec relief or contest

25   as to that.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 549

Page 847

```
 1              JUSTICE WALLIN:  Basically there's a

 2    reservation on coverage on just about -- on just

 3    about everything.

 4              THE WITNESS:  It's been denied in those

 5    cases.

 6              JUSTICE WALLIN:  In the case, the big case

 7    that's pending.

 8              THE WITNESS:  This -- right.

 9              JUSTICE WALLIN:  And it's all been denied

10    in the Canadian case; is that right?

11              THE WITNESS:  That's correct.

12    BY MR. SHERIDAN:

13       Q.   What's been denied in the Canadian case is

14    an entirely separate action --

15       A.   Yes.

16       Q.   -- pending in another country?

17       A.   That's correct.

18       Q.   Okay.  Receiver compensation, can you

19    explain to me or explain to the Panel the basis for

20    that deduction.  It's a big number.  Can you tell us

21    how you came to that?

22       A.   Yeah.

23              The receiver compensation, as I understand

24    it, we got some materials off the docket to arrive

25    at this understanding, did an analysis of it.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                          Exhibit G - Page 550

Vol. III (563-886)        MGA v. Lexington, et al.              11/10/2010

                                                              Page 848

     1          In fact, I think we even put it in one of

     2   our letters to Mr. Bidart and Ms. Pisoni.  That was

     3   pursuant to the verdict and judgment that was

     4   essentially entered against MGA.  And we considered

     5   it because it's really enforcing the judgment as

     6   opposed to defending the case; that we considered

     7   it, that receiver compensation, if we were asked to

     8   pay, would be an active indemnity as opposed to an

     9   active defense.

    10          Because you're really indemnifying MGA for

    11   what the Court has found it to be liable for.  And

    12   the consequence of that liability, including the

    13   appointment of a receiver, which was to marshal the

    14   assets of MGA and make sure they didn't disappear

    15   and went to the right -- the rightful owner of the

    16   Bratz doll drawings according to Judge Larson's

    17   judgment.

    18          And then one other thing I should add.  The

    19   orders from Judge Larson saying that -- or

    20   justifying his appointment of the receiver did so on

    21   the basis that MGA was found to have acted

    22   fraudulently, was about to act fraudulently.  And

    23   because that independent, whether it was there for

    24   slander or anything else that's covered or not

    25   covered, the fact is, according to Judge Larson's

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                **Exhibit G - Page 551**

Page 849

1  order, it was a willful act.

2            And because it's a willful act, under

3  Insurance Code 533, there's no duty on the part of

4  our clients to indemnify for that act, and we

5  consider it to be an act of indemnity.

6            MR. SHERIDAN:  That's all I have.

7            MR. BIDART:  I'll be taking, based upon

8  nine separate items here, well over the balance of

9  time.  So...

10            JUSTICE WALLIN:  Well, it's five minutes to

11  5:00, and I think I told --

12            THE WITNESS:  I can have Ruby take the call

13  and I can keep going.  I kind of prefer to do that.

14            RUBY HELSLEY:  The call's been canceled.

15            THE WITNESS:  Oh, it's been canceled.

16  Okay.  Let's go.

17            MR. BIDART:  As I say --

18            JUSTICE WALLIN:  Well, then, we should --

19  we should finish up with Mr. Wagoner if we can,

20  Mr. Bidart.

21            MR. BIDART:  That's if you wish.  I hope

22  I'm not -- it's about a half-hour.

23            JUSTICE WALLIN:  That's all right.

24            JUDGE SABRAW:  That's okay.

25  ///

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit G - Page 552

Page 850

```
 1                    REDIRECT EXAMINATION

 2    BY MR. BIDART:

 3        Q.   Mr. Wagoner, directing your attention to

 4    your testimony concerning the conversation with me

 5    about the Lamb case.

 6        A.   Right.

 7        Q.   I would like to ask you some questions

 8    about that.

 9             At the time we had that conversation,

10    Lexington was already defending the case under

11    reservation of rights; is that true?

12        A.   That is true.

13        Q.   And that had followed our filing and

14    service of a lawsuit against Lexington before the

15    reservation of rights, correct?

16        A.   It was before the reservation of rights

17    that I drafted.  It wasn't before the reservation of

18    rights that Chuck Creamer drafted.  But I think what

19    you mean is it was before the reservation of rights

20    accepting the defense.  And you are correct with

21    that.

22        Q.   And at the time -- for the entire period of

23    time between May 15, 2008, which was the date of

24    your reservation of rights letter to us agreeing to

25    provide a defense, and the conversation regarding
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 553

Page 851

 1    Lamb, Lexington was alone defending this claim and

 2    paying all of the costs associated with the defense

 3    under original panel rates and then later the

 4    settlement rates, correct?

 5         A.    That's correct.

 6         Q.    And then there came a time when you were

 7    aware that we had also sued Crum & Forster,

 8    Hartford, and Evanston; is that correct?

 9         A.    Actually, you didn't do it in that order,

10    Mike.  You sued Crum & Forster and Hartford and then

11    after you spoke --

12         Q.    I wasn't suggesting a particular order.

13    There was three lawsuits:  One against Hartford, one

14    against Evanston, and one against Crum & Forster; is

15    that true?

16         A.    Pending simultaneously?  I'm not -- I'm not

17    sure Hartford had been settled before you sued

18    Evanston.  I don't recall.

19         Q.    You're aware that at one point in time we

20    also sued Hartford?

21         A.    I'm aware of that.

22         Q.    You're aware at one point in time we also

23    sued Crum & Forster?

24         A.    I'm aware of that.

25         Q.    You're aware that at some point in time we

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 852

1   sued Evanston?

2       A.    I'm aware of that.

3       Q.    And in connection with the conversation we

4   had regarding the Lamb case, at that time none of

5   those three other carriers were defending; is that

6   correct?

7       A.    That's correct.

8       Q.    And as a result of -- strike that.

9             And during that conversation, we discussed

10  the fact -- and, by the way, we were having a very

11  cordial exchange, correct?

12      A.    I call it a friendly exchange.

13      Q.    Friendly exchange.

14            And it was a friendly exchange where we

15  were discussing my theories against the other

16  carriers, correct?

17      A.    That's correct.

18      Q.    And I told you that I had two theories,

19  independent theories against the other carriers.

20  One had to do with advertising liability, correct?

21      A.    I remember that one.  I don't remember the

22  second one.

23      Q.    And we had also asserted advertising

24  liability coverage as against Lexington, correct?

25      A.    I don't know that you did that.  Lexington

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 853

1    doesn't have coverage --

2         Q.   If you don't know, you don't know.

3         A.   No.  I'm trying to answer the question, if

4    you don't mind.  Lexington policy doesn't cover

5    advertising.

6         Q.   However, you didn't know whether or not we

7    were asserting an advertising liability claim

8    against Lexington?

9         A.   Oh, I think I understood that.

10        Q.   Okay.

11        A.   I think -- I believe I understood -- well,

12   I understood you were asserting every theory that

13   might work.

14        Q.   Okay.  And you also knew that I was

15   asserting -- right.  Only the ones that might work,

16   right?

17        A.   That was your --

18        Q.   You know that I wouldn't have any interest

19   in asserting anything that wouldn't work because I

20   couldn't win something that doesn't work.

21        A.   It depends on whether you think it will

22   work and whether it really will or not.  It can

23   sometimes be a disconnect.

24        Q.   It all worked in this case, did it not?

25        A.   It did.

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit G - Page 556

Vol. III (563-886)        MGA v. Lexington, et al.           11/10/2010

Page 854

1        Q.    And it worked in Lexington before the Judge

2    even had a ruling on it?

3        A.    Not the advertising.  The defamation is

4    what caused me to pick up the phone and tell Chuck

5    that I think you've got a duty to defend in this

6    case.

7        Q.    Actually, what you're referring to is the

8    disparagement claim, correct?

9        A.    Correct.

10       Q.    And the reason that you agreed that there

11   was a duty to defend on behalf of Lexington is

12   because you concluded that there were specific

13   allegations of disparagement by Isaac Larian during

14   the year 2006; is that true?

15       A.    I would have -- I know there was a

16   specific -- there was a specific date where there

17   was a specific comment attributed to Mr. Larian in

18   the second amended counterclaim.  There was other

19   comments of a general nature that were allegedly

20   made on dates other than that specific date.

21       Q.    And it was in Lexington's best interest if

22   I was able to capture coverage from the other

23   carriers as well; is that true?

24       A.    That is true.

25       Q.    And, in fact, that's precisely what

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 557

Page 855

1  happened, is on June 24 of 2009 we captured

2  coverage, both against Evanston and Crum & Forster;

3  is that correct?

4       A.   That's correct.

5       Q.   And often --

6       A.   Well, the date I wasn't sure of, but I'll

7  take your word for the date.

8       Q.   But up until the time we captured coverage

9  against those two other carriers, Lexington was

10  alone making whatever payments it was making in the

11  defense, correct?

12       A.   That's correct.

13       Q.   And from that date forward, you began

14  receiving contributions against that very same

15  amount; is that correct?

16       A.   That's correct.

17       Q.   And since we were able to achieve the duty

18  to defend against both Evanston and Crum & Forster,

19  Crum & Forster entered into an arrangement with

20  Lexington where it shared with Lexington the same

21  contract rates that you had negotiated, correct?

22            MR. SHERIDAN:  I want to object.  This

23  misstates the facts.

24            I need to get clarification, Mike, if I

25  could.  When you say "Lexington," you mean the

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 856

1    Chartis company?

2         MR. BIDART:  Any time I say Lexington, I

3    mean the Chartis companies, all three of them

4    together.

5         THE WITNESS:  Let me study your question

6    again if I could.

7         That's largely correct.  I wouldn't put it

8    that way, but I won't quibble with you.

9    BY MR. BIDART:

10    Q.   The arrangement that you've had --

11         JUSTICE STONE:  How refreshing.

12    BY MR. BIDART:

13    Q.   The arrangement that you've had since we

14    captured the duty to defend as against Evanston and

15    Crum & Forster is that Evanston contributes

16    three-sevenths of the bill, correct?

17    A.   I think it's Crum & Forster contributes

18    three-sevenths and Evanston contributes

19    four-sevenths.

20    Q.   Crum & Forster is three-sevenths?

21    A.   Correct.

22    Q.   Lexington is two-sevenths and Evanston is

23    two-sevenths?  So now, then, instead of Lexington

24    paying seven-sevenths of the contribution for

25    defense costs, it has been, since I prevailed in

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 559

Page 857

1    those motions, paying two-sevenths; is that correct?

2         A.   That's correct.

3         Q.   And so that --

4              JUSTICE WALLIN:  Are you arguing for a fee

5    from Lexington?

6              JUSTICE STONE:  Don't block bill.

7              MR. SHERIDAN:  He got his fee.

8    BY MR. BIDART:

9         Q.   That -- those events we just discussed did

10   not result in any increase whatsoever in the monthly

11   benefits to MGA, correct?

12             MR. SHERIDAN:  Misstates the facts.

13   Objection.

14             THE WITNESS:  Benefits --

15             JUSTICE WALLIN:  Overruled.

16   BY MR. BIDART:

17        Q.   Let me try to clarify.  I'll withdraw.

18        A.   I agree with that.  Okay.  I had to noodle

19   it through.

20        Q.   In other words, from the time that Evanston

21   and Crum & Forster came in, they began contributing

22   the proportionate share that you've just discussed

23   of the same rates that Lexington had already

24   negotiated, correct?

25        A.   Yes.  There's an argument that you're

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Vol. III (563-886)      MGA v. Lexington, et al.          11/10/2010

Page 858

 1   making that those rates are -- they can't take

 2   advantage of.  I understand that.

 3        Q.   Of course.  We're not saying that's what

 4   they should be doing, but that's what they are

 5   doing, correct?

 6        A.   Yes.  But let me just -- with one

 7   clarification.  They've actually done that.  There's

 8   no agreement that they pay those proportions of

 9   whatever we recommend.  They just so far have gone

10   along with those recommendations, but there's no

11   agreement that says they have to.

12        Q.   The truth is, is that for the entire period

13   of time that Crum & Forster and Evanston have been

14   contributing, that the recommendations you've made

15   to Lexington have been adopted by them as their

16   payment share, correct?

17        A.   Not without some discussion, but, yes.

18        Q.   Okay.

19        A.   And some protest and some possible change

20   of heart in the future, I understand.

21        Q.   Okay.  But in any event, the ongoing

22   defense costs, had we not prevailed on those

23   motions, would have been borne up to and including

24   this date entirely by Lexington, correct?

25        A.   That's most likely.  I can't imagine that

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**              **Exhibit G - Page 561**

Vol. III (563-886)      MGA v. Lexington, et al.              11/10/2010

Page 859

 1    it would have been any different unless you would

 2    have gotten -- there's one or two other carriers out

 3    there, but, yes.

 4         Q.   Now, you also discussed the fact that you

 5    feel that Lexington has really gone above and beyond

 6    the call of duty and been cooperative in the way

 7    they've dealt with this having to do with the

 8    payments made during the summer of 2008,

 9    $20 million, et cetera.

10              Do you recall that testimony?

11         A.   I do.

12         Q.   Now, at the time that we entered into the

13    settlement agreement of December 19, 2008, the truth

14    is, is that the amounts of money that had been paid

15    hourly by Lexington beginning May 15, 2008, until

16    the date of that agreement, were the top rate, was

17    $235 an hour, correct?

18              MR. SHERIDAN:   Objection.   "The truth is"?

19    That's argumentative, your Honor.   We're going to

20    talk about what the truth is.

21              JUSTICE WALLIN:   Sustained.

22              MR. BIDART:   Okay.

23         Q.   What was the rate?

24              JUSTICE WALLIN:   We're never interested in

25    truth.   This is a lawsuit.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit G - Page 562

Page 860

1            THE WITNESS:  That objection would have

2    escaped me.

3    BY MR. BIDART:

4       Q.   You knew that the rates that Lexington had

5    been paying during the period of time from May 15,

6    2008, until the date of the settlement agreement was

7    235 an hour at the top end, correct?

8            MR. SHERIDAN:  Objection.  Irrelevant what

9    we paid prior to the settlement agreement and prior

10   to this arbitration.

11           MR. BIDART:  I want to address what he's

12   saying about above and beyond the call of duty and

13   what he was doing for Lexington.

14           JUSTICE WALLIN:  Overruled.

15           THE WITNESS:  The -- what I -- those were

16   the 2860 rates, correct.  The -- what I did when I

17   first got the tender and made recommendation to

18   Lexington is I tried to find out the highest rate

19   that Lexington --

20   BY MR. BIDART:

21      Q.   I'm not asking that.  I'm just asking what

22   the rate was.

23      A.   I'm trying to explain.

24      Q.   You don't have to explain.

25           Was the rate 235 an hour?

CONFIDENTIAL - ATTORNEYS' EYES ONLY           Exhibit G - Page 563

Vol. III (563-886)      MGA v. Lexington, et al.              11/10/2010

Page 861

1       A.    It was.

2       Q.    Okay.  Listen carefully to the question.

3       A.    I think I have been.

4             MR. SHERIDAN:  Excuse me, your Honor.  This

5   is sort of --

6             JUSTICE WALLIN:  Argumentative.

7             But go ahead.  Ask another question.

8             THE WITNESS:  This is just a conversation.

9             JUSTICE STONE:  Next question.

10            JUSTICE WALLIN:  Don't argue.

11  BY MR. BIDART:

12      Q.    The amount of money that had been incurred

13  by MGA as of the date of the agreement in December

14  2008 was over $70 million, correct?

15      A.    That sounds about right.

16      Q.    In fact --

17      A.    Do you mean incurred pre-tender or incurred

18  total?

19      Q.    Everything that had incurred total prior to

20  that time.

21      A.    Including pre-tender?

22      Q.    Yes.

23      A.    That's true.

24      Q.    And in the settlement agreement that you

25  achieved on behalf of Lexington, you, Mr. Wagoner,

866-244-3181        www.OlympicReporting.com        909-460-5559

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**          Exhibit G - Page 564

Page 862

 1   achieved a settlement that not only had us agree

 2   that there was waiver of all claims for prior fees

 3   incurred pre-tender and post-tender, correct?

 4        A.   Everything was settled up until that

 5   September 30th date, correct.

 6        Q.   Yeah, but not only the fees.  There's also

 7   something else that was settled, and that was any

 8   and all claims for breach of the implied covenant of

 9   good faith and fair dealing, correct?

10        A.   There was a claim to which no value was

11   attributed in the settlement, but there was a claim.

12        Q.   No value attributed by you, correct?

13        A.   That's correct.

14             MR. SHERIDAN:  Excuse me.  Objection.

15             No value attributed by the settlement

16   agreement, Mr. Bidart.

17             MR. BIDART:  Understand.

18        Q.   But in other words, it wasn't characterized

19   but it was certainly one of the considerations for

20   the agreement, correct?

21             MR. SHERIDAN:  Objection.  This is

22   irrelevant, your Honor.

23             MR. BIDART:  No.  No.  I'm talking about

24   the value of what they bought as of the settlement

25   agreement.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit G - Page 565

Page 863

1          JUSTICE WALLIN:  Does it make a difference?

2    There was a settlement.

3          MR. BIDART:  Well, the point is this, is

4    that I think it's pretty clear from the direct -- or

5    the cross-examination of Mr. Wagoner --

6          JUSTICE WALLIN:  You mean you're saying

7    you're trying to suggest that it wasn't done out of

8    the goodness of their heart, that you might have

9    been holding something over them and they had

10   something over you and that is MGA needed the --

11         MR. BIDART:  Exactly.  Correct.

12         JUSTICE WALLIN:  So the parties got

13   together and made a deal and here we are.

14         MR. BIDART:  That's correct.

15   Q.    The point being is that there was -- there

16   was substantial consideration and waiver of claims

17   beyond just the fees that were at issue at the time

18   of that settlement agreement, correct?

19   A.    Mike, the reason why the settlement was

20   made was because of the 2860 arbitration potential.

21   2860 is what I tried to explain to you before.  2860

22   says that you pay basically the rates actually paid

23   by the insured.  So it has nothing to do with

24   reasonableness -- let me finish.

25   Q.    One thing is for sure, you didn't allow me

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 864

 1   to retain a right to sue you for bad faith

 2   thereafter?

 3              MR. SHERIDAN:  Objection.  Let him finish

 4   his answer.

 5              JUSTICE WALLIN:  Yeah.  Go ahead and

 6   finish, Mr. Wagoner.

 7              THE WITNESS:  Right.

 8              My interpretation of our argument under

 9   2860 was if we -- if Lexington's highest rate under

10   a general liability policy to pay defense lawyers,

11   which is what this is, a general liability policy is

12   235 an hour, then what 2860 says is the rates are

13   actually paid, reasonable or not.

14              The word "reasonable" is not anywhere in

15   2860.  You had an argument and I know of

16   instances -- in fact, you mentioned that Justice

17   Panelli gave you 400- or 450- in the molestation

18   cases.

19              MR. BIDART:  Not me.  That was awarded.  I

20   wasn't involved in that.  That was Hennigan.

21              THE WITNESS:  You mentioned that to me, and

22   I was aware of it and aware of other 2860 awards

23   where, although I read 2860 a certain way, I

24   understand the arbitrator is not bound to follow the

25   law necessarily.

CONFIDENTIAL - ATTORNEYS' EYES ONLY         Exhibit G - Page 567

Page 865

```
 1              And so I knew there was a danger in a 2860.
 2    In a case like this, an arbitrator could in theory
 3    find a higher amount, higher than the 235.  And that
 4    was the biggest thing that was considered.
 5              I agree with you that you had bad faith
 6    allegations pending against Lexington.  I didn't
 7    consider them to be meritorious at all, but I agreed
 8    they were folded into the release.
 9       Q.   Not you agreed, you insisted they be folded
10    into the release?
11       A.   I would assume that's a condition of
12    anything, yes.  That plus the pre-tender and
13    everything else.  It was trying to get a settlement.
14    Sure, you're not going to settle and leave things
15    outstanding.
16       Q.   And the point is at the time of the
17    settlement, the things that were on the table for
18    settlement were all the fees incurred prior to that
19    date, correct?
20       A.   Correct.
21       Q.   Which was $70 million, plus, correct?
22       A.   Including the pre-tender, yes.
23       Q.   Yes.  A potential claim for bad faith that
24    we had asserted, correct?
25       A.   You had asserted such a claim.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Vol. III (563-886)        MGA v. Lexington, et al.              11/10/2010

Page 866

```
 1        Q.    A potential claim for a breach of contract
 2   which we had asserted.  There were two causes of
 3   action?
 4        A.    That's true.  You had --
 5        Q.    Okay.  And all of those claims were wrapped
 6   up together and released, correct?
 7        A.    They were.
 8        Q.    Okay.  Now, the other thing that Lexington
 9   has done is that within the last month they've filed
10   another lawsuit against MGA and Isaac Larian,
11   correct?
12             MR. SHERIDAN:  Objection.  Irrelevant.
13             MR. BIDART:  Oh, no.  Information from MGA,
14   I'm talking about the goodness of their heart and
15   doing things to help MGA.  That was brought up at
16   their examination.
17             JUSTICE WALLIN:  All right.  Overruled.
18   Overruled.
19             THE WITNESS:  Yeah, they filed -- I
20   understand they have.  I have nothing -- I
21   understand they've filed dec relief to try to
22   with -- seek declaration that they can withdraw from
23   the defense based on the fact that the slander
24   allegations that originally triggered their defense
25   are no longer in the fourth amended counterclaim.
```

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**          Exhibit G - Page 569

Page 867

```
 1   BY MR. BIDART:

 2       Q.    And if Lexington has its way under that

 3   complaint, it will be relieved of any obligation

 4   going forward to defend all of the things that

 5   Ms. Hurst is talking about are now facing MGA in the

 6   future, correct?

 7       A.    I suppose if you appealed, there would be

 8   an issue.  But assuming you don't appeal, a dec

 9   relief saying there's no duty to defend would likely

10   result in the withdrawal by Lexington in that

11   result.

12       Q.    You're not handling that?  That's Drinker

13   Biddle & Reath, Mr. Sheridan's office?

14       A.    I believe that's true.  I haven't seen the

15   complaint.  I just heard about it.

16       Q.    You've not seen it?

17       A.    No.

18       Q.    Have you become aware that the other people

19   that are contributing to the defense, namely,

20   Evanston and Crum & Forster, have also made motions

21   to Judge Carter?

22       A.    I am aware of that.

23       Q.    And that the request of those motions is

24   also to be relieved of any duty to defend?

25              MR. HART:  Your Honor, I have to raise an
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit G - Page 570

Page 868

```
 1   objection to that.  It is wholly irrelevant, and
 2   it's going well beyond anything that's at issue in
 3   this case with regard to the fees.
 4            JUSTICE WALLIN:  Well, I think it all
 5   refers to post the time period we're concerned with
 6   here, Mr. Bidart, doesn't it?
 7            MR. BIDART:  Okay.  I'll move on.  Thank
 8   you, your Honor.
 9       Q.   You have been involved in litigation where
10   you were representing the interests of Lexington
11   against our office as in a case with the City of
12   Long Beach, correct?
13       A.   Correct.
14       Q.   And when you tried that case against
15   Ricardo Echeverria, you had yourself in the
16   courtroom, correct?
17       A.   I did.
18       Q.   And you had Annette Williamson of your
19   offices in the courtroom, correct?
20       A.   Correct.
21       Q.   And you had Lejf Knutson in the courtroom,
22   another lawyer in your office, correct?
23       A.   Correct.
24       Q.   And another young lady, a lawyer by the
25   name of Summer?
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit G - Page 571

Page 869

```
 1      A.    She wasn't in the courtroom, I don't think.

 2      Q.    Summer Johnson, you don't recall her being

 3   in the courtroom with you?

 4      A.    I remember she worked on the case.  I don't

 5   remember if she came to the court.  If she came in

 6   the court, it was for one day.  She was not seated

 7   at the counsel table.

 8      Q.    You did not try that case alone, did you?

 9      A.    I did not.

10      Q.    And so Ricardo Echeverria from our firm was

11   there with a co-counsel named Mr. Petty, correct?

12      A.    I couldn't think of his name earlier.  Yes,

13   Russ Petty.

14      Q.    Russ Petty.

15            And so in that case you had more lawyers

16   than your opponent had, right?

17      A.    I did.

18      Q.    And you did so because you thought that was

19   necessary and in the best interest of the defense of

20   Lexington, your client, correct?

21      A.    Not really.

22      Q.    You did it because you thought it was not

23   in the best interest of your client?

24      A.    No.  I wanted --

25            MR. SHERIDAN:  First of all, why he did
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit G - Page 572

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 340 of 486   Page ID
#:321968
Vol. III (563-886)      MGA v. Lexington, et al.                    11/10/2010

Page 870

 1   something in defense of his client is privileged,

 2   your Honor.  He can't ask that question, why he

 3   undertook an action on behalf of his client in a

 4   case that's unrelated to this case.

 5          JUSTICE WALLIN:  I don't see any privileged

 6   communication in that.

 7          Overruled.

 8          MR. SHERIDAN:  It's work product.  It's his

 9   basis for why he took an action on behalf of his

10   client.

11          MR. BIDART:  It's getting late.  I'll

12   withdraw it.

13          THE WITNESS:  For Lejf Knutson, he had

14   never tried a case.  I wanted him to have the

15   experience of trying a case.  We gave him one

16   question.  Judge Rafeedie complimented him and we

17   still talk about it.

18          Annette tried one case at her former firm,

19   and I wanted her to get the experience of trying a

20   coverage case, particularly of that significance.

21          JUSTICE WALLIN:  So you weren't charging

22   the client for that teaching?

23          THE WITNESS:  I think we charged them for

24   one and not the other one.

25          JUSTICE WALLIN:  All right.  It's kind of

CONFIDENTIAL - ATTORNEYS' EYES ONLY      Exhibit G - Page 573

Page 871

1    irrelevant, anyway.  So let's move on.

2    BY MR. BIDART:

3        Q.    You made a coverage determination that

4    receiver compensation was not covered, correct?

5        A.    We did.

6        Q.    Okay.  And you thought it was appropriate

7    to withhold payment for receiver compensation based

8    upon coverage determination, correct?

9        A.    It was a coverage determination, but it

10   wasn't a defense issue.  It wasn't a Buss deal.  It

11   was a determination that was an active indemnity,

12   and, therefore, it wasn't covered by the settlement

13   agreement or the duty to defend in the policy.

14            MR. BIDART:  Thank you very much.

15            I have nothing further.

16            MR. SHERIDAN:  That's it.

17            THE WITNESS:  Okay.

18            JUSTICE WALLIN:  That was your last

19   question?

20            MR. BIDART:  Yes.  Thank you, your Honor.

21            JUSTICE WALLIN:  All right.

22            Mr. Sheridan, did you have any more?

23            MR. SHERIDAN:  No, your Honor.

24            But I still think we have that housekeeping

25   issue regarding the Wing deposition.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                     Exhibit G - Page 574

Page 886

1          I, REAGAN EVANS, RMR, CRR, CLR, CSR NO. 8176, in

2     and for the State of California, do hereby certify:

3          That said proceedings were taken down by me in

4     shorthand at the time and place therein named, and

5     thereafter reduced to typewriting under my

6     direction, and the same is a true, correct, and

7     complete transcript of said proceedings;

8          I further certify that I am not interested in

9     the event of the action.

10         Witness my hand this 20th day of November, 2010.

11

12                    _____

13                    REAGAN EVANS, RMR, CRR, CLR
                      CSR NO. 8176
                      Certified Shorthand
14                    Reporter for the
                      State of California

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit G - Page 575

# EXHIBIT H

## (FILED UNDER SEAL – PURSUANT TO PROTECTIVE ORDER)

Page 887

IN RE JAMS ARBITRATION

MGA ENTERTAINMENT, INC., a        )
California corporation; and       )
ISAAC LARIAN, an individual,      )
                                  )
                 Claimants,       )
                                  )  Reference
        vs.                       )  No. 110059976
                                  )
LEXINGTON INSURANCE COMPANY,      )
CHARTIS SPECIALTY INSURANCE       )
COMPANY, and NATIONAL UNION       )
FIRE INSURANCE COMPANY OF         )
PITTSBURGH, PA,                   )
                                  )
                 Respondents.     )
_____  ) PAGES 887 - 1122

REPORTER'S TRANSCRIPT OF PROCEEDINGS

VOLUME IV

9:10 A.M. TO 4:19 P.M.

THURSDAY, NOVEMBER 11, 2010

ORANGE, CALIFORNIA

FILE NO:  101111RE

REPORTED BY:

REAGAN EVANS, RMR, CRR, CLR

CA CSR NO. 8176

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit H - Page 576

Page 888

1    VOLUME IV OF THE REPORTER'S TRANSCRIPT OF

2    PROCEEDINGS, taken at 500 North State College

3    Boulevard, 14th Floor, Orange, California,

4    commencing at 9:10 a.m. on Thursday, November 11,

5    2010, before Reagan Evans, RMR, CRR, CLR, CA CSR

6    No. 8176.

7

8

9

10

11

12                A P P E A R A N C E S

13

14   JAMS PANEL:

15

16       HON. EDWARD J. WALLIN

17       HON. RONALD M. SABRAW

18       HON. STEVEN J. STONE

19       HON. GREER H. STROUD

20

21

22

23

24

25

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 577

Page 889

1    APPEARANCES CONTINUED:

2

3    FOR THE CLAIMANTS:

4

5        SHERNOFF BIDART ECHEVERRIA LLP

6        BY:  MICHAEL J. BIDART, ESQ.

7             RICARDO ECHEVERRIA, ESQ.

8             STEVEN M. SCHUETZE, ESQ.

9        600 South Indian Hill Boulevard

10       Claremont, California 91711

11       (909) 621-4935

12

13   FOR RESPONDENTS LEXINGTON INSURANCE COMPANY, CHARTIS

14   SPECIALTY INSURANCE COMPANY, AND NATIONAL UNION FIRE

15   INSURANCE COMPANY OF PITTSBURGH, PA:

16

17       DRINKER BIDDLE & REATH LLP

18       BY:  MARK D. SHERIDAN, ESQ.

19            MARK C. ERRICO, ESQ.

20       500 Campus Drive

21       Florham Park, New Jersey 07932-1047

22       (973) 549-7000

23

24

25

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 578

Vol. IV (887-1122)      MGA v. Lexington, et al.              11/11/2010

Page 890

1   APPEARANCES CONTINUED:

2

3   FOR RESPONDENT CRUM & FORSTER SPECIALTY INSURANCE

4   COMPANY:

5

6       MUSICK, PEELER & GARRETT LLP

7       BY:  LARRY C. HART, ESQ.

8            SUSAN J. FIELD, ESQ.

9       One Wilshire Boulevard

10      Suite 2000

11      Los Angeles, California 90017-3383

12      (213) 629-7618

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 579

                                                            Page 891

 1                        I N D E X

 2                      VOLUME IV

 3

 4                                                    PAGE

 5     THURSDAY, NOVEMBER 11, 2010

 6        A.M. SESSION                                895

 7        P.M. SESSION                               1010

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit H - Page 580

Page 892

1              CHRONOLOGICAL INDEX OF WITNESSES

2

3    CLAIMANTS' WITNESSES                         PAGE

4

5    STEPHEN SCHULTZ

6        DIRECT EXAMINATION BY MR. SCHUETZE        898

7        CROSS-EXAMINATION BY MR. ERRICO           927

8        REDIRECT EXAMINATION BY MR. SCHUETZE      953

9        RECROSS-EXAMINATION BY MR. ERRICO         958

10       FURTHER REDIRECT EXAMINATION

11           BY MR. SCHUETZE                       959

12       CROSS-EXAMINATION BY MS. FIELD            959

13

14   JEANINE PISONI

15       DIRECT EXAMINATION BY MR. ECHEVERRIA      961

16       CROSS-EXAMINATION BY MR. HART            1028

17       CROSS-EXAMINATION BY MR. SHERIDAN        1070

18       REDIRECT EXAMINATION BY MR. ECHEVERRIA   1085

19       RECROSS-EXAMINATION BY MR. SHERIDAN      1088

20

21   CRAIG HOLDEN

22       DIRECT EXAMINATION BY MR. BIDART         1091

23       CROSS-EXAMINATION BY MR. SHERIDAN        1112

24

25

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit H - Page 581

Page 961

```
 1          JUSTICE WALLIN:  All right.  Time out for a
 2    minute.
 3          (Off the record from 10:50 a.m. to
 4          11:05 a.m.)
 5          JUSTICE WALLIN:  Let's start by swearing
 6    the witness.
 7
 8                    JEANINE PISONI,
 9    called as a witness by the Claimants, was
10    administered the oath and testified as follows:
11
12          JUSTICE WALLIN:  All right.  Ms. Pisoni,
13    would you state your full name and spell both your
14    first and last names, please.
15          THE WITNESS:  Jeanine Pisoni, J-e-a-n-i-n-e
16    P-i-s-o-n-i.
17          JUSTICE WALLIN:  Thank you.
18          MR. ECHEVERRIA:  Thank you, your Honor.
19
20                    DIRECT EXAMINATION
21    BY MR. ECHEVERRIA:
22      Q.   Good morning, Ms. Pisoni.
23           What is your current occupation?
24      A.   I am the senior vice president and general
25    counsel of MGA Entertainment.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit H - Page 582

Vol. IV (887-1122)      MGA v. Lexington, et al.              11/11/2010

Page 962

```
 1      Q.    And how long have you had that title?

 2      A.    I've had that title since February 13th,

 3   2008.

 4      Q.    Before we get into some of the specifics

 5   relevant to this arbitration, I would like to get a

 6   little bit of background on you.

 7            Can you describe for the Panel your

 8   educational background?

 9      A.    Sure.

10            I went to college at St. Mary's College in

11   Winona, Minnesota.  And then I worked for two years,

12   a fellowship at the Mayo Clinic, and went to law

13   school thereafter at DePaul College of Law in

14   Chicago.

15            I graduated there and then went to work at

16   the law firm of Vedder Price in the litigation

17   department, commercial litigation.

18            And then moved into intellectual property

19   and did both litigation and transactional work.  And

20   then I believe it was in 1996 that I moved over to

21   the law firm of Altheimer & Gray and continued in

22   the same practice areas.  Became an equity partner.

23            And then moved out to the West Coast in

24   July of 1999 to take a position with

25   Stila Cosmetics, and that was largely a business
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 583

Page 963

1   position, actually.

2         And then stayed there until the end of 2007

3   and then joined MGA in early 2008.

4         JUSTICE WALLIN:  Okay.  You don't need to

5   talk any faster than you are.

6         THE WITNESS:  Okay.

7   BY MR. ECHEVERRIA:

8     Q.   All right.  Now, Ms. Pisoni, as the senior

9   vice president and general counsel, can you describe

10  for the Panel what your duties and responsibilities

11  are?

12    A.   Sure.

13        I oversee the legal department for MGA

14  Entertainment, and that also includes our Little

15  Tikes division and all of our international offices.

16  Basically advising on all of the legal issues.

17    Q.   And presently how many lawyers are in the

18  legal department at MGA?

19    A.   There are currently two full-time lawyers

20  and three contract attorneys, and there is a -- an

21  additional lawyer that's coming in on Monday.

22    Q.   Now, when you first went to work at MGA in

23  February of 2008, how many lawyers were in the legal

24  department at that time?

25    A.   I believe at that time -- well, two lawyers

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**              Exhibit H - Page 584

Page 964

1    were laid off on my start date.  So there were two

2    additional lawyers at that time.

3              And then there were -- I believe there were

4    four other lawyers still on my start date as well.

5        Q.    Now, you mentioned one of the duties that

6    you have is overseeing all litigation involving MGA,

7    correct?

8        A.    Yes.

9        Q.    That would include the Mattel litigation,

10   correct?

11       A.    Yes.

12       Q.    Can you describe for the Panel in general

13   terms what your involvement has been in connection

14   with overseeing and monitoring the Mattel

15   litigation?

16       A.    Sure.

17             When I arrived in 2008, Skadden Arps was

18   representing MGA.  And we were basically trying to

19   deal with a barrage of discovery motions.  I believe

20   in January there were 50-plus depositions that had

21   been ordered by the Court.

22             We were getting ready to file summary

23   judgment, which was to be filed as well as the trial

24   prep.  Those were both going on simultaneously in

25   the February-March time frame for the trial that was

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 585

Page 965

```
 1   to begin at the end of May.
 2          So at that time my involvement was to try
 3   and look at the fees and see what I could do to get
 4   the fees under control with Skadden, which we were
 5   able to negotiate with Skadden during the -- when I
 6   arrived there for the trial budget.
 7          Then I also got much more involved, I would
 8   say, after the trial, which would have been in the
 9   fall.  When the trial concluded, there were a lot of
10   posttrial motions, and then we were starting for
11   Phase II.  So I became more involved in the
12   day-to-day at that point and have remained so since.
13      Q.   Okay.  In terms of your observations and
14   own personal experience in dealing with the Mattel
15   litigation, can you describe what impact that has
16   had on MGA and, in particular, the legal department?
17      A.   Sure.  Dealing with the Mattel litigation
18   has just probably been, I would say, one of the most
19   burdensome things that a company would ever have to
20   face.  It's bet-the-company litigation.  It's being
21   driven by Mattel and Quinn Emanuel, and they have
22   unlimited resources.
23          And that's evidenced, you know, by the
24   sheer number of filings and docket entries that we
25   have to confront, the documents that have had to
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 586

Vol. IV (887-1122)      MGA v. Lexington, et al.                11/11/2010

                                                               Page 966

 1    have been produced.  There's 550,000 documents that
 2    have been produced in this case, which, again, all
 3    have to come from the company.
 4            E-mails, searches -- the burdens I can't
 5    even begin to describe.  And we've had to do this
 6    under really tight financial constraints because,
 7    you know, this has really drained the company's
 8    resources.
 9            The company, since I have been there, has
10    been through two additional downsizings aside from
11    the one that occurred on the day I arrived.  And
12    it's made it just very difficult for us to try to
13    meet all of the demands for this litigation and also
14    try to keep the company alive.
15        Q.   Now, we'll get to some of the specific
16    retainer agreement issues in a little bit, but has
17    it been your responsibility since you arrived at MGA
18    to be involved in negotiating retainer agreements
19    with law firms and MGA from February 2008 to the
20    present?
21        A.   Yes.  While I may not have negotiated
22    personally every one, I have seen them or I've been
23    aware of them, yes.
24        Q.   And have you attempted to be as aggressive
25    as you could be in negotiating the lowest rates and

866-244-3181       www.OlympicReporting.com       909-460-5559

CONFIDENTIAL - ATTORNEYS' EYES ONLY         Exhibit H - Page 587

Page 967

1    the best terms possible for MGA?

2        A.   Yes.   I have been very aggressive, and

3    we've done a lot of comparative analyses amongst the

4    different firms so that we could see where we could

5    get the best deal.   Because we've had a lot of

6    constraints.

7             We have to deal with, you know, our

8    out-of-pocket cash.   We have to find law firms that

9    will wait for insurance reimbursement.   We have to

10   find law firms that have the resources to really do

11   battle with Mattel and Quinn Emanuel because that

12   has been overwhelming to some of the firms as well.

13            So basically what we try to do is juggle

14   all of those things and come up with the most

15   cost-effective way we can manage the litigation

16   going forward.

17       Q.   Now, have you been involved or -- strike

18   that.

19            Are you aware of the procedure by which MGA

20   submits defense fees and cost invoices to the

21   various carriers for payment?

22       A.   I am.

23       Q.   Can you describe that process for the

24   Panel?

25       A.   Sure.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 588

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 357 of 486   Page ID
#:321985
Vol. IV (887-1122)      MGA v. Lexington, et al.              11/11/2010

Page 968

1              What happens is the law firms send the
2       bills to MGA.  And one of our legal assistants takes
3       the Mattel bills.  And because of the timing that it
4       takes us to get reimbursement, they have to be
5       immediately transmitted to the carriers.  Because
6       what we need to do is get the bills to them by the
7       tenth business day of the month.
8              And then we will get a letter sometime
9       around the 10th to the 12th of the following month
10      in terms of what's going to be paid.  And then a
11      check will come in by the 19th.  And then we can use
12      those monies and try to divide them up amongst the
13      people that need to be paid to stay working for MGA.
14             So that's basically the process of how the
15      bills are submitted.
16      Q.    Now, did MGA always submit the bills
17      themselves to the carriers?
18      A.    No, we did not.  I believe that MGA started
19      submitting the bills in June of 2009.  Prior to that
20      time, actually, the Bidart law firm was submitting
21      them on our behalf.
22             And, actually, Mr. Bidart made an offer to
23      our company, because he saw the situation we were
24      in, to defer taking any fee that he is entitled to
25      under our fee agreement if we would take on the task

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit H - Page 589

Page 969

1    of submitting the bills.  And so clearly, again, as

2    a cost-savings measure, we did that.

3           So we submit the bills ourselves.

4       Q.   And that began when?

5       A.   I believe it was June -- end of May/June,

6    '09, when the last submission came through from the

7    Bidart firm.

8       Q.   Now, when you received the letters from the

9    carriers, there are certain deductions that are

10   taken, correct?

11      A.   Yes.

12      Q.   And there are certain requests for

13   clarification, correct?

14      A.   Yes.

15      Q.   And what is the process at MGA for

16   attempting to respond or get clarification on those

17   issues?

18      A.   Well, the process is that -- just to kind

19   of describe it, it's against the backdrop of all of

20   the deadlines and everything that's going on in the

21   legal department.  There's not a person that's just

22   assigned to deal with this.  We don't have those

23   resources, so we have several people that look at

24   the bills.

25          What we try to do is to go after where the

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 590

Page 970

1   biggest dollars are, because that's what the

2   insurance -- I'm sorry.  That's what the vendors are

3   going to be looking for.  They're going to be

4   looking to get paid on, you know, the biggest

5   dollars.  So we tried to focus on that.

6           So, for example, Rosa will try to get

7   answers to questions if we can answer them quickly.

8   It usually involves going back to the law firms and

9   trying to track down the information because it's

10  not usually information that we have.  Trying to get

11  clarification on any block or vague bills or any

12  other clarification that's needed.

13          We have chosen not to engage in a letter

14  writing back and forth with the carriers because

15  that just seems to be, you know, of no avail, and it

16  doesn't resolve the situation.  It just pulls

17  resources.

18          So what we try to do is get the information

19  that would result in payment of the bills.

20      Q.   Now, in terms of the deductions that have

21  been taken by the carriers, have there -- the

22  deductions been applied consistently, in your

23  experience, in dealing with this?

24      A.   No, they have not.

25      Q.   And can you explain the inconsistencies

CONFIDENTIAL - ATTORNEYS' EYES ONLY                 Exhibit H - Page 591

Page 971

1   that you've observed.

2        A.   Okay.  Well, if I could take them one at a

3   time.

4        Q.   Sure.

5        A.   Okay.  We talk about block billing as a

6   first one.  I believe that the carrier use- --

7   carriers used some formula to determine how to make

8   a payment on what they perceived as a block bill.

9             So they would look at the number of things

10  that were listed as a particular entry and count

11  them up.  And then basically, if certain tasks they

12  thought were fine, they would pay.  You know, if

13  there were three of five, they would pay three of

14  those five tasks.

15            Then what happened was in February one of

16  the letters referred to the fact that they were

17  going to start paying zero on block billing.

18            And that letter, I believe, came right

19  before a February meeting that we had with the

20  carriers in which we discussed the block billing.

21            So that was one change in practice.

22            A second change in practice related to the

23  multiple attorney attendance and interoffice

24  conferences.  Those had been paid initially.

25            Then in, I believe it was the April letter

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 972

1    from the Chartis companies, they said that they were

2    no longer going to pay for interoffice conferences

3    that were above what was provided in AIG guidelines,

4    which I believe was two hours for every six months.

5            And then they also had determined that they

6    were not going to be paying for some of the multiple

7    attorney attendances.  I believe that those changes

8    occurred despite the fact that they had told us they

9    were going to always continue to process bills in

10   the same manner they had been processing them.  They

11   told us that at the February meeting.

12           That was reaffirmed again, you know,

13   subsequent and to the February meeting, in the

14   summer.  But despite that, what happened was in

15   August we started seeing pretty significant

16   deductions being taken and reductions in payments by

17   the insurance companies on the attorney conferences.

18   And -- I'm sorry.  Interoffice conferences and

19   multiple attorney attendance.

20     Q.   Okay.  Besides the block billing, the

21   interoffice conferences and multiple attorneys, can

22   you think of any other areas where you observed

23   inconsistencies in terms of how the carriers took

24   deductions?

25     A.   Those are some of the larger areas.  I

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 593

Page 973

1    would say the only other thing that I recall seeing

2    was the fact that there was much more -- there were

3    many more deductions in this area of what's called

4    independent counsel, where they were going to pay

5    for only one law firm.  And so a lot of other firms

6    weren't paid.

7           And there were more objections to the fact

8    that they, you know, didn't know how they related to

9    the defense of the case.  And so those types of

10   deductions, again, seemed to be much more prominent

11   of late.

12       Q.    Okay.  Now, you made reference to a

13   February meeting.

14           Was that the February 18, 2009 meeting?

15       A.    Yes.

16       Q.    Can you describe who you recall being in

17   attendance at that meeting.

18       A.    Myself, Mr. Bidart, Mr. Sheridan,

19   Mr. Wagoner, Mr. Schmidt.  We also had counsel

20   there, so Joel Klevens from the Glaser Weil firm was

21   there.  Mark Overland from Overland Borenstein was

22   there.  And that's who I recall at the moment.

23       Q.    What was the purpose of that meeting?

24       A.    The --

25           JUSTICE WALLIN:  When was this again?

CONFIDENTIAL - ATTORNEYS' EYES ONLY                        Exhibit H - Page 594

Page 974

1           MR. ECHEVERRIA:  February 18, 2009.

2           JUSTICE WALLIN:  Okay.  Thank you.

3           THE WITNESS:  The purpose of this meeting

4   was to discuss how we could get the bills paid more

5   efficiently and also to introduce the carriers to

6   our counsel.  So Joel Klevens was there so that they

7   could ask him questions if they had questions.

8           And also to ensure that the carriers were

9   going to pay for Glaser Weil and Mitchell Silberberg

10  taking on the defense of the case.  Because of this

11  notion of one independent counsel, we needed to make

12  sure that both of those counsels were going to be

13  paid.

14  BY MR. ECHEVERRIA:

15      Q.   Can you describe what the circumstances

16  were at that moment in February of 2009 with respect

17  to MGA's past representation and then this Glaser

18  Weil and Mitchell Silberberg coming in?  Can you

19  describe for the Panel what was going on?

20      A.   Sure.

21           Well, we had obviously used the Skadden

22  Arps law firm that, you know, did a terrific job,

23  but they're very, very expensive.

24           And so one of the things that we looked at

25  as a cost-savings measure was for -- well, since we

CONFIDENTIAL - ATTORNEYS' EYES ONLY       Exhibit H - Page 595

Page 975

1    were going to be starting Phase II of the case --

2    which really the discovery had been stayed for

3    Phase II, so it hadn't been started yet.

4            Even Skadden had suggested that, you know,

5    there might be a way to utilize some other law firms

6    in a more cost-effective manner to handle that

7    discovery.

8            And so our plan was that if we used the

9    Glaser Weil firm plus Mitchell Silberberg, we would

10   get the IP expertise needed from Russ Frackman at

11   Mitchell Silberberg, and we would have Glaser Weil

12   in the case who had been in previously and knew

13   about the case.  And between those two firms, it

14   would be more cost-effective.

15       Q.   And what role, if any, would Skadden

16   continue to have after Glaser Weil and Mitchell

17   Silberberg came in to handle Phase II?

18       A.   Well, its formal role was working on the

19   appeal, but informally, you know, it's hard to draw

20   these very bright lines over who represents you at

21   one point in time.  Because sometimes a question

22   comes up that it just makes sense to call Skadden or

23   have Skadden help on something because of what they

24   knew from Phase I or, you know -- it's just more

25   cost-effective than to have somebody else try to

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 596

Page 976

1   recreate that.

2        So I would say that they have this ongoing

3   consulting role, and they also had the work on the

4   appeal.

5    Q.   Now, there's been some testimony concerning

6   discussion of transition fees.

7        What, if anything, do you recall being

8   discussed in that regard in the February 2009

9   meeting?

10   A.   I recall Mr. Wagoner making a statement

11   after we had said what our plan was, to bring in the

12   two law firms, that, you know, the carriers were not

13   going to be paying transition costs.

14        And I recall saying that that's not why we

15   were there.  We weren't trying to secure payment for

16   transition costs.  That wasn't what was on the

17   table.  What was on the table and what we were

18   talking about was bringing in the two law firms.

19        And, frankly, from my view, I really didn't

20   see an issue with transition costs because, as I

21   said before, Skadden handled Phase I, and Phase II

22   discovery had been stayed.  And so this was --

23   Phase II involved a whole different array of claims.

24   And so there would be different discovery.

25    Q.   And what do you recall being the

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 597

Page 977

1    reaction -- or how was the meeting left with respect

2    to the payment for Glaser Weil and Mitchell

3    Silberberg as independent counsel?

4        A.   Well, my understanding was that, again,

5    they were noncommittal at the time, but they were

6    free to ask questions.  I recall that we gave them

7    the retainer agreement so that they could see, the

8    carriers could see what we were doing.

9            And we had said, you know, that it was

10   going to be important to have some assurances of

11   timely payments so that we could keep these law

12   firms working for us.

13       Q.   Now, in terms of MGA's interest and

14   bringing in Glaser Weil and Mitchell Silberberg

15   after Skadden had just handled Phase I, was MGA

16   trying to save money as well?

17       A.   Yes.

18       Q.   Why?

19       A.   Because we don't have any.  I mean, it's

20   just that simple.  I mean, we are trying to stretch

21   whatever little money we have to keep the company

22   going.  I mean, we need to put the money in

23   advertising.

24           We have, like, one of the hottest dolls

25   right now, but we have to be able to have that money

CONFIDENTIAL - ATTORNEYS' EYES ONLY       Exhibit H - Page 598

Page 978

 1   to advertise.  And if the lawyers take all the cash,

 2   right, then you're not able to fuel the business.

 3          And what's going to be key to our survival

 4   is really being able to advertise and to, you know,

 5   develop new products and to do all of these things

 6   that I think are, you know, why MGA exists, frankly.

 7     Q.   Now, Glaser Weil and Mitchell Silberberg

 8   were on board for a short period of time as of

 9   February 2009 going forward; is that right?

10     A.   I don't remember the exact date, but that

11   it was a short period of time, yes.

12     Q.   Okay.  And what law firm then came in to

13   represent MGA at that time?

14     A.   The law firm of Orrick Herrington.

15     Q.   And can you tell us when -- strike that.

16          When was it that you recall Orrick first

17   being interviewed as a potential law firm to

18   represent MGA?

19     A.   It was in late May, I believe, or mid-May

20   that we were talking to Orrick.

21     Q.   And were you personally involved in those

22   negotiations?

23     A.   I was.

24     Q.   Who were you dealing with at Orrick?

25     A.   Annette Hurst.

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit H - Page 599

Page 979

```
 1      Q.    And were you the primary person negotiating
 2  on behalf of MGA?
 3      A.    I was.
 4      Q.    And describe, if you will, what the nature
 5  of those negotiations were with Annette Hurst at
 6  Orrick Herrington that led to the retainer
 7  agreement.
 8      A.    Sure.
 9            What happened, frankly, was even with
10  things divided between Glaser Weil and Mitchell
11  Silberberg, we were quickly falling behind, trying
12  to keep up with the motions and the things that were
13  going on.
14            Mattel files motions like I've never seen
15  filed before.  I mean, I know this probably sounds
16  crazy, but, I mean, I've litigated big cases, and
17  it's nothing like what you've seen in other cases.
18            And just to be able to keep up, I mean,
19  just to keep up with the -- keeping yourself out of
20  being sanctioned was just tapping the resources of
21  both of the firms.
22            And the Orrick firm was working with us and
23  trying to advise us on some of the licensing issues,
24  so they were familiar with all of the underlying
25  case.  And Mr. Larian had worked with Ms. Hurst
```

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit H - Page 600

Page 980

 1   before.  And Ms. Hurst is -- you know, she's really

 2   a star in intellectual property, very strong in

 3   copyright.

 4          And she had said, you know, "Would you ever

 5   consider Orrick for the case?"

 6          And, frankly, we're always thinking, okay,

 7   if we could get a cost-effective deal from Orrick.

 8          And so, frankly, what happened was I

 9   started with what I thought was almost a crazy

10   proposal for any major law firm to consider, which

11   was, you know, we can only really pay you 300 -- I

12   think it started at 250 a month and then we need you

13   to wait 60 days until the insurance companies can

14   make payment and you have to take that payment from

15   the insurance carriers.

16          Because what I didn't want to do is create

17   bad vibes between our lawyers and MGA.  That's not a

18   good way to manage bet-the-company litigation, is to

19   have your lawyers upset that they're not being paid.

20   And that's what had happened previously in various

21   situations.

22          So I said, "Let's try to manage it up

23   front."

24          That was the only way I could think of to

25   deal with this effectively.

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Exhibit H - Page 601

Page 981

```
 1              And so we started from that point in
 2   negotiating with the Orrick law firm.
 3              And I said, you know, "This is what we need
 4   to do.  We need to find a way to make this work."
 5              And then on top of it, we needed to have
 6   some very aggressive fee caps that would protect the
 7   company just in terms of overall expense.
 8              So in addition to basically acting as a
 9   bank for those 60 days, we need fee caps.  And I
10   thought we were, you know, arguably entitled to that
11   because we're talking about a lot of business.
12              So one of the things that Orrick wanted to
13   close the deal was they also wanted to handle the
14   appeal.
15              And so, then, for us, that actually looked
16   like a good deal because we would have everything in
17   one place.  And Orrick is a big law firm that could
18   handle that.
19              So that's where the negotiations all
20   started.
21      Q.   Okay.  Now, as part of your negotiations
22   with Orrick, did you seek to involve the insurance
23   carriers in those negotiations?
24      A.   Absolutely.
25      Q.   Tell us about that.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 602

Page 982

1      A.    Sure.

2            Well, what happened was we had the February

3      meeting.  And I remember that Mr. Bidart and I were

4      sitting there, and I just -- okay.  With very little

5      resources, which is all we have right now and all we

6      had then, we wanted to find way to make this go

7      smoothly.  We didn't want to be sitting here,

8      obviously, in an arbitration.  We wanted to figure

9      out how to make this work.

10           And so when we did the Orrick agreement, I

11     thought it was a great opportunity to involve the

12     carriers in the up-front negotiation because that's

13     when we had our leverage because Orrick was hungry.

14     They wanted the case.

15           And so when I did the preliminary draft of

16     the retainer agreement and it had the provisions in

17     there, one of the sticking points in particular --

18     or actually there were several -- involved, you

19     know, Orrick's basically saying that these AIG

20     guidelines just don't work for the kind of complex

21     litigation that the Mattel case is.

22           Another involved Orrick wanting to be paid

23     directly by the carriers.  So there were these kinds

24     of issues.

25           And so we set up a conference call with the

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 603

Page 983

1    carriers.  And we sent them the draft retainer

2    letter to review and to comment on.

3              JUSTICE WALLIN:  When was this?

4              THE WITNESS:  We did that in, I believe it

5    was -- there was conference calls starting

6    June 22nd.

7              And there were several calls in which we

8    sought to reach some kind of an agreement with the

9    carriers and Orrick.  Orrick was also on the phone

10   on some of those calls as well.

11   BY MR. ECHEVERRIA:

12      Q.   Now, you mentioned that either Orrick or

13   MGA wanted to have payments from the insurance

14   company go directly to Orrick.

15              Was it Orrick that was requesting that?

16      A.   Yes.

17      Q.   And did you convey that to the insurance

18   carriers?

19      A.   Yes.  And it's actually in the agreement.

20   In the agreement it was contemplated that that would

21   happen.

22              And then if we couldn't get that to happen,

23   MGA was going to be faced with the burden of having

24   to pay a retainer that they would hold for a window

25   of time.

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit H - Page 604

Page 984

1      Q.   Tell us about your discussions about that

2   issue, having -- that is, having the insurance

3   carriers pay Orrick directly.

4      A.   Well, the insurance carriers' position was,

5   as I recall, the fact that they said that the

6   agreement with counsel was with MGA and not the

7   carriers.

8           And so they didn't want to, you know, be

9   involved in that agreement.  They said it was our

10  agreement.  And so they would transmit monies to us,

11  and they weren't going to do anything different than

12  what was set forth in the settlement agreement.

13     Q.   And eventually there was a signed retainer

14  agreement reached between MGA and Orrick?

15     A.   Yes, there was.

16     Q.   Can you tell us when that happened.

17     A.   I believe it was July 2nd, right around

18  that 4th of July holiday.

19     Q.   All right.

20          I would like to pull up Exhibit No. 470,

21  page 1, which, for the record, is the Orrick

22  retainer agreement.

23          (Exhibit 470 first referenced in

24          Volume IV of the proceedings.)

25          MR. ECHEVERRIA:  And let's just pull up the

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 605

Page 985

1    top half of this first so we can get acclimated.

2              For the record, it's dated July 2nd, 2009.

3    And it's a letter from Annette Hurst to Isaac

4    Larian.

5         Q.   Ms. Pisoni, do you recognize this as the

6    first page of what is the retainer agreement between

7    Orrick and MGA?

8         A.   It looks like that.

9         Q.   Okay.  Let's go -- you mentioned that the

10   AIG billing guidelines were given to Orrick prior to

11   the execution of this retainer agreement.  Is that

12   right?

13        A.   That's correct.

14        Q.   And why were you giving them the AIG

15   billing guidelines?

16        A.   Because the insurance company, even though

17   we didn't agree, said that, you know, they should

18   look at those guidelines.  And, you know, up until

19   then, really, the guidelines had not been a big

20   issue, other than the insurance company handing them

21   to us.

22              But, look, from my standpoint, I -- I'm

23   trying to be the middle person between the carriers

24   and the law firms, to get them paid.  And if Orrick

25   felt like they could comply with those guidelines,

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 606

Vol. IV (887-1122)     MGA v. Lexington, et al.                    11/11/2010

Page 986

1    then that would have been okay.

2        Q.   Okay.

3        A.   So I sent them to them to see what they

4    thought.

5        Q.   And what reaction did you get from Orrick?

6        A.   Actually, a very specific reaction, that

7    the guidelines completely were not applicable to the

8    type of complex litigation that we were facing.

9             And, in fact, you know, Ms. Hurst said we

10   need to delete it from the retainer agreement.  And

11   after a lot of back-and-forth, you know, we tried to

12   talk to the carriers, and we couldn't get any

13   feedback.

14            So then I asked Ms. Hurst to actually put

15   in writing some of the objections to these

16   guidelines so that we could be very clear and have

17   something very concrete to discuss.

18       Q.   And these were the specific objections that

19   Orrick had to the AIG billing guidelines?

20       A.   That's correct.  And I believe that that

21   was incorporated into the retainer agreement as an

22   appendix.

23       Q.   All right.

24       A.   And there was also a paragraph or two that

25   addressed it in the main letter.

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**          Exhibit H - Page 607

Page 987

```
 1      Q.   All right.

 2           Let's go to page 6 of Exhibit 470.  And

 3      let's pull up from this heading down to this

 4      paragraph here.

 5           MR. SHERIDAN:  Which exhibit are you on?

 6           MR. ECHEVERRIA:  It's 470.  I know it's not

 7      a great copy, but is it large enough?  I'll read it

 8      into the record carefully.

 9           JUSTICE WALLIN:  I can see it well enough.

10           JUSTICE STONE:  We can see it on our

11      screen.

12           MR. ECHEVERRIA:  What I intend to do is to

13      carefully read it into the record once and then ask

14      some specific questions about it.

15           JUSTICE WALLIN:  Go ahead.

16           MR. ECHEVERRIA:  Okay.

17           JUSTICE WALLIN:  Wait a minute.  Let's give

18      Mr. Sheridan a minute to get it.

19           MR. ECHEVERRIA:  Sure.  Sure.

20           THE WITNESS:  I'm sorry.  Page what?

21      BY MR. ECHEVERRIA:

22      Q.   Page 6.

23           And specifically, Ms. Pisoni, it's the

24      section entitled "MGA Insurers."

25      A.   Okay.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 988

1      Q.    Do you see that?

2      A.    I do.

3      Q.    And is this the specific paragraph you were

4   just referencing in the Orrick retainer dealing with

5   Orrick's objections to the AIG billing guidelines?

6      A.    Yes.

7      Q.    Let me take a moment to read into the

8   record, and then I'll ask you some questions about

9   it.

10              It says, quote (as read):

11                  Our clients are the persons

12              and entities set forth herein, and

13              we are not being engaged by MGA's

14              insurers, nor do we, by virtue of

15              this engagement, have an

16              attorney-client relationship with

17              MGA's insurers.  We have reviewed

18              AIG's billing guidelines as

19              provided to us in the form set

20              forth in Appendix B.  If requested

21              to do so, we will comply with AIG's

22              requested use of Legal eXchange for

23              the transmission of our fee

24              statements and invoices to any of

25              MGA's insurers.

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit H - Page 609

Vol. IV (887-1122)      MGA v. Lexington, et al.              11/11/2010

                                                         Page 989

    1              Otherwise, we do not intend to

    2         abide by those guidelines because

    3         they are not appropriate for a

    4         complex business case of this type.

    5         We are not panel counsel, and are

    6         not being engaged by the insurers.

    7         We, therefore, do not believe the

    8         application of those guidelines is

    9         appropriate.

   10              The entire process described

   11         in the AIG guidelines does not make

   12         sense because we will not be

   13         directed by and reporting to a

   14         claims professional regarding this

   15         case.

   16              If AIG fails or refuses to

   17         reimburse Orrick on the basis of

   18         these guidelines, MGA will

   19         nonetheless remain responsible for

   20         payment to Orrick.  The budget and

   21         related procedures agreed herein

   22         are MGA's, paren, and its insurers'

   23         guarantee of efficient management

   24         and reasonable fees in conducting

   25         the representation in the case,

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 610

Page 990

1            close quote.

2            Now, was that language, language provided

3     by Orrick to MGA?

4        A.   Yes.

5        Q.   And was it your request that Orrick express

6     in writing the basis upon which it did not wish or

7     refused to comply with AIG billing guidelines?

8        A.   Yes.

9        Q.   Okay.  And this was the response that you

10    got?

11       A.   Yes.  I mean, I don't recall if this has

12    been revised, but during the discussions -- but,

13    yes, they articulated what their reasons were and

14    what their objections were.

15       Q.   Was this letter and this objection provided

16    to the insurance carriers?

17       A.   As a draft, yes, this letter and the

18    appendix were provided.

19       Q.   And who did you provide that to?

20       A.   They were provided to, I believe,

21    Mr. Sheridan and Mr. Wagoner.  I can't recall if I

22    sent it directly via e-mail to them or if it may

23    have came through Mr. Bidart.  But this was what was

24    the purpose of our call, was to discuss the draft of

25    this agreement.

Page 991

 1      Q.   And what, if any, reaction did you

 2   ultimately get from the carriers with respect to

 3   Orrick's objections to the AIG guidelines?

 4      A.   Again, it was simply the response that

 5   we're not going to agree to anything other than

 6   what's set forth in the settlement agreement.

 7   That's it.

 8      Q.   All right.

 9           Let's pull back from this paragraph,

10   Arnold, and go to the paragraph immediately below

11   it, the small one, second to the last.  There you

12   go.

13           And, for the record, this states, quote (as

14   read):

15               A more detailed discussion of

16           our concerns with and objections to

17           the AIG guidelines is set forth in

18           Appendix C, which is an annotated

19           version of portions of the AIG

20           guidelines setting forth our

21           objections thereto and shall be

22           considered part of this agreement,

23           close quote.

24           Is that the reference to Appendix C in the

25   agreement that we talked about earlier?

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit H - Page 612

Page 992

1      A.   Yes.

2      Q.   All right.

3           Let's go, then, to page 31, which is

4    Appendix C.  Actually, let's go to page 30.  I beg

5    your pardon.

6           And just pull up the top heading.

7           Do you have that in front of you,

8    Ms. Pisoni?  It's actually page 30 internally, but

9    it's Appendix C.  Yeah, unfortunately, it's not

10   Bates-stamped, but --

11     A.   Yes, I have it.

12     Q.   Okay.  Do you see the reference there to

13   "Orrick Specific Annotations to AIG Guidelines"?

14     A.   Yes.

15     Q.   Okay.  And is it your understanding that

16   within Appendix C, here, is where Orrick set forth

17   with greater specificity its specific objections to

18   the AIG guidelines and their belief that they were

19   inapplicable to a case like this?

20     A.   Correct.

21     Q.   And I just want to go through a couple of

22   them.  I'm not going to go through all of them.

23          But if you go to the next page, Arnold, 31,

24   which is the second page of Appendix C, internally

25   page 12.  And actually, let's go to the bottom part

CONFIDENTIAL - ATTORNEYS' EYES ONLY             Exhibit H - Page 613

Page 993

    1   here.  Pull back from that.  And just start from

    2   right here down to the bottom.  Exactly.  Let's get

    3   that blown up.

    4           And you see there's a reference to "Case

    5   Management, Part 5."

    6           Do you see that?

    7   A.    Yes.

    8   Q.    And in the second paragraph it states,

    9   quote (as read):

   10              The guidelines that tasks

   11           should be staffed at the

   12           appropriate level and partners

   13           should not be assigned to tasks

   14           that can be handled by associates

   15           shall not under any circumstance be

   16           a basis for disallowance of

   17           reimbursement of any fees.

   18              This is a highly complex,

   19           bet-the-company case that is

   20           staffed primarily by partners on

   21           the team of opposing counsel.  Lead

   22           counsel must retain the sole and

   23           absolute discretion to determine

   24           how to staff particular tasks,

   25           close quote.

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**            Exhibit H - Page 614

Page 994

1          Does that accurately set forth the position

2     Orrick was taking in terms of under what conditions

3     it was willing to represent MGA?

4          A.   Yes.  And they were very emphatic about

5     that particular provision.  Because of the magnitude

6     of this case and the scope of issues and the demands

7     that were being put on the law firms, it was -- they

8     needed to have a plan whereby they could divide

9     different pieces of the case because it was just

10    impossible for, you know, one senior person to

11    oversee every single aspect of the case.

12          And so they needed to have, you know,

13    multiple partners and associates working on this.

14    And they had to decide in their judgment how to best

15    staff the case.  And they did not want MGA trying to

16    say, well, you could, you know, use an associate at

17    a lower rate.

18          Because what I tried to do was to get

19    Orrick to agree to give me partners whose billing

20    rates were, you know, closer to the rates being paid

21    by the insurance companies, and they just wouldn't

22    agree to anything like that.

23          Q.   The draft of this agreement that you

24    provided to the carriers, did it include this

25    Appendix C?

CONFIDENTIAL - ATTORNEYS' EYES ONLY
                                         Exhibit H - Page 615

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 384 of 486   Page ID
#:322012
Vol. IV (887-1122)      MGA v. Lexington, et al.                    11/11/2010

Page 995

```
 1      A.   It did.
 2      Q.   And Appendix C goes on to state (as read):
 3               Orrick must be paid for
 4           internal conferences.  A case of
 5           this type cannot be managed
 6           effectively without internal
 7           conferences.
 8           I'm going to stop there.
 9           Was that expressed to you as another
10   condition that Orrick had of coming in to represent
11   MGA?
12      A.   Yes.
13      Q.   And what do you recall specifically being
14   said to you with respect to internal conferences and
15   the needs of Orrick to have those?
16      A.   Well, the need was to really -- it was
17   actually a cost-savings need.  Because what you
18   needed to do was to have everybody who could
19   effectively communicate.
20           So they had, I know, team conferences to
21   talk about what happened in other depositions.  They
22   needed to be able to make sure that what was going
23   on, you know, in some of the motions that were being
24   filed -- the motions to compel were picking up
25   things that were going on in depositions.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 616

Page 996

1          So they were very adamant that these

2    internal conferences were going to be key to our

3    being able to have a strong defense of this case.

4        Q.   And how many lawyers did you understand

5    Orrick was going to be having on board to represent

6    MGA?

7        A.   You know, we initially tried to map out a

8    team that was going to be relatively small.  But

9    things have happened in this case, you know, that --

10   and had happened previously in the case, that I

11   think it was always left in the discretion of

12   Annette Hurst as lead counsel to staff as she needed

13   to staff, because the company was protected by way

14   of fee cap.

15          So, you know, that was our protection as

16   opposed to trying to limit the number of attorneys

17   or limit the number of hours without, you know,

18   jeopardizing ability to defend ourselves.

19       Q.   You mentioned the term "fee cap."

20          Can you describe what fee caps you were

21   able to negotiate with Orrick?

22       A.   Sure.  Can I look at the agreement?  Would

23   that be okay?

24       Q.   Sure.

25       A.   All right.  Well, the Orrick agreement is

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 617

Page 997

 1  very complex.  I wish it were simpler, actually.

 2           But Orrick was -- here's the deal.  When we

 3  started the negotiation, Orrick only wanted to agree

 4  to a fee cap for, like, two months.  Because what

 5  they wanted to do was get in the case because they

 6  knew that prior counsel weren't doing everything

 7  that probably they should have been doing to

 8  adequately protect MGA's interests.  And they wanted

 9  to also be more aggressive in the defense.

10           And so they wanted this very short window.

11  So they said, "Let's agree to a fee cap for two

12  months."

13           And I said, "Wait a minute.  I can't do

14  that because if I do that, then what's going to

15  happen Month 3?  I get killed," because now I've

16  lost the negotiating power.  Right?

17           So I said, "Nope.  I need a fee agreement

18  that's going to take me all the way to trial."

19           Well, that was a back-and-forth --

20           JUSTICE WALLIN:  You mean through trial

21  or --

22           THE WITNESS:  Up to trial.

23           JUSTICE WALLIN:  Okay.

24           THE WITNESS:  I'm sorry.  Up to trial.

25           And that was a real bone of contention with

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 618

Page 998

 1   Orrick because they said, "Whoa.  We could -- we
 2   don't know what could happen."
 3           So then what we came up with was this
 4   concept of a fee cap, but it's a fee cap with a
 5   band.  Okay.  Because everybody thinks a fee cap
 6   means anything that gets over the fee cap, you don't
 7   pay.  Right?
 8           Well, Orrick said, "Wait a minute.  That's
 9   not going to work."
10           So the way it works is -- and I'm going to
11   try to be simple, but I can answer more details if
12   we need to -- is that you go up to whatever the
13   discounted fee cap is, which I believe the
14   discounted cap is at 1.4.  And this is a cumulative
15   cap, so that number changes as the months go on.
16           And then Orrick eats anything from 1.4 to
17   1.55.  Okay.  So they eat 150 grand because they
18   went over their fee cap.  That's their penalty.
19           Then anything over the 1.55 was split 50/50
20   with MGA.  Okay.  So that's basically how it worked.
21   But it's not a pure monthly fee cap.
22           And, actually, Mr. Steve Schultz, our
23   controller, is the one that went back and forth with
24   Orrick because there were issues of whether the fee
25   cap was cumulative or if it was monthly.  And they

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**               Exhibit H - Page 619

Page 999

1   all agreed that it was going to be cumulative, so he

2   does the calculations every month as to what that

3   translates to.

4           But that was the fee cap that was agreed to

5   and that has been in place with Orrick.

6           In August Orrick said, "We are quitting

7   unless we get some relief on the fee cap."

8           Because when you do the calculations,

9   Orrick had been penalized in the millions of

10  dollars.  And then there were a ton of deductions

11  that were being taken on their bills for block

12  billing and interoffice conferences.

13          And so they were just at wit's end.  And so

14  they basically said, "If you want the discovery done

15  in this case, we have to get a modified fee cap for

16  August," in which we agreed to modify that to 2.7.

17          JUDGE SABRAW:  Is it really just -- is it a

18  fee cap, though?  It sounds to me, as I'm trying to

19  grasp this, that it was really a reallocation or a

20  fee-sharing agreement after certain numbers or

21  certain monies were reached.  I mean, I don't see

22  this as a cap.

23          THE WITNESS:  As I said, it's not a -- we

24  called it a cap with a band.  That's how Orrick

25  described it, and so that's just the language.  But

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit H - Page 620

Page 1000

1     it's very unusual because -- I agree.  It's not

2     really -- as I said earlier, it's not really a cap.

3               JUDGE SABRAW:  It's just a shared risk

4     arrangement beyond certain numbers.

5               THE WITNESS:  Correct.  That's exactly

6     right.  They take the first 150- and the other is a

7     50/50.

8               JUDGE SABRAW:  Hmm.

9     BY MR. ECHEVERRIA:

10      Q.   In terms of your negotiation of this fee

11    cap or band or fee-sharing, whatever you want to

12    call it, was this all your attempt to reduce the

13    overall legal cost as it related to MGA?

14      A.    Twofold.  I mean, I guess -- here's the way

15    I look at this.  There's three objectives as general

16    counsel I have to be mindful of.

17              I have to not at all compromise the defense

18    of the company.  So I need to have them have the

19    resources they need to defend us.

20              Number two, I have to keep costs under

21    control overall, but then also on a monthly cash

22    flow basis because, remember, I can't have a huge

23    stack of cash going out the door either because we

24    have to run the business.

25              And so, you know, part of that -- all of

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1001

1   these factors have to be weighed and balanced.

2         And so I would say it's part of my trying

3   to balance all of those factors, not just one.  So

4   it's a reduced of overall costs, getting them to

5   wait the 60 days for payment and also to make sure

6   that we had a proper defense.

7      Q.   And did you invite the carriers to

8   participate in the negotiation you just described to

9   limit the fees and costs under the Orrick retainer?

10     A.   I did.

11     Q.   And did they ever take you up on that?

12     A.   We had e-mail exchanges and we had some

13  conference calls, but despite what I thought were

14  very strong efforts on my part to solicit input and

15  comments and let's address this up front and be

16  proactive, it was just really, you know, guys, we're

17  not doing anything more than what's in the

18  settlement agreement.  That's it.

19        And so that's what happened.

20     Q.   Now, one other subject on fee caps so we

21  finish that up.

22        Did you also negotiate a fee cap in the

23  Orrick retainer as it related to their work on the

24  Phase I appeal?

25     A.   Yes.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit H - Page 622

Page 1002

1      Q.   Tell us about that.

2      A.   That was, I believe, 510,000 discounted,

3  was the fee cap.  And I believe that's also in the

4  fee agreement.

5      Q.   And let's turn away from this page really

6  quick and go to page 4 of Exhibit 470, the Orrick

7  retainer.

8           The very bottom of the page, Arnold.  Right

9  there.

10           And, for the record, let me read it first.

11  It says, quote (as read):

12                Phase I proceedings.  An

13            undiscounted fee cap shall apply to

14            the currently pending appeal of the

15            Phase I proceedings in the amount

16            of 600,000 (equating to a

17            discounted fee cap of 510,000) in

18            the --

19           And let's go to the next page, just the top

20  two sentences.

21           (As read):

22                -- in the event that MGA has

23            earned the entire 15 percent

24            discount as a result of our receipt

25            of prompt payments.  This separate

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 623

Vol. IV (887-1122)       MGA v. Lexington, et al.                    11/11/2010

Page 1003

1               fee cap for the Phase I appeal

2               includes the oral argument, close

3               quote.

4               Now, how much did MGA actually pay to

5    Orrick under that particular fee cap?

6        A.    Well, let -- just -- let me be clear.  We

7    have paid up to the fee cap.  However -- and we've

8    paid, I believe, the hundred-thousand-dollar success

9    bonus, which is built in here for the appeal, so

10   we've also paid that.

11              And we have Orrick still insisting that we

12   need to pay more money on the appeal because the

13   appeal involved a lot more work than what was

14   initially envisioned.

15              And they had such huge cost overruns that

16   they're saying that it was basically changed

17   circumstances from what was envisioned in this

18   agreement.

19              So while we're in the process of trying to

20   negotiate the trial budget with Orrick right now,

21   that's one of the points of contention, is how much

22   more we would pay them above the fee cap on the

23   appeal and the bonus.

24       Q.    Okay.  All right.  We got on the subject of

25   fee caps.  And now I want to go back to the subject

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit H - Page 624

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 393 of 486   Page ID
#:322021
Vol. IV (887-1122)        MGA v. Lexington, et al.                11/11/2010

Page 1004

1    of Orrick setting forth its specific objections to

2    the AIG guidelines.  And we had left off at page 31

3    with the issue of interoffice conferences.  And what

4    I would like to do is go to the next page, 32, which

5    is internally page 13 of Appendix C.

6              Pull that up.  And let's just pull up the

7    top paragraph first.  It's page 13 internally.

8              And because it's not a great copy, I'll

9    read it into the record first.  It says, quote (as

10   read):

11                  Multiple attorney attendance.

12              There are many instances in this

13              case where multiple attorneys must

14              attend hearings before the Court,

15              conferences with the discovery

16              master to address disparate and

17              complex issues.  A blanket

18              limitation on one attorney per

19              event is, therefore, inappropriate,

20              close quote.

21              Was that the position taken by Orrick to

22   you?

23        A.   Yes.

24        Q.   And do you recall specific discussions

25   about that with Annette Hurst or others at Orrick in

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 625

Page 1005

1    negotiating the retainer?

2        A.    Absolutely.

3        Q.    Tell us about those.

4        A.    Sure.

5              Again, I think it all goes back to the

6    nature of the complexity of the case and how to

7    effectively manage it.  The case had to be divided

8    up by topics.

9              So, for example, Bill Molinski handles the

10   trade secrets piece.  Annette took a lot of the IP

11   claims.

12             And so you had different counsel handling

13   different issues.  And so when motions came up or

14   arguments came up, she knew that they were going to

15   need to have the experts in those fields be present

16   to avoid duplication amongst themselves and really

17   just to be able to manage the case effectively.

18   And, you know, I think she knew that from the way

19   things had happened previously.

20       Q.   All right.  Let's go to the next

21   subparagraph.  And this is, again, continuing on

22   Appendix C of the Orrick retainer where they set

23   forth their objections to the AIG billing

24   guidelines.  Paragraph C states (as read):

25                   Paralegal services.  Quote,

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 626

Page 1006

```
 1              paralegals will be required to

 2              perform file organization tasks in

 3              a case of this magnitude involving

 4              multi-office staffing, and it is

 5              appropriate to bill for such tasks.

 6                   Under no circumstances should

 7              paralegal fees be disallowed based

 8              on the vague guideline, quote,

 9              where there is no significant value

10              added to the case, close quote.

11                   Again, was that another position by Orrick

12       in terms of its objections to the AIG guidelines?

13       A.   Yes.

14       Q.   And did you have discussions with Ms. Hurst

15  or others at Orrick about that?

16       A.   Yes, we did have specific discussions

17  because of the fact that in an ordinary case of

18  ordinary magnitude, you would say, really,

19  docketing, filing, you guys should just do that.

20  You're a big law firm.

21                   But here, with the number of filings that

22  are going on and with the fact that all of those

23  filings have to be updated to SharePoint and, you

24  know, all of the under seal filings that go on in

25  this case, it's -- it's really very time-consuming,
```

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit H - Page 627

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 396 of 486   Page ID
#:322024
Vol. IV (887-1122)        MGA v. Lexington, et al.                    11/11/2010

Page 1007

1   and they need several paralegals dedicated

2   exclusively to this case.

3           And so she said that that is way more than

4   what is required of a normal case.  And so they were

5   going to bill us for that.  And that was just part

6   of -- you know, we keep taking these things one at a

7   time, and I want to go back.  It's part of the

8   overall deal.

9           I mean, we had to decide what was most

10  important to us.  And so we had to agree to that

11  point, which ideally I tried to get it out of the

12  agreement.  But that was one of their points they

13  wouldn't let go of.

14    Q.   Okay.  Let's go on to the next one, and

15  this is the last one I'm going to show you of

16  Appendix C.  And it's paragraph D.  And first

17  reading it into the record, it says (as read):

18               Personnel changes.  MGA will

19               be billed for Orrick -- Orrick's

20               necessary review of the file to

21               come up to speed in transitioning

22               the case.  And we expect Lexington

23               AIG to reimburse in accord with its

24               agreed-upon rate for those

25               services.

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Exhibit H - Page 628

Page 1008

1              Orrick will abide by MGA's

2           billing guidelines with reference

3           to changes of personnel.  Under no

4           circumstances should fees be

5           disallowed based on the vague

6           guideline, quote, multiple file

7           reviews by the same lawyer, close

8           quote.

9               There are hundreds, if not

10           thousands, of files in this case,

11           close quote.

12           First of all, was that another one of these

13   specific observations Orrick had to the AIG billing

14   guidelines?

15      A.   It was.  And we actually did have somewhat

16   of a compromise on that particular point that works

17   to all of our benefit, which was --

18      Q.   Tell us about that.

19      A.   Sure.

20           In the fee agreement there was, I believe,

21   a $200,000 credit for Orrick coming into the case

22   and getting the files and getting up to speed.

23   Because I said, well, you know, how do we -- how do

24   we handle this?

25           Again, remember, I wanted to try to make

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit H - Page 629

Page 1009

1    this go as smoothly as possible once the agreement

2    was signed -- once I gave away -- once I signed away

3    our leverage, I needed to try to have this run as

4    smoothly as possible.

5              So we negotiated for that 200,000 up front,

6    and that was a payback, I believe, over the course

7    of several months.  You know, it was 50,000 a month

8    for four months.

9        Q.   Okay.  And all of these three paragraphs of

10   Appendix C, which I've shown you, were all disclosed

11   and provided to the insurance carriers prior to MGA

12   signing off on this retainer; is that right?

13       A.   Absolutely.

14       Q.   All right.

15            MR. ECHEVERRIA:  Your Honor, I'm going to

16   switch to another area, and I notice it's the noon

17   hour.  I don't know if you want to take the lunch

18   break now.

19            JUSTICE WALLIN:  I understand lunch is

20   here.  So let's do that.

21            MR. ECHEVERRIA:  Okay.

22            JUSTICE WALLIN:  Time out.

23            (At 12:00 p.m. the proceedings were

24            adjourned for noon recess and

25            reconvened at 1:28 p.m.)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 630

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 399 of 486   Page ID
#:322027
Vol. IV (887-1122)      MGA v. Lexington, et al.                11/11/2010

Page 1010

1        THURSDAY, NOVEMBER 11, 2010; ORANGE, CALIFORNIA

2                         1:28 P.M.

3

4            JUSTICE WALLIN:  Let's resume.

5            Go ahead, Ricardo.

6

7            DIRECT EXAMINATION (CONTINUED)

8    BY MR. ECHEVERRIA:

9       Q.   Ms. Pisoni, I wanted to shift gears here

10   and talk a little bit about the various law firms

11   that have represented MGA in connection with the

12   Mattel action.

13           We've talked about some of them, namely

14   Skadden; Orrick; and Glaser Weil, but I want to go

15   through, identify some of the others and have you

16   tell us what their roles were and what they were

17   brought in to handle in terms of the litigation.

18   Okay?

19      A.   Yes.

20      Q.   Let's first identify Sidley Austin.

21           What role did Sidley Austin have in

22   connection with the defense of MGA in the Mattel

23   action?

24      A.   Okay.  Well, it had two roles.  They did

25   play some role on some discrete issues in the

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 631

Vol. IV (887-1122)        MGA v. Lexington, et al.                    11/11/2010

Page 1011

1   District Court based on some of their past

2   representation of MGA and their expertise.  They

3   advised us on those matters.

4            Also, Mark Haddad is an appellate lawyer

5   with Sidley, and he came in to handle the appeals of

6   the stay that they took over from Howard Rice.  And

7   then ultimately when we consolidated everything into

8   Orrick, Mark Haddad then transferred the brief over

9   and was completed and pursued by Orrick.

10           So that's been -- that was Sidley's role.

11      Q.    Okay.  How about Mitchell Silberberg?

12   Their role was what?

13      A.    Mitchell Silberberg was counsel for MGA in

14   the District Court action.  And they were co-counsel

15   with Glaser Weil.  And I believe that's what I

16   described this morning, that you had Glaser Weil and

17   Mitchell Silberberg coming in at the start of

18   Phase II to represent MGA.

19      Q.    And Mitchell Silberberg was the firm that

20   had the expertise on intellectual property?

21      A.    That's correct.  Russell Frackman.

22      Q.    Okay.  How about the firm Scheper Kim and a

23   lawyer by the name of Mark Overland, what role did

24   they have?

25      A.    Mark Overland represents Gus Machado, and

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 632

Page 1012

1    so he has been involved in the case, you know, for a

2    number of years.

3        Q.    Who is Gus Machado?

4        A.    Gus Machado is a former MGA employee that

5    is a named defendant in this action.

6        Q.    And why did MGA hire a lawyer to represent

7    Gus Machado?

8        A.    You know, because of potential conflicts of

9    interest, you know.  Without disclosing

10   attorney-client privilege, it was just decided that

11   they should have independent counsel that are part

12   of the joint defense agreement, you know, with MGA.

13       Q.    Okay.  How about the firm Pansky & Markle?

14       A.    Pansky, right.  That would be Ellen Pansky.

15   Ellen is an expert in ethics.  So she's MGA's ethics

16   counsel.  She has been a great resource for us when

17   there have been issues that come up.

18            There was a disqualification issue that

19   came up of the Skadden law firm and an OSC.  And in

20   order to make sure, for me to make sure that the

21   company was protected and its rights were protected,

22   we consulted with Ellen.

23       Q.    Okay.  How about the firm Lenczner Slaght?

24       A.    Lenczner Slaght is Canadian counsel that

25   represented MGA.  Mattel, as part of its strategy,

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 633

Page 1013

1    you know, to, I guess, instigate litigation in

2    multiple locations and then drag it all into the

3    District Court down here in Santa Ana, they sued us

4    in Canada and they sued us in Mexico.

5              Janine Brisbois is an MGA employee and she

6    was a named defendant in Canada and MGA was also a

7    defendant in the Canadian case.

8              That case didn't really get beyond initial

9    pleading stages and now has been dismissed,

10   basically.  Mattel has not pursued that.  So we're

11   at a standstill.  But that is -- Lenczner Slaght was

12   MGA's law firm.

13       Q.   Did Mattel cite to the Canada litigation in

14   the action here in Orange County?

15       A.   Sure.  Mattel has been trying to -- part of

16   their strategy is to say in the District Court here

17   before Judge Carter that, you know, we basically

18   took their IP and their people; not just here

19   locally, but we, you know, also took trade secrets,

20   et cetera, or employee issues from Mexico as well as

21   Canada.  So they're trying --

22              MR. SHERIDAN:  Go ahead.  I didn't mean to

23   interrupt.  I apologize.

24   BY MR. ECHEVERRIA:

25       Q.   Go ahead.

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit H - Page 634

Page 1014

```
 1      A.   So they're basically trying to relate all
 2  of those lawsuits as part of, you know, an argument
 3  that, you know, MGA's a bad actor.
 4           MR. SHERIDAN:  Your Honor, I would like to
 5  move to strike.  I don't know how she testifies
 6  about Mattel's strategy.  She's not --
 7           JUSTICE WALLIN:  Sustained.
 8           MS. FIELD:  It's not responsive to the
 9  question.
10           THE WITNESS:  Well --
11           JUSTICE WALLIN:  She's really just -- it's
12  obviously how she feels, but I understand that.  But
13  it's not --
14           You really can't testify as to what their
15  strategy is.
16           THE WITNESS:  Actually, let me -- may I --
17           JUSTICE WALLIN:  You can testify about what
18  they did.
19           THE WITNESS:  Well, I can also tell you,
20  though, that's what they've also said in their
21  opposition briefs to the summary judgment, so that's
22  where it comes from.
23           Maybe I need to rephrase that.
24           JUSTICE STONE:  So that's your
25  justification for bringing in additional counsel to
```

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit H - Page 635

Page 1015

1  represent the Canadian matters and the Mexican

2  matters; is that right?  Separate counsel.

3            THE WITNESS:  Yeah.  I guess -- here's the

4  point.

5            In their briefs to the Court and on the

6  summary judgment, Mattel is arguing that we were a

7  bad actor in all these jurisdictions, so that's how

8  they're using these lawsuits.

9            So I guess I'm attributing that to their

10  strategy, but it's based on what I'm reading in

11  their pleadings and hearing in their arguments, just

12  to kind of clarify that.

13            JUSTICE WALLIN:  So they're saying in

14  pleadings in the main action here --

15            THE WITNESS:  The District Court case.

16            JUSTICE WALLIN:  -- that somehow because of

17  something in foreign lands, that MGA has done bad

18  things?

19            THE WITNESS:  Yes, that is correct.  That

20  is being set forth in the briefs and in the summary

21  judgment briefs.  They are talking about what bad

22  acts we did in Mexico and Mexico trade secrets and

23  also what we did in Canada and Janine Brisbo did

24  there as well.  So that is --

25            MR. SHERIDAN:  Your Honor, I'm going to

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit H - Page 636

Page 1016

1  object.  This is all hearsay.  What they said in
2  their briefs is in their briefs.  We don't --
3          JUSTICE WALLIN:  I suppose, but I don't
4  know that any of us want to really expand this case
5  beyond just what she said.  And to be candid, I'm
6  not sure that makes a whole lot of difference to
7  what we are deciding.  So...
8          JUSTICE STONE:  No.
9          JUSTICE WALLIN:  And at least one of my
10 colleagues agrees.
11         JUDGE SABRAW:  I do.
12         JUSTICE WALLIN:  Oh, two do.  So let's move
13 on to something else.
14 BY MR. ECHEVERRIA:
15     Q.   Okay.  Howard Rice, what role did they
16 play?
17     A.   They were appellate counsel for the initial
18 applications to stay the injunctive relief before
19 the Ninth Circuit.
20     Q.   And the firm of Grimes & Battersby, what
21 role did they play?
22     A.   Sure.  That would be -- Greg Battersby is
23 IP counsel and also well known in IP licensing.  And
24 so they had very discrete IP issues on which they
25 advised MGA in connection with the defense of the

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit H - Page 637

Page 1017

1    Mattel litigation.

2         Q.    The firm Mintz Levin?

3         A.    I believe that there was an attorney, whose

4    name I can't recall at the moment, but he was one of

5    the judges in the mock appeal that we did for the

6    Ninth Circuit argument.

7         Q.    When you say "mock appeal," what do you

8    mean by that?

9         A.    Sure.

10         We just did a mock of the Ninth Circuit

11   argument with Josh Rosenkranz.  We had Ken Starr and

12   two other judges, and we did two mocks of that

13   argument before it was heard in December.

14        Q.    Okay.  How about the firm Covington &

15   Burling, what role did they play?

16        A.    Again, a judge in the mock for the ninth.

17        Q.    Okay.  Mina Meyer (phonetic) Grimes, what

18   role did they have?

19        A.    Again, a judge for the mock, one of the

20   mocks.

21        Q.    Blecher & Collins?

22        A.    That would be Max Blecher, who advises the

23   company on, again, discrete issues related to, you

24   know, unfair competition, antitrust, related to the

25   Mattel litigation.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 638

Page 1018

1      Q.    How about the firm Crowell Moring?

2      A.    Crowell Moring represented -- or did work

3   for MGA or -- I believe it was Isaac as well, IGWT,

4   looking at, I believe, some of the claims that were

5   alleged in the third amended counterclaims.  And so

6   they did work for us.

7      Q.    Okay.  Let's shift gears a little bit and

8   talk about MGA's billing guidelines.  There's been

9   some reference to them in this case.

10          First of all, are you familiar with MGA's

11   billing guidelines?

12      A.    Yes.

13      Q.    And what's the purpose of those billing

14   guidelines at MGA?

15      A.    Well, the purpose of the billing guidelines

16   are to be just that.  Billing guidelines that we

17   share with our counsel so that we have, you know,

18   some basis for discussing what the expectations are

19   in terms of the way the firms, you know, manage our

20   litigation.

21          And then, you know, we -- that's a starting

22   point for us on how we like to work with the firms.

23          JUSTICE WALLIN:  Were these developed

24   before you became general counsel?

25          THE WITNESS:  Yes, they were.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 639

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 408 of 486   Page ID
#:322036
Vol. IV (887-1122)        MGA v. Lexington, et al.                11/11/2010

Page 1019

 1              JUSTICE WALLIN:  And so were they developed

 2    after this case -- after the underlying case

 3    started, the main case?

 4              THE WITNESS:  You know, I'm not aware

 5    because I'm not sure of the timing, whether they

 6    came before they -- the Mattel case started.

 7              JUSTICE WALLIN:  That would have been on

 8    Mr. Holden's watch.  Was he there before you?

 9              THE WITNESS:  He was there about eight

10    months, I think, prior to myself.  So, yes, I

11    believe that would have happened while he was at

12    MGA.

13              MR. ECHEVERRIA:  And, actually,

14    Mr. Holden's going to testify in detail about the

15    MGA guidelines, so I'm not going to spend much time

16    with Ms. Pisoni on that.

17              JUSTICE WALLIN:  All right.  Fine.

18    BY MR. ECHEVERRIA:

19       Q.   With respect to the District Court action,

20    was there an order by Judge Carter that obligated

21    MGA to have office space within walking distance of

22    the courthouse?

23       A.   Yes.

24       Q.   Can you tell us a little bit about that.

25       A.   We were in court one morning before Judge

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit H - Page 640

Page 1020

1  Carter, and he was explaining the rules of his

2  court.  And one of the rules of his court was

3  basically to tell us -- he basically told our

4  counsel and Mattel's counsel to leave the courtroom

5  at that moment and to go and find office space

6  walking distance from the courthouse because he

7  wanted a place that there could be depositions, that

8  he could walk over to and observe, if necessary, or

9  solve problems.

10          And he said, "I want you both to go find

11  space and, you know, report back."

12          And, you know, that's where the depositions

13  are going to be held.  And that was the assignment

14  for the morning.

15          MS. FIELD:  Objection.  Hearsay.

16          JUSTICE WALLIN:  Overruled.

17  BY MR. ECHEVERRIA:

18    Q.   The office space that MGA has obtained, has

19  it been paying for that office space?

20    A.   Yes.

21    Q.   And is that pursuant to court order to have

22  that office space?

23    A.   Yes.

24    Q.   Okay.

25          MR. SHERIDAN:  Objection.  Hearsay.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 641

Page 1021

 1   There's been no order introduced.

 2           JUSTICE WALLIN:  Overruled.

 3           If you're representing that that, in fact,

 4   is not true, but, you know --

 5           MR. SHERIDAN:  There's no order.  There's

 6   no order.

 7           JUSTICE WALLIN:  It was just an oral order

 8   by Carter or what?

 9           THE WITNESS:  Yes.  It was a directive by

10   him, and it's an order.  And both -- we listened to

11   it.  I mean, I believe it's memorialized in a

12   transcript somewhere.

13           JUSTICE WALLIN:  Okay.

14           Overruled.

15           THE WITNESS:  Or our counsel would know

16   that.

17           MS. FIELD:  Objection.  Hearsay.

18           MR. ECHEVERRIA:  He's already ruled.

19           JUSTICE WALLIN:  Overruled.

20   BY MR. ECHEVERRIA:

21       Q.   Let's -- why don't we just move on.

22           JUSTICE WALLIN:  Yeah.  I don't think it's

23   a big deal.  Move on.

24   BY MR. ECHEVERRIA:

25       Q.   Let's talk about the receiver compensation.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 642

Vol. IV (887-1122)       MGA v. Lexington, et al.                    11/11/2010

Page 1022

1              Are you familiar with the receiver that was

2       appointed by the court?

3           A.   Yes, Patrick Fraioli.

4           Q.   Tell us about that.

5           A.   One of the various motions that Mattel

6       filed was a motion to appoint a temporary receiver.

7       And the Court ordered Patrick Fraioli to be a

8       temporary receiver.

9              And so he was there for I think about three

10      weeks.  And then his role changed into

11      court-appointed monitor.  And the Court ordered MGA

12      to pay -- well, actually, I think he paid himself,

13      frankly, pursuant to court order, because he was --

14      when he was temporary receiver.  And then he ordered

15      MGA to make certain payments to him for his monitor

16      services.

17          Q.   Were those expenses paid by MGA?

18          A.   Yes.

19          Q.   And were they paid in connection with the

20      defense of MGA in the underlying action?

21          A.   Yes.

22              MS. FIELD:  Objection.  Calls --

23              MR. SHERIDAN:  Objection.  Legal

24      conclusion.

25              JUSTICE WALLIN:  Sustained.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 643

Vol. IV (887-1122)      MGA v. Lexington, et al.                    11/11/2010

Page 1023

1    BY MR. ECHEVERRIA:

2        Q.   The Court ordered MGA to pay those

3    expenses; is that right?

4        A.   Yes.

5        Q.   And it did so?

6        A.   Yes.

7        Q.   All right.  I want to shift into one final

8    area.  And it goes back to the Orrick retainer

9    agreement.

10            Was there a limitation negotiated as part

11   of the Orrick retainer agreement on interoffice

12   conference time?

13       A.   Yes.

14       Q.   And what was that?

15       A.   A hundred hours.

16            MR. ECHEVERRIA:  Let's pull up, if we

17   could, Exhibit 470, page 3.  And let's first pull up

18   this second paragraph.

19            And let me just read into the record what

20   it says first.  Quote (as read):

21                In addition to the foregoing,

22            Orrick shall not bill in excess of

23            ten hours per month for internal

24            conferences involving more than

25            three attorneys without MGA's prior

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit H - Page 644

Page 1024

1          approval.
2                 Further, if more than two
3          attorneys will attend any hearing
4          (other than an ex parte hearing or
5          trial) or any deposition, Orrick
6          shall notify MGA in writing at
7          least three business days in
8          advance, and MGA shall have the
9          right to object.  Failure to object
10         in writing shall be deemed consent,
11         close quote.
12    Q.   Now, you see that references ten hours.
13         Was that modified before this agreement was
14  entered into?
15    A.   It -- actually, it wasn't modified.  To be
16  very clear, that was -- it was never contemplated to
17  be ten hours.
18    Q.   Okay.
19    A.   That was a typo.
20         And so before the agreement was executed,
21  there was an e-mail exchange with Ms. Hurst and
22  myself wherein we made some corrections.
23         MR. ECHEVERRIA:  Let's pull up Exhibit 99,
24  page 1.
25         (Exhibit 99 first referenced in

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit H - Page 645

Page 1025

 1              Volume IV of the proceedings.)

 2              MR. ECHEVERRIA:  And specifically paragraph

 3    5 here, Arnold.  Well, actually, let's back up and

 4    lay a little foundation first.

 5         Q.   Up at the top, this is an e-mail thread.

 6    It looks like from you to Annette Hurst; is that

 7    right?

 8         A.   Yes.

 9         Q.   And this was dated July 3rd, 2009,

10    regarding the Orrick engagement letter, correct?

11         A.   Yes.

12         Q.   All right.

13              Let's pull back, Arnold, and go to

14    paragraph 5.

15              And as part of your e-mail, you stated (as

16    read):

17                   Per our discussion, we did

18              agree that number of hours

19              permitted for internal conferences,

20              without prior approval, is 100, not

21              10, close quote.

22              So were you clarifying the agreement was

23    100 hours, not 10?

24         A.   Correct.

25         Q.   All right.  And the 100 hours pursuant to

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**              Exhibit H - Page 646

Page 1026

1    the terms in the Orrick agreement was to be paid by

2    MGA at what rate?

3        A.    At the full hourly rate that the Orrick

4    attorneys were billing.

5        Q.    Not --

6        A.    Correct.  No discounted rates.

7        Q.    Okay.  And the limitation that the carriers

8    have been placing on interoffice conference time has

9    been what?

10       A.    Two hours every six months, I believe.

11       Q.    Okay.  And the two hours every six months

12   that the carriers have been paying has been at what

13   rate?

14       A.    At the carrier rate of whatever those

15   negotiated rates are.

16       Q.    Okay.  Now, one final thing.

17             In the Orrick retainer agreement, is there

18   a provision that discusses paying for certain

19   clerical tasks?

20       A.    Yes.

21       Q.    And can you describe that?

22       A.    Yeah.  There's, I think, multiple

23   provisions.  I believe the appendix referred to some

24   of the clerical tasks that we looked at earlier.

25   And I believe there's also references in the main

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Exhibit H - Page 647

Page 1027

1    letter whereby Orrick really just dug its heels in

2    and said that this is not going to be clerical work

3    to, you know, organize a case of this magnitude, to

4    handle all the filings that are necessary and the

5    distributions to all the lawyers on the teams, that

6    that required dedicated personnel.  So...

7       Q.   Now, normally clerical task functions are

8    built in an overhead as part of an hourly rate.

9            Why did you agree to pay for that?

10      A.   Okay.  Ordinarily, I don't agree to those

11   kinds of things, but I thought I explained earlier

12   that we had to get a lot of things out of -- out of

13   our counsel in order to have what we needed, you

14   know, to continue on with litigating the case and

15   not having the company go under.

16           So we had to give up some things.  I mean,

17   in exchange for getting a fee cap or -- what did we

18   call it earlier?  I think an allocation of expenses,

19   right?

20      Q.   Fee-sharing?

21      A.   Fee-sharing.  Okay.

22           So in order to get the fee-sharing, in

23   order to get them to wait 60 days for payment and to

24   agree on a, you know, a 350 monthly payment and all

25   these other things, we had to give up some things.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 648

Page 1028

1          So on balance, that was one of the things
2    we had to compromise on.
3       Q.   Okay.  All right.
4          MR. ECHEVERRIA:  Those are all the
5    questions I have.
6          JUSTICE WALLIN:  All right.  Time out for a
7    second.
8          (Off the record from 1:47 p.m. to
9          1:48 p.m.)
10         JUSTICE WALLIN:  Back on the record for
11   cross-examination by Mr. Hart.
12         Go ahead, sir.
13         MR. HART:  Thank you, your Honor.
14
15                   CROSS-EXAMINATION
16   BY MR. HART:
17      Q.   Good afternoon, Mr. Pisoni.  How are you?
18      A.   Good afternoon.  Fine, thank you.
19      Q.   I'll jump right into this.
20         Is it fair to say that you are familiar
21   with the Mattel litigation?
22      A.   Yes, sir.
23      Q.   When you began your employment with MGA,
24   the Mattel litigation had already commenced; is that
25   right?

CONFIDENTIAL - ATTORNEYS' EYES ONLY
                                            Exhibit H - Page 649

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 418 of 486   Page ID
#:322046
Vol. IV (887-1122)       MGA v. Lexington, et al.                    11/11/2010

Page 1029

1      A.    Yes, sir.

2      Q.    Okay.  And how long had the Mattel

3    litigation been going on at that point when you

4    started with MGA?

5      A.    For years.

6      Q.    Am I correct that Skadden was MGA's outside

7    counsel for the Mattel litigation when you began

8    with MGA?

9      A.    They were -- yes, they were counsel at that

10   time.

11     Q.    Were there other law firms that were

12   participating in representation of MGA at that time?

13     A.    Yes.

14     Q.    Do you remember who they were?

15     A.    Let me think.

16     Q.    It's not a memory test.  I can pull it up

17   if we need to.

18     A.    I believe that we had -- Scheper Kim was

19   representing Gus Machado at that time.

20     Q.    I'm sorry.  I'll try to interrupt you as

21   you get to each one.

22           What was their responsibilities with regard

23   to Mattel?

24     A.    They were representing Gus Machado.

25     Q.    Okay.

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Exhibit H - Page 650

Page 1030

1     A.   Okay.  We had counsel in Mexico.  And I

2   don't recall the law firm's name.

3     Q.   I should clarify.  When I say "the Mattel

4   litigation" -- that's my fault.  When I say "the

5   Mattel litigation," I mean the litigation going on

6   in the United States.  Okay?

7     A.   Okay.

8     Q.   So I'm not talking about Canada or Mexico

9   or Thailand or anywhere else.  All right?

10    A.   Okay.

11    Q.   Very good.  And you were telling us what

12   other attorneys.

13    A.   Okay.  So there was Skadden.  You know

14   what, honestly, I can't recall right off the top of

15   my head --

16    Q.   No problem.  I'll get into it later.

17    A.   -- for the time frame.

18    Q.   At the time you joined MGA, Craig Holden

19   was employed there as well, correct?

20    A.   That is correct.

21    Q.   And what was his position with MGA?

22    A.   Craig was senior litigation counsel.

23    Q.   And was he responsible for the Mattel

24   litigation before you came on board?

25    A.   Yes.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 651

Page 1031

1        Q.    Is Mr. Holden with MGA now?

2        A.    No, sir.

3        Q.    What happened to Craig Holden?

4        A.    He is practicing at Lewis Brisbois.  He's

5    in private practice.

6        Q.    Who represents MGA, correct?

7        A.    Who represents MGA?

8        Q.    No.  Does -- does Lewis Brisbois represent

9    MGA in any matters?

10       A.    Currently, yes.

11       Q.    Do you know how many?

12       A.    There were some licensing disputes.  I'm

13   not sure of how many.

14       Q.    Nothing to do with the Mattel litigation,

15   however?

16       A.    Not correct.

17       Q.    Enlighten me, please.

18       A.    I believe that Mr. Holden is still doing

19   some work for MGA while at Lewis Brisbois --

20       Q.    Okay.

21       A.    -- on the Mattel case.

22       Q.    Do you recall when he left?  I don't

23   remember if I asked you that.

24       A.    I believe it was in September, and I'm not

25   sure of the exact date.  September of 2010.

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit H - Page 652

Page 1032

1      Q.    Thank you.

2            And who took charge of the Mattel

3     litigation at that point?

4      A.    Well, I over- --

5      Q.    Would that be you?

6      A.    That would be me.

7      Q.    All right.  Just trying to test you here a

8     little and see if you remember.

9            Am I correct that Crum & Forster has been

10    defending -- paying for the defense of both MGA and

11    Mr. Larian in connection with the Mattel action

12    subject to reservation of rights?

13     A.    They have been making some payments, yes.

14     Q.    Subject to reservation?

15     A.    I believe so.

16     Q.    You're familiar with the Lexington

17    settlement agreement, correct?

18     A.    Yes.

19     Q.    And you recall that the Lexington

20    settlement agreement specifically references the AIG

21    billing guidelines?

22     A.    It does have a reference in there to

23    billing guidelines, yes.

24     Q.    Have you ever reviewed the AIG billing

25    guidelines attached to the settlement agreement, the

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**

Exhibit H - Page 653

Page 1033

1    Lexington agreement?

2         A.    Well, I need to clarify something.

3         Q.    Please do.

4         A.    I think I said this in my deposition.  I

5    have never seen AIG guidelines connected to the

6    settlement agreement.  So that's not the context --

7    I don't know what was attached to the agreement.

8    That's not the context in which I reviewed them.

9         Q.    Very good.  And so that's something you

10   don't know?

11        A.    I don't know that.

12        Q.    All right.  Let me phrase it a little

13   differently, then.  Am I correct that you have

14   reviewed the AIG billing guidelines?

15        A.    I have reviewed them, yes.

16        Q.    And when was the first time you did that?

17        A.    Sometime after the February 18th meeting,

18   which was when --

19        Q.    You've got to put a year in it.

20        A.    February 18, 2009 --

21        Q.    There you go.  Thank you.

22        A.    -- meeting.

23        Q.    Let me ask you.  At any time have you

24   provided the AIG billing guidelines to any of the

25   attorneys representing MGA in the Mattel action?

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 654

Page 1034

1      A.    Have I provided them?  Well, at the
2    February 18th meeting I believe the insurers
3    provided -- or Chartis companies provided them to
4    Glaser Weil -- well, because we were sitting in the
5    room.  That's when we saw them.
6          And then, yes, I have provided them, we
7    talked about, to Orrick --
8      Q.    Okay.
9      A.    -- and some of the other firms.
10     Q.    Orrick.
11         Any other firms that you have provided the
12   AIG guidelines to?
13     A.    Uh, you know, I don't recall all the firms
14   that I had provided.  As I said, I believe seeing
15   them the first time was February '09.  And then
16   after that, providing them to the law firms.  But I
17   don't have a specific recollection as to a specific
18   firm other than Orrick.
19     Q.    Very good.  I'll be talking about other law
20   firms here as we go along.
21     A.    Okay.
22     Q.    Am I correct that MGA has its own billing
23   policies for outside counsel?
24     A.    MGA has a billing policy, correct.
25     Q.    And in addition to that basic policy --

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 655

Page 1035

```
 1              JUSTICE WALLIN:  I can't see her.  I can't
 2    tell if she's lying unless I can look at her.
 3              MR. HART:  And can you tell if she has more
 4    than one attorney next to her?
 5              COMMISSIONER STROUD:  Can you see her now?
 6              JUSTICE WALLIN:  That's much better.
 7    BY MR. HART:
 8      Q.    I need to clarify a little bit there.
 9            MGA has a basic set of billing guidelines
10    for outside counsel, correct?
11      A.    Yes.
12      Q.    And in addition to those, MGA has its own
13    written billing policies for outside counsel which
14    apply specifically to the Mattel litigation,
15    correct?
16      A.    I believe what I explained in my deposition
17    is that the guidelines are largely the same.  It
18    just has the word "Mattel" on the front.  And I
19    don't recall what the specific differences might be,
20    but there's not -- nothing comes to mind
21    specifically.  So it's basically the same set of
22    guidelines.
23      Q.    And I'm not going to ask you to go page by
24    page --
25      A.    Okay.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 656

Page 1036

1      Q.    -- but we do have guidelines, MGA

2    guidelines that apply specifically to the Mattel

3    litigation?

4      A.    Well, I would -- okay.  Again, I would just

5    say that there are MGA billing guidelines.  And, you

6    know, I don't know that I would say they apply

7    specifically to the Mattel litigation.  There were

8    MGA billing guidelines, and we used them on all of

9    our litigation --

10     Q.   At the top, don't they say MGA guidelines

11   for Mattel?

12     A.    There is a version that says Mattel.  But

13   as I said to you before, just to be clear, I think

14   it's largely the same as the other document.

15     Q.    I believe they're quite similar, but I just

16   want to establish that we have Mattel guidelines.

17   Okay?

18     A.    Okay.

19     Q.    All right.  Let's talk about those

20   guidelines for a moment.

21          Who drafted those guidelines?

22          JUDGE SABRAW:  Which ones?

23          MR. HART:  Thank you.

24     Q.    Let's talk about the general guidelines

25   first.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1037

1           Do you know who drafted those?

2       A.    Not for sure because it predated my time at

3    MGA.

4       Q.    Do you believe it was Craig Holden?

5       A.    I would guess that would be who it would

6    be, yes.

7       Q.    Have -- and, again, talking about the

8    general guidelines, have those billing policies been

9    revised at all since you joined MGA?

10      A.    I don't know that they've been -- had major

11   revisions.  Might have had some revisions.

12      Q.    How about the Mattel, the MGA-Mattel

13   guidelines, who drafted those?

14      A.    Again, same answer.

15      Q.    You believe it would be Craig Holden?

16      A.    Again, but not certain.

17      Q.    Okay.  We'll ask Mr. Holden directly about

18   that.  So that's fine.

19           Have those MGA-Mattel guidelines been

20   modified or revised at all since you joined the

21   company?

22      A.    Again, I'm not aware of anything specific.

23      Q.    Was there any modification whereby you were

24   designated as a contact person?

25      A.    Yes.  Actually, I think my name was put in

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 658

Page 1038

1    there as a contact person at some point.

2        Q.    Okay.  Do you know what caused that

3    revision?

4        A.    No.  I -- myself, maybe.  I just don't

5    recall.

6        Q.    You are generally familiar with the AIG

7    guidelines, correct?

8        A.    I am generally familiar with them, correct.

9        Q.    And you are generally familiar with the

10   MGA-Mattel guidelines, correct?

11       A.    Yes.

12       Q.    Would it be fair to say that the two are

13   substantially the same?

14       A.    Absolutely not.

15       Q.    Do both of them have references to block

16   bills?

17       A.    There's language in them with respect to

18   block billing, but anything more that you would want

19   from me, I would want to be able to review them.  I

20   just -- I'm not that familiar with them to tell you

21   how they address it.

22            But to be very clear, you know, the AIG

23   guidelines relate to, really, panel counsel and

24   counsel that worked for the --

25       Q.    That wasn't the point of my question.  I

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 659

Page 1039

1    was just talking about the document itself.

2        A.    Well -- okay.

3        Q.    Do the MGA guidelines have references to

4    vague billings?

5        A.    I believe there's some reference to vague

6    billing, yes.

7        Q.    And is there reference to any clerical

8    tasks?

9        A.    Yes.

10        Q.    I'm not going to test your memory.  You've

11    told us what you know and we actually have the

12    documents so we'll go through those ourselves.

13            Am I correct that the MGA billing policies

14    are provided to the attorneys retained to represent

15    MGA in the Mattel action?

16        A.    Yes.

17        Q.    Okay.  I would like to just go through a

18    couple of these real quick.

19        A.    Okay.

20            MR. HART:  Could I have Exhibit 95 up.

21            (Exhibit 95 first referenced in

22            Volume IV of the proceedings.)

23    BY MR. HART:

24        Q.    Do you recognize this as the retainer

25    agreement with Skadden?  If you can't see, we'll

CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                           Page 1040

 1   expand it for you.  Sorry about that.

 2       A.    Sorry.

 3             This is October -- is this the October 9th?

 4       Q.    October 9, '07, yes.

 5       A.    That would be the Skadden retainer

 6   agreement, yes.

 7       Q.    Okay.  And do you recall that that retainer

 8   agreement -- and it's already been testified to --

 9   contains a reference to the billing policies?

10       A.    My recollection from my deposition is that

11   I believe it did.

12       Q.    Okay.  I think that's already in the

13   record, so I won't do any more with regard to that

14   one.

15             Do you know who Howard Rice is?

16       A.    Yes.

17       Q.    Who is Howard Rice?

18       A.    They are a law firm out of San Francisco.

19       Q.    Representing MGA?

20       A.    They did represent MGA for a time in

21   connection with the -- a stay that we -- a stay

22   application we filed with the Ninth Circuit on the

23   injunctive orders that were granted by Judge Larson.

24       Q.    Thank you.

25             Could you put Exhibit 406 up.  Will you

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit H - Page 661

Page 1041

1    expand the top just so we can see the firm.

2           Do you recognize that as the first part of

3    the retainer agreement with Howard Rice?  You see it

4    says, "Thank you for engaging us."

5       A.   Yes.  Again, that looks like the document.

6            MR. ECHEVERRIA:  Sounds like they're

7    getting married or something.

8            MS. FIELD:  It was an important engagement,

9    long.

10           MR. HART:  Could I see page 5, please.  And

11   if you could highlight paragraph 10.  It's actually

12   just the last line of paragraph 10.

13      Q.   Do you see that in this retainer agreement

14   it says (as read):

15               MGA's corporate billing policy

16               will be applicable to this

17               engagement unless it conflicts with

18               the terms of the engagement.

19      A.   I do see that language, yes.

20      Q.   Okay.  Now --

21           JUSTICE WALLIN:  You said "engagement" for

22   the last word.  It's "agreement," I can see.

23           MR. HART:  Is it?  Your eyes are better

24   than mine, your Honor.

25           JUSTICE WALLIN:  So it's (as read):

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1042

1              MGA's corporate billing policy

2         will be applicable to this

3         engagement unless it conflicts with

4         the terms of this agreement.

5         MR. HART:  Thank you.

6         Can we see 443, please.

7         (Exhibit 443 first referenced in

8         Volume IV of the proceedings.)

9   BY MR. HART:

10     Q.   The Glaser firm was retained at some point

11  to represent MGA; is that correct?

12     A.   In connection with the Mattel litigation?

13     Q.   Yes.

14     A.   Yes.

15     Q.   And if we could see --

16     A.   Can I just see the beginning of the letter

17  just to be sure?

18     Q.   Surely.  Please.

19         If we could just expand that.

20         Does that help?

21     A.   Yes, thank you.

22     Q.   Very well.

23         And, let's see.  I think on page 1 there's

24  a reference to the MGA agreement.

25         Paragraph 1, the last sentence.  Got it?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 2:04-cv-09049-DOC-RNB   Document 10622   Filed 05/17/11   Page 432 of 486   Page ID
#:322060
Vol. IV (887-1122)      MGA v. Lexington, et al.                    11/11/2010

Page 1043

1          And do you see that this agreement says (as

2      read):

3               To the extent not inconsistent

4          with this letter, the firm

5          incorporates as if fully set forth

6          herein the MGA billing policy, a

7          copy of which is attached hereto as

8          Exhibit A.

9          Do you recognize that to be a term of that

10     retainer agreement?

11     A.    Yes, I see that language.

12     Q.    And do you recall that the MGA billing

13     policies were attached?

14     A.    This agreement was, what, October 2008?

15     Can we go back to the date of the agreement?

16     Q.    Sure can.  It is October 6th, 2008, yes.

17     A.    Okay.  Yes, I believe they were attached to

18     that agreement.

19          JUSTICE STONE:  It's pre-Pelicano.

20          MR. HART:  Can I see Exhibit 464, please.

21          (Exhibit 464 first referenced in

22          Volume IV of the proceedings.)

23     BY MR. HART:

24     Q.    Now, at some point was Mitchell Silberberg

25     retained to represent MGA with regard to the Mattel

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 664

Page 1044

 1   litigation?

 2       A.    Yes.

 3       Q.    And if I could take a look at paragraph 1

 4   in which it says that they attach and incorporate

 5   the MGA billing policy.

 6             Do you recall that?

 7       A.    I see that language.

 8       Q.    And do you recall that the MGA billing

 9   policies were, in fact, attached to that agreement?

10       A.    I would assume they would have been

11   attached.

12       Q.    Okay.

13             And if we could go to Exhibit 432, please.

14             (Exhibit 432 first referenced in

15             Volume IV of the proceedings.)

16   BY MR. HART:

17       Q.    Do you know the firm Crowell Moring?

18       A.    I do.

19       Q.    Were they engaged to represent MGA with

20   regard to the Mattel litigation?

21       A.    Yes.

22             MR. HART:  And if I could have you go to

23   page 2 of that agreement.

24             And near the bottom of the top paragraph,

25   it says "we understand."  Highlight that for us.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 665

Page 1045

 1      Q.   And if I'm reading correctly, it says (as

 2   read):

 3              We understand that MGA has a

 4         standard billing policy manual, and

 5         we agree to abide by the terms of

 6         that manual, which is incorporated

 7         herein by reference.

 8         Do you recall that term as part of that

 9   engagement?

10      A.   I don't recall that term, but I see it

11   reflected in the letter.

12      Q.   Okay.  We've already discussed the

13   Orrick -- and have testimony from the Orrick people,

14   and you do recall that they were engaged?

15      A.   Yes.

16      Q.   All right.

17         If I could ask you to put up Exhibit 479,

18   please.

19         (Exhibit 479 first referenced in

20         Volume IV of the proceedings.)

21   BY MR. HART:

22      Q.   Do you know who Sidley Austin is?

23      A.   I do.

24      Q.   Were they retained by MGA in connection

25   with the Mattel litigation?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1046

 1      A.   Yes.

 2           MR. HART:  If I could ask you to go to

 3   page 3, please.  And if you could go to the --

 4      Q.   And on the third page it says (as read):

 5              Further, we attach and

 6              incorporate by reference the terms

 7              of the MGA billing policy.

 8           Do you recall that that was the term of

 9   that retention?

10      A.   I see the language there, yes.

11      Q.   You have no reason to doubt that that's

12   part of the retention?

13      A.   Correct.

14      Q.   In fact, was it in the general business

15   practice to include the MGA billing policy and

16   retainer agreements with law firms that were

17   retained to represent MGA in the Mattel litigation?

18      A.   Yes.

19      Q.   Would it be correct, then, that you would

20   expect the law firms to abide by the MGA billing

21   policy?

22      A.   I would say that those are general

23   guidelines.  And with respect to the general

24   guidelines, our expectation is that the law firms

25   will comply or will at least engage in a discussion

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**        Exhibit H - Page 667

Page 1047

1    with us as to why, you know, they can't comply.  Or

2    why there are issues.

3         Q.   Fair enough.

4              Over the history of the Mattel litigation,

5    do you -- and I think I may have asked you this

6    before.  Do you have any idea how many different law

7    firms have been retained by MGA to perform work

8    related to the Mattel litigation?

9         A.   I do not know the specific number.

10        Q.   Is it something around 20 or more?

11        A.   Again, I don't know.

12        Q.   I will try to put something up that may be

13   of a little assistance to you.

14             Could we have the timeline?

15             MR. ECHEVERRIA:  What exhibit number is

16   this?

17             MR. SHERIDAN:  This is the demonstrative

18   that's being used.

19             JUSTICE WALLIN:  It wound up being used

20   like an exhibit.

21             MR. HART:  If you could just get the

22   colored graph on the right and expand that, if

23   you're able to do that.

24        Q.   While they're seeing if they can play with

25   it as I'm asking them to do --

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 668

Page 1048

1           MR. SHERIDAN:  As long as you promise not

2      to look at my scribbles.

3           THE WITNESS:  Or put them in the record.

4           MR. ECHEVERRIA:  It's a waiver of your work

5      product.

6           THE WITNESS:  That's okay.  I promise I

7      won't turn pages.  Thank you.

8      BY MR. HART:

9      Q.   You'll see that we have a list of the law

10     firms on the left-hand side:  Skadden Arps; Orrick;

11     Glaser Weil; Howard Rice; Mitchell Silberberg --

12     A.   That's not -- I'm sorry.  But just to be

13     clear, that's not law firms on the left side that

14     represented MGA.  So I can't -- that's not accurate.

15     Q.   Do you have a list of the law firms on the

16     left-hand side?

17     A.   No, they're not all law firms.

18     Q.   Let's take just as an example.  We'll limit

19     it so it will take more sense.  Let's take the first

20     ten.  I will read them.  I believe they're all law

21     firms.

22          Skadden Arps, that's a law firm, correct?

23     A.   Yes.

24     Q.   Orrick, that's a law firm?

25     A.   Yes.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 669

Vol. IV (887-1122)      MGA v. Lexington, et al.               11/11/2010

                                                              Page 1049

 1      Q.   Glaser Weil is a law firm?

 2      A.   Yes.

 3      Q.   Howard Rice is a law firm?

 4      A.   Correct.

 5      Q.   Mitchell Silberberg is a law firm?

 6      A.   Correct.

 7      Q.   Sidley Austin is a law firm?

 8      A.   Correct.

 9      Q.   Crowell Moring is a law firm?

10      A.   Correct.

11      Q.   Lenczner Slaght?

12      A.   Yes.

13      Q.   Pachulski Stang Ziehl & Jones, that's a law

14   firm?

15      A.   Yes.

16      Q.   And Grimes & Battersby?

17      A.   Yes.

18      Q.   Okay.  So we agree those are all law firms?

19      A.   Correct.

20      Q.   And if you look at the graph, you will see

21   that we have a bar that goes across showing the time

22   that they were engaged by Mattel -- or by MGA for

23   Mattel, right?

24      A.   Yes.

25      Q.   All right.  And you'll see that that

CONFIDENTIAL - ATTORNEYS' EYES ONLY
                                              Exhibit H - Page 670

Page 1050

1   timeline goes from September of '08 to April of

2   2010?

3        A.    Okay.

4        Q.    Now, taking that period of time -- and tell

5   me if this is correct -- the graph shows that we had

6   the same firms engaged for at least some portion of

7   that span and working at the same time:  Skadden

8   Arps; Orrick; Glaser Weil; Howard Rice; Mitchell

9   Silberberg; Sidley Austin; Crowell Moring; Lenczner

10  Slaght; Pachulski Stang Ziehl & Jones; Grimes &

11  Battersby.

12            All of those firms at some point along that

13  graph were working for MGA in the Mattel litigation

14  at the same time; is that correct?

15       A.    Base -- that's what your chart shows.

16       Q.    Yes.

17       A.    But I don't know what the foundation would

18  be to establish these dates or that it's accurate.

19       Q.    Do you have any doubt -- any reason to

20  doubt that that's accurate?

21       A.    Well, I would not agree that it's accurate

22  without --

23       Q.    Which firm do you think was not working for

24  MGA during that period of time?

25       A.    Again, if I were to answer that question,

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit H - Page 671

Page 1051

1    what I would want to do would be to verify those

2    dates myself.  And I'm just saying, I don't know

3    where these dates came from.  I don't know how you

4    determined the dates in here.

5         Q.   How about if Mike Schmidt says that's

6    accurate, would you have any reason to doubt it?

7              MR. ECHEVERRIA:  Objection.  Lacks

8    foundation.  Calls for speculation as to --

9              JUSTICE WALLIN:  For purposes of your

10   question, we can assume it's accurate.

11             MR. HART:  Thank you.

12             JUSTICE WALLIN:  That's doesn't mean that

13   she has to say it.

14             MR. HART:  No, she doesn't.

15        Q.   At the time you retained Sidley Austin --

16   by "you," I mean MGA -- retained Sidley Austin,

17   Skadden was still representing MGA in the District

18   Court action with respect to the Mattel litigation;

19   is that correct?

20        A.   I don't recall if they were representing us

21   in the District Court or if they were working on the

22   appeal at that time.

23        Q.   Fair enough.

24             At some point did Skadden assist Sidley

25   with work on the appeal?

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 672

Page 1052

1      A.    Yes, they did, because they were familiar

2    with the underlying record.

3      Q.    What did Skadden do?

4      A.    Again, because Skadden was familiar with

5    the trial court record, they did a lot of the

6    marshalling of the record evidence for the appeal,

7    for the appellate firms.

8      Q.    Marshalling the evidence, is that --

9      A.    Yes.  Being able to -- they knew the record

10   from all the weeks of trial, so they were able to be

11   the ones most familiar with the record evidence to

12   tee up for the appellate lawyers.

13     Q.    Okay.  Were there other law firms retained

14   in addition to Sidley Austin to work on the appeal?

15     A.    Yes, there were.

16     Q.    Howard Rice would be one?

17     A.    Well, there were -- to be clear?

18     Q.    Yes, please.

19     A.    Okay.  There were a number of appeals, not

20   just one set of appellate briefs.  There were, I

21   believe, two or three times that we filed motions

22   with the Ninth Circuit to get a stay of the

23   injunctive orders.

24     Q.    I appreciate that.  I'm just asking you

25   about the law firms that worked on the appeal.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 673

Page 1053

1       A.    I understand, but here's my problem.  Okay.

2       Q.    Sure.

3       A.    I just want to be clear.  You say work on

4    the appeal as if it were one thing, and it's not.

5       Q.    That's fair.  That's fair.

6       A.    And so what I'm trying to say is there were

7    multiple times that we went up on appeal on various

8    issues.

9       Q.    How about if I phrase it to work on the

10   appellate matters?  There were a number of law

11   firms --

12      A.    To work on appellate matters, that would be

13   fine.

14      Q.    Okay.  Was there one firm that was the

15   primary firm working on the appellate matters?

16      A.    Well, I would say that --

17      Q.    You know what, that's a poor question on my

18   part.  Let me rephrase it.

19            Was Sidley sort of the lead counsel for the

20   appellate matters?

21      A.    No, not necessarily.

22      Q.    Okay.  Who would you say was the lead

23   counsel for those?

24      A.    Again, different appeals, different lead

25   counsel.  So I can't answer that the way the

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 674

Vol. IV (887-1122)      MGA v. Lexington, et al.                    11/11/2010

Page 1054

  1   question's phrased.

  2       Q.   At some point was a decision made to

  3   terminate Howard Rice?

  4       A.   I believe -- and, again, I would have to go

  5   back to check to be a hundred percent sure, but that

  6   the -- Howard Rice finished briefing whatever that

  7   appellate issue was that they were working on.  And

  8   so they saw that through to completion.  And then we

  9   just did not use them for subsequent appellate

 10   briefing.

 11       Q.   What law firms are currently representing

 12   MGA in the Mattel litigation?

 13       A.   Today?

 14       Q.   Yes.

 15       A.   And, again, are you talking about just MGA

 16   and just in the U.S.?

 17       Q.   Yes.  I am talking about just MGA and just

 18   in the U.S.

 19       A.   Okay.  Because that was your qualifier

 20   before.

 21       Q.   Yes, it was.

 22       A.   Okay.  Well, we have Orrick Herrington.  We

 23   have Skadden, who is working with us as well.  And

 24   we are also working with Glaser Weil.  And I think

 25   that's who we're working with.

CONFIDENTIAL - ATTORNEYS' EYES ONLY               Exhibit H - Page 675

Page 1055

1      Q.    Is that all you can remember?

2      A.    I mean, I think that's right now who is

3   working with us, correct.

4      Q.    That's a pretty good list.  Thank you.

5            When -- when bills come in from the

6   attorneys on this Mattel litigation, who receives

7   those bills at MGA?

8      A.    The bills come into the legal department.

9   So typically Rosa Colorado or myself or -- I suppose

10  maybe sometimes they go to finance.  But typically

11  they come into the legal department.

12     Q.    And do they typically come to you, or do

13  they go to Rosa Colorado?

14     A.    Again, it's split.  Not set to go to one

15  person.

16     Q.    Do you review the bills when they come in?

17     A.    Do I review the bills when they come in?

18  Immediately?  Is that -- are you asking me a time

19  frame?

20     Q.    When you get a bill in from a law firm, do

21  you put it on your desk, sit down, and go through

22  it?

23     A.    No.

24     Q.    That's Rosa's job?

25     A.    No.  That's not how our bill processing

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 676

Page 1056

 1   works.

 2       Q.    Okay.  Let me move on, then.

 3             Let's talk about Rosa Colorado for a

 4   moment.

 5             Is she a graduate of law school?

 6       A.    Yes, she is.

 7       Q.    Which one?

 8       A.    I don't recall the name.

 9       Q.    Has she ever passed the Bar?

10       A.    I don't believe so.

11       Q.    How many times has she taken it, if you

12   know?

13       A.    I don't know.

14       Q.    Two times?

15       A.    I don't know.

16             JUSTICE WALLIN:  Well, if you take it 50

17   times and pass it, you're a lawyer.  If you take it

18   4 times and don't, you're still not a lawyer.  So...

19   BY MR. HART:

20       Q.    What is Ms. Colorado's title?

21       A.    You know, again, I believe she's like a

22   legal assistant/paralegal.  I'm not sure of the

23   exact title name.

24       Q.    Would she be legal assistant to you as

25   chief counsel?

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit H - Page 677

Vol. IV (887-1122)      MGA v. Lexington, et al.            11/11/2010

Page 1057

1        A.    Yes, but she does a lot of paralegal tasks

2    as well.  So...

3             We're really stretched thin, so we

4    multitask.  So she's not an assistant in the sense

5    that -- you know, a full executive assistant, that

6    way.

7        Q.    I understand.

8             When these bills come in, does anyone at

9    MGA review the bills to see if they comply with the

10   MGA guidelines?

11       A.    At some point we do review all of the legal

12   bills that come in on the Mattel case, yes.

13       Q.    Is there any one or more person that's

14   assigned that task?

15       A.    Multiple people in the legal department

16   review the bills in view of the billing guidelines,

17   the retainer agreements.  And that's just -- you

18   know, there's various people, depending upon

19   workload and emergencies, that people get pulled in

20   to do that.

21       Q.    Are all bills that relate to the Mattel

22   matter submitted to the insurers?

23       A.    All bills that related to the defense in

24   the Mattel litigation are submitted to the carriers,

25   yes, upon receipt.

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Exhibit H - Page 678

Page 1058

1      Q.    Are they submitted to the carriers even if

2   MGA has not paid that bill?

3      A.    Yes, because we agreed with the process

4   that in order to get the payment, we had to submit

5   the bills to the carriers practically upon receipt.

6   So they come in, and they get submitted to the

7   carriers.

8      Q.    Hold on one second.  I think I can cut some

9   of this out.  Don't want to keep you any longer than

10  necessary.

11     A.    Thank you.

12     Q.    Do you know who Brian Wing is?

13     A.    Yes.

14     Q.    Was he the C.F.O. at MGA?

15     A.    No.

16     Q.    What was his title?

17     A.    I believe it was executive vice president

18  of corporate development.  And I'm not sure if there

19  was something else added to that title.

20     Q.    If I'm correct, I think at one point he was

21  the executive vice president for corporate

22  development?

23     A.    Yes.

24     Q.    And then his title changed at some point to

25  the senior vice president of finance and tax.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 679

Page 1059

1              Would that be correct?

2       A.    That would be incorrect.

3       Q.    Did his title change at any time?

4       A.    Well -- okay.  Mr. Wing worked for MGA at

5  two periods of time.

6       Q.    That's true.

7       A.    So the first time he worked for us, he was

8  working in tax.  The time that he worked there when

9  I worked there, he was EVP of corporate development.

10  And as best I recall, there were no title changes

11  during that time.

12              And, I'm sorry.  I don't know if that

13  answers your question.

14       Q.    It does.  Thank you.

15              Am I correct that his responsibilities in

16  that capacity included corporate accounting?

17       A.    Again, Mr. Wing didn't report to me.  So I

18  don't know what his exact responsibilities were.

19       Q.    All right.  My last question, if you don't

20  know, it's fair enough to tell me you don't know.

21              Did he have responsibilities with regard to

22  finance for MGA?

23       A.    My understanding was, yes, that he did, you

24  know, have responsibilities in the financial area,

25  correct.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Vol. IV (887-1122)      MGA v. Lexington, et al.                11/11/2010

Page 1060

1     Q.   Do you recall having any communications

2   with Mr. Wing with respect to submission of invoices

3   to the insurance carriers?

4     A.   Yes.

5     Q.   What were those discussions?  First, let me

6   back up.

7          When did those discussions take place?

8     A.   Again, just trying to figure out the time

9   frame.  I know that Mr. Wing was there when we were

10  gathering a lot of the Mattel invoices for initial

11  submission to the carriers.  Actually, what we did,

12  I think, is we submitted them to the Bidart law

13  firm.  And so we were going through finance, trying

14  to get a spreadsheet of all of the various invoices.

15         And the financial team was the team that

16  was pulling all those together.  So I believe

17  Mr. Wing was involved in that.

18    Q.   Did he ever advise you that he was

19  concerned about payments made to the insurers for

20  MGA which were not being passed on to the attorneys?

21    A.   Did he ever -- could you repeat that

22  question again?

23    Q.   Surely.

24         MR. HART:  Could you read it back?

25         THE REPORTER:  Sure.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 681

Page 1061

1              MR. SHERIDAN:  I think there's a

2      misstatement.  You said payments made to the

3      insurers --

4              JUSTICE STONE:  You misspoke.

5              MR. SHERIDAN:  -- and I think --

6              MR. HART:  Okay.  I misspoke.  Let me go

7      back.

8         Q.   Did Mr. Wing ever advise you that he was

9      concerned about payments made by the insurers to MGA

10     which were not being passed on to the attorneys?

11        A.   Mr. Wing had sent a letter at some point; I

12     believe it was in May of --

13             MR. HART:  Can we put up Exhibit 93,

14     please.

15             (Exhibit 93 first referenced in

16             Volume IV of the proceedings.)

17     BY MR. HART:

18        Q.   You see at the top it has a date of May 2,

19     2009?

20        A.   That's correct.

21        Q.   And that is a letter addressed to Jeanine

22     Pisoni.  That would be you?

23        A.   That's correct.

24        Q.   As general counsel for MGA?

25        A.   Yes.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 682

Vol. IV (887-1122)      MGA v. Lexington, et al.            11/11/2010

Page 1062

1      Q.    And you recall receiving that letter?

2      A.    I do.

3      Q.    Let me read from this.  It says (as read):

4              As you know from our numerous

5              conversations, I have expressed

6              grave concern about a number of

7              activities taking place at MGA

8              Entertainment, Inc.

9      A.    I'm sorry.  I can't see it.  Okay.

10           MS. FIELD:  They were trying to blow it up.

11           THE WITNESS:  I just didn't know if I was

12     supposed to --

13     BY MR. HART:

14     Q.    I didn't mean to lose you there.

15           JUSTICE WALLIN:  We can put that exhibit in

16     front of her.

17           MR. SHERIDAN:  There's a booklet back there

18     with 93 if you need it.

19           JUSTICE WALLIN:  Yeah.

20           MR. HART:  Thank you, Mark.  I should have

21     thought of that before.

22           MS. FIELD:  We've all had eye tests.

23     Sometimes, though, the documents are so bad that it

24     doesn't matter if they're blown up or you have them

25     in front of you.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit H - Page 683

Page 1063

1            JUSTICE WALLIN:  Everybody that works with

2    insurance policies has a sharp eye, though.

3            MS. FIELD:  Not for long.

4            THE WITNESS:  Okay.

5    BY MR. HART:

6        Q.   Do you have Exhibit 93 in front of you?

7        A.   I do now.  Thank you.

8             Thank you.

9        Q.   Is that easier for you to read?

10       A.   Thank you, sir.

11       Q.   I'll go back and start over.

12            (As read):

13                As you know from our numerous

14            conversations, I have expressed

15            grave concerns about a number of

16            activities taking place at MGA

17            Entertainment, Inc., quote, MGA,

18            close quote, that relate to

19            breaches of internal controls.  The

20            request to generate misleading and

21            non-GAAP financials --

22            Let me stop there.

23            Do you know what GAAP means?

24       A.   Sure.  Generally Accepted Accounting

25    Principles, GAAP.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 684

Vol. IV (887-1122)       MGA v. Lexington, et al.              11/11/2010

Page 1064

1      Q.     Thank you.

2             (As read):

3                    MGA's continued insolvency as

4             well as potential inappropriate

5             reimbursements from insurance

6             companies for litigation expenses

7             relating to the Mattel lawsuit.

8             Do you recall reading that when you

9      received the letter?

10     A.     I do.

11     Q.     Let me go down to the third paragraph.

12            Could you bring that up for me.

13            And you can follow along, if you will.

14     Reading from the third paragraph of this Exhibit 93

15     (as read):

16                   As I shared with before, there

17            have been a number of occasions

18            when the C.E.O. --

19            And the C.E.O. would be Isaac Larian; is

20     that correct?

21     A.     Yes.

22     Q.     (As read):

23                   -- the C.E.O. asked me to

24            misrepresent our financials by

25            issuing a non-GAAP balance sheet to

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 685

Page 1065

 1              lenders or to remove legitimate

 2              accounts payable from our balance

 3              sheet in order to make our

 4              financials more appealing to

 5              potential lenders.

 6                   On every occasion I have

 7              declined to falsify the financial

 8              statements and have been met with

 9              negative/punitive responses, breach

10              of internal controls, or usurpation

11              of my authority.

12              Do you recall reading that when you

13         received this letter?

14         A.    Yes.

15         Q.    Did you send any written response to

16    Mr. Wing?

17         A.    I believe that I did.

18         Q.    I don't think we've ever received one.

19              Do you recall when you sent it?

20         A.    At this time -- I believe I testified at my

21    deposition the receiver, the temporary receiver, Pat

22    Fraioli, was in charge of MGA.  So the letter was

23    given to him.  And I basically was taking direction

24    from him at that point in time.

25              And I believe that there were -- there was

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit H - Page 686

Vol. IV (887-1122)     MGA v. Lexington, et al.                11/11/2010

Page 1066

1    a short letter that went back to Mr. Wing.

2        Q.   I'm sorry.  You said this letter was given

3    to him, the receiver?

4        A.   Yes.

5        Q.   You mean Exhibit 93 or some other document?

6        A.   Exhibit 93.

7        Q.   Okay.  You kept a copy for yourself as part

8    of your records?

9        A.   Yes, we did.

10       Q.   And if you sent a reply, would you keep a

11   copy of that reply as well?

12       A.   Yes.

13       Q.   In discovery, we requested all such

14   letters.  I don't think we ever received one.

15            Do you still have it, to your knowledge?

16            MR. ECHEVERRIA:  Objection to the extent

17   that mis- -- go ahead.  Never mind.

18            THE WITNESS:  Yes.  I'm sure we -- we have

19   it.

20   BY MR. HART:

21       Q.   Okay.  Let's turn to another matter.

22            At some point did MGA reach a settlement

23   with the Glaser firm?

24            You know who the Glaser firm is?

25       A.   Yes.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 687

Page 1067

1      Q.    Was there some fee dispute between MGA and

2    the Glaser firm?

3      A.    I believe, yes, there was a reconciliation

4    of the Glaser Weil account, that's correct.

5      Q.    And the reconciliation you referred to is

6    some sort of settlement of dispute?

7      A.    A final closure of their account, correct.

8            MR. HART:  Could we see Exhibit 78, please.

9            (Exhibit 78 first referenced in

10           Volume IV of the proceedings.)

11           THE WITNESS:  We're good.

12   BY MR. HART:

13     Q.    You've got it in that book?

14           MR. SHERIDAN:  It should be in that book.

15           THE WITNESS:  Yes.

16   BY MR. HART:

17     Q.    You have Exhibit 78 in front of you?

18     A.    I do.

19     Q.    Okay.  If you look, it's the second full

20   paragraph.  The paragraph is numbered No. 1.

21           Do you see that?

22     A.    Yes, I do see that paragraph.

23     Q.    Does that paragraph say (as read):

24              The MGA parties acknowledge

25              and agree that as of the date

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Vol. IV (887-1122)      MGA v. Lexington, et al.                11/11/2010

Page 1068

1           hereof, the MGA parties jointly and

2           severally owe the firm

3           $1,933,620.97 in fees and costs

4           (the fees and costs).

5               The MGA parties further

6           acknowledge that they received a

7           valid notice of the client's right

8           to arbitration dated August 11,

9           2009, on or about that date.

10              The MGA parties further

11          acknowledge that the firm, as part

12          of this letter agreement, agree to

13          reduce the fees and costs by 22 1/2

14          percent to $1,498,556.25, subject

15          to and conditional upon all other

16          conditions of this letter agreement

17          being fulfilled by the MGA party.

18          Did I read that correctly?

19      A.  Yes.

20      Q.  Were you involved in the negotiations that

21  resulted in this agreement?

22      A.  I believe I was.

23      Q.  I want you to look at --

24          Can we have page 2 put up.

25          If you could turn to page 2.

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit H - Page 689

Page 1069

1        A.    Yes.

2        Q.    Do you see your signature there?

3        A.    I do.

4        Q.    Under the portion that says "Acknowledged

5   accepted and approved, MGA Entertainment, Inc., by

6   Jeanine Pisoni," correct?

7        A.    That's correct.

8        Q.    And you recall signing that?

9        A.    Yes.  That's my signature.

10       Q.    At the time you reached this agreement with

11  the Glaser firm, did you advise the insurers that it

12  had taken place?

13       A.    Not to my recollection.

14       Q.    Did you provide any of the insurers with a

15  copy of the agreement?

16            MR. ECHEVERRIA:  At what time?

17  BY MR. HART:

18       Q.    At any time.

19            MR. ECHEVERRIA:  It's given to you in

20  discovery.

21  BY MR. HART:

22       Q.    Do you recall giving it to the insurers?

23  Let me rephrase it.  Apparently your counsel has

24  some trouble with it.

25            Am I correct that the first time you

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 690

Page 1070

1    revealed this settlement and the document was at the

2    mediation in this case -- I'm sorry -- arbitration

3    in this case?

4         A.   I don't know the answer to that question.

5    Sorry.

6              JUSTICE WALLIN:  You mean during these

7    proceedings?

8              MR. SHERIDAN:  (No audible response.)

9              JUSTICE WALLIN:  Oh, okay.

10             MR. HART:  I think that's all I have.

11   Thank you.

12             THE WITNESS:  Thank you.

13             MR. SHERIDAN:  I just have a couple

14   quick...

15             JUSTICE WALLIN:  All right.  Mr. Sheridan

16   has some questions.

17             Go ahead.

18

19                   CROSS-EXAMINATION

20   BY MR. SHERIDAN:

21        Q.   With respect to the appeal of the Phase I

22   proceedings, the Ninth Circuit just issued an

23   opinion in, correct?

24        A.   Yes.

25        Q.   Are you familiar with that?

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 691

Page 1071

1              Mitchell Silberberg -- I'm sorry.

2              Sidley Austin represented you in connection

3    with that matter?

4         A.   Yes.

5         Q.   Skadden Arps represented you in connection

6    with that matter?

7         A.   Yes.

8         Q.   Orrick Herrington represented you in

9    connection with that matter?

10        A.   Correct.

11        Q.   So all three firms worked on that appeal?

12        A.   That is correct.

13        Q.   And I believe you stated earlier that --

14   tell me what Sidley Austin's role was in that

15   appeal.

16        A.   Okay.  I'm going to call that the main

17   appeal, if that's okay, just so we can distinguish

18   between the appeals of the, you know, the stay

19   petitions, et cetera.

20              The main appeal, the role was that Sidley

21   was going to take on the lead role at identifying

22   the appellate issues in the oral arguments.  And so

23   they had been working in conjunction with Skadden on

24   the -- developing the opening brief.

25              And then at the same time we were

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 692

Page 1072

1  negotiating the deal with Orrick to get everything

2  in one law firm.  And Orrick had wanted to work on

3  the appeal as well and to handle the appeal.  And

4  they actually had some, you know, great talent in

5  Josh Rosenkranz.

6          And so what happened was we stopped Sidley,

7  and we had Orrick take the appeal from there, all

8  the way through.

9          And so Skadden stayed involved, and there

10  was a transition of Sidley to Orrick.

11     Q.   And Sidley was specifically retained to

12  work on the appellate issues?

13     A.   Yes.

14     Q.   And Orrick was retained to work on the

15  appellate issues?

16     A.   Yes.

17     Q.   And they worked on those appellate issues

18  at the exact same time?

19     A.   No.

20     Q.   They did not?

21     A.   No.

22     Q.   Sidley and Orrick didn't work on appellate

23  issues at the exact same time?

24     A.   There was a minimal time of overlap because

25  what happened was -- I think I just said.  Sidley

CONFIDENTIAL - ATTORNEYS' EYES ONLY        Exhibit H - Page 693

Page 1073

1    was doing the appeal.  Orrick, then, was looking to

2    come in to do the whole case.  And so Orrick then

3    took over.

4            Now, Orrick had done some work on the

5    appeal on its own, which is why we negotiated the

6    fee cap on the appeal with Orrick, so that we could

7    minimize our costs on that.

8            MR. SHERIDAN:  Can you pull up the billing

9    timeline, Sean.  Could you pull up just from Skadden

10   down to -- down to Sidley.

11           Actually, if anybody else has a copy of

12   this document --

13           MS. FIELD:  I do.

14   BY MR. SHERIDAN:

15       Q.   If you can see -- so you don't have to look

16   up there.

17       A.   Thank you.

18       Q.   Sidley Austin began in November of 2009 --

19       A.   Right.

20       Q.   -- correct?

21           And the last bill that was received,

22   according to testimony in this trial, was

23   October 10 -- October of 2009 -- I'm sorry.  They

24   began in November of 2008 and worked all the way

25   through to -- into 2009, the end of 2009, late 2009.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                      Exhibit H - Page 694

Page 1074

1          Do you see that up there?

2      A.   I see those dates, yes.

3      Q.   Okay.  And Orrick began in --

4      A.   They began in June, I believe.

5      Q.   Orrick didn't begin in February of 2009?

6      A.   On the appeal, no.

7      Q.   Were they hired for something other than

8   the appeal in February of 2009?

9      A.   Yes, absolutely.  They were consulting on a

10  number of issues related to the injunctive relief

11  that was being granted, how that would impact our

12  licensees.

13          There were a lot of things related to the

14  defense that Orrick was working on before they were

15  formally retained, and so they wouldn't have been

16  working on the appeal before June, I don't believe.

17  Possibly the end of May.

18     Q.   So May/June/July?

19     A.   May/June somewhere in that time frame.

20     Q.   And Sidley Austin was still billing for the

21  appeal during that time, correct?

22     A.   I don't know that to be was the case.  We'd

23  have to look at the actual bills and see if it was

24  on the appeal and what they were doing.

25     Q.   Who drafted the briefs for Orrick for the

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Exhibit H - Page 695

Page 1075

 1   appeal?

 2        A.   Who drafted the briefs for Orrick?

 3        Q.   In the main appeal.

 4             MR. ECHEVERRIA:  I'm sorry.  I'm not --

 5   vague and ambiguous.  The briefs for -- or who at

 6   Orrick drafted the briefs on behalf of the MGA?

 7   BY MR. SHERIDAN:

 8        Q.   Who drafted the briefs for the main appeal?

 9        A.   Oh, who drafted them?

10        Q.   Sure.

11        A.   Okay.  Well, I believe the initial drafts

12   were done -- I mean, Skadden had done a draft they

13   had sent to Sidley, which then sent that draft to

14   Orrick.

15        Q.   Do you know that Orrick received a draft

16   appellate brief from Sidley Austin?

17        A.   Yes, they did.

18        Q.   You're certain of that?

19        A.   I'm certain of that.

20        Q.   And you paid them $625,000 for that work on

21   the appeal, correct?

22        A.   There was other work that was pulled into

23   that appeal, but, yes.  That was my recollection of

24   the fee cap.

25             Actually, that's the -- I think the -- I

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 696

Page 1076

```
 1   don't know if that's the discounted or undiscounted
 2   number.  And it also included other things that were
 3   spelled out in that retainer agreement.
 4           So I'm not sure if it included appellate
 5   work that happened prior to that time because --
 6   remember, there was -- I remember I said there were
 7   multiple appeal issues.  I'm not sure what all was
 8   involved in that without digging into the history.
 9      Q.   Sidley's primary responsibility was
10   drafting the brief for the main appeal, correct?
11      A.   It was actually handling the appellate
12   issues.  So this goes back to what I said before.
13   There were multiple times that we went up to the
14   Ninth Circuit.  There was more than just the main
15   appeal.
16      Q.   But they drafted the brief for the main
17   appeal?
18      A.   They did the initial draft of the main
19   appeal.
20      Q.   And they gave it to Orrick?
21      A.   Yes.
22      Q.   Did you review a copy of that?
23      A.   Did I review a copy of it?  I believe I
24   did.  I mean, I have it in my -- I believe I got it
25   in my e-mail.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY               Exhibit H - Page 697

Page 1077

1    Q.   Did you ever forward it to Orrick?

2    A.   Yes.

3    Q.   Ms. Hurst?

4    A.   Or -- I don't recall if I sent it

5  personally or if Skadden worked on it, but it was

6  exchanged --

7    Q.   So somebody --

8    A.   -- with Josh Rosenkranz.  So I don't know

9  if it went to Ms. Hurst.

10    Q.   So somebody sent that brief to Ms. Hurst --

11  to Orrick?

12    A.   To probably Josh Rosenkranz, yes, is what I

13  recall.

14    Q.   You said previously that Mr. Holden now

15  works at Lewis Brisbois.  Is that correct?

16    A.   Yes, that is correct.

17    Q.   And he's a partner at that firm, correct?

18    A.   Yes.

19    Q.   And you use him as counsel for certain

20  matters for MGA?

21    A.   Yes.

22    Q.   Does he have a role with respect to the

23  Mattel litigation?

24    A.   Yes.  He's still working and consulting

25  with us on the Mattel litigation.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 698

Page 1078

1        Q.    Did you ever ask any of the insurers about

2     the firms that were on their panel counsel list?

3        A.    Did I ever ask?  No.

4        Q.    Are you aware that Lewis Brisbois's on the

5     panel counsel list?

6        A.    I'm not.

7        Q.    Are you aware that Lewis Brisbois has

8     preapproved rates with Lexington?

9              MR. ECHEVERRIA:  Objection.  Relevance.

10    For the period of this arbitration it has no

11    relevance.

12             JUSTICE WALLIN:  What period of time are we

13    talking about here?

14             MR. SHERIDAN:  I want to know if she's

15    aware that Lewis Brisbois is on Lexington's panel

16    and that they've agreed to predrawn rates.  I don't

17    think it needs to be limited in time.

18             MR. ECHEVERRIA:  It's irrelevant, though.

19    Lewis Brisbois has done no work for the period in

20    question.

21             JUSTICE WALLIN:  Well, I'm aware of that.

22    I know what you said is accurate.  But I'm not

23    sure --

24             JUSTICE STONE:  Overruled.

25             JUSTICE WALLIN:  Okay.  My consultant here

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Exhibit H - Page 699

Page 1079

1   says overruled.

2          So go ahead.

3          MR. SHERIDAN:  I'm sorry.  I didn't hear

4   that, your Honor.

5          JUSTICE STONE:  Concur.

6          JUSTICE WALLIN:  Overruled.

7          JUDGE SABRAW:  Overruled.

8          JUSTICE WALLIN:  So that means you can

9   proceed.

10         JUDGE SABRAW:  You can answer.

11         THE WITNESS:  I didn't know they were panel

12  counsel.  I thought I answered that.  I'm sorry.

13  BY MR. SHERIDAN:

14     Q.   And then you didn't know that they had

15  agreed to be bound by the AIG billing guidelines

16  either, correct?

17     A.   No.

18         MR. HART:  Not correct, she didn't know?

19         THE WITNESS:  I mean --

20         MS. FIELD:  That's a double negative.

21         THE WITNESS:  Yeah, it's a double negative.

22  I --

23  BY MR. SHERIDAN:

24     Q.   Sorry.

25         We talked previously about clerical issues

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 700

Page 1080

1    in Orrick.  And there was an exemption for certain

2    clerical work in the Orrick retainer agreement; is

3    that correct?

4         A.   That is correct.

5         Q.   It's for a certain file --

6         A.   Organization and management.  And then I

7    believe there's a reference in the appendix as well.

8         Q.   Which appendix would that be?

9         A.   I don't know that I remember the letter,

10   but I think we looked at it earlier.  It talked

11   about clerical work.

12        Q.   So there's an objection to the reference to

13   clerical work in the AIG billing guidelines in

14   Appendix C.  Is that what you're referencing?

15        A.   Correct.  I believe that's correct.

16        Q.   But the agreement between Orrick and MGA

17   only exempts clerical work regarding file

18   organization, correct?

19        A.   Again, we could look at the letter, but, I

20   mean --

21             MR. SHERIDAN:  Let's pull up Exhibit 470,

22   then.  Can you pull up the provision relating to

23   clerical.  I think we have it previously

24   highlighted.  Do we have it previously highlighted

25   or not?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit H - Page 701

Page 1081

1     Q.    I'm sorry.  You have a copy?

2     A.    Yeah.  I just took counsel's copy, but...

3     Q.    Bottom of page 2, Orrick agreement says (as

4   read):

5                 We will abide by MGA's billing

6             guidelines-Mattel matters set forth

7             in Appendix A excluding its

8             incorporation of the insurer

9             guidelines with the following

10            exceptions:

11                1, we will not seek approval

12            in advance for research of more

13            than four hours.

14                2, we will bill for the filing

15            of pleadings in litigation,

16            pleadings, file maintenance and

17            organization.  The size of this

18            case and the frequency of filings

19            make this more than an ordinary

20            clerical task.

21                And I don't believe there's any other

22   reference to clerical in here, other than Item

23   No. 4, which says (as read):

24                We object to the separate

25            itemization of every single copy

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 702

Page 1082

```
1            and fax charge, that we agree to
2            use MGA's preferred copy service
3            for all outside copying.
4            Correct?
5       A.   Yeah, that's in here.  I don't -- I haven't
6    read this whole thing again to see if there's
7    anything else, but that's here.
8       Q.   So with the exception of that limited --
9    other than that limited exception, the MGA billing
10   guidelines regarding clerical apply, correct?
11      A.   Well, again, I would say we apply our
12   guidelines in the Mattel case in a reasonable
13   fashion just because of the complexity of the case
14   and because of the way our law firms have to manage
15   the case.
16           So we have been paying, I think I said
17   before, a lot of the clerical, otherwise clerical
18   expenses MGA had been paying.  Even though the
19   carriers have been deducting, we've been paying
20   those.
21      Q.   You said you have been paying a lot.  Have
22   you been paying all of the clerical?
23      A.   You know, without looking at the numbers, I
24   can't tell you.  But we have paid a number of the
25   clerical expenses.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit H - Page 703

Page 1083

1      Q.    Okay.

2            Could you pull up the one from the opening

3      statement.  It's one from Orrick, 10-8-2010,

4      purchase USB cable from Radio Shack for satellite

5      printing.

6            Do you consider that task to be clerical?

7      A.    Actually, I believe that was done at a

8      deposition in Chicago.  I think we did question why

9      that was needed.  And it was because they could not

10     get the connectivity that was needed.  So that was

11     their tech person, I believe, getting the cable.

12     Q.    I'm sorry.  I didn't ask why they purchased

13     it.  I asked whether it's a clerical task or not.

14     A.    Well, that's what I would have to know to

15     assess if it was a clerical task.  So I don't recall

16     if I've paid it.  I don't know.  I know what it was

17     for.

18     Q.    And it's at issue in this case, correct?

19     A.    I'm sorry?

20     Q.    It's at issue in this case, correct?

21     A.    Again, I -- I don't know the specific

22     entries that are at issue in this case.

23     Q.    This is one of the deductions taken by the

24     carriers that your client's asking us to pay.

25     A.    Okay.  Okay.

CONFIDENTIAL - ATTORNEYS' EYES ONLY         Exhibit H - Page 704

Page 1084

1       Q.   Do you believe that we should have to pay

2    for that?

3       A.   Yes, I do.

4       Q.   Okay.  And did you pay for it?

5       A.   I believe we did, yes, but I'm not a

6    hundred percent sure --

7       Q.   But you have no --

8       A.   Right.

9            -- of the specific entries that we paid

10   for.

11      Q.   Okay.

12           JUSTICE WALLIN:  I think it would be wise

13   for the MGA side to not pursue that claim against

14   the carriers for the Radio Shack trip.  We've spent

15   enough time on it.

16           I'm totally convinced, Mr. Sheridan, on

17   that one.

18           MR. SHERIDAN:  I was trying to make a

19   point, your Honor.

20           MR. ECHEVERRIA:  I think we spent more time

21   talking about it than the half-hour that was billed

22   for it.

23           MR. SHERIDAN:  I think that's it.  I don't

24   have anything else.

25           MR. ECHEVERRIA:  I just have a couple of

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 705

Page 1085

1    follow-ups.

2              JUSTICE WALLIN:  Okay.  Yeah.  Go ahead

3    right there.

4              MR. ECHEVERRIA:  Okay.

5

6                    REDIRECT EXAMINATION

7    BY MR. ECHEVERRIA:

8        Q.   Ms. Pisoni, you were shown a letter that

9    you received from Brian Wing and asked if you read

10   the letter when you received it.

11             Do you recall that?

12       A.   Yes.

13       Q.   And there was some suggestion in the letter

14   from Mr. Wing about concerns he expressed about

15   insurance-related payments; is that right?

16       A.   Yes.

17       Q.   When you received that letter, what did you

18   do with it?

19       A.   I gave the letter to the temporary

20   receiver, Patrick Fraioli.

21       Q.   And did you look into some of these

22   allegations of Mr. Wing?

23       A.   Well, I believe that I knew enough about

24   what he was saying to know that there wasn't any

25   basis for that allegation.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 706

Page 1086

```
 1    Q.   Can you explain why you say that?
 2    A.   Sure.
 3         Because all of the invoices at the time
 4    that were being submitted to the carriers were
 5    being -- all those invoices were being sent to the
 6    Bidart law firm.  The Bidart law firm was submitting
 7    them.
 8         And we were -- there was no question from
 9    our finance team that what was -- we were clearly
10    paying out a lot more, tens of millions of dollars
11    more than MGA was receiving, to the various law
12    firms.
13         What we were doing was having to, you know,
14    pay out the monies and stretch them out as best we
15    could to keep the lawyers working for us.  So there
16    wasn't any concern that any of us had.
17         And, you know, I just attributed Mr. Wing's
18    allegations, along with his other allegations, which
19    I knew were baseless, to some ulterior motive that
20    he had.
21    Q.   Is Brian Wing currently in litigation with
22    MGA?
23    A.   He is.
24    Q.   In what capacity?
25         MR. HART:  Objection, your Honor.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY              Exhibit H - Page 707

Page 1087

1    Relevance.

2              JUSTICE WALLIN:  Well, you brought him up.

3              Overruled.

4              JUSTICE STONE:  You brought up the letter.

5              THE WITNESS:  Yes.  We filed a complaint

6    against Mr. Wing that's in arbitration.

7    BY MR. ECHEVERRIA:

8       Q.   And what's the nature of that complaint?

9       A.   There's a number of claims against -- that

10   is being alleged against Mr. Wing, including, you

11   know, breach of contract, breach of the duty of

12   loyalty, fraud in the inducement.  I don't recall

13   all the various allegations that are made.

14      Q.   And those are all the claims MGA is

15   asserting against Mr. Wing?

16      A.   That is correct.

17      Q.   And is that set for hearing, the

18   arbitration?

19      A.   There's a date that's projected out in the

20   future.  I'm not sure of the exact date.

21             MR. ECHEVERRIA:  Okay.  Those are all the

22   questions I have.

23             MR. SHERIDAN:  I have a couple more, if I

24   may, your Honor.

25             JUSTICE WALLIN:  Sure.  Go ahead.

CONFIDENTIAL - ATTORNEYS' EYES ONLY          Exhibit H - Page 708

Page 1088

1                    RECROSS-EXAMINATION

2    BY MR. SHERIDAN:

3        Q.    Ms. Pisoni, you just testified that you're

4    paying out millions of dollars more than you're

5    taking in from the insurance carriers.

6             In fact, I think you said, "we were clearly

7    paying out a lot more, tens of millions of dollars

8    more than MGA was receiving."

9        A.    That's correct.

10       Q.    Can you tell me the basis for your opinion?

11       A.    Yes.  Obviously my talking to my finance

12   team.

13       Q.    Including Mr. Schultz, who was deposed here

14   today?

15       A.    Yes.

16       Q.    And he told you that they paid tens of

17   millions of dollars more than they took in from the

18   insurance carriers?

19       A.    Yes.

20       Q.    Okay.  Do you know when that conversation

21   took place?

22       A.    I don't.

23       Q.    You talked about the billing policy and law

24   firms complying with the billing guidelines.

25             You didn't advise the carriers if MGA's

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit H - Page 709

Page 1089

1    defense counsel in the Mattel litigation were

2    preapproved to deviate from the requirements in the

3    billing policy, did you?

4         A.   Yes, I did.

5         Q.   You did?

6         A.   Yes.

7         Q.   Can you tell me when you told us that?

8         A.   Sure.  We talked about it when we were

9    talking -- we had a couple conference calls, I

10   believe, with Ms. Helsley, one or two, on bills.

11   And we expressed at that point that the MGA billing

12   guidelines were just guidelines.

13            We also said that, you know, a lot of these

14   objections on, you know, let's say it's block

15   billing, you know, that we were not holding the law

16   firms to a lot of those objections for, like,

17   Mr. Nolan, for example.

18            So we did have conversations about how

19   those guidelines were being filed -- or being

20   followed.  Sorry.

21        Q.   You testified you were not holding the law

22   firms to the guidelines.  Is that correct?

23        A.   Well, I said we were not holding them to a

24   strict letter of the guidelines.  We were having to

25   be flexible, given the complexity of the case.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit H - Page 710

Page 1090

1      Q.   But you were taking deductions from the law

2   firm bills based on your guidelines, correct?

3      A.   Were we taking some deductions from the

4   bills, yes.

5      Q.   And you took deductions from the bills for

6   excessive billing, correct?

7      A.   We may have.  I don't -- I don't know.

8      Q.   That was done by the legal department,

9   though, right?

10     A.   Deductions are taken by the legal

11  department.

12     Q.   Okay.  And you're the head of the legal

13  department, right?

14     A.   Yes.

15          MR. SHERIDAN:  Okay.  That's it.  That's

16  all I have.

17          Thank you.

18          MR. ECHEVERRIA:  I don't have anything

19  further.

20          JUSTICE WALLIN:  All right.  Thank you,

21  Ms. Pisoni.  You're excused.

22          THE WITNESS:  Thank you, your Honor.

23          JUSTICE WALLIN:  Time out.

24          (Off the record from 2:50 p.m. to

25          3:26 p.m.)

CONFIDENTIAL - ATTORNEYS' EYES ONLY            Exhibit H - Page 711

Vol. IV (887-1122)        MGA v. Lexington, et al.              11/11/2010

Page 1122

1       I, REAGAN EVANS, RMR, CRR, CLR, CSR NO. 8176, in

2   and for the State of California, do hereby certify:

3       That said proceedings were taken down by me in

4   shorthand at the time and place therein named, and

5   thereafter reduced to typewriting under my

6   direction, and the same is a true, correct, and

7   complete transcript of said proceedings;

8       I further certify that I am not interested in

9   the event of the action.

10      Witness my hand this 21st day of November, 2010.

11

12              _____

                REAGAN EVANS, RMR, CRR, CLR
13              CSR NO. 8176
                Certified Shorthand
14              Reporter for the
                State of California
15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - ATTORNEYS' EYES ONLY                Exhibit H - Page 712

# EXHIBIT I

## (FILED UNDER SEAL – PURSUANT TO PROTECTIVE ORDER)

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

NEW YORK
335 Madison Avenue, 17th Floor
New York, NY 10017
(212) 702-8100
Facsimile: (212) 702-8200

LOS ANGELES
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

SAN FRANCISCO
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

SAN DIEGO
4445 Eastgate Mall, Suite 200
San Diego, CA 92121
(858) 812-3107
Facsimile: (858) 812-3336

SILICON VALLEY
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

## LOS ANGELES OFFICE
# FACSIMILE TRANSMISSION

**DATE:**     June 7, 2007

**NUMBER OF PAGES, INCLUDING COVER:**

| **NAME/COMPANY** | **PHONE NO.** | **FAX NO.** |
|---|---|---|
| Michael Keats<br>Johanna Schmitt<br>O'Melveny & Myers LLP | | 212.326.2061 |

**FROM:**    Heidi Frahm

**RE:**    Mattel v. MGA

**MESSAGE:**

---

07975/2137407.1

| CLIENT # | 7975 | ROUTE/<br>RETURN TO: | Heidi Frahm- 4th Floor | ☒ CONFIRM FAX<br>☒ INCLUDE CONF. REPORT |
|---|---|---|---|---|
| OPERATOR: | | | CONFIRMED?  ☐ NO  ☐ YES: _____ | |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

**IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3000 AS SOON AS POSSIBLE.**

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit I - Page 713

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3223**

WRITER'S INTERNET ADDRESS
**timalger@quinnemanuel.com**

June 7, 2007

<u>VIA FACSIMILE AND U.S. MAIL</u>

Michael Keats, Esq.
Johanna Schmitt, Esq.
O'Melveny & Myers LLP
Times Square Tower
7 Time Square
New York, New York 10036

Re:   Mattel, Inc. v. MGA Entertainment, Inc.

Dear Michael and Johanna:

I am writing to confirm our discussions during our meet-and-confer yesterday regarding MGA's First Set of Requests for the Production of Documents and Things, dated November 22, 2006 (the "Requests").

As you know, Mattel has been producing documents pursuant to Rule 26(a) and in response to the Requests and other discovery served by MGA.  Our conference yesterday was prompted by your letter of May 23, 2007, which was sent prior to Mattel's most recent wave of production on May 30, 2007.  You acknowledged yesterday that MGA still has not reviewed all of the documents produced on May 30, 2007.

At the outset of our discussion, you clarified at my request that MGA is suing over, and therefore requesting documents relating to: (i) the initial wave of My Scene dolls; (ii) later My Scene dolls for which MGA contends the face design changed significantly to become more similar to Bratz dolls; and (iii) those doll themes and playsets identified in MGA's Second Supplemental Responses to Mattel, Inc.'s First Set of Interrogatories Re Claims of Unfair Competition, dated March 6, 2007 (the "Interrogatory Responses"), Interrogatory No. 2.  You said you will review the list of My Scene products that I provided to you on May 30, 2007, and get back to me, but

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100

SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700

SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

07975/2137333.1

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**

Exhibit I - Page 714

Michael Keats, Esq.
Johanna Schmitt, Esq.
June 7, 2007
Page 2

you also said you do not expect to identify My Scene products as the subject of MGA's claims
other than: (i) My Scene fashion dolls; (ii) My Scene plush pets; (iii) My Scene Stylin' Heads;
(iv) the following My Scene themes: Chillin Out, Night on the Town, Jammin' in Jamaica and
My Bling Bling; and (v) the My Scene Sound Lounge playset. You said that you will speak to
MGA and try to identify the particular My Scene dolls for which MGA contends the face design
changed significantly to become the same or substantially the same as Bratz dolls.

During our conference, I stated that Mattel had produced and/or would produce non-privileged
documents, to the extent responsive documents exist at all, pursuant to a reasonable, good faith
search relating to MGA's claims, in response to the following Document Request numbers, as
stated in Mattel's Responses dated January 15, 2007: 1, 2, 4, 5, 6, 7, 10, 11, 12, 13, 14, 15, 16,
17, 18, 20, 21, 22, 23, 24, 25, 26, 27, 30, 31, 34, 35, 36, 44, 68, 69, 70, 71, 72, 73, 74, 75, 79, 80,
81, 82, 83, 84, 85, 86, 87, 90, 91, 93, 94, 106, 107, 108, 109, 110, 111, 112 and 113.

Regarding Document Request No. 29, I said that Mattel produced last week the then-current
www.myscene.com web pages. I requested, and you agreed, to identify the other time periods
for which you are requesting iterations of the web pages.

Regarding Document Request No. 36, I requested, and you agreed, to identify NPD categories
regarding which MGA seeks discovery.

Regarding Document Request No. 45, I stated that Mattel's production would be consistent with
Request No. 44.

Regarding Document Request No. 46, I stated that Mattel has produced minutes of Board of
Director meetings that refer or relate to Carter Bryant. It is Mattel's position that the request is
overbroad in seeking all such documents relating to MGA, Larian or Bratz. I stated that Mattel
would consider further production in response to this request, but made no commitment.

Regarding Document Request No. 68, I stated that Mattel will produce commercials for My
Scene products. I requested, and you agreed, to notify us if MGA is also requesting commercials
for any other products.

Regarding Document Request No. 69, I requested, and you agreed, to identify specific categories
of documents that MGA is requesting, other than commercials themselves.

Regarding Document Request No. 71, I stated that Mattel's production was relating to My Scene,
and Mattel was not producing documents relating to the Barbie line unrelated to My Scene.

Regarding Document Request Nos. 77, I stated that Mattel has produced non-privileged
documents, pursuant to a reasonable, good faith search relating to MGA's claims, that include
communications with customers, retailers and members of the press.

07975/2137333 1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit I - Page 715

Michael Keats, Esq.
Johanna Schmitt, Esq.
June 7, 2007
Page 3

Regarding Document Request No. 78, I reiterated Mattel's objections stated in the January 15, 2007 Responses to the Requests. I made no commitment to produce documents responsive to this request that are not separately responsive to other requests for which Mattel is making production.

Regarding Document Request Nos. 80 through 85, I made no commitment to provide organization charts in particular, but I otherwise confirmed that Mattel was producing unprivileged responsive documents.

Regarding Document Request No. 96, I reiterated my previous position that the request is overbroad, and Mattel will not produce documents responsive to this request (unless they also fall within the scope of another request) unless it is narrowed to address only the facts that are the basis for the litigation. Mattel's statements about the litigation itself are irrelevant.

Regarding Document Request No. 97, I stated that Mattel would produce non-privileged documents, to the extent responsive documents exist at all, pursuant to a reasonable, good faith search relating to the facts of MGA's claims, as identified in the Complaint and the Interrogatory Responses.

I stated that Mattel would not produce documents in response to Document Request Nos. 89, 98 and 100, which are overbroad.

I said that we would review and get back to you on Document Request Nos. 3 and 95.

I informed you that Mattel anticipated making another wave of production during June, as part of its rolling production of documents.

We also discussed my letter of June 4, 2007, relating to the Interrogatory Responses. You indicated that you currently are aware of the following changes to the Response to Interrogatory No. 2, subject to approval by MGA: (i) at page 9, line 4, "'First-generation' 'Bratz' female fashion dolls" will become "all 'Bratz' female fashion dolls"; and (ii) at page 12, lines 3 and 4, "[t]he distinctive trapezoidal-shaped packaging for the 'Bratz Formal Funk Super Stylin' Runway Disco' play set" will be amended to also include the playset itself. You stated that the foregoing was not an exclusive list of changes that MGA may make to the Responses. You agreed to make any supplementation on or before June 20, 2007.

I requested, and you said that you would inquire, as to whether MGA has internal product numbers for every product that it contends that Mattel copied. Consistent with my June 4, 2007 letter, I requested that MGA include such internal product numbers, if they exist, in an amended response to Interrogatory No. 2.

At the beginning and end of the conference, I asked you for MGA's position regarding the scope of Mattel's obligations in relation to Document Request Nos. 64, 65, 66, and 67 in light of Judge

07975/2137333.1

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    Exhibit I - Page 716

Michael Keats, Esq.
Johanna Schmitt, Esq.
June 7, 2007
Page 4

Infante's order of May 22, 2007. I said that if they are viewed broadly, thousands of licenses and related documents might have to be produced, even though these materials make no mention of MGA and deal with product lines that are not at issue in the litigation (and even toy categories in which MGA does not compete with Mattel). You indicated that you believed that was the correct interpretation, but you also expressed a willingness to meet and confer, so the parties may agree on the scope of these requests. After our conference, I understand that Mike Zeller and Diana Torres agreed to a one-day extension of the time for Mattel to bring a motion for reconsideration as to this portion of Judge Infante's May 22, 2007 order, so that Ms. Torres can consult with MGA regarding a possible further extension while the parties meet and confer on these document requests.

If you have any questions regarding the foregoing, please call me. I look forward to continuing our discussion regarding those matters that have not been resolved.

Very truly yours,

Timothy L. Alger

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    Exhibit I - Page 717