**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

- - - - - - -


MATTEL, INC., ET AL.,                    )
                                         )
            Plaintiffs,                  )
                                         )
       vs.                               ) No. CV 04-9049-DOC
                                         )
MGA ENTERTAINMENT, INC., ET AL.,         )     Volume 1 of 2
                                         )
            Defendants.                  )
_____ )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Motions

Santa Ana, California

Wednesday, June 1, 2011

Jane C.S. Rule, CSR 9316
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-7755

11-06-01 MattelV1

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR PLAINTIFFS MATTEL, INC., ET AL.:

 4             QUINN, EMANUEL, URQUHART & SULLIVAN
             By:   JOHN B. QUINN
 5                 MICHAEL T. ZELLER
                   SUSAN ESTRICH
 6                 Attorneys at Law
             865 South Figueroa Street
 7           10th Floor
             Los Angeles, California 90017-2543
 8           (213) 443-3000

 9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
             BY:   THOMAS S. MC CONVILLE
12                 Attorney at Law
             4 Park Plaza
13           Suite 1600
             Irvine, California 92614
14           (949) 567-6700

15             - AND -

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
             BY:   ANNETTE L. HURST
17                 Attorney at Law
             405 Howard Street
18           San Francisco, California 94105
             (415) 773-5700
19
               - AND -
20
               KELLER RACKAUCKAS, LLP
21           BY:   JENNIFER L. KELLER
                   Attorney at Law
22           18500 Von Karman Avenue
             Suite 560
23           Irvine, California 92612
             (949) 476-8700

24

25
```

```
1    APPEARANCES OF COUNSEL (Continued):

2

3    Also Present:

4            ISAAC LARIAN, MGA CEO
             ROBERT ECKERT, Mattel CEO
5            RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan
             KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe
6            MELANIE PHILLIPS, Orrick Herrington & Sutcliffe
             FRANK RORIE, Orrick Herrington & Sutcliffe
7            DIANA RUTOWSKI, Orrick Herrington & Sutcliffe
             DENISE MINGRONE, Orrick Herrington & Sutcliffe
8            JEANINE PISONI, MGA Attorney at Law

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          **I N D E X**

2

3

4    MGA PARTIES' MOTION FOR JUDGMENT OF MATTEL'S INTENTIONAL
     INTERFERENCE WITH CONTRACT AND UNFAIR COMPETITION CLAIMS
5
     MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW RE MGA'S
6    CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO
     FEDERAL RULE OF CIVIL PROCEDURE 50(B); AND ALTERNATIVE
7    MOTION FOR REMITTITUR AND/OR NEW TRIAL

8    MGA PARTIES' MOTION FOR EXEMPLARY DAMAGES AND FEES PURSUANT
     TO CALIFORNIA'S UNIFORM TRADE SECRET ACT, CAL. CIV. CODE
9    3426.3, 3426.4

10   MGA PARTIES' MOTION FOR AWARD OF ATTORNEYS' FEES AND "FULL
     COSTS" UNDER SECTION 505 OF THE COPYRIGHT ACT
11
     MATTEL'S MOTION AND MOTION TO STRIKE AND CONFIRM WAIVED THE
12   MGA PARTIES' UNTIMELY OBJECTIONS TO MATTEL'S PROPOSED
     FINDINGS OF FACT AND CONCLUSIONS OF LAW RE MGA'S UNFAIR
13   COMPETITION CLAIM

14   GUSTAVO MACHADO'S MOTION FOR ATTORNEYS' FEES PURSUANT TO
     CAL.CIV. CODE 3426.4
15

16

17

18

19

20

21

22

23

24

25

1          SANTA ANA, CALIFORNIA, WEDNESDAY, JUNE 1, 2011

2                        VOLUME 1 OF 2

3                         (1:40 p.m.)

4          THE COURT:  All right.  We are back on the record.

5    All counsel are present, the parties are present.

6               Mr. Quinn?

7          MR. QUINN:  Thank you, your Honor.

8               You're Honor, we've prepared a tabbed binder with

9    quotations from some the cases and some of the evidence.  If

10   we can provide that to the Court and opposing counsel.

11              THE COURT:  Okay.

12              MR. QUINN:  Good afternoon, your Honor.

13              THE COURT:  Good afternoon.

14              MR. QUINN:  Your Honor, of course, will be making

15   the decision regarding exemplary damages, and in that

16   connection, the Court will be making factual findings, and

17   I'd like to -- I'm going to address the law pertaining to

18   exemplary damages, your Honor, but I'm also going to address

19   some of the factual issues, in particular, factual issues

20   that have been raised by MGA in their argument.  And with

21   respect to your Honor, I think there is not a factual basis

22   for many of the things that have been said to the Court, and

23   that it would be incorrect for this Court to adopt many of

24   the key factual representations that have been made.  In

25   particular, we have many times heard MGA to say, "The jury

1    found X," fill in the blank, or "The jury could have found

2    Y," fill in the blank, when, in fact, the jury did not find

3    X, it wasn't something within the scope of the verdict, or

4    the jury could not have properly found Y because there was

5    simply no evidence to support the conclusion that then

6    follows.

7              The first example of the latter, your Honor, was

8    the statement made by MGA's counsel that "We know that the

9    toy fair snooping, the use of false identities to get into

10   toy fair booths continued after 2005 because Ms. Rahimi" --

11   "it was outsourced to Ms. Rahimi and Ms. Osier."  Your

12   Honor, no evidence, no evidence whatsoever to support that

13   statement.  The jury -- that's not within the scope of the

14   verdict, so we can't say that the jury necessarily found

15   that, and the jury couldn't properly find that because there

16   is no evidence of that.  What --

17             THE COURT:  I'm sorry, just a moment.

18             *(Interruption in the proceedings.)*

19             THE COURT:  Please proceed.

20             MR. QUINN:  Thank you, your Honor.

21             The record evidence -- if I could direct the Court

22   to Tab 1 in the book that we have provided, the record

23   evidence was that Mr. Villasenor was directed by his

24   superior, Mr. Louie, in the November 2005 time frame to stop

25   this business.  When Louie was the new superior,

1    Mr. Villasenor asked him about what he thought of this
2    practice, and Mr. Louie told him to stop doing it, "You are
3    not to do that."  Mr. Villasenor's testimony there is on the
4    first -- in the first tab that Mr. Louie told him to stop,
5    and his understanding, Mr. Villasenor testified, was that he
6    would lose his job unless he stopped misrepresenting
7    himself.  Answer, "That's the way I felt, correct."
8            And then within something like 30 days, he was out
9    saying he was on a -- on leave.  He had a lawyer who then
10   wrote a letter demanding, as I recall, $3 million.  He never
11   worked for Mattel again.  And there is no evidence, there is
12   no evidence in the record that any person at Mattel ever
13   again used a false identification to get into an MGA toy
14   fair booth or to anyone else's toy fair booth.
15           MGA says, you know, just as an aside here, that
16   this only happened because of their 2005 lawsuit, and I
17   submit that that's not supported by the record either.
18   They've represented multiple times to this Court that that
19   2005 lawsuit did not concern these toy fair allegations and
20   sneaking into toy fairs, and we'll talk about that in more
21   detail.
22           I think the jury can't decide or can't -- you
23   know, we've heard a couple times that the jury could have
24   inferred that it would continue or there is circumstantial
25   evidence that it continued.  You know, there's got to be

1   some footprints in the snow to support the circumstantial

2   evidence argument.  You just can't infer it from just an

3   empty record.  There is no -- nothing from which

4   circumstantial conclusion or any evidence could be reached

5   that indicated that this continued past 2005.

6          The one other -- the one example that MGA cites is

7   the testimony of Sarah Allen in her e-mail, which is

8   Exhibit 9869.  That's in -- behind Tab 2 in the binder.  And

9   I'd point out, your Honor, that this -- this e-mail was

10  never claimed by MGA.  It does not appear on their trade

11  secrets chart.  Nothing referenced in there was included in

12  their trade secrets chart.  There was never any claim in

13  discovery at any point prior to the trial that Ms. Allen's

14  e-mail -- this is dated February 9, 2009, Exhibit 9869 --

15  contained any information that was trade secret.

16         The Court will recall that her testimony was she

17  was never even at the Nuremberg toy fair.  She said in the

18  e-mail, "Just picked up some bits and pieces from the MGA

19  stand at Nuremberg."  Her testimony was that she was told

20  this information that was related there -- which, by the

21  way, was very high level, there is nothing specific there --

22  by a retailer who had been in the booth, the kind of conduct

23  that both sides have engaged in, MGA is engaged in as well,

24  getting information from retailers.  There was no

25  contradiction to that testimony that she didn't go in the

1    booth, she wasn't even in Nuremberg.

2            So this is the only thing that MGA has been able

3    to point to that there was anything after 2005 that

4    indicates that it was use of a phony I.D. to get into a toy

5    fair booth.  And this is important, your Honor, because of

6    the law -- the law is that it's significant in assessing the

7    proprietary of exemplary damages, or the amount of exemplary

8    damages.  It's significant that the conduct has stopped and

9    is not ongoing.  I refer the Court to the BW -- BMW v. Gore

10   and the Witcher v. Bank of America cases, which is behind

11   Tab 3 in the binder.

12           As the U.S. Supreme Court said in BMW v. Gore, it

13   is also significant that there is no evidence that BMW

14   persisted in a course of conduct after it's been adjudged

15   unlawful even on one occasion.  And in the Witcher case, the

16   Court said that plaintiffs cannot support a claim for

17   punitive damages whereupon contacting counsel, the offending

18   conduct ceased.

19           So we're -- at the time of this trial, at the time

20   of this trial started in January of this year, it has

21   been -- there's no evidence that there had been any of this

22   type of activity, false representing of who you are to get

23   into toy fair booths since 2005, 6 years ago, 6 years ago.

24   So we are -- we are talking, now, and assessing the

25   propriety of making an example and teaching a lesson in the

1    context of activity which the record evidence is stopped --

2    voluntarily stopped at Mattel when Mr. Louie told

3    Mr. Villasenor "You are not to do that."

4            Another example of a -- a statement that was made

5    that -- at which there was no evidence, one of the alleged

6    trade secrets identified in the -- in the verdict was a toy

7    that was shown at the Nuremberg toy fair.  There is no

8    record evidence that Mr. Villasenor or anyone else went

9    into -- used a false I.D. to get into an MGA booth at the

10   Nuremberg toy fair, or was ever inside the Nuremberg toy

11   fair.  MGA argues, "Well, a jury could infer it."  Again, I

12   think in the absence of any evidence at all, in a vacuum

13   with no footprints in the snow, it's inappropriate to infer

14   that that happened when there is no evidence that it ever

15   happened at Nuremberg.

16           Then we come to the issue of the 35 boxes, which,

17   your Honor, I have to confess, is an issue that, you know,

18   frankly, mystifies me.  The record on that is the documents

19   were timely reviewed by Mattel, documents were produced out

20   of those boxes.  We had the late night hearing down at the

21   Arent Fox law firm.  The Court went through several boxes.

22   The discovery master went through all of the boxes.  The

23   Court saw the pink placeholders that have been placed in the

24   boxes to indicate where documents have been copied for

25   production.

1           The Court had the opportunity to speak with James

2    Cook, one of the three associates who had gone through those

3    boxes, and documents have been produced out of those -- out

4    of those boxes in advance of Mr. Villasenor's deposition.

5    After all that, the discovery master found five additional

6    documents which were produced after that late night review.

7    None of those were used at trial.  There obviously wasn't

8    anything there that MGA considered significant.

9           I suppose -- you know, I think the fact that 35

10   boxes were combed through a second time and, you know, given

11   the fact that different lawyers can make sometimes different

12   calls on the responsiveness of any particular document, the

13   fact that only five were found additional, I submit, your

14   Honor, indicates that Mattel did its job.  These documents

15   were timely provided by Mattel to its outside counsel.  It's

16   outside counsel did its job, went through those documents,

17   produced documents from those boxes appropriately.  You

18   know, at the risk of sounding lacking in remorse, I have a

19   hard time understanding why Mattel or counsel could be

20   criticized for anything at all that was done with respect to

21   those 35 boxes.

22           If you look at -- behind Tab 4, your Honor, you'll

23   see the Discovery Master's Order Number 108.  Discovery

24   master said on March 28th and 29th, "Pursuant to the request

25   of the Court, the discovery master conducted that review of

Case 2:04-cv-09049-DOC-RNB   Document 10626   Filed 06/02/11   Page 12 of 70   Page ID #:322129
CV 04-9049-DOC - 06/01/2011 - Vol. 1 of 2

12

1   the 35 boxes.  Mattel represents the boxes contain the

2   documents removed from Sal Villasenor's work area or

3   cubicle."  There were 121 documents that we had produced

4   from those boxes, 86 of those documents were produced before

5   Mr. Villasenor's deposition.  We heard a statement that they

6   didn't get anything relating to Mr. Villasenor until he

7   produced things at his deposition, and we think the record

8   shows otherwise.

9          All the rest of the documents, the difference

10  between the 86 and the 121, were produced before the

11  discovery cutoff, say for those 5 additional document that

12  the discovery master identified, and that MGA never

13  attempted to use at trial.  MGA did use -- mark as exhibits

14  eight documents, as indicated in the document behind Tab 4,

15  did use 8 documents that we timely produced out those 35

16  boxes.  The exhibit numbers are there.  But we've -- you

17  know, this -- this whole issue of the 35 boxes kind of took

18  on a life of itself in the trial in a circumstance where, I

19  repeat, as I stand here, your Honor, I'm unaware of any way

20  in which Mattel or our firm could be faulted for the

21  handling of that discovery.

22          It came up when counsel was questioning Mr. Eckert

23  on the stand, and she asked a question to the effect that,

24  "Didn't you think it was misleading that they showed you the

25  library, the intelligence library, after 35 boxes had been

Case 2:04-cv-09049-DOC-RNB   Document 10626   Filed 06/02/11   Page 13 of 70   Page ID
#:322130
CV 04-9049-DOC - 06/01/2011 - Vol. 1 of 2

13

1   removed?"  I objected, "Assumes facts not in evidence."  He

2   doesn't know where the 35 boxes come from.  We've

3   represented they didn't come from the intelligence library.

4   They came from Mr. Villasenor's cubicle.

5        And then it's one of those things at that point

6   that you can't really undo, because what are we going to do,

7   call a witness just to say where the 35 boxes came from?

8   You know, I -- on redirect of Mr. Eckert, I asked him, "Do

9   you know where those 35 boxes came from?"  He says he

10  doesn't know.  Under the circumstances, that was the best I

11  could do.

12       And then in closing argument, counsel makes an

13  argument about, you know, these 35 boxes were hidden, that

14  they are removed from the intelligence library before

15  Mr. Eckert ever got to see them.  There was no evidence at

16  all that those 35 boxes were ever in that ninth floor

17  intelligence library.  We've always maintained that's not

18  where they came from.  All of which, I think, is

19  unfortunately a side show which got some attention here in

20  the courtroom.  But what's relevant and what's true is that

21  we did our job, went through those boxes in a timely manner

22  and produced the relevant documents out of those boxes.

23       So that's, just by way of kind of a preamble, a

24  couple of examples of factual assertions that's been made,

25  which I think is not possible to fairly base any type of

1    punitive damages award on.

2          I'd now like to discuss and spend the balance of

3    most of my time, your Honor, discussing the factor of

4    reprehensibility as a factor in determining the punitive

5    damages.  And reprehensibility is a consideration both as a

6    matter of due process and under California law.  And under

7    both, as MGA has said, there are five factors to be

8    considered.  The first three, MGA conceded in its briefing

9    do not point in the direction of finding reprehensible

10   conduct here.  They are really irrelevant, whether it's --

11   first is whether the harm is physical versus economic,

12   whether the conduct jeopardized health and safety, and

13   three, whether it's an issue of financial vulnerability of

14   someone taking advantage of a party that has financial

15   vulnerability.

16         It's not our position, as MGA has said, that you

17   have to have all five in order to have a finding of

18   vulnerability.  We're well aware of cases where punitive

19   damages have been awarded and all five are -- all five are

20   simply not present.

21         We were the object of some scorn for pointing out,

22   you know, that no one died, no one was injured, no towns

23   were lost, but that's really the point of the first and

24   second factors.  This isn't an issue of physical injury.  It

25   isn't an issue of health and safety.  Indeed, no one died,

1    there was no injury here, and it is not inappropriate for us

2    to point that out.

3         We are also repeatedly ridiculed for having said

4    in our brief that it's only a doll when we clearly, as we

5    said in our brief, that we were quoting the Court, that the

6    Court had made that statement, "it's only a doll."  In the

7    mind of the Court, the Court had one point made that remark.

8         On the vulnerability issue, although in their

9    brief they conceded that that issue also -- that third

10   financial vulnerability issue tipped against a finding of

11   reprehensible conduct here.  There was an argument that was

12   floated in oral argument, "Well, since Mattel has greater

13   resources than MGA, this really may be a case where that

14   third factor of financial vulnerability really does apply

15   and should weigh in favor of reprehensible conduct.  That is

16   not the law.  That is a proposition that's been considered

17   and rejected.

18        I point the Court to the authority behind Tab 5 in

19   the materials.  MGA's revenue in 2010, we cite the evidence

20   there was $485 million.  The Court in the Symonds case said

21   that a defendant that had financial resources vastly

22   superior to plaintiff does not make plaintiff financially

23   vulnerable.  And then we also cite the Bridgeport case.

24        So we really have three factors here, the first

25   three that weigh against the finding of reprehensible

1    conduct, and that -- that fact, that concession in the

2    brief, that determination that three of the five factors

3    don't apply do sort of -- do require and do weigh into

4    whether any punitive award is appropriate, and if so, the

5    amount of the award, that it should, in fact, be any award

6    when you've got three of the five factors having no

7    application at all, any of the award has -- has got to be

8    strictly limited in light of that.  And for that

9    proposition, we referred Court to Levy v. Unumprovident

10   Corporation, 295 F.App.255, Ninth Circuit case, 2008, where

11   it said where three factors were lacking, a ratio of 1.5 to

12   1, the Court found was the constitutional maximum.  And then

13   the Jet Source v. Doherty case, a California case, 2007

14   case, also indicates that punitive damages are appropriately

15   limited when you've got numerous factors which simply have

16   no application.

17           The fourth reprehensibility factor -- moving on

18   from the first three, the fourth factor relating to

19   reprehensibility here is whether the conduct was isolated or

20   whether it happened at multiple times.  And here, obviously,

21   this concern 26 -- the jury found 26 products which were

22   trade secrets, which the jury -- the verdict determined had

23   been misappropriated involving six toy fairs.  I mean,

24   obviously this is something that happened repeatedly, it

25   happened more than once, but the relevant consideration that

Case 2:04-cv-09049-DOC-RNB   Document 10626   Filed 06/02/11   Page 17 of 70   Page ID #:322134
CV 04-9049-DOC - 06/01/2011 - Vol. 1 of 2

17

 1    case law teaches us is not whether it happened more than

 2    once, but whether it's conduct that was repeatedly engaged

 3    in, prohibited conduct that was repeatedly engaged in by a

 4    defendant knowing that it was unlawful.  And for that

 5    proposition, we cite the Court to the cases excerpted behind

 6    Tab 6, BMW v. Gore.  The question is whether, and I quote,

 7    "a defendant has repeatedly engaged in prohibited conduct

 8    knowing or suspecting that it was unlawful."  And in the BMW

 9    v. Gore case, the Court found no reprehensibility, found

10    that the conduct was not reprehensible, even though it was

11    an ongoing long-term practice because the practice itself

12    was not intentionally unlawful, was not done knowing it was

13    illegal even if the liability, the tort liability itself was

14    an intentional tort.

15            We have always and consistently and at all times

16    acknowledged that it was unethical and inappropriate to

17    misrepresent identities to gain access to toy fairs.  And I

18    refer the Court to the quotations, the excerpts from Tab 7,

19    behind Tab 7 from Mr. Eckert's testimony, from Mr. Normile's

20    testimony, from Jill Thomas' testimony, from my opening

21    statement and from my closing argument.  We have never ever

22    tried to suggest that this was in any way an appropriate

23    business practice for people to misrepresent themselves.

24            Among other things, that conduct violated in

25    multiple ways the Code of -- the Code of Ethics, the Code of

 1   Conduct that Mattel adopted in 2002 at Mr. Eckert's

 2   initiative after he joined the company.  It was -- it was

 3   clearly wrong to do that, and we've always said it was

 4   wrong.  That, I submit, is not the issue in terms of the

 5   fourth factor of reprehensibility.  The question is, was it

 6   known that this conduct was unlawful when it was

 7   repeatedly -- repeatedly done?

 8            And here, I have to draw an important distinction

 9   between using fake identification to gain access to an area

10   and stealing trade secrets.  The two are not the same.  I

11   mean, the jury rejected the claim as to 88 of the claim

12   trade secrets.  Affirm the claim as to 26, found

13   misappropriation.  As to 88, the jury -- even though false

14   identifications were being used, access was being gained to

15   toy fair booths with false I.D.s, that did not and does not

16   necessarily equate to theft of trade secrets, that the

17   jury -- that's a distinction that the jury -- the jury

18   clearly made.  So it's important, I think, to bear that

19   distinction in mind.

20            We agree and we understand that using false

21   identification was always wrong.  The issue about theft of

22   trade secrets is a different issue, and here I think we have

23   to -- the cases indicate that it's appropriate to take into

24   account whether the defendant should have known, could have

25   known that this was misappropriation of trade secrets, that

1    getting access to information that's being shown to

2    hundreds, potentially thousands of retailers and the press

3    in toy fairs is -- that that information is still trade

4    secret.  I submit even now, it's kind of a remarkable

5    proposition that you would have a toy fair and booths in a

6    toy fair where products are being shown to hundreds,

7    potentially thousands of people knowing, and we'll review

8    the evidence, that retailers talk and that they share that

9    information, as was acknowledged, and that that is still a

10   trade secret.

11          Now, this is going to should Mattel have known,

12   and I submit this is kind of work -- we're kind of on the

13   frontiers of trade secrets law, here, in terms of what

14   Mattel should have known.  So far I'm aware, no case has

15   ever held that shot -- that products shown to the press and

16   hundreds of customers will still qualify as trade secrets,

17   particularly when the operator of the booth, the person

18   doing the showing and admits and acknowledges that retailers

19   talk and will share with others, including competitors, what

20   it is that they see.

21          Again, we're not arguing with the verdict at this

22   point, your Honor.  The question here is in terms of

23   punitive damages, should Mattel have known that under those

24   circumstances that the law was, that is still trade secret?

25   I submit that's not an open and shut proposition, and that

1    should be weighed in the balance in determining the --

2    whether Mattel was knowingly engaged in unlawful

3    misappropriation of trade secrets.  I'm setting aside the

4    issue of using false identities, which we have never

5    defended and cannot defend, would not defend.

6         We cited the Acuson case, your Honor.  It's behind

7    Tab 8.  "When a manufacturer shows its products to buyers

8    and begins selling, trade secret protection is lost because

9    buyers are the ones who have an economic interest in the

10   product and whose demand for the product encourages

11   manufactures to supply it.  Disclosure to them is, for all

12   relevant purposes, disclosure to the world."

13        Now, we were -- questions were raised about our

14   citation to this case because it's an unpublished California

15   decision.  However, the federal law is, whatever the

16   California law may be about reliance on unpublished

17   decisions, the federal law is that federal courts can rely

18   and take guidance on -- from unpublished state law

19   decisions, and we've stated those cases at the bottom of the

20   page behind Tab 8, the Employer's Insurance of Wausau case

21   and the Nunez case, both Ninth Circuit cases, one 2003,

22   1,000 -- 2,000 -- one 1997.

23        To be sure in the Acuson -- the Acuson case

24   involved use of false identities to get into -- well, I

25   don't know if they call them fair, but trade shows.  But the

1    product at issue had also been sold, it had been on the

2    market and has been sold beforehand.  And that's a

3    distinction that -- I acknowledge an important decision and

4    one that MGA relies on, but I submit that the case shows

5    that when a manufacturer gives its information to buyers,

6    secrecy is lost, it's lost from the initial disclosure.

7            As Court said that -- with respect to the

8    concealment of identity, the Acuson court said, "Acuson has

9    not cited any case, and we have found none holding that a

10   competitor's concealment of its identity to obtain a

11   publicly available product will create liability under trade

12   secrets law."  I submit that it's not much of a distinction

13   or a stretch beyond that to say if you show something to

14   hundreds of buyers in a toy fair booth and to the press

15   knowing -- knowing that they are going to share that with

16   competitors, the information is no longer secret.  At least,

17   that was not -- it was not a foregone conclusion -- let's

18   put it this way, your Honor, it was not a foregone

19   conclusion under those circumstances that that information

20   was still a trade secret.

21           The evidence at trial showed that in the toy fair

22   industry, the expectation was that information shown to

23   customers would not remain secret, but that retailers would

24   share that information.  For example, price information with

25   other competitors in order to play, for example -- and it

Case 2:04-cv-09049-DOC-RNB   Document 10626   Filed 06/02/11   Page 22 of 70   Page ID #:322139
CV 04-9049-DOC - 06/01/2011 - Vol. 1 of 2

22

1    just says an example -- to play manufactures off against

2    each other.

3            MGA's chief financial officer and their designated

4    30(b)(6) witness on trade secrets, Mr. Jolicoeur so

5    testified, this is their 30(b)(6) witness who is to bind his

6    testimony is to bind the corporation on that subject.  And

7    if the Court can see this testimony behind Tab 9, the

8    question was, "If the information is released to the

9    retailer," this is in the context of a discussion of toy

10   fair, "if the information is released to the retailer, it

11   was released to the public?"  Answer, "Yes."

12           And there's another, I won't take the time to read

13   it, but there is another quotation there from their 30(b)(6)

14   witness' testimony where he acknowledges that where products

15   are being sold -- are being shown to customers, they become

16   publicly known.

17           And the fact that information shared with

18   retailers and customers became public is something that

19   Mr. Larian acknowledged on the stand.  We've excerpted some

20   of his testimony behind Tab 10.  "Mr. Larian, did you

21   believe that practically speaking, your experience is that

22   retailers go ahead and share the information you give them

23   with other people in the industry?"

24           Answer:  "They do."

25           "So that's your expectation at toy fairs, if you

1    share information with retailers, they are going to go ahead

2    and share it with other people in the industry?"

3              Answer:  "Sometimes they do."

4              "Do retailers sometimes choose to disclose

5    information for their own business purposes?"

6              Answer:  "Selectively, when it fits them well,

7    yes."

8              Then behind Tab 10, we have Mr. Brawer's testimony

9    concerning prices.  He was clear that, you know, once you

10   start sharing prices with retailers, that's -- there's a

11   fairly large public, he says, that tends to see this.  This

12   information is out there.

13             Tab 12, Lisa Saunders, her testimony was, "And

14   once a buyer" -- "once a retailer knows that information,

15   you have to" -- "knows that information, you have to assume

16   that there's a risk that other people are going to learn

17   about it, correct?"

18             Answer:  "Correct."

19             "Well, you do know that you've gotten information

20   about unreleased Mattel products from buyers, correct?"

21             Answer:  "Yes."

22             So again, I think it's -- the overwhelming

23   evidence at trial was that that which is shown in toy fair

24   booth does not remain confidential.  Not a defense to

25   falsifying who you are.  Again, this just goes to should

1    have we known that the information was going to be

2    disseminated and everybody knew and expected would be

3    publicly shared, should we have known that that was still

4    trade secret?

5            And then in terms of also what -- what Mattel

6    should have known was unlawful, and is this case kind of at

7    the far reaches, and is this cutting edge, as I have

8    suggested, the issue of head start damages where there is no

9    evidence of a head start product.  In the case of 17 of the

10   products, there was no matching product, 17 of the 26, there

11   was no matching product.  The idea of a head start damages

12   theory where there is no head start product that took

13   advantage of that, and when there is a monetary recovery, I

14   submit, is novel, and as near as we've been able to

15   determine, unprecedented.

16           For each of these alleged trade secrets, we have a

17   total default, "total default," I underline that, total

18   default in the evidence regarding use.  FOB pricing, not one

19   example of a price used, not used, adjusted, not adjusted

20   because somebody at Mattel knew about an FOB price.

21   Advertising, same thing; not one example of a toy that was

22   advertised, not advertised, on TV or in any other way, that

23   any decision whatsoever was made with respect to advertising

24   because someone learned about advertising plans for some MGA

25   product.

```
 1              Features of product, look and feel of a product,
 2   whether to make a decision -- a decision to make or not make
 3   a product, complete default.  We have a matchup of some
 4   alleged head start products, but I submit it's in the vacuum
 5   of identification of any feature that was supposedly taken.
 6   But my point here is, your Honor, could someone at Mattel,
 7   when looking back retrospectively now, known that this was
 8   unlawful misappropriation of trade secrets, unlawful taking
 9   advantage of a head start where the evidence was there's no
10   head start product that can be pointed to?  Again, they --
11   MGA's response is, "Well, the jury could have inferred it,
12   there could be some circumstantial evidence of it."  Again,
13   there are limits to that.  There needs to be some footprint,
14   something of which it can be inferred.
15              The state of the record is that we didn't do
16   anything with respect to any product with any of this
17   information.  And you know, the JMOL is a different issue,
18   and I'm not standing here to argue the JMOL.  Obviously
19   that's one reason that we've urged to the Court why our JMOL
20   motion should be granted.  But what I'm here standing
21   arguing, your Honor, is novelty, novelty of the result of
22   this record in terms of whether Mattel knew that -- or knew
23   or should have known that it was engaged in repeated
24   unlawful head start trade secret misappropriation.
25              So to get back to the -- and then we've heard
```

 1   some -- we've heard some language, rhetoric from MGA that

 2   Mattel's growth and its profits have been fueled, and it's

 3   maintained its dominant position by this trade secret theft,

 4   26 -- when 88 are rejected, 26 trade secrets allegedly

 5   account for Mattel's growth, and the fueling of its profits

 6   and the maintenance of its dominant position, a damages

 7   award of $88 million where Mattel's net worth has gone up by

 8   a couple of billion dollars during the time period at issue.

 9   There is simply no evidence that connects any growth that

10   Mattel -- to any of these -- these 26 trade secret thefts.

11           So to get back to the test of the BMW case, I

12   submit that this is not a case where Mattel should have

13   known that this was unlawful activity based on the law; far

14   from it.

15           In assessing reprehensibility, it is also

16   appropriate to consider the cases -- teaches whether MGA

17   itself thought that it was doing anything unlawful by

18   getting unreleased product information from its competitors,

19   or whether it thought that that activity itself was

20   problematical.  And the evidence at trial was that Mattel

21   knew -- or MGA knew for years about the sneaking into MGA

22   toy fair booths.

23           Behind Tab 13, we have Mr. Larian's testimony.

24   Mr. Larian testified in December of 2002 that he knew Mattel

25   came into an MGA showroom with a false business card.  He

1    heard this from a few different people.  He had known that

2    as of December 2009 and had known it for years, he said.

3            In the -- in January of 2008, MGA's counsel at

4    deposition, Mr. Plevin, asked about Sal Villasenor's

5    activities by name, identified Sal Villasenor and his

6    activities at toy fair.  We were never able to -- we weren't

7    able to develop a record about what he knew as of January of

8    2008, or how he got that information, but he knew enough to

9    ask about Sal Villasenor's conduct and his activities.

10           Mr. Brawer who became -- in 2004, became the

11   number two person in MGA, indisputably knew about Mr. Sal

12   Villasenor's activities, and we've got that testimony

13   collected behind Tab 14.  He acknowledged that when he went

14   over to MGA, he knew Mr. Villasenor was using false business

15   cards to get into toy fair showrooms.  He did nothing about

16   it, didn't say anything to anyone, like Mr. Larian; did not

17   about it.

18           The one thing that Mr. Brawer did do was try to

19   hire Mr. Villasenor, or at least bring him in for a job

20   interview, and that evidence is behind Tab 15, Exhibit

21   22395.  Mr. Villasenor e-mailed Mr. Brawer in late 2006, you

22   know, saying, "As you know, I've had 15 years of marketing

23   intelligence experience in the toy industry."  Brawer

24   forwards that to Machado saying possible replacement for

25   Christina.  Machado responds, "I remember this guy, had a

1   lot of insights about the competitive environment.  I would

2   also like to consider him."  You know, nothing about -- this

3   is consistent with Mr. Brawer doing nothing and Mr. Larian

4   doing nothing, nothing about, "We can't possibly hire this

5   person.  He misrepresents himself to get into toy fairs."

6   Knowing that that is exactly what he does, Mr. Villasenor

7   forwards his resume over to Mr. Machado and says, "This is

8   somebody we ought to consider hiring."

9        Again, all this goes to what people should have

10  known, what Mattel should have known, what was commonplace

11  in the industry, what was known, what was regarded as

12  acceptable or, at least, if unacceptable, as something that

13  happens.

14       MGA -- the evidence at trial was that MGA itself

15  routinely collected confidential information about its

16  competitors' unreleased products from retailers and others.

17  Behind Tab 16, we've collected excerpts from exhibits and

18  trial testimony, was showing MGA routinely obtaining

19  information about competitor's unreleased products.  Trial

20  Exhibit 9854, the 2008 e-mail attaching the M-booth report,

21  clearly Mattel booth report.  It says, "Two of our

22  colleagues have been able to enter the booth of our

23  competitor and wrote the attached report."  The report

24  contains information about unreleased Mattel products,

25  including the appearance, operation, play pattern and

 1    anticipated retail price.

 2            Exhibit 9533, I think we actually have these

 3    exhibits behind this first page, your Honor.  Exhibit 9533,

 4    "Dear Isaac."  It discusses a top-secret theme in a closed

 5    room at a toy fair.

 6            Exhibit 22225, Mr. Larian's e-mail saying, "I need

 7    a favor at New York toy fair.  Can you please get me a copy

 8    of catalog and price list for the following companies," and

 9    of Mattel, of course, was in that list.  And then

10    Mr. Larian's trial testimony about price lists he says are

11    secret, but then he was asked by Mr. Price, "Well, when you

12    say get me a copy of a catalog and price list for the

13    following companies, Mattel, did you think you were using

14    the retailer to steal trade secrets?"

15            Answer:  "No."

16            This collecting competitive intelligence,

17    collecting information on competitors' unreleased products

18    from retailers, wherever it could be obtained, was routine

19    in the industry.

20            Now, MGA is going to point out, "Well, we didn't

21    use fake cards.  We didn't misrepresent our identity to get

22    in, and we don't know how they got into Mattel toy fair

23    booths," but on the record, they didn't use fake business

24    cards.  Mattel did.  That, in itself, is not trade secret

25    theft.  There might be a trespass claim for getting there

1    under false pretenses, but in terms of you getting someone

2    to pump information from a retailer about unreleased

3    product, asking someone to pick up price lists, collecting

4    the information on -- from competitors' unreleased products,

5    I think it bears on whether this -- this type of activity

6    was something that was done in the marketplace, and whether

7    someone would think that that is stealing trade secrets to

8    get that kind of information when it's available, and,

9    indeed, MGA and other competitors avail themselves of means

10   available to them to get that type of -- to get that type of

11   information.  They also say in response to this, "Well, we

12   didn't have a whole department that did this," and I'll come

13   back and talk to that a little bit later on, your Honor.

14          So that's the reprehensibility factor.  Most of my

15   remarks have dealt to the issue of whether this should have

16   been -- people should have known that this was trade secret

17   theft under these circumstances or whether this is kind of a

18   more cutting edge novel issue.

19          The fifth factor under reprehensibility is whether

20   the results -- whether it was the -- the actions were the --

21   were the result of intentional malice, trickery -- trickery,

22   deceit or accident, obviously there was deceit involved

23   here, people misrepresenting who they were.  But I do think

24   this is appropriately put in perspective.  This was deceit

25   involving the use of fake business cards to gain access to a

Case 2:04-cv-09049-DOC-RNB   Document 10626   Filed 06/02/11   Page 31 of 70   Page ID #:322148
CV 04-9049-DOC – 06/01/2011 – Vol. 1 of 2

31

 1   toy fair booth which hundreds of people would go through,

 2   hundreds of people would have access to.  It was, in fact, a

 3   sneak peek at products that were either on the shelf in some

 4   cases, already the subject of publicity, or would soon be on

 5   shelves.  You know, MGA has criticized -- say we are

 6   trivializing this by referring to it as a sneak peek, but

 7   they don't really dispute the accuracy of that information

 8   because -- that description because that is basically what

 9   it was.

10          I'd now like to turn to some of the other issues

11   that MGA raised in its argument.  MGA put on no case of any

12   injury to MGA, no -- no evidence of any damages that MGA

13   incurred.  It was solely an unjust enrichment case in terms

14   of the monetary relief.  And the amount of harm to the

15   plaintiff is something that must be considered in assessing

16   punitive damages and would cite the Court to BMW v. Gore.

17   This is Tab 21.  The second perhaps most commonly cited

18   indicium of an unreasonable excessive punitive damages award

19   is its ratio to the actual harm inflicted on the plaintiff.

20   Here we have no evidence at all of any harm to the

21   plaintiff.  No effort to even put on a case regarding any

22   harm to the plaintiff.

23          Instead, we have had discussion of potential harm

24   to third parties, other competitors, Hasbro, other people in

25   the toy industry.  The difficulty with that is the law is

1    clear that in assessing the amount of punitive damages, it's

2    not appropriate, it violates due process to consider

3    punitive -- to make punitive damages awards based on harm to

4    third parties.  And for that, we refer the Court to Phillip

5    Morris U.S.A. v. Williams, 549 U.S. 346; Merrick v. Paul

6    Revere Life, 500 F.3d, 1007, "Punitive damage award that it

7    punishes a defendant for harm purportedly done to third

8    parties violates due process."

9           But here, we don't even have any evidence, any

10   evidence at all of harm to third parties.  We have nothing

11   on the record to indicate that any of those catalogs, for

12   example, that were of other companies that were in those 35

13   boxes that the Court saw, that any of that information is

14   trade secret, was regarded by those companies by trade

15   secret.  There is a complete -- there is simply no evidence

16   of that.

17          We do know that, and we've cited this, that Hasbro

18   has on YouTube footage of images of the inside of Hasbro's

19   New York toy fair booth, and we cited that in our brief, but

20   you'll also see the citations to that, your Honor, behind

21   Tab 20 in the book that I -- that I gave the Court.  This is

22   just by way of illustration.

23          We can't leap to the conclusion that any

24   information that Mr. Villasenor or anyone else collected,

25   whether it's a price list, a product catalog, or whatever it

1   is, that that was necessarily trade secret.  We do know, we

2   heard evidence in the trial that different booths have

3   different levels of security, that different companies have

4   different policy, that it's possible to get at least some

5   catalogs without going inside booths.  And now, we have

6   evidence that, you know, Hasbro at least permits, you know,

7   that there's filming of YouTube of the inside of its toy

8   fair.  So even if it's appropriate to consider whether or

9   not there was harm to third parties, we just simply don't

10  have any evidence in the record that could be considered.

11         We indicated in our brief that a high compensatory

12  damages award militates against having a larger punitive's

13  award, the larger the compensatory award is -- the

14  compensatory award -- the large compensatory award argued

15  against having a large punitive award, and for that

16  proposition, your Honor, we cite the cases behind Tab 28,

17  that's the State Farm Mutual case, the Modine Manufacturing

18  case, and the Merkin case, quoting the U.S. Supreme Court in

19  State Farm, "When compensatory damages are substantial than

20  a lesser ratio, perhaps only equal to compensatory damages,

21  can reach the outermost limit of the due process guarantee."

22  So I think MGA took some issue with that proposition, but

23  that is a correct statement of the law.

24         We heard that Mattel stole trade secrets for 20

25  years.  Again, the record simply does not support that.  The

1    jury -- in fact, the jury verdict rejects that simply

2    because a false identification was used to get into a toy

3    fair booth does not mean that whatever anyone saw in that

4    toy fair booth is a trade secret.  In fact, 88 times this

5    jury said it wasn't.  I mean, what was the record evidence

6    on this?

7            Mr. Villasenor started with a company in 1992.  He

8    assumes this job in 1995.  He says that as of 1992, he was

9    told that, you know, people had done this type of activity,

10   gone into toy fair booths for some period of time for some

11   number of years.  He doesn't have personal knowledge of it,

12   but there's no evidence there that whatever happened before

13   he joined, which is part of the 20-year period they want to

14   count, there is no evidence that trade secrets were stolen.

15   He starts this in 1995, and it's over in 2005, and the jury

16   found only six toy fairs where trade secrets were unlawfully

17   taken.

18           We also heard that Mattel buried the evidence.

19   The statement was made to the effect that if we don't

20   specifically ask for something, and they object and we don't

21   move to compel, it's Mattel's position that they don't have

22   to give us the documents.  And I think that is not Mattel's

23   position.  I think that's MGA's position.  I think that's

24   the drafters of the Federal Rules of Civil Procedures

25   position.  I think it's the position of practice under Rule

 1    34 in federal court that if there is an objection made, you

 2    don't have to produce the documents unless the parties can

 3    reach an agreement or there is a court order.  And the Court

 4    has seen that this is a –– MGA always took the same

 5    position.  It wasn't an instance of people just voluntarily

 6    producing documents in a vacuum.

 7              And the Court found that, especially with respect

 8    to these toy fair documents in phase one of this case, that

 9    the documents were not relevant then and were not –– Mattel

10    hadn't engaged in any misconduct.  The language from the

11    Court's order is behind Tab 24.  At summary judgment, the

12    Court expressly found that, and I quote, "All of the

13    evidence allegedly concealed by Mattel wasn't relevant to

14    the phase one proceedings and was subsequently produced."

15              And the Court rejected MGA's claim that Mattel

16    improperly failed to produce evidence concerning the market

17    intelligence group prior to the phase one proceeding stating

18    that these allegations have no support in the factual

19    record.  And we did produce –– a statement was made that

20    they didn't get –– wouldn't have gotten any of this

21    information relating to toy fair and Sal Villasenor and

22    didn't get any of it until Mr. Villasenor showed up at his

23    deposition and brought some of the documents with him.  That

24    is simply inaccurate.

25              We've summarized what the facts are behind Tab 23.

1    We produced the 2003 New York toy fair report with Sal

2    Villasenor's name and the New York toy fair 2003 competitive

3    review on the cover on January 2nd, 2008, about 5 or 6

4    months before Mr. Villasenor's deposition, and that's the

5    document they relied on very heavily.  They base their

6    August 2010 toy fair claims in their amended complaint

7    directly on this report.

8              *(Attorney discussion held off the record.)*

9              MR. QUINN:  I'm sorry.

10             Yeah, Mattel also produced --

11             *(Attorney discussion held off the record.)*

12             MR. QUINN:  Yeah, it's pointed out to me that that

13   toy fair 2003 competitive review on which MGA based its

14   August 2010 toy fair claims was produced two and a half

15   years before Mr. Villasenor's deposition.  It was produced

16   on January 2nd, 2008.

17             We also produced other reports with

18   Mr. Villasenor's name on them prior to his deposition, and

19   we've listed some of them behind Tab 23.

20             I'd like to now respond to some of the issues that

21   came up at the end of the last hearing concerning

22   destruction of the Bratz brand, the issue about the attorney

23   fees and the pursuit of the brand and the question the Court

24   raised about return on investment.

25             The Court raised the issue about whether Mattel

 1    destroyed the Bratz brand or intentionally did things that

 2    hastened its demise.  The first response I'd make to that is

 3    that is directly at issue in the other case, the antitrust

 4    case.  That's exactly what's alleged there, that we engage

 5    in litigation to -- set out to destroy the brand.  So we're

 6    talking about an issue here that if it's relevant at all to

 7    this case, and we submit it's not, but if it's relevant at

 8    all, there is a complete overlap.

 9              Second, there is simply no evidence in the record

10    that the misappropriation of the identified 26 trade secrets

11    had anything whatsoever to do with the decline in the Bratz

12    brand.  I mean, that was -- those dots were never connected.

13    There aren't dots to connect.  There is no evidence -- there

14    was no evidence introduced in this trial of injury to MGA.

15    They are not claiming that there was any injury to MGA as a

16    result of the misappropriation of 26 trade secrets.

17              The evidence is the Bratz brand was already in

18    decline as of the time of the first trial.  The Court and

19    the record evidence on this is summarized behind Tab 22,

20    Mr. Malackowski acknowledged that the Bratz brand began to

21    decline in 2006 and lost money, lost money in 2007 before

22    the first trial.  And the source document for this, this is

23    one of his exhibits, Mr. Malackowski's exhibit, and it's

24    based on sales by SKU reports which were admitted in

25    evidence in trial.  So this is a brand that was already in

 1    decline.

 2            Certainly, the legal fees that MGA incurred did

 3    not destroy the brand.  The evidence on that is abundant.

 4    If the Court will turn to Tab 30, we prepared a chart based

 5    on record evidence that MGA -- in the MGA's declaration

 6    regarding attorneys' fees and plotted the fees -- their

 7    account to the fees they incurred against the decline in

 8    Bratz sales, and the Court can see that there's simply no

 9    relationship between the decline of Bratz and MGA's legal

10    fees and costs in its case -- in this case.  Since 2007,

11    MGA's legal fees have varied from year to year, but Bratz

12    sales have dropped precipitously every single year.

13            If the Court will turn to the next tab, Tab 31.

14    Another way of looking at these bar charts, the total Bratz

15    sales and MGA's distributions to Mr. Larian dwarf by a very

16    large margin, MGA's legal fees and costs in this case.

17            THE COURT:  Say that again, please.

18            MR. QUINN:  I'm sorry?

19            THE COURT:  Repeat that.

20            MR. QUINN:  Both the Bratz sales and MGA's

21    distributions to Mr. Larian dwarf MGA's legal fees and costs

22    in this case.

23            THE COURT:  All right.  Just a moment.  Let me

24    look at the chart.

25            MS. KELLER:  Your Honor, we would object that this

 1    is not in evidence, and we don't think it's proper for this

 2    to be submitted to the Court.

 3            MR. QUINN:  We just extracted this from their

 4    declaration of Steven Shultz and their record evidence

 5    concerning the amount of sales.

 6            MS. KELLER:  We also don't think that it's proper

 7    to compare any distribution to Mr. Larian to anything.  It's

 8    completely irrelevant, as it should have no bearing on the

 9    Court's decision.  And that's particularly true in that a

10    lot of this money was plowed back into the company or paid

11    in taxes.

12            And your Honor, it also stops in 2008, so it's

13    very misleading.

14            MR. QUINN:  It's just different ways of addressing

15    the issue of what happened to the Bratz brand, is it because

16    of the litigation, this litigation?  We've shown that the

17    chart behind Tab 30 shows that the decline began in 2007.

18    Their own expert said that they lost money on Bratz in 2007,

19    although the legal fees stayed -- varied somewhat but were

20    fairly constant.  There was a precipitous decline in the

21    sales.  It's very hard to draw up any kind of a connection

22    between legal costs and what happened to the brand.

23            I think it's fair game to wonder, you know, if

24    Mr. Larian took 400, $500 million out of the company, and

25    there is no evidence, by the way, that they plowed any of

 1   that back in, whether that had something to do with what

 2   happened to the brand.  It's at least -- it's at least as

 3   supportable as any other hypothesis one might come up with.

 4            And then behind Tab 32, based on the record

 5   evidence, all but 70 million of MGA's attorneys' fees have

 6   been reimbursed by insurance, and of that 70 million, MGA

 7   has never paid some untold amount to the remaining balance

 8   to the Orrick firm according to the declaration filed by

 9   Ms. Hurst last week where she says that -- have been told

10   that not only has Mr. Larian not paid them, but even if

11   there is an award of attorneys' fees, she indicates in her

12   declaration that Mr. Larian has said that those won't be

13   paid to the Orrick firm either.

14            MS. HURST:  Okay.  Number one, that declaration

15   was submitted today, and we object to that.  It's irrelevant

16   to this proceeding.  But second of all, I can absolutely

17   state unequivocally that is not what it says, and that is a

18   total mischaracterization.

19            MR. QUINN:  And then another way of looking at

20   this, if we look at Tab 33, the question, "Did attorneys'

21   fees cause the death of Bratz?"  And this is all based on

22   record evidence that we've cited there at the bottom.

23            THE COURT:  And 33?

24            MR. QUINN:  Yeah, Tab 33.

25            THE COURT:  I just have a blank.

 1          MR. QUINN:  Thirty-four, too?

 2          THE COURT:  I've got 34, but there is no 33.

 3          MR. QUINN:  So we need 33.

 4          Do you have 33?

 5          THE COURT:  There is no 33.

 6          Thank you.  33 starts "Litigation to death."  I

 7    have that.

 8          MR. QUINN:  So the record evidence shows that

 9    Bratz total sales in 2010, 3.4 million; profits,

10    792 million; Mr. Larian's distributions --

11          THE COURT:  This one has -- okay.  Thank you.

12          Please continue.

13          MR. QUINN:  Mr. Larian's distribution's

14    399 million.  Now, these numbers on legal fees were -- were

15    backing into this number based on what they have told us.

16          Total fees and cost claimed in their motion,

17    $171 million, less insurance proceeds of $101 million,

18    that's an extrapolation because they claimed that they've

19    been out of pocket $70 million, so we are assuming the

20    difference between $171 million and $70 million represents

21    insurance proceeds, if the Court follows me.

22          We know it's a matter of public record that

23    O'Melveny's is a contested issue of $10 million in fees.  We

24    are estimating what the issue is with respect to the Orrick

25    firm's fees.  We don't know, but this is a guesstimate, if

```
 1    you will.  The total potential fees, then, paid or owed by

 2    MGA --

 3              THE COURT:  What about Ms. Keller?

 4              MR. QUINN:  We don't know.  I mean, we've kind of

 5    lumped them into the $42 million.  I mean, they --

 6              MS. KELLER:  Your Honor --

 7              MR. QUINN:  Ms. --

 8              MS. KELLER:  -- I will represent to the Court that

 9    Mr. Larian is current on his bills to me.  He is

10    absolutely -- it is absolutely untrue that we have not been

11    paid.  We have been paid timely on three different

12    installments, and I fully anticipate the fourth on which he

13    is now late will be paid, and so that is simply not true.

14              MS. HURST:  Your Honor, this thing is a total

15    mischaracterization of the record and the facts, and we

16    strongly object to it.

17              THE COURT:  Okay.

18              MS. HURST:  It's just wrong.  It's wrong based on

19    the face of the Shultz declaration --

20              THE COURT:  All right.  Thank you.

21              MS. HURST:  -- and the motion.

22              THE COURT:  Mr. Quinn, please continue.

23              MR. QUINN:  And then, finally, Tab 34, is this

24    something that, Ms. Estrich, you were going to address?

25              MS. ESTRICH:  The fees, yes.
```

Case 2:04-cv-09049-DOC-RNB  Document 10626  Filed 06/02/11  Page 43 of 70  Page ID #:322160
CV 04-9049-DOC - 06/01/2011 - Vol. 1 of 2

43

 1            MR. QUINN:  All right.  Yeah, so I will stop now

 2   because I think Ms. Estrich is going to address that.

 3            *(Attorney discussion held off the record.)*

 4            MR. QUINN:  All right.  Your Honor, Ms. Hurst's

 5   declaration dated May 26 in paragraph 8 states that Ms.

 6   Keller has not been paid.  That's where that came from.  She

 7   says, "MGA has multiple creditors in addition to Orrick,

 8   including law firms such as O'Melveny and Myers, Skadden

 9   Arps, and Keller Rackauckas, as well as Omni" -- "Lender

10   Omni 808.  In addition, MGA's insurance carriers are

11   asserting a right to recovery of proceeds."

12            So that's -- I may be misinformed, but that's

13   where I got the notion that Ms. Keller also may not be

14   current, but apparently she is -- she is current.

15            But then the numbers on this chart behind Tab 33,

16   we were estimating the unpaid amount to the Orrick firm

17   based upon Ms. Hurst's declaration, which we did not

18   include -- I'm told now that did not include the Keller or

19   the Skadden firm, which apparently also has an unpaid fee.

20            So I just don't think that the record supports the

21   notion that costs of legal fees has litigated MGA to death

22   or is responsible for the decline in the Bratz -- in the

23   Bratz brand.

24            The Court raised the question about the -- the

25   return on investment.  If, hypothetically speaking, MGA's --

1    or Mattel's fees have been $400 million, how does one

2    justify that, other than perhaps some desire to litigate in

3    order to destroy the brand or to destroy MGA?  I have

4    several responses to that, your Honor.

5              First, this, again, is squarely an issue in the

6    other case, the antitrust case, if this matters here at all,

7    if there is a huge overlap.  And we don't think it matters,

8    and as I recall, Ms. Keller also thought it didn't matter

9    for purpose of this proceeding.  But if it matters at all,

10   there is a huge overlap between the two cases.

11             There is no evidence, of course, that our legal

12   fees are anywhere near $400 million.  If the Court turns to

13   Tab 29, I think the Court will see where that name -- number

14   came from.

15             MS. HURST:  Actually, this is another

16   misrepresentation of the record.  That never came from

17   Exhibit E to my declaration, where an industry analyst BMO

18   Capital Markets Analyst Garrett Johnson was quoted as

19   "Mattel having spent $400 million."  So this exhibit is

20   offered for no purpose other than an effort to prejudice the

21   Court.

22             THE COURT:  It's an argument.

23             Counsel, Mr. Quinn?

24             MR. QUINN:  Your Honor, Mr. Larian -- this is an

25   e-mail Mr. Larian offered, referring to this $400 million

 1    number.  Maybe he got it from somewhere else.  I can tell

 2    the Court it's nowhere near accurate.  I mean, our actual

 3    fees are considerably -- considerably less than that.  So to

 4    the extent the Court is posing the question, "If you spent

 5    $400 million" -- I'm just advising the Court that that is

 6    not a realistic -- anywhere near, I will represent -- it's

 7    nowhere near a realistic number of what the -- Mattel's

 8    legal costs have been in this case.

 9            But, I think, focusing on the damages and what the

10    potential recovery would be and the potential return on

11    investment also has to take into account in an IP case what

12    the value would be if the brand could be recovered and what

13    could be done with that and what that is worth, what the

14    intellectual property is worth, wholly, apart from the

15    damages.

16            At the first trial, we had a jury instruction

17    regarding -- we didn't have a fiduciary duty claim in this

18    case.  We did at the first trial, and there was a jury

19    instruction that any benefit obtained as a result of the

20    breach of fiduciary duty should be returned, and we attached

21    a number to that, and it was a realistic number, in the

22    sense that it was supported by evidence in the record of

23    over $2 billion in terms of the value.

24            For a moment in time, it seemed like we had that,

25    and Mattel was prepared to bring that product to market

Case 2:04-cv-09049-DOC-RNB   Document 10626   Filed 06/02/11   Page 46 of 70   Page ID #:322163
CV 04-9049-DOC - 06/01/2011 - Vol. 1 of 2

46

 1   until there was a decision from the Ninth Circuit.  So in

 2   terms of return investment, the Court, I submit, also has to

 3   look not only at damages recovery, but the value of the

 4   intellectual property and exploiting the intellectual

 5   property.

 6          On the other side, the Court, I think, also has to

 7   look at the defensive value of having the intellectual

 8   property.  It will come as no surprise -- I mean, there was

 9   a claim in this case at one point that Mattel's MyScene

10   product was a knockoff, as it was put, of Bratz, and Mattel

11   was sued for that.

12          Now, obviously it would be a perfect defense to

13   any such claim if Mattel owned Bratz.  We could hardly be

14   accused of knocking off Bratz if we owned Bratz.  So in

15   terms of assessing the values at stake, I submit it's also

16   appropriate to take into account the defensive value of the

17   ability to own and control that intellectual property.

18          Also, the Court cannot -- I don't think it's

19   really possible to assess motives and return on investment

20   and decisions about going forward or not going forward

21   without some knowledge of what it would take or whether it

22   was possible to disengage and end the whole process, and

23   that, of course, is the subject that we can't get into

24   detail before the Court.  The Court does know that there

25   have been -- at different points, there were discussions.

1    The Court does know that Mr. Larian said in no uncertain

2    terms in this Court, in graphic language, "I will never

3    settle with you."

4             So in terms of what Mattel did or could do once it

5    was involved in this case, the Court doesn't have a complete

6    picture without knowing what the relative positions of the

7    parties were, or would be, with respect to disengagement or

8    resolution outside of court.  I will point out that MGA has

9    now sued Mattel three times for billion-dollar amounts, the

10   antitrust case being the third and most recent example.  So

11   whatever Mattel's attorneys fees have been, they've also

12   included defending two, now three, multi-billion-dollar

13   claims brought by MGA.

14             If I could just have one moment, your Honor.

15             (Attorney discussion held off the record.)

16             MR. QUINN:  Just in conclusion, an award of

17   exemplary damages, even in the face of a finding of

18   willfulness, is not automatic.  This Court has discretion to

19   decide whether or not, under all the circumstances of this

20   case, an award of exemplary damages is appropriate.  And we

21   submit, your Honor, that under the facts of this case, in

22   view of the substantial compensatory damages award, in view

23   of the novelty of some of the issues, in view of the total

24   lack of evidence of any harm to MGA, and the other things

25   I've mentioned, we respectfully submit that this is not an

 1    appropriate case for the award of exemplary damages.

 2              THE COURT:  Why don't we take a recess, Jane, so

 3    you can rest your hands.

 4              Would 20 minutes be okay?

 5              MS. ESTRICH:  That would be fine.

 6              THE COURT:  All right.  Then we'll see you in 20

 7    minutes, counsel.

 8              *(Recess.)*

 9              THE COURT:  Okay.  Ms. Estrich.

10              MS. ESTRICH:  I covered -- addressed the fee issue

11    last time, and we agreed on -- our side agreed that if she

12    wished to do so, although we had thought it was done, that I

13    would, in turn, respond.

14              MS. KELLER:  Your Honor, just to clarify the

15    record, I only addressed the fees, the $6 million worth of

16    fees, on our affirmative claim under the Trade Secrets Act,

17    because that had not been addressed.  I didn't address any

18    other fee issue.

19              MS. ESTRICH:  Your Honor, first of all, on CUTSA

20    fees, I would like to incorporate Mr. Quinn's argument

21    because many courts have held that in considering fees, many

22    of the same considerations apply, as with punitive damages,

23    but my focus, having done so, is really the fees issue in

24    CUTSA and how we think of our attorneys' fees.

25              I want to highlight a couple of basic problems

CV 04-9049-DOC - 06/01/2011 - Vol. 1 of 2

49

 1   that I see with Ms. Keller's argument, particularly as

 2   enlightened by Ms. Hurst's declaration.

 3            I also want to explain to the Court why I filed

 4   that declaration this morning, since I was criticized for

 5   doing so.  We received the Hurst declaration on Friday.  We

 6   asked our team to evaluate it carefully over the holiday

 7   weekend to determine its relevance of the issues presented

 8   here.

 9            I received a copy of that memorandum yesterday,

10   evaluated it to see whether the points raised would fit with

11   the argument I'm planning to give today, and as a courtesy

12   to the Court, rather than stand up here quoting a

13   declaration that the Court did not have, we believe that

14   because it was directly relevant to the issues today, that

15   the Court deserved to see it.  So I apologize if we didn't

16   give the Court more notice than this morning, but I didn't

17   want to file it until I knew that I was going to use it in

18   this discussion and that it was relevant.

19            I think there are a number of problems that I

20   would suggest to you with the analysis on the CUTSA fees.

21   The first is the question of apportionment.  We discussed

22   apportionment in connection with copyright fees.  In this

23   case, while the numbers are lower, the arithmetic is harder.

24   We're dealing here, as Ms. Keller points out, with the claim

25   first made in August 2010, and yet Orrick is asking us for

 1   every penny on affirmative claims going back three years.

 2   Were that not bad enough, we're getting hit -- or they are

 3   asking us to pay for O'Melveny's work on any affirmative

 4   claims going back six years.

 5           It appears we are being asked to pay fees that may

 6   not relate to the CUTSA claim at issue here because I'm not

 7   at all sure that that's what O'Melveny was working on six

 8   years ago, and if they were, we've got a real question as to

 9   why they waited until August of 2010 to raise it.

10           More to the point, we know that O'Melveny is out

11   $10 million, and so if we are being asked to pay O'Melveny's

12   fees for six years, I think it's fair to ask, and I'll

13   discuss this a little bit more, to pay those fees?  Did

14   anybody pay those fees?  Did insurance pay those fees?  Does

15   anyone ever intend to pay those fees?  Or is Mattel being

16   asked to simply provide a windfall to Mr. Larian, "Here,

17   here is a check.  You don't have to pay it to your lawyers.

18   You can keep it for yourself."  That is a significant

19   problem, and we are, frankly -- and I'm going to hit this

20   over again, and I apologize for doing so, but we are

21   somewhat in the dark, your Honor.

22           We received a declaration Friday that is at odds

23   in critical respects with the information we had to date,

24   including now knowing of all these bills that haven't been

25   paid.  I'll get back to that in a minute.

Case 2:04-cv-09049-DOC-RNB   Document 10626   Filed 06/02/11   Page 51 of 70   Page ID #:322168
CV 04-9049-DOC - 06/01/2011 - Vol. 1 of 2

51

1    The failure to apportion between claims is echoed

2  and, frankly, made worse by the failure to apportion between

3  what you lost and what you won.

4    Now, in this case, as the Court well knows, they

5  won 26 of the trade secret claims, and, as Ms. Keller said,

6  we're only talking about the trade secret claims here.  They

7  won 26 or 25, however many the Court should ultimately

8  decide, and they lost 88.  And there was substantial

9  authority -- I might cite an opinion of yours, with all

10  respect, if you don't mind, but there is substantial --

11    THE COURT:  Was I affirmed on it or reversed?

12    MS. ESTRICH:  I think it's brilliant; I don't

13  know.  It was right.

14    (Laughter.)

15    MS. ESTRICH:  In the EOS -- look, I tell my

16  students, "The Court, I don't always agree with courts."

17  You may still be right.

18    In the EOS GmbH Electro Optical Systems, the DTM

19  Corporation case, this Court wrote that "Some of the parties

20  seeking fees have not even met" -- has not met -- "even its

21  most minimal burden of showing entitlement to any fees or

22  costs," because in that case, it had redacted the work

23  descriptions in its invoices and failed to apportion between

24  its successful trade secret claims and lost their abandon

25  claim.

1          Now, it's not even just the 88, your Honor.  I

2    recall when Mr. Larian was telling everyone that he had

3    billion-dollar claims against us, affirmative billion-dollar

4    claims, that his claims were worth as much or more than

5    ours.  Well, in addition to the 88 they lost, they lost the

6    wrongful injunction claim, they lost the trade dress

7    infringement claim, or they -- based on trapezoidal

8    packaging and "Forever Best Friends," there was the trade

9    dress delusion claim based on, I guess, trapezoidal

10   packaging as well.  There was an unjust enrichment claim.

11   There was a common law unfair competition claim, not to

12   mention my very favorite claim, the RICO claim.  And they

13   are charging us or seeking fees for all affirmative claims,

14   and that's how the coding, at least as best we can tell,

15   because as Mr. O'Brien knows, we don't have access to a lot

16   of details, but the way they've coded things, we just have

17   no way of knowing which of these affirmative claims or how

18   much money in these affirmative claims was actually used to

19   win the 26 and how much was used to lose the 88 or on the

20   RICO claim or on some of these other trade dress claims and

21   delusion claims, the wrongful injunction claim, the unjust

22   enrichment claim.  I actually can think of a few more.

23          If Mr. Larian is taken at his word that the

24   affirmative claim was worth billions, then even what I view

25   as a very high and excessive award of damages on the 26

1    trade secrets amounts to only 4 percent of the billions he

2    was going to get.  So -- so I know last week the Court was

3    concerned and asking some questions as to, you know, how we

4    were -- you know, our recovery versus expenses, et cetera.

5    That's a game that two can play, and their recovery and

6    their partial victory, at least, requires apportionment,

7    your Honor.  There is no authority that one can cite, at

8    least that I know of, that says that we have winning claims

9    and losing claims.  You get all the money you spent on both.

10           There is a third -- a fourth issue I wanted to

11   address, and that's this whole question of compensation and

12   deterrence.  Ms. Keller said in court -- let me see if I can

13   find it right here.  Ms. Keller said in court that, you

14   know, "We have lawyers" -- I'll find the exact quote -- but,

15   "We have lawyers that need to be" -- somebody is handing it

16   to me in my hand -- "that they are deserving of

17   compensation."  MGA has argued that we should be compensated

18   for fees incurred in connection with the claims that Mattel

19   serially copied MGA products.

20           Your Honor, contrary to -- I mean, I don't know if

21   Ms. Keller has been paid her fees or not.  Ms. Hurst --

22   Ms. Hurst says she hasn't.  Ms. Keller says she has.  Who

23   are we compensating, your Honor, and who are we deterring

24   if, in fact, as Ms. Hurst has declared, the attorneys here

25   from Skadden, which is owed money, O'Melveny, owed

 1    $10 million, Orrick owed I have no idea how much, but

 2    certainly enough to make them file this motion to withdraw?

 3    How do you add it up?  Who are we deterring and who are we

 4    compensating?

 5             If Ms. Hurst is correct in her declaration, and I

 6    have no reason to doubt it, that they are not going to get

 7    any of the fees that you award, then what we are really

 8    doing here is providing a windfall to Mr. Larian.

 9             There is no authority, and, indeed, I can cite you

10    contrary authority, for the proposition that you are allowed

11    to get a windfall.  You are not allowed to get a windfall.

12             Ms. Hurst alleges in her argument, she said,

13    "Insurance is not going to get a single penny of this.  It

14    is absolutely" -- and I quote from oral argument of last

15    Thursday, "It is absolutely MGA's position that the

16    insurance companies will not be entitled to funds awarded on

17    a fee motion."  But then I turn around and I read her

18    declaration, and it says that "One of the reasons Orrick

19    expects to receive nothing in this fee award is because

20    there were so many other people and firms and entities that

21    it expects to be potentially fighting for that same award."

22             And I quote from paragraph 8 of Ms. Hurst's

23    declaration, "MGA has never indicated that it is willing to

24    use the proceeds from its anticipated judgment to pay

25    Orrick's fees.  Moreover, given the likelihood of an appeal,

1    Mattel's ability to post bond," blah-blah-blah, "it will be

2    years before MGA actually receives any judgment.  MGA has

3    multiple creditors in addition to Orrick, including law

4    firms such as O'Melveny and Myers, Skadden Arps," and I'm

5    glad to hear you've been paid, "and Keller Rackauckas, as

6    well as" our old friends "Lender Omni 808.  In addition,

7    MGA's insurance carriers are asserting a right to recovery

8    of proceeds they have paid for MGA's defense."

9            So we are in a position, your Honor, where we

10   literally don't know who we are paying; we don't know how

11   much Mr. Larian has paid anybody.  The arguments for

12   compensation and deterrence, with all due respect, fly out

13   the window here.  As far as we know, the lawyers are not

14   going to be compensated.  It was argued to you, your Honor,

15   both in the papers and Ms. Hurst's argument, that "We will

16   never get lawyers to take on cases; we will never get

17   private firms to represent indigent defendants if they don't

18   have some prospect of actually receiving attorneys' fees."

19           But Mr. Larian isn't planning to pay, according to

20   Ms. Hurst, much of his attorneys' fees.  Indeed, as we wait,

21   potentially the law firm number 14, or maybe we'll still be

22   on 13, it's clear that Ms. Hurst's list of the potential

23   creditors -- she doesn't say these are all the creditors.

24   She says, "These law firms 'include'" -- "it 'includes' law

25   firms."

 1            I have no idea how many law firms there are out

 2    there, but I do know that Ms. Hurst has said to us that at

 3    least her law firm, which, with great respect, has done the

 4    bulk of the work in the case for the last two years, has

 5    achieved significant benefits for Mr. Larian, that

 6    notwithstanding all that, she says, "Despite this track

 7    record of success," I read from paragraph 6, "MGA has

 8    refused to pay Orrick in full for its work in the Mattel

 9    action and for a variety of other matters.  To the contrary,

10    MGA has indicated that it will not pay Orrick and has no

11    plans to do so at the present time."

12            Your Honor, if they are not going to pay Orrick,

13    why should we?  We are -- the issue here is attorneys' fees.

14    It is intended by Congress in certain circumstances to

15    provide just that sort of incentive for attorneys to take on

16    legitimate but otherwise nonpaying cases.

17            The only exception to the general principle that

18    fees should relate -- attorneys' fees awards should relate

19    to the attorneys' fees that have been paid, the only

20    exception I have found is in the pro bono or house counsel

21    context.  And, of course, there, when you have pro bono

22    counsel, the very notion is they are not going to be paid,

23    but -- by the client, but the hope is and the incentive is

24    that if they triumph and if the cost is fair, attorneys'

25    fees will be paid.

1            But while I don't want to go into a long diatribe

2    about this, the Third, the Seventh, and the Second Circuits

3    have all held that the actual arrangements, whether there

4    are discounts given, what the actual billing arrangements

5    are, the actual payment arrangements, that that must be

6    taken into account in considering an attorneys' fees.

7    Indeed, the reality of whether they are going to be

8    collected and who they are going to be collected by and who

9    is going to get the money are critically relevant.  As one

10   court said, "They may not be absolutely determinative, but

11   the argument that it isn't relevant to attorneys' fees was

12   that the attorneys have been paid, are going to be paid,

13   will ever be paid, it is at least significant."

14           And my best case goes beyond that from the

15   Southern District of New York, and we'll be happy to provide

16   you these citations, and says that "What you actually pay is

17   the cap, the absolute cap, on what you can get for

18   attorneys' fees," and that's the CNN case.  It's a Video --

19   let me find it right in this pile here.

20           Oh, this guy is so good.

21           Video -- let me say it slowly, Video-Cinema Films,

22   Inc. v. CNN, 2004, WL 213032 at 4-5.

23           But there are a whole host of other cases,

24   including circuit cases, saying that "Even if it's not an

25   absolute cap, it is a relevant and significant figure."

1        And my assistant tells me that I can quote you

2   Crescent Publishing Group v. Playboy, 246 f3d 142, 150.

3   That would be the Second Circuit, 2001.

4        Then I can quote you Lieb, L-i-e-b, v. Topstone

5   Industries, Inc., 788 F.2d 151, 156, Third Circuit, 1986.

6        The direct quote from Lieb is that "A sum greater

7   than what the plaintiff" -- "the client has been charged may

8   not be assessed, but the award need not be that large.

9        In the Yahoo case, Northern District of

10   California, Yahoo! Inc. v. Net Games, Inc., 329 F.Supp. 2d

11   1179, 1183, Northern District of California, 2004, the Court

12   says, "The Court must take into consideration discounts

13   commonly given to clients and in attorneys' ability to

14   collect fees from its client," the Yahoo case in the

15   Northern District.

16        The Court goes on to say, "Nothing is said about

17   discounts given clients, writeoffs of time, collection

18   experience, or a whole host of other matters that determine

19   the attorneys' fees that actually prevail in the market."

20        "Paying a client's" -- "paying a client's

21   attorneys' fees that is not intended and will not be used to

22   pay its attorneys," the Court said in the Video-Cinema case,

23   "creates an unfair and impermissible windfall."  The Court

24   finds in that case -- this is a direct quote -- that

25   "Awarding more than CNN paid, pursuant to the fee agreement

1    here, would amount to a windfall for CNN and a penalty

2    against plaintiff."

3           Your Honor, the truth of the matter is we don't

4    know for sure.  As Mr. Quinn attempted to do in his chart,

5    we attempt to extrapolate numbers, but we don't know for

6    sure based on Ms. Hurst's declaration exactly how much MGA

7    owes the Orrick firm and doesn't intend to pay.  But we do

8    know that it is a significant amount, sufficiently

9    significant, as you read Ms. Hurst 's declaration, to

10   justify filing a motion to withdraw, making it clear the

11   state on attorneys' fees, even as we were arguing this

12   motion, and we are literally -- Judge Larson once said of

13   MGA's finances that he felt like it was a mystery that he

14   couldn't figure out, and that's why he appointed an auditor.

15          We've got another mystery here, but I would

16   submit, your Honor, that before you can award attorneys'

17   fees, at the very least, we need to know whether we are

18   being asked to pay fees that have not been paid, that may

19   not ever be paid, that Mr. Larian obviously chose not to pay

20   over literally the last six years, when we talk about

21   O'Melveny.

22          And when you talk about what a case is worth, your

23   Honor, and you were asking earlier if Mr. Quinn and

24   others -- you know, are our fees really $400 million for a

25   $40 million recovery, I should tell you that as best we've

1    been able to trace, the $400 million appears in e-mail after

2    e-mail sent by Mr. Larian to analysts and the press.  We

3    would be happy to document that, but it certainly doesn't

4    come from us, nor is it a figure which we believe to

5    accurately reflect our fees.  But in any event, it is

6    utterly irrelevant because we are not challenging the hourly

7    rate again, and we are not challenging the number of hours

8    per se.  The Court remains and retains discretion to do --

9    to evaluate everything, but we are not challenging that.

10          The final question I want to address, at least in

11   this section, is whether the Court can direct how the fees

12   are paid, because one obvious answer to the problem might

13   be, "Well, why don't we pay Ms. Hurst instead of giving a

14   windfall to Mr. Larian?  Why don't we pay Skadden instead of

15   giving it to Mr. Larian?  Why don't we pay O'Melveny?"  And

16   the short answer is, your Honor, "You do not, for better or

17   for worse, have the authority to direct that fees be paid to

18   an attorney."

19          The law states, "Section 505 permits a court in

20   its discretion to award attorneys' fees, but the Section

21   clearly provides for a fee award to be paid or to be made to

22   a prevailing party, not directly to counsel," and there are

23   numerous cases so holding, including the Crescent Publishing

24   Group case v. Playboy.

25          Now, there are statutes that allow you to

 1   attorneys' fees directly to attorneys.  That would be

 2   Section 1980A, where the Court is specifically authorized by

 3   statute to award attorneys' fees to attorneys.

 4          Section 505 of the Copyright Act clearly provides

 5   for a fee award to be made to a prevailing party, not

 6   directly to counsel.  We have found no authority that says

 7   that there is any different rule under CUTSA.  In other

 8   words, whatever fee award is to be given here is given to

 9   Mr. Larian.

10          Ms. Hurst in her declaration suggests further that

11   once an award is given, we are going to have a lot of people

12   competing for it, and that is going to have to be resolved,

13   but the attorneys sitting here are not the only attorneys

14   with claims.

15          MGA, as Ms. Hurst points out in her declaration,

16   has other creditors, some of whom are secured creditors.  We

17   don't -- we haven't seen the security agreements on all of

18   those.  We don't know if any of them would have a right that

19   was superior to the rights of any of these lawyers, and,

20   frankly, it would be a due process violation.  In addition

21   to the fact that the statute doesn't authorize you to

22   reimburse them directly, it would be a due process violation

23   to cut off the rights of superior lien holders and others.

24          So I would simply submit, your Honor, that in this

25   circumstance, you have tremendous discretion.  We can delve

 1    deeper in an effort to figure out what was paid, what

 2    wasn't, who it was paid to, and what the attorneys' fees

 3    really are here.

 4            We can delve deeper to figure out what's going on

 5    with the insurance.  We know insurance has paid a

 6    substantial amount.  We have heard directly conflicting

 7    testimony from MGA, one saying -- Ms. Hurst saying Thursday,

 8    "Insurance is not going to get a dime," and then she says

 9    today, "Insurance is going to come in and try to get some of

10    this award."  I don't know.

11            The other way we could proceed, and the way we at

12    Mattel obviously believe we should proceed here, is given

13    that there is very little case for compensation and

14    deterrence, given that nobody got paid, nobody got paid by

15    Mr. Larian, and, indeed, the fee award is a little up in the

16    air because, you know, when you pay your fees, it might be a

17    rational measure of the value of the claim, and

18    blah-blah-blah, but if you hire lawyers not intending to pay

19    them, then they disappear or they go off or they quit or you

20    fire them and they bring a lawsuit or, as Ms. Hurst

21    suggests, arbitration.  Who deserves compensation here?

22            Mr. Larian is going to get it, but why does he

23    deserve it?  Attorneys' fees, you read all of the history of

24    attorneys' fees, are not assumed to be a sort of, "Well, I

25    got what I got on compensation, I got what I got here, so

1   let me get some more money by submitting bills that were

2   never paid and then I never intended to pay so I can get

3   these guys over here to pay them instead."

4           I would submit to the Court that this is a case

5   not so different from O2Micro.  You have discretion.  In

6   O2Micro, the Court said, "Look, you've got compensation" --

7   in that case, they even got punitive damages under CUTSA --

8   "but when it comes to attorneys' fees" -- let's get serious

9   here, folks, he said, "you guys have been changing your

10  claims.  You won some; you lost some.  You've lost some that

11  you've won.  You know, you raised them.  They changed over

12  time."

13          And the Court in that case said, "This is

14  discretionary.  You may not have the discretion" -- "you do

15  not have the discretion to direct the award of fees to a

16  particular party, but you certainly have the discretion to

17  decide whether to grant fees or not."

18          And in a situation like this, where we have so

19  much difficulty figuring out what the numbers even are,

20  where Ms. Hurst's declaration makes clear that fees were not

21  necessary for Mr. Larian to get representation, he got 13

22  law firms and may end up with a 14th.

23          Where we are completely unclear on insurance

24  coverage, on who the fees would go to, on -- we're inviting

25  a second proceeding here, that it is well within the Court's

```
 1    discretion under O2Micro to conclude, as did the Ninth
 2    Circuit on costs, that these are reasonable claims that were
 3    raised by Mattel, that MGA's CUTSA claims achieved at best a
 4    very partial success, that there were numerous other claims
 5    for which they are seeking fees under CUTSA that weren't
 6    CUTSA claims anyway, trade dress claims, wrongful injunction
 7    claims.
 8             Where the numbers don't add up, where the fees
 9    don't serve compensation and deterrence, where we don't even
10    know what was paid, where lead counsel has told us, declared
11    under penalty of perjury, that she has no expectation on
12    being paid the very substantial amounts owed for the work in
13    this trial, notwithstanding what I would say is the
14    excellent and hard work of Orrick and of all the firms, then
15    this is precisely the case where it is only fair and,
16    frankly, only practical, short of major proceedings before
17    the discovery master or your Honor, that this is precisely
18    the case for a discretionary decision not to award fees.
19             Thank you very much.
20             THE COURT:  Thank you.
21             And --
22             MS. KELLER:  Your Honor, may -- Ms. Hurst will
23    address the fees issue first, and then I will address Ms.
24    Estrich's points.
25             THE COURT:  You may.  You may split the time.
```

1              MS. HURST:  Thank you, your Honor.

2              THE COURT:  Now, 5:00 for today's session is where

3    we are.  Today ends it.

4              MS. HURST:  Excuse me, 5:00 ends it?

5              THE COURT:  5:00.

6              MS. HURST:  We intend to be finished by then.

7              THE COURT:  Well, that doesn't mean the opposition

8    will be.

9              MS. HURST:  In the second Ninth Circuit decision

10   in "Fantasy v. Fogerty, 94 f3d 553," after the Supreme Court

11   had adopted the evenhanded approach in that case, the Ninth

12   Circuit said, and I quote, "The District Court found that a

13   fee award was appropriate to help restore to Fogerty some of

14   the lost value of the copyright he was forced to defend."

15             The Ninth Circuit held, after characterizing the

16   basis for the fee award, "Thus, since the reasons given by

17   the District Court in this case are well founded in the

18   record, and in keeping with the purposes of the Copyright

19   Act, we affirm:

20             The purpose of a compensatory fee award" -- a

21   compensatory fee award -- "when measured by the purposes of

22   the Copyright Act, is to," quote, "help restore some of the

23   lost value that the defendant was forced to defend."

24             Now, that is the legal standard governing this

25   motion.  It is not, and I say this advisedly, that

1   disgusting parade of horribles that Ms. Estrich just tried

2   to perpetrate on this Court, one of the worst violations of

3   the collateral source rule that I've ever heard, and in

4   obvious deliberate attempt to sew discord, it was completely

5   inappropriate, and, you know, frankly, was in keeping with

6   the hallway scrum that Ms. Estrich engaged in where she

7   dragged Mr. Larian's youngest son in front of the press and

8   had him commenting out there.  This is what we have come to

9   expect now from Ms. Estrich.  That was a despicable

10  recitation and completely irrelevant to the legal standards

11  governing this motion.

12          THE COURT:  No, let's stop with the personal

13  attacks.  I think it's not appropriate.

14          MS. HURST:  MGA's evidence on this motion of the

15  fees that it has incurred are set out in multiple portions

16  of the evidentiary record.  The declaration of Steven Shultz

17  sets out in detail that the fees were incurred.  That is the

18  appropriate legal standard, even as quoted by Ms. Estrich

19  from the CNN case where, when she read it, said, "The fees

20  charged."

21          MGA can't pay the balance of its fees because

22  Mattel has driven it to near bankruptcy in this litigation.

23  It's precisely because of Mattel's over-litigation, use of

24  litigation as a weapon, use of the expense of litigation as

25  a weapon, which it seeks now to continue to do by denying

1   MGA compensation for its legal fees, that MGA can't pay the

2   balance of its fees owed to various law firms.

3           It is a matter of public record in this case and

4   in the insurance proceedings, and the Court well knows that

5   there is still a massive amount of debt on MGA's books, book

6   value of the Omni 808 assumption of the Wachovia loan in

7   excess of $300 million.  Of course, of course there can be

8   no present expectation of payment, no judgment has been

9   entered in this case, and MGA is in a terrible situation

10  precisely because Mattel put it there, and to argue that

11  that's somehow a basis for denying compensation is

12  atrocious.  That is to take the injury that they have

13  inflicted and to wield it as a basis for denying

14  compensation.  It's outrageous.

15          Yes, the fee award goes to MGA, and MGA will

16  choose, in light of its own business purposes, its

17  obligations and otherwise, how to structure any payments out

18  of those fee awards, and it's perfectly entitled to do so,

19  and under no circumstances is that a basis for denial of

20  fees, nor is it a windfall.

21          There is no case authority supporting the

22  proposition that because MGA has many creditors and will

23  have to figure out how to best structure its payments, that

24  would be a basis of denial of fees, nor is it any surprise

25  to the Court, I'm sure, that MGA and its insurers dispute

1    whether they have a right to recovery under Bus.  Of course,

2    MGA disputes that and asserts that it's entitled to the

3    proceeds.  It maintains a bad faith action against a number

4    of its insurers -- that's no surprise -- nor is there any

5    inconsistency in noting that this is a disputed position.

6            The standard is whether the award would further

7    the purposes of the Copyright Act.  You know, thank God MGA

8    was able to juggle its obligations long enough to get

9    quality representation and keep Bratz in the market.  Surely

10   it was no thanks to Mattel, and that is precisely the

11   circumstance under Fantasy v. Fogerty where an award is

12   appropriate.

13           Now, as to Mattel's expenditure of fees, Exhibit E

14   to the Hurst declaration was an article published by the

15   Associated Press quoting an analyst who follows the industry

16   as having said, "Mattel spent $400 million," on April 22nd.

17   That didn't come from some May 26th e-mail of Mr. Larian.

18   It's hearsay, but the analysts follow and read their public

19   securities filings and have a basis for making these

20   estimates.  Most importantly, we've now heard two of their

21   lawyers stand up this afternoon and affirmatively assert

22   that they spent less than that.  They have placed at issue

23   directly in this proceeding now the amount that Mattel spent

24   on fees.

25           And it is relevant to objective reasonableness as

1    well as the reasonableness of the expenditure here.  They

2    could say how much it was if they thought it helped their

3    position.  The fact that they don't come forward with the

4    evidence warrants an inference against them on objective

5    reasonableness.  They have the evidence in their control.

6    They've repeatedly refused to come forward with it, despite

7    trying to be half pregnant with asserting, "Well, it's

8    somewhere less than $400 million."  Obviously, it would not

9    be good for them to introduce that evidence.

10           In addition to the Shultz declaration, there were

11   multiple transcripts of testimony submitted from witnesses

12   concerning fees incurred by MGA on its behalf in connection

13   with its defense of this suit.  The notion that this is

14   somehow money that is not owing is absurd, and beyond that,

15   the rest is irrelevant.  It's irrelevant and inflammatory,

16   and it's nothing more than a base attempt to infer

17   prejudice.

18              *(Live reporter switch with Maria Dellaneve.)*

19                           -oOo-

20

21

22

23

24

25

1                              -oOo-

2                          **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5     Title 28, United States Code, the foregoing is a true and

6     correct transcript of the stenographically reported

7     proceedings held in the above-entitled matter and that the

8     transcript page format is in conformance with the

9     regulations of the Judicial Conference of the United States.

10

11    Date:  June 2, 2011

12

13

14    _____

15    JANE C.S. RULE, U.S. COURT REPORTER
      CSR NO. 9316

16

17

18

19

20

21

22

23

24

25