Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL INC., et al.,          )
                              )
                Plaintiff,    )
                              )        MOTIONS
          vs.                 ) No. CV 04-9049-DOC
                              )        VOLUME 2
MGA ENTERTAINMENT, INC.,      )
                              )
                Defendant.    )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

WEDNESDAY, JUNE 1, 2011




Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

 1    **APPEARANCES OF COUNSEL:**

 2    **FOR THE PLAINTIFF:**    QUINN EMANUEL URQUHART OLIVER & SULLIVAN
                                BY:  MICHAEL ZELLER, ESQ.
 3                              and  JOHN QUINN, ESQ.
                                     SUSAN ESTRICH, AAL
 4                              865 S. FIGUEROA
                                10TH FLOOR
 5                              LOS ANGELES, CALIFORNIA 90017
                                (213)443-3000
 6

 7    **FOR THE DEFENDANTS:**   ORRICK, HERRINGTON & SUTCLIFFE
                                BY:  ANNETTE HURST, ESQ.
 8                              405 HOWARD STREET
                                SAN FRANCISCO, CALIFORNIA 94105
 9                              (415)773-5700

10

11    **FOR THE DEFENDANTS:**   ORRICK HERRINGTON & SUTCLIFFE
                                BY:  THOMAS MCCONVILLE, ESQ.
12                              4 PARK PLAZA
                                SUITE 1600
13                              IRVINE, CALIFORNIA 92614
                                 (949)567-6700

14

15                              KELLER RACKAUCKAS
                                BY:  JENNIFER KELLER, ESQ.
16                              18500 VON KARMAN AVENUE
                                SUITE 560
17                              IRVINE, CALIFORNIA 92612

18

19

20

21

22

23

24

25

1       SANTA ANA, CALIFORNIA; WEDNESDAY, JUNE 1, 2011

2                              -oOo-

3    (Whereupon there was a change in reporters, JANE SUTTON reporting

4    the previous session.)

5         **MS. HURST:**  The related assertions of MGA distribution

6    to Mr. Larian, also completely irrelevant to either a fee award or

7    punitive damages award are the same.  It's a subchapter S

8    corporation.  That's how the owners take out profit; the same way

9    Mattel pays dividends.  The same way any other company accounts

10   for its profits.  The evidence at trial was that $150 million of

11   those distributions were used; at least 150 were used to pay

12   taxes.

13        With respect to the remainder, at one time they were

14   here arguing that it was somehow improper that Mr. Larian had put

15   the money back into the company by loaning it to Omni 808 who then

16   loaned it to MGA.  By keeping the company afloat, they argue, Mr.

17   Larian was doing something improper.  So it's damned if you do,

18   damned if you don't.  If you take the money out, that's wrong; if

19   you put it back in, that's wrong.  What it is, is irrelevant.

20   Completely irrelevant to the legal standard for an award of fees

21   or punitive damages.

22        MGA is the party here seeking compensation.  Any

23   judgment will be in favor of MGA, although Mr. Larian personally,

24   certainly was a defendant.  Mr. Larian personally suffered

25   Mattel's years of excessive litigation.  And Mr. Larian

1   personally, as the majority owner in MGA, is the person who stands

2   to suffer the most from the massive loss in value to the Bratz

3   brand caused by Mattel as a result of this litigation.

4           Again they argue that whether Mattel destroyed the brand

5   is the question directly at issue in the antitrust case.  It may

6   be, but there is nothing improper about the Court adjudicating

7   that now.  The effect of that will be determined later.  But even

8   if it's binding, if the Court adjudicates it as having been a bad

9   faith destruction of MGA's brand, there is absolutely no reason

10  why it would be inconsistent with Park Lane Hosiery for this Court

11  to find that that conclusion was binding on Mattel.

12          The Court may choose not to do so given the broad

13  standard of fairness that will ultimately apply in the second

14  action, but whether it does or not, there is absolutely nothing in

15  inconsistent with common law principles of collateral estoppel or

16  the Seventh Amendment in doing so.

17          Mattel has cultivated a reputation as an aggressive

18  litigant.  It lost in Walking Mountain, it lost in MCA Records, it

19  lost in Goldberger.  In Goldberger they tried to have the judgment

20  vacated, or the summary judgment award against them for

21  noninfringement vacated pursuant to settlement because they didn't

22  want it out there in the public record that something is not

23  infringing, and the Court in that case refused to do it.  Found

24  that it was in the public interest for people know because Mattel

25  is a repeat player in the courts.  It was in the public interest

dd1e0e92-ce9a-4bb4-b424-9488ee8e0fb6

1   for companies to know that not every fashion doll infringes on

2   Barbie.

3           They say deterrence is inappropriate because the real

4   objective here was for them to get control of Bratz and they would

5   have brought it to market themselves.  There is absolutely no

6   evidence in the record to support that assertion.  They blocked

7   discovery of their plans for Bratz at every turn arguing it was

8   irrelevant.

9           Mr. Normile, in his deposition at page 247, testified

10  they had no business reasons at all for seeking injunctive relief

11  in this case.  Normile deposition, page 247, there were no

12  business reasons he could think of for them seeking the injunctive

13  relief in this case.  They had no intention of exploiting Bratz.

14  And it's made clear they didn't because of the timing of

15  introduction of Monster High.  They were working on Monster High

16  for three years.  It's like targeted to exactly the same market.

17  They had no intentions of introducing Bratz.

18          But you know what?  It wouldn't matter because at the

19  end of the day the jury found that they didn't own it.  And in the

20  meantime, they caused enormous harm to the brand and to MGA with

21  what turned out to be an unreasonable lawsuit.

22          So I go back to that language in Fantasy.  The award is

23  appropriate to help restore to MGA some of the lost value of the

24  copyrights it was forced to defend.  This is the paradigmatic case

25  for an award of fees to a defendant under the copyright act.

1          Your Honor, if it's all right with the Court, I'll

2     address the CUTSA fees as well and Ms. Keller instead and we'll be

3     done on the fees issue.

4          **THE COURT:**  Okay.  Mattel, you can submit your argument

5     then as well.

6          **MS. HURST:**  Your Honor, I guess the only other point I

7     would add is that Ms. Estrich's contention that the legal standard

8     is that you can't recover more than has actually been paid under

9     the copyright is clearly wrong because the lodestar under all of

10    the fee jurisprudence allows for contingency fees on the

11    plaintiff's side.  And under Ms. Estrich's proposed rule, you

12    couldn't have recovery where there is a contingency fee on the

13    plaintiff's side, and that's clearly wrong.  So the fact that MGA

14    has creditors precisely because Mattel nearly killed it is not a

15    basis for denying fees.

16         Now on to CUTSA, most of what Ms. Estrich argued about

17    the purported impropriety of seeking all of the fees on the

18    affirmative claims were matters that I had addressed on Thursday.

19    I'll try not to repeat myself.  But the bottom line is that the

20    factual gravamen of the harm, serial copying was part of the 2005

21    complaint.  It was not a trade secret claim because MGA didn't

22    know then that it had a trade secret misappropriation claim.

23         But as I previously pointed out, much of the evidence

24    that had been gathered in connection with the discovery on those

25    claims, to the extent it was produced, was used in connection with

1    the proof of the affirmative claim.  The development documents

2    that had been produced were used by Mr. Malackowski in making his

3    damages analysis.

4            So the point is that the evidence gathered in seeking to

5    remedy essentially the same harm under a different legal theory

6    was used at trial, and it is appropriate under those circumstances

7    to determine that the claims are related and successful.

8            The damages range that was offered by MGA at trial was

9    88.5 to $202 million.  Ms. Estrich is standing up arguing, you

10   know, MGA has got its billion-dollar claim and so forth.  But in

11   fact, the jury adopted the lower end of the range proffered by MGA

12   for all of its trade secrets.  So to argue that that's only

13   partial success because, you know, press statements about

14   billion-dollar claims is silly and doesn't meet the legal

15   standard.

16           By any measure that was a complete success on that

17   claim.  And, Your Honor, I believe Hensley does support the

18   proposition that when you have partial success on the fee-bearing

19   claims, you are still entitled to recover for the related work.

20   And there is no reason to think California would adopt a different

21   rule even though this is not partial success.

22           Your Honor, MGA has turned over to the discovery master

23   and the Court every iota of documentation for the billing records

24   that are the basis for its fee claim.  As is made clear by the

25   Schultz declaration, it was nowhere near everything that was

1    incurred.  What was actually incurred by MGA was more than

2    $200 million, not all of which was submitted because MGA

3    determined it would not be appropriate to do so.  That's clear on

4    the face of the Schultz declaration.  And this Exhibit 33 in

5    Mattel's binder, it should just be disregarded.  It's plainly

6    wrong.

7            Exhibit 33 is wrong in its estimate of total fees and

8    costs incurred wrong.  It's wrong in its estimate of insurance

9    proceeds which pay only -- even pursuant to the settlement, only a

10   fraction of the fee.  It's wrong in its estimates of amounts due

11   and owing to other counsel.  It's wrong in every respect.  It's

12   irrelevant.  It should be considered anyway, but it's also wrong

13   in every respect.

14           Yes, I certainly agree with Ms. Estrich that MGA is the

15   party here who would be entitled to compensation, and is.  And

16   it's entitled to compensation under the evenhanded standard

17   adopted by Fogarty.  If the decision of that case is to be given

18   any weight, if the decision of the Ninth Circuit in the second

19   appeal in that case is to be given any weight, this is the case

20   where fees should be awarded.

21           The same is true under CUTSA where the evidence shows

22   that MGA's litigation had a public benefit and produced a success.

23   Thank you.

24           **THE COURT:**  Ms. Keller.

25           **MS. KELLER:**  Thank you, Your Honor.

1    I have dealt with a lot of THE cases that Mr. Quinn

2  cited last week, and so I don't want to belabor them.  I will,

3  however, point out a couple of the major cases that he relies upon

4  are really in apposite.

5    Before I do that, starting with the first point that

6  Mr. Villaseñor was the end of the line really with the misconduct

7  of Mattel, even if you believed that, Mattel's market intelligence

8  type activities were going on from 1992 to 2005; 13 years of

9  repetitive stealing of trade secrets from competitors.  Now, I

10  know that Mr. Quinn doesn't like that characterization.  He tries

11  to split the baloney a little thin talking about how, well, just

12  because we used false identities and went into showrooms under

13  false pretenses that may be unethical, but that really isn't a

14  theft of trade secret.

15    And that's just a disguised JMOL argument.  It's the

16  same argument that was made to the jury.  It's the same argument

17  that's been made to the Court, that these can't be trade secrets

18  because some aspects of them may have been known or were known by

19  some people.  Some aspects may have been selectively shown to

20  journalists.  Others may have been selectively shown to retailers,

21  and therefore none, or none of the aspects here can be trade

22  secrets or collectively even they can't be.

23    That argument has been rejected, rejected, rejected.

24  These people were sneaking into the showrooms using false

25  credentials precisely because they couldn't get the information

1  other ways.  That's why they were doing it.  They couldn't get the

2  quality of the information and they couldn't get the completeness

3  of the information any other way.

4       But did it continue after 2005?  I think it did.

5  Mr. Villaseñor testified that after Mr. Louie called him in and

6  said, "I don't want you doing this anymore.  No more sneaking into

7  showrooms with false credentials, but I want you to get exactly

8  the same information," and Villaseñor said, "I can't, not without

9  doing that."  And Mr. Louie said, "Well, we're not countenancing

10  that, you can't do that anymore, but I want the identical

11  information."

12       And after a few go-rounds, Mr. Villaseñor concluded what

13  they were telling him to do is keep doing what he had been doing,

14  but don't let us know about it.  Just keep doing it, but we want

15  plausible deniability.  That was Mr. Villaseñor's conclusion.

16       And when he wrote the letter that he wrote, it was

17  clearly because he felt he was still being asked to do the same

18  thing; it's just that he was now being asked to give Mattel

19  executives a plausible deniability argument.  And Mr. Villaseñor

20  testified that they hired Sharon Rahimi as a contractor to

21  continue gathering the same information when he stopped doing it.

22  And he testified to that on day 37, volume two, pages 72 and 73.

23       And Matt Turetzky testified that Rahimi had been hired

24  to come in and help gather competitive information after the

25  policy change.  Mr. Turetzky said that day 37, volume one, at page

dd1e0e92-ce9a-4bb4-b424-9488ee8e0fb6

1    63, lines 13 to 22.

2            Mr. Friedman testified that Mattel and Sharon Rahimi

3    continued to have a consulting relationship through the present.

4    Of course, he denied it had anything to do with toy fairs, but the

5    jury was entitled to disbelieve that based on everything else that

6    the jury had heard.

7            As far as there being no evidence that Nuremberg was

8    ever one of the toy fairs that was snuck into, that's not true

9    all.  Trial Exhibits 26755 and 26758 were Nuremberg toy fair

10   reports.  Trial Exhibit 9251 was Mr. Villaseñor's expense

11   reimbursement for attendance at the Nuremberg Toy Fair.  He

12   testified that he attended the toy fair.  And he confirmed, day

13   37, volume two, page 125, he confirmed that he obtained

14   confidential information from private showrooms at Nuremberg.

15           And then trial Exhibit 9640 and 36028, which are the

16   same exhibit, those were the how-to-steal manual.  And guess what

17   they mention?  They mention Nuremberg and how to pose as a U.S.

18   retailer when you get into the Nuremberg Toy Fair.  So there was

19   no question that it was going on there, too, and very widespread.

20           Now, the jury was well within its rights to conclude

21   from all this that Mattel's conduct continued and that the

22   statements to Mr. Villaseñor were exactly as Mr. Villaseñor

23   believed; that he was being told, "We don't want any evidence of

24   it of which we're aware, but we want you to keep doing it," and

25   then hired independent contractors to fulfill the plan.

1          As far as the 35 boxes thing that Mr. Quinn was talking

2     about, Villaseñor put out many, many an e-mail inviting other

3     people in Mattel to come up to the Mattel library on the ninth

4     floor where they could get the toy fair reports.  He didn't say,

5     "Gee, I'd like you to come up to my cubicle where I have 35 boxes.

6     That would be some cubicle, by the way.

7          But there was ample evidence that this ninth floor

8     market intelligence library existed.  And it was dismantled

9     because of this litigation; spirited away to the offices of

10    outside counsel, never to be seen again until late in this trial

11    when the Court and counsel went on a midnight foray to Los Angeles

12    to look at some of it.

13         And so it's true that I asked Mr. Eckert, when he said

14    he had been to see the library now located in a storage closet on

15    the eighth floor and there was hardly anything in it, and he said

16    it in a manner that was designed, I think, to lead the jurors to

17    believe there was nothing to this allegation, yes, I asked him if

18    that wasn't a little bit misleading in light of the actual

19    evidence.

20         But as far as Mr. Quinn's statement, "Our firm can't

21    believe faulted for the handling of these boxes," it's really not

22    a question of whether his firm is being faulted.  It's a question

23    of why weren't they produced in a timely manner.  These documents

24    being produced in a timely manner, I don't think that two-thirds

25    of the way through the jury trial is timely.

dd1e0e92-ce9a-4bb4-b424-9488ee8e0fb6

1            Now, if we could talk -- if I could talk for a minute

2   about a couple of the cases that were cited.  We have talked a lot

3   about the reprehensibility concept, but the overarching three

4   factors that are used to determine the appropriateness of the

5   punitive damages award are reprehensibility -- harm -- and that

6   the company's net worth established its ability to pay the amount.

7   That's it.

8            As far as reprehensibility goes, I find it very

9   difficult to believe that it's true that Mattel had no idea that

10  what it was doing was something bad, or something that amounted to

11  the theft of trade secrets.  The whole idea was to steal the trade

12  secrets.  And as far as it being merely a sneak peek, every

13  advance theft of information about an unreleased product is a

14  sneak peek because the product is eventually going to be in the

15  marketplace, and that at that point it's going to be revealed for

16  all to see and reverse engineer and all that.

17           But the sneak peek was a very valuable thing to have as

18  Mr. Wagner, the expert for Mattel, agreed.  There wouldn't be any

19  economic value in doing all this as an idle act.  It had

20  substantial value.

21           Now, one of the cases that was cited by Mr. Quinn was

22  the Levy versus Unum case.  And he cited it for the proposition

23  that where you don't have all five factors and you look at only

24  the remaining factors, that somehow there is a constitutional

25  limitation on the ratio of damage.

1      That's not what the case says at all.  Not at all.

2  First of all, Levy versus Unum is not a trade secret case.  It's a

3  bad faith insurance case where the insured -- the Court said that

4  the insured had demonstrated, quote, "scant evidence of repeated

5  misconduct of the sort that injured him to others."  Or to

6  himself.  And the Court found that, quote, "A reduced punitive

7  damages award with a ratio of 1 1/2 to 1 was not constitutionally

8  excessive," in that case.

9      It didn't say this is a limit.  Didn't say 1 1/2 to 1 is

10  a limit.  It says in a case like this one where it looks like a

11  one-time deal, then a 1 to 1 1/2 ratio is not constitutionally

12  excessive.

13      It went on to say that the Supreme Court has declined to

14  impose a bright line ratio which a punitive damages award can't

15  exceed.  Here, we actually have do with a bright line ratio

16  because the legislature decided what it was, and it was twice the

17  amount of compensatories.

18      If Mattel is arguing that that means there is a

19  constitutional infirmity in exceeding it, then they're attacking

20  all of the states that have Uniform Trade Secrets Act legislation.

21  They're saying that CUTSA is unconstitutional for providing that

22  the Court made double the compensatories.  And that's not -- there

23  is no case so holding anywhere.  Absolutely none.

24      This isn't judge-made law.  This is legislature-made

25  law.  This is the standard.  The Court has discretion to award up

1    to twice the amount of the compensatories.  So Levy versus Unum

2    doesn't address that nor could it because it's not a CUTSA case.

3              And the BMW case was also quoted out of context.  The

4    BMW case likewise doesn't provide a ceiling.  It's not a CUTSA

5    case at all.  And the BMW case, the Court was a little bit

6    sympathetic to BMW because it was a case where -- it was basically

7    a defective parts case, but there was an industry-wide protocol

8    that was being followed and nobody seemed to think that this was a

9    defective part at the time.

10             And the Court actually found in BMW that the executives

11   at BMW were expressly trying to comport with the law and industry

12   practices.  So they didn't intentionally do anything wrong or

13   unethical or anything.  They were trying to do exactly what

14   industry standards held were fine.  And so in that case the Court

15   didn't think that whacking BMW with a huge amount of punitive

16   damages made any sense.

17             And some of the other cases that were quoted, as I

18   mentioned the other day, Your Honor, were actually class action

19   cases.  American versus Wasserman is one of the cases as I see it

20   appearing again in the binder that the Court was presented again

21   today.  Another securities class action case where the Court said

22   well, you know, the awards in class action litigation could be so

23   huge, the compensatory awards, because there are so many claims

24   that we don't need to hit somebody with punitive damages

25   necessarily.  The compensatory work can be so big we don't have to

dd1e0e92-ce9a-4bb4-b424-9488ee8e0fb6

1   go beyond that.  Completely different type of case.  Utterly

2   different type of case.

3          So it really comes back down to the argument that Mattel

4   has put forth in every conceivable context that this wasn't really

5   a theft of trade secrets at all.  And because it wasn't really a

6   theft of trade secrets at all, because this is supposed to be

7   cutting edge, that the Court shouldn't award any exemplary

8   damages.

9          By the same token, if they were correct, then I suppose

10  the JMOL should be granted or a motion for new trial should be

11  granted and that's the -- the same argument dressed up in a

12  different set of clothes.  Still underneath those clothes it's the

13  same argument and it makes no sense.

14         The citation to the Acuson case is really completely off

15  base because in that case the product had already been released in

16  the marketplace for some time.  I think it was actually for years.

17  And a competitor purchased it so how could it possibly be a theft

18  of trade secrets when the competitor purchased the product that

19  was already released?  Here, we're dealing with products that are

20  entirely unreleased.

21         The idea that you expect some leakage because some

22  retailers are going to -- might tell you a price and others might

23  tell you what the product is, that's another argument that's been

24  made over and over again.  The jury rejected it and so should this

25  Court.

1          There is nothing far out on the reaches or cutting edge

2     about this case.  This is as simple as it gets.  You are faking an

3     identity to steal information from a competitor that you are not

4     entitled to have, and do steal a complete set of information; not

5     just a part here or a part there.  It's not novel.  It's not

6     unprecedented.  It's as old as the concept of stealing is old.

7          Mr. Quinn talked about this conduct by Mattel being

8     commonplace in the industry.  No, it isn't.  It might be

9     commonplace in the industry to ask hey, have you heard anything

10    about the new product?  Could you tell me?  Have you seen a price

11    list?  It is not commonplace to have this organized effort that

12    Mattel had.

13         And it wasn't just an organized effort to get it.  The

14    presentations that they did about it, which were extremely

15    thorough, and the Court has seen some of the videos, the

16    presentations disseminated to hundreds of Mattel employees, why

17    did they do that?  They did it because it was an integral part of

18    their planning, their advertising campaigns.  Having this

19    information was absolutely critical to Mattel.

20         There is no evidence that any other competitor,

21    including MGA, ever had anything remotely like this.  Not ever.

22    And the fact that Mr. Villaseñor was once interviewed for a job at

23    MGA, which he never received, doesn't change that fact.  No one --

24    and you know Mattel would have been presenting that evidence, Your

25    Honor.  All they can come up with is a few e-mails where Mr.

dd1e0e92-ce9a-4bb4-b424-9488ee8e0fb6

Page 18

1   Larian or others are saying hey, can you get us any intel on what

2   Mattel is planning, or what somebody else is planning for this

3   upcoming season.  There was nothing remotely like this in the

4   industry.

5          So, unless the Court finds that CUTSA is

6   unconstitutional, that limit of twice compensatories should stand.

7   And this is a case where Mattel -- and I understand.  I would be

8   trying to do the same if I were one of the Mattel's lawyers.  I

9   would be saying well, it's only 26 trade secrets.  You can't take

10  those out of context and you can't look at them alone.  You have

11  to look at it against the backdrop of the reprehensible conduct

12  towards not just MGA, but third parties.  The reprehensible nature

13  of the conduct that should lead this Court to award punitive

14  damages, Your Honor.  And unless you have any questions, I'm

15  prepared to submit it.

16          **THE COURT:**  Mattel.

17          **MR. QUINN:**  I think I have six points, Your Honor.

18          The first on the issue about Mattel's plans for Bratz.

19  Keeping score here, that's relevant to the issue about whether in

20  taking into account the potential ROI on the investment, whether

21  it's appropriate to consider the affirmative use that Mattel might

22  have made on Bratz, do they have any information about that?  Yes,

23  there is information about that in the record.

24          The fifth interim report of the monitor -- and this was

25  after the case was, I think, with this Court.  Judge Larson

dd1e0e92-ce9a-4bb4-b424-9488ee8e0fb6

1    appointed the monitor to review Mattel's plans for Bratz.  And he

2    filed a report on that.  So contrary to the statement that was

3    made, they do have information about the plans that Mattel had to

4    exploit Bratz and to bring that to market.

5           Second, Ms. Keller thinks I'm slicing the baloney pretty

6    thin, as she put it, in drawing the distinction between the use of

7    false IDs, which I said is unethical and wrong, and the theft of

8    trade secrets.  And she said that the jury clearly rejected that

9    distinction.  I think the jury's verdict shows exactly the

10   opposite.  That the jury acknowledged that distinction.  That

11   although toy fair booths were entered using false IDs in all these

12   120, 130, whatever the total number were, instances, the jury only

13   found unlawful activity with respect to the 26.

14          So the jury understood that distinction, that there is

15   unethical conduct.  As an intellectual matter, we might say that's

16   trespassing, to misrepresent who you are to get inside.  But in

17   itself, that is not theft of trade secrets.  And the jury

18   recognized that distinction.

19          Third, I listened very closely to Ms. Keller's

20   statements regarding any evidence at all that false IDs were used

21   to get into toy fair booths after Mr. Villaseñor left, after 2005,

22   and I didn't hear any.  What we heard was a recounting of

23   Mr. Villaseñor's testimony that Mr. Villaseñor understood that

24   when Mr. Louie told him this better stop, and he understood that

25   to mean, "you'll be fired," that Mr. Louie still wanted him to get

1  the same information, still wanted him to do the same thing but

2  not tell him about it.

3          That was the -- that apparently was the account, or at

4  least that's Ms. Keller's recollection or interpretation of

5  Mr. Villaseñor's testimony.  I submit it's a big, big leap from

6  that construction of the testimony to a conclusion that Sharon

7  Rahimi used false IDs to enter toy fair booths after 2005.  It

8  just doesn't follow.  There is no evidence whatsoever that she did

9  that after 2005, or that anybody else did that after 2005.

10          Ms. Keller said the jury could have found it.  The jury

11  rejected, she said, rejected our argument, our interpretation of

12  the facts that it ended in 2005.  I submit that's not true.  There

13  is no finding that Ms. Rahimi used a false ID.  There is simply

14  nothing to support it.  If the jury had found it, we would be

15  arguing that the Court should disregard that because of the utter

16  lack of evidence.

17          Fourth, with respect to the 35 boxes, I still stand here

18  at a loss to understand what the criticism is of Mattel or anyone

19  else.  They say the boxes were spirited away.  Well, that's

20  another word, I guess, for collecting and preserving information

21  and documents to be produced in litigation.  They have got boxes

22  and boxes of documents, I'm sure.  MGA has lots of boxes of

23  documents which they have gone through, and they have produced

24  documents to us as appropriate in this litigation.

25          That's exactly what happened here.  It has never been

Page 21

1    the case that all boxes with all documents in them, including both

2    responsive and nonresponsive documents, are produced to the other

3    side.  To say that why weren't they produced in a timely manner,

4    why were they only produced two-thirds of the way through the

5    litigation, there was never any obligation to produce those boxes

6    of documents.  There was an obligation to produce certain

7    responsive documents that were responsive to document requests and

8    Court orders that were found in those boxes after we properly went

9    through them.

10          Most of that information, as the Court knows, relates to

11    other toy companies.  Almost all of it, in fact, relates to other

12    toy companies, not MGA.  And the Court will recall that there was

13    a ruling in discovery that information relating to other toy

14    companies was off limits, and that there was no obligation to

15    respond to that stuff.

16          So I still stand here completely mystified as to what

17    the criticism is, or the issue.  I think the record shows we did

18    our job, Mattel did its job, preserved the evidence.  When the

19    Court was interested in the 35 boxes, they were there.  And the

20    Court had a chance to confirm for itself what was in those boxes.

21          Fifth point with respect to CUTSA.  Yes, CUTSA says

22    exemplary damages up to two times.  But surely if you have a case

23    where the constitution and due process says under the relevant

24    constitutional standard a punitive award of more than one to one,

25    or less than one to one is inappropriate, the rule of CUTSA -- the

dd1e0e92-ce9a-4bb4-b424-9488ee8e0fb6

Page 22

1   exemplary damages two times rule in CUTSA has to fall and defer to

2   the constitutional standard.

3          Obviously the California legislature can't overrule

4   constitutional limits on punitives.  So the statutory limit may or

5   may not be constitutional in a given case depending upon the

6   circumstances.  And I assume that's why, at least part of the

7   reason, why the legislature left it to the discretion of the Court

8   to make the determination.

9          Again, the Court determined -- we heard statements that

10  there is no evidence that MGA engaged in this kind of activity.  I

11  concede as to the unethical misrepresentation of IDs.  There isn't

12  any such evidence that MGA did that.  But MGA did get into Mattel

13  toy fair booths and did collect information from retailers.  The

14  same kind of information.  If the Court -- the Court found this.

15  If the Court looks at tab 17 in the binder, the Court, in a ruling

16  on October 28, 2010, found that documents already produced by MGA

17  demonstrate that the individuals at issue gained access to

18  Mattel's showrooms as well as planograms held by Mattel's

19  retailers, obtained information about Mattel's product lines and

20  funneled that information to Mattel.

21         What is my point?  Again, my point is that if a

22  practice -- if a party seeking punitive damages has engaged in

23  similar behavior or where it is widespread in the industry, such

24  behavior is not reprehensible within the meaning of the law.

25  That's Intermedical Supplies Limited versus EBI, 181, F.3d 446,

dd1e0e92-ce9a-4bb4-b424-9488ee8e0fb6

Page 23

1    3rd Circuit.  Also Ford versus GACS, 265 F.3d, 670.  Satcher

2    versus Honda Motor Company, 52 F.3d, 1311.

3              Unless the Court has any questions...

4         **THE COURT:**  Six; you had six points.  Those were five.

5         **MR. QUINN:**  There was a sixth point.

6         **THE COURT:**  Let me go monitor the fifth report.  The

7    unethical conduct argument, the false IDs.  No evidence of false

8    identification in response to MGA.  The 35 boxes, no obligation to

9    produce.

10        **MR. QUINN:**  Where a party has engaged in similar

11   behavior.  The novel issue.  Many courts, including this one, have

12   denied punitive damages at all where novel, legal issues are

13   involved.  Because even willful unlawful conduct is not

14   reprehensible where it's not clearly illegal, or it couldn't have

15   been known that it was clearly illegal, particularly in light of

16   prevailing industry practices.

17             For that I would cite First Alliance Mortgage, a case I

18   believe known to this Court, where the court said, "It is

19   generally recognized in California and the Ninth Circuit that

20   punitive damages are not proper in cases of first impression,"

21   citing Waits versus Frito Lay, Ninth Circuit decision.  And

22   Kolstad versus American Dental.

23             And in First Alliance this Court said that the unique

24   nature of a case adds to the general caution, with which the Court

25   must consider the appropriate punitive damages.

1          And I think we have to wonder under this application of

2     the trade secrets law, is it a stretch to consider that if

3     someone, Mr. Larian, some other toy company representative,

4     approaches a retailer who has just come out of a toy fair booth

5     and said, "What can you tell me about what is in there?"  Or ask

6     them before they go in, "Can you come out with a price list?  What

7     did you see?  What is the play pattern?"  The very kind of

8     activity which is, I think the testimony showed, prevalent in this

9     industry, we have to ask ourselves, are those retailers, are those

10    persons who do that, if this is the law, if this is the rule, now

11    potentially liable for sharing information that they have gathered

12    at a toy fair?  I think that is also a groundbreaking proposition.

13    But we're very close to that here.

14          So that is my sixth point, Your Honor, that indeed the

15    law with respect to punitive damages does recognize the force of

16    importance of the novelty of an issue.  And indeed, I submit we

17    are kind of -- we are on a cutting edge here.  This is a matter of

18    first impression.  Thank you, Your Honor.

19          **THE COURT:**  All right.  Ms. Estrich.

20          **MS. ESTRICH:**  I have approximately six minutes and I

21    will confine myself to that.

22          A few corrections.  Mr. Zeller tells me we won the

23    Goldberger case twice.  I wasn't there, so I'll take Mr. Zeller's

24    word for it.

25          There was an allegation that somehow we had pushed MGA

1   into desperate financial situation that required them to become

2   deeply in debt.  I would simply point out the Wachovia instrument,

3   $300 million loan.  That was October 2006.  And it is our view

4   obviously that that was used -- that was necessitated not by

5   anything we did, but by their desire to perhaps get more

6   distribution, but I'll leave that aside.

7          Much of the argument on fees today has focused not on

8   CUTSA fees but on compensation for the lost copyright.  I would

9   happy to retell the story of Creedence Clearwater Revival, but I

10  don't think it's necessary.  Ms. Keller said last week that her

11  argument as to both punitives and fees was limited to CUTSA, and

12  that she did not think it appropriate, nor did she wish to argue

13  outside of the CUTSA framework.

14         Today we have heard as well that our lawsuit was an

15  unreasonable lawsuit.  Again, I don't think the Court needs to

16  hear me do my chapter and versus on what objectively unreasonable

17  is, but I think it's suffice to reiterate the Ninth Circuit found

18  this to be reasonable, both from Mattel's positions as to the

19  contract, reasonable and potentially, that a jury might accept

20  them.

21         Ninth Circuit also found that a jury might well conclude

22  that there had been a copyright violation here.  So I don't know

23  how you get an unreasonable lawsuit that we won before Judge

24  Larson.  Obviously the Court found he made mistakes, but it was

25  reviewed de novo on the key points.  We received a jury verdict.

Page 26

1    Substantial injunction.  Obviously we were reversed, but we were

2    reversed with a split cost and declaration of reasonableness.  And

3    finally, Your Honor, as I pointed out we survived with you motion

4    to dismiss and summary judgment.

5          And in my reading of virtually all of your opinions, I

6    have not seen too many objectively unreasonable claims survive

7    summary judgment with you.

8          In my remaining moment, Your Honor -- one other point.

9    Ms. Hurst kept referring to costs that were -- fees that were

10   incurred.  I would simply point out that incurred doesn't mean

11   paid.  It doesn't mean they're ever going to be paid.  And that

12   really is our question.  It simply means they were billed or

13   charged.

14         Finally, Your Honor, with your indulgence, I feel I need

15   to make a point of personal privilege.  I have tried throughout

16   this litigation to behave myself and to act towards opposing

17   counsel in a professional and respectful way.  Even today during

18   my argument I complimented Ms. Hurst for her hard work,

19   dedication, and frankly, excellent results.  I believe that in

20   litigation it is essential that parties, that attorneys treat each

21   other with professional courtesy.

22         Indeed, on the day of closing argument in this case I

23   was walking out of the courtroom here during a first break and I

24   happened to run into Mr. Larian and his daughter.  He is not my

25   enemy.  The Taliban is my enemy, but not Mr. Larian.  So I smiled

1   at him and at his daughter.  And Mr. Larian turned to me and he

2   said, "If you don't wipe that phony smile off your face, you are

3   going to need another plastic surgery."

4           I found that very hurtful and very inappropriate.  And

5   indeed, when I saw Ms. Hurst in the ladies' room visibly upset, I

6   said to her, "Have I done anything in this case to you or to any

7   of the attorneys or to Mr. Larian himself that would justify such

8   cruelty?"  And she said "No, you haven't."

9           On the day of the verdict, sometime after the verdict

10  was returned, Mr. Zeller and I, as the designated representatives

11  for the Mattel team went out with the assistance of a publicity

12  person who had gathered a group of reporters and told them we

13  would talk to them once.  We were not going to do one by one.  We

14  would have one conversation with Mr. Zeller and I any reporter who

15  might be interested.  It was my understanding that MGA was doing

16  similar press availability.

17          And Mr. Zeller and I were standing there giving our

18  understanding of what was next in the steps in the case when a

19  young man walked up to break into our group saying to me and to

20  the press, "Why are you listening to anything they say?"

21          I said to him it was not appropriate for him to be

22  there.  He began telling the press about an incident in which a

23  former associate of our firm's brother had apparently, on a

24  schoolyard, got into a back and forth with one of Mr. Larian's

25  sons; an incident that, frankly, Mr. Zeller had explored in

dd1e0e92-ce9a-4bb4-b424-9488ee8e0fb6

 1   deposition, because we believed it not to be true.  And Mr. Larian

 2   had said at the time he intended to make no claim as to that.

 3          The young man began trying to interrupt us in a way

 4   that, frankly, after 20 years in politics -- I mean, we respect

 5   each other's chances to speak to the press.  And finally, it was

 6   someone from the Larian team.  I looked over at them and I said,

 7   this kid doesn't belong here.  He shouldn't be here.  Somebody

 8   should tell him this is not appropriate.  That in dealing with the

 9   press, we respect each other's opportunity and then we respond as

10   appropriate.

11          That, Your Honor, is the sum of the story.  I didn't

12   grab him in.  I didn't punish him out.  I asked the MGA people to

13   please tell him to leave so Mr. Zeller and I could complete our

14   conversations.

15          Your Honor, I think our reputations matter a lot.  And I

16   value mine.  Thank you very much.

17          **THE COURT:**  Thank you very much.

18          Anything further?

19          **MR. ZELLER:**  There is the issue about the JMOL standard

20   that I know the Court had raised as one of the questions.  We had

21   worked something up on that.

22          I wonder perhaps if, in the interest of time, because I

23   don't know that -- I don't know if the Court has any questions,

24   but perhaps we could just do short submissions addressing the

25   Court's question, because we would be citing authority in any

Page 29

1   event what we think is the way of approach.

2           THE COURT:  What are your thoughts on behalf of MGA?

3   I'm the going to recess in exactly one minute.

4           MS. KELLER:  Your Honor, as far as we're concerned, the

5   briefs have been filed, I think the issues have been raised.  I

6   think we have had --

7           THE COURT:  I raised the issue.  I was initially

8   concerned about the substantial evidence standard balanced against

9   the Ninth Circuit's rule that judgment should be entered against

10  the party that prevailed if the evidence permits only one

11  reasonable conclusion and that conclusion is contrary to the

12  jury's verdict.  That's the case I cited, Josephs versus Bell.

13          I had asked you to identify the key authorities and

14  language from those cases to guide me in the review.  Why don't I

15  just undertake that myself.  And if I have questions, I'll reach

16  out.  Limited to three to five pages.  But I don't know if it's

17  worth bringing all of you back tomorrow at 9:00 o'clock for that

18  one issue.

19          MR. MCCONVILLE:  And we do have it in our brief, Your

20  Honor.

21          THE COURT:  Listen, I want to thank you.

22          MR. ZELLER:  I'm sorry to interrupt, Your Honor.  If

23  it's already been addressed by MGA, I would like just two pages to

24  address it.

25          THE COURT:  How about simultaneous briefing by no matter

Page 30

1    than Monday.  You are limited to five pages.  That way you don't

2    have to submit briefing.

3           If it's already included in your brief on behalf of MGA,

4    you're satisfied, so be it.  Limited to five pages instead of two.

5    Fair enough?

6           **MS. KELLER:**  We're hoping to conclude sooner rather than

7    later.  We can have ours in certainly no later than Thursday.  We

8    can have it tomorrow or Friday.

9           **THE COURT:**  You two -- well, you'll never agree on

10   anything.

11          **MS. KELLER:**  How about Friday?

12          **THE COURT:**  Friday by noon.  I can't get back to it

13   because of, just the case law, until the weekend.  That's where

14   I'm going to do a lot of work on the case.  How about Friday by

15   noon, simultaneous briefing on that issue.

16          **MR. ZELLER:**  That's fine.

17          **THE COURT:**  Okay.  Well, second, please don't

18   communicate with me in any form.  I know you have got my personal

19   e-mail address.  I want the associates to completely cease.  I

20   don't want any e-mails coming from any party from this point

21   forward, forever more.

22          I want to thank you all.  Good night.

23          (Whereupon the proceedings were adjourned at 5:03

24   p.m.)

25

Page 31

1

2                                  -oOo-

3

4                              CERTIFICATE

5

6            I hereby certify that pursuant to Section 753, Title 28,

7    United States Code, the foregoing is a true and correct transcript

8    of the stenographically reported proceedings held in the

9    above-entitled matter.

10

11   Date:  JUNE 2, 2011

12

13   _____

14   MARIA DELLANEVE, U.S. COURT REPORTER
     CSR NO. 9132
15

16

17

18

19

20

21

22

23

24

25