# ATTACHMENT  A

INDEX
# TRIAL EXHIBITS and TESTIMONY
### Cited in Outline re:
### Exemplary Damages Oral Argument

| TOPIC (Tab No) | DESCRIPTION |
|---|---|
| 1 | MATTEL STOPPED THE MISREPRESENTATION OF IDENTITY IN 2005 |
|  | *3/23/11 Trial Tr., Vol. 2 (Villasenor) at 101:17-19* |
|  | *3/23/11 Trial Tr., Vol. 2 (Villasenor) at 129:11-13* |
| 2 | NO EVIDENCE SUPPORTS MGA'S CLAIMS RE SARAH ALLEN'S EMAIL |
|  | TX 09869 |
|  | 4/5/11 Trial Tr. Vol. 5 (Allen) at 10:9-11:10 |
|  | 4/5/11 Trial Tr. Vol. 5 (Allen) at 19:11-16 |
| 3 | IT IS SIGNIFICANT THAT THE CONDUCT STOPPED |
| 4 | MGA'S FALSE CLAIMS ABOUT THE 35 BOXES |
|  | *Docket No. 10309: Discovery Master Order No. 108* |
| 5 | MGA IS NOT FINANCIALLY VULNERABLE |
| 6 | MATTEL'S CONDUCT WAS NOT REPETITIVE UNDER THE RELEVENT LEGAL STANDARD |
| 7 | MATTEL ALWAYS ACKNOWLEDGED THAT MISREPRESENTING IDENTITY WAS WRONG |
|  | *4/1/11 Trial Tr., Vol. 1 (Eckert), at 12:13-19* |
|  | *3/29/11 Trial Tr. Vol. 2 (Normile), at 30:25-31:5* |
|  | *3/30/11 Trial Tr., Vol. 1 (Thomas) at 44:2-8* |
|  | *1/18/11 Trial Tr., Vol. 1 at 94:7-9* |
|  | *4/8/11 Trial Tr. Vol 3, at 20:1-5* |
| 8 | NOVELTY WEIGHS HEAVILY AGAINST REPREHENSIBILITY |
| 9 | MGA'S CHIEF FINANCIAL OFFICER AND 30(b)(6) WITNESS ON MGA's TRADE SECRETS BELIEVED SHOWING INFORMATION TO RETAILERS MADE IT PUBLIC |
|  | *4/6/11 Trial Tr. Vol. 1 (Jolicoeur) at 13:16-18* |
|  | *4/6/11 Trial Tr. Vol. 1 (Jolicoeur) at 16:23-17:9* |
| 10 | LARIAN EXPECTED THAT INFORMATION SHARED WITH RETAILERS WAS PUBLIC |
|  | *3/25/11 Trial Tr. Vol. 1 (Larian) at 88:20-89:17* |
|  | *3/25/11 Trial Tr. Vol. 2 (Larian) at 68:16-18* |
| 11 | BRAWER EXPECTED THAT INFORMATION SHARED WITH RETAILERS WAS PUBLIC |
|  | *3/31/11 Trial Tr., Vol. 2, (Brawer) at 39:7-16, 41:10-42:9* |

| TOPIC (Tab No) | DESCRIPTION |
| --- | --- |
| 12 | OTHER MGA EMPLOYEES EXPECTED THAT INFORMATION SHARED WITH RETAILERS WAS PUBLIC |
| | 4/6/11 Trial Tr. Vol. 2 (Saunders) at 66:24-67:14 |
| 13 | LARIAN KNEW ABOUT THE PRECISE CONDUCT FOR YEARS |
| | Trial Tr., 3/25/11, Vol. 1 (Larian) at 147:25-149:11 |
| 14 | BRAWER KNEW ABOUT THE PRECISE CONDUCT NO LATER THAN 2004 |
| | 3/30/11 Trial Tr., Vol. 2 (Brawer) at 89:18-22 |
| | Trial Tr., 3/31/11, Vol. 1 (Brawer) at 77:15-78:5 |
| 15 | KNOWING WHAT HE DID, BRAWER INTERVIEWED VILLASENOR |
| | TX 22395 |
| | TX 09298 |
| | TX 09632 |
| | TX 09337 |
| 16 | MGA ROUTINELY OBTAINED INFORMATION ABOUT COMPETITORS' UNRELEASED PRODUCTS |
| | TX 09854 |
| | TX 09533 |
| | TX 22225 |
| | 3/25/11 Trial Tr. Vol. 1 (Larian), at 105:21-24 |
| 17 | THE COURT RECOGNIZED MGA'S SIMILAR ACTIVITIES |
| | Docket No. 9002: 10/28/2010 Order re Mattel's Ex Parte Application |
| 18 | ON THESE FACTS, UTSA EXEMPLARY DAMAGES SHOULD BE DENIED DESPITE WILLFULNESS FINDING |
| 19 | MATTEL CANNOT BE PUNISHED FOR PURPORTED HARM TO THIRD PARTIES |
| 20 | NEWS FOOTAGE DEMONSTRATES THE PUBLIC NATURE OF TOY FAIR |
| 21 | LACK OF HARM TO MGA WEIGHS AGAINST A PUNITIVE AWARD |
| 22 | THE BRATZ BRAND DECLINED DRAMATICALLY LONG BEFORE THE FIRST TRIAL |
| | TX 36104-00222 (Exhibit 29.1 to Malackowski report) |
| 23 | CONTRARY TO MGA'S STATEMENT, MATTEL PRODUCED DOCUMENTS CONCERNING VILLASENOR'S ACTIVITIES LONG BEFORE HIS DEPOSITION |
| | TX 09275; Jan. 2, 2008 production cover letter |

| TOPIC (Tab No) | DESCRIPTION |
|---|---|
| 24 | THE COURT ALREADY RULED NO EVIDENCE WAS IMPROPERLY CONCEALED |
| | Dkt. No. 9600 at 146, 156 |
| 25 | BRAWER HADN'T HEARD OF A MARKET INTELLIGENCE DEPT. |
| | 3/31/11 Trial Tr. Vol. 1, at 76:25-77:13 |
| 26 | MARKET INTELLIGENCE "GROUP" CONSISTED OF TWO PEOPLE |
| | 3/23/11 Trial Tr., Vol. 1 (Villasenor) at 58:1-9 |
| 27 | GOING TO TOY FAIRS WAS A SMALL PART OF VILLASENOR'S JOB |
| | 3/22/11 Trial Tr., Vol. 1 (Turetzky) at 132:20-133:12 |
| 28 | HIGH COMPENSATORY AWARD REQUIRES LOWER PUNITIVE AWARD |
| 29 | THE ONLY EVIDENCE OF MATTEL'S FEES IS LARIAN'S SPECULATION |
| | Larian's email Sent: Thursday, May 26, 2011 8:49 AM |
| 30 | THERE IS NO RELATIONSHIP BETWEEN THE DECLINE OF BRATZ AND MGA'S LEGAL FEES AND COSTS IN THIS CASE |
| 31 | BOTH TOTAL BRATZ SALES AND MGA'S DISTRIBUTIONS TO LARIAN DWARF MGA'S LEGAL FEES AND COSTS |
| 32 | INSURANCE HAS COVERED THE MAJORITY OF MGA'S FEES |
| 33 | "LITIGATION TO DEATH" IS A FICTION |
| 34 | PER MGA'S COUNSEL, MGA HAS NO INTENTION OF PAYING ITS INSURANCE COMPANIES OR ITS LAWYERS IN THE EVENT THE COURT AWARDS FEES |

# TAB #1

## Mattel Stopped The Misrepresentation Of Identity In 2005

"Q.   And you told us that Mr. Louie told you to stop misrepresenting yourself; do you recall that?
A.   That is correct."

*3/23/11 Trial Tr., Vol. 2 (Villasenor) at 101:17-19.*

"Q.   Your understanding was that you would lose your job unless you stopped misrepresenting yourself, correct?
A.   That's the way I felt, correct."

*3/23/11 Trial Tr., Vol. 1 (Villasenor) at 129:11-13.*

1    THE COURT:  In 2005?

2    MR. PRICE:  This one is 2004, which he says he

3    doesn't recall.

4    THE COURT:  He doesn't recall it, Counsel.

5    MR. PRICE:  Right.

6    THE WITNESS:  Right.

7    BY MR. PRICE:

8    Q    And if you'd look at 95 --

9    (Attorney discussion held off the record.)

10   BY MR. PRICE:

11   Q    Do you have 9593?

12   MS. KELLER:  Your Honor, I think this is in the

13   same category as the last one.  I think the witness has

14   already said he doesn't remember seeing it.

15   THE COURT:  Well, let's find out one more time.

16   Do you recognize this?

17   THE WITNESS:  I don't recall it.

18   THE COURT:  All right.

19   BY MR. PRICE:

20   Q    How about 27460?

21   MR. PRICE:  That's a duplicate, your Honor.  No

22   need to show it to him.

23   BY MR. PRICE:

24   Q    Mr. Villasenor, is it your testimony that you had no

25   understanding that your attorney was sending a communication



1    to Mattel which suggested that you were stressed because you

2    were told to continue misrepresenting yourself?

3              MS. KELLER:  Objection.  Misstates the document.

4              THE COURT:  Overruled.

5              THE WITNESS:  Can you repeat that?  I'm sorry.

6    BY MR. PRICE:

7    Q    Yeah, it was confusing.

8         In the December 2005 and the early 2006 time frame, you

9    did not intend to suggest by any of the communications

10   between you or your attorney and Mattel that you had been

11   told to continue misrepresenting yourself; you didn't mean

12   to suggest that, right?

13   A    I'm still a little confused.  I'm going to ask you to

14   repeat it one more time.

15   Q    Okay.  The time frame is December 2005 forward.

16   A    Correct.

17   Q    And you told us that Mr. Louie told you to stop

18   misrepresenting yourself; do you recall that?

19   A    That is correct.

20   Q    And I'm just asking you from that time forward, did you

21   ever mean to suggest or intend to suggest that Mattel had

22   done the opposite, that it had told you to continue

23   misrepresenting yourself?  Did you ever mean to suggest

24   that?

25              THE COURT:  Do you understand the question?

CV 04-9049-DOC - 03/23/2011 - Day 38, Vol. 2 of 3

102

1    THE WITNESS: I'm a little confused with the

2    question.

3    THE COURT: I'm going to sustain the objection,

4    although there is not one. It's not understandable.

5    MR. PRICE: Then it's obviously my fault.

6    THE COURT: That's okay. I'm just kidding you a

7    little bit, but --

8    BY MR. PRICE:

9    Q    You understood from 2005 -- from -- from sometime in

10   late 2005 forward that the direction to you was not to

11   misrepresent yourself, correct?

12   A    That is correct.

13   Q    And if anyone suggested that you were told to continue

14   misrepresenting yourself, that would be wrong, correct?

15   MS. KELLER: Objection. That calls for hearsay,

16   calls for commenting on another's testimony.

17   THE COURT: Sustained.

18   BY MR. PRICE:

19   Q    Whatever was causing you stress in the 2005 time frame

20   going forward, whatever was causing it, it wasn't because

21   you were told to continue misrepresenting yourself, right?

22   A    What was causing stress to me was the fact that I was

23   told not to continue to misrepresent myself. However, I was

24   also told at the same time that I needed to continue to get

25   that competitive information, being catalogs and price

CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

128

| 11:53 | 1 | was it was too much for one person to handle. |
| 11:53 | 2 | A.   That was just part of the reason. |
| 11:53 | 3 | Q.   Okay.  Well, we go up this chain, uh.  Did you ever go |
| 11:53 | 4 | to your friend, Mr. Bousquette, and say, "I -- I don't want |
| 11:53 | 5 | to do this.  It's too stressful"? |
| 11:53 | 6 | A.   No, not to Matt. |
| 11:53 | 7 | Q.   Did you ever tell anyone, "I don't want to do this. |
| 11:53 | 8 | It's too stressful," prior to your December 2005 e-mail, as |
| 11:53 | 9 | opposed to "I need more help"? |
| 11:53 | 10 | A.   I -- once again, I recall having conversations with |
| 11:53 | 11 | Bennett regarding how stressful it was. |
| 11:53 | 12 | Q.   And, therefore, you needed help? |
| 1:54 | 13 | A.   Needed -- correct. |
| 11:54 | 14 | Q.   Did you ever put anything in writing that it was too |
| 11:54 | 15 | stressful because you were -- you were misrepresenting |
| 11:54 | 16 | yourself? |
| 11:54 | 17 | A.   Not in writing. |
| 11:54 | 18 | Q.   And the first time you put something in writing was |
| 11:54 | 19 | when you were told you had to stop doing it or you'd lose |
| 11:54 | 20 | your job? |
| 11:54 | 21 | A.   Are you referring to 2005? |
| 11:54 | 22 | Q.   I'm gonna start with December 2005. |
| 11:54 | 23 | A.   The conversation with John Louie, is that what you're |
| 11:54 | 24 | referring to? |
| 11:54 | 25 | Q.   I'm saying that that time frame, December 2005, you |

| Time | Line | |
|---|---|---|
| 11:54 | 1 | understood that you would lose your job unless you stopped |
| 11:54 | 2 | doing it, unless you stopped misrepresenting yourself, |
| 11:54 | 3 | correct? |
| 11:54 | 4 | A.   I don't recall if I was told that, but I felt that way. |
| 11:54 | 5 | Q.   Okay.   I mean, you felt that you would lose your job if |
| 11:54 | 6 | you didn't stop, uh, misrepresenting yourself, correct? |
| 11:55 | 7 | That's how you felt? |
| 11:55 | 8 | A.   Wait.   I'm sorry.   I'm confused.   Did you say if I |
| 11:55 | 9 | didn't stop? |
| 11:55 | 10 | Q.   Yeah.   It was a double negative. |
| 11:55 | 11 | Your understanding was that you would lose your job |
| 11:55 | 12 | unless you stopped misrepresenting yourself, correct? |
| 11:55 | 13 | A.   That's the way I felt, correct. |
| 11:55 | 14 | Q.   Uh, and that's the first time that you put anything in |
| 11:55 | 15 | writing about stress:   When you were told not to |
| 11:55 | 16 | misrepresent yourself, correct? |
| 11:55 | 17 | A.   When they told me to stop misrepresenting myself. |
| 11:55 | 18 | Q.   That's the first time you put down anything in writing |
| 11:55 | 19 | that you were undergoing or had stress, correct? |
| 11:55 | 20 | A.   Right.   And part of the reason for that is because they |
| 11:55 | 21 | asked me to stop; however, they also asked me to continue to |
| 11:55 | 22 | get the information. |
| 11:55 | 23 | Q.   I mean, they wanted to continue to get valuable |
| 11:55 | 24 | information, correct? |
| 11:55 | 25 | A.   Competitive information. |

CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

130

| | | |
|---|---|---|
| 11:55 | 1 | Q.  And they wanted you to do that without misrepresenting |
| 11:55 | 2 | yourself, correct? |
| 11:55 | 3 | A.  That's what I was told. |
| 11:56 | 4 | Q.  And you have said that you did not agree with the |
| 11:56 | 5 | changes that new management wanted you to make, correct? |
| 11:56 | 6 | A.  I don't recall saying that. |
| 11:56 | 7 | Q.  If you'd look, uh, at your -- actually, that's how you |
| 11:56 | 8 | felt, though, whether you recall saying it or not, uh, uh, |
| 11:56 | 9 | that you felt that you didn't agree with some of the changes |
| 11:56 | 10 | that the new management in your department wanted to take |
| 11:56 | 11 | place -- that's -- that's how you felt? |
| 11:56 | 12 | A.  Once again, I don't remember feeling that way. |
| 1:56 | 13 | Q.  Well, you were shown Exhibit 9484-R.  We'll put that in |
| 11:57 | 14 | front of you. |
| 11:57 | 15 | (Document provided to the witness.) |
| 11:57 | 16 | (Document displayed.) |
| 11:57 | 17 | BY MR. PRICE: |
| 11:57 | 18 | Q.  And this is the e-mail that was sent in December of |
| 11:57 | 19 | '95 (sic); is that right? |
| 11:57 | 20 | A.  This is the e-mail that both my attorney and I worked |
| 11:57 | 21 | on together and was sent out, correct. |
| 11:57 | 22 | Q.  And that's what I wanted to -- to clarify.  At the top, |
| 11:57 | 23 | it says, "From:  Sal Villasenor," to Mr. Normile and Mark |
| 11:57 | 24 | Kimball.  And you're copying Mr. Michael Moore. |
| 11:57 | 25 | Do you see that? |

# TAB #2

## No Evidence Supports MGA's Claims Re Sarah Allen's Email

TX 9869—does not appear in any MGA trade secret chart or in any of its disclosures of purported trade secrets.

No evidence disputing Ms. Allen's testimony that she did not attend the Nuremburg Toy Fair.  <u>See</u> 4/5/11 Trial Tr. Vol. 5 (Allen) at 10:9-11:10.

No evidence disputing Ms. Allen's testimony that she received this information from a member of the press.  <u>See</u> 4/5/11 Trial Tr. Vol. 5 (Allen) at 19:11-16.

From:          Allmark, David
To:            Stockton, Bryan; Bossick, Jerome
BCC:           Stockton, Bryan; Bossick, Jerome
Sent:          2/10/2009 2:46:29 AM
Subject:       FW: Bratz update

fyi

*David Allmark*
*SVP & GM Mattel U.K./ Canada / EEMEA*
*Office +44(0)1628500050*
*Mobile +44(0)7912993991*

**From:** Allen, Sarah
**Sent:** 09 February 2009 18:16
**To:** Hammer Frausing , Trine; Murgatroyd, Melanie; Stanton, Kimberley
**Cc:** Jordan, Jackie; Allmark, David; Geddes, Dominic
**Subject:** Bratz update

Just picked up some bit and pieces from the MGA stand at Nuremberg.

Very limited range for Bratz spring/summer about 5 collections including a Cow Girl theme (!!)

New concept that was behind closed doors Moxie Girls (apparently this is a common terminology in the US meaning a girl with attitude) they are positioning this as the natural successor to Bratz and is the latest fashion doll collection that will be launched Autumn/Winter.

Best Friends Collection – again a new fashion doll collection much softer. Nice core range nothing special.

Sorry not much detail but something to keep an eye on.

Thanks

Sarah

*Stockton*   Deposition

Exhibit No. *9869*
*11-2* 2010   Brenda Countz

CONFIDENTIAL - ATTORNEYS' EYES ONLY

M 1815440

1

1

2

3

4              UNITED STATES DISTRICT COURT

5             CENTRAL DISTRICT OF CALIFORNIA

6                  SOUTHERN DIVISION

7                      - - -

8     THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

9

10       MATTEL, INC., et al.,
                        Plaintiffs,
11          vs.

                              CV-04-9049-DOC
12       MGA ENTERTAINMENT, INC.,   DAY 46
         et al.,                    Volume 5 of 5
13                   Defendants.

14       ---------------------------

15

16

17           REPORTER'S TRANSCRIPT OF PROCEEDINGS

18                Santa Ana, California

19               Tuesday, April 5, 2011

20

21

22              SHARON A. SEFFENS, RPR
                United States Courthouse
23              411 West 4th Street, Suite 1-1053
                Santa Ana, CA  92701
24              (714) 543-0870

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    Quinn on behalf of Mattel.
 2              MR. QUINN:  Thank you, Your Honor.
 3                   DIRECT EXAMINATION
 4    BY MR. QUINN:
 5    Q    Your name is Sarah Allen?
 6    A    Correct.
 7    Q    You live in London, England?
 8    A    I do.
 9    Q    And you work for your own company, Springall and Allen
10    Partnership?
11    A    Correct.
12    Q    And through that company you contract out services to
13    Mattel UK; is that correct?
14    A    Yes.
15    Q    You have had this arrangement for, like, 20 years?
16    A    Yes.
17              THE COURT:  I'm sorry, Mr. Quinn.  Could I get my
18    binder back?  I passed it down to each of you with my notes
19    on it.
20              Thank you very much.  I appreciate it.  Please
21    proceed.
22    BY MR. QUINN:
23    Q    And what generally are the types of services that you
24    provide to Mattel UK?
25    A    Public relations work.
```

10

1    Q    And in February of 2009 were you working for Mattel UK
2    through your company?
3    A    Yes, I was.
4    Q    Doing this type of work?
5    A    Yes.
6    Q    Over your career how many different toy fairs would you
7    say you have attended approximately?
8    A    Approximately probably 17, 18.
9    Q    Did you attend the Nuremberg Toy Fair in Germany in
10   February of 2009?
11   A    No, I didn't personally attend.
12        MR. QUINN:  Could we please take a look at Exhibit
13   9869 already in evidence, Your Honor.
14        If we could put that up on the screen and enlarge
15   that, Ken.
16   BY MR. QUINN:
17   Q    The first e-mail in the chain is from you?
18   A    Yes, it is.
19   Q    It's dated February 9, 2009.  Who are the people you
20   are sending this e-mail to?
21   A    They are UK marketing people and then also the
22   directors of the UK operation.
23   Q    Who is David Allmark there, the name we see at the top?
24   He has forwarded this on to Brian Stockton.  Can you tell us
25   who he is.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

11

1    A    He is the general manager of the UK.

2    Q    For Mattel UK?

3    A    Yes.

4    Q    You wrote in this e-mail:  Just picked up some bits and

5    pieces from the MGA stand in Nuremberg.

6         To be clear, you were not yourself at the Nuremberg Toy

7    Fair --

8    A    No, I wasn't.

9    Q    -- is that correct?

10    A    That's correct.

11    Q    How did you pick up these bits and pieces that you are

12    referring to?

13    A    I was given the information from a UK journalist.

14    Q    And this is a journalist who had been to the toy fair?

15    A    Yes.

16    Q    You wrote:  New concept that was behind closed doors,

17    Moxie Girlz.  Apparently this is a common terminology in the

18    U.S., meaning a girl with attitude.  They're positioning

19    this as the natural successor to Bratz and is the latest

20    fashion doll collection that will be launched autumn/winter.

21         Do you see that?

22    A    Yes, I do.

23    Q    Where did you get that information?

24    A    The journalist.

25    Q    Again, the same journalist?

1  A    Yes.

2  Q    Did you have a regular working relationship with this

3  journalist?

4  A    Yes, I did.

5  Q    How often would you speak to this journalist?

6  A    Once or twice a month.

7  Q    And do you only talk about toy fairs with this

8  journalist or other things as well?

9  A    No.  We would talk about general toy industry things,

10 you know, just state of the market.

11 Q    Did this journalist ever come to Mattel's Toy Fair

12 showroom?

13 A    Yes, he did.

14 Q    How would that happen?

15 A    We would invite him for a preview of product.

16 Q    What would be the reason for inviting the journalist

17 into Mattel's Toy Fair showroom for a preview of product?

18       MS. HURST:  Objection.  Relevance.

19       THE COURT:  Overruled.

20       THE WITNESS:  He writes to the leading toy title,

21 so we would always entertain him at the Mattel showroom to

22 show him the new products that would be launched later on

23 that year.  So we would do that twice a year, for the

24 spring/summer launch and the autumn/winter launch.

25 BY MR. QUINN:

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL, INC., et al.,
                    Plaintiffs,
    vs.
                                    CV-04-9049-DOC
MGA ENTERTAINMENT, INC.,            DAY 46
et al.,                             Volume 5 of 5
                    Defendants.

    --------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

Tuesday, April 5, 2011

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   Q   Are they your biggest client?

2   A   Yes.

3   Q   And you came all the way from London for this?

4   A   Yes.

5   Q   Did Mattel pay for your air fare to come here?

6   A   Yes.

7   Q   And are they paying for your time spent to come here

8   and testify?

9   A   Originally, no.

10   Q   Do you expect you will bill them for consulting after

11   coming here for this trip to testify?

12   A   You know, I have been here a lot longer than I had

13   anticipated, so I am sure there will be some recompensation

14   for my time.

15   Q   You came here on a business trip and extended to come

16   and testify?  Is that the story?

17   A   No.  I came to clarify the e-mail.

18   Q   Okay.  You were not at the MGA showroom in Nuremberg;

19   right?

20   A   No.

21   Q   So you don't know if there was a security guard there;

22   right?

23   A   No.

24   Q   You don't know if people were required to sign

25   nondisclosure agreements in order to get in; right?

19

```
 1    A      That's correct.
 2                MS. HURST:  Could we see 9869?
 3    BY MS. HURST:
 4    Q      You sent this e-mail on February 9, 2009; isn't that
 5    right?
 6    A      That's correct.
 7    Q      How close in time did you send the e-mail to when you
 8    received the information?
 9    A      I can't recollect specifically, but I think it would be
10    either that day or the day after.
11    Q      Who was the journalist you spoke to?
12    A      John Walsh.
13    Q      Who does he work for?
14    A      He is the publisher of Toys 'n' Playthings in the UK.
15    Q      Is that a magazine?
16    A      Yes.
17    Q      Now, why did you send this e-mail?
18    A      Because it was general information that I had received,
19    so I was just passing it on.
20    Q      You thought it would be valuable to Mattel; right?
21    A      It's general information that, you know, I would
22    receive within the course of my work talking to different
23    journalists.
24    Q      Well, there is a lot of general information out there;
25    right?
```

20

1    A    Yes.

2    Q    Do you send an e-mail to the head of Mattel's UK

3    operation every time you get a piece of general information?

4    A    I may well, yes.

5    Q    How many e-mails a day do you send to the head of

6    Mattel's UK operation?

7    A    Depending on the information.

8    Q    Well, how many?

9    A    I couldn't give you a specific number.

10   Q    Well, hundreds?

11   A    No.

12   Q    Can you tell me how many e-mails you sent to the head

13   of Mattel's UK operation on February 9th, 2009?

14   A    No.

15   Q    You sent this e-mail because you thought the

16   information would be useful to Mattel; isn't that right?

17   A    I just passed on the information that I had received.

18   Q    And you thought it would be useful; isn't that true?

19   A    I just passed on the information I had received.

20   Q    So thinking back to your state of mind there on

21   February 9, 2009, when you sent the information, you thought

22   it would be useful to Mattel; isn't that right?

23   A    I just simply passed on the information that I had

24   received.

25   Q    So you didn't think it would be useful?  You thought it

# TAB #3

## It Is Significant That The Conduct Stopped

"[I]t is also significant that there is no evidence that BMW persisted in a course of conduct after it had been adjudged unlawful on even one occasion."

    *BMW v. Gore*, 517 U.S. 559, 579 (1996).

"Plaintiffs cannot support a claim for punitive damages" where "upon contacting counsel . . . the offending conduct ceased."

    *Witcher v. Bank of Am.*, 2010 WL 3395689, at *1 (W.D. Va. Aug. 27, 2010).

# TAB #4

## MGA's False Claims About The 35 Boxes

"On March 28 and March 29, 2011, pursuant to the request of the Court, the Discovery Master conducted a review of thirty-five (35) banker's boxes of documents produced by Mattel. Mattel represents that the boxes contain the documents removed from Sal Villasenor's work area or 'cubicle.'"

*Discovery Master Order No. 108, Dkt. No. 10309.*

-- Of the 121 documents produced from these boxes, 86 were produced before Villasenor's deposition.

-- The rest were all produced before the discovery cut-off—save the additional five documents that the Discovery Master identified and MGA never attempted to use at trial.

-- MGA used 8 documents from the boxes at trial—all of which were produced during discovery, no later than October 4, 2010. See TX 9591; 9301; 9656; 9506; 9498; 9507; 9504; 9480.

Case 2:04-cv-09049-DOC-RNB Document 10628-1 Filed 06/02/11 Page 35 of 225 Page ID
#:322255
Case 2:04-cv-09049-DOC -RNB Document 10309 Filed 03/29/11 Page 1 of 2 Page ID
#:313146

1   Robert C. O'Brien (SBN 154372)
    ARENT FOX LLP
2   555 West Fifth Street, 48th Floor
    Los Angeles, CA 90013-1065
3   Telephone: 213.629.7400
    Facsimile: 213.629.7401
4   obrien.robert@arentfox.com

5   Discovery Master

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                        SOUTHERN DIVISION

11

12  CARTER BRYANT, an individual,     | Case No. CV 04-09049 DOC (RNBx)

13              Plaintiff,            | Consolidated with
                                      | Case No. CV 04-09059
14         v.                        | Case No. CV 05-2727

15  MATTEL, INC., a Delaware
    corporation,                      | **PHASE 2 DISCOVERY MATTER
16                                    | ORDER NO. 108 REGARDING
               Defendant.            | DOCUMENTS MAINTAINED BY
17                                    | MR. VILLASENOR**

18

19

20  CONSOLIDATED WITH
    MATTEL, INC. v. BRYANT and
21  MGA ENTERTAINMENT, INC. v.
    MATTEL, INC.
22

23

24

25

26

27

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

                                              ORDER NO. 108
                              [Case No. CV 04-09049 DOC (RNBx)]

Case 2:04-cv-09049-DOC-RNB  Document 10628-1  Filed 06/02/11  Page 36 of 225  Page ID
#:322256
Case 2:04-cv-09049-DOC -RNB  Document 10309  Filed 03/29/11  Page 2 of 2  Page ID
#:313147

On March 28 and March 29, 2011, pursuant to the request of the Court, the Discovery Master conducted a review of thirty-five (35) banker's boxes of documents produced by Mattel. Mattel represents that the boxes contain the documents removed from Sal Villasenor's work area or "cubicle" and are the materials identified by Jill Thomas in her deposition taken on March 27, 2011 (the Villasenor Files").

The Court instructed the Discovery Master to copy all documents from the Villasenor Files referring to "Bratz" or "MGA" and to replace the original documents in the their respective boxes after copying.

Enclosed are two binders (one for Mattel's counsel and one for MGA's counsel). Each binder contains a complete set of the documents from the Villasenor Files referring to "Bratz" or "MGA." The documents are divided by tabs indicating the box from which they were taken. To reflect the fact that these documents have been produced to the parties by the Discovery Master, the first page of each document is stamped "Confidential" in the upper right corner.

Pursuant to further instruction of the Court, I will review a sampling of the media items in the materials and make a separate report to the Court today. Upon conclusion of such review, I recommend that the Villasenor Files be returned to counsel for Mattel forthwith.

Dated:  March 29, 2011                    Respectfully submitted,

                                          By: _____
                                              ROBERT C. O'BRIEN
                                              Discovery Master

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 1 -                    ORDER NO. 108
                         [Case No. CV 04-09049 DOC (RNBx)]

# TAB #5

## MGA Is Not Financially Vulnerable

MGA's revenue in 2010 was $485 million.

> See TX 27241, 27267, 36644 (MGA sales by sku reports).

A defendant that "had financial resources vastly superior to" plaintiff does not make plaintiff "financially vulnerable."

> Simon v. San Paulo U.S. Holding Co., Inc., 35 Cal. 4th 1159, 1180 (2005).

"Westbound argues that it is financially vulnerable because it is a small company . . . and because defendants had 'financial clout' and 'strength in the music industry worldwide.'  Despite Westbound's size, Westbound has been a plaintiff in numerous similar lawsuits, and thus has been able to protect its rights in the courts."

> Bridgeport Music, Inc. v. Justin Combs Pub., 507 F.3d 470, 486-487 (6th Cir. 2007).

# TAB #6

## Mattel's Conduct Was Not Repetitive Under The Relevant Legal Standard

Question is whether "a defendant has repeatedly engaged in prohibited conduct *while knowing or suspecting that it was unlawful*".

> *BMW v. Gore*, 517 U.S. 559, 576-77 (1996).

There is an "absence of evidence of repeated misconduct" where Chrysler did not have notice that a part used in its Dodge trucks could cause severe injury

> *Clark v. Chrysler Corp.,* 436 F.3d 594, 604 (6th Cir. 2006).

# TAB #7

## Mattel Always Acknowledged That Misrepresenting Identity Was Wrong

**Eckert:**

Q.   Now, you agree that it was improper for Mattel employees to misrepresent their identities in order to gain access to MGA's showrooms, correct?

A.   Yes, it was wrong.

Q.   You don't believe a person should misrepresent one's self, period, right?

A.   That's correct.

*4/1/11 Trial Tr., Vol. 1 (Eckert), at 12:13-19.*

**Normile:**

Q.   And you would agree, wouldn't you, that an employee of Mattel's making misrepresentations in order to gather intelligence from other competitors that could potentially expose him to criminal liability would be a bad thing, right?

A.   Completely unacceptable conduct, yes.

*3/29/11 Trial Tr. Vol. 2 (Normile), at 30:25-31:5.*

**Jill Thomas:**

Q.   Has that separate code ever prohibited, in your view, your contractors from using fake IDs to get into competitors showrooms?

A.   The code of conduct prohibits the use of any misleading means to gain competitive information, so the answer is yes.

Q.   And did it prohibit that during the first half of the decade between 2000 and 2006?

A.   The code of conduct was implemented in January of 2003, so that would apply from January 2003 forward.  But it has never been a practice that I think Mattel would condone.

*3/30/11 Trial Tr., Vol. 1 (Thomas) at 44:2-8.*

**Opening:**
"I'm not going to excuse Mattel employees who use fake ID's. Shouldn't have happened."

*1/18/11 Trial Tr., Vol. 1 at 94:7-9.*

**Closing:**
"Their counterclaims against us, it was wrong.  It was wrong for people to misrepresent themselves.  It was wrong, and it was stupid, and it was unnecessary, and it stopped."

*4/8/11 Trial Tr. Vol 3, at 20:1-5.*

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

2

1   **APPEARANCES OF COUNSEL:**

2

    FOR PLAINTIFF MATTEL, INC., ET AL.:
3
                QUINN EMANUEL URQUHART & SULLIVAN
4               BY:  JOHN QUINN
                     WILLIAM PRICE
5                  · MICHAEL T. ZELLER
                     Attorneys at Law
6               865 South Figueroa Street
                10th Floor
7               Los Angeles, California 90017
                (213) 443-3000
8

9

10

11  FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12              ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
                BY:  THOMAS S. McCONVILLE
13                   Attorney at Law
                4 Park Plaza
14              Suite 1600
                Irvine, California 92614
15              (949) 567-6700

16              - AND -

17              ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
                BY:  ANNETTE L. HURST
18                   Attorney at Law
                405 Howard Street
19              San Francisco, California 94105
                (415)773-5700
20
                - AND -
21
                KELLER RACKAUCKAS
22              BY:  JENNIFER KELLER
                     Attorney at Law
23              18500 Von Karman Avenue
                Suite 560
24              Irvine, California 92612
                (949) 476-8700
25

DEBBIE GALE, U.S. COURT REPORTER

| 08:39 | 1 | responsible for acting with integrity, treating others with |
| 08:39 | 2 | dignity and respect, adhering to honesty and fairness in all |
| 08:39 | 3 | of our transactions and consistently," quote, "doing the |
| 08:39 | 4 | right thing," unquote. |
| 08:39 | 5 | And that's still true to this day, isn't it? |
| 08:39 | 6 | A.   Yes. |
| 08:39 | 7 | Q.   And, in fact, the Mattel website still talks about the |
| 08:39 | 8 | unwavering integrity that defines Mattel's corporate |
| 08:39 | 9 | culture, right? |
| 08:39 | 10 | A.   Yes, it does. |
| 08:39 | 11 | Q.   And it talks about how solid standards of corporate |
| 08:40 | 12 | governance are important to earning and maintaining trust, |
| 08:40 | 13 | right? |
| 08:40 | 14 | A.   Yes. |
| 08:40 | 15 | Q.   And take -- if you would, please, look at |
| 08:40 | 16 | Exhibit 20327. |
| 08:40 | 17 | (Document provided to the witness.) |
| 08:40 | 18 | BY MS. KELLER: |
| 08:40 | 19 | Q.   Is this the 2003 Mattel code of conduct? |
| 08:40 | 20 | A.   Yes, it is. |
| 08:40 | 21 | MS. KELLER:  Your Honor, I would move 20327 into |
| 08:40 | 22 | evidence. |
| 08:40 | 23 | THE COURT:  Received. |
| 08:40 | 24 | (Exhibit No. 20327 received in evidence.) |
| 08:40 | 25 | (Document displayed.) |

| | | |
|---|---|---|
| 08:40 | 1 | BY MS. KELLER: |
| 08:40 | 2 | Q.   And if you'd look at page 7. |
| 08:40 | 3 | A.   Dash 7? |
| 08:40 | 4 | Q.   Yes.  20327-7. |
| 08:40 | 5 | A.   I have it. |
| 08:40 | 6 | (Document displayed.) |
| 08:40 | 7 | BY MS. KELLER: |
| 08:40 | 8 | Q.   There's a portion that is entitled "Our |
| 08:40 | 9 | Responsibilities to Each Other," and then under that it |
| 08:40 | 10 | says, "Respect." |
| 08:40 | 11 | "We will treat others as we want to be treated, with |
| 08:41 | 12 | respect, dignity and fairness." |
| 08:41 | 13 | Now, you agree that it was improper for Mattel |
| 08:41 | 14 | employees to misrepresent their identities in order to gain |
| 08:41 | 15 | access to MGA's showrooms, correct? |
| 08:41 | 16 | A.   Yes, it was wrong. |
| 08:41 | 17 | Q.   You don't believe a person should misrepresent one's |
| 08:41 | 18 | self, period, right? |
| 08:41 | 19 | A.   That's correct. |
| 08:41 | 20 | Q.   The first time you heard anything about people in a |
| 08:41 | 21 | group called "Market Intelligence" using false information |
| 08:41 | 22 | to gain access to competitors' showrooms was at your |
| 08:41 | 23 | deposition in December of 2009, right? |
| 08:41 | 24 | A.   Um, it was in 2009 or 2010.  I believe in 2009 I heard |
| 08:41 | 25 | a hypothetical, but it was around that time. |

CV 04-9049 DOC - 4/1/2011 - Day 44, Volume 1 of 3

13

| | | |
|---|---|---|
| 08:41 | 1 | Q.    Please look at your deposition, page 156.  This is your |
| 08:41 | 2 | deposition of October 4, 2010, page 156. |
| 08:42 | 3 | (Document provided to the witness.) |
| 08:42 | 4 | THE WITNESS:  Line? |
| 08:42 | 5 | BY MS. KELLER: |
| 08:42 | 6 | Q.    Lines, uh, 14 through 19.  And 158, lines -- |
| 08:42 | 7 | A.    Oh, I'm sorry, it's 156? |
| 08:42 | 8 | Q.    That's right. |
| 08:42 | 9 | A.    I'm sorry.  I was at 157. |
| 08:42 | 10 | Q.    Lines 14 through 19. |
| 08:42 | 11 | A.    156, 14 through 19? |
| 08:42 | 12 | Q.    Yes. |
| 08:42 | 13 | A.    Okay. |
| 08:42 | 14 | Q.    Then 158, lines 12 through 20. |
| 08:42 | 15 | A.    All right. |
| 08:42 | 16 | Q.    So did you first hear about a group called "Market |
| 08:42 | 17 | Intelligence" -- |
| 08:42 | 18 | MR. QUINN:  This is not impeaching, Your Honor. |
| 08:42 | 19 | THE COURT:  Just a moment. |
| 08:43 | 20 | And on 158, Counsel, what lines? |
| 08:43 | 21 | MS. KELLER:  12 through 20. |
| 08:43 | 22 | THE COURT:  That's consistent, Counsel. |
| 08:43 | 23 | BY MS. KELLER: |
| 08:43 | 24 | Q.    Inside of Mattel, is it correct that the only |
| 08:43 | 25 | conversations you've had about this topic were with lawyers |

```
 1              (Interruption in the proceedings.)

 2              THE COURT:  Stop, both of you.  That's it.  Take a

 3     deep breadth, both of you.

 4              The objection is sustained.  It's argumentative.

 5     Now a question.

 6     BY MS. KELLER:

 7     Q    You understand that it's now Mattel's version that Sal

 8     Villasenor was a rogue employee with only one other person

 9     working with him who created this phony name of "market

10     intelligence," right?

11              MR. QUINN:  Objection.  Argumentative.

12              THE COURT:  Sustained.

13              MR. QUINN:  Move to strike, your Honor.

14              THE COURT:  Stricken.

15     BY MS. KELLER:

16     Q    So in this letter, Mr. Villasenor is telling you and

17     Mr. Kimball that Mattel itself had directed and instructed

18     him to gather market intelligence from competitors through

19     unlawful means, correct?

20     A    That is what the letter says.

21     Q    And it says that Mattel paid him to attend trade shows

22     and engage in misrepresentations and undercover assignments,

23     correct?

24     A    I think in substance, I am not sure where you are on

25     that point -- yeah, I see it.
```

1    Q    And he says that he feared his actions might expose him

2    to personal criminal liability, and that he was stressed

3    about the fallout, right?

4    A    Yes.

5    Q    So Mr. Villasenor was telling you personally that at

6    Mattel's direction, he had engaged in misrepresentations in

7    undercover assignments at trade shows and did it to gather

8    market intelligence from competitors, correct?

9    A    That is what his letter says.

10   Q    Now, being a lawyer, you are telling us this didn't set

11   off any alarm bells at the time?

12          MR. QUINN:  Objection.  Argumentative, "telling

13   us."

14          THE COURT:  Sustained.

15          MR. QUINN:  Move to strike.

16          THE COURT:  Stricken.

17          Counsel, your next question.

18   BY MS. KELLER:

19   Q    You're a lawyer, right?

20   A    I am a lawyer, yes.

21   Q    Lawyer in charge of guarding corporate ethics, right?

22   A    Yes.

23   Q    And corporate compliance, right?

24   A    Yes.

25   Q    And you would agree, wouldn't you, that an employee of

1   Mattel's making misrepresentations in order to gather

2   intelligence from other competitors that could potentially

3   expose him to criminal liability would be a bad thing,

4   right?

5   A    Completely unacceptable conduct, yes.

6   Q    And so did you educate yourself about all this when you

7   received this e-mail?

8   A    What I did is I took it to Ms. Thomas, my senior

9   employment lawyer, who had an investigation conducted with

10  respect to the allegations in the letter.

11  Q    She is not a criminal lawyer, right?

12  A    She personally is not a criminal lawyer.  We don't have

13  a criminal lawyer in-house.

14  Q    And you didn't go to one to find out, "Gee, what sort

15  of" --

16          MR. QUINN:  Argumentative.

17          THE COURT:  We are going to stop.  We are going to

18  strike the "gee" and "oh, golly gosh."  Stricken.

19          Reask the question.

20  BY MS. KELLER:

21  Q    And you didn't go to anybody with criminal experience

22  to find out what kind of exposure Mr. Villasenor might

23  actually have as a result of his actions, correct?

24  A    We went to a major firm that I believe probably would

25  have criminal expertise.

1    Q    Here is my question:  Did you seek out somebody with a

2    criminal law background or who practiced criminal law or was

3    a former prosector and say, "I want you to tell me what

4    criminal charges this guy could actually be subjected to"?

5              MR. QUINN:  Vague.  Him personally?

6              THE COURT:  Overruled.

7              THE WITNESS:  I assigned this to one of my

8    attorneys, who took it to a major firm that I expect would

9    have the ability to advise on criminal matters, and I was

10   not involved in the actual discussions with that law firm.

11             MS. KELLER:  I would object as it's nonresponsive

12   and move to strike.

13             THE COURT:  It's responsive.  Your next question.

14   BY MS. KELLER:

15   Q    Did you direct the person you delegated to to go get an

16   opinion about what charges Mr. Villasenor might face?

17             MR. QUINN:  Excuse me, this is communications

18   among counsel, your Honor.  Privilege.

19             THE COURT:  Overruled.

20             THE WITNESS:  No.  I had complete confidence that

21   she knew how to handle an investigation based on the facts

22   of what's presented here.

23   BY MS. KELLER:

24   Q    Did you direct her to do that?

25   A    I did not tell her specifically to do that, no.

| | | |
|---|---|---|
| 09:25 | 1 | A.   I learned that in the past that Sharon Rahimi had used |
| 09:25 | 2 | fake business cards to get into showrooms at toy fairs. |
| 09:25 | 3 | Q.   And at that point Sharon Rahimi had been a Mattel |
| 09:25 | 4 | employee in the past, right? |
| 09:25 | 5 | A.   Yes, she had.  She was no longer at Mattel. |
| 09:25 | 6 | Q.   And, uh, she was then -- then in 2006, a contractor for |
| 09:25 | 7 | Mattel, right? |
| 09:25 | 8 | A.   I believe that's the case. |
| 09:25 | 9 | Q.   Now, Mattel expects its contractors to adhere to its |
| 09:26 | 10 | code of conduct, right? |
| 09:26 | 11 | A.   Yes, they do. |
| 09:26 | 12 | Q.   All right.  So when you heard -- |
| 09:26 | 13 | A.   Let me correct that.  There is a -- there is something |
| 09:26 | 14 | that is very similar to our code of conduct for independent |
| 09:26 | 15 | contractors.  It's not worded exactly the same way since |
| 09:26 | 16 | they're not employees, but it's similar. |
| 09:26 | 17 | Q.   Well, does that similar code prohibit your contractors |
| 09:26 | 18 | from using fake ID's to get into competitors' showrooms? |
| 09:26 | 19 | MR. QUINN:  Time frame, Your Honor.  In effect, |
| 09:26 | 20 | when Rahimi was -- |
| 09:26 | 21 | THE COURT:  Just the time frame, Counsel. |
| 09:26 | 22 | MR. QUINN:  Yes, Your Honor. |
| 09:26 | 23 | BY MS. HURST: |
| 09:26 | 24 | Q.   Has that separate code ever prohibited, in your view, |
| 09:26 | 25 | your contractors from using fake ID's to get into |

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

44

| 09:26 | 1 | competitors' showrooms? |
| 09:26 | 2 | A.    The code of conduct prohibits the use of any misleading |
| 09:26 | 3 | means to gain competitive information, so the answer is yes. |
| 09:26 | 4 | Q.    And did it prohibit that during the first half of the |
| 09:26 | 5 | decade between 2000 and 2006? |
| 09:27 | 6 | A.    The code of conduct was implemented in January of 2003, |
| 09:27 | 7 | so that would apply from January 2003 forward.  But it has |
| 09:27 | 8 | never been a practice that I think Mattel would condone. |
| 09:27 | 9 | Q.    All right.  So as far as you were concerned, when you |
| 09:27 | 10 | learned that Ms. Rahimi had been using fake business cards |
| 09:27 | 11 | to get into competitors' showrooms, that was absolutely a |
| 09:27 | 12 | violation of Mattel's policy, right? |
| 09:27 | 13 | A.    I don't recall if her -- I believe her past conduct had |
| 09:27 | 14 | occurred before the implementation of the code of conduct, |
| 09:27 | 15 | so I don't believe it was a violation of that since it |
| 09:27 | 16 | didn't exist.  But I don't think it is conduct that Mattel |
| 09:27 | 17 | would have condoned. |
| 09:27 | 18 | Q.    You couldn't find any other policy that might have |
| 09:27 | 19 | violated at that point? |
| 09:27 | 20 | A.    I don't recall there being anything specific that |
| 09:27 | 21 | addressed that situation, but it certainly isn't something |
| 09:27 | 22 | that Mattel would have condoned even pre-2003. |
| 09:28 | 23 | Q.    So having found out that this contractor was engaging |
| 09:28 | 24 | in activity that Mattel absolutely does not condone, the |
| 09:28 | 25 | first thing that you did was instruct people to stop using |

CV 04-9049 DOC - 3/30/2011 - Day 42, Volume 1 of 3

45

| | | |
|---|---|---|
| 09:28 | 1 | that contractor, right? |
| 09:28 | 2 | A.   No, that's not correct. |
| 09:28 | 3 | Q.   Well, did you instruct them to discipline that |
| 09:28 | 4 | contractor in some way? |
| 09:28 | 5 | A.   I don't have a specific memory of what was done with |
| 09:28 | 6 | regard to Sharon Rahimi.  I do have a specific recollection |
| 09:28 | 7 | as to one of the other people who had left and become a |
| 09:28 | 8 | contractor, so I'm assuming that I did the same thing. |
| 09:28 | 9 | Q.   Okay.  Let's just focus on Ms. Rahimi for a moment. |
| 09:28 | 10 | A.   Okay. |
| 09:28 | 11 | Q.   It's true that you did not instruct anyone to terminate |
| 09:28 | 12 | Mattel's association with Ms. Rahimi after learning that she |
| 9:29 | 13 | had used fake business cards, right? |
| 09:29 | 14 | A.   No, I did not. |
| 09:29 | 15 | Q.   And in fact, you're not aware of Rahimi having been |
| 09:29 | 16 | reprimanded or disciplined in any way, right? |
| 09:29 | 17 | A.   As an employee, she was gone by the time we learned of |
| 09:29 | 18 | the past conduct. |
| 09:29 | 19 | Q.   You're not aware, yes or no, of Rahimi being |
| 09:29 | 20 | reprimanded or disciplined in any way, correct? |
| 09:29 | 21 | A.   Correct. |
| 09:29 | 22 | Q.   And you actually didn't know whether Rahimi was an |
| 09:29 | 23 | independent contractor in 2006, did you? |
| 09:29 | 24 | A.   I don't have a clear memory of whether she was or she |
| 09:29 | 25 | wasn't.  I only have a memory of one person, and I'm |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/18/2011 - Day 3, Volume 1 of 2

1

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4    - - - - - - -

5
     MATTEL, INC., et al.,                )
6                                         )
              Plaintiffs,                 )
7                                         )
         vs.                              )  No. CV 04-9049 DOC
8                                         )     Day 3
     MGA ENTERTAINMENT, INC., et al.,     )     Volume 1 of 2
9                                         )
                                          )
10            Defendants.                 )
                                          )  CERTIFIED COPY
11   _____)  Debbie Gale, CSR 9472

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    Jury Trial

16              Santa Ana, California

17          Tuesday, January 18, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-01-18 D3V1

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/18/2011 - Day 3, Volume 1 of 2

93

| | | |
|---|---|---|
| 11:33 | 1 | quote/unquote, "get in trouble for it." |
| 11:33 | 2 | And what does Mr. Larian say in response?  Again, |
| 11:33 | 3 | unqualified approval.  "Good job," quote/unquote. |
| 11:33 | 4 | Another time Ms. Saunders wrote to Paula Garcia |
| 11:33 | 5 | telling her, "delete this e-mail." |
| 11:34 | 6 | Can we enlarge that? |
| 11:34 | 7 | "Delete this e-mail."  It's an e-mail in which |
| 11:34 | 8 | Ms. Saunders was relaying information about Mattel's |
| 11:34 | 9 | unreleased products. |
| 11:34 | 10 | It's Exhibit 9456. |
| 11:34 | 11 | Ms. Saunders told Ms. Garcia only to delete the |
| 11:34 | 12 | e-mail once you talk to Isaac and Ron.  And Isaac Larian and |
| 11:34 | 13 | Ron Brawer, who's a very senior office at MGA.  In fact, MGA |
| 11:34 | 14 | interviewed for a potential hire a man by the name of Sal |
| 11:34 | 15 | Villasenor.  Now, you're going to hear the name Sal |
| 11:34 | 16 | Villasenor, probably testify.  Sal Villasenor was a Mattel |
| 11:34 | 17 | employee who was in charge of gathering market intelligence |
| 11:34 | 18 | about what competition is doing.  He was the one who was |
| 11:34 | 19 | involved in telling people about fake business cards and the |
| 11:35 | 20 | like and how to get into the showrooms and the like.  He was |
| 11:35 | 21 | in charge of these kinds of activities at Mattel. |
| 11:35 | 22 | MGA interviewed him about hiring him because he |
| 11:35 | 23 | was good, they said -- the e-mail record shows -- good at |
| 11:35 | 24 | gathering market intelligence. |
| 11:35 | 25 | You know, what I'm saying to you is MGA is going |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/18/2011 - Day 3, Volume 1 of 2

94

| | | |
|---|---|---|
| 11:35 | 1 | to be -- pretend to be shocked and appalled by what they're |
| 11:35 | 2 | gonna call espionage at toy fairs.  I'm telling you this is |
| 11:35 | 3 | something that's commonplace.  That people -- that once |
| 11:35 | 4 | things are shown at toy fairs, they're not confidential and |
| 11:35 | 5 | trade secret anyway.  You may have showrooms that are by |
| 11:35 | 6 | invitation only.  Everybody tries to do the best they can to |
| 11:35 | 7 | find out what products others are coming out with.  I'm not |
| 11:35 | 8 | going to excuse Mattel employees who use fake ID's. |
| 11:35 | 9 | Shouldn't have happened. |
| 11:35 | 10 | My point to you is this is all just an effort to |
| 11:35 | 11 | change the subject, to have some claim that they can assert |
| 11:36 | 12 | against Mattel.  That's what the evidence will be to |
| 11:36 | 13 | distract your attention from the theft of a whole product |
| 11:36 | 14 | line, the Bratz product line, and the systematic stealing of |
| 11:36 | 15 | confidential, proprietary, downloaded information throughout |
| 11:36 | 16 | North America. |
| 11:36 | 17 | We are not asking -- we will not ask you to award |
| 11:36 | 18 | Mattel damages because they snuck into our showrooms.  Just |
| 11:36 | 19 | like MGA, Mattel expected that what you show and talk about |
| 11:36 | 20 | to the masses, to the industry at toy fairs, is ultimately |
| 11:36 | 21 | gonna be learned by the competition.  This is not a case |
| 11:36 | 22 | about how competitors compete, you know, the rough and |
| 11:36 | 23 | tumble of American competitive enterprise that we're all |
| 11:36 | 24 | familiar with.  This is a case about how one competitor here |
| 11:36 | 25 | stole and created a whole product line through theft. |

CV 04-9049 DOC - 1/18/2011 - Day 3, Volume 1 of 2

95

11:36  1          What else are you going to hear by way of defense?

11:37  2  I mean, they're going to talk about a grab bag of other

11:37  3  types of claims that Mattel -- things that Mattel has

11:37  4  allegedly done, unfair types of competitive activities.

11:37  5          They may show you this slide.  It's a picture of

11:37  6  Mr. Eckert here, when he was under oath before.  And

11:37  7  apparently -- I mean, there's -- they've taken an e-mail

11:37  8  here where Mr. Eckert said in the e-mail, "Neil, do you want

11:37  9  me to kill this or let it slide?"

11:37  10         And what the e-mail is about is there's a Mattel

11:37  11  executive by the name of Neil Friedman, who has apparently

11:37  12  expressed concern about entering into a license agreement

11:37  13  with a company called THQ, because THQ also has a license

11:37  14  agreement with MGA.  Something to that effect.  He's

11:37  15  expressed a concern about it.  You know, should we be --

11:37  16  should we have THQ or this other company as a licensee when

11:38  17  MGA also has it too?  And Mr. Eckert writes, "What do you

11:38  18  want?  Do you want me to kill this deal or not?"

11:38  19         They're going to try to make a case to you that

11:38  20  Mattel systematically terminates licenses with companies who

11:38  21  do business with MGA.  Folks, didn't happen.  You know,

11:38  22  Mattel continues to this day to do business with THQ.  They

11:38  23  will not present you evidence, because there is none, of a

11:38  24  single instance where Mattel terminated a licensee because

11:38  25  they do business with MGA.

DEBBIE GALE, U.S. COURT REPORTER

17:28:21 1          What have we seen here?  What's -- what's -- what

17:28:24 2   has the evidence shown?  The evidence has shown a systematic

17:28:29 3   theft of intellectual property by MGA over a period of years

17:28:34 4   on multiple occasions by multiple people.  You've heard

17:28:37 5   about Mr. Castilla, who you heard pled guilty, pled guilty.

17:28:43 6   The "three amigos" in Mexico, Brisbois in Canada downloading

17:28:50 7   of information.  You saw Mr. Kinrich's analysis; 40 percent

17:28:54 8   more.  Hired over a hundred Mattel employees, 40 percent

17:28:58 9   more to the downloaders.  This isn't coincidence.  This

17:29:02 10  isn't an accident.  There was deliberate ongoing systematic

17:29:05 11  threat -- theft.  Yes, that's not, "Please enforce the rules

17:29:10 12  here."  That's not proper competition.

17:29:14 13          They appeal to you with these cheap kinds of

17:29:17 14  things:  Big company, bullying, you know, crushing people.

17:29:21 15  Eckert, you know, doesn't know anything, doesn't want to

17:29:24 16  hear anything.  This is an appeal to your -- your

17:29:26 17  prejudices.  It's not an appeal to your intellect.  It's not

17:29:31 18  an appeal to your reason.  It's a hoping that they can fool

17:29:35 19  you, and that's what their whole case has been.

17:29:39 20          You have heard about employees leaving Mattel to

17:29:41 21  go to MGA.  They stole Mattel's five years' strategic plan,

17:29:46 22  including forecasting information, the entire 2005 Barbie

17:29:50 23  line list for over a year before it was shared with

17:29:53 24  retailers, thousands of pages of information in Mexico.  Now

17:29:57 25  that's a playbook.  That's a theft of a playbook.  That's a

17:30:00 1   real taking.

17:30:03 2          Their counterclaims against us, it was wrong.  It

17:30:06 3   was wrong for people to misrepresent themselves.  It was

17:30:10 4   wrong, and it was stupid, and it was unnecessary, and it

17:30:15 5   stopped.  But I've got to tell you, I challenged them to get

17:30:19 6   up here and identify to you one trade secret.  Are you any

17:30:22 7   more enlightened than you were when I stood up here this

17:30:27 8   morning?  What was it, a beach-themed doll, a winter-themed

17:30:31 9   doll?  Is that a secret?  A Bratz CD, a motor scooter, you

17:30:38 10  know, what was it?  They didn't identify anything.  They've

17:30:42 11  taken -- here is 114 things, thrown it up against the wall,

17:30:47 12  see what sticks.  It's that cynical.  It's that cynical,

:30:51 13   their whole case.  And you just heard a smear, another

17:30:54 14  smear, 35 boxes taken from the library and hidden.  There

17:30:59 15  was no evidence of that.  You don't know where those 35

17:31:02 16  boxes came from.  You don't know if they came out of a

17:31:06 17  competitive intelligence library.  For all you know, those

17:31:12 18  were 35 boxes taken from Mr. Villasenor's office or someone

17:31:16 19  else's office that was preserved for this litigation.  It's

17:31:19 20  just -- it's absolutely just a smear.

17:31:23 21         Mr. Wagner said that, you know -- remember

17:31:28 22  Mr. Malackowski who says, "I'm an expert on comparing

17:31:31 23  things."  He says, "I'm not a doll expert."  Apparently,

17:31:35 24  he's an expert on comparing things, anything.  And he's

7:31:39 25  found matches, whatever that means, between various press

releases.

You saw that Mr. Wagner said, "Look, almost all of these were already public." I think they even agree that something can't be a secret if it's already public. Mr. Wagner said, "Look, these are all" -- "can be accounted. They were either press releases or that MGA had actually sold it before the toy fair, or, you know, Mattel's product, which he purportedly matches it to, came out before or a year after"; do you recall that testimony? Mr. Malackowski then got up on the stand and made no response to any of that.

You don't take your playbook and show it to the press. You don't take your playbook and show it to strangers from unknown toy companies, because that's what Carey Plunkett and the other people who did this were -- they were strangers using a phony name or a phony name of a toy company that was nonexistent. And what do we know? We know with that phony name and that phony business card, you could go in and get into MGA's showroom, and they would show you whatever they had there. What does that tell you about whether that's trade secret, that they would take a stranger, someone that they didn't know and say, "Here is our line for next year." It's not secret.

They also referred to the fact that Mr. Villasenor called up a PR person at MGA and got some information, what

# TAB #8

## Novelty Weighs Heavily Against Reprehensibility

When a manufacturer shows its products to buyers and begins selling, trade secret protection is lost, because buyers are the ones "who have an economic interest in the product and whose demand for the product encourages manufacturers to supply it. *Disclosure to them is, for all relevant purposes, disclosure to the world.*"

> *Acuson Corp. v. Aloka Co., Ltd.,* 257 Cal. Rptr. 368, 375-76 *(1989)* (citing The Commissioners' Comment to the Uniform Trade Secrets Act ("If the principal person who can obtain economic benefit from information is aware of it, there is no trade secret.")) (review denied and ordered not published, June 22, 1989).

"Acuson has not cited any case – and we have found none – holding that a competitor's concealment of its identity to obtain a publicly available product will create liability under trade secret law."

> *Id.* at 381.

Although obviously not binding, federal courts may consider depublished state court decisions.  See Employers Ins. of Wausau v. Granite State Ins. Co., 330 F.3d 1214, 1220 n.8 (9th Cir. 2003); Nunez by Nunez v. City of San Diego, 114 F.3d 935, 943 n.4 (9th Cir. 1997).

# TAB #9

## MGA's Chief Financial Officer And 30(b)(6) Witness on MGA's Trade Secrets Believed Showing Information To Retailers Made It Public

"QUESTION:  If the information is released to the retailer, it was released to the public?
ANSWER:  Yes."

*4/6/11 Trial Tr. Vol. 1 (Jolicoeur) at 13:16-18.*

"QUESTION:  The tradeshows you reference, those are in January?
"ANSWER:  There's tradeshows --
"There are tradeshows in January that are major tradeshows at which fall -- the fall line is shown -- at which the fall line is shown.
"QUESTION:  And showing them there makes them public information?
"THE WITNESS:  As the products are being shown to customers throughout the country and the world, the informa- -- you know, the fall lines are certainly -- become publicly known.

*4/6/11 Trial Tr. Vol. 1 (Jolicoeur) at 16:23-17:9.*

CV 04-9049 DOC - 4/6/2011 - Day 47, Volume 1 of 4

12

| | | |
|---|---|---|
| 08:43 | 1 | He's not going to rephrase it.  You listen to the |
| 08:43 | 2 | question and answer the question. |
| 08:43 | 3 | THE WITNESS:  Yes. |
| 08:43 | 4 | THE COURT:  All right.  Counsel. |
| 08:43 | 5 | BY MR. ZELLER: |
| 08:43 | 6 | Q.   As MGA's corporate designee, you believe that when |
| 08:43 | 7 | products and product information are shared with retailers, |
| 08:43 | 8 | they're disclosed to retailers, it becomes public |
| 08:43 | 9 | information, correct? |
| 08:43 | 10 | MR. McCONVILLE:  Objection.  Compound. |
| 08:43 | 11 | THE WITNESS:  No. |
| 08:44 | 12 | THE COURT:  Overruled. |
| 08:44 | 13 | And the answer was no; is that correct, sir? |
| 08:44 | 14 | THE WITNESS:  That is correct. |
| 08:44 | 15 | THE COURT:  Thank you. |
| 08:44 | 16 | BY MR. ZELLER: |
| 08:44 | 17 | Q.   Isn't it true that when MGA discloses information and |
| 08:44 | 18 | releases information to a retailer, it is released to the |
| 08:44 | 19 | public? |
| 08:44 | 20 | A.   No. |
| 08:44 | 21 | MR. McCONVILLE:  Objection.  Compound. |
| 08:44 | 22 | THE COURT:  Overruled.  Let's hear your answer.  I |
| 08:44 | 23 | can't hear it over the objection. |
| 08:44 | 24 | THE WITNESS:  No. |
| 08:44 | 25 | THE COURT:  Okay. |

CV 04-9049 DOC – 4/6/2011 – Day 47, Volume 1 of 4

13

| | | |
|---|---|---|
| 08:44 | 1 | BY MR. ZELLER: |
| 08:44 | 2 | Q.    If you can please take a look at your 30(b)(6) |
| 08:44 | 3 | deposition transcript dated September 2nd, 2010, at |
| 08:44 | 4 | page 8933 -- I'm sorry -- actually, 4934.  And this is lines |
| 08:44 | 5 | 20 through 22.  The date is September 2nd, 2010. |
| 08:45 | 6 | THE COURT:  And lines 9 through? |
| 08:45 | 7 | (Document provided to the witness.) |
| 08:45 | 8 | THE COURT:  Mr. Zeller, the lines again? |
| 08:45 | 9 | MR. ZELLER:  These are lines 20 through 22. |
| 08:45 | 10 | THE WITNESS:  Yes. |
| 08:45 | 11 | MR. ZELLER:  If I could read those lines, |
| 08:45 | 12 | Your Honor. |
| 08:45 | 13 | THE COURT:  Just a moment. |
| 08:45 | 14 | You may. |
| 08:45 | 15 | MR. ZELLER:  (Reading:) |
| 08:45 | 16 | "QUESTION:  If the information is released to the |
| 08:45 | 17 | retailer, it was released to the public? |
| 08:46 | 18 | "ANSWER:  Yes." |
| 08:46 | 19 | BY MR. ZELLER: |
| 08:46 | 20 | Q.    Isn't it true that by the time of the toy fairs in |
| 08:46 | 21 | January and February of a given year, the unreleased |
| 08:46 | 22 | products of MGA for the Fall season are public information? |
| 08:46 | 23 | A.    No. |
| 08:46 | 24 | Q.    In fact, you believe that unreleased products for the |
| 08:46 | 25 | Fall season become public as early as the prior December, |

| | | |
|---|---|---|
| 08:46 | 1 | correct? |
| 08:46 | 2 | A.   No. |
| 08:46 | 3 | Q.   If you can please take a look at your deposition |
| 08:46 | 4 | transcript of the same date, page 4986. |
| 08:46 | 5 | *(Document provided to the witness.)* |
| 08:46 | 6 | BY MR. ZELLER: |
| 08:46 | 7 | Q.   And this is started at line 1 -- actually, line 2. |
| 08:47 | 8 | THE COURT:  To what line? |
| 08:47 | 9 | MR. ZELLER:  Down to line 18. |
| 08:47 | 10 | THE COURT:  Just a moment.  Let me read that. |
| 08:47 | 11 | MR. McCONVILLE:  It's not inconsistent. |
| 08:47 | 12 | THE COURT:  Counsel, you may read that portion. |
| 08:48 | 13 | Portions of it are and portions of it are not. |
| 08:48 | 14 | MR. ZELLER:  Lines 2 through 18. (Reading:) |
| 08:48 | 15 | "QUESTION:  At what point in the year does the |
| 08:48 | 16 | Fall line become public knowledge? |
| 08:48 | 17 | "THE WITNESS:" -- |
| 08:48 | 18 | BY MR. ZELLER: |
| 08:48 | 19 | Q.   That was you, Mr. Jolicoeur? |
| 08:48 | 20 | THE COURT:  Just a moment, Counsel.  It should be |
| 08:48 | 21 | read over to line 2 on page 4987. |
| 08:48 | 22 | Both of you take a look at that. |
| 08:48 | 23 | MR. ZELLER:  Sure. |
| 08:48 | 24 | Through line 5, Your Honor?  That would be where |
| 08:48 | 25 | the witness's answer ends. |

| | | |
|---|---|---|
| 08:48 | 1 | THE COURT: That's fine. Well, that would be, I |
| 08:48 | 2 | think, a fairly complete reading. |
| 08:48 | 3 | Thank you, Counsel. |
| 08:48 | 4 | MR. ZELLER: (Reading:) |
| 08:48 | 5 | "QUESTION: At what point in the year does the |
| 08:48 | 6 | Fall line become public knowledge? |
| 08:48 | 7 | "THE WITNESS:" -- |
| 08:48 | 8 | BY MR. ZELLER: |
| 08:48 | 9 | Q. And that's you, Mr. Jolicoeur, right? This part that |
| 08:48 | 10 | I'm reading, this is your deposition? |
| 08:48 | 11 | A. Yes. |
| 08:48 | 12 | MR. ZELLER: (Reading:) |
| :48 | 13 | "As early, depending on the company, as December |
| 08:49 | 14 | of the prior year, the fall line is -- is starting to be |
| 08:49 | 15 | talked about. And by January and February, at the (sic) |
| 08:49 | 16 | tradeshows and other spots, I mean, the -- the lines are |
| 08:49 | 17 | generally public knowledge. |
| 08:49 | 18 | "So by March it would actually be -- you know, |
| 08:49 | 19 | orders are probably already being placed for the fall time |
| 08:49 | 20 | frame so that they can be produced. So by March it -- you |
| 08:49 | 21 | know, they're certainly -- you know, the fall line is |
| 08:49 | 22 | certainly public knowledge. |
| 08:49 | 23 | "QUESTION: The tradeshows you reference, those |
| 08:49 | 24 | are in January? |
| 08:49 | 25 | "ANSWER: There's tradeshows --" |

| | | |
|---|---|---|
| 08:49 | 1 | Then it continues on with your answer: |
| 08:49 | 2 | "There are tradeshows in January that are major |
| 08:49 | 3 | tradeshows at which fall -- the fall line is shown -- at |
| 08:49 | 4 | which the fall line is shown." |
| 08:49 | 5 | BY MR. ZELLER: |
| 08:49 | 6 | Q.   It's true that you agree that products shown at |
| 08:49 | 7 | New York Toy Fair are public information, correct? |
| 08:49 | 8 | A.   No. |
| 08:50 | 9 | Q.   Please take a look at page 4986, line 19, through 4988, |
| 08:50 | 10 | line 6, so the same transcript. |
| 08:50 | 11 | THE COURT:  Just a minute, Counsel. |
| 08:50 | 12 | MR. McCONVILLE:  I'm going to object.  It's not |
| :50 | 13 | inconsistent. |
| 08:50 | 14 | THE COURT:  Just a moment.  I'll need time to read |
| 08:50 | 15 | this now. |
| 08:51 | 16 | MR. ZELLER:  4986, line 19, all the way through |
| 08:51 | 17 | 4988 -- |
| 08:51 | 18 | THE COURT:  Line 6. |
| 08:51 | 19 | MR. ZELLER:  -- line 6. |
| 08:51 | 20 | THE COURT:  You may read those portions.  It has |
| 08:51 | 21 | both, Counsel; both consistency and inconsistency allegedly. |
| 08:51 | 22 | MR. ZELLER:  (Reading:) |
| 08:51 | 23 | "QUESTION:  The tradeshows you reference, those |
| 08:51 | 24 | are in January? |
| 08:51 | 25 | "ANSWER:  There's tradeshows -- |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:51 | 1 | "There are tradeshows in January that are major |
| 08:51 | 2 | tradeshows at which fall -- the fall line is shown -- at |
| 08:51 | 3 | which the fall line is shown. |
| 08:51 | 4 | "QUESTION:  And showing them there makes them |
| 08:51 | 5 | public information? |
| 08:51 | 6 | "THE WITNESS:  As the products are being shown to |
| 08:51 | 7 | customers throughout the country and the world, the |
| 08:51 | 8 | informa- -- you know, the fall lines are certainly -- become |
| 08:52 | 9 | publicly known. |
| 08:52 | 10 | "QUESTION:  And that's true by the time of |
| 08:52 | 11 | January, as to products the will be released the following |
| 08:52 | 12 | fall? |
| 08:52 | 13 | "THE WITNESS:  It's fair to say that in the early |
| 08:52 | 14 | part of the year, including January, there's a -- companies |
| 08:52 | 15 | in this industry are introducing their fall line, and that |
| 08:52 | 16 | by March and April and May, you know, companies are ordering |
| 08:52 | 17 | goods.  I can't say that that's a hundred percent true for a |
| 08:52 | 18 | hundred percent of all products and -- but it is certainly |
| 08:52 | 19 | more than largely true for the toy industry that that is |
| 08:52 | 20 | true." |
| 08:52 | 21 | BY MR. ZELLER: |
| 08:52 | 22 | Q.   And you also understand that when retailers go to toy |
| 08:52 | 23 | fairs they're given catalogs by MGA, correct? |
| 08:52 | 24 | A.   Uh, not necessarily. |
| 08:52 | 25 | Q.   And isn't it true that you know it's not unusual in the |

| 08:52 | 1 | toy industry for a retailer to share a toy manufacturer's |
| 08:52 | 2 | catalogs with competitors? |
| 08:52 | 3 | MR. McCONVILLE:  Objection.  Vague as to time. |
| 08:52 | 4 | THE COURT:  Overruled. |
| 08:52 | 5 | Generally speaking. |
| 08:52 | 6 | THE WITNESS:  Uh, not necessarily, no. |
| 08:53 | 7 | BY MR. ZELLER: |
| 08:53 | 8 | Q.   Does it seem unusual to you? |
| 08:53 | 9 | MR. McCONVILLE:  Objection.  Relevance. |
| 08:53 | 10 | THE COURT:  Overruled. |
| 08:53 | 11 | You can answer that question. |
| 08:53 | 12 | THE WITNESS:  Um, I don't know what the policies |
| 08:53 | 13 | of each company are.  MGA would not be sharing its catalogs |
| 08:53 | 14 | with other companies. |
| 08:53 | 15 | BY MR. ZELLER: |
| 08:53 | 16 | Q.   Well, you do know that MGA itself has obtained from |
| 08:53 | 17 | retailers Mattel catalogs that Mattel distributed at toy |
| 08:53 | 18 | fairs, correct? |
| 08:53 | 19 | MR. McCONVILLE:  Objection.  Vague as to time. |
| 08:53 | 20 | THE WITNESS:  Um, I don't know. |
| 08:53 | 21 | THE COURT:  Overruled. |
| 08:53 | 22 | BY MR. ZELLER: |
| 08:53 | 23 | Q.   Please take a look at 4941 -- actually, let's start |
| 08:53 | 24 | with Exhibit 9481. |
| 08:54 | 25 | Do you recognize this document, Mr. Jolicoeur? |

# TAB #10

## Larian Expected That Information Shared With Retailers Was Public

Q.   Mr. Larian, did you believe that -- that practically speaking, your experience is that retail -- retailers go ahead and share the information you give them with other people in the industry?
A.   They do.
Q.   So that's your expectation at -- at toy fairs.  If you share information with retailers, they're going to go ahead and share it with other people in the industry?
A.   Sometimes they do.

*3/25/11 Trial Tr. Vol. 1 (Larian) at 88:20-89:17.*

Q    Do retailers sometimes choose to disclose information for their own business purposes?
A    Selectively when it fits them well, yes.

*3/24/11 Trial Tr. Vol. 2 (Larian) at 68:16-18.*

| | | |
|---|---|---|
| 10:29 | 1 | recollection. |
| 10:29 | 2 | MR. PRICE:  Sure.  Just want to give you the page |
| 10:30 | 3 | so you have it in front of you.  It's Volume I, page 43, |
| 10:30 | 4 | lines 2 through 19. |
| 10:30 | 5 | *(Document provided to the Court.)* |
| 10:30 | 6 | THE COURT:  And there's no question pending, |
| 10:30 | 7 | Counsel. |
| 10:30 | 8 | MR. PRICE:  I understand. |
| 10:30 | 9 | BY MR. PRICE: |
| 10:30 | 10 | Q.   So Mr. Larian, was it your belief that Mattel was and |
| 10:30 | 11 | is a category captain for Walmart, and therefore, they see |
| 10:30 | 12 | everything -- competitor product, competitor pricing, |
| 10:30 | 13 | competitor packaging -- before it comes to the market? |
| 10:30 | 14 | A.   In 2001 they would. |
| 10:30 | 15 | Q.   Well, didn't you believe that Mattel was and is as of |
| 10:30 | 16 | the date you testified the category captain for Walmart, and |
| 10:31 | 17 | so they see everything -- |
| 10:31 | 18 | A.   In -- |
| 10:31 | 19 | Q.   -- including competitor information?  Isn't that what |
| 10:31 | 20 | your expectation was? |
| 10:31 | 21 | A.   In 2001 it was and it is. |
| 10:31 | 22 | Q.   It was then; is now, right? |
| 10:31 | 23 | MS. HURST:  Objection.  Misstates the witness's |
| 10:31 | 24 | testimony. |
| 10:31 | 25 | THE COURT:  Sustained. |

CV 04-9049 DOC - 3/25/2011 - Day 40, Volume 1 of 2

88

| | | |
|---|---|---|
| 10:31 | 1 | BY MR. PRICE: |
| 10:31 | 2 | Q.   Well, is it your testimony that Mattel was and is the |
| 10:31 | 3 | category captain, and they see everything including |
| 10:31 | 4 | competitor information? |
| 10:31 | 5 | MS. HURST:  Objection.  Misstates the witness's |
| 10:31 | 6 | testimony. |
| 10:31 | 7 | THE COURT:  Well, the problem is, Counsel, I don't |
| 10:31 | 8 | have page 42, so I don't know what came before.  I see the |
| 10:31 | 9 | answer on line 11, and I see the answer again all the way |
| 10:31 | 10 | down to line 19, but it's not in context right now. |
| 10:31 | 11 | MR. PRICE:  We'll bring it to you, Your Honor. |
| 10:31 | 12 | THE COURT:  I think it's such valuable time, you |
| 10:31 | 13 | ought to move on.  I think it's becoming unduly consumptive |
| 10:31 | 14 | of time over this point, but it's your time. |
| 10:31 | 15 | MR. PRICE:  I'd rather not use it on this. |
| 10:31 | 16 | THE COURT:  I'll be happy to sit here and read if |
| 10:32 | 17 | you want. |
| 10:32 | 18 | MR. PRICE:  Okay. |
| 10:32 | 19 | BY MR. PRICE: |
| 10:32 | 20 | Q.   Mr. Larian, did you believe that -- that practically |
| 10:32 | 21 | speaking, your experience is that retail -- retailers go |
| 10:32 | 22 | ahead and share the information you give them with other |
| 10:32 | 23 | people in the industry? |
| 10:32 | 24 | A.   They do. |
| 10:32 | 25 | Q.   So that's your expectation at -- at toy fairs.  If you |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/25/2011 - Day 40, Volume 1 of 2

89

| | | |
|---|---|---|
| 10:32 | 1 | share information with retailers, they're going to go ahead |
| 10:32 | 2 | and share it with other people in the industry? |
| 10:32 | 3 | A.    Sometimes they do. |
| 10:32 | 4 | Q.    Well, that's actually your expectation, practically |
| 10:32 | 5 | speaking, correct? |
| 10:32 | 6 | A.    Practically speaking, sometimes they do on certain |
| 10:32 | 7 | products. |
| 10:32 | 8 | Q.    Well, no, I don't -- say sometimes they do.  Your |
| 10:32 | 9 | experience is, practically, the retailers go ahead and share |
| 10:32 | 10 | information from MGA with other people in the industry, |
| 10:32 | 11 | correct? |
| 10:32 | 12 | MS. HURST:  Objection.  Asked and answered. |
| 10:32 | 13 | THE COURT:  Overruled. |
| 10:32 | 14 | MR. PRICE:  Correct. |
| 10:32 | 15 | THE WITNESS:  Yes. |
| 10:32 | 16 | THE COURT:  You can answer one more time, sir. |
| 10:32 | 17 | THE WITNESS:  Yes. |
| 10:32 | 18 | BY MR. PRICE: |
| 10:32 | 19 | Q.    So we're talking about, then, you're at the toy fairs, |
| 10:33 | 20 | and we're talking about your expectation of secrecy.  So |
| 10:33 | 21 | let's talk about, you also understand and know for a fact |
| 10:33 | 22 | that information shown to retailers at toy fairs is not |
| 10:33 | 23 | going to remain secret because you yourself -- MGA gets |
| 10:33 | 24 | information from competitive showrooms from MGA's customers? |
| 10:33 | 25 | A.    I'm sorry, I lost your question. |

DEBBIE GALE, U.S. COURT REPORTER

| 10:33 | 1 | Q.   Sure.  I mean, one of the reasons you expect -- have |
| 10:33 | 2 | the expectation that retailers will share with other people |
| 10:33 | 3 | in the industry what you show them at toy fair is because |
| 10:33 | 4 | MGA itself has obtained information about competitors by |
| 10:33 | 5 | getting it from retailers who went to toy fairs of |
| 10:33 | 6 | competitors? |
| 10:33 | 7 | MS. HURST:  Objection.  Unintelligible. |
| 10:33 | 8 | THE COURT:  Sustained. |
| 10:33 | 9 | THE WITNESS:  I still don't understand the |
| 10:33 | 10 | question. |
| 10:33 | 11 | THE COURT:  You don't have to answer it, sir. |
| 10:33 | 12 | MR. PRICE:  Sure.  Sure. |
| 33 | 13 | BY MR. PRICE: |
| 10:33 | 14 | Q.   MGA itself gets information from competitors' |
| 10:34 | 15 | showrooms, correct? |
| 10:34 | 16 | A.   No. |
| 10:34 | 17 | Q.   Catalogs? |
| 10:34 | 18 | A.   No. |
| 10:34 | 19 | Q.   Price lists? |
| 10:34 | 20 | A.   No. |
| 10:34 | 21 | Q.   2001, was MGA a competitor of Mattel? |
| 10:34 | 22 | A.   Yes. |
| 10:34 | 23 | Q.   Was MGA a competitor of Hasbro? |
| 10:34 | 24 | MS. HURST:  Objection.  Irrelevant. |
| 10:34 | 25 | THE COURT:  Sustained. |

CV 04-9049-DOC - 03/24/2011 - Day 39, Vol. 2 of 3

1   Q     So those pictures that we were looking at earlier from

2   the Hong Kong showroom in 2001 when Bratz was first

3   introduced, that was a separate locked showroom?

4   A     It was in a separate room.  I don't remember if it was

5   locked showroom or not, but --

6   Q     But it was a separate room and you controlled the

7   access to it?

8   A     Yes.

9   Q     Now, despite your instructions, do the retailers

10  sometimes disclose information when you've asked them not

11  to?

12  A     They do.

13  Q     And in fact, do retailers sometimes give you

14  information?

15  A     I have personally got a lot of information, but the

16  general rule is they do talk to you.

17  Q     Let me ask you to take a look at Exhibit 9533?

18  A     Yes.

19  Q     Do you recognize this as an e-mail that was sent to you

20  by Angelika Sternberg on or about February 3rd, 2007?

21  A     Yes, I do.

22              MS. HURST:  Your Honor, move to admit 9533.

23              THE COURT:  Received.

24              (Defendants' Exhibit No. 9533 is received in

25          evidence.)

 1   BY MS. HURST:

 2   Q    Now, is this an example of retail customers providing

 3   information to some of your colleagues?

 4   A    Yes, this is in Germany, yes.

 5   Q    Okay.  And what's -- what's your reaction to receiving

 6   this kind of information?

 7   A    I just don't have -- don't remember my reaction.

 8   Q    All right.  Is this any -- is it the case that you make

 9   all these instructions and you expect that the retailers

10   will keep the information confidential, but sometimes they

11   like to disclose it for their own purposes?

12             MR. PRICE:  Objection.  Leading and compound.

13             THE COURT:  Just reask the question, Counsel.

14             MS. HURST:  Sure.

15   BY MS. HURST:

16   Q    Do retailers sometimes choose to disclose information

17   for their own business purposes?

18   A    Selectively when it fits them well, yes.

19             MS. HURST:  And we can take that down, Mike.

20   BY MS. HURST:

21   Q    So if they want to try to bargain for a lower price,

22   they'd do that sometimes, right?

23   A    I think that's the only time I know that they do.

24   Q    All right.  You were here yesterday when you saw the

25   e-mail exchange between Mr. Villasenor and Mr. Turetzky

 1    about, you just saved me a million bucks with this price

 2    list; do you remember that?

 3    A    I do.

 4    Q    Can you explain to the jury how somebody might save a

 5    million bucks by getting a competitor price list?

 6              MR. PRICE:   I want to object.   That's speculation

 7    concerning that e-mail.

 8              THE COURT:   As far as the specific e-mail, it's

 9    sustained.   You can talk about how a competitor --

10              MS. HURST:   Yes.

11    BY MS. HURST:

12    Q    So generally speaking --

13              MR. PRICE:   I move to strike the preface.

14              THE COURT:   Stricken.

15    BY MS. HURST:

16    Q    Generally speaking, Mr. Larian, how might a competitor

17    save a million bucks by getting a competitor retail price

18    list?

19    A    My experience has been that one retailer comes and

20    tells you that your competitor is selling a similar product

21    at $1 or $2 lower, these retailers not all the time tell you

22    the truth, they are just doing that to do their job to get a

23    better price, so if I get my hand -- if somebody gets their

24    hand on the competitor's price list and say no, they are not

25    charging a lower price, then you would not bring your price

# TAB #11

## Brawer Expected That Information Shared With Retailers Was Public

Q   Do you have an expectation of a confidentiality when you tell a customer like Toys R Us this is our FOB price we're going to charge you? . . .

A   I have an expectation that based on my experience -- and you asked me this earlier -- when I tell customer anything, I am taking a huge risk that that information will then become public. Right?  That's what I said.  That doesn't mean that I have to go broadcast it to everybody who asks me.But whether a Court would find that information to be legally kept confidential or not, I have no idea.  *I have now told somebody who has access to thousands of people through their computer systems as to what that price is.  So I don't know whether that is really a confidential piece of information anymore.*

. . .

Q   At any time, at any time you tell a customer -- Toys R Us -- this is what I'm going to charge you, at any time, do you think that's proprietary and confidential?

A   It's proprietary for me -- I may be asking the customer to try to keep this information proprietary, but I may have crossed the line by providing them with this price list or this price by doing so and risking the confidentiality of that information. *You have to understand that once you start distributing these price lists and distributing the cost of product, meaning what the retailers are going to pay or what you expect to pay, there is a fairly large public that tends to see this.*  And how proprietary or how confidential this information really could be anywhere from zero to 100.  I really don't have the ability to judge that directly.  *But there's certainly a significant amount of leakage from the moment that you start telling retailers what the FOB cost is of a product.*

*3/31/11 Trial Tr., Vol. 2, (Brawer) at 39:7-16, 41:10-42:9.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL INC., et al.,                )
                                    )
                    Plaintiff,      )
                                    )      DAY 43
            vs.                     ) No. CV 04-9049-DOC
                                    )      VOLUME 2 OF 3
MGA ENTERTAINMENT, INC.,            )
                                    )
                    Defendant.      )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

THURSDAY, MARCH 31, 2011


Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

Page 38

1   you said -- your belief is that that's not something which is

2   nonpublic proprietary information; right?

3   **A**   My belief is that signing a document that claims that that is

4   proprietary information when it's written out this way is unclear,

5   correct.

6   **Q**   No, no.   I'm following up on the answer you gave.

7          Did you say that cost that you are charging to your

8   customer like Toys R Us, your belief are not necessarily nonpublic

9   information or proprietary information?

10          **MS. KELLER:**   Vague as time when the cost becomes public

11   information, Your Honor.

12          **THE COURT:**   Sustained.

13   BY MR. PRICE

14   **Q**   When you charge the amount -- if you tell a customer -- Toys

15   R Us -- this is going to be how much we charge you, okay, you are

16   telling Toys R Us with, as you said, thousands of employees, is it

17   your understanding that that would be confidential proprietary

18   information, nonpublic?

19   **A**   I don't know.   I really don't know.   It depends how Toys R Us

20   treats it.   If Toys R Us -- now that you have given that

21   information to somebody who potentially has -- who has now

22   disseminated it to thousands of people, it may not be confidential

23   anymore.

24   **Q**   You don't have an expectation of confidentiality when you

25   tell a customer like Toys R Us, this is what we're going to charge

a66c3eb4-db17-4d6b-8da9-41b4217e98ed

1    you for product?

2            **MS. KELLER:**  Objection.  Misstates the testimony.

3            **THE COURT:**  Overruled.

4            **THE WITNESS:**  I don't know whether that is kept

5    confidential, no.

6    BY MR. PRICE

7    **Q**    Do you have an expectation of a confidentiality when you tell

8    a customer like Toys R Us this is our FOB price we're going to

9    charge you?

10   **A**    Do I have an expectation of the customer?

11   **Q**    Based upon your experience?

12   **A**    I have an expectation that based on my experience -- and you

13   asked me this earlier -- when I tell customer anything, I am

14   taking a huge risk that that information will then become public.

15   Right?  That's what I said.  That doesn't mean that I have to go

16   broadcast it to everybody who asks me.

17           But whether a Court would find that information to be

18   legally kept confidential or not, I have no idea.  I have now told

19   somebody who has access to thousands of people through their

20   computer systems as to what that price is.  So I don't know

21   whether that is really a confidential piece of information

22   anymore.

23   **Q**    So you as a senior executive of MGA, in fact, head of sales,

24   thought it was a huge risk, therefore, not proprietary or

25   confidential, to tell a retailer what the FOB price was?

1              **MS. KELLER:** Misstates the testimony.

2              **THE COURT:** Sustained.

3    BY MR. PRICE

4    Q    Did you say it was a huge risk when you told the retailer

5    that is the FOB price we're going to charge you?  Is that right?

6    **A**    I don't remember if I said it was exactly huge risk.  As I

7    said, when you tell a retailer something, you are telling -- you

8    are risking -- you are certainly risking the information becoming

9    public, correct.

10   Q    So would you then contest that that's proprietary

11   information?

12             **MS. KELLER:** Objection.  Vague.

13             **THE COURT:** If you understand the question.

14             **THE WITNESS:** No, I didn't understand.

15   BY MR. PRICE

16   Q    This defines Mattel proprietary information and you say it

17   includes, in your understanding, FOB prices or A prices that you

18   tell customers you are going to going to charge them.

19             That's what you believe this would encompass among other

20   things?

21             **MS. KELLER:** Objection.  Vague as to time.

22             **THE COURT:** Sustained.

23   BY MR. PRICE

24   Q    When you read this, you said you had an issue with the

25   document.  My question is, did you agree at the time you read

1    this, or after you talked to your sister, that prices Mattel told

2    its customers it was going to charge them, FOB prices did you

3    agree those were proprietary and confidential?

4             **MS. KELLER:**  Vague as to time as to whether they're pre

5    or post release, Your Honor.

6             **THE COURT:**  Technically I think that's a good objection.

7    But I think, counsel, if we allow him to answer the question for

8    both sides, we'll find out what the answer is.

9    BY MR. PRICE

10   **Q**   At any time, at any time you tell a customer -- Toys R Us --

11   this is what I'm going to charge you, at any time, do you think

12   that's proprietary and confidential?

13   **A**   It's proprietary for me -- I may be asking the customer to

14   try to keep this information proprietary, but I may have crossed

15   the line by providing them with this price list or this price by

16   doing so and risking the confidentiality of that information.

17            You have to understand that once you start distributing

18   these price lists and distributing the cost of product, meaning

19   what the retailers are going to pay or what you expect to pay,

20   there is a fairly large public that tends to see this.  And how

21   proprietary or how confidential this information really could be

22   anywhere from zero to 100.  I really don't have the ability to

23   judge that directly.  But there's certainly a significant amount

24   of leakage from the moment that you start telling retailers what

25   the FOB cost is of a product.

1  Q    Or what you expect to charge an FOB cost?

2  A    I don't know the difference.

3  Q    Toy fairs, you would have price list and FOB costs; right?

4  A    There are price lists.

5  Q    And that would be given to companies like Toys R Us who had

6  thousands of employees?

7  A    That's correct.

8  Q    And you would expect -- you used the term "leakage"?

9  A    Yes.

10  Q    And by the way, with respect to the nondisclosure agreements

11  or with respect to keeping things private, did you sign an

12  agreement with MGA that was a nondisclosure agreement?

13  A    Yes, I did.

14  Q    And is that Exhibit 4240?  It's in MGA's binder.  It may not

15  be in ours.

16  A    Yes, I did.

17          MR. PRICE:  4240, move that into evidence.

18          THE COURT:  Received.

19          (Exhibit 4240 received in evidence.)

20  BY MR. PRICE

21  Q    And that in paragraph A has confidential information, and

22  there's a long paragraph about confidential information; correct,

23  4240?

24  A    I don't think what I'm looking at and what I'm looking at

25  here are the same.

Page 43

1   Q   Let's do 4240.  Look at page 10.

2   A   Okay.  Yes.

3   Q   And there is a huge paragraph there that goes into detail

4   about confidential information that you can't disclose; correct?

5   A   That's correct.

6   Q   And in connection with going to MGA, you also assigned

7   inventions; correct?

8       Look at 4240, page 8.  Do you see you have your

9   assignment of interest of inventions?

10  A   Yes.

11  Q   And that includes you're assigning all interest which

12  employee may have and all patentable, and/or not patentable ideas,

13  and/or inventions made or conceived by employees solely or jointly

14  with others during employee's employment with the company; right?

15  A   I do see that, yes.

16  Q   And you also -- in fact, this one specifically says ideas;

17  right?  Assignment of interest, the one you signed with MGA?

18  A   Shall not apply to any idea or invention developed by

19  employee.

20  Q   That's in your Mattel agreement.  You want to look at that?

21      MS. KELLER:  Object to the form of the, I guess it's a

22  statement rather than question.

23      THE COURT:  Just restate the question, counsel.

24  BY MR. PRICE

25  Q   You said MGA says that it doesn't apply to work -- I'm sorry.

# TAB #12

## Other MGA Employees Expected That Information Shared With Retailers Was Public

**Lisa Saunders:**
Q.   And once a buyer -- once a retailer knows that information, you have to assume that there is a risk that other people are going to learn about it; correct?
A.   Correct.

. . .
Q.   Well, you do know that you have gotten information about unreleased Mattel products from buyers; correct?
A.   Yes.

*4/6/11 Trial Tr. Vol. 2 (Saunders) at 66:24-67:14.*

CV 04-9049 DOC - 04/06/2011 - Volume 2 of 4

65

```
 1          THE COURT:  Yeah, it is, Counsel.

 2          MR. QUINN:  Your Honor, "POG" is an abbreviation

 3   for Plan-O-Gram, which is on Page -2.

 4          THE COURT:  Give me time to read it because I'm on

11:12 5   Page 1.

 6          MR. QUINN:  So -2 at the bottom --

 7          THE COURT:  Just a moment, Counsel.  I'll take the

 8   time to read it.

 9          No, that portion can be received, Counsel.

11:13 10         (Exhibit(s) 4944, received.)

11         (Pause in the proceedings.)

12   Q.   BY MR. QUINN:  So if we could take a look at Page -2, at

13   the bottom there's an e-mail from Mr. Larian to Mark Robinson

14   and others including yourself; correct?

11:13 15   A.   Correct.

16   Q.   And this is dated January 31, 2003; right?

17   A.   Correct.

18   Q.   And he writes, "As you go to the POG" -- is that an

19   abbreviation for "Plan-O-Gram"?

11:13 20   A.   It is.

21   Q.   -- "and talk to buyers, please let us know what our

22   competitors are doing in fashion dolls, minidolls, large

23   dolls:  Mattel."

24          Do you see that?

11:13 25   A.   Yes, I do.
```

1    Q.    And that's the type of request you would get from time

2    to time?

3    A.    Yes.

4    Q.    And you would send -- and you would share that

11:13 5    information because, as you've said, anything that's in the

6    Plan-O-Gram room, that's public domain; correct?

7    A.    Correct.

8    Q.    And you understood that Mr. Larian was asking you

9    whether, in the Plan-O-Gram, you could get any information

11:14 10    about competitors' products that hadn't yet been released;

11    correct?

12    A.    Not necessarily that had not been released but

13    competitors' products; yes.

14    Q.    But including products that had not yet been released?

11:14 15    A.    Yes.

16    Q.    And he says here "also talk to buyers."

17         I mean, you have discussed with buyers at K-Mart,

18    for example, and gotten information from buyers at K-Mart

19    about unreleased Mattel products; correct?

11:14 20         MR. MCCONVILLE:  Objection; beyond the scope of

21    what this witness was called for.

22         THE COURT:  No, you can answer the question.

23         THE WITNESS:  Very limited.

24    Q.    BY MR. QUINN:  But you have done that and you know

11:14 25    buyers talk; correct?

CV 04-9049 DOC - 04/06/2011 - Volume 2 of 4

67

1    A.    Yes.

2    Q.    And once a buyer -- once a retailer knows that

3    information, you have to assume that there is a risk that

4    other people are going to learn about it; correct?

11:14  5    A.    Correct.

6    Q.    And you -- you would expect that K-Mart has -- K-Mart

7    buyers have discussed with people at Mattel information about

8    unreleased MGA products; right?

9                MR. MCCONVILLE:  Objection; calls for speculation.

11:15 10                THE COURT:  Sustained.

11    Q.    BY MR. QUINN:  Well, you do know that you have gotten

12    information about unreleased Mattel products from buyers;

13    correct?

14    A.    Yes.

11:15 15    Q.    If we could switch to a different topic now, and if I

16    could ask that Exhibit 24907 be placed before you.

17                MR. MCCONVILLE:  Your Honor, this goes beyond the

18    scope.

19                THE COURT:  No, Counsel, this is --

11:15 20                MR. QUINN:  This was --

21                THE COURT:  Let me see this exhibit.  These are the

22    two areas that I'm allowing in rebuttal, Counsel.  Let's be

23    certain.

24                So when you say "new topic" that's what concerns

11:15 25    me, so let me see where we're going.

 1          MR. QUINN:  I will say, though, Your Honor, these

 2   documents were just produced to us within the last 24 hours.

 3          THE COURT:  It doesn't matter.

 4          That concludes her testimony, Counsel.

11:16  5          Those are the two areas I've allowed you to go

 6   into.

 7          MR. QUINN:  Thank you, Your Honor.

 8          Nothing further.

 9          THE COURT:  Cross-examination.

11:16 10                    **CROSS-EXAMINATION**

 11   BY MR. MCCONVILLE:

 12   Q.   Ms. Saunders, you were asked some questions concerning

 13   Plan-O-Grams.

 14          Do you remember those questions?

11:16 15   A.   Yes.

 16   Q.   Could you please describe for us, based on your

 17   experience, what it is MGA displays in the K-Mart

 18   Plan-O-Gram?

 19          MR. QUINN:  Objection as to time, Your Honor.

11:16 20          THE COURT:  Overruled.

 21          This is generally speaking, Plan-O-Gram rooms.

 22          MR. MCCONVILLE:  Okay.  I'll put a time frame on

 23   it.

 24          THE COURT:  Well, I -- I -- I'm sorry.  You're

11:16 25   correct, with some limitation.

# TAB #13

## Larian Knew About The Precise Conduct For Years

"QUESTION:  And if I understand your testimony, you're saying that Mattel did what?
"ANSWER:  Mattel came to our showroom with a false business card saying that they're either a journalist or -- that's my understanding -- or they work for other organizations, or they're a customer or came with a customer.

. . .
"QUESTION: "Is this something you heard from one person?
"ANSWER:  I heard it from a few people.

. . .
"QUESTION:  And is this something that you heard recently?  Was it some time ago?
"ANSWER:  Some time ago.
"QUESTION:  And can you give me an approximate time period?
"ANSWER:  Past few years."

   *Trial Tr., 3/25/11, Vol. 1 (Larian) at 147:25-149:11.*

*[NOTE: This was impeachment testimony from Larian's* **December 11, 2009** *deposition].*

CV 04-9049 DOC - 3/25/2011 - Day 40, Volume 1 of 2

146

| | | |
|---|---|---|
| 11:53 | 1 | BY MR. PRICE: |
| 11:53 | 2 | Q.   Mr. Larian, 991, line 10, through 992, line 23. |
| 11:53 | 3 | THE COURT:  Okay. |
| 11:53 | 4 | THE WITNESS:  Okay.  I need to read it. |
| 11:53 | 5 | MS. HURST:  Your Honor, I just object.  It's |
| 11:53 | 6 | improper to ask the witness about prior depo testimony.  He |
| 11:53 | 7 | should just ask him a question. |
| 11:53 | 8 | THE COURT:  We'll he previously had, but it's been |
| 11:53 | 9 | lost in antiquity now.  I don't think the jury can remember |
| 11:53 | 10 | it. |
| 11:53 | 11 | BY MR. PRICE: |
| 11:53 | 12 | Q.   Mr. Larian, you said -- you testified previously that |
| :53 | 13 | you first -- |
| 11:53 | 14 | MS. HURST:  Object to the form as referring to |
| 11:53 | 15 | prior testimony. |
| 11:53 | 16 | THE COURT:  Just ask him a question. |
| 11:53 | 17 | BY MR. PRICE: |
| 11:53 | 18 | Q.   You knew for the past few years, as of December 11, |
| 11:53 | 19 | 2009, that Mattel would come to your showroom with fake |
| 11:54 | 20 | business cards, saying they were either a journalist or a |
| 11:54 | 21 | customer? |
| 11:54 | 22 | THE COURT:  Now that's a proper question. |
| 11:54 | 23 | You can answer that. |
| 11:54 | 24 | THE WITNESS:  We had the suspicion that -- how our |
| 11:54 | 25 | product all of a sudden would look like theirs -- their |

| 11:54 | 1 | product looked like ours, so that's what we suspected. |
| 11:54 | 2 | BY MR. PRICE: |
| 11:54 | 3 | Q.   Well, no.  You heard from people that that was what had |
| 11:54 | 4 | happened, correct?  That's what you heard from people? |
| 11:54 | 5 | A.   That what? |
| 11:54 | 6 | Q.   That -- |
| 11:54 | 7 | A.   As of when? |
| 11:54 | 8 | Q.   As of the past few years, as of December 11, 2009, you |
| 11:54 | 9 | had heard from people in your office that -- |
| 11:54 | 10 | A.   No. |
| 11:54 | 11 | Q.   -- people from Mattel would come into your showroom? |
| 11:54 | 12 | A.   No. |
| 1:54 | 13 | MR. PRICE:  In this case, Your Honor, I'd ask to |
| 11:54 | 14 | read 991, line 10, through 992, line 23. |
| 11:54 | 15 | THE COURT:  You may. |
| 11:54 | 16 | Now you may read line 10 through 24, and you may |
| 11:55 | 17 | read line 18 through 23. |
| 11:55 | 18 | MR. PRICE:  Thank you, Your Honor.  (Reading:) |
| 11:55 | 19 | "QUESTION:  And if I" -- |
| 11:55 | 20 | THE COURT:  Better yet, I don't know why this |
| 11:55 | 21 | isn't read continuously all the way through line 23. |
| 11:55 | 22 | So you may read continuously from line 10, on page |
| 11:55 | 23 | 991, through 992, line 23. |
| 11:55 | 24 | MR. PRICE:  I will, Your Honor. |
| 11:55 | 25 | "QUESTION:  And if I understand your testimony, |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:55 | 1 | you're saying that Mattel did what? |
| 11:55 | 2 | "ANSWER: Mattel came to our showroom with a false |
| 11:55 | 3 | business card saying that they're either a journalist or -- |
| 11:55 | 4 | that's my understanding -- or they work for other |
| 11:55 | 5 | organizations, or they're a customer or came with a |
| 11:55 | 6 | customer. |
| 11:55 | 7 | "ANSWER:" (sic) "And when you say Mattel, what |
| 11:55 | 8 | individual or individuals are you referring to? |
| 11:55 | 9 | "ANSWER: I don't have their names here, but I |
| 11:55 | 10 | think we have names. |
| 11:55 | 11 | "QUESTION: And you said it was your |
| 11:55 | 12 | understanding, so I take it you derived this from somebody |
| :56 | 13 | or heard it from somebody? |
| 11:56 | 14 | "ANSWER: I didn't -- I don't remember who. |
| 11:56 | 15 | "QUESTION: I'm sorry.. You don't remember who you |
| 11:56 | 16 | heard it from? |
| 11:56 | 17 | "ANSWER: Not as I sit here today." |
| 11:56 | 18 | And then, "THE WITNESS: Excuse me. I'm losing my |
| 11:56 | 19 | voice, so I apologize." |
| 11:56 | 20 | Let me skip -- |
| 11:56 | 21 | Uh, "Yes" -- line 9, "Is this something you heard |
| 11:56 | 22 | from one person? |
| 11:56 | 23 | "ANSWER: I heard it from a few people. |
| 11:56 | 24 | "QUESTION: Do you remember any of them? |
| 11:56 | 25 | "ANSWER: I don't remember the names as I sit here |

| 11:56 | 1 | today, no. |
| 11:56 | 2 | "QUESTION:  Do you remember the context of any of |
| 11:56 | 3 | this; in other words, where you were or what the |
| 11:56 | 4 | circumstances were when you heard this from anyone? |
| 11:56 | 5 | "ANSWER:  Must have been in any -- in any office. |
| 11:56 | 6 | "QUESTION:  And is this something that you heard |
| 11:56 | 7 | recently?  Was it some time ago? |
| 11:56 | 8 | "ANSWER:  Some time ago. |
| 11:56 | 9 | "QUESTION:  And can you give me an approximate |
| 11:56 | 10 | time period? |
| 11:56 | 11 | "ANSWER:  Past few years." |
| 11:56 | 12 | BY MR. PRICE: |
| 1:56 | 13 | Q.   Now, Mr. Larian, it -- it was, you'll agree with me -- |
| 11:56 | 14 | I think, yes, I think -- that it's clearly wrong for people |
| 11:57 | 15 | to misrepresent themselves?  You agree, correct? |
| 11:57 | 16 | A.   I one hundred percent agree with you on that.  Yes, I |
| 11:57 | 17 | do. |
| 11:57 | 18 | Q.   And, uh, it's also kind of lazy, because you told us |
| 11:57 | 19 | the information in your catalogs is available to the public |
| 11:57 | 20 | as of the time of the toy fair, correct? |
| 11:57 | 21 | MS. HURST:  Object to the form, "You've told us." |
| 11:57 | 22 | Argumentative. |
| 11:57 | 23 | MR. PRICE:  I'll -- I'll -- |
| 11:57 | 24 | THE COURT:  Stricken. |
| | 25 | |

| 11:57 | 1 | BY MR. PRICE: |
| 11:57 | 2 | Q.   It's also lazy because the information -- |
| 11:57 | 3 | A.   What is lazy? |
| 11:57 | 4 | Q.   -- that's in your catalog at toy fairs becomes public? |
| 11:57 | 5 | MS. HURST:  I'm sorry.  I don't understand that |
| 11:57 | 6 | question. |
| 11:57 | 7 | THE COURT:  Are you saying "lazy" or "hazy"? |
| 11:57 | 8 | MR. PRICE:  Lazy. |
| 11:57 | 9 | THE COURT:  Lazy? |
| 11:57 | 10 | MR. PRICE:  Yeah.  Let me rephrase. |
| 11:57 | 11 | BY MR. PRICE: |
| 11:57 | 12 | Q.   The information in your catalogs is available from |
| 11:57 | 13 | retailers, right? |
| 11:57 | 14 | MS. HURST:  Objection.  Misstates the witness's |
| 11:57 | 15 | testimony. |
| 11:57 | 16 | THE WITNESS:  No. |
| 11:57 | 17 | THE COURT:  Overruled. |
| 11:57 | 18 | Your answer is? |
| 11:57 | 19 | THE WITNESS:  No. |
| 11:57 | 20 | THE COURT:  Okay.  Thank you. |
| 11:57 | 21 | BY MR. PRICE: |
| 11:57 | 22 | Q.   It's available in press releases, correct? |
| 11:57 | 23 | A.   Some of the information is, not all of them. |
| 11:57 | 24 | Q.   Available -- some of the information is available in |
| 11:57 | 25 | news articles, correct? |

# TAB #14

## Brawer Knew About The Precise Conduct No Later Than 2004

Q.   Okay.  Now, when you were at Mattel, did you become aware of whether any Mattel employees were using false credentials to get into competitors' showrooms at toy fairs?
A.   Yes, I was aware that Mattel employees used false credentials to get into competitor's showrooms.

*3/30/11 Trial Tr., Vol. 2 (Brawer) at 89:18-22.*

Q.   Now, let's talk about -- about your discussions with Mr. Villasenor.  And, uh, he told you that he was using false business cards to get into toy showrooms, correct?
A.   Yes, he did.

*3/31/11 Trial Tr., Vol. 1 (Brawer) at 77:15-78:5.*

CV 04-9049-DOC - 03/30/2011 - Day 42, Vol. 2 of 3

```
 1    strategies.

 2    Q    What do you mean by negative PR?

 3    A    I actually don't know exactly what he meant.  I assume

 4    that --

 5              MR. PRICE:  Objection.  Speculating.

 6              THE COURT:  Sustained.

 7    BY MS. KELLER:

 8    Q    What did you understand he was talking about?  What was

 9    your understanding of what he was talking about?

10              MR. PRICE:  Objection.  That's irrelevant.  He

11    said he didn't know.

12              THE COURT:  He can give us his mind set for his

13    alleged conduct, but it's hearsay as to Matt Bousquette.

14    Matt Bousquette isn't here testifying, so we don't know.

15              Counsel, thank you.

16              You can answer the question.

17              THE WITNESS:  So my understanding of what negative

18    PR meant was that we would be disparaging PR -- do

19    disparaging PR against Bratz or whatever competitor we

20    needed.

21    BY MS. KELLER:

22    Q    Do you mean formal ads that would have Mattel's name on

23    it or something more subtle?

24    A    I can't be certain, but it can be more subtle.

25    Q    Now, we --
```

```
 1            THE COURT:  Counsel, I'm going to strike this
 2    testimony.
 3            This is your interpretation or are these words
 4    from Matt Bousquette?
 5            THE WITNESS:  Matt Bousquette told me that the
 6    company would be initiating negative PR against Bratz.
 7            THE COURT:  And the rest of that is your
 8    interpretation?
 9            THE WITNESS:  I can only --
10            THE COURT:  Okay.  I'm going to strike the
11    remainder of that.  That answer remains, Counsel.  The
12    remainder of his interpretation is stricken.
13    BY MS. KELLER:
14    Q    So you never said to Matt Bousquette, for example, tell
15    me exactly what the plan is, what do you mean, what kind of
16    negative publicity?
17    A    No, I did not.
18    Q    Okay.  Now, when you were at Mattel, did you become
19    aware of whether any Mattel employees were using false
20    credentials to get into competitors' showrooms at toy fairs?
21    A    Yes, I was aware that Mattel employees used false
22    credentials to get into competitor's showrooms.
23    Q    And was this -- was this something that was well hidden
24    within Mattel?
25            MR. PRICE:  Objection.  Lack of foundation.  And
```

1   ambiguous.

2           MS. KELLER:  I'll back up and ask a different

3   question.

4           THE COURT:  Sustain the objection.

5   BY MS. KELLER:

6   Q    How did you first become aware of it?

7   A    The first I can recall of how I became aware of this

8   was Sal Villasenor, who worked in this department, actually

9   told me that he did it.

10  Q    And was it your understanding that he worked alone or

11  with others?

12  A    No, it was a whole department.

13  Q    And what was your understanding of what he would obtain

14  for Mattel to use?

15  A    He would go into showrooms and try and elicit catalogs,

16  price lists and any kind of marketing information, product

17  information he could from showrooms of various competitors.

18  Q    Unreleased products?

19  A    Yes, unreleased products.

20  Q    And did he mention which showrooms he went into

21  specifically in these conversations with you?

22  A    I can't recall specific showrooms, no.

23  Q    Now, after you went to work at MGA, did you ever tell

24  Mr. Larian or other people at MGA about what Mr. Villasenor

25  had been doing at Mattel?

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

76

| | | |
|---|---|---|
| 09:53 | 1 | that the department that he was in -- that the title was |
| 09:53 | 2 | something like competitive analyst, right? |
| 09:53 | 3 | A.   When are you saying I said that? |
| 09:54 | 4 | Q.   At the time that you were at Mattel, up until 2004, you |
| 09:54 | 5 | thought that Mr. Villasenor's department was, quote, |
| 09:54 | 6 | "competitive analysts" or something like that, correct? |
| 09:54 | 7 | A.   I -- I don't know that I remember that being the name |
| 09:54 | 8 | of the group. |
| 09:54 | 9 | Q.   If you'd look at -- this is January 26, 2010, page 646. |
| 09:54 | 10 | (Document provided to the witness.) |
| 09:54 | 11 | BY MR. PRICE: |
| 09:54 | 12 | Q.   Lines -- do you have 646?  It's lines 11 through 21. |
| 09:54 | 13 | A.   If you don't mind, I'm going to read a little bit |
| 09:54 | 14 | before. |
| 09:55 | 15 | Q.   11 to 21. |
| 09:55 | 16 | A.   Maybe I'm reading the wrong page. |
| 09:55 | 17 | THE COURT:  Do you have page 646? |
| 09:55 | 18 | THE WITNESS:  646. |
| 09:55 | 19 | THE COURT:  It should be lines 11 through 21, and |
| 09:55 | 20 | it would be contained probably on lines 19 and 20. |
| 09:55 | 21 | MR. PRICE:  Yes. |
| 09:55 | 22 | THE WITNESS:  So I'm sorry, can you restate your |
| 09:56 | 23 | question? |
| 09:56 | 24 | BY MR. PRICE: |
| 09:56 | 25 | Q.   At the time that you were at Mattel, you didn't know |

| | | |
|---|---|---|
| 09:56 | 1 | what Mr. Villasenor's department title was, and you thought |
| 09:56 | 2 | it might have been something like competitive analyst, |
| 09:56 | 3 | correct? |
| 09:56 | 4 | A.   Um, yes, correct. |
| 09:56 | 5 | Q.   And -- and you were being truthful about that; you're |
| 09:56 | 6 | not trying to hide whether the title was Market |
| 09:56 | 7 | Intelligence? |
| 09:56 | 8 | MS. KELLER:  Objection.  Your Honor, he said he |
| 09:56 | 9 | didn't know what it was. |
| 09:56 | 10 | THE COURT:  Overruled.  You can answer the |
| 09:56 | 11 | question. |
| 09:56 | 12 | THE WITNESS:  Um, I was trying to be truthful |
| 09:56 | 13 | throughout my depositions, yes. |
| 09:56 | 14 | BY MR. PRICE: |
| 09:56 | 15 | Q.   Now, let's talk about -- about your discussions with |
| 09:56 | 16 | Mr. Villasenor.  And, uh, he told you that he was using |
| 09:56 | 17 | false business cards to get into toy showrooms, correct? |
| 09:56 | 18 | A.   Yes, he did. |
| 09:56 | 19 | Q.   And you testified that there would be these -- these |
| 09:56 | 20 | big meetings where they do competitive -- uh, these |
| 09:56 | 21 | competitive reviews?  Do these videos? |
| 09:57 | 22 | A.   Yes. |
| 09:57 | 23 | Q.   A lot of people would be there, right? |
| 09:57 | 24 | A.   Correct. |
| 09:57 | 25 | Q.   You said, uh, that "Everyone knew what was going on." |

| | | |
|---|---|---|
| 09:57 | 1 | Do you remember that phase, "Everyone knew"? |
| 09:57 | 2 | A.   Yes, I do. |
| 09:57 | 3 | Q.   So hundreds of people, you say, knew what was going on |
| 09:57 | 4 | 'cause they were attending these presentations, correct? |
| 09:57 | 5 | A.   Correct. |
| 09:57 | 6 | Q.   And do you believe, as some have, that there's kind of |
| 09:57 | 7 | an incestuous relationship between employees in this |
| 09:57 | 8 | industry, where they can go from one company to another and |
| 09:57 | 9 | do go from one company to another? |
| 09:57 | 10 | A.   I don't like the term "incestuous." |
| 09:57 | 11 | Q.   It's not mine, but go ahead. |
| 09:57 | 12 | A.   But I do believe that there's a -- there's a lot of |
| 09:57 | 13 | people who go from one company to another in the toy |
| 09:57 | 14 | industry; that's correct. |
| 09:57 | 15 | Q.   So a lot of people who were gonna go from -- who were |
| 09:57 | 16 | going from one toy company to another, from Mattel to |
| 09:57 | 17 | another company, knew about this, right? |
| 09:57 | 18 | A.   Yes.  Well, I don't know whether they knew or not, but |
| 09:57 | 19 | I do know that -- that a lot of people do go from one toy |
| 09:57 | 20 | company to another. |
| 09:57 | 21 | Q.   Well, you said, "Everyone knew," everyone who was |
| 09:58 | 22 | attending these presentations, right? |
| 09:58 | 23 | MS. KELLER:  Objection.  I believe the testimony |
| 09:58 | 24 | was at the executive level, Your Honor. |
| 09:58 | 25 | MR. PRICE:  It wasn't. |

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

79

| | | |
|---|---|---|
| 09:58 | 1 | THE COURT:  Just a moment. |
| 09:58 | 2 | Overruled. |
| 09:58 | 3 | Answer the question. |
| 09:58 | 4 | BY MR. PRICE: |
| 09:58 | 5 | Q.    You said, "Everyone knew," not just the executive |
| 09:58 | 6 | levels? |
| 09:58 | 7 | A.    There was a large population at Mattel that knew about |
| 09:58 | 8 | this group, yes. |
| 09:58 | 9 | Q.    And at the time -- well, let me strike that. |
| 09:58 | 10 | Your belief is that even if it's wrong, that it's |
| 09:58 | 11 | common practice in the trade? |
| 09:58 | 12 | A.    What Sal did specifically? |
| 9:58 | 13 | Q.    What Sal did specifically. |
| 09:58 | 14 | A.    No, I don't know that to be common practice in the |
| 09:58 | 15 | trade. |
| 09:58 | 16 | Q.    When did it first occur to you that what Mr. Villasenor |
| 09:59 | 17 | was doing was wrong? |
| 09:59 | 18 | A.    Again, my most vivid memory of when I really had that |
| 09:59 | 19 | moment of understanding what Mr. Villasenor was doing was |
| 09:59 | 20 | wrong was during the taking of my depositions, whenever that |
| 09:59 | 21 | particular one was. |
| 09:59 | 22 | Q.    And, uh, that was in -- around January of 2010; do you |
| 09:59 | 23 | recall that? |
| 09:59 | 24 | A.    Yes, I do recall that. |
| 09:59 | 25 | Q.    And prior to that, you had no belief that what |

DEBBIE GALE, U.S. COURT REPORTER

# TAB #15

## Knowing What He Did, Brawer Interviewed Villasenor

TX 22395 --

> Villasenor emails Brawer in late 2006, stating "As I mentioned in our conversation, I have 15 years marketing research/competitive intelligence experience in the toy industry."

> Brawer forwards to Machado, saying "Possible replacement for Christina."

> Machado responds, "I remember this guy had a lot of insights about the competitive environment, I would also like to consider him."

See also TX 9298; 9632; 9337 (subsequent emails among Machado, Brawer, and Villasenor).

| | |
|---|---|
| **From:** | Gustavo Machado (MGA- LA) <GMachado@mgae.com> |
| **Sent:** | Tuesday, November 14, 2006 10:28 PM |
| **To:** | Ron Brawer <RBrawer@mgae.com> |
| **Subject:** | Re: Thank You! |

I remember this guy had a lot of insights about the competitive environment, I would also like to consider him.
Thanks
-------------------------
Sent from my BlackBerry Wireless Device
-----Original Message-----
From: Ron Brawer <RBRAWER@mgae.com>
To: Gustavo Machado (MGA- LA) <GMachado@mgae.com>
Sent: Tue Nov 14 21:34:36 2006
Subject: Fw: Thank You!
Possible replacement for christina
-----Original Message-----
From: Sal Villasenor <salvillasenor@sbcglobal.net>
To: Ron Brawer <RBRAWER@mgae.com>
Sent: Tue Nov 14 18:46:55 2006
Subject: Thank You!
Ron,
Thank you for making time in your schedule to talk to me yesterday.
As you requested, I will be emailing you a copy of my resume in the next few days.
As I mentioned during our conversation, I have 15 years marketing research/competitive intelligence experience in the toy industry. I am familiar with the products that you manufacture and believe my experience would benefit your company.
Thanks again for your time.
Sincerely,
Sal Villasenor

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA2 3297382
TX 22395-00001

**From:**     Ron Brawer
**Sent:**     Wednesday, January 17, 2007 01:59 AM
**To:**       Gustavo Machado (MGA- LA)
**Subject:**  FW: Don't forget me!


? --
Did you have him in for an interview?
-----Original Message-----
From: Sal Villasenor [mailto:salvillasenor@sbcglobal.net]
Sent: Tuesday, January 16, 2007 5:31 PM
To: Ron Brawer
Subject: Don't forget me!
Hi Ron,
Just wanted to remind you that I'm still very
interested in working for you and MGA. I know that
with NY Toy Fair right around the corner this is a
busy time for you. However, I would like to continue
our discussion about the possibility of me joining
your team.
Thanks - Sal V.
PS - keep in mind that with my extensive experience in
Market Intelligence, I know that I can be a valuable
resource at NY Toy Fair.

EXHIBIT
9298
7 12 10

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA2 0167656

TX 09298-00001

**From:** Gustavo Machado (MGA- LA)
**Sent:** Wednesday, January 17, 2007 02:02 AM
**To:** Ron Brawer
**Subject:** RE: Don't forget me!

He came around dec 15th, we chatted for 1/2 hour and we convened we would have an interview this year; which I will do the following week.
I will make sure to talk you about this in our following meeting.
-----Original Message-----
From: Ron Brawer
Sent: Martes, 16 de Enero de 2007 05:59 p.m.
To: Gustavo Machado (MGA- LA)
Subject: FW: Don't forget me!
? --
Did you have him in for an interview?
-----Original Message-----
From: Sal Villasenor [mailto:salvillasenor@sbcglobal.ne
The original message has been archived. Click the following link to retrieve it
https://webmail.mgae.com/AOneSearch?ID=97489EDF-C110-11DC-ABF6-001372695969_Employees.new

Exhibit 9632
Brawer
9 26 /10 / pge
P. Pyburn CSR 7304, RPR, CLR

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA2 0150736

TX 09632-00001

| | |
|---|---|
| **From:** | Sal Villasenor |
| **To:** | Gustavo Machado (MGA- LA) |
| **CC:** | Ron Brawer |
| **BCC:** | |
| **Sent Date:** | 2006-11-30 07:54:00:000 |
| **Received Date:** | 2006-11-30 07:54:09:000 |
| **Subject:** | Re: Hello |
| **Attachments:** | sal villasenor resume.doc |

Hi Gustavo,

As you requested, I am emailing you a copy of my resume.

I also look forward to an interview to discuss my qualifications and my interest in working with you and Ron at MGA.

Thank you again for your interest.

Sal V.


— "Gustavo Machado  (MGA- LA)" <GMachado@mgae.com> wrote:

> Hello Sal,
>
>
>
> Remember me? I used to work at Mattel Mexico, now I
> work for Ron as VP
> Marketing here in LA.
>
>
>
> He told me about you, and I am interested in getting
> your curriculum and
> having an interview with you.
>
>
>
> Please send your CV to this email at your earliest
> convenience, I will
> coordinate with HR to arrange an interview soon.
>
>
>
> Thanks.
>
>
>
> Gustavo
>
>

Exhibit 9337
Larian
8 / 12 /10  4  pgs
P. Pyburn CSR 7304, RPR, CLR

Confidential

MGA 4010001

TX 09337-00001

>
> DISCLAIMER:
> Sample Disclaimer added in a VBScript.
>

*9337.2*

Confidential

MGA 4010002

# SAL VILLASENOR

624 Adelyn Drive
San Gabriel. CA 91775
(626 Redacted
E-Mail: salvillasenor@sbcglobal.net

## SUMMARY OF QUALIFICATIONS

- Has several years of top, diversified experience.
- Strong background in many areas including market analysis, competitive intelligence, trend analysis, data compilation and analysis, product recommendation, and report preparation.
- Hard working, driven, and dedicated, highly-experienced in all aspects of the market analysis process, and thoroughly familiar with industry products, practices, and protocols.
- Well-versed in the research and analysis of consumer and competitive information on new products, media tactics, product pricing, and other key industry areas.
- Adept in the managing and organizing the dissemination of competitive intelligence, while developing all manner of specific, targeted information.
- Proficient in the analysis and delivery of NPD TRSTS, TMI, and OLP ad-hoc requests and reports.
- Experienced in the editing and continuous dissemination of compilations of secondary trend information in the form of newsletters, reports, and presentations.
- Able to provide valuable and essential insight into what is popular and trendy with kids, teenagers, and adults.
- An ability to provide primary trend coverage through attendance at conventions and trade shows, and prepare primary trend information in various media.
- Knowledge of computers, working with Windows, Word, Excel, PowerPoint, NPD PowerView (toy, video game, and apparel databases), Factiva, Lexis/Nexis, AutoCad 3D Modeling, Pro Engineer, Internet, and other systems.
- Bilingual, speaking English and Spanish fluently.

## PROFESSIONAL EXPERIENCE

MATTEL, INC., El Segundo, California
The world's largest toy manufacturer and distributor with sales of $5.2 billion.
Market Intelligence Manager (2004-2006)
- Developed an organized strategy and process for providing comprehensive and timely competitive intelligence insights.
- Utilized business and market expertise to interpret competitive information, draw intelligent conclusions, and formulate recommendations on potential counter measures and alternative actions open to the company.
- Communicated analysis to key senior management via competitive reports, executive summaries, special topic briefs, and executive meetings.
- Provided early warning to brand groups of changes in the competitive landscape which potentially affected or shaped the company's strategy.
- Provided NPD Consumer Panel responses to specific ad-hoc requests from marketing, design, and sales.
- Developed a network of contacts outside the company which allowed the easy acquisition of information not readily available in published reports.
- Attended industry conferences, conventions, trade shows, and points-of- sale to gain meaningful competitive information and trends.
- Subscribed to pertinent organizations, Internet websites, periodicals and newsletters to help identify and predict future trends amongst target groups (i.e., children, tweens, teens and adults).
- Created and updated the "What's Hot!" Display, which provided marketing and design departments with a hands-on opportunity to interact with competitive products currently at retail.

Marketing & Business Analysis Supervisor (2001-2003)
- Provided support and direction to all the marketing groups, in preparation of annual Brand Directional Outlines, Line Reviews, Subsidiary Meetings, Toy Fairs, and Strategic Plan Development.
- Kept abreast of key competitive happenings, and passed information along with implications to senior management.
- Interfaced with various syndicated research suppliers to evaluate their services and costs, as well as to insure high quality and timely information (e.g., NPD Funworld and Fashionworld, Yankelovich, Zandl Group, KidSay, Xtreme Information, Nielsen VideoScan, etc.).

*9337.3*

Confidential

MGA 4010003

TX 09337-00003

- Developed toy industry trend reports and provided information to various business units and senior management.
- Evaluated and provided input to NPD's consumer panel data and solution folders in order to insure the quality of data as well as the level of detail that was needed.

Marketing & Business Analysis Senior Analyst (1997-2000)
- Researched toy industry trends, market sizes, and potential competitors.
- Analyzed quantitative and qualitative data, and wrote detailed reports of the findings for the Boys' Division.
- Created industry overview reports documenting market growth, consumer behavior, etc.
- Developed monthly News & Trends newsletter.
- Established and enhanced research vendor relations.
- Responded in a timely manner to requests from marketing for competitive information using NPD's TMI and TRSTS data.

Sales Research Analyst (1992-1996)
- Evaluated and reported market performance of key products through the analysis and interpretation of Point of Sales (POS) and other related sales data.
- Reviewed the effectiveness of integrated marketing plans, including promotions and merchandising efforts and provided recommendations to maximize sales.
- Forecasted and tracked year-end consumer sales, and recommended changes to sales and manufacturing quotas by product and key accounts to maximize shipping opportunities and minimize inventory carry-over risk.
- Created and maintained meaningful management reports on consumer sales for assigned brands.

HUGHES AIRCRAFT COMPANY, El Segundo, California
Hughes Aircraft Company was a major defense/aerospace company founded by Howard Hughes.
Mechanical Designer (1988-1991)
- Provided design support for the B-2 stealth bomber's radar system and antenna.
- Oversaw the design and development of mechanical parts and assemblies from beginning to end.
- Constructed 3D CAD models and physical prototypes.

McDONNELL DOUGLAS AIRCRAFT, Long Beach, California
McDonnell Douglas was one of the most dominant aerospace companies in the world whose products included military and commercial aircraft, spacecraft and missiles.
Tool Design Engineer (1985-1987)
- Provided technical expertise to drive and fulfill company objectives in manufacturing practices and design projects.
- Reviewed and drafted rough sketches, drawings, specifications and other engineering data.
- Developed tooling concepts and designs for all tools, dies, fixtures, molds, and/or special equipment necessary to manufacture an aircraft.

## EDUCATION

CALIFORNIA STATE UNIVERSITY, LONG BEACH, Long Beach, California
Earned a Bachelor of Science in Business Administration and Marketing.

RIO HONDO COLLEGE, Whittier, California
Earned an Associate of Science in CAD/CAM Engineering/Mechanical Design/Drafting.

## REFERENCES

Available upon request

*9337.4*

Confidential

MGA 4010004

# TAB #16

## MGA Routinely Obtained Information About Competitors' Unreleased Products

*TX 9854* – (2008 email attaching "M Booth Report").

> "Two of our colleagues have been able to enter the booth of our competitor and wrote the attached report."

> Report contains information about unreleased Mattel products, including appearance, operation, play pattern, and anticipated retail price.

*TX 9533* -- "Dear Isaac", discussing "a TOP SECRET theme in a closed room at Toy Fair."

*TX 22225* --  Larian: "I need a favor at New York Toy Fair. Can you please get me a copy of catalog and price lists for the following companies".

*Larian's Trial Testimony Re TX 22225:*

Q.   Now, you've previously told the jury that, uh, those catalogs and those toy show -- toy fair showrooms are secret?
A.   They are.
Q.   And that those price lists are secret, right?
A.   They are.
. . .
Q.   Well, when you say, "get me a copy of catalog and price lists for the following companies:  Mattel," did you think you were using a retailer to steal trade secrets?
A.   No.

> *3/25/11 Trial Tr. Vol. 1 (Larian), at 105:21-24.*

00505.07975/4165939.1

| | |
|---|---|
| **From:** | Angelika Sternberg - Germany Office |
| **To:** | ZAPF - Jorge Arceo; Zapf - Christophe Baudic; Onno Van De Werken - Benelux Office; ZAPF - Marian Davis |
| **CC:** | Paula Garcia; Janet Han; Alice Kao; Ron Brawer; Isaac Larian (President / CEO); Thomas Pfau - Germany Office; Laura Wiese |
| **Sent:** | 2/13/2008 4:24:04 PM |
| **Subject:** | Nuremberg Toy Fair 2008 |
| **Attachments:** | Nuremberg TF 2008 Competitive Report.doc |

Two of our colleagues have been able to enter the booth of our competitor and wrote the attached report.

Best regards,
Angelika



CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA2 3120922

TX 09854-00001

# Report
# "M" booth
# Nuremberg TOY Fair 2008
# 10.02.2008

## Girls

**1) Fairies & Muses (TV)**
   a. Doll with skirt which changes style through touch of a button
   b. Two dolls taking hands and singing together
   c. Horse -- eating function; flashing hooves; when combing the mane the horse starts singing
   d. House for the fairies and horse
   e. Diamond shaped carriage with horse

**2) Mariposa (Easter highlight):**
World of fairies with wings which transform to large wings

**3) Shelly:**
Little Shelly for the bathtub, Shelly sitting in a water lily spattering water; slide for the bathtub

**4) Barbie (Christmas highlight):**
High quality Barbie with Christmas dress (red velvet with golden accessories)
(TV; packed with DVD with the story "A Christmas Carol" of Charles Dickens

**5) Barbie Cruiser:**
Large ship (like AIDA cruiser) with pool, it turns into a cruiser disco in the evening (disco style with light effects); room can be changed via elements that are turned around

**6) Barbie „Talk to me":**
Barbie included shirt for the girl which has the same look/style like the doll

**7) Sleeping Beauty Castle**

**8) House for Barbie:**
House can be designed by putting parts of the house together (parts of kitchen, bath with bathtub or shower etc.)

**9) Prima Ballerina Barbie:**
Spinning Barbie as a ‚Prima ballerina' on a platform, includes key for holding the spinning Barbie without the platform in order to extend the play of the girl (MSRP: around €35,00)

**10) Barbie on Ice:**
Large ice-skating Barbie (R/C) which does pirouettes, ice-skating moves like a swan (MSRP around €50,00)

**11) Barbie Mermaid (can swim in water)**

**12) Hairstyle:**
Colouring parts of the Barbie hair by a stick of chalk
Continuing themes of "Coole Zöpfe Barbie"
   1) Hair can be coloured
   2) Hair can be styled

*9854.2*

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA2 3120923

**13)Barbie with fruit lip-gloss and glitter for the girl (not smelling)**

**14)Hannah Montana:**
  1) Doll Hannah Montana: together with the TV serial (hair turns from blond to dark by turning a part of the head), singing the songs from the TV serial,
  2) Sleeping room of doll can be changed into a stage via elements that are turned around

**15)Dino**
  D-Rex: remote controlled dinosaur (around 40 cm high) which makes loud and typical noises by touching/stroking the head/back

**16)Doll**
  ‚My lovely Baby' baby doll has grown older and comes with several functions around the bathing room: drinking sounds, speaks simple sentences like „Mommy, I got to go to the toilet". When put on the toilet (no potty) typical sounds will be played/the content of the toilet changes. When tap is turned doll interacts with basin ("wash my hands"). Brushing teeth function: when brush is put in front of dolls head she will start to turn her head. When blanket is put in dolls hand she will go to sleep.

## My Scene:
  - Egyptian theme
  - Winter theme
  - Eye-catching packaging

## Mebees:

Can that has plush character inside. Play several stages of an attached game. At seventh stage can opens and hidden character can be revealed. Collecting theme

## Fisher Price:

  1) **Children Keyboard for computer**
  Paint games (as windows paint) – different backgrounds, change colours, use stamp-function, air brush. Pictures can be printed. Large touch pad to paint on.

## Hot Wheels:

  1) Motorcycle RC (remote control not with buttons but comparable to handheld of Nintendo Wii) RSP: around 80 €
  2) Hot Wheels parcour: extendable and variable. Cars can be shot through parcours like done on domino day.
  3) Water theme: shark – gorges diver – large boat composed of several smaller boats
  4) Monster....

## Electronics:

  1) Funkeys main station (MSRP: around 30 €)
  2) Dolls to buy later on



**Darmstadt, 13.02.2008/Kerstin+Katharina**

*9854.3*

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA2 3120924

TX 09854-00003

From:        Angelika Stemberg - Germany Office
To:          Isaac Larian (President / CEO)
CC:          Ron Brawer; Paula Garcia; Thomas Pfau - Germany Office
Sent:        2/3/2007 2:51:14 PM
Subject:     Competiton

Dear Isaac,

We have some news for you which we heard from customers regarding „Get Connected"-Barbie. They show it as a TOP SECRET theme in a closed room at Toy Fair. The retail price point will be around € 90 which is seen by the trade as far too high "for a simple doll with internet connection and a MP3 player".

The main theme (movie) will be "Princess of the island". (Robinson Crusoe story)
Storyline:
Barbie and a lot of animals are on a lonely island. A very nice and handsome guy is rescuing her and the animals from the island into civilisation and Barbie and this guy -of course- fall in love and want to get married. His parents are against this relationship since they want him to marry another girl. This girl –at the end- realize that a true love can not be skipped and dashed and finally backtrack and opens the way for Barbie and her beloved.

We furthermore heard that they are coming up with a new big Barbie house and an airplane.
In Polly Pocket they are introducing again high-priced accessories.

Brgds,
Angelika


Exhibit 9533
Garcia
9 16 /10 1 pgs
P. Pyburn CSR 7304, RPR, CLR

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA2 3089028

TX 09533-00001

| | |
|---|---|
| **From:** | Isaac Larian |
| **To:** | Mazel - Brady Churches |
| **Sent:** | 1/13/2000 9:00:31 AM |
| **Subject:** | NYTF |

Dear Brady,

Hope you have a safe trip home and thank for your business and support.

I need a favor. At NYTF, can you please get me a copy of catalog and price list for following companies:

Playmate, Tiger, Manley, Radica, Hasbro, Parker brothers, Thinkway toys, DSI, Toymax, Mattel, ToyBiz

Thanks.

Isaac Larian
CEO
MGA Entertainment
16730 Schoenborn Street, North Hills, California, 91343, USA
Tel 818-894-3150

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA2 2947853

TX 22225-00001

| 10:49 | 1 | THE COURT: Sustained. Stricken. |
| 10:49 | 2 | BY MR. PRICE: |
| 10:49 | 3 | Q. Uh, in any event, in January 13, 2000, you were asking |
| 10:49 | 4 | your retailer -- one of your retailers to get catalog and |
| 10:49 | 5 | price lists for the following companies, and Mattel is |
| 10:49 | 6 | listed there, correct? |
| 10:49 | 7 | A. Yes. |
| 10:49 | 8 | Q. And you thought that that was a perfectly appropriate |
| 10:49 | 9 | request of a retailer going into a competitor's showroom at |
| 10:49 | 10 | toy fair? |
| 10:49 | 11 | A. I don't recall my state of mind in 2000. I don't |
| 10:49 | 12 | recall. |
| 10:49 | 13 | Q. Well, do you think you would have done something that |
| 10:49 | 14 | you thought was sneaky and improper and unethical or |
| 10:49 | 15 | illegal? |
| 10:49 | 16 | A. Like what? Going to Mattel showroom with a fake ID and |
| 10:49 | 17 | a fake business card? That's unethical? |
| 10:49 | 18 | Q. No. I mean, asking a retailer who worked with you to |
| 10:49 | 19 | go into a competitor's showroom and -- and bring to you that |
| 10:49 | 20 | competitor's catalog and price list. I mean, did you |
| 10:50 | 21 | think -- would you have asked that if you thought it was |
| 10:50 | 22 | illegal, unethical, improper? |
| 10:50 | 23 | MS. KELLER: Objection. Assumes facts not in |
| 10:50 | 24 | evidence that's what was requested. |
| 10:50 | 25 | THE WITNESS: I'm not asking him to go to Mattel's |

CV 04-9049 DOC - 3/25/2011 - Day 40, Volume 1 of 2

| | | |
|---|---|---|
| 10:50 | 1 | showroom and get that information.  I don't see that |
| 10:50 | 2 | anywhere in here. |
| 10:50 | 3 | BY MR. PRICE: |
| 10:50 | 4 | Q.    Oh, I thought you said price lists were those secret |
| 10:50 | 5 | things that you would only give out to retailers in the |
| 10:50 | 6 | private showrooms? |
| 10:50 | 7 | A.    We do. |
| 10:50 | 8 | Q.    Okay.  So here the e-mail's about New York Toy Fair, |
| 10:50 | 9 | right? |
| 10:50 | 10 | A.    Yes. |
| 10:50 | 11 | Q.    You're talking about price lists, which you would |
| 10:50 | 12 | expect only to be in the private showroom, correct? |
| ·50 | 13 | A.    Or otherwise.  I don't know at that time. |
| 10:50 | 14 | Q.    Mr. Larian, you just don't want to admit that you |
| 10:50 | 15 | expect that things that go on in these toy fair showrooms |
| 10:50 | 16 | are gonna be told to the rest of the industry; you just |
| 10:50 | 17 | don't want to admit that, do you? |
| 10:50 | 18 | MS. HURST:  Object to the form. |
| 10:50 | 19 | THE COURT:  Sustained. |
| 10:50 | 20 | BY MR. PRICE: |
| 10:50 | 21 | Q.    Well, when you say, "get me a copy of catalog and price |
| 10:51 | 22 | lists for the following companies:  Mattel," did you think |
| 10:51 | 23 | you were using a retailer to steal trade secrets? |
| 10:51 | 24 | A.    No. |
| 10:51 | 25 | Q.    And if you'd look at Exhibit 9344. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 3/25/2011 - Day 40, Volume 1 of 2

106

| | | |
|---|---|---|
| 10:51 | 1 | *(Document provided to the witness.)* |
| 10:51 | 2 | BY MR. PRICE: |
| 10:51 | 3 | Q.   You see that that, produced by MGA, appear to be the |
| 10:51 | 4 | New York U.S. appointments for February of 2000 for the |
| 10:51 | 5 | New York Toy Fair? |
| 10:51 | 6 | A.   Yes. |
| 10:51 | 7 | MR. PRICE:  Uh, move redacted version of 9344 into |
| 10:52 | 8 | evidence, Your Honor. |
| 10:52 | 9 | THE COURT:  Received. |
| 10:52 | 10 | *(Exhibit No. 9344 received in evidence.)* |
| 10:52 | 11 | *(Document displayed.)* |
| 10:52 | 12 | BY MR. PRICE: |
| 52 | 13 | Q.   And you see on the third page there's a list and -- |
| 10:52 | 14 | MS. HURST:  Objection, Your Honor.  Prior order. |
| 10:52 | 15 | There's no reference here to Mattel. |
| 10:52 | 16 | MR. PRICE:  I'm gonna ask him whether the last |
| 10:52 | 17 | thing there is Mattel or not. |
| 10:52 | 18 | THE COURT:  I don't have the document, Counsel. |
| 10:52 | 19 | MR. PRICE:  Oh. |
| 10:52 | 20 | THE COURT:  We're going to have a continuing |
| 10:52 | 21 | series -- I'll need to get those documents up to me |
| 10:52 | 22 | apparently seriatim, because I can't get to the books fast |
| 10:52 | 23 | enough. |
| 10:52 | 24 | *(Document provided to the Court.)* |
| 10:52 | 25 | THE COURT:  And I don't know what I'm looking at, |

# TAB #17

## The Court Recognized MGA's Similar Activities

"Documents already produced by MGA demonstrate that the individuals at issue gained access to Mattel's showrooms, as well as "planograms" held by Mattel's retailers, obtained information [ ] about Mattel's product lines, and funneled that information to MGA."

*Order Re Mattel's Ex Parte Application, dated Oct. 28, 2010, Dkt. No. 9002.*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No. CV 04-9049 DOC (RNBx)                     Date: October 28, 2010

Title: MATTEL, INC. v. MGA ENTERTAINMENT, INC.

PRESENT:

#### THE HONORABLE DAVID O. CARTER, JUDGE

| Kathy Peterson | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

ATTORNEYS PRESENT FOR PLAINTIFFS: ATTORNEYS PRESENT FOR DEFENDANTS:

| NONE PRESENT | NONE PRESENT |
|---|---|

PROCEEDING (IN CHAMBERS): ORDER GRANTING IN PART AND DENYING IN PART
MATTEL'S EX PARTE APPLICATION [DOCKET 8991]

     Mattel's ex parte Application [Docket 8991] is granted insofar as it seeks to compel MGA to produce documents relevant to MGA's counterclaims in reply from the hard drives of Shawn Brower, Lisa Saunders, Janine Firth, Patrick Potgiesser, and Sandrine de Raspide. This production necessarily encompasses documents that refer or relate to any efforts by MGA or its foreign associates to gain access to Mattel's showrooms and/or planograms operated by retailers associated with Mattel. Contrary to MGA's argument, the Court's orders proscribing and/or limiting MGA's depositions of McShane, Franke, and Stockton did not limit discovery to the activities of Mattel's market intelligence group. Those orders simply prohibited MGA from using its "suppression of evidence" RICO allegations as a subterfuge through which to conduct discovery into other claims and counterclaims in this litigation, including claims and counterclaims subject to the October 4, 2010 discovery cut-off. Here, Mattel seeks discovery into whether MGA engaged in the same conduct it now complains about: wrongfully obtaining advance information about competitors' forthcoming product lines. Such discovery is relevant to Mattel's unclean hands defense and is also relevant to whether MGA considered the information at its showrooms confidential.

    Documents already produced by MGA demonstrate that the individuals at issue gained access to Mattel's showrooms, as well as "planograms" held by Mattel's retailers, obtained information from about Mattel's product lines, and funneled that information to MGA. For example, two members of a company named Zapf associated with MGA prepared a report from the Nuremberg Toy Fair identifying

| MINUTES FORM 11 DOC | Initials of Deputy Clerk kp |
|---|---|
| CIVIL - GEN | Page 1 of 3 |

Mattel's future product lines. (Dkt. 8992-1 at 3.)  Ms. Firth — one of the individuals whose files Mattel wants searched — admitted that she could "get in some major trouble" for sharing information with MGA.  (Id. at 5.)  Mr. Brower emailed MGA claiming that he "tried to steal a line list from the [M]attel showroom, but [] was able to get [] a licensee list and marketing one sheet."  (Id. at 8.)  Ms. Saunders sent MGA an email while attending a "planogram" and reported that "Barbie is doing the chat divas for fall 07," and instructed the recipient to "delete this email once you talk to" Larian and Ron Brawer.  (Id. at 12.)

MGA only produced these communications because Larian and/or Paula Garcia were recipients on the emails at issue and MGA has searched Larian and Garcia's hard drives for responsive documents.  Other communications on which Larian was not a recipient, or to which Larian was not carbon copied, may not have been produced, even though there is evidence that Larian did not receive all communications about information obtained about Mattel's product lines.  See, e.g., id. at 9 (email between Gersende Costaz and recipient list that did not include Larian).  Although such communications may have later been "forwarded" to Larian, id., MGA has not confirmed that all such communications were forwarded to an individual whose files MGA has searched for responsive information.  Though MGA objects to the burden caused by having to search the files of these individuals for responsive information, such burden is warranted by (1) the scope of MGA's counterclaims in reply; and (2) the highly probative nature of this information, which might lead a fact-finder to conclude that the activities by Mattel's market intelligence group were so commonplace that no toy manufacturer considered the information in its toy showrooms to be a trade secret. Furthermore, as Mattel notes, the Court compelled Mattel to search the files of 38 custodians at MGA's request earlier this month.

Mattel's Application is also GRANTED to the extent it seeks the last known address and last known telephone numbers for MGA employees Angelika Sternberg, Janet Han, Sandrine de Raspide and Janine Firth.  These individuals either reported information about Mattel's product lines or were apprised of such information.  See id. at 5, 9.  Mattel is entitled to depose them to determine the extent to which MGA and/or Larian directed the gathering and dissemination of information about Mattel's forthcoming product lines.  Any such deposition(s) must nonetheless be conducted in compliance with the deposition limits stipulated to by the parties and the Court will not expand the number of depositions to which either party is entitled.

Mattel's Application is DENIED to the extent it seeks the personnel files of former MGA employees potentially implicated in MGA's attempts to obtain advance information about Mattel's product lines.  Mattel has failed to sufficiently explain the basis for this burdensome discovery, which Mattel supports with the generic argument that MGA's failure to discipline the employees is relevant to its ratification of the same type of conduct allegedly committed by Mattel's market intelligence group. Mattel can look elsewhere — e.g., the communications sent by MGA in response — for evidence of MGA's ratification of the individuals' conduct.

MINUTES FORM 11 DOC
CIVIL - GEN

Initials of Deputy Clerk kp
Page 2 of 3

Mattel's Application is also DENIED to the extent it seeks an extension to the November 1,
2010 discovery cut-off in order to conduct the depositions of MGA's former employees. These
individuals can be deposed before the November 1, 2010 cut-off in a manner observant of existing
deposition limits. Allowing depositions after the November 1, 2010 deadline needlessly interferes with
the preparation and disposition of the parties' summary judgment motions on the counterclaims in
reply, which must be filed by November 15, 2010.

The Clerk shall serve this minute order on all parties to the action.

MINUTES FORM 11 DOC
CIVIL - GEN

Initials of Deputy Clerk kp
Page 3 of 3

# TAB #18

## On These Facts, UTSA Exemplary Damages Should Be Denied Despite Willfulness Finding

Russo v. Ballard Medical Products, 2007 WL 752164 (D. Utah Mar. 7, 2007) (denying motion for exemplary damages under UTSA despite jury's finding of willfulness because the objectives of exemplary damages were already "accomplished by the award of compensatory damages" for $20 million).

Perdue Farms Inc. v. Hook, 777 So.2d 1047 (2001) (reversing award of punitive damages under UTSA despite willfulness finding because defendant "had previously developed products using processes similar to [plaintiff's]" and "the only thing secret about [plaintiff's] process was the seasoning which [defendant] did not use.").

# TAB #19

## Mattel Cannot Be Punished For Purported Harm To Third Parties

"[T]he Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, i.e., injury that it inflicts upon those who are essentially strangers to the litigation."

> *Philip Morris USA v. Williams*, 549 U.S. 346, 349, 353 (2007) *(emphasis in original)*

"[P]unishment for nonparty injury adds 'a near standardless dimension to the punitive damages equation,' as jury speculation regarding the number of nonparties injured and the extent of their injuries magnifies traditional due process concerns regarding the arbitrariness, uncertainty, and lack of notice afflicting a punitive award."

> *Merrick v. Paul Revere Life Ins. Co.*, 500 F.3d 1007, 1016 (9th Cir. 2007) (quoting *Williams*)

# TAB #20

## News Footage Demonstrates The Public Nature of Toy Fair

These are cited in footnote 33 of Mattel's opposition brief and were lodged with the Court.

**2002 NYTF:**
http://www.youtube.com/watch?v=5-V0tPlsQLU

**2006 NYTF:**
IEEE Spectrum Magazine
http://video.google.com/videoplay?docid=-8994643910142214111#

Associated Press
http://xfinity.comcast.net/video/new-york-toy-fair/66141783/

CBS News
http://www.cbsnews.com/video/watch/?id=1309096n

Report by Steve Greenberg
http://video.google.com/videoplay?docid=4326385115367637655#

**At least two videos show the inside of Hasbro's showroom in great detail:**

Toy Fair 2002, Part 1
http://www.youtube.com/watch?v=q2Eun50P9CY&feature=related

Toy Fair 2002, Part 2
http://www.youtube.com/watch?v=xVkOFKl4Oel&feature=related

# TAB #21

## Lack Of Harm To MGA Weighs Against A Punitive Award

After reprehensibility, "[t]he second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio *to the actual harm inflicted on the plaintiff*.").

BMW v. Gore, 517 U.S. at 580 (emphasis added).

The jury's large award—based solely on unjust enrichment— already accomplishes punitive goals:

"Removal of any profits the defendant has earned by a wrongful act is a logical step toward deterring its repetition or imitation. A gain-based measure of this sort sends a clear signal to defendants that such misconduct does not pay and, thus, serves the deterrent function of punitive damages."

*Johnson v. Ford Motor Co.,* 35 Cal.4th 1191, 1208 (2005) (quotation omitted) [cited by MGA]

# TAB #22

## The Bratz Brand Declined Dramatically Long Before The First Trial

Malackowski acknowledged that Bratz began to decline in 2006, and lost money in 2007.

> *See* TX 36104-222 (Exhibit 29.1 to Malackowski report) [source documents for this chart are sales by sku reports that were admitted as TXs]

TX 36104-00222

MGA Entertainment, Inc. v. Mattel, Inc. and Affiliated Companies
MGA CONSOLIDATED STATEMENT OF OPERATIONS 2001 - 2010
Exhibit 29.1 (6/16/2011)
(in thousands)

| | 2001 [1] | 2002 [1] | 2003 [1] | 2004 [1] | 2005 [1] | 2006 [1] | 2007 [1] | 2008 [1] | 2009 [1] | 2010 [1] |
|---|---|---|---|---|---|---|---|---|---|---|
| **Gross Sales** | 105,073 | 211,278 | 603,327 | 672,233 | 771,261 | 767,345 | 1,093,453 | 794,244 | 432,230 | 699,284 |
| Sales Returns & Discounts | 8,626 | 12,814 | 45,492 | 18,576 | 64,877 | 43,907 | 107,428 | 75,278 | 40,116 | 38,315 |
| **Net Sales** | | | | | | | | | | |
| Basic Products and Licensing Revenue [10] | 96,447 | 198,463 | 557,835 | 653,657 | 706,381 | 710,838 | 991,857 | 690,893 | 431,721 | 459,614 |
| Basic Products and Licensing as % of Gross Sales | 35,137 | 195,544 | 325,409 | 322,400 | 426,408 | 668,042 | 519,302 | 310,598 | 65,494 | 14,043 |
| | 37.0% | 33.7% | 53.5% | 47.1% | 47.4% | 41.0% | 41.1% | 42.2% | 42.2% | 4.4% |
| **COGS** | | | | | | | | | | |
| Cost of Sale | 37,528 | 109,013 | 204,930 | 306,509 | 303,712 | 597,129 | 824,664 | 221,487 | 117,813 | 175,342 |
| | 8,501 | 7,311 | 43,731 | 31,426 | 43,571 | 34,572 | 123,064 | 88,633 | | 37,773 |
| **Gross Profit** | | | | | | | | | | |
| Gross Margin | 20,021 | 100,080 | 228,117 | 375,132 | 152,541 | 1345,347 | 9,154,600 | 140,022 | 133,180 | 337,040 |

| Operating Expenses | | | | | | | | | | |
| Sales & Marketing Expense [11] | 12,101 | 21,080 | 58,107 | 57,140 | 60,110 | 78,406 | 100,070 | 70,978 | 36,202 | 44,036 |
| Product Development Expense | 2,037 | 5,409 | 10,507 | 8,915 | 9,516 | 5,458 | 15,300 | 13,374 | 4,341 | 9,086 |
| Travel and Entertainment Expense | 280 | 608 | 970 | 1,461 | 2,102 | 3,156 | 6,317 | 4,517 | 5,117 | 2,446 |
| Salaries and Related Expenses | 6,000 | 11,442 | 13,356 | 18,316 | 40,906 | 4,978 | 101,128 | 78,918 | 53,170 | 46,820 |
| Professional Fees | 1,794 | 5,115 | 2,670 | 11,137 | 15,714 | 25,032 | 45,414 | 42,015 | 33,680 | 24,124 |
| Premium Related Expense | 1,259 | 2,146 | 4,556 | 8,958 | 11,095 | 13,827 | 24,911 | 25,117 | 17,117 | 13,627 |
| Employee Related Expense | 73 | 47 | 38 | 594 | 427 | 561 | 5,635 | 2,408 | 1,999 | 13,627 |
| Royalties, Postage & Delivery Expense | 348 | 810 | 1,611 | 1,984 | 2,498 | 209 | 4,704 | 2,547 | 2,531 | 2,321 |
| Other Expense | 1,698 | 4,403 | 2,336 | 2,566 | 7,872 | 3,849 | 4,108 | 4,731 | 13,249 | 673 |
| Distribution Expenses | 13 | 10 | | | 10 | 10 | 7,021 | 10,642 | 4,584 | 2,722 |
| **Total Operating Expense** | 27,721 | 54,421 | 156,972 | 113,299 | 188,094 | 1,252,298 | 1,330,084 | 1,200,996 | 1,174,221 | 1,366,846 |

| Net Operating Income | 1,300 | 931,439 | 1141,177 | 1943,133 | 1154,308 | 1116,660 | (883,290) | (893,785) | (141,433) | (931,446) |
| Less Royalties Paid to Carter Bryant [12] | 2,409 | 4,814 | 12,486 | 7,097 | 7,546 | 10,179 | 11,260 | 4,663 | | 1,215 |
| Add Back Sales & Marketing as Pct. MGA's Pre-Basic [13] | 465 | 3,022 | 6,753 | 6,467 | 6,843 | 6,764 | 9,243 | 4.9 | | |
| Add Back Product Development Expense as Pct MGA Pre-Basic [13] | 8,697 | 8,691 | 5,697 | 5,409 | 5,697 | 8,697 | 8,697 | 5,697 | 8,697 | 2,009 |
| Add Back Travel and Entertainment as Pct MGA's Pre-Basic [13] | 2,059 | 2,059 | 2,059 | 2,059 | 2,059 | 2,059 | 2,059 | 2,059 | 2,059 | 344 |
| Add Back Salaries & Expenses as Run MGA Pre-Basic [13] | 344 | 344 | 4,387 | 4,387 | 4,387 | 344 | 344 | 344 | 344 | 344 |
| Add Back Professional Fees as Run MGA's Pre-Basic [13] | 4,387 | 4,387 | 4,387 | 4,387 | 4,387 | 4,387 | 4,387 | 4,387 | 4,387 | 4,387 |
| Add Back Premium Related Expense as Run MGA's Pre-Basic [13] | 1,682 | 1,682 | 1,682 | 1,682 | 1,682 | 1,682 | 1,682 | 1,682 | 1,682 | 1,682 |
| Add Back Employee Related Expenses as Run MGA Pre-Basic [13] | 951 | 951 | 951 | 951 | 951 | 951 | 951 | 951 | 951 | 951 |
| Add Back Royalties, Postage & Delivery as Run MGA's Pre-Basic [13] | 461 | 461 | 461 | 461 | 46 | 461 | 461 | 461 | 461 | 461 |
| Add Back Other Expense as Run MGA's Pre-Basic [13] | 712 | 712 | 712 | 712 | 712 | 712 | 712 | 712 | 712 | 712 |
| **Net Operating Margin Adjusted for Add Backs and Carter Bryant Royalties** | 22,149 | 71,629 | 160,955 | 182,967 | 174,200 | 157.9% | (84) | (6,476) | (6,976) | 1,316 |

| Net Operating Income Margin as a % of Gross Sales (2002-2006) | 21.1% | 31.5% | 31.1% | 27.2% | 27.5% | 17.9% | -0.1% | -10.1% | -4.2% | -0.2% |
| Net Operating Income Margin as a % of Net Sales (2002-2010) | 24.6% | 34.0% | | | | | | | | |

Sources and Notes:

[1] MGA 2799973
[2] MGA 3799926
[3] MGA 3792207
[4] MGA 3510450
[5] MGA 3731967
[6] MGA 3731612
[7] MGA 3730493 - MGA 2730498
[8] MGA 2730515 - MGA 2730519
[9] MGA 2730500 - MGA 2730503
[10] Exhibit 27.0 (4/16/2011)
[11] Exhibit 29.2 (5/16/2011) is my understanding based on discussions with Steven Scocitz, MGA's Controller, that beyond Carter Bryant, Leven, Inc., and Barami Paristip royalties, all other third party royalty expenses are for non-Bratz products.
[12] 2001 MGA 1213530; MGA 3721115; MGA 3721115
2002 MGA 3721159 (MGA 1213594) MGA 1212052 MGA 3721177
2003 MGA 0720220 - MGA 0720686
2004 MGA 3720881 - MGA 3720931
2005 MGA 3720932 - MGA 3720985
2006 MGA 3720989 - MGA 3721052
2007 MGA 3721053 - MGA 3721169
2008 MGA 0002945
Due to the confidentiality of the employment contracts, headgear and footgear manufacturer, imported, sold, or distribution in the United Kingdom (purple as Bahman Paristip (net MGA 0002993 - MGA 0002934 and MGA 0001999)
or the 3% royalty on Island and additional products, the basis of expense equal to the average expenditures from 1997 - 2001.
[13] Exhibit 29.3 (5/16/2011) as it is erased on the basis of expense equal to the average royalties. MGA 3545791 to MGA 3545993, which are assumed to be negligible compared to worldwide total Bratz
[14] MGA 2945739
If additional documents or information become available, including information regarding damages methodologies and/or enterprises relied upon by any expert for Mattel, I may modify my conclusions and opinions to reflect additional information,
if necessary.

Confidential - Attorneys' Eyes Only

# TAB #23

## Contrary To MGA's Statement, Mattel Produced Documents Concerning Villasenor's Activities Long Before His Deposition

Mattel produced the 2003 NYTF Report—with Sal Villasenor's name and "New York Toy Fair 2003 Competitive Review"—on the cover, on January 2, 2008.

MGA based its August 2010 toy fair claims directly on this report, and it includes products on which the jury found liability.

_See_ TX 9275; Jan. 2, 2008 production cover letter.

Mattel also produced other reports with Sal's name on them prior to his deposition.

_See_ TX 9288 (Report from E3 trade show, admitted at trial, produced on Jan 28, 2008); TX 32836 (2001 Toy Fair Report, admitted at trial, produced on Feb. 21, 2010).

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

January 2, 2008

**VIA MESSENGER AND FEDEX**

Thomas J. Nolan, Esq.                          Alexander H. Cote, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP       Overland Borenstein Scheper & Kim, LLP
300 South Grand Avenue, Suite 3400             300 South Grand Avenue, Suite 2750
Los Angeles, CA 90071                          Los Angeles, CA 90071

Michael H. Page, Esq.
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111

Re:  MGA Entertainment, Inc. v. Mattel, Inc.

Dear Counsel:

I enclose with this letter the following, in a format consistent with the letter agreement of Mattel
and MGA dated March 29, 2007:  One hard drive containing documents with Bates numbers
M 0265001 through M 0452901.

Mattel continues to conduct a reasonable, good faith search for documents, and intends to
produce relevant, non-privileged documents as they are located.  If you have any questions
regarding the foregoing, please do not hesitate to call.

Sincerely,

Timothy L. Alger

Enclosures
07209/2338992.1

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 335 Madison Avenue, 17th Floor, New York, New York 10017 | TEL 212-702-8100 FAX 212-702-8200
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
PALM SPRINGS | 45-025 Manitou Drive, Suite 10, Indian Wells, California 92210 | TEL 760-345-4757 FAX 760-345-2414
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3336



# WW Strategic Planning & Business Development Department

| | |
|---|---|
| Date: | April 22, 2003 |
| To: | Distribution |
| cc: | Matt Bousquette |
| From: | Sal Villasenor, Kelly Osier & Carey Plunkett |
| Subject: | New York Toy Fair 2003 Competitive Review |

The 2003 New York Toy Fair Competitive Review explores trends and key competitive products in the toy industry, and reaching our target market, by examining the following topics/categories:

- Trends                       - Electronics              - Action Figures & Accessories

- Movies & Licenses            - Vehicles                 - Large Dolls & Plush

- Fashion & Small Dolls        - Games/Puzzles            - Activities

The 2003 competitive catalogs are available for viewing and copying. They are kept in the WW Marketing Research Library, located on the 9th floor Tower building in El Segundo.

Videotapes of the presentation, which covered the toy categories in this report, are available from Visual Services. If you would like copies please contact Ezell Kendrick with your name, budget center number, and mail stop.

The New York Toy Fair Competitive Review is another example of our continuing effort to catch the trends and stay on top of "what's hot" and "popular" with kids/tweens/teens.

If you have any questions, comments or suggestions regarding the attached report, please feel free to contact me.

Sal Villasenor
Mattel, Inc.
Worldwide Strategic Planning & Business Development Department

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# MGA
## Bratz Dolls



*Strut It Collection spr '03*

*Slumber Party spr '03*

*Eitan & Koby '03*

**Bratz Sty'l It Collection**
Yasmin, Dana, Cloe, Jade
TV Advertised
Avail: June 2003
FOB HK=$10.25

**New Bratz Boyz**
Adding Eitan and Koby
TV Advertised
Avail: July 2003
FOB HK=$10.25

**Bratz Winter Wonderland Collection**
Cloe, Dana, Jade & Yasmin & all four Boyz
TV Advertised
Avail: June 2003
FOB HK=$16.99

**Bratz Formal Funk Collection**
Yasmin, Dana, Cloe, Jade and four boyz
TV Advertised
Avail: June 2003
FOB HK=$22.50

CONFIDENTIAL - ATTORNEYS' EYES ONLY

M 0297415
TX 09275-0019

# MGA
# Bratz Playsets

**Bratz Runway/Formal Funk Playset**

Plug in any music source and watch the BRATZ girls strut around the cat walk. Can accommodate up to three dolls at one time. Includes 68 accessories.

TV Advertised
Avail: July 2003
FOB HK=$64.99

**Bratz FM Limo**

Pearl White, Blue, Silver, Black, Red, and Silver Blue

TV Advertised
Avail: July 2003
FOB HK=$45.00

**Bratz Motorcycle**

TV Advertised
Avail: July 2003
FOB HK=$26.50

**Bratz Pet Assortment**

Four versions TBD
Avail: July 2003
FOB HK=$10.25



*Salon n' Spa '02*



*Bratz FM Cruiser '02*

CONFIDENTIAL - ATTORNEYS' EYES ONLY

M 0297416
TX 09275-0020

# TAB #24

## The Court Already Ruled No Evidence Was Improperly Concealed

At summary judgment, the Court expressly found that "all of the evidence allegedly concealed by Mattel wasn't relevant to the phase 1 proceedings *and was subsequently produced*."  Dkt. No. 9600 at 156 (emphasis in original).

The Court rejected MGA's claim that Mattel improperly "fail[ed] to produce evidence concerning the market intelligence group prior to the phase 1 proceedings," stating that these allegations "have no support in the factual record."  Dkt. No. 9600 at 146.

Case 2:04-cv-09049-DOC-RNB   Document 10628-1   Filed 06/02/11   Page 183 of 225   Page
Case 2:04-cv-09049-DOC -RNB   Document 9600-1  Filed 01/05/11   Page 1 of 163   Page ID
#:285594

O

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTEL, INC., | CASE NO. CV 04-9049 DOC (RNBx) |
| v. | **AMENDED O R D E R ON MGA'S MOTION FOR SUMMARY JUDGMENT; MATTEL'S MOTION FOR PARTIAL SUMMARY JUDGMENT; MACHADO'S MOTION FOR SUMMARY JUDGMENT; MATTEL'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON MGA'S COUNTERCLAIMS-IN-REPLY** |
| MGA ENTERTAINMENT, INC., | |
| AND CONSOLIDATED ACTIONS. | |

Before the Court are the following Motions:

(1)   MGA Entertainment, Inc. ("MGAE"), MGA de Mexico, S.R.L. de CV ("MGA Mexico"), MGA Entertainment (HK) Ltd. ("MGA HK"), and Isaac Larian ("Larian")'s (collectively "MGA") Motion for Summary Judgment;

(2)   Mattel, Inc. ("Mattel") and Mattel de Mexico, S.R.L. de CV ("Mattel Mexico")'s joint Motion for Partial Summary Judgment;

(3)   Carlos Gustavo Machado Gomez ("Machado")'s Motion for Summary Judgment; and

(4)   Mattel's Motion for Partial Summary Judgment on MGAE's Counter-Claims in

Case 2:04-cv-09049-DOC-RNB   Document 10628-1   Filed 06/02/11   Page 184 of 225   Page
ID #:322404
Case 2:04-cv-09049-DOC -RNB   Document 9600   Filed 01/05/11   Page 156 of 163   Page ID
#:285749

2003) (noting that "the quantity of the work taken and the quality of the importance of the portion taken" are factors relevant to a determination of fair use). Second, MGA's alleged works contained factual information about MGA's products and "fair use is more likely to be found in factual works than in fictional works." *Stewart v. Abend*, 495 U.S. 207, 237 (1990). Third, Mattel's use of MGA's copyrighted works "was not in competition with the copyrighted use" and MGA has made no showing that Mattel's "subsequent use lessen[ed] the value of the copyrighted work." *Italian Book Corp. v. Am. Broadcasting Cos.*, 485 F. Supp. 65, 70 (S.D.N.Y. 1978).

(c)    Spoliation and Obstruction of Justice

MGA alleges that Mattel engaged in spoliation by redacting evidence produced during discovery, paying a severance package to a former member of its market intelligence group, and disclaiming knowledge about the market intelligence group during depositions in this case. No reasonable fact-finder could conclude that such conduct occurred on the basis of the evidentiary record. For instance, MGA has no evidence that the questions it posed to witnesses in this case required the disclosure of information reasonably possessed by the witnesses at the time of the deposition. MGA also has no witnesses that Mattel engaged any of the legion misconduct alleged in the counterclaims-in-reply, including, for example, suborning false testimony from Vargas. The idle speculation offered by MGA is certainly insufficient to carry its burden of proving that Mattel willfully destroyed material evidence in its possession that was subject to a preservation obligation. *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1078 (N.D. Cal. 2006). Nor can MGA prove that Mattel had a "[s]pecific intent to impede the administration of justice," in light of the fact that all of the evidence allegedly concealed by Mattel wasn't relevant to the phase 1 proceedings *and was subsequently produced. United States v. Ryan*, 455 F.2d 728, 734 (9th Cir. 1971). There is no evidence of the serious professional misconduct in which Mattel's outside counsel allegedly engaged.

### E.    Disposition

Mattel cannot establish injury to business or property by reason of a violation of sections 1962(c) and (d). MGA cannot establish injury to business or property by reason of a violation of

156

1      5.     Mattel's motion is denied as to MGA's claim for statutory unfair competition and

2      MGA's counter-claim in reply for trade secret misappropriation.

3  IT IS SO ORDERED.

4  DATED: January 5, 2011

5

6  *David O. Carter*

7  _____
       DAVID O. CARTER
       United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case 2:04-cv-09049-DOC-RNB   Document 10628-1   Filed 06/02/11   Page 187 of 225   Page
ID #:322407
Case 2:04-cv-09049-DOC -RNB   Document 9600   Filed 01/05/11   Page 1 of 163   Page ID
#:285594



O

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTEL, INC.,<br><br>v.<br><br>MGA ENTERTAINMENT, INC.,<br><br>———————————————<br><br>AND CONSOLIDATED ACTIONS.<br><br>——————————————— | CASE NO. CV 04-9049 DOC (RNBx)<br><br>**AMENDED O R D E R ON MGA'S MOTION FOR SUMMARY JUDGMENT; MATTEL'S MOTION FOR PARTIAL SUMMARY JUDGMENT; MACHADO'S MOTION FOR SUMMARY JUDGMENT; MATTEL'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON MGA'S COUNTERCLAIMS-IN-REPLY** |

Before the Court are the following Motions:

(1)  MGA Entertainment, Inc. ("MGAE"), MGA de Mexico, S.R.L. de CV ("MGA Mexico"), MGA Entertainment (HK) Ltd. ("MGA HK"), and Isaac Larian ("Larian")'s (collectively "MGA") Motion for Summary Judgment;

(2)  Mattel, Inc. ("Mattel") and Mattel de Mexico, S.R.L. de CV ("Mattel Mexico")'s joint Motion for Partial Summary Judgment;

(3)  Carlos Gustavo Machado Gomez ("Machado")'s Motion for Summary Judgment; and

(4)  Mattel's Motion for Partial Summary Judgment on MGAE's Counter-Claims in

Case 2:04-cv-09049-DOC-RNB  Document 10628-1  Filed 06/02/11  Page 188 of 225  Page
ID #:322408
Case 2:04-cv-09049-DOC -RNB  Document 9600  Filed 01/05/11  Page 146 of 163  Page ID
#:285739

1  theft had been completed. *See* MGA Opp'n to Mattel MSJ re Counterclaims-in-Reply at 46. No

2  reasonable fact-finder could conclude that these after-the-fact communications proximately

3  caused a theft that had already occurred.

4      Mattel's pattern of racketeering also did not cause direct injury to MGA in this litigation.

5  MGA identifies the following acts of litigation misconduct: (1) failing to produce evidence

6  relevant to MGA's statute of limitations defense prior to the phase 1 proceedings; (2) failing to

7  produce evidence concerning the market intelligence group prior to the phase 1 proceedings; and

8  (3) inducing Vargas to commit perjury during his deposition. MGA claims that some of these

9  acts resulted in the prior district court's issuance of a equitable relief that, though vacated on

10  appeal, caused significant damage to MGA's business opportunities. MGA claims that Mattel's

11  abuse of the discovery process "deceive[d] a federal judge into believing that Mattel was good

12  and MGA was evil, thus procuring a wrongful injunction against MGA that deprived MGA of

13  the sales of numerous Bratz products, interfered with MGA's relationships with retailers,

14  interfered with MGA's relationships with licensees, destroyed an estimated one billion dollars []

15  in brand equity, and nearly drove MGA out of business." Counter-Claims in Reply ¶ 5.

16      These unfocused allegations have no support in the factual record and irresponsibly

17  attempt to attribute a district court's decisions about equitable relief to Mattel's non-production

18  of documents. The undisputed evidence establishes that the equitable relief awarded by the

19  district court had nothing to do with the activities of the market intelligence group and was the

20  product of a careful and reasoned, albeit incorrect, application of the law by the district court.

21  MGA's suggestion that the district court disregarded its duty to apply the law and simply acted

22  on the basis of its instinct about whether one party was good and the other evil has no support in

23  the record. And even if the district court made its decisions on the basis of its feelings about the

24  parties, instead of the law, MGA cannot show that the district court would have considered

25  MGA any less "evil" and Mattel any less "good" after reviewing evidence about the market

26  intelligence group's conduct. *Bridge*, 553 U.S. at 660 ("[T]he plaintiff will not be able to

27  establish even but-for causation if no one relied on the misrepresentation.").

28      MGA's counter-claim in reply fails in all respects to satisfy section 1964(c)'s

Case 2:04-cv-09049-DOC-RNB   Document 10628-1   Filed 06/02/11   Page 189 of 225   Page
Case 2:04-cv-09049-DOC -RNB   Document 9600   Filed 01/05/11   Page 163 of 163   Page ID
#:285756
ID #:322409

5.  Mattel's motion is denied as to MGA's claim for statutory unfair competition and

MGA's counter-claim in reply for trade secret misappropriation.

IT IS SO ORDERED.

DATED: January 5, 2011

_David O. Carter_

DAVID O. CARTER
United States District Judge

# TAB #25

## Brawer Hadn't Heard Of A Market Intelligence Dept.

Q.   At the time that you were at Mattel, you didn't know what Mr. Villasenor's department title was, and you thought it might have been something like competitive analyst, correct?

A.   Um, yes, correct.

Q.   And -- and you were being truthful about that; you're not trying to hide whether the title was Market Intelligence?

A:  Um, I was trying to be truthful throughout my depositions, yes.

   *3/31/11 Trial Tr. Vol. 1, at 76:25-77:13 (objection omitted).*

| 09:52 | 1 | left, did you write any communications with Mattel where you |
| 09:52 | 2 | said that what you were being asked to sign was illegal or |
| 09:52 | 3 | unenforceable? |
| 09:52 | 4 | A.   Um, I believe -- |
| 09:52 | 5 | MS. KELLER:  Objection. |
| 09:52 | 6 | MR. PRICE:  There's no question -- |
| 09:52 | 7 | MS. KELLER:  Your Honor, may he be allowed to |
| 09:52 | 8 | answer? |
| 09:52 | 9 | THE COURT:  Answer the question. |
| 09:53 | 10 | THE WITNESS:  My perspective was that the |
| 09:53 | 11 | paragraph on employment restrictions was too broad. |
| 09:53 | 12 | BY MR. PRICE: |
| 09:53 | 13 | Q.   My question was, did you say anything to Mattel in |
| 09:53 | 14 | writing where you were saying that what you were asked to |
| 09:53 | 15 | sign was illegal or unenforceable? |
| 09:53 | 16 | A.   I don't recall where I used the word "illegal."  I know |
| 09:53 | 17 | that we disputed whether or not the paragraph on employment |
| 09:53 | 18 | restrictions or what they -- not employment restrictions, |
| 09:53 | 19 | but what they considered to be confidential information |
| 09:53 | 20 | would create an employment restriction. |
| 09:53 | 21 | Q.   Let me switch to a different topic here. |
| 09:53 | 22 | You discussed Mr. Villasenor in your direct |
| 09:53 | 23 | examination; do you recall that? |
| 09:53 | 24 | A.   Yes, I do. |
| 09:53 | 25 | Q.   And at the time that you were at Mattel, you thought |

| | | |
|---|---|---|
| 09:53 | 1 | that the department that he was in -- that the title was |
| 09:53 | 2 | something like competitive analyst, right? |
| 09:53 | 3 | A.    When are you saying I said that? |
| 09:54 | 4 | Q.    At the time that you were at Mattel, up until 2004, you |
| 09:54 | 5 | thought that Mr. Villasenor's department was, quote, |
| 09:54 | 6 | "competitive analysts" or something like that, correct? |
| 09:54 | 7 | A.    I -- I don't know that I remember that being the name |
| 09:54 | 8 | of the group. |
| 09:54 | 9 | Q.    If you'd look at -- this is January 26, 2010, page 646. |
| 09:54 | 10 | (Document provided to the witness.) |
| 09:54 | 11 | BY MR. PRICE: |
| 09:54 | 12 | Q.    Lines -- do you have 646?  It's lines 11 through 21. |
| 09:54 | 13 | A.    If you don't mind, I'm going to read a little bit |
| 09:54 | 14 | before. |
| 09:55 | 15 | Q.    11 to 21. |
| 09:55 | 16 | A.    Maybe I'm reading the wrong page. |
| 09:55 | 17 | THE COURT:  Do you have page 646? |
| 09:55 | 18 | THE WITNESS:  646. |
| 09:55 | 19 | THE COURT:  It should be lines 11 through 21, and |
| 09:55 | 20 | it would be contained probably on lines 19 and 20. |
| 09:55 | 21 | MR. PRICE:  Yes. |
| 09:55 | 22 | THE WITNESS:  So I'm sorry, can you restate your |
| 09:56 | 23 | question? |
| 09:56 | 24 | BY MR. PRICE: |
| 09:56 | 25 | Q.    At the time that you were at Mattel, you didn't know |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:56 | 1 | what Mr. Villasenor's department title was, and you thought |
| 09:56 | 2 | it might have been something like competitive analyst, |
| 09:56 | 3 | correct? |
| 09:56 | 4 | A.   Um, yes, correct. |
| 09:56 | 5 | Q.   And -- and you were being truthful about that; you're |
| 09:56 | 6 | not trying to hide whether the title was Market |
| 09:56 | 7 | Intelligence? |
| 09:56 | 8 | MS. KELLER:  Objection.  Your Honor, he said he |
| 09:56 | 9 | didn't know what it was. |
| 09:56 | 10 | THE COURT:  Overruled.  You can answer the |
| 09:56 | 11 | question. |
| 09:56 | 12 | THE WITNESS:  Um, I was trying to be truthful |
| 09:56 | 13 | throughout my depositions, yes. |
| 09:56 | 14 | BY MR. PRICE: |
| 09:56 | 15 | Q.   Now, let's talk about -- about your discussions with |
| 09:56 | 16 | Mr. Villasenor.  And, uh, he told you that he was using |
| 09:56 | 17 | false business cards to get into toy showrooms, correct? |
| 09:56 | 18 | A.   Yes, he did. |
| 09:56 | 19 | Q.   And you testified that there would be these -- these |
| 09:56 | 20 | big meetings where they do competitive -- uh, these |
| 09:56 | 21 | competitive reviews?  Do these videos? |
| 09:57 | 22 | A.   Yes. |
| 09:57 | 23 | Q.   A lot of people would be there, right? |
| 09:57 | 24 | A.   Correct. |
| 09:57 | 25 | Q.   You said, uh, that "Everyone knew what was going on." |

CV 04-9049 DOC - 3/31/2011 - Day 43, Volume 1 of 3

78

| 09:57 | 1 | Do you remember that phase, "Everyone knew"? |
| 09:57 | 2 | A.   Yes, I do. |
| 09:57 | 3 | Q.   So hundreds of people, you say, knew what was going on |
| 09:57 | 4 | 'cause they were attending these presentations, correct? |
| 09:57 | 5 | A.   Correct. |
| 09:57 | 6 | Q.   And do you believe, as some have, that there's kind of |
| 09:57 | 7 | an incestuous relationship between employees in this |
| 09:57 | 8 | industry, where they can go from one company to another and |
| 09:57 | 9 | do go from one company to another? |
| 09:57 | 10 | A.   I don't like the term "incestuous." |
| 09:57 | 11 | Q.   It's not mine, but go ahead. |
| 09:57 | 12 | A.   But I do believe that there's a -- there's a lot of |
| 09:57 | 13 | people who go from one company to another in the toy |
| 09:57 | 14 | industry; that's correct. |
| 09:57 | 15 | Q.   So a lot of people who were gonna go from -- who were |
| 09:57 | 16 | going from one toy company to another, from Mattel to |
| 09:57 | 17 | another company, knew about this, right? |
| 09:57 | 18 | A.   Yes.  Well, I don't know whether they knew or not, but |
| 09:57 | 19 | I do know that -- that a lot of people do go from one toy |
| 09:57 | 20 | company to another. |
| 09:57 | 21 | Q.   Well, you said, "Everyone knew," everyone who was |
| 09:58 | 22 | attending these presentations, right? |
| 09:58 | 23 | MS. KELLER:  Objection.  I believe the testimony |
| 09:58 | 24 | was at the executive level, Your Honor. |
| 09:58 | 25 | MR. PRICE:  It wasn't. |

# TAB #26

## Market Intelligence "Group" Consisted of Two People

Q.   Well, as of 2005, was there a two-person group called "Market Intelligence"?
A.   There was.  Correct.
Q.   And who were the two people in that group?
A.   Myself and a woman named Stephanie Page.

*3/23/11 Trial Tr., Vol. 1 (Villasenor) at 58:1-9.*

CV 04-9049 DOC - 3/23/2011 - Day 38, Volume 1 of 3

57

| | | |
|---|---|---|
| 10:01 | 1 | Q.    And there are two people who report directly to him. |
| 10:01 | 2 | Daniel Frechling and Emily Brown, correct? |
| 10:02 | 3 | A.    That's correct. |
| 10:02 | 4 | Q.    And there is an executive secretary up here on the |
| 10:02 | 5 | right, Jennifer Mennell, correct? |
| 10:02 | 6 | A.    Correct. |
| 10:02 | 7 | Q.    And under Mr. Frechling there are a number of people |
| 10:02 | 8 | who report to him, correct? |
| 10:02 | 9 | A.    That's correct. |
| 10:02 | 10 | Q.    And your name is on this line here, this vertical line |
| 10:02 | 11 | where it has Salvador Villasenor, again, Specialist Consumer |
| 10:02 | 12 | Research, correct? |
| 10:02 | 13 | A.    That's correct. |
| 10:02 | 14 | Q.    And up through this time, through 2003, when you would |
| 10:02 | 15 | send out reports, what would it have as the area, group, |
| 10:02 | 16 | department, or whatever, sending out the reports? |
| 10:02 | 17 | A.    Whatever name we were using at the time. |
| 10:02 | 18 | Q.    Now, let me ask you to look at Exhibit 25042. |
| 10:03 | 19 | (Document provided to the witness.) |
| 10:03 | 20 | BY MR. PRICE: |
| 10:03 | 21 | Q.    Do you have that in front of you? |
| 10:03 | 22 | A.    I do. |
| 10:03 | 23 | Q.    And do you recognize this as a 2005 document concerning |
| 10:03 | 24 | Market Intelligence? |
| 10:03 | 25 | A.    I don't recall ever seeing this. |

| | | |
|---|---|---|
| 10:03 | 1 | Q.   Well, as of 2005, was there a two-person group called |
| 10:03 | 2 | "Market Intelligence"? |
| 10:03 | 3 | A.   There was.  Correct. |
| 10:03 | 4 | Q.   And who were the two people in that group? |
| 10:03 | 5 | A.   Myself and a woman named Stephanie Page. |
| 10:03 | 6 | Q.   By the way, Ms. Page, how long did she work with you at |
| 10:04 | 7 | Mattel? |
| 10:04 | 8 | A.   Roughly two years.  Something -- somewhere around |
| 10:04 | 9 | there. |
| 10:04 | 10 | Q.   Did she report to you? |
| 10:04 | 11 | A.   She did. |
| 10:04 | 12 | Q.   Is she the only one who was a direct report to you |
| 10:04 | 13 | during your time at Mattel? |
| 10:04 | 14 | A.   During my entire 14 years? |
| 10:04 | 15 | Q.   Yeah, that was a direct report that you were managing? |
| 10:04 | 16 | A.   I had a few interns.  I had some temps reporting to me, |
| 10:04 | 17 | and Stephanie Page. |
| 10:04 | 18 | Q.   Other than interns and temps, during your entire time |
| 10:04 | 19 | at Mattel, did anyone report to you at Mattel other than |
| 10:04 | 20 | Stephanie Page? |
| 10:04 | 21 | A.   I think it was only Stephanie Page. |
| 10:04 | 22 | Q.   And Ms. Page, at any time, did she go to toy fairs and |
| 10:04 | 23 | use false identifications to get into showrooms? |
| 10:04 | 24 | A.   No, she did not. |
| 10:04 | 25 | Q.   And how do you know she didn't? |

| | | |
|---|---|---|
| 10:04 | 1 | A.   She never traveled with me. |
| 10:04 | 2 | Q.   Do you know whether or not Ms. Page was the one who |
| 10:05 | 3 | prepared the 2006, uh, toy fair report? |
| 10:05 | 4 | A.   I wasn't at Mattel in 2006, so I'm not aware of whether |
| 10:05 | 5 | or not she did or did not. |
| 10:05 | 6 | Q.   So let me get, uh, back then, to, uh -- to Mr. Brawer. |
| 10:05 | 7 | And if you'd look at Exhibit 9510. |
| 10:05 | 8 | (Document provided to the witness.) |
| 10:05 | 9 | MR. PRICE:   And this is already in evidence. |
| 10:05 | 10 | (Document displayed.) |
| 11:59 | 11 | BY MR. PRICE: |
| 10:05 | 12 | Q.   Do you recall Ms. Keller asked you questions about, uh, |
| '0:05 | 13 | this document yesterday you sent January 15, 2003.   Do you |
| 10:05 | 14 | see that? |
| 10:05 | 15 | A.   I do. |
| 10:05 | 16 | Q.   And, again, there's a distribution list that says "to," |
| 10:05 | 17 | correct? |
| 10:05 | 18 | A.   I'm sorry, where is that? |
| 10:05 | 19 | Q.   See where it says "to" and it has these names? |
| 10:06 | 20 | A.   Oh, I'm sorry, yes. |
| 10:06 | 21 | Q.   And it was your intent to send this information |
| 10:06 | 22 | basically to everyone that was up the chain of command, |
| 10:06 | 23 | correct? |
| 10:06 | 24 | A.   To the distribution list, correct. |
| 10:06 | 25 | Q.   And down here at the bottom you have "To:  Ron Brawer." |

# TAB #27

## Going To Toy Fairs Was A Small Part Of Villasenor's Job

Q.   And that other research that you saw from
Mr. Villasenor and others there at Mattel you understood
came from sources other than showrooms?
A.   Absolutely.
Q.   In fact, most of that information came from publicly
available sources?
A.   Yeah.  Publicly available sources and trend reports to
which we subscribed and -- yeah, exactly.

*3/22/11 Trial Tr., Vol. 1 (Turetzky) at 132:20-133:12.*

| | | |
|---|---|---|
| 11:11 | 1 | BY MR. ZELLER: |
| 11:11 | 2 | Q.   If we can take a look at the second page, this is the |
| 11:11 | 3 | first page that shows people in the organization.  At the |
| 11:12 | 4 | very top there you'll see Matt Bousquette, who you've |
| 11:12 | 5 | mentioned, the president at the time? |
| 11:12 | 6 | A.   Yes. |
| 11:12 | 7 | Q.   Did you ever tell Matt Bousquette that Sal Villasenor |
| 11:12 | 8 | or other people were using fake credentials to get into toy |
| 11:12 | 9 | fairs? |
| 11:12 | 10 | A.   No, I never did. |
| 11:12 | 11 | Q.   And then you'll see a little bit lower down, also, |
| 11:12 | 12 | however, on the first page here, there's a Ron Brawer.  It |
| 11:12 | 13 | shows "SVP"? |
| 11:12 | 14 | A.   I see that. |
| 11:12 | 15 |       MR. ZELLER:  If we can highlight that, Ken.  Do |
| 11:12 | 16 | you see?  It's on the second to the left column, second |
| 11:12 | 17 | down. |
| 11:12 | 18 |       (Technician complies.) |
| 11:12 | 19 | BY MR. ZELLER: |
| 11:12 | 20 | Q.   And you knew Mr. Brawer? |
| 11:12 | 21 | A.   Uh, sure. |
| 11:12 | 22 | Q.   You knew Mr. Brawer at Mattel? |
| 11:12 | 23 | A.   Yes. |
| 11:12 | 24 | Q.   And you know that he went to MGA? |
| 11:12 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:12 | 1 | Q.   Then if we can go through the next pages, and we'll see |
| 11:12 | 2 | how -- until we get to Sal Villasenor.  So if you can just |
| 11:12 | 3 | continue to scroll through these pages, until we get to |
| 11:13 | 4 | 97- -- or, excuse me -- 9272-25. |
| 11:13 | 5 |          (Document displayed.) |
| 11:13 | 6 | BY MR. ZELLER: |
| 11:13 | 7 | Q.   Going all the way through the organization is where, |
| 11:13 | 8 | then -- here, near the bottom, we find "Sal Villasenor." |
| 11:13 | 9 |      Do you see him? |
| 11:13 | 10 | A.   Uh, yes, I do now.  Yes. |
| 11:13 | 11 | Q.   You can also see it highlighted on the screen there. |
| 11:13 | 12 | A.   Yep. |
| 11:13 | 13 | Q.   And then you'll see there, as of February of 2003, he's |
| 11:13 | 14 | listed as "Specialist, Consumer Research"? |
| 11:13 | 15 | A.   Yes, I see that. |
| 11:13 | 16 | Q.   As you testified to, you knew at some point about Sal |
| 11:13 | 17 | Villasenor misrepresenting himself at these toy fairs, |
| 11:13 | 18 | right? |
| 11:13 | 19 | A.   Yes. |
| 11:13 | 20 | Q.   And these toy fairs, by the way, I mean, these are -- |
| 11:14 | 21 | these are annual events?  I mean, they're "once a year" type |
| 11:14 | 22 | of events? |
| 11:14 | 23 | A.   Uh, yes.  There's -- the New York Toy Fair is the big |
| 11:14 | 24 | one, but there's some smaller ones, as well. |
| 11:14 | 25 | Q.   So with respect to your understanding of what his job |

DEBBIE GALE, U.S. COURT REPORTER

| 11:14 | 1 | and duties were, it wasn't -- he wasn't spending all of his |
| 11:14 | 2 | time getting into showrooms? |
| 11:14 | 3 | A. No, no. Absolutely not. No. As I said before, he was |
| 11:14 | 4 | responsible for a lot of other types of research, as well. |
| 11:14 | 5 | Q. And that other research that you saw from |
| 11:14 | 6 | Mr. Villasenor and others there at Mattel you understood |
| 11:14 | 7 | came from sources other than showrooms? |
| 11:14 | 8 | A. Absolutely. |
| 11:14 | 9 | Q. In fact, most of that information came from publicly |
| 11:14 | 10 | available sources? |
| 11:14 | 11 | A. Yeah. Publicly available sources and trend reports to |
| 11:14 | 12 | which we subscribed and -- yeah, exactly. |
| 11:14 | 13 | Q. And some of these sources where Mattel obtained |
| 11:14 | 14 | information about competitors and the -- even unreleased |
| 11:15 | 15 | products, included press releases or other announcements by |
| 11:15 | 16 | companies such as MGA about product launches? |
| 11:15 | 17 | A. That's right. |
| 11:15 | 18 | Q. They included photo opportunities? |
| 11:15 | 19 | A. I believe so. |
| 11:15 | 20 | Q. They included news coverage? |
| 11:15 | 21 | A. Sometimes. |
| 11:15 | 22 | Q. There was coverage in the trade magazines and -- and |
| 11:15 | 23 | the trade news? |
| 11:15 | 24 | A. Yes. |
| 11:15 | 25 | Q. Information from these publicly available catalogues |

| | | |
|---|---|---|
| 11:15 | 1 | you had mentioned? |
| 11:15 | 2 | A.   Yes. |
| 11:15 | 3 | Q.   Information from publicly available price lists that |
| 11:15 | 4 | companies like MGA and others gave to retailers? |
| 11:15 | 5 | A.   That's correct. |
| 11:15 | 6 | Q.   And, in fact, that was the source of most of this |
| 11:15 | 7 | information in these toy fair presentations that MGA's |
| 11:15 | 8 | counsel asked you about? |
| 11:15 | 9 | A.   Yes. |
| 11:15 | 10 | Q.   And you've seen these toy fair reports, right? |
| 11:15 | 11 | A.   Absolutely, yes. |
| 11:15 | 12 | Q.   And these are -- these are product photographs that -- |
| 11:16 | 13 | that shows these competitive products, right? |
| 11:16 | 14 | A.   Yes. |
| 11:16 | 15 | Q.   I mean, these aren't pictures that are taken in the |
| 11:16 | 16 | showrooms.  These are glamor shots of products that are |
| 11:16 | 17 | actually taken by the manufacturers and distributed to the |
| 11:16 | 18 | world at large. |
| 11:16 | 19 | A.   Yeah, they -- they generally appear to be press photos. |
| 11:16 | 20 | Q.   And you understand that MGA, in connection with toy |
| 11:16 | 21 | fairs, issues press releases? |
| 11:16 | 22 | A.   Yes. |
| 11:16 | 23 | Q.   Issues press kits? |
| 11:16 | 24 | A.   Yes. |
| 11:16 | 25 | Q.   Takes journalists through its showrooms? |

# TAB #28

## High Compensatory Award Requires Lower Punitive Award

"When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damage, can reach the outermost limit of the due process guarantee."
. . .
"The compensatory award in this case [$1 million] was substantial."

> *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425-26 (2003).

A district court's denial of punitive damages after a large $55 million compensatory verdict is appropriate in light of "the deterrent function of enhanced  damages", particularly where willfulness issue was "sufficiently close on the evidence."

> *Modine Mfg. Co. v. Allen Group, Inc.,* 917 F.2d 538, 543 (Fed. Cir. 1990).

Punitive damages may not be necessary where "the overall size of compensatory damages alone may constitute a significant deterrent."

> *Mirkin v. Wasserman*, 5 Cal.4th 1082, 1106 (1993).

00505.07975/4165939.1

# TAB #29

## The Only Evidence Of Mattel's Fees Is Larian's Speculation

Excerpt from email (full email attached):

From: Isaac Larian (President / CEO)
[mailto:Larianl1@mgae.com]
Sent: Thursday, May 26, 2011 8:49 AM
To: Isaac Larian (President / CEO)
Subject: MGA wants $177M in punitive damages in Bratz case -


. . .


*"$400 million+ : Money that Mattel spent under Bob Eckert in this litigation."*

From: Isaac Larian (President / CEO) [mailto:LarianI1@mgae.com]
Sent: Thursday, May 26, 2011 8:49 AM
To: Isaac Larian (President / CEO)
Subject: MGA wants $177M in punitive damages in Bratz case - Yahoo! Finance

http://finance.yahoo.com/news/MGA-wants-177M-in-punitive-apf-3077850202.html?x=0&.v=3

$400 million+ : Money that Mattel spent under Bob Eckert in this litigation.

$440 million: Potential damages + Legal fees Mattel will pay MGA once this is all settled and done.

$1-$3 billion: Potential liability Mattel faces in MGA's antitrust case in the USA.

Why hasn't the board fired Eckert yet?

Why hasn't Mattel fired the people who were responsible for the Mattel corporate espionage ( Bob Normalie, GC, Jill Thomas , Michael Moore, Michael Shore, Carry Plunket, Alan Kay etc,etc)? Eckert , on the record told the jury that after the trial he will take action to " discipline"
these people? Eckert claimed that he ( supposedly ) didn't know about the market intelligence dept at Mattel till 2009! The jury of ~urse didn't believe him.

Why is Mattel still using " B' Box" ( the shell company set up by Mattel's ex market intelligence employee who also infiltrated MGA and other toy companies under false pretense)?

This email is subject to a disclaimer, please click on the following link or cut and paste the link into the address bar of your browser.

https://www.wellsfargo.com/com/disclaimer/red

1

# TAB #30

## There Is No Relationship Between The Decline of Bratz And MGA's Legal Fees And Costs In This Case

Since 2007, MGA's legal expenditures in this case have varied from year to year, but Bratz sales have dropped precipitously every single year.



*Compare* Exhibits to the Declaration of Stephen Schultz In Support Of MGA Parties' Motions for Fees *with* TX 24226.

# TAB #31

## Both Total Bratz Sales And MGA's Distributions to Isaac Larian Dwarf MGA's Legal Fees and Costs In This Case

From 2001 to 2007, Bratz sales totaled $3,022.8M and MGA's distributions to Isaac Larian totaled $391M, while MGA's legal fees and costs in this case totaled $33.7M.  Through 2008, Bratz sales totaled $3,299M and MGA's distributions to Isaac Larian totaled $399.8M, while MGA's legal fees and costs in this case totaled $84.2M.



_See_ TX 24226, TX 24166, Exhibits to the Declaration of Stephen Schultz In Support Of MGA Parties' Motions for Fees.

# TAB #32

**Insurance Has Covered The Majority of MGA's Fees**

All but $70M of MGA's attorneys fees have been reimbursed by insurance. *See MGA Parties' Motion For Award of Attorneys' Fees And "Full Costs" Under Section 505 of The Copyright Act at 5; see also 5/26/2011 Hearing Tr., Vol. 1, at 22:9-13.*

Of that $70M, MGA has never paid some untold amount of the remaining balance. *See Declaration of Annette L. Hurst, dated May 26, 2011 at ¶¶ 6 & 8.*

# TAB #33

### "Litigation to Death" Is A Fiction

Total Bratz sales through 2010:                              $3.4 billion
Total Bratz profits through 2010:                        $792.4 million
Total Larian distributions from 2001 through 2010: $399.8 million

*See* TX TX 24226, TX 24294-0042 - 0043, TX 24166.

### Total potential legal fees 2004 to date

Total fees and costs claimed:                          $171 million
Less insurance proceeds of:                            $101 million
Less unpaid to O'Melveny of:                            $10 million
Less unpaid to Orrick (est.) of:                        $42 million

### Total potential fees paid/owed by MGA:        **$18 million**

<u>See</u>, *Declaration of Stephen Schultz In Support Of MGA Parties'
Motions for Fees; Supplemental Declaration of Stephen Schultz In
Support Of MGA Parties' Motions for Fees; 5/26/11 Hearing Tr.,
Vol. 1, at 22:9-13; Complaint, dated July 13, 2010, in O'Melveny &
Meyers LLP v. MGA Entertainment, Inc., Case No. BC441593 at
¶ 1; Declaration of Annette L. Hurst, dated May 26, 2011 at ¶¶ 6 &
8.*

# TAB #34

## Per MGA's Counsel, MGA Has No Intention Of Paying Its Insurance Companies Or Its Lawyers In The Event The Court Awards Fees

"It is absolutely MGA's position that the insurance companies will not be entitled to funds awarded on a fee motion."

*5/26/11 Hearing Tr., Vol. 1 (Post-Trial Briefing) at 22:21-23.*

"MGA indicated that it had no present plan to pay Orrick the fees that are owed on this Belair matter or any other outstanding matter, other than remitting any further insurance proceeds that it receives as a result of reimbursement for Orrick's billings in the Mattel action."

*Declaration of Annette L. Hurst, dated May 26, 2011 at ¶9.*