CV 04-9049-DOC ~ 02/17/2011 ~ Day 19, Vol. 3 of 4

85

| | | |
|---|---|---|
| 14:40:53 | 1 | Los Angeles. |
| 14:41:18 | 2 | Q    Now, in the years 2004 to 2007, did MGA Mexico make |
| 14:41:24 | 3 | money or lose money? |
| 14:41:26 | 4 | A    We lost money. |
| 14:41:27 | 5 | Q    And we're talking about millions of dollars? |
| 14:41:31 | 6 | A    Millions. |
| 14:41:32 | 7 | Q    6,486,000 in the period ending December 31st, 2004? |
| 14:41:41 | 8 | A    And counting, yes. |
| 14:41:42 | 9 | Q    And then it up to over 7 million? |
| 14:41:45 | 10 | A    Yes.  It's still going. |
| 14:41:47 | 11 | Q    And kept going up? |
| 14:41:49 | 12 | A    It's still going, yes. |
| 14:41:50 | 13 | Q    And what was the reason that MGA Mexico was losing |
| 14:41:56 | 14 | money? |
| 14:41:58 | 15 | A    Bad management.  They were selling product at not |
| 14:42:04 | 16 | correct pricing.  Just bad management. |
| 14:42:10 | 17 | Q    Was there a problem with too much TV advertising |
| 14:42:13 | 18 | relative to the income? |
| 14:42:15 | 19 | A    Yes, all of those.  I mean, I call that also bad |
| 14:42:19 | 20 | management.  They were spending more money on TV than we had |
| 14:42:22 | 21 | sales coming in. |
| 14:42:24 | 22 | Q    When did you -- at some point did you shut down MGA |
| 14:42:27 | 23 | Mexico? |
| 14:42:27 | 24 | A    Yes. |
| :42:28 | 25 | Q    And when was that? |

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

86

| | | |
|---|---|---|
| 14:42:30 | 1 | A    Either 2009 or 2010.  I don't remember exactly. |
| 14:42:35 | 2 | Q    And what did you do with respect to Mr. Machado, |
| 14:42:39 | 3 | Ms. Trueba and Mr. Vargas? |
| 14:42:44 | 4 | A    I laid them all off. |
| 14:42:46 | 5 | Q    Now, Mr. Price also showed you Exhibit 8466, which is |
| 14:42:51 | 6 | in evidence. |
| 14:42:59 | 7 | And do you remember seeing what document? |
| 14:43:02 | 8 | A    Yes, I did. |
| 14:43:03 | 9 | Q    And you told Mr. Price you didn't know where these came |
| 14:43:07 | 10 | from? |
| 14:43:08 | 11 | A    Yes. |
| 14:43:09 | 12 | Q    And he told you it was found in the MGA Mexico offices? |
| 14:43:13 | 13 | A    That's what he said. |
| 14:43:14 | 14 | Q    And what about Exhibit 7104; same thing? |
| 14:43:20 | 15 | A    I don't have that. |
| 14:43:21 | 16 | Q    Well, let's take a look, here.  And that's also already |
| 14:43:26 | 17 | admitted. |
| 14:43:27 | 18 | A    Yes. |
| 14:43:28 | 19 | Q    And this was another one that Mr. Price told you was |
| 14:43:33 | 20 | found in the MGA Mexico offices? |
| 14:43:35 | 21 | A    Yes. |
| 14:43:37 | 22 | Q    And Exhibit 8466, the first one that you have there, is |
| 14:43:41 | 23 | that 883 pages? |
| 14:43:45 | 24 | A    I don't know how many pages.  It's this many pages |
| :43:49 | 25 | (indicating). |

| | |
|---|---|
| 14:43:49 1 | Q    Look at the first page of 8466. |
| 14:43:53 2 | A    Yes. |
| 14:43:53 3 | Q    Okay.  Looking at it now, and I think you saw that for |
| 14:43:58 4 | the first time the other day on the witness stand? |
| 14:44:00 5 | A    I did. |
| 14:44:02 6 | Q    Is this Mattel's information? |
| 14:44:04 7 | A    No.  This is Walmart Mexico's information. |
| 14:44:08 8 | Q    And how is this data collected?  Can you tell from |
| 14:44:13 9 | looking at this? |
| 14:44:16 10 | A    Yes.  Walmart has something called "Retail Link" |
| 14:44:18 11 | that -- for example, when we are a vendor to Walmart, we get |
| 14:44:23 12 | a code.  We can go on Walmart and find out how our product |
| 14:44:28 13 | is selling, how much inventory they have.  They basically |
| 14:44:31 14 | want you to manage their business, and we have similar |
| 14:44:38 15 | reports like this. |
| 14:44:40 16 | Q    So Walmart, when you say they want you to manage the |
| 14:44:43 17 | business, they -- they let you have access to this document, |
| 14:44:47 18 | and you can see how much is selling everywhere and how much |
| 14:44:51 19 | they have in their inventory? |
| 14:44:53 20 | A    Yes. |
| 14:44:54 21 | MR. PRICE:  Objection.  It's ambiguous as to |
| 14:44:54 22 | "you." |
| 14:44:56 23 | MS. KELLER:  All right. |
| 14:44:58 24 | THE COURT:  Sustained. |
| :44:59 25 | MS. KELLER:  Okay. |

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

88

| | | |
|---|---|---|
| 14:44:59 | 1 | BY MS. KELLER: |
| 14:45:00 | 2 | Q    Let's say you, MGA, would request Walmart -- or you |
| 14:45:03 | 3 | would be given access to Walmart's data, right? |
| 14:45:10 | 4 | A    That's correct. |
| 14:45:11 | 5 | Q    And then if you looked at Walmart's -- |
| 14:45:12 | 6 | MR. PRICE:  I -- I'll object.  It's ambiguous as |
| 14:45:13 | 7 | to "Walmart's data," it came to MGA, other competitors, et |
| 14:45:17 | 8 | cetera. |
| 14:45:18 | 9 | THE COURT:  Let's clear that up, Counsel. |
| 14:45:19 | 10 | BY MS. KELLER: |
| 14:45:20 | 11 | Q    Let's say Walmart says to you, MGA, "MGA, we want you |
| 14:45:24 | 12 | to start helping us manage our inventory a little better of |
| 14:45:29 | 13 | your products" -- |
| 14:45:30 | 14 | A    Yes. |
| 14:45:30 | 15 | Q    -- "because we are running out of some things, and |
| 14:45:33 | 16 | others we have too many of" -- |
| 14:45:35 | 17 | A    Yes. |
| 14:45:35 | 18 | Q    -- "and it's on you, MGA, we want you to manage this |
| 14:45:36 | 19 | for us." |
| 14:45:38 | 20 | A    Yes. |
| 14:45:38 | 21 | Q    Okay.  They are big enough that they can do that, |
| 14:45:41 | 22 | right? |
| 14:45:41 | 23 | A    Mattel is -- I mean not Mattel -- Walmart is, yes, but |
| 14:45:45 | 24 | they are too cheap.  They want you to do their work for |
| :45:49 | 25 | them. |

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

89

| | | |
|---|---|---|
| 14:45:49 | 1 | Q    But what I'm saying is they're big enough that if they |
| 14:45:52 | 2 | say "jump," you say "how high," right? |
| 14:45:55 | 3 | A    Yes, we do. |
| 14:45:56 | 4 | Q    So if Walmart wants you to manage your inventory, is |
| 14:46:00 | 5 | this the document you, MGA, would go to? |
| 14:46:04 | 6 | A    That's correct. |
| 14:46:04 | 7 | Q    And let's just pretend it doesn't say Mattel, let's |
| 14:46:09 | 8 | pretend it says MGA. |
| 14:46:11 | 9 | A    Yes. |
| 14:46:11 | 10 | Q    And so you would, then, go to a site, a website that |
| 14:46:14 | 11 | Walmart has, right? |
| 14:46:16 | 12 | A    It's called "Retail Link." |
| 14:46:17 | 13 | Q    Retail Link, and you would look and see how much each |
| 14:46:21 | 14 | thing you needed to replenish? |
| 14:46:23 | 15 | A    Right. |
| 14:46:23 | 16 | Q    And how much of each thing they had too much of? |
| 14:46:25 | 17 | A    Yes, and also moving from one store to another, tell |
| 14:46:30 | 18 | the buyer they need to buy more of this, tell the buyer they |
| 14:46:35 | 19 | need to buy less of that.  But there's two different |
| 14:46:38 | 20 | categories.  In certain areas -- well, I don't want to |
| 14:46:41 | 21 | volunteer.  Go ahead. |
| 14:46:43 | 22 | Q    Tell the buyer that their Riverside store is selling |
| 14:46:46 | 23 | more of one thing than the Fountain Valley store? |
| 14:46:50 | 24 | A    I prefer not to use Riverside, but yes. |
| :46:54 | 25 | Q    Okay.  So that information is useful to Walmart, true? |

**Exhibit G - Page 97**

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

90

| | | |
|---|---|---|
| 14:46:59 | 1 | A    Yes, it's for them. |
| 14:47:01 | 2 | Q    And it's information that you, MGA, could use to manage |
| 14:47:06 | 3 | your relationship with Walmart, right? |
| 14:47:09 | 4 | A    That's correct. |
| 14:47:09 | 5 | Q    And if somebody else gets that information, |
| 14:47:13 | 6 | particularly later on, is it useful to that other person? |
| 14:47:18 | 7 | If another company finds out how -- whether you've got to |
| 14:47:24 | 8 | replenish your stock at a given Walmart store, does that |
| 14:47:26 | 9 | help that other -- |
| 14:47:28 | 10 | THE COURT:  Just a moment.  "Later on," that's -- |
| 14:47:31 | 11 | MS. KELLER:  Okay.  Then let's say "at the time." |
| 14:47:33 | 12 | THE COURT:  Okay.  It doesn't matter.  Just define |
| 14:47:34 | 13 | what "later on" is. |
| 14:47:35 | 14 | BY MS. KELLER: |
| 14:47:36 | 15 | Q    Let's say another company learns at the time that you |
| 14:47:38 | 16 | have not been managing your inventory very effectively, is |
| 14:47:43 | 17 | that tremendously valuable information to that other |
| 14:47:46 | 18 | company? |
| 14:47:47 | 19 | MR. PRICE:  Objection.  Ambiguous.  Calls for |
| 14:47:49 | 20 | speculation. |
| 14:47:49 | 21 | THE COURT:  No.  You can answer the question. |
| 14:47:51 | 22 | THE WITNESS:  I'm going to give you an analogy. |
| 14:47:52 | 23 | It's like milk.  This information is fluid.  It changes |
| 14:47:56 | 24 | every day because every day millions of people go to Walmart |
| :48:00 | 25 | to buy product.  It's like buying milk.  If the milk stays, |

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

| | | |
|---|---|---|
| 14:48:05 | 1 | after a few days it goes bad, it's worthless, and this is |
| 14:48:09 | 2 | the same information.  This information is good for the day |
| 14:48:12 | 3 | you get it.  The day after, it's spoiled.  It's like |
| 14:48:18 | 4 | watermelon that goes spoiled. |
| 14:48:22 | 5 | I don't know if -- I use some Persian analogy. |
| 14:48:26 | 6 | I'm sorry. |
| 01:59:57 | 7 | BY MS. KELLER: |
| 14:48:29 | 8 | Q    No, no.  That's -- that's fine. |
| 14:48:30 | 9 | It's -- so for example, a week later or -- or even five |
| 14:48:35 | 10 | days later, the whole inventory picture could have changed? |
| 14:48:39 | 11 | A    It changes on less than five days later because |
| 14:48:43 | 12 | Walmart, so many -- or Target, so many customers are |
| 14:48:48 | 13 | shopping 24 hours a day, it changes by the minute.  It |
| 14:48:52 | 14 | changes every hour.  That information changes every hour.  I |
| 14:48:59 | 15 | got this information -- if you -- if somebody got it an hour |
| 14:49:03 | 16 | later, it would be different than what's in here.  An hour |
| 14:49:08 | 17 | after that, it would be different than what's in here.  It |
| 14:49:10 | 18 | just keeps changing.  It's no value to this information. |
| 14:49:15 | 19 | Q    But it looks pretty bad that your employees had |
| 14:49:18 | 20 | anything that they got out of Mattel, right? |
| 14:49:24 | 21 | MR. PRICE:  Objection.  Leading.  Argumentative. |
| 14:49:26 | 22 | THE COURT:  I'll sustain it. |
| 23:59:57 | 23 | BY MS. KELLER: |
| 14:49:28 | 24 | Q    Now, let me ask you a little different question.  If, |
| :49:36 | 25 | for some reason, you wanted this data, if for some reason |

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

92

| | | |
|---|---|---|
| 14:49:41 | 1 | you wanted to find out if Mattel was not managing its -- its |
| 14:49:46 | 2 | inventory or sales very well with Walmart, they had too much |
| 14:49:51 | 3 | of one doll in one store and not enough of another doll in |
| 14:49:55 | 4 | another store on a given Monday, would you be able to |
| 14:49:58 | 5 | collect that information somewhere else? |
| 14:50:01 | 6 | A    You can go to the store.  You can ask the buyers.  You |
| 14:50:05 | 7 | can check that.  There is no -- yes, you can. |
| 14:50:09 | 8 | Q    And if you want to get really meaningful information, |
| 14:50:13 | 9 | not day-to-day how much product is on the shelves, but if |
| 14:50:16 | 10 | you want to get really meaningful information about, say, |
| 14:50:19 | 11 | Mattel's sales, can you buy that from independent |
| 14:50:21 | 12 | organizations that gather it? |
| 14:50:26 | 13 | MR. PRICE:  Your Honor, the question is |
| 14:50:27 | 14 | argumentative because of the word "meaningful." |
| 14:50:31 | 15 | MS. KELLER:  I'll try to rephrase, your Honor. |
| 14:50:33 | 16 | BY MS. KELLER: |
| 14:50:33 | 17 | Q    If you want to get information that you can actually |
| 14:50:36 | 18 | use to gain a competitive advantage -- |
| 14:50:38 | 19 | A    Yes. |
| 14:50:38 | 20 | Q    -- something that is meaningful to your business in a |
| 14:50:41 | 21 | competitive sense about Mattel sales, can you go and buy it |
| 14:50:47 | 22 | somewhere? |
| 14:50:47 | 23 | A    Yes, you can.  You can -- |
| 14:50:49 | 24 | Q    Where can you by it? |
| :50:50 | 25 | A    In U.S.A., it's called MPD or TRSTS, total retail sales |

**Exhibit G - Page 100**

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

93

| | | |
|---|---|---|
| 14:50:58 | 1 | data.  In Mexico it's called Nielsen.  You'll have the |
| 14:51:02 | 2 | Nielsen ratings that rank the TVs, how many people are |
| 14:51:06 | 3 | watching, what channel.  That company provides the same |
| 14:51:09 | 4 | service in Mexico, in Canada, there is another one in |
| 14:51:15 | 5 | Australia called GFK.  Again, they get the data, and they |
| 14:51:23 | 6 | sell it to you. |
| 14:51:24 | 7 | Q    So this data -- is this data on competitors' sales -- |
| 14:51:28 | 8 | A    Yes. |
| 14:51:28 | 9 | Q    -- over certain periods of time? |
| 14:51:31 | 10 | A    Compare the sales at retail level. |
| 14:51:35 | 11 | Q    Over a certain period of time? |
| 14:51:37 | 12 | A    Yes. |
| 14:51:38 | 13 | Q    So what would those periods be? |
| 14:51:39 | 14 | A    Usually like in U.S.A., MPD now issues quarterly.  I |
| 14:51:45 | 15 | don't remember -- I don't remember how GFK or Nielsen does |
| 14:51:50 | 16 | it.  I don't know. |
| 14:51:51 | 17 | Q    And so is that -- |
| 14:51:52 | 18 | A    It's for sure annually. |
| 14:51:54 | 19 | Q    And is that information something that people -- |
| 14:51:56 | 20 | competitors actually use to decide how to compete? |
| 14:52:00 | 21 | A    Yes, they do. |
| 14:52:01 | 22 | Q    And they pay money for that? |
| 14:52:02 | 23 | A    Yes. |
| 14:52:03 | 24 | Q    In deciding how to compete, do competitors try to get |
| 14:52:07 | 25 | information about how much inventory somebody has on its |

**Exhibit G - Page 101**

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

94

| | | |
|---|---|---|
| 14:52:10 | 1 | shelf at Walmart on a given day? |
| 14:52:13 | 2 | A    I'm sorry, I don't understand. |
| 14:52:15 | 3 | Q    In deciding to compete with Mattel, do you, MGA, try to |
| 14:52:18 | 4 | go out and find out how much the inventory levels are on any |
| 14:52:24 | 5 | given day at Mattel -- I mean, at the Walmart? |
| 14:52:28 | 6 | A    Actually, Mattel, they just had their quarterly report |
| 14:52:30 | 7 | where -- |
| 14:52:34 | 8 | MR. PRICE:  Objection.  This goes beyond the scope |
| 14:52:35 | 9 | of the question and -- |
| 14:52:36 | 10 | (Interruption in the proceedings.) |
| 14:52:36 | 11 | MR. PRICE:  I'm sorry.  Beyond the scope of the |
| 14:52:36 | 12 | question and voluntary hearsay. |
| 14:52:36 | 13 | MS. KELLER:  I'll move on. |
| 14:52:39 | 14 | THE COURT:  Just reask the question. |
| 14:52:42 | 15 | MS. KELLER:  Okay. |
| 23:00:57 | 16 | BY MS. KELLER: |
| 14:52:43 | 17 | Q    Well, just to wrap up, this data, now that you've seen |
| 14:52:45 | 18 | it, now that you know what it was, was it of any use to you? |
| 14:52:48 | 19 | A    No.  It's worthless. |
| 14:52:51 | 20 | Q    Now, let's look at Exhibit 7104. |
| 14:53:08 | 21 | Do you see what that document is? |
| 14:53:10 | 22 | A    Yes. |
| 14:53:10 | 23 | Q    This is one of the other ones that you were shown the |
| 14:53:12 | 24 | other day that you were told was taken from the Mattel |
| :53:16 | 25 | Mexico -- taken from Mattel Mexico by the MGA employees? |

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

95

| | | |
|---|---|---|
| 14:53:20 | 1 | A    Or rather, found at MGA Mexico. |
| 14:53:24 | 2 | Q    Found at MGA Mexico. |
| 14:53:26 | 3 | And does this include suggested prices for spring 2005 |
| 14:53:32 | 4 | product set? |
| 14:53:34 | 5 | A    I can't find it in here. |
| 14:53:39 | 6 | I don't know where you're looking.  I don't see |
| 14:53:42 | 7 | suggested -- what did she call it? |
| 14:53:46 | 8 | Q    Nevermind.  I am not even going to ask you about that. |
| 14:53:48 | 9 | I'm going to ask you something else. |
| 14:53:51 | 10 | From what you see of what this document purports to be, |
| 14:53:57 | 11 | does it look like something that would be of any value to |
| 14:53:59 | 12 | you? |
| 14:54:00 | 13 | MR. PRICE:  Objection.  Lacks foundation. |
| 14:54:01 | 14 | THE COURT:  Overruled. |
| 14:54:02 | 15 | You can answer that question. |
| 14:54:05 | 16 | THE WITNESS:  It depends -- it depends when was |
| 14:54:08 | 17 | this obtained. |
| 23:59:57 | 18 | BY MS. KELLER: |
| 14:54:09 | 19 | Q    To the best you could tell, what is that document? |
| 14:54:12 | 20 | A    It says "Barbie 2005 preliminary line list." |
| 14:54:21 | 21 | Q    And what's a preliminary line list? |
| 14:54:24 | 22 | A    For Mattel or for MGA?  I know for MGA, it's a line |
| 14:54:27 | 23 | list we plan to come up with later on. |
| 14:54:31 | 24 | Q    When are -- when are suggested prices for spring 2005 |
| :54:36 | 25 | products set? |

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

96

| | | |
|---|---|---|
| 14:54:38 | 1 | A    I don't know about Mattel, but we set it up -- we have |
| 14:54:41 | 2 | a pre -- a pre-toy show, like we have one coming out in |
| 14:54:46 | 3 | April, and that's when we set up the suggested retail |
| 14:54:49 | 4 | pricing for spring of the year later. |
| 14:54:54 | 5 | Q    And would you have a preliminary line list with |
| 14:54:58 | 6 | suggested prices for 2005 before April 2004, would you? |
| 14:55:06 | 7 | A    I'm sorry? |
| 14:55:08 | 8 | Q    Would you have a preliminary line list with suggested |
| 14:55:13 | 9 | prices for 2005 before April of 2004? |
| 14:55:16 | 10 | A    I doubt it because that's not when the shows happen. |
| 14:55:19 | 11 | Q    Mr. Machado, Mr. Vargas and Ms. Trueba left Mattel |
| 14:55:23 | 12 | Mexico in April of 2004? |
| 14:55:26 | 13 | A    Yes. |
| 14:55:26 | 14 | Q    And if you can assume for a moment that this has |
| 14:55:30 | 15 | suggested prices for 2005 in it, then could this document |
| 14:55:34 | 16 | have been downloaded when they left Mattel? |
| 14:55:37 | 17 | A    I have no idea how they got this document and how it |
| 14:55:42 | 18 | found its way to MGA Mexico.  I have no idea and when. |
| 14:55:47 | 19 | Q    You were also asked about some testimony as to MGA's |
| 14:55:58 | 20 | knowledge of the documents seized in Mexico; do you remember |
| 14:56:02 | 21 | that? |
| 14:56:03 | 22 | A    I don't remember every question asked. |
| 14:56:17 | 23 | Q    Do you remember Mr. Price asking you about the contents |
| 14:56:21 | 24 | of the documents that were seized from MGA Mexico? |
| :56:26 | 25 | A    Well, he showed me these two documents, I believe. |

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

| | | |
|---|---|---|
| 14:56:29 | 1 | Q    Right, and you said you hadn't seen it before, right? |
| 14:56:33 | 2 | A    Yes, I had not seen it. |
| 14:56:34 | 3 | Q    And you said you didn't know what they were, true? |
| 14:56:37 | 4 | A    I did not. |
| 14:56:38 | 5 | Q    Now, you were also -- |
| 14:56:39 | 6 | A    I did not before I testified, but now I've looked at |
| 14:56:42 | 7 | them. |
| 14:56:42 | 8 | Q    Right, but you were also asked about having been |
| 14:56:47 | 9 | something called a 30(b)(6) witness on behalf of MGA; do you |
| 14:56:58 | 10 | remember that? |
| 14:56:58 | 11 | A    Yes, I do. |
| 14:56:59 | 12 | Q    And under the Federal Rules of Civil Procedure, is it |
| 14:57:01 | 13 | your understanding that a 30(b)(6) witness is a corporate |
| 14:57:09 | 14 | representative who is willing to become educated about a |
| 14:57:11 | 15 | particular topic? |
| 14:57:12 | 16 | A    Yes. |
| 14:57:13 | 17 | Q    So it doesn't necessarily mean that you have any |
| 14:57:15 | 18 | knowledge of the topic in advance, it just means that you |
| 14:57:18 | 19 | are willing to learn it so that you can testify to that |
| 14:57:21 | 20 | topic, right? |
| 14:57:23 | 21 |      MR. PRICE:  Objection.  It misstates the legal |
| 14:57:24 | 22 | standard, your Honor. |
| 14:57:27 | 23 |      THE COURT:  Well, this is his understanding of |
| 14:57:29 | 24 | what a 30(b)(6) is, and if he's designated himself such a |
| :57:40 | 25 | witness, then it's relevant to show what his understanding |

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

98

| | | |
|---|---|---|
| 14:57:45 | 1 | is of the duties and responsibilities that he has.  But if I |
| 14:57:51 | 2 | need to define that for you at a later time, I will. |
| 14:57:54 | 3 | Counsel? |
| 14:57:55 | 4 | BY MS. KELLER: |
| 14:57:55 | 5 | Q    Now, have you reviewed the portions of your deposition |
| 14:58:01 | 6 | testimony on July 7th, 2010, that deal with the search and |
| 14:58:06 | 7 | seizure of documents from MGA's subsidiary MGA Mexico? |
| 14:58:12 | 8 | A    I don't -- I didn't. |
| 14:58:14 | 9 | Q    And were you designated as a 30(b)(6) witness to |
| 14:58:20 | 10 | testify about your knowledge of the search and seizure, in |
| 14:58:23 | 11 | other words, of what happened when the police came to MGA |
| 14:58:27 | 12 | Mexico? |
| 14:58:27 | 13 | A    I was not. |
| 14:58:31 | 14 | Q    Were you designated to testify about -- here is what |
| 14:58:36 | 15 | I'm asking:  Were you designated to testify about the fact |
| 14:58:39 | 16 | that there was a raid? |
| 14:58:41 | 17 | A    Yes, I -- I was designated to know about the raid, but |
| 14:58:47 | 18 | I was not designated to know what happened during the raid |
| 14:58:52 | 19 | and after the raid. |
| 14:58:54 | 20 | MR. PRICE:  Your Honor, I object and move to |
| 14:58:56 | 21 | strike.  That's getting into an area of law and -- |
| 14:59:00 | 22 | MS. KELLER:  I'm asking for his understanding, |
| 14:59:02 | 23 | your Honor. |
| 14:59:03 | 24 | MR. PRICE:  His understanding is irrelevant. |
| :59:06 | 25 | MS. KELLER:  It's what he was asked about on |

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

99

| | |
|---|---|
| 14:59:07 1 | cross, which is why I'm asking him. |
| 14:59:09 2 | (Attorney discussion held off the record.) |
| 14:59:26 3 | THE COURT:  This is going to get into a number of |
| 14:59:28 4 | the rulings, Counsel.  I want to forewarn both parties |
| 14:59:32 5 | and -- |
| 14:59:37 6 | MS. KELLER:  I will just ask a different question, |
| 14:59:38 7 | your Honor. |
| 14:59:39 8 | THE COURT:  Well, you don't have to.  If you want |
| 14:59:41 9 | to continue, please do so, but I don't know that I'm going |
| 14:59:46 10 | to curtail that from Mattel. |
| 14:59:49 11 | Counsel? |
| 14:59:49 12 | BY MS. KELLER: |
| 14:59:50 13 | Q    Mr. Larian, were you personally present in Mexico when |
| 14:59:52 14 | the offices were raided? |
| 14:59:54 15 | A    I was not. |
| 14:59:55 16 | Q    Were you personally given copies by the Mexican police |
| 15:00:00 17 | of what they took from MGA Mexico? |
| 15:00:03 18 | A    No.  I wasn't there.  I wasn't given -- |
| 15:00:08 19 | Q    And would it be true that whether sitting as a |
| 15:00:11 20 | witness -- an ordinary witness or as a witness under |
| 15:00:16 21 | 30(b)(6) of the rules, you only know about that raid what |
| 15:00:22 22 | others have told you? |
| 15:00:23 23 | A    Yes. |
| 15:00:24 24 | Q    And would it also be true that you only know, in terms |
| :00:30 25 | of what documents were taken, what you have seen here in |

**Exhibit G - Page 107**

CV 04-9049-DOC – 02/17/2011 – Day 19, Vol. 3 of 4

100

| | | |
|---|---|---|
| 15:00:35 | 1 | court, and anything else that you have been asked to read |
| 15:00:43 | 2 | for this -- for this trial? |
| 15:00:45 | 3 | A    Yes. |
| 15:00:46 | 4 | Q    And so when you said the other day that you were seeing |
| 15:00:51 | 5 | those documents Mr. Price gave you for the first time, was |
| 15:00:56 | 6 | that the truth? |
| 15:00:57 | 7 | A    Yes. |
| 15:00:57 | 8 | Q    And I'm talking about 7104 and 8466. |
| 15:01:06 | 9 | A    Yes. |
| 15:01:10 | 10 | Q    And in this case, unless there is an exception either |
| 15:01:18 | 11 | by court order or because somebody is designated to be able |
| 15:01:22 | 12 | to see documents, are there documents that have been |
| 15:01:27 | 13 | designated "attorneys' eyes only"? |
| 15:01:30 | 14 |          MR. PRICE:  Objection.  That's irrelevant for the |
| 15:01:32 | 15 | 30(b)(6). |
| 15:01:33 | 16 |          THE COURT:  Sustained. |
| 15:01:33 | 17 | BY MS. KELLER: |
| 15:01:36 | 18 | Q    Well, you've seen some documents come up on the screen |
| 15:01:40 | 19 | that said "attorneys' eyes only"; is that right? |
| 15:01:45 | 20 | A    I have. |
| 15:01:45 | 21 | Q    And that means that unless there's an exception for |
| 15:01:47 | 22 | someone who has been designated as a 30(b)(6) witness on |
| 15:01:49 | 23 | that topic or the -- the attorneys are, in fact, the ones |
| 15:01:56 | 24 | looking that no one can look at those documents, right? |
| :01:59 | 25 |          MR. PRICE:  Objection.  Irrelevant in this case. |

15:02:03  1          THE COURT:  Well, it goes to his -- I'm going to

15:02:06  2    reverse my prior ruling.  It goes to his knowledge, Counsel.

15:02:09  3          You can ask.

15:02:11  4          THE WITNESS:  To my knowledge, there's three ways.

15:02:14  5    One is when a court -- when a judge de-designates something

15:02:20  6    that was marked AEO, "attorney eyes only," it becomes

15:02:28  7    public, then I have seen those before.  That's one way.

15:02:31  8    Another one is when -- when I was being prepared for

15:02:38  9    30(b)(6), I was shown certain documents to get prepared for

15:02:44 10    my testimony, and sometimes not all the documents, only a

15:02:49 11    portion that the counsel chose who said that's relevant to

15:02:53 12    my testimony to read, and those were AEO.

15:02:56 13    BY MS. KELLER:

15:02:57 14    Q    Now, was it your understanding -- I am just asking what

15:03:00 15    was in your head.  Was it your understanding that you were

15:03:03 16    not designated as a 30(b)(6) witness on the issue of what

15:03:08 17    was actually in the documents seized from Mexico?

15:03:13 18          MR. PRICE:  Object.  That's irrelevant as a matter

15:03:15 19    of law.

15:03:16 20          MS. KELLER:  That's what he was asked about the

15:03:18 21    other day, your Honor.

15:03:19 22          THE COURT:  Overruled.

15:03:19 23          THE WITNESS:  Yes, I was not designated on that,

15:03:21 24    and I remember my deposition, and that issue came over and

:03:26 25    over, and I just looked at my deposition again during the

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

102

| | |
|---|---|
| 15:03:30 1 | break. |
| 12:51:23 2 | BY MS. KELLER: |
| 15:03:31 3 | Q    And is that why you never read any of the documents |
| 15:03:35 4 | that were seized from MGA Mexico's offices? |
| 15:03:39 5 | A    I was not even given those documents to read, |
| 15:03:42 6 | Ms. Keller. |
| 15:03:46 7 | Q    So it's not that you are pretending to not know, |
| 15:03:52 8 | correct? |
| 15:03:53 9 | MR. PRICE:  Objection.  Leading.  Argumentative. |
| 15:03:55 10 | THE COURT:  Sustained. |
| 13:06:28 11 | BY MS. KELLER: |
| 15:03:55 12 | Q    Are you pretending not to know what's in the document? |
| 15:04:00 13 | A    I'm not. |
| 15:04:00 14 | Q    Are you claiming that you didn't want to read them -- |
| 15:04:04 15 | are you -- are you claiming that you didn't read them as a |
| 15:04:08 16 | way to be evasive? |
| 15:04:10 17 | A    I did not.  I just want to make clear that when I said |
| 15:04:23 18 | I did not, I did not try to be evasive. |
| 15:04:26 19 | Q    I understand. |
| 15:04:27 20 | Now, I want to move on to another topic, probably to |
| 15:04:31 21 | the great relief of all.  I want to talk to you about Jorge |
| 15:04:35 22 | Castilla, okay? |
| 15:04:37 23 | A    Yes. |
| 15:04:38 24 | Q    Who is Jorge Castilla? |
| :04:42 25 | A    What do you mean who is -- |

CV 04-9049-DOC – 02/17/2011 – Day 19, Vol. 3 of 4

103

| | | |
|---|---|---|
| 15:04:43 | 1 | Q   Who is Jorge Castilla, and who was he in 2006? |
| 15:04:47 | 2 | A   He was a previous Mattel employee who came to MGA. |
| 15:04:52 | 3 | Q   MGA United States or MGA Mexico? |
| 15:04:55 | 4 | A   MGA U.S.A. |
| 15:04:57 | 5 | Q   And if you could take a look at Exhibit 21423. |
| 15:05:11 | 6 | A   Yes. |
| 15:05:12 | 7 | Q   Is this an e-mail chain that includes e-mails from |
| 15:05:24 | 8 | Jorge Castilla to human resources at MGA and from a Linda |
| 15:05:38 | 9 | Whaley -- or from a Scuyler Bacon to a Linda Whaley? |
| 15:05:45 | 10 | A   Scuyler Bacon. |
| 15:05:46 | 11 | Q   Scuyler Bacon? |
| 15:05:49 | 12 | A   Yes. |
| 15:05:49 | 13 | Q   And who is Scuyler Bacon? |
| 15:05:51 | 14 | A   She used to be a recruiter at MGA U.S.A., worked for |
| 15:05:55 | 15 | MGA as an employee. |
| 15:05:57 | 16 | Q   And who is Linda Whaley? |
| 15:05:58 | 17 | A   She was, at one time, head of human resources of MGA. |
| 15:06:02 | 18 | Q   And that top e-mail was dated February 27th, 2006? |
| 15:06:08 | 19 | A   Yes, it is. |
| 15:06:09 | 20 | MS. KELLER:   Your Honor, I'd move 21423 into |
| 15:06:12 | 21 | evidence. |
| 15:06:12 | 22 | THE COURT:   Received. |
| 15:06:13 | 23 | (Defendants' Exhibit No. 21423 is received in |
| 15:06:13 | 24 | evidence.) |
| | 25 | |

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

104

| | | |
|---|---|---|
| 13:06:40 | 1 | BY MS. KELLER: |
| 15:06:14 | 2 | Q    Now, in February of 2006, Mr. Castilla responded to a |
| 15:06:19 | 3 | job listing for an international business analyst? |
| 15:06:23 | 4 | A    Yes. |
| 15:06:23 | 5 | Q    Who interviewed him? |
| 15:06:27 | 6 | A    Nicole Coleman, I believe. |
| 15:06:29 | 7 | Q    And did you ultimately interview him, too? |
| 15:06:33 | 8 | A    I think I saw him for a few minutes, yes. |
| 15:06:36 | 9 | Q    Now, in March 2000 -- of 2006, did you authorize pay of |
| 15:06:41 | 10 | $90,000 for him? |
| 15:06:43 | 11 | A    I'm sorry? |
| 15:06:44 | 12 | Q    In March 2006, did you authorize that he could be paid |
| 15:06:50 | 13 | $90,000 for his position? |
| 15:06:52 | 14 | A    I don't recall if I did or not. |
| 15:06:54 | 15 | Q    Did Mr. Castilla accept the job offer he was given at |
| 15:06:59 | 16 | MGA? |
| 15:07:00 | 17 | A    Yes, he works at MGA. |
| 15:07:02 | 18 | Q    And if you look at Exhibit 21423, and you look at a |
| 15:07:13 | 19 | February 25th, 2006 letter from Mr. Castilla, is this his |
| 15:07:18 | 20 | e-mail applying for the position? |
| 15:07:22 | 21 | A    Yes, it is. |
| 15:07:23 | 22 | Q    And this is addressed to human resources? |
| 15:07:26 | 23 | A    It is. |
| 15:07:27 | 24 | Q    And if you'd look a little farther down, you'll see |
| :07:30 | 25 | it's MGA? |

**Exhibit G - Page 112**

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

105

| | | |
|---|---|---|
| 15:07:32 | 1 | A    Yes. |
| 15:07:33 | 2 | Q    What does an international business analyst do? |
| 15:07:38 | 3 | A    Basically analyzing our sales and inventories on the |
| 15:07:44 | 4 | international level. |
| 15:07:46 | 5 | Q    And according to Mr. Castilla's resume, starting at |
| 15:07:59 | 6 | page 3 and going on to page 4, he had experience in that |
| 15:08:02 | 7 | area? |
| 15:08:04 | 8 | A    Yes. |
| 15:08:04 | 9 | Q    Now, if we look at Exhibit 6577 -- do you recognize |
| 15:08:14 | 10 | 6577 as an e-mail from Jorge Castilla to Scuyler Bacon dated |
| 15:08:21 | 11 | March 13th, 2006? |
| 15:08:23 | 12 | A    Yes. |
| 15:08:24 | 13 | MS. KELLER:  Your Honor, I'd offer that. |
| 15:08:26 | 14 | THE COURT:  Received. |
| 15:08:27 | 15 | (Defendants' Exhibit No. 6577 is received in |
| 15:08:27 | 16 | evidence.) |
| 13:09:24 | 17 | BY MS. KELLER: |
| 15:08:28 | 18 | Q    Now, if you'd look at the first page, you see that |
| 15:08:32 | 19 | Mr. Castilla is accepting the offer? |
| 15:08:35 | 20 | A    Yes. |
| 15:08:37 | 21 | Q    And this is the offer of employment that he received |
| 15:08:42 | 22 | from MGA for the position of manager sales planning? |
| 15:08:47 | 23 | A    Yes. |
| 15:08:47 | 24 | Q    And if you'd go to the bottom paragraph on this page -- |
| :09:00 | 25 | I'm sorry.  If you'd go to the bottom paragraph on page 4 -- |

| | |
|---|---|
| 15:09:08 1 | A    Page -- yes, go ahead. |
| 15:09:10 2 | Q    This is the actual offer of employment letter.  Let's |
| 15:09:17 3 | look at the very top where it says, "Dear Jorge, it is our |
| 15:09:20 4 | pleasure to extend an offer." |
| 15:09:21 5 | A    Yes, it is. |
| 15:09:22 6 | Q    And then if you'd go to the bottom, it says, "Your |
| 15:09:29 7 | offer of employment with MGA is based upon the understanding |
| 15:09:33 8 | that upon your assumption of full-time duties for MGA, one, |
| 15:09:38 9 | you will be able to perform all of your duties at and for |
| 15:09:42 10 | MGA fully and completely without violating any enforceable |
| 15:09:47 11 | contractual or other legal obligations that you owe to our |
| 15:09:50 12 | former employers, including Mattel; and number two, you have |
| 15:09:56 13 | not and will not violate any legally enforceable terms of |
| 15:10:00 14 | your agreement with Mattel or any other existing commitments |
| 15:10:04 15 | that you have to your former employers or to Mattel." |
| 15:10:08 16 | Is that -- was that standard language that MGA used? |
| 15:10:14 17 | A    As of when? |
| 15:10:17 18 | Q    Oh, as of 2006? |
| 15:10:18 19 | A    Yes. |
| 15:10:20 20 | Q    Let's look at the next page, 6577-5, at the very top |
| 15:10:30 21 | paragraph.  "In this regard, if you accept MGA's offer of |
| 15:10:37 22 | employment, among other things, you should not retain and |
| 15:10:41 23 | should not bring to MGA any of your former employers or |
| 15:10:47 24 | Mattel's property or confidential or proprietary |
| 15:10:50 25 | information, including customer-related information, (or any |

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

107

| | | |
|---|---|---|
| 15:10:56 | 1 | information regarding perspective customers or pricing), and |
| 15:11:02 | 2 | you should not use or disclose your former employers' or |
| 15:11:06 | 3 | Mattel's property and/or confidential and proprietary |
| 15:11:09 | 4 | information in connection with those employment at MGA or |
| 15:11:14 | 5 | otherwise." |
| 15:11:18 | 6 | And at the very bottom of 70 -- 6577, page 5, you see |
| 15:11:25 | 7 | that it says, "I understand and accept the above offer of |
| 15:11:30 | 8 | employments on the above-stated terms," and it's signed |
| 15:11:33 | 9 | "Jorge R. Castilla," dated March 13th, 2006. |
| 15:11:42 | 10 | A    Yes. |
| 15:11:42 | 11 | Q    And now let's go to page 6.  There's even another |
| 15:11:57 | 12 | document that Mr. Castilla is given to sign entitled |
| 15:12:02 | 13 | "Understanding regarding compliance with obligations to |
| 15:12:07 | 14 | former employers," and that's also dated March 10th, 2006; |
| 15:12:12 | 15 | do you see that? |
| 15:12:13 | 16 | A    I do. |
| 15:12:14 | 17 | Q    And this says, "Dear Jorge, you are currently receiving |
| 15:12:18 | 18 | MGA Entertainment Inc.'s, MGA's or the company, offer of |
| 15:12:24 | 19 | employment for the position of manager sales planning.  You |
| 15:12:27 | 20 | have informed us that you do not have a written employment |
| 15:12:30 | 21 | agreement in connection with your employment with Mattel. |
| 15:12:34 | 22 | You have also advised that you signed a confidentiality |
| 15:12:38 | 23 | agreement with Mattel, (the confidentiality agreement), but |
| 15:12:44 | 24 | that you do not presently have copies in your possession. |
| :12:48 | 25 | "It is MGA's policy to honor the agreements of a |

**Exhibit G - Page 115**

15:12:49 1   competitive company to the fullest extent required by
15:12:53 2   applicable state and federal law.  Therefore, your offer of
15:12:56 3   employment with MGA is based upon the understanding that
15:12:59 4   upon your assumption of duties for the company, one, you
15:13:03 5   will be able to perform all of your duties at the company,
15:13:05 6   fully and completely, without violating any enforceable
15:13:09 7   contractual or other legal obligations that you owed to your
15:13:13 8   former employers, including Mattel; and two, you have not
15:13:17 9   and will not violate any legally enforceable term of your
15:13:21 10   agreement with Mattel or any other existing commitments you
15:13:25 11   may have to your former employers or to Mattel."
15:13:32 12       And then it goes on even more.
15:13:35 13       "In this regard, if you accept MGA's offer of
15:13:38 14   employment, among other things, you should not," bold
15:13:40 15   letters, "retain and should not," bold letters, "bring to
15:13:46 16   MGA any of your former employers' or Mattel's property or
15:13:49 17   confidential and proprietary information, including
15:13:53 18   customer-related information or any information regarding
15:13:56 19   perspective customers, nor should you use or disclose your
15:14:00 20   former employers' or Mattel's property and/or confidential
15:14:06 21   and proprietary information in connection with your
15:14:10 22   employment at MGA or otherwise.
15:14:12 23       "All of Mattel's property and confidential and
15:14:14 24   proprietary information must be returned to Mattel before
:14:19 25   you commence work for MGA.  And to the extent that any

| | |
|---|---|
| 15:14:25  1 | confidential and proprietary information of your former |
| 15:14:28  2 | employers or Mattel, including customer-related information, |
| 15:14:31  3 | (or any information) regarding perspective customers, is |
| 15:14:37  4 | stored on your personal digital assistant, (PDA), and/or |
| 15:14:43  5 | Blackberry and/or home and/or laptop computers or in |
| 15:14:47  6 | personal files, all such information must be left at or |
| 15:14:52  7 | returned to Mattel, and you should not retain any copies in |
| 15:14:56  8 | a hard copy or in an electronic form. |
| 15:15:00  9 | "In addition, you should not solicit any of your former |
| 15:15:03 10 | colleagues or customers to leave Mattel or sever ties with |
| 15:15:07 11 | Mattel to join or establish a relationship with MGA or |
| 15:15:10 12 | otherwise. |
| 15:15:12 13 | "Likewise, to the fullest extent required by applicable |
| 15:15:18 14 | law, the company will not knowingly ask you to violate any |
| 15:15:21 15 | enforceable terms of your agreement with Mattel and will not |
| 15:15:25 16 | ask you to disclose or use the confidential and proprietary |
| 15:15:32 17 | information of your former employers' or Mattel, including |
| 15:15:36 18 | customer or prospective customer-related information. |
| 15:15:38 19 | "If someone at MGA asks you to engage in any act that |
| 15:15:44 20 | you believe may violate any enforceable terms of your |
| 15:15:47 21 | agreement with or obligations to your former employers or |
| 15:15:51 22 | Mattel or any other legal obligation under applicable law, |
| 15:15:57 23 | you should contact the company's general counsel or me |
| 15:16:00 24 | immediately to resolve this issue before taking such action |
| :16:04 25 | or making any such disclosure. |

| | |
|---|---|
| 15:16:07 1 | "Jorge, we hope you will join our team at MGA.  If you |
| 15:16:12 2 | have any questions regarding any of these matters, please |
| 15:16:15 3 | call me."  And this is signed, "Sincerely, Linda Whaley, |
| 15:16:17 4 | Director of Human Resources."  And you see that Mr. Castilla |
| 15:16:21 5 | had signed this document, too? |
| 15:16:25 6 | A    Yes. |
| 15:16:32 7 | Q    Now, if we can look at Exhibit 21070. |
| 15:16:49 8 | Do you see that as an e-mail from Mr. Castilla to Nancy |
| 15:16:52 9 | Kopang? |
| 15:16:54 10 | A    Yes. |
| 15:16:55 11 | Q    And the e-mail right under that is from you to |
| 15:16:58 12 | Mr. Castilla? |
| 15:17:00 13 | A    I'm sorry? |
| 15:17:01 14 | Q    And the e-mail right under that is a December 7th, |
| 15:17:03 15 | 2006 -- |
| 15:17:05 16 | A    Yes. |
| 15:17:05 17 | Q    -- e-mail from you to Mr. Castilla? |
| 15:17:10 18 | A    It starts from the bottom up.  It's an e-mail from |
| 15:17:13 19 | Castilla to me, and then it goes to Nancy. |
| 15:17:16 20 | Q    And who is Nancy Kopang? |
| 15:17:19 21 | A    She's my assistant. |
| 15:17:20 22 |         MS. KELLER:  Your Honor, I'd move 21070 in |
| 15:17:21 23 | evidence. |
| 15:17:25 24 |         THE COURT:  Received. |
| 15:17:25 25 | |

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

111

| | | |
|---|---|---|
| 15:17:25 | 1 | (Defendants' Exhibit No. 21070 is received in |
| 15:17:25 | 2 | evidence.) |
| 15:17:25 | 3 | BY MS. KELLER: |
| 15:17:28 | 4 | Q    Now, if I look at the bottom e-mail, the first one in |
| 15:17:32 | 5 | the chain, that's Mr. Castilla e-mails you to tell you, "Hi |
| 15:17:38 | 6 | Isaac, need to meet with you urgently regarding legal |
| 15:17:41 | 7 | matters I may need to deal with tomorrow regarding MGA.  I |
| 15:17:46 | 8 | am at home now but can come see you either outside or during |
| 15:17:48 | 9 | business hours.  Don't want to discuss this via e-mail, |
| 15:17:52 | 10 | phone.  Thanks." |
| 15:17:56 | 11 | And you e-mailed him back on December 7th, 2006, "Okay, |
| 15:18:06 | 12 | tomorrow." |
| 15:18:06 | 13 | And then you see an e-mail from Mr. Castilla to Nancy |
| 15:18:12 | 14 | Kopang on December 8th, 2006, "Hi Nancy, please let me know |
| 15:18:17 | 15 | when you can squeeze me in for 15 minutes with Isaac.  I am |
| 15:18:22 | 16 | flexible but need to speak with him urgently during the |
| 15:18:26 | 17 | a.m." |
| 15:18:27 | 18 | Now, when Mr. Castilla met with you, did he tell you |
| 15:18:30 | 19 | that he had taken some documents from Mattel? |
| 15:18:33 | 20 | A    He told me more than that. |
| 15:18:37 | 21 | Q    Okay.  What did he tell you? |
| 15:18:39 | 22 | MR. PRICE:  Your Honor.  I object if this is |
| 15:18:40 | 23 | offered for the truth but not for state of mind. |
| 15:18:44 | 24 | THE COURT:  Once again, it's from Mr. Larian's |
| 15:18:48 | 25 | state of mind and any conduct he took or action he took in |

| | |
|---|---|
| 15:18:50 1 | relation to the conversation.  Mr. Castilla hasn't |
| 15:18:54 2 | testified, so we don't have the ability to cross-examine up |
| 15:18:56 3 | to this time. |
| 15:18:57 4 | Counsel? |
| 13:20:34 5 | BY MS. KELLER: |
| 15:19:00 6 | Q    When he met with you, what did Mr. Castilla tell you? |
| 15:19:02 7 | A    He told me that when he left Mattel and went home, |
| 15:19:08 8 | there were FBI agents waiting for him when he got there on |
| 15:19:15 9 | his last day, and they asked him for his PDA and computers |
| 15:19:21 10 | and that he had -- and they took it from him because he had |
| 15:19:28 11 | taken some information from Mattel, and somehow they knew |
| 15:19:35 12 | and they had taken it from him.  I told him why are you -- |
| 15:19:39 13 | should I say what happened, the whole thing? |
| 15:19:42 14 | Q    Well, let me ask you some questions. |
| 15:19:44 15 | So he told you that he had taken some documents from |
| 15:19:47 16 | Mattel? |
| 15:19:48 17 | A    Yes. |
| 15:19:48 18 | Q    And he told you he had been visited by the FBI? |
| 15:19:53 19 | A    Right.  He didn't tell me what he had taken.  He just |
| 15:19:57 20 | told me some documents. |
| 15:19:59 21 | Q    Did he tell you whether he had used those documents at |
| 15:19:59 22 | all at MGA? |
| 15:20:11 23 | A    Well, I've got to tell you the whole conversation. |
| 15:20:11 24 | Q    Okay. |
| 15:20:11 25 | MR. PRICE:  Your Honor, I object.  It's now a |

| | |
|---|---|
| 15:20:11 1 | narrative. |
| 15:20:13 2 | THE COURT:  Sustained. |
| 15:20:13 3 | BY MS. KELLER: |
| 15:20:14 4 | Q    After Mr. Castilla told you that the FBI had come and |
| 15:20:16 5 | taken his computer and PDA, what did you say or what did he |
| 15:20:19 6 | say next? |
| 15:20:20 7 | A    First thing I said is, "Why the hell did you do that |
| 15:20:24 8 | when we told you not to do anything, not to bring anything?" |
| 15:20:27 9 | The second thing I asked, "Have you brought any of that |
| 15:20:29 10 | information to MGA?"  And he said no, he has not. |
| 15:20:33 11 | Everything was taken by FBI. |
| 15:20:35 12 | Q    Before he even had a chance to bring it to MGA? |
| 15:20:39 13 | A    Before he even started working at MGA. |
| 15:20:41 14 | Q    And did he tell you when this was that the FBI had |
| 15:20:45 15 | visited him and taken these things? |
| 15:20:47 16 | A    The day he had left Mattel. |
| 15:20:50 17 | Q    And he had left Mattel when? |
| 15:20:52 18 | A    I don't remember when. |
| 15:20:53 19 | Q    Was that back in March when we saw the offer of |
| 15:20:55 20 | employment? |
| 15:20:55 21 | A    Yes.  This was a month -- a month later, and the other |
| 15:20:58 22 | thing I asked him is "Why are you telling me this now?" |
| 15:21:00 23 | Q    "Why didn't you tell me at the time"? |
| 15:21:03 24 | A    Yes. |
| :21:03 25 | Q    What did he say? |

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

114

15:21:05  1    A    He said that he didn't want to get in trouble.  He

15:21:07  2    didn't want to lose his job.  And then I asked, "Why are you

15:21:12  3    telling me now?"

15:21:17  4    Q    Now, did he tell you that the thumb drive containing

15:21:20  5    those documents was in the hands of the authorities before

15:21:25  6    he ever started at MGA?

15:21:27  7    A    Yes, I -- I just testified to that, that he said that

15:21:30  8    FBI took everything that he had right there at his home.

15:21:41  9    Q    And you now know that the documents he just took

15:21:44 10    included some forecasting materials?

15:21:48 11    A    I have no idea.  I don't know.  I have never seen it.

15:21:51 12    Yes, I have heard from this litigation that he had some

15:21:54 13    forecasting.

15:21:55 14    Q    You've heard it, but you haven't seen them?

15:21:57 15    A    Never seen it.

15:21:58 16    Q    And Mr. Price asked you about that the other day,

15:22:00 17    didn't he, about whether the forecasting materials were

15:22:06 18    taken?

15:22:07 19    A    I don't remember what he asked.

15:22:16 20    Q    Now, Mr. Castilla signed two separate documents

15:22:25 21    agreeing not to take anything from Mattel when he left,

15:22:28 22    right?

15:22:28 23    A    That's correct.

15:22:29 24    Q    And did you talk to him about that?

15:22:33 25    A    Yes.

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

115

| | | |
|---|---|---|
| 15:22:33 | 1 | Q    Did you say, "Hey, you signed two separate documents |
| 15:22:36 | 2 | saying you weren't taking anything from Mattel"? |
| 15:22:39 | 3 | A    Yes.  I was very upset.  And now, six months, seven |
| 15:22:43 | 4 | months later, he was coming to me and telling me that he had |
| 15:22:44 | 5 | taken some documents from Mattel even though we told him not |
| 15:22:50 | 6 | to do it. |
| 15:22:51 | 7 | Q    And what was his explanation for why he took the |
| 15:22:55 | 8 | documents? |
| 15:22:56 | 9 | A    Some of the work that he -- his explanation was "This |
| 15:22:58 | 10 | is the work, the spreadsheets, et cetera, that I had created |
| 15:23:00 | 11 | myself, and I wanted to have a sample of my own work." |
| 15:23:05 | 12 | Q    After Mr. Castilla came to work at MGA, did your |
| 15:23:10 | 13 | forecasting get better? |
| 15:23:12 | 14 | A    It has not. |
| 15:23:12 | 15 | Q    And did your forecasting from April 2006, when he came |
| 15:23:18 | 16 | to work there, has it improved or has it gotten worse? |
| 15:23:24 | 17 | A    Our forecasting, in my opinion, now is worse than it's |
| 15:23:29 | 18 | been ever. |
| 15:23:29 | 19 | Q    Did you ever ask Jorge Castilla to take anything from |
| 15:23:34 | 20 | Mattel? |
| 15:23:35 | 21 | A    To the contrary.  We told him -- I personally told him |
| 15:23:38 | 22 | in the 5, 10 minute interview that I had with him to |
| 15:23:41 | 23 | "Please, don't even bring a paper clip.  Please just come |
| 15:23:45 | 24 | with your brain." |
| :23:47 | 25 | Q    At the time you interviewed Mr. Castilla, you were very |

**Exhibit G - Page 123**

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

116

| | | |
|---|---|---|
| 15:23:51 | 1 | sensitive about that issue, weren't you? |
| 15:23:54 | 2 | A    Yes.  We were already in a lawsuit with Mattel.  I just |
| 15:23:59 | 3 | didn't want one, and here I am. |
| 15:24:01 | 4 | Q    Now, if we take a look at Exhibit 9231, is that -- |
| 15:24:21 | 5 | A    I'm sorry, go ahead. |
| 15:24:34 | 6 | Q    Okay.  This is Exhibit 9231.  Is this an April 17th, |
| 15:24:40 | 7 | 2007 e-mail from you to Mr. Castilla and copying others, |
| 15:24:46 | 8 | including Ron Brawer? |
| 15:24:48 | 9 | A    Yes. |
| 15:24:50 | 10 | MS. KELLER:  Your Honor, I'd ask that that be |
| 15:24:53 | 11 | admitted. |
| 15:24:54 | 12 | THE COURT:  Received. |
| 15:24:54 | 13 | (Defendants' Exhibit No. 9231 is received in |
| 15:24:54 | 14 | evidence.) |
| 15:24:54 | 15 | BY MS. KELLER: |
| 15:24:55 | 16 | Q    And if you'd look at page 1, you are saying, "ZAPF |
| 15:24:58 | 17 | should be a 40 million-dollar line.  They did $17 million |
| 15:25:09 | 18 | last year with no TV and no new product.  What's wrong with |
| 15:25:13 | 19 | our sales and forecast guys"; do you see that? |
| 15:25:17 | 20 | A    I do. |
| 15:25:19 | 21 | Q    And the whole e-mail chain concerns shipping date |
| 15:25:24 | 22 | problems, doesn't it? |
| 15:25:26 | 23 | A    I have to read it. |
| 15:25:33 | 24 | Q    Oh, I'm sorry, in this e-mail -- this e-mail chain is |
| :25:37 | 25 | basically all about how forecasting has to get better; is |

15:25:41 1   that right?

15:25:42 2   A     It is, and selling.

15:25:44 3   Q     And this is well after Mr. Castilla had come on board

15:25:48 4   in April of 2006?

15:25:51 5   A     Yes, this is already April of 2007, a year later.

15:25:57 6   Q     And if we could look at 9730 -- 9232.

15:26:04 7   A     9232, I have it here.

15:26:20 8   Q     Is this an e-mail chain, the top e-mail of which is

15:26:21 9   from you to Ron Brawer, dated August 4th, 2006?

15:26:33 10  A     Yes.

15:26:34 11          MS. KELLER:  And your Honor, may I move this into

15:26:35 12  evidence?

15:26:38 13          THE COURT:  Received.

15:26:38 14          (Defendants' Exhibit No. 9232 is received in

15:26:39 15      evidence.)

15:26:46 16          THE WITNESS:  Go ahead.

15:26:46 17  BY MS. KELLER:

15:26:47 18  Q     What does this whole e-mail chain refer to?

15:26:51 19  A     It's forecast meeting recap.

15:26:53 20  Q     What do you mean by "forecast meeting recap"?

15:26:57 21  A     A meeting that they have to talk about the forecast,

15:27:02 22  recap.  I don't know how to explain it.

15:27:06 23  Q     All right.  Does this e-mail chain concern problems

15:27:09 24  with shipping dates and missed shipping dates, among other

:27:13 25  things?

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

118

| | | |
|---|---|---|
| 15:27:13 | 1 | A    Yes. |
| 15:27:13 | 2 | Q    And losing sales because of missing delivery dates and |
| 15:27:17 | 3 | shipping dates? |
| 15:27:18 | 4 | A    Yes. |
| 15:27:20 | 5 | Q    And it details quite a few problems with quite a few |
| 15:27:26 | 6 | stores; is that right? |
| 15:27:28 | 7 | A    Retailers, yes. |
| 15:27:30 | 8 | Q    Now, what does that have to do with forecasting?  Can |
| 15:27:34 | 9 | you explain? |
| 15:27:36 | 10 | A    Because the forecasting department has to do the |
| 15:27:39 | 11 | forecast so Hong Kong -- MGA Hong Kong can place orders with |
| 15:27:47 | 12 | the factory so they can -- the factory can produce it so we |
| 15:27:51 | 13 | can ship it to the customer during the time that they want |
| 15:27:54 | 14 | it.  So it's very, very important.  It's like a 360-degree |
| 15:27:59 | 15 | cycle. |
| 15:28:00 | 16 | Q    So the forecaster is supposed to project how much of a |
| 15:28:04 | 17 | product you think you are going to need? |
| 15:28:06 | 18 | A    That's correct. |
| 15:28:07 | 19 | Q    And how much of a product you'll think you'll need by |
| 15:28:10 | 20 | what date? |
| 15:28:11 | 21 | A    Yes. |
| 15:28:11 | 22 | Q    And to what stores it may be going? |
| 15:28:14 | 23 | A    The retail -- not store by store, but per chain. |
| 15:28:18 | 24 | Q    So Walmart might need this many, Target might need this |
| :28:24 | 25 | many of this item? |

**Exhibit G - Page 126**

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

119

| | | |
|---|---|---|
| 15:28:25 | 1 | A    Right, but Walmart has 3,300 stores, so -- |
| 15:28:26 | 2 | Q    Okay.  I don't mean to use the term "store."  Just per |
| 15:28:29 | 3 | retailer? |
| 15:28:30 | 4 | A    Right. |
| 15:28:30 | 5 | Q    So if your forecasting is way off, what happens to your |
| 15:28:33 | 6 | shipping? |
| 15:28:34 | 7 | A    We made shipments, we'd either have too much inventory |
| 15:28:37 | 8 | or too little inventory, we lose sales, we lose ads.  When |
| 15:28:42 | 9 | the ads that you see, for example, the Target circular, et |
| 15:28:49 | 10 | cetera, those are planned way ahead, and if the ad breaks |
| 15:28:52 | 11 | and Target doesn't have the merchandise -- |
| 15:28:59 | 12 | Q    So this -- these e-mails are from July all the way up |
| 15:29:04 | 13 | to August 2006? |
| 15:29:06 | 14 | A    Yes, they are. |
| 15:29:07 | 15 | Q    And so the period right after Mr. Castilla has come to |
| 15:29:12 | 16 | work there, your shipping dates are all off, right? |
| 15:29:16 | 17 | A    Yes. |
| 15:29:19 | 18 |         MR. PRICE:  Objection.  Leading and ambiguous. |
| 15:29:20 | 19 |         THE COURT:  No.  Overruled. |
| 15:29:22 | 20 |         Your answer? |
| 15:29:23 | 21 |         THE WITNESS:  They are off, yes. |
| 15:29:24 | 22 | BY MS. KELLER: |
| 15:29:24 | 23 | Q    And then a year later, we saw that they are still way |
| 15:29:26 | 24 | off, right? |
| :29:29 | 25 | A    Yes. |

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

120

| | | |
|---|---|---|
| 15:29:30 | 1 | Q    Let's look at Exhibit 34863.  And is this document |
| 15:29:49 | 2 | labeled "Walmart Replenishment Monthly and Quarterly Recap"? |
| 15:29:53 | 3 | A    Yes, it is. |
| 15:29:53 | 4 | Q    And this is covering 2007, 2008 and 2009? |
| 15:29:58 | 5 | A    Yes, it is. |
| 15:29:59 | 6 | MS. KELLER:  Your Honor, I'd move 34863 into |
| 15:30:04 | 7 | evidence. |
| 15:30:05 | 8 | THE COURT:  It's received. |
| 15:30:05 | 9 | (Defendants' Exhibit No. 34863 is received in |
| 15:30:06 | 10 | evidence.) |
| | 11 | BY MS. KELLER: |
| 15:30:06 | 12 | Q    Can you tell us -- can you explain what this document |
| 15:30:09 | 13 | is all about? |
| 15:30:10 | 14 | A    This, again, goes to replenishment of forecasting.  If |
| 15:30:15 | 15 | you go to the column where it says "fill rate" or |
| 15:30:23 | 16 | "missed," do you see that? |
| 15:30:24 | 17 | (Interruption in the proceedings.) |
| 15:30:25 | 18 | MS. KELLER:  Fill rate, f-i-l-l, or missed, |
| 15:30:25 | 19 | m-i-s-s-e-d. |
| 15:30:28 | 20 | THE WITNESS:  Let's go to the column called "Total |
| 15:30:30 | 21 | Order."  Let's show that, please. |
| 15:30:33 | 22 | BY MS. KELLER: |
| 15:30:33 | 23 | Q    Do you want a particular year? |
| 15:30:35 | 24 | A    Just any year.  Just total order.  It says "January, |
| :30:40 | 25 | 5,222,000."  Do you see that at the top? |

**Exhibit G - Page 128**

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

121

| | | |
|---|---|---|
| 15:30:45 | 1 | Q    Okay.  So that's for 2008. |
| 15:30:51 | 2 | A    Okay.  So here, we received an order for $5,222,480 |
| 15:30:53 | 3 | from Walmart in 2008, and that's just the month of January. |
| 15:31:03 | 4 | It's not even the peek season.  And we only shipped |
| 15:31:07 | 5 | $4.8 million of that.  We missed $394,000.  So basically we |
| 15:31:16 | 6 | filled only 92 percent of that order.  That shows our |
| 15:31:19 | 7 | forecasting was wrong.  And it goes -- it goes on and on.  I |
| 15:31:23 | 8 | mean, looked -- looked at -- this doesn't have column |
| 15:31:28 | 9 | numbers that go to December -- do you see the December? |
| 15:31:38 | 10 | Q    And that's the big month of the year for you? |
| 15:31:40 | 11 | A    Yes, November or December. |
| 15:31:42 | 12 | Could you highlight that, please, Mike?  It's in red. |
| 15:31:53 | 13 | Can you just go across to "total shipping" in November. |
| 15:32:01 | 14 | Order received, 9.583; do you see that? |
| 15:32:06 | 15 | Yes, here. |
| 15:32:09 | 16 | Okay.  So we received an order from Walmart in November |
| 15:32:12 | 17 | of 2008 for 9.5 million -- 5 -- $9,583,075, and we only |
| 15:32:26 | 18 | shipped $6,825,563.  We had a fill rate -- |
| 15:32:33 | 19 | Can you go one column forward? |
| 15:32:35 | 20 | We missed their forecast and their orders by almost -- |
| 15:32:40 | 21 | by more than 40 percent.  We only shipped 58 percent. |
| 15:32:44 | 22 | Q    So this November -- this November total order, it says |
| 15:32:47 | 23 | "16,408,638" -- |
| 15:32:51 | 24 | A    Where do you see 16 million? |
| :32:52 | 25 | Q    Under "total order." |

**Exhibit G - Page 129**

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

122

| Time | Line | Text |
|---|---|---|
| 15:32:54 | 1 | A    Right, and we only shipped 9 million of it, so |
| 15:32:56 | 2 | that's -- |
| 15:32:57 | 3 | Q    So you missed $6,825,563? |
| 15:33:03 | 4 | A    Right. |
| 15:33:04 | 5 | Q    That's a missed shipment. |
| 15:33:05 | 6 | What happened -- what does that mean in terms of the |
| 15:33:08 | 7 | cost to you? |
| 15:33:09 | 8 | A    It's huge, because in November -- October, November, |
| 15:33:12 | 9 | December are the most important months of the year.  It's |
| 15:33:17 | 10 | Christmas season.  That's when toy companies really make |
| 15:33:22 | 11 | their money.  We work on 40, 45 percent profit margin, so |
| 15:33:27 | 12 | losing almost a 7 million-dollar order means loss of profit |
| 15:33:32 | 13 | of $2.8 million just for that month, if you just take |
| 15:33:36 | 14 | 40 percent. |
| 15:33:37 | 15 | Q    And at that point, November of 2008, when you had that |
| 15:33:43 | 16 | terrible fill rate, Mr. Castilla had been with you for over |
| 15:33:49 | 17 | two years? |
| 15:33:49 | 18 | A    Yes, and it gets worse.  The next month it's only |
| 15:33:52 | 19 | 49 percent.  They only shipped half of the orders. |
| 15:33:56 | 20 | Q    Do you have any information whatsoever that |
| 15:34:01 | 21 | Mr. Castilla ever used any forecasting material that he took |
| 15:34:04 | 22 | from Mattel? |
| 15:34:05 | 23 | A    I do.  He did not. |
| 15:34:06 | 24 | Q    And that's because the FBI seized it before he came to |
| :34:11 | 25 | Mattel -- I mean, MGA? |

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

123

| | | |
|---|---|---|
| 15:34:12 | 1 | A    Not only that, but we hired forensic examiners to |
| 15:34:19 | 2 | look -- |
| 15:34:20 | 3 | MR. PRICE:  Object.  We are now getting into |
| 15:34:22 | 4 | hearsay, your Honor. |
| 15:34:24 | 5 | THE COURT:  Sustained. |
| 15:34:24 | 6 | BY MS. KELLER: |
| 15:34:25 | 7 | Q    Did you take any steps to see if there was any |
| 15:34:29 | 8 | possibility that Mr. Castilla had used anything? |
| 15:34:41 | 9 | Did you ever double check with Mr. Castilla and asked |
| 15:34:43 | 10 | him again whether he had used any data whatsoever that he |
| 15:34:49 | 11 | had taken from Mattel in doing any forecasting for MGA? |
| 15:34:54 | 12 | A    I did. |
| 15:34:54 | 13 | Q    And what did he say? |
| 15:34:56 | 14 | A    No.  He swore on his newborn baby and his wife that he |
| 15:35:03 | 15 | had never used it. |
| 15:35:05 | 16 | Q    Now, let's look at Exhibit 3487 -- 34867. |
| 15:35:14 | 17 | THE WITNESS:  I'm sorry, I need -- |
| 15:35:16 | 18 | THE COURT:  Okay.  We are going to take a recess. |
| 15:35:17 | 19 | You are admonished not to discuss this matter amongst |
| 15:35:19 | 20 | yourselves, nor form or express any opinions about this |
| 15:35:24 | 21 | case. |
| 15:35:25 | 22 | Counsel, come back in about 15 or 20 minutes. |
| 15:36:12 | 23 | (Recess.) |
| 17:13:19 | 24 | -oOo- |
| :13:21 | 25 | |

CV 04-9049-DOC - 02/17/2011 - Day 19, Vol. 3 of 4

124

```
10:54:25  1                        -oOo-
12:17:27  2                     CERTIFICATE
12:17:27  3
12:17:27  4        I hereby certify that pursuant to Section 753,
12:17:27  5   Title 28, United States Code, the foregoing is a true and
12:17:27  6   correct transcript of the stenographically reported
12:17:27  7   proceedings held in the above-entitled matter and that the
12:17:27  8   transcript page format is in conformance with the
12:17:27  9   regulations of the Judicial Conference of the United States.
12:17:27 10
12:17:27 11   Date:   February 18, 2011
12:17:27 12
12:17:27 13
12:17:27
12:17:27 14
12:17:27            _____
12:17:27 15         JANE C.S. RULE, U.S. COURT REPORTER
12:17:27            CSR NO. 9316
         16
         17
         18
         19
         20
         21
         22
         23
         24
         25
```

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HON. DAVID O. CARTER, JUDGE PRESIDING

| | |
|---|---|
| MATTEL INC., | ) **CERTIFIED COPY** |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. CV 04-9049-DOC |
| | ) |
| MGA ENTERTAINMENT, INC., | ) |
| | ) |
| Defendant. | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

THURSDAY, FEBRUARY 17, 2011

VOLUME 4

Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

Page 9

1    A    That's correct.

2    Q    And it tells him not to bring any information on his PDA or

3    Blackberry, or home, or lap top computer; right?

4    A    Yes.

5    Q    And not to retain any copies in either electronic or hard

6    copy form, all of that?

7    A    Yes.

8    Q    And if you look at the second page, is that Mr. Cooney's

9    signature?

10   A    It is.

11   Q    And do you see Linda Whaley's signature, too, the senior

12   director of human resources?

13   A    Yes.

14   Q    And what is the date that Mr. Cooney signs that agreement?

15   A    April 27, 2006.

16   Q    And in May of 2009, did Mr. Cooney leave MGA's employment?

17   A    He did.

18   Q    And do you remember what the circumstances were?

19   A    Yes.

20   Q    What were the circumstances of his leaving?

21   A    MGA was not doing very well.  He was concerned about his

22   family and the stability of the company, and he went to a company,

23   the name Jax Pacific.

24   Q    After he left in May 2009, in July 2009, was this when Mattel

25   first asserted that Mr. Cooney took Mattel information?

Page 10

1    **A**    Yes.

2    **Q**    Not before?

3    **A**    Any time.

4           **MS. KELLER:**  Thank you, Your Honor.  I have nothing

5    further.

6           **THE COURT:**  Do you need to switch out a number of

7    notebooks this evening?

8           **MR. PRICE:**  I think that's been done.  I think there is

9    going to be examination.

10          **THE COURT:**  I'm sorry.  My apologies.

11          Mr. Overland, questions, please, on behalf of

12   Mr. Machado.

13                          CROSS-EXAMINATION

14   **BY MR. OVERLAND:**

15   **Q**    This will be very brief, Mr. Larian.

16          I think you testified in answer to one of the questions

17   that was asked of you that Mr. Machado was employed by Mattel

18   Mexico.

19          Do you remember that?

20   **A**    Yes.

21   **Q**    Do you have any personal knowledge as to who employed

22   Mr. Machado?

23   **A**    I do.  Mattel Servicios.

24   **Q**    So when you said he was employed by Mattel Mexico --

25   **A**    I misspoke.

Page 11

1             **MR. OVERLAND:**  Thank you.  That's all.

2             **THE COURT:**  Do you want to proceed this evening?  Are

3    you prepared, or do you need binders changed out?

4             **MR. PRICE:**  I think we can use the next 20 minutes or

5    so.

6             **THE COURT:**  Redirect by Mr. Price on behalf of Mattel.

7                        REDIRECT EXAMINATION

8    **BY MR. PRICE:**

9    **Q**    Mr. Larian, you were testifying about some agreements you had

10   with Mr. Machado, Mr. Vargas, Ms. Trueba, Mr. Castilla,

11   Mr. Cooney.  And it's correct, and you were shown Exhibit 6793,

12   which had the provision from Mr. Machado, that he wasn't to bring

13   anything from Mattel.

14             Do you recall that?

15   **A**    Yes.

16   **Q**    And the same provision was in Ms. Vargas' contract as well?

17   **A**    Mr. Vargas, yes.

18   **Q**    The same provision was in Ms. Trueba's contract?

19   **A**    Yes.

20   **Q**    And then for Mr. Castilla, you also had a similar provision

21   in his contract?

22   **A**    Yes.

23   **Q**    In fact, you had a separate document, which over two pages

24   detailed that he was not to bring anything from Mattel; correct?

25   **A**    Yes.

Page 12

1   Q   And you had a provision in Mr. Cooney's contract as well?

2   A   Yes.

3   Q   But you never enforced any of those provisions, did you?

4   A   What do you mean by that?

5   Q   .I mean, you have the provision in the contract.  It's there.

6   But it's window-dressing.  You don't do anything about if a Mattel

7   employees steals from an employer?

8           MR. OVERLAND:  Objection.  Argumentative.

9           THE COURT:  That's as to window-dressing, but the

10   remainder of the question, Counsel.

11           MS. KELLER:  Your Honor, assumes facts not in evidence

12   as to Mr. Cooney, who was gone.

13           THE COURT:  Well, as to Mr. Cooney.

14   BY MR. PRICE:

15   Q   Let me limit it to Mr. Cooney a bit later.

16           Mr. Machado, Mr. Vargas, Ms. Trueba, Mr. Castilla, you

17   had these provisions on paper, which they signed, and you didn't

18   enforce them; right?

19   A   We didn't enforce them.  We told them not to bring anything.

20   Q   Now, when you say you told them not to bring anything, that

21   was before they brought something or after they brought something?

22   A   Before we hired them, we told them not to bring anything.

23   Q   So I'm talking about whether or not these are just words on a

24   piece of paper, or whether there is something that really matter

25   to you or MGA.  Okay?

Page 13

1            And so with respect to Mr. Castilla, Mr. Machado,

2     Mr. Vargas, Ms. Trueba, you never enforced the words that were on

3     those pieces of paper which they signed?

4            **MR. OVERLAND:**  Object as to the word "enforce" as being

5     vague.

6            **THE COURT:**  Overruled.

7            **THE WITNESS:**  We had told these people not to bring

8     anything and, unfortunately, they did.  If you mean by enforcing

9     them, firing them, no, we did not fire them.

10    BY MR. PRICE

11    **Q**    Well, not just did you fire them, did you -- you didn't

12    discipline them in any way, did you?

13    **A**    We did.

14    **Q**    Who did you discipline?

15    **A**    All of them.  Told them not to do that; not to bring it.  Why

16    did you do that?

17    **Q**    So you had these words on all of their contracts saying they

18    weren't to bring anything from Mattel; correct?

19    **A**    Yes.

20    **Q**    And I guess you are telling us that you really meant it when

21    you asked them to sign those pieces of paper?

22    **A**    Yes.

23    **Q**    And you thought it would be very important for them not to

24    steal information from Mattel; correct?

25    **A**    Yes.

Page 14

1  Q    You understood if they did steal information from Mattel,

2  that could reflect on their character?

3  A    They were -- if they were stealing things from Mattel against

4  our advice, they were breaching their agreement and their word to

5  MGA.

6  Q    And yet, when you found out that they stole from Mattel and,

7  you say, breached their agreement with MGA, the only thing you did

8  with all of them is say, "That's bad.  Don't do it again"?

9  A    Yes.

10  Q    Now, you said that you had a detailed discussion.  Was it

11  with Mr. Machado where he said that they didn't use any of the

12  Mattel information they took?

13  A    I don't know if it's Machado or with Susanna Kuemmerle, but

14  yes, they told me they did not use it.

15  Q    But at the same time you didn't ask them what they took?

16  A    I did not.

17  Q    And what they took they had in their desks at MGA?

18        MR. OVERLAND:  Objection.  Assumes facts not in

19  evidence.

20        THE COURT:  Overruled.  You can answer.

21        THE WITNESS:  I don't know what they had on their desk.

22  I wasn't in Mexico.

23  BY MR. PRICE:

24  Q    Well, when you had this discussion with them about this

25  important matter, about stealing information from Mattel, did you

Page 15

1    ask them -- did you bring this information into the MGA offices?

2    **A**    I did not.

3    **Q**    Well, you understood from the phone call that there had been

4    Mattel property that was found in the MGA's office?

5              **MR. OVERLAND:**  Your Honor, again, object in terms of the

6    admission of this for all purposes. ·If it's just for state of

7    mind, it's all right.  But I'd ask the jury be so instructed.

8              **THE COURT:**  Overruled.

9              **THE WITNESS:**  Can you reread the question again?

10   **BY MR. PRICE:**

11   **Q**    You learned that there was, in fact, Mattel information that

12   had been brought into the MGA offices; correct?

13   **A**    No.  When they called me, they told me -- and I'm talking

14   specifically about Susanna Kuemmerle -- that there was a raid in

15   MGA Mexico instigated by Mattel, and they were there with the

16   search warrant and were taking everything; taking everything from

17   all the offices.

18   **Q**    You said that you talked with someone -- either Mr. Machado,

19   Ms. Trueba, Mr. Vargas or Ms. Kuemmerle -- and were told they said

20   they didn't use any Mattel information?

21   **A**    Not on that call.  The first call, I thought you referring to

22   the first call when I received.  And that's what I was testifying

23   about.  The first call I received was from Susanna Kuemmerle

24   telling me that MGA Mexico was raided by Mexican police; that

25   Mattel Mexico had instigated that.  And they were taking --

1    Mexican police were taking everything from MGA offices.

2    Q    Let me rephrase my question then.  You said at some point you

3    spoke with Mr. Machado, Ms. Trueba and Mr. Vargas and they said

4    they didn't use Mattel information at MGA?

5    A    I didn't say I have talked to all of them.  I remember

6    talking to Gustavo and him saying that he didn't use any of that

7    information at MGA Mexico.

8    Q    First when you talked to Mr. Machado and he said that they

9    didn't use any information at MGA Mexico, did you ask him, was it

10   in the MGA Mexico offices?  Did you bring it there?

11   A    I'm sorry.  I don't understand your question.

12   Q    When you talked to Mr. Machado and he said to you, "We didn't

13   use any of this Mattel information," did you ask him, "Well, did

14   you bring it into the MGA offices?"

15   A    Yes, I believe he said he had brought it to MGA offices.

16   Q    Did you ask him, "What was it you brought?"

17   A    I don't recall if I did ask or not.

18   Q    Did you ask him, "Well, if you brought it into the MGA

19   offices and it was Mattel property, and you didn't use it, why did

20   you steal it to begin with?"

21             MR. OVERLAND:  Object to the term "stealing," Your

22   Honor.

23             THE COURT:  Overruled.

24             THE WITNESS:  I didn't ask that question.

25

Page 17

1    BY MR. PRICE

2    Q    Well, if he is going to tell you -- first of all, you know at

3    this point he has lied to you -- you say MGA -- because he said he

4    wasn't going to bring anything from Mattel; correct?

5    A    Yes.

6    Q    And then when he tells you, "we didn't use any of this" --

7    A    Yes.

8    Q    -- didn't you think you should ask him, why did you take it?

9    A    No.

10   Q    Well, when he said, "Yes, we did steal this, and we didn't

11   tell you, and I was dishonest with you," didn't you think -- I'll

12   strike the question.

13   A    He didn't say, "I stole this, I was dishonest with you."  He

14   didn't say any of those words.

15   Q    No, but that's what you thought when you talked to him;

16   right?

17   A    No.   What I asked him is that why -- first question I asked

18   is, "Why did you bring anything to MGA when I told you, when Tom

19   Parks told you, everybody told you just come with your brain?  And

20   have you used any of that in MGA?"  And he said he hasn't.

21   Q    And according to you, at that time you understood that he had

22   been dishonest with you when he told you he wasn't going to bring

23   anything; right?

24   A    Yes.

25   Q    And according to you, you understood at that time he had been

Page 18

1    dishonest with Mattel because he had stolen some things?

2    **A**    I didn't know if he had stolen things or not, but he was

3    dishonest, yes, for doing that; for bringing stuff to MGA when I

4    had told him personally not to bring it, when Tom Parks had told

5    him not to bring it.  And by doing so, yes, he was wrong.

6    **Q**    And so according to you, believing he was wrong and dishonest

7    to with respect to MGA and Mattel, you just took his word for it

8    that he hasn't used any of the information he had stolen from

9    Mattel and taken into the MGA offices?

10   **A**    I did.

11   **Q**    So have you told us everything you can recall about this

12   conversation with Mr. Machado about whether or not he had taken

13   any Mattel internal information or trade secrets?

14   **A**    I'm sorry?

15   **Q**    Have you told us everything you recall about the conversation

16   you had with Gustavo Machado concerning whether he had taken any

17   Mattel trade secrets or Mattel internal information?

18   **A**    As I recall right now, yes.

19            **MR. PRICE:**  Your Honor, if I could read from Mr.

20   Larian's deposition.  This is volume three, December 10, 2009.

21   This is page 681, lines 15 through 18.

22            **THE COURT:**  You may.

23   BY MR. PRICE:

24   **Q**    Again, this is December 10, 2009.

25   "QUESTION:  Have you ever spoken with Gustavo Machado concerning

Page 19

1    whether or not he had ever taken or used any Mattel trade secret

2    or Mattel internal information?

3    "ANSWER:  I don't recall if I did or not."

4                MR. PRICE:  And then, Your Honor, if we could read from

5    708, lines 17 through 25.  It's the same day.

6                THE WITNESS:  17 to?

7    BY MR. PRICE:

8    Q    17 through 25.

9                THE COURT:  You may.

10   BY MR. PRICE:

11   "QUESTION:  Has it ever come to your attention that there were

12   Mattel internal documents that were there at the MGA Mexico

13   office?

14   "ANSWER:  Just through my attorneys.

15   "QUESTION:  Is that something you have ever discussed with Susan

16   Kuemmerle?

17   "ANSWER:  Not that I recall.

18   "QUESTION:  Or Gustavo Machado?

19   "ANSWER:  No."

20               Now, Mr. Larian, you have said three or four, maybe five

21   times you have used the word, I think, "instigated," that Mattel

22   instigated the raid is the way you put it; correct?

23   A    Yes.

24   Q    But it's your understanding that there was, in fact, Mattel

25   property in the MGA office?

Page 20

1    **A**    There was some property in MGA offices yes.

2    **Q**    And you saw, I think it's an e-mail from Ms. Kuemmerle.   I

3    believe it's Exhibit 6766, if we can put that up.   If we can look

4    at the e-mail at the bottom of that first page there for

5    Ms. Kuemmerle.

6    **A**    Yes.

7    **Q**    And you recall that Ms. Keller read this out loud.   And the

8    second paragraph where it talks about, "Neither one of us ever

9    imagined that this particular" -- and all caps -- "WITCH HUNT was

10   going to take place in Mexico."

11          Do you see that?

12   **A**    I do.

13   **Q**    Now, in response to this, did you call Ms. Kuemmerle and say,

14   "But, Susan, Mattel internal documents were, in fact, in the MGA

15   Mexico offices brought there by these former Mattel employees"?

16   **A**    No.

17          **MS. KELLER:**  Objection.   Assumes facts not in evidence

18   that he knew that at the time, Your Honor.

19          **THE COURT:**  Overruled.

20   **BY MR. PRICE:**

21   **Q**    Let's look at then her discussion about reprimanding Gustavo,

22   Pablo and Mariana.   You see that's in the third paragraph there?

23   **A**    Yes.

24   **Q**    And she says, "We should have done it on October 28, 2005,

25   (day after the search in our offices); to do it now when we have

1   to pay our bonuses seems unfair and unethical to me, especially

2   when Gustavo was about to move to L.A. and Pablo is closing

3   Christmas bookings!  I think we must put in the balance the

4   effects of this decision."

5          Do you see that?

6   A   I do.

7   Q   And what she was worried about is that if you reprimand

8   Pablo, for example, at this time, your Christmas bookings might

9   not be as big as they otherwise would?

10  A   Yes.

11  Q   And so the reason she is telling you not to reprimand him is

12  because it would hurt business?

13  A   Yes.

14  Q   And you thought that was a legitimate reason not to even

15  reprimand someone who had stolen information from Mattel and

16  brought it to MGA Mexico?

17         MS. KELLER:  Objection.  Assumes facts not in evidence

18  that he knew there was any information stolen.

19         THE COURT:  I understand, Counsel.  Overruled.

20         THE WITNESS:  I'm sorry.  Can you repeat the question?

21  BY MR. PRICE:

22  Q   You thought that that business reason was reason alone not to

23  even reprimand Pablo --

24  A   Yes.

25  Q   -- for stealing Mattel information and bringing it into MGA's

Page 22

1    office?

2    **A**    That's not correct.

3    **Q**    You were copied on this e-mail; correct?

4    **A**    I was.

5    **Q**    And did you send any response to the effect of the fact that

6    it would hurt our business is no reason not to reprimand Pablo?

7    **A**    No.

8    **Q**    And at this point was he reprimanded?

9    **A**    No.

10   **Q**    But when you read this, and Ms. Kuemmerle said we shouldn't

11   reprimand Mr. Pablo because it might hurt or Christmas bookings,

12   what did you think?

13   **A**    I don't remember what I thought.  I know that I was not happy

14   that these guys had broken their promise to MGA.  I know that for

15   sure.

16   **Q**    Okay.  But I think you told Ms. Keller that you read this at

17   the time you got it?

18   **A**    Yes.

19   **Q**    And you certainly remember, because there is this e-mail with

20   capital letters "WITCH HUNT."  Do you remember that; right?

21   **A**    That's not why I remember it, it has capital letter "WITCH

22   HUNT."

23   **Q**    In this situation when Mr. Vargas had stolen information from

24   MGA Mattel and brought it to MGA, did you think that the business

25   of MGA was more important than the ethics of the situation?

Page 23

1    **A**    No.

2    **Q**    But you understood that was exactly what Ms. Kuemmerle was

3    saying?

4    **A**    That's not what she is saying.

5    **Q**    She is saying don't reprimand him because it's going to hurt

6    our Christmas bookings; right?

7    **A**    That's one of the things she is saying, yes.

8    **Q**    That is putting business over what is right; correct?

9    **A**    Well, yes.

10   **Q**    And then if you look at the next page, the next line, "I ask

11   you all, with what mood is Gustavo going to move and Pablo is

12   going to keep on pushing sales in Mexico."

13          Do you see that?

14   **A**    I do.

15   **Q**    By that you understood that if they reprimanded in any way

16   because of what they did, this could affect MGA's business?

17   **A**    Well, it could affect Gustavo's mood, whatever that means and

18   the sales of Mexico, yes.

19   **Q**    You thought it was in MGA's best interest for Mr. Machado to

20   move to Los Angeles; right?

21   **A**    Yes.

22   **Q**    And you previously testified that you considered that to be a

23   promotion; correct?

24   **A**    I don't remember what I testified to, but, yes, I think we

25   promoted him to move to L.A.

Page 24

1  Q    And you were afraid that if they had been reprimanded in any

2  way, that might interfere with MGA's business plans?

3  A    No.

4  Q    If you look at the top of this, it's the e-mail from

5  Mr. Villette dated May 9, 2006.  And in the second paragraph he

6  says, "After thinking about it, we should not tie the two issues

7  as they are separate."

8         And you understood what he was talking about with

9  respect to the two issues?

10  A    Can you keep that up there?

11  Q    Sure.

12  A    Where are you referring to?

13  Q    See the second paragraph where he says, "After thinking about

14  it, we should not tie the two issues as they are separate"?

15  A    Yes.

16  Q    And did you understand what those two issues were?

17  A    Yes.

18  Q    What were they?

19  A    The reprimand and the bonus are two separate issues.

20  Q    And was that your belief, that whether they should get a

21  bonus was a separate issue from what should happen to them as a

22  result of this discovery that they had stolen information from

23  Mattel and brought it into MGA's offices?

24  A    I'm sorry.  I'm not sure if I understand your question.  Was

25  it my belief?

Page 25

1  **Q**   Was it your belief those two issues were separate; that they

2  weren't somehow intertwined as to whether they should get a bonus

3  in light of the fact that they had stolen Mattel information and

4  brought it to MGA Mexico?

5  **A**   They should not have stolen.  Stealing is very hard word, but

6  they should not have brought Mattel information to MGA.  They were

7  wrong by doing that.

8  **Q**   And didn't you think that that issue was not separate from

9  but, in fact, should be related to whether or not they got

10  bonuses?

11  **A**   I don't remember my state of mind at that time, no.

12  Actually, no.

13  **Q**   You agree that you don't discipline someone by giving them a

14  bonus?

15  **A**   That's right.  You don't.

16  **Q**   And you don't discipline someone by giving them a promotion?

17  **A**   Yes.

18  **Q**   So if you look at the rest of this where it says, "However,

19  whether now or at a later stage, I strongly believe we need to

20  take some action at the corporate level.  As the number of former

21  Mattel employees will likely continue to increase, it must be made

22  clear anyone who breaks his or her engagement in writing not to

23  bring anything confidential, will be held accountable."

24           Do you see that?

25  **A**   Yes.

1    Q    You understood those were just words on a paper?

2    A    No.  It was future.  What Eric Villette was saying, that we

3    really need to take this a lot more seriously going forward.

4    Q    And if you are going to send a message that you actually take

5    it seriously and it's just not meaningless words, you would have

6    disciplined Mr. Machado, Mr. Vargas, Ms. Trueba; correct?

7    A    By that time Mr. Machado, Mr. Vargas, and Ms. Trueba had done

8    what they had done, but going forward I don't believe anybody

9    who's come from Mattel has ever done something like that.  I mean,

10   from Mattel to MGA.

11   Q    Well, you learned that Mr. Machado, Ms. Trueba, and

12   Mr. Vargas, you learned in October, 2005, that they had brought

13   information from Mattel to MGA Mexico offices; correct?

14   A    No.  In October 2005, I was told that there was a raid of MGA

15   Mexico instigated by Mattel Mexico.

16   Q    When were you told that information was found in the MGA

17   Mexico offices that was Mattel property?

18   A    At a later date.  I don't remember the date.

19   Q    So Mr. Castilla joined you, I guess, in March 2006?

20   A    Yes.

21   Q    That's after the search of the MGA Mexico offices?

22   A    Yes.

23   Q    Are you aware of any instances that you can think of where

24   MGA has disciplined any employee for taking Mattel information?

25   A    I can't recall.  There have been a handful of people who have

Page 27

1    done that and those handful that I remember I don't think we have

2    disciplined them to a point of firing them, etcetera.

3    Q    Or you do you know any instances where MGA has disciplined

4    employees for taking information from other competitors?

5    A    We haven't had people taking information from other

6    competitors.

7    Q    And where you did know of Mattel former Mattel employees

8    taking information from Mattel when they left, in all the

9    situations that you know about, those employees got bonuses;

10   right?

11   A    I'm sorry.  First of all, I didn't know when they left

12   whether they have taken any information.  That was the first part

13   of your question.  We found out later on.

14            Did they all get bonuses?  I know from these papers that

15   at least the three Mexican got bonuses, I don't know if the other

16   ones got bonuses or not.  I don't remember.  Maybe they did, maybe

17   they didn't.  I don't remember.

18   Q    So --

19   A    It is possible that they got bonuses.

20   Q    Why would anyone take your admonition not to take Mattel

21   information when they left Mattel and joined MGA, why would anyone

22   take it seriously if they never enforced it?

23            MS. KELLER:  Objection.  Argumentative.

24            THE COURT:  Overruled.

25            THE WITNESS:  I don't know why people do that.  Human

1    nature.  It's not a good thing, but people do that.

2    BY MR. PRICE:

3    Q    My question was, why would anyone take seriously what you put

4    into your accounts and what you say you tell people about not

5    taking information from Mattel when they join MGA, why would

6    anyone take that seriously if you don't discipline people who do

7    that and, in fact, you give them bonuses and promotions?

8              MS. KELLER:  Objection.  Objection to linking to, Your

9    Honor.

10             THE COURT:  Overruled.

11             THE WITNESS:  We have over thousand employees.  Looks

12   like five of them, five of the thousand did not take it seriously.

13   And shame on them for not doing that.  But they didn't kill

14   anybody.

15   BY MR. PRICE:

16   Q    My question is a bit different.  You know about several

17   Mattel employees who stole information from Mattel and then worked

18   for MGA; right?

19   A    You keep using the word "stolen."  I mean, I can go through

20   what I know, but the fact is that some of these employees brought

21   information, whether it's valuable or not, to MGA.  And they broke

22   the rule, the promise to me and to the company by doing that and

23   that's not appropriate.

24   Q    So going forward, why would anyone take these provisions in

25   your contract seriously if they knew that on the instances when

1    you knew people took information from Mattel, you did nothing

2    about it?

3    **A**    I can't guess, but I can tell you that of over a thousand

4    employees, there have been this handful who have done it.  It's

5    not been right.  But I just can't control everybody as much as we

6    push them not to do it.

7    **Q**    One way to control people, one way to send a message it's

8    wrong is when you find out that it happens, you actually take --

9              **MS. KELLER:**  Objection.  Argumentative.  Asked and

10   answered repeatedly, Your Honor.  Badgering this witness.

11             **THE COURT:**  Overruled.

12             **THE WITNESS:**  Yes.  That's one of the ways.  I did not

13   do that.

14             **MR. PRICE:**  Your Honor, would this be a good time to

15   break?

16             **THE COURT:**  This would be a good time to break.

17             All right, ladies and gentlemen, you are admonished not

18   to discuss this matter among yourselves or form or express any

19   opinion concerning the case.  Have a nice evening.  We'll see you

20   tomorrow at 8:30.

21                          (Jury out.)

22             **THE COURT:**  Counsel, I'd like to speak to the juror

23   number three, Ms. Nealon, about the best way to approach her

24   employer.  And I'm wondering with all of you present if we could

25   do that informally, because if we capture that on the record,

Page 30

1   perhaps her employer might be a little chagrined.  There might be

2   enforcement provisions that could be enacted, but I don't want to

3   put her in that position of being between her and her immediate

4   employer.

5            And I certainly would have all of you present, but I can

6   put all of that on the record.  So you tell me how you would like

7   me it to handle it.  But I would like her to make some suggestions

8   about how we could artfully approach either her manager or the

9   president of the corporation since they seem to do a lot of

10  business in federal court, and hopefully get their acquiescence.

11  I just don't want to jump over an immediate supervisor because it

12  causes hard feelings.  And I'm just wondering if she has a

13  suggestion how we could go about that.

14           If I put that on the record, everybody can come back and

15  see how she might make a suggestion.  And I don't think she wants

16  any future problems.  She is doing a public service.  But I leave

17  that to you.

18       **MS. KELLER:**  We're perfectly happy to have the Court

19  talk to her informally.

20       **MR. PRICE:**  Yes.

21       **THE COURT:**  With all of you present.  Be acceptable?  I

22  don't want any ex parte communicate with the Court in any way.  I

23  just think it might save her some embarrassment.

24           Second, do each of you want her as a juror?

25       **MS. KELLER:**  She has been very attentive, Your Honor.

Page 91

1          Good night.  See you tomorrow.

2                  (Whereupon the proceedings were adjourned at 7:37

3      p.m..)

4

5                                  -oOo-

6

7                              CERTIFICATE

8

9          I hereby certify that pursuant to Section 753, Title 28,

10     United States Code, the foregoing is a true and correct transcript

11     of the stenographically reported proceedings held in the

12     above-entitled matter.

13

14     Date:  FEBRUARY 18, 2011

15

16

17     MARIA DELLANEVE, U.S. COURT REPORTER
       CSR NO. 9132

18

19

20

21

22

23

24

25

CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

1

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3         HONORABLE DAVID O. CARTER, JUDGE PRESIDING

 4                   - - - - - - -

 5
     MATTEL, INC., et al.,            )
 6                                    )
              Plaintiffs,             )
 7                                    )
         vs.                          )  No. CV 04-9049 DOC
 8                                    )     Day 20
     MGA ENTERTAINMENT, INC., et al., )     Volume 1 of 3
 9                                    )
                                      )
10            Defendants.             )
                                      )
11   _____)   CERTIFIED COPY
                                            Debbie Gale, CSR 9472
12

13

14         REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    Jury Trial

16              Santa Ana, California

17            Friday, February 18, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-02-18 D20V1
```

CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

45

| 09:29 | 1 | MS. KELLER: Calls for speculation, Your Honor. |
| 09:29 | 2 | THE COURT: Overruled. |
| 09:29 | 3 | THE WITNESS: I can't even read this, frankly. I |
| 09:29 | 4 | don't know what these are. I can't even read 'em on the |
| 09:29 | 5 | copy in front of me, nor can I read it on the screen. |
| 09:29 | 6 | BY MR. PRICE: |
| 09:29 | 7 | Q. Okay. Well, look at the one below that. It says, |
| 09:29 | 8 | "princess fall theme TBD, awaiting movie results." Do you |
| 09:30 | 9 | see that? |
| 09:30 | 10 | A. Yes. |
| 09:30 | 11 | Q. So that's something they're forecasting, but they're |
| 09:30 | 12 | gonna have to wait until they get movie results, right? |
| 09:30 | 13 | A. I have no idea. I have no idea. |
| 09:30 | 14 | Q. Safe to say that Mr. Machado would have had a pretty |
| 09:30 | 15 | good idea of what this document was, right? |
| 09:30 | 16 | MR. OVERLAND: Objection. Calls for speculation. |
| 09:30 | 17 | THE COURT: Overruled. |
| 09:30 | 18 | THE WITNESS: I have no idea. |
| 09:30 | 19 | BY MR. PRICE: |
| 09:30 | 20 | Q. Would it be valuable information to MGA to know a year |
| 09:30 | 21 | ahead of time what Mattel planned to put on the market? |
| 09:30 | 22 | A. Yes. |
| 09:30 | 23 | Q. Would you consider that among the most valuable |
| 09:30 | 24 | information MGA could get about Mattel; that is, what |
| 09:30 | 25 | product lines it plans to introduce on the market in a year? |

CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

46

| | | |
|---|---|---|
| 09:30 | 1 | A.   Yes.  Or any other company. |
| 09:31 | 2 | Q.   Now, you -- you, uh, testified a bit in my examination |
| 09:31 | 3 | about -- and I think Ms. Keller's, about planograms? |
| 09:31 | 4 | A.   Yes. |
| 09:31 | 5 | Q.   I think you said those usually take place a couple of |
| 09:31 | 6 | weeks after toy fairs? |
| 09:31 | 7 | A.   No.  Different times.  They're two different seasons. |
| 09:31 | 8 | Q.   When you spoke with Mr. Machado, when he told you that |
| 09:31 | 9 | he had brought Mattel property in MGA Mexico, why didn't you |
| 09:31 | 10 | ask him if he'd taken anything as important as Mattel's |
| 09:31 | 11 | projections for what it was gonna put on market the next |
| 09:32 | 12 | year? |
| 09:32 | 13 | A.   I didn't even know -- I didn't know this document about |
| 09:32 | 14 | something -- I mean, it's Mattel is gonna bring to the |
| 09:32 | 15 | market next year or not, so I didn't ask that question. |
| 09:32 | 16 | Q.   Well -- |
| 09:32 | 17 | A.   If you're asking me if I asked that question, I did |
| 09:32 | 18 | not. |
| 09:32 | 19 | Q.   Well, did he and Ms.-- Mr. Vargas -- at least |
| 09:32 | 20 | Mr. Vargas and Ms. Trueba continued working at MGA Mexico |
| 09:32 | 21 | for how long after this search? |
| 09:32 | 22 | A.   What was date of the search again?  I'm sorry. |
| 09:32 | 23 | Q.   October 2005. |
| 09:32 | 24 | A.   I think they worked to 2007 or '8. |
| 09:32 | 25 | Q.   And you don't know one way or another whether they, uh, |

Exhibit G - Page 159

CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

47

| | | |
|---|---|---|
| 09:32 | 1 | used this information in pursuing MGA Mexico's business |
| 09:32 | 2 | plans? |
| 09:32 | 3 | A.   They told me they didn't use it.  As a matter of fact, |
| 09:33 | 4 | Mariana Trueba swore on her mother and her children that she |
| 09:33 | 5 | has never used it.  And I believe her. |
| 09:33 | 6 | Q.   Did she swear that she didn't take information? |
| 09:33 | 7 | A.   No. |
| 09:33 | 8 | Q.   And you've -- you've reviewed her deposition in |
| 09:33 | 9 | preparation for your 30(b)(6)? |
| 09:33 | 10 | A.   I don't recall if I did or not. |
| 09:33 | 11 | Q.   Let me ask you about Mr. Castilla.  For Mr. Castilla, |
| 09:34 | 12 | did you ever try to find out from him what kind of |
| 09:34 | 13 | information he took from Mattel? |
| 09:34 | 14 | A.   I did not. |
| 09:34 | 15 | Q.   Do you know whether or not he took from Mattel, uh, a |
| 09:34 | 16 | five-year strategic plan? |
| 09:34 | 17 | A.   I have no idea what he took.  Never brought anything to |
| 09:34 | 18 | MGA.  FBI took it before he came to MGA. |
| 09:34 | 19 | Q.   So when he came to you and said, you know, basically, |
| 09:34 | 20 | there's this -- there's this issue that's come up -- you |
| 09:34 | 21 | recall that? |
| 09:34 | 22 | A.   Yes. |
| 09:34 | 23 | Q.   You -- you asked him what he did? |
| 09:34 | 24 | A.   Yes. |
| 09:34 | 25 | Q.   Okay.  Uh, so did you ask him why he downloaded |

CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

48

| | | |
|---|---|---|
| 09:34 | 1 | Mattel's information before he left Mattel? |
| 09:34 | 2 | A.   I did. |
| 09:34 | 3 | Q.   And he said that -- tell us what he said. |
| 09:34 | 4 | A.   He said, "These are sample of some of the works that I |
| 09:34 | 5 | had done before.  I want to have a copy for myself."  I |
| 09:35 | 6 | didn't think about it. |
| 09:35 | 7 | Q.   Do you know whether or not his work at Mattel included |
| 09:35 | 8 | doing five-year strategic plans? |
| 09:35 | 9 | A.   I have no idea. |
| 09:35 | 10 | Q.   So your testimony now is that you did talk to |
| 09:35 | 11 | Mr. Castilla about whether or not he had taken or used any |
| 09:35 | 12 | Mattel trade secret or internal Mattel information? |
| 09:35 | 13 | A.   I'm sorry? |
| 09:35 | 14 | Q.   Your testimony now is that you did speak with |
| 09:35 | 15 | Mr. Castilla about whether or not he had taken or used |
| 09:35 | 16 | Mattel trade secrets or internal Mattel information? |
| 09:35 | 17 |         MS. KELLER:  Objection.  Compound. |
| 09:35 | 18 |         THE COURT:  Overruled. |
| 09:35 | 19 |         THE WITNESS:  I'm sorry.  I don't understand the |
| 09:35 | 20 | question. |
| 09:35 | 21 |         THE COURT:  Reask it. |
| 09:35 | 22 | BY MR. PRICE: |
| 09:35 | 23 | Q.   Have you ever spoken with Mr. Castilla -- |
| 09:35 | 24 | A.   Yes. |
| 09:35 | 25 | Q.   -- about whether or not he had taken or used any Mattel |

DEBBIE GALE, U.S. COURT REPORTER

**Exhibit G - Page 161**

CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

49

| 09:35 | 1 | trade secrets or internal Mattel information? |
| 09:36 | 2 | A.   At MGA -- okay.   You're asking has he taken information |
| 09:36 | 3 | or has he used it?   You're asking me two, three different |
| 09:36 | 4 | questions in one time.   That's my difficulty of |
| 09:36 | 5 | understanding and answering. |
| 09:36 | 6 | Q.   Have you ever spoken -- |
| 09:36 | 7 | A.   If you could break it down, I would be happy to answer |
| 09:36 | 8 | that. |
| 09:36 | 9 | Q.   Have you ever spoken to Mr. Castilla about whether or |
| 09:36 | 10 | not he had taken any Mattel trade secrets or internal Mattel |
| 09:36 | 11 | information? |
| 09:36 | 12 | A.   He told me that he did take information from Mattel |
| 09:36 | 13 | before he came to MGA. |
| 09:36 | 14 | Q.   So you -- you spoke to him about that? |
| 09:36 | 15 | A.   Yes. |
| 09:36 | 16 | Q.   Okay.   Have you ever spoken with him about whether or |
| 09:36 | 17 | not he used any trade secrets or internal Mattel |
| 09:36 | 18 | information? |
| 09:36 | 19 | A.   At MGA, you mean? |
| 09:36 | 20 | Q.   Yes. |
| 09:36 | 21 | A.   Yes.   He said he has not. |
| 09:36 | 22 | Q.   So you spoke to him about both subjects? |
| 09:36 | 23 | A.   To the best of my recollection, yes. |
| 09:36 | 24 |        MR. PRICE:   If we could read, Your Honor, from |
| 09:36 | 25 | Mr. Larian's deposition.   This is December 10, 2009.   This |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

50

| 09:37 | 1 | is page 718, lines 16 through 20. |
| 09:37 | 2 | (Document provided to the Court.) |
| 09:37 | 3 | THE COURT:  You may. |
| 09:37 | 4 | THE WITNESS:  Yes, go ahead. |
| 09:37 | 5 | MR. PRICE:  (Reading:) |
| 09:37 | 6 | "QUESTION:  Have you spoken with Mr. Castilla |
| 09:37 | 7 | about whether or not he had taken or used any Mattel trade |
| 09:37 | 8 | secrets or internal Mattel information? |
| 09:37 | 9 | "ANSWER:  I don't recall.  I don't recall one -- |
| 09:37 | 10 | one way or another.  I don't recall it." |
| 09:37 | 11 | BY MR. PRICE: |
| 09:37 | 12 | Q.   And it's fair to say that you yourself did not take any |
| 09:38 | 13 | steps to determine whether or not Mr. Castilla, in fact, |
| 09:38 | 14 | stole internal Mattel information; is that true? |
| 09:38 | 15 | A.   Personally, no, I turned everything over to the |
| 09:38 | 16 | lawyers. |
| 09:38 | 17 | Q.   And it's true that you yourself haven't taken any steps |
| 09:38 | 18 | to determine whether or not Mr. Castilla, in fact, used the |
| 09:38 | 19 | internal Mattel information that he stole? |
| 09:38 | 20 | A.   True.  I have not personally done that. |
| 09:38 | 21 | Q.   You -- uh, you did tell us, though, you thought it was |
| 09:38 | 22 | uh, a bad thing that Mr. Castilla did; it was wrong? |
| 09:38 | 23 | A.   Yes.  Because I told him not to bring anything, and he |
| 09:39 | 24 | was wrong no matter what.  Even if he had his work sample |
| 09:39 | 25 | that he was talking about, he shouldn't have done it. |

CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

51

| | | |
|---|---|---|
| 09:39 | 1 | Q.    Let me focus on -- I want to focus on your testimony |
| 09:39 | 2 | with Ms. Keller. |
| 09:39 | 3 | A.    Excuse me for one second. |
| 09:39 | 4 | Q.    Sure. |
| 09:39 | 5 | A.    Go ahead. |
| 09:39 | 6 | Q.    Mr. Larian, I want to talk to you about your testimony |
| 09:39 | 7 | in Mr. Keller's examination about -- about MGA in 2000/2001, |
| 09:39 | 8 | that timeframe.  Okay? |
| 09:39 | 9 | A.    Yes. |
| 09:39 | 10 | Q.    And you testified for us, a period of time, about how |
| 09:39 | 11 | MGA grew, how many employees it had at one time.  Do you |
| 09:40 | 12 | remember that? |
| 09:40 | 13 | A.    Yes. |
| 09:40 | 14 | Q.    And what's the peak in terms of MGA's employees? |
| 09:40 | 15 | A.    What do you mean?  How many employees did we have? |
| 09:40 | 16 | Q.    Yes. |
| 09:40 | 17 | A.    God, I think at one time we had over 2000 employees |
| 09:40 | 18 | worldwide. |
| 09:40 | 19 | Q.    So let's focus now in 2000.  And in 2000, I think you |
| 09:40 | 20 | had somewhere over 50 employees? |
| 09:40 | 21 | A.    Yes, somewhere 50 to a hundred.  Less than a hundred. |
| 09:40 | 22 | Q.    And you showed the jury a number of -- of dolls that |
| 09:40 | 23 | MGA had made prior to, uh, 2000, or in the 2000 timeframe. |
| 09:40 | 24 | Do you remember that? |
| 09:40 | 25 | A.    Yes. |

DEBBIE GALE, U.S. COURT REPORTER

**Exhibit G - Page 164**

CV 04-9049 DOC - 2/18/2011 - Day 20, Volume 1 of 3

152

|       |    |
|-------|----|
| 11:59 | 1  |
| 11:59 | 2  |
| 11:59 | 3  |
| 11:59 | 4  |
| 11:59 | 5  |
| 11:59 | 6  |
| 11:59 | 7  |
| 11:59 | 8  |
| 11:59 | 9  |
| 11:59 | 10 |
| 11:59 | 11 |
| 11:59 | 12 |
| 11:59 | 13 |
| 11:59 | 14 |
| 11:59 | 15 |
| 11:59 | 16 |
| 11:59 | 17 |
|       | 18 |
|       | 19 |
|       | 20 |
|       | 21 |
|       | 22 |
|       | 23 |
|       | 24 |
|       | 25 |

-oOo-

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:   February 19, 2011

_____
DEBBIE GALE, U.S. COURT REPORTER
CSR NO. 9472, RPR

DEBBIE GALE, U.S. COURT REPORTER

**Exhibit G - Page 165**

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

1

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4    - - - - - - -

5
     MATTEL, INC., et al.,                    )
6                                             )
               Plaintiffs,                    )
7                                             )
          vs.                                 )   No. CV 04-9049 DOC
8                                             )   Day 21
     MGA ENTERTAINMENT, INC., et al.,         )   Volume 1 of 3
9                                             )
                                              )
10             Defendants.                    )
                                              )
11   ─────────────────────────────────────────

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                   Jury Trial

16             Santa Ana, California

17          Tuesday, February 22, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-02-22 D21V1

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

38

| 09:19 | 1 | A.   There's no such a person called "Mr. Yokey."  The |
| 09:19 | 2 | person is Dario Berte.  You can read that. |
| 09:19 | 3 | Q.   Ah.  And this is around March 15, 2002? |
| 09:19 | 4 | A.   Yes, it is. |
| 09:19 | 5 | MR. PRICE:  Your Honor, move this into evidence. |
| 09:19 | 6 | MS. KELLER:  Objection.  Irrelevant. |
| 09:20 | 7 | THE COURT:  Received, Counsel. |
| 09:20 | 8 | (Exhibit No. 13858 received in evidence.) |
| 09:20 | 9 | (Document displayed.) |
| 09:20 | 10 | BY MR. PRICE: |
| 09:20 | 11 | Q.   If you look at -- just go to the paragraph, I think |
| 09:20 | 12 | it's third up from the bottom, "at the same time"? |
| 09:20 | 13 | A.   I'm sorry, I can't -- |
| 09:20 | 14 | Q.   Do you see it? |
| 09:20 | 15 | A.   Yes.  Go ahead.  I see it. |
| 09:20 | 16 | Q.   "At the same time please understand that we will not |
| 09:20 | 17 | license every category," paren, this is for every territory |
| 09:20 | 18 | and not only Italy," closed paren," and every product right |
| 09:20 | 19 | away.  The core of the brand are the dolls, and we do not |
| 09:20 | 20 | want to harm the sales of the dolls.  We also plan to roll |
| 09:20 | 21 | out the licensing program slowly and not all products in one |
| 09:20 | 22 | time." |
| 09:20 | 23 | A.   What is the question? |
| 09:20 | 24 | Q.   Did I read that correctly? |
| 09:20 | 25 | A.   Yes. |

**Exhibit G - Page 167**

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

39

| | | |
|---|---|---|
| 09:20 | 1 | Q.   Okay.   Now, on Friday, uh, I showed you Exhibit 22973 |
| 09:21 | 2 | which was the letter from Skadden, Arps, your attorneys, |
| 09:21 | 3 | attaching, uh, a copy of the disk in connection with the |
| 09:21 | 4 | search of MGA Mexico.   And we'll have that put in front of |
| 09:21 | 5 | you. |
| 09:21 | 6 | (Document provided to the witness.) |
| 09:21 | 7 | (Document displayed.) |
| 09:21 | 8 | THE WITNESS:   Go ahead. |
| 09:21 | 9 | BY MR. PRICE: |
| 09:21 | 10 | Q.   And you see the -- the last page there has a photocopy |
| 09:21 | 11 | of the disk.   Do you see that? |
| 09:21 | 12 | A.   Yes. |
| 09:21 | 13 | Q.   I think on Friday I gave you a copy of the copy, which |
| 09:21 | 14 | this looks like the photocopy.   It says "original" on it. |
| 09:21 | 15 | Do you see that? |
| 09:21 | 16 | A.   What? |
| 09:21 | 17 | Q.   I'm sorry.   You see this says -- this copy is a copy of |
| 09:21 | 18 | the disk, which has written on it "original."   Do you see |
| 09:22 | 19 | that? |
| 09:22 | 20 | A.   I see the word "original." |
| 09:22 | 21 | Q.   And it has MGA Bates number on it, 381-5506? |
| 09:22 | 22 | A.   Yes. |
| 09:22 | 23 | Q.   I'm going to bring up to you what we marked as 8858-A? |
| 09:22 | 24 | MR. PRICE:   Your Honor, may I approach? |
| 09:22 | 25 | THE COURT:   You may. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:22 | 1 | *(Exhibit provided to the witness.)* |
| 09:22 | 2 | THE WITNESS:  Okay. |
| 09:22 | 3 | BY MR. PRICE: |
| 09:22 | 4 | Q.   And do you see that 8858-A appears to match the |
| 09:22 | 5 | photocopy that is attached to the letter from Skadden, Arps, |
| 09:22 | 6 | Exhibit 22973? |
| 09:22 | 7 | A.   I see a couple other words on it.  I have no idea what |
| 09:22 | 8 | this is. |
| 09:22 | 9 | Q.   Well, it has the same Bates number, MGA 381-5506, |
| 09:22 | 10 | correct? |
| 09:22 | 11 | A.   Yes. |
| 09:22 | 12 | Q.   Has the same marking, "original," correct? |
| 09:23 | 13 | A.   Yes.   The word "original" is there. |
| 09:23 | 14 | MR. PRICE:  I move Exhibit 8858-A into evidence. |
| 09:23 | 15 | MS. KELLER:  Objection.  No foundation. |
| 09:23 | 16 | THE COURT:  All right.  I'm going to take it |
| 09:23 | 17 | subject to a motion to strike, Counsel, as I did before. |
| 09:23 | 18 | You can continue to ask questions, and I'll wait a little |
| 09:23 | 19 | bit further foundation from the different law firms, as I |
| 09:23 | 20 | indicated before.  But I'm not going to preclude you from |
| 09:23 | 21 | questions in this area. |
| 09:23 | 22 | BY MR. PRICE: |
| 09:23 | 23 | Q.   Well, at this point I just have really one question. |
| 09:23 | 24 | Did you, in connection with your testimony as a -- as a |
| 09:23 | 25 | 30(b)(6) witness, ever review the contents of this disk? |

| 09:23 | 1 | A.    No. |

A.    No.

Q.    When Ms. Keller was examining you, you talked about, uh, closing MGA Mexico.  Do you recall that?

A.    Yes.

Q.    And you, Isaac Larian, were able to close MGA Mexico because you control MGA subsidiaries, right?

A.    I don't know all the structure that our accountants and lawyers have set up.  But I'm -- I'm major shareholder of MGA Mexico, either me or through my family trust, et cetera.

Q.    Well, what I'm talking about is -- is not just are you a large shareholder, but that you have the ability on your own to control the closing of a subsidiary, the flow of funds from a subsidiary, how much money goes from a subsidiary to MGA, USA, correct?

A.    Yes.

Q.    And, in fact, uh, you will, uh -- you have in the past, uh, simply directed, uh, your chief finance officer to take money out of a subsidiary so you can make distributions to you and your sister, the shareholders of MGA USA?

        MS. KELLER:  Objection.  Irrelevant.  Court's prior ruling.

        THE COURT:  Overruled.

        You can answer that question.

        THE WITNESS:  Yes.

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

42

| | | |
|---|---|---|
| 09:25 | 1 | BY MR. PRICE: |
| 09:25 | 2 | Q.   And so I want to make sure we understand how that -- |
| 09:26 | 3 | how that worked in practice; that is, how you could control |
| 09:26 | 4 | the other subsidiaries to bring money to MGA USA.  And if |
| 09:26 | 5 | you'd look at Exhibit 22013 and, in particular, I want you |
| 09:26 | 6 | to look at page 7. |
| 09:26 | 7 | (Document provided to the witness.) |
| 09:26 | 8 | THE COURT:  Just a moment, Counsel.  I'm not sure |
| 09:26 | 9 | what 22013 is.  Now, I want to see it.  I'm going to allow a |
| 09:26 | 10 | certain amount of questions, as I indicated to you on the |
| 09:26 | 11 | weekend, about how money flows and whether alter ego is |
| 09:26 | 12 | involved and what the control mechanism is.  Specific |
| 09:26 | 13 | documents. |
| 09:26 | 14 | MR. PRICE:  Your Honor, there are two. |
| 09:26 | 15 | THE COURT:  I'll see that document. |
| 09:26 | 16 | MR. PRICE:  Sure.  And it's been redacted, |
| 09:26 | 17 | Your Honor. |
| 09:26 | 18 | THE COURT:  Okay.  Show me the page. |
| 09:26 | 19 | MR. PRICE:  It's 22013, page 7 and page 9. |
| 09:27 | 20 | (Document provided to the Court.) |
| 09:27 | 21 | THE COURT:  So those are the only pages you're |
| 09:27 | 22 | seeking? |
| 09:27 | 23 | MR. PRICE:  From this document, yes, Your Honor. |
| 09:27 | 24 | THE COURT:  You may question. |
| 09:27 | 25 | (Document displayed.) |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/22/2011 - Day 21, Volume 1 of 3

161

| | | |
|---|---|---|
| 12:04 | 1 | -oOo- |
| 12:04 | 2 | |
| 12:04 | 3 | CERTIFICATE |
| 12:04 | 4 | |
| 12:04 | 5 | I hereby certify that pursuant to Section 753, |
| 12:04 | 6 | Title 28, United States Code, the foregoing is a true and |
| 12:04 | 7 | correct transcript of the stenographically reported |
| 12:04 | 8 | proceedings held in the above-entitled matter and that the |
| 12:04 | 9 | transcript page format is in conformance with the |
| 12:04 | 10 | regulations of the Judicial Conference of the United States. |
| 12:04 | 11 | |
| 12:04 | 12 | Date:   February 22, 2011 |
| 12:04 | 13 | |
| 12:04 | 14 | |
| 12:04 | 15 | |
| 12:04 | 16 | DEBBIE GALE, U.S. COURT REPORTER |
| | | CSR NO. 9472, RPR |
| 12:04 | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER