# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

Case No. CV 04-9049 DOC (RNBx)                             Date: August 4, 2011

Title: MATTEL, INC. v. MGA ENTERTAINMENT, INC.

PRESENT:

### THE HONORABLE DAVID O. CARTER, JUDGE

          Julie Barrera                              Not Present
        Courtroom Clerk                            Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS: ATTORNEYS PRESENT FOR DEFENDANTS:

          NONE PRESENT                            NONE PRESENT

PROCEEDING (IN CHAMBERS): FINDINGS OF FACT AND CONCLUSIONS OF LAW ON EQUITABLE CLAIMS AND DEFENSES

          The claims between MGA Entertainment, Inc. ("MGAE"), MGA Entertainment (HK) Limited ("MGA HK"), MGAE de Mexico S.R.L. de CV ("MGA Mexico"), Isaac Larian ("Larian") (MGAE, MGA HK, MGA Mexico and Larian are collectively referred to as "MGA"), Carlos Gustavo Machado Gomez ("Machado"), Mattel, Inc. ("Mattel"), and Mattel de Mexico S.A. de CV ("Mattel Mexico") were tried between January 18, 2011 and April 21, 2011.  The jury was asked to reach a verdict on five of the claims and the Court took the remaining two claims, as well as the parties' equitable defenses, under submission.  Since the jury rendered its verdict on April 21, 2011, Mattel has consented to the entry of judgment in MGA's favor on Mattel's claim for unfair competition.  Mattel has also consented to the entry of judgment in MGAE and Larian's favor on Mattel's claim for intentional interference with contractual relations, thereby abandoning its invocation of the equitable doctrine of fraudulent concealment in response to MGAE and Larian's successful statute of limitations defense to that claim.  The only remaining unresolved matters are: (1) MGAE's claim for unfair competition and (2) Mattel's equitable defenses of laches and unclean hands to MGAE's successful claim for trade secret misappropriation.  In accordance with Fed. R. Civ. P. 52(a), the Court issues its Findings of Fact and Conclusions of Law on those claims and defenses as follows.

## MGAE's Claim for Unfair Competition

I.    Findings of Fact

1.    MGAE filed its claim for unfair competition on April 13, 2005.  It alleged that "Mattel has . . . willfully and maliciously used its power, influence and intimidation to threaten certain retailers, suppliers, licensees, distributors and manufacturers so as to limit, if not prevent, MGA from doing business with these retailers, suppliers, licensees, distributors and manufacturers, using its power and influence to intimidate and manipulate industry bodies." Compl. ¶ 113.  MGA further alleged, as part of that claim, that "Mattel has further used its power and influence to attempt to, if not actually, intimidate and threaten MGA's current and potential employees so as to cause MGA competitive injury." Id. The claim finally alleged that Mattel "intentionally" imitated features of MGA's products and packaging so as to confuse consumers, id. ¶¶ 110-12, though judgment was entered in Mattel's favor on that predicate misconduct.  See Mattel, Inc. v. MGA Entm't, Inc., ___ F. Supp. 2d ___, 2011 WL 1114250, at *70-72 (C.D. Cal. Jan. 5, 2011) (Carter, J.) [Docket 9600].  MGA has also asserted that its unfair competition claim is predicated upon Mattel's misappropriation of its trade secret information,[1] but the California Uniform Trade Secrets Act provides exclusive relief for the misappropriation of trade secret information.  See id. at *58.  In its August 2010 counterclaims-in-reply, MGA alleged that all of the information allegedly misappropriated by Mattel constituted trade secrets and courts consider the allegations "as reflected in the pleading" in determining the scope of CUTSA supersession.  See K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc., 171 Cal. App. 4th 939, 960 (2009).

2.    The principal evidence of Mattel's "intimidation [of] retailers" at trial concerned the corporate love triangle between Mattel, MGAE, and Kohl's Corporation ("Kohl's"), a retailer of consumer products.

3.    Kohl's sells toys, including fashion dolls.  See Trial Tr., dated March 29, 2011, Vol. I, at 112:3-9.  Kohl's does not manufacture or even design dolls but instead purchases them from toy companies, like Mattel and MGAE.  See id.

4.    Children can be fickle and parents indulgent, so the product market in the toy industry is notoriously dynamic.  Even Barbie, the perennial queen of the fashion doll industry, has been re-made time and again in order to appeal to new generations of children and simultaneously motivate existing Barbie owners to supplement their collections with the hipper, newer iterations of the product.  See TX 24032; see also Trial Tr., dated March 1, 2011, Vol. I, at 126:25-127:4.  Because toys can quickly become stale or dated, retailers like Kohl's traditionally order toys a mere 9-12 months in advance of the holiday shopping season, at which new products are traditionally unveiled.  Trial Tr., dated March

---

[1] The jury found for MGA and against Mattel on MGA's claim for trade secret misappropriation.

9, 2011, Vol. II, at 91:3-92:6.  Retailers preview products at meetings and presentations arranged by accounts managers at the toy companies.  <u>See</u>  Trial Tr., dated February 8, 2011, Vol. I, at 16:11-18.  Toy companies bring "samples" to these meetings and presentations, "discuss what the product is" and gauge retailers' "interest in the product" in contemplation of an eventual sale.  <u>Id.</u>

5. California based MGAE is the maker of the fashion doll line "Bratz."  <u>See</u> Trial Tr., dated February 16, 2011, Vol. II, at 119:20-120:1.  MGAE's primary competitor in the fashion doll market is Mattel, the maker of "Barbie."  Trial Tr., dated March 1, 2011, Vol. I, at 125:18-19.  Prior to Bratz's emergence, "Barbie" accounted for approximately 90% of sales in the fashion doll industry.  Trial Tr., dated March 1, 2011, Vol. II, at 22:7-19.

6. Bratz debuted in 2001 and struggled that year.  Trial Tr., dated February 11, 2011, Vol. III, at 68:4-8.  But the product quickly gained a following and became so successful that, at its height, MGAE instructed its outside manufacturer to "make one million dolls a week."  <u>Id.</u> at 57:21-22.

7. Between 2002 and 2004, Kohl's ordered Bratz dolls, among other products, from MGAE. Trial Tr., dated March 25, 2011, Vol. II, at 12:22-13:13.  MGAE sold $1,030,596 in products to Kohl's in 2002, $1,407,652 in products to Kohl's in 2003, and $5,089,159 in products to Kohl's in 2004.  <u>Id.</u>

8. In 2003 and 2004, Kohl's struggled to sell its inventory of Bratz products.  Trial Tr., dated March 25, 2011, Vol. I, at 8-18; <u>see also</u> TX 24335; TX 24342.  It contacted MGAE to request "markdown dollars for Fall '03 items that are not selling," <u>id.</u>, and offered to "place a domestic order dollar-for-dollar to offset any markdown contributions."  TX 24336.  MGAE resisted the request on the grounds that a mark down would "dilute" the brand.  <u>See</u> Trial Tr., dated March 25, 2011, Vol. I, at 34:2-6.  MGAE instead expressed a preference to subsidize Kohl's advertisements for Bratz products.  TX 24338.  However, when an intermediary hired by MGAE to manage its negotiations with Kohl's contacted the company asking for "the status on the advertising help that we discussed," TX 24339, MGAE did not promptly respond.  MGAE's response was not immediately forthcoming even though the intermediary noted that Kohl's "forecasted sales, markdowns, and year-end financial[s]" for MGAE products were "pretty bleak." <u>Id.</u>  The merchandise planner for toys at Kohl's at that time expressed concern that Kohl's could not "carry an additional 2 to 2.5 million [units of MGAE products] in the spring [of 2005] on this category."  <u>Id.</u>  Internal MGAE emails recognized that Kohl's faced a significant shortfall in its anticipated profit margin for MGAE products and debated how to respond to a Kohl's threat that if MGAE failed to provide "$1 million" to "get the margin up to 12 percent," Kohl's would not purchase MGAE products for the 2005 calendar year.  <u>See</u> TX 24342 ("They are currently preparing orders for the 47 new stores

opening in March/April, and they're awaiting our decision before placing the orders.").

9.      On December 17, 2004, MGAE's Chief Executive Officer Larian directed MGAE's sales director to offer Kohl's a markdown on the condition that it purchase less popular lines of Bratz dolls instead of simply "cherry-pick[ing]" MGAE's most popular products.  TX 24347.  Though there was no direct testimony or evidence about the response, if any, received by MGAE, Kohl's purchased $646,230 in products from MGAE in 2005, a significant decline from the prior year and strong circumstantial evidence that MGAE's offer had been rejected.  See Trial Tr., dated March 25, 2011, Vol. II, at 13:14-15.

10.     MGAE attempted to regain Kohl's business in 2005, but Kohl's was resistant.  Kohl's maintained that "[i]f there isn't going to be a substantial buy-in dollar increase and an increase in the overall margin, we're not going to be able to move forward."  TX 24358.  Internal MGAE emails recognized that "Kohl's feels strongly about their position they laid out for us last month" and "feel[s] MGA is the one that must decide if they want to have a presence in the toy department."  Id.  MGAE offered Kohl's a final offer for a $250,000 credit allowance in exchange for Kohl's buying 2.5 million units of MGAE products.  Trial Tr., dated March 25, 2011, Vol. I, at 46:13-15.  That offer was apparently rejected, as Kohl's purchased no MGAE products in 2006.  Trial Tr., dated March 25, 2011, Vol. II, at 13:16-17.  Kohl's continued to sell MGAE products in its store during this time period because it had some amount of excess inventory that had accumulated over the past few years.  Trial Tr., dated March 25, 2011, Vol. I, at 53:6-16.

11.     Enter Mattel.  On December 16, 2004, a Kohl's employee that negotiated with toy companies emailed a Mattel sales representative with a "Huge opportunity."  TX 37113.  His email explained that Kohl's had reserved 4-feet of shelf space for Bratz products in the Spring of 2005 and offered to sell that shelf space to Mattel in exchange for "some help with markdowns on old Bratz (we can talk $$ later)."  Id.  He pitched the offer as a "nice opportunity for Mattel to take back a little market share" by purchasing the right to Kohl's "throwing out Bratz and replacing the space with our friend Barbie."  Id.  Pursuant to that offer, Mattel and Kohl's entered into a contract on January 27, 2005 requiring Kohl's to "maintain a minimum of 8 ft. of Barbie [shelf] space for entire year 2005 and 2006," and meet other requirements in exchange for $1,250,000.  TX 24004.  At the time of the contract, Kohl's only had 8 feet of shelf space available for fashion dolls in its stores.  Trial Tr., dated April 6, 2011, Vol. III, at 66:3-7.

12.     In effect, the contract precluded Kohl's from placing MGAE's products on its fashion doll shelves for two years.  An internal Mattel email entitled "Great News Barbie!!" recognized and celebrated MGAE's exclusion from Kohl's shelves.  See TX 26612 ("The Competitor will NOT BE REPRESENTED in their Toy dept. for 2 years.").  However, the agreement between Mattel and Kohl's did not preclude Kohl's from selling MGAE's

products in other, less lucrative, areas of its stores.  See Trial Tr., dated April 6, 2011, Vol. III, at 69:9-17.

13.     MGAE renewed its relationship with Kohl's in 2007.  In 2007, Kohl's purchased $7,823,781 in products from MGAE.  Trial Tr., dated March 25, 2011, Vol. II, at 13:20-21.  In 2008, Kohl's purchased $3,651,054 in products from MGAE.  Id. at 13:22-23.

## II.     Conclusions of Law

1.     California's Unfair Competition Law permits courts to enjoin "[a]ny person who engages, has engaged, or proposes to engage in unfair competition."  Cal. Bus. & Prof. Code § 17203.  The court may also order a person that engages in unfair competition to "restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."  Id.

2.     To have standing to bring a claim under the Unfair Competition Law, a non-public entity, like MGAE, must have "suffered injury in fact and [must have] lost money or property as a result of the unfair competition."  Id. § 17204.  "Thus, to plead a UCL claim, [a] plaintiff[] must show, consistent with Article III [of the U.S. Constitution], that [it] suffered a distinct and palpable injury as a result of the alleged unlawful or unfair conduct."  Birdsong v. Apple, Inc., 590 F.3d 955, 960 (9th Cir. 2009).  This injury must be "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  Buckland v. Threshold Enters., Ltd., 155 Cal. App. 4th 798, 814 (2007) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130 (1992)).  MGAE has standing to bring this claim because it alleges that it was driven out of the market by an exclusive arrangement between its competitor, Mattel, and a prominent retailer, Kohl's.  Cf. Amarel v. Connell, 102 F.3d 1494, 1509 (9th Cir. 1996) ("[W]hen defendants engage in anticompetitive acts in an attempt to gain a monopoly, the competitor who is being driven out of the market is the party with standing.").  The California Supreme Court recently recognized that the UCL's standing requirement is not "quantitatively more difficult to satisfy" than the Constitutional requirement and can be met if the plaintiff "has a present or future property interest diminished."  Kwikset Corp. v. Superior Court, 51 Cal.4th 310, 321-24 (2011).

3.     MGAE failed to meet its burden of proving, by a preponderance of the evidence, that Mattel engaged in unfair competition.  The UCL defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  The "unlawful" prong of the UCL refers to acts "forbidden by law, be it civil or criminal, federal, state or municipal, statutory, regulatory, or court-made."  Saunders v. Superior Court, 27 Cal. App. 4th 832, 838-39 (1994).  The "unfair" prong – the one invoked by MGAE in this case – refers to a broader universe of conduct:

When a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that [1] threatens an incipient violation of an antitrust law, or [2] violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal.4th 163, 180 (1999).

4.      The federal Cartwright Act makes it "unlawful for any person engaged in commerce . . . to lease or make a sale or contract for sale of goods . . . on the condition, agreement, or understanding that the . . . purchaser thereof shall not use or deal in the goods . . . of a competitor . . . where the effect or such . . . contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."  15 U.S.C. § 4.

5.      The agreement between Mattel and Kohl's did not foreclose Kohl's from continuing to purchase MGAE's products and Kohl's subsequent conduct, including its efforts to re-negotiate an agreement with MGAE in 2005 confirm that fact.  Mattel's contract with Kohl's provided for the purchase of certain shelf space and an internal Mattel email speculated, on the basis of Kohl's limited shelf space, that MGAE would not be represented as a result.  However, there was no actual condition or understanding that Kohl's not deal with MGAE's goods.  Kohl's could have expanded its available shelf space beyond the 8 feet contracted for by Mattel.  In addition, or in the alternative, Kohl's could have displayed MGAE's products at other areas in its stores.  The emails between Kohl's and MGAE in 2005 evidence exactly this sort of arrangement – the simultaneous sale of MGAE and Mattel products in Kohl's stores – and the failure of that agreement had nothing to do with Kohl's preexisting contract with Mattel, but rather, Kohl's concern about MGAE's failure to subsidize a mark down of certain Bratz products.  Though Mattel may have hoped that its contract with Kohl's marked the end of the Kohl's-MGAE relationship, there was nothing in the agreement itself that compelled that outcome.

6.      Apart from the Kohl's transaction, MGAE did not present any material evidence of Mattel's alleged unfair competition at trial.  On examination by MGAE, Mattel's Chief Executive Officer admitted that the company preferred exclusive licenses, but MGAE failed to prove by a preponderance of the evidence that Mattel conditioned its business licenses on anti-competitive terms.  The existence of an email between Mattel's CEO and a fellow Mattel executive discussing whether to "kill" a deal with a third party licensee may have raised a genuine issue of material fact on this issue, but it does not meet the preponderance of the evidence standard.

6.     For the foregoing reasons, judgment is entered against MGAE and for Mattel on MGAE's claim for unfair competition.

## Mattel's Equitable Defenses of Unclean Hands and Laches

I.     <u>Findings of Fact</u>

1.     Mattel claims that MGAE's unclean hands bars, in whole or in part, its claim for trade secret misappropriation.  Mattel also claims that MGAE's delay in filing its claim for trade secret misappropriation bars, in whole or in part, its claim for trade secret misappropriation.

2.     The jury found, and the preponderance of the evidence shows, that Mattel employees used false pretenses to enter MGAE's showrooms for several years.  MGAE made reasonable efforts to maintain the secrecy of the information available at most of these showrooms, and that information, including unreleased product attributes, pricing information, advertising information, and the like, derived independent economic value from not being generally known.  MGAE operated the showrooms in compliance with law and custom, like the many other toy companies, including Mattel, that maintain showrooms at international toy fairs.  MGAE did not use the toy fair showrooms for any illicit purpose, and did not solicit visitors to commit wrongful acts.  Nor did MGAE engage in any inequitable conduct as to the Mattel employees that surreptitiously gained access to MGAE's showrooms.  The evidence instead shows that MGAE was not aware that these individuals were Mattel employees and that MGAE extended the same professional courtesy to these individuals as it did to its other showroom invitees.

3.     Like Mattel, MGAE acknowledged the tremendous value of the information available at competitors' toy fair showrooms.  It accordingly requested information about its competitors' upcoming plans from retailers and licensees.  Two MGAE employees also entered a toy showroom operated by Mattel and forwarded the information they obtained to MGAE's Chief Executive Officer.

4.     MGAE filed its claim for trade secret misappropriation in August of 2010.  The first Mattel employee to publicly admit to the misconduct did so in a July 2010 deposition.  Numerous Mattel executives, including executives that had actual knowledge of the misconduct, denied the misconduct when questioned at depositions earlier in this case.

II.    <u>Conclusions of Law</u>

1.     The doctrine of unclean hands is an equitable defense.  It precludes recovery to a plaintiff that engages in "unconscionable, bad faith, or inequitable conduct . . . in connection with

MINUTES FORM 11 DOC                                  Initials of Deputy Clerk: jcb
CIVIL - GEN                                          Page 7 of 9

the matter in controversy." <u>Fladeboe v. American Isuzu Motors, Inc.</u>, 150 Cal. App. 4th 42, 56 (2007) (citations omitted).  The doctrine applies in suits in equity as well as suits at law.  <u>Pond v. Insurance Co. of North America</u>, 151 Cal. App. 3d 280, 290 (1984).

2.  The fact that MGAE sought to obtain information about its competitors' products and price lists through legitimate sources, and that two MGAE employees walked through a toy booth operated by Mattel, is not even relevant to (let alone proof of) unclean hands. The doctrine of unclean hands does not encompass mere "unrelated improper past conduct."  <u>Id.</u>  The doctrine only applies if the inequitable conduct relates "directly to the transaction concerning which the complaint is made; i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants." <u>Fibreboard Papers Prods. Corp. v. East Bay Union of Machinists</u>, 227 Cal. App. 2d 675, 728 (1964); <u>see also</u> <u>Jarrow Formulas, Inc. v. Nutrition Now, Inc.</u>, 304 F.3d 829, 841-42 (9th Cir. 2002) ("[U]nclean hands does not constitute 'misconduct in the abstract, unrelated to the claim to which it is asserted as a defense.").  MGAE engaged in no such inequitable conduct in the context of Mattel's entry into its showrooms.  Moreover, its efforts to obtain information, through legitimate means, about its competitors was nothing like the conduct that gave rise to Mattel's liability in this case.  Unlike Mattel, MGAE (1) had no employees that even attempted to use false pretenses to gain access to competitors' showrooms; (2) did not conduct yearly company wide presentations disseminating illicitly obtained information; and (3) did not manage a group of employees dedicated to gathering information from toy fair showrooms around the world.  MGAE's conduct in other circumstances is not relevant to Mattel's unclean hands defense and, even if it were relevant to that defense, does not constitute the type of inequitable conduct that bars relief.

3.  The doctrine of laches is another equitable defense that may be invoked against claims in equity and at law.  "The test for laches is two-fold: first, was the plaintiff's delay in bringing suit unreasonable?  Second, was the defendant prejudiced by the delay?" <u>Internet Specialties W., Inc. v. Milon-DiGiorgio Enters.</u>, 559 F.3d 985, 990 (9th Cir. 2009) (citing <u>Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n</u>, 465 F.3d 1102, 1108 (9th Cir. 2006)).

4.  MGAE's "delay" in bringing suit was not unreasonable.  Numerous Mattel witnesses, including those with direct knowledge of the conduct giving rise to MGAE's claim, disclaimed knowledge at depositions conducted in 2008 and 2009.  Though MGAE may have suspected that Mattel gathered competitive information — an entirely innocuous fact — it lacked any real knowledge about the extent of Mattel's market intelligence activities, the methods used by the market intelligence group, and Mattel's unjust enrichment.

5.     For the foregoing reasons, judgment is entered against Mattel on its equitable defenses of unclean hands and laches.

The Clerk shall serve this minute order on all parties to the action.