UNITED  STATES  DISTRICT  COURT

FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

MATTEL, INC., et al.                          )        CASE NO. CV 04-9049 DOC (RNBx)
                                              )
              Plaintiffs,                     )
                                              )        O R D E R DENYING RENEWED
        v.                                    )        MOTION FOR JUDGMENT AS A
                                              )        MATTER OF LAW; DENYING
MGA ENTERTAINMENT, INC., et al. )                      MOTION FOR NEW TRIAL;
                                              )        GRANTING IN PART AND
              Defendants.                     )        DENYING IN PART MOTION TO
                                              )        REMIT DAMAGES AWARD
_____ )
                                              )
AND CONSOLIDATED ACTIONS                      )
                                              )
                                              )
_____ )

        Before the Court is Mattel, Inc. ("Mattel")'s Renewed Motion for Judgment as a Matter of Law, for New Trial, or in the alternative, for Remittitur. After considering the moving, opposing, and replying papers, as well as the parties' oral argument, the Court DENIES the request for judgment as a matter of law, DENIES the request for new trial, and GRANTS IN PART AND DENIES IN PART the request for a remittitur.

I.      Background

On August 7, 2010, MGA Entertainment, Inc. ("MGA") filed counterclaims-in-reply

against Mattel for trade secret misappropriation, violation of the Racketeer Influenced and Corrupt Organizations Act, and wrongful injunction. MGA's first and second counterclaims-in-reply arose out of the activities of Mattel's so-called "Market Intelligence" Group; a collection of employees dispatched to international toy fairs and directed to gather information from Mattel's competitors' private showrooms through the use of false pretenses. On the eve of trial, summary judgment was entered in Mattel's favor on MGA's RICO claim; however, the Court identified genuine issues of material fact that precluded the entry of summary judgment on MGA's claim for trade secret misappropriation.

Before the case was submitted to the jury, Mattel moved for judgment as a matter of law on MGA's remaining counterclaim-in-reply for trade secret misappropriation. This Court did not grant that motion, and the case was thus submitted to the jury. *See* Fed. R. Civ. P. 50(b). Following approximately two weeks of deliberations, the jury found that Mattel had misappropriated 26 trade secrets owned by MGA, and awarded MGA $3.4 million in damages for each act of misappropriation, reaching a total award of $88.5 million. The jury also found that Mattel's misappropriation had been willful and malicious, thus entitling MGA to exemplary damages under Cal. Civ. Code § 3426.3. Mattel timely renewed its motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) and, as that rule provides, alternatively moved for a new trial pursuant to Fed. R. Civ. P. 59. Mattel also moved to remit the damages award from $88.5 million to $85 million on the grounds that (1) the jury committed mathematical error, and (2) the jury awarded MGA a double-recovery for Mattel's misappropriation of one trade secret.

## II.     Motion for Judgment as a Matter of Law

Rule 50 of the Federal Rules of Civil Procedure provides for the entry of judgment on any issue or claim as to which a "reasonable jury would not have a legally sufficient evidentiary basis" to find for the non-moving party. Fed. R. Civ. P. 50(a). Because, "the jury – not the judge – is the trier of fact . . . judgment as a matter of law is appropriate only if no reasonable jury could find for a party on" the claim or issue in dispute. *Ritchie v. U.S.*, 451 F.3d 1019, 1023 (9th Cir. 2006). The standard parallels the standard that governs the entry of summary judgment

prior to trial. *See id.* Specifically, in determining whether to enter judgment as a matter of law, the court must "draw all reasonable inferences in favor" of the non-moving party. *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004). A renewed motion for judgment as a matter of law should only be granted if "substantial evidence" does not support the jury's verdict. *Id.* (citing *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992)). "Substantial evidence is such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Id.*

MGA claimed that Mattel misappropriated 114 trade secrets[1] from private toy fair showrooms and the special verdict form asked the jury to resolve the following contested issues of fact as to each: (1) whether MGA owned the claimed trade secret; (2) whether the claimed trade qualified as a trade secret under the California Uniform Trade Secrets Act (CUTSA); (3) whether Mattel misappropriated the claimed trade secret; (4) whether Mattel used "improper means," as that term is defined by CUTSA, to acquire the claimed trade secret;[2] and (5) the damages, if any, to which MGA was entitled as a result of Mattel's misappropriation of the claimed trade secret.

The jury found that MGA had proved that 40 of the 114 claimed trade secrets actually qualified as its trade secrets under CUTSA. Of those 40 MGA trade secrets, the jury found that Mattel had misappropriated 26, using improper means in each instance. The jury awarded MGA $3.4 million for each instance of misappropriation and erroneously calculated a total award of $88.5 million (totaling the individual awards actually yielded $88.4 million). Mattel, of course, does not renew its motion for judgment as a matter of law as to the 88 claimed trade secrets for which the jury found a failure of proof. Mattel here contends that a reasonable jury lacked a

---

[1] Most of the claimed trade secrets could be described as the "appearance, operation, intended play pattern, and plans to advertise on television" for a particular product previewed at MGA's toy fair showrooms.

[2] Acquisition by improper means is only one way in which a trade secret can be "misappropriated." *See* Cal. Civ. Code § 3426.1. The jury was nevertheless asked to make this determination because Mattel (like MGA) claimed that the Copyright Act preempted MGA's trade secret misappropriation counterclaim-in-reply to the extent an "extra element," like the use of "improper means," was lacking.

legally sufficient evidentiary basis upon which to reach a finding of liability for the other 26 trade secrets.

CUTSA defines a "trade secret" as information that "derives independent economic value, actual or potential, from not being generally known" and is the "subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). "Misappropriation" can occur through the acquisition, disclosure, or use of a trade secret by improper means, including but not limited to fraud, deceit, or indiscretion in violation of a confidential relationship. *Id.*, § 3426.1(b). The statute entitles the trade secret owner to recover the greater of its losses or the misappropriator's unjust enrichment. *Id.*, § 3426.3(a). In its motion, Mattel argues that MGA failed to adduce sufficient evidence to prove any of the elements (trade secret status, misappropriation, or damages) required to find liability as to the 26 trade secrets on which the jury's award was based.

### A.    Reasonable Efforts to Maintain Secrecy

Mattel first argues, as a general matter, that MGA did not make reasonable efforts to maintain the secrecy of information at its toy fair showrooms. The determination of whether "reasonable efforts" have been taken is quintessentially fact-specific. *See Mattel, Inc. v. MGA Entmn't, Inc.*, ___ F. Supp. 2d ___, 2011 WL 114250, at *19 (C.D. Cal. Jan. 5, 2011) (Carter, J.) (denying MGA's motion for summary judgment on Mattel's trade secret misappropriation claim). Only in extreme cases is it appropriate to take the issue away from the jury. *Tax Track Sys. Corp. v. New Investor World, Inc.*, 478 F.3d 783, 787 (7th Cir. 2007); *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179 (7th Cir. 1991) ("Only in an extreme case can what is a 'reasonable' precaution be determined on a motion for summary judgment, because the answer depends on a balancing of costs and benefits that will vary from case to case."); *see also Learning Curve Toys, Inc. v. Playwood Toys, Inc.*, 342 F.3d 714, 725-26 (7th Cir. 2003) ("[W]hether the measures taken by a trade secret owner to satisfy the [UTSA's] reasonableness standard . . . is a question of fact for the jury.").

Mattel claims that MGA readily publicized information about its forthcoming products by

inviting retailers and (sometimes) members of the press to its private showrooms. Even if no reasonable jury could conclude otherwise on the basis of the evidentiary record, that fact alone does not mean that MGA (or any company) failed to take reasonable efforts to maintain the secrecy of its confidential information. Indeed, the Supreme Court in *Kewanee Oil Co. v. Bicron Corp.*, recognized that trade secrets laws are designed to improve, not stunt, the dissemination of information for commercial purposes, like licensing a product or process to a third party. Rejecting the petitioner's argument that state trade secrets law conflicts with federal patent law's interest in disclosure, the Court suggested that, by granting trade secret holders an enforceable interest in the confidentiality of certain information, trade secrets law *prevented* owners from "hoard[ing]" information rather than "disseminat[ing] knowledge" to others. 416 U.S. 470, 486 (1974). Sharing information with third parties for commercial purposes does not necessarily eviscerate trade secret status; to the contrary, it falls among the types of behavior that trade secrets law seeks to incentivize.

Mattel suggests that the retailers and journalists that frequented private toy fair showrooms were not like the licensees contemplated by *Kewanee Oil*, because they were not obligated to keep MGA (or any toymaker's) product attributes, including pricing information, confidential. The evidentiary record would allow a reasonable jury to conclude otherwise. In its opposition, MGA cites to its employees' testimony that access to private showrooms was restricted in all instances and conditioned upon the agreement to maintain the confidentiality of information learned in those showrooms. *See, e.g.*, Trial Tr., dated March 24, 2011, Vol. II, at 55. MGA admitted into evidence an exemplar non-disclosure agreement presented to toy fair showroom entrants that stated "[y]our permission to visit MGA Entertainment's offices and facilities is granted subject to keep confidential any information that may be disclosed to you." TX 36635. The methods used by Mattel's "Market Intelligence" department lend credence to the existence and reasonableness of these measures by MGA to keep secret the information at its showrooms: Mattel's employees may have considered it necessary to concoct false credentials (including fake business cards and identifying information) in order to gain access to

competitors' showrooms. *See* Trial Tr., dated March 22, 2011, Vol. I, at 32-33. Senior Mattel executives were made aware that false identifications were necessary for access to competitors' toy fair showrooms and enabled the misconduct. *Id.* This rich evidentiary record provided a reasonable jury with sufficient grounds upon which to conclude that, as a general matter, MGA made reasonable efforts to maintain the secrecy of the product information available in its toy fair showrooms.

Mattel separately argues that a reasonable jury lacked a legally sufficient evidentiary basis to find reasonable efforts to maintain secrecy on a trade secret-by-trade secret basis, a requirement imposed by the court in *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064 (N.D. Cal. 2005). The basis for this argument is both that the evidence in the record conclusively established the absence of reasonable efforts to maintain the secrecy of information about many of the 26 products and that MGA failed to adduce sufficient evidence as to several of the 26 trade secrets at issue.

Mattel's first argument is predicated upon the apparent dissemination of press releases that contained information about MGA's products either prior to, or in the immediate aftermath of, toy fairs. Mattel notes that MGA press releases, dated February 11, 2004 and March 20, 2002, disclosed information about three of the 26 products at issue. Discussing the product Bratz Girls Nite Out, the MGA press release boasted:

It's Saturday night and that can only mean one thing: It's Bratz Nite Out! Join the girls as they paint the town red-hot red! Each Bratz comes three nightlife looks that can only be described as "funkalish"! Add over 30 accessories, a unique "party night" accessory, real eyelashes and body glitter for extra shine beneath the strobes! Also included is a 3-D movin-groovin' collectible card to invite you to a night out you're sure never to forget!

TX 20621.

But the press release obviously shares minimal information about the "Bratz Nite Out" product, using the generic term "funkalish" in reference to the all-important doll fashions, and

summarily commenting upon the "30 accessories" without further detail. A reasonable jury could certainly conclude that the information actually available to showrooms invitees, who previewed and inspected products like Bratz Nite Out, exceeded the tidbits offered by the MGA press release.[3]

Mattel commits a similar error by arguing that any and all information about three of the 26 products at issue could not have been subject to reasonable efforts to maintain secrecy because MGA shipped those products to retailers prior to the toy fair at which they were first previewed. A reasonable jury could have rejected the factual predicate for Mattel's argument, since MGA's Chief Executive Officer disputed that the company would have shipped off a particular product before the toy fair (thus eliminating the need to preview that product to retailers in the first place). *See* Trial Tr., dated March 25, 2011, Vol. I, at 63-64. Even if the products *had* been delivered to retailers in advance of Mattel's misappropriation, a reasonable jury could have nevertheless concluded that the retailers at issue were under an obligation to keep the products' identities and features secret prior to their release. *See* Trial Tr., April 6, 2011, Vol. II, at 17-21. These genuine issues of material fact aside, a reasonable jury could have concluded that while the physical information about products was available to retailers that received advance inventory, the products' advertising plans and marketing information was still

---

[3] Mattel claims that one of its internal email communications and memoranda prepared by members of its Market Intelligence department simply copied from the MGA press releases. This argument places undue emphasis on the internal emails and memoranda, elevating those documents (in Mattel's terms) to "critical" status. But there was a legally sufficient evidentiary basis for a reasonable jury to conclude that the internal Mattel documents merely reflected a small fraction of the information Mattel had gathered about MGA products from toy fairs. For instance, a former senior Mattel executive testified that, in addition to these internal memoranda and emails, Mattel's Market Intelligence department held an annual presentation about competitors' products that was attended by hundreds of Mattel employees. *See* Trial Tr., dated March 22, 2011, Vol. I, at 31:2-7 (testifying that 100-150 Mattel employees attended Market Intelligence department presentation). In other words, a reasonable jury could have concluded that the MGA products discussed in internal Mattel memoranda and emails were products about which Mattel had gained knowledge, but that not all of Mattel's knowledge was contained in those documents.

valuable enough that Mattel considered it economical to use false pretenses to gather that information from private showrooms.[4]

In addition to these anecdotal challenges, Mattel argues that MGA simply failed to adduce evidence to prove that information about most of the 26 products was subject to reasonable efforts to maintain secrecy. Mattel is correct that MGA bore the burden of proving each element of its CUTSA claim as to each claimed trade secret. *See, e.g.*, *O2 Micro Int'l*, 399 F. Supp. 2d at 1072-75. But a reasonable jury could have found that the elements of the claim had been met as to one category of information after considering evidence about another, similarly situated, category. For instance, Mattel argues that the only evidence in the record about three of the 26 products at issue could be found in two internal Mattel documents that reported the products' names, features, advertising status, and freight on board pricing. *See* TX 9275 (Lil' Bratz Vehicle Assortment & Lil' Bratz Deluxe Mall Playset & Mall Stores); TX 31530 (Dazzlin' Disco Café). MGA did not admit any evidence about the specific efforts taken to maintain the secrecy of information about any of the three products. However, sensitive information about the three products was available at the particular toy fairs, and an active member of Mattel's "Market Intelligence" department acknowledged using false pretenses to discover the information available at those toy fairs. That former employee, Mr. Salvador Villasenor, thereafter prepared internal memoranda discussing the three products, among many others. *See, e.g.*, TX 9275. It is both intuitive and reasonable for a jury to conclude that MGA protected information about *all* the products previewed at its toy fairs using the same methods, and that Mattel's use of false pretenses to evade MGA's security measures proved that fact.

Mattel itself relied upon general proof to shield its trade secret misappropriation claim from MGA's requests for summary judgment before trial. In that claim, Mattel alleged that

---

[4] Mattel separately argues that MGA failed to introduce evidence about its advertising plans for 10 of the 26 products at issue. But the actual evidence about the advertising plans for the remaining products, as well as Mattel's misappropriation of those advertising plans, was sufficient circumstantial proof that (1) MGA maintained advertising plans for its products; (2) those advertising plans were shared at its private showrooms; and (3) Mattel focused on misappropriating those advertising plans.

MGA induced several departing Mattel employees, including the creator of the popular Bratz doll line, to download and misappropriate confidential Mattel documents and product plans before leaving to work for MGA. MGA argued that Mattel had failed to substantiate its efforts to maintain the secrecy of the documents at issue. In response, Mattel submitted employee declarations speaking to *general* measures taken by the company to preserve the secrecy of entire categories of documents; with no document-by-document analysis. For example, the direct supervisor of a former Mattel Canada employee accused of taking documents to MGA submitted a declaration stating that Mattel Canada took the following efforts to maintain the secrecy of the documents: (1) requiring employees to log-in to their computers using a "user identification and password"; (2) distributing a "Code of Conduct" to employees; (3) reminding departing employees and subsequent employers of confidentiality requirements in "exit interviews" and follow-up correspondence; (4) forensically imaging departing employees' hard drives; and (5) regulating building access. Declaration of Steven Totzke in Support of Mattel's Opp. to MGA Mot. For Partial Summary Judgment ¶¶ 7-16. Critically, the declaration summarily stated that "[t]he efforts Mattel undertakes to maintain the secrecy of its confidential, trade secret information described above *apply equally to Brisbois Trade Secrets 1-22.*" *Id.* ¶ 16 (emphasis added).

Despite recognizing some differences between the individual documents encompassed by Mattel's claim, the Court credited these representations about Mattel's general efforts to maintain the secrecy of all documents in denying both parties' motions for summary judgment. *See Mattel*, 2011 WL 1114250, at *19 ("Although Mattel conducted extensive employee training, had its employees sign agreements, and controlled access to its databases, it often provided vague direction to its employees and in many circumstances, failed to mark proprietary documents, including the documents that are at issue in this case, as confidential."); *see also id.* at *24 (denying MGA's motion for summary judgment as to Swappin' Styles trade secret, even though Mattel did not "cite[] any evidence specific to [its] efforts to maintain the secrecy" of that product); *id.* at *30 (same for Castilla "trade secrets"); *id.* at *38 (same for Machado, Vargas,

and Trueba "trade secrets"). Mattel itself argued against the need for "trade secret"-specific efforts, claiming instead that "the reasonable efforts standard is flexible and can be satisfied in a number of ways, including through the use of appropriate confidentiality agreements." Mattel Opp. to MGA Mot. for Partial Summary Judgment at 68:9-11. It did not contend then, as it does now, that a trade secret plaintiff must demonstrate how each individual trade secret was kept secret; indeed, Mattel disputed that it needed to prove (as MGA has) how even a handful of its claimed trade secrets were kept secret. *See id.* at 68-69. Mattel's reliance on general proof was appropriate, sufficient to establish a genuine issue of material fact as to its own claim, and consistent with the Ninth Circuit precedent cited in Mattel's summary judgment papers. *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521-22 (9th Cir. 1993) (finding reasonable efforts requirement satisfied on the basis of general confidentiality agreements that encompassed, but were not limited to, the claimed trade secret). Having made similarly general representations about the security at its toy fair showrooms, MGA established a genuine issue of material fact about its efforts to maintain the secrecy of the 26 categories of information on which liability was found.

Mattel's varied arguments concerning CUTSA's reasonable efforts requirement are unconvincing. In evaluating whether MGA had satisfied its burden of proof as to a particular claimed trade secret, the jury did not need to myopically restrict its consideration to direct evidence about that particular trade secret. It could consider all of the evidence in the record, including evidence about (1) MGA's attempts to maintain the secrecy of other, similarly situated, trade secrets; (2) industry-wide practices like sign-in sheets and non-disclosure agreements; and (3) the extent and nature of Mattel's conduct in gaining access to the information. That factual record provided legally sufficient grounds for a reasonable jury to conclude that information about all 26 products at issue was subject to reasonable efforts to maintain secrecy.

**B.    Independent Economic Value**

Mattel wages a similar attack on the sufficiency of the evidence concerning the 26

claimed trade secrets' "independent economic value from not being generally known." *See* Cal. Civ. Code § 3426.1.  Several MGA witnesses testified about the importance of maintaining the secrecy of product information, especially pricing and advertising, in advance of the product's release. *See* Trial Tr., dated March 24, 2011, Vol. II, at 104-114.  They testified, on the basis of their experience in the toy industry, that a competitor could use that information to MGA's detriment. *Id.* at 114:10-13 (testifying that a competitor could use MGA's advance product information to "change their designs . . . come up with product . . . change their pricing, their marketing plans, sales plans, everything").  MGA presented several actual examples to substantiate the company's economic interest in the secrecy of information about unreleased products.  For example, MGA noted that Mattel had rushed to design and release products that "matched" unreleased MGA products, potentially after the "Market Intelligence" department obtained information about those unreleased products. *See, e.g., id.* at 117-131.  And every Mattel witness to opine on the issue, including Mattel's damages expert, acknowledged the competitive disadvantage to MGA (and corresponding benefit to Mattel) from the disclosure of information about unreleased products. *See, e.g.,* Trial Tr., dated April 5, 2011, at 34:11-23; Trial Tr., dated March 22, 2011, Vol. I, at 43-44; Trial Tr., dated March 18, 2011, Vol. I, at 114-115.

Mattel nevertheless argues that this sort of general proof is insufficient to carry the day on an individual trade secret-by-trade secret basis.  Instead, Mattel argues, MGA needed to adduce evidence about the independent economic value that each of the 26 claimed trade secrets derived from not being generally known.  This argument resembles Mattel's argument about the reasonable efforts element, and is similarly flawed.  The independent economic value prong is met when a business derives a "substantial business advantage" from keeping certain information secret. *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522 (1997) (quoting *Klamath-Orleans Lumber, Inc. v. Miller*, 87 Cal. App. 3d 458, 465 (1978)).  Mattel's own Chief Executive Officer testified about the unique importance of product features in the toy industry (drawing a contrast with his experience as a CEO of a cheese manufacturer):

11

1    [I]n the business I was from, the food business, cheese is fairly similar. Cheddar

2    cheese is the same as the next cheddar cheese, by definition, the standard of

3    identity of what is a cheddar cheese. So the name and the packaging and the

4    advertising, the pricing are all relatively more important, compared to toys where

5    the product is the king. So if you have a great product, it sells.

6  Trial Tr., dated March 1, 2011, Vol. I, at 137:11-18.

7        Mattel's CEO proceeded to explain that Mattel saw dozens of its product ideas fail "each

8  year" despite generous investment in the research and development of those ideas. *Id.* at 138:5-

9  21. At least one court has acknowledged the high attrition rate for new toys, surmising that "in

10  the highly competitive, billion-dollar doll industry, getting the doll's face and expression exactly

11  right is crucial to success." *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 136 (2d Cir.

12  2004). A reasonable jury could certainly conclude that MGA had a tremendous economic

13  interest in maintaining the secrecy of its unreleased products' features so as to prevent Mattel

14  from copying these "crucial" features and exploiting the "potential benefits of primacy" in the

15  toy industry. *Mattel*, 2011 WL 1114250, at *24 (denying MGA's motion for summary judgment

16  on Mattel's trade secret claim); *Sikes v. McGraw-Edison Co.*, 665 F.2d 731, 733-34 (5th Cir.),

17  *cert. denied*, 458 U.S. 1108 (1982); *MAI Sys.*, 991 F.2d at 521 ("The Customer Database has

18  potential economic value because it allows a competitor like Peak to direct its sales efforts to

19  those potential customers that are already using the MAI computer system.").

20        Of course, the jury was not left to reach this inference on its own, because ample evidence

21  and testimony in the record highlighted the importance of keeping information about unreleased

22  products secret. In an email thanking Mr. Villasenor for acquiring MGA's price list,

23  Villasenor's supervisor commended "This is great. You saved Mattel close to 1 million." TX

24  27464-158. At trial, the supervisor, a former Mattel employee, discussed the value of that

25  information as well as other information about MGA's unreleased products. Trial Tr., dated

26  March 22, 2011, Vol. I, at 44:5-6 (testifying that information about unreleased products "would

27  help us compete in the marketplace"). Other senior Mattel executives concurred. Trial Tr.,

28

dated March 18, 2011, Vol. I, at 114:21-22 ("It's always good for us to understand what's
coming from . . . a competitor."). A reasonable jury could easily conclude that the information
about MGA's unreleased products lost value upon dissemination because it enriched
competitors, like Mattel, at MGA's expense.

Mattel responds that the information at issue was generic and therefore valueless. It
argues that several of the unreleased products' were nothing more than dolls with common
themes like "winter wonderland," "prom," "girlfriends," "boyfriends," and "beach party" and
that MGA's CEO acknowledged that "many toy companies have done those themes over many
years." Trial Tr., dated February 17, 2011, Vol. II, at 6:13-15. But MGA claimed that Mattel
misappropriated more than just the "theme" of unreleased product lines, and a former employee
in Mattel's "Market Intelligence" department testified that he gathered information about
unreleased products' pricing, advertising, and packaging. Trial Tr., dated March 23, 2011, Vol.
III, at 23:1-27:6.

And even if MGA had restricted its claim to the product themes previewed at its private
showrooms, a reasonable jury could still conclude that the particulars of those themes derived
independent economic value from not being generally known prior to the products' release. In
prosecuting its claim that MGA had misappropriated the Bratz doll concept and associated
themes, Mattel argued that, notwithstanding the ubiquity of dolls with "bratty-looking" features
and clothing, the particular attributes, including even doll names, of the Bratz product
constituted trade secret information prior to the product's release. *See* Mattel Opp. to MGA
Mot. For Partial Summary Judgment at 66 ("MGA cannot credibly dispute that names under
consideration for unreleased or in-development product lines have at least 'potential' value to
toy companies, which is all that is required."). Mattel's present contention that MGA's products
were not "executed in a unique way," Renewed Mot. for Judgment as a Matter of Law at 15, is
not only an issue of fact, but also irrelevant, because, as Mattel previously argued, "*all aspects* of
unreleased products and products in development" (even uninventive products) are
"extraordinarily valuable." *See* Mattel's Response to MGA Separate Statement in Support of

MGA Mot. for Partial Summary Judgment ¶ H5 (emphasis added) (quoting Declaration of Evelyn Viohl in Support of Mattel's Opp. to MGA Mot. for Partial Summary Judgment ¶ 4).

Mattel's contention at the time of summary judgment was, and still is, reasonable. Even if a particular fashion or theme sported by an unreleased MGA product may not have been valuable in a vacuum, a reasonable jury could have concluded that MGA derived value from keeping its product strategies secret. Evidence about Mattel's use of information gathered at competitors' showrooms was circumstantial proof of the competitive harm to MGA from the release of information about its unreleased products. For instance, MGA planned to manufacture a Bratz doll named Bratz Forever Diamonds with a diamond built into its anatomy; an improvement and competitive response to a Mattel product in the market called "MyScene Bling Bling." Trial Tr., dated March 24, 2011, Vol. II, at 127:9-128:20. Bratz Forever Diamonds was previewed at a toy fair, Mattel's "Market Intelligence" department discussed the use of a real diamond in a subsequent internal report, and Mattel promptly altered its "MyScene Bling Bling" product to match MGA's offering before MGA could enjoy the "benefits of primacy," *Mattel*, 2011 WL 1114250, at *24. *Compare* TX 17527, *with* TX 36742.

Other evidence confirmed Mattel's diligence in discovering, undercutting, and thereby torpedoing competitors' future product plans. After receiving "confidential information from a reliable source" in December 2003 about a forthcoming MGA product called "4Ever Best Friends," Mattel executives directed the company's product development team to speedily devise a product with features that paralleled the MGA product ("a heart-shaped package with the dolls positioned on the left and right side of the package with chotzkas in the middle," TX 2114). Anticipating that MGA's product would be available less than four months later, in "March/April," a senior Mattel executive stated that he "turned the team on yesterday to respond to [MGA's forthcoming product] big time." TX 8751. In less than two weeks, Mattel came up with "Wee 3 Friends," a product whose name and appearance were obviously modeled after the MGA product. *See* TX 8204. By investing heavily to hastily design, produce, and distribute the matching product, Mattel (in its own terms) staged a "strong and aggressive move against

MGA," TX 8112, that one of its executives celebrated by distributing a photograph of himself next to a discount bin containing MGA's product, *see* TX 8772. The fervor and ultimate success of Mattel's response to this information from a "confidential source" was yet more circumstantial evidence from which a reasonable jury could have concluded that information about the 26 products as to which liability was found derived independent economic value from not being generally known.

Indeed, the jury could have concluded that information about unreleased products derived independent economic value from not being generally known regardless of whether a competitor could (or did) use that information to manufacture a matching product. MGA's damages expert noted that "even if [a company doesn't] launch a competitive product . . . [it still knows] the playbook" and can alter its product offering, release dates and pricing accordingly. Trial Tr., dated April 5, 2011, Vol. II, at 31:7-12. Mattel's Chief Executive Officer agreed: "[F]or somebody to take that and then build their plans, based on what we've done and the information we have at retailers, that's wrong." Trial Tr., dated April 1, 2011, Vol. I, at 98:13-16.

It is reasonable to conclude that, in the toy industry, timing is critical. Despite the relative failure of "bratty looking" Mattel fashion dolls like "Flavas" and "MyScene," the Bratz line was an international success between its 2001 launch and the 2008 equitable relief entered by Judge Larson. One reasonable explanation for the disparity is that MGA enjoyed the benefits of primacy, just as Mattel had long benefitted from "Barbie" seizing the market for female fashion dolls half a century earlier. *Mattel*, 2011 WL 1114250, at *22 (citing Ex. A to Declaration of Richard DeAnda in Support of Mattel's Motion for Summary Judgment). Each time MGA designed and previewed a new product, it aspired to capture (or discover) a new market. Keeping secret both the fact of its efforts and the substance of those efforts enabled MGA to prevent competitors like Mattel from altering their business strategies (as they did) and undercutting unreleased products (as they did).

### C.    Misappropriation

One of the ways that a trade secret can be misappropriated is by acquisition through the

use of improper means, including, but not limited to, "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Cal. Civ. Code § 3426.1.  An internal Mattel document instructed employees to create false identifications before attending toy fairs, using a "home phone number or [] a fake number [but not] your Mattel number." TX 36028.  Senior Mattel employees testified under oath that members of the company's "Market Intelligence" department used false identifications and posed as retailers to gain access to MGA's private showrooms and at least one former executive admitted that he allowed Mattel's employees to use his home address.  Trial Tr., dated March 24, 2011, at March 23, 2011, Vol. I, at 11:16-12:18; Trial Tr., dated March 22, 2011, Vol. I, at 32:21-37:24.  They admitted that such misrepresentations occurred and were necessary to gain access to MGA's showrooms and, as one senior Mattel executive explained, MGA "was a little bit obsessed with confidentiality."  Trial Tr., dated March 22, 2011, Vol. II, at 36:3-4; *id.* at 51:11-17; *see also* Trial Tr., dated March 22, 2011, Vol. I, at 132:16-19.  Several Mattel witnesses, including the company's Chief Executive Officer, admitted that the practices amounted to "misrepresentations" that violated the company's written Code of Conduct and fell short of ethical norms.  Trial Tr., dated March 30, 2011, Vol. I, at 43:24-44:8; Trial Tr., dated March 22, 2011, Vol. I, at 34:16-23; Trial Tr., dated March 18, 2011, Vol. I, at 104:18-105:1; Trial Tr., dated March 11, 2011, Vol. III, at 65:22-66:22.

Despite this testimony and evidence, Mattel argues that proof of misappropriation is lacking.[5]  In part, it relies on the argument that MGA failed to adduce evidence of "use."  It is

[5] Footnote 73 of Mattel's brief argues that MGA's trade secret misappropriation counter-claim in reply is preempted by the Copyright Act.  It cites no case law in support of this proposition, which this Court has already rejected.  *See Mattel*, 2011 WL 1114250, at *46.  In any event, MGA's claim was not only premised on the copying of copyrightable subject matter but, in addition, the misuse of confidential price lists, advertising plans, and other strategic information.  *See Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089 (9th Cir. 2005).  Nor is the claim preempted by the Copyright Act insofar as it concerns the reproduction of subject matter displayed in private showrooms because the use of "improper means" (which the jury found as to every one of the 26 categories of trade secrets) in breach of a confidential relationship supplies the necessary "extra element."  *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 717 (2d Cir.

not, of course, necessary to prove use in cases where there is evidence of acquisition by improper means. Cal. Civ. Code § 3426.1.[6] Nevertheless, the jury heard evidence that Mattel used the 26 categories of improperly acquired information in its internal memoranda and to develop competing products. *See, e.g.*, TX 9274; TX 9406; TX 9488; TX 9504; TX 9566; TX 9656; TX 26546; TX 26755; TX 26758; TX 31530; TX 32836.[7]

Far from lacking a legally sufficient evidentiary basis, MGA's claim that Mattel misappropriated its information was practically uncontested at trial. Mattel's Chief Executive Officer, General Counsel, two in-house counsel, three former high ranking executives, and a current employee all admitted under oath that employees misrepresented themselves to access competitors' private showrooms and gather information about unreleased products. Every one of these individuals acknowledged that the conduct was sanctioned by senior members of Mattel's corporate hierarchy and that it was improper. And, when presented with the internal

---

1992), *accord. Montz v. Pilgrim Films & Television, Inc.*, ___ F.3d ___, 2011 WL 1663119, at *6 (9th Cir. 2011) (en banc).

[6] Mattel also argues that, for 3 of the 26 categories of product information at issue, MGA failed to prove even improper acquisition because there was no evidence that any Mattel employee attended the 2006 New York Toy Fair, at which those products were previewed. But the jury was under no obligation to credit the testimony of the Mattel employee who denied attending the 2006 toy fair in light of contravening circumstantial evidence, including the fact that Mattel retained an independent contractor to gather information from competitors' showrooms, Trial Tr., dated March 30, 2011, Vol. I, at 44:9-47:11, and continued to distribute internal competitive reports like the ones confirmed to contain misappropriated information, *compare* TX 9566, *with* TX 9274. More importantly, a reasonable jury was not restricted to concluding that Mattel gathered information about the three categories of information by following its custom of using false credentials to gain access to private showrooms. There was also evidence that Mattel induced third parties, like retailers, to breach their obligations of confidentiality to MGA.

[7] Mattel notes that, to the extent MGA was attempting to prove misappropriation through use, it did not prove that Mattel "impaired [the misappropriated information's] commercial benefit to [MGA]." Mot. at 24:21-23 (citing *Gibson-Homans Co. v. Wall-Tite, Inc.*, 1992 WL 512411, at *11-12 (C.D. Cal. Oct. 27, 1992)). But that was precisely the conclusion that a reasonable jury could have reached on the basis of the evidentiary record discussed above.

17

memoranda and correspondence that lauded the conduct at issue, they conceded that Mattel benefitted from the conduct at MGA's expense.

### D.     Remedies

CUTSA entitles a claimant to recover the damages it suffers as a result of the misappropriation of its trade secrets as well as the difference in value between its damages and the misappropriator's unjust enrichment. Cal. Civ. Code § 3426.3(a). Many of the arguments Mattel makes in support of its challenge to this prong are mislabeled as challenges to the proof of "misappropriation." In short, Mattel argues that (1) there was no evidence that Mattel designed a product on the basis of any of the 26 categories of misappropriated trade secret information; and (2) the jury's eventual damage award had no support in the evidentiary record and was, at least in part, predicated upon the unreliable testimony of MGA's damages expert. Because the second argument asks the court to consider not what a hypothetical reasonable jury could find but, instead, what the jury in this case actually found, it must be evaluated under the Rule 59 new trial standard. *Cf. Litton Sys., Inc. v. Honeywell, Inc.*, 1996 WL 634213, at *4 (C.D. Cal. July 24, 1996) (denying motion for judgment as a matter of law but granting limited new trial because there was "no rational basis on which the jury could have reduced Litton's 'lump sum' damage estimate to account for Litton's losses attributable to conduct excluded from the jury's consideration").

Mattel's first argument rests on two false premises: (1) that MGA only attempted to prove that Mattel was "unjustly enriched" by its misconduct; and (2) that MGA restricted its proof of Mattel's unjust enrichment to the theory that "Mattel used MGA's information in 'matching' Mattel products, leading to 'head start' damages." Mot. at 23:22-24:1, 26:1-3. But a reasonable jury could have concluded that MGA suffered actual damage as a result of Mattel's misappropriation, separate and apart from any unjust enrichment by Mattel. MGA's Chief Executive Officer testified that MGA required retailers to keep confidential the company's advertising plans information, in order to prevent competitors from undercutting sales through "direct head-to-head competition." Trial Tr., dated March 24, 2011, Vol. II, at 112:19-24.

Mattel's misappropriation of such information, he testified, would mean "lost sales[,] lost profit[, and] lost shelf space" that would ultimately "financially hurt" MGA. *Id.* at 131:12-25.

MGA's Chief Executive Officer's testimony also contradicts Mattel's claim that product "matching" is the only vehicle for unjust enrichment. He testified about how Mattel could profit from information about its competitors' unreleased products, regardless of whether it used that information to design "matching" products. Mattel, he explained, could use advertising information to "adjust their marketing plan" and use freight on board pricing information to "change their pricing." *Id.* at 112:18, 114:11-14. The internal Mattel email in which a senior executive commended a "Market Intelligence" employee corroborated this testimony. TX 27464-158. None of this evidence related to the development of "matching" products and, contrary to Mattel's argument, a reasonable jury could have concluded both that MGA suffered actual damage as a result of Mattel's misappropriation and that Mattel's unjust enrichment extended beyond profits from the sale of toys that mimicked MGA's unreleased products.

Even if the Court were to accept Mattel's restrictive view of MGA's claim, the evidence would still be sufficient. MGA's Chief Executive Officer discussed several changes to Mattel products following Mattel's exposure to information about MGA products, ultimately concluding (as a reasonable jury could have) that "there were too many coincidences." Trial Tr., dated March 24, 2011, Vol. II, at 117:2-3, 117:5-131:10 (discussing Bratz Winter Wonderland Collection, MyScene Chillin' Out, Bratz Formal Funk Super Stylin' Runway Disco, MyScene Sound Lounge, Bratz Motorcycle Meygan, MyScene Vespa, Bratz Petz, MyScene pets, AlienRacers, Acceleracers, Bratz Girls Nite Out, MyScene Day and Nite Chelsea and Madison, Bratz Forever Diamonds, MyScene Bling Bling, Flashback Fever, MyScene Roller Girls, 4Ever Best Friends, and Wee 3 Friends). Mattel successfully objected to MGA's attempt to elicit testimony about other, similar, acts of misappropriation during trial, *see id.* at 129:3-6, and now argues that MGA's failure to identify "matching" products for every one of the 26 at issue is fatal. This argument directly contradicts Mattel's position at summary judgment that "courts infer 'use' based on 'a web of perhaps ambiguous circumstantial evidence from which the trier

of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place.'" Mattel Opp. to MGA Motion for Partial Summary Judgment at 70:21-24 (citing *Uniram Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 943 (N.D. Cal. 2007)). Applying the rule discussed in *Uniram* , Mattel argued that "the proof of MGA's use of other stolen trade secrets, such as Bratz, leads to a permissible inference of use as to all the stolen trade secrets." Mattel Opp. to MGA Motion for Partial Summary Judgment at 71:9-11.

In all events, the jury did not need to rely upon circumstantial evidence of unjust enrichment because MGA's damages expert, Mr. James Malackowski, testified about the aggregate benefit to Mattel from the misuse of MGA's information. Recognizing that Mattel's MyScene line prospered as the "Market Intelligence" department continued to gather information about MGA's products, Mr. Malackowski estimated that Mattel obtained enhanced profits between $149 and $202 million. Trial Tr., dated April 4, 2011, Vol. III, at 49:8-15. That alone is enough for the claim to survive summary judgment and, therefore, judgment as a matter of law. *O2 Micro Int'l*, 399 F. Supp. 2d at 1072-75. But Mr. Malackowski also equipped the jury to assess unjust enrichment on a trade secret-by-trade secret basis. Trial Tr., dated April 4, 2011, Vol. III, at 49:13-15. Though his testimony bears greater relevance to the motion for a new trial than the motion for judgment as a matter of law, it permitted a reasonable jury to both conclude that Mattel was unjustly enriched and calculate that unjust enrichment with adequate specificity, in light of the maxim that "it does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 566-67, 101 S.Ct. 1923 (1981) (quoting *Hetzel v. Baltimore & Ohio R.R. Co.*, 169 U.S. 26, 39, 18 S.Ct. 255 (1898)).

## III.    Motion for New Trial

In addition to challenging the sufficiency of the evidence, Mattel also argues that the eventual verdict rendered by the jury was unfounded. A challenge to the jury's verdict must be evaluated under Rule 59, which authorizes the court to "grant a new trial on all or some of the

issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). The Court may grant a new trial if the jury's verdict is against the clear weight of the evidence. *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1372 (9th Cir. 1987).

Mattel argues that the jury's award of $88.5 million – the sum total of $3.4 million for the misappropriation of each of 26 categories of trade secrets – lacks evidentiary support. California courts have recognized the difficulty in ascertaining damages with precision and, therefore, consider proof of the existence of damage more important than proof of amount. *Stott v. Johnson*, 36 Cal.2d 864, 875 (1951). This case is no different, since Mattel's use of the improperly acquired pricing, advertising, and product development information often went undocumented (with the exception of TX 27464-158). Nevertheless, MGA's expert witness testified that Mattel generated approximately $3.4 million in profits from each instance of trade secret misappropriation. Contrary to Mattel's argument, the jury's reliance on his opinion (if at all) was proper, since he used sales data from a broad and representative cross section of Mattel MyScene products to reach conservative conclusions about the unjust enrichment that flowed from Mattel's acts of misappropriation. Moreover, the jury was instructed that Mattel's independent contributions to the success of its products did not qualify as "unjust enrichment," Mr. Malackowski's opinion offered some tools to deduct those amounts, and the Court assumes that the jury followed the instructions. *See Francis v. Franklin*, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965 (1985); *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702 (1987). That the jury calculated and awarded an average and uniform award for each act of misappropriation is not grounds for a new trial, especially since Mattel similarly failed to introduce specific evidence of harm for each of its claimed trade secrets and, in an earlier phase of this lawsuit, successfully defended a similarly imprecise jury award. *See Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1044 (9th Cir. 1988), *aff'd* 496 U.S. 543 (1990) (holding that damages award should only be disturbed if "clearly unsupported by the evidence"); *see also Chalmers v. City of Los Angeles*, 762 F.2d 753, 760 (9th Cir. 1985); *MCI Comm's v. American Telephone & Telegraph*, 708 F.2d 1081,

1161 (7th Cir.) ("Once causation of damages has been established, the amount of damages may be determined by a just and reasonable estimate as long as the jury verdict is not the product of speculation or guess work."), *cert. denied*, 464 U.S. 891 (1983).

Mattel separately argues that the jury's compensatory damage award must be remitted. "Where there is no evidence that passion and prejudice affected the liability finding, remittitur is an appropriate method of reducing an excessive award." *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1387 (9th Cir. 1987). Here, the jury awarded MGA $88.5 million in total damages on its claim for trade secret misappropriation, even though it concluded that each of the 26 instances of trade secret misappropriation by Mattel resulted in $3.4 million in damages. The award of $88.5 million is $100,000 larger than the sum total of the 26 individual awards of $3.4 million. To correct this apparent mathematical error by the jury, the Court remits the damage award to $88.4 million.

The Court further remits the $88.4 million award to $85 million because the jury may have twice awarded MGA a $3.4 million recovery for the misappropriation of information about a product called "Bratz Girls Nite Out." The special verdict form twice asked the jury to determine whether Mattel had misappropriated information about the product, in light of MGA's claim that information about the product was previewed at two toy fairs to which Mattel gained access. The Court considers remittitur proper, especially because the jury awarded the exact same amount – $3.4 million – for both instances of misappropriation, suggesting a duplicative award. *See Morrison Knudsen Corp. v. Ground Improvement Techniques, Inc.*, 532 F.3d 1036, 1079 (10th Cir. 2008) ("Where, however, the jury verdict cannot be explained by evidence in the record and duplication is apparent, 'the court, either sua sponte or on motion of a party, should reduce the judgment by the amount of the duplication,' and thereby prevent double recovery.") (quoting *Mason v. Okla. Tpk Auth.*, 115 F.3d 1442, 1459 (10th Cir. 1997)). In light of the Court's remittitur of the damages award from $88.5 million to $85 million, MGA is entitled to a new trial if it does not accept the damages award as remitted. *See Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983).

22

**IV.   Disposition**

For the foregoing reasons, the Court DENIES Mattel's Motion for Judgment as a Matter of Law and Mattel's Motion for New Trial.  The Court GRANTS IN PART AND DENIES IN PART Mattel's Motion for a Remittitur of the Damages Award and remits the award from $88.5 million to $85 million.  Within forty eight hours of the filing of this Order, MGA shall inform the Court in writing of whether it (1) consents to the remitted damages award; (2) seeks a new trial; or (3) plans to appeal the remittitur.

IT IS SO ORDERED.

DATED: August 4, 2011

DAVID O. CARTER
United States District Judge