# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTEL, INC., et al.<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>MGA ENTERTAINMENT, INC., et al.<br><br>　　　　Defendants.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 DOC (RNBx)<br><br>**O R D E R** GRANTING IN PART AND DENYING IN PART MGA ENTERTAINMENT, INC.'s APPLICATION FOR EXEMPLARY DAMAGES, ATTORNEYS' FEES AND COSTS |

　　　　Before the Court is MGA Entertainment, Inc. ("MGA")'s Application for Exemplary Damages, Attorneys' Fees, and Costs. MGA requests the imposition of exemplary damages equal to double the compensatory damage award on MGA's successful counterclaim-in-reply for trade secret misappropriation. The jury found that Mattel had misappropriated 26 categories of trade secret information and that the misappropriation was willful and malicious. After considering the moving, opposing, and replying papers, the evidence in the record, as well

as the parties' oral argument, the Court GRANTS IN PART AND DENIES IN PART the Application.

### A. Introduction

The California Uniform Trade Secrets Act (CUTSA) proscribes the misappropriation of information that has independent economic value from not being generally known and is the subject of reasonable efforts to maintain secrecy. Cal. Civ. Code § 3426.1. The remedy for misappropriation is the greater of (1) the victim's actual damages or (2) the misappropriator's unjust enrichment. *Id.*, § 3426.3. "If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice" the compensatory award. *Id.* Though the existence of willful and malicious misappropriation is ordinarily considered a fact that a jury must find by clear and convincing evidence, the court calculates the amount of exemplary damages. *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1078 (N.D. Cal. 2005); *see also Ice Corp. v. Hamilton Sundstrand Corp.*, 615 F. Supp. 2d 1266, 1268 (D. Kan. 2009) (noting that UTSA was modeled on federal patent law); *but see Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1111 (9th Cir. 2001) (suggesting that clear and convincing evidence is unnecessary).

Any award of exemplary damages is constrained by the Constitution's prohibition against "'grossly excessive' punishment on a tortfeasor." *BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 562, 116 S.Ct. 1589 (1996) (quoting *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 454, 113 S.Ct. 2711 (1993)). The award of exemplary damages must be tailored to "further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." 517 U.S. at 568 (citations omitted). The defendant must "receive fair notice not only of the conduct that . . . subjects him to punishment, but also of the severity of the penalty that [the] State [could] impose." *Id.* at 574-75. The award of exemplary damages must reasonably correspond with the reprehensibility of the misconduct, the harm or potential harm suffered by the plaintiff, and civil penalties authorized or imposed in comparable cases. *Id.*

CUTSA restrains the potential for "irrational and arbitrary deprivations of property," *see, e.g., id.* (exemplary damages award equal to 500 times the compensatory award), by limiting exemplary damages to twice the compensatory award. Cal. Civ. Code § 3426.3(c). To determine the proper measure of exemplary damages within CUTSA's statutory range, California courts consider common law factors traditionally used to determine both whether and to what extent exemplary damages are warranted. *Cloud & Associates, Inc. v. Mikesell*, 69 Cal. App. 4th 1141, 1151-53 (1999); *O2 Micro Intern.*, 399 F. Supp. 2d at 1079. Those factors are: (1) the nature of the misconduct; (2) the amount of compensatory damages; and (3) the defendant's financial condition. *See Neal v. Farmers Ins. Exchange*, 21 Cal.3d 910, 928 (1978); *Adams v. Murakami*, 54 Cal.3d 105, 111 (1991). Though not the only factors that can be considered in a trade secret misappropriation case, *see Biocore, Inc. v. Khosrowshahi*, 2004 WL 303194, at *4 (D. Kan. Feb. 2, 2004), both Mattel and MGA request their application here.

**B.    Discussion**

    1.    Nature of the Misconduct

The jury found, by clear and convincing evidence, that Mattel willfully and maliciously misappropriated MGA's trade secret information. Some courts treat a finding of willful and malicious misappropriation as support for the "maximum possible amount in exemplary damages." *O2 Micro. Intern.*, 399 F. Supp. 2d at 1079; *see also Lundquist v. Reusser*, 7 Cal.4th 1193, 1214 (1994) (recognizing relationship between malice and reprehensibility). But this approach strips the Court of its independent obligation to consider the facts and calculate an equitable and constitutionally sound exemplary damages award, especially since the other two California common law factors (amount of compensatory damages and misappropriator's net worth) are objective facts. *See Gore*, 517 U.S. at 562. The Court therefore performs an independent evaluation of the nature of Mattel's misconduct.

The largest exemplary awards are reserved for the most reprehensible acts. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419, 123 S.Ct. 1513. To determine if, and to what extent, misconduct is reprehensible, courts must consider whether: (1) the

misconduct caused physical harm; (2) the misconduct disregarded the health or safety of others; (3) the misconduct targeted a financially vulnerable party; (4) the misconduct was repeated; and (5) the harm resulted from intentional malice, trickery, or deceit, or mere accident. *Id.*

Because parties do not ordinarily expect that misdeeds that cause purely economic loss may expose them to severe exemplary penalties, economic misconduct is not generally reprehensible enough to support a large award of exemplary damages. *See Gore*, 517 U.S. at 577. The exceptions, of course, are cases involving "affirmative acts of misconduct" marked not just by malice, but a breach of basic commercial ethics and fraud. *Id.* So entrenched is society's expectation that exemplary damages are proper in such cases that statutes, including the UTSA, routinely provide for the recovery of exemplary damages in cases involving financial loss and put the public on notice of the bounds of such relief. *See, e.g.*, Cal. Civ. Code § 3294. Plaintiffs request exemplary relief in cases involving purely economic loss, *see, e.g.*, Trial Tr., dated August 20, 2008, at 8168:14-16 (Phase 1(B) Closing Argument) ("You have an opportunity to teach him that if you get caught taking what is not yours, ***people won't just let you break even.***") (emphasis added),[1] courts recognize the availability of exemplary relief in cases involving economic loss, *see Planned Parenthood of Columbia/Willamette Inc. v. American Coalition of Life Activists*, 422 F.3d 949, 962 (9th Cir. 2005); *see, e.g., JPMorgan Chase Bank, N.A. v. KB Home*, No. 2:08-CV-01711 PMP RJJ, 2010 WL 3862088, at *7 (D. Nev. Sept. 27, 2010), and exemplary damages have been awarded in cases involving economic loss at ratios much higher than the 2:1 ratio MGA seeks here, *see, e.g., TXO Production Corp.*, 509 U.S. at 460-61.

---

[1] *See also* Trial Tr., dated July 23, 2008, at 5468 (arguing for deterrence); Trial Tr., dated August 20, 2008, at 8167:5-8 (arguing that malice was present in case involving purely economic loss because defendants "didn't care about injuring" plaintiff); *id.* at 8167:13-25 (arguing that alleged cover-up activity constituted oppressive conduct that should have been remedied by exemplary award); *id.* at 8168:6-11 (arguing that restricting relief in economic loss case to compensatory damages incentivizes defendant to repeat wrongdoing); *id.* at 8168:18-20 (arguing that defendants that cause economic injury should be taught "a lesson" and the amount of exemplary damages should be based upon "how much money they have"); *id.* at 8170:8-9 ("Crime doesn't pay; shouldn't pay.").

4

Nevertheless, though exemplary damages equal to twice the compensatory award *may* be awarded in cases involving purely economic loss, such an award is not justified here.

Mattel's conduct fell far short of basic ethical standards. For years, the company's senior management encouraged employees to use false pretenses to access competitors' private displays at international toy fairs and improperly acquire competitive information, including price lists, advertising plans, and unreleased product attributes. Mattel disseminated the improperly acquired information through internal memoranda, *see, e.g.*, TX 9275, and company-wide presentations, *see* Trial Tr., dated March 22, 2011, Vol. I, at 31:2-7; praised the employees that committed the wrongdoing, *see* TX 27464-158; used MGA's trade secret information to preempt MGA's unreleased products, *see, e.g.*, TX 8751, and reaped $85 million in unjust enrichment. These "market intelligence" tactics were intentional, pervasive, long-standing and egregious; indeed, Mattel's hierarchy admitted at trial that the information had value, *see* Trial Tr., dated March 18, 2011, Vol. I, at 114:21-22, and that its acquisition was wrongful, *see* Trial Tr., dated March 30, 2011, Vol. I, at 43:24-44:8,[2] while making unfulfilled pronouncements about future corrective action against the attorneys, executives and employees that encouraged or concealed the misconduct, *see* Trial Tr., dated April 1, 2011, Vol. I, at 50-52. Faced with competition and innovation that it "didn't relish," *Mattel*, 616 F.3d 904, 907 (9th Cir. 2010), Mattel resorted to nefarious tactics in an attempt to cling to its market position.

Society has an interest in deterring reprehensible conduct of this kind. But that interest in deterrence is not at its strongest here, since other members of the close-knit toy industry have been alerted to Mattel's misconduct as a result of this litigation and are likely to cast a wary eye towards their competitor in the future. Nor does Mattel's use of cheap fake business cards, silly nicknames, and amateurish tactics in a futile effort to stave off legitimate

---

[2] Mattel argues that its employees could not have been aware that the information they misappropriated from MGA's showrooms qualified as trade secrets. The jury heard this argument and rejected it by finding that Mattel engaged in willful and malicious misappropriation.

competition evoke a strong desire to punish. That one of California's largest companies abandoned innovation and resourcefulness for bumbling fraud evokes disappointment instead.

### 2. Compensatory Award

The second factor identified by the Supreme Court in *Gore*, as well the California Supreme Court in *Neal*, refers to the relationship between the compensatory damages award and the proposed exemplary award. Mattel argues that awards of exemplary damages and compensatory damages share an inverse relationship. To the contrary, the California Supreme Court has made clear that compensatory damages and exemplary damages should share a direct relationship, *Neal*, 21 Cal.3d at 928, such that a low compensatory award in a trade secret misappropriation case cannot trigger the "maximum possible amount in exemplary damages," *O2 Micro Intern.*, 399 F. Supp. 2d at 1079. Though the Ninth Circuit in *Planned Parenthood* held that an extremely high ratio of exemplary damages to compensatory damages may be appropriate in cases involving "particularly egregious" behavior and "insignificant economic damages," it nevertheless acknowledged that, as a general matter, a proper exemplary damages award can equal four times the compensatory damages award. *See* 422 F.3d at 962 (citing *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003)).

The jury awarded MGA $88.5 million in compensatory damages, an amount this Court has since remitted to $85 million. Both parties agree that the award was large. The Court is aware of no precedent that prohibits the doubling of this amount and, in fact, the case law suggests that a quadrupling meets constitutional scrutiny even if the "behavior is not particularly egregious." *Planned Parenthood*, 422 F.3d at 962.

### 3. Mattel's Net Worth

"[D]eterrence will not be served if the wealth of the defendant allows him to absorb [an exemplary damages] award with little or no discomfort." *Neal*, 21 Cal.3d at 928. The California Supreme Court has encouraged courts to hew to the historic norm that exemplary damages not exceed 10% of a defendant's net worth. *See Store Services v. Oosterbaan*, 214 Cal. App. 498, 514-16 (1989) (citing *Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.*, 155 Cal. App.

3d 381, 393-96 (1984)). The exemplary damages award in this case will amount to approximately 3.6% of Mattel's net worth and, therefore, will not come close to violating the California Supreme Court's instruction.

### 4. Disposition as to Exemplary Damages

In many other cases, the maximum statutory award of exemplary damages would be warranted, since all of the factors identified by the United States Supreme Court and California Supreme Court appear to have been satisfied. The jury found Mattel's conduct reprehensible and the evidence confirmed that Mattel encouraged its employees to consistently violate the California Uniform Trade Secrets Act. Mattel's employees admitted that the company benefitted from the misappropriated information and the jury concluded that Mattel's conduct resulted in tens of millions of dollars in harm. Finally, Mattel's high net worth suggests that a high award of exemplary damages is necessary to deter future misconduct, and trade secrets laws adopted by states across the country provide for exemplary damages equal to twice the compensatory award.

However, Mattel's conduct does not represent the most reprehensible form of trade secret misappropriation imaginable. It was silly, not evil, and it diminished in 2005. The need for deterrence is absent because the outcome of this litigation and other toy companies' knowledge about Mattel's pattern of misappropriation will preclude Mattel, or other any toy manufacturer, from engaging in this type of conduct again. Even recognizing its maliciousness, the conduct should not be punished by the largest exemplary damage award available. The Court instead awards MGA $85 million in exemplary damages – an amount equal to the remitted compensatory damage award.

### 5. Recovery of Reasonable Attorneys' Fees

MGA is also entitled to recover the reasonable attorneys' fees and costs it incurred to prosecute Mattel's willful and malicious misappropriation of trade secrets. Cal. Civ. Code § 3426.4. Those costs include "a reasonable sum to cover the services of expert witnesses, who are not regular employees of any party." *Id.* Though the award of fees is not automatic, *see O2*

*Micro Intern.*, 399 F. Supp. 2d at 1080, it is equitable in cases against well-funded defendants that commit acts of misappropriation that undermine legitimate competition and innovation. Mattel's profits from its acts of misappropriation far exceeded the costs MGA incurred in prosecuting this lawsuit, and any incentive to misappropriators must be eradicated through the award of fees, in addition to an award of exemplary damages.

      Mattel does not contest the reasonableness of MGA's attorneys' hourly rates or time allocation, but instead argues that MGA is not entitled to recover fees and costs incurred prior to the filing of its claim. However, there is nothing in Cal. Civ. Code § 3426.4 that "limits fee awards to work performed after the complaint is filed in court," *cf. Webb v. Bd. of Educ. of Dyer County, Tenn.*, 471 U.S. 234, 250-51, 105 S.Ct. 1923 (1985) (Brennan, J., concurring in part and dissenting in part) (citations omitted), and the equities in this case do not support a categorical exclusion of fees incurred prior to the formal filing of MGA's counterclaim-in-reply for trade secret misappropriation. Fees spent on pre-filing activities may be recoverable if they were "reasonably expended on the litigation." *Id.* at 243. That does not include time spent on separate legal proceedings, like an administrative complaint or (in this case) the prosecution of marginally related trade dress allegations, but it does include time spent preparing "the initial pleadings and the work associated with the development of the theory of the case." *Id.* It can also include hours spent on pre-filing factual investigation that are "equivalent to the time that would have been spent" later in the litigation. *See id.* at 243 n. 19; *see also North Carolina Dep't of Transp. v. Crest Street Cmty Council*, 479 U.S. 6, 15, 107 S.Ct. 336 (1986) ("[T]he discrete portion of the work product from the administrative proceeding that was both useful and of a type ordinarily necessary to advance the civil rights litigation . . . can be part of the attorney's fee award under § 1988."); *Sierra Club v. U.S. E.P.A.*, 625 F. Supp. 2d 863, 869-71 (N.D. Cal. 2007) ("[T]he court may award attorneys' fees for pre-litigation work that is necessary to the filing of an action.").

      Contrary to MGA's argument, most of the time spent on its affirmative claims between 2004 and 2010 did not advance its successful claim for trade secret misappropriation.

MGA's allegations about Mattel's unfair competitive practices had nothing to do with its claim for trade secret misappropriation; those claims instead alleged Mattel's manipulation of retailers, licensees, and other industry groups that did business with MGA. MGA's allegations about trade dress infringement by Mattel also bore little relationship with the claim for trade secret misappropriation, since the legal theories underlying those claims are distinct from trade secrets law. Nevertheless, some of the factual investigation performed by MGA's attorneys between 2007 and 2010 helped lay the foundation for its claim that Mattel mimicked unreleased MGA products through the use of misappropriated information.

Early in this litigation, MGA informed its attorneys that several Mattel products bore an uncanny resemblance to recently released MGA products. MGA's outside counsel duly investigated that claim, though they could not discover the underlying reasons. Nevertheless, at least some of the factual research conducted during that time period, especially the product comparisons, helped substantiate MGA's claim at trial that Mattel caused over $85 million in harm through misappropriation. *See* Trial Tr., dated March 24, 2011, Vol. II, at 117:5-131:10 (testifying about similarities between MGA's unreleased products and Mattel products); *see also id.* at 112:19-131:25 (testifying about the damage to MGA from Mattel's misappropriation of trade secret information).

Having reviewed the billing records submitted by MGA in connection with this Application, the Court concludes that MGA reasonably expended $2.52 million on its claim for trade secret misappropriation. Because MGA's counsel did not "block bill" after December 2007[3] and clearly identified the amount of time spent on each task, the Court has excluded the hundreds of hours MGA's attorneys spent investigating and prosecuting its unsuccessful claims that Mattel (1) infringed MGA's trapezoidal packaging; (2) interfered with MGA's business

---

[3] MGA's attorneys attempted to log hours for affirmative and defensive claims in separate invoices but, in rare instances, the invoices overlapped. For instance, an invoice prepared by the firm of Orrick, Herrington & Sutcliffe LLP that purports to cover hours dedicated to MGA's "defensive" case in September 2010 logs numerous entries relating to MGA's prosecution of its trade secret misappropriation counterclaim. The Court has accordingly examined all of the invoices prepared by MGA's attorneys and identified entries that expressly refer to time expended on the litigation of MGA's successful claim.

relationships; and (3) pursued a wrongful injunction. The amount awarded is limited to the time spent (1) investigating Mattel's mimicry of unreleased products, (2) preparing a pleading containing claims arising out of Mattel's access to MGA's trade secret information, (3) discovering evidence over the final months of 2010, (4) successfully opposing Mattel's dispositive motions, and (5) prosecuting the trade secret misappropriation claim at trial.

MGA's attorneys spent approximately 3,620 hours litigating the claim for trade secret misappropriation. Most of these hours cover work performed after the filing of the claims in August 2010. Before the claims were filed, MGA's attorneys spent approximately 430 hours performing factual investigation, revising multiple drafts of the claims, and researching an assortment of legal issues. Following the claims' filing, MGA's attorneys performed routine tasks relating to document review, depositions of key witnesses, preparation of briefs, oral arguments, and ultimately trial. A conservative fee rate of $600 dollars per hour (MGA's attorneys' average hourly rate exceeded that amount) yields a total fee award of $2,172,000. The Court further concludes that MGA reasonably expended approximately $350,000 in costs for the litigation of its claim.

Finally, Mattel argues that any attorneys' fee award must be apportioned to reflect MGA's partial success on its trade secret misappropriation claim. MGA claimed that Mattel misappropriated 114 categories of trade secret information, but the jury only found proof of misappropriation as to 26. The billing records reveal, however, that counsel's work was predominantly dedicated to common issues of proof for the claim, namely evidence that Mattel operated a market research department, the identity of employees that worked for the department, their activities, participation by high ranking members of Mattel's corporate hierarchy, the measures taken by MGA to maintain the confidentiality of information at its showrooms, and the market-related consequences of Mattel's misconduct. MGA proved all of these predicate facts at trial and, in addition, proved by clear and convincing evidence that Mattel acted willfully and maliciously. *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933 (1983). Though MGA did not obtain an unblemished outcome, it cannot be disputed that

an $85 million award and a finding of malice represents a significant victory, and that MGA is therefore entitled to the fees it incurred prosecuting the underlying trade secrets claim. *See Twentieth Century Fox Film Corp. v. Entm't Distributing*, 429 F.3d 869, 884 (9th Cir. 2005) ("Plaintiffs are to be compensated for attorney[s]' fees incurred for services that contribute to the ultimate victory in the lawsuit. . . . Rare, indeed, is the litigant who doesn't lose some skirmishes on the way to winning the war.") (quoting *Cabrales v. Los Angeles*, 935 F.2d 1050, 1052-53 (9th Cir. 1991)).

### C. Disposition

The jury's finding of willful and malicious misappropriation triggers MGA's entitlement to exemplary damages and reasonable attorneys' fees and costs under CUTSA. For the foregoing reasons, the Court concludes that both forms of relief are proper, because Mattel's conduct was reprehensible and harmful. The Court accordingly awards MGA $85 million in exemplary damages, $2,172,000 in reasonable attorneys' fees, and $350,000 in costs.

IT IS SO ORDERED.

DATED: August 4, 2011

_____
DAVID O. CARTER
United States District Judge