1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3          **SOUTHERN DIVISION AT SANTA ANA**

4          HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6

   CARTER BRYANT,                    )
7                                    )
                  PLAINTIFF,         )
8                                    )
            vs.                      ) CV NO. 04-9049-DOC
9                                    )
   MATTEL, INC.,                     )
10                                   )
                  DEFENDANT.         )
11  _____ )

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                SANTA ANA, CALIFORNIA

16            THURSDAY, DECEMBER 17, 2009

17                    7:29 P.M.

18

19

20

21          **DEBORAH D. PARKER, CSR 10342**
            **OFFICIAL COURT REPORTER**
22          **UNITED STATES DISTRICT COURT**
            **411 WEST FOURTH STREET**
23          **SUITE 1-053**
            **SANTA ANA, CALIFORNIA 92701**
24          **(714) 542-8409**
            **D.PARKER@IX.NETCOM.COM**

25

```
 1    APPEARANCES OF COUNSEL:

 2         FOR THE INTERVENOR DEFENDANT, MGA ENTERTAINMENT,
           INC.:
 3
                              THOMAS S. MC CONVILLE
 4                            ORRICK HERRINGTON & SUTCLIFFE, LLP
                              4 PARK PLAZA
 5                            SUITE 1600
                              IRVINE, CALIFORNIA 92614
 6                            (949) 567-6700

 7
                              ANNETTE L. HURST
 8                            ORRICK HERRINGTON & SUTCLIFFE, LLP
                              THE ORRICK BUILDING
 9                            405 HOWARD STREET
                              SAN FRANCISCO, CALIFORNIA 94105
10                            (415) 773-4585

11
           FOR THE DEFENDANT, MATTEL, INC.:
12
                              JOHN B. QUINN
13                            QUINN EMANUEL URQUHART OLIVER &
                              HEDGES, LLP
14                            865 S. FIGUEROA STREET
                              10TH FLOOR
15                            LOS ANGELES, CALIFORNIA 90017
                              (213) 624-7707
16

17
           FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:
18
                              ALEXANDER H. COTE
19                            SCHEPER KIM & OVERLAND LLP
                              ONE BUNKER HILL
20                            601 WEST FIFTH STREET
                              12TH FLOOR
21                            LOS ANGELES, CALIFORNIA 90071
                              (213) 613-4660
22
           ALSO PRESENT:
23
              DREW HANSEN, ATTORNEY, DISCOVERY REFEREE
24

25
```

3

```
1            SANTA ANA, CALIFORNIA; THURSDAY, DECEMBER 17, 2009;

2                           7:29 P.M.

3            THE COURT:  Okay.  Counsel in the Mattel Bratz

4    matter, if you would make your appearances, please.

5            MR. QUINN:  Good evening, your Honor.

6            John Quinn appearing for Mattel.

7            THE COURT:  Good evening.

8            MR. COTE:  Alexander Cote, for Gustavo Machado.

9            THE COURT:  Good evening.

10           MS. HURST:  Annette Hurst for MGA parties.

11           THE COURT:  Good evening.

12           MR. McCONVILLE:  Tom McConville as well, your

13   Honor.

14           THE COURT:  All right, Counsel.  Where's my

15   discovery referee?

16           Excellent.

17           MR. HANSEN:  Right here, your Honor.

18           Do you want me to come over?

19           THE COURT:  Yeah, if you would.  Why don't you

20   just come up and have a seat.  I may have questions for you.

21           I think you alerted the Court to a couple of

22   issues.  But let's -- I don't care which party starts.  I

23   understand that there are concerns with 30(b)(6) witnesses

24   on both sides.

25           Mr. Quinn?
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              MR. QUINN:  I'd be happy to start, your Honor.

 2              We do have an issue regarding the testimony of the

 3    30(b)(6) witness for MGA de Mexico.  MGA Mexico produced a

 4    stack of Mattel trade secret documents under its own Bates

 5    numbers.  And we've been trying to get testimony to

 6    establish where these documents came from, why they had

 7    them, what use was made of them, who kept them, those types

 8    of questions.

 9              I mean, we -- we're confident, we believe, I'll

10    represent to the Court, that these are copies of the

11    documents that were seized by the Mexican authorities from

12    the MGA de Mexico offices.  But we've been trying to

13    establish that in an evidentiary way.

14              We've been provided with a 30(b)(6) witness who is

15    a detective, who is basically -- his preparation was that he

16    was put in a room with the documents, he read the documents,

17    and he spoke with six MGA de Mexico employees, and that's

18    it.

19              He cannot answer any of the questions that, you

20    know, we need answers to, like where did they come from,

21    what are they, what use was made of them, where are they

22    kept, any type of chain of custody types of questions.  He

23    cannot answer any of these questions.

24              There were 30, as we understand it, MGA de Mexico

25    employees there at the time the Mexican police executed a
```

1    search warrant.  He only spoke to those six.  Not clear as

2    to why he only spoke to those six.

3              We believe these three -- these -- this stack of

4    documents was brought over from Mattel Mexico to MGA

5    de Mexico by three Mattel employees who moved, and they are

6    defendants.  He did not speak to them.  We understand that

7    the position of MGA is they're former employees.  But there

8    is ample case law, your Honor, that you have an obligation

9    that's necessary in responding to a 30(b)(6) notice to

10   educate your witness by speaking to former employees.

11             We're told by counsel that -- the representation

12   was made to us, *Well, if you speak to the witnesses, you*

13   *won't get anything because they're just going to take the*

14   *Fifth.*  That may or may not be, but fine, your Honor, we --

15   we need that testimony.  We need somebody to go talk to them

16   and report that they took the Fifth.

17             So basically, we have a witness who can't help us

18   at all with this basic problem about these documents that --

19   our documents that were produced by MGA under MGA Bates

20   numbers which we're confident came from this execution of

21   the Mexican authorities' search warrant at MGA de Mexico's

22   offices, but we're frankly in a position with this witness

23   where we can't make any progress at all in establishing the

24   evidentiary foundation or getting answers to the most basic

25   questions.

```
1              THE COURT:  Counsel on behalf of MGA.

2              MS. HURST:  Thank you, your Honor.

3              The investigator spoke with every current employee

4    of MGA de Mexico.  We have absolutely no problem instructing

5    him to continue his investigation and attempting to contact

6    all former employees.

7              THE COURT:  This is going -- was this represented

8    to Mattel?

9              MS. HURST:  Your Honor, I have said it in a

10   variety of contexts in the last couple of days.

11             THE COURT:  Yes or no?

12             MS. HURST:  Yes.  We will -- all we want to do

13   that -- well, two things:  First, we want to know that the

14   same standard is going to apply to Mattel, and this raises

15   the issue we have to their 30(b)(6) witness who's been --

16             THE COURT:  This isn't a bargaining session.

17   Let's finish one at a time.

18             MS. HURST:  Understand, your Honor.

19             The second issue is Mr. Machado, and his counsel

20   is here to address that.  We understand that Mr. Machado,

21   that one of the people whom our investigator would contact

22   and who is most likely to have the pertinent information,

23   because to the extent that we have an understanding what

24   occurred here, it was that any documents that were seized

25   came from Mr. Machado's office.
```

```
 1              We understand, therefore, that Mr. Machado would

 2    be most likely -- who is a counter-defendant in this

 3    lawsuit -- to have the relevant information that they're

 4    seeking.

 5              Mr. Machado is, as I understand it, willing to

 6    speak with our investigator and come and testify again in

 7    deposition in this case and at trial in this case without

 8    assertion of the Fifth Amendment if the Court will issue an

 9    order overruling his Fifth Amendment assertion.  And so,

10    really, we would like to provide the information.  We would

11    like Mr. Machado to talk to our investigator.

12              THE COURT:  What grounds do I have to overrule his

13    Fifth Amendment assertion?

14              MS. HURST:  They have no reasonable basis to

15    believe he is the subject of prosecution at this time.

16              THE COURT:  Does Mr. -- who represents

17    Mr. Machado?

18              MS. HURST:  Mr. Cote, who is here tonight,

19    represents Mr. Machado, your Honor.

20              THE COURT:  Mr. Cote, what's your position?

21              MR. COTE:  That is our position, your Honor.  We

22    originally asserted the Fifth Amendment because of a nexus

23    in the allegations of the complaint with what we understood

24    to be an ongoing investigation by the United States Attorney

25    in this district as well as a nexus for those allegations
```

8

1    and property that Mattel has alleged is located in

2    California, into Arizona.

3              We're now satisfied that there is no investigation

4    or prosecution pending in the district.  We have no

5    information about any such investigation or prosecution in

6    California or Arizona at this time.

7              THE COURT:  Who does Mark Overland represent?

8              MR. COTE:  He represents Mr. Machado with me, your

9    Honor.

10             THE COURT:  He represented last time that this

11   might resolve within a week or two and it was simply too

12   early but his client might be taking a better position, from

13   his standpoint.  So that has come to fruition which is --

14             MR. COTE:  What you're hearing tonight is that

15   reconsideration, your Honor.

16             THE COURT:  Yeah.  Yeah.

17             Mr. Machado, where is the gentleman?

18             MR. MACHADO:  He's not here, your Honor.  He's in

19   Mexico.

20             THE COURT:  Oh, he's in Mexico.  I can't get him

21   tonight?

22             MR. MACHADO:  Not tonight.

23             THE COURT:  Not tonight.  I think he would need to

24   be present, wouldn't he, if I --

25             MR. MACHADO:  Certainly.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              THE COURT:  -- make that finding that the Fifth

 2    Amendment does not apply?  And I think he has the right to

 3    assert and in a sense tacitly waive that.

 4              I feel a little reluctant to do that when he's out

 5    of this jurisdiction, but it would seem as a courtesy that

 6    we should schedule the deposition the same day he's -- we're

 7    doing that so he can be deposed on the same day.

 8              MR. COTE:  Makes sense, your Honor.

 9              THE COURT:  Okay.  And so let's just discuss

10    Mr. Machado for a second, because it doesn't resolve our

11    problem and it's a little askew from where we started, but

12    when do you think you could tell me the best available date

13    for his presence in this court and then at deposition that

14    immediately followed?

15              MR. MACHADO:  We can get that information --

16              THE COURT:  Tomorrow, excellent.  By 2:00 o'clock?

17    Perfect.  Thank you.  2:00 o'clock.

18              MR. MACHADO:  I don't know if I'll be able to

19    reach him by then, but I'll do my best, your Honor.

20              THE COURT:  Well, you will.  You'll accomplish it.

21    Thank you.  2:00 o'clock Friday.

22              All right now --

23              MS. HURST:  Your Honor, then I would just request,

24    if possible, just as a scheduling matter, that the Court

25    would permit that Mr. Machado's deposition proceed first,
```

1    and then if Mattel is satisfied --

2              THE COURT:  Mattel's never going to be satisfied.

3              MS. HURST:  You never know, your Honor.

4              THE COURT:  No.  No.  Mattel is not going to be

5    satisfied.

6              MS. HURST:  All right, your Honor.

7              THE COURT:  And -- and -- but perhaps there's no

8    reason for Mattel to be satisfied nor MGA to be satisfied

9    right now.

10             MS. HURST:  All right.

11             THE COURT:  So let's leave that on the table as we

12   go.  Let's go back to the original problem.

13             Courts, in my opinion, should not tell the parties

14   what to do.  Our power is not in making orders that

15   potentially won't be obeyed.  By the same token, I have the

16   ultimate power on the backside in terms of adverse

17   inferences.  So this doesn't present a problem to me.  But I

18   do think, you know, tentatively that that hasn't been a

19   significant enough effort with six current employees.

20             The disappointment is that I thought that we had

21   the right 30(b)(6) witness the first time around, and I'm

22   going to say again I told you so.  What really occurred with

23   the 30(b)(6) is we had a 30(b)(6) employee who was there

24   with the majority of the people who were employed.  And then

25   because of the allegation that she was going to -- what?

```
 1    Not waive?  She was going to -- help me.

 2              MR. COTE:  Waive the trade secrets, your Honor?

 3              THE COURT:  Yeah.

 4              MR. COTE:  Is that what the Court is referring to?

 5              THE COURT:  Yeah.  Yeah.

 6              We never really put her in that position.  In

 7    other words, we never formally required her to do that, to

 8    make that choice.

 9              I don't want to threaten MGA with an adverse

10    inference at this time, although I was drafting one that

11    would be equally unacceptable to each of you because I

12    anticipate that shortly Mattel may be in the same position.

13    You just might be the first out of the box with this

14    problem.  I can't foresee it.  But obviously it's not

15    enough.

16              How we resolve that, I leave to you to begin with

17    because I'll resolve that later if I need to.  But I've been

18    pushing each of you pretty hard.  It's obvious what's going

19    to occur.  And so why don't you tell me the solution -- your

20    best solution to it.

21              MS. HURST:  Your Honor, I would propose that

22    Mr. Small continue to contact every former employee at the

23    last known address information that MGA de Mexico has in its

24    possession, ask them about the documents the way he did all

25    of the six current employees, and then we'll make him
```

```
 1   available for further testimony on whatever he was able to
 2   learn.  We can't force them to talk to him, but if they do,
 3   we'll happily produce him to testify on whatever he learns.
 4            THE COURT:  I agree.  We all knew he was an empty
 5   vessel going in.  And so I'm going to leave that to your
 6   best wisdom, and you tell me an acceptable date when you
 7   think that he can conclude that so that we can go ahead with
 8   this 30(b)(6) witness.
 9            I also don't see any reason why we're not calling
10   back the prior 30(b)(6) witness from New Jersey and putting
11   her in the position of either -- well, I'll leave that to
12   your devices to begin with.  But I need some time schedules,
13   and I was scheduling tomorrow afternoon to talk to you about
14   this.
15            Now I've got another civil case that I'm trying to
16   be -- to fit in, but I'm not -- you're my first priority,
17   frankly.  We set tomorrow afternoon up for you and -- so
18   that doesn't resolve it.  It just says that I'm just not
19   satisfied at the present time with the six current
20   employees.
21            Why don't you discuss that with me tomorrow
22   afternoon.  There's no reason I need to make a decision
23   tonight.  I think you've offered the best solution, you
24   know, if in fact this agent is going to get going and
25   interview these people.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1           MS. HURST:  He can start immediately, your Honor.

2    He may have already started, I think.

3           THE COURT:  My guess is he has.  He's probably

4    professional.

5           MR. QUINN:  Your Honor, if I may.  It may be

6    relevant to this to note that this notice was originally

7    served two years ago when these individuals were still

8    employed, these three individuals.

9           THE COURT:  It's very relevant.  And if I was here

10   two years ago, I'd probably be in a much better position.

11   I've been on the case three and a half weeks or so, so

12   that's the end of the discussion.  Thank you very much.

13   We're not going back there.

14          MR. QUINN:  Your Honor, I'd point out there

15   apparently is an inventory of these documents that was

16   prepared we think by the police.  We don't know exactly.

17   They haven't shown this witness that inventory.

18          THE COURT:  Where is the inventory at?

19          MR. QUINN:  We understand -- we believe it's an

20   inventory of these documents --

21          THE COURT:  Where is the inventory located?

22          MR. QUINN:  We've been given a photocopy of it.  I

23   don't know where the original is.

24          THE COURT:  Well, prepared by who?  The Mexican

25   police?

1          MR. QUINN:  That's my understanding.

2          THE COURT:  Well, step back and talk to the source

3    of your understanding for a moment and tell me where they're

4    located.

5          MR. QUINN:  Your Honor, all I can say, it was

6    produced by MGA, that there is an inventory of these

7    documents produced by MGA.  I shouldn't say it was prepared

8    by the police because we don't know that.

9          THE COURT:  But their accusation is that you went

10   forward with the police, and it gets kind of convoluted who

11   has access to them and who doesn't since you brought this

12   suit down in Mexican.  So I expect to hear from your able

13   counsel that you've got equal access to them if you want

14   them.

15         MS. HURST:  Actually, I don't know what they're

16   talking about.  But if they think the document that should

17   be shown to our investigator and they're willing to identify

18   it for us by Bates number, we'll look at it.  We'll give it

19   to him.  If he thinks it's pertinent to his investigation,

20   then we'll do it.

21         THE COURT:  Do you want to go do that now?

22         MR. QUINN:  We can do that now, your Honor.

23         THE COURT:  Why don't you go step back and do it.

24   And let's give him the information on the record.

25         MS. HURST:  Maybe I can see the document

1    beforehand, your Honor.

2         MR. QUINN:  Your Honor, it's a document that was

3    produced.  It bears Bates numbers -- MGA Bates numbers

4    D438 --

5         THE COURT:  I'm sorry.  *D* like *dog*?

6         MR. QUINN:  Yes, your Honor.

7         THE COURT:  D?

8         MR. QUINN:  D, if I'm reading this right, 438.

9         THE COURT:  438 --

10        MR. QUINN:  596.

11        THE COURT:  -- 596 --

12        MR. QUINN:  Through --

13        MR. COTE:  Through?

14        MR. QUINN:  598.

15        THE COURT:  598.  Two pages.

16        MR. QUINN:  Well, that can't be right, your Honor.

17        MR. COTE:  Well, maybe we're up to 538,000 --

18    100,000 pages.

19        MR. QUINN:  I think that is right, your Honor.  I

20    think it is right.  It's 9697 --

21        THE COURT:  Just a moment.  You're burning up my

22    court reporter's hands.  You two can consult, come up with

23    the accurate record.

24        Rest your hands, Deborah.

25        *(Pause.)*

 1            THE COURT:  Anyway, copies can be made of those
 2   certainly.  Is that the only copy?
 3            MR. QUINN:  We've provided them with a copy, your
 4   Honor.  We also have a copy.
 5            THE COURT:  Good.  Now, we'll make the record
 6   then.  It's D4358596 through 598 that's being requested.
 7            MS. HURST:  That's fine, your Honor.
 8            THE COURT:  Now, having not thoroughly resolved
 9   that matter, but given direction, what's your next matter,
10   counsel?
11            MS. HURST:  Somehow my optimism is that it will be
12   fully resolved.
13            THE COURT:  It will.  It will be resolved, trust
14   me.  We're going to all get there.  There's a great saying
15   my wife has, *Some of our kids came through the front door,*
16   *some came through the back door, they all ended up in the*
17   *front room.*
18            MS. HURST:  Your Honor, I believe that the rest of
19   the issues are our issues.
20            MR. QUINN:  I have one more.
21            THE COURT:  Let's finish off with Mattel.
22            MS. HURST:  All right.
23            MR. COTE:  Okay.
24            MR. QUINN:  Your Honor, there are -- there's a
25   question regarding some interrogatories to Mr. Larian.  They

1    are really just two interrogatories that relate to his

2    ownership -- his interest, if any, in some of these

3    entities, Lexington and the like.  The Court will recall

4    that.

5              These are interrogatories that were served March 4

6    of 2009.  There was a discovery master order granted,

7    granting compelling responses August 14th, 2009.

8              THE COURT:  So it's --

9              MR. QUINN:  Circuit -- we don't have any

10   responses.  There was an appeal.

11             THE COURT:  Let's wait.  He comes back

12   January 4th, doesn't he?  Why don't you just ask him?

13             MR. QUINN:  It's an interrogatory, your Honor --

14             THE COURT:  I know that that's an interrogatory.

15   While he's coming back for a deposition, why don't you ask

16   him?

17             MR. QUINN:  Deposition he might say, *I don't*

18   *remember*.  Sitting here where he's answering an

19   interrogatory, there's an obligation to get information from

20   wherever it can be found.

21             THE COURT:  You're right.  You think you will have

22   it by January 4th?

23             MR. QUINN:  Your Honor, this is something that's

24   been pending for two years.

25             THE COURT:  Counsel, when did I come on the case?

1   I don't care what you did in the past.

2           Number two, I didn't choose to take this break.

3   All of you apparently agreed to let Mr. Larian go because of

4   the holiday, which I'm going to honor, but there's no reason

5   he couldn't have come back on December 26.  I mean, I'm

6   giving you that time off.

7           So you're showing graciousness towards Mr. Larian

8   as you are to Mr. Eckert.  I haven't met either of the

9   gentlemen.  I think I met Mr. Larian one time.  I don't care

10  if he's inconvenienced and I don't care if Mr. Eckert's

11  inconvenienced.  I'm not concerned that it's two years old.

12  I just care about the results.

13          So if he doesn't answer that question and has a

14  memory lapse, then maybe we should take it on January 4th

15  when he's here.  He's eventually going to answer it, isn't

16  he?

17          MR. QUINN:  It would be our hope, your Honor.

18          THE COURT:  He will.  Even if it's an *I don't*

19  *know*.  But he's going to answer it.

20          MR. QUINN:  Very well, your Honor.

21          THE COURT:  So I don't see that benefit of a

22  written interrogatory, although you're right technically and

23  we can chase that over the holiday season if you would like.

24  If you get an *I don't know* on the interrogatory, you're

25  going to get an *I don't know* at the deposition.  And if you

1    get an *I don't know* at the deposition, then we'll require

2    the interrogatory and he can put down *I don't know* again, or

3    he can answer it, okay?

4              MR. QUINN:  That's -- your Honor.

5              THE COURT:  So I just don't see -- I don't see the

6    rush on December 18th or tomorrow to frantically go after

7    Mr. Larian to get this done when it's two years old.

8              My question is why wasn't it done before?  But

9    that doesn't need a long explanation, because I don't care.

10   I'm new to the case.  It will get done.

11             Now, so far I'm not hearing anything that's of

12   grave consequence to me yet.  So let's turn to MGA.  I know

13   they have something earth-shattering tonight.

14             MS. HURST:  Your Honor, today Mattel 30(b)(6)

15   witness was designated on topics 6 through 9 regarding use

16   and disclosure of the alleged trade secrets by MGA.

17             THE COURT:  Okay.

18             MS. HURST:  And topic 13, the harm to Mattel

19   therefrom.

20             THE COURT:  Okay.

21             MS. HURST:  In order to prepare, the witness read

22   Mattel's interrogatory responses.

23             THE COURT:  Oh, I think the discovery master came

24   across and told me that -- I'm not sure -- today, yeah.

25             MS. HURST:  That is all --

```
 1              THE COURT:  He's kept me apprised, thank you, of
 2   what's going on.
 3              MS. HURST:  That is all the witness did.
 4              THE COURT:  That doesn't seem to be sufficient.
 5              MS. HURST:  It is not sufficient, your Honor.
 6              THE COURT:  It's not insufficient.  So how are we
 7   going to resolve that on behalf of Mattel?
 8              MS. HURST:  Personally, your Honor, I'd like --
 9              THE COURT:  Thank you very much.  Mattel is going
10   to be the first to suggest a solution just like you came up
11   with this one.
12              MS. HURST:  I appreciate that, your Honor.
13              THE COURT:  So give Mattel an opportunity to
14   resolve this first.
15              MR. QUINN:  Your Honor, may I have two seconds?
16              THE COURT:  Take as long as you want.
17         (Pause.)
18              MR. QUINN:  Your Honor, the issue here is we were
19   faulted in the deposition for not educating our 30(b)(6)
20   witness with their attorneys' eyes only documents, in other
21   words, documents produced by MGA --
22              THE COURT:  Oh, I see.
23              MR. QUINN:  -- that were produced to us and that
24   we didn't educate the witness because --
25              THE COURT:  Excuse me.  Because of attorneys' eyes
```

1    only, you couldn't show it to the witness.

2             MR. QUINN:  Yes.

3             THE COURT:  I understand.

4             MR. QUINN:  It conflicted with the clear terms of

5    the protective order, your Honor.

6             THE COURT:  Well, why don't we lift that?

7             MR. QUINN:  That can be done, your Honor, as long

8    as it's reciprocal and we -- it's a different --

9             THE COURT:  Certainly.  You know, I don't have a

10   great deal of reason to protect the prior protective orders.

11   In fact, I think that they were silly.  So why don't we just

12   lift them?

13            MR. QUINN:  That's fine, your Honor, as long as it

14   works both ways.

15            THE COURT:  It will work.  I'm not bargaining with

16   you.  We're lifting it now, and then we'll get to lifting

17   theirs.  Trust me, by the time we're done, I hope to lift

18   about 99 percent of them.  Remember this is just a doll.

19            MR. QUINN:  Understand.

20            THE COURT:  Eighteen to $35.  The doll hasn't been

21   to Vietnam, hasn't cured the Afghanistan problem, it hasn't

22   cured AIDS, it's done nothing for the swine flu.

23            MR. QUINN:  Or to stop global warming.

24            THE COURT:  Or to stop global warming, counsel.

25   So not to be concerned --

```
 1              MS. HURST:  Your Honor --

 2              THE COURT:  -- about protecting this great secret.

 3              MR. QUINN:  The one thing we wanted to make clear,

 4   your Honor, because this is an issue that came up in the

 5   Kuemmerle issue which I think was presented to your Honor

 6   before, by doing that on both sides, I assume we're not

 7   waiving trade secrets protection.  They wouldn't be waiving

 8   it.  We wouldn't be waiving it.

 9              THE COURT:  I'm not concerned, counsel.  That's

10   what you're hearing.  Wise counsel are going to get together

11   and solve this because I'm not going to protect your

12   companies.  I'm ready to lift all of these wonderful trade

13   secrets you've been trying to guard, and I hope you take

14   that back to your CEO's, and then you can take that up to

15   the Circuit.

16              MS. HURST:  Your Honor, we'd be happy to have the

17   protective order lifted immediately.

18              THE COURT:  Mm-hmm.

19              MR. QUINN:  I can't say that we would, your Honor.

20              THE COURT:  Well, make a call.  I know you have a

21   CEO who likes to work very hard.

22              MR. QUINN:  I know for a fact --

23              THE COURT:  Why don't you go get him on the phone.

24   I'll meet you here in half an hour, an hour.  Go call him.

25              MR. QUINN:  I can if your Honor wants me to.
```

```
 1              THE COURT:  I do.

 2              MR. QUINN:  I'll represent to the Court --

 3              THE COURT:  I do.

 4              MR. QUINN:  -- I know the answer as well.

 5              THE COURT:  Go ask him.  Because otherwise I'm

 6    going to just start lifting portions anyway, okay?  I'm

 7    telling you that.  So we don't have to have it blanket to

 8    begin with, but we're going to start lifting some of the

 9    things that really aren't critical.  And what I am seeing so

10    far is -- I'm not saying that this was abused, it was

11    overused.  And therefore it's hard for the Court to sort

12    out.

13              I wish these would have come to me originally.  I

14    would have been stringent, made you tell me on each occasion

15    why this needed a protective order.  And what happened is

16    they were filed as a matter of course.  So of course my

17    grandiose statement, which is not well-taken, I understand,

18    is that I'm inclined to lift these almost in total and start

19    over again and make you come to me specifically and tell me

20    why this is such a needed trade secret on an $18 to $35 doll

21    that's plastic.

22              MS. HURST:  Your Honor, if I may, I would like to

23    address the 35 --

24              THE COURT:  Well, we're not done yet.  We haven't

25    worked this out yet, have we?
```

```
 1              MS. HURST:  Your Honor --

 2              THE COURT:  This interrogatory.

 3              MS. HURST:  Your Honor, on the 30(b)(6) issue, I'm

 4    concerned because the looking at MGA's documents is only a

 5    small fraction of the problem that we faced here today.  Let

 6    me give the court an example.

 7              THE COURT:  No, no.  Specifics.  We're going to go

 8    through these one by one.  I'm not going to deal with great

 9    platitudes and make sweeping judgments.  We're going to go

10    through each of your needs until each night if you need to.

11              MS. HURST:  All right.

12              THE COURT:  We're only dealing right now with two

13    interrogatories.

14              MS. HURST:  Actually, your Honor, I think we're

15    talking about their 30(b)(6) witness was where we were in

16    the discussion.

17              THE COURT:  Okay.

18              MS. HURST:  All right.  Your Honor, we're talking

19    about their 30(b)(6) witness who only read the interrogatory

20    response to prepare for the deposition.

21              THE COURT:  And they read six interrogatories or

22    something?

23              MS. HURST:  Right.  And he's designated on five

24    topics.  And --

25              THE COURT:  Well, his complaint is they were
```

1    attorneys' eyes only so they couldn't be educated.

2          MS. HURST:  Well, that's what I wanted to address,

3    your Honor.  One of the facts set forth in the interrogatory

4    response as evidence of misappropriation of trade secrets

5    was that the three employees hurried out of the offices at

6    Mattel.  This is an example of what we face today, all

7    right?

8          So follow-up questions were asked about the idea

9    that they hurried out of the offices at Mattel.

10          Now, obviously this is information within Mattel's

11    control.  And no information could be given to sustain this

12    so-called fact in the interrogatory responses, like when did

13    they leave, were they escorted by security out of the

14    building, what perception was there that, you know, led to

15    this opinion that they were in a hurry.  No questions like

16    that could be answered, even though this is information

17    obviously exclusively within Mattel's control.

18          We're not talking about their failure to look at

19    our documents here.  We're talking about a much broader

20    systemic problem.

21          Another example, your Honor, on the harm topic,

22    the witness testified reading from the interrogatory

23    response, *We lost market share*.  That was it.  Couldn't

24    answer any other question related to that fact:  How much,

25    what products, how it related to the trade secret

```
 1   misappropriation.  No facts.  Obviously those are within
 2   their control.  They don't have to look at our documents.
 3            Now, surely we do have the issue about them
 4   looking at our documents.  And since the court ordered --
 5            THE COURT:  Where is this witness right now?
 6            MS. HURST:  I believe he was excused.
 7            THE COURT:  Well, put him on the stand.
 8            MR. QUINN:  He's in Irvine, your Honor.
 9            MS. HURST:  Your Honor, I think it would be a
10   waste of everyone's time to put him on the stand to say I
11   don't know some more.
12            THE COURT:  I haven't heard that yet.  I would
13   enjoy hearing I don't know.  So he's gone?
14            MR. QUINN:  He -- he is in Irvine.  He's not in
15   the immediate vicinity of the court right now, your Honor.
16            THE COURT:  How are we going to resolve this?
17            I will give Mr. Quinn the first opportunity just
18   like I gave you the opportunity to resolve, I want to give
19   Mr. Quinn the opportunity.
20            MR. QUINN:  Your Honor, what Ms. Hurst has
21   represented in terms of this witness' preparation is not
22   accurate.  In fact, this witness talked to some 20 people
23   and reviewed thousands of documents.
24            So an effort was made to -- we made a good faith,
25   fulfilled our obligations to educate this witness.
```

```
 1              THE COURT:  Now, assuming all that, how are we

 2    going to get this person educated enough to answer those

 3    simple questions?  I'm not saying it's not in bad faith or

 4    good faith.  I'm not going there.  I'm just looking for a

 5    resolution.

 6              MR. QUINN:  Your Honor, there's a witness by the

 7    name of Zalzman, Z-A-L-Z-M-A-N --

 8              THE COURT:  Zalzman.

 9              MR. QUINN:  -- who has testified on this issue of

10    these individuals leaving Mattel in a hurry.  He testified

11    for 20 to 25 pages on the basis --

12              THE COURT:  What does Zalzman say?

13              MR. QUINN:  Can I make that lifeline call, your

14    Honor?

15              THE COURT:  Yes.

16         (Pause.)

17              MR. QUINN:  Your Honor, Mr. Zalzman called these

18    individuals to a meeting and these individuals didn't want

19    to come to a meeting.  Part of the purpose of the meeting

20    was to deliver them their paychecks on the last day of work,

21    which is a requirement, and they didn't want to stick around

22    for their paychecks.  They didn't come to the meeting --

23              THE COURT:  Was that the answer?  Was that the

24    answer?

25              MR. QUINN:  Yes, your Honor.
```

```
 1              THE COURT:  Okay.  Now, why isn't MGA entitled to
 2    ask more than one witness that same question?
 3              MR. QUINN:  I think they are entitled to it, your
 4    Honor.
 5              THE COURT:  Second, why -- I think this is
 6    Mr. Storie; is that correct?
 7              MR. QUINN:  Yes, your Honor.
 8              THE COURT:  Why is that failure to study the
 9    "attorneys' eyes only" documents any different from
10    Ms. Kuemmerle's failure to do so in preparation for her
11    deposition?
12              MR. QUINN:  I think the difference is, your Honor,
13    Ms. Kuemmerle actually had possession of these documents.
14    They were at her desk.  So there's a distinction even in the
15    protective order between documents offered by or sent to a
16    witness.  And Ms. Kuemmerle actually had these documents at
17    MGA.
18              THE COURT:  Well, at some point, it becomes
19    ridiculous to have people continue to ask about how and why
20    people left.  But I'm not satisfied that MGA should be
21    limited to one person's explanation.
22              And how, once again, are we going to prepare
23    Mr. Storie to answer that question?
24              MR. QUINN:  Well, at a minimum, it looks like we
25    should show him Ms. Zalzman's testimony.
```

1          THE COURT:  I know --

2          MR. QUINN:  So if there's anything else that we

3    can do in that regard, we will do it, your Honor.

4          THE COURT:  Okay.  Now just a moment.

5          MS. HURST:  Does that mean I have to go back and

6    identify every question in the transcript where he said *I*

7    *don't know* to get all of those moved to compel?  Because --

8          THE COURT:  No.  Just ask him again.

9          MS. HURST:  Your Honor, this is -- we need some

10   kind of -- if I may, your Honor?

11         THE COURT:  No, no.  You may not.

12         MS. HURST:  The 20 witness --

13         THE COURT:  You just ask him again.  They're going

14   to prepare him and ask him.

15         MS. HURST:  All right.

16         THE COURT:  I don't know why you're going back.

17   It's just churning paper.  They're going to re-prepare him

18   and he's going to attempt to answer it.

19         MS. HURST:  Thank you, your Honor.

20         And is it fair to say that the Court's view

21   regarding preclusion of evidence will apply in this

22   context -- context equally to Mattel as it has --

23         THE COURT:  Oh, absolutely.

24         MS. HURST:  Thank you, your Honor.

25         THE COURT:  Adverse inference is my best weapon,

1    frankly.  Neither one of you want me to exercise that in

2    front of the jury.

3              MS. HURST:  Well, your Honor, we'd like to dispose

4    of these claims on summary judgment.  And we think --

5              THE COURT:  Thank you very much, counsel.  We're

6    not going there.

7              MS. HURST:  Thank you, your Honor.

8              THE COURT:  That's not going to get resolved.  And

9    if it does get resolved favorably to one party, so be it,

10   but I wouldn't count on it.  You're preparing for litigation

11   now.  And each of you should assume that you're going

12   forward.  On what, I'm not sure yet.

13             Now, MGA, you can't be done for this evening.

14   There's got to be more.

15             MS. HURST:  I'm afraid not, your Honor.

16             THE COURT:  Now, you notice I've given you all the

17   options to solve it first yourself.  I've got all the

18   weapons on the backside of this.  So I'm not concerned right

19   now.  These are not large problems.  They just need

20   re-education.  And the way you've been spending our last two

21   years, I'm not affronted that it's going to take a little

22   bit longer to re-prepare people.  This is a new court, a new

23   time.

24             Now, what aren't you satisfied with so far?

25             MS. HURST:  Your Honor, witnesses have not

```
1    prepared or have been instructed not to answer questions --
2              THE COURT:  Just a moment.  They feel the same way
3    about yours.
4              MS. HURST:  No.  On the specific issue, your
5    Honor, not what we've already been talking about now.  This
6    is a new issue.  Or have been instructed not to answer
7    questions on the grounds that they are related to phase I.
8              Your Honor --
9              THE COURT:  Well, give me an example.  What's the
10   question?
11             MS. HURST:  Well, for example, your Honor, in the
12   trade secret deposition that we were just talking about,
13   even though Mattel has an allegation that Bratz is part of
14   the trade secret misappropriation claims, in phase II the
15   witness was not prepared to talk about Carter Bryant's
16   departure from Mattel and the facts and circumstances
17   surrounding that, even though there's a brand-new claim of
18   trade secret misappropriation related to that in this phase
19   of the case.
20             THE COURT:  Well, this is really something that's
21   been troubling me also.  So let me ask both of you for your
22   wisdom.  Let's assume that the Ninth Circuit does not
23   reverse Judge Larson and we go forward on phase II and the
24   $100 million verdict is upheld.  Then your issue seems to be
25   moot, doesn't it?
```

            MS. HURST:  No, your Honor.  We have -- there's a

big problem here, and if I can try to summarize it in two or

three sentences.

            First of all, the elements of trade secret

misappropriation are different than the elements of

copyright infringement, and so the issues are somewhat

different.

            But second of all, we have in this phase of the

case in the RICO claim a criminal copyright infringement

predicate act.

            THE COURT:  That would seem to be relevant for

those purposes.

            MS. HURST:  Absolutely, your Honor.  And they keep

saying, well, *We got a verdict already*, but the problem is

the verdict said there was no willful infringement.  So

it's -- if the prior verdict is going to bind something,

then that should knock out the predicate act.

            THE COURT:  What's the hesitancy on Mattel's part

in re-answering that?  Because it's already been answered,

so we are spending more time, it seems.

            MR. QUINN:  Well, this is the issue, your Honor.

The question of should we designate a witness to educate

them about all the trade secrets that Carter Bryant took

with him, that was the subject of the first trial.  There

are, I don't know --

```
 1            THE COURT:  Why aren't we deposing Carter Bryant?
 2   Why are we going all the way around the problem with people
 3   who are educating -- getting educated about Carter Bryant?
 4   Where's -- why isn't Carter Bryant being deposed?
 5            MR. QUINN:  He could be deposed.
 6            THE COURT:  Why don't you just depose him?
 7            MS. HURST:  That's not going to answer the
 8   question.
 9            THE COURT:  It's a great start.
10            MS. HURST:  Yes, he should be deposed --
11            THE COURT:  He should be deposed before we get
12   into what I call the ancillary issues.
13            MS. HURST:  He should be deposed further -- let me
14   add this.  Mr. Larian answered many questions about phase I
15   in his deposition.  I didn't instruct him not to answer.
16   There was one question that came up that he had answered
17   35 times already in this case.  Mr. Bryant overruled the
18   objection and he answered it.  They're asking questions
19   about all kinds of phase I stuff.
20            THE COURT:  I would think it would be in Mattel's
21   benefit, and I don't know this for certain, that you would
22   be as open as possible on any potential evidence that bears
23   on the RICO claim.  And because -- I mean, after all, that's
24   something that you truly are seeking that might be a benefit
25   to you.
```

1           And the idea that in pushing that theory forward

2     there is any impression or insinuation that you are pushing

3     back from an inquiry about that leaves you in a very -- I

4     don't mean vulnerable position, but it just is a really

5     contradictory way to proceed when you're asking the Court

6     for this RICO, a civil RICO.  Let me repeat that, a civil

7     RICO.

8           Now, you know that there's a huge minority of the

9     courts that don't even believe civil RICO should exist.

10    So --

11          MR. QUINN:  Your Honor --

12          THE COURT:  -- I want to assume the opposite,

13    Mr. Quinn, and that is let's assume that the Circuit now

14    reverses Judge Larson.  We're off and running on a grandiose

15    trial just as fast as we can.  And I'm not going to be

16    spending very much time looking at, you know, your fifth

17    iteration of RICO.

18          MR. QUINN:  Understood, your Honor.

19          THE COURT:  Okay.  So if you really want that,

20    that's what I call the cat on the floor with the paws up in

21    the air.

22          MR. QUINN:  Your Honor, this is the question we

23    had in our mind.  On this issue of all facts, we're talking

24    about a 30(b)(6) witness now, where they should be educated

25    about everything Carter Bryant did or took in the

1    circumstances.  There are -- I'm not -- six, seven, eight,

2    ten, 12 witnesses who have testified in deposition and at

3    trial on that very subject already.

4              THE COURT:  Mm-hmm.

5              MR. QUINN:  To me it seems like a kind of an odd

6    exercise to educate --

7              THE COURT:  Sure.  You only have 25 depos apiece.

8    Remember, you wanted 50 and they wanted five or something?

9    I thought 25 was a nice number and that we only need 25

10   depos, that's it.

11             Now, I've been gracious and put one witness, maybe

12   shoved in two witnesses for 30(b)(6) that we've counted as

13   one by stipulation of the parties.  But this RICO, it hangs

14   in balance.  And, you know, from my standpoint, if it

15   survives, terrific.  But if it doesn't survive, infringement

16   still goes forward.  It really doesn't make a difference.  I

17   mean, tactically it may make a difference, but from the

18   court's perspective, this isn't a big decision on my part.

19             MR. QUINN:  Understood, your Honor.  And obviously

20   we --

21             THE COURT:  So how do we -- how do we resolve

22   that?  Let me turn back to you, Mr. Quinn.  I don't see the

23   benefit in not responding to something even though

24   technically you could be right on phase I.  I'm telling you

25   if this Circuit reverses Larson, I'm going to sit down and

1    have a status conference with both of you, but I'm going to

2    be pushing to get this case off the ground, I mean,

3    literally.

4              MR. QUINN:  I've got the message, your Honor.

5              THE COURT:  Very, very quickly.  And I don't want

6    you to be surprised at all about that.

7              Now, on the motions, the only reason I haven't set

8    the date of April 20th right now is this:  I would set your

9    date at April 20th right now, but if I do that, I'm not too

10   certain what the Circuit thinks, one, about that, and I

11   don't want any impression I'm, you know, pushing them.

12             Number two, it's inappropriate because I've caused

13   both of you to subpoena witnesses, and what happens if the

14   Circuit hands down a decision on March 25th?  That's not

15   fair to you.  We haven't even run motions.  So that's why

16   I'm going to insist on a stringent deposition schedule, but

17   I'm watching and letting the Circuit take whatever their

18   course is, if it's expedited or not, and try not to send you

19   through the expense and time.  I just want to keep this

20   deposition schedule.

21             So how do we resolve it?  And if you're going to

22   take the position of not answering, that's fine.

23             MR. QUINN:  Your Honor, we identified today six to

24   seven depositions that were taken relating to Bryant's

25   conduct --

```
 1              THE COURT:  Fine.
 2              MR. QUINN:  -- now the question is -- and, you
 3    know, we'll be guided by what the court said.
 4              THE COURT:  Answer the question then.
 5              MR. QUINN:  When do we take those six or seven --
 6              THE COURT:  Answer the question then.  Just
 7    reask --
 8              MR. QUINN:  My proposal, your Honor --
 9              THE COURT:  It's very quick.
10              MR. QUINN:  -- if that's what the court is asking,
11    my proposal --
12              THE COURT:  Suggesting.
13              MR. QUINN:  -- is that we identify to them the
14    testimony, deposition, trial testimony, and documents
15    bearing on that subject, that we do that rather than feed it
16    all to a witness.
17              THE COURT:  So let me hear the resolution, that
18    you simply go back through the record, point out to counsel
19    who's relatively new, who hasn't had the case for the last,
20    you know, three years you have, where these answers are
21    located.
22              MR. QUINN:  Yes, your Honor.
23              THE COURT:  And why wouldn't that satisfy you if
24    it's been answered a number of times?
25              MS. HURST:  Because it hasn't, first of all.  And
```

1   let me, on that point, say in particular that before the

2   first trial, Mattel expressly disclaimed that the name Bratz

3   was proprietary; that is, that it could be a trade secret.

4   And now we have them in interrogatory -- well, they served

5   the interrogatory response saying, *Here are 400,000*

6   *documents and 20 deposition transcripts.*

7          The problem with that is, it doesn't exclude

8   anything.  It doesn't tell us why if it meets the requisites

9   of trade secret --

10          THE COURT:  What specific questions do you want to

11   ask?  Why don't you write them down for me.  Remember I did

12   this exercise before?

13          MS. HURST:  I do.  But your Honor, in this

14   instance, I really am troubled that the burden should not be

15   on us here with this.

16          THE COURT:  No, it can be, because the court has a

17   right not to waste a lot of time with questions that may

18   have already been asked and answered.  And remember, I

19   haven't been through the case for two years.  So counsel may

20   have a resolution, he may not.

21          So you don't have to do that tonight.  But by

22   tomorrow, I would expect you to write down the questions

23   that you want asked and answered and then let's give him

24   some time to go back and see and produce even for the

25   court's reading what those answers are.

39

```
 1              MS. HURST:  Your Honor, I'll represent to the
 2    court that I would like substantive answers to the questions
 3    that were asked at the deposition on this issue.
 4              THE COURT:  And who would you like to ask?
 5              MS. HURST:  A 30(b)(6) witness prepared with
 6    knowledge to answer them substantively rather than saying I
 7    don't know.
 8              THE COURT:  Has a 30(b)(6) witness ever answered
 9    these questions before?
10              MS. HURST:  Not that I be -- not -- I don't
11    believe so, your Honor.
12              THE COURT:  Could I see a draft of the questions
13    you'd like to have asked?
14              MS. HURST:  Your Honor, if it would please the
15    Court, I would like to give the Court the transcript which
16    has the questions in it that have already been asked.
17              THE COURT:  Why can't you just write them down?
18              MS. HURST:  Because that -- they're already
19    written down, and it would be much easier.
20              THE COURT:  Write down the questions for me.
21              MS. HURST:  All right, your Honor.
22              THE COURT:  It doesn't have to be voluminous.
23    Just get a pen and write them down and give them to me
24    tomorrow in handwritten form.  You can go through the
25    transcripts.  I don't have to waste my time doing that.
```

1           And then you'll produce for me all the answers and

2     all locations to all of those questions and then we'll have

3     a whole bunch of hours expended doing that, and then I'll

4     probably have you answer the question one more time

5     regardless.  See where we're going to end up?

6           MR. QUINN:  I have -- I see where we're going to

7     end up, your Honor.

8           THE COURT:  That's where we're going to end up.

9     So you can do it one more time, if you'd like to, or you can

10    go through the process.  And what you can do is you can

11    prove to me, though, that you have answered these questions

12    before, because that will put you in the driver's seat.

13    Even if I allow it one more time, that's it.  So I fully

14    quickly find out who is doing what.  It's a credibility

15    issue for me.

16          So by 2:00 o'clock tomorrow?

17          MS. HURST:  Your Honor, we have a hearing with

18    Judge Smith at 1:00 --

19          THE COURT:  I'll be here.  When you're done, I'll

20    be sitting here.

21          MS. HURST:  All right.  Thank you, your Honor.

22          THE COURT:  You both go to that hearing.  And you

23    know that it's going to take place in one of the offices

24    here.  I'm not going to have you run over to JAMS.  I asked

25    him to come over here instead so that when you're done, you

1    can just come across the street or down the block instead of

2    driving.

3              MS. HURST:  Thank you.

4              THE COURT:  And you'll supply the court reporter

5    then, et cetera, and that will be a lot quicker.  Let's

6    bring him to us instead of all of you running out there.

7              Okay.  Now, that's much too easy so far.  What

8    else are we going to do tonight?

9              MS. HURST:  Your Honor, as part of this phase I

10   issue, Mr. Eckert was asked a question today.  The

11   foundation was –– for the question was that he has

12   participated in many licensing deals at Mattel, that he is

13   familiar with the customs regarding representations,

14   warranties, and due diligence with respect to intellectual

15   property transactions.

16             And I gave him the information about

17   Mr. Rosenbaum's e-mails saying that Carter Bryant did his

18   work in 1998 and about the transaction document, making the

19   representation in the warranty, and about Carter Bryant

20   telling MGA that he had created the Bratz drawings in 1998.

21   And I asked Mr. Eckert to tell the jury, in light of that,

22   what exactly MGA did wrong in that transaction, which was

23   exactly the question that Judge Wardlaw was asking at the

24   hearing.

25             THE COURT:  Is this the question:  *I'd like you to*

42

1 *assume that Carter Bryant told MGA that he created those*

2 *drawings in 1998 when they were negotiating in September of*

3 *2000. And I'd like you to assume that Carter Bryant's*

4 *lawyer told MGA's lawyer that the documents were created in*

5 *1998 in a period of time when Carter Bryant was not working*

6 *for Mattel.*

7 *The same with respect to what Carter Bryant said*

8 *that he did it when he wasn't working for Mattel. And I'd*

9 *like you to assume that MGA obtained from Mr. Bryant, after*

10 *having made those inquiries, a written representation and*

11 *warranty from Mr. Bryant that he owned the intellectual*

12 *property and was transferring it without violating any*

13 *agreement to any other party.*

14 *Assuming all those things to be true, tell me in*

15 *your view what MGA did wrong by proceeding in its*

16 *transaction with Mr. Bryant at that time and subsequently*

17 *exploit the intellectual property made by him in that*

18 *transaction?*

19 MS. HURST: That was one of the two questions,

20 yes, your Honor, upon which there was an instruction.

21 THE COURT: And the objection was?

22 MR. QUINN: Your Honor, I don't have the

23 transcript in front of me. I hope the objection was --

24 THE COURT: It was that it's *speculation and*

25 *incomplete hypothetical, improper opinion and calls for a*

1    *legal conclusion.*

2            MR. QUINN:  Yes, your Honor.  Sounds right.

3            THE COURT:  And MGA came back.  And their apparent

4    thought was that there are e-mails not shown to the phase I

5    jury that can prove the facts in this hypothetical and that

6    MGA really believes that the industry custom, if Mr. Eckert

7    had requisite knowledge to answer the question and that the

8    answer to such a question is relevant.

9            I think MGA can question this in another way.  The

10   question may be relevant, but I'm concerned.  It is an

11   incomplete hypothetical.  It may be legitimate.  I don't see

12   how it's relevant, frankly.  I think you can ask the same

13   thing in another way if you want to address industry custom.

14           For example, I wouldn't preclude you from asking

15   if MGA could simply ask about Mattel's practices.  But MGA's

16   CEO's opinion about legal issues is entirely irrelevant and

17   intrudes on the province of the jury, quite frankly.  I'd

18   never let that opinion in front of a court.

19           So you can get to the same information.  I'm

20   precluding you from asking that hypothetical question.

21           Now, I want you to stand up for a moment.  I want

22   you to raise your right hand.  Do you swear everything

23   you're about to state before this court will be true and

24   honest to the best of your beliefs so help you God?

25           DREW HANSEN, DISCOVERY REFEREE, SWORN

```
 1              THE WITNESS:  Yes, your Honor.

 2              THE COURT:  Take the witness stand for a moment.

 3              I've heard some minor concern about this discovery

 4    referee coming over and some complaint that's been called to

 5    my attention.

 6              First of all, I want to set the ground rules that

 7    please you.  I'm not pleased with the way the discovery

 8    referee was used in the last occasion.  I've made that

 9    informally known to both of you.  I think it caused a

10    distrust on both of your sides.

11              I want you to be satisfied that this court makes

12    its own decision and is not -- and will not allow this

13    discovery referee to give me any opinion at any time.

14              So if you have any questions, there he is.

15    Question him about my conduct in this thus far.

16              Counsel, let's begin with MGA, and then we'll turn

17    to Mattel.  And then we'll set the ground rules.

18              MS. HURST:  Your Honor, Mr. Hanson has made prior

19    representations on this issue with which MGA is satisfied.

20              THE COURT:  Don't be chilled by this.  I don't

21    ever want any other impression on either one of you that I'm

22    the judge, period, and I could care less what a discovery

23    referee states.  And number two, he's not to state anything

24    to me about an opinion.

25              Now Mattel's turn.  Any questions you'd like to
```

1    ask him about his -- any information he's given to me or

2    attempted to and any response that I've given, if such an

3    attempt was ever made.  Mattel, there he is.

4                MR. QUINN:  We have no questions on this.

5                THE COURT:  Then, sir, step down.

6                THE WITNESS:  Thank you, your Honor.

7                MS. HURST:  Your Honor, on the relevance of that

8    question --

9                THE COURT:  Let's do this.  Number two, let's set

10   up something that's absolutely comfortable to both of you.

11               What I don't want to do is get down the line and

12   go through some of the complaints you had about the

13   discovery referee and the insinuations concerning Judge

14   Larson and the monitor.  This needs to be pristine and

15   transparent.  And although I've encouraged you to be off the

16   record, at least with the initial, you know, portion of our

17   discussions with one another, my thought is that you have to

18   be absolutely comfortable and your clients have to be

19   comfortable.  So let's talk about that.

20               First of all, I'm going to represent to you that

21   no discovery referee at any time is going to make a decision

22   or give this Court input.  And if we're going to do that,

23   it's going to be on the record and you're going to know that

24   that's happening.

25               And number two, you have the option at any time

46

```
 1    putting this gentleman or Mr. O'Brien on the stand at any
 2    time.  Because unless you have confidence that I'm making my
 3    own decisions, the only thing I want from the discovery
 4    referee is I want an e-mail if you run into a problem.  Or I
 5    want to know what the problem is as it occurs during the
 6    daytime so when you come over during the evening I'm
 7    prepared.  Otherwise if I didn't know what the problems were
 8    that were occurring either by e-mail or by his coming over
 9    on occasion, you're coming in at 7:00 o'clock and I'm
10    listening to it the first time and then I'm going back in
11    chambers for an hour or two.  And that's not -- I'm wasting
12    your time.
13            But if you're uncomfortable with that and you want
14    to wait for him to give me input at the end of the day about
15    problems between the two of you, then I'm happy to conduct
16    it that way.
17            So if you two turn towards each other, have an
18    informal conference and tell me what you would like that
19    makes you feel absolutely comfortable and so we set the
20    guidelines for this court, and I'll take your wisdom at any
21    time.
22        (Pause.)
23            THE COURT:  Now, what are your thoughts?  What
24    makes both of you comfortable?  What makes your clients,
25    more importantly, comfortable?  Everything is transparent
```

1    or, if it's not, you know, that we get some working

2    relationship, because I don't want to get down the line two

3    months from now, have an adverse ruling again go against one

4    of you, and then having, you know, ill feelings about

5    something that was allegedly given to the court.  That's not

6    going to happen, but that's -- my word's not good enough on

7    that.  I want to make sure you feel comfortable with the

8    process and procedure.

9            So let's start with Mattel.  What do you need?

10           MR. QUINN:  Your Honor, we're comfortable with the

11   procedure.

12           THE COURT:  Well, let's find out.

13           Let's start with MGA.  What do you need?

14           MS. HURST:  Your Honor, because the Court has

15   raised this issue and because there are issues regarding the

16   past appointment of discovery masters in this case, I have

17   to -- I understand the Court doesn't want to go back to an

18   earlier time --

19           THE COURT:  No, I don't.

20           MS. HURST:  -- but I have to say this for the

21   record, and I do so reluctantly, but only because my client

22   does not waive its rights in this regard.

23           Mr. O'Brien represented a witness in this case.

24   He was -- his law firm was paid by Mattel to do so.  Under

25   28 U.S.C. 455 and Rule 53, your Honor, this was an apparent

```
 1    conflict of interest which should have prevented his

 2    appointment as the discovery master in this case.  It is the

 3    original sin from whence all the rest flows.

 4              Because he was a lawyer who was -- whose firm was

 5    being paid by Mattel to represent Margo Eldridge, Andy

 6    Gallerani, and another, a third witness whose name I don't

 7    presently remember, and because my client attempted to

 8    interpose that objection, which was then stricken from the

 9    record by Judge Larson, we have had an ongoing concern on

10    the part of MGA and Mr. Larian ever since.

11              THE COURT:  I see.  Now, let me ask you something.

12    I would appreciate and like the conference from both clients

13    and from you that the discovery referee is being used

14    appropriately.  What I really need from the discovery

15    referee is an almost immediate contact with the Court if

16    something is going wrong in the deposition, but I don't want

17    from the discovery referee any input.  I don't want any

18    advice.  In fact, I'm precluding it.  And the only place I

19    see that I need the discovery referee is on the 30(b)(6)s

20    and Mr. Larian and Mr. Eckert.

21              Now, if in fact you have other witnesses that you

22    think you need a discovery referee on, so be it.  But so

23    far, and I'll state it for the record, I think you've been

24    admirable.  Whatever the past problem is, I have no lack of

25    confidence in all the counsel.
```

1          Assuming you're right, if you want me to

2   disqualify the discovery referee, I'll certainly look into

3   that.  But you're the one that came to me about cost,

4   et cetera, and this is not going to go to the magistrate

5   judge.

6          MS. HURST:  I understand, your Honor.

7          THE COURT:  Number two -- you go ahead, counsel.

8          MR. COTE:  Thank --

9          THE COURT:  No, no, no.  I'm not speaking to you.

10  No, I meant -- I thought you had something to consult with

11  her about.

12         MR. QUINN:  No, I had something I wanted to say on

13  the record.

14         THE COURT:  We'll be back to you in a moment.

15         So it seems to me if all the discovery referee is

16  doing is alerting me, each time you got a response from the

17  discovery referee, it was my input back from chambers today

18  or yesterday.  So I'm using him simply as a bellwether that

19  we're running into problems about an objection, let's give

20  it to Carter as quick as possible so when you come in during

21  the evening time, I'm prepared at 7:00 or 8:00 o'clock.

22  Otherwise if you come in at 7:00 or 8:00 o'clock, it's going

23  to take me an hour or two to sort that out, or longer.

24         Now why don't you go back and talk to your clients

25  about that.  Tell them our discussion, and then let's bring

```
1    it up tomorrow.  Well, I'm sorry, you don't have avail --
2    Mr. Larian is available probably.  But I'm --
3              Now, counsel, I'm sorry.
4              MR. COTE:  Thank you, your Honor.
5              Since we're talking about original sin, I just
6    wanted to remind the Court that the original discovery
7    referee, Judge Infante, was appointed before my party was a
8    party to the case and was appointed by stipulation of the
9    parties, which was not including us.
10             And we've always objected to having a discovery
11   referee.  That objection was overruled by Judge Larson, and
12   I'm not asking the Court to revisit it --
13             THE COURT:  Sure.
14             MR. COTE:  -- I'm just providing some background
15   and making the Court aware of that.
16             But the proposal you suggested where that
17   substantive role of the special master would be extremely
18   limited I think addresses many of our --
19             THE COURT:  It's almost nonexistent.  If you'd
20   watched very carefully, what I'm trying to do is shrink the
21   discovery referee's involvement to critical people because I
22   think you've governed your case so well, number one.
23             Number two, I just need that discovery referee as
24   an alert mechanism, you know, what -- what is the problem
25   that you're running into.  Or have you resolved it by
```

```
1    4:00 o'clock.  I don't want -- and in fact, I'm instructing
2    and I'll do it publicly, the discovery referee to give me
3    any input or any of his thoughts about any of the rulings
4    that he thinks would be appropriate.  Simple as that.
5              MR. COTE:  I appreciate that, your Honor.  Thank
6    you.
7              THE COURT:  Yeah.  The benefit is that -- the
8    benefit is that then I have some continuity that if there's
9    a fatal, you know, conflict here, then I want to look into
10   that.
11             And number two, I have to decide if it's fatal or
12   not.  Because I like the fact I've got some continuity with
13   people who have been there before who can recognize if there
14   is a problem that I should be alerted to.
15             Most of the time, though, it's been de minimis,
16   frankly.  And on occasion, I've wondered why it even got a
17   discovery referee on the 30(b)(6)s.
18             I think we're almost done, quite frankly, with the
19   discovery referee when Mr. Larian finishes and Mr. Eckert
20   and this never-ending 30(b)(6) filling of the empty vessels,
21   I think we're pretty much done, aren't we?
22             MS. HURST:  I would be happy to be done now, your
23   Honor.
24             THE COURT:  And I'm not asking the discovery
25   referee to do anything other than to clean up many of the
```

1    motions that were pending in the transition, and many of

2    those were withdrawn between the two of you or held in

3    abeyance.

4           And number three, the reason you're coming in and

5    filing motions with me is that I can decide what goes to the

6    court, what potentially might go to a magistrate judge,

7    depending, what might go to the discovery referee.  But I'm

8    really reluctant to use the discovery referee for motions.

9           Because what happens is, even if there wasn't a

10   conflict from your standpoint, the discovery referee

11   actually causes me more work.  You see, I have to read the

12   discovery referee's report.  It's been layered.  I then have

13   to go back, if I'm conscientious, and reread his original

14   material anyway.  What you've really done is create double

15   the work for me.

16          And if we didn't have you over this evening,

17   Mr. McConville, it's nice to see you this evening, sir.

18          MR. McCONVILLE:  You too, Your Honor.

19          THE COURT:  It's always a pleasure.

20          I probably could have gotten 100 to 200 pages out

21   of you just from what we've been talking about tonight.

22          MS. HURST:  Your Honor, we had a couple of other

23   issues, if the court would give a few more moments.

24          THE COURT:  Oh.  At any time, counsel.

25          MS. HURST:  Your Honor, the Carter Bryant

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    settlement agreement has been produced but marked

2    "attorneys' eyes only" so that I can't show it to my client.

3    I would like that designation lifted so I can show the

4    document to my client.

5            THE COURT:  What's the objection concerning that?

6            MR. QUINN:  I mean, your Honor, it's been kept

7    confidential.  That was part of the deal with Mr. Bryant.

8            THE COURT:  Just a moment.  I didn't make that

9    deal.  Did Judge Larson make that deal?

10           MR. QUINN:  Of course not, your Honor.

11           THE COURT:  Okay.  It's lifted.

12           MS. HURST:  Your Honor --

13           MR. QUINN:  Your Honor, so it's not attorneys'

14   eyes only --

15           THE COURT:  It's not attorneys' eyes only any

16   longer.  He's a critical and key witness.  He always should

17   have been a witness.  This always should have been divulged.

18           A person has apparently made a settlement with

19   Mattel.  I really don't understand why that was entered into

20   with somebody who allegedly, quite frankly, is the person

21   who pilfered this information.  And how that is a secret

22   document is baffling to me.

23           Now, whatever that settlement was, I'm not

24   castigating any aspersions upon your settlement, but I'm not

25   protecting that settlement.  That's lifted.  You can show it

1    to Mr. Larian.

2           MR. QUINN:  Your Honor, the Court has a couple

3    times raised the questions about why that settlement, he was

4    the main perpetrator or whatever words the Court used.

5           THE COURT:  Well --

6           MR. QUINN:  There is an issue of collectibility,

7    your Honor, I'll just say that, and what kind of assets the

8    man has, as a short explanation there.

9           THE COURT:  You can go through and I will

10   certainly consider, you know, striking out those personal or

11   relevant portions, if you showed that to me in-camera.  But

12   I'm trying to send you a message.  These are coming off.

13   You're pursuing money.  When you pursue money, okay, then

14   you're forthcoming.  And if you're asking for RICO and

15   you're asking for a billion dollars or $500 million, I'm not

16   too concerned.  And if he is the pilferer and a settlement

17   is reached, for the life of me, I don't know why we're

18   protecting that settlement.

19          Now, there may be certain personal assets, but

20   those are so limited concerning maybe finances or the actual

21   residence of his home, or if you have a Social Security

22   number, of course I'm going to -- but now the duty's on you

23   to get those to me.  I'll give you a reasonable period of

24   time.  Tomorrow.  Or January 4th.  But it's lifted.

25          MR. QUINN:  Your Honor, the request that it not be

```
 1    attorneys' eyes only, do I understand that it's not

 2    subject -- there's a second tier of protection, if it's not

 3    attorneys' eyes only --

 4            THE COURT:  I'm not protecting anything concerning

 5    it.  There is no protection for this.

 6            Now I think counsel wants to talk to you for a

 7    moment.

 8       (Pause.)

 9            THE COURT:  By the way, I hope I'm sending a

10    co-equal message to MGA.  What Mattel is experiencing in

11    terms of discomfort, it's going to be co-equal for MGA.  If

12    you think some of these secrets that you think are so

13    well-guarded they're going to remain secret, no.

14            MS. HURST:  I understand, your Honor.

15            THE COURT:  Okay.  I mean, what you're hearing is

16    a very clear message from the court about what's going to

17    happen.

18            MS. HURST:  Your Honor --

19            THE COURT:  So this time it's Mattel that's a

20    little concerned.  It will be MGA very shortly, believe me.

21            MR. QUINN:  Could we take the court up on its

22    offer to give us till January 4 to take a look at that?  I

23    don't have that agreement in mind, your Honor.  And I can't

24    recall --

25            THE COURT:  Well, it's just a simple agreement.
```

1    Go get it and bring it down tomorrow.  Let's look at it.

2    It's not a big deal.

3              MR. QUINN:  Very well, your Honor.

4              THE COURT:  Okay.

5              MS. HURST:  Would I be permitted to show it to my

6    client in the meantime --

7              THE COURT:  No.  He can have -- he can go through

8    it for one 24-hour period, and he can show me if there's a

9    Social Security number or something else that's, you know,

10   of a personal nature.  Of course I'm going to protect that

11   and that may be attorneys' eyes only.  But as far as the

12   document itself is concerned, the settlement agreement

13   shouldn't be protected.

14             MS. HURST:  My client was privy to Mr. Bryant's

15   Social Security number in connection with its consulting

16   arrangement with him.  I agree with the Court that that is

17   not a Social Security number that should be filed publicly,

18   and I don't have any disagreement with that.

19             THE COURT:  Well, and probably his residence

20   address at the present time.  I mean, I just don't know

21   what's in there.  I'm going to give Mr. Quinn the

22   opportunity to go through the personal information that I'd

23   like to protect also.

24             But as far as the document, we're starting with

25   transparency now.  And the burden is on each of you to come

```
 1    back.  And trust me, MGA, in a very short period of time, is
 2    going to be in the same position with some alleged secret
 3    that they want to keep.  And I'm going to tell you, you
 4    should be starting with the presumption that these
 5    protective orders are being lifted.
 6              MS. HURST:  Your Honor, in that vein, I'd like to
 7    request that the Court prohibit any further blanket
 8    designation of deposition transcripts as attorneys' eyes
 9    only.
10              THE COURT:  No, I'm not going to do that right
11    now.  We'll get to that down the line.  Okay.
12              MS. HURST:  All right.  So, your Honor, we're
13    having this settlement conference on Sunday, and I would
14    like to be able to --
15              THE COURT:  What settlement conference?
16              MS. HURST:  Your Honor, we have a mediation
17    scheduled with Judge Tevrizian --
18              THE COURT:  Why?
19              MS. HURST:  -- on Sunday.
20              THE COURT:  Why?
21              MS. HURST:  Because the Ninth Circuit ordered the
22    parties to attempt settlement in connection with this stay
23    order last week.
24              THE COURT:  They didn't say when.
25              MS. HURST:  Well, it's scheduled for Sunday, your
```

1    Honor.

2            THE COURT:  Did they schedule it, or did you

3    schedule it?

4            MS. HURST:  We scheduled it based on a conference

5    with Claudia Bernard at the Ninth Circuit mediation program.

6            THE COURT:  Well, I know that -- just a moment --

7            MS. HURST:  I'm sorry.  And Judge Tevrizian's

8    availability.

9            THE COURT:  Then if I know that, I'm not in a rush

10   to lift this until after your settlement conference.  If you

11   two are at equilibrium right now, why am I divulging for one

12   side when there may be things that you want from MGA from

13   the other?

14           MS. HURST:  Your Honor, if the Court -- it's going

15   to impair the prospects of settlement if the Court does not

16   permit me to show this document to my client between now

17   and --

18           THE COURT:  Mattel's got the equal argument

19   concerning you also.

20           MS. HURST:  If there's something they want, I'm

21   happy to agree.

22           THE COURT:  What would you like?

23           MS. HURST:  I mean, if they want to lift the

24   confidentially designation --

25           THE COURT:  What would you like?

```
 1              MR. QUINN:  Your Honor, I don't have a list to
 2     hand -- to mind right now.
 3              THE COURT:  Well, why don't you look at it by
 4     tomorrow?
 5              MR. QUINN:  Very well, your Honor.
 6              THE COURT:  See if there's something critical that
 7     you think would help in this settlement.  But I know Carter
 8     Bryant, I think, is something that -- if you get that to me
 9     tomorrow -- why do you think it's so helpful?  Well, try
10     to -- strike that.
11              It's obvious why it would be helpful.  The more I
12     think about it, I'm inclined to lift it.  So let's --
13              MS. HURST:  Your Honor, I would make the same
14     request with respect to Mr. Eckert's transcript.  Not that
15     it be -- all confidentiality be lifted, but that I be
16     permitted to share it with the clients.
17              THE COURT:  Well, has Mr. Larian's transcript
18     been -- is he also in the same position, that it can be
19     shared with Mr. Eckert?
20              MS. HURST:  That's fine with us, your Honor.
21              THE COURT:  Counsel?
22              MR. QUINN:  There's a lot of testimony in
23     Mr. Eckert's deposition that we would object to showing to
24     Mr. Larian.  And in fact, this comes as a surprise because I
25     thought I had an agreement with counsel that this can be
```

1    designated "attorneys' eyes only."

2           THE COURT:  Yeah, I don't think I'm going to do

3    that yet.  It comes as a surprise to me.  I'd always

4    planned, quite frankly, that given the first opportunity

5    that Carter Bryant was going to be transparent, quite

6    frankly.  And I've always been concerned why that has been

7    attorneys' eyes only in this, quote, unquote, settlement

8    that's been reached with Carter Bryant.

9           So I think I'll delay that request, counsel, on

10   your part for the time being.

11          MS. HURST:  Thank you, your Honor.

12          THE COURT:  And -- well, we'll come back and

13   revisit it, but I think I'd like the depositions to be

14   completed by Mr. Larian and by Mr. Eckert.  And Mr. Larian

15   is not coming back until the 4th, so I don't see any reason

16   that I would lift this first concerning Eckert when you

17   haven't had an opportunity to finish Larian.  I don't think

18   that that's fair.

19          Also, I'm not certain what you're seeking to

20   protect, and I'd like to be careful and I'd like to go

21   through and see those portions that you think are, you know,

22   disadvantageous.

23          But how can you settle this matter if you're

24   really going to go see Judge Tevrizian without as much

25   information as possible?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              MR. QUINN:  Your Honor, actually I would be very,

 2    very surprised if -- although there is sensitive information

 3    in Mr. Eckert's deposition, I would be very, very surprised

 4    if there's anything in there that would have any bearing on

 5    settlement, quite candidly, your Honor.

 6              THE COURT:  Where is the settlement going to take

 7    place?

 8              MS. HURST:  The meeting is taking place here in

 9    Los Angeles JAMS offices starting on Sunday at 9:30, your

10    Honor.

11              THE COURT:  So because the Ninth Circuit ordered

12    that, they didn't say when -- when was each of your choices?

13              MS. HURST:  It was Judge Tevrizian's availability

14    plus counsel's vacation schedule that primarily --

15              THE COURT:  Okay.

16              MS. HURST:  -- drove the choice of the date, your

17    Honor.

18              THE COURT:  Well, that's fine.  I have no comment

19    about that.

20              MS. HURST:  They did say to try it on an expedited

21    basis, your Honor, so I'm afraid we took that a bit

22    seriously.

23              THE COURT:  Well, I'm glad you did.  But I'm

24    not -- from my standpoint, you have to remember, I only care

25    about litigation.  If you settle it, it's because it's
```

```
 1    equally painful or beneficial to both of you.  I'm not --
 2    I'm not the person.  The Ninth Circuit has the right to
 3    order you into settlement, but nobody has the right to order
 4    you to settle.
 5          So although I think the Circuit was very clear
 6    about where the case is going to end up, from their
 7    perspective, it couldn't be much clearer.
 8          All right.  What else are we going to do this
 9    evening?
10          MR. QUINN:  Mattel doesn't have anything further,
11    your Honor.
12          MS. HURST:  Your Honor, we have nothing further
13    this evening.
14          THE COURT:  Okay.  Now when are you going to get
15    together tomorrow?  Because I know that you just submitted
16    to me, which I haven't had time to read today, a new
17    deposition list.  And I have the old list, and I want to
18    thank you all for preparing that.  It gave me some idea
19    about how hard you were trying to get people, you know,
20    dates.  I haven't had time yet to look at the new list.  And
21    I'll try to do that sometime this evening.
22          But where do you stand in terms of your deposition
23    schedule?  Are we going to -- are we going to make it
24    through February without, you know, Saturday, Sundays?
25          MS. HURST:  I'll have my co-lead counsel,
```

1    Mr. McConville, who has been the architect of the

2    scheduling, address that if you don't mind, your Honor?

3              THE COURT:  Mr. McConville, always a pleasure,

4    sir.

5              MR. McCONVILLE:  Your Honor, always a pleasure to

6    appear.

7              To answer your question directly, I've been

8    working closely with Mr. Zeller and we've been working

9    collaboratively to get these schedules.  We -- at the end of

10   the day, your Honor, I think we're all -- if they don't know

11   I share with them my insight into how this courtroom works,

12   and we're all doing our best to get it done as hard as we

13   can.

14             THE COURT:  I believe that.  What problems are you

15   having?  Are you having scheduling problems with the

16   30(b)(6)s, for instance?

17             And by the way, I'm prepared to bring

18   Mr. Gordinier in at any time and talk to him about Omni.

19   I'm not sure it's necessary yet, but I'm waiting to see what

20   Mattel comes up with.

21             I saw on the last schedule that two of the people

22   that you initially and informally represented were

23   potentially abating were scheduled for January now.  Mike

24   Zeller was really concerned about one of those persons.

25   Have you served that person?

64

```
 1              MR. QUINN:  I do not believe we have been able to
 2    serve that person, your Honor.
 3              MR. McCONVILLE:  I think they did.
 4              MR. QUINN:  I stand corrected, your Honor.
 5              THE COURT:  That's okay.  Come on up for just a
 6    second.
 7              You're doing a great job, both of you are.
 8              MR. McCONVILLE:  I don't want to speak for
 9    Mr. Quinn, but Mr. Zeller told me a funny story.
10              THE COURT:  Come up, talk to Mr. Quinn.
11              And there's so much information out there that --
12    that was my main concern was Omni, and I know you've been
13    chasing that for quite a while so --
14              MR. QUINN:  Apparently the witness that Mr. Zeller
15    apparently was referring to, Mr. Gozini, has now been
16    served, your Honor.
17              THE COURT:  But there was another witness also
18    that he represented with Omni, Mr. --
19              MR. McCONVILLE:  -- Moinian.
20              THE COURT:  Moinian.  Have you served Mr. Moinian?
21              MR. QUINN:  No, we have not been able to serve
22    Mr. Moinian.
23              MR. McCONVILLE:  Your Honor, I don't know if they
24    have or haven't, but I've been in contact with Mr. -- with
25    Todd Gordinier, and he said he's available on X days.  Those
```

```
 1    are the dates that are on the calendar.

 2              THE COURT:  Okay.

 3              MR. McCONVILLE:  So I don't know if he's been

 4    served.  I don't know officially he's been served, or no.

 5              THE COURT:  I don't see any reason why he'd

 6    mislead you.  I mean, if he makes that representation, he

 7    should be here.

 8              Now, there's one other person, the gentleman from

 9    Switzerland?

10              MR. QUINN:  Yes.  Starts with an "S."

11              MR. McCONVILLE:  Samhoui.

12              THE COURT:  Mr. Samhoui.

13              Has Mr. Larian been asked where Mr. Samhoui is?

14    Because I would imagine that perhaps Annette can help him

15    with that.

16              Do we know where Mr. Samhoui is?

17              MS. HURST:  He has been asked, your Honor, under

18    oath in his deposition.  He said he's never heard of the

19    guy.  He's got no idea who he is and he's got no idea where

20    he is.

21              THE COURT:  Okay.  Does anybody have an idea where

22    Mr. Samhoui is?

23              MR. QUINN:  I don't think we do, your Honor.

24              THE COURT:  Okay.  What else do you need to do

25    this evening?  Mr. McConville?
```

```
 1              MR. McCONVILLE:  Nothing for MGA, your Honor.
 2              THE COURT:  Okay.  Counsel?
 3              MR. COTE:  Nothing for Mr. Machado.
 4              THE COURT:  Counsel?
 5              MS. HURST:  Mr. McConville speaks for our team,
 6    your Honor.
 7              THE COURT:  Okay.  Mr. Quinn?
 8              MR. QUINN:  Nothing for Mattel, your Honor.
 9              THE COURT:  And all your team.
10              Then I have a -- well, let me find out.  Don't
11    leave yet, because you're one of my first priority.
12              Counsel in the civil matter that we're engaged in,
13    what have you decided, quickly?  So I know when to bring
14    Mattel and MGA back.
15              MR. COTE:  Your Honor, we have a stipulation on
16    two of the witnesses.  We are still going to need tomorrow
17    afternoon, if it's available, and we will be prepared to put
18    on three or four witnesses.
19              THE COURT:  Three or four witnesses.  Yeah, I'll
20    work with you.  What I'm not going to do, though, is see
21    what I saw in court today.  I just -- that's very
22    frustrating for me when I'm keeping these kinds of hours.
23    Your choice is to either call those witnesses or not.
24    But -- well, you have five people today in court.  You're
25    going to call all five of those, correct?
```

```
 1              MR. QUINN:  That is our plan, your Honor.
 2              THE COURT:  Okay.  How many of those five people
 3    are you going to call tomorrow?
 4              MR. QUINN:  I think we'll go through at least
 5    three if we have that two and a half hours.
 6              THE COURT:  Great.  Then can we do this?  Can we
 7    start at 2:00 o'clock with you?  And maybe I could meet with
 8    Mattel and MGA in the morning then.  Maybe about, oh, 9:30,
 9    10:00 o'clock.
10              MS. HURST:  We're still in Mr. Eckert's deposition
11    then.
12              THE COURT:  Oh, you are.  When do you want to
13    visit with me?  I need to take them from 2:00 to 5:00,
14    et cetera.  Or could I visit with local counsel?  Could I
15    visit with just either Mr. Quinn and Mr. McConville on the
16    depositions?  I don't need all of you.  And that way you can
17    catch a plane and you can get back to your offices if
18    Mr. Eckert's present -- I mean, Mr. --
19              MS. HURST:  Mr. Zeller --
20              THE COURT:  Mr. Zeller.
21              MS. HURST:  -- because of the hearing at 1:00,
22    we're going to have to break from Mr. Eckert's deposition by
23    then anyway.
24              THE COURT:  So you're not going to finish him
25    tomorrow?
```

```
1           MS. HURST:  I don't think so, your Honor, because
2      there are a lot of documents that haven't been produced.
3           THE COURT:  Okay.  So he's going to come back then
4      on the 4th in all likelihood?
5           Then maybe I shouldn't be concerned about the
6      deposition schedule tomorrow because even if you're running
7      into problems, I'm not going to spoil the representation I
8      made to you.  You're still going to keep that break because
9      I promised it to you.
10          So maybe I should give you and Mr. Zeller over the
11     holiday to sort out any problems.  And any problems we have
12     could be resolved in the first week of January.
13          MR. McCONVILLE:  I'm confident we can work them
14     out, your Honor.  And if we can't, we'll let you know.
15          THE COURT:  Yeah.  So there's no real reason to
16     have a meeting after -- well, I'm going to be here anyway.
17     If you need me, I won't leave until you're satisfied and you
18     leave tomorrow evening.  How's that?  Fair enough?
19          MR. McCONVILLE:  I guess the only thing that's
20     hanging out there, your Honor, is the Carter Bryant
21     settlement.  You said you wanted to look at it tomorrow.  I
22     didn't know if --
23          THE COURT:  Sure, I'll be --
24          MR. McCONVILLE:  -- we were -- counsel were to
25     consult about it or if we were just going to give it to you
```

1    and then you'd let us know what happened.

2          THE COURT:  Well, I wanted the specific portions

3    pointed out to me.  I mean, it is going to be so minimal in

4    terms of what's being excluded, it's going to have to be

5    something private, like a Social Security number.

6          MR. QUINN:  I don't know if there is anything like

7    that in it.  We should be able to determine that very

8    quickly.

9          THE COURT:  Okay.  Well, I'll be here, and if you

10   run into problems, if I see you come through the door, I

11   need to finish this as a courtesy to the other set of

12   counsel because they've got people from West Virginia that

13   need to go home.

14         MS. HURST:  If the parties are able to reach

15   agreement with respect to the Carter Bryant settlement, your

16   Honor, would that be agreeable to the court?

17         THE COURT:  It's fine with me.  But would you tell

18   the discovery referee who is there, and he can just fax it

19   over and I'll take that representation.  If you want to make

20   a record, though, you know, because it's over your objection

21   obviously, I just don't know if I was in Mattel's position

22   that I'd be trying to protect that publicly.  I mean, from

23   the public standpoint, this is the person that supposedly

24   stole from you who you made a settlement with.  It's just --

25   but if you want to protect him, that's fine.

1         So we'll wait.  I'll be here.  Would you notify me

2  tomorrow by mail?

3         MR. McCONVILLE:  We'll do that, your Honor.

4         THE COURT:  Okay.  Thank you very much.

5    *(At 8:50 p.m., proceedings were adjourned.)*

6

7                          -oOo-

8

9                       CERTIFICATE

10        I hereby certify that pursuant to Section 753,

11  Title 28, United States Code, the foregoing is a true and

12  correct transcript of the stenographically reported

13  proceedings held in the above-entitled matter and that the

14  transcript page format is in conformance with the

15  regulations of the Judicial Conference of the United States.

16

17  Date:  January 12, 2010

18

19

20         _____

21                    Deborah D. Parker, Official Reporter

22

23

24

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*