111610DOC-02.txt
```
0001
 1                 UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3                SOUTHERN DIVISION AT SANTA ANA
 4          HONORABLE DAVID O. CARTER, JUDGE PRESIDING
 5
 6
   CARTER BRYANT, an individual,    )
 7                                  )
                 PLAINTIFF,         )
 8                                  )
            vs.                     ) CV NO. 04-9049-DOC
 9                                  ) VOLUME II
   MATTEL, INC., a Delaware         )
10  corporation,                    )
                                    )
11               DEFENDANT.         )
   _____    )
12  CONSOLIDATED WITH MATTEL, INC., vs.)
   BRYANT and MGA ENTERTAINMENT, INC. )
13  vs. MATTEL, INC.                 )
14
15
16            REPORTER'S TRANSCRIPT OF PROCEEDINGS
17                  SANTA ANA, CALIFORNIA
18               TUESDAY, NOVEMBER 16, 2010
19                      2:53 P.M.
20
21             DEBORAH D. PARKER, CSR 10342
                 OFFICIAL COURT REPORTER
22          UNITED STATES DISTRICT COURT
                411 WEST FOURTH STREET
23                  SUITE 1-053
            SANTA ANA, CALIFORNIA 92701
24              (714) 542-8409
             D.PARKER@IX.NETCOM.COM
25
0002
 1  APPEARANCES OF COUNSEL:
 2       FOR THE DEFENDANT, MATTEL, INC.:
 3                        MICHAEL ZELLER
                          SUSAN ESTRICH
 4                        BRETT DYLAN PROCTOR
                          QUINN EMANUEL URQUHART
 5                        865 SOUTH FIGUEROA STREET
                          10TH FLOOR
 6                        LOS ANGELES, CALIFORNIA 90017
                          (213) 443-3000
 7
 8       FOR THE INTERVENOR, MGA ENTERTAINMENT, INC.:
 9                        ANNETTE I. HURST
                          WARRINGTON S. PARKER, III
10                        ORRICK, HERRINGTON & SUTCLIFFE, LLP
                          THE ORRICK BUILDING
11                        405 HOWARD STREET
                          SAN FRANCISCO, CALIFORNIA 94105
12                        (415) 773-5740
13                        THOMAS S. MC CONVILLE
                          ORRICK, HERRINGTON & SUTCLIFFE, LLP
14                        4 PARK PLAZA
                          SUITE 1600
15                        IRVINE, CALIFORNIA 92614
                          (949) 567-6700
                             Page 1
```

```
                         111610DOC-02.txt
16
17                        WILLIAM MOLINSKI
                          ORRICK, HERRINGTON & SUTCLIFFE, LLP
18                        777 SOUTH FIGUEROA STREET
                          SUITE 3200
19                        LOS ANGELES, CALIFORNIA 90017
                          (213) 612-2346
20
21
22
23
24
25
0003
 1   APPEARANCES OF COUNSEL:
 2        FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:
 3                         ALEXANDER H. COTE
                          ANGELA M. MACHALA
 4                        MARK OVERLAND
                          DAVID C. SCHEPER
 5                        SCHEPER KIM & HARRIS LLP
                          601 WEST 5TH STREET
 6                        12TH FLOOR
                          LOS ANGELES, CALIFORNIA 90071
 7                        (213) 613-4660
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0004
 1        SANTA ANA, CALIFORNIA; TUESDAY, NOVEMBER 16, 2010;
 2                         2:53 P.M.
 3                          -oOo-
 4        THE COURT:  Thank you so much, counsel.
 5        MS. HURST:  Thank you, your Honor.
 6        Your Honor, point F in the court's outline, F.1.
 7        Now, Bryant had no right, title and interest in an
 8   idea to convey.  That's the Desney case.  Desney says that,
 9   Rokos versus Peck, and all of the California cases.  Go look
10   at Witkin.  There's a whole Section, 69, in the contracts
11   section.  Ideas not assigned.
12        There's a distinction in California law between an
13   implied in fact, pay for per use contract -- pay for use
14   contract, based on some confidential relation that arises
15   under the implied in fact scenario under Desney and the
16   transfer of title to an idea.  You can't treat an idea as
17   property, under California law.  You can have a pay for use
18   scenario, but you can't treat it as property.  So he had
19   nothing to assign.
                              Page 2
```

111610DOC-02.txt
```
20              And, here, we're really talking about the idea for
21  a product.  I mean, it's just a pure idea, the idea to use
22  Bratz for a fashion doll.
23              And, your Honor, under the Summerhays versus Scheu
24  case, the court says two things pertinent to this question:
25  First of all, even if somebody purports to assign an idea,
0005
1   they are not doing it to the exclusion of anyone else.  You
2   can't even construe an assignment of an idea that way.  You
3   would just construe it as, basically, a disclosure.  But
4   that disclosure would not even operate to divest the
5   disclosure of title and the idea, because nobody owns it.
6   That's what the Summerhays case says.
7               And then, the Summerhays:  And, boy, if we were
8   going to interpret the contract that way, it would be
9   unenforceable under Section 16600.
10              And now we have, apart from the supersession
11  clause of CUTSA, C-U-T-S-A -- all caps -- the next important
12  policy choice made by the California legislature of backbone
13  of Silicon Valley and the rest of the California economy
14  that Mattel is trying to abrogate:  Section 1600 of the
15  Business and Professions Code.
16              And this goes right to the court's question in
17  1.b):  Wouldn't that assignment always entitle you to trial?
18              You better believe it.  Conception or reduction of
19  practice.  You get them coming and going that way, whatever
20  he did before and whatever he did after.  And, in fact,
21  that's what the Applied Materials case said.  This is a case
22  Mattel cites for their proposition that somehow ideas are
23  assignable, which it doesn't say.  But then the court in
24  that case goes on to invalidate the assignment clause under
25  Section 16600 for precisely this reason.  That's what Mattel
0006
1   has to offer:  Cases that actually invalidate the contracts.
2               And so, as the court asked, under F.1.c):  Why
3   shouldn't the consuming public be --
4               And so, in question F.1.c) Why shouldn't the
5   consuming public be entitled to ideas that Mattel's
6   corporate hierarchy rejects but a competitor is willing to
7   manufacture?
8               It should.  Isn't the assignment of ideas
9   necessary for the creative field to flourish?  Will small
10  companies be disadvantaged?
11              The most efficient producers will win out under
12  this rule every time.  And that is what the law promotes.
13              THE COURT:  Also, does patent law then protect
14  them as well?
15              MS. HURST:  Where it's a patentable invention,
16  yes.
17              THE COURT:  So there's your protection.
18              MS. HURST:  Now --
19              THE COURT:  For your small companies, that's the
20  protection, isn't it?
21              MS. HURST:  Sure.
22              And the fact that they are nicer places to work
23  with friendlier cultures, entrepreneurial spirit and open to
24  new ideas, the kind that creative people appreciate.
25              Did the inventions agreement assign ideas?
0007
1               THE COURT:  That's going to be the key question I
2   have for Mattel, and Mattel should be alerted.  I don't
3   understand if Mattel contemplated that ideas were to be
4   incorporated in the inventions agreement.  The history that
```
Page 3

111610DOC-02.txt

```
 5   Mattel has of having that inclusion at one time but then
 6   with competent counsel, obviously, explicitly excluded the
 7   word "idea" in the early 1990s -- and I want you to directly
 8   address that when we get there, because it's an
 9   interpretation on your part that ideas is included within
10   the inventions agreement that Carter Bryant signed.
11            Counsel, please continue.
12            MS. HURST:  Thank you.
13            So I'll save any comment on that for rebuttal,
14   given the court's comments.
15            THE COURT:  You can comment now, if you would like
16   to, or you can wait.
17            MS. HURST:  Okay.  Well, no, no other witness has
18   explained it.
19            I mean, Kaye testified about this.  He was not
20   only the 30(b)(6) witness.  He's the senior vice president
21   of human resources at the time responsible for administering
22   the Carter Bryant contract.
23            Did anyone other than him explain it?  No, no.
24            Is Bryant's statement that he thinks he was aware
25   of an assignment ideas, relevant?  No.
0008
 1            Under the objective theory of interpretation, the
 2   only subjective expression of intent that could be relevant
 3   would be one that would meet Section 1649, which is a
 4   statement by the promissor that he understood the promise in
 5   the fashion that the promisee intended it at the time of
 6   execution.  That's the only exception under the
 7   parol evidence rule, even where extrinsic evidence can come
 8   in, given the objective theory of contract.  You don't get
 9   this parade of, Oh, I'm a manager at Mattel and I think
10   Mattel owns my ideas.
11            No.  That's not what kind of evidence gets to come
12   in once you've got an ambiguity.  It's got to be evidence
13   that supports the objective theory of contract
14   interpretation.  So, in fact, this testimony from Bryant was
15   given when they had the proprietary information check out
16   form in front of him.  That was the form they used when
17   people were leaving, the form that's still used in 1975,
18   1978, 82, 83, 84, 85, 86, 90, 91, 92, 93 language that
19   included ideas.
20            So all that time after they changed it on the
21   front end to a contract that said no ideas, and then they're
22   trying to get people as they're walking out the door with
23   this broader, more specific document where they try to grab
24   everything.  Using the broader, more specific document the
25   entire time, they are using the one from which they deleted
0009
 1   the word "ideas."  That's the Tahoe Bank case, right there.
 2   You can't do that.  You can't deliberately create an
 3   ambiguity and then try to take advantage of it on the back
 4   end.
 5            So that testimony is not admissible to show, under
 6   an objective theory of contract, the parties' intentions at
 7   the time of contract.  Even with an ambiguous contract where
 8   extrinsic evidence can be considered, that's not the type
 9   that can be considered.
10            Same answer with respect to the Morales testimony.
11   The question was compound.  But, moreover, the question put
12   to her about Exhibit 5395 and the testimony quoted by the
13   court, cited by Mattel, that was her separation agreement
14   where -- guess what? -- they stuck in that word "ideas"
15   again on the way out the door.  That doesn't show anything
```

Page 4

111610DOC-02.txt
```
16    about what the parties understood at the time she came in.
17    Not that notice to Ms. Morales would constitute notice to
18    Bryant in a situation where, as here, the undisputed facts
19    show that the human resources personnel did not explain the
20    contracts to people when they were signing them and,
21    in fact, were expressly instructed not to do so.
22              I think that brings us to question 3, the Bratz
23    design.  I have to say I'm not sure exactly what this theory
24    by Mattel is.  It's not in their pleadings.  It's not in
25    their Rog 31 response that there's some logo that's part of
0010
1     their copyright claim here.  And I don't know what else it
2     could be.  It's -- you know, if it's not -- if it's a logo
3     and it's not part of their copyright claim, it was not a
4     trademark at the moment it was drawn.  It was only a
5     trademark upon use.
6               So before use, the only property interest,
7     potential property interest in the logo is the abstract idea
8     in the name which we've already discussed, or the particular
9     expression of that logo which would be a copyrightable
10    interest and subject to the rules of copyright.  And, by the
11    way, there's a Ninth Circuit case that Mattel litigated.
12    It's a Hot Wheels versus Jada Toy case, talking about the
13    copyrightability --
14              THE COURT:  I think you dropped your voice.  Just
15    a moment, Deborah.
16              Did you get that, Deborah?
17              I didn't think so.
18              MS. HURST:  Hot Wheels versus Jada Toys.
19              THE COURT:  You need to slow down.
20              Now, pull the mike closer and repeat that, please
21    so I have a record.
22              MS. HURST:  There is a case litigated by Mattel,
23    the Hot Wheels versus Jada Toy case.  It talks about the
24    copyrightability of logos.  So they know that this is
25    supposed to be a copyright claim, if that's what they're
0011
1     trying to bring.
2               And what rights did Bryant even have in the
3     design?
4               I believe the testimony is that Ms. Cloonan, his
5     roommate, did that on her computer which is an important
6     point for answering the court's statute of limitations
7     questions.  I won't jump ahead to that, but it is important.
8               On work-for-hire, your Honor, in the Bancorp case,
9     the Ninth Circuit expressly said that its holding was not
10    limited to the fact that it had denied the petition for
11    leave to amend in the prior appeal but instead said this
12    would be the kind of abusive tactical change in all events
13    that would not be permitted under Rule 15.
14              On 4.b), exactly.  It can't have been.  As Mattel
15    admitted in every copyright registration that it filed, it
16    was not a work made for hire.  Carter Bryant was hired as a
17    project designer in 1999.  That means he got projects to
18    design.  And this goes to one of the court's questions on
19    the statute of limitations, but it's directly pertinent
20    here.  The test for work made for hire is that it was within
21    the scope of employment as measured by the three-part
22    Restatement of Agency, Section 28 test.  It can't be within
23    the scope of employment, unless it was part of the
24    employee's job duties.
25              He was a project designer.  If someone had given
0012
```

111610DOC-02.txt
1  him the project to design, Bratz, when MGA published it,
2  when they saw it in April 2001, after Sal Villasenor snuck
3  into our showroom, they would have known they had a claim
4  right away, if someone had assigned that to him as a
5  project -- in his role as a project designer at Mattel.
6          So they can't have it both ways here.  They can't
7  claim, Oh, really, it's a work made for hire, but we never
8  knew.  We never knew we had the right.
9          Their assertion that they never knew they had the
10 right precludes any assertion that it's a work made for
11 hire.  Not to mention their admissions in their copyright
12 registrations.
13         Mr. Molinski is giving me the look.
14         Your Honor, I think that brings us to point G., in
15 the court's outline:  Fiduciary duty.  It looks to me like
16 G.1. is directed to Mattel.
17         G.2.:  How does treating the former Mattel
18 employees as fiduciaries hew to (or betray) the purpose of
19 the doctrine, which was born in equity?
20         Hi, I'm Mattel.  I can fire you tomorrow without
21 any reason, but you owe me your utmost loyalty in exchange
22 for no continuing promise of employment, whatsoever.
23         Or, if you're a seamstress, $22,000 a year; or
24 Carter Bryant, $60,000 a year.  Can be fired at any moment.
25         If every rank-and-file employee in the state of
0013
1  California is suddenly in an at-will employment
2  relationship, is suddenly to be turned into a fiduciary?
3  That's not equitable.  Then you have a whole situation where
4  the employers have no duties at all to these employees, none
5  whatsoever, and all the employees are walking around signing
6  their lives away to the employers.  That's crazy.
7          You can't create a fiduciary duty where it doesn't
8  exist as a recognized legal relation, which is certainly the
9  case here with respect to the employees that we have moved
10 on.
11         And you can't create that duty by contract without
12 being clear about it, which Mattel was not.  And as the
13 court notes in G.2., a claim for breach of contract is
14 sufficient.  And furthermore, your Honor, the fact that the
15 contract covers the exact duty that they are positing
16 suggests that the contract is the proper way to address the
17 issue in the case of the first party obligation, not third
18 parties, because of the important policy also under
19 California law, Freeman and Mills and a variety of other
20 cases, that we don't blur the lines between contract and
21 tort liability.  That's just its own set of problems.
22         I'm going to stop and let Mr. Molinski take over
23 on trade secrets.
24         THE COURT:  All right.  Mr. Molinski.
25         MR. MOLINSKI:  Good afternoon, your Honor.
0014
1          On the trade secrets issues, I'm going to go
2  straight through the questions that your Honor had in the
3  H section of the outline.  They follow the elements of the
4  claim that we've addressed in our motion.
5          The H.1. section addresses the element of economic
6  value of those secrets in addressing the categories of the
7  secrets.
8          H.2. addresses the reasonable efforts requirement
9  for information to be a trade secret.  We'll go to that
10 next.
11         We'll go to the third point which addresses the
                              Page 6

111610DOC-02.txt
```
12  motion by MGA that there is no evidence of wrongful
13  acquisition, use, or disclosure of any of the confidential
14  information, whether it's a trade secret or not, and then
15  move to the issues specific that the court has raised on
16  Mexico.
17             I'll also be addressing the choice of law issue
18  after that, your Honor.  I know it skips over one issue in
19  between.  I apologize.  But it follows neatly with the trade
20  secret issue.
21             Before addressing the specific questions, only one
22  very brief preliminary statement, and that's what is not at
23  this point in front of the court.  There were multiple
24  complaints filed by Mattel, naming the eight individuals
25  here of the more than 100 people that were hired by MGA who
0015
 1  had previously worked for Mattel.  More than 100.  And they
 2  were able to find eight of those who they could somehow
 3  attach something that they would attribute wrongful.  I
 4  think that's going to be important in answering at least one
 5  of the questions the court has, if not others.
 6             But even for those eight, your Honor, I think it
 7  bears noting the dramatic difference in where we are now
 8  versus what they alleged in public filings that dragged
 9  these individuals through the mud.  Specifically, with
10  Mr. Brawer, as a perfect example, the original complaint,
11  your Honor, talked about him walking out the door with a box
12  full of documents.  That allegation is gone.  There is no
13  evidence, and it turned out that the videotape showed him
14  walking by the security guard and talking to him with the
15  box in his hand full of personal items, including family
16  photos.
17             Gone are the allegations of Mr. Brawer having lied
18  about printing a document saying he was doing it for a
19  meeting when it turned out that the very same e-mail that
20  they relied on for that allegation, Mr. Brawer asked to
21  print that 2004 sales plan by one of his coworkers and to
22  bring it to a meeting that he had later that day.  So the
23  very evidence that they alleged, to suggest that he somehow
24  lied about taking it to a meeting, actually instructs him to
25  do it.  And gone are the allegations that he took any
0016
 1  physical documents with him.
 2             What is left are a last-minute "Hail Mary" by
 3  Mattel where they lately added a claim that, Okay, well, if
 4  we can't prove he didn't take any documents, maybe he took
 5  something in his head.  And they allege three themes of
 6  dolls that they said Mr. Brawer took with him.  Three themes
 7  of dolls that they say Mr. Brawer saw at Mattel, and then
 8  brought to MGA.  The only evidence being that there were
 9  dolls at MGA that they claimed to be similar to those
10  themes.
11             Well, now they have dropped two of those three,
12  when it turned out that MGA was in the process of developing
13  those dolls well before Mr. Brawer came on board.  The only
14  reason I mention this, your Honor, is that it has to color
15  the view of the remaining trade secrets that they are
16  accusing these people of taking.  They had no evidence when
17  they brought this case that MGA used or disclosed anything
18  of Mattel's.  They have used these employees to try to wage
19  war against MGA and increase the cost of the litigation.
20             So let's go to the questions that the court
21  raised:  In the H.1. section, the first question the court
22  asked -- H.1.a) is on forecasting.  This, obviously, goes to
```
Page 7

111610DOC-02.txt
23  the allegations of Mr. Castilla having taken information.
24          Now, admittedly, Mr. Castilla did take information
25  from Mattel.  He took documents with him.  It's undisputed,
0017
1  your Honor, that those documents concerning forecasting were
2  taken by the FBI before he started at MGA, and there is no
3  evidence that he kept a copy of any of those documents and
4  no evidence that any of that was brought to MGA.  The court
5  asks to hear more about the forecasting process.
6          THE COURT:  Before -- I'm sorry.  Before he went
7  with MGA?  I thought that these documents were found in the
8  office.
9          MR. MOLINSKI:  No, your Honor.  Not for
10  Mr. Castilla.  And that is a very important point.
11          The FBI came to his house --
12          THE COURT:  Oh, my apologies.  You're absolutely
13  right.
14          MR. MOLINSKI:  A week before he started at MGA,
15  they took the documents and there's no indication that a
16  page of Mattel document made its way to MGA.
17          THE COURT:  Thank you.  I appreciate the
18  correction.
19          MR. MOLINSKI:  So what they are now claiming, your
20  Honor, is what's in Mr. Castilla's head, that even if they
21  can't prove he took documents, your Honor, that maybe he
22  used something he knew about forecasting that he learned at
23  Mattel.  That's it.  That's all they have left with Jorge
24  Castilla.
25          So on the forecasting question your Honor asks and
0018
1  that's:  How does the forecasting work?  Do they place
2  orders -- do they receive orders from retailers before they
3  manufacture the product?
4          Well, the straight answer to that, your Honor, is
5  sometimes, yes; sometimes, no.  If a product is manufactured
6  FOB Hong Kong -- meaning, the retailer is going to pick the
7  product up in Hong Kong -- then they will not manufacture
8  that product traditionally until the order is placed.
9  Because it's being picked up over there, they have more lead
10  time.  If the product is FOB Los Angeles or FOB California,
11  then, yes, they will manufacture that product before they
12  receive the order.  They will have it in warehouses here and
13  when the order is placed, they can fulfill that shipment.
14  So it happens both ways, your Honor.
15          But I think what the question is really trying to
16  get at is:  What is the importance of forecasting to the
17  inventory, the amount of product that's being manufactured?
18          And the answer to that, your Honor, requires a
19  little bit of knowledge of how the forecast is put together.
20  A forecast is put together, your Honor, not by the forecast
21  division, the people like Jorge Castilla who assemble these
22  systems to allow input.  The forecast is put together, your
23  Honor, by the sales team, and they do that by simply
24  educated guesses.  They'll sit down and they'll say, Okay,
25  what do we think this product will sell?  How many do we
0019
1  think this product will sell?
2          Sometimes they have some orders already; sometimes
3  they don't.  But it's an educated guess by the sales team.
4  The forecast system and process that Mattel claims as its
5  trade secret does not do that.  It doesn't provide you with
6  a forecast.  It only allows you a system to input that
7  information into.  The salespeople will take their best
                              Page 8

111610DOC-02.txt

```
 8  guess and they will put it into this system, and that system
 9  then will allow people in the company in Hong Kong who have
10  the toys manufactured in marketing to have a window into
11  what the company thinks they are going to sell on this
12  product.  That forecast is going to constantly be revised as
13  orders come in and as sales progress so they know -- they
14  can adjust those forecasts as the process goes.
15            But the system that they say Mr. Castilla had in
16  his head doesn't help you at all with the ability to make an
17  accurate forecast.  And the citation for that, your Honor,
18  is from the deposition of Nicole Coleman, who was the former
19  manager of Mr. Castilla, on pages 70 through 77 of her
20  deposition, where she describes this in detail.  But it's
21  also in the declaration of Laura Owens from Mattel who
22  acknowledges in her declaration, in paragraphs 11 and 14,
23  that when you make a forecast it's difficult to do because
24  you are just guessing based on a new product.
25            The unique thing about the toy industry, your
0020
 1  Honor, on the forecasting, is every product is a new
 2  product.  At least it is for MGA.  So you don't have 20
 3  years of history of a product.  When you have a new doll
 4  line coming out, which they do every year, you are just
 5  guessing how much of this we're going to sell.  Sometimes
 6  you're right and sometimes wrong.
 7            THE COURT:  And why wouldn't that information be
 8  even more valuable, since MGA didn't have the track record
 9  that Mattel had?
10            MR. MOLINSKI:  Why --
11            THE COURT:  Why wouldn't this forecasting material
12  be more valuable then, even to MGA, since MGA didn't have
13  the history of forecasting that Mattel had?
14            In other words, it's more valuable to steal.
15            MR. MOLINSKI:  Well, there is no information that
16  the forecasting system produces that assists you in making
17  that forecast.  It is a place to hold that information.
18            THE COURT:  Say what?
19            MR. MOLINSKI:  It's a place to hold that
20  information.  What the forecast system is, is a -- think of
21  it as a massive Excel spreadsheet.  It allows you to put in
22  information on, Here's what we think the sales are going to
23  be.  Here's when there's going to be a promotion.  Here's
24  where we think there's going to be an increase in the sales
25  as a result of that promotion.
0021
 1            THE COURT:  So what you're arguing is that this is
 2  valueless information?
 3            MR. MOLINSKI:  I'm not.  I'm arguing that the
 4  information that the -- the system does allow you to be more
 5  efficient as a company.
 6            THE COURT:  Therefore, it has value.
 7            MR. MOLINSKI:  It has some value in having a
 8  forecast system.
 9            THE COURT:  And it would have more value to MGA
10  taking this because they didn't have a history of this
11  forecasting?
12            MR. MOLINSKI:  That's not what I'm saying.
13            What I'm saying is that the system, itself --
14  every company has a forecast system and having a forecast
15  system is valuable to a company.  But the particular way
16  that a company does a forecast, puts together their forecast
17  system, the particular way -- we, at MGA, have had our own
18  forecasting system since well before Mr. Castilla got there.
```

111610DOC-02.txt
```
19   We had what was called the John Galt system, before
20   Mr. Castilla got there.
21            As he got there, they instituted a new system a
22   few months before he got there.  Two years later, they
23   instituted another system.  They have always had a forecast
24   system.
25            What Mattel is claiming as their trade secrets is
0022
 1   the very idea of a forecast system which we have always had.
 2   The particular nuance of how Mattel does its forecasting
 3   system isn't going to be useful for MGA, which has a very
 4   different -- its own system.  These are software system --
 5   it would be like the analogy if you're a law firm running on
 6   Apple and there's another law firm running on Microsoft,
 7   knowing how that other law firm puts together their
 8   spreadsheets on Apple isn't going to help you with your
 9   Microsoft system.
10            THE COURT:  It certainly would in a competitive
11   marketplace if I knew what my competitor was doing and what
12   they are targeting and the volume and the forecast.
13            I don't see it as an Apple and Microsoft
14   comparison at all.  And I don't understand, yet, how you're
15   able to argue that this is of little value.  If it's of
16   little value, why does Mr. Castilla have it in his
17   possession?  It seems to have some value.
18            MR. MOLINSKI:  Mr. Castilla, when he left, the
19   documents he took with him were a series of documents that
20   were historic --
21            THE COURT:  You know, I'm having to trouble with
22   this one, and I'll tell you why I'm having trouble with it.
23   If it's so valueless, then I'm certain that all these
24   in-seal documents and requests I have had from both Mattel
25   and MGA has little significance.  I've been flooded with
0023
 1   ex parte efforts to keep these valueless forecasts, et
 2   cetera, from the public eye.
 3            Why have I been exceeding to this ridiculousness,
 4   then?
 5            It has tremendous value.
 6            MR. MOLINSKI:  Mattel's forecasting system has
 7   value to Mattel.
 8            THE COURT:  And I think MGA's has to MGA.
 9            MR. MOLINSKI:  MGA's has to it.  It's absolutely
10   right, your Honor.
11            THE COURT:  And I think it would in the
12   competitive situation in the same industry.
13            Now, tell me why I'm wrong.
14            MR. MOLINSKI:  Well, for a couple of reasons, your
15   Honor:
16            First off, the systems are -- well, first off, let
17   me address what he took with him.  What he took with him --
18   but there is no evidence that he copied and brought to MGA
19   those documents --
20            THE COURT:  Okay.  We got as far as that argument.
21            MR. MOLINSKI:  Okay.  -- were historic documents
22   that talked about meetings that they would have and
23   PowerPoints that they would put together about how to
24   improve the Mattel forecasting system that was a system
25   called the Isis system.
0024
 1            Okay.  How could we make the Isis system move a
 2   little faster?  How can we make the Isis system do this or
 3   that we would like it do?
```

111610DOC-02.txt
```
 4              When he got to MGA, MGA had a system in place that
 5    did all of the same basic functions that the Mattel system
 6    did.  All of the same basic functions.  It allows the same
 7    inputs and it gives you outputs.  So the information at that
 8    level wasn't valuable to MGA.
 9              But second, your Honor, what's more -- what's now
10    at issue in this case is not the documents, because it's
11    conceded that they weren't taken to MGA.  What's at issue at
12    this point is whether information in his head about how
13    Mattel ran its system would have been valuable to MGA.  And
14    there is no specific evidence that they can point to to
15    suggest that he used one thing from Mattel to improve in any
16    way --
17              THE COURT:  He's an unsuccessful thief.
18              MR. MOLINSKI:  -- the MGA system.
19              THE COURT:  He's an unsuccessful thief.
20              MR. MOLINSKI:  I would not call him a thief for
21    walking out the door with knowledge.  It's information in
22    his head that he learned at the company from nine years of
23    working there.  If someone who walks out of the doors of
24    their former employer with knowledge in their head is a
25    thief, then, respectfully, everyone is a thief.
0025
 1              THE COURT:  Sure.  As long as it's knowledge in
 2    their head, they are certain entitled to a certain amount of
 3    what I call intellectual toolbox.  The question is when they
 4    take documents to support that intellectual toolbox, the
 5    reason for that.
 6              I expect free employment to ebb and flow,
 7    especially in a place like California, especially Silicon
 8    Valley, which fuels on that.
 9              What I don't expect is explicit documents to feed
10    that fuel box.
11              MR. MOLINSKI:  And I understand that, your Honor,
12    and there is not one iota of evidence to suggest those
13    documents made its way to MGA.
14              And I'll move to the next question on that.
15              The next question your Honor asks is:  Is it -- we
16    go to the Dan Cooney document.
17        (Pause.)
18              THE COURT:  Counsel.
19              MR. MOLINSKI:  The next question your Honor asks
20    about is Dan Cooney.
21              Again, the original claim with Mr. Cooney was that
22    he downloaded a bunch -- accessed a bunch of documents
23    before he left; and, therefore, he must have taken them.
24    That claim is gone.  It's now down to a single document that
25    he acknowledges he took.  It's called a Merchant Modeling
0026
 1    Optimization Tool, and that's raised in your Honor's
 2    question in H.1.c).
 3              The document that Mr. Cooney took, to answer your
 4    Honor's question about whether it is unique, is that it was
 5    not.  What that document was was a two-page document that
 6    was given to him by Toys "R" Us when he was at Mattel.  That
 7    is a simplistic spreadsheet for figuring out what's the best
 8    use of the space on our toy shelves.  So it has a series of
 9    columns, and it will say the size of the product, the price
10    of the product, the margin that we make on that product, how
11    long we expect that product to be on the shelf.
12              THE COURT:  Is this something that Mr. Cooney
13    explicitly worked on?
14              MR. MOLINSKI:  It is indeed, your Honor.
```

111610DOC-02.txt
15          He was given a hard copy of this by Toys "R" Us.
16   He then took that document and put it onto Mattel's system
17   in a spreadsheet form, an excel form.  And what he tried to
18   do at Mattel was then calculate out the formulas to figure
19   how all those boxes fit together.  And he was in the middle
20   of that project when he left the company.
21          He took that form with him.  Stripped it, your
22   Honor, of all substantive Mattel data.  Took out all the
23   number of skews and the number of products that Mattel were
24   selling to Toys "R" Us, took the blank form.  So he
25   continued to work on -- because he knew he would be selling
0027
1    to Toys "R" Us, and he knew this was the template that they
2    liked and he had been working on trying to figure out, okay,
3    how all these boxes fit together, and he took that with him.
4          It turns out he never used that at the company,
5    because, A, he never -- because Toys "R" Us was in the
6    middle of an acquisition.  They were purchased by another
7    company.  And they changed the tool that they used.  They no
8    longer used that.  And his boss at Mattel, Gene Murta, has
9    admitted that in deposition.  They were in the midst of
10   changing things.  The tools soon became obsolete.
11          More importantly, what Mr. Murta has said is that
12   if you would ask Toys "R" Us for a copy of this tool, they
13   will gladly give it to you, if you are at MGA, or anywhere
14   else, because they want their manufacturers to know what
15   they're striving for in terms of shelf space.
16          THE COURT:  So it's not much of a trade secret.
17          MR. MOLINSKI:  It is not, your Honor.
18          To answer your question:  Is it particularly
19   unique?  It was not, your Honor.
20          And that is the only thing that Mr. Cooney is now
21   accused of taking.
22          The next category, your Honor, is the efforts to
23   maintain secrecy.  And before addressing specific questions
24   on this, your Honor, let me briefly say that one important
25   reason to find in favor of MGA on this as a matter of law is
0028
1    the failure by Mattel to confront any of these individuals
2    with the information that they had about what these people
3    had taken.  I think that's important, your Honor, that they
4    knew Mr. Castilla, the day after he left, had downloaded
5    these 78 documents.  They knew the people in Mexico had
6    downloaded information before they left.
7          THE COURT:  Let me tell you where I think we're
8    going with this argument, according to your briefing; and
9    that is, that this is an insidious plot by Mattel to
10   have a compilation of people -- take information from under
11   their very nose, so that they can sue in the future.  That's
12   really the document briefing you've given me.  And I want to
13   say to you, on the face of it, it seems ridiculous.  A
14   company isn't going to sit there and watch themselves stolen
15   blindly and put themselves at a competitive disadvantage.
16          So right to begin with, I'm having difficulty with
17   that entire section of not your specific briefing but MGA's
18   briefing.
19          MR. MOLINSKI:  Your Honor, I understand that
20   concern, but the facts are what the facts are:  That these
21   people, they knew had taken information and they did not
22   confront them.  And they did not say, We know you took --
23   downloaded these 78 documents.  I hope you understand those
24   should not be used at the company.
25          They didn't move for a TRO.  They did not move for
                              Page 12

111610DOC-02.txt
0029
1    an injunction.  They didn't -- what they instead did was
2    went through criminal channels with some of these people,
3    although not with all of them.
4            THE COURT:  Doesn't that show at least the mindset
5    of Mattel, that they believed that there are -- rightly or
6    wrongly -- trade secrets out there that are of value?  In
7    other words, their very actions speak to some concern.
8            MR. MOLINSKI:  Your Honor, I, frankly, don't
9    believe it does.  I believe what their actions, in going to
10   the authorities instead of trying to stop these people from
11   using the information, suggests an effort to create a record
12   of getting criminal indictments against people that they
13   could use against MGA, instead of trying to actually stop
14   these people from using the information they claimed to have
15   taken.
16           Now, your Honor asked questions about the other
17   aspect of our argument, and that's the failure to stamp the
18   information as confidential.  As our papers set forth, only
19   six of the -- sorry, 20 of the 267 documents that they claim
20   were their trade secrets were stamped or designated in any
21   way as confidential.  Only six.
22           And your Honor asks the first question:  Yes, but
23   is -- how could we conclude that just merely not stamping
24   something would -- that an employee could expect he could
25   take the work done by somebody else?
0030
1            In answer to that question, your Honor, first --
2            THE COURT:  That's why I'm asking.  Let me just --
3            Bear with me a moment.  I can understand that if
4    I'm employed and I work in a specific -- or on a specific
5    project for a company that I might feel that that's part of
6    my intellectual toolbox.  I might be careful to excise
7    specific information like shelf space, et cetera.  And
8    because I worked on that product, possibly, that I had the
9    right to take that with me.
10           I have a difficult time understanding why an
11   employee takes the work of others when either he or she
12   leaves the company.
13           MR. MOLINSKI:  Your Honor, the first answer to
14   that is that the information that they did take, with one
15   singular exception, one document, which I'll address in a
16   second, Mattel concedes were documents that these
17   individuals had regularly worked on in the course of their
18   job.  These are not documents, your Honor, where somebody
19   reaches out beyond their job duties and takes something out
20   of somebody else's box, or goes on the server and takes
21   something that wasn't something that they were working on.
22   These are documents that was part of their job.
23           And I can cite you to the record on each of those.
24   For Keith Story's deposition, your Honor, he concedes that
25   everything that Brisbois was claimed to have taken were all
0031
1    part of her regular jobs duties and you would expect her to
2    have.  Everything that Brawer was claimed to have taken was
3    within his job duties.  Everything Cooney was claimed to
4    have taken were part of his regular job duties.  And
5    everything except one document, they claim, was part of
6    Castilla's regular job duties.  These were all documents
7    that they had normal course and scope, worked on each day,
8    or been provided a copy of to fulfill their job duties.
9            The only exception to that is a document called
10   the International Business Plan that Mattel claims
                          Page 13

111610DOC-02.txt

11  Mr. Castilla would not typically have access to.  Now, there
12  is conflicting testimony on that.  Whether that was a
13  document, I -- that singular document, his position is that
14  that was something he was provided for informational
15  purposes.  Mattel claims he wasn't.  But it was only one
16  document of the 267 that is outside of that where your
17  Honor's question is going with someone reaching out and
18  taking something they shouldn't.
19              Your Honor's next question is that:  Is there
20  evidence that Mattel employees who left for non-MGA
21  competitors -- we're now in Section 3 of H.3. of your
22  outline.  Is their evidence that employees who left for
23  non-MGA competitors downloaded or did not download Mattel's
24  material prior to their departure?
25              Frankly, your Honor, we don't know a lot about
0032
1  what individuals at Mattel did when they went to other jobs.
2  We weren't permitted that in the course of discovery.  We
3  were only permitted discovery into what people took with
4  them when they went to MGA.  But I can tell you, your Honor,
5  that at least a few of the people we've deposed have
6  acknowledged taking materials from Mattel, going to other
7  jobs other than MGA.
8              Tyler Bradley testified that she took Toy Fair
9  reports and other reports from Mattel when she left, because
10 they were samples of the work product she had done.  Very
11 same argument that Mr. Castilla had offered as to his reason
12 for taking information.  And at least two of the documents
13 that they claim Ms. Brisbois took were actually documents
14 that were templates that she had created while at
15 Proctor & Gamble before going to Mattel.  And she took those
16 over, those templates to help her in her work at Mattel and
17 then took them when she left.
18              But, I think, your Honor, an additional important
19 question on this topic is that back to what I said,
20 initially:  There were over 100 people who came to MGA from
21 Mattel.  And there were only eight that they've accused of
22 taking anything.  And the implication that -- your Honor's
23 question, at least the implication I draw from that, is
24 that, if people didn't take material when they went to other
25 jobs, then is that some suggestion that maybe with respect
0033
1  to people who went to MGA, there was some inducement for
2  them to do it?
3              THE COURT:  No, I've never had a clear indication
4  from this record or from either party the significance of
5  the eight to 100.  For instance, this is what the court
6  doesn't know:  I can see Machado, Trueba and Vargas being
7  important to Mexico and the formation of that company.  But
8  as to the other five, I've never had a relative comparison,
9  for instance, of their prominence.  In other words, a
10 low-level employee moving from -- whatever "low level" is
11 defined.  And I don't mean that in a derogatory sense, but
12 let's say nonmanagement or person not subject to a hierarchy
13 of information -- moving may not cause a great concern.
14 This may be a de minimis report that the person took with
15 him.
16              I've never had an indication, other than the job
17 description alluding to what some of these reports where,
18 for instance, if the other 92 people that moved from Mattel
19 were of great, of a greater status in terms of the
20 information that they had at their receipt when they moved
21 from Mattel.  In other words, the strongest position MGA
                              Page 14

111610DOC-02.txt

22  would be in is if you had vice-presidents and people of
23  great prominence subject to, or accessible to vast amounts
24  of information who never took that information when they
25  moved from Mattel to MGA.  Because it would negate a lot of
0034
 1  the RICO allegations; and that is, Gee, we've got 92 people
 2  coming over.  They had access to vast amounts of information
 3  and they brought none of this.  Therefore, somewhat
 4  absolving the allegations against Mr. Larian and MGA that
 5  they were conspiratorially taking a lot of information.  You
 6  would think a conspirator would be reaching out to the
 7  people who had that kind of access.
 8          Here, I've never had an indication other than who
 9  these people are, what the other 92 looked at, or looked
10  like.  And you can't supply it.  You don't have a record of
11  it before me.  So you're left to argue, Judge, they were
12  very important.
13          Counsel, thank you.
14      (Pause.)
15          THE COURT:  Now, you've got about an hour left,
16  counsel.
17          MR. MOLINSKI:  Thank you, your Honor.
18          Ms. Hurst reminds me that -- I believe there are
19  titles, at least --
20          THE COURT:  They are titles, but that doesn't mean
21  much yet.
22          MR. MOLINSKI:  And it was a variety of titles.
23  They were people who were vice-president level.  There were
24  people at higher title levels than Mr. Castilla.  Certainly,
25  people at higher title levels than the people in Mexico.
0035
 1  There were people at lower levels.
 2          THE COURT:  And there's no allegation.  So a
 3  strong argument on your part is:  They must have had greater
 4  access; therefore, the conspiracy falls apart because you
 5  would expect Mr. Larian, if he's involved, or MGA, would try
 6  to pirate that information.
 7          MR. MOLINSKI:  And a number of these people, I
 8  would argue, had at least equal access, if not greater
 9  access to the same type of information, to a variety of
10  different information.  And if the idea was that you were
11  going to build your whole company based on Mattel's
12  information, you would expect there to have been more.  And
13  if you look at the eight, that now has been whittled down,
14  as your Honor knows, to something less than that.  We know
15  that they dropped the claims against Mr. Contreras.  That's
16  out of the case.
17          I've mentioned Mr. Brawer.  They are down to a
18  single trade secret they say was in his head, who is the
19  most senior person who went over of the eight.  I think
20  there is little there.
21          With Mr. Cooney, again, there is a single
22  document.  And so, again, if this was an organized plan to
23  take information, even just looking at what's in the record
24  of these eight, it doesn't support that theory.
25          The next question, your Honor, asks -- and
0036
 1  wrapping up on --
 2          The next question in this area is as to the issue
 3  of ratification.  This goes to the issue of their claim that
 4  even though they don't have any evidence that anyone at MGA
 5  induced these people to take anything, used, or disclosed
 6  anything at the company -- and I'm talking specifically
                            Page 15

111610DOC-02.txt
```
 7  about Castilla and the others in the U.S., which is what we
 8  moved on -- Brawer, Castilla, Contreras, Cooney -- they say
 9  you can imply that there was some use because of
10  ratification.
11              And your Honor's question is:  Does the
12  acquisition by improper means require knowledge by the new
13  employer?
14              And the answer to that is, yes, on two grounds:
15  First, the definition of "ratification" itself is:  That is
16  the voluntary election by a principal to accept or adopt the
17  unauthorized conduct of an agent after the conduct has
18  already occurred.  That's the Rakestraw versus Rodrigues
19  case, 8 Cal.3d 67.  So just ratification alone has a
20  voluntary element to it.  You have to be knowingly electing
21  to adopt someone else's behavior.
22              But more importantly is the California Civil Code
23  on trade secrets which provides that for there to be -- for
24  there to be improper acquisition, it has to be either
25  knowing or done with reason to know.  And that's 3426B, your
0037
 1  Honor, and the cited case, the Jackso versus E*Trade that
 2  said, quote:  An inquirer is not liable under the CUTSA,
 3  unless he knew or had reason to know that the trade secret
 4  was improperly used or disclosed.
 5              And as to ratification, your Honor, that notion
 6  alone in the trade secrets law is what negates any use of
 7  ratification as a doctrine.  Because ratification, your
 8  Honor, would allow you to circumvent that requirement that
 9  you know or have reason to know what they are arguing is
10  that you don't need to know or have reason to know that
11  somebody stole something.  All you have to do is, after the
12  fact, somehow adopt their conduct as yours.  And that would
13  negate that very element of the Uniform Trade Secrets Act
14  that you have to know or have reason to know of it.
15              And the Droeger versus Wells case, your Honor, I
16  think, sums it up best, that said:  In light of the emphasis
17  in trade secret law on unfair use, it is generally not
18  appropriate to direct a jury to impute an agent's knowledge
19  of a secret to the principal.  Such an instruction would
20  permit recovery even when the trade secret was not actually
21  communicated to or used by the principal.  The plaintiff is
22  not entitled to a windfall when, in fact, there has been no
23  invasion of those interests which trade secret law seeks to
24  protect.
25              So because of the nature of trade secrets law,
0038
 1  your Honor, ratification does not work.
 2              I'm now going to go to the choice of law --
 3  actually, I'll go to the questions that your Honor had on
 4  Mexico in H.4. and answer them, briefly.  I know Mr. Cote is
 5  going to address these further.
 6              Your Honor raises questions on a few different --
 7  three specific issues in Mexico.  The first is the W
 8  presentation.  In answer to your Honor's question in H.4.a),
 9  Is the presentation delivered at the W what's contained in
10  Exhibit 33?, the answer is yes and no.  It was a subset of
11  that.  Both Mr. Vargas and Mr. Machado said when they looked
12  at that written presentation, Exhibit 33, they said:  Yes,
13  that was what we presented, but it wasn't all of those
14  slides.  It was some subset.
15              Keep in mind, your Honor, it was a half-hour
16  presentation.  So some subset of that 40- or 50-page
17  presentation was presented and none of them remember exactly
```
                              Page 16

111610DOC-02.txt
```
18  which slides were presented.  That's all there is on the
19  record of that, so we don't know specifically which slides.
20          Now, does that matter?  I would argue, no, in
21  answer to your second question, your Honor, as to what's the
22  significance of the fact that those slides all reference
23  third-party sources of information:  Infobasic, Mindshare
24  and ANTAS.  There is -- all of the information in those
25  slides, if you look at those slides, attributes its
0039
 1  source -- at least 95 percent of it.  There are a few
 2  generic background of Mattel in Mexico slides.  But it
 3  attributes its source of information to those three sources.
 4  Those are third-party information providers that you can
 5  license data from.  Infobasic provides information on
 6  distributors.  Mindshare provides advertising information
 7  and ANTAS provides sales data.  You can get that by paying a
 8  subscription fee like you can with A.C. Nielsen information
 9  and NPD data in the U.S.  These are third-party providers.
10  It is not Mattel information.  It's not Mattel trade
11  secrets.  It's somebody else's information and can't
12  constitute a basis for a trade secret claim.
13          And the implication that Mattel wants you to draw
14  that Isaac Larian must have known that these people were
15  planning to loot Mattel of information, because he saw this
16  half-hour presentation that referenced third-party providers
17  is just nonsensical.
18          THE COURT:  It's not Mattel's argument.  Mattel's
19  argument is that he must have known, because this was
20  information -- the Infobasic and Mindshare and ANTAS were
21  not systems that Mattel used; therefore, it must have come
22  from the -- I'm sorry.  Were systems that Mattel did not --
23  that Mattel did use that MGA did not use.  Therefore, it
24  must have come from some outside source, i.e., Mattel.  It
25  must have been unique to Mattel, although the systems are
0040
 1  not unique in and of themselves.  They just weren't systems
 2  that MGA used is their argument.
 3          MR. MOLINSKI:  I mean MGA, in fact, did use these
 4  sources, too.  They polled from third-party data, as did a
 5  number of other companies.  And so the implication that they
 6  must have taken that from Mattel I'm not sure is a
 7  reasonable one.
 8          THE COURT:  So they used Infobasic, Mindshare and
 9  ANTAS?
10          Yes or no?
11          MR. MOLINSKI:  Yes, they did.
12          With respect to the next question, your Honor,
13  with respect to the line lists, your first is:  What good
14  were the line lists if the entire industry had trouble
15  forecasting sales a year ahead?
16          I think this is more of a question for Mattel.
17  Our position is, these line lists work quickly, out of date.
18          And in answer to your next question ...was the
19  specific marketing information that the three individuals
20  took... again, that's a question, I think, for Mattel.
21          What we've seen in the documents provides very
22  little insight into the marketing being done in Mattel; but
23  I think that's a question for them.
24          THE COURT:  Why is that a question for them?
25          You are the party that would have unique
0041
 1  information about was taken by the three individuals and
 2  we've been discussing this from the time that this case was
```
Page 17

111610DOC-02.txt

```
 3   transferred to this court.  In other words, Susan Kuemmerle
 4   wasn't very much help during the deposition.  This
 5   information didn't fly over to the MGA offices in Mexico,
 6   and we've never had an explanation of, one, how it got there
 7   or even a concise summary of what it was.  That's your
 8   responsibility, not Mattel's.
 9              MR. MOLINSKI:  Well, then, I must have
10   misunderstood.  The question I was trying to understand is:
11   what specific information that Mattel would consider to be
12   its marketing information as opposed to some other
13   information?  And without knowledge of Mattel's systems and
14   what they considered to be their marketing plans, a lot of
15   this is information that we would not know.
16              But with respect to what did come over and what we
17   know did come over, Mr. Machado was deposed and he was shown
18   all the documents on this disk.  He recognized some of the
19   documents as documents that he did, in fact, download and
20   take with him.  Not all of them.  But certainly some of
21   them.  And the ones, specifically, he recognized were not
22   marketing-specific documents.  They were point of sale
23   documents in terms of retail or sales data that he did,
24   in fact, recognize.
25              Was the information intuitive to anyone engaged in
0042
 1   the sale of consumer goods?
 2              The answer to that is:  Mr. Vargas, himself, has
 3   acknowledged that was the case that -- even though there
 4   was, in these line lists, information about margins, he
 5   generally knew what the margins were that they would charge
 6   for products from years of working in the industry.  That
 7   was intuitive to him, and his testimony supports that.
 8              The next question is:  Where in the exhibits is
 9   the business plan?
10              It is not in the exhibits.  There has been no --
11   no one has been able to locate what is referenced as the
12   business plan.  I can tell you, your Honor, that the
13   business plan, itself, is a misnomer.
14              Mr. Vargas, himself, when he was asked if this
15   business plan -- which were words that were put in his mouth
16   at the deposition -- he corrected it and said, I would feel
17   more comfortable saying that that was a preliminary forecast
18   of our sales.
19              It wasn't a formal business plan, but the
20   testimony showed -- and it's from the Vargas deposition at
21   page 98 and the Vargas deposition at pages 100 through 101,
22   is that what it was, was they put together an estimate of
23   what they preliminarily expected to sell in Mexico.  They
24   presented that to Mr. Larian.  There was no formal business
25   plan.  And whatever it was, we've looked for it and we can't
0043
 1   find what it was from 2004 that they may have provided in
 2   written form.
 3              In terms of the next question, is:  What benefit
 4   would there be to this business plan?
 5              The next question:  Why would it be materially
 6   different if a departing employee developed a business plan
 7   for his new employer using lessons learned in his prior
 8   employment?
 9              Again, Mr. Vargas' testimony suggests that that's
10   exactly the case.  That much of what was in this business
11   plan, if you want to call it that, this projection, was
12   based on what he knew in his head.
13              Here's a question:  How did you decide what the
```

Page 18

111610DOC-02.txt
```
14  retail or margin was going to be in the business plan?
15          Answer:  By comparison as to what the competitors
16  offer.  In this case we knew based on our experience the
17  margins that the Barbie products offered to the clients.
18          It wasn't from a written document that he got
19  that.  It was from their experience in selling in the
20  industry.
21          What benefit could have flowed from this business
22  plan?
23          Again, I think this is a question for Mattel.  Our
24  view is that there was not a benefit from it.  In fact,
25  there was testimony from Mr. Vargas, again, that said that
0044
1   the projections in this purported plan were rejected by
2   Mr. Larian because his projections were higher.
3           Absent the trade secret material, wouldn't Machado
4   have known about Mattel's prices from his experience as a
5   Mattel employee?
6           Yes, he would, just as Mr. Vargas said he would.
7           Did the line lists permanently set prices?
8           No, in fact, they didn't even set prices for that
9   given year.  They set a preliminary price that was then
10  negotiated individually with the retailer.  So the ultimate
11  price a retailer may pay would be different from what's
12  actually in that line list.
13          Wouldn't retailers share Mattel's prices with
14  MGA de Mexico in order to induce MGA to lower its prices?
15          Absolutely.  They would often do that.  And
16  there's testimony in the record, again, from Mr. Machado and
17  Mr. Ibarra, one of the executives at Mattel Mexico, who said
18  that they would get price lists from retailers who would try
19  to play off one retailer from another.
20          Why weren't Machado, Vargas and Trueba asked to
21  sign noncompete agreements?
22          They, in fact, were.  Mr. Cote is going to address
23  this in further detail.  They were when they were walking
24  out the door, and they wouldn't sign it because they had
25  already given notice.
0045
1           Who employed Gustavo Machado?
2           Mr. Cote is going to address this issue on that.
3           So let me just, very briefly, address the choice
4   of law issues, your Honor, in the J section of your
5   questions.
6           In answer to Question No. 1 on choice of law
7   which, your Honor, I think very clearly the choice of law,
8   both sides agree with the test.  It's a governmental
9   interest test.  Here, when you were dealing with conduct
10  wholly in Mexico where Mattel concedes that the only damage
11  it suffered was in Mexico, clearly the Mexican interests
12  outweigh any U.S. interest on that score, your Honor.
13          In answer to your specific questions on
14  Question 1, the answer is:  There is evidence in the record
15  as to which statute would apply, and it is the tort statute.
16  Mr. Huerta Bleck, in his supplemental declaration, in
17  paragraph three, says that the tort -- the two-year tort
18  statute would apply and he cites to the provision in Mexican
19  law, not the ten-year breach of contract, simply because
20  there is an element of the tort claim on contract.  You ask
21  if there is California law.  Clearly, that's the same in
22  California.  You've got a two-year statute for the tort of
23  tortious interference with contract but a four-year for a
24  breach of contract, even though the tort of tortious
```
Page 19

111610DOC-02.txt
25    interference has an element of its claim, a breach, or a
0046
1     violation of a contract.
2              Question on No. 2, your Honor, we wholly agree.
3     At the very worst, what this case should involve is the
4     choice of California law for only the six documents that
5     Mattel claims it created and for the remaining several
6     dozen, almost 100 purported trade secrets that were owned by
7     Mattel Mexico or Mattel Servicios.  Mexican law should
8     clearly apply to those, your Honor.
9              On Question No. 3:  If California law applies, can
10    it be extended outside -- between a California corporation
11    and one of its employees outside of the state?
12             We, unfortunately, your Honor, could find no
13    authority on that, one way or the other.
14             Summing up on choice of law, your Honor, the only
15    argument Mattel advances on this issue is because they had a
16    few documents that were Mattel specific.  California has an
17    interest in protecting Mattel's interests through California
18    law and clearly your suggestion in Item No. 2, I think,
19    solves any of those concerns and clearly makes sense that
20    California law would only be applied to that limited subset
21    and not to the greater whole of the Mexican trade secrets.
22             Thank you, your Honor.
23             THE COURT:  Thank you, counsel.
24             Counsel.  You have 45 minutes left, counsel.
25             MS. HURST:  Thank you, your Honor.
0047
1              Out with the old notes.  In with the new.
2              Your Honor, on that last question, I just want to
3     go back to the duty of loyalty for a minute.
4              Labor Code Section 2863, which governs the at-will
5     employment relationship, says that the employee must give
6     preference to the employer over business transacted for his
7     or her own account.
8              "Preference" by definition implies a hierarchy or
9     ranking of multiple opportunities.  That cannot exclude
10    secondary employment.  By definition the plain meaning of
11    the statute is such.  And nobody thinks that a shift worker
12    at Burger King can't work the second shift at McDonald's.
13             So this duty of loyalty -- turning this into a
14    tort duty, as opposed to a work rule, is inconsistent with
15    the plain meaning of the California Labor Code section
16    governing the at-will employment relationship.
17             Now, all of the cases saying that there is this
18    duty of loyalty involving fiduciaries -- officers,
19    directors, general managers, managing agents -- people up
20    there in the hierarchy.  None of them involve rank-and-file
21    employees, which is inconsistent with the plain meaning of
22    Labor Code Section 2863.
23             So our proposition would be that this duty doesn't
24    even exist under California law as Mattel has posited it.
25    This tort duty, as opposed to an ability, perhaps, to make a
0048
1     work rule on their part, which may or may not be
2     enforceable, frankly, under 16600, depending on whether it's
3     really designed to protect trade secrets or not.  But it's
4     not consistent with Labor Code 2863 to make it a tort duty
5     as opposed to a work rule.
6              Now, generally, when you are dealing with
7     something like the internal affairs of a corporation, that
8     is the relationship inherent in the corporation and how it
9     conducts its affairs internally vis-à-vis one vis-à-vis the
                              Page 20

111610DOC-02.txt
10  other.  It will be the law of the state of incorporation or
11  the law of principal place of business that will apply.
12           So with respect to that last question, yes, there
13  is no specific case discussing does this concept of duty of
14  loyalty extend to Mexico.  But all one has to do is ask the
15  converse to see how ridiculous it is.  So let's suppose
16  that, you know, there is a subsidiary of Japanese company
17  Panasonic operating in California and there are all these
18  U.S. citizens, California residents who are employed by that
19  wholly owned subsidiary of a Japanese company.  Are they now
20  suddenly subject to Japanese legal duties?
21           Of course, they're not.  And that's what Mattel is
22  asking this court to do, is to impose its will upon Mexican
23  employees working for Mexican companies in Mexico.  That
24  is -- offends sovereignty.
25           And I'm sure Mr. Cote is going to say the same
0049
 1  thing.
 2           Your Honor, I'll move on to statute of
 3  limitations.
 4           Your Honor, question I.1.:  Why did we need to
 5  assume anything?  You know, probably, we shouldn't have.
 6  Because it is their burden on relation back, as we pointed
 7  out in our papers.
 8           Rule 15 uses the language "original pleading."  We
 9  were making an effort to try to conduct some analysis of the
10  text of the rule, but the court's absolutely correct that it
11  held that a compulsory counterclaim would relay back and a
12  permissive counterclaim would not in its order,
13  Docket No. 8892.
14           An import of that ruling as it applies to Mattel's
15  counterclaims is that they get their relation back, because
16  those were permissive.  So November 26th, 2006 would be the
17  relevant date under that analysis.
18           With respect to Question 2 -- your Honor, the real
19  politic of this litigation is that the relation back issue
20  has been hotly contested for so long that we felt like we
21  would be remiss if we didn't pick some kind of a straw man
22  target to construct the statute of limitations argument
23  around.  To be honest with you, the convoluted nature of the
24  possibilities here when you're picking different dates to
25  say there was accrual and different dates for relation back
0050
 1  make it virtually impossible to game out all of the
 2  theoretical possibilities.  So for purposes of conducting an
 3  argument that made any sense at all, we felt like we had to
 4  pick something, just so we can make a set of comparisons,
 5  okay?
 6           That's why we assumed but didn't concede.  I
 7  actually had a drawing on a whiteboard of all of the
 8  theoretical possibilities of one point.  It took me hours to
 9  make.  And at the end of it, you couldn't make heads or
10  tails of it.  There was no way to make sense of it
11  otherwise.
12           I.2.  I have to say, your Honor, we're not
13  actually arguing that that statement by Ivy Ross means that
14  she knew at the time.  In other words, we're not arguing
15  that that is the only reasonable inference that can be drawn
16  from that statement, okay?
17           We're arguing that in light of all of the things
18  that Mattel knew up until that point, they had actual
19  knowledge of harm, causation and wrongdoing under the Three
20  Fox versus Ethicon elements.
                              Page 21

111610DOC-02.txt

21          Now, the newly produced -- pardon me, new brand
22   cannibalization study shows that they had knowledge of both
23   causation and harm as of January 14, 2002.  Ironically,
24   that's one of the things that Mr. Wagner relies upon in his
25   declaration related to the RICO claim.  So they concede that
0051
1    that was knowledge on their part of causation and harm.
2    That's as of January 14, 2002.
3          And that -- by the way, your Honor, that document
4    was not available to Judge Larson when he wrote his summary
5    judgment orders on the statute of limitations saying, I
6    don't have any clear proof about the Three Fox elements.  I
7    don't have any clear proof showing when Mattel had knowledge
8    of any one of these three elements.
9          That document was not available to Judge Larson,
10   despite an order to compel in September of 2007 anything
11   that would be related to the statute of limitations defense.
12          What else did they know then?
13          Well, now, here's where the change in theory on
14   the trade secret claim actually works to Mattel's detriment.
15   Here, they have to live with their change in theory.  The
16   trade secret claim has never been the subject of statute of
17   limitations analysis, the Bratz trade secret claim.  And if
18   their trade secret is Bratz, as applied to fashion dolls,
19   then the moment they knew Mattel -- pardon me, MGA was
20   coming out with a doll with the name "Bratz," that was a
21   disclosure of their trade secret.
22          Under the Glue-Fold and Intermedics case, they had
23   the right to sue right then, because that disclosure is
24   itself one of the actionable harms under the Trade Secret
25   Act.  And what the statement by Ivy Ross shows is that they
0052
1    knew Bryant had been involved.  They knew not only that the
2    trade -- They had the trade secret and that there was a
3    trade secret disclosure by MGA, allegedly, but they had the
4    conduit.  They had the link.  That's what the statement by
5    Ivy Ross shows.  They had the link.  And there is a ton of
6    other evidence that they had the link.
7          In fact, Mattel, itself, in its own interrogatory
8    response says -- and this is supplemental interrogatory
9    response, the MGA Hong Kong, number one, at page 26, lines
10   11 to 14:  The fact that Carter Bryant was exposed to Bratz
11   as part of the Diva Starz naming process and then MGA later
12   used Bratz on its fashion dolls is sufficient to give rise
13   to an inference that he created Bratz while he was still at
14   Mattel.  That's in Mattel's own words.  And they knew all of
15   that by March -- really, before March 2002.  I think this
16   answers the court's questions in three as well.
17          In four, we did not find any case law of that
18   sort.
19          Five, Fraudulent Concealment.  Here is what
20   Mattel, undisputed fact No. E22, says:  Mattel believes its
21   trade secret claim did not accrue, blah, blah, blah.
22          They are putting their own mental state at issue
23   in their own summary judgment motion, Undisputed Fact E22.
24   They have directly put their beliefs at issue about when
25   they had a trade secret claim.  They can't put their belief
0053
1    sets at issue and allege fraudulent concealment and maintain
2    the privilege over those communications as part of that
3    investigation and all that other stuff that went on.  They
4    just can't do it.
5          Is MGA now conceding?

Page 22

111610DOC-02.txt
6              I don't think MGA is relying on fraudulent
7    concealment allegations at this point.  The court ruled that
8    MGA -- the relation back doctrine would cause MGA's
9    counterclaims and reply to relate back to Mattel's
10   counterclaims which occurred within three years of
11   Mr. Brawer's employment at MGA.  But, your Honor, if it
12   comes to pass, ultimately, that we have to make that trade,
13   we will.
14              Your Honor, that, I think, brings us to question
15   six of the court's order.  Let me get through this.  I'm
16   running out of time.
17              What evidence supports the argument made on
18   page 39, lines 2 through 15?
19              Michelle -- pardon me, Mattel should have talked
20   to its own employees in addition, Ivy Ross.
21              Well, in Mr. Quinn's closing in the phase one
22   trial, he pointed out that Elise Cloonan had made the Bratz
23   logo on her computer for Carter Bryant.  They could have
24   talked to her.
25              Likewise, Mattel argued that Sheila Kyaw, K-Y-A-W,
0054
1    had painted a face on a dummy doll for Carter Bryant.  That
2    was part of his breach of duty of loyalty, they claimed.
3    She was still employed at Mattel, all the way up through
4    2008 when she was deposed.  Maybe to this day, they could
5    have talked to her.
6              Carmen Monteagudo, a hair rooter, who Mattel
7    alleged was evidence of Carter Bryant's breach of his duty
8    of loyalty, because he -- pardon me, she helped Carter
9    Bryant while he was preparing to pitch MGA.  I think she is
10   still employed there to this day.  They could have talked to
11   her.
12              Three different people who they later claimed were
13   part of Carter Bryant's violation of his duties, they could
14   have gone and talked to and they would have found out from
15   those people he was working on Bratz while he was still
16   employed by Mattel.  Could they have gone ahead and sued?
17              Yes, because of the trade secret claim.  Because
18   of the disclosure.  Glue-Fold and Intermedics.
19              what would have happened when they sued under the
20   trade secret, on the name?
21              The first thing they would have asked for is:
22   Where did Bratz come from and who was involved in its
23   creation?
24              And what would have been one of the first
25   documents we would have had to turn over then?
0055
1              The exact same things that they admit triggered
2    knowledge on their part by the time they got them in
3    November of 2003.
4              So when you add in this trade secret claim and you
5    do the analysis, the Fox analysis from the perspective of
6    the trade secret claim and you think about when they had the
7    right to sue and what they would have learned, it's clear
8    they would have had all the information that they needed, if
9    they had simply sued on the claim they now claim to have
10   when they first had it.
11              Okay, I'm going to RICO.
12              All right.  Now, they've conceded they have no
13   copyright infringement -- civil copyright infringement claim
14   for the sculpts, everything after the first generation and
15   half of the first generation dolls.  They sure don't have a
16   criminal copyright infringement for those things.  And in
Page 23

111610DOC-02.txt
17  order to have a criminal copyright infringement claim on
18  just the first -- the other half of the first generation
19  dolls, it flies in the face of the ambiguity in the contract
20  and the legal standards for infringement.  Why is this
21  significant?
22          Because their whole scheme, the whole thing they
23  plead is that this scheme, this unlawful enterprise was to
24  steal Bratz and then continue unlawfully exploiting it
25  through criminal copyright infringement and to support that
0056
1   criminal copyright infringement with the flow of trade
2   secrets coming from Mattel to MGA.  That's their case,
3   paragraph one of the Fourth Amended Answer and
4   Counterclaims.  That's what it's always been.
5           So what happens when you take away the
6   infringement?
7           The whole thing disintegrates.  It falls apart.
8   There's no common thread holding it all together anymore.
9   No criminal common thread.
10          Now, could they have pled?  And I think I'm
11  jumping way ahead in one of the court's questions about
12  Boyle here in three.  Could they have pled that it was a
13  lawful common purpose?
14          Yes.  Under Boyle, they could have.  Because it's
15  true, certainly, that RICO is to also prevent infiltration
16  of legitimate enterprises.  But that's not what they pled,
17  and it's not ever been their theory of the case that there
18  was some lawful purpose.  Because that's completely
19  inconsistent with their criminal copyright infringement
20  predicate act.
21          And why would that be significant apart from the
22  fact that it causes the enterprise to fall apart, because
23  there's no pattern, there's no continuity, there's none of
24  the things that are required?
25          Well, because, certainly, it would be significant
0057
1   to know that for purposes of the proximate cause assessment,
2   you are no longer talking about a continuing unlawful
3   purpose and unlawful acts but instead a series of
4   isolated -- possibly related, if you accept their
5   allegations but not even their evidence -- acts of trade
6   secret misappropriation.
7           So they can't change their whole purpose that
8   holds their whole RICO claim together at this late stage in
9   the litigation having amended that thing 42 times.
10          Could they have pled a lawful common purpose under
11  Boyle?
12          Yes; did they, no.  Read paragraph one of their
13  fourth amended answer and counterclaims.
14          All right.  The court's question B.1.(a):  Is our
15  position bolstered by the rule that they must be
16  sufficiently distinct at the time?
17          Yes.  And that is the rule.  1.(b), I'm just going
18  to say yes.  If the court wants elaboration, maybe I'll give
19  it in rebuttal on some of these.
20          1.(c), yes.
21          1.(d), here they go, again.  Now, they're trying
22  to change the identity of the enterprise on the last day of
23  discovery.  In this motion, they are trying to change their
24  purpose.  This moving RICO target just shows how bankrupt
25  their theory is.  They are trying to --
0058
1           The copyright infringement claim having fallen
Page 24

111610DOC-02.txt

2  apart, now they are trying to change it so that somehow the
3  deprivation of honest services is the common thread that
4  extends across this ten-year period of racketeering
5  activity.  But in order to do that, they have to add the
6  poor seamstresses at $21,000 a year, moonlighting to make
7  ends meet, as part of a RICO enterprise, practically, in
8  opposition to our summary judgment motion.  Give me a break.
9          1(e):  Mattel's burden is to show the enterprise.
10 They have not put in evidence to show -- any evidence on
11 this point of exclusivity.
12         Should the actual relationship of the parties be
13 examined?  Yes.
14         1.(f).  In Kushner, only King was the defendant
15 person.  In Living Designs -- in other words, King, the sole
16 shareholder and an employee.
17         In Living Designs, there were clearly distinct
18 entities who were part of the association.  In fact -- by
19 "clearly distinct," people who had no other affiliation,
20 whatsoever; namely, the law firms, the expert witnesses and
21 the entity party.  And that is not the case here where
22 Larian has an affiliation with the MGA entities.
23         Was Mattel injured in its business or property by
24 reason of a violation of Section 1962?
25         I confess I did not understand the court's
0059
1  characterization of one of the injuries in 2.(a)(2) --
2  injury to profits of Mattel's hypothetical line of Bratz
3  dolls -- and how that might be different from 2.(a)(3):
4  Injury of Mattel's opportunity to market the Bratz line.
5          I understand them to be making two -- basically,
6  two claims:  One, they lost the opportunity to market Bratz
7  themselves; and two, they lost sales of Barbie at the
8  expense -- or other dolls at the expense of Bratz and, then,
9  with respect to the trade secret and the salaries.
10         This case is more like Oscar than Diaz and
11 Guerrero and Chaz, and some of the others.  And if you look
12 at Guerrero and Diaz, they distinguish Oscar on the ground
13 that in Oscar, the plaintiff had a leasehold interest that
14 she had no intention of commercially exploiting, and that's
15 why she didn't have standing in that case.  That's,
16 actually, the ground of distinction for Oscar that the
17 plaintiff had a leasehold interest, that is, a property
18 interest that she did not intend to exploit commercially;
19 that is, by subletting it.  That is exactly the case here.
20 The ground on which the courts distinguish Oscar in those
21 later cases is applicable here.  Mattel, to the extent we've
22 lost on ownership and everything else, had an interest that
23 it nonetheless, the undisputed facts show, it had no
24 intention of exploiting.  That is Oscar.  That knocks out
25 the lost opportunity claim as any kind of a "by reason of"
0060
1  concrete loss.
2          And then, that gets us to the speculativeness
3  issue as the court notes in its question 2.(b)(1):  Given an
4  expert witness' ability to assign a fixed value, is there
5  any way to systematically and consistently distinguish
6  between concrete financial loss and intangible property
7  interests?
8          The statute says Injury to business or property by
9  reason of the violation.  In the Ninth Circuit, the word
10 "injury" incorporates the concrete financial loss concept.
11 So, yes, the answer to the court's questions are:  Those are
12 two independent and both applicable concepts.  Both concrete

Page 25

111610DOC-02.txt
13    financial loss coming from the by reason of violation harm
14    to the injury -- pardon me, business or property.
15                In the Canyon County versus Syngenta case in the
16    Ninth Circuit, makes absolutely clear this is a dual
17    requirement in the Ninth Circuit, 519 F.3d at 975.  So it
18    has to be an concrete financial loss to an identified
19    specific business or property interest.
20                Now, that business or property interest, the cases
21    say, is defined under state law, as the court has noted in a
22    number of its questions.  And this, by the way, is another
23    reason why we need to deal with the preemption and
24    supersession issues, because they make clear what can be a
25    predicate act and what can't and what can cause harm, even
0061
1     potentially under RICO and what can't.
2                 The court identifies these cases on chances and
3     lost opportunities.  And, basically, your Honor -- I mean,
4     Anza.  Anza identifies the three factors.  One of which is
5     the speculativeness, the discontinuity between the predicate
6     act and the alleged harm.
7                 And Oscar, as I noted, in that case there was
8     never any intention to exploit the property.  So that
9     deprives the plaintiff of the loss opportunity claims.
10    That's one aspect of Mattel's case.  Here, then, you have
11    the lost profits on Barbie as the other prong of it, the two
12    prongs, basically.  And on the lost profits from Barbie,
13    Anza, Sybersound Records control.
14                And the Sybersound Records case is a really good
15    case.  There you have competing karaoke bars.  One of whom
16    has taken the licenses and the other of whom hasn't.  The
17    one who hasn't alleges their infringement is lowering the
18    cost of business, and therefore they are more effectively
19    able to compete with us.  That's Anza, it's too speculative
20    holding in that case dismissing that claim.
21                So, yes, the more direct victim inquiry is part of
22    the three prongs under Anza, as the court notes in its
23    questions, particularly C1.  But more direct victim, the
24    court is also correct, would only enhance the likelihood of
25    dismissal.  It doesn't detract from the necessity of
0062
1     dismissal when you meet the speculativeness prong under
2     Anza.
3                 That brings us to the Wagner declaration.  Where
4     to start?
5                 Let's start here.  Wagner assumes that all Bratz
6     sales for a nine-year period are caused by the predicate
7     act.  He assumes it.  He doesn't analyze it, or provide
8     evidence of it.  He simply assumes that every Bratz sale for
9     the nine years is caused by a predicate act.  You can't
10    assume that.  That's what you have to offer evidence of.
11                The Ninth Circuit has made clear that the only
12    infringed -- potentially infringing elements for the
13    drawings is the face paint, hair color and style, clothing
14    and accessories.  That's what you have to look at, if
15    infringement is your benchmark for the predicate act causing
16    the "by reason of injury."  You can't just say every Bratz
17    sale in its entirety was caused by that.  That's what you
18    have to prove.  And he simply assumed it.  He ignored the
19    "by reason" requirement entirely as it relates to the
20    copyright infringement predicate act.  He ignored the "by
21    reason of" entirely as it relates to the trade secret
22    predicate acts, too.  He doesn't link up a single Bratz sale
23    anywhere, anyhow, in any way to the alleged misappropriation
                                Page 26

111610DOC-02.txt
24   of trade secrets.  His whole analysis, it's like two ships
25   passing in the night.  Here's the "by reason of" requirement
0063
1    over here and here's Mr. Wagner over here and never the two
2    shall meet.  It's completely incompetent under the legal
3    standard to show anything at all.
4              Now, it's incompetent for a few other reasons as
5    well.  There's nothing in his CV or on the face of that
6    declaration that would explain why he's competent to do a
7    multi-factor regression analysis.  And here I refer the
8    court to the Federal Judicial Center's manual on scientific
9    evidence, which has an entire chapter on regression analysis
10   and talks about how statisticians and sociologists and
11   psychologists and economists are the people who you would
12   expect to be seeing doing a regression analysis.  Not a word
13   of CPAs and lawyers.  He's not qualified to even offer this
14   analysis; or if he is, his declaration does not explain why.
15             Second, he doesn't reveal the basis for the
16   regression analysis.  It's a total black box.  Here I
17   compared some market shares, and I factored out for general
18   economy terrorist acts.  And the rest of it, he doesn't
19   explain in any way.  And most importantly, he makes no
20   attempt to control for the numerous variables affecting
21   Barbie sales, which were the reasons that we identified why
22   MGA is entitled to summary judgment on this.  Because the
23   consumer and all these other factors are intervening causal
24   variables.  That's exactly the point.  If he was going to do
25   a competent regression analysis, they would have had to give
0064
1    him our separate statement that shows all of the other
2    factors -- that's our Undisputed Fact No. 58, Numerous
3    factors other than Bratz sales affected Barbie sales from
4    2001 through the present -- pages of evidence.  It's all in
5    their own words about what was affecting their sales through
6    that period of time.
7              If he really wanted to try to do a causation
8    analysis and even if he assumed that somebody could do that
9    and it would be consistent with Anza when it directly says
10   this is exactly what you can't do, he would have had to
11   control for all those variables and then find after you
12   factor out all those variables what's left that's
13   attributable to Bratz.  He didn't even remotely purport to
14   do that.
15             So the Wagner analysis, or whatever you want to
16   call it, is inadmissible.  But even if it were admissible,
17   it wouldn't dispute our showing on by reason of, because it
18   assumes what it's supposed to be evidence of.
19             That leaves the salaries.  Mattel cites a couple
20   of old mid '90s cases, based on special New York statutes
21   that allowed for recovery of salaries of faithless
22   employees.  That's a disgorgement theory, your Honor, which
23   all the subsequent case law has repudiated.
24             Your Honor, the final question, in Section 2:  If
25   Mattel foreclosed from recovering injury to future profits
0065
1    or market share but is nevertheless allowed to recover
2    injury to business opportunity, should its damages be capped
3    at the amount awarded, if any, for the intentional
4    interference of contractual relations claim?
5              Here, it's significant, of course, to note that
6    the preemption effect of copyright here.  Because you have
7    to evaluate the opportunity under the law that applies.
8    Now, I understand the court is saying, Well, there's
Page 27

111610DOC-02.txt

```
 9  possibly some state law interests by the intentional
10  interference with the contractual relations claim, but
11  that's not correct.  Because the copyright act preempts this
12  determination.  And then, you have to look at it.  Well, is
13  there a lost opportunity that's cognizable under the
14  copyright act?
15              And, of course, the answer as we demonstrated in
16  the motion is no.  And, frankly, your Honor, that lost
17  opportunity claim wouldn't meet certainty in the fact of
18  damages under California tort law.  The standard is
19  certainty of the fact of damages and a reasonable estimate
20  of the amount.  They couldn't show evidence to dispute
21  certainty and the fact of damages.  They admitted they
22  wouldn't use the name.  They admitted it was the
23  anti-Barbie.  They admitted it was inconsistent with their
24  corporate image.  They admitted they could not say they
25  would have ever had any chance of using it.  That's Oscar.
0066
 1  They had no intention of exploiting the property; therefore,
 2  the claim fails.  It's not a matter of calculation of the
 3  damages.  It's the standing.  The claim fails.
 4              Boyle -- we talked about three, your Honor.
 5              In 4, your Honor, continuing use of trade secrets
 6  clearly is not a predicate act or cognizable RICO injury.
 7  There's numerous cases now that say this:  Brotech,
 8  Intermedics, Binary Semantics, Management Computer Services.
 9  And the GM case misreads Uniroyal, on which it relies.  The
10  Uniroyal case, there was new and additional predicate acts
11  causing harm, rather than just some continuing harm theory.
12  The scheme to defraud here was the acquisition of the trade
13  secrets.  The use doesn't involve a fraud.  It didn't
14  happen.  But putting that aside, even theoretically, the use
15  doesn't involve a fraud.
16              Your Honor, in 4.b), Carpenter did turn on the
17  employee's duty under New York law, if you look at the case.
18  But not every alleged misappropriation of trade secrets is
19  going to be a scheme to defraud under a mail and wire fraud
20  predicate act.  It might well be actionable if it's
21  actionable under California law as a misappropriation of
22  trade secret, or it may be actionable under some Mexican
23  law.  But that doesn't make it a mail and wire fraud.
24              And, by the way, your Honor, particularly not when
25  the latest Second Circuit decision is:  RICO is not
0067
 1  extraterritorial.  We're really talking about
 2  extraterritorial application of RICO here now.
 3              Your Honor, I think the next few questions in this
 4  section are more directed to Mattel for C and D.
 5              4.e), your Honor, the argument about the 2002
 6  enactment of Section 1512(c) is not in our opening brief.
 7  It is, however, Mattel's burden to demonstrate the
 8  applicable law that applies.  Before passage of 1512(c),
 9  1503 required a pending federal proceeding.
10              All right, your Honor, that brings us, I think, to
11  part N of your outline on Affirmative Defenses -- actually,
12  I'm wrong.  I apologize.
13              Trade dress infringement, the court had first.
14              Your Honor, under Qualitex, the Supreme Court
15  decision in Qualitex, it's clear that a shape can be a
16  trademark.  That's the import of the symbol or device
17  language in the statute.  Mattel cannot demonstrate a
18  nonreputation-related disadvantage.  There is no other
19  defendant before the court.  If another defendant came in
```

Page 28

111610DOC-02.txt
20   and it was able to show a problem, then it might well have a
21   defense.  But speculating that there might be such a person
22   cannot invalidate MGA's trademark.
23              In question two:  Are we confusing correlation for
24   causation?
25              No.  Circumstantial evidence is competent to prove
0068
1   secondary meaning -- evidence of the type we've offered
2   here -- billion-dollar sales, hundred millions of units,
3   advertising -- all the things that we have showed.  The
4   point is after so many correlations, you create the causal
5   link between the mark and the source.  And it doesn't have
6   to be an identified source.  It can be a sole source, albeit
7   anonymous.  That's the law.
8              So the circumstantial evidence of secondary
9   meaning over use of such a long time with so many units,
10   with so much value and advertising and everything else, is
11   sufficient to go to the jury on the issue of secondary
12   meaning.  There is no doubt on that factual question.
13   That's sufficient.  That's the type of evidence that is
14   customarily used.  Moreover, Mattel's own documents
15   recognize that this mark was inherently distinctive by
16   calling it a unique pyramidal shape.  So we would not even
17   have to prove secondary meaning to own the mark, but we have
18   shown circumstantial evidence of secondary meaning is
19   customary in a trademark case to go to the jury on that
20   issue.
21              Your Honor, the testimony in the Garcia
22   declaration, the point is -- the footprint is the bottom of
23   the package.  She's talking about the trapezoid with the
24   narrower top and the wider bottom.  So because the top is
25   narrower, it lets in less light but has a wider footprint,
0069
1   because that's the bottom part that's taking up space on the
2   shelf.  So that particular part of her testimony is talking
3   about the trapezoid shape with the narrow top and the wider
4   bottom.
5              Your Honor, in response to question four, the
6   logic is applicable because even under the traditional
7   Sleekcraft factors, proximity creates more likelihood of
8   confusion.  It doesn't dispel it.
9              So you walk through the door.  You see the shape.
10   You can't read when you are walking through the door but
11   seeing the shape what it is.  You walk over there because
12   you saw the shape.  That's the initial interest confusion.
13   Especially if the adults are less discriminating than the
14   children over which doll they really want, they walk in
15   remembering somebody showed them a picture of it.  They walk
16   over to the trapezoid.  It used to be they would go home
17   with Bratz.  Now, they might go home with Toy Story 3
18   Barbie.
19              These are all questions of fact.  And, by the way,
20   your Honor, analyzing these factors in this fashion,
21   actually, you don't even do under Sleekcraft in this case.
22   Because the marks are identical and the goods are directly
23   competing and under Sleekcraft and Brookfield says as well,
24   that's a presumption of likelihood of confusion, basically.
25   When you have identical marks on directly competing goods,
0070
1   that's the strongest possible case of likely confusion.  We
2   probably should have moved for summary judgment on
3   likelihood of confusion.
4              Question seven, your Honor, the court asks:
                          Page 29

111610DOC-02.txt
```
 5    Doesn't the evidence show that the trapezoidal packaging has
 6    independent value, if any, because it's unique and
 7    innovative?
 8                Yes, it does have value, because it's unique and
 9    innovative, which shows that it's inherently distinctive
10    and, therefore, MGA owned it immediately upon use.  So it's
11    both inherently distinctive as a mark and it's acquired
12    great commercial strength by virtue of our long continuous
13    use, widespread sales both geographically and deep into the
14    market, as evidenced by units.
15                Your Honor, on question 8, MGA hasn't asserted
16    that Mattel marketed My Scene dolls in a trapezoid, so I'm
17    not sure I understood that one.
18                On nine, we didn't address strength of the mark.
19    Your Honor, it's inherently distinctive, so it's entitled to
20    protection.
21                We weren't on the market for long when they
22    introduced their product, so we didn't have a chance to
23    build up the commercial association in addition to the
24    inherent distinctiveness of the mark.  And frankly, it's
25    clear from the documents that they intended to deprive us of
0071
 1    that goodwill.  With that kind of intent, you go to the
 2    jury.
 3                On the unfair competition claim, your Honor, we
 4    are identifying the activities of the market intelligence
 5    group.  The court is correct.  We said that this was not a
 6    factual basis, originally, for our unfair competition claim.
 7    We have said -- we have consistently said, however, that the
 8    legal theory covers it.  So I think this is a situation,
 9    your Honor, where frankly if they don't need amendment for
10    Bratz as a trade secret, then we don't need amendment for
11    this.  And if they do need amendment for Bratz as a trade
12    secret, then we would concede that we would need amendment
13    for this as well.  Your Honor, in this instance, unlike the
14    Bratz as a trade secret instance, there's no prejudice to
15    them.  All the discovery has been done.  It doesn't matter.
16    Nothing has happened.
17                So if we need amendment, if the court concludes
18    that under the standard it's going to apply regarding
19    factual theories we need amendment, then we would ask for
20    amendment to conform the proof on that unfair competition
21    claim.
22                Your Honor, Clayworth says that injury and the
23    remedy are different.  So the standing and the money or
24    property -- restitution measure of money or property are not
25    the same thing under 17204.
0072
 1                Can MGA's existing business relationships be
 2    considered property?
 3                Here, we had existing relationships with Kohl's
 4    who they went and then entered into an agreement with to
 5    displace us from that relationship and all of our licensees.
 6    And, yes, that can be considered property under 17204.
 7                Same way if Mattel had ever shown the loss of some
 8    business relationship in response to our RICO motion, we
 9    might be having a different discussion about their showing.
10    But they've never done that.  They never identified any lost
11    concrete business relationship of any kind, unlike we did in
12    our opposition which was Kohl's and the licensing
13    relationships.
14                Your Honor, with respect to unjust enrichment,
15    let's face it, the cases are all over the map on this.  Some
```
                                 Page 30

111610DOC-02.txt

16  of them say there's a claim and some of them don't.  There
17  does not, frankly, appear to be any logical rationale why
18  some say yes and some say no, okay?
19          Frankly, if you want to characterize it as a
20  remedy for common law unfair competition claim, it's six of
21  one and half dozen of the other.
22          We do agree that there should not be jury
23  confusion based on duplication of claims that shouldn't be
24  in the case which is why, as I've said repeatedly today, the
25  court should decide the preemption issue before trial.  So
0073
1  if that is the court's concern with respect to this claim,
2  then certainly we agree that's a valid concern.
3          Your Honor, in (C)(2), the court is asking:  Are
4  we improperly trying to go behind the judicial reasoning
5  process with respect to Judge Larson?
6          Your Honor, unjust enrichment occurred because
7  they got a benefit of an injunction that was reversed.  It
8  was enjoined and then it was reversed.  That's all you need
9  to know under Galoob for it being a wrongful injunction.
10  You don't have to look at the reasons why.  Galoob,
11  specifically, says you don't have to look at the reasons
12  why.  There's no bad faith element or anything else.
13          With respect to the question -- some of the other
14  questions here, we were a bit concerned that, perhaps, the
15  court was conflating unclean hands and unjust enrichment.
16  In other words, it would have been the unclean hands defense
17  that would have been interposed in phase one, as opposed to
18  some kind of unjust enrichment claim.
19          And, your Honor, finally, the court asked how did
20  MGA's agreement with the suggestion for bifurcation, well,
21  your Honor, that decision was made in the absence of the
22  evidence.  That's precisely the point.  The decision was
23  procured in the absence of the evidence about what had been
24  happening, which was concealed, as we know, from the Corey
25  letter and everything else.  So the fact that there was this
0074
1  concealed evidence, procured decisions by both MGA and the
2  court.  But, I think, as I said in my first day with you,
3  that bifurcation was one of the worst decisions in the
4  annals of legal history.  So I'm hardly going to retreat
5  from that position now, your Honor.
6          I think I'm out of time.
7          THE COURT:  All right.  Thank you.
8          Counsel, on behalf of Machado.
9          MR. COTE:  Your Honor, do you want to stop at 5:00
10  today?
11          THE COURT:  Counsel, would you identify yourself
12  for the record.
13          MR. COTE:  I will, your Honor.
14          Alexander Cote, on behalf of Gustavo Machado, your
15  Honor.
16          Your Honor, I'm going to follow your advice and
17  proceed in the order that you listed the issues in the order
18  that you issued yesterday, the minute order that you issued
19  yesterday.
20          We have joined in the MGA's parties' motion in all
21  respects, except for one, which is the personal jurisdiction
22  argument.  And I don't want to repeat all the arguments they
23  made there.  What I'm going to try to do is confine myself
24  to anything we have to add to what Ms. Hurst and what
25  Mr. Molinski just said.
0075

111610DOC-02.txt

1   In light of that, I'll start where -- almost where
2   Ms. Hurst left off, which is question 4.b), on page 6.  And
3   I'm going to do 4.b) before I get to 4.a).
4         The question in 4.b), your Honor, is:  Even if
5   Mr. Machado wasn't a Mattel Inc. or a Mattel de Mexico
6   employee, why couldn't his alleged theft of trade secrets
7   from those entities be actionable?
8         We don't disagree with that point, your Honor.
9   That's not the position we've taken.  We don't challenge
10  the -- we don't challenge the trade secret cause of action
11  could be alleged against Mr. Machado or in fact is against
12  Mr. Machado.
13        In fact, for purposes of this motion and
14  discussion of RICO, we've conceded that Mattel can raise a
15  triable issue that there was a scheme to take documents
16  between February of 2004 and April of 2004.  And we've
17  conceded for purposes of this motion only that they can
18  raise a triable issue that that was wire fraud or mail
19  fraud.  So we are not contending that that doesn't fit the
20  criteria of mail fraud and wire fraud under Carpenter, which
21  is the case the court cited in Section 4.b).  We're
22  conceding that point for purposes of this motion.  It's our
23  contention that notwithstanding that, there is still failure
24  to state a RICO claim.
25        So I'm going to go in reverse order now to
0076
1   Question 4.a), also on page 6.  And the question there was:
2   Although Carpenter shows that the taking of materials
3   includes a fraudulent element, how does use require any
4   fraud at all?
5         Our answer is obviously it doesn't.  Carpenter
6   says:  Wire fraud encompasses a scheme to deprive another of
7   money or property by means of false or fraudulent pretenses.
8         Once you have the trade secrets, once you have the
9   documents that contain the alleged trade secrets, you have
10  deprived someone of their money or their property.  The
11  scheme is complete.  That's the end of the analysis.  Any
12  further use of the trade secrets is not a taking of the
13  property.  It's a use of the property.  That's not the same
14  thing.  And that's what the cases hold.
15        We cited the Kann case, K-A-N-N; Maze, M-A-Z-E and
16  Parr, P-A-R-R which are sort of seminal Supreme Court mail
17  fraud and wire fraud cases.  They show that mailings that
18  take place or wirings that take place after you've acquired
19  the property do not give rise to wire fraud or mail fraud.
20  And that's the argument we are making here.
21        Mattel has cited the case of Schmuck in its
22  opposition brief.  Schmuck involved the repetitive scheme
23  where the defendant was rolling back odometers and then
24  selling the cars and the mailing was sending the papers to
25  the DMV to transfer title.  In that case, the Supreme Court
0077
1   found mail fraud because the papers being sent to the DMV
2   enabled the defendant to repeat the process.  It was a
3   repetitive scheme.  And if you didn't send the papers to the
4   DMV, you couldn't do it again next time, because there's a
5   limited number of dealers you could sell cars to in his
6   area.  That mailing was critical to acquire more property.
7   That's not a trade secret use.  A trade secret use is
8   different.  When you are using the trade secrets, you are
9   not doing it to acquire more trade secrets.  You are using
10  it because, theoretically, or allegedly, it's somehow
11  advantageous to your business.  So it doesn't fit within
                        Page 32

111610DOC-02.txt

12   Schmuck either.
13           The court asked some questions about the General
14   Motors case that was cited by Mattel.  It's the Eastern
15   District case.  We think that there's three critical points
16   where the General Motors case is different than this case
17   and shouldn't apply:
18           Number one, just to be clear, the General Motors
19   case is talking about the open-ended continuity question.
20   Closed-ended continuity was clearly satisfied in that case
21   without reference to the trade secret use at all.  There was
22   16 months of acts, 16 months of conduct.  There was wire
23   fraud at the beginning.  There was witness-tampering at the
24   end.  You had your 16 months' there predicate acts without
25   even touching wire fraud at all.
0078
1            The General Motors case was talking about whether
2    open-ended continuity was satisfied.  But we know from the
3    HJ case that you need to show a risk of ongoing criminal
4    conduct, ongoing predicate acts.  What the General Motors
5    case found was that the use of the trade secrets wasn't an
6    ongoing cause of damages to the plaintiff, General Motors;
7    and then, the court equated damages to theft in some way and
8    said, That's an ongoing injury and, therefore, open-ended
9    continuity is satisfied.
10           Damages are not a predicate act.  You need to show
11   that the predicate acts are likely to continue.  That's what
12   the HJ, Inc. case says.  That's where, I think, the General
13   Motors court aired.
14           The other point I would draw the court's attention
15   to is that the General Motors court is very much in the
16   minority on this point.  You can look at the Binary
17   Semantics case which was cited to the court, I think, when
18   we talked about the same issue on the 12(b)(6) motion.  It's
19   2008 WL763 575, at page 4 of that opinion.  That opinion
20   makes it very clear that General Motors and Gould,
21   G-O-U-L-D, from -- I believe from the same district, just
22   get it wrong.  They are against the majority rule.  In that
23   case Binary Semantics, like Brotech cited by the court in
24   the order on the motion to dismiss, makes it clear that use
25   is not a predicate act and therefore, does not help solve
0079
1    the continuity problem under RICO.
2            Also, on page 6, the court asked a question about
3    the authority providing for protection of the documents
4    under copyright law.  The point that we would want to make
5    on copyright law is that Section 506 of the United States
6    Code, Title 17, requires willful infringement.  You can't
7    just copy and commit a predicate act.  It has to be willful
8    infringement to commit a predicate act.  And willfulness is
9    defined by the Danjaq case, D-A-N-J-A-Q, as knowledge that
10   the defendant's conduct constitutes copyright infringement.
11           The documents allegedly taken by Mr. Machado don't
12   have a copyright stamp on them.  They are not registered
13   with the Copyright Office.  There is no reason to believe
14   that Mr. Machado ever knew that they were copyrighted, if
15   they were in fact copyrighted.  There is no basis for
16   finding willfulness.  So even if they were copied and even
17   if that copy was in violation of some copyright, if it
18   wasn't disclosed to him, he couldn't have known about it.
19   And if he couldn't have known about it, it wasn't a criminal
20   act; and, therefore, it doesn't help on continuity.
21           The court's second question in paragraph --
22   question 4.c), on page 6, I think is right on point.  The
                                 Page 33

111610DOC-02.txt
23  court is asking if Machado is liable for criminal copyright
24  infringement by working for a company that manufactured
25  infringing products.  Isn't every MGA employee liable?
0080
 1            Yes, that's Mattel's theory.  Mattel's theory is
 2  that every one of the hundreds of people who worked at MGA
 3  at any time is guilty of the crime of criminal copyright
 4  infringement.  The willfulness problem prevents that
 5  argument, notwithstanding the fact that it doesn't make any
 6  sense.  Just being employed by someone and doing your best
 7  at your job is not enough to give rise to a willful
 8  infringement claim.  It's just not a criminal act.  It can't
 9  be the case that every single employee of every company
10  that's ever infringed a copyright.  We're talking millions
11  of people is also a felon, is also guilty of violating the
12  criminal statute.  That can't be the case.
13            On the next page, your Honor, you asked a question
14  about the Travel Act and how Mattel's employees were induced
15  to use their positions on behalf of MGA.  As we pointed out
16  in our brief, there is no evidence that ever took place with
17  respect to Mr. Machado.  Mattel says they have months of
18  e-mails showing communications between Mr. Machado and the
19  other employees in Mexico and Mr. Larian.  And they do.  But
20  there is not a single incidence of bribery anywhere in
21  there, or the commission of any other crime, or the
22  suggestion of any other crime, or an inducement to commit
23  any crime.  It's just not there.  The months of e-mails
24  don't establish anything, other than that there were
25  communications.
0081
 1            The same thing is true with respect to the two
 2  meetings that Mr. Machado had with Mr. Larian before he
 3  started with MGA.  They met in New York and they met at the
 4  W Hotel, in Mexico City.  The evidence is crystal clear at
 5  no time did Mr. Larian ever ask them to take Mattel
 6  documents.  In fact, the opposite is the case:  Everyone who
 7  was at any of those meetings said that Mr. Larian said, I
 8  just want your brain.
 9            There is no contrary evidence on that point.
10  There is no evidence to show that there was travel for the
11  purpose of committing a crime.
12            With respect to the presentation that was given at
13  the Mexico City Hotel in particular, there's no evidence
14  that Mr. Larian requested that that presentation be made.
15  In fact, Mr. Vargas' testimony, Mattel's chief witness on
16  the whole Mexican sphere of this case, he said that he came
17  up with the idea with Mr. Machado and Ms. Trueba
18  independently of anything that MGA ever said.  There's just
19  no evidence to the contrary on that.
20            The one other point about the Travel Act is:  All
21  of this alleged travel took place -- or it could also be
22  bribery, I suppose, under Skilling -- all of the
23  bribery/Travel Act violations that are alleged by Mattel,
24  all of that conduct took place between February and April of
25  2004, so we are still within that same two-month period.
0082
 1            So even if those are predicate acts, they still
 2  don't satisfy continuity.  They don't get us anywhere even
 3  if they were true.
 4            Your Honor raised some questions about preemption
 5  of the California Uniform Trade Secrets Act, or CUTSA.  I
 6  said "CUTZA," but I think Ms. Hurst said "CUTSA," and I'm
 7  sure she's right about that.  If the court agrees with the
                              Page 34

111610DOC-02.txt
```
 8  argument that MGA made about preemption in which we've
 9  joined, the court asked the question:  What claims would be
10  left?
11              Against Mr. Machado, the claims left would be
12  breach of contract, if any, because breach of contract is
13  carved out of the statute, the same balancing -- legislative
14  balancing Ms. Hurst was talking about.  And, of course, the
15  trade secrets claims themselves.  That's what would be left.
16              The court also raised a concern on page 8,
17  Question D.4. about conversion and whether this
18  interpretation of preemption guts a conversion cause of
19  action.  Well, it does.  That's what Silvaco said.  Silvaco
20  was a conversion case.  Mr. Machado didn't take any tangible
21  objects from his employment at Mattel.  There is no evidence
22  that he did.  The only evidence thing he's accused of doing
23  in violation of contracts and breach of fiduciary duty and
24  violation of duty of loyalty, et cetera, et cetera, is take
25  information.  That's exactly what Silvaco addressed or
0083
 1  focused on and would preempt all of those claims except for
 2  the contract claim and the CUTSA claim itself, of course.
 3              On pages 10 and 11 of the court's order, I'm
 4  looking at question G.1., the court asked the question about
 5  whether the inclusion of the word "trust" in certain
 6  contracts is enough to require fiduciary duty be granted on
 7  behalf of Mattel as opposed to on behalf of MGA, citing to
 8  the Rita Medical Systems case.
 9              Mattel's motion for summary judgment cites
10  language in the United States employees' contracts, language
11  that says:  The company depends on me to maintain
12  confidentiality, and I accept that trust.  Caution, this
13  agreement creates important obligations of trust.
14              That language does not appear in any contract with
15  Mr. Machado.
16              Mattel also argues that the fiduciary duty arises
17  out of the fact that Mr. Machado had an obligation to
18  preserve confidential information.  Assuming that that's
19  what those contracts do require, by Mattel's own argument,
20  it admits that it requires every employee to sign such an
21  agreement.  Mattel said in its summary judgment motion:
22  Since 1980 in the United States and since 2004 in Canada and
23  Mexico, Mattel will not hire employees who have not agreed
24  not to disclose its confidential information.
25              It's on page 49 of its summary judgment motion.
0084
 1  That means by Mattel's argument that every single one of
 2  those employees since 1980 must be a fiduciary, if
 3  confidentiality is enough.  The case law is clear.
 4  Confidentiality is not enough and not every single employee
 5  can be a fiduciary of Mattel.
 6              The one case that Mattel constantly cites in its
 7  opposition motion, in its motion and its replies is the
 8  Women's Federal Savings and Loan case.  They cite the case
 9  for the proposition that a contract can give rise to a
10  fiduciary duty.  We don't dispute the principle.  A contract
11  can give rise to a fiduciary duty.  In that case, the
12  contract said that the defendant was, quote, a trustee with
13  fiduciary duties, close quote.
14              No contract with Mr. Machado says that here.  No
15  contract with Mr. Machado comes even close to saying
16  anything like that here.  There's no contractual basis for
17  finding a fiduciary duty on behalf Mr. Machado towards
18  Mattel.
```
Page 35

111610DOC-02.txt
19              Page 13 of your order, your Honor, question page
20    4.f), so it would be "F" on that page:  why weren't Machado,
21    Vargas and Trueba asked to sign noncompete agreements?
22              I can't speculate as to why they weren't asked to
23    do it while they still worked at Mattel.  I don't know the
24    answer to that.  I do know that Mattel tried to get them to
25    do that after they left.  And it said:  We're only going to
0085
1     pay you your final paycheck if you sign this agreement.
2              They refused because that was illegal under
3     Mexican law, or at least that was their understanding.
4     That's the only evidence of a noncompete agreement that's in
5     the record, as far as I'm aware of, your Honor.
6              Also, on that page, your Honor raises a series of
7     questions about this company, Servicios.  I think this is an
8     important part.  I'm going to spend a little bit of time on
9     this more so than I have on the other points I've made.
10             The evidence is clear that Mr. Machado had one
11    employer and only one employer and that employer was Mattel
12    Servicios.  There is an employment contract that Mattel
13    attached to its papers as Exhibit 99 to the declaration of
14    Mr. Proctor.  It's also Exhibit B to my declaration,
15    Declaration of Alexander Cote.  That contract clearly
16    provides that the employer -- all capitals, in quotes -- is
17    Mattel Servicios.  Nobody else.  And that contract provides
18    that Mr. Machado does all of his work for the employer,
19    meaning Servicios.  That contract says the employer dictates
20    his duties.  That contract says that the employer can send
21    him to go work other places, including for Mattel de Mexico;
22    but if it does that, the work is done always -- and this is
23    a quote -- always at the instruction of the employer.  You
24    can continue to read that contract and find other instances
25    of the same kind of language.  The employer has the duty to
0086
1     coach him and train him.  The employer can force him to
2     undergo medical exams.  The employer has to pay him, not
3     Mattel de Mexico, not Servicios -- I'm sorry, not Mattel de
4     Mexico, not Mattel, Inc.  My apologies.
5              As if that wasn't enough, attached as Exhibit 59
6     to the Isaias declaration, I-S-A-I-A-S, Exhibit 59, is a
7     contract between Mattel de Mexico and Mattel Servicios.  It
8     is my understanding that Mattel de Mexico is the parent and
9     Mattel Servicios is the subsidiary.  I believe that's what
10    Mattel has said in its papers.
11             Mattel cited this contract to show that Mattel
12    Servicios, its, quote, unquote, sole purposes was to provide
13    services for Mattel de Mexico.  It doesn't say anything
14    about "sole purpose."  What it does say is how those two
15    companies were going to divide up the assets and the
16    liabilities of the two companies.  Among those are the
17    employment responsibilities.
18             In paragraph -- I believe it's Paragraph 4 of that
19    contract, the two companies agree:  It is expressly agreed
20    that Mattel Servicios shall be the sole employer of the
21    personnel.
22             Now, this is a contract between the parent and the
23    subsidiary.  This is not an arm's length agreement.  They
24    could have divided up the employees any way they chose to.
25    They did this -- they voluntarily chose this path.  There's
0087
1     no -- this doesn't raise a question of fact as Mattel
2     claims.  This ends the debate.  Mr. Machado had one employer
3     and that sole employer was Servicios.
                              Page 36

111610DOC-02.txt
```
 4              Now, in opposition and in reply, Mattel claims
 5      that a holding by the court that Mr. Machado worked for that
 6      one company, Servicios, would be elevating form over
 7      substance.  It seems as if Mattel is arguing some sort of
 8      novel reverse alter ego argument where there are clearly
 9      separate corporations, but Mattel wants the court to
10      disregard the separate corporations and find that the
11      employee of one is also the employee of the other.
12              As a novel position for a plaintiff or a
13      counterclaimant to take -- and they don't offer any
14      authority for such a position, because there is none.  The
15      purpose of the alter ego argument or the alter ego doctrine
16      is to protect people from inequitable results and to protect
17      people contracting with the corporation from inequitable
18      results.  The inequitable results here are illustrated by
19      the purpose behind Servicios, which is another question that
20      the court asked.  The purpose behind Servicios is clear.
21      It's to not pay the employees.  Under Mexican law, a Mexican
22      corporation is under an obligation to share its profits with
23      its employees.  But if you put all of the employees in one
24      company and you put all the profits in the other company,
25      you don't have to give them any money.  And that's why they
0088
 1      did it.  Mr. Esieeas Isaias, again, is the one who testified
 2      to that, as well as our expert on Mexican law.  It would not
 3      be equitable to disregard that.  They did it to injure the
 4      employees.  They did it for their own financial gain.  It
 5      wouldn't be equitable to reverse that.
 6              In fact, there is some case law out there that
 7      says that Mattel would be estopped from arguing that the
 8      corporate structure should be disregarded, because they have
 9      already benefited from the separation.  One case I found,
10      which, I apologize, is not in our papers, but it's Shapoff
11      v. Scull -- S-H-A-P-O-F-F and Scull is S-C-U-L-L -- 222
12      Cal.App.3d 1457.  That case says you can't put forward that
13      you are two separate corporations when it benefits you and
14      then say you're the same company later on when it's to your
15      detriment.  That's exactly what Mattel is trying to do here.
16              One other point on this separation of the
17      corporations.  If this court were to decree today that
18      Mr. Machado's true employer was actually Mattel de Mexico,
19      then a lot of people are entitled to a lot of profit-sharing
20      from Mattel for a lot of years.  And I don't think that's
21      what Mattel wants to have happen in this case.  I think this
22      is not a legitimately claimed position.
23              The natural consequences of the fact that
24      Mr. Machado's one employer is Servicios is that the policy
25      manuals and the employee handbooks that Mattel has tried to
0089
 1      impose or tried to transform into contracts with Mr. Machado
 2      are not supported by consideration.  That's the question the
 3      court asks at the bottom of page 13.  We don't believe that
 4      they are contracts at all for a variety of reasons, but
 5      chief among them is lack of consideration.  It's undisputed
 6      that in exchange for the documents, to wit, that Mattel
 7      issued to Mr. Machado, it's undisputed that he didn't give
 8      him anything in exchange for him supposedly agreeing to
 9      those terms.  That's undisputed.  What Mattel claims is,
10      Well, he had continued employment and the continued
11      employment is consideration.  They cite the Asmus case,
12      A-S-M-U-S.
13              Asmus was a Supreme Court case answering a
14      certified question from the Ninth Circuit.  The certified
```

111610DOC-02.txt
```
15  question was:  Once an employer's unilaterally adopted
16  policy has become part of the employment contract, may the
17  employer thereafter unilaterally terminate that policy?
18              Asmus is about employers.  It's not about third
19  parties interposing their will on a contract by fiat and
20  saying, This is now a contract because we said it is.
21  That's not contract law in California.
22              The other interesting point about the Asmus
23  argument is, we made an argument that the first claimed
24  contract called the questionnaire was superseded by the
25  second contract called the manual, because the manual says:
0090
 1  Any previous policies are superseded by this one.
 2              Mattel says the questionnaire wasn't a policy, so
 3  that provision doesn't apply.  Mattel says the questionnaire
 4  was an independent contract.  That's what they say in their
 5  opposition.  Well, if it was an independent contract, it
 6  needs independent consideration.  And there is none.
 7              The choice of law questions are what I would like
 8  to talk about next.  The court's question on page 15, J.1.
 9  on page 15, asks about this theory that, Well, some of
10  Mattel's claims involve a contract, even though they're not
11  for breach of contract.  So what authority stands for the
12  proposition that the ten-year statute should apply?
13              There's none that they have offered.  Their own
14  expert says that the statute of limitations, under Mexico
15  law, is two years for unlawful extra-contractual actions or
16  deeds.  Unlawful extra-contractual actions or deeds is one
17  of the better definitions of tort that I've ever heard.
18  These are tort claims.  They're not contract claims.
19              If this is a breach -- if this is a breach of
20  contract case -- of course, the fifth counterclaim is for
21  breach of contract.  I'm talking about the other claims.
22              If they are breach of contract claims, maybe there
23  would be a ten-year statute of limitations that applies,
24  which is why we didn't move for summary judgment on statute
25  of limitations grounds for the contract claim.  But for the
0091
 1  tort claims, which are obviously different because they
 2  appear in three different counterclaims than the contract
 3  counterclaim -- the seventh, the ninth and eleventh
 4  counterclaims -- they're tort claims.  And if they are tort
 5  claims, they have a two-year statute and that statute has
 6  run.
 7              Paragraph two, under J, the court asks about
 8  applying California law to the Mattel documents and applying
 9  Mexican law to the Mattel de Mexico or the Mattel Servicios
10  documents.  With respect to Mattel Servicios and
11  Mattel de Mexico, there's actually a statute on point.  It's
12  the Code of Civil Procedure, Section 361.  And what that
13  statute says -- it's the borrowing statute.  And what that
14  statute says is:  If a cause of action arises in another
15  state, the victim of that -- or the plaintiff in that cause
16  of action cannot take it to another state of which they are
17  not resident and revive it after it's expired, under the
18  original jurisdiction statute of limitations, CCP 361.
19              That's exactly what Mattel de Mexico or Mattel
20  Servicios would be trying to do in this case.  They would be
21  trying to use California's three-year statute of
22  limitations, or four-year statute of limitations to evade
23  Mexico's two-year statute of limitations.  They can't do
24  that under California law.
25              With respect to whether or not it should apply to
```
Page 38

111610DOC-02.txt
0092
1  the Mattel documents, the alleged Mattel documents, the
2  McCann case, which we cited in our papers, makes it clear
3  that when Section 361 doesn't apply, you turn to the
4  standard choice of law analysis.  It does not mean you
5  automatically apply California law.  You do the analysis and
6  that requires, among other things, determining if there's a
7  difference between the two laws which we have established,
8  because it's a two-year statute versus a three-, or
9  four-year statute.
10         The next step is determining if there is a true
11 conflict.  Mattel says Mexico doesn't have any interest in
12 this case, which frankly is a somewhat astonishing position
13 to take.  Mattel has caused a Mexican criminal case to begun
14 on exactly the same facts.  They filed a criminal complaint.
15 They got the police to raid MGA's offices.  They got my
16 client and others arrested, and they have a criminal case
17 that's been in litigation ever since.  If Mexico doesn't
18 have an interest in that, what are they doing?
19         Of course Mexico has an interest.  So you have to
20 balance the relative interests between Mexico and the
21 United States, or California in this case.  You don't
22 determine which policy is better.  You determine which
23 district or which jurisdiction has the stronger interest in
24 the case.  And it's clear that Mexico is the winner here.
25 Every actor involved in my part, Mr. Machado's part of this
0093
1  case is in Mexico:  Mr. Machado, Ms. Trueba, Mr. Vargas.
2  Mattel Servicios, Mattel de Mexico, MGA de Mexico.  All in
3  Mexico.  The victim is in Mexico.  The injury is in Mexico.
4         If I could --
5         THE COURT:  Why don't we resume here tomorrow,
6  counsel.  How much longer do you have?
7         You have a little while, don't you?
8         MR. COTE:  I don't have too much more, your Honor.
9         THE COURT:  Counsel, you're ordered back at
10 10:00 o'clock.
11         Good night.
12         MS. HURST:  Thank you, your Honor.
13         MR. QUINN:  10:00 o'clock, your Honor?
14         THE COURT:  Thank you, counsel.  That's excellent.
15 10:00 o'clock.
16     (At 5:33 p.m., proceedings were adjourned.)
17
18                         -oOo-
19
20
21
22
23
24
25
0094
1                      CERTIFICATE
2         I hereby certify that pursuant to Section 753,
3  Title 28, United States Code, the foregoing is a true and
4  correct transcript of the stenographically reported
5  proceedings held in the above-entitled matter and that the
6  transcript page format is in conformance with the
7  regulations of the Judicial Conference of the United States.
8
9  Date:  November 21, 2010
10
                        Page 39

111610DOC-02.txt

11
12
13          _____
            Deborah D. Parker, Official Reporter
14
15
16
17
18
19
20
21
22
23
24
25