111710DOC-02.txt

0001
```
 1                  UNITED STATES DISTRICT COURT
 2                  CENTRAL DISTRICT OF CALIFORNIA
 3                  SOUTHERN DIVISION AT SANTA ANA
 4            HONORABLE DAVID O. CARTER, JUDGE PRESIDING
 5
 6
   CARTER BRYANT, an individual,      )
 7                                     )
                   PLAINTIFF,          )
 8                                     )
              vs.                      ) CV NO. 04-9049-DOC
 9                                     ) VOLUME III
   MATTEL, INC., a Delaware           )
10 corporation,                       )
                                       )
11                 DEFENDANT.          )
   _____ )
12 CONSOLIDATED WITH MATTEL, INC., vs.)
   BRYANT and MGA ENTERTAINMENT, INC. )
13 vs. MATTEL, INC.                    )
14
15
16              REPORTER'S TRANSCRIPT OF PROCEEDINGS
17                   SANTA ANA, CALIFORNIA
18              WEDNESDAY, NOVEMBER 17, 2010
19                        4:17 P.M.
20
21              DEBORAH D. PARKER, CSR 10342
                   OFFICIAL COURT REPORTER
22              UNITED STATES DISTRICT COURT
                   411 WEST FOURTH STREET
23                      SUITE 1-053
                SANTA ANA, CALIFORNIA 92701
24                   (714) 542-8409
                D.PARKER@IX.NETCOM.COM
25
```
0002
```
 1 APPEARANCES OF COUNSEL:
 2      FOR THE DEFENDANT, MATTEL, INC.:
 3                          MICHAEL ZELLER
                            JOHN QUINN
 4                          SUSAN ESTRICH
                            BRETT DYLAN PROCTOR
 5                          QUINN EMANUEL URQUHART
                            865 SOUTH FIGUEROA STREET
 6                          10TH FLOOR
                            LOS ANGELES, CALIFORNIA 90017
 7                          (213) 443-3000
 8
        FOR THE INTERVENOR, MGA ENTERTAINMENT, INC.:
 9
                            ANNETTE I. HURST
10                          WARRINGTON S. PARKER, III
                            ORRICK, HERRINGTON & SUTCLIFFE, LLP
11                          THE ORRICK BUILDING
                            405 HOWARD STREET
12                          SAN FRANCISCO, CALIFORNIA 94105
                            (415) 773-5740
13
                            THOMAS S. MC CONVILLE
14                          ORRICK, HERRINGTON & SUTCLIFFE, LLP
                            4 PARK PLAZA
```
                            Page 1

```
                             111710DOC-02.txt
15                     SUITE 1600
                       IRVINE, CALIFORNIA 92614
16                     (949) 567-6700
17
                       WILLIAM MOLINSKI
18                     ORRICK, HERRINGTON & SUTCLIFFE, LLP
                       777 SOUTH FIGUEROA STREET
19                     SUITE 3200
                       LOS ANGELES, CALIFORNIA 90017
20                     (213) 612-2346
21
22
23
24
25
0003
 1   APPEARANCES OF COUNSEL:
 2        FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:
 3                         ALEXANDER H. COTE
                           ANGELA M. MACHALA
 4                         MARK OVERLAND
                           DAVID C. SCHEPER
 5                         SCHEPER KIM & HARRIS LLP
                           601 WEST 5TH STREET
 6                         12TH FLOOR
                           LOS ANGELES, CALIFORNIA 90071
 7                         (213) 613-4660
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0004
 1        SANTA ANA, CALIFORNIA; WEDNESDAY, NOVEMBER 17, 2010;
 2                            4:17 P.M.
 3                             -oOo-
 4           THE COURT:  Okay.  All right, Mr. Quinn.
 5           MR. QUINN:  Thank you, your Honor.
 6           Your Honor, I will be addressing the questions
 7   under F, relating to ownership, as well as G, relating to
 8   aiding and abetting breach of fiduciary duties and duty of
 9   loyalty.
10           The first question -- and there are several
11   subparts is -- should rights and title to ideas be
12   assignable?
13           I'm going to spend some time talking about that,
14   of course, your Honor.  But before I do, I want to make sure
15   that we understand what we are talking about and what the
16   evidence is in this case.
17           We are not talking about a naked abstract idea.
                             Page 2
```

111710DOC-02.txt

18  We are talking about a complete concept for a line of dolls
19  that was created, we contend, while Mr. Bryant was working
20  at Mattel.  And by a complete concept of line of dolls, I
21  mean, specifically, designs for the dolls in terms of their
22  look; fashions for the dolls; names for the dolls; personal
23  style signifiers, including pets for the dolls; sculpts for
24  the dolls, character, actually developed characters, likes
25  and dislikes; fully fleshed-out concept for the entire line
0005
1   that was created with the assistance, including a prototype.
2   Mr. Bryant called it a dummy.
3           I believe the MGA witnesses testified he came with
4   a prototype of the doll, which Ms. Garcia, who became the
5   Bratz product manager, said was a beautiful doll which he
6   created using Mattel products, using the assistance of
7   Mattel employees, Mattel contractors, a face painter, a hair
8   rooter.  And during the process while he was employed by
9   Mattel actually started work contacting vendors -- hair
10  vendor in Hong Kong -- misrepresenting that he was working
11  for -- now working for MGA while he was still employed.
12          So I don't think that we should get too carried
13  away with the concept of an abstract idea.  Because really
14  what we are talking about is a fully fleshed-out toy line,
15  which Mr. Bryant came to MGA with.  And that's important.
16  Because MGA agrees with us that that is protectable.  That's
17  protectable trade secret information.
18          The court has docket No. 254, the declaration of
19  Paula Garcia, who became the product manager for Bratz and
20  her testimony in her declaration paragraph 4 was that -- I'm
21  reading now:  Without question, a toy manufacturer's
22  unreleased toy concepts, i.e., those that have not been made
23  public, are among the most highly valuable trade secrets.
24  The drawings and designs for those concepts represent works
25  in progress and ideas for advancing and developing product
0006
1   lines.  Although such drawings and designs are valuable even
2   after the product's public release, their value is enormous
3   prior to the public release, because it is the new idea and
4   designs that are the most likely to generate new sales.
5           That's MGA acknowledging that this very type of
6   information is the most important valuable information that
7   a toy company has.
8           There's just one another thing before I get into
9   the concept of protectability of abstract ideas.  As
10  Mr. Zeller was saying in the context of copyright law,
11  there's no question that even if we subdivide these various
12  elements and say some of them are determined that -- some of
13  them are not protectable, the compilation of all of them of
14  individual public elements that would not be protectable can
15  be protectable.  And that's the O2 Micro case, which we
16  cited to the court, and I don't think that that issue was
17  disputed in the briefing on this motion.
18          So I'm going to turn now to the specific questions
19  about ideas that the court raised.  The court asked:  The
20  agreement assigns all right, title and interest in certain
21  things which Mattel contends include ideas.  Assuming
22  Mattel's argument is valid, did Bryant even have any right,
23  title and interest, in quotes, to ideas that could be
24  assigned to Mattel, citing the Interserve case.  And even if
25  Mr. Bryant had some kind of property interest in his ideas,
0007
1   what would that property interest entitle him to?
2           That's the first half of it that I would like to
Page 3

111710DOC-02.txt

3    address.  I guess the short answer to that, your Honor, a
4    short preliminary answer is that the circuit necessarily
5    decided that he did have some interest in ideas and that the
6    ideas were protectable and could be assigned under the
7    agreement, because they sent this back to a district court
8    for the court to make a determination about whether the
9    contract included ideas.
10           MGA argued to the Ninth Circuit, briefed to the
11   Ninth Circuit the notion that ideas are not protectable and
12   asked that the Ninth Circuit so rule.  And that argument did
13   not get traction.  Instead, the Ninth Circuit sent it back
14   here and said, There's an issue.  This was decided as a
15   matter of law.  The issue about whether ideas are covered
16   under the contract has been decided as a matter of law,
17   needs to come back because there might be extrinsic evidence
18   and potentially issues of fact.
19           The Ninth Circuit did not rule.  It would have
20   been easy to rule, because the issue was teed up that ideas
21   have no protection at all.  I think there is potential for
22   confusion when we talk about the protectability of ideas and
23   ideas as property interests.  Because we see these cases
24   like the case the court cited, Interserve, in its question,
25   as well as the Silvaco case, that have the statements in
0008
1    them that abstract ideas are not protectable but also in
2    each case have acknowledgments by the court that ideas can
3    be protected as a matter of contract law.  And I think the
4    way to think about this and sort of reconcile these
5    different concepts, the statements of abstract ideas are not
6    protectable, but yet we have this case law indicating that
7    they can be, an idea has been protected as a matter of
8    contract and I also submit as a trade secrets law, is to
9    think about these cases and the protection of ideas as I
10   think each of them involve relationships.
11           In the case of trade secrets it's relationship
12   between the employer of the company, the rest of the world
13   and the employee.  And in the contract area, it's the
14   relationship between the person submitting an idea, or who
15   comes up with an idea, or assigning an idea and the entity
16   or person who receives the idea.  It's only within those
17   zones that there is protection, if you will.  In other
18   words, we are not saying -- and I think it's wrong to sort
19   of go down the trail of what is the property interests that
20   Mr. Bryant had, for example, to isolate one thing, in the
21   name "Jade," or a word out of the dictionary.  As Ms. Hurst
22   said yesterday, Can we monopolize and take a word out of
23   circulation?
24           The answer to that is clearly no.  It's not a
25   question of rights against the world.  You have to look in
0009
1    terms of the context of the particular relationship.  As
2    Ms. Hurst said, Property or these rights can be thought of
3    as kind of a bundle of sticks.  In the case of someone who
4    is submitting an idea to a motion picture company in the
5    Desney case, for example, the idea of Tarzan in the Garden
6    of Eden, or something like that, that person had no right as
7    against the world to that idea.  That was not protectable.
8            But as between that person who submitted the idea
9    to the company and had an implied agreement or an agreement
10   that if they used the idea that that can be protected and
11   they are entitled to compensation, that's kind of a
12   different way to think about it.  We are not claiming that
13   Mr. Bryant necessarily as against the whole world could
                              Page 4

111710DOC-02.txt
14  exclude anybody in the world from using these ideas.  In
15  some sense, it's kind of ironic that because of the contract
16  that we had, he's maybe the only person in the world who
17  couldn't come out with a doll named Jade.  I mean, if we're
18  right -- and I'm going to turn to this, obviously -- that
19  ideas were covered by the contract.
20          The Silvaco opinion, discussing the concept of
21  trade secrets, also focuses on this issue of relationships
22  and who can be excluded and who can't.  If you look at the
23  language that's been quoted in Silvaco, the court said:
24  Trade secret law does not protect ideas as such.  Indeed a
25  secret may consist of something we would not ordinarily
0010
1   consider an idea (a conceptual datum ) at all, but more a
2   fact, such as customer's preferences, or the location of a
3   mineral deposit.  In either case, the trade secret is not
4   the idea or fact itself, but information tending to
5   communicate (disclose) the idea or fact to another.  Trade
6   secret law, in short, protects only the right to control the
7   dissemination of information.
8           So it's only within the scope of the company that
9   that is subject to protection.  If it's something that meets
10  the definition of a trade secret, which, again, very
11  broad -- anything that has economic value from not being
12  generally known that can be a trade secret -- that's
13  protected within the confines of that company.  That doesn't
14  mean that somebody else can't independently come up with an
15  idea for a doll Jade, just like somebody else could
16  independently come up with an idea for a movie involving
17  Tarzan and the Garden of Eden.
18          The court poses the question:  What rights did
19  Mr. Bryant have in his idea, if assuming it was assigned
20  when he initially came up with it?
21          We can pose the same question of the ideas of the
22  person who submitted the idea --
23          THE COURT:  We can pose the same question to the
24  idea to the person who submitted the idea to the motion
25  picture --
0011
1           MR. QUINN:  -- motion picture company.  What right
2   did they have was against the world may not protectable.
3   But once you have a contractual relationship, as we believe
4   you do here, then it is protectable.  I mean, I think that's
5   the way to understand this body of law, including what
6   Ms. Hurst referred to as the concept of pay for use.  She
7   said -- she recognized that there's this whole body of law;
8   she says that we are incorrectly applying these cases in
9   this context where the idea of somebody who has an abstract
10  idea that's not subject to exclusive ownership but they
11  submit it to someone with the understanding that they will
12  be paid for it, but that's irrelevant.
13          I think it is relevant, your Honor.  That's what
14  we are talking about here.  A claimed contract right we
15  assert to cover -- which can cover ideas, just as in the
16  Desney context.  It doesn't follow from the pay for use
17  doctrine that Mr. Bryant could not assign his ideas to
18  Mattel:  To the contrary, it's entirely consistent with it.
19          Likewise, Ms. Hurst referred to the discussion
20  about transfer of ideas in Witkin, at Section 70.  I think
21  that's entirely consistent with what I'm saying now.  There
22  Witkin says: An abstract idea is not the subject of
23  ownership; thus, its protection cannot be found in property
24  doctrines.  Nonetheless, it is common practice in the film,
                              Page 5

111710DOC-02.txt
```
25   radio and television industries to conceive and submit ideas
0012
 1   for sale before developing a concrete literary composition.
 2   The modern view is that the idea, though not property, has
 3   value and may be the consideration for an express or implied
 4   in fact contract and a basis for recovering quasi contract,
 5   citing the Desney versus Wilder case.  Entirely consistent,
 6   I think.
 7              Here, MGA has agreed that doll names that aren't
 8   disclosed are valuable.  They have value as trade secrets.
 9   That's not disputed.  Mr. Larian testified to that as well.
10   So if we think of it in terms of relationships and the
11   bundle of sticks, I think you can see that ideas can be
12   protectable and are protectable under California law within
13   a certain scope.  And it's kind of a red herring to think in
14   terms of, does that mean somebody that owns the idea as
15   against the whole world, as to which the answer is going to
16   rarely be yes.  But that doesn't mean that there aren't
17   protectable rights.
18              The court also asked:  Doesn't Mattel's
19   contract -- Don't Mattel's contract cases simply stand for
20   the proposition that an idea's disclosure may be of
21   substantial benefit to the person to whom it is disclosed,
22   thus entitling Mattel to nothing more than a breach of
23   contract claim predicated not on Bryant's failure to assign
24   but on his failure to disclose?
25              Again, I submit, your Honor, that that, again, is
0013
 1   contrary -- would be contrary to the Ninth Circuit's ruling,
 2   where it said, the Ninth Circuit, sending it back with an
 3   instruction consider the extrinsic evidence as to whether
 4   ideas come within the scope of this contract, recognized
 5   that the assignment, itself, might well be enforceable -- it
 6   would be enforceable if it does come within -- if it was
 7   assigned under the contract.
 8              So we're dealing with two separate promises here:
 9   One, a promise in the agreement to disclose inventions,
10   et cetera; and two, a promise that they are assigned.
11   Anything that I come up with in my employment on my
12   inventions, et cetera, in that language it's assigned.  They
13   are inconsistent.  There is no reason to give effect to one
14   and not give effect to the other.
15              The second question under F.b), the court asked
16   us:  Doesn't the assignment of ideas under the Inventions
17   Agreement allow a former employer to almost always create a
18   genuine issue of material fact about whether a former
19   employee conceived a successful idea during his term of
20   employment?  Wouldn't every one of these cases necessarily
21   survive the motion to dismiss stage and, since they would
22   almost always turn on questions of credibility, summary
23   judgment as well?
24              As a general proposition, your Honor, there would
25   still ultimately have to be proof.  I mean, this is -- to
0014
 1   the extent that ideas come within the scope of a contract,
 2   obviously, there's -- how do you enforce that?  There's,
 3   obviously, a potential for abuse there.  I think it,
 4   probably, more favors -- or at least favors the employee as
 5   much as the employer.  The employees could come up with
 6   ideas.  Recognize that, gee, I'm on a salary here, and I get
 7   a Christmas bonus.  But if I take my ideas somewhere else, I
 8   might get equity in the company, or I might get royalties,
 9   which we submit is what happened here.  I can make a lot
```
                              Page 6

111710DOC-02.txt

10  more money.  I think this -- the way this argument really
11  cuts is that the employer is disadvantaged if it can't --
12  and it's hard to do, and it will be hard to do in some
13  cases -- come up with proof that an idea was arrived at by
14  an employee while they are in the employer's employment.
15            That's not our case.  We have boatloads of
16  evidence that Mr. Bryant conceived the idea while he was
17  employed by Mattel; that he negotiated with MGA while he was
18  employed at Mattel; that he came up with a prototype doll
19  using Mattel's resources and employees; that he contacted
20  vendors; all in violation of his duties.
21            So we can all imagine a case where it might be
22  difficult or might be difficult issues of proof, but that is
23  not this case.
24            C), the court asks:  Why shouldn't the consuming
25  public be entitled to ideas that Mattel's corporate
0015
1   hierarchy rejects but a competitor is willing to
2   manufacture?  On the other hand, isn't the assignment of
3   idea necessary for the creative field to flourish?  Aren't
4   all small companies, like start-ups, operating at a
5   significant disadvantage if their few employees can walk
6   away with good ideas to a better funded competitor?
7             Your Honor, as I have said today -- it was said
8   yesterday many times that Mattel rejected Bratz, simply
9   isn't true.
10            Mr. Bryant said, page 242, lines 12 to 14 of his
11  deposition, I asked him:
12            Is there -- did you ever consider bringing the
13  Bratz idea to the attention of people at Mattel?
14            Answer:  No, I really didn't.
15            He kept it to himself.  It was never disclosed.
16  There has been some discussion about, we didn't use the name
17  "Bratz" in connection with another doll, the Diva Starz
18  doll.  There's another doll.  There was a list of potential
19  names.  That was Brats, B-R-A-T-S, not "Z."  Bratz with a
20  "Z" was never presented to us.  None of these things that
21  I've described to the court.
22            THE COURT:  But there was a description that the
23  Diva Starz was so substantially similar that Mattel was
24  concerned about it.
25            MR. QUINN:  Mattel has never thought that that was
0016
1   infringing -- that Bratz infringed Diva Starz.  There was
2   some concerns about potential similarity but not rise to
3   anything that people thought was a legal issue.
4             THE COURT:  Well, I don't think so.  I think he
5   has to give you permission.
6        (Pause.)
7             THE COURT:  Mr. Zeller is now jumping in.
8             MR. ZELLER:  The issue with Diva Starz didn't have
9   to do with the dolls.  It had to do with the fact that there
10  was certain kinds of artwork that was on the packaging and
11  that was --
12            THE COURT:  Trapezoidal packaging?
13            MR. ZELLER:  Correct.  And there was also concern
14  about a website that we thought -- Mattel thought MGA had a
15  connection to that was using Barbie and Diva Starz as
16  metatags, M-E-T-A-T-A-G-S, to draw attention to the MGA
17  site.  But there has been no accusation that the Diva Starz
18  dolls and the Bratz dolls were substantially similar.
19            THE COURT:  Just a minute.
20            MS. HURST:  May I cross-examine?
                        Page 7

111710DOC-02.txt
```
21            THE COURT:  No, you'll have your hour in rebuttal.
22            MS. HURST:  That was --
23            THE COURT:  Thank you.  No.  No.  You'll have your
24   hour in rebuttal.  You're not going back and forth now.
25   That's their three and a half hours.
0017
 1            MS. HURST:  I understand.
 2            THE COURT:  In that hour you have that, that's the
 3   time.  Not now.
 4        (Pause.)
 5            THE COURT:  This doesn't count against your time,
 6   counsel.  Just give me a moment.
 7        (Pause.)
 8            THE COURT:  Counsel, just a moment.  This may take
 9   a few moments.  I need to look at some notes.
10        (Pause.)
11            THE COURT:  Didn't Mattel become concerned about
12   the Diva Starz and Bratz dolls sometime in 2001, early 2001?
13            You can walk over and talk quietly.  You don't
14   have to do that in my presence.
15            MR. QUINN:  Could I defer to Mr. Zeller on that,
16   your Honor?
17            Frankly, he was going to discuss these statute of
18   limitations issues when we got to them.
19            THE COURT:  Okay.  Have Mr. Zeller join you then
20   so I can hear it, both of you.  You stay at the lectern.
21   You're arguing this portion, apparently.
22            What I'm searching for is, if that's in the new
23   cannibalization study, or how that concern came about.  Now,
24   I don't want a bunch of lawyer talk.  I want to get this
25   answered, simply and directly.
0018
 1            Did Mattel become concerned about a similarity
 2   between Diva Starz and Bratz, in early January/February of
 3   2001?
 4            MR. ZELLER:  There were --
 5            THE COURT:  Yes or no?
 6            MR. ZELLER:  Yes.
 7            THE COURT:  Okay.  Is that contained in the new
 8   cannibalization study?  Is that concern expressed there?
 9            MR. ZELLER:  I would have to check on that one.
10   It's expressed in other documents to be sure.
11            THE COURT:  I know it is, but I'm going to narrow
12   in on those documents so refine it.  That's what I'm
13   searching through.  Is it in the new cannibalization study?
14            MR. ZELLER:  I would have to --
15            THE COURT:  Ms. Hurst, this is not your time.
16   This is not your time.  Believe it or not, this is not your
17   time.
18            Okay.
19            MR. ZELLER:  We can check.
20            THE COURT:  Now, just a moment.  I'm going to
21   leave that for a moment and give you time to check that.
22            The question was asked as a hypothetical, not
23   about this case, but, obviously, the circuit posed that and
24   that was a part of the discussion that the circuit had.
25   Recall?
0019
 1            Well, you weren't at the circuit.
 2            MR. QUINN:  I wasn't there.
 3            THE COURT:  They apparently employed another law
 4   firm.
 5            MR. QUINN:  They did, indeed, your Honor.  I never
```

111710DOC-02.txt

```
 6   have been bashful about pointing that out.
 7              THE COURT:  Anybody?  Do you have the answer?
 8              MR. ZELLER:  We don't have the cannibalization
 9   study document here.  We are getting it, your Honor.  But to
10   the court's point, there's no question that people had
11   commented on lost doll sales as a result of Bratz, including
12   a particular age group.
13              THE COURT:  No, you're taking time now.  I want to
14   ask --
15         (Pause.)
16              THE COURT:  I originally posed that as a
17   hypothetical, because it's a really difficult question to
18   answer, this idea about questions of the abstract -- ideas
19   of the abstract.
20              But let's go back to Exhibit 25.  Exhibit 25 --
21              MR. QUINN:  To?
22              THE COURT:  Exhibit 25.
23              MR. QUINN:  In the trial?
24              THE COURT:  Now, Mr. Quinn, I'm just kidding you.
25   Come on back for just a moment.  What I'm demonstrating to
0020
 1   you is when we get into trial, it's a good lesson for all of
 2   us.  You have no idea what Exhibit 25 is, because I have
 3   just thrown a number at you, and I don't expect you to.
 4   It's the Inventions Agreement.  So don't catch me off guard
 5   as a judge.
 6              When you address me during the time of trial in
 7   front of the jury, don't flip up the Exhibit No. 4018.  You
 8   tell me what it is, okay?
 9              I didn't mean to embarrass you by that.  It's the
10   Inventions Agreement.
11              All right.  Let's go to subsection 2 for a moment.
12              We've moved away from the hypothetical, which I
13   really hoped to have a discussion with you about into
14   specifics.  If we are going to do that, then I'm going to
15   take this issue head on.  If Mattel meant to protect ideas
16   as a concept, you've, apparently, been able to persuade
17   Judge Larson -- and maybe there is a cognizable argument
18   that idea is included in Exhibit 25, paragraph 2, but it's
19   not explicitly stated.  In fact, in the briefing by MGA on
20   page 18, first full paragraph beginning "for example," down
21   to the concluding line, line 22, he was a drone, it sets
22   forth an argument that we've been able to trace back and we
23   subscribe that this is exactly what occurred.
24              From at least 1975 through 1993, Mattel's form of
25   assignment used the phrase, quote, at any time during the
0021
 1   period of my employment with the company to express the
 2   timely aspect of the scope of its assignment clause.
 3              Sometime in 1993 or 1994, however, Mattel changed
 4   that form of agreement and dropped the italicized language
 5   so that the provision then read:  At any time during my
 6   employment with the company.  At the same time Mattel
 7   dropped idea -- ideas -- in plural -- altogether from the
 8   scope of its assignment, referring me to Exhibit 9089 with
 9   Exhibit 9090.  Mattel also dropped the reference to
10   trademarks.
11              Now, in addition, in MGA's briefing, they argue
12   that the 30(b) witness Kaye admitted that Mattel could offer
13   no explanation for the actual reasons motivating these
14   changes.  If you wanted to protect ideas, why were they
15   explicitly dropped from the previous wording that contained
16   "ideas"?  Now, whether "ideas" is an abstract concept or
```

Page 9

111710DOC-02.txt

17   not, a concrete concept, which I hope to engage in a
18   philosophical discussion about.  Now, the specifics.  Why
19   did that occur?
20          MR. QUINN:  Jumping ahead, now, to the court's
21   question 2.a) and 2.b) under this section.
22          THE COURT:  If I want to protect ideas and I have
23   it before in a drafting form with an excellent law firm and
24   excellent lawyers and the recognition that ideas is one of
25   those concepts I want to protect, whatever "ideas" means,
0022
1    why did you explicitly -- not you but why was it explicitly
2    taken out of the language?
3          MR. QUINN:  Your Honor, sadly --
4          THE COURT:  Help is on the way.  He's right here.
5          MR. QUINN:  Sadly, the draftsperson, a Mattel
6    in-house lawyer by the name of John Mc Kay is deceased, and
7    he's -- we don't have anyone -- we have no -- and to answer
8    the court's question in 2.a), nobody has an explanation.
9          THE COURT:  How can ideas be protected, if it's
10   explicitly removed, regardless of what it means?
11         MR. QUINN:  Well, because Mr. Bryant never saw
12   that previous agreement.  He understood that ideas were
13   included.  There's language there -- there's very broad
14   language, your Honor:  Discoveries, blah, blah, blah.
15   "Ideas" isn't there, but it says:  Including but not limited
16   to.
17         THE COURT:  I know you've been able to persuade
18   Judge Larson that ideas was included in this broad language,
19   but the curiosity on my part is the opposite; and that is,
20   if I want to protect something, I not only draft it broadly,
21   even if I don't understand the concept.  I include ideas,
22   inventions.  Make up a word.
23         MR. QUINN:  Bazookas.
24         THE COURT:  Bazookas.  Thoughts.
25         Yeah, I put it in there, even if I don't know the
0023
1    cup of the water (sic).  But here when it was already
2    included, it was explicitly taken out.  How can you claim
3    that this is protected?
4          MR. QUINN:  Well, because the language is broad
5    and Mr. Bryant said he understood ideas were included.  Five
6    or six other witnesses under oath have said they understood
7    this included ideas.
8          Mr. Bryant's testimony on this in another trial,
9    Art Attacks trial.  Mattel wasn't a party to this case.
10   Mr. Bryant was asked:  Did you understand --
11         And the court asked a question with this question
12   and answer.  I personally don't see how it's objectable.
13   But in any event, there is no objection in the record.
14         Did you understand that your interest in any and
15   all inventions, improvements and ideas which you made or
16   conceived during your employment at the company was the
17   exclusive property of Mattel?
18         THE COURT:  May have a compound question.
19         In other words, we've thrown three or four
20   concepts in and now the witness is answering yes or no.
21         MR. QUINN:  Well, you are the judge, obviously.
22         THE COURT:  Objection sustained.
23      (Laughter.)
24         MR. QUINN:  Sometimes somebody says, Did you read
25   all three memos?
0024
1          Objection.  Compound.

111710DOC-02.txt
```
 2              Sometimes that's sustained; sometimes, it's not.
 3              THE COURT:  Did you have bacon, eggs and chicken
 4    this morning?
 5              I might answer yes, because I had bacon and eggs
 6    and forget the chicken.
 7              MR. QUINN:  There's no objection here.  That's
 8    called objection to the form of the question where I come
 9    from.  It's not there.
10              His answer is clear:  You know, I think, I was
11    aware of that.  It wasn't pointed out to me when I left.
12    Nothing on this contract was pointed out to me,
13    specifically.
14              THE COURT:  Is the 30(b) witness Kaye, deceased?
15              MR. QUINN:  No.  His deposition is taken.
16              THE COURT:  Then he's supposed to be 30(b)(6)
17    witness who can answer this question.  And his response is,
18    he could offer no explanation for the actual reasons
19    motivating the changes.
20              MR. QUINN:  And --
21              THE COURT:  We've got smart lawyers, great law
22    firms, terrific draftsman, well paying clients.  Why did we
23    remove "ideas"?
24              MR. QUINN:  Your Honor, nobody knows,
25    unfortunately.  Nobody knows.
0025
 1              THE COURT:  Then how can you claim it deserves
 2    protection?
 3              MR. QUINN:  Because it's Mr. Bryant, party to the
 4    contract.  First off, he never saw the previous contract.
 5    It was our view that drafting history is irrelevant, okay?
 6              So what the court is engaging me on is a change he
 7    didn't know anything about.  They cite insurance cases,
 8    which we think are distinguishable, because they really
 9    relate to insurance policy archaeology which has meanings
10    going back to Lloyds Coffee House in London.
11              THE COURT:  Now, we're back to Lloyds Coffee
12    House.
13              Answer my question.
14              MR. QUINN:  The answer is:  The party to the
15    contract said he was aware of that.  All right.
16              We've got six other witnesses.  Mr. Kaye, the
17    30(b)(6) witness, said his understanding was ideas are
18    included.  Pasco, Gilmore, Ross, Tomiyama, Martinez all said
19    they understood included ideas.
20              MGA's contracts includes ideas.  There's Applied
21    Materials --
22              THE COURT:  But MGA's contract explicitly includes
23    ideas, doesn't it?
24              Doesn't it?
25              MR. QUINN:  Yes.
0026
 1              THE COURT:  And Mattel's doesn't?
 2              MR. QUINN:  Does not.
 3              THE COURT:  Well, how can you protect ideas?
 4              MR. QUINN:  Because the party -- both parties to
 5    the contract say, Includes ideas.
 6              I win.
 7              THE COURT:  You win.
 8              MR. QUINN:  I win on that.  I got both parties to
 9    the contract saying, Ideas are included.
10              Now, Ms. Hurst had an explanation which frankly I
11    didn't get, went by me pretty fast about why we should
12    ignore Mr. Bryant's understanding.  This is back here to
```

111710DOC-02.txt

13  considering extrinsic evidence, because the Ninth Circuit
14  said this is ambiguous.  For heaven's sakes, you got to
15  consider the parties' own statements of their understanding
16  if you're trying to understand something the circuit said is
17  ambiguous.
18            THE COURT:  Just a moment.
19      (Pause.)
20            THE COURT:  I'll be right with you.  This is going
21  to take a couple minutes.
22            If you want to talk to your team, you can.
23      (Pause.)
24            THE COURT:  Now, in the Ninth Circuit opinion, the
25  circuit stated that the agreement could be interpreted to
0027
1  cover ideas but text doesn't compel that reading, and there
2  was a question to be determined on remand by either the
3  court or the jury.
4            Now, I would assume your position is that you
5  would like the jury to determine this; is that correct?
6            Or after our discussion, would you like the court
7  to determine it?
8            Do you want do talk to Mr. Zeller about that?
9      (Laughter.)
10           THE COURT:  Since we're reading ideas.
11           MR. QUINN:  Rather than consult with Mr. Zeller,
12  I'll just tell you what I really think.
13           And I've gotten some education on this from
14  Ms. Hurst, actually.  I've always understood that
15  interpretation of a written contract was a question of law
16  for the court.  However, when you get into issues of
17  extrinsic evidence, if there's issues of credibility
18  apparently, that's to be resolved by the jury.
19           THE COURT:  By a jury.
20           MR. QUINN:  Now, this sounds like a pretty
21  important principle.  We have a lot of contract cases to
22  decide in this state, and I don't know exactly how you do
23  that, how you put those two together.
24           THE COURT:  Well, that's what the circuit left us
25  with.
0028
1            MR. QUINN:  Right.
2            THE COURT:  By the court, or by the jury.
3            And my understanding is, normally, the court would
4  decide this, but I'm left with the suggestion that this
5  might be a finding by the jury.  And --
6            MR. QUINN:  Apparently, if there are issues of
7  credibility relating to the extrinsic evidence, those are
8  supposed to be resolved by the jury.  And I have asked
9  people to try to enlighten me about, well, what does that
10  mean, issues of credibility?  And I don't have an answer for
11  the court.
12           THE COURT:  And that's my concern for both
13  parties.  When you get up to argue on MGA's side, it seems
14  to me that when the circuit courts referred us back to
15  extrinsic evidence, it really puts the court in an odd
16  position where I would normally decide this, and now I'm a
17  little cautious and hesitant to make what I would normally
18  undertake as a judgment call.  Because reading between the
19  lines, I don't believe Judge Kozinski writes dicta when he
20  says, by the court, I would have clear direction.  By the
21  court, I would have accepted that as the normal rule that
22  I'm most used to.  When he says and/or the jury, and he
23  points to extrinsic evidence, I think he's signaling me from
                        Page 12

111710DOC-02.txt
24    the circuit's perspective, quite frankly:  You've got some
25    extrinsic evidence here and it might be best left for the
0029
1     jury.
2              Now, you're going to argue against that position,
3     I assume, on MGA's part.  I don't know, but I'm seeking some
4     help on that regardless.
5              MR. QUINN:  I'll wait to reconcile.
6              THE COURT:  If you both want to stipulate that I
7     decide it, I'm happy to do that.  Therefore, I have a
8     stipulation, and we can move on and the circuit can't really
9     disagree; but if not, then I'm not saying I will.  I haven't
10    made the decision.  But there's that other message and that
11    is what I am dealing with, extrinsic evidence, which was the
12    main concern of Justice Wardlow and Justice Trott and
13    Judge Kozinski.  I think that is a possibility that they
14    would like this submitted and that the cautious approach
15    would be to do so and make the court's own individual
16    finding in relation to that, or even use it as a advisory
17    jury opinion.  There's a lot of ways we can play that.
18             The problem is that counsel will always question
19    the court's integrity when we undertake that process,
20    because the feeling will be that we waited to see what the
21    jury did and then just agreed.  Let's be blunt about that.
22    That's what happens a lot of times in these kinds of cases.
23             Just a moment.  I'll be right with you.
24             Now, one of the thoughts I wrote came from the
25    briefing by MGA, on page 45, lines 20 to 28, and you can
0030
1     look at those lines for a moment.  But I wrote in notes, as
2     I read this part of the briefing, that if I allow Mattel to
3     interpret "idea" as included in the Inventions Agreement, or
4     even if the idea was explicitly mentioned, this would allow
5     Mattel to reach forward indefinitely through an employer --
6     I'm sorry, throughout an employee's career and claim that
7     every future idea belonged to them.
8              I wrote that this might be absurd mischief and
9     that it seemed to me that the competing interest that
10    California law has so often expressed is the interest in a
11    rather mobile workforce.
12             Now, if I just go 400 miles north to Washington,
13    it's entirely standard, probably because of Boeing's
14    influence, quite frankly, up there and Microsoft.  But here
15    this mobility, at least when we're dealing with California
16    concepts, seems to be a fluid workforce which has always
17    caused problems in terms of our intellectual toolbox.  What
18    did you bring to my company, or short-lived stay here?  You
19    now leave.
20             We've always had these employment disagreements.
21    Why isn't this on my part, if I make this decision, really
22    an invitation to be read from this point forward as
23    precedence and mischief, quite frankly, for other companies
24    tying an employee?
25             I mean, the concept I'm trying to get across is
0031
1     this:  Every past employer will argue that the idea occurred
2     during the term that that employee was at their company.
3     And what it does is it ties intellectual thoughts backwards.
4     It stifles this creativeness that California seems to want
5     to create as a policy.
6              I want you to help me with that.  Because
7     sometimes we not only make decisions, we ought to be aware
8     where our decisions lead us.
                           Page 13

111710DOC-02.txt
```
 9               MR. QUINN:  Right.  I understand what the court is
10  saying.  Potential for mischief, yes.  Potential for
11  mischief both ways.  An employee can come up with an idea
12  and then say, I thought of this really during an interregnum
13  of my employment when I was back in Springfield, Missouri,
14  living with my parents.  I mean, it has that potential on
15  both sides.  But I think the answer to the court's question
16  is, you know, still what trumps that is freedom of contract.
17               THE COURT:  So you can contract this away?
18               MR. QUINN:  You can contract that away.  Of
19  course.
20               THE COURT:  And how does this contract ideas away
21  in the Inventions Agreement that Mattel drafted, when you
22  exclude that concept?
23               MR. QUINN:  Well, we have some very broad language
24  in there.  Discoveries.  Other broad language.  We have
25  including but not limited to.
0032
 1               THE COURT:  I know you do.
 2               But why was it explicitly taken out?
 3               That's the obstacle that I'm having here; and that
 4  is, if you have broad language, for goodness sakes include
 5  thoughts, ideas, inventions, et cetera.  And when you
 6  explicitly take something out, it seems to me that you mean
 7  to delete it.
 8               MR. QUINN:  Well, I have said, and I think anyone
 9  would agree, I would be in a much stronger position right
10  now, and we probably wouldn't be having this discussion --
11               THE COURT:  We wouldn't be.
12               MR. QUINN:  -- if the word "ideas" was there.
13               But that doesn't mean that the parties can't
14  intend to include "ideas."  That doesn't mean, I submit,
15  that Mr. Bryant should be able to rely on a drafting history
16  he had no knowledge of, especially in the teeth of his own
17  admission, he understood ideas were included and when you
18  have our 30(b)(6) witness saying "ideas" were included, when
19  you have the other employees saying "ideas" were included.
20               The court asked about Ms. Morales' testimony, why
21  should the court credit Ms. Morales' testimony because --
22               THE COURT:  There's the difficulty.  That's where
23  you may prevail.  When the circuit came back with the
24  finding that Judge Larson should have relied on extrinsic
25  evidence, the strongest argument you have is that the court
0033
 1  should not only look at the explicit language, but now I
 2  need to take into account extrinsic evidence which normally
 3  I don't think I do.
 4               So if I'm reading this fairly from the circuit,
 5  what may save you on this argument is Judge Kozinski's
 6  language that this deserved extrinsic evidence
 7  consideration, which means interpretation when oftentimes
 8  and normally the courts don't do that.  Contract
 9  interpretation is up to the court.
10               MR. QUINN:  I know.  But California has these
11  really troublesome parol evidence rules that -- for
12  instance, it's got to be an integration.  That initial
13  question you have to look at extrinsic evidence, so it's
14  real hard.  I've come to learn that in England it's much
15  easier.  They just look at the four corners of the document.
16               THE COURT:  Well, MGA is forewarned also.  That's
17  your strongest position, quite frankly, is the direction of
18  the court to look at this, extrinsically.
19               MR. QUINN:  And lest we forget, your Honor, I'll
```
Page 14

111710DOC-02.txt

20    just advert to my opening remarks.  I think this discussion
21    about abstract ideas is in a sense academic, because we're
22    not talking about anything abstract.  We're talking about a
23    doll line which was to some degree all along the way reduced
24    to practice.
25                THE COURT:  Okay.  I won't interrupt you again.
0034
1                Why don't you continue.
2                MR. QUINN:  Thank you, your Honor.
3                If I could just go back to the previous point
4     1.c), which I didn't address:  Why shouldn't the consuming
5     public be entitled to ideas that Mattel's corporate
6     hierarchy rejects...?
7                One, we didn't reject.  But two, there would be
8     nothing wrong with our rejecting it and still wanting to
9     keep it and prevent others from using it.  For example,
10    suppose, you know, an Apple employee comes up with an idea
11    for some type of software, an idea, or something that would
12    make an iPhone inoperable with an Android phone.  Great
13    idea.  It would be fabulous for the consuming public.  I
14    have a pretty good idea what Steve Jobs' reaction to that
15    would be:  You deep six it.
16                That doesn't mean it doesn't have value.  That
17    doesn't mean that Apple isn't entitled to protection for
18    something they don't use.  Just like a motion picture
19    company that acquires scripts.  They want to make a movie
20    about the Vietnam War.  They acquire six scripts relating to
21    the Vietnam War.  They only make one of them.
22                That doesn't mean that they have -- it's no value
23    to them, or no loss of value to have somebody else making
24    another movie about the Vietnam War.  It's not a question of
25    value.  Under the statute, Uniform Trade Secrets Act, it
0035
1     also says Potential value.  Something that has potential
2     value.  Not being generally, no.
3                The court's third question relating to the Bratz
4     design, 3.a):  Even if Bryant's right, title and interest to
5     the Bratz design, as inked, were assignable under the
6     Inventions Agreement, what rights did Bryant even have in
7     the design?  Was the design trademarkable at the time it was
8     created?
9                It's not clear from the court's questions,
10    specifically, what Bratz's design the court is referring to.
11    There were, of course, drawings, designs for each of the
12    four characters.  There was also what's called the Hero
13    Shot, all for of them together that later became a logo and
14    trademark for Bratz used by MGA.  He had that completed and
15    ready as well.
16                Our view is that on the Inventions Agreement,
17    Mattel owned all those things.  They were -- were they
18    trademarkable?
19                Yes, they were trademarkable.  They were
20    trademarkable, even if they weren't yet being used in
21    commerce in a trademark sense as a process in the Patent and
22    Trademark Office where you can file a notice of intent to
23    use as a trademark and secure your rights.  So, as soon as
24    that was inked, that could have been -- a notice of intent
25    to use could have been filed.  Could it be used as a
0036
1     trademark?
2                Certainly, in the case of the hero shot, it could
3     be and was by MGA used as a trademark.  Once they are
4     reduced to a tangible medium of expression as they were when
                                Page 15

111710DOC-02.txt

5  they were inked on paper, there's a copyright there.  And
6  under Section 204 of the Copyright Act, the assignment
7  agreement was a sufficient writing to assign that copyright
8  that Mr. Bryant had in his own creation to Mattel.  So I
9  submit that there were rights there.
10            The court's fourth question under H is:  Work for
11 Hire.
12            Question a), I think, was really directed to MGA.
13            Question b):  How could this have been work made
14 for hire if Bryant worked in the Barbie Collectibles Group,
15 which did not produce non-Barbie lines dolls?
16            Again, this is kind of our -- we don't have to
17 choose, your Honor, between the contract theory and the
18 work-for-hire theory, as far as we are concerned.  Either
19 works.  We filed copyright registrations.  And as MGA points
20 out, check the box, you know, assignment, ownership by
21 assignment.  You have to check one.
22            We've submitted to the court the expert report of
23 the declaration of Mr. Oman, the former registrar of
24 copyrights.  As he said in his expert report, Look, Mattel
25 could do either.  Either suffice, you have to make a choice.
0037
1  That's what the form requires.
2            But that doesn't mean that we don't have any
3  work-for-hire claim here.  MGA portrays -- and the court's
4  question goes to this, is:  This is not having anything to
5  do with Mr. Bryant's job duties; and, therefore, it couldn't
6  fall within the scope of work-for-hire.  I think the reading
7  we heard yesterday about what Mr. Bryant's job duties were
8  is unduly narrow, as if he's somebody that sits by the
9  phone, responds to discrete assignments and has no
10 discretion.
11            In fact, he didn't work just on Barbie.  There's a
12 doll called the Skipper doll which he testified he was
13 involved in creating.  He worked on project Platypus.
14            Look at his own testimony.  Mr. Bryant's testimony
15 was that it was part of his job to come up with ideas.  We
16 cited this to the court from his deposition, page 116.
17            He was asked:  What was your position, sir?
18            Answer:  When I first started, I was an associate
19 designer.
20            Question:  And after that?
21            Answer:  I was promoted to designer.
22            Question:  And part of your job was to come up
23 with new ideas, right?
24            Answer:  Yeah.  That was part of my -- that was
25 part of my job.
0038
1            So he testified to that.  And then, he wrote --
2  afterwards, it's in evidence, he wrote a resume where he
3  describes his work, what he did at Mattel.  And he says --
4  this is his own description of his job duties -- Developing
5  doll toy concepts from initial idea to the preproduction
6  development stage.  This includes the full range of design,
7  from the design of the fashions and accessories, which
8  included shoes, hats, handbags.
9            It goes on.  The makeup.  All the rest of it.
10 Long list.  That's how he described his job.  But, moreover,
11 the case law is not that work-for-hire to apply that it
12 has -- the particular work has to fall squarely within the
13 only things an employee does.  There's case law to the
14 effect that it just has to be at least incidental, quote,
15 unquote, to the employee's job responsibilities.  That's the

Page 16

111710DOC-02.txt

16  Miller versus CP Chemicals case.  That's, also, Favela
17  versus Fritz, where the court found that the creation of
18  software is within the scope of employment of an employee
19  hired for data entry.  Quit a bit dissimilar.  Still found
20  that for work-for-hire purposes that sufficed.
21          So to respond to the court's question, we do
22  believe that there is a legitimate work-for-hire claim here
23  as well.
24          The court didn't ask the question about nights and
25  weekends.  But I can't move on, without at least adverting
0039
1  to it, because it's been the subject of so much discussion.
2          THE COURT:  Judge Kozinski also referred to the
3  bathroom and coming up with ideas there.
4          MR. QUINN:  Nights and weekends, you know, a
5  little bit, we are in the twilight zone here, your Honor.
6  Because MGA's position to this day, as they sit here, is
7  that this wasn't created nights and weekends while he worked
8  at Mattel.  This was created back in Springfield, Missouri.
9  So, this is a -- it's a nonissue.  That's the position they
10  have taken since the Ninth Circuit decision came down.
11          I would like to turn now, your Honor, to the
12  court's questions under G, aiding and abetting --
13          THE COURT:  Just a moment, counsel.
14          Just one minute, counsel.
15      (Pause.)
16          THE COURT:  I'm sorry, counsel.
17          Please continue.
18          MR. QUINN:  I'm turning now, your Honor, to the
19  questions under G:  Aiding and abetting, fiduciary duty and
20  duty of loyalty.
21          The first question the court asks as to the
22  existence of fiduciary duty:  Is it Mattel's position that
23  the mere inclusion of the word "trust" turns this from a
24  situation in which summary judgment would be granted for MGA
25  to one in which summary judgment would be granted for
0040
1  Mattel, since that is the only fact that distinguishes this
2  case from Rita Med. Systems versus the defendant.  I don't
3  have the complete name, here.
4          No, that's not Mattel's position.  There is no
5  dispute, first off, that fiduciary duties can be created by
6  agreement between the parties.  There is no case law that's
7  been cited to the court that says that there must be some
8  magic word that the word "fiduciary" must be used.
9          If you think about the word "fiduciary" and when a
10  fiduciary is and fiduciary law -- and if you were in a game
11  of -- what is it? -- charades where there's some game where
12  you try not to use the word, but you describe it, around it.
13  The first word everybody -- if you were playing that game
14  and tried to get somebody to say the word "fiduciary," is
15  "trust."
16          That's hammered home in the language of the
17  agreement.  When the agreement recites in the simplest
18  possible terms:  The company depends on me to maintain that
19  confidentiality and accept that position of trust.  And
20  then, it goes on.  It elaborates.  You won't disclose this.
21  You have access to our confidential information.  It then
22  closes in solid caps:  This agreement creates important
23  obligations of trust.
24          So, you know, if we had said the word "fiduciary,"
25  somebody might criticize us for using a word that an
0041

Page 17

111710DOC-02.txt
1   employee didn't understand.  I think this expresses the
2   concept, perhaps, in more laymen's terms, or would readily
3   be understandable to people.
4               THE COURT:  I accept that.  I think it's a very
5   good argument about trust.
6               Why was "ideas" removed?
7               MR. QUINN:  You know, I'm going to hold a séance
8   tonight and see if I can summon that lawyer.
9               THE COURT:  Because when we are relying upon
10  words, we have to question why words were removed, don't we?
11              MR. QUINN:  Well, when you are party to that
12  contract and you've see that change, that's real important.
13  But I submit, if you haven't seen the drafting history, that
14  shouldn't be an issue.
15              THE COURT:  What may rescue you is this extrinsic
16  evidence guidance from the circuit, but that may be all that
17  rescues you.
18              MR. QUINN:  I'll accept rescuing.  I've never
19  turned down a rescue, knowingly.
20              The Rita Med. Systems case, the court refers to,
21  How this is any different?, doesn't quote the contract
22  language.  So we don't know what was there.  And there
23  really isn't much discussion at all.  I think the best case
24  on this subject is a post-City of Good Hope decision, which
25  I know MGA relies on, called Think Village.  We cited to the
0042
1   court the Northern District of California decision in Think
2   Village.  It's a decision on motion to dismiss, but there
3   was also -- and we had not cited this to the court -- a
4   motion for summary judgment on breach of fiduciary duty
5   claim, a few months later.  In that case, the Think Village
6   court held that a nondisclosure agreement could have
7   established a fiduciary relationship, even stating -- and I
8   quote now -- The NDA, itself, does not specify that the
9   parties intended to enter into a nonfiduciary relationship,
10  close quote, and that, quote, The very existence of the NDA
11  strongly suggests all parties anticipated that the
12  information exchanged would be kept secret.  Denied summary
13  judgment on the fiduciary duty issue.
14              The court's next question:  How does treating the
15  former Mattel employees fiduciaries hew to (or betray) the
16  purpose of the doctrine, which was born in equity?
17  Relatedly, when the employment contract specifically
18  obligates the employee to maintain the confidentiality
19  materials, why isn't a simple claim for breach of contract
20  sufficient?
21              I think it's consistent with principles of equity,
22  your Honor, in that a corporation, obviously, is a legal
23  fiction.  It's inanimate.  It consists of its employees.
24  The owners in the case of a public company in particular
25  aren't around.  You have employees who have access to
0043
1   important valuable confidential information.  In the
2   industry where creativity is important, like the toy
3   industry, Ms. Garcia said this to MGA, Unreleased concepts
4   are the most valuable things they have.  Those are in the
5   hands of employees, the most important assets.
6               I think it's entirely consistent with concepts of
7   equity to protect the shareholders, the owners of the
8   business, from misuse of that very important trust.
9               Why isn't a simple claim for breach of contract
10  sufficient?
11              We can ask that same question, even if the word
                          Page 18

111710DOC-02.txt
12  "fiduciary" was there.  In cases where you have a trustee,
13  there is always a contract to, and we could ask, you know,
14  why did the common law evolve this concept of a fiduciary?
15  but the law has recognized principles of equity.  There are
16  some circumstances where people create obligations of trust,
17  contractual remedies aren't sufficient in those
18  circumstances presumably to deter misconduct.  And besides,
19  I don't think sufficiency is relevant.  Employees can have
20  contractual obligations as well as obligations arising from
21  other sources, such as the duty of loyalty.
22          Third question, under this heading the court asks:
23  Mattel argues that the facts raise and inference of aiding
24  and abetting, the elements of which are substantial
25  assistance or encouragement.  What facts show substantial
0044
1   assistance?  What facts show encouragement that is
2   substantial?  What would insubstantial encouragement look
3   like?  What facts show MGA's knowledge of the existence of a
4   fiduciary duty - did MGA see the Mattel employees' contract?
5   And if the contracts do not unambiguously create a fiduciary
6   duty, how could MGA reasonably have knowledge of that duty?
7           First, in terms of substantial assistance, we're
8   looking -- under the law, your Honor, this is a very low
9   hurdle to clear.  There's a Ninth Circuit decision, Casey
10  versus U.S. Bank National Association, in which the court
11  held that -- and I quote -- Ordinary business transactions a
12  bank performs for a customer can satisfy the substantial
13  assistance element of an aiding and abetting claim, if the
14  bank specifically knew those transactions were assisting the
15  customer in committing a specific tort.
16          It's a low hurdle, but in this case that hurdle is
17  cleared easily.  What assistance was given while he's
18  working for Mattel?
19          They paid him thousands dollars for his services.
20  They paid him for his expenses.  With his knowledge, he
21  started to contact vendors.  They had him sign an agreement
22  while he is working at Mattel -- while he's working at
23  Mattel which commanded that he worked for MGA on a, quote,
24  unquote, top priority basis.  And then, they -- we
25  maintain -- engaged in various acts of cover-up.  I mean,
0045
1   the court is well aware of some of that evidence from the
2   e-mails about the effort that was made to disguise that, so
3   I don't think there is any question that substantial
4   assistance is shown here.
5           What would insubstantial assistance be?  Fiol,
6   F-I-O-L, is the name of the plaintiff in the case, 50
7   Cal.App.4th 1318.  The court said in that case that the mere
8   failure to act would be insubstantial assistance.
9           The knowledge element, the law does not require
10  that Mattel have knowledge that the employees were
11  fiduciaries.  Rather, it requires actual knowledge of the
12  primary violation.  He's working for Mattel.  This is
13  something -- he's being disloyal to Mattel in engaging in
14  these transactions with MGA.  That's Nielson versus Union
15  Bank of California.  Specific knowledge that he's a
16  fiduciary is not required.
17          I would also refer the court to In re Alliance
18  Corp.  It's a Ninth Circuit decision where the court
19  similarly reached a decision that you don't have to have
20  knowledge that the person is a fiduciary if you know that
21  there is a primary violation that's been engaged in.
22          The court asked:  What did MGA know?  Did they see
Page 19

111710DOC-02.txt

23   the contract?
24           Well, he was dealing with Paula Garcia, an officer
25   of MGA, former Mattel employee who had signed the very same
0046
1    contract.  She hadn't been at Mattel's very long.  She knew
2    him at Mattel.  She denied that she knew he was a Mattel
3    employee at the time, but I don't think that evidence was
4    very credible.  There were several other employees at Mattel
5    who had signed that same contract.  Their lawyer,
6    Mr. Rosenbaum -- They engaged a lawyer, Mr. Rosenbaum, to
7    deal with Mr. Bryant and negotiate this royalty agreement.
8    He told -- Mr. Bryant told Mr. Rosenbaum, I have an
9    Inventions Agreement.  But I think it would be awkward for
10   me if I were to ask HR for a copy of it.
11           So they're on notice that there is an Inventions
12   Agreement and they decided, Hear no evil.  See no evil.
13           So they did have knowledge.  There were key people
14   at MGA, who Mr. Bryant was dealing with, who did have
15   knowledge of the terms of the Mattel contract.
16           Okay.  I believe that with respect to -- sorry,
17   your Honor, just very briefly on the issue of the duty of
18   loyalty.  MGA has advanced a theory under which it's okay to
19   work with -- it's not disloyal that the statutory language
20   suggests that you only have to give primary allegiance to
21   one employer and that it's not disloyal to be secretly
22   working for a competitor.  They cite no case for that
23   proposition, and I submit there is no case that supports
24   that theory of the scope of the duty of loyalty.
25           We also indicate he's a low-level employee.  The
0047
1    law doesn't distinguish between low-level employees and
2    senior employees.  There's no case that suggests there's a
3    difference in terms of their statutory duty of loyalty.  The
4    Huong case, HUONG, 150 Cal.App.4th 400, says that an
5    employee breaches its duty of loyalty when the employee
6    takes action which is inimical to the best interests of her
7    employer.
8            The suggestion has been made that Mr. Bryant did
9    nothing more than to prepare to compete and that that's
10   perfectly fine.  There is case law that says you can prepare
11   to compete while you're on somebody else's payroll.
12   Mr. Bryant, I think it's clear, did much more than that.
13           I'm about to turn the floor over to Mr. Zeller,
14   who may have some additional points with respect to what we
15   call the sample makers, rather than the seamstresses.
16           But just a final couple of things and couple of
17   loose ends, your Honor.  With respect to the trade secrets
18   claim, MGA's motion is very limited.  Their challenge to
19   this claim is just to whether the names -- Bratz, Jade and
20   Moxie -- can be trade secrets.  All the rest of the things
21   I've described, which are the scope of the Bratz trade
22   secrets, have not been challenged by MGA on this motion.  So
23   those at least, under no way, they can be -- can summary
24   judgment be granted as to those.
25           Just something a little bit out of order, your
0048
1    Honor.  One of the questions the court asked under Section
2    H.1.b):  How can product names be characterized by trade
3    secrets in light of the fact that once they are used, they
4    are evident to anyone using the finished product?
5            Well, once it's out there, it's no longer a trade
6    secret.  It's publicly known.  So by definition it isn't.
7    Mattel, like MGA, considers unreleased product information,

Page 20

111710DOC-02.txt
```
 8  as well as product names, to be trade secret and they can be
 9  until they become public.  I think Ms. Hurst agreed with
10  that yesterday, that unreleased names are confidential and
11  regarded as secret and valuable by MGA.
12          Last question I'll address that the court asked.
13  This is I.4.  The court asked:  Is there case law for the
14  proposition that a company can unknowingly maintain the
15  secrecy of information, thereby entitling the information to
16  trade secret status unbeknownst to the company?, which is
17  kind of an interesting formulation.
18          Again, a company, a corporation is a legal
19  fiction.  It's an inanimate concept.  It is in a practical
20  sense only its people.  So there are people -- if they are
21  people who know about a trade secret, obviously, that's the
22  only way a corporation can know is that its people know.
23  There's nothing in the law that says that something can't be
24  a trade secret until it's known by a certain level of person
25  in the hierarchy.  Especially when you're dealing in a
0049
 1  creative environment with hundreds of employees, that will
 2  never be the case that officers or senior people or managers
 3  will have knowledge of all the concepts that are being
 4  worked on.  That doesn't mean they're not still protected by
 5  the company, or owned by the company, or have value to the
 6  company.
 7          Unless the court has some questions, I'm prepared
 8  to turn the floor to Mr. Zeller.
 9          THE COURT:  Mr. Zeller.
10          MR. ZELLER:  The only thing I would add with
11  respect to the additional employees who were subject to the
12  employment agreements, the Inventions Agreements that they
13  signed with Mattel, that in our view imposed a duty of
14  loyalty and in some instances a fiduciary duty, when you're
15  talking about people even who are so-called low level,
16  people who worked there in the design center at Mattel, over
17  the years, these are people with tremendous discretion and
18  how it is that they carry out their duties.
19          This is something that, actually, Judge Larson had
20  pointed out in one respect in one of his orders, which is:
21  It is fair -- and this is in response to the court's
22  question about:  How does this really hew or betray the
23  purpose of the document?
24          It's consistent with it, because these employees
25  operate in a creative environment.  They are coming up with
0050
 1  new things.  They are creating designs.  They have a lot of
 2  discretion in how they carry it out.
 3          Mattel is not in the position to police them, and
 4  how it is that they are using the confidential information.
 5  That is why -- so, in that sense of what the power is
 6  between the relationship, it's the employees that can really
 7  police themselves, and they're the ones who know and need to
 8  ensure that they are not misusing Mattel's confidential
 9  information.
10          There's no way that Mattel can be in the head of
11  all these employees to make sure that they are acting
12  properly.  So, I think, further also goes to the court's
13  question of:  What does it get you in addition to a
14  contract?
15          Well, it gets you this additional duty, even apart
16  from some argument about enforceability of an agreement, the
17  language of an agreement.  But there is a duty under the
18  law -- and certainly by agreement as well -- that the
```
Page 21

111710DOC-02.txt

19  employees understand that when it comes to, particularly,
20  confidential information that they have the utmost duty to
21  the company, and that they are the ones who really are in
22  the position of policing themselves because Mattel can't
23  protect itself against all the various employees and what it
24  is that they come up with.
25          Turning to Section H -- this is trade secrets --
0051
1   in a), the court first asks about the argument here.
2           The answer is "yes."  That is the argument here.
3   And on average, Mattel begins, actually, manufacturing
4   product about four months prior to the delivery date.  The
5   initial retailer orders for that same product, come about
6   one to two months before it is being -- to be delivered.
7   And that's sort of partly what accounts for that inbalance,
8   in terms of when do you start to manufacture, what do you
9   have to forecast for inventory and then, actually, being
10  able to move it.  And that's why these forecasting systems
11  are important.
12          There is substantial evidence that MGA, in
13  particular, prior to the time that Mr. Castilla went over,
14  was having tremendous inventory problems; that they had
15  massive amounts of excess inventory that was causing alarm
16  among people like Mr. Larian, Mr. Brawer and others.  And
17  this just replete in their e-mails.  So they also had a
18  substantial need for exactly this kind of forecasting
19  system, because their system was not cutting it.  And then
20  Mr. Castilla gets recruited and taken over to MGA.
21          Subsection -- the next question about product
22  names, Mr. Quinn has addressed.  There is also other
23  evidence in the record, by the way, including by MGA,
24  Mr. Larian's testimony and the like, where they say very
25  specifically that products and development, including the
0052
1   name that's attached to it, is highly valuable and there is
2   a trade secret prior to the time that this information is
3   disclosed to others.
4           Section c), this is the question about the formula
5   depicted in Exhibit 1 to the Cooney declaration.  That
6   formula was much more than this intuitive understanding that
7   the court describes.  And, in fact, the confidential formula
8   in what's called the Merchant Modeling Optimization Tool
9   aggregated more than 20 data inputs to measure the
10  relationship between the fixed and variable data points and
11  calculate a set of values that could be quantified against a
12  benchmark that TRU Financial Metrics set.
13          So this is not simply looking at something as
14  intuitive as what the court was mentioning.  And the
15  confidential formula is what was embedded in this tool.
16  Interestingly enough, MGA yesterday made a point about --
17          THE COURT:  Mr. Cooney, yesterday, made a point
18  about what was in the data.
19          MR. ZELLER:  MGA made the point.  MGA made the
20  point that Mr. Cooney stripped the data out.
21          That wasn't even the trade secret.  The trade
22  secret is the formula.  Nor was this something that was just
23  given by TRU to Mattel.  TRU provided the metrics.  But
24  Mattel came up with the tool and the inputs in order to meet
25  those metrics.  The tool, itself, is -- basically it's a
0053
1   formula, and it was confidential.  It was protectable.
2           So, I mean, the very fact that Mr. Cooney took it
3   also, of course, gives rise to an inference that it was
                              Page 22

111710DOC-02.txt
```
 4  something that was of value to him and, certainly, there is
 5  plenty of testimony in this case that it was something that
 6  was valuable.
 7           Question 2, which has various subparts:  Efforts
 8  to Maintain Secrecy.  Sub a), this is really directed to
 9  MGA.
10           THE COURT:  Don't read the question.  Just give me
11  the answer to the question.  It's taking too much time to
12  read this.
13           MR. ZELLER:  This is really one to respond to and
14  they did, so I'll respond to MGA.
15           Yesterday, MGA's response to this was,
16  essentially:  Well, it didn't really happen.
17           Mattel conceded that all but one document that was
18  taken by the various thieves was actually relevant to their
19  job, or was part of their job, or something that they worked
20  on.  That is just wrong.  That's just factually incorrect.
21           I'll just give an example for Mr. Cooney.
22  Mr. Cooney, 63 of the documents he took, he did not work on.
23  That's 63 of them.  That's the majority.  As an example, he
24  didn't work on the sales planning enhancements.  That's at
25  least 23 of the documents he took.  He did not work on the
0054
 1  Isis Gap Analysis.  That's I-S-I-S, gap, G-A-P, analysis.
 2  That was six documents what he took.  He didn't work on the
 3  inventory updates, which were nine documents.  He didn't
 4  work on the original sales planning system documents, which
 5  are another four documents.
 6           And as MGA conceded -- and, perhaps, one of the
 7  most valuable documents of what he took was something called
 8  the five-year strategic plan.  And, by the way, someone has
 9  pointed, I may have misspoke.  I may have said this was
10  Cooney.  This is actually Mr. Castilla.  I thought I said
11  "Castilla."  But just for the record, I'm referring to
12  Mr. Castilla.  And he's one example.
13           The three in Mexico took enough documents that you
14  could, basically, fill a conference room with them.  Many of
15  which of they had nothing to do when they were there at
16  Mattel.
17           THE COURT:  At some point, you're going to
18  conclude your argument.  I think it's taking too long to
19  read the question back to me.  In other words, we keep
20  reading the question.  It's a waste of time.  I've got the
21  questions.
22           MR. ZELLER:  2.b).  This is directed to MGA.
23           2.c).  Mattel has not found any case law
24  recognizing that distinction.
25           THE COURT:  Okay.
0055
 1           MR. ZELLER:  3.a).  We're unaware of evidence on
 2  the record on downloading.
 3           THE COURT:  Okay.
 4           MR. ZELLER:  3.b).  It does require knowledge, but
 5  it can also be actual knowledge or constructive knowledge.
 6  And that can be under California Civil Code 3426.1.
 7  Moreover, the doctrine of ratification can, of course, apply
 8  where after the employer has been informed of the employee's
 9  actions that the employer does not fully investigate and
10  fails to repudiate the employee's conduct.  And, of course,
11  those facts both with respect to wrongful acquisition of
12  trade secret, as well as ratification, can be proved by
13  circumstantial evidence.
14           4.a), as MGA has conceded, it did not produce the
```
Page 23

111710DOC-02.txt

15   entirety of the presentation presented to Mr. Larian, even
16   though the court ordered it to do so.
17           One thing I would point out on that front is
18   that -- and this goes to the second question about the
19   relevance of the reference to Infobasic, Mindshare and
20   Antas, A-N-T-A-S.
21           First of all, MGA's counsel was just incorrect in
22   saying that MGA had subscriptions to those services.  Mattel
23   did.  There is no evidence of record that MGA did, contrary
24   to the representation made yesterday.  The reason it is
25   significant is because of the portions of the presentation
0056
1    that was produced in this case contained references to
2    information that Mattel had; therefore, showing it came from
3    Mattel.  Also, the fact that there are missing parts of this
4    presentation, certainly, is more than an inference can be
5    drawn that the reason we don't have them is because they,
6    too, show just as directly and maybe even more directly that
7    the presentation given to Mr. Larian was Mattel information.
8            So that's the significance in our view of that
9    information.
10           B), about line lists.  This in our view -- these
11   are actually two different concepts.  Line lists contain
12   detailed information about upcoming products.  Whether sales
13   can be forecasted for them is a separate issue.  A line list
14   is valuable because it's basically your playbook for the
15   coming year.  And what it says is:  We're going to come out
16   with these products, can have varying levels of description
17   of the future upcoming products, which, again, there's
18   copious evidence in the record that products and development
19   are, in fact, trade secret.  Subsection c) about the
20   specific marketing information, the short answer is in two
21   documents.  The 2005 All Worlds line list, which is
22   Exhibit 1 to the Nordquist declaration and another one is
23   the Barbie Viability Report which is the Wolinsky
24   declaration, Exhibit 1.
25           And this is not information that was intuitive to
0057
1    either of these groups because it's very, very specific
2    marketing information.  One example is that it actually
3    includes such matters as consumer perception of products
4    that was developed by Mattel.  So this is empirical data and
5    some circumstances, or there's one example here.  It's not
6    just simple intuitive information about how particular
7    products, or even how products generally will sell.
8            Subsection d):  Where in the exhibits about the
9    business plan?
10           Well, the business plan is not in the exhibits.
11   MGA was ordered to produce it and did not do so.  Again, I
12   think that certainly is an inference that we will be
13   remarking upon, both on this motion as well as at trial,
14   along I will point out more generally the fact for any
15   instances where MGA really tries to say and was saying
16   yesterday, There's no proof of this.  There's no proof of
17   that.  Mattel can't establish a certain fact.
18           We, in fact, have indications of the
19   Fifth Amendment by MGA executives, among others.  We also
20   have evidence of spoliation by them, wiping of hard drives
21   and other kinds of evidence destruction.  All of which will
22   be more than ample to refuse MGA's somewhat self-serving
23   proclamations that somehow there's no evidence that the
24   trade secrets went into MGA, which is also, by the way,
25   false for reasons I can get to, or any other kinds of bald

111710DOC-02.txt

0058
1  arguments that they want to make on that front.
2           The more specifics then in terms of the additional
3  questions, in subsection d), is that we have not seen the
4  plan to confirm what was in it, but there's evidence that at
5  least the information contained in it came from Mattel's
6  trade secrets, including a document that was entitled:
7  FRP Walmex, W-A-L-M-E-X -- new word -- AL 11 Abril,
8  A-B-R-I-L, 2004.
9           Next question.  Because we have not seen the plan,
10  we don't know whether they implemented it or not.  But the
11  inference is that I have mentioned will be sufficient to
12  establish that it did.
13           The next question, the material difference is that
14  the specific information used was not lessons learned but to
15  check the number of sales, Barbie sales, that were made to
16  Grupo, G-R-U-P-O -- new word -- Walmex, W-A-L-M-E-X.
17           The next subpart question response is that the
18  benefits that could have flowed from the business plan is
19  that MGA had a reasonable baseline projection for its
20  product sales.
21           Subsection e).  The short answer to these
22  questions, your Honor, is that we are not claiming that
23  price information shared with retailers is trade secret.
24  That's not our theory.
25           Subsection f) about noncompete agreements.  As far
0059
1  as we understand it, they were not asked to sign
2  non-competes because it's not permissible in Mexico.  The
3  agreement that Mr. Machado, Ms. Trueba and Mr. Vargas
4  refused to sign, which is Exhibit 141 of the Webster
5  declaration, was not a noncompete, as defendant's counsel
6  has said, both Mr. Machado's counsel and MGA's counsel.  It
7  was rather a document affirming their obligations not to use
8  or disclose Mattel confidential information.
9           Subsection g).  Gustavo Machado was employed by
10  Mattel Servicios.  Then, going onto the further questions:
11  Mattel Servicios is a wholly owned subsidiary of Mattel.
12  Its activity is to -- it employs personnel whose sole
13  activity is to act for other Mattel entities, including
14  Mattel Mexico and Mattel.
15           One thing I think is important to point out,
16  because this is something that MGA and Mr. Machado's counsel
17  has made quite a point about -- in fact, their entire
18  argument, really, has been a red herring.  They keep on
19  arguing about how, number one, the fact that Mr. Machado was
20  not employed by Mattel Mexico or Mattel, Inc., is not
21  dispositive.  The fact is, I will get to the specific basis
22  for this.  But he had an agency relationship with the other
23  entities.  His formal employment is not the sole issue in
24  terms of who did he owe a duty to.
25           There are other agreements and there are other
0060
1  obligations that were imposed upon Mr. Machado, including
2  voluntary.  The other thing is, is that they made quite a
3  point about the so-called reverse alter ego.  In fact,
4  Mr. Machado's counsel went so far as to say today that
5  Mattel Servicios was set up to bilk the employees.  That was
6  the word he used, "bilk."
7           The fact is, is that Mattel Servicios employees
8  participate in Mattel's bonus plan and profit-sharing.  The
9  reason why we don't have -- we have Mattel Servicios, is
10  because for them to then participate in those profits, too,
                          Page 25

111710DOC-02.txt

11  would be double counting.  That's why.  They already
12  participate in the profit-sharing.
13          So the idea that somehow there was a nefarious
14  purpose behind this that Mattel should be punished for which
15  is, number one, irrelevant but number two, it's just simply
16  false.
17          Now, with respect to the employment relationship,
18  we'll call it.  Number one, Mr. Machado signed and accepted
19  a Mattel, Inc. questionnaire.  And in that questionnaire, he
20  undertook the following obligation:  He says, I agree not to
21  divulge any company information to unauthorized recipients.
22  This is the Webster declaration, Exhibit 552.  And the
23  consideration for this, contrary to the arguments, is very
24  clear here.  The whole basis was, like any other kind of
25  MDA:  We will disclose information to you in exchange of
0061
1  your promise that you will not misuse it, or disclose it to
2  others.
3          Another basis for Mr. Machado's duty to Mattel --
4  beyond, somehow, his formal employment relationship with
5  Mattel Servicios, as being the beginning and end of it --
6  was the Mattel code of conduct.  That applies to all Mattel
7  employees worldwide.  And it also specifically requires that
8  anyone who is performing work or providing services on
9  Mattel's behalf, including field representatives, temporary,
10  or seasonal employees and legal agents are bound by those
11  duties.
12          A third source was the conflict of interest
13  manual.  And that's between Mr. Machado, on the one hand,
14  and both Mattel and Mattel Mexico, on the other hand.  And
15  this is an instance where there was, obviously, more than
16  one contracting party.  Mr. Machado received the benefits
17  that were spelled out in the agreement; namely, use of
18  technology resources, such as computers and phones.  It is
19  on those technological resources that Mr. Machado agreed to
20  receive confidential information and not to disclose it.
21  And this can be found at M0128312 where it imposes -- and
22  Mr. Machado agreed that he would not use these resources in
23  breach of any of Mattel's policy in any manner contrary to
24  the best interests of Mattel, or in such a way that they
25  disclose confidential information or property of Mattel to
0062
1  third parties, or for their personal or secondary benefit.
2          So I would submit that the whole argument here
3  about who he is formally employed by is not the beginning
4  end of the inquiry.  The inquiry should include and must
5  include, as our position has been, what obligations did he
6  owe to the plaintiffs in this case, and there are others.
7  And these are among the various sources that we have cited
8  in this case.
9          Section I, Question 1.  The court did not
10  expressly hold in that order that Mattel's counterclaims are
11  compulsory to MGA's unfair competition claim in its
12  April 2005 complaint.  In fact, in Footnote 4, the court
13  mentioned and said:  A narrow but presently inapplicable
14  exception may apply where the counterclaims and reply
15  respond to counterclaims that are themselves compulsory,
16  which, of course, is the opposite of suggesting that
17  Mattel's counterclaims were compulsory.
18          Question No. 2.  MGA conceded yesterday that they
19  are not pushing that interpretation.  In fact, Ivy Ross
20  testified that she did not know that Carter Bryant worked on
21  Bratz while he was at Mattel.  To the contrary, she stated
Page 26

111710DOC-02.txt
22  that he lied to her.  She personally talked to him about his
23  leaving Mattel.  And he said to her, in words or substance,
24  that he was going to a noncompetitive position, not to MGA.
25              Question 3.  This we've discussed a little bit,
0063
1   particularly Mr. Quinn's argument.  And we agree with the
2   first part of what the court is saying here.  Clearly, that
3   argument does not work, given that it is a different trade
4   secret.  We are not arguing Brats, B-R-A-T-S, was a trade
5   secret.  It is simply evidence of timing.  That's it.  And,
6   in fact, what Mr. Quinn was quoting when I was discussing
7   the matter with Judge Larson about propriety interest was
8   exactly that point, that we were not claiming Brats,
9   B-R-A-T-S.
10             And notably, yesterday, Ms. Hurst did not actually
11  answer this question.  Did not answer this question.
12             One thing I would also point out is that this same
13  issue about Brats, B-R-A-T-S, as being supposedly asserted
14  as a trade secret or otherwise giving notice to Mattel of
15  its claims was specifically addressed by Judge Larson in his
16  prior orders.  When he's talking about Diva Starz and the
17  project in his statute of limitations orders, he is talking
18  about the words Brats, B-R-A-T-S.
19             So this is simply a rehash of arguments that were
20  made previously by MGA.
21             Number 4.  We're not aware of any case law
22  directly stating that, but we certainly think that it falls
23  within the principles of trade secret protection, as well as
24  the contractual obligations of the parties.
25             Question No. 5.  This, I think, is more addressed
0064
1   to MGA.
2             Question 6.  This, too, is addressed to MGA, so I
3   will respond to what was stated yesterday.  And, in
4   particular, MGA's counsel identified three people who Mattel
5   could have gone to talk to in order to get knowledge or be
6   on notice of its claims.  The first person she mentioned was
7   Elise Cloonan.  Elise Cloonan was Carter Bryant's roommate
8   during the time when he worked at Mattel.  Elise Cloonan,
9   while MGA speculates about what she knew, she was deposed in
10  this case.  She stated, number one, she did not know that
11  Carter Bryant created Bratz until after she left Mattel.
12  She didn't even know, period, let alone when he created it.
13             Number two, she stated that during the time she
14  was employed by Mattel and she knew Carter Bryant, he never
15  showed her Bratz.  Never showed her the drawings, or
16  anything else along those lines.  So I mean, she claimed a
17  lack of knowledge.  And that's just abundantly clear from
18  her deposition.
19             They also cited Sheila Kyaw, K-Y-A-W, who was the
20  face painter.  In fact, Mr. Bryant admitted that he kept her
21  in the dark about what she was doing.  He presented
22  something to her and said, Paint it.  He presented a head to
23  her and said, Paint it.
24             So what notice that would possibly give,
25  particularly given Mr. Bryant's misleading of her.  It
0065
1   certainly did not say it was for a competitive project, MGA
2   did not disclose.
3             Insofar as then the hair rooter.  Her name is
4   Monteagudo, M-O-N-T-E-A-G-U-D-O.  It was the same thing.
5   Mr. Bryant admitted in his testimony that he didn't tell her
6   what it was for.  So I don't think that these additional
Page 27

111710DOC-02.txt
```
 7   examples that they threw out yesterday, which aren't even a
 8   matter of record -- and even though they bear the burden of
 9   proof on this -- or anything more than speculation.  And
10   what evidence there is, is actually refuted.  For the
11   record, actually refutes their argument about it.
12            The only other comment I'll make is that somehow
13   the idea that Mattel could have sued on other claims; and
14   therefore, discovered the facts about Carter Bryant creating
15   Bratz while he was employed by Mattel is irrelevant and,
16   frankly, contrary to Rule 11.  The case law is very clear.
17            You have to be on notice of your cause of action.
18   And that makes perfect sense.  Just, for example, Mattel had
19   a dispute with Mr. Larian and MGA about royalties over the
20   Barbie license, a couple years before that.  If Mattel had
21   sued, perhaps other facts would have come out which would
22   have led to notice and the like, but no one would even
23   possibly argue that somehow that started the statute of
24   limitations.  But, in fact, that is really what MGA is
25   arguing.  Mattel could have sued over some other property
0066
 1   right, could have done something else and, therefore,
 2   eventually found out the facts leading to what it is
 3   actually sued over.
 4            To be clear -- and this is ultimately why the
 5   statute of limitations decisions in this case focus on what
 6   was Mattel's claim here.  Mattel's claim has been that
 7   Carter Bryant created Bratz while he was employed by Mattel.
 8   Those are the facts that are salient to our claims.  That's
 9   the crux of it.  All these other things about, well, Mattel
10   might have, could have, should have, would have about a
11   whole variety of other potential claims, even against Bratz,
12   simply does not start the statute of limitations running.
13   That's quite clear under the authorities that are cited in
14   the brief and cited in the prior orders about statute of
15   limitations, including the Westinghouse case, the Fox case
16   and a number of other cases that have been literally briefed
17   endlessly in this court.
18            I can't even begin to say how many briefs we
19   already have, probably, on these issues.
20            THE COURT:  Counsel, this is not helping.  You
21   keep -- I want you to get to the point now.  I'm circling
22   each question now 10 times.  I'm going to cut you off in
23   just a moment, unless you get down to it.
24            Answer them succinctly, or I'm going to put some
25   time limits on you.
0067
 1            MR. ZELLER:  I understand.
 2            J, Choice of Law, No. 1 --
 3            THE COURT:  In other words, I'll give you an
 4   opportunity to each question, but I've heard it.  You are
 5   starting to circle these questions like a buzzard.
 6            I'm not the jury.
 7            MR. ZELLER:  I'm trying to respond --
 8            THE COURT:  Let's go.
 9            MR. ZELLER:  J.1., paragraph 17 of the Hector --
10   and it's C-A-L-A-T-A-Y-U-D declaration.
11            Number 2, choice of law issues should be uniformly
12   decided.  Courts applying the conflict of law rules do not
13   parse the applicable law as to elements of a single claim.
14            So in our view, it has to be one law that's
15   applied to the claim.
16            Also --
17            THE COURT:  Now, yesterday, the argument was by
```
Page 28

111710DOC-02.txt
18    MGA concerning 361, the reference to the borrowing statute.
19              MR. ZELLER:  Right.  That's something that they
20    raised for the first time, yesterday.  And, number one, 361
21    by definition cannot apply to Mattel, Inc.  I mean, that's
22    subtle law.  That's on the face of 361, because Mattel, Inc.
23    is a California resident.
24              THE COURT:  Okay.
25              MR. ZELLER:  And then, also, as to MGA Mexico,
0068
1    it's been briefed.  Our view is that California law applies,
2    in any event, simply because this is something that was
3    orchestrated by MGA out of this district.  Caused damage to
4    Mattel out of this district.  Information was generated in
5    this district and taken out of this district.  But some of
6    it had a root through Mexico.  And even where they want to
7    say, they focused just on, where did the physical acts of
8    theft took place?
9              THE COURT:  Well, some of it ended up in the MGA
10    offices in Mexico.
11              MR. ZELLER:  Correct.
12              THE COURT:  I'm not -- that's a very strong
13    factor, in other words.  I know the taking is a strong
14    argument from your perspective.  But how this ended up there
15    is a real conundrum, and I never had a satisfactory
16    explanation from Susan Kuemmerle, or anybody else.  And
17    that's a strong mark against MGA, right now.
18              MR. ZELLER:  That, I think, is absolutely a fair
19    point.  And it's true that we repeatedly brought 30(b)(6)
20    witnesses back to explain where did this come from.
21              THE COURT:  This is where it turns around on the
22    parties.  I just caution the parties.  There ought to be a
23    revelation on each side, because any missing evidence at
24    this point, any nonsense over these privileged logs and
25    their abuse, I would be scrambling if I was in your position
0069
1    to get everything to the other side, because you're going to
2    be stuck at trial with some very unexplainable issues
3    concerning why discovery wasn't complied with.  And I'll
4    keep it balanced right now.  But on both sides, the court
5    may be allowing a full exploration of that in front of the
6    jury.
7              So I'll just caution you that you can also draw
8    adverse inferences from the court, and this is where this
9    last couple of months really turn around on counsel on both
10    sides.  If I was in your position, I would be scrambling to
11    find things to hand over, but I'll leave that to each of
12    you.
13              MR. ZELLER:  Question J.3., we are not aware of
14    specific authority either way.  I've stated, I think, the
15    factual basis previously as to why it is that we think it
16    applies here; namely, the code of conduct and the other
17    documents that we mentioned, as well as the testimony of
18    Mr. Machado that he engaged in a variety of activities for
19    Mattel, including marketing, advertising and the like.
20              So I don't think there can be seriously disputed
21    that among his duties -- he may have, of course, to Mattel
22    Servicios but also to Mattel, Inc.  And they are not
23    mutually exclusive.  This is not an instance where having
24    duties to separate entities within the corporate family
25    somehow would be conflicting.  And there's simply no
0070
1    authority that prohibits an agent from having more than one
2    principal where there is no conflict.
Page 29

111710DOC-02.txt

```
 3              And I think up to that point then, we're with
 4    Mr. Quinn.
 5              Thank you.
 6              THE COURT:  Mr. Quinn.
 7              MR. ZELLER:  And I'm sure the court will pass on
 8    this opportunity, but I can address the cannibalization
 9    study that Ms. Hurst was raising yesterday on the statute of
10    limitation.
11              THE COURT:  Yes.  Okay.  Please.
12              MR. ZELLER:  What I would point out is, is that
13    MGA tries to treat this as being new information and that
14    this is somehow a new set of facts about Mattel knowing that
15    it was injured and the cause of its injury.
16              Number one, this is not new information.  This is
17    the same kind of information -- and MGA has admitted it --
18    that was disclosed, for example, prior to the court's --
19    Judge Larson's summary judgment rulings.
20              Bob Eckert testified about the loss of
21    international market share to Bratz in 2001 and lost
22    domestic market share by late 2001, or early 2002.  But,
23    obviously, there are legitimate reasons why it is that
24    Mattel would be losing market share.  They do not point to
25    Carter Bryant creating Bratz while he was employed by
0071
 1    Mattel, which is the wrongdoing that was here.
 2              THE COURT:  I think my question referred to Diva
 3    Starz.
 4              MR. ZELLER:  Yes.  But that's a separate thing.
 5    I'm responding, first, to her, but I'll -- okay.
 6              THE COURT:  All right.
 7              MR. ZELLER:  The cannibalization does not talk
 8    about Diva Starz.  I have it now.  It talks about something
 9    called "Fashion Divas," which is a product extension.  It is
10    not Diva Starz.  It is not the dolls that came out in 2000.
11    It's just a different set of products.  That does talk about
12    a study that was done where certain kinds of products were
13    tested, including Fashion Divas and was found that there was
14    a loss of sales for that product due to Bratz.  That's a
15    different product.
16              THE COURT:  Thank you very much.  You may be
17    seated.
18              All right, Mr. Quinn.
19              MR. QUINN:  K.  Trade Dress Infringement.
20              Question 1.  The court's concern we believe is
21    exactly right.  Well taken.  Trapezoid -- especially given
22    the scope of the trapezoidal shapes that MGA is trying to
23    claim exclusive ability for.  This is a very -- ability to
24    use.  This is a very significant concern.  In fact, there's
25    one -- even a quadra- -- you know, a five-sided plastic
0072
 1    package that they claim that they have exclusive right to
 2    use.  It's their Robert Buzz Lightyear, Exhibit 9315.  The
 3    court has a copy of it.  So it's not even just limited to
 4    quadrilateral packages.
 5              So this is an example of a basic geometric shape
 6    which is simply not capable of being trade dress protected.
 7              We agree as to 2.
 8              3.  Garcia's declaration, how can we object to the
 9    basis of hearsay and expert testimony of the hearsay was
10    erroneous or a mistake?
11              We withdraw that objection.  There are certain
12    statements in the Garcia declaration which we do believe are
13    in the nature of expert opinion, specifically, where she
```

Page 30

111710DOC-02.txt
```
14   states:  But the trapezoidal packaging does not function as
15   a spotlight, which, by the way, is contradicted by their
16   30(b)(6) witness' testimony.  And also the statement:
17   Moreover, a trapezoidal package with a narrow top and a
18   wider base would actually let less light in through the
19   narrow top than a rectangular package with a wider top.
20              This is simply a matter of opinion.
21              It appears that these other questions, under K are
22   really directed to MGA.
23              I will forego talking about -- unless the court
24   has any questions -- secondary meaning, or functionality, or
25   any of the rest of that.
0073
1               MGA's unfair competition claims:
2               One, really directed to MGA.
3               Two, court raises the question:  Why can't MGA's
4    existing be -- existing business relationships be money or
5    property within the meaning of the UCL?
6               Two points:  First, MGA has not identified any
7    existing business relationship that -- any specific
8    relationship that has been disrupted.  Their claim for
9    damages is sales, profits.  That's how they quantify and
10   characterize it.  They haven't identified any business
11   relationships.  But more importantly, the real -- the short
12   answer to this, your Honor, is governed by --
13              The court's question is answered by a Central
14   District of California decision, in December of last year,
15   Pom Wonderful, P-O-M, Wonderful, versus Welch Foods, 2009
16   WL5184422.  The plaintiff sought damages, not only sought
17   damages for goodwill but also injuries to Pom's relationship
18   with existing and prospective customers.
19              And the court said, No, you can't do that under
20   the statute.
21              THE COURT:  Do you know who the judge was in the
22   Central District?
23              MR. QUINN:  Maybe somebody can find it.
24              THE COURT:  Maybe somebody can find it for me.
25   Why don't you continue.
0074
1               Judge Matz, thank you.
2               MR. QUINN:  He's a brilliant judge, your Honor.
3               M.  Unjust Enrichment.  The court challenges us.
4    Question 1:  Why is it the better view?
5               I will give a -- especially, in view of how long
6    we've been going and the hour, I will give the court an
7    answer which is short and hopefully not flippant:  Because
8    the Ninth Circuit says so.  That's the Walker decision.
9               The Walker decision, the Ninth Circuit reviewed
10   the different California authorities with respect to unjust
11   enrichment and agreed that the better view was that there
12   was such a claim.
13              And then, finally, I think the only remaining
14   question that was directed to us was with respect to MGA's
15   affirmative defenses and with respect to the Massey
16   decision.  You know, I don't think so.  Massey, of course,
17   was a case where there wasn't affirmative waiver.  It wasn't
18   a case whereas here there is an affirmative waiver.
19   Actually, affirmative defenses were raised and then
20   specifically waived.  We think that's very much a different
21   situation when, you know, under Massey there's an
22   opportunity to reassert affirmative defense, after there's
23   an amended pleading.  We submit that's a different
24   circumstance.
```
Page 31

111710DOC-02.txt
```
25              Thank you, your Honor.
0075
1               THE COURT:  I would like Mattel to very clearly
2   explain the theory of each claim as to each
3   counterdefendant, because I need a clear record of that and
4   it's critical to properly apply in the suppression and
5   preemption arguments.
6               Yesterday, concerning ownership of ideas, I didn't
7   really get any clarity from MGA.  You left off yesterday by
8   arguing that Bryant had no right, title and interest in his
9   ideas that was assignable to Mattel.
10              There is a little authority for the proposition
11  that a traditional property right can exist in an idea which
12  does not lend itself to exclusive possession.  Like even
13  recognized tangible property interests under Kremen versus
14  Cohen.  However, there is still some interest in my ideas;
15  namely, I have an interest in choosing whether to disclose
16  that idea, whether to use that idea, or whether to forget
17  that idea.
18              An argument can be made that nobody else can force
19  me to do any of those things.  Those interests, whether they
20  are properly -- strike that, whether they are property or
21  liberty interests, seem so fundamental that I may be
22  entitled to substantial due process, prior to the
23  deprivation of those interests.  Here, Bryant may have
24  assigned away that right, essentially giving Mattel the
25  right to decide what to do with Bryant's ideas.  But I'm not
0076
1   sure whether that interest was extinguished at the time of
2   the assignment.
3               Now, the parties, I think, have already reviewed
4   and discussed Kremen, but I encourage you to go back and
5   read through some of the authorities cited by Kremen,
6   including the law review article of Val D. Ricks, at 1991
7   BYU Law Review, 1681, which appears to be one of the most
8   cited works in this field.  In reading all of the cases
9   Mr. Ricks cites, including an interesting case from the
10  Court of Common Pleas, as well as the New Hampshire Supreme
11  Court.
12              So I wanted to give adequate advance warning in
13  preparation of rebuttal arguments.  Although MGA will almost
14  certainly interpose a Trade Secret Act suppression argument,
15  I note that Kremen specifically noted that confidential
16  information can be converted.  Nor do I necessarily want you
17  to return to your argument that the most efficient producer
18  will use the idea.  Because as I explained in the minute
19  order, that sort of logic always favors big companies that
20  have lower marginal costs and are able to pay greater
21  incentives.  So I would like you to try to examine the case
22  law from new angles.
23              Concerning to your speaking to me concerning the
24  suppression issues, it's obviously tied up in the
25  distinction between, first, the physical work that contains
0077
1   the information and second, the actual information.
2               I recognized by MGA yesterday -- I want you to
3   think more carefully about my suggestion that, in cases
4   involving the conversion of trade secret information
5   contained in a physical document, a claim for conversion
6   should not be able to recover "remedies" that flow from the
7   disclosure of the information in the actual document.  I've
8   suggested in the minute order that does not cause the entire
9   claim to be superseded, because the actual physical property
```
Page 32

111710DOC-02.txt
```
10  on which the information was located still has value, if it
11  is a de minimis value.
12          So I don't quite understand why the conversion
13  claim, for example, doesn't survive to the extent that it is
14  predicated upon the theft of the physical property and not
15  the information contained therein.  Of course, MGA's concern
16  seems to be that if the claim partially survives, it will be
17  very hard for the jury to distinguish between the physical
18  object and the information when accessing damages.
19          Now, that's exactly why I've asked you to research
20  jury instructions in the case involving suppression claims,
21  and I really encourage you to revisit that issue in your
22  rebuttal arguments.
23          I think, finally, that leads to my last comment
24  before you start your rebuttal.  This concerns the
25  preemption issue.  I think a case out the Tenth Circuit
0078
1   looks at cases from other circuits has some interesting
2   things to say about MGA's argument.  The case is R.W. Beck,
3   Inc. versus E3 Consulting, LLC, at 577 F.3d 1332.  It's a
4   2009, Tenth Circuit case.
5           In preparing your rebuttal in a few moments -- and
6   you're going to have just a few moments -- I direct you not
7   only to that opinion but to the case cited within that
8   opinion, including Briar Patch out of the Second Circuit.
9           Understand, though, that I have not -- I've not
10  decided whether I agree with your argument that the state
11  law counterclaims are preempted to the extent based on use.
12  But the argument, Section 205(d) of the Copyright Act, also,
13  has preemptive effect on the counterclaims to the extent
14  those counterclaims are based on acquisition is entirely
15  unclear to me.  I'm not inviting you to convince me of the
16  argument.  First, you need to simply clearly explain the
17  argument.  It's not --
18          Well, it is unclear how the copyrightability of
19  the property has anything to do with whether its conversion,
20  disclosure, or acquisition gave rise to liability under
21  state law.
22          In fact, the argument can be made that the rights
23  protected by the state claims or state law claims actually
24  serve the purposes of the Copyright Act, which is to
25  preserve Mattel's exclusive right to the publishing of its
0079
1   copyrighted materials.
2           The courts look carefully at American Medical
3   Colleges versus Cuomo, at 928 F.3d -- I'm sorry, F.2d 519,
4   Second Circuit.
5           So I think I still need a better or clear
6   explanation, if you can give it to me, of how partial
7   suppression or partial preemption of a claim would work at
8   trial.
9           So you got one hour, and that's it now for MGA.
10  You got -- how long would you like for Mr. Machado?
11          MR. COTE:  10 or 15 minutes, your Honor.
12          THE COURT:  That means, Mattel, you got an hour
13  and 15 minutes.
14          I will see you exactly when the big hand is on the
15  nine.  I'll be sitting here waiting for you.
16          Go take a 10- or 15-minute break.
17      (Recess taken from 6:33 p.m. to 7:06 p.m.)
18          THE COURT:  All right.  Counsel, we are going to
19  get started.
20          We are on the record.  Both Mattel and MGA are
                        Page 33
```

111710DOC-02.txt

21    present.
22                This is the concluding one hour.  Counsel, you'll
23    conclude at 8:00 o'clock.
24                MS. HURST:  Thank you, your Honor.
25                Your Honor, turning to the court's questions at
0080
1     the end, with respect to preemption and supersession, your
2     Honor, let me start with the supersession by the Uniform
3     Trade Secrets Act and the conversion claim issues.
4                Your Honor, Silvaco specifically addresses this.
5     And Silvaco finds a conversion claim preemptive.  The court
6     says:  The conversion cause of action was predicated on the
7     conversion and the use of Silvaco's property as described
8     herein.
9                The court goes on to say:  No interest in property
10    was identified, other than one arising under trade secrets
11    law.  Because the only property described is the stolen
12    property that belongs to Silvaco that was contained in the
13    software.
14                Without the claim theft of a trade secret, the
15    complaint would set forth no foundation for this claim.
16    Since it does not sound in contract, it is superseded by
17    CUTSA.  The court expressly found the conversion claim for
18    the intangible right in the software to be superseded in
19    Silvaco.
20                In doing so, the court expressly rejected the
21    reasoning of the case cited by Mr. Zeller for the
22    proposition that this can all be cured with jury
23    instructions, the Cenveo case.
24                Mr. Zeller described the instruction given in that
25    case as a limiting instruction.  He said, Award liability in
0081
1     tort, if it's not a trade secret and award trade secret
2     remedies, if it is a trade secret.  That was the instruction
3     given in that case.
4                If we tried to follow that rationale in this case,
5     the trial would be a complete mess and the verdict form
6     would be an absolute disaster.
7                We'll have to set out for each of Mattel's claim,
8     267 trade secrets, multiple questions about whether there
9     are trade secret, whether there's some other type of
10    confidential business information, whether the requirements
11    are met.  And then, at the end of that, the remedy suggested
12    by Cenveo and this so-called limiting instruction, which is
13    exactly the opposite of a limitation, is that they could get
14    greater remedies for the things expressly found by the jury
15    not to constitute property, because they don't meet the
16    trade secret requirements.  Because under the ordinary tort
17    law, punitive damages are available without limitation other
18    than the due process limitations imposed by the
19    United States Supreme Court.  Whereas, in the Uniform Trade
20    Secrets statute, the exemplary damages are limited to double
21    damages.  It makes no sense.
22                You are going to go through one by one.  And if it
23    doesn't meet the California law requirements to be property,
24    you're going to have the possibility of awarding a greater
25    remedy.  And that is why in Silvaco the court said -- and
0082
1     here, the court quoted Cenveo.  In Cenveo, the court wrote,
2     quote:  Preempting plaintiff's conversion claim at the
3     pleading stage risks leaving claimant without a remedy for
4     information he proves has been stolen, end quote.
5                That was the quote from Cenveo that the court
Page 34

111710DOC-02.txt

```
 6   noted.  And then, in Silvaco, the court went on to say:  But
 7   information cannot be stolen, unless it constitutes property
 8   and information is not property, unless some law makes it
 9   so.
10          If the plaintiff identifies no property right
11   outside of trade secret law, then he has no remedy outside
12   that law and there is nothing unsound or unjust about
13   holding other theories superseding.
14          And then the court drops a footnote about
15   conversion, another footnote about conversion and says:
16   It's our law in California that the expansion of conversion
17   law to reach intangible property should not be permitted to
18   displace other, more suitable law.
19          So, yes, in California, we're incrementally
20   recognizing that in certain cases intangibles can be
21   property subject to conversion:  Stock.  Domain names.  But
22   when that incremental recognition of intangible property
23   rights butts up against another more suitable body of law,
24   we stop.  That's what the court said in Silvaco.  And
25   plainly, business information in documents of the type that
0083
 1   is at issue here is bumping into other, more suitable law.
 2   It's not any other kind of tangibly identified personal
 3   property right, or intangibly unidentified personal property
 4   right.
 5          So the reason of Silvaco is directly controlling
 6   here, both on the court's question about conversion and on
 7   the court's question about how would we do this at trial?
 8          The notion of this instruction from Cenveo is
 9   expressly rejected and this published opinion of the
10   California Court of Appeal review is denied.  It wasn't
11   de-published.  Casey Multimedia says the same thing:  This
12   is the law of California.  And the court --
13          And, by the way, it was decided after Kremen.
14   Decided after Kremen.  And despite Mattel's invitation to
15   disregard the law, the California courts in favor of Federal
16   District Court opinions which were expressly repudiated in
17   its decision, the court is not free to do that.  The
18   United States Supreme Court in two opinions issued on the
19   same day some time ago said:  If there's a published federal
20   appellate decision in California, the federal courts cannot
21   ignore that without a really good reason.  And when this is
22   the majority rule, no such good reason can be stated.  And
23   Mr. Zeller conceded that this is a majority rule.
24          Your Honor, with respect to the court's question
25   regarding copyright preemption, it's not just Section 205,
0084
 1   but it's also Section 201, Section 204.  All of these
 2   provisions concerning ownership of copyright.  And
 3   Section 201, 204 and 205 all operate together as applicable
 4   on the facts of this case to create a scheme in which
 5   ownership can be found.  And that scheme is limited to a
 6   work made for hire under 201(b), or a transfer in a writing
 7   under 204.  And then 205 applies to provide the framework
 8   for what to do if there are conflicting transfers.  If there
 9   are conflicting transfers.
10          Now, the Ninth Circuit in the Laws versus Sony
11   Entertainment case recognized the continued use of conflict
12   preemption principles, or implied preemption -- was the term
13   it used in that case.  It's really the same thing -- to
14   inform the copyright preemption analysis even under
15   Section 301.  So you look to what the accused wrongdoing is
16   and you say:  Does that look like some bundle of rights,
```

Page 35

111710DOC-02.txt
17   under 106?, which the answer to which here is yes.
18   Publication, distribution and use, all of those things look
19   like the bundle of rights in 106.
20            And so then, we look does this -- also have to
21   look, does this conflict with a copyright policy?
22            And where Mattel runs headlong into a conflict
23   with copyright policy is when they try to claim that
24   ownership can be transferred in some way, other than the
25   statute.  And this is what the Ninth Circuit said in Effects
0085
 1   Associates.  You can't come in here and claim a transfer
 2   without a writing.  There's not going to be an implied
 3   in fact transfer.  Your theory that movie producers do
 4   lunch, not contracts, is not going to work.
 5            So there has to be a writing or work made for
 6   hire, but that's it.
 7            THE COURT:  The court is "Hollywood Does Lunch."
 8   It comes from Judge Kozinski.
 9            MS. HURST:  Thank you, your Honor.
10            Now, the cases cited by the court in its comments
11   to frame the rebuttal argument support this view.  The R.W.
12   Beck case applied copyright preemption broadly.  The
13   American Medical Colleges case noted that fair use and
14   affirmative defense can also have conflict preemptive effect
15   and that is --
16            In the Altaira case, often discussed and cited by
17   Mattel, the first party to a contract who agreed to waive a
18   fair use right, that was found not to be conflict preempted.
19   But that was an application of the law of the particular
20   fact in that case.  It was not a holding that we don't have
21   to think about conflict preemption or look at conflict
22   preemption.  Even when it's an affirmative defense to the
23   contrary as the American Medical Colleges case makes clear,
24   we do have to look at conflict preemption whether you
25   characterize it as an affirmative defense or otherwise.
0086
 1            205(d) here is not just an affirmative defense.
 2   It is when you're looking at the good faith and notice
 3   provision.  But what it also does is provide a framework for
 4   the resolution of this dispute.  They claim they got a prior
 5   transfer.  We say we got a transfer.  It supplies a rule of
 6   decision about how to resolve that.  And it does so by
 7   incorporating the meanings of the other provisions in
 8   Chapter 2 of the Copyright Act.  Which is why in
 9   Harper & Row, which is a case in which they got a manuscript
10   which contained the memoirs of the former president, and
11   then the claim was that the nation unlawfully published the
12   excerpts of it and reproduced and distributed the unlawful
13   first publication of those excerpts.  The court found,
14   preempted the conversion claim related to some intangibles
15   in the manuscript and an interference with contract claim, I
16   believe as well, was found preempted in that case.  And what
17   the court said there was:  When you are looking at this
18   first publication and the subsequent distributions and
19   reproductions, it's all bundled up into the Section 106
20   rights.
21            That's exactly what we have here.  We have a
22   statutory framework that, starting with Section 101, which
23   defines work made for hire; Section 102, which explains what
24   can be protected and what can't; Section 106, which
25   describes the bundle of rights; all of Chapter 2, which
0087
 1   defines ownership and then Section 301, which applies these
                              Page 36

111710DOC-02.txt

2  principles expressly and then the case law which also
3  provides that copyright policy must be taken into account.
4  All of these things operate to provide a specific set of
5  rules of decision that Congress has found and balanced to
6  apply in this case.
7          It does not promote copyright policy to reward
8  authors for things that they don't own under the Copyright
9  Act.  And that is why these limitations are just as
10 important as the affirmative rights granted.  So it does
11 not -- it does -- pardon me.
12         It does create a conflict with copyright interests
13 to provide Mattel with greater ownership in something that
14 comes within the subject matter of copyright as this does
15 that is predicated on the bundle of rights in Section 106 to
16 provide them in effect a greater amount of ownership over
17 the ideas and the unprotectable expression limitations
18 specifically drawn in the act.  That conflicts with
19 Congressional policy.
20         I'm going to jump to ideas, your Honor.
21         The Ninth Circuit did not rescue.  The Ninth
22 Circuit noted that on the ambiguity of the contract with
23 respect to coverage of ideas, no extrinsic evidence had been
24 previously considered by the district court.  So then, the
25 court said, If it turns out -- if -- there's big "if" there,
0088
1  the meaning turns on the credibility of conflicting
2  extrinsic evidence, the jury should decide.  So that's the
3  question:  Does resolution turn, in part, on the credibility
4  of conflicting extrinsic evidence?  And the answer is "No."
5          There is no conflict in the credibility regarding
6  the drafting history.  The facts are undisputed on that.
7  There's no conflict in credibility about it.  Mattel has
8  admitted it can't explain itself.  And, of course, that's
9  relevant, because it's relevant even though it's a form
10 contract to elucidate Mattel's intentions.
11         There is no conflict in credibility about
12 Mr. Bryant's testimony.  It is what it is.  The only
13 question is whether it's competent to override the other
14 extrinsic evidence, the drafting history.  Mr. Kaye's
15 admission that they have no explanation.  The California law
16 that ideas cannot be protected.  These are all objective
17 points related to an objective interpretation of contract.
18         Mattel cannot create a dispute, a credibility
19 dispute in the extrinsic evidence by having its witnesses
20 testify as to their subjective intentions or even Carter
21 Bryant generally testify about subjective understandings
22 concerning different documents and not this contract.
23 Statements -- even when the contract is ambiguous,
24 statements just about subjective intent remain irrelevant.
25 It's not competent to offer a statement of subjective
0089
1  understanding or meaning.
2          The only exception is 1649.  Did someone admit,
3  the promisor admit that he understood the promise as Mattel
4  intended it -- say they intended it, but it doesn't make
5  sense given the fact that they deleted the word -- at the
6  time he signed the contract?
7          And as the court noted, the testimony quoted by
8  Mattel did not establish that.  Even taking it for what it
9  was, an answer to a compound question regarding a different
10 document, a proprietary information check-out form, when he
11 left.  Additionally, the other testimony quoted by
12 Mr. Bryant -- quoted from Mr. Bryant doesn't establish the

Page 37

111710DOC-02.txt
13   condition of 1649.  Therefore, there is no conflict,
14   credibility conflict in the extrinsic evidence and the court
15   should decide as a matter of law that the contract did not
16   cover ideas.  Because Mattel eliminated it from coverage
17   without explanation, because the law provides that ideas are
18   not assignable property -- which is a legitimate explanation
19   for its elimination -- because this was a form adhesion
20   contract imposed upon Carter Bryant as a condition of his
21   employment and because there is no credibility contest about
22   extrinsic evidence that would satisfy any condition
23   obviating that extrinsic evidence that I've just described.
24            And if the court -- the City of Hope case talks
25   about this and says that when and only when there is a
0090
1    credibility contest with respect to extrinsic evidence, then
2    the question of the meaning of the contract can be a
3    question of fact to be submitted to the jury.  That's what
4    the California Supreme Court says in City of Hope.
5            And so, if the Court finds that there is
6    credibility, a credibility determination that has to be made
7    about a conflict in extrinsic evidence, then the issue
8    should go to the jury.  But, respectfully, your Honor, we
9    submit that's not the case here.  The facts are,
10   essentially, undisputed.  They are undisputed.
11            Mattel chose this language.  As Mattel admits, it
12   had lawyers involved in the drafting.  It's a sophisticated
13   business entity in a superior bargaining position.  It had
14   available to it at all times the choice to use the word
15   "ideas," if it intended to do so.  It deliberately excised
16   that word from its contract.  It did so in accordance with
17   California law.  And, by the way, that's California law that
18   emanates from the California legislature, which in 1947
19   eliminated "ideas" from the definition of products of the
20   mind in the civil code of California.  An important policy
21   choice by the California legislature.
22            Mr. Bryant's testimony in the Art Attacks case
23   about the proprietary information checkout form does not
24   raise a credibility issue with respect to the court's
25   interpretation of that extrinsic evidence.  The court should
0091
1    interpret that extrinsic evidence to require summary
2    judgment for MGA on the issue of whether ideas could be
3    transferred pursuant to the contract.
4            The court asked the question about Diva Starz:
5    Was there concern that Bratz infringed Diva Starz at Mattel?
6            Yes, there was.  There was a litany of evidence in
7    the record on this.  Adrienne Fontanella, at pages 93, line
8    13 to 94, 22 testified, quote:  I remember my reaction was
9    this looks just like Diva Starz.
10            Jill Nordquist, Mattel's 30(b)(6) witness and
11   marketing manager, at pages 195 and 196, quote:  I thought
12   they looked like they were a knockoff of Diva Starz.
13            Ivy Ross, page 60, thought they were copied from
14   Diva Starz and Toon Teens when she saw them.
15            Tyzlof Ochongo (phonetic), a Mattel 30(b)(6)
16   witness, at pages 197 and 198, thought the Bratz doll was so
17   similar to Diva Starz that it must have been copied.
18            Mr. Turetsky -- and I think this may have been the
19   document the court was thinking of, rather than the new
20   brand cannibalization study -- but the Turetsky, August 2001
21   memo, which is at the Parker declaration, Exhibit 47 --
22            THE COURT:  It was, and I appreciate that.
23            MS. HURST:  Mr. Turetsky, at page 57, line 24:
                          Page 38

111710DOC-02.txt
24   There was a widespread belief that the inspiration for Bratz
25   had included Diva Starz.
0092
1            And, of course, Mr. Villasenor's reports,
2    beginning in February of 2001, described Bratz as Diva Starz
3    with a smarty attitude.
4            So the Turetsky report, which is described at the
5    bottom of page 13 and the top of page 14 of our motion,
6    Mr. Turetsky was a vice president of strategic planning.  He
7    sent that memo to senior vice president, Jerome Bossick,
8    also strategic planning:  We have grown increasingly
9    concerned, due to the similarity of some of their products
10   to ours.  The report describes Bratz as, quote:  Bearing
11   significant resemblance to Diva Starz in both appearance and
12   attitude, even the website has some similarity, end quote.
13   It goes on to identify Mr. Larian as the president and one
14   the founders of MGA.  MGA Hong Kong as an affiliate office.
15   Basically everybody who was later named, all identified in
16   that memo and described as having some relationship or
17   involvement to an express concern that Bratz was too similar
18   to Diva Starz.  And that was in August 2001.  And then, by
19   January, they had the results of the new brand
20   cannibalization study.
21           Now, Judge Larson did not have anything.  He did
22   not have the Turetsky memo.  He did not have the new brand
23   cannibalization study.
24           And on this point, your Honor, I mean, I just have
25   to say, if Mr. Zeller is going to testify from his personal
0093
1    knowledge about what the actual scope of the investigation
2    is?  What Mr. Zeller described when he made his argument are
3    documents withheld on Mattel's privilege log.  There is a
4    document entry on Mattel's privilege log about notations on
5    a website.  It's a communication between Mr. Zeller and
6    Mattel.  That's a waiver.
7            Mr. Zeller cannot come here in the guise of legal
8    argument and testify about what Mattel was actually
9    considering at the time.  And he especially can't do so when
10   what he said, Oh, our analysis was just limited to want
11   metatags on some website is directly inconsistent with this
12   Turetsky document, which says, not just that the website has
13   some similarity, but we're concerned about the product.
14           Now, they want to say, It's of no import that all
15   these employees were still working there, and that when they
16   had this data and they knew about their concern and they had
17   a statistically valid study, that new brand cannibalization
18   study, they did that in a statistically valid fashion to
19   determine the effect.  They want to say that the fact at
20   that moment that they could have gone and talked to Elise
21   Cloonan, Sheila Kyaw and Carmen Monteagudo is not relevant,
22   because each of those people didn't know what Carter Bryant
23   was doing.  But the point isn't whether they knew what
24   Carter Bryant had been doing.  The point is whether Mattel,
25   the larger Mattel knew it.  And they did.  Ivy Ross knew
0094
1    Mattel was involved in creating -- pardon me, Bryant was
2    involved in creating Bratz.  They believed Bratz was an
3    infringement problem.  They had three people -- at least
4    three.  It's actually more because there was someone who
5    would notarize his drawings for him, a Mattel employee, who
6    knew he was working on Bratz while employed by Mattel.  They
7    knew that.  They knew they had done something for Carter
8    Bryant related to a doll; and if they had been asked that
                              Page 39

111710DOC-02.txt

```
 9  question, they could have answered it.  Yes, I helped him
10  with something.
11          Even if they didn't know exactly what it was, they
12  knew -- they painted a face, rooted hair.  And Elise
13  Cloonan, what she did was the logo, so she knew it was
14  Bratz.  And if they had gone and asked and put that together
15  with their other information, they would have absolutely
16  known by January 14, 2002 that Carter Bryant had done Bratz;
17  that he had people at Mattel working with him on it while he
18  was still employed there and that they had been harmed by
19  it.  All by January 14th, 2002.
20          I don't even understand this argument that Brats
21  with an "S" is not a trade secret.  They can't have it both
22  ways.  If they want to say his exposure to an unused product
23  name -- unused product names are valuable and Chat Bratz and
24  Bratz was considered for Diva Starz, the very product we
25  were just discussing that they were concerned infringed --
0095
 1  and that Carter Bryant's exposure to that gives rise to an
 2  inference that he worked on Bratz while he was still
 3  employed by Mattel, then they also have to take the other
 4  inferences associated with that.
 5          Brats with an "S" and Bratz with a "Z" are not so
 6  dissimilar that you can simply say, Oh, well, we didn't have
 7  a reasonable inference at that point in time that one was
 8  not -- was based on the other.  That's just splitting hairs.
 9  You can't get the inference that he worked on it while he
10  was at Mattel, because he was exposed to Brats with an "S"
11  and at the same time claim you weren't on notice.  It's the
12  same inference.
13          Your Honor, with respect to fiduciary duty,
14  including the word "trust" in the contract cannot create a
15  fiduciary duty.  Every contract requires one party to impose
16  trust in another.  Every unilateral contract whereby one
17  party promises -- delivers something based on the promise of
18  payment, it requires trust.  It requires a leap of faith.
19  Our whole private economy runs on those leaps of faith made
20  every day.  If somebody delivers something, the other party
21  always has the opportunity to, pardon me, screw them over by
22  not paying.  That is the level of trust inherent in every
23  contract.  Putting that in words by saying, I'm putting my
24  trust in you by delivering this thing in exchange for your
25  promise, the same as any other unilateral contract, is not
0096
 1  creating a fiduciary duty.
 2          And how do if we know this?  Because Mr. Kaye, the
 3  30(b)(6) witness, admitted.  The man responsible for
 4  administering the contract, the senior vice president of
 5  human resources, admitted he couldn't say whether any
 6  language in that contract created a fiduciary duty.  He
 7  admitted that at pages 83, line 16 through 85, 8.  He called
 8  the agreement lawyerized.  He said, Only a lawyer can
 9  understand whether it created a fiduciary duty.
10          And just to be safe, I asked him a different way
11  in more nontechnical language, Does the agreement obligate
12  the employee to put Mattel's interests ahead of his or her
13  own?, which is really what we're talking about here.  We're
14  not just talking about trust.  As I said, every contract has
15  a level of trust.  What they're talking about is a fiduciary
16  duty.  That's put your interest ahead of mine under all
17  circumstances.  That's what "fiduciary duty" means.
18          And Mr. Kaye, once again, admitted he couldn't say
19  one way or the other whether that contract created such an
```
Page 40

111710DOC-02.txt
20  obligation, at page 294, line 22 to 292, line 17.
21          Your Honor, the City Solutions and the Rita cases,
22  both by Judge Alsup, in the Northern District -- smart
23  judge, not just because he agrees with me in this instance.
24  They have the right reasoning.  The mere obligation of trust
25  is not enough.  In fact, it's legally insufficient to create
0097
1   a fiduciary duty.
2           All right.  I don't have much time.  Copyright
3   infringement is complicated, but I'm going to take a run at
4   this anyway.
5           The court is obligated on summary judgment to
6   apply the extrinsic test.  And it is only if the claims can
7   survive the extrinsic test that we get to the jury.  Now,
8   Mattel had the obligation to do the analysis for the court
9   under the extrinsic test.  That's really clear in that
10  Berkla versus Corel case, your Honor.  I encourage you to
11  take a look at it.
12          And here is what Mattel said about having done so.
13  Now, this is Docket No. 8818, at page 14:  Putting aside the
14  open question of a changed copyright standard, Mattel's
15  response to Interrogatory No. 31 is sufficient.  It is a
16  highly detailed description of the similarities between
17  Bryant's work and MGA's Bratz dolls.
18          That's what they said.  They said it's sufficient.
19  They went on to argue for a whole paragraph about why it was
20  sufficient.  Now, it's no excuse to say that the petition
21  was still pending.  We had a trial date set.  We had a
22  discovery cutoff in this case.  We knew what the deadline
23  was for summary judgment.  And they only made a petition on
24  one issue, which is the virtual identity issue on the scope.
25  That didn't preclude them from going ahead and doing the
0098
1   substantial similarity analysis under the new standards
2   announced in the rest of the opinion.  They had the
3   obligation to do that.  And the fact that there was trial
4   testimony on this before -- the fact that there was
5   testimony on this before is exactly why we needed it when
6   you had a reversal at the Ninth Circuit.  The whole thing
7   proceeded under the wrong legal standard before.  It was
8   absolutely paramount that we get their new contentions
9   precisely because there had been a reversal and an
10  articulation of a new legal standard.  That's why we moved
11  to compel.  They can't just claim, See everything we did
12  before.  Because everything they did before was expressly
13  held to be insufficient by the Ninth Circuit.
14          The district court erred in failing to filter out
15  all the unprotectable elements of Bryant's sketches.  This
16  error was significant.  Although substantial similarity was
17  the appropriate standard, a finding of substantial
18  similarity between two works can't be based on similarities
19  in unprotectable elements.  It might have been reasonable to
20  hold that some of the Bratz dolls were substantially
21  similar, but we failed to see how the district court could
22  have found the vast majority of Bratz dolls, such as "Bratz
23  Funk and Glo Jade," or "Bratz Wild West Fiona" substantially
24  similar, even though their fashions and hairstyles are
25  nothing like anything Bryant drew.
0099
1           Would it be appropriate for me to invite the court
2   to come and look at these?
3           THE COURT:  Just hold them up.
4           MS. HURST:  All right.
                          Page 41

111710DOC-02.txt

```
 5              THE COURT:  Counsel, why don't you walk around
 6  holding the dolls, Mr. McConville.
 7         (Laughter.)
 8              THE COURT:  I'm just kidding.  It's a picture
 9  worth a thousand words.
10              There we go.  Now, take a picture.
11              MR. MCCONVILLE:  Can I juggle?
12              THE COURT:  All right.  I've got it.  Now, I've
13  also got diagrams in your briefings of each of these.
14              MS. HURST:  Sure.  Holding up Trial Exhibit 3-13,
15  793, which is one of Mr. Bryant's original drawings.
16              And Mr. McConville is holding up Wild West Fiona,
17  one of the dolls specifically noted by the Ninth Circuit.
18  Exhibit 14198.
19              THE COURT:  Now, leave those open and just put
20  them on the ledge someplace when you're done so I can see
21  them.
22              MS. HURST:  So what the Ninth Circuit said to
23  compare was the face paint.  Now, what that means here is,
24  in this instance -- in every instance, really, you'll see
25  when you look at these things -- the eyes.  The eyes are
0100
 1  painted on and the lips are painted on.
 2              Your Honor, I think there's open question under
 3  the Ninth Circuit opinion whether skin color should be
 4  considered or not.  But one can certainly argue that that
 5  should be an unprotectable element.  Skin color is,
 6  obviously, something that occurs in nature.
 7              But then, the next few items the court said had to
 8  be considered would be hair color and style and then
 9  fashions and accessories.  Those are the things the court
10  said look at.
11              Now, what Mr. Zeller wants you to do, which is
12  what led to Judge Larson's error, is strip all these stuff
13  off and only compare the faces and the bodies to each other.
14  That's expressly what the Ninth Circuit said you can't do.
15  You have to include the whole package.
16              Now, when you get these things up close and you
17  compare them, you will see that there are many differences.
18  Now, this is hard because, frankly, you have to look at
19  these things a few times to get the hang of it, especially
20  when you are doing this extrinsic test and you're trying to
21  filter out what's protectable from unprotectable and then
22  make a, sort of, imaginary comparison of what's left.  It's
23  tough.
24              But you can see the fashions are completely
25  different.  The accessories are different.  Over here in the
0101
 1  drawings, she has got a little barrette.  Over here in the
 2  dolls, she has got earrings.  She's got bracelets.  She's
 3  got all sorts of things.  The face paint is different.  The
 4  eye color is different.  The cant of the eyes is different.
 5  The painting of the eye shadow and the eyelashes is
 6  different.  The lips are different.  In the drawing, the
 7  lips are parted.  You can see the teeth.  The lips are
 8  fatter.  The proportions are different.  The expression is
 9  different.  The gaze is not the same.  The angle of the gaze
10  is not the same.
11              There is no nose on the drawing.  No nose.  The
12  doll has a nose.  That was in one of the lists of the
13  features.  You can go on and take the doll out of the box
14  and see a lot more things.  Even the sorts of things that
15  Mr. Zeller says to compare, there are significant
```

Page 42

111710DOC-02.txt

16    differences.  He wants to say this, sort of the body.
17             Well, take the hands.  In the drawings, every
18    single one of them you will look at the hand pose.  It's
19    sort of like this, the dolls -- thank you, Mr. McConville.
20             The dolls are more of a flat hand pose, like this
21    (indicating).  The relative proportions in the drawing of
22    head to body and in the doll are much more exaggerated.
23             Anyway, the list goes on.  Now, that was one the
24    dolls that the court specifically called out as the court
25    could not see how the conclusion could be reached of
0102
1    infringement.  In contrast, the court noted that, perhaps,
2    in the first generation, there might be a doll.  There might
3    be a doll that a jury could conclude would infringe.  And
4    this is the one that is the only one in Mattel's
5    Interrogatory Response No. 31 where a full package
6    comparison, as dictated by the Ninth Circuit, has been made.
7             And, now, I'm holding up Trial Exhibit 3-5, 791
8    and Exhibit 17558.  And as you can see, there are still,
9    when comparing the right things, significant differences.
10    The eyes are different colors.  The fashions are different.
11    The hat is different.  The hair is different.  There is a
12    puffy vest on the drawing.  There is no vest on the doll.
13             And element by element look at these -- and this
14    is the one that Mattel says is most similar.  You can see
15    similarities, too.  The shirt looks similar.  It's a striped
16    shirt.  The skirt looks similar.  You can't see the boots
17    down in here.  They are a little different.  Actually, these
18    in the drawing are, kind of, like combat boots.  They are
19    more fashion shoes.  They are tennis shoes on the doll.
20             This is the analysis the court has to undertake.
21    And they can't just wave their hands.  Mr. Zeller can't just
22    wave his hands and say, There's 14,000 products, and we'll
23    just -- what we will show or what we will say or what we
24    will do.
25             This is it.  This was the time.  Summary judgment.
0103
1             Under the Ninth Circuit law, the burden is on the
2    plaintiff to undertake the extrinsic analysis and to show
3    it's entitled to get to trial under the extrinsic analysis.
4    They had to do that in an interrogatory response.  And they
5    didn't.  And you know what?
6             Even when they served the supplemental Loetz
7    report, L-O-E-T-Z, it still doesn't have the comparisons in
8    it, on a doll-by-doll basis of what the Ninth Circuit said
9    has to be compared.  Well, when we get to trial and we'll
10    show it to you then, Judge?
11             It's exactly what the court found in Berkla versus
12    Corel was insufficient to meet the burden; that their
13    failure in discovery meant they lost at summary judgment.
14    It's difficult and counterintuitive, this extrinsic element
15    analysis.  There is no doubt about it.  But it is the
16    plaintiff's obligation to meet it to get to trial, and they
17    didn't do it.
18             That brings me to RICO.
19             There was one other thing I wanted to say about
20    ideas.  The way we constructed the ideas argument we made
21    the distinction between the ideas for the product names just
22    simply the word marks, Bratz and Jay, and everything else
23    that Bryant did.  And the reason for that is that everything
24    else Bryant did is copyrightable subject matter.  And the
25    pure ideas just for the word marks are other property,
0104
                              Page 43

111710DOC-02.txt
1  potentially other property.  They weren't when they were
2  ideas but potentially other property in the form of
3  trademarks.
4          The Selby case which is a Central District case
5  says, You can't do an end run around copyright preemption by
6  trying to grab the ideas that have been embodied in a work
7  that's fixed in a tangible medium of expression.  That's the
8  Selby case.
9          Now, Grosso is not contrary.  Grosso is a pure
10 pitch case.  And, your Honor, frankly, if it was, Laws and
11 some of the other more recent cases, are more pertinent
12 here.  Desney, pay per use, that pure pitch thing, the Ninth
13 Circuit struggling with it and now has it en banc in Motts.
14          And, you know, Judge Kozinski is a big fan of
15 copyright preemption.  You can see that in his concurrence
16 in the Full Ad decision.  So a betting man might assume that
17 Grosso is going to get overruled here.  But the court
18 doesn't have to worry about any of that, because we don't
19 have a Desney situation here.  We have pure ideas which are
20 not assignable for the product names, under California law
21 and anyway aren't covered by the contract for the reasons I
22 have described.  And then, on the other hand, we have things
23 fixed intangible medium of expression which are clearly
24 controlled by the copyright:  The logo, the drawings.
25          All right.  RICO.  Boy, are they pushing the
0105
1  envelope very quickly.  They are pushing the envelope all
2  over the place.  They are pushing the envelope on
3  distinctness.  They concede that they have defects, because
4  all they have is Bryant, but they don't have Bryant at the
5  time of the other alleged acts.  So -- and court has asked a
6  lot of questions about the significance of temporal
7  limitation, and there has to be one.  Because if there isn't
8  a temporal limitation, then the definition of "enterprise"
9  simply will collapse into the pattern of racketeering
10 activity.  It will become a pattern.  It will be no more.
11 It will be no less, and that is inconsistent with the
12 Supreme Court precedents.  The pattern cannot define the
13 association in fact enterprise.  The temporal limitation has
14 to be considered as critical to that understanding.
15          And they know they have this problem, because then
16 they try to put the seamstresses in on an interrogatory
17 response as part of the enterprise.  But, your Honor, they
18 can't do that, because Veronica Marlow, they claim, is one
19 of our agents.  To make us responsible for her acts on the
20 duty of loyalty claims, they claim she's one of her agents.
21 So that sweeps all of Marlow and seamstresses in under MGA,
22 if that's going to be their claim.  They can't have it both
23 ways.
24          So that doesn't get them distinctness, especially
25 because they can't, having amended their RICO claim like six
0106
1  times, change it in the middle of summary judgment.
2          Now, this was a remarkable concession by
3  Ms. Estrich, and I give her credit for being so honest with
4  the court.  Their interrogatory answer is insurance.  That's
5  what she said.  And in the alternative, your Honor, if
6  you're going to throw us out, well, then, we really want you
7  to let us keep that Larian is the person and MGA is the
8  enterprise.  You know, we had that discussion in March.
9  That was the time to do it.  If they were going to do it,
10 they just can't give it up.  They don't want to give up all
11 the defendants.  They want to keep everybody on the hook.
                          Page 44

111710DOC-02.txt

12  Now, they are stuck with that choice.  This is just tactical
13  bandying.  They are publishing the enterprise distinctness
14  to its limits.  They are pushing harm to its limits and
15  beyond.  Both of these concepts to its limits and beyond.
16          Here's how we know they are pushing harm beyond
17  the RICO limits, because they -- all three together, sit up
18  and said they wanted to claim a reasonable royalty under the
19  Georgia-Pacific factors for RICO harm.
20          Now, reasonable royalty is the theory that you use
21  when you can't prove damages and you can't prove profits.
22  It's the -- we couldn't prove anything based on causation.
23  Couldn't prove anything based on causation, damages or
24  profits which wouldn't be available under the disgorgement
25  theory for RICO, anyway.  So we're going to claim some kind
0107
1  of crazy loss of the value of use under Georgia-Pacific.
2          Your Honor, in the Uniform Trade Secrets Act, it
3  makes clear that reasonable royalty is available when you
4  fail in your proof as to damages or unjust enrichment.
5  Assuming reasonable royalty is available under the Copyright
6  Act, which, frankly, I think is a big assumption, given the
7  statutory language which has a causal requirement that even
8  assuming it, the case law says:  Only available when you
9  failed in your proof as to damages, on Davis versus The Gap
10  and the others we cited in the lost opportunities section in
11  our reply brief.
12          So by standing up here and saying, We're going to
13  claim a reasonable royalty as our RICO harm, they have
14  conceded that they cannot meet the proximate cause
15  requirement of RICO.  Now, they want to say, Well, on our
16  lost opportunity claim, we can't say because he never
17  disclosed it to us.
18          But we can't say it is dispositive.  They had the
19  burden here to come forward with proof that they would have
20  exploited it, not just that they can't say.  And all of the
21  undisputed facts we submitted are to the contrary.
22          Adrienne Fontanella testified they rejected the
23  name "Bratz."  Now, they rejected it for a reason.  The
24  reason is because it was inconsistent with the company's
25  image.  The connotation of the word didn't fit with the
0108
1  company's image and their product line.  Bob Eckert said the
2  same thing.  It doesn't matter whether it has a "S" or the
3  "Z."  The connotation of the word is the same.  They
4  rejected it for a reason.  It is applicable to Bratz with a
5  "Z," if they want to try to split that hair.  They rejected
6  "Toon Teens."  They can't come in here and claim some kind
7  of crazy lost opportunity with these stringent RICO harm
8  standards.
9          We are at summary judgment now.  Diaz, Guerrero,
10  Mendoza, all these pleading cases where the court speculates
11  maybe somebody will come in and show they were going to have
12  a lost employment opportunity, boy, those cases are on the
13  edge and those are the ones that Ms. Estrich goes back to
14  over and over again.  The Edge cases, pleading cases.  But
15  now we are at 12(b)(6).  And if -- pardon me, now we're at
16  summary judgment.
17          If at Rule 56 stage they can't come and prove they
18  would have exploited that opportunity like in Oscar, they're
19  done.  The only line that Ms. Estrich drew of anything that
20  could be excluded in their view of RICO -- now, this is
21  truly remarkable -- is personal injury and emotional
22  distress.  That's it.  If that's not pass the envelope and
Page 45

111710DOC-02.txt
```
23   beyond the Mars, I don't know what is.  The concreteness
24   requirement is completely gone under their analysis.  It's
25   just gone.  Now, this was also --
0109
 1           I appreciate Ms. Estrich's confirmation that under
 2   Boyle, they are claiming an illicit purpose -- I think, was
 3   her word.  I lost my page out of Anza.  The illicit purpose
 4   she said is, quote, a conspiracy to unfairly compete, end
 5   quote, with Mattel.
 6           Now, Anza says right in there, We cannot let
 7   RICO -- thank you, Mr. Parker.  The proximate causation
 8   requirement, quote, has particular resonance when applied to
 9   claims brought by economic competitors which, if left
10   unchecked, could blur the line between RICO and the
11   antitrust laws.  And that is exactly what Mattel is seeking
12   to do here, because no predicate act they have alleged would
13   satisfy the injury to competition requirement under the
14   Sherman Act.  Not one.
15           Under the Sherman Act, you have to show injury to
16   competition, and you have to show the harm that flows from
17   injury to competition.  Not injury to a competitor.  By
18   definition, their predicate acts are at best injury to a
19   significant competitor and, moreover, it's ridiculous to
20   think of Mattel, itself, the monopolist in this market for
21   so many years, bringing an antitrust claim against MGA.  So
22   they are trying to use RICO to do what they could never do,
23   under the most pertinently applicable federal statutes.
24           There is going to be no way to charge the jury
25   consistent with the law on harm from these -- by reason of
0110
 1   these predicate acts.
 2           Let's talk about the seamstresses for a moment, or
 3   the skilled pattern makers, as Mattel likes to call them.
 4   You'll have to charge the jury that Mattel can't get
 5   disgorgement under RICO.  You'll have to charge the jury
 6   that only concrete losses to Mattel are recoverable.  And
 7   then, you'll tell the jury, Here's one of these predicate
 8   acts involving the deprivation of honest services from the
 9   seamstresses.  And the Mattel is not going to stand up and
10   say anything like, The seamstresses didn't do their jobs and
11   that harmed us in some specific way.  To the contrary, the
12   undisputed facts are the seamstresses got excellent
13   performance reviews.
14           So then the jury goes back in the jury box and
15   they are scratching their heads, Why am I even hearing about
16   this?  I'm confused.  And they are just going to pluck
17   Mr. Wagner's crazy numbers out of the air to substitute.
18           Well, the judge gave it to us, so it must mean
19   we're supposed to do something with it.  He doesn't make
20   sense.  We're just supposed to ignore it.
21           That's the seamstresses.  And you got Bryant, lost
22   opportunity, we have talked about.  They admit they can't
23   prove causation, because now they are trying to seek a
24   reasonable royalty under RICO.  That's crazy.
25           Their other theory is harm from infringement,
0111
 1   which we talk about they can't show, at most, after the
 2   first generation anyway.  And now we have this, you know,
 3   regression analysis which they can't even defend, because it
 4   assumes the infringement caused the sales.  It's not even
 5   competent.
 6           Then you have the trade secrets.  Imagine a jury
 7   trying to scratch their head about the concrete loss
```
Page 46

111710DOC-02.txt
```
 8  requirement on the trade secrets?  They had the information
 9  at their disposal the entire time.  You're going to tell the
10  jury you can't get disgorgement.  It has to be concrete
11  loss.  And then, they are going to come in with some theory
12  of like, well, they must have stole all these trade secrets
13  to prop up their business, which -- or better yet, they got
14  increased market share in Mexico.  Again, confusing,
15  inconsistent with the law.  No way.
16          Increased market share in Mexico.  Market share in
17  the U.S. would be a cognizable interest under RICO, let
18  alone in Mexico.
19          Now, here's what Mr. Zeller said when he was
20  arguing about statute of limitations and why they didn't
21  know that they had a problem.  There were legitimate reasons
22  why Mattel would lose market share that had nothing to do
23  with Carter Bryant and Bratz.  Yeah, which is exactly why
24  Anza says that direct relation requirement cannot be met
25  here.
0112
 1          Your Honor, it's overreaching at every turn,
 2  overreaching in violation of statutory case law and
 3  statutory -- pardon me, requirements that are returned.
 4          Now, RICO doesn't have much of a carefully --
 5          THE COURT REPORTER:  Start over.
 6          THE COURT:  RICO doesn't have much of a carefully
 7  calibrated scheme as the court -- start over --
 8          MS. HURST:  -- as the court has noted.
 9          But those words injury to business or property by
10  reason of do mean something.  They mean more than something.
11  They mean concrete loss, plus a direct relation between a
12  predicate act and claimed harm.
13          Mattel is out beyond the stars on that requirement
14  and relying, repeatedly, on the fringe cases in every aspect
15  of its argument.  Out beyond the limitations of copyright
16  law.  Out beyond the limitations of tort law, trying to turn
17  every employment at-will employee in the state of California
18  into a fiduciary.  Out beyond the limitations in California
19  property law, trying to turn pure ideas into assignable
20  property.
21          As the court noted, RICO and the other claims in
22  this case can be used to litigate a party to death.  MGA has
23  suffered a lot as a result of this litigation.  Three rounds
24  of layoffs, hundreds of people have lost their jobs.  This
25  is not a situation where anybody is going scot-free.  But it
0113
 1  is time to put this to an end.
 2          THE COURT:  I'll rule one way or other, counsel.
 3  I think we're going to litigation in some form, don't you?
 4          MS. HURST:  Perhaps, on some of the trade secret
 5  claims.
 6          THE COURT:  Well, thank you.
 7          MS. HURST:  But I'm still putting the money on my
 8  30-day estimate, judge.
 9          THE COURT:  Okay.
10          MS. HURST:  Thank you.
11          THE COURT:  All right.  Now, just a moment,
12  counsel.  I have one direction to -- while I'm gone, why
13  don't you get set up.
14          MR. COTE:  Thank you, your Honor.
15     (Pause.)
16          THE COURT:  Counsel, we're on the record.
17  Counsel, would you reintroduce yourself to the record,
18  please.
```
                              Page 47

111710DOC-02.txt
19               MS. HURST:  Yes, your Honor.
20               Alexander Cote on behalf of Gustavo Machado.
21               Your Honor, as before, I don't want to repeat any
22       points that Ms. Hurst made, so I'm just going to complement
23       on a few discrete issues.
24               Before I get to that, I want to answer a question
25       the court posed before we started rebuttal.  The court was
0114
1        wondering how the CD was found in the MGA offices.  I can
2        give you the answer to that.  Mr. Machado testified in his
3        deposition that he used a thumb drive to copy files and take
4        them home to his home computer.  Then he burned a CD about a
5        year later.
6                THE COURT:  That's the CD.  Well, he did that on
7        multiple number of times.
8                MR. COTE:  He made one CD, your Honor.  And only
9        one CD.
10               THE COURT:  No, he burned a number of thumb
11       drives.
12               MR. COTE:  He used a thumb drive multiple times,
13       but one CD.  That's right.  The CD --
14               THE COURT:  Counsel, watch.
15               MR. COTE:  Back and forth.
16               THE COURT:  That took some effort, didn't it?
17               MR. COTE:  It did.
18               The CD had non-Mattel documents on it, and he was
19       accessing those documents in his office -- in particular,
20       his resume -- and that's why brought it to MGA's office.
21       That's what his testimony is.
22               THE COURT:  One of the things I'm going to be
23       curious about, if we get that far, is how targeted the
24       information was that Mr. Machado sought, especially in
25       relation to the meeting with Mr. Larian.  A lot of times --
0115
1        in fact, I think I wrote a 42-page opinion absolving the
2        defendant of criminal liability for numerous downloads -- I
3        mean, numerous -- but what you eventually found was that he
4        was taking as he left everything.  It wasn't targeted.  He
5        was taking his intellectual toolbox.  He was just sweeping,
6        if you will, because he was leaving the next day.  Now, we
7        may find that Mr. Machado was sweeping and taking
8        information from his intellectual toolbox, but we also may
9        find that it's targeted.  If it's targeted, that's not good.
10       So I don't know the answer to that yet, but we'll wait and
11       see.
12               MR. COTE:  I want to start with the RICO
13       allegations, your Honor.  The court made an observation that
14       RICO is in some ways more expansive than conspiracy.  And
15       that's certainly true in some respects.  But in other sense,
16       it's more restrictive.  In the context of conspiracy, the
17       act of a co-conspirator is attributable to all of the
18       co-conspirators.  In RICO, every single defendant must
19       commit a pattern of racketeering.  Which is to say, every
20       single defendant must commit continuing predicate acts.  You
21       can find support for that doctrine in the HJ case; in the
22       All Waste case, the Ninth Circuit says, around headnote 9.
23       You can found it in Craig Outdoor Advertising, an Eighth
24       Circuit case that we cited.  That requirement is where
25       Mattel's claims against Mr. Machado fail.  Mattel must
0116
1        identify actual predicate acts that Mr. Machado committed.
2        For example, the use of trade secrets that we spoke about
3        yesterday is not a predicate act.  It doesn't help them
                               Page 48

111710DOC-02.txt
```
 4   establish a RICO cause of action against him.  And once they
 5   identify the predicate acts, it has to bring evidence
 6   showing that he committed every single element of those
 7   predicate acts, and they fail on that count as well.  By way
 8   of example, we heard a lot about the criminal copyright
 9   infringement allegation.  The difference between a criminal
10   copyright infringement and a civil copyright infringement,
11   of course, is the element of willfulness.  It's knowledge
12   that the conduct is a copyright infringement.  The cases
13   that we've cited hold, for example, that a copyright stamp
14   can give rise -- give some evidence to support an inference
15   of that state of mind.  In this case, there's no stamps.
16   And, in fact, there's no evidence at all that a jury could
17   infer that state of mind on the part of Mr. Machado.  And
18   that's why that predicate act fails.  All of the predicate
19   acts alleged by Mattel have similar flaws.  And because
20   Mr. Machado didn't commit a pattern of racketeering, meaning
21   a continuous course of predicate acts, he's not liable for
22   RICO.  And that's why the RICO claims against Mr. Machado
23   fail.
24               The court also raised an issue --
25               THE COURT:  Just a moment.  Let me think about
0117
 1   that for a minute.
 2               MR. COTE:  Sure.
 3          (Pause.)
 4               THE COURT:  You believe that each defendant in a
 5   RICO must commit predicate acts.
 6               MR. COTE:  That's right.
 7               THE COURT:  How many?
 8               Ms. Estrich is trying to hold up her hand to help
 9   you.  Ms. Estrich is trying to hold up her hands.  Two.
10               MR. COTE:  The statute, of course, says two, but
11   it also requires a pattern.
12               THE COURT:  So, therefore, if I have a defendant
13   in the Aryan Brotherhood, hypothetically, and two of the
14   leaders of organization have committed two or more predicate
15   acts and they decide to go out and kill a number of black
16   inmates and they solicit somebody like Mr. Houston, and they
17   say, as a member of the Aryan Brotherhood, this organization
18   that has committed multiple violent acts, We're going to go
19   murder five black prisoners at Lewisburg, that Mr. Houston
20   has to have two predicate acts to be labeled RICO?
21               MR. COTE:  For him to be personally liable in
22   RICO, yes, he needs to commit a pattern of predicate acts.
23   There are four elements to RICO.  One of them is the
24   pattern, and you must satisfy every element against every
25   defendant.
0118
 1               THE COURT:  A pattern.  How many acts?
 2               MR. COTE:  How many acts?
 3               THE COURT:  For Mr. Houston?
 4               MR. COTE:  The HJ case says it's a continuous
 5   pattern.
 6               THE COURT:  For the individual in the RICO?
 7               MR. COTE:  For the individual in the RICO; that's
 8   right.  That's what All Waste case says.  The All Waste case
 9   found one of the defendants didn't commit enough predicate
10   acts to give rise to RICO, and that's the RICO claim against
11   that one defendant failed, even though it survived against
12   some of the others.
13               The court also raised a question about preemption
14   and the court identified, I think, a tension between -- this
```
Page 49

111710DOC-02.txt
```
15    is CUTSA preemption.
16            The court raised a tension between liability for
17    taking a tangible thing and liability for taking the
18    information that may be embodied in that tangible thing.
19    That tension does not exist with respect to Mr. Machado.
20    Mr. Machado did not take any physical things.  All he took
21    was data.  So that tension doesn't exist.  Because all he
22    took was data, under Silvaco, those claims are preempted,
23    100 percent.  Nothing falls outside of Silvaco with respect
24    to Mr. Machado.
25            With respect to the source of the fiduciary duty,
0119
 1    I have to confess, I'm somewhat baffled as to what the
 2    source is at this point.  In Mattel's opposition, they
 3    identify Mr. Machado's employment agreement with Servicios
 4    and they apply the manual of conflicts of interests.  Those
 5    are the same sources that they identify as contractual
 6    sources of fiduciary duty.  But a week later in their reply,
 7    Mattel wrote:  Mattel has never claimed that the manual of
 8    conflicts of interest created the fiduciary duty.  It's on
 9    page 10, line 27 of their reply.  There is, obviously, a
10    tension in the pleadings there.
11            Mattel also argued in its opposition that
12    Mr. Machado owed a fiduciary duty by virtue of his position
13    at Mattel Servicios.  And Mr. Zeller argued that the
14    employees of Mattel had discretion to make decisions.  And
15    because of that discretion that gave rise to a fiduciary
16    duty.  Mr. Zeller did not mention Mr. Machado, specifically.
17    I'm not sure if he meant to include Mr. Machado in that
18    argument.  I don't think he did because in the reply --
19    again, in the reply, page 9, line 25, Mattel wrote:  Mattel
20    has not sought a determination that Machado was a fiduciary
21    by operation of law as a consequence of his role.
22            So where does that leave us as the source of
23    Mr. Machado's fiduciary duty?  It leaves us with the
24    employment agreement.  The employment agreement is with
25    Servicios.  Mattel is not a party to it.  Mattel de Mexico
0120
 1    is not a party to it.  They're not mentioned at all.  They
 2    are not third-party beneficiaries to it at all.
 3            Perhaps, more importantly, that contract does not
 4    have the trust language that Mr. Zeller quoted during his
 5    argument.  It's just not there.  That language appears in
 6    the U.S. employment contracts with Mattel, Inc. employees.
 7    It's not in Mr. Machado's contract.
 8            We heard a new source this afternoon or this
 9    evening, and that's the code of conduct, and Mr. Zeller
10    quoted some language from the code of conduct.  There is a
11    problem with the code of conduct.  Mr. Machado never
12    accepted its terms.  This is admitted by Mattel.  They admit
13    in their briefing they can't produce a signed acceptance, a
14    signed document accepting the terms the code of conduct.
15    What they argue instead is that no acceptance was necessary.
16    It's a rather novel argument.  Contracts always require
17    acceptance in some way.  And there is no evidence of that
18    here.
19            And, in fact, the evidence shows that Mattel did
20    require written acceptance of the terms of the code of
21    conduct, and they admitted this in their own summary
22    judgment briefing.  If you look at facts C-8 and C-9, Mattel
23    describes how Mattel, Inc.'s president of brands sent a memo
24    to all U.S. employees, or a certain level of U.S.
25    employees -- on March 5th, 2004 requiring their signature
```
Page 50

111710DOC-02.txt
0121
1   accepting the terms of the code of conduct.
2           Mr. Machado left just weeks later, and he never
3   signed such a document.  That's undisputed.  The code of
4   conduct is not a contract.  It's a fiat.
5           I want to address briefly the choice of law
6   issues.  Mr. Zeller testified that you can find support for
7   the notion that breach of fiduciary duty and other claims
8   that might be related to contracts are governed by the
9   10-year statute of limitations under Mexico law.  Mr. Zeller
10  pointed to paragraph 17 of their expert's declaration.
11  Paragraph 17 says nothing of the sort.  What that paragraph
12  actually says is:  The statute of limitations for breach of
13  contract is 10 years from the day on which the obligation
14  could be claimed.  It does not say anything about torts
15  which are related to some contract.
16          With respect to the borrowing statute, the Code of
17  Civil Procedure 361, Mr. Zeller argued that it doesn't apply
18  to Mattel, Inc. because Mattel, Inc. is a resident of
19  California.  That's true.  I said that to the court this
20  morning when we started.  But it does apply to
21  Mattel de Mexico, which is not a citizen of California.
22  It's a citizen of Mexico.  It's organized under the laws of
23  Mexico.  And that means that under the borrowing statute,
24  all of those claims fail by Mattel Mexico, because they are
25  governed by Mexican law.
0122
1           Last point I want to make, your Honor, is about
2   Mr. Machado's employer, and I alluded to it earlier.
3   Servicios is the employer.  And I stand by and I repeat my
4   assertion that Servicios was formed for one reason, and that
5   was to bilk Mattel's employees.  That's the only reason.
6           Mr. Zeller --
7           THE COURT:  Mattel's employees or the taxation
8   structure in Mexico?
9           MR. COTE:  It's to deprive who would otherwise be
10  employees of Mattel de Mexico of their right to
11  profit-sharing under Mexico law.  I don't think it has a tax
12  implication.  I think it's a salary or a compensation
13  implication.
14          Mr. Zeller argues, Well, Mr. Machado and, perhaps,
15  others got to participate in Mattel's profit-sharing
16  program.  There is no evidence of a profit-sharing program
17  that they participated in.
18          Mexico has a very stringent requirement that the
19  profits have to be shared at certain percentages, and there
20  is no evidence that any of the companies in Mexico ever
21  complied with that requirement, nor would there be.  That's
22  the reason why Servicios exists:  To put the profits in one
23  entity, put the employees in the other and never the twain
24  shall meet.  It was designed to evade the laws of Mexico.
25          What is in the record -- and this is Webster's --
0123
1   excuse me, Exhibit 422 to the Webster declaration -- is that
2   Mr. Machado was paid a bonus.  That's what the evidence that
3   they actually cite.  The bonus was said by Servicios.  Not
4   by Mattel de Mexico.  Not the entity with the profits.  And
5   that document, although it's not translated for the court,
6   that document makes no mention of profits or taking a
7   percentage of profits.  It is not a stand-in for compliance
8   with Mexico law.  On its face, it does not comply with
9   Mexico law.
10          So did Mattel set up Servicios solely to bilk its
Page 51

111710DOC-02.txt
11  employees?
12          Absolutely.  And it would be an injustice if this
13  court allowed them to disregard that corporate distinction
14  that they benefited from for decades to go after my client
15  for procedural.
16          Thank you, your Honor.
17          THE COURT:  Thank you.
18          Why don't we take a recess.  You've been at it
19  quite a while.  What time would you like to come back and
20  that's the time we'll reconvene?
21      (Pause.)
22          THE COURT:  Counsel, 9:00 o'clock.
23      (Recess taken from 8:35 p.m. to 9:17 p.m.)
24          THE COURT:  We are back on the record.
25          All counsel are present.
0124
1          Mr. Zeller, this is your concluding argument for
2  about an hour and 15 minutes, approximately.
3          But concerning the preemption and suppression
4  issues, my question is:  Since the physical object is
5  distinct from information on it, how exactly and simply will
6  I instruct the jury?
7          MR. ZELLER:  We, of course, hope you will instruct
8  the jury along the lines of what we believe is the
9  appropriate scope of supersession.
10          THE COURT:  That doesn't answer my question.
11          MR. ZELLER:  I understand.  What, I think, the
12  court will have to say is that -- that the jury -- this is,
13  again, assuming the court accepts MGA's position.
14          THE COURT:  You want to talk to Mr. Quinn before
15  you answer this.  A lot hangs on the balance.  You might
16  want to step over.
17          This is not a quick answer.  Go over and talk to
18  your trial team, just so I know that this is the answer.
19  I'm not being disrespectful, but you are going to live with
20  this.
21          It's got to assume for a moment that we accept
22  MGA's position, obviously.
23      (Pause.)
24          MR. ZELLER:  The court will have to instruct the
25  jury what it is that it cannot consider for purposes of
0125
1  finding in Mattel's favor on the state law claims.
2          THE COURT:  Okay.  All right.  If you would like
3  to proceed.
4          MR. ZELLER:  Starting with the issue of conflict
5  preemption, which I think is quite clear was not raised in
6  MGA's motion -- so we don't even think it's properly in
7  front of this court.  The fact is that MGA cited no
8  authority, finding, or holding that trade secrets is
9  preempted by copyright.  It is nothing that they have cited.
10  There is a U.S. Supreme Court case, Kewanee Oil, which has
11  found that there was conflicts preemption between patent and
12  trade secret.  And, in fact, the reasoning of that decision
13  rejects the types of arguments that MGA has made here.
14  Including, of course, more prominently, that there's somehow
15  a tension between patent law which, of course, is to
16  encourage the disclosure of inventions, and trade secret law
17  which, of course, rewards not disclosing it.
18          So that we believe is really the appropriate
19  authority which shows that there's absolutely no conflict
20  here.  I would also point out to the Copyright Offices,
21  Circular No. 61, which is, it allows and provides the
                                    Page 52

111710DOC-02.txt
22    procedure for copyright registrations for materials that are
23    trade secret.  So this, obviously, shows that there is again
24    no conflict.
25              As the court was mentioning, I think, earlier,
0126
1     these cases make very clear -- and I think that even looking
2     at the policies and the language of the statutes, the
3     acquisition, disclosure and use of trade secret information
4     is qualitatively different from the exclusive rights that
5     are bestowed by copyright.  Now, MGA -- and I confess that
6     sometimes, I think, that they are aligning their arguments
7     but they rely on Silvaco.  Of course, I think there is a
8     concession here that it's inconsistent with Kremen, which is
9     the Ninth Circuit decision.  And in any event, certainly,
10    the California Court of Appeals can direct this court as to
11    what's appropriate for purposes of jury instructions.  That
12    appears to be at best a procedural kind of a directive.
13    Obviously, it takes a different viewpoint, perhaps, that
14    would support MGA on the merits of their supersession
15    argument.  But it certainly does not stand for the
16    proposition that somehow it would be inappropriate to
17    instruct the jury on what kinds of acts can or cannot be
18    considered for purposes of the nontrade secret state law
19    claims.
20              Also, it does certainly discuss, the Silvaco case
21    discusses the Cenveo, C-E-N-V-E-O, case, but it simply
22    discusses the fact that it disagrees with its view of what
23    is superseded and what is not.  It does not, as far as I
24    ascertain -- it's a lengthly decision -- it does not appear
25    to be criticizing the district court in that case for
0127
1     instructing.  And that is really the procedure that we are
2     talking about here.
3              THE COURT:  I don't think I'm going to instruct
4     the jury on what kind of acts can and cannot be considered.
5     In other words, if you are asking for examples to the jury,
6     I'm very reluctant to do that.
7              MR. ZELLER:  It's not going to be examples.  It
8     would be what can be considered and what can't.  There would
9     be an affirmative exclusion.  I mean, I understand the
10    court's evasion with my attempt to hedge this, because we,
11    of course, don't agree with the merits.  I just don't want
12    to come out sounding like we agree that that should be the
13    jury's instruction.  But accepting MGA's position, the
14    instruction would be -- and I'm sure it would have to be
15    more elaborate, to some degree.  But simply put, it would
16    say:  When you are considering Mattel's other state law
17    claims, you cannot consider the theft of confidential
18    information, or trade secret information.
19              That's what I'm suggesting.  It's not simply
20    saying, Here are some examples of what you cannot consider.
21    But consistent with the two cases I talked about,
22    previously, including the Cenveo case and then one from the
23    Southern District of California, it simply says:  You will
24    not consider in this in evaluating whether or not Mattel has
25    or the plaintiff has established the other state law torts.
0128
1              One aspect that MGA was calling out as being
2     ostensibly in conflict with the Copyright Act is Section
3     205(d).  And, in fact, what 205(d) requires for
4     recordation -- actually requires that the assignment be
5     recorded with the U.S. Copyright Office.  It does so by its
6     terms.  MGA never did that.  So it is completely a
                              Page 53

111710DOC-02.txt

```
 7  hypothetical assertion here that somehow there is a conflict
 8  between trade secret law on the one hand and Section 205(d)
 9  on the other, because 205(d) couldn't even possibly apply.
10  And that, I think, in fact, in some ways, too, why the
11  decisions that this court decided early are really to the
12  point where, in fact, no conflict was found between trade
13  secret and the Copyright Act.
14          I would also note the reasoning that was given
15  here -- and, I think, this is actually MGA's main point --
16  that somehow the scope of trade secret protection falls into
17  an area that Congress intended not to be protected by virtue
18  of the Copyright Act.  That's precisely the kind of
19  reasoning that Kewanee Oil rejected.  Precisely.  It said it
20  did not matter that trade secret law extended protection to
21  matters that were outside of patent and were found not to be
22  patentable.  And it would not make any difference to its
23  validity or that it was supposedly in conflict with federal
24  law.
25          Turning to the Diva Starz arguments, counsel --
0129
 1  MGA's counsel states that Judge Larson did not have this in
 2  front of him.  That's just simply incorrect.  It's actually
 3  called out more than once in the orders, the kinds of
 4  arguments that they have made.  They have made these
 5  arguments about Diva Starz and they made the same statute of
 6  limitations arguments literally for years.  All MGA now
 7  tries to point to is to say, Well, there was some additional
 8  things, but they are cumulative.  And, in fact, the
 9  testimony she was citing -- Adrienne Fontanella, Jill
10  Nordquist, Ivy Ross -- those were all before phase one
11  trial.
12          I would also point out that the Bratz brief, which
13  I'm sure the court is already heard a fair amount about, but
14  it's Exhibit 9216 -- a perennial favorite of MGA,
15  prominently featured in many, many briefs during the course
16  of this case -- specifically calls out that Diva Starz
17  represented a unique distorted look to the doll category.
18  It has been suggested that it was an inspiration for Bratz.
19  So this kind of language has been in documents over and over
20  in this case literally for years, and this is the kind of
21  thing that MGA has pointed to.
22          Now, the testimony and the documents that they
23  rely on do not say that Diva Starz was a copyright
24  infringement.  In fact, some of them say they have words
25  like "inspiration" which no one would view as saying that
0130
 1  that means it was a copyright infringement.  Moreover, many
 2  of the statements or the other statements that she read
 3  don't even talk about the comparisons of the doll.  They are
 4  vague in their use of words like "similar," without saying
 5  similar in what respect.  And even words like "knockoff," as
 6  MGA's own witnesses have said when confronted with their own
 7  e-mails, "knockoff" has many different meanings.  It is not
 8  copyright infringement.
 9          I would also say that the short answer to all of
10  this is that Mattel is not asserting copyright infringement
11  of Diva Starz.  None of this matters.  It only gets them to
12  the hypothetical realm of Mattel could have sued Bratz,
13  based some other property, some other copyright.  But it
14  does not have anything to do with showing that Carter Bryant
15  created Bratz while he was a Mattel employee.
16          And the Ivy Ross quote that MGA offered to the
17  court simply said she knew that he created Bratz.  Not that
```
Page 54

111710DOC-02.txt
18    she knew he created Bratz while he was employed by Mattel.
19    And that's what our claims are based on in this case.
20              The other aspect of MGA's argument -- and this is
21    well outside the record now at this point.  But she was
22    stating that somehow that Mattel had not asserted Diva Starz
23    as being a copyright infringement with somehow, I guess, a
24    waiver of the attorney-client privilege, or somehow
25    disclosing privileged communications.  The fact is, is that
0131
1     what it is that Mattel said and what is asserted against MGA
2     with respect to Diva Starz is in a letter that was sent to
3     MGA.  That letter stated that their website was using
4     metatags that it should not be using.
5               MGA wrote back and said, We're not really
6     responsible for this, but interestingly enough that conduct
7     stopped.  So it has nothing to do with the claims that are
8     being asserted here.
9               Also contrary to what it is that counsel stated,
10    Elise Cloonan denied at her deposition under oath that she
11    did the Bratz logo.  Again, direct testimony by Elise
12    Cloonan, certainly available to the court to read that
13    deposition.  I took it.  I can tell the general tenor of her
14    testimony was, is that she had no idea.  That is what she
15    stated under oath time and time again.
16              Also in terms of the Brats name, the B-R-A-T-S
17    name, the inference -- and it has never been our theory that
18    the inference is against Bryant.  The inference is against
19    Paula Garcia, somebody different who was working there at
20    MGA.  So, I mean, really, the bottom line -- and this is I
21    believe what is also shown by the prior court orders on
22    this, because we are litigating this issue over and over
23    again -- is that MGA likes to pull out various kinds of
24    desperate things, out of, basically, literally half of dozen
25    sources.
0132
1               THE COURT:  Just a moment.
2         (Pause.)
3               THE COURT:  All right.  Thank you, counsel.
4               MR. ZELLER:  From various sources and say,
5     basically, with anything more than speculation -- and really
6     mischaracterizing the pieces of those information -- and
7     say, Well, you can knit it all together and come up with an
8     inference that, perhaps, Carter Bryant created this while he
9     was at Mattel.  which, by the way, of course, is a fact that
10    they claim is simply not true at all.
11              Turning to the copyright issues, a jury has
12    already found infringement.  That occurred.  This is a
13    historical fact.  The idea that somehow there could not be a
14    triable issue of fact on summary judgment, I think, is in
15    itself impossible, given that there was a prior jury
16    verdict.  The Ninth Circuit decision did not say that there
17    was anything wrong with the verdict, per se.  The court, of
18    course, found that there were errors in the instruction, in
19    the legal instruction.  But the idea that a properly
20    instructed jury, making these comparisons -- and I mean,
21    let's call this what it is.  It's a visual works case.
22              In making those comparisons, it would not be able
23    to find on this record that there was infringement is, just
24    from that alone, I don't think is a tenable argument.
25              But let me also point out a couple of other
0133
1     things, which is, it is undisputed that MGA had access to
2     the drawings and the sculpts.  The Ninth Circuit pointed
                              Page 55

111710DOC-02.txt
3    this out.  It is also -- there is evidence that there was
4    direct copying by MGA.  That, too, is something even apart
5    from the obvious similarities between the works is enough to
6    create a triable issue of fact.  And this is not, as
7    Ms. Hurst tried to characterize, somehow vague promises on
8    our part, or this is somehow what we will do in the future.
9    We have already done this.  We have already been through
10   this exercise.  We showed a jury what it was that was
11   infringing and we will continue to do it.
12           There is a mischaracterization of the Loetz
13   report.  The Loetz report very specifically says he is
14   comparing all the dolls.  That is sufficient.
15           Now, I suppose at the end the day, perhaps, we're
16   being faulted for not flooding the court with thousands and
17   thousands of dolls to look at.  Frankly, I thought we were
18   doing the right thing.
19           THE COURT:  You were, counsel.  Thank you.  I'm
20   just joking with you.  Kind of walking around with all those
21   would be a heavy burden.
22       (Laughter.)
23           MR. MCCONVILLE:  I'm up to it, your Honor.
24           THE COURT:  I know you are, Mr. McConville.
25           You have the court's admiration.
0134
1            MR. ZELLER:  Certainly, the dolls are available to
2    the court in order to make those comparisons.  I really
3    don't think that this is a record issue, because these are
4    available.  They are the possession of the -- they have been
5    in the possession of the court more than once.  They are, of
6    course, currently in joint possession of counsel with the
7    court's supervision.  So it really is not to me, in any way,
8    somehow an idea that this is little more than, I guess, a
9    got you kind of argument of, Well, you should have submitted
10   all the dolls for the court to look at.  We don't think
11   that's what's necessary.
12           Also the interrogatory that MGA has cited now more
13   than once, in fact mentioned more than just the first
14   generation, or the first wave of dolls in itself.
15           I suppose at this point, with some peril to
16   myself, I will talk a little bit about these dolls.
17           THE COURT:  Get Mr. Quinn to help you.
18           MR. ZELLER:  One thing that I think is somewhat
19   interesting, given that MGA seems to suggest that having
20   seen the Diva Starz dolls that Mattel should have been
21   instantly alerted to copyright infringement, this for the
22   record is a Nikki Diva Starz doll.  This, for the record, is
23   a first generation so-called Cloe doll, C-L-O-E.  So you can
24   see this comparison, I guess, according to MGA, is saying,
25   These two substantially similar.  This would be a legitimate
0135
1    subject of copyright infringement between these two dolls.
2            However, the subsequent generation Bratz dolls,
3    those don't look anything like the first generation.
4            THE COURT:  Just a moment.  Just a moment.  Just a
5    moment.  Just a moment.
6            Hold them both up again.
7            MR. ZELLER:  For the record the second, or the
8    third one, rather, I'm holding up is Bratz Nighty Nite.
9            THE COURT:  I'm just seeing how long you can hold
10   the dolls up, counsel.
11       (Laughter.)
12           MR. ZELLER:  Can I put them down now?
13           Thank you.
                         Page 56

111710DOC-02.txt
```
14              I knew this would be at my peril.  So the idea
15   that, first of all, somehow these Diva Starz and Bratz
16   substantially similar but these other dolls are not,
17   subsequent generations, I think kind of speaks for themself.
18   There's a triable issue here.
19              THE COURT:  Did the Bratz -- I mean, strike that.
20              Did the Diva Starz doll ever become a big seller?
21        (Laughter.)
22              THE COURT:  It's not -- I mean, I mean to
23   disparage the doll.  It's interesting.
24              MR. ZELLER:  It's a fine doll, your Honor.
25              THE COURT:  Did that become a big seller?
0136
1               MR. ZELLER:  It actually did relatively well for a
2    year or two years.  Somewhere in there.  It wasn't a huge
3    success.  It wasn't a failure.  It was somewhere kind of in
4    the middle.
5               But, also, to the point -- part of the reason for
6    my peril is, is that I want to show the court what I was
7    referring to earlier as the heads.  They stayed the same.  I
8    mean, these are the same heads.  The heads on the dolls are
9    manufactured from molds.  They are taken from the same
10   models.  Generation after generation after generation.  So
11   these are manufactured items that have, maybe, different
12   hair coloring.  There can be variations in the eye
13   decoration and the face paint of them.  But the underlying
14   sculpt here, the head stays, and they are, then, mass
15   manufactured and they are put on these dolls.  This is why
16   that alone we think is sufficient for purposes of a
17   substantial similarity finding by the jury.
18              The other thing I would point, I can go through
19   some of these drawings, but Ms. Hurst focused on one exactly
20   one drawing of the comparison that she did.  And she pointed
21   out differences.  Those are certainly arguments one can
22   assume she will make to the jury as to why they are
23   different.  But as they acknowledged, there are
24   similarities, too.
25              And the only point is, is that's just one drawing.
0137
1    Carter Bryant created 90 of them.  90.  We can go through
2    and do massive numbers of comparisons.  We did it during
3    trial.  We made a record of doing this.  We can do it again.
4    But the idea that we can pick out one drawing, compare it to
5    one doll, say that there are differences in summary judgment
6    on substantial similarity needs to be granted, I just don't
7    think holds up at all.  It doesn't do in itself justice to
8    what it is that is at issue in this case.  And then, of
9    course, beyond the 90 drawings or so, we have a number of,
10   you know, three-dimensional sculptures that we had claimed
11   ownership to that are also part of the comparison for
12   copyright infringement purposes.
13              And, thankfully, I think that finishes my work
14   with the dolls.
15              The other point I would make is, is that MGA has
16   cited Bob Eckert and at least one other witness saying that
17   Bratz and Toon Teens were rejected.  But to be clear, they
18   were not talking about the Bratz that Carter Bryant created.
19   That is undisputed was never presented to Mattel.
20              Also, I would like to make sure that the record is
21   clear on this point.  During the RICO argument --
22              THE COURT:  I'm sorry.  It froze.  I've got it.
23   Thank you.
24              MR. ZELLER:  -- Ms. Hurst treated an argument of
```

111710DOC-02.txt
25  mine as being a concession, an admission that there were
0138
1   legitimate reasons to lose market share and attempted to use
2   this on RICO.
3           What I said is, is that one could have concluded
4   that in 2001 and 2002 and that it did not create an
5   inference.  Just the simple bare fact that Bratz was taking
6   away market share, or harm that MGA tried to use for
7   purposes of statute of limitations and lead to an inference
8   that Bryant created Bratz while he was at Mattel.
9           We, of course, now know that that was not
10  legitimate, so she's mixing apples and oranges here.  I'm
11  talking about what was, of course, known at the time in
12  2001, 2002, which is what MGA claims supposedly was to give
13  us notice of our claim here.  I don't think one can
14  legitimately, or I say reasonably, rather, assert at this
15  stage that we are conceding that that loss of market share
16  was anything about illegitimate.
17          I think, just simply, as a final point, unless the
18  court has questions, is the point about --
19          THE COURT:  I'm going to have one, when you're
20  done, I'm going to have one.
21          MR. ZELLER:  Sure.  Is this point about targeting
22  that the court mentioned.  And Mr. Machado's counsel didn't
23  really have much of an answer, and here's why:
24          Mr. Machado, when he testified, testified he did
25  it and, in fact, did target documents.  Here is what he
0139
1   said, and this is Corey Exhibit 17, at 203 through 204 of
2   his deposition, Volume III.
3           Question:  When did you start copying documents to
4   the USB drive?
5           Answer:  I don't recall.
6           Question:  Was it the day that you resigned?  Was
7   it six months before you resigned?
8           Answer:  Weeks before, but I -- I don't recall how
9   many.
10          Question:  How did you decide what to copy from
11  your computer?
12          Answer:  I picked documents that I thought could
13  be useful.
14          Question:  Do you know how?
15          Answer --
16          MR. ZELLER:  He's interrupting here.
17          -- useful at that time for my job question.
18          Question:  For which job?
19          Answer:  For the future job at MGA.
20          THE COURT:  Exhibit 17, at 203 through 204
21  deposition?
22          MR. ZELLER:  Yes.
23          THE COURT:  Okay.
24          MR. ZELLER:  I have nothing further, your Honor.
25          THE COURT:  All right.  Just one question.  I want
0140
1   you to go back and help me for a moment to the suppression
2   concerns I've got and the instructions and tell me, again,
3   whether and how limiting instruction is going to be given or
4   could be given that remedies this not liability overkill as
5   I'm phrasing it.  In other words, I've got to construct for
6   the jury something that's understandable.  Now, that doesn't
7   mean we can't have contrary theories.  We can plead in the
8   alternative sometimes.  We can have --
9           Help me with that.
                            Page 58

111710DOC-02.txt

10            MR. ZELLER:  If the court will just bear with me,
11  I can pull out the language that I thought was very simple
12  from the one that we had for burden of proof before.
13            THE COURT:  Absolutely.  Absolutely.  I appreciate
14  that guidance.
15            Number two, while you are doing that, let me speak
16  to the other counsel, and you can listen.  I am going to
17  order you to submit the briefing on the ideas issue that was
18  filed with the circuit court.  In other words, I don't want
19  new briefing.  You filed briefing with the circuit court,
20  didn't you, on the ideas issue?  Can I have it?
21            MR. MCCONVILLE:  Yes, your Honor.
22            THE COURT:  Thank you, Mr. McConville.
23            When would be convenient for counsel to get that
24  to the court?
25            MS. HURST:  We can lodge the Ninth Circuit briefs
0141
1  tomorrow.  We already lodged them before.  They are already
2  in the file.  Do you want us to send them again, or --
3            THE COURT:  Yeah, it's a morass back there.  Boxes
4  upon boxes.
5            MS. HURST:  We'll lodge them tomorrow.
6            MR. QUINN:  Sure.
7            THE COURT:  By tomorrow, 4:00 o'clock.
8            Does that give you enough time?
9            That would be helpful.  I can --
10            MR. ZELLER:  And this is a very simple way that
11  it's put from that Eldorado Stone case.  And it said that:
12  To prevail on its claim, plaintiff must show, among other
13  things -- and then the fourth element that it lists -- is
14  that defendants engaged in wrongful conduct separate and
15  apart from the misappropriation and use of trade secrets or
16  copyright and trademark infringement.
17            THE COURT:  Or any other instructions given, of
18  what I call, surrounding that instruction?
19            MR. ZELLER:  I don't believe so.  That's my
20  understanding.
21            THE COURT:  That's what police officers talk to me
22  about, best of my recollection.
23            MR. ZELLER:  No, I understand.  But that's the
24  salient language.  I mean, it is part of one instruction.
25  I'm aware of anything else in there.  I'm not trying to
0142
1  hedge.  That's the language, the salient language that we
2  have.
3            THE COURT:  Is that instruction, or slight -- is
4  that instruction satisfactory to Mattel?
5            MR. ZELLER:  Assuming we lose on the substantive
6  argument, yes, I think so.
7            THE COURT:  Okay.
8            MR. ZELLER:  And I do know Mr. Quinn had a few
9  remarks about some of the ideas issues that MGA was raising.
10            THE COURT:  Mr. Quinn.
11            MR. QUINN:  Well, just four points, your Honor.
12            The issues of the testimony of the Mattel
13  witnesses and Mr. Bryant concerning their intent and their
14  understanding of the Inventions Agreement as it relates to
15  ideas.  Again, Ms. Hurst, in her rebuttal, said you
16  shouldn't consider that.  I would have thought that the
17  parties' intention, their testimony concerning their
18  understanding is classic extrinsic evidence when you have to
19  go to extrinsic evidence.
20            Again, Ms. Hurst told us that California law is

111710DOC-02.txt

21   clear that ideas cannot be protected.  If that's true, I
22   would have thought there would have been a response to the
23   point, then why did the Ninth Circuit send it back for this
24   court to determine whether ideas were covered by the
25   contract, especially when MGA had urged the position to the
0143
1    Ninth Circuit that there is no protection for ideas?
2                THE COURT:  They could have made that
3    determination at the circuit.
4                MR. QUINN:  Third, Ms. Hurst says that there is no
5    conflict in the credibility concerning extrinsic evidence.
6    Well, if that's true and the extrinsic evidence concerning
7    the parties' intent is unanimous that ideas were intended to
8    be covered, it seems that we should get summary judgment
9    that ideas were covered.  She's saying there is no issue of
10   credibility for the jury.  Both parties' testimony is they
11   understood and intended that ideas would be covered.
12               The final point on the fiduciary duty, Mr. Kaye's
13   testimony, she said Mr. Kaye testified that he could not
14   identify any words in the Inventions Agreement that created
15   a fiduciary duty.  He was being questioned at that time
16   about earlier forms of agreement.  Not the kind of
17   agreement -- not the form of agreement that Mr. Bryant
18   signed but earlier forms of agreement that do not have that
19   trust language in it.
20               I can represent that to the court, during the
21   break, we looked that up and we looked at the exhibits.
22   It's irrelevant to this issue.
23               Thank you, your Honor.
24               THE COURT:  Okay.  All right.  I'll be back with
25   you in just a moment.
0144
1            (Pause.)
2                THE COURT:  Do each of you have a copy of the jury
3    questionnaire?
4                Well, I've got a copy.  I want to make sure each
5    of you have a copy in hand.
6                Most of these questions are acceptable.  Let me
7    tell you the one question I've got difficulty with.  I do
8    not want to know the specific school that a student is going
9    to, nor do I want to know the specific place of employment.
10   So what has to be modified in the questionnaire is, we can
11   ask their occupation -- you know, are you a truck driver?,
12   et cetera -- but I will not allow the employer.  You know,
13   TG Trucking, or I work at the registrar's office.
14               The same in terms of the schooling.  If we have
15   a -- in Question No. 7:  If you're a student, list the
16   school you attend.
17               No, we can ask the level of education.  If they
18   are going to a community college.  I'm not interested in
19   whether a Saddleback, or whatever.  In other words, I don't
20   want any ability for us to know a specific employer, or a
21   specific school.
22               Beyond that, the questionnaire is acceptable.
23               MR. MCCONVILLE:  Your Honor, 22, there was a
24   misspelling.
25               THE COURT:  Well, you can correct that.  Yeah,
0145
1    it's "propriety."  Take out the "r."
2                MR. MCCONVILLE:  Should be "proprietary."
3                THE COURT:  "Proprietary."  Well, you can correct
4    that.  That's easy.
5                If we can do that quickly, it seems to me -- you

Page 60

111710DOC-02.txt

```
 6   can do that and submit it.  Why don't we just take Question
 7   No. 2, thanks for catching the nit.  And if we can come to
 8   some drafting this evening, so we don't have to reassemble
 9   for this:  Job title and duties, fine.  If put in "job
10   title," I would suggest it's just "job title" and the second
11   where it says "employer/school," that it might say type of
12   employment/or duties.  Something to that effect.
13            MR. QUINN:  How about nature of employer?
14            THE COURT:  No, nature of employment.  Under no
15   circumstances do I want the employer.  I don't know that
16   they work at Orange Coast Lumber.
17            MR. QUINN:  Could you say nature of employment,
18   parentheses, without naming.
19            THE COURT:  You know something, you are wiser than
20   I am.  All of you are going to meet and confer in two
21   seconds, so get up out of your seats.  Let's get this done.
22   Let's come to an agreement on No. 10.
23            Sex and age are fine.  Education of children or
24   stepchildren are fine.  Occupation is fine.  But use
25   consistent language in No. 10, the last column with No. 7,
0146
 1   the second column.
 2            Use consistent language in No. 7, the second
 3   column with No. 10, the last column.
 4            Now, let me ask why you even need that question in
 5   relation to Question 15, just being the advocate for a
 6   moment.  I know you might want to know current employment.
 7   I understand that.  But isn't that covered because what you
 8   really care about in 15 is what they've done, not only today
 9   but historically.
10       (Pause.)
11            THE COURT:  Okay.  Now, let me toss out a couple
12   of other things, too.  We're not done yet.
13            I want to show you some potential bias that can
14   occur for a moment, okay?
15            Hold on.  We got all night.  I want you to go down
16   to Question No. 4.  I want to read this question to you and
17   I want you to look at how you set out different groups that
18   you are concerning bias for a moment:  Have you had any
19   positive or negative feelings towards or have you had any
20   positive or negative experiences with any of the following:
21   Immigrants.
22            Fine.
23            I'm at Question 35.  It's on page 4, bottom of the
24   page.
25            Now, let's read together:  Have you had any
0147
 1   positive or negative feelings toward, or have you had any
 2   positive or negative experiences with any of the following?
 3            Remember, 30 percent of a trial in terms of
 4   fairness is what you never capture on the record.
 5   70 percent is what we do in court.
 6            Now, hold on.  Immigrants, A; B, people from
 7   Persia or Iran.  And I'm assuming because of the negative
 8   comment made in Judge Larson's court, obviously; followed by
 9   C, homosexuals and D, people of Jewish faith.
10            I might separate your -- let's just assume one of
11   the witnesses is a homosexual and, obviously, you want to
12   test that.  But, obviously, Mr. Larian, you've told me is
13   Persian and he's also Jewish.  Why don't you put those
14   together and separate it out?  Because if I was reading
15   this, my assumption might be:  Do you put homosexual right
16   between people of Jewish faith and people of Persian or Iran
```

Page 61

111710DOC-02.txt

17  faith?  So I might assume that he's Persian, Jewish, or
18  homosexual.  I don't think that's the case.
19        (Laughter.)
20            THE COURT:  Well, let the record reflect he's
21  here, and -- well, I'm just joking with all of it, but I'm
22  not.  It's that separation.  I would put together your two
23  main concerns concerning Mr. Larian of Persian and Jewish,
24  for instance; and then, I would put together immigrants and
25  then, homosexual.  In other words, I would separate it, but
0148
1  if you agree.
2            MS. HURST:  Let's do it -- the current order --
3            So reorder the current order to -- this is my,
4  well, this is a proposal.
5            THE COURT:  You can work it out.  It's just a
6  suggestion.  I really don't care about the order.  I just
7  worry about the small things that you don't think make a
8  difference and here is the one half of one percent.
9            Do you got time for a story?
10            You never know who you're dealing with.  And in
11  1974 -- and I'll put this on the record -- there was a death
12  penalty case involving a man named Rubin Martinez who was
13  gay, down in Corona Del Mar, a very commercial -- a
14  wonderful real estate broker and a real asset to the
15  community, from all of the evidence.  He was picked up by
16  two men at the Boom-Boom Room in Laguna Beach, and he
17  thought he was going to go back to his home and have
18  consensual sex with two men who were straight.  The names
19  don't matter.  They are still doing life and a day.
20            And when they got back to the house, this horrible
21  story evolved where one of the men ran in and grabbed a
22  heavy wax candle off the mantle of a fireplace in the home,
23  as Rubin had opened the door and hit him on the side of the
24  head.  Now, it stunned him but it didn't knock him out,
25  completely.
0149
1            The other man ran into the middle bedroom and got
2  a miter-box and saw and proceeded to saw off his head while
3  he was still alive by hand.  Now, the saw apparently bound
4  three different times and later on we discovered he was
5  screaming and crying out, in just a terrible, terrible
6  homicide.
7            To make a long story short, a year later -- strike
8  that.  The means of death were so gruesome and so unique
9  that a wonderful reporter from the L.A. Times had responded
10  to the murder scene about 9:00 o'clock, 10:00 o'clock in the
11  evening -- actually, I'm sorry, about 11:00 o'clock.  Her
12  name was Joanne Reynolds.  And she was going to print in the
13  L.A. Times the means of death.  And thank God I responded to
14  the scene and was able to talk to Joanne and say, Please,
15  don't put that in the paper.  Because if you do and we ever
16  have someone who comes forward who has this unique method
17  and means of death, we'll know that we have a viable
18  suspect.  So would you, please, just print blunt force
19  trauma to the head and somebody might call you, if we get a
20  suspect, and somebody might make sure that you're not
21  scooped on the story.
22            A year later, going through the Newport Beach
23  Police Department, a young officer was interviewing parole
24  violators or people suspected of a parole violation and this
25  young man said, I have a friend of mine who told me he
0150
1  sawed-off a gay man's head with a handsaw.
                              Page 62

111710DOC-02.txt

```
 2            Well, of course, we wired the person up and
 3  maybe -- you're from Laguna beach, any of you?  There used
 4  to be a Denny's down there.  Went down the highway and the
 5  informant went in and started talking to Suspect No. 1, but
 6  we had a very officious waitress who kept pouring water with
 7  ice in it, so you could hear enough of the conversation to
 8  know you had the right person, but you -- he didn't have
 9  enough to get a case.  And off down the highway they went
10  and you got a picture, you know, a van following and
11  listening.  The suspect rolled down his window and turned on
12  the radio.  And so we didn't have enough.
13            So, finally, down at the Hyatt hotel, just off of
14  El Toro, Room 205 and 204 were rented.  We sawed a hole in
15  the wall and put a camera in one room.  Then, the informant
16  invited up suspect one and suspect two, and they engaged in
17  this, absolutely, gruesome conversation, including what they
18  would do in the future if they were in the same situation
19  with future people who had homosexual orientation.
20            The reason I tell you that story is that you have
21  to be really careful of these terms.  The young prosecutor
22  at that time, name unknown, selected a jury, and it turned
23  out that that young prosecutor selected a person in the
24  Marine Corps, thinking that this person would lead the
25  charge for truth and justice and, apparently, the jury
0151
 1  reached a verdict in the first degree murder case, special
 2  circumstances in about an hour and a half.  I think the most
 3  difficult thing in the entire case was to press the tape
 4  recorder and playback, you know, the video.
 5            We got to the death penalty phase.  And in the
 6  death penalty phase, it was 11 to one.  And, of course, the
 7  young prosecutor assumed it was either this guy or gal who
 8  wouldn't make contact.  And at the time -- I forget the
 9  judge.  I think, it was Judge Kenny Lay -- we went through
10  the voir dire for seven straight days of going through the
11  jury:  Is there anything possible that the court could do
12  that would help you reach a verdict in terms of instruction?
13            And every time we got to Juror No. 3 who said very
14  nicely, Oh, sure and back they went and back they went for
15  seven consecutive days.
16            Do you know who the person who hung up the jury
17  was?  The Marine.
18            And you know what his statement was?  I can -- I
19  can send anybody to life without possibility of parole, but
20  I'm never going to execute somebody who is a -- fill in the
21  F-word.
22            You have to be really careful of these terms and
23  how you group it, because you start creating, you know,
24  those potential bias.  And I compliment you on coming out
25  front with that, because we've got to find to begin with if
0152
 1  there's anybody who is biased against somebody of Jewish
 2  faith, an immigrant, Ukrainian, Persian, if you have
 3  witnesses who might be homosexual.  And I don't think we're
 4  going to ask that on the witness stand, I hope; but by the
 5  same token, that might become obvious to somebody, depending
 6  upon who testifies.
 7            That's the only reason I've taken the time to look
 8  at that grouping.  You do with that what you want.  And if
 9  you want to get into voir dire on that issue, I want to make
10  certain that we are not spending one month, Ms. Hurst, or
11  four months, Mr. Quinn, and we get the same situation that
12  Judge Larson entered into.
```

Page 63

111710DOC-02.txt
```
13              Number two, if we ever get this, I'm going to ask
14  you to start collecting news clippings.  I don't want to
15  read them necessarily, but I want you to give them to my
16  clerk once the trial starts.  And the reason for that is, I
17  want to know what the jury is reading.  Because sometimes
18  they read something innocuous, and they say something -- the
19  jury is not only salvageable.  We all agree that it's just
20  of no import.  We caution the jury.  And it's a good lesson,
21  quite frankly, if we can actually catch somebody doing that
22  with no consequences at the beginning of the case and remind
23  them of their duty.  Sometimes it's devastating and we need
24  to know if it's really causing taint, and then go through
25  the whole process with every juror and make sure they
0153
1   haven't considered that.
2               Just give them to the clerk when the case starts,
3   because you want to know what the Times and Register, or
4   those papers most likely read by the jury, are saying.
5               And, lastly, I have to figure out a way if you
6   choose to question in this area that I give you time.
7   That's my greatest fear, that there's some bias, starting
8   off with the jury, right to begin with.  It's just not a
9   fair trial from day one that we get a selection.  How you
10  take that on is tough.
11              Do you have time for one more story?  One more
12  story.  It's a quick story.  Back in the good ol' days you
13  could get a Hovey voir dire and go through a panel of 100
14  jurors in about seven days and ask them separately with
15  Witherspoon questions:  If you reach first degree murder,
16  would you automatically vote for the death penalty; or, if
17  you reached first degree murder, would you never vote for
18  the death penalty?  And the Witherspoon questions followed
19  from that, trying to get rid of what we call the automatics.
20              The problem is that one time some young judge took
21  a shortcut and decided that after listening to an older
22  colleague that it might be wise if we just took the
23  efficiency route and put 100 people in the room and ask them
24  all the questions and everybody would nod their heads like
25  robots and one member the jury stood up -- and asked the
0154
1   question if you would execute him and his comment was, as he
2   literally stood on his feet:  Yeah, I would kill that son of
3   a bitch or anybody who committed rape, murder, because my
4   sister was raped.
5               Now, tell me how you unring that from a potential
6   jury panel of 100 people, okay?
7               So it's just a great lesson over time, because you
8   learn from your mistakes.  And I've got to talk to you about
9   this court slowing down in that vital first phase of jury
10  selection.  And in case there is good legal cause what I'm
11  saying to you is:  I may take questioning outside of the
12  jury.  And I'll put tremendous pressure on you during the
13  time of trial, but I think we all have to come away,
14  especially with only three preempts, pretty certain we've
15  got a fair jury.  So, if we truly need a sidebar, that's
16  when I will break and take that sidebar that first day of
17  jury selection.  And we'll have a jury, by the way, the
18  first day.  With the questionnaire, you're going to get
19  questioning, but it's not going to be that long once I give
20  a questionnaire.
21              Now, Ms. Hurst.
22              MS. HURST:  On that front, your Honor, having --
23              On that front, your Honor, having thought about it
                            Page 64
```

111710DOC-02.txt
```
24  for a day and considered exactly those points, I did agree
25  with Mr. Quinn when we came back today that we would like to
0155
 1  have the numbers in advance of who's going to be put in the
 2  box, as many as the court is willing to give us, including
 3  up to the entire venire?
 4            THE COURT:  Remember, if I ever get you both
 5  agreeing to something, which has never happened, okay, I'll
 6  probably try to do it.  So in the past, in something as
 7  serious as a death penalty case, counsel and I have usually
 8  landed on 12 in the box and six additional, so I've usually
 9  given 18.  And you got those beforehand.
10            Here, we've got six in the box and 10 alternates.
11  So why don't we come up with a number like six to 10 and
12  that way you know the first 10 and you are not scrambling.
13  Because it will go fast enough that I don't want you having
14  to dig through the stack.  You're almost going to have to
15  memorize the 75.
16            Now, who are you going to have as jury
17  consultants?  Everybody has got a jury consultant.  Where
18  are they?
19            Will they raise their hands so I can see who they
20  are.
21            MS. HURST:  Mine is not here, right now.
22            THE COURT:  Okay.  Here's what happens with jury
23  consultants.  You look like you don't control the case,
24  because they are back there earning their money, trying to
25  advise you, okay.  And it looks like you're not competent
0156
 1  counsel when in fact you are.  You hired the jury
 2  consultant.
 3            Do you want the jury consultant to sit with you at
 4  the table, instead of the audience when you first make that
 5  selection?  Now, that's unheard of that the court is even
 6  offering that to you.  Usually you stick them in the back.
 7  You look foolish.  You have to walk up.  You have to lean
 8  over the side of the rail.  You talk to the jury consultant.
 9  It's obvious that it looks to the jury like you're not
10  competent, when in fact we are.
11            Now, Mr. Quinn, do you have a jury consultant?
12            MR. QUINN:  Yes.
13            THE COURT:  Any good?
14            MR. QUINN:  Yes.
15            THE COURT:  Okay.  Ms. Hurst?
16            MS. HURST:  Yes.
17            THE COURT:  Coequally good?
18            MS. HURST:  Hope so.
19            THE COURT:  You tell me in a week or so after you
20  talk to your clients, but I'll make them available and let
21  them sit without any explanation, if you want, to the jury
22  about who they are so the jury doesn't feel that they are
23  psychologically being picked apart.  And then, they just
24  disappear.  Nobody cares, because there's going to be so
25  many attorneys to begin with, probably, floating around the
0157
 1  courtroom, that when they disappear they're inconsequential.
 2            Now, I can talk to you about 50 other mistakes
 3  I've made in trial to 100, but I'm just starting down the
 4  road of trying to say to you, if you can think about
 5  something in a practical way that makes this fair besides
 6  all the 150 discovery motions we have gone through and the
 7  rulings that I'll make, et cetera, bring that to my
 8  attention, if you reach an agreement; if you don't, I don't
```
Page 65

111710DOC-02.txt
```
 9  care.  In other words, it has to be agreed upon, like the
10  questionnaire.
11          I tell you that god-awful story, Ms. Hurst, just
12  to kind of re-organize, because you might have somebody
13  who's of Jewish faith.  He's an immigrant or she is, but
14  they are just biased against people who are homosexuals or
15  vice versa.  You just don't know.  So just group it in maybe
16  a different way.
17          MS. HURST:  Will do.
18          THE COURT:  All right.  I'm not going to take any
19  more of your time.
20          Mr. Quinn, do you have anything further tonight?
21          MR. QUINN:  I do not.
22          MR. ZELLER:  We have a briefing schedule.
23          MS. HURST:  We wanted to address the motions in
24  limine, if the court is amenable to that this evening.
25          THE COURT:  But Sid asked me -- and we found it
0158
 1  helpful, because I can carry it with me.
 2          Will you be filing a thumb drive for the next
 3  round of summary judgment actions?  Because I would like to
 4  limit the amount of paper coming to court.  It's just not
 5  necessary.
 6          MR. ZELLER:  That's our intention.
 7          THE COURT:  Is that okay?
 8          MS. HURST:  Yes.
 9          THE COURT:  The second things is, you saw me kind
10  of kick out all your files today.  I don't need a mound of
11  files.  Put them on disk if you need to.  You are not
12  restricted.  You can get some boxes in here, but not the
13  towering inferno anymore.  Just sweep them out, okay?
14          Get them on disks.  You'll going to be well enough
15  prepared, because we're going to go all over everything
16  beforehand, so you don't need you know what I call the
17  confidence builder.
18          Yes, motions in limine.
19          MS. HURST:  So we had two.  We had divided them
20  into two categories:  Just the regular motions in limine and
21  then the Daubert motions directed specifically to expert
22  witnesses and Rule 702 issues and the like.
23          THE COURT:  You know how enthused I'm going to be
24  to sit through a series of Daubert motions.
25          MS. HURST:  I know.  Especially with 20 experts.
0159
 1          THE COURT:  Mattel has 20?
 2          MS. HURST:  Yes.
 3          THE COURT:  And how many do you have?
 4          MS. HURST:  Four.
 5          THE COURT:  Four, okay.
 6          Do you have 20?
 7          MS. HURST:  It might go up by one.  I don't know.
 8          THE COURT:  Do you have 20?
 9          MR. ZELLER:  I think that's, approximately, the
10  right number.
11          THE COURT:  Wave good-bye.  I warned you.
12          MR. ZELLER:  I understand.
13          THE COURT:  You don't cut it down, I'll cut you to
14  the bare bones.
15          MR. ZELLER:  And the court said that.
16          THE COURT:  You just didn't believe me.
17          MR. ZELLER:  Part of it has to do with, we don't
18  necessarily know what's an issue.  We've came forth with
19  everything that was an issue still.  Hopefully, some of
```
Page 66

111710DOC-02.txt

```
20  those are going to fall out.
21          THE COURT:  They will.
22          MR. ZELLER:  Yes, I understand.  Those will no
23  longer be issues in the case and that will certainly reduce
24  them.
25          THE COURT:  That's it.  Okay.
0160
 1          MS. HURST:  Okay.  So on the Daubert motions, we
 2  agreed on a briefing schedule, your Honor:  Motions on the
 3  23rd; oppositions on the 30th and replies on the 4th.
 4          THE COURT:  Well, no, not the 4th of January.
 5  I'll resolve those before Christmas.
 6          MS. HURST:  Well, your Honor --
 7          THE COURT:  No, no.  I'm resolving those
 8  beforehand.  I'm not taking those the week of January 4th.
 9          MS. HURST:  The expert depositions don't conclude
10  until about the 17th, your Honor.
11          THE COURT:  Of what?
12          MS. HURST:  December.
13          THE COURT:  Okay.  I'm taking them that week,
14  then.  Whatever the Monday and Tuesday and Wednesday are of
15  Christmas week, that's what we're doing.  I'm not doing them
16  on the 4th.
17          MS. HURST:  Okay.  How about no replies?  We will
18  do it the week between Christmas and New Year's.
19          THE COURT:  If you could be available
20  December 8th, 9th and 10.  We had the sentencing on the MEK.
21          MS. HURST:  The problem is, we won't have deposed
22  the experts by them.
23          THE COURT:  You will depose some of them.  No?
24          The easy way for me to do that is to not allow you
25  an opening statement to refer to any expert.  That's very
0161
 1  painful, but I've got that power.  And so, you've got to cut
 2  it down, and you got to reach an agreement about no reply
 3  and your briefing has to be cut down, and you got to be
 4  ready that first week of the -- before Christmas, that
 5  Monday, Tuesday and Wednesday.  That's the only time I'm
 6  going to give you.
 7          Now, if you can't reach an agreement, I'm just
 8  going to stop your experts from testifying.  It's as simple
 9  as that.  And then, we'll go through the Daubert hearing,
10  and we are can spend our nights and weekends doing that.
11          Now, everything is turning against all the
12  nonsense that's been going on and the discovery disputes.
13          MS. HURST:  All right.  So the court's cutoff for
14  resolution of the Daubert is?
15          THE COURT:  Whatever that Monday is.  I'm going to
16  be available for the Daubert hearings, the 20th, the 21st
17  and the 22nd.  That's it.  We don't complete them, you don't
18  have experts.
19          So I hope you'll select and do that wisely.  I
20  know you won't believe that, but if I can do that on a death
21  penalty case, I'll get it away with it on a civil case.
22  Trust me.
23          We came in on the Mexican Mafia with -- not with
24  Martinez, but on the first one, there were 16 experts.
25  Remember, you heard about that.  They got -- they were
0162
 1  government experts.  They weren't defense experts.  In fact,
 2  I precluded all of the government experts.  And what
 3  occurred was, there was no reason that the Emé informants
 4  weren't experts about everything that the government was
```

Page 67

111710DOC-02.txt
```
 5  seeking, in terms of the quality of dope and the words that
 6  were used.  We didn't need Valdez, or whatever the sergeant
 7  was, remember.  So we got rid of all those government
 8  experts.  Trust me, I have no particular dislike for
 9  experts.
10            MS. HURST:  You said we are going to be limited to
11  five each, your Honor?
12            THE COURT:  No, you'll self-select.  I'm not
13  limiting you at all.  You can bring 20, if you want to.
14            MS. HURST:  I'm not bringing 20.
15            THE COURT:  I can create a record limiting you.
16  You do whatever you want.  But I suggest everybody re-thinks
17  that very quickly.
18            Now, you'll have a better handle on that after the
19  summary judgment motions, so I want to be fair about that.
20  You're going to be overwhelmed because the prejudicial
21  effect will outweigh the probative value.  That's the ruling
22  you're going to hear.  As the experts cumulate, I can make a
23  very easy record.
24            Well, listen, is there anything you would like to
25  do tonight, or can I send you on your way home?
0163
 1            MR. MCCONVILLE:  I have a question, your Honor.
 2  We have lodged --
 3            THE COURT:  I'm sorry.
 4            MR. MCCONVILLE:  We have lodged tangible exhibits
 5  with our summary judgment motion.  There are currently
 6  depositions going on where they may need access to the
 7  lodged exhibits for depositions.
 8            THE COURT:  If there's any inconvenience to this
 9  court, no.  This case takes precedence.  This is going to
10  trial, and we are not going to inconvenience all of you
11  again, going back and getting the exhibits.  We have enough
12  time -- hard time to get them.  Tell them to come out here
13  and take the deposition.
14            MR. MCCONVILLE:  Okay.  If they need to use them,
15  can they come to the courthouse --
16            THE COURT:  As long as I have a chain, as long as
17  I have agreement, certainly they can.
18            In fact, I'll even send the exhibit back, but I
19  want that by stipulation.  I want to know it's returned.  I
20  don't want to hear any of these parties inconvenienced.
21  It's time that this case went the trial.
22            Mr. Zeller, are you okay?
23            MR. ZELLER:  Shall we leave with the court then
24  and lodge with the court the dolls that we were discussing
25  during the hearings?
0164
 1            THE COURT:  Yes. I appreciate that they get
 2  marked, because they were referred to for the circuit, so
 3  let's call that the Diva Starz.  It's got a 58 on the front.
 4  Is that the marking you want?
 5            The next Bratz doll, what would you like that
 6  Bratz doll marked as?
 7            Do you want to put a little tag up on it?
 8            MR. ZELLER:  Actually, we had identifying numbers
 9  for this one:  0190.
10            THE COURT:  Okay.
11            MR. ZELLER:  This one is the same as what was
12  previously marked as Exhibit 1578.
13            THE COURT:  I don't know if the circuit is going
14  to understand that.
15            Let's take the very first doll, the Diva Starz,
```
Page 68

111710DOC-02.txt
16   okay?
17               What's the marking for the Diva Starz?
18               MR. ZELLER:  It's identified by a production
19   number, which is MATDP 000082.
20               THE COURT:  That's the identification number.  Do
21   you want it marked?
22               MR. ZELLER:  Maybe we should mark them in order,
23   Exhibit 1.
24               THE COURT:  Exhibit 1 is going to be the
25   Diva Starz, and you'll put a little tag up on it so we'll
0165
1    take the "58" off of it right now.
2                MS. HURST:  Your Honor, I don't think that's part
3    of the summary judgment.
4                THE COURT:  Well, each of you showed me something.
5    You showed me some dolls also.
6                MS. HURST:  Ours were filed pursuant to the notice
7    of lodging.  I don't think Diva Starz has ever been part of
8    the evidentiary record.
9                MR. ZELLER:  Self-authenticating products that
10   have been part of the record in this case for years.
11               THE COURT:  Do you have any disagreement that
12   that's the Diva Starz?  I don't want to take --
13               MS. HURST:  I don't know whether it is or not.
14               THE COURT:  Okay.  Well, I'll take a recess and
15   you can go figure it out for a while.  Because what I don't
16   want to do is, I don't want to have the circuit guessing at
17   what the court looked at.  Each of you chose to show me
18   dolls.  I think the circuit deserves the courtesy of knowing
19   what the court was shown.  If there wasn't an objection, I
20   don't know how I undo the record for Judge Kozinski and
21   Judge Wardlaw and Judge Trott.
22               MS. HURST:  I asked --
23               THE COURT:  By midnight you'll figure it out
24   somehow.
25               MS. HURST:  -- Mr. Zeller beforehand.  He assured
0166
1    me it was already in the record.  And now I'm hearing that
2    it's not a previously marked exhibit that's been lodged with
3    the court.  It's just got a Bates number on it.
4                MR. ZELLER:  That's not correct.
5                THE COURT:  How are we going to resolve this so we
6    don't waste the evening on this?  This is what we have been
7    doing now for six months, or nine months.
8                Okay.  You call me when you're ready.  You'll stay
9    in session.
10               You'll figure it out.
11        (Pause.)
12               THE COURT:  We're back the record.  All counsel
13   are present.
14               And, counsel, how are we going to resolve this?
15               MS. HURST:  They are going to mark these as
16   Hearings Exhibits 1, 2 and 3.
17               THE COURT:  Okay.
18               MS. HURST:  And they agreed that I can have two
19   sentences about them.
20               THE COURT:  Okay.  About the exhibits?
21               MS. HURST:  About these (indicating).
22               THE COURT:  Certainly.  Please.
23               MS. HURST:  Mr. Zeller pointed out that he feels
24   the dolls look very different.
25               I just want the court to note when it examines
0167
                            Page 69

111710DOC-02.txt

```
 1  these, along with the other materials, this animated four
 2  doll shot here, which has been referred to on Bratz
 3  products, as a Hero Shot.
 4              THE COURT:  Okay.
 5              MS. HURST:  And -- that's my first sentence.
 6              My second sentence:  Z.  Bratz with a Z.  And it
 7  was Brats with an "S" that was considered as one of the
 8  names for this (indicating) and they ultimately chose --
 9              THE COURT:  On One and Two.
10              MS. HURST:  Right.
11              THE COURT:  Could you take the "58" off.  It's
12  confusing.
13              On One and Two, you will be referring to.
14              Okay.  Now, let's do this.  Remember from my
15  position as a judge, I'm a captive audience.  So when you
16  hold up an exhibit, I can't think quickly enough of what's
17  been lodged and what hasn't.  You catch me at a disadvantage
18  and then you destroy a good record, because I've got to
19  create that for the circuit.  So what's unfair -- and I'm
20  not whining about that -- to a court is, is I try to create
21  the courtesy of a good record.  When you held up your two
22  dolls, I don't know if they're lodged or not.  I just
23  assumed in good faith because there's no objection that they
24  were.
25              And when you hold up your dolls, which was quite a
0168
 1  sight, I don't know that if they're lodged or not.  And then
 2  when we get into that kind of silly dispute, trust me --
 3              Now, I'll put this on the record.  Bring your
 4  sleeping bags.  When you leave tonight, I've got a patent
 5  case back here, okay?
 6              I love patent law.  I can spend until 3:00 or
 7  4:00 o'clock in the morning.  I really can.  And you are
 8  going to pack in the time here, unless you get to a working
 9  relationship, and you are going to crack.  And I don't care,
10  okay?
11              So it will take about -- you'll last, you two, six
12  days, maybe eight.  No, sit down.
13              You might make it 10.  Now, here's the problem,
14  and you will hear this infamous story, and I'm threatening,
15  I'm just telling you to guard yourself over the silly things
16  and get involved in the important things.
17              Microsoft came in here with a whole bevy with
18  attorneys, with no marked depos, et cetera, and they thought
19  on Monday at 4:00 o'clock that they were going to snow us
20  and they wanted to continuance, and they just kept producing
21  stuff.
22              We run the record -- well, you weren't with me.
23  Debbie and Jane, 1:30.  We would have gone to 4:00 o'clock.
24  In fact, they would have had five minutes to brush their
25  teeth and comb their hair when the jury was coming in on
0169
 1  Tuesday.
 2              If you can you get me focused on the important
 3  things, I'm going to work with you and pay attention.  This
 4  stuff, no.  We're all done with that.  We're all done with
 5  that.  That came during your discovery.
 6              But if you want to do that, that's fine.  I'm at
 7  your disposal.  We'll play the game.
 8              So I want to compliment you on the record on this
 9  very wise compromise you've worked out as esteemed counsel.
10              You've been very courteous to the court.  It's
11  greatly appreciated.
```

                                111710DOC-02.txt
12                Good night.
13           (At 11:03 p.m., proceedings were adjourned.)
14
15                               -oOo-
16
17
18
19
20
21
22
23
24
25
0170
 1                            CERTIFICATE
 2           I hereby certify that pursuant to Section 753,
 3  Title 28, United States Code, the foregoing is a true and
 4  correct transcript of the stenographically reported
 5  proceedings held in the above-entitled matter and that the
 6  transcript page format is in conformance with the
 7  regulations of the Judicial Conference of the United States.
 8
 9  Date:  November 24, 2010
10
11
12                            _____
13                            Deborah D. Parker, Official Reporter
14
15
16
17
18
19
20
21
22
23
24
25