1              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
2                   EASTERN DIVISION

3    HON. STEPHEN G. LARSON, U.S. DISTRICT JUDGE PRESIDING

4

5    MATTEL, INC.

6                    Plaintiff,

7          vs.                    CASE NO. CV 04-09049 SGL

8    MGA ENTERTAINMENT, INC.,

9                    Defendant.

10

11

12                    DATE:   June 15, 2009

13                    TIME:   2:00 P.M.

14                    PLACE:  United States Courthouse
                              3470 12th Street
15                            Riverside, CA

16

17

18

19

20

21

22

23                    GARY D. GEORGE, RPR
24              170 N. Via Las Palmas Unit 1
                  Palm Springs, CA 92262
25                    (760) 699-5039

```
 1   APPEARANCES:

 2                        QUINN EMANUEL URQUHART OLIVER
                          & HEDGES
 3                        By:  John Quinn, Esq.
                               Michael T. Zeller, Esq.
 4                             Dylan Proctor, Esq.
                          865 S. Figueroa Street
 5                        10th Floor
                          Los Angeles, CA 90017
 6                        (213) 443-3180

 7                        On behalf of the Plaintiff;

 8
                          SKADDEN, ARPS, SLATE, MEAGHER
 9                        & FLOM LLP
                          By:  Jason D. Russell, Esq.
10                             Jennifer del Castillo, Esq.
                          300 South Grand Avenue
11                        Los Angeles, CA 90071
                          (213) 687-5328
12
                          On behalf of the Defendant.
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2

 3         THE DEPUTY CLERK:  Calling Item Number 18 on the

 4   calendar.  CV 04-09049 SGL.  Mattel, Incorporated vs. MGA

 5   Entertainment, Incorporated.

 6         Counsel, please come forward and state your

 7   appearances for the record.

 8         MR. RUSSELL:  Good afternoon, Your Honor.

 9         Jason Russell and Jennifer del Castillo for the MGA

10   parties.

11         THE COURT:  Counsel.

12         MR. QUINN:  Good morning, Your Honor.

13         John Quinn, Mike Zeller and Dylan Proctor for Mattel.

14         THE COURT:  Good afternoon.  Good afternoon to you

15   all.

16         Counsel, we are on calendar this afternoon on our

17   hearing the Court scheduled as a follow-up to some briefing

18   that you did related to the Court's injunctive relief and

19   specifically related to the accounting that must be done for

20   the period of time at which we find ourselves in.  What I want

21   to do is find that period of time and also and more importantly

22   I think provide definitive guidance to MGA for what they must

23   account as well as not only MGA but the monetary the Court has

24   appointed in this case so that we are all on the same sheet.

25         The Court has tried to be as specific as it can in its
```

4

1    orders but I recognize that more specificity is needed I think

2    to make sure that everyone has sufficient guidance for

3    accounting.

4           There is basically three areas I wanted to have

5    addressed this afternoon.  First of all is the beginning date

6    Mattel urges or April 29 as MGA urges or some date in between

7    through the present.  So that's the first issue.

8           I think a second issue has to deal with the burden of

9    proof.  Mattel suggested that burden of proof for the gross

10   revenues is initially with them and then it shifts to the

11   defense for purposes of reductions from the gross revenues.

12   And related to that is whether or not there is, in fact, a need

13   for an evidentiary hearing on this as urged by; MGA and if so,

14   what that evidentiary hearing would involve.

15          And thirdly and perhaps most importantly is the scope

16   of the products to be included.  The core fashion dolls, the

17   female fashion dolls they set at one end of the spectrum as

18   clearly to be included.  The difficulty arises in those

19   products which bear the Bratz name.  Those products which bear

20   a version of the Heroshot, those products that bear the Jade

21   name, what to do with those products.

22          So we start with the gross revenue but where do we go

23   from there?  And that's what the Court has been struggling

24   with.  And I appreciate the briefing but frankly the fact that

25   I'm calling for a hearing indicates that briefing not

5

1    sufficient so I need more and that is where I'm at.

2         So Counsel.

3         MR. RUSSELL:  Your Honor, just one point of

4    clarification before we start and that is the opening brief

5    that MGA filed was not under seal but the remaining three

6    briefs by the parties were filed AEO in light of the Court's

7    concern with respect to the Durken report and the fact that we

8    are very likely to discuss or at least potentially to discuss

9    sensitive financial material.  So I wonder if it might not be

10   prudent, and I hate to ask this to cause us to sit here to the

11   end of the day, so that we could have a sealed courtroom for a

12   discussion of specific numbers because I don't think it

13   appropriate to make everyone else leave the courtroom for that

14   part of the process.

15        THE COURT:  So you are moving to place this under

16   seal?

17        MR. RUSSELL:  Yes, Your Honor.

18        I mean again since three of the four briefs were AEO

19   and I don't know that it's going to be easy to delineate during

20   the argument what is or isn't AEO.  If we are going to into any

21   specific numbers, whatever, and again our opening briefs didn't

22   do that, but if you wish to get into specific numbers then,

23   yes, we would like to seal for that purpose.

24        MR. QUINN:  Your Honor, if I may, from our standpoint

25   we don't see a need to get into specific numbers.  We think

1   this can be dealt with without doing that.

2        THE COURT:  That's my sense as well in setting this

3   hearing.  I guess I'm looking more for the legal arguments as

4   opposed to a disclosure of what those legal -- I mean they are

5   going to have consequences I understand that, and those will be

6   flushed out in the form of the reports that are generated by

7   MGA, by the monitor, and those I could certainly see placing

8   those under seal, but I think that the basic legal arguments

9   here is to what should or should not be included.

10        Now having said that, and this is something that we

11   will be taking up more on the July 6th hearing, I have

12   extraordinary sophisticated illegal counsel in front of me and

13   I know you are all capable either in front of me or at side bar

14   making an appropriate objection and seeking to place something

15   under seal.  And if I don't hear an objection I'm assuming that

16   there is no objection.  That's understood.

17        MR. RUSSELL:  I understand that, Your Honor, for

18   purposes of today, but again I think, and I would hate and I'm

19   sure Mr. Quinn would agree that the jumping up and down and

20   interrupting one another when I think Mr. Quinn is probably

21   correct we are unlikely to get into specifics but I did out of

22   concern for interrupting one another when I don't know and he

23   doesn't know how the evidence is going to go.  But I don't have

24   a problem if doesn't.  I'm prepared to object.

25        THE COURT:  Don't hesitate to interrupt, Counsel.

7

1          MR. RUSSELL:  Thank you, Your Honor.

2          THE COURT:  Very well.

3          With that understanding in mind let's proceed.  I

4   don't have a whole lot of time but I did want to hear from you

5   because I have some fairly direct questions and like I say I

6   have a pretty clear understanding of what's -- I'm not saying

7   that there is nothing that's not in dispute, but it's really

8   how to deal with these products, the bridges that is the

9   biggest struggle for the Court and then, of course, there is

10  the issue of timing and burden of proof.

11         MR. RUSSELL:  Well, I mean again, Your Honor, I can

12  take them in any order you like but if we are talking about the

13  scope of the products I take it from the fact the Court is

14  struggling that at least except with Bratz the Court is not in

15  accord with the approach that MGA has which is to say it's

16  difficult in the absence of a specific record what the jury did

17  or didn't find infringing to say what would fall within the

18  scope of profit that should be escrowed.

19         We have attempted to give the best I think estimate

20  that we can by saying, well, this is what the jury found to be

21  infringing out of the universe of Bratz products.  And we cited

22  some cases, the Oscar Mayer case, the Aero case and the Hynix

23  case which apply mathematical extractions from what the jury

24  did to the total revenues to come forward with what is, in

25  essence, a royalty and we would submit that that's the

8

1    appropriate course to take here.

2          THE COURT:  If all we had was the jury verdict and not

3    the Court's order -- December 3rd order I suppose we might be

4    in a different universe but we are not.

5          MR. RUSSELL:  I understand that, Your Honor.

6          Maybe I need a little clarification because the jury's

7    verdict is the only thing, including the Court's order, that

8    speaks to what it is that Mattel owns.  I mean I guess the

9    constructive trust adds the name admittedly, but the injunction

10   does not change the scope of what it is that Mattel owns.  It

11   does prevent MGA from -- when the order becomes enforceable

12   from selling and profiting from --

13         THE COURT:  More than that.  The constructive trust

14   basically makes a finding that MGA is holding as a constructive

15   trust for Mattel proceeds related to, for example, the Bratz

16   name.

17         MR. RUSSELL:  I understand that, Your Honor, but again

18   we still go back to the fact that the Bratz name is almost

19   problematic.  I think everybody is struggling with that because

20   Mattel did not assert a trademark claim.  And to the extent

21   that there was value in the name they got it previously and

22   they've made no showing now with respect to what --

23         THE COURT:  They could have asserted a trademark name

24   because that could have easily been defeated.  The Court

25   understands that because they were not using the trademark.

1    They were not using in the public.  It was, as the jury found,

2    stolen from Mattel's property.  As a result MGA trademarked

3    Bratz and MGA was using it.  What the Court has found is during

4    that entire period that MGA used it in light of the jurors

5    finding and the Court's finding all profits attributed to the

6    use of that name were held in constructive trust for Mattel.

7              Up to the jury verdict we have a number, but what we

8    are now trying to determine is from some point, whether that be

9    the 1st of July or some other date going forward, how does the

10   Court instruct MGA and how does the Court instruct the monitor

11   as to what that number or what that percentage, what it should

12   be for again the nonfemale fashion doll that bear for example

13   Bratz, that bear Jade, the Heroshop.

14             MR. RUSSELL:  And again, Your honor, our brief tried

15   to deal with this issue by saying -- acknowledging they don't

16   have a trademark claim and acknowledging the difficulties.  And

17   the constructive trust, the Court thinks that under law the

18   constructive trust remedy necessarily capture the benefit to

19   MGA from the use of those trademarks and were awarded by the

20   jury going backwards.  But going forward you can take the same

21   mathematical extraction and apply it so that you capture both

22   the copyright number and the trademark using the remaining tort

23   claims.  And we gave you the percentage in our brief that we

24   think could be used.  And again I think that overstates it, but

25   it could be used and that's the range that you are going to go

1    with just the copyright profits you've got one number.  If you

2    are going to say the trademark -- a hundred percent of the

3    trademark goes to them you've got another number.  But we've

4    given you what we think is the range.

5           The only alternative, Your Honor, and this goes to the

6    evidentiary hearing point that we make, if Your Honor concluded

7    that don't want to follow the extraction principles in Aero,

8    Oscar Mayer and Hynix then unfortunately we may have to repeat

9    the apportionment analysis using the numbers that my

10   understanding are either finalized or being given to the

11   monitor now but the universe of Bratz profits.

12          THE COURT:  Would it be the same evidence,

13   Mr. Russell, or would it be new evidence?

14          MR. RUSSELL:  Well, it would be different because as

15   Mattel notes in its brief and frankly we would concede, the mix

16   of product is different now than it was before.  I mean there

17   are some products that are the same.  There is some new

18   products and unfortunately you've got to apply a new

19   apportionment analysis to those specific products, that

20   specific profit bucket if you will to come up with a number.

21   And that has been our difficulty is given the financial

22   constraints for MGA we don't think it's necessary, but

23   certainly would be expensive, we would prefer to avoid that if

24   it's possible, but that's what would have to occur.  First you

25   have to get what are the profits from the entirety of Bratz and

1    then do an apportionment analysis.

2           And of course our position is, and the Court we submit

3    should agree, Mattel still has the burden at the threshold of

4    showing that the new products are infringing.  So they still

5    have a causal burden and once they meet that then we would do

6    our apportionment analysis and that is what we intended when we

7    put that footnote in for Your Honor.

8           THE COURT:  And you agree that burden, assuming that

9    the first is met, then falls to MGA?

10          MR. RUSSELL:  Correct.

11          THE COURT:  Okay.  Very well.

12          MR. RUSSELL:  So that deals with the burden of proof

13   issue.  And I thought we sort of agreed to that at trial, yes.

14          THE COURT:  Anything further on the start date?

15          MR. RUSSELL:  I think we have worked it out as well as

16   we can in the briefs.

17          I will be happy to answer questions for Your Honor but

18   I don't want to belabor it.

19          THE COURT:  Very well.

20          Mr. Quinn.

21          MR. QUINN:  Thank you, Your Honor.

22          As we said in our papers, Your Honor, we don't think

23   the Court needs to get into an analysis as to what ultimately

24   are the profits that should ultimately be awarded now.

25          The question now is what should be placed in escrow to

1   make sure that at the end of the day when the time comes the

2   money is there.  And under both copyright law and trademark law

3   it's pretty clear that it's our burden to prove the gross when

4   it comes time to do that and the defendant's burden to prove

5   any deductions from that.

6           THE COURT:  That creates this --

7           I guess I don't like the idea of waiting until

8   sometime at the end of the day to then go back and

9   recalculate.

10          What you are suggesting is that I just take

11  everything, throw it into escrow and I guess then after the

12  2009 season has fully played out that we then look back and

13  conduct a determination -- a hearing or something to figure out

14  how much of that goes to Mattel and how much of that stays with

15  MGA.  Is that what you're saying?

16          MR. QUINN:  Yes, Your Honor.

17          And we don't really have a choice at this point

18  because MGA did not come forward with any proof on deductions.

19  And they didn't come forward with any evidence concerning

20  indirect costs, overhead costs, direct costs.  There is nothing

21  before the Court.  All that the Court has is whatever the gross

22  sales are going to be.

23          So I don't see any alternative at this point in trying

24  to frame what is going to be placed in escrow going forward.

25          THE COURT:  It would be much more I suppose -- I

1   suppose I'm concerned about the impact that has on MGA as a

2   company -- as a going concern because we are talking about

3   taking money that at least with respect to some of these

4   products one can envision that not all of it would go to

5   Mattel.  Fair enough?

6          MR. QUINN:  Direct costs.  If they prove the direct

7   costs that's a legitimate deduction.

8          THE COURT:  Right.

9          At a minimum there is going to be direct costs and

10  arguably there may be more than direct costs.

11         So if we are conceding going in that there is going to

12  be some money which by right is going to go back to MGA to tie

13  up everything between now and January, 2010 or February, 2010,

14  whenever that plays out seems inequitable.

15         MR. QUINN:  Your Honor, we are looking -- we are

16  talking about a fairly much more limited array of products at

17  this point.  We've submitted to the Court some information

18  concerning MGA's present line list and the Bratz products being

19  sold now are -- and frankly there is just a handful of them.

20  There isn't the hundreds of different products that we were

21  concerned about and that we looked about during the trial.  But

22  in terms of the equities and the Court here is sitting in part

23  as the chancellor talking about an accounting where there is a

24  constructive trust, these folks are continuing to sell Bratz

25  labeled merchandise and dolls long after there has been a jury

1    verdict of infringement.

2          Now they make an argument that because there was a

3    stay, at least up until the time of the stay -- you know until

4    the stay was lifted that is an evidence of willfulness.  I

5    submit there they are confusing two different concepts.  They

6    weren't in contempt but they certainly knew that there had been

7    a finding of infringement and they continued to sell.

8          So in terms of assessing the equities what do we do

9    here given that their intent, as Mr. Larian said they are going

10   to continue to sell Bratz product even after the results of the

11   first trial, I don't think it's unfair when they haven't come

12   forward with any evidence concerning what their direct costs

13   are to say that all that money for now must be put into

14   escrow.  In fact, as I read their brief they said, "We can't

15   tell you what the direct costs are.  We don't know what the

16   costs are direct or indirect."  I mean that's the situation

17   that we find ourselves in.

18         THE COURT:  Why should I not use and take on

19   Mr. Russell's his invitation that in the absence of that that

20   we use this analysis based on the jurors finding of damages

21   vis-a-vis the earlier products and an apply that?

22         MR. QUINN:  Well, I mean completely we went through --

23   that's an issue that we went through at some length, Your

24   Honor, in the post trial briefing and the arguments before Your

25   Honor.  As the Court pointed out that's pretty much water under

15

1     the bridge.  Nobody could tell us what that verdict on

2     infringement means.  As we said that might have been the jury

3     reacting to their having -- Mr. Kennedy having blurted out the

4     concept there was an injunction.  Their having introduced

5     evidence that MGA couldn't survive as a company.  There is no

6     way --

7           I mean they offered various explanations for what that

8     $10,000,000 represented.  Either it was at various times we

9     heard the first generation Bratz dolls or maybe the jury found

10    some small amount infringement in all the dolls.  The fact of

11    the matter is nobody will ever know what that number came

12    from.

13          And this Court sitting as a Court in equity doing the

14    analysis on the injunction motion made its own determination

15    that these products are infringing.  They are not entitled to

16    continue to sell those products.  And if they are going to do

17    it at the end of this year for reasons that we all know and

18    have discussed it's not inequitable to require that that money

19    be escrowed, especially given the questions that have been

20    raised concerning MGA's handling of its own finances.  And I

21    will just leave it at that.  I won't characterize it.

22    The Court knows what I'm referring to.

23          THE COURT:  And the Court is satisfied with the

24    current arrangement with the monitor in place.  That's not a

25    matter of, at least with respect to the Bratz property which is

16

1   the only concern of the Court at this point in time, that an

2   accurate accounting will and can take place.  It's just I need

3   to be able to give that guidance to the monitor and to MGA as

4   to what is it they need to be placing into that escrow account

5   and I just remain troubled with this notion of saying that they

6   have to include money and the costs in that.

7           And your point is well taken.  I don't have the

8   evidence before me right now but perhaps that's the calculus.

9   There is at least that.  There is at least the direct costs.

10  And assuming that number can be ascertained and confirmed by

11  the monitor as a Court in equity I'm reluctant to say that that

12  has to be set aside until January or February of 2010 whenever

13  we get around to us with making the final inventory or

14  accounting for the season.

15          MR. QUINN:  Your Honor, I would just say that it's

16  MGA's decision.  There is no one with a gun to their head

17  forcing them to continue to sell Bratz branded products.  It's

18  their decision in the face of all that's gone before us to

19  continue doing that.  They've got the jury verdict.  They have

20  this Court's ruling all staring them in the face.  In the face

21  of that if they want to keep selling.  That's their decision.

22          THE COURT:  And you are entitled to those profits.

23          MR. QUINN:  And they have not come forward.

24          The reason we don't have any up to date information

25  about what their costs are, which again everybody agrees is,

1   you know, should be deducted and it's their burden of proof is

2   because they say, "We can't it do it.  We don't know."

3          They could have -- presumably if it were possible to

4   do they would have submitted something to the Court today

5   saying, "You know our costs of goods sold for these products is

6   X."  But we find ourselves in a situation where we don't have

7   that information.  I would say at least for now until some

8   showing is made, Your Honor, that the escrow should be the

9   entirety of gross revenues received for sales of Bratz branded

10  products.

11         In terms of the start date, Your Honor, July 1 is the

12  date that we think is appropriate and that's because that is

13  the last date on which they gave us any profits information.

14  So it's got to be --  There was nothing before the jury after

15  July 1 because they hadn't provided that information.  We

16  submit that should be the start date for this escrowing

17  exercise.

18         THE COURT:  Thank you, Counsel.

19         Mr. Russell, please.

20         MR. RUSSELL:  Thank you.

21         First I just want to take up something Mr. Quinn said.

22  He said there is not a gun to MGA's head to sell Bratz.  In

23  fact there is a double barrel shotgun to sell the Bratz.

24  Mattel has stood before this court and told not only you but

25  the Ninth Circuit that they are prepared, ready, willing and

18

1   able to sell Bratz unless we leave it irrevocably damaged.  We

2   have no choice as the carekeepers of Bratz until it's turned

3   over to them to sell.  I mean that's one of the reasons why --

4        THE COURT:  Wait a second.  You could turn it over

5   today and just say, "Here."

6        MR. RUSSELL:  Well, they have said they are able to.

7   We all agree, I think everyone can agree that if the Bratz

8   brand leaves the shelves the brand is dead.  There is

9   undisputed evidence on that point.  Mattel has conceded as

10  much.  Your Honor asked them at the last hearing, "Are you in a

11  position to sell Bratz right now?"  And you said, "I understand

12  if you can't," and the answer back from Mr. Zeller after a lot

13  of dogged pursuing was, "We are not ready, willing and able

14  right now to do so."

15       So the choices are primary.  Either it's off the shelf

16  and the brand is dead and then we'll have Mattel saying,

17  "You've killed the brand and cost us this money," or we are in

18  a position where we must sell until such time as they are able

19  to pick up and sell the brand.  Those are our choices.

20       And under the circumstances since it's MGA's position

21  --

22       THE COURT:  Or in any event mind you -- I mean I've

23  tried to make this clear and let me make it clear again this

24  stay concerning the 2009 line ends January 21, 2010.

25       MR. RUSSELL:  I understand that, Your Honor

1    And if at that point they choose not to put products

2    on the shelves, that's what they do.  Now, of course, as Your

3    Honor knows this is the basis for our stay petition, MGA would,

4    of course, like to continue to sell Bratz.  They would like to

5    have ownership revested in them.

6        THE COURT:  The stay petitions have been considered by

7    this Court and the Ninth Circuit.

8        MR. RUSSELL:  I understand, Your Honor.

9        THE COURT:  Unless the Supreme Court is going to give

10   you a stay at this point we are done with that.

11       MR. RUSSELL:  I only raised that for the point, Your

12   Honor, that we are in a place where if there are to be -- if

13   there is to be a Bratz brand there must be someone selling it.

14   Mattel has taken a position that requires us we believe to sell

15   until the stay expires lest we face some claim by Mattel.

16       THE COURT:  Well, and to be clear also on that point I

17   did receive some notice from the monitor of a request to

18   hold --  Anything that the Court has in its possession, of

19   course, is available upon request through the monitor and

20   that's how we are facilitating that kind of transaction.

21       I also anticipate in imposing the monitor that a

22   monitor will facilitate communications between MGA and Mattel

23   to enact the court's -- during this transitionary phase.  I

24   really leave that up to the sophisticated counsel and

25   sophisticated business officials involved in this.  I'm hoping

1    the Court does not have to micro manage that.

2         MR. RUSSELL:  Certainly, Your Honor, we will do our

3    best to work with the monitor and with Mattel's counsel as

4    always.

5         The second point I wanted to raise for Your Honor was

6    Mr. Quinn is not correct when he tells you that there is no

7    evidence before Your Honor with respect to apportionment.  We

8    specifically laid forth as an alternative to the jury

9    extraction numbers our apportionment analysis from trial.  We

10   pointed out given the exigent time circumstances imposed by the

11   Court's briefing schedule of course it was not possible for two

12   reasons.

13        First, MGA does not account for its profits on a

14   monthly basis and we explained that not only during trial but

15   in our briefs.  So there is time required to create the actual

16   numbers.  That's being done now in conjunction with the

17   monitor.  Those numbers just simply weren't available.  My

18   answer is they are either now available or imminently will be,

19   those numbers are what the experts will have to look at.

20   But if we want to take the position of apportionment based on

21   the trial record is appropriate, and again it's an alternative,

22   we can concede that is fine, then Your Honor has all the

23   evidence it needs for purposes of apportionment including

24   costs.

25        The one component that's missing that Mr. Quinn hints

1    at is their briefs make the argument that it should only be

2    direct costs of sales as opposed to overhead essentially

3    awarding themselves to one issue they lost at trial willful

4    infringement.  And again, Your Honor, they don't have a single

5    case that says it's willful in our circumstances.

6              THE COURT:  Well, let me ask you this though because I

7    understand your point on the overhead, how would this Court

8    calculate the overhead attributable to the Bratz line as it

9    currently exists as opposed to how it did exist?

10             MR. RUSSELL:  Well, I mean I think this one will

11   require much more nuance analysis and probably working with the

12   monitor.  If Your Honor agrees that some of the overhead

13   expenses and the operating expenses are appropriate and we

14   think given the lack of a willful infringement finding that is

15   appropriate, then we are prepared to give the universe of

16   numbers to the monitor, and ultimately I guess they will go to

17   Mattel, and we can fight before Your Honor about what numbers

18   are appropriately allocated.

19             But, for example it's hard to imagine that direct

20   marketing costs, which are a direct cost of producing the

21   goods, that those shouldn't be charged against the profits.  If

22   you have millions of dollars of advertising why should Mattel

23   not pay for that since they are getting the benefits of it?

24             THE COURT:  Are there direct marketing costs being

25   incurred presently?

1           MR. RUSSELL:  Yes, Your Honor, there are.

2           THE COURT:  So there is advertising for Bratz going

3    on?

4           MR. RUSSELL:  That is my understanding, Your Honor.

5           And there are other costs.  There is shipping costs

6    beyond just the direct from Hong Kong to the United States,

7    which I would consider a direct cost of sale, but there are

8    from MGA facilities to various locations.  There are all kinds

9    of costs.  There is also the cost of maintaining the brand that

10   the trademark and the copyright against infringing action those

11   are costs that are in Mattel's interest that MGA is currently

12   incurring but not direct cost of sale, but they are certainly

13   appropriate to deduct from profits because Mattel is getting

14   the benefit of those expenditures and they should certainly pay

15   for them.

16          So I think Your Honor is going to have to in our view

17   rule on this argument that Mattel is trying make that they are

18   entitled to a willful infringement finding.  I don't see how

19   they could be given the jury finding and given this tension

20   that we have here between allowing the brand to go dead on the

21   one hand and Mattel's stated desire on the other to produce the

22   brand.  I mean how can it be willful under those

23   circumstances?  I submit it cannot.

24          And I will just go back to the last one which is --

25          THE COURT:  One alternative to all of that is to delay

1   and tell everybody what to do is say, "Fine.  We'll decide this

2   next February."

3        MR. RUSSELL:  Well, and the difficulty with that, Your

4   Honor touched on it, is that will wreak havoc on MGA at a

5   precarious point in time and there is really no justification

6   for that.

7        This isn't a situation where as their counsel painted

8   MGA has just gone out and said, "Forget the Court's orders.  We

9   don't care."  We have come back studiously and asked permission

10  and been given it.  And we do have this tension.  On the one

11  hand sure Mattel would love to go sell Bratz today but they

12  can't.  And we would love to get Bratz back but we can't.

13  We've got work together to do what you said, Your Honor, this

14  divorce.

15       And if we are lucky enough, if the Ninth Circuit does

16  what it does, then it's ours and if not it's theirs but at

17  least there is a brand on the shelves for consumers.  And why

18  should anybody be harming the retailers, distributors and most

19  important the children who are looking for this product to be

20  on the shelves in the intervening period?  Everybody knows

21  right now Bratz is going to be on the shelves until January 10,

22  2010.

23       THE COURT:  I understand.

24       MR. RUSSELL:  Thank you, Your Honor.

25       THE COURT:  Counsel, anything further?

1        MR. QUINN:  Your Honor, there is just simply no

2    evidence that there is any advertising being done on Bratz now.

3    I mean whatever evidence was introduced at trial that was the

4    old MGA where you had the old Bratz line.  Bratz is something

5    different now.  And we don't have any evidence that the brand

6    is being promoted.  All the suggestion is that the opposite

7    apparently is happening.

8            In terms of willfulness it was different.  The case

9    for willfulness was different before the verdict than what it

10   is now.  Now they have that verdict.  They are continuing to

11   sell.  They say that --  The suggestion is that they are

12   continuing to sell apparently as a favor to us.  That they have

13   to do it in order to preserve the brand and that we couldn't do

14   a line this fall.  Well, Your Honor, we wanted them to be

15   enjoined much sooner than they were the Court will recall.

16   They are the ones that fought to put that off for different

17   reasons at different times until finally the stay was lifted at

18   a point where, yes, at that point they were the only ones that

19   could do a fall line.  I mean if they had been enjoined last

20   December we could have done a fall line.  But we find ourselves

21   in this circumstance because of tactical decisions I submit

22   that MGA made.

23            In terms of apportionment again we don't think under

24   law any apportionment at all is appropriate, but whatever

25   showing was made regarding apportionment during the trial as to

1    the universe of Bratz products that existed then has no

2    application now as to this much more limited number of Bratz

3    products that apparently are being marketed.  We don't know

4    whether --

5          THE COURT:  I don't disagree with you, Mr. Quinn, but

6    then that begs the question of whether I should have this

7    evidentiary hearing that Mr. Russell made reference to.  I

8    agree with you on that point.

9          I am very disinclined to take the evidence of

10   apportionment from trial and take that circular peg and try to

11   put in a square hole now because I recognize, based on what

12   I've seen both under seal and out of seal, that it's different

13   and I'll leave it at that.

14         But I'm still not persuaded off the point that since

15   we all agree that some costs -- some money should not -- will

16   not ultimately be included in what is transferred from MGA to

17   Mattel that on a going forward basis we should try perhaps to

18   identify what that is so that we are not taking money that

19   should not be put aside.

20         MR. QUINN:  What I would suggest then, Your Honor, is

21   that we reschedule this for a couple weeks or whatever from now

22   and let them come forward with the evidence.  Let's see what

23   are the gross revenues?

24         What are the direct costs now specifically?

25         Maybe there needs to be a mechanism for us to ask them

1    to examine that in advance and then there is some record if the

2    Court feels uncomfortable escrowing the entire amount.

3          THE COURT:  We could use perhaps the June 22nd report

4    as a starting base so at least we have some real numbers.

5          MR. QUINN:  If we could have some mechanism where they

6    would make some disclosure to us as to what the costs are and

7    be prepared on some expedited basis to let us -- permit us to

8    look behind that, maybe with the assistance of the monitor,

9    then perhaps the Court could get some comfort as to what was

10   being escrowed does not include direct costs that might

11   ultimately be returned to MGA.

12         THE COURT:  I'm going to give you a chance to talk,

13   Mr. Russell.

14         And that deals --

15         We still have this larger scope issue.

16         MR. QUINN:  The larger scope, Your Honor?

17         THE COURT:  Right, the larger scope.  I mean beyond

18   the female fashion dolls.

19         MR. QUINN:  It uses the Bratz name, Your Honor.

20         THE COURT:  I understand that.

21         I gather from your papers you are suggesting at the

22   end of the day -- the end of the season, come next spring we

23   are going to have to some hearing where it's just going to be

24   easier done or more readily done with respect to the facts

25   involved, but with respect to these other products there is

1    going to have to be some assessment made as to what is the

2    equitable amount from those products that get transferred.

3              MR. QUINN:  Well, I think that's a straight forward --

4    I think that's a straight forward issue of trademark law, Your

5    Honor.  If you use somebody else's trademark you are liable for

6    profits.

7              The analysis is the same.  Is it willful or not

8    willful?

9              The only difference is do you get to deduct the

10   overhead and the taxes if it's innocent?

11             By definition we submit right now they can't make

12   innocent infringing sale of products with the Bratz name on

13   it.

14             THE COURT:  Right.

15             Mr. Russell.

16             MR. RUSSELL:   Well, first, Your Honor, I think it

17   might make sense to get some guidance from you in terms of this

18   willfulness issue.  Because if you are not going accept any

19   operating expenses at all then what the monitor and MGA are

20   working on is completely irrelevant.  I mean you are only going

21   to have direct cost of goods.  Right now I think part of what

22   is being done are the operating expenses.

23             What I would submit makes some sense is let's -- I

24   think June 22nd is the date for the monitor to submit, at some

25   point thereafter allow the parties to -- we share it with

1   Mattel and Mattel can comment and the parties could brief and

2   then the parties can focus in on rather than having an open

3   ended trial on the costs.

4        If Your Honor says, "Yes, operating expenses are

5   allowed and these categories are allowed," then what happens is

6   the monitor is in a perfect position to assess for Your Honor

7   the legitimacy of those costs.  And if we can have an

8   evidentiary hearing and if there truly is a question I don't

9   see any evidence of advertising and so on but we could limit

10  the scope.  I don't think it makes sense to rely on --

11       THE COURT:  So you think the Court can then provide

12  the guidance, have the reports come out, try to work it out and

13  if there is a dispute then have a hearing?

14       MR. RUSSELL:  Yes.  I mean I'm assuming that, yes.

15       The cost of goods I think there is not going to be

16  that much dispute.  I think what's in the vernacular referred

17  to as the gross margin is something that Mattel is familiar

18  with, but the numbers aren't going to be surprising.  The

19  surprise is going to be in the operating expenses and the

20  allocation there.

21       THE COURT:  Whether included or not?

22       MR. RUSSELL:  Correct.

23       And at the macro level that issue has been briefed for

24  Your Honor, and we submit it we are entitled to it and they

25  submit we are not.  Once that's done then you are down to the

1    micro.  They are saying there is not evidence.  We are happy to

2    put it on, but I'm not sure given the number --

3            THE COURT:  It's going to be disputed.

4            MR. RUSSELL:  It's going to be disputed.

5            Maybe it will.  But we've got the monitor to assist.

6    And it seems though somebody could brief, focus the issue for

7    the Court and deal with it.

8            THE COURT:  And Court also needs to be apprised on a

9    beginning date.  Burden of proof --

10           MR. RUSSELL:  Right.

11           And there is one offer I want to make on the jury

12   number.  Mr. Quinn tells you that it's water under the bridge.

13   It's a different analysis.  And with respect to what I will

14   call the percentage it's just not true.  We do know with

15   precision what the jury found was infringing.  It's not

16   speculation to say that the jury followed the jury instructions

17   and the jury form.  They were ordered to award all profits and

18   all benefit of every kind to MGA and that's what the entire

19   case was about.  That's what the instructions said.  That's

20   what the verdict form said.  We are not speculating to say what

21   percentage of total revenues and profits were awarded by the

22   jury to Mattel.  I mean the only question --

23           THE COURT:  The Court has spoken to its view of

24   voluntary recission and I'm not going to go any further at this

25   time.

1        MR. RUSSELL:  Fair enough, Your Honor.  Thank you.

2        THE COURT:  Thank you.

3        MR. QUINN:  Your Honor, if the Court --

4        We have keyed up now before the Court as an issue of

5    law as to the willfulness issue and I think the Court has what

6    it needs in order to decide what is deductible.  If the Court

7    made a ruling on that then I think with the help of the Master

8    we could straighten it out.

9        THE COURT:  That's what Mr. Russell is saying as well.

10   I think that makes a lot of sense.

11       This is very helpful to the Court this afternoon,

12   Counsel.  As always I appreciate your advice.  And the Court

13   will try to get something out definitely before June 22nd so

14   that we can have some guidance.  If I push it to close to the

15   22nd and you need a few days I know that the monitor will seek

16   relief from the Court as needed.

17       Thank you all.

18       (Whereupon, the hearing was adjourned.)

19

20

21

22

23

24

25              C E R T I F I C A T E

1

2          I hereby certify that pursuant to Section 753, Title

3    28, United States Code, the foregoing is a true and correct

4    transcript of the stenographically reported proceedings held in

5    the above-entitled matter and that the transcript page format

6    is in conformance with the regulations of the Judicial

7    Conference of the United States.

8

9    Dated: June 17, 2009

10

11                                   /s/ _____
                                     GARY D. GEORGE, RPR
12                                   Contract Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25