1                 UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
2

3           THE HONORABLE STEPHEN G. LARSON
        UNITED STATES DISTRICT JUDGE PRESIDING
4

5

6   MATTEL, INC.,

7            Plaintiff,

8       vs.                Case No. CV04-09049-SGL

9   MGA ENTERTAINMENT, INC.,
   and related actions and
10  consolidated with CV04-9059
   and CV05-2727,
11

12           Defendants.

13

14           DATE:  June 23, 2008

15           TIME:  5:00 P.M.

16           PLACE:  United States Courthouse
                  3470 12th Street
17                  Riverside, California

18

19

20

21

22            GARY D. GEORGE, RPR
           Official Court Reporter
23          312 N. Spring Street
              Room 455
24         Los Angeles, CA 90012
           (213) 894-3539
25

1    APPEARANCES:

2

3                    QUINN EMANUEL
                    BY:  Jon Corey, Esq.
4                        B. Dylan Proctor, Esq.
                    865 S. Figueroa Street
5                    10th Floor
                    Los Angeles, CA 90017
6                    (213) 443-3000

7                    On behalf of the Plaintiff Mattel, Inc.

8

9                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                    BY:  Thomas J. Nolan, Esq.
10                        Lauren E. Eguiar, Esq.
                    Four Times Square
11                    New York, New York 10035-6522
                    (212) 735-3000

12
                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
13                    BY:  Robert J. Herrington, Esq.
                    300 South Grand Avenue
14                    Los Angeles, CA 90071
                    (213) 687-5368

15
                    On behalf of the Defendant MGS
16                    Entertainment.

17

18

19

20

21

22

23

24

25

3

1              P R O C E E D I N G S

2

3           THE DEPUTY CLERK:  Calling the matter in Item 18.

4           Mattel, Inc. vs. MGA Entertainment, Inc. Case

5    Number CV04-09049.

6           Will counsel please state your appearances.

7           MR. COREY:  Jon Corey and Dylan Proctor on behalf

8    of Mattel.

9           Good afternoon, Your Honor.

10          THE COURT:  Good afternoon, Counsel.

11          MR. NOLAN:  Good afternoon.

12          Tom Nolan, Lauren Aguiar and Robert Harrington.

13          THE COURT:  Good afternoon.

14          I apologize for the lateness of the day.  We are

15   just trying to get through everything.

16          There is a number of matters that the Court wanted

17   take up this afternoon.  There may be some additional

18   matters that the parties want to take up.

19          On my list is the Peter Marlow matter.  I received

20   an ex parte application as a follow-up on our conversation

21   the other day.

22          There is the expert witness Mr. Menz.

23          The Court is prepared to rule on Janet Bryant,

24   Jacqueline Prince and Jeanne Galvano, the three witnesses,

25   and that's what I have right now.

4

1          Are there any other issues that we need to take

2     up?

3               MR. HARRINGTON:  Richard Irmen.

4               THE COURT:  Anything else from Mattel?

5               MR. COREY:  No, Your Honor.

6               THE COURT:  Very well.

7               Why don't we just take them up in the order that we

8     have them here.

9               We'll start with Peter Marlow.  I received the

10    ex parte application.  I have not received an opposition.  I

11    know it's not enough time to file it but I'll give you a

12    chance to respond at this time.

13              MR. COREY:  Thank you, Your Honor, but I think the

14    bottom line on this is the ex parte application is really

15    just an application to reconsider.

16              The rulings that the Court made on motion in limine

17    number 6, I don't know if the Court recalls issue.

18              THE COURT:  It's motions in limine five and number

19    six.

20              MR. CORREC:  Correct.

21              And I don't think we need to go much beyond that.

22              THE COURT:  Well, these are my thoughts.  You are

23    correct the Court ruled the exhibit is in evidence, correct,

24    the e-mail from --

25              MR. COREY:  The e-mail is in, that's correct, Your

1    Honor.

2         THE COURT:  Between Marlow and Garcia and Mr. Isaac

3    Larian a copy.  That's already into evidence.

4         MR. COREY:  Correct.

5         THE COURT:  From your perspective what precisely

6    has Peter Marlow testified to that's evidence of this

7    pattern?

8         MR. COREY:  Peter Marlow, I don't know if the Court

9    recalls the invoices that Veronica Marlow submitted that

10   identifies the samples makers and the 80 or so hours.  Peter

11   Marlow is the person who put that invoice together and one

12   of the things that he will testify to is, and we anticipate

13   bringing into the evidence with him, is the time sheets

14   showing that the specific individuals were Mattel employees'

15   recorded time just prior to the time that Carter Bryant left

16   Mattel and they were actually working on Bryant's product at

17   the time MGA left Mattell or excuse me by the time Carter

18   Bryant left Mattel.

19        Those are not in evidence.  Peter Marlow would be

20   our vehicle to get those type of documents in evidence.

21        THE COURT:  So those are the time sheets and that

22   was during the relevant time period?

23        MR. COREY:  That's correct, Your Honor.

24        THE COURT:  What else?

25        MR. COREY:  Well, I think the bigger picture on

6

1    this it's going to go to guilty knowledge of concealment and

2    we've plowed this ground a number of times and I think that

3    was the basis for the Court's ruling on the motion in

4    limine.

5         What I perceive in MGA's motion is they are saying,

6    "Well, he's disclaiming knowledge of -- MGA's knowledge of

7    the fact that these people were doing this."  And it may

8    very well be that is the testimony that he will give when he

9    is on the stand.

10        But the reason we are here having a trial is so

11   that jury can decide whether he is, in fact, telling the

12   truth, whether that's credible in light of some of the other

13   documentary evidence and some of the other evidence that

14   they heard in this trial.

15        THE COURT:  Very well.

16        Anything further from MGA on this?

17        Ms. Aguiar.

18        MS. AGUIAR:  Your Honor, the e-mail which is trial

19   Exhibit 13223 is in evidence.  It was in evidence in heavily

20   redacted format and obviously just for credibility, not for

21   any other reason as I understand it.

22        With regard to the time sheets that Mr. Marlow

23   would get in showing work I have two things to that say

24   about that.  First of all, Mr. Corey said Mattel employees,

25   plural.  That's not correct.  It was at most one employee.

1    I don't know -- I don't want to bicker over whether it was

2    or two, but it definitely was only one.

3          And I don't believe that in this part of the case

4    that whether there is a document showing that someone was

5    working for the Marlows has any relevance.  The issue here

6    is did MGA know of this?

7          THE COURT:  I agree with that.

8          MS. AGUIAR:  And I think that it's not a question

9    of coming in here and assessing Mr. Marlow's credibility.

10   Mr. Marlow's credibility is not at issue, number one.

11         Number two, his testimony is completely consistent

12   with the other people who gave were deposition testimony,

13   namely Veronica Marlow his wife, who said she never told

14   MGA, and Ms. Salazar who is their sort of inferential

15   witness that maybe sometime in 2003 MGA knew, but

16   Ms. Salazar at her deposition said they never knew.

17         So I guess my point is we are talking about a

18   nonparty.  We are talking about there is no dispute in the

19   record as to what his testimony is and that is MGA didn't

20   know.  MGA says it didn't know.  He says they didn't know.

21   And the two other witnesses who have given testimony on this

22   subject also say MGA didn't know.

23         THE COURT:  What do I do with the statement that he

24   did know.  He did tell them?

25         MS. AGUIAR:  Well, if you look at that testimony

8

1    though it's a very --

2          THE COURT:  I've looked at it.

3          MS. AGUIAR:  I appreciate it.  I'm sorry.  I'm sure

4    that you have.

5          But the way the question is worded in his

6    deposition he says yes, but you have to follow on through

7    the rest of the testimony on that point because my position

8    would be, first of all, he says he didn't say it.  He says

9    maybe, maybe his wife did.  So that's hearsay.  Okay.

10         So we are talking about what evidence can come in

11   through Mr. Marlow that's admissible evidence.  And the only

12   thing he would have to offer at best is speculation, which

13   would be one of my objections, and hearsay which would be my

14   other objection.  Possibly best evidence because his wife is

15   not the one being called to the stand, and Your Honor has

16   the deposition transcripts of his wife and of the employee

17   in question who both say MGA never knew.  And then you read

18   two pages or four pages later in the same transcript when

19   they ask him a much more specific finer point question, "Did

20   you ever tell MGA, not just that you have this person

21   working for you, but simultaneously they were working for

22   Mattel and for you?"

23         And his answer is pretty categorical, "No."

24         And he gave that testimony later on in the same

25   deposition and he give that testimony at his second

9

1    deposition.

2          So I just think the question is whether there is

3    any admissible evidence that could come in and I think

4    through Mr. Marlow that is not the case.

5          Mr. Corey said that -- I think toward the end of

6    his remarks he said something about the jury can make a

7    decision whether the other documentary evidence that's come

8    in supports an inference that MGA knew.  I mean respectfully

9    there is no documentary evidence that MGA knew this.

10          THE COURT:  Back to that e-mail.  The question is

11    whether or not a reasonable inference can be made from that

12    e-mail -- that heavily redacted e-mail that what would be

13    talked about there was MGA.

14          MS. AGUIAR:  Right.

15          THE COURT:  And that's what this comes down to.

16          I mean there is no question that the Court has

17    already ruled on the motion in limine in terms of the 404B

18    nature of this and I'm not changing my ruling on that.  But

19    the bigger question is this evidence of -- is there

20    sufficient admissible evidence of that pattern of that

21    guilty knowledge.

22          MS. AGUIAR:  And I would suggest that it's not

23    because Mr. Marlow in that one section of his deposition

24    says he doesn't know, that he was speculating as to whether

25    it happened, and frankly we now know that it was speculation

1    because under oath his wife said she never told MGA and

2    under oath Ms. Salazar said that MGA never knew to her

3    knowledge and she didn't tell MGA.

4         So I mean it's pretty clear that he was doing just

5    that, which is speculating, and then you have witnesses

6    supporting what Mr. Marlow said.  And I think that between

7    the fact that it's speculation and it's hearsay and you

8    don't have his wife here, what does he have to offer?

9         And with regard to the e-mail, I sound like a

10   broken record, but we were talking about an e-mail that was

11   from years after the fact.  An e-mail that on its face does

12   not say Mattel.  And when questioned about it in his

13   deposition Mr. Marlow gave the context of that e-mail, which

14   is that he sent to MGA after having a knock down, drag out

15   meeting with Mel Woods.

16        And Mel Woods, I forgot to mention him, he's

17   another witness who is totally consistent with Mr. Marlow's

18   testimony.  Mel Woods says, I asked them to tell me who was

19   working for them.  Why they were charging me so much.  Who

20   these people were and they never told me."

21        So then you have another person --  I mean there is

22   no inconsistency here.  There is no inference that MGA knew

23   when you have Mel Woods, Isaac Larian), Veronica Marlow,

24   Maria Salazar and Peter Marlow all saying the same thing

25   which is that, "MGA didn't know.  I never told MGA."

1          To me, Your Honor, there is no fair inference to be

2     drawn here.

3          THE COURT:  Mr. Corey.

4          MR. COREY:  Thank you, Your Honor.

5          It sounds to me like that's the same argument that

6     we heard when we had talked about issue five in the motions

7     in limine number six.

8          THE COURT:  What the difference is just to set this

9     up for you so you can address where the Court is right now.

10    I denied the motion in limine categorically to keep this out

11    because I do believe it is proper 404B evidence.

12         And to the extent that you have evidence that MGA

13    was utilizing secret Mattel moonlighting employees and

14    taking advantage of their work that goes to guilty

15    knowledge.  That goes to the elements of phase 1A and I feel

16    very comfortable with that ruling and I'm not backing off on

17    that.

18         The question is that I think Ms. Aguiar makes a

19    good job of raising is whether or not we have competent

20    evidence here of that we have a e-mail and I'm going to be

21    asking you in a moment to show me where in this e-mail that

22    you believe a inference -- a legitimate inference can be

23    made that this is talking about Mattel employees.

24         We have the testimony of everybody else saying --

25    basically saying, "No, we never spilled the beans that

1    anyone at MGA that this was a Mattel employee."  I think

2    what you need to go forward on this is some evidence either

3    direct or circumstantial that would allow a jury to find

4    that MGA knew that these employees were Mattel employees.

5           If you have that and then you couple it with my

6    ruling on the motion in limine and the evidence is

7    admissible.  Without that I think Ms. Aguiar is right.  And

8    that's where I am at right now.

9           MR. COREY:  Let me start with the deposition

10   testimony where he says yes.

11          Ms. Aguiar has an interpretation of that deposition

12   testimony and Mattel has a contrary interpretation of that

13   deposition testimony.  That's number one.

14          THE COURT:  What's the foundation?

15          How do you get around the foundation?  She stands

16   up and makes an objection, "Foundation."

17          MR. COREY:  Then we ask the question --

18          THE COURT:  You ask Peter Marlow, "Did you tell MGA

19   or did MGA know --"

20          Objection, foundation, calls for speculation."

21          What's your response?

22          MR. COREY:  And the next question is, "Mr. Marlow,

23   how do you know that?"

24          "My wife told me.  I had a conversation with one of

25   the seamstresses.  I had a conversation with Ms. Salazar."

1    I don't know that that's in the record.  I don't know that

2    that question has been asked.

3              THE COURT:  You stated it's all hearsay but it's

4    going for the truth of the matter asserted.

5              MR. COREY:  It is hearsay and it should come in.

6              THE COURT:  How?

7              MR. COREY:  Then that's the next piece.

8              One of the things that the jury is entitled to

9    inferring that evidence on is whether Mr. Marlow is

10   sufficiently affiliated with MGA that he is an agent of them

11   in order for him to make -- his knowledge will be attributed

12   to MGA.

13             And let me talk about that for just a minute.

14   There cannot be anyone associated with MGA more closely than

15   the Marlows.  They were the people who introduced Carter

16   Bryant to MGA.  They were there at the very beginning.  She

17   was shopping with Carter Bryant for fashion information --

18   information used on fashion for the very first dolls.

19   They've made millions on Bryant.

20             All of these people have been there hand-in-hand

21   marching through the development of this product and Peter

22   Marlow has been there the entire time.

23             So for them to stand up and say he didn't have

24   anything to do with it and he doesn't have any knowledge

25   about this, I think that's evidence that if they want to put

1   on, that's fine, but I get to put on my evidence that the

2   Marlows are very affiliated with MGA.  They are very ---

3          Sorry.  I'm getting ahead of myself.

4          That they are affiliated with MGA and the jury can

5   reach whatever conclusion they want to reach about how close

6   that affiliation is.

7          There is another e-mail in 2003 that goes so far as

8   to suggest that the Marlows are effectively acting as a

9   department of MGA in providing these particular services.

10          So when you start to put that kind of evidence in

11   the front of a jury or in front of the Court I think that

12   gets us over the hurdle of the hearsay and the Court's

13   question as to what evidence Mattel has of proving of MGA's

14   knowledge.  Because there is no question that the Marlows

15   knew exactly what they were doing with respect to having

16   hired these three Mattel employees and there is a question

17   as to whether it was one or two who were working at the time

18   that Carter Bryant left, but we'll he get to that.

19          And so where we end up is you have people at MGA

20   who knew that fashions were being created by some uncertain,

21   unknown quantity but being attributed in this 2005 e-mail to

22   --

23          Let me find the right paragraph.

24          They have a hundred years total doll making

25   experience with them and they worked for another toy company

15

1    within the Los Angeles basin.  There are not a lot of

2    candidates in that particular category.  So, Your Honor, I

3    think that's the showing that we would make and I think the

4    jury should be able to hear that.

5            If they want to bring on their witnesses to say,

6    "MGA never knew, MGA never knew, MGA never knew, they are

7    entitled to do that, but for it to preclude Mattel of having

8    the opportunity to put this evidence in I think would be in

9    error Your Honor.

10           THE COURT:  Very well.  Thank you, Counsel.

11           Ms. Aguiar, are you prepared to respond?

12           MS. AGUIAR:  I'm not sure what the direct relevance

13   is to the fact that Veronica Marlow was an outside vendor

14   for MGA and Peter Marlow is her husband and they made money

15   for the work that they have done for MGA.

16           The testimony is that they never made money beyond

17   the compensation for the services that were performed.  And

18   again if we had anything that Mattel could directly point to

19   that suggested that MGA knew -- someone actually saying, "I

20   told them," and then we had a battle of, "I didn't know,"

21   and then you have a witness saying, "But I did tell them."

22           THE COURT:  Well, that gets back to this

23   deposition, Counsel.

24           MS. AGUIAR:  Yes.

25           THE COURT:  I understand your response.

1          MS. AGUIAR:  But I just don't think you have that

2     here.  And so I don't think the fact that -- he was the

3     husband of an outside vendor for MGA for a number of years

4     makes what I said any different which is that we don't have

5     any conflicting testimony here.

6          And the best they can point to is an e-mail from

7     2005 which is put in evidence not to -- Mr. Zeller made this

8     argument to you and he said, "This goes to proving claims

9     that Mattel has to prove in this phase."

10         And you respectfully I think -- my interpretation

11    of what you said was, "That's not correct.  This is coming

12    in for credibility and only credibility.  This is way

13    outside the time frame."

14         Mr. Larian testified he didn't recall the e-mail

15    and based on the face of the e-mail it doesn't say,

16    "Mattel."  There could be other companies that this was

17    referring to.  And if you read Mr. Marlow's testimony about

18    this e-mail it would have been against his interest to

19    convey to MGA who these people were because his business was

20    to charge money for services that were performed by these

21    folks who were their employees.

22         So his testimony --

23         THE COURT:  It's against his interest.  What he's

24    trying to do though, I think you've explained the context in

25    which it was done, he was trying to explain his relationship

1    with MGA and so he is disclosing as much as he needs to

2    without fully coming right out and saying it.

3            MS. AGUIAR:  Right.

4            But I think it's important, and he explains this

5    in his deposition, to not tell them that because if he did

6    it would have gone directly against what he was trying to

7    do.  He was trying to say, "You need us and you need the

8    services that we and our subcontractors perform for you."

9            If he had basically said, "Oh, and wink, wink and

10   nod, nod, this is who they are," well, then that would have

11   been directly against his interest because then we could

12   have hired them.  And in fact, Mattel was trying to hire his

13   wife and bring her in-house.  She didn't want to -- I'm

14   sorry, I misspoke, MGA was trying to hire her.

15           And the last thing I will say is that in your

16   ruling on the motion in limine, and I could go back and look

17   at that from the May 22nd transcript, it's actually a little

18   bit unclear to me whether you were saying that this is

19   relevant to Phase 1 versus Phase 2 or whether you had

20   expressly held that this was relevant to 1A.

21           I mean I went back and read that today and we were

22   discussing at that argument the motion in limine was termed

23   bringing Phase 2 evidence into Phase 1.  So it wasn't clear

24   to me that you were expressly holding and ruling on that

25   motion that this stuff would come in 1A versus 1B or what

18

1    have you.  So I think that was an open question.

2           THE COURT:  Well, to close that question I denied

3    the motion in limine with respect to an argument that it was

4    Phase 2 evidence and not Phase 1 argument.

5           MS. AGUIAR:  Right.

6           But all I'm saying, Your Honor, is that I'm making

7    an argument right now that it's not 1A.  I don't know what

8    the answer is for 1B.  So all I'm saying is I understand

9    that's the --

10          THE COURT:  I will make it clear.  It's 1A

11   evidence.  It's 404B evidence.  It goes to state of mind of

12   the guilty knowledge of Mr. Larian in terms of the whether

13   or not he was aiding and abetting, and breaching fiduciary

14   duties, and breaching duties of loyalty, et cetera,

15   et cetera.  That's what it goes to.

16          MS. AGUIAR:  When I read the transcripts it wasn't

17   clear to me that it was 1A but I appreciate that.

18          THE COURT:  I may not have been artful in my choice

19   of words.  To be clear it is 1A.

20          The point that you well make is whether or not

21   there is sufficient evidence here.  And I understand your

22   argument.  I understand Mr. Corey's argument.

23          MS. AGUIAR:  Thank you, Your Honor.

24          THE COURT:  Very good.

25          The next issue that I wanted to address was the

1    Menz testimony.  And I suggested to counsel that it was

2    clear to the Court that there were perhaps some things that

3    Mattel did need to get in beyond what part Bryant had

4    testified to and that were an appropriate basis for another

5    witness, but because they didn't strike the Court of being

6    in dispute and to avoid what Mr. Nolan was concerned about

7    was getting into a trial within a trial I was hoping that

8    you could simply stipulate to a few of the basic elements.

9            Counsel indicated they would attempt to do so.

10   Where are we on that?

11           MR. COREY:  There was an attempt to do that, Your

12   Honor.  The attempt has not been fruitful.  The last version

13   that we got of a proposed stipulation from opposing counsel

14   essentially tracked what Mr. Bryant had said and so I think

15   that we are kind of back at square one with respect to that.

16           THE COURT:  Okay.

17           What is it that the Mattel is asking for Mr. Menz?

18           MS. AGUIAR  We have the two proposed stips.  Would

19   that be helpful?

20           THE COURT:  Sure, if you have them here if there

21   are two competing ones that's great.

22           (Whereupon, there was a short pause.)

23           THE COURT:  I'm reading from Marlow.  "Carter

24   Bryant purchased and downloaded the Evidence Eliminator

25   program and then installed it in his laptop on September 10,

20

1     2002."

2          Carter Bryant purchased the laptop in November,

3     2001.  On September 10, 2002 Mr. Bryant installed on his

4     laptop computer a program called Evidence Eliminator which

5     he had purchased and downloaded from the Internet."

6          Well, that sounds pretty close there.  What's on

7     that point?  Unless there is some nuance that's way above

8     this Court's head.

9          MS. AGUIAR:  We started off well.

10         THE COURT:  So far so good.

11         "Exhibit 1369 is the Evidence Eliminator web site

12    for 2002.  And Exhibit 13268 is the Evidence Eliminator help

13    file for 2002."

14         There is nothing to correspond with that.  I gather

15    MGA doesn't think that either of those things should be

16    introduced.

17         MR. NOLAN:  No, Your Honor.

18         THE COURT:  "The laptop computer was imaged on July

19    14, 2004 by a technician who was hired by counsel for Carter

20    Bryant.

21         The laptop computer was imaged on July 14, 2004 by

22    a technician who was retained by counsel for Mr. Bryant."

23         Retained.  Hired.

24         MR. NOLAN:  We don't have a problem with that.

25         MS. AGUIAR:  This wasn't totally frivolous.

1          THE COURT:  No, this is not.  We are making

2     tremendous progress.

3          MR. COREY:  It's not frivolous.  It's also in the

4     record by Mr. Bryant's testimony.

5          MS. AGUIAR:  We agree on that one.

6          THE COURT:  All right.  Let me go through this.

7     You've had your chance with this.   This is my turn.

8          "On July 12th the Evidence Eliminator program was

9     run on the laptop.  On July 12, 2004 the Evidence Eliminator

10     safe shutdown function was run on the laptop."

11          Pretty close.  I don't really see a difference

12     there.

13          "The operation of Evidence Eliminator on the laptop

14     changed the names of more than 9,400 files and folders on

15     the laptop into the random characters and made them

16     unrecoverable by computer forensic experts."

17          (Whereupon, there was a short pause.)

18          THE COURT:  Does MGA dispute that G point, that the

19     operation of Evidence Eliminator on the laptop overwrites or

20     in the past tense overwrote portions of the hard drive and

21     made any information or makes any information stored in that

22     space unrecoverable by computer forensic experts?

23          Is that disputed?

24          MR. NOLAN:  One moment, Your Honor.

25          THE COURT:  G point at page 2.

1        MR. NOLAN:  Your Honor, we thought based on what

2   our expert would testify which is, of course, what we are

3   trying to do is avoid having our expert and their expert --

4        THE COURT:  Right.

5        MR. NOLAN:  Their G is really addressed in our 4.

6        THE COURT:  I see that.

7        And you say it permanently eliminates the residue

8   of previously deleted files and renders such deleted files

9   unrecoverable.

10       And they say it overwrites portions of the hard

11  drive and makes any information stored in that space

12  unrecoverable by computer forensic experts.  It seems you

13  are really saying the same thing.

14       MR. NOLAN:  Well, Your Honor, I think our expert

15  would disagree that it's overwriting anything.  And that's

16  why we thought we get to the same point frankly but it's

17  more accurate the way our expert has described it as opposed

18  to where it's intentionally overwriting the program.

19       We thought that it's important enough to make the

20  distinction if we are going to stipulate to this, otherwise

21  we'll just have to offer the testimony as to exactly what it

22  does, but at the end of the day we both agree in 4 which is

23  what I thought they really needed.

24       THE COURT:  I just don't know if the jury really

25  needs to get into that level of details.

1          Would both parties be willing to stipulate that the

2     operation of Evidence Eliminator has the effect of rendering

3     any information stored on a hard drive unrecoverable by

4     computer forensic experts?

5          MR. COREY:  Can you say that again?

6          I think we may have an agreement here.

7          THE COURT:  "The operation of Evidence Eliminator,"

8     instead of describing how it does it, it just says, "has the

9     effect rendering any information stored in or on the hard

10    drive -- on the computer hard drive unrecoverable by

11    computer forensic experts."

12         MR. COREY:  That's fine, Your Honor.

13         MR. NOLAN:  The point that you are missing on that

14    is we think is absolutely critical is that a lot of this

15    information was previously deleted or all of it.  And so you

16    if you take out the previously deleted aspect you are taking

17    out of the whole function --

18         THE COURT:  I think that's worse for MGA though.

19    Not only are you dealing with the Evidence Eliminator but

20    you are previously dealing with a bunch of other stuff too.

21         MR. COREY:  No, Your Honor.  I think that's the

22    confusion in front of a jury because I think that this the

23    relevant testimony that would come in.  Computers will on

24    its own delete items.  And the issue in this case frankly is

25    that even Mr. Menz, if he testifies on cross examination,

24

1  will not be able to say that the overwritten files actually

2  were files that were previously deleted automatically by the

3  computer.

4       THE COURT:  I would assume he would also testify

5  that, as I understand it, that it overwrites anything that

6  was automatically deleted or manually deleted.

7       MR. NOLAN:  Absolutely, Your Honor.  I didn't mean

8  to say --

9       THE COURT:  Why don't we do this.  Why don't we

10 tweak it to this and see if Mr. Corey will still accept.

11 "The operation of Evidence Eliminator has the effect of

12 rendering any previously deleted information stored on the

13 computer hard drive unrecoverable by computer forensic

14 experts."

15      MR. COREY:  That's fine as far as it goes, but

16 there are also active files that were user selected that

17 Evidence Eliminator in the safe shutdown process also

18 overwrote.

19      And so I think if we can say --

20      THE COURT:  Where is that in the proposed

21 stipulation?

22      MR. NOLAN:  It's not.

23      MR. COREY:  I don't have a copy.  I left my copy in

24 my hotel room, but I can tell you that's what Mr. Menz will

25 testify to.

25

1          THE COURT:  You will agree that at least is an

2     accurate statement as far as it goes?

3          MR. COREY:  Absolutely as far as it goes, that's

4     correct.

5          THE COURT:  I need to understand how much further

6     you want it to go.

7          MR. COREY:  I think if we put in language along the

8     lines of previously deleted files and user selected files or

9     something like that.

10          THE COURT:  Let me ask MGA.

11          MR. NOLAN:  I apologize.  It wasn't in their

12     original stipulation that we both exchanged and talked to

13     our experts about.  So I would have to check with our expert

14     to see if that's factually accurate or not and I apologize.

15          MR. COREY:  It's not in our stipulation.

16          THE COURT:  It's not in either stipulation actually

17     as far as I'm reading these.

18          MR. NOLAN:  Your Honor, if I may, I think the other

19     point that we were trying to reach is to get back to the

20     state of mind where I think the Court was expressing the

21     concern under 403 that we not substitute the knowledge of

22     Mr. Menz for the knowledge of Mr. Bryant and by going into

23     that detail we may be doing that.

24          THE COURT:  And we can avoid that but you are

25     inserting the previously deleted.  If we just take that out,

1    and we could just go with, "Rendering any information stored

2    on the computer hard drive unrecoverable," that would

3    include both.

4         So when I added -- but the problem came up when I

5    added your level of detail and that's probably why it's not

6    present in the Mattel proposed stipulation because the way

7    it is written there was just broad enough to include both.

8    But it's when we went down the road adding, "Previously

9    deleted files," Mattel is saying that's not all that it

10   deletes but it also deletes these user specified deletions.

11        MR. NOLAN:  Your Honor, I'm willing to forego that

12   if we can make progress on this.  We will come back to it

13   but at the end of the day it's really whether or not we have

14   what we need in this stipulation.

15        THE COURT:  And you would agree with that,

16   Mr. Corey, that we don't need to make any specific reference

17   to previously deleted file, but we can just leave simply

18   that it's rendering any information stored on the computer

19   hard drive unrecoverable?

20        MR. COREY:  That's correct.

21        THE COURT:  Okay.

22        Do you agree, Mr. Corey, that no adult content was

23   located in Mr. Bryant's folder on the hard drive of the

24   laptop computer?

25        MR. COREY:  The folder is not the right term.  I'm

27

 1   trying to come up with the right term.

 2          But I do note that Mr. Bryant testified that there

 3   was adult content on the computer.

 4          THE COURT:  Is that really relevant at this point?

 5          MR. NOLAN:  Your Honor, well, we think it is

 6   because it's undisputed by the experts, Your Honor, that the

 7   laptop computer had two different types of folders for

 8   different users.  And Mr. Bryant's user folder had no adult

 9   contents on it.

10          There was adult content on it.  This is the point

11   that frankly caused me in chambers to be upset about the

12   representations that were made.  I raised this point at side

13   bar and I'll make it again.  Their own expert will say that

14   there was no adult content found on Mr. Bryant's side of the

15   computer and that's the folder side that he had access to.

16   And Mr. Irmen in his folder had adult contents in it.

17   That's where the adult contents came from not Mr. Bryant.

18          And I do believe it is relevant because Mr. Bryant

19   did testify in this case that he didn't download material

20   adult content.  That his use of this was simply eliminate

21   Internet access, history files and that type of thing.  So

22   I do think is critical and that's why we added to it ours.

23          MR. COREY:  I would like to double check with my

24   expert.  I think the right word though is "profile" not

25   "folder."

1          MR. AGUIAR:  Okay, that's fine.

2          THE COURT:  Very good.

3          Moving along then.  What about this element number

4    6 between September, 2002 and July of 2004, Mr. Bryant used

5    the safe shutdown function of the Evidence Eliminator on the

6    laptop computer?

7          MR. COREY:  I have no objection to that.

8          THE COURT:  We have already dealt with 4 and 5

9    basically.

10         Okay.  So now it just comes down to essentially a

11   few of the mechanics about the Evidence Eliminator.  What is

12   the defense objection to stipulating to these Exhibits 13629

13   and 13628?

14         MR. NOLAN:  Your Honor, with respect to 13629 the

15   Evidence Eliminator web site for 2002 there is a

16   foundational objection to the fact that we do not believe

17   that that is an accurate -- that there has been any

18   foundation to show that that, in fact, was the version that

19   was available in 2002.

20         As I understand it this has been archived back in

21   2008 and we do not believe it's the accurate one that was

22   actually used in 2002.  That's one part of the objection.

23         The other part of the objection is that they could

24   not establish the foundation that Mr. Bryant had read the

25   entire description whatever description may have been in

29

1    existence at the time.

2              THE COURT:  You remember that exercise?

3              MR. NOLAN:  Well, Your Honor, I'm not saying this

4    for the record, and I notice the Court's smile, the fact of

5    the matter is, Your Honor, that there is evidence that

6    describes the Evidence Eliminator software program as being

7    a tool to make your computer run faster.  That was in the

8    advertisement for it.

9              THE COURT:  What I was smiling at, Counsel, I stood

10   here and watched Mr. Bryant as he went down and he recalled

11   looking over bullet points on there and he seemed to recall

12   every innocuous description of the Evidence Eliminator and

13   skipped over every noninnocuous and perhaps that truly was

14   the testimony and it just struck the Court as somewhat

15   coincidental.

16             MR. NOLAN:  Well, Your Honor, I accept that, but

17   whether or not it was coincidental or not it was consistent

18   in what he understood he was acquiring.

19             He had no interest in the national security of the

20   United States or destroying anything within the Secret

21   Service or anything else.  That wasn't what his interest was

22   in.

23             But our main objection -- I apologize, the

24   evidentiary objection to 13629 it is simply foundational.

25   That that's not any proof that was actually the web site

30

1    that was in existence 2000 that he saw and (b) I will just

2    go to this if you don't mind and anticipate the next one

3    which is 13628 --

4           THE COURT:  Yes.

5           MR. NOLAN:  And I apologize, these may be offered.

6    One may be the help file and the other one.  The help file,

7    Your Honor, is located apparently on an archive part of the

8    computer hard drive.  There is no evidence however that

9    Mr. Bryant ever viewed the help file or even knew that it

10   was in existence on his computer.  There is no foundation.

11          What they want to do however is have evidence in

12   front of the jury which was never viewed by Mr. Bryant.

13   There is no testimony that he ever saw it.  It would be

14   highly prejudicial in lack of that type of foundation, Your

15   Honor.

16          And in fact, I would submit, Your Honor, that most

17   people may not be aware -- I've learned more about the scary

18   stuff about using a computer and how many cookies you can

19   pull on going to a Notre Dame fan site for instance for

20   football, okay, and how many files you can reach on that

21   type of stuff.

22          All I'm saying is that there are things that occur

23   on computers that people who are illiterate do not

24   understand what's there and that's why we have objected to

25   these two documents.  Simply no foundation.

31

1          THE COURT:  Let me hear you response to the

2     evidentiary objection to these two documents.

3          MR. COREY:   I think let me start with the Evidence

4     Eliminator web site, Your Honor.

5          I mean the Court did sit here and listen to

6     Mr. Bryant identify things that he apparently culled from

7     the web site.

8          THE COURT:  Well, out of fairness to Mr. Bryant it

9     wasn't simply -- he was being asked questions about it and

10    he was identifying them without actually having the web site

11    in front of.

12         MR. COREY:  Absolutely true.

13         He recalled looking at them somewhere I think was

14    the testimony.

15         THE COURT:  What's your foundation of the actual

16    one of this particular exhibit as opposed to some other

17    version thereof?

18         MR. COREY:  The foundation is going to be that

19    Mr. Menz testimony.  He will come in and explain, as kind of

20    a forensic computer person, what this archive does and how

21    it accomplishes these things and when it was archived.  And

22    he's going to talk about how he can ascertain and verify

23    that this was it circa 2002 web site for Evidence

24    Eliminator.

25         I mean I think --

1        THE COURT:  As opposed to some other web site?

2        MR. COREY:  Or other archives of the same web

3    site.  I mean they have the ability to go to the archive and

4    say --

5        THE COURT:  What was there for a particular date?

6        MR. COREY:  Correct

7        And say it shouldn't be this point.  It should be

8    another one and I haven't heard any of that yet but it's --

9    that's going to be the foundation for it.

10       THE COURT:  What about this help file?

11       The help file?

12       MR. COREY:  The help file, Your Honor, is not

13   really a help file.  It's more a recitation of the benefits

14   of Evidence Eliminator and how it works.

15       THE COURT:  What's the foundation that Carter

16   Bryant saw it?

17       I heard the testimony about the web site but I

18   don't recall anything about the help file.

19       MR. COREY:  Frankly I don't know that Carter Bryant

20   ever asked about the help file, but I think if the Court

21   were to look at it, the Court would see that it's not

22   technical document and it's one of the things that Mr. Menz

23   will talk about as about as being in existence on

24   Mr. Bryant's computer associated with Evidence Eliminator.

25       THE COURT:  Now on the same note on the web site,

1    kind of a corrolary to the web site we introduced, this is

2    what the standard package is for Evidence Eliminator is the

3    stipulation for the statement by MGA that on Mr. Bryant's

4    laptop computer Evidence Eliminator operated according to

5    the program, the false settings and ran in the background

6    when the laptop computer was turned on.  I guess you have no

7    objection to that.

8            MR. COREY:  I do in one respect.  The Evidence

9    eliminator running, it does run in the background.  Safe

10   shutdown is a separate operation that it runs.  That's one

11   point.

12           The other is it didn't run according to the default

13   settings because Carter Bryant when he went through and

14   installed it or whoever installed it clicked some check

15   boxes so it could capture some additional active files

16   rather than just getting rid of the deleted files.  And

17   that's the distinction there.

18           MS. AGUIAR:  Your Honor, in the spirit of

19   compromise what if we just said, "Evidence Eliminator ran in

20   the background when the laptop computer was turned on?"

21           MR. COREY:  Tha's fine.

22           THE COURT:  I'm sorry.

23           MS. AGUIAR:  Number 3 to say, "On Mr. Bryant's

24   laptop computer Evidence Eliminator," and then go down to,

25   "ran in the background when the laptop computer was turned

1    on."

2          MR. COREY:  And that's fine, Your Honor, as long as

3    we have the safe shutdown operation being run on January

4    12th, which I think we do.

5          THE COURT:  Right.

6          And then what we can do is include the fourth

7    statement by MGA, "Evidence Eliminator included a function

8    called safe shutdown which permanently deleted permanently

9    deleted files and rendered such deleted files

10   unrecoverable."

11         We can tie that up with what we already have

12   stipulated to, right, of the Evidence Eliminator includes a

13   function called safe shutdown which has the effect of

14   rendering any information stored on the computer hard drive

15   and in that space unrecoverable by computer forensic

16   experts.

17         MS. AGUIAR:  But the issue, Your Honor, that makes

18   it sound like that when you run that program it wipes the

19   hard drive.  That's not what it does.

20         If you read that that's the implication.  Can you

21   just read that one more time?

22         THE COURT:  Now we are going backwards.  We already

23   agreed on the line that, "The operation of Evidence

24   Eliminator had the effect of rendering any information

25   stored on the computer hard drive unrecoverable by computer

1    forensic experts."

2         MS. AGUIAR:  What we had said on that one, I think

3    that was the one where we had to go back and check with our

4    expert because I don't think it's true.  If you read that it

5    would say you run it and it basically wipes out anything

6    that's stored on the hard drive and that's certainly not the

7    case.

8         MR. COREY:  It does not wipe out everything that's

9    on the drive, Your Honor.

10        MR. NOLAN:  The point, Your Honor, I apologize, it

11   really an allocated space and when we use the hard drive it

12   suggests that it wipes out the hard drive, which it doesn't

13   do, it's an unallocated spice and that would be the better

14   term to use.

15        THE COURT:  About a half hour to operate the

16   Evidence Eliminator?

17        MR. NOLAN:  I believe he testified that -- he's

18   already testified that it took a long time to operate.

19        THE COURT:  A half hour?

20        MR. COREY:  There is no dispute on that.

21        THE COURT:  The Evidence Eliminator does not block

22   pop-up advertisements.  Is there a dispute on that?

23        MR. NOLAN:  Yes, Your Honor, there is a dispute on

24   that.

25             It's far more technical and that's why it ends up

36

1    in a stipulation with respect to this.  There is a

2    methodology with respect to the use of the hard drive -- I'm

3    sorry, the Evidence Eliminator program that does impact also

4    on the use of a separate program Spy Hunter that it has a

5    function that makes that not as capable as it should have

6    been.

7         So we don't I agree that it doesn't have some

8    effect on pop-ups.  Whether or not it eliminates them

9    completely or not, we don't dispute that it doesn't

10   eliminate them completely, but it does have an effect on the

11   use of the pop-up.

12        But I think what our overall problem here, Your

13   Honor, if I just go back, and this the last point I want to

14   make, is with respect to these web site, the help

15   information that's coming in, all the sudden I harken back

16   to the 403 discussion that we had before and the strong

17   objections that we had about the prejudicial impact, all we

18   are going to do now is make it absolutely certain that it's

19   more than his credibility.  That actually now what the jury

20   would have is far more information than Carter Bryant even

21   had with respect to how this thing operated on his computer

22   and that's the danger, Your Honor.

23        I think the more simplistic of ways that we've

24   approached it, some of the concessions that we made gets us

25   where we meet on the credibility, that gets the dates that

37

1    it was used.

2         THE COURT:  But you have to have the effect of the

3    operation of the Evidence Eliminator.

4         MR. NOLAN:  And we are not disputing that, Your

5    Honor, but I just don't want to say that it wipes out the

6    hard drive.

7         THE COURT:  You want to say that it permanently

8    eliminates the residue of previously deleted files and

9    renders those deleted files unrecoverable?

10        I suggest that Carter Bryant doesn't know that

11   either.

12        MR. NOLAN:  Well, I agree with that, Your Honor,

13   but at some point in time --

14        I can make a concession on that, but when it comes

15   to getting the entire web site in or the help file site

16   downloaded.  And in the jury room --

17        THE COURT:  Counsel, I haven't ruled on that yet.

18        MR. NOLAN:  I'm just trying to say --

19        THE COURT:  I understand that about the help file.

20        MR. NOLAN:  Your Honor, Mr. Bryant with respect to

21   the help file --

22        I just have the testimony on the help file.

23        THE COURT:  You know the pop-up advertisement, I

24   thought it was a little proper back in chambers but that

25   really does become an issue during the trial itself in front

1   of the jury or am I mistaken on that?

2            MR. COREY:  He did.  He did testify about the fact

3   that he had purchased Evidence Eliminator to block pop-up

4   ads.  I don't have that testimony.  I can find it and bring

5   it tomorrow.

6            THE COURT:  Do that.

7            So he made a mistake.

8            MR. COREY:  Not only did he make a mistake, he kept

9   the Evidence Eliminator knowing that it involved pop-up ads

10  and then went out and purchased another product.  I think it

11  goes directly to his credibility and veracity.

12           THE COURT:  Do we agree that Carter Bryant

13  purchased the Spy Hunter blocks pop-up --

14           MR. NOLAN:  I frankly do not know that he actually

15  purchased it.

16           If it's in our expert's report I will agree to

17  that, but I don't know whether or not he actually physically

18  did or someone using the computer did.  If it's being used

19  under his profile, Your Honor, we would admit that.  Our

20  expert would have to testify to that.

21           But going back to the pop-up issue, I think your

22  point is spot on, Your Honor, and that is that Mr. Bryant

23  testified, in fact, it's interesting he was asked at his

24  deposition about pop-ups.  He admitted in his deposition

25  that he bought it to make the computer run faster and block

1    pop-ups.

2          Mattel never asked him interestingly about what the

3    pop-ups were he was talking about.  His testimony at trial

4    was that he included pop-ups but his main concern, as he

5    testified here, was the access by family members to the

6    Internet history sites that he had gone to.  That's what he

7    was also concerned about.  And that's why pop-ups frankly,

8    Your Honor, I think is less of an issue.  That he really

9    just wants to prevent anybody by being embarrassed to be

10   taken to a site that he had previously visited or someone

11   else using the computer like Richard.

12         MR. COREY:  If I may, Your Honor, let me put a very

13   fine point on this.  The information that we have included

14   with respect to the pop-up ads was in the spirit of

15   compromise.  What Mr. Menz will testify to is that not only

16   was the Spyhunter  product installed, and I think you heard

17   Mr. Nolan's gloss on that, which was it was to prevent

18   people in his home from seeing pop-ups from these adult webs

19   sites, what the information on his hard drive shows is that

20   he specifically allowed pop-ups from 15 or 20 adult web

21   sites.  And so that's what Mr. Menz will testify to.

22         MR. NOLAN:  Your Honor, I would respectfully submit

23   that's in Mr. Mens' report.

24         One of the objections that if Mr. Menz may now try

25   to testify as to pop-ups.  That's not addressed in his

1    report at all and I could give to the Court the site -- the

2    exact site in his deposition in response to a question that

3    John Quinn asked him he did refer to pop-ups but there was

4    no follow-up on it.  My information is that Mr. Menz did not

5    address the pop-ups in his expert report.  So we are going

6    beyond the expert report that was submitted.

7                MR. COREY:  Then it will up in when they call

8    Mr. Funk.

9                THE COURT:  What?

10               MR. COREY:  Then it will come I when they call

11   Mr. Funk who does address the Spyware software, Your Honor.

12               THE COURT:  Well, the Court has given its best

13   effort to try to work out a stipulation.  I think we are

14   very close.  I think you are both being silly to use the

15   legal word by not reaching a stipulation on this.  We'll

16   call your experts.  I think we are so close and --

17               MR. COREY:  Your Honor, could we have the benefit

18   of the Court's mark-up?

19               THE COURT:  I will give you the full benefit of the

20   Court's mark-up.

21               MR. NOLAN:  But, Your Honor, with due respect to

22   the silliness of the legal positions that are being taken,

23   it seems to me that the silliness now benefits Mattel.

24               THE COURT:  No, I don't think so.

25               MR. NOLAN:  Because you allow the testimony to come

1    in with respect to a 403.

2         We have tried mightily to come to an agreement with

3    Mattel that frankly gives them, we thought, more than they

4    were entitled to than we've given on the point.  It's the

5    fact that Mattel doesn't give up on a particular point.  But

6    that ruling end result is exactly what they want and that is

7    a ruling to allows them to call Menz in light of the Judge's

8    previous ruling on 403.  That's my only point.

9         THE COURT:  The problem I have I think Mattel is

10   right that they are entitled to raise some of these

11   foundational issues about Evidence Eliminator before the

12   jury; otherwise, quite frankly, the prejudice can flow both

13   ways.

14        I think this jury needs to understand what it is

15   that was referenced to 51 times by your count.  I think

16   that's an appropriate, using the standard that trial courts

17   must use to determine whether expert testimony is

18   admissible, whether it benefits the jury, it educates the

19   jury or eliminates confusion, I think I need to provide that

20   information through your competing experts.

21        I really believe given the, not to over emphasize

22   this point any more than it's already been emphasized, the

23   appropriate way to do it by stipulation.

24        And I'm going to invite --

25        I'm going to take Mr. Corey up on this and I'm

1    going to type up my proposal to counsel.

2            MR. NOLAN:  I'm sorry for the strong reaction, Your

3    Honor.  I'm just saying that we worked last night trying to

4    reach this accommodation ourselves with them.

5            THE COURT:  You have had a very appropriate

6    demeanor throughout, Mr. Nolan.

7            MR. NOLAN:  I apologize.

8            THE COURT:  You've had a very appropriate demeanor

9    throughout this trial.  You have nothing to apologize for.

10           (Whereupon, there was a brief pause.)

11           THE COURT:  These are my thoughts.  I will sustain

12   the objection to Exhibit 1.3628, the help file.  I don't

13   believe there is adequate foundation for the help file to

14   come in.

15           What I suggest we do is simply this.  And the Court

16   is trying to keep in mind what information does this jury

17   need to have to avoid the confusion that might be left if

18   the jury did not receive expert testimony or stipulated

19   testimony considering Evidence Eliminator.

20           One.  Carter Bryant purchased and downloaded the

21   Evidence Eliminator program from the Internet and then

22   installed it on his laptop computer on September 10, 2002.

23           Two.  Exhibit 13629 is the Evidence Eliminator web

24   site for 2002."  Assuming that both sides can corroborate

25   this and there is no counter evidence to suggest that it's

1    not.

2         Three.  Evidence Eliminator ran in the background

3    when Carter Bryant's laptop computer was turned on for

4    Evidence Eliminator includes a function called Safe Shutdown

5    which permanently eliminates the residue of deleted files

6    and renders such files unrecoverable by computer forensic

7    experts."

8         I'm not referring to past ones or present ones,

9    just deleted files.  And I think that captures the essence

10   of what the jury needs to know about essentially what this

11   program does.

12        "Five.  The laptop computer was imaged on July 14,

13   2004 by a technician who was hired by counsel for Carter

14   Bryant in this case.

15        Six.  On July 12, 2004, the Evidence Eliminator

16   program was run on the laptop.

17        Seven.  It took Carter Bryant approximately

18   one-half hour to operate Evidence Eliminator.

19        Eight.  No adult content was located in Carter

20   Bryant's profile on the hard drive of the laptop computer."

21        If there is no dispute by the parties to those

22   eight elements the Court is inclined to forego expert

23   testimony.

24        Both parties run serious risks of having portions

25   of their expert testimony truncated dramatically if we have

1    to proceed by the witnesses themselves.

2            MR. NOLAN:  Your Honor, would the Court entertain

3    one quick comment?

4            THE COURT:  I will entertain comments from both

5    sides.

6            MR. NOLAN:  Your Honor, the first item that I don't

7    think is in dispute is number one.  Carter Bryant purchased

8    the laptop computer in November of 2001.

9            THE COURT:  Purchased --

10           MR. NOLAN:  A laptop computer in November of 2001.

11           Then the next point that I would have, which I

12   think really is a small point, number seven you say it took

13   Carter Bryant a half-hour to run the Evidence Eliminator

14   program.

15           THE COURT:  Approximately.

16           MR. NOLAN:  It wasn't the time factor.  It was the

17   fact that Carter Bryant ran it Your Honor --

18           THE COURT:  It took approximately one-half hour to

19   operate the Evidence Eliminator.

20           MR. NOLAN:  Thank you.

21           THE COURT:  Mr. Corey, your objection.

22           MR. COREY:  Just the last one that Mr. Nolan was

23   addressing.  When you say operate, is it to operate the Safe

24   Shutdown feature?

25           THE COURT:  Yes.

1    Is that correct?

2    MR. COREY:  Yes.

3    THE COURT:  "To operate the Safe Shutdown feature

4    of Evidence Eliminator."

5    And it was Safe Shutdown feature of Evidence

6    Eliminator that was run on July 12th; right?

7    MR. COREY:  Correct.

8    THE COURT:  Anything else?

9    MR. COREY:  With respect to the purchase date I

10   believe that's correct.  There is no dispute with respect to

11   that.  The one that Mr. Nolan had mentioned.

12   I apologize, Your Honor, from Mattel's perspective

13   I do think it is not disputed between the experts that there

14   was a separate pop-up blocker program that was purchased and

15   was running on the computer and it was purchased after the

16   purchase of Evidence Eliminator.

17   THE COURT:  Anything else?

18   MR. COREY:  No, Your Honor.

19   THE COURT:  It's down to that, Mr. Nolan.

20   It's down to Spyhunter.

21   MR. NOLAN:  Right.

22   And if I could, Your Honor, if I could just take a

23   look at the report tonight and if that's in fact in the

24   report without a dispute I will so advise the Court in the

25   morning.

1          THE COURT:  All right.

2          Hold on a second.

3          MR. NOLAN:  Likewise with respect to --

4          Do you want me to wait?

5          THE COURT:  That will be Number 9, "Carter Bryant

6     --

7          Do we know it was Carter Bryant or just somebody?

8          MR. NOLAN:  It may be better if spyware --

9          MR. COREY:  I'm happy with "somebody," Your Honor.

10         MR. NOLAN:  Or that a spyware software program was

11    installed on the computer and I could get the date.  That

12    might be the easiest.

13         THE COURT:  "The Spyhunter software program which

14    was designed to block pop-up advertisements on the laptop

15    computer was installed on the laptop computer."

16         I think that saves two witnesses.

17         MR. NOLAN:  Your Honor, facetiously I think we

18    should seal this transcript because if the other parties on

19    the respective teams know that you are available for both

20    typing and drafting stipulations you might be called on more

21    often than you wish, number one.

22         (Whereupon, there was laughter.)

23         MR. NOLAN:  And I appreciate the Court's efforts in

24    this direction.

25         Number two, I just want the opportunity tonight to

1   go back and look at that web site, that one evidence -- I'm

2   sorry, the one document, the web site Evidence Eliminator,

3   the 2002 issue, I just need to confirm that.

4           Is that okay, Your Honor?

5           THE COURT:  That's fine.

6           Okay, I hope that takes care of this.

7           Mr. Corey.

8           MR. COREY:  I just want to be very clear.  As I

9   understand what the Court has articulated Mattel is willing

10  to stipulate to that.  And I do want to say with respect to

11  the web site, one thing that is not in dispute is that

12  somebody had to access a web site to purchase this

13  particular software.

14          THE COURT:  I think that's --

15          I think you have a foundation on that from the

16  testimony of Mr. Bryant.  You don't have a foundation on the

17  help file.  I'm going to leave it at that.

18          MR. COREY:  Thank you, Your Honor.

19          MR. NOLAN:  And I'm going to come back and take a

20  look to make sure that's an accurate copy of what was posted

21  in 2002.

22          THE COURT:  I expect you to do that, Counsel, and I

23  will hear in the morning if there is any particular.  But be

24  prepared if there is anything that you do disagree with to

25  have chapter and verse otherwise, of course, we'll go with

1  the stipulation.  It saves a lot of time.

2          MR. COREY:  I appreciate the Court's efforts and I

3  will join in Mr. Nolan's motion to seal.

4          (Whereupon, there was laughter.)

5          THE COURT:  All right.  Anything else?

6          Mr. Herrington, you have an issue?  I'm sorry.

7          MR. HERRINGTON:  No, Your Honor.  It was just a

8  reminder.

9          THE COURT:  Go ahead and approach the lectern.

10          MR. HERRINGTON:  This is Robert Herrington.

11          It was just a reminder that we had submitted the

12  binder for Richard Irmen.

13          THE COURT:  That's right.  I don't have it ready.

14  We are not ready for that yet.

15          I am ready for the other.

16          Is there anything else that we need to take up?

17          MR. NOLAN:  I think only the one, and maybe it's

18  not a heads up but we ended -- you and I ended up in a

19  discussion about whether or not you were correct that you

20  had you struck the question and answer.

21          THE COURT:  Yes.

22          MR. NOLAN:  And I'm happy to say that I told you

23  that you were right on Friday and you continued to be right

24  all weekend.

25          THE COURT:  Okay.

1      MR. NOLAN:  So what we have done is we've advised

2  Mattel that based on that we are not going to push anything

3  more with Mr. Cunningham and I believe that Mr. Cunningham's

4  appearance in this case has been concluded and that Mattel

5  is moving on to the next witness.

6      THE COURT:  Very good.

7      MR. COREY:  That's correct, Your Honor.

8      THE COURT:  So while we are on that, and so

9  hopefully Menz is off assuming I get confirmation in the

10  morning.

11      Cunningham is done.

12      Mr. Larian is going to be called at some future

13  time.

14      MR. COREY:  That's correct, Your Honor.

15      THE COURT:  So who else does that leave then for

16  tomorrow?

17      You knew this question was coming so I trust you

18  are prepared.

19      MR. COREY:  I believe that leaves Ms. Kathy Lee

20  Park.

21      MS. AGUIAR:  She was added to their list just the

22  other day, Your Honor.  She is a new name.

23      THE COURT:  Very good.

24      MR. COREY:  She was added in response to something

25  Mr. Bryant had testified about.

1          And Mr. Marlow.

2          THE COURT:  We'll get to that a moment but, yes.

3          MR. COREY:  Then the custodian of records for MGA,

4    Your Honor.

5          THE COURT:  What about Elise Cloonan or Margaret

6    Leahy?

7          MR. COREY:  We were informed by Mr. McFarland that

8    Ms. Leahy is ill, but she has said she would be available I

9    believe on next Tuesday.

10         THE COURT:  Very good.

11         MR. NOLAN:  We agreed, Your Honor, to accommodate

12   that schedule much like the --

13         THE COURT:  Very good.

14         What about Ms. Gronich?

15         MR. COREY:  I believe that we are waiting for dates

16   for Ms. Gronich, who I understand has some custodial

17   responsibilities for some parents.

18         MS. AGUIAR:  I gave Mr. Zeller a date for Gronich

19   and we agreed to take her out of order.  She is up for July

20   1st.

21         THE COURT:  Very good.

22         MR. COREY:  And I believe Mr. Kaymark is the last

23   one.

24         THE COURT:  All right.

25         So it sounds like we'll get through at least the

1    witnesses that available now tomorrow?

2              MR. COREY:  That's the plan, Your Honor.

3              THE COURT:  Okay.

4              And then the defense is ready to start?

5              MR. NOLAN:  Yes, Your Honor.

6              And we've advised Mattel that if we do get to a

7    point where they conditionally rest tomorrow and if there is

8    time that we will go to videos and the videos that we would

9    like to play assuming that we have court clearance would be

10   Jacqueline Prince, Janet Bryant, Jeanne Galvano and Richard

11   Irmen in that order.

12             THE COURT:  Okay.  I can do the first three for you

13   right now.

14             MR. NOLAN:  That was the intent of how we would

15   play out tomorrow.

16             THE COURT:  That sounds good.

17             This Peter Marlow thing is really a close call and

18   it all comes down to what legitimate inferences can be drawn

19   from that e-mail combined with his statements in the

20   depositions.  As I see it those are the only two pieces of

21   evidence.

22             You've got to meet the threshold of 404B that the

23   bad act -- the prior bad act in this case or post bad act

24   actually happened and that's before you can bring in the

25   evidence -- the negative evidence and argue it to the jury.

52

1    So it's not so much back at the issue of whether or

2    not you still agree with the motion in limine, you know in

3    theory is that an appropriate legally admissible theory or

4    evidence to argue to the jury, it's whether or not you can

5    establish the predicate for this particular evidence.

6        Does that make sense, Mr. Corey?

7        MR. COREY:  And I understand exactly what the Court

8    is saying but it don't think -- I think Mattel is being put

9    to an artificially high standard because these are -- all of

10   the witnesses that Mr. Aguiar said would come in to deny

11   this are all MGA affiliated witnesses or --

12       THE COURT:  I'm with you on that.  That is a good

13   rebuttal to Ms. Aguiar's naming of all these witnesses, but

14   before we even get to that point you have a certain

15   threshold to meet and that's what I'm questioning whether or

16   not that e-mail, which doesn't reference Mattel, and there

17   needs to be some other assumptions made that when you are

18   talking about these -- yes, we all know that we are talking

19   about someone who has worked for all these years with a toy

20   company, but there is other toy companies in Southern

21   California.

22       MR. COREY:  Not with three sample makers with a

23   hundred years of experience.

24       THE COURT:  Again how much of that is as a result

25   of our educated knowledge on this topic as opposed to what

53

1    the jury has before it?

2            MR. COREY:  I think that's is going to be tough.

3    That's what we need to put on to educate someone about that.

4    I'm sure that we can.

5            But let's step back just a little bit, okay.  We'll

6    use the Marlows for now.  Okay.  What the Marlows were doing

7    in using these people to work on a competitive product is

8    wrong.  They knew that they were doing something wrong.  The

9    Marlows knew that they were doing something wrong.  MGA --

10            THE COURT:  That's not the issue.  The issue is

11    whether --

12            MR. COREY:  No.  And I'm getting to the issue.

13            And MGA, who Mattel argues knew what was going on,

14    knew what they were doing was wrong.  And so to expert

15    Mattel to come in with admissions from MGA affiliated

16    witnesses, no one is going to put this in an e-mail and

17    shoot it back and forth saying, "Oh, by the way these people

18    at Mattel are working on Bratz.  That's great.  They are

19    doing a great good job.  You should give them a bonus or pay

20    them a lot."

21            THE COURT:  I understand the argument.  And this is

22    the same argument that every government prosecutor faces

23    when they try to introduce 404B evidence.  It's tough to do

24    sometimes precisely because you've got to kind of prove up

25    the prior bad act to a certain extent.  And it's not that

54

1    it's not there.  It's just that it may not be there

2    evidentiary wise.

3         MR. COREY:  Well, what we have.  We have an

4    admission in a deposition that they can argue to the jury

5    about and we have the e-mail that is just about as unveiled

6    as you can be without using Mattel's name from Mattel's

7    perspective.

8         And so I won't say any more.  The Court just needs

9    to make a decision.

10        THE COURT:  I do understand your response.

11        Ms. Aguiar.

12        MR. AGUIAR:  I wasn't even going to stand up.

13        THE COURT:  And I will think about it tonight and I

14   will give you a decision in the morning.  It's a very, very

15   close call and I will do the best I can on that.

16        Anything else before I attend to and before I start

17   rattling off sustained or overruled for the next four or

18   five minutes?

19        And I want to go home, too, Mr. Nolan.

20        MR. NOLAN:  I'm not going home.  I had nothing else

21   to do today.

22        MS. AGUIAR:  This is a housekeeping matter, Your

23   Honor.

24        After your in-camera review of the documents that

25   you requested that we produce that single document and you

1    indicated that you may issue a minute order, we went back

2    and looked, and as we indicated to you in chambers that day,

3    we did see it was not privileged.  In fact, it was produced

4    several other times in the production at different Bates

5    numbers.

6              THE COURT:  I'm not surprised

7              MS. AGUIAR:  It was an error.  It shouldn't have

8    been in the pile.  So I just did want you to know that we

9    did inform Mattel of that.  We have the document.

10             THE COURT:  I received wind of that and I changed

11   the minute order over the weekend before I sent it out to

12   indicate forthwith as opposed to directing the clerk to

13   attach a copy.  So that went out this morning.

14             The two other minute orders that went out frankly

15   was another close case was this whole issue of whether to

16   reopen discovery on the surveillance.  And I'm denying it

17   for now.

18             I made clear I think Friday, Mr. Nolan, that if

19   there is any security concern that Mr. Larian has or his

20   children have, for the Court denying a right to discovery is

21   only in the context of this litigation.  Certainly he has

22   every right and duty, of course, to go to the police or

23   authorities and then as to his attorney you will properly

24   advise him as to who to seek or where to go.

25             MR. NOLAN:  And we have, Your Honor, we have taken

1   those steps.

2           THE COURT:  Very good.

3           MR. NOLAN:  And the only delay in doing that

4   frankly was because and maybe was being, I use this term

5   loosely, over cautious about this in light of the history of

6   this, Your Honor.  I wanted to make certain that it was

7   appropriate that we are allowed to release that to potential

8   law enforcement officers and they do whatever they want

9   without to respect to --

10          THE COURT:  That's up to them.  I trust they will

11  maintain professional conduct.

12          MR. NOLAN:  Right, Your Honor, we understand that.

13          THE COURT:  I think that's the better way to pursue

14  this as opposed to -- because it really has nothing to do

15  with this case.  As I indicated in the order it is so far

16  removed at this point from the statute of limitations time

17  period that I just don't see the relevant connection there.

18  And the Court does have reason to have concerns about the

19  reliability of that letter and I just don't think there is

20  enough there to justify --

21          MR. NOLAN:  And the last point on this, Your Honor,

22  is that you know how much I respect my colleague Ms. Aguiar

23  and she has substituted in terms of reminding me she told me

24  not to file this in the beginning.

25          THE COURT:  The letter?

57

1          MR. NOLAN:  The letter.

2          And that's more representation than I saw of it,

3     Your Honor, without regard to what was going in the back of

4     the courtroom.  I didn't know that.  I took it serious.

5          Ms. Aguiar was telling me why did we even bother

6     the Court with this at this stage.  So as usual she is right

7     on this one.  We'll take it through the right channels.  I

8     was just concerned about the status of things.

9          THE COURT:  You are.

10         And I don't know who was suggesting that you were

11    responsible for what was being passed out in the back of the

12    courtroom.  Whoever was doing that you can't control

13    everything.  You've got a little domain right up here.

14         MR. NOLAN:  I can't control anything at home or

15    here.  I try to.  But we tried our best, Your Honor, and

16    that happened and all I was saying is that we will deal with

17    it in the appropriate way.

18         THE COURT:  I think you probably did the right

19    thing about returning the letter --  These things need to be

20    brought to the Court's attention.  And I am mindful if there

21    is another incident it places it in context.  It's just when

22    we are going through that process it's important to keep

23    things sealed.

24         All right, very well.  That's all fodder under the

25    bridge at this point.

1    So if there nothing else let me go through the

2    depositions and we can all go home or at least back to your

3    hotel rooms.

4    I will start with Ms. Prince.

5    Okay, page 7.  I'm going to sustain --  Just let's

6    not include, "Having first duly sworn, was examined and

7    testified as follows."  That's really not testimony.  Let's

8    start with the question, "Good morning, Ms. Prince," as we

9    do with all testimony.  So I'm really not sustaining the

10   objection.

11   At page 10.  Overruled.

12   Page 20.  Overruled.

13   And please if I skip over something as we are going

14   along here alert the Court.

15   Page 32.  Overruled.

16   34.  Overruled.

17   On 42-43 I will overrule.  Is overruled line 17

18   through 25.

19   43 lines 1 through 9 is sustained.  The witness

20   gets a bit off topic here.

21   Page 47.  Sustained.

22   48 and 49.  Overruled.

23   51.  Overruled.

24   I'm letting in quite a bit of background here but

25   the relationship between Ms. Bryant and Ms. Prince has

1   become somewhat of an issue in this case.

2        71.  Overruled.

3        72 is overruled.

4        MR. PROCTOR:  Your Honor, number 52 there is an

5   objection.

6        THE COURT:  I'm going to overrule that.  It's not

7   clearly responsive.  But like I say this relationship or

8   their relationship has become an issue of significance.

9        72 and 73 is overruled as is 74 and 75.

10        Going next to page 89.  I will sustain the

11   objection there.

12        Page 107 overruled on the lines 14 through 19.  I'm

13   going to sustain it on 23 through -- turning to the top of

14   page 108.  I don't think there is foundation here and

15   assumes facts not found in evidence.

16        Overrule the objections on 108, 109.

17        110 overruled.

18        112 overruled.

19        Page 115 is sustained.

20        All right, page 124 to 125.  124 I will sustain the

21   objections on lines 21 through 25 and I will sustain the

22   objections on 125 lines 1 through 7 and 19 through 22.

23   Otherwise overruled.

24        I will sustain the objections on 128.

25        On 129 I'm going to strike lines 19 through 23

1    beginning with, "I'm not sure," on line 19.

2            Sustain the objections on 129.

3            MR. PROCTOR:  Your Honor, I apologize.  I lost

4    track here.  Can you clarify for me what the ruling is on

5    page 128.  You said 128 sustained.  Does that apply to the

6    entire page?

7            THE COURT:  No, it doesn't.  It applies to lines 19

8    through 23.  Just from, "I'm not sure," down to, "I meet a

9    lot of people are doing their own thing."

10           MR. PROCTOR:  Thank you.

11           129 you started to list something which does seem

12   to be tracking --

13           THE COURT:  Right.

14           Let me hear from the parties very briefly on this.

15   The next few pages all deal with what other people are doing

16   at Mattel.  Some of it is objected to and some of it is not

17   objected to.  And if I sustain the objections -- I thought

18   we had dealt with this in a motion in limine.

19           Mr. Proctor, do you want to address this?

20           MR. PROCTOR;  We did.

21           MGA designated this testimony.  We think it's

22   objectionable.  We made objections to it.  Out of an

23   abundance of caution we also counter designated in the event

24   the Court were to overrule the objections and need to have

25   the rest of the record designated.  We do think based on the

1    Court's ruling that it all should not come in.

2            THE COURT:  Let hear from someone from MGS.  Should

3    any of this come in given the Court's motion in limine

4    rulings?

5            MR. HERRINGTON:  Yes, Your Honor.  Mr. Price on

6    direct examination of Mr. Bryant elicited testimony from

7    Mr. Bryant about his state of mind in terms of other people

8    at Mattel moonlighting and there was a give and take on that

9    and this testimony corroborates what Carter Bryant was

10   stating in his testimony with Mr. Price and goes directly to

11   his credibility.

12           THE COURT:  I can see the state of mind here.  Now

13   we are kind of getting into the truth of whether or not

14   these people are doing this.  I mean it opens the door that

15   I'm concerned about.  I see their argument.

16           Mr. Proctor.

17           MR. PROCTOR:  I mean I think the short answer to

18   this there are other issues.  Just it's based on hearsay.

19   There are all sorts of issues with this.  But the short

20   answer is, it's going back to what the Court already ruled

21   and that is this is a motion in limine.  "Moonlighting" if

22   it is comparable to Mr. Bryant, fine, that may be able to

23   come in, but if it's not comparable to Mr. Bryant it can't.

24   And the testimony that was elicited after the initial

25   statements by Ms. Prince makes clear that she has no

1   knowledge based on hearsay or otherwise, it's all based on

2   hearsay, but she doesn't have knowledge based on hearsay of

3   anything comparable to Mr. Bryant specifically at the bottom

4   of page 132 and the top of 133.

5        THE COURT:  I'm looking at that right now.  I will

6   look at the portions you designate.  I agree those are

7   foundational issues here.

8        MR. PROCTOR:  She knows of no one working for a

9   competitor without authorization while at Mattel even based

10   on hearsay.  So getting into this at all makes no sense to

11   me.

12        MR. HERRINGTON:  Your Honor, as I understood the

13   Court's ruling in terms of the motion in limine there was a

14   distinction made between just general rumors and hearsay as

15   opposed to specific examples of people's names that were out

16   there doing other things at Mattel.  And Ms. Prince actually

17   provided testimony about a specific person who was designing

18   collectible dolls for Barbee at a time --

19        THE COURT:  Right.

20        But the problem is the foundational issues on the

21   bottom of page 132, the top of page 133.  "Do you know

22   whether or not Nora had Mattel's permission to do so?

23        I don't know.  I have no idea.

24        Are you aware of any instances of a Mattel designer

25   working on a doll line?

1        No?

2        Outside his or her Mattel time?

3        No, no knowledge."

4        That undercuts that.

5        MR. HERRINGTON:  Your Honor, when you have a

6   witness who they are trying to place with Carter Bryant in

7   terms of some sort of conspiracy, in terms of creating a

8   false notary and that they are somehow so closely

9   intertwined that they would engage in a conspiracy, to argue

10  that her knowledge about what other people were doing at

11  Mattel on their own their time is just irrelevant and there

12  is no foundation for it.

13       THE COURT:  Let me stop you there.

14       It's relevant to whether or not I allow in her

15  testimony about these employees.  She said she doesn't know

16  about these employees other than this Nora person that she's

17  -- that you want to introduce testimony about.

18       MR. HERRINGTON:  What she is saying is she doesn't

19  know whether that person had authorization.  She's saying

20  that person did other things.

21       THE COURT:  Right.

22       It goes to relevance.

23       Under the Court's motion in limine ruling there

24  would have to be a foundation that she was not authorized to

25  do it in the same way that Carter Bryant wasn't authorized

1    to do it.

2                MR. HERRINGTON:   Your Honor, in terms of --

3                Mr. Price asked Carter Bryant the question --

4    opened the door in terms of his state of mind whether other

5    Mattel employees -- whether he was aware other Mattel

6    employees moonlighting doing work on their own time on

7    nonMattel projects.

8                This testimony, whether or not she had

9    authorization of not this woman, Ms. Prince is aware of a

10   specific person who was doing nonMattel work outside Mattel

11   and this person, Ms. Prince, they are trying to put into a

12   conspiracy with Carter Bryant.

13               It goes directly to Carter Bryant's state of mind.

14   It also corroborates and goes to Carter Bryant's

15   credibility.

16               The foundational objection that Mattel is raising

17   goes to the weight and they impeach her on it.  They have

18   designated or counter designated the impeachment.  "Do you

19   really know if they were unauthorized?" The jury can weigh

20   that.  She says, "No."  The jury can weigh that and

21   determine, "Well, then I'm going to give any weight to her

22   testimony," or they can say, "You know what?  Maybe people

23   doing the other tings and maybe Carter was telling the

24   truth."

25               MR. PROCTOR:  We did not open the door to anything

1    from our perspective.  Number one, Mr. Bryant did not say --

2    Mr. Bryant was unequivocal at the deposition and then

3    eventually admitted at trial I believe that he was not aware

4    of anyone else who was moonlighting.  That's number one.

5           Number two, I entire issue of moonlighting, which

6    is MGA's term for it, but that entire issue is relevant, if

7    at all, only to affirmative defenses which are in 1B and not

8    in 1A.

9           Number three, even if we did somehow open the door

10   to something, there is no open the door exception to

11   hearsay.  The testimony here is unequivocal.  If you look at

12   page 131, line 18, her foundation for even the specific

13   example that's being proffered that this Nora Harri-Trezona,

14   a woman is, "Because I would hear about what happened."

15       Everything that she knows about this is based on

16   hearsay.  She lacks foundation for whatever she is saying

17   and it directly conflicts with the Court's motion in limine

18   ruling which says moonlighting comes in only if it is

19   comparable.  To say that an employee, a designer working on

20   something on the side with Mattel's permission is comparable

21   to what Mr. Bryant did working a line of dolls on the side

22   without Mattel's permission makes no sense for the

23   situations are quite clearly noncomparable.

24          If the Court is going to permit evidence of this

25   sort in we are going to have another objection, and this is

1    403, we are going to have to bring in somebody to talk about

2    this Nora woman and explain --

3              THE COURT:  Thank you, Counsel.

4              I ultimately do think there is foundational issues

5    here.

6              We are not going to have any testimony from line --

7    129 line 17 through 133 line 19.

8              Picking up on line 20 on page 133.  The objection

9    from the following page is overruled.

10             Turning to page 134 lines 1 through 11 is

11   overruled.

12             Objection on lines 12 through 15 by MGA is

13   sustained as is MGA's objections on lines 20 through 25 and

14   the top of page 135.

15             MR. PROCTOR:  Your Honor, I'm sorry, I keep losing

16   track.  The bottom of 133, I didn't catch the Court's

17   ruling.

18             THE COURT:  I'm allowing the bottom of 133 and the

19   top of 134 up until line 11.

20             MR. PROCTOR:  Thank you, Your Honor.

21             THE COURT:  Sustaining the rest on that page.

22             Sustaining MGA's objection on 136.

23             Overruling the objection -- Mattel's objection on

24   141.

25             Sustaining the objection on 143.

1        Sustaining the objection on 146.

2        Overruling the objection on 148.  Specifically just

3    the lines --  Yes, overruling the objection on 148.

4        153.  Sustaining the objections on 153 and 154.

5    Hearsay and speculation.

6        Sustain the objections on 155.

7        Overruled the objections on 167 and on 168.

8        I put a question mark here.

9        Exhibit 62 is in evidence, right?

10       MR. HERRINGTON:  Yes, Your Honor, it is in

11   evidence.

12       THE COURT:  Very well.

13       So I will overrule the objections also on 169,

14   170.  These are a series of questions about asking the

15   notary as you recall.

16       I will overrule the objections 171, 172 and 173.

17       175 overruled as well.

18       Overrule Mattel's objections on 179.

19       I will sustain the objections on 180 on lines 10

20   through 15.

21       Overrule the objections on 181 and 183.

22       Overrule the objection on 187.

23       Then overrule the objection on 195.

24       Let me turn next to Janet Bryant.  I believe I've

25   already done the first half of it.  I discovered that there

1    was a second half.  I'm really glad we are not dragging

2    Janet Bryant out to do this live.

3              MR. HERRINGTON:  Your Honor, according to my notes

4    we had left off on page 245 of the first volume.

5              THE COURT:  245 we have a question?

6              MR. HERRINGTON:  Yes, Your Honor.

7              Maybe I didn't catch it but there was one objection

8    on 245.

9              THE COURT:  245, I see it.

10             This is kind of confusing.  I kind of see the 403.

11   She says -- she's first asked, "Did you see the drawing?

12             Yes.

13             Did it have the notary stamp?

14             No, I didn't see it.

15             Question:  You don't recall seeing that?

16             Answer:  No.  I recall seeing the drawing.

17             Question:  I'm sorry.

18             Answer:  The drawing.  I saw the drawing.

19             Question:  Do you know for certain whether or not

20   that notary stamps with the signatures is on the drawing?

21             Answer:  I don't recall seeing the stamps on the

22   drawing."

23             Okay, at the end of the day she does recall seeing

24   the drawing without the stamp.

25             MR. HERRINGTON: Or, just the flip.  She recalls

```
 1    seeing the drawing, not the stamp.
 2            THE COURT:  It's overruled.  That's fine.  It's a
 3    little confusing.
 4            Page 257.  Overruled.
 5            258.  Both are sustained.
 6            259 overruled.
 7            267 overruled at this point.
 8            268 overruled.
 9            269 is sustained on both sets.
10            I think the next one is on 282 and the objections
11    are overruled.
12            The objections on page 290.  Overruled.
13            We skip to 303.  The objection there is sustained.
14            Page 305 sustained.
15            At the end of the day she says, "No."  A few pages
16    later 307 on line 15.
17            I think that's it.
18            MR. COREY:  Your Honor, very briefly, if we can go
19    back to 303.
20            THE COURT:  Yes.
21            MR. COREY:  And it looks to me like the objection
22    there is on --
23            THE COURT:  402 or 403 grounds, yes.
24            MR. COREY:  I think at best it goes to bias in
25    terms of the amount of money that Mr. Bryant could provided
```

```
 1    to them as a result of Bratz work.

 2             I ask the Court to just think about it a little

 3    more.

 4             THE COURT:  He is already --

 5             Hasn't this already come in?

 6             There was a reference to the $300,000.  I thought

 7    this already came in.

 8             MR. COREY:  Your Honor, if it did come in it was

 9    when I was not in the courtroom.

10             But Mattel's preference would be that it come

11    through the mouth of the witness rather than Mr. Bryant.

12             If the Court would like I can shorten that.

13             THE COURT:  Well, on the first part here --

14             MR. COREY:  Maybe I can short circuit that.  If we

15    can get --

16             THE COURT:  Let's go to 304.

17             MR. COREY:  304.

18             THE COURT:  304 Through 312.

19             MR. COREY:  Thank you.

20             I will overrule the objections on that.  It goes to

21    credibility.  I think it's probably somewhat cumulative but

22    --

23             Anything further on this?

24             MR. HERRINGTON:  Your Honor, may I just raise one

25    issue?
```

1          THE COURT:  Please.

2          MR. HERRINGTON:  This is on the other one.  I'm

3   sorry to go back to this.  There is just one Q and A where

4   it actually cuts off Jacqueline Prince's answer.  I

5   understand Your Honor's ruling regarding --

6          MR. COREY:  I'm sorry.

7          MR. HERRINGTON:  128.

8          THE COURT:  This is on the moonlighting?

9          MR. HERRINGTON:  It is a question and answer where

10   she offers speculation about a reason Carter Bryant may have

11   been concerned about -- may have expressed concern during a

12   meeting and then there was an objection at the end  to a

13   reference to moonlighting or people doing things on their

14   own time.

15          There is a bit of history in the give and take on

16   this specific section of the designations.  We had

17   originally objected to this entire section as speculation.

18   The answers in the give and take with Mattel's counsel they

19   ultimately cut their designation, ended up cutting at mid

20   answer at line 19.  And when we saw them do that we then

21   designated the entire section and removed our objection on

22   the tender based on their objection.

23          My point here would be that if we are going to cut

24   this question -- I'm sorry the answer, mid answer and the

25   rest of this is speculation.  She doesn't have a foundation

72

1    for why Carter is concerned and she's just --

2              THE COURT:  I did.  I sustained that.

3              MR. HERRINGTON:  The objection as written at least

4    in my notes and for clarification it was only from lines 19

5    through 23.

6              THE COURT:  That's right.  So you want to do it for

7    the entire thing?

8              MR. HERRINGTON:  Yes, Your Honor.

9              THE COURT:  I see.

10             Well, wait a minute.

11             I skipped over about three of these before.

12             MR. PROCTOR:  You skipped over it for a reason and

13   the reason is there is no objection to it and there was no

14   objection to it because MGA intentionally waived its

15   objections to that.

16             Originally when these binders were first prepared,

17   Your Honor, MGA made an objection to that passage and that's

18   actually why I sought clarification.  My version of the

19   binder still has the objection.  You can see it right here

20   even.  My version of the binder still has some objections to

21   that passage which they are now belatedly objecting to.

22             THE COURT:  They are belatedly objecting to it.

23   That's true.  You are correct.  That's a belated objection

24   and I'm going to sustain the belated objection.

25             We are going to take a five minute rest room break.

```
 1              Actually if we did this other one in the morning
 2    would that be --
 3              MR. COREY:  That's totally fine, Your Honor.
 4              THE COURT:  Let's adjourn for the day.  Let's pick
 5    up on this.  I will do this in the morning.  I will try to
 6    do the other one.  Who is the other?
 7              MR. HERRINGTON:  Richard.
 8              THE COURT:  I will do those two in the morning.
 9              And I will give you a decision on Peter Marlow.
10              MS. AGUIAR:  What time would you like us here in
11    the morning?
12              THE COURT:  8:30 is fine.
13              (Whereupon, Court was adjourned at 6:50 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

1              C E R T I F I C A T E

2

3         I hereby certify that pursuant to Section 753,

4    Title 28, United States Code, the foregoing is a true and

5    correct transcript of the stenographically reported

6    proceedings held in the above-entitled matter and that the

7    transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United States.

9

10   Dated:  June 29, 2008

11

12

13                         /s/_____

14                         GARY D. GEORGE, RPR, CSR
                           OFFICIAL COURT REPORTER
15

16

17

18

19

20

21

22

23

24

25