```
 1                 UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                      EASTERN DIVISION

 4       THE HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 5

 6   CARTER BRYANT, ET AL.,        )
                                   )
 7                  PLAINTIFFS,    )
                                   )
 8            VS.                  )    NO. ED CV 04-09049
                                   )    (LEAD LOW NUMBER)
 9                                 )
     MATTEL, INC., ET AL.,         )
10                                 )
                    DEFENDANTS.    )
11   _____)
     AND CONSOLIDATED ACTIONS,     )
12   _____)

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  RIVERSIDE, CALIFORNIA

16                  MONDAY, MAY 19, 2008

17

18

19

20

21

22

23

24
     Christy A. Cannariato, CSR #7954, RPR, CRR
25   CSR7954@att.net; (805)320-4655
```

```
 1   APPEARANCES

 2   ON BEHALF OF CARTER BRYANT:

 3   KEKER & VAN NEST
     BY: CHRISTA MARTINE ANDERSON, ESQ.
 4   710 SANSOME STREET
     SAN FRANCISCO, CA  94111-1704
 5   415-391-5400

 6
     ON BEHALF OF MATTEL:
 7
     QUINN EMANUEL
 8   BY: JOHN B. QUINN, ESQ.
     BY:  MICHAEL T. ZELLER, ESQ.
 9   BY:  JON D. COREY
     865 S. FIGUEROA STREET
10   10TH FLOOR
     LOS ANGELES, CA  90017
11   213-624-7707

12
     ON BEHALF OF MGA ENTERTAINMENT:
13
     SKADDEN, ARPS, SLATE, MEACHER & FLOM
14   BY: THOMAS J. NOLAN, ESQ.
     BY: JASON D. RUSSELL, ESQ.
15   300 SOUTH GRAND AVENUE
     LOS ANGELES, CA  90071-3144
16   213-687-5000

17

18

19

20   ALSO PRESENT:

21   AMBASSADOR PIERRE-RICHARD PROSPER

22

23

24

25
```

```
1                        I N D E X
2
3
4
5        Motions in Limine.........................Page 4
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              Riverside, California; Monday, May 19, 2008
 2                          1:35 P.M.
 3
 4
 5         THE CLERK:  Calling Item No. 12 in the matter of Carter
 6   Bryant versus Mattel, Case No. CV 04-9041 and related
 7   actions.
 8              May counsel please state your appearances for the
 9   record.
10         MR. QUINN:  Good afternoon, Your Honor.  John Quinn,
11   Mike Zeller, Jon Corey from Mattel.
12         THE COURT:  Good afternoon, Counsel.
13         MR. NOLAN:  Good afternoon, Your Honor.  Tom Quinn
14   Skaden, Arps, Slate, Meagher & Flom on behalf of MGA.
15         THE COURT:  Good afternoon.
16         MS. ANDERSON:  Christa Anderson and Matthew Werdegar.
17         THE COURT:  Good afternoon counsel and everyone else
18   gathered here this afternoon.
19              Ambassador Prosper, good afternoon to you as well.
20              We have several matters on calendar this
21   afternoon.  I'm going to ask, Ambassador Prosper, if you
22   would approach the lectern and give the Court an update with
23   respect to where we are with respect to settlement.
24         AMBASSADOR PROSPER:  Good afternoon, Your Honor.
25         THE COURT:  Good afternoon.
```

```
 1            AMBASSADOR PROSPER:   Thank you.
 2            Let me first begin by thanking all parties in this
 3    matter for the level of cooperation they have given me
 4    throughout this entire period.  I think it's safe for me to
 5    say that the access has been tremendous, the availability has
 6    been consistent, and I think there's been a general
 7    willingness to discuss these complex issues to try to find a
 8    resolution.
 9            As you know, in looking at this from a settlement
10    perspective, there are really two parts.  There is whether or
11    not a settlement Carter Bryant reached between Mattel and MGA
12    and whether or not there is a settlement that Carter Bryant
13    reached between Mattel and Carter Bryant.  And I will take
14    those two individually.
15            I will begin with the Bryant matter.  And I am
16    pleased to inform the Court that a settlement has been
17    reached between Carter Bryant and Mattel.  The terms of the
18    settlement will remain confidential, but what I can say is
19    that an agreement was reached that is fair and appropriate
20    under the circumstances and that there is no admissions of
21    wrongdoing or liability by any party, by either Mattel or
22    Carter Bryant.
23            And I will leave the details to the Court to
24    review and for counsel to discuss.
25            I want to thank John Quinn, his team, and his
```

```
 1   client for the tremendous level of cooperation and exchange
 2   in this.  I also want to thank Christa Anderson, her team,
 3   and her client for their level of attention and cooperation.
 4              On the second part as it relates to Mattel and
 5   MGA, at this moment there is not a settlement.  It is not
 6   because of lack of trying.  I think we've devoted a lot of
 7   hard work and time in this and hereto.
 8              I want to again thank John Quinn and his team, but
 9   I also want to thank Tom Nolan, his team, the MGA team, MGA
10   leadership.  We've also worked very, very hard, but I think
11   what we have here is a situation where both parties strongly
12   believe in the case.  They believe in the merits of their
13   case.  As a result of speaking with them and reviewing the
14   file myself, I believe that this is a triable case that in
15   the end could go either way, in my point of view.
16              That said, I do believe that there is a settlement
17   out there that Carter Bryant reached.  I am willing to remain
18   engaged if the Court and the parties would like for me to do
19   so.  Because, as you know, in the course of a trial anything
20   can happen, and minds can be changed.
21              So with that I'm available for any questions that
22   you may have.  I also remain available to continue to serve.
23          THE COURT:  Thank you, Ambassador.  I understand that
24   Carter Bryant has fully settled.
25              This is a complete settlement of all outstanding
```

```
 1   matters in this case; is that correct?
 2        AMBASSADOR PROSPER:  It is.
 3        THE COURT:  Very well.  Well, I appreciate your
 4   willingness to serve in a continuing capacity.  We not only
 5   have this matter, this case, this trial which is beginning
 6   tomorrow, but we may also have additional phases, second
 7   phase trial.  So I trust that we will continue to work with
 8   both Mattel and MGA after I've heard from counsel on several
 9   cases.
10        You have been very diligent, and I appreciate all
11   of your efforts.
12        I will want counsel -- I know that your schedule
13   does not permit you to observe the entire trial.  But I would
14   hope that counsel might be able to identify for you any
15   particular key witnesses that might assist in settling the
16   case, that might be important to settlement efforts, and in
17   your evaluation or assessment might be of assistance.
18        So I will ask you to meet and confer with Mr.
19   Quinn and Mr. Nolan perhaps to identify those witnesses that
20   they each think may be of particular value.  If you would do
21   that, I would appreciate it.
22        And again, thank you for your service in this
23   matter.
24        AMBASSADOR PROSPER:  Well, thank you, Your Honor.  And
25   I will engage Mr. Quinn.  The Mattel team has been, as I
```

```
 1    said, been very, very open and accessible, Mr. Nolan and the

 2    MGA team as well.

 3              THE COURT:  Very well.  Mr. Quinn, just to confirm with

 4    you, there has been a complete settlement with Carter Bryant?

 5              MR. QUINN:  Yes, Your Honor.

 6              THE COURT:  Very good.

 7                   And Miss Anderson?

 8              MS. ANDERSON:  Yes, Your Honor.  That's correct.

 9              THE COURT:  Very good.

10              MR. NOLAN:  Your Honor, may I inquire for a moment?

11              THE COURT:  Mr. Nolan, please.

12              MR. NOLAN:  We obviously were not part of the

13    settlement negotiations, and I understand from the settlement

14    officer in his description that Carter Bryant is not making

15    any admissions or concessions of any wrongdoing or liability

16    in the case.

17                   The one thing that was a little bit unclear was

18    that I just want to confirm that it is a complete release of

19    all known and unknown claims that Mattel may have had or

20    could have in the future arising out of the circumstances

21    here under a typical 1542 release.  So that I'm clear in this

22    case, that Mattel has dropped all claims against Carter

23    Bryant.

24                   Can I have that confirmation?

25              THE COURT:  All claims in this case.  The Court is not
```

```
 1    interested in inquiring into any of the terms of the
 2    settlement agreement itself, which Ambassador Prosper
 3    indicated are confidential.  My question is that this matter
 4    is being dismissed with prejudice, and I understand based on
 5    the representations made that it is.
 6              Is that correct, Mr. Quinn?
 7         MR. QUINN:  Yes, Your Honor.
 8         MS. ANDERSON:  Yes, Your Honor, it is.
 9         THE COURT:  Very well.
10         MR. NOLAN:  And this case includes both Phase 1A, 1B,
11    and Phase 2.
12         THE COURT:  I have the same concern, and that's why I
13    asked that question as well, Counsel.
14         MR. NOLAN:  Thank you.
15              Your Honor, I think the other question is -- and
16    we can either do it now or because we're just reacting to
17    this real time -- is that the specific terms of the agreement
18    I understand and appreciate that they are confidential.
19              However, I think all of us who would admit that
20    after nearly four years of litigation involving Carter Bryant
21    where Mattel was pursuing a substantial sum of money damages,
22    nearly $35,000,000, for it to be settled on the eve of jury
23    selection either creates an inference of significant sums of
24    money being paid, which a juror in this case could likely be
25    confused by, and if there are not substantial monies paid and
```

 1    it's just a nominal settlement and a walk away, then that in
 2    effect is also something that I think is relevant.

 3            Carter Bryant will be a witness in this case.  He
 4    is under trial subpoena by us.  He, I assume, will be a
 5    witness either called by Mattel or by us.  This issue may be
 6    looming out there.  And if -- and I want to come back --

 7        THE COURT:  That's interesting.  I'm just thinking I
 8    read over the weekend your motion in limine concerning the
 9    litigation involving your client and his brother.  And you
10    took the position that such settlements should not have any
11    role whatsoever in litigation.

12            So I'm surprised to hear you now suggesting that a
13    settlement involving Carter Bryant should play a role in the
14    litigation.  I'm kind of curious which position --

15        MR. NOLAN:  Well, with all due respect, Your Honor, I
16    don't mean to be sarcastic, but Fred Larian has never been a
17    party in this case.  He was not going to be a significant
18    witness in this case.

19        THE COURT:  I'm mindful of the arguments that you made
20    and the legal authority that you cite in the motion in
21    limine.  You seem to suggest that those types of settlements
22    are agreements.  It's quite well understood that the purpose
23    behind the Rules of Evidence which exclude settlement from
24    being introduced are to encourage settlement.

25            So I would have to think long and hard before --

```
 1   if you're suggesting that somehow the terms of the settlement
 2   agreement need to be disclosed or brought into court, that
 3   will be something which I think I will think long and hard
 4   before the Court would entertain doing.
 5             I could see -- I'm pleased that we were able to
 6   reach a settlement before we actually had the jury hear the
 7   opening statement tomorrow morning or opening statements,
 8   because I can see all of a sudden a party disappears.  There
 9   might be inferences going on there one way or the other.  But
10   this jury that we're going to assemble tomorrow is going to
11   be presented with a case of Mattel versus MGA.
12        MR. NOLAN:  I understand.  But, Your Honor, the motion
13   in limine with respect to Mr. Larian if we can just talk
14   about that just for a moment to show the contrast.
15             In truth, as the Court knows, in that arbitration
16   Mr. Larian, Fred Larian, dropped his claims, and no judgment
17   was entered.  Zero dollars.  In fact, to the contrary, after
18   confessing that he was sorry he even brought the claims and
19   that they were baseless against my client, the arbitrator
20   awarded X money against the person who brought it.
21        THE COURT:  The attorneys --
22        MR. NOLAN:  Your Honor --
23        THE COURT:  We're going to get into that.  You're going
24   to have full time to argue that motion in limine.
25        MR. NOLAN:  My only point, Your Honor, the purpose and
```

```
 1    thrust of that motion was that in this case what happened in
 2    an arbitration between Mr. Larian and his brother is
 3    completely irrelevant to any of the issues that are pending
 4    before the trial, including the amount of that settlement.
 5              But I respectfully disagree that that
 6    automatically applies to Carter Bryant.  I will give you an
 7    example.  And I don't believe this is going to be the case.
 8              THE COURT:  I didn't say automatically apply.
 9              MR. NOLAN:  I'm sorry, I didn't mean to imply that you
10    did.  I'm just saying that I don't even think it reads on
11    this particular issue.
12              Let's assume hypothetically that Carter Bryant,
13    who has been deposed for five days in this case, I think
14    maybe even longer, volumes and volumes of testimony, whom I
15    believe to be an honest witness, were, however, to change his
16    testimony significantly in this case now in favor of Mattel
17    in light of the settlement.
18              THE COURT:  Let's cross that bridge when we get to it.
19              MR. NOLAN:  That's the reason why I raise it.
20              THE COURT:  Let's not create issues.  The Court will
21    certainly give you leave to bring any motions that you
22    believe is appropriate on this point.  But right now we'll
23    just have, as far as I understand it, there's no settlement
24    between Mattel and MGA.
25              MR. NOLAN:  No, Your Honor.  Carter Bryant is the only
```

```
 1    case they dropped.
 2         THE COURT:  Okay.  Very good.
 3         MS. ANDERSON:  Excuse me, Your Honor.  Christa
 4    Anderson.
 5              May I ask a question?
 6         THE COURT:  Yes.
 7         MS. ANDERSON:  What is the Court's preference in terms
 8    of entrance of the stipulation of dismissal timing wise?
 9         THE COURT:  Well, you've both represented on your
10    parties' behalf that you've entered into this.  It's
11    stipulated to a dismissal.  The Court will expect that I will
12    receive a written form so that it will go into the docket.
13    But as far as I'm concerned, as of now Carter Bryant is
14    dismissed.
15         MS. ANDERSON:  Thank you, Your Honor.
16         THE COURT:  All right.  That's the first of several
17    issues we have for today.
18              I'm going to diverge before we get into
19    substantive matters on some housekeeping matters.  Courtroom
20    set up is the next item on my agenda for the hearing today.
21              I did receive and I signed -- received actually at
22    12:02 an order permitting some individuals to come in and set
23    up.  They were here at twelve o'clock, so we did let them in.
24    And I had some discussions actually in the presence of a law
25    clerk with the individuals just directing them in terms of
```

```
 1   where to move things and set things up.  So just for the
 2   record on that.
 3            Tomorrow morning we're going to reserve the left
 4   side of the courtroom in the back there for the prospective
 5   jury panel.  I know it's going to be tight, so the only side
 6   we're going to have for open seating is on my right side
 7   here.  We are going to bring in some additional chairs for
 8   the back there so people can sit during the selection, but I
 9   want to have 15, the first 15, numbers 1 through 15, jurors
10   in the box.  And then we will have 16 through 56 seated in
11   rows of ten.  There will be a row of chairs on my side of the
12   bar, and then the three rows of pews, each will have 10
13   persons seated.  These individuals will be selected from the
14   group of 60 that we have prescreened or were able to sit for
15   the time of the trial.
16            They will be randomly assigned a number 1 through
17   56.  They'll be seated in that order.  Then the Court will
18   introduce or have counsel introduce themselves and their
19   clients.  We will have a reading of the witness list, the
20   joint witness list, so that's something for you to divide up
21   amongst yourselves.  I will ask the counsel to read the names
22   on the witness list.
23            The Court will then conduct a voir dire of each of
24   the prospective jurors, all 56.  And I have my standard
25   questions.  I have received questions from MGA.  I have
```

1   received questions from Mattel.  I will incorporate your
2   suggestions into my questions.  On your table when you come
3   in tomorrow morning will be the list of the questions that I
4   will ask of each juror.

5          After we have gone through all 56 jurors, I will
6   then afford counsel an opportunity for a brief follow up, not
7   to exceed 30 minutes for each side.  Once we have completed
8   the questioning at side bar, I will entertain motions for
9   cause.

10         And just so you know, during side bar I don't want
11  any more than two counsel from each side just not to make it
12  too crowded over there.  I have the court reporter.  I will
13  have my courtroom deputy.  I will ask my law clerk and two
14  counsel.  That should be enough to fill up the space over
15  there.

16         So we'll then take motions for cause.  The court
17  will rule on the motions for cause.  I'm not going to excuse
18  anybody until the entire process is over so the people that
19  would excuse for cause would sit right where they're at.  You
20  will then return to your table and you will exercise the
21  peremptory challenges.

22         My plan right now is to seat 10 jurors, and that
23  will have basically four alternates built into it.  It should
24  be sufficient for the period of time for trial that we have.
25  You should understand, however, that if we still have 10

```
 1   jurors or 9 or 8 or 7, whatever number we have, all jurors
 2   remaining at the end of the case will be excused to
 3   deliberate, and they will be part of the jury that
 4   deliberates.
 5          After the motions for cause, you will exercise
 6   your peremptory challenges.  As it stands right now, I plan
 7   to give each side 10 peremptory challenges, but that may
 8   change depending on the number of jurors that we have left.
 9   I plan on being able to pick this jury from the group of 56.
10   So that's to say if each side has 10 peremptory challenges,
11   and we need 10 jurors in there, we need at least 30 jurors
12   post motion for cause in the pool for us to be able to be
13   assured that we will have 10 jurors.
14          If for some reason we only have 28, then instead
15   of that we'll have our 10, each side will have their 10, but
16   they'll have 9 peremptories, and we'll adjust it downward
17   based on how many prospective jurors we have left after the
18   motions for cause.
19          Once you've exercised your peremptories, taking
20   out and excuse those that have been excused for cause, we'll
21   then excuse those who have been excused based on your
22   peremptories, and the first 10 remaining will be the 10
23   members of the jury.
24          Just so that this is clear, if you pass on using a
25   peremptory, you lose it.  So if you do a third peremptory,
```

```
 1   you do not choose to exercise it, you cannot go back and use
 2   your third peremptory.  However, you can exercise a
 3   peremptory on any member of the panel at any time.  So if Mr.
 4   Quinn exercises his first peremptory to excuse Juror No. 2,
 5   Mr. Nolan excuses Juror No. 6, Mr. Quinn excuses Juror No.
 6   12, Mr. Nolan can go back and excuse Juror No. 1.  There's no
 7   limit in terms of who you can ask to be excused from the
 8   existing panel.  It's just once you use a peremptory that is
 9   it.
10         So I'm hoping that with that number of
11   peremptories and an exhaustive voir dire we should have a
12   very fair and equitable jury for both sides.  And I think 10
13   is probably the right number in terms of the length of this
14   trial.
15         So that is what we'll be doing.  I'm hoping to
16   complete that tomorrow.  If not tomorrow, it will carry over
17   to Wednesday morning, but certainly by Wednesday morning we
18   should be completed with the jury selection.
19         Are there any questions just on jury selection?
20         MR. QUINN:  Your Honor, so the challenges for cause and
21   the peremptories are not directed just to the box.
22         THE COURT:  That is correct.
23         MR. QUINN:  To anyone.
24         THE COURT:  You should picture that box as just being
25   another few rows.
```

```
 1            MR. QUINN:  Okay.

 2            THE COURT:  I use that for space purposes.  It's

 3    nothing -- there's nothing special about anyone sitting in

 4    the box other than they're the first 15 or 16 jurors.

 5            MR. QUINN:  Okay.

 6            MR. NOLAN:  Your Honor, and that it will always be

 7    sequential.  In other words, it will just keep moving them

 8    up.

 9            THE COURT:  Exactly.

10            MR. NOLAN:  Right.  The other question I have, Your

11    Honor, is that it's very generous with 10 peremptory

12    challenges, frankly, in a case of this size.  Little bit

13    surprising that we have so many, but that's fine.

14            But I want to make absolutely clear that if you

15    pass, I know you lose.  But if the other side passes we have

16    a jury.

17            THE COURT:  If both sides accept the jury as

18    constituted, then that ends the process.  Absolutely.

19            MR. NOLAN:  I just want to make certain.

20            THE COURT:  All right.  I would be very surprised if

21    that happens, Mr. Nolan.

22            MR. NOLAN:  Your Honor, there may just be some

23    surprises throughout the case.

24            THE COURT:  I assume.  But I appreciate your raising

25    that.
```

```
 1              All right.  There's no other questions?
 2         MR. NOLAN:  The other question is --
 3         THE COURT:  Yes?
 4         MR. NOLAN:  I know that in the past you -- I may be
 5    wrong, because as you might suspect there's always
 6    intelligence on court practices and things like that.  And
 7    I'm sure Quinn Emanuel, as Skadden has, have tried to figure
 8    out how cases were tried before you.
 9              Would the Court consider opening statements before
10    jury selection?
11         THE COURT:  Yes.  I'm sorry.  I thought I had explained
12    that before.  But absolutely.  There will be mini opening
13    statements not to exceed five minutes before jury selection.
14              I did receive and read your two proposed
15    statements of the case.  Well, let me say a few words about
16    the mini opening statement as well as the opening statement
17    itself.
18         MR. NOLAN:  And maybe this will also prompt maybe a
19    comment as well.  The mini opening statement with regard to
20    this phase is related to Phase 1A.
21         THE COURT:  Yes.
22         MR. NOLAN:  Thank you.
23         THE COURT:  Basically the purpose of the mini opening
24    statement is to provide the jury just some context for the
25    questions that we're going to be asking them.  I think it's
```

helpful for them to know what the case is about to be thinking about what the case is about in terms of asking these questions.  Because so much of this turns on essentially good faith, and they're kind of searching in their own mind as to whether or not there's some reason they can't be a fair juror in this case.  So I think the more they know about the case as opposed to telling them well it's a civil case involving two parties, I think that's quite helpful.

But on opening statements and on this kind of a tie-in, we'll talk about this during the motions in limine, there is going to be certainly motions in limine made, and we're going to be doing these after the opening statement that touch upon areas of controversy between the parties.  I would expect neither counsel to go into an area -- there's no need to go into an area of controversy during this mini opening statement.  If it's subject to a motion in limine, just stay away.  If you really feel compelled, let's talk about it tomorrow morning before you give the mini opening statement.

But let's stay away from areas that are in dispute at present.  I don't want to have a mini hearing on motions in limine before the mini opening statement.  So let's just stay away from those areas if we can and not get into them.  There's no need to.  You're simply telling the jury what the

1 | case is about from your perspective and what it's not about.

2 | Certainly do not get into any legal arguments.

3 | There's no reason to describe for example at the end of

4 | Mattel's proposed statement of the case there's no need to

5 | talk about what the Court has ruled on or what the Court

6 | hasn't ruled on.  That's a level of detail and minutiae,

7 | quite frankly, the jury doesn't need to know at this point in

8 | time.  Quite frankly, that is subject to a motion for

9 | reconsideration today.  The court may or may not have its

10 | order out until after the jury selection tomorrow.  So let's

11 | not get into that.

12 | It's basically in simple terms tell the panel what

13 | the case is about.  Opening statements have their own built

14 | in punishment.  I think when a counsel represents that

15 | they're going to prove something or that certain evidence is

16 | going to be revealed that turns out to be excluded either

17 | because of an objection or for any other reason, this

18 | promised something they can't deliver it then obviously the

19 | other side has fair game to point out in closing that you

20 | were told you were going to see X and you never saw X.

21 | So I don't want to have interruptions during these

22 | opening statements of evidentiary objections or whatever.

23 | There's just no real reason, at least at this stage, to get

24 | into what the evidence is going to show in detail.  But even

25 | in the opening statement itself where that is more

1     appropriate, I will expect counsel to understand that you run
2     the risk when you talk about evidence that doesn't appear of
3     having it come back to haunt you at the end with closing
4     argument.

5               So let's try to get through these opening
6     statements.  I try to respect counsel's ability to give
7     openings statement without interruption.  Unless it's a
8     really critical objection, I would ask you to refrain.

9               So anyways, those are my thoughts on that, but you
10    will sort of have that before we begin the questions because
11    the Court wants to give that as background to the questions.

12              I would not anticipate under any circumstance that
13    would proceed with opening statements, you know -- well, no
14    I'm sorry.  We'll giving our opening statements on the 27th.
15    So we're going to have a break between tomorrow's jury
16    selection.  I wouldn't anticipate tomorrow we're going to get
17    to the discovery motions or the motions in limine that
18    remain.  We'll probably begin with those on Wednesday after
19    we've selected the jury.  Or if we select the jury tomorrow,
20    first thing Wednesday morning.

21              That leads me to the next area.  I have received
22    by my count six more discovery motions since the last group
23    of discovery motions that I ruled on.  I'm hoping that we're
24    nearing the end of the discovery phase of this trial.  Should
25    I be expecting more appeals from Judge Infante or are we

1 | finally done?

2 | MR. NOLAN:  I think, Your Honor, we're actually hoping

3 | for the end of your patience on some of these.  That's what

4 | we really need.  We do not anticipate any more appeals simply

5 | because I don't know of any rulings that Judge Infante has

6 | made that someone would appeal.

7 | I know there is an ex parte that was recently

8 | filed by Mattel with respect to the privilege log that they

9 | were ordered to produce by today that we are filing our

10 | objections to that motion tomorrow, Your Honor.  We just got

11 | that motion.  That would have to be, I guess, heard whenever

12 | it's convenient for the court.

13 | To my knowledge, that's the last issue that we're

14 | aware of.  There was on Friday, late Friday, we understand

15 | there was also another.  And I don't know whether or not the

16 | Court has even seen this yet.  There was an amendment to the

17 | pre-trial conference order.

18 | THE COURT:  Yes, I have received that.  And I received

19 | your and I have read your objection to the amendment to the

20 | pre-trial conference order.  We'll get to that when I get to

21 | the pre-trial conference order.

22 | MR. NOLAN:  I just want to make sure.  That's all I

23 | really know about.

24 | THE COURT:  Thanks.  Thank you, Mr. Nolan.

25 | Mr. Zeller?

MR. ZELLER: At the risk of going, of course, after Mr. Nolan attempting to limit some of these things, there are a few motions that are still pending in front of Judge Infante that have not been ruled on. Some of them pertain to and they will overlap in all likelihood with issues that we would expect Your Honor to address.

And a number of these are is that in very recent depositions the Court will recall that the Court compelled the depositions and Judge Infante as well of Peter Marlow, the sample makers, the other people who by our mindset MGA had commercially bribed to work on Bratz while Mattel employees. Cabrera, Morales, and Salazar, and some of these others, they invoked the Fifth Amendment hundreds of times during their depositions. So that is going to have to be an issue that is going to have to be grappled with and I think through motion practice.

And then --

THE COURT: These are pending before Judge Infante?

MR. ZELLER: No, they are not, Your Honor.

THE COURT: We have to issue rulings on these.

MR. ZELLER: That's correct.

THE COURT: And they are clearly erroneous rulings and contrary to law. Is that what you're saying?

MR. ZELLER: Right. And so those issues will be -- of course there's the order that already precludes the parties

```
 1    from filing further motions with Judge Infante.  And plus
 2    these are Fifth Amendment issues.  They are not just going to
 3    be pure discovery issues anyway.  Obviously they're going to
 4    have an impact on the shape of trial testimony, potential
 5    inferences that can be drawn.  It is going to open up, you
 6    know, various issues on that front.
 7              Now, also related to those same witnesses were
 8    some motions that we had filed in front of Judge Infante that
 9    have not been ruled upon.  For example, one of the sample
10    makers had actually turned over documents that were torn up.
11    From what one can see from what is torn up, they are design
12    drawings by Carter Bryant.
13              We have asked -- we asked the other side to agree
14    that --
15         THE COURT:  Now is not the time to argue the motion,
16    Counsel.
17         MR. ZELLER:  No, I understand.  I'm just going trying
18    to give the Court an idea of what the issue is, which is
19    basically the reconstruction of those documents.
20         THE COURT:  So I would be more interested, just
21    numerically, how many motions are we talking about?
22         MR. ZELLER:  It's a little hard to separate them out is
23    the problem because some of them overlap.  We have at least a
24    couple of motions that are still pending in front of Judge
25    Infante.  I can't recall whether we separated them out or how
```

```
 1    we separated them out, but they basically involve some of
 2    these issues concerning Cabrera, Morales, and Salazar.  It
 3    was one motion or two.
 4              And then we of course have the ex parte that we
 5    recently filed in front of Your Honor pertaining to the
 6    Lighter and Kullman, K-U-L-L-M-A-N, issues who are some
 7    defendants' forensic experts.  Because that really involves
 8    some of the forensic testing of the stuff, and we've asked
 9    for their supplemental reports to be stricken because they
10    won't provide discovery.
11         THE COURT:  Get these in as soon as -- if you really
12    feel that they're necessary to be filed, please get them in
13    as soon as possible.  For anything that has been filed up to
14    this date, I'd ask that oppositions be in by the end of the
15    day tomorrow so that I can work on them tomorrow night and
16    then we can proceed with them.
17              I'd like to proceed with them, as I indicated
18    before, before the motions in limine.  It's nice to have
19    discovery done before the motions in limine as a general rule
20    of order.
21         MR. ZELLER:  And then there's another motion that's
22    also pending in front of Your Honor which involves Mr.
23    Palmeri yet again.  So we went back to Judge Infante.  He
24    ruled.  So the parties are now back.
25              As I recall, the opposition came in today, so
```

```
 1    there will be a reply.  And I believe that there's a
 2    stipulated briefing schedule on that one.
 3        THE COURT:  Very well.  Well, we'll hopefully get
 4    through these motions this week.  And I am going to issue --
 5    I don't ordinarily do this, but I look out in this courtroom.
 6    I see that I'm somewhat outnumbered in terms of lawyers.
 7            Without leave of Court, there are not to be any
 8    motions filed once the trial gets under way.  If counsel has
 9    a motion to make during trial, I'm hoping we can dispose of
10    it, resolve it orally.  If we can't, if the Court requires
11    written briefs, the Court will give leave for that.
12            But absent leave of Court, there will be no
13    written motions filed during the course of the trial once
14    we've started.
15            Yes, Mr. Corey?
16        MR. COREY:  Very, very briefly with respect to the stay
17    of Phase 2 discovery.
18            There are a number of motions that were pending in
19    front of Judge Infante that relate to Phase 2.  Once he rules
20    on those, I think the Court has suggested as there will be
21    some specific context, I want to make sure our time to appeal
22    issues or orders that relate to Phase 2 discovery is being
23    tolled.
24        THE COURT:  It will be tolled during the course of the
25    stay.
```

```
1              MR. COREY:   Thank you, Your Honor.
2          THE COURT:   Last thing I want is --
3          MR. COREY:   Just trying ease the burden, Your Honor.
4          THE COURT:   It will be tolled.   When I lift the stay on
5    the Phase 2 discovery, this will be lifted at the completion
6    of this trial.  So, too, that will lift the tolling on any
7    appeals.
8          MR. COREY:   Thank you, Your Honor.
9          THE COURT:   Very well.  All right.  As far as the
10   timing of the trial, I previously indicated 66 hours for each
11   side.  And that was when we had Carter Bryant in the case.  I
12   am going to modify that and limit each side to 60 hours now
13   that we have only the two parties in this case.
14              I am anticipating, and I want to shoot for getting
15   through six hours of trial testimony per day.  That's going
16   to be hard to do particularly at a sustained pace.  I
17   generally find it's normally only five hours range.  So we're
18   probably talking about 12 trial days for each side.
19              Mr. Quinn asked me whether the hour limitation
20.  time, 66 now 60, include opening statement.  It does not,
21   although I would like to get an estimate from both side in
22   terms of the length of the opening statement.  But it does
23   include sidebars, which the court strongly discourages, but I
24   understand the need to come up.
25              And generally what I will do is -- I actually went
```

```
 1    out and bought a little chess clock -- I will charge the
 2    sidebar time to the side requesting the sidebar.  That's
 3    really the only way.  It provides further incentive, I
 4    suppose, to choose your sidebars or request for sidebars
 5    carefully.
 6         MR. NOLAN:  Would you consider a reconsideration if we
 7    won the sidebar conference?
 8         THE COURT:  I understand there is an arbitrariness to
 9    this, Counsel.  So that's the timing of this.
10              We'll be starting at nine o'clock in the morning.
11    We'll go through five o'clock in the afternoon, and we'll do
12    the best we can to get those five or six hours in.  I think
13    that's it.
14         MR. NOLAN:  Your Honor, I do have one question.  I
15    apologize.  This one is more serious.
16              The reduction I understand what that means, which
17    is really going to be another question.
18              Now that they've dropped the claims against Carter
19    Bryant, I need some clarification of what we're trying in
20    this case in a sense.
21         THE COURT:  I'm actually --
22         MR. NOLAN:  Maybe I'm the only one --
23         THE COURT:  The pre-trial conference or I'm going to
24    actually have you make some changes to that between now and
25    the end of the week to reflect that change.  I think there
```

 1    needs to be some revisions made to it because I would want to

 2    have a pre-trial conference order that I will use basically

 3    as the bible for what the case is about, what the claims are

 4    in this case.  So that's something that we can take up I

 5    think more towards week's end.

 6              I also think -- why don't we go there now.  That's

 7    kind of the next thing on my agenda is the pre-trial

 8    conference.

 9              I have received in the most recent working

10    document I have is the lodging of the amended final pre-trial

11    conference order that was submitted the end of last week.

12    The court received its copy on Friday.  But I've also

13    received MGA's objections to Mattel's improper attempt to

14    amend his complaint and counterclaims through an untimely

15    addition to the final pre-trial conference order.  And that

16    was -- I received that actually this morning.  I read through

17    that.  It's dated yesterday, so I guess that does suggest I

18    received it this morning.

19              The whole pre-trial conference order is going to

20    have to be amended now to reflect the fact that it's not --

21    that Carter Bryant is not in the case anymore, and we just

22    have Mattel and MGA, but I would like to get a response from

23    Mattel on.  It does seem to be a rather late-in-the-day

24    addition of a claim.

25              Who from Mattel can address that?  I'm sort of

```
 1    sympathetic to Mr. Nolan in oral argument that have had time
 2    to raise this particular issue before now.
 3         MR. ZELLER:  As the Court has pointed out, we haven't
 4    had an opportunity to submit anything in writing in response
 5    to this.  I think -- and we would like that opportunity, your
 6    Honor.  Because we think that actually it is something that
 7    has been fairly at issue throughout the case.  It has been in
 8    discovery.  It has been the subject of depositions.  It has
 9    been the subject of interrogatory responses.
10         THE COURT:  I don't dispute any of that.  I can
11    certainly see this being an issue out there, but Mr. Nolan's
12    point simply is why wasn't this included in the first
13    pre-trial conference order of several weeks ago.  Why now on
14    the eve of trial do we have this new issue?
15         MR. ZELLER:  Well, I think I don't quite view it that
16    way.  The way I would view it, Your Honor, is it's classic
17    belt and suspenders.  We think that has been at issue.
18            Certainly we talked about in our pre-trial
19    conference order:  We own everything Bratz that was created
20    by Carter Bryant while employed by Mattel.  Now, we've said
21    including without limitation, you know, the point about the
22    names.  And frankly, one reason was is so that we could have
23    a fair opportunity to discuss it rather than, you know,
24    finding out three weeks into trial that there's some dispute
25    about it.
```

```
 1              But I do think in fairness, Your Honor, it was
 2    fairly encompassed in the language we had in the pre-trial
 3    conference order.  It has been at issue throughout this case.
 4    And they have had ample notice that that was part of our
 5    claim.  I mean, broadly speaking, Your Honor, we have said
 6    whatever it was that Carter Bryant created while employed by
 7    Mattel -- ideas, concepts, designations, designs, sculpts,
 8    prototypes, models, whatever they are they are owned by
 9    Mattel.  And of course the Court is well aware that there was
10    a rather heated debate over summary judgment whether it
11    involved such matters as ideas and concepts and the full
12    scope of an invention and everything else.
13              And so it really is no surprise to MGA that this
14    is at issue.  But I would say that in terms of the reason we
15    have the amendment, you know, it's -- it is to make perfectly
16    clear that it was always encompassed in what we have.  It's
17    belt and suspenders.
18              There is also -- there's going to be testimony,
19    there's going to be evidence on this subject anyway.
20    Regardless of whether the Court would say there is some
21    relief that would be potentially obtained as a result of the
22    taking of the name, because there is evidence that it was --
23    it came from Mattel.
24         THE COURT:  So is it the taking of the trademark?
25    Because the trademark doesn't come into existence until the
```

```
 1   trademark is actually placed into use.  And that doesn't take

 2   place until long after Carter Bryant has left Mattel.

 3        MR. ZELLER:  I agree with that.  But I don't think --

 4        THE COURT:  What is it -- it gets back to this thing

 5   I've been struggling with, is this notion of an idea.  What

 6   is it?  Is it a -- what is it?  What is the claim?

 7        MR. ZELLER:  Well, I think the claim comes certainly

 8   under that relief.  There may be consequences for purposes of

 9   MGA's right to use it as a mark, but we are not asserting

10   what we would say is, of course, an infringement claim,

11   because certainly on trademark per se, because as the Court

12   correctly points out, those rights only acquire through use.

13        However, what Carter Bryant did was is that he

14   said in his contract, Anything I create that relates to toys,

15   dolls, anything that relates to Mattel's business, including

16   ideas and concepts, belongs to Mattel.

17        So one thing is we think we would have the right

18   to a declaration that that name was part of the concept, part

19   of the project, part of the line, however one characterizes

20   it, that Carter Bryant created while he was at Mattel.

21        But No. 2, in terms of where the relief goes to,

22   it would be potentially tortious interference with contract.

23   It would be aiding and abetting.  Breach of fiduciary duty.

24   So it would have the -- it would have potential monetary

25   consequences associated with it.
```

```
 1           But part of the point I'd like to make, Your
 2    Honor, is that that product chronology and the use of the
 3    names and everything else, that is coming in regardless of
 4    any of these issues, because it is part of the chronology.
 5    In other words, there's evidence that within Mattel in late
 6    1999 and early 2000 Brats, B-R-A-T-S, was the name that was
 7    being considered for part of the Diva Stars project.  And
 8    this is really how Diva Stars relates to this case.
 9           That shows that of course it couldn't have -- the
10    Bratz project that was going on with Carter Bryant and MGA
11    couldn't have started at least with that name back in 1998
12    like Carter Bryant claims, because fundamentally he claims
13    that he had devised the name and just came to him back when
14    he was in Missouri in 1998.  Well, it would be quite an
15    astonishing coincidence that other people within Mattel --
16    and this is very well documented -- would be considering that
17    name as part of the Diva Stars project.
18         THE COURT:  Someone looking at a bunch of teenage girls
19    saying they're acting like brats.  How is that unique?
20         MR. ZELLER:  That's going to be their response.  But I
21    also have a better one, which is that one of those names was
22    Mall Brats M-A-L-L B-R-A-T-S.  That was one of the names that
23    MGA considered a few months later.  That's more than a
24    coincidence.
25         THE COURT:  Well, I don't want to spend a lot of time
```

```
 1    on this now.  I will give you a chance, Mr. Nolan, in a
 2    second.
 3              What I want to do, the Court is going to hear the
 4    remainder of the motions, the arguments on the motions for
 5    partial summary judgment, and that's going to have an effect
 6    on what the pre-trial conference order is going to look like.
 7              So why don't we get through that this afternoon,
 8    get the court's order.  I will try as hard as I can to get
 9    something out tomorrow.  It may not be until Wednesday.  And
10    then at the end of our week, once we've gone through
11    discovery and motions in limine, we can still go back to the
12    pre-trial conference order and hopefully have something in
13    place by the end of this week to govern things going forward
14    on next Tuesday.
15         MR. ZELLER:  I am informed that we have in fact while
16    I've been speaking filed our written responses to those
17    objections.  So hopefully it's --
18         THE COURT:  I will take those in.
19              Mr. Nolan, I will hear briefly from you.  Let's
20    save the bulk of this for later this week.
21         MR. NOLAN:  I think it's real clear.  It does come as a
22    surprise, first of all.  We purchased the mark some two years
23    later.  I think we purchased it in 2002 from a gentleman who
24    had owned the trademark since 1984.
25              It is clearly a recognition on the part of
```

```
 1    Mattel's lawyers that despite all of the time and effort that
 2    they put into this case they did not appreciate the fact that
 3    the trademark of Bratz was purchased by MGA some two years
 4    after.  I don't know the exact time, but way after Carter
 5    left after it was introduced into retail.  We paid for it.
 6    We bought it.  If it was an idea at Mattel, they should have
 7    gone out and tried to clear the name and get the trademark
 8    for it.  Simple as that.  It's never been a part of the case,
 9    Your Honor.  Never been part of the case.
10            But I will come back to this argument.  That was
11    just made at the time of the statute of limitations argument.
12        THE COURT:  Thank you, Counsel.
13            Very good.  Pre-trial conference order aside,
14    then.
15            Let's move next to -- well, I have basically two
16    things that I want to address today, and that's, in substance
17    between, now and the end of the day.  The first is the motion
18    for reconsideration from the last hearing and the remainder
19    of the motions for partial summary judgment that we did not
20    get to or the Court did not complete at the last hearing.
21            Before I get to any of that, though, I just wanted
22    to make a few comments.  And not just to counsel who are at
23    the head table but also perhaps more to the counsel that's in
24    the courtroom here, because I suspect there's probably a
25    number of other people who have been involved in this case.
```

```
 1              And I just wanted to -- I'm saying this now
 2   because I may not feel this way three hours from now.  I just
 3   wanted to say I appreciate the remarkable, remarkable work
 4   that both sides have put in.  This has been an extraordinary
 5   case for this Court.  You know reading through these motions,
 6   motion after motion, I can't help but be just truly impressed
 7   by the quality of legal craftsmanship that has gone into
 8   these papers.  I just I have never seen anything like it.

 9              Both sides are zealously advocating for their
10   clients, but by and large I have found nothing but accurate
11   references to legal authority, disagreed vehemently perhaps
12   how that legal authority applies to this particular case, but
13   you know, I have never really found anything which would
14   suggest that you haven't been citing to legal authority for
15   its accurate purpose.  And your references to facts, to
16   declarations, have always been right on.

17              So I really appreciate it.  And as much as that's
18   a credit to Mr. Quinn, Mr. Zeller, Mr. Nolan, Ms. Anderson,
19   it's also a credit to the second and third tier attorneys who
20   bear the lion's share of the hard work that goes into these
21   motions.  So there have been a few times the Court has had to
22   admonish, but that's been the exception I think which proves
23   the rule; that generally you've really behaved yourselves in
24   an extraordinarily professional way and manner throughout
25   this case.  And I trust you will continue to do that going
```

```
 1    forward.
 2              Emotions run high in a trial naturally, and it's
 3    important I think that we do not paint with broad brushes,
 4    that we do not make statements or accusations that are
 5    broader than they need to be.  There have been examples of
 6    that in recent weeks back and forth between the parties.
 7    Frankly there's been -- the Court has not been immune from
 8    some broad brushes.  Footnote 7 to the motion for
 9    reconsideration, for example, I thought was a little broad.
10              But I understand the context which all these
11    things are made.  And let's just be careful going forward
12    that we recognize each other's professionalism and dedication
13    and commitment to this process.
14              Anyway, I just wanted to start with a sincere
15    mention of appreciation from my perspective the privilege of
16    hearing this case.
17              Anyway, moving on to the motion for
18    reconsideration.
19              Let me invite counsel who made the motion to
20    proceed first.
21              Miss Anderson, this comes from part of Bryant.
22    You're no longer in this case, so I gather from your
23    perspective you defer?
24         MS. ANDERSON:  Yes, Your Honor.  That is correct.
25    Thank you.
```

```
 1          THE COURT:  All right.  Very well.
 2              Mr. Nolan, you never formally joined this motion,
 3     although you did file a reply, which I guess I should take as
 4     a joining in this motion unless I missed something.
 5          MR. NOLAN:  Your Honor, during the telephonic
 6     conference that we had --
 7          THE COURT:  That's right.  You did mention that you
 8     were joining.
 9          MR. NOLAN:  -- that I was going to formally.  And you
10     said our joinder would be so noted, and you ordered the
11     opposition to be filed.  At least I tried to join.
12          THE COURT:  Very well.  So you are joining in now --
13     you are on the record now formally joining in on this motion.
14          MR. NOLAN:  Yes, Your Honor.
15          THE COURT:  And you have filed a reply.
16          MR. NOLAN:  We have filed a reply.  And I informally I
17     thought on the record that was being transcribed I thought I
18     did as well.
19          THE COURT:  You probably did.
20          MR. NOLAN:  I appreciate it.  I think we have standing
21     because of --
22          THE COURT:  I will treat you as the moving party at
23     this point in time and allow you to proceed first, Counsel.
24          MR. NOLAN:  Then I will turn it over to Jason Russell,
25     who has the credit for really handling most of the written
```

1    motions to the Court.

2         THE COURT:  Very well.

3         MR. RUSSELL:  Thank you, Your Honor.  Just as a point

4    of clarification, I believe that Dylan made clear we didn't

5    join with those.

6              Well, Your Honor, hopefully the briefs made fairly

7    clear we really were focused on the fiduciary duty arguments

8    and specifically the City of Hope vs. Genentech decision,

9    which we concurred with Mr. Bryant's counsel's analysis that

10   that at a minimum was a clarification of the law, if it was

11   not an outright change in the law, that made clear that Your

12   Honor's ruling, which did not have the benefit of that

13   decision, ought to be reconsidered since it appears from the

14   plain language of Your Honor's order that you are relying on

15   the mere fact that Mr. Bryant entered into a contract that

16   had language purporting to propose trust and confidence in

17   him from Mattel, although I think all parties would agree

18   that the contract does not specifically say that a fiduciary

19   duty is to be imposed and does not acknowledge that Mr.

20   Bryant understood or accepted a fiduciary duty.  Indeed, that

21   is a very critical distinction that the City of Hope case

22   talks about.

23        THE COURT:  Is there any particular language that needs

24   to be present in a contract to trigger the duty, the

25   fiduciary duty?

```
 1          MR. RUSSELL:  Well, Your Honor, I don't think that any
 2   language in a contract by itself could create a fiduciary
 3   duty in this context, particularly given you've got an
 4   employee-employer relationship.
 5          THE COURT:  Let me stop you there.  Are you suggesting
 6   that under any circumstance that the language in a contract
 7   cannot be a fiduciary duty?
 8          MR. RUSSELL:  No, Your Honor.
 9          THE COURT:  So there are certain circumstances you
10   would concede that a contract can create a fiduciary duty;
11   correct?
12          MR. RUSSELL:  I would suggest, Your Honor, that those
13   would be circumstances in which the law already recognizes
14   such an obligation, such as attorney-client and the like.
15   I'm not sure that any contract in isolation after City of
16   Hope would be sufficient to create it, because as the City of
17   Hope case --
18          THE COURT:  So you reject the distinction that there
19   are certain fiduciary obligations that can be created by
20   virtue of a contract in sum and operate in violation of the
21   parties.
22          MR. RUSSELL:  Well, this is the point that was made in
23   Mattel's brief, and I think it's a distinction without a
24   difference in this case.
25               If you look at the holding that the California
```

```
 1   Supreme Court was very focused on, there, as here, there was
 2   a contract.  There, as here, one party stood in a much
 3   superior position with respect to protecting assets.  There
 4   it was to sell and account for patents and the like.  Here
 5   it's the turnover of patentable ideas.  But really a
 6   distinction without a difference.
 7            There, as here, the Court noted that there was an
 8   imposing of trust and similar type of language, and the Court
 9   made clear that that was insufficient.  There, of course
10   unlike here, there the parties were on equal footing, both
11   represented by sophisticated counsel.  And nonetheless, the
12   California Supreme Court held it insufficient.  Here, by
13   large contrast, Mr. Bryant was given no opportunity to have
14   counsel.  He was rushed through this.  This is a contract of
15   adhesion.
16            And I submit respectfully, Your Honor, that it
17   would have horrific consequences for employees in California
18   if a contract of adhesion can be thrust upon them, and they
19   are to assume a fiduciary duty, particularly where the
20   contract does not say that, it's one thing to say you are
21   going to be trusted by us.  Of course, that makes sense.
22   You're going to be an employee.  It is a competitive and
23   secret business --
24        THE COURT:  What do you mean by fiduciary duty?  Isn't
25   that the whole point of a fiduciary duty, is placing one's
```

```
 1   trust, and by virtue of placing one's trust expect them to be
 2   able to do certain things or not do -- refrain from doing
 3   certain things?
 4        MR. RUSSELL:  Well, Your Honor, in fact we cite some
 5   cases to you in our brief.  There's a distinction between a
 6   confidential relationship on the one hand --
 7        THE COURT:  I understand that.
 8        MR. RUSSELL:  -- and fiduciary on the other.  A
 9   fiduciary relationship has a special meaning.  And I think we
10   should pause long and hard before imposing it on a person
11   like Mr. Bryant, a low level employee with no managerial
12   responsibility, no ability to control anything at Mattel.
13        THE COURT:  Well, now you're talking in the macro
14   sense.  We're talking about --
15        MR. RUSSELL:  Well, if we could just go back --
16        THE COURT:  Counsel.
17        MR. RUSSELL:  Sorry.
18        THE COURT:  You don't have a time limit on this.  Let
19   the Court speak.
20            We're not talking about the general relationship
21   between Mattel and Carter Bryant.  We're talking about an
22   arguable fiduciary duty in the context of a particular
23   conduct by Carter Bryant vis-a-vis Mattel where clearly he is
24   in the better position to control or maintain the trust than
25   Mattel is.  I mean, because of course, Mattel doesn't know
```

```
 1    what he's doing but he knows what he's doing, that type of
 2    thing.
 3              In light of that, what would be a fiduciary duty?
 4    How would you define the fiduciary duty?  Let's assume if one
 5    were to exist.
 6        MR. RUSSELL:  Well, again, Your Honor, I think you have
 7    to go -- and I think this is what City of Hope teaches us.
 8    You have to go beyond the mere language of the contract in
 9    virtually every situation except I would submit those defined
10    by law, because you need to look not at the bare language.
11    It's perfectly easy to drop a sentence in a contract that may
12    or may not have been understood.
13              The City of Hope case reversed precisely because
14    the jury was instructed that a fiduciary duty could exist on
15    the basis of the contract without any evidence of what the
16    party's relationship was.
17              And that's precisely what we have here.  Mr.
18    Bryant is going to -- the jury is going to be told presumably
19    he owed a duty based on this contract.  Let them prove that.
20    If that's the case, let them put on evidence of what the
21    conduct is.
22              Your Honor has already said that we will be
23    allowed to present evidence on our defenses.  Some of those
24    defenses will show, for example, that people did not act in
25    accordance with the terms of the inventions agreement; that
```

```
 1    this was widely known; and that people did not accept this
 2    reposition of trust; and that they understood that Mattel did
 3    nothing to sanction it.
 4              Given that, certainly there is at least a genuine
 5    issue of fact that a jury might conclude there was not a
 6    fiduciary duty despite the language of the contract.  And
 7    again, I submit that that is a marked change from the law
 8    that you had before you previously.  But it's an important
 9    distinction.
10              And since that was the precise basis for the
11    reversal, and Your Honor's decision doesn't rely on the
12    conduct but merely the language of the contract, it should go
13    to the jury.
14         THE COURT:  I have some questions on the arguments on
15    Section 2870.  You make a statement that I don't really
16    understand.  It's on page 176 in your motion.  You say, "To
17    the extent that the Court intended to hold that a contract
18    which incorporates Section 2870 automatically assigns all
19    inventions to the full extent permitted by that law
20    regardless of the contract specific language, that holding is
21    also independent and reversible error tainting the Court's
22    contract interpretation."
23         MR. RUSSELL:  Well, Your Honor --
24         THE COURT:  I don't really get what you're saying
25    there.
```

```
 1            MR. RUSSELL:  I don't want to be difficult with you,
 2     Your Honor.
 3            THE COURT:  Then please don't be difficult with me.
 4            MR. RUSSELL:  We only joined in the motion on a limited
 5     grounds, and that was with respect to the fiduciary duty, not
 6     with respect to the specific language.
 7            THE COURT:  Very well.
 8            MR. RUSSELL:  So --
 9            THE COURT:  Actually you're not being difficult.
10     You're being very easy.  That's not a complication.  All
11     right.
12            MR. RUSSELL:  Anything further, Your Honor?
13            THE COURT:  Nothing from you.  I do have some questions
14     from Mr. Quinn.
15            MR. RUSSELL:  Thank you, Your Honor.
16            THE COURT:  I understand your argument, Mr. Quinn, with
17     respect to distinguishing the case at hand.  I guess what
18     this motion has done more than anything has caused me to
19     reconsider the Court's finding concerning the breach of the
20     fiduciary duty.
21            MR. QUINN:  Okay.
22            THE COURT:  So if you would address yourself to the
23     breach more than the existence of it itself.
24            MR. QUINN:  Right.  Well, the breach, Your Honor --
25            THE COURT:  The uncontroverted nature of that breach.
```

```
 1          MR. QUINN:  You have a person who is under a contract,
 2   which this Court has found holds that he's got to safeguard
 3   Mattel's proprietary information; that anything he creates,
 4   any of his inventions, ideas, designs, et cetera are the
 5   property of Mattel.  The contract explicitly says that he has
 6   an obligation to protect the confidentiality of Mattel's
 7   information.
 8          THE COURT:  Right.  And that's the point.  Let's assume
 9   -- and I understand that fiduciary duty is not synonymous
10   with confidentiality.  But assuming that part of the
11   fiduciary duty was confidentiality, and that's the specific
12   point that's referenced in the contract, does it go beyond
13   that?
14          MR. QUINN:  Does the contract go beyond that?
15          THE COURT:  No, does the fiduciary duty go beyond that?
16   Does the fiduciary duty go to encompass all the obligations
17   under the contract or just the requirement of
18   confidentiality?
19          MR. QUINN:  I think it goes -- I would say neither,
20   Your Honor.
21          THE COURT:  Do you understand my question?
22          MR. QUINN:  I think so, Your Honor.  And let me see if
23   this is helpful.
24          The language where he says that I accept this
25   position of trust, it's all clearly in the context of his
```

```
 1   handling of Mattel information.  And I think the scope of the
 2   fiduciary duty is fairly read to relate to that topic; that,
 3   you know, confidential information relating to Mattel, and as
 4   well I think other provisions in there, that he's not going
 5   to compete with the company --
 6           THE COURT:  Well, that's the question.  That's my
 7   question, Counsel.  You have pulled that in there.  I know.
 8   And I ordered it as well.  But that's what I'm reconsidering.
 9           MR. QUINN:  Your Honor, it's a --
10           THE COURT:  I think you were right the first time that
11   it relates to the confidential information.
12           MR. QUINN:  And as to that --
13           THE COURT:  Assuming I find the fiduciary duty, that
14   appears from the language to be what it's covering, not
15   necessarily the not to compete.  The fiduciary duty.  I'm not
16   saying that
17           MR. QUINN:  Right.
18           THE COURT:  The duty of loyalty is a separate issue,
19   but I'm talking about just the fiduciary duty.
20           MR. QUINN:  Well, you know, we can -- Your Honor, I
21   think you don't have to go past the fiduciary duty with
22   respect to confidential information, inventions, proprietary
23   information, because he clearly breached.  He clearly
24   breached that.  There were disclosures.  There were
25   discussions.
```

```
 1              The Court has determined that anything he created
 2   Mattel owned; that therefore is Mattel proprietary
 3   confidential information.  And he shared that.  There's
 4   really no dispute.  He had meetings.  He showed information.
 5   He created things.  There's really no question about any of
 6   that.
 7              But if you look at that agreement as a whole, it
 8   says, I undertake -- it's at the bottom of the agreement --
 9   I've assumed this position of trust, and there's a long list
10   of things that are part of that.  You know, including that
11   you're not going to deal with competitors, you're not going
12   to do things inimical to the interests of the company.
13   That's a case law interpretation in the language of the
14   contract.
15              He breached it by selling company property.
16   That's the Palo Alto.  There's a case that says that if you
17   sell company property, that's a breach of fiduciary duty.
18              He received money while he was an employee from a
19   competitor for undertaking a project for them.  Now they say
20   it's only a small amount of money and no big deal.  But
21   that's all within the scope of the four corners of that
22   agreement.
23         THE COURT:  I grant you that it's within the four
24   corners of the scope of that agreement.  The question is
25   whether it's within the four corners of the scope of the
```

```
 1   fiduciary duty.  We're talking about a fiduciary duty that's
 2   not created by operation of the relationship of the parties
 3   as much as it is by contract, and therefore it's limited to
 4   what the contract creates.  And that's --
 5           MR. QUINN:  Correct.
 6           THE COURT:  -- that's what I'm struggling with now.
 7           MR. QUINN:  I understand the issue that the Court has
 8   identified.  But I think when you have this recitation of
 9   undertakings on his part, which include the various things
10   we've discussed, including, you know, disclosures.  If he
11   engages in competitive information, he's obligated to
12   disclose it.  All in the context of talking about this is
13   confidential, I should be looking after my employer's
14   interests.  And at the bottom in solid caps "I accept this
15   position of trust."
16           THE COURT:  Thank you.
17           MR. RUSSELL:  Your Honor, first, with respect to the
18   breach, I think it is important to note that if indeed what
19   we're talking about here is a fiduciary duty outside the
20   scope of the contract, it's clear that the fiduciary duty
21   cannot be predicated on Mr. Bryant failing to disclose that
22   he was going to engage in competitive activities.
23           We cite Your Honor to the Bancroft-Whitney case.
24   And there's a slew of progeny after that, essentially an
25   unblemished line, consistent with California public policy,
```

```
 1    that a person looking for a job has no duty, even when
 2    they're an officer let alone a low level employee like Mr.
 3    Bryant, has no obligation to disclose preparations to
 4    compete.  So that can't possibly be the basis for breach of
 5    fiduciary duty.
 6         THE COURT:  This phrase "preparations to compete" has
 7    been used and employed frankly in the last hearing, and
 8    there's nothing momentous about saying that.  Yes, the law
 9    provides that a person can go out and make preparations to
10    compete.  The question is whether or not there are really
11    disputed facts suggesting that what Mr. Bryant did went
12    beyond mere preparation.
13         MR. RUSSELL:  Let me address that, because, Your Honor,
14    I think the reason we're having a trial is precisely that.  I
15    mean, Mr. Quinn's argument assumes within it that they own
16    the drawings.  That's what we're having a trial for.  The
17    facts are it's hotly disputed whether or not he created it
18    subject to that contract.  And when we get to tortious
19    interference, I'd like to talk about it because there's two
20    levels there.
21         But here, that's the purpose for the trial.  Mr.
22    Bryant disputes that he created anything subject to that
23    contract.  He represented it in writing to my clients.  His
24    lawyer represented it orally and in writing to our clients.
25    I don't see how under those circumstances we can say it's
```

```
 1   undisputed that it falls within the scope of the contract;
 2   nevermind a fiduciary duty predicated on conduct.
 3            And especially when the evidence is going to be,
 4   and it was presented in the motions -- disputed by the other
 5   side, no doubt -- that Mr. Bryant what he did was he took
 6   materials he prepared outside the scope of that contract.  He
 7   put together a pitch book.  He approached people to solicit
 8   them to sell the product.  And he sold it.  He owned it in
 9   his mind.
10            Let's let a jury decide whether or not that was
11   appropriate.  Mattel has not won that it owned these
12   drawings.  It has not won that is subject to the inventions
13   agreement.
14            All Your Honor has ruled, as I understand it, is
15   that the contract provides that what he did while at Mattel
16   they have a claim to potentially, depending on what the
17   evidence shows.  So this is hotly disputed.
18            THE COURT:  Thank you, Counsel.
19            Very briefly, Mr. Quinn.
20        MR. QUINN:  Okay, Your Honor.  Counsel is correct.
21   There is a dispute as to key essential drawings.  And I think
22   we probably come to this this afternoon.  There are certain
23   drawings that he did which are undisputed he did while he was
24   at Mattel.  And they're identified in our notice of motion.
25   I think that's teed up.  The Court had reserved that issue.
```

```
 1        THE COURT:  We're going to be discussing that
 2   momentarily.  Very good.  Thank you, Counsel.
 3           If there's nothing further on motion for
 4   reconsideration, the Court will issue an order on that.  I
 5   appreciate the parties' efforts on that.
 6           Let's move to the motions for partial summary
 7   judgment that were reserved.
 8           Just the Court has organized I've basically
 9   grouped these in four basic categories of issues that I would
10   like to address.  And if the parties want to address more,
11   that's fine.
12           In no particular order of importance, I have
13   Mattel issues 2C and 3.  This is whether there is a factual
14   dispute regarding the timing of certain drawings and the
15   dummy model and whether the first generation Bratz dolls are
16   substantially similar to 17 drawings and a doll sculpt drawn
17   or blueprint created by Bryant and whether or not those are
18   original protectable works of expression.  So that's the
19   first category basically related to the copyright
20   infringement and breach of contract.
21           And then I've got Mattel Issue 5, which is whether
22   MGA and Mr. Larian are liable for aiding and abetting in
23   Bryant's breach of duty of loyalty and fiduciary duty.
24           And then thirdly, the MGA intentional interference
25   with contractual relations, specifically the fourth element.
```

```
 1    This is MGA's motion whether Mattel's claims -- whether there
 2    was an actual breach of a contractual relationship whether it
 3    can be resolved on summary judgment.
 4              And then of course the fourth issue is the statute
 5    of litigations which then informs a number of the defenses.
 6              That's the order I have structured in my notes.
 7    Why don't we go ahead and begin with Mattel's, the first one
 8    I mentioned, issues 2C and 3.  And this is related to the
 9    drawings and the dummy doll, et cetera.
10              MR. QUINN:  Yes, Your Honor.
11              With respect to the particular drawings identified
12    in 2C, the opposition really didn't dispute the showing that
13    those were created by Mr. Bryant.  There was testimony and I
14    believe request for admissions that supported each of those.
15    And I don't know whether that is actually contested.  The
16    opposition briefing did not dispute it.
17              We have prepared a grid, Your Honor, that shows as
18    to each of these exhibits that are identified in the notice
19    of motion what the proof is.  We're prepared to walk through
20    on slides, if that's useful to the Court.  But I don't know
21    that it's disputed.  We think it was not disputed in the
22    opposition.
23              THE COURT:  Counsel, it's your hearing.
24              MR. QUINN:  All right.  Well, Exhibit 716, Slide 58.
25    If we could put that up on the screen.  This is Exhibit 716
```

```
 1   that's referenced in the notice of motion.
 2            Mr. Bryant testified about this in his deposition,
 3   slide 74.  This is Mr. Bryant's deposition, Volume 2 at 340,
 4   21 to 23.  If we can bring that up.  This is the formalwear
 5   fashion that he's being questioned about, Exhibit 716.
 6            Do we have the citation?
 7            Are we going to have a break this afternoon, Your
 8   Honor?  I'm having a sense that my presentation on this would
 9   benefit from some discussion during the break.
10        THE COURT:  Very well.  Want to take a recess?
11        MR. QUINN:  Not this moment.  When it suits the Court.
12        THE COURT:  Very well.
13        MR. QUINN:  I would move on to Topic 3, the issue about
14   substantial similarity.
15            Your Honor, going back to first principles here,
16   and we had some discussion of this at the last hearing, so I
17   will abbreviate the discussion.  But to show infringement,
18   the Plaintiff needs to show access and substantial
19   similarity.  Access here is undisputed, because MGA of course
20   had the drawings.  And the reason that's important, Your
21   Honor, is that substantially reduces --
22        THE COURT:  Well, Counsel, you have to show access and
23   have to show substantial similarity.  But you first have to
24   show ownership of the valid copyright.
25        MR. QUINN:  There is a copyright.
```

1           THE COURT:  I understand there's a copyright, but you
2      have to show ownership of the valid copyright.  And that's --
3      you don't really attempt to establish that first element.

4                You want the Court to get to substantial
5      similarity, but why should the Court do that if we don't even
6      have the factual predicate or the legal predicate in place
7      that there is a ownership of a copyright?

8           MR. QUINN:  Well, the copyright notices have issued.  I
9      don't think there's any dispute about that; that MGA has in
10     fact filed and received copyright registrations for these
11     drawings.  And that has certain consequences.  Presumption of
12     originality, for example.  But MGA has in fact filed
13     registrations for these drawings, has sued on the drawings
14     claiming that it has valid copyrights.

15               So maybe we'll come back to that some more, Your
16     Honor, if there's an issue there.

17               But there's no question there is access.  And the
18     point is that under the case law the burden on substantial
19     similarity is linked to the issue of access.

20               If we could go to Slide 41.  This is a quotation
21     from the Three Boys Music case.  There's the inverse ratio
22     rule, Your Honor.  There's a lower standard of proof in
23     showing substantial similarity where there is a high degree
24     of access.  So that's sort of the framework coming into the
25     substantial similarity analysis.  Of course, in the Ninth

```
 1    Circuit, we know there's an extrinsic test where you have to
 2    look first at specific expressive elements to see if they are
 3    similar.
 4             And, you know, we go to the expert reports and
 5    look at specific expressive elements, Your Honor.  I think
 6    the similarity, you know, it's a case of a picture being
 7    worth a thousand words.
 8             If we could look at Slide No. 6, on the left-hand
 9    side we have one of the Bratz dolls.  That's the Chloe doll.
10    On the right-hand side we have the drawing from Mr. Bryant.
11             If we go to Slide 7.  We looked at this one at the
12    last hearing, Your Honor.  On the left-hand side we have Mr.
13    Bryant's drawing of that doll.  On the right-hand side we
14    have the doll itself.
15             Slide No. 8.  If we go back to specific elements
16    in the drawings, specific expressive elements, look at the
17    lips, look at the eyes.  And the Court can see how similar.
18         THE COURT:  And the Court has seen it.  And I will be
19    the first to confess at first blush they look similar.  But I
20    have also read the expert reports where there are statements
21    in there by people who know a lot more about this business
22    than I ever will, and I mean that, that they're not --
23         MR. QUINN:  Maybe not, Your Honor.
24         THE COURT:  -- that they're not similar; that they're
25    not substantially similar.  I mean, isn't this a -- isn't
```

1     this an issue that's better left for this jury to decide?

2          MR. QUINN:   Well, I think first off the question of

3     whether it's sufficient originality, which you know, they say

4     you have to do this filtering analysis.  And that initial

5     question about whether it's done at the beginning as part of

6     the substantial similarity analysis or whether you do it

7     later, that's a question for the Court that the Court has to

8     decide as to whether there's sufficient originality.

9          But I do think we get into a level, Your Honor,

10    where you reach a point where you have to ask yourself could

11    any reasonable juror conclude -- and actually could any

12    reasonable -- yeah, could any reasonable juror conclude that

13    a child -- because the case law is that's when we're talking

14    about a toy that's the person whose opinions we should be

15    looking at -- that a child wouldn't find these substantial

16    similar.

17         And, you know, if we go through these, and I've

18    got a number of these slides, and maybe it's not necessary to

19    make the point, under the extrinsic test we've got to look at

20    particular expressive elements.  And you walk through this,

21    and, frankly, no matter what their expert says, Your Honor, I

22    think we're in the no reasonable juror realm could reach a

23    contrary conclusion.

24         With respect to the intrinsic test, there you look

25    at the overall similarity, of course.  And that's the

```
 1   visceral reaction of the lay juror.  As I was saying, Your

 2   Honor, the point here is that this test has got to be applied

 3   from the standpoint of the target audience, 8 to 12 year-old

 4   girls.  We've got some authority on that that we've selected

 5   on Slide 47 for the court.  And then we've -- there's some

 6   case law that the Sid and Marty Krofft case, the Lyons

 7   Phillips and Morris costumes case.  And I don't know that

 8   this is a disputed issue that we need to assess this from the

 9   standpoint of a target audience.  It really isn't a surprise.

10   It shouldn't be a surprise that there's a substantial

11   similarity in view of MGA's repeated admissions, not

12   disputed, that the dolls are based on the drawings.  Mr.

13   Bryant and we cite this in our moving papers.  We martialed

14   this evidence, Your Honor.  Mr. Bryant admitted that the

15   drawings served as guides for the creation of the dolls.  Mr.

16   Larian testified that the dolls were based on the drawings.

17   The copyright registrations recite that they are based on the

18   drawings.  Miss Garcia, who was the in-house person at MGA

19   who was in charge of developing the Bratz doll and worked

20   with Mr. Bryant, testified that she tried to stay true to the

21   inventor's vision in the drawings.  And in another case --

22        THE COURT:  I can't help but be taken by the last line

23   you have quoted on Lyons Phillip.  I remember reading this.

24   You rely on the reduced ability of young children to

25   distinguish between objectively different items and concepts.
```

```
 1                   Well I don't know a lot about dolls.  I have some
 2    experience with young children.
 3         MR. QUINN:  Me too, Your Honor.
 4         THE COURT:  Have you ever tried to convince a young
 5    child that a doll that you have to take away from them is the
 6    same as a stuffed animal?  I know you lost that blanket.  It
 7    really is the same.
 8         MR. QUINN:  Yeah, I'm familiar with the phenomenon,
 9    Your Honor.  That brings back some memories.
10         THE COURT:  Let's not underestimate such children to
11    distinguish --
12         MR. QUINN:  I think the Court has taken judicial notice
13    of the fact that children can become very attached to
14    inanimate objects.
15         THE COURT:  And quite an ability to distinguish between
16    different items and concepts.
17              But, in any event, I'm sorry to interrupt.
18         MR. QUINN:  Well, you know, we actually have put before
19    the Court a survey of children who were shown the drawings,
20    and what is this, and the Court knows what the children found
21    the answer to that.
22         THE COURT:  Yes.
23         MR. QUINN:  So, you know, what is the answer?
24              The principal answer to this is, Your Honor, that
25    we -- Mattel has made a fundamental grievous error by doing
```

1  this similarity analysis without first taking into account or

2  engaging this filtration process where we should have

3  filtered out everything that is generic and unprotectable.

4       THE COURT:  Analytical dissection.

5       MR. QUINN:  Exactly.  And their expert does this for

6  us.  And this is the passage I read.  And I think the

7  reporter lost patience with me last time because I was a

8  little fast.  But the Reporter finds, frankly, that there's

9  nothing, you know, in the Bratz drawings that's new or

10  original or deserving of the protection.

11       And he goes to, for example, if we can look at

12  Slide No. 2, the Spice Girls and the dolls based on the Spice

13  Girls.  If we can bring that up to the screen.

14       You know, basically we have multiethnic girls who

15  are hip.  And it's a girl group.  And you know, that's really

16  been done before.  So you look at he also cites to if we

17  could look at Slide 2, page 7, he cites to Laura Croft, Tomb

18  Raider.  Angelina Jolie as Laura Croft.  She's got, you know,

19  large lips, and she's trendy, and she's hip and she's

20  fashionable.  That he cites this as a precedent.  And then if

21  we look at Slide No. 2, page 4, Popular Culture, Sex in the

22  City, he cites to that.  Ally McBeal also he sees as

23  precedent for this.  Nothing here is original.

24       What's going on here?  And the mistake here is

25  that sure there is girl groups.  There are hip girls.  There

```
 1    are multiethnic hip girl groups that have been done before.
 2    And let's assume dolls have been done before.
 3            What he's doing, though, he's applying the filter
 4    to the idea, and he's throwing the unique expression out with
 5    the idea.
 6            THE COURT:  What's the unique expression?
 7            MR. QUINN:  The unique expression -- they maintain it's
 8    a unique expression, the particular configuration of this
 9    doll, including its clothing, which as I will show the Court
10    is protectable in the case of a doll because it's
11    nonfunctional.  Everything about it is unique.  They've
12    maintained its unique.  They've sued people saying it's
13    unique and there is nothing like it.
14            If you look at the Mattel versus Goldberger case,
15    Your Honor, I think we can apply the Court --
16            THE COURT:  Counsel, you're claiming that it's unique
17    as well.  You don't really dispute that.  You're just
18    claiming that you had the copyright to it or you had the
19    rights to it by virtue of the fact that --
20            MR. QUINN:  That's correct, Your Honor.  Yeah.
21            THE COURT:  Because if it was not unique for them it's
22    not unique --
23            MR. QUINN:  No, we are claiming that it's unique.  We
24    are claiming that it's original; that it's an original
25    creation that we own.  And the fact that it's got bow lips,
```

```
1   and it's got -- or large lips or large head or large feet,
2   those are -- we're not claiming that we own the idea of large
3   feet or large-headed dolls.  That's not -- that would be
4   claiming the idea.  We're claiming this unique expression.
5           And you know in the Goldberger case the court
6   recognized that -- if we could look at Slide No. 72, the
7   Court makes the point "there are innumerable ways of making
8   upturned noses, bow lips, and widely-spaced eyes.  Even if
9   the record had shown that many dolls possess upturned noses,
10  bow lips, and wide-spread eyes, it would not follow that each
11  doll, assuming it was independently created and not copied
12  from others, would enjoy protection from copying."
13          And that's the point here.  It's this particular
14  expression that's protected.  I think the fallacy of their
15  filtration analysis, you know, becomes obvious if you think
16  about applying it to, you know, one of the most common
17  subjects of art.  In Western art the still life, a bowl of
18  fruit, apples, lemons, whatever, under their analysis it's
19  all been done before.  You know, you couldn't have a unique
20  expression anymore of a bowl of fruit.  Couldn't be done
21  because it's all already been done.
22          But that's not the law.  You can have unique
23  expressions in ways of portraying that particular idea.
24          The level of originality that's required is fairly
25  low.  The US Supreme Court has said in the Feist case, slide
```

```
 1   39, "To qualify for copy protection, a work must be original
 2   to the author.  Original, as the term is used in copyright,
 3   means only that the work was independently created" and
 4   skipping over some words "and that it possesses at least some
 5   minimal degree of creativity.  To be sure, the requisite
 6   level of creativity is extremely low.  Even a slight amount
 7   will suffice."
 8            And Defendants have maintained, you know, they're
 9   taking the position now that these are not original works;
10   that the drawings are not original.  But they've sued people
11   on these drawings and have taken a position that this is
12   unique and that they are original.
13            Let's look at Mr. Larian's affidavit, Slide 14.
14   This is in the Hong Kong litigation.  Based on these 17
15   drawings that Mr. Bryant did, I think it starts down at the
16   bottom there, "In this case it is the 17 design drawings
17   exhibited as LSC-3, the complaint made by MGA, is that the
18   three-dimensional Funky Tweenz dolls have infringed the
19   two-dimensional drawings which are artistic works in which
20   subsists."  There they sued the maker of the three
21   dimensional dolls based on these drawings, taking the
22   position that these were original works.
23            You have to look at the complaint in this case
24   that MGA filed against Mattel where they take the position
25   that the Bratz dolls are unique.
```

```
 1                This is Slide 3 from page 1 of -- or I'm sorry,
 2    page 7 of MGA's complaint against Mattel, paragraph 25, where
 3    they allege that the Bratz dolls are intentionally shorter
 4    than the Barbie dolls and looked like no other; that they are
 5    unique.  All these features, nothing like it before.  And
 6    from the same complaint, Slide 3, where they refer in the
 7    first paragraph, first line of paragraph 28, "The Bratz line
 8    having a unique and distinctive look."  They have
 9    consistently taken the position that these are original
10    unique creations.
11            At the very least, Your Honor, if we assume that
12    all these different elements that the drawings really were
13    just a compilation of unprotectable elements, the compilation
14    can be protectable.
15            Look at Slide 46 where we cite the Court to the
16    Satava versus Lowry case, a Ninth Circuit decision where the
17    court said a combination of unprotectable elements is subject
18    to copyright protection.  So even if they're right that you
19    dissected this and it was made of unprotectable things, the
20    combination is protectable.
21         THE COURT:  Counsel, what about the timing issue that's
22    wrapped up in this as well?  Would you spend some time?  Is
23    it undisputed?  I know you take the position it's undisputed
24    about the timing, there's no factual dispute as to the timing
25    of these drawings.
```

```
 1          MR. QUINN:  As to the core drawings, the 17 drawings
 2   which are subject to the motion --
 3          THE COURT:  Yes.
 4          MR. QUINN:  -- there is an issue.  Of course.  I mean,
 5   we acknowledge that.  There's no agreement as to when those
 6   were created.
 7          THE COURT:  If that is the case, then perhaps I didn't
 8   word it well before.  I mean, there would be an issue in
 9   terms of why should the Court get to the substantially
10   similar issue before that issue is resolved.
11          MR. QUINN:  I would say because it would simplify the
12   trial.  The undisputed facts we submit show that it's
13   original, and they're substantially similar.  The question of
14   ownership is a separate question that can be tried.  I'm
15   putting aside for a moment the drawings which we maintain
16   there is no dispute at all.  But as to the ones where there
17   is a dispute, that's an issue that's going to have to be
18   tried.  That doesn't mean necessarily that we need to hear
19   testimony about, you know, whether this is not original
20   because the Spice Girls and Ally McBeal and other ethnic
21   groups -- I mean, the court can decide the issue on partial
22   summary judgment of substantial similarity and originality.
23               That leaves to be tried the timing issue.  In that
24   respect I would submit this is not really any different than
25   any of the other issues that are tendered for partial summary
```

```
 1    judgment.  Significantly narrows the trial.
 2              And Your Honor, the issue came up with doll
 3    clothing and whether fashions are protectable in these
 4    drawings.  If we could look at Slide 43.  As we understand
 5    the law, clothing for human beings is not copyrightable
 6    because it's functional.  But clothing for dolls, for
 7    nine-inch dolls, is not functional and is copyrightable.  And
 8    we've cited the Court to the Boyds Collection case where the
 9    court says, you know, clothing for a teddy bear has no
10    utilitarian function and therefore it's not excluded on that
11    grounds from copyright protection.
12              So we think, Your Honor, under -- if the Court
13    walks through the analysis, the intrinsic test, the extrinsic
14    test, dissecting individual expressive elements, the gut
15    reaction to the total look and feel, really this is something
16    that the Court can and should decide that there's no dispute.
17    And the originality issue, that is in the Court's province,
18    in the first instance anyway.
19              Thank you, Your Honor.
20         THE COURT:  Thank you, Counsel.
21              Mr. Nolan?
22         MR. NOLAN:  Thank you.
23              Do you mind putting that last slide up for just a
24    second?  Certainly this is not the most important, but I
25    wanted to make a point, Your Honor, with respect to this last
```

```
 1    quotation with respect to the functionality of clothes.

 2              What this refers to, the Boyds Collection case is

 3    clothing on a bear.  Now, I have been in Montana sometimes.

 4    I've never seen a bear dressed.  And it doesn't bother me to

 5    see a naked bear.  However, I remind the court when in our

 6    last appearance I showed you a composite comparison of two

 7    naked dolls.

 8              And I fully admit that I go home and tell my two

 9    daughters I can't believe it, I play with naked dolls all

10    day.  They're very troubled by it.  One is leaving for

11    college next year, so she thinks they're going to get beyond

12    it.

13              But the truth of the matter is there is a reason

14    why you had that reaction when we put it up there.  And

15    you're not the fact witness.  But I'm saying, Your Honor, it

16    reminds me why when you walk into the store at Wal-Mart or

17    Toys-R-Us they don't sell naked dolls.  They can sell a naked

18    teddy bear.  The clothes for the bear, has no functionality.

19    The whole purpose for the doll is for aspirational purposes

20    of a young girl to play with.

21              And if you were and think about this for just a

22    moment, carry this on just a little bit too far, is let's

23    assume girls are playing aspirationally with their dolls, and

24    they're changing the fashions.  And then all of a sudden the

25    girl comes out and the girl is only partially dressed.  Is
```

```
 1    there a reaction by others to say the dress is not finished
 2    or the doll is not finished?  That's the functional aspect of
 3    the fashions in the doll world, Your Honor.
 4            And with all due respect to Mr. Quinn, I know this
 5    case.  I do think that there is a distinction.  He cannot put
 6    up a case because there is no case, including interestingly,
 7    any case by Mattel where they've ever obtained copyright
 8    protection on a particular outfit for Barbie, for instance, a
 9    fashion from year to year.  These fashions change each year
10    for a reason.  They're a functional component of selling the
11    doll.
12        THE COURT:  Address this issue, though, of the
13    copyright that MGA has sought to enforce with respect to
14    Bratz.  Because there's no question that MGA for years now
15    has believed that they have a copyright in Bratz and that
16    there's something enforceable about it.
17            How would you describe the parameters of that?
18        MR. NOLAN:  I'm going to answer that because one
19    significant difference is that we own the copyright in those
20    cases.  That was not in dispute.
21            I do want to get back to the question originally
22    that you asked Mr. Quinn is because they can't prove that,
23    and that's clearly in dispute.
24            But let's go to Hong Kong for a moment.  What they
25    do in this case, and I think they will selectively do in
```

1    front of the jury if we lose our motion in limine, and we
2    have to go across the sea to Hong Kong and talk about Hong
3    Kong actions, what they don't show you, Your Honor, is in the
4    beginning of the declarations the drawings are part of, and I
5    believe, I may be wrong, a series of artistic works, related
6    artistic works.  There's certainly 17 drawings, molds,
7    sculpts, plastic -- what's the name of the -- there's a demo
8    cast.  There's all listed as artistic works that relate to
9    Bratz, relate to Bratz.
10           We're not saying in Hong Kong or here that Carter
11   Bryant's drawings do not relate in any way to Bratz.  In
12   fact, we've always said that they were the inspiration or one
13   of the inspiration points that we used.
14           In Hong Kong -- we'll get into this at the motion
15   in limine, Your Honor.  In Hong Kong you cannot sue on the
16   doll.  You could not sue on the copyright doll for
17   infringement.  You have to trace it back in a series of
18   artistic works.  And so I would show you at the motion in
19   limine the actual claim in the case, which includes a lot of
20   issues, including the drawings as relating to the overall
21   concept.  That's a shorthanded reference as to why.  There is
22   no case that I'm aware of, Your Honor, where solely on the
23   basis of Carter Bryant's drawings we relied on a copyright
24   infringement case.
25           And in fact, and in fact, if the evidence -- and I

```
 1   will make a proffer to Your Honor -- if the evidence -- if we
 2   had to go into this in Hong Kong, we would say that at the
 3   conclusion of their presentation of the evidence was that the
 4   drawings did not look like Bratz, and we went more to the
 5   different sculpts and molding.
 6        THE COURT:  Not the drawings, but certainly the dolls
 7   themselves are copyrighted.
 8        MR. NOLAN:  Clearly on copyright.  But that's
 9   different, but that's not what we're talking about in this
10   case.  That over there is a 3-D object.
11             Here what they're trying to do is claim ownership
12   in a copyrightable 2-D artwork and then take that, shortcut
13   it -- and I will talk about all the standards that they're
14   trying to shortcut -- and get you around that, Your Honor.
15   And they love to use this Hong Kong.  Respectfully, we'll do
16   this in the motion in limine, it's a huge red herring.  Huge
17   red herring.  We did not -- the law is different in Hong
18   Kong.
19             But more importantly, what they're putting up like
20   that quote is taken completely out of context.  It's a little
21   bit like, Your Honor, and I want to go back now to where we
22   were last time.  And if you want to take a break, we can.
23             It is a little bit like the shot of Sasha.  It's
24   Loetz 7 that they've put up at the last hearing and said
25   that's my Clint Eastwood moment.  I hope Nolan does that.
```

1    And there was a laugh in the audience.  Because you know why?
2    We've all been there.  We've all had that blink test.

3            But the more you look at it, and I think this is
4    why we need a trial in this case, there are disputed facts
5    because I think, and I know, not because I have children but
6    I know from the evidence in this case and the presentation in
7    this case, that we would not all be here, these parties would
8    not have spent tens of millions of dollars to bring this case
9    in the belief that this is such an easy issue that should be
10   decided by you because there's no disputed facts.

11           I mean, you started off -- and we really
12   appreciate it, that was very gracious of you to acknowledge
13   the work that's been done in this case.  But truly, Your
14   Honor, do you believe that this case would have gotten this
15   far if applying the appropriate standards in the Ninth
16   Circuit, applying the appropriate discipline of step No. 1,
17   analytical dissection.

18           Mr. Quinn, almost with a brush of his hand, moves
19   that out of the case.  But in truth, Your Honor, that is the
20   starting point.  They don't want to go there.  In their
21   opening brief, in their motion for summary judgment, in the
22   opening brief, they took the position that it was appropriate
23   to do filtration.

24           In the reply brief, they change course.  And I
25   guess they're allowed to do that, although today at lunch

1    break I was asking some of the people in the briefing team
2    are you allowed to do that procedurally. But I don't care
3    whether or not you can do it procedurally, Your Honor.

4            Here's the facts. When they first filed the
5    summary judgment motion, Glen Vilppu had not submitted his
6    report. They only had Lee Loetz's report. And they relied
7    on it. We found Glen Vilppu's report, then we filed our
8    opposition, and then in their reply brief for the first time
9    they switched gears and they move you to compilation. They
10   jump to compilation.

11           Now, that's interesting in and of itself because
12   what they do with compilation is a little bit breathtaking,
13   because what they're asking the court to do is they skip over
14   from the extrinsic test and they ignore the language from the
15   lone case that they cite to the J Toys case, yeah, J Toys,
16   which says that in the intrinsic cases tests, it is very
17   rare, very difficult to get summary judgment. It's really a
18   triable issue. That's clearly our point here with our
19   experts.

20           But when you jump over to compilation, all of a
21   sudden they want to apply the substantial similarity test
22   that they think applies under some of these cases after
23   analytical dissection, after the plaintiff has comes in with
24   a bill of particulars. Which they have never done, Your
25   Honor. You asked me at the last hearing, you know, well,

1   what do you think is protectable?  I at least answered the
2   question.  Mattel has never asked that question -- has never
3   answered that question.  They won't even answer the question
4   of whether or not they've had any evidence about the
5   ownership of the copyright.

6          But move that aside.  I understand why he doesn't
7   want to address that question.  But when you get over to the
8   compilation where they want you to be, Your Honor, citing to
9   the various cases that we've talked about in all of our
10  papers, you're talking about very thin, very thin protection.
11  It's interesting that -- which is really akin to virtual
12  identity.  It's interesting, and we're all surprised about
13  Mattel versus Goldberger -- this is the Second Circuit
14  decision from 2004 that they rely on.  This is the second
15  time in the hearing they've shown you quotes from Goldberger.
16  Okay?

17         This is the case.  Mattel was involved.  I think
18  Your Honor may be aware of it.  This is where Mattel was
19  claiming that Barbie CEO was infringed by the Rockette doll.
20  Let's just put that up just visually -- I represent to the
21  court that we obtained this from the Second Circuit.  Mattel
22  was involved in the case.  I'm sure if we're wrong -- and I
23  will lodge all this with the Court so you have this.

24         I just want to give you -- this is what Goldberger
25  is.  Mattel is claiming that CEO Barbie was infringed by the

```
 1  Rockette doll.  The procedural history of that case is kind
 2  of interesting.  District Court Judge Rakoff grants summary
 3  judgment in favor of the manufacturer of the Rockette doll.
 4  Mattel takes it up on appeal.
 5              And on appeal the Court makes the statements that,
 6  and quoting, but if I may Your Honor give you the entire
 7  quote from the Second Circuit, it says, "The protection that
 8                   flows from such a copyright is of course quite
 9                   limited.  The copyright does not protect ideas;
10                   it protects only the author's particularized
11                   expression of the idea...thus Mattel's
12                   copyright in a doll visage with an upturned
13                   nose, bow lips, and widely-spaced eyes, will
14                   not prevent a competitor from making dolls with
15                   upturned noses, bow lips, and widely-spaced
16                   eyes, even if the competitor has taken the idea
17                   from Mattel's example, so long as the
18                   competitor has not copied Mattel's
19                   particularized expression."
20              And they go on to say, Your Honor, that what's
21  afforded them is this thin protection.
22              And this is really what it is.  Bottom line, when
23  you cut through it, and I'm not a copyright lawyer.  You know
24  that by now I'm sure.  I'm blessed to have a lot of talented
25  people, Your Honor, who have guided me in making this
```

```
 1    presentation to you.
 2              In essence, the question is broad protection or
 3    thin protection.  It has a lot to do with protectable
 4    elements.  And that's not protectable.  Mattel wants to and
 5    hopes that you avoid that analysis and apply very broad
 6    protection to a copyright that they have overstepped the
 7    first point of even proving that they have ownership in, and
 8    claiming to you that there's broad protection here.  The test
 9    is really virtual identity.
10              So when you go to Loetz 7 it's to test this
11    protection.  We think it's thin protection.  And we're
12    confident Your Honor that a jury in this case -- we are very
13    confident, and all we want to do is get to a jury in this
14    case -- is that a jury is going to find that the dolls, the
15    3-D dolls, are not similar to Carter Bryant's 2-D rendition
16    of an idea of a four-line character multiethnic doll that
17    nobody else made other than Bratz.
18              I want to quote for you for another point that you
19    were talking about.  And we all know it.  We use our own
20    personal experience.  We're going to tell it to the jury.
21    They don't leave their common sense at home.  But this
22    question is of whether or not an eight year-old can make a
23    determination.
24              Could I have Loetz 7 up just for a moment?  We'll
25    go off of their Clint Eastwood moment shot for a minute, Your
```

1    Honor.

2          While we're doing that, Your Honor, I want to read

3    something out of the Second Circuit decision in Goldberger.

4    "The distinction between the idea and the expression,

5    although famously difficult to apply, is of great importance.

6    One artist version of a doll face with upturned nose, bow

7    lips, and widely spaced eyes will be irresistible to an eight

8    year-old collector.  Another artist version, which to a

9    grownup may look very like the first, will be a dud to the

10   eight year-old."

11         Your Honor, Paula Garcia will testify, and there's

12   going to be substantial testimony from leading experts in the

13   country, from Robert Tonner to Glen Vilppu, if someone made a

14   doll exactly a replicant of Carter Bryant's drawings, it

15   would not have sold if did not -- it had a different

16   expression.  It was not as soft as Sasha is on the right.  It

17   was not as appealing.  This conveys an edge that would not

18   have sold in the marketplace.  Paula Garcia, give her her

19   day.  Let her testify in front of this jury.  Let her tell

20   you how she designed this doll.

21         This is not summary judgment material, Your Honor.

22   There are disputed facts in this regard.

23         THE COURT:  Thank you, Counsel.  We're going to take a

24   recess for the court reporter.  She's been going for quite

25   awhile now.  For about 10 minutes.

```
 1                    (Recess.)

 2           MR. NOLAN:  Your Honor, just a few more points, if I

 3   may.

 4           THE COURT:  Very well.

 5           MR. NOLAN:  Thank you.

 6                When we left, we were talking a little bit about

 7   Mattel versus Goldberger, that case.  I think it's so helpful

 8   to focus on that case because I think in so many ways it

 9   affects what we're doing here.  I have already given you

10   quotes from the Second Circuit.  And I want to just carry out

11   what actually occurred in Goldberger after the Second Circuit

12   sent it back down with an instruction to Judge Rakoff, who

13   had thrown the case out on summary judgment anyway, saying

14   that he should afford thin protection.  Judge Rakoff did hold

15   the trial, and he made a finding.  The finding was against

16   Mattel.  Mattel attempted to have that judgment vacated.

17                And at 236 F.R.D. 175 from the Southern District,

18   I quote from Judge Rakoff "Mattel's assertion" -- and by the

19   way, the case had been settled now after the adverse ruling

20   -- "Mattel's assertion that its motion will not harm the

21   public interest is plainly unsupportable, not only for the

22   institutional reasons previously described, but also

23   precisely because of Mattel's aggressiveness.  There is a

24   public interest in knowing, as the Court's prior findings and

25   judgment establish, that not every female doll is a Barbie
```

```
 1    knock-off."

 2              Mattel appealed that, went to the Second Circuit.

 3    This is when Michael Zeller entered the case.  Appeared

 4    before the Second Circuit.  And the Second Circuit ordered

 5    the vacater, and this judgment was set aside.

 6    Coincidentally, that was November 20th of 2006.  And on

 7    November 20th of 2006 on the West Coast, Mattel filed leave

 8    to amend to add the copyright action in this case based on

 9    Carter Bryant's drawing.

10          THE COURT:  Thank you, counsel.  Let me give you a few

11    minutes to reply to all this.  Then we're going to move on.

12          MR. QUINN:  Your Honor, just briefly.  The Goldberger

13    case I'm not sure where that leads us.  Judge Rakoff granted

14    summary judgment against Mattel saying they're not

15    substantially similar.  Went to the Second Circuit.  The

16    Second Circuit said, oh, yes, we think they sent it back to

17    Judge Rakoff.  Judge Rakoff then had a bench trial where he

18    stuck to his initial view.  And there was an appeal.  I'm not

19    sure what any of that has got to do with what the Court has

20    got to decide here.

21              I'm comfortable with the way Mr. Nolan framed the

22    issue for the Court.  And that is, whether it's broad or thin

23    protection depends on what's protectable.  That's what he

24    said.  And what's protectable, i.e., what's original, that's

25    for Your Honor to decide.  That is your -- that is the
```

 1    Court's issue.  I think nobody disputes that.

 2             And there is no claim here -- and this is in our

 3    papers, I didn't mention this in my initial presentation --

 4    there is no claim here of copying.  Mr. Bryant submitted a

 5    declaration in opposition to this.  He didn't claim that he

 6    copied anything.  He's on record as saying these are original

 7    works of authorship.  So, you know, these are original visual

 8    works.  He says in his declaration that he was inspired.  He

 9    was aware of things that were out there in the marketplace.

10    He isn't claiming that he copied everything or anything.

11    That, I submit, is the beginning and the end of the inquiry

12    about whether these are original protectable works.

13         THE COURT:  There's a question on the timing of that,

14    though, that remains.

15         MR. QUINN:  There's the question certainly on the

16    timing of when these drawings were created.  No question

17    about it.  Was it done during hiatus --

18         THE COURT:  And Mattel's ability to claim the copyright

19    for themselves turns on that timing issue.

20         MR. QUINN:  That's true, Your Honor.  That's absolutely

21    true.  But I think that's a completely separate question and

22    has no bearing on the issue that the court can and, I submit,

23    should decide as to whether these drawings are substantially

24    similar to the dolls.

25         THE COURT:  Well, only to the extent -- and this goes

```
 1    back to the question I asked before the break -- is why
 2    should the Court -- and you will give me the answer, I
 3    suppose -- determine substantial similarity when it's not
 4    even established yet that you have the copyright that you
 5    claim?
 6         MR. QUINN:  The Court can do that.  I mean, they claim
 7    a copyright, too.
 8         THE COURT:  I understand.  Let's not -- you've got to
 9    claim a copyright for you to get an infringement claim.
10         MR. QUINN:  That's true.  And as --
11         THE COURT:  And that's not been established yet.
12         MR. QUINN:  That is teed up in our notice of motion,
13    Your Honor, as we framed the issue.  We weren't asking the
14    Court to make a determination of copyright infringement.  We
15    didn't ask the Court to do that.  We're not asking the Court
16    to do that now.
17         THE COURT:  I know you're not.  That's why you don't
18    touch that issue.  But why should I -- if we don't have that,
19    that's the first element of a copyright infringement, why
20    should I get to essentially the third element?
21         MR. QUINN:  Because let's say --
22         THE COURT:  You answered it.  You said it narrows the
23    issue.
24         MR. QUINN:  Let's say there were four elements to any
25    cause of action.  Let's say it's not copyright.  If element
```

```
 1   No. 3 is properly teed up for summary judgment, the court can
 2   address that.
 3        THE COURT:  All right.
 4        MR. QUINN:  Your Honor, we had some issues on the
 5   presentation about what I represented to the Court were
 6   undisputed.  Certain drawings identified in the motion which
 7   I represented to the Court that's undisputed that Mr. Bryant
 8   says he created while he was employed by Mattel.  That's I
 9   think 2C, issue 2C.
10        THE COURT:  Mmh-hmm.  Yes.  Yes.
11        MR. QUINN:  And we had some problems with our
12   presentation on that.  If I could just quickly go through
13   those now, and hopefully this will go quicker.
14             Exhibit 716 referred to in the notice of motion
15   these are all, by the way, gown drawings, drawings of the
16   Bratz -- what became known as the Bratz figure in a gown.
17   And that reminds me, by the way, if there's an argument that
18   clothes on a doll a three-dimensional doll are functional,
19   that doesn't work for clothes on a drawing.  There's no
20   argument that two-dimensional drawings of clothes are
21   functional.  And so I think that whole issue about whether,
22   you know, it shocked the conscience --
23        THE COURT:  You're taking the position essentially the
24   two-dimensional drawings should be the basis for the Court
25   finding infringement by a three-dimensional production;
```

```
 1    right?

 2         MR. QUINN:  Ultimately, yes.

 3         THE COURT:  So your argument essentially is they're one

 4    in the same.

 5         MR. QUINN:  Well, no.  The question, Your Honor, is:

 6    Is the two-dimensional -- is that image protectable or is

 7    that all -- do we filter out, in assessing originality of the

 8    two-dimensional image, do we filter out, to use their word,

 9    the clothes on the two-dimensional image?

10         THE COURT:  Right.

11         MR. QUINN:  I'm submitting, Your Honor, that if the

12    test is functionality, you don't filter out the clothes

13    because the clothes on a two-dimensional image are not

14    functional.  They're pure design.  They're pure decoration.

15         THE COURT:  Well, respond to Mr. Nolan's argument that

16    you can have a naked bear but not a naked doll.

17         MR. QUINN:  Well, I don't know.

18         THE COURT:  Have you ever seen a naked doll?  I mean

19    I'm sure like me you've seen lots of them lying around the

20    house.  That's only because, you know, things have fallen in

21    disrepair.

22         MR. QUINN:  But I can't really -- although I have five

23    daughters, I really can't say whether or not they sell naked

24    dolls.  I don't know.

25         THE COURT:  I've never seen one.
```

```
 1          MR. QUINN:  Maybe there aren't naked dolls.  My point
 2    is, if we're talking about three-dimensional images, that's
 3    irrelevant to the issue whether the drawing of clothes on a
 4    two-dimensional image are functional or not.
 5          THE COURT:  All right.
 6          MR. QUINN:  Anyway, if I could go through these
 7    exhibits.  Your Honor, still I represent to the Court we
 8    didn't see any opposition to the proposition that Mr. Bryant
 9    created these while he worked for us.  Mr. Nolan didn't
10    address it.  If we could quickly go through them.
11              Slide 58 is Exhibit 716.
12          THE COURT:  You're referring just to the fashion
13    designs here, the dresses.
14          MR. QUINN:  These images right here.  No, the entire
15    image.
16          THE COURT:  The nighttime fashions.
17          MR. QUINN:  Exactly, Your Honor.  Exhibit 716, which is
18    Slide 58; Exhibit 717, which is Slide No. 61; Exhibit 718,
19    which is Slide 57; Exhibit 719, which is Slide 62; Exhibit
20    721 which is Slide 56; Exhibit 22, which is Slide 63; some of
21    these are just black and white, and some are color versions
22    of the same things, Your Honor.  Exhibit 724, which is Slide
23    60; and Exhibit 725, the color version which is Slide 61.
24              All of these, it is undisputed, that Mr. Bryant
25    created these while he was employed by Mattel.  We asked him
```

```
 1   at his deposition.  Really, the discussion is kind of broken
 2   up in the deposition, but it's generally pages 302, line 16
 3   to 19; 340, line 2 to 241, line 17; 258, lines 2 to 16.
 4            But the punch line is at page 302.  We asked him
 5   when he created these evening fashion designs.  This is page
 6   302, line 16.
 7            Question:  When did you create those evening
 8   fashion designs?
 9            Answer:  Those were created in 2000.
10            Question:  And can you tell us when in 2000 they
11   were created?
12            Answer:  Sometime before the pitch.  I'm going to
13   say maybe July.
14            Sometime before the pitch to MGA.  By definition,
15   this is not a few years earlier when he was in Missouri.
16            And as well there is a sculpt drawing as well,
17   which is the last exhibit, Slide No. 59.  If we have that.
18   These are all the exhibits.  They're identified in the notice
19   of motion, which we think there's no dispute, were created
20   while he was employed by Mattel.
21            Thank you, Your Honor.
22         THE COURT:  Thank you, Counsel.
23         MR. NOLAN:  Your Honor, very quickly.  This will take
24   two minutes.  If I could just leave this up.
25            Your Honor, this sculpt drawing is -- first of
```

```
 1    all, they don't have a copyright on it.  They're not suing on
 2    infringement on it.  This is -- and Loetz didn't realize
 3    this, Your Honor.  I don't know if Mr. Quinn knows this.
 4    This is not taken from Carter Bryant's drawings.  This
 5    drawing was done from the third variation of the mold done at
 6    MGA.  And I guess now what Mr. Quinn is saying is that if an
 7    employee bound by Mattel's contract comes over and copies my
 8    client's proprietary information, that Mattel owns this
 9    controlled drawing.  But this is a red herring, Your Honor.
10    This drawing is off of a brass doll, not from Carter Bryant's
11    drawings.
12            If I could go back real quickly --
13        THE COURT:  Quickly.  We have an hour and ten minutes,
14    and we have some really important issues.
15        MR. NOLAN:  It is very disputed about these drawings.
16    And it is very interesting and clever on how the testimony
17    was shown to you.
18            Carter Bryant admitted that the evening fashion
19    designs, the dress itself, was done.  They're not suing on
20    the copyright infringement on a dress.  The core drawing
21    itself that goes to the -- that's the timing issue, Your
22    Honor.  Because all he does is he traces from the master
23    drawings.
24            We contend he did the master drawings in 1998.
25        THE COURT:  Would you suggest that that is drawings of
```

```
 1    those dresses which we're talking about here?  And I
 2    understand that may not be part of the copyright claim.  Was
 3    that part of the mere preparation for finding another job?
 4         MR. NOLAN:  Well, yeah.  It was a job interview, a
 5    complete job interview.  That's what the testimony is from
 6    him; that as he was going to the pitch meeting what he did
 7    was come up with an idea of, let's say, an evening fashion.
 8    It was never used by.  And I don't even know if it was
 9    ultimately shown by or to MGA.
10              All Mr. Bryant did to this extent was add some
11    color.  But the expert testimony in this case, Your Honor,
12    and I think this is uncontroverted, that neither the fashions
13    nor the color, regardless of when it was added to the core
14    drawings, added nothing to the enhancement of the mold in
15    creating the mold and the doll.  And that's what this case is
16    about, to the infringing 3-D object.
17              I will stop on that.  I think we've made all the
18    other points.
19         THE COURT:  Very well.
20         MR. QUINN:  Your Honor, none of that matters.  The
21    point is:  He made them while he worked for us.  We own them.
22         THE COURT:  I understand your position, Counsel.
23              All right.  Let's move on to the No. 5, the aiding
24    and abetting, breach of the duty of loyalty, and breach of
25    fiduciary duty.  What I would like to do is actually just
```

1   focus on the breach of duty, because the Court has got to
2   rethink this fiduciary duty and motion reconsideration.  But
3   the breach of duty of loyalty is pretty clearly statutorily
4   based.  There's no question that everyone needs to be aware
5   of that, the duty of loyalty.

6              Is there any question, Mr. Nolan -- and let me
7   start with you on this -- is there any question that MGA knew
8   that Carter Bryant was an employee of Mattel when they
9   interviewed him?

10             MR. NOLAN:  Your Honor, I don't think that there is an
11  issue that during the interview the fact that he was employed
12  at Mattel was known and that he assured us that what he was
13  showing to us was not related in any way to the work that he
14  was performing.  Thus, we did not believe at any time that he
15  was doing something during the course of his employment by
16  meeting with us.  It was no different than any number of
17  interviews that we've conducted of other employees who are
18  employed at other toy companies.

19             THE COURT:  Okay.  But as far as that first element,
20  there was no question that MGA knew that he was working for
21  Mattel and therefore would know that there's a duty of
22  loyalty to Mattel in operation of the law in the State of
23  California?

24             MR. NOLAN:  By operation of law in California.  But I
25  do believe that there is a disputed fact, though, given the

```
 1   affirmative defenses, and what happens in the toy industry,
 2   and the standard, and all of the history that we've outlined
 3   in the argument.  That mere knowledge, mere knowledge that
 4   someone has a duty of loyalty arising out of his employment
 5   at Mattel, or we'll say Skadden, Arps or some other, we'll
 6   take it out of the toy industry for just a moment.  That by
 7   itself, Your Honor, does not in any way or should not in any
 8   way satisfy the first element of the tortious interference.
 9            Because when you think about it, Your Honor, if
10   you were to do that, then every time you conduct an
11   interview, you've got -- you're one step to aiding and
12   abetting a breach of loyalty.
13            We did not ask, and this is really the test, Your
14   Honor --
15       THE COURT:  Wait.  You're kind of getting to the second
16   issue.  Maybe it makes sense to do both of these at the same
17   time, because your motion on the intentional interference
18   with contractual relations because you still have that --
19   what's missing there, and what the Court previously
20   determined was missing there, is that critical second element
21   in terms of there's a disputed fact as to the knowledge of
22   the contract between Carter Bryant and Mattel.
23       MR. NOLAN:  Right.
24       THE COURT:  MGA knew that he worked for them and may
25   have known there had been an employment contract.  But
```

```
 1    there's a disputed fact here in terms of what the employment
 2    contract or inventions agreement or the agreement actually
 3    called for or imposed.
 4        MR. NOLAN:  Correct.  And Mr. Russell is going to
 5    handle that part.
 6            I just wanted to handle this one question that you
 7    asked me, though, about duty of loyalty.  There is no
 8    evidence that suggests that although we knew he was an
 9    employee at Mattel that we ever asked him questions about
10    what work he was doing at Mattel.  And I think that that's an
11    important distinction here, Your Honor.  Because when you
12    think about it, although you mentioned earlier that the term
13    "prepared to compete" is used and thrown throughout these
14    briefs quite often.  And that's true --
15        THE COURT:  You mean as far as you know, that it
16    appears --
17        MR. NOLAN:  But I do want to -- no, of course I didn't
18    take it that way either, Your Honor.  But I think this is
19    really important when you think about it.  I think you have
20    to look about it in the context of this industry.
21            There will be record evidence in this case that
22    over the course of time that Mattel laid off approximately up
23    to maybe as many as a thousand employees at its work force
24    during various times, their own expert, Mr. Stein, who is the
25    former president of one of the divisions, himself admitted
```

```
 1    that although he had an employment contract that every day
 2    that Carter Bryant went to work or any other hourly employee
 3    or wage employee had the probability -- not the probability,
 4    I'm sorry, too strong -- could be laid off that day and
 5    escorted out of the building.
 6              Now, I say that because that's undisputed.  That's
 7    their own expert.  Now, I want to overlay that policy issue
 8    from California to try to understand what the rights of an
 9    employee are and to try to measure the duties of loyalty and
10    the practicalities of life.  And that is that an at will
11    employee, who has a duty of loyalty but could be laid off at
12    any time, certainly has the right to improve his position in
13    life and interview.  And that includes obviously interviewing
14    with the competitor.
15              Does the competitor automatically know that he may
16    be aiding and abetting in a breach of loyalty?  Well, if they
17    said, Can you give me designs from Mattel or what is Mattel's
18    next line, if there was any evidence of that in that
19    conversation, then I would agree with you.  But the simple
20    meeting on September 1st and the mere knowledge of a former
21    -- of an employee being employed at Mattel in a sense, Your
22    Honor, it's breath taking.  It's breath taking of what you
23    would be imposing on the employee at Mattel.
24              Last point.  I took the deposition on Saturday of
25    Matt Bousquette, President of Mattel Brands.  The biggest guy
```

```
 1   in Mattel Brands admitted on Saturday to me that although he
 2   was making something like a million and-a-half dollars a year
 3   he walked into work one day, no notice, summoned to Mr.
 4   Eckert's office the CEO, and in a three-minute conversation
 5   was fired.  He used the term "terminated."  And he was
 6   escorted out of the building.  Fortunately for Mr.
 7   Bousquette, he had a severance package worth about
 8   $5,000,000.
 9              Carter Bryant unfortunately did not have that.
10   You have to look at the policy issues and this breach of
11   loyalty, Your Honor.  All it was was Carter Bryant, who had
12   one position at Mattel, and wanted a different position
13   somewhere else, he had an idea.
14              That's what this case is about.  I do not believe
15   the first element has been satisfied.  That's enough.
16              Thank you.
17          THE COURT:  Mr. Quinn?
18          MR. QUINN:  Your Honor, there is a lot of evidence,
19   undisputed evidence, that Mr. Bryant did much more than just
20   go interview for another job.  Their records indicate he
21   worked four hours a day.  Their records indicate that he
22   undertook a project that was paid for for the Prayer Angels
23   project.
24              The records indicate that he contacted a vendor,
25   still working for Mattel, contacted a vendor in Hong Kong for
```

```
 1    hair.  It says on the document "I'm working with MGA now."
 2    In terms of, you know, the industry practice and standard and
 3    what do people know, MGA has these types of inventions of
 4    agreements.  They have something like 20 employees who are
 5    former Mattel employees who all have these kinds of
 6    agreements.  Their lawyer, Mr. Rosenbaum, who was tasked to
 7    looking into this, remember, he's told by Mr. Bryant I can't
 8    get a copy of it without raising suspicion.  He talks to Mr.
 9    Bryant's lawyer and realizes, he acknowledges, that they
10    would have suspected because of his experience in the
11    industry that the agreement probably provided that
12    Mr. Bryant --
13        THE COURT:  These are good arguments, Counsel.  But can
14    you accurately characterize them as undisputed, though?
15        MR. QUINN:  I think.
16        THE COURT:  These are very good arguments.
17        MR. QUINN:  Undisputed that he knew -- they knew he was
18    working for Mattel?
19        THE COURT:  That he knew -- no, no.  That's not -- he
20    knew that he was working at Mattel.  No question about that.
21    But in terms of the inventions agreement that governed him,
22    what the inventions agreement said, what his responsibilities
23    to Mattel.  Is that in your view undisputed?
24        MR. QUINN:  Your Honor, I've cited the evidence that I
25    would --
```

```
 1          THE COURT:  I'm not saying it's not good evidence, but
 2   it's evidence.  And there's evidence --
 3          MR. QUINN:  They know their employees have that kind of
 4   agreement, but the point is they're working with him.  They
 5   know -- he's working with them to develop products.  He's
 6   doing this product Prayer Angels.  They're paying him for it.
 7               This isn't just a man who goes out on a job
 8   interview who is in a sympathetic position in an industry
 9   where he might get laid off.  He's working for a competitor.
10   They know that.  He's working for them.  They know that.  I
11   mean, their own words, own records, say he's working four
12   hours a day.
13          THE COURT:  They hired him away.
14          MR. QUINN:  After.  Yes.  After.  That's -- this case
15   is all about after.
16          THE COURT:  I know.  Thank you, Counsel.
17          MR. RUSSELL:  Your Honor, may I just briefly?
18          THE COURT:  You may.
19          MR. RUSSELL:  First --
20          THE COURT:  And then go ahead.  You can spill into your
21   presentation on tortious interference.
22          MR. RUSSELL:  I think that's perfect.  They totally
23   relate.
24               With respect to aiding and abetting, it's
25   important we focus on the elements, something they don't want
```

1    to do, but I think we need to do.  If you look at the Nielson
2    case we cited to Your Honor, you'd see what is it we're
3    talking about with respect to the first element, because I
4    think it's agreement.

5         THE COURT:  Knowledge and providing substantial
6    assistance.

7         MR. RUSSELL:  It's a little bit more than that, though,
8    because it says "Under California law, liability may be
9              imposed on one who aids and abets the commission of
10             an intentional tort if the person, A, knows the
11             other's conduct constitutes a breach of the duty and
12             gives substantial assistance or encouragement to the
13             other to do so, and then B, gives substantial
14             assistance to the other in accomplishing a tortious
15             result and the person's own conduct, separately
16             considered, constitutes a breach of duty to the
17             third person."

18        What I think we need to focus on here is what was
19   MGA's knowledge.  And the record here is hotly disputed.  The
20   record is as follows:  It is undisputed that Mr. Bryant
21   approached MGA and not the other way around.  And that is
22   material to both the tortious interference claim and the
23   aiding and abetting claim.  And you need look no further than
24   the elements of the claims that Mattel pled.  And I'm happy
25   to put them on the screen if it would help Your Honor.

1            They admit that solicitation and inducement is a
2   material element for both claims.  It is undisputed.  And I'm
3   happy to cite you to the undisputed record because it is
4   undisputed in MGA's favor, not in Mattel's favor.

5            In fact, in responding to our motion for summary
6   judgment on tortious interference, the only dispute that
7   Mattel could muster was that it argued that Bryant approached
8   MGA earlier than we said.  They don't dispute that Mr. Bryant
9   approached MGA, not the other way around.  That alone kills
10  both claims.

11           But once you get past that, and again that's
12  undisputed for us, but once you get past that, there's a
13  second I think more devastating series of undisputed pieces
14  of evidence.  There's not a single shred of evidence to
15  dispute this.  Mr. Bryant was asked at the pitch meeting by
16  Mr. Larian and others, he was asked by Mr. -- or by Mr.
17  Rosenbaum, who was MGA's counsel, he was asked by his patent
18  attorney, "Is anything that you're doing a breach of any
19  obligation to Mattel?"  And not only did he say no, he
20  represented in writing in his contract with MGA and agreed to
21  indemnify them if that was not true.

22           Now, the only piece of evidence that Mr. Quinn can
23  cite you to is there is an e-mail that states that Mr. Bryant
24  was working for MGA four hours a day allegedly in this
25  period.  The testimony on that is that the e-mail was

 1 | misdated.  The evidence is thereafter undisputed that Mr.
 2 | Bryant wasn't asked a single thing to do, not one thing was
 3 | he asked to do from the date that he signed the contract
 4 | until he left.  In fact, the evidence is undisputed that MGA
 5 | didn't even know that Mr. Bryant had failed to quit.  Indeed,
 6 | it's undisputed Mr. Larian and others instructed Mr. Bryant
 7 | to quit immediately precisely because they didn't want him to
 8 | be there.  They wanted him to render services for them.

 9 | Now, as Mr. Nolan points out, the law is crystal
10 | clear.  They have a privilege to hire away competitors'
11 | employees.  And whether or not Mr. Bryant has a prohibition
12 | on that, whether or not he's subject to the liability for
13 | breaching a contract is irrelevant on both claims for that
14 | reason.  He chose, if he breached, he chose to approach us.
15 | He chose to represent that there was no contractual
16 | prohibition.  That is fatal to both claims.

17 | And with respect to the try out that they talk
18 | about, we've cited Your Honor to some cases, the Sark case
19 | and the Reeves case that hold quite clearly -- Sarks, Ninth
20 | Circuit; Reeves, California Supreme Court -- not only are we
21 | privileged to interview and hire a competitor's employees,
22 | but we might even advance salary.

23 | So this idea that Mr. Bryant was given some token
24 | sum to reimburse him for expenses on his tryout, under Ninth
25 | Circuit precedent that is legally irrelevant.  But equally

```
 1    irrelevant, if you think about what they're asking you to do,
 2    MGA took every step it reasonably could.  The only evidence
 3    that they can muster in response is when we asked Mr. Bryant
 4    to provide the contract, he said he didn't have it.  Now, we
 5    now know that it's Mattel's policy to not release the
 6    contracts to employees, as strange as that may seem.  And the
 7    only way he was going to get it was to go to Mattel and say,
 8    Can I have a copy please of my inventions agreement and my
 9    confidentiality agreement.  I think anyone who has ever
10    interviewed for a job can surmise what would have happened if
11    he had done that.
12              But given that we went to him and to his patent
13    attorney, both of whom who represented and he represented in
14    writing that there was no issue, contractual or otherwise, at
15    a minimum there is a genuine issue of fact.  I would submit
16    respectfully, Your Honor, with respect to both aiding and
17    abetting and tortious interference, we're entitled to summary
18    judgment.  And indeed, that was one of the points of
19    clarification I was hoping to get, because we did not
20    obviously have a chance to argue tortious interference last
21    time.  And I see Your Honor made certain rulings.  But I
22    think the fact that Your Honor found a genuine issue on the
23    existence of the contract or our knowledge of the contract
24    precludes any finding of intent.
25              We can only rely upon Mr. Bryant and Mr. Bryant's
```

```
 1   attorney, she being a seasoned patent attorney.  I think it's
 2   only reasonable that we can rely upon that and only more
 3   reasonable that we rely on his written representations and
 4   his agreement to indemnify.
 5            So again, I'm not sure where the undisputed
 6   evidence for Mattel lies.  Respectfully, I think MGA should
 7   win these claims, but, if not, certainly let's have a jury
 8   hear these issues and not have a finding that we had the
 9   intent to interfere or we knew because we knew he was an
10   employee we therefore aided and abetted a breach of fiduciary
11   duty or a duty of loyalty.
12            And again, while the duty of loyalty is obviously
13   inherent in any employee's job with their employer, certainly
14   an employer who is going to seek to hire away competitors'
15   employees knows that they are free to encourage that person
16   to leave.  Here, of course, we sat back.  Mr. Bryant
17   approached MGA, so they are on perfect grounds.  We cited
18   Your Honor to the restatement which says that, and this is
19   not the case, but in this situation where someone approaches
20   you and offers to contract with you, and you in fact know
21   that person cannot complete your contract and the contract he
22   has with another, you are still not liable for tortious
23   interference or aiding and abetting.
24            And it just makes sense.  I mean, the person who
25   committed a wrong, if there was one, was Mr. Bryant, not MGA.
```

```
 1   MGA took every reasonable step.

 2            THE COURT:  Thank you, Counsel.

 3            Mr. Quinn?

 4        MR. QUINN:  Your Honor, I confess I don't recall the

 5   Sark case that he refers to that indicates that you can pay a

 6   competitors' employee.  But I cannot believe that it stands

 7   for the proposition that, you know, a doll company, a company

 8   that wants to get into the doll business, can pay a doll

 9   designer while he's employed by a competitor to design a

10   doll.  Surely that is not the law that it's okay to do that.

11            Now, they've just referred to that as a try out

12   project.  Now, that was their initial response to this; that

13   this was part of the job interview process, and we asked him

14   to design something just as a try out to see what his skills

15   were.  In discovery we asked, tried to get discovery of that,

16   How many times have you done that?  Who else have you done

17   that with?  We struck an agreement that they would withdraw

18   that contention.

19            So that is improperly something -- they didn't

20   want us to have discovery on that.  That's not something

21   that's properly before the Court now.

22            But it's undisputed that they paid somebody to

23   design a doll while he was still employed by Mattel.  That

24   breaches the duty of loyalty.  But I submit it's also a

25   breach of fiduciary duty, and it proves aiding and abetting
```

1   of the breach of those duties.

2       THE COURT:  Thank you, Counsel.  All right.  I want to

3   focus on the statute of limitations.  I want to begin with

4   MGA's point.

5       MR. NOLAN:  Thank you, Your Honor.

6           Your Honor, what I would like to do, and we'll

7   make this as quick as possible, is I want to just talk about

8   a couple of facts.

9       THE COURT:  Let me say a few words that might help.  We

10  had some discussions on this at the last hearing.  And what

11  I'm struggling with on the statute of limitations issue,

12  there was certainly a lot of suspicion.  No question there

13  was suspicion that somehow when Bratz came out and Carter

14  Bryant was involved.  And they very well had been responsible

15  for it.  That's not the issue.

16          The issue that relates to the claim that's been

17  brought by Mattel is whether or not Carter Bryant, as they

18  are now alleging, basically came up with the idea and reduced

19  the idea in some form of practice of Bratz while he was an

20  employee at Mattel.  It's when they knew that that's the

21  critical date for the statute of limitations.  When they knew

22  it sufficient to survive a Rule 11 and satisfy the Rule 11

23  obligations.  And so I'm looking for evidence on that point.

24      MR. RUSSELL:  Your Honor, if I may step in for Mr.

25  Nolan for one second.  I certainly understand why Your Honor

```
 1    would think that, because that is the primary claim that
 2    Mattel levies now, they're copyright claim.  And so when they
 3    knew about the drawings and when they knew about the
 4    reduction of practice seems as though could be a fair inquiry
 5    for copyright.  And we can talk about that in a second, but I
 6    think we have to look a little bit --
 7            THE COURT:  I'm not mistaken that's have that claim.
 8            MR. RUSSELL:  They have that claim, but they have other
 9    claims.  And the other claims aren't so narrow.
10            Let's take tortious interference, for example.
11    The claim for tortious interference is not merely that MGA
12    tortiously interfered and got him to transfer the rights to
13    Bratz.  In fact, it's simply that the breach -- and we can go
14    to the second amended answer and counterclaims, and we can
15    see it if you would put up on the screen please, 120 --
16    nevermind, it is going to take too long.  Oh.
17            See, can you see here this is paragraph 124.  They
18    had a duty not to work for or assist any competitor of Mattel
19    such as MGA.  So the claim isn't simply we didn't know about
20    the drawings -- if that's what it was, I wouldn't stand here
21    Your Honor and argue -- but did Mattel have knowledge or
22    reason to suspect.
23            THE COURT:  So you agree that the copyright claim --
24            MR. RUSSELL:  No, not at all.  I'm going to come back
25    to it.
```

```
 1            THE COURT:  I'm sorry.
 2            MR. RUSSELL:  Not at all.  I want to start claim by
 3    claim.
 4            THE COURT:  Very well.
 5            MR. RUSSELL:  On this claim I would submit to Your
 6    Honor, and this is why Mr. Nolan argued the way he did last
 7    time, that October of 2000 is the relevant date.  That's when
 8    this claim accrued, the date that Mr. Bryant signed his
 9    contract with MGA, indeed before Mr. Bryant even left.  Mr.
10    Bryant, and it's undisputed, was making phone calls to MGA
11    preparing to go over there.  According to Mattel's evidence,
12    he's faxing things.  He's reaching out and soliciting other
13    Mattel employees to help him design the Bratz.  That's the
14    breach.
15            Now, what do we know about that?  We know from Mr.
16    Nolan's presentation last time that Jill Norquist, his
17    superior, suspected the day he left he was going to a
18    competitor, he was going to assist a competitor of Mattel.
19            Now, the standard for tortious interference does
20    not implicate the Discovery Rule.  The claim accrues
21    immediately upon the breach.  So one could argue right there
22    we're in business.  October 2000 they didn't file for another
23    four years.  Piece of cake.  But even if you assume for the
24    sake of argument that the Discovery Rule applies, the
25    California Supreme Court case of Fox, which we cite liberally
```

```
 1    throughout our papers, teaches that Mattel is charged with
 2    knowledge of anything that a reasonable investigation would
 3    have revealed upon suspicion.
 4              Now, what do we know?  They suspected at Day 1,
 5    the day he left Mattel, they suspected he's going to a
 6    competitor.  Now, what could they have done to investigate
 7    that?  Well, again, we don't have to guess; we know.  Mattel
 8    submitted for Your Honor Mr. Palmer's declaration showing
 9    phone records in September before he left.  That would
10    evidence Mr. Bryant is giving assistance to MGA before he
11    left.  He is breaching his contract, if you believe Mr.
12    Quinn's arguments.  The tortious interference claim has not
13    accrued.
14              But there's more.  If they had investigated, they
15    would know, and they are charged to know under the California
16    Supreme Court case of Fox --
17         THE COURT:  Wait a second.  What they knew in October
18    2000 was that he went to work for a competitor.  As Mr. Nolan
19    and you both have convincingly argued, that merely preparing
20    and going to work for a competitor does not give rise to any
21    claim.  Correct?
22         MR. RUSSELL:  Well, that's true.
23         THE COURT:  Correct?
24         MR. RUSSELL:  Absolutely true, Your Honor.
25         THE COURT:  That's what they knew at that point in
```

```
 1  time.  Right?
 2      MR. RUSSELL:  No.  I would submit no, Your Honor,
 3  because there are two distinct standards.  One is to
 4  establish liability.  There's no evidence to establish
 5  liability, but there is evidence to establish suspicion.  We
 6  have suspicion.  Miss Norquist testified that she was
 7  suspicious.
 8      THE COURT:  I understand that.  But again, if anyone
 9  files a complaint in this court based on a suspicion, it's
10  going to get turned right out.
11      MR. RUSSELL:  There's no dispute there.  We're not
12  talking about Rule 11 standard.  What has to happen is the
13  moment you are on suspicion, you must investigate.
14          Now, what do we know?  As I say, they are charged
15  to know about the phone calls, the faxes.  They are charged
16  to know, and you heard Mr. Zeller talk about it earlier, the
17  fact that Mr. Bryant was reaching out and working with Mattel
18  employees --
19      THE COURT:  But would that establish that there's
20  actually -- that the contract with MGA would have predated
21  the --
22      MR. RUSSELL:  Well, you don't need to know that the
23  contract predated his leaving.  All you need to know is they
24  are working with him, assisting him before he left.
25      THE COURT:  Wait a second.  Now you're putting
```

```
 1    substance to those conversations or those telephone calls.
 2         MR. RUSSELL:  Well, if I can't convince Your Honor that
 3    the mere fact that they knew about the phone calls and that
 4    they knew and are charged to know that Mr. Bryant is out
 5    there soliciting people to help MGA, if that doesn't do it
 6    for you --
 7         THE COURT:  Well, again, you're putting substance to
 8    those phone calls.  What Mattel would know is that phone
 9    calls were made.
10         MR. RUSSELL:  Correct.  And that would cause them to do
11    what?  To ask Mr. Bryant presumably:  Hey, I notice that you
12    have 27 phone calls to a competitor this month.  I thought
13    you worked for us.  But that didn't happen.  They didn't do
14    anything.  And so far from it, I think the facts are they let
15    him go.  In fact, they varied from their typical response,
16    which is to escort you out by the shirttail.  They let him
17    go.  But they're charged with the investigation that would
18    have been reasonable.
19              Would it have been reasonable given that suspicion
20    to ask Mr. Bryant?  Absolutely.  Would it have been
21    reasonable to go ahead and interview people in the design
22    center?  Absolutely.  One might suggest it would have been
23    reasonable for them to look at the notary book that Mr.
24    Bryant brazenly had the drawings notarized in that were in
25    Mattel's possession.  The drawings were in the design center
```

```
 1   notarized before he left.  I submit they're charged with that
 2   too.
 3            But it's okay.  I don't have to convince you of
 4   that, because I can go on further.  I will take you to the
 5   investigation, and we can talk about what we know.  Even
 6   though the investigation was privileged, and we can't know
 7   all of it, we do know some of it.  And we know because Mattel
 8   has admitted it.  We know what they investigated.  One of the
 9   things they investigated was -- and this is in Mattel's
10   Statement of Genuine Issues at paragraph 113, next page,
11   "Mattel investigated allegations that Carter Bryant may have
12   gone to work for MGA."  That's what they investigated.
13            Now, they say they didn't discover any evidence
14   that he worked for MGA.  It's hard to take that too seriously
15   given that it was common knowledge in the Summer of '01 that
16   Mr. Bryant had gone over to MGA.
17        THE COURT:  But it's not an undisputed fact.
18        MR. RUSSELL:  It may not be an undisputed fact, but
19   it's enough to put them on inquiry notice and start the
20   statute running, and that's all I need.  If you don't agree
21   with me, that's fine --
22        THE COURT:  No, no.  What I'm saying is, they conducted
23   an investigation, and they didn't discover anything, so it
24   would have been wrong for them to have brought a lawsuit.
25        MR. RUSSELL:  Well, no.  They say they didn't discover
```

```
 1    anything.  We're not stuck with that, and neither are you.
 2           THE COURT:  But that's the disputed fact.
 3           MR. RUSSELL:  But no.  That's where I have to stop you.
 4    They're charged with what they could have discovered.  What
 5    could they have discovered?  That's what the Fox case says.
 6    It says, "for inquiry notice, plaintiffs are charged with
 7    presumptive knowledge of an injury if they have the
 8    opportunity to obtain knowledge from sources open to their
 9    investigation."
10           Well, they obviously can interview their own
11    employees, and presumably they did so.  Now, I don't know
12    what Mr. Zeller found, but I betcha he found out that Mr.
13    Bryant was at MGA.  We know it was public knowledge on the
14    website that same month, March.
15           MR. ZELLER:  I apologize, Your Honor.
16           THE COURT:  Mr. Zeller, before you lodge your
17    objection.
18           Counsel, don't ever tell a federal court that
19    "this where I should stop you."
20           MR. RUSSELL:  Fair enough, Your Honor.
21           MR. ZELLER:  I apologize for interrupting, Your Honor,
22    but we went through this last time where they're commenting
23    on the assertion of privilege.  I assume that we'll
24    eventually get to Rule 56f, which we know is one of the major
25    remaining issues.  But I do object to this constant
```

```
 1   insinuation, this speculation, that somehow we knew based on
 2   nothing more than our assertion of privilege, which has been
 3   repeatedly upheld by this Court and by Judge Infante.  And I
 4   think it's my obligation to object.
 5        THE COURT:  Counsel, this Court is aware of the rulings
 6   that it has made and that Judge Infante has made on the
 7   privilege issue.  Thank you.
 8             Continue, Counsel.
 9        MR. RUSSELL:  Let me take you back, Your Honor.  First,
10   with respect, all I'm talking about is what we know that is
11   not privileged.  That's out in the record and what we can do
12   with that information.  And what we can do with it is we can
13   say they admit that they actually investigated whether he
14   went there.  So all I need to do is show you the case,
15   California Supreme Court case of Fox, that says they're
16   charged with presumptive knowledge of an injury if they have
17   the opportunity obtain knowledge from sources open to them.
18   Well, as I said, obviously their employees are open to them.
19             But there's a little bit more than that.  We can
20   put a little more color on the investigation --
21        THE COURT:  Their employees are open to them, Counsel,
22   but we don't know what is it that their employees could have
23   told them.  You're talking about the Mattel employees --
24        MR. RUSSELL:  Correct.
25        THE COURT:  -- in terms of what the Mattel employees
```

```
 1   have been able to tell them that's not speculation, that's
 2   not guesswork.
 3        MR. RUSSELL:  Well, again, let's take a look at what we
 4   also know from the investigation.  This is a quote from their
 5   case file, the investigation indicating what it was that
 6   Mattel thought based on what it was hearing.  That is to say,
 7   the timing that we've already laid out for you about when
 8   Bratz hit the market, the suspicions that they had.  Maybe
 9   the phone calls; we don't know.
10            What we do know is that they were suspecting that
11   MGA, headed by a person known as Isaac Larian, has recently
12   hired a number of former Mattel employees.  Their concern in
13   March of '02 that MGA is targeting their employees.  And what
14   are they doing?  Manufacturing products that appear to be of
15   Mattel designs.
16            So their concern they're investigating is whether
17   or not MGA is targeting their employees.
18        THE COURT:  Yes.  That's not disputed.
19        MR. RUSSELL:  In fact, that's their claim to this day.
20        THE COURT:  Yes.
21        MR. RUSSELL:  That's enough to put them on notice that
22   starts the clock running.  They suspected.  They
23   investigated.  They could have done a lot with that.  They
24   could have --
25        THE COURT:  There's a missing link in there, Counsel,
```

```
 1    and that is the suspicion which triggers the investigation.

 2    And then you jump to that puts them on notice.  Not if the

 3    investigation reveals that there is nothing there.

 4         MR. RUSSELL:  Well, since we don't know what it is that

 5    they did to investigate, I'm obviously hamstrung.

 6         THE COURT:  In fact, your position is that there's

 7    nothing there; right?  There would be no breach of duty; no

 8    breach of contract.  There's nothing there.

 9         MR. RUSSELL:  Absolutely true.

10         THE COURT:  So their investigation found there was

11    nothing there.

12         MR. RUSSELL:  That's true.

13         THE COURT:  So how could that be notice imputed upon

14    them?

15         MR. RUSSELL:  Well, but I don't have to establish that

16    they actually have a claim.  All I need to know -- let me

17    take you to a case.  Maybe this will help.

18              I don't need to establish this, though, they in

19    fact can make out the elements of the claim.  We cited Your

20    Honor to the Soliman case and to the Jolly case.  Plaintiff

21    need not be aware of the specific facts necessary to

22    establish the claim.  That is a process contemplated by

23    pre-trial discovery.

24              Now, we take the logic of that case and many, many

25    others.  What should have happened here was they suspected
```

```
 1    that Mr. Bryant breached his contract.  In their view of the
 2    world, his contacts with MGA was a breach.  They ultimately
 3    filed that complaint in April of '04.  They should have filed
 4    it and said, hey, who were you talking to, issued some
 5    discovery, and they would have immediately verified what
 6    their phone records already showed.  He went to MGA, he
 7    signed a contract, and he transmitted rights to the Bratz.
 8    They didn't do that.  Instead they sat on their hands.  And
 9    we can talk about why, but I don't think it matters why.
10          What matters is they had notice of something
11    wrong, and they either didn't investigate it adequately or
12    they did and we don't know about it.  But that's enough under
13    Jolly, Soliman, and Fox to start the clock running.  Their
14    failure to file.
15          And if you don't agree with me, Your Honor, I can
16    see that I'm having a hard time with you, that's fine.  Let's
17    let a jury decide that.  I think a jury would certainly find
18    there's at least a genuine issue here.
19        THE COURT:  All right.  Let's discuss with respect to
20    breach of contract.  What about the copyright issue?
21          Want Mr. Nolan to pick that up?  Thank you.
22        MR. NOLAN:   Your Honor, with respect to the copyright
23    issue, I think one of the important issues there is when did
24    they know about the contract and when did they know about the
25    drawings.
```

```
 1            THE COURT:  Well, is not the critical issue -- well,
 2   this is the kind of the segue into your colleague's defense
 3   on the breach of contract for interference claim.  The issue
 4   here is when did they know that Carter Bryant developed this
 5   while an employee at Mattel, assuming that he did.
 6         MR. NOLAN:  Right.  Your Honor, and I don't want to
 7   replow that ground.  Let me just frame the issue.  Past
 8   hearing testimony of Cassidy Park played to Your Honor --
 9         THE COURT:  Yes.
10         MR. NOLAN:  -- that it was common knowledge that Carter
11   Bryant was behind Bratz and designed Bratz.  That was common
12   knowledge.  This morning we learned a new fact from Mr.
13   Zeller's argument with respect to trying to reach the
14   trademark of Bratz that Bratz was a name that Mattel had been
15   considering for a project.  I don't know which project, but
16   we now know that they were aware that Bratz was a name that
17   was proprietary or at least some proprietary information
18   suggesting that Bratz was something that Mattel was very
19   interested in doing.  That was known at the time in the
20   Summer of '01.
21         THE COURT:  Well, we had this discussion earlier about
22   the name Bratz.  I mean, the name Bratz is something which --
23         MR. NOLAN:  But, Your Honor, what's important -- I
24   completely agree with you on that.  But for statute of
25   limitations purposes, Your Honor, think about it, Mr. Zeller
```

1    believes that that was proprietary information.  That's not

2    what I described it as.  He described it that that was

3    proprietary; that Mattel was thinking of using that.  Whether

4    or not it is, by their own admission they know --

5         THE COURT:  I think I understand your argument,

6    Counsel.

7         MR. NOLAN:  Okay.  I want to add one other thing just

8    to tie up on something here.  March 28th of 2002.  If you can

9    go to the -- not the disputed facts let's go to the

10   investigative file just for a moment.

11             On March 28th, 2002 -- and we're not commenting at

12   all.  I completely accept Your Honor's ruling, obviously.

13   Okay?  And I'm not commenting on what is behind in all of

14   this.

15             But what we do know, if you can go to the log

16   sheet.  And let's come up again.  March 28th of 2002.  In the

17   interview, remember this has been opened up as theft of

18   proprietary information.  Let's just stop for just a moment.

19   Let me regroup.

20             Common knowledge that Carter Bryant has designed

21   Bratz.  Apparently Bratz is a proprietary fact within Mattel

22   that they were thinking about by their own admission.

23   Cassidy Park says to the investigator -- and Mr. Russell was

24   talking about a reasonable investigation under the Fox

25   decision -- they go out and they ask the question.  Cassidy

```
 1    Park suggests, get more information on MGA issue.  She
 2    suggested Carter Bryant as illustrator, former employee, who
 3    may have plagiarized a design of Lily Martinez and created
 4    Bratz dolls for MGA.
 5          THE COURT:  But the question still remains when.
 6          MR. NOLAN:  Well, I understand, Your Honor, but I just
 7    want to make one clear point.  Because what I anticipate is
 8    they're going to say that was Tune Teens, and that was Diva
 9    Starz, and everything else like that.
10          THE COURT:  They've said that; right?
11          MR. NOLAN:  They have said that.  So let me just
12    anticipate that they were going to say that.  I will show you
13    that in the Mattel rebuttal expert report filed by Lee Loetz
14    and page 3, they talk about that Carter Bryant used some of
15    the elements from both Diva Starz and Tune Teens.  It still
16    continues in the rebuttal report, which we will confront in
17    trial in this case, cross-examine Lee Loetz on what elements
18    were taken from Teen Tunes and Diva Starz.  That's still in
19    the case.  So when they argue that it's really out of the
20    case, as they promised to you in January of 2007 on the
21    motion to amend the complaint, this has nothing to do with
22    Tune Teens, Diva Starz?  It's still in the case.
23            But let's go back to now your specific point,
24    which I respectfully submit, Your Honor, I don't think under
25    the Fox case the bar is set as high as you have set it.  It's
```

```
 1    the only way I can say it respectfully.

 2           THE COURT:  That's fine.

 3           MR. NOLAN:  We disagree, and here is why.  When you go

 4    back to Jolly, and when you go back to the Soliman line of

 5    cases, this idea of reasonable suspicion and what you need to

 6    do about it it's not designed to forgive investigations that

 7    were less than perfect.  If the investigation that was

 8    conducted by Mattel missed the 800-pound gorilla, that's not

 9    why the California Supreme Court has rules with respect to

10    the statute of limitations.  What they say is a reasonable

11    investigation.

12           And what I believe you have to determine, Your

13    Honor, is it reasonable to believe that when an ex employee

14    leaves, and you suspect that he's lying to you when he

15    leaves, Norquist, the day he leaves.  That's your testimony.

16    That's in the record undisputed.  We played it last time.

17    And if you know that the name of the doll when it comes out

18    is Bratz, and you know that it's proprietary, and then, Your

19    Honor, at the first toy fair in New York I think the first

20    one is Hong Kong then the second one is in New York, and now

21    I'm in early 2001, it hasn't been offered for retail, and the

22    public analyst who followed the toy fairs -- you know we have

23    this in the record, Your Honor, it's undisputed -- published

24    stories that say that they look similar to Tune Teens and

25    Diva Starz.
```

```
 1              And again, they say well, you know, we
 2     investigated that, and that turned out to be wrong.
 3     Interestingly, I don't know, Your Honor, but it seems to me
 4     that if they investigated it and it was wrong, I don't know
 5     why their rebuttal expert report on the eve of trial is still
 6     claiming that there are similarities.  I don't know why in
 7     their supplemental interrogatory responses that I played to
 8     Your Honor that they're still claiming in this case that it's
 9     just not the drawings, it's all of the other things that they
10     claim.
11              Remember, the last argument we had, and it's even
12     in your summary judgment motion, about the extrinsic value of
13     things that may have been converted, you know, whether or not
14     it was trash, the drawings.  They were on knowledge of that.
15     They could have gone in, and they could have investigated,
16     and they could have determined that, oh, you know what?  He
17     did this, he talked to this person, he had access to this.
18     Everybody is complaining -- you know, you said to us but
19     you're telling us, Mr. Nolan or MGA, that nothing was there
20     to find.  You know what?  I accept that for just a moment.
21              But look at what has happened in the meantime.
22     You have issued your ruling on the summary judgment motion,
23     and you have found that Mattel has the enforceable contract;
24     that the contract was not unambiguous.  That's the argument
25     that they asked you to find.  If the contract to Mattel at
```

```
 1    all times was unambiguous, then they were certainly on notice
 2    of some of the issues that triggered the claims that I'm
 3    still defending and will defend in front of this jury.  And
 4    they could have brought that lawsuit and passed any Rule 11
 5    sanction issue.  And the first interrogatory that would have
 6    gone out would say, Tell me what work you've been doing for
 7    Mattel -- I mean for MGA, and they would have found it.
 8    That's what those cases talk about on reasonable suspicion.
 9              You don't have to have a standard, and I don't
10    mean this sarcastically, that you're pretty convinced you're
11    going to get a summary judgment when you file a complaint.
12    That's not the standard.  It would have passed Rule 11
13    sanctions, Your Honor.
14              I want to make two real quick points, then I will
15    move on.  This is really the core issue.  We believe that the
16    investigative report of March of 2002 clearly demonstrates
17    that a competent and thorough investigation would have
18    connected all of the dots and would have connected the dots
19    maybe not finding out about the drawings, Your Honor, but
20    certainly would have found out about the breach of loyalty,
21    the intentional interference of contract, the conversion of
22    property from Mattel, the breach of the confidentiality
23    agreement.  And then from there they could have moved on,
24    much like the way this case was structured.
25              Their first case was filed against Carter Bryant.
```

1   Then they find out about the drawings.

2          When did they find out about the drawings?  This

3   is the last point that I will make, Your Honor, and then I

4   will sit down.

5          In your order you asked us not to make any more

6   submissions on the statute of limitations and/or the

7   briefing.  And we obviously we didn't.

8      THE COURT:  Unless there was something in terms of

9   evidence.  Because I certainly welcome anything.  And that's

10  one of the reasons why I put this over is one of the reasons

11  I ordered the deposition last Saturday if there's any

12  additional facts that I need, please now is the time.

13     MR. NOLAN:  Right.  In fact, I am submitting Your Honor

14  today two packages of information.  The first has to do with

15  Hong Kong.  And you know, because it's all over the record,

16  that they first learned about the contract by going to Tokyo,

17  meeting with the lawyers, and they were given a copy of the

18  contract.  Okay?  We have submitted Your Honor today the

19  claim that was actually filed in the Hong Kong action which

20  was filed in June of 2002, Cityworld litigation.

21          In that litigation and in the claim, we list 17

22  drawings.  We list the day of the contract as September 18th

23  because of course the contract is signed on October 4th, but

24  because the negotiations start on September 18th there will

25  be testimony that it's dated as of September 18th, but

1    actually the fax line showed it wasn't signed until October

2    4th.  But that's filed in Hong Kong.

3           Here's the important part.  There is a Wall Street

4    Journal article that comes out -- this is somewhat

5    interesting, because remember, the scope in California law is

6    a reasonable investigation.  The Wall Street Journal article

7    comes out, the infamous one now that's in July, that mentions

8    that Carter Bryant is in the middle of the dispute.

9           Mattel doesn't do anything.  It's actually lawyers

10   in Hong Kong that reach out.  And that's what we're

11   submitting to Your Honor today in the declaration from Marina

12   Bogorad.  It's the lawyers in Hong Kong that calls Mr.

13   Normile, General Counsel.  Actually I think they write a

14   letter first, and they say, By the way, we read about this.

15   We understand that Carter Bryant had taken something from

16   Tune Teens.  We have this lawsuit coming over here where MGA

17   has infringed or claimed we're infringing on something.  We'd

18   like to have copies of Tune Teens, and all that.

19          And the lawyers from Quinn Emanuel go over to Hong

20   Kong, and they say that when they got there they had a copy

21   of the contract.  Your Honor, the package that we show you

22   we're submitting to you today is one that has an agenda

23   attached to it.  And this would be at page 14 of the

24   submission.  The September 4th, 2003 is the first entry.  And

25   that's Cityworld counsel writes to Mattel's General Counsel

```
 1   Robert Normile.
 2            September 23, Mattel obtains a copy of the MGA's
 3   Cityworld claim.  This is on the document.  September 23,
 4   2003.
 5            They then go on and claim that they do not get the
 6   contract until November 24, 2003 when Mr. Moore and Mr.
 7   Zeller meet with the Cityworld counsel in Hong Kong.
 8            Your Honor, their own agenda in this document that
 9   we got in the 30(b)(6) deposition says that they obtained on
10   September 23 that information.  That's the operative date.
11   They blew the statute of limitations on the copyright claim
12   because they brought the copyright claim on November 20th.
13            Now, the next document submission that I'm making
14   to you today, Your Honor, is one that I referenced in the
15   argument with respect to abstract filtration.  This one is a
16   little more difficult.  And frankly, because I'm not going to
17   speculate, but we are producing to you today excerpts from
18   the record of the Second Circuit in Goldberger including that
19   the law firm of Quinn Emanuel entered into that case on
20   appeal for the sole purpose of vacating Judge Rakoff's
21   decision finding that Mattel was aggressive.  And they could
22   not, you know, could not assert the copyright.  I gave you
23   that language.
24            On that very day that the Second Circuit granted
25   relief and ordered Judge Rakoff to vacate the opinion in the
```

1    Goldberger case, they came and filed in this case the

2    amendment to supplement now and add the copyright claim

3    against MGA.

4              I raise it, Your Honor, in this sense.  There are

5    coincidences in life.  But when I go back and read the

6    January 2007 transcript, which I ask Your Honor to reread now

7    in light of this development, and this is the argument where

8    Dale Cendali was making some of these very similar arguments

9    to you that they couldn't find it.  Gosh, you know, they

10   couldn't find the drawings.  They just didn't know about the

11   drawings.  They didn't know about that precise point.

12             And in your order when you use relation back to

13   the contract, if you trace all of the arguments that were

14   made to Judge Minella before you were assigned the case when

15   they were resistant to have this case in federal court and

16   they wanted it back in state court, even asserting the

17   position, the absurd position based on everything that they

18   know -- I'm sorry, that's an overstatement, I apologize --

19   the position to Judge Minella that the amount in dispute was

20   not $75,000 because they didn't know whether or not the Bratz

21   property rights were going to be included.  Your Honor, that

22   is during the pendency of the Goldberger case.

23             Judge Minella remands it back to the state court.

24   Then Carter Bryant removed it again, says this is artful

25   pleading, this should be in federal court.  The only time

```
 1   they allow this to be in federal court, Your Honor, is when
 2   Judge Rakoff's decision finding them to have been aggressive
 3   in asserting the alleged particularability of Barbie's face.
 4   That's when they come in here and file.
 5           Your Honor, I believe I'm not going to comment on
 6   the assertion of privilege.
 7           THE COURT:  Very well, Counsel.
 8           MR. NOLAN:  These submissions will be in the record
 9   today, Your Honor.
10           THE COURT:  Yes.  Mr. Zeller?
11           MR. ZELLER:  Thank you, Your Honor.
12           I guess we're looking at a new attempt to cobble
13   together really what is a conspiracy among lawyers, which is
14   really founded on nothing more than speculation and in fact
15   is just factually wrong.
16           Let me start with this point, which is the Court
17   has already noted the inherent tensions really in their
18   positions.  On the one hand, nothing that Carter Bryant ever
19   did is actionable.  It's preparation to compete, merely
20   communicating with a competitor, all those sort of things.
21   And those are the facts that even after years of discovery
22   have now been established.  None of that is actionable.
23   However, we should have been running into court in October of
24   2000.
25           And I will say this, too, because it's not even
```

```
 1    clear what it is that they are claiming is an accrual date at
 2    this point.  And that's important because they bear the
 3    burden of proof on this issue.  They are the proponent of the
 4    statute of limitations defense.  And even now they cannot
 5    point to the time period when the claim started to accrue.
 6         THE COURT:  Well, let me just stop you there.  Yes,
 7    that's true for the defense at trial, but you're also moving
 8    for summary judgment on the statute of limitations issue.
 9         MR. ZELLER:  Right.  Right.  I mean, we've taken the
10    position, Your Honor, we moved for summary judgment, and we
11    think we're entitled to it because we think that the
12    undisputed facts show that our claims are not time barred.
13              We have certainly shown that with respect to their
14    issue there is a factual dispute because we have fraudulent
15    concealment.  And those facts, we think, are certainly
16    sufficient to get to a jury even if the Court were to find
17    that there was an earlier accrual date that we believe is
18    appropriate.  Because under our view of the law, once there's
19    fraudulent concealment, there is basically something that
20    looks more akin to an actual knowledge kind of standard.  And
21    that obviously then does get us, I think, particularly with
22    the other documents in relation back it seems pretty clear
23    that we would not be time barred.
24              But we understand.  We certainly never said that
25    the fraudulent concealment aspect of it is undisputed.  We
```

```
 1   just aren't relying on that to oppose their motion.

 2          But fundamentally we do want summary judgment.  We

 3   think we're entitled.

 4       THE COURT:  How can I reach summary judgment given --

 5   even if I don't fully accept what you were describing as this

 6   conspiracy theory, what Mr. Nolan articulates, why shouldn't

 7   I allow a jury to sort through this evidence and figure out

 8   who know what when?  This is the kind of fact-intensive

 9   dispute that's not really suitable to a summary judgment.

10   And adding, of course, the fraudulent concealment element on

11   top of it all, isn't this all something that we should

12   simply, starting next Tuesday, make this part of this file,

13   let the jury hear the issue with respect to investigations

14   and fraudulent concealment and all the other allegations that

15   are swirling around and have some sort type of

16   interrogatories at the end of the case that will resolve the

17   factual issues.  And then the Court can apply the legal

18   standard and try the case decide the issue of statute of

19   limitations.

20          Why -- how can I go out, given all of this, I know

21   you're disturbed by the allegations.  Mr. Nolan is disturbed.

22   Everyone is disturbed by the allegations.  Why shouldn't I at

23   this point this close to trial simply allow those allegations

24   to be played out by the jury?

25       MR. ZELLER:  Because the facts showing when Mattel's
```

1    claims actually accrued are undisputed.   I mean, it's quite

2    clear that what Mr. Nolan's strategy here is he wants to go

3    to the jury and basically point the finger at trial counsel.

4    This is his vehicle for doing it.

5           And even setting aside the rather inappropriate

6    nature of such a strategy, the fact is that there is no

7    factual basis, nothing that passes muster under Rule 56 to

8    support it.   That is the most appropriate point.   And as the

9    Court has pointed out, the issue of accrual is a legal issue.

10   When did Mattel's claim accrue?   The undisputed evidence, as

11   the Court has already noted, really -- or rather I should say

12   that the standard translates into the issue of when did

13   Mattel know or have reason to suspect that Carter Bryant

14   created Bratz while he was employed by Mattel.

15          THE COURT:   With respect to the copyright claim.

16          MR. ZELLER:   Correct.   And I will talk separately about

17   the other claims in a moment.

18          But ultimately, by the way, we think it's really

19   for everything, for reasons I'll explain.   But just focusing

20   on the copyright issue for a moment.

21          So the question is, the factual question, the

22   accrual issue, is:   When did Mattel know or suspect that

23   Carter Bryant created Bratz while employed by Mattel?   The

24   only evidence on that is exactly one way.   Mr. Nolan and Mr.

25   Russell stood up here.   They talked about a number of things.

 1    But that very question that the Court posed at the beginning
 2    of all this was never addressed.  They cannot point to
 3    anything that relates to when Carter Bryant created Bratz
 4    while employed by Mattel.  They talk about the
 5    investigations.  All the evidence shows that that was about
 6    Tune Teens.  That is the undisputed evidence.

 7            So to go back to Your Honor's point, to allow Mr.
 8    Nolan and his teammates to go in and basically conjure up
 9    this alleged conspiracy and make those arguments to the jury
10    when they have no factual basis, that's the purpose of Rule
11    56.  That's the Court's obligation is to ensure that those
12    sort of assertions that cannot withstand scrutiny, either
13    legal or even factually, should just be aired in front of a
14    jury.

15            And the evidence on this is one way; that Mattel
16    did not have the drawings, the Bratz drawings that it is
17    suing upon, even by Mr. Nolan's own standard, until November
18    of 2003.  Now, he apparently is referring to some different
19    evidence today.  I don't know what it is.  He hasn't provided
20    it to us.  He claims it shows September of 2003.  Could be a
21    typo.  I don't know what it is that he's referring to.
22    Perhaps we'll see it.

23            And I would ask the Court that if anything that
24    they do submit we be given an opportunity to respond, of
25    course.  But I don't know what this new, you know, supposed

```
 1    smoking gun is that Mr. --
 2          THE COURT:  Mr. Nolan?
 3          MR. NOLAN:  I haven't filed it.  I wanted to ask
 4    permission because of your earlier ruling.  It's not an
 5    argument.  It's just documents.  These are the documents --
 6          THE COURT:  My question is simple.  Have you provided
 7    it to --
 8          MR. NOLAN:  No, but we will as soon as the hearing is
 9    over.
10          THE COURT:  It was just a question.
11          MR. NOLAN:  Sorry.  Didn't mean to sound defensive.
12          MR. ZELLER:  But I'm not really sure ultimately what
13    the big conspiracy is between the discrepancy supposedly of
14    September and November of 2003.
15              But the fact is that when it is that Mattel's
16    lawyers went to Hong Kong is a pretty objectively verifiable
17    fact.  International travel requires some things like
18    passport stamps.  If the Court has any question about that,
19    we could certainly bring those in and show the Court
20    conclusively that Mr. Nolan's rank speculation that somehow
21    everyone knew months and months in advance, sat on their
22    hands knowing that Carter Bryant had created Bratz while
23    employed by Mattel and doing nothing about it, is exactly
24    what I'm saying it is, which is nothing but speculation.
25              It is not a colorable claim.  It is not one that
```

```
 1    survives summary judgment.  And I would like to comment on
 2    this, Your Honor.  And I do think it's important because they
 3    are the ones who bear the burden of proof.  They have to have
 4    enough evidence to get to a jury.
 5             And on the point I was making is that even under
 6    their own scenarios they cannot make up their minds what it
 7    is that Mattel supposedly knew.  I will quote from the
 8    earlier hearing in a moment.  But you will recall that Mr.
 9    Russell stood up here and said with respect to some of
10    Mattel's claims that as a matter of fact they accrued in
11    October of 2000.
12             THE COURT:  Yes.
13        MR. ZELLER:  Pretty categorical.  I will read from page
14    137 of the last transcript.  There was an exchange between
15    you and Mr. Nolan.  This is after a fair paragraph of text by
16    Mr. Nolan.  This picks up on that page at line 15:
17             "Now, with that suspicion, I'm not saying that
18    they had to run to court in October.
19             The Court:  I would certainly hope not.
20             Mr. Nolan:  Of course not."
21             So we are really moving --
22        THE COURT:  But are we talking about -- was that in the
23    context of the copyright claim or the breach claims?
24        MR. ZELLER:  He was talking about all the claims.  I
25    mean --
```

```
 1          THE COURT:  Address head on this issue that was raised
 2   now with respect to the intentional interference claims --
 3          MR. ZELLER:  Sure.
 4          THE COURT:  -- that this is something unlike a
 5   copyright claim which was more evident at an earlier stage.
 6          MR. ZELLER:  Right.  And I would say, Your Honor, that
 7   just as a final point on copyright infringement, we never
 8   really addressed this, but it's a rolling three-year statute
 9   of limitations.  Even if they were to prevail on their
10   motion, that still means we at least go back three years from
11   the date that we filed.
12          Now, with respect to the point the Court is making
13   on intentional interference, I mean, those claims also rely
14   on the same basic allegation of fact, which is that Carter
15   Bryant engaged in wrongful activity while employed by Mattel.
16   Those have been the predicates of all the claims that we have
17   asserted against Carter Bryant.  They pulled out I think some
18   short sentence.  I think it was paragraph 123 of the second
19   amended complaint.
20          But the fact is, is that, even there it's quite
21   clear it's talking about when they are Mattel employees.
22   They did this with the Mattel employees while they're
23   employed by Mattel.  To the extent that it's of course a
24   trade secret claim, that's a different issue because there is
25   a continuing duty.
```

```
 1              And the Court is aware that we obviously have a
 2   whole variety of trade secret theft claims.  So taking that
 3   and pulling it out is not the basis of our claim against
 4   Carter Bryant.  Everything, including intentional
 5   interference with contract, including aiding and abetting, is
 6   the fact that this activity was going on while Carter Bryant
 7   was employed by Mattel.  So it's the same factual -- the same
 8   factual predicate ultimately that is relevant for purposes of
 9   the statute of limitations as far as we're concerned.
10        THE COURT:  What about this argument -- let's just take
11   the breach of the duty of loyalty, for example, and the
12   telephone calls, the faxes in that month preceding his
13   termination or his leaving Mattel.
14        MR. ZELLER:  What they point to in terms of the facts
15   are, No. 1, if we looked at his phone records, he called MGA
16   among a bunch of other people.  We don't know what the
17   substance of those are.  There's no evidence that Mattel knew
18   what the substance were.  Merely calling a competitor is not
19   exactly actionable.  And I'm sure that the Court is generally
20   aware that even between toy companies the fact is is that
21   there are licensing relationships sometimes.  I mean, there's
22   nothing inherently wrong, and Mattel has never said that
23   there is anything inherently actionable about an employee
24   talking to another company.  That's a complete red herring in
25   terms of the arguments that they're making here.
```

```
 1              No. 2, I think the only thing that they otherwise
 2    would have spoke to was they said, well, Jill Norquist
 3    suspected that he was lying to her.  But again, it's hard to
 4    see what that exactly adds up to.  The fact that the lie that
 5    Carter Bryant said to Jill Norquist was that he was not going
 6    to go work for a competitor.  That is what she asked him.
 7    She certainly didn't say to him, Have you designed a doll
 8    that you sold, Carter, to a competitor?  Are you already
 9    working for a competitor?  Those aren't even the questions
10    that she asked.
11              But even if Carter might have lied, even if an
12    employee on his way out said, You know what?  I'm not going
13    to go to a competitor or even I'm not going to tell you where
14    I'm going, that is hardly a basis to run into this court and
15    waste this court's time with a lawsuit.
16              And I have to really take issue with Mr. Nolan's
17    idea or Mr. Russell's that somehow if we had sued on some
18    other claim if we had done that a couple years earlier and
19    that somehow that would have -- and then found out in
20    discovery through sending an interrogatory or some of the
21    discovery that that's even an appropriate consideration, one
22    could certainly imagine in many circumstances, Your Honor,
23    very minor breaches for example of a contract.  Maybe Carter
24    Bryant didn't return a pencil.  Is it really MGA's position
25    that this Court has to have its time wasted and there has to
```

```
 1   be a fishing expedition in this court by finding out, well,

 2   perhaps there's other things that he did.

 3            I don't even figure out how that would relate to

 4   the statute of limitations.  That's not the standard, in any

 5   event.  The standard is that there was reasonable suspicion

 6   that something was actionable.  And even MGA admits that all

 7   Mattel is ultimately charged with all this, through all of

 8   these factual innuendos and suspicions and everything else

 9   that they raise, that all Mattel is ultimately charged with

10   is what would an investigation have yield.

11            There is no evidence that even if Mattel had

12   investigated in October of 2000 it would have obtained the

13   drawings.  There is no evidence that even if Mattel had

14   investigated in October of 2000 it could have obtained the

15   MGA-Bryant contract.  The fact is that those were given to

16   Mattel in connection with that Hong Kong litigation.  You

17   know, so there is even by their own type of standards it

18   still does not avail them of some statute of limitations

19   trigger that goes back the years and years that they want to

20   argue that it does.

21            THE COURT:  Thank you, Counsel.

22            MR. ZELLER:  Just if I may make a couple of points,

23   because you know there were a number of factually incorrect

24   statements that were made during the course of that

25   presentation.
```

```
 1                One thing, and this goes to this whole issue about
 2   -- and I frankly confess I don't even know what the point is
 3   about this coincidence or whatever you want to call it
 4   between the Goldberger Appellate Decision and seeking an
 5   amendment in this case.  But I can tell you that it would
 6   have required quite a bit of prescience on our part to
 7   somehow have amended right when the Second Circuit decision
 8   came out.  Because we had been engaging in a meet and confer
 9   with MGA for quite some time before that decision came out
10   about amending the complaint.  The court may recall that Dale
11   Cendali in fact made quite a point of it that we had engaged
12   her or sent her a letter on Halloween, months before, before
13   this --
14        THE COURT:  I don't have a present recollection of
15   that, Counsel.  I will take a look.
16        MR. ZELLER:  I'm pretty sure that the record shows it.
17   I remember because she was saying it was a New York time and
18   it was already Halloween when we had sent her the meet and
19   confer letter, and somehow she took offense to it.
20                But the point is is that the record in this case
21   will show and does show that it was months, weeks, before the
22   Second Circuit decision came out that we were already engaged
23   with them in attempting to amend it.  In fact, we wanted to
24   avoid a motion.  We didn't want to burden the Court.  We
25   thought it was, frankly, a pretty straightforward proposition
```

1    that after the discovery stay, after there was some

2    discovery, that we did obtain that that was the appropriate

3    time to amend.

4         THE COURT:  Thank you, Counsel.

5              Very briefly, we're almost at the five o'clock

6    hour.

7         MR. RUSSELL:  I understand, Your Honor.  I will try to

8    be brief.

9              If I might just first, Your Honor, for your

10   assistance, we prepared a timeline that summarizes the

11   evidence that we talked about.

12             Aaron, if you could put it on the screen for a

13   second.

14             I will submit -- I won't belabor it other than to

15   say with respect -- let's start with the copyright claim for

16   a second and talk about why the evidence that Mr. Nolan

17   referenced matters.

18             The copyright claims against Mr. Larian and MGA

19   Hong Kong were first asserted in 2006, November 20th, 2006.

20   If you look at the reply brief that Mattel submitted, they

21   concede that their copyright claims accrued November 24th,

22   2003, because that is the date that they got the contract,

23   and that is the date that they got the drawings, and

24   therefore they were on notice.  Well, if, Your Honor, Mattel

25   got the contract and was aware of the claims in September,

```
 1    that is more than three years before they filed.

 2             Now, why does that matter?  Well, MGA Hong Kong

 3    and Mr. Larian were never parties in any proceeding before

 4    Your Honor until they were added for federal claims.

 5    Obviously they were named as Doe defendants, and I can go

 6    through that, but that does not save and does not allow them

 7    to insert those two defendants who are new parties as

 8    defendants in a copyright claim.  That claim is governed by

 9    Rule 15C.  And Rule 15C is very clear.  The only thing that

10    you're allowed to do for new parties is you're allowed to

11    insert a new party defendant if there was a mistake in

12    identity.  If you didn't know who the party was, you don't

13    get to know, you don't get to say I didn't know the role.

14    It's purely a mistake concerning the proper party's identity.

15             If you go to the next line, Aaron.

16             The Ninth Circuit explained it was not designed to

17    allow plaintiffs to sit on their hands and wait.  So as to

18    Mr. Larian and MGA Hong Kong, if Your Honor concludes that

19    there is evidence in the record that Mattel got the contract

20    in September of 2003 as opposed to November 24th, as to those

21    two defendants there is no argument but that they are time

22    barred.  They admit the accrual took place as soon as they

23    knew about the contract and the drawings.  So as to those

24    two, they're fairly critical.

25             Now, Mr. Zeller tried to argue to you that the
```

```
 1    copyright statute of limitations is a rolling statute of
 2    limitations.  Aaron, Slide 9.  That simply is not true in
 3    this case.  And we cited Your Honor to the Welles case.
 4            This is not a case about infringement.  And I
 5    don't care how many times they say it, we all know it's a
 6    case about ownership.  You heard Mr. Quinn at the beginning
 7    of the argument talk about ownership.  In fact, if you look
 8    at their opposition, they say this is a copyright claim, pure
 9    and simple.  Even though Mattel's claim additionally includes
10    allegation of ownership, and indeed if you look at the
11    pre-trial conference order the fight about the name on Bratz,
12    what we're talking about in this case, is ownership over the
13    rights to the Bratz.  That's what we're talking about.
14            And under Welles, it's not a rolling statute of
15    limitations.  If there is a public, plain, expressed
16    repudiation of a copyright ownership by another, you lose
17    your copyright.  It's akin to adverse possession.  This is
18    not a case where MGA was out there infringing property that
19    Mattel owned.  This is a case where MGA was in the public
20    claiming ownership, claiming in fact it registered the
21    copyrights years before Mattel did.
22            So Mattel, to the extent it thought it had claims
23    in 2003, certainly was aware that MGA thought it owned the
24    Bratz and it owned everything that it had.  Because by the
25    end of 2003, MGA had registered the copyrights, had
```

 1 │ identified Carter Bryant as the person who created them, and
 2 │ they had the contract.

 3 │          So for purposes here, as we show you in the Roger
 4 │ Miller case, and in the Minder Music case, even if you assume
 5 │ this is an infringement and ownership claim, the infringement
 6 │ claim is gone, so long as we can show you that there was a
 7 │ repudiation more than three years before they filed.

 8 │          Now, there are additional arguments that we make,
 9 │ Your Honor.  I will just to really quickly through it.  One
10 │ is, they didn't register these drawings that we're fighting
11 │ about here until October of 2006.  So there's nothing to talk
12 │ about in terms of relation back.  They can't stand up here
13 │ and tell you -- Slide 10, Aaron -- they can't tell you
14 │ there's a relation back because it's a jurisdictional
15 │ prerequisite to filing a copyright action that you register.
16 │ They didn't do that here.

17 │          If you look at the Brewer decision, it says, even
18 │ if the new claims are laid back to the original claims, they
19 │ may not be added because the district court did not have
20 │ jurisdiction to hear the new claims at the time the original
21 │ claims were filed.  In other words, you can't cure a time
22 │ barred copyright claim when you fail to register within the
23 │ limitations period.

24 │          They didn't register until October of 2006.  Too
25 │ late by then.  So you can't relate back to 2004.  So again,

```
 1    another reason.
 2             If you find, Your Honor, that Mattel had the
 3    contract or was aware of the drawings prior to November 20th,
 4    2003, their copyright claims are gone.
 5             I would like to segue off of this for a second and
 6    talk about the other claims.  I didn't hear Mr. Zeller really
 7    argue very hard that the state law claims are different.  I
 8    mean, he pooh-poohs the fact that I went to their pleadings.
 9    But where better to go to understand what they allege?
10             The breach of fiduciary duty, the breach of the
11    duty of loyalty, and tortious interference are far broader,
12    and the allegations make that clear they're fighting purely
13    about ownership of the Bratz.  If that were the case, the
14    claims would all be preempted.  But they convinced you, Your
15    Honor, at the last argument that there were additional
16    elements.  And I will accept that finding because Your Honor
17    has ruled on it, and they're stuck with that.
18             And so accordingly, there are different
19    considerations that apply to the state law claims than the
20    copyright claims.  I have just shown you why the copyright
21    claims failed.  And I can make similar arguments for, Your
22    Honor, if you don't accept that there is a genuine issue --
23    and we respectfully submit that there is -- that there was an
24    accrual of claims on the state side somewhere between October
25    of 2000 and March 2002.
```

 1              And I will parenthetically note that our briefs
 2    have been consistent throughout.  We make a series of
 3    arguments about when it could have accrued.  It could have
 4    accrued in October of 2000.  It could have accrued in Summer
 5    of '01, but no means later than March 2002.  So our briefs
 6    are very consistent on that.
 7              THE COURT:  Thank you, Counsel.
 8              MR. RUSSELL:  Thank you, Your Honor.
 9              THE COURT:  Very briefly, Mr. Zeller.
10              MR. ZELLER:  Very briefly, Your Honor, because actually
11    Mr. Russell did clarify something I think in terms of the
12    argument that they're making here, if I can respond to.
13              Which is you saw the timeline.  I mean, first let
14    me point out that both Mr. Nolan and Mr. Russell have been
15    quite clear that Mattel's claims, for what some purposes
16    accrues when they had the drawings.  And in fact, that makes
17    perfect sense.  How could we have sued for copyright
18    infringement for drawings before we have them?  And certainly
19    when there's no indication of our ownership of them prior to
20    that time.
21              The second point I would make is that they then
22    attempt to say that Mattel knew or had those drawings as of
23    September 23rd, 2003.  And the fact is is that the timeline
24    clarifies exactly what their argument is and shows in fact it
25    is not based on evidence.  What the timeline said was that

1   Mattel obtains a copy of the MGA claim.  That is the
2   statement of claim from the Hong Kong case, "which could have
3   contained drawings."  Yet again, we're back to the point of
4   nothing but speculation.

5              There is no evidence whatsoever, and in fact the
6   evidence is to the contrary, that Mattel did not have those
7   drawings until November of 2003.  So, I mean, their own
8   timeline really shows the kind of speculation that they're
9   engaged in, which is not appropriate either for summary
10  judgment, certainly doesn't pass summary judgment muster, and
11  certainly can't be allowed to go to the jury.

12             THE COURT:  Thank you, Counsel.

13             All right.  Court will take the remaining issues
14  on the motion for partial summary judgment along with the
15  motion for reconsideration under submission.  I will issue an
16  order as soon as I can.

17             I will see you tomorrow morning for our jury
18  selection.

19             MR. QUINN:  Your Honor, there's one issue which perhaps
20  due to an oversight has not been addressed either today or in
21  the order that the Court had previously issued, and that is
22  the motion for summary adjudication against Mr. Bryant for
23  breach of contract of his employment agreement.  The Court
24  made a ruling as to breach of fiduciary duty and as to breach
25  of duty of loyalty but not as to breach of contract that's in

```
 1    4.   I think the same facts support that.

 2         THE COURT:  I will take a look, Counsel.  I would like

 3    to see all counsel here tomorrow morning at 8:30 in case

 4    there's any issues we need to take up before we bring the

 5    jury panel down.

 6         MR. NOLAN:  I really implore your help on this, Your

 7    Honor.  We don't have copies of their exhibits.  We've been

 8    asking for copies of the exhibits.  We've been prepared to

 9    exchange since Friday.  The deadline was going to be noon

10    today.  It's been pushed, Your Honor.

11              I would ask that the Court require both parties to

12    exchange their exhibits by 6:00 p.m. tonight.  We were told

13    that we would be able to do this, and I have been told we

14    would not be able to do this.

15         THE COURT:  Let me stop you there.

16              Mr. Quinn, is that something you can get?  Who has

17    got the exhibits?

18         MR. COREY:  As far as I'm aware, Your Honor, they were

19    ready to go at 4:30.  I am informed we had some technical

20    difficulties, could not do it by noon.  Should not be a

21    problem as of an hour ago.

22         MR. NOLAN:  Well, okay.  Maybe by tonight.

23         THE COURT:  Very well.  All right.  Let's get that

24    taken care of this evening.

25         MR. COREY:  Of course.
```

```
 1          MR. NOLAN:  And then, Your Honor, we need some protocol

 2   with respect to being on notice when they're calling witness.

 3   That is, if they want our witnesses, if we want their

 4   witnesses.

 5          We were proposing that the Friday before the week

 6   of the trial that each side -- I mean, well, you know,

 7   whoever is up to bat says these are the witnesses next week.

 8          We've got people that are traveling.  We've got

 9   people who are -- got --

10          THE COURT:  Sounds like a reasonable request, Mr.

11   Quinn.

12          MR. QUINN:  Your Honor, he wants a week's notice of who

13   we're going to call.  Now, if he's got people out of town who

14   he controls, MGA witnesses, that's something that, you know,

15   some advance notice and planning is required.  What he really

16   wants to know is a week in advance who we are going to call.

17   I have never given that much notice in any case that I've

18   been involved in.  I mean, we proposed if they would agree

19   we'd give 48 hours notice as long as they didn't bring it up

20   with Your Honor, even though we would really prefer 24 hours

21   notice.

22          You know, if there are people out of town who, you

23   know, they need some planning, we can talk about that.  We'll

24   be sensitive to that.

25          THE COURT:  Let me think about it tonight.  We'll talk
```

```
 1    about it tomorrow morning.

 2         MR. NOLAN:  It's not a week in advance.  It's close of

 3    business on Friday who you're calling on Tuesday.  We're

 4    going to do the same thing.  It applies to us, too.  There's

 5    no secrets now.

 6         MR. QUINN:  For their witnesses, you know, we can talk

 7    about that, Your Honor.

 8         THE COURT:  Counsel, we'll talk about this in the

 9    morning.  This is a dangerous time to handle these issues.

10         MR. RUSSELL:  Your Honor, one last point of

11    clarification because they made a point of clarification for

12    you to look at.

13              With respect to the fraudulent prong of unfair

14    competition, it was not disputed under -- their response to

15    our motion, if you would just look and see, if perhaps that

16    might have been omitted.

17         THE COURT:  Thank you, Counsel.  Good evening.

18              (The proceedings adjourned at 5:11 p.m.)

19

20

21

22

23

24

25
```

```
 1                      REPORTER'S CERTIFICATE

 2

 3

 4          I, CHRISTY A. CANNARIATO, CSR #7954, Certified

 5  Shorthand Reporter, certify:

 6

 7          That the foregoing proceedings were taken before me

 8  at the time and place therein set forth;

 9

10          That the foregoing is a true and correct transcript

11  of my shorthand notes so taken.

12

13          Dated this 19th day of May, 2008.

14

15

16          _____

17          CHRISTY A. CANNARIATO, CSR #7954

18

19

20

21

22

23

24

25
```