1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   EASTERN DIVISION

4                      - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                      - - -

7    CARTER BRYANT,                    )
                                       )
8                     Plaintiff,       )
                                       )
9             vs.                      )   No. ED CV 04-09049
                                       )   (LEAD LOW NUMBER)
10    MATTEL, INC.,                    )
                                       )
11                    Defendants.      )
     _____)
12   AND RELATED ACTIONS,             )
     _____)
13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                   RIVERSIDE, California

17                   Monday, june 11, 2007

18                      10:49 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
               FEDERAL Official Court Reporter
24              3470 12th Street, Rm. 134
               RIVERSIDE, California  92501
25                   (951) 274-0844
               Csr11457@sbcglobal.net

```
 1   APPEARANCES:

 2

 3   On behalf of MATTEL, INC.:

 4
                          QUINN EMANUEL
 5                        BY:  JOHN B. QUINN
                          BY:  MICHAEL T. ZELLER
 6                        By:  Dylan proctor
                          865 S. FIGUEROA STREET,
 7                        10TH FLOOR
                          LOS ANGELES, California  90017
 8                        (213) 624-7707

 9

10   on behalf of CARTER BRYANT:

11                        KEKER & VAN NEST
                          BY:  MICHAEL H. PAGE
12                        BY:  CHRISTA MARTINE ANDERSON
                          710 SANSOME STREET,
13                        SAN FRANCISCO, California  94111-1704
                          (415) 391-5400
14

15   ON BEHALF OF MGA AND MGA MEXICO:
16
                          O'MELVENY & MYERS LLP
17                        BY:  STEVEN J. OLSON
                          BY:  DIANA M. TORRES
18                        400 SOUTH HOPE STREET
                          LOS ANGELES, CALIFORNIA  90071-2899
19                        (213) 430-6000

20
                          CHRISTENSEN, GLASER, FINK,
21                         JACOBS, WEIL & SHAPIRO, LLP
                          BY:  PATRICIA GLASER
22                        10250 CONSTELLATION BOULEVARD
                          LOS ANGELES, CALIFORNIA  90067
23                        (310) 553-3000

24

25
```

1          RIVERSIDE, CALIFORNIA; monday, june 11, 2007; 10:49 A.M.

2                              -oOo-

3          THE CLERK:  CALLING CALENDAR ITEM 9, CARTER BRYANT

4     VERSUS MATTEL INC., ET AL., CASE NUMBER ED CV 04-09049.

5          MAY WE HAVE COUNSEL PLEASE COME FORWARD AND STATE        10:49

6     YOUR APPEARANCES FOR THE RECORD.

7          MS. GLASER:  GOOD MORNING, YOUR HONOR.

8          PATRICIA GLASER FROM MGA.

9          THE COURT:  COUNSEL.

10         MR. PAGE:  GOOD MORNING, YOUR HONOR.                     10:49

11         MICHAEL PAGE, WITH KEKER & VAN NEST, FOR

12    CARTER BRYANT.  WITH ME IS CHRISTA ANDERSON; we have RECENTLY

13    SUBSTITUTED IN FOR MR. BRYANT.

14         MS. ANDERSON:  GOOD MORNING, YOUR HONOR.

15         THE COURT:  GOOD MORNING.                                10:50

16         MR. OLSON:  GOOD MORNING, YOUR HONOR.

17         STEVEN OLSON FOR MGA AND MGA MEXICO.

18         MR. QUINN:  GOOD MORNING, YOUR HONOR.

19         JOHN QUINN, MIKE ZELLER, DYLAN PROCTOR FOR MATTEL.

20         THE COURT:  THERE ARE SIX MOTIONS THAT THE COURT HAS     10:50

21    ON CALENDAR THAT THE COURT IS PREPARED TO ADDRESS AT THIS

22    HEARING.

23         THE FIRST TWO ARE SOMEWHAT RELATED.  I HAVE MGA AND

24    LARIAN'S MOTION TO DISMISS; MATTEL'S AMENDED COUNTERCLAIMS; AND

25    THEN, OF COURSE, CARTER BRYANT'S MOTION TO DISMISS           10:51

```
1   COUNTERCLAIMS.  I'LL CONSIDER THOSE TWO TOGETHER, GIVEN THE

2   OVERLAP;

3           THEN THE THIRD MOTION IS MGA MEXICO'S MOTION TO

4   DISMISS.  AND THAT'S THE ONE THAT'S BEING BROUGHT ON PERSONAL

5   JURISDICTION GROUNDS;                                          10:51

6           THE FOURTH IS MGA'S MOTION REGARDING THE DISCOVERY

7   MASTER'S MARCH 7, 2007 ORDER; AND, OF COURSE, RELATED TO THAT

8   IS THE FIFTH MOTION, BRYANT'S MOTION REGARDING THE DISCOVERY

9   MASTER'S MARCH 7, 2007 ORDER;

10          AND THEN THE SIXTH MOTION IS MATTEL'S MOTION           10:51

11  REGARDING THE ISSUES TO TRY IN PHASE ONE.  THOSE ARE THE SIX

12  MOTIONS THAT THE COURT IS PREPARED FOR.

13          I HAVE REVIEWED THE VOLUMINOUS PROCEEDINGS.  LET ME

14  JUST START BY SAYING I'M EXTRAORDINARILY IMPRESSED BY COUNSEL

15  ON ALL SIDES.  THE QUALITY OF THE LAWYERING IN THIS CASE IS AS 10:52

16  GOOD AS I HAVE SEEN.

17          NOW, ADMITTEDLY, IT WOULD PROBABLY MEAN MORE COMING

18  FROM A JUDGE WITH MORE EXPERIENCE THAN MYSELF, BUT I'VE SEEN A

19  FEW BRIEFS OVER THE YEARS, AND I'M VERY IMPRESSED BY THE

20  QUALITY ON BOTH SIDES.  IT'S A PLEASURE READING THINGS WHEN    10:52

21  THERE'S GOOD LAWYERING INVOLVED.

22          ALL RIGHT.  LET ME BEGIN WITH THE MOTION TO DISMISS

23  MATTEL'S AMENDED COUNTERCLAIMS, AND I'LL BREAK THIS DOWN INTO

24  THE DIFFERENT SUB GROUPINGS.  I'LL START WITH THE SUFFICIENCY

25  OF THE ALLEGATIONS OF THE PREDICATE ACTS.                      10:52
```

1          MR. QUINN, I'D LIKE TO BEGIN WITH MATTEL AND GET A

2    SENSE OF WHEN WE SHOULD EXPECT, OR WHETHER WE SHOULD EXPECT,

3    THE PRODUCTION OF ALL OF THE DOCUMENTS THAT BASICALLY FORM THE

4    BASIS FOR THE PREDICATE ACTS WHICH MGA AND BRYANT ARE CLAIMING

5    HAVE NOT BEEN TURNED OVER; SO IF MR. QUINN OR SOMEBODY ELSE        10:53

6    WANTS TO ADDRESS THAT, SOMEONE FROM MATTEL.

7          MR. QUINN:  YOUR HONOR, ALL OF THOSE DOCUMENTS HAVE

8    BEEN PRODUCED.

9          IF THE COURT IS REFERRING TO EXHIBIT C, THE LIST OF

10   E-MAILS AND FAXES --                                              10:53

11         THE COURT:  YES.

12         MR. QUINN:  I KNOW THERE WAS A STATEMENT IN ONE OF

13   THE BRIEFS AT ONE POINT IN TIME THAT A STATEMENT WAS MADE THAT

14   THEY HADN'T RECEIVED ALL OF THESE THINGS.  I HAVE CONFIRMED

15   THAT ALL OF THOSE DOCUMENTS HAVE IN FACT BEEN PRODUCED.           10:53

16         THE COURT:  AND YOU'VE RECEIVED THOSE -- THE

17   DEFENSE HERE -- IS THERE ANY CONTENTION THAT ANY OF THESE

18   DOCUMENTS HAVE NOT YET BEEN PRODUCED THAT ARE REFERENCED IN

19   EXHIBIT C?

20         MS. TORRES:  YOUR HONOR, WE LOOKED FOR THEM LAST            10:53

21   NIGHT AND WE HAVE THE VAST MAJORITY BUT THERE ARE SOME THAT WE

22   HAVEN'T BEEN ABLE TO IDENTIFY.

23         THE COURT:  SO COULD IT POSSIBLY BE THAT THEY HAVE

24   BEEN PRODUCED AND YOU SIMPLY HAVEN'T --

25         MS. TORRES:  IT'S POSSIBLE THAT THEY'VE BEEN PRODUCED       10:54

1  AND THE WAY THAT THEY'RE DESCRIBED DOESN'T ENABLE US TO FIND

2  THEM, BUT WE CAN WORK THAT OUT WITH COUNSEL.

3  　　　　　THE COURT:  MR. QUINN, ARE YOU GOING TO BE ATTACHING

4  THIS TO THE COMPLAINT ITSELF, OR IS THERE GOING TO BE SOME WAY

5  THAT WE'RE GOING TO HAVE TO MAKE SURE THAT --                10:54

6  　　　　　MR. QUINN:  LET ME JUST SAY, IF THERE'S SOME

7  CONFUSION ABOUT IDENTIFICATION ABOUT WHAT IS REFERRED TO IN

8  EXHIBIT C, WE WILL BE HAPPY TO SIT DOWN WITH THEM AND

9  SPECIFICALLY IDENTIFY EACH OF THE DOCUMENTS.  WE ARE EVEN

10 PREPARED TO ATTACH THEM TO THE COMPLAINT.                    10:54

11 　　　　　I THINK THAT'S AN OFFER THAT WAS MADE --

12 　　　　　THE COURT:  IT WAS.

13 　　　　　MR. QUINN:  -- LEADING UP TO THIS MOTION.  BUT THERE

14 REALLY SHOULDN'T BE ANY CONFUSION ABOUT WHAT THOSE DOCUMENTS

15 ARE.  WE CERTAINLY DON'T INTEND TO CREATE ANY -- AND WE        10:54

16 CERTAINLY -- IT'S OUR UNDERSTANDING THEY HAVE ALL THOSE

17 DOCUMENTS.

18 　　　　　IT'S POSSIBLE THEY MAY HAVE THEM AND JUST DON'T

19 IDENTIFY SOME OF THEM IN A WAY THAT MATCHES UP WITH THE WAY

20 THEY'RE IDENTIFIED IN EXHIBIT C.                              10:55

21 　　　　　THE COURT:  I'M GOING TO TAKE YOU UP ON YOUR OFFER

22 THAT YOU MENTIONED DURING THE DISCUSSIONS THAT YOU HAD IN THE

23 MEET AND CONFERS LEADING UP TO THIS.  I THINK IT WOULD BE

24 HELPFUL TO HAVE THOSE ATTACHED TO THE COMPLAINT SO THAT WE KNOW

25 EXACTLY -- AND THERE'S NOT GOING TO BE ANY DISPUTE DOWN THE    10:55

```
 1   ROAD -- AS TO WHAT THEY ARE.

 2          HAVING SAID THAT, I WILL ENTERTAIN ARGUMENT FROM

 3   EITHER BRYANT OR MGA.  I DO THINK THAT THERE PROBABLY IS A

 4   SUFFICIENT -- ONCE THOSE DOCUMENTS ARE ATTACHED AND ONCE

 5   THEY'RE CLEARLY IDENTIFIED, I THINK THAT DOES GET MATTEL       10:55

 6   PROBABLY PAST THE HURDLE OF IDENTIFYING THESE PREDICATE ACTS.

 7          I UNDERSTAND THAT SOME OF THESE DOCUMENTS, JUST FROM

 8   THE DESCRIPTIONS THAT I HAVE, ARE RATHER INNOCUOUS.  BUT TAKEN

 9   IN THE CONTEXT OF THE ALLEGATIONS THAT ARE MADE IN THE

10   COMPLAINT, IN THE RICO PROVISIONS, IT DOES SEEM TO BE          10:55

11   SUFFICIENT, AT LEAST AT THIS STAGE OF THE PLEADINGS, BUT LET ME

12   HEAR FROM COUNSEL ON THAT.

13          THAT'S MY TENTATIVE THOUGHTS ON THIS, ONCE WE GET

14   PAST THE ISSUE OF WHAT DOCUMENTS WE'RE SPECIFICALLY TALKING

15   ABOUT.                                                         10:55

16          MS. TORRES:  THANK YOU, YOUR HONOR.

17          I ACTUALLY HAVE THE COLLECTION THAT WE GOT LAST

18   NIGHT, AND I'M HAPPY TO PROVIDE THEM TO THE COURT FOR TODAY'S

19   HEARING.  I HAVE A COPY FOR COUNSEL AS WELL, IF THAT WOULD

20   HELP.                                                          10:56

21          THE COURT:  WELL, IF YOU HAVE AN EXTRA COPY, WHY

22   DON'T YOU DO THAT.

23          (CLERK RETRIEVES DOCUMENTS FOR THE COURT.)

24          THE COURT:  I CERTAINLY UNDERSTAND THAT ANY NUMBER OF

25   THESE DOCUMENTS IN ISOLATION MIGHT NOT BE SUFFICIENT, BUT I'M  10:56
```

```
 1   CONSIDERING THESE DOCUMENTS IN THE CONTEXT OF THE ALLEGATIONS

 2   THAT ARE MADE IN THE COMPLAINT ITSELF.

 3            MS. TORRES:  YOUR HONOR, THESE DOCUMENTS SORT OF FALL

 4   INTO TWO CATEGORIES.  THE FIRST ARE PRODUCT DEVELOPMENT

 5   DOCUMENTS; THEY ARE DOCUMENTS THAT -- E-MAILS, PRIMARILY --      10:56

 6   THAT GO TO AND FROM MGA AND MGA SUBSIDIARIES IN HONG KONG, AND

 7   THEY ARE THINGS LIKE, 'ATTACHED ARE FABRIC SAMPLES' OR

 8   'ENCLOSED ARE FABRIC SAMPLES'; 'ATTACHED IS THE APPROVAL FOR

 9   THIS COLOR OR THAT COLOR.'  THEY DEAL WITH THE PRODUCT

10   DEVELOPMENT OF THE BRATZ DOLLS.                                  10:57

11            NOW, MATTEL'S RICO COMPLAINT SETS FORTH BASICALLY

12   FIVE TYPES OF PREDICATE ACTS.  THERE'S MAIL FRAUD AND WIRE

13   FRAUD; THERE IS ESSENTIALLY SPOLIATION OF EVIDENCE, OR

14   TAMPERING WITH A DOCUMENT; THERE'S CRIMINAL COPYRIGHT

15   INFRINGEMENT; AND THERE'S USE OF THE MAILS OR FACILITIES OF      10:57

16   INTERSTATE COMMERCE TO COMMIT COMMERCIAL BRIBERY.

17            WHEN YOU LOOK AT THE MAIL FRAUD AND THE WIRE FRAUD,

18   THE MAIL FRAUD, UNDER 18 U.S. CODE 1341 REQUIRES THE USE OF THE

19   MAIL FOR THE PURPOSE OF CARRYING OUT A FRAUDULENT SCHEME.

20            THE COURT:  RIGHT.                                      10:58

21            MS. TORRES:  THAT REQUIRES A FRAUDULENT SCHEME.

22            THE COURT:  YES.

23            MS. TORRES:  AND IT ALSO REQUIRES THE USE OF THE

24   MAIL, NOT JUST INCIDENTAL TO THE FRAUDULENT SCHEME, BUT AS AN

25   IMPORTANT PART OF CARRYING OUT THE FRAUDULENT SCHEME.            10:58
```

```
 1              THE COURT:  BUT, FOR EXAMPLE, JUST USING THE
 2     REFERENCE THAT YOU MADE, IF IT'S ALLEGED THAT YOU STOLE
 3     FABRICS, OR YOU ENGAGED IN THE CONSPIRACY TO STEAL SOMEONE'S
 4     FABRIC, AND THEN YOU E-MAILED SOMETHING ABOUT THE FABRIC OR
 5     ABOUT THE PRODUCTION OR THE DESIGN OR THE MANUFACTURE OF THE     10:58
 6     PRODUCT, THE COMMUNICATION NEEDS TO BE LOOKED AT IN THE CONTEXT
 7     OF THE ALLEGATION, THE UNDERLYING FRAUDULENT ALLEGATION.  AND
 8     THAT'S WHAT MATTEL SEEMS TO BE ARGUING.
 9              MS. TORRES:  NOT ENTIRELY.
10              WHAT THEY ARE ARGUING, AS I UNDERSTAND IT, IS, PRIOR     10:58
11     TO OCTOBER 20TH OF 2000, CARTER BRYANT DID WORK ON THE BRATZ
12     DOLLS THAT THEY DIDN'T KNOW ABOUT AND THAT MGA PAID HIM TO DO
13     WHILE HE WAS STILL A MATTEL EMPLOYEE.
14              IF YOU LOOK AT EXHIBIT C --
15              THE COURT:  WHICH, IN THE CONTEXT OF THEIR     10:59
16     ALLEGATION, BASICALLY MEANS THAT THEY'RE ALLEGING THAT
17     CARTER BRYANT STOLE FROM MATTEL THEIR PROPERTY.
18              MS. TORRES:  PRIOR TO OCTOBER 20TH OF 2000.
19              IF YOU LOOK AT EXHIBIT C, THE OVERWHELMING
20     MAJORITY -- IN FACT, I THINK THERE WERE ONLY TWO SUPPOSED     10:59
21     PREDICATE ACTS LISTED THAT PRE-DATE OCTOBER 20TH OF 2000.
22              THE FIRST ONE, I BELIEVE, IS OCTOBER 4TH OF 2000.
23     I'LL TELL YOU EXACTLY WHERE IT IS.  IT'S EXHIBIT 2, ACTUALLY,
24     TO MATTEL'S REQUEST FOR JUDICIAL NOTICE.  IT'S AN E-MAIL FROM
25     MGA'S LAWYER, DAVID ROSENBAUM, TO CARTER BRYANT'S LAWYER,     10:59
```

1  ANN WONG, DATED OCTOBER 4TH OF 2000, WHICH IS THE DATE THE

2  CONTRACT WAS SIGNED, AND IT ATTACHES CLEAN AND REDLINED COPIES

3  OF THE BRYANT/MGA AGREEMENT.  AND MR. ROSENBAUM SAYS TO

4  MS. WONG THAT IF THE CHANGES TO THE DRAFT ARE UNACCEPTABLE, HIS

5  CLIENT, I.E. MGA, HAS ADVISED HIM THAT IT WOULD PROCEED WITH          11:00

6  OTHER PRODUCT PLANS AND TERMINATE ITS DISCUSSIONS WITH

7  MR. BRYANT.

8           I DON'T SEE HOW ANYTHING IN THAT E-MAIL CAN BE

9  RELATED TO A FRAUD IN CONNECTION WITH THE DEVELOPMENT OF BRATZ.

10          THE ONLY OTHER ONE THAT I FOUND THAT PRE-DATES          11:00

11  OCTOBER 20, 2000 IS EXHIBIT 3 TO THE REQUEST FOR JUDICIAL

12  NOTICE, AND THAT IS AN OCTOBER 5TH E-MAIL EXCHANGE BETWEEN

13  CARTER BRYANT AND ISAAC LARIAN IN WHICH CARTER THANKS ISAAC FOR

14  GIVING HIM THIS "INCREDIBLE OPPORTUNITY AND FOR BELIEVING IN ME

15  ENOUGH TO MAKE THIS HAPPEN."          11:00

16          ISAAC REPLIES, "CARTER, I BELIEVE YOU ARE VERY

17  CREATIVE AND THE LINE, IF DONE WITH FOCUS AND STRATEGIC

18  THOUGHT, WILL BE HUGE.  PLEASE ARRANGE TO MEET WITH PAULA ASAP

19  AND WORK ON THIS FULL TIME."

20          THOSE ARE THE TWO "PREDICATE ACTS" THAT PRECEDE          11:01

21  OCTOBER 20TH OF 2000.  EVERYTHING ELSE THAT INVOLVES CARTER

22  BRYANT OR THE DEVELOPMENT OF THE MGA BRATZ DOLLS IS LONG AFTER

23  CARTER BRYANT LEFT MATTEL AND SIMPLY DEALS WITH THE PRODUCT

24  DEVELOPMENT.

25          THE COURT:  BUT IF IT'S ALL RELATED TO THIS GENESIS          11:01

1    WHICH -- AND I'M CERTAINLY NOT PASSING JUDGMENT ON ANY OF THIS

2    AT THIS POINT, BUT JUST BASED ON THE ALLEGATION, IF IT'S

3    PREDICATED ON SOMETHING WHICH WAS, FROM MATTEL'S PERSPECTIVE,

4    ILLEGAL TO BEGIN WITH, AND THESE WERE ACTS DONE IN FURTHERANCE

5    OF OBTAINING PROFITS FROM THAT ILLEGAL ACTIVITY, FROM                11:01

6    DEVELOPING THE GAINS TO BE MADE FROM THAT ILLEGAL ACTIVITY, WHY

7    DOES IT MATTER THAT THEY TOOK PLACE AFTER THE BRATZ DOLL WAS

8    ALLEGEDLY STOLEN?

9            IF THERE WAS A RICO NARCOTICS CASE AND SOMEONE

10   IMPORTED NARCOTICS FROM LATIN AMERICA, THE ACTIVITIES THAT TOOK      11:02

11   PLACE LONG AFTER THE DRUGS WERE ACTUALLY BROUGHT ACROSS THE

12   BORDER -- THE MONEY LAUNDERING, THE MOVING OF THE PROCEEDS, THE

13   MARKETING OF THE DRUGS, ET CETERA -- ALL OF THAT WOULD STILL BE

14   TIED UP OR CONNECTED WITH THE UNDERLYING CRIMINAL ACTIVITY.

15           THAT'S PROBABLY A POOR ANALOGY HERE; WE'RE OBVIOUSLY         11:02

16   NOT TALKING ABOUT NARCOTICS OR ANYTHING OF THAT NATURE, BUT WE

17   ARE TALKING ABOUT RICO, AND I DON'T NECESSARILY SEE THIS

18   DIVIDING LINE THAT YOU'RE MAKING AS BEING ALL THAT RELEVANT.

19           MS. TORRES:  WELL, FOR PURPOSES OF MAIL FRAUD OR WIRE

20   FRAUD, THE PREDICATE ACT HAS TO BE IN FURTHERANCE OF THE FRAUD.      11:02

21           THE COURT:  RIGHT.

22           MS. TORRES:  IN OTHER WORDS, THEY CAN'T BE INCIDENTAL

23   AFTER-THE-FACT COMMUNICATIONS.

24           THE COURT:  BUT CAN'T PART OF THE FRAUD BE REAPING

25   THE BENEFITS OF THE ACTIVITY, OF DEALING WITH THE PROCEEDS OF        11:03

```
 1   GAINING BENEFIT FROM THE ACTIVITY?

 2         MS. TORRES:  I DON'T SEE HOW.

 3         THE COURT:  IF YOU AND I DECIDE TO ENTER INTO A

 4   FRAUDULENT CONSPIRACY, IT'S NOT JUST THE THEFT OF WHATEVER IT

 5   IS THAT WE'RE GOING TO DO, BUT IT'S HOW WE'RE GOING TO MAKE     11:03

 6   THAT THEFT BE OF BENEFIT TO US.  THAT'S ALL PART OF OUR

 7   FRAUDULENT CONSPIRACY, RIGHT?

 8         MS. TORRES:  BUT THE PREDICATE ACT OF MAIL AND WIRE

 9   FRAUD, THE ACTUAL FRAUD ITSELF, NEEDS TO USE THE INTERSTATE

10   WIRES OR THE U.S. MAIL.  IT'S NOT ENOUGH FOR THE FRAUD ITSELF   11:03

11   SIMPLY TO HAVE --

12         THE COURT:  WHEN DO YOU VIEW THE FRAUD BEGINNING AND

13   ENDING?

14         MS. TORRES:  WELL, I DON'T BELIEVE THERE WAS ANY

15   FRAUD IN THE FIRST PLACE.                                       11:03

16         THE COURT:  OF COURSE.  AND I'M NOT SUGGESTING THAT I

17   BELIEVE THERE WAS A FRAUD, EITHER.  ALL I'M SAYING IS, BASED ON

18   THE ALLEGATIONS THAT ARE BEING MADE, WHEN DO YOU BELIEVE THAT

19   THE FRAUD ALLEGEDLY BEGINS AND WHEN DO YOU BELIEVE THAT THE

20   FRAUD ALLEGEDLY ENDS?                                           11:04

21         MS. TORRES:  I DON'T BELIEVE THAT THEY SET FORTH A

22   BEGINNING DATE, BUT CERTAINLY AFTER CARTER BRYANT LEFT MATTEL

23   AND WASN'T WORKING THERE, AND THEY KNEW HE WASN'T WORKING

24   THERE.

25         THE COURT:  YOU THINK THE FRAUD ENDS AT THAT POINT?       11:04
```

```
 1          MS. TORRES:  I DON'T SEE HOW THERE CAN BE A

 2   FRAUDULENT SCHEME -- I DON'T SEE HOW THERE COULD BE A

 3   FRAUDULENT SCHEME.

 4          BUT TO BE HONEST WITH YOU, PART OF THE PROBLEM WITH

 5   THEIR RICO ALLEGATIONS --                                    11:04

 6          THE COURT:  I THINK THE LEGAL DEFINITIONS OF

 7   FRAUDULENT SCHEME AND CONSPIRACY IN THE RICO CONTEXT EXTENDS

 8   BEYOND WHAT YOU'RE SUGGESTING.

 9          MS. TORRES:  YOU CAN HAVE A FRAUDULENT SCHEME THAT

10   CONTINUES AFTERWARDS, TO THE EXTENT YOU'RE TRYING TO COVER UP 11:04

11   YOUR FRAUDULENT SCHEME.

12          THE COURT:  FOR EXAMPLE.

13          MS. TORRES:  ABSOLUTELY.

14          THE PROBLEM HERE IS, THEY DON'T IDENTIFY WHAT THE

15   FRAUDULENT SCHEME WAS.  THEY DON'T IDENTIFY THE TIME AND THE 11:04

16   PLACE AND THE MANNER OF EACH OF THE FRAUDULENT ACTS.  THEY

17   DON'T IDENTIFY THE ROLE OF EACH DEFENDANT.

18          WE HAVE MGA ENTERTAINMENT, INC., THE

19   LOS ANGELES-BASED COMPANY.  WE ALSO HAVE MGA HONG KONG, ITS

20   MANUFACTURING SUBSIDIARY.  THERE'S ABSOLUTELY NO ALLEGATION  11:05

21   THERE AS TO WHAT ROLE MGA HONG KONG PLAYED, OTHER THAN TO

22   MANUFACTURE A PRODUCT.  THEY DON'T SHOW ANY KNOWLEDGE.  THEY

23   DON'T SHOW ANY FRAUDULENT REPRESENTATIONS BY MGA HONG KONG.

24          THE COURT:  THE ALLEGATIONS OF THE FOREIGN

25   SUBSIDIARIES, I THINK, ARE MORE INVOLVED IN THE FACT THAT THE 11:05
```

1    ALLEGATION IS THAT MGA WAS TRYING TO BASICALLY BUY OFF

2    EMPLOYEES FROM THE FOREIGN SUBSIDIARIES TO HELP THEM CAPTURE

3    BRATZ AND CAPTURE INTELLIGENCE ABOUT WHAT MATTEL WAS DOING.

4            MS. TORRES:  THE ONLY ALLEGATION ABOUT HIRING A

5    MATTEL EMPLOYEE IN CONNECTION WITH THE INITIAL DEVELOPMENT OF          11:05

6    BRATZ, AS FAR AS I CAN TELL, IS THE HIRING OF CARTER BRYANT,

7    AND, YOU KNOW, THE SIGNING OF THE CONTRACT WHILE HE WAS STILL

8    AT MATTEL.

9            THE COURT:  SOME OF THIS GOES BEYOND JUST THE BRATZ

10   DOLL.                                                                  11:05

11           MS. TORRES:  CORRECT.

12           THE COURT:  RIGHT.

13           MS. TORRES:  I WOULD SAY -- I LOOK AT THEIR ORIGINAL

14   CLAIM AS REALLY TWO CLAIMS:  ONE, IN 2000, INVOLVING CARTER

15   BRYANT IN THE EARLY DEVELOPMENT OF BRATZ; AND LATER, STARTING        11:06

16   IN 2004, WHERE THEY ALLEGE THAT MGA HIRED MATTEL EMPLOYEES,

17   BEGINNING WITH INDIVIDUALS IN MEXICO AND CONTINUING ON TO THE

18   U.S. AND CANADA.

19           THERE IS A FOUR-YEAR GAP IN THEIR ALLEGATIONS.  AND

20   CERTAINLY, THAT UNDERMINES ANY CLAIM THAT THERE WAS A                 11:06

21   CONTINUOUS PATTERN OF ONGOING ACTIVITY BECAUSE THERE IS NOTHING

22   FROM 2000 UNTIL 2004 IN THEIR COMPLAINT.

23           THE CASE LAW THAT WE CITED IN OUR PAPERS SAYS YOU

24   HAVE TO ALLEGE SPECIFICALLY THE TIME, PLACE, AND MANNER OF EACH

25   ACT OF FRAUD; THE ROLE OF EACH DEFENDANT; HOW THE COMMUNICATION       11:06

1    FURTHERED THE FRAUD; AND THE FRAUDULENT NATURE OF THE

2    STATEMENTS; WHAT ARE THE FRAUDULENT STATEMENTS AND HOW ARE THEY

3    FRAUDULENT?

4         EVEN THE CASES MATTEL SITES, WHICH, THE ONE CASE THAT

5    THEY RELY ON PRIMARILY IS NOT A NINTH CIRCUIT CASE, BUT EVEN          11:07

6    THAT CASE STANDS FOR THE PROPOSITION THAT A RICO PLAINTIFF WHO

7    IS ALLEGING MAIL FRAUD OR WIRE FRAUD MUST SET FORTH WITH

8    SPECIFICITY EACH OF THESE ELEMENTS.

9         THE COURT:  RIGHT.  BUT THEY DON'T NEED TO SPECIFY IT

10   WITHIN -- EACH MAILING DOESN'T NEED TO CONTAIN ALL OF THOSE          11:07

11   ELEMENTS.

12        MS. TORRES:  NO, EACH MAILING DOESN'T NEED TO CONTAIN

13   EACH OF THOSE ELEMENTS.  BUT THEY HAVE TO TELL US, HOW DO THESE

14   FIT INTO THE PATTERN?

15        I CAN OPEN UP ANY ONE OF THESE, WE CAN OPEN UP THE             11:07

16   FIRST PAGE OF THE BINDER, "DEAR ALDO, HOPE ALL IS WELL.  WHEN

17   CAN WE EXPECT YOUR ORDERS FOR BRATZ AND PALM PUPPIES?"

18        I DON'T UNDERSTAND HOW THAT FURTHERS THE FRAUDULENT

19   SCHEME.  I DON'T UNDERSTAND WHAT ABOUT THAT IS FALSE.

20        THE NEXT PAGE, IT'S AN EXCHANGE OF E-MAILS BETWEEN            11:08

21   STEVEN LEE, WHO WAS THEN THE HEAD OF MGA HONG KONG, WITH EARLY

22   LIGHT, WHICH BECAME THE MANUFACTURER, AND ISAAC LARIAN,

23   REGARDING TOOLING FOR BRATZ:  "DEAR WILSON, THIS CONFIRMS OUR

24   PHONE CONVERSATION THIS MORNING THAT EARLY LIGHT IS TO PROCEED

25   WITH THE FOUR SET OF TOOLS FOR BRATZ TO SUPPORT OUR TARGET OF        11:08

```
 1   4,000 PIECES BEFORE 10-19-01..." AND IT CONTINUES; BUT THIS IS

 2   ABOUT TOOLING, AND IT'S ACTUALLY ABOUT TOOLING THE FOLLOWING

 3   YEAR, AFTER THE BRATZ DOLLS WOULD HAVE BEEN RELEASED TO THE

 4   MARKET.

 5        YOU CAN LOOK AT ANY SINGLE ONE OF THESE -- AND I          11:08

 6   UNDERSTAND THE COURT'S POINT THAT PERHAPS IN ISOLATION THEY MAY

 7   NOT BE "PREDICATE ACTS."  I WILL SAY THAT MATTEL'S COMPLAINT

 8   ALLEGES THAT THEY ARE EACH PREDICATE ACTS, BECAUSE EXHIBIT C IS

 9   LABELED "PREDICATE ACTS."  BUT NOTHING IN THE COMPLAINT TELLS

10   US HOW IT IS THESE COMMUNICATIONS WHICH INVOLVE THE DEVELOPMENT   11:09

11   OF THE PRODUCT AFTER CARTER BRYANT LEFT MATTEL -- THERE'S

12   NOTHING IN THEIR COMPLAINT THAT TELLS US HOW IT IS THAT IS AN

13   IMPORTANT PART OF THE FRAUD.

14        THE COURT:  I UNDERSTAND YOUR ARGUMENT.

15        YOU ALSO ARGUE THAT THERE'S NO RICO INJURY.               11:09

16        MS. TORRES:  YES.

17        TO HAVE STANDING UNDER ARTICLE 3, TO ASSERT A RICO

18   CLAIM, A PLAINTIFF MUST SATISFY AN INJURY-IN-FACT REQUIREMENT,

19   I.E. INJURY TO ONE'S BUSINESS OR PROPERTY.  UNDER RICO,

20   HOWEVER, RECOVERY IS LIMITED TO THE INJURIES FLOWING FROM THE   11:09

21   PREDICATE ACTS, AND IT DOES NOT EXTEND TO ALL INJURIES CAUSED

22   BY THE ENTERPRISE WHICH VIOLATES RICO.

23        THE ONLY INJURY MATTEL ALLEGES IN ITS COMPLAINT COMES

24   FROM THE ALLEGED THEFT OF ITS TRADE SECRETS, OR ITS LOSS OF

25   MARKET SHARE IN MEXICO.                                        11:10
```

```
 1          TRADE SECRET THEFT IS NOT RECOGNIZABLE AS AN INJURY

 2   UNDER RICO, NOR IS LOSS OF MARKET SHARE, PARTICULARLY LOSS OF

 3   MARKET SHARE TO A COMPANY'S SUBSIDIARIES.

 4          WHAT THIS CASE BOILS DOWN TO, WHAT THEIR RICO CLAIM

 5   BOILS DOWN TO, IS A GLORIFIED TRADE SECRETS THEFT ALLEGATION OR   11:10

 6   CLAIM.  TRADE SECRET THEFT IS NOT A PREDICATE ACT, BUT --

 7          THE COURT:  WAIT A SECOND.

 8          IF TRADE SECRET IS NOT A PREDICATE ACT -- YOU SAY

 9   IT'S NOT AN INJURY.

10          MS. TORRES:  EXCUSE ME?

11          THE COURT:  IT'S NOT AN INJURY?

12          MS. TORRES:  IT'S NOT A PREDICATE ACT LISTED IN THE

13   RICO STATUTE.

14          THE COURT:  I UNDERSTAND THAT, BUT IT CAN BE AN

15   INJURY.  IT'S A HARM.  IT'S AN ECONOMIC HARM.                   11:10

16          LET'S NOT MIX --

17          MS. TORRES:  YES.  BUT IF THE INJURY DOESN'T FLOW

18   FROM THE PREDICATE ACTS --

19          THE COURT:  THERE WE GO.  YOU STATED A MOMENT AGO,

20   YOU INITIALLY ARGUED THAT TRADE SECRETS IS NOT A HARM           11:11

21   RECOGNIZED BY RICO.  I DON'T THINK THAT'S --

22          MS. TORRES:  NO.  I'M SORRY.

23          TRADE SECRET THEFT IS NOT A PREDICATE ACT UNDER RICO.

24          THE COURT:  STANDING BY ITSELF.  BUT IF THE TRADE

25   SECRET IS THE INJURY RESULTING FROM THE MAIL FRAUD, THE WIRE    11:11
```

```
 1   FRAUD, THE WITNESS TAMPERING, THE BRIBERY, WHATEVER, THEN THAT

 2   IS A COGNIZABLE INJURY FOR PURPOSES OF BOTH STANDING AND THEN

 3   IN TERMS OF RECOVERY, CORRECT?

 4         MS. TORRES:  IF THAT'S THE CASE, THEN IT MAKES A

 5   NULLITY OF THE PRINCIPAL THAT RECOVERY IS LIMITED TO THOSE          11:11

 6   INJURIES FLOWING DIRECTLY FROM THE PREDICATE ACTS, AS OPPOSED

 7   TO ALL INJURIES THAT FLOW FROM THE RICO VIOLATION.

 8         THEY HAVE TO SHOW, OR AT LEAST ALLEGE FOR PURPOSES OF

 9   PLEADING, THAT THEY SUFFERED AN INJURY FROM THE PREDICATE ACTS.

10   AND THEY DON'T DO THAT HERE.  THERE IS NO ALLEGED INJURY FROM       11:12

11   ANY ONE OF THESE E-MAILS.

12         THE COURT:  MOVING ON TO THE RICO ENTERPRISE ITSELF,

13   ONE CASE THAT CAME OUT, ADMITTEDLY AFTER YOU HAD SUBMITTED YOUR

14   BRIEFS, IS THIS ODEM CASE, AND I WANT TO GIVE YOU A CHANCE TO

15   RESPOND TO THAT.                                                    11:12

16         MS. TORRES:  I BELIEVE MR. BRYANT'S COUNSEL IS GOING

17   TO ADDRESS THAT.

18         THE COURT:  IS THERE ANYTHING ELSE IN THIS FIRST

19   MOTION HERE THAT YOU WISH TO ADDRESS?

20         MS. TORRES:  YES.                                            11:12

21         THERE ARE THREE OTHER TYPES OF PREDICATE ACTS THAT

22   THEY ALLEGE.  THERE'S SPOLIATION OF A DOCUMENT IN VIOLATION OF

23   1512(C).  THEIR COMPLAINT DOES NOTHING BUT PARROT THE STATUTE.

24         NOW, I UNDERSTAND IN THEIR BRIEF, THEY SAY, YOU

25   KNOW -- THEY GIVE A LITTLE MORE INFORMATION.                        11:12
```

```
 1           THE COURT:  DO YOU HAVE ANY QUESTIONS IN TERMS OF
 2    WHAT THE DOCUMENT THEY'RE TALKING ABOUT IS?
 3           MS. TORRES:  I BELIEVE THAT I KNOW WHAT DOCUMENT
 4    THEY'RE TALKING ABOUT.  BUT, YOUR HONOR, WE'RE ENTITLED TO HAVE
 5    IT IN THE COMPLAINT, BECAUSE IF IT'S WHAT I THINK IT IS, THAT'S        11:12
 6    AN EASY ONE TO GET OUT ON A MOTION; THAT DOCUMENT IS VERY EASY
 7    TO DEAL WITH.
 8           THE OTHER ASPECT OF THE SPOLIATION CLAIM DEALS WITH
 9    REGISTRATIONS AND AMENDMENTS TO REGISTRATIONS OF COPYRIGHTS.
10    THAT, TO BE HONEST WITH YOU, I DON'T KNOW WHAT THEY'RE TALKING        11:13
11    ABOUT.
12           IF WHAT THEY'RE CLAIMING IS THAT WE AMENDED
13    REGISTRATIONS IN ORDER TO PREVENT THEIR USE IN A PROCEEDING,
14    WHAT PROCEEDING ARE THEY TALKING ABOUT?  BECAUSE THE COPYRIGHT
15    OFFICE DOESN'T -- THERE'S NO PROCEEDING THERE.                       11:13
16           AND THERE'S NOTHING THAT PREVENTS THEM FROM USING
17    EITHER THE REGISTRATIONS OR THE AMENDMENTS TO THE REGISTRATIONS
18    IN THIS PROCEEDING; SO I DON'T SEE HOW THAT, AS A MATTER OF
19    LAW, CONSTITUTES SPOLIATION OF EVIDENCE.  I THINK THEY SHOULD
20    BE REQUIRED TO PUT THAT IN THEIR COMPLAINT SO THAT WE CAN DEAL       11:13
21    WITH THAT ON A MOTION.
22           CRIMINAL COPYRIGHT INFRINGEMENT, THERE'S NOTHING IN
23    THEIR COMPLAINT THAT SAYS WHAT COPYRIGHTS THEY INFRINGED.  THEY
24    SAY IN THEIR OPPOSITION THAT IT'S THE ORIGINAL BRYANT DRAWINGS.
25    THEY NEVER ALLEGE KNOWLEDGE.  IN THEIR COMPLAINT, THERE IS NO        11:14
```

```
 1   ALLEGATION OF KNOWLEDGE, AND KNOWLEDGE IS A REQUIRED ELEMENT OF
 2   WILLFUL COPYRIGHT INFRINGEMENT, AS IS A SPECIFIC IDENTIFICATION
 3   OF THE COPYRIGHTS.  AND I DON'T THINK THAT THEY CAN ALLEGE
 4   KNOWLEDGE CONSISTENT WITH RULE 11 AFTER YEARS OF CLAIMING THEY
 5   WERE NOT CLAIMING COPYRIGHT INFRINGEMENT.                          11:14
 6           THE LAST ONE IS THE USE OF THE MAILS OR FACILITY OF
 7   INTERSTATE COMMERCE TO COMMIT COMMERCIAL BRIBERY.  AND, AGAIN,
 8   THERE'S NOTHING IN THEIR COMPLAINT THAT TELLS US WHAT THAT'S
 9   ABOUT.  THEIR PAPERS EXPLAIN IT A LITTLE BETTER.  BUT
10   BASICALLY, IT BOILS DOWN TO HIRING CARTER BRYANT AND HIRING THE   11:14
11   MEXICO INDIVIDUALS.
12           THE COURT:  THERE'S QUITE A FEW ALLEGATIONS IN THE
13   COMPLAINT THAT SEEM TO FLUSH OUT WHAT THE BRIBERY ALLEGATION
14   IS.
15           MS. TORRES:  ON THE CARTER BRYANT ISSUE?               11:14
16           I HONESTLY DIDN'T SEE IT.
17           THE COURT:  MAYBE I'M READING TOO MUCH INTO IT.  I'LL
18   TAKE ANOTHER LOOK AT THAT.
19           MS. TORRES:  I CONCEDE THAT IT'S IN THEIR OPPOSITION
20   PAPERS, BUT I DON'T BELIEVE IT'S IN THEIR COMPLAINT.          11:15
21           THE COURT:  FAIR ENOUGH.
22           MS. TORRES:  ONE LAST POINT, AND THAT IS ON THE TRADE
23   SECRETS.
24           THE COURT:  YES.
25           MS. TORRES:  THERE'S A CALIFORNIA CODE OF CIVIL       11:15
```

```
 1    PROCEDURE -- AND, YES, IT IS A CODE OF CIVIL PROCEDURE --
 2    2019.210 THAT REQUIRES THAT A DEFENDANT SET FORTH WITH
 3    REASONABLE PARTICULARITY ITS TRADE SECRETS ALLEGEDLY
 4    MISAPPROPRIATED BY THE DEFENDANT.
 5         THE COURT:  WHAT ABOUT EXHIBIT 8 OF THE PROCTOR      11:15
 6    DECLARATION?  DOES THAT MEET WITH THE CALIFORNIA CODE OF CIVIL
 7    PROCEDURE?
 8         MS. TORRES:  NO.  THAT IS A LISTING OF BATES NUMBERS;
 9    IT IS 13,000 PAGES LONG.  AND I'VE GONE THROUGH IT, AND THERE
10    ARE DOCUMENTS FROM THIRD PARTIES THAT SAY 'CONFIDENTIAL AND   11:15
11    PROPRIETARY COPYRIGHT,' A THIRD PARTY.  THOSE ARE NOT TRADE
12    SECRETS.  THEY SHOULD NOT BE ALLOWED TO SAY, 'HERE'S A BIG, FAT
13    RANGE OF DOCUMENTS; OUR TRADE SECRETS ARE SOMEWHERE IN THERE;
14    GO FIND THEM.'
15         THIS MOTION IS NOT A TECHNICAL EXERCISE.              11:16
16         I ACTUALLY DON'T LIKE MOTIONS TO DISMISS, BECAUSE,
17    FRANKLY, THEY TYPICALLY JUST GIVE AN OPPONENT A BETTER ROAD MAP
18    GOING FORWARD.  BUT IN THIS CASE, THIS IS A CRITICAL EXERCISE.
19    MATTEL FILED ITS ORIGINAL COMPLAINT AGAINST CARTER BRYANT MORE
20    THAN THREE YEARS AGO.  TWO MONTHS AGO, I TOOK THE DEPOSITION OF   11:16
21    A MATTEL 30(B)(6) WITNESS WHO WAS DESIGNATED TO TALK ABOUT
22    CARTER BRYANT'S ALLEGED VIOLATIONS OF HIS EMPLOYMENT DUTIES.
23         THIS WITNESS WAS THE FIRST MATTEL WITNESS TO MENTION
24    A PRODUCT NAMED DIVA STARS.  WE SPENT TWO AND A HALF YEARS
25    LITIGATING THEIR THEORY OF THE CASE THAT BRYANT MUST HAVE      11:17
```

```
 1   CREATED THE BRATZ WHILE AT MATTEL BECAUSE OF A PRODUCT CALLED
 2   'TOON TEENS.'  LAST FALL, THEY CHANGED THEIR THEORY AND CHANGED
 3   IT TO 'DIVA STARS.'
 4            IF WE DON'T GET MORE SPECIFICITY FROM MATTEL IN ITS
 5   COMPLAINT HERE, BOTH WITH RESPECT TO RICO AND WITH RESPECT TO          11:17
 6   ITS TRADE SECRETS, I'M AFRAID WE WILL BE HERE THREE YEARS FROM
 7   NOW LITIGATING MATTEL'S LATEST TRADE SECRETS THEORY.
 8            THE COURT:  YOU WILL NOT BE HERE THREE YEARS FROM
 9   NOW.
10            THANK YOU, COUNSEL.
11            MS. TORRES:  THANK YOU.
12            THE COURT:  LET ME HEAR FROM THE RICO ENTERPRISE ON
13   THAT, AND THEN I'LL GIVE MATTEL AN OPPORTUNITY TO RESPOND TO
14   THIS ENTIRE SECTION.
15            PLEASE, COUNSEL.                                               11:17
16            MS. ANDERSON:  THANK YOU, YOUR HONOR.
17            CHRISTA ANDERSON.
18            THE COURT:  I TRUST YOU'LL BE ADDRESSING
19   PARTICIPATION OR OPERATION OF THE ENTERPRISE AS WELL?
20            MS. ANDERSON:  YES, YOUR HONOR, I WILL BE.                     11:18
21            I'M HERE ON BEHALF OF CARTER BRYANT, SO IT MAY NOT
22   SURPRISE YOUR HONOR THAT I'M GOING TO FOCUS ON THE ALLEGATIONS
23   THAT RELATE TO MR. BRYANT.
24            AND ENGAGING IN THAT FOCUS REVEALS WHAT THE COURT IS
25   WELL AWARE OF:  THAT THE CORE OF THE ALLEGATIONS AGAINST                11:18
```

MR. BRYANT FOCUS ON WHETHER OR NOT MR. BRYANT HAD THE RIGHT TO

ASSIGN RIGHTS TO HIS BRATZ IDEA TO MGA OR WHETHER MATTEL HAS

THE RIGHT TO THAT IDEA.  THAT'S THE CORE OF THE CASE.

THE COURT:  WE DISCUSSED THAT IN OUR FIRST TRIAL,

THAT'S RIGHT.

MS. ANDERSON:  INDEED.

AND IT'S A SIMPLE CORE AT ITS HEART AND THAT

SIMPLICITY UNDERLIES THE FLAWS WITH THE RICO CLAIM THAT MATTEL

HAS TRIED TO ALLEGE IN THIS COUNTERCLAIM, AND IT'S UNDERSCORED

AS WE GO THROUGH SOME OF THESE IMPORTANT ELEMENTS OF RICO.

AS THE COURT IS AWARE, AND AS STATED VERY CLEARLY IN

THIS ODEM CASE FROM THE NINTH CIRCUIT THAT JUST CAME OUT, TO

STATE A CLAIM UNDER 1962(C), YOU HAVE TO ALLEGE THAT THE

DEFENDANT CONDUCTED AN ENTERPRISE THROUGH A PATTERN OF

RACKETEERING ACTIVITY.  IT'S AN UNAMBIGUOUS REQUIREMENT.

MATTEL HAS FAILED TO DO THIS FOR THREE REASONS.

FIRST, MATTEL HAS FAILED TO PLEAD THAT MR. BRYANT

ENGAGED IN THE REQUISITE PREDICATE ACT.  SECOND, MATTEL HAS

FAILED TO PLEAD A PATTERN OF THAT RACKETEERING ACTIVITY SUCH

THAT IT POSES A THREAT OF CONTINUING CRIMINAL ACTIVITY.  THAT'S

A REQUIREMENT OF THAT PATTERN.  AND FINALLY, MATTEL HAS FAILED

TO ALLEGE THE REQUISITE ENTERPRISE, MUCH LESS AN ENTERPRISE

THAT BRYANT DIRECTED, AND THE LAW REQUIRES THAT THEY PLEAD

FACTS TO SUPPORT THAT.

SO LET'S TAKE THIS ONE BY ONE.  AND I'M GOING TO GO

```
1    QUICKLY, BECAUSE I KNOW YOUR HONOR COVERED SOME OF THIS

2    PREDICATE ACT ISSUES BEFORE.  BUT AS TO MR. BRYANT, AND

3    FOCUSING ON THE MAIL FRAUD AND WIRE FRAUD ALLEGED PREDICATE

4    ACTS, MATTEL HAS ALLEGED NO ACTS OF MAIL FRAUD; THEY HAVEN'T

5    ALLEGED ANY SPECIFIC FACTS TO SHOW THAT MR. BRYANT USED THE          11:20

6    MAILS TO DO ANYTHING IN FURTHERANCE OF ANY KIND OF ACTIVITY.

7              THE COURT:  LET ME STOP YOU THERE FOR A SECOND.

8              THEY DON'T HAVE TO SHOW THAT EACH DEFENDANT DID ALL

9    OF THE ACTS.  THEY HAVE TO SHOW THAT THEY PARTICIPATED IN THE

10   OPERATION OF THE ENTERPRISE WHICH DID THE ACT.                       11:20

11             IT'S THE ENTERPRISE THAT DOES THE ACTS, AND THEN THE

12   INDIVIDUAL DEFENDANTS, THEY HAVE THE BURDEN OF SHOWING THAT

13   THEY PARTICIPATED IN THAT ONGOING OPERATION.

14             MS. ANDERSON:  YES, YOUR HONOR.  HOWEVER --

15             THE COURT:  NOT THAT THEY DIRECTED IT OR LEADED IT,        11:20

16   BUT THAT THEY PARTICIPATED.

17             MS. ANDERSON:  WELL, IT'S NOT BARE-BONES

18   PARTICIPATION.

19             THE COURT:  I DIDN'T SAY BARE BONES.

20             MS. ANDERSON:  IT'S A LITTLE BIT MORE THAN THAT.          11:20

21             BUT WHAT WE HAVE IS GUIDANCE FROM MATTEL'S OWN BRIEF.

22             IN THEIR OPPOSITION, FROM PAGES 5 TO 8, MATTEL TALKS

23   ABOUT WHAT THEY CLAIM ARE THE ACTS OF PARTICIPATION THAT

24   SUPPORT THEIR MAIL AND WIRE FRAUD PREDICATE ACTS.

25             THESE ARE ALL ACTS OF E-MAILING AND FAXING, ALL WIRE     11:21
```

```
1    FRAUD ALLEGATIONS.  I JUST WANT TO BE CLEAR THAT WE ARE
2    OPERATING IN THE WORLD OF ALLEGATIONS OF WIRE FRAUD WITH
3    RESPECT TO MR. BRYANT.  NOT MAIL FRAUD.
4            AS TO WIRE FRAUD, THEY HAVE TO ALLEGE INTERSTATE
5    ACTIVITY.  THEY HAVEN'T DONE IT.  THEY CAN'T DO IT.       11:21
6            THE COURT:  THESE ARE E-MAIL COMMUNICATIONS ON THE
7    INTERNET.
8            MS. ANDERSON:  YES, YOUR HONOR.
9            THE COURT:  RIGHT.
10           MS. ANDERSON:  HOWEVER, THEY'RE BETWEEN PARTICIPANTS  11:21
11   WITHIN THE STATE OF CALIFORNIA.  MR. BRYANT WAS OPERATING IN
12   CALIFORNIA AND MGA WAS IN CALIFORNIA.  THEY CAN'T ALLEGE THAT
13   ANY OF THESE COMMUNICATIONS PASSED OUTSIDE OF CALIFORNIA.  THEY
14   JUST CAN'T DO IT.  AND THEY HAVEN'T DONE IT.  AND THEY'RE
15   REQUIRED TO DO IT.  THE CASE LAW REQUIRES INTERSTATE ACTIVITY.  11:21
16   AS TO MR. BRYANT, THEY CAN'T PASS THAT FUNDAMENTAL HURDLE FOR
17   WIRE FRAUD.
18           SAME PROBLEM WITH THEIR TRAVEL ACT VIOLATION.  ASIDE
19   FROM THE FACT THAT THEY HAVEN'T ALLEGED SPECIFIC INTENT TO
20   COMMIT THE COMMERCIAL BRIBERY THAT THEY SAY IS THE FUNDAMENTAL  11:22
21   BASIS OF THEIR TRAVEL ACT CLAIM, ASIDE FROM THAT, THEY'VE
22   COMPLETELY FAILED ON THE INTERSTATE ACTIVITY PREMISE OF A
23   TRAVEL ACT VIOLATION.
24           SO ALL THEY'RE LEFT WITH IS THIS CLAIM OF CRIMINAL
25   COPYRIGHT INFRINGEMENT.  AND THAT DEFINITELY FALLS AN ITS FACE.  11:22
```

```
 1   THERE'S NO ALLEGATION THAT MR. BRYANT INFRINGED A PARTICULAR

 2   COPYRIGHT.  THE ALLEGATION IS THAT MR. BRYANT HAD A DRAWING AND

 3   AN IDEA THAT HE, ACCORDING TO MATTEL, IMPROPERLY ASSIGNED TO

 4   MGA.  THAT'S THE ALLEGATION.

 5          THE COURT:  GET TO THIS ISSUE OF -- I UNDERSTAND THAT    11:22

 6   THERE ARE GOING TO BE CERTAIN THINGS OR CERTAIN ASPECTS OF THIS

 7   RICO ENTERPRISE, AS ALLEGED BY MATTEL, THAT MR. BRYANT IS NOT

 8   GOING TO BE DIRECTLY, PERSONALLY INVOLVED IN.  AND MAYBE I'M

 9   MISTAKEN ON THIS, BUT IT'S MY UNDERSTANDING THAT THE PLAINTIFF

10   DOES NOT NEED TO SHOW -- MATTEL DOES NOT NEED TO SHOW THAT HE    11:23

11   WAS PERSONALLY, DIRECTLY INVOLVED IN EACH ONE OF THESE ACTS.

12          MS. ANDERSON:  WELL, THEY HAVE TO SHOW THAT

13   MR. BRYANT CONDUCTED THE AFFAIRS THROUGH THE PATTERN OF

14   RACKETEERING ACTIVITY.  AT A MINIMUM, THEY HAVE TO SHOW TWO

15   PREDICATE ACTS BY MR. BRYANT.  AND FRANKLY, THAT OFTEN IS NOT    11:23

16   ENOUGH.  AND I'M GOING TO GET TO THAT IN A MINUTE AS TO WHY

17   THAT'S NOT ENOUGH.

18          THE COURT:  WELL, IS IT TWO PREDICATE ACTS BY

19   MR. BRYANT OR HIS INVOLVEMENT OR PARTICIPATION IN TWO PREDICATE

20   ACTS?                                                           11:23

21          MS. ANDERSON:  THAT HE COMMITTED AND PARTICIPATED IN

22   THOSE ACTS.

23          AND YOUR HONOR MIGHT BE REFERRING TO THE CONSPIRACY.

24   THEY ALSO HAVE A -- -

25          THE COURT:  NO, I'M NOT GOING THERE.  THAT'S A           11:23
```

 1     SEPARATE ISSUE.

 2             MS. ANDERSON:  OKAY.

 3             NOW, AS FAR AS THIS CRIMINAL COPYRIGHT INFRINGEMENT,

 4     THAT FAILS ON ITS FACE.  THEY HAVE TO PLEAD THAT MR. BRYANT

 5     COMMITTED COPYRIGHT INFRINGEMENT WILLFULLY; THAT HE                    11:23

 6     INTENTIONALLY KNEW THAT THERE WAS A COPYRIGHT OUT THERE THAT HE

 7     WAS PURPOSELY INFRINGING UPON.

 8             THEY CAN'T ALLEGE THAT.  AT THE TIME THAT MR. BRYANT

 9     COMMITTED THE ACTS THAT THEY CLAIM ARE WRONGFUL HERE, NAMELY

10     ASSIGNING RIGHTS TO THE BRATZ IDEA TO MGA, THEY HADN'T EVEN           11:24

11     REGISTERED A COPYRIGHT.  IT DIDN'T EVEN EXIST.

12             THIS IS SORT OF A TAG-ALONG IDEA -- AND I SUPPOSE

13     BECAUSE THEY HAVE ALLEGED IT AGAINST MGA IN RELATION TO THE

14     CREATION OF THE BRATZ DOLLS, MAYBE THEY'RE JUST LUMPING

15     MR. BRYANT IN ON THIS PARTICULAR CLAIM.  BUT THAT IS SIMPLY NOT      11:24

16     SUFFICIENT.

17             ON TOP OF THAT, YOU HAVE THE ISSUE THAT'S IDENTIFIED

18     IN THE EVERCREEK CASE, WHICH WE CITED IN OUR BRIEFS.  A

19     GOOD-FAITH DISPUTE BETWEEN LITIGANTS OVER WHO OWNS THE RIGHT TO

20     SOMETHING -- IN THAT CASE, IT WAS A TRADEMARK -- DOESN'T             11:24

21     CONVERT INTO A CRIMINAL COPYRIGHT INFRINGEMENT CLAIM.

22             THE COURT:  BUT NOW WE'RE GETTING INTO -- WE'RE

23     TALKING ABOUT WHAT THEY ALLEGE VERSUS WHAT THE EVIDENCE IS

24     GOING TO SHOW, AND THESE ARE TWO SEPARATE ISSUES.

25             MS. ANDERSON:  FAIR ENOUGH, YOUR HONOR.                      11:24

```
 1          BUT NONETHELESS, THEY HAVEN'T SURPASSED THE HURDLE
 2   FOR CRIMINAL COPYRIGHT INFRINGEMENT, REGARDLESS OF THE
 3   EVERCREEK ISSUES.
 4          SO WITHOUT PREDICATE ACTS, THAT'S ONE FLAW WITH THIS
 5   RICO CLAIM.  BUT YOU ALSO HAVE SORT OF AN OVERLAY.  EVEN IF YOU   11:25
 6   HAD ASSUMED THAT THEY HAD SUFFICIENTLY ALLEGED PREDICATE ACTS
 7   BY MR. BRYANT, THEY STILL NEED TO ALLEGE THAT THERE IS A THREAT
 8   OF CONTINUING CRIMINAL ACTIVITY POSED BY MR. BRYANT.  THAT IS
 9   SIMPLY NOT THE CASE.
10          THIS IS A CASE AS TO MR. BRYANT.  THIS IS A SITUATION   11:25
11   JUST LIKE YOU SEE IN THE MEDALLION CASE FROM THE NINTH CIRCUIT
12   AND THE R.E. DAVIS CASE FROM THE NORTHERN DISTRICT OF ILLINOIS,
13   WHICH WE CITED IN OUR PAPER.  YOU HAVE A CLAIM BY MATTEL THAT
14   THEY DON'T LIKE THIS SINGLE WRONG THAT MR. BRYANT ALLEGEDLY
15   COMMITTED.  THEY DON'T LIKE WHAT HE DID.  THEY'VE ALLEGED A   11:25
16   NUMBER OF THINGS THEY CLAIM ARE PREDICATE ACTS THAT SURROUNDED
17   THAT SINGLE WRONG.  AND IT'S A SINGLE WRONG THEY CLAIM WAS
18   SUFFERED BY A SINGLE VICTIM, NAMELY MATTEL.
19          THAT IS NOT SUPPOSED TO BE TRANSFORMED INTO A RICO
20   VIOLATION.  CASES LIKE MEDALLION AND R. E. DAVIS SAY THAT IS   11:26
21   NOT WHAT IS INTENDED BY RICO; YOU HAVE TO HAVE A PATTERN THAT
22   POSES A THREAT OF CONTINUING CRIMINAL ACTIVITY.
23          THE ALLEGATIONS ASSERTED AGAINST MR. BRYANT DON'T
24   POSE ANY THREAT OF CONTINUING ANYTHING.  THEY ARE A DISPUTE
25   ABOUT WHO OWNS THE RIGHTS TO BRATZ AND WHO OWNED THEM WHEN AND   11:26
```

```
 1   NOTHING MORE.  THEY HAVEN'T ALLEGED THAT MR. BRYANT IS OUT
 2   THERE STEALING ADDITIONAL THINGS FROM MATTEL AND COMING UP WITH
 3   NEW IDEAS THAT HE DOESN'T HAVE THE RIGHT TO.  THAT'S NOT WHAT
 4   IT'S ABOUT.  IT'S ABOUT THIS SINGLE TIME FRAME BACK IN 2000.
 5   IT DOES NOT POSE A THREAT AND THEREFORE CANNOT BE A RICO        11:26
 6   VIOLATION.
 7           NOW FINALLY GETTING TO THE ODEM CASE, THE QUESTION OF
 8   ENTERPRISE:  YES, THE ODEM CASE DID COME DOWN AND SET THE STAGE
 9   TO RESOLVE SOME CONFUSION AROUND THE ENTERPRISE ELEMENT OF RICO
10   CLAIMS.  BUT WHAT ODEM WAS REALLY CLEAR ABOUT IS IT ADOPTED THE  11:27
11   TURKET REASONING, WHICH WAS ISSUED BY THE SUPREME COURT, AND IT
12   SAID, IF YOU'RE GOING TO HAVE AN ENTERPRISE, YOU HAVE TO ALLEGE
13   AN ONGOING ORGANIZATION, BE IT FORMAL OR INFORMAL.  THAT
14   ORGANIZATION HAS TO HAVE VARIOUS ASSOCIATES THAT FUNCTION AS A
15   CONTINUING UNIT.  THE ASSOCIATES HAVE TO WORK TOGETHER FOR A     11:27
16   COMMON PURPOSE OF ENGAGING IN THE COURSE OF CONDUCT.  AND
17   FINALLY, IT HAS TO HAVE AN EXISTENCE SEPARATE AND APART FROM
18   THE PATTERN OF ACTIVITY THAT'S AT ISSUE.
19           YOU DON'T HAVE ANY ALLEGATIONS THAT WOULD SUPPORT THE
20   NOTION THAT MR. BRYANT HAD AGREED TO PARTICIPATE IN ONGOING      11:27
21   CONDUCT OF ANY CONTINUING ENTERPRISE HERE, WHICH WOULD BE
22   REQUIRED UNDER TURKET.  IT HAS BEEN ADOPTED CLEARLY BY THE ODEM
23   COURT.
24           YOU DON'T HAVE ANY EVIDENCE, EXCEPT --
25           THE COURT:  WE'RE LOOKING AT THE ALLEGATIONS HERE.       11:27
```

```
 1   WE'RE NOT REALLY LOOKING AT THE EVIDENCE, COUNSEL.

 2           MS. ANDERSON:  RIGHT.  I APOLOGIZE.  I MEANT TO SAY

 3   ALLEGATIONS.

 4           WHEN YOU'RE TALKING ABOUT THE ALLEGATIONS IN THIS

 5   CASE, YOU'RE TALKING ABOUT ALLEGATIONS MADE BY MATTEL.  THERE      11:28

 6   ARE A BUNCH OF THINGS THAT THEY DON'T LIKE THAT MGA DID.  SOME

 7   OF THEM RELATE TO THE BRYANT CASE; SOME OF THEM RELATE TO OTHER

 8   THINGS.

 9           WHAT MATTEL WOULD HAVE THE COURT BELIEVE IS THAT THEY

10   HAVE SORT OF A COMMERCIAL DISPUTE WITH A COMPETITOR AND ALL OF     11:28

11   THESE THINGS THEY DON'T LIKE, THEY'VE LINED UP, AND THEN THEY

12   SAID, ALL OF YOU TOGETHER ARE PART OF AN ENTERPRISE.

13           THAT'S NOT SUFFICIENT, BECAUSE YOU DON'T SHOW ANY

14   CONTINUITY; YOU DON'T SHOW ANY ASSOCIATION FOR THE COMMON

15   PURPOSE; YOU DON'T SHOW ANY ALLEGATIONS THAT MR. BRYANT AGREED     11:28

16   TO PARTICIPATE IN ANY SUCH THING.

17           THE COURT:  I DON'T KNOW WHAT THEY SHOW OR DON'T

18   SHOW, BUT THEY HAVE MADE THOSE ALLEGATIONS THAT THAT'S

19   PRECISELY WHAT'S GOING ON.

20           MS. ANDERSON:  WELL, THEY CERTAINLY HAVE ALLEGED, IN       11:28

21   A CONCLUSORY FASHION, THAT THEY'VE MET THE ELEMENTS.  THEY

22   ALLEGED THAT AT THE END OF THE COMPLAINT.  BUT CONCLUSORY

23   ALLEGATIONS AREN'T ENOUGH WHEN YOU'RE TALKING ABOUT

24   TRANSFORMING A SIMPLE COMMERCIAL DISPUTE ABOUT MR. BRYANT'S

25   RIGHTS INTO A GRAND RICO CONSPIRACY, WHICH IS WHAT THEY'RE         11:29
```

1  TRYING TO DO HERE.

2          THE COURT:  FAIR ENOUGH.

3          MS. ANDERSON:  AND THE CONTINUING UNIT ASPECT OF THE

4  TURKET RULE FOR WHEN YOU HAVE AN ENTERPRISE SIMPLY ISN'T MET.

5          AND FINALLY, EVEN IF YOU COULD POINT TO ALLEGATIONS       11:29

6  IN THAT COMPLAINT THAT WOULD SUPPORT THE NOTION THAT THERE WAS

7  AN ENTERPRISE PLED HERE, AS TO MR. BRYANT YOU MUST HAVE

8  ALLEGATIONS THAT SHOW THAT HE PARTICIPATED IN THE DIRECTION OF

9  THAT ENTERPRISE.  NOT THAT HE SIMPLY DID SOMETHING ANCILLARY

10  THAT RELATED IN SOME WAY TO THE ENTERPRISE.  THEY HAVE TO SHOW     11:29

11  ALLEGATIONS THAT HE DIRECTED THE CRIMINAL ENTERPRISE THAT THEY

12  CLAIM EXISTED.  AND THAT'S TRUE UNDER EVERY SINGLE ONE OF THE

13  CASES THAT MATTEL HAS CITED, INCLUDING REEVES AND THE SEGO

14  CABLE CASE.  ALL OF THEM REQUIRE -- THERE HAS TO BE SOME

15  ALLEGATION THAT HE DIRECTED THE AFFAIRS OF THAT --               11:29

16          THE COURT:  WHAT DO YOU MEAN BY "DIRECTED THE

17  AFFAIRS"?  YOU ALMOST SEEM TO BE SUGGESTING THAT HE HAS TO

18  CONTROL OR LEAD THE --

19          MS. ANDERSON:  HE CERTAINLY DOESN'T HAVE TO BE THE

20  HEAD OF THE ORGANIZATION, OR EVEN A CORPORATE EXECUTIVE, BUT     11:30

21  YOU HAVE TO HAVE AN ALLEGATION THAT HE DIRECTED THE AFFAIRS,

22  EVEN IF HE WAS ONLY ONE OF MANY THAT DID.  HE STILL HAS TO HAVE

23  DONE IT.

24          AND THAT'S NOT ALLEGED.  HE WASN'T EVEN AN EMPLOYEE

25  OF MGA DURING THE TIME PERIOD THAT THEY'RE ALLEGING IS AT ISSUE  11:30

```
1   HERE.  HE'S AN INDEPENDENT CONTRACTOR.  SO THEY CAN'T ALLEGE
2   DIRECTION.  THEY CAN'T EVEN ALLEGE HE'S AN EMPLOYEE.  THEY
3   ALLEGE HE IS SOMEBODY WHO DID THINGS -- AT BEST, IN THEIR
4   COMPLAINT, THEY'RE ALLEGING THAT HE'S SOMEONE THAT DID THINGS
5   THAT SUPPORTED IN SOME WAY WHAT ULTIMATELY HAPPENED IN REGARD     11:30
6   TO THESE ALLEGATIONS.  THEY NEVER ALLEGE ANYTHING THAT WOULD
7   SUPPORT THAT HE DIRECTED THE AFFAIRS.
8           SO THOSE WERE THE THREE ISSUES RELATING TO THE
9   1962(C) CLAIM AS TO CONSPIRACY.
10          UNDER THE BALMER CASE, YOU HAVE TO HAVE ALLEGATIONS     11:31
11  THAT SUPPORT THAT THE DEFENDANT ACTUALLY REACHED TWO
12  AGREEMENTS.  THE FIRST IS, YOU HAVE TO PLEAD FACTS TO SHOW THAT
13  THE DEFENDANT AGREED TO CONDUCT OR PARTICIPATE IN THE AFFAIRS
14  OF THE ENTERPRISE.
15          AGAIN, THAT GOES BACK TO THIS WHOLE REEVES STANDARD.     11:31
16          AND SECOND, YOU HAVE TO ALLEGE THAT THE DEFENDANT
17  AGREED TO COMMIT TWO PREDICATE ACTS.  THEY HAVEN'T ALLEGED
18  EITHER OF THOSE THINGS YET.  AND BECAUSE OF THAT, THEIR
19  CONSPIRACY CLAIM CAN'T HOLD.
20          EVEN MATTEL ADMITS IN THEIR OWN PAPERS, TO              11:31
21  SUFFICIENTLY PLEAD SUCH A CLAIM FOR CONSPIRACY AGAINST
22  MR. BRYANT, THEY SAY THEY HAVE TO ALLEGE THAT HE KNOWINGLY
23  AGREED TO FACILITATE A SCHEME WHICH INCLUDES THE OPERATION OR
24  MANAGEMENT OF A RICO ENTERPRISE.
25          THEY HAVEN'T DONE IT UNDER BALMER.  THEY SIMPLY         11:31
```

```
1    HAVEN'T ALLEGED THOSE FACTS, BECAUSE THEY ALL, AGAIN, TURN ON

2    THIS WHOLE REEVES ISSUE REGARDING DIRECTION.

3              AND AS FAR AS THE OTHER ASPECT OF MR. BRYANT'S MOTION

4    TO DISMISS, WHICH IS TO DISMISS THE DUPLICATIVE CLAIMS -- I

5    DON'T KNOW IF THE COURT WANTS TO ADDRESS THEM NOW.          11:32

6              THE COURT:  GO AHEAD AND DO IT NOW.

7              THESE ARE THE STATE CLAIMS?

8              MS. ANDERSON:  YES.

9              THIS IS A STRAIGHTFORWARD ISSUE.

10             THE CLAIMS ARE DUPLICATIVE.  AND MR. BRYANT, UNDER    11:32

11   THE LAW, SHOULD NOT AND CANNOT BE HELD TO DEFEND AGAINST THE

12   SAME CLAIMS BROUGHT BY THE SAME PARTY IN THE SAME COURT AT THE

13   SAME TIME.

14             THE COURT:  THESE ARE THE CLAIMS THAT WILL MOST

15   LIKELY BE ADDRESSED IN THE FIRST TRIAL THAT WE HAVE?          11:32

16             MS. ANDERSON:  BASED ON WHAT I UNDERSTOOD YOUR HONOR

17   HAS SAID IN THE PAST, YES.

18             THE COURT:  I TEND TO AGREE.

19             MS. ANDERSON:  THAT'S ALL, YOUR HONOR.

20             THE COURT:  VERY WELL.                               11:32

21             MS. ANDERSON:  THANK YOU.

22             THE COURT:  I'LL HEAR FROM MATTEL.

23             MR. QUINN:  THANK YOU, YOUR HONOR.

24             PERHAPS I'LL BEGIN WHERE COUNSEL LEFT OFF, WITH THE

25   DISCUSSION OF THE CONSPIRACY COUNT, AND THEN TRY TO WORK      11:33
```

```
 1   BACKWARDS AS BEST I CAN.

 2           THE COURT:  OKAY.

 3           MR. QUINN:  WE READ THE BALMER CASE QUITE A BIT

 4   DIFFERENTLY.

 5               ACTUALLY, IN THE PAPERS FILED BY DEFENDANT, THEY    11:33

 6   PURPORT WITH A LENGTHY QUOTATION, WHICH THEY INDICATE IS FROM

 7   THE BALMER CASE.  I ACTUALLY THINK THAT'S FROM AN INTERNAL

 8   QUOTATION FROM A SEVENTH CIRCUIT CASE.  THEY'RE NOT ACTUALLY

 9   QUOTING THE BALMER DECISION, WHICH IS THE NINTH CIRCUIT

10   DECISION.                                                       11:33

11           WHAT THE NINTH CIRCUIT ACTUALLY DECIDED IN THE BALMER

12   CASE IS THAT FOR SOMEONE TO BE LIABLE FOR CONSPIRACY, THEY

13   DON'T HAVE TO AGREE TO ACTUALLY PARTICIPATE IN OR TO ENGAGE IN,

14   IN ANY FASHION, OR ENDORSE THE INDIVIDUAL PREDICATE ACTS.

15           WHAT THE NINTH CIRCUIT SAID IN BALMER -- AND I'LL       11:33

16   QUOTE THE DECISION NOW AT 1346 -- IS, I THINK, TO THE CONTRARY.

17   THE COURT SAID, AND I QUOTE, "PROOF OF AN AGREEMENT WHICH IS A

18   SUBSTANTIVE VIOLATION OF RICO, SUCH AS CONDUCTING THE AFFAIRS

19   OF AN ENTERPRISE THROUGH A PATTERN OF RACKETEERING, IS

20   SUFFICIENT TO ESTABLISH A VIOLATION OF SECTION 1962(D), THE     11:34

21   CONSPIRACY COUNT.  IT IS ONLY WHEN PROOF OF SUCH AN OBJECTIVE

22   IS LACKING THAT THE EVIDENCE MUST ESTABLISH THE DEFENDANT'S

23   PARTICIPATION OR AGREEMENT TO PARTICIPATE IN TWO PREDICATE

24   OFFENSES."

25           SO FOR THE REASONS I'M GOING TO DISCUSS, I THINK WE     11:34
```

```
 1   HAVE PLEADED SUBSTANTIVE RICO VIOLATIONS AGAINST EACH OF THE

 2   DEFENDANTS; SO THE PREDICATE FOR THIS ARGUMENT THAT THE

 3   CONSPIRACY CLAIM FALLS WITH THE INDIVIDUAL SUBSTANTIVE RICO

 4   CLAIMS, I DON'T THINK THE COURT IS GOING TO HAVE TO REACH.  BUT

 5   I THINK AS A MATTER OF LAW, IF A PARTY HAS ENTERED INTO AN        11:34

 6   AGREEMENT WHICH IS A SUBSTANTIVE VIOLATION OF RICO, YOU DON'T

 7   ACTUALLY HAVE TO HAVE THE AGREEMENT TO THE INDIVIDUAL PREDICATE

 8   OFFENSES.

 9        THE COURT:  OTHERWISE, THERE WOULDN'T BE TOO MUCH

10   LEFT FOR THE NOTION OF CONSPIRACY.                               11:34

11        MR. QUINN:  YES.  I THINK THAT'S ANOTHER ISSUE.

12        COUNSEL WAS QUITE EMPHATIC THAT WE REALLY WOULD HAVE

13   TO PLEAD THAT MR. BRYANT DIRECTED THE AFFAIRS OF THE

14   ENTERPRISE, AND I REALLY DON'T THINK THAT'S WHAT THE LAW IS.

15        THE COURT:  MR. QUINN, WHAT IS YOUR ALLEGATION?  WHAT      11:35

16   DID HE DO?  HOW DID HE PARTICIPATE?

17        MR. QUINN:  HE PARTICIPATED -- I MEAN, WE ALLEGE THAT

18   THERE WAS MATTEL PROPERTY, WHICH HE APPROACHED MGA WITH AND

19   SAID, "I'VE GOT THIS IDEA.  ARE YOU INTERESTED?"  WHILE HE'S

20   STILL EMPLOYED BY MGA.                                           11:35

21        MGA WAS INTERESTED; THEY ENTERED INTO AN AGREEMENT,

22   WHERE THEY IMMEDIATELY STARTED MAKING PAYMENTS TO HIM, MULTIPLE

23   PAYMENTS, WHILE HE'S STILL EMPLOYED BY MATTEL.

24        HE THEN USED MATTEL EMPLOYEES AND RESOURCES TO BEGIN

25   TO MAKE A PROTOTYPE AND ACTUALLY HELPED THEM BEGIN THE PROCESS   11:35
```

```
 1   OF DEVELOPING AND PRODUCING THIS DOLL, ALBEIT AT A VERY EARLY

 2   STAGE.

 3           THE COURT:  AND I GUESS WHAT I'M ASKING HERE IS NOT

 4   HOW DID HE USE THOSE EMPLOYEES, BUT HOW WAS HIS ROLE -- I HATE

 5   TO USE CRIMINAL LANGUAGE IN THIS, BUT WHAT WAS HIS ROLE IN THE      11:36

 6   OFFENSES, AS IT WOULD BE, AS WE WOULD SAY, UNDER THE SENTENCING

 7   GUIDELINES?  WHAT WAS HIS LEADERSHIP ROLE, IF ANY?

 8           MR. QUINN:  I DON'T KNOW THAT -- I MEAN, HE WAS

 9   CERTAINLY A KEY PLAYER, AND I THINK THE ALLEGATIONS SHOW THAT

10   HE WAS A LEADER IN THE SENSE THAT HE'S THE ONE WHO HAD THIS         11:36

11   MATTEL PROPERTY; HE TOOK IT TO MGA.  IN THAT SENSE, HE'S A

12   LEADER.

13           HE'S ALSO A LEADER IN THAT HE'S THE ONE WHO SHOWED

14   THEM HOW TO DEVELOP IT.  HE'S THE ONE WHO GOT THEM THE HAIR

15   SAMPLES.  HE'S THE ONE WHO CAME UP WITH THE FIRST PROTOTYPE.        11:36

16   HE'S THE ONE WHO CAME UP WITH THE PERSON WHO DID THE FIRST HEAD

17   SCULPT.  ALL OF THESE THINGS WHILE HE'S STILL EMPLOYED BY

18   MATTEL.

19           BUT, YOUR HONOR, I DON'T THINK WE HAVE TO SHOW THAT

20   HE'S A LEADER IN THE SENSE THAT HE'S IN THE MIDDLE OF THE WEB       11:37

21   OR HE'S A DIRECTOR OF THE ENTERPRISE.  I THINK THAT NOTION IS

22   PRETTY CLEARLY DEALT WITH BY THE U.S. SUPREME COURT IN THE

23   RIVAS CASE, WHERE THE COURT SPECIFICALLY ADDRESSED THE ISSUE

24   ABOUT, DOES IT HAVE TO BE -- AND I CAN'T REMEMBER IF IT WAS

25   DIRECTOR OR LEADER -- BUT WHAT THE STATUTE SAYS IS THAT YOU        11:37
```

```
 1   HAVE TO PARTICIPATE IN THE AFFAIRS OF AN ENTERPRISE, AND THE
 2   COURT SORT OF DISSECTS THE CONCEPT OF PARTICIPATION AND GETS
 3   OUT THE DICTIONARY AND CONCLUDES THE LOWER RUNG -- AND THOSE
 4   ARE THE ACTUAL PHRASES THAT ARE USED IN THE SUPREME COURT'S
 5   OPINION -- A LOWER RUNG PARTICIPANT CAN BE LIABLE FOR A          11:37
 6   VIOLATION OF RICO.
 7        SO I REALLY DON'T THINK THERE'S ANY SUPPORT FOR THE
 8   NOTION THAT IT MUST BE SHOWN THAT MR. BRYANT WAS A DIRECTOR,
 9   ALTHOUGH, INDEED, I THINK HE WAS A VERY KEY PARTICIPANT.
10        I DO BELIEVE THAT THE ODEM CASE LAID TO REST ANY          11:37
11   ISSUE ABOUT WHETHER THERE WAS SUFFICIENT STRUCTURE OR
12   CONTINUITY ALLEGED IN THE PLEADINGS.  WE HAD RELIED INITIALLY
13   IN THE PLEADINGS, BEFORE THE ODEM CASE CAME OUT, WITH THE NINTH
14   CIRCUIT AUTHORITY SAYING, IF YOU HAVE A CORPORATE PARTICIPANT
15   IN THE ENTERPRISE -- WE UNDERSTAND THE CORPORATION ITSELF CAN'T  11:38
16   BE THE ENTERPRISE; YOU HAVE TO HAVE SOME SEPARATENESS -- BUT IF
17   YOU HAVE A CORPORATE PARTICIPANT, ANY ENTERPRISE, THAT ALONE
18   PROVIDED SUFFICIENT STRUCTURE AND CONTINUITY.
19        THE COURT:  I AGREE.
20        MOVE ON TO THE TRADE SECRETS AND THE ARGUMENTS             11:38
21   CONCERNING THE TRADE SECRETS, PARTICULARLY THE OBJECTION THAT
22   THE PROCTOR DECLARATION HAS THESE 13,000 DOCUMENTS.  LET'S MOVE
23   BEYOND RICO ENTERPRISE.  I UNDERSTAND YOUR ARGUMENT THERE.
24        I'M SOMEWHAT CONCERNED ABOUT THIS ARGUMENT THAT -- I
25   HAVEN'T SEEN THE 13,000 DOCUMENTS, NOR DO I REALLY WANT TO AT    11:38
```

```
 1   THIS STAGE, THAT YOU ALLEGE ARE THE TRADE SECRETS.  COUNSEL IS

 2   SUGGESTING THAT IT'S JUST TOO OVERWHELMING IN TERMS OF BEING

 3   ABLE TO DECIPHER EXACTLY WHAT THESE TRADE SECRETS ARE THAT

 4   YOU'RE ALLEGING.

 5        MR. QUINN:  WELL, WE AGREE WITH COUNSEL THAT THE        11:39

 6   TRADE SECRETS VIOLATION, IN AND OF ITSELF, IS NOT A PREDICATE

 7   RICO ACT.  WHAT WE ARE SAYING IS THAT THERE WAS SPECIFIC MATTEL

 8   PROPERTY -- WE'VE BEEN TALKING MOSTLY ABOUT BRATZ, BUT WE'VE

 9   REFERRED ALSO TO OTHER DOCUMENTS.  THERE'S NO SECRET, YOUR

10   HONOR, THAT MEXICAN AUTHORITIES SEIZED THOUSANDS OF PAGES OF   11:39

11   DOCUMENTS THAT WERE IN THE CUSTODY OF FORMER MATTEL EMPLOYEES

12   WHO STARTED UP AN MGA MEXICO FACILITY.

13        THE COURT:  SHE'S SAYING, LOOKING AT THESE 13,000

14   DOCUMENTS, IF THAT'S WHAT THEY ARE, SHE CAN'T DETERMINE IF

15   THESE ARE -- HOW DOES SHE KNOW THAT THESE ARE TRADE SECRETS?   11:39

16   WHAT ARE THESE THAT SHE'S LOOKING AT?  WHAT MAKES THEM A TRADE

17   SECRET?

18        MR. QUINN:  WELL, THERE'S, OF COURSE, A STATE LAW

19   DEFINITION, WHICH IS VERY BROAD, BUT ANY INFORMATION HAVING

20   INDEPENDENT ECONOMIC VALUE, BY REASON OF IT NOT BEING GENERALLY 11:39

21   KNOWN, IS A TRADE SECRET.

22        THE COURT:  FAIR ENOUGH.

23        BUT HOW IS THE DEFENSE TO KNOW, WHEN THEY LOOK AT A

24   DOCUMENT, THAT THIS IS A TRADE SECRET AND WHAT THIS IS?  I

25   MEAN, WE'RE TALKING JUST IN TERMS OF BEING ABLE TO PREPARE A    11:40
```

```
 1    RESPONSE TO THIS.

 2           MR. QUINN:  WELL, FOR PURPOSES OF PREPARING A

 3    RESPONSIVE PLEADING, I DON'T THINK THEY HAVE TO KNOW WHAT EVERY

 4    SINGLE INDIVIDUAL TRADE SECRET IS.  THE STATUTE THAT THEY

 5    RELY ON -- AND THIS IS KIND OF IRONIC, BECAUSE EVEN IN              11:40

 6    CALIFORNIA STATE COURT, THE STATUTE THEY RELY ON IS NOT A

 7    PLEADING STANDARD.  I TRUST THE COURT APPRECIATES THAT.

 8           WHAT IT SAYS IS, IN A TRADE SECRETS CASE, A PLAINTIFF

 9    CANNOT COMMENCE DISCOVERY UNTIL THEY'VE IDENTIFIED, WITH

10    REASONABLE PARTICULARITY, THE TRADE SECRETS AT ISSUE.            11:40

11           EVEN IN CALIFORNIA, THAT'S NOT A PLEADING ISSUE, IT'S

12    NOT A PLEADING REQUIREMENT, THAT IN ADVANCE YOU IDENTIFY WHAT

13    THE TRADE SECRETS ARE.

14           THE COURT:  BUT THE TIME HAS COME FOR YOU TO SO

15    IDENTIFY, COUNSEL.                                               11:41

16           MR. QUINN:  YES, YOUR HONOR.  AND BELIEVE ME, THERE

17    IS A LOT OF DISCOVERY.  DISCOVERY IS GOING HOT AND HEAVY, YOUR

18    HONOR.

19           AND IN A SENSE, I'M ALMOST INCLINED TO SAY, IT'S

20    REALLY NOT A GREAT DEFENSE TO A TRADE SECRETS CLAIM TO SAY,      11:41

21    THERE'S SUCH A VOLUME THAT WE TOOK THAT WE DON'T KNOW -- YOU

22    KNOW, WE NEED YOU TO PARTICULARIZE IT.  I MEAN, IT'S A FACT.

23    WE ALLEGE THAT A THUMBNAIL -- WHAT DO YOU CALL THEM? -- A

24    MEMORY DEVICE UP IN CANADA WAS TAKEN.  THERE WAS AN EXECUTION

25    OF A SEARCH WARRANT IN MEXICO.  LITERALLY, THOUSANDS OF         11:41
```

1   DOCUMENTS WERE FOUND IN THE HANDS OF MGA EMPLOYEES.

2        THE COURT:  BUT JUST BECAUSE THE DOCUMENTS OR THE

3   INFORMATION ON A THUMB DRIVE IS INFORMATION WHICH BELONGS TO

4   ANOTHER CORPORATION DOES NOT MAKE IT A TRADE SECRET.

5        MR. QUINN:  NO.  THAT'S TRUE, YOUR HONOR.                    11:41

6        WHAT WE HAVE DONE IS, WE'VE IDENTIFIED THEM BY

7   SPECIFIC BATES PAGE NUMBERS, WHICH IS MORE THAN YOU OFTEN GET

8   IN TRADE SECRETS CASES.  I MEAN, YES, THERE'S A LARGE VOLUME OF

9   THEM.  SOME OF THIS LENDS ITSELF TO AN EASY SORT OF MOCKING.

10       COUNSEL JUST SAID, WELL, ONE OF THESE DOCUMENTS WAS        11:42

11  FROM A THIRD PARTY, GIVING SOME SPECIFICATIONS OR INFORMATION.

12  WELL, THE FACT OF THE MATTER IS, WE BELIEVE THE EVIDENCE WILL

13  SHOW THAT THE THIRD PARTY WAS ENGAGED BY MATTEL TO DO SOME

14  CONFIDENTIAL AND PROPRIETARY WORK FOR MATTEL, AND THAT

15  INFORMATION THAT WAS DEVELOPED BY THE THIRD PARTY WAS, IN FACT,  11:42

16  CONFIDENTIAL TRADE SECRET INFORMATION.

17       BUT I THINK A LOT OF THIS HAS GOT TO BE SORTED OUT

18  IN, PERHAPS, THE CUMBERSOME PROCESS OF DISCOVERY.  I DON'T

19  THINK AT THE PLEADING STAGE, WE SHOULD BE WORRYING ABOUT DOING

20  ANY MORE THAN WHAT WE'VE DONE AT THIS POINT, WHERE WE'VE GIVEN   11:42

21  THEM A LIST OF DOCUMENTS AND BATES NUMBERS.

22       AGAIN, I THINK THAT'S AN AWFUL LOT MORE THAN WHAT

23  USUALLY --

24       THE COURT:  THIS IS NOT JUST THE SUFFICIENCY OF THE

25  PLEADINGS RIGHT NOW.  MY CONCERN IS ALSO CASE MANAGEMENT AND     11:42

```
 1   GETTING THIS CASE TO TRIAL NEXT YEAR.

 2           MR. QUINN:  BELIEVE ME, YOUR HONOR, I SHARE THAT VERY

 3   CONCERN MYSELF.  I WON'T LIFT THE HOOD, BECAUSE I'M SURE THAT

 4   THE COURT DOESN'T WANT TO GET INTO RIGHT NOW WHAT'S GOING ON IN

 5   DISCOVERY.  BUT BOTH SIDES, I'M SURE, WOULD TELL THE COURT THAT    11:43

 6   THEY ARE FACING SOME CHALLENGES IN TRYING TO GET TO THE BOTTOM

 7   OF THOSE ISSUES.

 8           I MEAN, THE COURT MAY RECALL, MGA ALSO HAS A CLAIM

 9   AGAINST MATTEL FOR THEFT OF TRADE SECRETS; SO IN SOME RESPECTS,

10   WE COULD BE UP HERE MAKING A SHOE-ON-THE-OTHER-FOOT TYPE          11:43

11   ARGUMENT.  BUT I THINK THAT'S GOING TO HAVE TO BE SORTED OUT IN

12   THE ROUGH AND TUMBLE OF DISCOVERY.  IT IS SOMETHING THAT,

13   INDEED, WILL HAVE TO BE SORTED OUT.  THERE HAVE BEEN I DON'T

14   KNOW HOW MANY HEARINGS BEFORE JUDGE INFANTE ON DISCOVERY

15   MATTERS.  I DON'T KNOW IF JUDGE INFANTE HAS GRANDCHILDREN WHO     11:43

16   NEED TO GO TO COLLEGE, OR...

17           THE COURT:  NOW, NOW.

18           MR. QUINN:  WE'RE ALL DOING OUR PART, YOUR HONOR.

19           THE COURT:  I UNDERSTAND.  ALL RIGHT.

20           WE'LL DISCUSS JUDGE INFANTE'S ORDER IN A FEW MOMENTS.     11:43

21           IS THERE ANYTHING FURTHER ON THESE FIRST TWO MOTIONS?

22           MR. QUINN:  NOT UNLESS THE COURT HAS ANY QUESTIONS.

23           THE COURT:  VERY WELL.

24           LET'S GO TO MGA MEXICO'S MOTION TO DISMISS ON

25   PERSONAL JURISDICTION.                                           11:44
```

```
 1              MR. OLSON:  THANK YOU, YOUR HONOR.

 2              THE COURT:  I HAVE LITERALLY 36 PAGES HERE OF

 3   TYPEWRITTEN NOTES FROM ALL OF THE DOCUMENTS.

 4              MR. OLSON:  I CAN IMAGINE.

 5              THE COURT:  FIRST OF ALL, MR. LARIAN'S ROLE IS WHAT?      11:44

 6              MR. OLSON:  WITH RESPECT TO MGA MEXICO?

 7              THE COURT:  YES.

 8              MR. OLSON:  NOTHING.  HE, AT ONE POINT IN TIME, WAS A

 9   MANAGING DIRECTOR OF MGA MEXICO IN TITLE.

10              THE COURT:  IN TITLE, BUT NOT IN REALITY?               11:44

11              MR. OLSON:  IN TITLE.  AND THAT IS, UNDER MEXICAN

12   LAW, YOUR HONOR, YOU'RE REQUIRED TO HAVE AT LEAST ONE MANAGING

13   DIRECTOR, I THINK IS THE TERM.  I MAY BE USING IT WRONG.

14              THE COURT:  SO YOUR POSITION IS, THAT DESPITE BEING A

15   MANAGING DIRECTOR IN TITLE, HE NEVER SPOKE FOR MGA MEXICO?        11:45

16              MR. OLSON:  YOUR HONOR, IT'S AKIN TO BEING A MEMBER

17   OF A BOARD OF DIRECTORS.  IT'S SOMETHING YOU'RE REQUIRED TO

18   HAVE TO START A CORPORATION.

19              SO MY ARGUMENT ON THAT POINT WOULD BE, IF THAT WAS

20   THE CASE, THAT ALONE SUFFICED FOR PERSONAL JURISDICTION, THEN    11:45

21   THE SUBSIDIARIES WOULD ALWAYS BE SUBJECT TO JURISDICTION.

22              THE COURT:  WELL, NOT ALONE, BUT WHEN THAT IS COUPLED

23   WITH ACTIONS WHICH DO SEEM TO HAVE BEEN TAKEN, OR AT LEAST

24   ALLEGEDLY, ON BEHALF OF MGA MEXICO.

25              MR. OLSON:  WHAT ACTIONS ARE YOU REFERRING TO WITH     11:45
```

```
 1   RESPECT TO MR. LARIAN, YOUR HONOR?

 2        THE COURT:  IT'S YOUR POSITION HE NEVER TOOK ANY

 3   ACTION ON BEHALF OF MGA MEXICO?

 4        MR. OLSON:  WELL, IT'S NOT THAT HE NEVER TOOK ANY

 5   ACTION.  I MEAN, THERE ARE THESE SORT OF REGULAR COMMUNICATIONS   11:45

 6   THAT WOULD OCCASIONALLY -- ORDINARY COMMUNICATIONS THAT WOULD

 7   OCCUR BETWEEN THE PARENT CORPORATION AND THE SUBSIDIARIES.  AND

 8   ONE OF THOSE WAS ACTUALLY HIRING THE THREE INDIVIDUALS.  AND

 9   THERE'S A FOURTH, SUZANNA COOMERLY, WHO, ACTUALLY, THOSE THREE

10   REPORT TO.  AND SO HE WAS INVOLVED, ABSOLUTELY.                  11:46

11        THE COURT:  SO HE'S NOT JUST A FIGUREHEAD ON PAPER,

12   BUT HE ACTUALLY DID HAVE SOME INVOLVEMENT WITH MGA MEXICO?

13        MR. OLSON:  PARTICULARLY AT THE BEGINNING.  HE HELPED

14   CREATE MGA MEXICO.  I DON'T WANT TO, IN ANY WAY, MISLEAD THE

15   COURT ABOUT THAT.                                               11:46

16        BUT MY POINT IS THAT CANNOT BE ENOUGH FOR

17   JURISDICTION.  OTHERWISE, THE WHOLE LINE OF CASES IN THE NINTH

18   CIRCUIT AND ELSEWHERE WOULD SHOW THAT APPEARANCE, PRESENCE IN

19   THE FORM, IS NOT ENOUGH TO ESTABLISH JURISDICTION.  OTHERWISE,

20   THAT WHOLE LINE OF CASES WOULD BE FOR NAUGHT.  BECAUSE IT'S     11:46

21   HARD TO IMAGINE HOW YOU START A SUBSIDIARY WITHOUT THAT SORT OF

22   BASIC, ORDINARY CONTACT AT THE BEGINNING.  YOU CAN'T JUST HAVE

23   SOMEONE ON THE STREET IN MEXICO ALL OF A SUDDEN START THIS OUT

24   OF NOWHERE.

25        THE COURT:  LET'S PUT MR. LARIAN ASIDE, THEN.             11:46
```

JUNE 11, 2007                    BRYANT V MATTEL

```
 1              WHAT ABOUT MGA MEXICO ITSELF AS AN ENTITY AND THEIR

 2    INTERACTION WITH MATTEL IN CALIFORNIA?

 3              MR. OLSON:  WITH MGA IN CALIFORNIA?

 4              THE COURT:  WITH MGA, AND WITH MATTEL.

 5              MR. OLSON:  WITH RESPECT TO MGA, I WOULD CHARACTERIZE        11:47

 6    IT AS THE ORDINARY COMMUNICATIONS THAT WOULD OCCUR BETWEEN A

 7    SUBSIDIARY AND A PARENT.

 8              MGA MEXICO CONDUCTS NO SALES IN THE UNITED STATES.

 9    THEY BUY NO PRODUCTS FROM THE UNITED STATES.

10              THE COURT:  BUT IN THE LIGHT OF THE ALLEGATIONS THAT        11:47

11    ARE MADE, MGA MEXICO WAS PLAYING AN ALLEGED ROLE IN THIS

12    CONSPIRACY TO BASICALLY HURT MATTEL AND BENEFIT MGA.

13              MR. OLSON:  WELL --

14              THE COURT:  THAT WAS AIMED AT MATTEL.  AND IT'S NO

15    SECRET THAT MATTEL OPERATES OUT OF CALIFORNIA.  IT'S ALLEGED TO      11:47

16    BE AN INTENTIONAL ACT.  I DON'T UNDERSTAND WHY THIS IS NOT

17    EXPRESSED --

18              MR. OLSON:  BECAUSE, YOUR HONOR, IF ANYTHING, IT WAS

19    AIMED AT MATTEL MEXICO, NOT MATTEL U.S.

20              THIS WHOLE CASE, THIS WHOLE ISSUE, IS WHAT I WOULD         11:47

21    CHARACTERIZE AS A SIDESHOW BETWEEN TWO SUBSIDIARIES.  THE

22    WITNESSES ARE IN MEXICO.  THE DOCUMENTS ARE IN MEXICO.  MOST OF

23    THEM ARE IN SPANISH.  THE ALLEGED ACTS OCCURRED IN MEXICO.

24    MEXICAN LAW AND CUSTOM WOULD BE AT ISSUE WITH RESPECT TO

25    WHETHER OR NOT A THEFT OF TRADE SECRETS TOOK PLACE OR WHETHER       11:48
```

```
1    OR NOT, AS MR. QUINN MENTIONED EARLIER IN DESCRIBING WHAT A

2    TRADE SECRET IS, WHETHER OR NOT ADEQUATE STEPS WERE TAKEN TO

3    PROTECT THOSE AND KEEP THEM FROM BEING PUBLIC.  ALL OF THIS

4    INVOLVES MEXICO.

5              THE COURT:  I'M SORRY.  I INTERRUPTED YOUR TRAIN.          11:48

6              PLEASE, CONTINUE.

7              MR. OLSON:  THANK YOU.

8              JUST BRIEFLY, I'LL ADDRESS THEIR POINT THAT SERVICE

9    ON THESE THREE AGENTS IS SUFFICIENT.

10             I THINK IT'S CLEAR THAT IS NOT THE CASE.                   11:49

11             THE WENCHE CASE -- I'M PROBABLY PRONOUNCING THAT

12   WRONG; IT'S THE FIFTH CIRCUIT CASE, W-E-N-C-H-E -- SAYS THAT

13   SERVICE OF PROCESS ON A CORPORATE AGENT IS NOT ENOUGH.  AND

14   ALTHOUGH THE NINTH CIRCUIT HASN'T ADDRESSED THAT ISSUE

15   DIRECTLY, IT HAS, IN WELLS FARGO, REMANDED -- AFTER FINDING        11:49

16   SERVICE PROPER, IT'S REMANDED TO DETERMINE WHETHER DEFENDANT'S

17   ACTIVITIES WERE SUFFICIENTLY CONTINUOUS AND SYSTEMATIC.  SO I

18   THINK THAT THE NINTH CIRCUIT CLEARLY SUPPORTS THE IDEA THAT,

19   JUST BECAUSE YOU HAVE SERVICE ON -- WHAT, IN THIS CASE, WERE

20   THREE INDIVIDUALS WITH TITLES OF -- THAT CERTAINLY SOUNDS GOOD     11:49

21   ON PAPER.  I DON'T DISPUTE THAT.  BUT THE REALITY IS, FOR

22   EXAMPLE, DAPHNE GRONICH NEVER COMMITTED A SINGLE ACT WITH

23   RESPECT TO MGA MEXICO.  SHE JUST WAS THERE AT THE BEGINNING.  I

24   THINK THAT'S STATED IN HER DECLARATION.

25             THE COURT:  IT IS.
```

```
 1              MR. OLSON:  THE CASES THAT THEY CITE ON THIS POINT, I
 2    THINK, ARE QUITE MISLEADING, BECAUSE, FOR INSTANCE, NORTHERN
 3    LIGHT INVOLVED A WEBSITE AND A CLUB OF ONE MEMBER.  AND THERE,
 4    THE SERVICE WAS ON THAT ONE INDIVIDUAL, IN COURT, IN ANOTHER
 5    PROCEEDING.  I THINK THE FIRST AMERICA CORP. CASE, THAT'S THE      11:50
 6    PARTNERSHIP CASE, SO I DON'T THINK THAT'S APPLICABLE EITHER.
 7    NEITHER ARE THE NINTH CIRCUIT CASES ANYWAY.  AT BEST, THEY ARE
 8    ALLIES.
 9              I'VE ALREADY SPOKEN ABOUT THE FACT THAT MGA'S
10    CONTACTS IN CALIFORNIA DO NOT CREATE SUFFICIENT PERSONAL          11:50
11    JURISDICTION OVER MGA MEXICO.  THERE'S A WHOLE LINE OF CASES ON
12    THAT, YOUR HONOR, AND I DON'T THINK THE COUNTER CLAIMANTS HAVE
13    EVEN REALLY CHALLENGED THAT.  BECAUSE THAT'S THE FIELDS CASE;
14    THERE'S THE CUBBAGE CASE; THERE'S THE GATES LEER JET CASE.
15              THE COURT:  THAT'S NOT THE ISSUE.                       11:51
16              MR. OLSON:  YEAH.
17              AND THEN, YOU KNOW, JUST GENERALLY, ON GENERAL
18    JURISDICTION, AGAIN, AS I'VE SAID BEFORE, THESE ACTS ARE NOT
19    CONTINUOUS AND SYSTEMATIC, THE ONES THAT ARE ALLEGED.  THE
20    COMMUNICATIONS THAT THEY'RE TALKING ABOUT, IF YOU TURN TO        11:51
21    SPECIFIC JURISDICTIONS, THESE COMMUNICATIONS -- IF YOU LOOK AT
22    THE COMMUNICATIONS THAT ARE ALLEGED IN THE COMPLAINT AND THAT
23    ARE ADDRESSED IN THEIR OPPOSITION, THESE ARE COMMUNICATIONS
24    ABOUT EMPLOYMENT, ABOUT HIRING THESE INDIVIDUALS.
25              THE COURT:  WHAT'S ALLEGED TO BE ONGOING IS THE        11:51
```

```
 1   ALLEGEDLY ORCHESTRATED PLAN TO LURE MATTEL MEXICO EMPLOYEES TO
 2   MGA MEXICO, AND THAT WAS ORCHESTRATED IN CALIFORNIA.  AND
 3   THAT'S WHAT'S ONGOING.  AND THESE COMMUNICATIONS ARE PART AND
 4   PARCEL TO THAT.
 5           MR. OLSON:  RIGHT.  I MEAN, THE ALLEGATION IS THAT    11:51
 6   THERE'S THIS INTERNATIONAL CONSPIRACY TO -- I THINK YOU SAID
 7   "HIRE."  BUT I THINK THERE'S CERTAINLY NOTHING ILLEGAL
 8   WITH HIRING --
 9           THE COURT:  WELL, NO, NOT BY ITSELF.
10           MR. OLSON:  BUT I THINK WHAT YOU WERE GETTING AT IS    11:52
11   INTERNATIONAL --
12           THE COURT:  IT'S WHAT THE EMPLOYEES BRING WITH THEM
13   WHEN THEY GET HIRED.
14           MR. OLSON:  THAT'S RIGHT; INTERNATIONAL CONSPIRACY TO
15   STEAL TRADE SECRETS.  THAT'S CERTAINLY WHAT'S ALLEGED, YOUR    11:52
16   HONOR.
17           AND WHAT'S INTERESTING ABOUT THAT IS, IF THAT, IN
18   FACT, WAS THE CASE -- AND THE LARIAN DECLARATION MAKES VERY
19   CLEAR THAT THAT'S NOT THE CASE; HE SAYS PLAINLY THAT HE DID NOT
20   IN ANY WAY ASK ANY OF THESE INDIVIDUALS TO TAKE ANYTHING.      11:52
21           BUT LET'S JUST ASSUME HYPOTHETICALLY THAT THAT IS THE
22   CASE, THAT THIS WHOLE OPERATION IS BEING ENGINEERED FROM MGA'S
23   HEADQUARTERS IN VAN NUYS, WHY NAME MGA MEXICO?  IF THEY HAVE
24   MGA U.S.A., THROUGH ISAAC LARIAN AND THROUGH HIS ACTIVITIES,
25   WHY NAME MGA MEXICO?                                          11:52
```

```
 1              YOUR HONOR, I SUBMIT THAT THE REASON THEY DID THAT IS
 2    BECAUSE THEY KNOW THAT THERE IS NO CONNECTION BETWEEN WHAT'S
 3    GOING ON IN THE UNITED STATES AND IN MEXICO.  AND WHAT THIS
 4    COURT IS GOING TO BE FACED WITH, I'M AFRAID, IS THIS TREMENDOUS
 5    SIDESHOW GOING ON BETWEEN THESE TWO MEXICAN SUBSIDIARIES, WHERE    11:53
 6    EVERYTHING IS TAKING PLACE IN MEXICO, WITHOUT THE CONSPIRACY
 7    CONNECTION TO LOS ANGELES, TO VAN NUYS.
 8              THE COURT:  THAT WOULD BE BORN OUT OF THE MOTION FOR
 9    SUMMARY JUDGMENT, IF WE GET TO THAT STAGE.
10              MR. OLSON:  WELL, I CERTAINLY EXPECT THAT WOULD BE       11:53
11    THE CASE, BUT I THINK, EVEN HERE, YOUR HONOR CAN MAKE THAT
12    DECISION ON JURISDICTIONAL GROUNDS BECAUSE OF THE FACTS THAT
13    THEY PUT INTO PLAY IN THEIR COMPLAINT AND THE DECLARATIONS THAT
14    WE'VE ATTACHED, WHICH MADE IT CLEAR THAT THERE IS NO CONNECTION
15    BETWEEN THE TWO PARTIES.                                          11:53
16              THE COURT:  THANK YOU, COUNSEL.
17              MR. OLSON:  THANK YOU.
18              THE COURT:  DO YOU WISH TO BRIEFLY RESPOND?
19              MR. ZELLER:  YES, YOUR HONOR.
20              I THINK, REALLY, THAT THIS IS TOTALLY DISPOSED OF BY     11:53
21    FOCUSING ON THE STAGE OF THE PROCEEDINGS THAT WE'RE AT RIGHT
22    NOW.  THIS IS A MOTION TO DISMISS.  IT'S NOT SUMMARY JUDGMENT.
23    THESE KINDS OF ISSUES ARE RESOLVED IN OUR FAVOR.  AND BETWEEN
24    THE ALLEGATIONS THAT WE HAVE MADE AS TO THE CONNECTIONS AND THE
25    ORCHESTRATIONS FROM CALIFORNIA BY PARTIES IN CALIFORNIA, ALONG    11:54
```

```
 1   WITH THE EVIDENCE THAT WE'VE SUBMITTED, I THINK THAT MORE THAN
 2   AMPLY SHOWS THAT THERE'S ENOUGH OF A CONNECTION WITH MGA MEXICO
 3   TO ALLOW FOR THE ASSERTION OF PERSONAL JURISDICTION IN THIS
 4   CASE.  AND I THINK THAT REALLY IS THE BEGINNING AND END OF IT.
 5            AS THE COURT HAS POINTED OUT, THESE ARE ACTIVITIES        11:54
 6   THAT WE HAVE ALLEGED -- AND WE HAVE ALSO SHOWN THROUGH SOME
 7   EVIDENCE -- WERE ORCHESTRATED FROM SOUTHERN CALIFORNIA BY
 8   PEOPLE LIKE ISAAC LARIAN.  THE ONLY RESPONSE THEY HAVE TO IT
 9   IS, WELL, MR. LARIAN DENIES IT.  THAT'S JUST AN ISSUE GOING TO
10   THE MERITS OF THE CASE.  IT'S NOT ANYTHING TO DO WITH           11:54
11   JURISDICTION OVER MGA MEXICO.
12            THE COURT:  THANK YOU, COUNSEL.
13            MR. ZELLER:  THANK YOU.
14            THE COURT:  REGARDING THE FOURTH AND FIFTH MOTIONS,
15   THE DISCOVERY MASTER'S MARCH 7, 2007 ORDER, THAT'S BEING        11:54
16   CHALLENGED BOTH BY MGA AND BRYANT, LET ME GIVE YOU SOME
17   TENTATIVE THOUGHTS I HAVE, AND THEN I'LL CERTAINLY INVITE
18   RESPONSES TO THAT.
19            I'M NOT INTENDING TO IMPOSE A DE NOVO REVIEW TO THE
20   DISCOVERY MASTER'S FINDINGS.  AND THE REASON FOR THAT IS,       11:55
21   PURSUANT TO THE PARTIES' STIPULATION, THE COURT WAS TO TREAT
22   THE DISCOVERY MASTER'S RULING AS A RULING BY A
23   MAGISTRATE JUDGE; AND, THEREFORE, I USED THE SAME STANDARD THAT
24   I WOULD APPLY, PURSUANT TO THE PARTIES' STIPULATION, TO REVIEW
25   THE FINDINGS AS BEING CONTRARY TO LAW OR CLEARLY ERRONEOUS.     11:55
```

```
 1              AND IN REVIEWING ALL OF THE RULINGS USING THAT

 2   STANDARD, TENTATIVELY THE ONLY ONE THAT I FOUND THAT WAS

 3   CONTRARY TO LAW, THAT I THOUGHT WAS CLEARLY CONTRARY TO LAW,

 4   WAS NUMBER 50; THAT WAS REQUIRING BRYANT TO DIVULGE THE

 5   SUBSTANCE OF COMMUNICATIONS MADE AMONGST HIS COUNSEL.  BECAUSE    11:55

 6   IT CLEARLY WAS A JOINT DEFENSE AGREEMENT; THEY WERE OPERATING

 7   PURSUANT TO THAT.  AND I DON'T BELIEVE THAT IT IS PROPER TO

 8   MAKE MR. BRYANT RESPOND TO THAT QUESTION.

 9              BUT, OTHERWISE, I DO NOT FIND THE OTHER FINDINGS BY

10   JUDGE INFANTE TO BE CLEARLY ERRONEOUS OR CONTRARY TO LAW.        11:56

11   THOSE ARE MY TENTATIVE FINDINGS.

12              I'LL HEAR FROM BOTH SIDES ON THAT.

13              MR. PENNY:  YOUR HONOR, VERY BRIEFLY.

14              MICHAEL PENNY FOR CARTER BRYANT.

15              50 WAS ONE OF THE TWO INSTRUCTIONS I WAS PRIMARILY    11:56

16   CONCERNED WITH, AND I SEE YOU'RE IN THE SAME PLACE.

17              I BELIEVE THERE WERE TWO ALMOST IDENTICAL

18   INSTRUCTIONS INVOLVED:  39 AND 50; ONE OF WHICH WAS, 'WHAT DID

19   YOU SAY TO MGA'S COUNSEL IN THE PREP SESSION FOR THE DEPO?'

20   THE OTHER WAS, 'WHAT DID YOU SAY IN THE BREAK?'                  11:56

21              I THINK THE ISSUES ARE IDENTICAL.

22              THE COURT:  39?

23              MR. PENNY:  YES.  39 AND 50.

24              THE COURT:  IT'S, IN SUBSTANCE, THE SAME QUESTION.

25              MR. PENNY:  WITH THAT, I'LL SUBMIT YOUR HONOR.  THOSE  11:57
```

```
1    WERE THE ONES THAT WERE CONCERNS.

2              THE COURT:  VERY WELL.

3              I'LL HEAR FROM MATTEL.

4              MR. ZELLER:  YES, YOUR HONOR.

5              IF I MAY JUST POINT OUT FOR THE RECORD, AND I        11:57

6    RECOGNIZE THAT THIS MAY BE NEITHER HERE NOR THERE ULTIMATELY TO

7    THE COURT'S DECISION, BECAUSE, CERTAINLY WITH RESPECT TO THE

8    JOINT DEFENSE AGREEMENT, THAT WAS SIMPLY NOT EVIDENCED BELOW IN

9    FRONT OF JUDGE INFANTE.  I MEAN, THERE WAS A FRACTION OF A

10   SENTENCE THAT WAS IN DOUGLAS WICKHAM'S DECLARATION THAT SAID,   11:57

11   IN CONCLUSORY FASHION, 'WE HAVE A JOINT DEFENSE AGREEMENT.'

12             I WOULD ALSO POINT OUT, YOUR HONOR, FOR THE RECORD,

13   THAT JOINT DEFENSE AGREEMENT, WHICH WAS EVENTUALLY SUBMITTED

14   ONLY WITH RESPECT TO THE OBJECTIONS, AND ON A REPLY TO BOOT,

15   AFTER WE, OF COURSE, COULDN'T RESPOND TO IT, THAT THAT WAS NOT  11:57

16   PRODUCED IN DISCOVERY EITHER, EVEN THOUGH JUDGE INFANTE HAD

17   ALREADY ISSUED ORDERS THAT CERTAINLY CALLED FOR BRYANT AND MGA

18   TO PRODUCE THESE DOCUMENTS.  SO THE FIRST TIME WE'RE SEEING IT

19   IS ON THIS REPLY ON THE OBJECTIONS, AND I THINK, REALLY IN

20   FAIRNESS, I DON'T THINK IT SHOULD BE REGARDED.  THEY DIDN'T     11:58

21   MAKE THAT RECORD BELOW.  THEY'RE WAITING UNTIL THE OBJECTIONS

22   BEFORE THEY'RE ACTUALLY MAKING A RECORD THAT THERE WAS THIS

23   JOINT DEFENSE AGREEMENT, AND FRANKLY, IN VIOLATION OF

24   JUDGE INFANTE'S OTHER ORDERS.

25             THE COURT:  THAT MAY WELL BE THE CASE, BUT DO YOU     11:58
```

```
 1   DISPUTE AT THIS POINT THAT THERE IS, IN FACT, A JOINT DEFENSE
 2   AGREEMENT?
 3          MR. ZELLER:  I THINK THAT'S DIFFICULT TO ANSWER,
 4   PARTLY BECAUSE, TOO, YOUR HONOR, REMEMBER, WE WERE DENIED THE
 5   OPPORTUNITY TO EVEN QUESTION MR. BRYANT ABOUT THIS ALLEGED        11:58
 6   AGREEMENT ON TOP OF IT; SO, I MEAN, WHAT WE'RE BASICALLY
 7   PRESENTED WITH IS, YOU KNOW, MANY MONTHS AFTER THE FACT, WHEN
 8   THIS ISSUE WAS FIRST RAISED, A WRITTEN AGREEMENT THAT WE'VE
 9   BEEN DENIED DISCOVERY ON.
10          SO I THINK IT'S A LITTLE DIFFICULT TO, OF COURSE, IN       11:58
11   OUR POSITION, COME UP AND SAY TO THE COURT, 'NO, THIS IS AN
12   INVALID JOINT DEFENSE AGREEMENT.'  WE HAVE JUST BEEN DENIED
13   DISCOVERY WHOLESALE INTO THAT AGREEMENT, INCLUDING AT
14   MR. BRYANT'S DEPOSITION.
15          THE COURT:  I APPRECIATE YOUR POSITION.                    11:59
16          THANK YOU, COUNSEL.
17          THE LAST MOTION IS REGARDING THE ISSUES ON PHASE ONE.
18   I'M DISINCLINED TO ALTER MY PREVIOUS ORDER, ALTHOUGH I AM GOING
19   TO TRY TO GIVE THE PARTIES A LITTLE BIT MORE GUIDANCE ON WHAT I
20   ENVISION IN PHASE ONE AND PHASE TWO.  BUT IF THERE'S ANYTHING     11:59
21   FURTHER YOU'D LIKE TO SAY AT THIS TIME, PLEASE.
22          MS. GLASER:  THANK YOU, YOUR HONOR.
23          PATRICIA GLASER FOR MGA.
24          YOUR HONOR, I'M GOING TO JUST -- I HAVE A CHEAT
25   SHEET.  AND I KNOW IT'S LATE IN THE MORNING, AND I APOLOGIZE.     11:59
```

```
 1              THE COURT:  IT'S VERY EARLY IN THE AFTERNOON.

 2              MS. GLASER:  EARLY IN THE AFTERNOON.  THANK YOU.

 3         MAY I HAND THIS OUT TO COUNSEL AND TO THE COURT?

 4         IT'S AN APPROACH THAT WE THINK IS ACTUALLY

 5    INTERESTING AND IS AN APPROPRIATE COMPROMISE.                11:59

 6              THE COURT:  PLEASE DO.  I'M ALWAYS INTERESTED IN

 7    INTERESTING AND APPROPRIATE COMPROMISES.

 8              MS. GLASER:  MAY I TELL YOU WHAT ALL THAT MEANS, YOUR

 9    HONOR?  IT'S A LOT OF STUFF.

10              THE COURT:  PLEASE.                                12:00

11              MS. GLASER:  IF YOU ACTUALLY WENT DOWN -- WHAT WE

12    TRIED TO DO WAS, WE TRIED TO USE THIS AS AN IMPORTANT EXERCISE

13    IN TRYING TO FIGURE OUT, OKAY, HOW IS THIS REALLY GOING TO

14    WORK?  BECAUSE YOUR HONOR'S INITIAL SUGGESTION, IN OUR VIEW,

15    RESPECTFULLY, DOESN'T WORK IN THE REAL WORLD IN TERMS OF TRYING  12:00

16    THE CASE, BECAUSE WHAT IT DOES IS, IT DOESN'T TAKE INTO ACCOUNT

17    THE VARIETY OF THINGS THAT FLOW FROM WHAT YOUR HONOR HAD

18    INITIALLY ORDERED.  SO WHAT WE TRIED TO DO WAS -- WE WENT DOWN

19    AND TRIED TO COMPARE, WHAT IS IT THAT WE'RE SUGGESTING NOW,

20    AFTER THIS EXERCISE?  WHAT IS IT THAT WORKS, AS A PRACTICAL      12:01

21    MATTER?

22         AND THERE'S A FAMOUS FRENCH PHILOSOPHER, VOLTAIRE,

23    WHO SAID, 'GOD IS IN THE DETAILS.  NOT THE DEVIL.'  SO WITH

24    THAT IN MIND, WHAT WE TRIED TO DO WAS REALLY COME UP WITH

25    WHAT'S FAIR TO THE PARTIES AND WHAT WORKS.                      12:01
```

1          IF YOUR HONOR CONSIDERS THE FOLLOWING CONCEPT:  THAT,

2    IN OUR VIEW, YOU CAN'T SPLIT LIABILITY FROM DAMAGES.  THAT'S

3    NOT FAIR, BECAUSE WHOEVER THEN CONSIDERS -- DIFFERENT JURY, I'M

4    TALKING ABOUT.

5          THE COURT:  RIGHT.                                    12:01

6          MS. GLASER:  I UNDERSTAND IF YOU WERE BIFURCATING IN

7    FRONT OF THE SAME JURY.  IT HAPPENS ALL THE TIME.  NO PROBLEM.

8    BUT HERE, WHAT YOU'RE CONTEMPLATING IS TWO SEPARATE TRIALS.

9    AND TO HAVE DAMAGES PART OF THE SECOND PHASE AND NOT PART OF

10   THE FIRST PHASE WOULD BE HORRIFICALLY UNFAIR TO, CERTAINLY,     12:01

11   EITHER SIDE, IN TERMS OF HAVING THE SAME JURY, THE SAME TRIERS

12   OF FACT, DETERMINE WHAT FLOWS FROM THAT.  EVERYTHING FROM

13   MITIGATION TO THE FORMATION OF A CONTRACT -- THERE'S AN ALLEGED

14   BREACH OF CONTRACT HERE -- EVERYTHING FROM SUCH THINGS AS THE

15   DEGREE OF CULPABILITY, THE DATE OF FORMATION, THE DATE OF THE    12:02

16   BREACH; ALL OF THOSE THINGS ARE IMPORTANT FOR THE TRIER OF FACT

17   WHO'S CONSIDERING DAMAGES TO CONSIDER THOSE ISSUES.

18          AND THEN YOU SAY TO YOURSELF, WELL, WAIT A MINUTE,

19   THERE'S A BREACH OF CONTRACT AND THERE ARE COPYRIGHTS.  AND THE

20   FACTS, THE CENTRAL CORE FACTS, ARE EXACTLY THE SAME.            12:02

21          SO YOU REALLY NEED TO TRY THE BREACH OF CONTRACT AND

22   THE COPYRIGHT VIOLATIONS, WHICH, I THINK, COUNSEL ON THE OTHER

23   SIDE AGREE WITH, TOGETHER.  AND THEN YOU HAVE TO HAVE THE

24   DAMAGES FLOWING FROM THAT, BECAUSE THE CONSEQUENTIAL DAMAGES OF

25   BREACH OF CONTRACT HAVE TO BE CONSIDERED BY THE SAME TRIER OF    12:02

1   FACT WHO CONSIDERS THE DAMAGES THAT ARISE FROM THE COPYRIGHT

2   CLAIM.

3           AGAIN, YOUR HONOR, IT'S OF CRITICAL IMPORTANCE TO AT

4   LEAST MAKE THE INITIAL OBSERVATION THAT THE CORE FACTS FOR THE

5   CLAIM OF COPYRIGHT, THE CORE FACTS FOR BREACH OF CONTRACT, AND       12:03

6   THE CORE FACTS FOR THE DAMAGES FLOWING FROM THEM ARE ALL THE

7   SAME.  AND IT WOULD BE TERRIBLY UNFAIR, AND CERTAINLY

8   DUPLICATIVE, TO HAVE TO GO THROUGH THAT EXERCISE TWICE.

9           THEN YOU SAY TO YOURSELF, WHAT IS THE DIFFERENCE,

10  ULTIMATELY, IN THE FIRST PHASE BETWEEN WHAT WE NOW SAID -- I'M      12:03

11  ASKING YOU TO STEP AWAY FROM OUR PAPERS, BECAUSE WE HAVE GONE

12  THROUGH THIS EXERCISE -- WE ACTUALLY TRIED TO CONTACT OPPOSING

13  COUNSEL ON FRIDAY, AND FOR PERSONAL REASONS, THEY WERE

14  UNAVAILABLE, AND I APPRECIATE THAT.  AND MAYBE IT REQUIRES US

15  TO SIT DOWN FURTHER, BEFORE THE COURT RULES, WITH OPPOSING         12:03

16  COUNSEL, WHICH WE TRIED TO DO, OBVIOUSLY, LATE IN THE DAY.  BUT

17  MAYBE WHAT WE OUGHT TO BE TRYING TO DO, BEFORE THE COURT RULES,

18  IS TO SIT DOWN AND SEE IF WE CAN COME UP WITH AT LEAST WHAT THE

19  PARTIES -- AND I UNDERSTAND THE COURT HAS THE FINAL SAY -- WHAT

20  THE PARTIES THINK ACTUALLY WILL WORK, BECAUSE THEY DO -- SO        12:04

21  MUCH OF THIS CASE -- YOU CAN HAVE THESE FANCY RICO CLAIMS, AND

22  YOU CAN HAVE EVERYTHING ELSE, BUT WHAT IT BOILS DOWN TO AT THE

23  END OF THE DAY IS THIS CORE CENTRAL FACT THAT JUST RUNS THROUGH

24  EVERY CLAIM, EXCEPT WHAT WE PUT IN THE SECOND PHASE.

25           AND THEN WHAT YOU LOOK AT IN THE SECOND PHASE, WHICH       12:04

```
 1   ARE ENTIRELY SEPARATE, WHAT I'LL CALL CORE FACTS, AND THE
 2   DAMAGES THAT FLOW FROM THOSE CORE FACTS.  AND I THINK THE
 3   PARTIES ARE VERY CLOSE.  I'M NOT SAYING WE NECESSARILY ARE WITH
 4   THE COURT.  BUT I THINK IT WOULD BE HELPFUL FOR THE COURT TO AT
 5   LEAST GET THE BENEFIT OF AN ADDITIONAL CONVERSATION BETWEEN        12:04
 6   COUNSEL.
 7        THE COURT:  COUNSEL, ABSOLUTELY.
 8        MY INITIAL DECISION TO SEPARATE THIS AND ISOLATE THE
 9   ISSUE OF WHO OWNS THE BRATZ DOLLS WAS NOTHING MORE THAN AN
10   EFFORT TO TRY TO STREAMLINE WHAT EVERYONE SEEMED TO BE            12:04
11   IDENTIFYING AS THE KEY ISSUE IN THIS CASE.
12        MS. GLASER:  AND I APPRECIATE THAT.
13        THE COURT:  IF THERE IS ANOTHER WAY OF DOING THAT
14   THAT MAKES MORE SENSE, THE COURT IS MORE THAN WILLING TO
15   ENTERTAIN IT.  FURTHERMORE, IF THERE'S A WAY THAT THE PARTIES     12:05
16   CAN GET TOGETHER AND PROPOSE SUCH A WAY, THE COURT IS EVEN MORE
17   WILLING TO ENTERTAIN THAT; SO I AM NOT WEDDED TO ANY PARTICULAR
18   POSITION, OTHER THAN I'M TRYING TO KEEP THIS --
19        I GUESS WHAT I WANT TO AVOID -- WHAT I AM OPPOSED TO,
20   AT LEAST AT THIS POINT, IS JUST THROWING EVERYTHING INTO THE      12:05
21   BLENDER AND HAVING SOME TRIAL WHICH HAS RICO AND ALL OF THE
22   VARIOUS ISSUES THAT WE'RE DISCUSSING HERE.
23        MS. GLASER:  AND THAT'S WHY WE TRIED TO -- MY POOR
24   ATTEMPT, PERHAPS, TO SHOW YOU THE FIRST PHASE AND THE SECOND
25   PHASE.                                                           12:05
```

```
 1              AND IF I MAY MAKE THE FOLLOWING TWO SUGGESTIONS:

 2    ONE, WE MEET -- TRIAL COUNSEL, THE PEOPLE ACTUALLY GOING TO TRY

 3    THE CASE -- MEET THIS WEEK, AND THEN MAKE A SUGGESTION TO THE

 4    COURT; AND YOU CAN SEE WHERE OUR DIFFERENCES ARE AND THEN RULE

 5    ON THOSE DIFFERENCES, IF THAT WOULD BE SATISFACTORY TO THE          12:05

 6    COURT.

 7              THE SECOND THING I NOTICED IN LISTENING -- AND I

 8    REALIZE I'M A LITTLE JENNIFER-COME-LATELY TO APPEARING IN FRONT

 9    OF YOUR HONOR -- I WILL SAY THIS:  THAT WHAT POINTS OUT -- YOU

10    HAVE A STANDING ORDER, WHICH WE HAVE READ, OBVIOUSLY,              12:06

11    CAREFULLY, AND I THINK BOTH SIDES ALSO MIGHT WANT TO STIPULATE

12    THAT WE CAN HAVE MORE THAN ONE SUMMARY JUDGMENT, BECAUSE IF

13    ANYTHING -- IT HAPPENED THIS MORNING -- IT POINTED OUT THAT

14    THERE ARE OBVIOUSLY GOING TO BE A VARIETY OF MOTIONS FOR

15    SUMMARY JUDGMENT.                                                  12:06

16              THE COURT:  THAT'S MY STANDARD RULE.

17              THIS IS A CASE, CERTAINLY, WHERE I CAN ENVISION A

18    TWO-PHASED, OR EVEN A THREE-PHASED, SUMMARY JUDGMENT MOTION.

19              MS. GLASER:  THANK YOU, YOUR HONOR.

20              AGAIN, MY ONLY POINT WOULD BE THAT WE'LL BE GLAD --      12:06

21    THE ONLY THING WE WOULD LIKE IS A DATE CERTAIN TO COME BACK TO

22    THE COURT, ASSUMING COUNSEL AGREE, FOR US TO MEET AND CONFER,

23    AND THEN COME BACK TO THE COURT WITH AT LEAST WHAT OUR

24    SUGGESTED APPROACH WOULD BE TO A PHASE TRIAL.

25              THE COURT:  LET ME HEAR FROM THE PLAINTIFF ON THAT.      12:06
```

```
 1              DO YOU HAVE ANOTHER POSITION?

 2              MR. PAGE:  YES, YOUR HONOR.

 3              THE COURT:  PLEASE.

 4              MR. PAGE:  MICHAEL PAGE FOR CARTER BRYANT.

 5              I THINK WE COULD USE SOME OF THE COURT'S GUIDANCE,     12:07

 6    THOUGH, GOING INTO THOSE DISCUSSIONS.

 7              FROM MR. BRYANT'S POINT OF VIEW, OUR CONCERN IS REAL

 8    SIMPLE:  WE WANT HIM TO HAVE ONE TRIAL.

 9              THE COURT:  THAT MIGHT BE HARD TO DO, THOUGH, UNDER

10    ANY SCENARIO.                                                   12:07

11              MR. PAGE:  CERTAINLY ONE TRIAL AS OPPOSED TO

12    EVERYTHING THAT RELATES TO WHAT HE DID WHILE HE WAS A MATTEL

13    EMPLOYEE.  IF THEY HAVE RICO CLAIMS, THAT, THREE YEARS LATER

14    THE DOLLS (UNINTELLIGIBLE) ARE SOMEHOW PART OF A GRAND

15    CONSPIRACY, WE'LL DEAL WITH THAT.  WE DON'T THINK IT'S A        12:07

16    SERIOUS ISSUE.

17              BUT AS TO WHAT HE DID AT MATTEL AND WHAT HAPPENED UP

18    TO OCTOBER 20TH AND THE DAMAGES THAT FLOW FROM IT, MR. BRYANT

19    SHOULD HAVE ONE TRIAL.  IN FACT, IT'S A CONSTITUTIONAL

20    REQUIREMENT THAT HE DO.                                         12:07

21              ALL OF THE BRIEFS ON THIS ISSUE -- THEIR OPENING

22    BRIEF ON THIS ISSUE SAID THAT THEY WANTED TO DECIDE ALL OF THE

23    DAMAGES THAT FLOW FROM MR. BRYANT'S ACTIVITIES IN ONE TRIAL.

24              THE COURT:  IT'S A CONSTITUTIONAL REQUIREMENT THAT HE

25    HAVE ONLY ONE TRIAL?                                            12:07
```

```
 1          MR. PAGE:  IT'S A SEVENTH AMENDMENT ISSUE.  YOU CAN'T
 2   TRY SOMEONE'S LIABILITY TO ONE JURY AND THEN THE DAMAGES THAT
 3   FLOW FROM THAT LIABILITY TO ANOTHER JURY, AT LEAST WHERE THE
 4   FACTS INTERTWINE AS TO THE TWO.  AND THEY CERTAINLY DO HERE,
 5   BECAUSE WE HAVE PUNITIVE AND EXEMPLARY DAMAGE CLAIMS.              12:08
 6          BUT THEIR REPLY, FOR THE FIRST TIME IN A FOOTNOTE,
 7   LOGGED IN THE IDEA THAT 'OH, WAIT; WE DON'T WANT TO DO ANY
 8   DAMAGES AT ALL IN THE FIRST TRIAL; THAT'S ALL IN THE SECOND
 9   TRIAL.'
10          THAT'S A COMPLETE 180-DEGREE REVERSAL.  I CALLED THEM      12:08
11   AND SAID, 'WELL, DO YOU WANT DAMAGES IN THE FIRST TRIAL OR
12   NOT?'  I ASKED FOR CLARIFICATION, AND I WAS TOLD I WASN'T GOING
13   TO GET THAT CLARIFICATION.  I WAS TOLD THAT THE BRIEFS WERE
14   RIGHT.
15          WELL, THEY ARE DIAMETRICALLY OPPOSED TO EACH OTHER.        12:08
16          AS LONG AS WE HAVE A SITUATION WHERE MR. BRYANT ONLY
17   HAS TO BRING HIS FAMILY OUT TO TESTIFY; HE HAS TO COME OUT TO
18   TESTIFY; HIS LIVELIHOOD, HE IS ON THE LINE FOR THIS ONE SET OF
19   ACTS ONCE, AS TO WHO ELSE COMES IN, IT'S A QUESTION THAT CAN BE
20   WORKED OUT.  BUT THAT'S MY MAIN CONCERN.                          12:08
21          THE OTHER ISSUE THAT I THINK THAT WE NEED A LITTLE
22   BIT OF CLARITY FROM THE COURT ON IS, WE ALL KEEP SAYING
23   'OWNERSHIP OF BRATZ,' LIKE THAT WAS SOMETHING REAL.  AND I
24   THINK THAT'S GIVING RISE TO A CONSIDERABLE AMOUNT OF CONFUSION.
25   THERE IS NO SUCH THING AS 'OWNERSHIP OF BRATZ.'  THERE IS THE     12:09
```

```
 1   QUESTION OF COPYRIGHT IN THE DRAWINGS THAT MR. BRYANT DID.

 2   THAT'S A COPYRIGHT QUESTION.  IT'S A CONTRACT QUESTION AS TO

 3   WHO OWNED HIS WORK AT THE TIME.  THEN THERE'S, WELL, WHO OWNS

 4   THE COPYRIGHTS IN LATER DOLLS?  THERE'S A TRADEMARK CLAIM HERE.

 5   THERE'S NO MENTION OF THE NAME OF BRATZ.  THERE'S NO OWNERSHIP          12:09

 6   OF THE ACTUAL OBJECTS.

 7          IT'S IMPORTANT, AS WE GO FORWARD, TO TRY TO FIGURE

 8   OUT WHAT'S IN TRIAL ONE AND WHAT'S IN TRIAL TWO, THAT WE TALK

 9   PRECISELY ABOUT, ARE WE TALKING ABOUT A COPYRIGHT CLAIM?  WHAT

10   WORKS?  ARE WE TALKING ABOUT A COPYRIGHT INFRINGEMENT ACTION?          12:09

11   A CONTRACT ACTION?

12          'OWNERSHIP OF BRATZ' IS A CONVENIENT SHORT NAME, BUT

13   IT'S GETTING US REALLY CONFUSED IN TRYING TO WORK THIS OUT.

14          THE COURT:  VERY WELL.

15          MR. QUINN?                                                      12:10

16          MR. QUINN:  I THINK THIS PROPOSAL THAT WE'VE GOT

17   LOOKS PRETTY PROMISING, ACTUALLY, YOUR HONOR.

18          THE COURT:  ALL RIGHT.

19          MR. QUINN:  I WOULD JOIN IN COUNSEL'S REQUEST THAT WE

20   GET TOGETHER AND SEE IF WE CAN'T COME UP WITH SOMETHING BY             12:10

21   AGREEMENT.

22          IF WE ARE UNABLE TO, AND THERE ARE ANY OPEN ISSUES --

23   THIS REALLY IS PERHAPS EVEN MORE COMPLEX THAN IT LOOKS, AND I

24   DON'T KNOW IF THE COURT EVER DOES THIS, BUT I WAS WONDERING

25   WHETHER IT MIGHT BE POSSIBLE TO HAVE AN INFORMAL CHAMBER'S            12:10
```

1  CONFERENCE WITH THE COURT TO GO OVER SOME ISSUES IF WE'RE

2  UNABLE TO RESOLVE THEM AMONG OURSELVES.

3          THE COURT:  WE'LL CERTAINLY HAVE A HEARING IF YOU'RE

4  NOT ABLE TO RESOLVE IT.  I'M RELUCTANT TO DO IT IN CHAMBERS;

5  I'D LIKE TO KEEP IT ON THE RECORD.  WE CAN CERTAINLY DO IT IN          12:10

6  CHAMBERS IF IT'S ON THE RECORD.

7          MR. QUINN:  OKAY.

8          YOUR HONOR, JUST A PLACEHOLDER, THEN, IN CASE

9  WE'RE --

10         THE COURT:  WHY DON'T I SUGGEST THIS, WHY DON'T YOU          12:11

11  SPEND THE NEXT WEEK TRYING TO WORK ON THIS.  THIS IS VERY

12  PROMISING.  WHY DON'T YOU SPEND THE WEEK, AND WHY DON'T YOU

13  SUBMIT SOMETHING IN WRITING TO THE COURT --

14         MR. QUINN:  OKAY.

15         THE COURT:  -- AS TO WHAT YOU ALL THREE AGREE ON, AND          12:11

16  THEN, PROBABLY EVEN MORE IMPORTANTLY, WHAT YOU DISAGREE ON.

17         I UNDERSTAND THAT MR. BRYANT HAS SOME UNIQUE

18  CONCERNS, BEING AN INDIVIDUAL.  AND I APPRECIATE YOUR COMMENTS

19  THERE, COUNSEL.  LET'S SEE IF WE CAN'T WORK SOMETHING OUT THAT

20  ADDRESSES EVERYONE'S CONCERNS.  AND THEN AFTER YOU HAVE          12:11

21  SUBMITTED THAT IN WRITING TO THE COURT NEXT WEEK -- WHY DON'T

22  YOU SUBMIT SOMETHING NEXT MONDAY -- THE COURT WILL TAKE A LOOK

23  AT IT; AND THEN IF THERE'S A NEED TO HAVE A HEARING, WE'LL HAVE

24  A HEARING.  IF YOU'RE CLOSE ENOUGH WHERE I CAN DO THE FINE

25  TUNING WITHOUT HAVING A HEARING, I WILL DO THAT AS WELL, AND          12:11

```
 1   WE'LL GO FROM THERE.

 2           I'LL TRY TO GET AN ORDER OUT ON THESE OTHER FIVE

 3   MOTIONS SHORTLY.

 4           MR. OLSON:  THANK YOU, YOUR HONOR.

 5           MR. QUINN:  THANK YOU, YOUR HONOR.                12:11

 6           MS. ANDERSON:  THANK YOU, YOUR HONOR.

 7           THE COURT:  THANK YOU.

 8           WE'RE GOING TO TAKE A BRIEF RECESS, JUST TO GIVE THE

 9   COURT REPORTER A BREAK.  WE HAVE A FEW OTHER MATTERS TO TAKE

10   UP.                                                       12:12

11           THE COURT IS IN RECESS.

12           THE CLERK:  THE COURT STANDS IN RECESS.

13

14

15

16

17                        CERTIFICATE

18

19   I hereby certify that pursuant to section 753, title 28, united
     states code, the foregoing is a true and correct transcript of
20   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
21   conformance with the regulations of the judicial conference of
     the united states.
22

23   _____        _____
     THERESA A. LANZA, CSR, RPR                    Date
24   FEDERAL Official COURT Reporter

25
```