1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3                     EASTERN DIVISION

4                        - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                        - - -

7    mattel, inc.,                    )
                                      )
8                     Plaintiff,      )
                                      )
9            vs.                      )  No. ED CV 04-09049
                                      )  (LEAD LOW NUMBER)
10   carter bryant, et. Al.,          )
                                      )
11                    Defendants.     )
     _____)  hearing
12   AND RELATED ACTIONS,             )
     _____)

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 RIVERSIDE, California

17                 Monday, july 2, 2007

18                     1:51 p.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
               FEDERAL Official Court Reporter
24              3470 12th Street, Rm. 134
               RIVERSIDE, California  92501
25                  (951) 274-0844
                 Csr11457@sbcglobal.net

```
 1   APPEARANCES:

 2

 3   on behalf of PLAINTIFF, CARTER BRYANT:

 4                        KEKER & VAN NEST LLP
                          BY:  JOHN W. KEKER
 5                        710 SANSOME STREET
                          SAN FRANCISCO, California  94111-1704
 6                        (415) 391-5400

 7

 8   On behalf of DEFENDANT MATTEL, INC.:

 9                        QUINN EMANUEL
                          BY:  JOHN B. QUINN
10                        BY:  B. DYLAN PROCTOR
                          BY:  MIKE ZELLER
11                        865 S. FIGUEROA STREET,
                          10TH FLOOR
12                        LOS ANGELES, California  90017
                          (213) 624-7707
13

14
     ON BEHALF OF DEFENDANTS MGA ENTERTAINMENT AND ISAAC LARIAN:
15
                          O'MELVENY & MYERS LLP
16                        BY:  DALE CENDALI
                          7 TIMES SQUARE
17                        NEW YORK, NEW YORK  10036
                          (212) 326-2000
18
                          CHRISTENSEN, GLASER, FINK,
19                         JACOBS, WEIL & SHAPIRO, LLP
                          BY:  PATRICIA GLASER
20                        10250 CONSTELLATION BOULEVARD
                          LOS ANGELES, CALIFORNIA  90067
21                        (310) 553-3000

22

23   ALSO PRESENT:        SHIRLEY MORALES

24

25
```

```
 1        RIVERSIDE, CALIFORNIA; monday, july 2, 2007; 1:51 p.M.

 2                              -oOo-

 3        THE CLERK:  CALLING CALENDAR ITEM 11, carter bryant,

 4   et al., VERSUS mattel, inc., ED CV 04-09049, AND RELATED

 5   ACTIONS, CV 04-09049-SGL.                                    03:11

 6        MAY WE HAVE COUNSEL PLEASE COME FORWARD AND STATE

 7   YOUR APPEARANCES FOR THE RECORD.

 8        MR. QUINN:  JOHN QUINN, MIKE ZELLER, DYLAN PROCTOR

 9   FOR MATTEL.

10        MR. KEKER:  JOHN KEKER FOR MR. BRYANT.                  01:51

11        MS. CENDALI:  DALE CENDALI FOR MGA, MR. LARIAN.

12        MS. GLASER:  PATRICIA GLASER FOR ISAAC LARIAN AND MGA

13   AS WELL.

14        THE COURT:  WE'RE ON CALENDAR THIS AFTERNOON FOR

15   THREE MATTERS.                                               01:51

16        FIRST OF ALL, MGA'S MOTION REGARDING THE MAY 15, 2007

17   ORDER OF THE DESIGNATED MASTER, THE SPECIAL MASTER.  THERE'S

18   ALSO AN EX-PARTE APPLICATION RELATED TO THAT.  MGA'S MOTION

19   REGARDING THE MAY 16, 2007 ORDER; AND THEN, FOR LACK OF A

20   BETTER PHRASE, THE TRIAL-PHASING MOTION, WHICH, ESSENTIALLY, I   01:51

21   CARRIED OVER FROM A MOTION BROUGHT BY MATTEL EARLIER.

22        THOSE ARE THE THREE MOTIONS THAT I'D LIKE TO GET

23   THROUGH TODAY, AND THEN, HOPEFULLY, ISSUE AN ORDER LATER THIS

24   WEEK ON ALL THREE OF THOSE.

25        MS. GLASER:  WE HAVE, ACTUALLY, GOOD NEWS IN           01:52
```

```
 1   CONNECTION WITH THE TRIAL DATES, BECAUSE COUNSEL HAVE BEEN ABLE

 2   TO AGREE ON A RECOMMENDATION TO YOUR HONOR WITH RESPECT TO WHAT

 3   THE TRIAL DATES WOULD LOOK LIKE.  WE'RE NOT QUITE IN AGREEMENT

 4   WITH RESPECT TO WHAT THE FIRST PHASE WILL LOOK LIKE, AND I

 5   ASSUME WE CAN ARGUE THAT, BUT WE DO HAVE THE DATES, IF THE       01:52

 6   COURT IS WILLING.

 7              THE COURT:  LET ME KNOW WHAT YOU'RE PROPOSING.

 8              FIRST, MAKE REFERENCE TO THE EXISTING DATES AND THEN

 9   WHAT THE PROPOSED DATES ARE.

10              MS. GLASER:  YOUR HONOR, THE EXISTING DATES, THE       01:52

11   DISCOVERY CUTOFF WAS OCTOBER 22ND.  THE NEW DATE WOULD BE FACT

12   DISCOVERY CUTOFF, JANUARY 10TH;

13              DISPOSITIVE MOTIONS HEARING WAS NOVEMBER 19, 2007.

14   DISPOSITIVE MOTIONS HEARING WOULD NOW BE APRIL 7, 2008;

15              PRE-TRIAL CONFERENCE WAS JANUARY 14, 2008.  WE NOW     01:53

16   HAVE IT JUNE 2, 2008;

17              THE TRIAL WAS FEBRUARY 12TH, OF THE FIRST PHASE,

18   2008.  WE NOW HAVE JULY 1, 2008.

19              WE HAVE A FEW EXTRA DATES THAT WE WERE FITTING IN

20   WITHIN THAT TIME FRAME:  INITIAL EXPERT REPORTS WOULD BE DUE ON   01:53

21   JANUARY 21, 2008; REBUTTAL EXPERT REPORTS WOULD BE DUE

22   FEBRUARY 25, 2008; AND EXPERT DISCOVERY CUTOFF WOULD BE

23   MARCH 25, 2008.

24              MR. KEKER:  A CAVEAT TO THE PROPOSAL -- I'M

25   JOHN KEKER FOR MR. BRYANT.                                       01:53
```

```
 1            I'VE INFORMED COUNSEL THAT I HAVE A TRIAL SET BY
 2    JUDGE PFAELZER, A PATENT TRIAL IN THE CASE OF (UNINTELLIGIBLE)
 3    VERSUS GENENTIC, WHERE WE REPRESENT GENENTIC, ON JUNE 23, 2008,
 4    WHICH, IF IT WENT, WOULD CONFLICT WITH THESE DATES.  ALL OF US
 5    ARE RELATIVELY EXPERIENCED COUNSEL AND KNOW THAT WITH THESE        01:54
 6    PATENT CASES, ALL KINDS OF THINGS HAPPEN.  IT IS RARE THAT THEY
 7    GO OFF ON TIME, BUT IF THAT ONE WENT OFF ON TIME, THERE WOULD
 8    BE A PROBLEM.  AND IF WE SET THESE DATES, IT WOULD HAVE TO BE
 9    WITH THE UNDERSTANDING THAT JUDGE PFAELZER HAS ALREADY SET THIS
10    TRIAL AND I'M OBLIGATED TO BE THERE ON JUNE 23RD.                  01:54
11            I THINK IT'S WELL WORTH THE RISK AND WOULD HOPE THAT
12    SEVERAL MONTHS BEFORE THE TRIAL THAT THIS CONFLICT WOULD GET
13    RESOLVED JUST NATURALLY BECAUSE OF THE WAY THINGS WORK IN
14    CASES.
15            THIS IS A CASE THAT'S BEEN TO THE SUPREME COURT.           01:54
16    IT'S NOW BACK FOR TRIAL.
17            THE COURT:  LET ME ASK YOU THIS.
18            I'M INCLINED TO ADOPT SOMETHING VERY SIMILAR, AT
19    LEAST FOR PHASE ONE.  THE PROPOSAL THAT'S BEING MADE IS VERY
20    SIMILAR; I MEAN, THERE'S SOME PERMUTATIONS.  MATTEL IS            01:55
21    SUGGESTING, BASICALLY, KIND OF TWO SUBPHASES TO PHASE ONE
22    TRIAL.  BUT IN TERMS OF THE VAST MAJORITY OF THE ISSUES, BREACH
23    OF CONTRACT, BREACH OF FIDUCIARY DUTY, ET CETERA, IT SEEMS TO
24    BE IN AGREEMENT, AND I'M CERTAINLY INCLINED TO FOLLOW THAT.
25            DO YOU HAVE A TRIAL ESTIMATE BASED ON THE PROPOSED        01:55
```

```
 1   PHASE ONE TRIAL?

 2            MS. GLASER:  WE DO, YOUR HONOR.

 3            THE COURT:  WHAT IS THAT?

 4            MS. GLASER:  APPROXIMATELY, IT SHOULD BE FOUR TO SIX

 5   WEEKS.                                                          01:55

 6            I DON'T KNOW WHAT COUNSEL FOR MATTEL BELIEVES BECAUSE

 7   I HAVE NOT DISCUSSED THAT WITH THEM.  I PERSONALLY HAVEN'T.

 8   BUT THAT'S OUR BEST ESTIMATE.

 9            THE COURT:  I GUESS THE ONLY CONCERN I HAVE, AND THIS

10   CONCERN IS HEIGHTENED BY COUNSEL'S PATENT TRIAL, IS THE SPREAD  01:56

11   BETWEEN APRIL FOR THE MOTION CUTOFF AND JULY FOR THE TRIAL

12   DATE.  MOVING THE TRIAL FROM FEBRUARY 12, 2008 TO JULY 1ST IS

13   BASICALLY A FIVE-MONTH CONTINUANCE.

14            MS. GLASER:  I'M NOT AVERSE -- I'M NOW SPEAKING

15   SELFISHLY FOR PATTY GLASER -- I'M NOT AVERSE IF THE COURT       01:56

16   WANTED TO MOVE THE TRIAL UP A LITTLE BIT.  BUT TO BE FAIR, I

17   HAVEN'T CONSULTED WITH MR. QUINN'S CALENDAR.

18            THE COURT:  MY CONCERN IS, ONCE I GO OFF A DATE

19   THAT'S ALREADY SET, THEN I RUN INTO THE CAN OF WORMS OF

20   EVERYONE'S CONFLICTS; SO THAT'S MY HESITATION TO MOVE OFF THE   01:56

21   FEBRUARY 12TH DATE, AS IT STANDS RIGHT NOW.

22            MS. GLASER:  THAT'S THE REASON WE PICKED THE JULY 1ST

23   DATE, BECAUSE THAT DATE HAD BEEN CLEARED BY YOUR HONOR IN

24   CONNECTION WITH THE SECOND PHASE OF THE TRIAL.

25            THE COURT:  RIGHT.                                     01:56
```

1          MS. GLAZER:  SO THAT WAS AN EASY PICK FOR US.  BUT

2     THAT'S THE REASON WE DID IT.

3          MR. QUINN:  JUNE IS A PROBLEM FOR THE FOLKS AT

4     MATTEL, YOUR HONOR.  THERE'S A MATTEL TOY FAIR, IS WHAT THEY

5     CALL IT, WHERE THEY HAVE ALL OF THEIR CUSTOMERS -- IT'S A VERY          01:57

6     BIG DEAL FOR THEIR BUSINESS.

7          THE COURT:  WHAT ABOUT MAY?

8          MR. ZELLER:  PART OF THE CLIENT'S CONCERN WAS, IF WE

9     START IN MAY AND IT RUNS FOR FOUR TO SIX WEEKS, OR MAYBE EVEN

10    EIGHT, THEN WE'RE INTO THE MATTEL TOY FAIR.  AND THEN, OF          01:57

11    COURSE, THERE'S EASTER AS WELL.

12         THE COURT:  WHAT ARE THE DATES OF THE MATTEL TOY

13    FAIR?

14         MR. QUINN:  THAT, I DON'T KNOW THE ANSWER TO.

15         WHAT WE WERE TOLD WAS THAT JUNE, PEOPLE ARE CRAZY          01:57

16    WORKING ON IT AND PREPARING FOR THIS TOY FAIR.

17         APRIL WOULD WORK FOR US, BUT WE UNDERSTOOD THAT WAS A

18    CONFLICT WITH COUNSEL'S SCHEDULE.  MAY HAS THE CONCERN THAT IT

19    COULD BLEED OVER INTO THIS JUNE PERIOD, AND THAT'S HOW WE GOT

20    TO JULY, WHICH THE COURT HAD ALREADY SET ASIDE ANYWAY.          01:58

21         THE COURT:  FOR PHASE TWO.  RIGHT.

22         MR. QUINN:  RIGHT.

23         THE COURT:  WHAT IS THE APRIL PROBLEM?  WHO'S GOT THE

24    PROBLEM WITH APRIL?

25         MS. GLASER:  THERE'S NOT A PROBLEM SCHEDULING.  THIS          01:58

```
 1   IS THE ISSUE, THOUGH:  IN ORDER FOR THERE TO BE TIME TO DO
 2   EXPERT DEPOSITIONS BEFORE THE COURT HEARS DISPOSITIVE MOTIONS,
 3   WHICH, I THINK, IS ONLY FAIR TO BOTH SIDES, WE COULDN'T FIGURE
 4   OUT A WAY TO PULL THE DATE IN EARLIER, CERTAINLY IN APRIL.  WE
 5   COULD DO IT IN MAY.  WE'RE OKAY WITH THAT.  NO PROBLEM WITH        01:58
 6   THAT.  BUT IF WE DID IT IN APRIL, YOU JUST CAN'T COUNT BACK FAR
 7   ENOUGH.  AND THEN WHAT HAPPENS, THEN, IS, JUST LOGISTICALLY, IT
 8   HURTS BOTH SIDES.  AND I THINK THAT'S WHY WE WERE ABLE TO AGREE
 9   TO THIS JULY DATE, BECAUSE YOU'RE TRYING TO GET THE DISPOSITIVE
10   MOTIONS HEARD WITHOUT THE BENEFIT OF THE DEPOSITIONS OCCURRING     01:58
11   WITH THE EXPERTS.
12           THE COURT:  WE COULD ALWAYS JUST BACK DISCOVERY UP.
13           MS. GLASER:  YES, YOU COULD DO THAT.  YOU COULD DO
14   THAT.
15           THE COURT:  IS THERE ANY OTHER OBJECTION TO APRIL?         01:58
16           MS. GLASER:  THAT WAS OUR BIG OBJECTION.  WE REALLY
17   FELT -- AND I THINK WE ACTUALLY WERE PRETTY GOOD IN CONVINCING
18   THE OTHER SIDE -- THAT IT WOULD HURT BOTH SIDES IF WE ARE NOT
19   ABLE TO GIVE THE COURT THE BENEFIT OF EXPERT DEPOSITIONS.
20           THE COURT:  I UNDERSTAND THAT.  BUT ASSUMING THAT WE       01:59
21   COULD ADDRESS THAT PROBLEM WITH MOVING THE DISCOVERY UP JUST A
22   BIT, IS THERE ANY OTHER PROBLEM WITH APRIL?
23           APRIL IS AN EASIER MONTH FOR THE COURT TO SCHEDULE A
24   FOUR- TO SIX-WEEK TRIAL THAN JULY.
25           MS. GLASER:  IF THE OTHER ADJUSTMENTS WERE MADE, WE        01:59
```

1   DO NOT HAVE AN OBJECTION.

2           MR. ZELLER:  WE ARE SOMEWHAT CONCERNED ABOUT

3   SHORT-CHANGING FACT DISCOVERY.  WITHOUT, OF COURSE, STARTING TO

4   DELVE INTO THE OTHER MOTIONS THAT ARE BEFORE THE COURT AND ALL

5   THE OTHER THINGS THAT ARE GOING ON WITH DISCOVERY RIGHT AT THIS     01:59

6   JUNCTURE, THE FACT IS, THERE IS A LOT OF WORK THAT STILL NEEDS

7   TO BE DONE ON FACT DISCOVERY, AS, I THINK, IS PRETTY EVIDENT

8   FROM THE PAPERS THAT HAVE BEEN FILED WITH THE COURT.

9           WE ARE CONFIDENT THAT THAT'S GOING TO WORK ITS

10  NATURAL COURSE OUT AND WE ARE GOING TO GET THAT DISCOVERY, BUT     01:59

11  THAT, OBVIOUSLY, IS NOT GOING TO HAPPEN IN A DAY.

12          THE COURT:  OKAY.

13          MR. ZELLER:  IT IS GOING TO REQUIRE SOME ADDITIONAL

14  TIME.  THAT'S WHY WE DID THINK THAT ADDITIONAL TIME ON THE FACT

15  DISCOVERY MADE SENSE, WHICH NECESSARILY, BECAUSE OF THE            02:00

16  CONCERNS THAT MS. GLASER HAS JUST ARTICULATED, MEANT ALSO

17  MOVING OUT SOME OF THE EXPERT DISCOVERY.

18          THE COURT:  I'M NOT HEARING ANY OBJECTIONS, ANY

19  CONFLICTS, WITH APRIL.

20          MS. GLASER:  THAT'S CORRECT.                               02:00

21          MR. KEKER:  NO CONFLICTS WITH APRIL.  BUT, YOUR

22  HONOR, AS CARTER BRYANT'S COUNSEL, WE'RE GREATLY CONCERNED THAT

23  BECAUSE SO MUCH IS GOING TO BE PACKED INTO THIS DISCOVERY

24  PERIOD, THAT SOMEHOW IT WILL ALL KIND OF FALL PART, AND WE HAVE

25  TO COME BACK AGAIN.  AND PEOPLE SAY WE CAN'T TRY THE CASE IN       02:00

```
 1    APRIL.  WE WOULD VERY MUCH LIKE TO GET IT SET, GET IT DONE.

 2    AND IT SOUNDS LIKE JULY 1ST IS THE TIME THAT PEOPLE COULD

 3    COMMIT, BUT FOR MY PROBLEM.

 4            THE COURT:  RIGHT.

 5            MR. KEKER:  BUT THEY COULD MUCH MORE COMMIT TO -- IT      02:00

 6    WILL ALL BE DONE, WE CAN HAVE IT PACKAGED UP.  AND, AS I SAY, I

 7    MEAN, IT'S A PATENT CASE; THERE'S MANY A SLIP BETWEEN NOW AND

 8    THEN.  MARKMAN HASN'T EVEN HAPPENED; THERE'S SUMMARY JUDGMENT;

 9    THERE'S THE JUDGE'S SCHEDULE; AND SOMETIMES CASES DON'T GET

10    SET.  I JUST HAVE A FEELING THAT IT'S GOING TO WORK OUT, BUT I   02:01

11    CAN'T GUARANTEE IT.  THAT'S ALL.

12            THE COURT:  EXCUSE ME.

13            MR. HOLMES?

14            (BRIEF PAUSE.)

15            THE COURT:  ALL RIGHT.                                   02:02

16            FOCUSING ON THE MOTIONS AT HAND, I WILL ISSUE A --

17    I'LL CONSIDER THIS AS A MOTION, ESSENTIALLY, TO MODIFY THE

18    SCHEDULING.  I HAVE A SENSE OF WHERE WE'RE GOING ON THIS, AND I

19    WILL INCLUDE THIS AS PART OF THE ORDER I ISSUE ON TODAY'S

20    MOTIONS.                                                         02:02

21            LET'S BEGIN WITH THE MAY 15, 2007 ORDER FROM MGA.

22            MS. CENDALI:  DO YOU MEAN IN TERMS, YOUR HONOR, OF

23    OUR EX-PARTE APPLICATION OR WITH REGARD TO THE SPECIFIC ISSUES

24    ON THE 30(B)(6) WITNESSES AND THE DOCUMENTS?

25            THE COURT:  WHY DON'T WE GO WITH THE 30(B)(6).  AT       02:02
```

```
 1   THE END OF THE DAY, I'LL ADDRESS THE ISSUE OF TIMING OF THE
 2   DISCLOSURE, BUT LET'S GO TO THE HEART OF THE MATTER HERE.
 3          MS. CENDALI:  OKAY.
 4          WE BELIEVE THAT JUDGE INFANTE'S ORDER WAS EITHER
 5   CLEARLY ERRONEOUS OR CONTRARY TO LAW.                          02:02
 6          THERE'S THREE DIFFERENT ISSUES WITH REGARD TO THE
 7   30(B)(6) WITNESSES.  LET'S START FIRST WITH THE NET WORTH
 8   ISSUE.
 9          THEY HAVE COMPELLED THE PRODUCTION OF A WITNESS TO
10   TESTIFY ABOUT MGA'S NET WORTH.                                 02:03
11          THE COURT:  RIGHT.
12          MS. CENDALI:  MGA IS A PRIVATE COMPANY.  MGA DOESN'T
13   HAVE THAT NUMBER IN A NICE LITTLE PLACE SOMEWHERE.
14   TRADITIONALLY, AS WE ALL KNOW, THAT'S SOMETHING THAT COMES UP
15   IN THE CONTEXT.  AND IT'S ONLY RELEVANT IN THIS CASE TO THEIR  02:03
16   CLAIMS IN THE COUNTERCLAIMS FOR PUNITIVE DAMAGES, IF THEY EVER
17   GET THERE.  TRADITIONALLY, IT COMES UP AT THE END OF THE CASE
18   AND IN THE CONTEXT OF EXPERT DISCOVERY, WHICH, ESPECIALLY IF WE
19   PUT BACK PHASE TWO OF THE TRIAL, WHICH IT LOOKS LIKE MAY BE
20   HAPPENING --                                                   02:03
21          THE COURT:  RIGHT.  BUT WE DIDN'T DIVIDE THE
22   DISCOVERY.  WE'RE HAVING UNITARY DISCOVERY.
23          MS. CENDALI:  I UNDERSTAND THAT.
24          THE COURT:  RIGHT.
25          MS. CENDALI:  BUT THE ISSUE IS, SHOULD MGA HAVE TO,     02:03
```

```
1    UNDER THE FEDERAL RULES, PUT FORWARD A WITNESS TO OPINE, DO A

2    CALCULATION OF NET WORTH THAT IT DOESN'T KEEP?

3            WE'RE NOT SAYING THAT THEY'RE NOT ENTITLED TO THE

4    FINANCIAL INFORMATION.  THEY'RE ENTITLED TO THE FINANCIAL

5    INFORMATION.  AND THEIR OWN EXPERTS MAY ANALYZE IT AND         02:04

6    SCRUTINIZE IT AND COME UP WITH, 'I DEFINE THAT NETWORK IS X';

7    AND PRESUMABLY, OUR EXPERT WILL DO THE SAME.

8            THE COURT:  THEY'RE ONLY ENTITLED UNDER EXCEPTIONAL

9    CIRCUMSTANCES.

10            DID YOU MAKE THAT ARGUMENT BEFORE JUDGE INFANTE?      02:04

11       MS. CENDALI:  IT WAS THEIR BURDEN TO MAKE, AND THEY

12   DID NOT MAKE AN ARGUMENT AS TO EXCEPTIONAL CIRCUMSTANCES WITH

13   REGARD TO NET WORTH.  IT WAS THEIR BURDEN.

14            THE COURT:  I'LL ASK THEM THAT QUESTION.

15            BUT YOU NEVER MADE THE ARGUMENT THAT THEY HAD TO      02:04

16   ESTABLISH EXCEPTIONAL CIRCUMSTANCES AND THEY FAILED TO DO SO.

17            MS. CENDALI:  ON THE NET WORTH ARGUMENT, I BELIEVE

18   THAT IS -- WE SAID THAT THIS IS -- I DON'T KNOW IF WE PRECISELY

19   SAID, YOUR HONOR, TO BE FAIR, THAT IT WAS AN EXCEPTIONAL

20   CIRCUMSTANCE.  I THINK THAT MIGHT BE RIGHT.  BUT I DON'T       02:04

21   BELIEVE THEY DID EITHER.  I THINK THE FOCUS WAS JUST THAT IT'S

22   NOT SOMETHING THAT WAS KEPT.  AND UNDER THE FEDERAL RULES, THE

23   REQUIREMENTS ARE THAT SOMEONE ONLY CAN TESTIFY AS TO SOMETHING

24   OF MATTERS KNOWN OR REASONABLY AVAILABLE TO IT, SUBJECT TO

25   30(B)(6), WHICH IS NOT TRADITIONALLY A CALCULATION LIKE THAT.  02:05
```

```
 1  AND NEITHER SIDE HAS BEEN ABLE TO PRESENT TO YOUR HONOR ANY

 2  CASE, ANOTHER INSTANCE, WHERE A PARTY WAS REQUIRED TO PRODUCE A

 3  FACT WITNESS WITH REGARD TO NET WORTH.

 4         THE COURT:  PUTTING ASIDE THE 30(B)(6), JUST FOCUSING

 5  ON THE DOCUMENTS IN QUESTION HERE, ARE THERE ANY NONPRIVILEGED      02:05

 6  DOCUMENTS TO WHICH YOU'RE OBJECTING?

 7         MS. CENDALI:  IN THE CONTEXT OF THIS?

 8         I DON'T KNOW WHAT THOSE DOCUMENTS WOULD BE.

 9         NO, YOUR HONOR.  THEIR FINANCIAL INFORMATION, WE'VE

10  PROVIDED AUDITED FINANCIAL STATEMENTS.                             02:05

11         THE COURT:  YOU'RE SUGGESTING THEY'RE ALL PRIVILEGED,

12  BASICALLY?

13         MS. CENDALI:  NO, NO, NO.  I'M NOT SAYING THAT WITH

14  REGARD TO FINANCIAL INFORMATION.

15         IN OTHER WORDS, THERE'S BEEN NO ONE WHO'S DONE ANY          02:05

16  CALCULATION WITH REGARD TO THIS.  SO IT'S PRIVILEGED IN THE

17  SENSE THAT IT'S TRADE SECRET, IT'S PROPRIETARY, IT'S

18  CONFIDENTIAL, AND THERE'S NO EXPERT THAT HAS DONE ANY

19  CALCULATION.

20         THE COURT:  REFERRING TO THOSE DOCUMENTS THAT YOU           02:06

21  JUST CLASSIFIED AS TRADE SECRET AND CONFIDENTIAL, HAVE YOU

22  PROVIDED A PRIVILEGED LIST OF THOSE DOCUMENTS?

23         MS. CENDALI:  THOSE ARE NOT PRIVILEGED DOCUMENTS,

24  YOUR HONOR.  THOSE ARE REGULAR FINANCIAL DOCUMENTS, WHICH WE

25  PRODUCED TO THEM.                                                  02:06
```

1          SO, ESSENTIALLY, YOUR HONOR, OUR POSITION IS, WITH

2     REGARD TO NET WORTH, WE'LL GIVE THEM THE DOCUMENTS ABOUT THE

3     UNDERLYING FINANCIAL CONDITION, AND THEY CAN HIRE THEIR EXPERT

4     TO DO AN ASSESSMENT, A SUBJECTIVE, ANALYTICAL ASSESSMENT, AS TO

5     WHAT THOSE DOCUMENTS MEAN.                                          02:06

6          THE COURT:  DO YOU HAVE DOCUMENTS THAT ARE EXTENT AS

7     OF RIGHT NOW THAT WOULD GO TO THE ISSUE OF FINANCIAL NET WORTH

8     THAT YOU HAVE NOT PRODUCED?

9          MS. CENDALI:  NO, YOUR HONOR.

10         THE COURT:  SO THERE ARE NO SUCH DOCUMENTS.                     02:06

11         MS. CENDALI:  I DON'T KNOW WHAT THOSE DOCUMENTS WOULD

12    BE.

13         WE PRODUCED FINANCIALS, AUDITED FINANCIALS.  I

14    SUPPOSE SOMEONE COULD TAKE THE AUDITED FINANCIALS AND DO AN

15    ANALYSIS AND COME UP WITH --                                        02:06

16         THE COURT:  AND I GUESS I'M ASKING, HAS THAT BEEN

17    DONE?

18         MS. CENDALI:  NO.

19         THE COURT:  OKAY.

20         SO YOU DO NOT HAVE THOSE DOCUMENTS, THEN?                       02:06

21         MS. CENDALI:  CORRECT.

22         THE COURT:  YOU'VE PRODUCED ALL OF THE DOCUMENTS

23    RELEVANT TO THIS THAT YOU HAVE?

24         MS. CENDALI:  CORRECT.  THERE IS NO CACHE OF

25    DOCUMENTS THAT ANALYZE THE NET WORTH OF THE COMPANY THAT WE          02:07

```
 1   HAVE NOT TURNED OVER OR PUT ON A PRIVILEGED BLOCK.

 2          THE COURT:  SO THIS IS ONLY THE ISSUE OF MAKING

 3   AVAILABLE A 30(B) WITNESS THAT WOULD BE ABLE TO PUT THAT

 4   TOGETHER FOR THE PLAINTIFFS?

 5          MS. CENDALI:  THAT'S RIGHT.                          02:07

 6          AND I'M CONFIDENT THAT IF COUNSEL BELIEVES THAT THEY

 7   NEED ADDITIONAL FINANCIAL DOCUMENTS THAN THE ONES THAT WE'VE

 8   PROVIDED, I SUSPECT THEY'RE GOING TO TELL US THAT.  BUT WE'RE

 9   NOT OBJECTING TO GIVING THEM THE INFORMATION; WE'RE OBJECTING

10   TO THE 30(B)(6) WITNESS.                                   02:07

11          THE COURT:  WHAT ABOUT THE DOCUMENTS REGARDING THESE

12   UNRELEASED PRODUCTS?

13          MS. CENDALI:  YES.

14          THAT IS -- I THINK THAT SHOULD BE A GOOD-FOR-THE

15   GOOSE, GOOD-FOR-THE-GANDER THING, YOUR HONOR.  I DON'T THINK  02:07

16   EITHER SIDE SHOULD HAVE TO PRODUCE DOCUMENTS RELATED TO

17   UNRELEASED PRODUCTS, OR CERTAINLY NOT SUBJECT TO WITHOUT THE

18   HEIGHTENED THIRD-TIER STIPULATION THAT WE'VE AGREED TO, AND

19   CERTAINLY NOT AS EARLY AS --

20          THE COURT:  YOU ARGUE BASED ON RELEVANCE.  BUT LET'S  02:08

21   ASSUME THAT THE ALLEGATIONS ARE TRUE FOR A MOMENT, THAT BRATZ

22   ESSENTIALLY IS A STOLEN DESIGN OR PRODUCT FROM MATTEL.  UNDER

23   THEIR THEORY, ANYTHING THAT IS DERIVATIVE FROM BRATZ WOULD BE

24   ENCOMPASSED IN THEIR CLAIM.

25          MS. CENDALI:  WELL, FIRST, THEY WOULD HAVE TO SHOW   02:08
```

```
 1   THAT IT'S DERIVATIVE; THAT'S ONE THING.

 2           THE COURT:  AND HOW THEY WOULD SHOW THAT, PRESUMABLY,

 3   IS BY GETTING THESE DOCUMENTS.

 4           MS. CENDALI:  TRUE.  BUT LET'S FOCUS ON IT.

 5           WHY DOES IT MATTER IF UNRELEASED DRAWINGS -- WHAT           02:08

 6   THEY'RE LOOKING FOR ARE DOCUMENTS ABOUT UNRELEASED DRAWINGS, BY

 7   DEFINITION, THAT HAVE NOT YET COME TO FRUITION OF A PRODUCT,

 8   RIGHT?  SO UNLESS THERE'S A PRODUCT THAT'S OUT THERE MAKING

 9   MONEY, IT'S NOT AS IF THERE'S ANY RELEVANCE FROM A DAMAGES

10   POINT OF VIEW YET.  ONE WOULD HAVE TO PROJECT WHAT THE FUTURE      02:08

11   IS WITH REGARD TO DAMAGES.

12           AND THE QUESTION, AS IN ANY CASE, IS LOOKING AT THE

13   BENEFIT VERSUS THE BURDEN, ESPECIALLY IN A TRADE SECRETS CASE.

14   IN A TRADE SECRETS CASE, THE TEST IS WHETHER THE RISK OF

15   INADVERTENT DISCLOSURE OF THE MOVING PARTIES, THE PARTIES         02:09

16   SEEKING PROTECTION OF TRADE SECRETS, IS OUTWEIGHED BY THE RISK

17   THAT NOT PRODUCING IT WOULD IMPAIR THE ABILITY TO PROSECUTE THE

18   CASE.

19           THAT WAS THE BROWN-BAG DECISION IN THE NINTH CIRCUIT.

20           THE SPECIAL MASTER DID NOT APPLY THAT TEST.  THERE        02:09

21   REALLY WASN'T MUCH ANALYSIS AT ALL DONE BY EITHER PARTY OR BY

22   THE SPECIAL MASTER ON THE ISSUE OF THE UNRELEASED PRODUCTS

23   ISSUE.  AND I SUBMIT THAT THE MARGINAL BENEFIT, THE MARGINAL

24   BENEFIT, IS OUTWEIGHED BY THE RISK.  WHEN YOU'RE TALKING ABOUT

25   AVIS GIVING TO HERTZ KEY DOCUMENTS, OR, GOOGLE AND YAHOO AND      02:09
```

```
 1   THE LIKE, ESPECIALLY SINCE WHEN THE PRODUCTS ACTUALLY COME OUT,

 2   THEN YOU HAVE A TANGIBLE PRODUCT THAT YOU CAN LOOK AT.

 3          BUT YOU'RE TALKING ABOUT DRAWINGS AND THE LIKE.

 4          NOW, THE WAY THE PARTIES -- BOTH PARTIES, RECOGNIZE

 5   THIS, AND THAT'S WHY FOR 2007 DOCUMENTS, FOR PRODUCTS            02:10

 6   UNRELEASED IN 2007, WE AGREED TO A STIPULATION SAYING THAT

 7   NOBODY NEEDS TO PRODUCE THEIR 2007 UNRELEASED PRODUCT DOCUMENTS

 8   UNTIL JUNE 29TH, AND ONLY THEN, SUBJECT TO THIS MORE RIGOROUS

 9   PROTECTIVE ORDER.

10          WE LEFT IN THE STIP THE IDEA THAT WE WOULD TRY TO         02:10

11   WORK SOMETHING OUT WITH THE UNRELEASED 2008 DOCUMENTS.  WE

12   WEREN'T ABLE TO WORK SOMETHING OUT; SO THE NET EFFECT OF IT IS,

13   FOR THE 2008 PRODUCTS, WHICH ARE ALL THE MORE SECRET BECAUSE

14   THEY'RE FURTHER OUT IN TIME, WE'RE HAVING TO -- BOTH SIDES,

15   HAVING TO PRODUCE THEM TOO EARLY IN TIME, WITHOUT EVEN THE       02:10

16   THIRD-TIER PROTECTION THAT WE HAD NEGOTIATED.

17          SO OUR POSITION IS THAT SINCE IT'S -- YOU WILL NEVER

18   BE ABLE TO DRAW THE LINE COMPLETELY, YOU KNOW, AS LONG AS

19   THERE'S ONGOING PRODUCTS.  THERE WILL ALWAYS BE ONGOING

20   PRODUCTS THAT YOU'LL HAVE TO EXTRAPOLATE FROM A DAMAGES POINT    02:11

21   OF VIEW.  SO OUR POINT IS, GIVEN THE DUELING TRADE SECRETS

22   CONCERNS IN THIS CASE, WHICH WE BELIEVE FERVENTLY -- THAT'S WHY

23   WE FILED THESE AFFIRMATIVE CASE --

24          THE COURT:  WHERE DO YOU SUGGEST WE DRAW THE LINE?

25          MS. CENDALI:  I SUGGEST THAT WE DRAW THE LINE AT          02:11
```

1    PRODUCTS THAT HAVE BEEN RELEASED DURING THE SCOPE OF DISCOVERY.

2    AND IF THE FACT CUTOFF ENDS UP BEING AMENDED, WITH REGARD TO

3    PHASE TWO, ESPECIALLY, OR EVEN IF IT'S AMENDED WITH REGARD TO

4    PHASE ONE --

5           THE COURT:  WELL, THERE'S ONLY ONE DISCOVERY PERIOD.    02:11

6    AND RIGHT NOW IT'S SET FOR OCTOBER 22ND.  IT'S BEEN PROPOSED TO

7    CONTINUE THAT TO JANUARY 10TH.

8           MS. CENDALI:  WELL, TO CORRECT, YOUR HONOR, ACTUALLY,

9    WHILE DISCOVERY IS CONSOLIDATED, THERE'S A SEPARATE -- I THINK

10   IT'S A MARCH 10TH FACT DISCOVERY PERIOD FOR THE TRADE SECRETS   02:11

11   AND RICO CASE.

12          THE COURT:  YOU'RE RIGHT.  I'M SORRY.

13          MS. CENDALI:  SO MY SUGGESTION IS THAT WE MOVE IT OFF

14   FOR RELEASED PRODUCTS AT THE TIME --

15          THE COURT:  OF THE FINAL DISCOVERY.                     02:12

16          MS. CENDALI:  -- OF FINAL DISCOVERY, AND THAT THAT

17   WOULD BE THE BEST WAY TO DO IT, AND, IN ADDITION, THAT WE

18   CONTINUE TO USE THIS THIRD-TIER PROTECTION WITH REGARD TO

19   ANYTHING THAT'S UNRELEASED.

20          THE COURT:  OKAY.

21          MS. CENDALI:  SO MOVING, THEN, IF YOU'D LIKE, TO THE

22   ISSUE OF THE INK-TESTING DOCUMENTS, WHICH IS THE OTHER

23   30(B)(6) CATEGORY.

24          THE COURT:  I WANT TO KEEP THESE SEPARATE IN MY OWN

25   MIND, JUST FOR A SECOND.  I'LL INVITE YOU BACK UP TO ADDRESS    02:12

1    THAT MOTION.

2            LET ME HEAR MATTEL'S RESPONSE TO THIS FIRST MOTION.

3            THANK YOU, COUNSEL.

4            MR. ZELLER:  WELL, AS IT'S SETTLED NOW AT THIS POINT,

5    THE STANDARD IS CLEAR ERROR, AND REALLY WHAT WE HAVE IS THAT        02:12

6    MGA WOULD PREFER THAT SOMETHING BE DONE IN A DIFFERENT WAY,

7    DEBATING CERTAIN ASPECTS OF WHERE LINES CAN BE DRAWN, BUT THEY

8    HAVE NOT SHOWN CLEAR ERROR INSOFAR AS THE DISCOVERY MASTER'S

9    RULINGS ARE CONCERNED.

10           WE ARE OBLIGATED AS THE PLAINTIFF TO ESTABLISH NET        02:12

11   WORTH.  FOR PUNITIVE DAMAGES PURPOSES, WE'RE ENTITLED TO THAT

12   DISCOVERY.  AND THERE'S REALLY NO ARGUMENT MADE HERE AS TO WHY

13   WE SHOULD NOT BE ALLOWED TO HAVE A 30(B)(6) WITNESS ON THAT

14   SUBJECT.

15           THE COURT:  LET ME STOP YOU THERE, COUNSEL.  LET'S        02:13

16   JUST FOCUS ON THE ONLY ARGUMENT THAT REALLY IS ADVANCED AT THIS

17   POINT.

18           THERE'S NO ARGUMENT, AS I'M UNDERSTANDING IT, FROM

19   MGA THAT YOU'RE ENTITLED TO ALL OF THEIR FINANCIAL DOCUMENTS,

20   SUBJECT TO APPROPRIATE PROTECTIVE ORDERS.                          02:13

21           WHAT THEY'RE SUGGESTING IS THAT YOU'RE NOT ENTITLED,

22   IN THE ABSENCE OF SOME SHOWING OF EXCEPTIONAL CIRCUMSTANCES,

23   THAT YOU HAVE A RIGHT TO A 30(B) WITNESS WHO'S GOING TO

24   BASICALLY PULL ALL OF THIS TOGETHER FOR YOU, AS ALMOST AN

25   EXPERT, AND PRESENT IT ALL KIND OF NICELY TIED UP IN A BOW, AND    02:13

```
 1   THAT THAT'S THE CLEAR ERROR THAT JUDGE INFANTE MADE BY NOT

 2   ESTABLISHING THAT THERE WAS EXCEPTIONAL CIRCUMSTANCES, SIMPLY

 3   FINDING THAT IT'S RELEVANT, AS YOU'RE SUGGESTING.

 4        MR. ZELLER:  I HAVE TWO RESPONSES TO THAT, YOUR

 5   HONOR.                                                        02:13

 6        NUMBER ONE, I DON'T THINK IT'S QUITE THAT SIMPLE.

 7        THEY ARE OBJECTING TO THE ENTIRETY OF THAT CATEGORY.

 8   WE'RE CLEARLY ENTITLED TO ASK SOMEONE ABOUT THE FACTS

 9   UNDERLYING NET WORTH, AND THAT WAS PART OF WHAT IT IS THAT

10   THEY'VE APPEALED.                                             02:14

11        THE ISSUE THAT THEY'RE NOW RAISING IS SOMETHING THAT

12   THEY DID NOT RAISE WITH JUDGE INFANTE, AS THE COURT HAS, I

13   BELIEVE, POINTED OUT.  THEY DID NOT RAISE THE ISSUE THAT THERE

14   WERE EXTRAORDINARY CIRCUMSTANCES, OR VICE VERSA.

15        THE COURT:  THEY SAY THE BURDEN IS ON YOU.               02:14

16        MR. ZELLER:  WELL, YOUR HONOR, IT'S ACTUALLY, I

17   THINK, IN THESE CIRCUMSTANCES, THEIR BURDEN.  WE MOVED ON A

18   TOPIC.  IF THERE WERE ASPECTS OF A TOPIC THAT THEY THOUGHT WERE

19   IMPROPER FOR THAT REASON, THEY WERE, I THINK, OBLIGATED TO

20   RAISE IT.  AND HAVING FAILED TO RAISE THAT OBJECTION TO        02:14

21   DISCOVERY, I DO THINK IT'S WAIVED.

22        IT MAY BE ULTIMATELY OUR BURDEN TO PROVE EXCEPTIONAL

23   CIRCUMSTANCES IF IT'S RAISED AS A PROPER OBJECTION, BUT IT WAS

24   NOT RAISED AS AN OBJECTION HERE, AND, THEREFORE, WAS WAIVED, IN

25   OUR OPINION.                                                  02:14
```

```
 1            THE COURT:  ARE YOU GOING TO BE ASKING THE ULTIMATE

 2   QUESTION OF, WHAT IS YOUR NET WORTH?  IS THAT WHAT YOU'RE

 3   LOOKING FOR?  OR ARE YOU LOOKING FOR SOMEONE WHO'S GOING TO GO

 4   DOWN AND BE ABLE TO REVIEW THE DOCUMENTS THAT ARE PRODUCED, AND

 5   WHAT DOES THIS MEAN, WHAT DOES THAT MEAN?                        02:15

 6            MR. ZELLER:  IT'S BOTH, YOUR HONOR.  I MEAN, IT'S

 7   ABSOLUTELY BOTH.

 8            WE ARE, NO QUESTION, ENTITLED TO THE LATTER PART OF

 9   THAT, WHICH IS TO GO THROUGH THE DOCUMENTS; DO OUR ANALYSIS;

10   ASK THIS PERSON, IS THIS FACTUALLY TRUE; IS THIS FACTUALLY       02:15

11   ACCURATE; WHAT ARE THESE NUMBERS HERE THAT ARE REFLECTED IN

12   THIS DOCUMENT; WHAT ARE THEY BASED ON; WHAT OTHER RECORDS DOES

13   MGA HAVE THAT WILL ESTABLISH THE INTEGRITY OF THOSE NUMBERS?

14            THERE'S NO QUESTION THAT WOULD BE, IN FACT, A LARGE

15   PART OF THE EXAMINATION.                                        02:15

16            HOWEVER, IN TERMS OF THE ULTIMATE QUESTION OF, WHAT

17   IS MGA WORTH, THERE'S NO QUESTION THAT THAT IS SOMETHING THAT'S

18   RELEVANT TO THIS LITIGATION.  I DON'T THINK THAT'S EVEN IN

19   DISPUTE.

20            NUMBER TWO, IT'S STANDARD UNDER RULE 30(B)(6):  IS      02:15

21   THIS INFORMATION THAT IS THE BOTTOM LINE NUMBER SOMETHING

22   THAT'S REASONABLY AVAILABLE TO MGA?

23            THE COURT:  THEY'RE SAYING THAT IT'S NOT.

24            MR. ZELLER:  WELL, I'D HAVE TO DISAGREE TO THE EXTENT

25   THAT THIS IS INFORMATION WITHIN THEIR KNOWLEDGE, WITHIN          02:15
```

```
 1   SOMETHING THAT THEY CAN ASCERTAIN.

 2          THE CORPORATION -- AND I CERTAINLY DON'T THINK THAT

 3   THEY'RE GOING TO BE MAKING THE ARGUMENT -- IN FACT, QUITE TO

 4   THE CONTRARY -- WHEN IT COMES TO MATTEL, SAYING THAT MATTEL HAS

 5   TO MAKE AN INVESTIGATION TO DETERMINE CERTAIN FACTS AND

 6   THEREFORE EDUCATE A WITNESS AND PUT THAT PERSON UP TO TESTIFY

 7   ABOUT IT.  THAT'S NOT REALLY ANY DIFFERENT THAN WHAT WE HAVE

 8   HERE.

 9          IN FACT, GIVEN THE FACT THAT THEY ARE A CLOSELY-HELD

10   CORPORATION MAKES IT ALL THE MORE MYSTERIOUS, AT LEAST FROM OUR

11   PERSPECTIVE, AS TO WHAT THE FINANCIALS ARE AND WHAT IS MGA'S

12   POSITION AS TO ITS NET WORTH.  ARE WE GOING TO HEAR THAT

13   THEY'RE GOING TO SAY, IN FACT, THEY HAVE A NEGATIVE NET WORTH?

14   THAT'S CERTAINLY SOMETHING THAT I THINK WE'RE ENTITLED TO KNOW

15   AND SOMETHING TO EXPLORE.

16          THE COURT:  VERY WELL.

17          LET ME HEAR YOU ON YOUR OTHER MOTION.

18          MS. CENDALI:  THANK YOU, YOUR HONOR.

19          BUT, IF I MAY, I DON'T THINK THE EXCEPTIONAL

20   CIRCUMSTANCES TEST, AS I THINK ABOUT IT, EVEN APPLIES TO THIS

21   SITUATION ON THE NET WORTH, BECAUSE THE EXCEPTIONAL

22   CIRCUMSTANCES ARE PURSUANT TO RULE 26(B)(4)(B), WITH REGARD TO

23   DISCLOSURE OF NONTESTIFYING OR CONSULTING EXPERTS.  AND THAT

24   GETS ME TO THE 30(B)(6) THAT WE WERE ASKED TO BOTH -- THE COURT

25   -- INFANTE ORDERED US TO BOTH PUT FORWARD --
```

02:16
02:16
02:16
02:16
02:17

```
 1              THE COURT:  IF THAT DOESN'T APPLY, THEN, WHY CAN'T WE

 2   SIMPLY HAVE SOMEONE FROM MGA COME FORWARD AND EXPLAIN THE

 3   DOCUMENTS THAT YOU'VE PRODUCED?

 4              MS. CENDALI:  THERE'S A -- EXPLAINING FINANCIAL

 5   DOCUMENTS, THIS IS THIS NUMBER, THIS IS THAT NUMBER, THAT'S    02:17

 6   DIFFERENT FROM DOING THE CALCULATION THAT IS THE NET WORTH.

 7   AND AS YOU HEARD MR. ZELLER SAY, THEY WANTED BOTH.

 8              THE COURT:  THEY DO.

 9              JUST SO I'M CLEAR ON THIS, YOUR POSITION IS THAT MGA

10   DOES NOT KNOW WHAT THEIR NET WORTH IS?                        02:17

11              MS. CENDALI:  CORRECT.  THAT'S NOT A NUMBER THAT IT

12   HAS ANY -- IF YOU THINK ABOUT IT, THAT NUMBER IS NOT USED IN

13   THE WORLD VERY OFTEN IN ANY KIND OF BUSINESS SENSE.  THE

14   FINANCIAL INFORMATION IS DIFFERENT.

15              THE COURT:  BUT I WOULD IMAGINE, IN COMING UP WITH   02:17

16   THE NET WORTH, THERE ARE SEVERAL SUBCATEGORIES OF FINANCIAL

17   WORTH THAT PROBABLY WOULD BE USED IN THE BUSINESS WORLD.

18              MS. CENDALI:  NO, YOUR HONOR.

19              THE COURT:  LIABILITIES, FOR EXAMPLE; ASSETS.

20              MS. CENDALI:  IT COULD BE.  AND THE UNDERLYING       02:18

21   FACTUAL PREMISE THEY'RE ENTITLED TO INVESTIGATE AND HAVE THEIR

22   EXPERT -- THAT'S WHY THIS IS ALWAYS -- THEY HAVE NOT CITED A

23   CASE WHERE A 30(B)(6) WITNESS --

24              THE COURT:  I GUESS THERE'S JUST SOMETHING

25   INTUITIVELY THAT PUTS THE COURT OFF AT KNOWING, YOU KNOW, WE'RE  02:18
```

1  THIS BIG CORPORATION; HERE ARE OUR FINANCIAL DOCUMENTS; GO

2  FIGURE IT OUT.

3        MS. CENDALI:  BECAUSE IT'S JUST NOT SOMETHING THAT

4  HAS BEEN CALCULATED.  IT'S INHERENTLY A LITIGATION CONCEPT

5  THAT'S USED, BASICALLY, IN THE CONCEPT OF PUNITIVE DAMAGES.    02:18

6        THE COURT:  I UNDERSTAND THE BOTTOM LINE AND THE

7  CONCERN ABOUT THAT ULTIMATE QUESTION, BUT IT'S THE PENULTIMATE

8  QUESTION, THOUGH, I GUESS, THAT MAY BE -- I'VE GOT TO THINK

9  THAT SOMEONE HAS FIGURED OUT WHAT THE ASSETS OF MGA ARE.

10       MS. CENDALI:  THEY HAVEN'T ASKED FOR A 30(B)(6).         02:18

11       IF THEY HAD SAID, YOU KNOW, WE WOULD LIKE A 30(B)(6)

12 TO GO OVER YOUR BALANCE SHEET, OR SOMETHING LIKE THAT, THAT'S A

13 DIFFERENT QUESTION.  BUT THAT'S WHAT THEY ASKED.

14       THE COURT:  THEY'RE ASKING FOR A 30(B)(6).

15       MS. CENDALI:  AND WE HAVE CERTIFIED FINANCIALS THAT      02:19

16 WOULD ENABLE ANY EXPERT WORTH HIS SALT TO DO THIS ANALYSIS.

17       BUT MOVING TO THE --

18       THE COURT:  YES, PLEASE.

19       MS. CENDALI:  BUT STILL, AS PART OF THE 30(B)(6)

20 MOTION, JUST TO BE CLEAR, ONE OF THE OTHER TOPICS WAS THE INK   02:19

21 TESTING.

22       THE COURT:  YES.

23       MS. CENDALI:  AND THAT ALSO RELATES TO THE DOCUMENTS

24 MOTION, BECAUSE IT'S THE SAME CONCEPT.

25       IN THE INK-TESTING MOTION, THEY WANT TO HAVE A          02:19

```
 1   30(B)(6) WITNESS TESTIFY AS TO THE INK TESTING THAT WAS DONE

 2   AND THE REPORTS, ET CETERA, THAT WERE GENERATED AS A RESULT OF

 3   THAT.  AND THEY SEEK, IN THE DOCUMENT PRODUCTION PORTION OF IT,

 4   THE DOCUMENTS RELATING THERETO.  THAT'S WHERE YOU GET INTO THE

 5   EXCEPTIONAL CIRCUMSTANCES OF 26(B)(4)(B).  THEY NEITHER ARGUED      02:19

 6   EXCEPTIONAL CIRCUMSTANCES, NOR DID JUDGE INFANTE FIND THAT

 7   THERE WERE EXCEPTIONAL CIRCUMSTANCES, THAT WOULD GIVE RISE FOR

 8   THEIR ABILITY TO GET THOSE DOCUMENTS.

 9           IT'S A CLEAR CONTRARY TO LAW UNDER THE PLAIN

10   GUIDELINES OF THE FEDERAL RULES OF CIVIL PROCEDURE.                02:20

11           AND IT'S VERY MUCH, IN OUR VIEW, JUST LIKE THE

12   CONCERN RAISED BY THE COURT IN THE NORTHERN DISTRICT OF

13   CALIFORNIA, IN RE: PIZZA TIME, A SECURITIES LITIGATION CASE,

14   WHERE IT SAID THAT THIS RULE WAS DESIGNED IN PART TO PREVENT

15   LITIGANTS FROM TRYING TO CUT CASE PREPARATION CORNERS BY          02:20

16   LEACHING BASIC INFORMATION OR INVALUABLE OPINIONS FROM EXPERTS

17   RETAINED BY THEIR OPPONENTS.

18           PARTICULARLY IN POINT HERE, YOUR HONOR, BECAUSE IT

19   WAS LAST JULY THAT WE WERE STANDING RIGHT BEFORE YOUR HONOR

20   TALKING ABOUT THEIR MOTION TO TRY TO HAVE SOME UNIFIED FORENSIC    02:20

21   EXPERT APPOINTED.  AND AT THAT POINT, IF YOU RECALL, YOU HAD

22   SAID, WELL, GEE, IT LOOKS LIKE THE DEFENDANT TRIED TO DO

23   TESTING RIGHT AWAY WHEN THINGS WERE CURRENT AND YOU SAT BACK

24   AND YOU DIDN'T DO ANYTHING, AND YOU DIDN'T DO ANYTHING EVEN

25   AFTER YOU TOOK CARTER BRYANT'S DEPOSITION IN NOVEMBER AND          02:20
```

1    NOTICED THOSE PINPRICKS.

2         WELL, IT'S A YEAR LATER, YOUR HONOR.  I GUESS IT'S

3    JULY AGAIN.  THEY STILL HAVEN'T DONE ANYTHING.  AND THEY WANT

4    TO SEE WHAT OUR CONSULTING EXPERT DID IN ORDER TO HAVE A

5    TACTICAL ADVANTAGE.  THAT'S NOT RIGHT.                          02:21

6         THE WAY THE RULES ARE SUPPOSED TO -- THEY HAVE NOT

7    ARGUED EXCEPTIONAL CIRCUMSTANCES.  JUDGE INFANTE HAS NOT FOUND

8    EXCEPTIONAL CIRCUMSTANCES.  THEY LOSE, IN OUR VIEW, RIGHT AWAY,

9    BECAUSE OF THAT.  AND IF THE TIME COMES WHEN EXPERTS WILL BE

10   DESIGNATED, REPORTS WILL BE SUBMITTED, DEPOSITIONS WILL BE      02:21

11   TAKEN, REBUTTAL REPORTS WILL BE ENTERED, AND THAT'S WHEN THIS

12   IS SUPPOSED TO TAKE PLACE.

13        MY OTHER MOTION ON THE 30(B)(6) TOPIC WAS THEIR

14   MOTION TO GET A 30(B)(6) WITNESS TO ADDRESS ALL PRIOR SWORN

15   STATEMENTS MADE BY MGA ABOUT BRATZ AND THE CREATION OF BRATZ    02:21

16   AND THE LIKE.

17        AGAIN, I'M NOT FAMILIAR WITH A SINGLE CASE THAT HAS

18   EVER ORDERED SOMEBODY TO PUT FORWARD A 30(B)(6) WITNESS TO

19   TESTIFY AS TO THE OTHER TESTIMONY OF LOTS OF OTHER PEOPLE.

20        NOW, WE'RE NOT TALKING ABOUT TESTIMONY OF 20 YEARS        02:22

21   PAST OR ANYTHING LIKE THAT.  WE'RE TALKING ABOUT STATEMENTS

22   MADE AFTER 2001, LARGELY BY MR. BRYANT AND MR. LARIAN, WHO'S

23   ALREADY BEEN DEPOSED AT LENGTH BY PLAINTIFF.

24        THE COURT:  HAVE YOU IDENTIFIED WHO MADE THESE PRIOR

25   SWORN STATEMENTS?                                               02:22

```
 1            MS. CENDALI:  THERE'S NO DOUBT -- JUST TO BE CLEAR,
 2    WE ARE PRODUCING ALL OF THE DOCUMENTS ON THE PRIOR SWORN
 3    STATEMENTS.
 4            AND IN TERMS OF WHO THE ACTUAL PEOPLE ARE --
 5            THE COURT:  YES.                                      02:22
 6            MS. CENDALI:  -- I BELIEVE THAT THEY ARE MAINLY
 7    ISAAC LARIAN.  THERE WERE DEPOSITIONS IN OTHER CASES WHERE
 8    PAULA TRENTAFELIS-GARCIA TESTIFIED.  THEY DEPOSED HER TOO; THEY
 9    DEPOSED HER FOR, ALREADY, TWO DAYS.  AND THERE MAY BE ANOTHER
10    PERSON, PERHAPS A BECKY HARRIS, I THINK, WHO'S ALSO GOING TO BE  02:22
11    TESTIFYING IN THIS CASE.
12            I AM NOT CURRENTLY AWARE OF OTHER FOLKS.  AT BEST,
13    THIS SEEMS TO BE PREMATURE, BUT OUR POSITION IS, WE'RE NOT
14    TALKING ABOUT 500 PEOPLE.  AND WE'RE NOT TALKING ABOUT THINGS
15    100 YEARS AGO; THIS ISN'T LIKE FINDING OUT EPA THINGS FROM     02:23
16    50 YEARS AGO.  WHAT WE'RE TALKING ABOUT ARE SPECIFIC
17    STATEMENTS, I GUESS, THAT WERE MADE IN THE RECENT PAST ABOUT
18    PEOPLE THEY'VE ALREADY DEPOSED.  AND IT SEEMS A MISUSE OF THE
19    30(B)(6) PROCEDURE TO REQUIRE -- AND BURDENSOME -- FOR A SINGLE
20    PERSON TO HAVE TO BE IDENTIFIED TO ANALYZE EVERYBODY ELSE'S    02:23
21    TESTIMONY AND OPINE --
22            THE COURT:  IS SUCH A PERSON READILY AVAILABLE?
23            MS. CENDALI:  NO.  NO.  BECAUSE, THINK ABOUT IT,
24    THEY'VE ALSO CONFLATED ANYTHING ABOUT SOMEBODY'S OWN PERSONAL
25    KNOWLEDGE VERSUS KNOWLEDGE OF THE COMPANY; IS IT MGA'S         02:23
```

```
 1   STATEMENTS; IS IT PERSONAL KNOWLEDGE?

 2          THIS SEEMS TO BE A WAY TO GET AROUND THE LIMITATION

 3   ON THE NUMBER OF DEPOSITIONS OR TO TRY TO GET BACK WITNESSES

 4   WHO HAVE ALREADY BEEN DEPOSED AND NOW THEY THINK THEY'D LIKE TO

 5   GO BACK AND ASK THEM ABOUT SOME OF THEIR STATEMENTS THAT THEY       02:24

 6   DIDN'T ASK THEM BEFORE IN THEIR DEPOSITION.  SO, AT BEST, THIS

 7   IS PREMATURE, AND I THINK EVEN BEYOND BEING PREMATURE, IT'S

 8   BURDENSOME AND NOT WHAT 30(B)(6) IS INTENDED TO DO.

 9          THE COURT:  DO YOU WISH TO SAY ANYTHING ON YOUR

10   EX-PARTE APPLICATION FOR THE PRODUCTION DATE ISSUE?                 02:24

11          MS. CENDALI:  YES.

12          THE BOTTOM LINE IS, WE'RE DOING THE BEST WE CAN, YOUR

13   HONOR.  WE DIDN'T EXPECT -- WE KNEW THAT THE JUDGE WAS GOING

14   TO --

15          THE COURT:  CAN YOU GET IT BY THE END OF THIS MONTH?         02:24

16          MS. CENDALI:  I THINK, FOR THE DOMESTIC DOCUMENTS, WE

17   WILL GET IT BY THE END OF JULY.  WE'VE ALREADY PRODUCED, AS OF

18   FRIDAY, 110,000 PAGES OF DOCUMENTS.  WITH REGARD TO THE

19   HONG KONG DOCUMENTS, I COULD USE ANOTHER TWO WEEKS BEYOND THEN,

20   YOUR HONOR.                                                        02:24

21          THANK YOU.

22          THE COURT:  THANK YOU.

23          COUNSEL?

24          MR. ZELLER:  WITH RESPECT TO THE EX-PARTE, YOUR

25   HONOR, AS I'M SURE THE COURT IS AWARE FROM THE PAPERS, THIS HAS     02:25
```

1   BEEN A MOVING TARGET.  WE'RE NOW TOLD THAT DOMESTIC DOCUMENTS

2   AREN'T EVEN GOING TO BE AVAILABLE FROM MGA UNTIL THE END OF

3   JULY, AND THEN TWO WEEKS BEYOND THAT FOR HONG KONG.

4           THE COURT, I'M SURE, IS AWARE THAT BACK IN FEBRUARY,

5   WHEN WE MADE THIS MOTION, MGA REPRESENTED TO JUDGE INFANTE THAT   02:25

6   THEY WERE IN THE PROCESS OF COLLECTING THOSE DOCUMENTS AND

7   WOULD BE PRODUCING THEM.

8           THE COURT:  DO WE HAVE ANY REASON TO BELIEVE THEY'RE

9   NOT WORKING AS HARD AS THEY CAN TO GET THESE DOCUMENTS

10  PRODUCED?                                                         02:25

11          MR. ZELLER:  I DON'T KNOW IF THAT'S THE ISSUE AT THIS

12  POINT, YOUR HONOR.

13          THERE WAS A COURT ORDER TELLING THEM IN FEBRUARY --

14  OR, EXCUSE ME, AT THE HEARING IN MARCH, THAT THEY WERE GOING TO

15  HAVE TO PRODUCE THESE DOCUMENTS, AND THEY ADMITTED THAT THEY      02:25

16  DIDN'T EVEN START DOING THAT UNTIL NOW.

17          SO, YOUR HONOR, I THINK IT'S A LITTLE LATE JUST IN

18  TERMS OF WHETHER OR NOT THEY'RE WORKING HARD.

19          THE FACT IS, TOO, ON THE HONG KONG DOCUMENTS, THERE

20  IS EVIDENCE THAT THEY CAN ACCESS, AT LEAST THE ELECTRONIC         02:25

21  DOCUMENTS THAT THEY HAVE IN HONG KONG, FROM THE UNITED STATES.

22  AND THAT HAS NOT BEEN ADDRESSED AT ALL.

23          SO, I MEAN, LOOK, JUDGE INFANTE HAS OBVIOUSLY BEEN

24  SUPERVISING DISCOVERY NOW FOR MANY MONTHS.  HE PASSED ON THE

25  EXCUSES THAT MGA GAVE HIM AS TO WHY THEY HAD NOT COMPLIED WITH    02:26

```
 1   HIS ORDER, AND HE FOUND THEM TO BE WANTING.  THAT'S NOT CLEAR

 2   ERROR.  THAT'S, IN FACT, QUITE SUPPORTED BY THE RECORD.

 3          WE ARE GIVEN A MOVING TARGET OF WHEN IT IS THAT MGA

 4   SAYS IT'S GOING TO EVENTUALLY COMPLY WITH THIS ORDER ON

 5   DOCUMENTS THAT WE HAVE BEEN SEEKING FOR QUITE SOME TIME, AND,    02:26

 6   AS THE COURT POINTED OUT EARLIER THIS YEAR, ARE THE SAME

 7   CATEGORIES OF DOCUMENTS THAT SHOULD HAVE BEEN PRODUCED UP

 8   FRONT.

 9          AND, OF COURSE, WE WERE ALSO TOLD LAST WEEK THAT MGA

10   WAS GOING TO PRODUCE ITS DOMESTIC DOCUMENTS BY THE END OF THIS   02:26

11   WEEK.

12          THE COURT:  IS THAT TRUE?

13          MS. CENDALI:  WE TOLD THEM THAT WE INTENDED TO

14   SUBSTANTIALLY COMPLY WITH THE ORDER FOR THE DOMESTIC DOCUMENTS,

15   WHICH IS WHY, AS OF FRIDAY, WE PRODUCED ANOTHER 10,000          02:26

16   DOCUMENTS.

17          I'M TOLD THAT WE'RE TRYING TO DO CLEAN-UP ANALYSIS

18   AND WE'RE TRYING TO DO A GOOD JOB AND SEE IF WE CAN FIND

19   EVERYTHING THAT MIGHT BE THERE.

20          I DON'T KNOW HOW MUCH IS LEFT.  I'M TOLD THAT THERE       02:27

21   MAY BE SOME HARD COPIES, SOME ADDITIONAL ELECTRONIC --

22          THE COURT:  SO THIS ADDITIONAL FOUR WEEKS THAT YOU'RE

23   ASKING FOR AT THIS POINT FOR THE DOMESTIC DOCUMENTS, YOU DON'T

24   ANTICIPATE A LARGE VOLUME IN THAT FOUR WEEKS?

25          MS. CENDALI:  CORRECT.                                    02:27
```

1    I'M DOING THE BEST I CAN, YOU KNOW.  I THINK HE WANTS

2  MORE DOCUMENTS RATHER THAN FEWER DOCUMENTS, AND WE'RE SEARCHING

3  HARD TO GET EVERY POSSIBLE DOCUMENT THAT WE CAN.

4    THE COURT:  THE INTERNATIONAL, DO THEY HAVE THE BULK

5  OF THE INTERNATIONAL DOCUMENTS?                             02:27

6    MS. CENDALI:  WELL, YES AND NO.

7    ON THE INTERNATIONAL DOCUMENTS -- AND I THINK THESE

8  ARE THE KEY DOCUMENTS -- BACK IN THE DAY, BACK IN 2004, WE

9  PRODUCED OUR INITIAL PRODUCTION OF 10,000 DOCUMENTS LONG

10  BEFORE, YOUR HONOR, MATTEL EVER PRODUCED ANYTHING RELEVANT TO  02:27

11  THIS CASE.  AND I REALIZE THAT IT'S NOT GOOD TO GET INTO

12  TIT-FOR-TAT ARGUMENTS ON THIS, BUT THERE WILL COME A TIME WHERE

13  YOU WILL SEE THE NATURE OF MATTEL'S POOR DOCUMENT PRODUCTIONS

14  TO-DATE.  BUT I'M PUTTING A PIN IN THAT FOR RIGHT NOW.

15    WHAT I'M SAYING IS, WE PRODUCED, BACK IN 2004 -- AND  02:28

16  THERE WERE DEPOSITIONS ON THEM THAT BOTH PARTIES HAVE REALIZED

17  WERE THE CORE DOCUMENTS IN THE CASE.  THESE INCLUDED

18  COMMUNICATIONS BETWEEN HONG KONG AND MGA HONG KONG, WHICH ONLY,

19  AS OF JUNE 27TH, WHEN YOUR HONOR ISSUED HIS ORDER WITH REGARD

20  TO THE MOTION TO DISMISS, WAS EVEN DEFINITELY A PARTY TO THIS   02:28

21  CASE.  BUT THE COMMUNICATIONS BETWEEN THE U.S. AND HONG KONG

22  HAD PREVIOUSLY BEEN PRODUCED.  SO WHAT YOU'RE TALKING ABOUT NOW

23  ARE INTERNAL HONG KONG DOCUMENTS.

24    THE COURT:  VERY WELL.

25    LET ME HEAR YOUR FURTHER RESPONSES ON THE 30(B)(6),   02:28

1    THE INK TESTING AND THE WITNESS REGARDING THE SWORN

2    DECLARATIONS.

3              MR. ZELLER:  YES, YOUR HONOR.

4              TAKING THOSE IN REVERSE ORDER, WITH RESPECT TO THE

5    PRIOR SWORN STATEMENTS, THERE IS ONE PERSON IN PARTICULAR WHO          02:29

6    MS. CENDALI DID NOT MENTION --

7              THE COURT:  WHO'S THAT?

8              MR. ZELLER:  -- WHO IS STEVEN LEE, THE FORMER

9    MANAGING DIRECTOR OF MGA HONG KONG.

10             THE COURT:  DID YOU NOTICE HIS DEPOSITION?          02:29

11             MR. ZELLER:  WELL, HE'S NO LONGER WITH MGA HONG KONG.

12   SO THIS IS A PERFECT EXAMPLE OF SOMEBODY IN A KEY POSITION WHO

13   MADE EXTREMELY DAMAGING STATEMENTS.

14             THE COURT:  HOW CAN THEY MAKE HIM AVAILABLE AS A

15   30(B)(6) WITNESS IF HE'S NO LONGER --          02:29

16             MR. ZELLER:  WELL, THAT WOULD CERTAINLY BE PART OF

17   THEIR OPTION.  BUT I DON'T SEE HOW THEY CAN JUST SIMPLY SAY,

18   WELL, YOUR HONOR, WE SHOULDN'T HAVE TO GIVE A DEPONENT ON THESE

19   AFFIDAVITS THAT WERE SUBMITTED ON OUR BEHALF, MGA'S BEHALF, IN

20   LITIGATION, AND, BY THE WAY, THE PERSON WHO DID IT, WELL, YOU          02:29

21   CAN GO AND TAKE THOSE WITNESSES, BUT, OF COURSE, NOW MR. LEE IS

22   RETIRED TO THE PEOPLE'S REPUBLIC OF CHINA.  SO BY THE TIME THE

23   HAIGH CONVENTION IS SERVED ON HIM FOR A DEPOSITION, EVEN IF IT

24   WERE EFFECTIVE, WOULD BE TWO YEARS FROM NOW.

25             SO WE ARE CLEARLY ENTITLED TO KNOW THE AUTHENTICITY          02:29

```
 1   OF THOSE KINDS OF STATEMENTS.  MGA IS NOT ALLOWED TO TELL US

 2   AND SURPRISE US AT TRIAL THAT, IN FACT, MR. LEE NEVER WORKED

 3   FOR MGA, NEVER HAD AUTHORITY TO SIGN THOSE, THOSE AREN'T HIS

 4   SIGNATURE.

 5        ONE COULD, OF COURSE, SPIT OUT ANY NUMBER OF                02:30

 6   IMPONDERABLES AS TO HOW THEY WILL TRY AND CHALLENGE THAT

 7   EVIDENCE, WHICH WE THINK IS PRETTY CLEAR.  HE MAKES STATEMENTS

 8   ABOUT THE CREATION OF BRATZ AND ITS TIMING.  MGA SHOULD NOT BE

 9   ALLOWED TO CREATE WIGGLE ROOM FOR ITSELF AS TO THE MEANING OF

10   THESE STATEMENTS, THEIR AUTHENTICITY AND THE LIKE, AT TRIAL.     02:30

11        MOREOVER, WE DON'T KNOW WHAT THE SCOPE OF A NUMBER OF

12   THESE STATEMENTS ARE AT THIS POINT.  THERE MAY BE 20 OF THEM;

13   THERE MAY BE 40 OF THEM.  AND FOR US THEN TO HAVE TO GO AROUND

14   AND GET EACH AND EVERY INDIVIDUAL WITNESS AND DEPOSE THEM, EVEN

15   ASSUMING THAT THEY'RE AVAILABLE, THAT'S GOING TO USE UP OUR      02:30

16   INDIVIDUAL DEPOSITIONS.  AND PART OF THE PURPOSE OF 30(B)(6),

17   OF COURSE, IS TO AVOID THIS BANDING ABOUT OF WITNESSES, TOO,

18   PARTICULARLY IF WE GET WITNESSES, AND THEY MAY SAY, WELL, I

19   REALLY DON'T REMEMBER ANY OF THIS, AND THEN, OF COURSE, THEY'LL

20   BE UNDER NO OBLIGATION AND WE'LL HAVE WORTHLESS TESTIMONY.       02:30

21        THE COURT:  WHAT ABOUT THE INK TESTING?

22        MR. ZELLER:  THE INK TESTING, I THINK, IS ANOTHER

23   INSTANCE IN WHICH THEY WAIVED.  THEY DID NOT RAISE THE

24   EXCEPTIONAL CIRCUMSTANCES OBJECTION TO THAT TOPIC.

25        MOREOVER, THERE ARE PLENTY OF FACTS THAT HAVE NOTHING       02:31
```

```
 1    TO DO WITH CONSULTING EXPERTS.  SO IT'S REALLY A RED HERRING.

 2    WHAT WE'RE ASKING FOR IS EVIDENCE AND TESTIMONY REGARDING THE

 3    FACTS OF WHAT OCCURRED WITH THESE DOCUMENTS, WHEN WERE THE

 4    HOLES PUNCHED IN THEM, WHO DID IT, WHY WAS IT DONE?

 5          IF THEY HAVE LEGITIMATE OBJECTIONS BASED UPON THE        02:31

 6    CONSULTING EXPERT --

 7          THE COURT:  YOU STOPPED SHORT THERE.

 8          ARE YOU ALSO LOOKING FOR THE RESULTS OF THAT TESTING?

 9          MR. ZELLER:  WELL, IT DEPENDS ON WHEN THIS OCCURRED,

10    YOUR HONOR, FIRST OF ALL.                                      02:31

11          FOR ONE THING, IF WE'RE TALKING ABOUT NOW, IF THEY

12    HAVE A LEGITIMATE OBJECTION TO THE RESULTS OF WHAT THEIR

13    CONSULTANT DID AND THAT THEY HAVE PRESERVED IT, THEY CAN ASSERT

14    IT.  BUT THEY HAVE TO DO THAT IN RESPONSE TO QUESTIONS WE ASK.

15          THE REAL FLAW WITH THEIR APPROACH HERE, YOUR HONOR,      02:32

16    IS THAT THEY'RE THROWING A BLANKET OVER EVERYTHING, EVEN THOUGH

17    THEY'VE ALREADY DISCLOSED SOME OF THE FACTS, SOME OF THE FACTS

18    ARE ALREADY KNOWN.  AND WE'RE ENTITLED TO TAKE DISCOVERY ON

19    THOSE THINGS, TO FIND OUT, WAS THERE SPOLIATION, AND, IF SO,

20    UNDER WHAT CIRCUMSTANCES?                                      02:32

21          SO I THINK THAT THE BEST PROCEDURE HERE IS REALLY THE

22    ONE THAT'S NORMALLY CALLED FOR, WHICH IS, IF THEY HAVE A

23    PARTICULAR OBJECTION TO A PARTICULAR QUESTION OR INSTRUCTION

24    THAT THEY CAN GIVE AT A DEPOSITION, THAT'S WHEN THEY DO IT.

25    THEY CAN'T JUST SIMPLY SAY, WELL, TO BE SURE, PERHAPS WE'LL    02:32
```

```
1    HAVE SOME PRIVILEGE, AND THEREFORE, WE DON'T HAVE TO DISCLOSE

2    ANY OF THE FACTS.  AND THAT SEEMS TO BE WHERE THEY'RE HEADED

3    WITH THIS.

4              THE COURT:  THANK YOU, COUNSEL.

5              MS. CENDALI:  MAY I RESPOND BRIEFLY, YOUR HONOR?        02:32

6              THE COURT:  BRIEFLY.

7              MS. CENDALI:  FIRST, WITH REGARD TO MR. LEE, THIS IS

8    THE FIRST TIME WE'VE HEARD THIS ARGUMENT.  IT WAS NEVER IN ANY

9    OF THEIR PAPERS.  WHAT MR. ZELLER HAS LEFT OUT IS THAT LAST

10   WEEK, THEY SERVED A 30(B)(6) ON MGA HONG KONG, FACTUALLY.        02:32

11   THAT'S NOT WHAT THIS 30(B)(6) IS.  THIS 30(B)(6) IS A MACRO

12   30(B)(6) ON ALL TESTIMONY.  NOT THE 30(B)(6) ON MGA HONG KONG,

13   WHICH IS WHAT HE'S ARGUING.  THAT'S SEPARATE.

14             THE FACT THAT HE DOESN'T EVEN KNOW HOW MANY WITNESSES

15   THERE ARE PROVES OUR POINT THAT THIS IS PREMATURE.              02:33

16             MOREOVER, WITH REGARD TO THE INK TESTING, IT COULDN'T

17   BE CLEARER THAT THIS IS -- IT'S ALREADY IN THE RECORD THAT THIS

18   IS A CONSULTING EXPERT.  IT WAS THEIR BURDEN UNDER THE RULES TO

19   ARGUE EXCEPTIONAL CIRCUMSTANCES.  AND JUDGE INFANTE THEN, ONCE

20   THEY PRESENTED THAT TO HIM, SHOULD HAVE BEEN ABLE TO OPINE ON    02:33

21   THAT.

22             THEY DIDN'T DO THAT.

23             WE CAN'T WAIVE AN ARGUMENT THAT THEY FAILED TO MAKE.

24             THE COURT:  I UNDERSTAND YOUR ARGUMENT.

25             THANK YOU, COUNSEL.                                    02:33
```

```
 1            I WILL ISSUE AN ORDER ON BOTH OF JUDGE INFANTE'S

 2   ORDERS.

 3            THE TRIAL PHASING, I'D LIKE TO HEAR BRIEFLY FROM BOTH

 4   SIDES.  I'VE REVIEWED THE CHARTS AND THE MATRIXES, AND I THINK

 5   IT LOOKS LIKE YOU'RE IN PRETTY CLOSE AGREEMENT.  I GUESS I'D      02:34

 6   LIKE TO HEAR YOU JUST FOCUS ON THOSE.

 7            MS. GLASER:  THE DIFFERENCES?

 8            GOT IT.

 9            THE COURT:  PLEASE.

10            MS. GLASER:  I'M GOING TO TRY TO DO THAT.                02:34

11            IT SEEMS TO ME THERE ARE TWO DIFFERENCES.  AND IT

12   SEEMS TO ME THAT THEY ACTUALLY CONCEDED THE FIRST.  DAMAGES

13   THAT ARISE FROM THE SAME CORE FACTS THAT LIABILITY DOES SHOULD

14   BE IN THE SAME PHASE, AND I THINK -- I SORT OF IMPLIED A

15   CONCESSION IN THAT REGARD.                                       02:34

16            WHAT THEY THEN SAY IS, WELL, THEN, PHASE ONE SHOULD

17   BE TWO PHASES.  AND WE WANT TO TELL YOU WHY THAT'S NOT

18   POSSIBLE, AS A PRAGMATIC MATTER.

19            WHEN YOU TALK ABOUT DAMAGES THAT ARISE FROM

20   COPYRIGHT, BREACH OF CONTRACT, BREACH OF PROMISE, BREACH OF      02:34

21   FIDUCIARY DUTY, YOU CAN'T BE SORT OF -- EXCUSE THE EXPRESSION,

22   YOUR HONOR -- SORT OF PREGNANT.  YOU HAVE TO FIGURE OUT, OKAY,

23   THERE'S BEEN A COPYRIGHT VIOLATION; ASSUME THERE WERE ONE.

24   THEN YOU HAVE TO SAY, OKAY, WHAT ARISES FROM THAT COPYRIGHT

25   VIOLATION?                                                       02:34
```

1      WELL, YOU CAN'T STOP WITH THE DRAWINGS.  YOU HAVE TO

2  SAY, OKAY, THE NATURAL CONSEQUENCE OF A COPYRIGHT VIOLATION OR

3  A BREACH OF FIDUCIARY DUTY VIOLATION IS ALL OF THE DAMAGES THAT

4  FLOW FROM THAT.  OTHERWISE, IT'S PETE AND REPEAT.  YOU'RE GOING

5  TO HAVE TREMENDOUS DUPLICATION OF WITNESSES, TIME, AND                02:35

6  INEFFICIENCY.

7      SO WHAT WE'VE TRIED TO DO IS TO TAKE MATTEL'S INITIAL

8  SUGGESTION AND SAY, OKAY, YOU HAVE TO INCLUDE DAMAGES;

9  OTHERWISE, IT'S UNFAIR.  AND, TWO, ONCE YOU INCLUDE DAMAGES, IT

10 SHOULD BE EVERYTHING ARISING FROM, TO PUT IT IN ITS SIMPLEST         02:35

11 FORM, THE CARTER BRYANT STORY.

12     THAT'S WHAT WE'VE DONE, AND THAT'S WHAT OUR PHASE ONE

13 DOES, AND THAT'S THE DIFFERENCE BETWEEN THE TWO, YOUR HONOR.

14     THE COURT:  THANK YOU, COUNSEL.

15     MR. QUINN?                                                       02:35

16     MR. QUINN:  YES, YOUR HONOR.

17     THE DIFFICULTY IS -- AND WE THINK THERE IS A LOGICAL

18 BREAKDOWN IN THE TWO PHASES, BETWEEN CLAIMS ARISING OUT OF

19 MR. BRYANT'S ACTIVITY WHILE HE WAS EMPLOYED BY MATTEL AND

20 EVERYTHING ELSE.  AND I THINK EVERYBODY IS IN AGREEMENT ON THAT     02:35

21 MUCH.

22     THE PROBLEM COMES WHEN TRYING TO TRY THE COPYRIGHT

23 CLAIM IN THE FIRST PHASE, YOUR HONOR; THAT'S WHEN YOU GO WELL

24 BEYOND WHAT WORKS MR. BRYANT CREATED WHILE HE WAS EMPLOYED BY

25 MATTEL AND WHO OWNS THOSE WORKS.  THAT'S A LEGITIMATE AND           02:36

```
 1   SEPARATE, DEFINABLE QUESTION IN PHASE ONE.

 2            THE COURT:  I UNDERSTAND HOW THAT CAN EXPAND BEYOND

 3   WHAT WE INITIALLY ENVISIONED FOR PHASE ONE.  BUT WHAT IS THE

 4   DOWNSIDE OF INCLUDING THAT IN PHASE ONE IN A UNITARY TRIAL?

 5            MR. QUINN:  IN TERMS OF WHAT HE CREATED WHILE          02:36

 6   EMPLOYED BY MATTEL AND WHO OWNS THAT, WE AGREE THAT'S PHASE

 7   ONE, AND THAT'S PHASE ONE-A.  WHAT WE'RE BASICALLY PROPOSING IS

 8   A BIFURCATION OF LIABILITY AND DAMAGES IN PHASE ONE.

 9            THE PROBLEM WITH TRYING TO INTEGRATE THOSE AND TRYING

10   ALL OF THE COPYRIGHT TOGETHER AND DAMAGES IS THAT YOU THEN HAVE 02:36

11   TO GO WELL BEYOND THE ISSUE OF WHAT MR. BRYANT CREATED WHILE HE

12   WAS EMPLOYED BY MATTEL.  THEN YOU GET INTO THE 200 OTHER

13   PRODUCTS WHICH THEY FIRST BROUGHT UP THE ISSUE AND SAID, LOOK,

14   WE'RE GOING TO HAVE TO HAVE A MINI TRIAL ON 200 SEPARATE

15   PRODUCTS AS TO WHETHER THEY ARE DERIVATIVE OF THE WORKS THAT    02:37

16   MR. BRYANT CREATED WHILE HE WAS EMPLOYED BY MATTEL.

17            THE COURT:  AGAIN, WHAT'S THE DOWNSIDE IN INCLUDING

18   THAT IN PHASE ONE, SINCE, ACCORDING TO YOUR THEORY, WE WOULD

19   HAVE TO CROSS THAT BRIDGE EVENTUALLY?

20            MR. QUINN:  YOU MAY NOT NEED TO CROSS IT, BECAUSE IF   02:37

21   WE LOSE ON LIABILITY, IF WE LOSE ON OWNERSHIP - -

22            THE COURT:  -- DERIVATIVE WORKS.

23            MR. QUINN:  -- OF THE WORKS, WE MAY NEVER GET TO

24   THAT.

25            THE COURT:  YES.                                       02:37
```

1    MR. QUINN:  SO WE MAY NEVER GET TO THE COPYRIGHT

2  ISSUE, ONE, AND WE MAY NEVER GET TO THE DAMAGES ISSUES.  SO IT

3  SEEMS TO US THAT THIS IS A CLASSIC CASE WHERE IT MAKES SOME

4  SENSE TO BIFURCATE LIABILITY AND DAMAGES.

5    AND YOU HAVE TO DO IT -- YOU KNOW, WE THOUGHT ABOUT          02:37

6  THIS; CAN WE JUST TRY DAMAGES AS TO THE STATE LAW CLAIMS; FOR

7  EXAMPLE, BREACH OF FIDUCIARY DUTY IN ONE-A, AS IT WERE.  THE

8  PROBLEM WITH THAT IS, FOR BREACH OF FIDUCIARY DUTY, THERE'S

9  POTENTIALLY A DISGORGEMENT REMEDY.

10    THE COURT:  THAT GETS INTO OPPOSING COUNSEL'S             02:38

11  ARGUMENT AS WELL.  THAT'S WHY YOU CAN'T SPLIT THE DAMAGES UP

12  THAT WAY.

13    MR. KEKER:  COULD I BE HEARD, BECAUSE IT'S

14  MR. BRYANT'S GREAT INTEREST TO TRY HIS PART OF THE CASE ONCE.

15  EVERYONE AGREES THAT THAT'S WHAT SHOULD BE DONE.  EVERYONE       02:38

16  AGREES, I THINK, THAT THE CONSTITUTION DOES NOT PERMIT THAT TO

17  BE DONE BEFORE SEPARATE JURIES.  THE ONLY ISSUE LEFT IS WHETHER

18  OR NOT YOU SOMEHOW BIFURCATE THAT PHASE ONE TRIAL AND HAVE

19  DAMAGES ISSUES DECIDED SECOND.

20    THE COURT:  RIGHT.                                        02:38

21    MR. KEKER:  THAT DOESN'T SAVE -- OUR POSITION IS, IT

22  SAVES NOTHING.  ALL OF THE PRE-TRIAL WORK HAS TO BE DONE FOR

23  BOTH PHASES.  ALL OF THE DISCOVERY, OBVIOUSLY, HAS TO BE DONE

24  FOR BOTH PHASES.  YOU HAVE TO WORK THROUGH ALL OF THE MOTIONS

25  *IN LIMINE* AND JURY INSTRUCTIONS FOR BOTH PHASES, BECAUSE WHAT   02:38

```
 1   WILL HAPPEN IS THAT AS SOON AS THE LIABILITY TRIAL IS OVER, THE
 2   JURY GOES OUT, WE ALL SIT AROUND, WAIT FOR THEM TO COME BACK,
 3   AND THEN THEY HAVE TO GO OUT AGAIN.  AND THE TROUBLE THEN IS,
 4   IF THIS HAS TAKEN SOME PERIOD OF TIME AND THE DAMAGES PHASE, WE
 5   BEGIN TO REMIND THEM AGAIN, OKAY, WELL, BREACH OF FIDUCIARY          02:39
 6   DUTY, BUT IT WAS ONLY THIS MUCH, AND WE JUST GO OVER IT ALL
 7   AGAIN.  AND THAT'S WHY WE FEEL STRONGLY THAT, OBVIOUSLY, IT HAS
 8   TO BE THE SAME JURY AND THAT WE HAVE TO DO IT ALL AT ONCE
 9   BEFORE THAT SAME JURY.
10          THE COURT:  THANK YOU, COUNSEL.                               02:39
11          DID YOU WANT TO ADD TO THAT?
12          MS. GLASER:  PRACTICALLY NOT, EXCEPT TO SAY THAT,
13   AGAIN -- AND IF I'M REPEATING MYSELF, I APOLOGIZE -- EVERYTHING
14   THAT FLOWS FROM -- USING DISGORGEMENT, USING COUNSEL'S EXAMPLE,
15   IF YOU TALK ABOUT DISGORGEMENT, YOU CAN'T SORT OF STUTTER; IT'S     02:39
16   DISGORGEMENT FROM EVERYTHING THAT WE'VE DONE BAD ARISING FROM
17   CARTER BRYANT'S ALLEGED BAD ACTS.
18          THE COURT:  WHAT ABOUT MR. QUINN'S ARGUMENT, THAT TO
19   INCLUDE ALL OF THAT, YOU HAVE TO INCLUDE THE ALLEGED DERIVATIVE
20   WORKS?                                                              02:39
21          MS. GLASER:  I HAPPEN TO AGREE WITH THAT.
22          BUT THE PROBLEM IS THIS:  UNDER HIS THEORY -- EXCUSE
23   ME; I DIDN'T MEAN TO MAKE IT PERSONAL -- UNDER MATTEL'S THEORY,
24   IT ALL DOES FLOW, BECAUSE THEY'RE SAYING THESE ARE ALL
25   DERIVATIVE WORKS.                                                   02:40
```

```
 1              THE COURT:  BUT IF THE JURY COMES BACK AFTER SUBPHASE
 2   ONE AND SAYS 'NO COPYRIGHT VIOLATION, NO VIOLATION BY
 3   CARTER BRYANT,' THEN WE DON'T GET TO THE DERIVATIVE WORKS.
 4              MS. GLASER:  I UNDERSTAND THAT, YOUR HONOR.
 5              HOWEVER, IT'S IMPOSSIBLE -- THAT'S A GOOD RESULT FOR      02:40
 6   US, BUT IT'S IMPOSSIBLE TO BREAK IT UP THAT WAY.  AND WE THINK
 7   WHAT ULTIMATELY WILL END UP HAPPENING IS, YOU'RE GOING TO HAVE
 8   A TREMENDOUS DUPLICATION OF EXPERTS AND OF LAY WITNESSES.
 9              THE COURT:  IN SUBPHASE TWO?
10              MS. GLASER:  IN SUBPHASE TWO, WHEN INDEED IT'S MUCH       02:40
11   MORE ECONOMICAL JUST TO HAVE ONE PHASE.
12              THE COURT:  MR. QUINN, I'LL GIVE YOU THE LAST WORD ON
13   THIS.
14              MR. QUINN:  JUST TO BE CLEAR, I THINK THE ISSUE IN
15   THE FIRST TRIAL OUGHT TO BE:  WHO OWNS THE WORKS THAT             02:40
16   MR. BRYANT CREATED WHILE HE WAS EMPLOYED BY MATTEL?
17              IF THE FOCUS IS ON THAT, AND WE GET A YEA OR A NAY ON
18   THAT, THAT COULD BE -- IF WE GET A NAY, AS FAR AS MATTEL IS
19   CONCERNED, THAT COULD BE THE END OF THE STORY.
20              THE COURT:  I'VE BEEN CLINGING TO THAT KIND OF          02:41
21   SIMPLICITY FOR QUITE SOME TIME NOW, BUT YOU'VE CONVINCED ME
22   THAT THERE'S A LOT MORE THAT NEEDS TO GO INTO THAT QUESTION.
23   AND I GUESS THE QUESTION IS, ONCE WE ADD THAT 'LOT MORE' INTO
24   IT, DOES IT REALLY MAKE SENSE TO SEVER DAMAGES OUT FROM IT?
25   BUT I'LL THINK ABOUT IT.                                        02:41
```

1          MR. QUINN:  YOUR HONOR, IF WE'VE CONVINCED YOU THAT

2    THERE IS A LOT MORE THAT NEEDS TO GO INTO THAT, MAYBE WE

3    MISCOMMUNICATED ON THAT.

4          THE COURT:  A LOT MORE CLAIMS; I ENVISIONED IT AS A

5    SIMPLER, STRAIGHTFORWARD, BUT IT'S NOT.                      02:41

6          MR. QUINN:  IT'S REALLY ALL OF THE CLAIMS THAT ARISE

7    OUT OF HIS CONDUCT WHILE EMPLOYED BY MATTEL; WHETHER IT'S

8    CLAIMS FOR AIDING AND BETTING OR MR. LARIAN'S INVOLVEMENT --

9          THE COURT:  CARTER BRYANT'S QUESTION, AS IT WERE.

10         MR. QUINN:  YES.                                       02:41

11         BUT IT'S NOT NECESSARILY A COPYRIGHT ISSUE, AND I

12   THINK THAT THERE'S AN EASY WAY TO DIVIDE IT.  BUT WE'VE MADE

13   OUR PRESENTATION, YOUR HONOR.

14         THE COURT:  YOU HAVE.  THANK YOU, COUNSEL.

15         MR. KEKER:  COULD I PLEAD FOR THE LAST WORD, IN ONE    02:41

16   SENTENCE.

17         IT WILL BE UNFAIR TO MR. BRYANT IF THEY GET TO TRY

18   THEIR CLAIMS WITHOUT LETTING THE JURY UNDERSTAND WHAT THEY

19   THINK THE CONSEQUENCES OF THESE CLAIMS ARE.  THAT IS SIMPLY

20   UNFAIR TO MR. BRYANT.                                        02:42

21         THE COURT:  BEFORE WE BREAK FOR THE DAY, I UNDERSTAND

22   THAT THERE'S SOMEONE ELSE WHO WANTS TO SPEAK FROM THE AUDIENCE.

23         YOU MAY COME FORWARD.

24         PLEASE COME FORWARD TO THE LECTERN, MA'AM.

25         SHE'S BEEN RAISING HER HAND AND SITTING PATIENTLY.     02:42

```
 1            MS. MORALES:  MY NAME IS SHIRLEY CIAS MORALES, AND I

 2    HAVE A CASE AGAINST MGA ENTERTAINMENT.  I DO BELIEVE IT

 3    INCLUDES ALL OF ONE THROUGH TEN, SO THAT MIGHT BE CARTER

 4    BRYANT, AND I HAVE A PROBLEM WITH HIS COMPLAINT WHERE HE, ON

 5    HIS PAGE 14, MENTIONS TWO AND THREE, THAT HE SEEKS FOR          02:42

 6    DECLARATORY JUDGMENT THAT HIS IDEAS AND CONCEPTS AND DRAWINGS

 7    AND CONTRIBUTIONS FOR BRATZ WERE INDEPENDENT, BECAUSE I DON'T

 8    FEEL THAT THEY WERE.

 9            FOR THE PAST 12 YEARS, THE ENTIRE ENTERTAINMENT

10    INDUSTRY AND MUSIC INDUSTRY HAS BEEN INFRINGING UPON MY TRADE   02:42

11    DRESS, SO I FEEL THAT IF THESE ISSUES WERE ADDRESSED, THAT IT

12    WOULD BE MUCH SIMPLER TO RESOLVE THE ISSUES BETWEEN THESE TWO

13    COMPANIES.

14            THE COURT:  YOU HAVE BROUGHT A BROUGHT LAWSUIT --

15    YOU'RE SHIRLEY MORALES, CORRECT?                                02:43

16            MS. MORALES:  YES.

17            THE COURT:  AND YOU'VE BROUGHT A LAWSUIT AGAINST

18    BRATZ DOLLS IN THIS YEAR, JUST A FEW MONTHS AGO?

19            MS. MORALES:  YES; APRIL.

20            THE COURT:  VERY GOOD.                                  02:43

21            ALL RIGHT.  WELL, WHAT I WILL DO -- THAT GOT ASSIGNED

22    TO JUDGE PHILLIPS, AND IT MAY MAKES SENSE THAT -- IF IT IS, AS

23    YOU SUGGEST, RELATED TO THIS MATTER, IT MAY MAKE SENSE TO HAVE

24    THAT BROUGHT OVER TO THIS COURT.

25            MS. MORALES:  I FEEL LIKE I CAN CLEAR UP A LOT OF       02:43
```

1    THINGS BETWEEN THE TWO, AND IT WOULD SAVE 10,000 COPIES AND INK

2    TESTS AND STUFF LIKE THAT.

3            THE COURT:  WELL, I'LL TAKE A REAL CLOSE LOOK AT YOUR

4    COMPLAINT, AND WE'LL GO FROM THERE.  OKAY?

5            MS. MORALES:  OKAY.  THANK YOU.                            02:43

6            THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH, MA'AM.

7            MS. CENDALI:  THANK YOU, YOUR HONOR.

8            MS. GLASER:  THANK YOU, YOUR HONOR.

9            THE COURT:  WE'LL TAKE A BRIEF RECESS BEFORE THE

10   CRIMINAL CALENDAR.                                               02:43

11           THE CLERK:  THIS COURT IS NOW IN RECESS.

12

13

14

15

16

17                          CERTIFICATE

18

19   I hereby certify that pursuant to section 753, title 28, united
     states code, the foregoing is a true and correct transcript of
20   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
21   conformance with the regulations of the judicial conference of
     the united states.

22

23   _____        _____
     THERESA A. LANZA, CSR, RPR                         Date
24   FEDERAL Official COURT Reporter

25