```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3                       EASTERN DIVISION

 4                          - - -

 5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                          - - -

 7  CARTER BRYANT,                )
                                  )
 8                   Plaintiff,   )
                                  )
 9            vs.                 )  No. ED CV 04-09049
                                  )  (LEAD LOW NUMBER)
10  MATTEL, INC.,                 )
                                  )
11                   Defendant.   )
    _____)  BRYANT'S MOTION FOR
12  AND RELATED ACTIONS,          )  TERMINATING SANCTIONS
    _____)
13


14


              REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
                     RIVERSIDE, California
16
                   Monday, AUGUST 27, 2007
17
                        11:06 A.M.
18


19


20


21


22


23              THERESA A. LANZA, RPR, CSR
              FEDERAL Official Court Reporter
24             3470 12th Street, Rm. 134
              RIVERSIDE, California  92501
25                  (951) 274-0844
                Csr11457@sbcglobal.net
```

```
 1   APPEARANCES:

 2

 3   On behalf of Plaintiff/COUNTER DEFENDANT MATTEL, INC.:

 4
                          QUINN EMANUEL
 5                        BY:  JOHN B. QUINN
                          BY:  MICHAEL T. ZELLER
 6                        BY:  JON C. COREY
                          865 S. FIGUEROA STREET,
 7                        10TH FLOOR
                          LOS ANGELES, California  90017
 8                        (213) 624-7707

 9

10   on behalf of PLAINTIFF/COUNTER COMPLAINANT/DEFENDANT,
     CARTER BRYANT:
11
                          KEKER & VAN NEST
12                        BY:  MICHAEL H. PAGE
                          710 SANSOME STREET
13                        SAN FRANCISCO, California  94111-1704
                          (415) 391-5400
14

15

16   ON BEHALF OF MGA ENTERTAINMENT:

17                        O'MELVENY & MYERS LLP
                          BY:  DIANA M. TORRES
18                        400 SOUTH HOPE STREET
                          LOS ANGELES, CALIFORNIA  90071-2899
19                        (213) 430-6000

20                        CHRISTENSEN, GLASER, FINK,
                           JACOBS, WEIL & SHAPIRO, LLP
21                        BY:  PATRICIA GLASER
                          10250 CONSTELLATION BOULEVARD
22                        LOS ANGELES, CALIFORNIA  90067
                          (310) 553-3000
23

24

25
```

```
 1                        I N D E X

 2                                              Page

 3    ARGUMENT.....................................    4

 4    TESTIMONY....................................   83

 5

 6

 7
      WITNESS          DIRECT     CROSS     REDIRECT     RECROSS
 8    MICHAEL MOORE

 9    BY THE COURT        83
      BY MS. GLASER       86
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      RIVERSIDE, CALIFORNIA; monday, AUGUST 27, 2007; 11:06 A.M.

2                              -oOo-

3          **THE CLERK:**  CALLING CALENDAR ITEM SEVEN, CV

4    04-9049-SGL, CARTER BRYANT VERSUS MATTEL, INC.

5          MAY WE HAVE COUNSEL PLEASE COME FORWARD AND STATE          11:06

6    YOUR APPEARANCES FOR THE RECORD.

7          **MR. QUINN:**  JOHN QUINN, MIKE ZELLER, AND JON COREY

8    FOR MATTEL.

9          **MS. GLASER:**  PATRICIA GLASER FOR MGA AND DIANA TORRES

10   FOR MGA.                                                        11:06

11         **MR. PAGE:**  MICHAEL PAGE FOR CARTER BRYANT.

12         **THE COURT:**  GOOD MORNING, COUNSEL.

13         WE'RE ON CALENDAR FOR MGA'S MOTION FOR TERMINATING

14   SANCTIONS.  AND JUST TO CLEAR IT UP, BECAUSE IT APPEARS IN

15   DIFFERENT WAYS OR IS PHRASED IN DIFFERENT WAYS IN DIFFERENT      11:07

16   PAPERS BROUGHT BY THE DEFENSE, AS I UNDERSTAND IT, THIS IS BOTH

17   MGA AND CARTER BRYANT'S MOTION; IS THAT CORRECT?

18         **MR. PAGE:**  THAT'S CORRECT, YOUR HONOR.

19         **THE COURT:**  ALL RIGHT.  VERY WELL.

20         THE COURT HAS RECEIVED AND REVIEWED A RATHER               11:07

21   EXTENSIVE AMOUNT OF INFORMATION CONCERNING THIS.

22         AS I UNDERSTAND IT, AS I'VE BROKEN IT DOWN MYSELF,

23   WE'VE GOT ESSENTIALLY FIVE DIFFERENT CATEGORIES OR AREAS THAT

24   MGA AND CARTER BRYANT EXPRESSES GRAVE CONCERN ABOUT MATTEL'S

25   COMPLIANCE WITH ITS DISCOVERY OBLIGATIONS.  THE FIRST IS IN      11:07

```
 1   THIS CATEGORY OF E-MAILS AND THE SAVING OF THE E-MAILS, THE
 2   AUTO-DELETE POLICY; THE SECOND IS THE DELAY IN THE PRODUCTION
 3   OF THE 30(B) DEPOSITION WITNESSES REGARDING THE COMPUTER DATA
 4   STORAGE; THE THIRD IS IN REGARD TO THE ZEUS COMPUTER SYSTEM AND
 5   THE ABSENCE OF HARDWARE TO READ THE BACKUP TAPES; AND THEN THE        11:08
 6   FOURTH AND FIFTH AREAS REFER TO THE RETENTION OF AND LOCATION
 7   OF CARTER BRYANT'S PHONE RECORDS AND TIME RECORDS.
 8           WHAT I'D LIKE TO DO IS GO THROUGH EACH ONE OF THESE
 9   SEPARATELY, ALTHOUGH I CERTAINLY UNDERSTAND THAT IT'S THE
10   COLLECTIVE CONCERN THAT MOTIVATES THE DEFENSE MOTION FOR            11:08
11   TERMINATING SANCTIONS.
12           I ALSO TRUST THAT WE HAVE MR. MOORE PRESENT?
13           MR. QUINN:  YES, YOUR HONOR.
14           THE COURT:  VERY WELL; THE COURT HAD SOME QUESTIONS
15   CONCERNING HIS DECLARATION.                                        11:08
16           LET ME BEGIN WITH COUNSEL FOR DEFENSE.
17           WHO'S GOING TO SPEAK ON BEHALF OF THE DEFENSE IN
18   TERMS OF THE MOVING PAPERS?
19           MS. GLASER:  I AM, YOUR HONOR.
20           THE COURT:  ALL RIGHT.  LET'S BEGIN WITH YOU,              11:09
21   COUNSEL.
22           MS. GLASER:  PATRICIA GLASER, FOR THE RECORD.
23           IF I MIGHT -- AND I APPRECIATE THE BREAKDOWN -- I
24   HAVE PREPARED A SHORT LITTLE CHRONOLOGY THAT I WOULD LIKE TO
25   HAND TO COUNSEL AND TO THE COURT, BECAUSE I THINK IT WOULD BE      11:09
```

```
 1   EASIER TO FOLLOW OUR ARGUMENT, IF THE COURT WOULD INDULGE ME.
 2          THE COURT:  I'LL BE CURIOUS TO SEE HOW IT COMES UP
 3   WITH MY CHRONOLOGY HERE; THAT'S FINE.
 4          YOURS LOOKS LIKE IT'S A LOT NEATER THAN MY NOTES.
 5          MS. GLASER:  THANK YOU, YOUR HONOR.                          11:10
 6          MAY I START WITH QUOTING YOUR HONOR, IF I MIGHT?
 7          THE COURT:  OKAY.  YES, YOU MAY.
 8          MS. GLASER:  AND I ALWAYS TRY TO QUOTE JUDGES
 9   CORRECTLY.
10          THE COURT:  I APPRECIATE THAT.                              11:10
11          MS. GLASER:  IN YOUR COURT ORDER ON THE MOTION TO
12   AMEND IN JANUARY OF 2007, YOUR HONOR STATED -- AND I THINK YOU
13   WERE A LITTLE SLAPPING THE HAND, PERHAPS, OF MGA -- YOU SAID,
14   AND I'M QUOTING, "NOTICEABLY ABSENT FROM MGA'S ARGUMENT IS ANY
15   EVIDENCE THAT E-MAILS SO DELETED FROM MATTEL'S EMPLOYEES' INBOX   11:10
16   ARE FOREVER LOST, OR, AS IS MORE LIKELY, WHETHER SUCH
17   INFORMATION REMAINS OR IS OTHERWISE ARCHIVED ON SOME BACKUP
18   FILE ON MATTEL'S COMPUTER SYSTEM," END OF QUOTE.
19          WHEN YOU MADE THAT STATEMENT, YOUR HONOR, MATTEL WAS
20   PRESENT, OF COURSE.  MATTEL DID NOT CORRECT YOUR HONOR.  IT DID   11:11
21   NOT CORRECT THE RECORD, EVER.  MATTEL DID NOT TELL THE TRUTH
22   THEN.  AND, IN FACT, IN OUR VIEW, MATTEL HID THE TRUTH AS LONG
23   AS POSSIBLE.
24          THEY TOLD YOU AT THAT PROCEEDING ON THE MOTION TO
25   AMEND THAT THEY HAD PRESERVED ZEUS BACKUP TAPES, DIRECTLY        11:11
```

```
 1   CONTRARY TO MS. MARINE'S SWORN DEPOSITION TESTIMONY FROM '98 TO
 2   2001, AND THEY SAID THAT THERE IS, QUOTE, "NO EVIDENCE THAT
 3   E-MAILS HAD DISAPPEARED."
 4          THAT simply WASN'T THE CASE.
 5          THE COURT:  LET ME STOP YOU HERE, THOUGH, COUNSEL,      11:11
 6   BECAUSE MAYBE THIS IS A MISUNDERSTANDING ON MY PART.  LET'S NOT
 7   CONFLATE THE ZEUS PROGRAM AND THE E-MAILS.
 8          MS. GLASER:  I'M NOT.  I'M HOLDING THEM SEPARATE.
 9          THE COURT:  ALL RIGHT.
10          MS. GLASER:  THEY MAKE TWO SEPARATE REPRESENTATIONS.    11:12
11   THEY MADE THE REPRESENTATION THAT ZEUS BACKUP TAPES EXISTED FOR
12   THE '98 TO 2001 TIME PERIOD, AND THEY TOLD THE COURT THAT THERE
13   WAS NO EVIDENCE THAT E-MAILS HAD DISAPPEARED, I.E., 'OKAY, SO
14   WE HAVE AN AUTO-DELETE POLICY,' WHICH, BY THE WAY, YOUR HONOR,
15   CONTINUES UNTIL THIS DAY.                                     11:12
16          'FORGET ABOUT THAT, DON'T WORRY ABOUT THAT IN
17   CONNECTION WITH THE E-MAILS, BECAUSE WE HAVE BACKUP TAPES.'
18          AND YOUR HONOR WAS LED TO BELIEVE, EITHER BY SILENCE
19   OR AFFIRMATIVE STATEMENTS, THAT INDEED, E-MAIL -- I'M NOT
20   TALKING ABOUT ZEUS -- E-MAIL BACKUP TAPES EXISTED.  AND THE    11:12
21   TRUTH WAS, WE NOW FIND OUT FROM SWORN 30(B)(6) WITNESSES
22   PRODUCED ONLY IN JUNE, THAT, INDEED, TWO THINGS ARE TRUE:
23   MS. MARINE SAYS THERE ARE NO ZEUS BACKUP TAPES, ZEUS BACKUP
24   TAPES, GOING BACK ANY FURTHER AT LEAST NO EARLIER THAN 2005,
25   AND SHE WASN'T SURE.                                          11:13
```

1        WITH RESPECT TO THE E-MAIL TAPES, WE KNOW FOR A FACT

2   NOT ONLY HAS THE AUTO-DELETE POLICY NEVER BEEN PUT AWAY WITH,

3   EVEN WITH KEY WITNESSES, BUT WITH RESPECT TO BACKUP, THE BACKUP

4   TAPES FOR E-MAILS DON'T EXIST EARLIER THAN, QUOTE, "SOMETIME IN

5   2005; PROBABLY APRIL OF 2005."                                    11:13

6        SO THEY ARE GONE; WE DON'T HAVE ACCESS TO THEM.

7        SO WHEN YOUR HONOR -- I'M NOT SUGGESTING TO YOUR

8   HONOR, BECAUSE YOU'VE READ THE TRANSCRIPT, I'M SURE -- I'M NOT

9   SUGGESTING THAT WAS THE ONLY BASIS FOR YOUR GRANTING THE

10  MOTION.  BUT YOU WERE RELIEVED, I THINK IT'S FAIR TO SAY, YOU    11:13

11  WERE COMFORTABLE, THAT WE WERE RAISING AN ARGUMENT THAT DID NOT

12  YET PROVE TO BE A PROBLEM, BECAUSE THE BACKUP TAPES FOR ZEUS

13  AND THE BACKUP TAPES FOR E-MAIL EXISTED.  AND IT WASN'T TRUE,

14  YOUR HONOR, AND THEY ARE NOT EXISTING AT A KEY POINT IN TIME.

15       AND THAT'S WHAT I WANT TO ADDRESS.                          11:13

16       **THE COURT:**  LET'S TALK ABOUT THAT KEY POINT IN TIME,

17  BECAUSE PART OF THE KEY POINT IN TIME IS NOTICEABLY ABSENT FROM

18  YOUR TIMELINE, AND THAT'S THE '98 TO 2001 PERIOD.

19       YOU START WITH THE MGA RELEASE OF BRATZ IN JUNE OF

20  2001, BUT EVIDENCE OF WHAT WAS GOING ON BETWEEN CARTER BRYANT    11:14

21  AND MATTEL AND CARTER BRYANT AND MGA, WHICH IS GOING TO BE

22  IMPORTANT TO THIS CASE, OR AT LEAST THE ISSUES RAISED IN THE

23  VARIOUS CLAIMS, GOES BACK TO THAT PERIOD OF '98 TO 2001.

24       **MS. GLASER:**  I WANT TO ADDRESS THAT.

25       **THE COURT:**  I'LL THROW OUT MY CONCERN AND THEN YOU      11:14

```
 1   CAN ADDRESS IT FULLY.

 2          MY CONCERN, TO THE EXTENT THAT REALLY IS THE PERIOD,

 3   EVEN BY YOUR OWN VIEW OF WHEN MATTEL SHOULD HAVE SEEN

 4   LITIGATION AS PROBABLE, THESE E-MAILS AND THESE ZEUS BACKUP

 5   TAPES PURSUANT TO COMPANY POLICY WOULD HAVE BEEN LONG GONE EVEN   11:14

 6   UNDER THAT SCENARIO, OR SO IT WOULD SEEM.

 7          MS. GLASER:  THAT IS ACTUALLY NOT AT ALL CLEAR.

 8          SO, FOR EXAMPLE, WE KNOW THEY WERE INVESTIGATING

 9   BRATZ, CARTER BRYANT'S CONNECTION TO BRATZ, AND, IN FACT,

10   ALLEGATIONS HAD BEEN MADE BY EMPLOYEES AT MATTEL AT LEAST AS     11:15

11   EARLY AS MARCH 2002, AND, WE THINK, AS EARLY AS WHEN BRATZ CAME

12   OUT IN JUNE OF 2001.

13          AS YOUR HONOR SITS HERE AND AS I SIT HERE TODAY, IT

14   IS ABSOLUTELY NOT CLEAR, WHEN THEY WERE DOING THEIR

15   INVESTIGATIONS STARTING AS EARLY AS JUNE OF 2001, MAYBE AS LATE  11:15

16   AS MARCH OF 2002, WE HAVE NO IDEA WHAT THEY WERE ABLE TO LOOK

17   AT AND EXTRACT FROM THEIR RECORDS IN DOING THEIR

18   INVESTIGATIONS, WHICH ARE FOREVER GONE FROM US.

19          THE COURT:  WELL, STARTING WITH THE INVESTIGATION --

20   AND I DON'T MEAN TO MIX ISSUES HERE, BUT AS FAR AS DETERMINING   11:15

21   WHEN LITIGATION IS PROBABLE AS OPPOSED TO POTENTIAL --

22          MS. GLASER:  WELL, POTENTIAL IS ACTUALLY THE TEST.  I

23   MEAN, WE BELIEVE.  IT'S NOT JUST PROBABLE; IT IS LIKELY.  THE

24   WORD 'PROBABLE' IS A LITTLE LIKE 'IT'S GOING TOO FAR,' AND I'M

25   NOT SAYING SPECULATION ABOUT LITIGATION; THAT'S GOING TOO FAR    11:16
```

1    THE OTHER DIRECTION.  BUT CERTAINLY, THERE'S A REASONABLE

2    LIKELIHOOD THAT THERE WILL BE LITIGATION IN MARCH OF 2002.

3    THEY CLEARLY UNDERSTOOD THAT BRATZ AND CLEARLY UNDERSTOOD THAT

4    ALLEGATIONS WERE BEING MADE THAT CARTER BRYANT CREATED BRATZ ON

5    MATTEL'S TICKET.                                              11:16

6            AND INDEED, YOU WILL NOTE, YOUR HONOR, MR. De ANDA --

7    ONE OF THE DOCUMENTS THAT HAS BEEN PROVIDED TO YOUR HONOR IS AN

8    E-MAIL -- WHERE MR. De ANDA ACTUALLY SAYS 'I'VE BEEN

9    INVESTIGATING THIS FOR MONTHS AND I KNOW ABOUT THIS

10   CONNECTION.'  THAT'S IN CONNECTION WITH THE LETTER THAT        11:16

11   MR. ECKERT GETS DELIVERED TO HIM IN AUGUST, AND MR. DE ANDA

12   SAYS 'I'VE GOT THIS UNDER CONTROL; I'VE BEEN INVESTIGATING THIS

13   FOR MONTHS, THAT CONNECTION.'

14          THE COURT:  LET'S USE MARCH OF 2002; WE'RE TALKING

15   ABOUT A 90-DAY AUTO-DELETE POLICY.                            11:16

16          MS. GLASER:  I'M NOT SURE WE ARE.

17          EXCUSE ME.  THAT'S AUTO-DELETE.  THAT'S NOT THE

18   BACKUP RECORDS.  THAT'S THE AUTO-DELETE; THAT'S WHEN YOU AND I

19   CAN PUSH OUR BUTTON AND GET AUTO-DELETE.  BUT THE BACKUP

20   RECORDS, I WILL SUBMIT TO YOUR HONOR, I CAN'T HONESTLY TELL     11:17

21   YOU -- I DON'T THINK THE COURT KNOWS, AND I'M NOT SURE MATTEL

22   KNOWS, OR MAYBE THEY WILL PUT UP ANOTHER 30(B)6 WITNESS --

23          THE COURT:  THAT'S WHY MR. MOORE IS HERE TODAY.

24          MS. GLASER:  MR. MOORE, IN OUR VIEW, MISREPRESENTED

25   GROSSLY, TWICE, AND MR. ZELLER, TWICE, TO THIS COURT ABOUT     11:17

```
1   BACKUP TAPES EXISTING FOR ZEUS.  AND I'M NOT TALKING ABOUT

2   E-MAILS.  I'M TALKING ABOUT ZEUS.

3           AND THE IRONY OR THE PARTICULAR CONCERN IS THAT

4   MS. MARINE -- AND I'M SWITCHING ON YOU -- ON THE ZEUS TAPES,

5   MS. MARINE WAS PREPARED FOR HER DEPOSITION IN PART BY          11:17

6   MR. MOORE; HE WAS IN THE PREPARATION SESSIONS; THIS IS FOR THE

7   JUNE 2007 DEPOSITION; HE WAS THERE.  HE THEN ATTENDS HER

8   DEPOSITION AND LISTENS TO HER TESTIFY UNDER PENALTY OF PERJURY,

9   YOUR HONOR, THAT THE ZEUS BACKUP TAPES DO NOT EXIST FOR ANY

10  FURTHER BACK THAN 2005.                                        11:18

11          AND THEN THIS GENTLEMAN SUBMITS A DECLARATION TO YOUR

12  HONOR UNDER PENALTY OF PERJURY TWO MONTHS LATER, SAYING, 'YES

13  THEY DO.  ABSOLUTELY.  THERE'S A '98, A '99, A 2000.'

14          IN FACT, IT GAVE MONTHS AND OTHER YEARS.

15          THEN HE SAYS 'FOR AFTER THAT, WE HAVE THEM TOO, BUT    11:18

16  WE DON'T KNOW WHICH ONES.'  BUT HE DIDN'T TELL YOU WHICH ONES.

17          YOUR HONOR, THAT'S NOT OKAY.  THAT IS NOT OKAY TO

18  MAKE THOSE KINDS OF REPRESENTATIONS.

19          EITHER I -- AND I USE THIS KIND OF LANGUAGE

20  ADVISEDLY -- EITHER HE WAS SUBORNING PERJURY WHEN MS. MARINE   11:18

21  TESTIFIED UNDER PENALTY OF PERJURY WHILE HE WAS SITTING THERE,

22  OR HE'S NOT TELLING THE TRUTH IN HIS DECLARATION THAT HE

23  SUBMITTED TWO MONTHS LATER.

24          AND THEN, WHAT YOUR HONOR WAS GIVEN, I GUESS ON

25  FRIDAY -- AND I DON'T KNOW IF YOUR HONOR CONSIDERED THEM OR    11:19
```

1  NOT.

2          **THE COURT:**  I RECEIVED THE DECLARATION WHICH READ

3  MORE LIKE A SURREPLY THAN A DECLARATION, BUT I DID READ IT.

4          **MS. GLASER:**  THAT WAS MY IMPRESSION AS WELL.

5          HOWEVER, IN THAT SURREPLY, YOU WERE TOLD, 'WHAT ARE          11:19

6  YOU?  CRAZY, MGA?  YOU ARE ACTUALLY THINKING THAT SHE WAS A

7  30(B)(6) WITNESS?'  WHEN I HAVE TWO SOURCES, ONE IN FRONT OF

8  THE DISCOVERY MASTER IN THIS CASE IN APRIL OF 2007;

9  SPECIFICALLY IN FRONT OF THAT DISCOVERY MASTER, THE MATTEL

10  LAWYER SAYS 'WE ARE DESIGNATING MS. MARINE AS THE ZEUS 30(B)(6)   11:19

11  WITNESS; SHE'S THE LADY WHO KNOWS EVERYTHING.'

12          **THE COURT:**  SO YOU DID BRING A MOTION TO COMPEL.

13          ADMITTEDLY, I DIDN'T GO THROUGH ALL OF THE VARIOUS

14  MOTIONS THAT HAVE BEEN BROUGHT BEFORE THE DISCOVERY MASTER IN

15  GREAT DETAIL.                                                    11:19

16          WAS THE WHOLE ISSUE OF THE 30(B)(6) WITNESSES ON THE

17  COMPUTER DATA STORAGE, WAS THAT FULLY GET LITIGATED BEFORE THE

18  DISCOVERY MASTER?

19          **MS. GLASER:**  I DON'T THINK IT WAS ACTUALLY A MOTION.

20  LET ME TELL YOU WHAT I THINK HAPPENED.                           11:20

21          THERE WERE 30(B)6 WITNESSES, BACK IN THE END OF 2006

22  ON ZEUS, ON E-MAILS, AND THERE WAS A LIMITATION -- IN OUR VIEW,

23  AN ARTIFICIAL LIMITATION -- PLACED ON THE TIME PERIOD '98, '99,

24  AND 2000.  WE WEREN'T SATISFIED WITH THAT, AND WE WENT BACK AND

25  FORTH.  AND FINALLY JUDGE INFANTE, I DON'T THINK VERY HAPPILY,   11:20

```
 1   ENGAGED IN A -- PARTICIPATED IN A MEET AND CONFER AMONG

 2   COUNSEL, AND THAT WAS IN APRIL OF 2007, BECAUSE WE COULDN'T GET

 3   THESE -- TO GET TO THE REST OF THE TIME PERIOD, WE COULDN'T GET

 4   THEM BACK ON TRACK.

 5          THEN THERE WERE DEPOSITIONS THAT OCCURRED IN JUNE,        11:20

 6   AND I GUESS JULY ALSO, BUT JUNE, JULY, OF THIS YEAR, 30(B)(6)'S

 7   THAT WENT BEYOND THE ORIGINAL TIME PERIOD, PURSUANT TO

 8   JUDGE INFANTE'S ORDER.

 9          THEN WHAT HAPPENS IS THAT BOTH AT MS. MARINE'S

10   DEPOSITION BUT ALSO -- WHICH IS IN JUNE, I BELIEVE OF 2007; I    11:21

11   CAN GET YOU THE PRECISE DATE -- BUT ALSO WITH JUDGE INFANTE

12   SITTING THERE IN APRIL OF 2007 WHEN HE'S TRYING TO ORGANIZE ALL

13   OF THE CATS, TRYING TO HERD ALL THE CATS, THEY SPECIFICALLY

14   REPRESENT THAT MS. MARINE, NOT MR. MOORE, NOT MR. ZELLER, BUT

15   MS. MARINE, IS THE MATTEL 30(B)(6) DESIGNEE; SHE'S THE ONE WHO   11:21

16   KNOWS ABOUT ZEUS.

17          I'M NOT TALKING ABOUT E-MAILS NOW, I'M TALKING ABOUT

18   ZEUS.

19          SHE COMES TO TESTIFY FOR THAT DEPOSITION AND SHE SAYS

20   UNDER PENALTY OF PERJURY -- AND IT'S ATTACHED TO OUR PAPERS AND  11:21

21   I CAN GET YOU THE PRECISE CITE -- SHE TESTIFIES UNDER PENALTY

22   OF PERJURY WE DON'T HAVE -- COUNSEL, MR. JENAL, WHO WAS

23   ACTUALLY EXAMINING HER, SAID 'WHAT ABOUT '99?

24          NOPE.

25          2000?                                                    11:21
```

1            NOPE.

2            AND HE GOES THROUGH EVERY YEAR, AND WHEN HE GETS TO

3    2005, SHE SAYS MAYBE.  SHE'S NOT SURE.  BUT CERTAINLY NO

4    EARLIER THAN 2005, AFTER THE REPRESENTATIONS WERE MADE TO YOUR

5    HONOR.                                                              11:22

6            THAT'S NOT OKAY.  THAT'S JUST NOT OKAY.

7            NOW, I WANT TO COME BACK TO YOUR QUESTION.

8            THERE WERE A VARIETY OF INVESTIGATIONS THAT HAVE

9    OCCURRED WHERE -- AND MANY OF THEM RELATE TO CARTER BRYANT --

10   THIS IS BY MATTEL -- OVER THE YEARS; AND AT THOSE CRITICAL        11:22

11   POINTS IN TIME -- AND THAT'S ONE OF THE REASONS WE LAID THIS

12   OUT IN OUR PERHAPS POOR ATTEMPT AT A CHRONOLOGY.

13           **THE COURT:**  THIS IS FINE.

14           **MS. GLASER:**  IN THAT EFFORT, A NUMBER OF TIMES THERE

15   WERE INVESTIGATIONS, AND IF I COULD JUST SPEND A MINUTE,          11:22

16   BECAUSE I WANT TO ADDRESS YOUR QUESTIONS AS DIRECTLY AS I CAN,

17   BECAUSE IT DOES MATTER, YOUR HONOR.

18           **THE COURT:**  I'LL ALWAYS GIVE YOU A MINUTE.

19           **MS. GLASER:**  WHAT WE ATTEMPT TO DO WITH THIS TIMELINE

20   IS TO DEPICT WHAT THEY KNEW AND WHEN THEY KNEW IT AND THE         11:22

21   PURPORTED COVERUP.

22           IF YOU LOOK AT 2001, YOUR HONOR, YOU'LL SEE THAT IN

23   JUNE OF 2001, MGA RELEASES BRATZ.

24           IN THE SUMMER OF 2001, MATTEL EMPLOYEES -- AND

25   SPECIFICALLY, YOU CAN SEE FROM THE PAPERS WE SUBMITTED,           11:23

1   MS. JILL NORDQUIST AND A WOMAN NAMED ANN PARDUCCI, PART OF

2   SENIOR MANAGEMENT, ARE AWARE OF MR. BRYANT'S INVOLVEMENT WITH

3   BRATZ, THE MGA BRATZ.  IN FACT, THEY CLAIM, WRONGFULLY, THAT

4   CARTER BRYANT PLAGIARIZED A LILY MARTINEZ DESIGN TO CREATE

5   BRATZ.                                                          11:23

6           SO BACK IN JUNE, JULY, AUGUST OF 2001, THAT CLAIM WAS

7   OUT THERE AND SENIOR MANAGEMENT HAD THAT RELAYED TO THEM.

8           SO YOUR HONOR COULD SAY, 'WELL, OKAY, WHAT EXISTED IN

9   THE SUMMER OF 2001?'

10          YOUR HONOR, I KNOW THEY AUTO-DELETED EVERYTHING AFTER   11:23

11  90 DAYS, SO THAT DIDN'T EXIST.  I AGREE WITH YOU.

12          BUT THE BACKUP TAPES WERE SUPPOSED TO BE THERE.

13          WHERE ARE THEY?

14  **THE COURT:**  COUNSEL, FIRST OF ALL, WE'VE GOT TO APPLY

15  NOT EXISTING LAW ON DISCOVERY, OR THE EXISTING RULES OF        11:24

16  PROCEDURE ON 2001; WE HAVE TO APPLY EXISTING LAW.  COUNSEL FOR

17  A COMPANY CANNOT ADVISE THEIR CLIENTS TO COMPLY WITH LAWS OR

18  PROCEDURES THAT HAVE NOT YET BEEN ADOPTED; SO WE'RE NOT TALKING

19  ABOUT THE AMENDMENTS OR THE FEDERAL RULES THAT COME INTO PLAY

20  IN THE MID-DECADE.                                             11:24

21          WE'RE TALKING ABOUT THE RULES OF PROCEDURE THAT

22  EXISTED IN 2001.

23  **MS. GLASER:**  LET ME TELL YOU THE ONE THING THAT

24  DOESN'T EXIST TODAY, BACK IN 2000 OR 1998:  THERE'S NOT A RULE

25  THAT YOU START PRESERVING E-MAIL BACKUPS AND THAT YOU CONTINUE  11:24

1    TO AUTO-DELETE ONE YEAR AFTER YOU FILE A LAWSUIT, UNDER THE OLD

2    RULES, THE IN-BETWEEN RULES, OR THE RULES TODAY.  AND THAT'S

3    WHAT HAPPENED HERE, YOUR HONOR; THAT'S EXACTLY WHAT HAPPENED

4    HERE.

5            THE COURT:  WE DON'T HAVE A LAWSUIT FILED IN 2001.          11:24

6            MS. GLASER:  IN 2004, THEY FILED THEIR LAWSUIT.  THEY

7    DON'T START -- THEY HAVE NEVER STOPPED THE AUTO-DELETE PORTION,

8    AND THEY DON'T START PRESERVING BACKUP UNTIL A YEAR LATER.

9            THE COURT:  HELP ME OUT HERE.

10           I'M TRYING TO COME UP WITH A DATE THAT I CAN FIND          11:25

11   SHOULD HAVE BEEN THE DATE WHERE IT WAS LIKELY, PROBABLE --

12   WHATEVER PHRASE WE END UP USING -- THAT COUNSEL SHOULD HAVE

13   BEEN ON NOTICE AND THAT THEY SHOULD HAVE TAKEN REASONABLE STEPS

14   TO PRESERVE EVIDENCE.

15           MS. GLASER:  THE LATEST IS MARCH OF 2002.                  11:25

16           THE COURT:  I KNOW THAT'S YOUR ARGUMENT, BUT ALL THEY

17   HAVE IN MARCH OF 2002, THEY HAVE THE SUMMER OF 2001 KNOWLEDGE

18   THAT MGA HAS RELEASED BRATZ; ALLEGATIONS BY NORDQUIST AND A FEW

19   OTHERS, THAT, 'HEY, THEY STOLE THIS; CARTER BRYANT STOLE THIS

20   FROM US'; AND THEY START THEIR OWN INTERNAL INVESTIGATION.        11:25

21           IS THAT REALLY ENOUGH TO TRIGGER A DUTY TO PRESERVE

22   EVERYTHING IN ANTICIPATION OF LITIGATION AGAINST MGA?

23           MS. GLASER:  ABSOLUTELY.  ABSOLUTELY.

24           AND WHAT MAKES IT WORSE, YOU COULD SAY THAT, YOUR

25   HONOR, IF --                                                      11:25

```
 1            THE COURT:  I DIDN'T SAY ANYTHING; I JUST ASKED THE
 2   QUESTION.
 3            MS. GLASER:  I UNDERSTAND THAT.
 4            THIS IS THE PROBLEM:  THEY DO AN INVESTIGATION.  I
 5   HAVE NO IDEA WHAT THAT INVESTIGATION IS, BECAUSE WHATEVER        11:26
 6   E-MAILS THEY LOOKED AT OR WHATEVER ZEUS DESIGNS THEY LOOKED AT,
 7   I WILL NEVER SEE.  AND YOU CAN'T RECONSTRUCT THAT.  SO THEY HAD
 8   ENOUGH TO DO A FULL-SCALE INVESTIGATION BECAUSE MR. DE ANDA IN
 9   AUGUST, WHEN HE GETS THE ECKERT LETTER --
10            THE COURT:  I UNDERSTAND THAT YOU CAN'T SEE THAT.       11:26
11   BUT DOES A COMPANY HAVE AN OBLIGATION WHEN THEY ARE SIMPLY
12   DOING THEIR OWN INTERNAL INVESTIGATION, NOT KNOWING WHERE THAT
13   INTERNAL INVESTIGATION IS GOING TO GO.  FOR ALL THEY KNOW,
14   COULD HAVE FOUND OUT AT THE END OF THAT INTERNAL INVESTIGATION,
15   'NORDQUIST IS WRONG; THIS WAS ALL LEGITIMATE; THERE'S NO        11:26
16   PROBLEM HERE, WE'RE DONE.'
17            MS. GLASER:  YOUR HONOR, THEY ACTUALLY TELL YOU THAT
18   THEY DON'T DISCOVER THAT CARTER BRYANT WAS WORKING FOR MGA.
19   THEY ACTUALLY PUT THIS IN A PLEADING FILED IN THIS COURT UNTIL
20   LATE IN 2003.                                                   11:26
21            WE KNOW THAT'S NOT TRUE, BECAUSE WE KNOW THEY KNEW
22   ABOUT IT IN JUNE OF 2001.
23            THE COURT:  BUT THAT MAY BE TRUE, AND THERE MAY BE A
24   WHOLE BUNCH OF THINGS THAT ARE PROBLEMATIC AND DISTURBING OR
25   WHATEVER, BUT LET'S TRY TO KEEP OUR EYE ON THE BALL HERE.       11:27
```

1           WHEN WERE THEY OF THE UNDERSTANDING THAT LITIGATION

2   AGAINST MGA WAS LIKELY?

3           JUST KNOWING THAT CARTER BRYANT WORKED FOR THEM,

4   WHETHER IT WAS 2005 OR 2002 OR 2001 OR WHENEVER IT WAS, DOESN'T

5   MAKE LITIGATION LIKELY OR PROBABLE.                               11:27

6           **MS. GLASER:**  THE GENERAL COUNSEL IS DIRECTLY INVOLVED

7   IN AUGUST OF 2002.  YOU CAN TELL THAT FROM DE ANDA'S E-MAIL

8   WHERE HE SPECIFICALLY TALKS ABOUT HOW THIS HAS BEEN TURNED OVER

9   TO COUNSEL.

10          **THE COURT:**  THIS IS THE ANONYMOUS LETTER.            11:27

11          **MS. GLASER:**  THAT'S NOT JUST THE ANONYMOUS LETTER;

12  IT'S WHATEVER THE INVESTIGATION IS GOING ON.  YOU CAN SEE THAT

13  FROM de ANDA, AND I WOULD BE GLAD TO POINT THAT OUT TO YOUR

14  HONOR.  HE CLEARLY IS NOW INVOLVED; IT'S NOT JUST A SECURITY

15  ISSUE; IT IS A 'WE'RE INVOLVING THE GENERAL COUNSEL IN THIS.    11:27

16  PERIOD.'  SO ABSOLUTELY.

17          AND, YOUR HONOR, AN INVESTIGATION -- I'M GOING OFF ON

18  MY TANGENT AGAIN -- AN INVESTIGATION IS OCCURRING; AUTO-DELETE

19  IS OCCURRING; AND BACKUP TAPES ARE NOT BEING MAINTAINED.

20          THAT'S NOT FAIR.  IT'S JUST NOT FAIR.                    11:28

21          SO IF I MAY JUST BRIEFLY CONTINUE, BECAUSE THERE ARE

22  POINTS IN TIME TOO.  YOU CAN'T JUST LOOK THERE.

23          IF I MIGHT, AGAIN, I TALK ABOUT THE AUGUST 2002 --

24  I'M GOING BACK TO MY CHRONOLOGY -- THAT'S THE ANONYMOUS LETTER

25  THAT WAS SENT TO MR. ECKERT REGARDING CARTER BRYANT ACTUALLY    11:28

1    CREATING BRATZ WHILE A MATTEL EMPLOYEE.

2           DECEMBER OF 2003, MATTEL LAUNCHES 'MY SCENE' DOLLS TO

3    COMPETE WITH BRATZ.

4           ANOTHER POINT, JULY OF 2003, THERE'S ACTUALLY --

5    MATTEL PLACES A WALL STREET JOURNAL ARTICLE THAT MENTIONS          11:28

6    MR. BRYANT BORROWING MATTEL DESIGNS REGARDING ANOTHER DOLL

7    CALLED FLAVAS, F-L-A-V-A-S, TO CREATE BRATZ.

8           MATTEL INVESTIGATES MR. BRAUR, FORMER EMPLOYEE,

9    ALLEGING THAT HE MISAPPROPRIATED TRADE SECRETS.

10          A YEAR LATER, THEY SUE HIM.                                  11:29

11          THEY SAID THAT MR. BRAUR -- BY THE WAY, IN

12   INVESTIGATING MR. BRAUR, THESE ARE NOT TIMID PEOPLE, THEY USE

13   HIS SOCIAL SECURITY NUMBER TO REVIEW HIS E-MAILS; THEY SEARCHED

14   HIS PHONE RECORDS AND THEY SEARCHED HIS CORPORATE APARTMENT IN

15   NEW YORK; THESE ARE NOT PEOPLE WHO DON'T KNOW WHAT THEY ARE        11:29

16   DOING.  THESE ARE NOT PEOPLE THAT DON'T HAVE A REASONABLE

17   NOTICE THAT THIS IS GOING TO BE A PROBLEM.

18          BRAUR GOES TO MGA, YOUR HONOR.  THEY KNOW BRAUR GOES

19   TO MGA.

20          IN DECEMBER OF 2003, MATTEL INVESTIGATES MGA'S            11:29

21   ALLEGED MISAPPROPRIATION OF TRADE SECRETS REGARDING FLAVAS.

22          NOW, IN 2004, THE MY SCENE DOLLS ARE CHANGED TO LOOK

23   MORE LIKE BRATZ.

24          APRIL 2004 MATTEL SUES CARTER BRYANT, AS YOUR HONOR

25   WELL KNOWS.  AND FOR A WHOLE YEAR AFTER THAT, THEY CONTINUE TO    11:30

1    DELETE E-MAILS AND WIPE OUT THE BACKUP TAPES, FOR A WHOLE YEAR.

2         **THE COURT:**  BY THIS TIME WE'RE DEFINITELY INTO -- IT

3    APPEARS TO THE COURT ANYWAY -- THAT WE'RE INTO TERRITORY WHERE

4    MATTEL SHOULD HAVE BEEN AWARE.

5         **MS. GLASER:**  AND YOUR HONOR IS ASKING, 'OKAY,                    11:30

6    MS. GLASER,' YOU'RE SAYING, 'WELL, BUT THEY WOULD HAVE ALREADY

7    DELETED THE STUFF BACK IN '98, '99, 2000.'

8         I SAY TO YOUR HONOR, I DON'T KNOW IF THEY DID OR NOT.

9    I'M NOT TALKING ABOUT THE AUTO-DELETE; I UNDERSTAND THAT.  BUT

10   NOT THE BACKUP TAPES.  THEY HAVE ACCESS TO THAT AS THIS           11:30

11   INVESTIGATION IS GOING ON, AND I DON'T GET ANY OF THAT AND THEY

12   CONTINUE DOING IT FOR A WHOLE YEAR AFTER THE LAWSUIT IS FILED?

13        AND THEN, YOUR HONOR, LET ME GO ON.

14        MR. BRYANT SERVES HIS 30(B)(6) NOTICES FOR THE E-MAIL

15   MAVEN, THE ZEUS MAVEN, AND OTHER ISSUES, BACK IN DECEMBER OF     11:31

16   2004, AND YOU REALIZE THOSE DEPOSITIONS, YOUR HONOR, WERE NOT

17   TAKEN UNTIL THE END OF 2006 AND THE TRUTH DID NOT COME OUT

18   UNTIL THE MIDDLE OF 2007?

19        **THE COURT:**  WELL, THAT LEAVES THAT SECOND ISSUE, THAT

20   30(B)6 DEPOSITION; THAT'S WHY I ASKED YOU THE QUESTION I DID,    11:31

21   COUNSEL.

22        YOU CERTAINLY ARE CAPABLE OF FILING A MOTION TO

23   COMPEL IF YOU THINK THEY ARE DRAGGING THEIR FEET.

24        APPARENTLY, THAT DID NOT HAPPEN.

25        **MS. GLASER:**  LET ME BE CLEAR.

1          MGA, I'M NOR SURE IF YOU'RE REFERRING TO GENERIC

2    COUNSEL OR NOT, BUT MGA COMES INTO THIS IN APRIL OF 2005.

3          **THE COURT:**  OKAY.  WELL --

4          **MS. GLASER:**  MGA SENDS ITS FIRST LETTER FOR MATTEL TO

5    PRESERVE.                                                                    11:31

6          ON MAY 23, 2005, THERE'S A STAY ENTERED; THAT'S THE

7    STAY THAT NINTH CIRCUIT, TO BE FAIR TO EVERYBODY.

8          **THE COURT:**  RIGHT.

9          **MS. GLASER:**  THAT WAS A LITTLE OVER A YEAR THAT STAY

10   IS IN PLACE.                                                                 11:31

11         IN OCTOBER OF 2005, MATTEL INSTIGATES A RAID OF MGA'S

12   OFFICES IN MEXICO BY MEXICAN AUTHORITIES.  THAT'S BASED ON THE

13   PRIOR SUMMER OR THE EARLIER 2004, de ANDA IS INVESTIGATING

14   MEXICO; AND THAT'S CONFIRMED BY MR. ZELLER.

15         NOW, 2006 COMES -- AND THIS IS AUGUST 10TH, 2006 --         11:32

16   MGA SEEKS DEPO DATES FOR THE ZEUS AND E-MAIL 30(B)(6)

17   WITNESSES.  ON NOVEMBER 2006, MATTEL MOVES TO AMEND; THAT'S THE

18   MOTION THAT, YOUR HONOR, I QUOTED YOU ON FROM EARLIER.

19         MGA IS BROUGHT IN FOR THE FIRST TIME BY MATTEL AS A

20   DEFENDANT.  WE'RE ALLEGED TO HAVE AIDED AND ABETTED.  WE'RE       11:32

21   ALLEGED TO HAVE COMMITTED COPYRIGHT INFRINGEMENT.

22         CARTER BRYANT IS ALLEGED TO HAVE MISAPPROPRIATED --

23   THE AMENDMENT GOES TO HIS MISAPPROPRIATION OF TRADE SECRETS.

24         ON DECEMBER 28TH, 2006, MATTEL SUBMITS MR. ZELLER'S

25   DECLARATION REGARDING THE PRESERVATION OF E-MAILS; THAT WAS       11:33

1   ABSOLUTELY MISREPRESENTED TO YOUR HONOR, AND I'LL BE GLAD TO

2   QUOTE FROM IT.

3           IN JANUARY OF 2000, MATTEL BRINGS ITS TRADE SECRET

4   CLAIMS AGAINST BRYANT AND MGA AFTER THEY HAVE MISREPRESENTED TO

5   THE COURT REGARDING THE STATE OF THE RECORDKEEPING.          11:33

6           ON JANUARY 17, 2007, MR. KAWASHIMA, WHO IS THEIR

7   30(B)(6) WITNESS ON E-MAILS; HE SAYS THERE ARE NO BACKUP TAPES

8   FOR '98 THROUGH 2000 AND HE IS INSTRUCTED NOT TO ANSWER ANY

9   QUESTIONS FOR A PERIOD AFTER THAT.

10          HE DOES NOT TELL YOU -- IT'S NOT CLEAR TO ME, AND I'M    11:33

11  THE FIRST TO ACKNOWLEDGE THIS -- WHEN THOSE BACKUP TAPES WERE

12  DESTROYED, BUT WE KNOW THEY DON'T EXIST AS OF THE TIME OF HIS

13  DEPOSITION IN JANUARY OF 2007.

14          ON JANUARY 30, 2007, JUDGE INFANTE ORDERS THE

15  PRODUCTION OF MATTEL'S INVESTIGATION FILES.  THAT'S THE FIRST    11:34

16  TIME WE LEARN ABOUT DE ANDA'S INVESTIGATION AND THE FIRST TIME

17  WE SEE MR. ECKERT'S LETTER.

18          ON JUNE 19TH, MR. KAWASHIMA'S SECOND DEPOSITION IS

19  TAKEN AND HE REVEALS THAT THE AUTO-DELETE POLICY IS STILL IN

20  EFFECT, AND THE BACKUP TAPES ARE PRESERVED ONLY BACK TO          11:34

21  SOMETIME IN APRIL OF 2005; THIS IS THREE YEARS AFTER THEY

22  STARTED AN INVESTIGATION AND ONE YEAR AFTER MATTEL HAS SUED

23  CARTER BRYANT.

24          ON JUNE 26, 2007, MS. MARINE'S 30(B)(6) DEPOSITION IS

25  TAKEN REGARDING ZEUS; THAT'S THE THIRD DAY OF HER DEPOSITION.    11:34

1    SHE TESTIFIES THERE ARE NO ZEUS BACKUP TAPES GOING BACK TO '98,

2    AND THERE MIGHT BE ONE IN 2002 BUT SHE'S NOT SURE.

3            THIS IS THE DEPOSITION THAT MR. MOORE ATTENDED AND

4    WHICH HE ALSO, BY HER TESTIMONY, MET WITH HER TO PREPARE HER

5    FOR HER DEPOSITION.                                              11:35

6            AND FINALLY ON OUR TIMELINE, AUGUST OF 2007, MATTEL'S

7    AUTO-DELETION OF E-MAILS CONTINUES TO THIS DAY.

8            YOUR HONOR, IF THE COURT LOOKED AT NOTHING ELSE IN

9    CONNECTION WITH THIS VERY SERIOUS REQUEST FOR DISMISSAL, I HAVE

10   A FEW DOCUMENTS -- BECAUSE I KNOW THAT THERE WERE A MANIFOLD     11:35

11   NUMBER OF DOCUMENTS THAT WERE PUT IN FRONT OF YOU -- I ASK YOU

12   TO LOOK AT JUST A FEW DOCUMENTS.

13           IF I COULD GIVE YOU THE CITES, I'LL DO THEM FOR THE

14   RECORD.

15           **THE COURT:**  IF YOU WOULD LIKE TO, COUNSEL.           11:35

16           **MS. GLASER:**  THE MARCH 2002 INVESTIGATION NOTES;

17   THAT'S EXHIBIT 4 TO THE JULY 25, 2007, BURR DECLARATION;

18           THE AUGUST 5, 2002 LETTER TO MR. ECKERT; THAT'S

19   EXHIBIT 6 TO THE JULY 25TH, 2007 BURR DECLARATION;

20           MR. DE ANDA'S E-MAIL TO ALAN KAYE; EXHIBIT 7 TO THE      11:36

21   JULY 25, 2007 BURR DECLARATION;

22           THE INVESTIGATIVE LOG REGARDING THE MAY 10, 2004

23   ENTRY, WHICH IS PART OF THE EXHIBITS.  I DON'T KNOW THE EXACT

24   CITE, BUT I CAN GET THAT FOR YOUR HONOR;

25           THE REPORTER'S TRANSCRIPT OF THE MARCH 15 MEET AND       11:36

```
 1   CONFER; THIS IS BEFORE THE PRESERVATION OF BACKUP TAPES FOR
 2   E-MAILS BEGAN; THIS IS THE REPORTER'S TRANSCRIPT, EXHIBIT 3 TO
 3   THE AUGUST 20, 2007, BURR DECLARATION;
 4           MATTEL'S REPLY BRIEF OF DECEMBER 28, 2006, REGARDING
 5   ITS MOTION TO AMEND; THAT'S EXHIBIT 18 TO THE JULY 25, 2007          11:36
 6   BURR DECLARATION; THAT'S WHERE THE MISREPRESENTATION REGARDING
 7   MATTEL'S SPOLIATION HAS OCCURRED.
 8           I WOULD ASK YOU PLEASE, IN THAT REGARD, TO PLEASE
 9   LOOK AT MR. ZELLER'S DECEMBER 28TH, 2006 DECLARATION,
10   PARAGRAPH 14, PAGE 3.  IT'S EXHIBIT 19 TO THE JULY 25, 2007          11:37
11   BURR DECLARATION;
12           THERE IS AN ORDER REGARDING MATTEL'S MOTION TO AMEND,
13   PART OF WHICH I READ TO YOUR HONOR, WHICH IS EXHIBIT 20 OF THE
14   JULY 25, 2007 BURR DECLARATION;
15           THERE IS A DECLARATION OF MR. MICHAEL MOORE, WHICH IS     11:37
16   DATED AUGUST 13, 2007.
17           I'D ASK YOU, AND WE BROUGHT WITH US TODAY,
18   MS. MARINE'S DEPOSITION, SOME OF WHICH IS NOT IN THE RECORD
19   BEFORE YOUR HONOR, BUT IT DIRECTLY REFUTES WHAT YOUR HONOR HAS
20   HAD REPRESENTED TO HIM BY MR. MOORE AND MR. ZELLER;                11:37
21           AND THERE, OF COURSE, IS THE TRANSCRIPT OF
22   JUDGE INFANTE'S MEET AND CONFER, WHICH I'VE ALREADY ALLUDED TO,
23   AND I'LL BE GLAD TO GET THE PRECISE CITE.
24           YOUR HONOR, I HAVE JUST A FEW MORE MINUTES AND THEN I
25   WILL CERTAINLY SIT DOWN, BUT I DO WANT TO POINT OUT A COUPLE        11:38
```

1   MORE THINGS THAT I WOULD ASK YOUR HONOR TO LOOK AT.

2          THE COURT:  COUNSEL, LET ME ASK YOU A FEW QUESTIONS

3   THAT I HAVE IN THIS TIME.

4          MS. GLASER:  SURE; PLEASE.

5          THE COURT:  ON THE ZEUS COMPUTER SYSTEM, ON THE ISSUE   11:38

6   OF THE UNAVAILABILITY OF THE HARDWARE TO READ THE ZEUS BACKUP

7   TAPES THAT MATTEL APPARENTLY DOESN'T HAVE ANY MORE.

8          DOES THAT HARDWARE EXIST.

9          AND I'M NOT TALKING ABOUT FROM MATTEL, BUT IS THIS

10  SOMETHING THAT MGA IS CAPABLE OF READING?                    11:38

11         MS. GLASER:  THE ANSWER IS I HAVE NO IDEA AS I STAND

12  HERE TODAY.

13         THE COURT:  WHY DO YOU NOT HAVE ANY IDEA?

14         MS. GLASER:  FIRST OF ALL, WE WERE TOLD FOR QUITE

15  AWHILE THEY DIDN'T EXIST AT ALL; SO WE DON'T HAVE THOSE ZEUS  11:38

16  BACKUP TAPES.

17         THE COURT:  BY WHOM WERE YOU TOLD THAT IT DIDN'T

18  EXIST AT ALL?

19         MS. GLASER:  MS. MARINE SAID THAT IT DIDN'T EXIST AT

20  ALL.                                                         11:39

21         THE COURT:  I SUSPECT YOU JUST DON'T TAKE OPPOSING

22  SIDE'S WORD FOR IT?

23         MS. GLASER:  WHEN THEY ARE UNDER OATH, I DO; FORGIVE

24  ME, BUT I DO.

25         SHE'S UNDER OATH, SHE'S THE WOMAN MOST KNOWLEDGEABLE,   11:39

1    AND SHE SAYS THEY DON'T EXIST; THAT'S NUMBER ONE.

2         NUMBER TWO, THE EQUIPMENT WAS -- AND I'M GOING to use

3    MY WORD, BUT -- WAS PHYSICALLY DESTROYED.  IT'S GONE FROM

4    MATTEL AFTER THEY FILED THE LAWSUIT.  SO THEY HAVE THE

5    EQUIPMENT; BUT WHEN THEY FILED THE LAWSUIT, IT'S DISCARDED.    11:39

6    I'LL USE THE NICER WORD.  IT'S 'DISCARDED.'

7         EXPLAIN THAT TO ME.

8         IF THE ZEUS TAPES EXIST, WHY ARE THEY DISCARDING THE

9    EQUIPMENT NECESSARY TO LOOK AT IT?

10        NOW, IF THERE'S A THIRD PARTY VENDOR THAT CAN DO IT,    11:39

11   WE, MGA, DOESN'T HAVE THE CAPABILITY.  I DON'T KNOW IF A THIRD

12   PARTY VENDOR COULD, IF IT EXISTED.

13        **THE COURT:**  FAIR ENOUGH.

14        REGARDING THE CARTER BRYANT PHONE RECORDS AND THE

15   TIME RECORDS, IS THERE ANY EVIDENCE BEFORE THE COURT THAT --    11:40

16   AND I UNDERSTAND THAT THEY ARE NOT AROUND, AND ASSUMING THAT

17   THEY EXISTED TO BEGIN WITH, WHICH I DO, BASED ON WHAT IS BEFORE

18   THE COURT -- IS THERE ANYTHING WHICH WOULD INDICATE THAT THEY

19   WERE LOST, STOLEN, DESTROYED, OR MISPLACED?

20        IS THERE ANYTHING WHICH WOULD POINT THE COURT IN ONE    11:40

21   DIRECTION VERSUS ANOTHER?

22        **MS. GLASER:**  YES.

23        **THE COURT:**  DO YOU UNDERSTAND THE QUESTION?

24        **MS. GLASER:**  I UNDERSTAND THE QUESTION, AND I'M GOING

25   TO ANSWER IT SPECIFICALLY, BECAUSE I HAVE TO BREAK IT UP; THE    11:40

1    PHONE RECORDS AND THE TIME RECORDS.

2              **THE COURT:**  YES.

3              **MS. GLASER:**  IF YOU LOOK AT THE PHONE RECORDS, IT'S A

4    MIRACLE:  OCTOBER 2000 IS MISSING.

5              DO I KNOW IF THEY WERE DESTROYED?                        11:40

6              I HAVE NO IDEA.

7              **THE COURT:**  I DIDN'T ADD SUPERNATURAL CAUSES TO THE

8    LIST OF THINGS, BUT I SUPPOSE YOU CAN THROW THAT IN AS WELL.

9              **MS. GLASER:**  IT'S AS GOOD OF AN EXPLANATION THAT

10   WE'VE RECEIVED SO FAR.  BUT THEY ARE GONE, AND IT'S            11:40

11   CARTER BRYANT'S PHONE RECORDS.

12             THIS IS A TIME WHEN MATTEL SAYS --

13             **THE COURT:**  BUT AGAIN, IS THERE ANY EVIDENCE THAT I

14   HAVE TO WEIGH BEFORE ME THAT THE OCTOBER 2000 RECORDS ARE LOST,

15   STOLEN, CONCEALED, OR NEVER EXISTED?                          11:41

16             **MS. GLASER:**  THE PHONE RECORDS WERE TURNED OVER TO

17   LEGAL, AND THERE IS TESTIMONY FROM A SPECIFIC WITNESS ON THAT

18   POINT, AND WE DON'T HAVE THOSE PHONE RECORDS.

19             **THE COURT:**  THE PHONE RECORDS, AS I UNDERSTAND THAT

20   EVIDENCE, THE PHONE RECORDS IN MASSE WERE TURNED OVER TO LEGAL.  11:41

21   LEGAL SAYS THEY NEVER WERE THERE.  'WHEN WE WENT TO LOOK FOR

22   THEM, THEY WERE MISSING.'

23             HOW DO I REACH A CONCLUSION THAT THEY WERE DESTROYED?

24             **MS. GLASER:**  THEY DON'T SAY THEY WERE NEVER THERE.

25   THEY SAY THAT THEY DON'T HAVE THE OCTOBER 2000 OF MR. BRYANT.    11:41

1          **THE COURT:**  RIGHT.

2          **MS. GLASER:**  THEY DON'T KNOW IF THEY WERE EVER THERE.

3    ALL I KNOW IS THAT THEY ARE MISSING.

4          **THE COURT:**  FAIR ENOUGH.

5          **MS. GLASER:**  AND I ACKNOWLEDGE THAT.                    11:41

6          I'M NOT GOING TO REPRESENT TO THE COURT I KNOW THEY

7    WERE PROLOINED [SIC] OR BURNED OR WHATEVER.

8          **THE COURT:**  WHAT ABOUT THE TIME RECORDS?

9          **MS. GLASER:**  THERE ARE NO TIME RECORDS FOR MR. BRYANT

10   AFTER SEPTEMBER 8, 2000.  AND THE TESTIMONY GIVEN BY -- AND     11:42

11   THIS IS AT THE BURR DECLARATION, EXHIBIT 27, PAGE 116 -- THAT

12   EXPERT, THAT 30(B)6 WITNESS FROM MATTEL SAYS, QUOTE, "THEY

13   COULD HAVE BEEN DELETED WITHOUT..."  BUT THEY HAVE NO RECORD

14   THAT THEY HAVE BEEN DELETED.  AND, WORSE, THEY HAVE NO

15   ABILITY TO -- AND I USE THIS WORD ADVISEDLY -- 'MANIPULATE,' SO   11:42

16   YOU COULDN'T GO BACK AND TELL IF THEY HAD BEEN INTENTIONALLY

17   DELETED OR NOT.

18         I'M GIVING YOU EXACTLY WHAT I KNOW; NO MORE, NO LESS.

19   I KNOW THE E-MAILS WERE DELETED.  I KNOW THE ZEUS WAS DELETED.

20   I KNOW THERE IS A BACKUP FOR THOSE.  I CAN'T TELL YOU -- THE    11:42

21   TIME RECORDS, IT JUST SEEMS RATHER STRANGE THAT FROM

22   SEPTEMBER 8, 2000 ON, THERE ARE NO TIME RECORDS.

23         AND WE HAVE A GENTLEMAN TESTIFYING, AND I HAVE NO

24   REASON TO DISBELIEVE HIM, FROM MATTEL, SAYING, THAT AFTER

25   SEPTEMBER 8, 2000, HE MAY NOT HAVE SUBMITTED TIME RECORDS?     11:43

```
 1              YOUR HONOR, YOU HAVE TO ASK YOURSELF.  I THINK IT'S

 2     FAIR FOR US TO SAY TO EACH OTHER, IF NO ONE ELSE, YOU HAVE TO

 3     SAY TO EACH OTHER, 'WAIT A MINUTE.  MR. BRYANT IS WORKING FOR

 4     YOU; YOU HAVE NO REASON TO BELIEVE, UNDER YOUR OWN THEORY, THAT

 5     HE'S LEAVING TO GO TO MGA; YOU DON'T HAVE ANY TIME RECORDS FOR      11:43

 6     HIM FOR SEPTEMBER 8TH ONWARD.  HE STAYS, UNDER YOUR TESTIMONY,

 7     UNTIL SOME TIME IN THE LATTER PART OF OCTOBER.  YOU DON'T ASK

 8     HIM FOR TIME RECORDS; THERE'S NO QUESTION ABOUT WHERE THE TIME

 9     RECORDS ARE; NOTHING; HE'S JUST OKAY DOING WHATEVER HE'S

10     DOING.'                                                            11:43

11              I DON'T BELIEVE THAT, YOUR HONOR.  ESPECIALLY, I

12     DON'T BELIEVE IT AFTER WHAT HAS BEEN MISREPRESENTED TO US AND

13     TO THE COURT SO FAR.

14              ALL I KNOW IS I KNOW THAT MATTEL COULD HAVE DELETED

15     THOSE AND YOU AND I WOULD NOT KNOW IT.                             11:43

16          THE COURT:  THANK YOU, COUNSEL.

17              WHAT I'M GOING TO DO RIGHT NOW, IT'S 11:40 -- THERE'S

18     ONE BRIEF STATUS CONFERENCE THAT WAS CALENDERED FOR 11:00, AND

19     I SEE COUNSEL IS PRESENT, I'M GOING TO TAKE THAT MATTER UP

20     BECAUSE IT RELATES TO A TRIAL THAT POTENTIALLY IS GOING            11:44

21     TOMORROW, AND THEN WE'LL RESUME WITH THIS AT 1:15; WE'LL TAKE

22     OUR BREAK FOR LUNCH.

23          MS. GLASER:  THANK YOU, YOUR HONOR.

24          THE COURT:  I WANT TO MAKE SURE THAT EVERYBODY HAS AN

25     OPPORTUNITY TO ADDRESS THIS.
```

```
1            MR. PAGE:  YOUR HONOR, I HAVE A SPEAKING ENGAGEMENT

2    IN SANTA MONICA.  WOULD IT BE ALL RIGHT IF I HAD MS. GLASER

3    REPRESENT ME?

4            THE COURT:  IF YOU'RE WILLING TO DEFER TO YOUR

5    CO-COUNSEL, THAT'S ENTIRELY UP TO YOU.                      11:44

6            MS. GLASER:  HE'S A BRAVE MAN, YOUR HONOR.

7            THE COURT:  VERY GOOD.  I'LL SEE YOU ALL BACK HERE AT

8    1:15 AND THEN I'LL TAKE UP THE OTHER MATTER.

9            (LUNCH BREAK; CASE RECALLED.)

10           THE CLERK:  RECALLING ITEM NUMBER SEVEN, CASE NUMBER  01:17

11   ED CV 04-9049-SGL, CARTER BRYANT VERSUS MATTEL, INC.

12   COUNSEL?

13           MS. GLASER:  PATRICIA GLASER, YOUR HONOR, FOR MGA AND

14   DIANA TORRES FOR MGA.

15           MR. QUINN:  JOHN QUINN, MIKE ZELLER, JON COREY FOR     01:17

16   MATTEL.

17           THE COURT:  COUNSEL, YOU MAY PROCEED.

18           MS. GLASER:  THANK YOU, YOUR HONOR.

19           YOUR HONOR, WE HAD A BRIEF DISCUSSION BEFORE THE

20   BREAK WITH RESPECT TO WHAT THE LAW WAS WITH REGARD TO WHEN YOU  01:18

21   HAD TO START PRESERVING, AND I WANTED TO CLARIFY THAT.

22           THE COURT:  THE ISSUE OF WHETHER OR NOT -- YOU SAID

23   "LIKELY" AS OPPOSED TO "PROBABLE."

24           MS. GLASER:  AND I WANT TO QUOTE FROM A COUPLE OF

25   CASES, BECAUSE I THINK IT'S AN IMPORTANT ISSUE:  WHEN DOES THE  01:18
```

1    DUTY TO PRESERVE ARISE?

2            AND I'M QUOTING, "THE DUTY TO PRESERVE MATERIAL

3    EVIDENCE ARISES NOT ONLY DURING LITIGATION, BUT EXTENDS TO THAT

4    PERIOD BEFORE THE LITIGATION, WHEN A PARTY REASONABLY SHOULD

5    KNOW THAT THE EVIDENCE MAY BE RELEVANT TO ANTICIPATED                 01:18

6    LITIGATION."

7            THAT'S THE SILVESTRI V. GENERAL MOTORS CASE, 271 F.3D

8    583 AT 591; IT'S A FOURTH CIRCUIT 2001 CASE.

9            THE COURT:  SO "ANTICIPATED LITIGATION."

10           MS. GLASER:  "RELEVANT TO ANTICIPATED LITIGATION."       01:19

11           AS SOON AS A SPOLIATING PARTY HAD NOTICE OF POTENTIAL

12   CLAIMS.  THAT'S THE CECCONI CASE.  THAT'S A 2007 BANKRUPTCY

13   LEXIS 1323, NORTHERN DISTRICT OF CALIFORNIA, APRIL 17, 2007.

14           THE COURT:  THAT'S NOTICE OF POTENTIAL CLAIMS BEING

15   BROUGHT AGAINST THEM.                                             01:19

16           MS. GLASER:  YES, SIR.

17           THEN I CAN GO ON AND ON.

18           THE COURT:  I UNDERSTAND.  BUT NONE OF THESE ARE

19   NECESSARILY FITTING WHAT WE HAVE RIGHT HERE.  THIS IS A

20   SITUATION WHERE YOU'RE SUGGESTING THAT ONCE THEY THOUGHT THEY    01:19

21   WERE GOING TO SPRING OR PURSUE LITIGATION -- AND THAT'S THE

22   STANDARD THAT I'M GOING TO HAVE TO TRY TO COME UP WITH.

23           MS. GLASER:  LET ME BE CLEAR.  THEY THOUGHT, THEY

24   THOUGHT WHEN YOU CLAIM A WORK PRODUCT PRIVILEGE, I THINK WE

25   WOULD ALL AGREE, YOU ANTICIPATE LITIGATION.  THAT'S WHEN THE     01:19

```
 1   WORK PRODUCT PRIVILEGE APPLIES.

 2        THEY TOOK THE POSITION IN THIS LITIGATION THAT THE

 3   WORK PRODUCT PRIVILEGE APPLIES TO THE INVESTIGATION OCCURRING

 4   IN 2002.  FOR EXAMPLE -- AND I'M JUST USING IT AS AN EXAMPLE --

 5   ONE OF THE EXHIBITS, EXHIBIT 7 TO THE BURR DECLARATION OF        01:20

 6   JULY 25, 2007, IS THIS ALLEN K. E-MAIL, WHICH I'M SURE THE

 7   COURT HAS LOOKED AT MORE THAN YOU WANT TO.  THIS IS THE ONE

 8   THAT TALKS ABOUT, "I'M AWARE OF THE SITUATION" -- THIS IS TO

 9   ALLEN FROM MR. De anda -- "I'M AWARE OF THE SITUATION AND HAVE

10   BEEN WORKING ON IT FOR SEVERAL MONTHS.  MY FRUSTRATION IN THIS   01:20

11   MATTER WAS THE GENESIS OF" -- THEN THERE'S A BLANK -- "AND THAT

12   IS NOW IN THE HANDS OF ROBERT NORMILE," N-O-R-M-I-L-E, WHO, AT

13   THAT TIME, WAS THE GENERAL COUNSEL OF MATTEL.  "THE TRUTH OF

14   THE MATTER IS THAT CARTER BRYANT DID WORK FOR MATTEL; HOWEVER"

15   -- THEN THERE'S ANOTHER REDACTION.                              01:20

16        IT IS THIS DOCUMENT AND DOCUMENTS ARISING OUT OF THIS

17   TIME PERIOD, FROM MARCH TO AUGUST OF 2002, THAT THEY'RE

18   CLAIMING THE WORK PRODUCT PRIVILEGE ON; SO CLEARLY, THEY

19   THOUGHT IT WAS ANTICIPATION OF LITIGATION; THAT'S THE POSITION

20   THEY TOOK.                                                      01:20

21        NOW, LET ME JUST MAKE A FEW OTHER POINTS THAT WERE

22   TOUCHED ON.  I WANT TO BE VERY CLEAR ABOUT THE RECORD.

23        YOU ASKED ABOUT A MOTION TO COMPEL.  MR. KAWASHIMA,

24   WE KNEW TO COMPEL IN JANUARY OF 2007.  WE GOT AN ORDER THAT THE

25   DEPOSITION HAD TO OCCUR -- MR. KAWASHIMA IS THE E-MAIL GUY, THE 01:21
```

```
 1   30(B)(6) E-MAIL GUY.
 2          THE COURT:  RIGHT.  AND HIS DEPOSITION TOOK PLACE ON
 3   JANUARY 17TH.
 4          MS. GLASER:  JANUARY 17TH.
 5          HE WAS SUBSTITUTED IN FOR SOMEBODY ELSE BECAUSE WE          01:21
 6   COULDN'T -- HE KEPT -- THE OTHER FELLOW WHO THEY HAD ORIGINALLY
 7   DESIGNATED WAS NOT AVAILABLE OVER SEVERAL -- HIS DEPOSITION HAD
 8   TO BE DELAYED SEVERAL TIMES.  I'M NOT REMEMBERING HIS NAME.
 9          MR. ZELLER:  MR. KAYANO.
10          MS. GLASER:  MR. KAYANO.                                   01:21
11          THE COURT:  BUT, COUNSEL, AT THE END OF THE DAY,
12   CERTAINLY, DELAYS IN DEPOSITION SCHEDULING, IN THE ABSENCE OF
13   MOTIONS TO COMPEL, ARE NOT GOING TO BE THE BASIS FOR
14   TERMINATING SANCTIONS.
15          MS. GLASER:  I COULDN'T AGREE WITH YOU MORE, AND I'M       01:21
16   NOT SUGGESTING THAT.  I JUST WANTED TO MAKE SURE THAT -- YOU
17   HAD ASKED US ABOUT A MOTION TO COMPEL, AND ONE WAS MADE.
18          THE COURT:  RIGHT.
19          MS. GLASER:  NOW, IN THE ZEUS CHRONOLOGY, I WANTED TO
20   BE CLEAR ABOUT THAT.  MS. MARINE IS DEPOSED IN DECEMBER OF       01:22
21   2006.  THEY IMPOSED AN ARTIFICIAL LIMITATION OF 1998 THROUGH
22   2000.  JUDGE INFANTE, IN APRIL, AFTER WE GO BACK AND FORTH AND
23   SAY THAT'S AN ARTIFICIAL ONE, HE ORDERS THE DEPOSITION TO
24   RESUME, GOING A GREATER PERIOD, AND THAT IS IN THE APRIL OF
25   2007 MEET AND CONFER, OVER WHICH HE PRESIDES.  IT IS IN JUNE OF  01:22
```

```
 1   2007 THAT MS. MARINE IS THEN DEPOSED AGAIN, AND SHE'S ACTUALLY
 2   DEPOSED A THIRD DAY.
 3           A COUPLE MORE THINGS --
 4       THE COURT:  COUNSEL, I UNDERSTAND THIS RECORD, BUT
 5   WHAT ARE THE POINTS OF THESE --                              01:22
 6       MS. GLASER:  I'M SIMPLY TRYING TO ADDRESS SOME ISSUES
 7   THAT YOU HAD RAISED THIS MORNING, YOUR HONOR.  I APOLOGIZE IF
 8   IT DOESN'T SEEM RELEVANT, BUT I'LL TRY TO GET TO THE RELEVANCE.
 9           YOU ASKED ABOUT PHONE RECORDS AND WHETHER THERE WAS
10   ANY EVIDENCE OF ANYBODY DELIBERATELY TRYING TO GET RID OF PHONE  01:22
11   RECORDS.
12           THE COURT:  YES.
13       MS. GLASER:  THE TRUTH IS, IT'S THEIR COMPUTER
14   SYSTEM.  I CAN'T EXPLAIN WHY THEY DON'T HAVE THIS PARTICULAR
15   TIME FRAME THAT'S, BY THEIR DEFINITION, SO CRITICAL; BUT I      01:23
16   THINK IT'S THEIR OBLIGATION TO EXPLAIN, NOT OUR OBLIGATION TO
17   EXPLAIN, YOUR HONOR, WITH ALL DUE RESPECT TO THEM AND TO THE
18   COURT.
19           I WANT TO GO ON TO JUST A COUPLE MORE THINGS.
20       THE COURT:  COUNSEL, AGAIN, ARE YOU SUGGESTING THAT A      01:23
21   FAILURE TO OFFER UP WHAT, TO THIS POINT, YOU VIEW AS AN
22   UNSATISFACTORY EXPLANATION AS A BASIS FOR TERMINATING
23   SANCTIONS?
24       MS. GLASER:  NO.  BUT IT'S A BASIS FOR SANCTIONS.
25   THE TERMINATING SANCTIONS COME FROM NOT PRESERVING E-MAILS, NOT  01:23
```

1   PRESERVING THE ZEUS SYSTEM, NOT PRESERVING BACKUP, NOT EVEN

2   ATTEMPTING TO DO BACKUP UNTIL A YEAR AFTER THE ORIGINAL

3   LITIGATION WAS FILED.  BUT LET ME GO ON.

4          YOU ASKED ANOTHER QUESTION:  'WELL, WHY IS THIS

5   RELEVANT?  WHY IS THIS TIME PERIOD RELEVANT?'                    01:23

6          YOU ASKED THAT NICELY A COUPLE OF DIFFERENT WAYS.

7          **THE COURT:**  YES.

8          **MS. GLASER:**  I WANT TO GO INTO A COUPLE OF THINGS.

9          ONE:  THEY CLEARLY THOUGHT IT WAS RELEVANT, BECAUSE

10  THEY ARE CLAIMING WORK PRODUCT PRIVILEGE WITH RESPECT TO IT.     01:24

11         TWO:  THERE ARE --

12         **THE COURT:**  I HARDLY THINK THAT'S THE STANDARD,

13  COUNSEL, FOR DETERMINING RELEVANCY.

14         **MS. GLASER:**  WELL, NOT RELEVANCY.  BUT, YOUR HONOR,

15  THERE ARE INVESTIGATORY E-MAILS THAT WE WILL NEVER SEE DURING    01:24

16  THIS INVESTIGATION PERIOD THAT DISCUSS CARTER BRYANT AND

17  CARTER BRYANT'S INVOLVEMENT OR LACK OF INVOLVEMENT IN A WHOLE

18  VARIETY OF THINGS HAVING TO DO WITH MATTEL'S CLAIM THAT

19  MR. BRYANT IS A THIEF.

20         I'LL NEVER SEE THOSE; WE WILL NEVER SEE THOSE             01:24

21  E-MAILS.

22         ONE OF OUR KEY DEFENSES, WHICH YOUR HONOR HAS

23  ALLOWED -- AND YOU'LL BE SEEING -- IF YOU DON'T TERMINATE,

24  THERE WILL BE A MOTION FOR SUMMARY JUDGMENT, IF WE CAN GATHER

25  THE DOCUMENTS -- IS A LACHES DEFENSE.  WE BELIEVE -- ONE OF THE  01:24

1    THINGS ON OUR CHRONOLOGY THAT YOU WILL SEE, YOUR HONOR, IS THAT

2    MR. BRYANT TESTIFIED ON BEHALF OF MATTEL IN 2003.

3           WHAT A COINCIDENCE THAT SEVEN MONTHS LATER, NOT

4    BEFORE, SEVEN MONTHS LATER, AFTER THEY'VE DONE THEIR

5    INVESTIGATION, BUT SEVEN MONTHS AFTER HE TESTIFIES, THEY BRING        01:25

6    A LAWSUIT AGAINST MR. BRYANT.

7           HOW DO WE KNOW WHAT THEY KNEW IN 2002?  HOW DO WE

8    KNOW THAT, BECAUSE THE E-MAILS ARE GONE?  HOW DO WE KNOW WHAT

9    THEY KNEW IN 2003, WHEN THEY USED HIM AS A WITNESS?  CERTAINLY,

10   HOW DO WE KNOW WHAT THEY KNEW IN 2004, UP UNTIL 2005?               01:25

11          THERE IS NO EVIDENCE.  IT'S BEEN DESTROYED.

12          THERE ARE VARIOUS E-MAIL EXCHANGES WHICH UNDOUBTEDLY

13   OCCURRED AS A RESULT OF THE WALL STREET JOURNAL ARTICLE, WHICH

14   IS IN 2003, WITH RESPECT TO CARTER BRYANT BEING INVOLVED; AND,

15   AGAIN, THEFT OF MATTEL'S PRODUCT, MATTEL'S DESIGNS, MATTEL'S        01:25

16   DOLLS.

17          WE DON'T HAVE ANY OF THAT.  IT'S GONE.

18          HOW ABOUT WHEN MATTEL ANNOUNCES ITS LAWSUIT AGAINST

19   CARTER BRYANT -- THEY DO THESE -- RIGHT OR WRONG; I'M NOT BEING

20   CRITICAL OF THIS -- IN THESE TOWN HALL SETTINGS, "WE HAVE NOW       01:26

21   SUED CARTER BRYANT."

22          NONE OF THOSE E-MAILS --

23          HOW ABOUT AN E-MAIL THAT WOULD SAY, FOR EXAMPLE, "WHY

24   IN THE WORLD ARE THEY DOING THAT?"

25          THEY KNOW THAT HE DIDN'T DO X, Y, Z. WE HAVE NO IDEA,        01:26

JULY 24, 2006                    ED CV 04-09049

```
 1   BECAUSE THOSE ARE GONE.  THEY'VE DESTROYED THEM.

 2        I GO BACK TO THE LACHES DEFENSE.  WE BELIEVE, AND WE

 3   WILL BE ASSERTING THIS AND HAVE ASSERTED THIS ALL ALONG, THAT

 4   THEY DELIBERATELY DELAYED IN BRINGING THE LAWSUIT.  THAT'S BEEN

 5   POOH-POOH'D UP UNTIL NOW.  WE KNOW THAT THEY USED CARTER BRYANT   01:26

 6   AS A WITNESS IN SEPTEMBER OF 2003, AND WE KNOW THEY DIDN'T SUE

 7   UNTIL APRIL.

 8        THE VERY THINGS THEY WERE INVESTIGATING IN 2002 OR

 9   WHAT THEY WAITED UNTIL APRIL OF 2004 TO SUE MR. BRYANT FOR, WE

10   KNOW THAT THEY MADE REPRESENTATIONS TO THIS COURT IN ORDER TO    01:26

11   BRING MGA IN AS A DEFENDANT IN JANUARY OF 2007, AND THEY

12   MISREPRESENTED THE STATE OF THE RECORD TO YOUR HONOR.  AND

13   THAT'S PART OF THE BASIS, NOT THE ENTIRE BASIS, BUT CERTAINLY A

14   SIGNIFICANT PART OF THE REASON WHY YOUR HONOR GRANTED AN

15   AMENDMENT, GRANTED THEM THE RIGHT TO SUE MGA.  THAT WAS THE      01:27

16   WRONG THING TO DO.  THEY SHOULD NOT HAVE DONE THAT.

17        THE COURT:  COUNSEL, LET ME GIVE AN OPPORTUNITY TO

18   MR. QUINN AND MATTEL TO RESPOND.

19        MS. GLASER:  JUST ONE LAST THING.

20        ONE OF THE KEY THINGS HERE IS, DID MR. BRYANT MEET          01:27

21   HIS EMPLOYMENT OBLIGATIONS TO MATTEL?

22        I CERTAINLY BELIEVE, YOUR HONOR, THAT IN 2002, 2003,

23   AND 2004, THERE HAD TO HAVE BEEN CORRESPONDENCE, CERTAINLY IF

24   FOR NO OTHER REASON, BECAUSE OF THE INVESTIGATION, ABSOLUTELY

25   RELATING TO THAT.                                                01:27
```

1              AND WE DON'T HAVE IT, AND WE NEVER WILL.

2              **THE COURT:**  I'LL CERTAINLY GIVE YOU AN OPPORTUNITY TO

3    RESPOND.

4              **MS. GLASER:**  THANK YOU, YOUR HONOR.

5              **THE COURT:**  THANK YOU, COUNSEL.                      01:27

6              **MS. GLASER:**  YOUR HONOR, THE LAST THING.

7              **THE COURT:**  YES.

8              **MS. GLASER:**  ONE OF THE THINGS YOU ORDERED -- IF YOUR

9    HONOR IS WILLING, I KNOW YOU ORDERED MR. MOORE TO BE HERE.  WE

10   HAVE AN EXAMINATION OF MR. MOORE.  I REALIZE YOU MAY NOT HAVE   01:27

11   TIME TODAY, BUT IF IT BECOMES APPROPRIATE, WE WOULD LIKE TO

12   CROSS-EXAMINE MR. MOORE, BECAUSE WE THINK SOMEONE HAS A LOT OF

13   EXPLAINING TO DO.

14             THANK YOU.

15             **THE COURT:**  THANK YOU, COUNSEL.                      01:28

16             MR. QUINN?

17             **MR. QUINN:**  THANK YOU, YOUR HONOR.

18             I'VE KNOWN MS. GLASER FOR MANY YEARS, AND I'VE ALWAYS

19   ADMIRED HER ADVOCACY.  I THINK, THOUGH, IN THIS CIRCUMSTANCE,

20   ON THIS MOTION, THERE'S SOME THINGS THAT HAVE JUST GOTTEN       01:28

21   CONFUSED, AND I'M JUST GOING TO WALK THROUGH THEM ONE AT A

22   TIME.

23             **THE COURT:**  ONE OF THE THINGS THAT WOULD BE HELPFUL

24   TO THE COURT, MR. QUINN, IS JUST TO GET A BETTER OR CLEARER

25   SENSE OF EXACTLY WHAT POINT COUNSEL, EITHER INSIDE OR OUTSIDE   01:28

1   COUNSEL, DIRECTED MATTEL TO PRESERVE DOCUMENTS AND PRECISELY

2   WHAT THEY DID.

3          ONE OF THE REASONS WHY I WANTED MR. MOORE TO BE HERE

4   IS THAT SEVERAL OF THE STATEMENTS IN THE DECLARATION THAT HE

5   SUBMITTED TO THE COURT WERE VAGUE IN TERMS OF WHAT SPECIFICALLY     01:28

6   WAS ADDRESSED AND FOR WHAT TIME PERIODS.

7          **MR. QUINN:**  RIGHT.

8          **THE COURT:**  WHETHER WE DO THIS THROUGH YOU OR WHETHER

9   MR. MOORE TESTIFIES, I REALLY DON'T CARE.  I REALLY WANT TO

10  HAVE A CLEAR SENSE OF WHAT WAS SAID AND WHEN, AND THEN             01:29

11  CERTAINLY I'LL GIVE THE DEFENSE AN OPPORTUNITY TO RESPOND TO

12  THAT.

13         **MR. QUINN:**  I UNDERSTAND, YOUR HONOR, AND I'M

14  PREPARED TO ADDRESS THAT, AND MR. MOORE IS AS WELL.  BUT JUST

15  AS A PLACE TO START, YOUR HONOR, IF WE COULD PERHAPS START WITH    01:29

16  THE INFAMOUS ZEUS TAPES.

17         ONE OF MY COLLEAGUES HAD SUGGESTED, 'WELL, LET'S

18  BRING THE TAPES TO COURT SO WE HAVE THEM THERE AND WE CAN SHOW

19  THE JUDGE THAT WE HAVE THEM.'  I SAID, 'NO, THAT'S NOT GOING TO

20  BE NECESSARY.  WHEN WE REPRESENT TO THE COURT THAT WE HAVE         01:29

21  THESE TAPES, I'M SURE THAT WILL BE THE END OF THE MATTER.'

22         I'M NOW BEGINNING TO WONDER IF I MADE A MISTAKE AND

23  WE ACTUALLY SHOULD HAVE BROUGHT THE ZEUS TAPES, WHICH WE HAVE,

24  TO COURT.

25         **THE COURT:**  WELL, START WITH DESCRIBING EXACTLY WHAT     01:29

1    IS THE EXTENT OF THE ZEUS TAPES, AS YOU HAVE THEM.

2          **MR. QUINN:**  THE ZEUS TAPES, IT'S A DOCUMENT

3    MANAGEMENT -- OR IT'S NOT A DOCUMENT MANAGEMENT SOFTWARE

4    SYSTEM; IT'S A STORAGE SYSTEM WHICH HAS NO AUTO-DELETE FEATURE.

5    NOTHING GOES OFF ZEUS UNLESS SOMEBODY DELIBERATELY GOES IN AND          01:30

6    DELETES IT.

7          WE HAVE ZEUS BACKUP TAPES FOR APRIL, MAY, AUGUST,

8    SEPTEMBER, AND DECEMBER 1998; JANUARY AND FEBRUARY 1, 1999;

9    FEBRUARY, MARCH, APRIL, MAY, JUNE, JULY, AUGUST, AND

10   DECEMBER 2000; AND JANUARY AND JULY OF 2001; AND THAT'S THE           01:30

11   RELEVANT TIME FRAME THAT THE DEFENDANTS ARE REALLY RAISING AN

12   ISSUE ABOUT.

13         WE ALSO HAVE TAPES AFTER THAT.  AND, IN FACT, IN

14   2004, WE DID A COMPLETE BACKUP OF THE ZEUS SYSTEM TO SAVE

15   EVERYTHING THAT WAS THERE.                                            01:30

16         BUT I'M SORRY TO SAY, YOUR HONOR, THERE REALLY HAVE

17   BEEN SOME STATEMENTS MADE TO THE COURT TODAY --

18         **THE COURT:**  LET ME JUST STOP YOU HERE SO I UNDERSTAND

19   THAT.

20         THERE'S NOTICEABLE MONTHS ABSENT FROM THAT PERIOD,             01:31

21   FROM APRIL 1998 THROUGH, SAY, JULY OF 2001.

22         **MR. QUINN:**  YOUR HONOR, THESE WERE FOUND -- THESE

23   WERE KEPT OUT OF POLICY.  THESE, BY RIGHTS UNDER MATTEL'S

24   POLICY, SHOULD HAVE BEEN DESTROYED BACK IN THAT TIME FRAME.

25   THEY WERE FOUND AT A LOCATION IN PHOENIX, AND FORTUNATELY, THEY       01:31

1    EXISTED AND WE HAVE THEM.

2            **THE COURT:**  AT WHAT POINT IN TIME, IF EVER, DID

3    DIRECTION GO OUT FROM EITHER OUTSIDE COUNSEL OR MR. MOORE, OR

4    SOMEONE INSIDE MATTEL, THAT ALL ZEUS BACKUPS WOULD BE SAVED

5    FROM THIS POINT FORWARD?  OR HAS THAT EVER HAPPENED?                01:31

6            **MR. QUINN:**  IF I MAY TURN THE FLOOR TO MR. COREY,

7    YOUR HONOR.

8            **THE COURT:**  YES.

9            **MR. COREY:**  YOUR HONOR, THAT'S NEVER HAPPENED,

10   BECAUSE THERE'S NO AUTO-DELETE PROVISION ON ZEUS.  THINGS JUST      01:32

11   CONTINUE TO RESIDE ON ZEUS, AND IT GETS BIGGER AND BIGGER AND

12   BIGGER.  WE'VE MADE PROPHYLACTIC BACKUP TAPES OF ZEUS.

13           **THE COURT:**  FROM WHAT POINT FORWARD DO YOU HAVE A

14   COMPLETE BACKUP OF EVERYTHING THAT WAS PLACED INTO ZEUS?

15           **MR. COREY:**  I'M SURE THAT THERE'S A 2002 BACKUP TAPE     01:32

16   THAT'S COMPLETE.  I KNOW THAT WE HAVE ALMOST COMPLETE BACKUPS

17   OF ZEUS IN THE 2000 TO 1998 TIME PERIOD, BUT I BELIEVE THAT

18   THERE'S A TAPE OR TWO MISSING FROM THOSE SETS.

19           **THE COURT:**  WELL, THAT'S WHAT MR. QUINN JUST

20   ADDRESSED.  BUT FROM 2002 FORWARD, DO YOU HAVE EVERYTHING?          01:32

21           **MR. COREY:**  YES.  WE HAVE A COMPLETE SET OF BACKUP

22   TAPES FOR ZEUS FROM 2002 FORWARD.

23           **THE COURT:**  TO THE PRESENT?

24           **MR. COREY:**  YES.

25           **THE COURT:**  NOW, DOES MATTEL CONTINUE TO USE THIS        01:32

1  ZEUS SYSTEM?

2          **MR. COREY:**  YES.

3          **THE COURT:**  SO WHAT IS THE PROBLEM, THEN, WITH BEING

4  ABLE TO READ THE ZEUS SYSTEM IF YOU ARE STILL USING THE ZEUS

5  SYSTEM?                                                                    01:33

6          **MR. COREY:**  I'M NOT SURE I UNDERSTAND THE QUESTION.

7          **THE COURT:**  THERE'S AN ALLEGATION THAT YOU DO NOT

8  HAVE THE HARDWARE OR THE CAPABILITY TO READ ZEUS.

9          **MR. COREY:**  ARE YOU ASKING ABOUT THE ABILITY TO READ

10  THE BACKUP, THE OLDER BACKUP TAPES FROM ZEUS?                            01:33

11          **THE COURT:**  YES.

12          **MR. COREY:**  I DON'T THINK THERE IS A PROBLEM.

13          MATTEL HAS IDENTIFIED A VENDOR WHO HAS THAT HARDWARE,

14  AND WE'VE USED THE VENDOR TO RESTORE THOSE BACKUP TAPES, SEARCH

15  THE BACKUP TAPES, AND PRODUCE RESPONSIVE DOCUMENTS FROM THOSE            01:33

16  OLDER BACKUP TAPES.  THERE'S NO PROBLEM.

17          **THE COURT:**  SO FROM 2002 TO THE PRESENT, YOU HAVE

18  EVERYTHING ON ZEUS?

19          **MR. COREY:**  CORRECT.

20          **THE COURT:**  AND UP TO 2002, YOU HAVE THESE DATES THAT        01:33

21  MR. QUINN JUST REPRESENTED TO THE COURT?

22          **MR. COREY:**  THAT'S CORRECT.

23          **THE COURT:**  AND THERE'S NO AUTO DELETE ON ZEUS?

24          **MR. QUINN:**  THAT'S CORRECT, YOUR HONOR.

25          **THE COURT:**  COUNSEL, YOU MAY CONTINUE.                       01:33

1      **MR. QUINN:**  THERE HAVE BEEN STATEMENTS MADE TODAY

2  THAT A WITNESS, A MS. MARINE, JULIA MARINE, DENIED IN HER

3  DEPOSITION THAT THERE WERE ANY ZEUS TAPES.

4      **THE COURT:**  YES.

5      **MR. QUINN:**  LET'S BACK UP FOR A SECOND.                    01:33

6      **THE COURT:**  THAT WAS YOUR 30(B) DEPOSITION WITNESS;

7  CORRECT?

8      **MR. QUINN:**  YES.

9      BUT THE TESTIMONY SHE WAS REFERRING TO WAS IN A

10  DEPOSITION WHERE SHE HAD BEEN DESIGNATED ON A DIFFERENT TOPIC.  01:34

11  SHE HAD PREVIOUSLY, SEVEN AND A HALF MONTHS BEFORE, BEEN

12  DESIGNATED AS THE PERSON MOST KNOWLEDGEABLE WITH RESPECT TO

13  ZEUS.  THEY SENT AN ASSOCIATE TO TAKE THAT DEPOSITION.

14  INEXPLICABLY, THAT ASSOCIATE DID NOT ASK, "WHAT ZEUS TAPES DO

15  YOU HAVE?"                                                     01:34

16      SEVEN AND A HALF MONTHS LATER, SHE'S DESIGNATED TO

17  TESTIFY ON A DIFFERENT SUBJECT, AND SHE FORGETS WHAT SHE HAD

18  BEEN TOLD IN PREPARATION FOR HER DEPOSITION THAT MATTEL HAD

19  LOCATED THESE ZEUS TAPES IN PHOENIX, AND SHE TESTIFIED, NOT

20  THAT THEY DON'T EXIST, AS MS. GLASER REPRESENTED TO YOUR HONOR;  01:34

21  SHE TESTIFIED SHE JUST DIDN'T KNOW.

22      THAT'S PAGE 239 OF JULIA MARINE'S TESTIMONY, THE

23  PROCTOR DECLARATION, EXHIBIT 22.

24      "TO YOUR KNOWLEDGE, THERE WERE NO BACKUPS LONGER THAN

25  TWO YEARS WHEN YOU RESUMED YOUR RESPONSIBILITIES TO ADMINISTER  01:35

```
 1    ZEUS IN 2003?"
 2              THE WITNESS:  "YEAH.  I'M SORRY.  I JUST DON'T KNOW."
 3              SHE DIDN'T DENY THAT THEY DIDN'T EXIST; SHE JUST SAID
 4    SHE DOESN'T KNOW; AND WE WOULD INVITE THE COURT TO READ
 5    PAGE 239 AND THE PREVIOUS FOUR PAGES.                          01:35
 6              NOW, THAT TESTIMONY WAS ELICITED BY MR. JENAL, WHO IS
 7    SITTING HERE AND LISTENING TO MS. GLASER MAKE THESE
 8    REPRESENTATIONS TO YOU.
 9              THEY FAULT MR. MOORE FOR BEING IN THAT DEPOSITION AND
10    NOT SAYING SOMETHING.                                          01:35
11              NOW, LET'S STOP FOR A MINUTE, YOUR HONOR.
12              MR. MOORE IS HEARING AN EMPLOYEE DENY THE EXISTENCE
13    OF ELECTRONIC DATA WHICH HE KNOWS EXISTS.  THIS IS NOT
14    TESTIMONY THAT HE LIKES OR WANTS TO HEAR.  HE KNOWS THE TRUTH.
15    HE REMEMBERS BECAUSE HE'S THE GUY WHO WENT TO PHOENIX AND GOT   01:36
16    THESE TAPES.
17              (WHEREUPON, A SOTTO VOCE DISCUSSION WAS HAD
18              BETWEEN MR. QUINN AND CO-COUNSEL.)
19              MR. QUINN:  HE DIDN'T GO TO PHOENIX.  THEY WERE SENT
20    FROM PHOENIX TO HIM.                                           01:36
21              IF HE HAD SPOKEN UP, OR, DURING A RECESS IN THE
22    DEPOSITION, HAD SAID, "JULIA, YOU FORGOT; REMEMBER, SEVEN AND A
23    HALF MONTHS" -- I THINK MR. MOORE MIGHT HAVE BEEN FAULTED FOR
24    COACHING THE WITNESS.  HE DIDN'T WANT TO HEAR HER SAY, "I DON'T
25    KNOW."  HE WANTED TO HEAR HER SAY, "YEAH, WE GOT THE TAPES."    01:36
```

```
 1          THE WHOLE IDEA THAT HE --
 2          THE COURT:  WHY IS THIS HERE, MR. QUINN, ON THIS
 3  PARTICULAR ISSUE?
 4          MR. QUINN:  I DON'T KNOW, YOUR HONOR.  I DON'T KNOW.
 5          AS WE'VE SAID IN OUR PAPERS, MR. ZELLER HAS OFFERED      01:36
 6  MULTIPLE TIMES, "IF YOU WANT THE ZEUS TAPES, THEY'RE AVAILABLE.
 7  ALL ELECTRONIC DATA WE'VE GOT OF THAT NATURE IS AVAILABLE TO
 8  YOU."  WE SAID THAT IN OUR PAPERS, YOUR HONOR.
 9          THE COURT:  WHAT ABOUT THE E-MAILS?
10          MR. QUINN:  BEFORE WE LEAVE THAT, YOUR HONOR...          01:36
11          THE COURT:  PLEASE.
12          MR. QUINN:  THESE BACKUP ZEUS TAPES ARE DLT TAPES,
13  AND YOU DO NEED A CERTAIN DEVICE.  I GUESS THESE ARE NOT IN
14  FASHION ANYMORE, AND YOU NEED A CERTAIN DEVICE TO BE ABLE TO
15  READ THOSE.                                                     01:37
16          MS. GLASER IS EXCORIATING US SAYING, AND I QUOTE,
17  THAT WE'VE MADE IT IMPOSSIBLE -- THAT WE'VE DESTROYED THEIR
18  ABILITY TO READ THESE TAPES, WHEN SHE CAN'T ANSWER THE COURT'S
19  QUESTION ABOUT WHETHER IT'S POSSIBLE THAT THERE ARE VENDORS OUT
20  THERE THAT CAN HELP YOU DO THAT.                                01:37
21          WE KNOW THE ANSWER TO THAT BECAUSE WE'VE DONE IT.
22  THERE ARE SUCH VENDORS.  THESE TAPES -- I'M INVOLVED IN ANOTHER
23  CASE THAT INVOLVES DLT TAPES, AND A PARTY TO THE CASE WENT ON
24  E-BAY AND FOR $80 GOT A READER THAT MADE IT POSSIBLE TO READ
25  THESE TAPES.  THIS SIMPLY IS NOT AN ISSUE HERE.  THIS HAS NO    01:37
```

```
 1   BUSINESS COMING BEFORE THE COURT.  THEY HAVE MADE A

 2   REPRESENTATION TO THE COURT ABOUT WHAT THE TESTIMONY WAS, ABOUT

 3   WHAT WE'VE DONE.  IT'S A COMPLETELY MADE-UP ISSUE.

 4        WE HAVE THE TAPES.  WE'VE OFFERED THEM THE TAPES.

 5   THEY WOULD RATHER BRING A MOTION.                              01:38

 6        AND THERE'S A THEME HERE, YOUR HONOR, BECAUSE AS I GO

 7   THROUGH THIS, THIS IS GOING TO COME UP AGAIN AND AGAIN.  THE

 8   COURT'S GOING TO SEE THAT THERE'S A PATTERN; THAT RATHER THAN

 9   FIND OUT THE FACTS AND GET THE EVIDENCE, THEY WOULD RATHER COME

10   TO THIS COURT WITH A MOTION, TAKE THEIR SHOT AT A MOTION FOR    01:38

11   TERMINATING SANCTIONS.

12        THE TIME RECORDS:  SHE, MS. GLASER, REPRESENTED TO

13   THE COURT THAT THERE WAS SOMETHING SUSPICIOUS; THAT THEY DON'T

14   EXIST; THAT THEY WERE GIVEN TO THE LAWYERS; THAT THE WITNESS

15   WHO'S KNOWLEDGEABLE ABOUT THE TIME RECORDS, MR. ARNOLD ARTAVIA  01:38

16   (PHONETIC), TESTIFIED THAT THEY COULD HAVE BEEN DELETED.

17        THERE IS ABSOLUTELY NO SUCH TESTIMONY, YOUR HONOR.

18   THAT IS NOT WHAT HE TESTIFIED.

19        HE TESTIFIED THAT THE REASON THERE WERE NOT ANY

20   CARTER BRYANT TIME ENTRIES AFTER SEPTEMBER 8, 2000, WAS BECAUSE 01:39

21   CARTER BRYANT DID NOT KEY THEM IN; HE SIMPLY DID NOT KEY IN HIS

22   TIME ENTRIES.

23        AND HE ACTUALLY TESTIFIED THAT HE WAS AWARE OF NO

24   CIRCUMSTANCE WHERE DATA HAD BEEN DELETED OR CHANGED.

25        AGAIN, THAT WAS MR. JENAL WHO ELICITED THAT TESTIMONY      01:39
```

1    FROM THE WITNESS.

2              THERE'S SIMPLY NOTHING SUSPICIOUS HERE.

3              MR. BRYANT WAS A DESIGNER.  HE ISN'T PAID OFF OF TIME

4    RECORDS LIKE AN ASSOCIATE IN A LAW FIRM.  IT'S NOT A SITUATION

5    WHERE IF YOU DIDN'T ENTER YOUR TIME RECORDS, BELLS AND WHISTLES    01:39

6    WOULD GO OFF AND YOUR PAYCHECK WOULD BE WITHHELD.  IT'S NOT

7    LIKE A LAW FIRM.  IT'S BASICALLY ONE DEVICE THAT'S USED FOR

8    ALLOCATING COSTS.  AND FROM SEPTEMBER 8, 2000, UNTIL HE LEFT

9    ABOUT A MONTH LATER, HE SIMPLY DIDN'T KEY IN ANY TIME.  THAT IS

10   THE TESTIMONY.  AND I WOULD REFER THE COURT TO ARNOLDO             01:40

11   ARTAVIA'S DEPOSITION, SEPTEMBER 21, 2006.  IT'S ATTACHED AS

12   EXHIBIT 10 TO THE SUPPLEMENTAL ZELLER DECLARATION.

13             THAT IS WHY THERE ARE NO TIME RECORDS FOR THAT

14   PERIOD.

15             MATTEL HAS ALL DATA FROM THE TIME RECORDS, ALL OF IT,    01:40

16   GOING BACK TO 1995, FROM ITS TIME RECORD SYSTEM.  NOTHING IS

17   MISSING.  AN EMPLOYEE STILL HAS TO KEY IN WHAT HE OR SHE IS

18   DOING.

19             THE PHONE RECORDS, MISSING PHONE RECORDS, FROM

20   OCTOBER 2000:  AND FOR THE LIFE OF ME, YOUR HONOR, I CAN'T         01:40

21   UNDERSTAND WHY THEY ARE SO INTERESTED IN THIS.  THIS IS THE

22   TIME PERIOD WHERE IT'S NOW UNDISPUTED THAT CARTER BRYANT IS

23   WORKING FOR BOTH; HE'S WORKING FOR MGA, AND HE'S WORKING FOR

24   MATTEL.  HE'S MAKING PHONE CALLS -- WE WOULD LOVE TO HAVE THOSE

25   RECORDS FROM HIS PHONE AT MATTEL.  WHY THEY THINK IT HELPS THEM    01:40

1  OR WOULD BE HELPFUL TO THEM, I HAVE NO IDEA.  BUT, AGAIN, THIS

2  IS A COMPLETE NON-ISSUE.

3          THE COURT HAS DECLARATIONS AND HAS THE TESTIMONY.

4  THE COMPUTER THAT THE PHONE RECORDS WOULD GO INTO ONLY HAS

5  CAPACITY FOR 2.5 MONTHS WORTH OF PHONE RECORDS, AT THE OUTSIDE,          01:41

6  AND BECAUSE OF THAT LIMITATION, THOSE RECORDS ARE TAKEN OFF THE

7  COMPUTER AND ARCHIVED ON A TAPE EVERY MONTH.  THOSE ARCHIVES

8  LAST FOR THREE YEARS.

9          **THE COURT:**  BUT THE CONCERN HERE, MR. QUINN, IS THAT

10  JUST THAT MONTH IS MISSING; THAT YOU HAVE THE MONTH BEFORE, YOU          01:41

11  HAVE THE MONTH AFTER, YOU JUST DON'T HAVE OCTOBER OF 2000.

12          **MR. QUINN:**  IT'S UNACCOUNTABLE.  WE DON'T KNOW WHY.

13          IN 2003, WHEN WE WENT LOOKING FOR IT, NO ONE COULD

14  FIND THE TAPE FOR OCTOBER.

15          (WHEREUPON, A DISCUSSION WAS HAD

16          BETWEEN MR. QUINN AND CO-COUNSEL.)

17          **MR. QUINN:**  I'M TOLD WE ALSO DON'T HAVE THE DECEMBER

18  TAPE, YOUR HONOR.

19          SO WHEN WE WENT LOOKING FOR THEM IN 2003, THEY SIMPLY

20  DIDN'T EXIST.          01:42

21          NOW, THE REPRESENTATION WAS MADE TO THE COURT TODAY

22  THAT AN OCTOBER TAPE, OR PHONE RECORDS FOR THAT PERIOD, WERE

23  DELIVERED TO THE LAW DEPARTMENT AND THEN DISAPPEARED.  THAT WAS

24  NOT THE TESTIMONY.  THE WITNESS WHO TESTIFIED ON THAT WAS A

25  ROD PALMER.  HE WAS THE DESIGNATED EXPERT, PERSON MOST          01:42

1    KNOWLEDGEABLE ON THIS SUBJECT.  HIS TESTIMONY, PAGE 104 FROM

2    HIS DEPOSITION, IS BEFORE THE COURT.

3            QUESTIONED BY MR. JENAL, AGAIN, WHO IS SITTING HERE:

4    "DO YOU KNOW WHETHER ARCHIVED TAPES FOR THE MONTH OF OCTOBER

5    2000 WERE PROVIDED TO THE LEGAL DEPARTMENT?"                      01:42

6            ANSWER:  "I DON'T KNOW."

7            AND THE REPRESENTATION WAS MADE THAT SOMEHOW THESE

8    WERE GIVEN TO THE LEGAL DEPARTMENT AND THEN DISAPPEARED AND

9    THAT THERE'S SOMETHING SINISTER ABOUT THAT.

10           THERE'S SIMPLY NO EVIDENCE TO SUPPORT THAT, YOUR          01:42

11   HONOR.  IT'S CONTRARY TO WHAT THE EVIDENCE IS.

12           NOW THE E-MAILS.

13           THE CASE THAT WE ARE BRINGING HERE -- FIRST, I THINK

14   WE HAVE TO BEAR IN MIND, WHAT IS THE CLAIM THAT'S BEING PURSUED

15   HERE?                                                            01:43

16           THE CLAIM BEING PURSUED HERE IS THAT CARTER BRYANT

17   CREATED BRATZ WHILE HE WAS EMPLOYED BY MATTEL, AND, THEREFORE,

18   BY VIRTUE OF HIS AGREEMENT WITH MATTEL, WE OWN IT.  THAT'S THE

19   CLAIM THAT'S ASSERTED HERE.

20           MATTEL HAD NO NOTICE OF THAT CLAIM, THAT POTENTIAL        01:43

21   CLAIM, UNTIL NOVEMBER OF 2003, WHEN MATTEL OBTAINED A COPY OF

22   THE CONTRACT BETWEEN MGA AND MR. BRYANT, WHICH IS DATED DURING

23   THE TIME PERIOD THAT HE WAS EMPLOYED BY MATTEL.

24           THAT'S THE CLAIM THAT WE ARE PURSUING HERE.

25           THERE ARE OTHER CLAIMS THAT WERE THE SUBJECT OF           01:44

1    INVESTIGATION, YOUR HONOR.

2             **THE COURT:**  COUNSEL, I'LL SAVE YOU SOME TIME HERE,

3    BECAUSE THE COURT, IN REVIEWING THE DOCUMENTS PREPARING FOR

4    THIS HEARING -- NOVEMBER OF 2003 WAS THE DATE THAT I CAME UPON

5    AS WELL.  AND MY QUESTION FOR YOU OR MR. MOORE OR WHOEVER ELSE      01:44

6    CAN ANSWER THIS QUESTION IS, WHAT WAS DONE IN 2003 TO PRESERVE

7    THESE E-MAILS?

8             **MR. QUINN:**  WHAT WAS DONE IN --

9             **THE COURT:**  NOVEMBER OF 2003, SPECIFICALLY.

10            **MR. QUINN:**  I TAKE IT THE COURT DOES NOT NEED TO HEAR    01:44

11   WHAT THE INVESTIGATION WAS, WHAT MS. GLASER HAS REFERRED TO.

12            **THE COURT:**  I THINK I HAVE A PRETTY GOOD SENSE, AND

13   IF I HAVE QUESTIONS IN THE COURSE OF YOUR RESPONSE, I WILL ASK

14   THEM.

15            **MR. QUINN:**  ALL RIGHT.

16            **THE COURT:**  WHAT I WANT TO KNOW SPECIFICALLY IS, WHAT

17   IN NOVEMBER OF 2003, GIVING YOU THAT FOR THE MOMENT, WHAT DID

18   YOU, OR, MORE SPECIFICALLY, IN-HOUSE COUNSEL, DO IN 2003 TO

19   PRESERVE THE STATE OF THE RECORD FOR THIS ANTICIPATED

20   LITIGATION?                                                         01:44

21            IT WAS PRETTY CLEAR AT THAT POINT IN TIME THAT THIS

22   WAS HEADED FOR LITIGATION ON THE CLAIM THAT YOU JUST SUGGESTED.

23            **MR. QUINN:**  RIGHT.

24            WHAT WE DID DO AND WHAT WE DIDN'T DO?

25            **THE COURT:**  PLEASE.                                     01:45

```
 1          MR. QUINN:  SO NOVEMBER OF 2003, WE ARE -- REMEMBER,

 2   MR. BRYANT LEAVES IN OCTOBER OF 2000, SO WE'RE A COUPLE OF

 3   YEARS BEYOND THAT.

 4          AT THAT POINT, WE IDENTIFIED EMPLOYEES WHO WORKED

 5   WITH CARTER BRYANT, IN THE VICINITY OF CARTER BRYANT, WHO MIGHT    01:45

 6   HAVE SOME VISIBILITY INTO HIS ACTIVITIES.  THERE WERE

 7   APPROXIMATELY 35 EMPLOYEES.  WE IMAGED ALL OF THEIR COMPUTERS.

 8   WE HAVE ALL OF THAT DATA.

 9             WE WENT AROUND -- WE PERSONALLY --

10          THE COURT:  LET ME STOP YOU THERE FOR A SECOND.        01:45

11          WHEN YOU SAY 'IMAGED' A COMPUTER, WOULD THAT CAPTURE

12   ANYTHING THAT WOULD BE ON THAT COMPUTER, EITHER SAVED ON THAT

13   COMPUTER, DELETED ON THAT COMPUTER, BUT STILL SOMEPLACE IN ITS

14   HARD DRIVE?  ARE YOU TALKING ABOUT IMAGING THE ACTUAL HARD

15   DRIVES ASSOCIATED WITH THOSE COMPUTER TERMINALS?               01:45

16          MR. COREY:  YES.

17          MR. QUINN:  YES, YOUR HONOR.

18          THE COURT:  AND YOU'VE PRODUCED THOSE OR PROVIDED

19   THOSE OR MADE THOSE AVAILABLE TO MGA?

20          MR. QUINN:  WELL, SUBJECT TO THE FEDERAL RULES OF       01:46

21   CIVIL PROCEDURE AND PROPER REQUESTS BEING MADE.  THAT

22   INFORMATION, TO THE EXTENT IT'S RELEVANT AND IS PROPERLY ASKED

23   FOR, ET CETERA, IS AVAILABLE.

24          THE COURT:  HAS THAT INFORMATION BEEN SEARCHED FOR

25   RESPONSIVE DOCUMENTS?                                          01:46
```

1      **MR. ZELLER:**  WITH RESPECT TO THE HARD DRIVES THAT

2  HAVE BEEN IMAGED, SOME OF THEM HAVE BEEN; SOME OF THEM HAVE NOT

3  BEEN.  BUT FROM OUR PERSPECTIVE, THAT'S NOT A PRESERVATION

4  ISSUE; THAT'S AN ISSUE OF PRODUCTION.

5      OBVIOUSLY, THERE'S A COST ASSOCIATED WITH, YOU KNOW,      01:46

6  SEARCHING THE ENTIRETY OF THESE IMAGED HARD DRIVES.  SOME OF

7  THEM, WE BELIEVE, ARE MORE LIKELY TO HAVE EVIDENCE THAN OTHERS.

8  SO WE HAVE SEARCHED A NUMBER OF THEM.  DOCUMENTS THAT WE FOUND

9  THAT WERE RESPONSIVE AND NON PRIVILEGED FROM THE HARD DRIVES

10  THAT WE HAVE SEARCHED HAVE BEEN PRODUCED.  THOSE WERE PRODUCED   01:46

11  SOME TIME AGO IN THIS CASE.

12      BUT I DON'T WANT THE COURT TO THINK --

13      WE'VE ALSO COLLECTED A NUMBER OF HARD DRIVES.  IN

14  FACT, IT'S IN EXCESS OF A HUNDRED HARD DRIVES THAT WE HAD FOUND

15  BACK FROM THAT RELEVANT TIME PERIOD THAT WERE IN THE I.T.      01:47

16  DEPARTMENT'S POSSESSION, AND WE HAVE SEARCHED A NUMBER OF THOSE

17  AS WELL.  BUT BECAUSE WE HAVE A VERY LARGE MOUNTAIN OF DATA,

18  INCLUDING THROUGH THESE HARD DRIVES AND THE IMAGES AND

19  EVERYTHING ELSE -- WE HAVE DONE SEARCHES ON SOME, BUT NOT --

20      **THE COURT:**  WHAT YOU'RE SUGGESTING NOW IS A         01:47

21  PRODUCTION ISSUE AND NOT A PRESERVATION ISSUE, AND I'M NOT

22  BEING CALLED UPON TO PASS ON THE PRODUCTION ISSUE.

23      **MR. QUINN:**  EXACTLY.

24      **THE COURT:**  THAT IS CERTAINLY PRESERVED, POTENTIALLY,

25  FOR ANOTHER DAY.  THE ISSUE HERE IS THE ALLEGATION BY MGA THAT  01:47

```
 1   YOU DID NOT PRESERVE.

 2           SO MR. QUINN, CONTINUE WITH WHAT YOU DID PRESERVE.

 3           MR. QUINN:  ALL RIGHT.

 4           THE COURT:  YOU IDENTIFIED THESE 34 WITNESSES; YOU

 5   IMAGED THEIR COMPUTERS.                                        01:47

 6           MR. QUINN:  POTENTIAL WITNESSES; IMAGED THEIR

 7   COMPUTERS; SPOKE TO THEM INDIVIDUALLY; ASKED THEM WHAT THEY

 8   HAD, WHAT THEY HAD IN THEIR POSSESSION.

 9           THE COURT:  AND THIS IS ALL IN NOVEMBER OF 2003?

10           MR. QUINN:  IN THAT TIME FRAME.                        01:47

11           THE COURT:  WHAT TIME FRAME?

12           MR. QUINN:  WELL, MR. ZELLER CAN, PERHAPS, BRACKET

13   IT.

14           MR. ZELLER:  I THINK I CAN.

15           SOME OF THIS HAS OCCURRED AS OF NOVEMBER OF 2003.      01:48

16   THERE WAS OBVIOUSLY THE INVESTIGATION THAT WAS DONE IN THE

17   MONTHS PRIOR TO NOVEMBER OF 2003, WHEN MATTEL FIRST RECEIVED A

18   COPY OF THAT CONTRACT WITH CARTER BRYANT AND MGA; SO THERE WAS

19   AN INVESTIGATION THAT WAS IN PLACE FOR THOSE CLAIMS.

20           SO, OBVIOUSLY, A FAIR AMOUNT OF INFORMATION -- HARD    01:48

21   DRIVES, E-MAILS, THAT SORT OF THING -- WERE COLLECTED AS PART

22   OF THE INVESTIGATION.

23           EVERYTHING UP UNTIL NOVEMBER OF 2003 WAS PRESERVED;

24   EVERYTHING THAT HAD BEEN COLLECTED AS OF THAT TIME.  OBVIOUSLY,

25   THEN, ONCE IT BECAME -- REALLY, WHERE WE GET TO GETTING THE    01:48
```

```
 1   CONTRACT, AND IT BECOMES MORE LIKELY THAT THERE IS A LAWSUIT,

 2   CERTAINLY BY THAT JUNCTURE, THEN THOSE FORMAL KINDS OF

 3   PRESERVATION EFFORTS WERE UNDERTAKEN AND EXPANDED.

 4        THE COURT:  WHAT FORMAL PRESERVATION EFFORTS WERE

 5   UNDERTAKEN?  WHO TOOK THE LEAD ON THAT?                          01:48

 6        MR. ZELLER:  THAT WAS MR. MOORE.

 7        THE COURT:  WHAT EXACTLY DID HE DO?

 8        MR. ZELLER:  WELL, A NUMBER OF THESE THINGS OCCURRED

 9   BOTH BEFORE AND AFTER.  SOME OF IT --

10        THE COURT:  WHAT DID HE DO IN NOVEMBER OF 2003?            01:49

11        MR. QUINN:  IF I COULD JUST CONTINUE, YOUR HONOR, I

12   DO HAVE A LIST.

13        THE COURT:  ALL RIGHT, AS LONG AS WE'RE -- I JUST

14   DON'T WANT A LIST OF THINGS DONE IN THE COURSE OF THE HISTORY

15   OF THIS CASE.                                                    01:49

16        MR. QUINN:  NO, NO.  WE'RE TALKING ABOUT THINGS THAT

17   WERE DONE IN THE NOVEMBER 2003 TIME FRAME, GIVE OR TAKE MONTHS

18   ON EITHER SIDE.

19        THE COURT:  ALL RIGHT.

20        MR. QUINN:  THESE 35 INDIVIDUALS WERE INDIVIDUALLY         01:49

21   MET WITH, AND WHATEVER HARD INFORMATION THEY HAD, WHATEVER DATA

22   THEY HAD -- SOME OF THEM HAD E-MAILS AND HARD COPIES -- THAT

23   WAS ALL COLLECTED.

24        IN ADDITION, THE LIVE SERVERS, THAT THEN IN EXISTENCE

25   WERE LIVE, WERE SEARCHED FOR SOME 39 PEOPLE, AND E-MAILS WERE   01:49
```

```
 1    PULLED OFF OF THE LIVE SERVERS.

 2            SOME PEOPLE -- ALSO THERE'S -- ON THE MATTEL SYSTEM,

 3    THERE'S AN ABILITY TO KEEP E-MAILS ON NETWORK DRIVES.  PEOPLE

 4    WILL HAVE SOME OF THEIR OWN SPACE ON A NETWORK DRIVE.  AND FOR

 5    SOME NUMBER OF THESE PEOPLE, THOSE DRIVES WERE ALSO GONE INTO,      01:50

 6    THEIR SHARE OF THAT SPACE ON THE NETWORK DRIVES, AND E-MAILS

 7    WERE COLLECTED OFF OF THAT AS WELL.

 8            THE COURT:  AGAIN, I NEED A LITTLE BIT MORE IN THE

 9    WAY OF SPECIFICS.

10            WHO'S DECIDING WHICH E-MAILS?  IS IT ALL E-MAILS           01:50

11    RELATED TO CARTER BRYANT AND/OR BRATZ AND/OR ANY OF THIS

12    LITIGATION THAT MIGHT COME UP?  OR IS IT JUST THAT -- BECAUSE I

13    WANT TO MAKE SURE THIS IS PRESERVATION THAT WE'RE TALKING ABOUT

14    AND NOT PRODUCTION.

15            MR. QUINN:  IT IS PRESERVATION, YOUR HONOR.              01:50

16            MR. ZELLER CAN GIVE SOME MORE SPECIFICS.

17            MR. ZELLER:  YOUR HONOR, SOME OF THESE PRESERVATION

18    EFFORTS ARE OBVIOUSLY BEYOND THE E-MAILS.  BUT FOCUSING ON THE

19    E-MAIL PORTION OF IT, FOR EXAMPLE, THE E-MAILS PULLED FROM THE

20    SHARED DRIVES, I MEAN, THAT WAS EVERYTHING THEY HAD.  THESE ARE   01:51

21    NOT SEARCHES THAT WERE DONE BY A SPECIFIC KEY WORD, IN THE

22    SENSE OF SAYING, OKAY, WE'RE GOING TO GO ON TO THIS PARTICULAR

23    DRIVE OR THIS PARTICULAR LIVE SERVER AND ONLY PULL OFF E-MAILS.

24    THEY WERE DONE BY PEOPLE WE THOUGHT WERE RELEVANT AND NOT BY

25    KEY WORD.                                                       01:51
```

```
 1          THERE WERE ALSO KEY WORD TYPE SEARCHES DONE, AND

 2   THOSE TYPES OF THINGS WERE PRESERVED; BUT THAT WAS A DIFFERENT

 3   EFFORT.

 4          THE COURT:  VERY WELL.

 5          MR. QUINN:  IN ADDITION, AS MR. ZELLER MENTIONED, WE       01:51

 6   TRACKED DOWN SOME 130-PLUS OLDER HARD DRIVES THAT MATTEL I.T.

 7   HAD IN ITS POSSESSION; TOOK CUSTODY OF THOSE AND MADE SURE THAT

 8   THEY WERE NOT DISPOSED OF.  WE BACKED UP THE NETWORK SERVERS

 9   THAT WE THOUGHT MIGHT CONCEIVABLY HAVE RELEVANT INFORMATION AND

10   PRESERVED THOSE AS WELL.                                         01:51

11          SO THOSE ARE ALL OF THE THINGS THAT WERE DONE IN THIS

12   TIME FRAME, AFTER WE RECEIVED A COPY OF THIS CONTRACT.

13          GOING FORWARD, WE DID MAKE A DECISION NOT TO SUSPEND

14   THE AUTOMATIC E-MAIL DELETION POLICY.  AND THE REASON WE MADE

15   THAT DECISION AT THAT TIME IS THE FOLLOWING:                     01:52

16          THESE CONCERNED EVENTS GOING BACK TWO AND A HALF

17   YEARS, OR WHATEVER THE NUMBER IS, IT SEEMED TO US PRETTY

18   UNLIKELY THAT THERE WOULD BE E-MAILS THAT PEOPLE WOULD THEN BE

19   CREATING THAT WOULD HAVE SOME BEARING ON THOSE EVENTS WHEN

20   MR. BRYANT LEFT MATTEL TWO AND A HALF -- OR WHATEVER THE         01:52

21   NUMBER -- THE PERIOD OF TIME WAS BEFORE, BACK IN OCTOBER, IN

22   2000.

23          THE COURT:  COUNSEL, YOU SERIOUSLY MAINTAIN THAT IN

24   ANY LITIGATION IN WHICH THE ALLEGATIONS GO FAR BEYOND, AS THIS

25   ONE DOES -- IT GOES FAR BEYOND SIMPLY WHAT CARTER BRYANT DID OR  01:52
```

1   DID NOT DO BACK IN 2000; IT TALKS ABOUT ONGOING CONDUCT, AS

2   ALLEGED IN YOUR MOST RECENT COMPLAINT AGAINST MGA -- THAT THERE

3   WOULD NOT BE INFORMATION GENERATED IN THESE INTERNAL

4   INVESTIGATIONS THAT MIGHT HAVE SOME RELEVANCE OR BEARING?

5       **MR. QUINN:**  YOUR HONOR, THESE INTERNAL                    01:53

6   INVESTIGATIONS -- WE SORT OF SKIPPED OVER THAT -- THAT CONCERNS

7   SOMETHING QUITE DIFFERENT, WHICH WE DECIDED WE DID NOT HAVE A

8   CLAIM, THAT THERE WAS NO CLAIM.  AND WE DIDN'T TALK ABOUT THAT.

9       ONE OF THE PROBLEMS HERE IN DEALING WITH THIS IS, WE

10  HAVE KIND OF A HINDSIGHT BIAS.  WE ARE NOW SITTING HERE KNOWING  01:53

11  WHAT WE KNOW, LOOKING AT THE SIZE OF THE CASE THAT WE ARE NOW

12  LOOKING AT; AND IT'S TEMPTING TO TRY TO ASSUME THAT BACK IN

13  NOVEMBER OF 2003, WE KNEW WHAT WE KNOW NOW AND THAT WE KNEW

14  THAT WE HAD CLAIMS AGAINST MGA.

15      I SUBMIT, YOUR HONOR, WE DID NOT KNOW THAT.  ALL WE          01:53

16  KNEW WAS THAT THIS MAN HAD SIGNED A CONTRACT.  WE DIDN'T KNOW

17  WHETHER MGA HAD INDUCED HIM TO DO THIS; HAD PAID HIM; WE DIDN'T

18  KNOW THEY HAD PAID HIM WHILE HE WAS WORKING FOR US.  WE DIDN'T

19  KNOW WHAT THEY KNEW.

20      **THE COURT:**  THAT NEVER CROSSED THE MIND OF ANYBODY AT     01:54

21  MATTEL, THAT PERHAPS CARTER BRYANT WAS INDUCED AWAY FROM

22  MATTEL, ALONG WITH THE PRODUCTS OR DESIGNS THAT HE HAD MADE?

23      **MR. QUINN:**  NO, I'M NOT GOING TO SAY IT NEVER CROSSED

24  ANYBODY'S MIND, YOUR HONOR.  BUT WE HAD NO WAY OF KNOWING

25  WHETHER THERE WAS A VIABLE CLAIM AGAINST MGA.  FOR ALL WE KNEW,  01:54

1  THIS MAN HAD SIGNED A CONTRACT WITH MGA.  WE DIDN'T KNOW

2  WHETHER OR NOT MGA KNEW THEN THAT HE WAS WORKING FOR MATTEL.

3  WE DIDN'T KNOW WHETHER MGA KNEW THAT HE HAD AN INVENTIONS

4  AGREEMENT WITH MATTEL THAT MEANT THAT ANYTHING HE BROUGHT TO

5  MGA, WE OWNED.  WE SIMPLY DID NOT KNOW THAT AT THAT TIME.          01:54

6           WE DIDN'T EVEN KNOW, FOR SURE, WHAT THIS PRODUCT WAS;

7  WHAT THE ASSIGNMENT WAS THAT HE HAD BEEN GIVEN.  IT'S TURNED

8  OUT THERE WAS MORE THAN ONE THING THAT HE DID FOR MGA WHILE HE

9  WAS WORKING FOR US.

10          THE COURT:  WELL, WHAT DID YOU DO WITH RESPECT TO THE    01:54

11  E-MAILS GOING FORWARD, IF ANYTHING?

12          MR. QUINN:  I'VE IDENTIFIED FOR THE COURT THE EFFORT

13  THAT WE TOOK TO TRY TO IDENTIFY PEOPLE WHO MIGHT HAVE

14  KNOWLEDGE.

15          THE COURT:  YES.                                         01:55

16          MR. QUINN:  WE TOLD ALL OF THOSE PEOPLE TO KEEP ANY

17  DOCUMENTS THAT MIGHT BE RELEVANT TO THIS SITUATION, INCLUDING

18  E-MAILS, TO RETAIN THEM.  TO SUSPEND THE AUTO-DELETE POLICY --

19  AND WE'VE SUBMITTED DECLARATIONS FROM TECHNICAL PEOPLE -- WOULD

20  CREATE SERIOUS, SERIOUS PROBLEMS.  IT COULD CRASH THE COMPANY'S  01:55

21  SERVERS.  THE ZUBULAKE CASE SAYS YOU DON'T HAVE TO TAKE

22  EXTRAORDINARY MEASURES THAT THREATEN THE COMPANY'S ONGOING

23  OPERATIONS.

24          THE COURT:  BUT ON OR ABOUT NOVEMBER OF 2003, THESE

25  35 PEOPLE WERE ADVISED THAT IF THEY GENERATE OR RECEIVE ANY      01:55

1    E-MAILS RELATED TO THESE CLAIMS, THAT THOSE E-MAILS WERE TO BE

2    RETAINED.

3              **MR. QUINN:**  YES.  OR THIS SUBJECT.

4              AND NOT JUST E-MAILS, ANY DOCUMENTS.

5              **THE COURT:**  TO INCLUDE E-MAILS.                          01:55

6              **MR. QUINN:**  YES, YOUR HONOR.

7              IF THEY SAW ANYTHING LIKE THIS, THEY WERE TO KEEP IT.

8    WE PUT THAT LITIGATION HOLD IN PLACE.

9              IN ADDITION, WE PUT IN PLACE A SYSTEM -- IT'S A

10   SECURITY TOOL -- THAT SEARCHES E-MAILS AUTOMATICALLY BY CERTAIN   01:56

11   KEY WORDS, GOING FORWARD; SO E-MAILS THAT WERE CREATED THAT

12   TRIPPED ONE OF THESE WORDS WOULD BE CAUGHT AND GO TO A CERTAIN

13   MAILBOX.

14             **THE COURT:**  I ASSUME "CARTER BRYANT" AND "MGA" WERE

15   AMONGST THOSE WORDS?                                              01:56

16             **MR. QUINN:**  I THINK YOU CAN ASSUME THAT, YOUR HONOR.

17             SO WE SET THAT IN PLACE.

18             THE ONE THING WE DIDN'T DO IS SUSPEND THE AUTOMATED

19   DELETION POLICY.

20             **THE COURT:**  YOU'VE SAID THAT.  I UNDERSTAND THAT.     01:56

21             WHAT ELSE HAVE YOU DONE AS THE COURSE OF THE

22   LITIGATION HAS EVOLVED?  BECAUSE IT CERTAINLY HAS, AT VARIOUS

23   POINTS, TAKEN ON A MUCH BROADER SCOPE THAN SIMPLY A DISCUSSION

24   OVER CARTER BRYANT AND WHAT HE DID OR DIDN'T DO.

25             **MR. QUINN:**  RIGHT.                                    01:56

```
1              AS OF APRIL OF 2005, WE ACTUALLY BEGAN TO PRESERVE

2    ALL OF THE BACKUP TAPES.  AND THAT GOES BACK -- SO THAT WOULD

3    CAPTURE E-MAILS AS OF DECEMBER 2004.

4              THE COURT:  THESE ARE BACKUP TAPES FOR THE E-MAILS?

5              MR. QUINN:  YES, YOUR HONOR.                          01:57

6              AGAIN, WE DID NOT SUSPEND THE AUTO DELETE.  COUNSEL

7    IS RIGHT, E-MAILS ARE BEING DELETED TO THIS DAY.  WHEN THEY

8    SENT US THE PRESERVATION LETTER SAYING, 'YOU SHOULD SUSPEND

9    AUTO DELETE,' WE WROTE RIGHT BACK IMMEDIATELY, WITHIN DAYS, AND

10   SAID, 'WE'RE NOT DOING THAT.'                                  01:57

11             THE COURT:  BUT YOU DO HAVE BACKUPS FOR ALL OF THE

12   E-MAILS FROM DECEMBER 2004 TO THE PRESENT?

13             MR. QUINN:  ALL OF THEM, YOUR HONOR.  ALL OF THEM.

14             THE COURT:  AND THOSE ARE AVAILABLE TO MGA.

15             MR. QUINN:  THOSE ARE AVAILABLE TO BE SEARCHED, AND  01:57

16   WE HAVE PRODUCED DOCUMENTS OUT OF THOSE, YOUR HONOR.

17             THE ZUBULAKE CASE SAYS YOU DON'T NEED TO KEEP

18   DUPLICATES --

19             THE COURT:  I UNDERSTAND.

20             MR. QUINN:  -- YOU CAN MAKE REASONABLE JUDGMENTS AS  01:58

21   TO THE BEST WAY TO KEEP INFORMATION.  AND THAT'S EXACTLY WHAT

22   WE HAVE DONE.

23             AND WE CAN GO INTO MORE DETAIL, YOUR HONOR, ABOUT

24   THINGS IF THE --

25             THE COURT:  I WANT TO GIVE MGA A CHANCE TO RESPOND TO 01:58
```

1   THIS, BECAUSE, OBVIOUSLY, THEY CAN HARDLY CONTAIN THEMSELVES.

2           **MR. QUINN:**  CAN I RESPOND TO A COUPLE MORE THINGS,

3   YOUR HONOR, BECAUSE I SAT THROUGH SOME OF THIS AS WELL.

4           **THE COURT:**  VERY WELL.

5           **MR. QUINN:**  ON THE LACHES ISSUE, THAT WAS NEVER                01:58

6   RAISED IN THEIR MOTION PAPERS AT ALL.  IT'S NOT AN ISSUE THAT'S

7   BEEN BRIEFED.  IT'S NOT A BASIS FOR THIS MOTION.  THE SHORT

8   ANSWER TO IT, THOUGH, IS THAT IF A CLAIM IS BROUGHT WITHIN THE

9   STATUTE OF LIMITATIONS, PRESUMPTIVELY, THERE ISN'T A LACHES

10  PROBLEM.  AND THE COURT HAS DETERMINED THAT BECAUSE OF THE            01:58

11  RELATION BACK, THIS CLAIM WAS BROUGHT WITHIN THE STATUTE OF

12  LIMITATIONS.

13          THE WALL STREET JOURNAL ISSUE -- THEY KEEP SAYING WE

14  PLANTED THIS STORY.  THERE'S SIMPLY NO EVIDENCE OF IT; THAT

15  THAT WAS OUR STORY, THAT WE PUT IT.  THE AUTHOR OF THE WALL         01:59

16  STREET JOURNAL ARTICLE SAYS PEOPLE WITHIN MATTEL ARE --

17          **THE COURT:**  THAT IS NOT BEFORE THE COURT.

18          **MR. QUINN:**  ALL RIGHT.

19          THE FINAL POINT I WANT TO MAKE, YOUR HONOR, IS THAT,

20  IN MAKING THESE JUDGMENTS ABOUT PRESERVATION, LAWYERS HAVE TO     01:59

21  MAKE JUDGMENTS.  THERE OFTEN IS NOT A BRIGHT LINE ABOUT WHAT IS

22  A REASONABLE EFFORT TO PRESERVE EVIDENCE AND WHAT ISN'T A

23  REASONABLE EFFORT.

24          ONE THING THAT WOULD BE USEFUL TO US IN SORT OF

25  ASSESSING THE REASONABLENESS OF MATTEL'S CONDUCT HERE IS TO        01:59

JULY 24, 2006            ED CV 04-09049

1    KNOW WHAT MGA'S CONDUCT WAS, WHAT THEY THOUGHT WAS REASONABLE

2    IN ORDER TO PRESERVE EVIDENCE.

3         AND WE'RE DOING THAT IN A VACUUM HERE, BECAUSE MGA

4    HAS COMPLETELY BLOCKED ANY EFFORT -- AND THIS IS RELEVANT

5    BECAUSE OF THE UNCLEAN HANDS ISSUE THAT WE BRIEFED -- HAS          01:59

6    BLOCKED ANY EFFORT FOR US TO LEARN ABOUT WHAT THEY DID TO

7    PRESERVE EVIDENCE.  AND JUDGE INFANTE HAS SO FOUND.

8         THEY WERE ORDERED TO PROVIDE A 30(B)(6) WITNESS ON

9    THEIR DOCUMENT PRESERVATION EFFORTS.  JUDGE INFANTE FOUND THAT

10   THEY FAILED TO PRODUCE A WITNESS; HE FOUND THAT WAS A WILLFUL      02:00

11   VIOLATION OF HIS ORDER; HE SAID IT WAS, QUOTE, "FLAGRANT AND

12   EGREGIOUS," CLOSED QUOTE.

13        WE HAVE NEVER BEEN FOUND TO VIOLATE ANY ORDER THAT

14   JUDGE INFANTE HAS ENTERED.

15        WE HAVE NO IDEA WHAT MGA HAS DONE TO PRESERVE               02:00

16   EVIDENCE BECAUSE THEY WON'T TELL US; THEY WON'T RESPOND TO

17   REQUESTS.  THEY VIOLATED JUDGE INFANTE'S ORDER THAT THEY

18   PROVIDE US WITH A WITNESS ON THAT SUBJECT.

19        WE DO KNOW THEY PRODUCED THEIR HEAD OF I.T., ONE

20   KEN LOCKHART, WHO TESTIFIED THAT -- WHEN ASKED WHAT WAS DONE TO    02:00

21   PRESERVE EVIDENCE, HE TESTIFIED THAT HE KNOWS THAT IN 2005, A

22   SEARCH WAS DONE OF MR. LARIAN'S COMPUTER.  THAT'S THE ONLY

23   THING HE SAID HE WAS AWARE OF.  AND THAT'S 2005.  MR. LARIAN IS

24   THE CEO OF THE COMPANY AND A DEFENDANT IN THIS ACTION.

25        THERE IS AN MGA EMPLOYEE BY THE NAME OF KERRI BRODE,         02:01

```
1    WHO WE KNOW, WE KNOW, WORKED ON BRATZ CLEAR BACK IN 2000.  SHE
2    TESTIFIED THAT THE FIRST TIME THAT SHE WAS TOLD TO PRESERVE
3    DOCUMENTS WAS IN APRIL 2005.  SO WHAT INFORMATION WE'VE GOT AND
4    WHAT MGA THINKS IS REASONABLE TO PRESERVE IN TERMS OF TRYING TO
5    ASSESS THE RELATIVE EFFORTS OF THE PARTIES AND WHETHER WHAT          02:01
6    MATTEL HAS DONE IS REASONABLE IS VERY, VERY LIMITED.  BUT WHAT
7    WE DO KNOW ON THAT SUBJECT CERTAINLY INDICATES THAT MGA'S
8    CONDUCT IN THIS REGARD HAS HARDLY BEEN A MODEL OF COMPLIANCE.
9            THE COURT:  THANK YOU, COUNSEL.
10           MS. GLASER:  THANK YOU, YOUR HONOR.                          02:01
11           THE COURT:  PLEASE.
12           MS. GLASER:  A FEW THINGS.
13           I HAVE NO DOUBT ABOUT MR. QUINN'S INTEGRITY.  I WANT
14   TO BE VERY CLEAR ABOUT THAT.  BUT HE'S BEEN TOLD THE WRONG
15   INFORMATION, AND HE'S PROVIDING IT TO YOUR HONOR.                    02:02
16           LET ME READ FROM MS. MARINE'S DEPOSITION; NOT MINE,
17   NOT A LAWYER; THEIR 30(B)(6) WITNESS.  THIS IS VOLUME III,
18   TAKEN ON JUNE 26, 2007.
19           THE COURT:  JUST AS A PREFACE TO YOUR READING IT,
20   COUNSEL, WAS SHE CALLED FOR THIS TO BE A 30(B)(6) WITNESS?          02:02
21           MS. GLASER:  YOU BET SHE WAS.  AND LET ME BE VERY
22   CLEAR ABOUT THAT.
23           AT HER FIRST DEPOSITION, MR. COREY, WHO'S IN THE
24   COURTROOM HERE TODAY, SAID HE WANTED TO STATE ON THE RECORD
25   THAT MS. MARINE IS THE 30(B)(6) DESIGNEE REGARDING THE ZEUS        02:02
```

SYSTEM.  ON APRIL 4, 2007, MR. COREY AGAIN SAID, "WITH RESPECT

TO THE DOCUMENT MANAGEMENT SYSTEM USED BY THE DESIGNERS, I.E.,

THE ZEUS SYSTEM, THE 30(B)(6) DESIGNEE WAS JULIA MARINE";

SPECIFICALLY IDENTIFIED BY MR. COREY.

        **THE COURT:**  ALL RIGHT.

        **MS. GLASER:**  SO THIS NONSENSE IS GOING TO STOP.

        NOW, LET ME TELL YOU WHAT MS. MARINE SAYS IN HER

DEPOSITION:

        THIS IS A QUESTION ASKED ON PAGE 243, LINE 11:

        "DO YOU KNOW WHETHER MATTEL HAS PRESERVED BACKUP

TAPES FOR THE ZEUS FILE SERVER FROM 1999?"

        ANSWER, LINE 14:  "I'M NOT AWARE OF BACKUPS THAT

OLD."

        QUESTION:  "ARE YOU AWARE OF WHETHER MATTEL HAS

PRESERVED BACKUP TAPES FROM THE ZEUS SERVER FROM THE YEAR

2000?"

        "I DON'T THINK WE HAVE ANYTHING GOING BACK SO FAR,"

SHE SAYS, UNDER OATH.

        SHE'S THEN ASKED ABOUT EACH YEAR, AND NOT UNTIL

2005 -- AND IT'S ALL -- I'M READING FROM PAGE 243.

        **THE COURT:**  BUT, COUNSEL, IF I ACCEPT THAT, THAT MAY

SUGGEST THAT THEY PUT FORWARD A VERY POOR 30(B) WITNESS; IT

DOESN'T INDICT THE REPRESENTATION THAT, IN FACT,

NOTWITHSTANDING HER FAILURE TO BE AWARE OF THE BACKUP TAPES,

THAT THERE WERE AND THAT THERE ARE, IN FACT, BACKUP TAPES.

02:03
02:03
02:03
02:03
02:04

1            **MS. GLASER:**  OKAY.

2            MR. MOORE WAS SITTING AT HER DEPOSITION.  MR. MOORE

3   PREPARED HER FOR HER DEPOSITION, YOUR HONOR.  SHE TESTIFIED,

4   WHEN ASKED, "WHAT DID YOU DO TO PREPARE FOR YOUR DEPOSITION?"

5   THAT HE PREPARED HER FOR THE DEPOSITION.  SHE'S ONLY THERE TO        02:04

6   TALK ABOUT THE ZEUS SYSTEM.  SHE'S NOT THERE TO TALK ABOUT

7   ANYTHING ELSE.  AND MR. MOORE DOESN'T SAY A WORD.

8            **THE COURT:**  THAT'S NOT HOW DEPOSITIONS ARE CONDUCTED,

9   COUNSEL.

10           **MS. GLASER:**  OKAY.                                       02:04

11           TWO MONTHS LATER, WE MAKE A MOTION FOR SPOLIATION.

12  WELL, SHE DIDN'T CORRECT HER DEPOSITION.  SHE'S NOT CORRECTING

13  HER DEPOSITION.  THE LAWYERS ARE READING THE DEPOSITION.  THE

14  ONLY REASON WE THEORETICALLY KNOW THE TRUTH TODAY IS BECAUSE WE

15  MADE A SPOLIATION MOTION.                                           02:04

16           NOW, WHAT IS THAT ABOUT?

17           **THE COURT:**  WELL, YOU SHOULD NOT HAVE HAD TO DO THAT

18  TO GET TO THE BOTTOM LINE.  BUT AT THE SAME TIME, IS WHAT

19  MR. QUINN IS TELLING ME OR REPRESENTING TO THE COURT TRUE OR

20  NOT TRUE?                                                           02:05

21           **MS. GLASER:**  I HAVE NO IDEA, YOUR HONOR, BECAUSE

22  MS. MARINE SAYS THEY DON'T EXIST; MR. MOORE SAYS THEY DO; I'VE

23  NEVER SEEN THEM; THEY'VE NEVER BEEN PROVIDED TO US; AND THE

24  CONCEPT THAT YOUR HONOR IS BEING TOLD AND WE'RE BEING TOLD

25  TODAY, 'OH, WE'RE PROVIDING DOCUMENTS.  WE HAVE PROVIDED          02:05

```
 1   DOCUMENTS FROM THE ZEUS SYSTEM FROM THAT BACKUP.'

 2          I HAVE NO IDEA IF THAT'S TRUE, BECAUSE WE DON'T KNOW;

 3   WE'VE NEVER SEEN THEM; WE HAVE NOT HAD AN ABILITY WHATSOEVER TO

 4   INDEPENDENTLY LOOK.

 5          THAT'S JUST THE ZEUS SYSTEM, THOUGH.  LET'S TALK          02:05

 6   ABOUT THE E-MAIL SYSTEM FOR A MINUTE.

 7          YOU JUST HEARD --

 8          THE COURT:  WELL, BEFORE WE MOVE ON FROM THE ZEUS

 9   SYSTEM TO THE E-MAIL, BECAUSE THESE ARE THE TWO BIG ISSUES IN

10   MY MIND AT THIS POINT, THE ZEUS AND THE E-MAIL, PUTTING ASIDE   02:05

11   WHAT MS. MARINE SAID -- AND IT'S CLEAR THAT SHE SAID -- THE

12   QUESTION WAS ASKED, AS YOU JUST PHRASED IT, "DO YOU KNOW

13   WHETHER," AND SHE SAID, "I AM NOT AWARE," WHICH KIND OF

14   UNDERCUTS HER FOUNDATION --

15          MS. GLASER:  NO, NO.  SHE THEN SAYS, IN A FOLLOW-UP      02:06

16   QUESTION, "ARE THERE ANY BACKUP TAPES FOR 1999?"  SHE SAYS SHE

17   DOESN'T KNOW OF ANY; SHE DOESN'T THINK THAT ANY GO BACK THAT

18   FAR.

19          THE COURT:  THAT'S A FOUNDATIONAL PROBLEM WITH HER

20   TESTIMONY.  SHE DOESN'T KNOW.  SHE'S NOT SAYING, YES,           02:06

21   DEFINITIVELY THERE ARE OR, NO, DEFINITIVELY THERE ARE NOT.

22   SHE'S SAYING, "I DON'T KNOW."

23          NOW, I UNDERSTAND YOUR FRUSTRATION, AND I'M VERY

24   SYMPATHETIC TO THE FRUSTRATION OF CALLING FOR A 30(B) WITNESS

25   AT A DEPOSITION AND NOT GETTING A STRAIGHT ANSWER.              02:06
```

1      **MS. GLASER:**  BY THE WAY, SHE WASN'T PRESENTED ONCE AS

2    A 30(B)(6).  NOT TWICE.  THREE TIMES, YOUR HONOR, OVER A PERIOD

3    OF NINE MONTHS.  AND WE STILL, AS WE STAND HERE TODAY, ARE

4    BEING TOLD NOW THERE ARE TAPES.  OH, AND BY THE WAY, YOU'RE

5    BEING TOLD DOCUMENTS HAVE BEEN PRODUCED FROM THESE TAPES?      02:06

6          I HAVE NO WAY OF KNOWING THAT.

7          WE HAVEN'T SEEN ANY.

8      **THE COURT:**  BUT GETTING BACK TO MY POINT, WHEN YOU'RE

9    IN THAT KIND OF DEPOSITION AND YOU'RE HEARING FROM THE WITNESS,

10   "I'M NOT AWARE," OR "I DON'T KNOW" --                          02:07

11         **MS. GLASER:**  NO.  SHE'S NOT SAYING, "I DON'T KNOW."

12         YOUR HONOR, SHE SAYS RIGHT HERE -- THE PAGES I CITED

13   YOU, "WE DON'T HAVE BACKUP TAPES GOING BACK THAT FAR."

14         **MR. QUINN:**  LET'S HEAR THE TESTIMONY.

15         **THE COURT:**  COUNSEL, I THINK I HEARD IT MYSELF TO SAY  02:07

16   THAT "I'M NOT AWARE" AND "I DON'T KNOW."

17         **MR. QUINN:**  THE TESTIMONY IS, "TO YOUR KNOWLEDGE" --

18         **THE COURT:**  MR. QUINN, COUNSEL IS MORE THAN CAPABLE.

19         **MR. QUINN:**  I APOLOGIZE.

20         **THE COURT:**  THANK YOU.                                02:07

21         **MS. GLASER:**  "ARE YOU AWARE OF WHETHER MATTEL HAS

22   PRESERVED BACKUP TAPES FROM THE ZEUS SERVER FROM THE YEAR

23   2000?"

24         "I DON'T THINK WE HAVE ANYTHING GOING BACK THAT FAR."

25         CALL ME CRAZY.  I ACTUALLY --                            02:07

```
 1          THE COURT:  IT'S THE THIRD WORD THAT SHE USED IN THAT

 2   SENTENCE:  "I DON'T 'THINK.'"

 3          AND WHEN YOU'VE GOT A WITNESS HERE SAYING, "I DON'T

 4   THINK," OR "I'M NOT AWARE," YOU DON'T HAVE A VERY GOOD 30(B)

 5   WITNESS.  AND THAT'S SOMETHING YOU'RE ENTITLED TO, AND THAT      02:07

 6   WOULD HAVE BEEN A REALLY GOOD TIME TO STOP THAT DEPOSITION AND

 7   SAY, "GET US SOMEBODY WHO'S NOT THINKING OR GUESSING OR

 8   SPECULATING OR IS NOT AWARE, AND GET US SOMEBODY WHO KNOWS WHAT

 9   THEY'RE TALKING ABOUT."

10          BASED ON THAT RECORD, IT'S HARD FOR ME TO SAY NOW         02:08

11   THAT YOU WERE -- YOU'RE ASKING ME TO CALL MR. QUINN AND THESE

12   LAWYERS HERE LIARS.

13          MS. GLASER:  I'M ASKING YOU TO CALL THIS GENTLEMAN

14   BACK HERE NOT A TRUTHTELLER, YOUR HONOR.  AND I SAY THAT VERY

15   RELUCTANTLY.  I DON'T THINK MR. QUINN IS A LIAR.                 02:08

16          THE COURT:  MR. MOORE DID NOT INTERRUPT AN ONGOING

17   DEPOSITION TO INTERJECT.

18          MS. GLASER:  NO.  MR. MOORE DIDN'T CORRECT THE

19   DEPOSITION AND DIDN'T HAVE MS. MARINE CORRECT THE DEPOSITION

20   WHEN HE PURPORTEDLY, IN HIS DECLARATION TWO MONTHS LATER, KNOWS  02:08

21   THAT THERE ARE ALLEGEDLY ZEUS TAPES THAT WE HAVE NEVER SEEN, WE

22   HAVE NEVER BEEN GIVEN ACCESS TO, AND WE DON'T HAVE DOCUMENTS

23   FROM.

24          THE COURT:  HOW WOULD THAT DEPOSITION HAVE BEEN

25   CORRECTED, FROM YOUR PERSPECTIVE?                               02:08
```

1          LET'S ASSUME THAT MR. QUINN IS TELLING US THE TRUTH

2    TODAY, AS THE COURT IS DOING, HOW WOULD THAT DEPOSITION HAVE

3    BEEN CORRECTED?  YOU WOULD HAVE GOTTEN A LETTER FROM MR. MOORE

4    SAYING, "OUR 30(B)(6) WITNESS DIDN'T MEAN TO SAY, 'I WASN'T

5    AWARE'"?  SHE WAS AWARE?                                          02:09

6          SHE CAN'T SAY THAT IF SHE WASN'T AWARE.

7          **MS. GLASER:**  NO.  WHAT SHE WOULD HAVE SAID IS --

8    MR. MOORE WOULD SAY, "LOOK, WE HAVE THESE" -- NOT TO ME -- "WE

9    HAVE THESE TAPES.  NOW YOU UNDERSTAND THAT WE HAVE THESE BACKUP

10   TAPES.  YOU OR I NEED TO CORRECT THE RECORD, BECAUSE THOSE       02:09

11   BACKUP TAPES EXIST, AND WE HAVE MISLED MGA AND WE HAVE MISLED

12   THE COURT."

13         THAT'S WHAT THEY SHOULD HAVE DONE.  IT DOESN'T

14   HAPPEN, ALLEGEDLY, UNTIL WE MAKE A MOTION FOR SPOLIATION.

15         **THE COURT:**  BUT DO YOU SEE HOW THIS HAS CHANGED?        02:09

16   YOU'VE GONE FROM AN ARGUMENT WHICH SAYS I SHOULD ISSUE

17   TERMINATING SANCTIONS BECAUSE THEY HAVE DESTROYED EVIDENCE, TO

18   I SHOULD ISSUE TERMINATING SANCTIONS BECAUSE, 'WELL, THEY

19   REALLY HAVEN'T DESTROYED EVIDENCE, BUT THEY KIND OF LED US TO

20   BELIEVE THAT THEY MIGHT HAVE DESTROYED EVIDENCE, BUT THEY        02:09

21   REALLY DIDN'T.'

22         **MS. GLASER:**  THAT WAS THE LAST THING I SAID BEFORE I

23   SAT DOWN.

24         I THINK IT IS INCUMBENT -- I SAY THIS RESPECTFULLY TO

25   THE COURT -- THAT MR. MOORE -- NOT TODAY, BECAUSE I UNDERSTAND   02:09

1   YOU HAVE OTHER MATTERS -- BE PUT UNDER OATH, BECAUSE WE DON'T

2   LEARN ABOUT THESE ZEUS BACKUP TAPES ALLEGEDLY UNTIL HE FILES A

3   DECLARATION IN OPPOSITION TO THIS MOTION.

4            I DON'T BELIEVE HIM.  I DON'T BELIEVE THAT WE HAVE

5   BEEN PROVIDED DOCUMENTS FROM THE ZEUS BACKUP TAPES.  I DON'T            02:10

6   THINK THE COURT HAS BEEN PROVIDED THOSE DOCUMENTS.

7            **THE COURT:**  COUNSEL, TODAY IS THE DAY FOR THE

8   EVIDENTIARY HEARING.  IF YOU WOULD LIKE TO CALL MR. MOORE AND

9   ASK HIM ABOUT THAT, YOU MAY DO SO.

10           **MS. GLASER:**  I WOULD LIKE TO, AND I WOULD LIKE TO            02:10

11  MAKE A COUPLE MORE COMMENTS.

12           I HEARD MR. QUINN CAREFULLY TALK ABOUT THE E-MAIL

13  SYSTEM.

14           **THE COURT:**  YES.  AND WHAT THEY DID --

15           **MS. GLASER:**  LEFT TO THE JUDGMENT OF AN UNKNOWN GROUP       02:10

16  OF 35 PEOPLE -- BY THE WAY, THERE IS NO -- AND I'M NOT DOUBTING

17  MR. QUINN FOR A MOMENT; I'M SURE THAT'S WHAT HE'S BEEN TOLD.

18  THERE IS NO DECLARATION THAT SAYS, 'BY THE WAY, WE ARBITRARILY

19  PICKED 35 PEOPLE.'

20           **THE COURT:**  WAIT A SECOND.  I THOUGHT I DID READ           02:10

21  SOMETHING TO THAT EFFECT.

22           I'M GOING TO HAVE TO RELY ON PLAINTIFF'S COUNSEL TO

23  DIRECT ME TO IT, BUT I THOUGHT THEY DID LIST THOSE INDIVIDUALS

24  THAT THEY CONTACTED IN THE SURREPLY.

25           **MS. GLASER:**  NO.                                          02:11

```
 1            WELL, YOU KNOW WHAT, YOUR HONOR -- THE SURREPLY THAT
 2   CAME IN ON FRIDAY?
 3            THE COURT:  YES.
 4            MS. GLASER:  YOUR HONOR, I CAN HONESTLY SAY I DID NOT
 5   READ THAT CAREFULLY.  IF THE 35 WITNESSES ARE IDENTIFIED IN      02:11
 6   THAT, I STAND CORRECTED.
 7            THE COURT:  AND THEY MAY NOT BE.
 8            MS. GLASER:  THEN, YOUR HONOR, THEY INDICATED -- THEY
 9   DETERMINED WHO THE 35 WERE.
10            DO YOU KNOW, FOR EXAMPLE --                             02:11
11            THE COURT:  YOU CERTAINLY DIDN'T EXPECT THEM, IN
12   NOVEMBER OF 2003, TO GIVE YOU A CALL.
13            MS. GLASER:  YOUR HONOR, LISTEN TO THIS:
14   MR. BRYANT'S SUPERVISOR, ANN DRISKILL, WAS NEVER CALLED UPON TO
15   DO THAT.  SHE TESTIFIED UNDER PENALTY OF PERJURY.  HER           02:11
16   TESTIMONY IS BEFORE THE COURT.  WHO DID THEY INTERVIEW?  HER
17   SUPERVISOR SAYS THAT SHE HAS NEVER BEEN INTERVIEWED AND WAS NOT
18   TOLD TO PRESERVE ANYTHING UNTIL APRIL OF 2005.
19            THE COURT:  I'M SORRY.  HER LAST NAME AGAIN?
20            MS. GLASER:  DRISKILL, D-R-I-S-K-I-L-L.                 02:11
21            THE COURT:  VERY WELL.
22            MS. GLASER:  SO WHEN I'M TOLD THIS BY A LAWYER,
23   EXCUSE ME, I'M HAVING A LITTLE PROBLEM WITH THIS.  THIS IS WHY
24   WE MADE THE SPOLIATION MOTION.  WE'RE NOT GETTING THE
25   INFORMATION THAT WE'RE ENTITLED TO.  OUR DISCOVERY HAS BEEN, IN  02:12
```

1  OUR JUDGMENT, INEXORABLY DAMAGED BECAUSE OF THE DESTRUCTION OF

2  DOCUMENTS.

3            AND, YOUR HONOR, YOU SAID SOMETHING EARLIER TODAY

4  ABOUT YOU SORT OF ACCEPTING THIS NOTION OF THE 2003 DATE.

5  THAT'S THE DATE MATTEL IS ALLEGING THEY GOT A CONTRACT, IN      02:12

6  OCTOBER OR NOVEMBER OF 2003.  WE DON'T CONCEDE THAT.

7        **THE COURT:**  I KNOW YOU'RE NOT CONCEDING.  I'M SAYING,

8  JUST IN WORKING IT UP MYSELF, I WAS TRYING TO COME UP WITH A

9  DATE THAT I BELIEVE THAT MATTEL CAN'T ARGUE.

10            THEY WERE ARGUING 2005 IN SOME OF THEIR PAPERS, AND I    02:12

11  DON'T ACCEPT THAT.  IT'S AT LEAST NOVEMBER OF 2003.  AND THAT'S

12  WHY I WANT TO KNOW WHAT WAS HAPPENING.

13            YOU TRY TO PUSH THAT BACK TO 2002.  I THINK THAT MAY

14  BE PUSHING IT BACK A LITTLE TOO FAR, BUT I HAVEN'T MADE A FINAL

15  DECISION ON THAT.  BUT RIGHT NOW -- MY TENTATIVE WAS NOVEMBER    02:12

16  OF 2003.  IT'S KIND OF A DATE THAT ANY REASONABLE PERSON --

17        **MR. QUINN:**  LET ME QUICKLY CORRECT THAT.

18            THAT 2005 DATE, THAT'S THE DATE WE LEARNED OF OUR

19  CLAIMS AGAINST MGA.  IT'S A DIFFERENT DATE THAN THE

20  CARTER BRYANT.                                                  02:13

21        **THE COURT:**  I UNDERSTAND.

22            MY SENSE IS THAT MATTEL SHOULD HAVE BEEN THINKING

23  ABOUT ITS CLAIMS OR AWARE OF ITS CLAIMS, KNOWING THAT IT'S

24  LIKELY THAT THEY WOULD BE BRINGING THESE CLAIMS, PERHAPS AS

25  EARLY AS NOVEMBER OF 2003.  IT'S NOT A DEFINITIVE FINDING ON MY  02:13

1   PART.  THAT'S JUST A TENTATIVE MOTION.

2          **MS. GLASER:**  YOUR HONOR, YOU WERE ASKED --

3          **THE COURT:**  I WASN'T SUGGESTING THAT YOU --

4          **MS. GLASER:**  I UNDERSTAND.

5          YOU WERE TOLD ABOUT MR. ARNOLDO ARTAVIA, WHOSE          02:13

6   DEPOSITION WAS TAKEN ON SEPTEMBER 21, 2007.

7          **THE COURT:**  RIGHT.

8          **MS. GLASER:**  HE SAYS THAT THERE ARE NO CARTER BRYANT

9   TIME ENTRIES PRODUCED AFTER SEPTEMBER 8, 2000.  HE ALSO

10  TESTIFIED, AT PAGE 116 OF HIS DEPO THAT YOU HAVE, YOUR HONOR,   02:13

11  THEY COULD HAVE BEEN DELETED WITHOUT A TRACE.

12         HE DOESN'T KNOW.  HE WASN'T THERE.  HE DIDN'T DELETE

13  THEM HIMSELF.  AND I'M NOT SUGGESTING OTHERWISE.

14         ALL I'M SAYING TO YOU, YOUR HONOR, IS THAT YOU'RE NOT

15  BEING TOLD THE WHOLE PICTURE.                                  02:13

16         BUT THE MOST IMPORTANT THING IS, ON THIS E-MAIL

17  THING -- WHEN I SAY THE MOST IMPORTANT, I MUST TELL YOU, THEY

18  GET TO DECIDE WHO THE 35 ARE, WHOEVER THEY MAY BE; THEY GET TO

19  DECIDE -- I THINK THE 35 GET TO DECIDE WHAT THEY DELETE AND

20  WHAT THEY DON'T.                                               02:14

21         **THE COURT:**  WAS THERE ANYBODY ELSE BESIDES THIS

22  MS. DRISKILL THAT KIND OF STANDS OUT TO YOU AS SOMEONE WHO

23  SHOULD HAVE BEEN PART OF THESE PEOPLE THAT WERE NOTIFIED THAT

24  WERE NOT --

25         **MS. GLASER:**  WE HAVEN'T EVEN DEPOSED ENOUGH OF THEM   02:14

```
 1   YET TO KNOW.

 2              THE COURT:  FAIR ENOUGH.

 3          MS. GLASER:  I CAN'T MISREPRESENT THAT, YOUR HONOR.

 4          OF THE MATTEL PEOPLE DEPOSED SO FAR, NOT ONE OF THEM

 5   HAS IDENTIFIED THEMSELVES -- AND I CAN GIVE YOU A LIST -- AS      02:14

 6   SOMEBODY WHO'S BEEN INTERVIEWED AND ASKED THE VERY QUESTIONS

 7   THAT WERE ARTICULATED TO YOU BY MATTEL.

 8              THE COURT:  OKAY.  VERY GOOD.

 9          DO YOU HAVE ANY REASON NOT TO ACCEPT MR. QUINN'S

10   REPRESENTATION THAT AT LEAST FROM DECEMBER OF 2004, THERE'S       02:15

11   BEEN A BACKUP FOR ALL OF THE E-MAILS?

12          THIS WAS THE DECISION THAT WAS MADE IN APRIL OF 2005,

13   WHICH CAPTURES BACK TO DECEMBER OF 2004.  FROM THAT POINT

14   FORWARD, WE HAVE ALL OF THE E-MAILS?

15              MS. GLASER:  ABSOLUTELY.                               02:15

16          YOU MEAN FOR THE 35 PEOPLE, OR FOR EVERYBODY?

17              THE COURT:  WELL, FOR THE 35.

18              MR. QUINN:  FOR EVERYBODY.

19              THE COURT:  FOR EVERYBODY.  THAT WAS HIS

20   REPRESENTATION.                                                  02:15

21              MR. QUINN:  THE WHOLE COMPANY.

22              THE COURT:  EVERYBODY.

23              MS. GLASER:  I HAVE NO REASON TO BELIEVE FROM

24   APRIL 2005.  WE HAVE THEM, BECAUSE I ACCEPT THAT.  I HAVE NO

25   CONTRARY EVIDENCE THAT THE BACKUP STARTED THEN.  BUT I GUESS      02:15
```

```
 1   I'M OLD-FASHIONED ENOUGH TO THINK YOU SHOULD HAVE STARTED THE

 2   BACKUP AT LEAST WHEN YOU -- I MEAN, THE RULE IS YOU DO IT A

 3   YEAR AFTER YOU FILE A LAWSUIT.  IT'S NOT EVEN WHEN YOU FILE A

 4   LAWSUIT.  IT'S WHEN YOU WERE SUPPOSED TO BELIEVE THAT YOU HAD A

 5   REASONABLE LIKELIHOOD OF LITIGATION.                               02:15

 6          THAT DIDN'T HAPPEN HERE, YOUR HONOR.

 7          THE COURT:  I UNDERSTAND, COUNSEL.  I UNDERSTAND YOUR

 8   ARGUMENT.

 9          MS. GLASER:  YOUR HONOR, THE OTHER THING I ASKED YOU

10   TO DO -- AND I PROBABLY AM TOTALLY LEANING TOO HEAVILY ON YOUR     02:16

11   LAW CLERKS ON THIS.  THERE WERE A NUMBER OF DEPOSITIONS THAT

12   WERE -- EVIDENCE WAS PROVIDED TO YOUR HONOR.  AND I APOLOGIZE

13   TO THE LAW CLERKS IN ADVANCE, BUT THE TESTIMONY IS WHAT IT IS.

14          THE COURT:  COUNSEL, KEEP THE LAW CLERKS OUT OF THE

15   DISCUSSION.                                                        02:16

16          MS. GLASER:  THERE IS LOTS OF DEPO TESTIMONY AND LOTS

17   OF CITATIONS TO THE DEPO TESTIMONY.  I WILL ALLOW THAT TO SPEAK

18   FOR ITSELF.  THE REFERENCES THAT WE MAKE TO WHAT'S THERE AND

19   WHAT'S NOT, I BELIEVE, COULD NOT BE CLEARER, AND I WOULD ASK

20   THE COURT, IF THE COURT HAS THE TIME, TO PLEASE LOOK AT THOSE      02:16

21   DEPOS, BECAUSE MR. PALMER TESTIFIES ABOUT NO PHONE RECORD

22   RETENTION, NO OCTOBER REPORT, AND HE COULDN'T EXPLAIN WHY THERE

23   ISN'T THIS OCTOBER PHONE RECORD.  THIS IS THEIR WITNESSES, NOT

24   OURS.

25          THE COURT:  I UNDERSTAND.  NO ONE COULD EXPLAIN WHY         02:17
```

```
 1    YOU DON'T HAVE OCTOBER --

 2          MS. GLASER:   THEY HAVE NO BACKUP TAPES THROUGH 2003.

 3    THE BACKUP TAPES WERE DELIVERED TO THE LEGAL DEPARTMENT, AND

 4    THEY WERE DELIVERED FOR THE PERIOD OF MAY 2000 THROUGH NOVEMBER

 5    2000.  AND THERE IS THIS OCTOBER GAP THAT THEY DELIVERED THE        02:17

 6    RECORDS TO THE LEGAL DEPARTMENT.  THAT'S WHAT MR. PALMER

 7    TESTIFIED TO.  THERE WAS NO CALL PRIOR TO SEPTEMBER 11, 2000,

 8    FROM CARTER BRYANT TO MGA.

 9          NOW, I'M NOT SUGGESTING IT'S A DISPOSITIVE ISSUE OF

10    WHETHER OR NOT HE'S MAKING CALLS TO MGA OR RECEIVING CALLS FROM     02:17

11    MGA.  I'M NOT SUGGESTING THAT'S DISPOSITIVE.  BUT LET'S ASSUME

12    FOR A MOMENT THERE WERE NO CALLS.

13          THE COURT:   COUNSEL, YOU'D PROBABLY BE ABLE TO DO A

14    BETTER JOB AT TRIAL WITH THE ABSENCE OF THIS RECORD AND MAKING

15    IT LOOK LIKE THERE WAS SOMETHING AMISS HERE THAN YOU'RE EVER        02:17

16    GOING TO GET FROM THE VALUE OF THE EVIDENCE OF ACTUALLY HAVING

17    IT.

18          MS. GLASER:   YOUR HONOR, YOU'RE ABSOLUTELY CORRECT.

19    BUT THE MAIN THRUST OF THIS MOTION ARE THE E-MAILS, THE LACK OF

20    BACKUP, THE ZEUS, AND THE LACK OF BACKUP.  IT IS NOT THE PHONE      02:18

21    RECORDS, WHICH WE INTEND TO MAKE WHATEVER WE CAN OF THEM.

22          THE COURT:   BACK IN THE DAY OF A PROSECUTOR, I WOULD

23    HAVE LOVED TO HAVE THAT SITUATION, WHERE THAT ONE MONTH WAS

24    MISSING.  IMAGINATION IS A LOT BETTER.

25          MS. GLASER:   FINALLY, YOUR HONOR, WHAT WE'RE ASKING          02:18
```

1   FOR HERE IS, WE BELIEVE THAT THE MOTION TO AMEND WAS GRANTED

2   UNDER FALSE PRETENSES.  WE THINK THAT MOTION SHOULD HAVE BEEN

3   DENIED.  WE BELIEVE YOU SHOULD TERMINATE THAT PART OF THE CASE,

4   AT A MINIMUM.  AND THAT'S WHAT WE'RE ASKING FOR TODAY, YOUR

5   HONOR.                                                          02:18

6          I WOULD LIKE THE OPPORTUNITY TODAY, OR WHENEVER THE

7   COURT WISHES.  I HAVE AN EXAMINATION READY FOR THIS GENTLEMAN,

8   AND I KNOW THAT YOUR HONOR IS BUSY.

9          **THE COURT:**  THANK YOU, COUNSEL.

10         MR. QUINN, I'D LIKE YOU TO ADDRESS JUST THAT ONE         02:18

11  ISSUE, THAT ALLEGATION THAT MS. DRISKILL, CARTER BRYANT'S

12  DIRECT SUPERVISOR, AND ANY OF THE OTHER INDIVIDUALS WHO HAVE

13  BEEN DEPOSED, SEEM TO SUGGEST THAT THERE WAS NO SUCH DIRECTION,

14  AS YOU JUST REPRESENTED.

15         **MR. QUINN:**  PART OF THE PROBLEM NOW IS, WE'RE WAY      02:19

16  OUTSIDE ANY RECORD THE COURT HAS BEFORE IT ON THE SUBJECT OF

17  DRISKILL.

18         **THE COURT:**  TRUE.

19         **MR. QUINN:**  I AM INFORMED THAT MY PARTNER,

20  MR. ZELLER, INTERVIEWED MS. DRISKILL AND THAT MR. MOORE DID AS   02:19

21  WELL.  COUNSEL SAYS THAT IN HER DEPOSITION, SHE TESTIFIED SHE

22  WAS NEVER INTERVIEWED, NEVER ASKED THESE QUESTIONS.

23         SINCE THIS IS NOT AN ISSUE THAT ANY OF US FOCUSED ON,

24  WE'RE NOT PREPARED TO SAY WHETHER THAT'S TRUE OR NOT AS TO

25  WHETHER SHE TESTIFIED TO THAT.                                  02:19

```
 1        THE COURT:  WAS SHE ONE OF THE 35 PEOPLE?

 2        MR. ZELLER:  SHE WAS, YOUR HONOR.

 3        THE COURT:  IS THERE A LIST OF THESE 35 INDIVIDUALS?

 4        MR. ZELLER:  WE CAN CREATE A LIST OF THE 35 PEOPLE.

 5    AND THEN ALSO, JUST SO IT'S CLEAR --                          02:19

 6        THE COURT:  I DON'T WANT YOU TO CREATE A LIST.  I WAS

 7    WONDERING IF A LIST EXISTS.

 8        MR. ZELLER:  WHETHER IT'S A LIST, I DON'T KNOW.  WE

 9    CERTAINLY HAVE INFORMATION ABOUT THE IMAGES THAT WERE TAKEN,

10    PEOPLE THAT WERE SPOKEN TO, INTERVIEW NOTES, ALL THAT SORT OF  02:20

11    STUFF, IN WHICH WE CAN SAY, 'HERE ARE THE PEOPLE.'

12        THE COURT:  HOW DID YOU COME UP WITH THIS POSITION

13    THAT THERE WERE 35 PEOPLE THAT WERE IDENTIFIED?  HOW DO YOU

14    KNOW THAT, AS WE'RE STANDING HERE TODAY?

15        MR. ZELLER:  WELL, WE DID THAT BECAUSE DURING THE        02:20

16    TIME WE WERE PREPARING THE OPPOSITION, THAT'S WHAT WE HAVE

17    RECORDS OF.

18        THE COURT:  SO YOU HAVE RECORDS OF THE 35 PEOPLE

19    BEING CONTACTED?

20        MR. ZELLER:  IN VARIOUS FORMS, YES.                      02:20

21        THE COURT:  IN VARIOUS FORMS.

22    I THINK IT WOULD BE HELPFUL TO THE COURT TO KNOW,

23    BECAUSE THIS E-MAIL ISSUE IS REALLY THE ONE THAT LAYS --

24    I DO WANT TO HEAR FROM MR. MOORE IN A FEW MOMENTS

25    ABOUT THIS ZEUS BACKUP SYSTEM, BUT ASSUMING, AS MR. QUINN    02:20
```

1   REPRESENTED, THAT WE HAVE THE ZEUS BACKUP GOING ALL THE WAY

2   BACK TO APRIL OF 1998, THE ISSUE THAT'S LEFT IS THESE E-MAILS.

3          **MR. QUINN:**  RIGHT.

4          **THE COURT:**  IT SOUNDS LIKE FROM DECEMBER OF 2004,

5   APRIL OF 2005, BACKING UP TO DECEMBER 2004, YOU HAVE THE BACKUP          02:21

6   FOR THE E-MAILS.  I GUESS WHAT I REALLY WANT TO KNOW IS WHAT

7   HAPPENED BETWEEN NOVEMBER OF 2003 AND APRIL OF 2005?  IF WHAT

8   YOU'RE TELLING ME -- AND I'M NOT SAYING THAT IT'S NOT TRUE, BUT

9   I KNOW YOU'RE GETTING THAT INFORMATION FROM SOMEBODY ELSE.

10         I GUESS I NEED TO HAVE THAT FLUSHED OUT A LITTLE BIT          02:21

11  MORE.  PERHAPS MR. MOORE COULD DO THAT; PERHAPS SOMEBODY ELSE

12  COULD DO THAT.

13         **MR. QUINN:**  I THINK MR. MOORE CAN ADDRESS THAT.

14         I WILL ALSO SAY, YOUR HONOR, REMEMBER I TOLD YOU THAT

15  WE IMAGED SOME EMPLOYEES' COMPUTERS?          02:21

16         **THE COURT:**  YES.

17         **MR. QUINN:**  MS. DRISKILL IS ONE OF THEM.

18         **THE COURT:**  SO YOU WOULD HAVE EVERYTHING THAT'S ON

19  HERS.

20         **MR. QUINN:**  WE PRESERVED THAT.          02:21

21         **THE COURT:**  RIGHT.

22         **MR. QUINN:**  SO THAT'S ONE OF THOSE THAT WE HAVE.

23         THIS ISSUE ON ZEUS, WHAT MS. MARINE WAS DESIGNATED TO

24  TESTIFY ON, YOUR HONOR, WHETHER WE GAVE THEM A 30(B)(6) WITNESS

25  ON THE SUBJECT OF ZEUS WHO WAS NOT PREPARED, THE TESTIMONY IS          02:21

```
 1   THAT SHE WAS NOT -- IN THIS TESTIMONY THAT THEY'RE CITING, SHE

 2   WAS NOT TESTIFYING AS A ZEUS EXPERT.

 3          MR. JENAL ASKED, PAGE 161:

 4          QUESTION: "AND YOU UNDERSTAND THAT YOU'RE HERE TODAY

 5   TO TESTIFY ABOUT THE ZEUS DATA SYSTEM, FOR LACK OF A BETTER WAY    02:22

 6   OF PHRASING IT, AS IT WAS USED IN THE DESIGN CENTER AND

 7   ELSEWHERE AT MATTEL FROM BASICALLY 1998 THROUGH THE PRESENT; IS

 8   THAT CORRECT?"

 9          MR. COREY CORRECTS THAT:  "ACTUALLY, THE TOPIC THAT

10   SHE'S BEEN DESIGNATED IS NARROWER THAN THAT; IT'S THE DOCUMENT     02:22

11   MANAGEMENT SYSTEM USED BY DESIGNERS AT THE DESIGN CENTER."

12          SHE HAD EARLIER BEEN DESIGNATED AS THE EXPERT ON

13   ZEUS.  THEY SENT THE ASSOCIATE, WHO DIDN'T ASK 'WHAT ZEUS TAPES

14   DO YOU HAVE?'  SHE WAS LATER DESIGNATED -- YEAH, SHE TESTIFIED

15   THREE TIMES ON DIFFERENT TOPICS.  SHE WAS LATER DESIGNATED ON A    02:22

16   DIFFERENT SUBJECT.  ZEUS IS NOT A DOCUMENT MANAGEMENT SYSTEM.

17          BY THEN, WHEN SHE'S ASKED, "DO YOU HAVE ANYTHING THAT

18   GOES BACK TO THAT TIME PERIOD?"  SHE SAYS, IN THE PASSAGE I

19   READ, "I JUST DON'T KNOW."

20          SO I'M CONCERNED ABOUT ANY IMPRESSION THAT'S LEFT          02:22

21   THAT WE HAD NOT PROPERLY PRODUCED A PROPERLY EDUCATED 30(B)(6)

22   WITNESS ON THAT SUBJECT.

23          THE COURT:  THE POINT THAT I WAS TRYING TO MAKE

24   THERE, MR. QUINN, IS NOT THAT YOU DID THAT.  I WAS SAYING THAT

25   IF THAT WAS THE IMPRESSION THAT WAS BEING GIVEN TO THE OPPOSING    02:23
```

1    COUNSEL, THAT THEY SHOULD HAVE SAID 'THIS WITNESS, BY THOSE

2    KINDS OF RESPONSES, IS UNABLE TO ANSWER THE QUESTIONS THAT WE

3    THOUGHT THE 30(B) WITNESS WAS GOING TO GIVE.'

4          **MR. QUINN:**  YEAH.  BUT IN THE PASSAGE I JUST READ,

5    JENAL ASKS, YOU'RE HERE TO TESTIFY ABOUT ZEUS?  COREY SAYS, NO,      02:23

6    SOMETHING ELSE.

7          **THE COURT:**  I DON'T DISAGREE.

8          **MR. QUINN:**  BUT THE REAL IRONY HERE, AND THE THING

9    THAT'S COMPLETELY INEXPLICABLE, IS THAT WE'VE SAID THAT IF YOU

10   WANT TO SEE THE TAPES, THEY'RE AVAILABLE.                          02:23

11         **MS. GLASER:**  YOUR HONOR, THE LAST WORD, AND THEN I

12   WILL -- WHEN THE COMPANY SAYS, 'I DON'T KNOW; THEREFORE, THE

13   30(B)(6) DESIGNEE SAYS I DON'T KNOW, THE COMPANY IS SAYING, 'I

14   DON'T KNOW.'  LET ME TELL YOU WHAT -- AND I'M READING FROM THE

15   TRANSCRIPT OF PROCEEDINGS IN FRONT OF INFANTE.                     02:24

16         THIS IS MR. COREY -- EXCUSE ME, MR. JENAL SAYS, "AND

17   WHO'S THE DESIGNEE ON THE DOCUMENT MANAGEMENT SYSTEM?"

18   MR. COREY:  "THAT'S JULIA MARINE."

19         WHAT I CAN TELL YOU IS, WE'VE TAKEN HER DEPOSITION

20   BEFORE.  THERE WAS NO FORMAL DOCUMENT MANAGEMENT SYSTEM.  WHAT     02:24

21   THE DESIGNERS USED WAS SIMPLY THE FILE SYSTEM, THE FILE

22   MANAGEMENT SYSTEM ON THE ZEUS STORAGE SERVER, THE ZEUS DATA

23   SERVER.  SO SHE'LL BE APPEARING TO TESTIFY ABOUT THAT.

24         **THE COURT:**  AND THAT WAS IN ...

25         **MS. GLASER:**  THAT IS IN THE TRANSCRIPT OF PROCEEDINGS    02:24

 1    IN FRONT OF JUDGE INFANTE, SPECIFICALLY ON APRIL 4, 2007.

 2         **THE COURT:**  MR. QUINN, LET ME ASK YOU, WHO IS THE

 3    PERSON MOST KNOWLEDGEABLE ABOUT ZEUS?

 4         **MR. COREY:**  LET ME CLARIFY THIS.

 5         IN THE RELEVANT TIME PERIOD, WHICH IS 1998 THROUGH          02:24

 6    2003, THERE WERE TWO GENTLEMEN WHOSE NAMES I CAN'T RECALL WHO

 7    WERE RESPONSIBLE FOR ZEUS.  THEY LEFT THE COMPANY.  MS. MARINE

 8    HAD SOME RESPONSIBILITY FOR ZEUS PRIOR TO -- I THINK IT WAS

 9    1996 OR 1997.  SHE HAD RESPONSIBILITY FOR ZEUS IN -- I BELIEVE

10    STARTING IN 2003 OR 2004.                                       02:25

11         MATTEL'S KNOWLEDGE ON THIS SUBJECT OF ZEUS, WHAT

12    HAPPENED BETWEEN 1998 AND 2003, IS LIMITED.

13         **THE COURT:**  SO WHAT YOU'RE SAYING BASICALLY IS THAT

14    THIS IS THE PERSON MOST KNOWLEDGEABLE, NOT NECESSARILY THAT SHE

15    ACTUALLY IS KNOWLEDGEABLE.                                      02:25

16         **MR. COREY:**  THAT'S EXACTLY RIGHT.  WE DID OUR BEST.

17    WE TRIED TO TRACK THESE GUYS DOWN.  WE HAD SOME BRIEF

18    CONVERSATIONS WITH THEM.  THE KNOWLEDGE THAT SHE'S GIVING IS

19    THE KNOWLEDGE THAT MATTEL HAS.  MATTEL CAN'T BE HELD TO A

20    HIGHER STANDARD THAN THAT.  AND WHAT SHE TESTIFIED TO WITH      02:25

21    RESPECT TO THE DOCUMENT MANAGEMENT SYSTEM IS, THERE IS NONE.

22         **THE COURT:**  I'M GOING TO HEAR VERY BRIEFLY FROM

23    MR. MOORE, AND THEN WE'RE GOING TO TRY TO WRAP THIS UP.

24         MR. MOORE, IF YOU WOULD PLEASE COME TO THE WITNESS

25    STAND.                                                          02:25

1      **MS. GLASER:**  IS YOUR HONOR GOING TO ASK QUESTIONS, OR

2  MAY I?

3      **THE COURT:**  I'M GOING TO ASK SOME QUESTIONS.  I HAVE

4  A FEW QUESTIONS MYSELF; THAT'S WHY I CALLED THE WITNESS.

5      **MR. QUINN:**  DO YOU WANT HIM AT THE PODIUM?                    02:26

6      **THE COURT:**  THE WITNESS STAND, IF YOU WOULD.

7      **THE CLERK:**  DO YOU SOLEMNLY STATE THAT THE TESTIMONY

8  YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL

9  BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

10  HELP YOU GOD?

11      **THE WITNESS:**  I DO.

12      **THE CLERK:**  PLEASE STATE YOUR FULL NAME AND SPELL

13  YOUR LAST NAME FOR THE RECORD.

14      **THE WITNESS:**  MICHAEL CHRISTOPHER MOORE, M-O-O-R-E.

15                    **DIRECT EXAMINATION**

16  **BY THE COURT:**

17  Q   MR. MOORE, YOU'VE PREVIOUSLY INDICATED IN YOUR

18  DECLARATIONS YOUR POSITION WITH MATTEL.

19      THE COURT BASICALLY WANTS TO GET A CLARIFICATION OF

20  WHAT EXACTLY HAPPENED IN NOVEMBER OF 2003, IN TERMS OF WHAT YOU    02:26

21  DID TO PRESERVE THE DOCUMENTS.

22  A   MY EFFORT TO PRESERVE IN NOVEMBER 2003 REALLY BEGINS WITH

23  AN EXAMINATION OF WHAT WAS OUT THERE HISTORICALLY.  THE EVENT

24  OCCURRED IN 2000, SO I'M LOOKING FOR ANY EVIDENCE, ANY DOCUMENT

25  THAT WOULD HELP US UNDERSTAND THOSE EVENTS.  SO I HAD ALREADY     02:27

```
 1   GONE OUT DURING THE INVESTIGATION -- PREVIOUSLY TO NOVEMBER OF
 2   2003, I HAD GONE OUT DURING THE INVESTIGATION TO LOCATE PEOPLE
 3   WHO MAY HAVE KNOWN CARTER BRYANT; TO UNDERSTAND WHETHER
 4   CARTER BRYANT HAD A COMPUTER; TO TRY TO UNDERSTAND WHETHER
 5   CARTER BRYANT USED THE ZEUS SYSTEM; AND SO MY EFFORTS INCLUDE      02:27
 6   THAT TIME PERIOD.  AS I COLLECTED DOCUMENTS, I PRESERVED THEM
 7   DURING NOVEMBER OF 2003 AND BEYOND.
 8            AND AS WE IDENTIFIED PEOPLE WHO EITHER KNEW
 9   CARTER BRYANT OR WHO WE THOUGHT HAD DOCUMENTS OR E-MAILS
10   RELEVANT TO THE CASE, WE CONTINUED TO PRESERVE THOSE PEOPLE'S     02:28
11   DOCUMENTS.
12            FOR EXAMPLE, IF WE LOCATED SOMEBODY WHO HAD A
13   COMPUTER HARD DRIVE THAT WE THOUGHT HAD E-MAILS ON IT, WE WOULD
14   PRESERVE IT.
15   Q   WHAT INSTRUCTIONS DID YOU GIVE TO THOSE INDIVIDUALS THAT      02:28
16   YOU SO IDENTIFIED?
17   A   I WOULD ASK THEM WHETHER THEY HAD ANYTHING RELATED TO
18   CARTER BRYANT OR BRATZ.  I WOULD SAY, "PLEASE COLLECT IT AND
19   GIVE IT TO ME; AND IF YOU FIND ANYTHING IN ADDITION TO THAT,
20   PLEASE GIVE IT TO ME."                                           02:28
21   Q   WHAT ABOUT GOING FORWARD?
22   A   WELL, GOING FORWARD, THE INSTRUCTION IS, "IF YOU FIND
23   ANYTHING, GIVE IT TO ME AND MAINTAIN IT."
24   Q   WITH RESPECT TO THIS DEPOSITION THAT YOU WERE -- WERE YOU
25   PRESENT AT THIS MARINE DEPOSITION THAT'S BEEN REFERRED TO?       02:28
```

1    A    I BELIEVE I WAS PRESENT AT THE ONE IN JUNE OF 2000.

2    Q    THERE WAS AN INDICATION THAT SHE WAS NOT AWARE OF THE ZEUS

3    BACKUP?  DO YOU RECALL THAT?

4    A    YES.

5    Q    WHAT STEPS, IF ANY, DID YOU DO TO CLARIFY THAT WITH HER          02:29

6    AFTERWARDS?

7    A    WELL --

8    Q    THE TESTIMONY TODAY IS OR THE REPRESENTATION FROM

9    MR. QUINN IS THAT BACKUPS EXISTED.

10         DEFENSE COUNSEL TAKES ISSUE WITH THE FACT THAT YOU          02:29

11   SAT BY SILENTLY AND ALLOWED THIS TESTIMONY TO PROCEED.

12   A    YES.  I HAD A CONVERSATION WITH COUNSEL ABOUT WHAT TO DO

13   NEXT, BUT I DON'T WANT TO NECESSARILY GET INTO WHAT THAT WAS.

14   Q    I UNDERSTAND.

15   A    BUT I HAD AN UNDERSTANDING, AFTER THOSE CONVERSATIONS,          02:29

16   THAT MGA HAD KNOWLEDGE OF THESE TAPES' EXISTENCE, AND THAT THEY

17   HAD BEEN OFFERED, AND THAT, YOU KNOW, MY DUTY WASN'T TO CORRECT

18   HER MEMORY AT THAT TIME.

19   Q    AND HOW IS IT THAT YOU HAD INFORMATION THAT MGA WAS AWARE

20   THAT THESE TAPES EXISTED, NOTWITHSTANDING HER DEPOSITION          02:30

21   TESTIMONY THAT YOU WITNESSED?

22   A    HOW DID I KNOW THAT MGA --

23   Q    PERHAPS I MISUNDERSTOOD YOU.

24         I THOUGHT YOU JUST INDICATED THAT YOU UNDERSTOOD THAT

25   MGA WAS AWARE THAT THESE BACKUP TAPES EXISTED.          02:30

```
 1   A    I UNDERSTOOD THAT MATTEL'S OUTSIDE COUNSEL HAD OFFERED

 2   THESE TAPES TO MGA.

 3   Q    DID YOU HAVE PERSONAL KNOWLEDGE OF THE TAPES' EXISTENCE?

 4   A    YES.

 5           THE COURT:  COUNSEL, YOU HAD SOME QUESTIONS.              02:30

 6           MS. GLASER:  YES, YOUR HONOR.

 7                       DIRECT EXAMINATION

 8   BY MS. GLASER:

 9   Q    MR. MOORE, WERE YOU RESPONSIBLE FOR DETERMINING WHO THESE

10   35 OR 30 OR 25 OR 40 WITNESSES ARE?                               02:30

11   A    YES, I WAS.

12   Q    AND YOU ALONE?

13   A    WELL, WHEN WE IDENTIFIED SOMEBODY WHO WAS POSSIBLY

14   RELEVANT, THEN I WOULD BE THE ONE TO TAKE ACTION.  I HAD

15   PARALEGALS OR OTHER PEOPLE AS WELL, BUT IT WAS MAINLY ME, YES.    02:31

16   Q    IS THERE ANY WRITTEN INSTRUCTION THAT YOU PROVIDED TO

17   ANYONE WITH RESPECT TO WHAT THEY SHOULD PRESERVE, WHETHER IT'S

18   35 OR 30 OR 25, WHOEVER THESE PEOPLE ARE?  WERE THERE WRITTEN

19   INSTRUCTIONS OF WHAT THEY SHOULD PRESERVE?

20           FREQUENTLY -- AND I'M GOING TO USE AN EXAMPLE --         02:31

21   INSIDE COUNSEL, WHEN LITIGATION IS ABOUT TO ENSUE OR WHEN THEY

22   THINK THERE'S A CONCERN ABOUT LITIGATION PERHAPS DOWN THE ROAD,

23   THEY SEND AN E-MAIL OUT TO EVERYBODY, 'WHATEVER YOU DO, PLEASE

24   PRESERVE YOUR DOCUMENTS.'

25           IS THAT AN E-MAIL THAT EXISTS TODAY?  YES OR NO?         02:31
```

```
 1   A    THERE WASN'T A MEMO THAT WENT OUT.

 2   Q    EVER; CORRECT?

 3   A    WELL, NO.  ONE WENT OUT LATER IN CONNECTION WITH SORT OF A

 4   LARGER CASE.

 5   Q    NOT THIS CASE?                                          02:31

 6           MR. QUINN:  AMBIGUOUS AS TO WHAT "THIS CASE" IS.

 7           THE COURT:  WHAT DO YOU MEAN EXACTLY, COUNSEL?

 8           MS. GLASER:  WELL, HE SAID, "A LARGER CASE."

 9           MY FAULT.

10   BY MS. GLASER:                                               02:32

11   Q    WHEN DID AN E-MAIL GO OUT DIRECTING THE COMPANY'S

12   EMPLOYEES TO PRESERVE DOCUMENTS?

13   A    IN ABOUT APRIL OF 2005.

14   Q    AND THAT'S THE FIRST TIME AN E-MAIL WENT OUT?

15   A    THAT'S THE FIRST TIME AN E-MAIL WENT OUT TO COMPANY-WIDE.  02:32

16   Q    IN FACT, THAT'S THE FIRST TIME A DIRECTIVE WENT OUT, A

17   WRITTEN DIRECTIVE, WENT OUT AT ALL; ISN'T THAT TRUE?

18   A    I'M NOT SURE THAT'S TRUE.

19           MR. QUINN:  I DIDN'T HEAR THE ANSWER, YOUR HONOR.

20           MS. GLASER:  "I'M NOT SURE THAT'S TRUE," I BELIEVE,   02:32

21   IS WHAT HE SAID.

22           THE COURT:  ACTUALLY, THERE'S NO ANSWER ON THE -- THE

23   COURT REPORTER DIDN'T HEAR AN ANSWER EITHER.  LET'S NOT SPEAK

24   OVER EACH OTHER.

25           MS. GLASER:  SORRY.                                  02:32
```

1   BY MS. GLASER:

2   Q   IS IT TRUE THAT THE FIRST TIME A DIRECTIVE WENT OUT TO

3   MATTEL EMPLOYEES IN WRITING, TO PRESERVE RECORDS, WAS IN APRIL

4   OF 2005?

5   A   IN APRIL OF 2005, A DOCUMENT RETENTION MEMO WENT OUT, AND      02:33

6   THAT WAS THE FIRST TIME IT WENT OUT COMPANY-WIDE.

7   Q   DID AN E-MAIL GO OUT LESS THAN COMPANY-WIDE AT ANY OTHER

8   TIME BEFORE APRIL OF 2005 IN CONNECTION WITH CARTER BRYANT,

9   MGA, POSSIBLE LITIGATION, PROBABLE LITIGATION,

10  HOWEVER-YOU-WANT-TO-COUCH-IT LITIGATION, WITH MGA AND           02:33

11  CARTER BRYANT IN WRITING?

12  A   THERE WASN'T A MEMO THAT WENT TO MORE THAN ONE PERSON,

13  THAT I CAN REMEMBER, BUT THERE MAY HAVE BEEN AN E-MAIL TO MORE

14  THAN ONE PERSON TALKING ABOUT THE CASE AND ASKING FOR

15  DOCUMENTS.                                                      02:33

16  Q   I DIDN'T ASK THAT.

17      I WANT TO KNOW IF THERE WAS A WRITTEN DIRECTIVE THAT

18  WENT OUT TO ANY EMPLOYEE PRIOR TO APRIL OF 2005, ASKING THEM OR

19  TELLING THEM TO PRESERVE THEIR E-MAILS?

20  A   I CAN'T REMEMBER THAT ONE WENT OUT LIKE THAT.  HOWEVER, IT   02:34

21  COULD HAVE BEEN LESS FORMAL THAN THAT IN TERMS OF, YOU KNOW,

22  WITHIN AN E-MAIL, FOLLOWING UP A PHONE CALL.  I DON'T WANT TO

23  EXCLUDE THAT THERE MIGHT HAVE BEEN SOME E-MAILS OF THAT NATURE.

24  Q   IS IT FAIR TO SAY THAT WE DON'T KNOW, AS WE SIT HERE

25  TODAY, EXACTLY WHAT WAS TOLD TO WHOMEVER IT WAS TOLD, WHICHEVER  02:34

```
 1   EMPLOYEES IT WAS TOLD TO, WHAT THEY SHOULD BE PRESERVING?

 2   THERE'S NO WRITTEN RECORD OF A DIRECTION AS TO WHAT THEY SHOULD

 3   BE PRESERVING?

 4          THE COURT:  THOSE ARE TWO SEPARATE QUESTIONS.

 5   BY MS. GLASER:                                              02:34

 6   Q   IS THERE A WRITTEN RECORD OF WHAT THEY SHOULD BE

 7   PRESERVING?

 8   A   WELL, THERE'S THE MEMO THAT WENT OUT IN APRIL OF 2005.

 9   Q   OTHER THAN THAT, IS THERE A WRITTEN RECORD DESCRIBING WHAT

10   THEY SHOULD BE PRESERVING?                                  02:34

11          IN OTHER WORDS, IT'S LESS THAN THE UNIVERSE, CORRECT,

12   WHATEVER WENT OUT IN APRIL OF 2005?  WHATEVER YOU ASKED PEOPLE

13   TO PRESERVE, IT WAS LESS THAN THE WHOLE UNIVERSE OF THEIR

14   E-MAILS; CORRECT?

15          MR. QUINN:  I CAN'T FOLLOW THE QUESTION.             02:35

16          MS. GLASER:  I'LL WITHDRAW IT.  I'M SURE IT'S MY

17   FAULT.

18   BY MS. GLASER:

19   Q   WHEN YOU SENT OUT A DIRECTIVE, OR WHOMEVER SENT OUT THE

20   DIRECTIVE IN APRIL OF 2005, WERE PEOPLE ASKED TO PRESERVE     02:35

21   EVERYTHING OR LESS THAN EVERYTHING?

22   A   PEOPLE WERE ASKED TO PRESERVE DOCUMENTS RELATING TO

23   CERTAIN ISSUES.  AND I'M NOT SURE I CAN GET INTO WHAT THAT

24   DOCUMENT SAID WITHOUT CROSSING SOME PRIVILEGE LINE, BUT --

25          MS. GLASER:  YOUR HONOR, I THINK I'M ENTITLED TO      02:35
```

```
 1   KNOW, AND I THINK THE COURT, MORE IMPORTANTLY, I GUESS, IS
 2   ENTITLED TO KNOW IF THE REQUEST FOR PRESERVATION WAS A LIMITED
 3   REQUEST INAPPROPRIATELY LIMITED OR IF IT WAS A BROAD REQUEST.
 4   BECAUSE I WILL REPRESENT TO THE COURT, MGA'S COUNSEL SENT OUT
 5   SOMETHING SAYING, 'PRESERVE EVERYTHING.'                        02:36
 6           THE COURT:  YES, COUNSEL.
 7           MR. QUINN, I DO THINK THAT THE SCOPE OF THE RETENTION
 8   POLICY IS SOMETHING WHICH IS NOT PROTECTED BY PRIVILEGE AT THIS
 9   POINT.
10           MR. QUINN:  YOUR HONOR, MGA HAS TAKEN THE POSITION --  02:36
11   THE SHOE'S ON THE OTHER FOOT -- THAT WE'RE NOT PERMITTED TO
12   KNOW THAT.  THEY CLAIM THAT THAT'S PRIVILEGED INFORMATION AS TO
13   WHAT PEOPLE WERE TOLD TO RETAIN.
14           THE COURT:  IS THAT MGA'S POSITION?
15           MS. GLASER:  I DO NOT BELIEVE SO, YOUR HONOR.  I'M     02:36
16   NOT AWARE THAT WAS EVER DONE, BUT I DON'T WANT TO MISREPRESENT
17   -- I'M NOT AWARE OF THAT, BUT I'M CERTAINLY PREPARED TO LET THE
18   COURT KNOW AND COUNSEL KNOW WHAT PEOPLE HAVE BEEN ASKED TO
19   PRESERVE.
20           THE COURT:  PUTTING ASIDE THAT RECIPROCITY, WHICH I    02:36
21   THINK YOU WOULD CERTAINLY BE ENTITLED TO, GIVEN HOW THIS HAS
22   UNFURLED, THERE'S CERTAINLY NO PRIVILEGE ISSUE WITH RESPECT TO
23   THE SCOPE OF THE RETENTION POLICY, GIVEN WHAT THIS WITNESS AND
24   MANY OTHER WITNESSES FOR MATTEL HAVE ALREADY DISCLOSED.
25           MR. QUINN:  I WOULD AGREE, YOUR HONOR, IN TERMS OF     02:36
```

```
 1    SOME GENERAL SUBJECT MATTERS.

 2            THE COURT:   RIGHT.   THAT'S ALL WE'RE LOOKING FOR

 3    RIGHT NOW.

 4            MR. QUINN:   AND WHAT WE'RE TOUCHING ON HERE -- I MADE

 5    REFERENCE TO A SECURITY TOOL THAT WAS PUT IN PLACE BACK IN LATE    02:37

 6    2003.

 7            THE COURT:   THAT'S CORRECT.

 8            MR. QUINN:   MATTEL DOES REGARD THAT AS -- THAT'S

 9    SOMETHING THAT WAS PUT IN PLACE TO PROTECT MATTEL FROM -- AMONG

10    OTHER THINGS, IT WAS PUT IN PLACE TO PROTECT MATTEL FROM          02:37

11    INDUSTRIAL ESPIONAGE --

12            THE COURT:   YES.

13            MR. QUINN:   -- WHICH MATTEL HAD BEEN ON THE RECEIVING

14    END OF.

15            THE COURT:   ALLEGEDLY.                                   02:37

16            MR. QUINN:   I'M A LITTLE CONCERNED ABOUT DISCUSSING

17    THAT IN OPEN COURT, ESPECIALLY WITH MGA'S IN-HOUSE COUNSEL.

18            THE COURT:   WE'RE NOT ASKING FOR THOSE KINDS OF

19    SPECIFICS.

20            MR. QUINN:   SO AS LONG AS THE WITNESS UNDERSTANDS,       02:37

21    BECAUSE I THOUGHT HE MAY BE CONFUSED ABOUT WHETHER HE'S BEING

22    ASKED TO GET INTO THAT.

23            THE COURT:   AS I UNDERSTAND THE QUESTION RIGHT NOW,

24    WE'RE SIMPLY ASKING HIM TO DESCRIBE IN GENERAL TERMS THE NATURE

25    OF THIS APRIL 2005 MEMO.                                         02:37
```

```
 1            MS. GLASER:  MAY WE HAVE HIM PRODUCE IT -- NOT TODAY,

 2   OBVIOUSLY, BUT -- I'D LIKE TO SEE IT.

 3   BY MS. GLASER:

 4   Q    BUT GO AHEAD, IF YOU COULD DESCRIBE IT.

 5   A    WELL, IT ASKS PEOPLE IN MATTEL TO PRESERVE, COLLECT AND        02:38

 6   PRESERVE, OR PRESERVE DOCUMENTS, RELATED TO CARTER BRYANT,

 7   ANYTHING RELATED TO BRATZ, ANYTHING RELATED TO SOME OF THE

 8   ALLEGATIONS THAT WERE IN MGA'S COMPLAINT FILED THAT MONTH, SUCH

 9   AS DOCUMENTS RELATED TO MY SCENE, DOCUMENTS RELATED TO

10   EXCELLARATES -- THESE ARE BRANDS THAT I'M DESCRIBING OF           02:38

11   MATTEL -- AND LITTLE MOMMY.

12   Q    DIVA STARS?

13   A    I DON'T HAVE THE DOCUMENT IN FRONT OF ME, BUT I BELIEVE IT

14   WOULD HAVE RELATED TO DIVA STARS.

15   Q    DID YOU ATTEND MS. MARINE'S DEPOSITION IN JULY OF 2007?       02:38

16   A    I DID.

17   Q    IN FACT, YOU PREPARED HER FOR HER DEPOSITION, YOU AND

18   OUTSIDE COUNSEL, CORRECT, JUST THE TWO OF YOU?

19   A    I BELIEVE I WAS PRESENT FOR PART OF THAT PREPARATION, YES.

20   Q    AND ISN'T IT ALSO TRUE THAT YOU ACTUALLY RECEIVED LIVENOTE    02:39

21   AT THE DEPOSITION?  IN OTHER WORDS, YOU SEE THE QUESTION BEING

22   ASKED AND THE ANSWER BEING GIVEN, YOU ACTUALLY SEE IT ON A

23   COMPUTER IN FRONT OF YOU AS IT'S OCCURRING; RIGHT?

24   A    AT SOME DEPOSITIONS, I DO, AND AT THAT ONE, I BELIEVE I

25   DID.                                                              02:39
```

```
 1   Q    AND WHEN MS. MARINE TESTIFIED THAT TO HER KNOWLEDGE, AS

 2   THE 30(B)(6) WITNESS FOR THE COMPANY, THEREFORE THE COMPANY'S

 3   KNOWLEDGE, THERE WAS NOT THESE BACKUP TAPES -- ONCE SHE

 4   TESTIFIED THAT THERE WERE NOT ZEUS BACKUP TAPES, AT LEAST TO

 5   THE BEST OF HER KNOWLEDGE -- THE COURT CAN READ THE DEPOSITION      02:39

 6   HIMSELF -- WHEN SHE TESTIFIED TO THAT EFFECT, DID YOU CORRECT

 7   THE RECORD THEN OR AT ANY TIME UNTIL YOU GAVE YOUR DECLARATION

 8   IN OPPOSITION TO THE SPOLIATION MOTION THAT WE'RE HERE TODAY

 9   ABOUT?

10        MR. QUINN:  I OBJECT TO THE PREAMBLE, WHICH WAS                 02:40

11   SOMETHING TO THE EFFECT THAT THE WITNESS WAS TESTIFYING AS THE

12   PERSON MOST KNOWLEDGEABLE ON THE ZEUS SYSTEM, WHICH, AS THE

13   COURT KNOWS, IS NOT THE CASE.

14        WE'RE PREPARED TO STIPULATE THAT HE HAS NEVER CHANGED

15   THAT WITNESS'S TESTIMONY.                                           02:40

16        THE COURT:  VERY WELL.

17        I'M GOING TO SUSTAIN THE OBJECTION BECAUSE I THINK IT

18   DOES -- AND ALSO, THE WAY YOU PHRASED THAT QUESTION DOES NOT

19   ACTUALLY SIT WITH THE COURT'S UNDERSTANDING IN THE CONTEXT OF

20   HER ANSWERS.                                                        02:40

21        AS I INDICATED PREVIOUSLY, MY READING OF THOSE

22   ANSWERS IS MORE THAT SHE WAS NOT AWARE OR THAT SHE DID NOT

23   KNOW.  NOT THAT THIS WAS A CATEGORICAL, UNEQUIVOCAL 'NO, WE DO

24   NOT HAVE THOSE BACKUP TAPES.'

25        MS. GLASER:  YOUR HONOR -- AND I WON'T BEAT THIS               02:40
```

1   HORSE ANYMORE --

2          **THE COURT:**  THIS HEARING AND THIS MOTION IS NOT ABOUT

3   WHETHER OR NOT THERE WAS A PROBLEM WITH THE 30(B) WITNESS OR

4   WHETHER THERE WAS MISCOMMUNICATION OR A GARBLED RECORD IN TERMS

5   OF WHAT THIS WITNESS WAS QUALIFIED TO TESTIFY ABOUT OR NOT.          02:41

6   THAT'S NOT THE ISSUE BEFORE THE COURT.

7          WHAT JUSTIFIES A TERMINATING SANCTION, WHICH IS AN

8   EXTRAORDINARILY DRASTIC MEASURE FOR THIS COURT TO TAKE, IS IF

9   MATTEL LIED TO MGA OR MATTEL KNOWINGLY AND INTENTIONALLY

10  DESTROYED DOCUMENTS OR FAILED TO KEEP DOCUMENTS THEY KNEW THEY      02:41

11  SHOULD HAVE KEPT.  LET'S NOT LOSE SIGHT OF WHAT THIS IS ABOUT.

12         **MS. GLASER:**  I AGREE WITH THAT, YOUR HONOR.

13         **THE COURT:**  IF THIS WITNESS MISTAKENLY SAID THAT SHE

14  WAS NOT AWARE OF THOSE AND THERE WERE, IN FACT, DOCUMENTS --

15         I AM INTERESTED TO HEAR WHAT MR. MOORE DID OR WHY HE        02:41

16  DIDN'T DO IT, IF YOU WANT TO ASK HIM ABOUT THAT.  BUT LET'S NOT

17  TRY TO CHARACTERIZE THE WITNESS'S TESTIMONY.

18         **MS. GLASER:**  FAIR ENOUGH.

19         **THE COURT:**  I'VE HEARD IT SEVERAL TIMES NOW, I HAVE A

20  COPY OF IT, AND I AM CERTAINLY MINDFUL OF IT.                      02:41

21         LET'S HEAR WHAT MR. MOORE DID OR DID NOT DO.

22         **MS. GLASER:**  THEN, YOUR HONOR, LET ME TRY IT

23  DIFFERENTLY, THEN, WITHOUT CHARACTERIZING IT.

24  BY **MS. GLASER:**

25  Q    YOU KNEW MS. MARINE TESTIFIED THAT SHE WASN'T AWARE OF        02:42

1   BACKUP FOR ZEUS AT CERTAIN KEY PERIODS OF TIME; TRUE?

2   A    THAT'S TRUE.

3   Q    AND YOU DIDN'T CORRECT THE RECORD THEN DURING THE

4   DEPOSITION; TRUE?

5   A    THAT'S TRUE.                                        02:42

6   Q    AND UNTIL YOU FILED A DECLARATION IN OPPOSITION TO THIS

7   MOTION FOR SPOLIATION AND DISMISSAL OF THE CASE, YOU NEVER LET

8   MGA KNOW THAT WHAT SHE HAD SAID IN HER DEPOSITION, WHATEVER IT

9   WAS, WASN'T TRUE; TRUE?

10  A    I DIDN'T THINK THAT WHAT SHE SAID AT THE DEPOSITION WASN'T  02:42

11  TRUE; I JUST THOUGHT THAT SHE WASN'T AWARE OF THE TAPES'

12  EXISTENCE.

13  Q    IS IT FAIR TO SAY THAT MGA, WALKING AWAY FROM THAT

14  DEPOSITION, WOULD BELIEVE THAT ZEUS BACKUP TAPES DID NOT EXIST

15  FOR A CONSIDERABLE PERIOD OF TIME?                        02:43

16  A    I WOULD THINK THAT MGA WOULD FOLLOW UP ON THAT.

17  Q    AND WHEN THE COMPANY -- ASSUME FOR A MOMENT THAT SHE

18  WAS -- BY THE WAY, YOU WEREN'T DESIGNATED AS THE PERSON MOST

19  KNOWLEDGEABLE, THE 30(B)(6) WITNESS, IN CONNECTION WITH THE

20  EXISTENCE OF THE BACKUP TAPES FOR ZEUS, WERE YOU?          02:43

21  A    I WAS NOT DESIGNATED.

22  Q    ISN'T IT TRUE, SIR, AS YOU SIT HERE TODAY, YOU HAVE MORE

23  INFORMATION, AND YOU KNEW YOU HAD MORE INFORMATION, WHEN YOU

24  WERE PREPARING HER AND WHEN HER DEPOSITION WAS TAKEN, THAN

25  MS. MARINE; TRUE?                                         02:43

1      **MR. QUINN:**  NON PRIVILEGED INFORMATION, YOUR HONOR,

2  JUST FOR CLARIFICATION.

3          **THE COURT:**  YES, NON PRIVILEGED INFORMATION.

4          IT'S A TOUGH QUESTION TO ASK, COUNSEL.  I UNDERSTAND

5  WHAT YOU'RE TRYING TO GET AT.                                    02:43

6          **MS. GLASER:**  EXCUSE ME, YOUR HONOR.  THIS IS THE

7  GENTLEMAN WHO SAID HE GOT THE TAPES FROM SOMEPLACE IN ARIZONA.

8          **THE COURT:**  YOU SEE, THIS GOES BACK TO THE ISSUE OF

9  WHETHER OR NOT THIS WAS NOT THE RIGHT 30(B) WITNESS, AND I TEND

10  TO THINK THAT THIS IS PERHAPS A DISCOVERY DISPUTE WHICH SHOULD    02:44

11  HAVE BEEN PROPERLY FULLY LITIGATED, BUT THIS IS NOT THE

12  GRAVAMEN OF YOUR ALLEGATION AT THIS POINT.

13          **MS. GLASER:**  THE ONLY PROBLEM, YOUR HONOR, IS --

14          **THE COURT:**  IT'S FORGING INTO SOMETHING ELSE, AND

15  THAT SOMETHING ELSE IS NOT REALLY WHAT I WANT TO ENTERTAIN AT    02:44

16  THIS MOMENT.

17          **MS. GLASER:**  I UNDERSTAND THAT.  AND MY ONLY POINT

18  IS, YOUR HONOR, WE WERE MISLED.  I THINK THE RECORD IS CLEAR

19  THAT WE WERE MISLED.  AND I DON'T THINK WE HAVE AN OBLIGATION,

20  AFTER SOMEBODY IS DESIGNATED AS A 30(B)(6) WITNESS, TO SAY,      02:44

21  'OH, SHE'S NOT SURE.'  WHICH ISN'T WHAT SHE SAID.  SHE SAID

22  THAT SHE DOESN'T THINK 'WE GO BACK THAT FAR.'

23          SO THEY HAVE OFFERED HER.  I DIDN'T OFFER HER; I

24  DIDN'T DESIGNATE HER.  THEY DESIGNATED HER.  AND THIS GENTLEMAN

25  HAS MORE INFORMATION ON THE DATE SHE'S TESTIFYING THAN SHE       02:44

```
 1   DOES.  THAT'S A HEAD FAKE.  THAT IS HIDING EVIDENCE.  THAT IS

 2   NOT FAIR.

 3          THE COURT:  YOU WERE CERTAINLY ENTITLED, AT THE TIME

 4   THAT IT WAS ASKED, TO A YES OR NO ANSWER TO WHETHER OR NOT

 5   THESE BACKUP TAPES EXISTED, AND IT APPEARS THAT YOU DID NOT GET   02:45

 6   THAT FROM MS. MARINE.

 7          MS. GLASER:  I'LL MOVE ON, YOUR HONOR.

 8          THE COURT:  OKAY.  THANK YOU.

 9   BY MS. GLASER:

10   Q   BY THE WAY, HAVE ANY OF THE DOCUMENTS ON THE BACKUP TAPES    02:45

11   FOR THE ZEUS SERVER BEEN RETRIEVED FROM THE BACKUP TAPES AND

12   PROVIDED TO MGA OR ITS COUNSEL OR TO CARTER BRYANT OR HIS

13   COUNSEL?

14          THE COURT:  YOU'RE ASKING IF DOCUMENTS, PARTICULAR

15   DOCUMENTS, WHETHER DOCUMENTS CAME FROM THE BACKUP TAPES?        02:45

16          MS. GLASER:  YES, SIR.

17          THE WITNESS:  IF ANY DOCUMENTS FROM THE ZEUS BACKUP

18   TAPES WERE RETRIEVED FOR MGA'S COUNSEL?

19          I UNDERSTAND THAT THAT'S WHAT HAPPENED.

20   BY MS. GLASER:                                                  02:45

21   Q   WHEN DID THAT HAPPEN?

22   A   I'M NOT SURE WHEN IT HAPPENED.  THERE'S ONGOING

23   PRODUCTION.  BUT I DID ASK COUNSEL IF THIS HAD HAPPENED.  I DID

24   INQUIRE AS TO WHETHER DOCUMENTS WERE PRODUCED FROM THOSE ZEUS

25   TAPES, AND I UNDERSTAND THAT THEY WERE.                         02:46
```

```
1   Q    AND ARE YOU THE PERSON MOST KNOWLEDGEABLE WHO WOULD KNOW

2   IF THERE ACTUALLY -- OR IS IT OUTSIDE COUNSEL -- WHO WOULD KNOW

3   IF DOCUMENTS HAD BEEN RETRIEVED FROM THE ZEUS BACKUP TAPES AND

4   PRODUCED TO MGA AND MR. BRYANT IN THIS LAWSUIT?

5   A    WELL, I'M NOT SURE I CAN ANSWER THAT.                        02:46

6        I THINK THE ANSWER IS, WHEN I GOT THE ZEUS TAPES, WE

7   TURNED THEM OVER TO AN OUTSIDE FIRM, AND WE DEALT WITH THEM IN

8   TERMS OF -- WE STARTED SEARCHING THEM.  AND IF THERE WERE

9   RELEVANT DOCUMENTS ON THOSE TAPES, THEY WOULD BE PRODUCED, I

10  WOULD ASSUME.                                                    02:47

11  Q    IS IT FAIR TO SAY THAT YOU'RE NOT THE PERSON MOST

12  KNOWLEDGEABLE ABOUT WHAT, IF ANYTHING, HAS BEEN PROVIDED TO

13  COUNSEL OR ITS CLIENTS, MGA OR CARTER BRYANT, FROM THOSE BACKUP

14  TAPES OF ZEUS?

15       MR. QUINN:  I OBJECT.  WE'RE GETTING INTO A DISCOVERY       02:47

16  ISSUE HERE.

17       THE COURT:  I DON'T SEE THE RELEVANCE.

18       MS. GLASER:  I'LL MOVE ON.

19  BY MS. GLASER:

20  Q    MS. MARINE ALSO TESTIFIED THAT SHE DETERMINES WHEN TO       02:47

21  CREATE BACKUP TAPES AND THAT NO ONE FROM LEGAL HAS EVER

22  DIRECTED HER TO CREATE BACKUP TAPES; TRUE OR FALSE?

23       MR. QUINN:  I OBJECT, YOUR HONOR.  WE'VE GOT SOME

24  TESTIMONY THAT WE CAN ALL LOOK AT.

25       MS. GLASER:  I'LL ASK IT DIFFERENTLY TO AVOID THAT.         02:47
```

1           **THE COURT:**  THANK YOU.

2     BY **MS. GLASER:**

3     Q    IS IT TRUE THAT MS. MARINE DETERMINES WHEN TO CREATE

4     BACKUP TAPES AND THAT NO ONE FROM LEGAL HAS EVER DIRECTED HER

5     TO CREATE BACKUP TAPES?  TRUE OR FALSE?                          02:47

6     A    MY UNDERSTANDING IS THAT MS. MARINE CREATES BACKUP TAPES

7     AND SHE'S PROVIDED SOME BACKUP TAPES TO US, TO ME, TO THE LAW

8     DEPARTMENT.

9     Q    MY QUESTION IS, IS IT TRUE THAT LEGAL HAS NEVER DIRECTED

10    HER TO PROVIDE OR MAKE BACKUP TAPES; SHE DETERMINES, NOT YOU,    02:48

11    LEGAL, BUT SHE DETERMINES WHEN AND IF TO CREATE BACKUP TAPES

12    FOR ZEUS?  IS THAT TRUE OR FALSE, SIR?

13    A    I WANT TO ANSWER THE QUESTION.  IT SOUNDS A LITTLE

14    COMPOUND.

15          I SEEM TO REMEMBER ASKING HER AT ONE POINT TO MAKE A       02:48

16    ZEUS BACKUP TAPE, BUT SHE ALSO MAKES BACKUP TAPES IN HER

17    CAPACITY AS MANAGER OF THE ZEUS SYSTEM.

18          **THE COURT:**  MR. MOORE, LET ME ASK YOU THIS:

19          MR. QUINN INDICATED TO ME THAT FROM 2002 TO THE

20    PRESENT, ALL OF THE ZEUS BACKUP TAPES HAVE BEEN SAVED.           02:48

21          DO YOU RECALL THAT REPRESENTATION?

22          **THE WITNESS:**  I REMEMBER THAT THE REPRESENTATION WAS

23    THAT WE HAVE A 2002 BACKUP TAPE FROM ZEUS.

24          **THE COURT:**  AND EVERYTHING SINCE THEN.

25          MR. QUINN, AM I MISQUOTING YOU?  THAT WAS WHAT I           02:49

```
 1    WROTE DOWN IN MY NOTES.

 2            MR. QUINN:  IT WAS ACTUALLY MR. COREY.

 3            THE COURT:  I'M SORRY.

 4            WAS THAT YOUR REPRESENTATION?

 5            MR. COREY:  ALL OF THE BACKUP TAPES FOR ZEUS HAVE NOT      02:49

 6    BEEN PRESERVED SINCE THEN.  WE HAVE COMPLETE SETS OF BACKUP

 7    TAPES DONE AT INTERMITTENT PERIODS, DONE FOR PURPOSES OF THE

 8    LITIGATION.

 9            THE COURT:  YOU GAVE ME DATES OF APRIL, MAY, AUGUST,

10    DECEMBER OF 1998; AND WE WENT THROUGH ALL OF THESE SPORADIC      02:49

11    PERIODS UP THROUGH JULY OF 2001; AND THEN WE SAID WE HAD IT FOR

12    ALL OF 2002.  AND I THOUGHT I ASKED THIS QUESTION SEVERAL

13    TIMES; THAT SINCE 2002, WE HAVE ALL OF THE ZEUS BACKUP TAPES.

14            AM I MISTAKEN?

15            MR. COREY:  I WANT TO MAKE CLEAR THAT WE'RE TALKING       02:49

16    ABOUT THE ZEUS BACKUP TAPES AND NOT THE E-MAIL BACKUP TAPES.

17            THE COURT:  I'M NOT SAYING ANYTHING ABOUT E-MAIL.

18    I'M TALKING ABOUT ZEUS.

19            MR. COREY:  THERE IS NO AUTO-DELETE FUNCTION.

20    THERE'S NOT A RISK OF THINGS BEING LOST AUTOMATICALLY.  SO THE   02:49

21    ELECTION WAS MADE THAT AT INTERMITTENT TIME PERIODS, WE WOULD

22    CREATE A FULL BACKUP OF ZEUS.  AND THERE'S ONE FOR 2002, AND

23    THERE'S ONE FOR 2004.

24            THE COURT:  WHAT ABOUT 2003?

25            MR. COREY:  I CAN'T RECALL IF THERE'S ONE FOR 2003 OR     02:50
```

```
 1   NOT, BUT THINGS DON'T DISAPPEAR FROM ZEUS.  THIS IS WHAT

 2   MS. MARINE TESTIFIED TO.  ZEUS JUST KEEPS GETTING BIGGER AND

 3   BIGGER AND BIGGER.  PEOPLE DON'T DELETE.

 4          THE COURT:  WHAT ABOUT 2005?

 5          MR. COREY:  I DON'T KNOW IF WE HAVE ONE FOR 2005 OR        02:50

 6   NOT.  I BELIEVE WE DO.  I DON'T KNOW.

 7          MR. QUINN:  THE SYSTEM EXISTS.  IT DOESN'T HAVE AN

 8   AUTO DELETE --

 9          THE COURT:  THEN WHY CAN'T I GET A STRAIGHT ANSWER

10   THAT SAYS THAT THEY'RE THERE?                                    02:50

11          MR. COREY:  BECAUSE THE SYSTEM CONTINUES TO EXIST.

12          THE INFORMATION IS THERE.

13          THE COURT:  FOR 2002, FOR 2003, FOR 2004, FOR 2005,

14   FOR 2006, AND THROUGH NOW OF 2007?

15          MR. COREY:  WHAT MS. MARINE TESTIFIED TO WAS THAT --      02:50

16          THE COURT:  I'M ASKING YOU, COUNSEL, IS IT THERE OR

17   IS IT NOT THERE?  BECAUSE I HAVE MY NOTES HERE VERY CLEARLY

18   THAT WAS THE IMPRESSION THAT I WAS GIVEN.  AND I THOUGHT WE HAD

19   KIND OF MOVED BEYOND THIS WHOLE ZEUS ISSUE BECAUSE THEY WERE

20   THERE AND THEY'RE AVAILABLE AND MGA CAN COME AND LOOK AT THEM    02:51

21   OR ACCESS DOCUMENTS FROM THEM.

22          IS THAT TRUE OR NOT TRUE?

23          MR. COREY:  WE HAVE THE BACKUP TAPES FOR ZEUS THAT I

24   IDENTIFIED FOR YOU PRIOR TO 2002, FROM 2001 AND PRIOR.

25          I WANT TO MAKE SURE THAT I'M SAYING EXACTLY WHAT WE       02:51
```

1    HAVE.

2              WE HAVE A COMPLETE BACKUP OF ZEUS FOR 2002.  WE HAVE

3    A COMPLETE BACKUP OF ZEUS FOR 2004.  ALL OF THAT INFORMATION ON

4    THOSE BACKUP TAPES LIKELY CONTINUES TO EXIST ON ZEUS AS IT

5    EXISTS TODAY.                                                        02:51

6              PEOPLE HAVE BEEN INSTRUCTED NOT TO DELETE THINGS

7    RELEVANT TO THIS CASE; SO THERE SHOULDN'T BE A RISK OF LOSING

8    INFORMATION ON ZEUS.

9              THE COURT:  HAVE YOU MADE BACKUPS FOR 2003?

10             MR. COREY:  I DON'T KNOW.                                  02:51

11             MS. GLASER:  I HAVE NOTHING FURTHER.

12             THE COURT:  THANK YOU, COUNSEL.

13             I'M STARTING TO UNDERSTAND MGA'S FRUSTRATION,

14   COUNSEL.

15             MR. QUINN:  WE'D LIKE TO ADDRESS THAT.                     02:52

16             THE COURT:  PLEASE.

17             MR. QUINN:  WE'D LIKE TO UNDERSTAND THE SOURCE OF THE

18   FRUSTRATION, YOUR HONOR.

19             THIS IS A SYSTEM THAT JUST -- THE ZEUS SYSTEM, IT'S A

20   DATA STORAGE SYSTEM.                                                 02:52

21             THE COURT:  I UNDERSTAND THAT.

22             MR. QUINN:  IT JUST GROWS AND GROWS AND GROWS.

23             THE COURT:  I UNDERSTAND THAT AS WELL.

24             MR. QUINN:  PEOPLE HAVE BEEN TOLD 'DON'T DELETE

25   ANYTHING OFF OF THIS SYSTEM THAT'S RELATED TO THIS CASE.'  AS A      02:52

1  FALLBACK, JUST TO BE EXTRA CAREFUL, AT A COUPLE OF PERIODS, A

2  COMPLETE BACKUP, A SNAPSHOT, EVERYTHING THAT'S THERE, HAS BEEN

3  MADE; THAT'S A DUPLICATE.

4          THE COURT:  OKAY.

5          AS FAR AS THE 'DON'T DELETE ANYTHING RELATED TO THIS          02:52

6  CASE,' WHEN DID THAT DIRECTIVE GO OUT?

7          MR. COREY:  APRIL OF 2005, WITH RESPECT TO THE

8  EXPANDED CASE THAT WE'RE DEALING WITH NOW.

9          PRIOR TO APRIL OF 2005, THE ADMISSIONS THAT WE HAVE

10  FROM BRYANT ARE THAT HE NEVER USED ZEUS, BUT WE'VE PRESERVED          02:53

11  THAT INFORMATION.

12          THE COURT:  IT'S NOT ABOUT JUST BRYANT.

13          CAN YOU MAKE A BACKUP OF 2003 AND 2005 AND 2006 AND

14  2007?

15          MR. COREY:  THE INFORMATION THAT WAS THERE IN 2003          02:53

16  WOULD BE ON THE 2004 BACKUP TAPE.

17          THE COURT:  SO THE INFORMATION THAT WAS THERE --

18  OKAY.

19          MR. QUINN:  WE CAN DO A BACKUP TODAY, YOUR HONOR, AND

20  IT WILL CAPTURE EVERYTHING THAT WAS EVER ON ZEUS.          02:53

21          MR. COREY:  IT WILL CAPTURE THE INFORMATION THAT'S ON

22  THE 1998 BACKUP TAPES.

23          MS. GLASER:  YOUR HONOR, RESPECTFULLY -- AND I AM NOT

24  A COMPUTER MAVEN -- IF IT'S A FILE SYSTEM, WHICH IS WHAT

25  THEY'RE REPRESENTING, IF SOMEONE CHOOSES TO DELETE FILES FOR          02:53

```
 1   2003 -- I'LL USE THAT AS AN EXAMPLE -- THEY'RE GONE.  YOU COULD
 2   BACKUP TO YOUR HEART'S DELIGHT, AND IT'S GONE; IT'S NOT THERE.
 3          I'M NOT SUGGESTING THE LAWYERS ARE MISREPRESENTING;
 4   I'M SUGGESTING MR. JENAL, WHO KNOWS A LOT MORE ABOUT COMPUTERS
 5   THAN I DO, IS TELLING ME -- AND I HAVE NO REASON TO DOUBT HIM
 6   AT ALL -- IF YOU TRIED TO BACKUP -- AND I'M USING IT AS AN
 7   EXAMPLE -- 2003 OR 2002, TODAY, AND YOU HAD NOT DONE IT
 8   PREVIOUSLY, EASILY, DOCUMENTS COULD BE DELETED.
 9          THE COURT:  I UNDERSTAND THAT, COUNSEL, BUT I DON'T
10   HAVE ANY EVIDENCE BEFORE ME THAT SUGGESTS THAT ANYTHING WAS
11   DELETED IN 2003.
12          MS. GLASER:  YOU ARE RIGHT.  YOU DO NOT HAVE A
13   DECLARATION THAT TELLS YOU THERE WASN'T ANYTHING DELETED,
14   BECAUSE THAT ISSUE HAS NOT BEEN ADDRESSED PROPERLY, IN OUR
15   VIEW, BY MATTEL.
16          WE DON'T KNOW WHAT'S THERE AND WHAT'S NOT THERE; AND
17   WE'RE NOT GETTING STRAIGHT ANSWERS, YOUR HONOR.
18          MR. QUINN:  THE REALITY --
19          THE COURT:  MR. MOORE, YOU MAY STEP DOWN.
20          MR. QUINN:  HOW DID WE GET HERE?  BECAUSE THEY SAID
21   WE DON'T HAVE ANY ZEUS TAPES, PERIOD.  THAT'S WHAT THIS MOTION
22   WAS BASED ON.
23          THE COURT:  I UNDERSTAND, COUNSEL.  MY FRUSTRATION
24   IS --
25          MR. QUINN:  AND NOW WE'VE WANDERED --
```

1           **THE COURT:**  I UNDERSTAND.  AND I WAS TRYING TO PIN

2      THINGS DOWN.  THAT'S WHAT WE WERE DOING IN THIS HEARING.  AND I

3      STILL FEEL THAT THE RUG HAS BEEN PULLED A LITTLE BIT FROM

4      UNDERNEATH ME.

5           **MR. QUINN:**  I REALLY APOLOGIZE FOR THAT, YOUR HONOR.        02:55

6           PART OF THE PROBLEM IS, THE LAWYERS ARE TALKING ABOUT

7      TECHNICAL THINGS, BUT THE FACT OF THE MATTER IS, THIS THING

8      STILL EXISTS.

9           IS IT CONCEIVABLE THAT SOMEBODY COULD HAVE GONE IN --

10     I MEAN, IF THERE IS NO BACKUP IN 2003, IS IT CONCEIVABLE THAT     02:55

11     SOMEBODY, CONTRARY TO SOME INSTRUCTIONS, COULD HAVE GONE IN AND

12     DELETED SOMETHING AND THEN IT WOULDN'T APPEAR IN THE 2004

13     BACKUP?

14          I ASSUME THE ANSWER TO THAT IS YES.  IF YOU HAD A

15     DISHONEST OR A DISOBEDIENT EMPLOYEE, THAT COULD HAPPEN.          02:55

16          **THE COURT:**  OKAY.  ALL RIGHT.  I'M GOING TO GO

17     THROUGH THIS AGAIN.

18          COUNSEL, WHY DON'T YOU COME TO THE FRONT, BECAUSE YOU

19     SEEM TO BE THE ONE WHO'S MOST KNOWLEDGEABLE ABOUT THESE

20     BACKUPS.                                                         02:55

21          **MR. COREY:**  YOUR HONOR, I DON'T KNOW WHETHER THAT'S A

22     GOOD THING OR A BAD THING.

23          **THE COURT:**  YOU SEEM TO BE THE PERSON MOST

24     KNOWLEDGEABLE BEFORE ME.

25          FROM 1998, I HAVE APRIL, MAY, AUGUST, DECEMBER; IS         02:55

1    THAT CORRECT?

2          **MR. COREY:**  IT'S THE INFORMATION IN OUR PAPERS, YOUR

3    HONOR.  WE HAVE BACKUP TAPES FOR APRIL, MAY, AUGUST, SEPTEMBER,

4    AND DECEMBER OF 1998.

5          **THE COURT:**  ALL RIGHT.                                    02:56

6          IN ADDITION TO WHICH, SINCE THE ZEUS PROGRAM IS STILL

7    IN EXISTENCE, IF SOMETHING WAS SAVED IN OCTOBER OR NOVEMBER OF

8    1998 AND NOBODY HAS DELETED IT, IT SHOULD STILL BE THERE;

9    CORRECT?

10         **MR. COREY:**  THAT'S CORRECT, YOUR HONOR.                   02:56

11         **THE COURT:**  IN 1999, WHAT DO YOU HAVE BACKUP TAPES

12   FOR?

13         **MR. COREY:**  JANUARY AND FEBRUARY.

14         **THE COURT:**  THEN FOR 2000, WE HAVE FEBRUARY, MARCH,

15   THROUGH AUGUST, AND THEN DECEMBER; IS THAT CORRECT?              02:56

16         **MR. COREY:**  FEBRUARY, MARCH, APRIL, MAY, JUNE, JULY,

17   AUGUST, AND DECEMBER.

18         **THE COURT:**  ALL RIGHT.

19         AND THEN FOR 2001, WE HAVE BACKUP TAPES FOR JANUARY

20   THROUGH JULY?                                                   02:57

21         **MR. COREY:**  CORRECT -- FROM JANUARY AND JULY.

22         **THE COURT:**  JANUARY AND JULY.  OKAY.

23         SO FAR, THAT IS TOTALLY CONSISTENT WITH MY NOTES.

24         THEN WE HAVE A BACKUP TAPE FOR ALL OF 2002; CORRECT?

25         **MR. COREY:**  THAT'S CORRECT, YOUR HONOR.                   02:57

```
 1              THE COURT:  ALL RIGHT.

 2              AND THEN I HAVE HERE 2002 THROUGH THE PRESENT, WE

 3    HAVE BACKUP TAPES.  BUT YOU'RE TELLING ME THAT THAT'S NOT

 4    CORRECT?

 5              MR. COREY:  IF THAT'S WHAT THE COURT HAS IN ITS       02:57

 6    NOTES, THEN I MISSPOKE.

 7              THE COURT:  IT'S 2002 AND 2004 THAT WE HAVE BACKUP

 8    TAPES FOR; CORRECT?

 9              MR. COREY:  THAT'S CORRECT.

10              THE COURT:  NO OTHER YEARS?                           02:57

11              MR. COREY:  I BELIEVE THAT WE HAVE NOT DONE A

12    SEPARATE PRESERVATION FOR LITIGATION PURPOSES FOR ZEUS.  THERE

13    MAY BE OTHER BACKUP TAPES AFTER 2004 THAT MAY BE OUT THERE.

14              THE COURT:  SO FOR 2003, 2005, 2006, AND 2007, THERE

15    ARE NO BACKUP TAPES.  BUT, AGAIN, UNLESS SOMEBODY HAS DELETED   02:57

16    SOMETHING, YOU SHOULD HAVE, FROM JANUARY OF 1998 THROUGH THE

17    PRESENT, ACCESS TO WHATEVER IS ON ZEUS; CORRECT?

18              MR. COREY:  THAT'S CORRECT.

19              AND TO GIVE THE COURT A FRAME OF REFERENCE, IN, I

20    BELIEVE 1996, 1997, ZEUS WAS A STORAGE SYSTEM OF 100 GIGABYTES; 02:58

21    NOW IT'S AT 50 TERABYTES.  IT'S NOT A TRIVIAL STORAGE.

22              THE COURT:  THAT'S A LOT OF BYTES.

23              BASED ON WHAT MR. MOORE HAS JUST TESTIFIED TO, YOU

24    HAVE SENT OUT THIS ZEUS STORAGE TO AN OUTSIDE ENTITY AND THEY

25    ARE PRODUCING DOCUMENTS THAT ARE RESPONSIVE FROM THE ZEUS       02:58
```

 1   STORAGE FACILITY FOR THIS CASE; IS THAT CORRECT?

 2          **MR. COREY:**  THAT'S MY UNDERSTANDING, YOUR HONOR.

 3          I KNOW THAT THEY HAVE BEEN RESTORED.  THEY DON'T HAVE

 4   RESPONSIBILITY FOR PRODUCTION.

 5          **THE COURT:**  WELL, THEN, MAYBE SOMEBODY WHO IS                    02:58

 6   RESPONSIBLE FOR PRODUCTION CAN HELP ME OUT HERE.

 7          HAVE ALL OF THE DISCOVERY REQUESTS THAT HAVE COME

 8   FROM MGA AND CARTER BRYANT GONE TO THIS OUTSIDE SOURCE AND HAVE

 9   BEEN PART OF THE PRODUCTION?  CAN ANYBODY ANSWER THAT?

10          MR. ZELLER?                                                          02:59

11          **MR. ZELLER:**  I CAN PROBABLY BEST ADDRESS THAT.

12          THE SHORT ANSWER IS, NO, THAT'S NOT THE WAY IT

13   HAPPENS.

14          WE HAVE THE OUTSIDE VENDOR DO PARTICULAR KINDS OF

15   SEARCHES.  THERE ARE TREMENDOUS CHALLENGES, BY THE WAY, IN HOW       02:59

16   THE ZEUS SYSTEM IS SEARCHED, BECAUSE IT IS LARGELY GRAPHICAL

17   FILES.  SO IT'S NOT LIKE YOU CAN JUST GO IN AND SAY, 'EVERY

18   TIME THERE'S SOMETHING ABOUT BRATZ, GIVE IT TO ME.'  SO WE HAVE

19   TO COME UP WITH VARIOUS CRITERIA FOR THE VENDOR TO FOLLOW IN

20   EXTRACTING FILES FOR US TO REVIEW, WHICH IS WHAT THEY DO FROM       02:59

21   THOSE TAPES.  WE REVIEW THE DOCUMENTS THAT ARE PRODUCED TO US

22   BY THE VENDOR.  THIS STILL IS ONGOING.  WE HAVE BEEN DOING THIS

23   FOR SOME PERIOD OF TIME.  AND, YES, DOCUMENTS FROM THOSE

24   IMAGES, THOSE FILES, HAVE BEEN PRODUCED IN THIS CASE.

25          **THE COURT:**  I UNDERSTAND THAT.                                  02:59

1          BUT I JUST DON'T WANT THIS TO BE A SENSE OF

2    SPORADICALLY, DOCUMENTS HAVING BEEN PRODUCED.  I NEED TO HAVE

3    SOME ASSURANCE THAT THERE IS A COMPREHENSIVE -- TO THE EXTENT

4    THAT THERE ARE RESPONSIVE DOCUMENTS ON ZEUS, MGA IS ENTITLED TO

5    THEM.                                                          03:00

6          **MR. ZELLER:**  ABSOLUTELY, YOUR HONOR.  WE'VE MADE THAT

7    VERY CLEAR.  AND IT SO HAPPENS, ON A DOCUMENT MOTION THAT MGA

8    BROUGHT ON REPLY FOR THE FIRST TIME, THEY STARTED COMPLAINING

9    ABOUT ZEUS; AND THAT'S NOW IN FRONT OF JUDGE INFANTE.  WE'VE

10   MADE THE VERY POINTS, SOME OF THOSE THAT ARE RAISED HERE, WHICH  03:00

11   IS, YOU KNOW, 'HERE IS WHAT WE'RE DOING WITH ZEUS.'  SO THERE

12   IS TRANSPARENCY IN THAT WAY IN THE SEARCHES THAT WE'RE DOING

13   AND THE CHALLENGES THAT WE HAVE WITH RESPECT TO LOCATING THE

14   RIGHT DOCUMENTS OFF OF ZEUS, BECAUSE IT IS A CONSIDERABLY --

15   IT'S A MASSIVE SYSTEM.  THERE'S NO OTHER WAY OF PUTTING IT.     03:00

16   THERE ARE A LOT OF FILES.

17          WE'VE OFFERED THOSE TAPES SO IF THEY WANT TO SEARCH,

18   THEY'RE FREE TO DO IT.

19          **THE COURT:**  VERY WELL.

20          AND THEN WITH RESPECT TO THE E-MAILS, JUST TO MAKE      03:00

21   SURE MY NOTES ARE CLEAR HERE, OR MY UNDERSTANDING IS CLEAR, AS

22   OF APRIL OF 2005, ALL E-MAILS WERE BACKED UP?

23          **MR. QUINN:**  YES, YOUR HONOR.

24          **THE COURT:**  AND THAT STARTED, OR HAD THE EFFECT OF

25   BEGINNING, GOING BACK TO DECEMBER OF 2004, BECAUSE THOSE YET   03:01

1    HADN'T BEEN DELETED.

2            **MR. QUINN:**  YES, YOUR HONOR.

3            **THE COURT:**  AND THAT CONTINUES THROUGH THIS DAY?

4            **MR. QUINN:**  YES.

5            **THE COURT:**  COUNSEL, I'M GOING TO GIVE YOU THE LAST        03:01

6    WORD, BECAUSE IF I ACCEPT THESE REPRESENTATIONS, IT'S GOING TO

7    BE VERY DIFFICULT FOR THIS COURT TO COUNTENANCE THE SANCTION

8    THAT YOU'RE SEEKING, BECAUSE THEN IT BECOMES, TO MY WAY OF

9    THINKING, A PRODUCTION ISSUE AND NOT A PRESERVATION ISSUE.

10            WHAT I AM BEING TOLD -- AND I DON'T HAVE ANY EVIDENCE        03:01

11   THAT WOULD SUGGEST THAT THIS REPRESENTATION IS NOT ACCURATE --

12   IS THAT THE ZEUS SYSTEM IS ALIVE AND WELL; THAT THERE IS AN

13   OUTSIDE VENDOR WHO IS ABLE TO SEARCH AND OBTAIN DOCUMENTS FROM

14   IT, BASED ON CRITERIA.

15            NOW, IT MAY VERY WELL BE THAT THE WRONG CRITERIA ARE        03:02

16   BEING PUT IN; THE CRITERIA IS NOT FULLY RESPONSIVE TO ALL THE

17   REQUESTS THAT MGA IS MAKING; BUT THAT'S A PRODUCTION ISSUE TO

18   BE LITIGATED BEFORE JUDGE INFANTE; THAT IS NOT A PRESERVATION

19   ISSUE.

20            IF I ACCEPT THAT, AND I HAVE NO REASON NOT TO ACCEPT        03:02

21   THAT, THAT KIND OF ADDRESSES THE ZEUS CONCERN.

22            AS FAR AS THE E-MAIL ISSUE, IF I ACCEPT THE

23   REPRESENTATION THAT FROM DECEMBER OF 2004 TO THE PRESENT, WE

24   HAVE BACKED UP ALL E-MAIL AND THAT CONCERTED EFFORTS WERE MADE

25   PRIOR TO DECEMBER OF 2004 TO OBTAIN ANY RESPONSIVE E-MAILS --    03:02

1   MAYBE SOME HAVE SLIPPED THROUGH THE CRACKS, PERHAPS; BUT,

2   AGAIN, I DON'T HAVE THE QUANTUM OF EVIDENCE BEFORE ME TO

3   SUGGEST THAT E-MAILS WERE DELETED OR ANYTHING APPROACHING THE

4   LEVEL THAT WOULD BE REQUIRED FOR TERMINATING SANCTIONS.

5           AS FAR AS THE REMAINING CONTENTIONS, I HAVE SERIOUS          03:02

6   CONCERNS OR QUALMS ABOUT THE 30(B) WITNESS THAT WAS PUT FORWARD

7   IN TERMS OF YOUR RESPONSE.  IT'S NOT CLEAR TO ME THAT YOU EVER

8   GOT A 30(B) WITNESS ON THE ZEUS SYSTEM.  I UNDERSTAND THE

9   CLARIFICATIONS THAT WERE MADE BY MATTEL DURING THE DEPOSITION,

10  WHICH SUGGESTED THAT THIS WITNESS WASN'T HERE TO TESTIFY ON          03:03

11  ZEUS.  I ASSUME YOU MADE A REQUEST FOR THAT.  I DON'T KNOW WHY

12  YOU DIDN'T GET IT.  BUT, AGAIN, THAT'S NOT A PRESERVATION

13  ISSUE; THAT'S A PRODUCTION ISSUE, WHICH IS APPROPRIATELY TAKEN

14  UP BY A DISCOVERY MOTION.

15          AND THE LAST TWO ISSUES, THE PHONE RECORDS AND THE           03:03

16  TIME RECORDS, AGAIN, THERE IS NOT ANY EVIDENCE FOR ME TO FIND

17  THAT THERE WAS A WILLFUL DESTRUCTION OF EVIDENCE HERE.

18          MS. GLASER:  I'M NOT ASKING ON THE PHONE RECORDS,

19  JUST TO BE CLEAR, THE TELEPHONE RECORDS AND THE TIME RECORDS.

20  IF WE EVER GET TO TRIAL ON THIS, WE WILL DO WHAT WE --             03:03

21          THE COURT:  AND YOU WILL BE ENTITLED TO.

22          MS. GLASER:  BUT, YOUR HONOR, I WANT TO POINT OUT A

23  COUPLE OF THINGS.

24          THE COURT:  DO YOU UNDERSTAND MY THINKING, ANYWAY, IN

25  TERMS OF ZEUS?                                                     03:03

1          **MS. GLASER:**  I DO.  BUT I MUST TELL YOU, THE LEVEL OF

2    FRUSTRATION THAT WE ARE SUFFERING RIGHT NOW, BECAUSE

3    REPRESENTATIONS ARE MADE TO YOUR HONOR -- HOW WOULD WE KNOW?

4    HOW IN THE WORLD CAN WE -- WE HAVEN'T GOTTEN ANY DOCUMENTS FROM

5    ZEUS, I CAN TELL YOU THAT.  THEY HAVE NOT BEEN PROVIDED TO US.      03:04

6    IN FACT, WE WERE TOLD -- YOU KNOW WHAT?  ONCE WE WERE TOLD

7    THERE WERE ZEUS TAPES, THEN WE WERE TOLD THERE ARE NOT ZEUS

8    TAPES.  WE HAVEN'T GOTTEN ANY PRODUCTION.  AND IT'S A

9    MISREPRESENTATION TO THIS COURT.

10          CAN I PROVE IT TO YOU?  I WOULD BE ABLE TO PROVE IT      03:04

11   TO YOU.  I WILL EVENTUALLY BE ABLE TO PROVE IT TO YOU.  RIGHT

12   NOW I'M LISTENING FOR THE FIRST TIME THAT WE HAVE BEEN GIVEN

13   ZEUS DOCUMENTS FROM THE ZEUS TAPES.  I'M SAYING TO YOU, WE

14   DON'T BELIEVE WE HAVE; NOT ONE, NOT A LITTLE BIT, NOTHING.

15   THAT'S NUMBER ONE.                                                 03:04

16          NUMBER TWO, YOUR HONOR, IT IS NOT OKAY IN OUR SYSTEM

17   TO START PRESERVING E-MAILS AFTER YOU FILE A LAWSUIT.

18          I CAN'T PREDICT WHEN THEY'RE GOING TO FILE A LAWSUIT.

19   WE BELIEVE THEY DELIBERATELY DELAYED.  WE'RE NOT ASKING YOU TO

20   ACCEPT THAT TODAY.  BUT THEY SURE WAITED A LONG TIME.  AND THEY    03:05

21   DON'T HAVE ANY E-MAILS THAT THEY CAN PROVIDE TO YOUR HONOR.

22   THEY DO AN INVESTIGATION OF MR. BRAUR.  YOU CAN SEE IN OUR

23   TIMELINE.  I DON'T HAVE ANY E-MAILS FROM THAT PERIOD.  THEY DO

24   AN INVESTIGATION OF MEXICO.  THEY ARE URGING THE MEXICAN

25   GOVERNMENT TO GO AFTER FORMER EMPLOYEES OF THEIRS THAT NOW WORK    03:05

1    AT MGA.  THEY ARE DOING THAT.  I DON'T HAVE ANY E-MAILS.

2         **THE COURT:**  I DO HAVE THE TESTIMONY FROM MR. MOORE

3    THAT AS OF NOVEMBER OF 2003, THERE WAS AN EFFORT MADE; PERHAPS,

4    NOT AS GREAT AN EFFORT AS YOU WOULD LIKE TO HAVE SEEN, BUT

5    THERE WAS AN EFFORT MADE TO IDENTIFY WITNESSES.  35 OF THEM IS          03:05

6    THE NUMBER THEY HAVE OFFERED.  AND IT'S --

7         **MS. GLASER:**  THEY HAVEN'T OFFERED IT UNDER PENALTY OF

8    PERJURY, AND I'M NOT DOUBTING FOR A MOMENT --

9         **THE COURT:**  AND I'M NOT EITHER.

10        **MS. GLASER:**  I'M NOT ATTACKING THE INTEGRITY OF           03:05

11   MR. QUINN.  BUT I DO BELIEVE THAT WE'RE ENTITLED, AND I THINK

12   THE COURT IS ENTITLED, TO A VERY CLEAR DECLARATION UNDER

13   PENALTY OF PERJURY AS TO WHAT THEY'VE DONE WITH RESPECT TO

14   PRESERVING E-MAIL TESTIMONY.

15        AND, YOUR HONOR, IF I MIGHT, WE WOULD VERY MUCH         03:06

16   LIKE -- IF YOUR HONOR IS EVEN THINKING ABOUT NOT TERMINATING,

17   WHICH OBVIOUSLY YOU ARE, I WOULD VERY MUCH LIKE TO PROVIDE THE

18   COURT, AND COUNSEL, OF COURSE, AN OPPORTUNITY TO COMMENT ON A

19   JURY INSTRUCTION THAT WOULD GO TO THIS ISSUE, BECAUSE WE

20   THINK -- IT'S NOT JUST GAME PLAYING; WE THINK THAT THERE IS        03:06

21   UNRECOVERABLE EVIDENCE THAT WE WILL NEVER BE ABLE TO USE IN

22   THIS CASE THAT HAS CAUSED GREAT AND ONGOING DAMAGE TO MGA, AND

23   I'D LIKE TO AT LEAST HAVE THE OPPORTUNITY TO PROVIDE COUNSEL

24   AND YOUR HONOR WITH A LIMITING INSTRUCTION, BECAUSE THIS IS, IN

25   OUR VIEW, NOT ACCEPTABLE CONDUCT.          03:06

1      **THE COURT:**  YOU WILL HAVE THAT OPPORTUNITY, BUT NOW

2  IS NOT THE TIME TO BE DEALING WITH JURY INSTRUCTIONS.  THERE

3  ARE ALSO ALLEGATIONS THAT HAVE SURFACED THAT GO BOTH WAYS ON

4  THIS, AND I'M NOT GOING TO RESOLVE THOSE ISSUES UNTIL WE GET TO

5  THE PRETRIAL CONFERENCE.                                              03:06

6      WHAT I'M PRESENTED WITH RIGHT NOW IS THIS MOTION FOR

7  TERMINATING SANCTIONS, TO CALL THIS CASE TO AN END RIGHT NOW.

8  AND BASED ON THE RECORD BEFORE ME, FROM A RETENTION

9  PERSPECTIVE, I DO HAVE SERIOUS CONCERNS -- THE CONCERNS THAT

10  YOU'RE ARTICULATING NOW RELATE TOWARDS PRODUCTION.  YOU'RE       03:07

11  SAYING THAT WE DON'T HAVE ANY OF THESE DOCUMENTS; THAT WE

12  HAVEN'T RECEIVED ANYTHING.  WELL, THAT DOESN'T MEAN THAT THEY

13  HAVEN'T RETAINED WHAT THEY HAVE.

14      NOW, TWO, THREE MONTHS FROM NOW -- I'M NOT INVITING

15  THIS -- BUT TWO, THREE MONTHS FROM NOW IF IT TURNS OUT THAT      03:07

16  THEY HAVEN'T TURNED OVER ANYTHING FROM ZEUS, THAT THEY'RE NOT

17  ABLE TO GO BACK AND -- I'VE TRIED TO TAKE AS CAREFUL NOTES AS I

18  CAN -- IF THESE DON'T EXIST ANYMORE --

19      **MS. GLASER:**  WHAT DO WE DO ABOUT THE E-MAILS, YOUR

20  HONOR?  YOU CAN'T RECREATE THOSE IN TWO OR THREE MONTHS.         03:07

21      **THE COURT:**  YOU CAN'T RECREATE THOSE E-MAILS, BUT I

22  GUESS AT THE END OF THE DAY, I FIND THE NOVEMBER OF 2003 DATE

23  AS A REASONABLE DATE FOR THEM TO TAKE STEPS TO PRESERVE.  AND I

24  HAVE MR. MOORE'S TESTIMONY THAT THAT'S EXACTLY WHAT HE DID.

25      WOULD IT HAVE BEEN BETTER IF HE WOULD HAVE PREPARED       03:07

1  AN E-MAIL FOR GENERAL CIRCULATION TO ALL THE EMPLOYEES?  WOULD

2  IT HAVE BEEN BETTER IF HE WOULD HAVE DONE SOMETHING ELSE?

3       YES, PERHAPS.  BUT I HAVE NO REASON NOT TO BELIEVE

4  HIS TESTIMONY THAT THEY DID MAKE A GOOD FAITH EFFORT TO

5  IDENTIFY THOSE EMPLOYEES AND --                                   03:08

6       **MS. GLASER:**  THEN, YOUR HONOR, WHY DON'T WE HAVE ANY

7  BRAUR INVESTIGATION E-MAILS?  WHY DON'T WE HAVE ANY MEXICO

8  E-MAILS?  WE DON'T HAVE ANY OF THESE DOCUMENTS.  THIS IS NOT --

9  WE'RE NOT MAKING THIS UP.  WE DON'T HAVE THESE E-MAILS, AND WE

10  WILL NEVER HAVE THESE E-MAILS.                                    03:08

11      **THE COURT:**  I DON'T KNOW WHY YOU DON'T HAVE THAT.  I

12  CAN'T OFFER THAT EXPLANATION.  I DON'T KNOW IF THOSE E-MAILS

13  EXISTED TO BEGIN WITH.

14      **MS. GLASER:**  YOUR HONOR, I GUESS WE CAN HAVE A

15  REPRESENTATION UNDER PENALTY OF PERJURY, JUST LIKE, AS I THINK    03:08

16  YOUR HONOR -- I WOULD ASK YOU, AT LEAST AT THE VERY MINIMUM, WE

17  OUGHT TO GET SOMETHING UNDER PENALTY OF PERJURY ABOUT WHAT

18  THEY'VE DONE TO PRESERVE EVIDENCE PRIOR TO THEM HAVING A BACKUP

19  SYSTEM FOR THEIR E-MAILS IN APRIL OF 2005.

20      YOUR HONOR, I THINK WE'RE AT LEAST ENTITLED TO THAT,          03:08

21  AND I THINK YOUR HONOR IS ENTITLED TO THAT.  THERE HAS TO BE

22  SOME SANCTITY IN THE SYSTEM.

23      **THE COURT:**  MR. QUINN, I TEND TO AGREE; ALTHOUGH I

24  THINK IT'S GOING TO BE A MUTUAL REQUIREMENT.

25      **MR. QUINN:**  THE MEXICAN -- THE E-MAILS RELATING TO        03:09

1    MGA'S MEXICAN EMPLOYEES -- AND BY THE WAY, THOSE WOULD BE THE

2    EMPLOYEES THAT THE MEXICAN COURT, JUST WITHIN THE LAST FEW

3    DAYS, HAS ORDERED TO BE ARRESTED.

4           **MS. GLASER:**  THIS IS MISREPRESENTATION.

5           **THE COURT:**  MR. QUINN, THAT WAS NOT NECESSARY.                03:09

6    PLEASE.  WE DON'T NEED THAT.

7           **MR. QUINN:**  ALL RIGHT.

8           EXHIBIT C TO THE COMPLAINT, THE ATTACHED E-MAILS

9    RELATING TO THOSE MGA MEXICAN EMPLOYEES' ACTIVITIES -- I DON'T

10   KNOW -- IT'S VERY HARD FOR US TO SIT HERE AND LISTEN -- WE       03:09

11   FILED A SUPPLEMENTAL DECLARATION.  ORDER AFTER ORDER AFTER

12   ORDER HAS BEEN ENTERED AGAINST MGA, COMPELLING DISCOVERY.

13   JUDGE INFANTE FOUND THAT THEY DELIBERATELY, WILLFULLY,

14   FLAGRANTLY VIOLATED HIS ORDER IN REFUSING TO PRODUCE A WITNESS

15   TO TESTIFY ON DOCUMENT PRESERVATION, AND WE HAVE TO SIT HERE     03:09

16   AND LISTEN TO THIS.  THIS IS NOW, AT THIS POINT, A WITCH-HUNT.

17   THEY MADE A MOTION FOR TERMINATING SANCTIONS.  THEY HAVE

18   ABSOLUTELY NO BASIS FOR THAT.

19          YOUR HONOR, IN MY VIEW, THIS MOTION SHOULD NEVER HAVE

20   BEEN BROUGHT.  THE COURT SAID, "WHY IS THIS BEFORE ME?"  WE      03:10

21   TOLD THEM, "YOU WANT THE TAPES, YOU CAN HAVE THE TAPES."  WE

22   TOLD THEM.

23          **THE COURT:**  AND YOU ARE PREPARED TO PROVIDE TO

24   COUNSEL THE CRITERIA THAT YOU'RE USING TO DETERMINE WHICH

25   REQUESTS GO TO THIS OUTSIDE VENDOR WHO'S ABLE TO --             03:10

1          **MR. QUINN:**  BY THE WAY, THEY WON'T GIVE US ANY OF

2     THAT INFORMATION.

3          **MR. ZELLER:**  I MEAN, WE'RE CERTAINLY HAPPY TO TALK

4     WITH THEM ABOUT THAT, YOUR HONOR.  I THINK IT DOES HAVE TO BE A

5     TWO-WAY STREET IN TERMS OF WHAT THE PARTIES HAVE, IN DEPOSITION        03:10

6     SO FAR -- AND IT HAS BEEN ON BOTH SIDES -- HAVE SAID THAT THE

7     PARTICULAR SEARCH CRITERIA, THE THINGS THAT PEOPLE ARE TOLD,

8     THOSE ARE ATTORNEY-CLIENT COMMUNICATIONS AND, THEREFORE,

9     PRIVILEGED, OR IN SOME INSTANCES, WORK PRODUCT.  SO THOSE

10    ISSUES NEED TO BE DISCUSSED BY THE PARTIES AND POTENTIALLY            03:11

11    RESOLVED.

12          BUT, YOU KNOW, I DON'T THINK IT'S FAIR THAT WE WOULD

13    HAVE TO SAY, 'HERE, WE'RE GOING TO GIVE THEM ALL OF THE

14    CRITERIA,' WITHOUT GETTING THAT IN RETURN.

15          **THE COURT:**  I AGREE.  IT'S GOING TO BE MUTUAL.              03:11

16          **MR. QUINN:**  ESPECIALLY SINCE WE'VE OFFERED, YOUR

17    HONOR, TO GIVE THEM THE TAPES.  THEY CAN RUN ANY CRITERIA THEY

18    WANT.

19          **MS. GLASER:**  TWO THINGS:  IT IS ENORMOUSLY EXPENSIVE

20    TO GO THROUGH THE ZEUS TAPES, AND THAT'S AN EXPENSE THAT             03:11

21    CLEARLY MATTEL SHOULD HAVE TO BEAR.

22          BUT THE OTHER THING:  WE HAVEN'T SENT A DIRECTIVE

23    AROUND SAYING, 'PRESERVE THIS BUT NOT THIS.'  WE'VE ASKED

24    EVERYBODY TO PRESERVE EVERYTHING.  WE'RE NOT HIDING THAT.

25    THERE'S NO CRITERIA THAT'S OUT THERE.  WE'VE ASKED THEM TO           03:11

1    PRESERVE EVERYTHING.

2           **THE COURT:**  WHEN THE COURT SPEAKS ABOUT CRITERIA,

3    THERE IS A LOT ON THOSE ZEUS TAPES.  MATTEL DOES A LOT MORE

4    THAN JUST MATTERS RELATED TO BRATZ, OR WHATEVER.  THEY'VE GOT

5    BARBIE; THEY'VE GOT ALL KINDS OF DIFFERENT THINGS GOING THAT        03:11

6    ARE PRESUMABLY ON THESE ZEUS TAPES; SO THE CRITERIA THAT I'M

7    TALKING ABOUT IS WHAT CRITERIA ARE USED TO --

8           **MS. GLASER:**  THAT'S IN CONNECTION WITH ZEUS.

9           **THE COURT:**  RIGHT.

10          **MS. GLASER:**  WITH RESPECT TO E-MAILS --                  03:12

11          **THE COURT:**  LET'S NOT MIX THESE THINGS.

12          **MS. GLASER:**  -- WE'VE ASKED PEOPLE TO PRESERVE

13   EVERYTHING.  THEY HAVE NOT ASKED THEM TO PRESERVE EVERYTHING.

14   THEY HAVE CRITERIA THAT WE ARE JUST LEARNING ABOUT TODAY.

15          **THE COURT:**  AND I DON'T DISAGREE WITH THE PRACTICE OF     03:12

16   NOT PRESERVING EVERY E-MAIL.  I DON'T THINK MATTEL HAS TO

17   PRESERVE EVERY E-MAIL THAT'S GENERATED BY MATTEL.

18          **MS. GLASER:**  BUT, YOUR HONOR, THEY SHOULD HAVE TO,

19   AND WE ASKED THEM -- YOU KNOW WHAT?  DON'T PRESERVE EVERY

20   E-MAIL.  HOW ABOUT GIVING US THE LIST OF KEY PERSONNEL THAT ARE     03:12

21   WITNESSES THAT YOU'VE IDENTIFIED IN THIS CASE AS WITNESSES AND

22   PRESERVE THEIR E-MAIL FROM THE BEGINNING OF TIME?

23          THEY HAVEN'T EVEN DONE THAT.

24          AND WHEN WE PUSHED THEM ON THAT -- BECAUSE THE

25   INITIAL RESPONSE WAS, 'IT'S TOO EXPENSIVE, AND WE'LL CRASH THE      03:12

```
 1   SYSTEM IF WE TRY TO PICK OUT CERTAIN PEOPLE.'
 2           AND THEN WE LEARN FROM THEIR 30(B)(6) WITNESS, 'YES,
 3   YOU CAN DO THAT, AND IT WON'T HARM THE SYSTEM.  IT'S TIME
 4   CONSUMING, BUT IT WON'T HARM THE SYSTEM.'
 5           WE'RE NOT BEING TOLD THE SAME THING BY THEIR          03:12
 6   PURPORTED REPRESENTED, PUSH-FORWARD, 30(B)(6) WITNESSES AND THE
 7   LAWYERS.
 8           THAT'S GOT TO STOP.
 9           THE COURT:  WHAT I WANT FROM BOTH PARTIES IS TWO
10   SINGULAR DECLARATIONS, UNDER PENALTY OF PERJURY, SETTING FORTH   03:13
11   EXACTLY THE PRESERVATION POLICIES.  I WANT IT FROM MGA.  I WANT
12   IT FROM MATTEL.  AND I DON'T WANT TO JUST HEAR ABOUT 35
13   WITNESSES.  I WANT TO KNOW WHO THOSE 35 PEOPLE ARE.  I DON'T
14   WANT TO HEAR JUST ABOUT 'WE WERE ASKED TO SAVE EVERYTHING,'
15   BECAUSE OBVIOUSLY, MGA IS NOT SAVING EVERY E-MAIL IN THEIR       03:13
16   ENTIRE COMPANY.  YOU'VE GOT CRITERIA AS WELL.
17           MS. GLASER:  (INAUDIBLE.)
18           THE COURT:  YOU'RE SAVING EVERY E-MAIL?
19           FAIR ENOUGH.  IF THAT'S WHAT YOU'RE DOING, THAT'S
20   WHAT YOU'RE DOING.                                              03:13
21           MR. QUINN:  SO ARE WE, YOUR HONOR.  ALL THE BACKUP
22   TAPES --
23           THE COURT:  NOW EVERYTHING IS BEING BACKED UP?
24           MR. QUINN:  EVERY SINGLE ONE.
25           SO IF WE'RE GOING TO IDENTIFY THE PEOPLE WE SPOKE TO,   03:13
```

```
 1   I ASSUME MGA IS ALSO GOING TO IDENTIFY THE PEOPLE THEY SPOKE

 2   TO.

 3            THE COURT:  I'M ONLY ASKING FOR YOU TO IDENTIFY TO

 4   THE EXTENT THAT YOU LIMITED THE RETENTION TO THOSE INDIVIDUALS.

 5   IF THEY'RE DOING IT FOR EVERY EMPLOYEE, THEN THEY DON'T HAVE TO      03:14

 6   DO THAT.  IF YOU'RE DOING IT FOR EVERY EMPLOYEE AT MATTEL, THEN

 7   YOU DON'T HAVE TO DO IT.

 8            IF YOU ARE LIMITING OR SETTING CRITERIA, THEN I WANT

 9   TO KNOW WHO THOSE ARE, JUST FOR FUTURE REFERENCE.  I WANT THIS

10   FOR NO OTHER REASON THAN FOR ANY FUTURE DISPUTES THAT COME UP       03:14

11   SO THAT I'VE GOT A CLEAR, SINGULAR DOCUMENT THAT I CAN USE AS

12   REFERENCE TO LOCK BOTH SIDES IN.

13            MS. GLASER:  THANK YOU, YOUR HONOR.

14            THE COURT:  DO YOU UNDERSTAND WHAT I'M ASKING FOR,

15   MR. QUINN?                                                          03:14

16            MR. QUINN:  WHAT I'M HEARING, YOUR HONOR, IS -- THE

17   COURT'S REALLY GOING BACK -- IN TERMS OF IDENTIFYING PEOPLE WHO

18   WERE SPOKEN TO AND GIVEN THIS DIRECTION, THE COURT IS REALLY

19   GOING BACK TO THE NOVEMBER 2003 TIME FRAME AND WANTS TO KNOW,

20   WHO ARE THOSE INDIVIDUALS.                                          03:14

21            THE COURT:  BASICALLY, IT SOUNDS LIKE, FROM MATTEL'S

22   PERSPECTIVE, THERE WERE TWO CRITICAL PERIODS:  NOVEMBER OF

23   2003, WHEN 35 OR SO INDIVIDUALS WERE IDENTIFIED AND WERE GIVEN

24   CERTAIN INSTRUCTIONS -- I WANT TO KNOW WHO THOSE 35 INDIVIDUALS

25   WERE, APPROXIMATELY, AND WHAT THOSE INSTRUCTIONS WERE; AND THEN     03:14
```

1    IN APRIL OF 2005.  THAT'S APPARENTLY WHEN YOU HAD THE MORE

2    GENERAL DIRECTIVE THAT WENT OUT.  I WANT TO KNOW THE PARAMETERS

3    AND SCOPE OF THAT DIRECTIVE.

4            **MR. QUINN:**  RIGHT.

5            **THE COURT:**  SIMILARLY, FROM MGA, I WANT TO KNOW WHAT          03:15

6    MGA HAS DONE.

7            **MS. GLASER:**  AND, YOUR HONOR, COULD WE INCLUDE IN THE

8    CRITERIA WHEN THEY WERE TOLD WHAT TO PRESERVE AND WHAT THEY

9    WERE TOLD TO PRESERVE?

10           **THE COURT:**  I'M USING NOVEMBER OF 2003 -- I SUSPECT          03:15

11   THE DECLARATION WILL GIVE ME A MORE SPECIFIC TIME FRAME.

12           **MR. QUINN:**  AND I ASSUME THAT WOULD BE RECIPROCAL AS

13   WELL.

14           **MS. GLASER:**  I UNDERSTAND.

15           **THE COURT:**  OKAY.  VERY WELL.

16           **MS. GLASER:**  WHEN WOULD YOU LIKE THOSE?

17           **THE COURT:**  LET'S SAY A WEEK.

18           IS THAT POSSIBLE?

19           **MS. GLASER:**  HOW ABOUT TWO WEEKS, YOUR HONOR?

20           **THE COURT:**  TWO WEEKS?                                       03:15

21           **MR. QUINN:**  TWO WEEKS IS FINE.

22           **THE COURT:**  TWO WEEKS FROM TODAY.  TODAY IS THE 27TH.

23   LET'S HAVE THIS IN BY THE 10TH OF SEPTEMBER.

24           **MS. GLASER:**  YOUR HONOR, CAN WE ASK ONE MORE

25   QUESTION?                                                               03:15

1          **THE COURT:**  YES.

2          **MS. GLASER:**  IS IT POSSIBLE, YOUR HONOR -- AND I SAY

3    THIS AS RESPECTFULLY AS I CAN -- TO THE EXTENT YOU DENY THIS

4    MOTION, WOULD YOU BE WILLING TO CERTIFY FOR APPEAL?  THAT'S HOW

5    STRONGLY WE FEEL ABOUT IT.  AND I UNDERSTAND WHATEVER YOU MAY        03:16

6    DECIDE -- AT LEAST I BELIEVE YOU'RE TAKING IT UNDER SUBMISSION.

7          BUT WOULD YOU BE WILLING TO CERTIFY FOR APPEAL?

8          **THE COURT:**  WELL, COUNSEL, I DON'T THINK I'M WILLING

9    TO TAKE THIS UNDER SUBMISSION.  I REALLY, AT THE END OF THIS

10   HEARING, I DON'T -- I DON'T HAVE A BASIS BEFORE ME, ASSUMING         03:16

11   THAT THESE REPRESENTATIONS ARE WHAT THEY ARE AT THIS POINT, TO

12   TERMINATE THIS CASE.

13         **MS. GLASER:**  THEN MAY I ASK, YOUR HONOR,

14   RESPECTFULLY, IF YOU WOULD MIND -- WOULD YOU PLEASE CERTIFY

15   THAT FOR APPEAL SO THAT WE COULD TAKE AN IMMEDIATE APPEAL FROM        03:16

16   IT?

17         **THE COURT:**  WE'RE NOT GOING TO DELAY THIS CASE LIKE

18   THAT, COUNSEL.

19         **MS. GLASER:**  I'M NOT ASKING YOU TO DELAY IT.  I'M NOT

20   ASKING FOR A STAY.  I DIDN'T ASK THAT.  I WOULD LIKE TO BE ABLE       03:16

21   TO APPEAL THIS PARTICULAR ORDER.  I WOULDN'T ASK FOR A STAY.

22         **MR. QUINN:**  THERE'S A PROCEDURE TO BRING A MOTION.

23         **THE COURT:**  GO AHEAD.  YOU MAY MAKE YOUR APPLICATION,

24   COUNSEL.  I'M NOT GOING TO TAKE THAT ORALLY.

25         THE COURT HAS --                                               03:16

1          MS. GLASER:  I WANT TO BE CLEAR WITH YOUR HONOR.

2   WE'RE NOT INTERESTED IN DELAY AT ALL, BUT WE DO THINK THIS IS A

3   BIGGER ISSUE THAN, RESPECTFULLY, THE COURT DOES; AND I

4   APPRECIATE THAT.

5          THE COURT:  AND IT'S NOT THAT I DON'T TAKE THIS ISSUE          03:17

6   SERIOUSLY, COUNSEL.  IT'S JUST THAT AT THE END OF THE DAY, I

7   JUST DON'T THINK THERE'S THE EVIDENCE BEFORE ME TO MAKE THE

8   FINDING THAT YOU WANT.

9          YOU'RE ASKING ME TO TERMINATE A CASE, A SUBSTANTIAL

10  CASE, BASED ON FAILURE TO PRESERVE.  THAT'S WHAT YOU TOLD ME,          03:17

11  DURING THE COURSE OF THIS HEARING, WAS THE ISSUE.

12         MS. GLASER:  YES, YOUR HONOR.

13         JUST SO I'M CLEAR, COULD YOUR HONOR AT LEAST WAIT TO

14  RULE UNTIL YOU GET THESE SUPPLEMENTAL DECLARATIONS?

15         THE COURT:  FAIR ENOUGH.          03:17

16         MR. QUINN:  IN VIEW OF THE PROSPECT THAT COUNSEL

17  INDICATES THEY MAY WANT TO TAKE THIS TO ANOTHER LEVEL, I'D ASK

18  THAT THE COURT RULE ON THE EVIDENTIARY OBJECTIONS THAT WE MADE

19  JUST FOR THE RECORD.

20         MS. GLASER:  IN THAT REGARD, THERE WERE -- I GUESS          03:17

21  YOU'D CALL THEM DECLARATIONS, BUT, THE SURREBUTTAL.  I'M

22  ASSUMING EITHER YOU'LL GIVE US AN OPPORTUNITY TO RESPOND TO

23  THOSE OR YOU WILL DISCOUNT THEM AND NOT CONSIDER THEM FOR

24  PURPOSES OF YOUR DECISION.

25         THE COURT:  LET ME TALK ABOUT SOMETHING ELSE FOR A          03:18

JULY 24, 2006          ED CV 04-09049

```
 1   MOMENT.

 2              THERE HAS BEEN A VOLUMINOUS AMOUNT OF DOCUMENTS FILED

 3   UNDER SEAL, A HUGE AMOUNT OF DOCUMENTS FILED UNDER SEAL.  AND

 4   THE COURT HAS READILY ACCEPTED THE REPRESENTATIONS OF COUNSEL

 5   THAT THE DOCUMENTS INCLUDE INFORMATION THAT'S GOVERNED BY THE       03:18

 6   PROTECTIVE ORDER.

 7              THERE WILL COME A DAY, PRIOR TO TRIAL, IN WHICH THE

 8   COURT PLANS TO REVISIT THOSE ORDERS AND WILL IMPOSE UPON

 9   COUNSEL AN OBLIGATION TO GO THROUGH THOSE DOCUMENTS AND

10   DETERMINE WHAT TRULY NEEDS TO REMAIN UNDER SEAL DURING THE          03:18

11   COURSE OF THE TRIAL AND WHAT DOESN'T.

12              I ONLY MENTION THAT NOW, MANY MONTHS BEFORE THE

13   TRIAL, SO YOU CAN START THINKING ABOUT HOW YOU WANT TO APPROACH

14   THAT ISSUE.

15              BUT RIGHT NOW, WE HAVE HAD LITERALLY FEET AND FEET       03:19

16   AND FEET OF PAPER PLACED UNDER SEAL; AND AT THE END OF THE DAY,

17   WE'RE NOT GOING TO HAVE A DOCKET DOWNSTAIRS THAT IS ALL SEALED

18   UP IN THAT MATTER.  THERE'S A VERY HEAVY PRESUMPTION TOWARDS AN

19   OPEN AND PUBLIC TRIAL, AND ONLY THOSE PARTICULAR PORTIONS OF

20   DOCUMENTS THAT ARE CONFIDENTIAL OR THAT ARE TRADE SECRETS ARE       03:19

21   GOING TO REMAIN UNDER SEAL AS WE PROCEED THROUGH THIS.  SO BE

22   THINKING ABOUT THAT NOW.

23              I WILL CONTINUE TO GIVE COUNSEL A GREAT DEGREE OF

24   LATITUDE AS WE GO THROUGH THIS DISCOVERY PROCESS, BUT AT THE

25   END OF THE DAY, I SUSPECT THERE'S GOING TO BE VERY LITTLE WHICH     03:19
```

```
 1   IS ACTUALLY GOING TO BE UNDER SEAL.

 2         I'LL ISSUE A MINUTE ORDER DIRECTING FURTHER

 3   PROCEEDINGS IN THIS MATTER, BUT BE WORKING ON THIS DECLARATION.

 4         MS. GLASER:  THANK YOU, YOUR HONOR.

 5         MR. QUINN:  THANK YOU, YOUR HONOR.              03:19

 6         THE COURT:  GOOD DAY, COUNSEL.

 7

 8

 9

10

11                      CERTIFICATE

12

13   I hereby certify that pursuant to section 753, title 28, united
     states code, the foregoing is a true and correct transcript of
14   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
15   conformance with the regulations of the judicial conference of
     the united states.

16

17   _____        _____
     THERESA A. LANZA, CSR, RPR                    Date
18   FEDERAL Official COURT Reporter

19

20

21

22

23

24

25
```