1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3                     EASTERN DIVISION

4                          - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6

7    MATTEL, INC.,                      )
                                        )
8                       Plaintiff,      )
                                        )
9              vs.                      )  No. CV 04-09049
                                        )
10   MGA ENTERTAINMENT, INC., ET. AL.,  )
                                        )
11                      Defendants.     )
     _____)  Status Hearing
12   AND CONSOLIDATED ACTIONS,          )
     _____)
13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 Riverside, California

17             Tuesday, September 22, 2009

18                     10:19 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
               Federal Official Court Reporter
24              3470 12th Street, Rm. 134
               Riverside, California  92501
25                    951-274-0844
                 WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2   ON BEHALF OF MATTEL, INC.:

 3                        QUINN EMANUEL
                          By:  JOHN QUINN
 4                             MICHAEL T. ZELLER
                               B. DYLAN PROCTOR
 5                        865 S. Figueroa Street,
                          10th Floor
 6                        Los Angeles, California  90017
                          213-624-7707
 7

 8   ON BEHALF OF MGA ENTERTAINMENT/ISAAC LARIAN:

 9                        ORRICK, HERRINGTON & SUTCLIFFE, LLP
                          BY:  ANNETTE L. HURST
10                        BY:  WARRINGTON S. PARKER III
                          BY:  WALTER F. BROWN, JR.
11                        405 Howard Street
                          San Francisco, California  90071-3144
12                        213-687-5000

13                        ORRICK, HERRINGTON & SUTCLIFFE, LLP
                          BY:  WILLIAM A. MOLINSKI
14                        405 777 South Figueroa Street,
                          Suite 3200
15                        Los Angeles, California  90017-5855
                          213-612-2256
16

17   ON BEHALF OF SKADDEN ARPS:

18                        SKADDEN, ARPS, SLATE
                           MEAGHER & FLOM, LLP
19                        BY:  THOMAS J. NOLAN
                          BY:  JASON D. RUSSELL
20                        300 South Grand Avenue
                          Los Angeles, California  90071
21                        213-687-5250

22

23

24   /  /  /

25   /  /  /
```

Tuesday, September 22, 2009                              Status Hearing

```
 1   APPEARANCES (continued):

 2

 3   ON BEHALF OF DEFENDANT GUSTAVO MACHADO:

 4                         OVERLAND BORENSTEIN SCHEPER & KIM LLP
                           BY:  ALEXANDER H. COTE
 5                         601 West Fifth Street,
                           12th Floor
 6                         Los Angeles, California  90071
                           213-613-4660
 7

 8
     ON BEHALF OF O'MELVENY & MEYERS:
 9
                           GIBSON, DUNN & CRUTCHER, LLP
10                         BY:  J. CHRISTOPHER JENNINGS
                           333 South Grand Avenue
11                         Los Angeles, California  90071-3197
                           213-229-7836
12

13
     Also present:         Richard de Anda
14

15

16

17

18

19

20

21

22

23

24

25
```

Tuesday, September 22, 2009                              Status Hearing

# **I N D E X**

Page

Proceedings..................................    5

EXHIBITS              RECEIVED

3                    29
7                    48
2                    66
4                    66

```
 1      Riverside, California; Tuesday, September 22, 2009; 10:19 A.M.

 2                              -oOo-

 3          THE CLERK:  Calling Item Number 1 on calendar,

 4   Case Number CV 04-09049-SGL, Mattel, Inc., versus

 5   MGA Entertainment, Inc.                                          03:47

 6          Counsel, please come forward and state your

 7   appearances for the record.

 8          MR. QUINN:  John Quinn, Mike Zeller, Dylan Proctor

 9   for Mattel.

10          MS. HURST:  Annette Hurst, Warrington Parker, and      10:19

11   Bill Molinski for MGA parties.

12          THE COURT:  Good morning to you all.

13          MR. JENNINGS:  Chris Jennings from Gibson, Dunn &

14   Crutcher for O'Melveny & Meyers.

15          MR. COTE:  Alexander Cote from Scheper, Kim &          10:19

16   Overland for counter-defendant Gustavo Machado.

17          MR. RUSSELL:  Jason Russell, Tom Nolan, Jose Allen,

18   for Skadden Arps.

19          THE COURT:  Good morning to you all.

20          We're on calendar this morning for a status           10:19

21   conference on various matters.  The Court issued two orders,

22   one on August 31st, and part of that was the Order to Show

23   Cause concerning a matter on the attorney-client privilege log,

24   and then the other was an order on September 3rd asking

25   Mr. Richard de Anda to come in from the Mattel office.  The    10:19
```

```
 1    Court wants to resolve these two issues, if possible, today.
 2            We're going to be conducting a portion of this
 3    hearing here in the courtroom, we're going to be conducting a
 4    portion of this hearing in camera in chambers; so we'll have
 5    some musical chairs to conduct.  I see there's already been          10:20
 6    some musical chairs.  I guess we've resolved which side we're
 7    sitting on now.
 8            MS. HURST:  I don't think we have, your Honor, but...
 9            THE COURT:  I'm going to put that dispute in the same
10    category as the hotel dispute and just kind of defer that at        10:20
11    this time.  I've referred to this case for some period of time
12    as Mattel versus MGA.  When we consolidated, I think there was
13    some indication that that would be the title of it.  Then I
14    started looking at the Court's own orders and, just for
15    example, the August 31st order I titled this as Carter Bryant      10:20
16    versus Mattel and on September 3rd, I entitled this as Mattel
17    versus MGA.  We have multiple default things which print up the
18    minute orders, and depending which one we use, it comes up
19    accordingly.  I certainly cannot fault anyone for that.  That's
20    going to have to await wiser minds to decide who should sit        10:21
21    where.  What I will try to resolve today are these two issues
22    that the Court has brought up.
23            Let's begin with the issue with respect to the e-mail
24    that was sent that MGA submitted to the Court concerning
25    Mr. de Anda and the Canadian law enforcement officials.            10:21
```

```
 1              I trust Mr. De Anda is present today.

 2         MR. QUINN:  Yes, he is, Your Honor.

 3         THE COURT:  Okay.

 4         MGA has raised concerns about this.  It's unclear

 5  what -- Mr. Zeller made a proffer at the last hearing        10:21

 6  concerning what was done, but I think even Mr. Zeller wasn't

 7  exactly sure what all that was; so I thought the best way is to

 8  have Mr. de Anda come down and explain what happened.

 9         MR. QUINN:  Mr. De Anda is here, Your Honor.

10         THE COURT:  Mr. Quinn, since he is an officer of       10:22

11  Mattel, I'll give you the first opportunity, if you wish to

12  have Mr. de Anda come up and you can directly examine him.  If

13  you would prefer to have MGA go first with their examination,

14  that's fine.  But since it's your witness...

15         MR. QUINN:  I'd be pleased to do a direct               10:22

16  examination, Your Honor.

17         THE COURT:  Why don't you do that, and then MGA can

18  conduct a cross-examination.

19         Is that okay?

20         MS. HURST:  Thank you, your Honor.                      10:22

21         THE COURT:  All right.  That's how we're going to do

22  it.

23         THE CLERK:  Do you solemnly state that the testimony

24  you may give in the cause now pending before this court shall

25  be the truth, the whole truth, and nothing but the truth, so
```

```
 1    help you God?
 2                THE WITNESS:  Yes, I do.
 3                THE CLERK:  Please state your full name and spell
 4    your last name for the record.
 5                THE WITNESS:  Richard de Anda, d-e-A-n-d-a.      10:22
 6                          DIRECT EXAMINATION
 7    BY MR. QUINN:
 8    Q    Mr. de Anda, are you presently employed by Mattel?
 9    A    Yes.  I'm employed as a consultant.
10    Q    And are you an employee in that capacity, or do you act as  10:23
11    a contractor?
12    A    As a contractor.
13    Q    And at what point did you cease to be a Mattel employee?
14    A    Last December.
15    Q    In 2006 were you a Mattel employee?              10:23
16    A    Yes.
17    Q    What position did you hold at that time?
18    A    I was the vice president of global security and
19    investigations.
20    Q    In 2006 did you become involved in an investigation in   10:23
21    Canada relating to a former Mattel employee by the name of
22    Janine Brisbois?
23    A    Yes.
24    Q    Can you tell us just briefly what that investigation
25    concerned.                                            10:23
```

1    A    Yes; the theft of intellectual property from Mattel.

2    Q    How did you first learn about this issue regarding

3    Ms. Brisbois?

4    A    I believe I was contacted by either Jeff Massingberd,

5    who's the general manager of Mattel Canada, or Alberto Morales,    10:24

6    who's the HR representative for that area, and had informed me

7    that the employee was leaving for a competitor, MGA, at the

8    time.

9    Q    And did you learn anything about -- you say theft of

10   intellectual property.  What are you referring to?    10:24

11   A    I'm referring to confidential files or files that are

12   proprietary to Mattel.  What transpired is that we seized the

13   employee's computer and had an external company do an analysis.

14   We had determined that files had been downloaded that were

15   proprietary to Mattel upon her -- during her notice of leaving    10:24

16   for a competitor.

17   Q    As head of security at the time, did you have anything to

18   do with following up on this report?

19   A    Yes.

20   Q    What was your involvement in the followup?    10:25

21   A    What had happened -- while I was in east Aurora, New York,

22   after the initial investigation was completed, we had

23   determined that information had been taken.  I was in contact

24   with the Peel Regional Police Department in Toronto where the

25   Mattel Canada facility is based and I had contacted them and    10:25

Tuesday, September 22, 2009                         Status Hearing

```
 1    told them that I would like to meet with them.
 2              While in east Aurora on an unrelated matter, I
 3    received a phone call and we set up to arrange a spontaneous
 4    meeting.  I proceeded to the Peel Police Department to present
 5    the evidence that I had at the time.                              10:25
 6    Q    And this was in Toronto.
 7    A    Yes.
 8    Q    What was your purpose in going there to present evidence?
 9    A    To show them that a crime had been committed.
10    Q    And were you looking for them to do something?              10:26
11    A    Yes; to followup and investigate the crime and to
12    determine if it warranted prosecution or not.
13    Q    Had you had any previous contact with anyone who was at
14    the Peel Police Department prior to this?
15    A    Yes.                                                        10:26
16    Q    Who was that?
17    A    Well, probably two decades prior, I had a murder case that
18    involved the Peel Police Department.  And I believe we have had
19    other issues in that area where Mattel has filed crime reports
20    with the local Peel Police Department.                           10:26
21    Q    This episode, the two decades earlier, you were not at
22    Mattel at that time.
23    A    No, I was not.
24    Q    What was your position then?
25    A    I was managing a homicide unit for the Los Angeles Police   10:26
```

```
 1   Department.

 2   Q    And was there an individual there at the Peel Police

 3   Department who you knew based on your prior contact?

 4   A    Yes.

 5   Q    Do you recall that person's name?                        10:27

 6   A    I only recall his first name as Ron.

 7   Q    Based on your prior contacts with Ron and anyone else at

 8   the Peel Police Department, did you have any reason to think

 9   that anyone in that department could be corrupted by gifts?

10        MS. HURST:  Objection.  Leading; argumentative.          10:27

11        THE COURT:  Sustained.

12        Rephrase.

13   BY MR. QUINN:

14   Q    Had anything at all come to your attention concerning the

15   reputation of that police department in your dealings with    10:27

16   them?

17   A    No.  None whatsoever.

18   Q    Had you ever had any untoward incidents in your dealings

19   with the police department?

20        MS. HURST:  Objection.  Leading; argumentative.          10:27

21        THE COURT:  Sustained.

22   BY MR. QUINN:

23   Q    So you proceeded to the Peel Police Department in Toronto.

24        What happened?

25   A    I was introduced -- well, if I may, prior to, I had      10:28
```

```
 1   communications with a detective by the name of Rodney Jones,

 2   and when I arrived I met the individual at the police facility.

 3   I then was brought into a conference room where there were

 4   three other individuals that I was introduced to; I can only

 5   remember one of their names as Vincent Pucci.  And then I had I      10:28

 6   believe it was an 8-page report with regards to the matter, and

 7   I presented it to them; and that was basically it.

 8   Q    How much time did you spend there?

 9   A    Totally, probably less than two hours, I would say,

10   totally; probably more like an hour and a half totally.            10:28

11   Q    And how were matters left at the conclusion of the

12   meeting?

13   A    That they thought the case had some merit and they would

14   investigate it.

15   Q    Is that what they told you?                                   10:29

16   A    Yes; that was basically what they told me.  I don't recall

17   the exact words.

18   Q    Did they give you anything before you left?

19   A    Yes.

20   Q    What did they give you?                                      10:29

21   A    A ceramic coffee mug with their insignia, a logo for the

22   Peel Regional Police Department; a writing pen; and, like, a

23   lapel pin, I think.  That's the best of my recollection.

24        I remember the cup.

25        MR. QUINN:  Your Honor, I have a dark blue or purple         10:29
```

1   cup with the writing on it "Peel Regional Police Department,

2   I'd request permission to approach the witness to hand this to

3   the witness.

4           **THE COURT:**  Show it to Ms. Hurst first.

5           Now you may.                                          10:30

6   **BY MR. QUINN:**

7   Q    Can you identify that cup?

8   A    Yes; that is the cup that was given to me by the Peel

9   Police Department.

10  Q    And you said that they gave you some something else as    10:30

11  well.

12  A    Yes.

13  Q    And that was a pen?

14  A    A writing pen, and I believe a lapel pin.  I can vaguely

15  recall the lapel pin, but I'm certain that they did.           10:30

16  Q    And had you asked them to give you either one of those

17  things?

18  A    No.

19  Q    Did you ask them to give you anything?

20  A    Nothing whatsoever.                                       10:30

21  Q    All right.

22          When did they give you these things in relation to

23  your departure from the police department?

24  A    To the best of my recollection, it was after the meeting

25  in the conference room; that's when I believe they gave this to  10:31

1    me.

2    Q    Did they give you these things before or after they told

3    you they thought that the case you had presented had merit and

4    they were going to look into it?

5    A    It was after.  It was at the conclusion of our meeting.          10:31

6    As I recall, somebody had left the room after the end of our

7    meeting and then came in with the items.

8    Q    Did you say anything in response?

9    A    I said "thank you very much."

10   Q    Did they ask you for anything?                                     10:31

11   A    No, they did not.

12   Q    All right.

13         After that, did you return to your office in

14   El Segundo?

15   A    I did.                                                             10:31

16   Q    And did you send anything to the Peel Police Department?

17   A    I did.

18   Q    What did you send?

19   A    It was a handful -- basically, it was -- to the best of my

20   recollection, it was a handful of Matchbox-type cars, blister         10:31

21   packs; they were little police cars, little cars that had the

22   police insignia.  I asked my assistant at the time if she could

23   throw a few handful of police cars, Matchbox-type cars, in a

24   box and ship it to them as a reciprocating gift.  And that was

25   the end of it.  And I just glanced at it, at the box.                  10:32

```
 1   Q     How many cars were sent?

 2           MS. HURST:  Objection.  Lacks foundation.

 3           THE COURT:  Lay a foundation.

 4   BY MR. QUINN:

 5   Q     Do you know how many cars were sent?              10:32

 6   A     I don't know the exact amount, no.

 7   Q     Did you see the box before it went out?

 8   A     As I recall, it was a small box, I would say smaller than

 9   a shoe box, and to the best of my recollection there were just

10   a handful, probably a half-dozen, of these little blister    10:33

11   packs; that's the best of my recollection.

12   Q     Do you know what the approximate retail value of these toy

13   cars was?

14           MS. HURST:  Objection.  Lacks foundation.

15           THE COURT:  Sustained.                          10:33

16           Lay a foundation.

17   BY MR. QUINN:

18   Q     You worked at Mattel at the time.

19   A     Yes.

20   Q     Did you have knowledge concerning the prices of various  10:33

21   Mattel products?

22   A     Yes.

23   Q     Including the approximate prices of these toy cars.

24   A     If they were retail, I would say they were probably a

25   dollar each, if that.  They were basically samples that -- I  10:33
```

```
 1    have a drawer full of samples.

 2    Q    How did you get this drawer full of samples?

 3    A    They were given to us by other departments who viewed the

 4    product in its completed form, and basically my assistant would

 5    end up with a drawer full of samples.                              10:34

 6    Q    Is this something that you had all of the time there?

 7    A    Yes.

 8    Q    And the toys that were sent to the Peel Police Department,

 9    did this come from this collection that your secretary had?

10    A    Yes.  They were police-type vehicles.  I know people would   10:34

11    send us the police-type vehicles.

12    Q    And did you personally pack them up and arrange for the

13    shipment of this package?

14    A    No, I did not.

15    Q    Who handled that?                                            10:34

16    A    My assistant.

17    Q    What was your reason for sending these toy cars to the

18    Peel Police Department?

19    A    To reciprocate for the mug and the pins that they had

20    given me.                                                         10:34

21    Q    Did it enter your mind at all that you were attempting to

22    influence the Peel Police Department in any decision they might

23    make concerning the case that you had presented to them?

24    A    Not at all.

25         MR. QUINN:  Nothing further, Your Honor.                     10:34
```

```
 1              THE COURT:  Cross-examination.

 2              MS. HURST:  Thank you, your Honor.

 3                        CROSS-EXAMINATION

 4   BY MS. HURST:

 5   Q    What's your date of birth, Mr. de Anda?          10:35

 6   A    October 17, 1945.

 7   Q    I'm sorry.  I should have introduced myself.

 8         My name is Annette Hurst, and I represent the MGA

 9   parties.  Good morning.

10   A    Good morning.                                    10:35

11   Q    You held the position of Mattel's vice president of global

12   security in investigations for approximately 20 years; is that

13   correct?

14   A    No, that's not.

15   Q    Ten years.  Pardon me.                           10:36

16   A    Yes.

17   Q    And you retired from that position in December of 2008.

18   A    Yes.

19   Q    From May 1968 through November 1988, you were a police

20   officer with the Los Angeles Police Department.        10:36

21   A    Yes.

22   Q    When you retired from the L.A.P.D., you were a detective,

23   grade three; correct?

24   A    Yes.

25   Q    And that was a detective supervisor.             10:36
```

```
 1   A     That's correct.

 2   Q     An L.A.P.D. officer is an employee of the City of Los

 3   Angeles; correct?

 4   A     Yes.

 5   Q     And you were also a licensed private investigator in the      10:36

 6   State of California.

 7   A     Correct.

 8   Q     And are you still today?

 9   A     Yes.

10   Q     You were a member of the California Peace Officers'            10:37

11   Association while you were a police officer.

12   A     I was a member of the -- yes.

13   Q     And you have testified on numerous prior occasions;

14   correct?

15   A     That is correct.                                              10:37

16   Q     As part of your duties and responsibilities as a police

17   officer, you were required to familiarize yourself with the

18   ethics governing your profession; is that correct?

19   A     Correct.

20   Q     And in fact, as a detective supervisor, you were              10:37

21   responsible for enforcing ethical requirements; isn't that

22   true?

23   A     That is true.

24         MS. HURST:  Your Honor, if I may approach the witness

25   to hand up what we have premarked as Exhibit 1, the City of Los     10:38
```

```
 1   Angeles code of ethics.

 2          THE COURT:  Have you shared this with Mattel?

 3          (Mattel is provided a copy.)

 4   BY MS. HURST:

 5   Q    Mr. de Anda, was the City of Los Angeles code of ethics      10:38

 6   one of the ethics requirements with which you familiarized

 7   yourself as an L.A.P.D. police officer?

 8   A    I'm certain that it was part of the documentation that was

 9   given to us, but I -- it's been so long.

10   Q    All right.                                                   10:39

11          And you see there, Article Three is "Acceptance of

12   Favors and Gratuities."

13          MR. QUINN:  I object.  There is no foundation.  No

14   foundation has been laid that this was in effect at the time

15   that Mr. de Anda was employed by the L.A. Police Department.      10:39

16   In fact, there is a date on it which would indicate to the

17   contrary.

18          THE COURT:  It indicates that it was adopted by

19   counsel resolution on July 21, 1959 and amended August 23,

20   1979.  But the objection is well taken.                          10:39

21          Let's lay a foundation for this.

22          MS. HURST:  All right.

23   BY MS. HURST:

24   Q    Mr. de Anda, you were an L.A.P.D. police officer in 1979;

25   correct?                                                         10:39
```

```
 1   A     Correct.

 2   Q     And you previously indicated that one of your

 3   responsibilities was to familiarize yourself with the ethics

 4   governing your office and, indeed, to enforce them; is that

 5   correct?                                                          10:39

 6   A     Yes.

 7   Q     And you were an employee of the City of Los Angeles.

 8   A     That's correct.

 9   Q     Would you consider yourself to have been a person in the

10   public service in 1979?                                          10:40

11   A     Yes.

12   Q     Do you have any reason to doubt that you were, when you

13   were an L.A.P.D. officer, familiar with and responsible for the

14   City of Los Angeles Code of Ethics as it governed your

15   position?                                                        10:40

16   A     I'm sorry.  Could you repeat that.

17   Q     Sure.

18         In 1979 when you were a Los Angeles police detective,

19   do you have any reason to doubt, as you sit here today, that

20   you were not familiar with the Code of Ethics governing your     10:40

21   employment at that time?

22   A     I am certain that I was familiar with the generalities of

23   the Code of Ethics.

24   Q     In fact, you understood that there were ethical

25   requirements concerning police officers' acceptance of gifts,   10:41
```

1    weren't you?

2    A    Yes.

3    Q    Could I direct your attention to Article Three of

4    Exhibit 1.

5            **MR. QUINN:**  Your Honor, there' still been no                    10:41

6    foundation laid as to this document.

7            In the bottom right, it says "Updated July of 2005."

8    So we don't know what, if any, part of this document was in

9    effect when he was last employed by the L.A. Police Department

10   a decade or more before.                                                    10:41

11           **MS. HURST:**  May I respond, Your Honor?

12           **THE COURT:**  Please.

13           **MS. HURST:**  Your Honor, I think if one reads the

14   document, it is apparent that provisions regarding equal

15   employment important were recently updated to include sexual               10:41

16   orientations, transgender, status, and other sorts of things.

17   But based on Mr. de Anda's testimony, I've established that

18   there were provisions governing regulating the acceptance of

19   gifts in effect in 1979 when he was a police officer and,

20   accordingly, we should be permitted to examine regarding that              10:42

21   provision.

22           **THE COURT:**  I understand, Mr. Quinn.

23           Mr. Quinn's point is that we're not certain.

24           I suspect you're absolutely correct, and I would be

25   very surprised if all of Article Three was not in.                         10:42

```
 1            The point that Mr. Quinn is making is that we have no

 2    basis to know that one way or the other.

 3            The section that you're focusing on, I trust, is "Nor

 4    shall any such person accept any gifts, gratuities, or favors

 5    of any kind which might reasonably be interpreted as an attempt    10:42

 6    to influence their actions with respect to City business."

 7            MS. HURST:  That's correct, your Honor.

 8            Why don't I just ask the witness that question.

 9            THE COURT:  Yes.  Why don't you focus on that.

10            Thank you.                                                  10:42

11            MS. HURST:  Thank you, your Honor.

12    BY MS. HURST:

13    Q    Is it true that while you were a Los Angeles police

14    officer for 20 years, you understood that you should not accept

15    any gift, gratuity, or favor of any kind which might reasonably   10:43

16    be interpreted as an attempt to influence your actions?

17    A    Yes.

18    Q    As a Los Angeles police officer, were you familiar with

19    the Code of Profession Conduct and Responsibilities for peace

20    officers developed by the California Peace Officers'              10:43

21    Association?

22    A    I don't recall.  It's been so long.  I'm sorry.  I

23    don't --

24            MS. HURST:  If I may, Your Honor, approach to show it

25    to the witness.                                                   10:43
```

1          **THE COURT:**  As long as you show it to Mr. Quinn

2     first.

3          (Counsel is provided document.)

4          **THE COURT:**  You may approach the clerk and give her a

5     copy of the document.                                           10:44

6          **MS. HURST:**  Your Honor, I've handed the witness a

7     document entitled "Code of Profession Conduct and

8     Responsibilities for Peace Officers" which was premarked as

9     Exhibit 2.

10    **BY MS. HURST:**                                               10:44

11    Q    Mr. de Anda, would you turn to the first page inside the

12    cover of the document.

13          Do you see there, it has a copyright date of 1979 by

14    the California Peace Officers' Association?

15    A    Yes.                                                       10:44

16    Q    And you were a Los Angeles police officer in 1979.

17    A    Yes.

18    Q    Sir, would you turn, please, to the page numbered eight,

19    where canon eight appears.

20          **MR. QUINN:**  Your Honor, before the witness is         10:44

21    questioned about the document, I think we ought to have the

22    foundation that he's seen it before.

23          **THE COURT:**  Sustained.  This is foundational.

24    Although I trust that is what she's trying to do at this point.

25          Before we get into the substance, though, lay the         10:45

```
 1   foundation that he's familiar with this.
 2           MS. HURST:  Thank you.
 3   BY MS. HURST:
 4   Q   Mr. de Anda, have you had an opportunity to examine
 5   Exhibit 2?                                                    10:45
 6   A   Exhibit 2?  Yes.
 7   Q   And you're familiar with its provisions establishing
 8   minimum standards of ethical conduct for police officers;
 9   correct?
10   A   I vaguely recall this, yes.                               10:45
11           Like I said, it's been 20-plus years.
12   Q   All right.
13           In particular, while you were a Los Angeles police
14   officer, you were familiar with canon eight of these standards
15   which states "Peace officers shall not compromise their       10:46
16   integrity nor that of their agency or profession by accepting,
17   giving or soliciting any gratuity"?
18   A   Yes.
19   Q   And you understand that to be an ethical canon that
20   applied to your conduct throughout your tenure as a Los Angeles 10:46
21   police officer; correct?
22   A   That's correct.
23           MS. HURST:  Your Honor, I'd now like to offer to the
24   witness Exhibit 3, a document entitled "Mattel, Inc. Code of
25   Conduct," dated November 2003.  'Do the Right Thing' Code of   10:47
```

```
 1   Conduct, Bates number M0258446 through 459.

 2            Mr. Quinn has no objection.

 3            THE COURT:  You may.

 4            (Document is provided to witness.)

 5   BY MS. HURST:                                           10:47

 6   Q    Mr. de Anda, do you have Exhibit 3 before you?

 7   A    I do.

 8   Q    When you were Mattel's vice president of global security

 9   and investigations in November 2003, did you have familiarity

10   with Mattel's Code of Conduct?                           10:47

11   A    I did.

12   Q    In fact, you were responsible for enforcing that code of

13   conduct from time to time; isn't that correct?

14   A    That's correct.

15   Q    If you could turn to Page 2 of the document; you'll see  10:48

16   there's a little footer at the bottom, Page 2 of 14.

17   A    Yes.

18   Q    Do you see there the header "To Whom Does the Code Apply"?

19   A    Yes.

20   Q    And the code applied to all Mattel employees; correct?    10:48

21   A    That's correct.

22   Q    And that included you.

23   A    Yes.

24   Q    And that included your assistant as well.

25   A    Yes.                                                 10:48
```

1    Q     Who was the assistant, by the way, who sent the box?

2    A     Oany Rebalo.

3    Q     How do you spell that?

4    A     O-a-n-y is her first name; R-e-b-a-l-o.

5    Q     Is that a woman or a man?                                    10:48

6    A     It's a woman.

7    Q     Was Ms. Rebalo still employed by Mattel when you retired?

8    A     I don't recall.  She left approximately the same time; I

9    don't recall who left first.

10   Q     How long had she worked for you?                            10:49

11   A     Probably the better part of eight years.

12   Q     Now, also on Page 2 of Exhibit 3, there's a bullet point

13   there.  Do you see it?  "Those with leadership roles have

14   additional responsibilities."

15   A     Yes.                                                        10:49

16   Q     And that section of the code of conduct goes on to point

17   out that those who are leaders within Mattel have a special

18   responsibility to observe the code of conduct; correct?

19   A     Yes.

20   Q     And you were one such leader while you were employed at     10:49

21   Mattel as a vice president; correct?

22   A     Yes.

23   Q     Would you turn, please, to Page 4 of 14 in Exhibit 3.

24         Do you have that before you, Mr. de Anda?

25   A     I do.                                                       10:50

```
 1   Q    And do you see there's a heading there entitled "Gifts"
 2   with some underlining.
 3   A    Yes.
 4   Q    And then there's another heading entitled "Entertainment"
 5   with some underlining.  Do you see that?                          10:50
 6   A    Yes.
 7   Q    The last full paragraph before the "Entertainment" heading
 8   starts "We should not offer gifts..."
 9           Do you see that?
10   A    Yes.                                                          10:50
11   Q    Can you read that paragraph.
12   A    Yes.  "We should not offer gifts to others other than
13   token gifts of nominal value which are given as a common
14   courtesy and are standard business practices.  Even gifts of
15   nominal value should not be offered if the gifts would violate    10:50
16   known customer business practices.  Special research applies to
17   government officials in most countries, and we should always
18   consult the law department before offering gifts to any
19   government official."
20           It says in parentheses (see the discussion of            10:51
21   anti-corruption laws).
22   Q    Now, the Peel Police were government officials; is that
23   correct?
24   A    Correct.
25   Q    And they were government officials in a foreign country,     10:51
```

```
 1    the country of Canada.

 2    A    Yes.

 3    Q    And that was true in 2006; correct?

 4    A    That's correct.

 5    Q    Would you turn, please, to Page 12 of Exhibit 3; Page 12       10:51

 6    of 14.

 7    A    I'm there.

 8    Q    Do you see there, there's a little carat there with

 9    anti-corruption laws?

10    A    I do.                                                          10:51

11    Q    There's a paragraph beginning "Bribery of public officials

12    is absolutely prohibited."

13          Do you see that?

14    A    Oh.  Yes.

15    Q    Would you read that paragraph.                                 10:52

16    A    Sure.

17          "Bribery of public officials is absolutely

18    prohibited.  We should not offer, directly or indirectly,

19    anything of value to government authorities, including

20    political parties or candidates, to obtain an improper           10:52

21    advantage or to retain or obtain business.  No gifts,

22    contributions, or entertainment are to be offered of which

23    might create an appearance of impropriety.  We should

24    immediately report to the law department any suspected

25    violations of this requirement."                                  10:52
```

1   Q     Now, both of these provisions that you have just read on

2   pages 4 and 12, you understood to apply to you in 2006; is that

3   correct?

4   A     That's correct.

5              MS. HURST:  Move for the admission of Exhibit 3,                    10:53

6   Your Honor.

7              THE COURT:  Any objection?

8              MR. QUINN:  No objection.

9              THE COURT:  It's admitted.

10             (Exhibit 3 is received.)                                          10:53

11             MS. HURST:  Your Honor, Exhibit 4 is Mattel's Code of

12   Ethical Business Conduct, dated April 2005, M0924257 through

13   70.

14             THE COURT:  Very well.

15             (Witness is handed document.)                                     10:54

16   BY MS. HURST:

17   Q     Mr. de Anda, on the third page of Exhibit 4 is the date on

18   the document; I didn't find it on the prior two pages.

19             Do you see that?  "Mattel, Inc. Code of Conduct,

20   April 2005"?                                                                 10:54

21   A     Yes.

22   Q     And you were at Mattel in April of 2005.

23   A     Yes.

24   Q     And you understood the code of conduct to apply to

25   governing your conduct in 2005 at Mattel?                                   10:54

```
 1   A      That's correct.

 2   Q      And, in fact, you were responsible for enforcing the 2005

 3   Code of Conduct; correct?

 4   A      Correct.

 5   Q      Again, I direct your attention to Page 5 of Exhibit 4.        10:54

 6   Towards the bottom you'll see the heading entitled "Gifts."

 7          Do you see that?

 8   A      Yes.

 9   Q      And the 2005 Code of Conduct, like the 2003 Code of

10   Conduct, had a prohibition on giving gifts to government          10:55

11   officials without prior approval from the law department;

12   correct?

13   A      Correct.

14   Q      If you would turn to Page 11 of 14, please.  On Page 11 of

15   14, the last bullet point is entitled "Our Responsibility to       10:55

16   the Government in Compliance With the Law."

17          Do you see that?

18   A      Yes.

19   Q      And that portion of the code of conduct directed employees

20   to comply with all applicable laws, rules and regulations;         10:55

21   correct?

22   A      Yes.

23   Q      And it was your intention to follow the law in your role

24   as vice president of global security and investigations;

25   correct?                                                           10:56
```

```
 1   A     Absolutely.

 2   Q     And that included the foreign corrupt practices act;

 3   correct?

 4   A     Correct.

 5   Q     And you were familiar with the foreign corrupt practices    10:56

 6   act while you were the vice president of global security and

 7   investigations at Mattel; correct?

 8   A     Yes.

 9   Q     And you had training on its requirements.

10   A     Yes.                                                        10:56

11   Q     Turn, please, to Page 12 of Exhibit 4.

12         You see there's a heading there, "Anti-Corruption

13   Laws".

14   A     Yes.

15   Q     And the 2005 Code of Conduct, again, prohibited any gift    10:56

16   which might create an appearance of impropriety; correct?

17   A     Correct.

18   Q     And you understood that to govern your conduct in 2006 as

19   well.

20   A     Correct.                                                    10:57

21         MS. HURST:  Your Honor, Exhibit 5 is 15 USC, section

22   78(d)(d)-1.

23         (Document provided to witness.)

24   BY MS. HURST:

25   Q   Mr. de Anda, as part of your training on the foreign         10:58
```

1   corrupt practices act, you were provided a copy of the statute;

2   is that correct?

3   A    I don't recall, to be very honest with you.

4   Q    You familiarized yourself with its requirements.

5   A    I don't recall.  I'm certain somewhere down the line, but        10:58

6   I don't recall.  I'm certain I have, but I read so much that I

7   don't recall specifically reading this item.

8   Q    As the vice president of global security, global security

9   and investigations, you were responsible for interacting with

10  government officials in many countries worldwide; isn't that        10:59

11  true?

12  A    That's correct.

13  Q    And you were uniquely in a position to be interacting with

14  foreign officials worldwide as part of your position; isn't

15  that correct?                                                        10:59

16  A    Yes.

17  Q    But it's your testimony here today that you do not really

18  remember whether you familiarized yourself with the provisions

19  of the foreign corrupt practices act.

20  A    I read it generally.  As far as retaining everything it         10:59

21  says, I don't know that I have.

22  Q    You understood that it applied to public companies like

23  Mattel; correct?

24  A    Oh, yes.

25  Q    And you understood that in 2006 when you were at Mattel.        10:59

1    A    Correct.

2    Q    And you understood that it applied to employees of public

3    companies.

4    A    Yes.

5    Q    Including you.                                                    11:00

6    A    Yes.

7    Q    You understood that the foreign corrupt practices act

8    covered gifts, didn't you?

9    A    Yes.

10   Q    Gifts made to foreign officials under particular              11:00

11   circumstances; correct?

12   A    Yes.

13   Q    And you knew that in 2006.

14   A    Yes.

15   Q    Did you go to the law department in advance of sending the    11:00

16   package to the Peel Police?

17   A    Did I go to the law department?

18   Q    Yes.

19        You'll recall the Mattel Code of Conduct admonished

20   you to go to the law department prior to sending any gifts to    11:00

21   foreign officials?

22        Did you do so?

23   A    I did not.

24        **MS. HURST:**  Your Honor, Exhibit 6 marked for

25   identification is a document entitled "Investigation Into the    11:01

```
 1    Conduct of Janine Brisbois," M0926385 through 6799.

 2              (Document is provided to witness.)

 3         MR. QUINN:  Your Honor, if I may, this document is

 4    marked "Attorneys Eyes Only".  It does contain proprietary and

 5    confidential information.  To the extent counsel intends to go      11:02

 6    into the substance of it, we might want to go to side-bar.  I

 7    don't know where she's going with this, and I don't want

 8    something blurted out, if we can avoid it.

 9         THE COURT:  Just be mindful of that, counsel.

10         MS. HURST:  I will, Your Honor.                                11:02

11         Although, there's no foundation that any of this

12    information was provided to the Peel Police subject to any

13    obligation of confidentiality; so I'm not sure that the

14    predicate for maintaining confidentiality can be established on

15    Mattel's part.                                                      11:02

16         THE COURT:  Right.  But what we have done, to avoid a

17    pitfall that is not uncommon in this case, is, it's always

18    better to take care and not blurt something out; go to

19    side-bar.  Let's be mindful of that.

20         We have members of the press in the courtroom here.           11:03

21    Mr. Quinn has advised you there's a concern.  Just take it

22    easy.

23         MS. HURST:  Thank you, Your Honor.

24    BY MS. HURST:

25    Q    You were responsible for the overall conduct of the          11:03
```

1    investigation into Janine Brisbois's departure; is that

2    correct?  Within Mattel, I mean.

3    A    I was responsible, I think, along -- to be as precise as

4    possible, along with the law department, who also had a part in

5    the investigation.                                                    11:03

6    Q    In September 2005, Janine Brisbois was an employee of

7    Mattel in Canada, in Mississauga; is that correct?

8    A    I believe so, yes.

9    Q    She was the director of sales for the girls' business

10   team.                                                                 11:04

11   A    I believe so.

12   Q    And that included the responsibility for selling Barbie,

13   Polly Pocket, and other girl toys.

14   A    Yes.

15   Q    And she had particular responsibility for the Wal-Mart         11:04

16   account; correct?

17   A    I believe so, yes.

18   Q    She resigned on September 26, 2005.

19   A    I don't remember the exact date, but that sounds about

20   right.                                                                11:04

21   Q    And she informed her supervisor that she was going to go

22   to work for MGA as its vice president of sales for Canada;

23   correct?

24   A    That's my understanding.

25   Q    At that time, MGA was Mattel's number one competitor in        11:04

```
 1    Canada; correct?

 2    A    I don't know the status of that.  I'm sorry.

 3    Q    Would you turn, please, to Page 3 of Exhibit 6, which has

 4    the Bates number M0926392.

 5    A    Yes.                                                          11:05

 6    Q    If you'll review the first sentence on Page 3,

 7    Mr. de Anda.

 8         MS. HURST:  I've confirmed with Mr. Quinn that he has

 9    no confidentiality issues, Your Honor.

10         THE COURT:  You may proceed.                                  11:05

11    BY MS. HURST:

12    Q    The report provides that "the accused" -- that was

13    Ms. Brisbois; correct?

14    A    Yes.

15    Q    "Advised Mr. Totzke" -- that was her boss; correct?          11:05

16    A    Yes.

17    Q    That she was "going to leave Mattel and take up the

18    position with MGA Entertainment, Inc., Mattel's number one

19    competitor, as vice president of sales"; correct?

20    A    Yes, that's correct.                                         11:06

21    Q    Does that refresh your recollection that in late 2005, MGA

22    was Mattel's number one competitor in Canada?

23    A    It doesn't refresh my memory because I didn't know at the

24    time, and I still didn't know until right now reading this,

25    that they were our number one competitor.  I'm in the security    11:06
```

```
 1  business, not in the sales or marketing business.

 2  Q    You knew MGA was a competitor in 2006.

 3  A    Yes, I did.

 4  Q    You knew it was selling Bratz dolls.

 5  A    Yes.                                                          11:06

 6  Q    You knew the sales of Bratz dolls competed with the sales

 7  of Barbie dolls?

 8  A    Yes.

 9  Q    Barbie dolls were sold by Mattel.

10  A    Yes.                                                          11:06

11  Q    And all of that was happening in Canada as well as in the

12  United States.

13  A    Yes.

14  Q    As the director of sales for Mattel, Ms. Brisbois was

15  responsible for obtaining business on behalf of Mattel;           11:07

16  correct?

17  A    I would assume so.  I don't know her -- I'm not in that

18  part of the business, but I would assume, yes.

19  Q    Making sales.

20  A    Yes.                                                          11:07

21  Q    And as a BP of sales for MGA, it would be reasonable to

22  believe that she had the same responsibility; correct?

23           MR. QUINN:  Speculation, Your Honor; lacks

24  foundation.

25           THE COURT:  Sustained.                                   11:07
```

```
 1          Rephrase.
 2   BY MS. HURST:
 3   Q    At the time you were investigating Ms. Brisbois's
 4   departure and you learned that she was to become or had become
 5   the vice president of sales for MGA, you understood that she        11:07
 6   was likely to be responsible for generating sales of MGA
 7   products; correct?
 8   A    To be very honest with you, that never entered my mind
 9   because I'm not in that part of the business.  Her title and
10   capacity, her duties and responsibilities, I didn't really        11:07
11   focus, so I didn't really -- how do I say this -- have a
12   complete understanding.  But if she was in sales, she was in
13   sales.
14   Q    You provided information to the Peel Police about what her
15   responsibilities had been at Mattel.                               11:08
16   A    I don't recall.  I may have said that -- I don't recall
17   that I identified her responsibilities; maybe her title; but I
18   don't recall knowing her duties and responsibilities to that
19   extent.
20   Q    You said you presented an 8-page, I believe, document, on     11:08
21   questioning for Mr. Quinn, to the Peel Police when you met with
22   them in the spring of 2006.
23   A    Right.  I believe it to be eight pages.  I remember it
24   was -- for some reason, eight sticks in my mind, and I believe
25   it to be about that thick, eight pages worth.                      11:09
```

```
 1   Q    Would you turn to -- its going to be about the middle of
 2   Exhibit 6 that you have there in front of you.
 3   A    What page number?
 4   Q    The Bates number is on the lower right-hand corner that
 5   ends in 477.  You should be able to find it.          11:09
 6   A    Yes.
 7   Q    M0926477.  Do you see that?
 8   A    Yes.
 9   Q    Is that the document you presented to the Peel Police?
10          THE COURT:  Counsel, what page?               11:09
11          MS. HURST:  M0926477.
12          THE COURT:  Thank you.
13          THE WITNESS:  I believe so.
14          And I stand corrected, it's nine pages.
15   BY MS. HURST:                                         11:10
16   Q    I'm sorry?
17   A    I stand corrected; it's nine pages.
18   Q    That's pretty good.
19          Did you also provide statements by Mattel employees
20   to the Peel Police?                                   11:10
21   A    You know, I only recall supplying them this report.
22   Q    Did someone else acting pursuant to your supervision or
23   acting with you provide statements of Mattel employees to the
24   Peel Police?
25   A    I don't recall that was done.                    11:11
```

```
 1  Q    Could I direct your attention, please, to the Bates number
 2  ending in 434.
 3  A    I have it.
 4  Q    That's a page entitled "Anticipated Evidence of
 5  Steve Totzke, October 17, 2006."                              11:11
 6            Do you see that?
 7  A    Oh, yes, I do.
 8  Q    Did you provide this to the Peel Police?
 9  A    I don't recall ever doing so.
10  Q    Did Mr. Totzke inform you during the course of your      11:12
11  investigation that when Ms. Brisbois handed in her letter of
12  resignation she informed him she was going to MGA and would
13  have their top sales title?
14  A    I don't have a recollection talking to Mr. Totzke, for
15  some reason.  I remember talking to Jeff Massingberd and      11:12
16  Roberto Morales, but for some reason I don't have a
17  recollection of that.
18  Q    When you talked to Morales, did he tell you that he had
19  told Ms. Brisbois in her exit interview that she handled one of
20  the biggest accounts, Wal-Mart, and that she should not do    11:13
21  anything stupid?
22  A    He may have, but I just have no recollection.  I'm sorry.
23  Q    Mattel opened an investigation into Ms. Brisbois
24  immediately upon learning that she was going to depart for MGA;
25  is that correct?                                              11:13
```

Tuesday, September 22, 2009                          Status Hearing

```
 1   A    Pretty much immediately.

 2   Q    Just the fact that she was leaving for MGA was sufficient

 3   for you to open an investigation; isn't that right?

 4   A    Yes.

 5   Q    You mentioned that you engaged a forensic analyst to look      11:14

 6   at her hard drive; correct?

 7   A    Yes.

 8   Q    The hard drive was shipped from Mattel, Canada first to

 9   your global security department; correct?

10   A    I don't recall if that was the process.  I'm sorry.           11:14

11   Q    Would you turn to Page 481, please.

12   A    Yes.

13   Q    In the second paragraph there, "Elias requested that the

14   hard disk drive..."

15        Do you see that?                                              11:14

16   A    Yes.

17   Q    Jamie Elias -- is that the right way to pronounce it?

18   A    It's Jaime.

19   Q    Jaime Elias, he worked for you; is that correct?

20   A    Yes.                                                          11:15

21   Q    He was one of your investigators.

22   A    Yes.

23   Q    He requested that "the hard disc drive from the Mattel

24   computer assigned to Brisbois be sent to Mattel global

25   security."                                                         11:15
```

```
 1            Do you see that?
 2   A    Yes.
 3   Q    And in the remainder of that paragraph, it goes on to say
 4   "it was then shipped to the forensic analyst evidence data";
 5   correct?                                                          11:15
 6   A    Yes.
 7   Q    And in each instance, Mattel kept a record of the manner
 8   in which the hard drive was shipped and the tracking
 9   information related to that shipment; is that correct?
10   A    Correct.                                                     11:15
11   Q    And your global security department maintained other
12   records of its shipments as well, didn't it?
13            MR. QUINN:  Vague with what's referred to,
14   Your Honor; shipment of the hard disc drive.
15            THE COURT:  Clarify, counsel.                            11:16
16   BY MS. HURST:
17   Q    When you made shipments in connection with your
18   investigations, you maintained records of them; is that
19   correct?
20   A    Yes.                                                         11:16
21            MR. QUINN:  Your Honor, I still think it's vague and
22   overbroad.
23            THE COURT:  Yes.  Please specify.
24   BY MS. HURST:
25   Q    When you shipped things by Federal Express in connection    11:16
```

```
 1   with your investigations, you maintained copies of those labels

 2   related to those shipments in your department; isn't that

 3   correct?

 4            MR. QUINN:  Related to this investigation,

 5   Your Honor, or, like, forever, concerning every subject?    11:16

 6            THE COURT:  It's a more general question.

 7            Overruled.

 8            If you can answer.

 9            THE WITNESS:  I think I can answer.

10            With regard to shipping of evidence, yes, we keep   11:16

11   documentation to show that the evidence has been shipped.

12   BY MS. HURST:

13   Q   In fact, it was your practice to maintain records of

14   shipments of any type of shipment until you could confirm that

15   they were delivered; isn't that right?                      11:17

16            MR. QUINN:  Is this just evidence, Your Honor, or any

17   Federal Express sent at all?

18            MS. HURST:  It's just a practice; the question is the

19   practice.

20            THE COURT:  Overruled.                              11:17

21            THE WITNESS:  I'm sorry.

22   BY MS. HURST:

23   Q   Was it your practice to maintain records of shipments that

24   your department made at least until you could confirm that they

25   had been delivered?                                          11:17
```

1   A    Of any item?

2   Q    Yes.

3   A    I'm not certain, because I did not do it, but I would

4   assume so.

5   Q    That would be good practice, wouldn't it?                    11:17

6   A    Well, it depends.  I mean, all shipments now have tracking

7   numbers, so I'm certain -- I don't know, to be very honest with

8   you.  I did not handle the shipping.

9   Q    Your assistant handled that.

10  A    Yes.  It's hard for me to answer the questions.  I didn't    11:18

11  ship.

12  Q    Do you ever have anything go awry and you had to ask your

13  assistant what happened to it and she was able to confirm for

14  you?

15  A    Not that I recall.                                           11:18

16  Q    When was your meeting with the Peel Police in -- was it in

17  Mississauga?

18  A    Yes.  I believe so, yes.

19  Q    When was that meeting?

20  A    The exact date, I don't recall, but it was cold so it was   11:18

21  the early part of 2006; probably January of 2006, January or

22  February of 2006.

23  Q    You presented the document that I identified as part of

24  Exhibit 6 to them when you went there; correct?

25  A    That's the document I recall.  I think it's a 9-page         11:19

 1   document.

 2   Q    If you would like to refresh your recollection, it's got a

 3   Bates number 477.

 4   A    I recall this to be the document, yes.

 5   Q    It's got a March 17, 2006, date on it.                    11:19

 6        Do you see that?

 7   A    Yes.

 8   Q    So your meeting with the Peel Police would have been some

 9   time after March 17, 2006.

10   A    Right; it would have been.                                11:19

11   Q    Had Mattel already initiated any kind of investigation

12   with the Peel Police prior to the time that you went there for

13   a meeting?

14        **MR. QUINN:**  Concerning Ms. Brisbois?

15        **MS. HURST:**  Concerning Ms. Brisbois.  Thank you.     11:19

16        **THE COURT:**  Very well.

17        **THE WITNESS:**  There were communications.  I don't

18   know if you would call it an investigation.  There was just

19   contact made.

20   **BY MS. HURST:**                                             11:20

21   Q    Did you ever make a formal complaint on behalf of Mattel

22   concerning Mrs. Brisbois's departure from Mattel or any of the

23   conduct surrounding that?

24   A    No.  That was my purpose of visiting with the Peel Police

25   Department to present this matter to them.                    11:20

```
 1   Q     So it was your purpose to make a formal complaint when you

 2   went there.

 3   A     It was -- yes.

 4   Q     And you understood that Mattel was the complaining

 5   witness; correct?                                              11:20

 6   A     Yes.

 7   Q     And you, on behalf of Mattel, were the complaining

 8   witness; correct?

 9   A     That's correct.

10   Q     Was there a written confidentiality agreement concerning  11:20

11   what happened at that meeting?

12   A     No.

13   Q     When you went to the meeting, did you believe that

14   Ms. Brisbois had committed a crime under Canadian law?

15   A     Yes.                                                      11:21

16   Q     What crime did you believe she had committed?

17   A     Stolen intellectual property.

18   Q     Theft of trade secrets is not a crime under Canadian law;

19   correct?

20         MR. QUINN:  Your Honor, he's not a lawyer of any          11:21

21   kind, Canadian or otherwise.  We can argue about that; we can

22   look it up.

23         THE COURT:  To his knowledge.

24   BY MS. HURST:

25   Q     To your knowledge, Mr. de Anda, is there such a thing as  11:21
```

```
 1   criminal theft of trade secrets under Canadian law that governs
 2   the Mississauga geographic area?
 3   A    I don't believe there is exactly in that terminology.
 4   Q    Your objective for the meeting with the Peel Police
 5   included persuading them to open a criminal investigation into      11:21
 6   Ms. Brisbois's conduct; isn't that correct?
 7   A    No.
 8   Q    No?
 9   A    No.  Not persuade.  I think that is the wrong word.
10        I was simply there to present the facts as I knew            11:22
11   them.  In a criminal matter, the evidence is the evidence, and
12   all I was doing was presenting the evidence as I knew it.
13   Q    You hoped that they would open an investigation; isn't
14   that true?
15   A    If there was a criminal violation, yes.                      11:22
16        MS. HURST:  Your Honor, Exhibit 7 is the e-mail
17   exchange with Bates number M0925945 and 46.
18        (Document provided to witness.)
19        THE COURT:  This is Exhibit 7?
20        MS. HURST:  Yes, Your Honor.                                 11:23
21   BY MS. HURST:
22   Q    By the way, Mr. de Anda, have you spoken to anyone from
23   the Peel Police in the last six weeks or so?
24   A    Oh, no.
25   Q    Mr. de Anda, on the bottom of Exhibit 7, there is an         11:23
```

1   e-mail from Rodney Jones to de Anda, Richard, dated April 25,

2   2006.

3           Do you see that?

4   A   Yes.

5   Q   And did you receive that e-mail from Mr. Jones on or about      11:24

6   April 25, 2006, in the course of your business as Mattel's vice

7   president for global security and investigations?

8   A   I did.

9   Q   And you responded to the e-mail; is that correct?

10  A   I did.                                                           11:24

11  Q   And that is your response as indicated at the top of the

12  first page of Exhibit 7, from de Anda, Richard, sent Tuesday,

13  April 25, 2006, to Jones, Rodney; is that correct?

14  A   Yes.

15  Q   And you sent that e-mail in the course of your ordinary         11:24

16  duties as Mattel's vice president of global security and

17  investigations; is that correct?

18  A   Yes.

19          **MS. HURST:**  Your Honor, I'd move for the admission of

20  Exhibit 7.                                                          11:24

21          **THE COURT:**  Any objection?

22          **MR. QUINN:**  No objection.

23          **THE COURT:**  It's admitted.

24          (Exhibit 7 is received.)

25  / / /                                                               11:25

```
 1    BY MS. HURST:

 2    Q    Did you review this document in your preparation to

 3    testify here today?

 4    A    I did not.  I have not seen it since -- several years.

 5    Q    In the third paragraph of Mr. Jones's e-mail, he wrote,      11:25

 6    "We received the package you sent and made the distributions to

 7    the officers with young children."

 8              Do you see that?

 9    A    Yes.

10    Q    "Okay.  I admit to having a couple on my desk."             11:25

11              Right?

12    A    Oh.  Yes.  I'm sorry.

13    Q    How many officers with young children were there at the

14    Peel Police?

15              MR. QUINN:  Foundation.                                11:25

16              THE COURT:  Foundation, counsel.

17    BY MS. HURST:

18    Q    How many officers were there in the department that you

19    met with in the spring of 2006?

20    A    I would just have to take a rough guess.                    11:26

21              MR. QUINN:  Your Honor, I think the question is

22    ambiguous as to how many officers in the whole department,

23    or --

24              THE COURT:  We don't want a guess.

25              And that's not foundation.                            11:26
```

**BY MS. HURST:**

1

2  Q    When you met with the Peel Police in the spring of 2006,

3  you had prior familiarity with them as a result of your time as

4  an L.A.P.D. police detective and also in your role as Mattel's

5  vice president of global security and investigations; is that

6  correct?

7  A    With the Peel Police Department, yes.

8  Q    And they were the police department responsible for the

9  Mississauga area.

10  A    Yes.

11  Q    And the Mississauga area was where Mattel, Canada was

12  located.

13  A    Yes.

14  Q    So whenever you had a complaint to deal with on behalf of

15  Mattel, Canada, it was the Peel Police that you went to.

16  A    Yes.

17  Q    In the course of your duties as Mattel vice president, did

18  you familiarize yourself with the capabilities of the Peel

19  Police Department in the Mississauga area?

20  A    I don't understand what you mean by capabilities.

21  Q    Did you gain some understanding in the course of your

22  duties as Mattel's vice president as to approximately how many

23  police officers there were in the Peel Police Department?

24  A    I know that it was a medium-sized police department.  It

25  could have several hundred police officers.  I don't know the

11:26

11:26

11:26

11:27

11:27

```
 1  exact count.
 2  Q    Okay.
 3         Now, Exhibit 7 indicates that it's redacted on the
 4  top.
 5         Do you see that?                                        11:27
 6  A    Yes, I do.
 7  Q    And that was redacted because there was attorney-client
 8  privileged information there on the top of the original
 9  document; is that correct?
10         MR. QUINN:  Lacks foundation.                           11:28
11         THE COURT:  Sustained.
12         THE WITNESS:  I don't know the --
13         THE COURT:  Sustained.
14  BY MS. HURST:
15  Q    You forwarded your e-mail exchange with Mr. Jones to      11:28
16  attorneys at Mattel; is that correct?
17  A    Are you asking if I forwarded -- can you give me a time
18  period?  At this time, or...
19  BY MS. HURST:
20  Q    Sure.  At that time, at approximately the time that the   11:28
21  exchange occurred that's depicted in Exhibit 7, you forwarded
22  this exchange to attorneys at Mattel; isn't that correct?
23  A    It doesn't indicate, so I don't know if I did or I didn't.
24  Q    Exhibit 8 is "Mattel versus Carter Bryant and consolidated
25  cases supplemental privilege log, dated April 13, 2009,        11:29
```

```
 1   Page 181 of 182."
 2              (Document provided to witness.)
 3   BY MS. HURST:
 4   Q    Mr. de Anda, I'm going to direct your attention down at
 5   the bottom of Exhibit 8, there's an entry, 981.                      11:29
 6              Do you see that?
 7   A    Yes.
 8   Q    And it's document type "e-mail" with redacted in
 9   parentheses.
10              MR. QUINN:  Your Honor, there's a foundation             11:30
11   objection to question the witness about this document.
12              THE COURT:  That's what she's trying to do.  She's
13   just showing the document at this point.
14              MS. HURST:  Thank you, your Honor.
15   BY MS. HURST:                                                        11:30
16   Q    And in the document type, there is a Bates number.
17              Do you see that?
18   A    Yes.
19   Q    And it's the same Bates number that appears on the first
20   page of Exhibit 7; is that correct?                                  11:30
21   A    Yes.
22   Q    And the date is the same, April 25, 2006, as the date on
23   Exhibit 7; correct?
24   A    Yes.
25   Q    And it indicates from Richard de Anda.                          11:30
```

```
 1              Do you see that on the privilege log?

 2   A     Yes.

 3   Q     And two recipients:  Brian O'Connor, Jaime Elias,

 4   Jill Thomas.  Do you see that?

 5   A     Yes.

 6   Q     And Jaime Elias, you've already mentioned, was an

 7   investigator in your department; correct?

 8   A     Correct.

 9   Q     And Jill Thomas was an attorney at Mattel; is that

10   correct?                                                      11:30

11   A     Correct.

12   Q     And Brian O'Connor was an attorney at Mattel; is that

13   correct?

14   A     Correct.

15   Q     Having reviewed this privilege log entry, does that    11:31

16   refresh your recollection that you forwarded this e-mail

17   exchange to Mr. O'Connor, Mr. Elias, and Ms. Thomas?

18   A     I'm sorry.  I have no independent recollection at all.  I

19   send hundreds of e-mails per day, unfortunately; so to have

20   exclusive memory of this, I don't.                           11:31

21   Q     Was Mr. O'Connor working with you on the Janine Brisbois

22   investigation?

23   A     Yes.

24   Q     Was Ms. Thomas?

25   A     Yes.                                                    11:31
```

```
 1   Q    And was Mr. Elias?

 2   A    Yes.

 3   Q    Do you have any reason to doubt that you forwarded the

 4   e-mail exchange in Exhibit 7 to Mr. O'Connor, Mr. Elias and

 5   Ms. Thomas as indicated on Exhibit 8?                              11:31

 6   A    I have no doubt, but I have no recollection.

 7   Q    All right.

 8            Did you ever receive any kind of communication from

 9   Mr. O'Connor, an attorney for Mattel, indicating to you that

10   you should not have sent a package with gifts to the Peel        11:32

11   Police?

12            MR. QUINN:  Objection.  Privilege.

13            THE COURT:  It seems to call for privileged

14   communication, counsel.  Sustain the objection.

15            MS. HURST:  Thank you, your Honor.                      11:32

16   BY MS. HURST:

17   Q    Were you instructed by Mr. O'Connor not to send any

18   further gifts to the Peel Police?

19            MR. QUINN:  Same objection.

20            THE COURT:  Mr. O'Connor is an attorney; correct?      11:33

21            MS. HURST:  Yes.

22            THE COURT:  It seems to go to direction by counsel.

23            MS. HURST:  The Mattel's code of conduct specifically

24   prohibited giving gifts to law enforcement authorities and made

25   the law department the enforcer of that provision.               11:33
```

```
 1              THE COURT:  I understand that, but I don't know how

 2   that gets beyond the attorney-client privilege, though.

 3   BY MS. HURST:

 4   Q    Are you following counsel's instruction and refusing to

 5   answer that question?                                            11:33

 6              MR. QUINN:  I think the objection was sustained.

 7              THE COURT:  That's not proper, counsel.

 8              The attorney has objected.  I've sustained it before

 9   you even get to the witness on this.

10              MS. HURST:  All right.                                 11:33

11   BY MS. HURST:

12   Q    You said your assistant sent the package.

13   A    Yes.

14   Q    From your offices in El Segundo.

15   A    Yes.                                                         11:34

16   Q    What were the means of conveyance of the package?

17   A    It would obviously go through our mail room and whatever

18   mail service we had at that time would have been utilized, be

19   it DHL or UPS or FedEx.  I'm not certain.

20   Q    Usually those services require the preparation of a weigh   11:34

21   bill of some sort; correct?

22   A    That's my understanding.

23   Q    Who filled that out?

24   A    My assistant would have.

25   Q    To whom was the package addressed?                          11:34
```

```
 1   A     I believe it was to Rodney Jones.

 2   Q     Did Mattel pay for the shipping on the package?

 3   A     They would have, yes.

 4   Q     Was the package insured?

 5   A     I would doubt it.  I don't know, but I would doubt that.   11:34

 6   Q     Who signed the customs declaration?

 7            MR. QUINN:  Objection.  It assumes that there was

 8   one, Your Honor.

 9            THE COURT:  Sustained.

10            Lay a foundation.                                       11:35

11   BY MS. HURST:

12   Q    You sent the package to Canada; correct?

13   A    Yes.

14   Q    Ordinarily that requires a customs declaration when you

15   send a package to a foreign country; correct?                   11:35

16            MR. QUINN:  Lacks foundation.

17            THE COURT:  She's asking if he knows.

18            Do you know, sir?

19            THE WITNESS:  No.  I do not know.

20            MS. HURST:  Okay.                                       11:35

21   BY MS. HURST:

22   Q    You said the contents of the package were toy police cars;

23   correct?

24   A    To the best of my recollection.  Like I said, I just

25   glanced at it in passing, and I saw what was just a handful of   11:35
```

```
 1   cars and I maybe only saw one or two being a police car.
 2           THE COURT:  You said you saw the open box before it
 3   was sealed?
 4           THE WITNESS:  It was just an open box, but the way
 5   that they -- they were just thrown in so they were on top of         11:35
 6   each other.
 7           THE COURT:  You saw it, though, before it was sealed
 8   up?
 9           THE WITNESS:  As I recall, yes, Your Honor.  I just
10   glanced at it.  It was of no consequence.  It just looked like       11:36
11   little police cars in blister packs.
12           THE COURT:  Did there appear to be anything else
13   besides some police cars?
14           THE WITNESS:  I doubt it, your Honor.
15           I don't know.  I didn't dig down through the package,        11:36
16   but it was just a handful.  There's like a small -- smaller
17   than a shoe box, as I recall.
18           It's been a long time.  That's to the best of my
19   recollection.
20   BY MS. HURST:                                                        11:36
21   Q    You did not examine fully the contents of the package
22   before it was sent; is that correct?
23   A    I didn't go through it and sort through it; I didn't
24   inventory it.
25   Q    You didn't count the contents.                                 11:36
```

```
 1    A     No, I did not.

 2    Q     Which of Mattel's brand of toy cars was included in the

 3    package?

 4    A     To the best of my recollection, I remember the little

 5    police cars and I think they were Matchbox; they were just          11:37

 6    little blister packs of police vehicles.

 7    Q     Matchbox, Hot Wheels or Tyco brand?

 8    A     I would have to see them again, but my best recollection

 9    is that they were little Matchbox-type vehicles.

10    Q     Did they have any logos on them?                              11:38

11    A     I'm certain that they had Mattel logos; that was the whole

12    purpose.

13    Q     That was the whole purpose of what?

14    A     It was just a reciprocal gift; like police departments

15    give patches to their agencies; it was just to give them police    11:38

16    cars for reciprocating for their mug; kind of a swap; that's

17    all.

18    Q     After you sent the package, the Canadian police

19    interviewed Janine Brisbois; is that correct?

20    A     That's my understanding.                                      11:39

21    Q     And they reported to you regarding the results of that

22    interview; correct?

23    A     Somewhere down the line.  I was on vacation during that

24    period of time out of state.

25    Q     By the way, the investigation materials that you gave to     11:39
```

| | |
|---|---|
| 1 | the Peel Police identified MGA employees and Isaac Larian as |
| 2 | people involved in your investigation; isn't that correct? |
| 3 | A    If the report states so, yes. |
| 4 | Q    Would you turn to Exhibit 6, the page ending in 479. |
| 5 | A    Exhibit 6 is the -- |
| 6 | Q    The big fat one; 479. |
| 7 | A    I'm there. |
| 8 | Q    And this is part of the report you provided to the Peel |
| 9 | Police; correct? |
| 10 | A    Correct. |
| 11 | Q    And your report identified Diane Goveia Gordon of MGA as |
| 12 | someone involved, as a person involved; is that correct? |
| 13 | A    Yes. |
| 14 | Q    And it identified Mark Robinson of MGA Entertainment, |
| 15 | Canada, as a person involved? |
| 16 | A    Yes. |
| 17 | Q    And it identified Isaac Larian, president and CEO of MGA |
| 18 | Entertainment, as a person involved. |
| 19 | A    Yes. |
| 20 | Q    Now, when you went to meet with the Peel Police, had you |
| 21 | formed a belief that any of those persons had committed a |
| 22 | crime? |
| 23 | A    I don't believe I had formed an opinion, no. |
| 24 | Q    You didn't know one way or the other. |
| 25 | A    At the time, no.  Not that I recall. |

11:39

11:40

11:40

11:40

11:41

```
 1   Q    And when the police interviewed Ms. Brisbois, she told
 2   them that she had not forwarded anything to anyone else; isn't
 3   that correct?
 4            MR. QUINN:  Foundation, Your Honor.
 5            THE COURT:  Sustained.                              11:41
 6   BY MS. HURST:
 7   Q    After the police interviewed Ms. Brisbois, they reported
 8   to you on the contents of that interview; correct?
 9   A    Somewhere along the line, I did receive some information
10   that there was an interview, and I don't recall the exact      11:41
11   context of the information or the conversation.
12            It's been so long.  I'm sorry.  I just don't have...
13            MS. HURST:  Exhibit 9 is an e-mail exchange between
14   Mr. Pucci and Mr. de Anda, M0925943 and 44.
15            (Document provided to witness.)                     11:42
16   BY MS. HURST:
17   Q    When you went to the Peel Police Department in the spring
18   of 2006, did you ask them to investigate MGA as well as
19   Ms. Brisbois?
20   A    I don't recall that I asked them to investigate MGA.  I  11:43
21   asked them to pursue the information, the evidence, that I had
22   in the report that I had passed on to them.
23   Q    And what was your expectation as to whether that
24   investigation would involve MGA, when you met with them?
25   A    I did not know -- as far as expectations, the expectations  11:43
```

```
 1   were that Ms. Brisbois would be charged if there was a crime.

 2   And if MGA had solicited her to take this, then they would

 3   pursue that.  That's what I assumed.  I assumed they would do a

 4   complete, thorough investigation.

 5   Q    Were there less than ten cars in the package?              11:44

 6   A    You know, once again, I remember there just being a

 7   handful, and I'm thinking the number at a half dozen because

 8   more of the size of the container or the package than anything

 9   else.  Like I said, I did not dig down through it.  I just

10   glanced, maybe, at what was on top.                             11:44

11         And I'll be very honest with you, it's just vague.

12   Q    Your recollection is vague on this issue.

13   A    On the contents -- not of the entire incident, just the

14   contents, because I didn't dig through it; I didn't give it

15   much attention at all.                                          11:45

16   Q    Have you had a chance to look at Exhibit 9?

17   A    I have, yes.

18   Q    And the e-mail at the bottom of the first page of

19   Exhibit 9 is sent to you by Mr. Pucci on or about May 31, 2006

20   in the course of your duties as Mattel's vice president of      11:45

21   global security and investigations; is that correct?

22   A    Yes.

23   Q    And you responded to Mr. Pucci with a copy to Jaime Elias

24   on or about June 2, 2006, in the course of your duties as

25   Mattel's vice president of global security and investigations;  11:45
```

Tuesday, September 22, 2009                          Status Hearing

```
 1   is that correct?

 2   A    Yes.

 3   Q    In your response, you noted, about four sentences in, "per

 4   our earlier conversation, you indicate she stated that she did

 5   not forward the information on."                                    11:46

 6           Do you see that?

 7   A    Yes.

 8   Q    So Mr. Pucci told you that Janine Brisbois told him that

 9   she had not forwarded the information; correct?

10   A    Yes.                                                           11:46

11   Q    And then you requested that he attempt to establish

12   whether that was true or not by way of forensic analysis;

13   correct?

14           MR. QUINN:  Your Honor, the document speaks for

15   itself.                                                            11:46

16           THE COURT:  It does.

17           If you have a question on anything that he said in

18   terms of his understanding, you may question him on that.

19   BY MS. HURST:

20   Q    Did you request of Mr. Pucci that the Peel Police attempt     11:46

21   to establish whether Ms. Brisbois's statement was true by using

22   forensic analysis?

23   A    Yes, I did.  Like it says here, "Were you able to

24   establish that by way of forensic analyst?"

25           In other words, did they do anything other than just      11:47
```

```
 1   take her statement and word for it.
 2   Q    Do you have any idea, as you sit here today, why Mattel
 3   does not possess a single document concerning the package that
 4   was sent to the Peel Police other than your e-mail exchange
 5   with Mr. Jones?                                                    11:47
 6   A    Yes.
 7   Q    Why is that?
 8   A    Actually, I tried to look for -- once I understood what
 9   the issue was, I went to the mail room and actually e-mailed
10   them, asking them, and I had a conversation with the individual   11:48
11   in charge of the mail room, and I asked them the approximate
12   time and where the package was going; they said they only
13   retain shipping documents for a year, and they were purged.
14        So then I said, Well, can you contact whatever
15   carrier we had?  And I forgot what carrier it was, but they       11:48
16   did.  And they said, no, they purge theirs after a year also;
17   so the time had passed; so there was no document.
18   Q    So the mail department no longer had any record of the
19   package.
20   A    Right; and neither did the carrier.                          11:48
21   Q    How large was your supply of toy police cars that you kept
22   on hand in your office?
23   A    Police cars?  I don't know how many police cars, but
24   there's a file, a lateral file drawer, in a file cabinet that
25   has cars in it.                                                   11:49
```

```
 1   Q    Still today?

 2   A    The last time I looked, there was a few cars, sure;

 3   there's probably half a drawer.

 4   Q    You still maintain your office at Mattel?

 5   A    I still maintain my office.                            11:49

 6   Q    Same office that you had when you retired?

 7   A    Yes.

 8   Q    When you sent the package to the Peel Police with toy cars

 9   in it with the Mattel logo on them, you hoped to create a

10   positive feeling towards you and Mattel; isn't that right?    11:49

11   A    That wasn't my intent.  My intent was to reciprocate for

12   the gift they had given me.  That was all.  I had no motive or

13   any intent other than that.

14   Q    With a gift that would put the Mattel logo in front of the

15   Peel Police.                                                 11:50

16   A    I don't know that it would have -- well, I don't

17   understand the question.  You mean put the Mattel logo in front

18   of them...

19   Q    It was on the cars, correct, as you testified earlier?

20   A    It was on the packaging.                                11:50

21   Q    Okay.

22        It wasn't on the cars?

23   A    It is on the car; you turn the car over.  I need glasses,

24   personally, to see it.

25   Q    The toy cars -- strike that.                            11:50
```

```
 1              When you obtained the mug from the Peel Police, where
 2    did you keep it?
 3    A    I put it in a drawer.
 4    Q    Mr. Jones informed you that he kept your gift sitting out
 5    on his desk.                                                        11:51
 6              THE COURT:  Is that a question?
 7              MS. HURST:  Yes.  Exhibit 7.
 8              THE COURT:  What's the question?
 9              You just said "Mr. Jones informed you that he kept
10    your car sitting out on the desk."                                  11:51
11              Is there a question there?
12              MS. HURST:  Yes.
13    BY MS. HURST:
14    Q    Isn't that correct?
15    A    I vaguely recall something similar to that, yes.              11:51
16              MS. HURST:  I'm sorry, Your Honor.  I favor the
17    declarative style of cross-examination.
18              THE COURT:  I didn't know if that was a statement
19    or...
20    BY MS. HURST:                                                       11:51
21    Q    And when sitting on Mr. Jones's desk during the course of
22    his investigation, those toy cars were constant visible
23    reminders of Mattel; isn't that correct?
24              MR. QUINN:  Speculation; foundation.
25              THE COURT:  It seems to be.  You'd have to ask           11:51
```

```
 1    Mr. Jones about that.
 2              MS. HURST:  Your Honor, I'd also move for the
 3    admission of Exhibit 2, the Peace Officers' Association Ethical
 4    Manual, and Exhibit 4, the 2005 Code of Conduct.
 5              THE COURT:  Any objection?                          11:53
 6              MR. QUINN:  No objection.
 7              THE COURT:  They are admitted.
 8              (Exhibit 2 and Exhibit 4 are received.)
 9    BY MS. HURST:
10    Q    Mr. de Anda, did your responsibilities as vice president  11:53
11    of global security and investigations also include overseeing
12    the investigation of Mexican Mattel employees' departure of
13    Pablo Vargas, Marina Trueva Almeda, and Gustavo Machado?
14    A    Yes.
15              MS. HURST:  No further questions, Your Honor.        11:53
16              THE COURT:  Thank you, Counsel.
17              Any redirect examination?
18              MR. QUINN:  Yes, just briefly, Your Honor.
19                         REDIRECT EXAMINATION
20    BY MR. QUINN:                                                 11:53
21    Q    Mr. de Anda, in your 20 years of law enforcement, have you
22    had the experience of personnel and law enforcement giving each
23    other caps?  Hats?
24    A    Yes.
25    Q    Pins?                                                    11:54
```

```
 1    A     Yes.

 2    Q     Cups?

 3    A     I've never had a cup, but I've seen others with them, yes.

 4    Q     All right.

 5          That's something, in your experience, folks involving    11:54

 6    law enforcement do from time to time.

 7    A     Yes; patches.

 8    Q     You were asked some questions about the Mattel Code of

 9    Conduct Policy.

10          Would you turn, please, to the policy date           11:54

11    April 2005, which is Exhibit 4.  And I'd ask you to please turn

12    to Page 5 of 14 there.

13    A     Yes.

14    Q     And under the heading "Business Gifts and Entertainment,"

15    I'm just going to read to you that first sentence there.  It    11:54

16    says:  "Business gifts and entertainment can be used to

17    strengthen business relationships.  However, no gift, favor, or

18    entertainment should be accepted or provided if it will

19    obligate or appear to obligate the recipient."

20          Did you feel like you had been obligated or an           11:55

21    obligation had been created on your part when these Peel police

22    officers gave you the cup and the pen?

23          MS. HURST:  Objection.  Vague.

24          THE COURT:  Overruled.

25          You may answer.                                         11:55
```

Tuesday, September 22, 2009                              Status Hearing

| | |
|---|---|
| 1 | **THE WITNESS:**  I just felt a little awkward and wanted |
| 2 | to respond.  That's all.  I reciprocated back; that's all. |
| 3 | **BY MR. QUINN:** |
| 4 | Q    Why did you feel awkward? |
| 5 | A    Because I was given a gift and I had nothing to give them |
| 6 | as far as swapping, like what is done typically with police |
| 7 | departments. |
| 8 | Q    But did you feel that created some obligation on your |
| 9 | part? |
| 10 | A    No. |
| 11 | Q    In sending them the package, the toy cars, was it your |
| 12 | intent to create some obligation? |
| 13 | A    Not at all. |
| 14 | **THE COURT:**  I understood from what you were saying |
| 15 | there, you felt a social obligation, however, to reciprocate |
| 16 | the gift. |
| 17 | **THE WITNESS:**  Yes.  That's all.  Nothing further than |
| 18 | that. |
| 19 | **BY MR. QUINN:** |
| 20 | Q    The last sentence counsel quoted to you on that same page, |
| 21 | it says "Special restrictions apply to government officials in |
| 22 | most countries, and we should always consult the law department |
| 23 | before offering gifts to any government officials.  See the |
| 24 | discussion on anti-corruption laws." |
| 25 | And you told counsel that you did not consult the law |

11:55 (line 5)
11:55 (line 10)
11:56 (line 15)
11:56 (line 20)
11:56 (line 25)

```
 1   department before sending these toys.

 2          I'll just ask you, why didn't you consult the law

 3   department?

 4   A    Because I felt that it wasn't done to influence anyone; it

 5   was just basically reciprocating what they gave me.  It was        11:56

 6   absolutely -- I found it to be of no value.

 7   Q    If you would turn to Page 12, please, under

 8   "anti-corruption laws," counsel asked you, pointed this section

 9   out to you, in the second paragraph that begins "Bribery of

10   public officials is absolutely prohibited."                        11:57

11          Do you see that?

12   A    Yes.

13   Q    And it says in the Mattel policy, "We should not offer,

14   directly or indirectly, anything of value to government

15   authorities, including political parties or candidates, to         11:57

16   obtain an improper advantage or to retain or obtain business."

17          When you sent these toys to the Peel Police, were you

18   attempting to obtain an improper advantage?

19   A    No.

20   Q    It goes on to say "No gift, contributions, or               11:57

21   entertainment are to be offered which might create an

22   appearance of impropriety."

23          In sending these toys, this handful of toys that you

24   referred to, did you think you were creating an appearance of

25   impropriety?                                                       11:57
```

1    A     No, I did not.

2    Q     If you would look at Exhibit 7, that's the e-mail exchange

3    where, in the first e-mail, Mr. Jones confirms receipt of your

4    package.

5          Do you have that before you?                              11:58

6          I'm not sure you need it to answer my question.

7    A     Here it is.  I have it here.

8    Q     In your 20-plus years in law enforcement, are you familiar

9    with any example where a government official in writing

10   confirmed receipt of a bribe and thanked the sender for sending   11:58

11   a bribe?

12         **MS. HURST:**  Objection.  Beyond the scope.

13         **MR. QUINN:**  Has that ever happened?

14         **THE COURT:**  Sustained.

15         Counsel, you said this was going to be short.             11:58

16   **BY MR. QUINN:**

17   Q     What happened with the investigation in Canada?

18         **MS. HURST:**  Objection.  Beyond the scope.

19         **THE COURT:**  I think we're getting into an area --

20   certainly there are aspects of the investigation that were      11:59

21   explored in some detail on direct examination, so it's not

22   beyond the scope.

23         **MR. QUINN:**  It's just a question.  Did anything

24   happen?  Did it go anywhere, Your Honor?

25         **THE COURT:**  Rephrase your question.                   11:59

1    **BY MR. QUINN:**

2    Q    What was the result of the investigation in Canada?

3    A    Basically, the thumb drive that contained the information

4    was recovered by the Peel Police Department, and there were

5    never any criminal charges pursued or filed.                    11:59

6    Q    You indicated some uncertainty about the contents when you

7    were being questioned about police cars.

8            Is your uncertainty about the contents as to whether

9    the contents were all cars or whether the contents were cars

10   and all police cars, if you understand what I'm saying?         12:00

11   A    I think I do.

12           All I saw basically was just the few on top.  And as

13   I remember, they were laying flat, so there was only maybe two

14   that I saw; two that I could see, because of the box the way it

15   was.  So I don't know.  They were just cars that were taken     12:00

16   from my stash.

17   Q    Are you confident that whether they were police cars or

18   not police cars, they were all toy cars?

19   A    I'm pretty certain they were all toy cars, because we

20   wanted to send police cars because they were police officers.   12:00

21   Q    What was your instructions to your assistant that caused

22   her to put this together?

23   A    "Would you please just send some police cars to Rodney

24   Jones."

25           **MR. QUINN:**  Thank you, Your Honor.                   12:01

```
 1              THE COURT:  Anything further?

 2              MS. HURST:  Very briefly.

 3                      RECROSS-EXAMINATION

 4  BY MS. HURST:

 5  Q    At the time you sent the package to the Peel Police, you      12:01

 6  were not a police officer; is that correct?

 7  A    That's correct.

 8  Q    In fact, you were a complaining witness; correct?

 9  A    Yes.

10              MS. HURST:  Thank you.                                  12:01

11              THE COURT:  Very well.

12              You may step down, Mr. de Anda.

13              Before hearing argument on this issue, does either

14  party wish to present any further evidence or call any

15  additional witnesses?                                              12:01

16              Mattel?

17              MR. QUINN:  No, your Honor.

18              THE COURT:  MGA?

19              MS. HURST:  I'll move for the admission of Exhibit 6.

20  I think there's confidentiality concerns, so I wasn't sure what    12:01

21  procedure the Court --

22              THE COURT:  What I'd like you to do is, those

23  portions that you reviewed with the witness which there were no

24  objections to, perhaps we can create a second exhibit,

25  Exhibit 6-A, which would simply have those portions redacted       12:02
```

```
 1    and that will be part of the record in this proceeding.
 2             MS. HURST:  Thank you, your Honor.
 3             There are also statements in the document with
 4    respect to which the witness didn't have foundation but would
 5    be admissions that I believe would also be relevant to this          12:02
 6    proceeding in terms of how Mattel itself viewed Janine Brisbois
 7    at the time.
 8             THE COURT:  Again, let's meet and confer and come up
 9    with a document Exhibit 6-A which would have that.
10             MS. HURST:  Thank you.                                       12:02
11             THE COURT:  Is there any further evidence or
12    witnesses?
13             MS. HURST:  No, thank you.
14             Well, I should say this.
15             I was not given an opportunity to depose the witness        12:02
16    before today.  There may be other issues here about which we
17    don't have information, but we simply do not know.  And that
18    matter is before the Discovery Master now for hearing on
19    Friday.
20             So as to the broader topic, we're simply not prepared       12:02
21    to address that any more than has been done today.
22             THE COURT:  I wanted to address the specific topic as
23    soon as it was raised, and that's what we're doing today.  I'm
24    going to have to make my decision today based on what's before
25    me today, and you're going to have to make your argument based       12:03
```

```
 1    on what's before us.

 2            But with that in mind, I'll hear argument.

 3            And I'm going to ask MGA to go first, because part of

 4    what I think Mattel will need to respond to is it's not clear

 5    to me what it is that you're seeking.  It was characterized as     12:03

 6    an issue of concern or an area of concern in your brief; that's

 7    what prompted the Court to issue the order, because the Court,

 8    too, was concerned.  But I guess I need to know what it is that

 9    you are seeking, what relief you're seeking, and what is the

10    basis of that relief.                                              12:03

11            I need to know how to style this order, so it came

12    out a few days after the other order because I was not sure

13    what the "there" was.

14            MS. HURST:  I think that's fair, Your Honor.

15            Let me address that first.                                 12:03

16            The first thing we're seeking is the opportunity to

17    conduct a full investigation into that; that has been the

18    subject of the 30(b)(6) deposition regarding all communications

19    of any kind, including tangible things with law enforcement

20    officials, related to all of the investigations that have         12:04

21    occurred in connection with this case.  But that motion to

22    compel is pending before the Discovery Master now for hearing

23    on Friday, so I think the Court need not concern itself with

24    that at this point in time, unless the Court chooses to be

25    involved in that for some reason.                                  12:04
```

```
 1            I think, frankly, Your Honor, we wanted to bring this

 2    to your attention because we were very concerned, given that

 3    there are ongoing criminal investigations, to be able to verify

 4    that there are not practices or procedures in place at Mattel

 5    that would be improperly influencing those investigations.          12:04

 6    Particularly, frankly, Your Honor, with respect to the country

 7    of Mexico where we have gotten almost no visibility, through

 8    the document production and otherwise, as to what's going on

 9    down there.

10            But, Your Honor, I have to say, frankly, I don't            12:05

11    believe there's a noticed motion before the Court on this

12    today.

13            THE COURT:  The Court did this sua sponte.

14            MS. HURST:  Yes.  And we have made this part of MGA's

15    affirmative defenses as part of the case in terms of              12:05

16    interrogatory responses and otherwise, and I think really at

17    this point all we want is a full and fair opportunity to

18    investigate all matters that bear on Mattel's communications

19    with law enforcement officers.

20            As the Court knows, bringing the power of the state         12:05

21    to bear on a competitor is a fearsome thing, and I think we are

22    fairly concerned, given this e-mail, about how that has

23    occurred.  I think at this point -- I'll move to the substance

24    of the argument and not just the remedies, Your Honor.

25            Whatever Mr. de Anda subjectively believed at the          12:06
```

1   time he accepted the gifts, it was a violation of Mattel's code

2   of conduct to do that without prior approval by the law

3   department, and it was done in connection with an investigation

4   of the director of sales for Mattel.  And part of that

5   Exhibit 6, Your Honor, there are various statements in there          12:06

6   from Mattel's employees saying that she had particular

7   responsibility for the Wal-Mart account; that they knew she was

8   going to their chief competitor.

9          And, Your Honor, frankly, this is a situation where

10  you have a salesperson who's directly responsible at one             12:07

11  company for obtaining or retaining business, moving to the

12  principal competitor where she will again be responsible for

13  obtaining or retaining business in direct competition.

14         **THE COURT:**  I can understand under those

15  circumstances how the company losing the employee might be           12:07

16  concerned.

17         **MS. HURST:**  Yes.  Although, initiating a forensic

18  analysis of the hard drive simply on the basis of someone who

19  is going to a competitor strikes me as a bit overweening, but,

20  you know, what do I know.                                            12:07

21         **THE COURT:**  I've certainly seen overreactions by all

22  kinds of different companies in all different contexts, but

23  there's certainly nothing illegal or unlawful or even unethical

24  about a company being concerned about the potential theft of

25  trade secrets.  Correct?                                            12:07

Tuesday, September 22, 2009                          Status Hearing

```
 1              MS. HURST:  Presuming that Canadian privacy law
 2      permits the kind of -- I don't want --
 3              Putting that aside, of course not.
 4              THE COURT:  And there's nothing wrong with a company
 5      going to law enforcement if they subjectively believe that a      12:08
 6      crime may have been committed against them.
 7              MS. HURST:  They need to have an objective basis, I
 8      think, as well, Your Honor.  But with that caveat, I would
 9      agree, obviously.
10              THE COURT:  I didn't say anything about a subjective      12:08
11      basis.  If somebody subjectively believes that they have been
12      victimized, they have a right to call up the police and say
13      help.  Right?
14              MS. HURST:  Subject to the restrictions of malicious
15      prosecution and so forth, if they turn out -- that's all I       12:08
16      meant.
17              THE COURT:  Of course.
18              That's why it gets to this subjectiveness because of
19      malicious prosecution involving using or abusing the system to
20      prosecute.                                                       12:08
21              So let's put that aside.
22              I'm trying to deal with what I have before me right
23      now.  So there's nothing wrong with Mattel saying "We're
24      concerned," assuming of course there's a good faith basis for
25      that.                                                            12:08
```

```
 1            I have nothing before me right now to suggest to the

 2    contrary.

 3            Right?

 4        MS. HURST:  Well --

 5        THE COURT:  Before me right now.                          12:09

 6        MS. HURST:  No, Your Honor.

 7        THE COURT:  Okay.

 8            And it does appear that there is something in the

 9    Mattel handbook about any contact, which seems to be pretty

10    straightforward, with a public official from another country  12:09

11    that there should have been contact with the law department or

12    with a lawyer.  Whether that was done or not or whether it was

13    done before or after -- we've got redactions.  I don't know

14    what was or was not discussed with the attorneys, but that's

15    not fully before me.                                          12:09

16            MS. HURST:  Right.

17            THE COURT:  But as far as the gift itself, it seems

18    to be, based on the testimony, that Mr. de Anda received a

19    relatively de minimis gift.  I don't know what the value of

20    that mug is.  If it was made in China, like most of those mugs 12:09

21    are -- I've seen quite a few of them.  I'm sure any number of

22    us have received mugs from law enforcement officers from time

23    to time, or depending on the different professions that we get

24    in.  As a prosecutor, that was something I remember going on;

25    you would get mugs or you would get little plaques; you would  12:10
```

```
 1   get something de minimis of that sort.  Some people would have

 2   a whole series of mugs; some people in the office would just

 3   have rows and rows of these mugs; so we're talking about

 4   something valued at $5, $10, $15.

 5         And Mr. de Anda indicated that he felt he had a          12:10

 6   social obligation to reciprocate, and he provided some toy cars

 7   that were, I think, a half a dozen is the highest number that I

 8   have heard, at a dollar a car; so he sent something that was

 9   worth maybe $6.

10         Looking at all of these ethical standards that you       12:10

11   have submitted, for example, the first one, the code of ethics

12   for Los Angeles, it says that "the gift must be of a sort that

13   might reasonably be interpreted as an attempt to influence the

14   actions with respect to City business."  Here in the context of

15   this case, it would be reasonably expected to influence the     12:11

16   actions of the Peel Regional Police Department.

17         I don't know much about the Peel Regional Police

18   Department, but I just can't imagine that they would be

19   influenced or that they would do something illegal or wrongful

20   in exchange for $6 worth of toy cars.  I mean, unless these     12:11

21   cars were gold or something, I just don't.

22         And I certainly understand why you wanted to look

23   into this, because you get this e-mail and it talks about

24   gifts.  I guess this strikes me -- and I'm laying this out

25   because I'd like to hear your response to this -- because my    12:11
```

```
 1    tentative, after hearing the evidence, is that it was probably

 2    unadvisable.  And it was certainly inadvisable not to comply

 3    with their internal procedure, if, in fact, that was the case.

 4    Again, I don't have enough evidence to know whether it was not.

 5            But the gift was de minimis, it was responsive, and        12:11

 6    it was somewhat proportionate.  It's hard to see that rises to

 7    the ethical level of the type of gift that would be designed or

 8    intended to influence criminal law enforcement activities in a

 9    foreign country.

10            Do you think that these toy cars were intended to          12:12

11    influence?  Is that what MGA thinks?

12        MS. HURST:  I think I'd like to get the transcript.

13    But my recollection of Mr. de Anda's testimony was that part of

14    the purpose of the gift was to reciprocate with something that

15    had a Mattel logo on it.                                           12:12

16        THE COURT:  Right.  The practice is, I give you my

17    "tuit" or my coffee mug with my logo on it; you don't go down

18    to the store and buy something that had someone else's logo on

19    it.  You'd give them something -- and I had these little

20    Matchbox cars, these toy cars, when I was a kid; they have the     12:13

21    name on the bottom of the car.

22        MS. HURST:  Your Honor, we would like, especially

23    given the number of investigations and especially given the

24    Mexican investigation and the lack of documents that we have

25    seen about how that investigation came about, to be able to       12:13
```

```
 1    just conduct full and fair discovery regarding communications

 2    with law enforcement officers.

 3              THE COURT:  And that's fine; that's before the

 4    Discovery Master.  I'm asking about this instance here.

 5              MS. HURST:  I believe there is a strong -- I            12:13

 6    understand Mr. de Anda has come here today and told the story,

 7    which we've heard for the first time and haven't otherwise had

 8    the opportunity to investigate, and he's indicated that he felt

 9    a social sense of obligation.

10              The facts also show that he met with the police; he    12:14

11    was the complaining witness; shortly after that he sent them a

12    gift at the time while they were investigating the matter that

13    he was a complaining witness about.

14              THE COURT:  You just left out something in your

15    chronology.                                                      12:14

16              MS. HURST:  That they gave him a gift as well.

17              That's why the law and the code of conduct is there,

18    Your Honor.

19              THE COURT:  I understand that.

20              MS. HURST:  Because a sense of social obligation       12:14

21    should take back seat to the ethical requirements and the legal

22    requirements.

23              THE COURT:  Quite the contrary, counsel.

24              The code of conduct, the one that you provided,

25    actually recognizes those social obligations.                   12:14
```

```
 1              If I remember correctly going through these when you

 2     were showing these, for example, the one that you introduced,

 3     Exhibit No. 2, the code of professional conduct and

 4     responsibilities for the peace officers, canon eight, the part

 5     you read was "peace officers shall not compromise their        12:14

 6     integrity nor that of their agency or profession by accepting,

 7     giving or soliciting any gratuity."

 8              That is clear.  But what you did not read was the

 9     very next line or two lines down, 8.1, the standard for this,

10     which says "Peace officers shall refuse to offer or give or    12:15

11     receive gifts, favors or gratuities, either large or small,

12     which can be reasonably interpreted as capable of influencing

13     official acts or judgments.  This standard is not intended to

14     isolate peace officers' from normal social practices."

15              And I think the sense here, at least the sense that I  12:15

16     got from listening to Mr. de Anda -- and frankly, part of this

17     Court's own experience back when I was a prosecutor and dealt

18     with law enforcement was that part of the social practice

19     between law enforcement is to exchange these trinkets or their

20     patches or whatever as just part of polite discourse.          12:15

21              In foreign countries, it's not uncommon for small

22     trinkets to be given just as a matter of politeness.  It's

23     considered quite rude to refuse those and not to have something

24     on hand to reciprocate.  And it's the same type of thing.

25              I really think, based on what I have before me, this  12:16
```

```
 1   seems to be a lot of -- much about nothing or very little.

 2        MS. HURST:  I appreciate that it sounds like the

 3   Court has some knowledge of its own regarding these practices,

 4   and certainly in the law enforcement community, more generally.

 5        Your Honor, I think at this point that, as mentioned,   12:16

 6   we wanted -- the reason we raised this in the first place, I

 7   think, frankly, was just in the context of the Court's

 8   examination of various issues about how discovery was going in

 9   the case, and so forth.

10        As the Court has indicated, the full discovery          12:16

11   regarding these issues is before the Discovery Master at this

12   point.

13        Fairly, I think, Your Honor, the Court sees this as

14   an exchange with regard to a social obligations.  We remain

15   very concerned that complaining witnesses should not give gifts  12:17

16   to law enforcement officers who are investigating their

17   complaints.  And certainly I agree with the Court that officers

18   on the beat should be able to accept cups of coffee and so

19   forth.  But I think that the complaining witness law

20   enforcement relationship is one where there is a unique         12:17

21   opportunity for difficulties.

22        In this instance, Mattel's code of conduct did

23   require consultation with the law department.  I think

24   Mr. de Anda pretty fairly admitted that he did not do that.

25        THE COURT:  Excuse me, counsel.                         12:17
```

```
 1            I do agree that it was inadvisable on that basis and

 2     that it appears that he did not comply with the internal

 3     requirement.  However, that record is incomplete and

 4     necessarily limited by the attorney-client privilege in terms

 5     of what was communicated between Mr. de Anda and the attorneys      12:18

 6     internally.

 7            MS. HURST:  Thank you, your Honor.

 8            THE COURT:  All right.  Very well.

 9            MS. HURST:  I think I'll submit.

10            THE COURT:  Very good.                                       12:18

11        Anything further from Mattel on this point here?

12            MR. QUINN:  No.

13            THE COURT:  The next issue that the Court wants to

14     take up is the issue of the attorney-client privilege log.

15     Given the nature of this, most of this discussion has to take       12:18

16     place in camera.  Most.  But there was one question that I

17     wanted to address to MGA just to clear up now.

18            The document in question that current counsel for MGA

19     produced was listed as number 381.  It appears, or at least

20     Mattel suggests, and I don't know if this is true or not, that      12:19

21     Document 557 on the log has not been produced, and it appears

22     to be the same or similar document.

23            What is the status of that?

24            MS. HURST:  It's the same document, Your Honor.

25            THE COURT:  Okay.                                            12:19
```

```
 1          MS. HURST:  It's exactly the same.

 2          THE COURT:  It just got recorded twice?

 3          MS. HURST:  Correct.

 4          THE COURT:  Very good.  The Court will accept that

 5  representation.                                              12:19

 6          What I'm going to do at this point is meet with

 7  counsel in chambers concerning this.

 8          Why don't we go ahead, since we've been going for two

 9  hours now, let's take a ten-minute break.  Let's resume at

10  12:30.  And I'll have my courtroom deputy give you instructions  12:19

11  in terms of who's to come back and all of the musical chairs.

12  We'll set things up there, and that will give the court

13  reporter a chance to get set up as well.

14          We're in recess.

15          (Whereupon a brief recess was held.)              12:19

16          (In-chambers proceedings occurred

17           which are not a part of this record.)

18          (Proceedings held after resuming in open court:)

19          THE COURT:  We're back on the record outside of the

20  in-camera proceedings.                                    01:53

21          The Court at this point in time is simply going to

22  summarize essentially the elements of the order that will be

23  going out today in greater detail.

24          First, as indicated, the Court is going to vacate the

25  pretrial and trial dates that are presently set.           01:54
```

1          Second, the Court is going to continue the discovery

2     cutoff date to June 1, 2010; that order is made without

3     prejudice to reconsideration before the judge to whom this case

4     is going to be assigned, but I think it's important that we

5     have a discovery cutoff date.  I know in its previous motion,          01:54

6     Mattel was seeking an 8-month continuance.  The Court believes

7     that at least the continuance from December to June is in

8     order.  And I'll leave it up to Judge David Carter who will be

9     taking over this case to make a final decision on that.  But

10    pending any change by Judge Carter, the discovery cutoff date          01:54

11    will be June 1, 2010.

12          The Court will also be vacating -- I believe there

13    are two pending motions before the Court right now, and those

14    will be reassigned for hearing by Judge Carter.

15          The order to show cause set forth in the August 31st,            01:55

16    2009 order is deemed satisfied.

17          The request for stay made by MGA in camera is denied.

18          Again, of course, that can be submitted for

19    reconsideration before Judge Carter, but this Court does not

20    find any basis to stay the proceedings or recall at this time.         01:55

21          The Court has made itself available for settlement

22    proceedings; this is at the urging of Judge Carter; and counsel

23    for Mattel has indicated that they anticipate, and the Court

24    hereby directs them, to provide to MGA their written settlement

25    position within ten days of today's date.  After receipt, the          01:56

1   Court will organize a telephonic conference in which we will

2   set dates for settlement prior to this Court's departure.

3          I think the Court previously indicated its findings

4   with respect to Mr. de Anda.

5          Is there anything else that I have not covered that I          01:56

6   needed to cover today?

7          First, from Mattel's perspective.

8          **MR. ZELLER:**  One thing that I would ask at this

9   juncture, particularly in light of Your Honor's leaving the

10  bench and the transfer of the case, the Court will recall that          01:56

11  -- and I don't recall exactly when this ruling was made, but it

12  was made during the course of the hearing, and Your Honor

13  indicated this from the bench -- that basically Mr. Durkin's

14  report could not be used.

15         We are in a position where we don't have all of the          01:57

16  source documents that Mr. Durkin attached to his report,

17  including such matters as e-mails and financials and the like,

18  which is causing some problems in terms of, number one,

19  refuting statements that MGA has been making in briefs even as

20  recently as Friday to Your Honor.  And I give some specific          01:57

21  examples.  But, number two, just the inconvenience of this in

22  trying to take depositions without these documents.

23         So I would ask Your Honor to allow us to at least use

24  the source documents, the actual documents; not Mr. Durkin's

25  work product, not his report, not demonstratives that he          01:57

```
 1   generated, but, rather, those actual documents.  Because we are
 2   now getting into territory where -- and the example I would
 3   give is that in the Friday submission, MGA argued about how,
 4   "Well, Leon Farahnik is a completely irrelevant witness."  But
 5   the documents attached, these are MGA/Isaac Larian e-mails to          01:58
 6   Leon Farahnik to show exactly the opposite.  So I'm troubled by
 7   the fact that we're in a position where we know of evidence,
 8   documents, that are in MGA's position that would refute these
 9   kinds of statements and also that we're not being allowed to
10   use them.  I'm just unaware of any realistic objection that            01:58
11   could be made.
12          And since Your Honor had made that order from the
13   bench, I think it would be really ideal for Your Honor to
14   reassess that decision as to whether or not we can use those
15   source documents.                                                     01:58
16          THE COURT:  Anything else from Mattel?
17          MR. ZELLER:  No, Your Honor.
18          THE COURT:  Very well.
19          From MGA?
20          MS. HURST:  Your Honor, the issue of the production            01:58
21   of financial documents was the subject of a motion before the
22   Discovery Master which was ruled upon and continues to be the
23   subject of ongoing meet and confer between the parties.
24          I have in my possession the hard drive that was
25   supplied to Mr. Durkin.  We're making a forensic image of it so       01:59
```

```
 1    we can review and call out the privileged documents.  It's a
 2    time-consuming process.  We're in the process with the client
 3    right now collecting additional documents.  It's all being done
 4    in the ordinary course.  And given the dates that the Court
 5    just set, I see no reason for urgency or reopening the          01:59
 6    difficult can of worms regarding Mr. Durkin's report.
 7              That is just to respond to what Mr. Zeller said.
 8              THE COURT:  Very well.
 9              MS. HURST:  Your Honor, are the hearings in front of
10    the Discovery Master -- do they remain on calendar as a result  01:59
11    of the Court's orders today?
12              THE COURT:  Yes.
13              There will not be an interruption in a district judge
14    having responsibility for this case.
15              MS. HURST:  All right.  Thank you, your Honor.        02:00
16              MR. NOLAN:  Briefly, your Honor.
17              This will be the last time I think all of us will be
18    in this room, and I for one have had the pleasure of taking up
19    a lot of the Court's time, but more importantly, the time of
20    your staff.  And I think this is just as important to put on    02:00
21    the record.
22              From the moment you walk into the Federal District
23    Court in Riverside, from the guards that you meet in the
24    beginning to the people who stayed in court, the marshals and
25    everything else, they were always incredibly respectful and    02:00
```

```
 1   friendly and helpful.  And your staff, you were completely
 2   blessed throughout these proceedings.  And I know that we
 3   tasked them tremendously, so maybe this is one motion that I
 4   can get full agreement on.
 5            I personally want to thank each one of those          02:00
 6   individuals for all of the hard work in this case.  It really
 7   was phenomenal.
 8            MR. QUINN:  Join.
 9            THE COURT:  All right.  Very well.  So stipulated.
10            MR. COTE:  I hate to bring the harsh light of case    02:01
11   litigation issues after those kind words from Mr. Nolan, but
12   one point of clarification.
13            When Mattel prepares the settlement position, could
14   we be copied on that and included in whatever settlement
15   position it is?                                                02:01
16            I represent Gustavo Machado, who's a defendant in the
17   case.
18            THE COURT:  Absolutely.  That would make a lot of
19   sense, I presume.  We're talking about a potentially global
20   settlement here.                                               02:01
21            Is there a concern, Mr. Zeller?
22            MR. ZELLER:  I'm not aware of any reason we would not
23   provide it to Mr. Machado's counsel.  But to be blunt, about
24   Mr. Machado's participation, we've asked for it all along, and
25   Mr. Machado and his counsel have not participated.  So the     02:01
```

```
 1   written settlement proposals have, frankly, nothing to do with

 2   Mr. Machado or resolving it.

 3          Now, obviously we're amenable and open to resolving

 4   those issues to the extent that we can, but just understand

 5   that this whole process, from our perspective, even though we      02:02

 6   requested it -- and the Court can certainly inquire of

 7   Ambassador Prosper and get more details on this -- but

 8   Mr. Machado has not been a participant in any of this to-date;

 9   so I just wanted to alert the Court to that.

10          THE COURT:  Very well.                                      02:02

11          But on a going-forward basis, I gather he does want

12   to be a participant.

13      MR. COTE:  Yes.  And Ambassador Prosper actually

14   asked us to be on-call but not attend the previous settlement

15   conferences.  We were just across the street from his offices;    02:02

16   so we were there if he needed us, and he didn't.

17          THE COURT:  The Court will certainly want you.  If we

18   are going to have settlement conferences in October, we'll

19   certainly want you present.  Thank you.

20      MR. JENNINGS:  Chris Jennings for O'Melveny & Meyers.          02:02

21          One matter arising from the OSC is an outstanding

22   ex-parte application in which sanctions have been sought

23   against my client.  I just want to get clarification on that.

24   I assume the Court will deny that as moot, but I would ask that

25   it be resolved.  Our client does not want that outstanding.       02:02
```

Tuesday, September 22, 2009                                    Status Hearing

1          **THE COURT:**  I will be issuing an order later today or

2    first thing tomorrow which will address all of these issues.

3    But the OSC at this point, based on the information before the

4    Court, is deemed satisfied.

5          **MR. JENNINGS:**  Thank you.                                    02:03

6          **THE COURT:**  Court is adjourned.

7

8

9

10

11

12

13

14

15

16                          CERTIFICATE

17

18   I hereby certify that pursuant to section 753, title 28, United
     States Code, the foregoing is a true and correct transcript of
19   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
20   conformance with the regulations of the Judicial Conference of
     the United States.

21

22   _____          _____
     THERESA A. LANZA, CSR, RPR                        Date
23   Federal Official Court Reporter

24

25

Tuesday, September 22, 2009                          Status Hearing